# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs

    v.                    No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants

## TWENTY-SECOND MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES, AND PROTOCOLS

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE, LOPES, DEVEREAUX, & WEST LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
(401) 824-5100
Fax: (401) 824-5123
March 9, 2011

## TABLE OF ABBREVIATIONS/ACRONYMS

3CMS:            Correctional Clinical Case Manager System

ACH:             Acute Care Hospital

ADA:             Americans with Disabilities Act

ADD:             Attention Deficit Disorder

ADHD:            Attention Deficit Hyperactivity Disorder

ADLs:            Activities of Daily Living

AED:             Automatic External Defibrillator

APP:             Acute Psychiatric Program

ASH:             Atascadero State Hospital

ASMHS:           Administrative Segregation Mental Health Services

ASP:             Avenal State Prison

ASU:             Administrative Segregation Unit

BLS:             Basic Life Support

BMU:             Behavior Modification Unit

BPT:             Board of Prison Terms

C-file:          Central File

C&PP:            Clinical Policy and Programs

C&PR:            Classification and Parole Representative

Calipatria:      Calipatria State Prison

CAP:             Corrective Action Plan

CAT II:          Category II

CC:              Correctional Counselor

| | |
|---|---|
| CCAT: | Coordinated Clinical Assessment Team |
| CCC: | California Correctional Center |
| CCI: | California Correctional Institution |
| CCM: | Clinical Case Manager |
| CCPOA: | California Correctional Peace Officers Association |
| CCWF: | Central California Women's Facility |
| CDCR: | California Department of Corrections and Rehabilitation |
| Centinela: | Centinela State Prison |
| CHCF: | California Health Care Facility |
| CHSC: | Central Health Services Center |
| CIM: | California Institution for Men |
| CIW: | California Institution for Women |
| CM: | Case Manager |
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CMO: | Chief Medical Officer |
| CNA: | Certified Nursing Assistant |
| CO: | Correctional Officer |
| CPER: | Clinical Performance Enhancement and Review Subcommittee |
| CPR: | Cardiopulmonary Resuscitation |
| CRC: | California Rehabilitation Center |
| CSATF: | California Substance Abuse Treatment Facility |
| CSH: | Coalinga State Hospital |
| CSP/Corcoran: | California State Prison, Corcoran |
| CSP/LAC: | California State Prison, Los Angeles County |

CSP/Sac:              California State Prison, Sacramento

CSP/Solano:          California State Prison, Solano

CSR:                 Classification Service Representative

CTC:                 Correctional Treatment Center

CTF:                 Correctional Training Facility/Soledad

CTQ:                 Confined To Quarters

CVSP:                Chuckawalla Valley State Prison

CYA:                 California Youth Authority

DA:                  District Attorney

DAI:                 Division of Adult Institutions

DCHCS:               Division of Correctional Health Care Services

DDP:                 Developmental Disabilities Program

DDPS:                Distributed Data Processing System

DHS:                 Department of Human Services

DMH:                 Department of Mental Health

DNC:                 Death Notification Coordinator

DNR:                 Do Not Resuscitate

DOF:                 Director of Finance

DOM:                 Department Operations Manual

DON:                 Director of Nursing

DOT:                 Direct Observation Therapy

DRC:                 Death Review Coordinator

DRMC:                Delano Regional Medical Center

DSM:                 Diagnostic and Statistical Manual

| | |
|---|---|
| DTP: | Day Treatment Program |
| DVI: | Deuel Vocational Institution |
| EOP: | Enhanced Outpatient Program |
| EPPD: | Earliest Possible Parole Date |
| EPRD: | Earliest Possible Release Date |
| ERDR: | Emergency Response and Death Review Committee |
| ERRC: | Emergency Response Review Committee |
| ERV: | Emergency Response Vehicle |
| ETV: | Emergency Transport Vehicle |
| FIT: | Focus Improvement Team |
| Folsom: | Folsom State Prison |
| FPTTP: | Foreign Prisoner Transfer Treaty Program |
| FTE: | Full-Time Equivalent |
| GACH: | General Acute Care Hospital |
| GAF: | Global Assessment of Functioning |
| GP: | General Population |
| HCCUP: | Health Care Cost and Utilization Program |
| HCM: | Health Care Manager |
| HCPOP: | Health Care Placement Oversight Program |
| HCPU: | Health Care Placement Unit |
| HCQMC: | Health Care Quality Management Committee |
| HDSP: | High Desert State Prison |
| HQ: | Headquarters |
| HPS | Health Program Specialist |
| HS: | *Hora Somni*/Hour of Sleep |

| | |
|---|---|
| ICC: | Institutional Classification Committee |
| ICF: | Intermediate Care Facility |
| ICP: | Intermediate Care Program |
| ICU: | Intensive Care Unit |
| IDTT: | Interdisciplinary Treatment Team |
| IEX: | Indecent Exposure |
| IMHIS: | Inmate Mental Health Information System |
| IMSP: | Inmate Medical System Policy |
| INS: | Immigration and Naturalization Service |
| IP: | Inmate Profile |
| I/P: | Inmate/Patient |
| ISP: | Ironwood State Prison |
| IST: | In-Service Training *or* Incompetent to Stand Trial |
| ISU: | Investigative Services Unit |
| KOP: | Keep on Person |
| KVSP: | Kern Valley State Prison |
| LCSW: | Licensed Clinical Social Worker |
| LLE: | Language Learning Enterprises |
| LOC: | Level of Care |
| LOP: | Local Operating Procedure |
| LOU: | Locked Observation Unit |
| LPN: | Licensed Practical Nurse |
| LPT: | Licensed Psychiatric Technician |
| LVN: | Licensed Vocational Nurse |

| | |
|---|---|
| MAR: | Medication Administration Record |
| MCSP: | Mule Creek State Prison |
| MDD: | Major Depressive Disorder |
| MDO: | Mentally Disordered Offender |
| MERD: | Minimum Eligible Release Date |
| MH-4: | Mental Health Assessment |
| MHARP: | Mental Health Assessment and Referral Project |
| MHCB: | Mental Health Crisis Bed |
| MHOHU: | Mental Health Outpatient Housing Unit |
| MHP: | Mental Health Program |
| MHQMS: | Mental Health Quality Management Subcommittee |
| MHSDS: | Mental Health Services Delivery System |
| MHSPC: | Mental Health Suicide Prevention Coordinator |
| MHSR: | Mental Health Suicide Reviewer |
| MHTH: | Mental Health Temporary Housing |
| MHTS: | Mental Health Tracking System |
| MOD: | Medical Officer of the Day |
| MOU: | Memorandum of Understanding |
| MPIMS: | *Madrid* Patient Information Management System |
| MSF: | Minimal Support Facility |
| MTA: | Medical Technical Assistant |
| NAM: | Nurse Administered Medication |
| NCF: | Normal Cognitive Functioning |
| NKSP: | North Kern State Prison |
| NOS: | Not Otherwise Specified |

| | |
|---|---|
| NPPEC: | Nursing Professional Practice Executive Committee |
| NVDRS: | National Violent Death Reporting System |
| OCD: | Obsessive Compulsive Disorder |
| OHU: | Outpatient Housing Unit |
| OIA: | Office of Internal Affairs |
| OJT: | On the Job Training |
| OP: | Operating Procedure |
| OSS: | Office Services Supervisor |
| OT: | Office Technician |
| PBSP: | Pelican Bay State Prison |
| PC: | Primary Clinician |
| PHU: | Protective Housing Unit |
| PIA: | Prison Industries Authority |
| POC: | Parole Outpatient Clinic *or* Psychiatrist on Call |
| POD: | Psychiatrist on Duty *or* Psychiatrist of the Day |
| PPE: | Personal Protective Equipment |
| PPEC: | Professional Practice Executive Committee |
| PPRC: | Psychological Peer Review Committee |
| PSH: | Patton State Hospital |
| PSU: | Psychiatric Services Unit |
| PSW: | Psychiatric Social Worker |
| psych tech: | Psychiatric Technician |
| PTSD: | Post Traumatic Stress Disorder |
| PVSP: | Pleasant Valley State Prison |

| | |
|---|---|
| QIP: | Quality Improvement Plan |
| QIT: | Quality Improvement Team |
| QMAT: | Quality Management Assessment Team |
| QMC: | Quality Management Committee |
| QMT: | Quality Management Team |
| QNC: | Quality Nurse Consultant |
| R&R: | Receiving & Release / Reception and Receiving |
| RC: | Reception Center |
| RJD: | Richard J. Donovan Correctional Facility |
| RN: | Registered Nurse |
| RT: | Recreation Therapist |
| RVR: | Rule Violation Report |
| SCC: | Sierra Conservation Center |
| SHU: | Security Housing Unit |
| SI: | Suicidal Ideation |
| SMTA: | Senior Medical Technical Assistant |
| SMY: | Small Management Yard |
| SNF: | Skilled Nursing Facility |
| SNY: | Sensitive Needs Yard |
| SOAP: | Subjective/Objective Assessment and Plan |
| SPC: | Suicide Prevention Committee |
| SPRFIT: | Suicide Prevention and Response Focused Improvement Team |
| SPU: | Special Processing Unit |
| SQ: | San Quentin State Prison |
| SRA: | Suicide Risk Assessment |

SRAC:                   Suicide Risk Assessment Checklist

SRC:                    Suicide Review Committee

SRN:                    Senior Registered Nurse

SSA:                    Staff Services Analyst

SSI:                    Supplemental Security Income

SVP:                    Sexually Violent Predator

SVPP:                   Salinas Valley Psychiatric Program

SVSP:                   Salinas Valley State Prison

TCMP:                   Transitional Case Management Program

THU:                    Transitional Housing Unit

TLU:                    Transitional Living Unit

TPU:                    Transitional Program Unit *or* Temporary Protective Unit

TTA:                    Triage and Treatment Area

UCC:                    Unit Classification Committee

UCSF:                   University of California at San Francisco

UHR:                    Unit Health Records

UNA:                    Unidentified Needs Assessment

VSPW:                   Valley State Prison for Women

VPP:                    Vacaville Psychiatric Program

WHO:                    World Health Organization

WSP:                    Wasco State Prison

# TABLE OF CONTENTS

**TABLE OF ABBREVIATIONS**                                                i.

**INSTITUTIONAL SUMMARIES**

**Service Area A**

 California State Prison, Sacramento (CSP/Sac)                          11

 Folsom State Prison (Folsom)                                            22

**Service Area B**

 Pelican Bay State Prison (PBSP)                                         30

 High Dessert State Prison (HDSP)                                        41

 California Correctional Center (CCC)                                    59

**Service Area C**

 Mule Creek State Prison (MCSP)                                          63

 Sierra Conservation Center (SCC)                                        74

**Service Area D**

 California Medical Facility (CMF)                                       81

 California State Prison, Solano (CSP/Solano)                            95

 San Quentin State Prison (SQ)                                          103

 Deuel Vocational Institution (DVI)                                     115

**Service Area E**

 California State Prison, Corcoran  (CSP/Corcoran)                      128

 California Substance Abuse Treatment Facility (CSATF)                  147

 Pleasant Valley State Prison (PVSP)                                    159

Avenal State Prison (ASP)                                                     175

**Service Area F**

Salinas Valley State Prison (SVSP)                                            182

Correctional Training Facility (CTF)                                          200

**Service Area G**

California Men's Colony (CMC)                                                 210

Wasco State Prison (WSP)                                                      221

Kern Valley State Prison (KVSP)                                               232

North Kern State Prison (NKSP)                                                244

**Service Area H**

California State Prison, Los Angeles County (CSP/LAC)                         262

California Correctional Institution  (CCI)                                    274

**Service Area I**

California Institution for Men (CIM)                                          289

California Rehabilitation Center (CRC)                                        300

**Service Area J**

Richard J Donovan Correctional Facility ( RJD)                               308

Ironwood State Prison (ISP)                                                   325

Calipatria State Prison (Calipatria)                                          330

Centinela State Prison (Centinela)                                           335

Chuckawalla Valley State Prison (CVSP)                                        340

**Service Area K**

    California Institute for Women (CIW)                    350

**Service Area L**

    Central California Women's Facility (CCWF)         363

    Valley State Prison for Women (VSPW)             378

**SUMMARY**                                       386

**CONCLUSION**                              438

**EXHIBITS**                                      462

**<u>ADDENDUM A</u>**                            614

**<u>ADDENDUM B</u>**                            623

**<u>ADDENDUM C</u>**                            626

**<u>ADDENDUM D</u>**                            629

**<u>ADDENDUM E</u>**                            634

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs

       v.                    No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants

## TWENTY-SECOND MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED  PLANS, POLICIES, AND PROTOCOLS

This report is the special master's twenty-second review of the defendants' compliance with the plans, policies, and protocols that were provisionally approved by this Court in mid-1997, and which are now known as the Revised *Coleman* Program Guide ("Program Guide"). The monitoring period extended from February through July 2010.  As in the past, the special master's monitoring staff[1] received full cooperation from California Department of Corrections and Rehabilitation (CDCR) institutional mental health services staff and institutional administrators.   Counsel for plaintiffs and defendants accompanied the special master's staff on several site visits.

---

[1] Although the data collected and the findings discussed in this Report are the product of many members of different monitoring teams, references throughout this Report to these various monitors are stated in the singular rather than plural form.  Likewise, clinical judgments of the special master's experts are attributed to an expert.

The focus areas for this monitoring period were institutional mental health staffing levels, quality management, suicide prevention, medication management, inmate sexual misconduct, and transfers to higher levels of care. Other areas examined by the special master's staff included the institutions' provision of mental health services in their enhanced outpatient programs (EOPs), administrative segregation units (ASUs), RCs, and the correctional clinical case management system (3CMS) programs.  The special master also examined the institutions' use of outpatient housing units (OHUs) for mental health purposes, medical records and the mental health tracking system (MHTS), as well as inmates' access to mental health appointments, relationships between custody and mental health, and other day-to-day matters in the institutions that affect the delivery of mental health care to inmates.  During the twenty-second monitoring period, CDCR instituted the first wave of its transition from MHTS to a new internet-based system, known as MHTS.net.  Not unexpectedly, there were glitches in the transition, with inconsistencies and gaps in presented data.  The most vexing problem presented by the transition was the age of some of the presented institutional data. In some instances, the data was already six months old as of the time of the site visit.

All 33 CDCR institutions were reviewed.  There were full on-site monitoring visits at 25 institutions: Avenal State Prison (ASP), California Correctional Institution (CCI), California Institution for Men (CIM), California Medical Facility (CMF), California Rehabilitation Center (CRC), California State Prison, Los Angeles County (CSP/LAC), California State Prison, Sacramento (CSP/Sac), California State Prison, Solano (CSP/Solano), California Substance Abuse Treatment Facility (CSATF), Central California Women's Facility (CCWF), California State Prison, Corcoran (CSP/Corcoran), Correctional Training Facility (CTF), Deuel Vocational Institution (DVI), Folsom State Prison (Folsom), High Desert State

Prison (HDSP), Kern Valley State Prison (KVSP), Mule Creek State Prison (MCSP), North Kern

State Prison (NKSP), Pelican Bay State Prison (PBSP), Pleasant Valley State Prison (PVSP),

Richard J. Donovan Correctional Facility (RJD), Salinas Valley State Prison (SVSP), San

Quentin State Prison (SQ), Valley State Prison for Women (VSPW), and Wasco State Prison

(WSP).  Six institutions were monitored by means of a paper review, which required each of

them to provide the special master with documentation of their compliance during the

monitoring period with their local CAPs as well as any pertinent court-orders.  These institutions

were California Correctional Center (CCC), Calipatria State Prison (Calipatria), Centinela State

Prison (Centinela), Chuckawalla Valley State Prison (CVSP), Ironwood State Prison (ISP), and

Sierra Conservation Center (SCC).  Two other institutions which had previously been monitored

by full on-site visits, demonstrated sufficient progress in the preceding monitoring to be

advanced to an abbreviated on-site visit and hybrid, i.e. partial paper review, status in this

monitoring period.  These two institutions were California Institution for Women (CIW) and

California Men's Colony (CMC).

    Participation by the special master and his staff in the court-ordered coordination

of the *Coleman* case with the *Armstrong*,[2] *Perez*,[3] and *Plata*[4] cases remained active.  Among the

tasks taken up in the coordination process were making mental health crisis beds (MHCBs) both

Americans with Disabilities Act (ADA)-compliant and suicide-resistant; coordination of long-

term mental health construction projects such as the conversion of the Stark[5], Estrella, and

DeWitt facilities (which have previously been operated as juvenile justice detention facilities) as

well as the construction of a new, consolidated medical and mental health care center in Stockton

---

[2] *Armstrong v. Schwarzenegger*, No. C 94-2307 CW (N.D. Cal.).
[3] *Perez v. Tilton*, No. C 05-05421 JSW (N.D. Cal.).
[4] *Plata v. Schwarzenegger*, No. C 01-1351 TEH (N.D. Cal.).
[5] As of the time of this writing, the California Joint Legislative Budget Committee has suspended the Stark conversion project.

known as the California Health Care Facility (CHCF); improvement of inmate access to health care services via use of health care access teams; and refinement and implementation of a unified medication management tool for both medical and psychotropic medications.

Short-term, intermediate, and long-term mental health bed construction projects continued during the monitoring period. Several of the short-term projects were completed and activated, while progress was finally made toward making the long-term projects become reality, although accomplishment of that portion of the Stark facility that called for 525 new EOP beds and the 50 new EOP administrative segregation beds appears to be on an indefinite "hold" status and may well never come into fruition.

In addition to the findings gathered in the course of twenty-second round institutional monitoring, this Report also covers the range of developments which have occurred since the filing of the preceding Twenty-First Monitoring Report. That Report discussed conditions in the institutions that were examined through late 2008 and was filed on July 31, 2009.  The intervening period has seen both new and continued system-wide projects and developments that promise to result in improved institutional capability to treat and manage mentally ill inmates.  With the guidance and assistance of members of the special master's staff, CDCR prepared new plans for staffing and for mental health-custody collaboration training. Another cross-institutional development was defendants' comprehensive review of all suicide prevention policies, practices, and procedures, including all relevant provisions of the Program Guide.  This process, undertaken with the consultation of the special master's three psychiatric experts, one of his deputies, and a monitor resulted in a comprehensive report by defendants on numerous ways in which suicide prevention and reporting process may be made more efficient

4

and effective.  More detailed discussion of these projects and developments is provided at the conclusion of this report.

Following the conclusion of the Mental Health Assessment and Referral Project (MHARP) at the end of 2009, the special master conducted a follow-up on MHARP at a number of institutions.  By way of brief background, MHARP was the result of the *Coleman* court's order of March 31, 2009, in which the court once again addressed the long-standing problem of access to higher levels of care for seriously mentally ill CDCR inmates.  CDCR and Department of Mental Health (DMH) were ordered to identify and assess *Coleman* plaintiff class inmates at the 28 non-desert CDCR institutions who required DMH-level of mental health care and to refer those inmates for such care on an expedited basis.   By order of June 17, 2009, the *Coleman* court expanded the assessment project to include also all of the non-desert institutions.

One result of MHARP was the referral of nearly 1,000 inmates to DMH inpatient programs based on assessments that were done between April 15, 2009 and December 29, 2009. Another result of MHARP was CDCR's development of a process for clinical consideration and Interdisciplinary Treatment Team (IDTT) review of inmates for referral to DMH acute or intermediate levels of care.  This included the creation of a new tool, known as CDCR Form 7388, which is employed by institutional IDTT throughout CDCR for identifying and referring inmates to DMH inpatient.

After the conclusion of MHARP, it became apparent that follow-up was in order and that the number of inmates on the wait list for access to DMH intermediate inpatient care had grown to the staggering number of nearly 1,000. On March 30, 2010, following a status conference, the *Coleman* court ordered the special master to conduct a follow-up to MHARP. The goal of the MHARP follow-up was to assess 13 selected institutions' adoption of the

MHARP identification and referral methods and to guide these institutions with sustaining their progress and encouraging of prompt and clinically accurate referrals of seriously mentally inmates to higher levels of care as a routine practice. A detailed discussion of the findings and implications gathered from the MHARP follow-up appears below in this Report.

As a corollary to the MHARP project and follow-up on its entrenchment into DMH referral practices, defendants were ordered to "develop a plan to reduce or eliminate the wait lists for inpatient care and, in the interim, to better serve the treatment needs of *Coleman* class members placed on such lists." Order filed March 31, 2010, at 3-4. As of this writing, defendants have filed their plan with the Court, and discussions among the parties and the special master and his staff are ongoing.

This Report follows the same general format of previous monitoring reports. The institutional summaries are organized by CDCR regional service area, each of which typically includes up to four facilities, with a general population (GP) 3CMS program at each facility, an intensive residential EOP, and a hub institution with an MHCB for inpatient care of inmates in need of short-term intervention and stabilization of mental health crises. As in the past, this Report also offers comparative analyses of compliance levels among all 33 institutions, broken out by focus areas. It concludes with the special master's general findings, commentary on significant developments during the monitoring period, and any recommendations for consideration by this Court.

On December 31, 2010, the Special Master distributed this Report in draft form to the parties. Plaintiffs did not submit any objections or responses to the draft Report. On January 31, 2011, defendants submitted a number of objections and comments to the Special Master. All but one of those objections and comments concerned statements in the draft Report that had to do

with specific institutional issues or individual inmate case reviews.  These are addressed

throughout this Report as these issues and case reviews appear.

        The sole overall objection by defendants was in response to the Special Master's

"review and comments in this Report regarding nursing, medication management, information

technology (including MHTS.net) and medical record keeping to the extent that CDCR does not

have operational control over these areas."

        This objection seems to suggest that CDCR retains at least some control over

these areas, i.e. control that is something other than "operational," but it does not define or

explain what that type or degree of control involves.  Presumably, the "operational control" that

defendants reference is the authority and jurisdiction of the *Plata* receiver in the areas of nursing,

medication management, information technology, and medical record keeping.  The objection,

however, offers no indication of what the distinctions between CDCR's and the receiver's

responsibilities in these areas may be, if any.  For instance, the objection does not identify which

aspects of nursing or medication management functions may be exclusively within the control of

the receiver, which aspects may be subject to joint control and influence, or which aspects may

remain primarily under the control of CDCR.  Consequently, the objection provides no basis on

which the Special Master can determine what it is that he may respond to, or what modification,

if any, should be made to the Report.  It is simply too general and too vague to draw any

explanation from the Special Master that would be informative and responsive.

        The objection also implies that the content of the Report in the areas of nursing,

medication management, information technology, and medical record keeping exceeds the scope

of *Coleman* monitoring and reporting.  There is no basis for the objection on this ground. A

review of the *Coleman* court's charge to the Special Master indicates why.  The parameters of

*Coleman* monitoring and reporting were set by the Court's Order of Reference, filed December 11, 1995, shortly after the Court made its findings and recommendations on the merits of the *Coleman* case. The order gives the Special Master wide berth in what he shall examine, record, and report to the *Coleman* court so that he can carry out his duty to examine and report to the Court on any remedial plan that it orders:

A.    Duties of the Special Master

It is HEREBY ORDERED that the duties of the special master are and shall be limited to the following:

1.    To work with defendants and experts to be selected by the special master   in accordance with paragraph B(7), infra, to develop a remedial plan that       effectively addresses the constitutional violation set forth in this court's       September 13, 1995 order. In discharging this duty, the special master   shall consult with counsel for plaintiffs and counsel for defendants as he    deems necessary to the discharge of said duty.

*   *   *

3.    To make interim reports to the court on the progress of the remedial pan.

4.    ***To monitor defendants' implementation of and compliance with any remedial plan that this court may order.*** It is anticipated that the specific monitoring duties of the special master shall be developed in further detail once an appropriate remedial plan is fashioned and ordered by the court.          (emphasis added)

5.    To prepare and file with the court periodic repots assessing defendants' compliance with such remedial plan as the court may order.

*   *   *

B.    Powers of the Special Master

IT IS FURTHER ORDERED that the powers of the special master are and shall be limited to the following:

1.    To enter, at any reasonable time, with our without advance notice, any       port of any facility at any California department of Corrections (CDC)       institution . . .

2.  To interview, on a confidential basis or otherwise, correctional staff, employees, and appointees for the CDR for the purpose of performing his duties under this Order of Reference. Defendants shall provide suitable facilities and arrange for such interviews to be conducted under conditions satisfactory to the special master. In addition, the special master may engage in informal conferences with CDC staff, employees, appointees, and such persons shall cooperate with the special master and respond to inquiries and requests related to the performance of his duties, including request for the compilation or communication of oral or written information.

* * *

5.  To have unlimited access to the records, files and papers maintained by defendants to the extent that such access is related to the performance of the special master's duties under this Order of Reference. Such access shall include all departmental, institutional, and inmate records, including but not limited to, central files, medical records, and mental health records. The special master may obtain copies of all such relevant records, files, and papers.

* * *

*See* Order of Reference, filed December 11, 1995, Addendum D.

As shown above, the primary purpose of the special master's monitoring reports to the Court is to report factually on the conditions within the institutions and to assess the degree of defendants' compliance with the remedial plan, i.e. all stipulated agreements, applicable court orders, and the *Coleman* Program Guide. The subject matter areas identified by CDCR – nursing, medication management, information technology (including MHTS.net), and medical record keeping – are clearly within the scope of the Special Master's monitoring and reporting responsibilities, as they all involve aspects of the remedial plan. In particular, MHTS.net could not be more germane to the *Coleman* Court's interest. It involves strictly the management of mental health patient information. This goes directly to one of the core concerns within the care and treatment of mentally ill inmates in CDCR, which is the specific subject matter of the *Coleman* case. The Special Master has in the past and will continue to review these areas in subsequent reports.

Lastly, one might infer from defendants' objection that, as a result of the coordination orders of the *Coleman*, *Plata*, *Armstrong*, and *Perez* courts, or as a result of the powers of the *Plata* Receiver, the defendants are concerned that they do not have the level of control necessary to remediate any shortcomings in the areas of nursing, medication management, information technology, or medical record keeping that are identified in the Report.  At the inception of the coordination process, the (then) three courts of the coordinating cases envisioned that the parties to these cases may be involved from time to time in the coordination effort, as common or intertwined issues are addressed and need dictates.  In their order formally instituting the coordination process, the courts stated that the *Coleman* special master, the *Plata* receiver, and the court representatives of the other cases

> . . . will hold monthly meetings for the purpose of working collaboratively on issues related to coordination of the remedies in each of the (coordinating) actions.  The parties to each action will be permitted to submit, in advance of the meeting, proposed agenda items for consideration by the special masters, the racier, and the Perez court representative.  Attendance of the parties at said meetings will not be required or permitted except at the discretion of the special master, the receiver, and the *Perez* court representatives . . .

*See* Order, filed January 25, 2007, Addendum E.

If CDCR's concern is that  does not have the control necessary to address identified problems in the areas of nursing, medication management, information technology, and medical record keeping, then CDCR should consider raising those specific issues with the Special Master so that they may be brought to the coordination process for discussion and resolution within that context.

**California State Prison, Sacramento (CSP/Sac)**
April 12, 2010 - April 15, 2010

Census:

Overall, the institution's population and the number of participants in the MHSDS remained relatively stable between June 2008 and March 2010. As of April 9, 2010, CSP/Sac's inmate population was 2,909, a decrease of 81 inmates from the preceding monitoring period. There were 1,535 participants in the MHSDS, representing 29 fewer inmates than the 1,563 inmates reported in 2008.

The EOP mainline population was 382 inmates; 63 EOP inmates were in the administrative segregation hub. The two Psychiatric Services Unit (PSUs) held a combined census of 240 inmates. There were 685 3CMS inmates in the GP, with an additional 27 3CMS inmates in the Security Housing Unit (SHU) and 101 3CMS inmates in administrative segregation.

A total of 46 inmates were in the three MHCBs at CSP/Sac on April 9, 2010.

Staffing:

Staffing levels at CSP/Sac remained unchanged from 2008, with a vacancy rate of nine percent. Of the 233 established mental health positions, 211 were filled. The positions of chief psychologist and chief psychiatrist were both filled. All clinical psychologist positions, as well as the senior psychologist and senior social worker positions were filled. There was a seven percent functional vacancy rate among social workers, with 25 of 28 established positions filled and one vacancy covered by a contractor. The vacancy rate for psych techs stood at three percent, with 72 of 74 positions filled.

In psychiatry, one of two senior psychiatrist positions and seven of 22 staff psychiatrist positions were vacant, yielding a vacancy of 50 percent and 32 percent, respectively. It was observed that two of the vacant psychiatrist positions and the one vacancy senior psychiatrist positions were allocated to the recently opened MHCB unit.  Taking into account the service of registry staff, the functional vacancy rate in psychiatry was 25 percent.

The functional vacancy rate among clerical staff improved from a high of 43 percent in August 2009 to 21 percent in March 2010.

Quality Management:

The institution maintained functional quality assurance processes during the review period.  The local governing body met monthly, and the institutional Quality Management Committee (QMC) and Mental Health Quality Management Subcommittee (MHQMS) met weekly.  The minutes documented regular attendance by required attendees and attention to the implementation of Program Guide standards in the various mental health programs (MHPs).

A robust system of quality improvement teams (QITs) existed, with 21 operational QITs in place of the time of the site visit.  In general, the QITs employed sound methodology and usually resulted in useful reports; however, in some instances, audits appeared incomplete or were essentially a summary of results.

The institution conducted peer review for psychiatry and its clinical management staff, and was in the process of revising the peer review system at the time of the site visit.

Suicide Prevention:

There were no completed suicides at CSP/Sac during the monitoring period.

12

The suicide prevention and response focused improvement team (SPRFIT) continued to meet monthly, with appropriate attendance and useful minutes.

The SPRFIT reviewed a "self-harm" log at each meeting. "Mock suicide autopsies" were conducted as an instructional exercise in suicide prevention. In addition, as part of suicide prevention, the SPRFIT coordinator conducted a daily review of the custody-generated "morning report" and the Triage and Treatment Area (TTA) reports in order to identify acts of self-harm for possible intervention.

The SPRFIT also continued its suicide-attempt review process to identify potential system failures and individual factors related to detection of suicide risk, and developed recommendations to ameliorate potential suicide risk-related problems. One of the these suicide review processes resulted in the chartering of a QIT concerning requests of comprehensive or specific toxicology screens as needed in suicide-related events, rather than requesting generic toxicology reports.

Audits recorded 95-percent compliance with five-day follow-up after crisis bed discharges. During the reporting period, compliance with custody wellness checks following these discharges was recorded with a compliance rate in the range of 83 percent to 93 percent.

CSP/Sac continued to be compliant with most, but not all, of CDCR's plan to address suicide trends in administrative segregation. There were daily meetings by clinical and custody staff in administrative segregation. Audits of weekly summaries of daily rounds by psych techs found 88 percent compliance with documentation of these rounds. During the review period, the average compliance rate found by audits of psych tech daily log entries ranged from 94 percent to 100 percent.

The institution reported that it commenced tracking utilization of "new intake" cell tracking in January 2010.

Audited data found compliance rates ranging from 88 percent to 98 percent with administrative segregation pre-placement screenings.  For EOP administrative segregation inmates, CSP/Sac was compliant with filing chronos in UHRs for EOP administrative segregation inmates but not for 3CMS inmates.

Audit data regarding availability of inmate profiles (IPs) for psych techs as part of the suicide prevention plan was not presented to the monitor's expert.  CSP/Sac reported compliance with timely completion of the 31-item mental health screen in administrative segregation.  Non-MHSDS inmates reportedly refused out-of-cell screenings in substantial numbers.

Appropriate documentation of 30-minute welfare checks was not consistent throughout the institution.  In the 3CMS ASU, 30-minute welfare checks were properly staggered, while in the stand-alone ASU, there was evidence that the 30-minute welfare checks were not documented contemporaneously with the checks.

In interviews with the monitor's expert, both staff and inmates reported that the addition of 18 walk-alone yards allowed all inmates to be offered at least ten hours of recreation weekly.

Document reviews revealed that mandated emergency response drills were conducted.  Results were being reported to the QMC.  The ERRC held monthly meetings.

Medication Management:

Medication audits were conducted regularly by nursing and psychiatry as part of the quality management system at CSP/Sac.

14

The institution was compliant with providing newly arriving inmates with DOT medications by the end of the day after their arrivals. The institution had a 56-percent compliance rate for continuity of essential medications on inmates' arrivals from other institutions. It was also non-compliant with obtaining newly-ordered or changed medications within 24 hours after the order was written.

The institution was compliant with renewing or discontinuing medications before the expiration date and completion of an accompanying progress note. The institution also reported compliance with continuation of medication without interruptions following intra-institutional transfers.

Internal audits found that nursing staff documented medication "no shows" or refusals at a rate of 84 percent. Documentation of follow-up appointments for "no shows", refusals, or missing of at least 50 percent of medications was found to compliant at rate of 90 percent. The institution was noncompliant with meeting urgent referrals for inmate medication non-compliance while the inmate was under a Keyhea order.[6]

CSP/Sac reported compliance with the appropriate administration of DOT medications.

It was reported that the institution complied with HS medication standards and informed consent requirements.

There were laboratory test order protocols in place at the time of the site visit. Psychiatrists used the peer review process to assess compliance with laboratory studies of inmate blood levels of psychotropic medications. There were audits of monthly mood stabilizer

---

[6] The reference point for this statement came from the institution's own quality improvement study and was found in the institution's pre-site information which contained the following: "Reflected below is each medication management indicator and the current trend and corrective action that has taken place where indicated. . . 5. b. If the inmate was referred on an urgent basis to the prescriber and PHN for refusal/no show of one dose of Keyhea or two consecutive doses of insulin, TB, or HIV medications." *See* Institutional Management Report, Addendum C.

medication laboratory studies. Audits conducted during the review period found that the rate of institutional compliance was 74 percent. Clozapine audits, however, found a compliance rate of 100 percent.

The institution reported that as of January 31, 2010, there were 410 inmates at CSP/Sac under Keyhea orders, representing a significant increase from 270 Keyhea inmates at the time of the preceding site visit. During this review period, 45 Keyhea petitions were initiated, 223 petitions were renewed, four were denied, and one was rescinded.

CSP/Sac reported compliance with parole medications for paroling inmates who were identified, but indicated that not all were identified.

Sexual Misconduct:

During the monitoring period, 79 incidents of sexual misconduct were reported.

For reasons that were unclear to the monitor, CSP/Sac did not consistently follow all requirements regarding sexual misconduct. Required screenings were completed in 72 of the 79 incidents involving sexual misconduct, although the policy mandated screening in every incident. The institution also had a practice of not referring an inmate to an IDTT for sexual misconduct if the inmate had been to an IDTT within 90 days for previous sexual misconduct.

CSP/Sac identified eight inmates for comprehensive evaluation. There were seven inmates diagnosed with Exhibitionism or Paraphilia NOS during the review period.

The institution is one of the designated sexual misconduct treatment centers in CDCR. Over the course of the monitoring period, 28 inmates were enrolled in the Exhibitionism treatment program at CSP/Sac. The program utilized the Exhibitionist treatment manual and focused on group therapy as the primary treatment modality. At the time of site visit, there were two active Exhibitionism groups reported.

16

Transfers:

CSP/Sac implemented the use of CDCR Form 7388, the IDTT checklist form for criteria for referral to intermediate care at DMH. The institution reported that training had been provided to all clinical staff.

The institution had a full-time DMH coordinator assigned to maintain the required logs and serve as the central contact with DMH regarding transfers and returns. The coordinator was reported to be actively involved in implementing and monitoring the use of Form 7388.

As at other CDCR institutions, access to higher levels of care continued to be problematic at CSP/Sac. Significant numbers of inmates referred to DMH remained on the wait list for long periods of time. In a number of cases, CSP/Sac did not meet required timelines for completing intermediate care referral packages and similarly, DMH exceeded timelines for making acceptance decisions once it received referral packages.

As of March 5, 2010, there had been 55 referrals to acute care programs at DMH during the monitoring period. Of these 55 acute care referrals, 41 transferred, one transferred to an intermediate care program, one paroled after 60 days on the waitlist, and one was waiting for a Coordinated Clinical Assessment Team (CCAT) decision at the time of the site visit. Eleven of the 55 inmates referred to acute care were on the wait list at the time of the site visit, with an average wait time of 159 days. Five of the eleven inmates had been waiting for placements for longer than 235 days.

For those inmates who transferred, the average length of time from referral to transfer was 14 days. The data presented showed that 57 percent, or 24 of 41, of inmates transferred within ten days of referral; seven inmates transferred within 20 days; six inmates transferred within 30 days; and the remaining four inmates transferred after 30 days, with the

maximum number of days at 52.  All but one of these inmates transferred within 72 hours of a bed assignment.  At the time of the site visit, 20 of the 41 transferred inmates had returned to CSP/Sac following an average length of stay of 62 days in acute care.

There were 99 referrals to intermediate care during the review period; 41 transferred and 57 remained at the institution pending transfer as of March 5, 2010.  There were 11 Level IV inmates who were reviewed for possible placement at Atascadero State Hospital (ASH).  Of these, seven were approved for ASH and four for DMH at CMF.  Five of the seven inmates approved for placement at ASH transferred and had not returned at the time of the tour.

The average length of time to complete intermediate care referral packages was 18 days.  DMH took an average of 15 days to accept the inmates and CSP/Sac took an average of five days to transport the inmates after bed assignment.

The MHCB was busy during the monitoring period, with an average daily census of 46.  There were 234 MHCB admissions to CTC-I and CTC-II.  Most of these admissions were from CSP/Sac. Twenty-three inmates had more than two admissions to a CTC during the six-month review period.  The average length of stay was 15.5 days with a median of 12 days.  There were 140 admissions with lengths of stay greater than ten days, and ten instances of inmates remaining in an MHCB beyond the discharge date.  The primary problem area in the MHCB was transferring or discharging inmates within ten days of admission.  The compliance rate in this area was 40 percent.  Compliance with documentation of IDTT discussion regarding acute care referral or other forms of discharge planning was 100 percent

As a result of the conversion of its 20-bed MHOHU into an unlicensed MHCB during the monitoring period, the number of available MHCBs at CSP/Sac increased from 26 to 46 beds. The new MHCB unit came online in December 2009.  During December 2009 through

April 2010, there were 163 admissions into this MHCB unit; 12 percent were from other institutions. The average length of stay in the MHCB was 12 days, with a median of ten days. Twenty-seven admissions had lengths of stay greater than ten days, and two inmates remained in the MHCB beyond their discharge dates.

Prior to its conversion into an MHCB, there were 735 admissions into the MHOHU for evaluation and treatment with an average length of stay of 1.9 days. Of these 735 admissions, 559 or 79 percent were discharged back to their housing units, and 156 or 21 percent were admitted to an MHCB.

The MHCB did not have beds at the time of the site visit; inmates slept on mattresses on the floor. Audits indicated progressive improvement in meeting compliance requirements in December 2009 and January 2010.

Many inmates had multiple admissions to the MHOHU during the review period. Seventy-eight inmates accounted for 412 or 56 percent of the 735 admissions. Eight of these 78 inmates had ten or more admissions and one inmate was admitted 22 times. Twenty of the 78 inmates had five or more admissions and 51 were admitted between two and four times during the review period.

Between December 20, 2009 and January 31, 2010, alternative housing units were actively utilized for inmates who had pending admissions to an MHCB/MHOHU/OHU. They were 86 occurrences of alternative housing placements with an average length of stay of 1.8 days. Fifty-four or 63 percent of these placements were less than two days. There were 12 inmates held in an alternative housing for greater than three days with the longest being 5.5 days.

Forty-three or 50 percent of the inmates placed in the alternative housing unit were subsequently released back to their housing, while 34 or 40 percent were admitted to an

MHCB and nine were admitted to the unlicensed MHCB which was formerly the MHOHU.  For those inmates admitted to the MHCB, the average length of stay was 2.1 days.

Other Issues:

Administrative Segregation

Audits of the program key indicators showed that CSP/Sac was compliant in the EOP administrative segregation program with meeting IDTT timelines.  IDTT meeting attendance was compliant for primary clinician (PC) and psychiatrists; correctional counselor (CC) attendance was 88-percent compliant and inmate participation was 66-percent compliant. A significant proportion of clinical contacts occurred at cell front.

The institution was noncompliant with offering ten hours of structured group therapy, reporting an average weekly offering of 7.94 hours.  Group attendance remained problematic and decreased to 20 to 30 percent when groups were moved from the dining halls to the mental health treatment center.  Monthly psychiatric contacts were reportedly impacted by staffing vacancies with compliance rates of 84 percent and 77 percent in December 2009 and January 2010, respectively.

CSP/Sac produced UHR and MHTS audits that found compliance in the 3CMS program with initial and quarterly IDTTs, weekly clinical contacts, access to psychiatry, participation by required members of the IDTT, daily psych tech rounds, and weekly documentation of the these rounds.  Sixty-five percent of weekly clinical contacts occurred at cell front.

Confidential treatment space in the 3CMS administrative segregation program remained limited and continued to be shared with 3CMS SHU.  Interviews with staff and inmates

indicated that inmates were offered at least ten hours of out-of-cell time in administrative segregation per week.

PSU

At the time of the site visit, there were 240 inmates in the two PSU programs at CSP/Sac.    The institution reported compliance with meeting initial and subsequent IDTT requirements, but was frequently noncompliant with required attendance.  Audits indicated compliance with weekly clinical contacts throughout the monitoring period, and compliance for all but one month with psychiatry contacts.

CSP/Sac reported offering an average of eight hours of group therapy per week in the PSU.  Staff reported major difficulties with access to care.

EOP

Audit data reported compliance with initial and subsequent IDTT meetings and with weekly clinical contacts in this program.  Audits found compliance with psychiatry contacts at a minimum rate of 92 percent, but UHR reviews indicated a compliance rate of 85 percent. Staff reported that the variance was due to medical records issues.  CSP/Sac offered an average of 9.7 hours of structured therapeutic activity per week and exceeded the required ten hours in 18 of 28 weeks reviewed.  The most common causes for not meeting the ten-hour minimum requirement were institutional lockdowns and cancellations due to fog.

Group therapy was not appropriately documented in UHRs.  Cell-front contact data was not provided.

3CMS

Audits reported compliance with initial and annual IDTT meetings, as well as with PC and psychiatry contacts.  During the monitoring period, 3CMS mainline inmates were

offered group therapy.  At the time of the site visit, 45 inmates were on the wait list for group therapy. There were no dedicated group spaces available at the institution.

Psychiatry and PC attendance at IDTT meetings was compliant. Correctional counselors (CCs) attended 88 percent of IDTT meetings.  Inmates were present at 78 percent of the meetings but were reportedly offered the opportunity to attend 100 percent of the time. During the site visit, observed IDTTs were found compliant with required standards.

Referrals

CSP/Sac reported that it chartered a QIT in July 2009 to examine and remedy problems surrounding the tracking of mental health referrals, which showed improvement. Emergency referrals were not systematically tracked at the institution.

Medical Records/MHTS

Staff reported that UHRs were generally available at the EOP level of care (LOC) but expressed concern over inappropriate thinning of the UHRs.  Access and availability, as well as inappropriate thinning of UHRs, were reported to be problematic in 3CMS programs.

Heat Plan

The institution reported that its heat plan policy and procedure conformed to CDCR requirements.  In the walk-alone shaded areas, which were capable of providing a mist when temperatures exceeded 90 degrees, the institution's practice was to offer inmates the option of returning to the housing unit.

**Folsom State Prison (Folsom)**
July 20, 2010-July 22, 2010

Census:

Folsom housed 3,617 inmates.  This represented a decrease of 456 inmates in the overall population since the preceding monitoring period.  There was an increase, however, in

the MHSDS population from 731 to 772.  Of the MHSDS inmates, 726 were 3CMS GP

population, two were EOP GP inmates awaiting transfer, and 44 were 3CMS administrative

segregation inmates.  No MHSDS inmates were housed in alternative or emergency housing.

Staffing:

Both senior psychologist positions were filled as were all six staff psychologist

positions.  Two of the three allocated staff psychiatrist positions were vacant.  Three contract

psychiatrists and three CDCR staff psychiatrists from other institutions provided coverage for the

vacant positions.  All three social worker positions were filled. The one senior psych tech

position was filled as were all six psych tech positions. Of the 5.5 OT positions, one was vacant.

The .75 recreation therapist (RT) position was vacant.

Staffing vacancies had a negative impact on compliance with routine follow-up

and medication expiration appointments, as well as with psychiatrist 30-day contacts.

Quality Management:

Folsom's QMC met weekly.  The chief of mental health chaired Folsom's

MHQMS, which met monthly and reported to the QMC.  Meeting minutes were kept.

Folsom chartered 12 QITs.  Issues addressed included Exhibitionism mental

health evaluations, treatment plans, mental health referral timeliness, suicide risk assessment

checklists (SRACs), RVRs, administrative segregation pre-screening and psych tech rounds, and

referrals to higher levels of care.  Folsom also chartered six *ad hoc* QITs.

Psychiatry peer review was conducted monthly and focused on issues such as

medication noncompliance referrals, laboratory testing of inmate blood levels of psychotropic

medications, informed consent, and abnormal involuntary movement scale assessments.

Psychologist and clinical social worker peer review was combined. It addressed treatment plan evaluations.

Suicide Prevention:

There was one completed suicide at Folsom during the monitoring period.

The SPRFIT was chaired by the supervising psychologist, met monthly, and kept meeting minutes, but generally a quorum was not present. The monitor's expert observed a SPRFIT meeting at which six members were present. The SPRFIT chairperson could not identify who was required to attend the meetings regularly. SPRFIT minutes indicated ongoing discussion of five-day follow-up by custody and mental health.

The ERRC met monthly, with meeting minutes indicating quorum attendance at meetings. Staff discussions and data review showed that monthly emergency response drills were completed and results forwarded to the QMC.

Inmates returning from the OHU or an MHCB were housed in administrative segregation. A Folsom audit indicated that 27 of 31, or 87 percent, of such inmates received five-day follow-up before returning to their housing units.

The administrative segregation sergeant or designee met daily with PCs and psych techs to discuss new arrivals and other pertinent issues. Custody officers announced mental health appointments as "scheduled appointments."

Administrative segregation audits indicated a 78 percent compliance rate for pre-placement screenings, and an 87.2-percent compliance rate for pre-placement chronos. An audit of 31-question screens revealed a 97-percent compliance rate, and compliance rates between 39.9 and 50 percent for 30-minute welfare checks. Psych techs reportedly had access to IPs.

Eight intake cells were retrofitted with vents, light fixtures, and cement beds. Retrofitted doors increased cell visibility. Retrofitted cells were those in locations that could optimize inmate visibility. Electrical appliances were not available.

The administrative segregation exercise yard was available for five hours every other day for inmates requesting yard time. Inmate yard time was logged. Small management yards (SMYs) were available for walk-alone inmates.

Cut-down tools and micro-shields were available and readily produced by housing unit staff.

There were 12 3CMS inmates who were in administrative segregation for non-disciplinary reasons and who were endorsed and awaiting transfer to an SNY program. There were 11 3CMS inmates in administrative segregation for non-disciplinary reasons awaiting completion of an investigation.

Medication Management:

A medication continuity audit for new arrivals indicated 99.5 percent compliance with nurse-administered medications, and 96 percent compliance for keep-on-person medications. An audit of intra-unit transfers found a compliance rate of 80 for medication continuity.

There were approximately 180 medication noncompliance referrals. Time lapses between completion of medication noncompliance chronos and their receipt by mental health generally ranged from one to eight days. Nearly 55 percent of psychiatrist appointments that resulted from referrals due to inmate noncompliance with medications occurred more than seven days after the referral. This was generally due to delays in processing and scheduling.

"No shows" constituted 82 percent of medication noncompliance referrals. Although Folsom's medication management local operating procedure (LOP) required nursing staff to identify medication barriers and implement appropriate interventions, the nursing supervisor was unable to identify reasons for the high number of "no shows."

Folsom recently opened two additional pill lines, thereby reducing pill line lengths. However, pill lines were not audited. The monitor's expert observed that custody was not consistently present at pill lines, and it was reported that officers were often diverted from pill line assignments to other duties.

Of the 776 MHSDS inmates, 525 were prescribed psychotropic medications. Audits for informed consents for psychotropic medications indicated compliance rates between 94.5 and 100 percent. Monthly audits for laboratory tests for atypical and metabolic changes revealed compliance rates between 80 and 100 percent. Informed consent forms for mental health treatment averaged a compliance rate of roughly 50 percent.

One psychiatrist interviewed by the monitor's expert reported that Folsom's high number of DOT medications was a result of psychiatrists' practice of prescribing all psychotropic medications as DOT.

No Keyhea petitions were initiated.

Folsom reported 227 inmates receiving HS medications at 8:00 p.m. or later, and that HS medications were delivered to the housing units during lockdowns,

Parole medication audits showed a 100 percent compliance rate. One audit of paroling inmates indicated that all nine had pre-release needs assessment chronos in their UHRs, while another found only one of six paroling inmates had such documentation.

Sexual Misconduct:

There were two sexual misconduct RVRs issued during the monitoring period. Both inmates were placed in administrative segregation. Yellow placards were placed above their cell doors. These inmates were given mental health screening within 72 hours, and attended IDTT meetings within ten days of the incidents. Neither case was referred for a comprehensive evaluation. Both inmates received SHU terms and the cases were referred to the district attorney (DA) for possible prosecution.

Folsom did not provide treatment pending transfer for those inmates diagnosed with Exhibitionism. Folsom utilized custody-driven behavioral modification procedures for cases of sexual misconduct. An *ad hoc* QIT found that inmates were note being seen by mental health within 24 hours to rule out decompensation or intoxication.

Transfers:

Folsom reported that no inmates were referred to or returned from DMH programs. Reviewed DMH screening checklist forms did not indicate qualifying criteria for DMH referral. An individual clinician, rather than a treatment team utilizing the IDTT process, made DMH referral decisions.

Although Folsom reported that 33 of its inmates were admitted to MHCBs, a log review indicated that six inmates were actually held in alternative cells and released to mainline within 24 hours, and a seventh inmate was held as such for three days until he paroled. Of the 26 MHCB inmates who were placed, twenty were placed at the CSP/Sac MHOHU. Six of these inmates had stays there exceeding 72 hours. Two inmates were admitted to the CSP/Sac MHCB,

and four were transferred to CMF.[7]  The Folsom MHCB log did not assess the timeliness of the MHCB referrals.

Folsom reported that 38 EOP inmates were transferred to facilities with EOP programs.  Bed unavailability resulted in three of the transfers exceeding transfer timelines.  It was reported that the average number of days from EOP endorsement to transfer was 18.

Other Issues:

Administrative Segregation 3CMS

Audits of weekly PC contacts, monthly psychiatrist contacts, and quarterly IDTT meetings indicated compliance rates of 89.7, 55.6, and 100 percent, respectively.  Audits of CC attendance at IDTT meetings ranged from 67 to 75 percent, with the exception of January 2010, when it achieved 100 percent compliance.  Quarterly audits found poor compliance with Central File (C-file) data incorporation.

Psych techs reported that 35 of 44 administrative segregation 3CMS inmates were prescribed psychotropic medications.  Thirteen of the 44 inmates had lengths of stay greater than 90 days.  It was reported that IDTT and ICC meetings occurred weekly.

PCs had individual offices that permitted confidential interviews, and it was reported that only 100 of 1,433 inmate contacts were conducted at cell-front.  Due to a lack of group therapy space, no inmate group therapy took place.

Referrals

There were 144 emergent and urgent referrals, and 969 routine referrals.  Because the MHTS Legacy system did not distinguish among the three referral types, and included weekends and holidays in time calculations, recording was problematic.  There was an average

---

[7] Defendants requested that CDCR and DMH programs at CMF be distinguished from each other.  In this instance, and henceforth in this Report, references to CDCR operations at CMF will be referred to simply as "CMF" and DMH programs at that location will be designated as "DMH at CMF."

of 2.76 days from initiation of a routine referral to its receipt by mental health, and an average of 5.6 days from initiation to scheduling of an appointment.

Folsom permitted staff members to contact mental health with emergency referrals. Mental health clinical staff informed the monitor's expert of their practice of seeing all inmates who requested such a meeting, regardless of the type of referral.

Medical Records/MHTS

Competing priorities made UHR availability problematic. A positive practice observed at IDTT meetings by the monitor's expert was the filing in UHRs of treatment plans and DMH screening checklists used in IDTT meetings. It was reported that there were 12.25 inches of backlogged filing.

Two clinician audits of UHR and MHTS data for GP 3CMS inmates indicated incongruency rates of less than five percent. Administrative segregation clinician audits of UHR and MHTS congruency showed error rates of zero percent for October and November 2009, 18.2 percent for December 2009, and ten percent for January 2010.

Heat Plan

Each reviewed building at Folsom had a thermometer on its top tier. Correctional officers (COs) reported hourly temperature readings which were entered in the heat log. Review of logs at several buildings did not indicate activation above Stage One, and there were no heat-related incidents.

Inmates taking heat sensitive medications reported being required to exit the yard and return to their housing placement at a Stage One heat alert. Because pill lines were inside buildings, they were not impacted by heat alert plans.

RVRs

Of 377 RVRs issued to 3CMS inmates, 17 were referred for a MH-4. These 17 RVRs did not include information as to the number and nature of any mitigated penalties. No EOP or MHCB inmates were reported to have received RVRs, and none were issued for self-injurious or suicidal behaviors.

Pre-Release Planning

A quarterly audit of TCMP workers' involvement revealed that all nine paroling inmates' UHRs contained pre-release needs assessment chronos. Another such audit indicated that only one of six inmates' UHRs contained this documentation.

### Pelican Bay State Prison (PBSP)
April 6, 2010-April 8, 2010

Census:

On April 6, 2010, PBSP housed 3,368 inmates, which included 1,114 inmates in the SHU and 401 inmates in administrative segregation. The total number of MHSDS inmates housed in the institution was 478. The MHSDS population included 66 EOP mainline inmates and 190 3CMS mainline inmates; there were three 3CMS inmates housed in a gymnasium and 13 3CMS inmates in the SHU. The PSU housed 111 inmates including all administrative segregation EOP inmates. There were 93 3CMS inmates in administrative segregation. Ten inmates were in the MHCB at PBSP.

Staffing:

In the reporting period, covering August 2009 through February 2010, PBSP had a mental health staffing vacancy rate of 11 percent and a functional vacancy rate of 7.6 percent. Of the 95.5 allocated mental health positions, 10.8 were vacant. Use of 3.6 contractors reduced

functional vacancies to 7.2 positions.  Vacant positions included one senior psychologist, one senior psychiatrist, three staff psychiatrists, and 5.3 psych techs.

Quality Management:

Regular meetings with appropriate attendance were held by the local governing body, the QMC, and the mental health subcommittee.  PBSP reported that the list of required attendees at the QMC was revised to reflect changes in the organizational structure and allocated positions.

The institution reported that it had a robust QIT process which required representatives from every department, service, or discipline impacted by any issue identified for quality improvement action.  At the time of the review, there was an active QIT to address the timeliness of obtaining laboratory test results to monitor psychotropic medication levels.  One QIT examined PSU groups and recommended reducing the duration of groups from three hours to 1.5 hours for shackled inmates and inmates who preferred groups of shorter duration.

During the review period, the institution reportedly took action to restructure its key indicator supervision report.  This resulted from quality management recommendations to address the evolving *Coleman* reporting requirements directed by headquarters (HQ).

The chief of mental health continued to serve as the administrator of the institution's MHP, which then permitted the chief psychiatrist and chief psychologist to focus on treatment and program quality matters.

Participation in peer review continued to be required for all classes of licensed mental health care providers, and the various disciplines generally met the established peer review standards.  For psychiatry, the ongoing high vacancy rate affected ability to meet the peer

review requirements, with only two meetings held during the reporting period. It was reported that monthly psychiatry peer review meetings would resume, regardless of staffing levels.

Suicide Prevention:

There were no completed suicides during the reporting period. Seven incidents of self injurious behavior were documented. The SPRFIT met monthly with 100 percent attendance. However, there was concern expressed that most of the attendees were designees rather than principals. Minutes from the SPRFIT reported 100 percent compliance with custody wellness checks in administrative segregation and five-day clinical follow-up after discharges from the MHCB.

PBSP reported an 81.3 percent rate for pre-placement chronos in 3CMS administrative segregation, and also reported deficiencies for the stand-alone administrative segregation.

Audits found that in 53 of 56 or 95 percent of cases, completed 31-item screens were found in inmates' records. Audits also indicated compliance for welfare checks in the 3CMS program housing units. Psychiatric technicians (psych tech) completed rounds in the 3CMS ASU. The monitor's expert observed rounds during the site visit and found that they were adequately done, noting apparent good alliances between mental health staff and inmates and a non-hostile environment in respect to relations with custody.

Medication Management:

Medications were delivered at cell-front except in a Level I gymnasium and in the EOP mainline. There were no problems reported regarding medication delivery including medications delivered at HS.

32

Audit data documented compliance rates of 93 percent for medication continuity for newly arriving inmates, and 94.7 percent for intra-institutional transfers.

Audit data also indicated compliance with timely medication renewals.

The auditing process for medication noncompliance was problematic due to small samples and a restrictive definition of medication noncompliance that was not consistent with the Program Guide.[8] Staff psychiatrists reported no problems with timely processing medication orders.

---

[8] Defendants requested clarification of how the restrictive definition of medication noncompliance was inconsistent with the Program Guide.  The institution utilizes the following definition of medication noncompliance:

**Procedure for No-Shows/Refusals**
a.        If DOT/NA medications are refused or missed for three doses or fifty percent of the ordered doses in a seven-day period, the inmate-patient shall be referred to the primary care team for medication counseling and disposition.

Chapter 4 of the Program Guide, "Enhanced Outpatient Program", at sub-part E, "Required Treatment,"  p. 12-4-9, incorporates by reference *Volume 4, Chapter 11, Medication Management*:

REQUIRED TREATMENT
                                                         * * *
3.        Medication Evaluation and Treatment
                                                         * * *
b)        Refer to Inmate medical Services Policies and Procedures, *Volume 4,Chapter 11, Medication Management*, regarding procedures for administration of medication, medication refusals, Directly Observed Therapy, and other aspects of medication administration.

Consultation of the pertinent section of Chapter 11, Volume 4 reveals a more expansive definition of medication noncompliance than the one used by the institution.  *See* Chapter 11, Volume 4, "Division of Correctional Health Care Services, Inmate Medical Services, Procedure," subpart C, "Medication No-Shows/Refusal/Hoarding and Cheeking, item 4:

PROCEDURE:
                                                         * * *
C.        Medication No-Shows/Refusal/Hoarding and Cheeking
                                                         * * *
4.        A licensed nurse shall perform a weekly review of the MARs and refer in writing via a CDCR Form 128-C any patient who has missed 3 consecutive days of medications, or fifty percent (50%) of any medication in one week either by refusal, no-show, ***or shows a pattern of unexplained missed medications***, to the prescriber for medication follow-up counseling.  (emphasis added)

Consequently, the institutional definition of medication noncompliance is inconsistent with the Program Guide and Chapter 11 in that unlike Chapter 11, it does not include cases of inmates who "show a pattern of unexplained missed medications."

The institution reported that it was noncompliant with informed consent standards.

The institution was compliant with laboratory testing of inmate blood levels of psychotropic medications and administration of AIMS tests.

On February 22, 2010, there were 68 inmates on Keyhea orders at PBSP.  During the monitoring period, nine Keyhea orders were initiated, 68 were renewed, and ten expired or lapsed.  Five inmates with Keyhea orders in process were transferred prior to completion.

PBSP reported improvement in delivery of parole medications.  An audit sample showed an 80 percent compliance rate, for an improvement by 17 percent since the preceding monitoring period.

Sexual Misconduct:

PBSP continued to be one of three CDCR prisons with a treatment program for Exhibitionism.  At the time of the site visit, three inmates were enrolled in a psychotherapeutic group for indecent exposure (IEX).

During the reporting period, there were 36 RVRs issued for sexual misconduct, resulting in 27 mental health screenings and 36 IDTT reviews.  There were two referrals for comprehensive evaluations.  The institution continued to employ disincentives regarding IEX by placing yellow placards on identified inmates' cell doors and requiring the use of IEX-identifying uniforms.

Transfers:

The institution did not have a full-time DMH coordinator during the reporting period.  It continued to have problems with transfers to DMH and reported that problems meeting transfer time requirements were likely to remain ongoing and possibly increase.

There were 20 referrals to intermediate care during the reporting period. Nine inmates were transferred to DMH and eight remained on the SVPP waitlist at the time of the site visit. Waiting periods ranged from three to 11 months. The institution reported that it took an average time of 67.5 days from referral to transfer. One inmate transferred within 72 hours of bed assignment and the remaining eight transferred within four days of bed assignments.

There were 68 referrals to acute care during the reporting period. Fifty-seven transfers met the required timelines for referral to transfer. Of the 57 transfers, 36 transferred within 72 hours of bed assignments and 17 transferred within four to five days of bed assignments. Fourteen acute care referrals were rescinded for reasons which included improved functioning, transfer to intermediate care programs, medical problems, and parole.

The institution also reported that hearings for referred inmates with pending RVRs were expedited by custody and no inmates were routinely held for this reason. No rejections to DMH were based on impending release dates.

The DMH coordinator reported that notices of impending returns from DMH were received timely and regularly via the institutional classification and parole representative (C&PR). Returning inmates were placed in their prior OHU and were evaluated by psychiatry within 24 hours of return to afford medication continuity. Issues related to conflicts in institutional formularies for DMH-prescribed medications were resolved through telephone consultations with DMH clinicians. Discharge summaries were consistently received and copies were distributed to nursing staff and assigned psychiatrists.

During the reporting period, thirty one inmates were returned to PBSP from acute care. Five were initially placed in the MHCB and 26 were placed in EOP housing. Seven

inmates were discharged back to the institution from intermediate care. One was housed in the MHCB and six inmates were placed in EOP housing.

The institution appeared to utilize the required DMH referral criteria form, Form 7388, and discussed the required factors as part of their IDTT deliberations. However, this form was not used in the MHCB and all referral criteria were not reviewed.

The institution's CTC was licensed for ten MHCB beds. During the reporting period no crisis beds were used for medical services, but medical beds were utilized to provide mental health services.

Of the 181 inmates referred for MHCB placement, 166, or 92 percent, were admitted, with an average daily census of nine for the reporting period. The average length of stay was 9.13 days, with 55 placements exceeding ten days. There were 33 multiple admissions to the MHCB during the reporting period.

Other Issues:

SHU

The majority of SHU inmates were single-celled and the *Madrid* SHU exclusion order continued to be effectively implemented. Audits during the reporting period indicated that all nine new arrivals had a mental-health evaluation completed in ten days. SRACs were completed within the same timeframe, except for one inmate. Eight of the nine inmates had initial IDTT meetings within 14 days of arrival. There were formalized mental health treatment plans completed in all cases. Rounds were conducted every other week in the SHU by a CM.

The monitor's expert observed an IDTT meeting which was carried out in a competent manner. The CC present at the IDTT meeting did not have the C-file.

PSU

In addition to EOP inmates with SHU terms, EOP inmates waiting for transfers to an administrative segregation program were also housed in the PSU at PBSP. The institution reported an increase in cell-front visits and a decrease in the consistency of service delivery in the PSU during the reporting period. The reasons attributed to these problems included multiple staff reassignments, prolonged illnesses of staff, program modifications, and lockdowns. Treatment space continued to pose challenges in the PSU. PBSP reported that it had instituted a new policy and procedure ending the default use in the PSU of leg shackles, which under the new policy and procedure would only be used in cases when it was deemed necessary.

Institutional audits demonstrated compliance with Program Guide intake requirements, clinical contacts, and offered out-of-cell structured therapeutic activities in the PSU. The monitor's expert observed competent IDTT meetings in the PSU. In general the quality of treatment in the PSU appeared adequate. The institution acknowledged the need to better address the high refusal rate among a relatively small percentage of PSU inmates. Staff reported that central files were not regularly available for IDTT meetings in the PSU.

There continued to be problems with office and programming space. Psychiatrists often met inmates without adequate privacy, and group treatment occurred in the dining areas of housing units.

EOP

PBSP reported compliance with Program Guide requirements for weekly clinical case manager (CCM) contacts, timely access to psychiatry, and weekly average number of hours of structured out-of-cell therapeutic activities. Individual clinical contacts generally occurred in

an office setting, although some weekly clinical contacts occurred in the context of a group setting.

There was a reported refusal rate of 39 percent in the program, but it appeared that a small percentage of EOP inmates who persistently refused group treatment skewed this high refusal rate.

3CMS

In the 3CMS mainline, the treatment space on Facility A was significantly improved by the renovation of a hobby shop into six confidential treatment offices. Treatment space on Facility B remained problematic, as a parallel hobby shop conversion had not yet commenced.

IDTT meetings observed by the monitor's expert were attended by a full complement of required staff, but inmates' C-files were not available.  Staff reported that psychiatrists were not consistently available for IDTT meetings.  The observed IDTT reviews were appropriate.  Form 7388s for use in DMH consideration were completed and used in the deliberations of IDTT meetings.

The institution remained noncompliant in providing group activities to inmates in the 3CMS mainline, due in part to extended modified programming.[9] Individualized treatment planning was observed to have improved and was reported to be the subject of ongoing internal monitoring for compliance purposes.

_____

[9] Defendants requested that this statement be removed on the ground that under the Program Guide, group therapy is only one among several possible treatment modalities for 3CMs inmates.  Provision of at least one group on each 3CMS yard on an ongoing basis is a long-standing CAP item at PBSP (*see* PBSP Management Report for the Twenty-Second Monitoring Period, CAP Item No. 1, Addendum D). Moreover, the Management Report states, "Providing group therapy to mainline 3CMS program is the primary remaining CAP item from *Madrid* monitoring." Management Report, *supra* "Group Treatment."   It also states, "Near continuous modified programs and/or lockdowns made providing group therapy extremely difficult on both Facility A and B yards this reporting period as well as the period reported on in the last management report."  *See* Management Report, *supra*.

Administrative Segregation 3CMS

The 3CMS administrative segregation program at PBSP continued to experience serious problems including significant inmate violence and correlated lockdowns. Staff reported that this program was not fully staffed at the time of the site visit. Due to an increase in the administrative segregation population, access to recreational yards was significantly reduced and many inmates were no longer receiving mandated yard time.

PBSP also reported that it continued to implement *Madrid* court-ordered enhanced mental health services to 3CMS inmates housed in Facility A. This involved a privileged level system in which property and program participation increased as inmates progressed from one level to the next.

Referrals

PBSP reported compliance with responses to referrals. The institution reported that all 11 emergent referrals were attended to on the same date of the referral, and that all 68 urgent referrals were addressed by the next day. Audits further indicated that the institution was compliant with routine CM referrals and routine psychiatry referrals.

Medical Records/MHTS

PBSP continued to utilize the Madrid Patient Information Management System (MPIMS) system that was developed during the *Madrid* case. The system offered electronic medical records, a scheduling system, and reporting capacity to provide information for supervision and monitoring. Staff reported problems related to support and updating services from the system designer, as well as diminished in-house support.

The institution further reported that the information technology staff from the *Plata* receiver's office was in the process of developing software to enable migration of relevant

MPIMS data into MHTS.net. In addition, two staff members were being trained on MHTS.net to in order to provide manageable integration of the two data systems in the near future.

RVRs

During the review period, 167 RVRs were issued to inmates at the EOP or MHCB levels of care and to inmates in the PSU. Audit reports showed that MH-4s were completed for all but three inmates who were transferred to a DMH program before the assessment was completed.

There were 118 RVRs issued to 3CMS inmates during the review period, resulting in seven MH-4s being completed. The institution reported that it was conducting a study regarding RVRs issued to 3CMS inmates with the goal of developing training to achieve a higher referral rate for MH-4s if warranted.

Heat Plan

The heat plan was consistent with CDCR standards and was last updated in June 2009, as required. No heat alerts were reported to have occurred during the reporting period.

Lockdowns

PBSP reported that there were no full institutional lockdowns exceeding 24 hours during the reporting period. Multiple modified programs, which impacted access to health care, lasted from several days to several months throughout the reporting period. A number of lockdowns remained in effect at the time of the site visit. Ongoing program modifications were reportedly implemented due to prison violence, which hampered access to group therapy.

Access to Care

An internal institutional report concluded that there were ongoing escort staff shortages and that the current staffing level was insufficient to meet the demands of mental, dental, and medical appointments.

**High Desert State Prison (HDSP)**
June 29, 2010 – July 1, 2010

Census:

As of June 29, 2010, the prison population stood at 4,470 inmates, which included 3,575 mainline inmates, 539 RC inmates, and 356 administrative segregation inmates. This represented a one percent decline in the prison population, a 19 percent drop in the RC population, and an 11 percent decrease in the number of inmates in administrative segregation since the preceding monitoring round.

There were 926 MHSDS inmates, representing 21 percent of the total population. There were 29 EOP inmates, including 12 in the RC, 13 mainline inmates, and four in administrative segregation. There were 897 3CMS inmates; 130 in the RC, 689 mainline inmates, and 78 in administrative segregation. There were eight inmates in MHCBs.

Staffing:

The functional vacancy rate among allocated mental health positions ranged from less than five percent to approximately 20 percent due to fluctuations in psychiatric contract coverage during the reporting period. Positions for a chief psychologist and senior psychiatrist were filled, as were two of 2.5 senior psychologist positions.

Psychiatrist allocations, identified as six positions during the last two reporting periods, were reported to be four in number during this site visit. All four allocated psychiatrist positions were vacant, necessitating HDSP's continued reliance on contractors and telemedicine.

41

Contract coverage was variable, typically waning during winter months when commuting contractors were more likely to encounter inclement weather, and picking up during other times of the year.  Three to seven contract psychiatrists worked 1.3 to 6.2 full-time equivalent (FTE) hours per month.  Two telemedicine psychiatrists, available on three of four facilities, reportedly completed 230 to 280 appointments per month during the reporting period.  Despite the coverage provided by contractors and telemedicine, psychiatrists did not attend most IDTT meetings, response to medication-related referrals was slow and medication treatment continuity was often poor.

Among PCs, 21 of 23 positions were filled.  A full-time contractor provided coverage for a clinician on long-term sick leave, producing a functional vacancy rate of nine percent for PCs.  All social workers were licensed.  However, seven of 14 psychologists were unlicensed.  The chief psychologist reportedly supervised all of the unlicensed psychologists.

Three of ten psych tech positions were vacant, but all were covered by contractors.  A health programs specialist position was filled, as was one of 1.65 RT positions and eight of 10.5 clerical positions.

HDSP had received only 17 percent of the access to care officers that were identified by the Custody Support Services Division as needed to assist with escort to and from health care appointments and transport to and from outside medical appointments.

Quality Management:

The local governing body met monthly and the QMC met weekly.  Both meetings were attended by the appropriate managers and disciplines, as well as by the *Plata* receiver's northern regional administrator via teleconference.  The QMC reported monthly to the local governing body.

The mental health subcommittee, also well attended, met monthly, maintained minutes, and reported to the QMC. The meetings provided a useful forum for discussion of routine agenda items, *ad hoc* issues, and audit results.

HDSP did not review all required issues and program areas on a regular basis. Completed audits largely focused on the presence and timeliness of required documentation and were, in most cases, conducted by an office tech (OT) or the health care specialist. The audit methodology was flawed in that a single sample of UHRs was typically used to measure compliance with several requirements. This approach often yielded compliance percentages that were based on only one to two applicable cases, thereby rendering the results unreliable and misleading. In addition, findings of noncompliance, when based on appropriate sample sizes, failed to encourage analysis of underlying causes or prompt staff to develop CAPs.

Mental health managers rarely chartered QITs, preferring to resolve identified system issues using informal interventions. Two QITs were chartered during the reporting period. The first QIT, chartered in January 2010, was tasked with improving medication continuity for inmates transferring in and out of HDSP. The second QIT, formed in response to a CAP related to a completed suicide, was active during March and April 2010. This team developed an improved referral process between telemedicine providers and clinical staff at the prison.

Combined peer review meetings for psychologists and social workers started in January 2010 and convened approximately twice a month during the first half of 2010. Each clinician was required to bring a UHR belonging to an inmate on his/her caseload. The UHR was then reviewed by a team of peer clinicians. Each clinician received feedback from the team in several areas, including documentation, assessment, diagnosis, treatment planning, treatment

delivery, consultation, and referral.  All clinicians were also expected to present a case study or report on clinical research that was relevant to the MHSDS population at HDSP.

Suicide Prevention:

There was one completed suicide during the reporting period.

The SPRFIT met monthly. It was comprised of all required participants and maintained minutes.  The committee routinely reviewed completed and attempted suicides, including any related CAPs and treatment plans.  Areas of focus related to completed suicides included appropriate utilization of SRACs, UHR filing issues, and proper documentation of staff response to emergency medical procedures.

The results of suicide assessments were entered into the MHTS and compiled in IPs.  IPs were used as part of the screening process in administrative segregation and reportedly accompanied MHSDS inmates, as well as inmates with histories of MHSDS participation, when they transferred from the institution.

Cameras were installed in five of ten MHCB cells, as well as in three seclusion cells.  The cameras were reportedly used in conjunction with continuous observation for suicide watch and staggered 15-minute checks for suicide precaution.

The presence of grab bars and sink fixtures, as well as the lack of caulking around light fixtures in MHCB cells, were noncompliant with current licensing standards relative to suicide prevention.

PCs conducted five-day follow-up during regular work days.  Contract psychologists completed contacts during weekends and when the assigned PC was absent.  Staff reported that this arrangement worked well.  Compliance with five-day follow-up was noted in

SPRFIT meeting minutes to be close to 100 percent, according to minutes maintained by the SPRFIT.  Staff reported consistent compliance with required custody checks.

Internal audits showed inconsistent compliance with some aspects of the plan to address suicide trends in administrative segregation.  Morning meetings between clinical and custody staff were consistently documented during weekdays, but recorded only sporadically during weekends.  Compliance with the completion of pre-placement screens was reported to be 28 percent, a deficiency attributed to filing problems.  Internal audits showed that clinicians used the 31-question screen to interview all inmates within 72 hours of their arrival in administrative segregation. Daily psych tech rounds occurred but were not always appropriately documented in isolation logs.

Cells in the stand-alone ASU could not accommodate electrical appliances. Inmates housed in all other ASUs were permitted to have in-cell televisions and radios.

Most inmates who were new to administrative segregation were identified with intake placards on their cell doors and received 30-minute welfare checks for the first 21 days of placement.  Inmates who transferred from an ASU at another prison to the administrative segregation program at HDSP were not considered new arrivals and typically did not receive 30-minute welfare checks for a full 21 days.  In addition, logs indicated that checks were not conducted at staggered intervals, as required.  Nor was it clear from the documentation provided if supervisors reviewed the logs on a regular basis.

Supervisory staff reported that inmates in administrative segregation were routinely offered ten outdoor yard hours per week.

Medication Management:

Internal audits of medication continuity upon arrival could not be used to assess performance due to inadequate sample sizes.  A QIT was chartered to improve medication continuity for inmates transferred to and from HDSP.

Internal audits of medication continuity related to intra-institutional transfers within the institution, which utilized adequate sample sizes, yielded a compliance rate of 70 percent.  A separate audit that focused on medication continuity upon placement in and release from administrative segregation yielded a compliance rate of 88 percent.  Continuity upon discharge from the MHCB was not audited.  In an effort to improve medication continuity related to inmate movement within the prison, the institution implemented new procedures in February 2010.  The impact of these new procedures had yet to be audited.

Medication lapses related to renewal gaps were found to be rare in audits conducted during the reporting period.  Improvement in this area was attributed to the regular use of 14-day bridge orders and efforts on the part of psych techs to use medication expiration lists to schedule psychiatric appointments in a timely manner.

Internal reviews indicated that medication non-compliance was properly recorded on MARs.  However, audits found that recorded noncompliance did not result in psychiatric follow-up.  It was unclear if this deficiency was due to nursing staff's failure to properly report medication noncompliance or psychiatric staff's failure to respond to reported noncompliance.

Outdoor pill lines on facilities A and B were reported by staff and inmates to be long.  Inmates typically waited approximately 20 minutes to receive medication, at times having to endure inclement weather.  Despite this acknowledged problem, the institution did not audit pill line performance or protocols during the reporting period.

A significant number of MARs reviewed by nursing staff during the reporting period were noted to contain blank spaces. Nursing supervisors were attempting to improve MAR documentation with staff training and disciplinary action.

Two local audits found that medication orders were timely processed and distributed to the yards.

Internal audits yielded a compliance rate of 60 percent for the timely completion of informed consent forms.

It did not appear that HDSP had a consistent process in place for ordering initial laboratory studies and periodic monitoring of blood levels for inmates taking mood stabilizing medications. The institution did not audit performance in this area during the reporting period, nor did the institution track responses to abnormal laboratory test results.

There were 20 inmates at HDSP who received DOT medications. Adherence to DOT protocols was not reviewed by the institution during the reporting period. Staff reported that inmates in administrative segregation with DOT orders were not removed from their cell to ensure that medications were swallowed.

According to records maintained by the Keyhea coordinator at HDSP, the institution successfully initiated two Keyhea petitions and renewed two others during the reporting period. One inmate arrived at HDSP with a current Keyhea order. During the reporting period, no Keyhea orders expired and none were rejected by the administrative law judge or dropped on advice of legal counsel.

HS medications were not prescribed as clinically indicated at HDSP. Interviewed psychiatrists reported that HS orders were discouraged. In addition, the institution

acknowledged that no more than a few inmates were prescribed medications at HS due to nursing workload issues, often made more onerous by long-term lockdowns.

The facility appeared to have a reliable process in place for providing supplies of parole medications to inmates released from prison. A January 2010 audit, which included six MHSDS inmates, found that all reviewed inmates received parole medications.

Sexual Misconduct:

The institution issued 20 RVRs for IEX during the period from November 1, 2009 to April 30, 2010. Two inmates each received two RVRs and 16 inmates received one. Mental health screens were completed in all cases. In 18 of 20 cases, the screen was completed within 24 to 48 hours; one case took nine days and one took ten days. The log indicated that all cases were reviewed by an IDTT. No cases were referred for a thorough evaluation, and none of the involved inmates were diagnosed with Exhibitionism.

Yellow cardboard covers were placed over the bottom three-quarters of cell windows belonging to inmates who had been issued RVRs for sexual misconduct. Inmates who were issued sexual misconduct RVRs for behavior that occurred outside of the cell were required to wear exposure-control jumpsuits when leaving the cell.

All cases of IEX were referred to the DA's office. Inmates found guilty of sexual misconduct were routinely given SHU terms.

Transfers:

Access to DMH acute care was slow. Logs covering the six-month reporting period listed five acute care referrals, four of which resulted in transfer to DMH. None of the inmates were transferred to DMH within ten days of referral. The time lapses between referral and transfer ranged from 11 to 29 days. The fifth inmate, deemed by CDCR and DMH clinicians

to be gravely disabled, was on the wait list for 102 days before being transferred to the administrative segregation hub at CSP/Sac.  This inmate's DMH referral reportedly remained intact following his transfer to CSP/Sac.

HDSP referred ten inmates to DMH intermediate care during the reporting period. Nine of these inmates were identified during MHARP.  One was transferred to CMC en route to ASH after waiting 25 days.  Six inmates were transferred to EOP programs with their DMH referrals intact, waiting between eight and 47 days.  One inmate was transferred to an EOP program prior to the completion of his DMH referral packet.  At the time of site visit, two inmates had been waiting for beds at SVPP for 193 days and 104 days, respectively.

No DMH referrals were rescinded by the institution.  The DMH referral log was incomplete in that bed assignment dates were not recorded.  Consequently, compliance with the 72-hour transfer requirement could not be assessed.

Access to MHCBs for inmates at HDSP was adequate.  Inmates were not held in alternative areas or OHU beds pending admission to the MHCB, and HDSP inmates were not sent to MHCB units in other prisons.  On the contrary, HDSP had excess MHCB capacity and 44 percent of admissions were of inmates from other prisons.

During the period from November 1, 2009 to April 30, 2010, there were 138 MHCB admissions - an average of 23 admissions per month.  Of these admissions, 77 involved HDSP inmates and 61 involved inmates from other prisons.  Approximately 18 percent, or 25 of 138, of the admissions lasted longer than ten calendar days.  Seven admissions lasted longer than 20 days, with stays ranging from 21 to 100 days.  Five of these excessive stays were related to delayed DMH transfers and one was the result of a Keyhea petition.

Most MHCB admissions from HDSP involved inmates in the SNY and RC.  Staff reported that MHCB admissions from the SNY significantly increased for a period of time during which there was a rise in gang activity in the protected program.  Measures taken by the institution to curtail this activity had more recently reduced the demand for MHCB services.

As of the end of June 2010, there were 14 mainline EOP inmates awaiting transfer, nine or 64 percent of whom had been waiting longer than 60 days.  Five inmates had been waiting longer than 90 days, and two inmates had been waiting over six months.  As of the end of June 2010, there were four EOP inmates in administrative segregation, one of whom had been awaiting transfer to a hub for 164 days.  The remaining three inmates had been waiting less than 30 days.

Staff reported that it was not unusual for EOP inmates to wait longer than 60 days to be transferred from the RC.  However, logs were incomplete in that 42 of 46 EOP inmates listed as having been transferred from the RC during the reporting period did not have recorded transfer dates.  Consequently, the extent to which transfers were delayed could not be ascertained.  As of the end of June 2010, there were 12 EOP inmates in the RC.  Nine of the 12 inmates had been waiting 60 days or less.  The remaining three inmates had been waiting 88 days, 90 days, and 134 days, respectively.

Despite the significant number of EOP inmates with excessively long stays, HDSP did not utilize procedures for expediting EOP transfers during the reporting period.  In addition, custody staff did not conduct 30-day reviews of EOP inmates housed in administrative segregation for greater than 90 days.

The institution did not provide information regarding 3CMS inmates transferred from the RC during the reporting period.  Information provided during the site visit indicated that

nearly half of the 3CMS inmates in the RC in early June 2010 had been there longer than 90 days.

<u>Other Issues</u>:

<u>Reception Center</u>

The lack of confidential clinical space and poor psychiatric services continued to compromise mental health treatment in the RC.  During the period from November 1, 2009 to April 30, 2010, HDSP's RC processed 1,354 new arrivals, 1,020 of whom received 31-question screens.  It was unclear from the data why 25 percent of the inmates processed through the RC were not screened.  Of the 1,020 inmates screened, 304 or 30 percent were referred for a mental health evaluation.  Only 250 or 82 percent of the inmates referred for a mental health evaluation received one.  Again, the data provided no explanation.  Of the 250 inmates who received a mental health evaluation, 187 were diagnosed with a serious mental disorder and placed in the MHSDS.  Approximately 18 percent of the 1,020 inmates screened in the RC were placed in the MHSDS.

A local audit of 25 UHRs found that seven mental health evaluations were not timely completed, generating a compliance rate of 72 percent.  UHRs reviewed by the monitor contained timely completed bus screens and 31-question forms, but confirmed inconsistent compliance with the completion of mental health evaluations.

IDTT meetings in the RC were held in a small office that was primarily used by correctional staff.  IDTT reviews were scheduled monthly for EOP inmates and quarterly for 3CMS inmates. UHRs reviewed by the monitor confirmed compliance in this area.  3CMS inmates were not scheduled for periodic PC contacts, but could request one-on-one interviews via the referral process.

51

UHRs reviewed by the monitor highlighted a number of problems with psychiatric services in the RC.  Psychiatrists did not attend IDTT meetings, and quarterly medication reviews were not consistently documented.  Response to routine psychiatric referrals was slow and, in one case, response to an emergent referral took over a week.

Clinicians and psychiatrists assigned to the RC did not have office space dedicated for one-on-one interviews.  Consequently, nearly all clinical contacts took place in non-confidential areas.  In building A5, an estimated 80 percent of out-of-cell PC contacts and all mental health evaluation interviews occurred in a single holding cell that was located in the dayroom.  However, the module did not conform to design specifications in that its sides and front were not comprised of Lexan-covered window panes.  Nearly all other contacts occurred at open tables on the dayroom floor.

Clinical contacts in building A4 occurred at an open table on the dayroom floor.  Inmates waiting to be seen by a clinician sat on benches located about 25 feet from the interview table.  In building A3, clinicians interviewed inmates at dayroom tables or in an office that was used by correctional staff.  It was not clear what percentage of contacts occurred where.

HDSP was not compliant with treatment protocols for RC EOP inmates.  Most EOP inmates were reportedly housed in building A5.  However, HDSP did not have an official policy for clustering EOP inmates in designated areas of the RC.  The institution reported that most EOP inmates were screened within 72 hours of arrival, evaluated within a week of arrival and reviewed by an IDTT upon arrival and every 30 days thereafter.  However, performance in these areas was not tracked or audited during the reporting period.

EOP inmates in the RC were offered, at most, two to 2.5 hours of out-of-cell therapeutic activities a week, all within the context of one-on-one daily contacts.  Groups and

recreation therapy were not available to EOP inmates in the RC, reportedly due to inadequate allocations of clinicians and COs. Compliance with PC contacts was not audited during the reporting period. Nor did the institution track the percentage of cell-front contacts in the RC.

Clinicians reportedly assessed and documented the basic needs of EOP inmates scheduled to be released from prison and provided assistance with issues such as parole medications and outpatient clinic appointments. EOP inmates were referred to the TCMP/Benefits Liaison for assistance with benefits applications.

Administrative Segregation

MHSDS inmates on administrative segregation status were housed in buildings D6, D7, and D8, as well as in part of D5. Most non-MHSDS inmates on administrative segregation status were housed in the stand-alone unit, but were also in the buildings located on D facility.

Three full-time clinicians and a part-time clinician covered 82 MHSDS inmates in administrative segregation, generating average caseloads of approximately 23 inmates. An internal review of 50 UHRs conducted during the period from November 2009 to January 2010 yielded a compliance rate of 44 percent for the completion of weekly PC contacts in administrative segregation. Most of the non-compliant cases reportedly involved one or two missed weeks related to staff absences. Half of all clinical contacts took place at cell front. A QIT was recently chartered to explore ways to reduce the number of cell-front contacts.

Internal UHR audits yielded a compliance rate of 85 percent for the completion of quarterly psychiatric contacts in administrative segregation. Audits showed that initial and follow-up IDTT reviews occurred within Program Guide timeframes more than 90 percent of the

time.  PCs and CCs routinely attended IDTT meetings in administrative segregation, while psychiatrists did not.

An IDTT observed by the monitor's expert exemplified the clinical limitations that resulted from the lack of psychiatric participation.  In several of the reviewed cases, the IDTT was unable to address questions regarding medication side effects and could not immediately respond to mental health instability that required pharmaceutical intervention.  The treatment team often found it difficult to communicate medication-related concerns as many contract psychiatrists worked only during weekends.

The room used for IDTT meetings in administrative segregation was too small to accommodate chairs for all participants.  Consequently, staff resorted to standing or sitting on a medical stretcher that was stored in the room.  In addition, the therapeutic module in the room did not comply with specifications in that it did not have a seat or Lexan-covered window panes.

No group therapy was offered in administrative segregation at the time of the monitor's visit.

MHCB

The institution reported that IDTT meetings were held twice weekly in the MHCB and that all required disciplines routinely attended.  An IDTT meeting observed by the monitor's expert was attended by all appropriate disciplines and was noted to be a useful process.  However, more in depth discussion regarding treatment planning was warranted.

Logs indicated that inmates were placed in seclusion cells three to five times per month, usually for less than 24 hours, and that restraints were rarely used during the reporting period.  Inmates were placed in seclusion cells by physician's order and were routinely issued a

smock, safety blanket, and no-tear mattress.

An internal audit covering the last quarter of 2009 found noncompliance with some aspects of the institution's seclusion and restraint policy and procedure. For example, less than half of the inpatient records belonging to inmates placed in seclusion adequately documented the clinical rationale for seclusion. The treatment plans of a third of the inmates placed in seclusion were not modified to address the special clinical needs associated with seclusion. Finally, a third of the reviewed inpatient records did not contain adequate documentation of constant observation while in seclusion. Staff training was provided with respect to these findings and a follow-up audit was planned.

An internal audit of MHCB admissions covering the last quarter of 2009 found that intake history and physical examinations were not consistently completed in a timely manner and that discharge planning was deficient in some cases.

Inmates admitted to the MHCB, regardless of security status and clinical presentation, were subjected to movement and property restrictions that were, in some ways, stricter than those applied to inmates in administrative segregation. Out-of-cell activities, including one-on-one clinical contacts and outdoor recreation, required ICC approval. In practice, few inmates were granted such approval during their stay in the MHCB unit.

3CMS

UHR reviews and inmate interviews revealed that, despite the challenges posed by frequent lockdowns and rolling blackouts, 3CMS inmates were routinely seen at least quarterly by their PC. However, clinicians reported that contact often occurred in non-confidential settings due to a combination of space and escort limitations. While initial and

annual IDTT reviews were generally timely, composition was problematic in that psychiatrists did not attend.

Groups were offered to 3CMS inmates during the reporting period. However, lockdowns frequently resulted in poor attendance and group cancellations – factors that ultimately persuaded staff to suspend groups. Priority ducats for group sessions, one-on-one contacts, and telemedicine appointments were not consistently honored due to lack of custody resources during lockdowns and rolling blackouts.

UHRs were reportedly available to clinicians for scheduled appointments approximately 80 percent of the time.

Referrals

Due to HDSP's ongoing inability to employ a stable cadre of psychiatrists, PCs responded to all referrals, including those related to medication issues. Internal audits found that staff responded to 89 percent of routine referrals within five working days. Response to emergent referrals was often slow, with only 65 percent of audited cases resulting in contact within 24 hours. Referrals forwarded to psychiatrists and referrals related to medication non-compliance did not, in most cases, result in contact within five working days.

Medical Records/MHTS

MHTS.net, activated approximately six weeks before the site visit, was well-liked by staff. However, MHCB staff complained that patient data in the MHTS.net was not available to them during an inmate's first 24 to 48 hours in the MHCB. The MHTS.net liaison at HDSP had been notified of this problem.

Heat Plan

The monitor's tour of several housing units to review heat plan protocols produced mixed results. While some housing officers were familiar and compliant with all requirements, others were unfamiliar with heat protocols, were unable to find current heat lists, and could not identify heat risk inmates in the housing unit.

Temperature logs were maintained in all visited housing units. Wall-mounted thermometers in housing units and converted gyms appeared to be functioning properly. Housing officers did not have hand-held thermometers and, therefore, could not monitor temperature in those areas of the housing unit that were likely to be the hottest during heat waves.

RVRs

HDSP did not have a reliable process in place for tracking RVRs issued to 3CMS inmates. Only those cases referred to mental health were tracked. Consequently, clinicians did not have access to data needed to determine if an inmate's RVR history met the criteria for considering a higher LOC during an IDTT review. In addition, the prison was unable to calculate the percentage of RVRs that were issued to MHSDS inmates, or determine what percentage of RVRs issued to 3CMS inmates were referred to mental health.

During the reporting period, 79 RVRs were referred to mental health for the completion of a clinical evaluation that was to be used in the disciplinary process. Nearly two-thirds of these incidents, or 51, involved 3CMS inmates, indicating that HDSP had a reasonable process for referring cases involving bizarre and/or uncharacteristic behavior. Clinicians also completed mental health evaluations for 15 EOP cases, six MHCB cases, and seven non-MHSDS cases.

The institution's review of 30 RVRs related to the hearing officer documenting consideration of clinical input during the various stages of the deliberative process yielded compliance rates that ranged from 76 percent to 86 percent.

Access to Care

Due to inmate violence and gang activity, HDSP continued to utilize modified programs to control inmate movement and eliminate the opportunity for inmates to mingle. Inmates subjected to modified programming were not afforded access to yard or dayroom. All movement to and from out-of-cell activities, including healthcare appointments, required handcuffs and two escort officers. Medications were administered at cell front.

In addition to modified programs, the institution utilized rolling blackouts to address budget cuts that limited prison funds set aside to pay for CO overtime. On a daily basis, two of four facilities were placed on reduced program status so that correctional staff from those yards could be diverted to the other yards to run full programs. Yard and dayroom were cancelled on blackout days.

Modified programs and rolling blackouts compromised access to mental health services during the reporting period. Staff reported that HDSP's inadequate complement of access officers, compounded by the stricter escort requirements for modified programs and the reduced custodial coverage during rolling blackouts, created a situation in which officers were often unable to honor priority ducats for mental health appointments, including PC contacts, telemedicine interviews, and group activities.

## California Correctional Center (CCC)
(Paper Review)

Census:

CCC did not have a mainline MHP.  At the time of reporting, there were no MHSDS inmates housed at CCC.  Once identified, MHSDS inmates were transferred within an average of 18 days to institutions with appropriate programs.  The institution received, identified, and subsequently transferred a total of 16 MHSDS inmates during the reporting period.

Staffing:

Psychiatric services continued to be provided via telemedicine.  The sole psychiatry position was vacant, as it had been for several years.  Telemedicine was reportedly utilized up to four hours per month.  CCC's sole senior psychologist position and two of the three psychologist positions were filled.  Three of the 4.25 psych tech positions were filled, as was the half-time clerical position.

Quality Management:

CCC had a local governing body that met monthly. The QMC met weekly during the review period, with the exception of December 2009 when it met once.  The joint medical/dental/mental health subcommittee met monthly.  There were no QITs chartered by mental health during the monitoring period.  CCC did not have a peer review process in place.

Suicide Prevention:

CCC held a monthly suicide prevention meeting during the review period, except in November 2009.  A quorum was not consistently present.  The minutes reflected discussions regarding transfers to MHCBs, as well as discussions regarding the monthly suicide videoconference.  There was also discussion regarding local suicide prevention issues, noted in the minutes.

CCC was compliant with the completion of mental health screens within 72 hours of administrative segregation placement. The inmate suicide profile was included as part of the mental health screening process. There was no documentation provided regarding compliance with administrative segregation pre-placement screens. The institution also did not provide any method to identify new inmates on intake status upon arrival at administrative segregation. No information was provided to verify reported compliance with 30-minute welfare checks, nor was any information provided regarding access to yards.

The ERRC at CCC met monthly; minutes reflected discussions related to emergency responses. The ERRC covered the occurrence and review of medical drills. No information was provided regarding cardiopulmonary resuscitation (CPR) training at CCC. Additionally, no information was provided regarding appropriate maintenance of cut-down kits in housing units or accessibility of micro-shields.

Medication Management:

CCC's audit results regarding various aspects of medication management did not include relevant discussion of sample size or methodology, nor was there any accompanying documentation to confirm the facility's findings.

A CAP item included whether appropriate laboratory testing was conducted in a timely fashion. The facility reported that six inmates were prescribed psychotropic medications. Of these, three had laboratory testing ordered by the telemedicine psychiatrist. Although it appeared that testing was timely, it was not possible to determine whether the appropriate testing was performed for all individuals as clinically indicated.

There were no inmates on *Keyhea* orders throughout the monitoring period. No MHSDS inmates paroled from CCC during the monitoring period.

Sexual Misconduct:

There was conflicting information in the documentation provided regarding the number of RVRs written for sexual misconduct, with a range of five to seven during the reporting period. All resulted in screenings but there was no evidence of IDTT reviews in the documentation. Custody-driven behavioral modifications included placement of a yellow placard on the cell door in administrative segregation and the wearing of exposure-control jumpsuits when inmates were escorted outside of the cell.

Transfers:

There were no referrals to DMH during the monitoring period. CCC transferred one inmate to an EOP. EOP designation to endorsement took four days, and transfer took an additional five days. While awaiting transfer, the inmate was housed in the OHU.

CCC operated a 19-bed OHU during the monitoring period. There were six inmates admitted to the OHU for mental health reasons during this period. Three of those inmates were referred to an MHCB; one was subsequently rescinded. Two inmates had lengths of stay over 72 hours while awaiting transfer to an EOP and MHCB. The average daily census in the OHU was .14 inmates, and the average length of stay was four days, including the outliers mentioned above who were awaiting transfer to EOP and MHCB. CCC did not utilize holding cells during the monitoring period.

There were six MHSDS inmates inappropriately transferred to CCC during the monitoring period. Four or 67 percent of the six inmates were transferred from DVI. CCC transferred all of the inmates within seven days of their arrival. There were ten inmates (nine 3CMS and one EOP) placed into the MHSDS at CCC during the monitoring period. These inmates transferred out of CCC 18 days on average after identification.

Other Issues:

Administrative Segregation

The ASU at CCC was staffed with one psych tech and a clinical psychologist who also maintained a GP caseload.  There were no EOPs, and only two 3CMS inmates, housed in administrative segregation throughout the monitoring period.  CCC reported that PC contacts for MHSDS inmates in administrative segregation were not tracked.  CCC reported that all contacts were conducted in a confidential setting.

Psych tech rounds were completed and logs were maintained.  CCC did not operate any overflow ASU during the review period.

Referrals

CCC had a process in place for triaging and responding to referrals.  The institution tracked the date of receipt to appointment completion, which averaged 2.3 days.  It took four days from date of the referral for appointment completion.  CCC did not distinguish emergent and urgent referrals from routine in the presented data.

Heat Plan

There were no instances when the temperature reached 90 degrees or above.

RVRs

There were no RVRs issued to MHSDS inmates throughout the monitoring period, and no assessments were completed for GP inmates due to bizarre, unusual, or uncharacteristic behavior.  There were no RVRs written for hoarding and/or cheeking of medications.

**Mule Creek State Prison (MCSP)**
June 15, 2010 – June 17, 2010
July 13, 2010 – July 14, 2010

Census:

MCSP housed 3,795 inmates, including 1,997 in the MHSDS program. There were 1,448 3CMS inmates, including 66 in administrative segregation. There were 549 EOP inmates, including 32 in the EOP administrative segregation hub. There were five inmates in the MHCB unit and six in the MHOHU.

Staffing:

With the exception of a half-time medical transcriber position, all 121.77 allocated mental health positions were filled. Contractors provided an additional 4.1 FTE coverage.

The chief psychiatrist, chief psychologist, senior psychiatrist, and five senior psychologist positions were filled, as were 11.5 staff psychiatrist positions, 24 staff psychologist positions, and 8.5 social worker positions. All eight RT positions were filled, as were positions for 29 psych techs, a unit supervisor, an SRN, 11.62 nurses, 15 clerical staff, a health programs specialist, and an OSS II. A medical transcriber worked half-time.

Reportedly, a practice of using inmate workers as EOP program aides and EOP program clerk aides had been stopped at the time of the site visit.

Quality Management:

The MHQMS met twice monthly, was well attended, and maintained minutes. Routine audits covered PC and psychiatry contacts, IDTT meeting timelines, group therapy, referral responses, and unresolved CAP items. QITs focused on unresolved CAPs and peer review programs.

63

MCSP's recently implemented peer review process, which covered psychiatry, social work, and psychology, remained largely focused on quantitative performance measures, and only included a few qualitative issues.

Suicide Prevention:

There was one completed suicide during the monitoring period. The SPRFIT met monthly with attendance fluctuating between six and 15 individuals. Custody staff attended three of six meetings. Minutes were maintained. Standard agenda items included review of attempted suicides, five-day follow-up compliance, staff training needs, DOT issues, DMH referrals, and tracking reports related to suicide precautions. A completed suicide that occurred in August 2009 was reported at the September 2009 SPRFIT meeting. Plans to introduce suicide prevention groups were discussed at subsequent meetings.

Five-day follow-up was documented in 187 of 221 reviewed cases, for an 85 percent compliance rate.

Staff believed that pre-screens were completed prior to administrative segregation placement, but audit information was not provided. Although it was reported that inmates were routinely screened within 24 to 48 hours of administrative segregation placement, psych techs in administrative segregation informed the monitor that inmate refusals resulted in an estimated 80 percent of 31-question screens being conducted cell-front. According to staff reports, inmate profiles were routinely forwarded to psych techs in administrative segregation, but typically arrived too late to be reviewed prior to or during administration of the 31-question screens. Inmates who agreed to participate in confidential interviews were screened in holding cells located in the dayroom. Reviewed logs indicated time periods when 30-minute welfare checks

were not performed.  On one of the site visit dates, the start and stop times for some of the 30-minute welfare checks had been pre-recorded in the log.

Staff and inmates reported, and monthly audits confirmed, that daily psych tech rounds were completed in administrative segregation.

Yellow placards on cell doors identified new inmates.  MCSP had three retrofitted intake cells, but staff reported that the cells were not used to house inmates during their initial 72 hours in administrative segregation.

All administrative segregation cells, except those converted to MHOHU and observation cells, were equipped with electrical outlets, and inmates were permitted to have televisions and radios.

There were 20 walk-alone yards and two group yards.  Most inmates reported having between ten and 14 hours of weekly yard access.  However, administrative segregation inmates pending transfer to a mainline bed were retained on "orientation" status until transferred, and did not have yard access.  In June 2010, 31 inmates were in administrative segregation for this reason.

Provided documentation indicated that emergency drills were performed in the ASU monthly, and that all staff had received CPR training.

Medication Management:

MCSP struggled with providing inmates with prescribed medications within 24 hours of arrival, with internal audits indicating a 41 percent compliance rate.  Audits indicated an 86 percent medication continuity compliance rate for inmates moved within MCSP.  The institution did not perform medication continuity audits that targeted inmates moved in and out of administrative segregation, and inmates discharged from the MHCB unit and the MHOHU.

65

Internal MAR audits yielded compliance rates of 71 and 74 percent for referral of documented instances of medication noncompliance.  A separate audit of high risk cases, which included medications prescribed for tuberculosis, HIV, and Keyhea petitions, found that medication noncompliance was properly recorded and referred only 39 percent of the time. Nursing audits yielded a 35 percent compliance rate for responding to referred medication noncompliance within seven days of the last missed dose.

MCSP audits indicated EOP housing unit pill lines of less than two minutes, and 3CMS inmate outside pill lines of less than twelve minutes.

Psychotropic medication orders did not exceed 90 days, and necessary bridge orders did not exceed 30 days.

MCSP audits indicated that 95 to 100 percent of reviewed UHRs contained current informed consents for prescribed medications.  Internal audits indicated that psychiatrists consistently documented the rationale for medication changes in UHRs.

Audits indicated that for inmates taking Depakote and Lithium, UHRs consistently contained baseline and follow-up laboratory evaluations, as well as psychiatric progress notes that addressed the inmate's response to the medication.   However, nearly a third of the reviewed UHRs did not have Depakote levels within the last year or Lithium levels within the preceding six months.

MCSP administered all psychotropic medications by DOT.  Inmates with histories of hoarding and overdosing were placed on an "enhanced DOT" list, reviewed monthly by the SPRFIT, targeted for regular cell searches, and were subjected to more stringent observation when ingesting medications.  However, the monitor's expert found that the process for placing

inmates on the enhanced DOT list was inconsistent.  Observation of medication administration in an EOP housing unit indicated that routine DOT was performed appropriately.

MCSP initiated nine Keyhea petitions and renewed another 45, none of which were denied by the administrative law judge.  Two petitions were not pursued on advice of CDCR counsel.  Mental health staff declined to renew six petitions for clinical reasons, and one inmate transferred from MCSP prior to the Keyhea hearing.  No petitions expired unintentionally.

Approximately 1,700 inmates were prescribed medications at HS.  Audits indicated that 98 to 100 percent of HS medications were delivered at or after 8:00 p.m.

Audits indicated that inmates consistently signed for the receipt of parole medications upon release from prison.

Sexual Misconduct:

Thirteen inmates, including one MHCB inmate, one MHOHU inmate, five EOP inmates, five 3CMS inmates, and one non-MHSDS inmate, were issued IEX RVRs.  Although MH-4s and Exhibitionism screens were completed for all MHSDS inmates, the non-MHSDS inmate was not referred to mental health.  A review of the incident reports revealed three cases in which inmates did not intentionally expose themselves and, as such, issuance of an IEX RVR was not warranted.

One clinician was assigned to complete Exhibitionism screens, all of which were reportedly reviewed by the IDTT.  No cases were referred for full evaluation.  In March 2010, one inmate was diagnosed with Exhibitionism and recommended for transfer to an Exhibitionism treatment program based solely on screen results and an IDTT review.  As of June 2010, this inmate remained at MCSP.

Yellow placards partially covered the cell windows of inmates who were issued IEX RVRs, thereby limiting the inmate's ability to intentionally expose himself. Inmates issued RVRs for IEX while participating in activities outside of their cells were required to wear exposure-control jumpsuits. Nine of thirteen inmates found guilty of IEX received SHU terms. All but one case of IEX was referred to the local DA for possible prosecution.

Transfers:

MCSP was unable to transfer inmates to DMH programs within Program Guide timeframes. A growing wait list made acute care access slow for disabled inmates who did not exhibit a high risk for self-harm. As of May 2010, nine inmates, some of whom had been waiting several weeks, were on the acute care wait list.

SVPP's extensive wait list was a barrier to intermediate care access for high security inmates. As of May 2010, there were 30 inmates on the SVPP wait list who had been referred to DMH between April 2009 and April 2010. As of June 2010, only two of 16 inmates referred to SVPP as part of the December 2009 MHARP review had been transferred.

Access to intermediate care for lower security inmates was better, but often exceeded the 30-day transfer deadline. Between September 1, 2009 and February 28, 2010, 15 inmates were referred to ASH. Of these, 14 transferred from six to 42 days following referral. Two inmates who transferred to Coalinga State Hospital (CSH) waited 50 and 86 days, respectively. One inmate waited 34 days to be transferred to the DMH ICF at CMF.

MCSP's eight-bed MHCB unit could not accommodate its MHSDS population. The institution created a MHOHU using six retrofitted administrative segregation cells. Excessive demand for the MHOHU necessitated the conversion of five additional administrative segregation "overflow" observation cells. On rare occasions, other administrative segregation

cells were used to monitor psychiatrically unstable inmates for whom MHCBs, MHOHU cells, and overflow observation cells were unavailable.

Poor access to crisis care was exacerbated by lengthy MHCB stays and MCSP's inability to transfer inmates to MHCBs in other prisons. There were 81 MHCB admissions. Of those, 44 percent lasted longer than ten calendar days, and over 20 percent lasted longer than 20 days. Only a quarter of those excessive stays were related to DMH referral delays.

There were 267 MHOHU placements, approximately 40 percent of which lasted longer than three days, and 21 of which lasted ten days or longer. Forty-six percent of MHOHU releases were admitted to the MCSP MHCB.

Twenty-seven inmates were referred to PSU. Of those, four were ultimately removed from consideration due to their SHU expiration dates, two were inexplicably removed from the endorsement/transfer list, one was re-referred when the endorsement period expired, and one was postponed pending completion of the Keyhea process. The remaining 19 inmates were transferred to the PSU program at CSP/Sac. Eighteen transferred within 60 days of endorsement, and 14 transferred within 30 days.

Other Issues:

Administrative Segregation

As of June 9, 2010, there were 162 administrative segregation inmates, including 31 EOP, 76 3CMS, and 55 non-MHSDS inmates. There were 45 administrative segregation inmates who had been there longer than 90 days, including 29 3CMS and eight EOP inmates. Most inmates with excessive stays were involved in RVR disciplinary, legal, and/or investigatory procedures.

Audits indicated greater than 95-percent compliance with IDTT timeframes and weekly CM contacts for administrative segregation EOP and 3CMS inmates.  MCSP internal audits yielded a 53 percent compliance rate for offering administrative segregation EOP inmates with ten hours of weekly therapeutic activities.

Clinicians assigned to administrative segregation and administrative segregation overflow did not have access to offices or group rooms.  Consequently, all administrative segregation clinical contacts occurred in non-confidential, makeshift areas.  One-on-one PC interviews were conducted in therapeutic modules located on the dayroom floor.  Dayroom modules used by psychiatrists did not conform to specifications and lacked seating.  The two group areas did not afford sound or sight privacy.

Reportedly, many clinician-run and recreation therapy administrative segregation groups involved little more than watching movies.  The monitor's expert observed such a group in which a RT and four inmates watched a film together.  Inmate reluctance to talk about sensitive personal issues in non-confidential settings appeared to discourage discussion-oriented groups.

The monitor's expert observed an administrative segregation IDTT meeting held in a private office, which included all of the necessary participants and involved good interdisciplinary clinical discussion.  Although UHRs were present, central files were not, and the CC relied on notes based on a review of the central file and other information.  The Form 7388 DMH referral checklist was completed by the PC prior to the IDTT meeting.  However, neither the checklist nor consideration of a higher LOC was discussed in some of the cases presented.

MHCB

Staff review of 60 records indicated general Program Guide compliance. Clinicians completed intake evaluations and suicide risk assessments (SRA) when applicable. Treatment plans were developed within 72 hours of admission. Daily clinical contacts occurred. SRAs were completed upon discharge when applicable. PCs were informed of impending discharges. Inmates with three or more MHCB admissions within a six-month period were considered for a higher LOC, and mental health managers approved admissions lasting longer than ten calendar days.

MCSP records indicated that restraints were used in the MHCB 13 times, and inmates were placed in seclusion on 27 occasions.

All MHCB inmates were placed in a cell without furniture and issued a smock, tear-proof mattress, and no-tear blanket, regardless of the reason for admission and clinical presentation.

MHOHU

The MHOHU had continuous nursing coverage. Although MHOHU inmates were reportedly interviewed daily, this could not be verified. Staff reported that clinical interviews were usually conducted in holding cells that afforded limited sound confidentiality and no visual privacy.

Inmate cells were stripped of furniture and working electrical outlets. Each MHOHU and overflow cell had a standard door with a single narrow window that was not optimal for psychiatric observation. All inmates, regardless of the clinical rationale for placement, were issued smocks, tear-proof mattresses, and no-tear blankets. MHOHU inmates did not have access to therapeutic groups, yard or dayroom.

EOP

The institution's EOPs were fully staffed.  Individual interviews and group sessions routinely took place in confidential rooms.  Audits indicated the offering of a weekly minimum of ten therapeutic activity hours, timely completion of initial and quarterly IDTT reviews, and monthly psychiatric contacts.  Although audits showed consistent compliance with biweekly PC contacts in one EOP facility, there was a 66 percent compliance rate for PC contacts in another EOP facility.

An EOP IDTT meeting observed by the monitor's expert was well-run, clinically useful, and interdisciplinary.  Inmate participation was consistently encouraged.  In about half of the13 cases observed, the inmate's PC was absent and the case was presented by a colleague using documentation prepared by the absent clinician.  The cases were nonetheless well presented.  A few of the reviewed cases met criteria for DMH consideration, and the team's decision to forego referral was briefly discussed.  UHRs were available.  Although C-files were not available, the CC brought reports that summarized security and classification information.

On one yard, EOP inmates were allowed to commingle with GP and 3CMS inmates, with no problems identified by either staff or inmates.  There was no such commingling in the housing units.

3CMS

The 3CMS program was fully staffed.  PC caseloads ranged from 121 to 137 inmates per clinician.  Audits showed sustained compliance with Program Guide timeframes for completing intake mental health evaluations, initial and annual IDTT meetings, treatment plans, and quarterly psychiatric and PC contacts.

Approximately 24 percent of the 3CMS population participated in 38 psychotherapeutic and recreation groups. However, 3CMS inmates often waited a long time to be assigned to a group. The average number of inmates on a group activity wait list was approximately 500.

Referrals

MCSP data indicated noncompliance with Program Guide timelines for responding to emergent, urgent, and routine mental health referrals. Logs indicated that inmates and staff generated 1,019 mental health referrals. There were 144 emergent referrals, 44 of which failed to generate an immediate response. There were 108 urgent referrals, 77 of which did not prompt a response within 24 hours, and 767 routine referrals, 443 of which were noncompliant with Program Guide timelines.

Heat Plan

The monitor's expert visited two housing units and three converted gymnasiums, as well as the administrative segregation and administrative segregation overflow units. All visited areas had current lists of inmates taking heat-sensitive medications and routinely logged indoor temperatures every three hours. Inmates taking heat-sensitive medications were reportedly issued "heat pass" chronos, instead of heat cards, although it was reported that inmates did not need either to gain building access during Stage I heat alerts. When outdoor temperatures reached 90 degrees, all inmates were recalled from the yard, and only those inmates not on the heat list were permitted to return to the yard.

RVRs

MCSP issued 335 RVRs to EOP inmates, all of which were reportedly referred to mental health for completion of an evaluation to be used in the disciplinary process. Five RVRs

73

issued to 3CMS inmates were also referred to mental health. The total number of RVRs issued to 3CMS inmates was not provided.

A review of 14 RVRs issued to MHSDS inmates indicated poor compliance. In four of the reviewed cases, the RVR either misidentified the inmate's LOC, provided an inaccurate summary of the input provided by the clinician, or only partially documented the content of the clinical assessment. One of these cases was ordered reissued/reheard as a result of the deficiencies.

Hearing officers did not always respond to compelling information provided by clinicians. In other cases, the clinical assessments concluded that mental illness had not influenced the inmate's behavior despite evidence to the contrary.

## Sierra Conservation Center (SCC)
Paper Review

Census:

In March 2010, SCC housed a total of 5,450 inmates, with 3,585 inmates housed at SCC and the remaining 1,865 housed throughout the 19 camps of the institution. SCC continued to operate at 48 percent over its design capacity of 1,726 inmates, exclusive of camps. The number of inmates housed in administrative segregation decreased from 173 during the previous monitoring period to 140 inmates, for a 19 percent population decrease. The 3CMS population was 634 inmates, including 598 mainline and 36 administrative segregation inmates, which was 127 percent of the institution's 3CMS rated capacity of 499 inmates. There were nine EOP inmates awaiting transfer, four housed in GP and five housed in administrative segregation. Forty one of 140 or 20 percent of inmates housed in administrative segregation were MHSDS inmates. There were six inmates in the OHU for psychiatric reasons.

Staffing:

        The staffing vacancy rate remained low at 6.5 percent.  However, the functional vacancy rate at the institution increased marginally, as no clinical contract coverage was provided.  A staff psychologist position was converted to a chief psychologist position, which was filled.  The senior psychologist position was vacant. All 2.50 psychiatry positions were filled, with a .5 FTE position filled by a permanent intermittent employee (PIE). There were no vacancies among the ten psychologist positions. The RT position was filled, with a .5 FTE provided by a PIE.  Eight of 9.1 psych tech positions were filled, as were the social worker and senior psych tech positions. The six OT positions were filled.

Quality Management:

        There were no local governing body meetings during the monitoring period. From August through December 2009, the QMC met regularly, but not monthly.  Documentation did not substantiate the presence of required staff.  The mental health subcommittee met twice monthly but continued to function primarily as a staff meeting, serving merely as a vehicle for providing information to staff.  Meeting minutes were maintained but attendance was problematic.

        SCC reported that it had one chartered QIT, but there were none to identify, address, or resolve new or current issues.  The institution implemented a peer review process for psychiatrists and PCs.  The psychiatric peer reviews were both qualitatively and quantitatively adequate, and were based on UHR reviews.  PC reviews were also based on UHR reviews. While they met qualitative standards, it was unclear whether they were sufficiently quantitative in nature.

Suicide Prevention:

There were no suicides at SCC during the reporting period.  The local SPRFIT met monthly but attendance was problematic.  Meeting minutes noted discussion of statewide suicides, five-day clinical follow-up, and assessment of suicide risk.

SCC did not properly document audits of clinical and custodial follow-up upon discharges from the OHU.  It also did not provide data regarding its implementation of a large portion of the plan to address suicide trends in administrative segregation. The institution was compliant with pre-screening of inmates prior to placement in administrative segregation. Inmates were offered a confidential mental health screen within 72 hours of placement. It was not possible to determine from the audit provided whether inmate suicide profiles were used as part of the mental health screening process.  Additionally, SCC did not provide relevant data regarding 30-minute welfare checks for new intake inmates in administrative segregation, screening for recently-received bad news, or offering to administrative segregation inmates at least ten hours of yard per week.

The ERRC maintained minutes and covered completed deaths, injuries, and medically-related incidents that occurred during the monitoring period.  The institution reported that emergency response drills were scheduled in rotating areas of the institution including administrative segregation.  SCC reported that all correctional staff received CPR training every two years plus an annual refresher.  Basic life support (BLS) was required for all nursing/physician staff and offered to all health care staff monthly.

Medication Management:

SCC was compliant with provision of medication to newly arriving inmates within 24 hours of their arrival.

Audits found compliance for continuity of medication upon housing moves in all areas of the institution, including transfers in and out of administrative segregation and OHU discharges. The institution reported that orders for psychotropic medications occurred concurrent with patient contacts, except in the event of emergencies or bridge orders.  Medication orders did not exceed 90 days, and bridge orders did not exceed 14 days.

Audits of medication noncompliance found that 71 percent of identified medication-noncompliant inmates received follow-up from mental health staff.  No audits were performed to determine if inmates were identified appropriately.  An audit of MARs for blanks, refusals, and no-shows revealed that medication administration was appropriately documented.

SCC ran pill lines on two yards, each with four lines (morning, noon, afternoon, and HS).  The institution did not provide data regarding the lengths of pill lines.

SCC did not provide documentation to verify that medication orders were processed and administered in a timely manner.  The institution maintained 100 percent compliance for timely renewal of medications during the reporting period.

Audits of ten percent of the MHSDS population with current prescriptions found that 95 percent of medication orders were accompanied by current informed consent forms.

The audit regarding laboratory blood level studies found a 91-percent compliance rate for studies that were ordered, but it did not address whether the appropriate clinically-indicated studies had been ordered.

During the preceding monitoring period, all psychotropic medications were administered by DOT.  The practice during the monitoring period was for psychiatrists to prescribe medication by DOT only for inmates for whom it was clinically appropriate.  SCC's audit found 95-percent compliance with DOT administration.

There were no inmates at SCC with active Keyhea orders.

During the same period, there were 70 MHSDS inmates who were prescribed HS psychotropic medications, but the institution did not audit HS medications.

No audits were presented with respect to compliance in the area of parole medications.

Sexual Misconduct:

SCC tracked sexual misconduct incidents throughout the monitoring period. The six inmates who received RVRs for sexual misconduct were all referred for a mental health screen, although none of the screens were completed within 24 hours as required by the Program Guide. IDTT meetings were conducted timely. None of the six inmates were referred for a comprehensive evaluation.

Transfers:

The institution's log tracking referrals to higher levels of care was incomplete and contained conflicting information. It appeared that SCC referred one inmate to the DMH Acute Psychiatric Program (APP) at CMF; he was identified for acute care on November 19, 2009, but as of February 23, 1010, he remained in the SCC GP yard awaiting a bed number.

Logs revealed that there were five referrals to intermediate care during the review period: one to the DMH ICF at CMF, one to SVPP, and three to ASH. One inmate transferred to DMH intermediate care at CMF 58 days after identification by the IDTT, and another inmate transferred to ASH 52 days after identification by the IDTT. The status of the remaining three inmates was not usefully documented.

Access to MHCBs improved markedly during the monitoring period. From August through December 2009, SCC referred 20 inmates to MHCBs. On average, transfers

occurred within 48 hours of referral, with a range of same day to eight days.

The institution continued to operate a 12-bed OHU shared by medical and mental health patients. PC contacts occurred daily and psychiatry contacts occurred every day except Wednesday, when they were on-call. The majority of clinical contacts occurred in a confidential setting. From August 1, 2009 through January 31, 2010, there were 114 psychiatric admissions to the OHU, or an average of approximately 19 per month. The average daily census for mental health patients in the OHU was 2.85 inmates. The average length of stay was greater than 72 hours, at 4.68 days, with a range of one to 53 days. Fifty-four percent of the total admissions resulted in lengths of stay exceeding 72 hours. Five inmates remained in the OHU longer than ten days, with a range of 16 to 53 days. Extended lengths of stay were largely due to waits by EOP inmates for transfer to EOP mainline and/or hubs, and waits for MHCBs.

Ten inmates had more than three admissions to the OHU during a six-month period (six inmates had three admissions, two inmates had four admissions, one inmate had six admissions, and one inmate had eight admissions). All but two of these were transferred to an MHCB.

Logs showed that six inmates were placed in holding cells pending admission to the OHU. The average placement lasted 1.4 hours with a range of one-half hour to three hours.

SCC transferred 24 EOP inmates. On average, the number of days between referral to EOP and endorsement was 15, and the average number of days between endorsement and transfer was 33. There were two inmates in the institution over 60 days, due to EOP administrative segregation hub bed unavailability.

Other Issues:

### Administrative Segregation

Institutional audits revealed sustained compliance with completion of weekly PC contacts in administrative segregation throughout the reporting period.  Approximately 20 percent of clinical contacts were provided cell-front.  The previously reported problem of escort officers remaining in the interview room during clinical encounters was addressed by the institution.  A corrective action was implemented. It instructed officers to remain outside the door unless requested by the clinician.

The institution remained compliant with the provision of daily psych tech rounds, with a 98-percent compliance rate, as well as with documentation in isolation logs.  Facility staff reported that psych techs continued to be routinely pulled from the ASU to pass medication.  During the preceding monitoring period, SCC provided nine psychotherapeutic groups in administrative segregation; however, these groups were not held consistently during this monitoring period.

SCC did not provide documentation related to timeliness of initial and follow-up IDTT meetings, but compliance was demonstrated with appropriate member attendance.  Frequency of psychiatric contacts in administrative segregation was not reported.

### 3CMS

SCC was generally compliant with Program Guide requirements regarding the provision of mental health services for 3CMS inmates.  The facility reported that PC and psychiatric contacts occurred in a private setting without custody officers present.  Psychiatric contacts were timely.  Additionally, the facility reported compliance with timeliness and the appropriate composition of IDTT meetings throughout the monitoring period.

The institution offered approximately 15 psychotherapeutic groups per week. The groups were run by psych techs. Eight hundred and thirty-four 3CMS inmates and 613 GP inmates participated in group therapy during the six- month review period. Twenty-seven 3CMS and 18 GP inmates were on a wait list.

Referrals

Response to mental health referrals was problematic. There continued to be delays in referral routing to the mental health department. Reviewed data demonstrated that referrals took approximately two days to reach mental health. While emergent response times were appropriate, response times for urgent referrals routinely exceed 24 hours, taking an average of four days, with a range of zero to 12 days to be seen.

Heat Plan

SCC had a current heat plan LOP. There were four heat-related incidents during the monitoring period, although none of the inmates involved were prescribed heat risk medications.

RVRs

During the monitoring period, SCC issued 983 RVRs. One hundred forty seven or 17 percent were issued to mental health caseload inmates (140 3CMS, five EOP, and two MHCB). The data presented did not substantiate compliance with timeliness and completion of the MH-4s required by the Program Guide.

**California Medical Facility (CMF)**
May 4, 2010 – May 6, 2010

Census:

On May 4, 2010, CMF housed 2,705 inmates, representing a 12-percent decrease in population since the preceding monitoring period. There were 1,277 inmates in the MHSDS,

or 47 percent of the prison's population.  There were 522 EOP inmates including 486 in mainline and 36 in administrative segregation.  There were 618 3CMS inmates, including 581 in mainline 37 in administrative segregation.

There were 46 inmates in the free standing MHCB and 90 inmates in the OHU, with one PSU inmate awaiting transfer.  There were no caseload inmates housed in emergency beds.

Staffing:

The chief psychologist position was filled as were 2.5 senior psychiatrist positions and the two chief psychologist positions.  Of the 10.5 allocated senior psychologist positions, eight were filled, leaving a vacancy rate of 24 percent.  Among staff psychiatrists, seven of the 22 allocated positions were vacant, but 3.5 contractors reduced the functional vacancy rate to 16 percent.

There were ten newly allocated psychologist positions which left 12 of the 26 psychologist positions vacant.   Use of three contractors reduced the functional vacancy rate to 35 percent.  It was reported that seven new psychologists were hired and would be at the institution by the second week of May 2010.

Of the 17 allocated clinical social worker positions, one was vacant but was covered by a contractor.

The one senior psych tech position remained vacant.  Thirty two of 48.97 psych tech positions were filled.  Seven contractors reduced the functional vacancy rate to 20 percent. Thirteen of the psych tech positions were recent allocations for the MHCB unit.  The one psychometrist position remained vacant.

There was a 40 percent vacancy rate among RTs, with eight of the 13.3 positions filled.

There were 18.5 clerical positions, 12.5 of which remained unfilled for a vacancy rate of 57 percent. The one occupational therapist position was filled, as were the medical secretary, health program specialist (HPS) I, clinical health services administrator, and associate governmental program analyst positions. The standards and compliance coordinator position was vacant.

Quality Management:

CMF had a well developed quality management program. Meeting minutes documented the efficacy of the quality assurance process. The institution identified necessary improvements and implemented corrective actions.

Three local governing bodies met every other month and covered three separate licensed areas of the institution: (1) CMF, which included all outpatient services, medical CTC, GACH, medical OHU, and VPP ICF and acute care; (2) hospice; and (3) MHCB.

The QMC met bi-monthly from October 2009 through February 2010, and weekly beginning in March 2010. Beginning in January 2010, the mental health subcommittee met weekly and tracked all previous CAP items and other issues through a performance indicator reporting system. The mental health subcommittee conducted various audits during the review period, including audits of medical records, DMH referrals, MHCB admissions, transfers, clinical restraint and seclusion, medication management, exhibitionism, and suicide prevention.

CMF had five active QITs at the time of the monitoring visit: nursing group process, psychiatry on duty refinement, medical records audit tools, intake process improvement, and MHSDS/DMH coordination.

In addition there were headquarters-initiated and locally-initiated focus improvement teams (FITs) including a LOPs committee, medication management committee, high risk/high LOC committee, and an administrative segregation EOP committee.

Suicide Prevention:

The SPRFIT met monthly and was composed of approximately 30 members, including both clinical and custody staff.  During the period of October 2009 through March 2010, attendance at meetings ranged from 11 to 21 members but a quorum was never present.

Although suicide prevention video conferences were held on a monthly basis, attendance varied, with no attendees for October 2009, five for November 2009, 36 for December 2009, and 17 for both February and March 2010.  There was no video conference in January 2010.  Examples of issues addressed by the SPRFIT included tracking of suicide attempts, and serious self-injurious behaviors and gestures.  Institutional data indicated 98-percent compliance for clinical five-day follow-up and 95 percent compliance for custodial five-day follow-up during the reporting period.  The institution was 86-percent compliant for the presence of the sergeant's signature on the custody observation log for each watch.

Thirty-minute welfare checks were documented in all ASUs except for T-1, the temporary unit, where it was not possible to determine the onset of watches or if checks were staggered.

Documentation indicated that administrative segregation inmates were provided ten hours of yard time per week.

Inmates transferring from other institutions arrived with suicide risk profiles 41 to 75 percent of the time.  Inmates transferring out of CMF left with completed suicide risk profiles 56 to 81 percent of the time.  However, the audit was flawed in that records which did not

include a suicide risk profile were not determined to be deficient and were not included in the audit.

The compliance rate ranged from 83 to 100 percent for completing the 31-questionnaire upon admission to the ASU.

Incident reports and mock emergency response drill reports were contained in the quality management documents.  All staff produced micro-shields upon request and cut-down kits were accessible in all units.  CMF maintained a high risk program to track inmates with histories of suicide ideation, attempts, or gestures.  The assigned psychologist drafted a high-risk protocol and assisted the treatment team in developing alternative treatment plans.

Medication Management:

Staff reported limited interruptions with the transition to the Guardian Maxor pharmacy program in April 2010.  Quarterly nursing audits commenced in January 2010 and covered only a portion of the reporting period.

The institution was compliant with continuity of medications upon arrivals at the institution.

Audits indicated that compliance with medication continuity for intra-institutional moves was only 29 percent.  There were no audits specific to medication continuity after MHCB discharge or movements to and from ASUs.

CMF had a compliance rate of 98 percent for timely renewal of medications, 90 percent for nursing identification of medication noncompliance on the MAR, and 95 percent for timely mental health follow-up after medication noncompliance.

GP 3CMS inmates received their medications at a central pill line.  EOP inmates received their medications in the EOP units.

Problems were noted regarding obtaining timely informed consent for treatment with psychotropic medications.  Training was provided to psychiatrists as a corrective action measure.

CMF previously examined the issue of laboratory studies through the peer review process, but the audit tool did not address whether appropriate laboratory testing was obtained or whether abnormal results were identified and addressed.  Supervisory audits were utilized to address these issues.  An audit in January 2010 indicated compliance with obtaining laboratory studies for mood stabilizing drugs, but an April 2010 audit showed some slippage with the compliance rate dipping to 88 percent.

Ninety percent of the MHSDS inmates were prescribed psychotropic medications, and all were by DOT.  CMF instituted an LOP for the administration of DOT but there were no audits to verify the process.

The institution did not track whether inmates subject to Keyhea orders for intramuscular injections were missed; this was a source of some medication errors. A psych tech served as CMF's full-time Keyhea coordinator.  The institution utilized the process when clinically appropriate.  At the time of the visit, there were 54 inmates with Keyhea orders; 49 had been renewed and 14 had been initiated.  There were no reports of expired orders.  One petition was denied for lack of information, one case was denied in court, and three cases were not pursued on the advice of counsel.  Eight inmates paroled and 16 were transferred to other institutions.

Although an LOP provided guidelines for the administration of medications at HS, audits did not address this issue.

Parole medications were ordered and distributed at the time of release but the institution did not adequately document the receipt of such medications.  The institution began auditing this item in January 2010.

Sexual Misconduct:

Across the reporting period, a total of 20 RVRs for sexual misconduct were issued at CMF. Of the 20 RVRs, 13 or 65 percent were issued to MHSDS inmates and the remaining seven or 35 percent were issued to inmates assigned to DMH at the time of the offense.  Two of the 13 RVRs were issued to inmates in the MHCB while the remaining 11 RVRs were issued to ten inmates in CMF outpatient programs.  Though CMF was not a designated Exhibitionism treatment facility, staff were assigned to assess each inmate who received a disciplinary report for IEX in order to make recommendations regarding specialized treatment needs.

Three or 23 percent of the 13 cases were reported by custody staff to MHSDS within 24 hours of the behavior; ten were not reported within the required time frame.  Five of the 11 initial mental health screens were completed within the 72-hour period allowed by policy.  Sixty two percent of the cases were reviewed by the IDTT within ten working days.  Late notification by custody was cited as the reason that 38 percent of the screens were not reviewed within the ten-day time requirement.

In eight of the 13 clinical assessments performed following RVRs issued to MHSDS inmates, the assessment indicated that the mental disorder appeared to contribute to the behavior that led to the RVR.  Eight cases of sexual misconduct were referred to the DA.

A total of five inmates were referred for comprehensive evaluations.  Three were diagnosed with Exhibitionism and recommended for transfer to institutions offering specialized

treatment.  At the time of the visit, no inmates had transferred to specialized Exhibitionism

treatment programs; four inmates were awaiting transfer.

The institution offered group and individual therapy treatment related to sexual

misconduct for inmates not diagnosed or screened for sexual misconduct.

Transfers:

The DMH referral and tracking process operated effectively and consistently at

CMF.  The higher LOC team was primarily responsible for facilitating referrals to DMH.  CMF

established a "High Risk" tracking and treatment system through which inmates identified as

representing unusual risk were assessed and tracked.

During the reporting period, CMF identified a total of 53 inmates for referral to

acute care.  Twenty-three or 43 percent of these referrals were rescinded as a result of clinical

improvement or parole.  Completion of the referral packets for the 30 remaining inmates ranged

from eight days to 56 days from identification to referral packet completion.  The average time

required for referral packet completion was 17.03 days with 13, or 43 percent, exceeding 14

calendar days.  Acceptance by DMH generally occurred within two days, with two exceptions of

four and 15 days, respectively.  Twenty-one of 30 inmates were transferred by March 15, 2010,

with an average time of 15 days from acceptance to transfer.

Across the period from October 1, 2009 through March 31, 2010, MHCB staff

identified a total of 77 inmates for intermediate care.  Seventeen referrals were rescinded as a

result of parole, Vitek hearings or clinician's decision to withdraw the referral.  Of the 77

referrals, 42 were referred to ASH, 14 to SVPP, and 17 to VPP.  Four referrals were designated

only as intermediate care.

For intermediate care referrals, the average time from identification to completion of the referral packet averaged 18.64 days. Twenty-two of these referrals required longer than 14 calendar days for completion. The average time from referral submission to DMH acceptance or rejection was approximately 18 days, with 38 referrals requiring more than 14 days from referral submission to decision. The time required from acceptance to transfer to ASH was approximately 4.5 days. It did not appear that any of the inmates referred to SVPP during the monitoring period had been transferred.

CMF continued to operate S-2 as an MHCB unit for CMF inmates. At times, inmates who had stays in S-2 longer than ten days had their status administratively changed from MHCB to APP. In these instances, staff reported difficulty in determining whether an inmate was discharged from acute care or from the MHCB. This was problematic since inmates discharged from the MHCB, and not acute care, typically received five-day follow-up. To avoid any uncertainty, staff characteristically assigned five-day follow-up for all discharges from S-2.

Institutional data indicated that 140 referrals were made to the S-2 MHCB during the reporting period, for an average of 23 per month. All transfers occurred on the same day as the referral. On the day of the site visit, there were 20 inmates housed in S-2, with an average length of stay of 28 days.

During the reporting period, a total of 386 inmates were referred to the MHCB and 360, or 93 percent, were admitted. More than 17 percent of all admissions during this period were repeat admissions. Sixty-five percent of inmates admitted to the MHCB returned to their sending institution. The remaining 35 percent of discharges had more complicated dispositions including DMH referrals, parole or release, and referral to alternate prisons able to treat inmates after a change in LOC.

Across the reporting period, there were 38 EOP inmates who had stays in administrative segregation in excess of 90 days. At the time of the site visit, there were ten inmates in administrative segregation for more than 90 days. Five were pending CSR action, two were pending disciplinary proceedings, two were pending transfer, and one was held with a MERD date of August 4, 2010. The institution was reviewing these cases monthly.

Other Issues:

### Administrative Segregation

Inmates at CMF in administrative segregation were housed in the following units as follows: M-3 housed EOP inmates, I-3 housed EOP and 3CMS inmates, S-3 housed 3CMS and GP inmates, and T-1 housed only GP inmates. The units were staffed with one program lead, one psychiatrist, three social workers, five psychologists, three RNs, and three psych techs. In March 2010, 30 percent of administrative segregation EOP inmates were on the intermediate care wait list and 21 percent were on alternative treatment plans.

CMF maintained a one-to-nine clinician-to-inmate ratio in the EOP hub. EOP inmates were seen by PCs weekly and 3CMS inmates were seen at least every other week, in accordance with a memo outlining staff adjustments due to furloughs. Inmates awaiting transfer to DMH were seen at least biweekly. Confidential space for individual interviews was available.

On average, 17 percent of clinical contacts were cell-front during the reporting period.

The institution was compliant with daily psych tech rounds, timely completion of intake assessments, initial IDTT meetings, and quarterly IDTT meetings. Attendance by the CC I at IDTT meetings was problematic due to the reassignment of the regular CC I during December 2009.

EOP inmates housed in Units I-3 and M-3 were consistently offered ten hours of structured therapeutic activities per week. These inmates received, on average, 8.2 hours on I-3 and 6.6 hours on M-3 of structured therapeutic activities per week. Approximately eight percent of group hours on I-3 and 22 percent of groups on M-3 were cancelled. Of the groups cancelled, custody cancellations were attributed to institutional flu vaccines; clinical cancellations were due to furloughs, long-term illness, and psych tech redirection. Staff and inmates confirmed that most EOP inmates in administrative segregation were routinely offered five two-hour groups per week. Inmates who habitually refused to attend group therapy were seen daily by the PC.

Group therapy was provided in the dayrooms on I-3 and M-3. The rooms had six or seven therapeutic modules for group therapy provision. There was an additional area in the corridor where seven additional modules were located to provide recreation therapy. Confidentiality was nonexistent in this area. The other group therapy areas provided limited to poor confidentiality as offices were located inside of the rooms, necessitating staff to enter the room during conduct of group therapy.

The monitor's expert attended group therapy sessions conducted on both the I-3 and M-3 units. There were several inmates who exhibited markedly psychotic symptoms including disorganized thinking and speech, auditory hallucinations, and lability. Medical records indicated that multiple DMH hospitalizations for MHCB stabilization on S-2 were not infrequent.

MHCB

Although the 50-bed MHCB served as a statewide resource for crisis care, staffing for the unit was problematic. The redirection of staff to the MHCB from other programs resulted in understaffing of those programs.

91

The MHCB contained four safety cells which were used for 22 incidents of seclusion across the reporting period. The average duration of seclusion was 2.5 hours. During the reporting period, restraints were used 18 times in the four available restraint cells in the MHCB unit, with the average duration of restraint lasting approximately four hours.

The monitor's expert's observation of an IDTT meeting found the requisite attendees present and both UHRs and C-files present. There was appropriate discussion from both clinical and custody staff.

CMF maintained the practice of cuffing all inmates regardless of their custody status and placing them in interview cells for the duration of the IDTT meeting.

EOP

Space constraints continued to limit the provision of treatment in the eight EOP units at CMF. As a result, group therapy and IDTT meetings were held in the dayroom of each EOP unit, with case management contacts and psychiatric appointments occurring in confidential offices on the various housing wings. The institution supplemented the structured therapeutic activities with therapeutic work activities and occupational therapy services.

Staff audits indicated that an average of 14.8 hours of structured therapeutic activities was scheduled weekly and 10.7 hours were offered weekly. Inmates received an average of 7.6 hours weekly.

An institutional audit indicated that CMF was compliant with providing biweekly CM contacts and monthly psychiatry appointments, and scheduling ten hours of structured therapeutic activities per week. However, the institution's compliance rate for providing quarterly IDTT meetings was 86 percent.

An audit revealed a lack of CC I attendance at IDTT meetings, with a compliance rate of 67 percent.

3CMS

The institution's 3CMS mainline inmates were housed in units H, I, J, T, U, V, and Y.  The total 3CMS population averaged approximately 575 across the monitoring period.  At the time of the site visit, the 3CMS program offered 13 time-limited groups including personal growth, grief and loss, impulse control, anger management, recovery, parenting, pre release, art, and substance abuse.  Staff reported that wait lists for groups were monitored and updated regularly, and that inmates were typically added to groups as openings allowed and at the beginning of each new quarter.

Monthly MHTS-based data for the period of October 2009 through March 2010 indicated compliance with Program Guide requirements on timeliness of initial and annual IDTT meetings.  Monthly compliance with the required timelines for initial IDTT meetings ranged from 90 to 100 percent, while compliance with annual IDTT meetings ranged from 86 to 100 percent, with five of the six months exceeding 90 percent.

An audit of 47 UHRs for the months of October 2009 and December 2009 found documentation of routine IDTT meetings occurring at least every 365 days, at rates of 88 percent and 94 percent, respectively.   Documentation of 90-day contacts by clinicians was found to be 88 percent compliant in October 2009, and 83 percent compliant in December 2009.

Staff continued to report that shortages of office and treatment space existed through the monitoring period.  Although confidential space was available for most clinical contacts, overall limitations existed in the quality and quantity of both office and treatment space.  3CMS treatment areas included the U-Wing clinic and R-2.  These two locations offered

a total of three group rooms and three interview rooms for the provision of services to a program designed for 600 inmates.

At the time of the site visit, an observed 3CMS IDTT meeting found that the team composition was consistent with Program Guide requirements and included the PC, psychiatrist, CC, and the inmate. The CC and the PC presented an adequate case summary prior to the inmate's arrival. The team took considerable time with the inmates. Problem-solving occurred within the context of the meeting. UHRs and C-files were both available at the meeting.

Referrals

Institutional data indicated that CMF was compliant with tracking, processing, and responding to routine, urgent, and emergent referrals.

Heat Plan

Pursuant to a memo issued by the warden, staff was required to have copies of heat plan cards in their possession. Heat logs were available for review as were weekly lists of inmates prescribed heat-sensitive medications. Appropriate inmates were provided with heat cards. There were no heat activations during the reporting period.

RVRs

During the reporting period, 1,104 RVRs were issued to CMF inmates. Of the 283 referred for MH-4s, 231 or 82 percent were MHSDS inmates. The remaining 52 assessments were for 48 DMH inmates and four GP inmates. The hearing officer considered the clinical recommendations in the dispositions in 173 or 63 percent of the RVRs.

## California State Prison, Solano (CSP/Solano)
March 23, 2010 – March 25, 2010

Census:

CSP/Solano's census was 5,102 inmates, a decrease of 629 or 11 percent since the preceding monitoring visit in May 2008.  There were 1,390 3CMS inmates, 128 fewer than reported in the twenty-first monitoring period visit.  The EOP population continued to fluctuate and decreased from 19 to 12 since the preceding monitoring period.  The number of inmates in the MHCB was seven, a slight decrease from eight since the preceding monitoring visit.  There were 295 inmates in administrative segregation, including two EOP inmates and 120 3CMS inmates.

Staffing:

Since the preceding monitoring period, the institution's overall mental health staffing vacancy rate decreasing from 15 percent to 13 percent.  With use of contractors, the functional vacancy rate also fell, from four percent to two percent.

The chief psychiatrist position was filled as were the two senior psychologist positions.  The vacancy rate for psychiatrist positions remained problematic with only two of five positions filled. However, use of contract psychiatrists fully covered these vacancies.  The institution reported that interviews for the vacant psychiatrist positions were scheduled for the end of April 2010.

The vacancy rate among staff psychologists remained low with 13.52 of 15.52, or 88.2 percent, of these positions filled.  Two full-time contract psychologists were employed, reducing the functional vacancy rate for psychologists to zero percent.  Interviews were scheduled for the end of April 2009 to fill the two vacant psychologist positions.  Five of the six social worker positions were filled; a contractor covered the remaining vacancy.

The sole senior psych tech position was filled as were all 8.5 line psych tech positions and all three RT positions.

Among the 9.5 allocated clerical positions, there was only one vacancy.

Quality Management:

The quality assurance program at CSP/Solano was operational but functioning at the preliminary stages of development.  Essentially no audits were performed with respect to Program Guide requirements other than to address CAP items.  At times, results of the available audits directly contradicted information obtained during the site visit.

Information regarding the local governing body was not provided.  The QMC met bimonthly and minutes were maintained.  The MHQMS met monthly exception in December 2009.  Meeting minutes were maintained and attendance was sometimes problematic. Information from the MHQMS was forwarded to the QMC.

The facility had several QITs in place to address deficiencies with workspace, communications, MHCB overflow, suicide prevention, PC notes, peer review, MHTS, and group therapy.  Peer review was not in place during the review period.

Suicide Prevention:

Except for one month, the SPRFIT met monthly during the reporting period. Required participants were frequently absent.  Minutes were maintained but indicated that pertinent issues such as custody follow-up after discharges from crisis care, and inconsistencies in the implementation of the plan to address suicide trends in administrative segregation, were not identified.  The institution did not provide requested information regarding compliance with custody follow-up.

Clinician reports and medical records contradicted the institution's report of 100-percent compliance with clinical five-day follow-up after MHCB discharge. The monitor's expert's review indicated a 60 to 70-percent compliance rate. There were lapses in the documentation of five-day follow-up, most noticeably upon discharges to administrative segregation. The institution implemented a new practice of ordering five-day follow-up for inmates who presented to the MHCB with suicidal ideation (SI), but not for all inmates discharged from the MHCB.

The plan to address suicide trends in administrative segregation was not fully implemented. Both custody and mental health staff were unaware of the entirety of the plan. Documentation of inmates being screened within 72 hours of placement in administrative segregation was compliant in only 53 percent of cases. The institution was 50-percent compliant with documenting pre-placement medical clearance. Sixty percent of clinical contacts occurred out-of-cell.

Inmates were not consistently identified as new intakes upon arrival in administrative segregation. Some cells were retrofitted with smaller vent coverings, but new-intake cells were not distinguished by any visible means of identification within the unit.

Buildings 9 and 10 each had 20 SMYs. Inmates were offered at least ten hours of yard per week. Cells were equipped with electricity but inmates were not allowed televisions or radios.

Bus screens included a question for recently-received bad news.

Thirty-minute welfare checks were generally documented in buildings 9 and 10 but were not always staggered.

Although there was no documentation of daily morning meetings with custody and mental health staff, it was reported that these meetings occurred informally.

The ERRC met monthly. Documentation indicated that mental health was represented at the meetings and training was provided when issues of inappropriate response arose; however, meeting minutes were not informative.

CPR refresher training was reportedly provided to staff. Documentation of training was requested but not provided.

All officers, with the exception of one, had micro-shields on their persons. Cut-down tools were present in all ASUs, including the overflow unit and selected housing units on all yards.

There was documentation that emergency drills were performed in the ASUs.

Medication Management:

The Guardian Maxor pharmacy system was initiated at CSP/Solano in March 2010, resulting in major changes in medication management procedures. Minimal auditing was performed regarding medication management; audits addressed only identified CAP items.

Although the institution reported 89 percent compliance with medication continuity for arriving inmates, other evidence indicated continuing problems.

The institution remained non-compliant with medication continuity following intra-institutional transfers, no audits were performed with regard thereto. Both inmates and staff reported lapses in medication continuity after housing transfers including MHCB discharges to administrative segregation. These reports were corroborated by a review of medical records.

Inmates and staff reported lapses with medication renewals. Delays of several days in duration were not uncommon.

Institutional audits indicated 83 percent compliance in identifying MAR noncompliance, and 63 percent compliance in following up after identification of medication noncompliance.

Pill lines continued to be problematic throughout the institution and extended into the evening resulting in delays in HS medication passes.

Audits indicated 78 percent compliance with obtaining informed consents.

Institutional audits indicated 80 percent compliance with timely filing of laboratory studies.  Audits regarding laboratory studies for Depakote and Lithium indicated a compliance rate greater than 90 percent.

Supervisory observations of pill lines indicated 93 percent compliance with DOT but an audit of 60 inmates in pill lines indicated 86 percent compliance with DOT.

During the monitoring period, no Keyhea petitions were initiated, expired, or renewed.  No petitions were not pursued on the advice of counsel.  There were no hearings that resulted in a decision not to issue an order for involuntary medications.

The institution did not routinely track parole medications.

Sexual Misconduct:

The institution reported a total of 18 RVR MH-4s `conducted for 16 mental health inmates during the reporting period.  Three of the inmates were EOPs and eight were at the 3CMS LOC.  It was reported that all of the 3CMS RVRs were referred for a MH-4 due to bizarre, unusual, or uncharacteristic behavior.  During the reporting period there was only one RVR issued for sexual misconduct which did not result in a screening or comprehensive evaluation.

99

The institution did not track the total number of RVRs issued to mental health inmates but only tracked RVRs that resulted in MH-4s.  It was therefore not possible to determine the percentage of mental health inmates who received RVRs in comparison to the overall prison population.

Only 11 percent of RVRs addressed clinician input.  Although institutional procedures required that any reports that did not address clinician input be returned for re-writing, this was not taking place, as indicated by the institution's own audits.

Transfers:

The institution had two DMH coordinators, one in the MHCB and one in GP**.** Staff was utilizing the DMH referral log designed by HQ.  CSP/Solano was receiving faxed notifications of acceptances to DMH and discharges from DMH.

During the monitoring period, there were 25 referrals to DMH with 11 transfers within timeframes.  The average time from transmission of the packet to acceptance by DMH was 12.5 days, and the average time from bed availability to transfer was 4.5 days.  Seven referrals made during MHARP were not made within the requisite timeframes.  One of the inmates referred in the MHARP process remained at the institution and was number 537 on the SVPP waitlist.

Staff was trained to utilize Form 7388, the DMH criteria screening form, and all forms for referrals and non-referrals for inmates who met at least one criterion were collected.  Observation of IDTT meetings by the monitor's expert indicated that discussion of the criteria on Form 7388 routinely did not occur.

CSP/Solano held one Vitek hearing during the monitoring period and placement in DMH was upheld.  The associate warden of health care services served as the Vitek officer

and brought in a CC I as the inmate staff assistant.  A clinician and a psychiatrist were also present.

Forty-two EOP inmates transferred during the monitoring period, with 95 percent of the transfers meeting Program Guide timeframes.  The average number of days to transfer was 35.

Other Issues:

Administrative Segregation

Psych tech rounds were being conducted in the ASUs but no groups were provided.  Confidential treatment space continued to be a problem.  The three therapeutic modules offered limited sight and sound confidentiality but did not meet specifications.   No administrative segregation overflow unit was used during the monitoring period.  Staff reported that two escort officers were designated for mental health but were used for other duties during lockdowns and extensive searches.

Institutional audits indicated that 60 percent of 3CMS inmates in administrative segregation continued to have weekly CM contacts out of cell.  IDTT meetings were conducted on the dayroom floor, which also provided inadequate sight and sound confidentiality.

The monitor's expert observed IDTT meetings which included the necessary participants.  Pertinent clinical discussion occurred but only one presentation included the possible need for referral to a higher LOC.  The CC I was present with C-files.  There were no EOP inmates housed in the unit for more than 90 days.

MHCB

The MHCB program was staffed with one psychiatrist, one psychologist, one social worker, a RT, and five mental health nurses. There were 86 admissions during the reporting period, with an average length of stay of 11.6 days.

Restraints were used on three occasions during the monitoring period.

Observations of IDTT meetings indicated good attendance and clinical discussion. Form 7388, the IDTT intermediate care criteria form, was not regularly completed.

EOP

EOP inmates who were awaiting transfer were seen weekly but no therapy groups were available at the time of the visit.

3CMS

There were no audits and no available data regarding initial evaluations. A limited audit indicated that the institution had a 53-percent compliance rate for initial IDTT meetings, and an 89-percent compliance rate for annual IDTT meetings. The rate of participation in IDTT meetings for PCs and psychiatry was 98 percent, but for CC Is it was only 77 percent.

As of March 5, 2010, MHTS indicated that over 90 percent of 3CMS inmates had 90-day clinical contacts. An audit of UHRs indicated that 62 percent included treatment plans.

There were seven therapy groups, with a total of 61 inmates, during the reporting period. Groups were run on every yard. These were in addition to three ongoing recreation groups with 89 inmates participating.

<u>Referrals</u>

The referral process at CSP/Solano remained problematic.  Referrals were not tracked by priority, i.e. emergent, urgent, or routine.  The average length of time from referral to appointment was 18 days for GP inmates and 16 days for MHSDS inmates.  Only 14 percent of all reported referrals were seen within five days.

<u>Heat Plan</u>

The institution was compliant with heat plan policies and procedures.

### **San Quentin State Prison (SQ)**
April 26, 2010 – April 28, 2010

<u>Census</u>:

Although SQ's overall census decreased by five percent since the preceding reporting period, the MHSDS population increased by six percent.   SQ's census was 4,947 inmates, of whom 1,226 or 25 percent were MHSDS inmates.  This included 516 3CMS inmates and one EOP inmate in the mainline housing units.  There were 24 EOP inmates and 63 reported 3CMS inmates in the condemned housing unit.  In the ASUs, there were 52 EOP hub inmates, 176 3CMS inmates, and 65 RC EOP inmates.  The RC housed 402 3CMS and 48 EOP inmates.

<u>Staffing</u>:

San Quentin had an overall mental health staffing vacancy rate of 18 percent, but the use of registry contractors reduced the functional vacancy rate to 4.3 percent.

The chief psychiatrist and senior psychiatrist positions were filled, as were the chief psychologist and all six senior psychologist positions.  Of the 12.55 staff psychiatrist positions, 4.55 were vacant and 2.2 were filled by registry staff.  Thirty four of the 37.1 staff psychologist positions were filled, and use of 7.6 contractors more than covered the 4.5 vacancies.  Of the ten allocated social worker positions, eight were filled.  The senior psych tech

position was filled, as were 15 of the 16.6 psych tech positions.  Only one of the 5.75 RT

positions was filled.  Ten of the 12.5 mental health clerical positions were filled; but use of 3.90

contractors more than covered these vacancies.

San Quentin did not use telemedicine during the reporting period.

Quality Management:

The QMC met monthly.  Meetings were attended by the requisite mental health

staff and high level custody staff.  The mental health program subcommittee (MHPS) met

weekly and reported to the QMC quarterly.  Reviewed minutes of both committees' meetings

indicated appropriate form and substance.  Substantive areas that were addressed by the MHPS

included reviews of current QITs, FITs, audits, and various status reports.  The institution

reported nine active QITs which focused on referrals, discharge planning, mental health space,

records transfer, high-risk inmates, transitional housing, and CTC operations.  FITs worked on

duty to warn and the Prison Rape Elimination Act.  SQ indicated that audits were conducted in

24 separate areas and status reports included, but were not limited to, Keyhea processes, difficult

inmate management, suicide prevention, personnel staffing, "no-show" refusals, county jail

mental health continuity of care, peer review, and DA referral reports.  Follow-up audits were

conducted to determine if recommended actions solved or improved any identified problems.

The findings and decisions of the QMC and MHPS were communicated to staff members

through various effective methods.

Two peer review committees were in place, one for psychologists and social

workers, and one for psychiatrists.  A new LOP scheduled to go into effect would shift the peer

review process from operating on a rotating basis to working more as a standing committee.

Suicide Prevention:

The SPRFIT met monthly with the exception of December 2009, due to the transition into the new central health services building.  The chair position of the SPRFIT was in transition at the time of the site visit.  Copies of PowerPoint presentations and sign-in sheets served as substitutes for meeting minutes.  Attendance at SPRFIT meetings continued to suffer from a lack of participation by multiple disciplines, but measures were being taken to increase attendance.

The institution did not have a death review committee.

Emergency response drills were performed monthly.  Cut-down kits were found in all ASUs.  Custody reported that all officers received mandatory first aid/CPR training and all officers produced micro-shields when requested.

In administrative segregation, the institution used 30 cells on the first two tiers in the Carson unit as intake cells, but acknowledged the use of other tiers as the need arose. Inmates returning to the unit on five-day follow-up were placed on the first tier whenever possible.

A review of the logs indicated that welfare checks were occurring, but they were documented on pre-printed forms, with checks occurring every half hour with no staggering.

Audits found a 100-percent compliance rate for daily rounds conducted by psych techs, and for conduct of mental health screenings within 72 hours of admission to the unit.

Audits covering the period of September through December 2009 found a 99-percent compliance rate for five-day follow-up for inmates returning from an MHCB or OHU. These reports were provided to the QMC.

Administrative segregation yard schedules indicated that inmates were offered 12 hours of yard per week.

In response to a CAP item, the institution completed mental health screenings for administrative segregation inmates and condemned inmates re-housed in the Adjustment Center. Staff reported that inmates in the Adjustment Center were allotted approximately four hours of yard time every other day.

Medication Management:

Audits regarding medication management continued to be problematic at SQ. Methodological issues included small sample sizes, inappropriate samples, and incomplete definitions. Audits for timely renewals upon MHCB discharge, transfers in and out of administrative segregation, and renewals and processing of orders were not done during the monitoring period.

Non-formulary medications were allowed for 14 days without non-formulary approval. Inmates discharging from the CTC had their non-formulary medications reviewed. The senior psychiatrist or chief psychiatrist could approve a non-formulary request in urgent situations. Staff reported the absence of required non-formulary medication forms for inmates returning from DMH with non-formulary prescriptions.

Audits with regarding to new arrivals were insufficient to draw valid inferences concerning continuity of medications.

Although staff reports and limited audits indicated a decrease in medication management issues, questions remained concerning appointments being made for medication non-compliance, appointments completed for medication non-compliance, and whether documentation was available during the assessment concerning medication non-compliance.

There were no reported problems concerning pill lines.

Institutional audits showed non-compliance for the presence of informed consent forms and MARs in the UHRs.

The use of laboratory test results to monitor inmates' blood levels of psychotropic medications remained problematic for the institution.  Training of psychiatrists on this issue was ongoing.

Attendance at morning groups reportedly hindered the administration of morning medication but some nurses would bring medication to group sessions.

A recent practice was instituted to administer psychotropic medications as nurse-administered medications, unless specifically ordered DOT, at the discretion of each psychiatrist.  Nursing supervisors were responsible for verifying the method of medication administration.

Appropriate processing of Keyhea cases was maintained through constant contact between the Keyhea program coordinator at SQ and the Office of Legal Affairs.   The Keyhea population was monitored daily; status reports were produced no less than four times per month.  No Keyhea petitions had been denied since December 2007.  Fourteen petitions were initiated during the monitoring period and 11 were renewed.  There were no decisions not to issue an order, and no opinions of legal counsel to not renew or initiate any petitions.

Approximately 25 inmates received HS psychotropic medications, which were delivered after 8:00 p.m.

The institution reported that from September 2009 through February 2010, parole medications were picked up 94 percent of the time.

Sexual Misconduct:

During the reporting period, the institution issued a total of nine RVRs related to sexual misconduct, all of which resulted in sexual misconduct screens. Three RVRs resulted in IDTT reviews and were referred for comprehensive evaluations. All three resulted in diagnoses of Exhibitionism or Paraphilia NOS. Of these three diagnosed inmates, one was awaiting transfer, one was pending an IDTT review to determine eligibility, and one was in the RC and not eligible for transfer.

Transfers:

During the period from November 2009 through April 2010, there were 59 referrals to DMH, 56 to intermediate care and three to acute care. Twenty-five or 43 percent transferred to a DMH facility. Twenty or 35 percent discharged prior to transfer, three won their Vitek hearings, and four transferred from the RC to mainline prior to DMH transfer.

There were six inmates on the SVPP waitlist at the time of the site visit, one from May 2009, two from October 2009, one from November 2009 and two from December 2009. The SVPP waitlist was problematic for the institution, due to RC inmates who paroled before transfer to DMH and then returned to SQ within a short period of time, requiring the referral process to start over again.

The institution reported success with transferring intermediate care inmates to ASH using the ongoing intermediate care pilot project, rather than SVPP. Reportedly, referral packets were prepared in a timely manner 80 percent of the time, with marked improvement during March and April 2010.

There were 153 referrals to the newly activated MHCB unit from January through March 2010. All resulted in admissions to the unit. MHCB lengths of stay ranged from one day

to 22 days.  The average length of stay was 3.5 days, with six instances of stays exceeding ten

days.  The average daily census for the unit was nine.  Of the 153 admissions to the MHCB unit,

the institution reported that IDTT meetings were conducted for 123 or 80 percent of those

admissions. There were no instances of three or more admissions for the same inmate to the

MHCB unit in the month of January 2010, but there were three in February, and five in March.

Prior to the opening of the new MHCB unit, there were a total of 161 MHCB

referrals, with 146 accepted and transferred from September through December 2009.  Five were

cancelled due to parole, and ten inmates who improved while awaiting placement were re-

housed.

There were 383 OHU placements from September through December 2009, with

an average daily census of 11 and an average length of stay of 3.5 days.  For inmates who had

three or more placement in the OHU, there were nine in September 2009, eight in October, seven

in November, and 11 in December.

For the period of September 2009 through February 2010, the institution reported

an average monthly census of 155 EOP inmates, with an average of 81 in the RC and 74 in

administrative segregation.  Institutional data indicated that the average monthly census of EOP

inmates with stays in the RC in excess of 60 days was 41, or 51 percent.  For EOP inmates in

administrative segregation, 45 or 61 percent had stays in excess of 60 days.  The average

monthly census of EOP inmates who had stays in excess of 90 days in administrative segregation

was 13 or 18 percent.  These inmates were reviewed every 30 days outside the ICC process.

For the reporting period of September 2009 through February 2010, the institution

reported an average monthly census of 473 3CMS inmates, with an average of 399 in the RC and

74 in administrative segregation.  Institutional data indicated that the average monthly census of

3CMS inmates with stays in the RC in excess of 90 days was 170, or 43 percent.  In administrative segregation, 42 or 56 percent of the 3CMS inmates had stays in excess of 90 days.

Other Issues:

Reception Center

Institutional audits indicated that all inmates received an initial mental health screening within 24 hours of arrival.  During the period of September 2009 through November 2009, the institution was compliant with providing mental health evaluations within seven days. Compliance dropped to 62 percent for the months of December 2009 and January 2010, but improved to 78 percent in February 2010.  Noncompliance was attributed to the activation of the central health services building, shifting duties, custody escorts, modified custody programs, lockdowns, and problems with the new ducat system.

For EOP inmates in the RC, the institution reported 97-percent compliance with five hours of structured therapeutic programming per week, 87 percent compliance with offering five hours per week, and 25 percent compliance with inmates receiving five hours per week.

For EOP inmates in the RC ASU, the institution reported 95-percent compliance with scheduling ten hours of programming per week, 73 percent with offering ten hours per week, and 31 percent with inmates receiving ten hours per week.  Barriers to providing treatment included lockdowns, inmate refusals, quarantines, scheduling problems, furloughs, and insufficient custody escorts.

During the reporting period, SQ was compliant with providing initial IDTT meetings within 14 days of arrival through November 2009, but compliance rates ranged between 27 percent and 53 percent over the following three months.  This decrease coincided with the transition into the new central health services building.

3CMS inmates in the RC were seen monthly rather than every 90 days, with a compliance rate of 96 percent.  The institution reported that 94 3CMS RC inmates participated in group treatment.

Administrative Segregation

SQ maintained five units categorized as lockup units: the Adjustment Center with condemned row and administrative segregation inmates, East Block with condemned row inmates, North Segregation with condemned row inmates, Carson unit with administrative segregation inmates, and Donner unit which functioned as an administrative segregation overflow unit.  The adjustment center had five cells on the third floor used for groups.  Walk-alone and group yards were available.

Mental health inmates, inmates on five-day follow-up, and new arrivals were housed on the first tier in the adjustment center.

MHCB

SQ activated 17 MHCBs when the central health services building opened in January 2010.  There were two safety cells with in-floor toilets.  Recreation yards were accessible but infrequently used unless inmates were in the unit for more than ten days.

Staff reported compliance in the following areas: IDTT meetings conducted within 72 hours of admission with CCs, nursing staff, and C-files present; treatment plans developed or updated: H & Ps performed within 24 hours of admission; intake assessments updated or generation of a new Form 7386; daily clinical contact with psychologist or psychiatrist; SRAC completed upon admission and discharge for inmates with SI; and mattresses, blankets and smocks provided in safety cells.  This information was consistent with audit findings.

111

In the observed MHCB IDTT meetings, custody was not present unless the inmate was being interviewed.  Nursing provided relevant input at the meetings.  All inmates were cuffed and staff was required to wear protective vests.

EOP

RC EOP inmates were housed on the lower tiers of the Donner unit, which formerly functioned as an OHU, and allowed for increased observation and rounding by staff.

With few exceptions, audit results were captured from combined data of multiple program areas with similar requirements, such as weekly contacts for EOP administrative segregation, 3CMS administrative segregation, and condemned grade B 3CMS.  The results were reported as a single compliance rate for all program areas unless otherwise noted.

Institutional data indicated compliance with screening EOP inmates within 72 hours of arrival.  SQ was compliant with completing initial MH-4s through November 2009, but compliance declined to 64 percent in December 2009, 24 percent in January 2010, and 78 percent in February 2010.  Noncompliance was attributed to shift in duties, custody issues, modified custody programs, lockdowns, quarantines, and a new ducat system.

Compliance rates for initial IDTT meetings also declined to 38 percent in December 2009, 27 percent in January 2010, and 53 percent in February 2010, with an average compliance rate of 69 percent for the reporting period.  Institutional audits indicated that SQ was compliant with 60 day follow-up IDTT meetings, but 30-day IDTT meetings were 84 percent compliant.

Audits found that the institution was compliant with providing EOP inmates with weekly clinical contacts, but an audit specific to RC EOP inmates indicated 88 percent compliance.

SQ reported that 64 percent of all clinical contacts were conducted at cell front. An analysis conducted by the institution attributed 50 percent of the cell-front contacts to unavailable escorts, housing movement, lack of holding space, lack of office space, lockdowns, and quarantines. Thirty-five percent of cell-front contacts were due to inmate refusal and 15 percent were due to mental health staffing issues. However, the majority of the compliance rate data was reported prior to the transition into to the new correctional health services building.

The quality of clinical documentation in the UHRs was variable, ranging from thorough to not clinically informative.

Staff reported that inmates were offered five hours of group treatment 87 percent of the time, and received group treatment 25 percent of the time.

Administrative Segregation EOP

An institutional audit for screening chronos indicated an 82-percent compliance rate. Institutional data indicated that ten hours of group therapy were offered to 74 percent of EOP administrative segregation inmates, with a 31 percent average participation rate and a daily refusal rate ranging from ten to 64 percent.

The institution was compliant with conducting daily rounds and provided intensive treatment program rounds to EOP inmates who chronically refused to attend groups. Psych techs attempted to identify reasons for failing to attend and encouraged inmates to participate.

3CMS

SQ was 92-percent compliant with providing quarterly CM contacts and 99 percent compliant with providing timely psychiatric contacts. Annual IDTT meetings had a

113

compliance rate of 86 percent.  In 96 percent of cases, clinical contacts occurred every 30 days, as opposed to the minimum requirement of every 90 days.

Based on SQ's continuity-of-care model, IDTT meetings crossed all MHPs.   All required participants were present, and C-files and UHRs were available.  There was appropriate clinical discussion including treatment goals, but Form 7388, the IDTT intermediate care criteria referral form, was not routinely discussed.

PCs and release clinicians collaborated on pre-release planning for 3CMS inmates.

Administrative Segregation 3CMS

Audit data was combined across program areas.  Audits found an overall compliance rate of 97 percent for PC contacts, but noncompliance with IDTT meetings during the reporting period.

Groups

Institutional data indicated that 74 groups were available per week at SQ.   These groups included adjustment center group; condemned-A group; condemned-B group; condemned-C croup; condemned therapeutic yard; RC EOP groups; substance abuse; emotion management; pre-release planning; medication management; SNY groups; SNY substance abuse; SNY emotion management; SNY recreation therapy; therapeutic yard; and 3CMS substance abuse.

Referrals

The institution reported that emergent referrals were not tracked and that urgent and routine referrals were not tracked or logged separately.  The data indicated that a total of 3,651 referrals (which included both urgent and routine) were made during the reporting period,

and that 78 percent were resolved within five days. The institution understood that all referrals must be tracked and logged separately according to priority, i.e. emergent, urgent and routine.

RVRs

During the reporting period, the institution issued a total of 215 RVRs to mental health inmates, with 143 issued to 3CMS inmates and 72 to EOP inmates. There were eight 3CMS inmates referred to mental health due to bizarre, unusual, or uncharacteristic behavior. A review of C-files indicated that the decisions of the hearing officer included a review of clinical input regarding the inmate's mental health.

Pre-Release Planning

Staff reported that two full-time clinicians served as release planners for EOP inmates. The institution reported a compliance rate of 97 percent for completing release plans within 30 days of release, and a compliance rate of 91 percent for meeting documentation standards for release plans.

**Deuel Vocational Institution (DVI)**
May 18, 2010 – May, 20 2010

Census:

DVI housed 3,904 inmates, with a total MHSDS population of 797 inmates. There were 68 inmates in the 3CMS mainline and 18 inmates in the OHU. There were 341 inmates in administrative segregation, including 100 3CMS inmates and six EOP inmates pending transfer to a hub institution. In the RC, there were 569 3CMS inmates and 36 EOP inmates.

Staffing:

DVI had no functional vacancies in mental health clinical staffing. Of the 76.2 allocated mental health positions, 3.05 were vacant. The one psychologist vacancy and .75

115

psychiatrist vacancy were filled by contractors. Only one open position, for an OT, was not covered by a contractor. Telemedicine was not used during the monitoring round.

Quality Management:

The QMC at DVI met weekly and included representation by all medical disciplines, including dental and mental health as well as custody. Co-chairmanship was shifted from the chief executive officer (CEO) of health care co-chairing and the warden to only the CEO. Minutes were maintained and appeared reasonable. The CEO described the focus of the QMC as overly-limited.

The mental health subcommittee met weekly but addressed issues that would have been more appropriate for staff meetings. There was no formal agenda. Attendance was routinely limited to mental health staff despite requests for custody participation. A review of the minutes for the reporting period reflected minimal or no reviews of audit results or other formal activity. Findings and announcements from the QMC and mental health subcommittee were communicated to staff via weekly staff meetings.

There were six QITs chartered during the reporting period. The focus of the QITs included administrative segregation pre-placement screening, medication issues, treatment issues, and OHU utilization. One QIT, EOP treatment in administrative segregation, was dissolved prior to completing its work.

Peer review was occurring but needed improvement. One significant methodological flaw permitted the reviewed clinician to select the cases to be reviewed, despite the obvious potential for bias. In addition, the results of peer review were provided to supervisors in a redacted format that was not useful.

Suicide Prevention:

The SPRFIT met monthly and included representation from custody, nursing, administrative staff, and representatives from all mental health departments. Required members were regularly present, as documented in the meeting minutes. The standing agenda included numerous items covering multiple areas of concern in suicide risk management. Audits were reviewed and discussed and LOPs were reviewed and adjusted, as necessary.

The institution tracked compliance with five-day clinical follow-up and custody checks by auditing all cases. For the 30-minute welfare checks, compliance rates ranged from 84 percent to 97 percent. Five-day clinical follow-ups were audited for their occurrence as well as documentation omissions, but overall compliance rates were not provided. The institution remained noncompliant in these two important areas.

Institutional audits and records indicated varied and problematic compliance rates for prescreening all inmates prior to placement in administrative segregation. The institution was compliant with mental health screening of inmates within 72 hours of admission to administrative segregation. Although inmates were reportedly offered confidential settings for the screenings, these often occurred in the presence of a captain. Daily meetings between custody and mental health staff occurred in the ASU. Inmates were identified as "intake-status" and received 30-minute welfare checks by custody staff for the first three weeks of placement in administrative segregation. Cells used for intake were regular two-man cells that were not physically modified to address safety issues. All entries regarding the 30-minute welfare checks were reviewed each month and audited. However, the institution did not have a 100-percent compliance rate with this suicide-prevention practice.

<u>Medication Management</u>**:**

Medication continuity for new arrivals was compliant, according to nursing audits.

While intra-institutional movement did not result in medication disruption for inmates housed in the mainline or ASUs, medication continuity was quite problematic for inmates moving from the RC or OHU.

Renewals of psychotropic medications were addressed through scheduling or the strike team, but no compliance data was available for verification.

The audit of medication noncompliance was methodologically flawed and no conclusions could be drawn regarding compliance in this area.

DVI dispensed 17,000 prescriptions per month. Medical and mental health staff worked collaboratively to improve the delivery of medication and continuity of care. All medications were passed in the housing units or wing areas, which eliminated the central pill line and any associated wait times.

There was improved compliance with protocols for baseline and periodic laboratory blood draws for inmates on atypical antipsychotic medications, lithium, valproic acid and carbamazepine. There were some areas of noncompliance, such as routine studies for inmates on atypical antipsychotics, but overall the institution had improved its compliance and efficiency in this area. However, the current process did not ensure that the treating psychiatrist considered the results in subsequent interactions with the inmate, nor did the audit review those parameters.

Essentially, all psychotropic medications were considered and administered DOT. This was unduly burdensome for medication administration staff and inmates. The DOT

administration was monitored by the SRN II as part of the comprehensive medication audit process but compliance data was not provided.

There were 575 orders for HS medication administration in April 2010. There was contradictory information regarding compliance with the 8:00 p.m. administration time for HS medications, with nursing staff reporting compliance and mental health staff reporting noncompliance. As a result of contradictory data, no conclusions regarding compliance were made.

At the time of the site visit, there were three inmates on Keyhea orders. During the monitoring period, no new Keyhea orders were initiated but two orders were renewed. No orders were denied and one order was allowed to expire at the discretion of the treating psychiatrist. Three inmates were transferred prior to scheduling of Keyhea hearings.

Audit results regarding medications for paroling inmates indicated that DVI was compliant or approaching compliance in this area.

Sexual Misconduct:

During the reporting period, there were six RVRs issued for sexual misconduct, two of which were not referred to mental health. Of the four that were referred to mental health for screening, one inmate was screened and referred for a comprehensive evaluation but paroled before the evaluation was completed. Three inmates were transferred prior to screening, and one was scheduled for screening at the time of the monitor's visit. The institution was noncompliant with meeting timelines for IEX screenings. Transfers:

The DMH referral log was disorganized, with missing and incomplete data and cases were not in chronological order. According to the logs provided, no DMH referrals were classified as rescinded during this monitoring round. Mental health staff reported that there were

42 referrals to DMH during the monitoring period.  Based on a review of the logs, there were actually 41 cases identified for DMH LOC but only 12, or 29 percent, were actually referred by March 31, 2010.  There were 11 referrals to intermediate care and one to acute care.  Seventeen, or 41 percent, of the 41 identified referrals were identified during MHARP.

For those inmates who were actually referred to DMH, the institution was noncompliant in meeting timelines. The average length of time from identification to transmission of the referral packet was 59.9 days.  Some delays were due to extra time taken for completion of history and physical examinations or to schedule Vitek hearings.  However, even in the absence of any delays, packets took an inordinate amount of time to complete.  Twenty one of the 41 identified referrals paroled without a referral packet being completed.  For those without a referral packet, the time from identification to parole or transfer ranged from four to 172 days.  Supervisory staff reported a lack of LOPs for Vitek hearings and the absence of staff training.  The DMH log did not always report whether a Vitek hearing was actually held or the result of the hearing.  A number of cases indicated the need for a Vitek hearing but gave no further information.  Staff was working on developing a system to quickly identify parole violators who had paroled while within the DMH referral process, for example inmates whose packets had been submitted.

During the monitoring period, four inmates transferred to mainline institutions before they could be transferred to DMH, five inmates were transferred to ASH, and nine inmates were awaiting transfer to DMH due to long wait lists.  Because of problems with the logs, average transfer times could not be computed for all inmates who transferred.

Observations of IDTT meetings during the site visit revealed that referrals to DMH were not discussed during these meetings.  The Form 7388 (the form used for

consideration for referral to higher levels of care) was not reviewed among the IDTT and was completed only sporadically. When the form was utilized, it was often not fully completed or was completed inaccurately. When DMH referral was indicated, there was rarely any information in the chart to note the need for such a referral, or that a referral had occurred. There was lack of consistency between the actual treatment received by inmates and the referral or identification process.

Despite reports of no referrals being rejected during the monitoring period, two cases identified for referral to DMH went to CCAT. Both inmates were determined to be inappropriate for DMH, even without referral packets. The DMH coordinator reportedly received no communication or required documentation, via e-mail, fax or telephone, from DMH regarding discharged inmates. DVI implemented its own tracking process, but it was unclear if this significant problem was addressed through the chain of command.

Management staff reported that medical inmates increasingly occupied OHU beds, causing more frequent placements of mental health inmates into the 11 overflow cells established in the L1 unit. Inmates placed into an overflow cell reportedly had one-to-one observation throughout their stays. Minor cell modifications failed to correct areas of concern, including multiple tie-off points and severely degraded facilities.

During the monitoring period, there were 853 OHU placements, with an average daily census of 10.7 and an average length of stay of 3.11 days. The lengths of stay ranged from one day to 84 days, with 273 admissions or 32 percent exceeding 72 hours. Inmates were typically discharged from the OHU back to their housing units, though some transferred to an MHCB. All lengthy stays were due to medical holds.

In the overflow unit there were 241 admissions, excluding the month of January 2010 when data was not provided. The average length of stay for overflow cells was 2.2 days.

During the monitoring period, there were 384 referrals to the MHCB and 252 transfers. DVI did not report the average length of time to transfer to an MHCB, nor was the available data sufficient to make such computations.[10] Consequently, it was unclear if DVI met transfer timelines from the OHU to the MHCB. Supervisory staff did report better access to MHCBs with the opening of the SQ MHCB unit and that consequently transfer times decreased.

Holding cell logs indicated that most inmates spent no more than two hours in a holding cell prior to being housed in the OHU or overflow cells. Inmates in holding cells were placed on one-to-one observation with a custody officer. Based on the data collected by the QIT regarding OHU use, the institution discovered that a significant amount of OHU utilization was driven by medication and/or housing/custody issues. To address this issue, DVI developed a response process with a special "strike team" that identified these issues early in the assessment and provided an immediate response to the inmate's concerns. This resulted in decreased OHU placements.

There was no data provided for any inmates who became mainline EOP cases and thus required transfer during the monitoring period. The monitor's point-in-time analysis of data provided by the institution indicated that in 33 of 34 EOP administrative segregation cases examined, DVI was noncompliant with meeting transfer timelines. It was not clear why these inmates were not tracked properly and transferred timely.[11]

---

[10] Defendants requested that this sentence be removed on the ground that the institution represents that logs of length of time to transfer to MHCBs have been kept for the past eight years and were part of the proof-of-practice report provided to the monitor. The monitor reports, however, that all available logs and other material on this point were reviewed, but the information provided did not make it possible to compute average length of time to transfer to MHCBs.

[11] Defendants objected to this sentence on the ground that it "lacks foundation and is vague." The preceding sentence states the outcome of the point-in-time analysis which found that 33 of 34 EOP administrative segregation

Collection of RC data was problematic for DVI. Loss of data during the conversion to MHTS.net and the failure to track information contributed to this problem. Transfer times for 3CMS and EOP inmates could not be determined due to incomplete data. DVI provided a list of 45 EOP inmates, reportedly pending transfer at the time of the site visit, which contradicted the census data provided. The institution was unable to provide any data on 3CMS or EOP inmates who were transferred. A weekly report was provided to C&PR with a list of EOP inmates who were all considered expedited cases.

There were serious concerns with RC processing, tracking, and compliance with transfer timelines for MHSDS inmates. A point-in-time analysis showed that DVI was noncompliant with meeting transfer timelines for these inmates. It was also concerning that CC supervisors and/or the C&PR were not maintaining this data. DVI could not indicate how many inmates had been brought into its RC or the numbers transferred out or released.

Other Issues:

Reception Center

There were one clinical social worker, one psychologist, and two psych techs allocated for RC EOP inmates. Due to water damage during the Fall of 2009, the MHP lost both office space and treatment space in the RC. As a result, clinicians saw inmates in the units in specially constructed booths with insufficient lighting. Clinicians competed with other staff members for the use these booths. Consequently, many individual contacts occurred at cell front. The lack of treatment space also hampered staff ability to complete their tasks within established timeframes. Group therapy and IDTT meetings were held in the dining hall which provided limited time, poor acoustics, and lack of confidentiality.

---

cases that were examined did not meet transfer timelines. This analysis supports the stated concern, i.e. a lack of timely transfers to EOP hubs, as it indicates a compliance rate of less than one percent for this important metric.

Institutional audits indicated that bus screens and initial mental health screens occurred in accordance within Program Guide timelines, but these findings were not supported by the data or medical records.  Initial evaluations were not audited by the facility.  Initial EOP IDTT meetings were approaching compliance levels and subsequent IDTT meetings were compliant.  Mental health staff reported that weekly CM contacts had a 99-percent compliance rate, but this was not supported by information in the medical records.  Compliance with weekly contacts varied, with some inmates seen in accordance with timelines approximately 90 percent of the time but others were seen within timelines only about 50 percent of the time.

The average number of structured therapeutic activities per inmate could not be computed.  Data for structured therapeutic activities was not aggregated and was based on groups scheduled and conducted.  No information on individual inmate attendance and no methodology behind the numbers was provided.

DVI reported that inmates placed on alternative treatment plans due to inability to benefit from full group schedules were seen at least three times per week.  However, DVI did not report compliance with monthly IDTT meetings for these inmates, or whether higher levels of care were considered.  These inmates appeared to be clinically appropriate for expedited transfers.

OHU

There were two psychologists and one psychiatrist assigned to the OHU.  SRACs were completed at the times of arrival, discharge, and at each IDTT meeting, but evaluations were not done in accordance with the Program Guide.  The one confidential room in the OHU functioned as a staff office, interview room, and IDTT meeting room.  Due to the limited

availability of this treatment space, inmates were typically seen only in IDTT meetings when evaluations or interviews occurred.

Inmates discharged from holding cells were placed on a five-day or two-day follow-up. Any two-day follow-up order was *per se* noncompliant with the Program Guide. Audit results indicated compliance with completion of five-day follow-ups, although some data entry errors existed. If an inmate was admitted to the OHU for SI and stayed there less than 48 hours, he received a two-day follow-up, unless a five-day follow-up was specifically ordered. DVI did not audit two-day follow-ups, nor could compliance with this non-approved timeline be verified from the data provided. No information about custody follow-up or monitoring was provided.

Staff reported that neither restraints nor seclusion were utilized in the OHU during the reporting period.

Administrative Segregation EOP

There were seven EOP inmates in administrative segregation at the time of the site visit. None received any group therapy. Therapeutic modules were installed during the site visit. Care continued to be compromised by the lack of confidential treatment space in administrative segregation. Due to space limitations, most contacts with PCs and psychiatrists occurred at cell front.. Data indicated compliance with weekly clinician contact, but the data was flawed and may have overestimated compliance.

3CMS

3CMS inmates had a small group therapy session every two weeks. The primary focus of the group was coping skills. Group attendance per month varied from none to ten.

Most contacts for mainline 3CMS inmates were individual contacts with their PC.  Psychiatry contacts occurred at intervals of one to three months.

Administrative Segregation 3CMS

PCs attempted to maintain weekly contacts with administrative segregation inmates, but confidential treatment space was limited and consequently most contacts occurred at cell front.  The location of the contact was recorded in the progress notes.  Assigned clinicians attended ICC hearings and provided input.  Initial IDTT reviews were completed timely.  Quarterly reviews occurred thereafter, as evidenced by staff reports and UHR reviews.  IDTT meetings appeared to have the required attendees.  Although there were no discussions of the possible need for transfer to a higher LOC, PCs independently completed the Form 7388, the checklist of factors for consideration of referral to a higher LOC.  These forms were provided to the supervisor for review, together with completed and signed treatment plans.  This process did not conform to the policy directive to discuss and complete the checklist within the IDTT meeting.

Referrals

A review of referrals compiled by the institution for one month confirmed that DVI was compliant with Program Guide requirements for emergent, urgent, and routine referrals.

Medical Records/MHTS

DVI was not integrating all crisis placements such as MHCB, OHU, and overflow cells.  Data regarding OHU utilization was compiled from different sources.  This was due in part to the loss of data from a system malfunction and the need to maintain data not currently available in either MHTS system.  The result was unavailable or contradictory data.

DVI experienced complications with the implementation of the new MHTS.net tracking system.  Two significant problems associated with MHTS directly affected the adequacy of care.  According to clinical and support staff,  the present configuration of MHTS.net automatically changed the LOC of inmates returning from DMH or MHCB to GP status, in effect removing them from the MHSDS.  Consequently, inmates returning from either DMH or the MHCB were at risk of not receiving required treatment unless staff recognized and identified them as a returning mental health inmate. The second problem was similar with respect to returning MHSDS parole violators.  MHTS.net automatically identified return parole violators as non-MHSDS inmates which negatively affected their access to care.

Heat Plan

On March 30, 2010, DVI issued a revised version of its heat plan, with an effective date of May 2, 2010.  In April 2010, the institution issued an addendum to implement a revised medical rounds log for stage III heat alerts.  Staff reported that psychiatry was responsible for distributing heat cards when prescribing heat-related medication, as well as discussing heat issues with inmates as part of the informed consent process.  Staff reported that pharmacy issued a heat list periodically during the heat period.

RVRs

DVI was noncompliant in meeting the standards and timelines of the disciplinary process with MHSDS inmates.  For the period of December 2009 through March 2010, DVI reported completing MH-4s for 19 EOP inmates and three 3CMS inmates who were issued RVRs.  These assessments were not all completed in accordance with Program Guide timelines. In addition, hearing officers did not consistently document the results of the MH-4 in their findings or what role, if any, it played in their dispositions.  The facility also had no process to

track RVRs for MHSDS inmates.  Only inmates who received requests for MH-4s were tracked, but even that information was not provided to clinicians.

Pre-Release Planning

Pre-release planning remained problematic at DVI.  Medical records contained sparse evidence of any planning.   Although staff reported that TCMP clinicians met with paroling inmates, a small sample of EOP inmates with imminent release dates indicated that none of them were seen by TCMP.  A review of the medical records corroborated this finding. There was a pre-release planning group but it was only available to certain inmates rather than all inmates with imminent release dates.  Staff received no reentry training other than what was provided by DVI mental health staff or guest speakers invited to the institution.

**California State Prison – Corcoran (CSP/Corcoran)**
March 8, 2010 – March 11, 2010

Census:

CSP/Corcoran's census on March 8, 2010 was 5,542 inmates, four percent fewer than were reported during the preceding monitoring period.  The MHSDS population at CSP/Corcoran increased by just under five percent, with a population of 1,474 inmates, comprising 27 percent of the prison's population.  There were 381 inmates in administrative segregation and 1,431 in SHU, thereby placing a third of the prison's inmate population in lock-up units.  Fifty-three percent of the inmates in administrative segregation and 39 percent of the inmates in the SHU were participants in the MHSDS.

The EOP hub capacity was increased from 54 to 99.  As of March 8, 2010, there were 76 inmates in the hub program, a 76 percent increase over the 45 that were reported in the preceding monitoring period.  The EOP mainline census remained unchanged at 140 inmates. There were 519 3CMS mainline inmates, 13 percent fewer than the 599 that were reported in

September 2008.  The number of 3CMS inmates in administrative segregation grew by 25 percent, and stood at 123 as of March 8, 2010.  The number of 3CMS inmates in the SHU grew by 44 percent and stood at 551.  There were 23 inmates in MHCBs, and another 39 MHSDS inmates in medical beds within the GACH.

Staffing:

Staffing at CSP/Corcoran improved since the preceding monitoring visit. CSP/Corcoran had filled 88 percent of all allocated mental health positions.  It also used contractors, telemedicine, and dual appointments to reduce the functional vacancy rate to just under five percent.  However, the institution reported that furlough days increased the functional vacancy rate to 12 percent during the last three months of 2009, with an average of 10.7 FTE work hours lost to furloughs during the months of October, November, and December 2009.

Nearly all of the 10.8 supervisory positions were filled.  A part-time supervisory social worker position remained vacant.  Psychiatry staffing remained problematic, with 10.3 of 16.8 positions vacant.  Long-term contractors and telemedicine reduced the functional vacancy rate in psychiatry to 13 percent.  Among staff psychologist and social worker positions, 2.61 of 54.61 remained vacant, all of which were covered by dual appointments and contractors, including a full-time contract marriage and family therapist..  All senior psych tech positions were filled ,and only one of 37.64 psych tech positions remained vacant.  Similarly, nine of 9.57 recreational therapist positions were filled, as were 15 of 16.57 clerical positions.  Positions for a HPS I and medical secretary were filled, and one of two OSS II positions remained vacant.

<u>Quality Management</u>:

The local governing body met four times between July and December 2009. The QMC met monthly during this period. The monthly meetings routinely included reports from the various disciplines and departments, including information from the mental health subcommittee.

The mental health subcommittee also met monthly and minutes indicated that pertinent topics were discussed, including updates from various QITs and input from the SPRFIT.

There were five QITs ongoing at the time of the site visit. These included two QITs focused on the EOP hub program; one tasked with developing strategies for convincing more inmates to accept cellmates and the other focused on improving treatment. QITs regarding medication refusal protocols and continuity of discharge medications produced updated LOPs that were pending approval at the time of the site visit.

For psychologists and social workers, CSP/Corcoran had in place an active peer review process which involved monthly chart audits. Mental health supervisors were in the process of improving the less developed peer review process for psychiatrists.

<u>Suicide Prevention</u>:

There was one completed suicide at CSP/Corcoran during the reporting period.

The SPRFIT met monthly during the reporting period and kept minutes, though attendance was problematic. While the SPRFIT generally functioned as intended, there were notable deficiencies. Ongoing problems regarding the documentation of clinical five-day follow-up did not appear to have been addressed by the SPRFIT. It was also often unclear from the meeting minutes whether SPRFIT recommendations were forwarded to the QMC. There were no suicide CAPs generated during the reporting period.

An MHCB log showed 74 percent compliance with clinical five-day follow-up, while UHR audits yielded a compliance rate of only 52 percent. The lower compliance rate was reportedly an artifact of UHR filing issues. Institutional audits showed 87-percent compliance with custody checks during the reporting period.

Monthly medical emergency drills were documented in all ASUs during the reporting period. Cut-down tools were maintained in the 3A04 ASU and the stand-alone ASU. A cut-down tool was not available in the EOP hub unit.

All interviewed custody officers had micro-shields. Extra micro-shields were stored in the control towers of the ASUs. The institution reported that all staff had been trained in CPR.

PCs, custody supervisors, and psych techs met daily to discuss inmates newly arrived in administrative segregation, problem cases, and special situations. The meetings were documented in the administrative segregation sergeant's log book. Monthly emergency drills were also documented.

Internal audits found 69-percent compliance with the completion of pre-screens prior to an inmate's placement in administrative segregation, and 79-percent compliance with the completion of 31-question screens within 72 hours of an inmate's placement in unit 3A03. The institution did not audit the completion of 31-question screens for inmates placed in unit 3A04 or the stand-alone unit.

New intake inmates in all ASUs were identified with placards on their cell doors. There were designated intake cells located on both tiers directly in front of the control booth. All intake cells in the EOP hub had been retrofitted with suicide-resistant vents.

Custody staff completed 30-minute welfare checks on new-intake inmates during their first 21 days in administrative segregation. Internal audits conducted during the six-month reporting period yielded an overall compliance rate of 93 percent for the completion and documentation of daily psych tech rounds in administrative segregation.

Administrative segregation cells were equipped with electricity and inmates were permitted to have in-cell appliances.

There were 20 walk-alone yards adjacent to unit 3A03 and staff reported that this space had, thus far, provided sufficient capacity to offer ten yard hours per week to all MHSDS inmates in the unit. 3CMS inmates in unit 3A04 were reportedly offered four to six yard hours per week, utilizing both walk-alone and small group yards.

There were a large number of MHSDS inmates who were placed in administrative segregation while waiting to be transferred to SNY programs. At the end of 2009, nine of 43 or 21 percent of EOP inmates in administrative segregation were on SNY status. Similarly, 36 of 138 or 21 percent of 3CMS in administrative segregation were on SNY status.

Medication Management:

Staff and inmates reported medication continuity problems upon arrival at the institution. Internal audits showed that medications were routinely ordered within eight hours of an inmate's arrival at the institution. However, *Coleman* and *Plata* audits found that only 65 to 68 percent of incoming inmates received their first dose within 24 hours of arrival.

Internal audits yielded an 86 percent compliance rate for proper continuation of medications when inmates were moved within the institution.

Institutional audits also found a 70-percent compliance rate for timely renewal of medications.

The compliance rate for proper notation of medication noncompliance on MARs was found to be only 50 percent, according to institutional audits. It was also found that less than five percent of documented cases of noncompliance were referred to mental health and followed up by psychiatry. Only 23 percent of inmates prescribed Keyhea medications were referred to mental health after missing a single dose. Internal audits covering the second half of 2009 found that 50 to 91 percent of reviewed MARs had areas that were left blank, rendering it impossible to determine if medications were administered, refused by the inmate, or retained as a result of the inmate's failure to come to the pill line.

EOP inmates and inmates in administrative segregation were given medication at cell front. Mainline 3CMS inmates were administered medication via pill lines in the yard. Pill line waits were not audited during the reporting period.

An institutional audit completed in February 2010 found that 64 percent of reviewed records contained current informed consent forms for all prescribed medications. However, another audit, completed during the reporting period, indicated that less than five percent of reviewed records contained consent forms that were signed by the inmate.

Local audits indicated that laboratory studies of inmate blood levels of psychotropic medications were ordered timely. However, it was unclear from the documentation provided if all medications requiring regular laboratory testing were included in the audit. In addition, psychiatrists reported difficulty obtaining laboratory test results in a timely manner, including those in which abnormal values were found. This issue, apparently caused by a breakdown in internal processes for distributing test reports, was being corrected.

All psychotropic medications were ordered DOT. Internal audits found a compliance rate of 95 percent for DOT administration protocols.

The institution reported that Keyhea orders were not adequately tracked during the reporting period as result of personnel issues. The Keyhea coordinator was replaced in December 2009, after which accurate tracking reportedly resumed. During the period from July 1, 2009 to February 8, 2010, CSP/Corcoran initiated 35 Keyhea petitions and renewed another 65. All Keyhea petitions were initiated in the MHCB. As of February 8, 2010, there were 95 inmates at CSP/Corcoran with current Keyhea orders. A total of 29 injections were administered during the reporting period as a result of inmates refusing to take Keyhea medications.

There were approximately 1,400 inmates who were prescribed psychotropic medications at HS. The institution reported that all HS pill lines and cell-front passes observed during the reporting period were conducted at or after 8:00 p.m.

The institution did not audit or track information regarding the provision of parole medications during the reporting period. A new process for collecting data relative to parole medications was implemented in January 2010.

Sexual Misconduct:

CSP/Corcoran was compliant with sexual misconduct protocols. Between July and December 2009, CSP/Corcoran issued 94 RVRs to 62 inmates for sexual misconduct, 66 percent of which involved inmates housed in the SHU. All sexual misconduct RVRs were referred to mental health for completion of mental health evaluations. Seven cases were referred for a comprehensive assessment, two of which were deemed to meet the diagnostic criteria for Exhibitionism.

The monitor's expert reviewed approximately 25 RVRs issued for IEX, all of which were referred to mental health for completion of a mental health evaluation. All of the reviewed RVRs accurately referenced the content of the mental health evaluations. The

134

monitor's expert also reviewed several comprehensive evaluations.  When proffered.

Exhibitionism diagnoses were well-supported.

   All inmates found guilty of IEX received six- to nine-month SHU terms and were

referred to the local DA for possible prosecution.  There were 93 cases referred to the DA during

the last six months of 2009.  Inmates who exposed themselves in areas outside of their cells were

required to wear exposure-control jumpsuits when attending activities outside of their cells.

    At the time of the monitor's visit, only one inmate had completed the

Exhibitionism treatment program.  Eight of 11 inmates refused to participate.  The remaining

three inmates reported that involvement in the Exhibitionism treatment program had been

beneficial.  Four EOP inmates diagnosed with Exhibitionism were precluded from participating

in CSP/Corcoran's treatment program due to its location within the SHU.

Transfers:

   CSP/Corcoran had begun to implement new protocols designed to prompt routine

consideration of higher levels of care based on objective and subjective criteria developed

through the MHARP process.  However, the monitor's review of UHRs and DMH logs, and

observation of IDTT meetings, indicated that the new protocols were not uniformly implemented

and that problems remained.

   Staff reported that psych and return protocols were routinely followed for inmates

who were sent from CSP/Corcoran.  In these cases, the institution reportedly received

notification of impending discharges from DMH two weeks in advance, and routinely received a

discharge summary prior to an inmate's return from DMH.  However, psych and return protocols

were not consistently followed for inmates who were referred to DMH by other prisons and then

discharged to CSP/Corcoran.  In such cases, mental health staff often discovered the inmate's psych and return status during the initial contact.

During the last six months of 2009, there were nine Vitek hearings, all of which rejected the inmate's refusal to transfer to DMH.  The Vitek committee generally consisted of a CC, who served as the hearing officer, the treating psychiatrist, and the inmate's PC.  MHARP more than doubled CSP/Corcoran's rate of referrals to DMH programs.

The log provided for the monitor's review indicated that 46 DMH referrals were generated during the last six months of 2009: 19 to SVPP, 15 to acute care, nine to ASH, and three to the DMH ICF at CMF.  The log recorded all required data points for only four of these referrals.  While access to acute care and SVPP intermediate care appeared to remain slow, the full extent of the problem could not be fully assessed due to poor recordkeeping.

With regard to acute care, the data indicated that the time lapse between referral and transfer exceeded ten days in at least nine cases.  Seven inmates referred to acute care waited longer than 20 days, and four inmates waited longer than 40 days.

Access to SVPP and the DMH ICF at CMF could not be assessed because transfer dates were not recorded in 21 of 22 cases.  It was unclear from the log if the referred inmates were still waiting for DMH beds.  Access to ASH appeared to comply with Program Guide requirements.  Referral and transfer dates were recorded for seven of nine ASH referrals, all of which resulted in transfer within 30 days.

Access to MHCBs at CSP/Corcoran was good.  There were 23 MHCBs in CSP/Corcoran's 99-bed GACH.  Medical inmates were moved to outside hospitals when the number of MHCB inmates exceeded 23.  Alternative holding areas were not used to monitor inmates waiting for MHCBs.

The number of MHCB admissions from CSP/Corcoran declined from 474 during the last six months of 2008 to 320 during the last six months of 2009, for a decrease by 32 percent. Fewer admissions from CSP/Corcoran created additional capacity for admissions from other prisons. During the last six months of 2009, there were a total of 387 MHCB admissions, for an average of 65 per month. Ninety five or about a quarter of the admissions lasted longer than ten calendar days. CSP/Corcoran did not have an OHU or MHOHU.

Access to the PSU continued to be slow and difficult in many cases. Medical holds related to Keyhea petitions, as well as MHCB admissions and DMH referrals/transfers, often delayed initial PSU endorsements or invalidated existing endorsements. Once endorsed, finding available high-security caged bus seats and PSU beds took weeks. The records appeared to indicate that there were 16 inmates with current PSU endorsements pending transfer at the time of site visit. On average, these inmates had been awaiting transfer for 132 days, with a range of 80 to 199 days.

Other Issues:

Administrative Segregation

CSP/Corcoran had three ASUs. The EOP hub was located in sections A and B of housing unit 3A03. Administrative segregation-status 3CMS inmates were housed in section C of unit 3A03 and in all three sections of unit 3A04.

CSP/Corcoran consistently complied with court-ordered requirements applicable to the stand-alone ASU. MHSDS inmates were removed from the unit within 24 hours in most cases. Mental health screens were completed within 72 hours of an inmate's placement in the unit. Daily psych tech rounds occurred. Clinical staff responded timely to mental health

referrals from the unit.  A full-time psych tech was assigned to the stand-alone unit during
second watch from Monday through Friday.

During the last six months of 2009, 18 inmates were placed in the MHSDS and transferred to
3CMS housing within 24 hours.  During this same period, another 12 3CMS inmates were
mistakenly placed in the stand-alone unit.  Ten of these 12 inmates were removed from the unit
within 24 hours. All referrals submitted by, or on behalf of, inmates in the stand-alone unit were
considered urgent and required a clinical response within 24 hours. While not all referrals
generated a response within 24 hours, staff did respond to all referrals within five working days.

<u>MHCB</u>

With the exception of overly-restrictive safety and security protocols, the
monitor's observation of an IDTT meeting and review of inpatient records indicated that the
MHCB operated well and generally responded effectively to a considerable demand for crisis
care services.

MHCB staffing had been enhanced to include three clinical teams, each comprised of a
psychiatrist, a psychologist, and a social worker.  Two full-time RTs provided coverage seven
days a week.  Clinical space included four treatment rooms, each equipped with a therapeutic
module.  None of the modules conformed to specifications.

All inmates admitted to the MHCB unit, regardless of their security status or
reason for admission, were issued a suicide smock, tear-proof blanket, and tear-proof mattress,
and were handcuffed when moved and placed into therapeutic modules during clinical
interactions.  These property and movement restrictions remained in place throughout the
inmate's stay in a MHCB, regardless of his clinical presentation.

Internal UHR audits covering the last six months of 2009 showed compliance with timely completion of initial and follow-up IDTT meetings, intake SRACs, initial treatment plans, and discharge summaries. However, noncompliance was found in other areas. The institution was 24-percent compliant with requirements for completion of a mental health evaluation by the referring clinician; 71-percent compliant with consideration for DMH referral following three or more MHCB admissions; 79-percent compliant with contact with the referring PC prior to discharge; and 37-percent compliant with the presence of a CC at IDTT meetings.

Five-point restraints were used on 19 occasions during the six-month reporting period. Length of time in restraint ranged from 1.5 hours to three and a half days. Restraint lasted longer than ten hours in ten cases and exceeded 24 hours in seven cases.

SHU

Due to the expansion of the SHU program at CSP/Corcoran, the number of 3CMS inmates in SHU increased from 490 to 557 during the last six months of 2009, and stood at 551 in March 2010. These numbers included administrative segregation-status 3CMS inmates with expired SHU terms, all of whom received daily psych tech rounds and weekly PC contacts while awaiting transfer from the SHU.

The increased number of 3CMS inmates in the SHU prompted the allocation of an additional PC, which brought the total allocation to 12.75 and produced an average caseload of 43 inmates. Two RTs conducted 3CMS groups on both SHU yards.

Treatment space continued to be limited. On one of the SHU yards, four PCs, a psychiatrist, and a RT shared three treatment rooms that were used for all group and individual sessions.

Mental health appointments were rarely missed as a result of escort issues. Tracking data provided by the institution indicated that 47 percent of mental health contacts in the SHU were completed at the cell front.  Nine percent of the cell-front contacts were attributed to clinician workload issues and 38 percent were related to inmate refusals.

UHR audits conducted by the institution during the reporting period found good to excellent compliance with SHU Program Guide timeframes.  The compliance rates were 87 percent for initial IDTT reviews being held prior to the intake ICC, and 90 percent for timely completion of quarterly IDTT reviews.  Monthly PC contacts were documented 94 percent of the time, and documentation of weekly psych tech rounds was found in the UHR 88 percent of the time.  IDTT meeting participation rates were above 90 percent for psychiatrists, CCs, and psych techs.

Group therapy in the SHU consisted of five clinician-facilitated groups, two Exhibitionism treatment groups and 18 recreation therapy groups.  The institution reported that a total of 1,124 SHU inmates had participated in recreational group therapy during the six-month reporting period.  There were 53 SHU inmates on group therapy waitlists.

EOP

CSP/Corcoran's mainline EOP program provided services to 145 to 155 inmates during the reporting period.  The EOP unit also housed ten to 11 3CMS inmates pending transfer to another institution at any given time. Staffing, which included 8.75 FTE PCs, two full-time psychiatrists, and three full-time RTs, was adequate.  Psych techs were also assigned to the program and were responsible for daily rounds, medication administration, and conduct of 12 groups per week.  PC caseloads ranged from 22 to 26 inmates.

The EOP programming building included shared office space for clinicians and two large group rooms. Groups facilitated by PCs usually included 14 to 18 inmates. Recreation therapy groups typically included over 50 inmates and, at times, as many as 80 inmates. Recreation therapy groups took place on the yard and in the housing unit. These 30-minute groups, offered four days a week, were also large with two to three RTs facilitating groups of more than 50 EOP inmates.

Tracking data covering the last six months of 2009 indicated that mainline EOP inmates were offered, on average, a little less than 14 therapeutic hours per week and received, on average, over twelve hours per week. During this period, 15 to 23 percent of scheduled appointments were not completed. Nearly all of the missed appointments, 84 to 97 percent, were attributed to inmate refusals.

Compliance rates for various Program Guide requirements differed, depending on the information source. On the one hand, monthly performance data obtained from the MHTS showed near 100-percent compliance with most Program Guide requirements applicable to EOP inmates. Internal UHR audits, on the other hand, yielded compliance rates of 76 percent for timely completion of initial evaluations, 84 percent for completion of monthly psychiatric contacts, 81 percent for completion of weekly CM contacts, and 66 percent for completion of SRAs.

Administrative Segregation EOP

In November 2009, the EOP administrative segregation hub was moved from unit 4B1L to Sections A and B of unit 3A03 to accommodate an increase in capacity from 54 to 99 inmates. The unit's census stood at 79 at the time of the site visit. The institution had chartered

a QIT to compel more inmates to accept cellmates so that full capacity could be reached by May 2010.

Compliance rates for weekly PC contacts differed, depending on the information source.  MHTS tracking data showed near 100-percent compliance with weekly contacts, whereas local UHR audits yielded a compliance rate of 88 percent. Tracking data indicated that 63 percent of clinical contacts occurred out-of-cell in a confidential area.

Provided data indicated that EOP hub inmates were offered an average of 11.3 therapeutic hours per week and received an average of 5.4 hours per week.  An internal audit found that 96 percent of the missed appointments were attributed to inmate refusals.

Internal audits showed substantial compliance with Program Guide timelines for initial and quarterly IDTT reviews.  CCs attended IDTT meetings 94 percent of the time, and psychiatrists were present 99 percent of the time.  An IDTT meeting attended by the monitor's expert was attended by all required disciplines, all of whom were noted to participate in the process.

A psychologist served as the pre-parole planning coordinator for EOP hub inmates.  This same clinician also carried a small caseload, attended all ICC meetings, functioned as a liaison between inmates and the parole outpatient clinic (POC), assisted inmates in finding outside housing, and conducted a pre-parole planning group.

There were 34 EOP inmates who had been in administrative segregation longer than 90 days.  Of these, 65 percent had been endorsed and were awaiting transfer to a Level IV SNY program or PSU.

3CMS

There were mainline 3CMS inmates on facilities 3A and 3B and SNY 3CMS inmates on facility 3C. Two PCs were assigned to each facility. Inmate caseloads ranged from 77 to 98. Telemedicine was used to augment psychiatric coverage on facility 3A. On-site psychiatric coverage was reported to be inconsistent on all three facilities, which compromised continuity of treatment and limited IDTT attendance.

Internal audits yielded compliance rates of 96 percent for completion of quarterly PC contacts and 93 percent for completion of annual IDTT reviews. Initial mental health evaluations were completed within ten working days of arrival 83 percent of the time. Intake IDTT reviews were held within 14 days of arrival 80 percent of the time. Staff reported that one in five mental health evaluations were delayed because UHRs were unavailable. The frequency of psychiatric contacts was not audited during the reporting period.

IDTT meeting participation rates for CCs was 90 percent. The IDTT meeting attendance rate for psychiatrists was 78 percent, due to uneven psychiatric coverage across facilities during the reporting period. IDTT meetings observed by the monitor's expert on facilities 3A and 3B were noted to be thorough, interactive, and clinically meaningful.

Facilities 3A and 3B each offered three groups to 3CMS inmates, while facility 3C had temporarily discontinued groups following the assignment of new PCs to the yard. There were a total of 53 inmates on waitlists for 3CMS groups.

Administrative Segregation 3CMS

Administrative segregation-status 3CMS inmates were moved to housing units 3A03 and 3A04 in November 2009. The number of 3CMS inmates in administrative segregation averaged 156 during the reporting period.

143

According to institutional data, an average of 75 percent of clinical contacts occurred cell-front.  Most of the cell-front contacts were the result of inmate refusals; an average of 12 percent of cell-front contacts were related to clinician time and workload issues.

There was significant turnover among PCs in the 3CMS administrative segregation program during the reporting period, mostly related to extended medical leave, internal reassignments, and increased utilization of dual appointments.  By the end of the reporting period, 7.25 clinicians were assigned to the program, producing average caseloads of approximately 22 inmates.

There were seven healthcare access officers assigned to the 3CMS administrative segregation program.  Access officers also escorted psych techs during daily rounds.

Groups were not offered to 3CMS inmates in administrative segregation.   Staff reported that the availability of excess space for 3CMS groups in the new treatment center would be assessed after the EOP hub reached its intended capacity of 99 inmates.

Internal audits showed that mental health evaluations and initial IDTT reviews were not consistently completed within Program Guide timeframes.  UHR reviews covering the reporting period yielded compliance rates of 73 percent and 63 percent, respectively, for completion of initial evaluations and IDTT reviews within ten working days of placement in administrative segregation.

Compliance rates for weekly PC contacts within the 3CMS administrative segregation program differed, depending on the data source.  MHTS tracking data showed 98-percent compliance, whereas UHR audits yielded an 81-percent compliance rate for the completion of weekly PC contacts.

Both MHTS tracking data and UHR audits produced compliance rates of above 90 percent for the timely completion of quarterly IDTT reviews. However, IDTT meeting participation rates for CCs remained problematic. Tracking information provided by the institution indicated that, during the last six months of 2009, IDTT participation rates were 87 percent for psych techs, 86 percent for psychiatrists, and 25 percent for CCs.

Referrals

CSP/Corcoran had implemented a reliable system for capturing performance data relative to routine, urgent, and emergent referrals. The data distinguished between self and staff referrals, separated PC referrals from psychiatric referrals, and identified referrals related to medication noncompliance. According to the data, CSP/Corcoran continued to struggle to meet Program Guide deadlines for responding to routine, urgent, and emergent referrals. Failure to respond timely to referrals was reported to be the result of delays inherent to the multi-stepped referral process and scheduling difficulties related to planned and unplanned staff absences.

A printout of all referrals generated during December 2009 listed 325 routine referrals with submission and completion dates. Of these referrals, 198 or 61 percent did not prompt a response within seven calendar days, and 64 or 20 percent failed to produce contact within 14 calendar days.

RVRs

During the last six months of 2009, 247 RVRs were referred to mental health for completion of an evaluation that was to be used in the disciplinary process. Of those RVRs, 33 or 13 percent were issued to MHCB inmates, 97 or 39 percent were issued to EOP inmates, 104 or 42 percent were issued to 3CMS inmates, 12 or five percent were issued to non-MHSDS inmates, and in one case, the inmate's MHSDS status was not recorded.

Of the 104 referred RVRs involving 3CMS inmates, 72 or 69 percent were related to sexual misconduct.  The remaining 32 cases were related to a handful of different infractions.  The monitor's review of a small sample of RVRs issued during the reporting period found consistent compliance with many of the required protocols.   However, performance in other areas was problematic.  Mental health evaluations were not completed within 15 days of the incident in more than half of the cases reviewed.

Use of Force

Use of force appeared to be carefully reviewed.  According to the data provided by the institution, during the last six months of 2009, there were a total of 122 use-of-force incidents, of which 71 or 58 percent involved MHSDS inmates.  During this period, there were 221 incidents that did not involve use of force.  Of these, 136 or 62 percent involved MHSDS inmates.  Over a quarter or 27 percent of the incidents reported during the monitoring period were related to sexual misconduct.

According to information provided by the use of force coordinator, during the period from July 1 to December 31, 2009, there were 355 incidents at CSP/Corcoran that required the completion of an incident package.  Of these incidents, five were calculated cell extractions involving MHSDS inmates and three were emergency cell extractions involving MHSDS inmates.  Compared to preceding monitoring periods, this data reflected a reduction in the use of calculated and emergency cell extractions..

Digital recordings of the calculated cell extractions and incident reports of the emergency cell extractions indicated that use-of-force protocols were routinely followed.  Unlike during preceding reporting periods, the use-of-force executive review was timely completed and up to date.  There was no backlog of incidents awaiting review at the time of the site visit.

Pre-Release Planning

Two clinicians dedicated half-time hours to providing pre-release planning for mainline and administrative segregation EOP inmates.  PCs also provided some parole planning.  Tracking data indicated that 54 of 131 or 41 percent of EOP inmates scheduled to parole during the last six months of 2009 were contacted by their PC for parole planning.  The institution reported that clinicians also facilitated pre-parole groups to which EOP inmates were assigned six months prior to their release.

**California Substance Abuse Treatment Facility (CSATF)**
July 26, 2010 – July 28, 2010

Census:

On July 26, 2010, CSATF's population was 6,676, a six-percent decline from the preceding monitoring period.  The number of administrative segregation inmates increased by 12 percent to 305, which included 122 MHSDS inmates.

The MHSDS census stood at 1,664 inmates.  There were 133 EOP SNY and 12 administrative segregation EOP inmates.  The 3CMS mainline population totaled 1,393 inmates.  There were 110 administrative segregation 3CMS inmates, and 16 3CMS inmates in the MHCB unit.

Staffing:

To accommodate the activation of two new EOP programs, mental health staffing allocations increased by 82 percent to reach 106.8 FTE positions.  This resulted in an increase of the vacancy rate to 32 percent as CSATF attempted to fill these newly-allocated positions.  With dual appointments, an estimated ten percent of mental health staff provided additional coverage.  Use of contractors, dual appointments, and psychiatric telemedicine brought the functional vacancy rate to 29 percent.

147

The chief psychiatrist and chief psychologist positions were filled, as were two of three senior psychologist positions. Four of seven staff psychiatrist positions and 1.77 of 14.57 staff psychologist positions were vacant.

One of two supervisory social worker positions was vacant, as were 3.5 of 14.5 social worker positions. Both senior psych tech positions were filled, but 14 of 43.23 psych tech positions were vacant. One of four RT positions was vacant, as were 5.5 of 13.5 clerical positions. The one health programs specialist I position was filled.

Quality Management:

The local governing body was chaired by the warden and met quarterly. The QMC, which was chaired by the health care manager (HCM), met weekly. Minutes were informative and standard agenda items included progress reports on inmate medical appeals, UHR audits, and subcommittee reports.

The mental health subcommittee was chaired by the mental health director and met twice monthly. Although meeting attendance was generally good, furloughs reportedly reduced custody representation. Minutes were useful and informative. Routine agenda items included SPRFIT and QIT reports, and monthly audit results. Information from the QMC and subcommittee meetings was shared during regular mental health staff meetings.

The mental health subcommittee chartered one QIT that was tasked with improving compliance with referral timeframes. Mental health staff also participated in a QIT chartered by the medical subcommittee to examine a broad range of pharmacy issues.

Monthly UHR audits typically consisted of sample sizes that were too small to generate reliable results, while audit findings were not accompanied by a written analysis or a description of possible corrective action.

Peer review at CSATF was limited to UHR reviews and was undeveloped.

Suicide Prevention:

The SPRFIT met monthly, maintained thorough minutes, and presented a summary of its activities at mental health subcommittee meetings. SPRFIT meetings were chaired by the chief of mental health and included representatives from mental health, custody, and nursing. Standing agenda items included the review of internal and statewide suicide statistics, compliance with five-day follow-up protocols, and discussion of strategies to improve suicide prevention initiatives. MHCB staff also presented difficult clinical cases at most of the meetings. The SPRFIT initiated CSATF's response to suicide reports and audited compliance with recommended corrective actions.

Compliance with five-day follow-up appeared to hover near 100 percent. Not all tracking records of custody checks were submitted for review.

Attendance logs indicated that mental health and custody staff in administrative segregation conducted daily morning meetings to identify new arrivals, and to discuss cases involving suicide risk, behavioral alerts, and other issues that might warrant emergent or urgent referrals. Although CSATF reported that pre-placement screens were completed, supporting audit data was not provided. Although audits and placement logs indicated that the 31-question screen was routinely used to screen non-MHSDS inmates, MHSDS inmates and inmates transferred from the stand-alone ASU to Building E1 were not screened. Psych techs reported that administrative segregation inmates were offered out-of-cell screens in confidential areas. Approximately half of the Building E1 screens were conducted cell-front, reportedly at inmates' request. Audits yielded a 93-percent compliance rate for the completion and documentation of administrative segregation daily psych tech rounds.

Designated intake cells were strategically placed and retrofitted with new doors, cement bunks, and suicide-resistant vents.  It was unclear to what extent the intake cells were used to house high-risk inmates during their first 72 hours in administrative segregation.  New intake inmates were identified with door placards that included the inmate's placement date.  Custody staff reported, and logs reviewed by the monitor's expert appeared to confirm, that new intake inmates received 30-minute welfare checks. However, logs indicated that rounds were not staggered but were routinely conducted at regular intervals, nearly always beginning and ending at the same time.  Inmates were permitted to have televisions or radios in their cells.  Cut-down tools were maintained in the control booth, and documentation indicated that monthly emergency drills were conducted.

Medication Management:

Audits yielded compliance rates of 90 to 100 percent for timely continuation of medications for new arrivals and for internally-transferred inmates.

Audits of MARs indicated that inmates who were not present at pill lines were referred to mental health 69 percent of the time, and inmates who signed refusal forms for prescribed medications were referred 79 percent of the time.  CSATF's review of formal inmate complaints indicated that psychiatrists did not respond timely to medication non-compliance referrals.

Although staff reported that pill line waits were not problematic, pill lines were not audited.

Staff reported, and audits confirmed, that it typically took more than three days to process and administer medication orders.  Delays were often longer when the pharmacy did not receive faxed medication orders.

150

CSATF did not audit the completion of informed consent forms or laboratory protocols. Staff reported that laboratory test reports were not timely filed in UHRs.

All psychotropic medications were ordered to be administered DOT. However, audits showed inconsistent compliance with DOT protocols due to nursing supervisor shortages, and related nursing vacancies and turnover.

While use of Keyhea orders has been historically low at CSATF, Keyhea orders increased following activation of the EOP SNY program. During the preceding 11 months, CSATF initiated 18 Keyhea petitions, 13 of which resulted in orders. The administrative law judge rejected one petition. Staff decided not to pursue two cases involving inmates who subsequently agreed to take prescribed medications.

Over 600 inmates were prescribed HS medications. Nursing shortages led to inconsistencies in HS protocols.

Internal audits showed that parole medications were consistently provided to inmates upon release.

Sexual Misconduct:

CSATF issued 13 IEX RVRs, all of which were reportedly referred for screens and review by a treatment team. None of the cases were referred for a comprehensive evaluation.

Placards were placed on cell door windows of inmates found guilty of IEX. Jumpsuits were used for administrative segregation inmates but were not required for those in the GP.

Transfers:

Although all 16 DMH acute care referrals resulted in transfer, only three of the transfers occurred within ten days of referral. Transfer delays ranged from 11 to 80 days, with six inmates waiting 20 days or longer.

CSATF generated 15 intermediate care referrals, including five to SVPP, six to ASH, and four to the DMH ICF at CMF. Eight referrals resulted in transfer, three of which occurred within 30 days. Transfer delays in the remaining five cases ranged from 41 to 97 days. Two referrals were rescinded by CSATF, and five involved inmates who left CSATF prior to transferring to DMH.

There were 244 MHCB admissions. Lengths of stay exceeded ten days in 89 cases. Just over 17 percent of admissions lasted 20 days or more. Nine percent lasted 30 days or longer, and 4.5 percent lasted 40 days or more.

Although alternative holding areas were not used to house inmates pending MHCB placement, holding cells in the TTA were used on 22 occasions to temporarily monitor inmates waiting for an MHCB. CSATF data indicated that none of these placements exceeded four hours.

Forty-one EOP inmates transferred from CSATF. This included nine hub transfers, none of which occurred within 30 days. Transfer delays ranged from 33 to 194 days. Of the 18 inmates transferred to mainline EOP programs, two were delayed, waiting 82 and 125 days, respectively. One EOP inmate waited 77 days to transfer to a PSU program.

CSATF inappropriately received four EOP inmates from RCs. Three of these inmates transferred to an EOP program within 30 days, and the fourth inmate waited 44 days.

Six EOP inmates were transferred from other prisons to the CSATF MHCB.  Two EOP inmates paroled from CSATF and one EOP inmate transferred to CSATF in order to appear in court.

Other Issues:

Administrative Segregation

CSATF had two ASUs.  Building E1 housed from 130 to 180 inmates, including 100 to 135 MHSDS participants.  A stand-alone unit also housed non-MHSDS inmates.  There were no overflow ASUs.

Four PCs, each with caseloads of 25 to 35 inmates, covered administrative segregation.  Compliance rates ranged from 46 to 100 percent for the completion of intake evaluations within ten days of arrival in administrative segregation, and 96 percent for weekly PC contacts.  Inmate refusals largely resulted in 38 percent of PC contacts occurring cell-front.

Administrative segregation group space consisted of six treatment modules that did not meet design specifications.  Ambient noise in the unit helped prevent eavesdropping of group discussions, and efforts were made to reduce foot traffic in the area when activities took place.  Nonetheless, this arrangement did not afford adequate confidentiality, and limited the therapeutic value of group sessions.

Each PC assigned to administrative segregation facilitated at least one weekly group.  Group themes included anxiety support, self-esteem, problem solving, and coping skills.

The monitor's expert observed an administrative segregation IDTT meeting.  It was held in a private but small room.  All inmates were placed in therapeutic modules and in all but one case, were unrestrained during the meeting.  The module was positioned such that inmates were required to peer through the side panel to face treatment team members.  Several of the reviewed cases were not presented by the inmate's PC, and in some of them, the presenting

clinician was not familiar with the inmate's clinical history and treatment plan. DMH referral was not discussed during the meetings. UHRs and C-files were available.

The average administrative segregation length of stay for 3CMS inmates was 55 days. Twenty-two percent of administrative segregation 3CMS inmates stayed longer than 90 days, and 13 percent had stays exceeding four months. Data on lengths of stay for EOP inmates in administrative segregation was not provided.

Staff assigned to the stand-alone ASU was familiar with the prohibition against placement of MHSDS inmates in the unit, and reported that mental health staff responded timely to staff and inmate referrals. However, CSATF did not provide tracking data regarding the movement of MHSDS inmates in and out of the stand-alone unit, and did not have referral response data for unit inmates. No MHSDS inmates were housed in the stand-alone ASU during the site visit.

EOP SNY

CSATF activated a 176-bed Level I-II EOP SNY program on April 5, 2010, and was scheduled to activate an 88-bed Level II dual diagnosis program in August 2010. The space accommodated all treatment requirements, including the delivery of medications within the housing unit.

Although staff recruitment commenced months before activation of the EOP SNY program, delayed credentialing and other lapses resulted in the new program opening its doors without a full complement of mental health staff. As of July 2010, half of the 58.6 positions allocated for the new EOP program remained vacant. Vacant positions included those for a psychiatrist, 5.27 PCs, a recreational therapist, 14 psych techs, four nurses, and three OTs.

Despite staffing challenges, the EOP SNY program accepted 15 inmates weekly during most of the activation period.  The high rate of parole among Level I and II prisoners resulted in the program's census remaining below capacity at 133 inmates during the site visit.

Due to other demands, PCs had yet to facilitate groups, and all groups were run by psych techs.  Group participation data was not available.  Interviewed staff and inmates indicated that inmates were offered an average of more than 20 hours of weekly group therapy.  Two community meetings observed by the monitor's expert were well run.  Staff and inmates complained about the lack of recreational supplies.

Inmates in the new EOP SNY program had limited yard access.

COs did not attend IDDT meetings in the new EOP SNY program, which was attributed to inadequate custody staffing allocations.

3CMS

PC caseloads averaged 120 inmates.  Compliance rates in some areas declined due to the diversion of 3CMS clinicians to assist with the activation of the EOP SNY program.  Data collection problems associated with the conversion to MHTS.net.

Audits of approximately 100 UHRs yielded compliance rates above 90 percent for completion of annual IDTT meetings, participation of required disciplines at IDTT meetings, and documentation of consideration of level-of-care changes during IDTT meetings.  Quarterly PC contacts were documented 97 percent of the time, and consideration of an inmate's appropriateness for group therapy was documented 86 percent of the time.

Sample sizes used to gauge compliance with new arrival requirements seemed too small to produce reliable results.

CSATF's review of 63 UHRs showed inconsistent compliance with parole planning requirements for 3CMS inmates. Only 61 percent of reviewed records documented parole planning. About half of the reviewed records documented inmates' participation in parole planning, and less than half indicated that parole planning started 60 to 90 days prior to parole.

There were nine active groups for 3CMS inmates. Inmates attending groups observed by the monitor's expert were complimentary of clinician facilitators and uniformly reported that groups were helpful.

Referrals

CSATF provided conflicting data on referrals. One report indicated that 785 referrals, including 670 routine, 105 urgent, and 10 emergent, were submitted to PCs. But logs that tracked PC referrals listed 827 referrals without distinguishing among referral types. It took clinicians an average of 6.9 working days to respond to these referrals. Further CSATF data indicated that psychiatry received 1,137 referrals, including 997 routine, 120 urgent, and 20 emergent referrals.

Medical Records/MHTS

MHTS.net was activated in March 2010 and was estimated to be from 70 and 80 percent functional. Although staff had resolved many of the initial start-up and data corruption difficulties, they continued to struggle with producing accurate MHSDS rosters, among other issues.

Behavior Modification Unit (BMU)

CSATF provided conflicting records for the BMU. One source reported 137 BMU placements, including 11 3CMS and no EOP inmates, but another source identified nine 3CMS and one EOP inmate as having spent time in the BMU. This second source reported that

two MHSDS inmates, including the sole EOP inmate, were discharged to administrative segregation after an undisclosed period of time in the BMU.  Six 3CMS inmates were released to the GP after 90 days in the BMU, and one 3CMS inmate was released after two weeks.  The remaining 3CMS inmate had been in the BMU for 209 days as of the end of February 2010.

At the time of the site visit, there were 42 inmates assigned to the BMU, none of whom were MHSDS inmates.  The CO regularly assigned to the BMU stated that most inmates placed in the program were cooperative, moved timely through the privilege stages, and were released to GP housing within 90 days.  The BMU log confirmed this report, indicating that over 70 percent of inmates placed in the unit were removed within 90 days.  Only one inmate had been in the BMU longer than 120 days at the time of the monitor's visit.

Inmates in the BMU were required to view educational videos and to complete in-cell reading and writing assignments.

Heat Plan

The monitor's expert visited housing units on five of seven yards to review heat plan protocols.  Temperature logs in all visited housing units were maintained and current.  Lists of inmates taking heat-sensitive medications were reportedly circulated daily by the pharmacy, but were not found in two of the housing units.

Heat cards were not used.  Rather, heat lists and CDCR ID cards were used to identify inmates during Stage I heat alerts.  On some yards, the letters "UHT" were written with red ink on CDCR ID cards belonging to inmates taking heat-sensitive medications.

Thermometers in visited housing units were mounted on dayroom walls at a height that was even with second tier cells.  Officers did not have hand-held thermometers for taking temperatures in individual cells or areas that were likely to be the warmest during hot

weather.

RVRs

RVR data did not include information from all facilities and was therefore incomplete.  Tracking data was also incomplete, making it difficult to gather accurate RVR histories when completing Form 7388, the DMH referral checklist.

Lockdowns

Lockdowns had the greatest effect on facilities C and D. All inmates on facility C were locked down for at least half of the reporting period, with facility C northern and southern Hispanic inmates being locked down for the entire reporting period.  All facility D inmates were locked down for nearly a third of the reporting period.  Northern Hispanic inmates on facility G were locked down for 40 days, and all inmates on facility B were locked down for 19 days. Other facilities were locked down for ten days or less.

Staff reported, and access data provided by CSATF confirmed, that a low percentage of mental health appointments were missed due to lockdowns and modified programs.

Access to Care

CSATF reported that escorts were adequate to ensure access to all health care appointments during routine operations, lockdowns, and rolling appointments.  Non-supervisory staff reported generally good working relationships with custody staff in all program areas.

<u>**Pleasant Valley State Prison (PVSP)**</u>
April 27, 2010 – April 29, 2010

<u>Census</u>:

As of April 6, 2010, PVSP reported a total population of 4,720 inmates, a decrease of 448 inmates since the preceding monitoring period.  The number of inmates on the MHSDS caseload was 1,911.  Of these, seven were in the MHCB and two EOP inmates were in administrative segregation pending transfer to a hub. There were 126 3CMS inmates in administrative segregation and 1,776 3CMS mainline inmates.

<u>Staffing</u>:

The total allocation of mental health staff was 59.12 positions, of which 53 of were filled by permanent staff.  The staffing allocation was based on the institutional capacity of 1,651 MHSDS cases, rather than the actual census of 1,912 inmates. The overall mental health staffing functional vacancy rate was 5.3 percent.   Since the preceding monitoring period, PVSP completed the hiring process for 2.5 staff psychiatrists, one OT, five psychologists, and one senior psychologist.    Additionally, the institution employed one senior psychologist and two staff psychologists on a contract basis.  Mental health custody staffing was not reported.

<u>Quality Management</u>:

QMCs were all scheduled for regular meetings, maintained minutes, had appropriate membership, and addressed relevant topics.  To varying degrees, all committees demonstrated problems related to regular attendance, which at times led to cancelled meetings. At other times, meetings were held without a quorum present.

Meeting minutes indicated that the local governing body met monthly and was comprised of adequate membership.  The local governing body addressed relevant topics and

received reports from the QMC.  Attendance rates were variable, ranging from seven to 12 members per meeting for the months of October 2009 through February 2010.

All appropriate disciplines were represented in the QMC.  The committee maintained adequate minutes and received reports from the mental health subcommittee. Relevant topics were addressed.  A review of the minutes indicated that the committee met each month during the reporting period.  Attendance ranged from eight members to 18 per meeting.

According to the chief of mental health, the mental health subcommittee was transitioning from a CAP-based model to a management report model.  During the reporting period, the mental health subcommittee met monthly except for December 2009.  The subcommittee was comprised of the required membership and meeting minutes were maintained. In November 2009, the committee met without a quorum present.

The mental health subcommittee examined relevant topics such as admissions and discharges from the MHCB, and medications for new admissions. Audits were not sufficiently specific and methods employed, samples utilized, and remedial actions recommended were not communicated clearly in the documentation.

One QIT was chartered during the monitoring period.  It addressed missing medication orders and laboratory results.  Since the preceding monitoring period, three QITs were active, including one that reviewed handling of IEX referrals.  A new QIT concerning timeliness of addressing new referrals was being chartered.

Reportedly, peer review was divided by discipline and was well-established, but not all disciplines met regularly during the review period.  The two social workers on staff reviewed each others' work.  Peer review activities were both qualitative and quantitative. Examples of quantitative areas addressed included the appropriateness of diagnoses, and whether

suicide-related concerns were addressed.  A review of meeting minutes indicated that no psychiatry peer review was conducted during December 2009 or January 2010.  This was attributed to the need for psychiatrists to see a large number of newly arrived inmates.

Suicide Prevention:

The institution reported no completed suicides during the monitoring period. Mental health staff reported excellent working relationships with custody and cross-disciplinary communication about inmate risk factors.  Staff also reported having a low threshold for enrollment in the MHSDS, which they said provided the opportunity to monitor inmates and respond proactively to situations which might increase suicide risk.  Staff reported that all incoming inmates were screened.

The emergency response review committee (ERRC) was scheduled to meet monthly.  The committee reviewed all incident reports for deaths, Code 3 emergencies, and suicide attempts for appropriateness of response by both uniformed and civilian staff.  Meeting minutes reflected an issue with receiving corrective actions from nursing.  The ERRC did not meet in November 2009 or February 2010.

The SPRFIT was comprised of appropriate membership and met monthly. Relevant issues were discussed and minutes were maintained.  The SPRFIT appropriately focused on new arrival protocols, risk factors related to new admissions, and due to a recent increase in new admissions, five-day follow-up/custody observations.  Although the SPRFIT met regularly, the January 2010 meeting fell short of a quorum.

The monitor met with both custody and psych techs in ASU II.  Both confirmed that daily morning meetings were conducted to discuss newly-admitted MHSDS inmates or problem cases.

Inmates were pre-screened by nursing staff prior to administrative segregation placement.  The screening materials included a question regarding possible suicidality.  Additionally, the nurse conducting screenings in ASU II obtained the inmate treatment profile from MHTS during the pre-screening.  Per institutional procedure, the psych techs provided a mental health screening of all inmates placed into administrative segregation, utilizing the 31-question screening tool.  Ninety-nine percent of the screenings were completed within 72 hours of placement.

A total of 247 MHSDS inmates were admitted to the ASU II during the reporting period, with mental health screenings completed within 72 hours in all but two cases.  Two small interview rooms were available to conduct confidential screens and interviews with administrative segregation inmates.  Adequate custody staffing was available to conduct escorts for these sessions.

Three new intake cells were identified and retrofitted for suicide risk reduction within Unit II.  Staff indicated that the influx of new admissions often required the utilization of additional cells within the unit for these cases, with the date of admission noted on a sheet of paper posted on the cell door.  The intake cells were located opposite the custody office to facilitate observation of new arrivals.

Staggered 30-minute custody welfare checks were conducted on all inmates in both ASUs throughout their stays in the units.  Institutional logs indicated that these checks were completed, but were late for 54 of 619 inmates in ASU I (non-MHSDS inmates) during this period, and for 52 of 498 inmates in ASU II (MHSDS inmates) during September and October 2009.  Since November 2009, audits of compliance with this requirement were tabulated by custody staff rather than clinical staff, and no late or missed checks were recorded.  Audits

indicated that all checks were completed on a timely basis during the last four months of the reporting period. The monitor's expert's review of the log of these checks corroborated this finding.

All cells in Unit II, but none in Unit I, were equipped with electrical outlets, and inmates were permitted to have their own televisions and radios.

Unit II had 20 separate yards available for exercise. At the time of the site visit, the yards were reportedly sufficient to meet the ten hours per week requirement for the mental health population of 132 inmates. All inmates in administrative segregation were offered three yard days per week, with four hours of yard time two days per week, and two hours of yard time one day per week. Yard time was logged with entries indicating whether the offer was accepted or refused, but a review of a sample of these logs indicated that entries were incomplete. No other logging of yard time was maintained in the unit.

The monitor conducted spot checks of custody staff in administrative segregation and found all staff to have micro-shields on their person. Cut-down tools were located in the unit control space. Staff reported and audits confirmed that custody attended CPR training on a two-year basis, and participated in quarterly emergency response drills, some of which involved mental health scenarios.

Medication Management:

There appeared to be a communication gap between mental health staff and nursing staff regarding overall medication management and the needs of the MHSDS population. General information regarding issues of mutual concern was not shared in a collaborative manner. Information regarding nursing observations of inmates in crisis who were held in the TTA was unavailable to mental health. The monitor's expert's review of cases in which RVRs

for misuse of medication were written collaboratively by nursing and custody staff indicated that nursing staff did not routinely notify mental health staff of those incidents.

A staff audit of new arrivals from September 1, 2009 to February 28, 2010 found that of the 181 newly arriving inmates on psychotropic medications, 17 or less than one percent received their medications within 24 hours.

According to staff reports, medication continuity following intra-institutional transfers was better, although still non-compliant. A staff audit of 37 cases of intra-institutional moves from August 1, 2009 to February 28, 2010 found that in 29 or 74 percent of cases, medication was administered within one day or less. A staff audit of continuity following placement into administrative segregation for the period from August 1, 2009 to January 31, 2010 found that continuity was sustained in 81 of 96 or 84 percent of cases.

PVSP did not provide systematic information regarding new orders, renewals, or expirations of orders. A nursing supervisor reported, however, that delays in the administration of new orders was audited and had been a topic of meetings between nursing and the pharmacy. Some delays in processing new orders were attributed to fax hardware.

Problems were evident with the institution's response to medication noncompliance. Mental health staff reported that it was difficult to monitor medication compliance, in part because the accuracy of MARs was unreliable. A nursing supervisor reported that nursing staff was re-trained on noncompliance policy and procedures and results were being monitored at the time of the monitor's visit.

PVSP did not have pill lines. All medication was administered in the housing units. Some inmates reported that they were not always let out of their cells when the medication cart was in the building.

A staff audit of 416 UHRs found that all but 42 contained a record that informed consent had been obtained.

Laboratory testing orders were tracked manually.  Psychiatrists reported that they had developed their own audit and met weekly to review laboratory test orders and determine if results were filed in UHRs.  A staff audit of 25 random cases drawn from January and February 2010 found that all tests were completed as ordered.

Every order for psychotropic medication was written DOT.  No audits of DOT practices were done, but nursing supervisors reportedly made spot checks to observe medication administration.

During the monitoring period, three Keyhea petitions were filed.  Six inmates were under a Keyhea order at the time of the monitor's visit.  The Keyhea coordinator maintained a log and MARs identified inmates with Keyhea orders.  Staff reported that there were deficiencies in medication administration to Keyhea inmates and that on-the-job training was being used to address these issues.

Anecdotal reports indicated that medication ordered HS was typically administered at or after 8:00 p.m., but staff and inmates reported that the HS delivery was not always made to every building.  Inmates were sometimes asked to take HS medication at the 6:00 p.m. evening medication pass or be recorded as having refused that dose.  No audit results were reported.

A staff audit of 50 cases found that 45 inmates signed for a supply of medication when they paroled.

Sexual Misconduct:

Ten RVRs were issued for sexual misconduct during the reporting period, with four inmates referred to mental health.  The documentation provided by the institution conflated the terms "screening", "full evaluation", and "comprehensive evaluation."  IDTTs addressed meeting the criteria for a diagnosis of Exhibitionism, rather than whether or not the inmate should be referred for a comprehensive evaluation or whether a treatment plan needed to be modified.  Discussions with mental health staff indicated that the protocol was followed but terminology problems may have caused the confusion.

All four referred cases were screened and were the subject of an IDTT meeting.  Only one case was referred for a comprehensive evaluation.  The inmate was referred for Exhibitionism treatment.  Staff believed that the inmate could not be transferred due to his SNY classification and therefore no review was conducted regarding his programming options.

Inmates found guilty of sexual misconduct violations involving exposure were placed in administrative segregation.  Signs were affixed to their cell doors noting their exhibitionist behavior, and window covers partially obstructed views into the cell.  The institution reported that exposure-control jumpsuits were provided but this was not verified during the site visit.  Treatment was offered by individual PCs.  A group dedicated to the treatment of the disorder was not in operation at the time of the site visit.

Transfers:

PVSP made five referrals to acute care during the monitoring period.  In some cases, staff waited too long to refer to DMH.  A staff audit showed that an average of 12.8 days elapsed between admission to the MHCB and referral to DMH.  DMH took an average of 7.4

days for a decision and placement on a waiting list, and 7.8 days to transfer. All inmates bound for DMH consented and consequently no Vitek hearings were necessary.

At the time of the site visit, there were no inmates awaiting transfer to intermediate care. Two inmates who warranted referral to intermediate care were identified by MHARP, but both were moved to other prisons to receive EOP treatment before they came up on the intermediate care wait list.

In April 2010, PVSP began using the new form to document consideration of DMH referral during IDTT meetings. The monitor's review found that documentation that DMH transfer criteria were considered for inmates during their IDTT meetings was found in a small number of UHRs.

According to logs provided by the institution, there were 20 EOP inmates at PVSP during the monitoring period. Only two remained at the time of the site visit. Four inmates were retained in administrative segregation longer than 90 days while awaiting transfer to an EOP program. Three EOP inmates who needed to go to an administrative segregation hub or a level III SNY yard experienced the longest stays. Waits were 175 and 278 days in the cases of two inmates who went to CMC's EOP administrative segregation hub, and 357 days in the case of an inmate who went to KVSP's Level III SNY EOP. Among the remaining EOP transfers, 15 were moved in less than 60 days, five of whom were transferred within 30 days. Logs indicated that one EOP inmate who remained at PVSP at the time of the monitor's visit had been awaiting a bed at KVSP's Level IV SNY EOP since January 9, 2010.

Other Issues:

### Administrative Segregation

Per institutional policy, all 3CMS and EOP inmates in administrative segregation were assigned a PC who was required to make individual inmate contacts on a weekly basis. The unit had two confidential interview rooms, each with an individual holding cell. Once placed into these holding cells, inmates were released from handcuffs and leg irons. Institutional records indicated that during the reporting period, a total of 3,948 PC contacts were completed for 140 to 150 inmates, for an average of 27 contacts per inmate during the 26-week period. An institutional audit of 52 cases revealed that 46 had a least one weekly CM contact. These contacts occurred at cell front 47 percent of the time during the reporting period.

The monitor observed six administrative segregation ICC hearings. The hearing panel consisted of 12 members, one of whom was the unit psychologist. The remaining members were custody or counseling staff. The meeting was chaired by the chief deputy warden. C-files were present in all cases, but UHRs were not available. The psychologist did not take an active role in the discussions or decisions, most of which involved disciplinary and housing decisions.

Initial IDTT reviews were not being completed prior to initial ICC hearings on a routine basis. An institutional audit of this issue found that only 21 of 51 or 41 percent of inmates were seen for an IDTT review during the first 14 days after arrival. PCs and psychiatrists assigned to administrative segregation attended and participated in IDTT meetings.

Institutional logs of psych tech rounds in both ASUs were maintained and indicated a daily compliance rate in excess of 99 percent for each unit. The monitor observed rounds in ASU II which housed 3CMS inmates. The psych tech conducting rounds

demonstrated knowledge of individual caseload inmates, who uniformly exhibited a willingness to communicate with her.

Except in three cases, psychiatric contacts exceeded the minimum required in administrative segregation, according to an institutional audit of 51 records. A total of 65 contacts were required during this period, with 143 actually made. Only three of the 51 cases audited had fewer than the required number of psychiatric contacts. All psychiatric assessments were conducted in confidential settings, according to the chief of mental health.

The monitor's expert attended one IDTT meeting in administrative segregation. The participants included custody staff (associate warden, lieutenant, and sergeant), a CC, the unit psychiatrist, the unit psychologist, and a supervising psychologist. Both the UHR and C-file were available and reviewed. The inmate participated in the review, which considered the clinical need for single-cell housing. The IDTT members completed the Form 7388, the DMH referral criteria form.

Treatment provided to EOP inmates awaiting transfer to an EOP hub was essentially the same for all MHSDS inmates in administrative segregation. Treatment included weekly PC contacts, access to individual and group therapy, daily psych tech rounds, and regular psychiatric reviews.

PVSP offered two recreational groups per week to administrative segregation inmates in ASU II and often incorporated the use of videos and follow-up discussions. Inmates volunteered for these groups through the psych techs who conducted the sessions. Time spent in these activities was not included in measuring compliance with the requirement of the ten hours of mandatory out-of-cell time, according to the unit lieutenant.

MHCB

PVSP's CTC was licensed for five MHCBs but staffed for six beds. However, the institution reported that a DCHCS directive allowed the use of 13 CTC beds as crisis beds when necessary. PVSP treated crisis bed inmates from other prisons. At the time of the site visit, four inmates had lengthy stays in the CTC due to medical conditions.

Mental health staff reported that access to the MHCBs was good. With regard to admission to the MHCB, PVSP chose to be over-inclusive rather than too restrictive. Discharge plans included five-day follow-up and hourly custody observations. A few inmates not admitted to the MHCB were scheduled for five-day follow-up visits. Records of MHCB use were clear, complete, and included all monitoring targets, except for restraint and seclusion logs and logs of holding cell use in the TTA which were both incomplete.

During the six months from September 2009 to February 2010, there were 99 admissions to the MHCB. Staff calculations showed that the average length of stay ranged by month from 6.5 to 11.43 days. Eleven stays exceeded ten days and three of those 11 cases had lengths of stay of just 11 or 12 days. Administrative delays in moving inmates after clinical discharge were brief. Fourteen inmates had multiple admissions; 12 were admitted twice and two had three admissions each.

Review of records in the MHCB indicated that staff seemed to prefer to try two trials of medication before referring inmates to acute care, with some success. However, in four cases this method did not work. In three of the four cases, inmates were not referred until days 14, 19, and 20 of their stays and consequently, access to acute care was delayed. In the fourth case, a review of MHCB records indicated that this approach led to further delays totaling nearly six weeks.

170

IDTT meetings observed in the MHCB were attended by a full team. All disciplines and inmates participated. C-files were available and cases were discussed thoroughly. Handcuffs were used in IDTT meetings on a case-by-case basis, either when clinical and security staff agreed that they were needed, or when either one unilaterally assessed the risk of injury as unacceptably high.

The staff's review of the 80 inmates discharged from the MHCB with planned five-day follow-up found that 79 were seen for each of the five days, and the remaining inmate was seen on four of the five days. A staff audit of 28 cases in which quarterly follow-ups pertaining to suicidality were scheduled over the course of one year found that 75 percent were seen for follow-up within ten days of the 90 day due date, 83 percent were followed up within ten days of the 180-day post-suicide follow-up date, 94 percent were seen within ten days of the 270-day due date, and 57 percent were seen within ten days of the one-year post-suicide follow-up date.

Inmates deemed at risk for suicidality were also observed hourly by custody staff for at least 24 hours. Many inmates were checked hourly for several days rather than monitored closely only for the first 24 hours. Staff reported that documentation of hourly custody observations was forwarded to both yard captains and mental health OTs.

<u>3CMS</u>

There were approximately 1,900 hundred inmates at the 3CMS LOC at PVSP at the time of the site visit. This represented a 15.8 percent increase since the preceding monitoring visit. This increase, coupled with a slight decrease in overall population, raised the proportion of 3CMS inmates at PVSP to approximately 41 percent of the total population.

Institutional data and chart reviews indicated that 3CMS inmates were generally seen within Program Guide requirements.  Institutional audits indicated that IDTT meetings were conducted in accordance with Program Guide timelines over 95 percent of the time, and that the psychiatrist was present at 98 percent of the IDTT meetings.  These same studies indicated that a custody representative was present in 87 percent of the cases.  Chart reviews and attendance by the monitor's expert at two IDTT meetings supported these findings. C-files, however, were not present at the IDTT meetings attended by the monitor's expert on either on A or B yard and in one case the UHR was not present.  Staff reported that UHRs were generally available at IDTT meetings.

Groups

The availability of group treatment for 3CMS inmates remained a concern at the institution.  Construction-related restrictions on the availability of treatment space forced the MHP to work in a shifting environment and lead to the periodic cancellation of groups.  At the end of the reporting period, there were 114 inmates on the wait list for group treatment.  The institution reported that 86 percent of inmates were considered for groups.  Many of the 3CMS treatment plans reviewed by the monitor's expert indicated that group treatment would be provided "when available," without any assessment or indication of what type of group would match the inmate's clinical needs.  With rare exception, these inmates were not on the group wait list provided by the institution during the site visit.  At the time of the site visit, no groups were scheduled on A yard; two groups were scheduled on B yard, one on C Yard, and five on D yard. In addition, several groups were scheduled in ASU D-4.  However, the groups on D yard were not functioning regularly.

IDTT/Treatment Plans

Levels of attentiveness to inmates' clinical needs varied significantly. Often the PC conducting the initial IDTT meeting did not provide subsequent clinical care.   In the observed IDTT meetings, inmates appeared to leave the meetings with information concerning their next psychiatric visit, but not the frequency or scheduling of their CM contacts. The meetings addressed relevant medical issues, and the DMH referral criteria form, Form 7388, was utilized at all times.  The meetings were conducted in small, cramped, albeit confidential, spaces.

Heat Plan

Institutional heat logs were maintained in the institution's litigation office and were not reviewed during the site visit.  The LOP was currently under revision.

RVRs

No RVRs were issued to inmates in the MHCB.  Per the institutional log, only two RVRs were issued to EOP level inmates during this reporting period.  MH-4s were requested in each case.  Each assessment was completed within prescribed timelines.

Thirty-three RVR MH-4s were requested for 3CMS inmates during the reporting period.  Completion dates were not noted in five of these cases. Timely assessments were completed for the remaining 28 cases, all of which were completed within two to three days from referral.

Per institutional policy, MH-4s for RVRs were based upon an interview with the inmate and review of the UHR and C-file.  The conclusions and recommendations were frequently only documented by a check in the "no" or "yes" box on each of the three issues to be addressed.  When comments were included, they were written in terms that would be clear and understandable to a layman reader.

A random sample of ten of the 28 cases referred for MH-4s was reviewed by the monitor. The results of these assessments were well documented in the findings of the hearing officers. In no case was there apparent mitigation of the disposition.

The monitor's expert reviewed three cases in which RVRs were issued for self-mutilation. Those cases were not handled in accordance with protocol. In each case the individual was found guilty of "self-mutilation in an attempt to manipulate staff." None of these three cases had been referred to the chief of mental health for authorization prior to issuing the RVR or prior to adjudication.[12] Generic MH-4s were completed in each case, and findings indicated that mental health issues did not influence the behavior associated with the infraction.

Pre-Release Planning

PVSP reported an increased emphasis on pre-release planning. The chief of mental health reported that no TCMP worker was assigned to the facility but a POC social worker visited the institution. Documentation indicated 50 contacts with paroling inmates during the review period. A new operational procedure regarding pre-release planning was pending approval by the local governing body. The operational procedure provided specific responsibilities for mental health staff on pre-release planning including coordination with community providers. Staff expressed some concern about the labor intensive nature of these pre-release efforts.

---

[12] Defendants requested that these three sentences be revised or removed from this Report on the ground that the three cases "were non-suicidal acts of self-mutilation, not suicide attempts" and therefore, based on Program Guide p. 12-10-29, the approval and signature of the Chief of Mental Health were not required prior to issuance of the RVR or prior to adjudication. As defendants stated in their request, these three cases involved charges of, and eventual findings of, "self-mutilation in an attempt to manipulate staff." The fact that these three cases involved self-mutilation triggered the requirement of the approval and signed authorization of the Chief of Mental Health before any RVR may be issued. Consequently, the lack of such approval and authorization was a lapse under Program Guide Ch. 10, "Suicide Prevention and Response," subpart G, "Mental Health Evaluation Component for a Rules Violation Report", item no. 5 ("The clinician's summary must be approved and co-signed by the institution's Chief of Mental Health before issuance of a CDCR 115.")

**Avenal State Prison (ASP)**
June 15, 2010 – June 17, 2010

Census:

On June 16, 2010, the inmate census was 6,499. There were 1,431 MHSDS inmates including 1,404 3CMS inmates, 18 EOP inmates, and nine inmates in the OHU. In the ASU there were 48 3CMS and three EOP inmates. The overall population decreased by ten percent since the preceding monitoring period, but the MHSDS population increased by 12 percent. This resulted in an increased percentage, 17.7 percent to 22 percent, of caseload inmates relative to overall population.

Staffing:

The institution saw a small decrease in the vacancy rate among allocated mental health positions from the preceding monitoring period, down from 19 percent to 18 percent. Use of registry staff reduced the functional vacancy rate to 12 percent. A new CEO began working at the institution in February 2010 and assumed the functions previously performed by the HCM. The chief psychologist and two senior psychologist positions were filled.

Of the four allocated psychiatrist positions, 3.75 were vacant but a full-time psychiatrist was scheduled to start in July 2010.

Thirteen of the 15 allocated psychologist positions were filled and contract staff covered the remaining two positions.

Of the 2.5 allocated social worker positions, 1.5 was filled and a contractor covered the remaining position. The senior psych tech position was filled as were all ten of the line psych tech positions.

One of the 1.15 RT positions was filled and seven of the 8.5 mental health clerical positions were filled. The one OSS II position was filled as was the one RN position.

175

During the reporting period, the institution utilized 191 hours of telemedicine for an average of 16 hours per week.

There was concern that the re-assignment of four of the 11 psych techs from the yards to the ASU and the reclassification of a RN position back to a yard nursing position had a detrimental effect on the provision of care to MHSDS inmates.

One psychiatrist position was re-allocated to SVSP in October 2009 but ASP expected to re-gain this allocation sometime after July 2010.

Quality Management:

The local governing body met regularly with the required participants during the reporting period.  The five scheduled meetings were attended by 100 percent of the required participants.  The institution reported that the Regional Administrator participated in the local governing body meetings either by telephone or in person.

The mental health quality management process functioned reasonably well and utilized audits that examined both qualitative and quantitative measures.  The QMC met regularly and addressed relevant topics.  Institutional reports and minutes of QMC meetings indicated that a quorum of required participants attended the meetings 80 percent of the time.

The mental health subcommittee maintained informative minutes and addressed relevant topics which included a backlog of referrals awaiting triage, administrative segregation pre-placement screenings, and the expiration of psychotropic medications.  The overall attendance for the mental health subcommittee was 78 percent during the reporting period.

The institution continued with the active use of the QIT process with nine QITs operating at various times during the reporting period.

Peer review occurred at ASP, but psychiatry shortages caused psychiatrists to provide direct care in lieu of participating in the peer review process. Minutes indicated that psychology peer review occurred regularly but often resembled group discussions rather than a review of each clinician's work. In one instance, the methodology utilized in psychology peer review concluded that reviews of inmates who were considered for DMH placement but not referred were appropriately completed. However, no substantive review of the records was conducted.

Suicide Prevention:

The SPRFIT met five times and reviewed ten cases of suicide attempts during the monitoring period. Attendance at meetings was adequate.

The ERRC met monthly and addressed identified issues.

Compliance with pre-placement screenings rose from 52 percent to 95 percent, with 80 percent of the screenings placed in the UHR. To ensure that staff received copies of positive screenings in a timely manner, despite the lack of inclusion in the UHR, ASP instituted a practice of faxing positive screenings directly to the ASU.

At the time of the visit, the plan to address suicide trends in administrative segregation had been implemented.

Medication Management:

Since the preceding monitoring period, medication management improved in some areas and deteriorated in other areas. Institutional audits indicated that the compliance rate for continuity of medications for new arrivals decreased to 86 percent from 96 percent during the preceding monitoring period.

177

Staff audits reported 100 percent compliance for medication continuity for intra-institutional transfers.

Although the institution reported that pill lines averaged between one and 20 minutes, inmates reported longer wait times.  The pill lines were not protected from the elements but water was available for inmates while they waited.

Staff audits found that 98 percent of psychotropic medications were renewed prior to expiration.

The institution was partially compliant with timely ordering and reviewing of laboratory tests.  Staff audits indicated that 77 percent of ordered tests were noted within 24 hours, 70 percent were submitted within 72 hours, and 80 percent of completed tests were reviewed by psychiatry within five days.

During the reporting period, one Keyhea petition was initiated but the inmate transferred to the MHCB.  There were no reports of failures to renew or pursue Keyhea orders.

Both staff audits and inmates reported that medications written at HS were delivered at appropriate times.

Sexual Misconduct:

During the reporting period there were four RVRs issued for sexual misconduct, which resulted in four IEX screenings and IDTT reviews but no comprehensive evaluations.

The institution had no inmates with diagnoses of Exhibitionism or Paraphilia NOS during the reporting period and did not offer treatment related to sexual misconduct.  No sexual misconduct RVRs were referred to the DA.  Custody driven modification options included yellow placards placed on the cell door and the use of exposure-control jumpsuits.

Transfers:

During the monitoring period the institution reported 12 referrals to DMH. There were two referrals to APP but one was rescinded by the clinician and referred to intermediate care. Of the ten inmates referred to intermediate care, one paroled prior to placement, one transferred prior to placement, seven were accepted and transferred, and one was denied by DMH, which was subsequently upheld by CCAT. No inmates returned to the institution from DMH.

At the time of the site visit, there were no inmates remaining at the institution who had been referred during MHARP.

The institution was compliant with acute care timelines, but not with intermediate care transfer timelines. For intermediate care referrals, the average time from referral to acceptance was approximately 34 days, and the average time from acceptance to transfer was approximately 3.5 days.

Inmates were reviewed for DMH transfer at IDTT meetings. Form 7388, the DMH referral criteria forms, were present in the records. For those inmates who were reviewed but not referred, rationales for not referring to DMH were supportable and included on the appropriate form.

There were six administrative segregation beds and seven GP beds for mental health inmates in the OHU. One senior psychologist was assigned to supervise the OHU. One psychiatrist was assigned to the unit Monday through Friday and on weekends, as staffing allowed. One psychologist and one psych tech were assigned to the unit Monday through Friday.

Treatment space improved on the administrative segregation side of the OHU with the completion of a confidential treatment room to accommodate individual contacts and IDTT meetings.  Confidential treatment space on the GP side of the OHU remained problematic.  Only inmates on administrative segregation status were cuffed in the OHU.  Beds were provided to all inmates unless clinically indicated otherwise.

At the time of the visit there were no mental health inmates in the OHU.  Across the reporting period there were 137 admissions to the OHU, with 64 for psychiatric observation and 73 for suicide prevention.  Thirty-two of those inmates were referred to an MHCB and 28 transferred.  Forty-five inmates had stays longer than 72 hours, with the average stay lasting four days.

During the reporting period, the institution housed 33 EOP inmates in administrative segregation, with an average time from EOP endorsement to transfer of 73 days, with the longest stay being 153 days.

Other Issues:

Administrative Segregation

The ASU had a room with eight therapeutic modules in addition to four confidential interview spaces for mental health contacts.  The institution reported that 89 percent of clinical contacts occurred out of cell.  Group therapy was scheduled for MHDSD inmates in the unit, but approximately 30 percent of group treatments were cancelled due to lack of staff.

It was reported that ASP had a compliance rate of 98 percent for the completion of custody welfare checks.  Morning meetings with mental health staff and the unit sergeant occurred daily.  Although ASP reported that daily rounds were made by psych techs, this could

not be verified by the monitor's expert due to uncertainty surrounding when rounds were conducted and who conducted them.

The institution completed 20 SMYs. The monitor's expert observed these yards being actively used.

IDTT meetings observed by the monitor's expert were attended by a full complement of disciplines. All UHRs were available, but only 50 percent of the C-files were available. There was good interaction with the inmates. Relevant issues were addressed. The attendance rate for CC Is was problematic at 50 percent during the reporting period.

On the date of the site visit, there were 56 inmates in administrative segregation with stays in excess of 90 days, with stays ranging from 93 days to 430 days. Reasons for retention included pending DA referrals, endorsements to the SHU, and waits for transfers to SNYs. It was reported that inmates were reviewed every 30 days regardless of their length of stay, and that the requisite reports were sent to HQ.

EOP

For the reporting period, institutional audits indicated that PC contacts, psychiatry contacts, and IDTT meetings were over 93 percent compliant and that inmates had access to groups.

3CMS

Despite its active group treatment program, the institution reported that only 493 of 636 group sessions were completed during the monitoring period.

Staff audits indicated high compliance rates for PC contacts and IDTT meetings, with initial psychiatry contacts ranging from 84 percent to 98 percent compliant. Initial IDTTs

had an 86-percent compliance rate. The institution reported IDTT meeting attendance rates ranging from 82 percent for CC Is to 100 percent for PCs.

Referrals

The institution reported a compliance rate of 87 percent for routine referrals, with the average number of days to completion being 3.46. The compliance rate for urgent referrals was 94 percent, with the average number of days for completion being .4 days. The compliance rate for emergent referrals was 100 percent.

RVRs

The institution issued nine RVRs to EOP inmates during the reporting period. All were referred for mental health screenings. In ten cases of RVRs issued to 3CMS inmates, their conduct was described as bizarre, unusual, and uncharacteristic. The total number of RVRs issued during the reporting period was 811, with 210 or 26 percent issued to 3CMS inmates.

Heat Plan

The institution was compliant with current heat plan policies and procedures.

**Salinas Valley State Prison (SVSP)**
March 15, 2010 – March 18, 2010

Census:

On March 15, 2010, the population at SVSP was 3,551, representing a decrease of two percent since the preceding monitoring period. SVSP experienced a notable shift in population from mainline to lock-up units since the preceding reporting period.

Caseload inmates numbered 1,340, as compared to 1,392 in June 2008. The percentage of caseload inmates relative to the overall population remained unchanged at 38 percent during the preceding monitoring period. There were 407 inmates in administrative segregation, of whom 231 or 57 percent were caseload inmates.

There were 234 inmates in intermediate care at the institution under the care of DMH staff.  Eight inmates were in MHCBs.  There were 222 EOP inmates, 173 in GP and 49 in the EOP hub.  There were 1,110 3CMS inmates, which included 929 in GP and 182 in administrative segregation.

Staffing:

As of March 2010, the total mental health vacancy rate stood at 22 percent, down from 31 percent in June 2008.  Registry staff reduced the functional vacancy rate to less than one percent.

All seven mental health supervisory positions, including positions for a chief psychiatrist, a chief psychologist, a senior psychiatrist and four senior psychologists, were filled.

Three of eight line psychiatrist positions remained vacant, with contractors covering approximately half of these vacancies during most months.  Among psychologists and social workers, 12 of 36 positions remained vacant with contractors covering all of these vacancies.

Among 5.3 allocated RT positions, there were 2.3 FTE vacancies, all of which were covered by contract LVNs.  Only one of 22 psych tech positions was vacant but was also covered by a contract LVN.  All 12 clerical positions were filled.

Quality Management:

SVSP continued to have an active and inclusive quality management process. The various quality assurance committees were well attended and met regularly. However, there continued to be areas in need of improvement, particularly related to auditing practices.

The local governing body met every other month.  The MHQMS met weekly during the six-month reporting period.  Minutes were maintained and included thorough

summaries of the topics discussed during the meetings.  Pertinent information disseminated at the various meetings was communicated via area supervisors to line staff.

SVSP continued to use QITs to resolve areas of noncompliance.  QITs typically included supervisory and line staff, and produced written results and recommendations that were discussed in the various quality management meetings.  Active QITs included compliance with suicide prevention clinical five-day follow-up and 24-hour security checks, access-to-care barriers for EOP inmates in administrative segregation, mental health referrals related to safety concerns, development of a public service announcement related to inmate access to MHPs, timely production of laboratory test results, and improved UHR filing.

During the last six months of 2009, the psychiatry peer review committee met seven times during the last six months of 2009 and audited the work of seven providers through the review of 32 UHRs.  Feedback was provided to the individual psychiatrists by the committee's chairperson.   Psychology peer review met three times for routine UHR reviews and three times to complete focused reviews related to completed suicides.  Three of the routine monthly sessions were canceled as a result of staff absences related to furlough days.

SVSP regularly audited open CAP items, corrective actions related to completed suicides, and various Program Guide standards.  The institution also produced daily tracking reports for several items, including MHCB admissions and discharges, inmate arrivals and transfers within the institution, administrative segregation placements, pending and expiring Keyhea petitions, pending RVR MH-4s, and MHSDS inmates released from administrative segregation to mainline yards.

Most audit reports did not define the issue being studied, describe the audit methodology, assess the audit results, or discuss the institution's plan, if any, to address

noncompliance.  Consequently, it was frequently difficult to understand audit results, assess the reliability of compliance rates and discern whether or not corrective action was warranted.   The institution failed to complete regular audits in a number of important areas, including psychiatry contacts, PC contacts for 3CMS inmates, and timeliness and composition of IDTT meetings in the EOP and 3CMS programs.[13]  The institution did not track offered and completed EOP therapeutic activities or transfers from the stand-alone ASU.  The absence of audit data hampered ability to determine compliance in these areas.

Suicide Prevention:

SVSP's SPRFIT met monthly during the reporting period.  Attendance was good and minutes were maintained.  Routine agenda items included the completion of intake screens and rounds in administrative segregation, reviews of attempted and completed suicides, compliance rates for five-day follow-up and security checks upon release from MHCBs and alternative areas, adherence to DOT protocols, and staff training needs.  The SPRFIT regularly presented updates to the mental health subcommittee, and recommended local initiatives to improve suicide prevention.

Internal tracking showed full compliance with five-day follow-up of inmates discharged from the MHCB, exception in August 2009 when the compliance rate dipped to 86 percent.  Compliance rates ranged from 95 to 100 percent for providing five-day follow-up to inmates discharged from alternative holding areas.

---

[13] Defendants requested that this statement concerning lack of audits, and similar statements concerning lack of audits on pages 195 and 196, *infra*, be clarified.  They submit that regular audits were conducted and available to the monitor at the time of the Twenty Second Monitoring Period site visit.  However, the monitor reports that such audits were not made available at that time, The Special master requests that at the time of the next regularly scheduled monitoring visit, the institution provide to the monitor its audits of the areas noted above, as well as those noted on pages 195 and 196, *infra*.

Information gathered by the institution indicated that custody logs were returned for 89 percent of MHCB discharges and that 28 percent of these logs were incomplete. Similarly, logs were submitted for 88 percent of inmates returned to housing from alternative holding areas, 26 percent of which were incomplete. The SPRFIT had chartered a QIT to address noncompliance in this area and to review local tracking forms that did not comply with current statewide suicide prevention policy.

Staff reported that nursing pre-screened all inmates prior to their placement in administrative segregation, including questions about past and present SI. However, compliance in this area could not be verified due to lack of audits. Internal audits yielded compliance rates from 82 to 93 percent for completion of 31-question screens within 72 hours of an inmate's placement in administrative segregation. Compliance reached or exceeded 90 percent during two of six months in the last half of 2009. On average, more than 80 percent of inmates agreed to participate in the screening interviews. An average of 90 percent of the UHRs audited by the institution contained completed 31-question screens. Approximately 20 percent of the 31-item screens resulted in referral to mental health for additional evaluation.

Inmates placed in administrative segregation were identified by "intake" or "orientation" placards on their cell door and received 30-minute welfare checks during their first 21 days in administrative segregation. Documentation reviewed by the monitor's expert indicated that rounds were not completed at staggered intervals. A log in the stand-alone unit contained documentation gaps, one of which indicated that rounds were not completed for six consecutive hours on March 23, 2010.

Data provided by the institution indicated that daily psych tech rounds were completed and documented in all ASUs.

Inmates in all ASUs were permitted to have televisions or radios in the cells.

Data provided by the institution indicated that EOP inmates in administrative segregation were routinely afforded ten hours of outdoor yard per week.

Institutional data indicated that the number of EOP inmates in administrative segregation longer than 90 days ranged from 18 to 25 during the last six months of 2009. Excessive stays ranged from 93 to 463 days, and included six EOP inmates who were retained in administrative segregation longer than 200 days.  Excessive stays were most commonly related to DA referrals, which often took up to six months to resolve.  Delayed classification reviews, sometimes caused by internal processing errors, also resulted in long stays in administrative segregation.  SVSP did not appear to complete monthly reviews of EOP inmates in administrative segregation longer than 90 days.  There was no documentation of any efforts to expedite disciplinary processes or consider alternative housing for EOP inmates with long stays in administrative segregation.

Medication Management:

SVSP routinely audited several components of medication management and appeared to utilize adequate sample sizes.  However, audit documentation did not include a statement of the problem being studied, a description of the methodology employed or an assessment of the results.  Audit results had to be explained by staff.  Auditing difficulties related to the production of multiple MARs under the new Maxor Guardian pharmacy  system led pharmacy to initiate a plan to include multiple medication orders on one MAR.
As of the end of January 2010, psychotropic medications were prescribed for 889 inmates, 52 percent of whom were taking mood stabilizers.

187

Internal audits completed during the reporting period yielded compliance rates of greater than 90 percent for continuity of medications upon arrival and following intra-institutional moves.

Institutional data indicated that staff referred 41 to 178 inmates per month for medication noncompliance during the last half of 2009.  Audits of medication noncompliance were methodologically flawed and could not be used to assess performance.

Nursing staff reported that pill lines were typically completed within one hour and did not conflict with inmate meal times.

Internal audits found compliance rates of at least 90 percent for renewals of medication orders, and at 75 percent for changed medication orders.

Internal UHR audits yielded a compliance rate of 97 percent for the presence of current medication consent forms.

SVSP audited 1,046 UHRs, of which 542 or 52 percent were those of inmates on mood stabilizing medications. The institution reported that appropriate laboratory blood level studies were ordered 97 percent of the time, and that 91 percent of reviewed UHRs contained test results.  Four percent of the reviewed reports noted abnormal results; action was taken in 89 percent of these cases.  However, presentation of the compliance rates without adequate explanation of the audit methodology rendered it impossible to evaluate the validity of these results.  A small sample of reviewed UHRs confirmed that laboratory tests were appropriately ordered for inmates taking Depakote. However, only two of five UHRs belonging to inmates taking Lithium documented appropriate testing.

The institution provided a list of inmates prescribed DOT medications. Nursing supervisors observed the administration of DOT medications during the reporting period.

Keyhea petitions were timely initiated and renewed, and nearly always upheld by the administrative law judge.  During the last six months of 2009, SVSP initiated five Keyhea petitions and renewed another 43 petitions.  Two petitions were rejected by the administrative law judge and two cases were not pursued on advice of CDCR counsel.  Eleven orders were purposely permitted to expire.  As of December 31, 2009, there were 60 inmates at SVSP with Keyhea orders.

Over 80 percent of psychotropic orders were prescribed at HS. Audits designed to verify that HS medications were administered at or after 8:00 p.m. were flawed and could not be used to assess performance.  Plans were underway to improve audit methodology in this area.

Staff reported that approximately 70 percent of paroling inmates with psychotropic prescriptions received a supply of medication prior to their release but no audits were conducted.

Sexual Misconduct:

During the last six months of 2009, SVSP issued 21 sexual misconduct RVRs to 16 inmates.  Two inmates received two RVRs and one inmate received four RVRs.  All 21 incidents were reportedly referred for initial screens, IDTT reviews, and comprehensive evaluations.  However, records reviewed by the monitor's expert indicated that although initial screens were not completed, all incidents of sexual misconduct resulted in the completion of a comprehensive mental health evaluation.  No inmate met the diagnostic criteria for Exhibitionism but seven inmates were referred to centralized Exhibitionism treatment programs based on multiple sexual misconduct RVRs or alternate criteria.

<u>Transfers</u>:

During the second half of 2009, SVSP generated ten referrals to acute care and ten referrals to intermediate care, exclusive of MHARP.  The DMH referral log did not consistently record all required data.  Referral and acceptance dates were sometimes missing, and in some cases both dates were missing.

The incomplete logs indicated that five of ten acute care referrals resulted in transfers.  Four referrals were rescinded by the institution.   In one case, the referred inmate was returned to housing without explanation.  Of the five inmates who were transferred to acute care, two waited longer than 100 days, one waited 22 days, and two waited 12 days.  Three of five transfers did not occur within 72 hours of receiving a bed assignment.  Two inmates were transferred within four days of receiving a bed assignment, and one transfer was delayed by two weeks.

Of the ten inmates referred to SVPP during the last six months of 2009, none had transferred as of mid-March 2010.  Two referred inmates won their Vitek hearings and one referral was withdrawn by the institution.  Seven referred inmates were pending transfer to SVPP, all of whom had been waiting longer than three months at the time of the monitoring visit. One inmate had been waiting at least five months and another had been waiting at least six months.

Staff was familiar with DMH referral protocols and completed the referral checklist during IDTT reviews.  However, lack of tracking data and staff's failure to use available data appeared to compromise the accuracy of the information recorded on the checklists.

The monitor's expert review of UHRs indicated that referral checklists were routinely attached to treatment plans but were not consistently completed properly. Clinicians often failed to document why inmates who met the objective criteria for considering a higher LOC were not referred to DMH.

Eight MHCBs were insufficient to meet the needs of SVSP's existing MHSDS population that included over 220 EOP inmates and more than 1,100 3CMS inmates. Inadequacy of MHCB resources was particularly concerning, given the planned growth of SVSP's mental health mission, which included ongoing expansion of the EOP hub program, and the near doubling of the mainline EOP program expected in 2013.  None of the designated MHCBs were reportedly used to house long-term medical inmates during the monitoring period.

According to logs maintained by custody staff assigned to the CTC, there were 229 alternative cell placements during the last six months of 2009, for an average of more than one per day or 38 per month.  Nearly 90 percent of the placements lasted less than 24 hours. Lengths of stay for the remaining ten percent varied considerably, ranging from 28 hours to almost eight days.  Admission statistics provided by the institution covering the 20-month period from May 2008 to December 2009 indicated that nearly a quarter of the inmates deemed to require MHCB placement following assessment in the TTA had to wait one to three days to receive a crisis bed.

During the second half of 2009, staff generated 447 MHCB referrals, of which 341 or 76 percent either failed to meet admission criteria or were released to housing after spending time in an alternative holding area.  One hundred six resulted in MHCB admission, generating an average monthly admission rate of 18.  A very small number of cases were admitted to MHCBs in other prisons during the reporting period.

MHCB lengths of stay exceeded ten calendar days for 37 cases or 37 percent of all admissions.  Sixty-two percent of these cases missed the ten-day deadline by four days or less.  Twenty-three admissions lasted 11 to 15 days, seven admissions lasted 16 to 20 days, and seven admissions lasted three weeks or longer.  All of the admissions that lasted longer than three weeks involved inmates who were referred to DMH.  The number of days in a crisis bed for this group was 21, 25, 28, 29, 33, 114, and 133, respectively.  Excessive stays related to slow access to DMH further exacerbated the limited capacity of SVSP's MHCB unit.

Clinical and physical discharge dates were the same in 74 percent of all MHCB discharges during the last six months of 2009.  Of the 28 discharges that experienced administrative delays, 13 were delayed by one day or less, three were delayed by two days, four were delayed by three days, two were delayed by four days, three were delayed by five days and three were delayed by six days.  A total of 72 bed-days were lost due to administrative discharge delays during the second half of 2009.  Many administrative delays involved inmates awaiting transfer to other prisons.

During the last six months of 2009, 83 inmates were admitted once to the MHCB, ten inmates were admitted twice, and one inmate was admitted three times, producing a multiple admission rate of about one percent.  One of 94 inmates admitted to the MHCB had more than three admissions during the last six months of 2009.

SVSP did not have a MHOHU.

The institution did not provide historical data related to PSU transfers.  Monthly reports regarding the status of EOP inmates in administrative segregation longer than 90 days indicated that there were two to seven endorsed EOP inmates in administrative segregation pending transfer to PSU during the last half of 2009.  The data provided did not indicate how

long it took to endorse EOP inmates with SHU terms or how long it took to transfer inmates endorsed to a PSU.

According to the institution's C&PR, there were seven endorsed inmates awaiting transfer to a PSU at the time of the site visit, with four waiting for a bed at PBSP and three waiting for a bed at CSP/Sac.  Reportedly, none of these inmates had been waiting longer than two months.  One inmate's transfer was on indefinite hold pending the completion of a Keyhea petition.

Other Issues:

MHCB

The eight-bed MHCB unit was staffed with a clinical director, psychiatrist, psychologist and OT, all of whom shared a small office.  Institutional tracking reports showed full compliance with the completion of SRACs upon admission to and discharge from the MHCB during the last six months of 2009.

An IDTT meeting in the MHCB observed by the monitor's expert was attended by all required disciplines, but discussion among the participants was limited.  CCs did not regularly attend IDTT meetings and were not integral parts of the treatment team.  All inmates were cuffed when escorted to and from the IDTT meeting and placed in a holding cell during the meeting.  The institution reported that clinical restraints were not used in the MHCB during the reporting period.

Alternative holding areas were used to monitor inmates when crisis beds were not available.  SVSP used a combination of inmate waiting rooms and small modules in the CTC to hold inmates who were waiting to be placed in MHCBs.  The spacious waiting rooms, which

were equipped with toilets, were used to hold inmates overnight, during non-business hours, and on weekends. Mattresses were provided at night.

During the work week, inmates held in the waiting rooms were moved to small, phone booth-size modules prior to the start of clinic hours, usually around 8:00 a.m. Logs maintained by COs assigned to the CTC indicated that inmates were checked every 15 minutes and rarely spent more than four consecutive hours in the small modules before inmates were returned to housing, placed back in one of the waiting rooms, escorted to a mental health interview, or admitted to an MHCB. Inmates were often shuttled back and forth between waiting rooms and modules for days before being admitted to an MHCB.

EOP

The addition of a second senior psychologist improved supervision and increased the emphasis on quality management. In addition, documentation in treatment plans improved notably. Programs were introduced to provide regular Activities of Daily Living (ADLs) prompting for low functioning inmates and enhanced one-on-one attention for inmates with high refusal rates.

While internal audits continued to show consistent compliance with weekly PC contacts, numerous progress notes reviewed by the monitor's expert lacked meaningful clinical information. In several cases, documentation of weekly contacts consisted of a series of photocopied notes distinguishable only by differences in dates. Progress notes lacked substantive content and were unrelated to the current treatment plan. Many progress notes failed to indicate where contact occurred. Incomplete documentation rendered it impossible to quantify the problem.

194

Staff reported that most EOP inmates were scheduled for 14 hours of therapeutic activities per week, but group treatment was not documented in the UHR and offered hours were not tracked. Compliance with the number of hours offered could not be determined and data did not indicate how many scheduled group hours were refused by inmates. This deficiency created gaps in the vital management information and did not provide clinicians the necessary data to determine if poor participation warranted consideration for a higher LOC.

The mainline EOP program did not audit compliance with monthly psychiatric contacts or IDTT requirements.[14] A sample of UHRs showed inconsistent compliance with monthly psychiatric contacts but timely initial and quarterly IDTT reviews. However, the initial IDTT meeting served solely as a mechanism for releasing inmates from orientation status and was not used to develop an initial treatment plan. Consequently, initial group assignments were not treatment plan driven. IDTT attendance was not tracked by the institution.

Administrative Segregation EOP

The EOP hub capacity increased from 45 to 72. The hub had exceeded its capacity of 45 by an average of 31 percent prior to the increased capacity level. The number of EOP inmates in administrative segregation ranged from 55 to 65 and stood at 49 in March 2010. Additional treatment space was not created and staffing allocations were not augmented to accommodate the EOP hub's increased capacity. Some clinical staffing was donated by other institutions. SVSP increased treatment capacity with the addition of evening therapy groups to accommodate the expanded hub program. Additional staff was assigned to provide group therapy, screen incoming inmates, deliver medications, and perform daily rounds.

Rates of compliance for offering EOP hub inmates ten hours of therapeutic activity per week ranged from 12 to 100 percent. The monitor's expert observed that the

---

[14]*See* footnote 13, page 185, *infra.*

therapeutic modules used for groups were not the approved models and were not clean. The average refusal rate for all offered mental health activities was 35 percent, and monthly data indicated that 30 to 40 percent of EOP inmates refused more than half of offered groups during the reporting period. Inmates attended more than 90 percent of PC scheduled appointments. Data indicated that 76 percent of individual contacts occurred out-of-cell in a confidential setting.

An IDTT observed by the monitor's expert was attended by all required disciplines. In most cases, the UHR and C-file were present. The psychiatrist had access to the current MAR when the UHR was unavailable. Clinicians were familiar with the reviewed inmates. Team discussion included consideration of a higher LOC with specific references to the objective criteria developed through MHARP.

Six officers were regularly assigned to the EOP hub to provide escorts to and from group sessions and individual interviews. Staff reported that escorts to individual interviews were often interrupted due to officers escorting inmates to and from group sessions. This often resulted in excessive down-time between interviews and occasionally prevented clinicians from completing all scheduled appointments. Mental health input was minimal but adequate in an observed ICC meeting. The holding cells were not clean.

3CMS

Similar to the EOP program, the mainline 3CMS program suffered from poor data tracking and insufficient auditing routines.[15] Although the institution reported a compliance rate in excess of 90 percent for quarterly PC contacts, the indirect performance measure was not reliable and offered no information regarding the quality of documentation. UHRs documented frequent clinical contact, but presented a mixed picture from the standpoint of quality. Progress

---

[15] *See* footnote 13 page 185, *infra.*

notes covered a wide spectrum of quality.  Some were thorough, thoughtful, and relevant to goals articulated in the treatment plan, but others were brief and bereft of clinical information. Similarly, some treatment plans listed clinically relevant interventions and treatment goals, while others simply recited the minimum Program Guide requirements.

Initial evaluations and IDTT requirements were not audited.  A small sample of UHRs indicated that initial IDTT reviews were not completed within 14 working days, while annual IDTT updates were timely in most cases.  UHR reviews also showed that assigned psychiatrists and CCs did not consistently attend IDTT meetings.  However, IDTT reviews observed by the monitor's expert were attended by all required disciplines and were noted to be very good.

Psychiatry contacts were not audited by the institution during the reporting period. UHRs reviewed by the monitor's expert did not consistently document quarterly psychiatric contact.  Psychiatric progress notes were frequently illegible.

SVSP continued to struggle to complete scheduled mental health appointments. Slightly less than half of all ducated appointments were completed during the last six months of 2009.  Cancelled appointments were largely attributed to lockdowns and other custody factors during the first three months of the reporting period.  However, by the end of 2009, inmate refusals were identified as the primary reason for missed appointments.

SVSP offered groups to 3CMS inmates on all yards during the reporting period, although scheduled sessions on A Facility and C Facility were frequently cancelled due to lockdowns and modified programs.  During the last six months of 2009, 17 percent of groups on A Facility and 28 percent of groups on C Facility were cancelled.  Group sessions, which usually

included a mix of 3CMS and non-MHSDS inmates, ranged in size from two inmates to 29 inmates.

Information provided by the institution indicated that during the reporting period, 22 inmates were removed from the stand-alone ASU following their placement in the MHSDS. SVSP did not track the timeliness of such transfers, rendering it impossible to assess compliance with the court-ordered 24-hour standard.

Administrative Segregation 3CMS

Internal audits consistently yielded compliance rates of greater than 90 percent for the completion of the initial IDTT review prior to the intake ICC hearing.  Compliance with weekly PC contacts varied from month to month, largely as a function of rising and falling cancellation rates.  Compliance rates for offered, out-of-cell weekly clinical contacts ranged from 69 to 100 percent, but were below 90 percent during four of the last six months of 2009. Noncompliance in this area was primarily related to clinician absences, followed by staff redirection, and space constraints.  Inmates refused a significant percentage of offered contacts, with 38 to 66 percent of contacts occurring at cell front.

Referrals

SVSP tracked referral response times for urgent and routine referrals submitted by mainline 3CMS and non-MHSDS inmates.  Referrals submitted by, or on behalf of, administrative segregation inmates and EOP inmates were not tracked.  SVSP did not have a reliable system for capturing data relative to emergency referrals, as this subcategory of referrals rarely produced a paper trail that could be readily tracked.

SVSP continued to struggle to respond timely to referrals submitted by 3CMS inmates.  Data provided by the institution indicated that urgent referrals prompted contact within

24 hours 77 percent of the time, and that routine referrals generated a response within five working days 78 percent of the time.  With regard to requests from non-MHSDS inmates, the compliance rate was 87 percent for urgent referrals and 73 percent for routine referrals.

BMU

The institution reported that 12 inmates, including two 3CMS inmates, were assigned to the BMU, located in building C8.  During the last six months of 2009, a total of 27 inmates participated in the BMU program.  Seven of these inmates were at the 3CMS LOC.

RVRs

There was a decrease in the number of RVRs issued during the reporting period, with MHSDS inmates no longer receiving a disproportionate number of RVRs. SVSP issued 1,513 RVRs during the last six months of 2009, which was a decline by 37 percent since the preceding monitoring period.  A total of 624 RVRs were issued to MHSDS inmates during the reporting period, which was a decline by 48 percent compared to the preceding monitoring period.  MHSDS inmates comprised 38 percent of the prison's population and received 41 percent of the RVRs.

The institution issued 131 RVRs to EOP inmates, all of whom were referred to mental health for completion of an evaluation to be used in the disciplinary process.  Seventeen out of 493 or slightly over three percent of the RVRs issued to 3CMS inmates were referred to mental health.  No RVRs were issued to MHCB inmates.

The institution reported that hearing officers routinely took clinical findings into consideration.  A review of 12 RVRs issued to EOP and DMH inmates confirmed that SVSP was largely compliant with RVR protocols.  EOP and DMH inmates were appropriately referred to mental health.  RVRs recorded the inmate's MHSDS LOC, documented the assignment of a staff

assistant, and summarized the content of the mental health evaluation. In a few cases, mental health input was used to justify penalty mitigation, which typically entailed assessing the low range of credit loss or electing to retain privileges.

While mental health evaluations were routinely completed, they were not always completed timely. Seven of 12 of the RVRs reviewed were not completed within 15 calendar days of the incident, as required by the Program Guide. MH-4s used stock language and repetitive generic phrases that were likely to be disregarded by the hearing officer.

<u>**Correctional Training Facility (CTF)**</u>
May 4, 2010 – May 6, 2010

<u>Census</u>:

CTF had a total inmate population of 6,319 as of May 2010, with 997 inmates in an MHSDS program that primarily served a 3CMS population. The caseload census represented an increase of 101 inmates since the preceding monitoring period. In the OHU there were five inmates, two of whom had been elevated to EOP LOC and were awaiting transfer. Of the 217 inmates housed in administrative segregation, 38 were at the 3CMS LOC and one was an EOP inmate.

<u>Staffing</u>:

CTF did not have an allocated chief or senior psychiatrist position. Of the 3.5 allocated staff psychiatrist positions, 2.5 were filled. One of these full-time positions was covered by two psychiatrists from SVSP who each worked an additional two days at CTF. The one allocated full-time psychiatrist vacancy was covered by registry staff.

At the time of the site visit, the chief psychologist position was filled. That chief psychologist also served as the chief of mental health. The 1.5 senior psychologist positions

were filled.  All 12.5 psychologist positions, including the designated *Clark* clinician, were filled.

The 1.5 social worker positions, one senior psych tech position, and all ten line psych tech positions were filled.

Of the nine allocated OT positions, eight were filled and the one vacant position was covered by registry staff.  The institution continued to have a vacant .65 RT position.

Telemedicine services were utilized one day per week.

 Quality Management:

The quality management process at CTF continued to improve but did not attain full compliance.  There was no functioning local governing body.  The QMC met weekly and was chaired by the acting HCM.  The mental health quality subcommittee met biweekly, reported to the QMC, and chartered seven QITs that reported to the QMC. The monitor's expert observed a QMC meeting.  The information and data presented were relevant to the issues being discussed.  However, some key QMC members were not in attendance.  Another QMC meeting during the monitoring period had been cancelled due to lack of a quorum.

A review of QITs indicated some confusion with the QIT process.  There were difficulties with the auditing and data collection processes which lad to concerns with the interpretability and utility of the data provided by the audits.  Mental health management reported that they were aware of these difficulties and were in the process of establishing a quality management team to work on improving audits.

CTF had a psychology and social worker peer review process, but it did not separate the respective clinical disciplines.  The peer review committee consisted of three

members with one serving as chairperson.  During the monitoring period, five peer review and support meetings were held, resulting in the review of 14 clinicians.

There was no formalized peer review for psychiatry, but the lead staff psychiatrist audited approximately 36 to 42 charts of fellow staff psychiatrists.  Results were then provided to the chief of mental health.

Suicide Prevention:

There were two completed suicides during the review period.

The SPRFIT met monthly and was chaired by CTF's suicide prevention coordinator.  Regular attendance remained problematic although it had improved since the preceding monitoring period.  Information on the prior month's suicide attempts, OHU placements, and MHCB transfers was usually provided for review during the meetings.

The ERRC reportedly met monthly.  Although emergency response drills reportedly occurred, documentation regarding proof of practice was not provided.  QMC minutes indicated that the findings of the ERRC were reported to the QMC, but review of QMC minutes indicated that this was not always the case.

A newly implemented procedure at CTF included daily discussion of the status of holding cells, five-day follow-ups, and welfare checks during the morning executive meeting. Five-day follow-up logs indicated a 92-percent compliance rate. It was reported that the compliance rate for the completion of SRAs was 92 percent.

CTF reported daily documented meetings between custody and mental health staff in administrative segregation.  The monitor's expert observed such a meeting which covered inmates' status, mental health concerns, and newly arrived inmates.  CTF reported that inmates were pre-screened prior to administration segregation placement, and that administration of the

31-question screen within 72 hours was being audited. However, little compliance data was presented and the auditing methodology for the data that was presented was flawed.

Twelve intake cells had been retrofitted. With the exception of the intake cells, administrative segregation disciplinary inmates had access to television outlets. Staff reported that welfare checks were completed on the half-hour, but were not staggered. A log was available on the unit but the monitor's expert observed that it was not maintained accurately. Inmates in administrative segregation were offered showers and 3.5 hours of outside yard three times per week. CTF recently opened 18 new SMYs for the ASU.

Medication Management:

Review of medication management was limited due to a lack of available audits and data. A staff audit of 100 new arrivals with current orders for psychotropic medication found a 61-percent compliance rate for administration of the medication within 24 hours of the inmates' arrivals.

Few inmates transferred within CTF. No data was available from recent QITs concerning continuity of medication when inmates moved between the OHU and their assigned housing unit, or when inmates transferred into or out of administrative segregation.

An audit found that psychiatrists saw inmates and wrote progress notes prior to medication renewals in 97 percent of cases.

Medication noncompliance logs maintained by psych techs corroborated reports that nursing staff were referring cases of medication noncompliance. Mental health staff reported that MARs were not consistently accurate sources of information regarding medication compliance.

Staff reported that unexplained interruptions in the administration of medication were common.  Staff psychiatrists estimated that it took two to three days for new medication orders to reach inmates.

Inmates reported numerous problems with pill lines including long waits, schedules that conflicted with other necessary activities, lack of medication despite having a current order, and receiving the wrong medication.  Nearly half of the more than 40 inmates interviewed reported receiving the wrong medication and gaps in continuity.  Several inmates reported that they missed medication passes due to scheduling conflicts.  However, no recent pill line audits had been conducted.

Data available from QITs and audits conducted in response to prior CAP items indicated a 68-percent compliance rate for obtaining inmates' informed consent for the use of psychotropic medications.

Audit and QIT data also indicated a 37-percent compliance rate for ordering of laboratory tests of inmate blood levels of mood-stabilizing medications.

Staff reported that no Keyhea petitions were initiated during the monitoring period.  Inmates who met Keyhea criteria were removed to an MHCB unit in another institution.

Although data indicated that 529 inmates were receiving medications at HS, accuracy could not be verified.  It was reported that under ordinary circumstances, HS medications were usually administered after 8:00 p.m.

CTF reported full compliance with Program Guide requirements for medication continuity for paroling inmates, but supporting data did not appear to have been provided.  Staff believed that inmate refusals of parole medication were rare.

Sexual Misconduct:

CTF reported few referrals, screenings, and IDTT meetings for sexual misconduct.  Two inmates were screened and one received a comprehensive evaluation which resulted in placement in the CSP/Corcoran Exhibitionism treatment program.

Transfers:

CTF maintained a DMH referral log.  All six referrals to intermediate care were initiated during the MHARP review in December 2009 and resulted in referrals to DMH within several weeks after identification.  Two inmates transferred to ASH and one subsequently returned to CTF.  CTF deferred a third inmate's transfer to ASH pending a medical hold.  A fourth inmate was awaiting transfer to SVPP while his place on the wait list varied between 250 and 500.  The fifth inmate was provided EOP LOC, transferred to CMC, and was then referred to ASH.  The sixth inmate was transferred to an MHCB at SVSP.  None of the referrals required a Vitek hearing.

The monitor's expert's observation of IDTT meetings revealed that the criteria for DMH referral consideration were not routinely discussed.  CTF maintained a non-referral log for inmates who met criteria for referral to DMH but were not referred.  CTF identified nine inmates as having met at least one criterion for DMH referral.  Of these inmates, eight were at the EOP LOC and one was at the 3CMS LOC.

The CTF OHU had 21 beds, four to five of which were designated for mental health use.  However, when a mission change resulted in an influx of SNY inmates in September 2009, the OHU mental health census typically ranged between seven and eight inmates.  Staff audits and other information indicated that OHU operations were challenged by insufficient

beds, poor medication continuity, and a small number of low-functioning EOP inmates who had lengthy OHU stays while awaiting transfer.

CTF utilized an OHU for mental health purposes. Logs of supervisory oversight were complete. The institution reported 98 admissions to the OHU, with an average length of stay of 66.5 hours. This was an improvement over the preceding monitoring period. Of these 98 OHU admissions, 63 percent were reported to have been placed in the OHU for SI and 24 percent were subsequently transferred to MHCBs. Only one quarter of these transfers to MHCBs occurred within 24 hours. OHU staff reported that no inmates were placed in restraints during the monitoring period.

CTF did not present cumulative data on the use of holding cells, but a review of logs indicated holding cell durations in compliance with the Program Guide. High ranking CTF staff reported that they avoided use of holding cells for inmates in need of crisis care.

During the current monitoring period, 29 inmates required transfer to an institution that could provide EOP LOC. The average transfer time was 28 days. Ninety percent of inmates were transferred within 60 days. At the time of the monitor's visit, there were four EOP inmates awaiting transfer. Two of them had stays in excess of 60 days.

Other Issues:

3CMS

Available mental health treatment space for the 3CMS population varied at the institution and remained problematic at some locations. Reportedly there were usually sufficient numbers of access to care officers to provide necessary escorts.

CTF reported difficulty meeting Program Guide requirements for timeliness of initial PC and psychiatric assessments during the early part of the monitoring period. Audits

indicated 97-percent compliance with initial PC contacts, 94-percent compliance with regular PC contacts, and 98-percent compliance with 90-day psychiatry contacts.

The compliance rate for initial IDTT meetings was 86 percent. For annual IDTT meetings it was 82 percent. Participation at IDTT meetings was noncompliant, and attendance by CC Is was not provided. An IDTT meeting observed by the monitor's expert included all the required participants, but the format of the discussions was more for a clinical interview than a treatment plan. Inmates' reports corroborated this observation. UHRs were available at the IDTT meeting, the institution reported that on some days 20 to 40 percent of UHRs were not available at the start of the day due to double-ducating between among mental health, medicine, and dental. Filing of UHRs was hindered by a shortage of staff.

Forty eight groups were held during the monitoring period, with 257 3CMS inmates participating in groups. Group topics included coping, healing, parole planning, anger management, and a lifers group. Few 3CMS inmates reported knowing about such group treatment although many expressed an interest in it.

<u>Administrative Segregation 3CMS</u>

There were 38 3CMS inmates housed in administrative segregation. CTF reported that during the early part of the monitoring period, it had had difficulty completing the initial PC interviews and IDTT meetings prior to the ICC meetings. Data regarding rates of compliance with timelines of PC contacts and IDTT meetings was not provided. CC Is did not attend IDTT meetings until shortly before the site visit. The monitor's expert observed two IDTT meetings. Necessary participants were present at both, but the CC I was not engaged at one of the meetings. It was evident during clinical presentations and discussions at the IDTT meetings that clinicians were knowledgeable about their patients, and that inmates were

207

comfortable with their clinicians. Interviews with inmates corroborated this. A problematic procedure observed during the IDTT meeting was the scheduling and discussion of medication management with the inmate.

Data that CTF did report indicated 200 psychiatry contacts and 804 PC contacts, with 89 percent of the latter occurring in a confidential setting. Observations and discussions with inmates indicated that psych tech clinical rounds, PC contacts, and psychiatry contacts occurred regularly.

The compliance rate for psych tech daily rounds was reported to be 99 percent, indicating non-compliance.[16] The monitor's expert accompanied a psych tech on administrative segregation rounds and found that the psych tech executed the duties competently.

CTF reported that PCs attended all ICC meetings.

Referrals

In 2009, CTF recognized problems with the mental health referral tracking procedure and initiated a system to remedy these problems. A QIT was also chartered to address documenting emergent referrals.

There were 1,982 referrals during the monitoring period. Overall, these referrals were partially compliant with Program Guide requirements as CTF averaged 7.2, slightly longer than the required five working days or seven calendar days to complete an appointment. There was also difficulty with CTF audit data regarding emergent referrals. The institution defined noncompliance with urgent referrals as not being seen within 72 hours rather than 24 hours,

---

[16] Defendants requested that this sentence be modified to indicate that the 99-percent rate for daily psych rounds is compliant. Daily psych tech rounding in administrative segregation is a suicide prevention measure, among others, within the "Defendants' Plan to Address Suicide Trends in Administrative Segregation," specifically part IV of the Plan, filed on October 2, 2006. It is also required by the Program Guide, Chapter 7, Administrative Segregation", sub-part E, "Clinical Rounds." Although in this case the 99-perent rate was very close to 100 percent, because it involves a suicide prevention measure, compliance is not achieved until a rate of 100-percent compliance is accomplished.

which rendered the data useless.  An analysis of audit data indicated a 45-percent compliance rate for routine referrals.

Heat Plan

CTF recently updated its heat plan operating procedure (OP).  There were four stage-one heat alerts during the monitoring period.  Instead of issuing heat cards to the inmates, a red stripe was placed on their identification cards.  Inmates stated that the red stripe made them feel stigmatized since their modified identification cards identified them as mental health inmates.

RVRs

Institutional data indicated that 1,033 RVRs were written during the monitoring period.  Sixteen percent of these were issued to MHSDS participants.  Of the total RVRs, 22 or two percent were referred for MH-4s.  Fifteen of these 22 were MHSDS inmates, including 12 3CMS, two EOP, and one in the MHCB unit.  MH-4s for four of the 22 RVRs indicated that mental health issues played a role in their issuance, and should have been considered during adjudication of disciplinary charges.

Among the 22 cases referred for MH-4s, the majority of precipitating behavior was related to physical, sexual, or verbal aggression.  A spot check by the monitor's expert of approximately six cases in which the RVR triggered a MH-4 suggested that custody staff requests for RVR evaluations were quite expansive.

Pre-Release Planning

CTF provided several parole planning groups for inmates.  Although CTF did not provide audit data on pre-release planning through TCMP, its emerging focus on matters such as SSI preparation was noted.  It was reported that clinicians received pre-parole planning packages

to discuss with inmates who had impending parole dates.  CTF's management report also noted the creation of a referral system for TCMP providers for those cases demanding priority attention.

### California Men's Colony (CMC)
Hybrid Paper Review

Census:

On March 10, 2010, CMC's total inmate population was 6,687, an increase from approximately 6,000 during the preceding monitoring period.  The MHSDS population remained constant at 1,790 inmates.  There were 1,187 3CMS and 483 EOP inmates.  Fifty-seven 3CMS inmates were in administrative segregation, as were 30 EOP inmates.  There were 33 inmates in the temporary MHCB unit known as the locked observation unit (LOU).

Staffing:

Of CMC's reported 127.48 allocated MHSDS positions, 114.98 were filled.  The chief psychiatrist and chief psychologist positions were filled.  The three senior psychiatrist positions were filled, as were the five senior psychologist and four senior psychologist specialist positions.  Although two of the 19.5 staff psychiatrist positions were vacant, a half-time contractor provided psychiatric services.  The one vacancy of the 35.48 allocated staff psychologist positions was covered by a full-time contract psychologist.

The sole vacancy among the seven supervising psychiatric social worker (PSW) positions was covered by contracted services.  Although 1.5 of 13 allocated social worker positions were vacant, contracted services covered this vacancy.  Thirty of the 32.90 psych tech positions were filled, as were all 11 RT positions.  Three full time marriage and family therapists also provided services.

CMC did not utilize psychiatry telemedicine services.

Quality Management:

CMC had a local governing body that met regularly, and a QMC that met monthly.

The mental health program subcommittee (MHPS) met biweekly, and included medical, mental health, custody, pharmacy, and nursing staff.  Eight of 11 MHPS meetings had a quorum.  Minutes were maintained.  The MHPS reported to the QMC monthly.

Six QITs were chartered.  Active QITs addressed five-day clinical follow-up, MHCB overflow procedures, mental health referral responses, and parole planning.  QIT results were written, and recommendations were forwarded up the chain of command.  QIT membership regularly included line and supervisory staff.

CMC had a well-developed peer review process for psychiatry, psychology, and psych techs.

Suicide Prevention:

Except for December 2009, the SPRFIT met monthly  and maintained meeting minutes.  Although all disciplines were present at meetings, quorums were not present.  SPRFIT meeting minutes were submitted monthly to the MHPS for review and approval.  Substantive areas of discussion included MHCB admissions, wellness checks, suicides, restraint use, and administrative segregation.  The SPRFIT forwarded to the MHPS recommendations on custody welfare check procedures for MHCB discharges, and five-day clinical follow-up procedures. The MHPS approved both initiatives.

The ERRC met at least monthly, and twice monthly during three months of the monitoring period.  Quorums were met for all but three meetings, and minutes were maintained. Reviewed incidents included inmate deaths, suicide attempts, CPR, and the use of outside

ambulance services.  Identified problems were forwarded to appropriate supervisors.  Meeting minutes were submitted to the QMC.  Monthly emergency response drills were conducted in administrative segregation.

CMC reported approximately 92-percent compliance with five-day post-MHCB discharge follow-up.

There were daily morning meetings between the administrative segregation custody sergeant and mental health staff.

After a CMC audit revealed that medical records did not contain administrative segregation pre-placement screens, CMC provided in-service training (IST) to the nursing staff.  The 31-question screen was offered to 84 percent of administrative segregation inmates within 72 hours of placement, although there was no documentation of whether the screenings were completed in a confidential setting.  CMC reported full compliance with 30-minute welfare checks, which were completed at staggered intervals.

CMC had 17 intake cells retrofitted with vents, light fixtures, and beds designed to reduce the risk of suicide.  The cells were located closest to the custody station, and had doors that increased visibility into the cell.

Cells were not equipped with electrical outlets.

There were an adequate number of walk-alone yards to provide all inmates with at least ten hours of weekly yard.

As of March 2, 2010, there were 15 inmates in administrative segregation for non-disciplinary reasons awaiting transfer to an SNY yard.

<u>Medication Management</u>:

Medication continuity for newly arriving inmates improved from 70 percent during the preceding monitoring period to close to 90 percent.

CMC's UHR review for inmates transferring from the MHCB unit to administrative segregation indicated full compliance for medication continuity. Another audit revealed 91-percent compliance for medication continuity for inmates transferring from the MHCB unit to regular housing. Ninety-three percent of inmates transferred from administrative segregation to other housing units experienced no medication interruption.

Prescription audits revealed that 99 percent were renewed on time, and that 14-day bridge orders and 90-day maximum medication orders were compliant. Seventy-nine percent of medication orders were administered on the next day's dose. Delays were largely due to the transition and adjustment to the Maxor Guardian pharmacy system.

Cases of medication noncompliance were identified through weekly MAR reviews. Post-identification interviews were conducted by the nursing staff. Contacts were documented in UHRs. Psychiatry referrals were made as necessary. Inmates on Keyhea medications were identified after one missed dose, and sent to the clinic for intramuscular medication administration. Inmates housed in administrative segregation and the MHCB units were referred directly to psychiatry. Although no audits or data were provided regarding the timeliness of responses to referrals for medication noncompliance, CMC chartered a QIT to review the issue and develop further policy. However, a MAR-completion audit indicated that only 26 percent of missed medication doses were properly documented.

CMC conducted twice-quarterly audits of pill lines where MHSDS inmates were housed. Documentation from two audits indicated average wait times of 20 minutes and seven

minutes, respectively.

CMC audits demonstrated that 83 percent of UHRs contained informed consent forms for psychiatric medications.  An audit of laboratory testing for blood levels of psychotropic medications given to *Keyhea* inmates examined whether the appropriate laboratory testing for treatment with atypical antipsychotic medications and mood stabilizing medications was conducted.  The audit indicated that approximately 80 percent of routine laboratory testing occurred within the last six months, and that 100 percent of laboratory tests, or refusals, were documented in medical records.

With the exception of the MHCB unit, CMC did not maintain a centralized list of inmates prescribed medications DOT.

There were 120 inmates with Keyhea orders between September 2009 and March 2010.  CMC had yet to fully develop a Keyhea tracking system.  Seventy-eight administrative law judge hearings were held.  Keyhea orders were permitted to expire in only two cases and no Keyhea orders lapsed due to oversight.  Forty-six inmates had Keyhea orders renewed.  Four petitions were denied, and one inmate petition was not pursued based on the advice of counsel.  Four inmates left CMC prior to their hearings.

There was a 40 percent increase in HS medication use, with 687 HS prescriptions written for 433 inmates.  It was reported that HS medication delivery began at 8:00 p.m.

An audit covering a two-month period indicated that 60 of 72 paroling inmates received medication upon release.

Sexual Misconduct:

CMC issued 22 sexual misconduct RVRs.  Mental health screenings and IDTT meetings were held for 16 of them.  Two of the inmates were referred for comprehensive

evaluations.  One resulted in a diagnosis of Exhibitionism and referral to a treatment program.
Sixteen of the cases were referred to the DA for prosecution.

Although CMC did not provide Exhibitionism treatment, exposure-control
jumpsuits and cell door signs were utilized.

Transfers:

CMC generated 198 referrals to DMH.  Sixty of the referrals were from the
MHCB unit, and 138 were from clinicians.  Forty-two referrals were subsequently cancelled, and
25 were being processed at the time of reporting.  Of the remaining 131 referrals, 97 were
accepted, 12 were rescinded, and 22 were pending an acceptance or rejection decision.  Ninety-
two percent of referred inmates were at the EOP LOC, seven percent were 3CMS inmates, 14
percent were housed in administrative segregation, and two referrals were made for GP inmates.

CMC referred 60 inmates to DMH acute care, and rescinded 27 of the referrals
prior to transfer.  Package completion time averaged five days, and acceptance generally took on
average an additional 11 days.  Transfers averaged two days after a bed assignment.  Thirty-
seven percent of DMH acute care referrals were made subsequent to an inmate's tenth day in the
MHCB unit. One inmate referred for acute care won his Vitek hearing.

CMC referred 138 inmates to DMH intermediate care.  Of these referrals, 68 were
made to ASH, 22 were to SVPP, and ten were to the DMH ICF at CMF.  The remaining 38
referrals were dropped as the inmate paroled, transferred, improved, or won a Vitek hearing prior
to the referral.  Package completion averaged 18 days, and acceptance generally took an
additional 18 days.  There were no rejections.  Of the inmates referred to DMH intermediate
care, 72 actually transferred, with 64 going to ASH, six to CMF, and two to SVPP.  Sixteen of
the 22 referrals to SVPP were placed on the wait list upon acceptance.  Transfers to ASH and

CMF averaged five days after acceptance notification. Six inmates referred for intermediate care won their Vitek hearings.

Inmates returning to CMC from DMH were admitted to the MHCB unit. CMC reported adequate notification and discharge summaries from DMH upon inmates' return.

There were 783 admissions to the MHCB unit, all originating from CMC. The 42 MHCBs averaged a 94-percent occupancy rate, with an average length of stay of 8.7 days. Nineteen percent of MHCB admissions had lengths of stay exceeding ten days. Seventy-five inmates had three or more MHCB admissions, for 359 total admissions. One inmate had 12 MHCB admissions, two had ten, and three had nine.

Renovation of the OHU to house the court-ordered interim MHCB unit was completed in July 2008. The unit contained 40 beds, and two additional safety cells.

CMC transferred four inmates to the PSU. It took an average of 25 days for endorsement, and an additional average of 46 days from endorsement to transfer.

CMC utilized eight holding cells. The average length of time an inmate was kept in a holding cell awaiting MHCB placement was 62 minutes. Less than five percent of inmates placed in holding cells had more than one admission.

Other Issues:

Administrative Segregation

CMC reported improvement in clinical office space with the addition of three confidential interview offices and three non-confidential staff desks. Audits indicated that CMC achieved full compliance with providing weekly PC contacts for administrative segregation inmates, including those placed in the EOP administrative segregation hub. Inmate refusals resulted in 44 percent of these contacts being conducted cell-front.

216

MHCB

An audit of MHCB charts indicated a 97-percent compliance rate for IDTT meetings occurring within 72 hours of MHCB admission, and for the presence of completed treatment plans within 72 hours of initial IDTT meetings. Although CC attendance at IDTT meetings was problematic, C-files were routinely available. MHCB file audits further revealed that informed consent forms and pre-admission screens were present 72 and 54 percent of the time, respectively. For inmates with multiple MHCB admissions, only 38 percent of reviewed UHRs revealed discussions about transfer to a higher LOC.

CMC reported that for inmates awaiting MHCB admission, it did not use alternative or temporary housing. Rather, it used an overflow process whereby more stable MHCB inmates were transferred to modified cells across from the LOU in order to make room for new MHCB admissions. The moved inmates were not "discharged" from the MHCB unit, and received the same care and treatment as those housed in the LOU. A total 195 inmates were placed in overflow cells. The average length of stay was 1.45 days.

Restraints were not used in the LOU, as the cells were too small. CMC's GACH used clinical restraints on 24 occasions, with two inmates accounting for 15 of the episodes. Tracking log problems made CMC unable to report the duration of time that an inmate remained in restraints.

Inmates were placed in seclusion rooms on 25 occasions. Two inmates had five episodes each, and two others had four episodes each. The longest retention in a seclusion room was for 24 days. Problematic log entries made it impossible to determine average seclusion room lengths of stay.

217

EOP

CMC's compliance rate for weekly PC contacts was 94 percent.  It was reported that unless there was a lockdown, such contacts took place in confidential settings.  There was no evidence that lockdowns routinely prevented clinical contact or group therapy appointments, but there were no audits to confirm this.

Although 97 percent of IDTT meetings were timely, CC and psychiatry attendance were problematic and C-files were not brought to the meetings.  Treatment plans varied from thorough and individualized to incomplete.  Although it was reported that psychiatric contacts occurred at least monthly, no documentation addressed the confidentially of such contacts.

CMC audits indicated that EOP inmates were offered an average of 13.25 hours of weekly group therapy, and attended a weekly average of 6.6 hours.  EOP inmates had access to education, vocational rehabilitation, and jobs.

Administrative Segregation EOP

Although CMC was compliant with timely IDTT meetings in the EOP administrative hub, CCs were not in attendance, and C-files were not present.  Treatment plans were complete and individualized.  With the exception of one day, daily psych tech rounds and weekly summaries were completed.

CMC was compliant with monthly psychiatric contacts, but there was no data as to whether the contacts were confidential or occurred cell-front.  Although EOP administrative segregation inmates were offered an average of 15 hours of weekly out-of-cell structured therapeutic activity, inmates attended a weekly average of only seven hours of such activity.  Inmates who refused over 50 percent of offered structured therapeutic activities were visited

daily by clinicians, and treatment plans were modified to address the issue.

While administrative segregation group space was adequately lit, ventilated, and private, it was small and prevented arrangement of therapeutic modules in a configuration that encouraged group discussion.

Eight EOP inmates had administrative segregation lengths of stay that exceeded 90 days. Their well-being was reviewed by the administrative segregation hub facility captain and the CC II, who forwarded a monthly report to HQ.

3CMS

Although CMC audits demonstrated 97-percent compliance with quarterly PC contacts and compliance with psychiatry contacts, there was no documentation as to confidentiality of these contacts. IDTT meetings were timely, but psychiatry and CC attendance was problematic. Treatment plans were individualized.

CMC provided group therapy for 3CMS inmates. Although staff and inmates expressed the desire for more group treatment, physical plant space limited additional group therapy options. In C Quad, where the majority of 3CMS inmates were housed, only one room was available for group treatment. Wait lists approached 100 inmates for many offered groups.

Administrative Segregation 3CMS

CMC completed 97 percent of PC contacts for administrative segregation 3CMS inmates. Forty four percent of these contacts occurred cell-front. Although 80 percent of psychiatric contacts were completed as clinically indicated, there was no documentation as to whether the contacts were confidential.

Although 90 percent of 3CMS administrative segregation IDTT meetings were completed timely, CC attendance remained problematic. Treatment plans were individualized.

Daily psych tech rounds were compliant, and weekly summaries were completed.

Referrals

Ninety percent of routine referrals were seen within five working days, and 96 percent were seen within six working days. Ninety-four percent of urgent referrals were seen within 24 hours, and 99 percent were seen within two working days. Ninety-four percent of emergent referrals were seen on the same day, and all were seen within one working day.

Medical Records/MHTS

The new MHTS.net system had not been activated at CMC. The facility continued to use its local management information system.

Heat Plan

CMC had several stage II and III heat plan activations during August, September, and October 2010. On August 27 through 29, stage III heat plan activations occurred on all quads on the third tiers. Five inmates presented with medical symptoms. Medical rounds were performed and documented for all areas as required.

RVRs

CMC issued 11 RVRs to inmates in the MHCB unit, 204 RVRs to EOP inmates, and 495 RVRs to 3CMS inmates. All MHCB and EOP inmates received MH-4s, and 38 MH-4s were completed for 3CMS inmates.

Pre-Release Planning

Three TCMP staff serviced CMC. The institution was in the process of encouraging TCMP to provide services to the CDCR inmates at ASH. CMC also had one senior PSW supervisor and psych tech dedicated to pre-release planning and offered pre-release planning groups.

<u>Licensed Marriage and Family Therapist Pilot Program</u>

Two of the five licensed marriage and family therapists from the pilot program remained as contract employees at CMC.  They operated as PCs with caseloads in EOP, and one in the dual-diagnosis program.  The therapists underwent the same credentialing and peer review process as the social workers.

**<u>Wasco State Prison (WSP)</u>**
May 18, 2010 – May 20, 2010

<u>Census</u>:

On April 30, 2010, WSP housed 5,989 inmates, including 1,268 in the MHSDS program.  The 3CMS census was 1,155 inmates, which included 1,054 in the RC, 64 in mainline, and 37 in administrative segregation.  There were 104 EOP inmates, including 91 in the RC, 11 in administrative segregation, and two mainline EOP inmates.  There were nine inmates in the MHCB unit.

<u>Staffing</u>:

WSP reported 91.07 budgeted mental health staff positions.  On May 4, 2010, 20.05 of these positions were vacant, although 7.66 of the vacancies were filled with "dual appointments."  This brought the overall mental health staffing vacancy rate to 13.6 percent.

Only 1.5 of 7.55 psychiatry positions was filled, but use of contractors reduced the functional vacancy rate to 13 percent.  Although 7.5 of the 39.52 psychologist positions were vacant, contractors reduced the functional vacancy rate to 14 percent.

Five of seven psych tech positions were filled but the one senior psych tech position was vacant.  Two of three psychometrist positions were filled, as was one of 1.5 RT positions.

<u>Quality Management</u>:

WSP's local governing body met quarterly, and the QMC met monthly. QMC meeting minutes indicated good participation.

The MHQMS met monthly but had difficulty with regular participation. One meeting was cancelled for lack of a quorum.

There were two QITs. The SPRFIT instituted one to review custody 24-hour wellness checks as part of five-day follow-up. A second QIT addressed the use of alternative temporary housing in lieu of MHCB placements.

Psychiatrist turnover limited psychiatry peer review. The review process involved psychiatrists meeting in pairs to review five UHRs from each other's caseload. Two peer review reports were completed. There was no peer review among other clinical disciplines.

<u>Suicide Prevention</u>:

The SPRFIT was scheduled to meet monthly but attendance was problematic. Two SPRFIT meetings were cancelled for lack of a quorum. The monitor's expert attended a SPRFIT meeting at which attendance was good and discussion covered a range of subjects, including a review of attempted suicides and other incidents of self-injurious behavior.

The ERRC met monthly and conducted monthly emergency drills. A review of minutes indicated that the ERRC only reviewed code III cases that required ambulance transfer to an outside facility, and did not review emergency responses resulting in TTA treatment or MHCB placement.

Documentation of daily meetings between administrative segregation custody and mental health staff was not available. It was reported, however, that there were daily meetings regarding admissions, and of inmates possibly experiencing mental health problems.

WSP reported that all inmates received a pre-placement screen.  However, psych techs did not use IPs as part of the mental health screening process.  A weekly nursing audit of ten UHRs indicated 93-percent compliance with completion of the 31-question screen.

Administrative segregation intake cells had not been identified or retrofitted for suicide prevention, and cells had not been equipped with electric outlets.  New arrivals were identified by placement of a placard outside their cell doors.

Although it was reported that all administrative segregation inmates received 30-minute welfare checks and a log review indicated that they took place within required timelines, they were not staggered.

It was reported that all administrative segregation inmates were offered a weekly minimum of ten hours of yard in the unit's 22 walk-alone yards.  Inmates confirmed such yard availability.

The ASU had one conference room and one clinical office available for confidential interviews.  Staff reported adequate escort support.

WSP logs indicated that as of May 14, 2010, no inmates were in administrative segregation for non-disciplinary reasons pending SNY transfer.

Medication Management:

There was a lack of reliable data to accurately assess medication management.  Reviewed audit data indicated small sample sizes, inconsistent methodology, and findings at odds with clinician and inmate reports.  Staff reported some problems with inter-disciplinary communication on missed medications and medication refusals.  Inmates complained about not receiving medications, particularly after cell moves or medication changes.

The only data presented by mental health management on medication continuity was with non-formulary medications upon DMH discharge. Of 21 inmates who returned from DMH, eight returned with non-formulary medications, with six of the eight continuing on non-formulary medications at WSP.

It was reported that there was a 55-percent compliance rate with follow-up appointments for medication noncompliance.

WSP pill line length varied depending on the yard. Although pill line duration data was not provided, inmates and staff reported long lines. Inmates also reported sometimes having to decide between receiving medication and missing work.

Laboratory audit information was limited to data collected through psychiatry peer review, in which laboratory study results were noted in the UHRs 60 percent of the time.

WSP prescribed approximately 90 percent of medications as DOT. Nursing management expressed concern with this practice and its impact on their workload.

Staff reported that the Keyhea process was utilized regularly and that the percentage of successful Keyhea hearings increased since the chief psychiatrist had assumed clinical responsibility. Thirty-eight Keyhea orders were initiated since July 2009, and 18 were active.

The institution was noncompliant with proper administration of HS medications. It was reported that all 1,322 doses of HS medications were delivered between 6:00 p.m. and 9:00 p.m.

Parole medication audit data was not provided.

Sexual Misconduct:

WSP issued 19 sexual misconduct RVRs, all of which were referred for assessment, with 11 subsequently referred for a comprehensive evaluation. Two of the 11 inmates evaluated were diagnosed with Exhibitionism or Paraphilia NOS, and were transferred to CSP/Sac. The monitor's expert's review of a sample of the comprehensive evaluations found them to be thorough.

Inmates diagnosed with Exhibitionism or Paraphilia NOS received individual therapy as part of their treatment. It was reported, and staff indicated, that custody-driven behavioral modification procedures such as the use of exposure-control jumpsuits, placards posted on cell doors, and designations on housing boards were in place. However, there were also reports of sheets partially covering cell windows.

Transfers:

WSP made 91 referrals to DMH. Fifteen Vitek hearings were held; inmates won three of them and the referrals were rescinded.

Acute care accounted for 34 of the DMH referrals, resulting in 26 placements. Acute care referral timeframes were generally met.

There were ten referrals to ASH with six inmates placed, three paroled, and one transferred to another institution. Of 12 VPP referrals, three inmates were placed, three were pending, two were rescinded, two paroled, and two transferred to another institution. Of 35 SVPP referrals, six were placed, seven were on the wait list, six were pending notification of acceptance, eight paroled, and eight transferred to other institutions. DMH rejected one inmate for intermediate care placement. Timeframes for intermediate care referrals were generally not

met.  The number of intermediate care referrals also decreased from an average of nine monthly referrals during the prior five months to one per month during the last three months.

It was reported that 22 DMH discharges returned to WSP.  The DMH coordinator reported receiving prior notification in 77 percent of cases, and reported receiving discharge summaries in 86 percent of cases.  Thirty-six percent of inmates discharged back to WSP from DMH returned on non-formulary medications.  WSP psychiatrists discontinued these medications 25 percent of the time.

There were 240 MHCB admissions.  MHCB lengths of stay averaged 4.7 days, with 26 stays exceeding ten days.  Twenty-nine inmates had multiple MHCB admissions ranging from three to 11 admissions.  The MHCB referred all such inmates to DMH acute care, and 14 inmates subsequently returned to WSP.

Eleven EOP inmates transferred to the PSU, with an average of ten days between referral and endorsement, and an average of 47.5 days between endorsement and transfer.  An EOP inmate with an imposed SHU term was subsequently transferred to PSU.

WSP utilized holding cells as alternate temporary housing for inmates awaiting MHCB placement.  It was reported that a clinical determination was made as to whether a suicide watch was necessary whenever an inmate was placed in alternate temporary housing for mental health needs.

Data from the transfer log indicated that 20 administrative segregation EOP inmates transferred to an EOP administrative hub, with an average 61.5-day transfer time.  It was reported that there were 208 EOP inmate transfers, of which 70 paroled prior to transfer.  Eighty-two EOP inmate transfers were beyond the 60 day timeline.  On March 31, 2010, eight EOP inmates were awaiting transfer to an administrative segregation EOP placement, with waiting

periods ranging from two to 135 days.  There were 75 EOP inmates pending transfer to a GP

EOP program.  Forty six of these exceeded the 60-day transfer time requirement.

WSP reported that 1,263 3CMS inmates transferred and 224 of these transfers

occurred beyond the 90 day timeframe.  On March 31, 2010, 519 3CMS inmates were awaiting

transfer.  Of these, 257 exceeded the 90-day timeframe.  There was no data on the number of

3CMS inmates who paroled.

Other Issues:

Reception Center

For the EOP in the WSP RC, staffing reports indicated that there were one

psychiatrist, eight psychologists, 1.25 social workers, three psych techs and .5 RTs.  EOP therapy

groups and IDTT meetings were held in a location that seemed to maximize privacy and

confidentiality. EOP housing was not clustered.

Monthly institutional audits indicated that 100 percent of arriving inmates

received same day screening for five of six months, while January 2010 had an 85 percent

compliance rate.

There was 89.5 percent compliance with conducting initial EOP evaluations

within seven days, 93 percent compliance with initial IDTT meetings, 91.8 percent compliance

with follow-up IDTT meetings, and 92 percent compliance with weekly PC contacts.

Data on the average number of inmate out-of-cell activity hours was not available,

but it was reported that 92 percent of EOP inmates were offered five hours per week of

structured therapeutic out-of-cell activities.

Although WSP offered group therapy, many EOP inmates refused to participate,

with 124 of 152 audited cases refusing group therapy. The monitor's expert observed EOP IDTT

meetings at which all necessary disciplines were represented. However, UHRs and C-files were not always available and custody issues were not consistently discussed.

No data was available to determine compliance with the court-ordered plan concerning the pre-parole benefit application process, and a large number of WSP clinical staff members were unfamiliar with the process. However, 18 EOP inmates were identified on the tracking sheet as having paroled. Of the 18, SSI applications were filed in eight cases.

MHCB

WSP operated six MHCBs and one safety cell in a 17-bed CTC. However, reported collaboration between medical and custody staff resulted in up to 11 CTC beds being used as MHCBs.

MHCB inmates were not usually handcuffed or placed in holding cells during clinical interviews or IDTT meetings. Custody staff was present. A seclusion room was available and used on 13 occasions, with use ranging from 1.5 to 23 hours. A log was maintained and was available. A UHR review indicated that restraint use was properly documented and implemented according to policy. A log was also maintained of five-point restraint use and indicated eight occasions when it was used, with a range of 2.5 to 18 hours. Documentation indicated that policies and procedures were followed.

The monitor's expert observed the MHCB IDTT process. There was good attendance and thorough clinical discussion with C-files and UHRs available. Custody officers assigned to the MHCB unit were sensitive to mental health issues.

All inmates discharged from the MHCB were placed on five-day follow-up.

Administrative Segregation EOP

As WSP was not an administrative segregation EOP hub institution, the only EOP inmates in administrative segregation were RC EOP inmates.  There was no ongoing review of their transfer status by either the unit captain or the CC II.

The monitor's expert attended an ICC meeting that reviewed two EOP inmates.  C-files were available but UHRs were not.  Custody and classification issues were discussed.  Staff reported that administrative segregation EOP hub beds had historically been difficult to obtain.  There appeared to be good daily collaboration between custody and mental health staff.

One private office was available for clinicians to see ducated inmates individually, and clinicians shared the office without conflict.  According to WSP audits, 48 percent of individual contacts occurred in a private office.  However, the majority of unscheduled contacts were conducted cell-front.

Groups were held in therapeutic modules.  The arrangement of the modules did not encourage peer interaction.  Clinicians were aware of the therapeutic limitation of the modules' placement but space limitations restricted the modules' rearrangement.  It was reported that MHSDS inmates placed in administrative segregation for protection due to gang related issues usually refused to participate in mental health services.

WSP did not maintain separate data for administrative segregation EOP inmates to measure compliance with structured out-of-cell therapeutic activities.

The monitor's expert observed an IDTT meeting.  All required participants were present.  However, the UHR and C-files were often unavailable, which hampered the clinician's ability to formulate clinically meaningful treatment plans.  It also appeared that clinical staff

made little, if any, effort to have inmates sign releases to obtain prior mental health or medical information.

3CMS

Approximately 62 percent of 3CMS inmates were taking psychotropic medications, and were seen regularly by a psychiatrist. It was reported that PCs were seeing inmates more frequently than once every 90 days.

Administrative Segregation 3CMS

As clinically indicated, PCs saw 3CMS inmates with extended administrative segregation stays and followed inmates who refused to participate in out-of-cell therapeutic activities. It was reported that gang-related issues remained an obstacle to promoting inmate cooperation with out-of-cell activities. A coping group was offered to inactive gang members.

The monitor's expert observed an IDTT meeting. Treatment plans were updated and included a SRA, and medications were reviewed by the attending psychiatrist. A CC I provided available case factors, although C-file unavailability made this information incomplete. Staff also reported that C-files were not always available during the initial ICC meeting. A UHR review together with IDTT meeting observations, suggested that treatment plans were generally adequate.

Referrals

WSP reported that clinicians were notified of the need for immediate contact when the mental health unit received an emergency referral. Non-emergency referrals were triaged daily to determine how quickly the inmate needed to be seen.

WSP received a monthly average of 1,400 non-emergency referrals during the monitoring period. Urgent referrals were scheduled for the next day, and routine referrals

averaged 15.7 days to an appointment. Although WSP did not routinely track response times for emergent and urgent referrals, emergency follow-up data retrieved for the period of December 16, 2009 through March 31, 2010 indicated that 69 psychology emergency referrals and 77 psychiatry emergency referrals were received and seen on the same day.

Heat Plan

The monitor's expert reviewed the institution's heat alert LOP which was found to comply with applicable standards. Temperature records were maintained by the litigation coordinator. The thermometer for administrative segregation was in a conspicuous location and appeared to be functioning adequately. No heat alerts were recorded.

RVRs

A log review by the monitor's expert found that four MHCB inmates, 121 EOP inmates, and 28 3CMS inmates were referred for a MH-4 after receiving an RVR. It was reported that RVR assessments always included an inmate interview and review of the UHR and RVR. When available, PCs were also interviewed as part of the assessment.

An audit of 40 files in which RVRs were issued indicated that in 92 percent of cases which had MH-4s, they were referenced in the hearing officers' findings. WSP provided C-files for five of 15 inmates who satisfied mental health criteria for mitigation of RVR dispositions. The C-file review indicated that in four of the five cases, the hearing officer noted the findings from the MH-4s, with penalty mitigation provided in three of the cases.

WSP reported that no RVRs were issued for self-injurious or suicidal behaviors.

Lockdowns

WSP initiated 13 lockdowns, resulting in the implementation of modified programs in at least one of the four facilities. These lockdowns primarily affected delivery of

care by limiting access to group therapy. The time periods ranged from two days to ongoing, with one lockdown of Hispanic inmates at Facility D ongoing since November 30, 2002.

            Pre-Release Planning

            WSP's pre-release planning program included two TCMP employees and weekly clinician pre-parole planning groups. EOP inmates in the pre-parole planning group were provided with a resource packet relevant to their parole community, and were encouraged to discuss aftercare needs with clinicians and other group members. Pre-release group therapy was available to mainline 3CMS inmates.

**Kern Valley State Prison (KVSP)**
April 20, 2010 – April 22, 2010

Census:

            In April 2010, KVSP housed 4,808 inmates, including 1,418 in the MHSDS program. The institution's EOP population increased following activation of the Level IV SNY EOP program in mid-August 2008, and stood at 108 inmates, with 89 in the SNY program, five in the MHCB unit, and 14 in administrative segregation. KVSP's 3CMS population grew from 472 in October 2007 to 1,295 in April 2010. There were 130 3CMS inmates in administrative segregation and 12 in the MHCB unit.

Staffing:

            KVSP staffing improved since the institution's June 2005 activation. Eleven of the 57 allocated mental health positions remained vacant, although contractors reduced the functional vacancy rate to zero. All five supervisory positions were filled. Contractors provided the equivalent of three FTE staff psychiatry positions, covering all five such positions. Six of 21 allocated psychologist and social worker positions were vacant, with contractors filling 8.5

positions.  All clerical positions were filled, as was a health programs specialist position, nearly all psych tech positions, and two of three RT positions.

Quality Management:

KVSP's quality management program was characterized by poor documentation and inadequate auditing practices.  DMH referral tracking logs, alternative cell placements, and IEX screens were poorly maintained.  Performance audits were missing or unreliable.  Custody reports related to reviews of EOP inmates in administrative segregation longer than 90 days and completion of monthly emergency drills were not provided.

The MHQMS was scheduled to meet twice monthly and did so, except in December 2009 when both meetings were cancelled for lack of a quorum.  Not all required staff attended meetings.  The nursing director and a medical records representative were among those who missed meetings, but custody staff was represented.  The committee kept substantive minutes, routinely monitored certain aspects of mental health care, received audit reports, and forwarded select reports and draft operational procedures to the QMC.  Standing agenda items included the status of pending EOP transfers, use of holding cells, MHCB treatment, five-day follow- up, and incidents of self-injurious behavior.

KVSP chartered one QIT, to improve UHR access for scheduled mental health appointments.  The QIT, the third of its kind, had yet to resolve this issue.

Peer review programs could not be fully assessed due to lack of information.  KVSP did not provide meeting minutes or audit reports for psychologist or social worker peer review activities.  Audits of psychiatric peer review appeared to be largely quantitative assessments of Program Guide requirements.

Suicide Prevention:

In response to CDCR recommendations, mental health staff received SRA training.

The SPRFIT met monthly, maintained minutes, and reviewed mandatory agenda items.  A SPRFIT meeting observed by the monitor's expert was poorly attended.  Review of minutes indicated that the bulk of meetings were devoted to case reviews, video training conferences, MHCB admission data, and critical incidents.

KVSP was 95 percent compliant with five-day follow-up for the 383 cases which required such monitoring upon MHCB discharges.  Of 331 reviewed cases, 18 were noncompliant in that one or more monitoring days were missed.

Lack of audit information made compliance with CDCR's plan to address suicide trends in administrative segregation difficult to assess.  KVSP did not provide information regarding compliance with monthly emergency drills in administrative segregation.

Nursing staff used CDCR's current bus screening form, which included a question about whether or not the inmate had recently received bad news, to interview arriving inmates. Staff believed that nursing screens were conducted prior to administrative segregation placement, but acknowledged not knowing how the screens were documented or where the documentation ended up.  A review of 80 UHRs indicated that none contained chronos documenting the completion of nursing pre-placement screens.  Although monthly audits indicated full compliance with completion of the 31-question screen within 72 hours of administrative segregation placement, lack of audit methodology made the reliability of the findings at least somewhat questionable.  Audits indicated that daily psych tech rounds were documented in isolation logs.

Newly-arriving inmates in the administrative segregation stand-alone units were identified with door placards, and received 30-minute welfare checks during their first 21 days in administrative segregation.  KVSP had two stand-alone ASUs for non-MHSDS inmates (Unit 1 and Unit 2), a primary ASU for MHSDS inmates (Unit B1), and an overflow unit for MHSDS and non-MHSDS inmates (Unit B2).  Although ASU I rounds were completed at regular intervals, some ASU II logs indicated that rounds were consistently completed in a staggered manner.  Intake protocols in ASU B1 and B2 were not evaluated.

The stand-alone units did not accommodate in-cell appliances.  However, Facility B administrative segregation inmates, most of whom were MHSDS participants, were permitted to have in-cell appliances.

The stand-alone ASUs and Unit B1 had sufficient walk-alone yards to permit inmates to have ten outdoor yard hours per week.  However, Unit B2, which in practice was an ASU, did not have its own walk-alone yard, and only those B2 inmates cleared for group yard were offered ten yard hours weekly.

Medication Management:

Medication management compliance was mixed.  Nursing staff primarily collected medication management data through weekly reviews of ten UHRs and ten MARs.  These audits, which did not differentiate between psychiatric and medical prescriptions, yielded an average 76-percent compliance rate for timely medication continuity following inmate transfers within KVSP.

Nursing audits yielded compliance rates of between 84 and 92 percent for timely medication renewals.  Contrary to the Program Guide, in some cases psychiatrists were permitted to write 120-day prescriptions and 30-day bridge orders for psychotropic medications.

Medication noncompliance documentation showed improvement.  Weekly audits indicated that medication refusals were properly noted on the back of MARs 92 percent of the time.  However, only 40 percent of recorded medication noncompliance cases were accompanied by documentation of follow-up contact within seven days of the last missed dose.  Performance data as to psychotropic medications was not available.

There were no reported pill line problems.

Nursing audits indicated that 74 to 97 percent of all medication orders were processed by the pharmacy and delivered within 24 hours.  However, only 33 percent of audited psychotropic orders were timely processed.

Internal audits of 80 UHRs found compliance rates for informed consent ranging from 80 to 95 percent, although sample sizes were small.

Other internal UHR audits found compliance rates for appropriateness of documentation of laboratory blood level studies ranging from 80 to 100 percent, but sample sizes for these audits were also small.

Contrary to departmental policy, all psychotropic medications were ordered DOT which further strained nursing resources.

KVSP renewed and initiated 18 Keyhea petitions between August 1, 2009 and March 31, 2010.  Although staff reported that the Keyhea process functioned well, the monitor's expert observed a hearing at which staff did not appear to be sufficiently familiar with the Keyhea process.

There were 649 inmates prescribed medications at HS.  MARs reviewed by the monitor's expert, as well as staff and inmate reports, indicated that medications prescribed at HS were consistently administered at or after 8:00 p.m.

Pharmacy staff reported that parole medications were typically delivered to reception and receiving one day before an inmate's parole, and given to the inmate upon his release.  Data indicated that during the first quarter of 2010, KVSP processed and delivered parole orders for all 50 inmates with medication prescriptions, with 39 inmates accepting the medications and 11 refusing them.

Sexual Misconduct:

The monitor's expert's review found incomplete documentation and generally poor performance for the institution's adherence to sexual misconduct violation protocols. It did not appear that KVSP used IDTT meetings for all inmates issued sexual misconduct RVRs. Three inmates diagnosed with Exhibitionism were not transferred to a centralized treatment program.  One was retained at an EOP LOC in administrative segregation.  Another involved an inappropriate diagnosis of Exhibitionism of a non-MHSDS inmate who was not added to the MHSDS caseload and not treated by mental health.

Transfers:

KVSP provided several different DMH referral logs, none of which were complete, organized, or consistent with one another.

KVSP generated approximately 36 referrals to acute care, of which 19 transferred, ten were pending transfer, and seven were rescinded.  Twelve of 19 inmates transferred to acute care waited longer than ten days, with four of the waits between 29 and 71 days, and two pending more than 100 days.  Staff reported that acute care referrals based on disability were routinely assigned low priority, as compared to referrals prompted by suicidal behavior.   The monitor's expert's observed an initial IDTT meeting of an EOP inmate recently returned from DMH acute care and found inconsistent performance with psych and return protocol.  Neither the

inmate's UHR nor DMH discharge summary were available.  As a result, the inmate's initial treatment plan was developed without recent acute care treatment clinical information.

Logs appeared to indicate that of the 24 inmates referred to intermediate care, 12 were referred as part of the MHARP review process.  As of April 2010, all referred inmates remained on SVPP's wait list.

A 73-percent increase in the institution's MHSDS population during the preceding 22 months, including activation of a 96-bed EOP/SNY program, strained access to the institution's 12 MHCBs.  There were 281 MHCB admissions, involving 161 inmates.  Records indicated that 24 of 161 inmates had three or more MHCB admissions, and 51 admissions exceeded ten days.

Although KVSP did not provide information as to PSU endorsements and transfers, a report of inmates released from administrative segregation indicated that access to a PSU was slow.  From October 1, 2009 through January 2010, four inmates remained in administrative segregation between 177 and 234 days pending transfer to a PSU program.

There were 98 alternative holding cell placements.  Of the 79 cases for which placement and/or removal dates/times were provided, 80 percent were for one day or less, twelve lasted approximately two days, and four lasted between three and seven days.  Nursing staff reportedly provided continuous observation during the inmates' alternative holding cell stays.

Access to CMC's administrative segregation hub was poor.  Only three EOP inmates were transferred to the hub and waited in KVSP's ASU between 53 and 76 days before being transferred.  Other EOP inmates with long administrative segregation stays were never transferred to the hub.  In some cases, inmate RVRs resulted in lengthy legal, disciplinary, and investigative processes that apparently precluded transfer.  Inmates deemed to be unsafe in

KVSP's EOP SNY program often spent months in administrative segregation awaiting transfer to other prisons.

Other Issues:

Administrative Segregation

The 401 administrative segregation inmates included 150 MHSDS inmates, which included 130 3CMS, 14 EOP, and six MHCB inmates who had returned to administrative segregation from the MHCB unit without a level-of-care update. Of 130 3CMS administrative segregation inmates, 44 had stays in excess of 90 days. Seven of 14 EOP inmates, and three of the six designated as MHCB, were in administrative segregation longer than 90 days. The lengths of stay of the seven EOP inmates ranged from 131 to 563 days, with KVSP reporting that most had been involved in RVR disciplinary, legal and/or investigatory processes. Custody staff did not appear to complete monthly reviews of EOP inmates who were in administrative segregation longer than 90 days.

Six PCs were assigned to cover the administrative segregation MHSDS population. Although KVSP reported that compliance rates for weekly PC contacts ranged from 82 to 96 percent, audit materials did not substantiate these findings. KVSP audit data also did not substantiate reported compliance rates of 90 to 96 percent for the completion of administrative segregation IDTT reviews.

Lack of adequate space for individual contacts and group sessions compromised MHSDS administrative segregation. All PC contacts occurred in phone-booth size, expanded metal cells that lacked seats and afforded limited auditory and visual privacy. IDTT meetings were held at a table placed in a corridor. Group space consisted of four therapeutic modules in a small room, which was reported to be able to accommodate eight weekly groups, or 32 inmates,

just over 20 percent of the administrative segregation MHSDS population.  Group access was further diminished by cancellations reportedly resulting from access officers' unavailability to provide escorts.

Court orders mandated that MHSDS inmates not be housed in KVSP's stand-alone ASUs.  MHSDS inmates mistakenly placed in them, or inmates deemed to require mental health services after placement in them, had to be removed within 24 hours.  Of ten 3CMS inmates mistakenly placed in the stand-alone ASU, eight were removed within 24 hours, and the remaining two were removed within 48 hours.

No information regarding response to mental health referrals from stand-alone administrative segregation inmates was provided.

MHCB

MHCB staffing included three psychiatrists, two psychologists, a social worker, a RT, and an OT.  There were five to seven nurses and a supervising nurse assigned to the MHCB unit.  Seven COs were assigned during second watch, and five officers were assigned during third watch.

MHCB audits included staff reviews of 27 UHRs.  The reviewed records suggested that SRAs were completed upon admission, that initial IDTT reviews were usually held within 72 hours of admission, and that discharge summaries were produced upon an inmate's release from the MHCB unit.  Problematic areas included lack of consistent CC and inmate attendance at IDTT meetings, and staffs' failure to inform PCs of impending discharges.

KVSP logs indicated that five-point restraints were used 38 times.  Restraint time was typically short, lasting four hours or less in 68 percent of cases, and less than 12 hours in over 90 percent of cases.  Inmates were placed in seclusion rooms for between .2 and 42.3 hours

on 31 separate occasions.

With the exception of medical/surgical MHCB inmates, MHCB inmates were subjected to restrictive security protocols.  Inmates were handcuffed when escorted and placed in therapeutic modules for mental health appointments.  MHCB inmates were housed in cells without furniture, issued tear-proof mattresses, precluded from wearing anything but a suicide smock or underwear, and were denied reading glasses and reading materials.

EOP SNY

The 96-bed EOP SNY program, activated in August 2008, was staffed with a clinical supervisor, five full-time PCs, a full-time psychiatrist, and a RT who spent approximately 80 percent of her time in the program.  Psych techs assigned to the program provided approximately 22 hours of weekly groups.  PCs facilitated two to three weekly groups.

KVSP reported that all EOP SNY inmates were offered at least ten weekly structured therapeutic activity hours, and that compliance had been sustained since June 2009.  KVSP offered a range of groups.  Nineteen inmates had work assignments.  There were also art and medication education activities, although statewide funding cuts had ended access to educational programs.

Monthly audits of weekly PC contacts indicated an average 87-percent compliance rate.  Inmates interviewed by the monitor's expert indicated satisfaction with PCs.

KVSP audit results based on staffs' review of 39 UHRs showed that initial IDTT meetings were consistently held within 14 days of an inmate's arrival, and that quarterly IDTT reviews routinely occurred.  All required disciplines attended an IDTT meeting observed by the monitor's expert.  UHRs and C-file information were generally available, and team discussion and participation was good.  Each case discussion included an assessment of the need for a

higher LOC, and completion of MHARP documents.

Psychiatric contact in the EOP program was problematic.  An internal review of 39 UHRs yielded a 77 percent compliance rate for documented monthly psychiatric contacts.  Psychiatric interviews continued to be held in shared office space that did not afford adequate privacy.

3CMS

Staff reports and audit findings noted in quality assurance subcommittee minutes indicated compliance rates between 87 and 96 percent for quarterly PC contacts.  But clinicians acknowledged that large caseloads sometimes limited the frequency and duration of such contacts.  Although clinicians had access to one-on-one interview offices, security protocols limited confidentiality.  It was reported that priority ducats for 3CMS appointments were not routinely honored during lockdowns, resulting in cell-front contacts.

Despite ongoing challenges to obtaining access to group space, quality management records indicated that roughly 80 3CMS inmates were enrolled in groups.

Referrals

Continued noncompliance with mental health referral responses was reported.  Errors in entering referral data into the computer-based logs resulted in emergent, urgent, and routine identifiers not being recorded.  As such, provided data identified six emergent and no urgent referrals, but recorded 2,955 routine referrals.

With response times ranging from two to 118 days, none of the emergent referrals prompted an immediate response.  Of the 2,955 reported routine referrals, 2,064 failed to generate contact within five working days.

Medical Records/MHTS

Despite the efforts of three QITs, one of which was chartered during the reporting period, UHR availability for scheduled mental health appointments continued to range from 40 to 80 percent. Efforts to persuade medical records staff to heighten the priority assigned to mental health appointments were reportedly unsuccessful. UHRs, when available to staff, were often found to be overstuffed and disorganized. When overstuffed records were culled in order to make them more manageable, critical paperwork frequently was not transferred to the new volume.

Heat Plan

KVSP monitored and recorded outdoor and indoor temperatures year round. A tour of three facilities' housing units confirmed that indoor temperature was recorded every three hours. However, because housing unit officers were not issued handheld thermometers, temperatures were not taken on upper tiers, in individual cells, or among bunks in the gyms, the areas most likely to be hottest.

A heat report printed for the monitor's expert listed inmates taking heat-sensitive medication by housing so officers could easily identify heat-risk inmates living in their units.

RVRs

According to institutional data, KVSP completed 106 MH-4s that were used in the disciplinary process. This included 77 RVRs issued to EOP inmates, 25 RVRs issued to 3CMS inmates, three issued to MHCB inmates, and one issued to a non-MHSDS inmate.

A review of eight RVRs issued to seven EOP inmates indicated mixed compliance. Although a few incorporated mental health input into the disciplinary process, others highlighted noncompliance with established protocols. In some cases, mental health input was not

referenced in RVRs or not considered during deliberations.  In others, the full content of the

mental health evaluation was not summarized in the RVR, and the hearing officer's rejection of

clinical input was not explained.  In three of eight cases reviewed, required mental health

evaluations were not completed within 15 days of the incident.

### North Kern State Prison (NKSP)
May 4, 2010 – May 6, 2010

Census:

NKSP's inmate census stood at 5,448, unchanged since the preceding monitoring

visit in September 2008.  There were 4,979 RC inmates, which was 562 or 13 percent more than

were reported in September 2008.  The number of EOP inmates in the RC had grown to 84, for

an increase by 75 percent.  The number of 3CMS inmates in the RC had grown by 31 percent to

reach 1,036.   The mainline 3CMS population stood at 102, which was 13 or 15 percent, more

than were reported in September 2008.

The number of inmates in administrative segregation had not changed appreciably

since the last monitoring visit.  There were a total of 166 administrative segregation inmates,

which included two EOP inmates and 44 3CMS inmates.

There were ten inmates in MHCBs and ten inmates in an alternative holding area,

known locally as the Mental Health Temporary Housing (MHTH) unit.

Staffing:

NKSP continued to fill most of its allocated mental health positions.  The overall

vacancy rate among mental health positions was 7.5 percent.  The functional vacancy rate was

reduced to four percent with coverage provided by contractors and duel appointments.

Positions for the chief psychologist, senior psychiatrist, and three senior

psychologists were all filled.

One of 7.5 line psychiatrist positions had been vacant since September 2009.  Use of dual appointments to reduce the functional vacancy rate to less than ten percent.  The institution claimed that psychiatric allocations were inadequate, in large part due to the workload associated with frequent medication adjustments and widespread medication noncompliance within the growing RC population.  Noted deficiencies, including slow responses to medication-related referrals, inconsistent psychiatric attendance at IDTT meetings and poor treatment continuity, were attributed to inadequate psychiatric resources.

Among PCs, 3.12 of an allocated 43.12 psychologist and social worker positions were vacant.  Contractors and interns reduced the functional vacancy rate for PCs to near zero.  All three psychometrist positions were filled, as were positions for seven of 8.25 psych techs, two RTs, eight RNs, an SRN II and a health programs specialist.

One of nine clerical positions was vacant.  Turnover among clerical staff was identified as one of the major problems affecting the MHP at NKSP, and in particular gaps in MHTS data.

Quality Management:

The governing body met quarterly, and the QMC met monthly.  Meetings were reported to be well attended.

The mental health subcommittee met monthly with good attendance.  It reviewed audit results, chartered QITs, prepared for impending mission changes, and adjusted staff assignments to reflect population shifts.  It conducted 21 audits covering numerous components of the MHSDS program at the institution. Reports from the subcommittee were presented in writing and verbally at quality management meetings.

There were four ongoing QITs, each comprised of two individuals. A psychologist and supervising nurse formed a standing medication management QIT that monitored the efficacy of the auditing tool and focused on problem areas that came to the fore as a result of auditing. The senior psychiatrist and pharmacist teamed up to develop an auditing tool for laboratory protocols. A psychologist and the healthcare access captain developed a system for tracking and auditing RVRs issued to MHSDS inmates, and a psychologist joined an HRT II to find ways to improve UHR filing and availability. As of the end of April 2010, each team reportedly continued to monitor its given area and provide staff training as needed. A fifth QIT, tasked with improving compliance with five-day follow-up upon discharge from the MHCB unit, MHTH cells, and alternative holding areas appeared to have been dissolved after issuing final recommendations.

Psychiatric peer review meetings were convened monthly and were chaired by the senior psychiatrist. The meetings served as an open forum for psychiatrists to discuss specific cases, and provided an opportunity for the senior psychiatrist to offer feedback on the results of UHR audits. Psychologists and social workers attended monthly PC peer review meetings. Teams of two clinicians reviewed UHRs and provided feedback to fellow clinicians regarding documentation and clinical work. Any glaring deficiencies were reportedly shared with clinical supervisors.

Suicide Prevention:

There were two completed suicides during the reporting period.

The SPRFIT met monthly during the reporting period. Standing agenda items included review of MHCB admission and MHTH placement data, compliance with five-day follow-up, review of attempted and completed suicides, and discussion of issues highlighted

during the most recent statewide suicide prevention video conference.  Attendance at the monthly conferences was limited to CTC staff and mental health supervisors due to the small size of the video conference room used by the mental health department restricted.  Key information communicated during these meetings was reportedly shared with program directors and non-supervisory staff.

The institution reported that all inmates released from MHCBs, MHTH cells, and alternative holding areas were provided five-day follow-up, regardless of the clinical reasons for their placement in those beds.  However, compliance with five-day follow-up was noted to be inconsistent during the reporting period.  Reportedly, a QIT tasked with improving performance in this area instituted changes that had more recently improved compliance.  Information regarding compliance with custody checks was not provided.

Compliance with the CDCR's plan to address suicide trends in administrative segregation was mixed.  The institution reported that nursing staff routinely pre-screened inmates prior to their placements in administrative segregation, and that the screening form included questions regarding past and current suicidal behaviors and feelings.  However, audit data was not provided, and performance in this area could not be independently verified.

Custody staff and psych techs reportedly met in the morning on a daily basis to ensure that all new intake inmates were timely identified.  Staff and inmates indicated that 31-question screens were routinely administered within 72 hours of placement in administrative segregation, and that most screens were conducted in holding cells located on the dayroom floor. Compliance in this area was not audited.

New intake inmates, identified with white notices on their cell doors, reportedly received 30-minute welfare checks during their first 21 days in administrative segregation.  Logs

reviewed by the monitor during the site visit were poorly maintained.  On the day of the monitor's tour, 30-minute checks were not documented from 9:30 a.m. to 12:00 p.m.  Logs covering the first few days of May 2010 contained three two-hour gaps from noon to 2:00 p.m.

There were a few designated new intake cells equipped with cell doors with two windows, a single cement bunk and suicide-resistant air vents.  The strategically located retrofitted cells were not used to house at-risk inmates during their first 72 hours in administrative segregation, as envisioned by the plan.

Audit data showed, and interviewed staff and inmates confirmed, that psych techs conducted daily rounds in administrative segregation.

There were ten walk-alone yards adjacent to the ASU.  Interviewed inmates reported having access to seven to ten hours of yard per week.  Two group yards were recently closed by the warden after repeated incidents of violence.

Cells in administrative segregation were not equipped with electrical outlets.  Inmates reported that a television attached to the dayroom wall in administrative segregation was no longer used.

Medication Management:

Institutional audits showed overall improvement in medication management, largely attributed to implementation of the Maxor Guardian pharmacy system.  However, several discrete areas remained problematic.

The institution reported that medication continuity upon arrival improved after a part-time psychiatrist and full-time psychologist were assigned to triage all inmates processed through receive and release.  However, internal audits showed inconsistent compliance in this area.  Nursing audits found that medications were routinely ordered for newly arriving inmates

within eight hours of arrival, and were administered to inmates within 24 hours of arrival 85 percent of the time.  However, a separate audit indicated that RC inmates received ordered medication within 24 hours of arrival, yielding a compliance rate of 66 percent.  In a separate audit, the institution reviewed the UHRs of 58 inmates who arrived at NKSP with current orders for Depakote, Lithium, and antipsychotic medication, and found that medications were timely continued.

The institution was compliant with the timely renewal of medication orders, but case reviews found that inmates who had been moved received their medications within one day in 84 percent of cases.  However, medication prescriptions for inmates new to the MHSDS took longer to process, as just over half of 32 reviewed orders were available to the inmate by the following day.

Case reviews found that in 80 percent of cases, changed medication orders were processed and delivered to inmates within one day. However, treatment continuity was reported to be poor in that inmates were rarely seen by the same psychiatrist from one medication evaluation to the next.  The institution attributed this deficiency to an inadequate allocation of psychiatrists, which required managers to frequently adjust psychiatrist assignments to compensate for staff absences.

Only four of nine cases referred to mental health for medication noncompliance were seen by a psychiatrist within seven days.  MAR documentation was problematic, particularly with regard to medication noncompliance..  Nearly a quarter of reviewed MARs were found to be incomplete or illegible.  No-shows and refusals were not properly recorded on the MAR in 19 of 30 reviewed cases, generating a compliance rate of only 31 percent.  Referrals

for medication noncompliance were not properly documented in eight of 17 audited cases, yielding a compliance rate of 47 percent.

Pill lines took place in housing units and reportedly operated smoothly.

The senior psychiatrist's review of 51 UHRs yielded compliance rates of greater than 90 percent for presence of updated informed consent forms and ordering of appropriate laboratory blood level studies, among other things.  The above-referenced  audit of UHRs of 58 inmates who arrived at NKSP with current orders for Depakote, Lithium and antipsychotic medication found that a standard battery of laboratory tests was obtained upon arrival, and that a psychiatrist reviewed lab reports and appropriately adjusted treatment in response to abnormal test results, but follow-up laboratory studies were not ordered in three of four cases involving inmates who had been taking Lithium or antipsychotic medications for a number of months. Staff acknowledged that there was some confusion about how often blood level studies were required to monitor inmates who had reached therapeutic levels of Lithium and antipsychotic medications.

Most psychotropic medications at NKSP were nurse administered.  Medications were prescribed DOT for inmates with histories of hoarding, overdoses, medication noncompliance, and risk of medication noncompliance.  A log maintained by the institution listed 50 inmates with current DOT orders.  Performance in this area was not audited.

According to a log provided by the institution's Keyhea coordinator, from September 1, 2009 to February 28, 2010, NKSP initiated 13 Keyhea petitions, nine of which resulted in six to 12-month orders.  One Keyhea petition was rejected by the administrative law judge, and three petitions were pending completion at the time of the site visit.  Two Keyhea orders were successfully renewed during the reporting period.  It did not appear that any Keyhea

orders expired, intentionally or unintentionally.  There were five inmates at NKSP with active Keyhea orders as of April 2010.

Staff reported, and interviewed inmates confirmed, that HS medications were routinely administered at or after 8:00 p.m., but compliance in this area was not audited during the reporting period.

Sexual Misconduct:

The institution reported that 16 RVRs were issued for sexual misconduct during the reporting period.  Two inmates were referred for evaluations.  One met the diagnostic criteria for Exhibitionism but paroled prior to transfer.  The second individual met diagnostic criteria for Exhibitionism and was awaiting transfer to a treatment program at the time of the monitoring visit.

Inmates screened for IEX were reportedly reviewed by an IDTT in administrative segregation.  All RVRs for sexual misconduct were referred to the DA.

Transfers:

Problems with access to higher levels were largely the result of statewide shortages of DMH and EOP beds, but internal deficiencies at NKSP exacerbated the situation. The institution cited a number of obstacles to fully implementing MHARP protocols.  In the absence of the regular DMH coordinator who was out on long-term leave, the responsibility for tracking DMH referrals and completing logs had fallen to other individuals, including a clinical supervisor.  The supervisor was responsible for coordinating the completion of DMH referral packets and maintaining referral records.  In addition, physicians had not been trained on how to complete DMH's history and physical form.  Staff reported that inmates who returned to NKSP from DMH often showed no improvement which lead to a reluctance to refer inmates to DMH.

NKSP provided several different DMH referrals logs, each of which presented slightly different information.   There appeared to have been 20 acute care referrals during the reporting period, including one inmate who was referred twice.  Two referrals were rescinded by the institution.  One referred inmate was transferred to ASH as an MDO after being on the waitlist for 102 days.  Four referred inmates were pending transfer at the time of the site visit, and had been waiting 41 days, 70 days, 75 days and 76 days, respectively.  Thirteen referrals resulted in transfers to acute care.  Only two inmates were transferred within ten days of referral. Three inmates waited longer than 20 days, three inmates waited 39 to 46 days, one inmate waited 60 days, and two inmates waited longer than 100 days.  Inmates pending transfer to the acute care were typically discharged from the MHCB and placed in the MHTH unit.  MHCB staff often waited too long to refer inmates to DMH, leading to prolonged MHCB and MHTH stays. Most of the excessive stays in the MHTH unit involved inmates who were waiting for acute care beds.  NKSP staff did not follow local policies governing the operation of MHTH cells.  Lengths of stay regularly exceeded 72 hours.  Cuff status and property restrictions, including the issuance of bedding and sheets, were not regularly reviewed and lifted when appropriate.

Incomplete referral logs indicated that all intermediate care referrals during the reporting period were generated as part of MHARP.  Four referred inmates remained at NKSP at the time of site visit.  Both inmates were admitted to the MHCB unit or placed in an MHTH cell following their referral to DMH.

NKSP's CTC included ten MHCBs.  During the six-month reporting period, there were 129 MHCB admissions, 56 or 43 percent of which lasted longer than ten calendar days. Nearly a quarter of the admissions lasted longer than 20 days, and over ten percent exceeded 30 days.  Admissions data and staff indicated that most excessive stays in the MHCB unit were

related to waitlisted DMH referrals and delayed EOP transfers.  A RT was assigned to the MHCB and reportedly provided out-of-cell activities to inmates housed in the unit for prolonged periods of time.  NKSP staff did not utilize HCPOP to transfer inmates to MHCB units in other prisons when local crisis beds were unavailable.

In response to the lack of MHCBs, NKSP created the Mental Health Temporary Housing unit, or MHTH, which had ten renovated cells in a RC housing unit.  When MHTH cells were filled, inmates were placed in alternative holding areas, including non-renovated cells adjacent to the MHTH unit, three dry cells in receive and release, two wet cells in the CTC, and two dry contraband cells.

The MHTH and alternative holding areas functioned as triage units for the MHCB.  Nearly all inmates referred for crisis care were placed in an MHTH cell or holding area in order to be assessed for possible admission to the MHCB.  Nearly a quarter, or 119, of the placements in MHTH cells and alternative holding areas resulted in admission to the MHCB.  Transfers from the MHTH cells and alternative holding areas accounted for over 92 percent of all MHCB admissions.  In nearly a third of these cases, the inmate spent more than three days in the MHTH or alternative area before being admitted to the MHCB.

During the six-month reporting period, there were 436 placements in MHTH cells and 78 placements in alternative holding areas for a combined average of 86 placements a month, or almost three per day.  A quarter of all placements lasted longer than 72 hours.  Approximately 14 percent of all placements lasted longer than five days, and nearly four percent of placements lasted longer than ten days.  There were twelve outliers with lengths of stay that ranged from 20 to 61 days, most of which involved inmates waiting for DMH beds.

NKSP reported daily MHTH census and admission and discharge numbers to HCPOP, but did not refer individual inmates to the state-wide MHCB waitlist.

The institution's management report identified four inmates with multiple MHCB admissions, while data provided on site listed 13 inmates with multiple admissions. Forty-eight inmates had multiple crisis events during the reporting period. This included inmates placed in MHTH, which is not among the types of housing approved by the Program Guide. DMH referral checklists were completed during these reviews, but participants did not discuss the possibility of DMH referral during the meeting observed by the monitor's expert. Most of these cases did not appear to have been considered for referral to DMH. NKSP did not combine data for MHCB admissions, placements in MHTH cells, and stays in alternative areas when tracking crisis events. This data was vital to the management of high-risk inmates and a required part of IDTT reviews.

The RC held 63 to 102 EOP inmates during the reporting period. A total of 34 EOP inmates paroled from the RC, and another 150 EOP inmates transferred to other prisons. Forty six percent, of these inmates waited longer than 60 days to be transferred or released from prison. Despite long stays in the RC and the significant number of EOP inmates with multiple MHCB admissions and MHTH placements, the institution did not use the priority EOP transfer process during the reporting period.

NKSP did not consistently meet transfer guidelines for 3CMS inmates in the RC. As of the beginning of April 2010, over a third of the 975 3CMS inmates in the RC had stays in excess of 90 days. Over 20 percent of the 3CMS population had been in the RC longer than 120 days, eleven percent had been waiting more than 150 days, and six percent had languished for

more than six months.  NKSP staff did not utilize CDCR procedures for expediting 3CMS transfers from the RC when clinically indicated.

Other Issues:

Reception Center

The institution processed an average of 530 new arrivals per week and was staffed with a full-time clinical supervisor, 18 psychologists, 1.5 social workers, three psychometrists, and an office assistant.  In addition, a clinical team comprised of a psychiatrist and psychologist interviewed all inmates in receiving and release (R&R) as they arrived at the institution.

Data provided by the institution indicated that 99 percent of intake inmates completed all required diagnostic screening within 72 hours of arrival.  UHRs reviewed by the monitor's expert confirmed compliance with Program Guide timeframes for completion of bus screens and 31-question screens.  However, internal data showed that only 72 percent of inmates referred for further assessment received a mental health evaluation within 18 days of arrival.  Similarly, in 60 percent of cases, level-of-care chronos were completed within 18 days of arrival.

Most EOP inmates in the RC were housed in two buildings, one of which housed SNY inmates.  A full-time psychiatrist and 7.5 PCs were assigned to cover 84 EOP inmates in the RC, generating average PC caseloads of approximately eleven inmates.

The institution audited 100 UHRs during the reporting period to assess compliance with various requirements specific to EOP inmates in the RC.  The audits showed that newly arriving EOP inmates were screened by psych techs within 24 hours of arrival, but found that daily psych tech rounds were documented only 44 percent of the time.  SRACs were timely completed and filed.  Inmates designated at the EOP LOC while in the RC were consistently given a mental health evaluation within seven days and routinely reviewed by an

initial IDTT within 14 days. Psychiatric medication evaluations were completed within 30 days 85 percent of the time. Weekly CM contacts were documented 89 percent of the time. UHRs reviewed by the monitor's expert indicated that inmates were removed from their cells for nearly all PC contacts.

Internal audits and UHRs reviewed by the monitor's expert found that EOP inmates in the RC consistently received monthly IDTT reviews. IDTT meetings were routinely attended by the inmate, the PC, a psych tech, and a CC. Psychiatrists attended IDTT reviews only 53 percent of the time.

The institution reported that inmates entering the RC at the EOP LOC were given a mental health evaluation within seven days of arrival in 76 percent of cases, and were reviewed by an IDTT within a week of arrival in 96 percent of cases. However, no audit data was provided to support these compliance percentages.

A chronic shortage of suitable group treatment space prevented the institution from offering EOP inmates five hours of structured out-of-cell therapeutic activities per week. Chapel space was intermittently available for EOP groups, but shifting schedules for religious activities and poor ventilation limited the practicality and suitability of these areas. Consequently, most group activities were held in dayrooms, which afforded insufficient confidentiality and interrupted television viewing in the housing unit. The institution reported that 77 percent of EOP inmates were eligible to participate in offered activities at any given time. Only 48 percent of eligible inmates received five hours a week of out-of-cell therapeutic activities, and only 19 percent of eligible inmates were scheduled such that they received an hour per day of out-of-cell time.

A total of 34 EOP inmates paroled during the monitoring period and reentry planning was provided to some degree. Inmates identified as having a release date within 60-120 days and who required assistance with benefits were referred to the contracted benefits liaison. PCs reportedly communicated with psychiatrists to ensure that parole medications were ordered, and faxed treatment plans and medication profiles to clinicians in the POC in order to facilitate continuity of treatment. Supervisory staff reportedly received parole planning/reentry training in 2009.

Internal audits yielded a compliance rate of 96 percent for documentation of quarterly clinical contacts for 3CMS inmates in the RC. In 80 percent of cases, level-of-care chronos were updated quarterly. A TCMP social worker interviewed 3CMS inmate who had impending release dates, coordinated parole outpatient appointments, and initiated the application process for social security and disability benefits, if indicated.

Administrative Segregation

NKSP had one ASU, located in Building 6 on D facility. There were no overflow units in use. NKSP did not have a stand-alone unit.

An internal audit of 60 UHRs found consistent compliance with all but one of the reviewed Program Guide requirements. Initial mental health evaluations, IDTT meetings, and treatment plans were completed within prescribed timeframes. Clinicians provided input during ICC hearings. Treatment plans were updated quarterly by an IDTT and documented consideration of group therapy. CCs attended IDTT meetings, but psychiatric participation in IDTT reviews was documented only 64 percent of the time.

Weekly PC contacts were documented. Most occurred in three therapeutic modules in the day room. Mobile screens were placed around the modules but provided

inadequate visual and auditory privacy.  Thirty six percent of PC contacts occurred at the cell front.  These were nearly all the result of inmate refusals that were believed to have been influenced by pressure from fellow gang members.  A very small percentage of cell-front contacts were attributed to clinician workload issues and lack of custody escort.

Three full-time psych techs were assigned to administrative segregation.  They screened intake inmates, conducted daily rounds, and facilitated groups.  Four groups, including coping skills, anger management, medication review and current events, were offered to administrative segregation inmates during the reporting period.  Groups were held in a small room that was equipped with three phone booth-sized holding cells, one of which did not have a seat.  Low group participation was attributed to peer attitudes.  More recently, most groups had been shortened or cancelled as a result of personnel changes, security initiatives, and adjustments to escort assignments in administrative segregation.

An IDTT meeting observed by the monitor's expert was attended by all required disciplines and informed by the presence of UHRs and central files.  The attending clinicians and psychology interns demonstrated a thorough familiarity with the reviewed inmates.

MHCB

The MHCB unit was not audited on a regular basis and did not have performance data for key Program Guide requirements, such as the completion of SRACs and discharge summaries.

The ten-bed MHCB unit was staffed with a full-time psychiatrist, 1.5 psychologists, a recreational therapist, and a half-time supervising psychologist.  In addition to coordinating the Keyhea process at NKSP, the recreational therapist reportedly offered out-of-cell activities to inmates with prolonged MHCB stays.

IDTT meetings were routinely attended by all required disciplines, including a rotating CC, although a meeting observed by the monitor's expert did not include a CC.  None of the reviewed cases included a discussion about the factors indicating consideration for referral to DMH.  Treatment plans developed by the treatment team were minimally adequate.

Mental health rounds largely consisted of cell-front interviews conducted by a psychiatrist and/or a psychologist seven days a week, including weekends and holidays.

During the reporting period, three inmates were placed in restraint for durations that ranged from 4.6 hours to 64.5 hours.  One inmate was placed in seclusion twice, for 7.8 hours and 48 hours, respectively.

Regardless of security status, clinical presentation, or lengths of stay, inmates admitted to the MHCB were hand-cuffed when removed from the cell.  Cells were not furnished, in-cell property and clothing were restricted, and access to out-of-cell activities was limited.

The MHTH unit consisted of ten renovated cells in a RC housing unit.  All of the cells were equipped with a sink and toilet, as well as a wall switch for the cell light.  All furniture was removed from the cells.  Regardless of the reason for placement and clinical presentation following placement in the MHTH, all inmates were issued a tear-proof mattress, suicide blanket, and suicide smock for the duration of their stays.  Inmates placed in MHTH cells or alternative holding areas for suicidal behavior were provided one-to-one or one-to-two continuous observation.  However, MHTH cell doors were constructed with materials that hindered visibility into the cell.  Inmates had little to no personal property, no access to yard or dayroom, and very limited out-of-cell time.  These default restrictions, particularly onerous for inmates with long stays, contravened the institution's LOP, which called for regular review and, if indicated, relaxation of these restrictions, including the provision of standard bedding.

MHTH staffing consisted of one nurse during first and third watches, and a nurse and certified nursing assistant (CNA) during second watch. A psychiatrist and psychologist visited the MHTH unit daily. They conducted IDTT reviews during weekdays and completed rounds during weekends. The weekday IDTT meetings were attended by a psychiatrist, psychologist, and building sergeant, who was noted to be actively engaged and familiar with each inmate during an IDTT meeting observed by the monitor's expert. UHRs and central files were brought to each weekday IDTT review.

3CMS

One PC was assigned to cover NKSP's small mainline 3CMS program, which included 102 inmates. An internal audit of 60 UHRs found consistent compliance with all but one of the reviewed Program Guide requirements. Initial mental health evaluations, IDTT meetings, and treatment plans were completed within prescribed timeframes. Treatment plans documented consideration of group therapy. Quarterly PC contacts were documented but psychiatric participation in IDTT reviews was documented only 44 percent of the time.

The institution reported that several mainline 3CMS and non-MHSDS inmates participated in eleven groups during the six-month reporting period. Inviting non-MHSDS mainline inmates to participate in groups had reportedly diminished stigmatization of mental health treatment and increased participation among MHSDS inmates. Mental health services reportedly coordinated with educational programs so that work towards GEDs and participation in college courses could be included in the treatment planning process.

Referrals

PCs responded immediately to 226 emergent referrals from staff, and in an average of five days to routine staff referrals. PCs took an average of nearly nine days to

respond to 382 routine referrals from inmates. Psychiatrists did not respond to referrals within required timeframes. There were no urgent referrals from staff or inmates recorded during the reporting period.

Medical Records/MHTS

An internal audit found that UHRs were provided for 9,505 of 13,764 scheduled appointments, generating an availability rate of 69 percent. A QIT had been chartered to improve UHR availability and organization.

MHTS data reliability was poor. An internal study showed that documents found in the UHR, including progress notes, mental health evaluations, treatment plans, and group participation records, were not recorded in the MHTS 31 percent of the time. Limitations with the MHTS necessitated the creation of several alternative data collection and reporting systems.

Heat Plan

Heat logs were maintained in the units, but not all units had a list of inmates taking heat-sensitive medications. The heat list in the ASU was undated, making it impossible to determine if the information was current.

The pharmacy circulated a daily list of inmates taking heat-alert medications. The list was organized by housing, which helped housing officers identify heat-risk inmates in their assigned units, but was not circulated to the housing units.

RVRs

During the reporting period, NKSP issued a total of 883 RVRs. One third of these involved MHSDS inmates, with 236 RVRs issued to 3CMS inmates, 42 to EOP inmates, and five to MHCB inmates. Of the 283 RVRs issued to MHSDS inmates, 35 were dismissed, and seven were reduced to administrative chronos.

Contrary to Program Guide requirements, it did not appear that clinicians completed MH-4s for all EOP and MHCB inmates who were issued RVRs.  According to information provided by the institution, MH-4s were completed for 36 of 42 EOP cases and four of five MHCB cases.  Assessments were completed for 13 of 236 3CMS cases and for three non-MHSDS cases.

Access to Care

In an effort to reduce overtime expenses, NKSP instituted rolling blackouts on three of four facilities.  During blackouts, officers were diverted from their assigned facility to assist with mealtimes on other yards, reducing their availability to escort inmates to mental health appointments.   Staff also attributed increased demand for the MHTH unit to inmate frustration that resulted from these rolling blackouts.

**California State Prison, Los Angeles County (CSP/LAC)**
March 22, 2010 – March 25, 2010

Census:

On March 22, 2010, CSP/LAC housed at total of 4,619 inmates, of whom 1,733 were in the MHSDS program.  The caseload population included 701 mainline 3CMS inmates, 220 mainline EOP inmates, 412 RC 3CMS inmates, 144 RC EOP inmates, 180 administrative segregation 3CMS inmates, 73 administrative segregation EOP inmates, and three MHCB inmates.

Staffing:

The chief psychiatrist position was vacant during part of the monitoring period but it had been filled as of the time of the monitor's visit.  The chief psychologist position was filled, as were 6.5 of 11 staff psychiatrist, three of six senior psychologist, and 28 of 33.8 staff psychologist positions.

262

Eight of nine social worker positions were filled, as were 22 of 23 psych tech, five of 6.15 RT, and 12.5 of 14.5 clerical positions.  The unit supervisor and HPS I positions were filled, as was one of two OSS II positions.  Two senior psych tech positions were vacant.

Use of contractors or staff in "acting" designation resulted in a mental health staffing functional vacancy rate of 16.3 percent.

Quality Management:

The local governing body appeared to be no longer in existence.  The QMC met twice monthly.

The mental health subcommittee generally met four times monthly, and reported to the QMC.  Although meeting minutes indicated regular custody attendance at MHSC meeting, custody staff often arrived late or left early.  Substantive areas addressed by the MHSC included staffing vacancies, out-of-cell therapeutic activities for administrative segregation EOP inmates, medication management, and various program area reports.

CSP/LAC chartered QITs on the administrative segregation EOP hub, medication management, and peer review for psychologists and social workers.  QIT documentation review indicated a range of quality from good to poor.  QIT written recommendations were forwarded to the MHSC.

Psychiatry peer review did not meet, while psychologist and social worker peer review had only recently begun to meet.

Suicide Prevention:

The SPRFIT met monthly and addressed substantive areas but had little role in the corrective action process.

263

Monthly ERRC meetings reviewed the timeliness and appropriateness of actions taken.  Custody staff's lack of attendance was problematic.

Although five-day clinical follow-up for inmates discharged from MHCB was tracked, inmates discharged from other crisis placements were not.

In administrative segregation, pre-placement screen data was not provided and the screening forms generally could not be located in the medical records.  Audits reporting full compliance for timely completion of the 31-question screen lacked sound methodology.  Although custody reported compliance with welfare checks, they typically were not staggered and the lengths of time documented did not appear to be sufficient to allow for quality checks.

Inmate intakes often exceeded the number of intake cells.  Placards were placed on cell doors to identify intake status inmates.  Although it was reported that all administrative segregation 3CMS and EOP inmates were offered individual out-of-cell contacts, data indicated that most clinical contacts occurred at cell front.

Medication Management:

Medication management audits were not conducted regularly, often covered limited time periods, and were based on unspecified methodology.

Medication continuity for new arrivals was problematic, with medications frequently were not ordered within eight hours of RC inmates' arrivals.  New arrival bridge orders were not properly screened and signed by a physician.  Medication continuity also remained problematic for inmates arriving from other CDCR institutions.

Although medication continuity for intra-institutional moves had improved, no audits addressed medication continuity upon MHCB or administrative segregation discharge.

Nursing audits suggested that most inmates had medications renewed prior to expiration, but compliance was not achieved.  Two nursing audits found indicated compliance rates of 51 percent and 56 percent, respectively, for proper staff documentation of MARs for inmates who were "no shows" or who refused medications.

Pill lines were staggered by housing units, and waiting times for medications generally averaged 20 minutes.

Completion of informed consent forms for psychotropic medications improved.

CSP/LAC reported compliance for laboratory testing of inmates' blood levels for certain psychotropic medications.  Audit data suggested near compliance for ordered lab tests, but audit methodology was not provided.

A total of 570 inmates were prescribed DOT medications.  The pharmacy maintained a centralized list of all patients prescribed DOT medications.  Inmates were individually selected for DOT based on criteria that included risk for cheeking, history of noncompliance or substance abuse, severe psychosis or confusion, and/or high risk potential for medication abuse.  All medications for administrative segregation inmates were administered DOT, as were most medications for inmates at the EOP LOC.

There were 24 inmates on Keyhea orders, with four Keyhea petitions having been initiated during the monitoring period and six inmates awaiting Keyhea hearings.

There were 1,359 inmates who were administered HS medications at 8:00 p.m. or later.

An audit of provision of parole medications was methodologically flawed and could not be used to determine actual compliance.

Sexual Misconduct:

There were 21 RVRs for sexual misconduct, including 13 for 3CMS, six for EOP inmates (one of whom had two incidents), and one non-MHSDS inmate. All were screened but not timely. While it was reported that the IDTT process reviewed all 21 inmates, documentation was not provided.

One inmate was referred for a comprehensive evaluation which was adequately completed. He was diagnosed with Exhibitionism and transferred to CSP/Corcoran for unrelated reasons. One sexual misconduct RVR resulted in a SHU term, and five sexual misconduct RVRs were referred to the DA.

CSP/LAC did not provide Exhibitionism treatment. Security measures such as window coverings and exposure-control jumpsuits were used.

Transfers:

CSP/LAC had different DMH coordinators for acute and intermediate care referrals. At times, this created difficulty with accessing and integrating information. The DMH identification process developed during MHARP was not fully implemented. Observation of IDTT meetings, medical record reviews, and analysis of provided data indicated that mental health staff underutilized DMH. Clinicians were not consistently completing and appropriately using Form 7388, the checklist for referrals to higher levels of care, nor was there sufficient discussion of DMH referral.

CSP/LAC referred 13 inmates to DMH acute care. The times from MHCB admission to DMH clinical referral averaged 11.25 days, and the times from completion of the referral packets to submission averaged four days. Transfer times from DMH referral to transport averaged 11 days.

Of the 17 inmates referred to intermediate care, 16 were referred to SVPP, and one was referred to ASH. Thirteen of these referrals resulted from MHARP. Vitek hearings delayed the referral process, with the addition of 17 days on average for completion. Referral package completion averaged 21 days. The one ASH referral took 25 days from the IDTT's identification to completion of the referral package, with the inmate transferring to another CDCR institution prior to acceptance.

Two inmates transferred to SVPP intermediate care, four inmates transferred to other CDCR institutions, one paroled, and ten remained on the wait list. The time from referral to acceptance in intermediate care averaged 14 days; however, inmates waited an average of 76 days for bed assignments. CSP/LAC reported two DMH rejections, both of which were reviewed by CCAT. One of the inmates was subsequently placed on the DMH wait list.

DMH notification of returning inmates reportedly improved. Returning inmates appeared to be seen timely seen by psychiatrists, but not by PCs, with delays of more than a month in some cases.

CSP/LAC had nine designated MHCBs in the 18-bed CTC. CSP/LAC used alternate housing, including the TTA, when MHCBs were unavailable. Administrative segregation inmates in need of crisis care remained in administrative segregation while awaiting an MHCB.

Alternate housing inmate admissions and lengths of stay were omitted from MHCB data, making the actual number of MHCB referrals, admissions, and lengths of stay impossible to determine. Institutional data that was provided indicated that at least 130 inmates were referred during a three-month period to the MHCB, but only 67 referrals resulted in MHCB admissions during the six-month review period. Staff reported that less than ten percent of

MHCB referrals actually resulted in MHCB admission.  The average length of stay was 10.8 days, but stays longer than ten days increased from 15 to 40 percent.  One inmate reportedly had three or more MHCB admissions.

Use of alternate housing reportedly remained high with all 130 known referrals evaluated there during three months of the monitoring period.  While the TTA was reportedly used because of MHCB unavailability, a review of bed usage logs appeared to indicate that MHCBs were in fact available.  Reviews of TTA logs revealed multiple TTA placements, with some inmates having three or four such placements over a two-month period without admission to the MHCB unit.

CSP/LAC referred 11 inmates to PSU.  The time from ICC action to endorsement averaged 21 days.  Seven inmates transferred to PSU, with an average of 32 days from endorsement to transfer.

Transfer timelines were exceeded for 149 EOP inmates and 273 3CMS.  At the time of the monitor's visit, 80 RC EOP inmates and 145 RC 3CMS inmates had been awaiting transfer longer than 60 and 90 days, respectively.  Seventeen RC EOP inmates awaiting transfer had lengths of stay longer than 200 days; six of those exceeded 400 days.

Inmates identified as EOP while housed in the SNY program were placed in administrative segregation instead of remaining in the SNY while awaiting transfer.  Bed unavailability was the primary reason for the transfer delays.  Requests for expedited transfer of EOP inmates were rare.

Other Issues:

### Reception Center

CSP/LAC processed 3,863 inmates through the RC. Staff reported 96-percent compliance with initial and ongoing IDTT meetings.  CSP/LAC reported that weekly PC contacts had a 99.6-percent compliance rate, but roughly 75 percent of these contacts were not confidential.  Record reviews suggested that most of them were limited to basic check-ins, and that little actual therapeutic activity occurred.

As confidential treatment space was limited, only 26 percent of PC EOP contacts occurred in a confidential setting.  Though typically offered a weekly average of six hours of structured group activity, RC inmates received an average of 3.3 hours, which suggested that inmates were refusing groups.  It appeared that CSP/LAC provided minimal re-entry services. Mental health clinicians contacted parole officers about housing and transportation issues.  Staff reported minimal interaction with TCMP staff.

### Administrative Segregation

Administrative segregation IDTT meetings observed by the monitor's expert were interactive, but discussion of EOP treatment plans and referrals to higher levels of care was minimal.  Contrary to provided data indicating that a CC was present at all administrative segregation IDTT meetings, the assigned CC was not in attendance.  Data indicated full compliance for presence of C-files at IDTT meetings.

No audits of psychiatric contacts were conducted.  CSP/LAC reported periods of psychiatry shortages, which was consistent with record reviews which appeared to indicate noncompliance for psychiatric contacts for 3CMS and EOP inmates.

Many inmate photos placed outside of cell doors were written upon and given female or other inappropriate characteristics.  Inmates reported that this exemplified custody staff's disrespect of them.

MHCB

Inmates were handcuffed when escorted.  Restraints were used on three occasions, and in the seclusion room on seven occasions.  Although logs were maintained, necessary documentation was not always completed.  The lack of a RT prevented inmates from utilizing yard time.

EOP

There was no data for PC contacts and IDTT meeting timeliness for July and August 2009.  Data on timeliness of IDTT meetings data from October through December 2009 indicated noncompliance.

Although PC contact data for September through December 2009 indicated compliance above 90 percent for all but one week, the majority of contacts occurred in non-confidential settings.  Clinicians' progress notes often reflected what appeared to be brief inmate check-ins rather than genuine therapeutic activity.

An open CAP item addressed provision of a minimum of ten hours of structured group activity per week.  Compliance data was not available for this item for July or August 2009.  Data for September through December 2009 indicated an average of 8.3 hours of structured group activity offered, and 4.3 hours received.

Administrative Segregation EOP

CSP/LAC's hub capacity increased to 74, with staff reporting an average of 69 EOP hub inmates.  Administrative segregation lengths of stay averaged 243 days.

There was noncompliance with the required review of EOP administrative segregation inmates whose stays exceeded 90 days.  Of 73 EOP inmates there at the time of the site visit, 29 were there longer than 90 days.  While CSP/LAC was compliant with completing reports summarizing the status of administrative segregation inmates held over 90 days, it did not appear that a meaningful review was taking place.

Confidential clinical contacts occurred primarily in two rooms with poor acoustics.  Although CSP/LAC reported full compliance with weekly clinician contacts, no data was provided,[17] and a limited medical records review did not support a finding of full compliance.

It was unclear whether IDTT meetings were held prior to the initial ICC hearings because there was no data and the record review could not confirm compliance.  Treatment plans remained technically compliant but with insufficient individualization.

Provided data indicated that CSP/LAC offered an average of 10.3 hours of weekly structured group activity, with an average of 7.1 hours received.  Although group participation varied, inmates refusing 50 percent or more of group treatment were seen daily by their PCs.  Although staff and inmates reported that all inmates were scheduled for ten weekly hours of yard, no supporting data was provided.[18]

3CMS

CSP/LAC experienced a mission change with the September 2009 completion of the conversion of one of its yards from a RC to a Level IV SNY.

---

[17] Defendants requested that the Report be revised to indicate that data was provided to the monitor.  However, the monitor reported that the data was not provided.  The Special Master requests that the institution provide this sort of data to the monitor at the time of the next regularly scheduled monitoring visit.
[18] *See* footnote 17, page 271, *infra*.

In over 90 percent of cases, non-SNY 3CMS inmates did not receive individualized treatment or timely IDTT meetings. The lack of psychiatric presence, treatment plan discussion, and access to higher levels of care limited the quality of IDTT meetings.

Lack of adequate programming space and insufficient numbers of access-to-care officers' limited access to group therapy on the SNY 3CMS yard. Inmates reported frustration with the lack of group therapy and with the non-confidential nature of their contacts with psychiatrists and clinicians.

Administrative Segregation 3CMS

CSP/LAC reported compliance with weekly clinical contacts but did not provide supporting data. The physical locations of some treatment areas resulted in such contacts being non-confidential. Psychiatric contacts were not audited but supervisory staff and a medical records review indicated compliance problems due to staffing issues.

It could not be determined if IDTT meetings were held prior to the initial ICC meeting. Medical record reviews appeared to indicate noncompliance with timeliness of quarterly IDTT meetings. Medical record reviews also indicated general noncompliance with treatment plan completion during IDTT meetings. Treatment plans were completed, they often were not individualized.

Referrals

Although referral tracking improved, routine mental health referral follow-up was noncompliant, with an average of at 10.38 days from receipt of referral to the inmate being seen. Urgent and emergent referral responses were compliant.

Heat Plan

Indoor and outdoor temperatures logs were maintained.  Lists of inmates taking heat-sensitive medications were produced weekly, and distributed to housing units.  Heat cards were distributed to inmates when heat-sensitive medication prescriptions were written. Thermometers were appropriately located and operable in the housing units, and cooling measures were reportedly provided during Stage II alerts.  There were no Stage III heat alerts.

RVRs

There were 307 RVRs issued to EOP inmates, and 18 RVRs issued to MHCB inmates.  CSP/LAC did not track 3CMS RVRs, but nine 3CMS inmates received MH-4s.

CSP/LAC did not monitor or audit the RVR process.  While an RVR review generally suggested that hearing officers considered MH-4s when imposing penalties, there were several cases in which hearing officers either used inappropriate standards or ignored relevant MH-4 information.  The CTC clinician completed MH-4s for incidents that occurred in the MHCB.

Pre-Release Planning

A total of 872 3CMS and 250 EOP inmates transferred or paroled from CSP/LAC.  125 EOP inmates were released to the community, and were not endorsed prior to departure.

There was a general lack of formal pre-parole planning. Staff reported that informal pre-parole planning, which consisted of providing referral contact information (as opposed to linkage services) occurred when requested by inmates.

## California Correctional Institution (CCI)
May 11, 2010 – May 13, 2010

Census:

As of May 5, 2010, the total MHSDS population stood at 1,443, which was approximately a quarter of the prison's inmate population. There were 58 EOP inmates and 1,385 3CMS inmates.

There were 125 MHSDS inmates, including 13 EOP inmates and 112 3CMS in administrative segregation. In the RC there were 22 EOP inmates and 274 3CMS inmates. There were ten MHSDS inmates in the OHU on May 5, 2010. The SNY program housed 12 EOP inmates and 772 3CMS. Of the 169 inmates in the SHU, nine were EOP and 160 were 3CMS. There was one EOP inmate and 58 3CMS inmates in mainline.

To accommodate program needs and demand for more administrative segregation beds, the institution was considering converting an unspecified number of mainline beds to SHU beds.

Staffing:

Of the 86.84 allocated mental health positions, 12.34 were vacant, for a vacancy rate of 14.2 percent. Contractors reduced the functional vacancy rate to 1.5 percent. Among supervisory staff, positions for a chief psychologist and seven senior psychologists were filled. A long-term contract psychiatrist filled the senior psychiatrist position four weeks prior to the monitor's visit.

Over half or 4.5 of the seven staff psychiatrist positions remained vacant. With use of contract psychiatrists, 6.7 of these positions were covered during the reporting period. Despite this, supervisors and line staff uniformly described ongoing problems related to insufficient psychiatric resources.

Among PCs, 4.84 of 30.84 allocated psychologist positions remained vacant. All five social worker positions were filled. Contract psychologists covered an average of 4.3 positions during the reporting period. Functional vacancy rates were low among PCs. The institution reported that Levels I and II SNYs, which housed 93 percent of the institution's 3CMS inmates, were open-movement 3CMS yards, where a PC can carry a caseload of 150 to 200 inmates. PCs on the Level II SNY yard reported 3CMS caseloads of 155, 175, and 169 during the monitor's visit. On the maximum yards and in the ASU/SHU, the ratio of PCs was as low as one to 40.

Three of the 14 allocated psych tech positions remained vacant, which reportedly required existing staff to work overtime. Both senior psych tech positions were filled, as were positions for 2.5 RTs, a RN, a health programs specialist, and 15 clerical positions.

Quality Management:

CCI had a comprehensive and interactive quality management program. Meetings were frequent and generally well-attended, numerous audits were conducted on a regular basis, QITs were chartered, LOPs were developed and updated, and peer review activities were organized.

During the six-month reporting period, the QMC met nine times, with a quorum present. Minutes were maintained. Meetings were chaired by the HCM and custody was represented at all meetings. Mental health matters were discussed in five of the nine meetings.

The mental health subcommittee met twice monthly during the reporting period. Minutes were kept, documenting a total of 12 meetings. Custody was represented at nine of the meetings. The meetings appeared to provide a useful forum for discussing a wide range of issues relevant to the MHSDS programs at CCI.

During the reporting period, QITs were chartered to deal with untimely psychiatric follow-up and untimely response to referrals, neither of which had produced final reports as of mid-May 2010.  CCI was in the process of forming two QITs, one for delivery of parole medications and another for completion of pre-parole counseling contacts.

Staff reported that there was no formal peer review committee at CCI during the reporting period.  The psychiatric peer review process consisted of quarterly meetings during which the work of one psychiatrist was evaluated by a committee comprised of one or more peer psychiatrists.  The committee reviewed 50 UHRs containing notes written by the psychiatrist under review.  The results of the UHR reviews were averaged and summarized in a general evaluation, which was sealed in an envelope and given to the reviewed psychiatrist.  This individual had the option to attend the committee meeting to answer questions.

In December 2008, a staff psychologist took on the role of peer review leader and developed a peer review process for psychologists and social workers.  Reportedly, feedback was reportedly provided by peers to clinicians during meetings and by the peer review leader on an individual basis when substandard documentation persisted.

Suicide Prevention:

There were two completed suicides at CCI during the six-month review period. No RVRs issued for suicide attempts or self-injurious behavior issued during the reporting period.

The SPRFIT met monthly during the reporting period.  Areas of discussion included the development of a LOP for five-point restraints, processes for compiling and distributing medication error reports, OHU placements,  continuity of medications upon

276

release from the OHU, MHCB admissions, and DMH transfers.  Completed suicides and implementation of related CAPs were also discussed.

The institution's compliance rates for clinical five-day follow-up ranged from 97 to 100 percent during the six-month reporting period.  Compliance rates for three-day custody checks ranged from 68 to 79 percent and averaged 72 percent during the six-month reporting period.

Documentation indicated that suicide precaution checks were completed every 30 minutes instead of every 15 minutes during the last two weeks of September 2009.  A subsequent audit found that 25 percent of the suicide precaution checks conducted during the period from January 23 to February 24, 2010 were not conducted at 15-minute intervals.

Audits completed in November 2009 and April 2010 found that cut-down kits were available in all housing units included in the review.

In administrative segregation, minutes of mental health subcommittee meetings for February 2010 indicated that nursing pre-screens were not being completed on a consistent basis.  A May 2010 audit of 25 UHRs of inmates placed in Level II administrative segregation yielded a compliance rate of 60 percent for the presence of chronos related to nursing pre-screens.

Internal audits indicated that inmates were consistently screened by psych techs within 72 hours of their placement in administrative segregation.

Each of the ASUs had retrofitted intake cells with suicide-resistant vents, new doors, and larger windows.  However, these cells were not routinely used to house new intake inmates.

New-intake inmates were identified with white placards attached to the cell doors in Facility 4A and on the back door of the cells in the Level II ASU.  Documentation indicated that 30-minute welfare checks were conducted but were not staggered.

Inmates in administrative segregation at CCI were not permitted to have in-cell appliances.

There were approximately 40 walk-alone yards adjacent to Facility 4A.  Staff reported that the current number of walk-alone yards was insufficient to afford all inmates in administrative segregation ten yard hours of yard time per week.  Most inmates were offered seven to nine yard hours per week.  Inmates placed in the Level II ASU did not have access to outdoor yard.

Medication Management:

CCI attained full compliance with continuity of medication for inmates arriving from county jail in December 2009, but compliance plummeted to 20 percent with a wait time of 3.6 days by March 2010.  Data for January 2010 indicated that the rate of compliance with continuity of medication for RC inmates was 24 percent, with a two to six-day wait period.

Audit data indicated that compliance with continuity of medication following inmate moves within the institution was at 83 percent in October 2009 and 93 percent in December 2009, but declined to 43 percent in March 2010 with an average wait time of 2.7 days in March.  During the period from October 2009 to March 2010, continuity of medication following transfer from the OHU to housing units ranged from 86 percent compliance in March 2010 to full compliance in February 2010 and over 90 percent for five of the six months during monitoring period.

Audits in January and March of 2010 found that medications were renewed prior to expiration in all of the audited cases.

Compliance with psychiatry "return to clinic" orders was problematic. Audit data from October 2009 through February 2010 indicated that compliance was at 49 percent, and a March 2010 audit found compliance at 53 percent.

A single audit of pill lines on the Level I and II yards, the only areas where pill lines occurred, found that inmates typically remained in line for ten minutes or less.

The facility performed a single audit of the presence of signed consent forms for psychotropic medications. This audit, which consisted of a sample of 21 records, found full compliance with having the required consents within the health care records.

CCI continued to experience significant problems with managing laboratory tests of blood levels of psychotropic medications. There were deficiencies with ordering of the tests required for medication initiation and with timely completion of blood draws. Audit data documenting the timeliness of interpretation of laboratory test results was not available.

At the time of the monitor's visit, the institution reported that a total of 743 inmates were prescribed medication DOT. Three observations of the DOT medication procedure found consistent noncompliance with the required mouth-check procedure.

At the time of the monitor's visit, there were three CCI inmates with active Keyhea orders. No Keyhea petitions were initiated during the monitoring period. There were only three times when medications were involuntarily administered, twice for inmates who had active Keyhea orders and the third for an inmate for whom no Keyhea petition was filed. Keyhea orders for two inmates were allowed to expire during the monitoring period, one by a psychiatrist order and one when an inmate paroled.

A total of 486 inmates were prescribed medications at HS.  Audits found noncompliance, as HS were not being consistently delivered after 8:00 p.m.

The facility's monthly tracking information indicated that, during the period from October 1, 2009 through February 28, 2010, 63 to 95 percent of inmates who paroled with active prescriptions for psychotropic medication received a 30-day supply of medication at the time of parole.  Compliance was achieved in three of these five months.

Sexual Misconduct:

During the period from October 1, 2009 to March 31, 2010, CCI issued 12 RVRs for IEX, all of which were referred to mental health clinicians for completion of an Exhibitionism screen.  Provided documentation indicated that a mental health evaluation was completed in every case.  A pre-formatted progress note and written progress note were also completed in most cases.  These documents were completed within an average of 3.5 days of the incident, with a range of one to nine days.

Five positive screens resulted in referrals for a more thorough evaluation.  The monitor was provided with copies of four completed evaluations, all of which diagnosed Exhibitionism and recommended transfer to an Exhibitionism treatment program.  The fifth case involved an inmate who was transferred to the Exhibitionism treatment program at CSP/Corcoran on March 29, 2010.  Treatment plans for these inmates indicated that CCI addressed exhibitionist or impulsive behaviors through routine PC contacts pending transfers to an appropriate treatment program.

Nine of 12 incidents involving IEX were referred to the DA.  SHU terms were extended in four cases.

Exposure-control jumpsuits were not used at CCI.

Transfers:

Information from the DMH referral log indicated that 22 inmates were identified as requiring DMH care during the period of November 12, 2009 through March 17, 2010.  Two referrals to acute care required one day each for completion of the referral packet and appeared to have been accomplished in accordance with the Program Guide.  Transfer appeared to have occurred within Program Guide timeframes for one of these two inmates.  Two inmates were transferred to crisis care after identification and prior to transfer.

The completion of referrals to DMH ICFs occurred within Program Guide timeframes in three of 18 cases, for a 17-percent compliance rate.  Transfer of inmates to ICFs was significantly delayed when it did occur.  Only four of the 18 inmates identified as requiring intermediate care were transferred into ICFs.  Eleven inmates were identified for transfer to SVPP.  Five of these inmates were transferred to other institutions and six were still awaiting transfer at the time of the monitor's visit.  One inmate was identified for transfer to the DMH ICF at CMF.  Completion of the referral for this inmate required 20 days, and acceptance occurred 53 days later.  Six inmates were referred to ASH.  Completion of these referrals required six to 29 days with an average of 14.5 days.

CCI's OHU consisted of 16 beds, 11 of which could be used for mental health crisis care.  At times, two additional beds in the Facility 4 clinic area were used as OHU overflow beds.  During the period from October 1, 2009 to March 3, 2010, there were 471 referrals to the OHU.  These referrals resulted in a total of 223 crisis admissions or 47 percent.  As in preceding monitoring periods, CCI's OHU served as a primary crisis care facility.  One half, or 112, of all inmates admitted to the OHU were referred to the MHCB and 83 inmates, or 74 percent of those referred, were admitted to the MHCB.  A total of 103 OHU admissions

281

exceeded 72 hours, with the average length of OHU stay at 4.1 days.  The monthly average

length of stay beyond the MHCB transfer order ranged from 2.5 days to 4.3 days.

Staff reported that an internal CCI policy *required* that inmates with three or more

OHU placements within a six-month period be referred to DMH, as compared to the existing

statewide process which *required consideration* of DMH referral after three crisis care

placements in six months.  Audits conducted in October 2009 through March 2010 indicated that

although two to 13 inmates met this criterion in any given month, the number of

recommendations for transfer to higher care ranged from one to 11.

CCI was unable to consistently meet the 60-day transfer timeline for EOP

inmates.  The percentage of EOP inmates overdue for transfer during the reporting period ranged

from 32 to 56 percent.  A MHSDS pending priority LOC list dated May 12, 2010, listed 52 EOP

inmates, with 23, or 44 percent, awaiting transfer longer than 60 days.  The institution reported

that transfer delays were due to lack of suitable beds throughout the state.

Other Issues:

Reception Center

RC EOP inmates were typically housed in Housing Units 3 (GP) or 4 (SNY).

Internal audits found that CCI was 87 percent compliant with timely IDTT meetings during the

period from November 1, 2009 to March 15, 2010.  Staff reported that most instances of

noncompliance were only two days past the requisite timeline.

Staff also reported obstacles to the provision of out-of-cell activities for RC EOP

inmates.  These included frequent lockdowns with cell searches in the Facility 4 SNY program,

restrictions on the time available for inmate access, and limited group space.  Though

information presented in the management report indicated that all RC EOP inmates received at

least five hours of clinical treatment per week, available information suggested that limitations in access to out-of-cell activities occurred during frequent periods of lockdown. Groups offered to RC EOP inmates included recreation therapy, problem solving, coping skills, social skills, ADLs and symptom management.  Recreation therapy groups typically occurred on the yard and were of uncertain content.

<u>Administrative Segregation</u>

CCI had two ASUs; one located on Facility 4A, and another 24-cell unit on the Level II yard.  As of May 13, 2010, there were 156 inmates in Facility 4A and 48 inmates in the Level II ASU.  There were 89 inmates, or 44 percent, in administrative segregation longer than 90 days.

Of the 204 inmates in administrative segregation at the time of the monitor's visit, 77 or 38 percent were MHSDS inmates, including five EOP and 72 3CMS.  All five EOP inmates in administrative segregation had been there longer than 90 days; 166 days, 127 days, 286 days, 176 days, and 368 days, respectively.  Institutional data indicated that 20 EOP inmates remained in administrative segregation longer than 90 days during the period from October 1, 2009 to March 31, 2010.  The reasons for excessive stays included lack of bed availability in ten cases, "other" reasons in seven cases, endorsement delays in two cases, and no bus seat in one case.  However, other documentation indicated that investigations related to safety concerns and disciplinary proceedings for violent/assaultive behavior also contributed to excessive stays in administrative segregation.

Of the 72 3CMS inmates in administrative segregation, 31 or 43 percent had been there longer than 90 days.  There were 11 3CMS inmates in the Level II administrative segregation, five of whom had excessive stays at 153 days, 163 days, 107 days, 119 days, and

266 days.  This was problematic given that inmates in the unit did not have access to outdoor yard.

Three primary care clinicians covered 66 MHSDS inmates housed in administrative segregation on Facility 4A, each carrying caseloads of 25 to 26 inmates.  One clinician covered 11 3CMS inmates housed in the Level II administrative segregation and carried a small mainline caseload. Mental health and correctional staff reported that the assignment of four access-to-care officers to administrative segregation was insufficient to coordinate access to all activities, including PC interviews, IDTT meetings, and groups.  The access–to-care captain believed that four officers were sufficient to meet Program Guide requirements, but acknowledged that the institution had received about half or 52 of the 93 of the access-to-care officers that were initially planned.

Institutional audits showed inconsistent compliance with weekly PC contacts in administrative segregation and indicated that about half of all clinical contacts occurred in confidential settings.

There were 23 cases in which the inmate had been in administrative segregation ten weeks or longer.  In ten of these cases, the compliance rate for recorded contacts was 90 percent or above, and in 18 cases, the compliance rate was 80 percent or above.  There were five cases in which the compliance rate for weekly PC contacts ranged from 45 to 75 percent.

According to information gathered during the reporting period, there were 2,360 PC contacts in administrative segregation.  Of these, 52 percent occurred in a private setting.  Of the 1,130 contacts that occurred at cell front, 70 percent were related to inmate refusals, 19 percent were related to clinical staff time issues, seven percent were related to lack of escort, and three percent were listed as "other."

Internal audits showed that initial IDTT reviews were routinely held within 14 days of an inmate's placement in administrative segregation. However, compliance rates for C-file availability during IDTT reviews varied from 70 to 96 percent and averaged 86 percent during the reporting period. Staff also reported that CC attendance at IDTT meetings was inconsistent.

OHU

Staffing in the OHU included a RN and a CNA. The medical officer of the day (MOD) was assigned responsibility for medical issues and was responsible for providing coverage 24 hours per day. An on-call psychiatrist made daily rounds and attended to medication issues. There were two full-time psychologists who performed rounds with the psychiatrist five days per week. One psych tech was assigned to the OHU during second and third watch seven days per week.

Monthly audit data found that the percentage of OHU clinical contacts for which inmates were offered contact in a private setting ranged from 91 to 100 percent.

Overflow Cells

By policy, inmates who were placed within the OHU overflow cells were placed on suicide watch, including one-to-one observation, for the duration of their placements in these cells. Property restrictions within the holding areas were the same as those in place within the OHU. Data regarding placements into the OHU holding cells were aggregated with the data regarding OHU placement to yield an assessment of inmates' total crisis care placements. During the period from October 1, 2009 to March 31, 2010 a total of 33 crisis placements in holding cells occurred. Twenty five or 76 percent of these placements were moved to the OHU

after one to four days.  Eight inmates were placed into holding cells and then discharged without being placed into the OHU.  The average length of stay in holding areas was 1.6 days.

SHU

Institutional data indicated a total of 1,420 PC contacts in the SHU, with 614 or 43 percent occurring in a private setting.  Of the 806 contacts that occurred at cell front, 685 or 85 percent were related to inmate refusals, 46 or six percent were related to clinical staff time issues, 35 or four percent were related to lack of escort, and 40 or five percent were listed as "other."  Audits showed nearly full compliance with weekly psych tech rounds in all SHU units.

EOP

There was inconsistent compliance with the requirement that EOP inmates be seen weekly while pending transfer.  The institution provided 21 weekly audits that showed compliance rates for weekly contacts for EOP inmates ranging from 84 to 100 percent during the reporting period.  Compliance dipped below 90 percent during five of 21 weeks.

3CMS

Caseloads for PCs working with 3CMS inmates on Levels I and II ranged from 52 to 162 inmates.  Unit II 3CMS CMs reported caseloads of 155 to 172 inmates.  Psychiatric caseloads were reported as 241.5 inmates for each psychiatrist.

The presence of CCs at IDTT meetings remained problematic.  Data from 11 audits of IDTT meeting composition found compliance below 90 percent for eight of 11 audits.  UHRs were generally available to the treatment team.  The presence of the C-file for these meetings was inconsistent and data from the management report indicated that the proportion of IDTT meetings for which C-files were available was below 90 percent for eight of 11 audits.

Available data based on the MHTS and the management report suggested that compliance with the requirement for timely clinical contacts and timely IDTT meetings was consistently above 90 percent. Weekly data indicated that 87 to 95 percent of 3CMS inmates were seen within 14 days of arrival. These same reports indicated that initial IDTT meetings occurred within 14 days for 93 to 97 percent of arriving 3CMS inmates.

Available information suggested that there were a total of 40 groups in operation on September 30, 2009 and 50 groups running on March 12, 2010.

Referrals

Staff reported that psychiatric vacancies had affected the institution's ability to respond timely to psychiatric referrals. Audits completed in December 2009, January 2010, February 2010, and March 2010 showed that on average psychiatrists responded to routine referrals within five working days 64 percent of the time. Compliance rates for urgent referrals ranged from 38 to 52 percent, and from 55 to 75 percent for emergency referrals.

Medical Records/MHTS

Loose filings ranged from a half inch to 5.5 inches during the reporting period. The institution was in the process of creating one central medical records location. At the time of the site visit there were five medical records offices, with one on each facility. The legacy MHTS was still in use. Concordance studies that covered all five facilities produced compliance rates that ranged from 83 to 100 percent.

Heat Plan

Indoor temperature was logged every three hours in most areas. The temperature logs in Buildings 5 and 6 on Facility 4A (administrative segregation) and in the Level II ASU were missing temperature entries. In addition, entries in two housing units (Dorm 1 on Facility

II and Building 7 on Facility 4A) were pre-recorded.  A list of inmates taking heat risk medication was found in some, but not all, housing units in Facility 4A.  Heat lists were not delivered to dorms on Facility II and could not be found in Building 7 on Facility 4A.  Heat cards were delivered to inmates taking heat-sensitive medications.

The pharmacist confirmed that every Monday two heat lists were generated, one being alpha list organized by facility and the other organized by housing unit.

RVRs

According to information provided by the institution, CCI issued 37 RVRs to EOP inmates during the reporting period.  All of these were referred to mental health for completion of evaluations.  Audits completed by the institution covering the last quarter of 2009 indicated that evaluations for all cases referred to mental health were completed, and that 75 percent of those evaluations were referenced in the RVR.  A similar audit conducted during the first quarter of 2010 found that all cases referred to mental health resulted in the completion of an evaluation, that all RVRs referenced the results of the evaluations, and that half of the RVRs discussed how the information in the evaluation was used or considered by the hearing officer.

There were 229 RVRs issued to 3CMS inmates during the reporting period.  No 3CMS inmates were referred for a mental health evaluation based on bizarre, uncharacteristic, or unusual behavior.  Mental health evaluations for RVRs were completed by two RVR coordinators who were both psychologists.

Pre-Release Planning

CCI reported that its practice was to provide a "parole release clinical exit interview" for those inmates who were within the MHSDS caseload at the time of parole.  From October 2009 through March 2010, from 69 to 97 percent of paroling inmates were offered such

an interview. These meetings involved discussion of topics including the inmate's plan for housing after release, reiteration of the importance of contacting the POC, and dealing with questions regarding finding employment.

**California Institution for Men (CIM)**
February 22, 2010-February 25, 2010

Census:

On February 22, 2010, CIM housed 5,129 inmates, including 3,004 in the RC, and approximately 2,000 in the minimum support facility. This represented a 16-percent decrease in the overall population since the preceding monitoring period.

Although the MHSDS population decreased from 1,411 to 1,334 since the preceding monitoring period, the proportion of MHSDS inmates increased from 23 to 26 percent. Approximately 85 percent of the MHSDS inmates were at the 3CMS LOC. There were 161 EOP inmates, with 25 in the MHCB unit. Of 384 inmates in administrative segregation, 86 were 3CMS inmates and 26 were EOP inmates.

Staffing:

CIM had a mental health staffing vacancy rate of 4.8 percent, and a functional vacancy rate of 3.87 percent. The one chief psychiatrist, one chief psychologist, and four senior psychologist positions were filled. Of the 14.5 staff psychiatrist positions, five were vacant but three were covered. Of the 39.54 staff psychologist positions, 39.5 were filled.

The one supervising social worker position was filled, but there was a .9 social worker vacancy. Both senior psych tech positions were filled, as were 13.5 of 15.5 psych tech positions. All four RT positions were filled but there was a .05 clerical vacancy.

Quality Management:

Quality management information was well-organized and comprehensive.

Local governing body minutes were not provided.  The QMC met monthly and included representatives from relevant disciplines.  The monitor's expert observed a QMC meeting which was well run and addressed issues from the SPRFIT and the mental health subcommittee.

Suicide Prevention:

The SPRFIT met monthly. Participants necessary for a quorum were present at all but two meetings.  Minutes reflected discussions of suicide CAPs and relevant suicide issues. The SPRFIT audited administrative segregation treatment, five-day follow-up after MHCB discharge, and custody wellness checks, and forwarded recommendations to the mental health subcommittee.

The emergency response and death review committee (ERDR) meeting minutes addressed staff responses to medical emergencies.  Emergency response medical drills were performed monthly in administrative segregation.  Although CPR refresher training was reportedly provided to staff, training documentation was not provided.

An institutional audit of five-day follow-up found that 96 percent of inmates were seen on their first day, but only 76 percent were seen all five days.

Although cut-down tools, personal protective equipment, and micro-shields were observed at all toured housing units, there was a lack of uniformity in their maintenance.

In administrative segregation, there were lapses in documentation of the daily morning meetings between the administrative segregation lieutenant and mental health staff.

CIM audits indicated that 92 percent of EOP inmates and 86 percent of 3CMS inmates received pre-placement screens.

Data also indicated that the 31-question mental health screen was conducted. The IP was used as part of the mental health screening process, and inmates were asked about recently-received bad news. A majority of screens, as well as 81 percent of PC contacts, were conducted at cell front, which afforded inadequate confidentiality.

Sixteen cells were modified as intake cells and retrofitted with appropriate vents, light fixtures, and cement beds. These cells were located closest to the unit's entrance. Inmates were placed in these and other, unmodified cells during the 21-day intake period, and had signs placed on their cell doors indicating that they were on intake status.

A log review documenting 30-minute welfare checks indicated frequent intervals exceeding 30 minutes.

Administrative segregation cells were not equipped with electrical outlets.

A review of logs as well as inmate and staff interviews revealed that inmates had not received yard for three weeks prior to the site visit.

Medication Management:

An audit of new arrivals indicated 97 percent compliance with medication continuity.

Medication continuity for intra-institutional transfers had a 98-percent compliance rate. This did not include MHCB or administrative segregation transfers, where there were reports of medication discontinuity. Audit results appeared to conflict with inmate and staff reports of medication continuity difficulties for new arrivals and those who had housing moves.

No pill line audits were conducted. Supervisory staff reported that attempts were made to limit pill lines to no more than two hours in duration, and no more than 140 inmates in line.

Facility audits of informed consent indicated a 54-percent compliance rate for arriving inmates, and a 91-percent compliance rate after the inmate was seen by a psychiatrist.

CIM had a procedure for psychiatrists to order and monitor laboratory studies. This resulted in the review of all laboratory studies for certain inmates, as well as for atypical antipsychotic medications.

There were 1,570 inmates prescribed DOT medications. CIM reported lack of a centralized pharmacy list for inmates prescribed psychotropic medications by DOT.

Twenty-six Keyhea petitions were initiated; almost all were approved. Two Keyhea orders lapsed or expired; none were renewed; counsel rejected three; and one was rejected at the certification hearing. Twelve inmates on Keyhea petitions transferred to other institutions, and four paroled on active Keyhea orders.

Although HS medications were prescribed for 460 inmates, no audits indicated whether such medications were administered after 8:00 p.m.

A parole medication audit found an 83-percent compliance rate.

The Medication Administration Process Improvement Project (MAPIP) was developed within the *Coleman*/*Plata* coordination process and was piloted at CIM. CIM provided audits based on previous *Coleman* audit methods from July through December 2009 and the MAPIP audit methodology beginning in October 2009. Staff acknowledged continuing difficulties with audit methodology, sample sizes, and results.

Sexual Misconduct:

CIM was noncompliant with tracking sexual misconduct incidents. A QIT revealed a systemic breakdown in timely screenings and evaluations.

Transfers:

The institution utilized Form 7388, the tool for identification of inmates for referral to higher levels of care at DMH.  However, review of implementation of these protocols indicated that participants in IDTT meetings did not routinely consider data on whether inmates had had three or more MHCB placements, a criterion for referral to DMH care.  Data on crisis care in transitional bed housing was also not taken into consideration with data on MHCB placements for a clear picture of inmates' crisis care histories.  There was also no process for reporting the number of RVRs received by an inmate.

CIM maintained an incomplete DMH transfer log.  From July 1, 2009 through December 31, 2009, 80 referrals to DMH were initiated through IDTT meetings.  Of these referrals, 53 percent were initiated in the MHCB and 20 percent were initiated in administrative segregation.  There were 21 transfers to DMH programs, five rescissions, and five acceptances that were placed on the wait list.  Forty six inmates paroled or transferred to other institutions.  A review of referrals for which MHCB documentation was available indicated that 41 percent were initiated after ten days in the unit and 15 percent were initiated after 20 days. There were 14 Vitek hearings, none of which were won by inmates.

CIM did not meet time frame requirements for package completion and referral to DMH.  Acute care referrals to DMH averaged 4.5 days after IDTT recommendation.

Intermediate care referrals averaged 19 days after IDTT recommendation. Sixty-one percent of SVPP intermediate care referrals transferred to other institutions or paroled prior to transfer to SVPP.  These inmates waited an average of 55 days from SVPP acceptance to transfer to another institution or parole.  Inmates accepted to SVPP waited an average of 98 days to transfer.  The average length of time for DMH to respond to intermediate care referrals

increased from ten to 14 days, and the average time from acceptance to transport increased slightly to approximately eight days.

CIM reported difficulty receiving notification of inmates returning from DMH, and of a lack of communication between CDCR and DMH clinicians. CIM reported that DMH discharge summaries arrived sporadically and at times well after the inmate's arrival.

CIM operated 36 MHCBs. There was a decrease in MHCB admissions from 1,094 to 838. The average daily MHCB census was 29 inmates, average daily admissions were 4.5 inmates, and average length of stay was 6.5 days. Of the 838 MHCB admissions during the reporting period, 109 inmates had more than three admissions during the preceding six months. Additionally, 115 admissions, or 97 individual inmates, had stays longer than ten days, and 38 admissions had stays longer than 20 days. For admissions with lengths of stay over ten days, DMH referrals increased from 47 to 58 percent, with 57 inmates referred. Thirty-two percent inmates with multiple MHCB admissions were referred to DMH.

ICC recommended seven inmates for PSU transfer. Average processing time from referral to endorsement was 28 days. Three of these inmates paroled prior to transfer, three transferred, and one was awaiting transfer. Post endorsement delays were due to PSU bed shortages.

CIM continued to use holding cells for inmates awaiting MHCB or RC transfer. Staff reported no mechanism to notify staff of an MHSDS inmate's holding cell placement pending transfer to a RC. Inmates reported extended holding cell wait times. Data indicated that inmates remained in holding cells an average of three hours and 17 minutes while awaiting transfer to the TTA for psychiatric evaluation. Twenty-eight percent of placements exceeded four hours, with several exceeding eight hours. Placement log documentation remained

294

incomplete.

Of 459 EOP inmates who left CIM, 256 paroled directly from the RC. Two hundred fifty one 3CMS inmates were endorsed and transferred to other institutions.

Other Issues:

Reception Center

CIM's overall MHSDS population included a large EOP and 3CMS RC population. EOP inmates were occasionally housed with 3CMS and non-MHSDS inmates. RC stays for EOP and 3CMS inmates averaged 99.5 and 111 days, respectively.

Like most mental health treatment programs at CIM, the RC at East facility experienced significant disruption following the August 2009 disturbance which resulted in approximately 250 injuries. Modification orders subsequently put into effect resulted in restrictions on inmate movement through December 2009.

Data from MHTS audits indicated compliance from September through December 2009 with Program Guide EOP requirements for initial screens completed within 24 hours, and initial evaluations completed within seven days. There was compliance with weekly contact requirements for three of the five months from August through December 2009.

An audit of 25 records regarding EOP IDTT meetings indicated a 52-percent attendance rate for CC Is, a 53-percent attendance rate for psychiatrists, and a 47-percent attendance rate for inmates. Staff reported that health care records were ducated but were not consistently available at IDTT meetings. Although C-files were generally not present at IDTT meetings, it was reported that CC Is typically brought case summaries with them.

A record review of 50 3CMS inmates found 98-percent compliance with the Program Guide for initial mental health evaluations. There was 87-percent compliance with the

90-day psychiatric review requirement.  There were 108 3CMS inmates housed in Unit III at the Stark facility, which was used as a reception facility.  Information provided indicated that 31 percent of 3CMS inmates had extended stays in Stark reception greater than 60 days.

It was reported that inmates received 1.5 hours of daily out-of-cell time which included gymnasium and dayroom time.  However, a group of 20 3CMS inmates reported that although there was improvement in the amount of out-of-cell time during the month prior to the site visit, there remained a general lack of yard time.

All but one inmate indicated receiving consistent clinical contacts by the psychiatrist, psychologist, and RT.  Inmates complained about the administration of HS medications between 6:00 pm and 7:00 pm.

Administrative Segregation

An average of 30 EOP and 100 3CMS inmates were housed in the ASUs.

Working relationships between correctional and mental health staff were generally improved from prior years.

Staff reported that each clinician had one assigned clinic day per week, which did not afford adequate time to meet with caseload inmates.  Clinical contacts were frequently limited to ten to 15 minutes.  Although some modular office construction resulted in improved treatment and office space, there was a lack of sound privacy during out-of-cell clinical interventions.

Frequency of out-of-cell clinical contacts remained problematic.  Although audits indicated that 95 percent of administrative segregation MHSDS inmates received weekly clinical contact with their PC, 53 percent of EOP contacts and 74 percent of 3CMS contacts took place cell-front.

296

Medication continuity of care remained difficult.  It was common for inmates to not receive prescribed medications for several days.

Refusal rates by inmates for attendance at IDTT meetings remained high due to reported instructions from gang leaders.  The monitor's expert attended several IDTT meetings which were conducted in a clinically competent manner and consistent with Program Guide requirements.

The monitor's expert observed that psych tech rounds were consistent with Program Guide requirements.

Access to outdoor recreational yard remained problematic.  Although CIM constructed 21 SMYs, these yards had to serve more than 350 inmates.  A review of ten inmates' 114s indicated no yard access for at least three weeks.

Therapeutic modules purchased from PIA did not comply with specifications.  The location of Lexan on the modules made it difficult to hear.  Inmates remained cuffed while in the modules.

A CC tracked EOP inmates whose stays in administrative segregation exceeded 90 days.  Five such inmates were at CIM on February 1, 2010, and they were all appropriately reviewed.

Overflow Cells

Treatment was not provided to inmates in holding cells.  Holding cell "furniture" was limited to a bench built into the cell.  CIM continued to use overflow areas known as transitional bed housing (TBH) to provide crisis care.  Data indicated placement of 30 inmates in TBH for over 72 hours, and placement of 47 inmates in such housing from two to six times.  Although over 90 percent of transitional bed placements were for suicide precaution; suicide

watch inmates were not placed in this housing.  There was no access to yard.  IDTT meetings did not occur regularly.  The institution did not regularly track multiple TBH admissions, nor did they trigger DMH consideration.

3CMS

An audit of 55 3CMS charts revealed areas of noncompliance.  Fifty-eight percent of records indicated that 3CMS inmates were seen for initial intake within 14 days of arrival.  CCs attended 55 percent of IDTT meetings, while inmates and central files were present at IDTT meetings only 11 percent of the time.

The monitor's expert attended the weekly mainline 3CMS IDTT meetings.  Attendees included several psychologists including PCs who presented the cases, a psychiatrist, CC, psych tech, and a RT.  PCs presented cases and discussion followed.  Treatment plans were generally appropriately adjusted for the time periods that the inmates were to remain at CIM.  Although health care records were not present, it was reported that clinicians reviewed them prior to the IDTT meeting and brought summaries with them.  C-files were not present.   Case presentations included information regarding inmates' release dates.  Discussions incorporated parole planning.

The mainline 3CMS yard offered eight, eight-week groups, a one-day pre-parole group, and a weekly veterans' group.  Staff reported no significant wait lists for such groups.

Referrals

CIM had an adequate procedure for processing inmate requests for mental health services.  Staff generally reported an adequate process for tracking PC and psychiatric follow-up to the requests.  An audit indicated that 83 percent of psychiatry referrals were timely.

<u>Medical Records/MHTS</u>

Staff reported MHTS unreliability.  Unit health record maintenance remained problematic, with access to records described as difficult.  Loose filing backlogs were approaching three weeks.

<u>RVRs</u>

RVRs were issued to five MHCB inmates, 156 EOP inmates, and 42 3CMS inmates.  A review of RVRs generally indicated consistent documentation that MH-4s were considered in determining case dispositions.

<u>Pre-Release Planning</u>

CIM's parole planning process included an initial assessment and tracking of inmates' release dates in order to develop parole plans around that date.  However, parole planning did not occur for all inmates.  No single database contained reliable information identifying all upcoming inmates eligible for parole planning.  It was reported that parole planning had been complicated by the newly-implemented inmate early release process.

Review of parole planning suggested inconsistencies in effectiveness.  There were discrepancies between initial assessments and subsequently developed plans.  Mental health providers varied in their use of adaptive skills and other information. Inmates were not assisted with applications for SSI or other entitlement programs, although life skills were offered.   From July through December 2009, of the 230 EOP inmates identified as paroling, 153 or 67 percent had parole assessments.  During the same period, 50 to 79 percent of paroling inmates received parole plans.

## California Rehabilitation Center (CRC)
April 6, 2010 – April 8, 2010

Census:

CRC's total inmate population was essentially unchanged from the preceding monitoring period, while its 3CMS population grew by seven percent. CRC had 4,299 inmates, with 1,073 in the 3CMS program. Of 573 civil addicts, 119 were 3CMS, while 15 of 69 RC civil addicts were 3CMS. There were three 3CMS inmates in the OHU. Of 260 CRC inmates temporarily housed at CIM, seven were EOP and 63 were 3CMS.

Staffing:

Of CRC's 38.25 allocated mental health positions, only a half-time RT position was vacant, for a staffing vacancy rate of 1.3 percent. CRC did not use contract staff. CRC employed a chief psychologist, senior psychiatrist, senior psychologist, health programs specialist, 2.25 line psychiatrists, 17 psychologists, two social workers, three psych techs positions, and 7.5 clerical workers. CRC did not use telemedicine.

Quality Management:

The local governing body did not meet. As a result, several finalized LOPs were not signed. These included procedures for alternative housing for OHU placements, suicide history tracking, pre-release planning for inmates with non-revocable parole status, the institutional heat plan, and duty to warn.

QMC meetings were held weekly. Minutes indicated that meetings were well attended.

Mental health subcommittee meetings were held monthly. Minutes indicated that attendees included mental health, custody, and nursing staff, and that there was always a quorum. Set agenda items included review and approval of minutes of the preceding meeting, case

300

presentations of inmates placed in the OHU and transferred to an MHCB unit, a summary of

monthly OHU audits, and discussion of LOPs.  The mental health subcommittee also discussed

audit results, with an emphasis on areas of noncompliance.  Discussion topics included mental

health appointments during modified programs and medical quarantines, incomplete MAR

documentation, MHARP protocols and training, and local policy for issuing RVRs for positive

urine analyses.  However, at times subcommittee efforts to develop and implement solutions to

identified problems appeared to be stymied by limited cooperation and communication among

mental health, custody, and nursing staff.

       The monitor's expert observed a mental health subcommittee meeting.  Although

mental health issues were presented and stimulated good interdisciplinary discussion, it remained

unclear what would be done and who was responsible for the resolution of issues.

       No QITs were chartered.

       Peer review was conducted for only psychologists.  In September 2009, CRC

revised its peer review process to bring local protocols into compliance with central office

directives.  The peer review focus was shifted from compliance with Program Guide timelines to

assessment of clinical work quality using a five-point Likert scale.  Each psychologist reviewed

five randomly selected UHRs and provided feedback prior to the peer review meeting.  Monthly

peer review meetings were attended by all staff psychologists and facilitated by a peer review

coordinator.  Completed audit/evaluation forms were given to the health programs specialist for

filing.  Minutes included tips for clinicians to consider when completing peer evaluations, policy

questions that arose as part of UHR reviews, and highlights of discussion points related to the

monitor's visit.

Suicide Prevention:

The SPRFIT was folded into the MHQMS and met monthly.  A fixed agenda item was discussion of inmates placed in the OHU and transferred to an MHCB unit for suicidal reasons.

CRC reported that inmates placed in the OHU for suicidal behavior were issued safety smocks, tear-resistance blankets, and mattresses.  Continual observation was provided and documented.  SRACs were usually completed upon OHU placement, and in all cases within one working day of placement.  OHU inmates were seen during regular work days by a psychologist and, if clinically warranted, by a psychiatrist.  Inmates placed in the OHU during weekends were seen by an on-call psychiatrist within 24 hours of placement.  A psychologist facilitated a group for inmates deemed to be at moderate risk for suicide.

Inmates placed in the OHU for suicidal behavior reportedly received five-day follow-up monitoring following OHU release.  It was not clear from provided information whether inmates who returned to CRC from other prisons' MHCB units received five-day follow-up. CRC did not provide tracking or audit information for five-day follow-up or 24-hour custody checks.

IPs, which summarized SRAs, were printed and placed in UHRs of inmates transferred to other CDCR prisons.  To facilitate this process, mental health clerical staff routinely received a list of inmates with impending transfer dates.

Medication Management:

Some audits indicated areas of consistently good medication management practices, but others were based on small sample sizes or lacking audit data, making performance difficult to assess.

An internal review of 60 UHRs found that medications were timely administered upon inmates' arrivals.

Although audit data for medication continuity following intra-facility moves was not provided, staff and inmates reported isolated medication continuity problems that had been resolved quickly.

CRC maintained logs that recorded medication noncompliance and refusals. Between August 1, 2009 and January 31, 2010, the logs listed 227 incidents of noncompliance and 99 refusals. Reportedly, all incidents of noncompliance were referred to mental health. Refusals were triaged by a psych tech and referred to psychiatry, if warranted. Logs indicated that psychiatric referrals did not always result in contact within five working days. Staff reported that most of the delayed responses resulted from scheduling difficulties caused by furlough days.

CRC monitored pill lines on a weekly basis. Institutional data and inmate interviews indicated that pill lines across all yards were organized and efficient.

Local procedures for initiating laboratory testing, responding to abnormal values, and consulting with medical personnel when indicated were consistent with statewide medication management protocols. Interviewed staff was familiar with these procedures. However, CRC did not audit performance in this area.

A total of 257 inmates were ordered DOT medication. An audit of 30 cases revealed that poor communication between nursing and custody staff sometimes failed to ensure that inmates swallowed DOT medications. Inmates reported that inconsistent compliance with DOT protocols was an ongoing problem.

CRC did not initiate any Keyhea petitions, and there were no CRC inmates with current Keyhea orders.

There were 710 HS medication orders, including psychotropic and medical medications.  CRC's audit of 68 cases and interviews with inmates indicated that HS medications were routinely administered at or after 8:00 p.m.

An institutional review of 18 inmates released from prison indicated that parole medications were ordered for all reviewed inmates and were consistently provided to them prior to release.

Sexual Misconduct:

One IEX RVR was issued.  The completed screen concluded that a more thorough evaluation was not needed, and the inmate was transferred to the ASU at CIM.

Transfers:

There were no DMH referrals or transfers.

Lacking an MHCB unit, CRC transferred inmates to MHCB units at other institutions.  Of ten MHCB referrals, CRC rescinded four, and the remaining six resulted in transfers.  Three of the six inmates were transferred within 24 hours of referral, and the other inmates each waited two, three, and four days respectively before being transferred.

CRC's OHU had ten beds which were used interchangeably to treat medical and mental health inmates.  Between August 1, 2009 and January 31, 2010, there were 41 OHU placements, which occurred at the rate of seven per month on average, with a range of three to 11 placements.   Six of these placements exceeded 72 hours; three lasted four days; two lasted five days; and one lasted eight days.

Of the 41 OHU placements, twenty-two were returned to CRC dormitory housing, eight were transferred to the CIM RC EOP program, six were sent to an MHCB unit in another

prison, and one was transferred to the CIM administrative segregation program. The remaining four cases were either transferred due to safety concerns or their destinations were not identified.

CRC inmates identified as requiring EOP LOC were transferred to the CIM RC EOP program by way of an inter-facility transfer arrangement. It was reported that CRC transferred 23 EOP inmates to CIM between August 1, 2009 and January 31, 2010. Of these inmates, 18 either paroled from CIM or were transferred to an EOP program within 60 days. Three inmates took longer than 60 days to be transferred to an EOP program, waiting 145, 75, and 64 days, respectively. Two inmates waited 135 and 67 days, respectively, before being released on parole.

Other Issues:

Reception Center

CRC's small RC processed civil addicts who were required to complete court-ordered substance abuse treatment prior to paroling. There were 14 civil addicts in the RC in April 2010. According to CRC data, of 461 civil addicts processed through CRC's RC, 454 received timely screens. Of these, 134 screened positive for needing further evaluation, and 77 were placed in the 3CMS LOC.

3CMS

CRC monthly audits consistently yielded compliance rates exceeding 90 percent for the completion of intake evaluations within ten working days, and for initial IDTT reviews and treatment plans within 14 working days of arrival.

Audits of IDTT meeting sign-in sheets between August 2009 and January 2010 identified 1,039 meetings. Psychiatrists attended 954 of these meetings, for a 92-percent compliance rate. CCs attended 942 IDTT meetings, for a 91-percent compliance rate.

A January 2010 audit based on MHTS contact data for 80 3CMS inmates found that quarterly PC contacts were recorded for all reviewed cases. An internal audit of 209 annual IDTT reviews found that 181 were timely completed, for an 87-percent compliance rate.

Groups were a significant part of the institution's 3CMS program, with mental health staff offering 27 groups. Clinicians referred 359 inmates to groups, with 169 being assigned to one or more groups. However, 46 inmates declined group participation, 44 left CRC prior to group assignment, and 100 were placed on a group wait list.

Referrals

CRC audited response times for 235 referrals, including six emergent, five urgent, and 224 routine referrals. The audits showed that emergent and urgent referrals prompted responses within Program Guide timeframes. Of the 224 routine referrals, 180 resulted in contact within five working days, for an 80-percent compliance rate.

Medical Records/MHTS

CRC conducted two audits of UHR availability, finding compliance rates of 88 percent and 79 percent for availability of UHRs for scheduled and unscheduled appointments, respectively. A separate audit that tracked UHRs requested for scheduled mental health appointments during the week of January 11, 2010 yielded a 97-percent compliance rate. However, CRC reported that UHR organization was poor as mental health forms were often misfiled.

Although CRC installed MHTS.net in January 2010, clerical staff continued to use legacy MHTS for entering data and generating reports. Information entered into the legacy system was transferred daily to MHTS.net.

Heat Plan

Compliance with heat plan protocols was poor during the first half of the reporting period.  CRC's physical plant made noncompliance particularly problematic, as nearly all CRC inmates were housed in wooden dorms that lacked air conditioning and were almost 70 years old.  Indoor temperatures often exceeded 95 degrees during hot weather.

Inmates taking heat-sensitive medications were housed in designated dorms that were not physically different from other dorms.  With inmates concentrated as such, compliance with certain heat protocols was made easier.

Stage III heat alerts were triggered in 18 dormitories in August 2009, 12 dorms in September 2009, and four dorms in October 2009.  Nurses did not conduct rounds in nine of the 12 affected dorms in September, and in none of the affected dormitories in October.

A nursing audit found that heat logs were not fully completed every day, and that custody supervisors did not always sign them.  The audit noted that industrial fans inside some heat-risk dormitories were broken, and that the watch office was not always notified when temperatures inside heat-risk dorms reached 90 degrees.

Mental health subcommittee meeting minutes noted that the thermometers used to track outside temperatures and trigger Stage I heat alerts consistently under-reported temperatures when compared to those recorded by hand-held thermometers in areas where inmates gathered.

RVRs

MHSDS inmates were issued 253 RVRs between August 1, 2009 and January 31, 2010.  Six of these cases were referred to mental health for completion of a disciplinary evaluation.  Of these six cases, one was dismissed, two were reduced to administrative chronos,

307

two were assessed 60 days' forfeiture of time credit, and one was assessed 30 days' forfeiture of time credit.

### Pre-Release Planning

Two TCMP social workers were assigned to CRC. They reportedly interviewed inmates with impending parole dates, scheduled POC appointments, and helped inmates initiate and renew social security disability benefits.

**Richard J. Donovan Correctional Facility (RJD)**
March 1, 2010-March 4, 2010

Census:

During the monitoring period, RJD's total population remained between 4,500 and 4,700 inmates. In March 2010, RJD's census was 4,698 inmates, which included 420 inmates in administrative segregation. The MHSDS population was 1,863 inmates, 40 percent of the prison's total population. There were 1,090 MHSDS inmates in GP, including 300 EOP inmates and 790 3CMS inmates, a significant decrease from the 1,223 3CMS inmates during the preceding monitoring period. Included in the GP census were 518 3CMS and nine EOP sensitive needs inmates.

There were 541 MHSDS inmates in the RC, including 103 EOP inmates and 438 3CMS inmates. Included in the RC census were 181 3CMS and 40 EOP sensitive needs inmates. Fifty-one percent or 214 of 420 inmates of the administrative segregation population were MHSDS inmates. These were 53 EOP inmates and 161 3CMS inmates. There were 18 inmates in MHCBs.

Staffing:

During March 2010, RJD had only 6.56 clinical vacancies of 127.56 mental health positions, including licensed psych techs and nurses. All psychiatry positions were filled

as of December 2009, including the chief psychiatrist, senior psychiatrist and 12.5 staff psychiatry positions.  A new chief psychiatrist began in an acting position in January 2009 and became permanent in May 2009.   The senior supervising psychiatrist had been at RJD for over three years.  Among the vacancies were 2.44 in nursing and one psych tech vacancy.  Vacancies were high among clerical positions, with only 4.2 of 18 such positions filled.  Additionally, both MHTS tracking supervisor positions (supervising program technician and office services supervisor (OSS) II) remained vacant throughout the reporting period.

Quality Management:

During the covered period, the local governing body scheduled two meetings, one of which was not held due to lack of a quorum.  The board discussed the correctional health treatment center and credentialing for provider staff.

The QMC held monthly meetings from July 2009 to January 2010.  A review of minutes of meetings in November and December indicated appropriate representation at the meetings.  The mental health department was represented by either its chief or a senior psychologist.  The committee addressed institutional health care issues across disciplines, and reviewed minutes of subcommittee meetings including the mental health subcommittee.

The mental health subcommittee was active during the review period.  Minutes of committee meetings and audits showed that the subcommittee examined multiple critical issues including DMH transfers and MHCB placements.

The institution reported that there were two ongoing QITs during the review period.  One covered the mainline EOP yard time and the other addressed the administrative segregation EOP treatment program.

The peer review process in place at the time of the site visit started in January of 2010 and was scheduled for evaluation in March 2010. RJD had one committee in place to review psychologist and social workers and another to review psychiatrists. The chairperson for the psychology/social worker peer reviews was appointed by the chief psychologist, who in turn invited other clinicians into the committee which was comprised of four psychologists and one social worker. Remedial action was triggered by two of the same or similar errors in two reviews. Staff was advised that by July 2010, the names of reviewed clinicians who required remedial training would be forwarded to supervisors.

Suicide Prevention:

The institution's SPRFIT reportedly lacked a chair during July and August 2009 and became dormant. A new chair was appointed during September 2009. No meeting was held in October due to lack of a quorum, but meetings subsequently resumed. Documentation showed that meetings held on December 3, 2009, December 17, 2009, and January 21, 2010 were appropriately attended. During these meetings, the SPRFIT addressed matters related to the suicide prevention monitoring tool, suicide restraint mattresses, MHCB discharges, five-day follow-up, and 90-day suicide follow-up tracking. In addition, the institution participated in the system-wide videoconferences held during the review period.

A review of provided documentation indicated that RJD was unable to substantiate that the post-MHCB discharge five-day follow-up was being done. The institution did track suicide ideation, suicide attempts, and self-injurious behavior.

Audits found that RJD was compliant with completing the 31-question screen within 72 hours in a confidential setting unless the inmate refused. Verification of audit results from chart reviews was not possible because the documentation was not located in the charts.

New arrival welfare rounds completed by custody officers were an area of concern.  For all housing units and all shifts, the documentation of rounds indicated that the times and durations of the checks were not staggered, making it extremely difficult to verify that they were being done properly.  Except for August, the institution was non-compliant with administrative segregation psych tech rounds for every other month in the monitoring period.

Access to yard increased significantly during the review period due to the completion of the walk-alone yards.  As a result of the walk-alone yards constructed behind housing Units 7 and 8, all inmates were scheduled for a minimum of ten hours of yard time per week.  Both staff and inmates reported that inmates were typically offered ten hours.

Medication Management:

An audit covering the period from January to February 2010 indicated only 72-percent compliance with medication continuity upon arrival.  For transfers from other CDCR facilities, institution audits indicated 93-percent compliance during the second half of 2009.  Audits of medication continuity for inmates arriving from county jails showed compliance at 98 percent for the third quarter of 2009.

During September 2009, the facility's audits indicated only 72-percent compliance following intra-facility transfers.  Audits of medication continuity after MHCB discharge during the second half of 2009 found a 97-percent compliance rate.

The facility audited two to three separate pill lines on a rotating basis.  Facility I pill lines were audited for this monitoring period.  During January 2010, an audit indicated a median wait time of two minutes with a maximum wait time of five minutes.  Audits conducted during August 2009 showed a median wait time of eight minutes with a maximum wait time of 11 minutes.

No specific audit was conducted to determine if medication orders were processed and administered in a timely manner. Psych techs and medical assistants were previously utilized at RJD to troubleshoot medication related problems, but these positions had been discontinued. The Maxor Guardian pharmacy system was initiated at RJD on March 22, 2010. Although this change occurred after the monitoring period, the effect of this transition and related staffing concerns was apparent at the time of the monitor's visit. Supervisory staff at the facility reported significant leadership, staffing, and data entry issues that had a negative effect on the performance of the pharmacy.

Institutional audits found a compliance rate of 70 percent for the presence of informed consent forms in medical records during January 2010.

An audit performed by the institution during January 2010 indicated 83-percent compliance with laboratory testing for mood stabilizing medications and all anti-psychotic medications. Laboratory test orders and results were documented in the appropriate sections of the medical record. The institution did not audit whether abnormal results were addressed as clinically indicated.

Nursing supervisors occasionally observed pill lines to evaluate DOT protocols. Audit results from December 2009 to January 2010 indicated 97-percent compliance overall with DOT protocols.

As of December 31, 2009, there were 14 patients on Keyhea orders. From July 1, 2009 to December 31, 2009, ten Keyhea petitions were initiated at RJD, but the treating psychiatrist did not pursue two of these cases. One Keyhea hearing was not scheduled due to the inmate's transfer to a county jail for a court date, and one Keyhea petition lapsed due to staff error when the ten-day certification deadline was not met. Five Keyhea orders were renewed,

three were not renewed based on the decision of the treating psychiatrist, and two petitions were

rejected at the hearing.  There were no petitions that were not pursued on advice of counsel.

Two inmates paroled while under Keyhea orders.  Five inmates on Keyhea orders transferred to

other institutions, but of these, none of the transfers occurred prior to either the initial or renewal

Keyhea hearings.

Although HS medications were prescribed at RJD, the facility was unable to

provide a list of psychotropic medications that were administered as HS.[19] Audit results from

December 2009 showed 72-percent compliance with HS pill lines that began at 8:00 p.m. or

later.

Audits performed during the second half of 2009 indicated that 96 percent of

inmates received their medications at the time of parole.

Sexual Misconduct:

During the review period, there were 31 RVRs written for IEX and one RVR for

sexual assault.  Twenty-four inmates received screens with only one receiving a full evaluation.

The inmate who reportedly received the full evaluation was found to meet criteria for IEX

treatment and was referred for transfer the next day.  However, there was no evaluation

document located in the UHR, no diagnosis of Exhibitionism listed on the mental health screen,

and no determination that the inmate met the alternative criteria for referral to the treatment

program.

One inmate received nine RVRs for IEX between January and August 2009, yet

he was not found to require a full evaluation nor did he receive a screen following any of the

---

[19] Defendants requested removal of this sentence, based on the institution's provision of a list of all medications administered at HS.  Regarding HS medications, RJD provided a list of all medication administered at HS; however, they were unable to provide a specific list of psychotropic medications that were administered at HS.  They acknowledged only 72 percent compliance with an audit of HS medication administration during December 2009.

three incidents that occurred during the monitoring period. Based on the documents provided by the institution and UHRs reviewed, none of the inmates who received RVRs during the monitoring round were diagnosed with Exhibitionism or a Paraphilia NOS.

The sexual misconduct log did not track whether an individual was seen by the IDTT. Discussion with mental health staff confirmed that IDTT meetings for inmates with sexual misconduct RVRs were not occurring in accordance with the Program Guide.

No inmates were transferred to an IEX treatment program during the monitoring round. RJD did not provide any type of treatment for Exhibitionism. While the single inmate referred to an Exhibitionism treatment program awaited transfer, he was provided with 3CMS mental health services, but did not receive any treatment focused on his sexually inappropriate behaviors. He did receive custodial interventions such as an identifying sheet on the cell door, panels to minimize view of the cell, and an exposure-control jumpsuit.

Transfers:

During the period from August 2009 to December 7, 2009, a total of 20 inmates were identified for referral to acute care. Fifty percent of the identified inmates were never transferred to acute care but were returned to the yard. One inmate was transferred to a yard after being given a bed assignment in a DMH acute care program, while nine other inmates were returned to the yard after waiting five to 33 days for an acute care bed assignment. The average number of days from initial identification to transfer was 21.6 days. There were five instances in which transfer to DMH acute care did not occur within 72 hours of a bed assignment, with a range of six to eight days.

RJD made 72 referrals to intermediate care, with 33 to ASH, 23 to SVPP, and 16 to VPP. Forty-two or 58 percent of the referrals resulted in transfers to intermediate care. RJD

314

took an average of 15 days from identification to package completion and actual referral to intermediate care. Of the 33 inmates referred to intermediate care at ASH, 29 transferred and four inmates paroled prior to transfer completion. Transfer times improved during the monitoring period, from an average of 43 days to an average of 34 days from identification to transfer. There were no rejections from ASH. Only four inmates transferred to intermediate care at SVPP during the monitoring period. Transfers for the four inmates took an average of 72 days after identification for referral by RJD. Referral to acceptance took an average of 13 days, excluding two outliers of 95 days and 144 days. There were no rejections from SVPP. Two inmates transferred to other CDCR institutions after waiting 41 days and 165 days. One referral was rescinded after 195 days and another inmate paroled 65 days after acceptance. Fifteen inmates were on the wait list on average of 140 days. Two of the referrals to VPP were rescinded, two inmates paroled (one prior to acceptance and the other 25 days after acceptance), and one inmate transferred to CMC 127 days after acceptance. Two inmates were waiting, one of whom was waiting for 181 days. No information was available for the second inmate. For the nine inmates that transferred to VPP, the time from identification to transfer took an average of 57 days, and referral to transfer took an average of 22 days. VPP notification of acceptance took an average of 13 days, excluding two outliers of 42 and 91 days. There were no rejections.

Of the 16 Vitek hearings from July 1, 2009 to December 31, 2009, none resulted in a finding for the inmate. Excluding a 99-day outlier, it took an average of two days for RJD to forward the referral packets to DMH once the Vitek process was complete.

During the monitoring period, 49 inmates returned from DMH. Discharge summaries were received for 73 percent of the returning inmates. Receipt of discharge summaries improved after September 2009, when RJD implemented a new tracking process for

the summaries.

The MHCB unit at RJD consisted of 15 beds, including one seclusion and one mobile restraint bed.  The MHCB census exceeded 15 inmates during the months of September, October, November, and December 2009 for a total of 116 days.  The average daily census was 16 inmates, with a high of 21 inmates.  If beds were not available, medical patients were transferred to community hospitals.  There were no instances when medical patients utilized MHCBs during the reporting period.

There were 369 MHCB discharges from July 1, 2009 through December 31, 2009.  The average length of stay was 6.5 clinical days, but administrative days increased this average to nine days.  Lengths of stay exceeding ten days decreased to 16 percent, down from 23 percent during the preceding monitoring period.

Repeat admissions increased over the monitoring period, with 23 inmates admitted to the MHCB three times or more over a six-month period.  Thirty nine percent or nine of 23 inmates with repeat admissions were referred to DMH acute or intermediate care.

From July 2009 through November 16, 2009, there were a total of eight occasions on which five-point restraints were ordered for MHCB inmates.  During this same time period, there were eight orders for seclusion.

RJD utilized holding cells for inmates waiting transfer to the MHCB.  Logs were maintained but often lacked signatures, release times, and approvals for four-hour time limits.  Incidents of suicidal inmates remaining in holding cells longer than four hours were not appropriately documented.

RJD referred 19 MHSDS inmates to the PSU during the monitoring period.  Ten inmates transferred, and nine were pending endorsement and/or transfer.  The average number of

days from committee action to CSR endorsement increased from 24 days during the preceding monitoring period to 29.2 days during this period.  The number of days from CSR endorsement to transfer averaged 31.9 days.  On average, the total number of days from committee action to transfer was 61 days.

On March 4, 2010, provided data showed that there were 22 RC EOP inmates held at RJD with lengths of stay exceeding 60 days.  The data indicated that 14 or 64 percent were already endorsed to MCSP, KVSP, and CMC.  Of the remaining eight, one had been transferred to DMH, one had paroled, and two inmates had their levels of care changed to 3CMS. The remaining four were at various stages of custody review decisions with respect to transferring them to EOP programs.  On March 4, 2010, there were 56 EOP inmates at this LOC for less than 60 days; five of them had already been endorsed to EOP institutions on that date.

The data presented for March 4, 2010 showed that there were 122 RC 3CMS inmates at RJD with lengths of stay exceeding 90 days.  Of these, six or four percent had been endorsed to CSATF, MCSP, and the SHU at CSP/Corcoran.  The remaining 271 3CMS inmates at the institution had been at that LOC for less than 90 days.

Other Issues:

Reception Center

At the time of the monitor's visit, there were 78 EOP inmates in the RC.  The EOP RC program was staffed with five psychologists, one PSW, and two psychiatrists who also provided services to the 3CMS population.  RJD reported over 90-percent compliance with completion of evaluations within seven days for inmates arriving with EOP histories.  However, a review of the 30-day period of arrivals from January 19, 2010 through February 17, 2010 revealed far less compliance.  Further, institutional audits found over 90-percent compliance for

timely initial IDTT meetings, but the monitor's sample found less than 90 percent.[20]  RJD

reported over 90-percent compliance for weekly individual PC contacts.  Seventy five percent of

these were conducted in a confidential setting.

RJD consistently offered five hours of structured therapeutic activity per week to

RC EOP inmates, but only 36 percent of the RC EOP inmates actually received five hours of

structured out of cell activity throughout the monitoring period.  Obstacles included refusals,

conflicting ducats, lockdowns, and staff furloughs.

At the time of the site visit, RJD's RC discharge planning continued to evolve and

presented noted improvements.  The institution continued to have a full-time clinical staff

focused on re-entry/discharge planning at RJD.  Re-entry planning at RJD continued to be an

improving work in progress.

Administrative Segregation:

There were 420 inmates in administrative segregation as of February 18, 2010.

Fifty-one percent or 214 were MHSDS inmates, with 53 at the EOP LOC and 161 at the 3CMS

LOC.  As of February 23, 2010, 108 MHSDS inmates were held in administrative segregation

over 90 days, with an average length of stay of 216 days.  Twenty-five EOP inmates were held

over 90 days and had an average length of stay of 233 days with a range of 92 to 773 days.  The

83 3CMS inmates had an average length of stay of 210 days.  The institution did not review

inmate cases every 30 days as required.

---

[20] Defendants requested clarification of this sentence based on an RJD staff report that the monitor said at the exit conference that RJD was compliant with timeliness of initial IDTT meetings.  As specifically stated at the beginning of every post-site visit exit conference, Coleman monitors' and experts' statements during post-site visit exit conferences are merely preliminary and are not binding.  Final pronouncements on the monitor's findings and conclusions are reserved until issuance of the Special Master's Monitoring Report, after the information gathered during the site visit has been more thoroughly examined and analyzed.

Timeliness requirements for initial IDTT meetings for both 3CMS and EOP inmates housed in administrative segregation remained problematic. Only one audit with a sample size of ten EOP and ten 3CMS charts was conducted during the monitoring period. Results indicated that IDTT reviews were never completed prior to the initial ICC for 3CMS or EOP inmates. Access to C-files remained problematic for IDTT meetings. Treatment plans were typically generic for both 3CMS inmates and EOP inmates and often simply restated Program Guide requirements.

RJD staff reported compliance with weekly PC contacts in administrative segregation. However, the audit covered only two months of the monitoring period and the sample size was unknown. A review of UHRs by the monitor's expert found that the institution was approaching compliance with individual contacts but full compliance could not be documented. Documentation of compliance in this area was further complicated by the poor organization of the UHRs.

RJD offered contacts to all 3CMS inmates. Only 62 percent occurred out-of-cell. No data was provided for EOP inmates.

Group therapy was available for 3CMS administrative segregation inmates housed in Unit 6. Staff reported that there were three groups available and that all 3CMS inmates were offered at the opportunity to participate in at least one of those groups weekly. Staff also reported that EOP inmates were scheduled for 14 hours per week of structured therapeutic activity. The average amount received during the monitoring period was approximately six hours. The group therapy space for the EOP hub remained on the dayroom floor in housing Unit 6 and was not confidential.

There were no audits for psychiatric contacts in administrative segregation.  The monitor's expert's review of UHRs found noncompliance in this area.  Psychiatric contacts appeared to have been sporadic at times, with one order written for medications and follow-up in 120 days for a 3CMS inmate.  Based on the limited chart review, EOP inmates were not consistently seen monthly.  The location of the contact at cell-front versus in a confidential setting was often not noted, and progress notes were frequently illegible.

MHCB

Quarterly audits from May 2009 through January 2010 indicated that only 78 percent of MHCB IDTT meetings included the required participants.  Institutional audits for compliance with the requirement of provision of psychiatry visits in the MHCB five days per week found full compliance in all of the audited cases.

At the time of the monitor's visit, RJD's CTC staffing included a full-time RT who provided services to inmates placed into the CTC for medical as well as mental health services.  The RT had established a schedule of dayroom and outdoor activities.  Access to these activities was dependent upon direction from the mental health clinician who was treating the patient.

During the site visit, the monitor's expert's observation of inmates on suicide watch status in the MHCB found staff posted at the doors of the inmates' cells.  Inmates wore smocks and had blankets.  Some inmates also had mattresses on the floor.  Staff was observed to be maintaining notes at 15-minute intervals.

RJD did not utilize any OHUs or overflow cells during the monitoring period.

EOP

EOP inmates were housed in Facility I in the mainline, in housing units 1 and 2. Outside yard time for EOP inmates continued to be a challenge for RJD. Dayroom time also remained problematic because of the need to use the space for treatment.

Mental health staff at RJD reported that they reduced groups due to furloughs. Supervisory staff described scheduling three 90-minute clinical groups over a two-week period. Inmates were scheduled for two 90-minute groups one week, but during the following week they had one 90-minute group scheduled and one individual clinical contact scheduled.

Throughout the monitoring period, mainline EOP inmates received an average of only five hours of structured treatment.  Mental health supervisory staff reported an expectation that clinicians see those inmates refusing group for an individual contact, but this was not tracked.

There was insufficient treatment space available for the capacity of the RJD EOP mainline, with only four acceptable group rooms.  Within the treatment building, there were two group areas in a common area, separated only by office divider panels.  The area was noisy and provided no confidentiality.  Further, mental health staff used the housing unit dayrooms as additional treatment space, which posed obvious confidentiality problems.

Due to lack of data, the facility could not report on compliance with PC contacts. Mental health supervisory staff reported that it was extremely difficult to audit compliance because of the practice of bi-weekly individual treatment combined with clinician-led group treatment contact.  However, a review of a small number of UHRs suggested that the facility was approaching compliance in this area.

IDTT meetings were held but the institution remained noncompliant with timeliness of initial IDTT meetings.  Subsequent IDTT meetings and treatment plan updates were not audited, as evidenced by a lack of data in the institution's management report and associated documents.  A chart review by the monitor's expert suggested that the institution improved with timeliness for quarterly IDTT meetings and treatment plan updates.  The institution also did not track or audit compliance with attendance of required members at IDTT meetings.  However, staff reported that all assigned staff attended.

3CMS

RJD's mainline 3CMS program operated on Facility I and Facility III.  Staffing included a total of six PCs who maintained caseloads that averaged 139 inmates on Facility I and 129 inmates on Facility III.  A total of three FTE psychiatrists were assigned to the program.  During the monitoring period, the census of the 3CMS mainline program averaged 791 inmates.

Clinicians assigned to the Facility III 3CMS program had single-person offices capable of providing adequate confidentiality.  All groups were held in half of a large open room with a moveable partition down the middle.  Staff reported that at times, nursing education classes were held simultaneously with mental health groups in the other half of the room, and that the divider provided adequate confidentiality.

The Facility I 3CMS program shared four confidential group treatment rooms with the EOP program housed on the same yard.  Clinicians assigned to the program had private offices, which were used for one-to-one meetings with inmates.  Adequate confidentiality was provided in both group and individual treatment settings within Facility I.

RJD had established an EOP to 3CMS transition or step down program on Facility I.  The program provided supplemental clinical visits for inmates whose LOC had been lowered.

From July through September, the compliance rate for time requirements for completion of the initial mental health evaluation was 60 percent.  Completion of the initial treatment plan occurred within prescribed timeframes 74 percent of the time.  Timely IDTT meetings occurred for 76 percent of the cases.  From October through December, compliance with the Program Guide requirements for completion of the initial evaluation, treatment plan, and IDTT review was above 90 percent.

Caseload-by-caseload audits of compliance with the requirement for PC contacts found considerable variability, with compliance increasing toward the end of the monitoring period.  Compliance levels for all caseloads were above 90 percent by December 2009.

At the time of the site visit, a total of 14 3CMS groups were offered, with six in Facility I and eight in Facility III.  Groups in Facility I, enrolled 14 to 21 inmates, while those on Facility III had six to 12 participants.  As of January 2010, there were no inmates on waiting lists for facility I groups, but there were 40 inmates on waiting lists for the groups offered on Facility III.

During the site visit, the monitor's expert visited the Facility III 3CMS IDTT meeting and toured the clinical space used by that program.  The composition of the IDTT included several PCs along with a psychiatrist and a CC I.  C-files were present and inmates participated meaningfully in the meeting, but there was no discussion of the inmates' possible need for referral to higher levels of care.

Referrals

RJD remained noncompliant with mental health referral timeframes, as it did not have a mechanism in place to track mental health referral follow-up by PCs. Further, RJD tracked only psychiatric follow-up in some but not all facilities at the institution. Audits showed that only 81 percent of psychiatry referrals met Program Guide timeframes.

Medical Records/MHTS

Medical records were problematic. Staff reported a minimum two-week lag for filing of documents in UHRs. Further, staff reported and the monitor's expert's review verified that charts were disorganized and often coming apart.

Heat Plan

Indoor and outdoor temperatures were maintained and forwarded to the coordinator during July, August, September, and October 2009. The litigation coordinator submitted monthly reports to CDCR HQ. During the reporting period, there were four days of stage I heat alerts and there were no stage II or III alerts.

RVRs

From July 2009 through December 2009, 161 MH-4s were requested for 104 EOP, 39 3CMS, 16 MHCB, and two GP inmates who had received RVRs. Timely completion of the MH-4s improved to 99-percent compliance, with only two late evaluations.

RJD was noncompliant with consistent documentation of the senior hearing officers' consideration of the mental health input in the RVR process.

While RJD tracked RVRs for all EOP and MHCB inmates, only RVRs for 3CMS inmates whose behavior was bizarre, unusual, or uncharacteristic were tracked. This was problematic, as three RVRs in a three-month period would be a trigger for DMH consideration.

**Ironwood State Prison (ISP)**
Paper Review

Census:

As of March 2010, the total inmate population at ISP was 4,157 inmates, and the total reported MHSDS population was 15 inmates. There were three EOP inmates and thirteen 3CMS inmates housed in the GP. The total ASU population was 165 inmates, including two 3CMS inmates. There were no EOP inmates housed in administrative segregation at the time of reporting.

Staffing:

ISP previously had a chief psychiatrist position that had been eliminated. Only .5 of the allocated 1.5 staff psychiatry positions was filled. Neither contract coverage nor telemedicine were utilized. The one allocated senior psychologist position was filled, as were the 2.62 psychologist positions. The one senior psych tech position was filled and four of the 4.14 psych tech positions were filled. Two of the 3.5 clerical positions were vacant.

Quality Management:

The QMC met bimonthly and maintained minutes. Minutes revealed discussions of general health care issues including mental health concerns. As in the preceding monitoring round, ISP did not have a mental health subcommittee. There were no QITs chartered and there was no formal peer review process in place.

Suicide Prevention

There were no completed suicides during the monitoring period.

ISP referred to its SPRFIT as its suicide prevention subcommittee (SPS). The SPS at ISP functioned essentially as the mental health quality subcommittee with a focus on issues related to suicide prevention in addition to other mental health concerns. The committee

did not meet monthly, and attendance was problematic.  A quorum was not achieved throughout the entire monitoring period.  ISP staff attended monthly suicide prevention conferences via videoconference.  The institution did not have any suicide CAPs to respond to during the monitoring period, and as a result, it did not develop or advance any recommendations.

It was unclear from the documentation how many inmates returned from an OHU or MHCB and required five-day follow-up.  ISP reported that it completed two five-day follow-ups, but provided documentation for only one inmate.  The documentation did not include any reference to custody checks.

The suicide prevention LOP was being revised, and reportedly will be submitted to the QMC for final approval upon completion.

The ERRC at ISP met monthly and the minutes reflected review and identification of areas of needed improvement.  Emergency medical drills were completed in the ASU during three months of the monitoring period. No information regarding CPR training was provided

ISP implemented CDCR's Plan to Address Suicide Trends in Administrative Segregation.   The institution described its process for identification of new intakes for the first 21 days and provision of 30-minute welfare checks, no documentation was provided to support the report.  Similarly, ISP reported compliance with the completion of pre-placement screens, but no documentation was provided to support that finding.  ISP did not track whether mental health screens in administrative segregation were provided within 72 hours of placement during the monitoring period.  ISP did utilize the suicide tracking IP.

Medication Management:

Although ISP provided audit summaries, there were no descriptions of methodology.  It was unclear whether some of the provided audits included a sufficient sample

of mental health medications.  Further, no validating documentation was included.

ISP reported compliance for continuity of medication following intra institutional transfers, but there was no documentation included to validate that finding.

Further, ISP reported compliance with renewing medication before expiration but did not provide a description of the audit.  ISP was compliant with new medication orders or dose changes, which were received by the end of the following day.  The maximum length of medication orders written by the psychiatrist was 90 days, and the maximum length of bridge orders for medication was 14 days.

Institutional audits demonstrated compliance with follow-up by a psychiatrist within seven days after episodes of medication noncompliance.

ISP reported that nursing supervisors observed pill lines, and that no inmate waited longer than 20 minutes.

ISP did not provide documentation of compliance with completion of timely informed consent forms.  They reported that the pharmacy did not fill medication orders without a consent signed by both the inmate and prescriber.

With respect to the ordering and monitoring of the appropriate laboratory studies for blood levels of mood stabilizing medications and atypical antipsychotic medications, ISP did not provide documentation regarding compliance.  It did appear, however, that the facility had an adequate procedure in place regarding laboratory studies.

All psychotropic medications at ISP were ordered DOT.  ISP did not maintain a centralized list of these inmates.  It reported that nursing supervisors consistently observed medication administration on the second and third watches.  Again, however, there was no documentation provided for verification of these observations.

There were no inmates on Keyhea orders during the monitoring period.

ISP reported that there were 11 MHSDS inmates who were prescribed HS medications during the monitoring period.  The institution's LOP described the appropriate time of administration for these medications, but there was no documentation to verify supervisory audits of the HS pill line.

ISP reported that the audit for the provision of parole medications did not yield applicable medical records for review throughout the monitoring period.  ISP did have a process in place for providing parole medications.

Sexual Misconduct:

Four RVRs for sexual misconduct were issued during the monitoring period.  All of these were referred for a mental health screen.  Two inmates were reviewed in the IDTT meeting and the other two paroled prior to any IDTT review.  One inmate received a comprehensive evaluation.  There were no diagnoses of Exhibitionism or Paraphilia.  All of the incidents were referred to the DA.  ISP did not report the implementation of any custody-driven behavioral modification procedures.

Transfers:

There were no referrals to DMH during the monitoring period.

ISP tracked the arrival of MHSDS inmates for only the last two months of the monitoring period, when it received five 3CMS inmates.  There were no EOP inmates inappropriately transferred to ISP during that same period.

During the monitoring period, ISP placed 95 inmates into the MHSDS.  There were 75 3CMS inmates, ten EOP inmates, and ten inmates referred to MHCB.  Transfer of one 3CMS inmate but no EOP inmates exceeded transfer timelines.

Other Issues:

### Administrative Segregation

No MHSDS inmates were housed in administrative segregation over 90 days during the reporting period. ISP housed 15 MHSDS inmates including three EOP inmates and ten 3CMS inmates in administrative segregation. Two inmates were referred to MHCB from the unit. ISP reported compliance with daily psych tech rounds, but documentation covered only three months of the monitoring period. No information was provided regarding the provision of yard time in administrative segregation.

ISP was compliant with PC weekly contacts, there was no tracking out-of-cell versus cell front contacts. The institution reported daily meetings with custody and mental health staff in administrative segregation.

### MHCB

ISP did not have a MHCB unit. During the reporting period, the institution sent ten MHCB referrals to CVSP's OHU on the day of identification.

### Holding Cells

ISP reported that due to deficient tracking, it was unable to determine if inmates were placed in holding cells. A tracking form was subsequently created and implemented.

### PSU

ISP transferred one inmate transferred to a PSU during the monitoring period. It took six days from referral to endorsement, and an additional nine days to transfer to the PSU institution.

EOP

ISP transferred nine EOP inmates during the reporting period.  All transferred within 30 days except one inmate who refused to leave his cell and missed the bus.  He subsequently transferred on the fortieth day.

Referrals

ISP reported that it did not have an adequate tracking system regarding mental health referrals and consequently, it did not appropriately report timeliness of response to routine, urgent, and emergent referrals.

Medical Records/MHTS

The institution audited the appropriateness of documentation of medication compliance on MARs.  Their audits revealed an overall compliance rate of 22 percent.  A CAP was developed and implemented as a consequence of the audit results.

Heat Plan

Housing units at ISP did not reach 90 degrees or above during the review period.

RVRs

There were no RVRS issued to MHSDS inmates, and there were no MH-4s for any GP inmates due to bizarre, unusual, or uncharacteristic behavior.  There were no RVRs for cheeking and/or hoarding during the monitoring period.

**Calipatria State Prison**
Paper Review

Census:

On March 8, 2010, Calipatria's total inmate population was 4,169.  One EOP inmate and 29 3CMS inmates were housed in the GP.  There were 462 inmates housed in administrative segregation, including nine 3CMS inmates. There were 16 inmates in the OHU.

<u>Staffing</u>:

During the monitoring period, Calipatria's mental health department was fully staffed, with the exception of one half-time psychiatrist who was out on long-term leave. Allocated positions included two psychiatrists, six clinical psychologists, and 3.5 OTs. Calipatria reported nine of the 9.5 psych tech positions were filled, with registry staff covering the half-time vacancy. The one senior psych tech position was filled.

<u>Quality Management</u>:

Quality management at Calipatria remained unchanged from the preceding monitoring period. UHR reviews remained the primary vehicle for quality management. Review of some of the UHR audits revealed problems with methodology and sample size. There were no chartered mental health QITs nor any peer review process at Calipatria during the reporting period.

<u>Suicide Prevention</u>:

The SPRFIT reviewed all suicide attempts and suicide-related CAP items. It was unclear from institutional documentation whether the mental health subcommittee and SPRFIT met separately, or continued to be combined, as during the preceding monitoring period. A quorum was not consistently achieved for the meetings. It was also unclear whether the meetings were held monthly.

The ERRC met monthly over the duration of the monitoring period, and minutes were maintained. A review of the minutes indicated that the ERRC evaluated emergency response to medical emergencies including suicide attempts. Appropriate staff attended only 67 percent of the meetings and no recommendations were made and/or forwarded to the QMC or other committees.

The 15 inmates discharged from the OHU required clinical five-day follow-up and custody checks.  All of the clinical follow-ups were documented, but the custody checks were not.

The institution did not demonstrate compliance with required suicide prevention procedures in administrative segregation. Calipatria did not adequately demonstrate compliance with pre-placement screening or completion of mental health screenings within 72-hours of placement into administrative segregation. The institution also did not supply documentation related to suicide tracking/IPs used in the administrative segregation screening process, or 30-minute welfare checks during inmates' first 21 days in administrative segregation, nor did it provide information regarding offered yard time in the unit, completion of medical emergency drills, or CPR training.

Medication Management:

Calipatria was compliant for continuity of medication for the two MHSDS inmates taking psychotropic medications who were erroneously transferred to Calipatria.

The institution reported compliance with continuity of medication following intra-institutional moves, although there was no indication that moves from the OHU or administrative segregation were included in the auditing.

Renewals were timely, as was the processing of orders.

Appropriate and timely action in response to medication noncompliance was problematic because of lapses in the MAR documentation.  Timeliness of responses to referrals was not addressed in the provided materials.

Calipatria was compliant with the presence of informed consent forms for all medications ordered.

The institution reported compliance with adherence to CDCR protocols regarding laboratory blood level studies for inmates taking psychotropic medications, including atypicals and metabolic changes.  However, that finding was based on the review of one UHR.

There were no inmates on Keyhea orders during the review period.

Parole medications were ordered and distributed as required.

Sexual Misconduct:

Calipatria issued approximately seven RVRs for sexual misconduct.  Six of the seven inmates were screened and no inmates were referred for a comprehensive evaluation after the initial screen. There was no custody-driven behavioral modification procedures employed during the review period.  Four of the seven were referred to the DA, two were pending referral, and one had due process issues and was ordered reissued.  Two of the seven resulted in SHU terms, three of the remaining had recommended SHU terms and two had not yet been heard.

There were communication and tracking problems between mental health staff and custody regarding sexual misconduct occurrences, with discrepancies between their respective lists of inmates.

Transfers:

Calipatria continued to have problems with timely access to MHCBs.  It had 18 OHU cells, four of which were designated for mental health care.  During the monitoring period, there were 31 mental health placements in the OHU.  Fourteen or 45 percent of the placements had lengths of stay longer than 72 hours, largely due to MHCB transfer delays.  Twenty four inmates were referred to an MHCB, although only 12 of the 24 inmates transferred, and the remaining 12 stabilized in the OHU while waiting for a crisis bed.  Calipatria did not report the average daily census for the OHU or multiple admissions to the OHU.

During the reporting period, 15 3CMS inmates were inappropriately transferred to Calipatria from other CDCR institutions.  No EOP inmates were inappropriately transferred.  Timely transfers of these inmates to appropriate MHPs remained problematic.

During the review period, Calipatria identified 24 MHCB, 12 EOP, and 154 3CMS inmates who required transfer to program institutions, but failed to provide sufficient documentation of timeliness of transports.

Other Issues:

Administrative Segregation

Calipatria regularly operated two ASUs.  During the monitoring period, it activated two additional overflow units.  There was one PC assigned to the main ASU that housed the MHSDS inmates.  That clinician met with custody staff daily throughout the monitoring period.  The two staff psychiatrists provided services weekly in administrative segregation.  While it appeared that daily psych tech rounds were completed, appropriate documentation was not completed.  Further, Calipatria did not capture information to verify compliance with weekly confidential out-of-cell PC contacts.  No information regarding IDTT reviews was provided.

Referrals

Calipatria responded to 349 routine and 43 emergent referrals.  The institution reported an average response time of approximately four days, but it did not segregate data on emergent referrals from routine referrals.  Further, Calipatria did not report on response to urgent referrals.

Behavior Modification Unit

On March 24, 2010, there were 27 inmates in Calipatria's BMU.  None were

MHSDS inmates.

RVRs

Mental health staff completed two RVR MH-4s for EOP inmates and three MH-4s for 3CMS inmates.

Heat Plan

There were no heat alerts in the housing units during the monitoring period.

**Centinela State Prison (Centinela)**
(Paper Review)

Census:

On January 29, 2010 the inmate census was 4,653, down by approximately 400 since the preceding monitoring period.  There were 307 inmates housed in administrative segregation. There were no EOP inmates housed at Centinela at the time of reporting.  There were 31 3CMS inmates pending transfer, eight of whom were housed in administrative segregation.

Staffing:

Centinela was allocated 19.87 mental health positions, three percent of which were vacant.  Positions for the senior psychologist, social worker, senior psych tech, six psych techs, and one RT were filled.  A half time psychiatrist position was vacant but adequately covered by registry staff throughout the monitoring period.  Additionally, registry staff covered a .12 staff psychologist position during the same period.

Quality Management:

Centinela had a well-developed, organized, and functional quality management program.  Through its quality management processes, the facility identified problems, worked toward corrective action and conducted audits.

Centinela's local governing body met twice during the monitoring period and included the warden, CMO/HCM, and a regional administrator.

The QMC met monthly and included mental health representation.

The mental health subcommittee met at least monthly, and on some occasions, twice per month. A quorum was routinely present at subcommittee meetings, which were chaired by the senior psychologist. Meeting agendas included review of updated and new OPs regarding suicide-risk tracking, restraint training for the CTC, screenings in administrative segregation, and Program Guide training.

No QITs were chartered during the review period, although Centinela utilized an "action item" method to identify and address areas of needed improvement. Some of the action items that were addressed included training of staff on medication refusal procedures, training regarding restraint use, and appropriate documentation of new arrivals to administrative segregation.

Centinela's peer review process was limited by the small number of clinicians at the facility.

Suicide Prevention:

SPRFIT meetings were held monthly and minutes were maintained. A quorum was not achieved during the entire reporting period. The SPRFIT responded to local suicide prevention needs including tracking of suicide-related incidents, five-day follow-up, and other pertinent issues during its meetings.

The ERRC met monthly and maintained minutes, although attendance appeared problematic. The committee covered a variety of issues that included the appropriateness of CPR efforts, suicide attempts, and staff response to emergencies. Centinela reported that CPR

training was provided to custody and clinical staff every two years prior to expiration of certification. Monthly emergency response drills were completed throughout the monitoring period.

Centinela reported full compliance with completion of five-day follow-up for inmates discharged from the CTC.

In administrative segregation, pre-placement screenings were implemented, but the rate of compliance was not reported. There appeared to be a problem with consistently identifying new arrivals to the unit. Seventy percent of inmates placed in administrative segregation received a mental health screen in a confidential setting and 96 percent were completed within 72 hours. Custody staff completed 30-minute welfare checks during the first 21 days of placement in administrative segregation. While there was improvement with documentation of custody welfare checks, audit results showed only a 70-percent compliance rate.

Medication Management:

Ninety-two percent of newly arriving inmates with current prescriptions for psychotropic medications received their medication within 24 hours.

Audits found 92-percent compliance for medication continuity for intra-institutional transfers, including discharges from the CTC.

Centinela reported 99-percent compliance for timely renewals of medications. However, the institution was not compliant with providing inmates with their medication within 24 hours of new medication orders, with only 50 percent of inmates receiving medications within the required timeframe.

Institutional audits revealed problems with documentation and follow-up of

medication noncompliance.

Pill line length was not audited.

Informed consent forms were found in greater than 90 percent of the UHRs reviewed.

Centinela did not perform audits regarding laboratory studies of inmate blood levels of psychotropic medications.

There were no Keyhea orders during the monitoring period.

Centinela's local policy, which allowed for HS medications to be delivered one hour before or one hour after 8:00 p.m., did not conform to the Program Guide.

The institution reported full compliance for ordering and distribution of medications upon transfer or parole.

Sexual Misconduct:

Centinela reported issuing 11 RVRs related to sexual misconduct during the monitoring period. All 11 RVRs resulted in a screening and nine were subject to IDTT review (one inmate transferred prior to review). Five were referred for a comprehensive evaluation, and three inmates were diagnosed with Exhibitionism, including one with a previous diagnosis. All three were referred for Exhibitionism treatment but were transferred from Centinela in conformity with MHSDS transfer deadlines. Nine of the 11 incidents were referred to the DA for prosecution.

Transfers:

Centinela's CTC was licensed for inpatient medical use and had an average of five mental health admissions per month. It was institutional policy that inmates in need of mental health crisis care were initially admitted to the CTC and subsequently referred to an

MHCB.  Timely transfers to MHCBs were problematic throughout the monitoring period, largely due to a system-wide lack of available MHCBs.

The CTC contained one seclusion room which was not utilized during the monitoring period.  IDTTs were completed within 24 hours of CTC admission, and inmates were seen daily by mental health clinicians.  There were 38 admissions for mental health purposes.  Of those, 16 were transferred to MHCBs and the remaining 22 were discharged back to outpatient care after having stabilized.

No holding cells or alternative housing areas were utilized throughout the monitoring period.

There were three EOP inmates, all of whom transferred within 60 days.  EOP inmates were seen weekly by a PC while awaiting transfer.

Centinela inappropriately received nine 3CMS inmates from other CDCR institutions throughout the state.  Only one inmate transferred within 30 days of arrival. Centinela also placed approximately 170 inmates in the 3CMS program, all of whom transferred from the institution within 90 days.

Other Issues:

Administrative Segregation:

There were no EOP inmates housed in administrative segregation over 90 days during the monitoring period.  Inmates who were placed on the mental health caseload while in the stand-alone ASU, or MHSDS inmates who were mistakenly housed in the stand-alone unit, were transferred within required timeframes.

Institutional audits of isolation logbooks indicated that psych tech rounds were completed daily, and that MHSDS inmates were seen weekly by PCs.  The RT and psych techs

provided group therapy in each of the ASUs.  Groups included anger management, leisure

education, and wellness.  During the monitoring period, Centinela activated SMYs and provided

ten hours of yard time per week for all inmates housed in administrative segregation.

Referrals

Centinela had an adequate process for collecting, triaging, and tracking responses

to referrals for mental heath services.  The institution was compliant with meeting routine

referral requirements outside of administrative segregation.  There were 38 emergent referrals

reported, all but one of which were seen immediately.  Eleven percent or 17 of 192 urgent

referrals were not seen within 24 hours.  There were 292 referrals from administrative

segregation, inclusive of emergent, urgent, and routine referrals, of which 93 percent were seen

within required timeframes.

Medical Records/MHTS

Institutional reviews of MARs showed that documentation was complete and

legible 70 percent of the time.  Only 65 percent of the MARs were located in the medical record.

RVRs

During the monitoring period, Centinela issued one RVR to an EOP inmate.  He

did not receive a MH-4 and was transferred to an MHCB that same day.  There were 13 RVRs

issued to 3CMS inmates, with ten MH-4s completed.

**Chuckawalla Valley State Prison (CVSP)**
Paper Review

Census:

At the time of reporting, the total number of inmates at CVSP was 3,404.  From

September 2009 through February 2010, CVSP provided mental health services to 141 inmates.

There were 77 3CMS inmates and 11 EOP inmates housed in mainline, 58 inmates housed in the

OHU, and 15 3CMS inmates housed in administrative segregation.  No EOP inmates were housed in administrative segregation.

Staffing:

      Psychiatric staffing remained problematic throughout the monitoring period, with one of the 1.5 allocated positions vacant.  A part time contract psychiatrist provided coverage three days per week, but the institution reported experiencing difficulties particularly with psychotropic medication management of OHU admission when there was no psychiatrist on duty (POD).

      The senior psychologist position was filled, as were four of the 4.5 line psychologist positions.  The senior psych tech and four of the 5.5 psych tech positions were filled.  None of the three clerical positions were vacant.

Quality Management:

      CVSP had a local governing body in place that met only during September, October, December, and January of the reporting period.  A quorum was present at only one meeting.

      The QMC met at least monthly during the review period.

      The Mental Health Subcommittee also met monthly.  Minutes reflected discussion of various topics in the mental health delivery system.  There was no evidence of any referrals from the Mental Health Subcommittee to the QMC.

      There were no QITs during the monitoring period.

      CVSP reported that there was no peer review for psychiatry or psychology due to the limited number of clinicians on staff.  Weekly rounds were conducted with all professional staff present.  The psychiatrist and PC presented cases, with review from all of the attending

clinicians.

All mental health staff were involved in audits for quality management. UHR audits continued to be the primary quality management activity at CVSP.

<u>Suicide Prevention</u>:

The SPRFIT at CVSP met monthly but a quorum was never achieved throughout the monitoring period. As in the preceding monitoring period, attendance by custody staff remained problematic. During meetings, there was no discussion of response to any local suicide prevention concerns, nor were there any suicide CAPS to respond to during the reporting period. Topics of discussion consisted of completion of RVR MH-4 requests, OHU placements, MHCB referrals, administrative segregation medication issues, IST training, and mental health staffing.

The ERRC met monthly and minutes were maintained. CVSP conducted at least one drill per month followed by written review. All inmate deaths were reviewed, but none of the multiple actual medical emergencies were examined by the committee during the monitoring period. Emergency response drills were conducted in the ASU and provided documentation of attendance. CVSP also provided a report on all staff that attended CPR certification training throughout the monitoring period. Custody staff audited the possession of micro-shields and cut-down tools in the housing units. While cut-down kits were found in all of the units inspected, the institution reported inconsistencies in the inspection of the kit contents. Custody staff had micro-shields in their possession.

CVSP did not participate in any of the monthly suicide prevention videoconferences or other training provided via videoconference, as the institution does not have the necessary equipment. The institution reported, however, that it participated by teleconference, using presentation slides and audio.

No data regarding five-day follow-up/custody observations was provided.

In administrative segregation, a facility audit found that the institution had successfully implemented the pre-placement screen and filing in the mental health chrono section of the UHR.  A log indicated compliance for completion of the mental health screen within 72 hours of administrative segregation placement.  However, information regarding whether the screens occurred in a confidential setting was not provided, or whether inmates were asked about recently received "bad news" as part of the screening process.

CVSP reported noncompliance with 30-minute welfare checks on all inmates on three-week intake status. An audit revealed problems with staggering of the welfare checks and proper documentation.  The institution identified problems with the placement and appropriate removal of new-arrival cell door placards.

Medication Management:

CVSP was only 50 percent compliant with ordering medications for newly-arriving inmates. As a result of an audit, a CAP was developed.

For inmates arriving from other CDCR facilities, CVSP was 90 percent compliant with ordering medications within eight hours of arrival, but no data was presented as to when the inmate actually received the medication..  An audit of only three UHRs indicated no interruption of medication for inmates who moved within the institution.

The institution reported full compliance for medication renewal prior to expiration, but it was unclear from the audit data if it encompassed only psychotropic medications or chronic care medications as well.

An institutional audit demonstrated compliance with follow-up after detection of medication noncompliance.

CVSP reported that they conducted pill lines on every yard, except ASU and the OHU where the medications were distributed cell-front. The facility acknowledged that pill lines were not audited.

Timely receipt of newly-ordered or changed medications was found in 96 percent of cases, although this percentage was not specific to continuity of medication upon arrival, nor was it clear if psychotropic medications were included in the sample. The maximum length of medication orders was 90 days, and the maximum length of bridge orders was 14 days.

CVSP reported compliance with obtaining timely informed consent and placement of it in the UHR. It was unclear if the data provided was from pharmacy records or UHRs. CVSP reported that the pharmacy would not fill medication orders without a consent signed by both the inmate and prescriber. Only one prescription was declined by the pharmacy due to the absence of an informed consent.

The institution did not provide audit results regarding whether the appropriate laboratory testing for blood levels of mood stabilizing and antipsychotic medications was performed.

All psychotropic medications were ordered to be administered by DOT. A centralized list for psychotropic medications administered by DOT was maintained by the pharmacy. No specific audit for DOT was conducted, but the institution did examine DOT while auditing whether MARS were filed appropriately.

There were no inmates on Keyhea orders during the monitoring period.

CVSP had 11 MHSDS inmates on HS medications throughout the monitoring period. The LOP was consistent with administration after 8:00 p.m. An institutional review of eight UHRs found full compliance.

Sexual Misconduct:

During the monitoring period, ten inmates received RVRs for sexual misconduct. All were referred for evaluation by a mental health clinician. Institutional audits noted problems in several areas, and the issues were submitted to the mental health subcommittee for review.

None of the ten referrals resulted in a comprehensive evaluation and/or diagnosis of Exhibitionism or Paraphilia NOS, nor was any treatment provided.  Custody-driven behavioral modification measures included Lexan covers and placards on cell doors, and exposure-control jumpsuits.  None of these cases were referred to the DA's office, but three resulted in SHU terms.

Transfers:

There were no referrals to DMH during the reporting period.  CVSP reported that inmates appropriate for DMH referrals were not at the institution long enough to be considered for referral.  Reportedly, they were transferred to a MHCB program and the PC included DMH consideration in the inmate's MHCB transfer information.

Because CVSP did not have an MHCB, inmates from CVSP and ISP who were identified as needing MHCB care were housed in CVSP's OHU until transferred to an MHCB program.  In the past ISP clinicians provided treatment to the ISP inmates housed in CVSP's OHU. However, during the twenty-second reporting period, CVSP assumed responsibility for providing all services to inmates from both CVSP and ISP.  ISP clinicians completed all appropriate documentation for admission to the OHU, including a mental health evaluation, suicide risk evaluation, and any other relevant data via the mental health progress note and a current medical history and physical.  Once the patients were admitted, CVSP clinicians were assigned.

During the monitoring period, there were 30 MHCB referrals who were admitted to the OHU at CVSP, divided equally between CVSP and ISP inmates.  CVSP reported the average time from referral to transfer to the MHCB was 1.5 days, with a range of zero to seven days, depending on MHCB availability.  CVSP did not report the number of OHU beds at the institution or the average daily OHU census.  No MHCB inmates were returned to CVSP after discharge during this monitoring period.

There were a total of 42 placements into the holding cells.  The average length of stay was approximately one hour and 17 minutes.  MHSDS inmates placed in the holding cells received a suicide prevention gown prior to placement into the cells located directly in front of the officers' station in central health.  No mattresses or other items were in the holding cells, nor were there any multiple admissions to these cells.  There were only two instances of MHSDS inmates placed in the holding cell while awaiting placement in a cell in the OHU due to suicide watch and precaution.  The average stay for the inmates was 51 minutes.

There were no referrals to a PSU during the monitoring period.

Ten inmates were identified for EOP LOC during the reporting period.  Seven of the ten inmates were GP or SNY inmates and three of those inmates had their LOC changed to MHCB.  The four remaining inmates were transferred in an average of 27 days, with a range of eight to 38 days.  Four of the ten EOP inmates were housed in administrative segregation and three transferred in an average of 17 days with a range of three to 27 days.  CVSP reported one inmate awaiting transfer to a hub, but there was no further information provided on the length of his wait.

Twenty one MHSDS inmates, including eight with medications, were inappropriately transferred to CVSP during this monitoring period.  Nine of the inmates

transferred from CVSP in an average of 45 days, with a range of 35 days to 90 days. Four inmates paroled and five inmates were awaiting transfer at the time of reporting. All EOP inmates transferred during the reporting period.

Sixty-eight 3CMS inmates transferred to an institution with a 3CMS program during the reporting period in an average of 38 days, with a range from one to 91 days. All 3CMS inmates in administrative segregation transferred within an average of 22.7 days, excluding a 72-day outlier whose transfer was affected by a medical hold and parole issues.

Other Issues:

OHU

CVSP reported completion and use of small management exercise yards for the OHU but did not report the number. Four holding cells were utilized pending admission to the OHU. Logs were maintained, and the healthcare access captain and the associate warden of healthcare conducted log audits. The audit noted that time the inmate was removed from the cell was sometimes omitted.

Administrative Segregation

CVSP reported an excellent working relationship between mental health and custody staff in administrative segregation. The ASU officer, the PC, and the psych techs attended morning rounds meetings. Notes were documented on the morning rounds form and retained by the mental health department. The institution reported that the ASU sergeant maintained documentation but noted several problems with the sergeant's log book entries.

There were 14 3CMS inmates in administrative segregation during the monitoring period. Compliance was noted for psychiatric contacts and weekly PC contacts. The institution was compliant with completion of confidential clinical contacts and maintained a log for cell

front contacts of those inmates who refused their appointments. One inmate refused three times and two others refused only once. Daily psych tech round logs were maintained and provided in the documentation. CVSP reported that it did not conduct out-of-cell activities. Construction of SMYs was completed during this monitoring period but CVSP did not report the number of them.

EOP

CVSP audited only one EOP inmate UHR for the reporting period. Based on that UHR, CVSP reported compliance with PC and psychiatry contacts, as well as completion of the initial evaluation and IDTT meeting within 14 days. All appropriate disciplines participated in the IDTT meeting for the inmate. EOP inmates housed in GP, SNY and administrative segregation were seen weekly by the PC, and as clinically indicated by the psychiatrist. Daily psych tech rounds were also reportedly compliant.

3CMS

CVSP reported that while awaiting transfer, 3CMS inmates received follow-up appointments by their assigned PC and psychiatrist on an as-needed basis. The institution reported improved access to care due to the additional 25 custody positions it received in August 2008 for the health care access unit. While not directly related to *Coleman*, CVSP reported that these additional positions led to improved access to all areas of healthcare. Additionally, in August 2008, a mental health office was designated in each of the medical buildings on the individual yards, thereby allowing clinician/inmate contacts on the yards.

Referrals

All mental health referrals at CVSP were processed through the infirmary or the psych tech medical boxes, both of which were monitored twice daily by the psych techs. CVSP

responded to 13 emergent referrals, 91 urgent referrals, and 415 routine referrals during the monitoring period.  While the institution maintained a log noting the date the referral was written and received and whether it was routine, urgent, or emergent, the log did not show what response was provided and when.  Further, it was unclear from the materials if the institution complied with timely response and follow-up based on the type of referral.  There was also no information in the progress notes on response to referrals.

Medical Records/MHTS

The facility audited documentation of the MAR by nursing staff and found a compliance rate of 72 percent.  Reportedly a corrective action was developed based on the audit results.

Heat Plan

During the monitoring period, CVSP completed the high-pressure vacuum air conditioning system throughout the institution.   There were no instances of housing units reaching 90 degrees during the review period.

RVRs

There were only two RVRs involving MHSDS inmates, both at the 3CMS LOC.  Both received MH-4s, and one noted that the inmate's mental disorder contributed to the behavior that led to the RVR.  The assessment and clinician findings were noted in the RVR, and the hearing officer found the inmate not guilty, as his mental disorder was a "significant factor contributing to the misbehavior."

There were no RVRs for self-injurious behavior or suicidal behavior, nor were there any instances of medication hoarding or cheeking during the reporting period.

349

## California Institution for Women (CIW)
### (Hybrid)

Census:

CIW's census was 2,584 inmates, which included 274 fire camp inmates. The mental health caseload population was 831 inmates, or 32 percent of the prison's population. This represented the continued increase of 14 percent over the two preceding monitoring periods. There were 80 inmates in the mainline EOP and 529 inmates in the mainline 3CMS program. There were an additional 14 EOP inmates and 165 3CMS inmates in the RC. Six inmates were in the MHCB, ten inmates were in the PSU, and one EOP inmate was in the OHU for medical reasons. There were ten EOP and 16 3CMS inmates housed in administrative segregation.

Staffing:

CIW remained nearly fully staffed during the monitoring period, with only a half-time staff psychologist vacancy. The functional vacancy rate was virtually zero, and registry staff was only used for psych techs during the monitoring period.

Allocated positions included one chief psychiatrist, one senior supervising psychiatrist, one chief psychologist, five senior psychologists, and 8.5 staff psychiatrists. Additionally, CIW had 26 staff psychologists, one supervising social worker, 7.5 social workers, two senior psych techs, 17 psych techs, and four RTs. Clerical positions included one unit supervisor, one HPS I, one OSS II, nine OTs, and one medical transcriber.

Quality Management:

CIW's local governing body and QMC met monthly throughout the monitoring period.

The mental health subcommittee also met monthly, and on occasion met twice monthly. Mental health staff regularly attended meetings, and custody staff were present at

most.  Meeting minutes were maintained.  There appeared to be continued communication between the mental health subcommittee and QMC regarding relevant issues.  The subcommittee remained very active and reviewed a myriad of program areas including, but not limited to, seclusion and restraints, five-day follow-up, EOP hub treatment, and medication noncompliance issues.

Over the monitoring period, CIW had active QITs on EOP groups, TTA/OHU returns, the administrative segregation EOP hub, and medication management.  Line staff regularly participated, written results were produced, and the recommendations were forwarded up the chain of command.

CIW continued its active peer review process for psychiatrists, psychologists and social workers.   Meetings were conducted monthly for each discipline.  Based on the provided information, peer review for psychiatrists and social workers was quantitative rather than qualitative, while psychologist peer review was both qualitative and quantitative.

Suicide Prevention:

The SPRFIT met monthly during the review period but a quorum was not regularly present.  Minutes were maintained and issues were reported to the mental health subcommittee.  The policy and procedure on suicide history tracking was finalized, and staff was trained on the policy during the monitoring period.  Meeting minutes demonstrated that the meetings addressed various aspects of suicide prevention including tracking self-injurious behaviors, the assessment of DMH referrals and transfers, review of emergency response, and staff training.  The SPRFIT chartered QITs.

The ERRC met monthly.  Minutes revealed that they routinely assessed emergency responses.  If a response was deemed inappropriate, the committee initiated

corrective actions to address deficiencies.  CPR recertification was provided upon expiration.
All clinical and custody staff except support and clerical staff received CPR training.

While the institution had an established process for post-MHCB five-day follow-up, CIW approached compliance but was unable to maintain it during the review period.  CIW reported that custody observation was not audited.[21]

CIW had in place LOPs regarding suicide precautions and watches as well as data entry, transfer, and receipt of IPs and their use in administrative segregation screening.

CIW implemented CDCR's Plan to Address Suicide Trends in Administrative Segregation.  Thirty-minute welfare checks were completed.  CIW had a LOP relevant to the placement of inmates in administrative segregation, although documentation was not provided verifying supervisory review of logs of 30-minutes welfare checks.

Medication Management:

Continuity of medication was problematic for newly arriving inmates, largely due to third watch bus screening.  Institutional audits revealed that only 18 percent of new inmate arrivals received their medication within 24 hours.  With regard to inmate arrivals from other CDCR institutions, compliance was notably higher at 84 percent, as these inmates arrived with medication information, resulting in shorter processing time.

Continuity of medications upon movement within CIW was compliant during the monitoring period at 92 percent, as was the renewal of medication upon discharge from the

---

[21] Defendants requested that this paragraph be modified to indicate compliance with post MHCB follow-up and custodial observation, based on reported compliance with these requirements at rates of 93 percent and 95 percent, respectively.  Because post-MHCB five-day follow-up and custodial observation are suicide prevention measures [see Program Guide, Ch. 10, "Suicide Prevention and Response," sub part B.2.B (7), "Each Local SPRFIT Shall:"; sub part D.2.b. "Suicide Watch, . . . "Discharge or Return" and "MHCB Discharge,"] compliance with, and SPRFIT audit of, these requirements must be at the rate of 100 percent in order to be deemed "compliant," unlike the general 90-percent compliance rate standard to which many other functions are held.

MHCB.  Compliance with medication continuity upon transfer to and from administrative segregation was improved at 88 percent and 81 percent, respectively.

CIW had a process in place for the renewal of expiring medications but no specific audit was performed.  The institution was noncompliant with processing medication orders within 24 hours.  The maximum duration of medication orders for mainline 3CMS and EOP inmates was 90 days.  For MHCB inmates, it was a maximum of ten days.  The maximum length of bridge orders was 14 days throughout the monitoring period.

CIW conducted a limited audit for the 3CMS population and found 88-percent compliance for response to referrals for medication noncompliance.  CIW did not complete an audit regarding medication noncompliance for any other population.

There were seven pill lines at CIW during the monitoring period.  Pill line lengths were not audited.  Improvement was noted due to a second pill line added to the EOP building, a third pill line added to the mainline, and a separate daily keep-on-person medication pick-up line created during the monitoring period.

Overall compliance for presence of informed consent in the UHRs was 73 percent, with the rate driven down largely due to low compliance in the RC.

While psychiatric peer review evaluated the appropriateness of laboratory studies, CIW did not provide information regarding audits for laboratory testing for blood levels of mood-stabilizing medications.

CIW maintained a centralized list of inmates with DOT orders outside of the MHCB.  During February 2010, there were 348 MHSDS inmates who were administered medications by DOT.  The nursing supervisor performed monthly audits of medication administration to verify that the staff administering the medication consulted the DOT list or

MAR and followed DOT as indicated.  There were no incidents reported related to hoarding or cheeking medications, and CIW maintained a LOP regarding this issue.

CIW tracked Keyhea petitions.   During March 2010, there were nine inmates at CIW with Keyhea orders.  Eleven Keyhea petitions were initiated and five were renewed.  Of those, nine were granted for cause, four were denied, two were pending administrative law judge hearings, and one inmate paroled prior to the hearing.  One order expired while the inmate was out to Patton State Hopital (PSH).  All initiated petitions were pursued on the advice of counsel.

During the monitoring period, CIW trained all staff psychiatrists regarding central office guidelines for prescribing medications at HS.  During March 2010, there were 218 MHSDS inmates for whom medications were prescribed at HS.  Medication lines were staffed until 10:00 p.m. during the monitoring period to complete HS medication distribution.

While CIW had a procedure for parole medications in place, it did not audit whether they were ordered and distributed to inmates who were released.

Sexual Misconduct:

There were three RVRs related to sexual misconduct during the review period, all resulting in a sexual misconduct screenings and IDTT reviews.  No sexual misconduct screenings were referred for a comprehensive evaluation.  CIW did not offer treatment related to sexual misconduct.  All three RVRs were referred to the DA, and none resulted in a SHU term.

Transfers:

During the review period, the acting chief psychiatrist was also the DMH coordinator.  He was supported by other clinicians due to time constraints with adequately performing both roles.  CIW had difficulty obtaining discharge summaries and other relevant data for inmates returning from PSH throughout the monitoring period.

CIW referred 28 inmates to intermediate care at PSH.  Of these, 19 referrals were made as a result of the MHARP process, and nine were made by CIW staff.  As of April 2010, only two of the 19 MHARP referrals were accepted by PSH; one transferred, and the other paroled while on the wait list.  Of the 17 inmates who were not accepted, four were rejected, four were rescinded by CIW due to improvement in these inmates' clinical conditions, one inmate was pending medical clearance, two inmates were out to court, one inmate was successful at her Vitek hearing, and five inmates paroled prior to decision by PSH.  For those who paroled, two went to county mental heath facilities on conservatorship and the remaining three left with aftercare plans.

Of the nine non-MHARP inmates, two were accepted, one was rescinded, three were rejected, one inmate paroled while on the wait list, and two were rejected due to pending transfers to PSH as mentally disordered offenders (MDOs).

All referrals from the MHCB were made within the first ten days of stay.  For non-MHARP referrals, all packages were completed and sent within five days of clinical determination by the IDTT.  With regard to the three inmates who were accepted and transferred, two transferred within 30 days of referral and left within 72 hours.

DMH referral was discussed during IDTT meetings.  The team utilized Form 7388, the DMH referral consideration checklist, during IDTT meetings.  CIW noted on the Form 7388s and maintained a separate log of any justifications for not referring when an inmate met referral criteria.

CIW operated an 18-bed MHCB unit that included ten MHCBs and eight swing beds.  During the monitoring period, there were 291 referrals and 279 admissions to the MHCB; long-term medical inmates utilized no beds.   The average length of stay was five days, but there

were 14 admissions or less than one percent with lengths of stay greater than ten days. There were no administrative delays. Twenty four inmates, or less than one percent, had three or more admissions within a six-month period. CIW provided safety gowns, safety mattresses, and bedrolls.

The OHU at CIW was utilized only for medical purposes.

CIW did not utilize temporary holding cells for any inmates pending mental health evaluation or placement in MHSDS levels of care. There were three temporary holding cells in the program office, but none of the inmates placed in them were either on, or waiting to be placed on, suicide watch or suicide precaution.

CIW operated a ten-bed PSU which had five admissions during the reporting period.

There were 79 EOP inmates transferred from the RC during the monitoring period. The average length of stay from arrival to transfer was 52 days. Nineteen inmates had stays in excess of 60 days, with an average length of stay of 75 days from arrival to transfer. There were no referrals for expedited transfer during the monitoring period.

During the monitoring period, 337 3CMS inmates transferred from the CIW RC. Twenty-three, or seven percent, were not transferred within 90 days. Reasons for delayed transfers were missing chronos, late C-file arrival at the institution, three inmates out to court, four inmates due to parole, transportation delays, and RVR delays. The average length of stay from arrival to transfer was 54.5 days.

Other Issues:

### Reception Center

Historically, EOP RC inmates were housed in the mainline EOP housing unit and programmed with the mainline EOP inmates. However, as of January 11, 2010, EOP RC inmates were housed in the RC due to the closure of the east wing of the EOP housing unit for reconstruction to house the future 20-bed PSU. The EOP RC was fully staffed with one staff psychiatrist, 1.5 staff psychologists, and one clinical social worker who also provided care to 3CMS inmates in RC. .

CIW remained compliant with screening within 72 hours newly arriving inmates with a history of EOP treatment. Evaluations were completed within seven days, and IDTT meetings were held within 14 days of arrival. CIW remained close to compliant with a rate of 89 percent for weekly PC contacts. All contacts occurred out-of-cell during the monitoring period. CIW continued to offer more than five hours per week of structured therapeutic out-of-cell activities. RC EOP inmates were offered an average of 7.37 hours per week and received an average of 5.35 hours. During the review period, inmates received two hours of yard time per day for out-of-cell, non-therapeutic activities.

### Administrative Segregation

During the monitoring period, one EOP inmate was retained in administrative segregation for seven months while awaiting a bed in PSU. There was no documentation of 30-day reviews of the inmate by the facility captain and CCII.

CIW was compliant with the completion of daily psych tech rounds but not with documentation. Corrective action was taken.

The institution was compliant with weekly PC contacts for EOP inmates

throughout the monitoring period.  Twenty percent of contacts were provided at cell front.  No information was provided on weekly PC contacts for 3CMS

inmates.

CIW offered five hours of psychotherapeutic groups per week to EOP inmates but space shortages and a lack of therapeutic modules had a limiting effect.  Provision of recreation therapy was limited due to the lack of supplies and physical plant issues.  The remaining five hours was provided through individual contacts with PCs.

IDTT meetings were conducted timely for EOP inmates, but composition of the IDTT was not documented.  CIW did not provide documentation regarding IDTT meetings for 3CMS inmates in administrative segregation.

CIW was compliant with completion of mental health screens within 72 hours of administrative segregation placement, and the revised pre-placement medical clearance that included suicide risk screening was implemented.  Screenings were filed in the mental health section of the UHR.

No documentation was provided regarding Title 15 out-of-cell activities.

CIW completed monthly medical emergency drills in administrative segregation.  The institution did not operate an administrative segregation overflow unit during the monitoring period.

MHCB

In the MHCB unit, there was compliance with daily psychiatric contacts and completion of SRAs at the times of admission and discharge.  Timely IDTT meetings that were conducted bi-weekly throughout the monitoring period.  CC presence at the IDTT meetings was identified by the institution as problematic and was referred to the access-to-care committee for

resolution.

There were 27 episodes of restraint and/or seclusion during the monitoring period, involving seven inmates. A log was maintained and indicated inmates for whom restraints were ordered repeatedly. Restraint and seclusion usage was concerning, with one inmate in seclusion for over 37 hours, only to be placed subsequently in restraints for an additional 41 hours.

PSU

CIW operated a ten-bed PSU during the monitoring period. There were five admissions to the PSU during the reporting period. CIW was not compliant with completion of an intake assessment within five calendar days of arrival. Timeliness and attendance at IDTT meetings were compliant. PSU inmates were seen individually on a weekly basis by the PC, and attended weekly group therapy. Psychiatric contacts occurred at least monthly. Clinical contacts were completed in a confidential setting. CIW was compliant with daily psych tech rounds seven days per week, although there was a documentation problem during September 2009. Corrective action was undertaken by the supervisory staff addressing the deficiency.

CIW offered ten weekly hours of structured therapeutic activities throughout the monitoring period. Groups included but were not limited to women's issues, coping skills, and wellness and recovery. CIW was compliant with the provision of ten hours of weekly out-of-cell exercise during the monitoring period.

EOP

Prior to the review period, endorsed and unendorsed EOP inmates were housed and programmed together. With the construction of the new PSU that will be located in the east

wing of the Supportive Care Unit (SCU), CIW moved the majority of RC EOP inmates to the RC where they were housed and received their treatment.

Weekly PC contacts were conducted as required. Facility audits indicated 95-ercent compliance with weekly contacts. The available data indicated that EOP inmates were evaluated by the psychiatrist at least monthly. Confidential space for interviews was available for clinicians, although occasional contacts occurred in the dining room, which afforded auditory but not visual confidentiality. The facility planned to track the occurrence of non-confidential clinical contacts.

Audits of the timeliness of IDTT meetings indicated compliance at greater than 90 percent. With regard to IDTT composition, there was documentation of the presence of psychiatrists at all IDTT meetings, but there were lapses in CC I attendance.

EOP inmates were offered on average 11 hours of structured therapeutic activities per week but actually received an average of 5.6 hours.

A second pill window was added in the EOP building, which along with the move of the RC EOP inmates to the RC, resulted in much improved and shorter pill lines for EOP inmates.

3CMS

CIW maintained compliance with Program Guide requirements regarding 3CMS care. PCs saw inmates at least quarterly, with facility audits indicating 96-percent compliance with quarterly contacts. Most clinical contacts occurred in confidential offices while some contacts occurred in offices located in housing unit Walker-B that were converted inmate cells that provided limited confidentiality.

IDTT meetings in the 3CMS program were timely completed with participation by appropriate disciplines and inmates.

Groups

During the monitoring period, 322 3CMS inmates participated in psychotherapeutic group therapy. No data was provided regarding waiting lists.

Referrals

CIW had a mechanism in place for collecting, triaging, assigning, responding to, and recording mental health referrals. It was compliant with meeting timeframes for response to emergent, urgent, and routine referrals throughout the monitoring period.

Medical Records/MHTS

Access to medical records was improved but still problematic. Compliance with delivery increased from 78 percent to 84 percent over the monitoring period. Conflicting appointments were noted as the primary reason for unavailability of the records.

Implementation of MHTS.net was deferred until June 2010. Adequate documentation was provided through MHTS legacy for this reporting period.

Institutional audits indicated compliance with adequacy of MAR documentation.

Heat Plan

During the monitoring period, CIW addressed the previously-noted problem of temperature variances throughout the housing units. It installed thermometers at the ends of hallways where sunlight enters throughout the day and requested the purchase of handheld thermometers to gauge cell temperatures. The local heat plan was amended to reflect these changes. During the monitoring period, there were well over 100 instances of housing unit temperatures reaching 90 degrees or above, and 37 instances of housing unit temperatures

reaching 95 degrees or above.  Completed medical rounds were documented.

RVRs

CIW issued 54 RVRs to EOP and MHCB inmates.  All received RVR

MH-4s except two who paroled prior to evaluation.  There were 388 RVRs issued to 3CMS

inmates with only 12 receiving RVR MH-4s due to exhibition of bizarre, unusual, or

uncharacteristic behavior.  While the hearing officers documented consideration of the MH-4s,

there was no evidence that there was any impact on the dispositions.  CIW mental heath staff

also tracked all 3CMS inmates who received RVRs for whom no assessments were requested to

determine if MH-4s had indeed been indicated in any of those cases.

Pre-Release Planning

CIW had a re-entry plan in place for EOP inmates due to be released in 60

to 120 days.  The plan stated that based on the inmate's needs, she would be given information

including obtaining of housing and benefits from Social Security, Medi-Cal and/or disability

entitlements.

During the reporting period, 141 EOP inmates were released to the community

from CIW.  Clinical social workers were trained on EOP re-entry planning; training included on-

the-job training, meetings, and prison-to-parole conferences.

RC 3CMS inmates were assigned to the pre-release clinical social worker when

their release dates were approaching.

Construction

The 20-bed PSU, to be located in the east wing of the SCU, was scheduled for

completion December 2010.  No delays were noted.  There were also plans in place for a 45-bed

inpatient facility to be newly constructed.

**<u>Central California Women's Facility (CCWF)</u>**
July 26, 2010 – July 28, 2010

<u>Census</u>:

As of July 27, 2010, the total institutional census at CCWF was 3,705, representing a decrease by 328 since the preceding monitoring period.  A total of 1,177 inmates were in the MHSDS, representing 31.7 percent of the population.  Fifty-seven inmates were at the EOP LOC, one of whom was housed in the RC. The total 3CMS population was 1,117 with 932 3CMS inmates in mainline housing and 163 housed in the RC.  Two inmates were housed in the MHCB.  There were 54 inmates housed in the ASU including 22 3CMS inmates.  The institution no longer housed inmates in emergency beds such as converted gyms or dayrooms.

<u>Staffing</u>:

Mental health staffing at CCWF improved significantly since the preceding monitoring visit.  The senior psychiatrist and chief psychologist positions were both filled.  Of the 4.5 senior psychologist positions allocated, 2.5 were filled, resulting in a 44-percent vacancy rate. Coverage by a portion of a dual appointment reduced the functional vacancy rate to 39 percent. The one supervising social work position was filled, as were the two supervising RN II positions.

All 8.5 line psychiatry positions, all 28.74 psychologist positions, and all eight social work positions were filled.  Seven of nine RN positions were filled, resulting in a 22-percent vacancy rate.  The senior psych tech position and all eight of the allocated psych tech positions were also filled.   The vacancy rate for RTs was three percent.

All support staff positions were filled at the time of the visit including one HSP I positions, one medical secretary position, 9.5 OTs, and one office assistant, although three persons in these positions were on extended leave during the reporting period.

Quality Management:

Overall, quality assurance activities were active and had improved at CCWF since the preceding monitoring period.  The facility created a Quality Management Analytical Unit which appeared to review relevant areas on a weekly basis, although documentation regarding these audits was not presented. In contrast to previous monitoring periods, staff was made aware of the results of quality management audits.  The chief of mental health met with senior staff members who then presented information from quality management efforts to line staff.  This process was confirmed by staff.

Documentation indicated that the local governing body met a total of three times between September 29, 2009 and December 23, 2009.

The QMC met 11 times between August 13, 2009 and January 28, 2010.  Minutes were taken at each meeting.

The mental health subcommittee met regularly during the reporting period and kept minutes.  Overall, attendance was adequate.  Areas of focus included treatment in 3CMS, EOP, RC, and administrative segregation, as well as medication management, heat plan, RVRs, pre-release planning, MHCB, suicide prevention, and nursing issues.  The mental health subcommittee did not charter any QITs during the reporting period, but the chief of mental health explained that multiple QITs had been chartered just prior to the reporting period.

Peer review was increasingly active and broken out by discipline at CCWF during the reporting period.  It remained a work in progress.  While most of the peer review activities were quantitative, the review instruments showed that the facility was beginning to examine qualitative issues during peer review activities.

364

Suicide Prevention:

There was one completed suicide at CCWF during the reporting period.

SPRFIT met monthly during the reporting period, with all required members regularly present and minutes of the meetings maintained.  Attendees included the   coordinator, chief psychologist/chief of mental health, DMH coordinator, senior psychiatrist, senior psychologist, supervising clinical social worker, associate warden for health care, facility captains, and the health care captain.  Meetings focused on suicide prevention efforts, discussion of suicide attempts and other self-injury, MHCB admissions, mental health referrals for self-injurious behaviors, and medication noncompliance.  Audits of compliance with suicide prevention measures in administrative segregation as well as post-MHCB five-day clinical follow-up and custody checks were also reviewed. Audits indicated that security checks occurred as required 100 percent of the time, but five-day clinical follow-up occurred in only 81 percent of cases.

The ERRC was charged with conducting death reviews as well as the other functions.  There was no separate death review committee.  All custody staff was reportedly up-to-date with CPR training.  A check of the cut-down tools and micro-shields indicated their presence on the unit.

Generally, CCWF implemented CDCR's plan to address suicide trends in administrative segregation.  However, there were potential difficulties in proper execution of the some of the elements of the plan that were observed during the site visit.  Custody reported that morning meetings between mental health and custody occurred regularly each weekday morning but were not documented.  The third shift custody personnel met daily with the psych tech. Documentation of custody wellness checks every 30 minutes was present, although some

difficulties were found. A review of the logs posted on the day of the visit indicated that rounds were not staggered all of the time. The start and stop times of some of the entries indicated that rounds of both the top and lower tiers were completed in less than one minute. Additionally, more than 30 minutes had elapsed between the last entry on the log and the end of the monitor's visit to the unit, indicating an issue in timely completion of these rounds.

Cells had electrical outlets and inmates were allowed one electrical appliance following ICC approval.

A schedule provided administrative segregation inmates ten hours of weekly of yard time. It was reported that in the hot weather more than half of inmates refused outdoor recreation, and that on rare occasions the facility had insufficient exercise space. Conversely, it was also reported that there were small, individual exercise yards at the institution that were dormant due to lack of need.

Medication Management:

Documentation provided by the institution addressed the various medication-related policy and practice issues in narrative form only, without audits to demonstrate performance levels. The only exceptions were audits related to DOT, pill lines, bridge orders, and baseline laboratory blood level studies. These audits continued as part of nursing practice and/or psychiatric peer review.

The institution reported that medications for newly-arriving inmates were automatically continued with a medical order for 30 days. Inmates on psychotropic medications were evaluated by the psychiatrist within 14 days of arrival. This practice was corroborated by UHR review and reports by mental health line staff.

366

Medication continuity following intra-institutional housing moves was addressed by a daily report of all transfers of inmates on psychotropic medications and assigned to a psych tech for review. The psych tech contacted the receiving yard to ensure that medications accompanied the inmate. If this did not occur, the psych tech contacted the sending yard and coordinated the transfer of the medications. The assignment of PCs to serve as liaisons for all mental health concerns for a given yard also aided in identifying potential lapses of medications in these circumstances.

The institution reported that medication noncompliance policies were followed but documentation contained no audit information substantiating the information. Psychotropic medication orders were routinely processed on the same day the order was written. The UHRs were reviewed by psych techs to determine if consent forms were present, if non-formulary requests were completed, and to inform the prescriber of any missing information in order to complete everything on the same day. Orders were faxed to the pharmacy and routine medications were available the next day.

Pill call line duration was monitored twice weekly by a psych tech. Audit results indicated that most wait times were less than 20 minutes.

The institution reported that informed consents for psychotropic medication were completed when new medications were initiated and when they were renewed annually thereafter. For inmates receiving heat risk medications, an additional heat risk medication consent form was also completed annually. Original forms were filed in the UHR with a copy provided to the inmate. The presence and timeliness of informed consent was audited in the psychiatry peer review process.

Adherence to CDCR protocols regarding laboratory studies of inmate blood levels of psychotropic medications was also audited as part of the psychiatry peer review process. Medication blood level monitoring and metabolic testing audits demonstrated 72-percent compliance for atypical antipsychotic medications; 86-percent compliance for laboratory studies for lithium prescriptions; 92-percent compliance for valproic acid, and 94-percent compliance for carbamazepine prescriptions. Although the sample sizes were small, records were chosen specifically for the particular medication and protocol being audited. Deficiencies were immediately addressed with the prescriber so that corrective action could be taken. Because this process was in its infancy, no conclusions could be drawn regarding the adequacy of compliance with recommended protocols.

CCWF's policy required that all psychotropic medications be administered DOT. Twice weekly, the psych tech assigned to conduct nursing audits went to randomly selected yards at different pill call times to monitor the DOT protocol. All audit results during the reporting period indicated compliance with DOT medication administration.

CCWF utilized the Keyhea process when clinically necessary. There was a Keyhea coordination team responsible for tracking and monitoring inmates on Keyhea orders. CCWF maintained a mental health database of all inmates on these orders. Four inmates were on Keyhea orders at the time of the monitor's visit. All renewals during the reporting period were successful. One renewal order was not sought based upon clinical rationale.

The vast majority of medications ordered for HS administration were medical medications, approximately 1000 per month. Psychotropic medications numbered approximately 300. The actual time of administration was not audited but inmates reported that medications were administered after 8:00 p.m.

Paroling inmates were given a 30-day supply of medication at the times of their release.  The pharmacist received "due to parole" lists daily and reviewed them to ensure that proper release medications were ordered and filled to be supplied to R&R.

Sexual Misconduct:

During the reporting period, four RVRs related to sexual misconduct were issued to 3CMS inmates.  No inmates were diagnosed with Exhibitionism or Paraphilia NOS during the reporting period.

Transfers:

The institution reported that the only DMH care available for female inmates was intermediate care; consequently no referrals were made to acute care.  However, CCWF staff reported that all female inmates transferred to DMH were placed on an admissions unit at PSH that may be considered analogous to an acute care unit.

During the audit period, 39 inmates were referred to DMH, included 14 MHARP referrals.  Of the 25 non-MHARP referrals, two were rescinded by CCWF and five were rejected by DMH.  Eleven transferred within 72 hours of bed assignment and six waited longer for transfer.  During the same time period, six inmates were returned from DMH.

The institution maintained a DMH referral log which did not contain all of the relevant information, making it impossible to calculate the timeframes from referral to acceptance or acceptance to bed assignment.  Staff reported that the referral packages were completed and sent to DMH within five working days of the decision to utilize a higher LOC, but supporting documentation was not always present.  Reasons for DMH rejection were no always recorded.

Mental health staff reported receiving advance notice via telephone or e-mail about pending returns from DMH. This reflected CDCR's process of sending all women from PSH to CIW prior to returning them to CCWF.

The clinic at CCWF was licensed as a Skilled Nursing Facility (SNF) rather than a CTC, which does not permit mental health beds to be licensed as MHCBs and also does not permit the use of seclusion or hard restraints. As a result of this distinction, CCWF referred to the mental health beds in the SNF as MHP beds, even though it adhered to Program Guide requirements for MHCBs. The institution had 12 MHP beds but use of all of them would require double-celling in several of the rooms. Suicide-resistant mattresses were used as beds and placed directly on the floor of the rooms. Given the acuity level of referred inmates, all were generally single-celled, which effectively limited capacity to eight beds. One room was modified to serve as a safety cell. No mental health beds were utilized for long-term medical inmates.

The average daily census in the MHPB ranged from two to five inmates. For the reporting period, 92 inmates were referred to MHPBs and 71 were admitted. Twenty-seven of the inmates stayed over than ten days, with an average length of stay at 13.44 days, although this figure was skewed by outliers. Reasons for extended stays included pending Keyhea proceedings, waits for a DMH admission decision and/or bed assignment, and clinical judgment to continue treatment interventions beyond the ten days in MHPB. There were no administrative delays for discharged inmates leaving a MHPB.

The 16 administrative segregation EOP inmates were transferred to VSPW. All except three transferred within 30 days; two transferred in 31 days and one took 39 days. The

average number of days to transfer was 21.4 days. PSU EOP inmates were confined to administrative segregation.

Other Issues:

### Reception Center

RC EOP inmates were housed in the mainline EOP housing unit and were offered the same number of hours and scope of programming as mainline EOP inmates. There were four RC EOP inmates at the time of the monitor's visit.

### Administrative Segregation

The ASU was located on the A yard which shared a building with the EOP program. The administrative segregation overflow unit, when activated, was housed within the EOP unit. Staffing consisted of one half-time psychiatrist, one psychologist, and one social worker. The facility reported CM caseloads of 12 inmates per clinician.

A range of 63 percent to 90 percent of case management contacts occurred in a private setting. One room, referred to as the "palm room," had a therapeutic module, but most case management contacts occurred in holding cells partitioned by screens. Staff asserted that the general din of the setting provided auditory privacy in addition to the visual privacy provided by the screens. Psychiatry was making a sustained effort to increase administrative segregation inmate attendance at IDTT meetings and reduce cell-front contacts. The chief psychiatrist instituted a policy prohibiting the administrative segregation psychiatrist from renewing medications or conducting clinician interviews at cell front, which reduced refusals and increased face-to-face assessments. By January 2010, all inmates were coming out of their cells to see the psychiatrist.

Compliance with weekly PC contacts was reportedly 100 percent, which was supported by chart reviews.  However, CCWF did not have the capacity to produce MHTS.net reports regarding compliance with weekly contacts for administrative segregation 3CMS inmates.  Instead, the facility used weekly printouts from MHTS.net of those eligible for these contacts and logged separately whether weekly contacts occurred.

CCWF did not provide group therapy for administrative segregation MHSDS inmates.

There was documentation of daily psych tech rounds for the main and overflow ASUs but there was concern regarding how rounds were conducted.

The monitor's expert attended administrative segregation IDTT meetings.  UHRs were available for all cases reviewed. At the time of the monitor's visit, CCWF was in the process of scanning all C-files into the SOMS system to enable computer access to files, which made C-files unavailable for any of the observed IDTT meetings and made the lack of custody information problematic in cases with custody issues.  All IDDT meetings were attended by a full complement of staff and the inmate.  The chief psychiatrist went to the cell of any inmate who chose not to attend an IDTT meeting to discuss her reasons.  IDTT meetings were conducted professionally and demonstrated a good working knowledge of the case.  Staff reported that the treating psychiatrist or PC attended the ICC hearing and provided relevant information.  Form 7388, the DMH referral checklist, was utilized but appeared to have been completed prior to the IDTT meeting.  The factors for consideration for referral were not discussed, and relevant custody information was not available.

Cell doors of new admissions were designated with yellow placards during the inmate's first 21 days of placement.  The facility regularly utilized more than four intake cells.

Inmates in intake status were housed on both upper and lower tiers with some located near the officers' station with a good line of sight.  However, other new admission cells were located on the other side of the housing unit and on the second tier, making it difficult for custody to observe the inmates.  The cells used for new admissions were not suicide-resistant, and the windows of many cells were partially or completely covered by cardboard.

Custody identified one cell as a management cell for inmates demonstrating behavioral issues.  It was stripped of shelves and bunks.  Other cells with double windows which enhanced visibility were identified by custody staff as being ADA cells.

Administrative segregation rounds conducted by the psych tech were observed.  The psych tech exhibited a good rapport with the inmates and generally limited his interactions to caseload inmates.

MHCB

Mental health staff followed Program Guide requirements for MHCBs in the operation of the MHP beds.  One concern was the lack of confidential program space for administrative segregation inmates admitted to the mental health beds.  There were no program modules in the unit, so interactions with mental health staff were conducted either at the cell front.  Inmates were also given the option of using the locked shower with staff standing outside and dressed in a security vest and clear face shield.

OHU

No OHUs or holding cells or tanks were used for inmates awaiting crisis bed admission.

EOP

Mainline and RC EOP inmates were housed together in a single pod on A Yard. IDTT meetings occurred quarterly or more often, as clinically indicated. All required disciplines attended the quarterly IDTT meeting. The institution created an opportunity for clinical members of treatment teams to meet in advance of the IDTT meeting to report on cases scheduled for review. Inmates experiencing problems but not scheduled for review were also discussed so that an intervention may be made or an IDTT meeting scheduled. The availability of the UHR for IDTT meetings improved, with an LVN assigned to retrieve records on the day of the meeting and return them afterwards, although UHRs were not utilized at an observed IDTT meeting. CDCR forms were not in the files but were circulated for signatures.

The institution was compliant with weekly PC contacts. Psychiatric contacts occurred monthly and more often if clinically indicated.

EOP inmates were offered more than ten hours of out-of-cell therapeutic activity weekly. On average, each EOP inmate attended approximately nine hours per week. EOP group programming included offerings by CCMs, psych techs, and RTs. The monitor's expert attended an EOP group conducted by a social worker for inmates with impending release dates. Inmate attendance was tracked and individual contacts were made more frequently if group attendance was low or deviated from prior months.

Job opportunities for EOP inmates were limited to a single job as housing unit porter, and generally EOP inmates were not eligible for job assignments until their LOC was reduced to 3CMS.

374

<u>3CMS</u>

Mainline 3CMS inmates were housed in Facilities B, C, and D.  Institutional data indicated that mental health services were provided to this population by five psychiatrists, 14 psychologists, five social workers, and two RTs.

Treatment teams were initiated in March and April of 2009.  The facility reported that initial assessments were completed within Program Guide requirements in 96 percent of the cases, and that the psychiatrist was present for all 3CMS IDDT meetings.  The facility continued to experience difficulty with the presence of UHRs at these meetings.  The monitor's expert attended 3CMS IDTT meetings which were adequately conducted.  Appropriate staff attended and UHRs were available.  Much of the pertinent clinician discussion occurred at "pre-meetings" and most of the paperwork, including Form 7388, the DMH referral criteria form, was filled out in advance which limited the relevance of the actual IDTT meeting.

Chart reviews and observations of IDTT meetings supported the assertion that more inmates were being seen as clinically indicated rather than every 90 days regardless of clinical need.  Only one mainline 3CMS inmate, who had been in the facility for 30 consecutive days, reportedly did not have a PC contact within the proceeding three months.

Group treatment was active in the mainline 3CMS program at CCWF.  The facility reported approximately 35 to 40 clinical groups, ten to 15 recreation groups and 25 wellness groups.  3CMS inmates were considered for group treatment at the IDTT meetings observed during the site visit.  At the time of the last site visit, over 300 inmates were on the wait list for groups.  However, data provided by the institution indicated that by the end of the reporting period, the wait list for group treatment for 3CMS inmates had been reduced to 150, with an average wait of 76.6 days for initiation of group therapy.  Monthly management reports

revealed that as of January 19, 2010, there were 538 pending group referrals for the 3CMS and GP inmates, indicating the strong desire for group treatment. Surveys conducted by the facility showed that inmates participating in group treatment perceived gains in their mental health relative to the period prior to participation in group programs. The monitor's expert observed a small but well-run pre-release group for 3CMS inmates. The facility reported that there were dedicated clinicians who assisted with pre-release services. Mental health staff reported good working relationships with the two TCMP workers who assisted with SSI and other benefits applications.

Data indicated that between 70 percent and 81 percent of the 3CMS population was prescribed psychotropic medications. Data also indicated that between 86 percent and 90 percent of psychiatric appointments were completed as scheduled.

Referrals

Yard clinicians maintained a log containing the date and time of referral receipt, date and time or referral response, and disposition. Essentially all referrals were seen on the same day during the week and on the next business day in the case of routine referrals received on holidays or weekends. Follow-up appointments were scheduled as necessary.

The institution piloted a project in which specific mental health clinicians were assigned to specific yards and given the responsibility of being a "first responder" to all mental health referrals from inmates as well as staff. The pilot succeeded in reducing response timeframes, and the clinician yard liaison concept was adopted throughout the institution. In addition, staff coverage hours were extended from 4:00 p.m. to 7:00 p.m.

Medical Records/MHTS

It was difficult to assess the status of MHTS at the institution.  Data was being entered, but the validity of institution-level *ad hoc* reports was not tested or confirmed.  The mental health staff maintained a number of logs and spreadsheets outside of MHTS, such as five-day follow-up logs, referral response tracking, Keyhea, and MHCB admissions/readmissions, which were utilized to provide analytics for the management report and site visit.

Heat Plan

A monthly heat plan summary report was sent to CDCR HQ that detailed housing units in which inside temperatures reached 90 degrees, medical rounds performed in housing units reaching 95 degrees, inmates determined to be suffering from heat-related illnesses, a statement that inside and outdoor temperature logs were maintained in the compliance coordinator's office at the institution, and a statement that a weekly list of inmates receiving heat-risk medications was distributed to all division heads.

There was one instance of a housing unit indoor temperature reaching 90 degrees. The heat plan was in effect at the time of the monitoring visit.  Individual inmate UHRs contained copies of informed consent documents detailing information about heat sensitivity and psychotropic medications.   EOP inmates verbalized understanding of the need to limit their outdoor time when temperatures exceeded 90 degrees and the need to remain well hydrated and cool indoors.

RVRs

The institution reported that 88 EOP inmates received RVRs during the reporting period and that all were referred for and received mental health evaluations.  Additional data

indicated that 779 3CMS inmates received RVRs during the reporting period and that 49 or 6.2 percent were referred for mental health evaluations.

While it appeared that mental health concerns were considered to some degree during the RVR process, the documentation of assessments, recommendations, and custody responses required improvement.  It was not clear from the data if the MH-4s were taken into consideration on findings of guilt, innocence, or mitigation of penalty.  However, interviews with mental health staff and custody staff responsible for conducting hearings indicated that both occurred in some instances.  Although data which suggested mitigation was captured, it was not entirely clear that mitigation had actually occurred.  Review of the RVR packets indicated some instances in which mitigation related to mental health concerns occurred, but in others it did not occur and no justification was given.

**Valley State Prison for Women (VSPW)**
June 1, 2010 - June 3, 2010

Census:

As of May 28, 2010, there were 3,483 inmates housed at VSPW.  The MHSDS population included 11 inmates in the OHU, 28 EOP inmates, and 1,169 3CMS inmates.  There were 11 EOP inmates in the RC, two in the GP, none in administrative segregation, and nine inmates in the SHU.  There were 171 3CMS inmates in the RC, 903 housed in GP, 35 in administrative segregation, and 32 in the SHU.

Staffing:

The vacancy rate for mental health staffing decreased from 22.77 to 14.4 percent since the preceding monitoring period.  VSPW had a permanent chief of mental health.  The chief psychologist and four senior psychologist supervisor positions were filled, but the .2 supervising social worker positions remained vacant.  VSPW's request for a psychiatric

378

supervisor was on hold.

All 6.5 psychiatry positions were filled.  Of 27.7 clinical psychologist positions, 23.5 were filled.  Contract psychologists were not utilized.  Eight tenths of the 5.3 social worker positions were vacant.  The senior psych tech position was filled, as were thirteen of 14.66 line psych tech positions.  Of 3.75 RT positions, .75 was vacant.  Three of 3.44 RN positions were filled, as was the HPS I position.  Of 8.5 OT positions, 7.5 were filled.

Quality Management:

The local governing body met once.

The QMC met five times between October 2009 and April 2010, and had consistent mental health representation.  The QMC's medication management subcommittee addressed access to care, psychotropic medication, and other issues.  QITs were chartered to address medication noncompliance and administrative segregation mental health treatment.

VSPW was revamping its peer review process, which included active qualitative and quantitative social worker and psychologist peer review.  Psychiatry peer review did not occur.

Suicide Prevention:

The SPRFIT met four times but did not appear to have quorums.

Five-day follow-up after discharge from MHCBs, safety cells, and OHU observation cells was 73, 84, and 84 percent, respectively.  Follow-up lapses primarily occurred on weekends.

With respect to CDCR's plan to address suicide trends in administrative segregation, morning meetings between mental health staff and the ASU sergeant reportedly occurred.  Although audits indicated 85-percent compliance for pre-placement screens, there

were no audits of whether or not mental health screenings were completed within 72 hours of administrative segregation placement. Inmate 30-minute welfare checks were staggered and well documented. Two cells were modified for intake but they were rarely used solely for that purpose. Clear cell-front signs indicated intake status. Inmates were allowed televisions but not radios in their cells. Some inmates were permitted to cover doors and windows, limiting inside cell observation, which was problematic. Cut-down tools and personal micro-shields were present.

Medication Management:

VSPW audits indicated 78-percent compliance with medication continuity upon arrival at the RC.

Medication continuity audits for inmates transferred to the GP revealed 96-percent compliance. Audits for housing transfers, including moves to and from administrative segregation and the OHU safety cell, indicated 97-percent compliance with medication continuity.

An audit of medication renewals indicated that 90 percent were completed without lapses.

Audits suggested that approximately 50 percent of inmate medication refusals, and otherwise medically noncompliant inmates, were timely seen within seven days.

Although a VSPW audit revealed average pill line wait times of approximately one minute, the audit methodology was flawed. Staff and inmates reported pill line waits of between at least 30 and 45 minutes, with pill lines occasionally interfering with HS medication administration. Staff and inmates also reported medications missing at pill lines, which they attributed to difficulties with pharmacy processing and nursing medication administration.

The monitor's expert found no evidence of poor psychiatric prescribing practices, such as the withholding of psychotropic medications or their punitive use for behavioral control, as were noted during past site visits.

VSPW audits indicated full compliance with timely informed consents.

Institutional audits of laboratory studies for mood stabilizing medications and Abilify indicated that laboratory blood level studies were obtained timely, with follow-up occurring as clinically required.

Although all psychotropic medications were administered DOT, no audits were performed to determine whether DOT was appropriately performed when ordered.

There were four Keyhea cases between October 2009 and March 2010.

There were 351 inmates who were prescribed medications at HS.

VSPW did not track parole medication compliance.

Sexual Misconduct:

VSPW reported two sexual misconduct RVRs, as compared to eight during the preceding monitoring period. While neither case resulted in a screening or IDTT review, both were referred for comprehensive evaluations, and one was subsequently referred to the DA. Both comprehensive evaluations appeared minimally adequate. Neither resulted in a diagnosis of Exhibitionism or Paraphilia NOS or indicated significant concern with the inmates' mental health status.

VSPW used exposure-control jumpsuits for cases of IEX.

Transfers:

As compared to the preceding monitoring period, VSPW conducted more reviews of inmates with multiple MHCB or OHU admissions for higher levels of care.

VSPW reported access to PSH for intermediate care but not for acute care. Log reviews revealed that ten inmates were referred to PSH and seven transferred. One DMH rejection was upheld by CCAT. CCAT also rescinded a referral. Another inmate paroled prior to transfer. It was also reported that mental health staff often considered enhancement of 3CMS services before initiating a DMH referral.

Review of medical records and other documentation, and staff interviews, indicated that VSPW used Form 7388, the DMH referral checklist. However, the monitor's expert observed, and OHU staff reported, that they completed Form 7388 only during IDTT meetings which occurred on admission and close to discharge, although transfer to DMH would be discussed at any time if it appeared that it was needed.

It was reported that the combination of the DMH coordinator's responsibilities with OHU responsibilities led to difficulties with completion of duties related to DMH referrals. There were reported problems with the receipt of necessary custody documents and clinician chronos. DMH discharge summaries reportedly did not always accompany inmates upon their return from DMH. Documentation indicated that no inmates referred to DMH were transferred within 30 days. Of seven inmates who transferred to DMH, the average time from referral to transfer was 94.1 days. Of five DMH transfers with known acceptance dates, the average time from acceptance to transfer was 28.6 days. A document review of inmates who were not referred to DMH but who met one or more of the referral criteria indicated varied and sometimes insufficient rationales for non-referral.

VSPW reported a total of 191 safety cell admissions. Twelve of these inmates were subsequently transferred to a higher LOC, and 99 were transferred for observation. Of 80 inmates discharged from safety cells, 76 were placed on post-release watch, and two

subsequently returned to safety cells.

VSPW reported a total of 13 EOP transfers, with 12 completed within required timelines. As VSPW lacked an EOP program and an MHCB unit, inmates requiring such care were transferred to CCWF. VSPW transferred 21 inmates to the CCWF MHCB unit. Twelve returned to VSPW following treatment, while five of the remaining nine were retained for higher levels of care. Eleven of the 12 who returned were placed on suicide watch upon their return to VSPW. However, VSPW was noncompliant with post-release five-day follow-up, which was attributed to poor communication and weekend staffing issues.

Other Issues:

Reception Center

Although VSPW reported that 88 percent of the 1,547 RC inmates were seen within 24 hours of transfer, VSPW did not separately track 3CMS inmate transfer times. However, limited staff audits revealed that mental health evaluations were completed timely 95 percent of the time.

RC IDTT meetings were conducted only for initial EOP placements and for inmates removed from the MHSDS caseload. There were IDTT meetings for 83 initial EOP placements and for 93 inmates removed from MHSDS.

Staff at VSPW reported that pre-release planning for RC EOP inmates was integrated with pre-release clinical care as well as well as done separately. The institution also reported that "clinical pre-release planning" was occurring.[22] Staff reported that groups geared toward pre-release planning were offered, utilizing techniques to assist paroling inmates in overcoming some of the psychological barriers to re-entry.

---

[22] *See* Institutional Management Report, Addendum E.

Administrative Segregation

VSPW acknowledged problems with CC I attendance at administrative segregation IDTT meetings.  An audit indicated that C-files were generally not present at IDTT meetings in mainline, but were present in administrative segregation IDTT meetings.

Adequate space remained problematic in administrative segregation.  Individual clinical contact space was also inadequate and afforded minimal sound confidentiality. Clinicians also used dayroom floor holding cells that afforded no sight or sound confidentiality. Although PC contacts exceeded 90 percent, the frequency of cell-front contacts was problematic, with approximately 59 percent of EOP contacts and 40 percent of 3CMS occurring cell front. The administrative segregation overflow unit was reportedly not utilized.

VSPW administrative segregation provided weekly group therapy.  Group therapy space consisted of a small room containing five therapeutic modules which did not comply with specifications, making interaction difficult.  Audits indicated that these group therapy offerings averaged 13 hours, with an average of 11 hours actually received.  The monitor's expert attended a well-run group therapy session that included EOP SHU inmates.  EOP inmates who did not attend the majority of their groups were seen daily at cell front by PCs.

Although it was reported that inmates received ten hours of yard per week, this information could not be verified.  It was reported that clinicians attended ICC meetings.  Daily psych tech rounds were documented.

As of May 2010, five EOP inmates remained in administrative segregation longer than ninety days.  Three of these inmates were awaiting a PSU bed, one remained due to court proceedings, and the third was awaiting DA action.  No documentation that was provided indicated whether additional action was taken to address the prolonged stays.

384

OHU

The OHU consisted of 20 rooms and three safety cells.  It was reported that one room was primarily used as a safety overflow cell, and five rooms were utilized for mental health observation.

There was progress with reducing lengths of stay for inmates in observation and safety cells.  VSPW length of stay audits for OHU and safety cell inmates indicated that 11 inmates, some with multiple admissions, had lengths of stay exceeding 72 hours.  Cell conditions remained restrictive, with no bed, toilet, or access to running water.  Staff reported that OHU inmates or those in holding cells were not as restricted as those in administrative segregation. The monitor's expert attended OHU IDTT meetings, which were well-run and individualized, with medical records and C-files present.  Staff demonstrated good clinical decision-making and rapport with inmates, and afforded inmates adequate participation time.

3CMS

Review of medical records indicated that 3CMS inmates were generally seen within Program Guide clinical requirements.  Adequacy of space was problematic.  The visiting area, which mental health staff and inmates described as noisy and lacking visual and auditory confidentiality, was used for most clinical and recreational activities.  IDTT meetings were well attended, with 95 percent of audited meetings satisfying attendance requirements.

Groups

VSPW had 22 active groups, a significant drop from the 48 during the preceding monitoring period.  The groups covered a diverse range of topics.  VSPW reported a total of 9,067 group inmate contacts, including 6,055 for therapy groups and 3,012 for recreational groups.  Of these contacts, 1,881 were for EOP inmates, 6,932 were for 3CMS inmates, and 254

were for GP inmates.

<u>Referrals</u>

Referrals were requested by 1,786 inmates.  Of these, 1,376 were seen within seven days of receipt of the mental health request.  Of 239 staff referrals, 195 were seen within seven calendar days.  Ninety nine percent of the 614 crisis/urgent referrals that were received were seen within 24 hours.

<u>Space</u>

Space issues were significant.  At least ten mental health clinicians did not have an office, desk, computer, or phone.  Other clinicians shared offices.  Inmates were seen in facility visiting areas, which meant that mental health appointments were often cancelled due to other scheduled events.  It was reported that the lack of space caused morale issues.  Clinicians expressed concern with providing services in non-confidential settings.

VSPW implemented several interventions to address its space concerns, including the identification of facility space that could be converted to mental health offices and group space.  A temporary solution was to use the gymnasium and some education areas for mental health purposes.  A request to convert storage space was submitted to HQ.

<u>Heat Plan</u>

VSPW reported no conditions requiring initiation of the heat plan.

<u>RVRs</u>

Three RVRs were issued for medication cheeking, but no RVRs were issued for self-injurious behavior.  VSPW reported that RVRs were audited quarterly.  Of 482 RVRs, six were for EOP inmates and 177 were for 3CMS inmates.  It was reported that all of the EOP inmates received MH-4s.  Findings in two of the cases indicated that mental illness may have

contributed to the RVR occurrences, and in one of these cases the disposition was mitigated.

## SUMMARY

### I.     Overview of the Monitoring Focus Areas

#### A.     Staffing:

The continual decline in mental health staffing vacancies during the past few monitoring periods began to level off during the twenty second monitoring period.  As of July 31, 2010, the total number of established mental health positions for chief, senior, and line psychiatrists; chief, senior and line psychologists; clinical social workers; psych techs; and RTs was 2,238.7.[23]  Of these positions, 1,876.5 were filled by full-time employees.  The collective vacancy rate for all of these positions was 16.2 percent, as compared to the vacancy rate of 19 percent during the preceding monitoring period.  The use of contractors reduced the functional vacancy rate of all mental health disciplines to 10.9 percent, which was a slight improvement over the twenty-first monitoring period's mental health functional vacancy rate of 11 percent.

For the 195.7 chief and senior psychiatrist and psychologist positions, the vacancy rate was 11.2 percent, representing a decline from the 14 percent vacancy rate reported in the preceding monitoring period.  No contractors were used to cover any of these vacancies.

Among the 2,043 line mental health staff positions, there were 339 unfilled positions, yielding a vacancy rate of 17 percent.  Use of contractors reduced the functional vacancy rate among all line mental health positions to 11 percent which remained unchanged from the preceding monitoring period.

---

[23] Source of staffing data reported in this section: *CDCR Secured FTP Website for Monthly Reports*, posted on August 31, 2010, covering the month of July 2010.

The vacancy rate for the 18 allocated chief psychiatrist positions dropped from 16 percent to 11 percent since the preceding monitoring period.  Only CMF and CSP/LAC were operating without chief psychiatrists.

The vacancy rate for senior psychiatry positions saw a marked improvement from the preceding monitoring period, with a decline to 14 percent from the previously reported 38 percent.  The three institutions that each had one vacant senior psychiatry position were CMF, CSP/Corcoran, and PBSP, none of which used contractors to cover these vacancies.  All other institutions with senior psychiatry allocated positions had no vacancies.

All chief psychologist positions remained filled for a second consecutive monitoring period.

The vacancy rate for senior psychologists remained unchanged from the preceding monitoring period, at 13 percent.  Twenty-one institutions filled all of their posts for senior psychologists.  CCI, CMC, and RJD had vacancy rates ranging from three percent to 14 percent, while CMF, CSATF, CCWF, PVSP, SQ, and WSP had vacancy rates ranging from 30 percent to 44 percent.  CSP/LAC and SCC had the highest vacancy rates, at 50 percent for CSP/LAC, and 100 percent for SCC which only had one allocated position.  No contractors were used to cover senior psychologist vacancies at any institutions.

Filling line psychiatry positions remained problematic for CDCR.  Since the preceding monitoring period, the vacancy rate was reduced less than two percent, from 33 percent to 31.8 percent, but the functional vacancy rate more than doubled from six percent to 13.5 percent.  CRC, CSP/Solano, PVSP, SCC and VSPW filled all of their line psychiatry allocations with full-time psychiatrists, while CIM, CMC, Calipatria, DVI, MCSP, NKSP and RJD had vacancy rates ranging from four percent to 17 percent.  Seventeen institutions had

vacancy rates ranging from 23 percent to 67 percent.  ASP had a vacancy rate of 80 percent while CCC and HDSP each had 100 percent vacancy rates.  Contractors reduced the functional vacancy rates at ASP and HDSP to 16 percent and 25 percent, respectively, but CCC did not utilize a contract psychiatrist to fill its one allocated position.

In line psychology, vacancy rates continued their steady decline with a reduction from 18 percent reported in the preceding monitoring period to a rate of 10.8 percent.   The functional vacancy rate saw a more modest decline, from six percent to 3.4 percent.  Those institutions with vacancy rates of ten percent or lower were CCC, CIM, CIW, CMC, CRC, CSP/Corcoran, CSP/Sac, CSATF, Calipatria, Centinela, CCWF, CTF, DVI, Folsom, HDSP, ISP, MCSP, RJD, SQ, and SCC.  With the use of contractors, another group of institutions, ASP, CCI, NKSP, PVSP, and SVSP, reduced their functional vacancy rates to less than ten percent.  The remainder of institutions had vacancy rates ranging from 11 percent to 32 percent and functional vacancy rates ranging from 11 percent to 27 percent.  CMF had the highest vacancy rate and functional vacancy rate at 32 percent and 27 percent, respectively.

The institutions saw an increase in the both the vacancy rates and functional vacancy rates in social worker positions since the preceding monitoring period.  The vacancy rate rose from 11 percent to 14.3 percent and the functional vacancy rate nearly doubled from six percent to 11.9 percent.  A total of 11 institutions filled all of their social worker positions with full-time employees.  Two institutions had vacancy rates under ten percent.  With the use of contractors, another two institutions fully covered their social worker positions, and one institution reduced its functional vacancy rate to three percent.  Two institutions, ASP and KVSP had vacancy rates of 40 percent.  SVSP reported the highest vacancy rate at 50 percent.  The

remaining institutions that employed social workers had vacancy rates ranging from 11 percent to 30 percent.

Although the vacancy rate for psych tech positions declined slightly from 19 percent to 17.7 percent, the use of contractors to fill vacant positions remained virtually non-existent with only 3.1 FTE psych tech contractors used throughout all institutions. Some improvement was seen with six institutions filling all of their psych tech positions with full-time employees, an increase from the one such institution in the preceding monitoring period. CIM, CSP/Sac, CSP/Solano, CTF, NKSP, and RJD managed to maintain vacancy rates of ten percent or less. Fifteen institutions, ASP, CMC, CSP/Corcoran, Centinela, Folsom, HDSP, ISP, KVSP, PBSP, PVSP, SVSP, SQ, SCC, VSPW, and WSP, kept their vacancy rates at 30 percent or less. The remaining six institutions, CCI, CMF, CRC, CSP/LAC, CSATF, and CVSP had vacancy rates ranging from 31 percent to 41 percent.

The overall vacancy rate for RTs was 20 percent. Of the 25 vacant positions, only 4.8 were filled by contractors, which lowered the functional vacancy rate to 17 percent. CIM, CSP/Sac, Centinela, DVI, HDSP, NKSP, PBSP, and SCC filled all of their RT positions with full-time employees. Among the 20 remaining institutions that employ RTs, five had vacancy rates under ten percent. CRC and Folsom had .5 and .7 allocated RT positions respectively, but neither of these institutions filled or covered these positions. All other institutions had vacancy rates ranging from 13 percent to 62 percent, with the highest functional vacancy rate of 50 percent.

    **B.**    <u>**Quality Management:**</u>

During the monitoring period, the quality management processes at CCI, CIW, Centinela, CSP/Sac, Folsom, and NKSP continued to function reasonably well. As in the

preceding monitoring period, the process at CTF continued to improve but did not achieve compliance. CCWF created a Quality Management Analytical Unit which appeared to review relevant areas on a regular basis. PBSP revised the list of required attendees at the QMC to reflect changes in the organizational structure and allocated positions. HDSP developed an improved process for referrals between telemedicine providers and clinical staff at the prison. CMF tracked all previous CAP items and other quality assurance issues through a performance indicator reporting system.

A number of concerns were noted during the monitor's site visits. CSP/LAC experienced problems with custody staff attendance at mental health subcommittee meetings. At Calipatria, quality management was not fully functioning and UHR reviews continued to be the primary tool for quality management. A review of a sample of the UHR audits revealed problems with methodology and sample size. SVSP failed to complete regular audits in a number of important areas, including psychiatry and PC contacts. KVSP's quality management program was characterized by poor documentation and inadequate auditing practices. ISP did not have a mental health subcommittee or formal peer review process in place, nor did it charter any QITs. At SCC, the mental health subcommittee continued to function primarily as a staff meeting and attendance was problematic.

During the monitoring period, the local governing bodies of CCC, CIW, CSP/Sac, HDSP, and PVSP met monthly. The local governing bodies of CSATF, NKSP, and WSP met quarterly. ASP, CMC, and PBSP reported that their local governing bodies met regularly. At CSP/Corcoran, the local governing body met a total of four times between July and December. CVSP also reported four local governing body meetings but a quorum was present at only one meeting. CCWF held three local governing body meetings, Centinela held two, and RJD and

VSPW each held only one.  CMF's local governing body met bi-monthly.  SCC did not have any local governing body meetings.  CTF did not have a functioning local governing body and CSP/LAC's local governing body was no longer in existence.  CSP/Solano and MCSP did not provide any information about the local governing body.  CRC and SCC held no local governing body meetings.

The QMCs at ASP, CCI, CSP/LAC, PBSP, SCC, SVSP, and VSPW met regularly and CCWF's QMC met bi-weekly.  QMCs at CCC, CMF, CRC, CSP/Sac, CSATF, CTF, DVI, Folsom and HDSP met weekly, while at CIM, CIW, CMC, Centinela, CSP/Corcoran, CVSP, NKSP, PVSP, RJD, SQ, and WSP, they met monthly.  KVSP's QMC met twice a month and CSP/Solano and ISP's QMCs met bi-monthly.  Quality management at Calipatria continued unchanged from the preceding reporting period.  MCSP provided no information about the QMC.

CMF had a well-developed quality management program.  The institution identified necessary improvements and implemented corrective actions.  Additionally, CCI had a comprehensive and interactive quality management program.  At DVI, the CEO who serves as chair of the QMC described the focus of the committee as too limited, which could present challenges in the future.

The mental health subcommittees at CMF, CSP/Sac, DVI, SVSP, and SQ met weekly, while at CMC and CTF they met bi-weekly.  At CCI, CSATF, CCWF, KVSP, MCSP, and SCC the mental health subcommittees met twice per month.  At CCC, CIM, CIW, CRC, Centinela, CSP/Corcoran, CSP/Solano, CVSP, Folsom, HDSP, NKSP,  PVSP, RJD, and WSP they met monthly.  At CSP/LAC, the mental health subcommittee met four times per month.

ASP, PBSP, and VSPW reported regular meetings. ISP did not have a mental health subcommittee.

Mental health subcommittee minutes kept by CCI, CIW, CRC, Centinela, CSP/Sac, CCWF, HDSP, MCSP, NKSP, PBSP, PVSP, SVSP, and SQ documented regular attendance by required attendees. Meeting attendance was problematic at CSP/LAC, CSP/Solano DVI, SCC, and WSP. Custody staff at DVI routinely did not attend mental health subcommittee meetings. At CSP/LAC, there were problems with custody staff often arriving at the meetings late and/or leaving early. Minutes kept by ASP, CIW, CSP/Corcoran, CVSP, PVSP, SVSP, and SQ indicated that pertinent topics were discussed. The mental health subcommittees at CMC and KVSP routinely reported back to the QMC.

Throughout the monitoring period, several institutions chartered and used QITs appropriately and effectively. QITs were active at ASP, CCI, CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, CSATF, DVI, Folsom, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SVSP, SQ, VSPW, and WSP. SQ had nine active QITs focusing on seven areas, including, but not limited to, referrals, discharge planning, mental health space, and high-risk inmates. QITs at CIW, CSP/LAC, HDSP, NKSP, and VSPW focused on medication management. CSP/Solano had several QITs in place to address deficiencies with workspace, communications, MCHB overflow, suicide prevention, MHTS, and group therapy.

At MCSP, QITs focused on unresolved CAPs and peer review programs. A QIT at HDSP was formed in response to a CAP related to a completed suicide. Folsom chartered 12 QITs. Issues included IEX mental health evaluations, treatment plans, referral timeliness, psych tech rounds, and SRACs. SCC chartered one QIT, but none to identify or

resolve new or current issues.  At CTF, a review of QITs conducted indicated some confusion with the QIT process.

There were no QITs chartered or active at CCC, CIM, CRC, Centinela, Calipatria, CCWF, CVSP, and ISP.  Centinela used an "action item" method to identify and address areas of needed improvement.  CCWF reported having a proactive stance in identifying and addressing issues as they arose.

Audits occurred regularly at CCI, CMF, Centinela, CSATF, MCSP, NKSP, and SQ.  SQ conducted audits in 24 areas, while follow-up audits were conducted to determine if recommended actions had improved any identified problems.  At RJD, audits showed that the subcommittee examined multiple critical issues related to providing adequate mental health care.  ASP utilized audits that examined both qualitative and quantitative measures.  In mental health subcommittee meetings, CRC discussed audit results with an emphasis on noncompliance.  CCWF created a Quality Management Analytical Unit to review relevant areas weekly, but documentation of these audits was not provided.  SVSP produced regular audits on open CAP items and various Program Guide standards.  However, SVSP failed to complete regular audits in a number of other important areas.  The absence of data made it impossible to determine compliance in those areas.

CTF had difficulties with the auditing and data collection process.  This led to concerns with the interpretability and utility of the data provided.  At CSP/Solano, there were no audits performed specific to Program Guide requirements except those addressing CAP items.  In addition, at times, results of available audits contradicted information obtained during the site visit.  At HDSP, a single sample of UHRs was typically used to measure compliance with several requirements.  This approach often yielded compliance percentages that were based

on only one to two applicable cases, thereby rendering the audit results unreliable and potentially misleading.  At PVSP, the audit methodologies were found to be flawed.  At KVSP, performance audits were missing or unreliable.  At Calipatria, the audits showed problems with methodology and sample size.  Limited or no information was available on the auditing processes at, CCC, CIW, CMC, CSP/Corcoran, CSP/LAC, CVSP, DVI, Folsom, ISP, PBSP, SCC, VSPW, and WSP.

An active peer review process was in place at CCI, CIW, CMC, CRC, CSP/Corcoran, CSP/Sac, CCWF, CTF, Folsom, HDSP, NKSP, PBSP, PVSP, SVSP, and SQ.  At CIW, peer review for psychiatrists and social workers was quantitative rather than qualitative, while psychologist peer review was both qualitative and quantitative.  At DVI, peer review occurred and had positive elements; however, the process also had flaws that were concerning.  For example, the clinician under review was allowed to select the cases to be reviewed.  Peer review at CSATF was limited to UHR reviews and was undeveloped.  At ASP, psychology peer review occurred regularly but often resembled group discussions rather than a critical review of the clinician's work.

Turnover at WSP limited psychiatrist peer review, nor was there peer review among the other clinical disciplines at the institution.  At RJD, there was one committee to review psychologist and social workers and another for psychiatrists.   Although improved since the last site visit, peer review at CCWF remained a work in progress.  MCSP's recently implemented peer review process covered psychiatry, social work, and psychology, but remained largely focused on quantitative measures of performance.  SCC implemented a peer review process for psychiatrists and PCs.  Although the psychiatric peer reviews met qualitative and quantitative standards, it was unclear whether the PC peer reviews were sufficiently qualitative.

There were no peer review programs in place at CCC, CSP/Solano, Calipatria, CVSP, and ISP. At CVSP, this was due to the limited number of clinicians on staff. At KVSP, peer review programs could not be fully assessed due to lack of information. The institution did not provide any documentation about peer review meetings or activities. At CSP/LAC, peer review was problematic as psychiatry peer review did not meet, while psychologist and social worker peer review had only recently begun to meet. Centinela's peer review process was limited by the small number of clinicians at the facility. VSPW was revamping its peer review process, which included active qualitative and quantitative social worker and psychologist peer review. Psychiatry peer review did not occur at VSPW.

### C.    <u>Suicide Prevention</u>

By the twenty-second monitoring period, all institutions had established an interdisciplinary team, generally in the form of a SPRFIT, for the purpose of taking actions to prevent inmate suicides. CCC and ISP continued to use the nomenclature "suicide prevention committee." The percentage of institutions meeting Program Guide SPRFIT requirements for holding monthly meetings with relevant agenda items and proper attendance remained unchanged. However, a number of institutions that were compliant in these areas during the preceding monitoring period were no longer compliant. The 11 or one third of CDCR institutions that satisfied these requirements included ASP, CCI, CRC, CSP/Sac, CSATF, CCWF, DVI, HDSP, PBSP, PVSP, and SVSP. Six institutions, CIM, CIW, CMC, CSP/Corcoran, CSP/Solano, Folsom, and NKSP, were no longer compliant.

While CIM, CIW, CMF, CMC, CSP/Corcoran, CSP/Solano, Centinela, Calipatria, CTF, KVSP, MCSP, NKSP, SQ, SCC, and VSPW met requirements for holding monthly meetings, addressing substantive suicide-related matters, and maintaining minutes of meetings,

they struggled with achieving appropriate attendance by all disciplines. CCC, ISP, RJD, and WSP were unable to hold regular monthly meetings during the review period.

ASP, CCC, CIW, CMC, CSP/Sac, CSP/Solano, Calipatria, CVSP, CTF, Folsom, ISP, SCC, and WSP had fully functional institutional ERRCs. Minutes of the ERRC meetings at CSP/Solano were inadequate. Findings of the ERRC were not consistently reported to the QMC at Calipatria and CTF.  Quorums were not consistently present at ERRC meetings at CMC and Calipatria.  At WSP, the ERRC did not review emergency responses that resulted in triage and treatment or MHCB placements. The ERRC at CVSP did not review medical emergencies as required.

Slightly under one-third of the institutions reported completing CPR training for nearly all custody staff, as required. These institutions included CIW, Centinela, CSP/Corcoran, CSP/Solano, CCWF, CVSP, MCSP, PVSP, and SCC.  CIM reported that appropriate CPR training was completed, but did not provide supporting documentation. Three institutions, CCC, Calipatria, and ISP, did not provide information regarding custody CPR training.

The following institutions completed mandated monthly emergency response drills in administrative segregation:  CCC, CIM, CIW, CMC, CSP/Corcoran, CSP/Sac, CSP/Solano, CSATF, Centinela, CVSP, CTF, Folsom, ISP, MCSP, SCC, and WSP.  Calipatria, CTF, and KVSP reported conducting monthly emergency drills but did not provide supporting documentation.

Close to half of institutions were compliant with five-day clinical follow-up of inmates discharged from crisis care, which represented a significant improvement over the one third of compliant institutions that were compliant during the preceding monitoring period. These institutions were CCI, CMF, CSP/Sac, CSATF, Centinela, Calipatria, CTF, HDSP, KVSP,

PBSP, SQ, SVSP, and WSP. The following institutions were approaching compliance in this area: CIW, CSP/Corcoran, CCWF, Folsom, MCSP, NKSP, and VSPW. Institutions that struggled with documenting or auditing five-day clinical follow-ups included CVSP, DVI, ISP, RJD, and SCC. CRC did not provide tracking or audit information regarding compliance with post-MHCB five-day follow-ups.

Institutions across the system continued to experience problems meeting or documenting compliance with custody checks following discharges from crisis care. CMF and CCWF were compliant with this Program Guide requirement. CSP/Sac reported compliance in the range of 83 percent to 93 percent. CIW and HDSP did not audit compliance with custody checks after discharges from crisis care. CSP/Solano, Calipatria, CVSP, DVI, and SCC did not consistently document compliance or the results of audited findings related to custody follow-ups. CRC did not provide tracking or audit information regarding compliance with post-MHCB custody checks.

All institutions have implemented at least some of the measures of CDCR's plan to address suicide trends in administrative segregation. However, compliance following implementation varied among institutions. Moreover, close to half of the institutions did not adequately document or audit their implementation of all components of the suicide risk reduction plan in administrative segregation. These institutions included CCC, CSP/LAC, CSP/Sac, CSP/Solano, Calipatria, Centinela, CCWF, CTF, HDSP, ISP, KVSP, MCSP, SVSP, and VSPW.

Nearly two thirds of the institutions utilized retrofitted or designated cells with placards for the newly-arriving inmates in administrative segregation. These institutions included CCI, CIM, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, CTF, Folsom, HDSP, MCSP,

PVSP, SVSP, VSPW, and WSP. CSP/Solano and RJD did not distinguish intake cells of newly-arriving inmates in administrative segregation by signage during their first 21 days. CCC did not report its method of identifying newly-arriving inmates in administrative segregation.

The daily meetings that were required between mental health and custody staff in administrative segregation were documented at ASP, CMC, CSP/Corcoran, CSP/Sac, CSATF, CVSP, CTF, DVI,  Folsom, ISP, and VSPW. CIM did not consistently document occurrence of the daily meetings.  HDSP consistently documented morning meetings during weekdays, but only sporadically on weekends. CSP/Solano, CCWF, and WSP reported that each held daily meetings, but did not present adequate supporting documentation.

Psych tech daily rounds in administrative segregation were compliant at CCC, CCI,  CIM, CIW, CMC,  CSP/Corcoran,  CSP/Sac, Centinela, CSATF, CCWF, CVSP, CTF, KVSP, MCSP, NKSP, PBSP, SQ, SVSP, and VSPW, representing over half of the institutions. ASP, Calipatria, HSDP, and ISP reported compliance but did not provide adequate supporting documentation. RJD was not compliant with meeting psych tech rounding requirements in administrative segregation.

CIM, CIW, CSP/Sac, CVSP, PBSP, PVSP, SCC, and WSP documented that they administered pre-placement screens prior to placements in administrative segregation. ASP, CIM, CSP/Sac's 3CMS ASU, and VSPW provided verification that they were close to compliance or achieved compliance at a point in time during the review period. One half of the institutions reported noncompliance, or did not adequately document pre-placement screening, nor audit compliance with completion of pre-placement screening prior to housing in administrative segregation. These institutions included CCC, CCI, CMC, CSP/Corcoran,

CSP/LAC, CSP/Solano, CSATF, Calipatria, Centinela, CTF, Folsom, HDSP, ISP, KVSP, NKSP, SVSP, and VSPW.

Nearly 70 percent of the institutions continued to complete post-placement 31-question screens of all new admissions into administrative segregation. CCI, CIM, CIW, CMF, CSP/Sac, Folsom, HDSP, PBSP, PVSP, RJD, and SCC adequately documented compliance with this requirement. CMF and SVSP demonstrated that they were nearly compliant with timely completion of these screens in a confidential setting. Due to high refusal rates, MCSP conducted the required post-placement screenings primarily cell-front, while DVI conducted the screenings in the presence of the facility captain, compromising confidentiality in both cases. CSP/LAC, CSATF, CTF, KVSP, NKSP, and VSPW reported compliance but the documentation presented was inadequate to support this finding. CMC, CSP/Corcoran, and CSP/Solano reported noncompliance with the post-placement screening requirement.

Completion of custody 30-minute wellness checks were documented at 24 or 72 percent of all institutions. However, many institutions did not conduct custody wellness checks in a staggered manner or struggled to comply with appropriate documentation, including audits, related to these checks. ASP, CMC, CSP/Corcoran, KVSP, PBSP, PVSP, and SVSP were compliant with conducting custody wellness checks and appropriately documented them. CMF was compliant with wellness checks except for Facility T1. Two thirds of the institutions, including CCC, CCI, CIM, CIW, CSP/LAC, CSP/Sac, CSP/Solano, CSATF, Calipatria, CCWF, CVSP, CTF, DVI, Folsom,  ISP, KVSP, MCSP, NKSP, SVSP, SQ,  SCC, and WSP reported problems with compliance with wellness checks, conducting staggered checks, or adequately auditing these checks.

Consistent access to ten hours or more of yard in administrative segregation was provided at 40 percent of the institutions. These included CMF, CMC, CSP/Sac, Centinela, CCWF, CTF, Folsom, HDSP, MCSP, RJD, SQ, and WSP. Out-of -cell exercise for inmates housed in segregated housing was accessible to some but not all administrative segregation inmates at CSP/Corcoran, KVSP, and SVSP.  PBSB had sufficient yards, but access was problematic as a result of staffing shortfalls. CCI, CIM, CTF, and NKSP did not offer required yard hours to administrative segregation inmates. CCC, CSP/LAC, Calipatria, CVSP, SCC, and VSPW did not provide yard access information for their ASUs.

Most institutions continued to lack the capacity to allow electronic entertainment devices such as televisions and radios in administrative segregation, or elected not to permit them. Such devices were permitted in administrative segregation at CIW, CSP/Corcoran, CSATF, CCWF, CTF, MCSP, and SVSP.  KVSP permitted devices in administration segregation units other than the stand-alone. PVSP permitted devices in ASUs which had the capacity for such use.

In a sample of ten institutions' ASUs, nine of the institutions' officers had micro-shields in their possession and had cut-down kits appropriately accessible. These institutions were CMF, CIM, CSP/Sac, CSP/Solano, CCWF, CVSP, PVSP, SQ, and VSPW. CCC did not supply information related to micro-shields and cut-down tools.

**D.**     **Medication Management:**

      **1.**     **Medication Continuity for Newly Arriving Inmates**

Institutions that were compliant with providing medications for newly- arriving inmates within 24 hours of arrival included CMF, CRC, CSATF, Calipatria, Centinela, DVI, Folsom, PBSP, SVSP, and SCC.  Although CIM audits noted compliance, staff and inmates

indicated that continuity of medications for new arrivals was problematic. CSP/Solano reported 89-percent compliance but other evidence suggested problems with medication continuity. CMC improved but just missed compliance, and ASP's performance slipped from compliant to noncompliant.

Institutions that were noncompliant with medication continuity for newly-arriving inmates included CCI, CIW, CSP/Corcoran, CSP/LAC, CSP/Sac, CVSP, CTF, NKSP, MCSP, PVSP, RJD, and VSPW. Several of these institutions struggled considerably, with compliance rates at CIW, MCSP, and PVSP at 18, 41, and 9 percent, respectively, although CIW reported 84 percent compliance for new arrivals from other CDCR institutions. Continuity of medications for new arrivals could not be assessed at HDSP and WSP due to unreliable data.

### 2.    Medication Continuity Following Intra-Institutional Transfers

Institutions that were compliant with medication continuity after intra-institutional transfers included ASP, CIM, CIW, CSP/Sac, CSATF, Calipatria, Centinela, CVSP, ISP, PBSP, SVSP, SCC, and VSPW. CMC was compliant for inmates transferring from the MHCB unit to administrative segregation and regular housing, and from administrative segregation to other housing units. Calipatria reported compliance but did not appear to include OHU and administrative segregation transfers. ISP reported compliance but did not provide supporting documentation. CIW also achieved compliance with post-MHCB discharges, while medication continuity upon transfers to and from administrative segregation, though improved, was noncompliant. SCC and VSPW achieved compliance following transfers to and from administrative segregation. CVSP's reported 100-percent compliance was based on a sample

size of three.  CIM's reported 98-percent compliance did not include MHCB or administrative segregation transfers, which reported medication discontinuity.

CSP/Corcoran, MCSP, and NKSP just missed compliance, with rates ranging from 84 to 86 percent.  However, MCSP's audits did not include inmates moved in and out of administrative segregation, or discharged from the MHCB unit or the MHOHU.  CRC reported that medication continuity problems with intra-facility moves were isolated and quickly resolved but did not provide audit data.  While intra-institutional movement at DVI did not result in medication disruption for inmates housed in the mainline or ASUs, medication continuity was problematic for inmates transferring from the RC or OHU.

Medication continuity following intra-institutional transfers was problematic at CCI, CMF, CSP/Solano, Folsom, HDSP, KVSP, PVSP, and RJD.  However, an RJD audit after MHCB discharge indicated 97-percent compliance. Although a CCI audit indicated 24-percent compliance for RC inmates, medication continuity following transfer from the OHU to housing units exceeded 90 percent for five of the six months reviewed.

Although medication continuity improved at CSP/LAC, it remained problematic for inmates arriving from other CDCR institutions.  No audits addressed medication continuity upon MHCB or administrative segregation discharge.  PVSP was also noncompliant for MHSDS inmates placed in administrative segregation.  WSP inmates complained about not receiving medications after cell moves, but there was a lack of reliable data from WSP.

### 3.     Medication Order Renewals

Medication renewal orders were reported to be timely at ASP, CCI, CMF, CMC, CSP/Sac, Calipatria, Centinela, CVSP, ISP, NKSP, PBSP, SVSP, SCC, and VSPW.  ISP was

also compliant with new medication orders and dose changes. Medication renewal lapses were rare at HDSP. KVSP just missed compliance.

Medication order renewals were noncompliant at CIM, CSP/Corcoran, and CSP/Solano. CIW and SQ did not audit medication renewals. DVI and PVSP did not provide medication renewal data.

### 4.   **Medication Noncompliance**

CMF reported that it met applicable requirements in response to inmate noncompliance with medications, although it did not track whether inmates on Keyhea orders for intramuscular injections received them. CCWF reported compliance but did not provide supporting documentation. CVSP reported partial compliance. A limited audit of the 3CMS population at CIW found that the institution had barely missed compliance in this area.

As a general matter, shortfalls with appropriate identification, documentation, referral, and response to inmate medication noncompliance plagued many institutions. CSP/Corcoran, CSP/Sac, CSP/Solano, CSATF, Calipatria, Centinela, Folsom, HDSP, KVSP, MCSP, NKSP, SCC, VSPW, and WSP were noncompliant or otherwise problematic. At CSP/Corcoran, less than five percent of documented noncompliance cases were referred to mental health and followed up by psychiatry. A MCSP audit of high risk cases, which included inmates on tuberculosis, HIV, and Keyhea medications, found that medication noncompliance was properly recorded and referred only 39 percent of the time.

PBSP's medication noncompliance auditing process relied on small samples and a restrictive definition of "noncompliance." MARS at PVSP were unreliable. CTF mental health staff reported that MARs were not necessarily reliable sources of information on medication

noncompliance. DVI's and SVSP's audits were methodologically flawed. CIM audit findings were contradicted by medical records and by staff and inmate reports.

     **5.**     **Pill Lines**

Pill line lengths and waits were appropriate at CCI, CMC, CRC, CSP/LAC, CCWF, ISP, KVSP, MCSP, NKSP, RJD, and SQ. SVSP reported that pill line waits were typically completed within one hour. CSATF's pill lines were reportedly compliant but were not audited. ASP's report of average pill line wait times of 20 minutes or less was refuted by inmates, who reported longer wait times. A VSPW audit indicating pill line waits of less than one minute relied on flawed audit methodology. Staff and inmates reported pill line waits of at least 30 minutes. At Folsom, expansion of available pill lines reduced wait times, but custody was not consistently present at pill lines. Although CIW did not audit pill lines, it was reported that expanded pill lines had shortened them.

Although pill lines were reportedly problematic at CTF and HDSP, those institutions did not conduct audits. Pill lines were also problematic at CSP/Solano and WSP. Pill lines were not audited at CIM, Centinela, and CVSP. CIM supervisory staff reported that attempts were made to limit pill lines to no more than two hours or 140 inmates. CSP/Corcoran and SCC did not provide data on lengths of pill lines.

     **6.**     **Processing Orders**

Calipatria, HDSP, and PBSP indicated that medication orders were processed timely. KVSP was partially compliant.

CIW and CSATF were noncompliant. SCC did not provide documentation on timely processing of medication orders.

7.    **Informed Consent**

CVSP and ISP reported that pharmacies did not fill medication orders without a consent signed by both the inmate and prescriber.   CCI, CSP/Sac, Calipatria, Centinela, CVSP, MCSP, NKSP, PVSP, SCC, and VSPW complied with requirements regarding obtaining and maintenance of informed consent forms.  CSP/LAC improved in this area.  Although SVSP audits indicated compliance, the audit methodology was problematic.  KVSP reported partial compliance.  Folsom complied with informed consent for psychotropic medications, but not for mental health treatment.

CIM, CIW, CMC, CSP/Corcoran, CSP/Solano, CTF, HDSP, PBSP, RJD, and SQ were noncompliant, although CIM was compliant with obtaining informed consents after inmates were seen by a psychiatrist.  CMF noted problems obtaining timely informed consents for psychotropic medication treatment.

CSATF did not audit informed consent forms, and ISP did not provide data.

8.    **Laboratory Testing**

Laboratory testing was compliant at PBSP and VSPW.  Calipatria's reported compliance was based on only one UHR review.  Although SCC was compliant, it was unknown whether appropriate clinical studies were ordered.  PVSP completed laboratory tests as ordered. CMF was compliant in January 2010 but subsequently slipped to noncompliance.  Although CRC's laboratory testing protocols appeared to be consistent with CDCR requirements, audits were not performed.  ASP, CMC, CSP/LAC, CSP/Solano, CCWF, DVI, Folsom, KVSP, MCSP, and NKSP were partially compliant, although CCWF's results were based on small sample sizes.

Laboratory testing was problematic or noncompliant at CCI, CSP/Corcoran, CSP/Sac, CSATF, CTF, HDSP, RJD, SQ, and WSP.  CIW, CVSP, and ISP did not provide audit

results, and Centinela did not perform audits.  It was not possible to determine whether CCC and SVSP performed laboratory testing appropriately.

### 9. DOT Medication Administration

CSP/Corcoran, CSP/Sac, CCWF, RJD, and SCC indicated compliance with DOT medication administration protocols.  CSP/Solano reported partial compliance.  However, CCI, CRC, and HDSP did not comply with DOT protocols, while CSATF audits showed inconsistent compliance.  CVSP, NKSP, PVSP, and VSPW did not audit DOT protocol compliance.

The large numbers of DOT orders at many institutions gave rise to questions about their clinical necessity or whether they were being ordered perfunctorily.  CMF, CSP/Corcoran, CSATF, CCWF, CVSP, ISP, KVSP, MCSP, PVSP, and VSPW required all psychotropic medications to be administered DOT.  DVI essentially considered all psychotropic medications DOT.  Medications were also prescribed DOT at Folsom, as were 90 percent of medications at WSP.

SCC administered psychotropic medications DOT as clinically appropriate. NKSP prescribed medications DOT for inmates with histories of hoarding, overdosing, or medication noncompliance.  CSP/LAC prescribed medications DOT to all administrative segregation and most EOP inmates.  SQ dispensed psychotropic medications as nurse-administered medications unless specifically ordered DOT.

CSP/LAC and SVSP maintained centralized lists of inmates prescribed DOT medications.  CMC maintained such a list for the MHCB unit, while CIW maintained a list of non-MHCB inmates with DOT orders.  CIM and ISP did not maintain a centralized list of inmates prescribed medications DOT.

### 10.    Keyhea Process

The Keyhea process was used appropriately at ASP, CCI, CIM, CIW, CRC, CSP/LAC, CSP/Sac, CSP/Solano, CSATF, CCWF, DVI, HDSP, MCSP, NKSP, PBSP, RJD, SVSP, and WSP.  SQ maintained appropriate processing of Keyhea cases through constant contact between its program coordinator and the Office of Legal Affairs.  Although KVSP reported that the Keyhea process functioned well, the monitor's expert observed a hearing in which staff did not appear to be familiar with Keyhea legal requirements and protections.

CMF, CMC, and CSP/Corcoran did not adequately track Keyhea orders.  PVSP staff reported deficiencies in medication administration to Keyhea inmates.  No inmates had active Keyhea orders at CCC, Calipatria, Centinela, CVSP, ISP, or SCC.  No Keyhea petitions were initiated at CTF or Folsom.

### 11.    HS Medications

HS medication orders were used appropriately at ASP, CMC, CRC, CSP/Corcoran, CSP/LAC, CSP/Sac, Folsom, KVSP, MCSP, and PBSP.  SQ properly distributed HS psychotropic medications.  CTF reported that, under ordinary circumstances, HS medications were administered after 8:00 p.m.  Although some information indicated that HS medications were administered at or after 8:00 p.m. at CCWF, CVSP and NKSP, no audits verified these reports.

Institutions that were noncompliant with HS medication orders included CCI, Centinela, HDSP, PVSP, RJD, and WSP.  Nursing shortages led to inconsistencies with HS protocol at CSATF.  There were delays with HS medication passes at CSP/Solano.  DVI

provided contradictory data as to HS medication delivery.  CIM, CMF, and SCC did not conduct HS medication audits.

### 12.    Parole Medications

Compliance with standards for providing medications to paroling inmates was achieved at CRC, CSATF, Calipatria, Centinela, Folsom, HDSP, KVSP, PVSP, and RJD. Although CSP/Sac reported compliance for identified paroling inmates, there were some paroling inmates who were not identified.  CTF reported compliance but lacked supporting data. MCSP audits indicated that inmates consistently signed for the release of parole medications. DVI audits suggested compliance or near compliance.

CCI, CIM, CMC, PBSP, and SVSP were noncompliant with parole medications. CIW, CMF, CSP/Corcoran, CSP/LAC, CSP/Solano, SQ, SCC, VSPW, and WSP did not adequately audit or document parole medications.  ISP did not have a process in place for providing parole medications.

### E.    Sexual Misconduct:

Compliance with protocols regarding IEX and sexual misconduct violations remained variable among the institutions during the monitoring period.  Custody-driven measures including cell door and window placards and exposure-control jumpsuits were widely utilized throughout the institutions.  Assessment of SHU terms and referrals to the DA were routine.  There were approximately 300 sexual misconduct RVRs issued throughout the institutions during the monitoring period.  Ten percent, or about 30 inmates, were referred to treatment programs.

CDCR operated Exhibitionism treatment programs at CSP/Corcoran, CSP/Sac, and PBSP.  Throughout the monitoring period, CSP/Corcoran reported that eight of 11 identified

inmates refused to participate in the program. Three inmates participated and reported that the program was beneficial. One inmate completed the program during the review period. EOP inmates were precluded from the Exhibitionism Treatment Program at CSP/Corcoran due to its location in the SHU. CSP/Corcoran was compliant with the Department's protocols for IEX RVRs. CSP/Corcoran issued 94 RVRs for sexual misconduct. All mental health screens and IDTT meetings were completed timely. Comprehensive evaluations were adequately completed for seven inmates, and two inmates were diagnosed with Exhibitionism. CSP/Corcoran utilized custody-driven measures.

During the review period, 28 inmates were enrolled in CSP/Sac's 18-month treatment program. The program utilized the Exhibitionism Treatment Manual and focused on group therapy as the primary treatment modality. CSP/Sac did not consistently follow IEX protocols, as only 72 of 79 inmates with sexual misconduct RVRs were screened, and not all inmates were referred to the IDTT.

At the time of the monitor's visit, only three inmates were enrolled in the Exhibitionism Treatment Program at PBSP. PBSP screened only 27 of the 36 inmates who received RVRs for sexual misconduct. All 27 were referred to the IDTT. PBSP completed two comprehensive evaluations. Custody-driven measures included door placards and exposure-control jumpsuits.

Sexual misconduct violation protocols were well implemented at ASP, CCI, CIW, CMC, CRC, CSATF, Folsom, ISP, NKSP, SCC, and WSP. All indicated inmates were screened timely and referred to the IDTT appropriately. Comprehensive evaluations were completed adequately. ASP, CMC, Folsom, HDSP, and WSP reported the routine use of custody-driven measures, including cell door placards, window coverings, and exposure-control jumpsuits.

410

While SVSP and VSPW did not strictly adhere to Departmental protocols regarding mental health screens and IDTTs, they completed comprehensive evaluations for all inmates who received sexual misconduct RVRs throughout the monitoring period. SVSP found no inmates met the criteria for a diagnosis of Exhibitionism. However, seven inmates were referred to treatment programs due to multiple sexual misconduct RVRs or alternate criteria. VSPW completed two comprehensive evaluations. There were no referrals to treatment programs. VSPW reported utilization of custody-driven measures.

Calipatria, Centinela, HDSP, and SQ were generally compliant with CDCR sexual misconduct RVR protocols. Calipatria missed one screen for the seven RVRs for sexual misconduct. Two of 20 screens at HDSP were untimely. Centinela and SQ did not complete IDTT reviews for all indicated inmates.

CCC, CIM, CMF, CSP/LAC, CVSP, DVI, KVSP, MCSP, PVSP, RJD, and CSP/Solano did not consistently follow Departmental protocol regarding sexual misconduct RVRs. Adequate tracking and documentation was problematic at CCC, CIM, and KVSP. Further, screenings and referrals to the IDTT were not routine at those institutions. KVSP did not refer all inmates diagnosed with Exhibitionism to a treatment program. CCWF provided no information other than that there were four RVRs for sexual misconduct over the monitoring period.

CMF, CSP/LAC, DVI, PVSP, and CSP/Solano struggled with completion and timeliness of mental health screens. CMF and DVI noted delays in custody notification as the primary reason for untimely completion. CMF and PVSP referred only approximately 50 percent to the IDTT. CSP/LAC produced no documentation of any completed IDTT reviews.

411

MCSP screened all mental health caseload inmates who received RVRs for sexual misconduct except the one non-caseload inmate.  MCSP issued 13 RVRs for sexual misconduct over the monitoring period, but there were three incident reports that revealed instances in which the inmates did not intentionally expose themselves and were ultimately found guilty of the infraction.

RJD reported 32 RVRs for sexual misconduct during the review period, but only 24 inmates were screened.  There was no documentation of referral to the IDTT.  Only one inmate received a comprehensive evaluation and a referral to a treatment program.  One inmate received nine RVRs for sexual misconduct over a seven-month period but he was never referred for a comprehensive evaluation.

**F.    Transfers:**

**1.    Non-Desert Men's Institutions**

Lack of timely access to appropriate levels of care negatively impacted mental health services at every point along the continuum of care.  The synopsis of this situation that was stated in the Twenty First Monitoring Report remains all too accurate and bears repeating: "Inmates waiting for acute and intermediate care beds at DMH and for EOP beds occupied MHCBs.  At the same time, inmates awaiting care in those MHCBs filled growing numbers of MHOHU beds and makeshift holding areas, while inmates in need of care languished in RCs and administrative segregation.  The result of this logjam was a population of seriously ill inmates held for far too long in the wrong treatment setting, or cycling in and out of acute crisis, or spending increasing amounts of time in ASUs."  Twenty-First Monitoring Report of the Special Master, at 399 (July 31, 2009).

412

DMH acute care resources for male inmates, limited to 130 beds at CMF, proved to be increasingly insufficient during the monitoring period.   Only three of the 22 prisons that referred inmates to the acute care program – ASP, PBSP, and WSP – reported timely access on a consistent basis.  CMC and CSP/LAC nearly met the Program Guide standard with average transfer delays of 11 days.  Approximately half of the acute care referrals from CSP/Sac and CCI missed the ten-day transfer guideline.  Rates of compliance for meeting the deadline ranged from 15 percent to 40 percent for CSP/Corcoran, CSATF, KVSP, and NKSP.  None of the inmates referred to the acute care program from HDSP and SVSP were transferred within ten days.

Many of the delayed transfers, and all of the excessive waits, were associated with referrals of non-suicidal acutely psychotic inmates.  Such referrals, considered low priority, were routinely placed on an acute care waiting list that approached 100 inmates during the monitoring period.  CMF, CSP/Sac, KVSP, MCSP, and NKSP reported having five to twelve inmates on the waiting list at the time of the monitor's visit, many of whom had been languishing several months.  Other prisons, including CSP/Corcoran, CSATF, and SVSP, reported transfer delays that ranged from 40 days to over three months.

Despite increasingly slow access, many institutions continued to generate a reasonable number of acute care referrals.  CMF, CMC, CSP/Sac, and PBSP produced more than 50 referrals to acute care during the monitoring period, followed by KVSP with 36 referrals and WSP with 34 referrals.  CSP/Corcoran, CSP/LAC, CSATF, NKSP, and RJD produced between 11 and 20 referrals, while ASP, CCI, DVI, HDSP, PVSP, SVSP, and SQ generated ten or fewer referrals.  Delayed access to the acute care program notably increased the number of rescinded referrals at some prisons.  The portion of acute care referrals that were rescinded by the

institution reached 45 percent at CMC and 43 percent at CMF.  Approximately 20 percent of all acute care referrals from PBSP and KVSP were rescinded by these institutions.

Men's prisons utilized DMH intermediate care resources to a greater extent than during the preceding monitoring period.  Only three of 26 non-desert men's prisons – CCC, CRC, and Folsom – did not refer inmates to DMH.  However, incomplete DMH referral logs sometimes rendered it impossible to determine how many referred inmates actually transferred to each program and whether or not transfer guidelines were met.  Logs were notably deficient at CIM, CSP/Corcoran, DVI, KVSP, NKSP, SVSP, and WSP.

Ten prisons referred inmates to the DMH ICF at CMF.  Approximately 80 percent of the referrals were from CMC, CMF, and RJD.  Incomplete logs suggested that slow access to the DMH ICF at CMF frequently resulted in cancelled referrals.  Nine of 16 referrals from RJD and only three of 12 referrals from WSP resulted in transfer.  Cases with documented referral and transfer dates often revealed noncompliance with the 30-day Program Guide transfer guideline.  There was insufficient data to determine compliance with the requirement to transfer inmates within 72 hours of receiving a bed assignment.

Fifteen prisons produced ASH referrals, most coming from CMF, CMC, MCSP, and RJD.  Incomplete data indicated that 60 to 90 percent of the referrals resulted in transfer, but that a significant number of the transfers did not occur within 30 days of referral.  Again, there was insufficient data to gauge compliance with the 72-hour transfer requirement.

Approximately 20 prisons referred inmates to the SVPP.   An increasingly small number of SVPP referrals resulted in transfer, as the program's wait list swelled to 575 in February 2010 and averaged 492 during the first half of 2010.  None of the SVPP referrals produced by CCI, CTF, HDSP, KVSP, and SVSP resulted in transfers.  Less than 20 percent of

the SVPP referrals generated by CSP/LAC, RJD, and WSP resulted in transfer, and less than half

of the SVPP referrals produced by CSP/Sac and PBSP resulted in transfer.  As a result, growing

numbers of Level IV inmates were denied access to intermediate care.

During the monitoring period, defendants activated 17 MHCBs at SQ and

continued to use a number of stopgap measures designed to temporarily increase MHCB

capacity.  Among these measures was the utilization of 62 temporary MHCBs at CMC and

CSP/Sac, the operation of 36 unlicensed infirmary beds at CIM, and appropriation of 20 acute

care beds for local crisis care at CMF.  Despite these efforts, 15 of 26 non-desert men's prisons

reported having untimely access to crisis care.

MHCB units at CIM, CSP/Sac, KVSP, MCSP, NKSP, SVSP, and WSP were too

small to accommodate the local inmate population.  These prisons increasingly used alternative

holding areas to monitor inmates for whom crisis beds were unavailable. Placements in

alternative holding areas were reported to number 625 at CIM, 514 at NKSP, 229 at SVSP, 98 at

KVSP, and 86 at CSP/Sac.  MCSP used 11 retrofitted cells in administrative segregation to

monitor an average of 45 inmates per month, 40 percent of whom were retained in the cells

longer than 72 hours.

CSP/LAC, with an MHSDS population that included 437 EOP inmates and 1,293

3CMS inmates, applied overly-restrictive criteria for MHCB admission.  Less than ten percent of

the cases referred to the MHCB were admitted, resulting in an average of only 11 admissions per

month.   Inmates waiting to be assessed for admission to the MHCB unit were sometimes placed

in alternative holding areas for one to two days, despite the availability of crisis beds.  By

comparison, NKSP, also a large RC with ten MHCBs, accepted an average of 22 crisis bed

admissions per month.  PBSP, with an MHSDS population that is only a quarter the size of

CSP/LAC's, accepted 92 percent of all crisis care referrals and admitted an average of 28 inmates a month to its ten-bed MHCB unit.

Inadequate MHCB capacity was further restricted by excessively long admissions, most of which involved inmates on DMH waiting lists. Sixty percent of MHCB admissions at CSP/Sac lasted longer than ten days, followed by 44 percent at MCSP, 43 percent at NKSP, 37 percent at SVSP, 36 percent at CSATF, and 33 percent at PBSP. Among the other prisons with MHCB units, the percentage of admissions that lasted longer than ten days ranged from 25 percent at CSP/Corcoran, 14 to 18 percent at CIM, HDSP, HDSP, and KVSP, down to 11 percent at WSP and PVSP.

Eight prisons – CSP/Corcoran, CSP/Solano, CSATF, HDSP, PBSP, PVSP, RJD, and SQ – had a sufficient number of MHCBs to accommodate their local inmate populations. CMF continued to use 20 beds within the DMH acute care program as MHCBs. Access to these beds was timely. The 50-bed MHCB unit at CMF accepted referrals from prisons other than CMF. The unit accepted 93 percent of all referrals and admitted an average of 60 inmates per month during the monitoring period. The average length of stay was 23 days, half of which was related to transfer delays following clinical discharge.

Seven prisons did not have licensed MHCBs and relied on other prisons for crisis care. Among these prisons, CCC and CRC reported having timely access to crisis beds on a consistent basis. ASP, CTF, DVI, and SCC placed inmates in OHUs pending transfer to outside MHCB units. Delayed access to MHCBs often resulted in prolonged OHU stays. The percentage of OHU placements that exceeded 72 hours was reported to be 54 percent at SCC, 33 percent at ASP, and 32 percent at DVI. Only a quarter of the 24 MHCB referrals produced by CTF resulted in transfer within 24 hours. DVI used alternative holding areas on 241 occasions to

monitor inmates for whom OHU cells were unavailable.  The average length of stay for inmates placed in these alternative holding areas was 2.2 days.

Nearly all EOP inmates were transferred timely from the mainline programs at CSP/Solano, CTF, Folsom, and SCC, followed closely by CSATF with 89 percent and PVSP with 83 percent of EOP transfers meeting the 60-day timeframe.  Nearly a quarter of the EOP inmates transferred from CRC waited longer than 60 days.   EOP inmates transferred from the mainline program at ASP waited an average of 73 days.

None of the institutions with data relative to transfers to EOP hubs reported compliance with the 30-day timeframe.  Transfer delays commonly exceeded 60 days and sometimes reached nine months to a year.

Six institutions – CMC, CSP/LAC, CSATF, MCSP, RJD, and WSP – provided historical data that indicated that most PSU transfers occurred within 60 days of endorsement. At the time of the monitor's visit, CSP/Corcoran had 16 EOP inmates with active SHU terms, all of whom had been awaiting endorsement/transfer for more than 60 days.  Similarly, KVSP had four EOP inmates with active SHU terms who had been in administrative segregation from 177 to 234 days.  There were seven EOP inmates with active SHU terms at SVSP, none of whom had been waiting longer than 60 days.

None of the Department's RCs consistently transferred EOP inmates within 60 days.  The compliance rates for meeting the 60-day timeframe ranged from a low of 49 percent at SQ to a high of 59 percent at RJD.  The Department's protocols for expedited 30-day transfers was rarely used.  HDSP and DVI did not adequately track transfers of EOP inmates from the RC.

Only CSP/LAC, NKSP, RJD, and SQ provided data on lengths of stay for 3CMS inmates in their RCs.  At the time of the monitor's visit, half of the 3CMS inmates in HDSP's

RC and a third of the 3CMS inmates in NKSP's and RJD's RCs had been waiting longer than 90 days.  SQ, the only institution with historical data, reported that 43 percent of 3CMS inmates transferred from the RC waited longer than 90 days.

        **2.**       **Desert Institutions**

        Calipatria, CCC, Centinela, CVSP, and ISP did not have MHSDS programs due to their desert locations.  The MHSDS census at these prisons ranged from 16 inmates at ISP to 103 inmates at CVSP.  The desert institutions placed a combined total of approximately 530 inmates in the MHSDS during the monitoring period.  Centinela, CVSP, and ISP reported meeting the 60-day and 90-day transfer timelines for inmates placed in EOP and 3CMS, respectively, by institutional staff.  Calipatria's compliance with transfer timelines could not be ascertained due to inadequate tracking records.

        Calipatria, Centinela, and CVSP mistakenly received a combined total of 45 MHSDS inmates during the monitoring period.  ISP provided incomplete records indicating that the institution received five 3CMS inmates in error during the final two months of monitoring period.  Contrary to transfer guidelines, nearly all of these 50 inmates waited longer than 30 days to be returned to an institution with an MHSDS program.   It has long been settled in this case that MHSDS inmates should not be housed at desert institutions, given that many of them are taking heat-sensitive psychotropic medications which can lead to dire results under high-temperature conditions.  Greater attention must be given to avoiding such mistaken transfers in the future.

        Access to MHCBs for desert institutions continued to be slow in many cases.  Thirty inmates referred to an MHCB unit from the OHU at CVSP, which included inmates from ISP, waited an average of 1.5 days and, in one case, seven days.  Centinela reported that sixteen

418

transfers to outside MHCB units were problematic, but did not provide supporting data.  Forty-five percent of OHU placements at CSP lasted longer than 72 hours.  Most of these were attributed to delayed transfers to outside MHCB units.

### 3. Women's Institutions

While referrals to DMH substantially increased during the monitoring period, access to DMH for female inmates continued to be problematic.  All female inmates deemed to require a DMH LOC were referred to PSH.  DMH referrals did not distinguish between acute and intermediate levels of care, and it remained unclear what, if any, acute care services were available to female inmates at PSH.  Access to PSH was notably compromised by high refusal rates at CCWF and CIW and by long transfer delays at VSPW.

Three women's institutions produced a combined total of 77 referrals to PSH nearly four times more referrals than were generated during the preceding monitoring period. With 39 referrals and 17 transfers to PSH, CCWF continued to utilize DMH resources with the greatest frequency and efficacy.  However, incomplete DMH referral logs rendered it impossible to determine CCWF's compliance with the 30-day transfer timeline.  CIW produced 28 PSH referrals, only three of which resulted in transfer.  Nine, or a third, of CIW's referrals were rejected by DMH.  VSPW produced ten referrals to PSH, seven of which resulted in transfer. However, the average time lapse between referral and transfer was 94 days – more than three times longer than the 30-day standard set forth in the Program Guide.

CCWF had a ten-bed licensed MHCB unit and CCWF had a SNF with eight mental health beds, known locally as Mental Health Program Beds (MHPBs).  Access to both units was timely.  Neither institution used holding areas to monitor inmates waiting for crisis

beds.  CIW had 279 MHCB admissions, five percent of which lasted longer than ten days.  In contrast, CCWF had 71 MHPB admissions, 38 percent of which exceeded ten days.

VSPW used three rubberized safety rooms and five observation cells in its OHU to monitor inmates in crisis.  Inmates who, after brief observation, were deemed to need crisis care were transferred to the MHPBs at CCWF.   The percentage of safety room and observation cell placements at VSPW that exceeded 72 hours fell from over 40 percent during the preceding monitoring period to only six percent during this monitoring period.  There were 21 transfers from VSPW to the MHPBs at CCWF.

A quarter of the EOP inmates transferred from the RC at CIW waited longer than 60 days, while only seven percent of 3CMS transfers exceeded 90 days.  One of thirteen EOP inmates transferred from VSPW waited longer than 60 days.  VSPW did not track 3CMS transfers.  CCWF transferred 16 administrative segregation-status inmates to the EOP hub at VSPW, three of whom missed the 30-day deadline by a few days.  Five EOP inmates were placed in the PSU at CIW during the monitoring period.

### 4.    Referrals

Many institutions continued to struggle to implement reliable systems for tracking response to routine, urgent, and emergent referrals.  More than half of all institutions, or 18 of 33 prisons, did not provide response data for urgent and emergent referrals.  Eight prisons – CIM, CSP/Sac, CVSP, ISP, PVSP, KVSP, RJD, and WSP did not provide reliable and/or complete tracking data for routine referrals.

Half of the 28 prisons that provided full or partial performance data for routine referrals were noncompliant with the five-day response timeframe.  CSP/Corcoran, CTF, and KVSP reported responding to less than half of routine referrals within five working days.

Compliance rates for meeting the five-day standard ranged from 62 percent to 82 percent at CCI, CRC, MCSP, RJD, SVSP, SQ, and VSPW.  Average response times for routine referrals exceeded 16 days at CSP/Solano and ten days at CSP/LAC, and ranged from five to nine days at CSATF and NKSP.  Fourteen prisons – ASP, CCC, CIM, CIW, CMF, CMC, CSP, CCWF, Centinela, DVI, Folsom, HDSP, PBSP, and SCC – reported compliance rates that exceeded 90 percent or average response times that averaged less than five working days for routine referrals.

Of the 15 institutions that provided tracking data for urgent referrals, 11 reported consistent compliance with the 24-hour response timeframe.  These institutions included ASP, CIW, CMF, CMC, CRC, CSP/LAC, Centinela, CCWF, DVI, PBSP, and VSPW.  The compliance rates for responding to urgent referrals within 24 hours were 77 percent at SVSP, 65 percent at HDSP, and 29 percent at MCSP.  None of the urgent referrals tracked by KVSP prompted a response within 24 hours.

Fourteen of 15 institutions that provided tracking data for emergent referrals reported consistent compliance with the requirement for an immediate response.  These institutions included ASP, CIW, CMF, CMC, CRC, CSP/LAC, Centinela, CCWF, DVI, NKSP, PBSP, SCC, VSPW, and WSP.   MCSP reported that it responded immediately to 69 percent of emergent referrals.

Two institutions, HDSP and NKSP, reported that response to referrals related to medication management was particularly slow due to insufficient psychiatric resourced.

## II.    Follow-Up to the Mental Health Assessment and Referral Project of 2009: Examination of Institutional Implementation of DMH Referral Practices

### A.    Background

Historically, access to higher levels of mental health care in DMH programs has been frustratingly slow.  Seriously mentally ill inmates have waited for overly-long periods of

time before they receive treatment at those programs.  In many cases these inmates have

occupied MHCBs for extended periods while they await transfers to DMH, as other inmates in

need of those MHCBs are placed into less desirable treatment locations.  The problem was

studied and addressed in the Unidentified Needs Assessment (UNA)of 2005, but its persistence

called for a resumed focused effort to streamline access to this important level of mental health

care for those inmates in greatest need of intensive clinical interventions.

       As stated above, the Court's order of March 31, 2009 required CDCR and DMH

to work together to conduct an identification and assessment of *Coleman* caseload inmates at the

28 non-desert CDCR institutions to identify any inmates in need of DMH-level of mental health

care and to refer those inmates for such care on an expedited basis. The *Coleman* court then

expanded the project to include all non-desert institutions in its order of June 17, 2009.  The

project was denominated as the MHARP.  The assessments began on April 15, 2009 and

concluded on December 29, 2009.

       As a result of the assessments, almost 1,000 inmates were referred for inpatient

mental health care in DMH programs.  Another product of MHARP was CDCR's development

of a process for clinical consideration and IDTT review of inmates for referral to DMH acute or

intermediate levels of care.  As part of this process, the new checklist tool known as CDCR Form

7388 was developed by CDCR as the official form for DMH referral identification and decision-

making by IDTTs throughout the system.

       On March 29, 2010, the Court conducted a status conference at which the

defendants briefed the Court on steps they had taken to ensure that referral and transfer of

inmates to DMH-level care was proceeding in such a way that no further special assessments

should be necessary, and that those in need of higher levels of care were being identified and

referred promptly.  At that time, the wait list for inmates in need of intermediate inpatient care had grown to the alarmingly high number of 574, and the wait list for acute care had grown to 64.  Order, filed March 30, 2010, at 2-3.  The Court noted in the same order that defendants reported that they had taken "incremental steps toward establishing a sustainable process of identification and referral of those inmate-patients who need a higher LOC." Order, filed March 30, 2010, at 2.  However, the Court also noted that "the size of the wait lists suggest[ed] that the short-term bed projects which have come on line will not be sufficient to eliminate the wait lists for inpatient care" and that "defendants' long-term bed projects will not be activated for another three years."  *Id.* at 3.  To that end, the Court ordered the special master to "monitor defendants' implementation of their policies and practices regarding referral and transfer of *Coleman* class members for inpatient care." It also ordered the special master to evaluate the sustainability of defendants' inpatient referral process, and in the event the evaluation uncovered any deficiencies, the special master was to "take all steps necessary to ensure that defendants correct such deficiencies."  The special master was ordered to report by the end of the year (i.e. 2010) on the defendants' process for identification and referral of inmates to higher levels of care, either in the special master's regular monitoring report or in a special report.   The special master elected to meet that specific reporting requirement within this regular monitoring report, as follows.

      **B.**      **Review of the DMH Referral Process at Thirteen Selected Institutions**

        To carry out this charge, the special master selected three of his experts to conduct this court-ordered review.   This process was separate and distinct from the regular institutional monitoring process, and was conducted with individual site visits dedicated solely to examining the selected institutions' integration of the new DMH referral processes and the status and quality of their implementation.  The special master identified the 13 most important

institutions at which to evaluate the efficacy of CDCR's DMH referral process.  This selection was based on these institutions' provision of complex mental health services and programs to a large MHSDS population, most notably inmates at the EOP LOC. The 13 institutions were CIM, CMF, CMC, CSP/Corcoran, CSP/LAC, CSATF, DVI, KVSP, MCSP, NKSP, RJD, SQ, and WSP. A team comprised of two experts was assigned to review each of these institutions.  Visits occurred from May 26 to July 22, 2010.  CDCR was asked to provide for each institution the following information covering the six-month period prior to the date of the scheduled site visit: (a) DMH referrals; (b) a list of inmates who met the criteria for consideration for intermediate level care but had not been referred; and (c) a list of inmates who had three or more MHCB placements, which is one of CDCR's criteria triggering DMH consideration. CDCR was also asked to provide, for the 90-day period before the site visit, information on those MHSDS inmates who had three or more RVRs and those who were in the EOP but participated in less than half of offered treatment, which are also objective criteria for consideration for DMH referral.

During the site visits, the experts consulted with mental health and custody staff, reviewed UHRs and C-files, and toured housing units at the institutions. They examined whether the institution had implemented the DMH referral system to identify inmates who met criteria for consideration, reviewed those inmates in an appropriate IDTT setting, and arrived at a clinically justifiable and properly documented decision on whether to refer.

### C.     The Experts' Findings at the 13 Institutions

***CSP/Corcoran (May 26-27, 2010)***:  As of the experts' site visit, CSP/Corcoran had implemented CDCR's DMH referral process and assigned a full-time DMH coordinator. However, the institution was experiencing significant problems with MHTS.net which had

424

recently been implemented there. Capabilities with the DMH consideration and referral processes were limited because many important data points were not yet available to clinicians. The system was unable to identify inmates who were participating in less than 50 percent of clinical programming.  In addition, data on inmates who had three or more crisis bed admissions in six months, or three or more RVRs in three months, was generally unavailable to clinicians, and when it was, institutional staff did not consistently identify inmates who met one or more of these criteria for consideration for DMH referral.

CSP/Corcoran's practice was to begin tracking DMH referrals at the time the DMH coordinator was notified of the referral, rather than at the time the referral was actually made by the IDTT. This practice affected referral status and timeframes for completion of referral packages.  On the guidance of the special master's experts, the institution agreed to begin tracking referrals from the date of the IDTT decision.

Another problem was the institution's inability to identify inmates who had already been referred to DMH but transferred to CSP/Corcoran before admission to a DMH bed. There was also a similar problem with inmates who had been identified as clinically suitable for consideration for DMH referral at a different institution before transfer to CSP/Corcoran before the referral process was completed.  A third problem was the absence of a system to track inmates who had multiple crisis bed admissions in various institutions. Discussions with institutional staffs suggested that these problems existed system-wide.

**_CIM (June 2 – June 3, 2010)_**:  At the time of the experts' visit, CIM had implemented the DMH referral process and assigned a part-time DMH coordinator. However, the institution reported that it did not have a process for identifying inmates who were participating in less than 50 percent of their scheduled activities, which is a major clinical factor

for consideration for DMH referral and for the efficacy of the DMH referral process itself.  The institution had only recently begun to track RVRs in a manner that would identify inmates who had three or more within a three-month period. Before the experts' visit, the institution had not routinely produced a report identifying inmates who met this criterion.

The experts found that CIM had a process to identify inmates who had three or more mental health crisis placements in the MHCB or temporary bed housing (TBH). However, it used two nonintegrated tracking systems which limited capacity to track multiple placements across both crisis care units. Attempts by the DMH coordinator to manually integrate the two logs were inconsistent and often failed to capture TBH admissions that did not result in physical transfers to MHCBs. The result was that a number of clinically suitable inmates were not considered for DMH referral.  Moreover, data regarding both MHCB and TBH placements were not routinely available to line clinicians, further inhibiting the DMH referral process.

The practice at CIM was to commence tracking DMH referrals on the date when the DMH coordinator received the referral, rather than on the date the IDTT actually made the referral. This time lapse affected the entire process by delaying access to DMH beds. Completion of referral packets at the institution took excessively long; some took a month from the date the DMH coordinator received the referral information to the date the packet was completed, significantly exceeding Program Guide requirements.

*__CSP/LAC (June 9 – 10, 2010__*):  At the time of the site visit, the DMH referral process had been implemented but was still in its very early stages.  The institution continued to utilize two clinicians as DMH coordinators despite the finding during the preceding monitoring period that this practice led to limited identification of inmates and marginal rates of DMH

426

referrals. On average, CSP/LAC had referred less than one inmate per month to DMH during the months following the conclusion of MHARP.

The institution reported significant problems with identifying inmates who met the criteria for consideration for DMH referrals. Data on multiple crisis bed admissions and RVRs was not available to clinical staff. Although information regarding inmate non-participation in programming was available, manual tabulations were necessary to identify those who participated in less than 50 percent of offered clinical activities. This imposed additional duties on care providers, and did not occur consistently.

The experts also found several instances of incorrect use of CDCR Form 7388. In many cases, clinicians used a single identifying criterion ("could benefit from a more structured environment") as the basis for DMH consideration, yet in other instances of inmates who met multiple criteria, clinicians decided not to refer. When the experts repeated an institutional audit of the DMH referral process using the very same UHRs as in the institution's audits, they found different results. The primary variant was that the institution had designated some Form 7388s as "complete," but the experts' examination detected otherwise. In addition, a number of Form 7388s that the institution's audit had found satisfactory lacked specific or sufficient clinical justification for the decision to not refer or did not correlate the justification to the criteria that had been the basis for considering referral.

**_San Quentin (June 14 – 15, 2010)_**: San Quentin had implemented the DMH referral system and assigned a full-time DMH coordinator. At the time of the site visit, the institution was averaging 16 to17 referrals monthly during recent preceding months.

427

In preparing for the site visit, San Quentin itself identified a significant number of inmates who met the criteria for consideration for DMH referral but had not been previously considered.  Supervisory staff indicated that they had begun to address this issue.

Although the institution had implemented a system for identifying inmates who participated in less than 50 percent of offered activities, the reliability of this system was questionable.  A number of inmates met one or more criteria but had not been identified by the institution until it was preparing for the site visit.  In addition, the experts identified a number of inmates as meeting criteria but the institution had not considered these inmates.

*DVI (June 16 -17, 2010)*:  DVI had implemented its DMH referral process at the time of the site visit. Additional resources including assignment of a full-time DMH coordinator and clerical support time had been allocated.  The institution also put into place audit procedures for monitoring its DMH referral process and initiated three QITs to address, respectively, completion of patient histories and physical examinations (H&Ps) for inmates who were referred, DMH referral process and tracking, and the Vitek process.

DVI also improved a number of institutional processes that affected the initiation and completion of DMH referrals. It reduced timeframes of six critical paths within the DMH referral process, bringing them into compliance with Program Guide requirements. These were completions of H&Ps, C-file documentation, referral packets, and Vitek hearings; forwarding of the completed package to the CDCR central office in Sacramento; and provision of results of Vitek hearing to the institution's DMH coordinator.

However, a number of pertinent deficiencies came to light in the course of the visit. Data related to the number of MHCB placements was not integrated with data on placements into OHUs for crisis care. This affected one of the major clinical criteria for

considering DMH referral, that is, three or more crisis bed placements during a six-month period. Discharge summaries in some inpatient records did not adequately document the reason for crisis care placement, the course of the care given there, the outcome of the inpatient treatment, and recommendations for follow-up treatment.  In addition, treatment plans were not adjusted consistently following the inmate's release from crisis care.

The experts' review of a limited sampling of cases at the institution yielded identification of 75 inmates who were clinically suitable for consideration for DMH referral, but none of them had not been presented by clinicians or reviewed by an IDTT.

*CMC (June 23 – 24, 2010)*:  At the time of the site visit, CMC had implemented the DMH referral system and had a full-time DMH coordinator and additional clinical support staff. The institution was able to track inmates who participated in less than 50 percent of offered therapeutic activities, had multiple crisis care admissions, and multiple RVRs. However, the RVR reports were unavailable to care providers for purposes of consideration for DMH referral. Supervisors agreed to remediate this problem.

Clinicians in the MHCB did not regularly complete Form 7388s; several were still using outdated versions of the form along with the authorized version.  CMC actively audited its use of Form 7388. The expert's review of the institution's auditing process found a mixed picture, with some of the audits incorrectly identifying some Form 7388s as completed correctly when they were not.

The institution reported a number of concerns with the care of its inmates while at DMH.  One was that Keyhea orders for some of its inmates who had been referred and transferred to DMH lapsed during their inpatient care, and that some of the affected inmates had returned to CMC with no ongoing orders even though they remained medication noncompliant.

CMC also indicated that inmates were apparently being returned to the institution from DMH earlier than clinically similar inmates had returned in the past. Another matter of concern was that a number of their inmates who had been admitted to acute care at DMH and recommended for intermediate care had not been referred to that LOC prior to returning to CMC.

**_KVSP (June 28- 29, 2010)_**:   KVSP had implemented the DMH referral system, but did not have a full-time DMH coordinator assigned at the time of the experts' site visit.  The responsibilities of coordinating referrals to DMH was assigned to two different clinicians, which significantly impacted the referral process including identifying and considering inmates who met criteria, as well as the timely completion of packages of those inmates who were referred.

Like other CDCR institutions, KVSP was experiencing a number of problems with availability of reliable data.  Its tracking system was incapable of producing relevant reports identifying inmates who were participating in less than 50 percent of offered clinical activities, which led to under-identification of inmates who met criteria for DMH referral consideration.  In addition, this institution did not correlate mental health crisis placements in MHCBs with crisis placements in alternative housing, which also led to under-identifying inmates who were clinically suitable for consideration for DMH referral.

A review of a sample of completed Form 7388s raised questions about the adequacy of rationales in a number of cases in which the IDTT had decided not to refer.  Many failed to address even the criteria which had triggered consideration for referral.

**_CSATF (June 30 – July 1, 2010)_**:  CSATF had implemented the DMH referral process and had a full-time DMH coordinator. However, the institution's problems with MHTS.net substantially hindered the process of identifying inmates for consideration for DMH referral. Like other institutions, CSATF did not have information management system capability

to identify inmates who participated in less than 50 percent of their assigned therapeutic activities, nor were clinical staff in the mainline EOP program able to identify inmates who typically declined to participate in activities.  The institution was also unable to identify those inmates who had three or more RVRs within three months, another of the criteria to prompt consideration for DMH referral.  In the course of their review, the experts identified a group of inmates as suitable for consideration for referral, none of whom had been identified by the institution as suitable.

*RJD (July 7 – 8, 2010)*:  By the time of the experts' visit, RJD had implemented the DMH referral and had assigned a full-time DMH coordinator.  Once psychiatrists assumed responsibility for conducting the H&Ps required by DMH, they were completed timely.  However, DMH referral packages were significantly delayed due to the Vitek hearing process in place at the institution and delays associated with documentation of case factors.

RJD, like other institutions, was experiencing significant problems related to implementation of MHTS.net.  It was not producing adequate tracking data for use in the DMH referral process.  Also, staff reported major data losses that required re-entry by clerical staff, which raised questions about the validity and reliability of the information that was in the system. There was a decreasing but still significant backlog of "open" appointments for data entry which presented a major task for clerical staff and which was exacerbated by clerical vacancies and personnel hiring freezes.

The process in the MHCB unit for initiating and considering DMH referral was very problematic. The experts' examination found incidents of incomplete IDTT paperwork and incomplete and inaccurate Form 7388s. Staff interviews in the MHCB unit indicated that they erroneously believed that inmates in crisis beds were clinically ineligible for consideration and

referral to DMH intermediate care, and that they did not begin to actively consider a DMH referral to acute care until an inmate was well into or beyond ten days in a crisis bed. The experts found instances in which one clinician acted to remove an acute care inmate referral from the waitlist outside of the IDTT process. The institution agreed to take remedial action on this.

At the time of the site visit, staff informed the experts that information from MHTS.net on inmate participation in therapeutic groups was unreliable. In addition, inmates were dropped from the institution's MHTS.net databases following cell moves or returns from outside medical care, which significantly compromised their access to mental health care. In addition, MHSDS inmates who returned from DMH inpatient care or parole were also dropped from the mental health rolls and had to be re-identified and placed back into the MHSDS. RJD reported serious difficulties with RVR data for 3CMS inmates, which also hindered the DMH referral process at the institution.

In the course of reviewing inmates on the DMH waitlist to determine their continued clinical suitability for remaining on the list, RJD developed a practice of not using the IDTT format, contrary to Program Guide requirements for such changes. Instead, an institution-developed "high risk committee" was used for this purpose. After consultation with the experts, the institution agreed to utilize the IDTT process for this purpose.

*NKSP (July 12 – 13, 2010)*: NKSP had implemented the DMH referral system and assigned two DMH coordinators. The institution had not implemented MHTS.net at the time of the visit, but it had developed an RVR tracking system. It also had a system for tracking inmates who participated in less than 50 percent of clinical programs but it was not aggregated and covered only one week at a time, making it substantially ineffectual for DMH consideration purposes. NKSP also did not integrate data on MHCB placements and MHCB overflow

placements, which affected the availability of accurate information to clinicians regarding multiple MHCB placements. Moreover, there were instances of crisis placements that were documented in UHRs but were not logged in either unit, which also had a detrimental effect on availability of this information for DMH consideration purposes.

Contrary to all DMH referral training and established proper procedure, the institution had adopted a practice of automatic pre-filling of two criteria on the Form 7388s. The experts' review of a sample of Form 7388s revealed inconsistencies in connecting the criteria for consideration for DMH referral with clinical rationales for decisions to not refer. The experts found a number of inmates whom the institution had not identified as meeting criteria for consideration for DMH referral, but who did in fact meet such criteria.

Institutional staff expressed concern that inmates who were referred and transferred from the RC to DMH were discharged back to the institution to complete the reception process, even in cases in which these inmates were clinically appropriate for placement outside of a RC environment.

_**WSP (July 14 – 15, 2010)**_:  By the time of the experts' visit, WSP had implemented the DMH referral process and assigned a full-time DMH coordinator, although there had been a recent change of coordinators and a number of referrals were not tracked properly in the course of the transition.

The institution reported that its backlog of data entry was significant, with some appointments as far back as June 1, 2010 that still had not been entered into the database by the time of the site visit. RVRs were collected in an electronic database and available for use by clinical staff, but clinical staff did not have access to information regarding inmates who were not participating in 50 percent of offered programs offered.

A review of a sample of completed Form 7388s revealed inconsistencies between information entered on the form and information in the corresponding UHR, notably for criteria marked as "negative" on the Form 7388 while evidence in the UHR suggested otherwise.

*CMF (July 19 – 20, 2010)*:  This institution has had a long-standing functional DMH referral process in place and has routinely considered and referred inmates in the regular course of clinical operations. There was a full-time DMH coordinator who supervised three additional clinical staff and one clerical support staff as part of the institution's DMH referral program.

The experts identified a number of cases in which inmates who met criteria for consideration for referral to DMH had not been reviewed for referral, although some of them had already been identified and were scheduled for consideration shortly after the site visit.  There were issues with the institution's tracking system, with a number of cases in which inmates were listed as meeting no criteria on one tracking system, but as meeting criteria on another system. The experts found several records in which clinical notes were identical, although different dates appeared on them. This was brought to the attention of supervisory staff who agreed to take remedial action.

The institution reported that the DMH waitlist was not routinely available to the institutions, which inhibited CMF's ability to identify inmates transferred in from other institutions after they had been referred to DMH and were awaiting transfer.

*MCSP (July 21 – 22, 2010)*:  This institution had implemented the DMH referral process.  At the time of the site visit, it did not have a full-time DMH coordinator but had a clinician handle those duties and other clinical responsibilities in the CTC and the MHOHU.

Identification of inmates for consideration for DMH referral was significantly hampered by limitations on tracking of important information. MHTS.net did not track inmate participation in offered therapeutic programs. Mental health crisis placements in MHCBs and the MHOHU were not aggregated. The RVR tracking system did not include 3CMS inmates. As a result, clinical staff did not have access to complete data on these factors by which to identify and consider inmates for referral.

The experts' examination of UHRs at MCSP showed that Form 7388s were not consistently found in these records. Sampled Form 7388s revealed that all clinicians did not appropriately complete the forms and that clinical justifications for not referring were not consistently connected to the criteria for consideration for referral. Some clinicians at the institution were using old versions of Form 7388 which had been superseded.

The experts examined institutional audits of completed Form 7388s and supporting documents, and discovered disparities between the audits results and information in the underlying records. Audit findings of the same records by different clinicians were also inconsistent.

The institution reported that it was not consistently informed in a timely manner when an inmate was returning to the institution from DMH care.

C.    **Summary and Conclusions Drawn from the Experts' Follow-up on DMH Referral Practices at the 13 Selected Institutions**

All thirteen reviewed intuitions had implemented the DMH referral process. CMF, CMC, CSP/Corcoran, CSATF, DVI, RJD, SQ, and WSP had full-time DMH coordinators in place. CIM, KVSP, and MCSP had part-time DMH coordinators, and CSP/LAC and NKSP each had two DMH coordinators.

435

CIM and CSP/Corcoran started their tracking of DMH referrals from the time the DMH coordinator received the referral information, rather than the date of the IDTT's decision to refer.  This resulted in delays in completing referral packages. Both institutions agreed to correct this problem.  CIM, CSP/Corcoran, DVI, KVSP, and RJD were not meeting Program Guide timelines for completing DMH referral packages.

CSP/LAC was significantly under-referring to DMH.

Many institutions were not properly utilizing Form 7388, the designated form for the DMH referral process. The forms were not filed in the UHR at MCSP.  At WSP, some information entered in a sample of reviewed Form 7388s was inconsistent with information in the inmates' UHRs. Clinicians at NKSP pre-filled Form 7388s, while the forms at CMC, CSP/LAC, and MCSP were found to be incomplete.  In instances where inmates were considered but not referred, the clinical justifications or rationales at CSP/LAC, KVSP, MCSP, and NKSP did not routinely correlate with the criteria that triggered consideration for referral. Some clinicians at CMC and MCSP were using outdated versions of the form.

In the MHCB units at CMC and RJD, clinical staff was not completing Form 7388s for inmates who met criteria for DMH consideration.  At RJD, referrals of crisis care patients to DMH were not considered until these patients were well into or ten days beyond their crisis care stays.  Clinical decisions regarding DMH referrals were sometimes made outside of the IDTT process.

At the time of the site visits, MHTS.net was in its early stages of implementation. CMF, which was not yet on MHTS.net, had information management system capabilities to identify inmates who had multiple MHCB placements and multiple RVRs, and who participated in less than half of clinical activities, and made this information available to clinicians. CMC had

similar information management capacity and generated the required information, but the RVR information was not routinely made available to clinicians as part of the DMH referral process.

CMF, CMC, and NKSP were able to generate data on whether inmates were participating in less than half of therapeutic activities and made it accessible to clinicians. However, a rather large number of other institutions could not generate data on inmate rates of participation in clinical activities, or reported that the data was not reliable, or did not provide the information routinely to clinical staff, or identified other problems associated with information on criteria for consideration for DMH referral.  These institutions were CIM, CSP/Corcoran, CSP/LAC, CSATF, KVSP, MCSP, RJD, SQ, and WSP.

Information on inmate multiple mental health crisis care placements was generated and available to clinicians at CMC, CMF, and SQ.  However, the other institutions had problems with tracking inmates with multiple mental health crisis placements. Problems included data unavailability or the lack of capacity to integrate multiple placements in the MHCB and in alternative crisis care housing.

Data on inmates who had received multiple RVRs was generated and made available to clinicians for the DMH review process at CMF, CSATF, NKSP, and WSP.  CIM began generating this information and making it available to clinicians shortly before the site visit.  CMC generated the RVR data but did not routinely make it accessible to treating clinicians.  However, there were problems with gathering such data at CSP/Corcoran, CSP/LAC, MCSP, and RJD.

CDCR had no system at all for notifying any institution of incoming inmates who had already been placed on the DMH wait list or who were awaiting a decision on whether they would be referred.

437

In summary, the dedicated post-MHARP follow up on institutional DMH referral processes and practices showed that progress has been made at the institutions in at least some aspects of the new process, but that no single institution has completely and successfully satisfied all elements of it. This finding must be interpreted in the context of the nearly 1,000 inmates who were identified and referred to DMH as a result of MHARP. The magnitude of this figure and its implications are staggering when one considers what this number means in concrete, day-to-day terms. The unmet need for inpatient care was of such scale that approximately 1,000 inmates who were so seriously mentally ill as to require immediate inpatient care were not even in the queue for transfer to an appropriate high-level care program at the time they were identified within MHARP. With this knowledge, one is forced to confront the unpleasant but necessary prospect that these patients may have lingered indefinitely in that situation, had the MHARP project not taken place.

At this time, the size of the wait lists for admissions to higher levels of care will continue to be followed. The hope and intent is that CDCR institutions will continue to acquire greater skill and effectiveness with the new DMH referral process and integrate them into their regular practices, and that any new developments with improving the provision of higher levels of care to CDCR inmates will be worked out and implemented. All that said, unless there is indication that MHARP has truly taken root and brought about significant lasting improvement at the institutions with patient identification and referral to higher levels of care, the concern with timely access to DMH programs may well merit another concentrated MHARP-like review to diagnose any lingering issues and resolve the problem, hopefully once and for all.

**CONCLUSION**

I.     <u>**Summary of Institutional Performance in the Monitoring Focus Areas**</u>

Overall, the positive trend seen in mental health staffing during the past few monitoring periods continues, albeit with less of a dramatic improvement than was seen in the past two monitoring periods. There was slight overall improvement in mental health staffing, which continued the positive trend that was seen in the past two monitoring periods although the rate of improvement tapered off. Efforts to reach full staffing appear to be yielding benefit and should be continued.

The collective mental health staffing vacancy rate fell from 19 percent to 16.2 percent, and with use of contractors, the functional vacancy rate for all mental health staffing was virtually unchanged since the preceding monitoring period at 10.9 percent. For supervisory mental health staff, the vacancy rate fell to 11.2 percent, but as usual no contractors were used to cover these vacancies. Improvement was the most notable for senior psychiatrists, with a drop in vacancy rate to 14 percent, down from 38 percent.

Among line mental health staff positions, the overall vacancy rate was 17 percent. With use of contractors, the functional vacancy rate was 11 percent, which represented no change.

As in the past, the greatest mental health staffing challenge for CDCR remained in line psychiatry positions. The previously-reported vacancy rate of 33 percent was lowered marginally to 31.8 percent. Unfortunately, use of contractors did not ameliorate the situation as much as it had in the past. The functional vacancy rate was 13.5 percent, as compared to the earlier rate of six percent. For line psychologists, the picture was somewhat brighter, as vacancy rates continued their pattern of steady decline with a reduction from 18 percent to 10.8 percent.

Use of contractors brought the functional vacancy rate down to 3.4 percent from the six percent rate of the preceding monitoring period.

There was backsliding with staffing levels for social worker positions, as the vacancy and functional vacancy rates grew from past rates of 11 percent and six percent to 14.3 percent and 11.9 percent, respectively.   There was a slight improvement with staffing of psych tech positions, as the vacancy rate declined from 19 percent to 17.7 percent.  As in the past, there was almost non-existent use of contractors to lower the vacancy rate any further.  For RT positions as well, the vacancy rate remained rather high at 20 percent, which was down by only three percent since the preceding monitoring period.  The functional vacancy rate was 17 percent.

In the area of quality management, most of the institutions maintained the fundamentals of a working quality management structure.  A majority of institutions' local governing bodies, QMCs, and mental health subcommittees met regularly.  The majority of institutions' mental health subcommittee meetings had appropriate attendance and took up pertinent agenda items, although custody attendance was lacking at a few institutions.  QITs were active at a large number of institutions.

With regard to audits, CCI, CMF, Centinela, CSATF, MCSP, NKSP, and SQ conducted regular audits.  ASP, CRC, CCWF, and RJD used audits appropriately.  However, a number of institutions were experiencing difficulties with conduct of audits.  These included Calipatria, CSP/Sac, CTF, HDSP, PVSP, and SVSP.

Peer review was in place and active at almost half of the institutions – CCI, CIW, CMC, CRC, CSP/Corcoran, CSP/Sac, CCWF, CTF, Folsom, HDSP, NKSP, PBSP, PVSP, SVSP, and SQ.  At a smaller number of institutions, peer review was conducted but needed

expansion and/or improvement.  A number of institutions including CMF, CCWF, CTF, HDSP, and PBSP, recognized weaknesses with quality management and worked on improving their quality assurance mechanisms.

Efforts to reduce suicides in the institutions resulted in some improved compliance rates in this important area.  All institutions had established an interdisciplinary team, generally in the form of a SPRFIT, as the body through which suicide prevention measures would be evaluated and administered.  The number of institutions which conducted SPRFIT meetings according to Program Guide requirements – one-third of institutions -- remained the same, although the identities of the compliant institutions had shifted.  Sizeable groups of other institutions met at least some of the Program Guide SPRFIT requirements such as achieving regular required attendance at meetings and/or holding the meetings on a regular basis.

ERRC meetings were fully functional at 13 institutions.  CPR training of custody staff was completed appropriately at just under one-third of institutions.  Monthly emergency response drills in administrative segregation were done at slightly over half of institutions, and three more reported conduct of these drills but failed to provide supporting documentation.

There was significantly increased compliance across institutions with conduct of five-day clinical follow-up after inmates were discharged from crisis level care. Almost half of institutions met this requirement, compared to only a third of institutions during the preceding monitoring period.  In addition, another seven institutions reach near-compliance.   Insofar as custody checks following discharges from crisis level care, the institutions had more difficulty, particularly with documentation, tracking, and auditing of these follow-ups.

With respect to implementation of suicide prevention protocols in administrative segregation, all institutions have implemented at least part of the requirements, but almost half of

institutions failed to adequately document or audit their compliance with the elements of this plan. Almost two-thirds used retrofitted or designated intake cells for inmates during their initial 21 days in administrative segregation, which is generally a period of elevated suicidality. Daily meetings between mental health and custody staff took place and were documented at 11 institutions, while others reportedly conducted such meetings but did not properly document them. A sample of ten institutions found that micro-shields and cut-down kits were appropriately available to officers in nine of those institutions.

Over half of institutions had daily psych tech rounds in their ASUs, and about another handful reportedly conducted these rounds but did not provide adequate supporting documentation. For administration of pre-placement medical screens, approximately half of institutions reported that they were noncompliant, or did not adequately document or audit these screens. With post-placement 31-question screens, the institutions did better, with almost 70 percent of them conducting these screens on all new admissions to administrative segregation. Seventy-two percent of institutions were documenting completion of 30-minute welfare checks. However, at two-thirds of institutions, problems persisted with proper timing of these checks on a staggered basis as well as with appropriate documentation of them. Access to ten or more hours of yard time per week was available at 40 percent of the institutions. A number of institutions did not provide information on yard access in their ASUs. Most institutions still did not have electronic entertainment devices in administrative segregation cells, due to structural limitations or an institutional decision to simply not allow them.

In the area of medication management, institutional performance remained mixed. About half were compliant with maintaining medication continuity for newly-arriving inmates, and slightly over half of institutions were compliant with medication continuity following intra-

institutional transfers of inmates.  A clear majority of institutions were timely with medication order renewals.

Many institutions fell short with response to inmates' noncompliance with their medications.  Problems in this area included breakdowns with identification, documentation, referrals, and responses.  Likewise, institutional auditing of medication noncompliance was often deficient.  At least half of institutions managed lengths of pill line and wait times appropriately, but audits in this area were not always solid methodologically or were not done at all at a few institutions.  The institutions were about evenly split with proper obtaining and use of medication informed consent forms from inmates.

A significant number of institutions were partially compliant with laboratory testing of inmates' blood levels of psychotropic medications, but an approximately equal number were problematic or noncompliant in this area.

Large numbers of DOT orders at many institutions continued to raise questions about the appropriateness of these orders.  Ten institutions – CMF, CSP/Corcoran, CSATF, CCWE, CVSP, ISP, KVSP, MCSP, PVSP, and VSPW required that all psychotropic medications be administered DOT.

Appropriate use of the Keyhea process was widespread.  Some institutions continued to lag behind, with inadequate tracking of Keyhea orders, deficiencies in Keyhea administrations, or lack of use of the Keyhea process.  HS medications were also used appropriately at a sizeable group of institutions, while a little more than a handful were outright noncompliant in this area.  However, institutional audits in this area were flawed or outright absent at several other institutions.

Proper distribution of parole medications remained a mixed picture among the institutions.  Compliant institutions outnumbered those which were noncompliant with meeting standards for providing these medications, but a number of institutions did not adequately document or audit their practices in this area.

In the area of inmate sexual misconduct and IEX, the variability that has been seen in compliance with applicable protocols during the past few monitoring periods continued into the twenty second monitoring period.  There was fairly widespread use of custody-driven measures such as use of cell door and window placards and exposure-control jumpsuits, as well as assessments of SHU terms and referrals to the DA.  About one-third of the institutions implemented sexual misconduct protocols reasonably well, with inmates screened timely and referred to the IDTT, and comprehensive evaluations for Exhibitionism completed adequately.  Throughout the system, there were approximately 300 sexual misconduct RVRs issued to inmates, with about ten percent of these cases resulting in referral to Exhibitionism treatment programs at the three designated institutions, CSP/Corcoran, CSP/Sac and PBSP.  Apart from such intervention, there was no other specialized treatment offered for Exhibitionism at the institutions.

Timely access to higher levels of care continued to elude the mental health care delivery system at every level.  The overall picture was one of inmates occupying MHCBs while awaiting admission to DMH care or to an EOP, while other inmates in need of those MHCBs remained in OHUs and alternative housing.  Transfers of inmates in need of care from RCs remained far too slow.

Many institutions made a reasonable number of referrals to acute care, but the number of acute care beds at 130 was increasingly insufficient.  Delays in reaching acute care led

to a number of rescissions. Transfer to acute care at CMF, the only such facility offering that LOC, was timely at only three of the 22 institutions which referred to that program, and nearly timely at one other. Those on the acute care wait list for too long were generally acutely psychotic non-suicidal inmates. At the time of the monitor's visit, five institutions had anywhere from five to 12 inmates on the wait list. Many of these inmates had been languishing there for several months.

The number of referrals to intermediate inpatient care at DMH increased since the preceding monitoring period, due in substantial part to MHARP. Twenty-three of the 26 men's non-desert institutions referred inmates to intermediate care. Noncompliance with the 30-day transfer timeline was common, although deficient documentation and logs made ascertainment of compliance rates for timely transfers difficult to ascertain in some cases. Some institutions had marked increases in rescissions due to the long wait times. As the wait list for SVPP grew to an average of 492 inmates from January to June 2010, the number of transfers to intermediate care at SVPP dwindled. At six institutions, none of their referrals to SVPP resulted in transfers.

The problem of lack of timely access to MHCBs persisted during the twenty-second monitoring period, with fifteen of the 26 men's non-desert institutions reporting untimely access. Although some new MHCBs were activated and some temporary MHCBs were used, units at several institutions were too small to accommodate the local population, leading to many placements in alternative holding areas. About one-quarter of institutions had enough MHCBs for their own populations, with timely access. One institution underutilized available MHCBs by imposing unduly exclusionary criteria to admission and placing inmates needing crisis care into holding areas for one or two days before placing them into MHCBs. As in the past, patient

stays in MHCBs were overly long, as many of these patients awaited transfer to DMH programs, causing a back-up for other patients in need of MHCBs and overly-long stays in OHUs.

Several institutions were able to transfer EOP inmates from mainline within the 60-day timeline. However, no institution reported compliance with the 30-day timeframe for transfers to an EOP hub, with transfers commonly exceeding 60 days and in some cases taking nine months to a year.

Timeliness of transfers to PSUs was mixed, with six institutions providing documentation that showed compliance, but others with EOP inmates who had active SHU terms waiting several months.

None of the RCs consistently transferred EOP inmates within 60 days, with compliance rates ranging from 49 to 59 percent. Only a handful of RCs provided data on 3CMS transfers, and from such limited data it appeared that none of these institutions complied with the 90-day transfer timeline.

The desert institutions placed a total of 530 inmates in the MHSDS during the monitoring period. Three of the five desert institutions reported compliance with the 60-day and 90-day timelines for transfers of EOP and 3CMS inmates, respectively. Of the 50 MHSDS inmates who were mistakenly sent to desert institutions, nearly all waited longer than 30 days for return to an institution with a MHP. Access to MHCBs from the desert institutions continued to be slow generally.

For women inmates, the only available DMH program continued to be PSH, with no distinction between acute and intermediate levels of care. Problems with access to care continued, with high refusal rates at two women's institutions and long transfer delays at the third one. Referrals nearly quadrupled since the preceding monitoring period, again due in large

measure to MHARP, but the average time from referral to transfer was over three times longer than the 30-day timeframe.  MHCBs were available at one of the two women's institutions with MHCBs, although a small number of stays were overly long at one institution, while over one-third of stays were too long at the other.  The third women's institution, which used rubberized safety rooms and observation cells in its OHU for women in need of crisis care, showed significant improvement since the preceding monitoring period.  The rate of such alternate placements exceeding 72 hours fell from over 40 percent to six percent since the preceding monitoring period.  Transfers of EOP inmates from the only women's RC, at CIW, were too long in about a quarter of cases, but transfer timelines for 3CMS inmates were compliant.

Insofar as tracking response to referrals for routine, urgent, or emergent mental health care, more than half of all institutions did not provide data for urgent or emergent referrals, and eight did not provide reliable or complete data for routine referrals.  Based on the limited data provided, about half of routine referrals were non-compliant with the five-day response timeline.  For urgent referrals, which require a response within 24 hours, almost three-quarters were compliant.  For emergent referrals, over 90 percent were compliant with the requirement for immediate response.

## II.    <u>Mental Health Bed and Treatment Space Construction</u>

The twenty second monitoring period was also a time of continued activity, some of which was set in motion before the monitoring period officially began.  A notable example of this was the *Coleman* court's order of March 31, 2009, requiring defendants to respond on a comprehensive and long-term basis to the continued shortage of mental health beds for CDCR inmates, from the EOP LOC up to acute inpatient LOC provided by DMH. The order had a few major components.  One was to set a number of short-term deadlines for compliance with

outstanding orders for mental health beds.  This included the 50-bed MHCB unit at CMC and the 64-bed ICF at SVSP.  It also required defendants to submit a detailed schedule for completion of all other court-ordered construction projects, and to develop concrete proposals to meet the remaining short-term, intermediate, and long-range bed needs of *Coleman* plaintiff class members.  The second major component of the order was for the CDCR and DMH defendants to work together to conduct an assessment and identification of inmates at selected CDCR institutions who may require DMH level(s) of mental health care and to refer and admit those inmates for such care on an expedited basis.

There was a second major bed construction order, filed on June 17, 2009.  This followed a hearing on defendants' bed project activation schedules for already-ordered projects, their short-term and intermediate bed plans for meeting the current mental health bed need, and their long-range bed plan.  Among other things, the court approved the schedules for the court-ordered plans, and required defendants to report monthly to the special master on adherence to the schedule for each project and to take all steps necessary to secure funding for all projects.  Defendants were required to admit *Coleman* class members to fill all dedicated 256 intermediate level care beds at ASH at the rate of not less than ten per week, and, under the guidance of the special master, to finalize their plan for expediting admissions to DMH inpatient facilities.  The assessment and identification of inmates for referral to DMH was expanded to all non-desert institutions.  The order also disapproved the defendants' long-range bed plan.

A third major order, filed on September 24, 2009, required defendants to file a variety of status reports on funding sources, staffing, and alternative avenues by which outstanding court-ordered bed and space projects may be accomplished within discrete timeframes.  The order also required defendants to file yet another detailed long-range plan

including activation schedules, with the condition that all projects in the plan be fully staffed and activated by 2013.

The mandate for defendants in the twenty second monitoring period was set in large part by this trilogy of orders. The defendants demonstrated advancement toward these goals, but still, much remains to be done. There was continued progress with CDCR's short-term, intermediate, and long-range mental health bed construction projects. As of this writing, all projects except the Stark project are expected to be accomplished in compliance with the 2013 activation deadline. The MHCB portion of the Stark project (*see* below) was approved by order of January 4, 2010. However, that portion of the project for additional EOP beds in both GP and administrative segregation has not been approved, due largely to concerns about its latest projected activation and patient admissions date of 2014. With regard to the Stark project, the California Joint Legislative Budget Committee has, for the time being, suspended further consideration of this project for funding approval, given the strain currently surrounding the State of California's budget. .

### A. DMH Acute Care

At CMF APP wing P-2, 36 beds have been converted to acute care beds and remain operated by DMH. As for the 32 beds to be similarly converted in the P-1 wing there, the special master was notified that the project was completed and all 32 beds were filled on December 17, 2010. The shower retrofit at P-1 was completed on December 20, 2010 and was available for inmate use on the following day.

For women inmates, who have received DMH higher levels of care at only 30 beds at PSH, a licensed combination of 45 acute and intermediate care beds is planned at CIW. While the LOC planned for these beds has traditionally been delivered only by DMH programs,

this program is expected to be run by CDCR. Patient admissions are planned to begin in January 2012 and be completed two months later.

The CHCF project in coordination with the *Plata* receiver is expected to produce another 43 acute care beds. As of this writing, ground has been broken for this project. The target date for completion of patient admission to these beds is December 2013.

## B.    DMH Intermediate In-Patient Care, High Custody

The serious, long-standing need for intermediate care for inmates who have high custody factors is a significant aspect of mental health bed construction plans. The new high-custody 64-bed intermediate care facility at SVSP has been completed. At the same facility, in the Treatment Center 2 (TC-2), ten cells were converted to double-occupancy cells and were filled as of February 2010. This project added another ten high-custody intermediate level beds. The conversion of the C-5 and C-6 units at SVSP to high-custody intermediate care programs will result in the addition of another 116 such beds. As of this writing, defendants have been ordered to begin admitting at least ten patients per week to the C-5 unit until it is filled, and then beginning on January 18, 2011 to admit no less than ten patients per week to the C-6 unit until both C-5 and C-6 are both filled. Defendants' appeal of this order to the Ninth Circuit Court of Appeals is pending a disposition by the appellate court.

Another 64 high-custody intermediate care beds are planned for CMF, with patient admissions scheduled to begin in October 2012 and reach completion in December 2012.

The CHCF is expected to produce by far the largest increase in high-custody intermediate care beds, with another 432 beds. As noted above, patient admission to CHCF beds is not expected to begin until March 2013 and be completed by December 2013.

450

### C.    DMH Intermediate In-Patient Care, Low Custody

For low-custody intermediate care beds, DMH completed conversion of 44 Day Treatment Program (DTP) beds at CMF to low-custody intermediate care beds.  Four new high-custody intermediate care beds were added at SVSP D-5 and D-6 units and are now occupied.  In addition, DMH converted 25 beds at ASH to low-custody intermediate care beds.

### D.    MHCB

Insofar as MHCB projects, 17 new MHCBs have been added at the San Quentin CTC.  At CSP/Sac, 20 MHOHU beds have been converted into temporary unlicensed MHCBs, pending completion of permanent MHCBs as part of CDCR's long-term bed plan.  These beds were activated in December 2009.

For the licensed 50-bed MHCB unit at CMC, the working drawings are just about complete as of this writing, with patient admission to begin in August 2012 and be completed in October 2012.  In cooperation with the *Plata* receiver, there are expected to be another 137 MHCBs at the CHCF.  Patient admissions are expected to begin in March 2013 and finish by the end of that year.  Thirty MHCBs at the Stark facility[24] have been approved for construction, but funding under AB 900 remains unavailable.  As a result, this project remains suspended with no timetables for completion.

### E.    PSU

Twenty women's PSU beds will be built at CIW, with activation planned to begin in December 2010 and be completed in February 2011.  At CSP/Sac, 152 PSU beds are planned to come on line, with a March 2013 date for commencement of patient admissions and a May 2013 date for full activation.

---

[24] As stated above, defendants' original proposal in November 2009 to renovate the Stark Juvenile Justice Facility to treat adult inmates also included 525 EOP beds and 50 EOP administrative segregation beds.  Those aspects of the proposal have not been approved as of this time.

F.      **EOP**

1.      **EOP Administrative Segregation**

By far, the largest number of projects is focused on increasing the number of EOP beds. A subset of these projects are intended for inmates at this LOC who are in administrative segregation. Three projects adding a total of 92 EOP administrative segregation beds have already been completed. The first of these is at CSP/Corcoran with the conversion of a Level IV GP unit, plus another 18 beds, for a total of 45 additional EOP administrative segregation beds at that institution. The second such project is at SVSP where another 27 beds have been added, and the third project is at CSP/LAC, where increased staffing has resulted in an additional 20 EOP administrative segregation beds.

Two more EOP administrative segregation projects – both of which are coordinated projects with the *Plata* receiver -- should add a total of another 90 EOP administrative segregation beds. The Estrella Health Care Facility will add 40 such beds, with patient admissions scheduled to begin May 2012 and be completed in September 2012. The other coordinated project is the DeWitt facility, which will add 50 EOP administrative segregation beds, with patient admissions beginning September 2013 and reaching projected full occupancy in December 2013.

2.      **EOP General Population**

The largest class of new beds in CDCR's plan is EOP GP beds. Two of the four projects in coordination with the *Plata* receiver will add a total of 525 EOP beds, made up of 150 EOP beds at the Estrella facility plus 375 EOP beds at the DeWitt conversion project. These two coordinated projects are scheduled for completion in September 2012 and December 2013, respectively.

In January 2010, CDCR was granted permission to replace its 72-bed EOP administrative segregation project and its 96 EOP GP project at SVSP with the new 300 EOP General Population Treatment and Office Space A-Quad Project.   This will result in a net increase of 12 beds over the earlier proposal to add 96 EOP GP project to the existing 192 EOP GP which would have totaled 288 beds. (Docket 3761).  Completion for this project is expected for October 2013.

A dual diagnosis (i.e. mental illness and substance abuse) and treatment program with 88 EOP GP beds at CSATF has accepted some patients, but full activation has been deferred to November 2010.  At CCWF, a 70-bed EOP with treatment and office space is to be completed by the end of December 2013.

### 3.   EOP Sensitive Needs Yards

For new EOP SNY programs, CDCR has completed a 176-bed EOP SNY at CSATF.  As of this writing, the program is fully activated.  CDCR is also converting a 190-bed GP high-custody level SNY at RJD into a 150-bed EOP SNY for high-custody level inmates. Patient admissions have begun and are ongoing.

### G.   Mental Health Office and Treatment Space; Cell Risk Mitigation

A number of construction projects are dedicated to augmenting mental health professional office and/or treatment space.  At CSP/Sac, treatment and office space will be built for the 152-bed PSU and the EOP.  Completion of the PSU space is expected for March 2013, with patient admissions to begin at that time, and with full activation in May 2013. Completion of the EOP space is expected for January 2012.  Office and treatment space will be built for the 67-bed EOP GP at CMF. Activation is scheduled to begin in February 2013 and to be completed two months later.  Added office and treatment space projects are planned for the EOP at

CSP/LAC, to be completed in September 2012; the EOP administrative segregation at CSP/Corcoran, to be completed in April 2013; and the EOP at CCWF, to be completed in December 2013.

There is also a project to retrofit 124 cells in various yards at CMF to make them suicide-resistant. This project is expected to be completed in March 2011.

## III.    CDCR Mental Health Staffing Plan

Inadequacy of mental health staffing in CDCR prisons has been one of the key focal areas of *Coleman* monitoring since entry of the initial remedial order in 1995. From that time forward, mental health staffing remained a critical element in the formulation of a lasting solution to caring for the mentally ill within the custody of CDCR. During the twenty-second monitoring period, CDCR took a significant step toward confronting this challenge.

Among the things required of defendants by the Court's June 17, 2009 order was for them "to take all steps necessary to resolve all outstanding staffing allocation issues" and to "complete a staffing plan by the end of August 2009 . . . under the guidance of the Special Master following the model that was used to develop the activation schedules and the short-term and intermediate plan before the court." [Order June 17, 2009]. Members of the special master's staff assisted a CDCR work group dedicated to developing a mental health staffing plan that was based on a methodology that can address current mental health staffing needs as well as lend itself to necessary adaptation in years to come. The CDCR work group was headed by the Chief Deputy Secretary of Correctional Health Care Services (DCHCS), and included representatives of the CDCR Legal Department, Department of Adult Institutions (DAI), Budget Department, DCHCS, and the *Plata* receiver's nursing staff. Other key participants were

representatives of the California Department of Finance (DOF) and the California Department of the Attorney General.

The defendants concluded that the previously-completed Workload Study had not been developed to a level that was feasible for implementation, and was unsuitable for this project. The special master agreed with that assessment, for the same reasons that he had recommended that it not be adopted in mid-2008. The Workload Study was neither sufficiently comprehensive, nor based on reliable data or objective measures. The defendants decided to develop a staffing plan that is broader than required by the Court's order and addresses a number of concerns in other inmates' rights cases, including those involving medical and dental care, and access to care within the ADA. The special master concurred with that decision, believing that it will be helpful with management of CDCR staffing issues in the future.

From July 1 to September 9, 2009, the staffing plan work group had six in-person meetings and one teleconference. CDCR used data from six other state correctional systems for comparison purposes. It examined staff-to-inmate ratios for RC intake (screening and evaluation), the EOP for GP, EOP administrative segregation, EOP RC, EOP condemned, 3CMS for GP, 3CMS RC, 3CMS administrative segregation, 3CMS SHU, and PSU. Management within the plan included a director of mental health services, a clinical director for institutions with 500-plus mental health caseload inmates, and a senior psychiatrist for institutions with a MHCB unit for three or more major MHPs.

CDCR produced its initial plan on September 30, 2009. The special master's staff worked with defendants, plaintiffs, and other key participants to help refine it. The final plan was ultimately presented in February 2010. Its most significant and necessary changes over prior staffing plans and/or practices were the use of staff-to-caseload inmate ratios, the inclusion

of relief factors for most clinical line staff, and the inclusion of custody staffing, which is essential to the day-to-day logistics of delivering mental health care to inmates. Based on need, CDCR Division of Correctional Health Care Services (DCHCS) will retain the right to allocate line and supervisory staff positions to specific correctional institutions.  This will allow for actual ratios at any given institution to vary as necessary, while total system staff ratios will be consistent with the staffing plan so that the CDCR mental health system will, as a whole, have an appropriate staff-to-inmate ratio for each position.  The special master's experts considered these ratios and allocations for the 3CMS, EOP, and non-mental health administrative segregation areas to be appropriate as long as they may be re-adjusted based on actual experience and as future needs and analyses unfold.

The special master concluded that the staffing plan proposed by the defendants' merited approval, and recommended that it be adopted.  [See Exh. A, special master's letter of March 4, 2010].  The staffing analysis model that CDCR used employed staff-to-caseload inmate ratios, the inclusion of relief factors for most clinical line staff, and the inclusion of custody staff – an indispensible element of the delivery of mental health care to inmates.  The resulting staffing ratios and allocations were found to be reasonable, with the proviso that they may be readjusted if necessary, based on actual experience and as future analyses may warrant.  After having the opportunity to vett questions and concerns in numerous in-person meetings and teleconferences, plaintiffs notified the special master that they would not object to the plan.  As of this writing, funding necessary for implementation of the staffing plan has not yet received legislative approval.

IV.     <u>CDCR Mental Health-Custody Staff Training Plan</u>

        The order of June 17, 2009 also required defendants to develop a staff training

plan as part of the defendants' short-term and intermediate bed plan.  The plan was required to

address dysfunctionality in mental health-custody relations.  The court approved defendants'

proposal to use the "DMH Therapeutic Strategies and Interventions" for training staff at the C

and D units at SVSP, but ordered them to develop another plan, under the guidance of the special

master, for training of other staff.  The special master appointed some of his staff of experts and

monitors to work with CDCR representatives, the Division of Adult Institutions (DAI), the

Department of Finance, and the California Attorney General's office, to develop an appropriate

training plan.  The group met on seven occasions over a nine-week period beginning June 30,

2009.  As part of the process, defendants voluntarily offered three pilot mental health training

sessions, with attendance by the parties' counsel and members of the special master's monitoring

team, followed by discussion and input from attendees.

        After a one-month extension of time, the defendants produced their plan in mid-

October 2009.  With the continued guidance and input of the special master's experts and

monitors, defendants then submitted a revised plan ten days later, incorporating the

recommended changes.  The plan focused on interactions between custody and mental health

staff and their treatment of mentally ill inmates.  It also provides for use of quality improvement

techniques to refine and improve the plan on an ongoing basis, as needed.  The special master

reviewed and approved the plan, as written, with the recommendation that the staffs who conduct

the training receive further training themselves.  Plaintiffs posed no objection to the plan.  The

special master has been advised that such additional training sessions are getting underway,

albeit over a rather lengthy extended period of time, as are the training sessions for custody and mental health staff.

## V.    CDCR-DMH Suicide Prevention Project

The continuing problem of suicides among CDCR inmates was the focus of a great deal of work by special master's staff and the defendants' staff during the past year. On April 14, 2010, this court ordered defendants, under the guidance of the special master, to review all suicide prevention and review policies and their implementation and to identify any modifications that may be necessary to address this problem.   After seven in-person meetings and three teleconferences, defendants produced a report offering a number of strategies and revisions to existing policies and procedures.  The special master's report on this project has been submitted and, as of this writing, the parties have submitted their responses.  An order has been entered, requiring defendants to adopt the various recommendations in the special master's report, and a decision is pending insofar as his recommendation for a plan to implement the use of suicide-resistant beds in CDCR MHCBs.

## VI.    MHTS.net

In November 2008, the California Prison Health Care Services (CPHCS) initiated a new project to develop an internet-based newer generation of the existing CDCR MHTS.  The goal was to consolidate the electronic databases used by each adult institution into a single unified database.  This new MHTS, dubbed MHTS.net, was conceived and designed as an interim measure to overcome many of the limitations of CDCR's prior Excel-based "legacy" system.  The moving force behind this project was to readily make available to care providers the mental health records of inmates who were transferred from one institution to another. The other major impetus behind this project was to set the stage for the next level of electronic record-

keeping, the eventual electronic-Unit Health Records (e-UHR).  The e-UHR is one of the many projects of the *Plata* receiver whose staff continues to work on developing and refining it.

   *Coleman* monitoring during the twenty-second round coincided with CDCR's first effort at transition from its legacy MHTS to the internet-based MHTS.net. As is typical with major shifts to electronic modalities, the transition was less than smooth.  CDCR predicted and notified the special master that foreseeable systemic "growing pains" would impact mental health care delivery at a number of institutions. One of the technical problems with implementation of MHTS.net involved data movement between the databases.  This aspect of the transition had the most direct impact on *Coleman* monitoring during the twenty-second round, as implementation of MHTS.net delayed the development of reporting systems for institutional compliance and management.  The impact on monitoring was felt most acutely in the resulting gaps and inconsistencies in the ranges of data available at several institutions. As *Coleman* monitoring is premised on capturing and presenting as close as practically possible a "snapshot" of conditions across institutions in any given monitoring period, these inconsistencies and gaps in institutional data collection made the usual *Coleman* data collection, analysis, comparison, and reporting that much more difficult and challenging.

   From February 12, 2010 through May 17, 2010, MHTS.net was implemented at 16 institutions: ASP, CIM, CRC, CSP/Corcoran, CSP/LAC, CSP/Solano, CSATF, Centinela, CCWF, DVI, Folsom, HDSP, MCSP, RJD, SVSP, and VSPW.  Among these 16 institutions, ten did not report data problems with the transition to MHTS.net or utilized the legacy system to generate institutional data for the monitor's site visits in the twenty-second round.  These institutions were ASP, CRC, CSP/Corcoran, CSP/LAC, CSP/Solano, Centinela, HDSP, RJD, SVSP, and VSPW.  However, several institutions experienced multiple problems with MHTS.net

during this monitoring period.  In June 2010, CDCR reported to the special master that institutions that had implemented MHTS.net had temporarily lost some of the reporting features available in the legacy system.  As of the end of the monitoring period in July 2010, these reporting features were not fully restored at all affected institutions.

The information-gathering problems encountered as a result of the MHTS.net transition were varied but uniform in their capacity to frustrate data collection.  The validity and reliability of the data from MHTS.net at CCWF was difficult to assess. This institution's reported data that was over six months old at the time of the site visit. Moreover, CCWF had not tested or confirmed the validity of its institutional-level MHTS.net reports at the time of the visit, and continued to maintain a number of key MHSDS data points outside of MHTS.net.  Another institution that was struggling with MHTS.net was CSATF, which was unable to produce data for all of its programs beyond February 28, 2010, even as late as a site visit occurring from July 26 to July 28, 2010.  This meant that at the time of monitor's visit, the presented data was more than four months old.   At CSATF, staff estimated that at that time of the site visit, MHTS.net was 70 to 80 percent functional.

Folsom also presented data up to February 28, 2010 for its site visit which took place from July 20 to July22, 2010. At DVI, MHTS.net somehow automatically removed from the MHSDS rolls those inmates who were returning from crisis care, inpatient care at DMH, or parole.  The untoward effect of this was to cause these inmates to initially be denied access to needed mental health care until the problem was observed and manually corrected. The data presented by MCSP covered the period from September 2009 to February 2010, while the monitor was on site from June 29 to July 1, 2010.  At CRC, where MHTS.net went "live" in January 2010, clerical staff continued to rely on the legacy system to enter data and generate

reports, while they transferred the inputted data to MHTS.net daily. This practice did not permit the institution to test the reliability and validity of its MHTS.net system.  CIM was also still utilizing its legacy system at the time of the monitor's visit.  Staff there reported that tracking data had been found unreliable. PBSP continued to utilize the MPIMS, which is a stand-alone electronic medical records, scheduling, and reporting system that is unique to that institution and not integrated to MHTS.net.  NKSP's legacy MHTS was rated as poor; an internal study found that in nearly one third of cases, documentation of mental health care filed in UHRs was not recorded in MHTS.

By the end of the twenty-second monitoring period in July, 2010, MHTS.net had not been implemented at 17 CDCR institutions.  These were CCC, CCI, CIW, CMF, CMC, CSP/Sac, Calipatria, CTF, CVSP, ISP, KVSP, NKSP, PBSP, PVSP, SQ, SCC, and WSP.

## VII.    Closing

In conclusion, each of the projects which defendants must complete is a very substantial undertaking, demanding a great commitment of CDCR staff time and resources.  The agenda henceforth is comprehensive, requiring among other things that CDCR (1) re-evaluate and update CDCR suicide prevention policies and practices; (2) make sure that seriously mentally ill inmates are properly identified,  referred, and transferred to receive the higher levels of mental health care that they need and that are only available from DMH; (3) review and comply with all elements of their Administrative Segregation Unit Enhanced Outpatient Program Treatment Improvement Plan, including the conduct of a review every 30 days of all EOP inmates housed in ASU hubs for over 90 days; (4) complete the construction of mental health treatment space and beds for inmates at varying levels of care; (5) implement fully their new mental health staffing plan; (6) train staff for greater collaboration between custody and mental

461

health; and (7) refine and implement MHTS.net to its fullest extent and benefit.

The scale of these projects is matched only by the enormity of improvement that is promised upon their successful completion.  Considering that CDCR must advance these projects simultaneously, it is clear that for now CDCR's resources are already fully absorbed in what it needs to do.  Defendants' resources should not be diverted from accomplishment of all of these important goals by additional recommendations.  Adding more to the agenda could dilute already-strained resources and inadvertently prove counterproductive in the long run. Accordingly, the special master has no recommendations for any further orders of the Court at this time.

Respectfully submitted,

/s/

_____
Matthew A. Lopes, Jr., Esq.
Special Master

March 9, 2011

EXHIBIT A
California State Prison, Sacramento (CSP/Sac)
April 12, 2010 - April 15, 2010

**Inmate A**

This EOP inmate was housed in the PSU, and had a diagnosis of Schizophrenia.  He arrived at CSP/Sac on 12/1/09, from SVPP, where he had been hospitalized since 6/19/08.  According to the DMH discharge summary, the inmate was referred due to his refusal to participate in EOP programming; he also had increasing isolation, social withdrawal, and poor impulse control.  The psychiatric discharge summary described a very ill individual who did not respond well to medications, and could not be maintained on Clozaril due to physical concerns; this despite initial improvement following two trials of the medication.

A psychiatrist's progress note dated 11/5/09 stated that "…all medications have failed and the patient remained resistant to treatment and behavioral modalities…"  No treatment recommendations were provided to CSP/Sac.  Another DMH discharge summary, completed by a psychologist, stated that "…(inmate A) remains minimally functional in ICF…is likely not able to fully function at the EOP LOC…(and) it is recommended that (inmate A) be maintained at a long-term psychiatric treatment facility…"  CSP/Sac staff reported that the inmate returned at approximately the same functional level as when he was sent to SVPP.

The inmate was on a Keyhea order for grave disability, and had been since at least January 2008.  His medications included Risperdal 37.5 mg injections every other week, Cogentin 1 mg twice daily, Navane 5 mg twice daily, and Geodon 80 mg twice daily.  He had a backup order for Abilify 9.75 mg injection for refusal of oral psychotropic medications.  Although the treatment plan included group therapy, the groups listed did not appear clinical in nature, and included the laughter and current events groups.  The treatment plan also did not include plans for increased group participation or group therapy modification to incorporate more clinically appropriate groups.  Although Form 7388s, the checklist for DMH referral, were present, they were not filled out completely.

Medical record psychiatric documentation was detailed, and demonstrated significant treatment time dedicated to the inmate in an effort to increase insight and establish a therapeutic relationship.  The PC contacts appeared to be less comprehensive, and most occurred at cell front; at times these contacts occurred cell-front due to inmate refusal, although custody reasons were also noted.

Findings

This inmate was seen by his PC, psychiatrist, and the IDTT, in accordance with Program Guide requirements, following his return to CSP/Sac from SVPP.  However, treatment plans were not substantive, and included incomplete forms as to DMH referral consideration.  Treatment plans also lacked specific goals to increase the inmate's level of functioning, and his treatment involvement.  The IDTT progress note was also incomplete, and all required participants were not present at the IDTT meeting.  Overall, the care provided to this inmate appeared to be inadequate given his illness.

**Inmate B**

This EOP inmate arrived at CSP/Sac on 2/3/10, and was housed in the PSU.  He was seen consistently by the psychiatrist and PC.  There was no documentation that an initial IDTT meeting was held.  An updated treatment plan dated 2/11/10 contained little clinically adequate information, and essentially restated Program Guide requirements.  PC progress notes identified "develop treatment plan with inmate" repeatedly over the weeks with no other treatment interventions mentioned.

Fully completed Form 7388s, the checklist for DMH referral, were not in the medical record.  Although areas of concern were highlighted, they were not addressed.  For example, the inmate stated that he was refusing multiple groups because of concerns for his safety after being attacked by another inmate while being escorted to the treatment area; however, there was no documentation that the clinician addressed this issue.

<u>Findings</u>

This inmate was seen at required intervals by the psychiatrist and PC.  It appeared, however, that PC contacts usually occurred at cell front.
Although the mental health evaluation was completed timely, the form was incomplete and provided little beneficial clinical information.  Treatment plans were not individualized, but were generic in nature.  Some medical record documentation was incomplete.

**Inmate C**

This EOP inmate arrived at CSP/Sac on 5/2/07.  He was housed in the PSU.  The inmate had been on Keyhea orders since at least 8/26/09.  He was prescribed Zydis 5 mg at p.m., Trileptal 600 mg twice daily, Risperdal 1 mg twice daily as needed for agitation, Risperdal microspheres 25 mg injections every two weeks, Artane 5 mg twice daily, and a backup of Geodon 20 mg injections twice daily as needed for refusal of as needed medications.

There was no documentation of group therapy involvement in the medical record.  PC contacts frequently occurred at cell front.  Psychiatric contacts occurred consistently with good documentation of clinical encounters.

<u>Findings</u>

This inmate was seen in accordance with Program Guide timelines by his PC, psychiatrist, and the IDTT; however, the IDTT meeting did not include all the necessary participants.  Psychiatric progress notes were extensive, and documented that the clinician spent significant amounts of time with the inmate.  PC documentation was minimal, and contacts frequently occurred at cell front.  Documentation of treatment planning was poor; treatment goals and interventions were not consistent with interventions indicated in the PC progress notes.  There was no fully completed Form 7388, the checklist for DMH referral.

465

**Inmate D**

This inmate arrived at CSP/Sac on 9/8/09.  He was housed in the PSU.  He was reportedly second on the DMH wait list for transfer to SVPP at the time of the site visit.
He was provided with a diagnosis of Schizoaffective Disorder bipolar type.  He had been on a Keyhea order since January 2009 for grave disability.  He was prescribed Cogentin 1 mg twice daily, Risperdal microspheres 50 mg injections every other week, Navane 5 mg twice daily, Depakote 2000 mg at p.m., and a backup of Thorazine 50 mg injection for refusal of psychotropic medications.

The inmate was seen by the IDTT and ICC on the same date, which occurred within 14 days of his arrival at CSP/Sac.  There was a treatment plan in the medical record, but the Form 7388, the checklist for DMH referral, was not entirely completed.  The Form 7388 only documented the presence of the PC and IDTT leader at the IDTT meeting, although the IDTT progress note indicated attendance by all required participants.  The treatment plan listed treatment goals, but did not include treatment interventions.

Subsequent IDTT meetings occurred on 1/11/10, 2/11/10, and 4/8/10.  It appeared that the inmate was on the DMH wait list for some time, yet he was not seen by the IDTT monthly until 2010.  The Form 7388 from the IDTT meeting dated 4/8/10 also had all but one criterion marked negatively.  It also stated that the inmate had recently returned from ICF LOC; this was an untrue statement.

Although the inmate was seen weekly by a clinician, due in part to staff reassignments, he was not always seen by his PC.  PC contact notes suggested that minimal treatment occurred during those contacts.  Psychiatric progress notes were extensive, and included documentation of inmate education as to psychotropic medications.  There was no group therapy documentation.

<u>Findings</u>

The inmate was seen timely for his initial IDTT, but not for subsequent IDTT meetings.  Treatment planning documentation was of poor quality, and treatment interventions appeared to be inadequate; the only exception was the quality of psychiatric contacts, which was good.  There was no documentation that the inmate was offered the necessary group therapy hours.

**Inmate E**

This EOP inmate arrived at CSP/Sac on 3/22/06, where he was housed in the PSU.  He had been transferred to CSP/Sac from ASH under Welfare and Institutions Code 7301, after he was determined to be an unacceptable safety risk to ASH staff and patients.  The documentation described an escalating pattern of aggression, violence, and sexually inappropriate behavior.  He had been classified as a MDO, and could be accepted back into the state hospital after he attained twelve months without sexually inappropriate, aggressive, or violent behavior and if CDCR's annual extensions for the patient have been continued.  It appeared that the inmate had achieved up to eleven months without any incidents, but then engaged in sexually inappropriate behavior,

including calling out to female staff and rubbing his genitals.  On 6/11/09, he was determined to meet the alternate criteria for Exhibitionism treatment.

Documentation indicated that the inmate was seen weekly by his PC, and monthly by his psychiatrist.  However, the psychiatry progress notes were illegible, and the PC notes did not provide details as to treatment goals or interventions.  Many of the PC contacts occurred at cell front.

The inmate was prescribed Haldol 10 mg twice daily and Cogentin 2 mg twice daily, and was reportedly compliant with psychotropic medications.  He was placed in the IEX treatment group; however, his level of participation could not be determined due to a lack of documentation as to group therapy participation.

An interview with this inmate revealed that he was frustrated, confused, and uncertain of what he must do to return to the state hospital.  He had increasing paranoia that he was unjustly incarcerated; this was reinforced by his current lack of treatment and PSU placement.

Findings

It did not appear that the staff was providing treatment aimed at improving the inmate's functioning to allow for his return to DMH.  The mental health care that was provided appeared to be inadequate, and the assessment of his ability to safely return to DMH may have been overly restrictive.  Treatment planning was inadequate, and lacked specificity.   PC contacts were frequently conducted at cell front, and documentation of these contacts did not adequately include treatment goals and interventions.

**Inmate F**

This EOP inmate arrived at CSP/Sac on 9/8/09, and was housed in the PSU.  He had been on a Keyhea order since December 2009, due to danger to others.  He was provided with diagnoses of Schizophrenia undifferentiated type and Antisocial Personality Disorder.  He was treated with Risperdal 3 mg twice daily, Depakote 1000 mg twice daily, and Geodon 80 mg at p.m. with Geodon 20 mg injections as backup for refusal of Risperdal or Depakote.  The medical record indicated that the inmate improved substantially following implementation of the Keyhea order.  Although he had previously been referred to DMH, the CCAT rescinded this referral based on his improved functioning.

The inmate had previously been assigned to modified/reduced programming.  This status was removed during his January 2010 IDTT meeting due to the inmate's improved functioning following the Keyhea order.  He was seen timely for his initial IDTT and a Form 7388, the checklist for DMH referral, was completed at that time.  A 30 day IDTT meeting was conducted on 3/24/10 for ICF review.  There was no documentation of completion of a treatment plan or update, but only an IDTT progress note completed by someone other than the PC.

<u>Findings</u>

This inmate was generally seen at intervals that were in accordance with Program Guide requirements, and the mental health treatment that he was provided was generally adequate. However, treatment plans should have been consistently and timely updated. The IDTT meetings also did not always include the necessary participants, and psychiatric notes were generally illegible.

## Inmate G

This 3CMS inmate arrived at CSP/Sac on 11/24/09. He was placed at the EOP LOC on 12/29/09. A treatment plan dated 12/29/09 provided a diagnosis of Psychotic Disorder NOS. The inmate was treated with Remeron 45 mg at HS. It appeared that the inmate was briefly prescribed Risperdal, but there was no medical record documentation as to its discontinuation. The medical record also did not contain group therapy documentation or PC notes after 12/31/09.

<u>Findings</u>

The mental health care provided to this inmate was inadequate. There was a lack of documentation as to timely PC and psychiatric contacts. IDTT meetings did not include the necessary participants. Documentation regarding the rationale for medication discontinuation and changes was also lacking.

## Inmate H

This inmate's case was reviewed due to plaintiffs' attorneys' inquiry as to his care, and its possible limitations, due to his need for a wheelchair. The inmate was housed in the PSU. Staff indicated that there was an issue with the inmate's access to treatment after his wheelchair was sent out for repair. Although no record could be produced, staff reported that the wheelchair had not been available to the inmate for at least one month. Although staff repeatedly contacted appropriate personnel to have the wheelchair repair expedited, they were reportedly told that there was a problem with the wheelchair repair contract, which caused further delay. The inmate was not provided with a loaner wheelchair. He used his walker on one occasion to obtain individual treatment, and reported to his clinician that this was very painful. He did not come out of his cell for any further contacts. At one point, the inmate's frustration resulted in his going on a hunger strike. Staff also could not transport him for weighing as he would not agree to be transported on a gurney. This was all very problematic for the inmate, and for the mental health and medical staff trying to help him.

The inmate was provided with diagnoses of Psychotic Disorder NOS and Borderline Personality Disorder; a possible diagnosis of Narcissistic Personality Disorder had also been contemplated. He was prescribed Artane 5 mg twice daily and Effexor 75 mg twice daily. The inmate was reportedly compliant with his prescribed medications.

The inmate had been scheduled for only six hours of treatment due to wheelchair access issues, and his need for noon medication administration. As of 3/1/10, he was scheduled for a full

468

program of ten hours of treatment, with a goal of attending 85 percent of scheduled groups. There were numerous wheelchair accessible cells in the treatment center that could accommodate him. The inmate was seen in accordance with timelines outlined in the Program Guide by psychiatry and his PC.

Findings

The inmate was not provided full access to mental health programming until 3/1/10. He was generally seen timely by the psychiatrist and PC; however, some progress note entries suggested PC frustration that may have impacted provided care.

**Inmate I**

This inmate arrived at CSP/Sac on 8/11/09, from SVPP. The inmate had been placed in the MHOHU/temporary housing on fifteen separate occasions; the last placement occurred on 3/7/10.

The medical record's social work discharge summary dated 8/6/09 indicated that the inmate had been hospitalized at DMH on three occasions; he was admitted to DMH on 6/16/09. The undated DMH psychiatric discharge summary stated that after much difficulty, the inmate had begun to progress. At that time, it was determined that the inmate was stable for discharge to CDCR. DMH provided discharge diagnoses of Bipolar I Disorder mixed episode, Intermittent Explosive Disorder, Dysthymic Disorder, and Polysubstance Dependence; provision of a diagnosis on Axis II was deferred.

The mental health staff at CSP/Sac provided the inmate with diagnoses of PTSD, Intermittent Explosive Disorder, and Antisocial Personality Disorder. The inmate was placed in a dialectical behavior therapy group. Group therapy progress notes were not located in the medical record.

The Form 7388, the checklist for DMH referral, which was dated 3/8/10, indicated that the inmate was making progress in dialectical behavior therapy group, and that DMH placement would disrupt this. It also stated that, in light of the inmate's history of no functional or behavioral changes with DMH treatment, DMH referral should be deferred to allow full dialectical behavior therapy group participation.

This inmate was on a Keyhea order, and was prescribed Abilify 30 mg at p.m., Depakene syrup 500 mg in the morning, and Abilify 9.75 mg injection backup if psychotropic medications were refused with a maximum of two doses in a 24 hour period. A psychiatric progress note dated 4/13/10 indicated that the inmate was benefitting from his medications, and reported satisfaction with them.

PC progress notes documented contacts that were usually extensive and appropriately focused on treatment plan goals, and indicated improvement in the inmate's overall level of functioning. The inmate was seen at least twice weekly. In each contact, the inmate continued to request DMH placement, but the clinical staff documented reasonable justification in their reluctance to refer.

Findings

This inmate was receiving adequate mental health care.  He did not appear to require DMH referral at the time of the site visit; nonetheless, he should be closely monitored.  DMH referral should be reconsidered if improvement was not noted within the next several months.

**Inmate J**

This 3CMS inmate was housed in administrative segregation.  He reported poor access to his PC, and the MHCB.  He stated that he was housed in a ZZ cell for approximately three weeks during January 2010.  He also stated that his son had died during January 2010.

A medical record review indicated that the inmate had three alternative safe housing placements (ASHP) during January 2010 (1/22/10 to 1/26/10; 1/26/10 to 1/27/10; and 1/27/10 to 1/28/10).  The inmate's nephew, who was described as being like a son to him, was murdered.  He was again admitted to a ZZ cell on 2/25/10.

The most recent IDTT meeting that occurred on 3/16/10 did not address the death of the inmate's nephew, or his multiple ASHPs.  Review of the medical record also documented regular PC contact.  At the inmate's request, the monitor's expert attempted to facilitate referral to the chaplin.

Findings

Although the inmate's report as to the duration of his ASHP stay was not accurate, he did in fact have multiple ASHPs.  These stays should have resulted in a MHCB placement, or at least been adequately addressed in an updated treatment plan.

**Inmate K**

This inmate was admitted to the MHCB on 12/28/09; he remained there until 1/4/10.  The inmate was a 31-year-old single man who reported that he had eight children by six women.  He had been assessed as not having a developmental disability, and his test for adult basic education (TABE) score was 8.6.  He was admitted to the MHCB after reporting that he was going to hurt himself.  He was described as agitated and labile, and had threatened to cut himself; he demanded to be placed in four-point restraints.  He reported being angry with custody staff.

The inmate had eight MHCB admissions since 2008.  He had been on a Keyhea order, but that was discontinued.  He had completed the eighth grade and fulfilled all GED requirements with the exception of math.  He had been placed in over 20 foster care and group homes, as well as Juvenile Hall and the California Youth Authority (CYA).  Clinical notes described the inmate as a "well groomed man with muscular build.  He is clean shaven with long braided hair.  Pleasant, cooperative with good eye contact.  Speech WNL, linear and goal directed."  His diagnoses were Mood Disorder NOS, Antisocial Personality Disorder, and epilepsy.  His history was significant for mental health treatment since childhood for rages, mood swings, and uncontrollable behavior.  MHCB notes indicated "(a)t first agitated, uncooperative, angry if he did not get his way.  He

refused his meds threatened an officer and bragged about having stabbed an officer in the past. He started taking his meds and calmed some, then Depakote was added – he gradually calmed further.  On discharge he was calm, not depressed or agitated."

Subsequent progress notes described the inmate's thinking as linear and coherent; he was also described as alert and fully oriented with good grooming and good eye contact.  He was further described as "stable; affect inconsistent from one venue to another – often laughing and engaged with other inmates on the block, on the yard, and in groups, but presents as distressed in the presence of PC.  Always alert and well oriented x3; hygiene, speech, and motor activity within normal limits; unreliable historian; manipulative."

At the time of the site visit, the inmate was on the wait list for SVPP intermediate care.  He was reportedly not compliant with medications, but his Keyhea order was denied by the judge on 9/16/09.  He reportedly attended 58 percent of his groups, and 57 percent of yard, during the past 90 days.  There were also reports that the inmate exaggerated his symptoms.

Findings

Review of the medical record indicated that the inmate had been referred to DMH, and placed into the EOP, subsequent to discharge from the MHCB on 1/4/10.  He was not medication compliant as he won his Keyhea hearing on 9/16/09.  The medical record reflected good cognitive functioning and hygiene, and that the inmate was participating in at least half of his groups and yard.

**Inmate L**

This 3CMS inmate was involved in a serious cell fight which resulted in a head trauma (subarachnoid hemorrhage).  It appeared that this trauma affected the inmate's memory.  He was placed into the EOP on 4/8/10.  There were also indications of "selective mutism;" a progress note dated 4/8/10 stated "the writer entered the section where the inmate is housed to have him sign consent form.  I was able to hear him conversing with one or more neighbors in a normal voice.  When his cell was approached and I announced myself he turned his back on me and refused to respond or acknowledge my presence.  I spoke loudly enough that there was no question he heard me.  I told him I would write on the form that he refused to sign."

Findings

This inmate was receiving mental health services at the EOP LOC, and this LOC appeared to be appropriate.

EXHIBIT B
Folsom State Prison (Folsom)
July 20, 2010 - July 22, 2010

**Inmate A**

This 3CMS inmate arrived at Folsom on 7/15/10, from CSP/Solano.  At the time of arrival, the inmate had been prescribed Paxil, Buspar, and Risperdal.  These medications were ordered on 7/27/10.  An initial treatment plan identified auditory hallucinations, anxiety, and loss as problematic issues for this inmate.  Treatment interventions that were identified included reality testing, healthy living, medication management, medication compliance, cognitive behavioral therapy, and increased coping skills.  The inmate was described as medication compliant.  He was provided with a diagnosis of Psychotic Disorder NOS, and was assessed as having a GAF score of 60.

Findings

The inmate did not receive needed psychotropic medications until 12 days after his arrival at Folsom.  It did not appear that the option of group therapy was considered for him.  The annual IDTT should have included discussion of diagnostic clarification.

**Inmate B**

This 3CMS inmate was transferred to Folsom on 7/9/10, from SVSP.  He had been prescribed Paxil and Vistaril prior to transfer.  At the initial IDTT meeting, the inmate reported that he had not received medication since his arrival at Folsom.

The inmate was provided with a diagnosis of Depressive Disorder NOS, Cocaine and Alcohol Dependence, and Antisocial Personality Disorder.  He was assessed as having a GAF score of 65.  Although he reportedly had a history of a suicide attempt in 1988, he denied SI at the time of the IDTT meeting.  Provided clinical interventions included quarterly PC contacts, stress management, and relapse prevention training.  The inmate was eligible for parole during 2011.  Discharge planning was discussed in the treatment plan, which described pre-release planning within six months of parole with a TCMP worker.  A completed Form 7388, the checklist for DMH referral, was located in the medical record.

Findings

Although this inmate arrived at Folsom on 7/9/10, he did not receive necessary medications until 7/16/10.  The treatment plan was individualized and comprehensive, and appropriately included discharge planning.  It did not appear that group therapy was considered for the inmate.

**Inmate C**

This inmate transferred to Folsom on 7/13/10, from WSP's RC.  He was provided with a diagnosis of Bipolar Disorder.  At the time of transfer, he had been prescribed Geodon; he had been prescribed Remeron in the past.  He had a reported history of intermittent involvement in the MHSDS, including placement at times in the 3CMS and EOP programs.  The inmate also reportedly had a history of medication noncompliance with subsequent decompensation.  He had a GAF score of 64.

473

At the time of the initial IDTT meeting, the inmate was reportedly noncompliant with prescribed Remeron and Geodon. A completed Form 7388, the checklist for DMH referral, was completed at the IDTT meeting. The treatment plan identified mood disorder symptoms, poor impulse control, medication noncompliance, and grief issues as problem areas. Although the treatment plan identified interventions, they were somewhat generic in nature.

Findings

The inmate timely received his medications upon arrival at Folsom. However, it did not appear as though he had been referred to or evaluated by a psychiatrist since his arrival. The Form 7388 was completed by the PC and located in the medical record, but the IDTT meeting did not include discussion of DMH referral.

**Inmate D**

This 3CMS inmate transferred to Folsom on 7/9/10, from SVSP. He was provided with a diagnosis of Dysthymic Disorder, and was assessed with a GAF score of 68. He had been prescribed Remeron 15 mg/day at HS. The mental health evaluation was completed on 7/14/10.

Findings

The C-file was not available for review at the IDTT meeting. Although the inmate was scheduled for parole during 2011, there was no documentation of discharge planning discussion. The Form 7388, the checklist for DMH referral, was completed and located in the medical record. The inmate had been referred appropriately to an anger management group.

**Inmate E**

This inmate was transferred to Folsom on 5/18/10, from NKSP. The inmate was placed into the 3CMS program on 5/28/10; at that time he reportedly had a GAF score of 65. He reportedly was placed at the EOP LOC on 7/16/10, when he presented with difficulty programming, poor ADLs, paranoia, and auditory hallucination; his GAF score at that time was assessed as 48.

The inmate was prescribed Celexa, Abilify, Trilafon, and Benadryl. He subsequently signed a refusal for Benadryl and Trilafon on 6/28/10. He was provided with a diagnosis of Schizoaffective Disorder.

Findings
This inmate was closely monitored, and his LOC was appropriately changed from 3CMS to EOP. After his EOP placement, he was seen weekly by his PC and psychiatrist. Consistent follow-up was documented in the medical record.

**Inmate F**

This EOP inmate was awaiting transfer to an EOP program.  He spoke only Spanish, and required the use of an interpreter.  He was prescribed Remeron and Risperdal.  There was documentation that the inmate was medication noncompliant on or about 7/14/10 when he did not show up for medications.  He was placed into an EOP program on 7/21/10.

<u>Findings</u>

This inmate was seen consistently by his PC, leading to the increase in his  LOC.  As the inmate had been placed at the EOP LOC close to the time of the site visit, review of the frequency of follow-up could not be determined.

EXHIBIT C
Pelican Bay State Prison (PBSP)
April 6, 2010 - April 8, 2010

**Inmate A**

This EOP inmate's medical record was reviewed at the request of plaintiffs' attorneys. The inmate resided in the B-3 housing unit. He suffered from a bowel condition that added significant stress to his mental health treatment. It was requested that the monitor's expert review the inmate's current treatment plan to determine whether he should be transferred to another treatment setting to address his expressed medical and mental health treatment concerns.

Findings

The inmate's medical record was reviewed. He was seen by a physician during August 2007 related to an appeal relevant to his medical complaints, with specific reference to his gastrointestinal symptoms. A progress note adequately documented the physician's judgment for determining that the inmate was currently receiving adequate medical care for his gastrointestinal complaints. This inmate was not in need of transfer to another treatment setting.

**Inmate B**

This administrative segregation 3CMS inmate's medical record was reviewed at the request of plaintiffs' attorneys. The inmate reported that he had been off of his prescribed medications for approximately six months. He had been referred to psychiatry prior to an MHCB admission. As of the monitoring visit, the inmate reported that he still had not received mental health medications.

The inmate reported that he was being subjected to a longer IEX disciplinary sentence under PBSP IE pilot program regulations. The inmate believed that recently adopted statewide IE regulations would impose a shorter IE disciplinary term. It was requested that the monitor's expert review the inmate's medication regimen, confirm what disciplinary actions had been taken against him, and determine whether the inmate had been evaluated for possible inclusion in CDCR's IE treatment program.

Findings

This inmate's medical record was reviewed. An updated treatment plan was last documented during December 2006, when it was determined that the inmate did not have any Axis I diagnoses. It was determined that the inmate's inappropriate sexual behavior was not related to a paraphilia, but was directly related to a personality disorder. The inmate had previously been diagnosed with Bipolar Disorder and/or Mood Disorder NOS. Documentation was inadequate relevant to the change in his diagnosis, which appeared, at least in part, to be a mental health computer tracking issue.

A review of the inmate's C-file indicated that he was found guilty of IEX on 3/10/07, but no penalty was assessed due to time constraints. He was also assessed 90 days on 9/10/07 for an incident that occurred on 7/24/07. He had two pending RVRs for IEX incidents on 11/8/07 and 11/9/07. There was a pending DA referral for the 11/9/07 incident; the DA rejected the referral for the 7/24/07 incident. RVRs for IEX were referenced as occurring during 2005 and 2006, for

which credit was assessed.  The inmate also had multiple RVRs for incidents involving willfully delaying, willfully resisting, and willfully inciting, for which penalties and loss of privileges were assessed.  Another IEX assessment was pending.

PBSP's policy and procedure regarding IE was governed by the pilot Freitag litigation, and not the statewide IE regulations.  The monitor's expert understood that the penalty provisions of the Freitag policies and procedures were different than the statewide regulations.

EXHIBIT D
Mule Creek State Prison (MCSP)
June 15, 2010 - June 17, 2010
July 13, 2010 - July 14, 2010

**Inmate A**

This EOP inmate was housed in the GP. He was diagnosed with Major Depressive Disorder (MDD) with psychotic features. He was treated with Keppra 1000 mg/day at HS.

The inmate transferred to MCSP on 11/16/09, from SVSP. His EOP treatment history was noted, and he was referred to mental health. He was initially transferred to the ASU, and was placed at the EOP LOC; he had been EOP at SVSP. The inmate's medications were ordered on the following day. He was subsequently transferred to the Level IV EOP SNY. Subsequent progress notes indicated that the inmate had sporadic group compliance, and discussed the inmate's chronic pain; his treatment focused upon addressing depressive and anxiety symptoms. He was seen consistently by the psychiatrist and PC, and his medications were adjusted as clinically indicated.

Findings

There was documentation of informed consent for treatment with psychotropic medications, and that the necessary participants were present at the initial IDTT meeting. Treatment planning was timely, and was specific to the inmate's individual treatment concerns. The Form 7388, the checklist for DMH referral, was documented. The inmate was seen at least bimonthly by the PC, and at least quarterly by the psychiatrist.

**Inmate B**

This EOP inmate was transferred to MCSP on 10/21/09. He was diagnosed with Schizoaffective Disorder, and was treated with Geodon 120 mg/day. He was housed in the ASU, after reportedly threatening staff, for much of the monitoring period. It appeared that the inmate was briefly transferred to the EOP during December 2009. He returned to administration segregation on 1/11/10, following a charge of harassment using mail. He was followed consistently by PCs and psychiatrists.

Findings

There was documentation of medication continuity upon arrival at MCSP. The medical record contained informed consent forms for treatment with psychotropic medications. Consistent psychiatric contacts, and weekly PC progress notes and psych tech notes of daily rounds, were documented. IDTT meetings included the necessary participants. Documentation indicated that the appropriate laboratory testing for treatment with Geodon had been conducted. It appeared that the treatment team completed the Form 7388, the checklist for DMH referral. It was of concern, however, that this inmate with reported cognitive deficiencies was charged with having undue familiarity with staff, and was housed in administrative segregation, when progress notes indicated that his mental status might have contributed to this behavior.

**Inmate C**

This EOP inmate was housed in the GP.  He was diagnosed with MDD with psychotic features.  He was treated with Prozac 40 mg/day, Buspar 60 mg/day, and Abilify 30 mg/day.  The inmate was on a Keyhea order that would expire on 9/28/10.

The inmate had been housed at MCSP since September 2008.  He was a participant in the MHSDS at the EOP LOC throughout the monitoring period.  Progress notes indicated that the inmate had been on a Keyhea order since November 2008 due to dangerousness to self.  Since being placed on Keyhea, the inmate was reportedly involved in group therapy, consistently medication compliant, and exhibited stability of psychotic symptoms and suicidal thinking; however, he had poor insight as to his mental illness.

The inmate was placed in administrative segregation for one day after his involvement in an altercation.  Upon his return to EOP, he was seen by the psychiatrist on 12/3/09 due to a report of auditory hallucinations.  The progress note indicated that Abilify and Prozac would be increased at that time.  At the next psychiatric contact on 12/24/09, however, the psychiatrist noted that the medication increase had not occurred; the inmate's medications were adjusted at that time.  Subsequent progress notes indicated improvement of symptoms after additional medication adjustments.  However, the inmate remained with poor insight regarding his need for treatment with psychotropic medications.

Findings

There was documentation that the inmate was involved in group therapy in the EOP, and that IDTT meetings considered transfer to a higher LOC.  The inmate was seen consistently by the PC and psychiatrist.  The appropriate laboratory testing for treatment with Lithium was conducted, as a trial of Lithium was considered.  There was no documentation, however, that the necessary participants were present at the initial EOP IDTT meeting.

Of concern was documentation that the psychiatric progress note written on 12/3/09 indicated that medications would be increased due to an increase in psychotic symptoms with depression.  There was no documentation that such orders were provided by the psychiatrist.  There was documentation of laboratory orders by the same psychiatrist on that date.  This medication adjustment did not occur until the inmate was seen for psychiatric follow-up on 12/24/09.

**Inmate D**

This EOP inmate was housed in the GP.  He was diagnosed with Schizophrenia paranoid type and Mood Disorder NOS.  He was treated with Geodon 160 mg/day, Navane 5 mg/day, Inderal 80 mg/day, Remeron 30 mg/day, Prozac 40 mg/day, and Cogentin 6 mg/day.

This inmate arrived at MCSP on 1/22/10, from NKSP.  He was initially placed into the ASU to bed unavailability in the EOP, and was later placed into EOP housing.  Subsequent progress notes indicated that the inmate presented with chronic delusional thinking and auditory

hallucinations, but he was medication compliant and involved in treatment. Remeron was added on 2/24/10 to address continued depressive symptoms.

<u>Findings</u>

Informed consent forms for treatment with psychotropic medications was present in the medical record. The inmate's medications were ordered upon arrival at MCSP; however, it was not possible to verify actual medication delivery as the January 2010 MAR was not in the medical record. There was documentation of weekly psych tech progress notes of daily rounds, and PC contacts in administrative segregation and the EOP. The appropriate laboratory testing for treatment with Depakote was obtained, and abnormal laboratory results were addressed as clinically indicated. The EOP IDTT meeting included the necessary participants. There was documentation of the completion of the Form 7388, the checklist for DMH referral, at the IDTT meeting. However, the treatment plan was generic in content.

**Inmate E**

This 3CMS inmate was housed in the GP. He was diagnosed with Adjustment Disorder with depressed mood; a provisional diagnosis of Dysthymic Disorder was also present in the medical record. The inmate had been housed at MCSP since 2005. He was treated with Remeron 30 mg/day at the time of the site visit. Progress notes indicated that the inmate was seen consistently by the psychiatrist and PC. He reportedly was stable and working, and enjoyed his job.

<u>Findings</u>

There was documentation of at least quarterly PC and psychiatric contacts. The IDTT meeting included the necessary participants, and the treatment plan was specific to the inmate's treatment needs.

EXHIBIT E
California Medical Facility (CMF)
May 4, 2010 - May 6, 2010

**Inmate A**

The inmate had a history of attempted suicide beginning at the time of his crime in 1991.  He had prior DMH admissions; his last DMH hospitalization occurred on 1/5/10.  The inmate had been placed on the high risk caseload in Level II, and was seen by the IDTT monthly.  He was seen by his PC weekly, but had inconsistent participation in structured therapeutic activities.  The psychologist from the high risk team presented information on the inmate's treatment planning to assist the treatment team.  The inmate was prescribed several medications including Invega, Thorazine, Mellaril, Lithium, and Cogentin.  The psychiatrist who attended the IDTT was not the inmate's treating psychiatrist, but was covering for another psychiatrist.

Findings

This inmate's care and treatment appeared to be appropriate for his mental health needs.  He was followed by the high risk team, and the IDTT team members appeared knowledgeable about his history and current functioning.  The psychiatrist at the IDTT meeting was not the treating psychiatrist for this or other inmates presented, and had to review the medical records to obtain information during the IDTT meetings.

**Inmate B**

This inmate was observed in an IDTT meeting during the site visit, and his medical record was subsequently reviewed.  The inmate had a diagnosis of Schizophrenia paranoid type.  He had a history of gouging both of his eyes in 2007, resulting in blindness.  The inmate had been in the EOP for a number of years, and had a two year history at DMH APP.

The inmate had returned from the SVPP ICF program one week prior to the IDTT meeting.  He was hospitalized in the SVPP ICF program for eight weeks, and was discharged with a GAF score of 30.  DMH discharge documents indicated that the inmate had received the "maximum benefit" from hospitalization.  Since his arrival on the N-1 unit at CMF, the inmate had not come out of his cell for groups; he only left for medications and meals.  The inmate was on a Keyhea order, and was treated with Risperdal, and with Geodon and Haldol as backup medications as necessary.

Upon interview, the inmate presented with fixed delusions of both grandiose and paranoid themes.  These delusions included concerns that others would harm him, and that he would harm others.  The inmate provided a rambling, tangential, and idiosyncratic rendition of his thoughts; he also presented with pressured speech, with religious references.  He reported that he was not suicidal but had safety concerns regarding others.  The psychiatrist in the IDTT meeting was not the inmate's treating psychiatrist, and had to review the medical record during the IDTT.  The psychiatrist asked extensive questions about medication changes, medication compliance, and overall symptoms.

A review of the inmate's medical record indicated that he was admitted to the CDCR on 3/15/07, and transferred that same day from CMF to DMH APP.  The inmate was treated at DMH from September 2007 to February 2008.  The medical record indicated that he gouged his eyes out

during November 2007, while on suicide watch at DMH.  The inmate's most recent DMH stay occurred at the SVPP ICF from 1/23/09 to 4/27/10, with his return to N-1 as noted above.

Findings

This inmate's care and treatment were of serious concern in that he appeared to have a severe and persistent psychotic disorder with fixed delusions, fears of being harmed by others, and a history of harming himself; the medical record indicated that such self-harm included gouging out his eyes while on DMH suicide watch.  Of great concern was his return from the SVPP ICF to the EOP at CMF with a GAF score of 30, after he reportedly had received "maximum benefit."  This inmate's care and treatment should be reviewed, and he should be closely monitored for the need to return to a higher LOC, such as DMH ICF, for long term treatment.

**Inmate C**

This inmate was observed during the biweekly group meeting with his PC on the N-1 unit.  Medical record review indicated that the inmate was on a Keyhea order, and was provided with diagnoses of Schizoaffective Disorder and Personality Disorder NOS.  An IDTT meeting on 5/4/09 noted these diagnoses.  A CC-I was not present at the IDTT meeting.

The inmate was referred to the DMH ICF program.  The Form 7388, the checklist for DMH referral, addendum dated 6/8/09 indicated that the inmate was seen monthly because of the pending ICF referral; he had been accepted at CSH for a Clozaril trial but was waiting for a bed.  A Form 7388 dated 7/1/09 indicated that the inmate had apparently transferred to ASH, where he remained until 12/31/09, when he returned to CMF.

IDTT meetings were conducted on 2/1/10 and 4/8/10.  At the April 2010 IDTT meeting, the Form 7388 addendum was completed and described the inmate's diagnosis, mental status exam, and progress toward treatment recommendations, but did not list medications.  The addendum noted that the inmate had been transferred to ASH; however, he did not receive a Clozaril trial.  The reasons that were noted included "no referral question provided" and "resistant to blood draws."  A PC note of 3/30/10 described this process.

The inmate continued to be seen on a monthly basis by the IDTT and the psychiatrist.  It was noted that during March 2010, the inmate participated in 26 of 45 hours of structured therapeutic activities; the remaining hours were either cancelled or excused.

Findings

Although the inmate's care and treatment at CMF appeared to be appropriate, the medical record presented a confusing picture.  It stated that the inmate was accepted at CSH for a Clozaril trial, but subsequently transferred to ASH where he did not receive the trial.  The record was also confusing in that it stated that the reason the inmate did not receive the Clozaril trial was because of the lack of a clear referral question, and the inmate's resistance to blood draws.  There was no additional information regarding efforts by DMH staff to obtain the inmate's consent for the Clozaril trial while at ASH, or of the reasons that he was not transferred to CSH.  It did not

appear that the inmate was offered the required ten hours of structured therapeutic activities weekly.

## Inmate D

This EOP inmate's medical record was reviewed. The inmate was on a Keyhea order. He was admitted to the CDCR on 12/19/96, and transferred to CMF on 8/4/09. An IDTT dated 10/20/09 was completed, but the meeting was not timely. The IDTT provided a diagnosis of Psychotic Disorder NOS and Personality Disorder NOS. There was no CC-I present at the IDTT meeting.

The inmate had been hospitalized at DMH due to dangerousness to self and others, and he was subsequently transferred to the EOP ASU after receiving a 115 for IEX. The RVR that the 115 was based on was dismissed. The Form 7388, the checklist for DMH referral, dated 6/18/09 noted that the inmate had seven MHCB admissions during the past six months due to SI and delusional thinking. There was documentation that indicated that during February 2010, the inmate was offered sixteen hours of structured therapeutic activities; he received six and refused ten hours. An additional twenty-eight hours of groups were cancelled during that month. A Form 7388 was not located in the medical record for January 2010.

Findings

This inmate had multiple MHCB admissions in a short time period, and ultimately was transferred to DMH. However, he continued to have poor participation in structured therapeutic activities, and did not receive IDTT review in a timely fashion. Transfer to ICF LOC should have been considered.

## Inmate E

This mainline EOP inmate's medical record was reviewed because he had an alternative treatment plan based on his low attendance in structured therapeutic activities. The inmate had diagnoses of Schizophrenia paranoid type and Personality Disorder NOS. The treatment plan dated 12/8/09 was an addendum to the alternative treatment plan and noted that the inmate had been waiting 29 months, since DMH referral, to be transferred to DMH. The inmate had poor participation in programming for 15 months, and was seen every 30 days for treatment planning. He also received individual PC contacts, and attended a case management group. Treatment plan addendums were not located in the medical record for January or February 2010; there was only a March 2010 notice indicating that the treatment plan was reviewed without the inmate's presence. The inmate was seen every two weeks by his PC, and several times per month by the psychiatrist.

Findings

This inmate's participation in structured therapeutic activities was poor; however, the CMF mental health staff developed an alternative treatment plan format. Unfortunately, monthly updates were not located in the medical record; despite this, the inmate was seen frequently by

the PC and psychiatrist.  The inmate should be closely monitored for further disposition as the treatment plan indicated that he had been waiting for 29 months for DMH transfer.

## Inmate F

This mainline EOP inmate was admitted to the CDCR on 4/5/96, and transferred to CMF on 12/24/08.  An IDTT dated 2/24/10 indicated a diagnosis of Schizophrenia paranoid type, Polysubstance Dependence, and Antisocial Personality Disorder.

The inmate was hospitalized at DMH from 10/29/09 to 12/2/09 for SI.  After his return to CMF, he was seen by a psychiatrist on a monthly basis.  He participated in approximately 80 percent of structured therapeutic activities during February 2010.  This resulted in the inmate only participating in 16 hours that month, and 18 hours were cancelled.

Findings

This inmate was not offered the required ten weekly hours of structured therapeutic activities during February 2010, when CMF had a high number of lockdown days.  Otherwise, the inmate's care and treatment appeared to be appropriate for his mental health needs.

## Inmate G

This inmate was observed during the biweekly meeting with his PC, and his medical record was subsequently reviewed.  The inmate was admitted to CMF during November 2008 with a diagnosis of MDD, severe with psychotic features.  After his arrival at CMF, the inmate was transferred to DMH APP based on his history of eight previous suicide attempts, and traumatic brain injury.  He returned to CMF and was placed on a high risk management protocol.  He was seen by his PC weekly in either individual or group contacts.  He participated in 80 to 90 percent of the structured therapeutic activities offered to him during February and March 2010.  There were, however, thirty cancelled groups in February 2010.  The inmate was seen by a psychiatrist on a monthly basis.

Findings

This inmate's care and treatment appeared to be appropriate with the exception of the high cancellation rate for structured therapeutic activities during February 2010.

## Inmate H

The monitor's expert reviewed this mainline EOP inmate's medical record.  He was admitted to the CDCR during 1999, and transferred to CMF on 12/8/08.  A Form 7388, the checklist for DMH referral, dated 9/18/09 indicated diagnoses of MDD, severe and recurrent with psychotic features, and Generalized Anxiety Disorder.  There was appropriate documentation of IDTT meetings that occurred on 12/4/09 and 2/18/10.  The inmate was seen monthly by a psychiatrist, and weekly by his PC.  The inmate's group attendance was low for February 2010 due to the high number of group cancellations; the inmate attended 13 of 25 groups that month.

Findings

This inmate's care and treatment appeared to be appropriate for his mental health needs, with the exception of the low number of structured therapeutic activities offered during February 2010.

**Inmate I**

This mainline EOP inmate was admitted to the CDCR on 10/14/99. He was placed into the EOP program on 3/11/10, and had an IDTT on 3/23/10. The IDTT provided diagnoses of Substance-Induced Psychotic Disorder, Cocaine Dependence, and Phencyclidine Abuse. There was no CC-I in attendance at the IDTT. The inmate was seen twice monthly by a psychiatrist during March 2010, and weekly by his clinician. There was no information in the medical record regarding participation in structured therapeutic activities.

Findings

Although the inmate's care and treatment appeared to be appropriate, there was a lack of documentation as to the amount of structured therapeutic activities that the inmate had been offered.

**Inmate J**

This inmate was housed in the mainline EOP. He was admitted to the CDCR on 10/28/09, and transferred to CMF on 1/15/10. IDTT documentation dated 1/15/10 indicated a diagnosis of Bipolar Disorder NOS; the inmate also had a history of head injury. All required treatment team members participated in the IDTT meeting. The inmate was seen by his PC and psychiatrist weekly. The inmate attended 13 of 17 hours of offered structured therapeutic activities during February 2010; 27 hours were cancelled during that month.

Findings

This inmate's care and treatment appeared to be appropriate with the exception of the low number of structured therapeutic activities offered during February 2010.

**Inmate K**

This inmate was observed during his biweekly group meeting with his PC. His medical record was also reviewed. The inmate was admitted to CDCR on 10/28/92, and transferred to CMF on 5/28/97. The inmate was provided with diagnoses of Schizoaffective Disorder, Attention Deficit Hyperactivity Disorder (ADHD), and Personality Disorder NOS.

The inmate had a history of two previous suicide attempts. IDTT meetings conducted on 10/28/09 and 1/22/10 included the necessary participants. The inmate was offered structured therapeutic activities as follows: December 2009, 33 hours received of 47 hours available; February 2010, 31 hours received of 39 hours available; and March 2010, 62 hours received of 70 hours available. The inmate was seen by his PC weekly, and by the psychiatrist monthly.

Findings

This inmate's care and treatment appeared to be appropriate for his mental health needs.

**Inmate L**

This inmate was observed during his biweekly group meeting with his PC. His medical record was also reviewed. The inmate was admitted to CDCR on 1/11/02, and transferred to CMF on 8/12/03. The inmate, when seen during the group meeting, was in a wheelchair. The medical record indicated that the inmate did not have any neurologic or other dysfunction in his lower extremities or back; there was consideration that he had a Conversion Disorder versus a Factitious Disorder. The inmate had a history of Bipolar I Disorder and Personality Disorder NOS.

Although the inmate was transferred to CSH for six weeks to pursue a Keyhea order, he returned from CSH with no Keyhea order in place. He also had been transferred to SVPP to pursue a Keyhea order, but returned to CMF without a Keyhea order in place.

The inmate participated in approximately 80 to 85 percent of the structured therapeutic activities offered to him. He was seen by his PC on a weekly basis. He was not prescribed psychotropic medications. The medical record indicated that the psychiatrist met with the inmate monthly to encourage him to consider taking psychotropic medications, but the inmate refused.

When interviewed, the inmate remained delusional with rapid, pressured, and sometimes irrelevant speech. It was determined that the inmate did not pose a risk of danger to self or to others, or have grave disability, despite his insistence on placement in a wheelchair.

Findings

This inmate's care and treatment appeared to be adequate in that the staff was doing as much as they could to enhance treatment without using psychotropic medications. The inmate refused medications, and DMH staff determined that the inmate did not meet the criteria for a Keyhea order; therefore, none was obtained. The staff should continue to pursue the inmate's consent to take psychotropic medications as it would likely improve his condition.

**Inmate M**

This mainline EOP inmate was observed during a biweekly meeting with his PC, and his medical record was subsequently reviewed. The inmate was admitted to CDCR on 2/3/88, and transferred to CMF on 7/23/95. The inmate had diagnoses of Schizoaffective Disorder, Personality Disorder NOS, and brain injury. His IDTT meetings occurred timely with the appropriate participants present. The inmate was seen by his PC on a weekly or biweekly basis, and was seen monthly by a psychiatrist. The inmate attended 85 to 90 percent of his scheduled structured therapeutic activities; these activities included work activities that were reflected in his medical record.

Findings

This inmate's care and treatment appeared to be appropriate for his mental health needs.

**Inmate N**

This mainline EOP inmate was observed during his biweekly meeting with his PC.  His medical record was also reviewed.  The inmate was transferred to CMF on 3/6/06, and his IDTT provided diagnoses of Schizophrenia paranoid type and Mood Disorder NOS.  The IDTT addenda of 9/22/09, 12/17/09, and 3/10/10 were appropriate based on the requirement for mental status examination, diagnoses, and progress in treatment; they did not, however, list the inmate's medications.  The inmate was seen weekly or biweekly by his PC, and monthly by a psychiatrist.  The inmate attended 47 of 60 structured therapeutic activity hours in November 2009, 36 of 41 in December 2009, and 28 of 35 in February 2010.  A listing of structured therapeutic activities for January 2010 was not located in the medical record.

Findings

This inmate's care and treatment appeared to be appropriate for his mental health needs, with the exception of the number of therapeutic hours offered during February 2010, due to lockdown cancellations.

**Inmate O**

This EOP inmate was housed in the EOP ASU.  He was diagnosed with Schizophrenia paranoid type.  He was not treated with psychotropic medications at the time of the monitoring visit.

The inmate was transferred to CMF on 12/24/08, from PVSP.  He was receiving 3CMS LOC at that time.  The medical record indicated a history of DMH treatment and prior EOP placement.  The inmate exhibited evidence of delusional thinking with agitation, and was transferred to the EOP on or about March 2009.  Subsequent progress notes indicated that the inmate continued to exhibit disorganized and at times aggressive behavior, loose associations with thought blocking and neologisms, paranoid delusional thinking regarding others' attempts to harm him, treatment refusal, and refusal of psychotropic medications.  He was referred to DMH for intermediate care during September 2009.  He was also placed on an alternative treatment plan due to DMH referral and treatment refusal.  An ICC determined that the inmate was not suitable for dormitory living, and he was referred to SVPP and placed on the wait list.  The inmate was placed in administrative segregation during March 2010 due to a staff assault; he remained in that unit at the time of the visit while awaiting DMH transfer.

Findings

This inmate was appropriately referred to DMH for ICF LOC, and placed on a modified treatment plan which addressed his specific treatment issues.  Of concern was the long wait list for SVPP admission for this severely ill inmate housed in the ASU; however, the treatment team appropriately monitored the inmate with increased frequency.  Also of concern were psychiatric

progress notes, such as one dated 12/30/09, which indicated that the inmate was psychiatrically stable and should be considered for 3CMS LOC; this psychiatrist also did not recommend or encourage treatment with antipsychotic medications. These findings were in direct contradiction to other progress notes that described the inmate as floridly psychotic and treatment resistant. Despite these symptoms, it did not appear that the inmate met the criteria for a Keyhea petition; however, he should continue to be followed closely as to the need for MHCB and/or DMH acute care, and/or a Keyhea petition.

**Inmate P**

This EOP inmate was housed in the ASU. He was diagnosed with MDD recurrent and Substance-Induced Psychotic Disorder with hallucinations. He was treated with Abilify 25 mg/day, Prozac 40 mg/day, Cogentin 2 mg/day as needed, and Benadryl as needed.

The inmate transferred from DVI to CMF on 10/2/07 at the 3CMS LOC. The inmate had a period of treatment in the EOP during late 2007. Progress notes indicated that he had a history of poor treatment compliance with group therapy and medications. The inmate was transferred to the ASU during November 2009 due to safety concerns, where he initially presented with some increase in depressive symptoms. At the time of his transfer he was evaluated after initially presenting with SI; he was appropriately evaluated and referred to the psychiatrist for medication review. The inmate was also transferred to the EOP LOC at that time. Subsequent progress notes indicated that the inmate attended most of his groups and was medication compliant, but with continued complaints of racing thoughts and auditory hallucinations. He was otherwise described as functioning at his baseline.

Findings

There was documentation of the completion of an ASU pre-placement chrono at the time of placement in that unit. The treatment plan was individualized for this inmate's specific needs. He appeared to be at the appropriate LOC, and the IDTT considered the need for transfer to a higher LOC. Clinical contacts occurred as required.

**Inmate Q**

This EOP inmate was housed in the ASU. He was diagnosed with Schizoaffective Disorder bipolar type. He was treated with Geodon 120 mg/day. He had a long history of mental health treatment that included DMH and MHCB hospitalizations. He was originally transferred to CMF on 1/13/09, from RJD, and was receiving EOP LOC. During August 2009 he was transferred to the ASU for protective custody after he incurred debts on the yard.

It appeared that the inmate programmed well in the ASU, but he reported chronic auditory hallucinations and delusional thinking. He was subsequently transferred back to RJD during November 2009, where he was placed in the ASU. The inmate suffered head trauma while housed at RJD reportedly after a fall requiring treatment at an outside hospital. He was also hospitalized at the MHCB at RJD due to SI during March 2010. The inmate returned to CMF on or about 4/22/10, and was returned to the ASU due to safety concerns.

Findings

This inmate was appropriately placed at the EOP LOC. IDTT meetings consistently documented consideration of the need for transfer to a higher LOC. Clinical contacts occurred as required. The inmate was scheduled for group therapy as clinically indicated.

**Inmate R**

This EOP inmate was housed in the ASU. He was diagnosed with Bipolar Disorder NOS. He was treated with Depakote 2000 mg/day, Zoloft 150 mg/day, and Thorazine 100 mg/day. He had a long history of suicide attempts and mental health treatment. He had chronic tremors of his extremities and torso that affected his speech and balance. The inmate was previously housed in the EOP at CMF, and was transferred to the ASU during January 2010 after a battery on a corrections officer, resulting in a possible third strike. He initially presented with anxiety upon transfer to the unit, but this decreased after the DA did not pick up the case. The inmate was involved in group and individual therapy. He was referred to the neurologist due to his movement disorder. The most recent progress notes indicated that the inmate remained with depressive symptoms, but actively participated in his treatment.

Findings

The appropriate laboratory testing for treatment with Depakene was performed. The inmate was properly placed into the EOP LOC. IDTT meetings consistently considered the need for transfer to a higher LOC. Clinical contacts occurred as required. The inmate was scheduled for group therapy as clinically indicated.

**Inmate S**

This EOP inmate was discharged from DMH ICF on 3/31/10. He was admitted to VPP ICF from RJD during July 2008. He was serving a life sentence for murder. The inmate had a history of several suicide attempts as well as hospitalization as an adolescent at ASH. At the time of DMH admission, the inmate reported moderate depression, substantial anxiety, and paranoia. At the time of discharge, he reportedly had decreased anxiety and paranoia, and was cooperative with treatment interventions at VPP. His discharge medications included Zoloft, Vistaril, Haldol, and Abilify.

On 3/29/10 the inmate reportedly exhibited anxious mood with pressured speech. A progress note dated 4/7/10 described similar symptoms. Three days later, the clinician described the inmate as psychotic with severe symptoms. The inmate was prescribed Haldol and Inderal at that time. The inmate was reportedly medication compliant.

The most recent treatment plan located in the medical record was dated 2/4/08. A progress note dated 4/7/10 extended the Form 7388, the checklist for DMH referral, evaluation process for an additional 14 days; it did not appear that the evaluation was timely completed. Although the inmate was assigned to ADL, community meeting, and rehabilitation therapy, his group attendance was inconsistent.

Findings

This inmate was unstable at the time of review, and it appeared that he was less stable than at the time of DMH discharge.  There was no documentation in the medical record of clinical consultation between DMH and CDCR.  The discharge summary was located in the medical record.  There was no indication that the IDTT had recently considered this inmate for DMH referral.

**Inmate T**

This EOP inmate was admitted to VPP acute care on 2/3/10, from CSATF.  This occurred following an incident in which he made superficial lacerations to his arm, and reported that he had command hallucinations telling him to cut himself.  He was discharged from VPP on 3/18/10.  The inmate had a history of several previous MHCB admissions.  At DMH he denied that he intended to kill himself, and was compliant with treatment. Although some notes indicated that the inmate did not present at DMH with evidence of psychosis, he was provided with discharge diagnoses of Psychotic Disorder NOS and Borderline Personality Disorder.  He was treated with Risperdal, Zoloft, and Benadryl.

The most recent CDCR treatment plan was dated 4/12/10.  The Form 7388, the checklist for DMH referral, indicated that the inmate did not meet any criteria for DMH referral consideration. PC progress notes dated 4/5/10 and 4/19/10 described the inmate as stable.  He was seen by the psychiatrist on 4/28/10 and 5/5/10.  The inmate was not scheduled for groups during March 2010.  There was no documentation that this inmate had been involved in group therapy since his mid-March 2010 DMH discharge.

Findings

The inmate appeared stable since his DMH discharge.  It did not appear that this inmate had been seen or provided with out-of-cell therapy as per Program Guide requirements.

**Inmate U**

This EOP inmate arrived at CMF on 3/24/10, from DMH.  The discharge summary noted that the inmate was admitted on 6/17/09 with a history of auditory hallucinations, suicidal thoughts, and paranoid delusions.  At the time of discharge he was described as pleasant, polite, alert, and oriented.  The discharge diagnosis was Schizoaffective Disorder bipolar type, in partial remission.

A treatment plan dated 4/19/10 included a diagnosis of Cyclothymic Disorder and Personality Disorder NOS.  The Form 7388, the checklist for DMH referral, attached to this plan indicated no basis for DMH referral consideration at that time.  Although the inmate was seen by a psychiatrist on 3/24/10, the notes documenting this encounter were illegible.  On 3/30/10 he was seen by a PC who reported that the inmate presented as clean and oriented with appropriate eye contact.  At a clinical contact that occurred on 4/14/10, the inmate was again described as stable.

493

<u>Findings</u>

This inmate appeared to be stable after DMH discharge.

EXHIBIT F
San Quentin State Prison (SQ)
April 26, 2010 - April 28, 2010

**Inmate A**

This EOP inmate was housed on condemned row.  He was provided with a diagnosis of MDD, severe and recurrent with psychotic features, in partial remission.  He had a history of depression and auditory hallucinations; he had recently been hospitalized in the MHCB for a suicide attempt with ideation secondary to auditory hallucinations.  The five-day follow-up forms were located in the medical record, and indicated that he had stabilized.  At the time of the monitoring visit, the inmate was in the Intensive Treatment Program (ITP) due to his lack of general participation in treatment.

Findings

This inmate had a long history of depression, auditory hallucinations, and suicide attempts.  His group participation was considered to be poor, and resulted in his placement in the ITP.  The medical record did not inclde a Form 7388, the checklist for DMH referral, indicating IDTT consideration of such referral.  As this inmate likely met DMH intermediate care referral criteria, he should have been considered as a candidate; it appeared that the inmate's status on condemned row prevented this consideration.

**Inmate B**

This 3CMS inmate was a new arrival to SQ from DVI; the inmate had been sentenced to 236 years.  His medication regimen included Prozac, Risperdal, and Trazodone.  Progress notes in the medical record indicated that he reported his only symptom at the time of the monitoring visit was "some depression."  The clinical assessments were completed at DVI prior to transfer to SQ.

Findings

This inmate appeared to be receiving mental health services at the appropriate LOC.

**Inmate C**

This EOP inmate was housed on condemned row.  He had been diagnosed with Delusional Disorder paranoid type, and his illness was long-standing.  According to progress notes in the medical record, treating clinicians' expressed concern with the inmate's deteriorating mental status.  He was described as "bizarre with delusions of persecution and being controlled by wireless airwaves."

The inmate had recent MHCB admissions that occurred on 3/11/10 and 4/9/10 due to increased agitation, loud and pressured speech, and increased paranoid delusional ideation.  A progress note dated 4/14/10 for mental health follow-up reported that "…custody informed that the (inmate) had been pacing in his cell and shouting at custody accusing them of plotting to kill him and make it look like a suicide…His delusional belief system is fully intact and not amenable to reality checking."  Due to concerns regarding the inmate's mental health status, his PCs saw him at least twice weekly.

496

This inmate had a history of numerous head injuries as well as multiple hospitalizations at DMH APP. The inmate also had 14 OHU placements and four MHCB admissions since early 2010. He was considered to be a high risk patient.

<u>Findings</u>

This inmate had a long-standing major mental disorder that included paranoid delusional thinking. He had multiple OHU, MHCB, and DMH APP placements, and there was concern that his mental health was deteriorating. The expert consulted with the mental health supervisory staff about this inmate, who concurred that DMH intermediate care was clinically appropriate, but not available.

**Inmate D**

The initial IDTT meeting for this 3CMS inmate occurred on 4/16/10. The IDTT documentation was not complete as it lacked relevant clinical information and a treatment plan. The initial evaluation was more informative and reported that the inmate had a diagnosis of Schizoaffective Disorder with multiple prior psychiatric hospitalizations. The inmate was admitted to a locked psychiatric facility for four months, and made a serious suicide attempt at age 26. He had received six 115s for minor infractions. The IDTT documentation indicated that the inmate had a "mood disorder and doing well and stable on meds." It further indicated that he had been treated for anxiety with Buspar and Remeron.

<u>Findings</u>

The IDTT documentation and treatment plan for this newly arrived inmate was neither complete nor informative. Although the inmate was described as "doing well and stable on meds," this inmate had a substantial psychiatric history which included involuntary hospitalizations and suicide attempts. The inmate should have been monitored closely with greater attention given to formulating a more thorough treatment plan, and consideration for transfer to a higher LOC.

**Inmate E**

This 3CMS inmate had a long history of traumatic brain injury. He had multiple surgeries, and had reportedly been in a coma. Medical record documentation also indicated that the inmate had AIDS and experienced chronic pain. He was provided with a diagnosis of Cognitive Disorder NOS. He was described as hostile, argumentative, and rude; he reportedly stated that he would stab someone if he did not get medications. He was referred to the TTA after that threat.

The inmate reported that he had completed his GED and had 18 college credits. He further reported that he had read all of the classics while serving seven years in prison, and was also reading Russian authors.

Findings

This inmate had a long history of traumatic brain injury, and it was possible that he was suffering from personality changes due to this brain injury. This inmate might benefit from a thorough neuropsychological evaluation.

**Inmate F**

This EOP inmate recently returned from DMH after hospitalization for SI. He had a long history of SI, and the IDTT recommended return to DMH as the inmate "continues to exhibit poor judgment, poor reality testing, and a tendency towards self-destructive behavior - including erratic medication compliance - that requires close monitoring of symptoms and behavior – closer than our EOP program can provide."

Findings

As per the IDTT, this inmate warranted another referral to DMH. This case might require involvement of the CCAT.

**Inmate G**

This EOP inmate's medical record indicated some confusion with his appropriate LOC. He was described as exhibiting a dysphoric mood with flat affect; he was further described as alert and fully oriented. He also reportedly exhibited poor judgment and insight. An IDTT note stated that a change to the 3CMS LOC was warranted; however, the PC's subsequent note indicated that the IDTT would retain the inmate at the EOP LOC.

Findings

This inmate appeared stable, but there was confusion within the treatment team regarding the appropriate LOC. The IDTT should clarify the appropriate LOC for him.

EXHIBIT G
Deuel Vocational Institution (DVI)
May 18, 2010 - May 20, 2010

**Inmate A**

Based upon available medical records, it appeared that this inmate arrived at DVI during August 2009. The inmate had multiple OHU and MHCB admissions during the monitoring period. Although he was identified for referral to DMH for intermediate care on 12/11/09, the DMH referral packet was not actually submitted until 3/11/10. On 2/24/10, a chrono in the medical record indicated a referral to DMH acute care. The inmate remained on the DMH referral log indicating that acceptance was pending. However, an IDTT progress note dated 4/1/10 and the DMH referral checklist did not note that status; nor was there indication that the inmate met any of the criteria for referral. The inmate was downgraded from EOP to 3CMS during that IDTT meeting.

Findings

It was of concern that there appeared to be a several month delay in the submission of this referral to DMH. There also appeared to be confusion regarding actual referral to DMH, and whether the inmate met referral criteria. Treatment plans were generic and not individualized. Downgrade from EOP to 3CMS was also of concern as this inmate met the criteria for consideration of referral to DMH acute care.

**Inmate B**

This inmate was identified for DMH intermediate care referral on 11/4/09; however, there was no documentation in the medical record referencing the referral. At the time of the site visit, the DMH log indicated that no referral had been submitted. It appeared from the medical record that the inmate paroled on 1/8/10, and returned to custody on 1/15/10. An IDTT progress note dated 2/17/10 did not comment on the prior identification for referral to DMH intermediate care; nor was possible referral to a higher LOC discussed.

This inmate reportedly had a history of several incarcerations at DVI RC, and had an extensive history of mental illness. The DMH log indicated that the inmate had been identified for referral again on 3/17/10; however, no referral was submitted at that time. Progress notes indicated that the inmate consistently refused mental health care, including confidential clinical contacts.

Findings

This inmate was identified as needing referral to DMH intermediate care on two occasions; despite this, it appeared that he was never actually referred to DMH. This inmate met the criteria for DMH referral and should have been referred.

**Inmate C**

This inmate arrived at DVI on 8/18/09, and was referred for further evaluation on 8/21/09. He was placed into the 3CMS LOC on 10/30/09, and was subsequently placed into the EOP LOC on 12/8/09. No mental health evaluation was located in the medical record, but a treatment plan dated 12/15/09 included a diagnosis of Anxiety Disorder NOS. There was documentation of five

OHU placements, and at least one MHCB hospitalization, since his arrival at DVI.  According to the C-file, the inmate was transferred from the MHCB at CMF to DMH acute care at VPP; however, documentation of this hospitalization was not located.

Findings

This inmate was not transferred to the EOP LOC within required timelines; however, his placement in the MHCB and DMH were contributing factors.  The inmate had a significant history of mental health treatment, and met the criteria for consideration of DMH hospitalization.  DMH referral should have been considered for this inmate.

**Inmate D**

This inmate arrived at DVI on 3/26/10, from SQ.  The inmate had at least four OHU placements and two MHCB admissions since 3/1/10.  Although a mental health evaluation completed on 3/26/10 provided a diagnosis of Psychotic Disorder NOS, the inmate was not prescribed psychotropic medications at the time of the site visit.  A review of the medical record indicated that the inmate was previously diagnosed with Bipolar Disorder NOS while hospitalized in the MHCB at HDSP.  A psychiatric progress note at DVI documented the psychiatrist's intent to prescribe Prolixin, Cogentin, Prozac, and Symadine; however, no corresponding order was located in the medical record.  A treatment plan was also not located in the medical record.

Findings

This inmate was seen timely for his bus screen, mental health screen, and mental health evaluation.  The inmate was not seen timely by the psychiatrist, PC, or IDTT.  His transfer to the EOP LOC was delayed due to his multiple OHU placements and MHCB admissions.

**Inmate E**

This inmate arrived at DVI on 3/29/10.  He was screened for mental health issues on 3/30/10, and subsequently referred for further evaluation.  The evaluation of that same date listed MDD, severe with psychotic features, as his primary diagnosis.  He was placed into the EOP at that time.  An IDTT was conducted on 4/1/10.  The inmate was prescribed Cogentin 1 mg/day, Haldol 5 mg/day, and Remeron 30 mg/day, which were all administered at HS.

Findings

The care that was provided to this inmate was generally consistent with his required LOC, but with some omissions noted.  He was seen consistently by the PC and psychiatrist.  However, treatment plans were not individualized for the inmate's specific treatment needs.  The necessary participants were not present at the IDTT meeting as no CC-I was present.  The medical record was disorganized and progress notes were not filed chronologically.

**Inmate F**

This inmate arrived at DVI on 3/30/10, and was screened by mental health on 4/1/10, when he was referred for further evaluation. The evaluation occurred on 4/14/10, and listed a diagnosis of Psychotic Disorder NOS with a recommendation for placement at the 3CMS LOC. The inmate was admitted to the OHU at that time for SI. He was subsequently transferred to the MHCB at CMF. While hospitalized in the MHCB, it was determined that the inmate required a comprehensive diagnostic assessment that was only available at specific DMH facilities. The treating staff also determined that a trial of Clozaril was indicated, as well as referral to DMH. It was, however, unclear if the inmate was ever actually referred; the DMH referral checklist stated that assessment would be ongoing, suggesting that no referral was made.

Findings

The inmate was generally seen by the PC and psychiatrist as required. The initial IDTT meeting did not appear to have occurred timely. It appeared that there was consideration of transfer to a higher LOC. It did not appear, however, that an actual referral was completed or documented; nor was there explanation regarding this omission.

**Inmate G**

This inmate returned to DVI on 5/13/10 after he had either been at a county jail or on parole for approximately one month. His C-file was not available. There was no documentation that the inmate received a mental health screening. The mental health roster indicated that the inmate had actually been housed at DVI since March 2010. The staff reported that arrival dates were incomplete in MHTS.net, and this case would suggest that to be true.

Findings

This inmate should have received bus and mental health screens upon his arrival at DVI. There appeared to be a problem with the accuracy of data in the MHTS.

**Inmate H**

This inmate arrived at DVI on 1/19/10. He was screened, evaluated, and seen by the IDTT on the following day, and was placed into the EOP.

A review of the medical record indicated that the inmate had two OHU placements, and one MHCB admission due to grave disability. His most recent treatment plan listed his primary diagnosis as Schizophrenia disorganized type. He was prescribed Haldol Decanoate 100 mg intramuscular every two weeks. A psychologist progress note dated 4/5/10 stated that the inmate should be prioritized for DMH referral and placement. The medical record indicated that the inmate was referred to DMH on 4/12/10.

Findings

There was documentation that the inmate was appropriately screened and timely evaluated. He was seen consistently by the PC and psychiatrist. He was also appropriately referred to DMH for stabilization.

**Inmate I**

This EOP inmate was housed in the ASU. He returned from DMH acute care on 5/10/10. As a precaution, he was placed in the OHU immediately upon his return from DMH, and was released to administrative segregation the following day. DMH provided the inmate with a diagnosis of Schizophrenia paranoid type; yet the diagnosis of Psychotic Disorder NOS was continued at DVI, as was the diagnosis provided prior to DMH transfer. The inmate was prescribed Abilify, Zyprexa, Cogentin, Vistaril and Depakote, which were ordered upon his return to DVI.

Findings

Medications were appropriately ordered the day the inmate arrived at DVI. The DMH discharge summary was not located in the medical record; nonetheless, some handwritten notes and medication information accompanied the inmate upon his return to DVI. The inmate was appropriately placed into the EOP LOC given his recent return from DMH acute care, and his psychiatric symptomatology. He was not receiving EOP LOC services in administrative segregation at DVI; DVI was unable to provide the requisite hours of out-of-cell structured therapeutic activity due to inadequate treatment space.

**Inmate J**

This EOP inmate was housed in the ASU. He arrived at DVI on 3/7/10. The medical record indicated that the inmate required multiple MHCB hospitalizations due to "decompensation, auditory hallucinations and disorganized thinking." He was provided with diagnoses of Psychotic Disorder NOS and Mood Disorder NOS. Progress notes indicated that the inmate improved dramatically when he was prescribed Zydis, which was a non-formulary medication. His most recent MHCB hospitalization occurred during March 2010 and, as a precaution, he was placed in the OHU immediately upon his return. He remained in the OHU from 3/29/10 to 3/31/10. The non-formulary approval for Zydis expired on 4/12/10, and, anticipating the expiration, the treating psychiatrist ordered Haldol and Cogentin as a substitute. The last psychiatric progress note in the medical record was written on 4/9/10 when the medication change was ordered.

Findings

There was no documentation of the rationale for substituting medications rather than requesting an extension of the non-formulary medication. This was of concern in light of the inmate's clinical response to Zydis, and previous repeated episodes of decompensation on other agents that were prescribed. The inmate was seen on daily psych tech rounds in administrative segregation, but was not seen at appropriate intervals by either the psychiatrist or PC. His

treatment plan had not been updated since his return from the MHCB. Of concern was the lack of additional psychiatric follow-up after the medication substitution.

Clinically, the inmate appeared to be appropriate for the EOP LOC; however, he was not receiving that level of clinical services at the time of the site visit.

**Inmate K**

This 3CMS inmate was housed in GP. He arrived at DVI on 2/1/10. The intake screening was remarkable for a history of Bipolar Disorder and mental health difficulties. He had been treated with Seroquel 600 mg/day in the county jail; information regarding treatment there accompanied the inmate, and was included in the medical record. Upon arrival at DVI, the inmate's Seroquel dose was tapered and discontinued, and he was started on Trilafon. Two months later, after the inmate experienced difficulties with Trilafon and a second traditional antipsychotic medication, a non-formulary medication request for Seroquel was submitted and approved.

A comprehensive mental health evaluation was completed on 2/8/10. The initial treatment plan was dated 3/17/10, and included a referral to psychiatry for medication evaluation with follow-up to occur in one month. The treatment plan also identified manic symptoms and drug use as problems. The intervention included a generic listing of interventions rather than a comprehensive intervention plan specific to this inmate. The Form 7388, the checklist for DMH referral, accompanied the treatment plan, and no referral factors were identified.

Findings

The inmate appeared to be at the appropriate LOC in the 3CMS program. He was seen approximately monthly by psychiatry, and at least quarterly by the PC. Treatment planning lacked individual specificity. It was unclear why an attempt to secure non-formulary drug approval was not initiated upon his arrival at DVI instead of treatment with medications that had previously been ineffective for him.

**Inmate L**

This 3CMS inmate arrived at DVI on 6/16/10. He was provided with a diagnosis of Schizoaffective Disorder. He was treated with Depakote 1000 mg twice daily. This medication was ordered upon his arrival to DVI; quarterly laboratory studies, including a complete blood count and Valproic Acid level, were also ordered. A serum Valproic Acid level on 6/23/09 was reported as 127.8 μg/mL, which was mildly elevated. This elevated serum level was not noted until a psychiatric appointment on 10/7/09, when a repeat serum Valproic Acid level was ordered. The dosage of Depakote remained the same. The repeat blood level was 28.8 μg/mL, which was sub-therapeutic and unexpected given the previous level and absence of a prescribed dosage change. There was no mention of this lab result in any subsequent psychiatric progress note.

Psychiatric visits occurred monthly. A psychiatric progress note was dated 2/3/10, which was also the date of an IDTT meeting; the psychiatric progress note indicated that clinical interaction

occurred during the IDTT meeting.  The inmate reported at a visit that occurred on 3/24/10 that he had not received his Depakote for two weeks.

The inmate was seen by his PC on 10/7/09, 10/27/09, 1/5/10, 3/8/10, 3/24/10, and 4/21/10.  Two treatment plans identified as the initial treatment plan were dated 7/30/09 and 2/3/10.  Interventions were listed as "1:1 Contact, Med Management, Dx Education, Coping Skill and CBT (Cognitive Behavioral Therapy) for Depression."  PC progress notes did not specifically mention the use of any of these modalities.  The inmate was routinely questioned about his medication compliance, and was reportedly compliant.  Despite such reported compliance, the PC progress note stated that the inmate was "counseled about the consequences of medication noncompliance."

Findings

The inmate appeared to be stable, and was receiving care at the appropriate level in the 3CMS program.  Although medications were ordered at the time of arrival at DVI, the inmate's case illustrated the persistent problems with medication continuity, failure to respond to laboratory results, and treatment plans that lacked specificity.  It was also not appropriate for the psychiatric clinical contact to occur during the IDTT meeting.

**Inmate M**

This 3CMS inmate arrived at DVI on 12/17/09; the bus screen identified a history as a Vietnam veteran with PTSD, and a "chemical imbalance" for which he was treated with Effexor.  The inmate was seen by the psychiatrist on the day following his arrival when Effexor was continued.  A comprehensive mental health evaluation was conducted on 12/30/09 that concluded that the inmate had a significant history of alcoholism, PTSD, depression, and anxiety.  He was provided with diagnoses of Mood Disorder NOS and Alcohol Dependence.

Subsequent psychiatric contacts were documented on 1/27/10 (a cell-front interview), 3/3/10 (evaluation during the course of an IDTT meeting), and 4/14/10.  PC contacts occurred on 2/8/10, 3/1/10 and 5/10/10.  The treatment plan dated 3/2/10 listed "depressive and PTSD symptoms" as problems with the following interventions: "1:1 Contact Med Management, Coping Skills Training, Relapse Prevention, Dx Education, CBT for Depression."

Findings

The inmate appeared to be stable, and was receiving care at the appropriate level in the 3CMS program.  He was seen by the PC and psychiatrist consistently and within Program Guide requirements.  There was a problem noted regarding the psychiatrist providing psychiatric evaluation and treatment during the IDTT meeting.  The treatment plan was vague, and was not individualized for this inmate's specific treatment needs.  Possible interventions for specific problems were also vague and generic, and were not addressed during treatment with the PC.

**Inmate N**

This 3CMS inmate arrived at DVI on 1/5/10. Information from the sending county jail indicated that he had been treated for depression with Zoloft and Effexor, and included the medication dosages previously prescribed. The medications were ordered at 1:00 pm on the day of his DVI arrival, and the MAR indicated that medications were administered beginning on the following day.

The psychiatrist saw the inmate on 1/6/10 when an informed consent form for treatment with psychotropic medications was obtained. Subsequent psychiatric appointments occurred on 1/25/10, 2/24/10 (during an IDTT meeting), and 4/14/10. The treating psychiatrist added Abilify to the antidepressant regimen at the April appointment for "targeting residual depressive and anxiety symptoms." The inmate had not been seen for psychiatric follow-up as to his response to this medication addition at the time of the site visit. PC contacts occurred on 2/23/10 (brief mental health evaluation), 4/5/10, 5/4/10, and 5/13/10. An IDTT meeting was conducted 2/24/10.

Findings

From medical record documentation, the inmate appeared to be receiving the appropriate LOC in the 3CMS program. Difficulties in the care provided included use of the IDTT meeting for psychiatric medication management, failure to use any therapeutic intervention beyond medications to address mild symptoms that may have been amenable to cognitive behavioral interventions, and failure to timely monitor new medication responses.

**Inmate O**

This 3CMS inmate arrived at DVI on 3/12/10. Transfer information from the county jail verified that the inmate was treated there with Haldol, Cogentin, and Prozac, and was provided with diagnoses of Schizophrenia and possible Bipolar Disorder. The medications were ordered for the inmate upon his arrival at DVI. A mental health evaluation was conducted on 3/25/10, and a diagnosis of Schizophrenia paranoid type was provided. There was documentation by nursing staff as to consistent medication refusal on 4/5/10 and 4/20/10. The inmate stated that he had been refusing Haldol due to medication side effects that were not addressed by Cogentin. He was seen by the psychiatrist on 4/15/10, but the psychiatric progress note did not mention this medication side effect; rather, it indicated that the medication was discontinued "against medical advice." On 4/27/10, the PC saw the inmate in preparation for the IDTT meeting. The psychiatrist documented a psychiatric visit that occurred during the IDTT meeting on 4/28/10; the progress note indicated that the medications had been discontinued. The inmate was reportedly asymptomatic at the time of the IDTT meeting. The plan was for follow-up within 30 to 60 days.

Findings

Although this inmate was seen consistently by the PC, and timely by the psychiatrist, problems were noted regarding the inmate's care. Medication side effects were not effectively addressed, leading to medication refusal by this inmate with a known history of a recurrent psychotic disorder. The inmate's complaint of muscle stiffness, a known side effect of Haldol, could have easily been addressed by changes in the Cogentin dosage or time of administration. The planned interval for follow-up was too remote given the nature of the inmate's illness and lack of needed treatment.

**Inmate P**

This 3CMS inmate arrived at DVI on 11/19/09 from a county jail. Transfer information from the county accompanied the inmate, and revealed a history of treatment for hypertension and migraine headaches. For reasons that were unclear, the inmate was referred to mental health and placed on the 3CMS caseload. He was seen by psychiatrists on 12/15/09, 12/16/09, 1/14/10, 2/18/10, and 2/24/10. One of the psychiatrists prescribed a low dosage of Thorazine, and another psychiatrist prescribed Buspar. It is unclear from the progress notes whether either psychiatrist was aware of the other psychiatrist's prescriptions or visits.

A brief mental health evaluation by the PC on 2/23/10 provided Amphetamine Dependence as the sole Axis I psychiatric disorder. Additional PC visits occurred on 12/8/09, 2/9/10, and 5/13/10. At the time of the site visit, the inmate requested that all medications be discontinued; he cited his desire to obtain a job as his reason for medication discontinuation, and also stated that the medications were never needed.

Findings

There was inadequate documentation in the medical record to justify the prescription of any type of psychotropic medications for this inmate. It appeared that the care provided to this inmate was somewhat fragmented, and there were apparent communication issues.

**Inmate Q**

This 3CMS inmate was housed in the ASU at the time of the site visit. He arrived at DVI on 4/15/10 as a parole violator from Butte County Jail; information from the county jail accompanied him to DVI. The inmate's history was significant for diagnoses of Bipolar Disorder and Schizophrenia; he had not, however, been treated with psychotropic medications. A comprehensive mental health evaluation was performed on 4/27/10, and diagnoses of Mood Disorder NOS and Polysubstance Dependence were provided. The evaluator noted that the inmate had previously been in the 3CMS program, and had received a past diagnosis of Psychotic Disorder NOS.

At an IDTT meeting that occurred on 5/4/10, the above diagnoses were confirmed. The intervention in the depression treatment plan was identified as cognitive behavioral therapy. The Form 7388, the checklist for DMH referral, was completed on the same date, and was attached to the IDTT form. No criteria for consideration of a higher LOC were noted at that time. The

507

following day, the inmate was scheduled for a psychiatric assessment when he was prescribed Remeron for depressive symptoms.  The inmate was seen daily during administrative segregation rounds.

Findings

The inmate was seen consistently by clinicians, and did not appear to require a higher level of mental health care.  It appeared, however, that medication management was the only treatment modality that was utilized to address this inmate's minimal psychiatric symptoms, despite other available alternatives.  The inmate's condition had been managed for years without medication during previous CDCR stays, and in the community.  His symptom distress was consistently recorded as fairly mild by several observers.  In spite of a lengthy history of mental health treatment in CDCR institutions and in the community on parole, there was a lack of documentation of efforts to clarify this inmate's diagnosis despite apparent disagreement regarding this issue.

**Inmate R**

This 3CMS inmate was housed in the ASU at the time of the site visit.  He arrived at DVI on 1/12/10 from the San Joaquin County Jail.  He was not treated with psychotropic medications at the county jail.  The bus screen that was conducted on the day of his arrival at DVI revealed no history of mental health treatment or current mental health difficulties.  An administrative segregation pre-placement screening was also conducted on the DVI arrival date, and this screening was negative for mental health concerns; therefore, no referral for mental health services prior to administrative segregation placement was required.  The mental health screening was conducted on 1/13/10, and was also negative for mental health concerns.

During late January 2010, the inmate requested a mental health appointment.  He was seen by a psychologist, and underwent a comprehensive mental health evaluation on 2/1/10.  He was provided diagnoses of Depressive Disorder NOS and Amphetamine Dependence.  The case was reviewed at the IDTT meeting on 2/9/10; planned interventions included treatment with the antidepressant medication Effexor, and weekly appointments with his PC to "process" his depressive symptoms.  The medication was subsequently initiated.  A follow-up psychiatric appointment occurred on 4/15/10 when the medication dosage was increased.  PC contacts occurred two to three times monthly, but not exactly on a weekly basis.  The inmate was seen daily during psych tech rounds in the ASU, and he did not report any complaints.  Weekly summary notes indicated that the inmate was sleeping well and did not exhibit or report depressive symptoms; this report was consistent throughout the monitoring period.

Findings

The inmate did not appear to require a higher level of mental health care.  He was seen by his PC at intervals that exceeded Program Guide minimum requirements.  There was inconsistency between descriptions of the inmate's presentation during rounds, and his presentation with his PC and treating psychiatrist.  It would have been helpful if the various clinicians addressed these inconsistencies at an IDTT meeting to try to reconcile them toward more informed care.  It

appeared that medication management may have occurred during the IDTT meeting because there was no corresponding psychiatric progress note to indicate an independent assessment at the time that Effexor was prescribed. A medication informed consent form was not located in the medical record.

**Inmate S**

This 3CMS inmate was housed in the ASU. He was 60 years old with a long documented history of Schizophrenia paranoid type, and had received treatment in the community and throughout his 28 year CDCR incarceration on death row. His death sentence had recently been overturned, and he was transferred to DVI due to mobility impairment (chronic obstructive lung disease and emphysema). He arrived at DVI on 1/13/10, and his medications, including Remeron and Geodon, were ordered on the day of arrival.

There was little mental health information in the medical record volume (volume 2 of 2) that accompanied the inmate, and the inmate was not particularly forthcoming during his initial interaction with his PC. The DVI clinician contacted the SQ PC for information.

The inmate was seen by the psychiatrist on 1/14/10, and his medications were ordered at that time. On 1/27/10, the inmate reported that he had not yet received his medications, and the psychiatrist re-ordered them on that date. During February 2010, the inmate refused medications but agreed to resume taking them when seen by the psychiatrist on 3/3/10. The last psychiatric appointment occurred on 4/14/10; this contact occurred at cell front as the inmate refused to come out of his cell.

The initial IDTT meeting at DVI occurred on 1/27/10. At that time, the PC indicated plans to see the inmate "weekly to assist…in better reality testing and assist in attaining excellent med compliance." Although seen consistently by the PC, the inmate was not seen weekly. Most of the PC contacts were brief, and were conducted cell front. The psychiatric progress notes consistently reflected that the inmate exhibited delusional thinking; however, PC progress notes did not document evidence of active or residual symptoms of Schizophrenia.

<u>Findings</u>

The inmate was not seen weekly by the PC, and clinical contacts primarily occurred at cell front. It was of concern that there was a discrepancy between the assessments performed by the psychiatrist, previous treatment providers, and PC as to the presence of psychosis for this inmate; this led to questions regarding the adequacy of the assessments performed. There appeared to be a problem with medication continuity, requiring the psychiatrist to write an additional order to ensure medication availability. The inmate had significant stressors including having his death sentence overturned after spending over twenty years on death row. It was thus important that the mental health staff address the presence of psychotic symptoms, and the need for additional services. Transfer to an EOP should have been considered; however, the IDTT progress notes did not reflect any discussion of this issue, or an appreciation of the issues involved.

509

EXHIBIT H
California State Prison, Corcoran (CSP/Corcoran)
March 8, 2010 - March 11, 2010

**Inmate A**

This EOP inmate was housed in the EOP hub.  He was diagnosed with Bipolar I Disorder, most recent episode depressed, and Borderline Personality Disorder; the medical record also indicated an alternative diagnosis of Adjustment Disorder with depression.  He was treated with Abilify, Lithium, Neurontin, and Depakote.  He was on a Keyhea order, due to dangerousness to self and others, which would expire on 8/15/10.

This inmate had a long history of mental health treatment, including multiple DMH hospitalizations.  He also reportedly had a history of multiple suicide attempts.  He was housed in the EOP at SVSP until July 2009 when he was transferred to the CSP/Corcoran EOP hub.  Progress notes indicated that he frequently was uncooperative, did not attend groups, and requested transfer to the 3CMS program.  He was also volatile and irritable with mood swings and a history of staff assaults.  He returned to SVSP to attend court several times.  During September or October 2009, he was transferred to the 3CMS program.  His most recent MHCB admission during December 2009 indicated that he had previously been in the EOP program, and was transferred to the 3CMS program.  He was admitted to the MHCB due to refusing insulin and not eating.  He was again transferred  out to court at SVSP, and returned to CSP/Corcoran on 2/26/10.  Clinicians noted that he faced a possible third strike for a staff assault, and was housed in the CSP/Corcoran SHU.

It appeared that the inmate was readmitted to the MHCB on 1/25/10 after making suicidal threats, and taking fifteen allergy pills.  He was discharged to the EOP hub on 2/12/10 at the EOP LOC.  The most recently documented clinical contact was dated 2/22/10, and indicated the inmate's refusal to attend group therapy.

Findings

The medical record was in disarray.  It was very large (volume 12 of 12) and disorganized, making it difficult to follow the course of treatment.  Progress notes not infrequently indicated that clinical encounters occurred without the medical record.  The two most recent MHCB admission records, and most recent treatment plan, were not in the medical record.

A number of clinical encounters reportedly occurred at cell front.  It was unclear if this was a result of inmate refusal, lack of an escort officer, or other factors.

There was a lack of documentation of five-day follow-up after MHCB discharge for suicidal reasons.  Although the inmate history documented consistent clinical contacts, the medical record did not reflect clinical contact for three weeks prior.  Diagnostic clarification was indicated to determine the presence of a mood disorder and/or Borderline Personality Disorder.

The inmate refused laboratory testing during January 2010.  It was unclear from the medical record whether this information was provided to the psychiatrist for review.

**Inmate B**

This EOP inmate was housed in the EOP hub. He was diagnosed with MDD, severe with psychotic features and Impulse Control Disorder NOS; however, various diagnoses were present in the medical record. He was treated with Risperdal Consta, Buspar, Cogentin, Zoloft, and Benadryl.

It appeared that the inmate transferred to CSP/Corcoran from MCSP, where he had been housed in the ASU. He had been changed from the EOP LOC to 3CMS on 7/2/09 while housed at MCSP. He appeared to have transferred on or about 10/26/09 to the CSP/Corcoran SHU, where he was initially maintained at 3CMS LOC.

The inmate was hospitalized in the MHCB from 11/28/09 to 12/1/09. The discharge summary noted that the inmate was unhappy with his cellmate and was suicidal. He was discharged with a change in medications to the above-referenced medications.

Progress notes described the inmate as presenting with Malingering, and he frequently requested transfer to a higher LOC. There were also frequent medication changes, and multiple diagnoses provided. Due to concerns regarding poor treatment compliance, poor ADLs, and increased depressive symptoms, he was transferred to the EOP hub for EOP LOC on or about 2/11/10.

Findings

There was a need for diagnostic clarification for this inmate who was transferred between the 3CMS and EOP levels of care with various diagnoses, and treated with a variety of psychotropic medications in the recent past. The 3CMS, SHU, and administrative segregation treatment plans were generic and not treatment specific. There was little documentation, other than the initial EOP hub treatment plan, to review the care provided after transfer to the EOP LOC.

There was documentation of numerous cell-front clinical contacts due to inmate refusals and other issues. The medical record also appeared to be missing information, such as recent laboratory results. Although the psychiatrist indicated that laboratory studies would be conducted, orders and results were not located in the medical record.

**Inmate C**

This 3CMS inmate had been diagnosed with Exhibitionism, and was included in CSP/Corcoran's Exhibitionism treatment program. At the time of the site visit, however, the inmate had been refusing group treatment. Chronos in the medical record indicated that the inmate had been charged with IEX on at least fourteen occasions.

The inmate was admitted to the MHCB on 3/20/08 with a diagnosis of Depression NOS, due to SI and increased situational stressors. He was discharged on 3/24/08. He was admitted to the MHCB again on 1/8/09 after he smeared feces on his tray, exhibited increasingly reclusive behavior with poor grooming, and refused to leave his cell. A progress note on that date indicated that the inmate had previously reported hallucinations, persecutory delusions, and

512

dissociative symptoms. The inmate's medications were adjusted at that time. He was provided with a diagnosis of Psychotic Disorder NOS, with a provisional diagnosis to rule out Schizoaffective Disorder, and was described as stable at the time of MHCB discharge.

The inmate was seen at cell front on 8/7/09, when he declined to speak to the PC. Progress notes documented that he had been refusing services since March 2009. Weekly cell checks through the month of August 2009 indicated that the inmate was cooperative with fair hygiene and poor cell maintenance. He continued to refuse out-of-cell appointments, and remained uncooperative during cell-front contacts through September 2009, although attempts were made for weekly contacts during this period. The inmate's grooming and hygiene were described as normal.

A progress note that documented an IDTT meeting that occurred on 10/15/09 was located in the medical record; the form was almost completely blank with the exception of entries documenting the meeting's participants, which did not include a CC-I. The inmate was seen weekly by a PC but was uncooperative, refusing out-of-cell contacts, and refusing to speak to the PC. A psychiatric contact that occurred on 10/26/09 indicated that the inmate had not been taking medication for some unspecified period of time. An undated Form 7388, the checklist for DMH referral, was located in the medical record; none of the referral indicators were positively noted, despite the fact that the inmate had not participated in offered treatment for several months. Another undated Form 7388 that was located had several indicators for DMH referral noted, but there was no information as to the basis for not referring the inmate to DMH.

On 11/23/09, the inmate met with the clinician assigned to the Exhibitionism treatment program when he stated that he wanted to return to the Exhibitionism treatment groups. He then declined to attend the IDTT meeting that occurred on the following day.

Cell-front PC contacts occurred weekly through January 2010 as the inmate refused out-of-cell visits. On 1/27/10, a PC progress note indicated that the inmate again refused to speak with the PC. On 2/9/10, the inmate spoke with the PC when he agreed to leave his cell for an individual session, but then refused to participate in the interview. A Form 7388 completed on 2/9/10 documented that several referral indicators were marked positively. Recommendations on the Form 7388 appeared to indicate that consideration was being given to changing the inmate to the EOP LOC.

Findings

Although this inmate was diagnosed with Exhibitionism, and was included on the Exhibitionism treatment roster, he declined all participation in this program. He had been provided with weekly PC contact but refused out-of-cell contacts to date. Of concern was the fact that weekly medical record progress notes indicated that the plan was to continue cognitive behavioral therapy even though the inmate had not left his cell, and had essentially declined interaction with the PC, for more than six months.

A number of Form 7388s located in the medical record were incomplete. The inmate should have been considered for an increase in his LOC, at least to EOP, if not to ICF LOC. The

treatment plan had not been timely updated, and it did not appear that a CC-I attended treatment team meetings.

**Inmate D**

This 3CMS inmate was endorsed to the Exhibitionism treatment program at CSP/Corcoran. He arrived at CSP/Corcoran on 6/18/09, from CCI. He refused a scheduled PC visit on 9/28/09, but was seen by the psychiatrist on the same day when he was provided with a diagnosis of Depressive Disorder NOS. Psych tech notes on that date and from the previous week indicated that the inmate was not compliant with medications. His hygiene and cell maintenance were described as adequate.

The inmate refused the PC visits that were scheduled for 9/21/09, 10/5/09, and 10/20/09. A Form 7388, the checklist for DMH referral, was completed on 10/1/09; it noted that the inmate met one of the criteria for DMH referral due to his participation in less than 50 percent of treatment. A note at the bottom of the Form 7388 indicated that the inmate was making an "active choice" regarding group attendance; it was unclear what importance, if any, this statement had for DMH referral.

The inmate met with a PC on 11/20/09 to discuss his removal from the Exhibitionism treatment program; he was provided with a primary diagnosis of Antisocial Personality Disorder at that time. On 11/23/09 and 11/30/09, the inmate again discussed his desire to leave the Exhibitionism treatment program. On 12/1/09, an IDTT recommended the inmate's removal from the Exhibitionism treatment program. A progress note on 12/7/09 indicated that a chrono discharging the inmate from the Exhibitionism treatment program had been generated.

The inmate refused PC contacts scheduled for 12/23/09 and 12/29/09. Despite his apparent discharge from the Exhibitionism treatment program, the inmate was seen by program staff on 1/14/10, and again on 2/2/10. He refused an appointment on 1/27/10. He was seen by a psychiatrist on 1/26/10 and 1/29/10. The progress note from the 1/26/10 encounter indicated that the inmate's Remeron would be discontinued due to medication noncompliance.

Findings

This inmate was seen by a psychiatrist and PC at the intervals required by the Program Guide. Although the inmate was endorsed to the Exhibition treatment program, he refused to participate. The inmate only sporadically participated in clinical contacts. He was noncompliant with his prescribed medication. Progress notes indicated that IDTT meeting composition on 10/1/09 lacked the CC-I.

**Inmate E**

This inmate was housed in CSP/Corcoran's mainline EOP. He had a history of DMH hospitalization, and was discharged on 6/30/09. The most recent treatment plan was dated 1/20/10. He was diagnosed with Major Depression severe with psychotic features. The most

recent treatment plan specified "1 to 1 counseling," "LPT groups," and "recreational therapy" as treatment interventions.

The medical records indicated that the inmate was hospitalized in the MHCB on 6/7/08 for symptoms of anxiety. These symptoms resolved, and the inmate was discharged on 6/9/08. At a psychiatric evaluation that occurred on 10/16/09, the inmate was provided with a diagnosis of Major Depression. Wellbutrin and Paxil were continued at that time. On 10/28/09, when the inmate was seen at the IDTT meeting, he was described with behaviors of psychomotor agitation and uncontrollable shaking. The inmate also reported recent suicide ideation without plan at this encounter. A Form 7388, the checklist for DMH referral, dated 10/28/09 was located in the medical record. The Form had several criteria marked affirmatively, and also indicated that the inmate had already been referred to DMH. He was evaluated by an LCSW on 10/30/09 when he was described as stable. When the inmate was seen by the PC on 11/5/09, he was described as likely feigning symptoms, and was provided with a primary diagnosis of Polysubstance Abuse.

The inmate was seen for an emergency psychiatric contact on 11/6/09 when he reportedly exhibited increasing agitation. Medications were adjusted, including an increase in Paxil. On 11/13/09, during a follow-up psychiatric appointment, the inmate was described as paranoid with dysthymic mood. Paxil was discontinued on that date. At a subsequent psychiatric appointment that occurred on 12/17/09, Wellbutrin and Vistaril were continued. At that time the inmate was described as stable, but with dysthymic mood.

Findings

It appeared that the inmate was seen consistently according to Program Guide requirements. The IDTT meeting included the necessary participants. The inmate was appropriately referred to DMH, and was awaiting transfer at the time of the site visit.

**Inmate F**

This inmate's case was reviewed at the request of the plaintiffs' attorneys. He had been transferred to CSP/Corcoran for inclusion in the Exhibitionism treatment program, but was removed from the program due to "sexual exposure." The inmate had previously been given an 18 month SHU term for IEX.

At the time of the monitoring visit, this 3CMS inmate had been incarcerated for over 30 years. Progress notes of one of two MHCB hospitalizations during 2009 indicated that the inmate had previously received EOP LOC. The inmate's LOC was changed to 3CMS when it was determined that his Axis II personality disorder traits were predominant. He was removed from the Exhibitionism treatment program as a result of repeatedly exposing himself to staff during meetings.

It appeared that the inmate was hospitalized in the MHCB on at least two occasions during 2009; during March he was admitted for SI, and during April he was admitted after COs reported that he had been storing feces and urine, and reportedly had thrown feces at them. Progress notes

515

indicated that the inmate was delusional at the time of this admission, and stated that female COs were attempting to tempt him with various sexual activities.

The inmate received six IEX RVRs from 3/2/09 to 3/7/09. He was diagnosed with Exhibitionism, and endorsed for the Exhibitionism treatment program.

A Keyhea evaluation that occurred on 4/18/09 resulted in diagnoses of Bipolar Disorder, Exhibitionism, and Antisocial Personality Disorder. An IDTT meeting that occurred on 5/21/09 documented the completion of the Form 7388, the checklist for DMH referral, and several of the indicators were marked affirmatively. Notes on the Form 7388 indicated that the inmate would be referred to DMH at that time.

Progress notes during June 2009 included notations of several incidents when the inmate made explicit sexual threats to psych techs. The notes suggested that the inmate was possibly delusional, believing that he had a relationship with a psych tech. Psych tech clinical round progress notes indicated that the inmate's cell and hygiene were normal. By mid to late June 2009, the inmate had been removed from the Exhibitionism treatment program.

During September 2009, the inmate was seen by the PC when he reportedly demanded weekly treatment; he also expressed anger with the PC as he had not been seen for approximately three weeks. Progress notes during September and October 2009 suggested that the inmate continued his attempts to re-enter the Exhibitionism treatment program, and had again engaged in IEX incidents. His verbal presentation during this period was described as narcissistic and threatening without evidence of psychosis.

During October and November 2009, the inmate was seen by two PCs during a period when his mental health care was transferred from one clinician to another. An individualized treatment plan during early November 2009 indicated that the inmate was involved in interventions to address his limited impulse control. Progress notes of these encounters indicated that the inmate was generally accepting of this approach, and was positive about his involvement. His mental status was described as stable at that time.

Findings

This inmate presented with significant characteristics of an Axis II personality disorder. Although he had been diagnosed with Exhibitionism, it appeared that his primary difficulties were related to impulsivity and narcissism. His involvement in the Exhibitionism treatment program was terminated as a result of his behavior toward staff. The staff designed an appropriate individualized treatment program to address the inmate's impulsivity. The medical record review indicated that the inmate was seen at intervals that exceeded Program Guide requirements. It appeared that this inmate was receiving adequate mental health care.

**Inmate G**

This inmate was at the EOP LOC. On 12/7/09, a PC progress note described the inmate's thinking as organized with mildly restricted affect. On 12/14/09, the inmate became agitated and

confrontational with the PCs; progress notes indicated that he was not psychotic or clinically depressed at that time.

An IDTT meeting occurred on 12/23/09.  At a psychiatric evaluation that occurred on 1/28/10, the psychiatrist indicated that diagnoses of both Psychotic Disorder NOS and Schizophrenia were being considered.  Group therapy progress notes during December 2009 and January 2010 indicated that the inmate often required redirection as he attempted to dominate groups in which he participated.

On 2/2/10, the PC described the inmate as tangential, pressured, and anxious, making interactive discussion with him difficult.  A progress note dated 2/3/10 indicated that the treatment team considered a change in treatment group assignment.  Group leader progress notes during February 2010 indicated that the inmate's group participation had improved.  A psychiatric evaluation on 2/25/10, however, described the inmate with marked disorganization.  A Form 7388, the checklist for DMH referral, dated February 3, 2010 documented that the inmate did not meet DMH referral criteria.

Findings

This inmate appeared to be receiving appropriate mental health care with the exception of adequate consideration for referral to DMH.  PC visits, IDTT meetings, and psychiatry visits appeared to be occurring at intervals in compliance with the Program Guide.  The inmate did not appear to be functioning at an optimal level, and should have been considered for DMH referral; this had not occurred at the time of the site visit.  The IDTT meetings did not appear to include CC-I presence.

**Inmate H**

This inmate was housed in the SHU, where he was placed due to safety concerns.  He had a self-reported family history of maternal suicide and anxiety.  He had an EPRD of July 20, 2010.  The inmate was evaluated due to reports that he had severe anxiety symptoms, and had not gone to yard, taken a shower, or participated in any out-of-cell activities since 2008.

The most recent weekly checks indicated that the inmate was cooperative with normal mood, hygiene, and cognition.  His cell was reportedly clean.  The inmate refused out-of-cell contacts with his PC, but was seen at cell front every thirty days.  Medical records indicated that during the monitoring period, the inmate came out of his cell for monthly psychiatric evaluations.  He reportedly also presented for his medical appointments.  Medical records of the inmate's stay at SVSP prior to transfer to CSP/Corcoran indicated that the inmate had safety concerns while at SVSP; at SVSP, he also had a similar pattern of reported anxiety, and not coming out of his cell for PC appointments.

Findings

A more thorough analysis and assessment by staff of mental health and correctional factors was warranted for this inmate.  There were reported safety concerns.  In addition, the inmate was regularly observed with tense, irritable behavior, and had a family history of anxiety and suicidal

behavior.  Despite this, the inmate reportedly maintained his ADLs, and was stable without SI.  He was also seen monthly by a psychiatrist for medication management.

**Inmate I**

This 3CMS inmate was housed in the SHU.  He had been receiving mental health services at the EOP LOC during October 2009.  He received 3CMS LOC for an extended period of time prior to transfer to CSP/Corcoran.  He had a history of PTSD after he experienced an in-cell rape; subsequently he had a history of refusing cellmates due to the reported trauma.  Anxiety symptoms related to cellmates remained a focus of his treatment.  Progress notes indicated that the inmate presented as stable from a mental health standpoint, and continued to be evaluated by psychiatry with regard to medication issues.  There was documentation that the inmate had some episodes of medication noncompliance.  He had been referred to the emergency room for evaluation after a cellmate change, and this was addressed with no resultant admission.

An IDTT note dated 12/9/09 reported that the inmate had been noncompliant with PC contacts and groups.  He also requested EOP placement for increased mental health treatment.  The note also stated that the inmate was seeking EOP LOC for secondary gain, was utilizing MHSDS for single cell status, and hoped to minimize the consequences of multiple RVRs for refusing to accept a cellmate.  The note documented that the inmate had been in and out of the 3CMS since 1996.  It indicated that the longest period that the inmate took psychotropic medications was for two months during 1999.

Findings

This inmate appeared to be stable with no apparent need for EOP LOC at the time of the site visit.

EXHIBIT I

California Substance Abuse Treatment Facility (CSATF)

July 26, 2010 - July 28, 2010

**Inmate A**

This inmate's medical record was reviewed at plaintiffs' attorneys' request due to their concern with the appropriateness of his current level of mental health care.

A psychiatrist progress note dated 10/19/09 indicated that the inmate was seen due to his refusal of medications. He had been on the mental health caseload since 2002. The inmate had a mental health history that was remarkable for recurrent depressive disorder. He presented with symptoms that included sleep disturbance and feelings of depression lasting for one to two months. His mental status examination revealed no evidence of psychotic symptomatology. His presentation was consistent with depression and anxiety. A trial of Paxil was initiated, and he was to return to the clinic for follow-up in one month.

The inmate refused his psychiatric appointment on 11/16/09. An 11/18/09 PC progress note indicated that the inmate was stable but still with some symptoms. Another psychiatrist referral was initiated, and the inmate was seen by the psychiatrist three days later. Paxil was discontinued, and Vistaril was initiated. The inmate was to be seen by the psychiatrist again in ten weeks.

On 12/14/09, the inmate was again noted to be noncompliant with taking medications (Benadryl). He provided conflicting information as to his symptomatology. It was determined that the inmate was drug-seeking as to his request for treatment with Elavil. Benadryl was discontinued, and Vistaril was continued. He was referred to his PC for further assessment.

On 1/11/10, his PC documented that his presentation was essentially unchanged. On 2/1/10, the inmate reported increased stress due to lack of sleep. Relaxation techniques were discussed with him, and his PC provided him with a handout.

The inmate complained to the psychiatrist on 2/4/10 that he was having significant symptoms of depression and anxiety. Somatic symptoms were described following a flu shot during early January 2010. Paxil and Remeron were prescribed with a plan to reassess him in two weeks.

A PC progress note dated 2/19/10 indicated that the inmate was feeling somewhat better. On 3/31/10, he reported continuing improvement to the psychiatrist; he was noted to be less somatic but still with anxiety. His medications were continued.

The inmate refused to attend an appointment with a psychiatrist on 4/27/10, and this appointment was rescheduled. On 5/12/10 his PC noted no significant changes. The inmate declined to attend his 5/13/10 IDTT meeting. He remained at the 3CMS LOC. He was not interested in attending group therapy.

The psychiatrist reported on 5/19/10 that the inmate had stopped his medications about one month earlier. He subsequently became more depressed. His presentation was consistent with a diagnosis of MDD. He agreed to a trial of Zoloft, and Remeron was continued. The inmate refused his 6/17/10 appointment with a psychiatrist. He was noted to again be noncompliant with medications.

On 7/20/10, the inmate told his PC that mental health services were not helping him. The psychiatrist again evaluated this inmate two days later. He had received a recent 115 for refusing a urine test. At that time, the treating clinicians indicated that a possible diagnosis of MDD was being considered in the differential diagnosis. He was reportedly requesting help from mental health staff in the context of getting an excuse from attending school and obtaining a job. The plan was to discontinue the Zoloft, and see him again in three months.

Findings

This inmate was treated at the appropriate mental health LOC. He did not present with symptoms of psychosis. His treatment was made difficult due to his lack of medication adherence. He was, however, offered mental health interventions in a timely manner.

**Inmate B**

The inmate's medical record was reviewed at the request of plaintiffs' attorneys. The inmate reported that his clinical condition had deteriorated after transfer from KVSP to CSATF due to reportedly not having received psychotropic medications for about one month following transfer to CSATF.

A KVSP PC progress note dated 4/7/10 indicated that the inmate's presentation was consistent with a diagnosis of Mood Disorder NOS. While housed at KVSP, the inmate was treated with Tylenol, aspirin, Enalapril, Vistaril, Metformin, Gabapentin, Metoprolol, Tramadol and Simvastatin. Vistaril was also subsequently prescribed, although the most current order was not present in the medical record.

This inmate was transferred to CSATF on or about 5/10/10. Clinical contacts occurred on 5/10/10, 5/11/10, 5/27/10, 6/25/10, 7/3/10, 7/7/10, and 7/20/10. He was seen for psychiatric evaluations on 6/21/10 and 6/29/10. During his last psychiatrist's appointment, he declined psychotropic medications other than Vistaril.

Findings

Information reported by the plaintiffs' attorneys about this inmate did not appear to be consistent with his medical record review. The inmate had been receiving Vistaril at KVSP, which was later restarted at CSATF. His self-reported significant clinical deterioration was not consistent with the monitor's expert's review of his medical record. Due to MAR incompleteness, it was not possible to determine how long the inmate went without Vistaril following transfer to CSATF.

**Inmate C**

This 3CMS inmate's medical record was reviewed with a focus on documentation from September 2009 to 3/1/10. A 9/8/09 PC progress note indicated that the inmate was stable. He was diagnosed as having depression.

An IDTT meeting occurred two days later. No change was noted in his treatment plan as compared to the previous one. The inmate was noted to be depressed by his PC during a 12/9/09 appointment. He was referred to the psychiatrist. Two days later, the psychiatrist evaluated the inmate. Celexa was started with a plan to evaluate the inmate again in six weeks. During a 2/5/10 appointment, the inmate reported skipping most of his medications. Celexa was discontinued with a plan for follow-up within three months.

The psychiatrist again evaluated this inmate on 2/25/10. The inmate reportedly continued to experience mood swings. Despite the previous progress note, this note indicated that the inmate was compliant with the Celexa prescription. Review of the physician order sheets and MARs were not helpful in clarifying this discrepancy.

A psychiatrist reported on 4/23/10 that the inmate wanted to "get back on to the Topamax and Celexa." The Celexa was discontinued, and no medications were initiated at that time. On 5/19/10, the inmate was seen by the PC with plans to follow-up with the psychiatrist. The next two psychiatrist progress notes were dated 5/21/10 and 6/18/10. Topamax was prescribed. The inmate was described as stable on 6/18/10. Celexa was also prescribed at that time. A non-formulary request form was initiated. The most recent IDTT meeting occurred on 9/18/09.

Findings

During the monitoring period, this inmate's treatment was consistent with Program Guide requirements.

**Inmate D**

The medical record of this 3CMS inmate was reviewed with a focus on documentation from September 2009 to 3/1/10. This inmate had been transferred from DVI to CSATF during February 2010. He was noted on February 4, 2010 to be a parole violator with new charges. Symptoms were assessed to have been drug induced.

An IDTT meeting was documented on 2/9/10. A PC's progress note was dated 4/13/10. The inmate's medications were discontinued by the psychiatrist four days earlier due to his no-show for medications for three weeks. He was seen again by the psychiatrist, without the medical record, on 6/18/10.

Findings

This inmate's treatment during the monitoring period was consistent with Program Guide requirements. After the monitoring period, problems relevant to implementation of medication noncompliance procedures were evident.

**Inmate E**

This inmate was reportedly an EOP inmate who was housed in a GP housing unit. The inmate's medical record (volume number unknown) was incomplete, with mental health progress notes present beginning 5/11/10 and ending 7/23/10. Various notes indicated the inmate's LOC as

3CMS or EOP without an adequate explanation for either LOC. He had several MHCB admissions during this time period. He was prescribed Risperdal.

Of particular interest were three progress notes. One such note dated 7/16/10 indicated an EOP LOC inmate, and listed psychosis as the major problem. A progress noted dated 7/21/10 indicated that there was no Axis I diagnosis, and contained an addendum indicating that the inmate's presentation was consistent with Psychotic Disorder NOS, and 3CMS LOC. A third progress note dated 7/23/10 identified depression as the major problem, and listed the inmate as receiving 3CMS LOC. The medical record did not contain a treatment plan.

Findings

It was not possible to understand or evaluate this inmate's treatment plan or MH-4 based on medical record documentation. Recommendations were made to the staff for this inmate's reassessment.

**Inmate F**

This 3CMS inmate's medical record was reviewed with a focus on progress notes generated from September 2009 to 3/1/10. During most of the monitoring period, the inmate was housed at NKSP. He was transferred to CSATF on 2/26/10, when he was initially seen by his PC. His second documented PC contact was dated 3/14/10. The inmate's presentation was consistent with the diagnosis of Schizophrenia paranoid type.

An IDTT progress note was dated four days later. The Form 7388, the checklist for DMH referral, was completed at that time. The inmate was initially referred to the psychiatrist on 3/14/10, and was seen by the psychiatrist on 4/6/10. His Risperdal and Vistaril were continued. At that time, the inmate had not been receiving medications for four days. He reported increased auditory hallucinations at that time. The inmate was again seen by his PC on 5/28/10, when he had reportedly improved. There was another psychiatric assessment on 6/4/10, although the psychiatrist's progress note did not include a substantive assessment.

Findings

Based on medical record documentation, the inmate was timely seen by his PC but apparently not by the psychiatrist. Progress notes indicated medication continuity problems although this was difficult to confirm by MAR reviews due to the nature of the MAR medical record documentation. It appeared that this inmate was receiving mental health services at the appropriate LOC.

**Inmate G**

This 3CMS inmate's medical record was reviewed with a focus on progress notes generated from September 2009 to 3/1/10. The inmate was seen by a CSATF psychologist on 10/15/09. He subsequently was referred to a psychiatrist for assessment of his symptoms of anxiety. An IDTT meeting occurred on 10/22/09.

The psychiatrist evaluated the inmate on 10/26/09.  The inmate's presentation was consistent with a diagnosis of Anxiety Disorder NOS.  A trial of Paxil was initiated.  The psychiatrist again assessed this inmate for follow-up on 11/16/09.  A reduction in panic attacks was reported.  His Paxil was increased at that time.

Subsequent PC progress notes were dated 11/24/09, 2/10/10, 3/10/10, 4/27/10, and 7/21/10.  Subsequent psychiatrist progress notes were dated 2/2/10 and 3/28/10.  These notes were difficult to read but appeared to indicate a reasonable response to medications.  PC progress notes indicated that this inmate was functioning well.

The most recent treatment plan was dated 10/22/09.  Panic attacks and anxiety were listed as his two problems.  A SRA was also completed at that time.

Findings

This inmate was receiving treatment consistent with Program Guide requirements.

**Inmate H**

This 3CMS inmate was housed in the ASU.  The inmate's medical record was reviewed with a focus on progress notes generated during the current monitoring period.  The most recent IDTT meeting occurred on 6/2/10.  Depression was noted as the inmate's primary problem.  The Form 7388, the checklist for DMH referral, was completed at the 3/1/10 IDTT meeting.

A psychiatrist evaluated this inmate on 3/3/10.  Vistaril was started based on the inmate's response to past medications.  He was also seen by a PC on the following day based on documentation on the Form 7389, the brief mental health evaluation.  An effective communication form was completed on 3/23/10, as was the Form 7389.  Subsequent PC contacts were documented on a weekly basis; these contacts appeared to generally occur out of cell.  The progress notes were essentially generic in nature, and reflected what appeared to be brief monitoring visits.
The psychiatrist again assessed this inmate on 4/28/10.  A diagnosis of Mood Disorder NOS was considered in the differential diagnosis.  Tegretol was initiated at HS.  A 5/19/10 psychiatrist progress note indicated that the inmate was less anxious.  His Tegretol was increased, and Vistaril was continued.  The inmate was seen at cell front on 6/28/10 because he refused to come out of the cell to see the psychiatrist.  Psych tech round documentation was present in the medical record.

Findings

This inmate's treatment was consistent with Program Guide requirements.

**Inmate I**

This 3CMS inmate was housed in the ASU.  The inmate's medical record was reviewed with a focus on progress notes generated during the current monitoring period.  Weekly progress notes

were documented by the PC, which included references to effective communication.  Progress note documentation provided useful information.

Psychiatrist progress notes were dated 3/5/10, 5/5/10, 6/16/10, and 7/26/10.  Documented treatment concerns included Hepatitis C infection.  Prescribed medications included Celexa and Atarax.

A 3/17/10 treatment plan indicated the inmate's main problem to be an unstable mood.  Diagnoses provided were Bipolar Disorder NOS by history and Polysubstance Dependence.  The Form 7388, the checklist for DMH referral, was completed during the IDTT meeting.  Documentation relevant to psych tech rounds was present in the medical record.

<u>Findings</u>

The inmate's treatment was consistent with Program Guide requirements.  Medical record documentation appropriately described the inmate's course of treatment.

**Inmate J**

This 3CMS inmate arrived at CSATF on 1/28/10 from ISP.  The treatment plan at that time documented quarterly PC contacts, and medication management as treatment interventions.  The Form 7388, the checklist for DMH referral, was dated 2/10/10 and indicated that the inmate did not meet any of the DMH referral criteria.

A PC progress note dated 2/8/10 essentially provided a statement of the inmate's history, and very brief mental status information; the inmate was essentially stable at that time.  He was seen by a psychiatrist on the following day when he was provided with differential diagnoses of Adjustment Disorder versus MDD.  On 3/2/10, the inmate was seen by the PC when the mental status exam noted decreased concentration and restricted affect.  He was seen for a follow-up psychiatric appointment on 5/5/10; a PC appointment on that same date described the inmate as essentially stable with restricted affect**.**

<u>Findings</u>

This inmate was initially seen within ten days of his arrival at CSATF.  He was seen by a PC and psychiatrist at intervals of less than 90 days.  He appeared to be stable at the time of the site visit.  It did not appear that the one-to-one interventions to address depression that were described in the treatment plan occurred.  With this exception, it appeared that this inmate received adequate mental health care.

**Inmate K**

This 3CMS inmate had a history of special education and diagnosis of Psychotic Disorder NOS according to a RC evaluation that was completed during 2006.  He had been receiving mental health care in the 3CMS program for at least two years prior to the site visit.  A SRA completed on 6/9/09 indicated that the inmate had a history of suicide attempts by overdose and hanging; a history of Schizoaffective Disorder was also noted in the assessment.  It appeared that the inmate

was admitted to the MHCB on 2/13/09. A progress note on 3/19/10 described the inmate as clean with a normal mental status examination. On 4/10/10, an evaluation noted that the inmate was experiencing auditory hallucinations, including some command hallucinations, but was described as having adequate hygiene. A treatment plan on 6/6/10 provided a diagnosis of Psychotic Disorder NOS. The mental status examination at that time noted that the inmate was odiferous and disheveled with impaired speech. The Form 7388, the checklist for DMH referral, dated 6/16/10, indicated that the inmate did not meet DMH referral consideration criteria. He was seen by a psychiatrist on 12/30/09, 3/10/10, and 6/25/10.

Findings

This inmate appeared to have been seen by the PC and psychiatrist at intervals specified by the Program Guide. More recent progress notes indicated that the inmate was poorly groomed and hearing voices. There was no recommendation in the medical record of more frequent monitoring of this inmate in light of a worsening of symptoms. The inmate should likely have been formally considered for DMH referral, and it appeared that this did not occur.

**Inmate L**

This 3CMS inmate was provided with a diagnosis of MDD, in full remission, according to a treatment plan dated 6/17/10. He was not prescribed psychotropic medications at that time. The treatment plan also recommended quarterly PC contacts as a treatment intervention to decrease symptoms. His mental status examination was described as unremarkable at that time. An evaluation that occurred on 9/10/09 indicated that the inmate had been off his medications for some period of time, but indicated that he was stable. The inmate was evaluated again by the PC on 12/16/09 when he was described as stable. Subsequent progress notes on 3/15/10 by an LCSW, and on 6/10/10 at the IDTT meeting, also described the inmate as stable.

Findings

This inmate was seen by clinicians at the appropriate intervals, and was not treated with psychotropic medications. He was reportedly stable and was receiving mental health services at the appropriate LOC.

**Inmate M**

This 3CMS inmate was housed in the ASU at the time of the site visit. A treatment plan dated 1/4/10 indicated that the inmate was diagnosed as having Psychotic Disorder NOS. The treatment plan indicated that the inmate was to receive one-to-one clinical contacts with the PC to address mood instability. He was refusing group therapy at that time.

The inmate was seen at cell front for evaluation on 4/27/10; although the documentation of this contact provided limited information, the inmate was described as presenting with normal affect and mood. Subsequent clinical contacts occurred on 5/3/10, 5/10/10, and 5/18/10. The inmate refused parole planning on 5/18/10. He was evaluated weekly during May, June, and July 2010.

An administrative segregation pre-placement chrono dated 7/18/09 indicated that the inmate was in the 3CMS program at that time.  The Form 7389, the brief mental health evaluation, dated 7/3/09 indicated that the inmate was provided with a diagnosis of Mood Disorder NOS.  The Form 7388, the checklist for DMH referral, dated 3/29/10 indicated that the inmate met criterion five; however, a note on the form indicated that the inmate was not referred to DMH because he "was functioning adequately at current LOC."   A second Form 7388 dated 7/25/10 indicated that the inmate again met criterion five; however, he again was not referred as "inmate is currently at the appropriate LOC in the MHSDS and functions adequately."

Psych tech notes in the medical record indicated that the inmate presented with normal hygiene.  COs had identified this inmate as one who seldom left his cell.  The monitor's expert's contact with the inmate revealed that he was adequately groomed.  His speech and thought processes were normal.  He reported that he did not leave his cell because of a past incident in which he was attacked by another inmate.

<u>Findings</u>

It appeared that this inmate had been housed in the ASU for a period of time.  COs reported that he functioned marginally in that unit.  He was seen by clinicians at required intervals.  Although the IDTT had apparently considered the inmate's need for DMH placement, the decision thus far was that such referral was not indicated.

EXHIBIT J

Pleasant Valley State Prison (PVSP)

April 27, 2010 - April 29, 2010

**Inmate A**

This 3CMS inmate arrived at PVSP on 10/9/09. He was initially provided with diagnoses of Psychotic Disorder NOS and Antisocial Personality Disorder; he was later provided with a diagnosis of Schizoaffective Disorder depressed. He was treated with Remeron and Haldol. His mental health history was significant for multiple suicide attempts; the most recent occurred during 2006.

On 10/20/09, the inmate reported SI and paranoid ideation. He also reported a history of hospitalization at ASH, and of receiving treatment at the EOP LOC. He believed that people were poisoning his food and, as a result, only ate pre-packaged foods.

At times during the monitoring period, the inmate reported increasing paranoia, as well as depression and auditory hallucinations. The PC indicated that the inmate would be seen for follow-up within two weeks; however, the next documentation of follow-up occurred over one month later. The inmate was otherwise seen consistently by the PC and psychiatrist.

Findings

This inmate had a history of suicide attempts and a reported history of DMH hospitalization. He was followed consistently by the PC and psychiatrist at PVSP, with the exception of one occasion when his follow-up was not provided timely. The inmate required close monitoring for consideration of the need for transfer to a higher LOC.

**Inmate B**

This inmate arrived at PVSP on 9/28/09, approximately six months after placement in the MHSDS at the 3CMS LOC. He was diagnosed with Mood Disorder NOS. The inmate was stable without medications until 2/3/10, when, due to irritability, he requested mental health services. He was treated with Remeron. He was seen for follow-up in six weeks when he reported continued improvement.

A treatment plan dated 11/18/09 noted a history of problems with mood and impulse control, as well as the inmate's concern that his mother had not contacted him. The treatment plan also noted negative thinking as a problem with goals of reducing negative "self-talk" and improving impulse control. Groups were to be provided "as available." Subsequent progress notes did not discuss these issues, with the exception of one progress note that indicated that the inmate's mother had contacted him.

Findings

This inmate was followed consistently by the psychiatrist and PC. He was seen with increased frequency when clinically indicated. PC progress notes did not document adherence to the treatment plan. There was no indication that group therapy was provided, although it was recommended.

**Inmate C**

This 3CMS inmate arrived at PVSP on 1/11/08.  He was provided with a diagnosis of Depressive Disorder NOS.  The inmate was prescribed Benadryl.  A progress note review indicated that the primary source of the inmate's mental health treatment was individual therapy with the PC.

The treatment plan listed problems that included depressive feelings, lack of motivation, negative thoughts, and some obsessive-compulsive issues.  A PC's progress note dated 2/1/10 indicated a plan for the inmate to be seen in follow-up within 30 days to address the above-noted issues; however, he was not seen again until 4/5/10.

The 1/13/10 treatment plan included group treatment as a treatment intervention; however, there was no documentation of group involvement or inclusion on the group therapy wait list.   The treatment plan noted specific and appropriate cognitive interventions such as relaxation techniques to improve sleep, and specific assignments to increase positive thoughts.

Findings

The inmate was generally seen consistently by the PC and psychiatrist.  As noted in the treatment plan, he would likely have benefitted from group therapy.  However, it did not appear that he received group therapy, nor was he on the group treatment wait list.  The treatment planning and treatment provided was clinically appropriate for this inmate.

**Inmate D**

This 73 year old Vietnamese inmate was observed during a group interview of 3CMS inmates, and his medical record was reviewed.  He was provided with a diagnosis of Adjustment Disorder with depressed mood.  He was treated with Remeron and reportedly benefitted from it.

The inmate's social history was significant for his university attendance, and service as an officer in the Vietnamese army.  He had a history of two strokes, and there were recent concerns as to the presence of dementia.  During the group interview, the inmate presented with preservation, and other inmates expressed concern with his well-being.

Mental health progress notes since 10/28/09 documented continuing staff concern as to the inmate's increased confusion and impaired thought processes.  Although a Clark referral had been submitted, the medical record did not include documentation that the evaluation had been completed.  The IDTT noted the need to improve this inmate's functioning in the correctional setting, and the need to determine the presence of dementia.  Group therapy was recommended.

Findings

The inmate was followed consistently by the mental health staff, but did not receive the necessary diagnostic testing as to a possible dementia diagnosis; this despite concerns of decreased functioning, confusion, and depression.  The inmate required diagnostic and treatment planning reassessment; this information was conveyed to the mental health supervisory staff.

**Inmate E**

This inmate had a history of DMH treatment.  Following a stay of approximately ten weeks, he was discharged during February 2009 from DMH with diagnoses of Adjustment Disorder with depressed mood, Polysubstance Dependence, and asthma.  He was provided with a GAF score of 45.

During January 2010, the inmate began an intermittent hunger strike while housed in the ASU.  According to documentation in the inpatient MHCB record, he ended the hunger strike on 4/19/10.  On 4/24/10, the inmate was placed in restraints and seclusion because he attempted to injure himself, and reddened his wrists. At the time of the site visit in April 2010, the inmate had been in the MHCB for nearly two months, and was on the wait list for transfer to DMH acute care.

Findings

Access to acute care at DMH was poor; this resulted in the inmate's prolonged MHCB hospitalization.  The PVSP mental health staff should have initiated a DMH referral earlier in the inmate's MHCB hospitalization.

**Inmate F**

This inmate came to the attention of mental health staff when he exhibited bizarre behavior on the yard.  He was subsequently admitted to PVSP's MHCB unit following a referral by an officer.  The officer reported that the inmate was walking around the yard telling people about his crime, which involved injury to a child, in a boastful manner, and proclaiming that he had committed many prior crimes against children.  When he was brought to the MHCB, the inmate refused to talk to a female clinician.  At that time he was described as incoherent and disorganized.  He exhibited religiosity, ideas of reference regarding his notoriety, and harbored highly distorted beliefs.

This inmate had a self-reported extensive history of psychiatric treatment, suicide attempts, and gaps of years between episodes of treatment.  He also reported a significant familial history of mental illness and suicide.

On 4/27/10, which was the tenth day of the MHCB hospitalization, the staff was uncertain as to whether or not the inmate met criteria for referral to a higher LOC.  As of 4/29/10, the inmate remained in the MHCB for twelve days.

Findings

This case was notable in several respects.  First, although the inmate was identified as a candidate for DMH referral, and his name appeared on two lists that ostensibly recorded referrals made to DMH, he had yet to be referred.  Second, his length of stay in the MHCB exceeded ten days, but the staff had not yet reached a firm decision as to his need for DMH treatment.  Lastly, the facts of the case should have elicited earlier and more aggressive mental health treatment before and during the most recent psychotic episode.  This inmate should have been considered earlier for referral to a higher LOC.

**Inmate G**

This EOP inmate was awaiting transfer to an EOP at the time of the monitoring visit.  Prior to transfer to PVSP, he had been housed at CSP/Sac, where he was placed in the MHOHU due to SI.  Upon arrival at PVSP, he was immediately placed in the MHCB, where he remained for approximately eleven days.  He was discharged to the 3CMS LOC with diagnoses of Depressive Disorder NOS and Psychotic Disorder NOS.  He was assessed with a GAF score of 65, and was prescribed Celexa and Abilify.  Following discharge, he was seen daily for five days.

On March 24, 2010, nine months after arrival at PVSP, the inmate was placed into the EOP.  An individualized treatment plan associated with this IDTT meeting was located in the medical record.  The inmate was seen at least weekly after his placement in the EOP.

The inmate was followed consistently by the psychiatrist and PC for scheduled follow-up appointments, and in response to self-referral requests.

<u>Findings</u>

It appeared that the mental health staff was responsive to this inmate's mental health needs and requests for assistance.

However, documents in the medical record were filed out of sequence and in the wrong sections.  Medications were administered within one day of orders being written.  Although the inmate was typically seen monthly, and is some instances at shorter intervals, by psychiatry, planned psychiatric follow-up visits were sometimes missed.  Suicide risk evaluation checklists were completed appropriately, and included relevant clinical information and suicide risk evaluation.  Five-day follow-up was completed as required.  The treatment plan was individualized, and the necessary participants attended the IDTT meeting.

**Inmate H**

This inmate arrived at PVSP on 12/1/09, from MCSP, at the 3CMS LOC.  He was placed into the EOP LOC on 12/10/09.  At MCSP, he was housed in the ASU due to safety concerns.  He was also placed on SNY status.  He had a Test of Adult Basic Education (TABE) score of 1.7, raising questions as to his levels of literacy and adaptive functioning.

At the initial IDTT meeting, the inmate was provided with diagnoses of Dementia NOS and Polysubstance Dependence.  A history of head trauma was noted.  The IDTT meeting considered referring the inmate for a Clark evaluation, but this did not occur.  Although an EOP chrono was written on 12/10/09, the day of his initial IDTT meeting, there appeared to be communication difficulties between clinical and custody staff.  Institutional logs indicated that the C&PR did not know that the inmate needed to be transferred to an EOP until one month later, on 1/9/10.  A second EOP chrono was dated 1/9/10, and a third was written on 1/14/10, the date that the inmate was discharged from the MHCB.  He was endorsed for transfer by the CSR on 3/24/10, approximately ten weeks after the C&PR inadvertently became aware of the need for transfer to a prison with an EOP, and 14 weeks after the clinical determination was first made.

<u>Findings</u>

This case was notable because the inmate had been awaiting transfer to an EOP for four months. Due in part to dementia, he was too low functioning to look after himself without daily support and supervision. He was assessed to require the EOP LOC within days of arrival at PVSP.

The medical record was in disarray. Documents were out of sequence and filed in the wrong sections. But it appeared that the inmate's intake processing was timely. An initial IDTT meeting was also timely conducted, and the necessary participants were present at the meeting. There appeared to be a breakdown in communication between mental health and custody staff that probably delayed the inmate's transfer to an EOP by one month. Approximately ten weeks elapsed between C&PR action and CSR endorsement.

**Inmate I**

This 3CMS inmate had incurred three RVRs; one for sexual misconduct and two for medication misuse. He was housed in the ASU at the time of the monitoring visit. He was placed there during October 2009, after receiving an RVR for sexual misconduct. He was issued RVRs for medication misuse during November and December 2009, when he attempted to cheek and hoard medications.

Upon his arrival to the ASU, a psych tech attempted to perform an initial screening, but the inmate refused. A refusal form dated 10/19/09 documented this refusal to participate in the screening. Subsequently, the inmate was seen by a PC on 10/21/09 for an initial contact. The medical record contained documentation associated with an initial IDTT meeting conducted in administrative segregation. The plan was insufficiently individualized and omitted pertinent information regarding acute and long-term stressors, including chronic pain.

PC contacts were not documented weekly during administrative segregation, and three or four weekly contacts were missed. The medical record indicated that some contacts were conducted at cell front.

A PC's progress note written during February 2010 indicated that the inmate was suspected of feigning a seizure in order to hoard medication. Psych tech summaries of daily rounds were documented weekly and filed in the medical record.

The treatment plan was updated within 90 days. The updated plan was individualized. The plan noted the inmate's history of attempting to hoard medication and included a more precise diagnostic formulation. As of January 2010, the inmate was provided with a diagnosis of Depressive Disorder NOS. His GAF score was assessed at 65. Group treatment was considered, but not recommended.

According to the C-file, the DA declined to prosecute the sexual misconduct offense. During November 2009, the inmate was observed cheeking DOT medication, when the order included morphine. On 12/29/09, while in administrative segregation, the inmate dropped two pills on the floor (Klonopin and Neurontin), and was issued an RVR for delaying a peace officer. RVR

533

documentation indicated that his TABE score was above 4.0, and he was treated at the 3CMS LOC. He was not referred for a mental health evaluation because his behavior was not considered bizarre, unusual, or uncharacteristic.

Four days after the RVR for IEX was issued, in a mental health note dated 10/20/10, a clinician concluded that no mental health issues caused the behavior that resulted in the RVR. The note did not address whether or not the inmate was screened, and whether the case would be considered by an IDTT as per IEX protocol.

<u>Findings</u>

Recent mental health documents were filed out of sequence in the medical record, and it appeared that some documents may have been missing from the record. There were some issues noted regarding the care that was provided to this inmate. IDTT meetings were conducted timely in the ASU. One treatment plan was insufficiently individualized, but an updated plan was clinically appropriate. A mental health screening was attempted within 24 hours of the inmate's placement in administrative segregation. Several weekly PC contacts were missed. Documentation of psych tech rounds and other clinical contacts contained pertinent information. PC progress notes recorded whether contacts were conducted at cell front.

The mental health staff was made aware of the inmate's attempts to hoard medication, and was responsive to his need for treatment. The mental health staff did not follow the IEX protocol.

**Inmate J**

This inmate arrived at PVSP on or about 9/4/09 at the 3CMS LOC. He transferred from CSATF where he reportedly had been doing well on Remeron, Zoloft, Benadryl and Elavil (ordered for pain). After arriving at PVSP, orders for Gabapentin and morphine were continued.

The initial mental health contact, IDTT meeting, and treatment plan were timely. A full team attended the IDTT meeting, but the treatment plan was insufficiently individualized. For example, although the treatment plan included a diagnosis of Depressive Disorder NOS, the PC's note included a diagnosis of MDD, severe and recurrent without psychosis. Additional documentation completed in connection with the IDTT meeting including a PC's progress note, a suicide risk evaluation checklist, and a psychiatric progress note; all contained more individualized information, including information as to prior suicide attempts and a more refined diagnosis.

MARs located in the medical record documented sustained medication continuity, but there were no MARs in the medical record for the first two months of the inmate's stay at PVSP. The inmate reported disruptions in medication continuity for several months, from his arrival at PVSP to early 2010. Besides psychotropic medication, he received treatment for chronic pain.

In mid-September 2009, the inmate reported that he was taking Remeron but had not been receiving Zoloft; he also expressed concerns about medication side effects and mood stability.

He reportedly continued to experience mood instability, problems with medication, and the effects of morphine withdrawal.

During October 2009, the inmate was seen in response to an emergency referral when he made superficial scratches in an attempt to obtain medical attention.  At that time, he stated that he was in pain, but had not received pain management medication as ordered, and was experiencing signs and symptoms of morphine withdrawal.  He was seen by a PC who referred him to the CTC for further evaluation, where he was seen by a psychologist and a physician.  He was not admitted to the MHCB but was cleared to return to his yard.

During January 2010, the inmate reported that he had not been receiving Zoloft.  In February 2010, when seen by the PC, he reported feeling worried that his pain medication would be discontinued.

This 3CMS inmate was issued an RVR for self-mutilation on or about 10/4/09.  According to the C-file, a mental health evaluation performed for disciplinary purposes stated that no mental health factors should be considered in adjudication.  It did not mention that the inmate reported that he had not received medication for pain and was reportedly experiencing morphine withdrawal symptoms.  The evaluation was located in the C-file but was not filed in the medical record.  Documentation in the RVR packet accurately noted the inmate's LOC, and the findings of the mental health evaluation.  The inmate pled guilty and was assessed 90 days loss of dayroom and telephone use, and lost 30 days of time credits.  There was no documentation that the RVR for self-mutilation was authorized by the Chief of Mental Health, as required by CDCR protocol.

<u>Findings</u>

Mental health treatment was compliant with many Program Guide requirements, but some important omissions were noted.  The protocol for issuing an RVR for self-mutilation was not followed by the mental health staff.  Zoloft was not administered consistently despite continuous orders. The initial treatment plan was insufficiently individualized and had other minor errors, including an error on an important date.  Associated documents, however, contained more individualized information.  A mental health evaluation performed for disciplinary purposes did not report that medication continuity was a significant stressor for this inmate.  However, intake processing was timely, and mental health clinicians were responsive to the inmate's treatment needs.

EXHIBIT K
Avenal State Prison (ASP)
June 15, 2010 - June 17, 2010

**Inmate A**

This EOP inmate was placed into the ASU on 4/21/10 due to a battery charge on another inmate. He was provided with a diagnosis of Bipolar Disorder most recent episode depressed and Polysubstance Abuse; he also had multiple medical problems.  He had received treatment with Geodon and Abilify at different times during his therapy.  Recent stressors included the death of his father several months prior; since that time, the inmate reported SI.  He arrived at ASP during November 2009 when he was placed into the 3CMS program.  A psychiatric progress note dated 11/5/09 indicated that the inmate was recently transferred from CSP/Corcoran, where he had refused Geodon for ten weeks.  Subsequent progress notes indicated that the inmate suffered a broken sternum after he was assaulted at CSP/Corcoran.

A suicide risk evaluation checklist that was completed on 4/26/10 noted several recent instances of SI. The inmate's mental health history was significant for multiple suicide attempts; the most recent attempt occurred during 2007.  He had a history of multiple inpatient hospitalizations for psychiatric reasons.  He had multiple suicide risk factors including safety concerns, recent SI and assaultive behavior, and a perceived lack of support systems.  After he cut his writs, he was hospitalized in the MHCB from 1/23/10 to 2/22/10.  The inmate was also housed in the OHU on or about 4/19/10.

This inmate was seen during the IDTT meeting on 3/3/10.  At that time he requested to have his Abilify increased, and he reported increasing auditory hallucinations and decreased sleep (two to three hours at night).  Subsequently he was seen weekly by the PC and consistently by the psychiatrist.  A number of the progress notes indicated that the inmate was seen by the clinician without the medical record.  The inmate was again admitted to the OHU on or about 3/23/10. Five-day follow-up and weekly clinical contacts were conducted following discharge from the OHU.

The Form 7388, the checklist for DMH referral, was completed on 4/28/10; it indicated that the inmate did not meet criteria for possible DMH referral.

Findings

This inmate was seen weekly by the PC, and consistently by the psychiatrist, according to Program Guide requirements.  He did not meet criteria for referral to DMH, and EOP appeared to be the appropriate LOC for him.  Due to the suicide risk factors noted above, this inmate was at increased risk and required ongoing monitoring while housed in administrative segregation awaiting transfer to an EOP program.

**Inmate B**

This EOP inmate was housed in the ASU.  He was provided with a diagnosis of MDD with psychotic features.  He was treated with Effexor and Vistaril.  Progress notes during the spring of 2010 indicated that he was referred to the EOP LOC, and had also been referred to DMH.  A progress note dated 4/22/10 indicated that the PC would reschedule the inmate for completion of the DMH referral packet.  A psychiatric progress note dated 4/18/10 stated that the inmate was

stable at the 3CMS LOC.  A progress note dated 4/22/10 indicated that this inmate appeared appropriate for DMH referral but that the mental health staff would monitor him for up to 30 days to determine if he was better suited for the EOP.  An IDTT meeting on 4/29/10 updated the LOC to EOP but also noted that the inmate would be considered for 3CMS when his GAF score increased.  The Form 7388, the checklist for DMH referral, of that same date noted that the inmate met several of the criteria for DMH referral.  Subsequent progress notes on 5/6/10 and 5/10/10, and documentation regarding an IDTT meeting on 5/7/10, indicated that the DMH referral was underway.

A subsequent IDTT meeting on 5/26/10 indicated that the inmate had not responded sufficiently to at least six months of treatment to a degree that facilitated adequate functioning; it also noted that the inmate had previously been referred to DMH.  No DMH referral was initiated at that time.

A suicide risk evaluation on 5/25/10 documented multiple risk factors for suicide including perception of loss of support, a first prison term, hopelessness, helplessness, recent bad news, and a change to administrative segregation status.  A PC note dated 6/10/10 documented the inmate's request for medication to address increasing auditory hallucinations, and again noted that this EOP inmate had been referred to SVPP.  This progress note documented the inmate's understanding that his release date from prison was imminent; therefore, the chances of being transferred to either EOP or DMH prior to discharge were remote.  A psychiatric progress note dated 6/14/10 documented that the inmate was experiencing agitation, and a recurrence of auditory hallucinations.

Findings

Although the inmate was consistently seen by clinical mental health staff, the care provided to him was not well coordinated.  Despite numerous notations documenting referral to DMH, this inmate's name was not on the DMH wait list provided by ASP.  This case was brought to the attention of the Chief of Mental Health for remedy.

**Inmate C**

This 3CMS inmate was diagnosed with MDD recurrent.  He had been classified as requiring SNY status.  At the time of the monitoring visit, the inmate had only recently been housed at ASP.  Medical record documentation on 4/26/10 included the Form 7388, the checklist for DMH referral, which correctly noted that the inmate did not meet any DMH referral criteria.  An IDTT progress note dated 4/29/10 indicated that the C-file was unavailable at the IDTT, and that the inmate believed that he would be released on 5/26/10.  Group therapy was also recommended.

Findings

There was documentation that this inmate was appropriately evaluated for possible DMH referral at the time of the IDTT meeting.  Despite IDTT recommendations for group therapy, at the time of the site visit there was no evidence that the inmate had participated in groups.  This was consistent with ASP reports of a wait list for group therapy.

538

**Inmate D**

This 3CMS inmate was classified as requiring an SNY.  He had been provided with a diagnosis of Adjustment Disorder.  Progress notes indicated that he was consistently seen by his PC to address anxiety symptoms concerning his upcoming prison release, and his history of SI. Additional stressors included his family situation, and potential administrative segregation placement.  His medical record contained a Form 7388, the checklist for DMH referral.

Findings

There was documentation that the inmate was seen by the PC and psychiatrist as required. Despite the inmate's upcoming release from prison, there was no adequate documentation of parole planning or referral to or involvement of the TCMP.  There was documentation that the IDTT meeting considered DMH referral.

**Inmate E**

This inmate had not participated in the MHSDS until 3/25/10.  On 12/15/09, the PC reported that the inmate expressed the belief that he was being shot through the television.  Subsequent progress notes by psychiatrists described the inmate as exhibiting mild memory deficits.  He reportedly refused treatment for kidney disease, and exhibited poor insight regarding his illness. On 3/8/10, he was referred by medical staff as to his competency to make his own medical decisions.  There was also a notation that a DMH referral was rescinded; however, there was an indication that the inmate would be referred again for diagnostic clarification.

On 3/25/10, the treatment plan indicated that the inmate might be exhibiting delusional thinking, and that he was refusing treatment for renal failure.  The DMH referral checklist on that date indicated the need for a comprehensive assessment for diagnostic clarification.  Subsequent progress notes indicated that the inmate did not have an Axis I psychiatric diagnosis, and expressed concern as to his cognitive functioning.

Findings

There was a lack of documentation in the medical record as to the inmate's diagnosis, treatment planning, and need for clarification regarding consideration for DMH referral. This case was referred to the Chief of Mental Health, who indicated that a case conference would be convened to address these issues.

EXHIBIT L
Salinas Valley State Prison (SVSP)
March 15, 2010 - March 18, 2010

**Inmate A**

This EOP inmate was housed in the ASU at the time of the monitoring visit.  A treatment plan dated 3/3/10 included diagnoses of Schizophrenia paranoid type and Antisocial Personality Disorder.  The treatment plan was individualized, addressed target behaviors, and indicated that the inmate participated in most of his groups and individual clinical appointments.  The quality of his group participation was described as excellent, and the inmate was described as articulate and coherent.  The Form 7388, the checklist for DMV referral, was attached to the treatment plan; all of the criteria were marked negatively on the form.

The inmate was transferred to the ASU on 9/3/09.  He was placed on a Keyhea order due to grave disability.  Previous diagnoses included MDD, severe and recurrent with psychotic features.  The inmate had at least one DMH admission, and several MHCB admissions, for decompensation and poor self-care.

At a psychiatric evaluation on 1/6/10, the inmate was reportedly stable, and had a good clinical response to medication management.  The inmate attended most groups during January, February, and early March 2010.  Psych tech rounds were documented from January through early March 2010; the form was generally completed, although there were some blanks.  These notes described the inmate as cooperative, and his cell and hygiene were described as normal.

The medical record contained weekly PC progress notes from January through March 2010.  During this period, the inmate was described as stable without overt evidence of active psychosis, although the inmate continued to exhibit a flat affect.  He was reportedly compliant with medications.

Findings

This inmate appeared to be receiving mental health services at the appropriate LOC.  He appeared stable although there was some indication of persistent dysphoric mood.  There was a clinically appropriate treatment plan, and the inmate was seen at the required intervals by the PC and psychiatrist.  The administrative segregation pre-screening form was not located in the medical record.

**Inmate B**

A treatment plan dated 1/20/10 indicated that this inmate was serving a life sentence.  He was provided with a diagnosis of Delusional Disorder.  Progress notes indicated that the inmate was programming with good group attendance, and presented with a pleasant and cooperative demeanor.  The treatment plan problem list included only anger as a problem area; the plan did not mention the inmate's delusional thinking that the officers had a contract to harm him.

Documentation of weekly psych tech rounds was located in the medical record.  These notes described the inmate as cooperative with appropriate mood and hygiene.  Weekly PC progress notes were present for the period of January to March 2010.   These notes indicated that the inmate was often angry.  His grooming was generally described as being appropriate, although

there were times when he was described as "scruffy." The inmate presented with a persecutory delusion that the officers were attempting to harm him. His speech was generally normal. Group attendance was inconsistent during mid-February 2010, but subsequently improved. The inmate was generally seen by his PC in a confidential setting.

Findings

This inmate appeared to be stable with fixed persecutory delusional thinking, and intermittent mood disturbance. The medical record progress notes were clinically relevant, and clinical contacts were timely. The treatment plan did not acknowledge the inmate's primary difficulty, which was his persecutory delusional thinking. Documentation of administrative segregation pre-screening, and the 31-question screen, were not located in the medical record.

**Inmate C**

This 3CMS inmate was housed in the ASU at the time of the site visit. An undated treatment plan stamped as received by the medical records department on 11/22/09 documented diagnoses of Depressive Disorder, Psychotic Disorder NOS, and Antisocial Personality Disorder. This inmate was also diagnosed with degenerative spinal disease and arthritis, and utilized a wheelchair.

Progress notes of psych tech rounds during December 2009 through mid-February 2010 indicated that the inmate was cooperative with normal mood and grooming. He had refused approximately one-third of his weekly clinical contacts since early February 2010. Weekly PC progress notes were located in the medical record. These notes indicated that the inmate presented with normal grooming, organized thinking, and a cooperative attitude with clinicians. The inmate was reportedly concerned with maintaining his single cell status.

The inmate was given an indeterminate SHU term on 2/11/10. A chrono dated 3/10/10 indicated that the inmate wrote a family member that he had thoughts of suicide. A progress note dated 3/11/10 indicated that the inmate told the clinician that he was tired, and refused out-of-cell clinical contact. The inmate denied SI at that time.

Findings

This inmate appeared to be receiving care that was consistent with the Program Guide. Progress notes were generally clearly written, and were clinically relevant. The treatment plan was current and individualized. Documentation of administrative segregation pre-screening, and the 31-question screen, were not located in the medical record.

**Inmate D**

This EOP inmate was housed in the ASU at the time of the monitoring visit. A pre-placement chrono dated 2/20/09 was located in the medical record, and indicated that the inmate had no suicidal thoughts or evidence of psychosis at that time. The inmate was apparently hospitalized in the MHCB during October 2006 after making a statement that he wanted to die.

A treatment plan dated 2/10/10 indicated that the inmate was transferred to administrative segregation on 1/29/10 after he was charged with participating in a riot. He had been removed from the 3CMS caseload on 9/30/09, and became increasingly depressed after administrative segregation placement apparently precluded a transfer that he desired. He was diagnosed with an Adjustment Disorder at that time.

Psych tech notes of segregation rounds through 2/24/09 described the inmate as cooperative, with normal mood and grooming. A PC progress note on 2/2/10 described the inmate as sad; he told the clinician that he wanted to return to the MHSDS as he had become depressed since transfer to administrative segregation.
The inmate was seen in the IDTT meeting on 2/10/10 for initial evaluation; this meeting occurred timely. He was seen again by a clinician on 2/16/10, when he reported still being depressed, and concerned about possible transfer. On 3/2/10, his mood was again described as depressed. A progress note on 2/16/10 indicated that the inmate had been placed on Paxil, an antidepressant medication.

Findings

This inmate was seen timely by the PC and psychiatrist. IDTT meetings were also timely. Progress notes were clinically relevant, and psych tech rounds were well documented.

**Inmate E**

This GP EOP inmate was prescribed Lithium. The appropriate laboratory testing was conducted. The inmate also received medications via a Keyhea order. He was provided with diagnoses of Schizoaffective Disorder and Antisocial Personality Disorder. A 2/11/10 IDTT summary note was reviewed, which included useful clinical information. The inmate was described as refusing groups due to the "groups being too large." Chronic auditory hallucinations were noted. A review of progress notes indicated that weekly PC contacts occurred, but the inmate's group therapy attendance was poor.

Findings

The problem with this inmate's treatment was his lack of participation in structured therapeutic activities. This issue was minimally addressed in the most recent treatment plan. The appropriate laboratory studies for treatment with Lithium were obtained.

**Inmate F**

This inmate was prescribed Lithium. The appropriate laboratory testing was conducted. He was provided with diagnoses of Bipolar I Disorder and Cocaine Abuse. His initial IDTT meeting occurred on 2/24/10. The treatment plan was clinically appropriate.
The inmate was housed in the ASU due to safety concerns; this housing was problematic due to the proximity to another inmate (the "shotcaller"), who reportedly harassed him for having refused to stab another inmate.

543

<u>Findings</u>

Initial follow-up with custody staff indicated that the inmate's current housing was appropriate. This was of concern due to the above history. Following discussion with an Associate Warden, a decision was made to transfer the inmate to another housing unit to move him away from the previously described inmate.

**Inmate G**

This GP EOP inmate was prescribed Lithium. The appropriate laboratory testing was conducted. The inmate was also prescribed medication via a Keyhea order.
A 2/4/2010 IDTT note indicated that this inmate was on the wait list for transfer to DMH. He did not participate in most of the groups offered to him.

<u>Findings</u>

The current plan for transfer to DMH was appropriate.

**Inmate H**

This GP C3MS inmate was prescribed Lithium. With the exception of thyroid studies, the appropriate laboratory testing for treatment with Lithium was obtained.

<u>Findings</u>

Thyroid function tests should be obtained.

**Inmate I**

This 3CMS inmate was prescribed Lithium. Progress notes indicated that the appropriate laboratory testing was ordered during January 2010. However, physician order sheets in the medical record did not reflect such orders, and laboratory results were not present in the medical record. The psychiatric progress note during February 2010 indicated that "lab reg re-submitted;" however, the same problem was noted by the monitor's expert; physician order sheets in the medical record did not reflect such orders, and the medical record did not contain laboratory results.

<u>Findings</u>
The laboratory testing process appeared to be flawed based on a review of medical records.

EXHIBIT M
Correctional Training Facility
May 4, 2010 - May 6, 2010

**Inmate A**

This inmate was admitted to the CDCR during May 2009 to serve a three-year term. Approximately two months after arriving at CTF, he was identified for referral to ASH during the MHARP review that occurred from 12/28/09 to 12/29/09.

A review of available records indicated that there were discrepancies regarding the dates of DMH referral. According to a log, the referral was sent to DMH on 1/25/10. Dates in the log indicated that the inmate was accepted for admission the following day, and transferred five days later. The medical record, however, indicated that the inmate was accepted for admission on 2/1/10, and transported to ASH on that date. After a stay at ASH of approximately five weeks for assessment and diagnostic clarification, the inmate was returned to CTF on 3/10/10.

The DMH discharge summary provided diagnoses of Mild Mental Retardation with a history of a head injury in 1990 associated with a three-day loss of consciousness, and Mixed Receptive/Expressive Language Disorder. The inmate was assessed with a GAF score of 35 at the time of discharge. The discharge summary recommended a neurological evaluation, a hearing test, and treatment with a low dose anticonvulsant or an atypical antipsychotic medication.

An IDTT meeting was conducted upon the inmate's return to CTF on 3/10/10. The documentation did not indicate that a CC attended the IDTT meeting. The inmate's GAF score was assessed at 55, in contrast to the lower assessment of 35 made previously by DMH staff. Follow-up at two-week intervals was planned.

<u>Findings</u>

Delays were noted in the referral of this inmate to DMH. There were also inconsistencies in the documentation regarding actual dates of referral and DMH transfer. There was an indication that communication regarding the inmate's return to CTF from DMH was impaired as CTF did not immediately identify this inmate upon his return from DMH.
Although the IDTT meeting was held timely, the necessary participants were not present at this meeting.

**Inmate B**

This 3CMS inmate incurred several RVRs during the monitoring period, and had a history of disciplinary problems. Only one offense elicited a referral to mental health for a mental health evaluation. The inmate pled not guilty. The offense was threatening staff. The inmate was overheard on the telephone saying that he was angry enough to injure an officer. The inmate experienced an acute psychiatric episode and was transferred to the MHCB at CMF shortly after the offense. Presumably because he was in the MHCB, the mental health evaluation was completed nearly four weeks after the offense. The evaluation found that the adjudication should not consider any mental health factors.

One RVR incorrectly noted that the inmate was not a participant in the MHSDS, but others correctly identified him as part of the MHSDS at the 3CMS LOC.

<u>Findings</u>

One of several RVR packets incorrectly identified this inmate as not participating in the MHSDS.  In another disciplinary incident, there was a four-week delay between an RVR and the subsequent mental health evaluation.  Apart from the issue of timeliness, the process for considering mental health input during disciplinary adjudication was compliant with departmental requirements. However, the temporal proximity of the offense and the inmate's treatment in an MHCB might reasonably have pointed to a positive mental health finding.

**Inmate C**

This 3CMS inmate's case was reviewed during an IDTT meeting, and his medical record was reviewed.  He was provided with a diagnosis of Schizoaffective Disorder.  Most recently, he had been insistent about being discharged from the 3CMS caseload.

Recent progress notes referenced hospitalizations at state hospitals, including ASH and Napa, as well as treatment at the EOP LOC.  The inmate was described as resistant to EOP treatment; however, he requested treatment with Haldol Decanoate.

Various clinicians held differing opinions regarding diagnostic considerations for and treatment of this inmate.  He was variously described as mentally ill, as well as presenting primarily with symptoms of a personality disorder.  One psychiatrist suggested conducting another IDTT meeting to consider changing the inmate's LOC to EOP.  Another psychiatrist did not object to discharging the inmate from the mental health caseload as requested.

<u>Findings</u>

This inmate needed diagnostic clarification and a thoughtful multidisciplinary treatment approach.  In light of his history and lack of insight, it was likely that he warranted continued mental health treatment to address his maladaptive behavior rather than removal from the MHSDS.  The mental health staff was not uniformly responsive to his clinical picture, nor were they consistent in their view of the case.

EXHIBIT N
Wasco State Prison (WSP)
May 18, 2010 - May 20, 2010

**Inmate A**

This inmate was receiving mental health services at the 3CMS LOC.  The most recent medical record progress note, dated 4/28/10, indicated that the inmate stated as follows: "I have not had a panic attack and when I feel one coming on, I'm able to stop it."  He explained that he had experienced cessation of panic attacks since his last contact with his PC.  He attributed this change to his religious faith, medication compliance, and the therapeutic interactions with his PC.  The inmate admitted that he had submitted a 602 grievance to find out why he had been housed at WSP for an extended period of time, and had not been transferred to a mainline institution.

The inmate's hygiene and grooming were described as good.  He utilized a prosthesis for his left leg that enabled him to walk freely without assistance.  His speech was described as normal, and the inmate was responsive to questions.  His affect was described as calm, and his eye contact was appropriate, but with some tearfulness.  He denied depressive mood, but his history of SI was indicative of depressive symptoms.  He denied current SI.   It was reported that the inmate had limited insight into his problems, but he was receptive to interpretations by his PC.

The inmate was seen by a PC on 2/2/10, 2/17/10, and 3/17/10.  He was provided with a diagnosis of Panic Disorder without agoraphobia; an additional provisional diagnosis of PTSD was also present in the medical record.  The inmate was assessed with a GAF score of 65.  His medication regimen included Paxil 10 mg/day, and Remeron 30 mg/day.

Findings

This inmate had access to mental health services, and was actively engaged in treatment.  He appeared to be stable at the appropriate LOC at the time of the monitoring visit.

**Inmate B**

This 3CMS inmate was housed in administrative segregation.  He had been provided with a diagnosis of Mood Disorder NOS.  He arrived at the WSP RC on 9/17/09, and was placed in the ASU during January 2010.  The most recent initial health screening dated 9/17/09 did not include documentation of prior 3CMS involvement; however, the inmate had been identified as a participant in the 3CMS LOC on several previous screening forms.  The inmate responded negatively to all screening questions.  He had signed several refusal forms in which he refused medications, evaluations, and treatment attempts.

At the time of the monitoring visit, the inmate was not prescribed psychotropic medications.  There was documentation that the inmate was seen daily during psych tech rounds, and weekly by the PC at cell front.  He reportedly went to yard.
The inmate reportedly had three prior suicidal attempts, but was cleared for referral when the latest suicide risk evaluation checklist was completed during October 2009.  The inmate denied having SI.  The initial IDTT meeting that occurred during January 2010 was documented and filed in the medical record.  Although a subsequent IDTT was due during April 2010, there was no documentation of it in the medical record.

Findings

This inmate was not amenable to treatment interventions.  The initial health screening in the R&R did not incorporate his prior history of mental health treatment.  The IDTT maintained daily observations of the inmate's behavior.  However, in view of his history of suicidal attempts and current depressed state, the inmate required consistent clinical contacts and IDTT meetings. It was unclear whether the inmate had been seen in IDTT during April 2010.

**Inmate C**

This EOP inmate was housed in the ASU.  He arrived at the WSP RC on 2/10/10.  A mental health evaluation was completed on 2/23/10, and the inmate was provided with a diagnosis of Psychotic Disorder NOS.  The inmate participated in EOP group therapy.  Psych tech daily rounds and weekly summaries were documented in the medical record.  The inmate was prescribed Haldol, Artane, and Paxil, but a medical record review indicated that he was noncompliant with prescribed medications.  The inmate signed a medication refusal form on 3/5/10.

There were conflicting diagnoses documented in the medical record, including Mood Disorder NOS, Psychotic Disorder NOS, and Schizoaffective Disorder.  A suicide risk evaluation checklist was completed.  The IDTT meeting was conducted timely.  Psych tech rounds, PC contacts, and psychiatric evaluations occurred timely, and the progress notes were clinically relevant.

Findings

There was a need for diagnostic clarification for this inmate, and the IDTT should have assessed and clarified this issue.  Although this inmate was reportedly noncompliant with prescribed medications, no documentation indicated whether this issue had been clinically addressed.

550

EXHIBIT O
Kern Valley State Prison (KVSP)
April 20, 2010 - April 22, 2010

**Inmate A**

This SNY EOP inmate had been referred to DMH for ICF LOC.  The referral was made on 11/18/09.  The decision to refer to DMH was reviewed at each IDTT meeting, and the inmate remained on the wait list at the time of the monitoring visit.  He was provided with a diagnosis of Psychotic Disorder NOS; he was previously diagnosed with Schizoaffective Disorder.  The inmate was on a Keyhea order that would expire on 7/28/10.  The inmate was prescribed Risperdal orally with Abilify injections if the oral medication was refused.

The inmate was seen by the PC weekly.  Progress notes indicated that he was evaluated by different psychiatrists for a period of time due to staffing issues.  On 1/15/10, a psychiatrist noted that the interview occurred at cell front and described the inmate as religiously preoccupied, and experiencing auditory hallucinations.  There was no acknowledgment of the Keyhea order, but the plan for the follow-up visit was to order "any needed labs and consider increase in Risperdal."  The next psychiatrist visit occurred on 2/9/10 and did not reflect any consideration of a dosage increase or laboratory studies.  On 3/15/10, the permanently assigned psychiatrist saw the inmate and noted the Keyhea order, as well as "impaired processing and reasoning" although no examples were provided.  No dose increase was contemplated, and no laboratory studies were ordered.  None of the psychiatrists noted the DMH referral decision or the placement of the inmate on the wait list for ICF LOC.

At an IDTT meeting on 3/2/10, the PC wrote that the inmate had improved over the course of the preceding two months to the extent that the IDTT would consider rescinding the ICF referral at the next meeting if his stability was maintained.  The PC progress notes, group therapy notes, and psychiatric progress notes did not reflect that there had been improvement in the inmate's condition.  The notes also did not relate to one another, reference anything in the previous note, or even consistently acknowledge critical information such as the Keyhea order or status on the ICF wait list.  This was a reflection of the unavailability of the medical record for mental health clinical encounters.

Findings

This inmate was seen weekly by the PC.  There was initially a problem with poor continuity of care by the psychiatrists, but this issue was resolved after the inmate was assigned a permanent psychiatrist.  It appeared that the lack of an available medical record for clinical encounters was a barrier in the provision of coordinated and informed mental health care.  This inmate was appropriately referred to a higher LOC, and had been on the DMH ICF wait list since November 2009.

**Inmate B**

This SNY EOP inmate had a diagnosis of Schizoaffective Disorder.  He was prescribed Thorazine, Cogentin, and Zoloft.  The inmate was seen weekly by his PC; he was seen monthly by the psychiatrist.  Progress notes indicated that he attended group therapy.  He was referred to DMH for ICF LOC as part of MHARP.  The referral was heard by CCAT on 2/18/10; although the reason for this CCAT hearing was unclear from the medical records documentation.  The

CCAT committee rescinded the referral based on "improved medication compliance and depression situational." A recommendation for medication review for consideration of the addition of a mood stabilizer was made.

Psychiatric progress notes dated 3/15/10 and 4/13/10 did not reflect acknowledgment of the CCAT decision or consideration of the recommendation regarding medication. Laboratory studies included a complete blood count and blood chemistries; lipid and thyroid profiles were located in the medical record and were most recently completed on 3/22/10. A routine EKG that was performed on 3/24/10 was also present in the medical record.

Findings

This inmate appeared to be receiving mental health services at the appropriate LOC in the EOP. It did not, however, appear that the psychiatrist was aware of and had considered the CCAT recommendation regarding treatment with a mood stabilizing medication.

**Inmate C**

This inmate's medical record was reviewed as the inmate had recently returned from DMH acute care. He had been transferred to DMH APP on 2/26/10 from the MHCB at KVSP, and was returned to KVSP on 4/16/10. At the time of the initial EOP IDTT meeting at KVSP on 4/21/10, the PC had not received any information from DMH regarding the hospitalization, and had not received the inmate's medical record. The DMH discharge summary was faxed to KVSP shortly after the IDTT had concluded. The expert requested the medical record for review on the same date; however an investigation by medical records revealed that although the inmate had returned on 4/16/10, his medical record remained at DMH-CMF as of 4/22/10.

Findings

Admission to the EOP following return from DMH acute care appeared to be clinically prudent; however, review of the overall care was not possible due to the absence of the medical record. The lack of medical record availability adversely affected the clinician's ability to provide adequate mental health care.

**Inmate D**

This EOP inmate was provided with a diagnosis of Depressive Disorder NOS. He was treated with Remeron. The inmate was seen weekly by his PC. Progress notes indicated that counseling sessions focused on assisting the inmate in dealing with trauma associated with having been the victim of a violent act in the past. The inmate attended groups and had a job assignment. He was seen monthly by the psychiatrist.

The treatment plan in the medical record was generic in terms of describing specific interventions and articulating treatment goals. No objective measures to assess symptom severity were described or utilized.

<u>Findings</u>

The inmate was seen weekly by his PC and monthly by the psychiatrist as required. The inmate appeared to be stable and did not require transfer to a higher LOC at the time of the monitoring visit. The IDTT screening checklist for referral to DMH was located in the medical record and had been completed on the day of the IDTT meeting.

**Inmate E**

This inmate had been receiving EOP LOC since 11/24/09. He was provided with a diagnosis of Schizoaffective Disorder bipolar type. He had a history of engaging in self-injurious behavior. He was prescribed Buspar, Thorazine, and Depakote. The most recent Valproic Acid level in the medical record was obtained on 9/23/09, and the level was in the therapeutic range. Zoloft had been prescribed but was discontinued on 3/30/10 at the inmate's request. Cogentin was added; however, it was unclear why this medication was prescribed as there was no documentation of medication side effects that would warrant such medication. The rationale for medication selection, adjustment, or discontinuation was not readily explained in the psychiatrist's progress notes.

The inmate was admitted to the CTC from 10/22/09 to 10/26/09 for reports of SI and depression. He was placed into the EOP shortly after his discharge from the CTC.

<u>Findings</u>

This inmate was followed consistently by the psychiatrist and PC as required. Progress notes demonstrated that significant clinical work was conducted with his PC as to the inmate's history of trauma. Psychiatric progress notes did not include important information regarding the rationale for treatment decisions. The inmate was reviewed at the IDTT for a higher LOC and did not meet the criteria for consideration at that time.

**Inmate F**

This inmate was in the EOP. The medical record included several diagnoses including MDD without psychotic features and Delusional Disorder. The inmate was prescribed Buspar, Zoloft and Remeron. Informed consent forms for the medications were current and present in the medical record. A comprehensive laboratory panel including blood chemistries, lipids, and thyroid function tests was conducted during January 2009, and all values were within the normal range. The inmate attended groups, and he was followed consistently by the PC and psychiatrist.

<u>Findings</u>

There was documentation that this inmate was seen weekly by his PC and monthly by the psychiatrist. The treatment plan was generic without clearly articulated goals. As there were several diagnoses present in the medical record, it appeared that the IDTT should address the need for diagnostic clarification. Based upon the medical records review, the inmate did not appear to require a higher LOC.

**Inmate G**

This 3CMS inmate's medical record was reviewed at the request of plaintiffs' attorneys due to concerns as to whether he was receiving mental health services at the appropriate LOC.

According to a recent treatment plan, the inmate had diagnoses of Mood Disorder NOS and insulin dependent diabetes. Progress notes indicated that he experienced high levels of anger and depression.

The inmate had a history of multiple transfers to outside hospitals for various medical issues as well as for self-inflicted lacerations. The inmate was also treated for chronic pain, and was prescribed Gabapentin for this condition. At the time of the review, he was housed in a GP unit. He was transferred from the ASU less than one month before the monitoring visit. The inmate reported that he had not received his prescribed medications since the housing transfer that had occurred two months earlier.

During the six months prior to the site visit, the inmate was admitted to the MHCB on multiple occasions due to SI. He was admitted to the MHCB more than three times during the first 14 weeks of 2010. Following discharge from the MHCB during February 2010, one day of five-day follow-up was missed (the third day), but he was seen for a fifth follow-up visit on the sixth day. Numerous suicide risk evaluation checklists were completed. His level of risk generally ranged from low to moderate, but with a high level of chronic suicide risk.

While housed in the ASU, the inmate was seen weekly by a PC, usually out of cell. Progress notes contained relevant clinical information. IDTT meetings were held timely, and treatment plans were updated. Progress notes indicated that while housed in the ASU, the inmate frequently reported that medication was not administered, including medication he needed for his medical condition.

Findings
This inmate appeared to be receiving mental health services at the appropriate LOC in the 3CMS program. He was seen weekly by the PC while housed in the ASU, and was seen timely subsequently. Suicide risk evaluations were completed when clinically appropriate. There appeared to be lapses in the provision of five-day follow-up after discharge from the MHCB for suicidal reasons. Clinical documentation regarding his recent mental health treatment contained pertinent clinical information. Despite the inmate's complaints regarding medication continuity, a review of the medical record indicated that medications were administered as prescribed.

**Inmate H**

This 3CMS inmate arrived at KVSP from CSATF during May 2009. The inmate was provided with a diagnosis of Psychotic Disorder NOS. His GAF score was assessed at 67. He was evaluated by mental health clinicians within one week of arrival at KVSP.

The inmate was seen quarterly by his PC until early 2010, when over four months elapsed between PC contacts. When he was seen on 10/16/09 by a psychiatrist, the progress note indicated a plan to follow-up in 30 days, but the visit did not occur.

Findings

The mental health treatment that was provided to this inmate did not conform to Program Guide requirements. Intake processing was timely, but the initial IDTT meeting did not include a CC. There also appeared to be a problem with the timely renewal of psychotropic medications, and a review of the medical record revealed that orders for psychotropic medications had expired. Psychiatric contacts also occurred at intervals greater than 90 days. This problem was made worse by the lack of psychiatric continuity of care; this inmate had been seen by three different psychiatrists.

Although PC contacts occurred at greater than 90 day intervals, the inmate was seen in a treatment group that was conducted by his PC during this period.

## Inmate I

This 3CMS inmate was interviewed in a group on 4/22/10. During the interview, he reported that he had not received his prescribed psychotropic medications for two weeks. This inmate was provided with a diagnosis of Schizoaffective Disorder. He was assessed with a GAF score of 55. A review of the medical record indicated that he was prescribed and had current orders for Prozac, Haldol, and Artane. An order for Depakote had expired on 3/30/10, and had not been renewed at the time of the review. There was documentation that the inmate was last seen by psychiatry on 12/21/09. There was also documentation that a cell-front psychiatric contact occurred on 4/15/10.

The only documentation of PC contact at KVSP was a cell-front contact that occurred on 1/6/10. The rationale provided for this cell-front contact was "heavy ducat/time constraint." The inmate was subsequently seen by the PC three months later on 4/9/10. There were no PC contacts documented between August 2009 and January 2010.

Findings

The mental health treatment that was provided to this inmate did not conform to Program Guide requirements. Although the inmate was not housed in the ASU, access to confidential clinical contacts was precluded by lockdowns or other issues. There were gaps in medication continuity, and there appeared to be a lapse in medication continuity of 15 days between orders for Depakote. Treatment planning was not individualized. There was also a lapse in the documentation of quarterly PC contacts.

## Inmate J

This inmate's medical record was reviewed, and the inmate was interviewed at the request of plaintiffs' attorneys who expressed concerns as to his dormitory housing. The inmate transferred

from NKSP to KVSP on 8/28/09 at the 3CMS LOC.  He was due to be released to the community within several days of the monitoring visit, on 4/25/10.

The inmate was housed in the A Yard dormitory when he was seen on 4/21/10.  He reported that he had been seen recently regarding pre-release planning; however, he indicated that important issues such as a benefits application or mental health follow-up had not been discussed.

There was documentation that the inmate was seen by a psychiatrist during November 2009, approximately three months after he arrived at KVSP; he was prescribed Abilify, Remeron, and Benadryl for treatment of depression and anxiety.  At the time of the monitoring visit, the inmate had not been seen for psychiatric follow-up; this was a span of almost five months.  A medication reconciliation sheet showed that an order for Abilify was written on 2/9/10, and an order for Remeron was written on 12/1/09.

On 12/1/09, the inmate was seen by a PC for individual contact.  The next PC contact occurred approximately 100 days later.

Findings

This inmate appeared to be functioning adequately in the dormitory where he had been housed.  There were, however, several issues noted regarding the care provided to him.  Psychiatric contacts were not timely, and intervals of approximately five months elapsed between contacts.  Orders for psychotropic medication were written without face-to-face contact, for periods greater than the allowable fourteen day bridge orders.  As this inmate's release from prison was imminent, it was of concern that there was no documentation of adequate discharge planning.

**Inmate K**

This 3CMS inmate transferred to the CSP/Corcoran SHU where he had been housed since September 2009, and returned to KVSP on 3/8/10.  The bus screening form documented treatment with Paxil which was ordered on the following day for thirty days.  The only documented psychiatric contact in the medical record was a visit that occurred on 3/25/10; the psychiatrist planned to order Paxil, but subsequent notes suggested that this order was not completed.  The medical record contained an inmate self-referral dated 4/12/10 for eyeglasses.  The inmate was seen on 4/13/10 by a nurse, who assessed him as being "at risk for withdrawal from Paxil & blurry vision;" psychiatry was notified of the problem.  The note also said that the inmate was informed that he should be receiving Paxil soon.

The inmate had a treatment plan update in October 2009 at CSP/Corcoran, and an earlier plan was written in July 2009 at KVSP.  Both were completed in connection with IDTT meetings.  The July plan was not individualized, and the inmate did not attend the IDTT meeting; it was held while the inmate was housed in the ASU.

<u>Findings</u>

There were significant problems regarding psychiatric care for this inmate. It appeared that there were lapses in psychiatric contact, resulting in medication discontinuity and possible medication withdrawal symptoms. The treatment plan was insufficiently individualized and required update.

EXHIBIT P
North Kern State Prison (NKSP)
May 4, 2010 - May 6, 2010

**Inmate A**

This 3CMS inmate was identified for referral to DMH during MHARP, and remained at NKSP pending DMH transfer.  He arrived at NKSP on 10/22/07.  Following MHARP, he was referred to DMH APP, calling into question his maintenance at the 3CMS LOC.

A medical record review indicated that, pending MHCB placement, the inmate was placed in an overflow cell after hours on 3/17/10.  However, the inmate's name was not located on the MHTH log.  He was seen by IDTT on the following morning.  The Form 7388, the checklist for DMH referral, and a suicide risk evaluation checklist, were completed, but no treatment plan was located in the medical record.

The inmate was discharged from the MHCB on 3/19/10.  Although a suicide risk evaluation checklist, and an IDTT progress note, were completed, there again was no treatment plan.  A suicide risk evaluation checklist completed at the end of the five-day follow-up was incomplete.  The inmate was provided with a diagnosis of Psychotic Disorder NOS.  He was treated with Abilify 10 mg/day.

Findings

This inmate did not receive adequate mental health care for his functional level.  No enhanced care was provided in light of the inmate's prolonged stay on the DMH wait list.  The inmate also did not receive care at the appropriate level in the 3CMS program while awaiting transfer.  DMH referral was indicated for this inmate.

**Inmate B**

This EOP inmate arrived at NKSP on 6/2/09.  He was recommended for EOP LOC on 6/10/09, but had not transferred to an EOP at the time of the site visit.  He was seen monthly since December 2009; prior to that time, he was seen erratically with three months or more between IDTT meetings.  The inmate was provided with a diagnosis of Schizophrenia paranoid type.  He was referred to DMH ICF during MHARP.  He had been pending transfer since 11/23/09.  The inmate was treated with Risperdal Consta 50 mg injections every two weeks, Depakote ER 1000 mg/day at HS, and Benadryl 50 mg/day at HS.  Starting in December 2009, treatment plans were more individualized, included several clinically appropriate therapeutic goals, and included inmate input.

Findings

This inmate was seen in accordance with Program Guide requirements since December 2009.  Prior to that time, treatment planning, IDTT meetings, and PC contacts were neither timely nor comprehensive.  The care that this inmate received improved after December 2009.  He remained appropriate for DMH ICF referral, but should also be closely monitored for possible DMH APP referral.  He had not received any special enhanced treatment as a result of his placement on the DMH ICF wait list.

**Inmate C**

This inmate arrived at NKSP on 11/6/09, and was identified by MHARP for DMH intermediate care. He had a diagnosis of Schizoaffective Disorder. He was prescribed Cogentin 2 mg/day, Depakote 1000 mg/day, Haldol Decanoate 50 mg injections every two weeks, Vistaril 50 mg at night, and Risperdal 3 mg/day.

The inmate had been treated at the EOP LOC since 12/10/09. He was not seen by the IDTT during March 2010. The inmate had multiple MHCB admissions and MHCB overflow placements during the monitoring period. Since February 2010, treatment plans were more individualized and included specific interventions; progress information accompanied treatment goals.

Findings

This inmate was seen weekly by his PC, but earlier contacts appeared to be perfunctory and not associated with specific treatment goals. The inmate was not seen for five-day follow-up in accordance with Program Guide requirements. He was not seen consistently by the psychiatrist, and some of the contacts that occurred appeared to be minimal in content. While there was improvement noted over time, the care provided did not appear adequate in light of the inmate's symptoms and functional level. This inmate had not received any special or enhanced services as a result of his placement on the DMH wait list. He remained appropriate for treatment at DMH.

**Inmate D**

This inmate arrived at NKSP on 7/10/09 to serve his first prison term. He had previously been found incompetent to stand trial (IST). He was hospitalized at PSH from 11/15/08 to 4/27/09, before competency was restored and sentencing commenced. These hospital records were requested and received, documenting a diagnosis of Schizophrenia paranoid type.

The inmate was seen on the date of arrival at NKSP by the psychiatrist; a mental health screening was conducted on 7/14/09. The inmate was admitted to MHTH on 7/18/09 due to danger to self and grave disability. He received mental health services at the 3CMS LOC prior to that placement. A treatment plan dated 8/10/09 indicated that the inmate had been admitted to the MHTH again, and was discharged on 8/17/09. Three days later he was again placed in the MHTH because of high risk of self-injurious behavior; the suicide risk evaluation checklist was completed on the same date.

There were several subsequent placements into the MHTH, most commonly due to danger to self. The inmate was placed in the EOP on 8/5/09; he was also designated as developmentally disabled (DD2) on 7/28/09. The Form 7388, the checklist for DMH referral, indicated that the inmate was stable in the EOP as of 4/29/10.

This inmate also had multiple MHCB admissions during the monitoring period. Based on information in the medical record, it appeared that he was transferred to DMH on 10/7/09.

However, there was no DMH discharge summary in the medical record, nor was there a bus screen form noting transfer out of or return to NKSP. The medical record also did not contain an updated placement chrono. The inmate was reportedly housed in the MHTH on 4/23/10, and all DMH returns were routinely placed in the MHTH upon return to NKSP. A Form 7388, the checklist for DMH referral, dated 4/26/10, stated that the inmate had spent ten weeks at DMH. It was not clear if the inmate was hospitalized in the APP, or treated in the ICF program.

The diagnosis that was documented for this inmate fluctuated between Schizophrenia paranoid type and Schizoaffective Disorder, depending upon the provider making the diagnosis. The inmate was prescribed Depakote liquid 750 mg/day and Zydis 30 mg/day.

Findings

The mental health care provided to this inmate was poorly documented. It was also noncompliant with Program Guide timelines for both the EOP RC and MHCB transfer timelines. The DMH hospitalization was most likely in acute care; this inmate would have been an appropriate candidate for ICF LOC following that discharge.

**Inmate E**

This EOP inmate arrived at NKSP on 12/22/09. He reported during the bus screen that he had been in the EOP; the inmate received his mental health screen on the same day. He was also seen by the psychiatrist on that day, and was moved to the MHTH unit. On 12/24/09, he was transferred to the MHCB where he remained until 1/19/10, when he was moved to the MHTH. There were no interim placement chronos located in the medical record until one dated 4/22/10 that indicated EOP LOC.

The inmate had a history of DMH placement. A progress note dated 1/26/10 suggested that the inmate had been referred to DMH, but no documentation was located from inpatient hospitalization to corroborate that statement. All MHCB documentation indicated that the inmate was doing well. No DMH discharge summary was located in the medical record. There was no medical record documentation during February or March 2010 indicating that the inmate had transferred from NKSP. A progress note dated 4/22/10 stated, however, that the inmate had been referred to DMH APP on 1/27/10, and was awaiting transfer.

The most recent diagnosis provided for this inmate was Bipolar I Disorder. He was prescribed Depakene liquid 2000 mg/day, Remeron 7.5 mg/day, Cogentin 1 mg/day, and Risperdal 6 mg/day.

Findings

This inmate's care was poorly documented. He did not receive a treatment plan while in the MHCB, although he was seen regularly by the psychiatrist and psychologist. There was no clinical justification provided that documented the rationale for the prolonged length of stay in the MHCB; nor was there any documentation that DMH placement was considered. A health history and physical exam was not completed. Based upon the documentation available for

562

review, it appeared that the inmate did not transfer to DMH for treatment, and was not provided with mental health services at NKSP that were in accordance with the Program Guide. This inmate should have been considered for referral to the DMH ICF program.

**Inmate F**

This EOP inmate arrived at NKSP on 3/25/10. A review of the medical record did not indicate whether he had a history of treatment in the EOP. His mental health screen was completed on 3/29/10; he was referred for further evaluation, and was seen that day by the psychologist for that evaluation. Subsequently, the inmate was recommended for EOP LOC.

The inmate was placed in the MHTH on 3/30/10 due to dangerousness to others, and was discharged on 4/1/10. The Form 7388, the checklist for DMH referral, was completed on the discharge date. Although the inmate met several criteria for DMH referral consideration, the staff reportedly did not refer him because he was a new arrival to NKSP. An EOP IDTT was conducted on 4/1/10 in the EOP RC building, but the inmate was not present because he had not been moved to that unit.

The inmate returned to the MHTH on 4/14/10, and was released on 4/20/10. Another EOP IDTT was conducted on 4/28/10, and a Form 7388 was completed at that time; the inmate was not found to meet DMH referral criteria.

The inmate's most recent diagnosis was Schizoaffective Disorder. He was prescribed Remeron 15 mg/day, Risperdal liquid 8 mg/day, Depakote ER 100 mg/day, and Cogentin 2 mg/day.

Findings

This inmate spent most of his time since arrival at NKSP in the MHTH without any documented staff attempts to place him in an MHCB; attempts should have been made for MHCB placement. The inmate was also not seen by the psychiatrist while in EOP in accordance with Program Guide requirements. Suicide risk evaluation checklists were not completed as required. The treatment plans completed in the EOP appeared to be generic with no individualization of problems, interventions, or treatment goals. The inmate was timely and consistently seen by his PC. This inmate should have been considered for DMH treatment.

**Inmate G**

This inmate arrived at NKSP on 9/16/09; he was designated as DD2, which indicated a moderate level of developmental disability. He received his mental health screen on 9/21/09, but did not receive an initial mental health evaluation until April 2010. His first evaluation was completed on 4/16/10 during a stay in the MHTH overflow unit. His first suicide risk evaluation checklist was completed on 3/12/10. The initial treatment plan was dated 4/16/10. While there was no placement chrono clearing the inmate for GP, documentation by the DDP psychologist suggested that the inmate was considered cleared as a non-MHSDS inmate; the DDP psychologist conducted the only clinical contact. This psychologist referred the inmate to the mental health staff, precipitating the MHTH placement, and ultimately the EOP LOC placement.

Findings

The mental health care that this inmate received was inadequate.  There was poor documentation of the care provided.  The inmate also was not identified as requiring mental health services until approximately seven months after his arrival at NKSP; he required MHTH placement, and ultimately EOP LOC.

EXHIBIT Q
California State Prison, Los Angeles County (CSP/LAC)
March 22, 2010 - March 25, 2010

**Inmate A**

This 3CMS inmate arrived at CSP/LAC on 2/4/10, and was housed in the ASU. The inmate remained on RC status, although his placement in administrative segregation remained unclear. The only medical record available for review was temporary and incomplete, and many of the progress notes were illegible. The inmate's medical record was requested as the inmate was observed during psych tech rounds presenting with agitation and frustration. He also recently had reportedly flooded the tier in the ASU.

According to medical record documentation, it appeared that the inmate had symptoms of depression, which resulted in his MHSDS placement. There was a pre-placement chrono in the medical record which documented administrative segregation placement upon arrival at CSP/LAC. Psych tech round documentation was minimal and provided little information. It did not appear that the inmate was seen by his PC until 2/21/10. A brief mental health evaluation was completed on the following day, which documented a diagnosis of Adjustment Disorder NOS resolved. That same evaluation indicated that the inmate was housed in an ASU, but also stated that he did not require follow-up for 90 days. On 2/23/10, the inmate was reportedly reviewed by the IDTT in absentia. The treatment plan from that date was incomplete, and listed no interventions. Although the inmate reported that he had been off psychiatric medications for four months, there was no referral to psychiatry; the medical record indicated that the inmate had not yet been seen by psychiatry.

Findings

The care that was provided to this inmate did not meet Program Guide requirements. He was not seen timely by the PC and psychiatry. Follow-up was not provided as indicated. Treatment planning was incomplete. Medical record documentation, including documentation of psych tech rounding, was also poor.

**Inmate B**

This 3CMS inmate was housed in the ASU; the most recent placement chrono indicated placement on 4/23/09. The 31-question mental health screen was completed on 12/24/09. An ICC progress note dated 10/29/09 stated that the inmate was placed in administrative segregation for safety reasons. This inmate's medical record was reviewed as his cell door photo had been defaced. The inmate had a feminine appearance, and plaintiffs' attorneys had alleged discrimination in the ASU toward transgendered inmates.

The most recent treatment plan dated 3/9/10 included a diagnosis of Psychotic Disorder NOS. He was treated with Navane 4 mg twice daily, Artane 2 mg twice daily, Remeron 15 mg at HS, and Benadryl 50 mg at HS. It appeared from the medical record that the inmate may have arrived at CSP/LAC on administrative segregation status, but was not initially evaluated as required. Contact with the PC appeared to improve during late October 2009. The inmate was typically seen at cell front. Although the rationale for conducting cell-front contacts was not provided, when a reason was provided, it was usually attributed to inmate refusal. The inmate was seen by multiple psychiatrists during the monitoring period.

<u>Findings</u>

This inmate was not seen in accordance with Program Guide requirements.  Clinical contacts were conducted at cell front with no apparent effort to encourage out-of-cell evaluation.  Clinical contacts primarily appeared to be brief and incomplete without documentation of substantive clinical contact.  Of concern was the approximately three month delay in mental health screening for this 3CMS administrative segregation inmate.

## Inmate C

This EOP inmate arrived at CSP/LAC on 12/11/08, and was housed in the ASU.  The medical record's most recent treatment plan was dated 3/3/10, and included a diagnosis of Mood Disorder NOS.  It appeared that the inmate was treated with Abilify, Buspar, Remeron, Trileptal, and Benadryl.  It was difficult to discern the medication regimen as no actual medication orders were located in the medical record after 11/30/09.  The last psychiatric contact occurred on 12/17/09.  PC contacts did not occur weekly as required, as there were some lapses in contact.

<u>Findings</u>

There were problems noted regarding the mental health care provided to this inmate.  Psychiatric care was especially problematic with omissions noted as to follow-up and medication renewal.  Although close to compliance, PC contacts were not documented weekly as required.  The inmate was seen timely by the IDTT, and treatment planning was adequate.

## Inmate D

This EOP inmate was housed in the ASU.  He was treated with Zyprexa 20 mg in the morning, Benadryl 50 mg, and Haldol intramuscular as needed for medication refusal; the inmate was under a Keyhea order for danger to others.  He had been housed in administrative segregation for 1,898 days as of 3/23/10, and continued to await his court case for murder of a peace officer.  The inmate was HIV positive, but did not take any medications.  He had been provided with a diagnosis of Delusional Disorder, and he typically refused most medical interventions, including laboratory studies.  He was angry with his treating mental health staff, and especially with his psychiatrist due to the Keyhea order continuation.  The inmate had no insight regarding his mental illness.  As he frequently refused groups, he was often seen daily at cell front in an effort to encourage participation.  He regularly declined out-of-cell contacts.

<u>Findings</u>
This inmate was seen at intervals that were consistent with the Program Guide.  Mental health staff worked to encourage out-of-cell contacts and group therapy.  As this inmate may have met the criteria for DMH consideration, he should be reviewed for possible referral to DMH for intermediate LOC.

**Inmate E**

This EOP inmate was in the ASU, where he had been housed for more than 90 days.  He arrived at CSP/LAC on 6/23/09.  He was provided with a diagnosis of Mood Disorder NOS; a provisional diagnosis of Anxiety Disorder NOS was also under consideration.  The inmate was prescribed Benadryl 100 mg at HS, and Remeron 30 mg at HS.  A current treatment plan was in the medical record, and it appeared that the inmate was seen weekly by his PC.  But the medical record's disorganization made group therapy attendance difficult to determine.

Findings

This inmate was followed consistently by his PC, and was seen timely by the IDTT.  Despite this, it appeared that the treating team could have been more aggressive in addressing the inmate's symptoms.  The psychiatric care that was provided was problematic; there was a lack of documentation of consistent and timely evaluation.

**Inmate F**

This EOP inmate returned to CSP/LAC from DMH APP on 12/7/09.  He was housed in the ASU at the time of the site visit.  The inmate was not seen in an IDTT meeting until 1/6/10.  The inmate continued to exhibit bizarre behavior, poor self-care, and frequent refusal of treatment services.  Although documentation in the medical record supported the need for referral to DMH for intermediate LOC, he was not referred at that time.  At the next IDTT meeting that occurred on 3/3/10, however, the inmate was referred to ICF due in part to a lack of improvement in his level of functioning.  The inmate was provided with a diagnosis of Psychotic Disorder NOS by the psychologist, while the psychiatrist listed Schizophrenia paranoid type versus Schizoaffective Disorder bipolar type as differential diagnoses.  He was treated with Depakote SR 1000 mg twice daily and Risperdal M tabs 3 mg twice daily.

The inmate was not seen weekly by the PC after his return to CSP/LAC.  He was seen consistently by psychiatrists.  There were no DMH discharge summary documents in the medical record, and there was no documentation of five-day follow-up.

Findings

Although this inmate was not seen timely by the IDTT or his PC, he was seen timely by psychiatry.  The inmate was eventually referred to DMH, although it appeared that he should have actually been referred to ICF LOC immediately upon his return to CSP/LAC.  As there was no DMH discharge summary in the medical record, it could not be determined if DMH APP clinicians even reviewed this inmate for ICF placement.

**Inmate G**

This EOP inmate arrived at CSP/LAC on 3/19/09.  He was previously treated at SVPP during 2008.  The Form 7389, the brief mental health evaluation, dated 10/1/09 listed Schizophrenia paranoid type as his diagnosis.  The inmate was housed in the ASU, but he was moved to the

mainline EOP on 2/26/10. A progress note dated 3/1/10 indicated that this was a high functioning "calculating" inmate who had a history of exploiting low functioning peers; one such inmate was observed placing his canteen at this inmate's door. The PC also reported that the inmate had a history of defecating and smearing feces around his cell. Staff suspected that this behavior was conducted to avoid cell searches. While the inmate's cell was dirty with urine and feces, he reportedly kept a clean change of clothes in a tied plastic bag. Staff documentation indicated that this inmate presented with predatory behavior.

The inmate was seen weekly by the PC, and the medical record contained a current treatment plan. He was prescribed Thorazine 400 mg/day and Cogentin 2 mg/day.

Findings

The inmate appeared to be receiving adequate mental health care, and was seen timely in accordance with Program Guide requirements. However, the inmate's described predatory behavior had not been addressed.

**Inmate H**

This inmate arrived at CSP/LAC on 12/6/09 from the DMH APP program. He was admitted to DMH APP on 11/6/09, and was discharged on 12/7/09 with a diagnosis of Schizoaffective Disorder. A DMH discharge summary in the medical record stated that the inmate had improved to the degree that he no longer required inpatient care, although the inmate refused to participate in groups. The referral reason was not provided, nor were there any actual treatment recommendations for the staff; this despite the fact that the inmate had a history of serious suicide attempts and self-injurious behaviors. Although the inmate was seen promptly by the mental health staff upon arrival, there was some delay in actual receipt of medications upon his return to CSP/LAC.

Approximately four days after the inmate's arrival at CSP/LAC, he reported SI to custody staff. He was then transferred to the ASU; however, medical record information made it difficult to determine the actual transfer date, or the reason for transfer. It appeared as though the inmate may have been placed in administrative segregation upon his arrival at CSP/LAC.

Findings

This inmate was seen timely by the mental health staff at CSP/LAC in accordance with Program Guide requirements. The DMH discharge summary did not contain clinically beneficial recommendations for the receiving facility's mental health staff.

**Inmate I**

Although this inmate returned to CSP/LAC on 10/9/09, from DMH SVPP, the discharge packet was not sent to CSP/LAC until 10/22/09. The inmate had been admitted to SVPP on 11/16/08. He was referred to DMH due to his inability to program, and his lack of social skills. It appeared that the DMH psychiatrist did not complete his discharge summary until 10/16/09, which was

one week after the inmate's transfer.  The discharge recommendations from the "social worker summary" were not legible due to dark highlighting that did not transfer after the document was faxed.  This inmate was not seen by his treatment team until almost one month after his arrival. After that time, the treatment team saw him in accordance with Program Guide requirements. Documentation of five-day follow-up as reported by CSP/LAC staff was not located in the medical record.

Findings

This inmate was not seen timely for his initial IDTT meeting, but was seen appropriately after that time.  Psychiatric and PC contacts were timely.  The DMH discharge summary was not faxed prior to the inmate's arrival.  It was also of questionable value to the receiving facility as it did not contain specific recommendations for maintaining the inmate's stability.

**Inmate J**

This inmate returned to CSP/LAC on 1/20/10, from DMH.  Although the medical record contained a DMH discharge summary, the date that the document was received could not be determined.  According to the discharge summary, the inmate was admitted to DMH on 6/10/09, and was discharged on 12/11/09.  The inmate had been referred to DMH due to his inability to function in the EOP, and his lack of programming participation due to severe depression.  The bus screen form noted that the inmate spoke little English, and that Vietnamese was his primary language; however, DMH documentation noted neither such language limitations nor the use of interpreters.  The medical record contained contradictory information as to this inmate's language abilities.  The inmate remained on an active Keyhea order while he was hospitalized at DMH.

The inmate was seen by the CSP/LAC psychiatrist on 1/21/10, and medications were ordered. The inmate was not seen by the PC until 2/4/10; documentation of five-day follow-up was not located in the medical record.  According to the medical record, the inmate had not been seen in an IDTT meeting, and there was no current treatment plan.  The inmate was provided with a diagnosis of MDD.  He was prescribed Celexa 20 mg every evening, Zyprexa 25 mg at HS, and Benadryl 100 mg at HS.

Findings

The DMH discharge summary was minimally adequate, and it was unclear if CSP/LAC timely received it.  Although the inmate was seen timely by the psychiatrist, he was not seen timely by his PC or the IDTT.

**Inmate K**

This inmate arrived at CSP/LAC on 11/13/09, from DMH.  Although the DMH discharge summary was comprehensive, it did not provide treatment recommendations beyond medications.  The inmate was seen by the PC on 11/18/09, and was seen by the psychiatrist on 11/19/09.  No current treatment plan was located in the medical record, nor was there evidence

that five-day follow-up occurred.  The inmate appeared to be relatively stable upon return from DMH.

Findings

The inmate was not seen timely by the IDTT, but was seen timely by psychiatry and his PC. Treatment planning was necessary to maintain the inmate's stability after his return from DMH.

**Inmate L**

This inmate reported that he was not seen timely by his PC.  He transferred to CSP/LAC on 7/30/09, from CCI.  The initial screen was positive from a mental health perspective.  CCI progress notes indicated a provisional diagnosis of a mood disorder.  Medications prescribed at CCI included Geodon and Abilify.

The first MH-4 at CSP/LAC was dated 8/4/09, and was completed by a psychologist.  The inmate reported that "the meds are fine."  An appointment was made with the psychiatrist for medication evaluation follow-up.  The plan was to see this inmate again in 90 days.  An IDTT occurred on 8/26/09.  Review of the initial treatment plan indicated that a staff psychologist and psychiatrist were present.  The diagnoses of Anxiety Disorder and Adjustment Disorder were made.  Progress notes by a psychiatrist were dated 8/26/09 and 9/8/09.  The next two PC progress notes were dated 10/30/09 and 2/1/10.  The next and last psychiatric progress note was dated 2/11/10.

Findings

This inmate did not receive timely follow-up from the psychiatrist.  The medical records review did not confirm the inmate's report as to not receiving timely PC contacts.

**Inmate M**

This inmate was transferred to CSP/LAC on 1/28/10, from CCI.  The inmate had been provided with a diagnosis of Mood Disorder NOS; he also had Hepatitis C.  Although CCI progress notes indicated a past history of receiving EOP LOC, the inmate was in the 3CMS program immediately prior to his transfer to CSP/LAC.

The inmate was initially evaluated at CSP/LAC on 1/26/10.  Due to safety concerns, he was housed in the ASU at that time.  It was noted that the inmate could benefit from continued work on anger management issues.  Subsequent PC progress notes were dated 2/9/10.  His IDTT meeting was completed on 2/9/10, and a psychiatric consultation took place on 2/23/10.  No psychotropic medications were indicated.  Medical record documentation indicated that a psychiatrist was not present at the IDTT meeting.

<u>Findings</u>

Relevant Program Guide timeframes were met.  However, the lack of available group therapies, such as anger management, was problematic, as was the absence of a psychiatrist at the IDTT meeting.

**Inmate N**

This inmate was transferred to CSP/LAC on 7/23/09.  The first MH-4 at CSP/LAC was dated 7/24/08, and took place in the ASU.  A PC follow-up occurred on 8/4/09.  The inmate's presentation was consistent with an Adjustment Disorder that had since resolved.  An IDTT meeting was scheduled.

A psychiatrist's progress note was dated 10/15/09.  Benadryl was started at that time.  A PC met with this inmate in a confidential setting on 11/2/09.  Subsequent PC notes were dated 11/13/09, 11/16/09, 11/23/09, 12/1/09, 12/4/09, 12/7/09, 12/16/09, 12/23/09, 12/30/09, 1/6/10, 1/13/10, 1/19/10 and 1/27/10.  The inmate was released to the C Yard on 1/28/10, and there were no subsequent documented PC progress notes.

This inmate's IDTT meeting at CSP/LAC occurred on 1/5/10.  Appropriate clinicians attended this IDTT meeting, which was held in the ASU.

<u>Findings</u>

The inmate was seen by a PC consistent with Program Guide requirements during his stay in the ASU.  However, it did not appear that he had been seen by a PC since his transfer to the C Yard.  His IDTT meeting was not conducted timely.

**Inmate O**

This inmate reported that he had only been seen by his PC twice during the previous seven months.  The inmate's medical record was reviewed.  He was transferred to CSP/LAC on 8/14/09.  His initial healthcare screen was positive from a mental health perspective.  The initial MH-4 was completed by a psychiatrist on 8/25/09.  He was provided with a diagnosis of MDD recurrent, in remission.  Medications were assessed to not be indicated at that time.  PC progress notes were dated 10/28/09 and 2/10/10.  An IDTT meeting was dated 11/10/09.  A psychiatrist was not present at the IDTT meeting.

<u>Findings</u>

This inmate's initial clinical contacts at CSP/LAC were not timely.  His IDTT meeting was also not timely, and was not attended by a psychiatrist.  His treatment was not consistent with Program Guide requirements.

**Inmate P**

This inmate was transferred to CSP/LAC on 10/29/09. He reported that he initially had difficulty obtaining his prescribed medications. The medical record of this inmate was reviewed. On 11/3/09, a physician's progress note indicated that a 14 day bridge order was written to facilitate the inmate's continuity of care based on the Guardian Pharmacy Reconciliation Form.

An initial psychiatric examination was completed on 11/5/09. The inmate's presentation was consistent with the diagnoses of Depressive Disorder NOS, and Anxiety Disorder NOS. Remeron was continued.

A PC's progress note was dated 11/5/09. Subsequent PC notes were dated 11/12/09, 2/5/10, and 3/12/10. Another bridge order was written by a psychiatrist on 3/1/10. Although an IDTT meeting took place on 12/29/09, medical record documentation indicated that a psychiatrist was not in attendance. The filing in the medical record was disorganized.

Findings

A review of the medical record appeared to confirm medication continuity problems. The IDTT meeting was not conducted in a timely manner, and took place without a psychiatrist present.

**Inmate Q**

This inmate's medical record was reviewed at the request of plaintiffs' attorneys due to reports that he had recently been victimized by his cellmate, and had problems with administrative segregation custody staff. The EOP inmate was housed in the ASU, and had been placed on SNY status. The inmate reported on 2/26/10 that he was raped the previous day by his cellmate. His suicide watch was discontinued that day, and he was discharged to custody. The monitor's expert was unable to determine where this assessment occurred (e.g., the TTA?).

The next progress note was dated 3/2/10. Subsequent progress notes demonstrated timely clinical follow-up. A 3/18/10 progress note included the following entry: "(a)dmitted that 'I've been stating things in the past about my previous cellie because I wanted single-cell status."… Sergeant has filed CDC-115 as rape kit was found to be negative…"

This EOP inmate had requested to have his LOC changed to 3CMS. He was told that the IDTT would consider this request after he went for three months without being placed on suicide watch.

Findings

Except for his initial follow-up, this inmate had received timely mental health evaluations by the PC since his February 2010 allegation was made. It was unclear whether his allegation was untrue. He was receiving mental health services at the appropriate LOC.

573

**Inmate R**

This inmate's medical record was reviewed at the request of plaintiffs' attorneys due to reports that he had been housed in administrative segregation for over one year, and had spent many years in the SHU. Information was also obtained from the inmate's PC. The inmate reportedly suffered from mental health difficulties since his administrative segregation release during December 2009. Other class members reported that the inmate was not eating, and was having difficulty coping.

Since 12/3/09 this inmate had been housed in the CSP/LAC EOP. Previous housing included the following: SHU placement from 3/22/96 to 9/13/02; Folsom on 4/17/07; GP EOP from 1/18/08 to 9/9/08; ASU from 9/9/08 to 12/3/09; and GP EOP from 12/3/09 to present. Since at least 12/14/09, the inmate wanted an "in-cell feeding" chrono due to his perception of experiencing mental health difficulties after his release from the SHU. He was worried about getting into a fight with other inmates. He previously had such a chrono for approximately two months during early 2008 in a GP EOP following a stay in the SHU for approximately six years. He recently returned to the EOP following a 15 month administrative segregation placement.

Recent progress notes documented the treatment team's assessment that such a chrono was not appropriate at that time despite the inmate's "hunger strike" in protest of this decision. Review of these notes also indicated disagreement between the staff and the inmate regarding this issue. A referral by the Coleman central office response team occurred during January 2010.

The inmate also requested a transfer to the D2 EOP because he thought that he would be fed in his cell in that unit. He also requested a transfer to DMH for similar reasons. On 3/6/10, he was retained in the EOP in order to address his depression and psychosocial concerns.

Another assessment occurred on 3/8/10 following a referral from the central office. He was described on 3/16/10 as "promoting his campaign to be cell fed."

Findings

Based upon the inmate's history, it would be reasonable to grant him a temporary chrono for in-cell feeding as was allowed in the past; such specified conditions would include participating in his treatment plan.

574

EXHIBIT R
California Correctional Institution (CCI)
May 11, 2010 - May 13, 2010

**Inmate A**

This inmate had been housed at CCI since November 2009. He reportedly had a history of a diagnosis of Developmental Disability, and was involved in community support services. His educational history was significant for repeating at least two grades. He was involved in special education services from the first grade through the remainder of his school career. He was classified as developmentally disabled (DD2) on 2/4/10; progress notes from this assessment indicated that the inmate required direction and prompting from officers as well as assistance in reading, writing, and preparing documentation. A mental health evaluation indicated that the inmate was serving his sixth prison term for parole violation and petty theft. He was provided with diagnoses of Bipolar II Disorder, PTSD, and borderline intellectual functioning.

The inmate was initially placed at the 3CMS LOC. Psych tech progress notes during November 2009 documented that the inmate's grooming and cell maintenance were fair. On 11/17/09, a clinical interview described the inmate as "stable and future oriented;" an increase in the LOC was determined not to be indicated at that time. The inmate requested interviews with clinicians on several occasions during November and December 2009 due to anxiety regarding his release date and impending parole. He was placed in the ASU on 2/5/10. On 3/14/10, the inmate was evaluated at his request when he was described as tearful, dysphoric, and slow to respond to questions. He was evaluated again on 3/28/10 and on 4/8/10; on both occasions, he was described as tearful and dysphoric.

On 4/16/10, the IDTT met and provided a diagnosis of Depressive Disorder NOS; they also noted the inmate's history of mild mental retardation. The treatment plan included as interventions the relocation of the inmate to an appropriate facility for DD2 inmates. The psych tech medical records documentation completed during the week of 4/12/10 indicated that the inmate's hygiene and cell maintenance were fair. Although staff reported that the inmate had been recommended for transfer to the EOP LOC, documentation of this change was not located in the medical record.

Findings

It appeared that this inmate's primary difficulties were attributable to his developmental disability. He often presented with dysphoric mood and tearfulness, and had been provided with a diagnosis of Bipolar Disorder. The level of his cognitive functioning was unclear; it was assumed that he met diagnostic criteria for mental retardation as he had a history of involvement in the community regional center for developmentally disabled individuals. The inmate required the level of support which would be available within a developmental disability program. His transfer was substantially delayed, and this may have contributed to his receipt of least one additional disciplinary infraction and an apparent SHU term. He had been awaiting appropriate placement since 3/26/10. The inmate had been appropriately monitored by the mental health staff. A Form 7388, the checklist for DMH referral, dated 4/16/10 was located in the medical record, and none of the criteria for DMH referral consideration had been noted.

**Inmate B**

This EOP inmate had been housed in the ASU for more than 120 days (he arrived during August 2009) while awaiting transfer to an EOP program.  The length of his administrative segregation placement was apparently a result of a pending court case.  A new arrival evaluation that was completed on 1/9/09 indicated that the inmate was incarcerated for burglary with prior terms.  He was provided with a diagnosis of Schizophrenia paranoid type.  His mental health history was remarkable for a history of assaultive behavior, and threatening to kill his roommate.  He was prescribed Risperdal and Zoloft.  A PC progress note dated 12/17/09 indicated that the inmate was stable and presented "as delusional and paranoid in remission."

The inmate was seen approximately weekly by a PC from 1/24/09 to 5/13/10.  He was seen by a psychiatrist on 4/2/10 and 5/5/10, and was seen in the IDTT meeting on 4/30/10.  A treatment plan that was developed on that date included "medication" and "1:1 CM" as interventions for treatment.  There was no indication that the treatment team considered whether this inmate required referral to DMH at that time; the Form 7388, the checklist for DMH referral, attached to the treatment plan was blank.    Based on the progress notes, it appeared that the inmate presented as generally stable during the period from March 2010 until the site visit.

Progress notes in the medical record suggested that this inmate had been referred to DMH, was accepted at SVPP on 9/2/09, and was awaiting transfer.

Findings

This inmate had been awaiting transfer to an EOP program for over 120 days, and had been awaiting transfer to DMH since 9/22/09.  Although the inmate appeared to be stable at the time of the monitoring visit, he required a LOC beyond that which he was receiving at CCI.  He was seen consistently by the PCs and psychiatrist at the intervals required by the Program Guide.  However, the treatment plan was vague and nonspecific for this inmate's treatment needs.

**Inmate C**

This EOP inmate was housed in Yard II at CCI.  He arrived at WSP during June 2009.  At the time of arrival, he was noted to have a history of suicidal thoughts and suicide attempts by overdose.  He was placed in the WSP MHCB on 7/21/09 after stating that he planned to cut his wrists with a razor.  He was discharged approximately one day later, and returned to CCI.

It appeared that the inmate was maintained at the 3CMS LOC until 2/23/09, when he was transferred to the EOP.  A treatment plan of that same date indicated that the inmate was cooperative, anxious, and fully oriented with no evidence of the presence of a thought disorder.  He was diagnosed with MDD severe with psychotic features.  A Form 7388, the checklist for DMH referral, was completed at that time; it indicated that the inmate was negative for all criteria of consideration for DMH referral.

The inmate was seen approximately weekly by a PC from 5/2/09 until 5/13/10, with the exception of the period from 4/1/10 to 5/5/10.  A progress note on 5/22/10 indicated that the

577

inmate was confused and anxious regarding delays in his transfer. The inmate was seen in response to an urgent referral on 3/24/10, when he was described as "decompensating;" he was also described as agitated and anxious regarding his upcoming transfer. He was referred to the psychiatrist for medication consideration; this appointment was not completed until 4/13/10.

The inmate apparently received an RVR on or about 4/1/10 when he refused to report for work. The RVR assessment indicated the clinician's opinion that the inmate's behavior was likely affected by his mental health condition at the time. Subsequent progress notes indicated that the inmate continued to be relatively stable, but was anxious regarding his transfer status. A single RT note dated 5/5/10 indicated that the inmate participated in a variety group.

Findings

This inmate was seen by the PC and psychiatrist at the required intervals. He had been awaiting EOP transfer for approximately three months. The inmate remained anxious regarding this transfer, and a clinician expressed the likelihood that this anxiety may have contributed to an RVR that he received during April 2010.

Progress notes in the medical record were well written and legible. The inmate's most recent treatment plan recommended weekly contact with the PC and exercise; the inmate had no access to group therapy. It appeared that the inmate was described as "decompensating" during the time when an appointment with the psychiatrist was delayed for more than two weeks. The inmate received an RVR during the time that he was awaiting this appointment.

## Inmate D

This inmate had been in the EOP since at least December 2009. At the time of the site visit, he had been referred to DMH SVPP, and was awaiting transfer. A treatment plan dated 2/25/10 indicated that the inmate had a history of suicide attempts including a commitment during 2007 (while he was in the community) for attempting to hang himself. At that time he was diagnosed with Schizophrenia paranoid type. On 3/17/10, he refused to attend an IDTT meeting, and was described as exhibiting bizarre behavior; this behavior included masturbating in public, and licking other inmates' toes while they slept. The progress note documented the decision to refer the inmate to DMH.

The inmate was seen weekly by clinicians from 3/9/10 through 5/7/10. He was seen by a psychiatrist on 3/23/10, 3/29/10, and 4/29/10. On 4/1/10, he was described as alert and attentive but disheveled. Progress notes indicated that his condition had improved slightly from previous weeks. On 4/14/10, he was described as unkempt and malodorous with decreased energy and mood that began several days prior. His condition appeared to stabilize beyond that point in time and, on 5/7/10, he was described as continuing "to make small progress."

Findings

This inmate had been appropriately placed at the EOP LOC. He had access to weekly PC and consistent psychiatric contacts, but not to therapy groups or any other mental health services.

578

The PC's progress notes were well written and legible.  Although the inmate was maintained at the EOP LOC, DMH remained the recommended LOC.

**Inmate E**

This inmate had been in the 3CMS program since at least 12/2/09.  He was placed in the MHCB from 1/18/10 to 1/20/10.  He was readmitted to the MHCB at CSP/Solano for SI from 1/26/10 to 1/29/10.  The inmate apparently stabilized after medication adjustment, and was discharged after three days of hospitalization.  A treatment plan dated 2/25/10 indicated that the inmate was being referred to DMH due to multiple (three or more) MHCB admissions.  He was diagnosed with Schizoaffective Disorder at that time.

An updated treatment plan was completed on 5/6/10.  This treatment plan documented that the inmate's orientation, affect, mood, and thinking were within normal limits.  His diagnosis remained as previously stated.  The inmate was seen by the PC on 2/1/10, while still at the 3CMS LOC, when he was described as "positive" but with pacing.  He was evaluated by the psychiatrist on 2/3/10, 3/5/10, and 3/24/10.  A PC progress note dated 2/23/10 described the inmate as stable since beginning treatment with medications.  A DMH referral packet was in the process of completion on this date.  The inmate remained stable when he was seen on 3/8/10, 4/5/10, and 5/3/10.  The PC noted that the inmate would parole during June 2010.  Psych tech progress notes indicated that the inmate had fair grooming and cell maintenance, and was medication compliant.  Progress notes from an IDTT meeting that occurred on 5/6/10 indicated that "there were no new issues and the parole is on track."

Findings

Although this inmate was determined by the IDTT as requiring referral to DMH, he was maintained at the 3CMS LOC.  He remained stable following a medication adjustment.  It appeared that the inmate was seen timely at intervals that were consistent with Program Guide requirements.  It appeared that the inmate required EOP LOC, and he may not have required DMH transfer if he had received EOP LOC.

EXHIBIT S
California Institution for Men (CIM)
February 22, 2010 - February 25, 2010

**Inmate A**

This 3CMS inmate had a history of DMH ICF hospitalization during mid-2009.  SVPP discharge notes dated 9/16/09 indicated that the inmate's participation in the program had been minimal; he had, however, reportedly been compliant with medications that appeared to have assisted with his stability.  Progress notes dated 1/9/10 indicated that the inmate provided minimal responses to questions.  Although the inmate's hygiene was described as adequate, progress notes indicated that his toilet was filled with fecal matter.

On 1/12/10, the inmate arrived at the PC's office wearing a spit mask; he had recently been given a "mandatory shower" due to poor hygiene.  Progress notes indicated that the inmate had been refusing psychiatric medications.  He displayed inappropriate laughter, impaired cognitive functioning, and delusional thinking.  He was referred to the MHCB at that time.  There was minimal documentation regarding this hospital placement in the medical record.  The inmate was apparently discharged from the MHCB on 1/15/10; he was provided with a discharge diagnosis of Schizophrenia.  Progress notes that were completed during the five days following MHCB discharge indicated that the inmate showed signs of stabilization.

Additional MHCB hospitalizations occurred on 1/24/10 and 1/27/10.  On 1/27/10, progress notes described the inmate as stable and compliant with medications.  It was noted that the clinician contacted the POC regarding the inmate's recent decompensation.  A subsequent progress note dated 2/4/10 described the inmate's condition as stable.  The treatment plan of 2/16/10 included the Form 7388, the checklist for DMH referral; however, the Form 7388 did not indicate whether the inmate met DMH referral criteria, and suggested that the inmate had reached his baseline level of functioning.  The inmate discussed parole plans with the parole discharge coordinator on 2/16/10; the content of that note suggested that the inmate participated in the process in a meaningful fashion.

Findings

This inmate was seen at intervals consistent with Program Guide requirements.  The inmate had a recent history of recurrent decompensation which appeared to have been correlated with medication noncompliance.  Progress notes suggested that there were inconsistent observations of this inmate's acute mental illness.  The Form 7388 which was completed on 2/16/10 did not document that the inmate met criterion nine (three or more MHCB admissions in six months); it appeared that this inmate may have also met other criteria for DMH referral consideration.  The rationale for not referring this inmate for DMH care did not adequately acknowledge the inmate's recent history of multiple MHCB placements.

**Inmate B**

This inmate was incarcerated for absconding from parole.  He was provided with a diagnosis of Schizophrenia disorganized type.  He was treated with Risperdal and Cogentin.  A review of his medical record indicated that he would parole from CIM within one month of the monitoring visit.  A mental status exam at the time of the treatment plan that was completed on 1/21/10 indicated that the inmate presented with tangential thought processes and incoherent speech.  He

was also described as exhibiting labile mood and impaired cognitive functioning with limited judgment and minimally adequate self-care.

A progress note dated 2/18/10 indicated that the inmate was stable, attending groups, and compliant with medications.  The PC indicated that DMH referral would not be considered at that time.  Psych tech notes from the preceding two months indicated that the inmate's hygiene was adequate.  There was documentation of the inmate's attendance at group; however, it appeared that he had difficulty participating in group projects and contributing to group discussions.

A Form 7388, the checklist for DMH referral, was not located in the medical record.  There was also no documentation of an IDTT meeting discussion as to the inmate's possible need for DMH referral; it was not clear whether he had met criteria for such consideration.  The medical record contained weekly progress notes.

The medical record titled "parole planning" contained a single progress note.  This contained only the inmate's name, LOC, and very brief information regarding the inmate's functioning; there was no information regarding the inmate's parole needs.  It did not appear that the inmate had any contact with the TCMP.

Findings

It appeared that the inmate generally received adequate mental health care.  He was consistently seen by the PC and psychiatrist.  There were problems noted regarding treatment planning.  The Form 7388 was not located in the medical record.  Parole planning was inadequate, and not responsive to the inmate's discharge planning needs.

**Inmate C**

This inmate was referred to the MHCB on 12/4/09, 12/31/09, 1/12/10, and 1/29/10.  He was evaluated on 1/29/09 during weekly administrative segregation rounds.  He was admitted to the MHCB during late January 2010, although the progress notes were not located in the medical record, and was discharged on 1/29/10.  Progress notes which documented clinical contacts during five-day follow-up after MHCB discharge, and psych tech notes in the medical record through early January 2010, indicated that the inmate was stable.

On 1/11/10, a psychologist progress note stated that the inmate reported that he was suicidal.  The note also stated that the inmate wanted to go to the hospital, and that he would "do what it takes to get there."  The inmate later reported that he wanted to go to the hospital because he was "bored" and wanted "to look at" female staff.  Another progress note on the following day again stated that the inmate was attempting to gain admission to the MHCB, and that he was reporting SI for secondary gain.  The inmate was admitted to the MHCB again during late January 2010.  Progress notes documenting five-day follow-up after discharge again documented that the inmate was stable during this period.

582

<u>Findings</u>

This inmate had a history of multiple MHCB admissions.  Information from the medical record indicated that he was relatively stable both before and after these admissions.  The progress notes in the medical record suggested that the inmate had reported SI for secondary gain.  The only treatment plan in the medical record was undated, and did not document that there was consideration of the need for DMH referral.  This LOC should have been considered for this inmate given his history of multiple MHCB admissions.

EXHIBIT T
Richard J. Donovan Correctional Facility (RJD)
March 1, 2010 - March 4, 2010

**Inmate A**

This 3CMS inmate was housed in the ASU.  He received one RVR for IEX during the monitoring period.  According to RJD's IEX log, the inmate was screened and received a comprehensive evaluation on 12/9/09.  The mental health screen provided minimal information about possible criteria met for IEX treatment; this was the only document located in the medical record that provided such information.  The IEX log, however, suggested that the inmate met criteria, and he was referred for transfer to an IEX treatment program.  The medical record indicated that the IEX incident occurred at Calipatria, but the inmate was not screened there prior to transfer to RJD.  There appeared to be some confusion as to whether this inmate was in the 3CMS program at the time of the alleged incident, and medical record documentation illustrated this confusion.  At the time of the site visit, the inmate continued to await transfer to an IEX treatment program.

This inmate was seen weekly 90 percent of the time; he generally refused out-of-cell contacts. Progress notes suggested that the cell-front contacts were minimal, and of limited content. According to the progress notes, the inmate did not want to wear the IEX suit; he thus refused to come out of his cell for contacts because of the IEX suit requirement.

According to the C-file, this inmate had at least 17 IEX RVRs.  The C-file included a chrono dated 12/8/09 that indicated that the inmate needed to be referred for endorsement and transfer to an IEX treatment program.  The inmate was seen during an ICC that occurred on 12/30/09; however, the committee did not address the need for transfer to an IEX program.  The committee instead retained the inmate in the ASU, and requested a 60 day extension.  After three months of inaction, the CC-II informed the mental health supervisory staff that, attempts were being made to bring the case to the ICC for endorsement; however, this resulted in an unnecessary delay.

Findings

The IEX protocol was not followed in this case, and the inmate was not transferred to a treatment program in a timely manner.  This inmate was not seen timely by the PC in the ASU.  He was seen timely by the psychiatrist.

**Inmate B**

This inmate received treatment in the 3CMS program; there was some ambiguity as to whether he was placed in 3CMS for medical necessity.  The inmate appeared to have been seen weekly during the monitoring period, but clinical contacts were primarily conducted at cell front. Documentation in the medical record indicated that these cell-front contacts were minimal, and lacked relevant clinical interaction; this despite the inmate having had nine Exhibitionism incidents between January 2009 and 8/31/09.  Three of these incidents occurred during the monitoring period, and they resulted in a mental health screening.  It appeared that the mental health staff relied on a prior screening conducted on 2/27/09 after three separate incidents of exposure/masturbation.  This screening found that the inmate's behavior was "premeditated and predatory;" however, it was determined that the behavior did not meet the criteria for IEX treatment, nor was there any recommendation for intervention for this behavior.

There was contradictory information in the medical record as to the inmate's diagnosis; diagnoses including Malingering, Adjustment Disorder, and Psychotic Disorder NOS. The inmate was hospitalized in the MHCB during December 2009 for SI and superficial self-inflicted lacerations on the left forearm following a cell fight in which he cut his cellmate with a razor. Despite being maintained in the MHCB for several days, the inmate was provided with a diagnosis of Malingering. A MHCB progress note by a psychiatrist indicated that she told the inmate that she could not prescribe him medications that he requested for sleep and anxiety. The inmate was treated with Remeron 30 mg at HS.

Findings

The IEX protocol was not followed for this inmate. The inmate should be re-evaluated to determine if he meets criteria for referral to IEX treatment. The mental health supervisory staff was advised regarding this recommendation. In addition, the inmate required a comprehensive diagnostic evaluation at RJD with appropriate treatment planning.

**Inmate C**

This inmate was found hanging by custody staff in the ASU during the monitoring visit. The monitor's expert observed the emergency response that occurred after the incident. The staff was observed approaching the cell with a protective shield, and standing outside the door for approximately 60 to 90 seconds prior to taking any action. During that time there was no alarm. At the 60 to 90 second point, they began to yell, "get the cut down kit," and "hit your alarm" repeatedly. The alarm was sounded after approximately 15 to 30 additional seconds.

The custody staff continued to yell for the cut-down kit and at about the same time, officers from other units responded to the scene. The cut-down scissors were brought to the waiting staff at the inmate's door. At no point did the observed staff attempt to make verbal contact with the inmate. The staff entered the cell, and the inmate was removed from the cell, brought outside of the cell door, and placed on the concrete floor. The officers were observed standing around the inmate. Once the inmate was placed on the ground outside of the cell, the officers were not observed assessing for pulse or respiration.

Nursing staff arrived within another 15 to 30 seconds of the inmate's removal from the cell, and produced an ambu bag. The nursing staff was observed assessing the inmate, and it did not appear that CPR was initiated. The inmate was removed and taken to the CTC for evaluation, and ultimate admission to the MHCB. The staff in the housing unit indicated that this behavior was apparently "part of his (the inmate's) M.O."

The inmate had a MHCB admission that occurred from 1/30/10 to 2/2/10. At that time, he was provided with a diagnosis of Malingering and Antisocial Personality Disorder by the discharging psychiatrist. According to the MHCB records, the inmate was admitted for SI. The discharge summary dated 2/4/10 stated that the inmate had been experiencing SI due to "cellmate issues and yard politics." It was also noted that the inmate was "no longer appropriate for MHSDS per IDTT consensus," and the psychiatrist completed a removal chrono. It appeared, however, that the housing unit mental health staff maintained the inmate at the 3CMS LOC. The history and

586

physical noted that the inmate had been found with a noose made from his sheets, but had not used it. The inmate reportedly had stated to the staff that he was tired of being in prison, and wanted to kill himself. According to a nursing note dated 1/30/10, the inmate was found lying on the floor of his cell with a piece of cloth loosely tied around his neck. His breathing was observed to be even and unlabored, and he responded to his name being called by sitting up.

This inmate arrived at RJD during December 2009, from Centinela. According to a progress note in the medical record, the inmate reported that he "feigned" depression so that he would be prescribed psychotropic medications which would result in a transfer out of Centinela. There were repeated progress notes stating that the inmate should be removed from the MHSDS; it was unclear if that actually occurred.

Based on the medical record, the inmate was not seen weekly while housed in the ASU. Following his MHCB hospitalization that began on 1/30/10, he was re-admitted on 2/20/10, and was discharged on 3/1/10. His admitting diagnosis was Adjustment Disorder; provisional diagnoses of Malingering and Antisocial Personality Disorder were also identified. A removal chrono was apparently completed again at the time of MHCB discharge on 3/1/10; the discharge summary suggested that diagnostic clarification was still indicated. The treatment plan from that MHCB hospitalization did not include any information in the intervention section; the reader was referred to the intake section, which also did not include relevant information about actual treatment interventions. Throughout the MHCB documentation, there were references to inmate malingering and suggestions that the inmate was malingering to avoid returning to Centinela. It did not appear that this issue was explored with the inmate. The progress notes also indicated that the inmate was not considered appropriate for DMH referral, but no rationale for this conclusion was provided.

Findings

This inmate appeared to have been repeatedly viewed as malingering after continuous suicidal attempts and gestures. He was not seen timely by clinicians while housed in the ASU, and treatment omissions were also noted while the inmate was housed in the MHCB. Treatment plans were not properly completed, and did not contain relevant individualized treatment goals and interventions. The emergency response after the inmate's suicide attempt appeared to have occurred within acceptable time frames.

**Inmate D**

This EOP inmate was housed in the ASU. As of 2/22/10, he was prescribed Haldol 10 mg/day and Benadryl 100 mg/day. He arrived at RJD from the San Diego County Jail on 1/13/10 after a short period of release to the community. There was a refusal document in the medical record noting that the inmate had refused all laboratory studies that were ordered by Dr. Ruiz; no such orders were located. The inmate's medication noncompliance resulted in his psychiatric medications being discontinued without actual clinical contact. There was no documentation of any attempts regarding education or evaluation for this inmate.

587

The inmate received a sexual misconduct RVR and an IEX screen but was found not to require any further intervention from the mental health staff related to the sexual misconduct misbehavior.  The inmate appeared to have been seen weekly by his PC; however, contacts appeared to be superficial, and it was unclear if the contacts occurred out of cell.  It appeared that the inmate was seen daily by psych techs.  There was a current treatment plan in the medical record, and the IDTT included attendance by the required participants.  The inmate participated in groups, but there were multiple entries in which the inmate was unable to attend group due to space unavailability.  It appeared that the groups were overbooked, and once filled the inmate could not attend.

Findings

This inmate was seen timely by clinicians in the ASU.  It was unclear, however, if the contacts occurred in a private setting.  Progress notes lacked documentation of clinically substantive contacts, and these contacts were not consistent with the interventions outlined in the treatment plan.  Prior to discontinuation of psychotropic medications, the inmate should have been seen for review of medications, education, or other interventions to assist in treatment compliance.  This inmate's access to group therapy was negatively impacted by group overbooking, and limited group therapy space.

**Inmate E**

This 3CMS inmate was housed in the ASU.  He was placed in the 3CMS program for medical necessity based on a placement chrono dated 12/8/09.  The inmate arrived at RJD on 11/16/09, from San Diego County Jail, and was prescribed Remeron 30 mg at HS.  A current treatment plan and IDTT progress note were located in the medical record; however, the IDTT note included items that were pre-selected, such as DMH referral status "n/a."

This inmate received a sexual misconduct RVR and an IEX screen but was determined to require no further intervention related to the sexual misconduct.  The IEX screen indicated that the IDTT agreed with the diagnosis of Depressive Disorder NOS; provisional diagnoses of Bipolar Disorder, Malingering, and Antisocial Personality Disorder were also included, suggesting that an IDTT had been conducted in accordance with IEX policy and procedure.  However, there was no documentation of an actual IDTT correlated with the IEX process located in the inmate's medical record.

Findings

While it appeared that the inmate was generally seen in accordance with Program Guide requirements for administrative segregation clinical contacts, problems were noted as to adherence to the implementation of IEX policy for this inmate.  The treatment plan was also inadequate, and clinical contacts did not appear to focus on specific treatment goals.

**Inmate F**

This EOP inmate was housed in the ASU.  He arrived at RJD on 4/13/09, from CSP/Sac.  He was provided with a diagnosis of Bipolar I Disorder, and was prescribed Geodon 160 mg/day, Benadryl 175 mg/day, and Effexor XR 150 mg/day.  This inmate was hospitalized in the MHCB for SI and insomnia from 2/22/10 to 2/25/10; medical records regarding this hospitalization were not available.  The inmate was reviewed for possible DMH referral, but was not referred.  He was also hospitalized in the MHCB from 11/12/09 to 11/23/09.  The discharge summary indicated that he was admitted with a diagnosis of Bipolar I Disorder mixed episode, but was discharged with a diagnosis of Antisocial Personality Disorder, and Borderline Personality Disorder.  At the beginning of the admission, the inmate was prescribed involuntary medications (Geodon, Lithium, Cogentin, and Benadryl) due to danger to self and others.  He was also hospitalized in the MHCB from 9/8/09 to 9/14/09.

The inmate had been housed in the ASU since 10/26/09 for possession of a weapon, and his case was pending classification staff representative (CSR) review for transfer.  From the information available, it did not appear that the inmate was seen weekly by his PC, or daily by the psych tech.  The medical record contained an incomplete Form 7388, the checklist for DMH referral, and did not contain a current treatment plan.

Findings

The mental health care provided to this inmate was problematic.  Although the inmate was considered for referral to a higher LOC, documentation of this consideration was inadequate.  The inmate was not consistently followed by administrative segregation clinicians and psych techs.  Treatment planning was incomplete.  This inmate had multiple MHCB admissions, and the rationale for non-referral was not well documented.

**Inmate G**

This EOP inmate arrived at RJD on 1/14/10, from the San Diego County Jail.  It appeared that the inmate was admitted to the MHCB shortly after his transfer to RJD; however, documentation was not clear regarding this matter.  It also did not indicate the reason for MHCB admission.  The inmate was discharged from the MHCB on 1/22/10.  The discharge summary indicated that Zyprexa 20 mg twice daily, and Benadryl 100 mg every evening, had been prescribed.  The discharge diagnosis was Schizophrenia paranoid type.

The inmate was seen for five-day follow-up as required.  The treatment plan was minimally adequate; it indicated that the inmate had been considered for review as to DMH admission, but included pre-printed items that were utilized for all inmates.  Although review of the medical record indicated that the inmate was generally seen weekly, it appeared that he was not seen for one weekly contact.  A subsequent order dated 2/24/10 requested "Zyprexa levels asap."

<u>Findings</u>

The inmate was seen in accordance with the Program Guide for individual PC contacts, but his treatment plan was minimally adequate. He did not receive adequate psychiatric treatment based on medical record documentation.

**Inmate H**

This inmate arrived at RJD on 8/17/09, and was placed into the 3CMS program on 8/31/09. On 10/30/09, he was placed into the EOP. The inmate was prescribed Tegretol 40 mg/day for a seizure disorder. His psychotropic medications included Lithium 600 mg/day, Desyrel 300 mg/day, and Abilify 10 mg/day. These medications were placed on hold after the inmate refused required laboratory studies; the inmate had previously requested that the medications be discontinued. A corresponding psychiatric progress note indicated that the primary goal was to stabilize the inmate's thyroid functioning, and noted the inmate's request that the medications be discontinued. The psychiatrist did not, however, document any plan regarding the medications, and did not attempt to educate the inmate on the impact of refusing psychiatric medications. Although the psychiatrist also stated that the inmate did not meet the criteria for EOP inclusion, the inmate remained at the EOP LOC. The inmate was not seen by the psychiatrist after this time. A PC progress note dated 2/26/10 indicated that the inmate requested his psychotropic medications again; the note did not indicate whether a psychiatric referral had been completed.

The inmate frequently refused group therapy, and there was no documentation that the PC addressed this issue clinically. A medical record review could not confirm that the inmate was seen weekly. Although completed, the treatment plan merely stated Program Guide requirements as interventions. Based on the medical record, this inmate had significant psychiatric symptomatology, and the care provided was inadequate for his level of illness.

<u>Findings</u>
This inmate did not receive adequate mental health care. Documentation regarding treatment decisions was incomplete. The inmate was not seen weekly as required. Treatment planning was not individualized.

**Inmate I**

This EOP inmate arrived at RJD on 9/17/09, from the San Diego County Jail. Although it appeared from the medical record that the inmate was placed into the EOP soon after his arrival, the exact date was unclear. The inmate was prescribed Geodon 80 mg/day according to a physician's order dated 2/22/10; however, a progress note from that date indicated the inmate was to be prescribed Remeron and Benadryl in addition to Geodon. The medical record contained a current, individualized treatment plan.

A medical record review did not result in a determination as to the occurrence of weekly PC contacts, as group progress notes were not always completed properly; although dates were present, there were no further indications of attendance. It was also not clear that the inmate was seen by the psychiatrist monthly, as it appeared that he was seen quarterly. This inmate was

interviewed during the site visit, and he presented as a high functioning individual. The PC noted that extensive past substance abuse may have contributed to symptoms of psychosis, suggesting that the Schizophrenia diagnosis may have been a provisional diagnosis. The inmate also reported conflict with his PC, who believed that the inmate could benefit from 3CMS LOC; the inmate wanted to remain at the EOP LOC.

Findings

This inmate was not seen in accordance with the Program Guide as to PC and psychiatric contacts. He would benefit from a thorough diagnostic assessment.

**Inmate J**

This inmate's medical record was reviewed at the request of plaintiffs' attorneys. The primary issue related to concern that the inmate had been referred to DMH, but had been waiting months for transfer. Plaintiffs' counsel was concerned about the inmate's mental status. A review of the Special Master's MHARP database maintained by the Coleman team showed that the inmate had been reviewed during Phase 2 of MHARP while at RJD. It was determined that a referral was not required at that time. It was recommended that the inmate receive a treatment plan update, and a psychiatric re-evaluation.

The inmate was seen by psychiatry during that time. It was not clear from the medical record that the concerns of the MHARP review staff were communicated to the psychiatrist. The documentation indicated that this evaluation was a typical psychiatric contact. The inmate was prescribed Remeron 45 mg/day, Prozac 20 mg/day, and Benadryl 100 mg/day. The inmate received an updated treatment plan, but it was incomplete as the medical record was missing pages, and data was missing from pages that were in the medical record. It was clear from the treatment plan and other documents in the medical record that there was disagreement regarding the inmate's diagnosis and functional level. Despite these concerns, the record suggested that the inmate was being treated at the appropriate LOC; except for treatment planning, EOP Program Guide requirements were generally compliant.

Findings

This inmate had not been referred to DMH, so he was not awaiting transfer. His mental status did not appear to be deteriorating, and he was generally seen in compliance with Program Guide requirements. However, the inmate was not seen by IDTT timely, and his treatment plan was not individualized, and otherwise remained problematic.

**Inmate K**

This inmate's medical record was reviewed at the request of plaintiffs' attorneys due to concerns that he had been disciplined for refusing a cellmate, and was not receiving adequate care for Gender Identity Disorder (GID), or PTSD. This inmate had been housed in the ASU since 11/26/08. He was initially charged with battery on another inmate, and accrued another RVR for battery on staff.

The inmate was endorsed to the SHU on 12/24/09.  There was no evidence that the inmate was housed in administrative segregation for not accepting a cellmate.  Rather, the inmate had a cellmate, and cited him as a source of comfort.  The inmate had not been diagnosed with PTSD but was diagnosed with MDD, severe and recurrent, Polysubstance Abuse, GID, Antisocial Personality Disorder, and Borderline Personality Disorder.  The medical record reflected that the inmate functioned at a high level with a GAF score of 70.  The most recent treatment plan identified depressive symptomatology and personality disorder associated behaviors as problem areas.  According to medical record documentation, the inmate did not view GID as a problem area.

Findings

This inmate was receiving treatment at the appropriate LOC.  It was unclear why he had been housed in administrative segregation for so long without endorsement to a SHU.  The most recent treatment plan had appropriate target treatment goals, but was inadequate in terms of interventions utilized for those goals.

**Inmate L**

At the time of the monitoring visit, this inmate was followed through the high risk program at RJD.  The most recent treatment plan dated 1/26/10 indicated that the inmate was provided with a diagnosis of Schizoaffective Disorder.  He was transferred to his current housing unit on 1/13/10 after having been moved from the 3CMS program to the EOP.  A progress note written at that time indicated that the inmate exhibited odd behavior, and was observed placing clothing in the toilet.

On 1/26/10, the inmate was reportedly refusing program activities, and spoke minimally when approached by staff.  A Form 7388, the checklist for DMH referral, was located in the medical record, and indicated that the inmate was positive for three of ten categories, including criterion five (less than 50 percent participation).  However, the inmate was not referred to DMH as the treatment team was attempting to stabilize him.  Information in the psych tech notes from mid-January 2010 indicated that the inmate did not attend groups.  His hygiene was characterized as fair, and he was reportedly compliant with medications.

On 12/29/09, the inmate was seen by a clinician after he refused a cellmate.  The clinical information in this progress note was limited.  A note written the following day indicated that the inmate was withdrawn; it was unclear whether this was an out-of-cell interview.  A contact that occurred on 1/5/10 occurred at cell front; the inmate was described as sad, but not in distress.

A progress note dated 1/12/10 indicated that the inmate was classified as developmentally disabled (DD1), and had been "removed from the DD program."  The inmate also reportedly had become increasingly withdrawn.  On the following day, the inmate was apparently extracted from his cell when his LOC was increased to EOP, and he refused to make the necessary cell move.  He was then prescribed Haldol, Ativan, and Benadryl for agitation.  On 1/15/10, a progress note indicated that the inmate was refusing involvement in EOP program activities.  He

presented with restricted affect and refused to come out of his cell on 1/22/10.  Progress notes written at the time of the initial IDTT meeting indicated that, although the inmate's condition was described as deteriorating, clinicians believed that he did not meet DMH referral criteria.

Progress notes during early February 2010 indicated that the inmate's cell maintenance was marginal.  By late February 2010, his hygiene had improved somewhat, but he remained uncooperative with program offerings.  He was described as stable by the end of that month.

Findings

This inmate's LOC had recently been increased to EOP.  He resisted this LOC change, which resulted in cell extraction.  The inmate refused involvement in EOP treatment since entering the program.

Weekly progress notes were adequately written.  The 1/26/10 treatment plan indicated that the treatment team decided to continue monitoring at that time.  The most recent information in the medical record appeared to indicate that the inmate's condition had improved somewhat.  Although this appeared to be an appropriate approach for this inmate, continued monitoring of the need for DMH referral was indicated.

**Inmate M**

This 61-year old inmate was receiving mental health services at the EOP LOC at the time of the monitoring visit.  Progress notes since 2008 indicated that the inmate had repeatedly violated parole by not attending POC appointments.  He had been diagnosed with Bipolar Disorder for some time.  It appeared that this inmate had been stable for periods of time without medication.  He was prescribed Lithium for over ten years; the Lithium was subsequently discontinued due to the occurrence of renal cysts.  The inmate had been hospitalized at ASH on at least one occasion.

Progress notes from October 2009 indicated that the inmate was delusional at that time.  A treatment plan dated 1/20/10 documented a diagnosis of Bipolar I Disorder severe with psychotic features, and an Axis II diagnosis of Antisocial Personality Disorder.  The medical record contained the Form 7388, the checklist for DMH referral, which had criteria seven, eight, nine, and ten marked affirmatively.  The inmate was referred to DMH as a result of this IDTT review.

The weekly psych tech summary from the week of 1/11/10 was blank.  A progress note dated 12/10/09 stated that the inmate was being seen for an RVR evaluation, and that he was agitated at that time.

A progress note dated 1/21/10 described the inmate as grandiose, delusional, and marginally compliant with medication and program offerings.  Notes dated 1/25/10 indicated that the inmate was to parole within a few weeks.  Progress notes dated 1/28/10, 2/2/10, and 2/8/10 indicated that the inmate was again grandiose, delusional and threatening to the staff.  He was described as having fair grooming and hygiene.  It was determined that the inmate did not meet the criteria for a Keyhea order.

During the monitoring visit on 3/1/10, the inmate's inpatient record was reviewed in the MHCB. The inmate had been hospitalized in the MHCB since 2/17/10.  Involuntary medications were initiated on that date, and the inmate was prescribed Risperdal and Depakote.  Progress notes at the time of the MHCB admission indicated that the inmate was agitated and smearing feces. Two days later, he was noted to be naked in his cell, smearing feces, and presenting with grandiosity and delusional thinking.  By 2/20/10, the inmate was able to engage in conversation, although he was described as disheveled on the following day.  On 2/23/10, the inmate presented with grandiosity and a labile mood.  On 3/1/10, the inmate remained delusional, but other symptoms had apparently improved.  He was scheduled to parole during March 2010.

Findings

At the time of the site visit, this inmate was psychotic, and had been placed on involuntary medications.  Over a period of approximately two weeks following initiation of the Keyhea process, he remained psychotic although negative symptoms improved somewhat.  He was appropriately referred for DMH transfer, and will likely be placed on the wait list.

There were weekly progress notes from the PC.  The treatment plan included the Form 7388, the checklist for DMH referral, with appropriate criteria noted.   However, the Form 7388 that was completed in the MHCB appeared to be inaccurate as all of the criteria were incorrectly marked negatively.

**Inmate N**

This inmate was referred to VPP, and he returned to RJD on 8/18/09.  A DMH discharge summary dated 8/11/09 was located in the medical record's inpatient section.  The inmate had been admitted to VPP on 7/16/08, from RJD, due to suicide ideation and self-injurious behavior. The inmate was on a Keyhea order.

This inmate had a history of multiple suicide attempts, auditory hallucinations, paranoid ideations, and delusion thinking.  His previous psychiatric inpatient history included one hospitalization that occurred two months prior to the time that he murdered his wife.  He was apparently treated at DMH for approximately one year, and returned to RJD on or about August 2009.  The mental status examination at the time of that discharge suggested that the inmate's condition had improved somewhat; his thinking was characterized as good, and his insight was described as fair.  The inmate did not appear to be psychotic at that time, and he was maintained on a medication regimen that included Geodon, Lithium, and Haldol Decanoate.

The most recent treatment plan, dated 11/30/09, indicated that the inmate was diagnosed with Schizoaffective Disorder.  A Form 7388, the checklist for DMH referral, completed at that time was marked negatively for all criteria.  The inmate was receiving care at the EOP LOC at that time.

The inmate was admitted to the MHCB for suicide watch on 1/26/10, after he reported that he was having suicidal thoughts.  The inmate was discharged from the MHCB on 1/28/10 with

prescriptions for Haldol, Lithium, and Geodon. The treatment plan at that time included psychiatry services, individual clinician contact, and group therapy.

Progress notes during early January 2010 indicated that the inmate exhibited increased levels of paranoia. On 2/1/10, the inmate was characterized as stable with rather restricted affect. He did not exhibit obvious symptoms of active psychosis, and his grooming and hygiene were described as fair. The inmate was medication compliant at that time. During February 2010, the inmate's attendance at group therapy was sporadic.

He was seen by a psychiatrist on 1/21/10. The inmate was seen by a psychologist during late January 2010 for five-day follow-up, which was not completed.

It appeared that the inmate was seen approximately biweekly by his PC. The monitor's expert could not establish that the inmate was seen on other weeks during group therapy.

Findings

This inmate returned from DMH inpatient care during August 2009, and remained somewhat unstable since that time. Although the inmate likely met criterion for consideration for referral to DMH intermediate care, there was no evidence that such consideration occurred.

**Inmate O**

This inmate returned to RJD from DMH during January 2010. He was admitted to ASH on 1/20/10, from RJD. He was incarcerated for sexual assault, and multiple instances of Exhibitionism; he paroled during September 2009, and was arrested three weeks later. It appeared that he was admitted to the MHCB on at least four occasions between 11/10/09 and 12/7/09 due to SI. During his hospitalizations, the inmate reportedly did not exhibit evidence of acute psychiatric symptoms, and he was discharged with a diagnosis of Adjustment Disorder. His inpatient history indicated recurrent crises that appeared to be related to his fears or experience of victimization.

On 1/21/10, the inmate was provided with diagnoses of Bipolar Disorder, Polysubstance Abuse, Paraphilia, and Frotteurism. Progress notes dated 1/23/10 indicated that "(the inmate) has been observed inciting other peers, causing them to get agitated, he has been needy of staff, asking multiple questions, demanding staff to answer." The inmate also reportedly presented with challenging behavior toward weaker and less stable peers. By 1/25/10, he was described as increasingly verbally aggressive towards the unit staff. The DMH discharge summary written on the following day indicated that the inmate was being returned to CDCR as he was "not an appropriate candidate for ongoing admission to ASH."

Geodon was tapered and discontinued after the hospital admission as it was the psychiatrist's impression that the inmate did not demonstrate psychotic symptoms. Depakote was initiated for mood and impulse control issues. The inmate reportedly exhibited characteristics of Borderline Personality Disorder. He reportedly refused groups at that time. He was admitted to the MHCB on 1/29/10 due to suicidal thinking, and was discharged on 2/5/10 after a medication adjustment. Progress notes dated 2/16/10 and 2/25/10 indicated that the inmate continued to present primarily

595

with symptoms of a severe personality disorder. The most recent progress notes indicated that the inmate was attending groups.

Findings

This inmate reportedly exhibited personality disorder traits which resulted in the termination of his hospitalization at ASH. He will likely continue to present with these significant behavioral issues, and will likely not be accepted to or retained in a DMH ICF. It appeared that he was consistently followed by clinicians at RJD. A well-designed behavioral treatment approach was one of few options available for this inmate's treatment.

The treatment plan indicated that the inmate would receive individual weekly treatment to increase coping skills, and individual treatment for substance abuse. Previous treatment plans indicated that the individual was to receive cognitive behavioral therapy (CBT) for emotion regulation. Documentation in the medical record did not confirm that the prescribed treatment occurred.

Two Form 7388s, the checklist for DMH referral, in the medical record were not completed; one form was blank, and the other had several indicators marked affirmatively without explanation as to why referral was not recommended.

**Inmate P**

This inmate was apparently hospitalized at ASH from 5/4/09 to 12/7/09. He was referred after it was determined that he functioned inadequately in the EOP. He was discharged on Geodon. The inmate had a history of self-injury, including cutting; it did not appear that most of the incidents resulted in serious injury. In one instance, the inmate likely accidently cut himself while punching a window.

The most recent treatment plan was dated 12/16/09. The mental status exam documented symptoms of flat affect, auditory hallucinations, and paranoid thoughts. A mental health evaluation that was dated 12/8/09 indicated that the inmate's mental status was stable. He was provided with a diagnosis of Schizoaffective Disorder.

An IDTT had not been completed by 12/29/09. A progress note by the psychologist dated 1/5/10 described the inmate as somewhat lethargic with organized thinking, and no indication of a thought disorder. Subsequent progress notes described the inmate as stable.

Findings

This inmate remained stable since his return from ASH on 12/8/09. The inmate was seen timely by clinicians after his return to RJD.

596

**Inmate Q**

This inmate's medical record was reviewed at the request of plaintiffs' attorneys due to concerns that he had recently been removed from the EOP, despite the PC's belief that this move was not warranted. They reported that the inmate had a serious mental health episode one month later, and expressed concern regarding the LOC change. The inmate was changed from the EOP to the 3CMS LOC on 12/22/09.

A progress note dated 9/29/09 indicated that the inmate was included in the EOP, and was working as a porter in his assigned housing unit. He commented to the clinician that he felt safe on that unit, and was reportedly stable and functioning appropriately at that time. On 10/13/09, he reported his belief that he would be threatened if he was transferred to an SNY. The clinician stated that the inmate was determined to remain in the EOP; this was understandable as a result of prior threats.

By late October 2009, the inmate was threatening to have his family's attorney deal with any attempt to place him into the 3CMS program. Progress notes indicated that the inmate's group participation during November 2009 was inconsistent. During November 2009, he reported that his pregnant wife had committed suicide, and that he still desired to remain in the EOP. The clinician wrote of the necessity for the IDTT to consider whether the inmate should remain in the EOP. During December 2009, the inmate reported that his brother had just died. He apparently was taken to an outside hospital on 12/23/09, after he attempted to hang himself in the day room with several other inmates present.

A Form 7388, the checklist for DMH referral, was completed on 12/2209, and did not list positive indicators for DMH referral. A suicide risk evaluation checklist was completed on 12/30/09, and indicated that the inmate was at a moderate risk for suicide. The inmate was brought to the crisis holding area on that date after he told a custody officer that he was thinking of cutting his neck.

Progress notes dated 1/5/10 indicated that the inmate was attempting to convince the staff that he needed to remain in the EOP. His mood was described as anxious, but there was no clear indication of the presence of a thought disorder. It appeared that even though the chrono to move the inmate to the 3CMS program had been completed, the inmate remained in the EOP, and attended groups through mid-February 2010.

<u>Findings</u>

This inmate appeared to believe that he would be at physical risk if he was removed from the EOP and placed into a 3CMS program within an SNY setting. To date, he threatened self-injury but had not made serious attempts to harm himself. If the IDTT determined that the inmate should be moved to the 3CMS program, he should be closely monitored through this transition as he will remain at some risk for self-injury.

**Inmate R**

This inmate was transferred to DMH on 8/19/09, after a referral due to mood instability with episodes of mania, suicidal thoughts, and frequent suicide attempts. He had been discharged from ASH during April 2009, and placed at the EOP LOC. He continued to exhibit symptoms of anxiety and depression as well as a "worsening movement disorder" likened to Huntington's disease. After observation, the ASH staff concluded that the "movement disorder" did not occur consistently, and the symptoms diminished when the inmate was not within visual range of mental health or medical staff. Psychological testing identified factors that led to a diagnosis of Malingering. The psychiatric report indicated that the inmate functioned well when not treated with psychotropic medications. The inmate was described as less cooperative when he was confronted with the impression of malingered behavior. A DMH progress note at the time of his ASH discharge included the impression that "(the inmate) seems to have sophisticated ability to manufacture movement disorder and also psychiatric symptom production." The inmate was discharged from ASH during early October 2009, and progress notes documented the impression that the inmate had no mental illness that required treatment with psychotropic medications.

EOP clinical contacts that occurred up to October 2010 described the inmate as consistently complaining regarding medication discontinuation. Psychiatrists consistently recommended against re-initiating these medications based on the discharge diagnosis of Malingering. The inmate's condition remained essentially unchanged through December 2009 and January 2010. He remained at the EOP LOC.

During February 2010, the inmate was seen by a psychiatrist. At that time, he requested treatment with Lithium, Celexa, and Vistaril, which were prescribed. The inmate reported that he was "doing better" at the time of his next psychologist visit.

Findings

This inmate underwent psychological testing, and was diagnosed with Malingering; subsequently, his medications were discontinued. The inmate continued to insist that he required medication, and medications were again prescribed. The prescribing psychiatrist provided no rationale for this change in clinical impression, and departure from previous IDTT recommended treatment. There also was a lack of clear evidence that the psychiatrist reviewed previous clinical documentation. This case should be reviewed through the peer review or quality management process.

**Inmate S**

This 3CMS inmate's most recent treatment plan dated 1/14/10 prescribed PC contact, medication management, and group therapy as treatment interventions. A Form 7388, the checklist for DMH referral, was included with the treatment plan, and had all indicators marked negatively.

There was documentation that the inmate had refused essentially all offered groups, and many of his individual clinical appointments, since August 2009. Progress notes dated 12/14/09 stated that the inmate exhibited depressed affect; this was essentially the only documented clinical

contact with this inmate for several months.  Notes from an IDTT meeting that occurred on 1/14/10 did not document that consideration of the need for referral to DMH or EOP were discussed.

Findings

The information present on the Form 7388 was not consistent with other information in the medical record.  The IDTT should have considered this inmate's need for a higher LOC (EOP) due to his lack of participation in therapeutic activities, and his described depressive symptoms.

EXHIBIT U
Central California Women's Facility (CCWF)
July 26, 2010 - July 28, 2010

**Inmate A**

This 3CMS inmate arrived at CCWF on 6/24/10. She was on RC status. The inmate reported mental illness treatment in the community during the medical screening conducted on the day of arrival. She had been prescribed Seroquel, which was ordered upon her arrival at CCWF. She received her first dose of psychotropic medication within 24 hours.

A mental health evaluation was conducted on 6/29/10, five days after arrival, when the inmate was described as being asymptomatic. She denied ever having experienced classic symptoms of either psychosis or affective disorder in spite of her report that she had been provided with a diagnosis of Schizoaffective Disorder. She received social security disability income in the community, which she said was based on her psychiatric illness, and a coexisting medical condition (lupus).

The first psychiatrist appointment occurred on 7/6/10 (within 12 days of admission). The psychiatrist planned to taper and discontinue Seroquel due to the absence of symptoms; follow-up within two to three weeks was planned to re-evaluate the need for medication.

Findings

There was medication continuity upon arrival at CCWF. The dosage of Seroquel prescribed upon arrival was 700 mg/day, which was a large therapeutic dose. The medical record did not indicate whether outside treatment records were sought. The rationale that the inmate remained stable and asymptomatic on a therapeutic dose of Seroquel could have been used as justification for seeking authorization to continue this non-formulary medication, particularly with supporting documentation from outside treatment sources. There was documentation that psychiatric follow-up was scheduled with appropriate plans for medication management.

**Inmate B**

This 3CMS RC inmate arrived at CCWF on 6/15/10. At the time of reception, the inmate reported a history of Schizophrenia. Her medications included Lithium, Geodon, and Cogentin; these medications were ordered on the day of admission, and the first doses were administered within 24 hours of arrival.

A mental health evaluation was conducted on 6/17/10. The inmate was provided with a diagnosis of MDD, severe and recurrent, with psychotic features. An appointment with the psychiatrist was scheduled, and the inmate was seen for psychiatric evaluation on 6/23/10. Medication informed consent forms were misfiled in the medical record. The inmate participated in a sleep hygiene group offered in reception. A PC contact occurred on 7/13/10. A second psychiatric appointment was conducted on 7/19/10; it was scheduled as the inmate had experienced medication side effects after a planned reduction of the Cogentin dosage. The previous dose was resumed, and the side effects resolved.

Findings

This inmate received her medications timely after her arrival at CCWF.  Although it was somewhat unusual to treat an individual with Cogentin for possible Geodon side effects, this patient was prescribed both medications in the community, and when she entered the CDCR. The treating psychiatrist should have attempted to obtain prior mental health records before attempting to taper the Cogentin.  This may have prevented the inmate from experiencing uncomfortable medication side effects.  The Cogentin dose was subsequently resumed, the side effects resolved quickly, and the inmate agreed to continue taking the medication.

This inmate was psychiatrically stable, and appeared to be functioning well at the 3CMS LOC. Program Guide timeframes for mental health and psychiatric evaluations after arrival were met.

**Inmate C**

This 3CMS RC inmate returned to CCWF on 6/9/10 as a parole violator.  She had returned to CCWF on several prior occasions as well.  This time, she complained of depression during the medical screening, and was referred to mental health for evaluation.  She had received mental health treatment at the 3CMS LOC in the past at VSPW.  The inmate also had a long history of polysubstance abuse and dependence.

The inmate underwent a mental health evaluation on 6/14/10, and was referred to the psychiatrist for an assessment as to the need for treatment with medication.  The psychiatric appointment was conducted on 6/18/10.  Antidepressant medication was initiated.  The medication informed consent form was signed, and filed in the medical record.  The inmate attended both sleep hygiene and depression groups while in the RC.

The inmate was seen by her PC and treating psychiatrist again during July 2010.

Findings

This inmate appeared to be stable, and was receiving mental health services at the appropriate LOC.  She would likely have benefitted from treatment for her co-occurring substance use disorder contemporaneously with her mental health treatment.

**Inmate D**

This EOP inmate was serving her first prison term after having been convicted of second degree murder.  The inmate arrived at CCWF on 8/5/09, and underwent a mental health evaluation on 8/7/09.  The evaluation indicated that COs had already reported two incidents in which the inmate had become verbally agitated since arrival.  Psychotropic medications were ordered at the time of the receiving screening, and the first doses were administered within 24 hours. Medication informed consent forms, and a heat medication consent form, were signed and located in the medical record.

The inmate reported having received mental health treatment since age 13. She was diagnosed with Schizoaffective Disorder bipolar type, and had a history of seizures and hypothyroidism. She was placed in the EOP on 9/17/09, and remained there at the time of the site visit. An initial treatment plan was dated 9/30/09, and there were updates on 12/23/09, 3/17/10 and 6/9/10. The Form 7388, the checklist for DMH referral, was completed and located in the medical record. None of the screening risk factors were identified. The inmate was compliant with medications and attended groups regularly. There were weekly PC progress notes in the medical record which indicated individual contacts. The inmate was also followed by the medical department for her seizure disorder and hypothyroidism. Her medical and psychiatric conditions were stable according to progress note documentation, treatment team meetings, and laboratory studies.

Findings

This inmate appeared to be receiving and benefiting from the current LOC. Mental health interventions that were provided were consistent with or exceeded Program Guide requirements. There was medication continuity upon the inmate's arrival at CCWF. There was documentation that the inmate was reviewed at the IDTT meeting for consideration of referral to a higher LOC.

**Inmate E**

This EOP inmate was returned to prison due to a parole violation during mid-May 2010. She was received at VSPW, and placed in the 3CMS program. During late May 2010, VSPW mental health clinicians referred her to EOP placement at CCWF due to the need for more intensive depression treatment following the death of her brother. VPSW mental health progress notes indicated that the inmate was endorsed to CCWF during June 2010. She arrived at CCWF on 7/1/10.

The inmate was immediately admitted to the EOP upon transfer. An initial mental health treatment plan was dated 7/6/10. The inmate had weekly individual contacts with her PC, and was seen individually by the psychiatrist on 7/7/10. She was diagnosed with Schizophrenia. She was reportedly compliant with prescribed medications that included Haldol and Cogentin. The inmate was scheduled to parole on 8/3/10, and was attending pre-parole planning group. The inmate was an active group treatment participant.

Findings

A review of the medical record indicated that the inmate was stable at the EOP LOC. Interactions with clinicians and group offerings met or exceeded minimum Program Guide requirements; more importantly, her care appeared to be dictated by actual clinical need. There was a relatively short delay in access to the EOP LOC after referral from VSPW.

**Inmate F**

This 3CMS inmate was housed on condemned row, which was located in the ASU. Her medical record review indicated that she transferred to condemned row during January 2004. She was placed in the 3CMS program within five days of arrival, due to depression and coping difficulties.

She was diagnosed with Mood Disorder NOS. The inmate was treated with Lamictal, Buspar, and Celexa, and reportedly responded well to this medication regimen. The most recent mental health screening that occurred on 5/13/10 indicated a plan for quarterly PC contacts.

The inmate was seen by the psychiatrist on 5/11/10, and her medications were continued at that time. A 4/6/10 evaluation documented that the inmate presented with a stable mental status examination, and was encouraged to consider attending groups. During a clinical contact that occurred on 2/11/10, she reportedly exhibited uncharacteristic "rage" and "anger," which she attributed to interpersonal issues on the unit. She requested to "work" on those issues. The plan described was for PC contacts every two months. She was seen on 2/2/10 when she indicated that she would meet out of her cell the following week, and was "doing well and had no pressing concerns." The inmate was seen by the psychiatrist on 11/24/09 when she appeared depressed. A progress note dated 9/8/09 indicated possible EOP placement.

Findings

This inmate was seen in accordance with Program Guide requirements. The mental health staff appeared responsive when the inmate's mental status deteriorated. However, the "issues" that the inmate requested to "work" on were not reflected in subsequent treatment planning documents.

**Inmate G**

This 3CMS inmate was housed in the GP. She arrived at CCWF during November 2008. Her original mental health screen indicated that she was prescribed Zoloft for "situational stress." During this incarceration, she was diagnosed with Adjustment Disorder with depressed mood; additional diagnoses of Cannabis Abuse and Polysubstance Dependence in sustained remission were also present in the medical record.

A review of the medical record revealed that later during the inmate's incarceration she experienced increased "stress" related to psychosocial events; the frequency of PC contacts was appropriately increased during these periods.

Findings

This inmate was seen at intervals that were consistent with Program Guide requirements. She was seen more frequently during times of increased psychosocial stress. These clinical interventions may have averted the later need for crisis intervention. There was also documentation of group treatment involvement.

**Inmate H**

This 3CMS inmate was diagnosed alternately with Depressive Disorder NOS, Dysthymic Disorder, and provisionally with an Adjustment Disorder. She was treated with supportive therapy, and was not prescribed psychotropic medications. She was seen frequently by her PC, and referred to psychiatry as warranted.

Findings

This inmate was seen consistently by the PC, and as needed by the psychiatrist. These contacts were consistent with Program Guide requirements. It also appeared that the inmate was seen considerably more frequently during periods of developing crisis.

**Inmate I**

This 3CMS inmate was provided with a diagnosis of Alcohol Dependence; previous diagnoses included PTSD (provisional) and Adjustment Disorder NOS. During the monitoring period, Geodon was discontinued. Although she continued to be treated with Zoloft and Remeron, the psychiatrist was in the process of reducing these medications. The inmate was provided with supportive psychotherapy and monitoring during this process. This ultimately led to the inmate being removed from the 3CMS program with only "as needed" monitoring by mental health staff. This process was accomplished with increased oversight by the PC, who evaluated the inmate regularly during this period.

Findings

This inmate was followed consistently by mental health clinicians during her placement in the ASU, her removal from the 3CMS program, and the tapering of her medications. These tasks were accomplished in the context of regular mental health follow-up, and monitoring by a consistent treatment team.

**Inmate J**

This 3CMS inmate was returned to CDCR on 4/1/10 following her parole after a previous incarceration on 5/31/08. She was receiving care at the 3CMS LOC at the time of the review. She was housed in the GP.

The inmate was provided with a provisional diagnosis of Bipolar I Disorder most recent episode mixed, in partial remission, Obsessive Compulsive Disorder (OCD), ADHD, and Polysubstance Dependence. She was also diagnosed alternatively with Adjustment Disorder with anxiety and depressed mood, and "mood disorder." She was prescribed Seroquel, Abilify, Thorazine, and Strattera during the monitoring period.

This inmate's psychiatric history was significant for multiple suicide attempts; the most recent occurred during April 2009. She also had six inpatient psychiatric hospitalizations, residential and inpatient substance abuse treatment, and a childhood history of abuse by her mother. Recent

history during the time between parole in 2008 and re-arrest included the death of her father; this reportedly led to a period of severe instability, and subsequent suicide attempts and psychiatric hospitalizations. The medical record contained no evidence of attempts to contact these collateral sources of information.

Findings

This inmate was followed consistently during this incarceration, but her mental health care did not demonstrate the degree of coordination or continuity required by this complex clinical presentation. Contact with collateral sources of information would likely have clarified a complex diagnostic picture, and illuminated suicide risk factors.

EXHIBIT V
Valley State Prison for Women (VSPW)
June 1, 2010 - June 3, 2010

**Inmate A**

This inmate's case was reviewed to assess general compliance with Program Guide requirements for the 3CMS LOC, and to verify the use of the DMH review process at VSPW. The inmate participated in a group of 3CMS inmates interviewed during the monitoring visit. She was diagnosed with Psychotic Disorder NOS and Polysubstance Abuse. She was treated at VSPW with Geodon and Celexa after arriving from the county jail, where she was reportedly treated with Risperdal 2 mg/day and Zyprexa 5 mg/day.

Since her transfer to VSPW during January 2010, which was her first incarceration, this inmate was placed at the 3CMS LOC. Her history was significant for two past suicide attempts, physical and sexual abuse, and homelessness during 2000. During her incarceration, the symptoms that she exhibited included auditory command hallucinations telling her to cut her wrists, depression, agitation, and racing thoughts. An additional stressor for this inmate was the death of her uncle in March 2010, during a period when she was demonstrating clinical depression signs.

In a 3/22/10 progress note, the staff noted that the inmate remained severely depressed, had missed breakfast for four weeks, and had lost six pounds during the past four weeks. She exhibited issues with treatment adherence during the monitoring period. A nursing note dated 1/27/10 indicated that the inmate was seen for medication noncompliance when she stated that she did not like the way the Risperdal made her feel. A 3/30/10 nursing note, in which the inmate was seen for medication noncompliance, indicated that she had been missing her morning medication dose because she missed breakfast due to decreased appetite. A psychiatric progress note dated 1/26/10 noted complaints of medication side effects. A subsequent psychiatric progress note dated 2/16/10 indicated the inmate's complaint that the medication was not "working."

The inmate was seen frequently by a PC and psychiatrist during the monitoring period. The Form 7388, the checklist for DMH referral, completed in connection with the treatment plan on 4/6/10 indicated no positive responses.

Findings

This inmate was seen regularly and within Program Guide requirements by both PCs and psychiatrists during the monitoring period. The inmate demonstrated some symptoms of concern, and had difficulties with medication adherence. Although she was seen by nursing and the psychiatrist as to these issues, it was unclear whether her difficulties with adherence were sufficiently addressed. The Form 7388 was utilized and accurately completed; however, its use did not appear to lead to a documented review as to whether the inmate might have benefited from referral to either EOP or DMH LOC.

**Inmate B**

This inmate's case was reviewed to assess general compliance with RC Program Guide requirements. The inmate participated in a group of RC inmates who were interviewed during the monitoring visit.

The inmate was diagnosed with Depressive Disorder NOS, Amphetamine Dependence, and Alcohol Dependence. She was treated with Celexa, which she eventually requested to discontinue. This inmate was screened upon arrival at the RC; although she "failed" the screen, she indicated that she did not wish to be seen by mental health. She was engaged in mental health treatment at the 3CMS LOC despite these views. Although she periodically reported symptoms of anxiety, she requested removal from the 3CMS program; she had periods of reduced adherence to treatment during the monitoring period.

Findings

This inmate, who did not appear to have intensive mental health needs as documented in the medical record, was seen within Program Guide requirements during the monitoring period. She also was adequately screened for mental health needs upon admission to the RC.

**Inmate C**

This inmate's case was reviewed because she was in the 3CMS program; she was placed at the EOP LOC during the monitoring period.

This inmate was diagnosed with Schizoaffective Disorder depressed type, PTSD, and Polysubstance Dependence. She was treated with Celexa and Abilify. She was maintained at the 3CMS LOC until 5/18/10, when she was transferred to the EOP.

The inmate's IDTT was apparently completed while she was housed in the OHU on 3/26/10; a Form 7388, the checklist for DMH referral, was completed at that time, with findings that did not indicate the need for referral to a higher LOC. Nonetheless, the rationale provided for not referring the inmate to DMH was that she was admitted to the OHU due to situational stressors. Further medical record review indicated that the inmate's son's birthday had recently passed; the inmate was incarcerated due to corporal punishment of an eight year old child. An undated IDTT note and Form 7388 documented all negative responses.

The inmate was seen regularly during the monitoring period by both the psychiatrist and PC. She appeared reasonably stable until March 2010, when she became increasingly anxious about her parole in two years. From 3/24/10 to 3/26/10, she was placed in the OHU due to "severe" depression, homicidal ideation, and continued auditory hallucinations.

This inmate's mental status remained unstable through the spring of 2010; she had increasing anxiety that focused on her parole planning, and fear that she would have no support system upon release. On 4/27/10, she was reportedly experiencing nightmares, flashbacks, and passive suicidal thoughts, and on 5/4/10 she told her PC that this was "the worst (she) had ever been in

609

(her) life." On that date, the PC acknowledged this deterioration, noting that the inmate had not been doing well for the past six to eight weeks. Progress notes indicated that the staff would consider the inmate's transfer to the EOP LOC at that time, and would monitor her weekly as to the necessary LOC.

A progress note dated 5/11/10 documented that the inmate was willing to consider transferring to the EOP LOC, and was "very fragile" and "decompensating rapidly." The IDTT dated 5/18/10 noted mood swings, depression, active auditory hallucinations, poor functioning, and feelings of hopelessness with passive SI. At that time, she was placed at the EOP LOC. After this occurred, the inmate complained about the housing change, and by 5/21/10 she was seen by the nurse after she was medically noncompliant for three days. Subsequent progress notes indicated that daily clinical contacts had occurred, and there was improvement in medication compliance. A progress noted dated 6/2/10 indicated that the inmate was experiencing racing thoughts, and was "eager" to be transferred to the EOP LOC.

Findings

This inmate was consistently followed by the mental health staff during the monitoring period. In addition to noting her decompensation, the staff should have considered her more timely transfer to the EOP LOC.

**Inmate D**

This 3CMS inmate's case was reviewed to assess general compliance with Program Guide requirements. The inmate expected to parole on 6/19/10. Her husband and three children were living in Mexico following the revocation of the husband's residency.

The inmate was diagnosed with Anxiety Disorder NOS and Depressive Disorder NOS; she was treated with Celexa 20 mg/day.

A primary focus of her treatment appeared to be parole planning anxiety issues. She originally thought she would be paroling to Arizona, and she planned on acquiring stable housing before reconnecting with her children. This plan changed abruptly as her family relocated to Mexico. She also had poor adherence to medication treatment.

Findings

This inmate was seen regularly and timely during the review period by both psychiatry and the PC. She was also referred to and assessed by the pre-release planning clinician.

**Inmate E**

This inmate's case was reviewed to assess compliance with Program Guide requirements. She was diagnosed with Depressive Disorder NOS, and Amphetamine and Cannabis Dependence. She was treated with Prozac 40 mg in the morning, which was later increased in an attempt to address her irritability; Abilify 5 mg/day was subsequently added to the medication regimen.

The inmate was housed in the RC on 2/22/10, and she received her first PC contact one month later. She was followed consistently by the PC and psychiatrist.

The suicide risk evaluation checklist that was dated 2/22/10 revealed both static and acute risk factors. Although the inmate reported periods of anxiety and depression, she was described as generally stable throughout the monitoring period. Her presentation during a group interview was consistent with the descriptions provided in the medical record.

Findings

This inmate was seen within Program Guide requirements during the monitoring period, and was timely assessed upon arrival at the RC.

**Inmate F**

This EOP inmate was housed in administrative segregation/SHU, and was awaiting transfer to the PSU. She was diagnosed with Schizophrenia undifferentiated type. She was treated with Zoloft 50 mg/day, Haldol Decanoate 100 mg intramuscular every month, and Risperdal 4 mg/day; this medication was discontinued on 5/1/10.

The inmate arrived at VSPW during December 2008 when she was receiving treatment at the 3CMS LOC. At the beginning of the monitoring period, she remained in the 3CMS program, and was housed in the SHU. An IDTT was conducted during October 2009. Progress notes indicated that the inmate was generally stable, but she was frequently noncompliant with medications, and occasionally covered her cell door. During December 2009, the inmate showed evidence of decompensation, with social withdrawal and poor hygiene.

During January 2010, the inmate became increasing more paranoid, and refused all psychotropic medications; at that time Risperdal was restarted. The inmate was eventually transferred to the OHU for further monitoring. The inmate had at least seven admissions to the OHU safety cell due to psychosis and SI. During February 2010, she was changed to the EOP LOC. The most recent admission indicated that she was more stable than during previous admissions. The inmate was awaiting transfer to a PSU at the time of the site visit.

Findings

There was documentation that the inmate was refusing medications repeatedly during April and May 2010, which the nursing staff noted. There was documentation of nursing referral, and of timely mental health follow-up, after episodes of medication noncompliance. The inmate was appropriately changed to a depot medication due to her chronic medication noncompliance. The IDTT meeting in the SHU during the review period included the necessary participants; however, the treatment plan was generic in content. The completion of the Form 7388, and the PC's presence at the ICC, was documented.

Progress notes documented that the inmate had her cell windows covered preventing visualization of the inside of her cell, and of her activities, on several occasions during October 2010. The inmate reported that she kept her window covered to keep her room dark while

sleeping. This suggested that she may have had her window covered for a period of time, and this could have prevented discovery of unwanted activities. This issue appeared to be problematic, and was a chronic administrative segregation issue that required remedy.

Five-day follow-up after discharge from the OHU safety cell, and weekly clinical contacts in the SHU, were documented, as was encouragement for the patient to come out of cell for contacts. There was documentation of the completion of the Form 7388 for OHU admission, and of group attendance, although it could not be determined if the ten hour weekly requirement was met.

**Inmate G**

This EOP inmate was housed in administrative segregation/SHU, and was awaiting transfer to the PSU. She was diagnosed with Schizophrenia paranoid type. She was treated with Risperdal 1 mg/day, Risperdal Consta 25 mg intramuscular twice monthly, Vistaril 50 mg/day, and Zoloft 50 mg/day.

This inmate arrived at VSPW during March 2009. She was initially placed into the 3CMS program; however, during June 2009, she was removed from the MHSDS. The inmate received a SHU term for battery on a peace officer. A progress note during October 2009 indicated that the inmate was depressed, irritable, and assaultive, with a history of treatment with Geodon at CCWF. She was then returned to the MHSDS at the 3CMS LOC, and was treated with Geodon. She continued with mood instability, and was placed into the EOP during November 2009. Her Geodon was adjusted, and Prozac was added; however, there was documentation of medication noncompliance.

The inmate continued to have sporadic treatment compliance, and frequently refused out-of-cell clinical contacts. It appeared that her medications were discontinued due to chronic refusal. She exhibited increasing isolation, irritability, and paranoia, and ultimately was transferred to the OHU on two occasions during late March and April 2010 after assaulting an officer. She was referred to PSH while she was housed in the OHU. Her medications were resumed, and subsequent progress notes indicated improvement.

Findings

This inmate was appropriately referred to PSH for stabilization. Five-day follow-up after OHU discharge, nursing referral after an episode of medication noncompliance, and consistent mental health intervention to address medication noncompliance, were all documented. The medication regimen was appropriately changed to Risperdal Consta to address the inmate's medication noncompliance. Weekly clinical contacts for the inmate while in the MHSDS in administrative segregation, and consistent psychiatric contacts, were also documented. Some IDTT meetings included the necessary participants, but CC-I presence was not always documented. The presence of the PC at the ICC was documented. The treatment plan and IDTT addressed the inmate's poor group attendance, medication noncompliance, and social isolation. There was documentation of group attendance, but it could not be determined if the ten hour weekly requirement was met.

612

**Inmate H**

This 3CMS inmate was housed in the GP.  She was diagnosed with Psychotic Disorder NOS. She was treated with Risperdal 1 mg/day, Celexa 20 mg/day, and Vistaril 50 mg/day.

The inmate arrived at VSPW on 3/13/10 from a county jail.  She received her mental health screening on 3/25/10, and was referred for further evaluation.  She was placed into the 3CMS program on 4/18/10.  As she initially presented with depressive symptoms, she was initially treated with Zoloft.  This medication was changed to Celexa due to medication side effects. Risperdal and Vistaril were added to address anxiety and psychotic symptoms.

Findings

This inmate was seen as required by the psychiatrist and PC.  The mental health screening and evaluation were timely.  Medications were adjusted as clinically indicated.  She was involved in group therapy.  The IDTT meeting included the necessary participants.  The treatment plan was comprehensive and treatment specific.

# ADDENDA

# Addendum A

### Order of Reference

### Filed December 11, 1995

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

      **Plaintiffs,**             **No. CIV S-90-0520 LKK JFM P**

   **vs.**

PETE WILSON, et al.,

      **Defendants.**        **<u>ORDER OF REFERENCE</u>**

      On November 17, 1995, the magistrate judge filed findings and recommendations regarding a proposed order of reference of this matter to a special master. The findings and recommendations were served on all parties and contained notice to all parties that any objections to the findings and recommendations were to be filed within ten (10) days. On December 1, 1995, defendants filed objections to the findings and recommendations.

      In accordance with the provisions of 28 U.S.C.§ 636(b)(1)(C) and Local Rule 305, this court has conducted a <u>de novo</u> review of this case. Upon completion of said review, the court finds that one objection raised by defendants warrants further discussion and amendment of the order proposed by the magistrate judge.

      Defendants object to the proposed order of reference

insofar as it directs the special master to work jointly with counsel for plaintiffs and counsel for defendants in development of a remedial plan. Defendants propose that the special master be directed to work jointly with defendants and experts selected by the special master.

The principal responsibilities of the special master, as previously described by this court, are to provide expert advice to defendants to ensure that their decisions regarding the provision of mental health care to class members conforms to the requirements of the federal constitution and to advise the court regarding assessment of defendants' compliance with their constitutional obligations. (Order filed September 13, 1995, at 81-82 n.63.) Thus, the main work of the special master in developing a remedial plan will be with the defendants to this litigation, with due regard for both the constitutional deficiencies identified by the court and the deference owed to the discretion of prison administrators ire the discharge of their duties.

Nonetheless, this remains an adversarial proceeding where both sides of the litigation are represented by counsel. All parties are entitled to the advice of counsel as this litigation proceeds. Therefore, while the special master will be directed to work with defendants, he will also be directed to consult with counsel for all parties as necessary in the discharge of his duties.[1]

This court has appointed J. Michael Keating, Jr. to serve as a neutral special master pursuant to Federal Rule of Civil Procedure 53 and the inherent powers of the court. The purpose of this appointment is to assist the court in fulfilling its obligation to fashion a remedy for the constitutional violations in the delivery of mental health care to members of the plaintiff class and to monitor implementation of that remedy. The specific duties and powers of the special master, along with other terms of his appointment, are enumerated herein.

Good cause appearing therefore, the court hereby makes

616

the following order of reference:

### A. Duties of the Special Master

It is HEREBY ORDERED that the duties of the special master shall be limited to the following:

1. To work with defendants and experts to be selected by the special master in accordance with paragraph B(7), _infra_, to develop a remedial plan that effectively addresses the constitutional violations set forth in this court's September 13, 1995 order. In discharging this duty, the special master shall consult with counsel for plaintiffs and counsel for defendants as he deems necessary to the discharge of said duty.

2. To submit to the court within thirty (30) days of the date of this order, a proposed timeline for development of said remedial plan. In developing said timeline, the special master shall give due regard to the urgency of the problems to be remedied and the timelines recommended in the June 6, 1994 findings and recommendations.

3. To make interim reports to the court on the progress of the remedial plan.

[1]/Counsel will be entitled to be heard in any proceeding before this court concerning the adoption of a remedial plan. The court, and the remedial process, will be greatly assisted if the special master has consulted with counsel and addressed their concerns, insofar as possible, prior to the time the proposed remedial plan is submitted to the court.

4. To monitor defendants` implementation of and compliance with any remedial plan that this court may order. It is anticipated that the specific monitoring duties of the special master shall be developed in further detail once an appropriate remedial plan is fashioned and ordered by the court.

5. To prepare and file with the court periodic reports assessing defendants' compliance with such remedial plan as the court may order.

Prior to such filing, the special master shall serve, upon one designated representative of counsel for plaintiffs and one designated representative of counsel for defendants, a copy of each compliance report in draft form, and shall afford

counsel a reasonable time within which to submit to the special master specific, written objections. Upon the request of either party, submitted in conjunction with the specific written objections, the special master shall, after giving reasonable notice to counsel, convene a hearing at which time he shall fully consider the written objections of the parties. Thereafter, the special master shall serve and file his compliance report with the court in accordance with Federal Rule of Civil Procedure 53(e)(1).

      6. To advise the court concerning any modification to the remedial plan that is requested by a party or that appears necessary to effectuate the purposes of the remedial plan.

      7. The duties set forth herein may be further specified, expanded or modified only by order of this court.

      **B. <u>Powers of the Special Master</u>**

      IT IS FURTHER ORDERED that the powers of the special master are and shall be limited to the following:

      1. To enter, at any reasonable time, with or without advance notice, any part of any facility at any California Department of Corrections (CDC) institution except the San Quentin State Prison, the Northern Reception Center at Vacaville and the California Medical Facility-Main at Vacaville.

      2. To interview, on a confidential basis or otherwise, correctional staff, employees, and appointees of the CDC for the purpose of performing his duties under this Order of Reference. Defendants shall provide suitable facilities and arrange for such interviews to be conducted under conditions satisfactory to the special master. In addition, the special master may engage in informal conferences with CDC staff, employees, and appointees, and such persons shall cooperate with the special master and respond to inquiries and requests related to the performance of his duties, including requests for the compilation or communication of oral or written information.

3. To interview, confidentially or otherwise, inmates housed at any CDC institution, except the San Quentin State Prison, the Northern Reception Center at Vacaville and the California Medical Facility-Main at Vacaville, as may be necessary to perform his duties under this Order of Reference. Such interviews shall be held at the institution where the inmate is incarcerated.

4. To attend formal institutional meetings and proceedings at CDC headquarters or at any CDC institution except the San Quentin State Prison, the Northern Reception Center at Vacaville and the California Medical Facility-Main at Vacaville as may be necessary to perform his duties under this order of Reference.

5. To have unlimited access to the records, files and papers maintained by defendants to the extent that such access is related to the performance of the special master's duties under this Order of Reference. Such access shall include all departmental, institutional, and inmate records, including but not limited to, central files, medical records, and mental health records. The special master may obtain copies of all such relevant records, files, and papers.

6. To require the posting of notices in any part of any institution in the class in such number and form as the master may direct to the extent that such notices are necessary and appropriate to effectuate an effective remedy.

7. To retain or employ independent experts, specialist, assistants, administrative support staff or any other such person whose advice or assistance the special master deems necessary to the effective fulfillment of his duties under this Oder of Reference. All such persons, as well as the nature of their compensation, shall be approved by the court in advance of their retention or employment.

8. To hold and conduct hearings with respect to defendants' implementation and compliance with such remedial plan as this court may order. To this end, the special master shall have the power to require the attendance of material witnesses,

including prisoners confined by the CDC, the defendant, and any employees or appointees of the CDC, and the special master shall exercise all other powers describes in subsection (c ) of Rule 53 of the Federal Rules of Civil Procedure.

    9. The powers described herein may only be modified by order of this court.

    10. In exercising the powers enumerated herein, the special master may act by himself or through employees of, or assistants to, the special master approved by the court. All actions of such assistant(s)or employee(s)shall be supervised and coordinated by the special master in order to accomplish the objectives of this reference.

    11. The special master shall not be empowered to direct defendants or any of their subordinates to take or to refrain from taking any specific action to achieve compliance. The sole power to direct compliance and punish noncompliance remains with the Court. Neither the special master nor anyone in his employ shall intervene in the administrative management of the CDC or any of the institutions that are part of the class in the instant action.

    C. **Compliance Reports**

    IT IS FURTHER ORDERED that any compliance report of the special master filed in accordance with paragraph A(5) above shall be adopted as the findings of fact and conclusions of law of the court unless, within ten days after being served with the filing of the report, either side moves to reject or modify the report. The court will entertain no objection to the report unless an identical objection was previously submitted to the special master in the form of a specific written objection in accordance with the provisions of paragraph A(5) above. The objecting party shall note each particular finding or recommendation to which objection is made, shall provide proposed alternative findings or recommendations, and may request a hearing before the court. Pursuant to Fed. R. Civ. P. 53(e)(2), the court shall accept the special master's

findings of fact unless they are clearly erroneous.

   **D. <u>Compensation of the Special Master</u>**

   IT IS FURTHER ORDERED that the special master shall be compensated at a reasonable hourly rate of one hundred fifty dollars ($150.00) per hour for services performed in accordance with this order, except that he shall be compensated at the rate of seventy-five dollars ($75.00) per hour for travel time. All reasonable expenses incurred by the special master in performing his duties under this order shall be reimbursed as costs of the mastership.

   The special master's fees and expenses shall be borne by the defendants as part of the costs of this action. Defendants are hereby ordered to deposit, within thirty (30) days of the date of this Order, the sum of two hundred fifty thousand dollars ($250,000.00) with the Clerk of the Court as an interim payment of costs, which amount shall be invested in an interest-bearing account. All interest earned in the account shall accrue to the benefit of defendants. The special master shall periodically submit to the Clerk of the Court, with a copy to defendants' designated representative, an itemized statement of the special master's fees and expenses, which shall be payable on receipt. At such point that the above sum is substantially drawn down, the court may order defendants to deposit additional sums with the Clerk of the Court.

   DATED: December, 1995.

                              UNITED STATES DISTRICT JUDGE

# Addendum B

**Order**

**Filed January 25, 2007**

THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

**RALPH COLEMAN, et al.,**

        Plaintiffs,           No. CIV S-90-0520 LKK JFM P (E.D.CaI.) vs.

ARNOLD SCHWARZENEGGER, et al.,

        Defendants.

**MARCIANO PLATA, et al.,**

        Plaintiffs,           No. C 01-1351 TEH (N.D.Cal.) vs.

ARNOLD SCHWARZENEGGER, et al.,

        Defendants.

**CARLOS PEREZ, et al.,**

Plaintiffs,                    No. C 05-05241 JSW (N.D.Cal.) vs.

**JAMES TILTON, et al.,**          **<u>ORDER</u>**

Defendants.

On January 18, 2007, a conference was held the in the above cases to discuss coordination of the remedial processes underway in each case. In addition to the undersigned, participants in the conference were the Honorable John F. Moulds, Special Master J. Michael Keating, Jr., Deputy Special Master Matthew A. Lopes, Receiver Robert Sillen, and Chief Assistant to the Receiver John Hagar.

The parties to each of the above-captioned cases are informed that the special master in <u>Coleman</u>, the receiver in <u>Plata</u>, and, if and when appointed, a representative of the court in <u>Perez</u> will hold monthly meetings for the purpose of working collaboratively on issues related to coordination of the remedies in each of the above-captioned actions.[1] The parties to each action will be permitted to submit, in advance of the meetings, proposed agenda items for consideration by the special masters, the receiver and the <u>Perez</u> court representative.[2] Attendance of the parties at said meetings will not be required or permitted except at the discretion of the special master, the receiver, and the <u>Perez</u> court representative; nor will the special master, the receiver, or the <u>Perez</u> court representative be required to

---

[1] On January 22, 2007, the Court in <u>Perez</u> issued an order notifying the parties in that case of its belief that it would be useful to appoint a Court representative to facilitate coordination with the Special Master in the <u>Coleman</u> case and the Receiver in the <u>Plata</u> case. Because this issue has not been finalized, all references in this order to a <u>Perez</u> court representative should be understood to refer to such a representative when, and if, a representative is appointed.

[2] The <u>Coleman</u> parties shall submit proposed agenda items to Special Master Keating or his designee, the <u>Plata</u> parties shall submit proposed agenda items to Receiver Sillen or his designee, and the <u>Perez</u> parties shall submit proposed agenda items to the court representative in that action or said representative's designee.

prepare or file written reports of said meetings. Nothing in this order shall be construed to alter or amend such other reporting requirements as may presently exist or be created by subsequent court order, nor shall anything in this order be construed to alter or amend such rights of the parties in each action as have been or  maybe established by court orders, the Local Rules of Court, or the Federal Rules of Civil Procedure, to raise, as appropriate, objections with each court to such reports as may be filed by a special master, receiver or other court representative,

623

The undersigned will continue to meet on a quarterly basis with the special master in Coleman, the receiver in Plata, and the court representative in Perez to further facilitate the coordination of the remedial process in these cases.

IT IS SO ORDERED.

DATED: January 25, 2007.

/s/_____
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

DATED: January 25, 2007.

/s/_____
THELTON E. HENDERSON
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF CALIFORNIA

DATED: January 25, 2007.      /s/_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF CALIFORNIA

624

# ADDENDUM C

**CSP/Sac Twenty Second Monitoring Period**

**Institutional Management Report**

**Pages 84-86**

The following areas of corrective action were identified in Medical Records as of March 5, 2010:

Work Areas
Downsizing of the work areas to make them more efficient
Minimizing clutter in the work area
Cleaning the records area on a regular basis for prevention of illness
Re-organizing the current and old health record volumes to improve chart location

Staff
Retraining staff on new Unit Health Record procedures
Retraining staff on desk duties and procedures
Combining desk duties & procedures to help with vacant positions until filled
Redirecting staff to help in areas where staff shortages occur until positions are filled
Develop desk manuals pertaining to all duties in the medical record department
Assignment of terminal digits to staff for the filing of loose material in the Unit Health Record
Tracking and completing requests for outside mental health records

## VIII.  MEDICATION MANAGEMENT

During the review period, August 1, 2009 – January 31, 2010, a total of 480 charts were reviewed for the purpose of medication management audits.  The average percentage of compliance for all indicators during this period of time was 89%.

Reflected below is each medication management indicator and the current trend and corrective action that has taken place when indicated.

2a- If the inmate/patient (I/P) arrived from another CDCR institution on essential prescription medications, did the medications accompany the I/P upon arrival?

This indicator remained out of compliance with an overall average of 56%.  This particular indicator is dependent upon other institutions sending the medication with the inmate when he is

being transferred.  This consists of random audits which are completed by a SRN II that identify the prisons which are the greatest offenders.  This information is then shared with the DON of that institution.

2b- If an I/P arrives from another institution on medication, did the I/P receive his Nurse Administered/Direct Observation Therapy (NA/DOT) medication by the end of the day after arrival?

Overall compliance is 95%.

2c – (This indicator was added since the last Management Report) If the inmate on Keep on Person (KOP) medications received his self-carry medications from the R&R nurse on arrival from other CDCR institutions.

The audit report indicates that this item did not meet criteria for audit September 2009 – January 2010, because no inmate-patients arrived with KOP medications.  The statewide system to allow inmate-patients to transport with KOP medications available upon arrival is apparently not being followed by any institution.

3a- For all new medication orders or dose changes administered NA/DOT, are the ordered/changed medication provided to the inmate-patient within 24 hours after the order was written?

Overall compliance is 62%.  Prior to the rollout of MAXOR in February 2008 SAC was compliant with this requirement.  However, an acceptable level of compliance has not been reached since February 2008.

Identified problems and details of corrective action can be found in the Medication Management Subcommittee Minutes (Binder 2.C.15).  Problems include:
- The MAXOR system is designed to provide medications within 24 work hours, so medications faxed after 3:00 pm on Friday are not filled until Monday or Tuesday.
- Non Formulary medication forms are often in the signature process after an order is written, and the order cannot be filled until the Non Formulary approval is received by the Pharmacy
- For medication titration orders, the medication is often not received on the day the order is written, so the titration dosages and dates on the MAR form do not match the dosages and dates that the medications are actually provided.
- Pharmacy staff attendance;
- Technical problems with fax machines for orders sent to the pharmacy.

3b - (This indicator was added since the last Management Report).  Are the ordered/changed "Keep on Person" medications provided to the inmate within 24 hours after the order was written?

Overall compliance is 93%.

626

4a-Did the provider renew or discontinue essential medications on or before the expiration date?

Overall compliance is 100%

4b-Is there a progress note by the provider supporting each order for new, changed, or discontinued medication?

Overall compliance is 90%. This is an improvement since the last Management Report.

5a-If an inmate-patient is a no show or refused medication, did staff document this by circling their initials in red in the date and time slot where the medication should be recorded?

Overall compliance is 84%, with improvement over the review period. Compliance November – January was 89%.

5b- If the inmate was referred on an urgent basis to the prescriber and PHN for refusal/no show of one dose of Keyhea or two consecutive doses of insulin, TB, or HIV medications.

Overall compliance is 92%. Compliance in August was 67% and September was 0%. Compliance improved in November and December to 100%. (In October and January, audited records did not meet criteria to review this item).

 5c- If there's a follow-up appointment documented within 7 days of referral, for inmates who refuse/no show for three consecutive days or missed 50% of medications over a seven day period.

Overall compliance is 90%.

6- If the inmate-patient was transferred to another housing area, is there documentation that medication administration was continued without interruption?

Overall compliance is 98%.

7a-Is the previous months MAR filed in the Unit Health Record?

Overall compliance is 92%

7b-Are entries on the MAR complete and legible?

Overall compliance is 73%. Training is ongoing for nursing staff by SRNIIs and SLPTs for units that have incomplete and illegible entries on the MAR.

8-Is there a Pharmacy Supplies and Medication for I/P Release signed by the inmate-patient at the time of release, in the Unit Health Record (UHR)?

Overall compliance is 100%.

# ADDENDUM D

**PBSP Twenty Second Monitoring Period**
**Institutional Management Report**
**Pages 31-33**

### A. Mainline CCCMS

As of January 31, 2010, 212 inmate patients received mainline CCCMS Mental Health Services in Facilities A and B (202 on Facilities A and B, one in TPU, five in THU, and four Level I inmate patients in Facility A gym). Four CMs and one senior supervising psychologist are assigned to handle this caseload. One additional CM has been assigned to this area to counteract difficulties in meeting treatment team ordered contact rates created by the documentation time requirement involved in the use of MPIMS and by staffing vacancies resulting from the furlough program. In February 2010, the CCCMS Senior Supervising Psychologist and his CMs were switched with the Senior Supervising Psychologist of EOP and her CMs with the hope of enhancing cross training staff in differing levels of care and to counteract staff "burnout." It is hoped this transition will be beneficial for the overall MHP, but is also understood further adjustments will likely be required as staff settle into their new roles. The current Senior Supervising Psychologist for the mainline CCCMS program also functions as the SPR FIT Coordinator. The Senior Supervising Psychologist also assists in filling in by covering caseloads and/or group coverage as short-term staffing shortages dictate. Staffing ratios currently approximate one CM to 53 inmate patients. Shortages in psychiatry resulted in no consistently assigned Psychiatrist to the mainlines, such that psychiatric coverage is provided on a rotational basis and approximates one Psychiatrist to 212 inmate patients.

Changes in mission focus involve the addition of a TPU to the existing THU. The TPU is essentially a sensitive needs program for inmates awaiting transfer to prisons who can house inmates with sensitive needs. It is located in Facility B-4, A-Section and has a capacity to house 40 inmates.

The THU is a program for inmates that are gang drop outs and is located in Facility B-3, C-Section, and has a capacity to house approximately 40 inmates. The THU had 40 inmates as of January 31, 2010, five of whom were in CCCMS. The TPU had 39 inmates at the end of this reporting period.

Treatment space on Facility A has been greatly enhanced by the reconstruction of the Facility A Hobby Shop into six confidential treatment offices completed in November 2008. In exchange, four previous mental health offices were returned to custody for a net increase in two office spaces. These offices are occupied by two Facility A clinicians, a Psychiatrist, and three Ad Seg clinicians who have no office space in the Ad Seg treatment area. Furthermore, group therapy on Facility A has been

successfully completed as scheduled approximately 50% of the time  (26 completed, 21 cancelled), with the majority of group cancellations coming due to lockdowns or other modified programs.  It has been particularly difficult to accomplish group therapy since various modified programs prohibited the mixing of races or otherwise prevented inmate movement.  Group therapy space has recently become a problem as education has reclaimed the room previously utilized for groups on Facility A.  In response, the dining area of Facility A-4 has been utilized for group therapy.

Treatment space on Facility B remains problematic as it awaits approval of the parallel hobby shop conversion that has solved office space shortages on Facility A.  Both custody and HCS desire approval and funding of this conversion, though fiscal constraints limit its likelihood in the foreseeable future.  See Proof of Practice Binder 1, Tab A14.  More problematic than treatment space on Facility B, is the availability of security escort officers.  Providing custody services for psychiatry, two CMs, and/or loading group therapy with only one escort officer is accomplished with significant difficulty.  To compound this, when yards are on lockdown/modified program, as they have been for the majority of this reporting period, multiple officers are needed for the minimal flow of inmate patients to fill appointments or group treatment.  Furthermore, as a result of these lockdowns/modified programs, group therapy has occurred only four times this reporting period and has been cancelled eight times.  Even when inmate patients are allowed to be moved, program restrictions prohibit group therapy since various inmate patient groups are not allowed to be mixed.  A fundamental problem with escort staff is that out of eight escort officers assigned to Facility B HCS, seven are assigned to medical and only one is assigned to mental health to serve two CMs, one Psychiatrist, and to load and unload groups.  There is a similar problem on Facility A, however, modified programs have not affected Facility A as significantly.

* * * * *

1. **Group Treatment**
   Providing group therapy to the mainline CCCMS program is the primary remaining CAP item from *Madrid* monitoring.  For specifics, refer to CAP #1 of this report.

   On Facility A, two groups were scheduled each week (Anger Management and Substance Abuse) and Facility B had one group (Anger Management).  Groups were designed to hold between 12 and 15 members although they may have started with as many as 20.  On Facility A, 26 group sessions were completed and 21 were cancelled due to lockdowns, modified programs, emergency response drills, holidays, or staff unavailability.  On Facility B, four groups were completed and eight were cancelled for one of the aforementioned reasons.  For this reporting period an average of 30 inmate patients were involved in group therapy on Facility A and B collectively for a month.

Proof of Practice is gleaned from the EHR and is summarized in Binder 1, Tab A2.

✱   ✱   ✱   ✱   ✱

**Pages 89 -91**

**1 - CCCMS**
**PROBLEM:**
Attempt to initiate group therapy in response to prior recommendations failed due primarily to a series of lengthy lockdowns that substantially limited inmate movement.
**GOAL:**
Provide at least one group on each CCCMS yard (Facility A and B) on an ongoing basis. Groups are to be 12 sessions long, for as long as it takes to accomplish the sessions. Breaks between groups are to be no longer than one month.
**CORRECTIVE ACTION:**
1. Unless a lockdown is announced, CMs will ensure their respective groups will occur. The CCCMS Supervisor/Program Director will be notified immediately if a group is cancelled by custody.
2. A minimum of at least four group topics will be offered to the inmates, one of which is Anger Management. CMs will canvass their inmates to determine their preferences for one of the offered groups. CMs will then choose which group topics to present based on this needs assessment.
3. CMs have standardized their procedures for conducting groups. All groups on both yards will begin during the same week and run for no more than 12 consecutive weeks. When a CM is absent, another CM or the CCCMS Senior Supervising Psychologist will substitute to run the group to ensure it is not cancelled. Certificates will be awarded based on an 80% attendance record, allowing for two cancellations for custody reasons.
4. Each group will begin with a minimum of eight inmates. Location and security concerns will dictate a preference for larger groups.
5. The Senior Supervising Psychologist will report monthly to the MHQMS the status of the group therapy processes on Facility A and B.

**OBSTACLES ENCOUNTERED:**
Near continuous modified programs and/or lockdowns made providing group therapy extremely difficult on both Facility A and B yards this reporting period as well as the period reported on in the last management report. One particular difficulty involved modified programs in which only one race was allowed to be moved on a given day. In addition, groups were cancelled for emergency response drills, holidays, and staff unavailability secondary to the furlough program. Whenever possible the Senior Supervising Psychologist filled in as group facilitator rather than cancel a group yet staff vacancies did result in group cancellations.
**OUTCOME MEASUREMENT:**
Groups will be occurring on both Facility A and B; 12 sessions in length with no longer than one month between 12 session sets with a 90% success rate precluding cancellations due to custody lockdowns and/or modified programs.
**RESPONSIBILITY:**
CCCMS Senior Supervising Psychologist, and Chief Psychologist.
**TARGET DATE:**

Initially December 1, 2000; is currently ongoing

**STATUS**:

Goal not met on either Facility A or B this reporting period.

**CAP:**

**March 1, 2009**

Each group on Facility A and B, GP yard at PBSP were scheduled to run for 12 weeks not counting cancellations. Groups are started with as many as 20 inmates scheduled (up from the previous 10) due to the high drop-out rate due to transfers, job assignments, and/or program failures. Group participants are not allowed to miss more than two unexcused groups before being considered for removal due to non-participation. Anger Management continues to be the ongoing topic available on both yards primarily as it is most often mentioned by inmates as part of their sentencing/remediation requirements. As of 4/20/2009, a further advancement toward providing group coverage on the CCCMS GP yards will begin with the offering of a second group, Substance Abuse Issues, to the ongoing Anger Management Group.

Implementation of the CAP from the previous reporting period focused on a change of the Senior Supervising Psychologist position to include the responsibility to monitor, report, and fill in as group leader as needed for the providing of ongoing group therapy availability to CCCMS inmates in the GP. As of this reporting period, that CAP has proven to be quite effective.

On Facility A there were 26 potential group sessions available during this reporting period. Of these, four weeks were cancelled secondary to Facility A lockdowns and/or modified program custody issues (9/9/2008 through 9/30/2008). This amounted to 15.4% of potential group therapy sessions and was beyond the control of the MHP. Of the remaining 22 potential group therapy sessions, only one was cancelled due to mental health staff availability and another for mandatory all day *Clark* training. Efforts are ongoing to define ways such that no cancellations will occur due to CM availability such as borrowing PTs from PSU. The remaining 20 group therapy sessions were conducted for a 91% compliance rate (i.e., 20 out of 22 possible not counting cancellations beyond mental health control, i.e., custodial lockdowns and/or modified programs). For Facility A the CAP goal has been met and plans are in place to expand services beyond one ongoing group to two groups.

On Facility B no group therapy sessions were conducted during this reporting period due to ongoing violence on the yard resulting in custodial lockdowns and/or modified programs. There were no episodes where groups could have been conducted but were otherwise cancelled. The addition of a second group on Facility B is also planned as an expansion of group availability and group topic availability.

Overall given the opportunities for Mental Health Services to provide group therapy to CCCMS inmates in the GP this CAP has been met. It is anticipated that the successes experienced on Facility A will be experienced in Facility B when the custodial environment allows. Furthermore, plans for increasing group therapy topics and openings will undoubtedly increase the presence of group therapy as an existing mode of treatment for CCCMS LOC inmates. At this time, there is no proposed change in the CAP other than limiting the number of times groups are cancelled due to staff unavailability or mandatory training. It is recommended that this CAP be closed once it is demonstrated that the successes experienced on Facility A can be documented on Facility B as well. See Proof of Practice Binder 1, Tab A2.

**January 31, 2010**

Once again groups on Facility A and B were scheduled to run for 12 weeks not counting cancellations. Groups were started with as many as 20 inmates because of a high drop out rate

due to transfers, job assignments, and other program factors. On Facility A, two groups were scheduled each week (Anger Management and Substance Abuse). Facility B had only one group scheduled (Anger Management).

On Facility A, 26 group sessions were completed and 21 were cancelled for the aforementioned reasons. On Facility B four group sessions were completed and eight were cancelled for those same reasons. Groups on Facility B yard were scheduled less often due to restrictions secondary to modified programs and/or lockdowns. Since they weren't scheduled we do not have the ability to report on whether the groups would have been cancelled due to staff unavailability. The lack of ongoing scheduling of group therapy on Facility B yard represents a major deficiency in meeting the goals of this CAP.

For this reporting period an average of 30 inmates were enrolled in group therapy on Facility A and B yard collectively per month.

The CAP for this problem will be that the newly assigned Senior Supervising Psychologist and the Chief Psychologist will work with the CCCMS scheduler to ensure that groups are scheduled for 12 week sessions (or more until completion) with no more than one month down time between group iterations on an ongoing basis. The Senior Supervising Psychologist and group scheduler will be responsible for providing monthly reports to the HCCU. Data from those reports will be included in the KI to monitor scheduling, completion, and cancellation of group sessions, as well as whether the cancellations were due to staff unavailability or institutional reasons.

# ADDENDUM E

### VSPW Twenty-Second Monitoring Period

### Institutional Management Report

### Pages 14-15, 29-31

**PAGES 14-15**

## Pre-Release Planning in Reception Center

**Valley State Prison for Women identifies as early as possible all RC I/Ps who have, or might have, imminent release dates, that is, within 60 to 120-days. An assigned discharge clinician provides post release planning to such I/Ps with treatment plans that include clinical pre release planning and resource management to address their individualized re-entry needs.**

**The discharge clinician works in conjunction with the parole agent and POC, pairing resources based on the paroling I/Ps identified needs. The pre-parole planning activities also include motivational interviewing to enhance personal insight and referring I/Ps to the benefits social worker to make applications for federal and state benefits (when the I/Ps meets the referring criteria). It also includes, completing screenings and applications for inpatient drug treatment placements. The discharge clinician also acts as a liaison with POC for continuity of mental health treatment.**

**Additionally, discharge clinicians work intensely with I/Ps receiving mental health services at the Enhanced Outpatient LOC and closely with their assigned agent of record and family if appropriate and permitted (releases of information are signed). The discharge clinician provides mental health summaries to the POC for EOP I/Ps. When it is determined appropriate, a conservatorship is recommended, and the discharge clinician works with the POC and county mental health liaison to facilitate this process.**

## Mainline CCCMS

**There are currently eleven clinicians filling 10.5 positions which provide case management to over 900 patients located on three mainline yards. In addition, one clinician manages the Group Therapy Program and Clinical Education, and two clinicians are assigned to Pre-Release. Over the last six months, October 2009 to March 2010, these clinicians have made 7,976 I/P contacts in individual sessions equaling approximately 1,329 contacts per month (see Table 9). Three psychiatrists have provided services for over 900 I/Ps, resulting in 2,648 I/P contacts during this same period. New to the team are two Recreational**

**Therapists that have served GP, as well as the RC. Currently they are working on GP yards and in the ASU HUB.**

**Table 9:  Number and Type of MHSDS Contacts in Mainline by Month**

Pages 29-31

******

# Mental Health Pre-Release Program

**Currently there are three clinicians that are assigned to work in the MHPR program; of these, one clinician is assigned to the reception center (RC) and ASU and the other two are assigned to mainline yards B, C, and D.**

## MHPR Activities

Long Termers
**For those I/Ps who are returning back to the community after being incarcerated for more than 10-years clinicians work intensely through clinical pre release encounters with the focus on emotional preparation prior to release.  In addition, the discharge clinician coordinates post-release resources and services for long term I/Ps, such as referring I/Ps to the benefits social worker for federal and state benefits and pairing the I/Ps with community based resources.**

Reception Center EOP I/Ps
**An assigned discharge clinician provides pre-release services to RC EOP I/Ps with imminent release dates.  The discharge clinician works in conjunction with the parole agent and the POC, while pairing resources based on the paroling I/Ps identified needs.  The discharge clinician provides mental health summaries to the POC for EOP I/Ps. When it is determined appropriate, a conservatorship is recommended, and the discharge clinician works with the POC and county mental health liaison to facilitate this process.**

## Return Rates of MHPR Participants

**This report reviews return rates of patients receiving MHPR services during the months of March 2008 through March of 2010. Using the Mental Health Tracking System (MHTS) clerical support filtered a completed appointment history for each of the clinicians assigned to the MHPR program. The report consisted of the total number of contacts for CCCMS, EOP and GP. Approximately 20% of each of the clinicians completed CCCMS; EOP and GP appointments were used as a sample for this report. There were a total of 3,513 completed MHPR appointments of those 702 were used as a sample (see Table 27).**

**Table 27: Total Number of Mental Health Pre-Release Contacts for March 2008 through March 2010.**

| Level of Care | March 1st 08-09 | March 16th 09-10 | Total Contacts |
|---|---|---|---|
| CCCMS | 1,777 | 1,355 | 3,112 |
| EOP | 77 | 121 | 198 |
| GP | 136 | 67 | 203 |
| TOTAL | 1,970 | 1,543 | 3,513 |

**Each of the patients' CDCR number was input into the Offender Based Information System (OBIS) system to access the following information: date released, return to custody, the date of return to custody and their current disposition (current institution, if applicable). This information was organized by categories: LOC, date of release, LOC and month of return to custody (if applicable). Analyses of each of the categories were completed.**

**During March of 2008 through March of 2010 there was a total of 3,513 completed MHPR appointments: 3,112 CCCMS, 198 EOP and 203 GP. These contacts included follow up appointments with patients; on average patients received 2 MHPR contacts. Based on an analysis of the data, I/Ps who received MHPR services during March 2008 to March 2009 had recidivism rates of 46% at the CCCMS LOC, 30% for EOP and 43% for GP. This is lower than California recidivism rates (see Table 28).**

**Table 28:  Return Rate by LOC from March 1, 2008 to March 15, 2009**

| Level of Care | # of IP's seen | Total Returned | Return Rate | Success Rate |
|---|---|---|---|---|
| CCCMS | 358 | 167 | 46% | 53% |
| EOP | 14 | 2 | 30% | 70% |
| GP | 30 | 13 | 43% | 57% |
| TOTAL | 402 | 182 | 45% | 55% |

**During March 2009 to March 2010, I/Ps who received MHPR services had recidivism rates of 31% for CCCMS, 30% EOP and 16% GP (see Table 29 below). It appears that patients who receive MHPR services prior to release increase their probability of successful reintegration back into the community one to two years after release (see Table 30). Data shows that patients who received MHPR services prior to their release had a total return rate of 30% within one year**

following release, compared to the states general prison population recidivism rate of 50-70% within one year.

This report reviews return rates of patients receiving MHPR services during the months of March 2008 through March of 2010. Data of completed MHPR appointments were collected through March 31st 2010 to provide the most accurate number of appointments completed. Return and release dates were gathered on patients on April 27th to provide the latest and most accurate data available. For this reason, recent return rates may be lower due to insufficient elapse of time since the date of release.

## Future Plans for MHPR Program

The MHPR coordinator will continue to track the recidivism rates for the MHPR community re-entry program. Currently, the Offender Parole Clinical Summary offers limited access to measure linkage to POC; a more reliable measure will need to be employed to track the rate of successful linkages to the POC. Surveys, identifying gaps and barriers to a successful transition back into the community from I/Ps who have returned will be included in future data. Also, data from Phase Two, implementation of pre-release groups and Short-term Skill Building Focused Therapy has begun. Effectiveness of these program activities and their impact on return rates will be included in future data.

**Table 29:  Return Rate by Level of Care from March 16, 2009 to March 31, 2010**

| Level of Care | # of IP's seen | Total Returned | Return Rate | Success Rate |
|---|---|---|---|---|
| **CCCMS** | **249** | **40** | **16%** | **84%** |
| **EOP** | **33** | **12** | **37%** | **63%** |
| **GP** | **18** | **6** | **34%** | **66%** |
| TOTAL | 300 | 58 | 19% | 81% |

**Table 30:  Return Rate by Level of Care and Time**

| Level of Care | # of IP's seen | Total Returned | Returned to Prison within* | | | |
|---|---|---|---|---|---|---|
| | | | One Year | | Two Year | |
| **CCCMS** | **607** | **207** | **192** | **31%** | **15** | **2%** |
| **EOP** | **47** | **14** | **14** | **30%** | **N/A** | |
| **GP** | **48** | **19** | **8** | **16%** | **11** | **23%** |
| TOTAL | 702 | 240 | 214 | 30% | 26 | 4% |