1  KAMALA D. HARRIS
   Attorney General of California
2  JONATHAN L. WOLFF
   Senior Assistant Attorney General
3  DEBBIE J. VOROUS, State Bar No. 166884
   GREGORY G. GOMEZ, State Bar No. 242674
4  DAVID E. BRICE, State Bar No. 269443
   Deputy Attorneys General
5   1300 I Street, Suite 125
    P.O. Box 944255
6   Sacramento, CA 94244-2550
    Telephone:  (916) 324-5345
7   Fax:  (916) 324-5205
    E-mail:  Debbie.Vorous@doj.ca.gov
8
   Attorneys for Defendants
9
                    IN THE UNITED STATES DISTRICT COURT
10
                   FOR THE EASTERN DISTRICT OF CALIFORNIA
11

12

13

14  **RALPH COLEMAN, et al.,**                 2:90-cv-00520 LKK JFM P

15                            Plaintiffs,   **DEFENDANTS' RESPONSE TO**
                                            **PLAINTIFFS' OBJECTIONS TO**
16       **v.**                             **DEFENDANTS' PLAN RE:**
                                            **INTERMEDIATE CARE FACILITY**
17                                          **AND ACUTE INPATIENT WAITLISTS**
   **ARNOLD SCHWARZENEGGER, et al.,**
18
                            Defendants.
19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

Page

3  INTRODUCTION................................................................................................1

4  DEFENDANTS' RESPONSES............................................................................3

5  I.    DEFENDANTS SUBMITTED A CONCRETE, SUSTAINABLE
       PLAN TO REDUCE OR ELIMINATE THE SVPP AND APP
6      WAITLISTS AND, IN THE INTERIM, TO BETTER SERVE THE
       TREATMENT NEEDS OF THE INMATE-PATIENTS ON THE
7      WAITLISTS. ................................................................................3

8        A.   Defendants Complied With the Court's Order to Reduce or
             Eliminate the Waitlists and Plaintiffs' Objections Have No Merit........3
9
         B.   Defendants Complied with this Court's Order to Better Serve the
10            Treatment Needs of the Inmates on the Waitlists and Plaintiffs'
             Objections Have No Merit.......................................................7
11
12  II.   COMMENTS NOT ADDRESSED BY DEFENDANTS' PLAN...............10

13       A.   The Court Should Reject Plaintiffs' Requests to Ignore the Custody
             Factors as Unsafe; and Plaintiffs' Additional Request to Convert
             the DMH Hospitals into Prisons is not Feasible....................................10
14
15       B.   Ordering Defendants to Submit a Plan to Expedite Construction
             of the Court Ordered Projects for ICF Beds is Unnecessary................19
16
17       C.   This Court Should not Accelerate Admissions into the 64-bed
             ICF Unit at California Medical Facility.................................................19
18
19       D.   Coalinga State Hospital Staff are not "Designated"
             *Coleman* Staff..........................................................................20
20  CONCLUSION.................................................................................................21

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

CASES

*Bell v. Wolfish*
 441 U.S. 520 (1979) ........................................................................................ 12

*Toussaint v. McCarthy*
 801 F.2d 1080 (9th Cir. 1986) ......................................................................... 9

*Whitley v. Albers*
 475 U.S. 312 (1986) ........................................................................................ 12

STATUTES

18 United States Code

 § 3626(a)(1) .................................................................................................... 20

 § 3626(a)(1)(A) ............................................................................................... 16

California Welfare and Institutions Code

 § 7301 .............................................................................................................. 17

 § 6600(b) ......................................................................................................... 17

California Penal Code

 § 290 ................................................................................................................ 14

 § 1370 .............................................................................................................. 3

COURT RULES

Federal Rules of Evidence

 §801 ................................................................................................................ 10

 §802 ................................................................................................................ 10

OTHER AUTHORITIES

California Code of Regulations Title 15

 § 3341.5(9) ...................................................................................................... 15

 § 3375.1 ........................................................................................................... 13

Defs.' Resp. to Pls.' Obj. to Defs.' Plan Re: ICF and Acute Inpatient Waitlists  (2:90-cv-00520 LKK JFM P)

1

## TABLE OF AUTHORITIES
### (continued)

2
**Page**

3
§ 3375.3 ................................................................................................................... 13

4
§§ 3375.3(b)(4)(D), (F), (G), and (H) .................................................................... 14

5
§ 3377 ............................................................................................................... 13, 15

6
§ 3377.1 ............................................................................................................ 14, 15

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Resp. to Pls.' Obj. to Defs.' Plan Re: ICF and Acute Inpatient Waitlists («Matter Primary Court Case #»)

| Acronym List | |
|---|---|
| **Term** | **Definition** |
| **APP** | Acute Psychiatric Program |
| **ASH** | Atascadero State Hospital |
| **CDCR** | California Department of Corrections and Rehabilitation |
| **CHCF** | California Health Care Facility |
| **CMF** | California Medical Facility |
| **CSH** | Coalinga State Hospital |
| **DMH** | Department of Mental Health |
| **EECP** | Extended Enhanced Outpatient Program |
| **EOP** | Enhanced Outpatient Program |
| **HC-POP** | Health Care Placement Oversight Program |
| **ICC** | Institutional Classification Committee |
| **ICF** | Intermediate Care Facility |
| **IDTT** | Interdisciplinary Treatment Team |
| **MHCB** | Mental Health Crisis Bed |
| **SVP** | Sexually Violent Predators |
| **SVPP** | Salinas Valley Psychiatric Program |
| **SVSP** | Salinas Valley State Prison |
| **VPP** | Vacaville Psychiatric Program |

1

**INTRODUCTION**

On March 31, 2010, this Court ordered that Defendants, under the guidance of the *Coleman* Special Master, develop a plan to reduce or eliminate the Salinas Valley Psychiatric Program (SVPP) and Vacaville Psychiatric Program (VPP) waitlists for inmate-patients referred to Intermediate Care Facility (ICF) and Acute Psychiatric Program (APP) (hereafter the SVPP and the APP waitlists, respectively) treatment programs operated by the California Department of Mental Health (DMH). The Court also ordered Defendants, in the interim, to better serve the treatment needs of the inmate-patients on those lists. Defendants complied with the Court's order and submitted their Plan on November 24, 2010. Defendants have since supplemented their Plan. Defendants' Plan has already had a substantial impact on reducing the SVPP waitlist and better serving the inmate-patients on the waitlist.

