**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.**

**Plaintiffs,**

**vs.**                                           **No. CIV S-90-0520 LKK JFM P**

**EDMUND G. BROWN, JR., et al.**

**SPECIAL MASTER'S REPORT ON HIS**
**EXPERT'S REPORT ON SUICIDES COMPLETED IN THE CALIFORNIA**
**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**IN CALENDARS YEAR 2008 AND 2009**

Attached is the Coleman Special Master's Expert's Report on Completed Suicides in the California Department of Corrections and Rehabilitation ("CDCR" or "Department"), for calendar years 2008 and 2009 (2008/2009 Suicide Report). The Report is submitted as part of the Special Mastership's continuing review of the Defendants' compliance with court-ordered remediation in the matter of *Coleman v. Schwarzenegger*, No. CIV S-90-0520 LKK JFM P (E.D. Cal.). The analyses, findings, and conclusions in the 2008/2009 Suicide Report are the work of Raymond F. Patterson, M.D., with the assistance of various members of my staff. Dr. Patterson is a nationally recognized expert on suicides in the correctional setting who has written the *Coleman* annual suicide reports over the past decade.

The 2008/2009 Suicide Report differs to some extent in content and format from previous annual suicide reports because of certain developments in the area of suicide prevention which took place during 2009-2010. On December 24, 2009, I filed my Report and Recommendations on my Expert's Report on Suicides Completed in the

1

California Department of Corrections and Rehabilitation in Calendar Year 2007. The Defendants then filed objections to my recommendations.

In view of the preceding decade of annual suicide reports indicating numerous ongoing concerns with suicide prevention and response within CDCR institutions, the *Coleman* court ordered on April 14, 2010 that Defendants, under my guidance, review all existing suicide prevention policies and practices, all suicide review and reporting processes, and the implementation of such policies, practices, and procedures over the ensuing 120 days. The process involved several meetings and teleconferences with the Defendants and selected members of my team, beginning on May 18, 2010 and concluding on August 25, 2010.

On August 14, 2010, Defendants produced their timely "Report on Activities Taken Following the Court's April 14, 2010 Order" and then submitted an amended report on August 25, 2010 (Defendants' Amended Report). Defendants' report was then shared with Plaintiffs' counsel. On September 8, 2010, Plaintiffs provided me with a letter summarizing their position on Defendants' report. On September 22, 2010, Defendants submitted to me their written reply to the Plaintiffs' letter.

Given the Defendants' concentrated activity through much of 2010 to improve their performance in the area of suicide prevention, I recommended a deviation from the usual full annual suicide report with detailed expert reviews of each suicide case. I asked the parties to suggest a summarized and streamlined format for my expert's annual suicide report for the years 2008 and 2009. The Plaintiffs requested in their letter of September 8, 2010, and the Defendants agreed in their letter of September 22, 2010, to

the following components of my expert's suicide report for calendar years 2008 and

2009:

1. Statistical summaries of suicides for the years 1998 through 2009;

2. Chart 1[1], which lists suicides by CDCR or DMH facility;

3. Chart 2, which describes housing, "R"-suffix, method, history of suicidal
   behavior, history of mental health treatment, Keyhea orders, severe or life-
   threatening illness, presence on the mental health caseload at time of death,
   demographics, and significant indications of inadequate treatment;

4. Findings which specify whether the Defendants complied with the timelines of
   their own suicide review and reporting process, and the percentage of suicides
   that were foreseeable and/or preventable;

5. Table 1, with all elements; and

6. Table 2, with all elements.

I concurred with the parties' proposed format and stated that my expert's report

on suicides in CDCR for calendar years 2008 and 2009 would be prepared as described

above.  Docket No. 3918, Special Master's Report, filed September 27, 2010, at 31-31.

That is the format of the 2008/2009 Suicide Report, which is filed simultaneously with

this Report.

I also included in my Report of September 27, 2010 a number of

recommendations for orders.  Defendants objected to only one of the recommendations,

which called for them to submit a plan to furnish suicide-resistant beds in mental health

crisis bed units within CDCR institutions.  On November 17, 2010, the *Coleman* court

adopted my recommendations to which no objections had been made, and stated that it

---

[1] The charts and tables refer to the charts and tables that have appeared in the Special Master's expert's
annual suicide reports to date.

would address the recommendation regarding a plan for suicide-resistant beds in a subsequent order.

