**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**

    **Plaintiffs,**

      **v.**                       **No. CIV S-90-0520 LKK JFM P**

**EDMUND G. BROWN, JR., et al.,**

    **Defendants**


**SPECIAL MASTER'S REPORT ON DEFENDANTS' PLAN RE:
INTERMEDIATE CARE FACILITY AND ACUTE INPATIENT WAIT LISTS**


Matthew A. Lopes, Jr., Esq.
Special Master
Pannone Lopes Devereaux & West LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
(401) 824-5100
Fax: (401) 824-5123
June 13, 2011

## TABLE OF ABBREVIATIONS/ACRONYMS

| | |
|---|---|
| 3CMS: | Correctional Clinical Case Management System |
| APP: | Acute Psychiatric Program |
| ASH: | Atascadero State Hospital |
| ASP: | Avenal State Prison |
| C-file: | Central File |
| CC: | Correctional Counselor |
| CCAT: | Coordinated Clinical Assessment Team |
| CCI: | California Correctional Institution |
| CCWF: | Central California Women's Facility |
| CDCR: | California Department of Corrections and Rehabilitation |
| CHCF: | California Health Care Facility |
| CIM: | California Institution for Men |
| CIW: | California Institution for Women |
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CRC: | California Rehabilitation Center |
| CSATF: | California Substance Abuse Treatment Facility |
| CSH: | Coalinga State Hospital |
| CSP/Corcoran: | California State Prison, Corcoran |
| CSP/LAC: | California State Prison, Los Angeles County |
| CSP/Sac: | California State Prison, Sacramento |

CSP/Solano:          California State Prison, Solano

CTF:                 Correctional Training Facility/Soledad

CVSP:                Chuckawalla Valley State Prison

DAI:                 Division of Adult Institutions

DCHCS:               Division of Correctional Health Care Services

DMH:                 Department of Mental Health

DON:                 Director of Nursing

DTP:                 Day Treatment Program

DVI:                 Deuel Vocational Institution

EECP:                Extended Enhanced Outpatient Program Care Plan

EOP:                 Enhanced Outpatient Program

Folsom:              Folsom State Prison

GACH:                General Acute Care Hospital

GP:                  General Population

HC-POP:              Health Care Placement Oversight Program

HDSP:                High Desert State Prison

ICF:                 Intermediate Care Facility

IDTT:                Interdisciplinary Treatment Team

ISP:                 Ironwood State Prison

ITP:                 Individualized Treatment Program

JCAHO:               Joint Commission on Accreditation of Healthcare Organizations

KVSP:                Kern Valley State Prison

LOC:                 Level of Care

MCSP:               Mule Creek State Prison

MHARP:             Mental Health Assessment and Referral Project

MHCB:              Mental Health Crisis Bed

MHP:               Mental Health Program

MHSDS:             Mental Health Services Delivery System

MHTS:              Mental Health Tracking System

MOU:               Memorandum of Understanding

NKSP:              North Kern State Prison

OAL:               Office of Administrative Law

OHU:               Outpatient Housing Unit

PBSP:              Pelican Bay State Prison

PSH:               Patton State Hospital

PSU:               Psychiatric Services Unit

PVSP:              Pleasant Valley State Prison

RJD:               Richard J. Donovan Correctional Facility

RT:                Recreation Therapist

RVR:               Rule Violation Report

SCC:               Sierra Conservation Center

SQ:                San Quentin State Prison

SVP:               Sexually Violent Predator

SVPP:              Salinas Valley Psychiatric Program

SVSP:              Salinas Valley State Prison

UHR:               Unit Health Records

UNA:                     Unidentified Needs Assessment

VSPW:                    Valley State Prison for Women

VPP:                     Vacaville Psychiatric Program

WSP:                     Wasco State Prison

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs,

       v.                             No. CIV S-90-0520 LKK JFM P

EDMUND G. BROWN, JR., et al.,

    Defendants

SPECIAL MASTER'S REPORT ON DEFENDANTS' PLAN RE:
INTERMEDIATE CARE FACILITY AND ACUTE INPATIENT WAIT LISTS

## I.    <u>Introduction</u>

On March 31, 2010, the *Coleman* court directed defendants, the California Department of Corrections and Rehabilitation (CDCR) and the Department of Mental Health (DMH), to work under the guidance of the special master "to develop a plan to reduce or eliminate the waitlists for inpatient care and, in the interim, to better serve the treatment needs of the *Coleman* class members placed on such lists." (docket no. 3831)

Following a stipulated extension of time (docket no. 3894), defendants filed their wait list plan on November 24, 2010 (docket no. 3962) and filed supplemental materials on February 4, 2011.  Plaintiffs then filed formal objections to defendants' plan on February 25, 2011. (docket no. 3987)  On April 27, 2011, the special master was ordered to report to the court within 45 days "on the adequacy of defendants' plan and whether, in light of plaintiffs' objections, any modification(s) thereto should be required." (docket no. 4004 at 2)

The court ordered the plan due to the extraordinarily large number of high-custody inmates awaiting inpatient mental health care, with 574 men requiring intermediate level care, 64 men requiring acute level care, and a number of women awaiting inpatient care as well.  At issue here, are the levels of care that traditionally were only available to CDCR inmates who moved into DMH-run programs.  Without admission to a DMH program, seriously mentally ill inmates languished, and often further decompensated, with no alternative source of appropriate treatment while they waited.

While historically the number of inmates waiting to receive higher levels of care was unacceptably high, it surged even higher with the identification and referral of many inmates in need of care as a result of the completion of the court-ordered Mental Health Assessment and Referral Project (MHARP) at the end of 2009.  The purpose of MHARP was to determine the existence and extent of any previously unidentified need for inpatient beds among members of the *Coleman* plaintiff class.[1]  This project was an interdisciplinary effort by CDCR, both clinical and custody, and DMH under the direction of the special master.  The review was a success, resulting in the identification of inmates with serious mental illness who otherwise would not have been identified.

With that said, the elevated numbers should not be viewed as merely a product of MHARP that will abate over time.  These numbers capture a more accurate picture of the true need for higher levels of care.  There have been many cases of inmates who should have been identified and referred for care at DMH, but were not, and thus

---

[1] During a court-ordered meeting with the special master and defendants on March 26, 2009, the Navigant consultant advised the parties that there could be an unidentified need and an assessment was the appropriate vehicle to make that determination.

never made it onto a wait list, causing wait list numbers to appear artificially low.

MHARP brought to light such "hidden" cases, resulting in the uptick in referrals to

DMH.

      The special master has reviewed and considered defendants' plan.  He

now submits this report with his recommendations to the court that the plan be approved

and that further action be taken immediately.  The defendants' plan reflects a good deal

of work and thoughtful consideration of ways to manage the difference between the

numbers of seriously mentally ill inmates and the numbers of readily available inpatient

beds for them.  The special master's recommendations are offered with the intent that

they initiate a course of action that will remove, on a lasting basis, the long-standing

systemic barriers to provision of higher levels of care for seriously mentally ill members

of the *Coleman* plaintiff class.

## II.    <u>Background</u>

      Toward the goal of a deeper understanding of this problem and its present

context, this report also provides a detailed retrospective on the past efforts to resolve the

difficulties in access to higher levels of care for inmates, which instruct the present and

set the stage for meeting the Court's March 31, 2010 order and its expectations.

### A.    <u>MHARP and Its Predecessor, the Unidentified Needs Assessment</u>

      The March 2010 order requiring defendants to develop a plan for

addressing the wait list was precipitated by the findings that resulted from MHARP that

had been ordered by the court one year earlier.  (docket no. 3556)  Again the purpose of

MHARP was to determine the existence and extent of any previously unidentified need

for inpatient beds among members of the *Coleman* plaintiff class.[2]  On March 31, 2009,

the wait list for high custody inmates pending transfer to an intermediate care facility

(ICF) level of care stood at 149.[3]  One year later, after the conclusion of MHARP, the

same wait list had increased to a staggering 575[4] and it was clear that a need for inpatient

beds had been identified.

The long-standing problem of access to DMH beds has been repeatedly

addressed by the special master in his monitoring reports.[5]  The discovery of unidentified

bed needs only highlighted and exacerbated an already-challenged process for placing

inmates into intermediate care facilities.  Without available DMH beds, high custody

inmates referred to a DMH facility languish between a correctional system that is not

equipped to treat their high-level clinical needs and a mental health system that is

reportedly ill-equipped to manage their custodial status.

The prototype utilized for the MHARP of 2009 was the Unidentified

Needs Assessment (UNA), an earlier study that analyzed DMH access.  UNA was

conducted pursuant to a court order in October 2004 (docket no. 1607) and was based on

the recommendations of the special master.[6]  The wait list issues that plague defendants

today are reminiscent of those identified in the UNA report dating back to 2005.

Similarly, the proposed remedies in the present plan have much of the same framework

from six years ago.

---

[2] During a court-ordered meeting with the special master and defendants on March 26, 2009, the Navigant consultant advised the parties that there could be an unidentified need and an assessment was the appropriate vehicle to make that determination.

[3] DMH monthly report on intermediate care census and wait list data at CMF and SVPP for March 2009.

[4] DMH monthly report on intermediate care census and wait list data at CMF and SVPP for March 2010.

[5] Docket No. 2895-2 at 38-39; Docket No. 3029-7 at 49-50, 3029-8 at 1; Docket No. 3638-8 at 13-15.

[6] Docket No. 1602 ''Special Master's Final Recommendation on Methodology for Defendants' Unmet Inpatient Bed Needs Assessment.''

In March of 2005, defendants reported to the special master that 400 inmates were identified through UNA who otherwise would not have been referred to higher levels of care.[7]  Defendants' 2005 plan consisted of three phases.  Defendants' plan addressed the specific needs of inmates which included "the establishment of 'wait list' management and the monitored provision of appropriate level-of-care services to those awaiting transfer to an inpatient bed."[8]  Defendants' plan also acknowledged that it would "require the active participation of management and staff from the DMH to produce joint outcomes that effect increased bed availability, and subsequent use of standard admission and discharge criteria, utilization oversight and converting beds from other programs for inpatient use."[9]  Another intermediate strategy identified in Phase II of the 2005 plan was the "exploration of new treatment programs or designations that are necessary for providing appropriate treatment for inmate-patients identified as a result of UNA ."[10]

> **B.** **History of the Problem of Access to Higher Levels of Care and Efforts to Overcome It**

> **1.** **At the Beginning**

The longstanding issues of lack of access to higher levels of care for seriously mentally ill inmates in CDCR predated the UNA study and have existed since the beginning of the *Coleman* case itself.  Among the evidence presented in the trial of the *Coleman* case, was the serious deficiency in access to inpatient care at DMH facilities.  The Scarlett Carp Report termed access to acute inpatient care a "major

---

[7] UNA Report at 3.
[8] Id at 2.
[9] Id at 2.
[10] Id at 3.

problem"[11] with wait times of several months for transfers to Atascadero State Hospital

(ASH) for inpatient hospitalization in 1992.  *Coleman v. Wilson*, 912 F.Supp. 1282, 1309

(E.D. Cal. 1995).  After the final decision in the case, defendants' plans were adopted and

DMH became responsible for the provision of inpatient mental health care for men

housed in CDCR.

