DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
JANE E. KAHN – 112239
LISA ELLS – 243657
AARON J. FISCHER – 247391
ROSEN, BIEN & GALVAN, LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California 94104-4244
Telephone: (415) 864-8848

WARREN E. GEORGE – 053588
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, California 94111-4066
Telephone: (415) 393-2000

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>EDMUND G. BROWN, Jr., et al.,<br><br>　　　　Defendants.[1] | Case No. Civ S 90-0520 LKK-JFM<br><br>**PLAINTIFFS' RESPONSE TO SPECIAL MASTER'S REPORT ON DEFENDANTS' PLAN RE: ICF AND ACUTE INPATIENT WAIT LISTS**<br><br>Judge: Hon. Lawrence K. Karlton |

---

[1] The names of Defendants currently serving and their official capacities have been substituted pursuant to Fed. R. Civ. P. 25.

[515085-11]

# TABLE OF CONTENTS

**Page**

I. The Court Should Adopt the Special Master's Recommendations as to Implementation and Monitoring of the EECP and Completion of Further Assessment of Unmet Needs for Inpatient Care .......................................................... 3

    A. The Special Master Should Monitor and Report on Implementation of the EECP and Prisoners Placed in the EECP Should Not Be Removed from an Inpatient Care Wait List (Recommendations 1 and 2) ..................... 3

    B. Defendants Should Be Ordered to Conduct a Further Assessment of Unmet Needs for Inpatient Care Among *Coleman* Class Members (Recommendation 4) ...................................................................................... 4

II. The Court's Order Should Address the Vacant Beds at Coalinga, Atascadero, *and* Patton State Hospitals while *Coleman* Class Members Linger on Wait Lists or Are Otherwise Denied Admission for Inpatient Care (Recommendation 3) ................................................................................................ 5

    A. The Court's Order for an Evidentiary Hearing Should Require Defendants to Show Cause Why the More than One Hundred Vacant Beds at Coalinga State Hospital *and* Atascadero State Hospital Cannot Be Filled with Class Members Lingering on the Wait List ............................. 6

    B. The Court's Order Should Provide a Remedy for Defendants' Unconstitutional Denial of Clinically Necessary Inpatient Care for Female Class Members Awaiting Admission Despite Vacant DMH Beds ................................................................................................................ 8

        1. The Unconstitutional Denial of Timely Admission for Inpatient Hospitalization Is Serious and Ongoing for Female Class Members ................................................................................................ 9

        2. Defendants' *De Facto* Wait List for Female Class Members Is Nonsensical and Causes Significant Harm to Mentally Ill Prisoners, and Defendants Have Failed to Address this Constitutional Violation in Any Way ................................................. 10

    C. The Special Master's Report Confirms that Defendants' Failure To Utilize DMH Resources to Timely Transfer Prisoners for Critical Inpatient Care Has Resulted in "Inexcusable" Denials of Constitutionally Required Care and Supports Plaintiffs' Requests .............. 12

III. Plaintiffs Are Prepared to Proceed Promptly with the Evidentiary Hearing on the Order to Show Cause ........................................................................................ 14

CONCLUSION ........................................................................................................... 14

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| APP | Acute Psychiatric Program |
| ASH | Atascadero State Hospital |
| CDCR | California Department of Corrections and Rehabilitation |
| CDCR-DMH MOU | CDCR-DMH Memorandum of Understanding: Intermediate Care/Non-Acute Services |
| CIW | California Institution for Women |
| CSH | Coalinga State Hospital |
| DMH | Department of Mental Health |
| EECP | Extended Enhanced Outpatient Program Care Plan |
| EOP | Enhanced Outpatient Program |
| ICF | Intermediate Care Facility |
| MHARP | Mental Health Assessment and Referral Project |
| PSH | Patton State Hospital |
| SVPP | Salinas Valley Psychiatric Program |
| VPP | Vacaville Psychiatric Program |

