1   KAMALA D. HARRIS
    Attorney General of California
2   JONATHAN L. WOLFF
    Senior Assistant Attorney General
3   DEBBIE J. VOROUS, State Bar No. 166884
    DAVID BRICE, State Bar No. 269443
4   Deputy Attorneys General
     1300 I Street, Suite 125
5    P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone:  (916) 324-5345
     Fax:  (916) 324-5205
7    E-mail:  Debbie.Vorous@doj.ca.gov

8   *Attorneys for Defendants*

9                 IN THE UNITED STATES DISTRICT COURT

10               FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13   **RALPH COLEMAN, et al.,**              2:90-cv-00520 LKK JFM P

14                          Plaintiffs,    **DEFENDANTS' RESPONSE AND**
                                           **OBJECTIONS TO SPECIAL MASTER'S**
15                                          **REPORT ON DEFENDANTS' PLAN RE:**
            v.                             **INTERMEDIATE CARE FACILITY AND**
16                                          **ACUTE INPATIENT WAIT LISTS**

17   **EDMUND G. BROWN JR., et al.,**

18                          Defendants.

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3    I.    INTRODUCTION .......................................................................................................... 2

4    II.   DEFENDANTS WITHDRAWAL OF EXTENDED ENHANCED
            OUTPATIENT PROGRAM CARE PLAN ............................................................... 3
5
      III.  OBJECTION RE: COALINGA STATE HOSPITAL ................................................. 5
6
               A.    THE COURT SHOULD REJECT THE SPECIAL MASTER'S
7                     RECOMMENDATION TO SET AN EVIDENTIARY HEARING ON
                      COALINGA BECAUSE THE COURT MUST GRANT DEFENDANTS
8                     WIDE DEFERENCE IN MATTERS OF PRISON SECURITY AND
                      SAFETY ............................................................................................................. 5
9
               B.    THE COURT SHOULD ALSO REJECT THE SPECIAL MASTER'S
10                    RECOMMENDATION FOR AN EVIDENTIARY HEARING BECAUSE
                      DEFENDANTS HAVE COMPLIED WITH THIS COURT'S ORDER
11                    AND THE UNDERLYING BASES FOR HIS RECOMMENDATION
                      ARE WRONG ..................................................................................................... 7
12
               C.    AN EVIDENTIARY HEARING IS NOT APPROPRIATE BECAUSE
13                    CONVERTING COALINGA INTO A PRISON SETTING TO PROVIDE
                      INTERIM CARE TO THE INMATE-PATIENTS ON THE SVPP
14                    WAITLIST IS NOT A SHORT-TERM SOLUTION AND
                      DEFENDANTS' BED PLANNING EFFORTS MEET THE NEED. ................. 11
15
      IV.  OBJECTION RE:  REPEAT OF THE 2009 MHARP ................................................. 11
16             A.    THE SPECIAL MASTER'S REPORT ON DEFENDANTS' PLAN IS AN
                      IMPROPER VEHICLE TO RECOMMEND THAT THIS COURT
17                    ORDER DEFENDANTS TO REPEAT THE 2009 MHARP .............................. 13

18             B.    THE COURT SHOULD REJECT THE SPECIAL MASTER'S
                      RECOMMENDATION TO REPEAT THE 2009 MHARP BECAUSE HIS
19                    RECOMMENDATION IS COUNTER-PRODUCTIVE TO
                      ESTABLISHING A SUSTAINABLE DMH REFERRAL PROCESS ............... 14
20
                      1.    Defendants Have Developed and Implemented Multiple Steps to
21                           Manage and Sustain the Referral Process and a Repeat of the 2009
                             MHARP is Unnecessary. ...................................................................... 14
22
                      2.    There is No Added Value in Repeating the 2009 MHARP and to
23                           Repeat it Would be Unreasonable ........................................................ 24

      V.   CONCLUSION ........................................................................................................... 26
24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Bell v. Wolfish*
    441 U.S. 520 (1979) ................................................................................ 6

*Toussaint v. McCarthy*
    801 F.2d 1080 (9th Cir. 1986) .............................................................. 7, 8

*Whitley v. Albers*
    475 U.S. 312 (1986) ................................................................................ 6

STATUTES

18 U.S.C. § 3626(a)(1)(A) ............................................................................ 6, 7

Penal Code § 1370 .......................................................................................... 9

ii

| Acronym List | |
|---|---|
| Term | Definition |
| APP | Acute Psychiatric Program |
| ASH | Atascadero State Hospital |
| CMF | California Medical Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CHCF | Correctional Health Care Facility |
| Coalinga | Coalinga State Hospital |
| DMH | Department of Mental Health |
| EECP | Enhanced Outpatient Program Care Plan |
| EOP | Enhanced Outpatient Program |
| HC-POP | Health Care Placement Oversight Program |
| ICF | Intermediate Care Facility |
| MHARP | Mental Health Assessment Referral Project |
| MHCBs | Mental Health Crisis Beds |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP | Salinas Valley State Prison |
| VPP | Vacaville Psychiatric Program |

1

## I.    INTRODUCTION

In the two years since the Court's orders on the high-custody inpatient waitlists, Defendants have made and continue to make tremendous progress.  The waitlist is down, referrals are up, Defendants developed and implemented a procedure to sustain the referral process, and there is now in place a process for Defendants to monitor and audit the results.  However, the Special Master's most-recent report and recommendations might lead the Court to believe that Defendants have not made progress and are backsliding.  This is not true.  Therefore, Defendants object to the Special Master's recommendations to move dangerous, high-custody inpatient-patients into Coalinga State Hospital, a dorm-setting facility, and object to the need for a third mental health assessment and referral project.

On April 27, 2011, the Court ordered the *Coleman* Special Master to file a report on the adequacy of Defendants' Plan to reduce or eliminate the Salinas Valley Psychiatric Program (SVPP) and Vacaville Psychiatric Program (VPP) waitlists for inmate-patients referred to Intermediate Care Facility (ICF) and Acute Psychiatric Program (APP) (hereafter the SVPP and the APP waitlists, respectively) treatment programs operated by the California Department of Mental Health (DMH).  The Special Master's Report on Defendants' plan contains four inappropriate recommendations for orders by the Court.

First, the California Department of Corrections and Rehabilitation (CDCR) developed as one approach to reducing the SVPP waitlist, an Extended Enhanced Outpatient Program Care Plan (EECP).  The Special Master's first recommendation is to approve the EECP on the condition that no inmate-patients who are accepted and placed in the EECP shall be removed from the SVPP waitlist.  The Special Master's second recommendation is to monitor and review the EECP.  In light of the Special Master's recommendations on the EECP, CDCR is withdrawing the EECP from Defendants' plan.  Therefore, the Special Master's first and second recommendations with respect to the EECP are moot and the Court need not address them.

Second, Defendants object to the Special Master's third recommendation that the Court set this matter for an evidentiary hearing on why Defendants cannot admit high-custody dangerous ICF inmate-patients off the SVPP waitlist who require celled housing into the low-custody

2

1  dormitory setting at Coalinga State Hospital (Coalinga). Defendants object because having an

2  evidentiary hearing impedes on the discretion provided to prison and hospital officials in matters

3  of security and safety. Additionally, the Court should reject the Special Master's

4  recommendation for an evidentiary hearing on Coalinga because the bases underlying his

5  recommendation are wrong. Moreover, converting Coalinga into a prison setting to provide

6  interim care to the inmate-patients on the SVPP waitlist is not a short-term solution to providing

7  care—Defendants' bed planning efforts already provide 432 new ICF and 43 new APP beds that

8  are currently under construction and that Defendants expect to activate in March 2013.

