1  DONALD SPECTER – 083925
STEVEN FAMA – 099641
2  PRISON LAW OFFICE
1917 Fifth Street
3  Berkeley, California  94710-1916
Telephone:   (510) 280-2621
4
5
6
7  CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
8  180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
9  Telephone:   (415) 864-8848

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
JANE E. KAHN – 112239
LISA ELLS – 243657
AARON J. FISCHER – 247391
LAURA BOYSEN-ARAGON – 248083
ROSEN, BIEN & GALVAN, LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:   (415) 433-6830

WARREN E. GEORGE – 053588
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, California  94111-4066
Telephone:   (415) 393-2000

10  Attorneys for Plaintiffs

11  UNITED STATES DISTRICT COURT

12  EASTERN DISTRICT OF CALIFORNIA

13

14  RALPH COLEMAN, et al.,

15        Plaintiffs,

16     v.

17  EDMUND G. BROWN, Jr., et al.,

18        Defendants.[1]

19

20

21

22

Case No. Civ S 90-0520 LKK-JFM

**DECLARATION OF PABLO
STEWART, M.D., IN SUPPORT OF
PLAINTIFFS' BRIEF ON
EVIDENTIARY HEARING
REGARDING ORDER TO SHOW
CAUSE WHY EMPTY DMH BEDS
CANNOT BE FILLED WITH CDCR
INMATES AND IN SUPPORT OF
ADDITIONAL RELIEF**

Judge:   Hon. Lawrence K. Karlton
Date:     August 17, 2011
Time:    10:00 a.m.
Crtrm.:  4

23

24

25

26

27  [1] The names of Defendants currently serving and their official capacities have been
substituted pursuant to Fed. R. Civ. P. 25.

28

[528908-18]

---

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1    I, Pablo Stewart, M.D., declare:

2        1.    I am a physician licensed to practice in California, with a specialty in clinical

3    and forensic psychiatry.  I am Board certified in Psychiatry and Neurology.  I make this

4    declaration in connection with the evidentiary hearing set by this Court for August 17,

5    2011 concerning continuing obstacles and delays in timely and appropriate access to

6    inpatient psychiatric hospitalization for acutely ill CDCR prisoners with serious mental

7    illness.  A true and correct copy of my current curriculum vitae is attached hereto as

8    Appendix A.

9        2.    I previously completed two expert reports in the three-judge court

10    proceedings in this case regarding prison overcrowding.  My initial report, dated

11    November 9, 2007, was filed with the Court on October 30, 2008, Docket No. 3217, and is

12    referred to herein as my "11/9/07 Report."  My supplemental report, dated August 15,

13    2008, was also filed with the Court on October 30, 2008, Docket No. 3221, and is referred

14    to herein as my "8/15/08 Report."

15        3.    My 11/9/07 Report sets forth my full academic and professional career,

16    including my extensive work as a consultant and expert for jail and prison facilities in

17    California and in other states (including Michigan, Georgia, and New Mexico) as well as

18    the various professional positions I have held.  *See* 11/9/07 Report ¶¶ 1-20.  Of particular

19    relevance here, from approximately 1984 thorough 1986, I was an attending psychiatrist

20    for the Spanish-speaking inpatient psychiatric unit of San Francisco General Hospital,

21    treating non-correctional populations.  Between 1986 and 1990, I was the Senior Attending

22    Psychiatrist for the Forensic Unit of the University of California, San Francisco, which

23    was located at San Francisco General Hospital.  In that role, I had administrative and

24    clinical responsibility for a 12-bed maximum-security psychiatric ward and worked as a

25    liaison with the Jail Psychiatric Services of the City and County of San Francisco.

26    Between August 1988 and December 1989, I also served as the Director of Forensic

27    Psychiatric Services for the City and County of San Francisco.  In that capacity, I had

28    administrative and clinical oversight responsibility for the psychiatric care provided to the

1   inmate population in San Francisco at both the county jails and in the 12-bed locked

2   inpatient treatment unit at the San Francisco General Hospital.  From 1990 through 1995, I

3   served as the chief of an inpatient psychiatric unit of the San Francisco Veteran's Hospital,

4   where I treated a community population of veterans.

5          4.     My 11/9/07 and 8/15/08 Reports also detail my presentations before mental

6   health professionals, prosecuting and defense attorneys, probation officers, and judges, and

7   my publications in professional and peer-reviewed journals over the past several years.

8   *See* 11/9/07 Report ¶¶ 1-20; *see also* 8/15/08 Report ¶ 3.

9          5.     Since submitting my 11/9/07 and 8/15/08 Reports, I have not authored any

10  additional publications.

11         6.     Since submitting my 11/9/07 and 8/15/08 Reports, I have testified as an

12  expert in court or in a deposition in the following matters related to correctional health care

13  issues:  *Coleman v. Schwarzenegger*; *Plata v. Schwarzenegger*.

14         7.     I currently work as a private psychiatric consultant and as a Clinical

15  Professor in the Department of Psychiatry at the University of California, San Francisco,

16  School of Medicine.  I am being compensated as an expert in this case as follows:  $250

17  per hour for routine office work, writing, document review, and other similar tasks; $3,000

18  per day for tours and full day meetings or projects; $400 per hour for time testifying in

19  depositions and at trial, with a 4 hour minimum for that work.

20         8.     I have been retained by Plaintiffs' attorneys in the *Coleman* case as an expert

21  on prison and forensic mental health care, and the impact of inadequate and delayed access

22  to inpatient psychiatric hospitalization on prisoners' mental health.  I have been asked to

23  render my opinion as to the following subjects:  (1) Whether and how delays in access to

24  inpatient psychiatric hospitalization cause harm to prisoners; (2) Whether the current DMH

25  waitlist reflects the true demand for inpatient care within CDCR; (3) Whether the steps

26  taken by Defendants to reduce the waitlist for inpatient care have been safe and effective

27  from a clinical perspective; and (4) Whether mentally ill patients, including patients posing

28  a danger to themselves or others due to the acuity of their symptoms, can be safely and

[528908-18]

2

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1   effectively managed in inpatient psychiatric hospital settings.

2        9.     In preparing for this report, I reviewed a number of documents.  My review

3   included multiple CDCR reports concerning suicides of class members who had been at

4   the EOP level of mental health care when they died, and who had committed suicide

5   within the last two years.  Eleven of those reports are discussed further below.  Because

6   they contain confidential class member information, these documents are filed under seal

7   with the Court as exhibits to the declaration of Lisa Ells ("Ells Declaration").

8        10.    I also reviewed Defendants' rejection letters for female prisoners referred for

9   inpatient care to Patton State Hospital, as well as excerpts of two female class members'

10  medical and central files.  Because they contain confidential class member information,

11  excerpts of these documents are filed under seal with the Court as exhibits to the Ells

12  Declaration

13       11.    I also reviewed a MHSDS Management Report prepared by California State

14  Prison-Los Angeles County ("CSP-LAC" or "LAC") for the Special Master's 24th round

15  of monitoring, which is currently in progress.  Because it contains confidential class

16  member information, the report is filed under seal with the Court as an exhibit to the Ells

17  Declaration

18       12.    I also reviewed certain documents produced to Plaintiffs' on a monthly basis

19  by DMH reporting on licensure and inpatient bed utilization data.  Because the DMH

20  monthly bed utilization reports contain confidential class member information, these

21  documents are filed under seal with the Court as exhibits to the Ells Declaration.  The

22  DMH monthly licensure reports do not contain any confidential information and are filed

23  with the court as exhibits to the declaration of Aaron Fischer ("Fischer Declaration").

24       13.    Additionally, I reviewed a series of other documents, including pages from

25  multiple public websites, testimony by Victor Brewer, Defendants' DMH waitlist plan

26  filing and exhibits, the Special Master report and recommendations on the waitlist

27  reduction efforts with exhibits, the parties' responses, including supporting declarations

28  and exhibits, and sections of the 2007 Operating Manual for Coalinga State Hospital.

**Delays and Denials of Access to Inpatient Psychiatric Hospitalization Cause Harm and Death**

14.     In my experience in other forensic inpatient hospital settings, and in my knowledge and training of proper psychiatric care as a clinical matter, patients who need inpatient care must be moved immediately when they are determined to need treatment at that level of care.  Delays of even days in moving patients to appropriate clinical settings cause needless harm and suffering, and can lead desperately ill patients to commit suicide or become assaultive or aggressive before their mental illness can be properly treated. Waits of a month or even weeks would be considered completely unacceptable and extremely dangerous.  A wait of over four months is shocking and appalling.

15.     Based on my first-hand observations during my expert tours in the overcrowding proceedings, including my tours of SVSP and other CDCR facilities, I saw the devastating impact that delays in access to inpatient psychiatric hospitalization in CDCR have, causing unnecessary harm and suffering, and sometimes suicide.  *See* 11/9/07 Report ¶¶ 162-188; 8/15/08 Report ¶¶ 86-92.  In addition to the appalling and completely preventable suffering caused by inadequate access to appropriate levels of care, delays make seriously mentally ill prisoners even sicker, which means it takes longer to stabilize and treat them once they reach the proper level of care.  That causes all of the higher levels of care in CDCR's system—EOP, MHCB, ICF and APP—to become backed up, as patients are stuck in clinically improper settings, preventing others from using those beds, and then remain longer in the higher levels of care once they reach them.  8/15/08 Report ¶¶ 91-92.

16.     As I have previously observed, this system wide shortage, which starts at the highest levels of care in DMH, also causes the population of mentally ill prisoners to be extraordinarily acute.  8/15/08 Report ¶¶ 89-92.  Additionally, because of the tremendously overcrowded conditions within CDCR, seriously mentally ill prisoners are housed and treated in units that are not safe and cause more suffering.  For instance, seriously mentally ill class members are housed in ZZ cells, cages, unlicensed medical OHU beds, and

1  administrative segregation in an effort to manage them while they await appropriate

2  inpatient psychiatric hospitalization.  11/9/07 Report ¶¶ 140-143, 162-175; 10/15/08

3  Report ¶¶ 25-29.

4       17.    The situation reported by CSP-Los Angeles County during the Special

5  Master's recent 24th round tour from July 25-28, 2011 illustrates the point.  During that

6  tour, Defendants provided to the Special Master team and Plaintiffs' counsel a document

7  entitled "Mental Health Services Delivery System Management Report, Round 24,"

8  ("LAC Report") which purports to cover the progress of that institution's mental health

9  programs from December 1, 2010 through May 31, 2011.  This document is attached as

10 Exhibit A to the Ells Declaration.

11      18.    For the six-month period between December 1, 2010 and May 31, 2011,

12 LAC reported that almost half of the admissions to its MHCB unit during that six month

13 period (56 of the 113 admissions) lasted longer than the 10 days MHCB units are designed

14 to treat people for.  Approximately half of those over-long stays (46%) were caused by

15 prisoners remaining in the MHCB due to a "DMH referral awaiting a bed."  LAC Report at

16 19.  While those prisoners took up much-needed crisis beds while waiting to transfer to

17 inpatient psychiatric hospitals, 128 other prisoners on suicide watch were forced into

18 "alternative housing" while waiting for a properly licensed and staffed crisis bed to

19 become available.  LAC Report at 20.  Five of those men remained in those incredibly

20 harsh and punitive alternative housing settings on suicide watch for more than three days,

21 including one man who remained there for eight days because "[n]o MHCB [was]

22 available."  Id.  As LAC illustrates, shortages in ICF beds create backlogs in higher levels

23 of care that then have harmful ripple effects throughout the system, affecting many more

24 class members than just the hundreds on the ICF waitlist.

25      19.    The harm caused by delays in treatment can be irreparable.  For instance,

26 untreated depression has been linked to increased rates of Alzheimer's disease.  The

27 literature also shows that delays in the treatment of psychotic disorders result in a worse

28 prognosis for the overall lifespan of the illness.  In other words, the patient ends up with a

[528908-18]

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1    more severe form of the illness than he would have if the treatment had been initiated in a

2    timely manner.

3         20.    In addition to harming the class members themselves, Defendants' practice

4    of housing acutely ill men who need inpatient psychiatric treatment in lower levels of care

5    is also unsafe for staff members and other prisoners.  Prisoners in acute distress often act

6    unpredictably, and sometimes can be impulsive or aggressive due to their improperly

7    treated mental illness.  Outpatient clinicians do not have the training, the enhanced

8    staffing, or the physical resources to be able to safely manage and provide treatment to

9    them.  Forcing these clinicians to attempt to provide the best care they can for prisoners

10   who belong in inpatient beds is not only dangerous, it also seriously compromises the

11   outpatient clinicians' ability to abide by governing professional standards and ethical

12   obligations.  Keeping prisoners in need of inpatient psychiatric treatment in lower levels of

13   care is also obviously dangerous for other prisoners and custody staff, who have even less

14   training or experience with appropriate methods for safely and humanely managing people

15   in acute psychological distress.

16        21.    Defendants in their response to the Special Master recommendation tout the

17   fact that they have reduced the wait time for SVPP beds from 183 days to 121 days in the

18   last year.  Defs' Response to Special Master DMH Report (Docket 4035) at 9.  But that is

19   still an unconscionable and dangerous delay of over four months for people who

20   desperately need inpatient psychiatric hospitalization immediately.  In addition, as

21   described below, the methods utilized by Defendants over the past year have not been safe,

22   appropriate and effective in providing the best possible care to the greatest number of

23   acutely ill patients in the emergency conditions that persist in CDCR at this time.

24        22.    The serious delays in access to inpatient psychiatric hospitalization in the

25   CDCR system today continue to cause harm to mentally ill prisoners, including cases

26   involving serious self-injury and death.  I discuss three such cases below.

27        Class Member A

28        23.    A recent example of a prisoner who engaged in serious self-harm while

[528908-18]

6

1   awaiting inpatient care was reported in the LAC Report during the Special Master's 24th

2   round tour there from July 25-28, 2011.  Ells Decl. Ex. A.  In the LAC Report, Defendants

3   list documented cases of serious self-injury over the last six months.  One man on that list,

4   Class Member A, stands out.  According to DMH bed utilization reports from December

5   2010 through the present, which I reviewed in preparing this report and are attached as

6   Exhibits B through H to the Ells Declaration, Class Member A was referred for acute

7   inpatient psychiatric hospitalization, Vacaville's APP program, on December 1, 2010.

8   While awaiting APP admission, Class Member A twice engaged in acts of serious self-

9   injury, each time requiring the use of 5-point restraints.  These two serious incidents of

10  self-injurious behavior occurred on December 13 and 14, 2010 at LAC.

11          24.     Class Member A was ultimately accepted to APP on December 6, 2010 and

12  was admitted to the Vacaville acute program on December 15, 2010.  His clinical team at

13  APP referred him for ICF level of care on January 21, 2011, and he was accepted by DMH

14  for that level of care on February 24, 2011.  On March 2, 2011, when he stood at

15  approximately 239th on the SVPP waitlist, Class Member A was discharged from APP

16  back to LAC's EOP program—outpatient care—despite the clinical determination by his

17  inpatient APP program clinicians that he actually needed prolonged inpatient care at the

18  ICF level.  Apparently because of the system-wide pressure caused by the shortage of ICF

19  beds, his APP clinicians decided to release Class Member A to a lower level of care rather

20  than have him tie up an acute bed—a very scarce resource designed for only short-term

21  inpatient stabilization of prisoners in crisis—for the many months that he would inevitably

22  linger on the SVPP waitlist.

23          25.     On April 29, 2011, while still on the ICF waitlist, Class Member A again

24  engaged in serious self-injurious behavior resulting in 5-point restraints at LAC.  He was

25  sent back to APP on May 10, 2011, and as of June 30, 2011, he was still 51st on the SVPP

26  waitlist over four months after he was "accepted" for ICF care.  It is my understanding,

27  based on observations by Plaintiffs' counsel during the LAC tour, that Class Member A

28  remained at APP through July 12, 2011, when he was discharged again to LAC.  I also

7

1  understand that, two days later, on July 14, 2011, Class Member A required placement in

2  the MHCB at LAC, where he remained at least until July 27, 2011.

3      26.    Class Member A provides a clear illustration of the serious suffering of

4  mentally ill prisoners who lack timely access to the inpatient psychiatric treatment they

5  have been clinically determined to need.  His case also demonstrates, as discussed above,

6  that the massive shortage of ICF beds clogs and strains the other higher levels of care—

7  EOP, MHCB, and APP—which are in turn forced to attempt to treat people like Class

8  Member A who should not be in those settings at all.  That, in turn, creates and/or

9  exacerbates existing shortages in each of those levels of care, preventing prisoners who

10  should be in MHCB, EOP, or APP levels of care from reaching that higher level of care.

11  Broken systems like CDCR, with its serious bed shortages at all of the higher levels of

12  care, force clinicians into no-win situations, in which there is no way to get sick people to

13  the clinically appropriate level of care they need, every single day.  And the patients

14  literally suffer for it.  In my opinion, promptly opening additional ICF beds and removing

15  the obstacles to admissions to those beds is the only way to cure these problems and

16  prevent additional cases of unnecessary serious self-harm for those lingering on the waitlist

17  like Class Member A.

18      <u>Class Member B</u>

19      27.    I have reviewed the CDCR suicide report for Class Member B dated

20  February 18, 2010, which is attached as Exhibit J to the Ells Declaration and referred to

21  herein as "Class Member B Report."  Class Member B was an EOP class member who was

22  discovered hanging in his administrative segregation cell at the California Institution for

23  Men on September 23, 2009.

24      28.    Class Member B began reporting serious mental health problems to mental

25  health staff while housed at Chuckawalla Valley State Prison.  Class Member B Report at

26  7.  In March 2009 he described his level of anxiety and depression as ten on a scale of ten.

