1   DONALD SPECTER – 083925           MICHAEL W. BIEN – 096891
    STEVEN FAMA – 099641              ERNEST GALVAN – 196065
2   PRISON LAW OFFICE                 JANE E. KAHN – 112239
    1917 Fifth Street                 LISA ELLS – 243657
3   Berkeley, California  94710-1916  AARON J. FISCHER – 247391
    Telephone:   (510) 280-2621       LAURA BOYSEN-ARAGON – 248083
4                                     ROSEN, BIEN & GALVAN, LLP
                                      315 Montgomery Street, Tenth Floor
5                                     San Francisco, California  94104-1823
                                      Telephone:   (415) 433-6830
6
    CLAUDIA CENTER – 158255           WARREN E. GEORGE – 053588
7   THE LEGAL AID SOCIETY –           BINGHAM McCUTCHEN LLP
    EMPLOYMENT LAW CENTER             Three Embarcadero Center
8   180 Montgomery Street, Suite 600  San Francisco, California  94111-4066
    San Francisco, California  94104-4244   Telephone:   (415) 393-2000
9   Telephone:   (415) 864-8848

10  Attorneys for Plaintiffs

11                  UNITED STATES DISTRICT COURT

12                EASTERN DISTRICT OF CALIFORNIA

13

14  RALPH COLEMAN, et al.,            Case No. Civ S 90-0520 LKK-JFM

15           Plaintiffs,              **PLAINTIFFS' BRIEF ON
                                      EVIDENTIARY HEARING
16       v.                           REGARDING ORDER TO SHOW
                                      CAUSE WHY EMPTY DMH BEDS
17  EDMUND G. BROWN, Jr., et al.,     CANNOT BE FILLED WITH CDCR
                                      INMATES AND IN SUPPORT OF
18           Defendants.[1]           ADDITIONAL RELIEF**

19                                    Judge:   Hon. Lawrence K. Karlton
                                      Date:    August 17, 2011
20                                    Time:    10:00 a.m.
                                      Crtrm.:  4
21

22

23

24

25

26  _____

27  [1] The names of Defendants currently serving and their official capacities have been
    substituted pursuant to Fed. R. Civ. P. 25.
28

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................. 1

RELEVANT PROCEDURAL BACKGROUND ........................................ 2

PLAINTIFFS' EVIDENCE.................................................................... 7

ARGUMENT...................................................................................... 8

I.    DEFENDANTS' FAILURE TO PLACE MENTALLY ILL PRISONERS
      REQUIRING IMMEDIATE INPATIENT CARE IS A SERIOUS
      CONSTITUTIONAL VIOLATION CAUSING SERIOUS,
      IRREPARABLE, AND LIFE-THREATENING HARM TO CLASS
      MEMBERS.................................................................................. 8

II.   CSH HAS THE ABILITY TO SAFELY HOUSE AND APPROPRIATELY
      TREAT MENTALLY ILL PRISONERS, INCLUDING HIGHER-
      CUSTODY PRISONERS WHO ARE AT SVPP OR ON THE SVPP ICF
      WAIT LIST ................................................................................ 12

III.  DEFENDANTS' BLANKET EXCLUSIONARY CRITERIA AND CASE-
      BY-CASE EVALUATION PROCESS ARE INAPPROPRIATE AND
      UNREASONABLE, AND IMPROPERLY DEPRIVE PATIENTS IN NEED
      OF INPATIENT CARE FROM ACCESSING THAT CARE,
      PARTICULARLY GIVEN THE CURRENT EMERGENCY SITUATION ........ 15

      A.    The Custody-Based Criteria Used to Categorically Exclude Class
            Members from DMH Beds Create Artificial and Unjustifiable Barriers
            to Timely Inpatient Care.................................................... 16

      B.    Even Class Members Not Automatically Excluded Are Facing
            Artificial and Unjustifiable Barriers to Admission into Open and
            Available Lower-Custody Inpatient Beds .............................. 17

      C.    Defendants' Response to this Court's Orders to Meaningfully Review
            Class Members for Placement into Lower-Custody DMH Beds Has
            Failed Miserably .............................................................. 18

            1.    Defendants' Review of Class Members on the SVPP ICF Wait
                  List Has Been Useless Given Defendants' Stubborn Adherence
                  to the Blanket Exclusionary Criteria ............................ 18

            2.    Defendants' Review of Class Members Already Housed at
                  SVPP Has Been a Total Failure as a Result of Defendants'
                  Stubborn Adherence to the Blanket Exclusionary Criteria and
                  Refusal to Consider Each Patient's Stabilization and *Current*
                  Condition ................................................................ 19

[534603-11]

i

IV.   DEFENDANTS HAVE MADE A BAD SITUATION WORSE BY
      ABANDONING THE EXTENDED ENHANCED OUTPATIENT
      PROGRAM CARE PLAN, A PRIMARY COMPONENT OF THEIR PLAN
      TO ADDRESS THE WAIT LISTS, AND BY SOWING CONFUSION
      WITHIN DEFENDANTS' MENTAL HEALTH SYSTEM ................................. 21

V.    DEFENDANTS' LONG-TERM BED PLAN DOES NOTHING TO
      ADDRESS THE CURRENT EMERGENCY SITUATION AND HAS
      BEEN PLAGUED BY DELAYS........................................................................ 23

VI.   THE COURT SHOULD USE ITS AUTHORITY UNDER THE PLRA TO
      ENFORCE ITS ORDERS TO FILL *COLEMAN*-DESIGNATED BEDS AT
      CSH AND ASH, AND TO FURTHER ORDER DEFENDANTS TO FILL
      UNUSED AND AVAILABLE DMH BEDS WITH CLASS MEMBERS TO
      MEET THE UNMET NEED FOR INPATIENT CARE ......................................... 24

      A.    The Court Should Enforce Existing Orders to Fill All *Coleman*-
            Designated Beds at CSH and ASH................................................. 28

      B.    The Court Should Further Order Defendants to Take Immediate Steps
            to Fill Other Unused and Available DMH Beds with Class Members
            to Address the Current Crisis ......................................................... 29

      C.    The Court Should Order Defendants to Expedite Inpatient Bed
            Projects Necessary to Reduce or Eliminate the Wait List............................ 29

      D.    The Court Should Order Defendants to Provide Necessary Treatment
            to All Female Prisoners, and to End Their Policy of Denying Inpatient
            Care at Patton State Hospital, Which Is the *Only* Available Placement
            for Female Class Members Requiring Acute or Intermediate Inpatient
            Hospitalization............................................................................... 30

VII.  A NEW MHARP IS NECESSARY BECAUSE *COLEMAN* CLASS
      MEMBERS WHO NEED INPATIENT PSYCHIATRIC
      HOSPITALIZATION ARE NOT BEING REFERRED........................................... 31

CONCLUSION.............................................................................................. 35

[534603-11]

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1

# TABLE OF AUTHORITIES

2

**Page**

3

## Cases

4

*Armstrong v. Schwarzenegger*,
    622 F.3d 1058 (9th Cir. 2010) ........................................................ 26, 27

*Bounds v. Smith*,
    430 U.S. 817 (1977) .................................................................. 26

*Bowring v. Godwin*,
    551 F.2d 44 (4th Cir. 1977) .......................................................... 8

*Cabrales v. Cty. of Los Angeles*,
    864 F.2d 1454 (9th Cir. 1988) ........................................................ 9

*Coleman v. Brown*,
    No. 10-17546, 2011 U.S. App. LEXIS 8391 (9th Cir. Apr. 22, 2011) ................... 25

*Coleman v. Schwarzenegger*,
    2009 U.S. Dist. LEXIS 67943 (E.D. Cal. Aug. 4, 2009) ............................... 9

*Coleman v. Wilson*,
    912 F. Supp. 1282 (E.D. Cal. 1995) ................................................. 3

*Feliciano v. Rullan*,
    378 F.3d 42 (1st Cir. 2004) ......................................................... 27

*Inmates of Allegheny Cty. Jail v. Pierce*,
    612 F.2d 754 (3d Cir. 1979) ......................................................... 8

*Lewis v. Casey*,
    518 U.S. 343 (1996) ............................................................... 25, 26

## Statutes

Prison Litigation Reform Act (PLRA),
    18 U.S.C. § 3626(a)(1)(A) ........................................................ 2, 24

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iii

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1

**TABLE OF ABBREVIATIONS**

2

| Term | Definition |
|------|-----------|
| APP | Acute Psychiatric Program |
| ASH | Atascadero State Hospital |
| CDCR | California Department of Corrections and Rehabilitation |
| CMF | California Medical Facility |
| CSATF | California Substance Abuse Treatment Facility |
| CSH | Coalinga State Hospital |
| DMH | Department of Mental Health |
| EECP | Extended Enhanced Outpatient Program Care Plan |
| EOP | Enhanced Outpatient Program |
| EOP-ASU | Enhanced Outpatient Program-Administrative Segregation Unit |
| EOP-GP | Enhanced Outpatient Program-General Population |
| HC-POP | Health Care Placement Oversight Program |
| ICF | Intermediate Care Facility |
| LAC | California State Prison-Los Angeles County |
| MHARP | Mental Health Assessment and Referral Project |
| MHCB | Mental Health Crisis Bed |
| MHSDS | Mental Health Services Delivery System |
| MOU | Memorandum of Understanding |
| PLRA | Prison Litigation Reform Act |
| PSH | Patton State Hospital |
| SVPP | Salinas Valley Psychiatric Program |
| VPP | Vacaville Psychiatric Program |

[534603-11]

iv

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

**INTRODUCTION**

The denial of timely access to inpatient psychiatric hospitalization continues to plague Defendants' mental health system.  This is an emergency situation that is irreparably harming seriously mentally ill class members and putting lives at grave risk.  The lengthy wait lists for inpatient hospitalization at the Intermediate Care Facility (ICF) and Acute Psychiatric Program (APP) levels of care, and the resulting delays of several months to access such care, persist despite **more than 120 vacant ICF beds that this Court has already ordered be designated for *Coleman* class members**, and **hundreds more open and readily available beds within Defendants' mental health care system**.  Defendants' stubborn and unreasonable insistence that these beds cannot be filled due to illogical exclusionary criteria demonstrates Defendants' continued "inability to effectuate timely transfers of CDCR inmates most in need of inpatient treatment to higher levels of care."  Special Master Report on Defendants' Plan Re:  Intermediate Care Facility and Acute Inpatient Wait Lists (hereinafter, the "Special Master Report") at 52, Dkt. 4020.  As a direct result, "seriously mentally ill inmates languish, and often further decompensate, with no alternative source of appropriate treatment while they wait[]" for several months or more to be placed in an inpatient hospital bed.  *Id.* at 2.

