1  DONALD SPECTER – 083925
STEVEN FAMA – 099641
2  PRISON LAW OFFICE
1917 Fifth Street
3  Berkeley, California 94710-1916
Telephone:  (510) 280-2621
4

5

6
CLAUDIA CENTER – 158255
7  THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
8  180 Montgomery Street, Suite 600
San Francisco, California 94104-4244
9  Telephone:  (415) 864-8848

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
JANE E. KAHN – 112239
LISA ELLS – 243657
AARON J. FISCHER – 247391
LAURA BOYSEN-ARAGON – 248083
ROSEN, BIEN & GALVAN, LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone:  (415) 433-6830

WARREN E. GEORGE – 053588
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, California 94111-4066
Telephone:  (415) 393-2000

10  Attorneys for Plaintiffs

11

12  UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

13

14

15  RALPH COLEMAN, et al.,

16          Plaintiffs,

17      v.

18  EDMUND G. BROWN, Jr., et al.,

19          Defendants.[1]

20

21

22

23

24

25

26

Case No. Civ S 90-0520 LKK-JFM

**DECLARATION OF JOSEPH L. McGRATH IN SUPPORT OF PLAINTIFFS' BRIEF ON EVIDENTIARY HEARING REGARDING ORDER TO SHOW CAUSE WHY EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES AND IN SUPPORT OF ADDITIONAL RELIEF**

Judge:  Hon. Lawrence K. Karlton
Date:   August 17, 2011
Time:   10:00 a.m.
Crtrm.: 4

27  [1] The names of Defendants currently serving and their official capacities have been substituted pursuant to Fed. R. Civ. P. 25.

28

[530187-15]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF ABBREVIATIONS**

| Term | Definition |
|---|---|
| APP | Acute Psychiatric Program |
| ASU | Administrative Segregation Unit |
| Atascadero | Atascadero State Hospital |
| CDCR | California Department of Corrections and Rehabilitation |
| CMC-E | California Men's Colony - East |
| CMF | California Medical Facility |
| Coalinga | Coalinga State Hospital |
| CSATF | California Substance Abuse and Treatment Facility and State Prison, Corcoran |
| DD2 | Developmental Disability |
| DMH | Department of Mental Health |
| DPS | Department of Police Services |
| DRB | Departmental Review Board |
| EOP | Enhanced Outpatient Program |
| HC-POP | Healthcare Placement and Oversight Program |
| ICF | Intermediate Care Facility |
| IDTT | Interdisciplinary Treatment Team |
| LWOP | Life Without the Possibility of Parole |
| MCSP | Mule Creek State Prison |
| MDO | Mentally Disordered Offender |
| MHCB | Mental Health Crisis Bed |
| MHSDS | Mental Health Services Delivery System |
| Pelican Bay | Pelican Bay State Prison |
| Patton | Patton State Hospital |
| PSU | Psychiatric Services Unit |
| PTSD | Post-Traumatic Stress Disorder |
| RVR | Rules Violation Report |
| SHU | Security Housing Unit |
| SNY | Sensitive Needs Yard |
| SVP | Sexually Violent Predator |
| SVPP | Salinas Valley Psychiatric Program |
| VPP | Vacaville Psychiatric Program |

[530187-15]

i

I, Joseph L. McGrath, do hereby declare:

1.      I am a former employee of the California Department of Corrections (CDCR), with a career of more than 30 years in corrections.  I have personal knowledge of the matters set forth herein, and if called as a witness I could competently so testify.  I make this declaration in connection with the evidentiary hearing set by this Court for August 17, 2011 concerning seriously mentally ill CDCR inmate access to necessary inpatient psychiatric hospitalization at Department of Mental Health hospitals.  A true and correct copy of my current resume, including cases in which I have served as a consultant or expert for the past six years, is attached hereto as Appendix A.

## BACKGROUND AND INTRODUCTION

2.      From 1973 to 1976, I served in the United States Air Force, last stationed at McClellan Air Force Base.  I received an honorable discharge as an E-4, Sergeant, in 1976 upon the conclusion of my enlistment.  After completing my military service, I attained a Bachelor's Degree in Corrections/Social Justice from California State University, Sacramento.

3.      I worked for and with California state corrections for 30 years.  I began my career in corrections in 1979 as a Youth Counselor with the California Youth Authority at the Preston Youth Correctional Facility.  In 1982, I became a Correctional Counselor at California Medical Facility (CMF) in Vacaville, California.  During my eight (8) years at CMF, I served in special assignments related to hospital licensing of the Acute Care Hospital and the Department of Mental Health (DMH) beds.  I also served as the Litigation Coordinator during the *Gates* trial. (Class action involving inmates at CMF resulting in a consent decree to improve medical care and psychiatric care and the treatment of HIV+ inmates and to reduce crowding conditions at CMF.)  I was responsible for security and operations of CMF's Northern Reception Center and also supervised the inmate classification for psychiatric treatment and administrative segregation units.  Following my time at CMF, I worked in CDCR headquarters for over three (3) years where I provided review and classification endorsement of inmate cases for program placement and transfer

[530187-15]

1

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1   on a statewide basis.  I also provided expertise and direction regarding medical and

2   psychiatric classifications and program issues.  During this time, I developed policies

3   related to all aspects of prison operations including inmate discipline, classification and

4   prison program management.

5         4.      Following my time at CDCR headquarters, I rose through the ranks at

6   Pelican Bay State Prison (Pelican Bay) over a ten (10) year period, serving as Associate

7   Warden and Chief Deputy Warden, and I was appointed Warden of Pelican Bay in 2000.

8   Pelican Bay is a maximum security facility, designed to house California's most serious

9   criminal offenders.  One half of the prison is a Level IV maximum security general

10  population setting.  The other half of the prison is a Security Housing Unit (SHU) designed

11  for inmates presenting serious management concerns.  In addition to my work managing

12  daily operations and administration of Pelican Bay, including the high-custody security

13  issues, I also developed and negotiated the Use of Force Policy for CDCR department-

14  wide application.  While at Pelican Bay, I worked in conjunction with the Health Care

15  Manager to enhance systems for delivery of medical and mental health services to the

16  inmate population.  I coordinated the development of the Psychiatric Services

17  Unit/Enhanced Outpatient Program (PSU/EOP) for seriously mentally ill inmates.  During

18  this process I sat on Interdisciplinary Treatment Teams with clinical staff making decisions

19  about treatment plans for mentally ill inmates. I also chaired the PSU/EOP Institutional

20  Classification Committees involved in making program placement and programming

21  decisions for the entire mental health program population at Pelican Bay.  I played an

22  instrumental role in Pelican Bay's response to, implementation of, and eventual

23  compliance with the *Madrid* remedial plan. (Remedial plan resulted from a class action

24  involving inmates from Pelican Bay regarding eliminating excessive force, improving

25  health care and removing inmates with mental illness from the SHU.)

26        5.      I have first-hand experience with the ongoing custodial and security

27  obstacles to obtaining mental health care for inmates coming from high security

28  institutions or classifications.  While I was at Pelican Bay, inmates were summarily

[530187-15]

2

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1 rejected from DMH hospitals due to security and custody concerns. These inmates had

2 serious mental illness and yet, exclusionary criteria prevented them from receiving

3 appropriate levels of mental health treatment, specifically inpatient care.

4       6.     I concluded my career as an employee of CDCR as the Chief Deputy

5 Secretary of CDCR for Adult Operations. I retired from CDCR in June of 2006. From

6 June 2006 to June of 2009, I served as the Director of the Custody Support Service

7 Division for the California Health Care Receivership, Inc., where I acted as the *Plata*

8 Court's Federal Receiver's custody expert and was responsible for the development and

9 implementation of health care custody units at all 33 California prisons.

10       7.     Since June 2009, I have been working as a corrections consultant. My areas

11 of expertise include, among other things, correctional health care and mental health care

12 programs and delivery; high security program operations; inmate classification; use of

13 force; and conditions of confinement. As part of my consulting practice, I am occasionally

14 asked to assist courts by providing expert testimony. In the past six (6) years I have

15 consulted or testified in eight cases. I have been a consultant for the State of California,

16 San Joaquin County, the Los Angeles County District Attorney, and the Los Angeles

17 Public Defender. I have also consulted or testified on behalf of an individual litigant in a

18 prisoner assault case. (*James Grandy vs. United States Department of Justice*, Case No.

19 CV 09-01270 (C.D. Cal. 2011) I have provided expert testimony in the following cases:

20       a.    *Henderson vs. Petersen*, Case No. C 07-2838 (N.D. Cal.) – Expert

21 consultation and report to the Court for Defendants regarding the use of force by

22 correctional officers. Deposition given on April 20, 2011. Trial testimony given on

23 July 25, 2011.

24       b.    *James Grandy vs. United States Department of Justice*, Case No. CV

25 09-01270 (C.D. Cal. 2011) – Expert witness report to the Court for Plaintiff and Court

26 testimony at trial – Expert testimony related to maximum security prison operations.

27       c.    *In Re Disciplinary Appeals by San Joaquin County Correctional*

28 *Officers Gregory Fuher and Michael Griggs* (2006) – Hearing testimony for San Joaquin

3

1   County as use of force and employee discipline expert (Case related to use of force

2   resulting in inmate death).

3          d.    *In re Andres Herrera*, California State Personnel Board (2005), Case

4   No. 04-2960 – Hearing testimony for State as use of force expert (Case related to a

5   California Youth Authority Officer's use of force (canine) against inmate).

6          8.    I have been asked by plaintiffs' attorneys in the *Coleman* case to look at

7   issues raised by the Court's order of July 22, 2011 (Dkt. 4045) setting an evidentiary

8   hearing and requiring defendants to "show cause why the 50 beds at Coalinga State

9   Hospital designated for *Coleman* class members, as well as any other vacant beds at the

10  facility, cannot be filled with high-custody CDCR inmates."  The Special Master's Report

11  on Defendants' Plan Re:  Intermediate Care Facility and Acute Inpatient Wait Lists, Dkt.