Defendants have successfully reduced the SVPP waitlist by 58%, from 542 inmate-patients in March 2010 to *230* inmate-patients in March 2011. Additionally, Defendants established procedures to conduct psychological assessments within the prisons and are approved to initiate specialized drug treatment at two prisons. Positive Behavioral Support Services are expanded and Defendants are using software along with revised discharge and admission forms to facilitate admissions and discharges to and from DMH operated ICF programs. Defendants are also reviewing inmate-patients for Extended Enhanced Outpatient Program Care (EECP) services at five institutions designated to provide these services. Additionally, Defendants completed two of their construction projects adding 116 new ICF beds and 32 new APP beds. An additional 64 ICF beds are scheduled for activation later this year. Moreover, Defendants are providing interim services to the inmate-patients on the waitlist such as increased Interdisciplinary Treatment Team appointments and daily clinician contacts. In sum, Defendants are making tremendous progress on reducing the waitlist and serving the inmate-patient population.

Still, Plaintiffs filed extensive objections to three of the five approaches identified by Defendants in their Plan to address the SVPP and APP waitlists and ask the Court to order that Defendants submit a new plan to provide enhanced interim services to inmate-patients on the SVPP waitlist. Plaintiffs also include multiple extraneous requests concerning custody criteria.

1

1  Plaintiffs erroneously allege that Defendants are relying on blanket exclusionary policies and

2  artificial barriers to continue an alleged practice of excluding inmate-patients on the SVPP

3  waitlist—inmate-patients who require placement in housing units with prison cells—from vacant

4  beds in dormitory settings at Atascadero State Hospital (ASH), Coalinga State Hospital (CSH), or

5  the dorms at the VPP at the California Medical Facility (CMF).  Additionally, Plaintiffs urge this

6  Court to order that Defendants accelerate their bed planning efforts and that DMH move CSH

7  clinical staff to outpatient mental health programs located in California Department of

8  Corrections and Rehabilitation (CDCR) prisons.

9       Defendants, in consultation with the *Coleman* Special Master and his experts, complied

10  with the Court's order and Plaintiffs' objections have no merit.  Additionally, because

11  Defendants' Plan better serves the treatment needs of inmate-patients on the SVPP waitlist,

12  Plaintiffs' request is unnecessary and premature.  Indeed, the Defendants should have the time to

13  fully implement the proposals and to determine whether the proposals have significantly impacted

14  the waitlist before the Court places an additional plan or additional requirements on Defendants.

15  Nonetheless, Defendants now respond to Plaintiffs' objections.  Defendants also provide

16  additional information about the EECP and ICF Pilot Program sections of their Plan.  Defendants

17  also ask the Court to deny Plaintiffs' extraneous requests as outside the scope of this proceeding,

18  unnecessary, and premature.  Plaintiffs presented no evidence to support their requests and the

19  Court should reject their efforts to utilize Defendants' Plan as a vehicle to obtain extraneous

20  relief.  Additionally, Defendants are not relying on blanket exclusionary policies and artificial

21  barriers to deny inmate-patients on the SVPP waitlist dormitory ICF beds—they are relying on

22  valid, security requirements consistent with inmate, staff, and public safety.  Regardless, Plaintiffs

23  cannot freely substitute their judgment for that of prison officials concerning prison safety, bed

24  planning efforts, or CSH staffing.

25  ///

26  ///

27  ///

28  ///

1    **DEFENDANTS' RESPONSES**

2    **I.    DEFENDANTS SUBMITTED A CONCRETE, SUSTAINABLE PLAN TO REDUCE OR ELIMINATE THE SVPP AND APP WAITLISTS AND, IN THE INTERIM, TO BETTER SERVE THE TREATMENT NEEDS OF THE INMATE-PATIENTS ON THE WAITLISTS.**

3

4    **A.    Defendants Complied With the Court's Order to Reduce or Eliminate the Waitlists and Plaintiffs' Objections Have No Merit.**

5

6    Defendants complied with the Court's order and submitted a comprehensive Plan that

7    contains five approaches to manage, reduce, or eliminate the SVPP and APP waitlists:  (1)  an

8    Extended Enhanced Outpatient Program Care Plan (EECP) to provide treatment interventions

9    targeted to a specific subgroup of inmates who frequently experience a cyclical pattern of

10   placement in SVPP ICF beds; (2) Utilization Management strategies to conduct reviews designed

11   to optimize inmate-patient care; (3) Extension and expansion of the ICF Pilot Program to

12   maximize use of the dormitory beds at ASH, CSH, and the VPP dorms; (4) Activation of the

13   SharePoint system that will allow CDCR and DMH to electronically share inmate-patient

14   information; and (5) construction of additional ICF and APP mental health care beds.  (Docket

15   No. 3962–1 at 5–24.)

16   Even though Defendants did not file their Plan until November 24, 2010, Defendants had

17   already begun implementing several of the approaches, such as conducting reviews of the SVPP

18   and APP waitlists designed to optimize inmate-patient care and implementing the ICF Pilot

19   Program.  (Docket No. 3962–1 at 11–19.)   A review of the current SVPP waitlist provides

20   evidence that Defendants have met the Court's order by managing and reducing the list.

21   Specifically, as of March 14, 2011, the SVPP waitlist *totaled 230* inmate-patients not including

22   Penal Code section 1370 inmate-patients.  (McGill Decl. ¶ 5.)  This number represents a 58%

23   reduction in the waitlist since March 16, 2010, when the SVPP waitlist totaled 542 inmate-

24   patients.  (Docket No. 3962–1 at 12.)  Additionally, of those 230 inmate-patients, only 29 inmate-

25   patients remain on the SVPP waitlist from the original 542 inmate-patients who were on the

26   waitlist on March 16, 2010.  (McGill Decl. ¶ 5.)   With respect to those 29 inmate-patients,

27   CDCR is seeking updates to their medical and mental health conditions for priority placement in

28   SVPP.  (*Id.*)

3

1     Additionally, Defendants have made substantial progress in implementing other pieces of

2     their Plan.  For instance, Defendants established procedures for conducting CDCR Psychological

3     Assessments and are providing outpatient assessments within CDCR.  (Vorous Decl. ¶ 2, Ex. 1,

4     Supplemental Psychological Assessment Plan.)  Providing psychological assessments and testing

5     on site at CDCR institutions is designed to, in part, reduce the wait times for those inmate-

6     patients on the SVPP waitlist that continue to require ICF level of care.  (*Id.*)  Similarly, San

7     Quentin State Prison and the Central California Women's Facility have been approved for

8     initiating Clozaril treatment and California State Prison, Sacramento and the California Medical

9     Facility 50-bed Mental Health Crisis Bed (MHCB) unit, are in the midst of obtaining approval.

10    (McGill Decl. ¶ 7.)  Clozaril is initiated as a psychiatric treatment for mental illness.  (*Id.*)  By

11    initiating Clozaril at four CDCR institutions, inmate-patients will be diverted from the SVPP

12    waitlist, opening up ICF bed for other inmate-patients.  (Docket No. 3962–1 at 10.)