On April 12, 2011, my expert's 2009/2009 Suicide Report was distributed in draft form to the parties. In response, Plaintiffs requested that I recommend an order by the *Coleman* court requiring the following:

> Defendants shall implement within their "High-risk" protocol, a procedure for all patients identified as "high risk", who shall not be discharged from an MHCB and/or DMH unit to an ASU environment until the discharge treatment team determines that the inmate is clinically stable and is unlikely to decompensate in the ASU based upon the patient's clinical history and the environment and quality of mental health care in the ASU.

Plaintiffs' letter dated May 11, 2011, p.9.

The concern embodied in Plaintiffs' request is that there be an adequate level of continued care of MHCB and DMH patients who have an elevated risk of suicide and are facing discharge to an administrative segregation unit. The "High-risk" protocol referenced in their request is one of the Defendants' three general suicide prevention strategies which they proposed in their Amended August 25, 2010 Report on Activities Taken Following the Court's April 14, 2011 Order. The impetus for this particular strategy was the apparent need for improved suicide risk assessments of those inmates who display symptoms of serious mental illness of past suicidal behavior, ideation, or statements. Defendants proposed a High Risk Inmate-Patient Management program which amounts to a strategy to identify, track, and treat inmate-patients at elevated risk of suicide. These inmate-patients include those "who display signs of psychiatric decompensation, unstable medical conditions, grave disability, self-injurious behavior, danger to others, frequent DMH or MHCB admission, or who have housing/custody concerns. Those who engage in suicidal behaviors such as suicidal ideation, or who

attempt suicide, fall into the general category of inmates who are at high risk."
Defendants' Amended Report, p. 20.

The Defendants' strategy specifically acknowledges and addresses, among other things, the concentration of high-risk inmates who have had frequent MHCB or DMH admissions and the special needs of these patients. Such patients will be identified and placed on a list. That list will then be divided into two categories: one for chronically mentally ill EOP inmates who have multiple MHCB or DMH admissions and the other for inmates who suffer from chronic suicidal ideation or self-injurious behavior and who have revolving MHCB or DMH admissions. A high-risk management program will then be developed and piloted at the institutions where most of these repeat MHCB or DMH admissions occur. The identified inmates (as well as any other inmates deemed high risk and referred by any clinician) will then be referred to the high-risk program, where their files will be reviewed with a focus on risk of suicidality. The inmate will then be assigned to the high-risk program, where a detailed individualized management protocol will be developed for the individual inmate, or if appropriate he or she will be assessed for referral to a higher level of care. Defendants' Amended Report, p. 20-21.

As part of the protocol, when a high-risk inmate moves into administrative segregation, the high-risk management team or coordinator will communicate with appropriate clinicians in administrative segregation about the arrival of this inmate. Supervisory staff will be notified and provided with a copy of the protocol to ensure continuity of care and to promote reduction of the inmate's risk for suicidality. Defendants' Amended Report, p. 21-22.

Plaintiffs' concern for the care of inmates who are entering administrative segregation after discharge from an MHCB or a DMH unit is undoubtedly valid and important in the area of suicide prevention. The historical pattern of higher rates of suicide in segregated units, and the suicide risk factor of segregation itself, are well known and will continue to be subjects worthy of further discussion and work. However, Defendants appear to have already confronted this concern within their strategy for a high risk inmate-patient management program. In my September 27, 2010 Report on Defendants Review of Suicide Prevention Policies, Practices, and Procedures, I recommended that the Defendants' High Risk Inmate-Patient Program, along with their other proposals, be implemented at least on a trial basis. The *Coleman* court adopted that recommendation in its Order of November 17, 2010.

The changes resulting from the suicide prevention and review project in 2010 have only recently been ordered, and Defendants are still in the process of implementing those changes. It is important for them to be allowed to take root and to be monitored and evaluated for their efficacy. It is now time for the Defendants to proceed with creating, implementing, and refining their strategies, including the one for managing inmate-patients at high risk of suicide. Defendants' time and resources should be allocated toward achievement of that goal. There does not appear to be a present need for a further order of the court as requested by Plaintiffs. Accordingly, apart from my existing recommendation with regard to a plan to furnish suicide-resistant beds, I do not recommend any further orders with respect to suicide prevention and review at this time, and will not request that the *Coleman* court order Defendants to implement the measures recommended by the Plaintiffs.

Respectfully submitted,

/s/

_____

Matthew A. Lopes, Jr., Esq.
Special Master

May 16, 2011