By 1998, DMH's reluctance to treat CDCR inmates at ASH was readily

apparent with DMH indicating that an increased demand for ASH beds by other

populations would strain bed availability for CDCR inmates.  To accommodate shifting

bed needs, DMH and CDCR proposed a new plan with three basic components:  (1) the

licensing of 84 DMH intermediate care beds at CMF in the existing day treatment

program (DTP); (2) the licensing of 64 DMH ICF beds at Salinas Valley State Prison

(SVSP) and; (3) the reduction of the inmate population at ASH to 200 beds.  At that time,

DMH was considering construction of an additional 258 beds at ASH as well as 1,500

more beds for Sexually Violent Predators (SVPs).  However, an agreement between

CDCR and DMH would reduce the net number of beds at ASH for CDCR inmates.

The *Gates*[12] case was merged into the *Coleman* case in November 1998,

by a court-approved agreement of the parties.  The agreement required defendants to

address the need for inpatient care of seriously mentally ill inmates housed at CMF and to

develop a transition plan to govern the fusion of the two cases.  The transition plan was

approved by the court on February 10, 2000. (docket no. 1132)  The transition plan

directed CDCR, with the assistance of DMH, to conduct a study of CDCR's inpatient bed

---

[11] California Department of Corrections, Mental Health Delivery System Study, Final Report, February 16, 1993.
[12] *Gates v. Gomez*, E.D.Ca. case no. S-87-1636 LKK JFM.

usage and to identify the actual need for acute and intermediate care inpatient beds for

CDCR inmates.  The *Coleman* court then directed the special master to conduct an

interim assessment of CDCR's need for inpatient beds and to file a report pending the

completion of defendants' study.  The special master filed an interim report (also known

as the Koson report) with recommendations on March 30, 2000 (docket no. 1143), and

filed a final report on June 12, 2000. (docket no. 1172)  The special master's

recommendations were adopted and ordered by the court on August 28, 2000. (docket no.

1195)

The court order included access to both acute and  intermediate levels of

care and required collaboration between CDCR and DMH in their efforts to comply.

Three years later, in 2003, the State activated the 64-bed stand-alone

inpatient intermediate care unit at SVSP.  Howver, little else was done to execute the plan

for DMH care of CDCR inmates.  Further, by mid-2004, defendants had still not

adequately studied and assessed their use of inpatient mental health beds.

On June 2, 2004, the special master filed the Report on the Defendants'

Unmet Inpatient Bed Needs Study and Interim Recommendations on the closure of the

DMH DTP and ICF at CMF. (docket no. 1583)  He recommended that defendants be

prohibited from closing the DTP/ICF at CMF until the court had approved a plan for

addressing the need for DMH beds among the seriously mentally ill prison population.

The special master filed a supplemental report in July 2004 and assigned the *Coleman*

experts to consult and assist defendants in the design of their DMH bed need study which

was to be completed by August 15, 2004. (docket no. 1593)  The special master noted the

anticipated significant expansion of inpatient DMH beds at Coalinga State Hospital for

CDCR inmates (CSH), which was scheduled to open in September 2005. The special master also recommended that defendants be required to seek a temporary extension of their license to operate the DTP/ICF at CMF, and that he would provide an updated report on the status of CSH which would set the stage for determining the future of the DTP at CMF.

In its order of July 9, 2004, the *Coleman* court found that further involvement by the special master was needed due to "*defendants' repeated failure to adequately assess the unmet need for DMH inpatient beds for seriously mentally ill inmates in the state prison population, and the concomitant delays that have attended access to such beds.*" (emphasis added) (docket no. 1594 at 1-2)  This is the same problem which persists to the present day. The court ordered defendants to continue to run the DTP/ICF at CMF until the court approved a plan to provide DMH care to CDCR inmates at both the acute and intermediate levels of care. In the interim, defendants had to work on obtaining a sufficient extension of their license to do so. They were also ordered to implement their proposal for weekly documented reviews of potential referrals to DMH inpatient care by Interdisciplinary Treatment Teams (IDTTs) in each EOP, psychiatric services unit (PSU), and MHCB unit within CDCR.

In addition, defendants were ordered to develop and submit to the special master a comprehensive plan for effectively educating institutional clinicians in all CDCR EOPs, PSUs, and MHCBs about DMH inpatient resources and referrals, in accordance with pertinent portions of the special master's report, and to submit to the special master a comprehensive plan for managing and monitoring the admissions process for all DMH inpatient programs. The court also ordered the special master to

8

review defendants' plans and report further to the court, with inclusion of a timeline for

development and submission of a plan to provide DMH inpatient care.  The special

master informed the court that he would provide a report on defendants' plans for the

allocation of beds at CSH for members of the plaintiff class.

In March 2005, defendants developed with a plan for responding to the

need for inpatient beds which called for the construction of three regional facilities, each

with 1,500 beds, to be completed in 2013.  The California State Legislature rejected that

plan.  Defendants then submitted yet another plan in August 2005.

### 2.    The Defendants' 2006 Bed Plan

In the special master's Fifteenth Monitoring Report, filed in January 2006,

he offered five specific recommendations which the court adopted in its order of March

2, 2006. (docket no. 1772)  One recommendation that would require defendants to build

another 64-bed unit in the planned expansion of SVPP for Level IV inmates at SVSP was

adopted by the court.  Two other recommendations concerned defendants' submission of

a plan by April 16, 2006 for the provision of acute and intermediate levels of care to all

CDCR inmates in need of such care, and a plan for providing MHCBs for all inmates

within 24 hours of determination of such need.

In its March 2, 2006 order, the court directed defendants to file these plans

with the court not later than April 17, 2006 and stated in part:

> Not later than April 17, 2006, defendants shall file with the court a plan
> for the provision, in conjunction with DMH or otherwise, of acute and
> intermediate inpatient beds for all seriously mentally ill male and female
> inmates in the CDCR clinically determined to be in need of these levels of
> inpatient care. The plan must address interim and long-range needs based
> on updated population projections; detail financial and construction plans,
> timetables, and staffing requirement needed to meet the needs; and ensure
> that construction and financial elements of the plan are sufficiently timely

9

for inclusion in the FY 2006-2007 Budget.  An element of the plan should include a detailed analysis of upgrading the physical security of DMH's CSH that results in a reasoned report on the feasibility - or infeasibility - of the use of some portion of that facility for the inpatient treatment of Level III and/or Level IV CDCR inmates.  (docket no. 1772 ¶ 3)

On April 17, 2006, defendants filed their "Statewide Mental Health Bed Plan, April 2006." (docket no. 1786-1)  Defendants acknowledged in their plan that recent changes in legislation and policy had enabled DMH to house and treat 50 CDCR Level I, II, and III inmates at CSH, which were, by CDCR's definition, inmates who needed a lower level of custody.  Defendants concluded that the physical security features of CSH needed no upgrades to house Level III CDCR inmates, provided that those inmates were low custody.  *Id*. at 13-14.

At the evidentiary hearing held on April 26, 2006 to address the adequacy of the defendants' plans for acute, intermediate and MHCB beds, the evidence was undisputed that the inpatient bed shortage was causing seriously mentally ill inmates to languish in horrific conditions without access to immediately necessary mental health care.

Following the evidentiary hearing, the court entered an order on May 2, 2006, stating that defendants' inpatient bed plan was based on outdated population figures and did not respond adequately to the severe shortage of intermediate care beds and MHCBs. (docket no. 1800)  Testimony indicated a shortage of 125 intermediate inpatient beds with the most serious shortfall of beds for Level IV inmates.  The court approved the plan, subject to modification based on new population data, and ordered defendants to file an amended long-term plan, based on current population projections.

Defendants were ordered to include with their amended long-term plan a list of projects that could be accelerated as well as a list of any statutory, licensing, or staffing barriers to such acceleration and/or timely opening of the projects described in the amended long-term plan.  To address the ICF bed shortage, defendants were ordered to maintain 36 ICF beds in the P-2 unit at CMF until further order of the court, to open 36 ICF beds at SVSP designated for receiving inmates from CMF, and to create an additional 36 ICF beds at SVSP for Level IV inmates on the same time table as the other 36 beds already in existence at the institution.

Defendants were ordered to review the list of 123 inmates awaiting ICF placement at SVSP and to identify who would be appropriate for placement at ASH. After a review of the list by CDCR, officials from both CDCR and DMH were to take all steps necessary to effect all placement decisions.  Disputes as to appropriateness of any placement were to be submitted to the special master for resolution.  The court ordered that 25 ICF beds be made immediately available for appropriate CDCR inmates at CSH and another 25 beds added within 30 days.

Defendants were ordered to file a report within six months on the feasibility and cost of creating 30 ICF beds at CSH for Level IV inmates; the report was to be prepared collaboratively by CDCR, DMH, and the California Department of General Services.  The court also ordered that defendants not close any ICF beds on the basis of licensing without approval of the special master.

Approximately one month later, the director of DMH, Stephen Mayberg, was added as a defendant to the *Coleman* case. (docket no. 1855)  The court noted its frustration with DMH, stating in part:

11

Moreover, DMH plays a critical role in creating sustainable and effective solutions for inpatient care within the California Department of Corrections and Rehabilitation (CDCR). It is also apparent that, for multiple reasons, DMH is failing to address specific court-ordered remedies. DMH's attempts to remedy the shortage of inpatient beds has been marked by delay and difficulty. Adding Dr. Mayberg as a party-defendant to this action, and thereby subjecting DMH to the supervision of the Court and the involvement of the Special Master, is the only way to insure an effective remedy in this case. *Id*. at 1-2.

The special master filed a report and recommendations on September 11, 2006 on defendants' long-term mental health bed plans (docket no. 1969), followed closely by a set of modified recommendations on October 10, 2006. (docket no. 1994)

By its order of October 20, 2006, the court adopted the modified recommendations of the special master, and ordered the following with respect to care at DMH facilities:

\* \* \*

2.      The program population projections in the revised and updated Navigant Study are approved.  Defendants shall contract with Navigant Consultants to conduct annual population reviews and updates of their projections for mental health program (MHP) populations from 2007 through 2009.  Thereafter, defendants may obtain such population projections services through the normal contract bidding process.  The Navigant service contract shall be controlled and supervised by the CDCR's Division of Correctional Health Care Services rather than the CDCR's Division of Legal Affairs. The Special Master, and such of his experts as he may assign to the task, shall work with the defendants and Navigant to improve the projections and ensure that all necessary data is collected to make future projections as accurate as possible.