On March 31, 2010, the Court ordered Defendants to develop a plan to "reduce or eliminate the wait lists for inpatient care and, in the interim, to better serve the treatment needs of *Coleman* class members placed on such lists." Order at 3, Dkt. No. 3831. After some delay, Defendants submitted Defendants' Plan Re: Intermediate Care Facility and Acute Inpatient Waitlists (hereinafter, the "DMH Plan") to the Court on November 24, 2010. Dkt. No. 3962. On February 25, 2011, Plaintiffs submitted their Objections to Defendants' Plan to Address Waitlists for Inpatient Care and to Reduce Harms Inflicted on Class Members on Waitlists (hereinafter, "Plaintiffs' Objections"), Dkt. No. 3987, to which Defendants responded on March 18, 2011, Dkt. No. 3994. On April 27, 2011, the Court directed the Special Master to file a report within 45 days "on the adequacy of defendants' plan and whether, in light of plaintiffs' objections, any modification(s) thereto should be required." Order at 2, Dkt. No. 4004.

On June 13, 2011, the Special Master filed the Special Master Report on Defendants' Plan Re: Intermediate Care Facility and Acute Inpatient Wait Lists (hereinafter, the "Special Master Report"), Dkt. No. 4020, in which the Special Master recommends the following:

1. That defendants' Plan Re: Intermediate Care Facility and Acute Inpatient Wait List be approved. All parts of the plan should be implemented immediately with the condition that no inmates who are accepted and placed in the EECP shall be removed from the wait list.

2. That the special master should be ordered to monitor and conduct a review of the EECP, including but not limited to staffing. The special master should be ordered to report to the court either in his regular monitoring report or in a special report, whether inmates transferred to the EECP should be removed from the wait list.

3. The Court should set this matter for an evidentiary hearing for defendants to show cause why the 50 beds at Coalinga State Hospital designated for *Coleman* class members, as well as any other vacant beds at the facility, cannot be filled with high-custody CDCR inmates.

4. The defendants should be ordered to conduct a further assessment to determine whether there are unmet needs for inpatient care among the plaintiff class. The assessment should be modeled after MHARP which was conducted in 2009, and only at the original twelve identified male institutions and two female institutions and under the guidance of the special master. As part of this process, the special master should also be directed to monitor the continued

[515085-11]

1
PLAINTIFFS' RESPONSE TO SPECIAL MASTER'S REPORT ON DEFENDANTS' PLAN RE: ICF AND ACUTE INPATIENT WAIT LISTS

1               implementation and sustainability of defendants' policies and
practices regarding referral and transfer of *Coleman* class members
2               for inpatient care. The special master should be ordered to report to
the court on defendants' identification and referral process either in
3               his regular monitoring report or in a special report.

4 Special Master Report at 54.

5       The Court granted the parties the opportunity to file and serve responses to the

6 Special Master Report and the Special Master's recommendations contained therein no

7 later than July 1, 2011. Order, Dkt. No. 4025, June 17, 2011.

8       Plaintiffs herein submit their response to the Special Master Report.

## INTRODUCTION

10       Nearly sixteen years after this Court identified the significant delays that mentally

11 ill prisoners face with respect to Department of Mental Health (DMH) inpatient psychiatric

12 hospitalization, resulting in "exacerbation of illness and patient suffering" and constituting

13 a violation of the Eighth Amendment, *see Coleman v. Wilson*, 912 F. Supp. 1282, 1309

14 (E.D. Cal. 1995), the Special Master has provided his report and recommendations to

15 address the still massive wait lists for inpatient hospitalization for mentally ill prisoners.

16 These recommendations are essential to any effort towards reducing and eliminating the

17 wait lists for inpatient psychiatric care in Intermediate Care Facility (ICF) or Acute

18 Psychiatric Program (APP) beds, and towards providing vital care to *Coleman* class

19 members lingering on a wait list or otherwise being denied timely admission for inpatient

20 hospitalization.

21       Plaintiffs endorse each of the Special Master's recommendations and request that

22 they be ordered by the Court, with a critical modification to the third recommendation.

23 The third recommendation as currently stated would require Defendants to show cause

24 why the fifty (50) DMH inpatient beds at Coalinga State Hospital (CSH) designated for

25 male *Coleman* class members, as well as other CSH beds, cannot be filled with high-

26 custody CDCR prisoners. This recommendation is of course essential to providing an

27 appropriate and long overdue remedy. However, the current recommendation is

28 incomplete, as it fails to address (1) the large number of vacant beds at Atascadero State

[515085-11]

Hospital (ASH) designated for *Coleman* class members; and (2) the *de facto* wait list that a growing number of female *Coleman* class members face as a result of DMH's refusal to treat them at Patton State Hospital (PSH), which remains the *only* facility with an inpatient program to meet these female prisoners' treatment needs.