9      Finally, Defendants object to the Special Master's fourth recommendation that the Court

10  order Defendants to conduct a further unmet needs assessment modeled after the 2009 court-

11  ordered Mental Health Assessment and Referral Project (MHARP) (hereafter 2009 MHARP).

12  Defendants object to this recommendation because the Special Master improperly uses his report

13  on Defendants' plan to reduce the ICF waitlists as a vehicle for recommending a court order that

14  increases that list. Additionally, repeating the 2009 MHARP is counter-productive to the goal of

15  sustaining the referral process that Defendants have put in place, is unnecessary, adds no value to

16  the referral process, and would result in an unreasonable use of state resources.

17      The Court should therefore not consider the Special Master's first and second

18  recommendations regarding the EECP, and reject his third and fourth recommendations regarding

19  Coalinga and a repeat of the 2009 MHARP.

20      **II.     DEFENDANTS WITHDRAWAL OF EXTENDED ENHANCED**
          **OUTPATIENT PROGRAM CARE PLAN**

21

22      The California Department of Corrections and Rehabilitation (CDCR) designed the

      Extended Enhanced Outpatient Program (EOP) Care Plan (EECP) as one of five approaches to

23

      manage and reduce the SVPP waitlist. (Docket No. 3962–1 at 4, 6–8; Docket No. 3994–1 at 20–

24

      23.)[1] Specifically, CDCR designed the EECP to provide treatment interventions targeted to a

25

26      [1] In Defendants March 18, 2011 filing, Defendants reported that of the 68 inmate-patients
      that they identified as of November 24, 2010, as meeting the EECP clinical indicators for

27      transfers to an EECP institution, they had admitted 23 of the previously identified inmate-patients
      to ICF programs. (Docket No. 3994 at 10–11.) The Special Master interprets the transfer of the

28      23 inmates to mean a "32-percent reduction of inmates previously identified as eligible for the

                                        (continued…)
                                              3

1    subgroup of EOP inmate-patients who exhibit serious and persistent mental illness and whose

2    level of functioning is insufficient to allow general population placement.  (*Id.*)  Additionally,

3    these inmate-patients frequently experience a cyclical pattern of placement in Mental Health

4    Crisis Beds and/or ICF beds without any long lasting effects.  (*Id.*)  Under the Plan, CDCR

5    expected to remove inmate-patients from the SVPP waitlist who were eligible for EECP services.

6    (*Id.*)

7        The Special Master's first two recommendations relate to the EECP in the following ways:

8        1.  That defendants' Plan Re:  Intermediate Care Facility and Acute Inpatient
            Wait List be approved.  All parts of the plan should be implemented
9            immediately *with the condition that no inmates who are accepted and placed
            in the EECP shall be removed from the wait list.*
10
        2.  That the special master should be ordered to monitor and conduct a review of
11           the EECP, including but not limited to staffing.  The special master should be
            ordered to report to the court either in his regular monitoring report or in a
12           special report, whether inmates transferred to the EECP should be removed
            from the wait list.
13
        (Docket No. 4020 ¶¶ 1–2) (italics added).
14
15        Rather than object to the Special Master's two recommendations on the EECP, CDCR is

16    withdrawing the EECP from Defendants' plan for the following reasons.  The Special Master's

17    first recommendation, in effect, defeats the purpose of the EECP because it recommends against

18    CDCR removing inmate-patients from the SVPP waitlist who are provided EECP services.  Thus,

19    absent the ability to use the EECP to reduce the SVPP waitlist, the EECP should no longer be part

20    of Defendants' Plan.  The Special Master's second recommendation, which seeks an order to

21    monitor and review the EECP, is redundant.  According to the Special Master, the Defendants'

22    EECP Plan is simply EOP treatment afforded per the *Coleman* Program Guide:  "An EOP inmate

23    who does not warrant referral to a higher level of care should be provided with all the necessary

24    treatment that is clinically indicated by the IDTT.  If all the services that are part of the EOP were

25    actually being provided, the EECP would be redundant and therefore unnecessary."  (Docket No.

26    _____

27    (…continued)
     EECP program."  (Docket No. 4020 at 32.)  But this simply represents that during the review
     process and while Defendants were starting to implement the program, that 23 inmate-patients
28    were in fact transferred to an ICF program, not that they were found ineligible for EECP services.

4

1  4020 at 40–41.)  Because the Special Master and his Team already monitor treatment at the EOP

2  level of care, there is no need to further monitor the EECP.  CDCR therefore withdraws the EECP

3  from Defendants' plan for the additional reason that the Special Master and his Team already

4  monitor EOP level of care and there is no added benefit to keeping the EECP in the Defendants'

5  plan and undergoing additional monitoring.

6  ### III.    OBJECTION RE: COALINGA STATE HOSPITAL

7  The Special Master's third recommendation is that:

8      3.  The Court should set this matter for an evidentiary hearing for defendants to
9         show cause why the 50 beds at Coalinga State Hospital designated for
          *Coleman* class members, as well as any other vacant beds at the facility,
10         cannot be filled with high-custody CDCR inmates.

   (Docket No. 4020 ¶ 3.)

11
12  The Court should reject the Special Master's recommendation to set an evidentiary hearing

13  on Coalinga because, to grant a hearing, would be disregarding the wide deference given to prison

14  officials in matters of prison security and safety.  Additionally, the bases underlying the Special

15  Master's recommendation are wrong.  Moreover, converting Coalinga into a prison setting to

16  provide interim care to the dangerous inmate-patients on the SVPP waitlist is not a practical

17  short-term solution to providing care.  Defendants' bed planning efforts already provide for 432

18  new ICF and 43 new APP beds that are currently under construction and that Defendants expect
19
   will be activated starting in March 2013.

20  **A.    THE COURT SHOULD REJECT THE SPECIAL MASTER'S RECOMMENDATION TO SET
       AN EVIDENTIARY HEARING ON COALINGA BECAUSE THE COURT MUST GRANT
21      DEFENDANTS WIDE DEFERENCE IN MATTERS OF PRISON SECURITY AND SAFETY.**

22  As Defendants show in their March 18, 2011 filing in response to Plaintiffs' Objections to

23  Defendants' Plan Re:  Intermediate Care Facility and Acute Waitlist Plan (hereafter Defendants'

24  March 18, 2011 filing), the dormitory beds at Coalinga are not appropriate beds for the

25  dangerous, high-custody inmates-patients on the SVPP waitlist who require celled housing for

26  several reasons.  (*See* Docket No. 3994 at 15–24 and Docket No. 3610 at 11–12 for a detailed

27  description of reasons.)