27  *Id.*  On April 7, 2009, Class Member B requested to see mental health staff because he was

28  "always depressed," and the next day a clinician added him to the mental health services

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

[528908-18]

1  caseload at the 3CMS level of care.  *Id.*  He was observed to be responding to internal

2  stimuli, and presented as "delusional, and was pre-occupied with issues of guilt,

3  redemption, and punishment."  *Id.*  Class Member B took psychiatric medication briefly,

4  but his prescription was discontinued on June 10, 2009 upon his request.  Class Member B

5  Report at 8.

6         29.    Class Member B transferred to CIM on May 11, 2009.  Class Member B

7  Report at 8.  On July 21, 2009, he was issued an RVR for being out of bounds, after

8  custody staff observed him standing by a perimeter fence "'looking distracted and

9  unfocused.'"  Class Member B Report at 9.  He was placed in a holding cell, where a

10  Senior Hearing Official interviewed him and wrote that Class Member B "'did not appear

11  to be mentally stable.'"  *Id.*  Despite this assessment of Class Member B's impaired

12  functioning, the same official adjudicated Class Member B's RVR and found that a mental

13  health assessment was not required because "'the described behavior of [Class Member B]

14  did not appear unusual, uncharacteristic, or bizarre.'"  *Id.*  Class Member B spent six hours

15  in a holding cell and was then celled with another prisoner, who alleged to staff the next

16  day that Class Member B had sexually assaulted him.  *Id.*

17         30.    Class Member B was moved to administrative segregation on July 23, 2009,

18  and the mental health screening chrono conducted by a nurse "cleared him for general

19  population, suggesting that [Class Member B] was not identified as a mental health

20  caseload inmate."  Class Member B Report at 9-10. Custody staff completed

21  documentation as well that day, which "indicated that [Class Member B] was not seen by

22  mental health" and noted, "'The Mental Health Services Delivery System (MHSDS) status

23  of [Class Member B] is CLEAR.'"  *Id.* at 10.  Previously scheduled routine appointments

24  with a psychologist and psychiatrist for July 23 and July 29, 2009 never occurred.  *Id.*  He

25  was seen cell-front by a mental health clinician on August 5 and 12, 2009, as he refused to

26  come out of his cell.  Class Member B Report at 11.  The psychiatric technician's notes on

27  August 12, 2009 stated that Class Member B appeared to be having auditory hallucinations

28  and referred him to psychiatry and for an IDTT assessment.  The psychiatrist referral never

[528908-18]

1  materialized.  *Id.*

2      31.    Class Member B's IDTT treatment plan on August 12, 2009 reported he was

3  disorganized, psychotic, and pre-occupied with sexual behavior.  Class Member B Report

4  at 11.  He again refused to leave his cell to speak with his primary clinician on August 19,

5  2009, and five days later he reported to staff that he was suicidal.  Class Member B Report

6  at 12.  Class Member B was admitted to a MHCB on August 25, 2009 on a suicide watch,

7  and his suicide risk was rated to be high.  *Id.*  He remained in the MHCB for 28 days, and

8  although he denied suicidal ideation or mental health concerns, he was observed to be

9  delusional, guarded and paranoid.  Class Member B Report at 13.  Class Member B

10  reported auditory hallucinations, including hearing the devil whispering in his ear to rape

11  the Virgin Mary and fearing that God would seek revenge on him by killing him.  *Id.*

12  Despite his serious psychosis and an evaluated GAF score of 20, reflecting serious

13  impairment, Class Member B refused medication and was not considered to meet the

14  *Keyhea* criteria for forced medication.  *Id.*

15      32.    Within days of his admission to the MHCB, clinical staff considered

16  referring him to DMH at the ICF level of care, but did not do so for approximately a week.

17  Class Member B Report at 13.  Even after staff determined he needed inpatient care and

18  referred him, however, they did not submit the referral to DMH for close to three more

19  weeks until September 22, 2009—the day after Class Member B was discharged from the

20  MHCB at the EOP level of care to a ZZ cell, where he was held overnight until moving

21  back to administrative segregation on September 22, 2009.  Class Member B Report at 14.

22  In the two days after his MHCB discharge, staff did not comply with five-day custody

23  wellness checks or 30-minute welfare rounding for multiple hours on end.  *Id.*  Class

24  Member B killed himself on September 23, 2009.  He was accepted into DMH at the ICF

25  level of care on October 8, 2009—over two weeks after his death.  *Id.*

26      33.    In my opinion, a lack of timely access to inpatient care played a major role in

27  Class Member B's suicide.  When he was discharged after 28 days in the MHCB, he was

28  still described as having tangential thoughts, and presenting as easily distracted, paranoid

[528908-18]

1   and delusional.  Class Member B should have been referred to inpatient care at a far earlier

2   point in his decompensation and psychosis, and should have been accepted and transferred

3   to inpatient psychiatric hospitalization as an emergency case.  The dysfunctional

4   CDCR/DMH system resulted in his death by suicide.  Because no inpatient beds were

5   available, Class Member B was transferred from an MHCB to a ZZ cell—perhaps the most

6   harsh setting a mentally ill prisoner can be housed in, particularly someone with acute

7   psychotic symptoms like Class Member B—and then to another harsh setting,

8   administrative segregation, where the CDCR reviewer concluded "the increased social

9   isolation" coupled with Class Member B's increasing anxiety and stress "all contributed

10  further to [Class Member B's] psychological deterioration."  Class Member B Report at

11  18.  The lack of immediate access to inpatient care for men like Class Member B, who was

12  seriously, acutely mentally ill at the time of his death, is absolutely unconscionable.

13          Class Member C

14          34.     I have reviewed the CDCR suicide report for Class Member C dated April

15  12, 2010, which is attached as Exhibit K to the Ells Declaration and referred to herein as

16  "Class Member C Report."  Class Member C was an EOP, monolingual Spanish speaking

17  class member who was discovered hanging in his administrative segregation cell at CSP-

18  Corcoran on January 13, 2010.

19          35.     Class Member C had an extensive history of acute mental illness where he

20  has been consistently been diagnosed with various psychotic disorders, including

21  schizophrenia, resulting in delusions and command auditory hallucinations.  Class Member

22  C was seriously mentally ill at the time of his commitment offense.  Class Member C

23  Report at 6.  He was restored to trial competency at Atascadero State Hospital, but agreed

24  to a plea deal although his court-appointment evaluators all recognized that "his delusional

25  beliefs and tormenting symptoms were the primary cause of his crime."  *Id.*  CDCR's

26  reviewer concludes that Class Member C was "clear[ly] … tormented by his mental

27  illness" during his incarceration,  and that various attempts to calm the symptoms with

28  medications never worked.  Class Member C Report at 1.

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

36.     Class Member C's mental health seriously deteriorated over the last few years of his life.  He reported seven suicide attempts while in prison, and had numerous OHU and MHCB admissions for suicide concerns, including three in his first two months in prison in 2003, three in July 2007, one each in March and August 2008, two in February 2009 and two in October 2009.  Class Member C Report at 16-18.  He also received five serious RVRs between 2006 and his death in 2010, which were precipitated by his symptoms of mental illness that included command hallucinations to hurt himself and others.  Class Member C Report at 9-11, 21-22.  Because of his violent behavior caused by his mental illness, he spent the vast majority of his last years in segregated housing units.  Class Member C Report at 21.  Class Member C also suffered from auditory hallucinations telling him not to take his psychotropic medications, and from delusions that the medicine was poisonous.  Class Member C Report at 8.  He "became suicidal, requiring an increased level of care to re-stabilize [, and] re-stabilization became more and more difficult with each cycle of [medication] non-compliance."  *Id.*

37.     On February 20, 2009, Class Member C was admitted to an MHCB after complaining of suicidal ideation, delusional beliefs that he had been microchipped with an implant, and severe and persistent command auditory hallucinations.  Class Member C Report at 10.  His GAF score was 30.  *Id.*  He was referred for acute inpatient care at VPP, but waited months until May 27, 2009 to be admitted—far outside of the 10 day window permitted by the Program Guide.  Class Member C Report at 11.  While waiting for acute inpatient care he desperately needed, Class Member C further deteriorated in the MHCB, and asked if staff could "'operate on his ears to make him deaf so that the computer could no longer record everything he hears.'"  *Id.*

38.     Once Class Member C got to APP, staff debated initiating a Clorazil trial because no other medications had worked, but decided to pursue a lesser course of medications.  Class Member C Report at 11.  On June 27, 2009, while at APP, Class Member C "in response to delusional ideation and command auditory hallucinations … assaulted a medical technical assistant and was subsequently referred for prosecution."  *Id.*

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1   APP staff considered referring him to ICF care, but decided not to because of the assault.

2   Class Member C Report at 11, 25.  He was instead discharged to administrative

3   segregation at the EOP level of care at CSP-Corcoran on August 6, 2009.  Class Member C

4   Report at 11.

5        39.     Class Member C was again admitted to an MHCB two months later due to

6   command hallucinations telling him to kill himself.  Class Member C Report at 11-12.

7   MHCB staff again decided to initiate a DMH referral for inpatient treatment and a Clozaril

8   trial, which was completed in October 2009.  Class Member C Report at 12-13.  Class

9   Member C was again discharged to ASU EOP.  Class Member C Report at 12.  He

10  remained actively psychotic and suicidal in that setting while awaiting an ICF bed,

11  suffering from depression, auditory hallucinations, suicidal ideation due to the command

12  hallucinations, and paranoid delusions.  Class Member C Report at 13.  Many of his mental

13  health clinical contacts in the last months of Class Member C's life were either cancelled

14  and not rescheduled, conducted cell front in a non-confidential setting, or occurred without

15  a Spanish interpreter present such that the monolingual Class Member C could not

16  understand what was happening.  Class Member C Report at 13-15.  On December 21,

17  2009, Class Member C reported to staff that he had stopped attending groups because he

18  could not understand what was being discussed "'because no one speaks Spanish'" and

19  that his medication was not helping.  Class Member C Report at 14.

20       40.     Class Member C was accepted at SVPP for intermediate inpatient care on

21  November 9, 2009.  Class Member C Report at 13, 15.  He remained on the SVPP waitlist

22  for over two months before he killed himself in January 2010.

23       41.     In my clinical judgment, delays and lack of access to inpatient care

24  contributed to the suicide of Class Member C, and caused extreme and unnecessary

25  suffering in the months before his death.  Class Member C should have received the

26  inpatient psychiatric hospitalization treatment his CDCR and DMH clinicians agreed he

27  needed much earlier than he did.  Instead, he waited for acute care for over three months

28  before he was finally admitted to VPP in May 2009 and killed himself later that same year

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1   after waiting more months for inpatient treatment at SVPP that never came.  Lengthy

2   delays in accessing inpatient care due to lack of referrals and bed shortages when he was

3   ultimately referred in 2009 and 2010 made him sicker and harder to treat in the outpatient

4   setting where he was left to decompensate in an actively psychotic state for months and

5   years on end.  His illness led him to assault a staff member in VPP, which then led DMH

6   staff to decide not to refer him for ICF care due to security concerns that were entirely a

7   byproduct of his deficient mental health treatment.  As discussed below, in my experience

8   with community and forensic mental hospitals, patients like Class Member C who are at

9   risk of violent behavior can be and routinely are successfully treated in inpatient settings

10  until they are stabilized.  It is very important to note that the alleged assault at VPP

11  occurred after Class Member C had waited an unconscionably long time—three months

12  from February through late May 2009—to be transferred there, during which he

13  deteriorated further in a crisis setting that should only house prisoners for 10 days.  In my

14  opinion, denial of prompt inpatient treatment must be considered part of the etiology of

15  this assaultive behavior.  That DMH would then rely on this very assault to deny future

16  access to inpatient care is not just clinically unsound; it is grotesque.  There is no question

17  that Class Member C should have been treated in an inpatient setting long before he died,

18  and that doing so would very likely have prevented his suicide.

19        **The Current Waitlist for Inpatient Mental Health Care Does Not Reflect the
20        True Need**

21        42.     In preparing for this report, I reviewed a number of CDCR suicide reports.

22  All of the reports I reviewed concerned suicides of class members who had been at the

23  EOP level of mental health care when they died, and who had committed suicide within

24  the last two years.  This time period was selected because Defendants, pursuant to this

25  court's March 31, 2009 order and under the direction of the Special Master and his experts,

26  undertook a modified needs assessment process, coined the Mental Health Assessment and

27  Referral Project ("MHARP"), in order "to determine the existence and extent of any

28  previously unidentified need for inpatient beds among members of the Coleman plaintiff

[528908-18]

1  class," Special Master DMH Report (Docket No. 4020) at 2, "and to refer on an expedited

2  basis any inmates identified in this modified assessment process for inpatient care," *id.* at

3  19. One of the major components of the project was CDCR's creation of a new checklist

4  tool specifying criteria that should trigger clinicians' consideration of a DMH referral. *Id.*

5  at 45. As summarized by the Special Master in his report at pages 45-47, the MHARP

6  project lasted from April 15, 2009 through December 29, 2009 and included training on

7  the referral process and criteria, as well as assessments at CDCR's 28 non-desert prisons.

8      43.    The MHARP uncovered a massive level of unmet need for inpatient care,

9  resulting in the referral of 561 additional prisoners needing DMH inpatient care in the first

10  three months alone. Special Master DMH Report (Docket No. 4020) at 21. By the time

11  the assessments were completed on December 29, 2009, almost 1,000 prisoners who had

12  not previously been identified as needing inpatient care were referred to DMH. *Id.* at 47.

13  As a result of the MHARP process, the waitlist for prisoners awaiting transfer to an ICF

14  level of care skyrocketed from an already deplorable 149 prisoners in March 2009 to a

15  staggering 575 by the time the process was completed in March 2010. *Id.* at 4. The wait

16  for admission to an acute care inpatient bed, which typically has a waitlist of twenty or less

17  patients, grew to 64 prisoners in the same timeframe. *Id.* at 47. As discussed above, these

18  levels of unmet need, and the lengthy time extremely ill prisoners suffer while awaiting

19  appropriate treatment, are absolutely unconscionable and cause real—sometimes

20  irreparable—harm and death.

21      44.    Given the failure of previous efforts to accurately capture the need for

22  inpatient care and ensure timely referrals for those prisoners needing such care, the 2010

23  MHARP was designed to be self-sustaining. As part of the process, and with cooperation

24  of DMH and CDCR staff in all stages of development and implementation, each prison's

25  mental health clinicians were trained on how to use the new referral checklist to identify

26  and refer prisoners needing inpatient care on an ongoing basis such that further unmet need

27  assessments would be rendered unnecessary. But the Special Master's follow-up review of

28  13 institutions' implementation of the new DMH referral process between May 26 and

[528908-18]

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1  July 22, 2010 makes clear that the MHARP was not successful, and that CDCR was still

2  failing to identify and refer prisoners needing inpatient care. Special Master DMH Report

3  (Docket No. 4020) at 48-49 (referencing Special Master report on MHARP follow-up

4  within 22nd monitoring report, filed on March 9, 2011)).

5       45.     The Special Master's chart at page 50 of his Report encapsulates CDCR's

6  clear ongoing problem with under-referring patients who need inpatient care, and the

7  failure of the MHARP to meet its goal of becoming self-perpetuating: Clinicians' average

8  monthly referrals spiked from approximately 51 prior to the MHARP to approximately 132

9  during the 8 months the MHARP lasted. In the three months after the Special Master team

10  left and the MHARP ended, referrals promptly plummeted by 41% to approximately 75

11  ICF referrals per month. The average referral rate briefly rose somewhat to 95 per month

12  for the three months the Special Master conducted his follow-up in the summer of 2010.

13  But after that ended in August 2010, referrals crashed back down to about 55 per month—

14  almost the same rate as before the MHARP started. Notably, the number of prisoners on

15  the mental health caseload rose by 2,500 during this same two year period. Special Master

16  Report (Docket No. 4020) at 50.

17       46.     Based on my experience in touring CDCR facilities, interviewing clinical

18  staff, and reviewing relevant documents in this case, it is clear to me that CDCR is

19  continuing to fail to identify and refer to DMH a significant number of prisoners who

20  desperately need inpatient mental health treatment as a clinical matter. Consequently, the

21  real unmet need for inpatient care—partially reflected in the deplorable 147-man waitlist—

22  is actually far more extensive than Defendants are reporting.

23       47.     Defendants' own June 2011 audit of their referral practices, which they

24  discuss in their response to the Special Master's report, shows that the ICF waitlist level

25  remains artificially low. Using a subset of the MHARP referral criteria, CDCR identified

26  2,083 people at 14 of the 33 prisons who should have been considered for a DMH referral

27  for inpatient care, but were not. The 14 prisons then randomly selected and reviewed

28  1,408 of those 2,083 prisoners' files to determine whether to refer them to DMH if

1  inpatient care had not already been considered.

2    48.    Apparently, and for no discernible clinically appropriate reason, almost 700

3  seriously mentally ill prisoners who CDCR identified as meeting certain of the referral

4  criteria were not included in the corrective audit, meaning CDCR did not ask clinicians to

5  reevaluate whether these men currently need inpatient care.  In my opinion, and based on

6  CDCR's own referral procedure, every one of those 2,083 prisoners should have been

7  assessed for referral and referred to inpatient care if necessary.  Given the fact that,

8  according to CDCR's own records, each of the 675 men had recently displayed signs of

9  serious acuity, in my experience it is highly likely that inpatient care would have been

10  clinically appropriate for many of those 675 men excluded from the corrective audit.

11    49.    In addition to that deficiency, it is likely that Defendants' audit further

12  undercounts the number of patients needing inpatient care today for two additional

13  reasons.  First, CDCR did not review every prison, despite the fact that it is my

14  understanding that Phase IV of the MHARP, which focused on the prisons deemed less

15  likely to have patients needing inpatient care, uncovered an additional 285 prisoners who

16  should have been referred to DMH.  Second, the audit did not look for every one of the

17  MHARP referral criteria.  For example, the audit did not search for individuals who had

18  MHCB stays of greater than 10 days.  As such, I believe the number of prisoners needing

19  inpatient care is almost certainly significantly higher than captured in the corrective audit.

20    50.    Of the remaining 1,408 randomly selected men who met the DMH referral

21  criteria but were not referred, CDCR identified 628 men—almost 50% of the group—

22  whose clinicians had never even considered for a DMH referral despite the fact that all of

23  the men met the referral criteria.  Only 201 of the 1,408 men had been considered for

24  referral—meaning that CDCR clinicians at these 14 prisons were following the MHARP's

25  referral process less than 10% of the time.