The need to use *all* available inpatient beds to meet this enormous and critical need *now* is plain.  As the Special Master has identified, class members lingering on the wait list are stuck between a "correctional system that is not equipped to treat their high-level clinical needs and a mental health system that is *reportedly* ill-equipped to manage their custodial status."  Special Master Report at 4 (emphasis added).  Plaintiffs have now toured Coalinga State Hospital (CSH) with a security expert with several decades of experience running CDCR programs, including as Warden of Pelican Bay State Prison.  His expert findings establish that class members can be safely housed and appropriately treated at CSH.  Filling open CSH and other Department of Mental Health (DMH) beds with class members is a necessary step to provide a constitutional remedy to this crisis situation.

[534603-11]

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1    Plaintiffs request that the Court enforce its previous orders to fill all 50 CSH beds

2  and all 256 Atascadero State Hospital (ASH) beds designated for *Coleman* class members.

3  However, given the continued and overwhelming unmet need for inpatient care, additional

4  relief is required.  Plaintiffs therefore seek an order, as consistent with the Prison Litigation

5  Reform Act (PLRA), 18 U.S.C. § 3626(a)(1)(A), requiring Defendants to take the

6  following steps to remedy what is a dangerous and life-threatening emergency for

7  hundreds of mentally ill men and women:

8        - Defendants must end their policy of denying necessary inpatient psychiatric
         hospitalization to male and female *Coleman* class members based on
9        artificial custody-related barriers.

10       - Defendants must promptly activate and fill four adjacent 50-bed CSH units
         (including the *Coleman*-designated unit) that currently sit vacant, so long as
11       there remains an inpatient bed shortage.

12       - Defendants must, upon activation of the 64-bed ICF unit at California
         Medical Facility (CMF), accelerate admissions from 6 to 12 patients per
13       week.

14    In addition, there is clear evidence that Defendants are failing to identify and refer a

15  substantial number of prisoners who desperately need inpatient psychiatric hospitalization.

16  That is, if the true scope of class member needs for inpatient care was properly identified,

17  the already appallingly lengthy wait list, and delays in access to inpatient care, would

18  increase significantly.  To ensure a complete remedy for class members in need of

19  inpatient psychiatric hospitalization, there must be another Special Master-supervised

20  assessment of unmet needs for inpatient care that ensure proper implementation and

21  sustainability of DMH referral policies and practices moving forward.

22    After years of failure, constitutional violations, and devastating harms, *Coleman*

23  class members and this Court can wait no longer.

### RELEVANT PROCEDURAL BACKGROUND

25    The Court is well aware of the history of seriously mentally ill *Coleman* class

26  members suffering as a result of months upon months of delays in accessing inpatient

27  psychiatric hospitalization, a constitutional violation dating back to the beginning of this

28  case nearly two decades ago, when this Court found "significant and unacceptable delays"

2

1    in access to appropriate levels of care, requiring prompt remedial action.  *Coleman v.*

2    *Wilson*, 912 F. Supp. 1282, 1308 (E.D. Cal. 1995).  The Court has issued order after order

3    seeking to remedy the substantial shortage of inpatient care beds, while concurrently

4    recognizing "defendants' repeated failure to adequately assess the unmet need for DMH

5    inpatient beds for seriously mentally ill inmates in the state prison population, and the

6    concomitant delays that have attended access to such beds."  Order at 1-2, Dkt. No. 1594,

7    July 9, 2004.

8        By April 2006, the Court found that it was "undisputed that the [inpatient bed]

9    shortage is leaving critically mentally ill inmates languishing in horrific conditions without

10   access to immediately necessary mental health care," constituting—in the words of the

11   State's then-Director of Correctional Health Care Services—a "crisis."  Order at 2, Dkt.

12   No. 1800, May 2, 2006.  At that time, with 123 class members awaiting placement into an

13   ICF bed, the Court ordered a number of steps, including prompt activation of 50 ICF

14   inpatient beds at CSH for use by *Coleman* class members.  *Id.* at 5.  Defendants did not

15   appeal this order.  The Court further directed Defendants to report on the feasibility of

16   creating 30 additional high-custody ICF beds at CSH, *id.*, a project that has to date gone

17   nowhere.

18       As class members continued to face substantial delays in accessing inpatient

19   hospitalization, the Court and the Special Master identified "artificial barriers" preventing

20   timely admission into DMH hospitals and warranting the "develop[ment of] new policies

21   and procedures to expedite admissions."  *See* Order at 3, Dkt. No. 3556, Mar. 31, 2009.  At

22   the time of this significant finding, the 50 CSH beds designated for *Coleman* class

23   members were filled with approximately 49 mentally ill prisoners requiring ICF care.

24   Declaration of Aaron J. Fischer in Support of Pls.' Brief on Evid. Hr'g Re: Order to Show

25   Cause Why Empty DMH Beds Cannot Be Filled with CDCR Inmates and in Support of

26   Additional Relief ("Fischer Decl.") ¶ 31.  Yet, by May 2010, without warning or Court

27   approval, Defendants stopped housing and treating *Coleman* class members at CSH, and

28   *not a single class member has received care at CSH for the last 15 months.  Id.*

1    A similar trend has occurred with respect to the June 18, 2009 court order to fill 256

2    ICF beds at ASH.  *See* Order at 3-4, Dkt. No. 3613; *see also* Order at 6, Dkt. No. 3787,

3    Jan. 27, 2010 (denying Defendants' request for relief from the requirement to use all 256

4    ASH beds).  The most recent DMH bed utilization data reveals that 73 ICF beds

5    designated for *Coleman* class members at ASH now sit vacant.  *See* Declaration of Lisa

6    Ells in Support of Pls.' Brief on Evid. Hr'g Re: Order to Show Cause Why Empty DMH

7    Beds Cannot Be Filled with CDCR Inmates and in Support of Additional Relief ("Ells

8    Decl.") Ex. B.  These beds are empty in direct violation of the Court's orders, and despite a

9    still-massive ICF wait list that likely significantly underrepresents the actual current need

10   for such inpatient beds among class members.

11   On March 31, 2009, the Court ordered the Mental Health Assessment and Referral

12   Project (MHARP), to identify class members in need of DMH inpatient care who had not

13   been properly identified and referred.  Order ¶ 7, Dkt. No. 3556.  The MHARP, conducted

14   under the Special Master's supervision, resulted in the DMH referral of nearly 1,000

15   prisoners who had not previously been identified as needing inpatient care.  Special Master

16   Report at 47.  With class members' need for inpatient hospitalization more accurately

17   assessed, the wait list for ICF level of care skyrocketed from 149 prisoners in March 2009

18   to approximately 575 by the time the MHARP was completed in March 2010.  *Id.* at 4.

19   On March 31, 2010, the Court directed Defendants to "forthwith direct their

20   attention to solving the ongoing, and growing, problem" of access to inpatient care, noting

21   the approximately 574 class members on the ICF wait list and as many as 97 class

22   members on the APP wait list.  Order at 2-3, Dkt. No. 3831.  The Court ordered

23   Defendants to develop a plan to "reduce or eliminate the wait lists for inpatient care and, in

24   the interim, to better serve the treatment needs of Coleman class members placed on such

25   lists."  *Id.* at 3.  After some delay, Defendants submitted Defendants' Plan Re:

26   Intermediate Care Facility and Acute Inpatient Waitlists (hereinafter, the "Defs.' DMH

27   Plan") to the Court on November 24, 2010.  Dkt. No. 3962.  On February 25, 2011,

28   Plaintiffs submitted their objections to Defendants' DMH Plan, Dkt. No. 3987, to which

[534603-11]

4

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1  Defendants responded on March 18, 2011, Dkt. No. 3994.  On April 27, 2011, the Court

2  directed the Special Master to file a report within 45 days "on the adequacy of defendants'

3  plan and whether, in light of plaintiffs' objections, any modification(s) thereto should be

4  required."  Order at 2, Dkt. No. 4004.

5       On June 13, 2011, the Special Master filed his Report on Defendants' Plan Re:

6  Intermediate Care Facility and Acute Inpatient Wait Lists (hereinafter, the "Special Master

7  Report"), Dkt. No. 4020, in which the Special Master recommended that the Court order

8  the following:

9       1.  That defendants' Plan Re:  Intermediate Care Facility and
         Acute Inpatient Wait List be approved.  All parts of the plan
10       should be implemented immediately with the condition that no
         inmates who are accepted and placed in the EECP [Extended
11       Enhanced Outpatient Program Care Plan] shall be removed
         from the wait list.
12
         2.  That the special master should be ordered to monitor and
13       conduct a review of the EECP, including but not limited to
         staffing.  The special master should be ordered to report to the
14       court either in his regular monitoring report or in a special
         report, whether inmates transferred to the EECP should be
15       removed from the wait list.

16       3.  The Court should set this matter for an evidentiary hearing
         for defendants to show cause why the 50 beds at Coalinga State
17       Hospital designated for *Coleman* class members, as well as any
         other vacant beds at the facility, cannot be filled with high-
18       custody CDCR inmates.

19       4.  The defendants should be ordered to conduct a further
         assessment to determine whether there are unmet needs for
20       inpatient care among the plaintiff class.  The assessment should
         be modeled after MHARP which was conducted in 2009, and
21       only at the original twelve identified male institutions and two
         female institutions and under the guidance of the special
22       master.  As part of this process, the special master should also
         be directed to monitor the continued implementation and
23       sustainability of defendants' policies and practices regarding
         referral and transfer of *Coleman* class members for inpatient
24       care.  The special master should be ordered to report to the
         court on defendants' identification and referral process either
25       in his regular monitoring report or in a special report.

26  Special Master Report at 54.

27       The parties filed responses to the Special Master Report and to the

28  recommendations contained therein on July 1, 2011.  Plaintiffs requested the Court adopt

[534603-11]

1  the Special Master's recommendations and further order Defendants to: (1) show cause

2  why vacant beds at both CSH and ASH cannot be filled with higher-custody male CDCR

3  prisoners; and (2) end their policy of denying necessary inpatient psychiatric

4  hospitalization to female *Coleman* class members based on artificial and irrational

5  custody-related barriers, or order Defendants to show cause why beds at Patton State

6  Hospital (PSH) cannot be filled with higher-custody female CDCR prisoners, including

7  those women that have been excluded in recent months. Dkt. No. 4034. Defendants

8  objected to all four of the Special Master's recommendations, and further noted that

9  Defendants were withdrawing the EECP, their leading clinical approach to address the

10  inpatient wait lists. Dkt. No. 4035.