12  4020, filed on 06/13/2011 (Special Master's Report) describes the life-threatening

13  emergency that has resulted from a shortage of beds for mentally ill inmates in desperate

14  need of inpatient psychiatric hospitalization.  I understand that "[e]xtraordinarily large

15  number[s]" of *Coleman* class members are currently "languish[ing]" on a long wait list for

16  months and sometimes indefinitely, waiting for a bed to receive necessary inpatient

17  psychiatric hospitalization.  Dkt. 4020 at 7.  And yet, hundreds of beds sit empty at DMH

18  hospitals.  I understand that defendants presented a plan to this court to construct an

19  adequate number of high-custody Intermediate Care Facility (ICF) beds, but that

20  completion of these projects is still several years away.  I also understand that the Court

21  has instructed defendants to make every effort to address the emergency created by this

22  several year gap in the long-term construction program where there will be an ongoing

23  shortage of high-custody ICF beds.  Specifically, I have been asked to provide the Court

24  with the following information:  (1) an evaluation of the security and operations of

25  Coalinga State Hospital to determine whether DMH can safely house and effectively treat

26  high-custody CDCR inmates with serious mental illness and (2) an evaluation of the

27  security screening criteria currently utilized by CDCR and DMH to determine  whether a

28  CDCR inmate is eligible for Intermediate Care Facility treatment in a DMH facility other

1  than Salinas Valley Psychiatric Program (SVPP).  My work and findings primarily focus

2  on Coalinga State Hospital; however, my conclusions are applicable to DMH hospitals

3  with similar security and staffing levels.

4       9.     I am being compensated as an expert in this case as follows:  $150 per hour

5  for document review, writing and other similar work; $200 per hour for time testifying in

6  depositions and at trial; and $1,500 per day for full-day inspections and tours.

7       10.    In order to respond to these questions and in forming my opinions, I have

8  reviewed various documents and information, applied my professional knowledge and

9  experience and personally inspected Coalinga State Hospital (Coalinga).  I inspected

10  Coalinga State Hospital on August 8, 2011.  During the inspection I met with several

11  members of the hospital's senior administrative staff including the Executive Director,

12  Pam Ahlin; Clinical Administrator, Audrey King; and Hospital Administrator/Chief

13  Security Officer, George Maynard.  I also met with the CDCR lieutenant in charge of

14  CDCR operations at the hospital; the Coalinga internal security monitoring team; members

15  of the Hospital Police Department including the Acting Chief of Police; and several unit

16  supervisors who directly interact and work with the patient population on a daily basis.  I

17  inspected the perimeter security systems and the interior security systems and interviewed

18  senior custodial/security officials from CDCR and DMH as well as operational staff

19  performing their duties.  I was also provided with a full set of current security and

20  operational policies and procedures for Coalinga.  Additionally, I inspected the physical

21  structure of the hospital including patient rooms, medical and psychiatric treatment

22  facilities, and receiving and release.  In my evaluation of the security and custody criteria

23  being used to determine eligibility for placement in inpatient beds and in some cases

24  preventing access to necessary inpatient psychiatric hospitalization at Coalinga, I looked at

25  regulations regarding security classifications at CDCR.  I also reviewed central files and

26  DMH records of inmate-patients currently receiving inpatient psychiatric treatment at

27  SVPP to (1) evaluate which criteria appeared to prevent these inmate-patients from

28  receiving treatment at a DMH hospital other than SVPP and (2) assess whether these

[530187-15]

1 inmate-patients could be safely housed at a lower level DMH facility including Coalinga

2 and Atascadero State Hospital (Atascadero). In my evaluation, I also considered the

3 documents listed in Appendix B, attached hereto.

4       11.     I have come to the following conclusions:

5           a.     Coalinga State Hospital can and should safely house and appropriately

6 treat a range of CDCR inmates, including high-custody CDCR inmates. Coalinga has

7 approximately 400 empty beds and has appropriate policies, procedures and clinical and

8 custodial staffing models, as well as recent success, in housing and treating *Coleman* class

9 members.

10           b.     Inmate-patients requiring inpatient psychiatric hospitalization should

11 not be excluded from Coalinga or any DMH state hospital placement based on blanket

12 one-size fits all custody criteria. All placement determinations regarding inpatient

13 psychiatric hospitalization must be individualized and primarily consider recent individual

14 behavior in CDCR or DMH and the urgent need for psychiatric hospitalization as over-

15 riding factors.

16 **OPINIONS**

17 **OPINION 1: COALINGA STATE HOSPITAL CAN AND SHOULD
   SAFELY AND APPROPRIATELY TREAT A RANGE OF CDCR
18    INMATES, INCLUDING HIGH-CUSTODY CDCR INMATES.**

19       12.     Currently, there are no *Coleman* class members at Coalinga. I was informed

20 on my inspection of Coalinga that the last *Coleman* class member was discharged from

21 Coalinga in April 2010. Since then, defendants have not moved any CDCR inmates to

22 Coalinga. I was also informed that one 50-bed unit is designated currently for *Coleman*

23 class members, and awaiting patients. Currently, there are a total of approximately 400

24 open beds at Coalinga. 200 of these beds are adjacent to one another and include the 50

25 beds allotted for *Coleman* class members. These 200 beds seem like a logical place to

26 promptly and safely house more *Coleman* class members.

27

28

[530187-15]

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

**A.    DMH is Equipped to Safely House and Appropriately Treat A Range of Patients, Including High-Custody Inmate-Patients.**

13.    DMH's first priority is the treatment of their patients, both those civilly committed and those referred by CDCR.  While DMH's mission is challenging, it serves an essential function in the State of California.  DMH has stated, on its public web site, that it is up to the task and has "met this challenge by prioritizing and balancing state-of-the-art treatment and public safety."  Fischer Decl. Ex. R.  DMH hospitals "have passed national rigorous accreditation reviews. Each hospital is staffed by professionally trained clinicians and an administrative support team who provide full-time inpatient care to the most serious mentally ill and those incapable of living in the community." *Id.*  DMH has historically dealt with assaultive patients who are not inmates.  DMH treats non-CDCR inmates in all stages of mental health and potential dangerousness to self or others.  Atascadero and Patton State Hospital (Patton) currently treat patients who are civilly committed because they are determined to be Incompetent to Stand Trial or Not Guilty by Reason of Insanity.  These patients, while not currently under the jurisdiction of CDCR, may pose a very real security risk.  Nonetheless, DMH accepts these patients and makes appropriate adjustments to staffing and operational procedures for their safe housing.  Similarly, DMH hospitals, including Coalinga, treat Mentally Disordered Offenders (MDOs) and Sexually Violent Predators (SVPs), the moment after they are released from CDCR prison terms without regard to their CDCR custody levels, security classifications or original criminal sentence.  Again, DMH adjusts to the security requirements of the individual.

**B.    Coalinga is a Maximum-Security State Hospital and Can Safely House and Appropriately Treat Certain High-Custody CDCR Inmate-Patients.**

14.    According to DMH's web site, Coalinga is a "maximum-security state hospital."  Fischer Decl. Ex. R.  Based on my inspection of Coalinga, including my inspection of their physical plant, conversations with Coalinga personnel, and review of Coalinga's operating procedures, I could not agree more.  Coalinga does not have the same

[530187-15]

1    design specifications as a CDCR level IV maximum security prison.  That does not mean,

2    however, that Coalinga cannot safely house level IV CDCR inmate-patients.  A DMH

3    facility is not built to meet the design standards of a CDCR level IV prison.  When an

4    inmate-patient is housed at a DMH hospital, CDCR's security level regulations are

5    inapplicable.  The reasoning behind the regulations should be considered in evaluating

6    security needs, *i.e.*, perimeter security and internal security, including staffing and program

7    operations, but provides no basis to automatically preclude CDCR classified high-custody

8    inmates from being housed in DMH hospitals.

9          15.    There are three prongs to establishing effective security regardless of

10   security level.

11                a.    First is the physical plant. Facilities are designed to provide security

12   in the physical structure using design criteria intended to support the mission of keeping

13   inmates or patients confined and safe.

14                b.    The second prong of security is the staffing.  Staffing levels depend

15   on the physical plant within which they operate and the mission of the facility.

16                c.    The third prong of security is the operations or operational procedure;

17   that is, how the staffing is deployed and operates within a given physical plant.  Procedures

18   determine how staffing will operate in the context of a physical plant, staffing numbers and

19   the mission of the program.

20          16.    Because the elements of physical plant design, staffing and operations are

21   dependent upon one another and work collectively to provide effective security, it is

22   necessary to adjust staffing and operations to complement the physical plant.  Some

23   facilities require more staffing and innovative operations to compensate for designs that

24   provide less security by physical structure alone.

25          17.    CDCR depends heavily upon physical plant structure and relatively lower

26   staffing levels to ensure effective security within the prisons.  DMH hospitals have a

27   physical plant that supports the clinical program but is not "hardened" to the level of a

28   CDCR high medium/maximum security prison.  DMH hospital security, in consideration

[530187-15]

8

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

of the institution's therapeutic mission, depends more on richer custodial and clinical

staffing and specific operational procedures and programming than physical plant design

to achieve effective security.  In my opinion, the most important aspects of prison security

are communication and the staff/inmate relationship supported by interaction and sight

supervision.  All too often when corrections professionals focus on physical plant structure

and design, it is to the detriment of staff contact and relationships and communication with

inmates.  Staff contact, relationships and communication with inmate-patients is just as

important, if not even more important, in a mental health treatment setting, to achieve an

environment that is safe for patients, staff and the public.  DMH embraces this philosophy

in the program design.

18.    It is obvious to me that DMH and CDCR officials at Coalinga are well-

trained professionals who appropriately address public safety and staff and patient security.

Similar to a CDCR prison, Coalinga has extensive security measures and systems in place

for both internal security, which is provided by DMH, and external perimeter security,

which is provided by CDCR.

Coalinga Internal Security

19.    Within the hospital, the Coalinga Department of Police Services (DPS) has

an active presence.  I was accompanied by a few officers on my inspection and

encountered many more officers throughout the hospital.  Officers are also always

stationed at several central posts within Coalinga and are also on constant patrol within the

facility and in specific program areas.  Officers carry the same incident response

equipment that a CDCR officer carries in a prison, including pepper spray, expandable

batons and restraint gear.  The role and responsibilities of hospital police are outlined in

great detail in the DPS Policy and Procedure Manual and the DPS Post Orders, which

defendants provided to me on my inspection of Coalinga.

20.    As I was informed throughout my inspection, security is not limited to

hospital police officers.  Each clinical staff member also has a role in security.  The

Coalinga State Hospital Operating Manual includes extensive Security Administration

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1   Directives including policies regarding patient counts, procedures at security sally ports,

2   patient and room searches, security and facility access clearances, administrative isolation,

3   and law enforcement intervention and use of force.  Multiple observation rounds every

4   hour of patient-occupied areas are also required.  Such levels of inmate-patient observation

5   and contact are consistent with, and in some cases more concentrated than, those of similar

6   programs in high security CDCR prisons.  One of the directives recognizes that

7   "[Coalinga], as a maximum-security forensic state hospital, differs in philosophy and

8   orientation from security in a prison or jail…. [and Coalinga] has an *additional* internal

9   security overlay that requires an ongoing staff focus on surveillance, containment, [and]

10  clinical-supervision."  (emphasis added)  Ells Decl. Ex. GG.