13    DMH provided Positive Behavioral Support Services training at San Quentin State Prison,

14    and DMH and CDCR are continuing to identify additional institutions where DMH will provide

15    the training.  (McGill Decl. ¶ 8.)  By implementing Positive Behavioral Services, inmate-patients

16    who have been higher users of ICF programs, will not have to return to DMH.  (Docket No.

17    3962–1 at 11.)  Moreover, Defendants have completed training on SharePoint and new referrals

18    and discharges are placed onto the SharePoint site, which has streamlined both the referral and

19    discharge process by providing more comprehensive information to CDCR and DMH.  (Docket

20    No. 3962–1 at 20; McGill Decl. ¶ 6.)  Likewise, CDCR and DMH have further revised the

21    referral and discharge forms, and improved the continuity of care between CDCR and DMH

22    treatment teams and improved inmate-patient care.  (McGill Decl. ¶ 6.)  The new DMH referral

23    form allows referring clinicians to more clearly define the inmate-patient's current level of

24    functioning challenges and treatment needs.  (*Id.*)

25    Last, Defendants have developed the service model for the EECP, allocated staff for EECP

26    services, developed a new Interdisciplinary Treatment Team Screening checklist to include

27    possible screening for the EECP services, developed training materials and incentive and material

28    lists for EECP services, started  training on the EECP services, and have identified and reviewed

4

1    potential inmate-patients for EECP services.  (Vorous Decl. ¶ 3, Ex. 2 – Extended Outpatient

2    Program Care Plan; McGill Decl. ¶¶ 9, 11.)

3        Nonetheless, Plaintiffs inappropriately and without evidence criticize three of the

4    approaches that Defendants expect to implement to address the SVPP and APP waitlists, as

5    follows:  (1)  the EECP is not supported by sufficient staff and resources and should not be used

6    as a means to reduce the SVPP waitlist (Docket No. 3987 at 14:2–16:2); (2)  Defendants'

7    expansion of the ICF Pilot Project to include quarterly reviews of the SVPP waitlist is inadequate

8    to reduce or eliminate the SVPP waitlist (*id.* at 16:3–23); and (3) Defendants' use of the current

9    bed projects does not respond to the Court's order (*id.* at 17:21–18:5).[1]  But Plaintiffs cannot

10   dictate what means Defendants use to respond to the Court's order.  Additionally, the Court

11   should reject Plaintiffs' objections for the following reasons.

12       Plaintiffs provide no admissible evidence to support their assertions that the EECP is not

13   supported by sufficient staff and resources.  Conversely, Defendants' EECP Plan states that

14   CDCR has allocated staff for EECP treatment at CMF, Salinas Valley State Prison (SVSP), Mule

15   Creek State Prison, and California State Prison, Corcoran.  (Vorous Decl. ¶ 3, Ex. 2 at 2.)  Since

16   Defendants submitted the EECP Plan, CDCR has added California State Prison, Sacramento as an

17   institution that will provide EECP services.  (McGill Decl. ¶ 10.)  And Plaintiffs' efforts to

18   second-guess the professional judgment of clinicians concerning the clinical indicators for EECP

19   services and removal of inmate-patients from the SVPP waitlist, should be rejected.  Regardless,

20   the EECP contains safeguards to ensure that inmates-patients are not removed from the SVPP

21   waitlist absent clinical justification.   (Vorous Decl. ¶ 3, Ex. 2, at 5–7.)  Moreover, the inmate-

22   patients receiving EECP services will not be removed from the SVPP waitlist until they are

23   housed at a designated EECP institution.  (*Id.* at 6.)  Defendants are continuing to review the 68

24   inmate-patients that they identified as of November 24, 2010, as meeting the EECP clinical

25   indicators for transfer to an EECP institution, and rejected 20 inmate-patients because they did

26   not meet refined clinical indicators.  (McGill Decl. ¶ 11.)  In the meantime, Defendants have

27   _____
        [1] Plaintiffs' do not object to Defendants' Utilization Management Strategies or Activation
28   of SharePoint.  (Docket No. 3987 at 12 n.2.)

Case 2:90-cv-00520-KJM-SCR     Document 3994     Filed 03/18/11     Page 11 of 26

1    admitted 23 of the previously identified inmate-patients to ICF programs. (*Id.*) Defendants are

2    also reviewing the inmate-patients added to the SVPP waitlist since November 24, 2010. (*Id.*)

3         Plaintiffs' argument on the ICF Pilot Project only partially reflects how Defendants expect

4    to use it as an approach to manage and reduce the SVPP waitlist. Defendants' Plan concerning

5    the ICF Pilot Program involves two actions. First, CDCR Health Care Placement Oversight

6    Program (HC-POP) is working to extend the Pilot Program beyond the initial two-year pilot

7    period; that is, to convert the ICF Pilot Program modified custody criteria into permanent Title 15

8    California Code Regulations. (*See* Docket No. 3962–1 at 17.) The Pilot Program allows for

9    reviewing all ICF referrals based on revised custody factors and guidelines and evaluating on a

10   case-by-case basis select inmate-patients for possible referral to a low-custody dormitory bed at

11   ASH or the VPP dorms in lieu of the SVPP. (Vorous Decl. ¶ 4, Ex. 3.) This review has proved

12   very successful. During the first year of the Pilot Program—from November 2009 to November

13   2010—the Pilot resulted in a total of 201 acceptances at either ASH or the VPP dorms that would

14   have previously been excluded from ASH or VPP dorm placement consideration and referred to

15   SVPP. (Docket No. 3962–1 at 17–18.) The second action—the action that Plaintiffs focus on as

16   inadequate—is that HC-POP has extended the ICF Pilot Program to include quarterly reviews of

17   the inmate-patients on the SVPP waitlist. (*Id.* at 18.) But a quarterly review of the SVPP waitlist

18   dated January 11, 2011, resulted in eight inmate-patient acceptances at either ASH or the VPP

19   dorms. (Vorous Decl. ¶ 5, Ex. 4 at 3.)

20        CDCR and DMH have also completed the process that they will use on an ongoing basis to

21   review the inmate-patients currently housed in SVPP for potential placement at ASH or the VPP

22   dorms according to the ICF Pilot Program criteria. (*See* Docket No. 3989, Ex. D. at 76, noting

23   Defendants' December 7, 2010 report noting this process as not yet completed.) This plan

24   includes three parts: (1) review of cases scheduled for placement at SVPP within 30 days of

25   transfer; (2) quarterly review of SVPP's population; and (3) ongoing review for alternative ICF

26   program eligibility at the Initial, Annual, and Program Classification Committee Reviews.