3.      The Special Master shall monitor closely the swap of acute inpatient beds between CMF and ASH and any delays in the transfer of seriously mentally disordered inmates to MHCBs within 24 hours of a clinical referral and report to the court in writing on these two issues within ninety days.

4.      Within sixty days from the date of this order defendants shall file a final long range plan for the provision of acute and intermediate inpatient beds, as well as a plan for the provision of EOP beds, for all seriously mentally

12

ill male and female CDCR inmates clinically determined to be in need of those levels of care. These consolidated plans shall meet or exceed the program population projections contained in the approved Navigant study and shall include a process for regular updates of bed need projections and ongoing planning for new mental health beds based on subsequently revised projections. Defendants' plan shall also address the feasibility of a "Design and Build" approach for the construction projects specified in the consolidated plan and shall coordinate the use of such an approach with related Design and Build efforts in the *Plata* case. Defendants' consolidated plan shall include a timetable, budget planning and resource allocations to meet projected populations by June 30, 2011. The consolidated plan shall also include construction of the 50-bed MHCB unit at CMC proposed in defendants' revised interim bed plan.

any

* * *

6.      Defendants' interim plan for the temporary establishment of 76 inpatient intermediate DMH beds in the D-5 and D-6 units at SVSP and 30 beds in the P-3 Wing at CMF is approved. The Special Master shall review these programs, as well as the other intermediate inpatient DMH programs opened in CMF and SVSP pursuant to the defendants' interim plan and report to the court by March 31, 2007 on the defendants' success in implementing these interim programs. (docket no. 1998)

On November 11, 2006, defendants submitted their report on the feasibility of creating 30 intermediate care beds at CSH for Level IV, high-custody CDCR inmates. An amended report was filed on December 20, 2006. The report outlined two options for complying with the court order of May 2, 2006. Option A would convert existing hospital space to accommodate Level IV inmates, and option B would construct a new unit to house these Level IV inmates. For a variety of reasons, including financial savings, it was determined that a new unit would better serve the population and could be built faster than converting an existing unit.

On December 19, 2006, defendants submitted another long-range bed plan. In the special master's February 7, 2007 report, he described defendants' plan as superseding all previous long-range mental health bed plans. (docket no. 2133) The

13

special master also recommended scheduling a hearing within 30 days at which

defendants would demonstrate the reasonableness and feasibility of their proposals to

assume responsibility for the provision of inpatient care in place of DMH and reorganize

and consolidate their delivery of existing mental health services.

### 3.    The Defendants' Supplemental Bed Plan of 2007

In its order of March 26, 2007, the court deferred the special master's

request for a hearing. Instead, the court ordered defendants to provide to the special

master within 90 days a detailed report on how CDCR's assumption of responsibility for

services presently provided to class members by DMH would be accomplished and, if

further study suggested such assumption of responsibility was not feasible, what

alternative(s) would be pursued.

On April 12, 2007, the special master filed another report on the bed plan

which discussed defendants' establishment of interim ICF beds and the need for approval

of some basic components of defendants revised December 2006 bed plan. (docket no.

2186) He recommended that defendants submit a supplemental report expanding on the

relationship between CDCR and DMH, and CDCR's plan for implementing the

reorganization and consolidation of its intensive mental health plans in seven of its 33

institutions. On April 17, 2007, the court adopted these recommendations in full and

ordered the defendants to submit the report. (docket no. 2200)

On June 28, 2007, the court addressed the state of occupation of ASH beds

by class members, noting that in the defendants' December 2006 bed plan, there was a

provision for a total of 256 beds at ASH, of which 25 were for acute care, and 231 were

for intermediate level care. (docket no. 2301) As of May 25, 2007, there were only 73

14

*Coleman* class members at ASH, and as of June 8, 2007, that number had fallen to 67. As a result, the court ordered defendants to file a plan for making available, within 30 days, up to 125 intermediate care beds for *Coleman* class members referred to ASH.  The plan was to  include staffing, with a breakdown by name and function of attending clinicians, and a date certain for its implementation which would be no later than 60 days from the date of the June 28, 2007 order.  Then, no later than November 30, 2007, defendants were to file with the special master a plan for making available the full complement of 231 intermediate care beds for *Coleman* class members referred to ASH. The court stated that it would not entertain a request to limit the total number of intermediate care beds required by the order, absent a recommendation from the special master that fewer beds were required.

On August 17, 2007, defendants filed their supplemental bed report which addressed the relationship between DMH and CDCR and the consolidation plan.  It modified the defendants' earlier theme of CDCR's assumption of responsibility for all inpatient acute and intermediate levels of care.  The change was to reduce CDCR's responsibility for all inpatient care to about half.  Also, the plan was to concentrate the delivery of such care into nine centers, one female and eight male, (expanded from five in the earlier version of the plan) within existing institutions with DMH participating in the planning and design of space, training, and mentoring CDCR administrators, and ensuring adequacy of resources for CDCR's inpatient programs.

The special master expressed deep concern about a number of aspects of the plan, but nevertheless recommended that it go forward without further delay. One concern was his doubt about CDCR's capacity to build facilities in which therapeutic

15

needs predominate, given CDCR's record with delivering lower levels of care. Nevertheless, the special master endorsed the immediate implementation of the defendants' plan with the assumption that implementation of the plan was unlikely to occur within a decade and that modifications might be made as needed over this long conversion period. (docket no. 2432 at 13) He concluded that no evidentiary hearing was needed, given his recommendation that the supplemental bed plan be approved and adopted.

On October 17, 2007, the court approved the plan. (docket no 2461) It granted the defendants' request for 30 days to research whether the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) provided accreditation for intermediate care beds in a non-hospital prison setting. If such accreditation was possible, then defendants would submit to the special master, within six months, a plan for meeting and procuring for all CDCR-operated inpatient programs, applicable state licensure and accreditation by JCAHO.

The court also ordered the defendants to submit to the special master within 120 days a proposal for the design of adequate mental health treatment and counseling space at SVSP, and a proposal for the design of adequate mental health treatment and counseling space at CMF within 150 days.

On November 30, 2007, defendants filed their plan to enable *Coleman* inmates use of all 231 ICF beds at ASH. (docket no. 2580) DMH reported that it was working with the Vacaville Psychiatric Program (VPP) to ensure that any referrals sent to VPP were also reviewed by the ASH correctional case records manager. ASH staff continued to contact CDCR institutions to remind them that ASH was taking referrals and

16

to help them through the process as stated in the MOU for ICF services.  ASH reported

that its plan to have 231 ICF beds would be accomplished by over-bedding specific units

which had staff available to create 72 additional beds, and by transferring out patients

adjudicated by other penal code designations to open up beds for *Coleman* class

members.  DMH reported that by the end of December 2007, ICF bed capacity for

*Coleman* class members would be 147, and by July 2008 it would be 231.

### 4.    The Defendants' Amended Bed Plan of 2008

Defendants submitted an amended long-range bed plan on July 16, 2008.

A salient feature of the plan was its significant reliance on bed projects envisioned by the

*Plata* receiver[13], including the creation of 5,000 medical beds and 5,000 mental health

beds.  The previous plan for CDCR to assume responsibility for delivery of care,

traditionally the responsibility of DMH, was abandoned.  CDCR and DMH agreed that

DMH would continue to provide all inpatient acute and intermediate mental health

services rather than transfer those responsibilities to CDCR.  It was expected that two of

the *Plata* receiver's new California Health Care Facilities (CHCFs) would provide DMH

acute and intermediate mental health services, and would be run by DMH in

collaboration with the receiver's medical program and CDCR's mental health program.

Another change was to incorporate women's mental health facilities into the

collaboration agreement.  Also, defendants updated the population projections on which

the plan was premised and based them on the Spring 2008 Navigant projections.

### 5.    The Re-Focus on Defendants' Long-Range Mental Health Bed Needs in 2009

---

[13] *Plata v. Brown*, No. C01-1351 TEH.

By February 2009, the three-judge trial on the *Coleman* and *Plata* plaintiffs' overcrowding case had taken place.  Evidence at that trial showed that the shortage of ICF beds persisted, with a lack of 166 such beds, a wait list that reached as high as 173 patients, and waiting times that sometimes lasted for a year.

Matters came to a head when the *Coleman* court entered an order on February 2, 2009 to show cause why it should not require defendants to continue to operate, on a temporary emergency basis, all MHCBs at the CIM general acute care hospital (GACH) with existing staffing levels at that time. (docket no. 3505)  This order prompted a request for an evidentiary hearing by plaintiffs on the status of the defendants' bed plan.  In its order entered on February 17, 2009, the court said that there were "substantial questions as to what bed plan defendants are presently following," ordered defendants to file and serve a statement setting forth the present bed plan within 15 days, i.e. March 4, 2009, and set an evidentiary hearing one week later. (docket no. 3515)

Defendants requested an additional 90 days to submit their statement on the bed plan on various grounds.  The *Coleman* court was unmoved and directed defendants to work immediately on the development of a plan, and within ten days to provide a written progress report, including the status of the 50-bed MHCB at CMC. (docket no. 3540)  The court also ordered that the evidentiary hearing set for March 24, 2009 would be for the purpose of considering what further steps were required to ensure timely compliance.

Defendants submitted their progress report on their development of the bed plan on March 19, 2009.  Five days later, the court held a hearing on what further

18

steps must be taken to insure timely compliance with pertinent existing orders.

Following that hearing, the court entered what may be its most comprehensive order to date concerning defendants' unfinished mental health bed projects. (docket no. 3556) The order, entered March 31, 2009, addressed mental health beds in the contexts of existing bed construction project orders as well as the defendants' long-range mental health bed strategy.  The court set short-term deadlines with respect to the outstanding bed construction orders.  The court also ordered defendants to proceed with the construction of the 50-bed MHCB at CMC and to open the 64-bed ICF at SVSP no later than June 15, 2009.  It also ordered the filing of detailed activation schedules for completion of all other specific court-ordered construction projects.  Reminiscent of another order entered on May 2, 2006 (docket no. 1800 ¶ 3), the court stated in part:

> Each activation schedule shall include a date certain by which the project shall be completed, a description of every step necessary to complete the project, specific timetables by which each such step shall be completed, a list of every state agency involved in the project, the names and addresses of all persons responsible for approval/execution of each stage of the project, and a timetable for certification to the special master the action or actions taken and whether the project remains on schedule. (docket no. 3556 ¶ 3)

The court also ordered the defendants to develop and file concrete proposals to meet all remaining short-term, intermediate, and long-range bed needs of the *Coleman* plaintiff class.  In support of this comprehensive mental health bed effort, the court ordered CDCR and DMH clinicians to jointly conduct a modified assessment (which later came to be known as MHARP) to determine whether there were unmet needs for inpatient mental health care among the *Coleman* plaintiff class, and to refer on an expedited basis any inmates identified in this modified assessment process for inpatient care.  This modified assessment was to not only accelerate delivery of inpatient

19

treatment to inmates who required it, but to serve a larger purpose by re-defining the

landscape of mental health care that would shape the future of bed construction for

seriously mentally ill inmates.  The court also ordered defendants to continue to develop

concrete proposals for meeting the remaining short-term, intermediate, and long-range

bed needs of the plaintiff class by May 26, 2009.