For the reasons discussed below and in Plaintiffs' previously filed Objections (Dkt. No. 3987), Plaintiffs request that, in addition to adopting the recommendations set forth by the Special Master, the Court order Defendants to show cause why vacant beds at both CSH and ASH cannot be filled with higher-custody male CDCR prisoners. Plaintiffs further request that the Court order Defendants to end their policy of denying necessary inpatient psychiatric hospitalization to female *Coleman* class members based on artificial and irrational custody-related barriers, or order Defendants to show cause why beds at PSH cannot be filled with high-custody female CDCR prisoners, including those women that have been excluded in recent months.

## ARGUMENT

**I. The Court Should Adopt the Special Master's Recommendations as to Implementation and Monitoring of the EECP and Completion of Further Assessment of Unmet Needs for Inpatient Care**

**A. The Special Master Should Monitor and Report on Implementation of the EECP and Prisoners Placed in the EECP Should Not Be Removed from an Inpatient Care Wait List (Recommendations 1 and 2)**

Plaintiffs request that the Special Master's first and second recommendations, regarding the implementation and monitoring of the Extended Enhanced Outpatient Program Care Plan (EECP), be adopted and ordered by the Court.

As Plaintiffs have previously stated, Defendants have failed to commit necessary resources for timely implementation of EECP services, which will require enhanced staffing and other resources in order to provide the prescribed hours of treatment and other therapeutic components described in the plan. *See* Pls.' Objections at 9-11. Defendants have also identified what is a poorly defined sub-group of *Coleman* class members for EECP services, including prisoners who do not meet the criteria for ICF referral or are not recommended for referral to ICF treatment, or who display significant and ongoing

emotional and behavioral impairments following ICF treatment. *See id.* at 10. Given the apparent deficiencies and uncertainties in the EECP, it is critical that the Special Master monitor and conduct a review of the EECP, and report his findings to the Court.

Likewise, it would be premature and counterproductive for Defendants to remove any prisoner from the wait list for inpatient care upon their placement in the EECP, without a clinical determination that inpatient treatment is no longer clinically necessary for that individual. Such a practice should be precluded unless and until the Special Master and the Court find that the EECP is fully implemented and capable of providing necessary treatment and therapeutic benefit to prisoners placed in the program. *See id.* at 10-11 & n.3; *see also* Special Master Report at 35 (finding that the EECP, as described, would be "redundant and therefore unnecessary" if "all the services that are part of the EOP [Enhanced Outpatient Program] were actually being provided").

Plaintiffs thus request that the Court adopt the Special Master's first and second recommendations. The Court should direct the Special Master to monitor and conduct a review of the EECP, including but not limited to staffing, and to provide a report to the Court on such review. The Court should order Defendants not to remove any prisoner placed in the EECP from a wait list for inpatient care until further order of the Court.

**B.  Defendants Should Be Ordered to Conduct a Further Assessment of Unmet Needs for Inpatient Care Among *Coleman* Class Members (Recommendation 4)**

Plaintiffs request that the Special Master's fourth recommendation, regarding the completion of a further assessment of unmet needs for inpatient care among *Coleman* class members, be adopted and ordered forthwith by the Court.

The Special Master Report provides data clearly demonstrating "dramatic declines" in the number of referrals for inpatient care in the periods that have followed the Mental Health Assessment and Referral Project (MHARP) (April to December 2009) and the Special Master's "DMH Referral Follow-Up" review of Defendants' implementation of policies and practices regarding referral and transfer of class members for inpatient care (May to July 2010). From August 2010 to April 2011, the average monthly ICF referral

[515085-11]