   / / /
28
   5

1    Specifically, Defendants conducted an adequate review of the exclusionary criteria as

2  evidenced by the success of the ICF Pilot Program (discussed below), and concluded that the

3  dangerous inmate-patients on the current SVPP waitlist are not appropriate for the dormitory beds

4  at Coalinga.  (Docket No. 3962–1 at 17-19; 3994 at 20-21.)  The process that Defendants follow

5  to review an inmate-patient's eligibility to a DMH facility establishes that state officials have

6  made a considered choice in matters of security (that is, in developing the ICF Pilot Program),

7  and, contrary to the Special Master's assertion, are not constructing "artificial barriers" to keep

8  dangerous inmate-patients out of vacant beds at Coalinga.  (Docket No. 3994 at 15–24; Docket

9  No. 4020 at 48-49, 56–58.)  DMH hospitals are not equipped to handle violent inmate-patients.

10  (Docket No. 3994 at 23.)  Conversely, prisons do have celled housing that can handle violent

11  inmate-patients in a safe and secure setting.  (*Id*.)  Thus, declining to take violent inmate-patients

12  into Coalinga—a Level II facility with dormitory style housing—does not equate to constructing

13  "artificial barriers"—it equates to housing violent inmate-patients in prison facilities that have

14  celled housing and are equipped to handle violent inmates in a safe and secure setting.

15    The Court must grant Defendants wide deference in matters of security.  "Prison

16  administrators . . . should be accorded wide-ranging deference in the adoption and execution of

17  policies and practices that in their judgment are needed to preserve internal order and discipline

18  and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).  This discretion

19  applies not only to prison security measures taken in response to an actual confrontation with

20  inmates, but also to "prophylactic or preventive measures intended to reduce the incidences of

21  these or any other breaches of prison discipline." *Whitley v. Albers,* 475 U.S. 312, 322 (1986).

22  This deference requires "that neither judge nor jury freely substitute their judgment for that of

23  officials who have made a considered choice." *Id.*

24    Nor can the Court disregard safety as the Special Master suggests.  (Docket No. 4020 at 49,

25  57–59.)  Safety is such an important consideration when crafting injunctive relief that Congress

26  specifically wrote it into the Prison Litigation Reform Act:  "The Court shall give substantial

27  weight to any adverse impact on public safety or the operation of a criminal justice system caused

28  by the relief." 18 U.S.C. § 3626(a)(1)(A).  Custody factors are the embodiment of the prison

6

1    system's safety concerns; they are written specifically to protect inmates, staff, and the public

2    from dangerous individuals, regardless of their mental health needs.  The fact remains that the

3    reason these inmate-patients have been placed on the SVPP waitlist is that they are too dangerous

4    or violent for dorms.  (Docket No. 3994 at 23.)  And all that Coalinga has, is dorms.  (*Id.*)

5         Therefore, for the same reasons discussed in Defendants' March 18, 2011 filing, the Court

6    should reject the Special Master's recommendation to set an evidentiary hearing.  Defendants are

7    relying on valid, security requirements consistent with inmate, staff, and public safety and this

8    Court should resist the effort to freely substitute its judgment for that of prison and hospital

9    officials concerning prison security and safety.

10   **B.    THE COURT SHOULD ALSO REJECT THE SPECIAL MASTER'S RECOMMENDATION
          FOR AN EVIDENTIARY HEARING BECAUSE DEFENDANTS HAVE COMPLIED WITH
11        THIS COURT'S ORDER AND THE UNDERLYING BASES FOR HIS RECOMMENDATION
          ARE WRONG.**

12        The Special Master alleges that the Court should order an evidentiary hearing because

13   Defendants' plan does not eliminate or reduce the waitlist to a "reasonable" level pending the

14   completion of any long-term remedies.  (Docket No. 4020 at 30.)   In support of this allegation,

15   the Special Master asserts that after the 64-bed Intermediate Care Facility Project at the California

16   Medical Facility (CMF 64-bed project) is completed in February 2012, there will be no more beds

17   for *two* years until the Correctional Health Care Facility (CHCF) in Stockton is completed in

18   December 2013, and "no additional measures will be undertaken to reduce the wait lists pending

19   the completion of the remaining construction projects in 2013."  (*Id.* at 44.)  Additionally, the

20   Special Master states that between 172 and 187 inmate-patients on the SVPP waitlist will remain

21   relatively stagnant until completion of the CHCF in December 2013.  (*Id.* at 44, 47.)

22        But this Court's order does not require that Defendants eliminate the waitlist nor does it

23   specify that Defendants reduce the waitlist to a number that the Special Master believes is

24   "reasonable;" it requires that Defendants develop a plan that, in the interim, better serves the

25   treatment needs of the inmate-patients placed on the SVPP waitlist.  (Docket No. 3831.)  Even so,

26   the Constitution does not prescribe the precise mechanisms for satisfying its mandate to provide

27   access to adequate mental health care.  *Toussaint v. McCarthy,* 801 F.2d 1080, 1086–87 (9th Cir.

28

7

1   1986).  As Defendants outlined in their March 18, 2011 filing, Defendants' plan is adequate—it

2   better serves the treatment needs of the inmate-patients on the SVPP waitlist pending new beds,

3   e.g., Defendants are conducting prospective, concurrent, and retrospective reviews of the inmate-

4   patients on the waitlists; improving communications between CDCR and DMH to facilitate

5   admissions and discharges to and from DMH operated programs; extending and expanding the

6   ICF Pilot Program; and providing interim services to the inmate-patients beyond Enhanced

7   Outpatient Program requirements, such as increased Interdisciplinary Treatment Team (IDTT)

8   appointments and daily admission contacts.  (Docket No. 3994 at 12–13.)  Moreover, for inmate-

9   patients who need crisis care, those inmates are being provided inpatient hospital care in Mental

10  Health Crisis Beds (MHCBs) or Outpatient housing units.  (*Id.*)  And as of June 29, 2011, the

11  waitlist for MHCBs totaled only 5.  (Bertucci Decl. ¶6.)

12       The Special Master incorrectly states that after the CMF 64-bed project opens up, there will

13  be no more beds for *two* years and that no additional measures will be taken to reduce the SVPP

14  waitlist pending the completion of the remaining construction projects in 2013.  (Docket No.

15  4020 at 44, 47.)  Both statements are wrong.  First, Defendants expect that the new CHCF will

16  start admitting ICF inmate-patients from the SVPP waitlist on March 13, 2013, not in December

17  2013.  (Docket No. 3794–2 at 3–5.)  Second, as Defendants outlined in their March 18, 2011

18  filing, Defendants are continuing to take measures to manage and reduce the SVPP waitlist, such

19  as conducting reviews of the waitlist designed to optimize inmate-patient care, providing

20  psychological assessments and testing on site at CDCR institutions, initiating Clozaril treatment

21  at select institutions, implementing Positive Behavioral Services, implementing SharePoint, and

22  revising and implementing referral and discharge forms.  (Docket No. 3994 at 8–9.)

23       Moreover, the ICF Pilot Program case-by-case evaluations of inmate-patients for potential

24  eligibility for referral to a DMH dormitory bed have proved extremely successful.  During the

25  first 18 months of the Pilot Program—between November 2009 and April 2011—CDCR's Health

26  Care Placement Oversight Program (HC-POP) evaluated on a case-by-case basis 405 ICF

27  referrals, which resulted in 377 placement recommendations at either Atascadero State Hospital

28  (ASH) or the Vacaville Psychiatric Program (VPP) dorms at CMF—referrals that otherwise

8

1   would have been sent to the SVPP.  (Bertucci Decl. ¶ 4.)  Additionally, beginning January 2011,

2   HC-POP has reviewed the SVPP waitlist on a quarterly basis to determine if those non case-by-

3   case referrals that were recommended for placement have had any recent case factor changes (i.e.,

4   custody level and placement score changes) that would warrant an evaluation for alternative

5   placement at ASH or the VPP dorms.  (Docket No. 3962–1 at 18.)   A review of the SVPP

6   Waitlist dated January 11, 2011, resulted in eight cases being approved for ASH or VPP dorm

7   placement, and a review of the SVPP waitlist dated April 22, 2011, resulted in ten cases being

8   approved for ASH or VPP dorm placement, for a total of 18 cases over a four month period, or

9   over four per month.  (Docket No. 3994–1 at 61; Bertucci Decl. ¶ 5.)