26    51.    Defendants lump the remaining 579 of the 1,408 men considered as part of

27  the corrective audit into a single undifferentiated category covering people who

28  transferred, paroled, or, upon further review, did not meet the referral criteria.  Despite the

17

[528908-18]

1   fact that some unknown proportion of these 579 prisoners are still in the system and have

2   recently shown clear signs of needing inpatient care, CDCR clinicians are not reevaluating

3   whether these men need to be referred to DMH either.  That too means that potentially

4   hundreds of additional men should be on the DMH waitlist as of today.  Even as faulty as

5   this audit is from a clinical perspective in terms of undercounting the total need for

6   inpatient care, it makes clear that the current need for inpatient care is much, much higher

7   than the waitlist shows, meaning that many, many prisoners will continue to suffer

8   unconscionably long delays while waiting for the inpatient level of care they desperately

9   need.  It also makes clear that, despite the extensive efforts undertaken during the

10  MHARP, CDCR's inpatient care referral system remains completely broken, as it was

11  when I last examined this issue during the overcrowding proceedings in 2007 and 2008.

12      52.     As I have previously discussed in my two prior reports filed with this Court

13  during the overcrowding proceedings, one of the major reasons the referral system is

14  broken is because of the lack of sufficient DMH beds, and artificial barriers to inpatient

15  referrals and transfers.  Simply put, clinicians will not bother to refer patients for care they

16  have no likelihood of receiving in a remotely timely fashion. 11/9/07 Report ¶¶ 59-60, 76,

17  155-156, 170; 8/15/08 Report ¶¶ 20-24, 56.  Notably, the waitlist for intermediate inpatient

18  care is only slightly shorter today (163 as of the most recent reported data I have seen from

19  June 2011, which is attached as Exhibit A to the Fischer Declaration) than when I last

20  opined on the strong disincentive effect of a lengthy waitlist on clinician's willingness to

21  refer in August 2008, when the waitlist stood at 171 seriously mentally ill men.  Unless

22  and until there are sufficient numbers of inpatient beds to care for all of the mentally ill

23  people in the system who need to be in a hospital, CDCR's chronic problem with under-

24  referrals—and the resulting inaccurately low waitlist that fails to capture all of the unmet

25  need for that level of care—will never be resolved.

26      53.     The broken nature of CDCR's DMH referral process—even after the

27  MHARP—is most starkly illustrated by the appallingly high number of suicides of EOP

28  prisoners who should have been, but never were, considered for referral for inpatient care

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

[528908-18]

1    between 2009 through the present.  In preparing for this report, I reviewed CDCR official

2    reports of eight such men, who I discuss further below.

3            Class Member D

4            54.    I have reviewed the CDCR suicide report for Class Member D dated May 18,

5    2011, which is attached as Exhibit L to the Ells Declaration and referred to herein as

6    "Class Member D Report."  Class Member D was an EOP class member who was

7    discovered hanging from the air vent in his cell at CSP-Los Angeles County ("LAC") on

8    March 30, 2011, after the completion of all phases of the MHARP.  He was Level IV and

9    close A custody status when he died.  Approximately a year before he committed suicide,

10   Class Member D, was housed at Centinela and was not on the mental health caseload.

11   Class Member D Report at 10.  He asked to see mental health staff because he was not

12   sleeping well and was feeling depressed.  Class Member D Report at 5.  He was seen by a

13   clinician cell-front because of a yard lockdown, but reported that he did not feel

14   comfortable talking about his mental health concerns in this nonconfidential setting.  *Id.*

15   Instead of ensuring he was seen confidentially, staff told him that they would try to arrange

16   for him to see a clinician in a private setting the next week.  *Id.*  That meeting never

17   occurred.  Class Member D Report at 5-6.

18           55.    On May 8, 2010, Class Member D again asked to see mental health staff and

19   was admitted to the CTC on a suicide precaution due to severe depression and suicidal

20   ideation.  Class Member D Report at 6.  At that time, he also reported a previous suicide

21   attempt years prior.  *Id.*  After remaining in the CTC on suicide precaution for a week, he

22   transferred to an MHCB at CMF on May 15, 2010.  *Id.*  Clinicians in the MHCB wrote that

23   Class Member D showed "significant symptoms of depression" and "some paranoia," and

24   that he was seen "frequently with his eyes closed sitting on his bed with his fingers in his

25   ears."  *Id.*  Although he was prescribed antidepressant and antipsychotic medications, he

26   refused to take them.  *Id.*  After remaining in the MHCB for an additional 9 days, he was

27   discharged into the EOP program at LAC on May 24, 2010.  Class Member D's total stay

28   in a medical setting for suicide precaution was 17 days.  *Id.*  Accordingly, Class Member D

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1  should have been evaluated for referral to DMH care, but there is no documentation that

2  his clinicians considered that option.

3       56.    Class Member D continued to deteriorate in the EOP program at LAC,

4  presenting sometimes as psychotic, and other times as depressed.  Class Member D Report

5  at 6.  In the year prior to his death, Class Member D's clinicians at LAC changed his

6  primary diagnosis frequently without clinical comment or explanation.  Class Member D

7  Report at 18, 20-21, 23-24.  LAC clinical staff either failed to review or ignored his

8  MHCB discharge papers, never mentioning the fact that he was in the MHCB on suicide

9  precaution in any of his first four IDTTs at LAC and neither mentioning nor carrying

10  forward his discharge diagnosis of major depressive disorder, severe, with psychotic

11  features.  Class Member D Report at 19-21.  Although he arrived at LAC on June 7, 2010

12  after a discharge from the MHCB with a documented history of suicidal ideation, chronic

13  moderate suicidal risk, and variable acute suicidal risk, only a single suicide risk

14  evaluation was completed by LAC mental health staff—8 months after his arrival.  Class

15  Member D Report at 9, 20, 22-23.  Other mental health treatment plan documentation from

16  his IDTTs contained inaccurate information about his MHCB stay and the mental health

17  history of an entirely different inmate.  Class Member D Report at 20.

18       57.    During the three months prior to his death, Class Member D had an abysmal

19  group attendance rate of 12 out of 213 scheduled groups—approximately 5%.  Class

20  Member D Report at 6.  That appallingly low group attendance rate also should have

21  triggered his clinicians to consider a DMH referral, but it did not.

22       58.    In the three months leading up to his death, none of Class Member D's

23  contacts with his primary clinician occurred in a confidential setting, despite the fact that

24  he had a known history of reluctance to speak in front of others about his mental health

25  problems.  Class Member D Report at 6, 20, 24-25.  About a third of the time, Class

26  Member D refused to speak at all with his primary clinician during his weekly one-to-one

27  contact.  Class Member D Report at 6.  In the week prior to his death, Class Member D's

28  primary care clinician canceled his weekly contact appointment on March 24, 2011 due to

20

[528908-18]

"custody time constraints," and Class Member D cancelled his next scheduled appointment with his clinician two days before his death on March 28, 2011.  Class Member D Report at 7.

59.    Class Member D refused to take his mental health medications at least half of the time they were offered to him in the four months preceding his suicide, including on each of the three days prior to his death.  Class Member D Report at 7, 19.  Prolonged non-compliance with medication should have triggered a consultation with his psychiatrist.  Class Member D Report at 7, 20-21, 25.  No such consultation was scheduled or occurred.  *Id.*  Class Member D hanged himself in his cell on March 30, 2011.

60.    Based on the information provided in CDCR's suicide report for Class Member D, in my opinion, Class Member D should have been evaluated for inpatient DMH care and such care was almost certainly warranted.  Class Member D's lengthy stay in the CTC/MHCB for suicidal ideation meets the MHARP criteria for consideration of referral, as does his shockingly low group attendance in the months leading up to his death.  Nonetheless, there is no indication that such a referral was ever considered despite the MHARP process.  With a total ICF waitlist of 196 as of March 2011, however, a referral for inpatient care would have essentially been futile.  *See* Fischer Decl. Ex. E (3/31/11 DMH ICF Licensure Report).  As discussed above, if inpatient care is not readily available when patients need it, clinicians will not refer.

Class Member E

61.    I have also reviewed the CDCR suicide report for Class Member E  dated April 13, 2011, which is attached as Exhibit M to the Ells Declaration and referred to herein as "Class Member E Report."  Class Member E was an EOP class member who was discovered hanging in his cell at CSP-LAC on January 25, 2011, after the completion of all phases of the MHARP.  Class Member E had a lengthy history of fluctuating between requesting and refusing mental health treatment and medication for his mood swings and bipolar disorder, going back approximately nine years.  He also had numerous suicide attempts in the community, including one incident in 2007 when he told his parole officer

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1   that "'people were trying to kill him and his family and [that] he wanted to kill himself.'"

2   Class Member E Report at 10.  He was consequently committed on a 5150 involuntary

3   hold to a community hospital, where his psychotic symptoms promptly resolved with the

4   help of antipsychotic medications.  *Id.*  Class Member E reentered CDCR in 2008, at

5   which point staff at NKSP-RC referred him for a mental health evaluation due to his prior

6   placement in the 3CMS level of care and bipolar diagnosis.  *Id.*  He reported no mental

7   health problems or history of suicide attempts, and was not put on the caseload or

8   prescribed any medications.  *Id.*

9       62.    A few months later, however, Class Member E's mental health began to

10  deteriorate.  He was evaluated by a mental health clinician on May 14, 2009 after

11  submitting an appeal accusing CDCR staff of experimenting on him and reading his mind.

12  Class Member E Report at 11.  He reported no history of psychiatric hospitalizations or

13  suicide attempts, however, to the mental health clinician sent to speak with him.  *Id.*  Three

14  weeks later, Class Member E was admitted to a mental health crisis unit on June 7, 2009

15  after being evaluated as a high suicide risk, but continued to refuse to take psychiatric

16  medication.  *Id.*  Various clinicians in the MHCB assigned him GAF scores varying

17  between 30 and 47, and he was noted to be paranoid and delusional, complaining that

18  CDCR staff could read his mind and were sending him messages through the television.

19  Class Member E Report at 11-12.  Class Member E was discharged from the MHCB

20  without medication for his psychotic symptoms to the Level IV facility at CSP-LAC at the

21  3CMS level of care on June 11, 2009.  Class Member E Report at 12.  He was placed at

22  maximum custody, single-cell status because he had a history of assaultive behavior.

23  Class Member E Report at 19.

24      63.    Class Member E continued to suffer from delusions and hallucinations at

25  LAC, where he went on a hunger strike due to his delusion that staff were reading his

26  mind.  Class Member E Report at 13.  Nonetheless, Class Member E vehemently refused

27  psychiatric medication and treatment.  *Id.*  His psychiatrist considered seeking a *Keyhea*

28  order but did not pursue it.  *Id.*  On July 15, 2009, his IDTT team changed his level of care

22

[528908-18]

1  to EOP due to his psychotic and delusional behavior, although he was still not prescribed

2  medication.  *Id.*

3      64.    Through the fall of 2009, Class Member E continued to suffer from paranoia

4  and delusions, but consistently refused medication for the symptoms and asked to be

5  removed from the EOP program.  Class Member E Report at 13-14.  His weekly primary

6  care contacts were provided by a number of different clinicians whose evaluations of his

7  mental health condition varied wildly—Class Member E was alternately described by two

8  different clinicians in the same time period as stable without medication with psychosis in

9  remission, and as actively responding to internal stimuli, talking to himself, and believing

10  he was being persecuted by a law-enforcement conspiracy.  Class Member E Report at 14.

11      65.    In the final year of his life, Class Member E was scheduled for 772 mental

12  health appointments, but kept only 177 of those.  Class Member E Report at 14.  Five of

13  the 177 contacts were cell-front interviews.  *Id.*  Class Member E refused to attend mental

14  health appointments on 475 occasions, and was not seen cell-front when he refused.  *Id.*

15  Class Member E also generally refused to leave his cell to attend EOP groups because of

16  his delusional fear that people could read his mind.  Class Member E Report at 15, 26.

17      66.    During this time frame, clinicians repeatedly described Class Member E as

18  withdrawn, isolative, and floridly psychotic.  Class Member E Report at 15-17.  He

19  suffered from obvious responses to internal stimuli and poor reality testing.  *Id.*  His

20  clinicians described him as paranoid, and his GAF score generally reflected a serious level

21  of impairment and functioning.  Class Member E Report at 15.  Nonetheless, his IDTT

22  team determined that he did not qualify for a *Keyhea* order.  *Id.*

23      67.    Class Member E's active, ongoing psychosis led to his treatment team to

24  repeatedly consider referring him to DMH because of both his high refusal rate and his

25  general inability to function within the outpatient setting.  Class Member E Report at 15,

26  26-27.  Nonetheless, the team decided not to although he was described as "psychotic,

27  yelling at walls at night, has paranoid delusions," refusing to leave his cell, refusing to take

28  medication, and having no insight into his mental health issues.  Class Member E Report at

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

15.  His primary care clinician did not refer Class Member E because he concluded inpatient care might have a "de-stabilizing effect," *id.*, a highly problematic finding for the reasons discussed below.  As Class Member E continued to decompensate, clinical staff continued to consider referring him to DMH, but never did.  Class Member E Report at 15, 26.

68.    In the months before his death, Class Member E blocked the air vent in his cell, which suggests he had become much more psychotic, as this action is indicative of worsening auditory hallucinations and/or increased paranoia.  Class Member E Report at 24.  Additionally, although he expressed "chronic paranoia regarding the prospect of having a cellmate," likely due to his delusions that others could read his mind, Class Member E's single cell status was removed and he was pending double cell placement.  *Id.* He hanged himself in his cell on January 25, 2011.

69.    The CDCR's official review of Class Member E's suicide approved of the decision not to refer Class Member E for inpatient care on the basis that "a higher level of care may not improve mental health treatment for certain inmates" such as Class Member E.  Class Member E Report at 27.  The report also says "that treatment at DMH would [not] have benefitted [Class Member E], given his need to isolate and his consistent refusal to attend group treatment, which is an essential part of the treatment offered at that level of care."  Class Member E Report at 26.  I strongly disagree with these conclusions as a clinical matter.  Class Member E's isolation and refusal to participate in group treatment were a direct outgrowth of his severe improperly treated mental illness, and in my experience, appropriate inpatient care and medication routinely and successfully resolve those symptoms.  Although his clinicians were loath to disrupt his "stable" existence by sending him to DMH for inpatient care, Class Member E Report at 15, Class Member E's mental state was marked by extreme suffering due to his severe and unrelenting psychosis. In my experience working in psychiatric hospitals, Class Member E's described behavior would certainly warrant inpatient care if he were in the community, and he in fact appears to have been much sicker than the vast majority of patients I have treated in inpatient

24

1  settings outside of the CDCR setting.

2       70.     Class Member E's clinicians decided that he could not benefit from a higher

3  level of care even though he was actively psychotic and delusional for months on end and

4  had never received any sustained inpatient care for his severe mental illness.  In fact, Class

5  Member E's one experience with inpatient care, when he was committed to a mental health

6  hospital on a 72-hour hold, was highly successful—his psychosis resolved within a matter

7  of days with medication.  In my opinion, and based on my observations and interviews of

8  clinical staff during my expert tours of CDCR during the overcrowding proceedings in this

9  case, Class Member E's clinicians would have been much more likely to try treating him at

10  a higher level of care if there had been any hope that he could reach an inpatient bed in a

11  remotely timely fashion.  With a total ICF waitlist of 232 as of February 2011, however, a

12  referral for inpatient care would have essentially been futile.  *See* Fischer Decl. Ex. F

13  (2/28/11 DMH ICF Licensure Report).  As discussed above, if inpatient care is not readily

14  available when patients need it, clinicians will not refer.

15       Class Member F

16       71.     I have also reviewed the CDCR suicide report for Class Member F dated

17  February 2, 2011, which is attached as Exhibit N to the Ells Declaration and referred to

18  herein as "Class Member F Report."  Class Member F was an EOP class member who was

19  discovered hanging in his cell at Pelican Bay State Prison on December 9, 2010, after the

20  completion of all phases of the MHARP.  Class Member F, who was serving a sentence of

21  life without possibility of parole, "suffered from a chronic psychotic condition with

22  intermittent exacerbations, for which he was treated in both inpatient and outpatient

23  settings" during his 13 years in CDCR.  Class Member F Report at 1.  Class Member F had

24  been hearing "well formed" command hallucinations ordering him to harm himself or

25  others since his middle teen years.  *Id.* at 7.  His severe, intrusive and persistent auditory

26  hallucinations were described as "resistant to treatment."  *Id.* at 1.

27       72.     Class Member F's GAF score for the last 5 years of his life ranged between

28  30 and 50, indicating "a range of severe and persistent psychiatric impairment."  *Id.* at 7.

[528908-18]

1    Class Member F's clinicians changed his medications and dosages numerous times over

2    the years in an effort to eliminate his auditory hallucinations, including putting him on

3    "massive" dosages of many different antipsychotic drugs at once in an attempt to dull the

4    voices, but nothing worked.  Class Member F Report at 8, 17.  The severe hallucinations

5    resulted in 12 MHCB admissions and three DMH hospitalizations (two acute level

6    admissions for six months in 1999 and for six weeks months from 11/6/09 through

7    12/23/09, and one intermediate level at SVSP for two months in 2005), but his illness

8    continued essentially unabated.  *Id.* at 6.

9        73.    During Class Member F's last DMH stay in late 2009, his clinicians

10   discussed attempting to treat his symptoms with Clozaril, but Class Member F resisted.  *Id.*

11   at 11.  Upon his discharge to PBSP EOP, his clinicians continued to recommend that Class

12   Member F try Clozaril for his serious, unabating psychosis.  *Id.* at 11.  In the fall of 2010

13   he agreed to do so.  *Id.* at 11.  Class Member F's clinician's determination that Clozaril

14   was clinically appropriate for his treatment should have triggered a referral under the

15   MHARP guidelines because DMH was, in fall 2010, the only setting in which Clozaril

16   could be initiated.  No referral occurred, however.  Later that year on December 2, 2010,

17   his treatment team apparently discussed referring him to ICF treatment at SVSP but

18   decided to wait and revisit the possibility later.  *Id.* at 16.  Class Member F killed himself 2

19   days later.  The waitlist for SVPP beds in December 2010 stood at 326.  *See* Fischer Decl.