11      On July 22, 2011, the Court issued an order adopting the Special Master's second,

12  third, and fourth recommendations. Dkt. No. 4045. The Court set an evidentiary hearing

13  for August 17, 2011, at which Defendants were ordered to show cause why the 50 beds at

14  Coalinga State Hospital designated for *Coleman* class members, as well as any other

15  vacant beds at the facility, cannot be filled with high-custody CDCR inmates. *Id.* The

16  Court ordered that it also would take evidence as to whether that inpatient needs

17  assessment described in Defendants' objections was appropriate to adequately identify

18  *Coleman* class members in need of inpatient care who should have been but were not

19  identified through Defendants' DMH referral process. *Id.*

20      The Court further directed Defendants to inform the Court whether the EECP would

21  continue. *Id.* On August 4, 2011, Defendants submitted a nonsensical response riddled

22  with contradictory statements and qualifiers, and providing no coherent answer to the

23  Court's inquiry as to the status of the EECP. Defs.' Resp. to Court's July 22, 2011 Order

24  Re: EECP at 1, Dkt. No. 4053.

25      As of July 29, 2011, the Salinas Valley Psychiatric Program (SVPP) ICF wait list

26  stood at 171. Fischer Decl. Ex. A. Meanwhile, Defendants have reported to the Court that

27  they are in the process of reviewing 829 of 2,083 class members they have identified as

28  meeting criteria for DMH referral but who have not been referred. *See* Defs.' Request to

[534603-11]

6

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1    Vacate Evid. Hr'g at 7-8, Dkt. No. 4054, Aug. 9, 2011.

2                              **PLAINTIFFS' EVIDENCE**

3           Plaintiffs herein submit their brief in support of an order requiring Defendants to

4    comply with existing Court orders and to promptly utilize all open and available DMH

5    beds, as necessary to provide class members with timely access to essential inpatient

6    psychiatric hospitalization.  Plaintiffs rely on evidence already submitted to the Court and

7    part of the case record, as well as documents and data recently provided by Defendants,

8    which are submitted herewith to the Court.  Plaintiffs further rely on the expert reports of

9    their security expert, Joseph L. McGrath, and psychiatric expert, Dr. Pablo Stewart.

10          **Joseph L. McGrath** has more than 30 years of experience working for and with

11   California state corrections, including as a Correctional Counselor at California Medical

12   Facility (CMF), as a CDCR headquarters employee, and as Associate Warden, Chief

13   Deputy Warden, and ultimately Warden of Pelican Bay State Bay Prison, a maximum

14   security CDCR institution designed to house some of California's most serious criminal

15   offenders.

16          **Dr. Pablo Stewart** is a licensed physician, with a specialty in clinical and forensic

17   psychiatry.  Dr. Stewart completed two expert reports in the three-judge court proceedings

18   regarding prison overcrowding, and has previously provided expert testimony in this

19   litigation and in *Plata v. Schwarzenegger*, Case No. C01-1351 (N.D. Cal.).

20          Plaintiffs' experts declarations do not contain information or data subject to the

21   Protective Order in this case, and are filed as part of the public record.  To the extent

22   Plaintiffs' experts reference or rely upon sensitive information or data subject to the

23   Protective Order, such materials, including class member names and identifying

24   information, are coded and provided in the Declaration of Lisa Ells, which is filed herewith

25   under seal.

26          The evidence and argument submitted herein shall be supplemented as appropriate,

27   including at the evidentiary hearing set for August 17, 2011.

28

**ARGUMENT**

The evidence presented here and in the record supports an order enforcing this Court's previous orders to fill *Coleman*-designated beds at CSH and ASH, as well as an order to promptly make use of other open and available DMH inpatient beds necessary to meet class members' currently unmet needs for inpatient psychiatric hospitalization. The failure to address the massive DMH wait lists and to provide timely access to inpatient care has caused—and continues to cause—serious, irreparable, and deadly harms to class members. The record demonstrates that Defendants can, and must, use all available DMH beds to safely house and appropriately treat mentally ill prisoners requiring hospitalization. CSH, which has not housed a *Coleman* class member for 15 months, has the ability to provide effective security to admit and treat higher-custody class members. Defendants' current system, including their use of blanket exclusionary criteria, is serving only to exacerbate the unconstitutional denial of timely admission into open DMH beds and to prevent hundreds of class members from accessing desperately needed care.

Plaintiffs seek injunctive relief for this deplorable situation that is daily putting lives at risk. Simply put, Defendants must utilize all available beds to meet the current emergency need for inpatient hospitalization among class members. Defendants must be required to eliminate inappropriate exclusionary criteria and other artificial barriers to filling open DMH beds, to use current, individualized, and meaningful assessments of class members' security needs to facilitate admissions into now-empty beds, and to take necessary steps to effectively manage their system of providing inpatient care.

I.    **DEFENDANTS' FAILURE TO PLACE MENTALLY ILL PRISONERS REQUIRING IMMEDIATE INPATIENT CARE IS A SERIOUS CONSTITUTIONAL VIOLATION CAUSING SERIOUS, IRREPARABLE, AND LIFE-THREATENING HARM TO CLASS MEMBERS**

Under the Eighth Amendment, there is "no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart." *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977); *accord Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979); *Cabrales v. Cty. of Los Angeles*, 864 F.2d 1454,

1461 (9th Cir. 1988).  The Special Master has recognized that there is no legitimate basis

for denying essential treatment in a hospital to mentally ill prisoners while equally

essential treatment is customarily provided to medically ill prisoners:

> Inmates in need of medical care are routinely treated at
> community hospitals regardless of their security classification.
> Seriously mentally ill inmates should be accorded the same
> prompt access to mental health treatment as inmates who
> receive prompt emergency medical treatment.

Special Master Report at 53-54.

The ongoing failure to use *open and available DMH hospital beds* to provide

necessary and timely psychiatric treatment to class members has long been recognized as

causing egregious and inexcusable harms, and those harms continue to this day.  They

include:  (1) the horrific and likely preventable deaths of mentally ill prisoners who, denied

timely and clinically necessary inpatient hospitalization, commit suicide; (2) the needless

and irreparable harms suffered by acutely ill class members who further decompensate

while awaiting an inpatient bed; and (3) a domino effect in which prisoners who, while

languishing on DMH wait lists, require placement in other scarce CDCR mental health

treatment beds (including Mental Health Crisis Beds (MHCBs)), thus delaying or

preventing necessary care for other mentally ill prisoners.

First, Defendants' custody-related exclusions and other artificial barriers have

caused, and continue to cause, horrific and likely preventable suicides of prisoners denied

timely, clinically necessary care.  The *lethal harm* suffered by class members denied

timely inpatient care has been apparent for several years.  *See, e.g.*, Declaration of Pablo

Stewart in Support of Pls.' Brief on Evid. Hr'g Re: Order to Show Cause Why Empty

DMH Beds Cannot Be Filled with CDCR Inmates and in Support of Additional Relief

("Stewart Decl.") ¶¶ 1-170; *Coleman v. Schwarzenegger*, 2009 U.S. Dist. LEXIS 67943, at

*202 (E.D. Cal. Aug. 4, 2009) (placement in inappropriate levels of mental health care

considered among "'major contributing factors' to foreseeable and preventable suicides"

among mentally ill prisoners); Special Master's 2004 Suicide Report at 6 ("During the

year, a significant number of inmates who were referred or should have been referred to

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1   higher levels of care, including DMH, were not considered for referral, were not referred,

2   had their referral cancelled or were waiting transfer pursuant to a referral when they

3   died.").

4           Defendants' deliberate indifference to literally hundreds of seriously mentally ill

5   men and women in immediate need of inpatient psychiatric hospitalization continues to

6   cause unnecessary and avoidable pain, suffering, and death.  That these deaths occur at a

7   time when there are literally hundreds of empty licensed inpatient psychiatric beds in

8   highly secure state psychiatric mental hospitals owned and operated by Defendants is

9   indefensible.  This Court has previously found that two suicides committed by male

10  prisoners, in February and April 2010, respectively, were caused by delayed access to

11  inpatient psychiatric hospitalization and resulting inappropriate housing in administrative

12  segregation.  *See* Order at 3, Dkt. No. 3945, Oct. 22, 2010; *see also* Stewart Decl. ¶¶ 28-42

13  (Class Members B & C).  Plaintiffs' expert, Dr. Stewart, has identified at least eight more

14  suicides of EOP prisoners since 2009 that illustrate not only the broken nature of CDCR's

15  DMH referral process—even after the Court-ordered MHARP—but also the continuing

16  reality that class members not provided timely access to clinically indicated inpatient

17  hospitalization are at serious and urgent risk of suicide.  Stewart Decl. ¶¶ 55-116

18  (identifying eight suicides committed by EOP prisoners (Class Members D-K) who should

19  have been, but never were, considered or referred for inpatient care).  In short, EOP

20  prisoners meeting the criteria for DMH referral consideration, and almost certainly

21  requiring psychiatric DMH hospitalization, are not being considered or timely referred,

22  with deadly consequences.  *Id.*; *see also* Part VII, *infra*.  With a wait list of several hundred

23  patients, DMH referrals for several mentally ill men who have committed suicide would

24  likely have been futile – that is, these class members would *not* have been admitted to an

25  ICF bed prior to the date of their death even if they had been timely referred for DMH

26  treatment.  Stewart Decl. ¶¶ 61, 71.  As such, clinicians throughout the system today are

27  not bothering to refer prisoners to DMH who need inpatient care, thereby further obscuring

28  the real level of demand for such beds in the system today.  *Id.* ¶ 168; Declaration of

[534603-11]

10
PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

Joseph L. McGrath in Support of Pls.' Brief on Evid. Hr'g Re: Order to Show Cause Why Empty DMH Beds Cannot Be Filled with CDCR Inmates and in Support of Additional Relief ("McGrath Decl.") ¶ 97.

Second, the denial of timely inpatient hospitalization has a serious, and often irreparable, impact on the health and well-being of class members made to wait for months on end for the treatment they need.  Such delays and denials make seriously mentally ill prisoners even sicker, which means it takes longer to stabilize and treat them if and when they finally get to a hospital bed.  Stewart Decl. ¶ 16.  The harm caused by delays in treatment can be irreversible, including increased susceptibility to other mental disease and a worse long-term prognosis.  Id. ¶ 20.  In other words, a mentally ill class member ends up with a more severe form of illness than he would have if the treatment had been initiated in a timely manner, and may never recover from such deterioration.  Id.

Even if class members languishing on the DMH wait lists do not commit suicide, they are at increased risk of significant and irreparable harm through serious suicide attempts or serious self-injurious behaviors occurring in lower level-of-care placements.  See, e.g., id. ¶¶ 24-27 (Class Member A suffered serious incidents of self-injurious behavior prior to admission to an APP bed in December 2010, was referred for ICF care but sent to outpatient EOP program due to being 239th on ICF waitlist, and subsequently engaged in further serious self-injurious behavior requiring crisis bed care, all while still awaiting ICF admission).  These harms are serious and lasting, and they are preventable through the provision of timely care.