11       21.    Coalinga's internal security includes an electronic communication system

12  with both a "local intercom system" and a "duress paging system" which integrates paging

13  capabilities with a "wireless personal alarm system."  Fischer Decl. Ex. AA.  Coalinga

14  staff members carry an individual personal alarm at all times.  I was informed on my

15  inspection that Coalinga staff are continually trained on security procedures.  I found the

16  personal alarm and response system to be state-of-the-art.  Constant monitoring enables

17  immediate response to emergencies.  CDCR prisons would benefit from such a system.

18       *Coleman* Class Members at Coalinga

19       22.    Several of the Coalinga officials I spoke with were personally familiar with

20  the Coalinga program and operations for *Coleman* class members that had ceased

21  operation in April, 2010.  I was informed that when *Coleman* class members were

22  previously housed and treated at Coalinga, hospital police officers provided around the

23  clock security in the individual units designated for *Coleman* class members.  Specifically,

24  three officers and one sergeant were assigned to the unit housing 50 inmate-patients during

25  second and third watch and two officers and one sergeant were assigned during first watch,

26  the graveyard shift.  I had conversations with several Coalinga personnel who worked

27  closely with and treated *Coleman* class members at Coalinga.  They told me that

28  operational procedures and staffing levels were different when class members were living

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1    at Coalinga. For example, all *Coleman* class members were escorted (individually and in

2    groups) throughout the hospital by hospital police officers and clinical staff. Such escorts

3    are not provided for most SVP and MDO patients. Several personnel also told me it was

4    really "no issue" and "not a problem" to work with the *Coleman* class members and adjust

5    to these modified procedures from a custodial and clinical perspective. They noted that

6    *Coleman* class members had more acute psychiatric issues than the current SVP population

7    at Coalinga, but reported that they did not have additional problems or concerns when

8    working with class members. For *Coleman* class members, Coalinga used the *Keyhea*

9    procedures for involuntary medication while for SVPs and MDOs, a different set of legal

10   procedures were used. In fact, one individual stated that the *Coleman* class members were

11   "more well-mannered" than the current Coalinga population.

12       23.    I was also informed that DMH had made some minor physical modifications

13   to the 50-bed unit for the *Coleman* class members. For example, the beds were bolted to

14   the floor, certain furniture was removed from the rooms and a different type of locker was

15   installed. It was my understanding that DMH had or would make similar appropriate

16   security modifications if and when the *Coleman* class members returned to Coalinga.

17       24.    As a result of these conversations, my inspection of the physical plant at

18   Coalinga and a review of the operating procedures at Coalinga, it is my opinion that

19   Coalinga safely housed and provided adequate treatment for *Coleman* class members until

20   April, 2010. I see no reason why Coalinga cannot do so again, immediately, especially in

21   light of the immediate and life-threatening emergency shortage of inpatient beds for

22   psychiatric treatment.

23       <u>Description of Coalinga layout and facilities</u>

24       25.    Coalinga has a capacity of 1,500 patients. Coalinga's population as of

25   August 8, 2011 was (1) 825 Sexually Violent Predators (SVPs) who are civilly committed

26   to Coalinga, (2) approximately 50 SVPs who are currently out-to-court and not currently at

27   the Coalinga facility, and (3) approximately 100 Mentally Disordered Offenders (MDOs).

28   There were more than 400 vacant beds currently at Coalinga for general population use. In

11

[530187-15]

1   addition to the 1,500 general population beds, there are 150 beds which are used for

2   admissions, acute medical and psychiatric treatment, and discharge. I was informed that

3   the 50 beds allotted for discharge have been empty and unused since Coalinga opened its

4   doors in 2005.

5          26.    Coalinga houses patients in 50-person units. Each unit has ten 4-person

6   dorms and 10 single rooms. I was informed by Ms. Ahlin that Unit 21 has been set aside

7   for *Coleman* class members. Ms. Ahlin also informed me that there are approximately 400

8   total empty beds at Coalinga and that there are three 50-person units adjacent to Unit 21

9   that are all currently vacant—for a total of 200 vacant beds in four adjacent units. The

10  doors to the single rooms and dorms that I observed were capable of being locked with a

11  deadbolt from the outside of the room. Additionally, the doors that connect each unit to

12  the main corridor of the hospital could be and were routinely locked from both the inside

13  and the outside. One room on each 50-person unit is designated as a "wet room" and

14  includes a toilet and sink. The other patients use communal toilets, sinks and showers.

15         27.    In addition to bedrooms and bathrooms, each 50-person unit is equipped with

16  several clinician offices; a central nursing and staff station; a day room with a television; a

17  rehabilitation room; a conference room, which I was informed can be used for group

18  treatment; and two observation rooms where clinicians could implement 5-point restraints,

19  seclusion, suicide watch or one-to-one observation, as needed. Each 50-person unit shares

20  an outdoor yard with one other 50-person unit.

21         28.    Each 50-person unit is richly staffed with 2 treatment teams, each team

22  consisting of a psychologist, psychiatrist, two medical doctors, social worker, registered

23  nurse, rehabilitation therapist, and a psychiatric technician. Each treatment team is

24  assigned to 25 patients.

25         29.    Each SVP spends at least his initial 56 days at Coalinga in the admissions

26  unit. The admissions unit has 50 beds. While in the admissions unit, the patient is

27  assigned to a team who develops a treatment plan for the patient, including identifying

28  medical issues and barriers to discharge. Treatment begins during this orientation period.

[530187-15]

12

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1   Coalinga officials informed us that they had decided that *Coleman* class members and

2   MDOs not be housed upon arrival in the admissions unit but instead were housed in the

3   regular *Coleman* or MDO housing units, respectively.  I was informed that this was based

4   on DMH's policy of segregating SVPs from *Coleman* class members and from MDOs.

5       30.     The 50-bed acute unit includes two wings of single rooms, nine (9) of which

6   are medical isolation units.  The isolation units all have full bathroom facilities within the

7   room.  There are also two seclusion rooms which each had soft/leather restraints on the

8   beds where patients could be restrained or forcibly medicated if clinicians deemed

9   necessary and appropriate.  The acute unit is currently licensed as a medical unit, but had

10  also been licensed as a psychiatric acute unit in the past.

11      31.     The main part of the hospital is known as the "mall," and is a large

12  thoroughfare that connects all sections of the hospital.  Available services include the

13  dining hall, barbershop, canteen, library, gym, vocational and educational programs and

14  treatment rooms.

15      32.     It has also been my experience that staff-to-patient ratios are far more staff

16  intensive in a DMH setting than staff-to-inmate ratios in a prison setting.  My observations

17  during my inspection of Coalinga confirm this fact.  DMH programs are richly staffed.

18  Coalinga has substantial clinical and custodial staff.  As mentioned previously, I was

19  informed on the inspection of Coalinga that when *Coleman* class members were treated at

20  Coalinga, this program was even more heavily staffed by clinicians and custodial staff.

21  This additional staff at DMH facilities serves to augment security.  DMH has done well

22  over the years with providing good security in physical plant designs that were established

23  to support the therapeutic milieu, and not specifically designed with security as the

24  predominate consideration. They have done so with higher staff to inmate-patient ratios

25  and these staffing ratios have been accepted and funded as the standard for DMH programs

26  by the California Legislature. This collectively supports my position that physical plant,

27  staffing and operating procedures work collectively and in concert for sound security.

28      33.     Coalinga has an extensive amount of treatment and housing spaces as well as

being richly staffed from both a custodial and clinical perspective. Administrative, clinical and custodial staff demonstrated an ability to be flexible in response to various behaviors, conduct, and types of patients. I am confident that Coalinga can safely house and appropriately treat a range of CDCR inmate-patients, including high-custody inmate patients.

34.    In my opinion there is a variety of things that Coalinga could do to modify current procedures and staffing, if necessary, to enable the appropriate treatment and safe housing of these additional patients. All of my recommendations are based on policies or programs that Coalinga has implemented in the past with *Coleman* class members, or currently implements with Coalinga's SVP and MDO populations. None of the recommendations below would have to be implemented, but any of them could be implemented if deemed necessary by hospital staff.

a.    As Coalinga has done in the past, Coalinga police officers can be permanently stationed within the units that house *Coleman* class members and provide escorts and additional security.

b.    Whereas the current Coalinga population appeared to be generally free to roam the hospital building, *Coleman* class members could be restricted, as was Coalinga policy in the past, and escorted by Coalinga police officers when leaving their unit.

c.    *Coleman* class members could remain segregated from the rest of the Coalinga hospital population both in housing and in activities. Access to Coalinga facilities including vocational services, treatment outside of the housing units, the library, canteen, dining hall and gym could be scheduled to maintain separation of *Coleman* class members from other hospital patients.

d.    Given the expansive amount of treatment and office space within each housing unit, *Coleman* class members could receive programming primarily or exclusively within their own units, and could have less frequent access to the main section of the hospital.

e.      As Coalinga currently does with the MDO population housed there, if a particular population is difficult to manage with a full 50-person unit, units could be limited to a more manageable number, such as 30.  Each of the ten 4-person dorms could be limited to two patients and the 10 single rooms could be filled.

f.      As Coalinga currently does with the SVP population housed there, one unit could be utilized as an admissions unit where *Coleman* class members would be housed upon arrival if they needed to be stabilized before moving out into the general patient population. There are empty and unused housing units at Coalinga available for this function.

g.      As Coalinga currently does with a portion of the SVP population, one unit could be utilized as a "behavior unit" with video camera monitoring for additional security.  The goal of such unit would be to adjust behavior to allow patients to re-enter the general *Coleman* population at Coalinga.

35.      Based on my inspection of Coalinga, I am of the opinion that Coalinga is a well-secured facility.  Coalinga can safely house and appropriately treat a range of CDCR inmates, including CDCR-classified "high-custody" inmates.