27   (Vorous Decl. ¶ 5, Ex. 4.) While it is true that further review of inmate-patients on either the

28   SVPP waitlist or in the SVPP may yield small results, Defendants still *must* adhere to the

6

1    established ICF Pilot Program criteria and custody regulations in order to maintain the safety and

2    security of the inmates and staff at DMH facilities.  (*Id.*)

3        Last, Defendants' construction projects are a vital means to address the bed shortage and,

4    as represented by the C5/C6 Project at SVSP, <u>do</u> reduce the waitlists.  (Vorous Decl. ¶ 6, Ex. 5.)

5    Additionally, a further reduction in the SVPP waitlist will occur when the 64-bed ICF project at

6    CMF is activated later this year.  (Docket No. 3962–1 at 26–27.)  And based on the Navigant

7    Consulting Spring 2009 Population Projections for Fiscal Year 2013, Defendants' long-range bed

8    project at the California Health Care Facility (CHCF), which is expected to start admitting ICF

9    and APP inmates in March 2013, will eliminate the waitlists.  (Docket No. 3962–1 at 22–24.)  In

10   the meantime, Defendants have also fully activated their P-1 project for 32 more VPP beds at

11   CMF.  (Vorous Decl. ¶ 7, Ex. 6.)

12       Defendants took action *forthwith* to address the SVPP and APP waitlist.  Thus, Defendants'

13   Plan complies with this Court's order to reduce or eliminate the SVPP and APP waitlists, and the

14   Court should reject Plaintiffs' unsupported statements to the contrary.

15       **B.    Defendants Complied with this Court's Order to Better Serve the Treatment
               Needs of the Inmates on the Waitlists and Plaintiffs' Objections Have No Merit.**
16

17       Plaintiffs object that Defendants' Plan to better serve the treatment needs of the *Coleman*

18   class members placed on the SVPP waitlist is "insufficient and unresponsive to this Court's

19   order" because Defendants have "committed no additional staff or resources" to support those

20   treatment needs.  (Docket No. 3987 at 18:8–10.)  Plaintiffs ask this Court to order that

21   Defendants submit a plan to provide system-wide enhanced interim services to class members

22   who are on an inpatient waitlist and to implement that plan within sixty days.  (Docket No. 3988 ¶

23   9.)  The Court, however, should deny Plaintiffs' request because Defendants already have a

24   sufficient and responsive plan; thus, Plaintiffs' request is unnecessary.  Moreover, Plaintiffs'

25   request is premature.

26       Defendants have and are continuing to implement multiple approaches to better serve the

27   treatment needs of the inmate-patients on the SVPP waitlist pending construction of additional

28   ICF beds for inmate-patients requiring celled housing, e.g., EECP services, prospective,

7

1    concurrent, and retrospective review of the inmate-patients on the waitlists, improved

2    communication between CDCR and DMH to facilitate admissions and discharges to and from

3    DMH operated programs, extending and expanding the ICF Pilot Program, and providing interim

4    services to the inmate-patients beyond Enhanced  Outpatient Program (EOP) requirements such

5    as increased Interdisciplinary Treatment Team appointments and daily clinician contacts.

6    (Docket No. 3962–1 at 5–20, 24–26; Vorous Decl. ¶¶ 2–5, Exs. 1–4.)    Additionally, Defendants

7    are now putting in place a new interim process to treat inmate-patients on the SVPP waitlist who

8    can safely program at the four EECP institutions with existing EECP inmate-patients.   (McGill

9    Decl. ¶ 12.)  Defendants expect to complete this review by May 2011 and, at that time, expect to

10   be able to estimate how many inmate-patients pending ICF transfer can receive interim services at

11   an EECP institution.  (*Id.*)  High-risk inmates are also now being tracked with high-risk progress

12   notes documented weekly.   (Docket No. 3962–1 at 25.)  Moreover, for inmate-patients who need

13   crisis care, those inmates are being provided inpatient hospital care in MHCBs or Outpatient

14   Housing Units.  (*Id.*)  Of the 230 inmate-patients on the SVPP waitlist as of March 14, 2011, 38

15   inmate-patients were receiving crisis care in a MHCB and 20 in an APP bed.  (McGill Decl. ¶

16   11.)

17        Plaintiffs are also incorrect in stating that Defendants have not committed additional

18   resources and staff to their Plan.  For instance, Defendants' multiple Utilization Management

19   strategies, the ICF Pilot Program, SharePoint, and the bed planning efforts all by their very nature

20   involve substantial resources and staff.  Similarly, increased interactions designed to manage and

21   treat the inmates on the waitlist require staff support.  Additionally, CDCR has allocated

22   additional staff for EECP treatment and expanded the use of consultative services from the DMH

23   Positive Behavioral Unit at VPP.  CDCR HC-POP has also obtained a new permanent full-time

24   Correctional Counselor III designated solely to work on evaluating DMH referrals under the ICF

25   Pilot Program.  (Vorous Decl. ¶ 5, Ex. 4 at 1.)  With respect to the 30 male institutions providing

26   interim enhanced services to the individual inmate-patients on the waitlists, however, those

27   services are "consistent with available resources," as Plaintiffs note.  (Docket No. 3962–1 at 25;

28   Docket No. 3987 at 18:17–19.)  But the Court's order does not require that Defendants commit a

8

1  level of staff and resources that Plaintiffs believe appropriate; it requires that Defendants develop

2  a plan that, in the interim, better serves the treatment needs of the inmate-patients placed on the

3  SVPP waitlist.  Even so, the Constitution does not prescribe the precise mechanisms for satisfying

4  its mandate to provide access to adequate mental health care.  *Toussaint v. McCarthy*, 801 F.2d

5  1080, 1086–87 (9th Cir. 1986).   Defendants' Plan is adequate—it better serves the treatment

6  needs of the inmate-patients on the SVPP waitlist and a further plan is unnecessary.[2]

7      Moreover, an additional plan at this time is premature. Defendants have made significant

8  progress in both managing and reducing the waitlist, but still need additional time in order to

9  gauge the Plan's full effect.  (Docket No. 3962–1 at 26–27.)  Importantly, once the five

10  institutions begin treatment under the EECP (including interim treatment of ICF inmate-patients

11  not meeting EECP clinical indicators), the Utilization Management strategies fully take effect,

12  and the 64-bed ICF unit at CMF is activated, the number of inmate-patients currently on the

13  SVPP waitlist should reduce and the composition of the inmate-patients on that waitlist will

14  change; that is, the types of required housing units and levels of care.  For instance, because a

15  large number of EOP inmate-patients from prisons with established mental health programs may

16  transfer to EECP services, other opportunities for targeted interventions for non-EOP inmate-

17  patients may arise.   Additionally, any order for a further plan would take focus away from

18  implementing the current plan and would likely impact the success of that plan.  And taking

19  resources away from Defendants' current plan would likely negatively impact the mental health

20  care for *Coleman* class members.