      The court held a follow-up hearing on June 16, 2009.  Among the matters

taken up at the June 16th hearing was defendants' schedule for the activation of

previously court-ordered construction projects, the short-term and intermediate plans for

meeting mental health bed needs, and defendants' long-range bed plan.  The court

approved the schedules proposed by the defendants for the 13 previously court-ordered

projects, many of which were long overdue, and ordered defendants to provide monthly

progress reports to the special master.

      The court approved the defendants' plan to meet the short-term and

intermediate bed needs, subject to conditions,[14] and stated that the plan presented by

defendants met the projected need for the year 2013 for intermediate care hospital beds,

including those for high security inmates as identified in the Navigant Fall 2008

---

[14] The court's approval rested on the following conditions:

a.  Defendants shall promptly notify the Special Master of any impediments to timely completion of the approved short-term and intermediate projects, including but not limited to those described by defense counsel at the hearing.  Defendants shall file a copy of any such notification with the court and serve a copy on counsel for plaintiffs.  Defendants shall include with any such filing a proposed remedy to the impediment, and plaintiffs may file a prompt response.

b.  Consistent with counsel's representation at the time of the hearing, the C5 and C6 units at Salinas Valley shall be completed on the schedule proposed by defendants so that, upon completion, they are substantially similar to the D5 and D6 units when all construction is completed in said units in July 2009.

c.  Defendants shall continue to take all steps necessary to secure any funding that is still required for full implementation of all projects in their short-term and intermediate plan.

d.  Defendants shall continue to take all steps necessary to resolve all outstanding staffing allocation issues.  To that end, defendants shall complete a staffing plan by the end of August 2009.  The plan shall be developed under the guidance of the Special Master following the model that was used to develop the activation schedules and the short-term and intermediate plan before the court.

e.  Defendants shall comply with the schedule to fill the full complement of 256 intermediate care beds at Atascadero State Hospital (ASH).

projections.  The court specifically ordered the C-5 and C-6 units at SVSP to be completed on defendants' proposed schedule so that they would be substantially similar to the D-5 and D-6 units completed earlier at SVSP.[15]  The court rejected defendants' long-range bed plan and its contemplated transfer of DMH beds to CDCR absent the court's approval.  (docket no. 3613)

With regard to the ongoing modified needs assessment and the resulting referral of 561 inmates for DMH inpatient care as of the time of the June 16, 2009 hearing, the court noted that there appeared to be a substantial number of plaintiff class members above and beyond those identified in Navigant projections who were in need of hospital-level care.  In the interest of expediting these transfers, DMH was ordered to explore whether non *Coleman* patients at ASH could be transferred to CSH in order to increase the number of available beds at ASH.

The court approved the continuation and expansion of the modified needs assessment to all non-desert CDCR institutions.  It also approved the defendants' plan to convert 256 DMH hospital beds to provide intermediate level care at ASH to members of the plaintiff class, with the understanding that DMH would admit plaintiff class members at the rate of *no less than ten per week* until all the beds were filled by plaintiff class members by October 31, 2009.  Defendants were ordered to submit a plan to expedite admissions to DMH facilities and finalize it under the guidance of the special master within 30 days.  A status conference on the activation schedules and the short-term and

---

[15] Defendants appealed that part of the court's order which directed the defendants to fill the C-5 and C-6 units at SVSP at a rate of no less than ten inmates per week.  In a decision dated April 22, 2011, the Court of Appeals for the Ninth Circuit upheld the District Court's order and concluded that the District Court fully complied with the requirements of the Prison Litigation Reform Act.  (docket no. 4003)

intermediate projects, and further hearing on the defendants' long-range bed plan, was set for September 22, 2009.

In its written order filed on September 24, 2009, (docket no. 3686) the court ordered defendants to describe all steps that could be taken to expedite the completion of the 64-bed project at CMF and the conversion of the C-5 and C-6 units at SVSP. These two projects would make available an additional 180 ICF high-custody beds. In a stipulation and order filed on November 2, 2009 (docket no. 3720) defendants were granted an extension of time to December 31, 2009 to comply with the court's June 18, 2009 order that they fill the full complement of 256 intermediate care beds at ASH with *Coleman* class members. Defendants were also ordered to report to the special master on how many additional intermediate care beds, if any, were required at ASH or CSH.

The parties further stipulated that by November 30, 2009, the Health Care Placement Oversight Program (HC-POP) would review all inmates on the SVPP wait list using the criteria developed for the ICF Pilot Program, to determine if any were eligible for admission to ASH or VPP. (docket no. 3720 ¶ 2)

Defendants moved for temporary relief from the court's June 18, 2009 order requiring DMH to admit members of the plaintiff class to ASH at a rate of not less than ten inmates per week until the full complement of 256 beds are filled. By its order of January 27, 2010, the court granted the motion for relief in part and ordered defendants to fill the 256 beds by no later than February 26, 2010 and to admit no less than ten inmates per week. The matter was set for a status conference on March 29, 2010. (docket

no. 3787)  Following the hearing on March 29, 2010, the court entered its order two days

later and directed defendants to draft their wait list plan.  (docket no. 3831)

### III.    Defendants' Plan for the Care of Patients on the Intermediate Care Facility and Acute Care Facility Wait Lists

#### A.    The Process

   The first meeting after the entry of the March 31, 2010 order was held on

May 5, 2010, allowing defendants time to assemble the individuals who would serve as

the architects of the wait list plan and also providing sufficient time to formulate a broad

conceptual plan to present at the initial meeting.  In attendance at this meeting were the

special master, his experts and monitors, and defendants.  The conceptual plan delivered

at the first meeting would serve as the framework upon which defendants' final plan was

constructed.  At the conclusion of the first meeting, the special master scheduled four

additional in-person meetings between May 17 and June 21.[16]  Defendants presented the

first detailed outline of their plan at the June 7, 2010 meeting.  One theme that echoed

throughout the meetings was that CDCR and DMH recognized they had to work

collaboratively in order for this plan to succeed.

   On June 3, 2010, plaintiffs provided the special master and defendants

with correspondence detailing some of their ideas on how to reduce the wait list and

provide treatment to inmates on the wait list.

   The special master determined that the workgroup should be pared down

in order to approach the problems with a more focused view and assigned two of his

experts to represent the special master at future meetings.   From July 29, 2010 through

---

[16] The meeting held on May 24, 2010 was via teleconference.

November 22, 2010 these two experts met with defendants in person and via telephone on nine occasions.

Plaintiffs participated in three teleconferences with defendants and the special master to discuss defendants' plan - the first on November 24, 2010; the second on December 3, 2010; and the third on January 18, 2011.  Plaintiffs were provided the opportunity to make recommendations and comments on defendants' plan both informally and with the court.  By stipulation and order dated February 2, 2011, plaintiffs agreed to not object to specific parts of defendants' plan.[17] (docket no. 3979)

Defendants submitted supplemental materials on the Extended Enhanced Outpatient Program Care Plan (EECP) and the Psychological Assessment Plan with the special master on February 4, 2011 and plaintiffs filed their formal objections to defendants' plan on February 25, 2011. (docket no. 3987)  In their pleading, plaintiffs also stated they hade no objections to the utilization management section and the SharePoint section of defendants' plan.  *Id*. at 7 footnote 2.  On March 18, 2011, defendants filed their responses to plaintiffs' objections.

The special master recommends that the court approve those parts of defendants' plan to which plaintiffs do not object.

### B.    Defendants' Plan

---

[17] Plaintiffs' did not object to the following sections of Defendants' Plan: (a) Section II.B.1.c, Initiation of a Statewide Clozapine Initiation Policy (Docket No. 3962–1 at p, 10); (b) Section II.B.1.d, Positive Behavioral Services (Docket No. 3962–1 at p. 11); (c) Section II.B.1.e., Review of SVPP and APP Waitlists (Docket No. 3962–1 at pp. 11–15); (d) Section II.B.2, Concurrent Review (Docket No. at 3962–1 pp. 15– 16); (e) Section II.B.3.b, Frequent Inpatient Hospitalizations (Docket No. 3962–1 at p. 16); (f) Section II.B.4, Additional Transition Planning and Continuity of Care Processes (Docket No. 3962–1 at 17); and (g) Section II.D., SharePoint (Docket No. 3962–1 at pp. 19–20.)

Defendants' plan complies with the spirit and intent of the March 31, 2010 court order directing CDCR and DMH to work under the guidance of the special master "to develop a plan to reduce or eliminate the waitlists for inpatient care and, in the interim, to better serve the treatment needs of the *Coleman* class members placed on such lists." (docket no. 3831 ¶ 2)  Defendants should also be commended for the time and resources that were dedicated to creating responses to this complex problem.

Defendants structured their plan in accordance with the court order.  The first part of the plan addresses the court order to reduce or eliminate the SVPP and APP wait lists.  The second part of the plan addresses the interim care provided to inmates who remain on the wait lists pending transfer to an inpatient facility.  The third and last section of defendants' plan anticipates the impact of the plan on the wait lists.

Of the various sections and sub-sections contained in defendants' plan, plaintiffs' objections are leveled at three specific sections of the plan.  Plaintiffs object to two sub-sections of the plan contained in the "Plan to Address the SVPP and APP Waitlists"; the Extended Enhanced Outpatient Program Care Plan (EECP) and the Intermediate Care Facility Pilot Project.  Plaintiffs also object to the section of the plan entitled "Interim Treatment Provided to Inmates on the Waitlists."  Although plaintiffs do not object to the defendants' bed projects, they do object to their inclusion as a means of reducing the wait lists since the projects were all court-ordered prior to the inception of the current wait list plan.

The plan submitted by defendants, while generally acceptable, does not succeed in eliminating the wait lists or reducing them to a reasonable level pending the completion of any long term remedies.  The special master also has some concerns about

25

removing inmates from the wait list upon placement in the EECP and would recommend that these inmates remain on the wait list until such time as the special master has had the opportunity to monitor the efficacy of the EECP.