4

PLAINTIFFS' RESPONSE TO SPECIAL MASTER'S REPORT ON DEFENDANTS' PLAN RE:  ICF AND ACUTE INPATIENT WAIT LISTS

rate has reached the pre-MHARP referral rate, which the MHARP demonstrated to be significantly below the referral rate appropriate to meet class members' actual needs for inpatient hospitalization. *See* Special Master Report at 49-50 (current ICF referral rate is 58.5% less than during MHARP period, and 42.6% less than during DMH Referral Follow-Up period). Twenty-Third Round Monitoring has revealed that "problems with DMH institutional referral practices still persist." *Id.* at 49. The Special Master accurately concludes that the ongoing problems with DMH referral practices constitute a "dire situation that calls for another assessment at this time to gauge the present state of need within the institutions for expedited referral to DMH inpatient care, and to reinforce the institutions' implementation of sound referral practices to ensure continuing access to such care for seriously mentally ill patients." *Id.* at 51.[2]

The need for further assessment to determine the existence and extent of unmet needs for inpatient care among *Coleman* class members, modeled after the 2009 MHARP and under the guidance of the Special Master, is indisputable. The Court should order this assessment forthwith, and direct the Special Master to monitor and report on the continued implementation and sustainability of Defendants' policies and practices regarding referral and transfer of *Coleman* class members for inpatient psychiatric hospitalization.

**II.  The Court's Order Should Address the Vacant Beds at Coalinga, Atascadero, *and* Patton State Hospitals while *Coleman* Class Members Linger on Wait Lists or Are Otherwise Denied Admission for Inpatient Care (Recommendation 3)**

The Special Master's third recommendation, which would require Defendants to show cause why the fifty (50) bed at CSH designated for *Coleman* class members, as well as any other vacant beds at the facility, cannot be filled by mentally ill prisoners lingering on the still massive wait list for inpatient care, is essential but incomplete. The

---

[2] Any reduction to the DMH inpatient wait list in recent months is almost certainly due to the significant decrease in DMH referral rates during that time period. If the DMH Referral Follow-up period's average monthly ICF referral rate had been maintained during the August 2010 to April 2011 period, approximately **365.4 more referrals** would have been made, *see* Special Master Report at 50, resulting in the addition of hundreds more prisoners to the current wait list for ICF care.

recommendation fails to address (1) the large number of vacant beds at ASH designated for *Coleman* class members; and (2) the *de facto* wait list that a growing number of female *Coleman* class members face as a result of DMH's refusal to treat them at PSH, which remains the *only* facility with an inpatient treatment program to meet these female prisoners' treatment needs.

Plaintiffs request that the Court order an evidentiary hearing and require Defendants to show cause why vacant beds at CSH, ASH, *and* PSH that are designated for *Coleman* class members, as well as any other vacant beds at these facilities, cannot be filled by mentally ill prisoners who are lingering on a wait list or are otherwise being denied timely inpatient hospitalization. Defendants' exclusionary criteria and custody-related barriers preventing class members' DMH admission, and the resulting denial of timely access to critically needed treatment, apply at each of these facilities. Each facility consistently excludes *Coleman* class members despite having numerous vacant beds. Addressing the exclusions of class members from these facilities together, as through a single evidentiary hearing, will provide the most efficient use of judicial and litigation resources, and provide a timely remedy to those mentally ill prisoners, male and female, being denied critically needed inpatient care.

### A. The Court's Order for an Evidentiary Hearing Should Require Defendants to Show Cause Why the More than One Hundred Vacant Beds at Coalinga State Hospital *and* Atascadero State Hospital Cannot Be Filled with Class Members Lingering on the Wait List

The persistence of vacant beds at ASH and CSH has contributed significantly to the massive ICF wait list and nearly two-year delays in access to inpatient care. *See* Pls.' Objections at 6; Special Master Report at 44 ("[I]t is clear that the inaccessibility to DMH facilities is a primary cause of inmates lingering on the wait list" for inpatient psychiatric hospitalization.). The most recent DMH Monthly Bed Utilization data establishes that *none* of the fifty (50) CSH beds designated for *Coleman* class members is filled with a *Coleman* class member, and that fifty-eight (58) of the 256 ASH beds are currently vacant. Declaration of Aaron J. Fischer in Support of Plaintiffs' Response to Special Master's

Report on Defendants' Plan re: ICF and Acute Inpatient Wait Lists ("Fischer Decl."), ¶ 5. Since December 2010, DMH has reported an average census of *Coleman* class members at ASH of 207.5, and thus an average of 48.5 vacant beds during that period. *Id.* ¶ 6.