10          Last, the Special Master states that between 172 and 187 inmate-patients will remain

11   relatively stagnant on the SVPP waitlist until the CHCF is completed in December 2013.  (Docket

12   No. 4020 at 47.)  Defendants believe that this number is wrong for several reasons.  First, as

13   noted, Defendants expect to activate the CHCF in March 2013, and start admitting inmate-

14   patients at the rate of six inmate-patients per week.  (Docket No. 3794–2 at 3–5.)  Second,

15   because the SVPP waitlist as of June 29, 2011, totaled 141 inmate-patients, not including Penal

16   Code section 1370 inmate-patients, it is unlikely that the waitlist will be between 172 and 187

17   after the CMF 64-bed project is fully activated in early 2012 or that it will remain at that rate for

18   any length of time.[2]  (McGill Decl. ¶ 3.)  The 141 number represents a 74% reduction in the

19   SVPP waitlist since March 16, 2010, when the waitlist totaled 542 and this Court ordered

20   Defendants to develop a plan to reduce or eliminate the waitlist.  (Docket No. 3962–1 at 12.)

21   Additionally, Defendants have made tremendous progress in reducing the length of time inmate-

22   patients are staying on the SVPP waitlist.  As of June 6, 2010, the average length of time an

23   inmate-patient stayed on the SVPP waitlist was 183 days while as of June 6, 2011, the average

24   length of time was 121 days, for a reduction of 34%.  (McGill Decl. ¶ 3.)  The below chart

25

26          [2]  Defendants recognize that if the Court adopts the Special Master's fourth
     recommendation to order Defendants to conduct a repeat of the 2009 MHARP, the goal of the
27   assessment would be to increase the SVPP Waitlist.

28

9

1  reflects the number of inmate-patients on the SVPP waitlist as of June 29, 2011, and the month

2  that those inmate-patients were placed on the waitlist:

3  SVPP WAITLIST – 05/01/10 THROUGH 06/29/11



16  (McGill Decl. ¶ 3)  Note:  The inmate-patient placed on the SVPP waitlist in May 2010 is on hold

17  pending court hearings.  (*Id.*)  The two inmate-patients placed on the SVPP waitlist in June 2010

18  will be admitted by the first week of July 2011.  (*Id.*)

19      Defendants noted in their November 24, 2010 Plan that they cannot quantify the impact to

20  the SVPP waitlist from their Utilization Management activities, but expect that their activities

21  will result in monthly reductions to the waitlist.  (Docket No. 3962–1 at 8–17.)  Defendants also

22  make a conservative estimate that during the year 2011, they will remove nine inmate-patients per

23  month from the waitlist as a result of Utilization Management reviews of the SVPP waitlist and

24  length of stays in ICF treatment programs and from HC-POP's reviews of the waitlist.  (*Id.* at 26.)

25  Defendants' efforts in managing and reducing the SVPP waitlist, however, proved more

26  successful than anticipated, e.g., HC-POP reviews have averaged over four inmates per month,

27  not two as estimated, and reviews of lengths of stays in the SVPP have resulted in an 18% (or 65

28  day) reduction in stays over the past year.  (Docket No. 3962–1 at 26; Bertucci Decl. ¶ 5; McGill

10

1    Decl. ¶ 4.)  Thus, given Defendants' success in managing and reducing the SVPP waitlist, it

2    would be reasonable to expect that a further decline in the number of inmate-patients on the

3    SVPP waitlist will occur throughout 2011 and after Defendants activate the CMF 64-bed project.

4    **C.    AN EVIDENTIARY HEARING IS NOT APPROPRIATE BECAUSE CONVERTING
         COALINGA INTO A PRISON SETTING TO PROVIDE INTERIM CARE TO THE INMATE-
5         PATIENTS ON THE SVPP WAITLIST IS NOT A SHORT-TERM SOLUTION AND
         DEFENDANTS' BED PLANNING EFFORTS MEET THE NEED.**
6
7         The Court should further reject the Special Master's recommendation for an evidentiary

8    hearing on Coalinga for the additional reason that converting Coalinga into a prison setting in

9    order to house the inmate-patients on the SVPP waitlist is not a short-term solution.  As

10    Defendants discussed in their March 18, 2011 filing, converting Coalinga (a mental hospital

11    housing civilly committed sexually violent predators) into a prison setting that could provide

12    Level IV security and celled housing is not feasible.  (Docket No. 3994 at 22-23.)  Additionally,

13    DMH, at this Court's request, conducted studies in order to evaluate the feasibility of physically

14    modifying Coalinga and concluded it was not feasible to modify the hospital.  (Docket No. 3592

15    at 56–87.).

16         Thus, because Coalinga is not an appropriate short-term solution to provide care for the

17    inmate-patients on the SVPP waitlist and Defendants are building 432 new ICF beds—

18    substantially more beds than even the Special Master states will be needed—that they expect to

19    activate in March 2013, the Court should reject the Special Master's recommendation to order that

20    Defendants appear at an evidentiary hearing and show cause why they cannot place the inmate-

21    patients on the SVPP waitlist requiring celled housing into the dormitory beds at Coalinga.

22                    **IV.    OBJECTION RE: REPEAT OF THE 2009 MHARP**

23         The Special Master's fourth recommendation is as follows:

24         4.    That defendants should be ordered to conduct a further assessment to
               determine whether there are unmet needs for inpatient care among the plaintiff
25             class.  The assessment should be modeled after MHARP which was conducted
               in 2009, and only at the original twelve identified male institutions and two
26             female institutions and under the guidance of the special master.  As part of
               this process, the special master should also be directed to monitor the
27             continued implementation and sustainability of defendants' policies and
               procedures regarding referral and transfer of *Coleman* class members for
28             inpatient care.  The special master should be ordered to report to the court on

                                              11

defendants' identification and referral process either in his regular monitoring report or in a special report.

(Docket No. 4020 at ¶ 4.)[3]

The goal of the 2009 MHARP was to determine the existence and extent of any previously unidentified need for inpatient care and to develop a process for clinical consideration and IDTT review of inmates for referral to DMH ICF or APP levels of care. (Docket No. 4020 at 8–9, 50-52.) As such, the 2009 MHARP was time and labor intensive: it involved all 28 non-desert institutions; two to three day visits at each institution over a nine-month period of time; required the participation by CDCR Headquarters nurses, psychologists, and health program specialists, along with a DMH psychologist and social worker; required that CDCR and DMH staff develop spreadsheets to track all referrals, rescissions, and paroles; and required that Defendants develop and provide a five-hour mandatory training to primary clinicians on access to higher levels of care. (Docket No. 3828-4 at 2; Docket No. 4020–1 at 1–20; Radvasky Decl. ¶ 2; McGill Decl. ¶¶ 5–6.)