20   Ex. H (12/31/10 DMH ICF Licensure Report).

21       74.    In my opinion, in addition to meeting the referral criteria for initiation of

22   Clozaril, Class Member F should have been referred for inpatient care under the MHARP

23   criteria because his chronic psychotic symptoms had not responded sufficiently to

24   treatment to allow him to function at an adequate level.  His GAF score remained between

25   30 and 50 for five years, and his persistent violent command hallucinations never

26   significantly abated.  In my clinical judgment, based on the information provided in the

27   CDCR's suicide report, Class Member F should have been referred for ICF care.  If that

28   care had been readily accessible instead of having a hundreds-deep waitlist, his clinicians

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1  would have been more likely to refer him.

2      Class Member G

3      75.     I have also reviewed the CDCR suicide report for Class Member G dated

4  November 12, 2010, which is attached as Exhibit O to the Ells Declaration and referred to

5  herein as "Class Member G Report." Class Member G was an EOP class member who

6  was discovered hanging in his cell at Kern Valley State Prison on July 5, 2010, after the

7  completion of all phases of the MHARP. Class Member G struggled with severe

8  depression and suicidal thoughts for his entire term in prison before his death, and was

9  consistently considered to be at high risk of suicide.

10      76.     Class Member G repeatedly attempted suicide both in prison and the

11  community, and "[m]ental health staff viewed him as a chronic risk for suicide." Class

12  Member G Report at 19.  One of Class Member G's clinicians described him as a "dead

13  man walking" due to his often-repeated plans to kill himself.  *Id.* at 25.  The clinician noted

14  that "[s]ooner or later he will probably succeed despite any mental health effort." *Id.* at 6.

15      77.     In particular, the report documents that Class Member G's mental health

16  began deteriorating sharply in early 2010, when he had three MHCB admissions between

17  January and June 2010 for suicide threats and precautions.  In addition to these admissions,

18  Class Member G was referred but not admitted to an MHCB on January 4, 2010 after

19  reporting another suicide attempt.  *Id.* at 8, 13.  He refused medications 18 times in the

20  months of May and June 2010.  *Id.* at 12.  On June 23, 2010, staff informed Class Member

21  G's primary clinician that he appeared to be doing worse and reported wanting to "shut

22  down." *Id.* at 10.  When interviewed, Class Member G told his primary clinician he was

23  having suicidal thoughts daily, although he insisted he was not suicidal.  *Id.*  The clinician

24  referred Class Member G to an MHCB for suicide precautions based on his mental health

25  history and chronic risk of suicide, and he was admitted on the same day.  *Id.*

26      78.     On June 24, 2010 while Class Member G was in the MHCB unit on suicide

27  precaution, an MHCB clinician determined that Class Member G's "chronic suicidality

28  indicated that a referral to DMH was warranted" and completed the IDTT Screening

[528908-18]

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1    Checklist for Referral to DMH form.  *Id.* at 27.  Nonetheless, Class Member G was not

2    referred to DMH and the IDTT failed to document any rationale for that decision.  Class

3    Member G Report at 27, 11.  In fact, there is no documentation that Class Member G's

4    IDTT team met to discuss his mental health treatment plan at all before he was discharged

5    from the MHCB.  The SVPP waitlist as of June 30, 2010 was 305.  *See* Fischer Decl. Ex. J

6    (6/30/10 DMH ICF Licensure Report).  He hanged himself on July 5, 2010, after a failed

7    attempt to kill himself the day prior.

8        79.    In my opinion, Class Member G should have been referred for inpatient care.

9    His persistent and chronic suicidal ideation and multiple suicide attempts met the MHARP

10   criteria for referral, given his three MHCB admissions and an additional MHCB referral in

11   the six months prior to his suicide.  His own clinician described Class Member G as a dead

12   man walking who would ultimately succeed in killing himself.  Class Member G clearly

13   was not functioning adequately in the EOP level of care and should have been moved to an

14   inpatient bed, and would have been more likely to have been referred if the waitlist for

15   such care was not hundreds of people long.

16       Class Member H

17       80.    I have also reviewed the CDCR suicide report for Class Member H dated

18   March 12, 2010, which is attached as Exhibit P to the Ells Declaration and referred to

19   herein as "Class Member H Report."  Class Member H was an EOP class member who

20   suffered from schizophrenia.  He committed suicide by hanging at North Kern State Prison

21   on December 7, 2009, during the final stages of Phase IV of the MHARP.

22       81.    One of the official problems reported by the Suicide Report concerns clinical

23   staffs' failure to consider a DMH referral for Class Member H, who had three crisis bed

24   admissions during May, June and July 2009, including one for more than 10 days, and four

25   serious RVRs on officers when he was most likely under the influence of paranoid

26   delusions and command auditory hallucinations.  Class Member H Report at 25.

27       82.    Class Member H had "a significant mental health history starting in the mid-

28   1990s, including outpatient and inpatient treatment," as well as several suicide attempts.

1  Class Member H Report at 1, 4.  During his first prison term, Class Member H had two

2  ASH admissions in 2000 and 2002, as well as several MHCB admissions.  *Id.* at 5.

3       83.     He was received at NKSP RC for his second term on May 13, 2009.  *Id.* at

4  16.  Two weeks later, he told custody staff that the "[Los Angeles Police Department]

5  'tortures him every night telling him they will stop if he hurts staff'" and was evaluated to

6  have a GAF score of 30, "indicating severely impaired psychological functioning." *Id.* at

7  6-7, 19.  He was then placed in the MHCB overflow unit (called the Mental Health

8  Temporary Housing, or "MHTS"), where his GAF score was determined to be 20,

9  indicating he was considered "a danger of harming others or himself, with severe

10  impairment." *Id.* at 7.  He remained in the MHTS for five days.  *Id.*  On June 1, 2009, his

11  suicide risk was evaluated as high, but he was nonetheless released to return to his housing

12  unit.  *Id.*

13       84.     "As he was about to be escorted to his regular housing unit he punched a

14  correctional officer," and was then "immediately subdued and escorted to the Mental

15  Health Crisis Bed Unit for evaluation." *Id.* at 7.  He was promptly readmitted and stayed

16  in the MHCB for 14 days.  *Id.* at 7.  His GAF score was 20 at the time of his admission,

17  reflecting "severely impaired due to psychiatric symptoms." *Id.* at 7.  He was placed on

18  suicide precaution and observed for danger to self and others.  Changes to his medication

19  helped but did not resolve his delusions and hallucinations.  *Id.*

20       85.     Class Member H was discharged from the crisis unit on June 15, 2009 to the

21  administrative segregation unit at EOP level of care, but continued to suffer from psychotic

22  symptoms and had difficulty coping.  *Id.* at 8.  The CDCR Report for Class Member H

23  states that on July 10, 2009, he was placed in a holding cell, pending transfer to an MHCB

24  after "he 'gassed' a correctional officer"—which Class Member H told clinicians was

25  caused by his auditory hallucinations—but was instead placed in the temporary crisis unit

26  for approximately 48 hours.  *Id.* at 8, 9.  On July 12, 2009, he was returned to ASU.  *Id.* at

27  9.

28       86.     On July 18, 2009, the Report states that Class Member H "assaulted another

1  correctional officer by throwing an unknown liquid on the officer during distribution of

2  medications." *Id.* at 9. He was evaluated for possible MHCB admission, but was returned

3  to his ASU cell instead and put on management status where his mattress and personal

4  property were removed. *Id.* He was only seen cell front by clinical staff and denied

5  groups during this time, which lasted 6 weeks until August 29, 2009, when he refused to

6  exit the shower and was "extracted" by officers and rehoused in the temporary crisis unit

7  for evaluation. *Id.* A suicide risk assessment done on August 31, 2009, found his suicide

8  risk moderate, that he was "delusional, experiencing auditory hallucinations, and having a

9  blunted affect," and that his GAF score was 15. *Id.* He was admitted to the MHCB and

10  remained there until September 3, 2009. *Id.*

11       87.    Class Member H appeared to improve somewhat by October 2009, with

12  fewer psychotic symptoms, although the Report notes that he only participated in group

13  therapy twice and refused out of cell contact with his case manager twice. *Id.* at 10. The

14  psychiatrist documented in mid-October 2009 that Class Member H continued to express

15  psychotic symptoms. *Id.* During November 2009, he refused all out of cell contacts, and

16  began refusing his psychotropic medication. *Id.*

17       88.    On December 2, 2009, Class Member H's treatment team met and recorded

18  that he had decreased participation in treatment and had been refusing his medications.

19  The team made some recommendations, but did not consider a DMH referral. *Id.* at 11.

20  On December 6, 2009, he was placed in a holding cell after a visit with his mother, and

21  began braiding a sheet and expressed suicidal ideation. *Id.* He was seen out of cell by a

22  psychiatric technician, but was returned to his cell without seeing a mental health clinician

23  because there were other suicidal prisoners in the unit at that time. *Id.* at 11-12. He was

24  discovered hanging in his cell the next day. *Id.* at 12.

25       89.    This is a damning suicide report. The Report notes the fact that during Class

26  Member H's stay at NKSP, there were 22 suicide risk assessment completed but even

27  those assessing him as having a high or moderate risk of suicide failed to mention

28  treatment interventions to reduce risk, including a discussion regarding an increase in his

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1  level of care. *Id.* at 19, 20. If an increase in his level of care had been properly

2  considered, "[o]ne consequence of such a discussion, in light of [Class Member H]'s

3  multiple visits to the Mental Health Temporary Housing unit could have been a referral to

4  a Department of Mental Health Intermediate Care Program." *Id.* at 20. As noted above,

5  CDCR's own Report identifies as a problem the failure to discuss a referral to DMH

6  despite the multiple crisis beds admits, multiple RVRs, and an MHCB stay greater than the

7  10 day limit. "[B]y mid-July, [2009, 5 months before his death,] clinical staff had enough

8  information to assume that this inmate-patient met this criterion for referral." *Id.* at 26.

9      90.    According to multiple MHARP criteria, Class Member H's clinicians should

10  have considered referring him to inpatient care. In my professional opinion, Class

11  Member H's described symptoms and extremely low level of functioning clearly

12  warranted inpatient care for months before he committed suicide, and the massive waitlist

13  for such care served as a deterrent to doing so. The week before he killed himself, the

14  SVPP waitlist had soared to an incomprehensibly high 504 patients. *See* Fischer Decl. Ex.

15  M (11/30/09 DMH ICF Licensure Report).

16      Class Member I

17      91.    I have also reviewed the CDCR suicide report for Class Member I dated May

18  18, 2010, which is attached as Exhibit Q to the Ells Declaration and referred to herein as

19  "Class Member I Report." Class Member I was an EOP class member who was

20  discovered hanging in his ASU cell at Mule Creek State Prison on February 13, 2010, after

21  the completion of all phases of the MHARP.

22      92.    Class Member I had a well-documented history of depression and psychosis

23  starting in 2005, after he went through the gang debriefing process, although his specific

24  diagnosis fluctuated. Class Member I Report at 5, 15-17, 29. He had been on *Keyhea*

25  involuntary medication orders from July 2005 until his death, Class Member I Report at 1,

26  but nonetheless was routinely noted to be suffering from auditory and visual command

27  hallucinations, extreme paranoia and fearfulness. Class Member I Report at 5-15. Class

28  Member I reported 20-40 suicide attempts, including two serious verified attempts in 2005.

1  Class Member I Report at 15.  He also threatened suicide often, resulting in numerous

2  OHU and MHCB stays for suicide precaution.  Class Member I Report at 1.

3      93.    Class Member I "had numerous serious disciplinary violations and spent the

4  vast majority of his time in Segregated Housing Units," often for violent behavior toward

5  other inmates or custody officers.  Class Member I Report at 1.  Of the 11 years he spent in

6  prison prior to his death, less than two were in general population housing units.  Class

7  Member I Report at 24.  He was accused of assaulting a custody officer at Mule Creek

8  State Prison in 2008, and was found incompetent to stand trial under Penal Code section

9  1370 on July 10, 2008.  Class Member I Report at 8.  He remained on the waitlist for

10  SVPP for more than six months, and finally arrived there on January 14, 2009.  *Id.*  After

11  less than a month at SVPP, he was deemed competent and returned to the PSU at CSP-

12  Sacramento on February 4, 2009.  Class Member I Report at 9.

13      94.    On May 14, 2009, his clinician in the PSU stated in Class Member I's

14  progress report for the previous six months that he "'ha[d] not really progressed

15  satisfactorily here in the Psychiatric Services Unit (PSU) program.'"  Class Member I

16  Report at 9.  The clinician wrote that Class Member I was filled with anxiety, was agitated

17  and had mood changes, often complained of depression, and "'always talks about his intent

18  to kill himself by using a razor.  He has required Mental Health Outpatient Housing Unit

19  visits, almost two (2) times a week for crisis stabilization…. He constantly talks about his

20  suicidal ideation.'"  *Id.*

21      95.    Class Member I was subsequently released to a general population EOP

22  yard, and continued to deteriorate.  Class Member I Report at 9-10.  He received a rules

23  violation report for refusing to cell with an inmate, and was consequently moved to

24  administrative segregation.  Class Member I Report at 10.  His treatment plan, completed

25  on July 9, 2009, stated that Class Member I's "paranoia was so strong he became very

26  agitated, fearful, and uncomfortable when his cellmate played his television."  *Id.*  The

27  treatment plan also noted that Class Member I had "significant memory and cognitive

28  deficits, cognitive impairment, blunted affect, severe anxiety, paranoid delusions, presence

32

[528908-18]

1   of auditory and visual hallucinations, moderate depression with chronic suicidal ideation

2   and multiple suicide attempts." *Id.*  Class Member I told clinician that he thought people

3   were poisoning his food and controlling his head with wires, and expressed serious safety

4   concerns due to enemies.  *Id.* Nonetheless, Class Member I's RVR mental health

5   evaluation concluded mental illness had not played a part in his decision to refuse to house

6   with his cell mate.  *Id.*

7        96.    After learning he was being transferred to Mule Creek State prison, Class

8   Member I had a series of four OHU admissions for suicide precaution in the span of five

9   weeks.  Class Member I Report at 10-11.  He reported being concerned about transferring

10  to Mule Creek because he had previously attacked a custody officer there, and expressed

11  feeling abandoned by his family and fears of being attacked on the yard at CSP-

12  Sacramento.  *Id.*

13       97.    A week after he was discharged from the OHU for the fourth time on August

14  9, 2009, Class Member I was transferred to Mule Creek State prison and put in the

15  administrative segregation unit.  Class Member I Report at 11.  Three days later, a

16  psychiatric technician observed that Class Member I had been cutting his wrists.  *Id.*  Class

17  Member I said he had cut himself because he was extremely stressed out due to fears of

18  enemies.  *Id.*  CDCR was unable to verify that Class Member I had any enemies, Class

19  Member I Report at 27, and in my clinical view his extreme fearfulness and paranoia about

20  enemies and retaliation were an outgrowth of his mental illness.  Over the next few

21  months, he continued to report to clinicians that he was having increasing auditory and

22  visual hallucinations, including command hallucinations to harm himself, was anxious and

23  paranoid around others, and stressed about his housing situation.  Class Member I Report

24  at 11-12.

25       98.    On January 19, 2010, Class Member I told his psychologist he had been

26  refusing to go to chow because he was paranoid and "'at the end of the line,'" and

27  threatened to cut his wrists if he was forced to go.  Class Member I Report at 12-13.  Two

28  days later he told his psychiatrist he wanted to go to DMH.  Class Member I Report at 13.

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1  The CDCR Report states that Class Member I "was placed in administrative segregation

2  after 'slicing a child molester' in the dayroom" on January 27, 2010. *Id.* The next day he

3  told his clinician that he had been lying about his symptoms, but also reported that

4  "although he liked his current cellmate he wanted to kill him but did not did not know

5  why." *Id.* Class Member I continued to deny having any mental health problems in his

6  next few clinical contacts in late January and early February 2010. Class Member I Report

7  at 13-14. One clinician noted on February 9, 2010 that he was not attending groups, and

8  his mental health team was considering lowering his level of care. Class Member I Report

9  at 14.

10       99.    The next day, on February 10, 2010, Class Member I was again admitted to

11 the OHU because of auditory hallucinations and suicidal ideation. Class Member I Report

12 at 14. Class Member I was reported to be "alert and hypervigilant… [and] easily distracted

13 by various stimuli." *Id.* He was observed to be rocking and having a tic-like blink in his

14 right eye. *Id.* He denied hearing voices or feeling suicidal, but said he was feeling agitated

15 and like banging his head. Class Member I Report at 14. *Id.*

16       100.   Class Member I was discharged from the OHU on February 12, 2010. Class

17 Member I Report at 14. The next day, on what was supposed to be the first clinical

18 assessment of his five-day follow-up, Class Member I refused to meet with the clinician.

19 *Id.* Instead of taking additional steps to interview Class Member I or assess his current risk

20 status as required by the Program Guide, the clinician merely noted on Class Member I's

21 progress report that he had refused to be seen. Class Member I Report at 14-15. Class

22 Member I hanged himself later that night. Class Member I Report at 1.

23       101.   Class Member I clearly met a number of the criteria for DMH referral under

24 the MHARP. He had four OHU admissions for suicide precaution between July 1, 2009

25 and August 9, 2009. In May 2009, Class Member I's PSU clinician reported that he was

26 not progressing in the EOP level of care over a six month period, and described him as

27 decompensating into a psychotic state, constantly talking about killing himself, and

28 "gravely disabled … as well as having very poor insight and judgment regarding his

understanding of his mental illness when he is in his keep acute psychotic state." Class Member I Report at 9. He was requiring OHU visits an average of twice a week for crisis stabilization. For the last year of his life Class Member I was consistently described as having command hallucinations, extreme anxiety and stress resulting in self-harm, and other symptoms of serious mental illness and suffering. In my clinical opinion, based on the information provided in CDCR's suicide report, Class Member I should have been referred for inpatient care. The 572-person waitlist for SVPP in February 2010 likely deterred his clinicians from considering that option despite the fact that he met multiple MHARP criteria through the final year of his life. *See* Fischer Decl. Ex. K (2/28/10 DMH ICF Licensure Report).