Third, the delayed access to inpatient psychiatric hospitalization has a frightening domino effect in which class members languishing on DMH wait lists clog other precious mental health beds.  All of the higher levels of care in CDCR's system—EOP, MHCB, ICF and APP—have become backed up, as patients are stuck in other clinically inappropriate mental health beds, which are themselves a precious resource in the system, and then remaining longer in the higher levels of care once they reach them.  Stewart Decl. ¶¶ 15-23.  For example, acute MHCB units at CDCR institutions are filled with men

1    requiring and awaiting inpatient hospitalization; these men often stay in MHCBs far

2    beyond the ten days those beds are intended to treat patients in crisis.  As a result, other

3    class members who require licensed MHCB level of care for short term psychiatric

4    emergencies are housed instead in inappropriate temporary "alternative" units, including

5    "ZZ" cells, administrative segregation, and even holding cages—harsh housing conditions

6    that further exacerbate mental illnesses and strain the system's limited resources.  *Id.* ¶ 17.

7          The situation reported by California State Prison-Los Angeles County (LAC) during

8    the Special Master's recent 24th round tour from July 25-28, 2011 illustrates this serious

9    problem.  For the six-month period between December 1, 2010 and May 31, 2011, LAC

10   reported that almost half of the admissions to its MHCB unit (56 of 113 admissions) lasted

11   longer than the 10 days for which MHCB units are designed to treat people.  Almost half

12   of those extended stays (46%) were caused by prisoners remaining in the MHCB due to a

13   "DMH referral awaiting a bed."  Ells Decl. Ex. A at 19.  While DMH-referred prisoners

14   filled precious crisis beds, 128 other prisoners on suicide watch were forced into

15   "alternative housing" while waiting for a properly licensed and staffed crisis bed to

16   become available.  Five men remained in harsh and punitive alternative housing settings on

17   suicide watch for more than three days, including one man who remained there for eight

18   days because no MHCB was available.  *Id.*  Shortages in inpatient DMH beds create

19   backlogs in higher levels of care that then have harmful ripple effects throughout the

20   system, affecting many more class members than just the hundreds on the inpatient wait

21   lists, as well as prison staff and other prisoners.  Stewart Decl. ¶¶ 19.

22   **II.**   **CSH HAS THE ABILITY TO SAFELY HOUSE AND APPROPRIATELY
     TREAT MENTALLY ILL PRISONERS, INCLUDING HIGHER-CUSTODY**

23   **PRISONERS WHO ARE AT SVPP OR ON THE SVPP ICF WAIT LIST**

24         CSH is a maximum security facility with the ability to safely house and

25   appropriately treat seriously mentally ill class members.  While the evidence demonstrates

26   that Defendants can begin admitting class members in CSH beds without any further

27   security measures, there are also practical and readily available means for Defendants to

28   address any perceived security inadequacies, as through the addition of staff or minor

[534603-11]

12

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

enhancement of operational procedures.  McGrath Dec. ¶¶ 32-35.

Plaintiffs' security expert, Joseph L. McGrath, based on his recent tour of Coalinga State Hospital, discussions with CDCR and DMH custody and security staff, and reviews of central files and DMH records of class members who have been referred for inpatient care and rejected from lower-custody DMH beds, has concluded that CSH can and should safely house and appropriately treat a range of CDCR prisoners, including high-custody prisoners, in need of inpatient hospitalization.  *Id.* ¶¶ 24, 35.  He further concluded that no modifications to CSH's physical plant are required to provide necessary security and begin admitting class members.  *Id.* ¶ 41.

CSH is a highly secure facility.  Defendants themselves tout the fact that CSH, like ASH, is a "maximum-security" forensic hospital with a secure perimeter and a "state-of-the-art" security system.  *Id.* ¶ 14.  First, CSH's <u>internal security</u> is provided through a state-of-the-art system that, in many ways, is superior to what is provided inside prisons, given the facility's "*additional* internal security overlay that requires an ongoing staff focus on surveillance, containment, [and] clinical supervision."  *Id.* ¶¶ 19-21 (quoting CSH Security Administration Directive).  The facility is richly staffed and has a comprehensive security system that would ensure the safe placement of class members, including higher-custody class members.  *Id.* ¶¶ 28, 33.  CSH has successfully housed and treated *Coleman* class members using enhanced custody staffing and modification to its policies and procedures as recently as April 2010.  Fischer Decl. ¶ 31.  CSH can easily do so again, and begin accepting higher-custody class members now.  McGrath Decl. ¶¶ 24, 34-35.

Second, CSH's <u>perimeter security</u> is extremely well secured by state-of-the-art security systems, as well as by CDCR officers who are stationed at the hospital's entrance and are in charge of guarding the entire perimeter.  *Id.* ¶¶ 36-41.  In fact, Plaintiffs' expert found that the perimeter security at CDCR prisons would benefit from implementation of some of the advanced security measures now in place at CSH.  *Id.* ¶ 40.  Since opening in 2005, there has not been a single escape attempt at CSH.  *Id.*  Plaintiffs' expert concluded that CSH's perimeter is well secured by the physical plant and CDCR patrols, and—if

13

1   Defendants have concerns regarding the placement of higher-custody mentally ill prisoners

2   at the hospital—can readily augment staffing and modify perimeter operations to ensure

3   adequate security. *Id.* ¶ 38.

4         Defendants' argument that CSH simply cannot house *any* CDCR prisoners

5   requiring hospitalization is undermined by the fact that CSH *did house* them from 2006 to

6   April 2010. Fischer Decl. ¶ 31. Defendants at no time provided to Plaintiffs or filed with

7   the Court any reports of security problems involving class members during this time

8   period. During Plaintiffs' recent tour at CSH, several CSH personnel who worked closely

9   with *Coleman* class members reported that, with some adjustments to staffing and

10  operational procedures, it was "no issue" and "not a problem" to house and treat these

11  patients. McGrath Decl. ¶¶ 22-24.

12        Notably, Defendants have admitted that CSH is a *higher security facility* than ASH,

13  which has been housing high-custody class members in need of inpatient psychiatric

14  hospitalization for more than a decade. *See* Special Master Interim Report on DMH

15  Inpatient Care at 11, Dkt. No. 1143, Mar. 31, 2000 (finding that 36% of the CDCR inmate-

16  patients at ASH were Level IV prisoners). In testimony before this Court, DMH Deputy

17  Director John Rodriguez confirmed that CSH would be among the "highest security

18  facilities" among DMH hospitals, with its robust physical plant security measures and

19  CDCR patrols. *See* Dkt. No. 1790-3 at 18.

20        Nor should Defendants be permitted to rely upon the 2006 Coalinga Feasibility

21  Study, Dkt. Nos. 2014 & 2092, as a basis for excluding class members, including higher-

22  custody prisoners, who require psychiatric hospitalization. Defendants continue to cite the

23  Coalinga Feasibility Study for inaccurate information about the security capacity at CSH,

24  including the lack of "internal armed coverage" and "housing units with cells." Defs.'

25  Resp. to Pls.' Objs. to Defs.' Plan at 18, Dkt. No. 3994. The recent CSH tour made clear

26  that both of these factual claims are absolutely false: CSH security staff carry the same

27  incident response equipment that CDCR officers carry in prison, McGrath Decl. ¶ 19, and

28  CSH has the capacity to provide celled housing as needed. *Id.* ¶¶ 26, 30.

14

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1    The Coalinga Feasibility Study itself contains several improper assumptions about

2 the security needs of higher-custody class members if placed at CSH.  McGrath Decl.

3 ¶¶ 42-44.  Defendants' study was fundamentally misguided in its attempt to convince the

4 reader that CSH cannot safely house high-custody class members in the absence of a $29.8

5 million, multi-year construction project.

6    The reality is that CSH has the physical plant, staffing and operational procedures in

7 place to safely house and appropriately treat high-custody CDCR prisoners now, and

8 Defendants have a number of practical and attainable options to provide additional

9 security, including increased staffing or operational procedural enhancements, if they deem

10 such measures necessary.

11 **III.    DEFENDANTS' BLANKET EXCLUSIONARY CRITERIA AND CASE-BY-CASE EVALUATION PROCESS ARE INAPPROPRIATE AND**

12 **UNREASONABLE, AND IMPROPERLY DEPRIVE PATIENTS IN NEED OF INPATIENT CARE FROM ACCESSING THAT CARE,**

13 **PARTICULARLY GIVEN THE CURRENT EMERGENCY SITUATION**

14    Defendants currently categorically exclude whole swaths of prisoners needing

15 inpatient care based on custodial factors.  Even for those prisoners who are not

16 categorically excluded, Defendants apply a "case-by-case review" process to hundreds of

17 prisoners that, in many cases, produces the same result: unconstitutional denials of

18 inpatient psychiatric hospitalization to hundreds of prisoners needing such care.  A huge

19 proportion of these blanket and case-by-case exclusions are inappropriate and

20 unreasonable, and improperly deprive patients in desperate need of inpatient care from

21 timely accessing that care, given the emergency shortage of inpatient beds.  This is

22 unacceptable.  Hundreds of DMH inpatient hospital beds, including beds designated for

23 *Coleman* class members, sit open and available every day of the year.

24    The record makes clear that class members who can be safely treated in lower-

25 custody DMH beds are being denied such placement.  Class members must be afforded a

26 fair and individualized assessment of their security needs, and placed in open and available

27 lower-custody beds as soon as possible.  At a minimum, class members with recent

28 behaviors indicating a true safety or security risk for lower-custody DMH facilities should

1   be timely admitted to SVPP of CMF/VPP higher-custody inpatient DMH units, where their

2   condition can be stabilized.  McGrath Decl. ¶¶ 49, 61, 78, 99; Stewart Decl. ¶¶ 143, 149.

3   Once they are stabilized with appropriate treatment and/or medication, they should be

4   transferred to a lower security inpatient facility—including CSH and ASH—opening up

5   precious higher security beds for other class members.  McGrath Decl. ¶ 61; Stewart Decl.

6   ¶ 149.  Defendants must ensure that all available beds are used to meet the current unmet

7   need for inpatient psychiatric hospitalization, and they must provide practical security

8   enhancements to provide safe and appropriate treatment as warranted.