**C.      CDCR Provides Effective Security.  Minimal Enhancements to CDCR Perimeter Security at Coalinga and Other DMH Hospitals Will Enable DMH to Safely House and Appropriately Treat Certain Inmate-Patients With Life Sentences.**

36.      Within the prison setting, CDCR is responsible for arranging appropriate security for the protection of inmates and staff at the prison as well as the public outside the prison.  This is the primary consideration and responsibility of custody staff.  At Coalinga, CDCR has a strong presence at the two entrance and exit points and around the perimeter; CDCR is responsible for external and perimeter security at Coalinga.  Further, Coalinga's immediate proximity and collaboration with Pleasant Valley State Prison would allow additional CDCR officers to respond via mutual aid agreement, if needed, in the case of a major emergency at Coalinga.  The duties of the CDCR officers responsible for perimeter security at Coalinga are laid out in great detail in CDCR post orders specific to

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1    Coalinga.

2        37.    CDCR officers are stationed at the sally port entrance to the secure units of

3    the hospital.  They screen all visitors entering and exiting Coalinga.  Additionally, they

4    monitor the perimeter with video cameras and a state of the art microwave motion

5    detection system.  Two control towers, one at the pedestrian gate and one at the vehicle

6    gate, are staffed by CDCR officers and two berms, raised observation posts, are also

7    staffed by CDCR officers.  Officers have a combined visual of the entire perimeter.

8    CDCR officers also control the vehicle sally port and are responsible for all patient

9    transports off of the hospital premises.  Additionally, two roving officers constantly patrol

10   the perimeter, each in a truck.

11       38.    I would recommend that perimeter security be enhanced through minor

12   changes in operations (no construction would be required) to permit Coalinga to house

13   inmate-patients serving life sentences.

14       39.    Coalinga's perimeter security includes a "double fence consisting of an

15   interior candy cane fence secured to a grade beam with no-climb fabric topped [sic] and

16   with a roll of razor tape."  Amended Feasibility Study, Level IV, 30 Bed Intermediate Care

17   Facility at Coalinga State Hospital, Prepared by Kitchell, November 10, 2006 (Amended

18   Study).  Dkt. 2092 at 7, filed 12/20/2006. I personally observed and inspected the full

19   perimeter fencing.  High security California prisons have electrified fences; however,

20   electrified fences are a newer development in CDCR's history. While electrified fences are

21   a very good security design, the additional benefit was a reduction in staffing needed for

22   perimeter security.  In the absence of an electrified fence, armed towers and/or roving

23   patrols are used, and can be used at Coalinga, to ensure equivalent, effective security.

24       **D.    Coalinga has a State-of-the-Art Electronic Perimeter Security System.**

25       40.    In addition to Coalinga's no-climb, razor tape-topped, double fence

26   perimeter, and CDCR officer presence outside of the perimeter, Coalinga also has an

27   electronic security system on its perimeter.  The perimeter fence is protected by "redundant

28   perimeter security electronic systems, an above-ground microwave motional detections

1  system and a buried coaxial cable ground motion detecting system." Amended Study, Dkt

2  2092 at 7. These state-of-the-art systems detect and monitor movement near the perimeter

3  and prevent escapes and escape attempts. CDCR prisons would benefit from such an

4  advanced security system. I was informed by staff that there has not been a single escape

5  attempt since Coalinga was opened in 2005. Coalinga's perimeter is well secured by

6  CDCR.

7    41.    Based on my inspection of Coalinga and review of Coalinga security

8  documents, I am of the opinion that Coalinga can appropriately house high-custody CDCR

9  inmate-patients in its existing physical plant without any need for physical modifications to

10  the structure or its security systems. Coalinga should utilize the same modifications in

11  policies, procedures and staffing that it previously employed when housing *Coleman* class

12  members at Coalinga. To the extent that the addition of even higher custody inmate-

13  patients may require additional staffing and modifications to operational procedures in

14  order to provide adequate security, Coalinga could easily do so, without construction.

15  CDCR and DMH administrative and custodial staff are trained to adjust staffing and

16  modify operational procedures constantly as they respond to patient and staff needs and

17  changes in patient population.

18    **E.    The Coalinga Feasibility Studies Do Not Adequately Address Security
         Considerations at Coalinga.**

19

20    42.    I reviewed the Coalinga Feasibility Study of October 2006. Comparative

21  Feasibility Study, Coalinga State Hospital Intermediate Care Facility, Prepared by

22  Kitchell, October 6, 2006 (Coalinga Study). Dkt. 2014, filed 11/1/2006. I also reviewed

23  the Amended Study created in November 2006. (The Coalinga Study and the Amended

24  Study, hereafter the Coalinga Studies.) The Coalinga Studies responded to the Court's

25  request for information regarding the feasibility of creating 30 Intermediate Care Facility

26  beds at Coalinga State Hospital for level IV, high-custody inmates. The Coalinga Studies

27  determined that it would cost $29.8 million to demolish a portion of Coalinga and

28  construct new facilities at Coalinga to house these 30 inmate-patients. The Coalinga

1    Studies did not adequately address security considerations at Coalinga because (1) the

2    main focus of the study was on inadequacies in the physical plant structure of Coalinga

3    rather than on a true security review of the facility and (2) the reviewers were required to

4    make a number of assumptions, some of which are inapplicable to the population.

5        43.    As I have stated throughout this declaration, perceived inadequacies in the

6    physical plant security can be overcome with augmented security measures in staffing and

7    operational procedures.  The purpose of increased perimeter security is to prevent escapes.

8    Coalinga has a secure perimeter and CDCR provides excellent perimeter security.

9    However, if officials perceive the existing perimeter security to be inadequate for high-

10   custody inmate-patients, staffing on the perimeter could be enhanced.

11       44.    Further, most of the Coalinga Studies' assumptions about the "high-custody"

12   inmate-patients and their treatment were inapplicable.  My opinion of these assumptions

13   are as follows:

14           a.    The inmate-patient has a "[d]ocumented history of violence and

15   volatility in a prison setting," Dkt. 2014 at 8. This assumes that every level IV inmate has a

16   history of violence and volatility in a prison setting. As I discuss in greater detail below, a

17   recent history of violence or volatility is relevant, but a history from the distant past should

18   not carry the same weight.  I also have known level IV inmates who were placed in a level

19   IV prison solely on the basis of length of sentence and who were not a behavioral problem.

20   Additionally, as discussed in greater detail below, the cultural dynamics of an inpatient

21   treatment facility are different from those of a prison, in some cases inmate-patients adapt

22   favorably to such dynamics.  In fact, during the Coalinga inspection we were told by

23   Coalinga staff in the admissions unit about an SVP who had been an identified as an active

24   gang member in CDCR that had adjusted well to the Coalinga program.

25           b.    Serving these inmate-patients requires "CDCR Level IV, maximum

26   security construction," Dkt. 2014 at 8.  The Coalinga Studies seems to rely primarily on

27   physical plant considerations and fails to consider the two other essential aspects of

28   security—staffing and operational procedure, as discussed above.  Additionally, as I

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1  discuss in greater detail below level IV CDCR inmates are often safely and appropriately

2  housed in both CDCR facilities and non-CDCR facilities that do not meet "CDCR

3  Level IV, maximum security construction." *Id.*  Many of these placements are due to the

4  specialized need of the inmate for medical or mental health care.

5            c.  <u>Movement within the facility:  inmates must be in restraints</u>, Dkt.

6  2014 at 8.  While it may be necessary to restrain inmate-patients based on behavior, it

7  should not be assumed that all level IV inmate-patients require restraints for movement.

8  Level I, II, III and IV inmate-patients are often housed in general population programs

9  within the prison EOP programs and are completely without need for restraints.

10            d.  <u>Housing will be in maximum-security single cells</u>, Dkt. 2014 at 8.

11  Maximum security single cells matching CDCR construction standards are simply not a

12  requirement for a maximum security state mental hospital such as Coalinga.  As described

13  below, even housing in single rooms may not be a necessary requirement if the inmate-

14  patient has been stabilized prior to arrival at Coalinga.  Even if the inmate-patient had an

15  S-suffix (requiring single cell status) or was otherwise single-celled prior to receiving

16  appropriate mental health treatment, it may be determined after considering current

17  behavior and level of functioning that a DMH dorm setting is appropriate.  Coalinga, in

18  any event, has single rooms throughout the facility and also has restraint and seclusion

19  rooms that are used for patients that are violent or otherwise need constant observation.  Of

20  course, there are some inmate-patients that are judged to be highly volatile with a

21  continuing history of explosive episodes that are better suited for the "hardened" physical

22  plant of SVPP.  In my experience, these are more the exception than the rule among the

23  inmate-patients with mental illness.

24      **F.**  **Atascadero and Patton Can Apply Additional Security Measures, as Necessary, to Safely House and Effectively Treat a Range of CDCR Inmate-Patients.**

25

26      45.  As I have previously stated, DMH can account for perceived deficiencies in

27  physical plant security through augmentations in staffing and operational security.  While I

28  have not personally inspected Atascadero and Patton, both are reported to have secure

19

1    perimeters and internal police departments.  Like Coalinga, DMH labels Atascadero as a

2    "maximum security, forensic facility."  Fischer Decl. Ex. T.  In my opinion, Atascadero

3    and Patton should be able to safely house and appropriately treat a range of CDCR

4    inmates.

5    **OPINION 2:  INMATE-PATIENTS SHOULD NOT BE EXCLUDED**
     **FROM DMH STATE HOSPITAL PLACEMENT BASED ON**
6    **BLANKET, ONE-SIZE FITS ALL CUSTODY CRITERIA.  ALL**
     **DETERMINATIONS MUST EFFECTIVELY CONSIDER RECENT**
7    **INDIVIDUAL INMATE-PATIENT BEHAVIOR AS AN OVER-**
     **RIDING FACTOR IN PLACEMENT DECISIONS**

8    **A.    Inmates Must Not Be Denied Access to DMH Hospitals Outside of a**
     **Prison Setting Due to Blanket Custodial Criteria.  Individualized Review**
9    **of In-Custody Behavior is Essential in Determining Where an Inmate**
     **Should Receive Inpatient Psychiatric Hospitalization.**

10

11    46.    Specifically, inmates should not be categorically denied access to DMH beds

12    at hospitals outside of a prison setting based on blanket exclusions that fail to consider an

13    inmate's recent behavior while in prison.  Such exclusions are inappropriate and

14    ineffective and contrary to the missions of both CDCR and DMH.  The facts leading to an

15    inmate's original commitment at CDCR will likely never change, but his behavior may.