21      The 2011-12 Governor's Budget proposed a major realignment of the State's public safety

22  programs to allow all levels of government to focus on becoming more efficient and

23  effective.  *See* http://www.ebudget.ca.gov/pdf/BudgetSummary/Realignment.pdf   and the February 25,

24  2011, changes to the realignment proposal http://www.dof.ca.gov/budget/historical/2011-

25  12/documents/Restructure_and_Realignment_new.pdf .  Both houses of the Legislature passed AB

---

26      [2] The fiscal crisis in California is severe and real, contrary to Plaintiffs' assertions.
27  ("California is projected to face a budget gap of $25.4 billion in 2011–12. . . .This year's revenues are $3.1 billion lower than were projected at the time of the 2010 Budget Act."  Budget Summary Introduction at 4.)  *See* http://www.ebudget.ca.gov/pdf/BudgetSummary/Introduction.pdf.

28

109 (The 2011 Realignment Legislation addressing public safety) on March 17, 2011; however, this legislation will only become operative upon the creation of a community corrections grant program to assist in implementing this act and upon an appropriation to fund the grant program. This legislation shifts the responsibility for housing a preponderance of parole violators and housing specified offenders, without current or prior serious violent or sex convictions, from CDCR to local jurisdictions. Upon implementation, this change in responsibilities could result in significant reductions in the number of mentally ill inmates confined at CDCR. This would then free up more mental health staff to provide certain levels of care. Thus, it would be premature for the Court to order any action regarding interim care on the waitlist at this time.

## II.    COMMENTS NOT ADDRESSED BY DEFENDANTS' PLAN.

Plaintiffs' response also includes multiple extraneous requests concerning custody criteria, accelerating construction projects, and DMH clinical staff. (Docket No. 3988 at ¶¶ 2–7, 10.) The Court should reject Plaintiffs' extraneous requests because they reach beyond the scope of this proceeding. Plaintiffs have presented no evidence to support their requests and their efforts to use Defendants' filing of their Plan as a vehicle to obtain the requests should be denied. This Court should also reject the requests for the reasons set forth below.[3]

### A.    The Court Should Reject Plaintiffs' Requests to Ignore the Custody Factors as Unsafe; and Plaintiffs' Additional Request to Convert the DMH Hospitals into Prisons is not Feasible.

Plaintiffs argue that Defendants are applying blanket exclusionary criteria and artificial barriers to exclude inmate-patients on the SVPP waitlist from over 100 open beds at ASH, CSH, and the VPP dorms. (Docket No. 3987 at 23:17–24.) But Plaintiffs confuse the idea that there are "*open* ICF beds designated for *Coleman* class members requiring an ICF level of care," with the notion that those dorm beds are appropriate beds for the inmates-patients on the SVPP

_____

[3] Plaintiffs further object that Defendants have "created a blanket exclusion for *all* ICF inpatient care for condemned prisoners at San Quentin State Prison." (Docket No. 3987 at 20 n.6.) Because this issue is not part of Defendants' Plan and Plaintiffs are not requesting any Court orders associated with their objection, Defendants are not providing a response at this time. Nonetheless, the evidence that Plaintiffs rely on to raise their objection is inadmissible hearsay concerning communications made by state officials and offered for the truth of the matter asserted. Fed. R. Evid. 801, 802.

1  waitlist—inmates requiring celled housing.  (Docket No. 3987 at 19:26–27.)  They are not.  Even

2  the May 2, 2006 order that Plaintiffs cite for this proposition, states that the inpatient beds at ASH

3  and CSH shall be made available for "appropriate CDCR inmates" not all the ICF inmates.

4  (Docket No. 1800 ¶¶ 7–11.)  As discussed below, Defendants rely on a fully developed

5  program—the ICF Pilot Program—to determine which inmate-patients are appropriate for a

6  dormitory setting at ASH, CSH, or the VPP dorms.  (Vorous Decl. ¶ 4, Ex. 3.)

7      Nonetheless, Plaintiffs attempt to side step this reality and argue instead that the custody

8  factors should not apply so that the violent inmate-patients on the SVPP waitlist who require

9  placement in celled housing can be admitted into the dormitory settings at ASH, CSH, and the

10  VPP dorms.  Specifically, Plaintiffs ask that the Court issue the following three orders:  (1) The

11  Special Master shall appoint an independent expert to conduct a "comprehensive, objective

12  review of the exclusionary criteria for DMH admission into lower-custody inpatient facilities"

13  (Docket No. 3988 ¶ 2);  (2) Defendants shall "achieve a 90% bed utilization of all inpatient

14  facilities—including CMF APP units, CMF ICF units, the 256–bed ICF unit at Atascadero State

15  Hospital, and the 50-bed ICF unit at Coalinga State Hospital—and shall maintain that minimum

16  bed utilization rate at all inpatient facilities until the inpatient waitlists reach zero" (*Id.* ¶ 4); and

17  (3) "Defendants shall not exclude from any DMH ICF facility those *Coleman* class members who

18  have been referred for ICF level of care and have a scheduled parole date within one year" (*Id.* ¶

19  5).   Additionally, Plaintiffs ask the Court to order that "Defendants shall create and submit a plan

20  for DMH facilities providing ICF care to implement necessary security measures—including

21  staffing, resources, and physical plant modification—to house and treatment *Coleman* class

22  members referred for inpatient care" (*Id.* ¶ 3).[4]

23      Plaintiffs raise three arguments in support of their position that the custody factors must be

24  ignored.  First, Plaintiffs argue that Defendants lack the ability to "conduct an adequate review of

25      [4] Because this Court previously ordered that "[a]ll inmates . . . SHALL have full access to
DMH inpatient treatment irrespective of their release date," and Plaintiffs present no evidence
26  that DMH is denying inpatient services to inmate-patients within one year of their parole date,
Defendants assume that Plaintiffs are seeking an exception for inmate-patients on the SVPP
27  waitlist who are within one year of their parole date and who otherwise would not be eligible for
ASH, CSH or the VPP dorms.  (*See* Docket No. 2930 at 5:11–13.)

28

1  exclusionary criteria for admission into lower-custody inpatient facilities" and thus are using

2  artificial barriers to exclude inmates from those beds.  (Docket No. 3987 at 23:17–24; Docket No.