As for the under-utilization of resources within the control of DMH, it is clear that far too many beds remain vacant within DMH facilities as inmates are denied necessary treatment while languishing on a wait list for months.

Data produced by defendants indicated that for April 2011 there were 54 low-custody ICF beds available at ASH; 27 at VPP and three dorm beds at SVPP. The 50 beds at Coalinga have been vacant for nearly a year.

### a.    Extended Enhanced Outpatient Program Care Plan (EECP)

A large portion of defendants' wait list plan is devoted to the EECP. Defendants designed the EECP to provide treatment at select institutions[18] for a sub-group of EOP inmates who exhibit serious and persistent mental illness. They state that a sub-group of EOP inmates has received licensed mental health services but remains unable to reside in a general population (GP) setting. According to defendants, these inmates demonstrate a poor prognosis for transition to the Correctional Clinical Case Management System (3CMS) level of care but also do not require acute care, do not meet the criteria for referral to an ICF and would not benefit from an ICF level of care. Defendants report that the goal of the EECP is to maintain inmates at their highest level of functioning within CDCR and avoid referral to a higher level of care and inevitable placement on a wait list. Pursuant to the plan, inmates who do not successfully adapt to

---

[18] These institutions are Mule Creek State Prison, California Medical Facility, California State Prison at Corcoran, Salinas Valley State Prison, and California State Prison at Sacramento.

the EECP will be placed back on the wait list in the same position they held prior to removal from the list.

Defendants identified 68 inmates who were eligible for EECP services and would be removed from the wait list after placement in an EECP-designated institution. However, in their response to plaintiffs' objections, defendants revealed that 23 of the 68 identified inmates were admitted to ICF programs, resulting in a 32-percent reduction of inmates previously identified as eligible for the EECP program.  (docket no. 3994-2 at 4, McGill Decl. ¶ 11)   This demonstrates that inmates who defendants originally thought were eligible for the EECP were in fact not eligible  and could not be removed from the wait list.  This questions the actual number of inmates who will be eligible for the EECP.

Defendants enumerate eight components of the EECP.

### 1.    Staffing

Defendants report that four designated institutions have either hired or are hiring additional staff to provide EECP treatment.[19]  A total of 29.5 positions have been allocated among the institutions including clinical psychologists, social workers, psychiatrists, recreation therapists (RTs) and office technicians.  Defendants report that the additional staff allows them to provide this enhanced treatment to 96 inmates at each institution.  Defendants acknowledge that additional staffing is necessary for the provision of enhanced treatment and report that the EECP designated institutions have hired or are in the process of hiring staff for this purpose.[20]

---

[19] California State Prison at Sacramento was not a designated EECP institution at the time the staffing allocations were made.

[20] Defendants' supplemental EECP materials dated February 4, 2011 at page 2.

Plaintiffs indicate that defendants have failed to provide adequate information regarding the actual number of staff hired for the EECP and also question whether any new staff hired will simply fill the current understaffed GP EOP programs or if the new hires will be additional staff specifically hired for the EECP. Plaintiffs also state that placement of inmates back on the wait list when the EECP is determined to be unsuitable, will create coordination problems, confusion among clinicians, and delays in the delivery of inpatient care. (docket no. 3987 at 10, footnote 3)

The special master and experts question the staffing numbers and ratios provided by the defendants. For two of the four designated EECP institutions, there are no additional allocations for psychiatrists and for the other two designated institutions, the psychiatrist staffing ratios are lower than GP EOP programs. These staffing ratios are inapposite to the level of services provided by the EECP, namely enhanced treatment and therapeutic treatment "predominantly delivered on a 1:1 level."[21]

It is unclear why defendants have chosen to staff the designated EECP institutions with different levels of staffing when each designated institution is reportedly capable of treating 96 inmates. For two of the institutions there are no additional psychiatrists allocated for the EECP. Another issue was raised during a teleconference that additional staffing was not in fact being allocated and that institutions were merely bringing their EOP program staffing up to required levels. This then begs the question whether there is sufficient staffing to provide the inmates with enhanced treatment in the EECP.

---

[21] *Id*. at page 8.

Given the concerns associated with the staffing numbers and ratios, together with the general hiring freeze that is gripping the State of California, it is unclear how the defendants intend to staff the EECP at the designated institutions.  This is another reason why the special master must have the opportunity to evaluate the EECP.

### 2. **The EECP Inmate-Patient**

Defendants provide a comprehensive list of areas and symptoms that, when manifested by an inmate and identified through specific clinical indicators, creates a clinical profile of an individual experiencing chronic mental health symptoms who may be considered for EECP services.  Defendants list a number of clinical indicators used to identify inmates who will be considered for EECP services.  To be eligible for the EECP, each inmate must show that he:

- Has received services at EOP level of care, and the prognosis for eventual transition to 3CMS level of care is poor.

- Has an Axis I persistent condition requiring treatment primarily for management of: negative symptoms; impoverished thinking; low level of continuous positive psychotic symptoms; and medication management.

- Demonstrates deficits in daily living activities and skills, and recreational and leisure activities.

- Presents a cyclical regressive pattern of functioning but optimal level of functioning is limited/poor.

- Currently, does not require APP care.

- Currently, does not meet criteria for referral to ICF treatment. OR;

- Is not recommended for referral to ICF treatment, because the IDTT determines inmate-patient is unlikely to benefit and reasons are clearly documented. OR;

● The inmate has been treated at the DMH ICF level-of-care and continues to display significant emotional and behavioral impairments.

● The inmate is not in need of further diagnostic clarification.[22]

### 3.    Inmate-Patient Case Formulation

The decision to refer an inmate who meets the clinical indicators for EECP services must document the justification and rationale for the referral. Defendants identify three sources of inmate referrals for the EECP: (1) high custody inmates waiting for an ICF bed at SVSP; (2) inmates identified by the EOP IDTT evaluation process; and (3) inmates transitioning back to CDCR from DMH.

Defendants need to clarify a procedural issue in this section of the plan as it is currently written. The language would suggest that inmates transitioning back to CDCR from DMH are not transferred directly to the EECP designated institution, but rather are returned to their sending institution and then sent to the EECP designated institution.

### 4.    Process for Review of Suggested Recommendations for EECP Services

Defendants establish three separate processes for accepting inmates for EECP services depending on the source of the inmate's referral.

i.    Defendants will continue to screen inmates who are on the ICF SVPP wait list to determine if they meet EECP clinical indicators. The files of inmates meeting the indicators are reviewed collaboratively by DMH and CDCR at CDCR headquarters to determine an inmate's appropriateness for EECP services. If an

---

[22] Defendants' supplemental materials on the Extended Enhanced Outpatient Program Care Plan dated February 4, 2011.

inmate is appropriate for EECP services he will not be removed from the wait list until housed at a designated EECP institution.

ii.     Inmates identified by the GP EOP IDTT are referred to the EECP Care Plan Coordinator/Supervisor who must reach a decision within 30 days whether the inmate is suitable for the EECP.  Inmates not suitable for EECP remain at the GP EOP level of care.

iii.     Inmates returning to CDCR from DMH will be recommended for the EECP if indicated by DMH upon discharge.  CDCR reviews the suggestions and determines the appropriateness of EECP placement.

**5.     EECP Model**

Defendants base their EECP model on the following ten tenets:

i.     Therapeutic environment

The environment in this outpatient setting is based on a community with stable relationships, consistency and minimal disruptions.

ii.     Treatment milieu

The EECP multidisciplinary team will differ from mainline EOP staffing by placing greater emphasis on recreation therapists and nurses working with custody to provide extensive one-to-one attention to complete daily tasks.

iii.     Treatment goals

Treatment will involve activities of high interest and low demand to keep the inmates engaged and to promote socialization, self-independence and management of symptoms.

iv.     Therapeutic assignments

Progressive treatment will be utilized to prevent inmates from being overwhelmed by gradually introducing them to staff, inmates and different activities and allowing the EECP team to assess an inmate's response and tailor the treatment to the inmate's abilities.

31

v.    Therapeutic activities

Inmates will participate in activities generally in a one-to-one setting but may also be included in small groups.  Activities will include daily living skills, physical fitness, health education, recreational therapy, mental health awareness, mental health symptom management, medical symptom management, problem solving, education, work, and leisure activities.

vi.    Activities will be accompanied by motivating social reward incentives

To the extent possible, the EECP will utilize social reinforcers such as movies, bingo, canteen, special announcements and extra recreational time to motivate inmates and provide social affirmation.

vii.    Level of programming

Structured therapeutic activities will average 13 hours per week over a seven day period.  The programming will be tailored to an inmate's skills, abilities and tolerance level.

viii.    Assessment of skills and behaviors

The EECP team will establish a baseline for each inmate which will then be evaluated on an ongoing basis.

ix.    Maladaptive behaviors

An evaluation of chronic behavior will be utilized to assess maladaptive behavior which inmates employ to either avoid something, obtain something or to make something happen.

x.    Mainstreaming

Over time, the EECP treatment team will assess if an inmate is suitable for more routine GP EOP treatment as part of the inmate's transition to the GP EOP level of care.

**6.    EECP Training**

Defendants will provide training to all individuals involved in the EECP,

including CDCR and DMH clinical staff, EECP clinical staff, custody, medical,

education, vocation and ancillary staff.  Training began on December 30, 2010 and will

32

be complete by July 2011.  In addition to the clinical training, EECP staff will also be trained to enter information directly into the Mental Health Tracking System (MHTS.net).

### 7. EECP Quality Management

Defendants will use quality management and a monitoring process to evaluate the quality and quantity of treatment provided at the EECP designated institutions.  However, no formal processes or procedures have been developed or implemented as of the date of this report.

### 8. Monitoring EECP Inmate-Patient Progress (Outcome Measures)

Defendants will evaluate the efficacy of the EECP by monitoring the progress of individual inmates and the EECP population as a whole.  However, defendants have no specific monitoring tools in place to accomplish this goal.

### b. Plaintiffs' Objections to Defendants' EECP Plan

Plaintiffs' object to defendants' EECP plan based on its use as a means of removing inmates from the wait list but do not object to the therapeutic value of providing this treatment to inmates on the wait list.

Among the list of clinical indicators for inmates who may be considered for EECP are inmates who do not require acute care, who do not meet the referral criteria for an ICF level of care or who do not get recommended for referral by the IDTT. Plaintiffs accurately state that inmates who meet one of these three clinical indicators would not be referred for an inpatient level of care and would not even be placed on the wait list.  Treating inmates with these specific clinical indicators would have no impact on the wait list.