The Special Master has reported that the "only way to achieve any meaningful reduction of the wait list is by placing these inmates [from the higher-custody Salinas Valley Psychiatric Program (SVPP) and the SVPP wait list] into inpatient beds." Special Master Report at 44. The Court has repeatedly directed Defendants to find ways to move class members requiring inpatient hospitalization to lower custody DMH facilities, where there are open beds. *See, e.g.,* Order at 4, Dkt. No. 3929, Oct. 5, 2010 (directing Defendants to develop a review program for inmates presently housed in a high-custody inpatient hospital to determine whether any of those inmates can be transferred to a lower-custody ICF facility); Order at 2, Dkt. No. 3720, Nov. 2, 2009 (directing Defendants to review all of the inmate-patients on the waiting list for the high custody program at SVPP to determine whether any of are eligible for admission to ASH or the Vacaville Psychiatric Program (VPP)); Order at 3-4, Dkt. No. 3613, June 18, 2009 (directing Defendants to fill all 256 beds at ASH with *Coleman* class members in need of ICF care).

Yet Defendants have refused to make any meaningful changes to their exclusionary criteria for inpatient care at DMH facilities. Defendants' response has been entirely inadequate, and has had a "negligible effect" on the wait list. *See* Special Master Report at 38. The recent ICF Pilot Project, for example, resulted in *zero* transfers of class members from the high-custody SVPP ICF facility to facilities with open beds, such as ASH and CSH. *See id.* at 37; Pls.' Objections at 11-12. Defendants' DMH Plan provides for a quarterly review of the SVPP ICF wait list for possible placement of higher custody mentally ill prisoners in a lower-custody unit, such as at CSH or ASH, but establishes no formal process for such review; by Defendants' own estimate, the SVPP wait list review process will reduce the wait list by just *two* patients per month. DMH Plan at 16-17.

Given that CSH and ASH *each* have approximately fifty (50) vacant beds designated for *Coleman* class members, and even more vacant beds generally, *see* Special

1  Master Report at 44, and given that Defendants have consistently failed to complete a
2  meaningful and effective review of higher custody prisoners in need of inpatient
3  hospitalization to facilitate admissions at CSH and ASH, it is appropriate and necessary for
4  the Court to order Defendants to show cause why vacant beds at either facility cannot be
5  filled with class members lingering on the ICF wait list.  The relevant factual issues
6  regarding exclusion of *Coleman* class members – including the custody-related
7  exclusionary criteria used to deny access to inpatient DMH care and the available means to
8  provide adequate security – are largely the same at the two DMH facilities.  Judicial
9  efficiency and the need for a timely remedy are served by the Court's consideration of
10  whether Defendants should be required to place class members awaiting inpatient care in
11  vacant beds at both CSH and ASH.

   **B.** **The Court's Order Should Provide a Remedy for Defendants' Unconstitutional Denial of Clinically Necessary Inpatient Care for Female Class Members Awaiting Admission Despite Vacant DMH Beds**

14    In the Court's order directing Defendants to develop a plan to reduce or eliminate
15  the wait lists for inpatient hospitalization, the Court found that the wait lists for mentally ill
16  prisoners, including male prisoners referred for intermediate care and acute inpatient care
17  *and female prisoners referred for inpatient care* constituted a "serious and substantial
18  problem." Order at 2-3, Dkt. No. 3831.  The Court ordered Defendants to forthwith direct
19  their attention to solving the ongoing and growing problem of these delays in providing
20  inpatient care.  *Id.* at 3.  Since the Court issued its order, however, Defendants have
21  persisted with a policy of wholesale denial of inpatient psychiatric hospitalization for a
22  subset of female *Coleman* class members, based on irrational and artificial custody factors
23  and despite vacant DMH beds at PSH.  These female mentally ill prisoners have been
24  placed on what amounts to a *de facto* wait list for admission to a still under-construction
25  CDCR inpatient facility.  Defendants' DMH Plan fails to address this ongoing
26  constitutional violation in any way.  The Special Master Report, meanwhile, confirms that
27  Defendants' failure to utilize available DMH resources has resulted in "inexcusable"
28  denials of constitutionally required care.  Special Master Report at 49.  These facts support

1 Plaintiffs' instant request that the Court's order on Defendants' DMH Plan address this
2 unconstitutional denial of inpatient care to female *Coleman* class members.