Following the 2009 MHARP, the Special Master then conducted a follow-up MHARP. (Docket No. 4020 at 52–54.) This follow-up MHARP occurred between May 26, 2010 and July 22, 2010, and involved reviews at 13 institutions by a team of the Special Master's experts. (*Id.*)[4] The Special Master asked CDCR to provide for each institution the following information: (a) a list of inmates who had three or more MHCB placements during the preceding six month period; (b) information on inmates who had three or more Rules Violation Reports during the ninety day period before the site visit; and (c) information on inmates in the EOP who had participated in less than half of their offered treatment during the ninety day period before the site visit. (*Id.*)

---

[3] The twelve male institutions are: California Institution for Men (CIM), California Men's Colony (CMC), California Medical Facility (CMF), California State Prison, Corcoran (COR), California State Prison, Los Angeles (LAC), Mule Creek State Prison(MCSP), Richard J. Donovan Correctional Facility (RJD), California State Prison, Sacramento (SAC), Salinas Valley State Prison (SVSP), Wasco State Prison (WSP), California Correctional Institution (CCI), and San Quentin State Prison (SQ). (Docket No. 4020 at 51.)

[4] The 13 institutions were: CIM, CMF, CMC, COR, LAC, California Substance Abuse Treatment Facility (SATF), Deuel Vocational Institution (DVI), Kern Valley State Prison (KVSP), MCSP, North Kern State Prison (NKSP), RDJ, SQ, and WSP. (Docket No. 4020 at 53.)

12

1   And, on site, the Special Master's experts consulted with mental health and custody staff,

2   reviewed inmate-patients' Unit Health Records and C-files, and toured housing units.  (*Id.*)

3          Now, the Special Master wants to conduct a third MHARP.  According to the Special

4   Master, this will be the same as the 2009 MHARP, with the sole difference being that only 14

5   institutions will be visited this time around—the original twelve male institutions and two female

6   institutions.  (Docket No. 4020 ¶ 4.)  In lieu of yet another MHARP and in light of the

7   tremendous progress made in this area, Defendants recently proposed to the Special Master a six-

8   step process that would serve as a modified MHARP, and would allow DMH and CDCR

9   clinicians and management to serve a central role in evaluating the inmate-patients who would be

10  suitable candidates for transfer.  (Docket No. 4020, Ex. B.)  Defendants' proposal more pointedly

11  focused on the procedures that Defendants have put in place to manage, audit, and monitor

12  referrals by CDCR to DMH.  (*Id.*)  The Special Master refuses to allow Defendants' progress to

13  succeed and refused to consider Defendants' suggested alternate process, instead insisting on a

14  repeat of the 2009 MHARP.

15         The Court should reject the Special Master's recommendation to order Defendants to repeat

16  the 2009 MHARP because the Special Master's use of his Report on Defendants' plan to reduce

17  the SVPP and APP waitlists is an improper vehicle to make this request.  The Court should also

18  reject the Special Master's recommendation because it would be counter-productive to

19  establishing a sustainable referral process.

20  A.     THE SPECIAL MASTER'S REPORT ON DEFENDANTS' PLAN IS AN IMPROPER
        VEHICLE TO RECOMMEND THAT THIS COURT ORDER DEFENDANTS TO REPEAT THE
21      2009 MHARP.

22         This Court ordered Defendants to develop a plan to reduce or eliminate the SVPP waitlist.

23  (Docket No. 3831 ¶ 2.)  Defendants complied with the Court's order, submitted their plan on

24  November 24, 2010, and updated it on March 18, 2011.  (Docket No. 3962; Docket No. 3994.)

25  As a result of the strategies that Defendants put in place as part of their plan, Defendants have

26  successfully reduced the SVPP waitlist by 74% from 542 inmate-patients in March 2010 to 141

27  inmate-patients on June 29, 2011.  (McGill Decl. ¶ 3.)  The Special Master found Defendants'

28  plan adequate and recommended that the Court approve it.  (Docket No. 4020 ¶ 1.)  But the

13

1   Special Master did not stop there.  He went beyond Defendants' plan and is also recommending

2   that the Court order Defendants to repeat the 2009 MHARP.  This counters the very reason that

3   the Court ordered Defendants to develop and implement their plan—to manage and reduce or

4   eliminate the SVPP waitlist.  Repeating the 2009 MHARP could, by its very nature, increase

5   referrals.  (Docket No. 4020 at 50–52.)  This will result in a never-ending cycle of Special

6   Master-led referrals.  Instead, as discussed below, Defendants' procedures should be allowed to

7   succeed without continual interference from the Special Master.  However, the Court does not

8   even need to reach this argument because the Special Master's report in response to Defendants'

9   plan is not the proper vehicle to make a recommendation on increasing the waitlist.   Thus, the

10  Court should reject this recommendation for that reason alone.

11  **B.     THE COURT SHOULD REJECT THE SPECIAL MASTER'S RECOMMENDATION TO
         REPEAT THE 2009 MHARP BECAUSE HIS RECOMMENDATION IS COUNTER-
12       PRODUCTIVE TO ESTABLISHING A SUSTAINABLE DMH REFERRAL PROCESS.**

13          Even if the Court considers the Special Master's recommendation to order Defendants to

14  repeat the 2009 MHARP, the Court still should reject his recommendation because it would be

15  counter-productive to establishing a sustainable DMH Referral Process.  Defendants have

16  developed and implemented multiple steps to "develop a sustainable referral process" as reflected

17  in the rate of referrals since the Special Master concluded his 2010 follow-up to the 2009

18  MHARP.  Another assessment is unnecessary.  Additionally, there is no added value in repeating

19  the 2009 MHARP, and to do so would be unreasonable.

20          **1.     Defendants Have Developed and Implemented Multiple Steps to Manage
               and Sustain the Referral Process and a Repeat of the 2009 MHARP is
21             Unnecessary.**

22          Over the past three years, CDCR and DMH have developed and implemented multiple

23  steps to manage and sustain the referral process, as reflected by the rate of referrals since the

24  Special Master completed his May to June 2010 follow-up to the 2009 MHARP.  (*See* Docket

25  No. 4020 at 52–54 for discussion on 2010 follow-up to 2009 MHARP.)  These steps are

26  discussed below.  Additionally, since CDCR now has workable audit tools and the ability to

27  monitor and remedy deficiencies, a repeat of the 2009 MHARP is unnecessary.

28

14

1    In 2008, CDCR established a Utilization Management (UM) Unit.  (McGill Decl. ¶ 5.)

2  Between January and March 2009, the UM Unit developed a new Interdisciplinary Treatment

3  Team (IDTT) screening tool for referral to higher levels of care.  (*Id.* at ¶¶ 5–6.)  That tool was

4  used for the 2009 MHARP and, as noted, the 2009 MHARP also involved extensive training not

5  only on this form, but also on the referral process.  (*Id.;* Docket No. 4040–1 at 20.)  The IDTT

6  tool contains multiple screening elements, including whether the inmate-patient has incurred three

7  or more Rules Violation Reports during the last three months, whether the inmate-patient has had

8  three or more admissions to a MHCB during the last six months, and whether the inmate-patient

9  has less than 50% overall cooperation with programming over the past three months, that, when

10  checked, trigger consideration for referral to a higher level of care.  (Docket No. 4020–1 at 20.)