Class Member J

102. I have also reviewed the CDCR suicide report for Class Member J dated November 12, 2009, which is attached as Exhibit R to the Ells Declaration and referred to herein as "Class Member J Report." Class Member J was an EOP class member who was discovered hanging in his Psychiatric Services Unit cell at Pelican Bay State Prison (PBSP) on June 14, 2009. While Class Member J committed suicide at PBSP, he had only arrived at that institution six days prior to his death after decompensating over the course of approximately seven months while at High Desert State Prison (HDSP). Although Class Member J died before the Phase IV expansion of the MHARP to PBSP and HDSP later in 2009, substantially the same referral criteria existed before the MHARP in the 2006 Program Guide. *See* Fischer Decl. Ex. Q 12-6-7, 12-6-8 (2006 Program Guide, Chapter 6).

103. Class Member J arrived in CDCR in July 2006 as a low-level offender (Level II points) and was placed in a camp setting until September 17, 2008, when he was transferred to High Desert State Prison after developing some medical problems. Class Member J Report at 1. After being assaulted by other prisoners a few days prior, Class Member J on December 17, 2008 ripped his t-shirt, made a noose, and attempted to hang himself from his cell door while custody officers were a few feet away. Class Member J

1  Report at 7.  He was transferred to the MHCB, where his GAF score was 30, "indicating a

2  serious impairment in communication and judgment."  Class Member J Report at 1, 5, 8.

3  He remained in the MHCB for twelve (12) days.  Class Member J Report at 5, 8.  On

4  December 29, 2008, Class Member J reported to his treatment team in his final MHCB

5  IDTT that he was feeling suicidal.  Class Member J Report at 5.  Nonetheless, no Suicide

6  Risk Assessment Checklist was filled out and he was discharged from the crisis unit.  *Id.*

7       104.    Class Member J's mental health deteriorated sharply.  In the six months

8  leading up to his death, beginning on December 18, 2008, he had eighteen (18) CDCR-115

9  RVRs, all but two of which were for aggressive acts towards staff.  Class Member J Report

10  at 11, 13.  The Suicide Report notes that:  "This behavior represented a dramatic change

11  from his previous behavior in prison."  Class Member J Report at 11.  The CDCR reviewer

12  concludes that Class Member J's unusual behavior could be linked to at least three of his

13  crisis bed admissions over the next six months before his suicide.  Class Member J Report

14  at 11, 17.  Nonetheless, despite a dramatic change in Class Member J's institutional

15  behavior, staff failed to make required mental health referrals in 15 of his 18 CDCR Rule

16  Violations.  Class Member J Report at 11, 17.

17       105.    On March 20, 2009, Class Member J was again assessed as being a high risk

18  for suicide and placed in the unlicensed mental health outpatient housing unit ("MHOHU")

19  at the California Correctional Center ("CCC"), due to a lack of available beds at the High

20  Desert State Prison MHCB.  Class Member J Report at 5.  Class Member J was discharged

21  two days later on March 22, 2009 with a treatment plan to reduce the suicide risk.  *Id.*

22  Less than a month later he was admitted to the Correctional Treatment Center at High

23  Desert State Prison on April 20, 2009 for suicide watch and precaution after staff

24  discovered a noose and a weapon in his cell.  Class Member J Report at 5-6.  Class

25  Member J was discharged from the MHCB seven days later and concurrently removed

26  from the Mental Health Services Delivery System on April 27, 2009.  Class Member J

27  Report at 6.

28       106.    The next day, on April 28, 2009, a psychiatrist noted that Class Member J

[528908-18]

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1   refused to get out from under his bed and would not communicate beyond waiving one

2   hand.  Class Member J Report at 6.  That same day he was again placed in the Mental

3   Health Services Delivery System at the EOP level of care because his treating clinicians

4   believed him to be delusional.  *Id.*  Other clinicians wrote that they believed his behavior to

5   be antisocial and manipulative rather than delusional.  *Id.*

6        107.   Following his MHCB discharge on April 27, 2009, he was charged with two

7   RVRs for assaulting staff in the span of a week.  Class Member J Report at 6.  He was

8   consequently readmitted to the MHCB for the third time in a month on May 7, 2009.

9   Class Member J Report at 6, 8.  After he was admitted, staff found a noose in his cell.

10   Class Member J Report at 6.  He remained in the MHCB until May 14, 2009, when he was

11   discharged to the EOP administrative segregation HUB to await transfer to PBSP's PSU.

12   Class Member J Report at 6, 8.  While waiting to transfer, Class Member J was again

13   admitted to the Medical Services Unit on May 18, 2009 before being discharged from an

14   MHCB bed two days later.  Class Member J Report at 6.  He arrived at the PBSP PSU on

15   June 8, 2009 and killed himself six days later, before his initial IDTT, which was

16   scheduled to occur three days later.  Class Member J Report at 1, 7.

17        108.   In accordance with the Program Guide referral criteria and MHARP criteria,

18   Class Member J was an obvious candidate for referral to inpatient psychiatric

19   hospitalization.  The CDCR Report of Class Member J's suicide correctly notes his

20   clinicians should have considered referring him to DMH:  "[Class Member J] had four

21   crisis bed admissions and one admission to a medical unit in lieu of a crisis bed within six

22   months prior to his suicide.  He also had a history of two suicide gestures while in the

23   California Department of Corrections and Rehabilitation … Given his numerous crisis bed

24   admissions prior to this death, it would have been reasonable to consider a Department of

25   Mental Health admission or a thorough diagnostic study with psychological testing to

26   clarify the inmate's diagnosis and guide the treatment plan."  Class Member J Report at 15.

27   I agree.  The clear signs that Class Member J needed inpatient care to stem his swift

28   decompensation also included a MHCB stay of over ten days in December 2008 and his

[528908-18]

1  dramatic change in institutional behavior, resulting in eighteen RVRs between December

2  18, 2008 and his suicide six months later on June 14, 2009, with nine of the RVRs

3  occurring within three months of his suicide.  This behavior shows that Class Member J

4  needed a highly structured inpatient psychiatric program due to his self-injurious/suicidal

5  behavior and impaired functioning.  Nonetheless, Class Member J was not considered for a

6  DMH referral despite meeting many of the DMH referral criteria.  The lengthy waitlist for

7  SVPP care, which stood at 337 patients the month he died, unquestionably served as a

8  deterrent for referral, as discussed above.  *See* Fischer Decl. Ex. EE (6/30/09 DMH ICF

9  Licensure Report).

10          Class Member K

11          109.    I have also reviewed the CDCR suicide report for Class Member K dated

12  March 4, 2010, which is attached as Exhibit S to the Ells Declaration and referred to herein

13  as "Class Member K Report."  Class Member K was an EOP class member who was died

14  on August 16, 2009 after hanging himself in his cell on the SNY yard at Kern Valley State

15  Prison ("KVSP").  Although Class Member K died shortly before the Phase IV expansion

16  of the MHARP to KVSP in 2009, substantially the same referral criteria existed before the

17  MHARP in the 2006 Program Guide.  *See* Fischer Decl. Ex. Q at 12-6-7, 12-6-8 (2006

18  Program Guide, Chapter 6).

19          110.    While incarcerated, Class Member K suffered from severe depression and

20  repeatedly discussed his plans to commit suicide because of a pervasive sense of

21  hopelessness and despair about his life sentence.  As the Report states, Class Member K

22  "continually announce[d] he w[ould] eventually kill himself and … demonstrated his

23  willingness to do so" with three near-lethal suicide attempts by overdose.  Class Member K

24  Report at 27, 16.  Two of those attempts resulted in DMH placements:  in 2004 he was

25  admitted to APP, and in 2007 he was admitted to APP and discharged to SVPP.  Class

26  Member K Report at 7-9.

27          111.    After Class Member K's discharge from SVPP on October 23, 2007, he was

28  housed in Corcoran's EOP administrative segregation HUB for 302 days while he awaited

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1   transfer to the KVSP SNY EOP yard.  Class Member K Report at 10, 18.  During his time

2   at the EOP administrative segregation HUB, his willingness to participate in mental health

3   treatment, including groups and weekly individual treatment contacts, increased in a

4   "positive and productive manner" and he became more motivated and open in his contacts

5   with mental health and other inmates.  Class Member K Report at 11.  He continued to

6   struggle with depression and anxiety, however.  *Id.*  At one point his treatment team

7   discussed transfer to an inpatient setting due to his level of depression, combined with his

8   serious past suicide attempts, but decided against it.  *Id.*

9          112.    After transferring to KVSP EOP SNY on August 26, 2008, KVSP

10  psychiatrists tapered and then discontinued Class Member K's prescription for Haldol

11  during two appointments at which Class Member K's unit health records were unavailable.

12  Class Member K Report at 12, 14, 28.  Class Member K had been started on Haldol while

13  at DMH in 2007 after other medications had failed to alleviate his symptoms, and his

14  DMH discharge summary recommended that he stay on the medication.  Class Member K

15  Report at 9, 11.  While at COR after his DMH discharge, Class Member K described

16  Haldol as a "magic potion" and a "light switch" in terms of helping him cope with his life

17  sentence and overarching depression.  Class Member K Report at 9, 11.  As the Report

18  notes, had the KVSP clinicians reviewed Class Member K's UHR, they would have

19  discovered clearly documented clinical "[e]vidence that [Haldol] had assisted the inmate in

20  more effective functioning" at his previous institution, after years of failed treatment for

21  his depression.  Class Member K Report at 28.

22         113.    Soon thereafter, Class Member K's participation in groups decreased

23  significantly to approximately 50% of the time.  Class Member K Report at 16.  On June

24  29, 2009, Class Member K "told a psychiatrist about his continuing depression and his

25  need for more effective treatment."  Class Member K Report at 25.  Without consulting his

26  unit health record, the psychiatrist wrote a prescription doubling Class Member K's dosage

27  of Celexa (the replacement medication prescribed to him in lieu of Haldol), but it was

28  never filled.  *Id.*

[528908-18]

114.    By July and August 2009, Class Member K began refusing almost all offered groups.  Class Member K Report at 16.  On July 28, 2009, at his final psychiatric appointment before he killed himself, Class Member K requested to be taken off of all medications, and, without consulting Class Member K's unit health records, the psychiatrist discontinued his psychotropic medications.  Class Member K Report at 25.  The next day, on July 29, 2009, Class Member K told his case manager he was "'feeling life has no purpose/value.'"  *Id.*  In notes dated August 4, 2009 and August 11, 2009, his case manager documented Class Member K's additional clearly suicidal statements:  "'suicide was inevitable but doesn't know when,'" "'he's made a conscious decision and is at peace within himself,'" "'speaks of life as a waste,'" and his stated belief that "'suicide [i]s a rational choice.'"  *Id.*  Despite raising the topic of suicide in such "significant and blatant ways" to his primary clinician and "clearly … allud[ing] to the approaching suicide," no formal suicide assessments of Class Member K were conducted during this time period.  Class Member K Report at 29.

115.    Class Member K met several criteria for consideration of a referral for inpatient care under the MHARP and Program Guide referral guidelines.  He should have been considered for a referral to DMH because of his marked decline in group attendance while at KVSP to approximately 50%, culminating in a refusal of all group therapy in July and August 2009, as well as his clearly stated plans to commit suicide, and his history of three near-lethal suicide attempts and resulting DMH hospitalizations.  In the month of his suicide, the SVPP waitlist was reported as 426 patients.  *See* Fischer Decl. Ex. O (8/31/09 DMH ICF Licensure Report).  In my opinion, that lengthy waitlist influenced his clinicians' decisions not to consider Class Member K for referral.

**Defendants' Efforts To Reduce the ICF Waitlist Have Caused Harm, and Are Likely To Cause Further Harm If Not Implemented Safely and Closely Monitored**

116.    Ironically, even though Defendants recently discovered through their self-audit a massive under-referral problem that keeps the inpatient waitlist artificially low,

1   their efforts to address the waitlist have largely focused on getting people off the waitlist

2   through a number of means other than actually providing more timely access to inpatient

3   psychiatric hospitalization.  While in my opinion some of the changes implemented by

4   Defendants to shrink the waitlist could be clinically appropriate if implemented carefully

5   and monitored closely, other efforts may have contributed to irreparable harm and

6   unnecessary death.

7        117.   For instance, in my opinion Defendants' decision to remove the restriction

8   limiting the initiation of Clozapine, the generic name for the drug marketed as Clozaril, to

9   DMH inpatient settings is appropriate, so long as strict protocols are developed and CDCR

10  clinicians are well trained and closely monitored.  There is no clinical reason to restrict the

11  initiation of Clozapine to inpatient settings only.  But the use of clozapine must be

12  monitored very closely because, while the drug is a tremendously powerful antipsychotic,

13  it can cause life-threatening side effects if not properly administered.  As I previously

14  explained, I refer to Clozapine as the "atomic bomb" of antipsychotic medications because

15  it is a medication of last resort that has the potential to effectively shut off a patient's bone

16  marrow if it is not very closely monitored with weekly or bi-weekly blood draws.  8/15/08

17  Report ¶ 44.  In my opinion, Defendants must develop clinical protocols on the initiation

18  and administration of Clozapine within CDCR, all CDCR clinicians who are permitted to

19  administer the medication should be required to be specially trained before they are

20  allowed to prescribe it, and the Special Master should monitor the Clozapine process

21  closely in order to be certain that CDCR clinicians are utilizing the drug safely.

22       118.   As another part of their "utilization management" process for ICF beds,

23  Defendants report that they have undertaken a review of prisoners' lengths of stay in DMH

24  ICF programs, including the high-custody beds at SVPP.  *See* Declaration of Lucinda

25  McGill in Support of Defendants' Response and Objections to the Special Master's Report

26  on Defendants' ICF and Acute Inpatient Waitlists (Docket No. 4035-3) ¶ 4 ("McGill

27  Decl.").  The presumptive goal of this effort is to shorten prisoners' stays in these high-

28  demand beds in order to move waitlisted prisoners into the inpatient beds more quickly,

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1   thereby drawing down the waitlist.  Without providing any information on the clinical

2   criteria used to evaluate whether a patient could safely and stably be discharged from

3   inpatient care and returned to prison, Defendants report that their efforts to reduce average

4   lengths of stay have succeeded.  McGill Decl. ¶ 4.

5       119.    Defendants also created the Extended Enhanced Outpatient Program

6   ("EECP") to reduce the waitlist by providing enhanced treatment within CDCR and "avoid

7   referral to a higher level of care and inevitable placement on a waitlist."  Special Master

8   DMH Report (Docket 4020) at 31.  Although Defendants appear to have since abandoned

9   the EECP, apparently because the Special Master recommended monitoring of the

10  program, *see* Defs' Response to Special Master DMH Report (Docket 4035) at 5,

11  Defendants had previously provided supplemental materials regarding the status of EECP

12  staffing and training, which revealed the nascent state of the new program in February

13  2011.  Special Master DMH Report (Docket 4020) at 33.  In his review of the EECP, the

14  Special Master noted that:  "[g]iven the concerns associated with the staffing numbers and

15  ratios, together with the general hiring freeze gripping the State of California, it is unclear

16  how the defendants intend to staff the EECP at the designated institutions."  Although the

17  EECP units were not fully staffed and trained, on February 15, 2011, DMH clinicians

18  discharged a fragile patient to CMF's EECP unit where he committed suicide hours later.

19          Class Member L

20      120.    I have also reviewed the CDCR suicide report for Class Member L dated

21  April 26, 2011, which is attached as Exhibit T to the Ells Declaration and referred to herein

22  as "Class Member L Report."  Class Member L was an EOP class member who was

23  discovered hanging in his cell at CMF on February 15, 2011, the day he was discharged

24  from DMH.

25      121.    Class Member L was seriously and chronically suicidal for his entire ten-

26  year incarceration.  Class Member L Report at 1.  He entered CDCR in 2000.  In his first

27  fourteen months in prison, Class Member L was admitted to the MHCB nine times for

28  suicidal ideation and chronic depression.  Class Member L Report at 5.  Throughout his

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

incarceration, he reported hearing persistent auditory hallucinations of "his mother's voice telling him, in his native language, to kill himself." *Id.*  He was admitted fifteen times to VPP for acute inpatient care between 2001 and 2011, when he killed himself. *Id.*  Class Member L attempted to kill himself at least ten times while in CDCR and DMH custody, and at least twice while in the community.  Class Member L Report at 8.

122.    Class Member L moved between different levels of mental health care—EOP, MHCB, APP, and ICF—over and over again during his time in prison.  As the Report notes, "[t]he number of movements in and out of various mental health placements during his ten-plus years of incarceration was staggering…  He rarely stayed in one setting long enough for therapeutic interventions to be effective."  Class Member L Report at 13.

123.    In his final year of life, Class Member L was admitted on January 25, 2010 to Atascadero State Hospital at the intermediate level of inpatient care.  Class Member L Report at 6.  In March of that year, he attempted suicide by trying "to choke himself with a piece of cloth while lying on his bed." *Id.*  After his participation in group therapy improved, and pursuant to his multiple requests to leave ASH and return to CDCR, Class Member L was discharged on September 15, 2010 despite documentation by DMH staff of his long-term chronic suicide risk.  Class Member L Report at 6-7.