9         **A.    The Custody-Based Criteria Used to Categorically Exclude Class
               Members from DMH Beds Create Artificial and Unjustifiable Barriers**
10              **to Timely Inpatient Care**

11        A close look at Defendants' blanket exclusionary criteria demonstrates their

12   unreasonableness, particularly at a time when so many men are languishing in

13   inappropriate placements while they wait for an inpatient hospital bed.[2]  As Plaintiffs'

14   security expert has concluded, none of these criteria should operate as a blanket exclusion

15   that prevents clinical and custody staff from determining, through an individualized and

16   meaningful assessment, whether a class member in need of inpatient care can be safely

17   housed and appropriately treated at lower-custody DMH facilities.  McGrath Decl. ¶¶ 50-

18   56.  Such blanket exclusions prevent appropriate consideration of highly relevant facts – in

19   particular, a patient's *current* safety and security risks, as well as DMH's ability to provide

20   necessary security for that patient.  *Id.*

21        For example, Defendants categorically exclude many class members from open

22   lower-custody DMH beds based on static factors, including a class member's prison term

23   or behavioral problems from years in the past.  Many of these class members, however,

---

24

25   [2] Defendants' DMH placement procedures make *no* mention of consideration for class
     members' placement at CSH, which is a higher-custody facility than ASH.  *See* Part II,
26   *supra*.  Plaintiffs focus on the ASH exclusionary criteria because, to the extent such criteria
     are improper for considering class members' placement at ASH, they are equally or more
27   improper for considering class members' placement at CSH.

28

[534603-11]

16

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1    have no recent threatening or assaultive behaviors, and should be meaningfully considered

2    for lower-custody DMH hospital placement.  *See, e.g.*, McGrath Decl. ¶¶ 57-59 (Inmate-

3    Patient Q  forced to wait on the SVPP wait list for four months due to automatic exclusion

4    based on non-violent behavior that occurred 18 months prior to referral, despite current

5    findings that he posed no risk of assaultive or aggressive behaviors).  It is unreasonable

6    and inappropriate to exclude entire categories of class members without regard to their

7    actual current behaviors.  If Ralph Coleman, the lead plaintiff in this case, required

8    inpatient hospitalization, he would be automatically and permanently excluded from CSH

9    and ASH based on his LWOP sentence, and thus would be made to languish on the SVPP

10   ICF wait list.  This is in spite of the reality that Mr. Coleman has been an exemplary

11   prisoner since arriving in CDCR custody in November 1979, has positively programmed

12   throughout his incarceration, and has received zero serious disciplinary reports.  His case

13   demonstrates that Defendants' LWOP blanket exclusion is unfounded.  *Id.* ¶ 54.

14          Likewise, Defendants invoke multiple blanket exclusionary criteria on the grounds

15   that certain case factors involve higher escape risks, with no regard for whether an

16   individual class member has any history of escape or there is any basis to believe an escape

17   attempt may occur.  McGrath Decl. ¶¶ 53-54.  These kind of broad generalizations are

18   unreasonable.  That is particularly true when discussing admission to a highly secure

19   facility like CSH, which has highly advanced perimeter security.  Defendants have no

20   legitimate basis for categorically excluding these seriously mentally ill men without any

21   individualized and meaningful assessment to determine if they can be safely housed at

22   CSH or ASH.  These same categories of prisoners are routinely provided medical care in

23   community facilities that are far less secure than CSH or ASH.

24          **B.    Even Class Members Not Automatically Excluded Are Facing Artificial
               and Unjustifiable Barriers to Admission into Open and Available
25             Lower-Custody Inpatient Beds**

26          Even for class members not meeting the blanket exclusionary criteria, Defendants

27   are imposing additional artificial and unjustifiable barriers to lower-custody DMH beds.

28   Plaintiffs' security expert has reviewed the records of class members who do not meet any

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1   of the exclusionary criteria but are nevertheless being excluded from open and available

2   CSH and ASH beds, instead languishing on the inpatient wait list or unnecessarily

3   occupying a precious higher-custody inpatient bed at SVPP.  Many of these men have only

4   recently been treated at CSH or ASH, without incident, and there is no legitimate reason

5   for excluding them from such placements now.  *See, e.g.*, McGrath Decl. ¶¶ 92-95

6   (Inmate-Patient R treated at ASH in 2006 and twice recommended by CDCR staff for ASH

7   placement following ICF referral, in May 2010 and October 2010, yet ultimately placed in

8   precious high-custody SVPP ICF bed); *id.* ¶¶ 57-59 (Inmate-Patient O treated at ASH and

9   CSH in 2008 and twice recommended by CDCR staff for ASH placement following ICF

10  referral, in May 2010 and November 2010, yet ultimately placed in SVPP ICF bed);

11
12  **C.    Defendants' Response to this Court's Orders to Meaningfully Review Class Members for Placement into Lower-Custody DMH Beds Has Failed Miserably**

13      Despite repeated orders by this Court, Defendants have failed to engage in any kind

14  of *meaningful and consistent assessments* of class members to identify those that they may

15  be placed in a lower-custody DMH facility, including at CSH.  Most significantly,

16  Defendants have refused to even conduct individualized reviews for possible admission at

17  CSH and ASH for a substantial number of class members based on these blanket

18  exclusions.  *See* Decl. of Debbie Vorous in Support of Defs.' Resp. to Pls.' Objs. to Defs.'

19  Plan, Ex. 4, Dkt. No. 3994-1, Mar. 18, 2011 (noting Defendants' position that the

20  "established ICF Pilot Program [exclusionary] criteria and custody regulations must be

21  adhered to" despite court orders to reconsider such criteria).  Defendants have similarly

22  refused to take practical and sensible steps to enhance security at these lower-custody

23  DMH facilities, such as through enhanced staffing, operational procedures, or established

24  clinical interventions.  Hundreds of class members are suffering unnecessarily as a result.

25
26  **1.    Defendants' Review of Class Members on the SVPP ICF Wait List Has Been Useless Given Defendants' Stubborn Adherence to the Blanket Exclusionary Criteria**

27      Defendants' DMH Plan states that, beginning in January 2011, Defendants would

28  review the SVPP ICF wait list on a quarterly basis, using the same exclusionary criteria, to

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1  determine if class members on the wait list could be placement in a lower-custody DMH

2  inpatient facility.  Defs.' DMH Plan at 16-17.  In January 2011, Defendants looked at the

3  308 men on the SVPP ICF wait list for possible placement in a lower-custody DMH

4  inpatient facility.  Due to the blanket exclusionary criteria, only 34 of those 308 men were

5  given a case-by-case evaluation, of which 5 were approved for placement at ASH, 2 were

6  approved for placement in VPP unit dorms, and 0 were approved for placement at CSH.

7  Fischer Decl. Ex. X.[3]  In April 2011, Defendants looked at the 209 men on the SVPP ICF

8  wait list for possible placement in a lower-custody DMH inpatient facility.  Once again,

9  due to the blanket exclusionary criteria, only 25 of those 209 men were given a case-by-

10  case evaluation, of which just 4 were approved for placement at ASH, 6 were approved for

11  VPP unit dorms, and 0 were approved for placement at CSH.  *Id.* Ex. Y.  For a wait list of

12  several hundred mentally ill prisoners in critical need of immediate inpatient care, these

13  outcomes are woefully inadequate.  A review every *three months* is grossly insufficient,

14  McGrath Decl. ¶ 99, and Defendants' continued adherence to the same blanket

15  exclusionary criteria makes such reviews, in any event, almost completely useless.

16       2.    **Defendants' Review of Class Members Already Housed at SVPP Has Been a Total Failure as a Result of Defendants' Stubborn Adherence to the Blanket Exclusionary Criteria and Refusal to Consider Each Patient's Stabilization and *Current* Condition**

17

18

19       The Court has also directed Defendants to conduct a review to determine whether

20  class members already housed at higher-custody DMH facilities can be transferred to a

21  lower-custody ICF facility.  Order at 4, Dkt. No. 3929, Oct. 5, 2010.  Defendants' response

22  has been a complete and utter failure.  Defendants again refused to reconsider any of the

23  existing exclusionary criteria that are creating unreasonable and artificial barriers to

24  inpatient treatment, with predictable—and unacceptable—results: only *two class members*

25  _____

26

27  [3] In contrast, 36 class members who were waiting to be placed in a psychiatric hospital bed came off the wait list because they were discharged on parole.  *Id.*

28

1  were even found eligible for any kind of case-by-case review, and *not a single class*

2  *member* was permitted to transfer to a lower-custody DMH facility, where beds continue to

3  be readily available.  *See* Declaration of Aaron J. Fischer in Support of Pls.' Objs. to Defs.'

4  Plan to Address Waitlists for Inpatient Care & to Reduce Harms Inflicted on Class

5  Members on Waitlists, Ex. D, Dkt. No. 3989, Feb. 25, 2011 (Report on Outcome of

6  Evaluation of Inmates in Level IV DMH Inpatient Hospital Facilities for Transfer to

7  Another ICF Facility, Dec. 7, 2010).  That is, Defendants refused even to complete a

8  meaningful review of hundreds of class members in a higher-custody DMH bed for

9  possible transfer to a lower-custody bed, which would make room for other men on the

10  wait list.

11      In their March 16, 2011 supplement to their December 7, 2010 report, Defendants

12  clarified their plan to evaluate SVPP patients for possible placement in the lower-custody

13  units at ASH, CSH, and VPP.  *See* Decl. of Debbie Vorous in Support of Defs.' Resp. to

14  Pls.' Objs. to Defs.' Plan, Ex. 4, Dkt. No. 3994-1.  Disappointingly but not surprisingly,

15  Defendants admitted that their review process is "not expected to yield a high number of

16  inmate-patients that would be eligible for placement in ASH, CSH, or the VPP dorms."  *Id.*

17      Defendants' refusal to consider hundreds of class members currently housed at

18  SVPP—including scores of individuals who have stabilized and are programming

19  successfully in SVPP's dorm units—is inexcusable.  In his limited review of just a handful

20  of class members currently housed at SVPP, Plaintiffs' security expert has identified

21  several individuals who are stabilized such that they can and should be immediately

22  transferred to CSH or ASH, opening up an SVPP bed for other mentally ill prisoners

23  desperately awaiting inpatient care.  McGrath Decl. ¶¶ 57-59 (Inmate-Patient O, who

24  transferred to SVPP ICF program on January 26, 2011 from CSATF Level II EOP, has

25  programmed successfully, reaching the final level of treatment programming within 60

26  days of arrival, can and should be transferred to ASH or CSH); *id.* ¶¶ 81-83 (Inmate-

27  Patient P, who transferred to SVPP ICF program on December 27, 2010 from CSATF

28  Level II EOP, has programmed successfully, reaching the final level of treatment

[534603-11]

20

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1   programming, can and should be transferred to ASH or CSH); *id.* ¶¶ 84-91 (Inmate-Patient

2   Q, who transferred to SVPP ICF program on March 15, 2011 from CSATF Level II EOP,

3   has programmed successfully, reaching the final level of treatment programming in less

4   than 60 days, can and should be transferred to ASH or CSH); *id.* ¶¶ 92-95 (Inmate-Patient

5   R, who transferred to SVPP ICF program on December 27, 2010 from CSATF Level II

6   EOP, was attending all groups and participating fully by his 30-day review yet remains at

7   SVPP, can and should be transferred to ASH or CSH).

8           What is clear from the dismal results of Defendants' efforts is that Defendants are

9   not serious about filling open and available DMH beds with class members, which remains

10  the *only* means of timely addressing the unconscionable denials of access to inpatient

11  psychiatric hospitalization.  The current emergency situation requires prompt and effective

12  action, including the elimination of blanket exclusionary criteria and the consistent,

13  meaningful, and individualized evaluation of class members' *current* behaviors and

14  security needs to ensure utilization of all available DMH beds.