16    An inmate's behavior is constantly monitored by CDCR and a much better determinate for

17    future risk of violent or assaultive behavior.  With respect to inmates with mental illness, it

18    is especially important that recent behavior be the basis for decisions regarding the

19    appropriate location for inpatient psychiatric treatment.  In my experience, compliance

20    with medication and mental health programming can make a huge difference in stabilizing

21    an inmate's behavior.  The length of an inmate's sentence should not prevent the inmate

22    from receiving necessary mental health treatment and rehabilitation.

23    47.    Currently, CDCR and DMH are using blanket security exclusions that

24    prevent inmates from receiving inpatient psychiatric hospitalization at Atascadero and

25    Coalinga.  Thus, hundreds of inmates are instead only eligible for SVPP, where there is

26    currently a vast shortage of beds and inmates wait for months, sometimes indefinitely,

27    before being admitted.  Clinicians and custody officers, CDCR and DMH all agree that

28    these inmates need treatment, and that this need is immediate.  Yet, inmates wait, while

[530187-15]

20

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1    beds at Atascadero and Coalinga remain unfilled.

2        48.    It is my opinion that individualized review of recent in-custody behavior is

3    essential to ensure that inmates are appropriately placed in available beds to receive the

4    inpatient mental health treatment that they desperately need.  There are a number of things

5    CDCR and DMH can do to make sure that inmate-patients are securely housed and receive

6    an appropriate level of care in a timely manner.

7        49.    Unlike the current process, there should be no categorical custodial

8    exclusions from DMH inpatient treatment.  All inmate-patients should be evaluated on a

9    case-by-case basis to determine their appropriate treatment location.  In determining

10    whether an inmate-patient could be securely housed and appropriately treated at Coalinga

11    the main factor that would exclude them from placement is a recent history of assaultive or

12    violent behavior while in custody.  I would suggest that inmates with a recent history of

13    assaultive or violent behavior be admitted to SVPP, where they can stabilize and their

14    behavior can be evaluated while stabilized.  Once an inmate-patient has been stabilized

15    with appropriate treatment and/or medication, whether that stabilization occurs in CDCR

16    or in a DMH facility, such inmate-patient should be promptly reconsidered for transfer to a

17    lower security inpatient facility including Atascadero and Coalinga.  Length of sentence or

18    other static custody criteria should not, in and of themselves, exclude an inmate from

19    inpatient DMH treatment at Coalinga and Atascadero.  Using a sentence-based custody

20    designation without taking into account behavior is inappropriate and unnecessary and will

21    prevent inmates from being appropriately treated and safely housed.

22        **B.**    **The Categorical Exclusionary Criteria Used By CDCR and DMH are**

23            **Inappropriate Because They Do Not Consider Recent In-Custody Behavior of Inmates.**

24        50.    CDCR and DMH currently categorically exclude inmates from inpatient

25    DMH treatment at Atascadero and Coalinga for a number of reasons.  I reviewed a list of

26    blanket exclusionary criteria in an Instructional Memorandum dated July 16, 2009 RE:

27    Pilot Program for Intermediate Care Facilities at Atascadero State Hospital, California

28    Medical Facility and Salinas Valley State Prison.  Dkt. 3989, filed 02/25/2011.  I am

21

1   addressing the criteria defendants use to categorically exclude inmates from admission to

2   Atascadero in this declaration because it does not appear that CDCR inmates are even

3   considered for placement at Coalinga directly from CDCR.  I was informed by Coalinga

4   personnel that all inmate-patients were treated at Atascadero prior to transfer to Coalinga.

5   My critique of the Atascadero criteria is applicable to Coalinga as well.  The Memorandum

6   explains inmates are currently excluded from Atascadero based on a number of custody

7   criteria that have little or nothing to do with recent behavior while in prison or at a DMH

8   facility.  Those inmates who are not categorically excluded by this blanket criterion will

9   then be evaluated on a case-by-case basis.

10          51.     Currently inmates are categorically excluded from necessary inpatient

11  psychiatric hospitalization at Atascadero (and by correlation, Coalinga) if they have one or

12  more of the following custody factors:

13                  a.      Maximum custody due to threatening, assaultive, or inciting behavior;

14                  b.      A sentence of life without the possibility of parole (LWOP);

15                  c.      S-suffix due to non-clinical reasons[2];

16                  d.      Close A Custody[3];

17                  e.      Committed in-custody homicide;

18                  f.      High notoriety/public interest; or

19                  g.      An active hold for an offense with potential sentence of:  LWOP,

20  Multiple Life Term, 50 years or more, Life Term, or 15 years or more.

21          52.     The aforementioned criteria are primarily based on static factors that will

22  permanently preclude an inmate from receiving treatment at Atascadero or Coalinga.  On

---

[2] The S-suffix "alert[s] staff of an inmate's need for single cell housing." Cal. Code Regs. tit. 15, § 3377.1(c) (2011).

[3] Inmates are designated as Close A Custody as a result of several case factors including sentence length and escape history.  *See* Cal. Code Regs. tit. 15, § 3377.2(b) (2011). Pursuant to regulations, CDCR houses Close A Custody male inmates "in cells within Level III and Level IV facilities." Cal. Code Regs. tit. 15, § 3377.1(a)(2)(A) (2011).

28

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

their face, the criteria can be categorized in two separate categories:  (1) concerns

regarding escape risk; (2) concerns regarding assaultiveness or violence.  However, in

practice, the criteria miss the mark, and exclude many inmates who are not actually escape

risks or currently violent.  Inmates should be individually assessed to determine whether

the inmate can be safely housed and appropriately treated at Atascadero or Coalinga, or

another DMH institution.

Escape Risk

53.    Exclusionary factors relating to sentence length, potential sentence length,

and the notoriety or public interest of the inmate or his crime are obviously, and for good

reason, due to the concern over potential escape for an inmate-patient who will not parole

to the free community for a very long time, if ever.  Additional security measures may be

appropriate for such individuals, but it is my opinion that adequate security can be

employed to reduce any risk of escape both for perimeter security and interior

programming through modifications in operations and staffing as appropriate.  Inmates

with an LWOP sentence, life sentence or otherwise lengthy sentence should not be

categorically excluded from Atascadero or Coalinga; they should be individually assessed.

54.    To support this point, I have reviewed custody classification documents from

the central file of Ralph Coleman, the lead plaintiff in this case.  Mr. Coleman has a

sentence of LWOP.  Because of his sentence, he would be automatically and permanently

excluded from placement at Atascadero or Coalinga.  Mr. Coleman has been an exemplary

inmate since arriving in CDCR custody on November 2, 1979.  Mr. Coleman is 66 years

old.  On June 22, 2005, the Departmental Review Board (DRB) conducted a placement

review for a Level III override and approved his transfer to California State Prison-Solano

for GP Level III placement.  In the review, the "DRB reviewed all case information,

specifically noting Inmate Coleman's case factors of LWOP, and a positive program since

his arrival in CDCR.  The committee notes that Coleman has not received any serious

disciplinary reports in nearly 26 years of incarceration and acts to commend him for his

positive program."  Ells Decl. Ex. AA.  Although Mr. Coleman's preliminary classification

23

[530187-15]

1  score is ZERO, per regulation, he has a mandatory minimum score of 52 based on his

2  LWOP status. *Id.* This means he will always be a "Level IV" inmate under CDCR's

3  current classification system. Mr. Coleman receives mental health care at CCCMS level of

4  care with a diagnosis of Post-Traumatic Stress Disorder (PTSD) and is currently housed at

5  CMC-E on the mainline. In my opinion, there is no reason that Mr. Coleman should be

6  excluded from receiving inpatient psychiatric hospitalization at Coalinga or Atascadero

7  should the need arise. His case demonstrates that the LWOP blanket exclusion is

8  unfounded.

9       Risk of assault or violence

10      55.    An inmate should not be categorically excluded from inpatient psychiatric

11  treatment at Atascadero or Coalinga based on threatening, assaultive or inciting behavior.

12  Often, in my experience, assaultive, threatening behavior is related to a decompensation in

13  mental health and is remedied with treatment. It would be appropriate to re-review an

14  inmate for inpatient placement at Atascadero or Coalinga after a period of compliant and

15  conforming behavior in a DMH higher security unit such as VPP or SVPP. Inmates who

16  have a history of threatening, assaultive or inciting behavior while in prison should be

17  individually assessed. Clinical and custodial staff must work together to determine

18  whether the inmate can safely program and not be a threat to others. Acts committed more

19  than six months in the past should have much less weight than recent acts. The recent

20  behavior of the inmate while in a DMH program should hold far greater weight than

21  historical bad acts, especially those committed in CDCR prisons.

22           a.    Additionally, inmates who are currently classified by CDCR as

23  single-cell only should not be categorically excluded from inpatient treatment at Coalinga

24  or Atascadero. As a general rule, all inmates, while in prison, would rather be in a single-

25  cell than a double cell or dorm setting. From my experience, inmates often take actions to

26  ensure that they will be housed in a single cell. However, this does not mean that an

27  inmate-patient would not be housed appropriately in a dorm or multi-person cell in a

28  hospital setting where they are being treated. This being said, this criterion bears close

[530187-15]

1    consideration because there may be good reason that a particular inmate should never be

2    housed with others.  However, it is my opinion that the *reason* for the single cell placement

3    is a far greater consideration than the mere fact that one is currently living in a single cell.

4    Again, the inmate should be individually assessed to determine whether he can be

5    appropriately housed in a dorm setting at Atascadero or Coalinga, or another DMH

6    institution.  In addition, as noted, Coalinga has numerous single rooms and does not rely

7    solely on dorm housing.

8           b.     Even an inmate who has committed an in-custody homicide should

9    not be permanently excluded from DMH hospitals.  However, because this is such a

10   serious violation and predicting behavior is not without risk, I believe that if an inmate-

11   patient has committed an in-custody homicide, initial inpatient placement at a CDCR

12   facility program such as SVPP is most appropriate.  After successful programming these

13   cases should be considered for placement in a DMH hospital such as Coalinga on a case-

14   by-case evaluation.  I believe that a significant period (two to three years) of compliant

15   programming in prison or in another higher-custody DMH institution such as SVPP or

16   VPP would be necessary to support such a transfer.

17       56.    My review of inmate files suggests that the exclusionary criteria have

18   become more rigid in recent years.  Inmate-patients who were previously accepted and

19   treated at Atascadero have been recently redirected to SVPP, even when custody points

20   and security levels have decreased.

21   Inmate-Patient O[4]

22       57.    Inmate-Patient O is an EOP inmate classified as Level II and Medium A

23   custody.  He was treated at Atascadero and Coalinga from 7/23/08 until 4/2/09 when he

24   discharged from Coalinga to California Men's Colony-East (CMC-E).  When he was

25

26   _____

27   [4] Unless otherwise indicated, references are to Excerpts from Inmate-Patient O Central and
     Medical Files, Ells. Decl. Ex. CC.