3  3988 ¶ 3.)  Plaintiffs are incorrect.

4         Defendants have conducted an adequate review of exclusionary criteria as evidenced by the

5  success of the ICF Pilot Program.  (Docket No. 3962–1 at 17.)  The Court must grant Defendants

6  wide deference in matters of security.  "Prison administrators . . . should be according wide-

7  ranging deference in the adoption and execution of policies and practices that in their judgment

8  are needed to preserve internal order and discipline and to maintain institutional security."  *Bell v.*

9  *Wolfish*, 441 U.S. 520, 547 (1979).  This discretion applies not only to prison security measures

10 taken in response to an actual confrontation with inmates, but also to "prophylactic or preventive

11 measures intended to reduce the incidences of these or any other breaches of prison discipline."

12 *Whitley v. Albers*, 475 U.S. 312, 322 (1986).  This deference requires "that neither judge nor jury

13 freely substitute their judgment for that of officials who have made a considered choice."  *Id.*

14         The process that Defendants follow to review an inmate-patient's eligibility for admission

15 to ASH or the VPP dorms establishes that state officials have made a considered choice in matters

16 of security (that is, in developing the ICF Pilot Program), and are not constructing "artificial

17 barriers" to keep inmate-patients out of open beds at ASH or the VPP dorms.  In order to

18 understand how prison officials apply the ICF Pilot Process, an understanding of the current

19 regulatory process is helpful.  This process includes application of the regulations that govern

20 facility security levels and inmate placement and inmate custody designations, as follows:

21     **Facility Security Levels and Inmate Placement:**

22         Each CDCR prison is designated at a security level based on its physical security and

23 housing capabilities.  The security levels are:

24     LEVEL I:       Open dormitories with a low security perimeter.

25     LEVEL II:      Open dormitories with a secure perimeter, which may include armed
               coverage.
26

27     LEVEL III:     Secure perimeter with armed coverage and housing units with cells
               adjacent to exterior walls.

28

Defs.' Resp. to Pls.' Obj. to Defs.' Plan Re: ICF and Acute Inpatient Waitlists (2:90-cv-00520 LKK JFM P)

LEVEL IV:     Secure perimeter with internal and external armed coverage and housing units with cells adjacent to exterior walls or cell block housing with cells non-adjacent to exterior walls.

Cal. Code Regs. tit. 15, § 3377.

SVSP and CMF are Level III/IV Facilities— they have a secure perimeter with armed coverage and housing units with cells.  ASH and CSH, based on the above custody criteria, are similar to a Level II facility—they do not have internal armed coverage or housing units with cells.  (Docket No. 3592–2 (CSH Feasibility Study); Docket No. 3760 at 5:16–6:2; Vorous Decl. ¶ 4, Ex. 3 (ICF Pilot Program).)

Each inmate-patient is then assigned to a facility with a security level that corresponds to the following placement score ranges:

LEVEL I:       0-18 points

LEVEL II:      19-27 points

LEVEL III:     28-51 points

LEVEL IV:      52 points or more

Cal. Code Regs. tit. 15, § 3375.1.

Inmate placement scores are based on individual assessments of certain enumerated case factors as well as both favorable and unfavorable behavior in accordance with classification regulations.  Cal. Code Regs. tit. 15, § 3375.3.  In determining an inmate's score, background factors are first assessed including the inmate's length of term and whether the inmate has been validated as a member of a gang or disruptive group.  (*Id.*)  Favorable and unfavorable points are subsequently added to the preliminary score based primarily on the inmate's behavior in custody. (*Id.*)  Unfavorable points must be added to the inmate's score for certain violent and disciplinary behavior, e.g., battery or attempted battery on a non prisoner; manufacture or possession of a deadly weapon; deliberate and willful behavior that might lead to violence or disorder; and battery causing serious injury. Cal. Code Regs. tit. 15, §§ 3375.3(b)(4)(D), (F), (G), and (H).

The calculations of these scores under the regulations evince the direct correlation between inmate-patients with high placement scores and their associated serious safety and security concerns.  This correlation further demonstrates that the placement of these inmate-patients into

13

institutions with higher level security requirements are not based on arbitrary decisions, but rather

carefully calculated assessments taking into consideration the likelihood of inmates committing

future violent or disruptive acts.

**Inmate Custody Designations:**

Additionally, Inmate Custody Designations establish where an inmate shall be housed and

assigned:

| | |
|---|---|
| Maximum Custody: | Housing shall be in cells in an Administrative Segregation Unit. |
| Close A Custody: | Housing shall be in cells within Level III and Level IV facilities in housing units located within an established facility security perimeter. |
| Close B Custody: | Housing shall be in cells within designated institutions in housing units located within an established facility security perimeter. |
| Medium A Custody: | Housing shall be in cells or dormitories within the facility security perimeter. |
| Medium B Custody: | Housing shall be in cells or dormitories within the facility security perimeter. |
| Minimum A Custody: | Housing shall be in cells or dormitories within the facility security perimeter. |
| Minimum B Custody: | Housing may be in cells or dormitories on facility grounds, in a camp, in a Minimum Support Facility or in a community based facility such as a Community Correctional Facility. |
| "R" Suffix: | An "R" Suffix shall be affixed to an inmate's custody designation to ensure the safety of inmates, correctional personnel, and the general public by identifying those inmates who have a history of specific sex offenses as outlined in Penal Code Section 290. |
| "S" Suffix: | An "S" Suffix shall be affixed to an inmate's custody designation to alert staff of an inmate's need for single cell housing. |

Cal. Code Regs. tit. 15, § 3377.1.

Thus, an inmate-patient's classification score and/or custody designations will dictate, in

the first instance, whether an inmate-patient requires placement in a housing unit with cells.

Consequently, sending inmates who have been assessed to require higher levels of security, based

on histories of violent or disruptive behavior, to ASH, CSH, or the VPP dorms will endanger the

staff and other patients in the programs.