33

Plaintiffs object to removing EECP eligible inmates from the wait list prior to a clinical determination that an ICF level of care is no longer necessary for such inmates. However, intrinsic in defendants' decision to place an inmate in the EECP is the determination that an ICF level of care is no longer clinically appropriate for the inmate.

c.    **Special Master's Evaluation of Defendants' Plan for an EECP**

Classifying the treatment provided to this sub-group of EOP inmates as a separate plan with specialized treatment ignores one of the basic requirements of the IDTT, which is to "have an individualized treatment plan that provides for treatment consistent with the inmate-patient's needs."[23] The treatment services provided to EOP inmates as specified in the Program Guide should serve as the minimum level of treatment afforded to EOP inmates and not as a benchmark that does not have to be exceeded. This is evidenced by language contained in the Program Guide relative to treatment provided to EOP inmates which states that "[e]ach inmate-patient shall be offered <u>at least</u> ten hours per week of scheduled structured therapeutic activities as approved by the IDTT."[24] By their very nature, treatment plans are tailored to an inmate's individual needs. If there is a clinical indication that an inmate requires more than ten hours per week of structured therapeutic activities or more clinical contacts than minimally required by the Program Guide, the IDTT should be adapting an inmate's treatment plan to his needs. If an inmate does not respond to treatment based on the minimum requirements specified in the Program Guide, it should not take a separate plan, like the EECP, to provide a level of care that exceeds those minimum requirements.

---

[23] MHSDS Program Guide, 2009 Revision at 12-4-8.
[24] *Id.* at 12-4-8 emphasis added.

34

An EOP inmate who does not warrant referral to a higher level of care should be provided with all the necessary treatment that is clinically indicated by the IDTT.  If all the services that are part of the EOP were actually being provided, the EECP would be redundant and therefore unnecessary.

With that being stated, it is laudable that defendants have implemented additional treatment options to better serve those EOP inmates who do not respond to the minimum treatment services required by the Program Guide.  However, at this time it would be premature to say that an EOP inmate on the wait list should be removed from it while he is treated within the EECP.  Prudence would seem to dictate that such an inmate should remain on the wait list until such time as his level of care changes or he has sufficiently stabilized and no longer requires a higher level of care.  The provision of specialized treatment pursuant to the EECP should not serve as an automatic basis to remove those inmates from the wait list.  An inmate who is referred to a DMH facility and is placed on the wait list should not be removed unless a clinical determination has been made to rescind the referral.

Although exclusionary criteria are most often associated with lack of access to DMH facilities, the EECP appears to be plagued with these same issues and barriers.  For example, defendants categorize inmates who are not suitable for or conducive to the EECP specialized services as those inmates who exhibit "behaviors such as calculative manipulation and victimization of other inmate-patients; disruptive behavior that interferes with other inmate-patients' treatment and the program schedule; violent acts towards others; taunting or preying upon others' sexually deviant behaviors;

and disregard for safety of others."[25]  These exclusionary criteria appear to eliminate many high custody inmates on the SVPP wait list from consideration for placement in the EECP.  Utilization of these criteria could serve as a barrier to reducing the SVPP wait list.

Finally, it is unclear to what degree the SVPP wait list will be reduced on a monthly basis once the initial identified inmates are removed from the wait list and placed in EECP designated institutions.

### d.    Defendants' Intermediate Care Facility Pilot Project

In November 2009, defendants implemented an ICF Pilot Program designed to increase referrals to low custody ICF beds by reviewing inmates on a case by case basis whose custody factors had previously prevented referral to a low custody ICF bed.  The pilot program was officially approved by the California Office of Administrative Law (OAL) in October 2009 and is in effect for two years until October 23, 2011.

Through new custody criteria and guidelines, HC-POP is allowed to recommend inmates for referral to ASH or VPP dorms who were previously excluded based on custody factors.  HC-POP reviewed the complete wait list as of September 2009 for potential referrals to ASH or VPP dorms and has continued this review through the date of this report.  The reported number of ICF referrals between November 4, 2009 and November 12, 2010 who transferred to ASH or the VPP dorms due to the ICF Pilot Program was 201.  The initial implementation of this pilot program has proven to be a tremendous success.  However, the expected reduction in the SVPP wait list as a result of

---

[25] Defendants' supplemental materials on the Extended Enhanced Outpatient Program Care Plan dated February 4, 2011 at page 7.

the ICF Pilot Program is only two inmates per month.  Defendants are evaluating the

regulatory and policy changes necessary to extend the pilot program beyond the

November 2011 termination date.

   In a further effort to reduce the ICF wait list, on October 5, 2010 the court

ordered defendants to "meet with the special master to develop a review program

modeled on the DMH-ICF Pilot Program for evaluation of inmates presently housed in

Level IV inpatient facilities to determine whether any of those inmates can be transferred

to another ICF facility." (docket no. 3929 ¶ 5)  The goal of the review was to determine if

any Level III or Level IV lower custody inmates were eligible to transfer out of SVPP

and into another ICF facility, thereby making more beds available for higher custody ICF

inmates on the wait list.  The special master met with defendants on October 6, 2010 and

they submitted the results of their review to the special master on December 7, 2010,

which identified 12 inmates as potential candidates for transfer to another DMH program.

CDCR then utilized the ICF Pilot Project criteria to determine if an inmate was eligible

for a case-by-case review for possible transfer to a low-custody bed at ASH or a VPP

dorm.  No inmates were deemed eligible for transfer.

   In their responses to plaintiffs' objections, defendants filed a plan to

review the SVPP population which served as a supplement to their December 7, 2010

report.  Defendants intend to continue the ongoing review of the SVPP population in an

effort to place inmates into lower level ICF beds and free up beds in the SVPP for higher

level custody inmates.  (docket no. 3994-1 at 58-65)  These reviews occur at various

points in time:

    &bull; Review of cases scheduled for placement at SVPP within 30 days
      of transfer;

37

- Quarterly review of SVPP's population; and
- Ongoing review for alternate ICF program eligibility at the Initial, Annual, and Program Classification Committee Reviews.[26]

Under the plan, there is a full-time correctional counselor III designated solely to evaluate DMH referrals under the ICF Pilot Project. Unfortunately, defendants acknowledge the ineffectiveness of this plan and report that only eight out of 308 reviewed inmates on the SVPP wait list were approved for ASH or VPP placement. *Id.* at 61.

"Plaintiffs object to Defendants' planned expansion of the ICF Pilot Project as inadequate and unresponsive to the Court's order." (docket no. 3987 at 11) The exclusionary criteria and the negligible effect of the ICF Pilot Project on a wait list comprised of hundreds of inmates form the basis of plaintiffs' objection. Embedded within plaintiffs' objection is the frustration of knowing that lower level ICF facilities are reporting vacant beds.

### e. **Defendants' Bed Projects**

Defendants point to their short-term, intermediate-term, and long range bed plans as ways of reducing both the ICF and APP wait lists. Although these projects pre-date the court's order to reduce the wait lists[27], some projects were completed during the development of defendants' wait list plan and other projects will be coming on line in the future which will have a direct and quantifiable impact on both the ICF and APP waitlists. During the period of May 2009 through February 2011, defendants added a total of 68 APP beds and 130 ICF beds for high custody inmates through their short and

---

[26] Docket No. 3994-1 at 59.
[27] Docket No. 3592 dated May 26, 2009.

38

intermediate term bed projects.[28]  The CMF 64-bed ICF high custody project is currently scheduled to be fully activated by December 23, 2011, eleven months ahead of schedule. CIW is scheduled to open its 45-bed ICF/acute care unit and be fully activated by March 9, 2012.[29]

The construction project that will have the greatest impact on the ICF and APP waitlists is the CHCF which will add 432 beds for ICF high-custody inmates and 43 beds for inmates in need of acute care.  The scheduled activation date for this project is not until December 8, 2013.  Defendants will meet the bed need for both ICF and APP inmates only when all these projects are completed.

Plaintiffs criticize defendants for including the short-term, intermediate-term and long range bed plans in the plan to reduce the wait lists.  Although plaintiffs are correct that these projects pre-date the current order to reduce the wait lists, two of the projects will be fully activated in 2011 which will increase the number of ICF high-custody beds by 180[30].  Whether these two projects are mentioned in a footnote or in the body of defendants' plan, their effect on the wait list should not be ignored as their completion is inextricably linked to a reduction in the waitlists.  With that being said, there will still be a period of nearly two years after the completion of the 64 beds at CMF, when no additional measures will be undertaken to reduce the wait lists pending the completion of the remaining construction projects in 2013, barring any delays.

---

[28] 32 beds in CMF P-1 unit and 32 beds in the P-2 unit were converted to APP beds.  The C-5 and C-6 units at SVSP were converted to 116 high custody ICF beds; two beds in the D-5 unit and two beds in the D-6 unit at SVSP were converted to high custody ICF beds and a ten-bed wing in the TC-2 unit at SVSP was double bunked for an additional ten beds.

[29] Defendants' plan does not include any female inmates.

[30] The 116 beds in the C-5 and C-6 units at SVSP were fully activated at the time of this report, but were not fully activated at the time defendants filed their plan.  The 64 beds at CMF are scheduled to be fully activated by February 17, 2012.

**f.**    **Interim Treatment Provided to Inmates on the Wait Lists**

Defendants' wait list plan states that inmates referred for a higher level of care and who remain on the wait list, will continue to receive treatment at their pre-referral level of care.  In addition they will also receive supplemental treatment until they transfer to a DMH facility or are removed from the wait list.  The features of this supplemental treatment provided to inmates on the wait list are as follows:

- Frequent and consistent interaction with the institutions requesting updated clinical status of the inmate-patients as well as provided encouragement to increase face-to-face activities between clinician staff and inmate-patients and one-on-one contacts as resources allowed.

    → A survey of all 30 male institutions, which demonstrated a significant effort by clinicians to individualize treatment plans within their resource constraints.[31]

- Providing the 30 male institutions with interim services beyond EOP program requirements, consistent with available resources, as follows:

    → IDTTs offered every 30 days or more often as clinically indicated;
    → IDTTs daily as clinically indicated;
    → Psychiatrist review every 2 weeks;
    → Referral to Coordinated Clinical Assessment Team consultation and development of ITPs;
    → Assigned one psychologist to inmate-patients on the SVPP wait list;
    → Placements in MHCBs or Outpatient Housing Units, as appropriate;
    → Placed on a high risk list as appropriate with high risk progress notes documented weekly;
    → Contact with case manager twice a week;
    → Housed in one specific area for easier observation and assessment by clinicians, licensed psychiatric technicians, and custody; and
    → Developed Positive Behavioral Plan.