### 1. The Unconstitutional Denial of Timely Admission for Inpatient Hospitalization Is Serious and Ongoing for Female Class Members

Since June 2010, DMH has denied admission of female prisoners referred for inpatient care at PSH at least fifteen (15) times, based solely on Defendants' determination that these women pose a risk of assault or violence. *See* Fischer Decl., ¶ 13. CDCR clinicians have referred some of these women *multiple times* for inpatient hospitalization during this time period, only for them to be rejected each time. *Id.* ¶ 14. PSH is the *only* facility available to provide an inpatient level of care to female mentally ill prisoners. With no alternative inpatient beds for these women, these mentally ill prisoners languish in their current placements, even as their clinicians find such placements inadequate and determine that inpatient hospitalization at PSH is necessary.

For each of these custody-based rejections from inpatient care, Defendants have relied on the July 5, 2010 CDCR-DMH Memorandum of Understanding: Intermediate Care/Non-Acute Services (hereinafter, the "CDCR-DMH MOU"), a document that has never been approved by the Court or the Special Master. Fischer Decl., Ex. B. The relevant provision of the CDCR-DMH MOU provides as follows:

> Inmate-patients who are deemed a significant assault risk, have a history of victimizing other inmate-patients (including inciting others to act in a dangerous manner), or present a high escape risk, shall not be referred to the State hospitals. In these cases, the psychiatric programs, VPP or SVPP, shall provide mental health services.

CDCR-DMH MOU at 11.

The identified alternative program placements in the CDCR-DMH MOU – VPP and SVPP – provide inpatient care to *male* prisoners only. Thus, to the extent the MOU is used to exclude female prisoners in need of inpatient hospitalization for mental illness, *there is no alternative inpatient treatment setting, forcing these women to wait not only for an inpatient bed to become vacant, but for such a bed to exist at all.*

[515085-11]

9

PLAINTIFFS' RESPONSE TO SPECIAL MASTER'S REPORT ON DEFENDANTS' PLAN RE: ICF AND ACUTE INPATIENT WAIT LISTS

As a result of Defendants' rejections, mentally ill female prisoners are made to linger in clinically inappropriate settings, with clinically inadequate treatment. These women have faced, and continue to face, what amounts to a *de facto* wait list. Defendants' current mental health bed plan includes the activation of a 45-bed inpatient APP/ICF facility at California Institution for Women (CIW), which will not be completed until *at least* March 2012. *See* Fischer Decl., Ex. D (Defs.' Letter to Special Master re: *Coleman* Construction Activation Schedules at Ex. 11, June 2, 2011).[3] Mentally ill female prisoners who are denied clinically indicated inpatient hospitalization at PSH must wait indefinitely for admission. Without an order of this Court, Defendants' unconstitutional denial of critically needed mental health treatment for these women will continue until *at least* March 2012. In fact, Defendants' delays in completing and activating CIW's ICF unit and other inpatient facilities suggest that the denial of care may last significantly longer.

### 2. Defendants' *De Facto* Wait List for Female Class Members Is Nonsensical and Causes Significant Harm to Mentally Ill Prisoners, and Defendants Have Failed to Address this Constitutional Violation in Any Way

The DMH rejection letters for female *Coleman* class members denied clinically indicated inpatient care demonstrates that such denials (1) are nonsensical, and (2) result in significant harm to these women.

Among the criteria for DMH inpatient hospitalization is that the patient has a serious mental disorder and "is a danger to self or others as a consequence of a serious

---

[3] It remains uncertain whether the CIW 45-bed APP/ICF unit's activation and patient admissions will be completed on schedule. Defendants have reported that the start of construction for the CIW APP/ICF unit is delayed by 92 days; a report on the impact of this delay has not been provided to the Special Master and Plaintiffs' counsel. *See* Fischer Decl., Ex. D. The staff hiring process for the CIW APP/ICF unit is also delayed by 19 days, with CDCR reporting that it is still seeking hiring freeze exemptions for critical positions. *Id.* Activation delays continue to plague Court-ordered construction projects. Defendants have recently informed the Court of (1) an estimated 55-day delay to complete activation of the California Men's Colony 50-bed MHCB unit, and (2) an estimated 57-day delay to complete activation of the California Medical Facility 64-bed ICF unit. *See* Defs.' Update to Court re: California Men's Colony 50-Bed MHCB Unit and California Medical Facility 64-Bed Intermediate Care Facility, Dkt. No. 4024, June 16, 2011.