11    During the first six months of 2010, the CDCR UM Unit developed and implemented

12  additional quality improvement activities to manage and sustain the referral process.  These

13  activities included:  (1) revising the IDTT Screening for Higher Level of Care tool; (2)

14  developing DMH referral and non-referral logs; (3) developing the IDTT Screening Checklist

15  Audit/Summary tools (known as 3A/B audit tools) and Peer Review Audit/Summary Tools

16  (known as 4A/B audit tools); (4) tracking and processing all ICF referrals; (5) maintaining the

17  referral data base; (5) monitoring the 3A/B and 4A/B audit tools, providing feedback, and in-

18  service training as needed; (6) monitoring the time lines of referrals and number of referrals by

19  institution; (7) initiating monthly DMH Coordinator conference calls; (8) implementing review of

20  all rescission documentation; and (9) reviewing length of stay in ICF and APP programs.

21  (Docket No. 3828 at 9–10, Docket No. 3828–4 at 2–3; McGill Decl. ¶ 7.)  These activities, which

22  continue as part of Defendants' UM process, are proving successful.  (McDecl. ¶ 12.)  For

23  instance, over the past year, the timelines from IDTT identification to referral have improved by

24  over 10% and the timelines for IDTT identification to referral including a *Vitek* hearing, have

25  improved by over 17%. (*Id*.)

26    On March 15, 2010, after completing the 2009 MHARP, CDCR sent out a memorandum to

27  the institutions to initiate the new IDTT Screening Checklist form, DMH referral and non-referral

28  logs, and audit tools.  (McGill Decl. ¶ 8.)  CDCR directed institutions to audit 20 charts each

15

week.[5]  (*Id.*)  For the IDTT Screening Checklist Audit/Summary Tool (3A/B Audit Tool), the tool asked five questions:

1. Was an IDTT Screening Checklist for Referral to DMH completed at the IDTT?

2. Are all the fields complete on the CDCR 7388 IDTT Screening Checklist form?

3. If it was determined that the inmate-patient met screening element(s) for referral to a higher level of care, but decision was made to not refer, was the clinical rationale documented on the Screening Checklist in the designated space provided on the CDCR 7388?

4. If an APP or ICF referral was recommended, was the packet forwarded to Headquarters or DMH within the five working days of initiation (patient signed consent)?

5. If an APP or ICF referral was recommended was the packet forwarded to Headquarters or DMH within ten working days if a *Vitek* hearing was required (patient did not sign consent)?

(*Id.*)

The Peer Review Audit Summary Tool (4A/B Audit Tool) asked three questions:

1. If the inmate-patient met the DMH criteria and was not referred, was the reason for not referring documented?

2. Were alternative interventions documented in the treatment plan?

3. Was the clinical decision to not refer the inmate-patient to DMH clearly documented and reasonable?  (*Id.*)

For this audit, the first ten charts were randomly selected from scheduled IDTTs to ensure the IDTT form was in the inmate-patient's Unit Health Record and completed and to monitor the timelines of the referrals.  (McGill Decl. ¶ 9.)  CDCR directed the institutions to select the next ten from the non-referral log to monitor documentation if the inmate-patient was not referred to DMH.  (*Id.*)  The audits gave percentages of compliance for each question on the audit form. (*Id.*)  Each month, CDCR Headquarters UM reviewed the audits and documented the percentages. (*Id.*)  Then, as necessary, the Headquarters UM contacted the institution to complete the audits and conduct in-service training and assist in process improvements.  (*Id.*).

---

[5] Starting in October 2010, institutions were allowed to audit monthly.  (McGill Decl. ¶ 8.)

16

The last six months of 2010 also saw considerable quality improvement activities. Though not required as part of this Court's March 31, 2010 order, Defendants' plan to reduce and or eliminate the SVPP and APP waitlists also contained two strategies to manage and sustain the referral process: (1) UM strategies to conduct reviews designed to optimize inmate-patient care; and (2) activation of the SharePoint system to allow CDCR and DMH to electronically share inmate-patient information. (Docket No. 3962–1.) Specifically, the UM strategies involved revising referral forms, and CDCR UM staff provided ongoing training on the referral process, the new forms, and on SharePoint. (*Id.* at 9, 42–43, 47–65.)

After identifying barriers through the audits, CDCR, in February and April 2011, revised the referral forms and revised the IDTT - Screening for Higher Level of Care form (now known as the CDCR 7388-B Interdisciplinary Treatment Team - Screening for Higher Level of Care form). (Docket No. 3994 at 9; McGill Decl. ¶ 11.) CDCR expanded the scope of this form to obtain further information on reasons why referrals are not made when clinicians check multiple clinical indicators on the form and to reflect changes made by Defendants' ICF/APP Waitlist Plan. (*Id.* ¶ 11.) And in June 2011, CDCR replaced the 3A/B and 4A/B audit tools with a new 7388-B audit tool that more closely tracks the revised 7388-B Interdisciplinary Treatment Team - Screening for Higher Level of Care form. (*Id.*)

CDCR directed each institution, during the month of June 2011, to send to Headquarters a sample of approximately five audit results and supporting 7388-B IDTT Screening for Higher Level of Care Forms for inter-rater reliability review. (McGill Decl. ¶ 13.) A CDCR psychologist and nurse consultant review the 7388-B forms and audits and confirm the results. (*Id.*) Identified discrepancies are documented and sent to the DMH Coordinator at the institution for review and training, as necessary. (*Id.*) CDCR expects to complete the first round of reviews in July 2011. (*Id.*) With this new audit tool there will be close attention paid to ensure that each checked indicator has a justification for non-referral and a discussion of intervention. (*Id.*)

Finally, CDCR Headquarters now has the data capability through MHTS.net to identify those inmate-patients who meet the following three clinical indicators for referrals to higher levels of care: (1) inmate-patients who have had three or more admissions to a MHCB or

17

placement in an Outpatient Housing Unit during the last six months; (2) inmate-patients with an average of less than 50% of overall programming for the last three months; and (3) EOP inmate-patients with three or more closed CDCR 115-MH Rules Violation Report: Mental Health Assessments during the last three months. (McGill Decl. ¶ 14.) This capability now provides CDCR Headquarters with an additional tool to monitor inmate-patients for referral to a higher level of care. (*Id.*)

Thus, as shown, CDCR has developed and implemented a sustainable procedure to process referral to higher levels of care. Additionally, two recent large scale audit activities by CDCR and its institutions—one based on the 3A/B and 4A/B audit tools and one based on data from MHTS.net—establish that CDCR now has the capability to audit, monitor, and address deficiencies, as necessary. Therefore, a repeat of the 2009 MHARP—and visit to the institutions—is unnecessary. The recent audits are discussed below.

First, in order to ascertain an average yearly percentage compliance audit rate for all 14 institutions that the Special Master has indicated would be part of the repeat 2009 MHARP, CDCR, for each institution: (1) calculated the monthly results from all eight audit questions identified above for the 3A/B and 4A/B audit tools for the time period of April 2010—the month following the March 15, 2010 memorandum initiating the audit process—to March 2011; (2) totaled the monthly percentage compliance rates for all eight audit questions; and (3) divided the total percentage compliance rate for all eight audit questions by the number of months that the institutions provided audit data for. (McGill Decl. ¶ 10.) As the below table reflects, the average yearly (except where as noted) compliance rate for the 3A/B and 4A/B audits for each of the 14 institutions show, except for a few outliers, favorable results:

| Institution | Percentage Rate | Number of Months Reported |
|---|---|---|
| CCWF | 97 | 12 |
| CIM | 85 | 11 |
| CMC | 86 | 12 |
| CMF | 82 | 11 |
| COR | 100 | 12 |
| LAC | 86 | 12 |

18

| MCSP | 97 | 12 |
| RJD | 77 | 12 |
| SAC | 85 | 12 |
| SVSP | 89 | 12 |
| WSP | 93 | 12 |
| CCI | 100 | 12 |
| SQ | 100 | 7 |
| CIW | 95 | 11 |

(McGill Decl. ¶ 10; Docket No. 4020 at 51.)