124.    The very next day, Class Member L was admitted to VPP "for suicidal ideation with a plan to hang himself," after telling clinicians he had lied to ASH staff about how he was feeling because he did not like being there.  Class Member L Report at 7.  After treating him for five weeks, VPP staff offered to transfer him to an intermediate care facility, but he refused, "saying he did not understand groups and wanted to be someplace where he could have a single cell." *Id.*  VPP staff discharged him to CMF on October 28, 2010, where he "continued to report hearing his mother's voice telling him to kill himself and not stay alive in prison." *Id.*

125.    Class Member L was again admitted to the VPP acute unit approximately one month later, after staff discovered a razor blade in his cell and he admitted to having thoughts of hanging himself.  Class Member L Report at 7.  He complained that he did not

43

[528908-18]

like having a cellmate at CMF and "stated he had no reason to live." *Id.* Class Member L

reported feeling suicidal on December 28, 2010 and was placed on suicide precautions. *Id.*

After adjustments to his medication, Class Member L began to show marginal

improvement by late January 2011. *Id.* His treatment team "began to discuss discharge

options with" Class Member L, *id.*, which caused him significant distress:

> In response to the pressure of discharge planning, the inmate refused his
> medication, tore his clothing, and started banging his head. He was again
> placed on suicide precautions. [Class Member L] told the treatment team
> that he did not want to go to EOP and did not want to go to the intermediate
> DMH program … because he would only be able to stay for a few months.
> DMH staff believed, based on prior experience with [Class Member L] and
> his habit of remaining isolated, that he would not participate in the
> intermediate program… The psychiatrist reiterated in the discharge
> summary that [Class Member L] stated he did not want to be in DMH and
> did not want to go to groups. Therefore, the team decided to discharge
> [Class Member L] back to EOP, as it did not appear that DMH could do
> anything more for him.

Class Member L Report at 7. Class Member L repeatedly expressed to his treatment team

at APP his desire to return to administrative segregation where he could have a single cell

and not go to groups. Class Member L Report at 7, 12.

126. Class Member L was discharged from the acute hospital to the N-1 unit at

CMF on February 15, 2011. Class Member L Report at 12. The N-1 unit was at that time

designated as an enhanced EOP chronic program ("EECP") unit under Defendants' DMH

waitlist plan. *Id.* The local operating procedures for N-1 require a closely coordinated

handoff for each pending discharge before an inmate-patient is released from DMH to the

unit, including requiring a senior or chief psychiatrist to visit the DMH unit and "interview

each patient and review the discharge plan" before the patient is permitted to transfer into

N-1. *Id.* In Class Member L's case, the handoff was bungled, and Class Member L was

discharged out of DMH and transferred to N-1 before the psychiatrist approved his move.

*Id.*

127. In fact, the psychiatrist wrote a note stating that "he would <u>not</u> have cleared

[Class Member L] for transfer" because the psychiatrist "wanted [Class Member L] to

demonstrate safety with sheets before clearing the transfer" due to his extensive history of

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

[528908-18]

1    suicide attempts.  Class Member L Report at 13 (emphasis in original).  After learning that

2    Class Member L had been discharged without his approval in violation of the local

3    operating procedure, the psychiatrist decided not to move him back into DMH in order to

4    prevent further disruption.  *Id.*  Class Member L hanged himself with a sheet in his cell in

5    N-1 a few hours later.  *Id.*

6    128.    In my opinion, the Report of Class Member L's suicide reveals a number of

7    problems resulting from Defendants' efforts to reduce the waitlist.  First, in my experience

8    and based on the information provided in the Report, Class Member L is the type of patient

9    that should have remained in inpatient care, possibly permanently.  The acute care VPP

10    clinicians apparently decided not to refer Class Member L for the intermediate level of

11    inpatient care because he did not participate in groups willingly and expressed a desire to

12    isolate himself in a single-cell in administrative segregation.  These are classic symptoms

13    of the type of very serious depression that, in my experience, is best treated in an inpatient

14    facility over a sustained period of time.

15    129.    Because he did not make sufficient gains in his previous DMH stays, Class

16    Member L was released to an outpatient setting because the DMH team determined that

17    the most clinically appropriate level of care—"permanent placement in an intermediate

18    care setting"—was "not available for CDCR inmates."  Class Member L Report at 14.  In

19    an adequately functioning system with sufficient numbers of beds, however, acutely ill,

20    chronically suicidal patients like Class Member L would have access to the level of care

21    they clinically require, regardless of how long they need to be at that level of care.  I have

22    treated a number of patients who cannot function outside of inpatient care and must

23    therefore remain in an inpatient setting permanently.  Based on his own clinician's

24    assessment of his extremely limited functioning, Class Member L appears to be one of

25    those patients.  Because of Defendants' pressure to reduce the waitlist, patients like Class

26    Member L are forced out of DMH and into deplorable housing conditions in CDCR before

27    they should be in order to open inpatient beds for other patients.  Based on what is

28    documented in the Report, the massive inpatient bed shortage likely had a direct impact on

[528908-18]

1   Class Member L's clinically inappropriate discharge and resulting suicide.

2        130.    Additionally, it appears to me that Defendants' coordinated efforts to reduce

3   the waitlist resulted in a bungled handoff in the newly opened EECP program between

4   DMH and CDCR, against official policies and the clinical judgment of a psychiatrist.  This

5   type of failure to closely and collaboratively coordinate the care of the most seriously

6   vulnerable mentally ill prisoners is, unfortunately, entirely consistent with the severe

7   dysfunction I observed during the overcrowding proceedings and in my monitoring of

8   CDCR during the *Gates* and *Madrid* litigation.  Given Class Member L's many serious

9   suicide attempts, documented chronic suicide risk, and profound coping deficits that

10  became heightened when transferring between units, his psychiatrist's clinical

11  determination that he should be required to demonstrate safety with sheets before

12  transferring out of DMH was entirely appropriate.  In the rush to discharge Class Member

13  L, custody staff moved him out of the APP unit without his clinician's approval, and the

14  psychiatrist decided not to move him back against his own clinical judgment.

15  Unfortunately, his clinician's concern was well founded, as Class Member L promptly

16  used his sheets to hang himself the day he was discharged.

17       131.    Moreover, the Report reveals that CDCR and DMH staff were not

18  adequately trained in how to safely coordinate the discharge of a patient into the EECP

19  unit.  In my experience, this type of situation can occur when a treatment unit is opened

20  before staff are fully prepared to safely manage and treat mentally ill patients.  That may

21  well have occurred here due to the rush to open the EECP program to relieve the inpatient

22  bed crunch, particularly since the program was not fully staffed or trained in February

23  2011, when Class Member L was discharged to the EECP and then promptly killed

24  himself.  Special Master DMH Report (Docket 4020) at 33.  The Report on Class Member

25  L's suicide comes to the same conclusion, identifying the poor preparation of the unit staff

26  to participate in a safe coordinated discharge of a DMH patient as a problem requiring

27  corrective action.  Class Member L Report at 14-15.  Custody staff did not follow the

28  official local operating procedure, and did not even appear to be aware of it.  Class

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1    Member L Report at 12.  Once the psychiatrist realized his patient had been unsafely

2    discharged against his clinical judgment, he should have taken further steps to ensure the

3    patient was observed more closely or moved back to an inpatient setting to decrease the

4    known serious risk of suicide.  He decided not to because the move had already occurred

5    and he did not want to create additional disruption.  Neither DMH nor CDCR took

6    responsibility for ensuring this extremely sick man received proper care, and that

7    breakdown played a significant role in his death.

8        132.    Finally, Class Member L's suicide report reveals significant cultural

9    problems that are consistent with what I observed in Defendants' units housing mentally ill

10   prisoners on my previous tours, and that impeded a safe, coordinated discharge and post-

11   suicide investigation here.  For instance, custody staff from the staff sergeant in charge of

12   the EECP housing unit all the way up through the associate warden were ignorant of and

13   hostile to the reviewer's inquiries regarding the discharge breakdown and refused to

14   acknowledge that any mistake had been made.  Class Member L Report at 14.

15       133.    In my opinion, Class Member L's suicide reveals that Defendants appear to

16   have thrown open the doors to a new treatment program—the EECP program—without

17   ensuring sufficient staff, training, or preparedness to successfully treat and manage the

18   seriously mentally ill prisoners assigned to the program.  This is not a new phenomenon,

19   but rather is merely the latest example in Defendants' long history of slapdash efforts to

20   address the longstanding massive shortage of beds in the higher levels of care.

21       134.    It is ironic that the reviewer considered the DMH treatment team's decision

22   to discharge Class Member L to be clinically appropriate because he would be part of the

23   EECP program, which they considered to be the next best alternative to permanent

24   inpatient care, given the program's problems.  Even if the EECP program were properly

25   implemented, however, in my estimation it is in no way an appropriate substitute for

26   inpatient care, and in fact appears almost indistinguishable from the Program Guide's

27   definition of an EOP program.

28       135.    Although Defendants have reported that they are not continuing the EECP

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

[528908-18]

1    program after the Special Master sought to monitor it, *see* Defs' Response to Special

2    Master DMH Report (Docket 4035) at 5, the LAC Report, discussed above at paragraph

3    11, suggests otherwise. LAC reported to the Special Master just weeks ago that it has an

4    active EECP program in D1, and headquarters staff trained EOP clinicians about the

5    program on March 22, 2011. LAC Report at 18. Notably, LAC also reports that its mental

6    health program has been subject to a continuous hiring freeze since January 2011. That

7    means LAC almost certainly did not hire additional staff for the EECP program to

8    supplement its clinicians' existing caseloads, which LAC reported are "higher than we

9    would have preferred" already due to the hiring freeze. LAC Report at 7-8. Given the

10   extremely poor implementation of the EECP program at CMF that played a role in Class

11   Member L's death and Defendants' wavering commitment to implementing the program

12   properly, in my opinion any purported "enhanced" EOP program such as the EECP must

13   be closely monitored by the Special Master team to prevent further additional harm.

14       **Mentally Ill Patients, Including Those Who Display Aggressive or Violent
         Behavior As a Symptom of Their Inadequately Treated Illness, Can Be Safely**
15       **and Effectively Treated In DMH Inpatient Hospitals Such as Coalinga,
         Atascadero and Patton State Hospitals**
16

17       136.    In my experience as a psychiatrist working with acutely ill forensic and non-

18   forensic populations requiring inpatient psychiatric hospitalization, it is not uncommon for

19   some patients to be actively psychotic when admitted to a mental hospital, which means

20   they may exhibit unpredictable or aggressive behavior. Detailed, well-developed

21   procedures and protocols have been developed to allow clinicians in inpatient units to

22   safely manage unstable and aggressive patients. Clinicians who work in inpatient settings

23   receive extensive training on techniques to ensure sick patients who may be aggressive due

24   to their untreated mental illness can be safely admitted and stabilized. These patients are

25   typically admitted to an intake unit that is specifically designed to treat and manage acutely

26   mentally ill individuals. Necessarily, this unit has enhanced, specially trained clinical staff

27   and a security team to assist in restraining and subduing an aggressive patient when

28   clinical intervention fails. Within that unit, clinicians have the ability to restrain a patient

1    and seclude him or her in an individual room away from other patients if necessary to

2    prevent violence.  Wrist and ankle restraints are often employed by a clinician to subdue a

3    patient until they are stabilized.  Psychotropic medication is typically successful at

4    alleviating the patient's psychiatric symptoms in a relatively short period of time, and

5    clinicians have the ability to forcibly medicate patients when necessary.

6        137.    After the patient is stabilized, he or she is typically moved to less restrictive

7    settings within the facility to continue receiving care.  At this point, the patient may be

8    accompanied by security, which, for some patients that remain at risk of aggression, can

9    include additional safety measures, such as two-to-one staffing ratios, meaning at least two

10   people remain with the patient at all times when they are outside of their housing setting,

11   or walking restraints, meaning restraints that bind a patient's hands to their waist while still

12   allowing them some arm movement so they can perform basic tasks like feeding

13   themselves and writing.  As the patient responds to treatment and stabilizes, these types of

14   restrictions are often, although not always, lifted.

15       138.    I have reviewed the custody-based restrictions that Defendants currently

16   employ to prevent some patients in desperate need for inpatient psychiatric care from

17   utilizing open beds in Coalinga, Atascadero, and Patton State Hospitals.  The restrictions

18   are devoid of meaning or import to a clinician treating mentally ill patients in an inpatient

19   hospital setting, and certainly do not justify keeping those patients out of the level of care

20   they are clinically deemed to need.  A patient's original commitment offense or history of

21   violence or rules violations in CDCR, for instance, is part of a patient's clinical history that

22   a treatment provider should be aware of, but is not the primary factor driving the clinical

23   interventions in an inpatient facility once the prisoner is admitted to a psychiatric hospital.

24   Only a patient's current behavior, including violent behavior driven by psychosis or other

25   acute symptoms, is relevant to the clinical interventions.  As discussed above, the

26   treatment providers in psychiatric hospitals are well trained to manage aggressive or

27   potentially assaultive behavior.  In my opinion, Defendants' custodial restrictions are

28   artificial, clinically unsound restrictions on inpatient care that should be removed.

139.    Outside of the deplorable agreement between CDCR and DMH that authorizes DMH to refuse inpatient psychiatric treatment to prisoners who need it and who cannot access that level of care anywhere else, public mental health facilities must accept and treat any patient who needs inpatient care, no matter how acute their symptoms are and no matter what behavioral challenges they might pose.  They do not have the luxury of turning away anyone who needs inpatient care, and it would be clinically inappropriate to do so regardless.  State licensing standards require that all mental health hospital have the capability to manage and treat any and all patients needing inpatient psychiatric treatment—it is their very mission as an institution to do so.  Coalinga, Atascadero, and Patton are all required to meet these licensing standards, and they all have the capability of treating CDCR prisoners safely.

140.    In fact, Coalinga State Hospital, Atascadero State Hospital, and Patton State Hospital all treat wide ranges of mentally ill patients today who bear no clinically significant difference from the CDCR prisoners those hospitals reject.  According to the DMH website, Coalinga currently treats sexually violent predators, many of whom used to be treated at Atascadero.  *See* Fischer Decl. Ex. R (http://www.dmh.ca.gov/ Services_and_Programs/State_Hospitals/Coalinga/default.asp).  DMH's 2011 Budget reports that, as of June 29, 2011, Coalinga was estimated to be treating 100 patients deemed incompetent to stand trial, not guilty by reason of insanity, or mentally disordered offenders, and another 904 patients that include some mix of sexually violent predators and other patients authorized for inpatient treatment under Penal Code sections 2684 and 2974 and Welfare and Institutions Code 1756.  *See* Fischer Decl. Ex. S at 4 (DMH 2011 Budget).  Atascadero's inpatient population was estimated to include 932 patients deemed incompetent to stand trial, not guilty by reason of insanity, or mentally disordered offenders, and another 292 people held under the other Penal and Welfare and Institutions code sections.  *Id.*; *see also* Fischer Decl. Ex. T (http://www.dmh.ca.gov/ Services_and_Programs/State_Hospitals/Atascadero/Treatment.asp).  Similarly, Patton is a forensic mental health hospital that treats "judicially committed, mentally disordered adult

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1  individuals," including an estimated 1,352 patients deemed incompetent to stand trial, not

2  guilty by reason of insanity, or mentally disordered offenders.  *See* Fischer Decl. Ex. S at 4

3  (DMH 2011 Budget); Fischer Decl. Ex. U (http://www.dmh.ca.gov/

4  Services_and_Programs/State_Hospitals/Patton/default.asp).

5      141.   I am familiar with all of these types of patient populations, and have treated

6  many of them in inpatient settings.  Many of the patients falling in these categories have a

7  history of aggressive behavior, and some of them present as violent due to their mental

8  illness when they are admitted for care.  In my opinion, there is no clinical difference

9  between these populations of patients and the CDCR prisoners who need inpatient care.

10      142.   I know of no legitimate clinical or practical reason for turning CDCR

11  prisoners in desperate need of inpatient psychiatric care away from the many, many open

12  beds at these facilities.  Hospital staff who work with forensic inpatient populations are

13  trained to manage aggressive behavior with enhanced supervision measures, appropriate

14  medication, and other techniques and resources.  CDCR patients can be similarly managed.

15  If that requires DMH to hire and train additional staff to ensure Coalinga, Atascadero, and

16  Patton can properly and safely manage the CDCR patients, which is highly likely, that is a

17  small price to pay.  Until Defendants open up sufficient numbers of beds to treat the

18  Coleman class members needing inpatient treatment, far too many prisoners will continue

19  to suffer and decompensate in inappropriate levels of care within CDCR's dangerous and

20  stressful housing conditions.

21  **Coalinga State Hospital Can Employ Measures To Safely Manage and Treat**
**High Security CDCR Prisoners**

22

23      143.   In my opinion as a clinician, and in my experience working in other inpatient

24  settings, Coalinga State Hospital can safely manage mentally ill prisoners, including those

25  who may pose a high risk of danger until they can be stabilized.

26      144.   In preparation for this report, I have reviewed sections of the Coalinga State

27  Hospital Operating Manual.  One section, entitled Medical/Nursing Services

28  Administrative Directive No. 552 ("A.D. No. 552") and signed and dated March 8, 2007,

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1    addresses "Restraint and/or Seclusion."  A.D. No. 552 is attached as Exhibit CC to the

2    Fischer Declaration.  A.D. No. 552 sets forth in great detail Coalinga's policies and

3    procedures for the use of restraint and seclusion techniques where necessary "to ensure the

4    safety of all persons after all verbal and less restrictive interventions have failed."  *Id.* at 1.

5    Approved restraint methods include, where necessary and clinically appropriate, the use of

6    mechanical restraints, such as wrist and ankle or walking restraints, and manual hold

7    techniques to physically restrain a patient.  *Id.* at 2-4.  A.D. No. 552 also describes the

8    appropriate provision of medication, including involuntary medication, to stabilize

9    aggressive patients.  *Id.* at 3, 5.  All of these policies and procedures are employed only to

10   the extent necessary to facilitate the patient's participation in individualized "recovery-

11   oriented treatment services."  *Id.* at 1.

12           145.    The operating manual also makes clear Coalinga has the ability to seclude

13   patients, i.e., to impose "the involuntary confinement of a person alone in a room or an

14   area from which the person is physically prevented from leaving."  A.D. No. 552 at 4.  The

15   directive describes Coalinga's detailed procedures for the proper utilization of its seclusion

16   and restraint rooms, including requirements for constant in-person supervision of all

17   individuals in restraints, for ongoing re-assessments regarding the continued need for

18   seclusions and/or restraints, and for obtaining and renewing physician or psychiatrist

19   orders authorizing seclusion or restraint.  *Id.* at 10-11.