15  **IV.  DEFENDANTS HAVE MADE A BAD SITUATION WORSE BY
         ABANDONING THE EXTENDED ENHANCED OUTPATIENT PROGRAM**
16  **CARE PLAN, A PRIMARY COMPONENT OF THEIR PLAN TO ADDRESS
         THE WAIT LISTS, AND BY SOWING CONFUSION WITHIN**
17  **DEFENDANTS' MENTAL HEALTH SYSTEM**

18          Defendants' sudden decision to abandon the Extended Enhanced Outpatient

19  Program Care Plan (EECP), the leading approach in their plan to address the inpatient wait

20  lists, demonstrates Defendants' lack of commitment to address the deadly serious problem

21  of delayed access to urgently needed hospital beds.  After Plaintiffs expressed their

22  concerns about the program—including staffing, criteria for program participation, and the

23  removal of class members referred for inpatient care from the wait list based on EECP

24  placement rather than actual inpatient treatment need—Defendants provided further

25  information about the EECP, and began training clinical staff on its implementation.  The

26  Special Master identified some of the weaknesses and uncertainties about the EECP,

27  including the lack of additional staffing and resources, as well as the fact that the program

28  may be "redundant" given its promise to do nothing more than provide services that EOP

21

1   prisoners should already be receiving.  *See* Special Master Report at 27-29, 34-36.  The

2   Special Master nonetheless endorsed EECP's immediate implementation, with the proviso

3   that class members placed in the EECP should not be automatically removed from the wait

4   list and that he monitor its implementation.  *Id.* at 54.  Plaintiffs have supported the Special

5   Master's recommendations.

6          In response, Defendants abruptly announced that they were "withdrawing the EECP

7   from Defendants' plan" in protest of the Special Master's recommendation that class

8   members placed in EECP yet still requiring DMH hospitalization not be removed from an

9   inpatient wait list.  Defendants acrimoniously state that such a requirement "defeats the

10  purpose of the EECP because it recommends against CDCR removing inmate-patients

11  from the SVPP waitlist who are provided EECP services.  Thus, absent the ability to use

12  the EECP to reduce the SVPP waitlist, the EECP should no longer be part of Defendants'

13  Plan."  Defs.' Resp. & Objs. to Special Master's Report at 4, Dkt. No. 4035.  Defendants'

14  objection—to the sensible suggestion that class members referred for inpatient

15  hospitalization remain on the wait list until they are either admitted into a hospital bed or

16  stabilized to the point they no longer clinically require inpatient care—speaks volumes of

17  their efforts to address class members' serious psychiatric needs.

18         The Court directed Defendants to clarify whether the EECP would continue, Dkt.

19  No. 4045.  Defendants informed the Court that it was "abandoning" EECP "as an approach

20  to reduce or eliminate the SVPP waitlist."  Defs.' Resp. to Court's July 22, 2011 Order Re:

21  EECP at 1, Dkt. No. 4053.  In the very next sentence, however, Defendants stated they still

22  plan to provide "EECP-type" services to some number of mentally ill prisoners at four

23  prisons.  *Id.* at 1, 2.  Defendants stated that they were committed to "concentrate and

24  expand EECP services," *id.* at 2-3, though at the same time asserting that expansion of

25  EECP had been "interrupted due to the realignment of the prison population under

26  Assembly Bill 109," *id.* at 3, but that, in any event, the Special Master should not specially

27  monitor the program.  *Id.*

28         Defendants' sudden, if equivocal, abandonment of the EECP, the primary clinical

[534603-11]

22

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1   component of their plan to address the inpatient wait lists, highlights the urgent need for

2   the Court to take prompt action to provide an effective remedy.  Moreover, Defendants'

3   obfuscation as to the existence and implementation of EECP within their mental health

4   treatment system has sowed confusion, with deadly consequences.  Plaintiffs' psychiatric

5   expert, Dr. Stewart, has identified one recent suicide, in February 2011, in which a

6   seriously mentally ill class member was the subject of a bungled handoff from a DMH

7   facility to a newly opened EECP program, with inadequate EECP staffing and training

8   likely being a contributing factor to the class member's death.  Stewart Decl. ¶¶ 121-136

9   (Class Member L).[4]  The time for feckless measures to address the delays in inpatient care

10  is over; the need for a true remedy—placing seriously mentally ill class members in the

11  appropriate level of care—is required.

12  **V.    DEFENDANTS' LONG-TERM BED PLAN DOES NOTHING TO ADDRESS
        THE CURRENT EMERGENCY SITUATION AND HAS BEEN PLAGUED
13      BY DELAYS**

14          Defendants' continued reliance on their long-term bed plan to somehow address

15  today's serious constitutional harms is without merit.  By Defendants' own admission,

16  even with successful implementation of their DMH Plan and activation of all long-term

17  bed projects, the inpatient bed shortage would continue until *March 2014*.  *See* Defs.'

18  DMH Plan at 25.  What is more, Defendants' long-term bed plan is now even further

19  delayed, as Defendants' recent filing about the Stark construction project makes clear.  *See*

20  Dkt. No. 4054 at 9-11, Aug. 9, 2011 (Defendants' scheduled December 2013 activation of

21

22  [4] There further appears to be confusion as to where EECP services are and are not being
    provided.  Defendants assert in their August 4, 2011 filing that EECP services are being
23  provided in "some limited form" at four CDCR institutions: California Medical Facility,
    Mule Creek State Prison, California State Prison-Corcoran, and Salinas Valley State
24  Prison.  Defs.' Resp. to Court's July 22, 2011 Order Re: EECP at 3.  Just one week earlier,
    clinical staff at California State Prison-Los Angeles County reported to the Special Master
25  Team that certain class members at that prison were clustered into a single EOP unit and
    receiving EECP services.  *See* Ells Decl. Ex. A at 18.  Partial and uncoordinated
26  implementation of psychiatric treatment programming is no way to run a mental health
    program.
27

28

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1   Stark facility to treat 525 Enhanced Outpatient Program-General Population (EOP-GP), 50

2   Enhanced Outpatient Program-Administrative Segregation Unit (EOP-ASU), and 30

3   MHCB prisoners delayed indefinitely).  Activation delays continue to plague Court-

4   ordered construction projects, including: (1) an estimated 55-day delay to complete

5   activation of the California Men's Colony 50-bed MHCB unit, and (2) an estimated 57-day

6   delay to complete activation of the California Medical Facility 64-bed ICF unit.  *See* Defs.'

7   Update to Court re:  California Men's Colony 50-Bed MHCB Unit and California Medical

8   Facility 64-Bed Intermediate Care Facility, Dkt. No. 4024, June 16, 2011.

9          Under Defendants' best case scenario, there will remain a shortage of inpatient

10  psychiatric hospital beds for several more years.  The Special Master's recommendations

11  and the Order to Show Cause, meanwhile, appropriately address the here and now, asking

12  the critical question of whether Defendants, both CDCR and DMH, are maximizing the

13  use of their existing inpatient psychiatric resources and removing all possible obstacles to

14  assure that, in the current emergency, the denial and delay of inpatient psychiatric

15  hospitalization is minimized.  The evidence, unfortunately, is to the contrary.  There is

16  much more that can and must be done and there is no good reason that hundreds of

17  licensed and available DMH beds at CSH, ASH, and PSH should remain empty while

18  hundreds of patients who require that level of care are "accepted" but then denied access

19  for many months or more.

20  **VI.   THE COURT SHOULD USE ITS AUTHORITY UNDER THE PLRA TO**
    **ENFORCE ITS ORDERS TO FILL *COLEMAN*-DESIGNATED BEDS AT**
21  **CSH AND ASH, AND TO FURTHER ORDER DEFENDANTS TO FILL**
    **UNUSED AND AVAILABLE DMH BEDS WITH CLASS MEMBERS TO**
22  **MEET THE UNMET NEED FOR INPATIENT CARE**

23         Given the Court's repeated findings of serious and ongoing constitutional violations

24  regarding access to inpatient psychiatric hospitalization, Plaintiffs' seek an effective

25  remedy that satisfies the PLRA requirement that such relief be "narrowly drawn, extend[]

26  no further than necessary to correct the violation of the Federal  right, and [be] the least

27  intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. §

28  3626(a)(1)(A).

1    An order that requires Defendants to fill *open and available* inpatient DMH beds is

2 narrowly drawn.  The current wait time of several months for class members who

3 desperately need inpatient psychiatric hospitalization immediately is shocking,

4 unconscionable, and dangerous.  Stewart Decl. ¶¶ 15, 21.  As determined by the Special

5 Master and supported by the record, "inaccessibility to DMH facilities is a primary cause

6 of inmates lingering on the wait list," and "[i]t is inexcusable to have beds in DMH

7 facilities that remain empty month after month when hundreds of mentally ill inmates are

8 in need of inpatient treatment."  Special Master Report at 44.  Filling unused and available

9 DMH beds at CSH, and elsewhere in the DMH system, is essential to address the serious,

10 irreparable, and deadly harms now being inflicted on class members.  *See Coleman v.*

11 *Brown*, No. 10-17546, 2011 U.S. App. LEXIS 8391, at *3-4 (9th Cir. Apr. 22, 2011)

12 (finding that the record of denial of timely access to inpatient psychiatric hospitalization is

13 "more than sufficient to demonstrate that plaintiffs 'have suffered, or will imminently

14 suffer, actual harm'" to warrant emergency injunctive relief under the PLRA) (quoting

15 *Lewis v. Casey*, 518 U.S. 343, 349 (1996)).

16    The relief sought by Plaintiffs extends no further than necessary to remedy the

17 serious constitutional violations being inflicted on hundreds of class members.  As the

18 record in this case demonstrates, the inpatient wait lists effect the denial of timely access to

19 inpatient care, a violation of the Eighth Amendment.  These serious constitutional harms

20 will inevitably continue until, by Defendants' own estimate, at least March 2014 absent the

21 emergency relief now sought by Plaintiffs.  As the Special Master has stated, the "*only*

22 way to achieve *any meaningful reduction of the wait list* is by placing . . . inmates

23 [languishing on inpatient wait lists] into inpatient beds."  Special Master Report at 44

24 (emphasis added).