28

accepted at Atascadero he had a higher custody classification - Level III, with 35 points and Medium A custody. Inmate-Patient O was again referred to the ICF level of care on May 17, 2010. The DMH ICF Placement Screening Sheet noted no categorical exclusions and no need for a case-by-case review. He was referred to Atascadero on May 24, 2010. He was clinically "accepted" to ICF care (not transferred, but accepted on paper) on June 3, 2010, he was described as "agitated, pacing, severely depressed, guilty, obsessive … delusions about guilt, kids, shame, death, limited insight and judgment." Despite his clear need for ICF care, Inmate-Patient O did not transfer to SVPP until January 26, 2011, more than seven months after acceptance. While waiting for his DMH transfer, Inmate-Patient O was moved to California Substance Abuse Treatment Facility and State Prison, Corcoran (CSATF) Level II EOP on September 15, 2010, where he continued to exhibit psychotic symptoms, and was again identified as requiring ICF level of care. While the DMH Placement Screening Sheet dated 12/15/10, found no preclusionary factors or need for a case-by-case evaluation, no specific ICF program was checked this time. Despite this and the previous referral to Atascadero in May 2010, Inmate-Patient O was transferred to SVPP and not Atascadero on January 26, 2011. At that time, the SVPP wait list had 243 patients and there were empty beds at Atascadero, Coalinga, and Vacaville Psychiatric Program (VPP). Fischer Decl. Ex. G.

58.     Inmate-Patient O was determined appropriate for dorm housing when he arrived at SVPP, and programmed successfully and quickly advanced through the treatment stages. Within 60 days of arrival, he was promoted to Stage 3, the final level of treatment programming. In April 2011 he received a commendation for serving as a mentor in his housing unit and for "leading other patients toward success by role modeling commitment to himself and to this program." None of the DMH documents I reviewed , which include regular assessments by his clinical team and updated treatment plans, include any recommendation that Inmate-Patient O be reviewed for transfer to a lower custody ICF program or discuss the outcome of any such review.

59.     In my opinion, Inmate-Patient O could and should have been transferred to

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1   Atascadero or Coalinga, opening up another bed at SVPP for higher security patients.  It is

2   reasonable to assume that there are numbers of other similar patients who are stable and

3   ready for transfer to Coalinga or Atascadero.

4         **C.**     **CDCR'S Case-By-Case Evaluation of Inmates Must Be Meaningful and Should Not Serve as a Backdoor to Categorical Exclusion From DMH**

5                   **Hospitalization at Coalinga or Atascadero.**

6         60.     CDCR has already identified certain criteria for case-by-case analysis of

7   inpatient treatment at DMH facilities.  As I state throughout this declaration, I believe that

8   a case-by-case consideration is the most effective means for determining safe housing and

9   appropriate treatment for each inmate-patient.  Such case-by-case determination should be

10  focused on recent in-custody behavior.

11        61.     Assaultiveness and violence may also be symptoms of a mental illness.

12  Recent episodes of violence or assaultiveness should be evaluated to determine if these

13  episodes were merely the product of the mental illness that needs treatment.  Additionally,

14  if these episodes occurred while the inmate was awaiting prescribed treatment, this should

15  be taken into consideration.  While these factors should be considered in deciding the

16  appropriate level of custody in both a prison and mental health facility, such limiting

17  factors should be consistently re-evaluated, at least every 30 days, to determine whether

18  the inmate-patient has stabilized to a level that would allow them to transfer to a lower

19  security level facility within DMH, thus freeing up higher-custody level beds for inmates

20  who desperately need them.  When necessary, inmate-patients should be stabilized at a

21  higher-security level facility such as SVPP or VPP, and when appropriate transferred to

22  Coalinga or Atascadero.  In the alternative, admission units at Atascadero and Coalinga

23  could be utilized for this purpose.

24        62.     Further, this case-by-case analysis must be meaningful, and not just a

25  backdoor to categorical exclusions.  Each inmate with serious mental illness must receive

26  an individual evaluation to determine where they can be safely housed to receive the

27  appropriate level of mental health treatment and the evaluation should be repeated at least

28  every 30 days.  This consideration should be part of the IDTT review.

63.    An inmate's interdisciplinary team which includes both clinicians and custody staff must have the latitude to send an inmate to a DMH facility when he or she is ready—this decision should not be based on a rigid, or punitive period of time.  When inmate-patients do not receive necessary mental health treatment, it threatens the safety and security of prison staff, other inmates, the inmate his or herself and ultimately the public at large.

64.    Coalinga and Atascadero can and should safely house and appropriately treat high-custody inmate-patients.  *Coleman* class members with a level III or IV CDCR custody classification should not be limited to SVPP or VPP for inpatient treatment; as I have discussed in great detail Coalinga and Atascadero can and should admit these patients.

**D.    High-Custody Inmates Do Not Necessarily Present an Additional Safety or Security Risk.**

65.    An inmate may be considered "high-custody" for a number of reasons within CDCR.  Inmates are allocated points based on factors including sentence length, behavior, age and participation in the Mental Health Services Delivery System (MHSDS).  An increase in points may have nothing to do with in-custody conduct; an inmate may have exemplary in-custody conduct, but will still be classified as high-custody based on sentence length.  Additionally, the very fact that a person is identified as needing mental health treatment can increase their custody level.

**E.    Inmate Classification as Described in the California Code of Regulations Title 15 is a Tool for Effective Bed Management Within a Prison.  Such a Classification Is Not Applicable Outside of a Prison.**

66.    I am extremely familiar with CDCR's method of inmate classification, as set out in Title 15 of the California Code of Regulations.  These regulations serve as a guide for housing inmates within a prison setting.  These regulations are not dispositive and certainly not without discretion on housing placement.  In fact, specific inmate needs will often require override of these regulations both within and outside the prison setting.  Further, this override is specifically contemplated in the regulations.  An inmate who

[530187-15]

28

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1  "requires an outpatient or higher degree of medical or psychiatric care at a facility

2  specifically staffed for the type of treatment necessary" may be "housed in a facility with a

3  security level which is not consistent with the inmate's placement score." Cal. Code Regs.

4  tit. 15, § 3375.2(a), (a)(1) (2011). In my experience, there are many occasions when an

5  inmate would be housed in a facility with a security level which is "not consistent with the

6  inmate's placement score."

7        67.    Generally, inmates are housed in a prison with a security level that

8  corresponds with their points. The higher the points, the higher security level. Level III

9  and IV prisons have celled housing. Cal. Code Regs. tit. 15, § 3377(c), (d) (2011). Level I

10  and II prisons have dorms. However, these security levels are by no means absolute. As a

11  result of my review of sections of the McManis Consulting, Consulting Services for

12  California Department of Corrections & Rehabilitation, Mental Health Bed Need Study:

13  Based on Spring 2011 Population Projections, May 2011 and CDCR's weekly EOP

14  Population Report (Fischer Decl. Ex. BB), I realize that there are a large number of EOP

15  inmates who are classified as a level I or II custody level but are required to live in a level

16  III or IV facility due to a lack of EOP beds at level I and II CDCR institutions. Inmates are

17  housed in cells in level III and IV institutions, even if they are cleared to live in dorms due

18  to their custody level.

19        68.    CDCR regulations regarding security levels I through IV are descriptions of

20  the level of security the physical plant provides. These regulations are nothing more than a

21  guideline to safely house people. They are a way for CDCR to manage beds in prisons.

22        69.    These regulations do not apply when inmates are taken outside of the prison

23  setting. I would estimate that as many as 500 medical beds outside of prison walls are

24  currently filled with CDCR inmates in the state of California. These hospital facilities do

25  not meet the security or construction standards outlined in CDCR regulations, yet CDCR

26  inmates are currently housed in those medical hospitals and facilities, and must be housed

27  there. CDCR custody staff adapt to the situation at hand. When the physical plant is not

28  as secure as CDCR would like, CDCR figures out other ways to provide adequate security,

1   such as increased staffing.

2       70.    In my experience, there are a number of ways to override CDCR security

3   regulations based on an individual's specific need for treatment. For example, if a

4   particular inmate has points that equate to custody level IV and has a specific medical

5   issue requiring treatment at CMF (a level III facility), that inmate should be able to receive

6   necessary treatment at CMF, in spite of the fact that CMF is not a level IV facility. These

7   overrides happen routinely and regularly, even for condemned inmates who require mental

8   health hospitalization in the Acute Psychiatric Program (APP) unit at VPP.

9       **F.**    **Mental Health Treatment is Medical Treatment. CDCR Routinely**
    **Arranges Appropriate Security for Medical Treatment.**
10

11       71.    If an inmate requires emergency medical assistance they are sent to

12   community hospitals including UC Davis, UCSF, Marin General and many others

13   throughout the state. While CDCR has developed some "locked wards" throughout

14   California for housing acute care inmate-patients, many are simply placed in the

15   community hospitals without any physical plant modifications to increase security. These

16   hospitals generally have extremely limited existing security measures. Yet, custody staff

17   regularly determine how to provide security so that the inmate-patient is appropriately

18   treated while being securely housed. No limits are placed on the inmate-patient's

19   treatment based on custody status, whether they are serving a term of LWOP, whether they

20   are on death row, or whether they are highly assaultive. Mental health treatment should be

21   no different. Rejecting mental health patients for exhibiting the symptoms of their illness

22   would be like a community hospital refusing to take someone because they are sick.

23       72.    For example, when death row inmate-patients are transported to outside

24   community hospitals for inpatient treatment, the transportation and hospital guarding

25   custody teams are enhanced with a custody supervisor (usually a Sergeant) and additional

26   tactical weapons officers to fortify the security for that hospital placement.

27       73.    Custody staff can likewise arrange for appropriate security in an inpatient

28   DMH facility where a security infrastructure is already in place. DMH is designed and

1  equipped to treat the clinical and security needs of individuals with serious mental illness.

2  DMH hospitals have the staffing, the mission, and the environment to do so.  DMH

3  hospitals are different from prisons.  But DMH has its own internal security policies and

4  Department of Police Services that, in my opinion, could and should provide appropriate

5  security for *Coleman* patients when housed at Coalinga.