14

**ICF Pilot Program:**

If, based on the above, an inmate-patient requires celled housing, prison officials look to the ICF Pilot Program.  (Vorous Decl. ¶ 4, Ex. 3.)  The ICF Pilot Program amends, in part, California Code of Regulations, Title 15, sections 3377 and 3377.1 by allowing CDCR HC-POP to determine, on a case-by-case evaluation, whether certain categories of inmate-patients who, because of their custody factors, would not be appropriate for placement in the dormitory settings at ASH or VPP.  (*Id.*)  Specifically, with respect to ASH and the VPP dorms, the ICF Pilot Program now allows for a case-by-case evaluation of CDCR inmates with the following facility security levels and/or custody designations:

Atascadero State Hospital

- Maximum custody (based on non-disciplinary reasons)
- Committed SHU-able offense(s) per CCR, Title 15, section 3341.5(9), provided that
- the SHU Minimum Eligible Release Date has been expired for 12 to 18 months
- (depending on offense)
- Level IV placement scores
- Sensitive Needs Yard or safety concerns
- Close B custody

CMF-ICF Dorms

- Maximum custody (based on non-disciplinary reasons)
- Committed SHU-able offense(s) per CCR, Title 15, section 3341.5(9), provided that the SHU Minimum Eligible Release Date has been expired for 12 months
- Level IV placement scores
- Sensitive Needs Yard or safety concerns
- Close A custody

(Vorous Decl. ¶ 4, Ex. 3 at 9–10.)

The ICF Pilot Program, however, grants correctional officials, through the prison's Institutional Classification Committee process, the discretion to decline HC-POP's recommendation to refer a particular inmate based on safety concerns and the need for celled

15

1   housing unique to that inmate-patient. (Vorous Decl. ¶ 4, Ex. 3 at 9.) Nonetheless, the ICF Pilot

2   Program has proved successful in reducing the SVPP waitlist for those inmate-patients who

3   require celled housing and need an ICF level of care and Plaintiffs present no evidence to show

4   that it has not been applied in an appropriate fashion. Custody factors are not "artificial barriers"

5   as Plaintiffs characterize them and this Court should reject their urging to the contrary.

6       Second, Plaintiffs argue that Defendants must further ignore the custody factors in order to

7   meet their Constitutional obligations to the inmate-patients on the SVPP waitlist and it is

8   unconscionable to not place those inmate-patients into the open beds at ASH, CSH, and the VPP

9   dorms. (Docket No. 3987 at 22:4–19.) But this Court cannot disregard safety, as Plaintiffs

10   suggest. Safety is such an important consideration when crafting injunctive relief that Congress

11   specifically wrote it into the Prison Litigation Reform Act: "The court shall give substantial

12   weight to any adverse impact on public safety or the operation of a criminal justice system caused

13   by the relief." 18 U.S.C. § 3626(a)(1)(A). Custody factors are the embodiment of the prison

14   system's safety concerns; they are written specifically to protect inmates, staff, and the public

15   from dangerous individuals, regardless of their mental health needs. The fact remains that the

16   reason these inmate-patients have been placed on the SVPP waitlist is that they are too dangerous

17   or violent for dorms. And all that ASH, CSH, and the VPP dorms have, are dorms.

18       As the California Supreme Court explained in *In re Cathey*, 55 Cal. 2d 679, 693 (1961),

19   an individual whose "institutional record shows that he should be subject to maximum security

20   confinement" has no right to be in ASH:

21       He has no right to be confined under circumstances which will give him the
         opportunity to kill or maim his custodians, his fellow inmates or himself, or to
22       destroy the property of the institution where he is detained. He does have a right
         to care and treatment, within the limits permitted by the nature of the security risk
23       which he presents, looking toward his restoration to sanity so that he can be tried
         on the pending criminal charges.
24
25   *Id.* at 694.

26       When the California Legislature passed the precursor statute to Section 7301 of the

27   Welfare and Institutions Code to allow DMH to refer dangerous patients back to CDCR because

28   they cannot be safely housed in DMH, it noted the urgency of the need:

16

Some of these individuals now confined are extremely dangerous and require confinement in secure facilities for their own protection and for the protection of the public. *The state hospitals are not provided with adequate security features for such individuals and it is necessary that they be confined in facilities of the Department of Corrections.* In order to permit such confinement at the earliest possible time, it is necessary that this act take effect immediately.

*Cathey,* 55 Cal. 2d at 692, n. 8 (emphasis added).

The same dangers that concerned the Legislature when it passed the statute exist today. There are still dangerous inmate-patients who must be placed in celled housing while receiving ICF treatment. That housing does not exist in DMH, neither at ASH or CSH, nor at the VPP dorms. Asking the Court to order that these inmate-patients be moved into a dorm setting threatens the safety of not only DMH clinicians and staff but also the safety and welfare of the inmate-patients themselves, who will be vulnerable to the violent acts of their fellow patients in the dorm.

Plaintiffs' argument that these custody barriers are artificial because DMH admits patients who are violent into ASH or CSH—patients who are incompetent to stand trial, are not guilty by reason of insanity, or are mentally disordered—is incorrect. (Docket No. 3987 at 24:4–11.) While DMH does take these patients, if they become violent, the patients are transferred out of DMH care. Section 7301 of the Welfare and Institutions Code allows DMH to transfer these patients to a state prison when the person "needs care and treatment under conditions of custodial security which can be better provided within the Department of Corrections." Cal. Wel. & Inst. Code § 7301 (2010). The sexually violent predators (SVP) have a history of sex crimes such as rape and sexual assault. *See* Cal. Wel. & Inst. Code § 6600(b). The designation as a "SVP" does not necessarily mean that this population is *currently* violent. On the other hand, the inmate-patients on the SVPP waitlist have been determined to require celled housing due to required security levels and/or custody designations. DMH hospitals are not equipped to handle violent patients. Conversely, prisons do have celled housing that can handle violent inmates in a safe and secure setting. Thus, declining to take violent inmate-patients into a Level II facility with dormitory style housing does not equate to constructing artificial barriers—it equates to housing violent inmate-patients in prison facilities that have celled housing and are equipped to handle

17

1   violent inmates in a safe and secure setting.

2        Third, Plaintiffs argue that Defendants should not exclude from ASH, CSH, or the VPP

3   dorms any inmate-patient that has a scheduled parole date within one year because the inmate-

4   patients may parole without receiving any treatment at all.  (Docket No. 3988 ¶ 5, Docket No.

5   3987 at 24:12–21.)  This justification is problematic for the same reasons as above—depending

6   on custody classifications, many of these inmate-patients require placement in celled housing in a

7   prison environment.  The same state laws and safety concerns apply regardless of an inmate-

8   patient's parole date and there is no basis to treat this class of inmate-patients differently than the

9   remaining inmate-patients on the SVPP waitlist.