- Engaging in monthly teleconferences with the DMH coordinators at all 33 institutions to discuss how to improve the process regarding how new inmate/patients are being referred to the appropriate higher level of care, clarify directives; and facilitate changes.

---

[31] The Program Guide provides for individual treatment plans for EOP inmates.  MHSDS Program Guide at 12-4-8.

40

- Reviewing twice a month the SVPP wait list to track inmate-patient movement, including paroles, verify that the inmate-patients on the respective wait list still need inpatient services, and remove those inmate-patients already placed in DMH programs, thereby optimizing bed usage and list accuracy.

- Improving the level of information exchange between DMH clinical staff and CDCR referring staff, particularly as it relates to understanding what services are available to an inmate-patient upon return to CDCR.

- Expanding the use of consultative services from the DMH Positive Behavior Unit at VPP in order to improve treatment plans for inmate-patients on the SVPP wait list and provide consultative services for difficult cases.

- Providing EECP at CMF and SVSP.

        In addition, defendants are "putting in place a new interim process to treat inmate-patients on the SVPP wait list who can safely program at the five EECP institutions with existing EECP inmate-patients."  (docket no. 3994 at 4-5, McGill Decl. ¶ 12)

        Plaintiffs' objection to this portion of defendants' plan is grounded in defendants' apparent lack of staffing and resources necessary to implement their proposals in addition to the qualifying language which provides defendants with an escape mechanism should implementation become too costly or too taxing on staff. Defendants premise the provision of this interim care on the availability of resources and staff. (docket no. 3962-1 at 22-23)  Plaintiffs correctly indicate that some services identified by defendants in their plan as "beyond EOP program requirements" *Id.* at 23, or actions taken to address the treatment needs of inmates on the wait list are already included as required treatment for EOP inmates.

        Other provisions included in defendants' plan to provide interim care to inmates on the wait list are extraneous to the provision of such care and are merely

41

processes undertaken by defendants to monitor referrals, track inmate movement and improve the exchange of information between CDCR and DMH.  *Id.*

Defendants' plan also contains conflicting information regarding treatment provided to inmates on the wait list.  The EECP at CMF and SVSP is listed as a treatment option for inmates on the wait list (*Id.* at 23) but the plan clearly states that inmates on the SVPP wait list who are eligible for EECP will be removed from the wait list.[32]

### g.    Summary of Projected Impact of Quality Management, the ICF Pilot Project, and the Bed Projects on the SVPP Wait List

Defendants' wait list plan anticipates how the various elements of their plan will effectively reduce the wait lists.  They anticipate that the activation of the CMF P-1 unit with its 32 acute care beds will reduce the APP wait list to near zero by December 2011.  Other elements of their plan would reduce the SVPP wait list as follows:

- diagnostic clarification would reduce the wait list by 14 inmates as of December 2010.
- length of stay reviews would reduce the wait list by two inmates per month.
- wait list reviews would reduce the wait list by five inmates per month.
- ICF Pilot Project would reduce the wait list by two inmates per month.

After the activation of 116 ICF high custody beds in the C-5 and C-6 units at SVSP in February of 2011 and the addition of 64 ICF high custody beds at CMF in December of 2011, the number of inmates on the SVPP wait list would remain relatively stagnant between 172 and 187 for a period of nearly *two years* until the completion of the CHCF in 2013.[33]  Any delays in the CHCF project will inevitably extend this period of

---

[32] Defendants' supplemental materials on the Extended Enhanced Outpatient Program Care Plan dated February 4, 2011 at page 6.
[33] Docket No. 3962-1 at 27.

stagnancy due to the lack of any other identifiable measures to further reduce the wait

lists. What defendants have accomplished is a reduction in the wait list numbers to the

level that existed prior to MHARP but concede that there is a point in time when no

further reduction in the wait list will occur without an increase in the number of ICF

beds.

## IV.    Plaintiffs' Proposals

### A.    Eliminate Artificial and Irrational Barriers to Access to DMH Facilities

Plaintiffs' arguments regarding custody exclusionary criteria that prevent

inmates from being placed in ICF lower custody beds are not new to either the parties or

the court. Plaintiffs state that the minimal success of the DMH-ICF Pilot Project,

defendants' quarterly review of the SVPP ICF wait list and the review of inmates housed

in high-custody ICF facilities for possible transfer to lower-custody facilities, clearly

illustrate defendants' inability to conduct an objective review of the exclusionary criteria.

They ask that such a review be conducted by an independent expert appointed by the

court or by the special master.

Plaintiffs find it illogical that ASH and CSH house sexually violent

predators, severely mentally disordered prisoners, and defendants found not guilty by

reason of insanity, but exclude wait list inmates who ultimately parole to the community

without receiving any inpatient treatment. Plaintiffs also state that defendants should be

prohibited from excluding from any DMH ICF facility, *Coleman* class inmates who have

scheduled parole dates within one year.

Plaintiffs request that all fully activated DMH facilities designated to

provide inpatient care to *Coleman* class members, achieve a 90-percent bed utilization

43

rate until the wait list is eliminated. To achieve that goal, plaintiffs request that defendants submit a plan to remove any barriers such as security, staffing, resources and physical plant limitations that currently prohibit the housing and treating of *Coleman* class members at the designated DMH facilities.

Without opining on plaintiffs' proposals, it is clear that the inaccessibility to DMH facilities is a primary cause of inmates lingering on the wait list. It does no good to identify inmates for higher levels of care if they simply become numbers on a list. These inmates must be provided with inpatient treatment and at present CDCR does not have the capabilities to provide such treatment. The only way to achieve any meaningful reduction of the wait list is by placing these inmates into inpatient beds. Pursuant to data provided by defendants, as of June 8, 2011, the total number of licensed bed capacity at Coalinga was 1,500 beds, with 400 beds held in suspense, for a net total of 1,100 beds. The 400 beds held in suspense are those beds that are currently unoccupied and for which the license has been suspended for their use. Of the 1,100 licensed beds, the census was 917 with 183 available beds as of June 8, 2011. It is inexcusable to have beds in DMH facilities that remain empty month after month when hundreds of mentally ill inmates are in need of inpatient treatment.

The special master concurs with plaintiffs regarding defendants' failure to utilize not only Coalinga, but all other resources within the control of DMH, to transfer inmates in need of critical inpatient care.[34]

---

[34] Plaintiffs ask the court to order defendants to accelerate construction projects contained in the long-range bed plan. In addition, they ask that defendants accelerate admissions from six inmates per week to 12 inmates per week to the 64-bed ICF unit at CMF now scheduled to open in February 2012. The court has previously ordered defendants to accelerate any of the construction projects to the extent possible (docket no. 3613 ¶ 1).

## V.             __MHARP Revisited__

The *Coleman* court's order of March 31, 2009 required defendants CDCR and DMH to work together to conduct an identification and assessment of *Coleman* caseload inmates at the 12 non-desert CDCR institutions to identify and assess any inmates in need of DMH-level of mental health care and to refer them for such care on an expedited basis.  (docket no. 3556 ¶ 7)  The court directed that the "special master and his experts shall supervise the modified assessment." *Id.*  While the special master supervised the process, the MHARP project was a collaborative endeavor between DMH, CDCR Division of Correctional Health Care Services (DCHCS) and Division of Adult Instituions (DAI).

In joint meetings held in April 2009 involving DMH, DCHCS, and DAI, supervised by the special master's team, the two departments developed a process to generate lists of potential inmates for DMH referral, conduct the assessments, refer and transfer inmates to DMH inpatient beds and train CDCR mental health clinicians and correctional counselors for the implementation of MHARP.

A central objective of MHARP was for CDCR to develop its process for clinical consideration and IDTT review of inmates for referral to DMH acute or intermediate levels of care.  One part of this process was CDCR's development of a new checklist-tool for stimulating and guiding appropriate clinical discussion and consideration, subsequently known as CDCR Form 7388.  It would later be adopted as the official form for DMH referral identification and decision-making by IDTTs throughout the system.

45

The original institutions selected for MHARP consisted of prisons with historically the highest rates of referrals to DMH.[35]  MHARP was designed to be implemented in two phases. (See Exhibit A attached hereto.)  Phase I of MHARP employed the criteria originally developed for the UNA study to identify inmates to be reviewed for possible referral to DMH.  Experts from the special master's team then visited the institutions to determine if the process appropriately employed the identification criteria.  Between the end of Phase I and the beginning of Phase II, many institutions began referring selected inmates to DMH.

During Phase II, review teams from DMH and CDCR visited each of the 12 institutions to determine if previously identified inmates were appropriate for referral. The decision to refer was the responsibility of the DMH and CDCR clinicians and the *Coleman* experts were on site to observe the process and provide suggestions when indicated.  If disagreements arose between CDCR and DMH clinicians whether or not to refer a particular inmate, the matter was be submitted to the correctional clinical assessment team (CCAT) for resolution.  CDCR custody staff, under the supervision of a correctional counselor II, completed case factor sheets for each inmate identified on the lists.  Custody factors were not used to exclude any inmate from being placed on the list to be considered for DMH referral.

Phase III was designed to train institutional staff on access to higher levels of care and to conduct an analysis of the compiled data for bed planning purposes. Because of the large number of individuals identified in Phase I, individuals who were not reviewed in Phase I were subsequently reviewed in Phase III.

---

[35] These institutions were CCI, CIM, CMC, CMF, CSP/Corcoran, CSP/Lac, MCSP, RJD, CSP/SAC, SQ, SVSP and WSP.