1 mental disorder." *See* Fischer Decl., ¶ 9, Ex. A (Mental Health Services Delivery System Program Guide at 12-6-2).  Yet female prisoners are being *excluded* based on determinations that they are a danger to others, even where their assaultive behaviors are the direct consequence of a serious mental disorder.  *See, e.g., id.*, ¶ 16 (patient referred for DMH inpatient hospitalization based on "delusional beliefs that EOP officers are telling her to hit others" and that she is "receiving 'messages from her mother inside her head to take care [of] certain inmates," but rejected due to risk of violence); *id.* ¶ 17 (patient referred for DMH inpatient hospitalization based on "inadequate functioning in the prison milieu" and "failure to transition to EOP treatment setting," but rejected due to risk of assault).  It makes no sense that the very criteria for a patient's admission to DMH inpatient hospitalization serve as the basis for rejection from such care, particularly where no alternative inpatient treatment setting is available.

Female prisoners denied necessary inpatient hospitalization are placed in serious danger of further decompensation and resulting harm to their mental and physical well-being.  *See, e.g., id.* ¶ 18 (patient referred for DMH inpatient hospitalization based on self-injurious behavior and self-harm that has led to *nine (9) Mental Health Crisis Bed (MHCB) admissions* in eight months, but rejected due to past "episodes of assaultive behavior" requiring physical restraint).  The multiple clinical referrals for DMH inpatient hospitalization for some of these women (who are rejected each time) demonstrates that their current CDCR placements are inadequate; without timely inpatient hospitalization, these patients face further decompensation following their improper and repeated rejections from PSH.  *See, e.g., id.* ¶ 19 (patient referred in December 2010 and again in May 2011 based on "suicidality and self-injury," including "carv[ing] letters and symbols on her thighs," and rejected both times based on risk of assault, despite clinician's finding that "[w]hen she has a supportive environment, the patient is able to engage and would benefit from a lesser restrictive unit with other peers" and eight (8) prior inpatient hospitalizations, including three (3) hospitalizations at PSH).

Defendants have failed to address, or even recognize, the problem of female class

[515085-11]

11

PLAINTIFFS' RESPONSE TO SPECIAL MASTER'S REPORT ON DEFENDANTS' PLAN RE:  ICF AND ACUTE INPATIENT WAIT LISTS

members denied inpatient care based on "safety and security factors" in their DMH Plan and their Response to Plaintiffs' Objections. Defendants' refusal to admit this subset of *Coleman* class members to open DMH beds at PSH is no different than their refusal to admit a subset of male *Coleman* class members to CSH and ASH. The implicit bases for these rejections are that DMH may exclude these patients from open inpatient beds, that DMH has no duty to meet custody or security needs to allow for class members' timely admission into vacant inpatient beds, and that DMH may instead wait until long-term and often delayed construction projects result in additional inpatient beds. Defendants' position boils down to an argument that an unconstitutional level of mental health care should simply be tolerated for the next several months or years. The Court should not accept this argument with respect to either male or female mentally ill prisoners.

### C. The Special Master's Report Confirms that Defendants' Failure To Utilize DMH Resources to Timely Transfer Prisoners for Critical Inpatient Care Has Resulted in "Inexcusable" Denials of Constitutionally Required Care and Supports Plaintiffs' Requests

Defendants should not be permitted to use artificial barriers, including custody or security factors, to deny *Coleman* class members timely access to needed mental health care, while there are empty inpatient DMH beds. The Special Master Report finds that the "inaccessibility to DMH facilities is a primary cause of inmates lingering on the wait list," and that "[i]t is inexcusable to have beds in DMH facilities that remain empty month after month when hundreds of mentally ill inmates are in need of inpatient treatment." Special Master Report at 44. The Special Master goes on to find what is now clear to all involved in this litigation, from the Court and legal counsel to clinicians and mentally ill prisoners:

> It does no good to identify inmates for higher levels of care if they simply become numbers on a list. These inmates must be provided with inpatient treatment and at present CDCR does not have the capabilities to provide such treatment. The only way to achieve any meaningful reduction of the wait list is by placing these inmates into inpatient beds.