Admittedly, some of the 14 institutions may need follow up. But, as discussed above, CDCR has already taken steps to address deficiencies identified through these audits. (McGill Decl. ¶ 9.) More importantly, however, is what this audit reflects: the development of a process to manage, audit, monitor, and remedy deficiencies. Far from what the Special Master suggests, the audit does not clearly show a need for a full fledged repeat of the 2009 MHARP at all 14 institutions.

For two weeks in June 2011, CDCR UM Unit initiated a review of the DMH referral process. (McGill Decl. ¶ 15.) This review, which was independent of the 7388-B audit tool discussed above, essentially followed the process that Defendants recently proposed to the Special Master that would serve as a modified MHARP. For each of the 14 institutions that the Special Master wants to visit as part of the repeat of the 2009 MHARP, CDCR generated a list of those inmate-patients who met one or more of the following three clinical indicators from the CDCR screening form (7388 or 7388-B): (1) inmate-patients who have had three or more admissions to a MHCB or placement in an Outpatient Housing Unit during the last six months; (2) inmate-patients with an average of less than five hours of weekly programming for the last three months; and (3) EOP inmate-patients with three or more closed CDCR 115-MH Rules Violation Report: Mental Health Assessments during the last three months. (*Id.*) CDCR created this list from reports generated from MTHS.net. (*Id.*) This list contained 2083 names with identified indicator or indicators marked for each inmate-patient. (*Id.*) CDCR then sent the list to the 14 institutions and directed each to randomly review up to 150 of the names of inmate-patients identified on the list. (*Id.*) This directive resulted in a net review of 1408 names. (*Id.*)

19

For those inmate-patients not already referred for ICF or APP care and/or still in the institution, CDCR directed the institutions to: (1) review from the inmate-patients' Unit Health Record the inmate-patient's last CDCR screening form (7388 or 7388-B) to insure that the clinical indicator or indicator(s) were checked on the 7388 or 7388-Bs; and (2) that justification for non-referral was documented.  (*Id.*)

The audit of the 1408 names resulted in the following three findings:  (1) for 201 names, the institutions reported that the clinical indicator or indicators were checked and justification was documented; (2) for 628 inmates, the institutions reported that the clinical indicator or indicators were not checked and/or justification was not documented; and (3) for 579 names, the institutions reported that the inmate-patients had transferred, paroled or did not meet the clinical indicators after review.  (McGill Decl. ¶ 16.)  For the 201 names, CDCR directed the institutions to send the 7388 or 7388-Bs to Headquarters so that the UM Unit could review the forms to verify the institution's findings.  (*Id.*)  For the 628 inmates, CDCR directed the institutions to review the inmate-patient's Unit Health Record and determine whether an IDTT should be initiated to evaluate the inmate-patient for potential referral to a higher level of care.  (*Id.*)  The institutions have until the end of July to complete this review.  (*Id.*)

Again, though this audit reveals that some of the 14 institutions may need follow up, it demonstrates that CDCR now has the data base capability to identify those inmate-patients who meet clinical indicators for referral to a higher level of care, without going out to the institutions. Additionally, it demonstrates that CDCR has put in steps to improve the process and that it is taking steps to remedy deficiencies.  Moreover, CDCR expects to complete this large sample review process every six months.  (McGill Decl. ¶ 16.)  In sum, CDCR is monitoring the results of its process, making revisions were necessary, following-up with the institutions, providing ongoing training, and achieving sustainable results.  Under these circumstances, a repeat of the 2009 MHARP is unnecessary.

The Special Master makes three arguments in support of his recommendation that the Court order Defendants to conduct a repeat of the 2009 MHARP:  (1) "given . . . the tentative state of implementation of the new DMH referral processes [as found in the 2010 MHARP Follow-Up

20

1    (May 26 to July 22, 2010)] it was clear that further review was in order;" (2) the referral numbers

2    are back to the pre-2009 MHARP numbers (54.7% average rate from 8/10 to 4/11); and (3)

3    findings from the 23rd Monitoring Round support another MHARP.  (Docket No.  4020 at 53–

4    55.)  None of these reasons support another 2009 MHARP.

5         First, the conclusions that the Special Master draws from the 2010 follow-up to the 2009

6    MHARP do not support a repeat of the 2009 MHARP.  The 2010 follow-up to the 2009 MHARP

7    occurred nearly a year ago and involved 13 prisons, only nine of which are the same as those that

8    the Special Master recommends including in the repeat of the 2009 MHARP:  CIM, CMC, CMF,

9    COR, LAC, MCSP, RJD, SQ, and WSP.  (Docket No. 4020 at 49-51.)  According to the Special

10   Master, his experts' findings from the 2010 follow up to the 2009 MHARP were:  "Overall, the

11   MHARP follow-up found that while progress was made at the institutions with at least some

12   aspects of the new process, no single institution was successful with implementing all elements of

13   it.  The core strategy for improving and sustaining the referral process - use of the Form 7388 --

14   was not being employed in a useful or productive manner at most of the 13 institutions."  (Docket

15   No. 4020 at 54; *see also* Docket No. 3990 at 448–451.)

16        Specifically, the experts found that inmate-patients with three or more MHCB admissions

17   during the preceding six months, inmate-patients who had three or more Rules Violation Reports

18   during the three months prior to the site visits, and inmates who participated in less than half of

19   offered treatment over the three month period prior to the visit—all screening elements on Form

20   7388—were not always being considered.  (Docket No. 4020 at 53.)  But these findings from

21   nearly a year ago are not indicative of the process today.  Specifically, at the time of the 2010

22   follow-up to the 2009 MHARP, Defendants had just started to implement the audit tools and

23   monitor the referral process (including the new Form 7388).  Additionally, as the Special Master

24   acknowledged, the MHTS.net system was newly implemented and several data points were not

25   yet available to clinicians.  (Docket No. 3990 at 438–448.)  MHTS.net has now been

26   implemented in all the prisons and CDCR has the ability to track multiple MHCB admissions and

27   those inmate-patients who have participated in less than half of clinical activities.  (McGill Decl.

28   ¶ 14.)

21

Second, the Special Master's conclusions drawn from the reported ICF referral numbers do not reflect an improper reduction of referrals back to pre-MHARP numbers. The Special Master reports the pre-MHARP (6/08 to 3/09) ICF referrals as averaging 50.9 a month. (Docket No. 4020 at 55.) Additionally, he reports the current referrals (8/10 to 4/11—the time period after the 2010 follow-up to the 2009 MHARP occurred) as averaging 54.7 per month. (*Id.*)[6] According to CDCR, however, the ICF referrals from August 2010 through April 2011 totaled 722, for an average of 80.22 referrals per month, not 54.7. (McGill Decl. ¶ 17.) The below graph reflects the ICF referrals from August 2010 through April 2011:

### ICF REFERRALS
### AUGUST 2010 – APRIL 2011



Further the ICF referrals from January 2010 through June 2011, which total 1,635, reflect an average referral rate of 91 per month. (McGill Decl. ¶ 18.) Not considering the 41 referrals

---

[6] The Special Master's Report does not identify the source of the alleged referral numbers. For that reason, Defendants are unable to explain the discrepancy in the numbers.