20           146.    Finally, A.D. No. 552 describes Coalinga's Prevention and Management of

21   Assaultive Behavior (PMAB) procedures, about which staff receive specific training in

22   order to "recognize risk factors for violence and utilize proper preventive therapeutic

23   behavioral management skills to de-escalate a potential crisis or emergency event."  A.D.

24   No. 552 at 4, 9, 13-14.  A.D. No. 552 also delineates  the criteria clinicians should use to

25   determine when it is appropriate to employ seclusion and restraint techniques in an

26   emergency, and also to release a patient from seclusion or restraint "when the violent or

27   dangerous behavior that created the emergency is no longer displayed."  *Id.* at 9, 12.  All of

28   the procedures described by A.D. No. 552 are consistent with similar procedures and

52

1   policies of the other inpatient settings I have experience with, as I describe above.

2       147.    In fact, Coalinga appears, according to DMH, to be better equipped than

3   most mental hospitals to treat acutely mentally ill prisoners, even those deemed "high

4   security" by CDCR.  According to DMH's website, Coalinga is a "leading example for

5   mental health service delivery for challenging populations," including forensically

6   committed individuals such as sexually violent predators, as well as CDCR prisoners

7   (Penal Code section 2684).  *See* Fischer Decl. Ex R (http://www.dmh.ca.gov/

8   Services_and_Programs/State_Hospitals/Coalinga/default.asp).  DMH states that Coalinga

9   has a "state-of-the-art security system" surrounding the hospital, and that the security

10  system is run by CDCR.  According to DMH's web site, the CDCR-run security system

11  includes armed guards to control entry and exit from the facility, observation towers, and

12  perimeter patrols.  DMH staff inside the facility "are provided extensive training and

13  supervision to ensure compliance with essential security policies and procedures" in order

14  to manage difficult patients.  DMH further states that Coalinga has "a number of internal

15  security measures" within the hospital itself, such as lockable units, metal detectors and

16  other security measures, that DMH says are comparable to those found "in a maximum-

17  security setting."  *See* Fischer Decl. Ex R (http://www.dmh.ca.gov/

18  Services_and_Programs/State_Hospitals/Coalinga/Security.asp).

19      148.    In my experience, this level of security is far greater than at most state

20  hospitals or even other forensic inpatient facilities treating correctional populations, where

21  seriously mentally ill people are safely and effectively treated every day of the year.

22      149.    While in my opinion it would be safe and preferable to admit CDCR patients

23  needing inpatient care directly to Coalinga from CDCR for treatment, CDCR prisoners can

24  also be safely moved from the SVPP ICF program to Coalinga or Atascadero after they

25  have stabilized without significantly compromising their care.  While it is generally

26  preferable to maintain the continuity of a patient's treatment team where possible, patients

27  frequently change clinicians during the normal course of inpatient treatment when they

28  change units, including moving from the intake unit into the treatment program.  Victor

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1    Brewer, Executive Director of the Salinas Valley and Vacaville Psychiatric Programs,

2    testified in this case on October 4, 2010 that this is true of SVPP today.  Excerpts of his

3    testimony are attached as Exhibit V to the Fischer Declaration.  Particularly given the

4    emergency shortage of inpatient beds, it is far preferable as a clinical matter to utilize the

5    open ASH and CASH beds by moving SVPP patients in after they stabilize in SVPP as an

6    interim solution until additional beds come online, including the planned CMF 64-bed unit,

7    rather than let those beds sit empty.  In my opinion, not utilizing the open ASH and CSH

8    beds would be an unconscionable waste of available inpatient psychiatric resources given

9    the extreme need for that level of treatment among Coleman class members today.

10           **Patton Improperly Rejects Female Prisoners Who Have No Alternative**
             **Inpatient Setting**
11

12           150.    Patton State Hospital is a licensed psychiatric hospital that treats a wide

13    range of patients, including CDCR prisoners (Penal Code section 2684).

14           151.    In preparing for this report, I reviewed the Patton rejection letters issued by

15    Defendants since November 2009.  The letters confirm that nineteen women were

16    prohibited from accessing needed inpatient psychiatric hospitalization because of "security

17    concerns."  Fifteen of the reject letters specifically reference a section of a 2010

18    CDCR/DMH memorandum of understanding ("MOU") that permits referral of *male*

19    prisoners to the high security prison inpatient programs for *males* at SVPP, rather than to

20    ASH or CSH, based upon security concerns.  *See* Fischer Decl. Ex. W at 11-12 (August

21    18, 2010 MOU).  Patton, however, is the only psychiatric hospital program available for

22    *female* prisoners.  It is absurd for a clinical referral system to knowingly attempt to divert

23    female patients to a facility that accepts only male patients.

24           152.    Several of these women had multiple rejections from Patton despite clear

25    clinical need.  I discuss two of these women below.  The rejections of these two women by

26    Patton State Hospital were clinically inappropriate, unfounded and have likely resulted in

27    increased pain and suffering for these women.

28

54

1    Class Member M

2    153.    I have also reviewed two Patton State Hospital letters regarding Class

3    Member M dated December 14, 2010 and May 23, 2011, which are attached as Exhibits U

4    and V to the Ells Declaration, respectively.  I have also reviewed portions of Class

5    Member M's medical and central files from the relevant time periods discussed below,

6    which are consistent with the Patton letters and my description.

7    154.    Class Member M was referred twice by her treating clinician to Patton for

8    inpatient care, but was rejected on December 14, 2010, and again on May 23, 2011.

9    According to the December 14, 2010 rejection, Class Member M's treating clinician

10   referred her for admission to Patton State Hospital for the following reasons:

11          She has had 10 OHU admits in the past 5 months.  She has continued to
            engage in self-injurious behaviors:  [Class Member M] has carved letters and
12          symptoms on her legs.  She currently has unhealed scars on her left thigh.
            She periodically stops taking her psychiatric medication.  She has more
13          recently refused to attend EOP groups.  [Class Member M] has been
            observed by staff responding to internal stimuli.  She has been hostile and
14          uncooperative with clinical and custody staff.

15   Ells Decl. Ex. U at 1 (12/14/10 Letter).

16   155.    Despite her clinician's determination that she needed a higher level of care,

17   Patton rejected Class Member M because she was considered an elevated risk of assault.

18   The December 2010 rejection letter lists multiple rule infractions that occurred inside the

19   prison that are described as fighting, assault, battery and noncompliance with assigned

20   housing.  Ells Decl. Ex. U at 1 (12/14/10 Letter).  In one incident, Class Member M was

21   described as  "'requesting more medication STAT and desire to go to OHU yelling "'I'm

22   gonna kill you.  I want you to die.'"'  *Id.* at 2.  During this incident, Class Member M was

23   described as "actively psychotic."  *Id.*  The clinician's mental status examination

24   characterized her as exhibiting the following behaviors:  "'Rapid mood swings.  Swearing,

25   yelling threats.  Appeared to have internal stimuli.'"  *Id.*  In another incident, she kicked

26   the table and papers during a treatment team meeting and acted aggressively towards the

27   warden.  *Id.*  She was charged with attempted assault on the warden.  *Id.*

28   156.    In my experience, this type of behavior by a seriously mentally ill person is

55

[528908-18]

1   an indication of inadequately treated mental illness.  It is noteworthy that Class Member M

2   has been previously hospitalized five times at Metropolitan State Hospital and three times

3   at Patton State Hospital, with only a single assault during all of these hospitalizations.  Ells

4   Decl. Ex. V at 2 (5/23/11 Letter) (noting that "her previous hospitalization at Patton in

5   2007 ended after she assaulted her psychiatrist").  As discussed above, psychiatric

6   hospitals regularly manage patients who become unstable and/or aggressive and do so with

7   enhanced supervision including the use of intake units, enhanced staff supervision,

8   seclusion and restraints.  DMH's rejection of otherwise qualified patients on the basis of a

9   perceived risk of violence is dangerous and inappropriate.  From what I understand, this

10  policy is directed only at CDCR prisoners and not at the remainder of the Patton State

11  Hospital population.

12      157.   After Patton rejected her in December 2010, Class Member M's treatment

13  team again attempted to get her the inpatient care she needed.  Her treating clinician

14  referred her again to Patton on May 12, 2011 due to poor treatment compliance, paranoia,

15  and difficulty with medication compliance.  Ells Decl. Ex. V at 1 (5/23/11 Letter).  In

16  doing so, her clinician specifically noted that she would benefit from a less restrictive

17  therapeutic environment.  *Id.*  Patton rejected this second referral based upon security

18  concerns that "place her beyond the managing capacities of Patton State Hospital," in light

19  of Patton's dorm setting.  *Id.* at 2.  In support of the rejection, the May 2011 letter  lists

20  Class Member M's commitment offense, prior prison misconduct, and the 2007 assault on

21  her psychiatrist as the basis for rejecting her.  *Id.*

22      158.   This is not an appropriate basis for denying this patient access to inpatient

23  care.  Class Member M's misconduct indicates psychiatric instability and staff failure to

24  properly manage her behavioral issues.  As discussed above, psychiatric hospitals regularly

25  admit and manage unstable and aggressive patients through the use of intake units,

26  enhanced supervision, restraints and seclusion.  Patients are moved into more open

27  treatment settings when clinically ready and receive appropriate levels of supervision to

28  ensure they can function safely and participate in their clinical treatment.  Moreover, it is

[528908-18]

56

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1    clear that Class Member M has continued to suffer in the clinically inappropriate

2    outpatient setting she is stuck in because of Defendants' artificial barriers to inpatient care,

3    as my review of her records reveal that she was again admitted to the MHCB recently after

4    her second rejection from Patton.

5         Class Member N

6         159.    I have also reviewed three Patton State Hospital letters regarding Class

7    Member N dated December 15, 2009, September 13, 2010, and December 13, 2010, which

8    are attached as Exhibits W, X, and Y to the Ells Declaration, respectively.  I have also

9    reviewed Class Member N's medical and central files from the relevant time periods

10   discussed below, excerpts of which are which are attached as Exhibit Z to the Ells

11   Declaration.

12        160.    Class Member N has been referred to Patton State Hospital three times since

13   2009.  Patton rejected her each time because of security concerns.  On November 30, 2009,

14   Class Member N was referred because she exhibited: "'disorganized thought process

15   (word salad), bizarre behavior (disrobing and sexual comments toward staff), response to

16   internal stimulation (auditory hallucination), mood instability (manic episodes followed by

17   immediate tearfulness and depressed symptoms and difficulty engaging in groups and

18   [Case Manager] contact).'"  Ells Decl. Ex. W at 1 (12/15/09 Letter).  DMH rejected her on

19   December 15, 2009 because "the level of violence [Class Member N] engages in is beyond

20   the managing capacities of PSH.  Adding to this her non-participation and feigning of

21   symptoms, we believe would be unable to safely achieve CDCR's treatment expectations."

22   *Id.* at 2.  She was subsequently admitted to a crisis unit on December 28, 2009 due to

23   instability, and although her treatment team noted that she met the criteria for a DMH

24   referral, she was not referred at that time.  Ells Decl. Ex. Z at 59 (12/29/09 IDTT

25   Screening Checklist).

26        161.    On August 25, 2010, Class Member N was again referred to Patton because

27   of her psychiatric instability.  The referring CDCR clinician noted that she had at least six

28   crisis bed admissions since April 2010 as a result of "acute psychosis ('voices making fun

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1  of me') and/or acute suicidal ideation," was currently in a MHCB bed for over ten days,

2  refused more than half of her mental health treatment, and "consistently present[s] with

3  loose associations, disorganized thoughts and speech, distractibility, and impulsivity."

4  Ells Decl. Ex. Z at 53-56 (8/25/10 DMH Referral Form at 1, 4).

5       162.    Patton rejected Class Member N's treating clinician's second inpatient

6  referral on September 13, 2010, based upon the 2010 CDCR/DMH MOU provision

7  declaring that "[p]atients, who are deemed a significant assault risk … shall not be referred

8  to the State hospitals."  Ells Decl. Ex. X at 1 (9/13/10 Letter).  Despite a clear need for

9  inpatient care, Class Member N was rejected on the clinically bankrupt basis that a legal

10 document (the CDCR/DMH MOU) directs that *male* prisoners with certain custody factors

11 should go to SVPP, a location that does not accept females.

12      163.    During the two months after the second DMH rejection, Class Member N's

13 clinical team continued to document her ongoing need for inpatient care, but did not refer

14 her.  *See* Ells Decl. Ex. Z at 64-73 (10/7/10 and 10/21/10 Mental Health Treatment Plans).

15 Finally, two months after her second rejection, her clinicians tried for the third time in less

16 than a year to refer her to Patton for inpatient care because she continued to experience

17 serious decompensation, including additional crisis bed admissions—including one

18 admission lasting approximately 21 days—and on-going treatment refusal.  *See* Ells Decl.

19 Ex. Z at 74-77 (11/18/10 Mental Health Treatment Plan).

20      164.    On December 13, 2010, Patton rejected Class Member N—an acutely ill

21 woman in desperate need of inpatient care to treat her active psychosis and chronic

22 suicidality—for the third time, again based on her "history of severe violence" and

23 "current behavior indicating an active risk of violence."  Ells Decl. Ex. Y at 2 (12/13/10

24 Letter).  Clinical notes from this timeframe document Class Member N presenting as

25 labile, loud and unpredictable, unstable, but not as physically violent.

26      165.    Around the time that Class Member N's third DMH referral was rejected, her

27 clinicians continued to document a patient who was severely decompensated and could not

28 be effectively treated by her CDCR clinical team.  For example, notes from a treatment

1    team held on January 7, 2011 documented her clinicians' judgment that "standard EOP

2    treatment is inadequate for [Class Member N], and the treatment team has referred her to

3    Patton State Hospital.  However, she was rejected.  [Class Member N] requires acute care

4    at this time…This is the 12th MHCB admission."   Ells Decl. Ex. Z at 93 (1/7/11 IDTT

5    DMH Screening Checklist).

6         166.    Following the third DMH rejection in December 2010, Class Member N's

7    clinical team appealed the DMH exclusion and a Coordinated Clinical Assessment Team

8    ("CCAT") review meeting was held with representatives from CIW, Patton State Hospital

9    and CDCR Central Office.  Ells Decl. Ex. Z at 92 (1/7/11 CCAT Summary).  None of the

10   participants questioned the clinical appropriateness of Class Member N's referral to Patton

11   and her desperate need for inpatient psychiatric hospitalization.  Patton staff, however,

12   reiterated their concerns about the safety of staff and other patients if Class Member N was

13   admitted.  CIW staff pointed out that Class Member N had committed no acts of violence

14   or even verbal threats of violence since September 2009—sixteen months prior.  The

15   Patton rejection was upheld anyway, based on stale information about historical Class

16   Member N's conduct.  According to the CCAT note, Class Member N's clinical team

17   asked when they could re-refer her to Patton for inpatient care, and were told that they

18   could only do so if, at some point in the future: (1) Class Member N no longer has any

19   dynamic risk factors for violence present; (2) Class Member N is medication compliant;

20   (3) Class Member N has made no verbal threats of violence for an undefined period of

21   time;  and (4) Class Member N is deemed able to function in a general population setting.

22   *Id.*  The factors set forth in the CCAT note are exclusionary preconditions that are

23   overbroad, inappropriate, and will result in Class Member N's improper exclusion from

24   inpatient care that she has been clinically determined to need in order to treat her severe

25   mental illness.  In fact, in a Catch-22 situation, some of Patton's stated exclusionary

26   preconditions are exactly the behaviors that demonstrate Class Member N's desperate need

27   for psychiatric hospitalization in the first place.

28         167.    Following the CCAT meeting on January 6, 2011, Class Member N was

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1   repeatedly evaluated by her clinical team, and although she continued to exhibit behavior

2   that met DMH criteria, she was not referred again.  *See* Ells Decl. Ex. Z at 81, 85, 91

3   (IDTT Screening Checklists, dated 1/13/11, 1/27/11, and 2/10/11).  In my experience, and

4   as I discuss further above, CDCR clinicians are unlikely to complete DMH referrals that

5   are futile.  *See also* 8/15/08 Report ¶¶ 8-9.  DMH's multiple rejections of Class Member N,

6   as well as the CCAT's exclusionary preconditions for any future referrals of Class Member

7   N, ensure that she will not be re-referred for inpatient psychiatric treatment despite clear

8   clinical need   In fact, my review of DMH monthly reports from December 2010 through

9   the present reflect that she has not been re-referred since her last rejection in December

10  2010.

11        168.   Class Member N was previously treated at Patton in 1993, 1994, 2004, 2005,

12  and 2006-2008.  Ells Decl. Ex. W at 1 (12/15/09 Letter).  During her 2004 and 2006-2008

13  admissions, she was charged with assaults on Patton staff members.  *Id.*  The 2004

14  accusation was made when Class Member N was at Patton because she had been declared

15  "Not Guilty By Reason of Insanity" under Penal Code 1370.  Ells Decl. Ex. Z at 3 (3/24/04

16  Patton Discharge Summary at 1).  At the time of the alleged 2004 assault, she was being

17  observed one-to-one, meaning a single staff person was monitoring her, despite the fact

18  that she was known to have been frequently aggressive and assaultive.  *Id.* at 4.  Following

19  the alleged assault, she was discharged from Patton to jail.  *Id.*

20        169.   The alleged 2008 staff assault occurred when Class Member N was supposed

21  to be under two-to-one observation (i.e., two staff members to one patient).  *See* Ells Decl.

22  Ex. W at 1 (12/15/09 Letter).  However, at the time of the alleged assault, Class Member N

23  was not actually being observed by two staff persons, but rather by only one.  *See* Ells

24  Decl. Ex. Z at 23-25 (5/20/08 San Bernardino County Probation Report at 3; 1/26/08

25  Patton State Hospital Police Department Crime/Incident Report at 5).  Patton staff's failure

26  to follow protocol and maintain the required two-to-one supervision placed those staff

27  members at known risk.  This incident, and the alleged 2004 assault, could have been

28  prevented if Patton had maintained the level of supervision determined necessary for Class

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1  Member N.  Yet, it is these alleged assaults which Patton relies heavily upon to reject

2  Class Member N three times.  I am deeply concerned about the well-being of this patient.

3  In my opinion the denial of inpatient psychiatric hospitalization puts her at grave risk of

4  serious and permanent injury and otherwise avoidable, pain and suffering.  She is also at

5  increased risk of suicide.