25    Prospective relief requiring Defendants to fill open and available inpatient beds

26 with class members in urgent need of inpatient psychiatric hospitalization is necessary,

27 and—given Defendants' record of failure to fill inpatient beds and provide necessary

28 inpatient treatment—such relief is the least restrictive means to remedy the constitutional

1  violations.  *See Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1071 (9th Cir. 2010)

2  ("Allowing defendants to develop policies and procedures to meet [their legal duties] is

3  precisely the type of process that the Supreme Court has indicated is appropriate for

4  devising a suitable remedial plan in a prison litigation case.").  This Court has repeatedly

5  relied on the State to come up with its own plans to address the severe inpatient bed

6  shortage.  *See Lewis v. Casey*, 518 U.S. 343, 361-63 (1996); *Bounds v. Smith*, 430 U.S.

7  817, 832-33 (1977).  The Court has directed Defendants to find ways to address the harms

8  caused by denied or delayed access to inpatient psychiatric hospitalization, including by

9  creating new beds, moving class members awaiting inpatient care into open beds, moving

10  stabilized class members in high-custody beds into lower-custody beds, and providing

11  more appropriate treatment for those class members on inpatient wait lists.  Defendants

12  have failed at every turn to meet their constitutional duties and to find ways to remedy the

13  constitutional violations suffered by seriously mentally ill prisoners.  *See, e.g.*, Order at 2-

14  3, Dkt. No. 3831, Mar. 31, 2009 (noting that Defendants have taken "an intractable

15  position with respect to the use of Atascadero State Hospital (ASH) and Coalinga State

16  Hospital (CSH) for any part of necessary solutions [to the delays in inpatient care]" and

17  finding that "[s]uch intransigence is not new to this litigation, but it must change"); Order

18  at 1-2, Dkt. No. 1855, June 28, 2006 ("DMH is failing to address specific court-ordered

19  remedies . . . to remedy the shortage of inpatient beds").

20        This Court has bent over backwards to provide a necessary remedy that "corrects

21  the violations of prisoners' rights with the minimal impact possible on defendants'

22  discretion over their policies and procedures."  *Armstrong*, 622 F.3d at 1071.  Defendants'

23  longstanding and continued failures to effectively address the wait lists that cause

24  unconstitutional delays in critical mental health treatment, and their apparent decision to

25  chip away at their own plan (by withdrawing the EECP) to address the problem,

26  demonstrate their inability and refusal to provide an effective remedy to this serious and

27  longstanding violation of hundreds of mentally ill prisoners' constitutional rights.  At this

28  stage, "the same vindication of federal rights" cannot be "achieved with less involvement

1    by the court in directing the details of defendants' operations." *Id.* at 1071; *see also*

2    *Feliciano v. Rullan*, 378 F.3d 42, 55 (1st Cir. 2004) (noting that defendants' "abject

3    failure" guides the inquiry regarding the appropriateness of relief where defendants had

4    been unable to "cure the constitutional infirmities plaguing the delivery of health care in

5    the correctional system" for more than two decades).

6          More than five years after the Director of DMH was added as a Defendant in this

7    case, and more than sixteen months after the Court directed Defendants to develop a plan

8    to reduce or eliminate the wait lists for inpatient care and to reduce the harms faced while

9    people linger on those lists, this Court must again act to protect the Eighth Amendment

10   rights of *Coleman* class members in desperate need of timely access to inpatient

11   hospitalization.

12         The Mental Health Services Delivery System (MHSDS) Program Guide

13   requirements were created to ensure timely placement of class members suffering serious

14   mental illness into treatment settings that mental health professionals have identified as

15   clinically necessary.  The Program Guide requires that class members in need of inpatient

16   hospitalization at the ICF level of care be transferred to and placed in an ICF bed within 30

17   days of referral.[5]  Program Guide 12-6-11.  There is no reason that, given the number of

18   open and available DMH beds, the Program Guide timeliness requirements for ICF care

19   cannot be met for class members who, under Defendants' current system, are made to wait

20   for months before receiving appropriate care.

21         ***Defendants cannot be permitted to continue use blanket exclusionary criteria and***

22

23   _____

24   [5] Referrals must be completed within five working days from the identification of the need
     for inpatient treatment if the inmate consents to transfer, and ten working days if a due
25   process hearing is required.  *See* Program Guide at 12-6-9.  DMH must review the referral
     packet within three working days and "immediately notify the referring institution . . . of
26   the decision to accept or reject."  *Id.* at 12-6-10.  For inmates accepted to DMH, transfer
     must take place within 30 days of referral, and inmates accepted to DMH must "be
27   transported to DMH within 72 hours of bed assignment."  *Id.* at 12-6-11.

28

[534603-11]

27

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1  ***other artificial barriers to preclude the timely inpatient hospitalization of class members.***

2  The presumption must be that DMH will accept and treat any patient in need of such

3  inpatient care. Defendants must conduct meaningful and consistent reviews of all class

4  members to ensure utilization of all available hospital beds, and implementing security

5  measures to protect staff and patients as warranted.

6      **A.    The Court Should Enforce Existing Orders to Fill All *Coleman*-
             Designated Beds at CSH and ASH**

7

8          This Court must enforce existing orders to fill DMH beds at CSH and ASH that

9  have long been designated for *Coleman* class members, *see* Order at 2, Dkt. No. 1800,

10  May 2, 2006 (ordering prompt activation of 50 ICF beds at CSH for *Coleman* class

11  members); Order at 3-4, Dkt. No. 3613, June 18, 2009 (ordering that Defendants fill 256

12  ICF beds at ASH with class members), yet sit empty without justification.

13          With respect to CSH, Defendants removed every single *Coleman* class member

14  from the facility in May 2010, after nearly four years of filling all or nearly all 50

15  *Coleman*-designated beds and without warning or leave of the Court. Not a single class

16  member has received treatment at CSH for the last 15 months. Fischer Decl. ¶ 31. Given

17  the Court's existing order, as well as Plaintiffs' evidence that CSH is ready and able to

18  house and treat *at least* 50 *Coleman* class members, this Court should enforce its order and

19  require Defendants to fill those beds forthwith.

20          The Court should take similar action with respect to the 256 ASH beds designated

21  for class members. The Court has provided Defendants substantial leeway in complying

22  with its orders on filling the ASH beds, including twice extending the deadline to reach full

23  census. Order, Dkt. No. 3720, Nov. 2, 2009; Order at 7, Dkt. No. 3787, Jan. 27, 2010.

24  The Court has at no point approved the emptying of any of these beds, and instead

25  confirmed that their use continues to be constitutionally required. Order at 6, Dkt. No.

26  3787, Jan. 27, 2010 (denying Defendants' request for relief from the requirement to use all

27  256 ASH beds based on the finding that "[g]iven the evident demand for inpatient care and

28  the continued drastic shortage of inpatient beds, *it is simply too early to consider*

[534603-11]

28

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1  *decreasing the number of beds available for* Coleman *class members at ASH*.") (emphasis

2  added).  Yet the number of class members at ASH is decreasing at a disturbing rate.  *See*

3  Fischer Decl. ¶ 31.  Based on the most recent bed utilization data provided by Defendants,

4  there are now *73 empty ICF beds at ASH*, deepening the inpatient bed shortage crisis and

5  violating this Court's order to fill *all* 256 *Coleman*-designated ICF beds at the facility.

6  Given the current crisis-level circumstances and unconscionable risk of irreparable harm to

7  hundreds of mentally ill class members, this Court should direct Defendants to comply

8  with existing court orders to fill the ASH beds, a remedy that remains as critically urgent

9  as ever.

10       **B.     The Court Should Further Order Defendants to Take Immediate Steps
                  to Fill Other Unused and Available DMH Beds with Class Members to**
11 **Address the Current Crisis**

12       There are currently several hundred empty beds at CSH, including four empty and

13  adjacent 50-bed units at CSH (including the *Coleman*-designated 50-bed unit).  McGrath

14  Decl. ¶ 12.  Each of the four adjacent 50-bed units is equipped with the clinical and

15  security requirements to provide inpatient psychiatric care to class members without delay.

16  McGrath Decl. ¶¶ 26-28.  These four units should be utilized forthwith to address the

17  overwhelming unmet need for inpatient psychiatric hospitalization among *Coleman* class

18  members.  Even if all 50 CSH beds and 256 ASH beds are filled pursuant to the Court's

19  previous orders, an enormous number of class members will still find themselves

20  languishing on the wait lists.  The Court should therefore order Defendants to promptly

21  activate those empty, clustered units, and to take steps to transfer class members in need of

22  inpatient psychiatric hospitalization into those beds, providing necessary staff, resources,

23  and security measures to ensure that these seriously mentally ill class members receive the

24  treatment they require.

25       **C.     The Court Should Order Defendants to Expedite Inpatient Bed Projects
                  Necessary to Reduce or Eliminate the Wait List**
26

27       Plaintiffs seek an order for Defendants to submit a plan to accelerate construction

28  projects so that additional desperately needed ICF beds can be more promptly activated.

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

[534603-11]

1   With respect to the 64-bed ICF project at CMF, scheduled to start admitting patients on

2   December 5, 2011, Plaintiffs seek an order for Defendants to modestly accelerate

3   admissions, from the planned 6 patients per week to 12 patients per week.  This Court has

4   repeatedly found such expedited admissions to be necessary and appropriate.  *See* Order

5   ¶ 8, Dkt. No. 3613, June 18, 2009 (ordering that the admission rate at ASH ICF beds be no

6   less than ten per week until all 256 beds are filled by *Coleman* class members); Order at 4,

7   Dkt. No. 3945, Oct. 22, 2010 (ordering that admission rate at SVPP ICF beds be no less

8   than ten per week until all C5 and C6 beds are filled by *Coleman* class members).

9       **D.    The Court Should Order Defendants to Provide Necessary Treatment to All Female Prisoners, and to End Their Policy of Denying Inpatient**

10  **Care at Patton State Hospital, Which Is the *Only* Available Placement for Female Class Members Requiring Acute or Intermediate Inpatient**

11  **Hospitalization**

12        Plaintiffs continue to object to Defendants' denial of inpatient care to female class

13  members at Patton State Hospital (PSH), the only facility available to provide acute and

14  intermediate inpatient hospitalization to these women.  In ludicrous fashion, Defendants

15  have relied on a CDCR-DMH Memorandum of Understanding that provides that patients

16  "who are deemed a significant assault risk, have a history of victimizing other inmate-

17  patients (including inciting others to act in a dangerous manner), or present a high escape

18  risk, shall not be referred to the State hospitals.  In these cases, the psychiatric programs,

19  *VPP or SVPP*, shall provide mental health services."  Fischer Decl. Ex. W (CDCR-DMH

20  MOU at 11-12) (emphasis added).  VPP and SVPP, however, provide inpatient care to

21  *male prisoners only*.  Female prisoners in desperate need of inpatient psychiatric

22  hospitalization are being rejected, in some cases *multiple times*, despite clear clinical need;

23  they are forced to wait not for an inpatient bed to become vacant, but for such a bed to

24  exist at all.  Stewart Decl. ¶¶ 151-170.