6       74.     In my experience, each institution has its own cultural dynamic that impacts

7  behavior.  Behavioral expectations and individual responses to the environment are

8  determined in part by institutional culture.  If an inmate is transferred from a level IV

9  prison facility to a DMH inpatient facility, that same inmate may well respond and behave

10 very differently to the DMH facility because the behavioral expectation associated with the

11 hospital culture at that DMH facility is very different from the culture of the maximum

12 security prison.  DMH inpatient hospitals focus on treatment and operate within a clinical

13 environment.  For example, inmate-patients who have great fears in a prison setting may

14 adapt very well to a clinical treatment setting.  Coalinga personnel echoed this during my

15 inspection and expressed that they had not had gang problems at the hospital.

16      75.     In my experience, the symptoms of mental illness may include an inability to

17 socialize.  After having participated in hundred, maybe thousands, of classification and

18 IDTT meetings and making program decisions about mentally ill inmate-patients'

19 programs, it is clear that the ability to appropriately interact and socialize is a target goal in

20 most patient cases.  Thus, appropriate treatment facilities include a day room where

21 inmate-patients socialize as part of their treatment.

22      **G.     CDCR Regularly Transfers Inmates Among Institutions to Meet Bed**
23                **Needs.  DMH Must Manage Beds to Ensure That Inmate-Patients**
                  **Receive Necessary Inpatient Hospitalization.**

24      76.     Each CDCR institution has a mission.  Inmates are transferred among CDCR

25 institutions when their security classification, custody level, or program need changes, they

26 have a disability requiring specific accommodations, or they require medical treatment.

27 Likewise, when an inmate's mental health care needs change, they, too, should be

28 immediately transferred to the facility that can provide an appropriate level of care.  CDCR

[530187-15]

31

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

is skilled at efficiently transferring inmates whose needs have changed.  In the current state of overcrowding emergency that CDCR faces, bed space is extremely valuable.  CDCR has taken measures to maximize every available space to house inmates.  DMH needs to manage their beds more effectively, to ensure that beds are filled.  It is unconscionable that beds sit empty at DMH hospitals when inmates have been prescribed treatment and yet they languish on a wait list.

### H. Inmate-Patients at SVPP Need to Be Re-Evaluated to Determine If They Can Be Safely Housed and Appropriately Treated at Coalinga or Atascadero.

77.     It is my understanding that defendants have not been moving inmate-patients from SVPP to Atascadero.  I know from my inspection of Coalinga that defendants have not been moving *any* inmate-patients to Coalinga.  Based on my review of several inmate-patient central files and DMH records, which are discussed in more detail in below, it appears that defendants could and should be transferring inmate-patients to Atascadero and Coalinga.

78.     SVPP was designed to house the highest high-custody CDCR inmate-patients.  It is essential that CDCR and DMH frequently re-evaluate the inmate-patient populations at DMH programs at VPP and SVPP to identify inmate-patients who are stabilized and could be securely housed and appropriately treated in the empty and available units at Coalinga or Atascadero.

79.     Inmates are frequently reclassified within CDCR.  Custody staff review current behavior and other factors to determine if an inmate is housed in an appropriate setting.  Because of due process and liberty interests, inmates housed in Administrative Segregation must be constantly re-evaluated.  So, too, must the inmate-patients at higher-custody DMH hospitals such as SVPP and VPP.  It is essential that CDCR reevaluate these individuals based on recent behavior to determine whether they can receive appropriate treatment and secure housing at a lower security CDCR bed or DMH facility.  In the Interdisciplinary Treatment Team (IDTT) process, which occurs every 30-days, each inmate-patient should be evaluated to determine whether, based on recent behavior, they

[530187-15]

1   should be moved into a dormitory setting, whether it be at SVPP or another DMH hospital.

2   Bed moves should become a more fluid process within DMH, allowing inmate-patients to

3   transfer to DMH hospitals outside of prisons when appropriate based on recent behavior.

4       80.   In my opinion, if an inmate-patient is currently living in a dorm, whether in a

5   CDCR institution or a DMH facility, I see no reason why that inmate could not be

6   immediately transferred to an empty bed at Coalinga or Atascadero.  By living in a dorm,

7   the inmate-patient has demonstrated that he can live with others and does not require

8   solitary living.

9   <u>Inmate-Patient P</u>[5]

10      81.   Inmate-Patient P is a CDCR inmate who transferred to SVPP ICF program

11  on December 27, 2010, from CSATF's Level II EOP Sensitive Needs Yard (SNY)

12  program.  At that time, the SVPP wait list had 326 patients and there were empty beds at

13  Atascadero and Coalinga.  Fischer Decl. Ex. H.  He has now been in the SVPP ICF

14  program for more than seven months.  Inmate-Patient P is Level II, with 19 points, and has

15  Medium AR/SNY custody.  He is also approved for double cell and/or dorm housing.

16  Inmate-Patient P appears to have an R suffix, which relates to a sex related offense or rule

17  violation, because of a juvenile offense and a 2003 rule violation issued for Indecent

18  Exposure.  Although Inmate-Patient P's classification sheet shows that his adjusted point

19  score would actually be ZERO because he has remained disciplinary-free, he has 19

20  mandatory minimum points solely because of the R suffix.  Inmate-Patient P has SNY

21  status because he is a street gang drop-out.

22      82.   After Inmate-Patient P was referred by CDCR clinicians for DMH ICF

23  placement in October 2010, his DMH  ICF housing placement was reviewed three times

24  by the CDCR/DMH custody screening process.  On October 26, 2010, he was referred to

25  ───────────────────

26
27  [5] Unless otherwise indicated, references are to Excerpts from Inmate-Patient P Central and
    Medical Files, Ells Decl. Ex. DD.

28

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1    Atascadero State Hospital, with a case-by-case review required due to his SNY status.  On

2    November 30, 2010, HC-POP conducted the case-by-case review of his SNY status and

3    affirmed the ASH placement.  In early December 2010, however, Inmate-Patient P's DMH

4    ICF referral was reviewed two more times.  No explanation is provided, but on

5    December 1, 2010, he was recommended for VPP dorm placement due to his SNY status,

6    and on December 3, 2010, he was recommended for SVPP due to his SNY status.

7    Although Inmate-Patient P had been recommended for ASH twice, and has Level II

8    custody points and prior dorm living at CSATF, he was excluded from ASH and CSH and

9    transferred to SVPP on December 27, 2010.  DMH records reveal that Inmate-Patient P

10    has programmed at SVPP the past seven months without any violence and was even

11    moved to the dorm housing unit because of his move to the highest stage of treatment.

12    None of the DMH documents, which include regular assessments by his clinical team and

13    updated treatment plans, include any recommendation that Inmate-Patient P be reviewed

14    for transfer to a lower custody ICF program or discuss the outcome of any such review.

15        83.    In my opinion, Inmate-Patient P could and should have been transferred to a

16    DMH ICF program at Atascadero or Coalinga, months ago, thereby opening up higher

17    custody ICF beds at SVPP.

18    Inmate-Patient Q[6]

19        84.    Inmate-Patient Q is an example of a vulnerable and low risk class member

20    who was denied timely ICF care based on illogical and inappropriate exclusionary criteria,

21    and who should be transferred from SVPP to an open lower custody bed given the current

22    inpatient bed shortage.  He is an EOP inmate who was referred for inpatient ICF treatment

23    on November 16, 2010 and spent nearly four months on the SVPP ICF wait list before

24    transferring to SVPP on March 15, 2011.  At that time, the SVPP wait list had 196 patients

25

26    _____

27    [6] Unless otherwise indicated, references are to Excerpts from Inmate-Patient Q Central and
     Medical Files, Ells Decl. Ex. EE.

28

[530187-15]

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1  and there were empty beds at Atascadero and Coalinga.  Fischer Decl. Ex. E.  where he

2  remained as of early August 2011.  He is classified as DD2 (developmentally disabled),

3  and has SNY status because of his limited intellectual capacity and vulnerability to other

4  inmates.

5        85.    Inmate-Patient Q was placed in the Level III EOP SNY program at Mule

6  Creek State Prison (MCSP) on April 14, 2009, but was transferred to a Level IV unit after

7  he was accused of "stalking" a female officer in September 2009—he never touched the

8  officer but did follow her around the yard.   As a result, he was transferred to the Level IV

9  program at MCSP, where he was subsequently lowered to the 3CMS level of care on

10  March 11, 2010.  He transferred to a CSATF SNY yard on May 12, 2010.  There, he

11  received a Rule Violation Report (RVR) for indecent exposure-masturbation on June 26,

12  2010, for which he received a SHU term.  On October 13, 2010, he was returned to the

13  EOP level of care, and received two additional RVRs shortly thereafter, each one for

14  indecent exposure-masturbation (October 24 and 26, 2010).  For at least one RVR, it was

15  determined that his mental illness contributed to the behavior at issue.

16        86.    On November 16, 2010, Inmate-Patient Q was referred to DMH SVPP based

17  on his inadequate level of functioning at the EOP level of care.  Inmate-Patient Q's

18  clinician noted that it was "fairly clear that he has little or no understanding of or

19  appreciation for the circumstances surrounding his current situation and recent behaviors;

20  much less their gravity."  His clinical team found that he "requires a level of supervision,

21  care, and intervention that is not currently available at CSATF.  He requires a structured,

22  consistent, and planned environment which allows implementation of a structured

23  behavioral approach to his problems that is informed by an optimal behavioral assessment

24  conducted in a more conducive setting.  This [inmate-patient] has (a) an excessive reliance

25  on masturbation and sexual fantasy when in distress (and the observed threshold for this is

26  quite low) and (b) an obvious lack of sophistication in the interpersonal area which, among

27  other things, has gotten him into trouble with staff and leaves him open to predation on the

28  yard.  These deficits will be better addressed in alternative coping skills development and

[530187-15]

35

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1  social skills to learning and success.…  He typically appears oblivious when engaged in

2  [sexually inappropriate] behavior."

3    87.    Because of his maximum custody status—based on the above mentioned

4  "stalking" incident—Inmate-Patient Q was automatically excluded from Atascadero and

5  Coalinga, where there were open and available ICF beds.  The DMH Placement Screening

6  Sheet also notes that Inmate-Patient Q was subject to case-by-case evaluation because of

7  the imposed or pending SHU terms for his three recent RVRs for indecent exposure and

8  masturbation, as well as his SNY/Safety Concerns.  His safety concerns were described as

9  his fears "due to his mental incapacity and DD2 status" and that "he will be assaulted on a

10  mainline setting."  Notably, staff documented that there was no "evidence of

11  assaultive/aggressive ideation/intent/plan."

12    88.    Because he was excluded from lower custody ICF beds and placed on the

13  SVPP wait list, Inmate-Patient Q remained at CDCR for approximately four months

14  following his DMH referral.  He was placed in the administrative segregation unit (ASU)

15  at CSATF, which is not an EOP ASU.  He continued to have significant difficulty

16  functioning in the ASU.  On February 16, 2011, after three months on the ICF wait list, he

17  was placed in a Mental Health Crisis Bed (MHCB) because he was suicidal.  Clinicians

18  documented that he had a black eye and cuts on his face from an attack by his cellmate,

19  who had a "history of violence against weaker inmates."  Inmate-Patient Q's mental

20  condition also deteriorated.  He reported to MHCB staff that "his girlfriend was being

21  flushed down the toilet and he dove into the toilet trying to save her," that "he was running

22  after a girl [and] his pants fell down while running, he tripped and hit eye."  He further

23  reported that his "brain feels like it is floating" and that he was hearing voices.

24    89.    On March 15, 2011, he was finally admitted to SVPP, where he was placed

25  in a dorm setting.  His progress notes and other DMH records show that he has

26  programmed successfully in the SVPP dorm unit, has not had any indecent exposure or

27  spontaneous masturbation behavior in public areas, has been respectful to staff and peers,

28  and has not had any impulsive/assaultive behaviors since his DMH admission.  He reached

36

the highest level of programming (Stage 3) by May 12, 2011, and—with one exception

when he became agitated and refused to follow an order during showers—has not had any

documented disciplinary issues.

90.     In my opinion, the automatic exclusion of this inmate from lower custody

beds at Coalinga and Atascadero was inappropriate, particularly given the length of the

SVPP ICF wait list and the many open beds at Coalinga and Atascadero.  The automatic

exclusion based on his maximum custody status is inappropriate given the remoteness of

the non-violent "stalking" behavior at issue—nearly 18 months prior to referral—and the

documented findings that he did not pose a current risk of assaultive or aggressive

behaviors.  Exclusion based on his recent "SHU-able" indecent exposure offenses is also

inappropriate.  Clinicians referred this inmate for inpatient care based on his inability to

control and understand these behaviors; it makes no sense to exclude him from timely

inpatient care based on those same behaviors, which can be safely and effectively managed

in a hospital setting.  Finally, I see no reason that his SNY/safety concerns based on his

mental incapacity and fear about being placed in a "mainline" general population setting

should prevent him from being safely housed at Coalinga or Atascadero.  The reality is that

he was physically victimized in an inappropriate ASU setting, and required acute MHCB

treatment, while unnecessarily waiting on the SVPP wait list for nearly four months.

91.     In my opinion Inmate-Patient Q could be immediately placed in one of the

open Coalinga or Atascadero beds to make room for higher custody inmates currently on

the SVPP wait list.

Inmate-Patient R[7]

92.     Inmate-Patient R is a CDCR inmate who transferred to SVPP on

December 27, 2010, from CSATF's Level II EOP program.  At that time, the SVPP wait

---

[7] Unless otherwise indicated, references are to Excerpts from Inmate-Patient R Central and
Medical Files, Ells Decl. Ex. FF.

[530187-15]

1    list had 326 patients and there were empty beds at Atascadero and Coalinga.  Fischer Decl.

2    Ex. H.  He has been at SVPP for more than seven months.  Inmate-Patient R has Level II

3    points (19) and Medium A custody, with SNY status based upon his request due to his

4    commitment offense.  SNY inmates are housed separately from general population

5    inmates, often due to safety concerns.  In 2006, Inmate-Patient R was treated at Atascadero

6    for four months.  According to a classification chrono, Inmate-Patient R was discharged

7    from Atascadero due to resisting staff and SNY concerns.  Inmate-Patient R reported

8    during his SVPP Intake that he had been "kicked out due to fighting."

9          93.    In April 2010, Inmate-Patient R was referred for DMH ICF placement at

10   both Vacaville Psychiatric Program (VPP) and Atascadero.  He was evaluated on a case-

11   by-case basis due to his SNY status.  At the time of his referral, he was Level II, with 19

12   points, had no disciplinary history.  He was housed in the dorms at CSATF in the EOP

13   program.   On May 3, 2010, Healthcare Placement and Oversight Program (HC-POP)

14   completed its case-by-case review and found Inmate-Patient R appropriate for placement

15   at Atascadero.  In its review, HC-POP noted that there is no documentation that Inmate-

16   Patient R actually had substantiated/verified safety concerns.  While waiting for ICF

17   transfer, Inmate-Patient R decompensated and was treated in the Acute Psychiatric

18   Program (APP) at VPP from August until October 2010.  When he returned to CSATF, he

19   was re-referred to Atascadero.  On October 27, 2010, his housing placement was reviewed

20   and he was again recommended for Atascadero, on a case-by-case evaluation of his SNY

21   status.  Two additional DMH ICF program reviews were completed before Inmate-Patient

22   R was transferred to SVPP.  Almost one month later, on November 22, 2010, he was

23   recommended for SVPP placement due to his SNY status.  Three weeks later, on

24   December 14, 2010, he was referred for a case-by-case review with no ICF program

25   designated.  Inmate-Patient R transferred to SVPP on December 27, 2010.  On January 5,

26   2011, during his initial committee review he was approved for dorm housing.

27         94.    Inmate-Patient R progressed rapidly in the ICF program at SVPP.  He was

28   attending all of his offered groups and "participating fully" at his 30 day review.  The

[530187-15]

1   SVPP wait list stood at 326 inmates as of December 31, 2010.  Despite Inmate-Patient R's

2   rapid and successful programming in SVPP and the significant SVPP waitlist and empty

3   Atascadero and Coalinga beds, his treatment team did not consider him for transfer to a

4   lower custody ICF program.

5        95.    It is my opinion that Inmate-Patient R could be immediately placed in one of

6   the open Coalinga or Atascadero beds to make room for higher custody inmates currently

7   on the SVPP wait list.

8        **I.    The Failure to Provide Timely and Necessary Mental Health Treatment
            to Inmates Who Need It Threatens the Safety and Security of Prisons.**

9

10       96.    I am of the opinion that what is best for the inmate is also what is best for

11  prison staff as it relates to mental health treatment.  Leaving a portion of the mentally ill

12  prison population untreated, or under-treated, and languishing on waiting lists, while

13  custody staff are required to respond to these inmates without the appropriate clinical

14  treatment, serves only to perpetuate a culture of violence and chaos.  Institutional staff,

15  other inmates and the mentally ill inmate him or herself face tremendous risks when

16  housed in an inappropriate setting without appropriate treatment.  The effects on custody

17  staff and the inmate population are dire.  It is often beyond the ability and resources of

18  custody staff to manage inmates with serious mental illness, yet they are asked to do it on a

19  daily basis.  Ensuring that inmates are receiving the appropriate level of mental health care

20  is paramount in managing a prison population.

21       **J.    The Long Wait List May Deter Clinicians From Referring Inmates For
            Inpatient Treatment.**

22

23       97.    In addition to the obvious effects that lack of treatment has on a patient, in

24  my experience, a long wait list also has a deterrent effect on referrals.  In my experience

25  from working closely with clinicians in mental health programs at Pelican Bay State

26  Prison, clinicians quickly learn which inmates will be rejected from DMH due to custody

27  factors.  Unfortunately, these are often the same inmate-patients who need DMH inpatient

28  treatment the most.  However, like all prison resources, clinical staff are stretched thin.  A

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1  clinician knows who will and who will not be accepted into a DMH inpatient program

2  based on the stated exclusionary criteria used by CDCR and DMH.  This same clinician

3  may soon learn not to waste their time referring someone who will indefinitely remain on

4  the waitlist.  While I managed the Psychiatric Service Unit (PSU) at Pelican Bay, I often

5  saw doctors who identified inmates as good candidates for clozapine,[8] after the inmate

6  failed to respond to any other psychotropic medication.  However, the administration of

7  clozapine required a skilled nursing facility with 24-hour coverage; this was nursing

8  coverage that the PSU did not have.  The doctors had to refer their inmate-patients to

9  DMH, but these inmates would inevitably be denied because they were determined to be

10  too dangerous and not well medicated—the exact two factors that clozapine would

11  address.  Eventually doctors stopped referring all but a few of these inmates to DMH,

12  because they knew their referrals were futile.

13  **CONCLUSIONS AND RECOMMENDATIONS**

14       98.     Coalinga is a state-of-the-art, maximum security state hospital.  Coalinga can

15  and should safely house and adequately treat a range of CDCR inmates, including high-

16  custody inmates.  I have identified some minor security enhancements above that Coalinga

17  could implement to accomplish this goal.  These enhancements were, in large part,

18  previously used at Coalinga when *Coleman* class members were living there.  The

19  remaining suggestions have to do with breaking down the barriers to inmate-patient

20  placement at DMH hospitals.  My specific suggestions include the following:

21       99.     The SVPP waitlist can be reduced and more rapid inpatient care can be

22  achieved for more patients.  DMH must manage beds as CDCR does, with more fluidity.

23  Inmate-patients living in SVPP or VPP should be immediately re-evaluated and continue

24  to be re-evaluated every 30 days for lower-level placement at Coalinga or Atascadero.

25

26

27  [8] Clozapine is an antipsychotic drug.  Its use must be closely monitored because improper use can be lethal.

28

[530187-15]

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1  Inmate-patients currently living in SVPP or VPP cells who have stabilized should be

2  reviewed for transfer to a dorm setting either at SVPP or at Atascadero or Coalinga.  Any

3  inmate-patient currently living at a dorm at VPP or SVPP should be reviewed for transfer

4  to Atascadero or Coalinga as soon as possible.  Following these reviews inmate-patients

5  should be moved as appropriate.

6      100.    Blanket exclusions from DMH inpatient psychiatric hospitalization should be

7  eliminated.  Further, case-by-case individualized determinations should be frequent and

8  primarily based upon current, recent behavior rather than static factors or historic behavior.

9  / / /

10  / / /

11  / / /

12  / / /

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

[530187-15]

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF

1      I declare under penalty of perjury under the laws of the State of California that the

2 foregoing is true and correct, and that this declaration is executed at San Francisco,

3 California this 11th day of August, 2011.

4

5                                       Joseph L. McGrath

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[530187-15]

DECL. J. McGRATH ISO PLS.' BRIEF ON EVIDENTIARY HEARING RE ORDER TO SHOW CAUSE WHY
EMPTY DMH BEDS CANNOT BE FILLED WITH CDCR INMATES & ISO ADDITIONAL RELIEF