10       In addition to requesting that the Court ignore the established custody factors, Plaintiffs also

11  ask the Court to essentially convert the DMH hospitals into prisons "to house and treat *Coleman*

12  class members referred for inpatient care."  (Docket No. 3988 ¶ 3.)  DMH, at this Court's request,

13  previously determined that it was not feasible to physically modify CSH in order to convert the

14  dormitory beds at CSH into a facility that could accommodate Level IV high custody inmate-

15  patients on the single-cell ICF waitlist.  (Docket No. 3592–2.)  ASH, like CSH, does not have the

16  safety components of a Level IV facility and only has dormitory beds.  (Docket No. 3760 at 5:16–

17  6:2; Vorous Decl. at ¶ 4, Ex. 3 at 7.)  Celled housing in a prison setting is different from a dorm

18  or even a single room in a DMH hospital.  (Docket No. 3592–2.)  For example, cell walls in a

19  Level IV facility have high construction requirements, requiring more steel reinforcement.  (*Id.*)

20  Also, single cells in a Level IV facility also have toilets inside them, requiring an extensive

21  retrofit of the current dorm rooms.  (*Id.*)  Thus, converting CSH and/or ASH into a prison setting

22  that could provide Level III/IV security and celled housing is not feasible.  Moreover, it is not a

23  practical solution to providing interim care to the inmate-patients on the SVPP waitlist for the

24  very reason that this request is not a short-term solution and Defendants' bed planning efforts

25  provide for 432 ICF beds at the CHCF in 2013.

26       Additionally, what Plaintiffs propose—transferring inmate-patients with cell custody

27  restrictions into a dorm setting—contradicts the purpose of state hospitals and would require

28  changing the entire DMH mission to provide treatment in a completely different environment.

1    No longer would state hospital dorms be filled with patients and clinicians, but instead with

2    correctional officers.  This absurd result would unnecessarily burden CDCR staffing and clog

3    DMH hospital wards with correctional officers.

4        The Court should therefore deny Plaintiffs' requests because they impinge on prison

5    security measures.

6    **B.    Ordering Defendants to Submit a Plan to Expedite Construction of the  Court**

7    **       Ordered Projects for ICF Beds is Unnecessary.**

8        Plaintiffs ask the Court to order that Defendants submit a plan to accelerate construction of

9    the pending 64-bed ICF project at CMF and the 432 ICF beds that are part of the CHCF project.

10   (Docket No. 3987 at 26:9–14; Docket No. 3988 ¶¶ 9–10.)  Since this Court has already ordered

11   that Defendants expedite the court-ordered long-range construction projects to the *extent* they can,

12   any further orders are unnecessary.  (Docket No. 3613 ¶ 1.)  Regardless, Defendants have already

13   taken substantial steps to expedite construction of the 64-bed ICF project at CMF; that is,

14   Defendants accelerated the end construction date by over ten months, from August 2, 2012, to

15   September 26, 2011.  (Docket No. 3591 at 28; Docket No. 3845–1 at 13.)  Similarly, Defendants

16   obtained legislative authority to use the "design-build" procurement process in contracting and

17   procuring a state contract for the CHCF project, and have been able to accelerate the end

18   construction date by nine months, from December 4, 2013, to March 8, 2013.  (Docket No. 3724–

19   2 at 15; Docket No. 3794–1 at 3.)  This Court should therefore reject Plaintiffs' efforts to replace

20   their lay opinion for the professional opinions of the *Plata v. Brown* Receiver, and CDCR

21   facilities and program employees on whether any additional accelerations are appropriate or even

22   possible.

23   **C.    This Court Should not Accelerate Admissions into the 64-bed ICF Unit at**
     **       California Medical Facility.**

24       Plaintiffs ask this Court to order that upon activation of the 64-bed ICF project at CMF, that

25   Defendants increase admissions from the rate of 6 per week to 12 per week.  (Docket No. 3988 at

26   ¶ 7; Docket No. 3987 at 26:14–16.)  This Court should deny Plaintiffs' request because it is

27   outside the scope of this proceeding, and Plaintiffs' efforts to use Defendants' filing of their Plan

28

19

1   as a means to amend a Court-approved project absent following the proper motion procedure is

2   improper.  Defendants submitted their activation schedule, including staffing, based on the Court-

3   approved schedule that assumed admissions at the rate of six inmate-patients per week.  (*See*

4   Docket No. 3613 ¶ 1.)  Plaintiffs cannot replace their lay opinion for the professional opinion of

5   program employees on the appropriate admission rate.  Additionally, Plaintiffs present no

6   evidence whatsoever to demonstrate that they are entitled to injunctive relief under the Prison

7   Litigation Reform Act (18 U.S.C. § 3626(a)(1).  Thus, the same reasons Defendants raised in the

8   context of this Court's prior order to double admissions to the C5/C6 project at SVSP, which is

9   currently on appeal and scheduled for oral argument before the Ninth Circuit Court of Appeals on

10  April 12, 2011, apply here.  For these reasons, the Court should reject Plaintiffs' extraneous

11  request to increase admissions to the CMF project.

12      **D.    Coalinga State Hospital Staff are not "Designated" *Coleman* Staff.**

13      Plaintiffs ask this Court to order that Defendants "ensure that staff and resources designated

14  to provide ICF level of care to *Coleman* class members at Coalinga State Hospital, are used to

15  provide services to *Coleman* class members referred for inpatient care, whether delivered at

16  Coalinga State Hospital or at the CDCR facilities housing mentally ill prisoners on the inpatient

17  list."  (Docket No. 3988 at ¶ 10.)  Once again, Plaintiffs confuse the requirement to make 50 beds

18  available at CSH with the notion that there are designated *Coleman* resources and staff.  There are

19  not.  As previously reported to this Court and at the evidentiary hearing on October 4, 2010, the

20  California Legislature allocates DMH a certain number of "established" positions to run CSH—it

21  does not create a certain number of "established" position to provide care for the *Coleman* class

22  members.  (Docket No. 3913 at 12:25–13:6; Docket No. 3939 at 56:15–60:20.)  Thus, should

23  there be a need for inpatient care in the 50-beds at CSH, staff and resources exist to provide that

24  care.  Demanding that clinical staff move from CSH to a CDCR prison in another part of the state

25  to care for inmate-patients housed in other mental health care programs is not only unrealistic it

26  could likely subject DMH to legal action.  (*Id.*)

27

28

20

1

**CONCLUSION**

2        For the foregoing reasons, Defendants respectfully request that the Court disregard

3  Plaintiffs' objections and deny their extraneous requests for additional Court orders.

4  Dated:  March 18, 2011                   Respectfully Submitted,

5                                KAMALA D. HARRIS
                                Attorney General of California

6

7                                */s/ Debbie J. Vorous*

8                                DEBBIE J. VOROUS
                                Deputy Attorney General
                                *Attorneys for Defendants*

9  CF1997CS0003
  31223518.doc

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Resp. to Pls.' Obj. to Defs.' Plan Re: ICF and Acute Inpatient Waitlists (2:90-cv-00520 LKK JFM P)