Phase IV of MHARP was designed to review the remaining 16 non-desert institutions, which included 13 male institutions and three female institutions[36] utilizing the same process employed at the original 12 institutions.[37]

The assessments began on April 15, 2009 and concluded on December 29, 2009. *The project resulted in the referral of nearly 1,000 inmates for inpatient mental health care in DMH programs.*

### The 2010 MHARP Follow-Up Examination of
### Institutional Implementation of DMH Referral Practices

On March 29, 2010, the *Coleman* court conducted a status conference at which the defendants briefed the court on steps they had taken to ensure that referral and transfer of inmates to DMH-level care was proceeding in such a way that no further special assessments should be necessary, and that those in need of higher levels of care were being identified and referred promptly. At that time, the wait list for inmates in need of intermediate inpatient care stood at the alarmingly high number of 574, and the wait list for acute care had grown to 64. (docket no. 3831 at 2-3)

In its order following the status conference, the court noted that defendants had taken "incremental steps toward establishing a sustainable process of identification and referral of those inmate-patients who need a higher level of care." *Id.* at 2. However, the Court also noted that "the size of the wait lists suggest[ed] that the short-term bed projects which have come on line will not be sufficient to eliminate the wait lists for

---

[36] These institutions were ASP, CIW, CCWF, CRC, CSATF, CTF, DVI, CSP/Folsom, HDSP, KVSP, NKSP, PBSP, PVSP, SCC, CSP/Solano and VSPW.
[37] The review of the non-desert institutions was ordered by the court on June 17, 2009, *see* docket no. 3613 ¶ 10.

inpatient care" and that "defendants' long-term bed projects will not be activated for another three years." *Id*. at 3. In its order the court stated:

> The special master shall monitor defendants' implementation of their policies and practices regarding referral and transfer of <u>Coleman</u> class members for inpatient care. This monitoring shall include, as necessary, collection, review and analysis of relevant data. If at any point during monitoring it becomes apparent to the special master that the sustainability of defendants' inpatient referral process is jeopardized by deficiencies uncovered during monitoring, he shall take all steps necessary to ensure that defendants correct such deficiencies. The special master shall report to the court on defendants' identification and referral process by the end of the year, either in his regular monitoring report or in a special report. (*Id.*)

The special master appointed a team of his experts to conduct a review at 13 institutions[38] to specifically examine the status and quality of their integration of the MHARP-generated DMH referral processes. On-site visits began on May 26 and ended on July 22, 2010. CDCR was asked to provide for each institution the following information covering the six-month period prior to the date of each institution's site visit: (a) DMH referrals; and (b) a list of inmates who met the criteria for consideration for intermediate level care but had not been referred. CDCR was also asked to produce (a) a list of inmates who had three or more MHCB placements during the preceding six month period; (b) information on inmates who had three of more RVRs during the ninety-day period before the site visit; and (c) information on inmates in the EOP who participated in less than half of offered treatment during the ninety-day period before the site visit, all of which are objective criteria for consideration for DMH referral. On site, the special master's experts consulted with mental health and custody staff, reviewed UHRs and C-files, and toured housing units at the institutions.

---

[38] CIM, CMF, CMC, CSP/Corcoran, CSP/LAC, CSATF, DVI, KVSP, MCSP, NKSP, RJD, SQ, and WSP.

The special master's report entitled "Follow-Up to the Mental Health Assessment and Referral Project of 2009: Examination of Institutional Implementation of DMH Referral Practices" was incorporated within his Twenty-Second Monitoring Report, which was filed with the court on March 9. 2011.  Overall, the MHARP follow-up found that while progress was made at the institutions with at least some aspects of the new process, no single institution was successful with implementing all elements of it. The core strategy for improving and sustaining the referral process – use of the Form 7388 -- was not being employed in a useful or productive manner at most of the 13 institutions.  Given the staggering number of inmates who were identified in the MHARP, and the tentative state of implementation of the new DMH referral processes, it was clear that further review was in order.

Recent monitoring reports received by the special master indicate that problems with DMH institutional referral practices still persist.  This will be covered in the special master's Twenty-Third Monitoring Report, which is expected to be distributed in draft to the parties in July 2011.

The court however, cannot wait for the issuance of the report, for the raw data shows escalating numbers of referrals that coincided with the MHARP and later with the DMH Follow-Up, and dramatic declines to pre-assessment levels after these assessments were concluded.  The chart below corroborates the monitor's observations and findings that the new DMH referral practices are not being fully implemented once these assessments are completed.



A reduction in the overall prison population does not account for the downturn in referrals. Unlike the non-MHSDS CDCR census, the mental health population has continued to grow since the pre-MHARP period. In March 2009 the mental health population stood at 33,803; in March 2010 it increased to 35,324, and in March 2011 it rose to 36,389.[39] Although one could logically predict that such growth in the mental health population would result in an increased number of referrals, this clearly has not happened.

The special master is mindful of defendants' concerns with conducting another assessment after a relatively short lapse of time since the preceding assessment.[40] However, the deficiencies and problems with defendants' implementation of the DMH referral practices and policies identified in the special master's Twenty-Second

---

[39] Data taken from CDCR Summary of Outpatient Population.
[40] Defendants detailed their concerns with the special master performing another assessment and proposed their own methodology for conducting the assessment in a letter to the special master dated June 8, 2011. See Exhibit B attached hereto.

Monitoring Report were clear.  Based on the objective and quantifiable data, as

demonstrated in the chart above, there has emerged a pattern of rising and falling

numbers of referrals that are correlated with the occurrences of assessments.

The recent enactment of AB 109[41] and the intended realignment of tens of

thousand of prisoners from CDCR to local counties will undoubtedly ease the

overcrowding within the institutions.  However, any reliance on AB 109 as a solution to

CDCR's overcrowding crisis is premature, as this legislation at present is an unfunded

mandate that cannot be implemented without further action by the California State

Legislature.  Seriously mentally ill inmates currently waiting for inpatient care, as well

those who will need care in the future, do not have the luxury of time while the

legislature grapples with various funding mechanisms.  This is a dire situation that calls

for another assessment at this time to gauge the present state of need within the

institutions for expedited referral to DMH inpatient care, and to reinforce the institutions'

implementation of sound referral practices to ensure continuing access to such care for

seriously mentally ill patients.

## VI.    <u>Recommendations</u>

Defendants' plan clearly represents the efforts of many individuals from

CDCR and DMH who spent countless hours on this collaboration.  The difficulty of their

task is great, and their effort to meet that challenge is apparent.

Defendants' efforts to create a level of care which they describe as higher

than the EOP level of care, but lower than ICF care may well turn out to be a component

of the solution to treating the seriously mentally ill in the prisons.  However, the EECP is

---

[41] "AB 109, Committee on Budget, Criminal justice alignment" was approved by the Governor on April 4, 2011 and filed with the Secretary of State the same day.

very new and is, by definition, still in its formative stages.[42]  The problem, meanwhile, remains complex and convoluted and not susceptible to an easy resolution.  It would be premature at this time for any determination or any associated recommendation that would lead to automatic removal from the wait list of any patient who is placed into the EECP.

The problems addressed by the plan are neither new nor unfamiliar to the defendants.  The UNA report was issued six years ago and exposed many of the same obstacles that exist today which prevent the delivery of inpatient care to CDCR inmates.  The number of inmates in need of inpatient care spiked after the UNA study and then gradually decreased until the same process was court-ordered in 2009 and renamed MHARP.

It is understandable that the court's exasperation with the seemingly futile effect of its mandates to provide inpatient treatment repeatedly finds its way into the body of its orders.  More than once this court has admonished the defendants for their inability to effectuate timely transfers of CDCR inmates most in need of inpatient treatment to higher levels of care.[43]  The court has specifically addressed DMH's refusal to use both ASH and CSH to reduce the wait list of Level IV inmates referred for inpatient treatment.  In its March 31, 2009 order, the court stated:

> Over the course of two days, DMH officials came forward with several proposals for inpatient care in locked units at CDCR institutions targeted at reducing or eliminating the backlog of Level IV inmates awaiting intermediate care.  However, DMH officials took an intractable position with respect to the use of Atascadero State Hospital (ASH) and Coalinga State Hospital (CSH) for any part of necessary solutions.  The special

---

[42] As a distinct level of care, the EECP should also be incorporated into the *Coleman* Program Guide, with its description, elements, and requirements with any applicable timeframes.

[43] Docket no. 1855; docket no. 2930; docket no. 3556.

> master made a series of recommendations to the court based on those
> meetings. Those recommendations are discussed below.

> The court is encouraged by the initial report from the special master in all
> respects with the exception of DMH's position on the use of ASH and
> CSH. Such intransigence is not new to this litigation, but it must change.
> (docket no. 3556 at 2-3)

In another order dated June 28, 2006, the court stated:

> It is undisputed that DMH is already an active participant in these
> proceedings. Moreover, DMH plays a critical role in creating sustainable
> and effective solutions for inpatient care within the California Department
> of Corrections and Rehabilitation (CDCR). It is also apparent that, for
> multiple reasons, DMH is failing to address specific court-ordered
> remedies. DMH's attempts to remedy the shortage of inpatient beds have
> been marked by delay and difficulty. (docket no. 1855 at 1-2)

The barrier to inpatient treatment for those inmates most in need of

treatment has not been limited to the instant case. In response to a motion filed by

plaintiffs jointly in the *Coleman* case and in the *Valdivia* case,[44] Judge Karlton issued an

order on August 7, 2008 which stated in part:

> Plaintiffs have demonstrated that Defendants in both cases have been
> pursuing and continue to pursue a statewide systemic policy of denying
> inpatient hospitalization to parolees confined by CDCR during the period
> before their parole violation hearings are complete, and to all inmates
> during the period within 35 days of a release on parole. (docket no. 2930
> at 4)

The time has come to fill all available beds designated for *Coleman* class

members at all designated DMH facilities. It is unacceptable that hundreds of inmates

wait for months for so-called appropriate inpatient beds when month after month

defendants report empty DMH beds ranging in numbers above 100. Defendants, and

DMH in particular, must find a way to utilize all available beds which have sat vacant far

too long and end the needless suffering of inmates in dire need of inpatient care. Inmates

---

[44] *Valdivia v. Schwarzenegger*, S-94-671 LKK GGH.

53

in need of medical care are routinely treated at community hospitals regardless of their

security classification.  Seriously mentally ill inmates should be accorded the same

prompt access to mental health treatment as inmates who receive prompt emergency

medical treatment.

Accordingly, the special master recommends the following:

1.    That defendants' Plan Re: Intermediate Care Facility and Acute Inpatient
      Wait List be approved.  All parts of the plan should be implemented
      immediately with the condition that no inmates who are accepted
      and placed in the EECP shall be removed from the wait list.

2.    That the special master should be ordered to monitor and conduct a review
      of the EECP, including but not limited to staffing.  The special master
      should be ordered to report to the court either in his regular monitoring
      report or in a special report, whether inmates transferred to the EECP
      should be removed from the wait list.

3.    The Court should set this matter for an evidentiary hearing for defendants
      to show cause why the 50 beds at Coalinga State Hospital designated for
      *Coleman* class members, as well as any other vacant beds at the facility,
      cannot be filled with high-custody CDCR inmates.

4.    The defendants should be ordered to conduct a further assessment to
      determine whether there are unmet needs for inpatient care among the
      plaintiff class.  The assessment should be modeled after MHARP which
      was conducted in 2009, and only at the original twelve identified male
      institutions and two female institutions and under the guidance of the
      special master.  As part of this process, the special master should also be
      directed to monitor the continued implementation and sustainability of
      defendants' policies and practices regarding referral and transfer of
      *Coleman* class members for inpatient care.  The special master should be
      ordered to report to the court on defendants' identification and referral
      process either in his regular monitoring report or in a special report.

Respectfully submitted,

/s/

_____

Matthew A. Lopes, Jr., Esq.

54

Special Master

June 13, 2011