*Id.*

While the Special Master's third recommendation is limited to requiring Defendants

to show cause why CSH's beds cannot be filled with high-custody CDCR prisoners, the Special Master makes clear that he "concurs with plaintiffs regarding defendants' failure to utilize *not only Coalinga, but all other resources within the control of DMH*, to transfer inmates in need of critical inpatient care." *Id.* (emphasis added).  Plaintiffs seek an order to remedy the serious and substantial problem of denying constitutionally required inpatient hospitalization to *Coleman* class members, male *and* female, for whom such care is clinically necessary.  The Special Master Report has identified the need to provide such a remedy forthwith:

> "The time has come to fill all available beds designated for *Coleman* class members at all designated DMH facilities. . . . *Defendants, and DMH in particular, must find a way to utilize all available beds which have sat vacant far too long and end the needless suffering of inmates in dire need of inpatient care.* Inmates in need of medical care are routinely treated at community hospitals regardless of their security classification. Seriously mentally ill inmates should be accorded the same prompt access to mental health treatment as inmates who receive prompt emergency medical treatment."

*Id.* at 53-54 (emphasis added).

The Special Master Report, the Court's findings on the need to address delays in the provision of inpatient care, and the current exclusionary policies being used by Defendants make plain the need for an appropriate remedy for both male *and* female class members being denied clinically necessary, and constitutionally required, inpatient hospitalization at CSH, ASH, *and* PSH.[4]

---

[4] As Plaintiffs have argued previously, Defendants have no legitimate basis for excluding seriously mentally ill prisoners requiring inpatient psychiatric hospitalization.  The transfers of prisoners with serious medical conditions to hospital beds are not subject to exclusionary criteria, and there is no reason that prisoners with serious mental health issues should be subject to such exclusions resulting in denial of necessary and timely care. If a prisoner requires medical care at an outside hospital, CDCR transports the prisoner to the hospital and provides whatever security is necessary.  The same arrangements can be made for mentally ill prisoners at CSH, ASH, PSH, or other DMH hospitals.

[515085-11]

13
PLAINTIFFS' RESPONSE TO SPECIAL MASTER'S REPORT ON DEFENDANTS' PLAN RE:  ICF AND ACUTE INPATIENT WAIT LISTS

### III. Plaintiffs Are Prepared to Proceed Promptly with the Evidentiary Hearing on the Order to Show Cause

Plaintiffs will serve limited and expedited discovery reasonably necessary for purposes of the evidentiary hearing on the Order to Show Cause. Such discovery will consist of inspections with appropriate experts at the DMH facilities where there are vacant beds designated for *Coleman* class members, as well as file reviews of class members in need of inpatient care but excluded from lower custody DMH facilities.

Given the urgent need for an appropriate remedy to the ongoing exacerbation of illness, patient suffering, and constitutional violations resulting from the significant delays in access to inpatient hospitalization, Plaintiffs will complete the inspections in a prompt and efficient manner and will be prepared to proceed with an evidentiary hearing by mid-August 2011.

## CONCLUSION

Plaintiffs request that the Court adopt the Special Master's first, second, and fourth recommendations regarding Defendants' DMH Plan. Plaintiffs request that the Special Master's third recommendation for an evidentiary hearing be modified such that Defendants are ordered to (1) show cause why vacant beds at both CSH and ASH cannot be filled with higher-custody male CDCR prisoners; and (2) end their policy of denying necessary inpatient care to female *Coleman* class members based on artificial and irrational custody-related barriers, or show cause why beds at PSH cannot be filled with high-custody female CDCR prisoners.

DATED: July 1, 2011                Respectfully submitted,

ROSEN, BIEN & GALVAN, LLP

By: */s/ Aaron J. Fischer*
Aaron J. Fischer

Attorneys for Plaintiffs

[515085-11]