22

1  generated by the Special Master's 2010 follow up to the 2009 MHARP (May 26 to July 22, 2010)

2  the average referral rate for this eighteen month time period, is still 89.  The below graph reflects

3  the monthly referral rates from January 2010 to June 2011:



19      (McGill Decl. ¶¶ 18.)

20      Additionally, the Special Master appears to neglect the fact that Defendants have taken

21  several actions that, by definition, have reduced the number of referrals to ICF level of care.  For

22  instance, by initiating diagnostic clarification and Clozapine, and continuing Positive Behavioral

23  Services, Defendants anticipated that the inmate-patients who would otherwise have been referred

24  to DMH would be re-directed and continue to receive treatment in CDCR.  (Docket No. 3962–1

25  at 8, 10–11, 81–89; Docket No. 3994 at 12–14.)  Defendants have also established prospective,

26  concurrent, and retrospective review processes designed, in part, to decrease unnecessary

27  hospitalizations.  (*Id.*)  Thus, the current referrals to ICF do not reflect an improper reversion back

28  to pre-2009 MHARP numbers and the Court should reject this argument for that reason.

23

1    Third, the Special Master argues that "[r]ecent monitoring reports received by the Special

2    Master indicate that problems with DMH institutional referral practices still exist."  (Docket No.

3    4020 at 54.)  At most, this simply states that there may still be problems with the process at some

4    prisons, not that there are under-referrals, that all the prisons involved in the 2009 MHARP

5    should be revisited, or that a review of the process versus the full MHARP, would be insufficient.

6    Moreover, Defendants' audit of the DMH referral process establishes otherwise.

7    Therefore, Defendants have developed and implemented a sustainable referral process and a

8    repeat of the 2009 MHARP is unnecessary.

9        **2.    There is No Added Value in Repeating the 2009 MHARP and to Repeat it
             Would be Unreasonable.**

10   As the Special Master acknowledges in his Report, "[a] central objective of MHARP was

11   for CDCR to develop its process for clinical consideration and IDTT review of inmates for

12   referral to DMH acute or intermediate levels of care."  (Docket No. 4020 at 50.)  As discussed

13   above, Defendants have developed and implemented a process designed to sustain referrals.

14   Thus, repeating the 2009 MHARP would offer no added value at this point in time.  The Special

15   Master reports that a repeat of the 2009 MHARP is necessary to "reinforce the institutions'

16   implementation of sound referral practices to ensure continuing access to such care for seriously

17   mentally ill patients."  (Docket No. 4020 at 56.)  The problem with this statement, however, is

18   that repeating the 2009 MHARP would not accomplish this goal.  The 2009 MHARP was

19   designed to put this process in place, not review it.  And, as discussed above, the Special Master

20   refuses to allow Defendants' processes to succeed and refused to consider an alternative process

21   suggested by Defendants in lieu of another full 2009 MHARP.  (Docket No. 4020, Ex. B.)

22   Sending a team of clinicians from CDCR and DMH Headquarters to determine whether the

23   decisions made by the IDTT were correct (and to the exclusion of the IDTT), adds no value and is

24   counter-productive to the processes that Defendants have put in place to empower the IDTT to

25   make a decision about treatment disposition for a potential candidate for DMH.  (*See* Docket No.

26   3828; McGill Decl. ¶¶ 4–16.)  Likewise, it adds no value to deliver the same type of training for

27   / / /

28

24

1    clinical staff about the referral process, particularly given the ongoing training that is occurring.

2    (*Id.*)

3         Moreover, repeating the 2009 MHARP would be counter-productive to the referral process

4    because repeating the 2009 MHARP would pull staff away from current UM and other *Coleman*

5    related obligations as well as treatment to spend months traveling around the state and

6    participating in a MHARP.  (McGill Decl. ¶ 19.)  Consequently, repeating the 2009 MHARP

7    would take away the CDCR nursing staff and assigned psychologists who are responsible to

8    monitor the MHARP process and the reduction of the SVPP waitlist plan.  (*Id.*)  CDCR does not

9    have extra staff to backfill these positions and perform these critical tasks.  (*Id.*)  Thus, repeating

10   the 2009 MHARP would have the exact opposite effect of the desired goal to sustain referrals and

11   would interfere with Defendants' ability to implement its plan to address the ICF and APP

12   waitlists—the plan that should be the true focus of the Special Master's Report and

13   Recommendations, not a repeat of the 2009 MHARP.

14        Likewise, DMH lacks the extra clinical personnel to participate in a repeat of the 2009

15   MHARP.  (Radavsky Decl. ¶ 3.)  Each of the two clinicians that were at Headquarters in 2009

16   and worked on the 2009 MHARP has been reassigned and neither is available for this project.

17   (*Id.*)  Consequently, participation by DMH for MHARP workload at CDCR institutions would

18   have to be supported by clinicians at DMH facilities, which will have a direct and detrimental

19   impact on DMH's treatment programs affecting *Coleman* class inmate-patients.  (*Id.* at ¶ 4.)

20   There are no extra clinical staff available that can support this workload as was done for the 2009

21   MHARP.  (*Id.*)

22        Last, it is patently unreasonable for the Special Master, concurrent with the 24th round of

23   monitoring, to recommend that Defendants also be ordered to participate in a time and staff

24   intensive MHARP that will include prisons that are part of the 24th Monitoring Round and those

25   that are not.

26   / / /

27

28

                                          25

# V.    CONCLUSION

Defendants respectfully request that the Court not consider the Special Master's first and second recommendations regarding CDCR's Extended Enhanced Outpatient Program Care Plan (EECP) because Defendants are withdrawing the EECP from their November 24, 2010 Plan Re: Intermediate Care Facility and Acute Inpatient Waitlists.

Next, Defendants respectfully request that the Court reject the Special Master's third recommendation that the Court set this matter for an evidentiary hearing on Coalinga State Hospital because having an evidentiary hearing impedes on the discretion provided to prison and hospital officials in matter of security and safety.  Additionally, the Court should reject the Special Master's third recommendation on Coalinga because converting Coalinga into a prison setting is not a short-term solution to providing care—Defendants' bed planning efforts already provide 432 new Intermediate Care Facility beds that are currently under construction and that Defendants expect to activate in March 2013.

Defendants also respectfully request that the Court reject the Special Master's fourth recommendation on repeating the 2009 MHARP because the Special Master improperly uses his report on Defendants' plan to reduce the SVPP waitlist as a vehicle to increase the waitlist.

Finally, the Court should reject the recommendation because repeating the 2009 MHARP is counter-productive to the goal of sustaining referrals that Defendants have put in place, is unnecessary, adds no value to the referral process, and would result in an unreasonable use of state resources.

Dated:  July 1, 2011                              Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California

/s/ Debbie J. Vorous

DEBBIE J. VOROUS
Deputy Attorney General
Attorneys for Defendants

CF1997CS0003
31295318.doc

26

DEFENDANTS' RESPONSE AND OBJECTIONS TO SPECIAL MASTER'S REPORT ON DEFENDANTS' PLAN RE:  INTERMEDIATE
CARE FACILITY AND ACUTE INPATIENT WAIT LISTS (2:90-cv-00520 LKK JFM P)