6  / / /

7  / / /

8  / / /

9  / / /

10  / / /

11  / / /

12  / / /

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

[528908-18]

61

DECL. OF P. STEWART ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1     I declare under penalty of perjury under the laws of the State of California that the

2 foregoing is true and correct, and that this declaration is executed at San Francisco,

3 California this 3ʳᵈ day of August, 2011.

4

5                             Pablo Stewart, M.D.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Appendix A

<u>CURRICULUM VITAE</u>

*PABLO STEWART, M.D.*
824 Ashbury Street
San Francisco, California 94117
(415) 753-0321; fax (415) 753-5479; e-mail: pab4emi@aol.com
(Updated 4/15/2011)

<u>EDUCATION:</u>    University of California School of Medicine, San Francisco, California, M.D., 1982

United States Naval Academy Annapolis, MD, B.S. 1973, Major: Chemistry

<u>LICENSURE:</u>    California Medical License #GO50899
Hawai'i Medical License #MD11784
Federal Drug Enforcement Agency #BS0546981
Diplomat in Psychiatry, American Board of
Psychiatry and Neurology, Certificate #32564

<u>ACADEMIC APPOINTMENTS:</u>

September 2006-    <u>Academic Appointment:</u> Clinical Professor, Department of
Present    Psychiatry, University of California, San Francisco,
School of Medicine.

July 1995 -    <u>Academic Appointment:</u>  Associate Clinical Professor,
August 2006    Department of Psychiatry, University of California, San Francisco,
School of Medicine.

August 1989 -    <u>Academic Appointment:</u>  Assistant Clinical Professor,
June 1995    Department of Psychiatry, University of California, San Francisco,
School of Medicine.

August 1986 -    <u>Academic Appointment:</u>  Clinical Instructor, Department of
July 1989    Psychiatry, University of California, San Francisco, School of
Medicine.

<u>EMPLOYMENT:</u>

December 1996-    <u>Psychiatric Consultant</u>
Present    Provide consultation to governmental and private agencies on a
variety of psychiatric, forensic, substance abuse and organizational
issues; extensive experience in all phases of capital litigation.

| January 1997-<br>September 1998 | <u>Director of Clinical Services, San Francisco Target Cities</u><br><u>Project</u>.  Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court   Also responsible for providing clinical in-service training's for the staff of the Project and community agencies that requested technical assistance. |
|---|---|
| February 1996 -<br>November 1996 | <u>Medical Director, Comprehensive Homeless Center,</u><br><u>Department of Veterans Affairs Medical Center, San Francisco.</u><br>Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | <u>Chief, Intensive Psychiatric Community Care Program,</u><br><u>(IPCC) Department of Veterans Affairs Medical Center, San</u><br><u>Francisco</u>.  Overall clinical/administrative responsibility for the IPCC, a community based case management program.  Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center.  This is a social work managed program that provides comprehensive social services to homeless veterans. |
| April 1991 -<br>February 1995 | <u>Chief, Substance Abuse Inpatient Unit, (SAIU), Department</u><br><u>of Veterans Affairs Medical Center, San Francisco.</u><br>Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | <u>Psychiatrist, Substance Abuse Inpatient Unit, Veterans</u><br><u>Affairs Medical Center, San Francisco.</u>  Clinical responsibility for patients admitted to SAIU.  Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | <u>Director, Forensic Psychiatric Services, City and County of</u><br><u>San Francisco</u>.  Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco.  Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | <u>Senior Attending Psychiatrist, Forensic Unit, University of</u><br><u>California, San Francisco General Hospital.</u>  Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward.  Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward.  Liaison with Jail Psychiatric Services, City and County of San Francisco.  Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |

| | |
|---|---|
| July 1985<br>June 1986 | <u>Chief Resident, Department of Psychiatry, University of California San Francisco General Hospital.</u>  Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second year medical students. |
| July 1984 -<br>March 1987 | <u>Physician Specialist, Westside Crisis Center, San Francisco, CA.</u>  Responsibility for Crisis Center operations during assigned shifts; admitting privileges at Mount Zion Hospital.  Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 -<br>July 1985 | <u>Psychiatric Consultant, Marin Alternative Treatment, (ACT).</u>  Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 -<br>November 1984 | <u>Physician Specialist, Mission Mental Health Crisis Center, San Francisco, CA.</u>  Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982-<br>July 1985 | <u>Psychiatric Resident, University of California, San Francisco.</u> Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | <u>Infantry Officer - United States Marine Corps.</u> Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Commander of a Vietnamese Refugee Camp.  Received an Honorable Discharge.  Highest rank attained was Captain. |

<u>HONORS AND AWARDS:</u>

| | |
|---|---|
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award For Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship. One of sixteen nation-wide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry. Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>May 2008 | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 - | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 -<br>January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000-<br>April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001-<br>Present | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002-<br>June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003-<br>April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003-<br>January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |
| February 2004-<br>June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004-<br>January 2006 | Member of Human Services Commission, City and County of San Francisco. |

| | |
|---|---|
| February 2006-<br>January 2007 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007-<br>Present | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing.  Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine.  Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine.    Duties  included  screening  applications  and interviewing candidates for medical school. |
| October 1978 -<br>December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic.<br>Provided  free  instruction  on  the  public  on  proper  methods  of exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| | |
|---|---|
| July 2003-<br>Present | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| September 2001-<br>June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| January 2002-<br>January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| April 1999-<br>April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998-<br>June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 -<br>November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| March 1995-<br>Present | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 -<br>June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 -<br>February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 -<br>June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 -<br>February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |

| | |
|---|---|
| September 1990 - November 1996 | Off ward supervisor, PGY II psychiatric residents, Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 - November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 - June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 - Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 - December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Alcoholism". This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional. This course is offered fall quarter each academic year. |
| July 1987- June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 - June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 - August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 - August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |
| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital, Department of Psychiatry. Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |
| July 1985 - August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital. Teach and supervise medical residents in interviewing and communication skills. Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

<u>COMMUNITY SERVICE:</u>

| | |
|---|---|
| February 2006-<br>December 2009 | Board of Directors, Physician Foundation at California Pacific Medical Center. |
| June 2004-<br>Present | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-<br>June 2008 | Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services. |
| June 2003-<br>December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD). This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit. |
| October 2002-<br>August 2006 | Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section. |
| July 1998-<br>June 2000 | Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project. This Project provides assistance to programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities. |
| July 1998-<br>February 2004 | Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities. NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, critical mental health, medical and educational services, and treatment programs. NCCD ceased to be the monitoring agency for this project in June 1999. At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency. The work remained unchanged. |
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign Against Drug Abuse (SF CADA). |
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer Center (ATTC), University of California, San Diego. |

| | |
|---|---|
| December 1992 - December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines. |
| June 1991- February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic. Overall responsibility for psychiatric services at the clinic. |
| December 1990 - June 1991 | Medical Director, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.  Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996- July 1997 | Psychiatric Expert for the U. S. Federal Court in the case of Madrid v. Gomez.  Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 - January 2000 | Psychiatric Expert for the U.S. Federal Court in the case of Gates v. Deukmejian.  Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 - December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.  Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues.  Special emphasis on dual diagnostic patients. |
| July - December 1981 | Medical/Psychiatric Consultant, Youth Services, Hospitality Hospitality House, San Francisco, CA.  Advised youth services staff on client management.  Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 - June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 - Present | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| June 1991- June 1994 | Board of Directors, Pacific Primary School, San Francisco, CA. |
| April 1989 - July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 - May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

PRESENTATIONS:

1.    San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1.    (10/12/1990).    "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.    Grand Rounds.  Department of Psychiatry, University of California, San Francisco, School of Medicine.  (12/5/1990).  "Advances in the Field of Dual Diagnosis."

3.    Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference.  (3/3/1991).  "Planning a Satisfying Life in Medicine."

4.    24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California.  (9/11/1991).  "The Chronically Ill Substance Abuser."

5.    Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics.  (11/26/91).  "Mentoring as an Art."

6.    Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine.  (4/25/1992).  "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.    First International Conference of Mental Health and Leisure.  University of Utah. (7/9/1992).  "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.    American Group Psychotherapy Association Annual Meeting.  (2/20/1993).  "Inpatient Groups in Initial-Stage Addiction Treatment."

9.    Grand Rounds.  Department of Child Psychiatry, Stanford University School of Medicine.  (3/17/93, 9/11/96).  "Issues in Adolescent Substance Abuse."

10.    University of California, Extension.   Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11.    American Psychiatric Association Annual Meeting.  (5/26/1993).  "Issues in the Treatment of the Dual Diagnosis Patient."

12.    Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis.  (6/23/1993).  "Dual Diagnosis Treatment Issues."

13.    Utah Medical Association Annual Meeting.  (10/7/93).  "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14.    Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993).  "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15.    Haight Ashbury Free Clinic's 27th Anniversary Conference.  (6/10/94).  "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16.     University of California, San Diego.  Addiction Technology Transfer Center Annual Summer Clinical Institute:  (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98).  "Treating Multiple Disorders."

17.     National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists. (9/10/94).  "Psychiatry, Homelessness, and Serious Mental Illness."

18.     Value Behavioral Health/American Psychiatry Management Seminar.  (12/1/1994).  "Substance Abuse/Dual Diagnosis in the Work Setting."

19.     Grand Rounds.  Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry.  (1/24/1995).  "Models of Addiction."

20.     San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project.  (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01).  "Demystifying Dual Diagnosis."

21.     First Annual Conference on the Dually Disordered.  (3/10/1995).  "Assessment of Substance Abuse."  Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22.     Delta Memorial Hospital, Antioch, California, Medical Staff Conference.  (3/28/1995).  "Dealing with the Alcohol and Drug Dependent Patient."  Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23.     Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada.  (11/23/95).  "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24.     The Labor and Employment Section of the State Bar of California.  (1/19/96).  "Understanding Alcoholism and its Impact on the Legal Profession."  MCCE Conference, San Francisco, CA.

25.     American Group Psychotherapy Association, Annual Training Institute.  (2/13-2/14/96), National Instructor - Designate training group.

26.     American Group Psychotherapy Association, Annual Meeting.  (2/10/96).  "The Process Group at Work."

27.     Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28.     International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29.     Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client".  (11/14/96)

30.     Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery".  (11/22/96)

31.    Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32.    Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33.    DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California.  (7/31/97)

34.    The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender".  Wilsonville, Oregon. (8/1/97)

35.    The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children."  Newport Beach, California.  (2/12/98)

36.    American Group Psychotherapy Association, Annual Training Institute, (2/16-2/28/1998), Intermediate Level Process Group Leader.

37.    "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience."  The Haight Ashbury Free Clinics Inc., in conjunction sponsored this seminar with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis.  San Francisco, California.  (3/6-3/8/1998)

38.    "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection."  The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39.    Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40.    Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient."  (6/17/1998)

41.    Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42.    "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer."  The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference.  San Rafael, California.  (6/20/1998)

43.    "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44.    Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45.    "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46.    9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues and Pain Management for Chemically Dependent Patients." San Francisco, CA. (9/10/98)

47.    Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000." "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA. (9/18/98)

48.    Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder." Napa, CA. (9/23/98)

49.    "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA. (9/30/98)

50.    "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA. (10/13/98)

51.    California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA. (10/15/98)

52.    California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel. (10/15/98)

53.    Northwest GTA Health Corporation, PEEL MEMORIAL HOSPITAL, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada. (10/23/98)

54.    1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA. (12/11/98)

55.    "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA. (1/7/99)

56.    Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder." (1/19/99)

57.    "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA. (1/22 & 2/5/99)

58.    Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High Risk Offender." (2/17/99)

59.    American Group Psychotherapy Association, Annual Training Institute, (2/22-2/24/1999).  Entry Level Process Group Leader.

60.    "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii.  (3/5 & 3/6/99)

61.    "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA.  (3/10/99)

62.    "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA.  (3/11/99)

63.    "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA.  (3/17/99)

64.    Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i.  Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies.  Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility.  (4/2-4/9/99)

65.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA.  (4/14/99)

66.    "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA.  (4/21/99)

67.    California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California.  (4/29/99)

68.    "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i.  (4/30/99)

69.    State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital."  Honolulu, Hawai'i.  (4/30/99)

70.    "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i.  (4/30/99)

71.    11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Concord, California.  (5/6/99)

72.    The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Escondido, California.  (5/7/99)

73.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California. (5/13/99)

74.    "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", Third annual conference presented by the Southern California Mental Health Directors Association. Anaheim, California. (5/21/99)

75.    15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho. (5/25/99)

76.    "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California. (6/3/99)

77.    "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan. (6/14/99)

78.    "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan. (6/17/99)

79.    "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan. (6/26/99)

81.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California. (7/13/99)

82.    "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California. (7/15/99)

83.    "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84.    1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry. Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness. What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California. (8/3/99)

85.    "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center. Kahului, Maui. (8/23/99)

86.    "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California. (9/13/99)

87.    "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California. (9/14/99)

88.     "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California.  (9/16/99)

89.     "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California.  (9/23/99)

90.     "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona.  (9/28/99)

91.     "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i.  (10/8-10/10/99)

92.     "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California.  (10/12/99)

93.     "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California.  (10/14/99)

94.     "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California.  (10/21/99)

95.     "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California.  (1/27/00)

96.     "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California.  (3/6/00)

97.     "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California.  (3/16/00)

98.     "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California.  (3/17/00)

99.     "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California.  (4/3/00)

100.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California.  (4/4-4/5/00)

101.    "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California.  (5/15/00)

102.    National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California.  "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.    "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California.  (6/9/00)

104.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunderoad Adolescent Treatment Centers, Inc., Oakland, California.  (6/29 & 7/27/00)

105.    "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California.  (9/8/00)

106.     "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California.  (9/9/00)

107.    Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey.  "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108.    "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.  (11/1/00, 3/13/01)

109.    "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110.    "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California.  (12/5/00)

111.    "Wasn't One Problem Enough?"  Mental Health and Substance Abuse Issues. 2001California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California.  (3/2/01)

112.    "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process."  County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California.  (3/8 & 4/5/01)

113.    "Assessment of the Patient with Substance Abuse and Mental Health Issues."  San Mateo County General Hospital Grand Rounds.  San Mateo, California.  (3/13/01)

114.    "Dual Diagnosis-Assessment and treatment Issues."  Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California.  (5/8/01)

115.    Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California.  (5/10/01)

116.    National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice."  I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol.  New Orleans, LA.  (6/1-6/2/01)

117.    Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California.  (6/15/01)

118.    Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington.  (11/15/01)

119.    The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California.  (4/25/02)

120. Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

121. 3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System." (6/5/02)

122. New Mexico Department of Corrections, "Group Psychotherapy Training." Santa Fe, New Mexico. (8/5/02)

123. Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California. (8/15/02)

124. California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California. (8/22/02)

125. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

126. First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas." El Centro, California. (1/28/02)

127. Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128. Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129. "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (10/1/03), (12/3/03)

130. "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California. (10/18/03)

131. "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Pasadena, California. (4/2/04)

132. Lecture tour of Japan (4/8-4/18/04). "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (9/9/04)

134. "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Sacramento, California. (4/8/05)

135.   "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University.  San Francisco, California. (8/13/05)

136.   Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse."  San Francisco, California. (10/24/05)

137.   Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse."  Woodland, California. (1/25/06), (6/23/06)

138.   "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.   Lecture tour of Japan (4/13-4/23/06).  "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness."  Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.   "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference.  Sacramento, California. (4/25/06)

141.   "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.   "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference.  Sacramento, California. (4/27/07)

143.   "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network.  Medford, Oregon.  (5/10/07)

144.   "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar.  San Francisco, California.  (8/2/07)

145.   "Capital Punishment," Human Writes 2007 Conference.  London, England.  (10/6/07)

146.   "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California.  (10/30/07)

147.   "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference.  San Diego, California. (12/13/07)

148.   "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada.  (4/10/08)

149.   "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program.  Chelan, Washington.  (6/3/08)

150.   "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference.  Burlingame, California.  (6/19/08)

151.   Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152.    2010 B. E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th.)

153.    Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA.  This conference was designed to assist the Federal Court to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154.    Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court.  San Francisco, California. (1/12/2011)

PUBLICATIONS:

1)    Kanas, N., Stewart, P. and Haney, K. (1988). *Content and outcome in a short-term therapy group for schizophrenic outpatients*.  Hospital and Community Psychiatry, 39, 437-439.

2)    Kanas, N., Stewart, P. (1989*). Group process in short-term outpatient therapy groups for schizophrenics.*  Group, Volume 13, Number 2, Summer 1989.

3)    Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.*  Journal of Psychoactive Drugs, Vol. 23(4) Oct-Dec 1991, 387395.

4)    Banys, P., Clark, W.H., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. Journal of Substance Abuse Treatment, Vol 11(1), 9-15.

5)    Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, W.H., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.*  The Journal of Nervous and Mental Disease, Vol 182(10), 570-575.

6)    Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W. O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trail Of Tyrosine for Cocaine Dependence.*  Journal of Psychoactive Drugs, Vol. 28(3), July-September 1996

7)    Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999

8)    Stewart, P. (1999).  *New Approaches and Future Strategies Toward Understanding Substance Abuse.*  Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)    Stewart, P. (2002).  *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. By Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)    Stewart, P., Inaba, D.S., and Cohen, W.E.  (2004). *Mental Health & Drugs.*  Chapter in the book, <u>*Uppers, Downers, All Arounders, Fifth Edition*</u>, CNS Publications, Inc., Ashland, Oregon.

11)    James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* <u>National Institute of Corrections</u>, Accession Number 019468.

12)    Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as <u>AMICUS CURIAE</u> in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13)    Stewart, P., Inaba, D.S., and Cohen, W.E.  (2007). *Mental Health & Drugs.*  Chapter in the book, <u>*Uppers, Downers, All Arounders, Sixth Edition*</u>, CNS Publications, Inc., Ashland, Oregon