25        The rejections of these women from inpatient hospital beds are clinically

26  inappropriate, unfounded, and have resulted in increased pain and suffering.  *Id.* ¶ 153.  In

27  many cases, the dangerous behaviors at issue are an indication of inadequately treated

28  mental illness, *id.* ¶ 157, meaning that the very behaviors demonstrating the need for

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1    inpatient beds are being used as the basis for denying such treatment.  Such a Catch-22

2    situation is absurd, puts mentally ill women at great risk of harm, and is resulting in

3    systemic violations of the Eighth Amendment.

4        Psychiatric hospitals, including PSH, regularly manage patients who become

5    unstable and/or aggressive and do so with enhanced supervision, including the use of

6    intake units, enhanced staff supervision, seclusion and restraints.  *Id.* ¶¶ 145, 156, 158.

7    The facility has the means and expertise to provide effective security—including its own

8    police department and a secured perimeter that is monitored by CDCR—and can modify

9    existing staffing levels and operational procedure to further enhance security.  McGrath

10   Decl. ¶¶ 24, 32-35, 41.  The rejections of these otherwise qualified female patients on the

11   basis of a perceived risk of violence is dangerous and inappropriate.  *Id.*  Female class

12   members are being made to continue to suffer, and to further decompensate, in clinically

13   inappropriate outpatient settings.  *See e.g.*, Stewart Decl. ¶¶ 154-159 (Class Member M

14   required emergency MHCB admission soon after her *second* rejection from PSH); *id.*

15   ¶¶ 160-170 (Class Member N with active psychosis and severe risk of suicide rejected a

16   *third* time from DMH based on her "history of severe violence" and "active risk of

17   violence," despite CDCR clinical team finding that "standard EOP treatment is

18   inadequate" and that she requires acute care following her twelfth MHCB admission).

19       Defendants have the ability to meet the security needs of these mentally ill women

20   through enhanced staffing and operational procedures, along with clinical intervention,

21   restraints, seclusion, and psychotropic medication.  McGrath Decl. ¶¶ 32-35.  Defendants

22   have not, and cannot, provide a legitimate basis for their denial of critically needed

23   treatment to mentally ill women.  This Court should direct Defendants to meet their

24   constitutional duties with respect to providing clinically necessary psychiatric

25   hospitalization to these seriously mentally ill women forthwith.

26   **VII.  A NEW MHARP IS NECESSARY BECAUSE *COLEMAN* CLASS
           MEMBERS WHO NEED INPATIENT PSYCHIATRIC
27         HOSPITALIZATION ARE NOT BEING REFERRED**

28       The referral process for inpatient psychiatric care is broken.  Patients are being

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1  harmed as a result.  Plaintiffs' psychiatric expert concluded that at least eight EOP class

2  members who committed suicide in the last two years met the MHARP criteria for referral.

3  These inmate-patients required inpatient care, but were never referred.  In many of these

4  cases, the mental health treatment teams never even considered a referral to inpatient

5  psychiatric hospitalization.

6         As the Special Master has documented, the MHARP uncovered a massive level of

7  unmet need for inpatient care, resulting in the referral of 561 additional prisoners needing

8  DMH inpatient care in the first three months alone.  Special Master Report at 21.  By the

9  time the assessments were completed on December 29, 2009, almost 1,000 prisoners who

10  had not previously been identified as needing inpatient care were referred to DMH.

11  Special Master Report at 47.  As a result of the MHARP process, the wait list for prisoners

12  awaiting transfer to an ICF level of care skyrocketed from 149 prisoners in March 2009 to

13  575 by the time the process was completed in March 2010.  *Id.* at 4.

14         Defendants have not achieved the goal of a self-sustaining referral process.  The

15  Special Master's follow-up review of 13 institutions' implementation of the new DMH

16  referral process between May 26 and July 22, 2010 demonstrated that Defendants had not

17  implemented an effective referral process, and that Defendants are still failing to identify

18  and refer prisoners in need of psychiatric hospitalization.  *Id.* at 48-49 (referencing Special

19  Master report on MHARP follow-up in 22nd monitoring report, filed on March 9, 2011).

20         This Court has recognized that the problem of under-referrals to inpatient care is

21  continuing.  What is changed is that the "problem has become cyclical rather than

22  constant."  Order at 9, July 22, 2011, Docket No. 4045.  The upward part of this cycle, in

23  which referrals are brought closer in line with inpatient need, has been driven only by the

24  Special Master's focused monitoring and oversight of the referral process.  Special Master

25  Report at 50, Chart.  Clinicians' average monthly referrals spiked from approximately 51

26  prior to the MHARP to approximately 132 during the 8 months the MHARP lasted.  In the

27  three months after the Special Master Team left and the MHARP ended, referrals promptly

28  dropped by 41%, to approximately 75 ICF referrals per month.  The average referral rate

[534603-11]

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1   briefly increased to 95 per month for the three months the Special Master conducted his

2   follow-up in the summer of 2010. But after that ended in August 2010, referrals crashed

3   back down to about 55 per month—almost the same rate as before the MHARP started—

4   despite the fact that the number of prisoners on the mental health caseload rose by 2,500

5   during this same two year period. *Id.* at 50.

6       Defendants point to the recent drop in the DMH inpatient wait list in arguing

7   against any order directing them to utilize open lower-custody DMH beds. This reduction,

8   however, is almost certainly due to the significant decrease in DMH referral rates. If the

9   DMH referral follow-up period's average monthly ICF referral rate had been maintained

10  during the August 2010 to April 2011 period, *see* Special Master Report at 50,

11  approximately 365.4 more referrals would have been made, resulting in the addition of

12  hundreds more prisoners to the current wait list for ICF care.

13      While Defendants challenge the Special Master's numbers, even their own June

14  2011 audit of their referral practices shows that the ICF wait list level remains artificially

15  low. Using a subset of the MHARP referral criteria, Defendants used their own records to

16  identify **2,083** people at 14 of the 33 prisons who met one of three selected MHARP

17  criteria for DMH referral, but were not referred. Defs.' Resp. & Objs. to Special Master's

18  Report at 19, Dkt. No. 4035; Declaration of Lucinda McGill in Support Thereof ("McGill

19  Decl.") ¶ 4, Dkt. No. 4035-3. Defendants' own partial audit demonstrates that a large

20  unmet need remains.

21      Defendants' partial audit, however, cannot solve the under-referral problem without

22  further involvement of the Special Master. Defendants randomly selected and reviewed

23  1,408 of the originally identified 2,083 prisoners' files to determine whether referral

24  criteria and justification for non-referral were properly documented. For 579 of the 1,408

25  prisoners, Defendants determined, without further explanation or breakdown, that the men

26  had "transferred, paroled, or did not meet the clinical indicators after review," McGill

27  Decl. ¶ 16, and simply stopped there even though these seriously ill men may currently be

28  in psychiatric distress elsewhere in the system. Of the 829 men left in the audit,

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1    Defendants found that in 75% of the cases, clinicians had never properly considered a

2    DMH referral, despite the fact that all of the men objectively met referral criteria. *Id.* ¶ 16

3    (628 of 829 prisoners had not been considered for referral, while clinicians for remaining

4    201 had considered DMH and decided not to refer). That appallingly bad referral rate

5    alone justifies the Special Master's recommended intervention.

6         Defendants' proposed alternative to the Special Master's recommendation would

7    sweep most of the current under-referrals under the rug, with predictable harms to human

8    life and safety. Under Defendants' proposed alternative to the Special Master's

9    monitoring recommendation, almost 700 seriously mentally ill prisoners who Defendants

10    themselves identified as displaying objective signs of needing inpatient psychiatric

11    hospitalization are simply ignored. For these 675 of the 2,083 prisoners originally flagged

12    in Defendants' corrective audit as meeting one of three MHARP criteria, Defendants will

13    not even attempt a clinical reevaluation to determine whether these men are still so acutely

14    ill and poorly functioning in an outpatient setting that they need to be admitted to DMH for

15    care. There is no clinically appropriate basis for Defendants' decision to ignore clearly

16    documented signs of recent psychiatric distress for 675 prisoners, and there is a high

17    likelihood that many of these men require inpatient hospitalization. Stewart Decl. ¶¶ 43-

18    54.

19         The Court should reject Defendants' cynical view that the "goal of [a further

20    assessment of unmet needs for inpatient care] would be to increase the SVPP Waitlist."

21    Dkt. No. 4035 at 9, n.2. The goal of such further assessment is, in fact, *to accurately and*

22    *completely identify the unmet needs of inpatient care*, so that a properly and narrowly

23    drawn constitutional remedy may be provided. Under the MHARP, every single one of

24    those 2,083 prisoners should have been assessed for referral and referred to inpatient care

25    if necessary. That Defendants cannot or will not evaluate every one of the 2,083 prisoners

26    who appear to meet the referral criteria indicates that their corrective audit is

27    fundamentally flawed. These flaws, as well as other deficiencies, *see* Stewart Decl. ¶¶ 43-

28    53, ensure that the audit will result in a massive undercount of the prisoners in the system

[534603-11]

34

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF

1  today who need inpatient psychiatric hospitalization.

2       As this Court recognized in its July 22, 2011 order, "questions concerning the

3  adequacy of defendants' referral process cannot be separated from the ongoing problem of

4  inpatient wait lists." Order at 7-8, Dkt. No. 4045. This presents, of course, a Catch-22 in

5  the most basic sense: An accurate sense of the scope of the inpatient bed shortage cannot

6  be determined without a properly functioning referral process, yet the wait list for inpatient

7  beds is a major reason that clinicians do not refer prisoners in need of those same beds.

8  Stewart Decl. ¶ 52. This simple fact, and the serious harm that results from the broken

9  referral process, is starkly illustrated by the many suicides over the last two years of men

10 who should have been, but never were, considered and referred for inpatient psychiatric

11 care. *Id.* ¶ 53. If the MHARP had worked nearly as well as Defendants now claim, those

12 class members' needless deaths after months upon months of suffering could well have

13 been avoided. That these class members lost their lives due in part to Defendants'

14 decades-long inability to maintain a properly functioning referral process poignantly shows

15 exactly why the Special Master's recommendation to revisit the MHARP is so absolutely

16 necessary.

17                           **CONCLUSION**

18       Based on the evidence now presented and in the record, Plaintiffs request that the

19 Court reject Defendants' efforts to further delay a desperately need constitutional remedy

20 to the problem of delayed and denied access to inpatient psychiatric hospitalization.

21 Plaintiffs request that the Court order the relief requested herein.

22

23 DATED:  August 11, 2011            Respectfully submitted,

24                                    ROSEN, BIEN & GALVAN, LLP

25                                    By:  */s/ Michael W. Bien*
26                                         Michael W. Bien

27                                    Attorneys for Plaintiffs

28

PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY
DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF