# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

      Plaintiffs

          v.                    No. CIV S-90-0520 LKK JFM P

EDMUND G. BROWN, JR., et al.,

      Defendants

## TWENTY-THIRD ROUND MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES, AND PROTOCOLS

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE, LOPES, DEVEREAUX, &WEST LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
(401) 824-5100
Fax: (401) 824-5123
December 1, 2011

i

## ACRONYMS and ABBREVIATIONS

3CMS:             Correctional Clinical Case Management System

ADLs:             Activities of Daily Living

AED:              Automatic Electronic Defibrillator

Ambu bag:         Ambulatory Bag Used for CPR

APP:              Acute Psychiatric Program at Vacaville

ASH:              Atascadero State Hospital

ASP:              Avenal State Prison

ASU:              Administrative Segregation Unit

BMU:              Behavioral Modification Unit

BPT:              Board of Prison Terms

C-file:           Central File

C&PR:             Classification and Parole Representative

CAL:              Calipatria State Prison

CAP:              Corrective Action Plan

CC I:             Correctional Counselor I

CC II:            Correctional Counselor II

CCAT:             Coordinated Clinical Assessment Team

CCC:              California Correctional Center

CCF:              Community Correctional Facility

CCI:              California Correctional Institution

CCWF:             Central California Women's Facility

| | |
|---|---|
| CDCR: | California Department of Corrections and Rehabilitation |
| Cen: | Centinela State Prison |
| CIM: | California Institution for Men |
| CIW: | California Institution for Women |
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CMO: | Chief Medical Officer |
| CO: | Correctional Officer |
| CPR: | Cardiopulmonary Resuscitation |
| CRC: | California Rehabilitation Center |
| CSATF: | California Substance Abuse Treatment Facility |
| CSH: | Coalinga State Hospital |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CTC: | Correctional Treatment Center |
| CTF: | Correctional Training Facility |
| CVSP: | Chuckawalla Valley State Prison |
| DAI: | Division of Adult Institutions |
| DCHCS: | Division of Correctional Health Care Services |
| DHS: | Department of Human Services |
| DMH: | Department of Mental Health |

DON:                    Director of Nursing

DOT:                    Direct Observation Therapy

DTP:                    Day Treatment Program

DVI:                    Deuel Vocational Institute

EOP:                    Enhanced Outpatient Program

ERRC:                   Emergency Response Review Committee

FIT:                    Focused Improvement Team

Folsom:                 Folsom State Prison

GACH:                   General Acute Care Hospital

GAF:                    Global Assessment of Functioning

GP:                     General Population

QMC:                    Quality Management Committee

HDSP:                   High Desert State Prison

HQ:                     Headquarters

HS:                     *Hora Somni*/Hour of Sleep

ICC:                    Institutional Classification Committee

ICF:                    Intermediate Care Facility

IDTT:                   Interdisciplinary Treatment Team

IEX:                    Indecent Exposure

ISP:                    Ironwood State Prison

KOP:                    Keep on Person

KVSP:                   Kern Valley State Prison

LCSW:                   Licensed Clinical Social Worker

LOC:                    Level of Care

LOP:                    Local Operating Procedure

LOU:                    Locked Observation Unit

LPN:                    Licensed Practical Nurse

LPT:                    Licensed Psychiatric Technician

LVN:                    Licensed Vocational Nurse

MAR:                    Medication Administration Record

MCSP:                   Mule Creek State Prison

MHCB:                   Mental Health Crisis Bed

MHOHU:                  Mental Health Outpatient Housing Unit

MHSDS:                  Mental Health Services Delivery System

MHTS.net:               Mental Health Tracking System

MOD:                    Medical Officer of the Day

MOU:                    Memorandum of Understanding

MPIMS:                  Madrid Patient Information Management System

MTA:                    Medical Technical Assistant

NKSP:                   North Kern State Prison

NOS:                    Not Otherwise Specified

OHU:                    Outpatient Housing Unit

OT:                     Office Tech

PBSP:                   Pelican Bay State Prison

PC:                     Primary Clinician

PHU:                    Protective Housing Unit

| | |
|---|---|
| PIA: | Prison Industry Authority |
| po: | *per os* (by mouth) |
| PPE: | Personal Protective Equipment |
| PPEC: | Professional Practice Executive Committee |
| PSH: | Patton State Hospital |
| PSU: | Psychiatrist Services Unit |
| PSW: | Psychiatric Social Worker |
| PT: | Psych Tech |
| PVSP: | Pleasant Valley State Prison |
| QIP: | Quality Improvement Plan |
| QIT: | Quality Improvement Team |
| R&R: | Reception and Receiving |
| RC: | Reception Center |
| RJD: | Richard J. Donovan Correctional Facility |
| RN: | Registered Nurse |
| RT: | Recreation Therapist |
| RVR: | Rule Violation Report |
| SCC: | Sierra Conservation Center |
| SHU: | Segregated Housing Unit |
| SMY: | Small Management Yard |
| SNF: | Skilled Nursing Facility |
| SNY: | Sensitive Needs Yard |
| SPRFIT: | Suicide Prevention and Response Focused Improvement Team |

SQ:                     San Quentin State Prison

SRE:                    Suicide Risk Evaluation

SRC:                    Suicide Review Committee

SVP:                    Sexually Violent Predator

SVPP:                   Salinas Valley Psychiatric Program

SVSP:                   Salinas Valley State Prison

TCMP:                   Transitional Case Management Program

TLU:                    Transitional Living Unit

TPU:                    Transitional Program Unit *or* Temporary Protective Unit

TTA:                    Triage and Treatment Area

UCC:                    Unit Classification Committee

UHR:                    Unit Health Record

UNA:                    Unidentified Needs Assessment

VSPW:                   Valley State Prison for Women

VPP:                    Vacaville Psychiatric Program at CMF

WSP:                    Wasco State Prison

## TABLE OF CONTENTS

**TABLE OF ACRONYMS AND ABBREVIATIONS**   ii.
**SPECIAL MASTERS TWENTY-THIRD ROUND MONITORING REPORT**   1

Exhibit A   79

Exhibit B   85

Exhibit C   93

**APPENDIX A - INSTITUTIONAL SUMMARIES**   109

**Service Area A**   109

California State Prison, Sacramento (CSP/Sac)   109

Folsom State Prison (Folsom)   127

**Service Area B**   136

Pelican Bay State Prison (PBSP)   136

High Desert State Prison (HDSP)   152

California Correctional Center (CCC)   166

**Service Area C**   170

Mule Creek State Prison (MCSP)   170

Sierra Conservation Center (SCC)   182

**Service Area D**   190

California Medical Facility (CMF)   190

California State Prison, Solano (CSP/Solano)   205

San Quentin State Prison (SQ)   215

Deuel Vocational Institution (DVI)   228

**Service Area E**                                                                                      244

    California State Prison, Corcoran  (CSP/Corcoran)                              244

    California Substance Abuse Treatment Facility (CSATF)                          264

    Pleasant Valley State Prison (PVSP)                                           278

    Avenal State Prison (ASP)                                                     294

**Service Area F**                                                                                      307

    Salinas Valley State Prison (SVSP)                                            307

    Correctional Training Facility (CTF)                                          327

**Service Area G**                                                                                      337

    California Men's Colony (CMC)                                                 337

    Wasco State Prison (WSP)                                                      355

    Kern Valley State Prison (KVSP)                                               369

    North Kern State Prison (NKSP)                                                381

**Service Area H**                                                                                      398

    California State Prison, Los Angeles County (CSP/LAC)                         398

    California Correctional Institution  (CCI)                                    422

**Service Area I**                                                                                      434

    California Institution for Men (CIM)                                          434

    California Rehabilitation Center (CRC)                                        447

**Service Area J**                                                                                      460

    Richard J Donovan Correctional Facility ( RJD)                                460

    Ironwood State Prison (ISP)                                                   476

Calipatria State Prison (Calipatria)                                            483

Centinela State Prison (Centinela)                                            488

Chuckawalla Valley State Prison (CVSP)                                  493

**Service Area K**                                                                      499

California Institute for Women (CIW)                                     499

**Service Area L**                                                                       514

Central California Women's Facility (CCWF)                            514

Valley State Prison for Women (VSPW)                                  530

**APPENDIX B - CASE REVIEWS**                                            541

Exhibit A - California State Prison, Sacramento (CSP/SAC)          542

Exhibit B - Folsom State Prison (Folsom)                                    551

Exhibit C - Pelican Bay State Prison (PBSP)                                 555

Exhibit D -   High Desert State Prison (HDSP)                             562

Exhibit E -  Mule Creek State Prison (MCSP)                             568

Exhibit F -  California Medical Facility (CMF)                             578

Exhibit G -  California State Prison, Solano (CSP/Solano)           591

Exhibit H -  San Quentin State Prison (SQ)                                 597

Exhibit I -  Deuel Vocational Institution (DVI)                          603

Exhibit J -  California State Prison, Corcoran (CSP/Corcoran)    607

Exhibit K -  California Substance Abuse Treatment Facility (CSATF)    619

Exhibit L -  Pleasant Valley State Prison (PVSP)                         628

Exhibit M - Avenal State Prison (ASP)                                     634

Exhibit N -  Salinas Valley State Prison (SVSP)                          643

Exhibit O -  Correctional Training Facility (CTF)                        654

Exhibit P -  Wasco State Prison (WSP)                                    663

Exhibit Q -  Kern Valley State Prison (KVSP)                             671

Exhibit R -  North Kern State Prison (NKSP)                              680

Exhibit S -  California State Prison, Los Angeles County (CSP/LAC)       688

Exhibit T -  California Correctional Institution (CCI)                   698

Exhibit U -  California Institution for Men (CIM)                        708

Exhibit V -  California Rehabilitation Center (CRC)                      714

Exhibit W -  Richard J. Donovan Correctional Facility (RJD)             719

Exhibit X -  Central California Women's Facility (CCWF)                 731

Exhibit Y -  Valley State Prison for Women (VSPW)                       740

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    **Plaintiffs**

    **v.**                         **No. CIV S-90-0520 LKK JFM P**

EDMUND G. BROWN, JR., et al.,

    **Defendants**

### TWENTY-THIRD ROUND MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED  PLANS, POLICIES, AND PROTOCOLS

### INTRODUCTION

This report covers the special master's twenty-third review of the defendants' compliance with the plans, policies, and protocols that were provisionally approved by this Court in mid-1997, were later revised and updated, and are currently known as the Revised *Coleman* Program Guide (Program Guide).  The twenty-third monitoring period extended from October 2010 through April 2011.  As in the past, the special master's monitoring staff received full cooperation from the institutional mental health staff and administrators of the California Department of Corrections and Rehabilitation (CDCR).

All 33 CDCR institutions were covered in the twenty-third round.  The primary areas of focus remained the same as those in the preceding monitoring period -- institutional mental health staffing levels, quality management, suicide prevention, medication management, inmate sexual misconduct, and transfers to higher levels of care.  Other areas examined by the special master's staff included the institutions' provision of mental health services in the

enhanced outpatient program (EOP), administrative segregation units (ASU), reception center

(RC), and the 3CMS.  The special master also examined the institutions' use of outpatient

housing units (OHUs) for mental health purposes, medical records and the mental health tracking

system (MHTS.net), as well as inmates' access to mental health appointments, relationships

between custody and mental health, and other day-to-day matters in the institutions that affect

the delivery of mental health care to inmates.

      The special master conducted full on-site tours at 25 institutions: Avenal State

Prison (ASP), California Correctional Institution (CCI), California Institution for Men (CIM),

California Medical Facility (CMF), California Rehabilitation Center (CRC), California State

Prison, Los Angeles County (CSP/LAC), California State Prison, Sacramento (CSP/Sac),

California State Prison, Solano (CSP/Solano), California Substance Abuse Treatment Facility

(CSATF), Central California Women's Facility (CCWF), California State Prison, Corcoran

(CSP/Corcoran), Correctional Training Facility (CTF), Deuel Vocational Institution (DVI),

Folsom State Prison (Folsom), High Desert State Prison (HDSP), Kern Valley State Prison

(KVSP), Mule Creek State Prison (MCSP), North Kern State Prison (NKSP), Pelican Bay State

Prison (PBSP), Pleasant Valley State Prison (PVSP), Richard J. Donovan Correctional Facility

(RJD), Salinas Valley State Prison (SVSP), San Quentin State Prison (SQ), Valley State Prison

for Women (VSPW), and Wasco State Prison (WSP).  Counsel for plaintiffs and defendants

accompanied the special master's monitoring staff on their tours of MCSP, CMF, and RJD.

      The six institutions which were monitored by means of paper review during the

preceding monitoring period were again reviewed in that manner.  These institutions were

California Correctional Center (CCC), Calipatria State Prison (Calipatria), Centinela State Prison

(Centinela), Chuckawalla Valley State Prison (CVSP), Ironwood State Prison (ISP), and Sierra

Conservation Center (SCC).  Each of these institutions provided the special master with

2

documentation of their compliance with *Coleman* Program Guide requirements and any pertinent court orders.  Also, California Institution for Women (CIW) and California Men's Colony (CMC) continued to be monitored in a hybrid format, which entails an abbreviated on-site visit plus a paper review.

On July 27, 2011, this report was distributed in draft form to the parties.  As in the past, the parties were given 30 days in which to submit to the special master their responses to the draft report.  Plaintiffs did not submit any response.  On August 26, 2011, defendants forwarded various comments and objections.  On November 23, 2011, defendants withdrew their earlier comments and objections, and submitted amended ones, which are addressed in relevant portions of this report.

Before this report launches into the findings in the focus areas and other developments that occurred during the twenty-third monitoring period, a look back is in order with regard to the origin for, and reasons why, the special master examines what he does.  The standards which drive *Coleman* monitoring began with the *Coleman* remedial order, *Coleman v. Wilson*, 912 F.Supp. 1282 (E.D. Cal. 1995), filed on September 13, 1995, which held that defendants' mental health care delivery system fell short of a level that would satisfy the Eighth Amendment to the United States Constitution.[1]  Shortly after entry of the remedial order, the *Coleman* court appointed a special master to oversee the remedial phase. Order, filed December 11, 1995, Docket No. 639.  The specific duties of the special master, outlined in a separate order also filed on December 11, 1995, Docket No. 640, included the development of a remedial plan

---

[1] The *Coleman* court identified the elements of a constitutionally adequate prison mental health care system as (1) proper screening to identify individuals with serious mental disorders, both at the time of their admission to CDCR and over the course of their incarceration; (2) competent staff in numbers sufficient "to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders"; (3) timely access to appropriate levels of care, including both beds and programs, and appropriate medication; (4) an adequate medical records system; (5) administration of psychotropic medication only with appropriate supervision and periodic evaluation; and (6) an adequate suicide prevention program.   912 F.Supp. at 1305-15 (*quoting Balla v. Idaho State Board of Corrections*, 595 F.Supp. 1558, 1577 (D. Idaho 1984)).

to effectively address the constitutional violations identified in the remedial order, as well as the preparation and filing of interim reports on the progress of defendants' implementation of, and compliance with, the remedial plan.

In the first year of the remedial phase of the *Coleman* case, the special master oversaw the defendants' development of plans, policies, and procedures by which the defendants' compliance with the court's remedial order would be structured and measured.  At that time, the fundamental structure of CDCR's embryonic mental health care services delivery system was already rooted in the four basic levels of care: the Correctional Clinical Case Management system (3CMS), the Enhanced Outpatient Program (EOP), Mental Health Crisis Bed (MHCB), and Department of Mental Health (DMH) inpatient hospital care.  When defendants first undertook the development of the remedial plan, mental health services were to be delivered in 12 geographical service areas, with all elements of the plan to be gradually integrated into the institutions.  As early as the first year of the remedial phase, placement of inmates into the continuum of services in the Mental Health Service Delivery System was initiated primarily though a uniform screening process at CDCR RCs.

On January 30, 1997, the *Coleman* court entered an order directing the special master to submit for approval the plans, procedures, policies, forms, and other applicable documents on the defendants' mental health care system.  The deadline for the submission was May 30, 1997, and the process that ensued was intense and comprehensive.  In February and March, 1997, the *Coleman* parties met separately with the special master and his staff during nine full days of meetings to discuss, issue by issue, the defendants' proposed plans, policies, and supporting documents.  The parties then undertook an in-depth process of negotiations to develop the overall remedial plan.  During April and May, 1997, the parties and counsel met together with the special master and his staff for five days of meetings to reconcile their

4

differences, where possible, and clearly define their respective positions on unresolved differences.  With some exceptions that needed further work, it was through the parties' give-and-take on the details that they finally arrived at a set of benchmarks that embodied a system to comport with the requirements of the *Coleman* court.  The parties had accomplished an arms' length agreement that they accepted as the blueprint for the defendants' mental health care delivery system.  By mid-1997, the product of these negotiations had developed into six volumes of plans, policies, procedures and forms.  These were submitted by the special master with his report to the *Coleman* court dated June 5, 1997, and thereafter were collectively known as the "Mental Health Services Delivery System Program Guides."

On June 24, 1997, the court accepted the special master's report and ordered two specific modifications which he recommended[2], thereby granting provisional approval to the Program Guides, and directing the special master to "forthwith commence monitoring defendants' implementation of and compliance with the remedial plans provisionally approved by the court in accordance with this court's December 11, 1995 order of reference."  Order filed June 27, 1997, Docket No. 858, at 2-3.

In late 2002, at the defendants' request, the *Coleman* parties resumed the process of negotiating further refinements to the Program Guides, with the goal of working out any further necessary revisions and updates and obtaining the court's approval.  That marked the beginning of a three-year round of meetings, intense review, analysis, and negotiations between the parties, followed by continued reiteration and critique of draft versions of the final product. In February 2006, the *Coleman* special master submitted a report and recommendations on the

---

[2] These modifications were that defendants shall (1) revise the policy on the use of Clozapine to specifically include a provision granting to CDCR psychiatrists the discretion to maintain on Clozapine a newly arrived inmate already stabilized on the drug through a program other than those at Atascadero State Hospital or Patton State Hospital, subject to the housing and monitoring conditions recited in the policy; and (2) adopt a process whereby custodial administrators who override a clinical recommendation to transfer an actively decompensating inmate out of administrative segregation are required to put the reasons for the override in writing and the override is subject to review.

Revised Program Guide to the *Coleman* court, recommending its adoption and approval. By that time, the set of the program guides had been organized into a more formalized compendium, which has since been referred to as the "*Coleman* Program Guide." The special master noted that the creation of the Revised Program Guide was a protracted dynamic process, but nonetheless, "the ceaseless give and take between the parties during the revision process has generated . . . a blueprint for the provision of mental health services that both sides can take pride in." Special Master's Report, filed February 3, 2006, Docket No. 1749, at 10.

Given that the parties had negotiated their differences on what the special master described as 95 percent of the revised Program Guide, he recommended that the court approve those portions of it. He also recommended that a process be initiated for resolving those remaining issues that had eluded resolution, continuing the format of negotiation by the parties to work out any disagreements. On March 3, 2006, the *Coleman* court approved all undisputed provisions of the Revised Program Guide. Order, filed March 3, 2006, Docket No. 1773.

It was the parties' protracted negotiations which brought about the plans, policies, and procedures which, through further negotiation, were refined into the *Coleman* Program Guide of today and which, along with applicable court orders, set the benchmarks for mental health services in CDCR prisons. These are the standards which drive the special master's examination, evaluation, findings, and recommendations that are found in every compliance report of the special master. The Revised Program Guide remains a work in progress, and continues to undergo negotiated revision and updating, as the need arises and as it must in order to remain responsive to the demands of changing conditions and emerging issues in the prisons.

## **RECENT DEVELOPMENTS**

This Report was distributed in draft form on July 27, 2011, approximately four and a half months following the Special Master's Twenty-Second Monitoring Report, which was

filed on March 9, 2011, Docket No. 3990. During this exceptionally brief interim between compliance reports, there have been a few developments of note.

## I.    Court-Ordered Coordination of the *Coleman, Armstrong, Perez,* and *Plata* Cases

The court-ordered coordination process among the *Coleman*, *Armstrong*,[3] *Perez*,[4] and *Plata*[5] cases remained active and productive. Progress was made in a number of areas. Among the notable advancements was the Medication Administration Process Improvement Project (MAPIP), which has been a joint project of the California Prison Health Care Services (the *Plata* receiver's program) and CDCR, with input from the *Coleman* special master's experts. This project was implemented to assist CDCR in the development of a mechanism to help manage medication management issues and related quality assurance activities, and has resulted in the development of a medication management audit tool. The MAPIP pilot was successfully completed at CIM, CSP/Corcoran, and CCWF, using the new tool. Plans are currently underway to implement the tool at the remaining institutions during the twenty-fourth monitoring period.

Other developments in the coordination context included conversion to electronic unit health records (eUHRs) which went live at all three women's institutions. Conversion at the men's institutions is expected to be implemented in the near future.

## II.    Construction of Mental Health Beds, Treatment, and Office Space; Cell Modification

There has been some progress in the area of construction of mental health beds, treatment space, and office space. The news has been generally positive with regard to the short-term and upgrade construction projects, but it has been mixed with regard to some aspects of the long-range bed plan projects.

---

[3] *Armstrong v. Schwarzenegger*, No. C 94-2307 CW (N.D. Cal.).
[4] *Perez v. Tilton*, No. C 05-05421 JSW (N.D. Cal.).
[5] *Plata v. Schwarzenegger*, No. C 01-1351 TEH (N.D. Cal.).

A.    **Coordinated Bed Projects with the *Plata* Receiver**

Four of the long-range bed construction projects are coordinated efforts with the *Plata* receiver. The first and most significant of these is the California Heath Care Facility (CHCF) project in Stockton. Of all the bed construction projects, the CHCF will add, by far, the largest number of beds for higher levels of mental health care for *Coleman* class members. It will provide another 43 acute care beds, 432 high-custody intermediate care beds, and 137 MHCBs. Presently, this project remains on a projected timetable for full activation on December 31, 2013.

Another of the coordinated bed construction projects is the DeWitt Nelson facility conversion. This project will add another 375 EOP general population (GP) beds and 50 EOP administrative segregation beds. It is presently scheduled for completion of construction in March 2013 and full occupancy on August 18, 2013. The funding for completion of the first design-build package for this project was approved by the California Department of Finance during the week of June 13, 2011, and the design-build contract was awarded during the week of June 20, 2011.

The Stark facility conversion project is another of the coordinated bed projects with the *Plata* Receiver. It would add an additional 30 MHCBs, 525 EOP beds and 50 EOP administrative segregation beds. However, as of this writing, the project remains suspended with no timetables for completion. The most that can be said for the Stark project at this time is that its future is uncertain, at best.

The remaining coordinated bed project is the Estrella facility conversion which would add 150 EOP general population beds and 40 EOP administrative segregation beds. However, since the filing of the preceding monitoring report, the California Joint Legislative Budget Committee has placed funding of the Estrella project on hold until the State has taken

into account the extent to which Assembly Bill 109 (AB 109), the public safety realignment bill, may lead to a reduction in the incarcerated population within CDCR facilities. AB 109, which was recently enacted by the California State Legislature and signed by the governor, would realign the placement of certain low-level offenders from state to local jurisdictions. Some projections indicate that it may reduce the CDCR prison census by 38,000, which potentially may open up space for EOP beds in existing CDCR facilities and thereby reduce the need for such beds in the Estrella facility. As of this writing, the Estrella project is being delayed day-for-day from its earlier projected completion date of September 16, 2012.

**B.** **Department of Mental Health, Acute Care**

Wing P-1 at CMF Acute Psychiatroc Program at Vacaville (APP) holds 32 acute care beds. Retrofitting of those beds was completed on December 20, 2010. Retrofitting of the 36 beds in wing P-2 at the same facility began on May 4, 2011, and was completed on July 29, 2011.

The licensed 45-bed acute and intermediate care facility (ICF) located at CIW is presently scheduled for completion by March 9, 2012. This project represents a significant change in the provision of acute and intermediate care to CDCR inmates. Unlike all other delivery of these higher levels of care, this project is the first of its kind in that CDCR rather than DMH will be the provider, with DMH serving in a consultative capacity. The requirement that defendants provide additional acute and intermediate care beds for women inmates has a long history in *Coleman*. On March 2, 2006, defendants were ordered to file a plan no later than April 17, 2006 for the provision of such inpatient beds for all seriously mentally ill male and female inmates in CDCR determined to be in need of these levels of care. Order, filed March 2, 2006, Docket No. 1772, at 3. In their response to that court order, defendants proposed to add, among other things, 25 acute and intermediate care beds for women. Defendants' Response to Court

9

Order of March 2, 2006, filed April 17, 2006, Docket No. 1786, at 11, 12, 17.  The *Coleman*

court approved that plan, subject to modification based on then-current population projections,

and ordered defendants to file an amended long-term bed plan within 60 days.  Order, filed May

2, 2006, Docket No. 1800, at 4.

On June 30, 2006, defendants submitted to the special master an amendment

referencing an updated bed forecast from Navigant Consulting, and requested an additional 60

days to incorporate further revisions to their plan.  Several months later, on December 19, 2006,

defendants submitted their mental health bed plan, in which they increased to 45 the number of

needed additional acute and intermediate care beds for women.  In that report, defendants

incorporated two new bed plan components.  One of these was consolidation of the delivery of

all CDCR residential, crisis, and inpatient mental health care into just eight CDCR institutions.

The other component was assumption by CDCR of responsibility for provision of all inpatient

mental health services, in place of DMH which had been the long-term provider of intermediate

and acute inpatient care.  It is this latter component which is the bedrock of the 45-bed acute and

ICF at CIW.

CDCR's proposed adoption of the responsibility that historicially had been

DMH's gave rise to some concern, given that CDCR had no history of treating patients with

mental illnesses of such a high degree of severity.  The special master voiced this concern in his

report of February 7, 1997.  Docket No. 2133.  He recommended that the *Coleman* court

schedule a hearing at which defendants might demonstrate the reasonableness and feasibility of

their December 2006 bed plan.  On March 27, 2007, the court deferred its decision on whether to

hold the hearing, and instead directed defendants to present a report to the special master within

90 days detailing how they would accomplish taking responsibility for the services that DMH

had been providing to *Coleman* class members.  Order, Docket No. 2173.  Subsequently, on

April 17, 2007, the court ordered defendants to file a supplemental report by June 15, 2007

addressing both CDCR's relationship with DMH and its bed consolidation concept. Order,

Docket No. 2200. Following the court's granting of their request for an extension of time,

defendants filed their long-range bed plan on August 17, 2007, incorporating the 45-bed project

for the women's beds. Docket No. 2375.

   On September 24, 2007, the special master filed his report on the bed plan. While

acknowledging the challenges inherent in CDCR's assumption of responsibility for DMH-level

care, the special master recommended that the court approve defendants' plan and that it go

forward without further delay, given the extent of the need for inpatient beds. Docket No. 2432.

By order of October 18, 2007, the *Coleman* court adopted the special master's recommendations

and approved the plan, but also required defendants to (1) submit a plan with timeframes for

meeting licensure and accreditation by the Joint Commission on Accreditation of Healthcare

Organizations (JCAHO); (2) submit a memorandum of understanding (MOU) on DMH's

mentoring and direct service obligations for integration in an inter-agency agreement; (3) submit

a plan for anticipated clinical and custody staffing needs, and a program for providing the

personnel required to recruit, vett, hire, and retain adequate staffing; and (4) submit a plan on

recruitment and compensation for an administrator to run the program. Order, filed October 18,

2007, Docket No. 2461, at 4-6.

   In its plan for staffing the program, CDCR reports that it intends to operate and

staff this new facility similarly to the DMH intermediate care program at SVSP, except that

psych techs (PTs), registered nurses (RNs), and licensed vocational nurses (LVNs) will be used

in lieu of the medical technical assistants that are used by DMH. CDCR also reports that it plans

to secure JCAHO accreditation and licensure. Recruitment and hiring will be conducted in

conjunction with the California Prison Health Care Services (CPHCS). *See* Staffing Plan for 45-

Bed Psychiatric Program for Women, Exh. A.   A MOU among CDCR, CPHCS, and DMH has been executed.  It generally establishes a framework by which DMH will train and mentor, and provide consultation for, CDCR staff in the operation of the program.  *See* Memorandum of Understanding, Exh. B.   Once this facility is completed, JCAHO-approved, and activated, the program will be monitored by the *Coleman* special master.

### C.    Department of Mental Health, Intermediate In-Patient Care, High Custody

Although the high-custody 64-bed ICF at SVSP and ten additional intermediate care beds in TC-2 at the same facility have been completed, a significant need for such beds continues.  Intermediate care beds appropriately remain an integral part of mental health bed planning and construction, as too great a number of inmates in need of this level of care (LOC) continue to wait for long periods of time before they are treated.  As of June 30, 2011, there were 147 inmates requiring such care on the wait list for the Salinas Valley Psychiatric Program (SVPP).  *See* DMH Monthly Report on the Licensure of Intermediate Care Treatment Programs at the California Medical Facility, Vacaville and the SVPP, SVSP, July 5, 2011.

The conversion of the C-5 and C-6 units at SVSP was completed and the combined 116 beds in these units have been fully activated.  As of this writing, CDCR continues to operate on the conditional approval for occupancy that it received from the State Fire Marshall earlier this year, and awaits its final certificate of occupancy, which it has reported that it expects in the very near future.  In the meantime, Defendants' appeal of the *Coleman* court's order that CDCR shall admit at least ten patients per week to the C-5 unit until it is filled, and then fill the C-6 unit at the same rate, was denied by the Ninth Circuit Court of Appeals on April 22, 2011.

Completion of the 64 high-custody intermediate care beds at CMF has been delayed due to water line conflicts, and is now scheduled for completion by the end of 2011. Patient admissions are expected to begin within the first half of 2012.

**D.    DMH Intermediate In-Patient Care, Low Custody**

There have been no new developments with construction of intermediate care low-custody beds.  DMH's conversion of 44 Day Treatment Program (DTP) beds at CMF to low-custody intermediate care beds, and its conversion of 25 beds at Atascadero State Hospital (ASH) to low-custody intermediate care beds, were already completed by the time of the special master's report on the preceding monitoring period.

**E.    Mental Health Crisis Beds**

Although 17 new MHCBs were added at San Quentin, and 20 MHOHU beds at CSP/Sac were converted into temporary unlicensed MHCBs, the need for MHCBs continues to exceed the supply of MHCBs system-wide, as discussed in greater detail below.

For the licensed 50-bed MHCB unit at CMC, the projected full occupancy date has been revised due to construction delays.  Originally, this project was projected for completion on January 6, 2013 and for full occupancy on March 28, 2013.  It was then accelerated to a completion date of July 14, 2012 and a full occupancy date of October 4, 2012.  However, the discovery of asbestos-contaminated soil under the site grading has necessitated deferral of the completion date to September 5, 2012, and the full-occupancy date to November 27, 2012, subject to possible delays due to unforeseen conditions at the site.

**F.    Psychiatric Services Units**

As noted above, the 20-bed PSU at CIW was completed and fully activated on February 23, 2011.

**G.    Enhanced Outpatient Programs**

By their sheer numbers, the new EOP beds – both general population and administrative segregation – to be coming on line will have the most widespread impact on the delivery of mental health care to CDCR inmates.

1.      **Enhanced Outpatient Program - Administrative Segregation**

As noted in the special master's preceding monitoring report, completed construction at CSP/Corcoran, SVSP, and CSP/LAC has already added 92 EOP administrative segregation beds.

2.      **Enhanced Outpatient Program - General Population**

The SVSP A-Quad project will add 108 new EOP general population beds to the existing 192 such beds, plus treatment and office space. This project remains on a timetable for completion of construction on June 30, 2013, with activation to begin on July 31, 2013 and reach completion on October 2, 2013.

The CSATF dual diagnosis (i.e. mental illness and substance abuse) and treatment program with 88 EOP general population beds became fully activated in November 2010.

3.      **Enhanced Outpatient Program - Sensitive Needs Yards (SNYs)**

The conversion of the 190-bed general population high-custody level SNY at RJD into a 150-bed EOP high-custody SNY was completed in September 2010, and was fully activated by December 29, 2010.

The 176-bed EOP SNY at CSATF was completed and fully activated as of August 31, 2010.

H.      **Mental Health Office and Treatment Space**

Construction of office and treatment space for the general population EOP at CMF is underway. Construction is scheduled for completion on February 18, 2013, and activation is scheduled to begin on February 19, 2013 and be completed on April 19, 2013. Revised activation start and complete dates are being evaluated.

14

At CSP/Sac, the construction of treatment and office space for the 152-bed PSU is scheduled to begin in November, 2011 and be completed by March 2013. Activation is scheduled for completion by May 26, 2013.

Construction of the office and treatment space for the 192-bed EOP at CSP/Sac began on October 28, 2010. Activation is expected to begin on February 1, 2012 and to be completed on April 1, 2012.

Construction is now in progress on the treatment and office space project for the 150-bed EOP at CSP/LAC. Completion is projected for July 8, 2012, with hiring of staff completed one month earlier, and full activation on September 12, 2012.

Ongoing work on office and treatment space for the 45-bed administrative segregation EOP at CSP/Corcoran is scheduled for completion on February 13, 2013, and for activation on April 15, 2013.

Construction of the office and treatment space project for the 70-bed EOP at CCWF remains scheduled for completion on October 31, 2013, with activation to begin on November 1, 2013 and to be completed on December 31, 2013.

## I.    Cell Modification

The project to retrofit 124 cells in wings Q-1, Q-2, Q-3, S-1, and S-2 at CMF to make them suicide-resistant was completed on April 20, 2011. A notice from CDCR indicated that installation was flawed for some of the windows and door frames in the CMF 50-bed Correctional Treatment Center (CTC), which is an MHCB. This problem has been repaired as of this writing.

## III.   Update on Defendants' Review of Suicide Prevention Policies, Practices, and Procedures

The high rate of suicides in CDCR prisons remains a disturbing situation which needs to end. In 2005, CDCR reported 36 suicides, while the special master's expert concluded

15

that in fact there were 43 suicides.  In 2006, there were 43 suicides.  The number of suicides in 2007 was 34, while in 2008 there were 37 suicides, and in 2009, there were 25 suicides.  For all of these years except 2009, the rate of suicides in CDCR prisons exceeded the average annual suicide rate in American prisons.  Calculations of the number of suicides in 2010 indicated that CDCR has confirmed 35 suicides among its inmates.  At the time this report was distributed in draft form on July 27, 2011 there had been 18 suicides in 2011.  At CMC alone, there were eight suicides from December 2009 through January 2011, with six of these suicides occurring during 2010, and three as of July 27, 2011.

Consecutive years of no discernible, lasting improvement with suicide prevention in CDCR eventually led the *Coleman* court to order defendants to conduct an in-depth examination of the problem.  Following the Special Master's Expert's Report on Suicides Completed in the CDCR in Calendar Year 2007, filed September 17, 2009, Docket No. 3677, the *Coleman* court entered an order requiring defendants to review, under the guidance of the special master, all suicide prevention policies and practices, all suicide review and reporting processes, and their implementation, over the course of a 120-day period.  Order, filed April 14, 2010, Docket No. 3836.

At the conclusion of that process, defendants submitted to the special master a report dated August 25, 2010, proposing a variety of modifications to the *Coleman* Program Guide that are geared to address the problem of inmate suicides.  Their report also cited the development of the SharePoint website to facilitate accurate, effective, and up-to-date communication between CDCR and DMH concerning their mutual inmate-patients.  Defendants identified three main focal points for a comprehensive strategy to resolve the problem of inmate suicides: (1) change of conditions in ASU, (2) high risk inmate-patient management, and (3) clinical competency in the conduct of suicide risk evaluations (SREs).

On September 27, 2010, the special master filed his report, with

recommendations, on defendants' review and suicide-prevention proposals described in their

August 25, 2010 report.  Special Master's Report on Review of Suicide Prevention Practices,

Policies, and Procedure, filed September 27, 2010, Docket No. 3918.  On November 17, 2010,

the *Coleman* court ordered the following:

- o That defendants' proposed *Coleman* Program Guide revisions and suicide prevention strategies presented in their report of August 25, 2010 be implemented forthwith;
- o That defendants consult with the special master's experts with regard to the use of, and clinical practices within, CDCR OHUs, and any related proposed changes to the *Coleman* Program Guide concerning OHUs;
- o That within 60 days, defendants shall submit their proposal for improvement of clinical competency levels of current CDCR clinicians with administration of the SRE;
- o That defendants implement the SharePoint website system and the system-generated alert for high acute suicide risk inmates on MHTS.net as soon as possible, and within the following 60 days conduct a demonstration of these systems for the special master and/or designated members of his staff at a mutually convenient time; and
- o That the special master's recommendation concerning submission of a plan by defendants to furnish suicide-resistant beds in their MHCBs shall be addressed by a subsequent order.

Order, filed November 18, 2010, Docket No. 3954.

On January 11, 2011, the SharePoint system was demonstrated to the special

master and selected members of his staff.  Shortly thereafter, the system-generated alert for high

acute suicide risk inmates was added to the MHTS.net system.

On January 18, 2011, defendants submitted their update on improving clinical

competency with administration of the SRE.  Their proposal is to eventually develop and

implement a proctoring/mentoring model program in which experienced clinicians will orient,

train, mentor, and monitor clinical staff who perform SREs and provide crisis intervention.

Defendants reported that they were developing the proctoring/monitoring process by means of a

pilot, identifying five test institutions – CIM, KVSP, NKSP, RJD, and WSP -- which indicated

the greatest need for intervention, according to the following set of indicia of elevated risk for

suicides and psychiatric decompensation that were derived as the result of Departmental

research:

- Percentage of mental health population of the total population,
- Suicide watch incidents,
- Repeat incidents of suicide watch,
- Mental health crisis bed admissions,
- Intermediate care admission, including repeat admissions,
- Percentage of inmates presenting in crisis on third watch, and
- Staffing allocations and current resource of each institution.

      Defendants reported that the five identified institutions will each receive

additional staff, including a senior psychologist specialist, to help implement and conduct the

proctoring/mentoring program.  In the meantime, Division of Correctional Helath Care Services

(DCHCS's) Suicide Prevention and Response Focus Improvement Team (SPRFIT) will develop

the proctoring/mentoring resources for the five institutions' use.  These include training tools

(e.g. clinical vignettes for practice and skill assessment, quality-of-care review tools, forms, etc.).

Staff to be mentored will be new employees, any employee on probation, any staff referred for

skills enhancement through a supervisory channel, and any staff who request

proctoring/mentoring.  Metrics to measure the impact of the program are to be developed,

followed by quarterly progress reports.  Defendants reported that after the proctoring/mentoring

program has been in place for one quarter, it will be re-evaluated and modified, if necessary, and

then rolled out at other identified institutions.

      As of the time this report was distributed in draft form, there had been no further

updates since their court-ordered update of January 18, 2011 on their pilot to improve

competency with the SRE, or any other aspect of their strategy to reduce the number of suicides

in CDCR prisons.  On August 8, 2011, defendants reported in a letter to plaintiffs that it had

completed the relevant policies and procedures on the proctor/mentor initiative, and that the

changes were being reviewed by the pertinent labor unions. Defendants also reported that they had developed a "Suicide Risk Evaluation Quality of Care Review Tool," and that training on that initiative will occur concurrent with the training on the high-risk initiative. It is not known whether the pilot has been initiated, or if it has, whether it has been in place for at least three months, which would trigger defendants' initial quarterly re-evaluation and implementation of any indicated changes in the pilot. That notwithstanding, defendants committed to undertaking this pilot, which holds some promise for improving the detection of suicidality among inmates. This is an indispensable element of any effective suicide prevention plan. It is now time for an updated status report from defendants on their proctoring/mentoring program on clinical competency with SREs, which should include:

- the present staffing of the program;
- a description of, and a status report on, the development of the referenced tools and any other resources that have been developed within the program;
- whether any staff have been referred, are receiving, or have completed the proctoring/mentoring process;
- results of any measurements of the impact of the program at the five test institutions, as well as any other relevant findings;
- the state of expansion of the program beyond the five initial test institutions; and
- projected dates by which any as-yet incomplete elements of the program will be completed.

Defendants' update should also cover their other suicide-prevention proposals that were presented in their report of August 25, 2010. These include, and are not necessarily limited to, (1) the extent of defendants' implementation of their proposed *Coleman* Program Guide revisions and other suicide prevention strategies described in defendants' report of August 25, 2010, and (2) a description/status report with regard to defendants' use of, and clinical practices within the OHUs in CDCR institutions. The special master is examining the operation and findings of the pilot on improving clinical competency in the administration of SREs during the ongoing Twenty-Fourth Monitoring Period.

19

On November 16, 2011, defendants filed their updated plan to furnish suicide-resistant beds in all MHCBs where patients would not otherwise be provided such beds. Docket No. 4119. The special master approved the defendants' plan and on November 17, 2011 filed his report on it. Docket No. 4121. The plan will provide a total of 250 suicide-resistant beds and 18 restraint beds throughout 19 CDCR institutions, all of which will be installed on a rolling basis, to be concluded by the summer of 2012.

## IV.    Update on Defendants' Pilot Project to Improve Mental Health Assessments of 3CMS Inmates Who Are Subject to the Disciplinary Process

In his Seventeenth Round Monitoring Report Part B, filed on April 2, 2007, Docket No. 2180, the special master noted the unsatisfactory state of institutional use of mental health assessments for 3CMS inmates in conjunction with the prison disciplinary system. Such assessments are implemented to facilitate the identification of inmate misconduct that might have been caused or affected by mental illness, and to encourage appropriate institutional response. Average rates of referral for a mental health assessment of 3CMS inmates issued RVRs were below five percent at the time of the special master's report. Even among the few assessments that were completed, many contained errors and inconsistences, were inadequately documented, were not considered in the disposition of the disciplinary charge, and suggested overall that the purpose of these assessments had been overlooked. The special master recommended that defendants be ordered to develop a plan to identify and implement the changes necessary to broaden the impact of the mental health assessment process on 3CMS inmates, to test those changes, and then to implement them systemwide. The plan would be submitted to the special master and plaintiffs' counsel for review and comment.

On August 2, 2007, the *Coleman* court adopted the recommendations of the special master in Part B of his Seventeenth Monitoring Report that defendants develop a plan within 60 days for identifying and developing changes necessary to broaden the impact of the

20

then-existing mental health assessment process in CDCR prison disciplinary matters for 3CMS inmates. Defendants were further ordered to test the resulting changes and then implement them systemwide. The special master was ordered to report to the court on the adequacy of the plan and to make any appropriate recommendations in his next regularly scheduled monitoring report. Order, filed August 2, 2007, Docket No. 2345.

As of the time this report was distributed in draft form, defendants had made three submissions pursuant to the court's August 2, 2007 order. On October 1, 2007, they submitted their initial proposal, outlining the steps needed to identify and develop the required changes. In this response, defendants reported that they assembled a work group composed of CDCR mental health staff at PVSP and CMC and staff from the CDCR Division of Adult Institutions (DAI), and conducted a preliminary discussion with two members of the special master's staff. They proposed a review of the existing RVR process to better indicate baseline estimates for mental health referrals, analyze each step in the existing process, and identify training needs. They also reported that a clinical review of prior RVRs issued to 3CMS inmates at CMC and PVSP was being conducted, with findings on the use of any mental health assessments being compiled in a database. For any inmates identified as warranting referral, additional data was being gathered, for the purpose of additional analysis of mental health factors related to their RVRs. For any inmates whose histories suggest decompensation, a UHR review would be done to assess *post hoc* whether their mental illness was a factor in the behaviors which led to the RVRs.

Defendants also stated in their October 1, 2007 proposal that preliminary findings from the clinical review of the prior RVRs indicated that three to five percent of cases reviewed needed further mental health assessment; that the reviewing clinicians in the work group had the benefit of information derived from the completed RVR process to consider in determining whether to make a referral to mental health; and that although hearing officers routinely noted

that the mental health evaluation was considered during the disciplinary hearings, there was no clear indication of what impact these evaluations really had. The defendants' proposed plan of action for the RVR process at that time was to conduct a pilot program at RJD, which has a large 3CMS population. The pilot would consist of the following activities:

- Assign an experienced mental health clinician as RVR coordinator (two, if in a large 3CMS program);
- Have the RVR coordinator review the RVR, and consult other sources as necessary, to determine if complete mental health assessment is suggested;
- Implement an RVR tracking system;
- Have RVR mental health evaluations be prepared by clinicians who have received additional forensic training, and more accurately reflect the forensic nature of the evaluation; and
- Modify the RVR report to standardize and more readily identify the degree to which mental health input was considered and play a role in the disposition of the RVR.

Also, with regard to staff training, the following activities were to be included in the pilot:

- Emphasize the importance of specificity in the write-up of the original 115;
- Provide additional training for hearing officers on identifying individuals who, as a result of additional information gathered during the RVR process, may benefit from a mental health evaluation;
- Train RVR coordinators on factors to consider in reviewing the RVR; and
- Train clinicians who will conduct the mental health evaluations on their forensic nature, methods of conduct of the evaluations, and the re-standardized format for reporting the results of the evaluations.

Defendants' second submission to the special master, dated May 1, 2008, was a revised plan. They reported that the pilot at RJD began on February 5, 2008 and was to be completed by August 5, 2008, and that an RVR coordinator had been appointed. The pilot focused on appointment of the RVR coordinator, implementation of the RVR tracking system, modification of the RVR report to include the degree to which mental health assessments were considered and resulted in mitigation of penalties, and modification of the training module for staff. The RVR coordinator submitted monthly progress reports to DCHCS, covering project activities, early trends/findings, and difficulties/obstacles encountered. Defendants reported that

since their initial submission, they had organized another work group of clinical and custodial

staff from DCHCS and DAI, which identified a three-prong process to further enhance the pilot

at RJD by implementing the following:

- Screen each newly-admitted 3CMS inmate into administrative segregation during the first weekly clinical contact, by reviewing the administrative segregation placement notice and the UHR and interviewing the inmate to determine if referral to mental health is indicated;
- For each 3CMS inmate issued an RVR while already in administrative segregation or the SHU, have custody staff send a copy of the RVR to the inmate's primary clinician (PC), who will then determine whether the inmate should be referred for a mental health assessment, to be completed by a different clinician; and
- Review RVR logs to identify 3CMS inmates who have received five or more RVRs within a four-week timeframe, who will then be referred to mental health for a mandatory assessment.

Defendants reported that the six-month pilot at RJD would be completed by

August 5, 2008, and the report on it would be provided to DCHCS by August 31, 2008,

including recommendations regarding workload impact, need for other additional resources, and

training needs for consideration prior to statewide implementation.  Defendants also reported that

by September 1, 2008, the DCHCS/DAI work group would:

- Review RJD's report and recommendations on the pilot;
- Evaluate the process used in the pilot;
- Assess referral rates as a percentage of the 3CMS RVRs, how many of those referred that were deemed to be caused by mental health concerns, and evidence of mitigation of penalty;
- Recommend revisions to the RVR process as a whole, based on their analysis;
- Adjust training objectives to reflect information acquired through the pilot;
- By November 1, 2008, develop an implementation plan that includes a procedure for effective monitoring of the RVR process; and
- Examine alternative methods of fostering behavior modification.

The promised date of November 1, 2008 for development of the plan came and

went, with no product.  Nothing further was submitted by defendants for *over three years*

following their May 2008 report.  After repeated requests from the special master, defendants

finally produced their report on the pilot on June 3, 2011.  It states that the RJD pilot did in fact

end on August 5, 2008, after which the pilot was evaluated, and recommendations for statewide implementation were considered. However, the three-prong approach described in the May 1, 2008 update was never implemented. Staff were unable to implement and test the viability of requiring clinicians in the ASU to screen each newly admitted 3CMS inmate, review the administrative segregation placement notice and UHR, and interview the inmate to determine if he needed a referral for an assessment. The pilot also did not develop and test a process of notification of PCs that their 3CMS inmates in administrative segregation or the SHU received an RVR, or to allow for these clinicians' participation in the decision whether to have the inmate assessed. Because there were no updates from defendants between May 1, 2008 and June 3, 2011, the special master was not informed that these key elements of the RJD pilot had never taken place.

The RJD pilot took the following form, as reported by defendants as of the time this report was distributed in draft form. It was staffed with two social workers and an RVR coordinator who randomly selected 100 pre-pilot 3CMS RVRs that had not been referred for mental health assessments, and reviewed them to determine whether they should have been referred for assessments. They also developed an electronic tracking system for RVRs referred for assessments, a tracking system to manage the assessment process, a step-by-step process for processing RVR referrals, and a related draft local operating procedure (LOP); trained clinicians and correctional officers on improving the quality of the assessment process; and collected data on the degree to which the results on the assessment form (Form 115-MH) were considered in findings in RVR dispositions, and penalty mitigation. The pilot staff reported that out of the 100 RVRs reviewed, they identified three that should have been referred for an assessment. Otherwise, they reported that the requests for Form 115-MHs were being completed correctly, based on appropriate identification of inmates' bizarre, unusual, or uncharacteristic behaviors.

In addition, defendants stated in their June 3, 2011 report that 386 RVRs were issued to 3CMS inmates during the RJD pilot, and that 31 or eight percent of these were referred for an assessment.  Pilot staff reviewed these 31 cases for degree of consideration of the assessment results in findings and mitigation in the RVR dispositions.  They found that in 87 percent of these cases, the disposition referenced the assessments and any mitigation in penalties.  Clinicians conducting the assessments interviewed 30 or 97 percent of these 31 inmates, reviewed 26 or 84 percent of their UHRs, and consulted with these inmates' PCs in 28 or 90 percent of these cases.  Because it was found that clinicians conducting the assessments generally were not addressing the consequences or penalties associated with the outcomes of RVRs, pilot staff also conducted four training sessions for both mental health and custody staff, focusing on, among other things, clinical input regarding RVR penalties.

Defendants concluded in their June 3, 2011 report that staff referred an appropriate number of 3CMS inmates for assessments, that clinicians were providing appropriate assessments, and that the Form 115-MHs were considered in mitigation of penalties at the RVR hearings.  However, the evaluation of the RJD pilot also indicated that clinicians conducting the assessments were not consistently addressing the consequences of penalties on the Form 115-MHs, and that there may have been 3CMS inmates whose behavior did not fit within the existing "bizarre, unusual, or uncharacteristic" classification, but who should have been assessed.

Defendants' June 3, 2011 report concluded with a list of five actions for statewide application that bore very little resemblance to their plan of three years earlier.  These action items are identified as follows:

- A five-year roll-out of RVR coordinator and support staff positions[6];
- A test policy whereby any 3CMS inmate who receives an RVR for use of force or violence against another person, a breach of or hazard to facility security, or a serious disruption of facility operations shall receive an assessment;

---

[6] As identified in defendants' staffing plan.

- Updating and conduct of the Disciplinary Training Lesson Plan, to emphasize the need to mitigate disciplinary actions when the inmates' behavior was the result of mental illness, and the role of clinicians in articulating more appropriate interventions into the inmates' behavior patterns;
- Use of MHTS.net to track fields for Form 115-MHs, and use of the Strategic Offender Management System (SOMS) to flag inmates who received multiple RVRs within specified periods of time; and
- For Interdisciplinary Treatment Team (IDTT), accessibility of information identifying inmates who have received multiple RVRs within specified periods of time.

The passage of over three years between defendants' May 1, 2008 update and their June 3, 2011 report, and approximately four years from the time they were ordered to develop and implement a plan to address this problem, was far too long a lapse. Examination of the defendants' June 3, 2011 report suggested that little was accomplished during the three-year interim. Precious time to refine the plan and resolve the problem was lost. More substantively, the transmutation of the 3CMS RVR plan into the five items listed above signalled too much of a retreat from the original assessment process of 1998, when a mental health evaluation was required for every *Coleman* caseload inmate who received an RVR. A five-year roll-out period for appointment of RVR coordinator and support staff positions was also too long. The so-called "test policy" with three designated specific scenarios that required a mental health assessment invited a situation in which these scenarios could have ended up being the only one under which 3CMS inmates with RVRs were referred for mental health assessments. The two new electronic tracking tools, MHTS.net and SOMS, while useful for managing information and a welcome support for management of the RVR mental health assessment effort, did nothing to directly assist or promote the referral, conduct, and proper use of assessments of 3CMS inmates with RVRs, and thus have limited value within this plan. Likewise, the availability of information on inmates' histories of multiple RVRs was helpful, but again, it did not directly foster better practices with mental health assessments for 3CMS inmates who were issued RVRs.

It appeared that defendants had lost sight of the original identified problem and the goal of the pilot to resolve that problem. Given the limited character of what defendants proposed as their plan, appropriate use of the mental health assessments in the disciplinary process for 3CMS inmates may well have ended up being even more limited than it was before the plan was ordered.

The court's order of August 2, 2007 required defendants to develop their plan within 60 days, or by October 1, 2007. By the end of July 2011, when this report was circulated in draft form, nearly four years had passed with very little progress. Defendants had violated the court's 60-day time limitation not merely by weeks or months, but literally by years. Had defendants produced their report on the RJD pilot more promptly, these shortcomings could have been addressed expeditiously and the problem may have been on its way toward resolution. Unfortunately, that was not the case until very recently.

On May 10, 2011, two months prior to the submission of the draft RVR report, defendants circulated a field memorandum directing prisons to complete mental health assessments for all 3CMS inmates receiving Division A, B or C RVRs (i.e., the most serious infractions for which guilty inmates can receive non-repealable extended prison sentences of 91 to 360 days). The new protocols were to be implemented statewide by June 1, 2011. Based on agreements reached among the special master and parties during a handful of meetings in September and October, 2011, defendants submitted a revised field memorandum that added the requirement to complete mental health assessments for RVRs issued to 3CMS inmates that may result in SHU terms. The revised memorandum was circulated on or about November 3, 2011. Both memoranda clarified that mental health assessments would continue to be completed for 3CMS inmates who exhibited bizarre, unusual or uncharacteristic behavior that resulted in

27

Division D, E, or F RVRs (i.e., lesser infractions for which guilty inmates can receive repealable extended prison sentences of zero to 90 days.)

On October 27, 2011, defendants distributed a lesson plan for introducing the revised RVR protocols to prison staff. Training teams from all 33 prisons, each comprised of two custody officers and two mental health clinicians, will attend four-hour training sessions during November and December 2011. According to defendant's plan, each training team will return to its respective institution and provide four-hour instruction to mixed classes of custody officers and clinicians who are involved in the RVR process. The RVR training curriculum, which is accompanied by a Power Point presentation, is designed to clarify custodial and clinical roles and responsibilities within the RVR process. Realistic scenarios will be used to demonstrate when it is appropriate to complete mental health assessments and assign staff assistants. Participants will receive practical guidance on how to provide and use clinical input in the disciplinary process, as well as on penalty mitigation and the oversight responsibilities of the senior and chief hearing officers.

As of this writing, it has been agreed among the parties and the special master that the training portion of the plan will be updated with regard to the definition and extent of penalty-mitigation envisioned by the plan. Also it has been agreed that CDCR staff will verify that the training is consistent with existing applicable Program Guide provisions. A member of the special master's staff, along with plaintiffs' counsel, will attend and observe an upcoming training session. Defendants' implementation and operation of their 3CMS RVR plan will then be reviewed in the course of regular *Coleman* monitoring activities.

The special master approves the defendants' revised 3CMS RVR plan. Defendants should proceed as quickly as possible to implement it, given that four years have passed since it was ordered.

28

**V.**      **Update on Work by the Division of Adult Institutions in Administrative Segregation**

There have been recent reports of actions being taken by the CDCR Division of

Adult Institutions (DAI) to address the long-standing concerns that surround extended lengths of

stay for mental health caseload inmates in administrative segregation.  DAI organized and sent

"strike teams" to review and analyze the movement of caseload inmates through ASU.  This

resulted in a review of eight such facilities in 2009-2010, and a finding of 1,200 inmates in

overflow housing, which reinforced the need to expedite the movement of inmates through their

administrative segregation stays and into appropriate housing.  The most recent report of the

number of overflow beds indicates a decline to 425 in overflow beds.  The strike teams' review

appears to have stimulated a greater commitment by DAI to undertake a number of positive

strategies.

In March 2011, a new tracking system was developed for improved tracking of

inmates in administrative segregation and monitoring of institutional compliance.  This system

will follow the (1) reason for placement in administrative segregation, (2) length of stay, (3)

status and details of any referral to the district attorney for prosecution, (4) reason for placement

changes, (5) out-to-court status, (6) institutional classification committee (ICC) review dates and

actions taken, as well as other data deemed important to operation of the unit.  This tracking

system is intended to identify and report to DAI all inmates whose stays in administrative

segregation have exceeded 90 days, and to assist with arranging program or treatment

adjustments or locating SNY beds.  It was reported that the number of monthly reviews of

inmates with stays exceeding 90 days has increased, and that designated staff have been assigned

to work on placement issues for such inmates.  It was also reported that the number of inmates

with stays exceeding 90 days has been reduced, while concomitantly the number of inmates

endorsed and waiting for transfer has increased. Per a June 2011 memorandum, related staff training is in progress.

Another project is an ongoing audit of administrative segregation beds in all of the hub institutions, which reportedly has been completed thus far at CMF, CSP/Sac, MCSP, and San Quentin, with the remainder of hubs to be audited soon. A further long-standing item with regard to stays for caseload inmates in administrative segregation is the availability of electrical entertainment appliances, which appears in the defendants' Plan to Address Suicide Trends in Administrative Segregation. Reportedly, all institutions were notified to make available electrical appliances in administrative segregation and on the tiers, if they have the capability to do so. Institutions which cannot make necessary modifications without significant cost were directed to consider alternative means such as use of rolling portable televisions.

The foregoing reports are encouraging. They offer some cause for optimism that there will be relief from excessively long stays in administrative segregation – a location which has consistently been correlated with increased incidence of suicide. They also suggest a commitment within the DAI to standardize operations and increase accountability, both generally and with regard to mental health factors, within CDCR ASU. It is important to maintain the apparent momentum in this respect. During the upcoming twenty fourth monitoring period, the special master will examine and review these ongoing activities within the ASUs at the prisons.

## VI.    Update on Mental Health and Custody Collaboration Training

Mental health and custody collaboration training came back into the foreground after a hearing on June 16, 2009, when the *Coleman* court ordered defendants to develop a plan for collaboration training of mental health and custody staff. Order, filed June 18, 2009, Docket No. 3613. During the ensuing months, under the guidance of assigned *Coleman* experts and monitors, defendants conducted training pilots at CSP/Sac and CSP/Solano, and developed a

training plan that focused on the interaction between custody and mental staff and their treatment of mentally ill inmates. The plan included a provision that CDCR would continue to use quality improvement techniques to gauge the effectiveness of its training, would address the training as indicated and appropriate, and would confer with the special master on any changes to the plan. Defendants submitted an amended plan on October 26, 2009, incorporating changes recommended by the special master's experts. The plan was generally approved as written, although there were concerns with the amount of time required to extend the contract for monitoring the quality of the training for long-term effectiveness, and with the lack of materials such as lesson plans for the sessions in which persons who will be conducting the training will themselves be trained.

The plan ultimately submitted by defendants identified seven institutions – CSP/Corcoran, CSP/LAC, CSATF, RJD, and SVSP, plus in the new programs at CSP/Sac and San Quentin – for the training within designated programs at those institutions. At the time this report was distributed in draft form on July 27, 2011, the most recent report from defendants was at the February 2011 *Coleman* policy meeting, at which they indicated that training had been completed at all of the designated institutions except CSATF and RJD, that training outcome evaluations were being received from staff who had completed the training, and that they were discussing how to analyze and utilize that feedback. At that time, funding for training had been requested for only the seven designated institutions, although defendants represented that they wanted to train all CDCR staff.

As of this writing, defendants report that the training in the designated programs at all seven institutions has been completed, and that it will be expanded institution-wide at the same seven institutions. There will be a two-year roll-out period for the institution-wide training.

**VII.    Transitions to Hybrid Review**

CSPs/Sac and Folsom have demonstrated levels of compliance with *Coleman* Program Guide standards and court orders, and the capacity to monitor and manage themselves, that are sufficient to justify the transition of these institutions to a hybrid form of review.  This means that, as for CIW, for example, limited site visits and paper reviews will be conducted for CSP/Sac and Folsom to assess their compliance levels.

CMC was placed on hybrid review status as of July 31, 2009, within the special master's Twenty-First Round Monitoring Report.  However, the alarmingly high number of recent suicides at CMC – eight from December 2009 through January 2011, six in 2010, and three thus far in 2001 – has placed CMC's hybrid review status in jeopardy, and may necessitate a  return to full on-site monitoring if this institution does not resolve this problem.  The special master will be closely examining CMC's performance in the area of suicide prevention and response in future monitoring.

## OVERVIEW OF THE MONITORING FOCUS AREAS

The format of this report is a significant departure from the format of the special master's compliance reports of the past several years.  A summary of performance of each institution in all of the focus areas continues to appear in this report, but as Appendix A rather than as the main body of the report.  The clinical case reviews prepared by the special master's experts remain organized institution-by-institution, and are now attached as Appendix B to this Report.  It is hoped that this more streamlined presentation enhances the reader's ability to glean the major themes and points of this Report, as well as provides the details of the special master's monitors' and experts' findings which are their source.

**Mental Health Staffing:**

<u>All Mental Health Positions</u>

The overall vacancy rate in mental health staffing continued to slowly decline during the twenty-third monitoring period.  As of April 30, 2011, the number of all established mental health positions for chief, senior, and staff psychiatrists; chief, senior, and line psychologists; clinical social workers; PTs; and recreation therapists (RTs) was 2,192.99[7], which was a reduction by 45.71 positions since the preceding monitoring period.  Of these established positions, 1,886.15 were filled with full-time employees.  The collective vacancy rate for all of these mental health positions was 14 percent, as compared to the overall vacancy rate of 16.2 percent during the preceding monitoring period.  The use of contractors reduced the functional vacancy rate among all mental health disciplines to 7.7 percent, for an improvement over the twenty-second monitoring period's mental health functional vacancy rate of 10.9 percent.  However, while collective mental health staffing vacancy rates indicate a subtle downward trend, there remain pockets of significant vacancies in mental health staffing in some of the individual institutions, as noted below.

Among the 1,999 total non-supervisory or line mental health staff positions, who directly serve the mental health population in the prisons, there were 280 unfilled positions, yielding a vacancy rate of 14 percent.  Use of contractors reduced the functional vacancy rate among these  mental health positions to seven percent, which represented a decrease from the 11 percent functional vacancy rate reported in the preceding monitoring period.

<u>Chief Psychiatrists</u>

The vacancy rate for the 18 allocated chief psychiatrist positions increased from 11 percent to 17 percent since the preceding monitoring period.  CIW, CMC, and CSP/LAC were

---

[7] Source of staffing data reported in this section: CDCR Secured FTP Website for Monthly Reports, posted on May 27, 2011, covering the month of April, 2011.

operating without chief psychiatrists. This was the second consecutive monitoring period in which the chief psychiatrist position at CSP/LAC was vacant.

### Senior Psychiatrists

The vacancy rate for senior psychiatry positions markedly rose since the preceding monitoring period, with an increase from 14 percent to 29 percent. The six institutions that each had one vacant senior psychiatry position were CMC, CSP/Corcoran, CSP/Sac,[8] MCSP, PBSP, and SVSP, none of which used contractors to cover these vacancies. No other institutions with allocated senior psychiatry positions had vacancies.

### Staff Psychiatrists

Filling staff psychiatry positions remained problematic for CDCR. This is concerning, given the historical shortage of psychiatrists among the ranks of CDCR mental health staff, and their pivotal role in the design and delivery of individualized patient care. On June 13, 2002, the *Coleman* court ordered that "[d]efendants shall maintain the vacancy rate among psychiatrists and case managers[9] at a maximum of ten percent, including contracted services." Order, filed June 13, 2002, Docket No. 1383. Since the preceding monitoring period, the vacancy rate among staff psychiatrists increased from 31.8 percent to 34 percent, while use of contractors reduced the functional vacancy rate to 11 percent. While an 11-percent functional vacancy rate is only slightly higher than the maximum ten-percent figure, it also means that 23 percent of psychiatry staffing coverage is provided by contractors rather than permanent staff. For many reasons, while contracted services are better than uncovered clinical hours, they are not the equivalent of services provided by full-time clinical personnel. Significant use of contractors

---

[8] Defendants requested that CSP/Sac be removed from this list because the senior psychiatry position that had been allocated was not supported by the staffing model, and therefore hiring for the position was denied. CSP/Sac was originally included in this list because the documentation presented to the monitor at the time of the site visit indicated that a senior psychiatry position was vacant.

[9] Now referred to as "primary clinicians," which includes line psychologists and social workers.

to cover therapeutic hours results, at least to some degree, in discontinuity in the physician-patient therapeutic relationship.  Moreover, the level of clinical supervision and commitment is likely to be lower than it would be among permanent clinical staff.

CIM, CSP/Solano, SCC, and VSPW filled all of their line psychiatry allocations with full-time psychiatrists, while CCI, CMC, CRC, Calipatria, CCWF, DVI, NKSP, and PVSP 33had vacancy rates ranging from four percent to 15 percent.  Seventeen institutions had vacancy rates ranging from 30 percent to 79 percent.  HDSP and ISP each had vacancy rates of 100 percent in psychiatry.  Contractors covered all vacancies in staff psychiatry at ASP, CCI, DVI, KVSP, NKSP, RJD, and SQ.  ISP did not utilize a contract psychiatrist to cover its one allocated psychiatry position, but HDSP reduced its functional vacancy rate from 100 percent to 30 percent with use of contractors.

### Chief Psychologists

The vacancy rate for the 31 allocated chief psychologist positions was 13 percent, as compared to the preceding monitoring period which had no vacancies among chief psychologists.  CIM, Centinela, and NKSP each had one allocated chief psychologist position which was vacant.  CMF had two chief psychologist positions with one vacancy.  No contractors were used to fill the positions.

### Senior Psychologists

The vacancy rate for senior psychologist positions decreased slightly, from 13 percent to 11 percent, since the preceding monitoring period.  Nineteen institutions filled all of their posts for senior psychologists.  CMF, CMC, CSP/LAC, CSP/Sac, and RJD had vacancy rates ranging from three to 17 percent, while CCWF, PVSP, SVSP and SQ had vacancy rates ranging from 23 to 29 percent.  CIM and CTF had vacancy rates of 40 percent and 67 percent,

respectively.  The sole senior psychologist positions at Centinela and SCC were both vacant.  No contractors were used to cover senior psychologist positions at any institutions.

### Primary Clinicians

The vacancy rate among PCs, whose ranks are made up of both psychologists and social workers, was 12 percent.  With use of contract coverage, the functional vacancy rate was reduced to 4.5 percent.

### Staff Psychologists

Since the preceding monitoring period, line psychologist vacancy rates remained virtually unchanged, at 11.5 percent, as did functional vacancy rates for line psychologist positions, which decreased slightly from 3.4 percent to three percent.  Those institutions with vacancy rates of ten percent or less were CIM, CIW, CMC, CCWF, DVI, HDSP, ISP, NKSP, PBSP, RJD, SCC, and VSPW.  With use of contractors, a large group of institutions -- ASP, CCI, CCWF, Centinela, CTF, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, KVSP, MCSP, PVSP, SVSP, and SQ  -- reduced their functional vacancy rates to less than ten percent.  Calipatria, CVSP, and WSP had vacancy rates of 17 percent, 33 percent, and 14 percent respectively, and did not use contract coverage for vacancies in psychology.

### Social Workers

There was little change since the preceding monitoring period with filling and covering of social work positions.  The vacancy rate remained virtually unchanged at 14 percent, and the functional vacancy rate decreased slightly from 11.9 percent to ten percent.  A total of ten institutions filled all of their social worker positions with full-time employees, while 14 institutions had vacancy rates of 20 percent or less.  The remaining eight institutions with allocated social worker positions had vacancy rates ranging from 22 percent to 40 percent.  CCI

had the highest vacancy rate, at 40 percent, and did not utilize any contractors.  Of the 35 vacant

social work positions system-wide, contractors covered only 9.5 vacancies.

Psych Techs

There was a marked decrease in vacancies among PT positions.  The vacancy rate

of 17.7 percent during the preceding monitoring period fell to 8.3 percent.  The use of

contractors to fill vacant positions remained virtually non-existent, with only 1.4 contractors used

throughout the system.  A total of eight institutions, or two more than during the preceding

monitoring period, filled all of their PT positions.  Vacancy rates were ten percent or less at

CCC, CIM, CMF, CSP/Corcoran, CSP/Sac, CTF, Calipatria, HDSP, SVSP, SQ, and SCC.

Twelve institutions -- CCI, CMC, Centinela, CCWF, CSATF, ISP, KVSP, PBSP, PVSP, RJD,

VSPW, and WSP -- had PT vacancy rates ranging from 11 to 22 percent.  Folsom had the highest

vacancy rate at 29 percent.

Recreation Therapists

The overall vacancy rate for reception therapists was 17 percent, a modest

decrease from the 20 percent rate reported for the preceding monitoring period.  Of the 21

vacancies, only 2.4 were filled by contractors, which lowered the functional vacancy rate to 15

percent.  CIM, Centinela, DVI, HDSP, NKSP, PBSP, and SCC filled all of their RT positions

with full-time employees.  Of the 22 remaining institutions that employ RTs, five had vacancy

rates under ten percent, and 17 had vacancy rates ranging from 13 percent to 50 percent.  CRC

and CTF had .5 and .65 allocated positions respectively, which were not filled.

**Quality Management**:

The indispensability of an effective quality assurance program to maintaining an

adequate inmate mental health treatment system has been recognized for a long time in the

*Coleman* case.  In 1994, among the findings and recommendation for the appointment of a

special master, Magistrate Judge Moulds recommended that "(w)ithin ninety (90) days of the order of the district court, defendants shall develop and implement a system for quality assurance and peer review of mental health services.  Said system shall be developed in consultation with an expert to be designated by the court after consultation with the special master. . ."  Findings and Recommendations, filed June 6, 19954, Docket No. 547, at 80-81.  This recommendation, along with others, was adopted by the *Coleman* court.  *Coleman v. Wilson*, *et al*., 912 F.Supp. 1282, 1308 (E.D. Ca. 1995).

        In 1997, within the context of the early stages of development of the *Coleman* Program Guide, quality assurance began to take on a more defined character.  The special master reported generally "broad agreement over the substance of (quality assurance) policy," with some persisting disagreement between the parties.  Special Master's Report on Plan, filed June 6, 1997, Docket No. 850, at 10.  He recommended that he "be directed to work with the parties to reach agreement on an implementation schedule for the quality assurance plan or, in the absence of agreement, to submit a recommended schedule along with the first quarterly monitoring report."  *Id.*  That recommendation was adopted by the Court, per order filed June 24, 1997, Docket No. 858, at 2.  On July 20, 1998, the special master filed his Recommended Schedule for Implementation of Defendant's Quality Assurance Plans, Docket No. 958, in which he reported that defendants' had created and begun the implementation of a system-wide task force that developed substantive guidelines for services essential to an effective quality assurance and peer review process.  *Id.* at 2.

        By mid-2002, however, the process still had not taken off, resulting in the filing of an order on June 13, 2002 requiring that "(w)ithin sixty days from the date of this order defendants shall develop a plan to speed the implementation of the quality assurance process within each CDC facility."  Docket No. 1384, at 2.  Progress thereafter, however, remained slow:

"The department-wide quality management effort has progressed slowly."  Special Master's

Eleventh Round Monitoring Report, filed June 10, 2003, Docket No. 1519, at 270; "The

defendants' development of a system-wide quality assurance system, the capstone of its overall

compliance effort, has progressed slowly."  Special Master's Twelfth Round Monitoring Report,

filed December 9, 2003, Docket No. 1553, at 249; "Quality assurance in general, and peer review

in particular, are the necessary pathways to the termination of judicial supervision, and the

defendants need to continue to strengthen both."  Special Master's Thirteenth Round Monitoring

Report, filed June 18, 2004, Docket No. 1587, at 252; "Institutions with a substantially or fully

adequate infrastructure for quality assurance were about equal in number to those with

marginally adequate or inadequate infrastructures."  Special Master's Sixteenth Round

Monitoring Report, filed December 14, 2006, Docket No. 2081, at 396.

As of the present time, quality management systems within the institutions have

improved, but still have a significant distance to go before they can be deemed adequate.  The

value and effectiveness of the quality management bodies that exist today in the prisons are only

as good as the appropriateness of their composition and the attendance by their members.  These

bodies obviously include the institutional quality management committees (QMCs) and the

mental health subcommittees, but the same holds true for other committees that are less directly

concerned with quality management activities, but have a direct effect on the broader mental

health concerns and the care given to individual inmates.  The institutional suicide prevention

and response focus improvement teams (SPRFITs) and the IDTTs are two types of bodies which

come to mind.  The presence and input of both mental health and custody personnel are essential

at the meetings of these committees.  Mental health and custody each bring their own unique

perspective to the table.  They need to be aware of each other's roles and responsibilities in order

to carry out their duties collaboratively, i.e. constructively, promoting the consistent objectives of

the committee as a whole, and avoiding interference or unwitting hindrance of each other's important functions.  Within the SPRFITs, for example, it is important that the appropriately authorized personnel be present and participate in order that the DCHCS-issued corrective actions will be ordered by an official who has the authority to do make such orders and will be carried out under that person's supervision and oversight.

Another example of a committee for which composition and consistent attendance and participation is important is IDTTs.  While IDTTs are not directly engaged in quality management activities *per se*, they are the conduit for bringing the improvements brought about in the quality assurance process into the care of the individual inmates.  Within the mental health contingent on an IDTT, the degree of interdisciplinary participation should be aligned with the various disciplines that are part of the chain of delivery of care to the patients.  For example, each individual caseload inmate's treatment plan is created, in accordance with the standard of care benchmark found in the Program Guide.  Program Guide Chapter 3, 12-3-8 – 12-3-9; Chapter 4, 12-4-6.  In order for an IDTT to come up with a useful treatment plan for care that will be delivered effectively, there should be, at a minimum, the presence and input from at least the inmate's treating psychiatrist, his or her PC, a correctional counselor, and the inmate himself, and if possible a PT and custody officer. *Id.*  The clinicians can plan the patient's treatment, but custody is an integral part of the institution's ability to actually deliver that treatment to the patient.

At this point in the *Coleman* case, it remains as clear as it was back in 1994, when the remedial order was being formulated, that a solid quality management program is among the basic keys to implementation and maintenance of long-term improvement in the delivery of mental health care in the CDCR prisons.  It is also clear that the best performing prisons are those which have the most robust quality improvement programs.

40

During the twenty-third monitoring period, about a quarter of the institutions --, CCI, CMC, CSP/Sac, CCWF, Centinela, MCSP, NKSP, PBSP, SQ, and VSPW -- maintained quality management processes that functioned reasonably well.  At Folsom, the quality management program included active participation by nursing, mental health staff, and custody staff.

A handful of institutions undertook new initiatives in quality management.  SVSP revamped its auditing protocols and quality management program and continued to demonstrate improvement as a result.  CSP/LAC prepared and completed a 38-item CAP to address significant issues in the delivery of mental health care, in addition to taking remedial actions in quality management.  By the time of the monitoring re-visit to RJD during the twenty-third round, it had developed a list of orders to address issues that was similar to the measures taken at CSP/LAC.  In addition to CCI's peer review for psychiatrists and PCs, the institution conducted monthly peer review of all mental health clinical staff.  CSP/Solano's mental health subcommittee increased the frequency of its meetings from monthly to twice per month during the reporting period.

However, there were also a number of concerns noted during the monitoring site visits.  Folsom's quality management committee did not meet weekly as intended, and many of the institution's QITs failed to develop and implement new procedures.  SCC's quality management committee suffered from a lack of mental health representation, with scarce documentation that mental health issues were being addressed.  CSATF's capacity to audit many areas was hampered by its inability to extract data from MHTS.net.  Attendance at PVSP's mental health subcommittee meetings continued to be problematic.  WSP's mental health quality management process did not develop during the monitoring period, and staff aimed to establish a regular auditing schedule.

41

Local Governing Bodies

The local governing bodies at CCC, CMF, CRC, CSP/Corcoran, CSP/Sac, CSP/Solano, CVSP, HDSP, MCSP, and PVSP met monthly. Other institutions' local governing bodies met less frequently. The local governing bodies at Centinela and NKSP met three times during the monitoring period. The local governing bodies of RJD, VSPW, and WSP met quarterly. CMC, CSP/LAC, and ISP reported that their local governing bodies met twice during the monitoring period. SVSP's local governing body, which was scheduled to meet every other month, met only once during the monitoring period, as did the local governing bodies at ASP and CSATF. Since that time, ASP's local governing body was disbanded. SCC's local governing body did not meet at all. Calipatria's and CIW's local governing bodies were comprised of the warden and the CEO. CTF and DVI did not have functioning local governing bodies.

Quality Management Committees

Institutional quality management committees met regularly at CCI, CRC, CSP/Corcoran, CSP/Lac, CSP/Solano, CSATF, CVSP, KVSP, MCSP, NKSP, and PBSP. At CCC, CMF, CIM, CSP/Sac, CTF, and HDSP they met weekly, while DVI's quality management committee met bi-weekly. At ASP, Calipatria, CCWF, Centinela, CIW, CMC, ISP, PVSP, SCC, SQ, VSPW, and WSP, quality management committees met monthly. RJD's quality management committee met quarterly. The quality management committees at Folsom and SVSP were scheduled to meet weekly, but did not do so.

Mental Health Subcommittees

Mental health subcommittees at ASP, CCI, Centinela, CSP/Corcoran, CSP/LAC, CSP/Solano, CTF, KVSP, MCSP, and PVSP met regularly. At CMF, CSP/Sac, and SQ, mental health subcommittees met weekly, while at CCWF, CMC, DVI, PBSP and SVSP, they met every two weeks, and at CIW and RJD they met twice per month. At Calipatria, CCC, CIM, CRC,

CVSP, Folsom, HDSP, ISP, NKSP, SCC, VSPW, and WSP, mental health subcommittees met monthly.

Minutes of mental health subcommittee meetings indicated consistent attendance by required members at ASP, CCI, CCWF, Centinela, CMC, CSP/LAC, CTF, HDSP, and SVSP; CSP/Corcoran and CSP/Sac both reported appropriate attendance. However, at Calipatria, CVSP, and Folsom, a quorum was not always achieved, and at PVSP, RJD, and WSP, attendance was problematic. Minutes also indicated that pertinent topics were discussed at ASP, Calipatria, CCI, CIW, CMC, CRC, CSP/Corcoran, CSP/Sac, HDSP, MCSP, PBSP, RJD, SQ, and SVSP. At SCC, although mental health topics were discussed, mental health subcommittee meetings served primarily as a conduit of information and not as a means to address mental health quality improvement.

At CIW, CSP/Corcoran, CSP/Solano, Centinela, CCWF, Folsom, RJD, and SQ, mental health subcommittees routinely reported back to the quality management committee. However, at PVSP, minutes did not reflect that mental health issues were brought to the quality management committee for resolution, even when issues required resolution by a higher level of authority. WSP's mental health subcommittee reports to the quality management committee did not speak to substantive mental health issues. Minutes of mental health subcommittee meetings at KVSP were sparse.

Quality Improvement Teams

Quality improvement teams (QITs) were charted and used appropriately and effectively at a number of institutions. QITs were active at ASP, CCWF, CIM, CIW, CMF, CMC, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, CTF, DVI, Folsom, HDSP, MCSP, PVSP, RJD, SCC, SVSP, and VSPW. PVSP chartered a QIT to examine response times to referrals to mental health and psychiatry. CCWF chartered one QIT to address five-day

clinical follow-up procedures and another to address its recent designation as a Clozapine initiation and maintenance facility.  HDSP chartered two QITs addressing, respectively, RC timelines and weekly PC contacts in administrative segregation.  At MCSP, there were four QITs chartered, of which two were focused on EOP groups.  CSATF chartered two QITs, one to improve mental health response referral times, and the other to develop reliable auditing processes for five-day follow-up.  Among the other institutions, CSP/Sac chartered six QITs, SQ chartered seven, and DVI chartered nine.  PBSP used QITs liberally to address mental health care issues.  Line staff at ASP and SQ were reportedly actively participating in QITs, and at DVI they were reportedly called on to participate as appropriate.  CIW reported that line staff were invited to participate in QITs, but few did regularly.

There were no QITs chartered or active at CCC, CRC, CVSP, ISP, KVSP, or NKSP.  Centinela continued using an "action item" method to identify and address areas in need of improvement.  WSP did not fully utilize the potential of the QIT process to strategically examine obstacles to treatment access.  At Folsom, many QITs failed to develop and implement new procedures.

Some institutions continued to utilize focused improvement teams (FITs) rather than QITs to monitor performance in important areas and to recommend remedial activities as needed.  FITs were active at ASP, CIW, MCSP, SVSP, and SQ.

Audits

The institutions used audits as a quality management tool to varying degrees.  At PVSP, the overall quality of conducted audits was improved, but continuing difficulties frustrated audit efforts.  At SVSP, revamped auditing protocols consisted of six stand-alone quality management reports for mainline and administrative segregation MHSDS programs as well as for MHCB and psychiatric services.  CIW, CMF, Centinela, CCWF, CVSP, DVI, and

44

HDSP addressed audits at mental health subcommittee meetings.  Audits were conducted at

KVSP, but they were generally not used as a tool to identify and rectify deficiencies.  On a

monthly basis, NKSP conducted 23 different audits in the mental health program.  At WSP, the

methodology of certain audits and the array of indicators that were subject to audit indicated an

undeveloped quality management process.

      Peer Review

        There was broad variation among the institutions' implementation and use of peer

review, but the majority of institutions still needed to further develop their peer programs.  An

active peer review process was in place at CCI, CMC, CCWF, Folsom, PBSP, PVSP, SQ, and

VSPW.  Peer review at CSP/Sac, which was in progress during the preceding site visit, was

completed and implemented during the monitoring period.  At HDSP, peer review was in a

process of transition from a chart review format to a more qualitative process.  SCC's peer

review for PCs remained primarily quantitative while psychiatry peer review was both

qualitatively and quantitatively adequate.  At DVI, the peer review process continued to evolve.

At CSP/Corcoran, peer review processes were in various stages of development at the time of the

site visit.  Psychiatric peer review continued to evolve at NKSP.  CRC began developing a

psychiatry peer review process in September 2010, which was nearly finalized as of February

2011.  CIM had recently implemented a peer review process.  A formal peer review process was

initiated by the CVSP mental health subcommittee in November 2010.  Because the peer review

instrument used for PCs at RJD did not meet objectives, a new one was developed and submitted

to the mental health subcommittee.  At Centinela, peer review was limited, given the low number

of clinicians at the institution, and at Calipatria, peer review began in December 2010.

        Other institutions lagged behind with their peer review processes.  SVSP reported

that psychiatry peer review was hampered by turnover and instability among contractors, while

at CIW, it was curtailed significantly by psychiatric staffing limitations.  At ASP, psychiatry peer review was limited to mutual written audits with limited communication.  PBSP had low attendance at psychology peer review, resulting in the chartering of a QIT.  At MCSP, peer review was limited in scope and unlikely to effectuate improvements in performance.  There was no psychiatry peer review at CSP/LAC and HDSP, and no peer review programs at CCC and ISP.  Peer review at WSP was on hiatus pending direction from DCHCS.

**Suicide Prevention**:

> Suicide Prevention and Response Focused Improvement Teams

By the time of the twenty-third monitoring period, system-wide progress was made in the area of suicide prevention, with a suicide prevention and response focused improvement team (SPRFIT) having been established at every institution.  However, SPRFIT processes did not appear to be fully integrated into most institutions' procedures, as only seven institutions – ASP, CSP/Corcoran, CSP/LAC, CSP/Sac, CTF, HDSP, and VSPW -- met Program Guide requirements to meeting monthly, with proper attendance and relevant agenda items.

Twenty-one institutions -- ASP, CCC, CCI, CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CTF, Centinela, CCWF, DVI, Folsom, HDSP, MCSP, PBSP, SQ, SCC, WSP, and VSPW – held regular monthly meetings.  An additional eight institutions  -- CIM, CSP/Solano, CSATF, CVSP, KVSP, PVSP, RJD, and SVSP -- missed one monthly meeting during the review period, and Calipatria, ISP, and NKSP each missed two or more monthly meetings during the six-month monitoring period.  CRC combined its SPRFIT meetings with monthly mental health subcommittee meetings.

ASP, CSP/Corcoran, CSP/LAC, CSP/Sac, CTF, HDSP, and VSPW were the only institutions whose SPRFIT minutes reflected attendance by all required participants.  Minutes were maintained by all institutional SPRFITs, but content was sparse at SVSP and KVSP, and

minutes were not maintained monthly at CSP/Solano.  The minutes at CSATF were unclear regarding what was discussed during the meeting;

SPRFITs at 26 institutions took up relevant agenda items.  At the other institutions, some relevant topics were not discussed, or the focus of the group deviated from SPRFIT objectives; for example, at CVSP the SPRFIT functioned primarily as a mental health staff meeting.  PVSP did not review whether suicide risk assessments were being completed.  SVSP's SPRFIT minutes did not reflect any discussion of a recent suicide or suicide attempt.  At CMC, there has been unprecedented frequency in the numbers of suicides, with eight across the period of December 2009 through January 2011, six during 2010 alone, and three so far in 2011.This institution failed to develop quality improvement plans (QIPs) for all of the suicides that occurred throughout the monitoring period.  CMC did, however, form a suicide prevention quality improvement committee and a root-cause analysis committee, in addition to its SPRFIT, to address the four suicides that occurred during the monitoring period.  Further, the SPRFIT at CMC remained active in identifying and monitoring pertinent suicide-related issues and responding to the suicide QIPs that were developed.

Emergency Response

Nineteen institutions -- CCC, CCI, CMC, CRC, CIW, CSP/Corcoran, CSP/Sacramento, CSP/Solano, Calipatria, Centinela, CVSP, Folsom, HDSP, ISP, KVSP, PBSP, RJD, SVSP, and SCC -- had functioning  emergency response review committees (ERRCs) and maintained useful minutes for their meetings.  ERRC attendance was satisfactory throughout the monitoring period at CIW, CMC, CRC, Folsom, HDSP, PBSP, SVSP, and RJD.  However, a number of institutions -- CIM, CMF, CSP/LAC, CSATF, CTF, CCWF, DVI, MCSP, NKSP, PVSP, VSPW, and WSP -- did not report or provide any data regarding a functioning ERRC throughout the monitoring period.  ASP reported the existence of an ERRC but no meetings.

Cardiopulmonary Resuscitation (CPR) training, including annual refresher training for custody staff, was completed at 13 institutions, ASP, CCI, CIM, CIW, CSP/Sac, CSATF, CCWF, CVSP, Folsom, KVSP, PBSP, MCSP, and SCC.  The remaining 20 institutions did not provide information on CPR training of custody staff.

Nearly 60 percent of the institutions completed mandatory monthly emergency response drills in administrative segregation.  CCI, CMF, CVSP, DVI, HDSP, KVSP, and WSP did not report completion of the drills.  ISP missed one month.  CTF's documentation of these drills was problematic.

Approximately 45 percent of institutions were compliant with access to cut-down tools and possession of on-person CPR micro-shields by custody officers.  Some officers at PVSP stored their micro-shields in their lunch sacs, rendering access difficult.  CCC and CVSP did not report on appropriate access to cut-down tools within the housing units.  CIM, CIW, CMF, CMC, CRC, CSP/LAC, CSP/Solano, CSATF, CCWF, CTF, DVI, and NKSP, and VSPW did not provide any documentation on the location of either cut-down tools or micro-shields.

Five-Day Clinical Follow-Up

Only CCC, Folsom, and PVSP were compliant with five-day clinical follow-up of inmates discharged from crisis care.  This was a significant decrease since the preceding monitoring period.  Centinela, ISP, and SCC reported compliance but did not provide any verifying documentation.[10]  Twelve institutions remained very close to compliance.  These were ASP, CSP/Sac, CCWF, DVI, HDSP, KVSP, MCSP, PBSP, RJD, SVSP, SQ, and WSP. CSP/LAC was close to compliance for inmates discharged from its own MHCBs, but was noncompliant for inmates returning from crisis care at other institutions.  CRC and CSATF did

---

[10] In response to the draft of this report, defendants stated that SCC provided an OHU log in the proof-of-practice binder.  However, the monitor reports that this material was not provided.

not provide any pertinent data.[11]  CIM remained problematic in this area, with only 43-percent compliance.

### Custody Follow-Up

CCI, CIM, CSP/Sac, HDSP, RJD, and SQ reported compliance rates in the 90-percent range.  However, over half of institutions did not report on compliance with custody checks following inmates' discharges from crisis care.  CSP/Corcoran's compliance rate slipped from 82 percent to 78 percent.  SVSP provided follow-up for only 64 percent of inmates discharged from crisis care.

### CDCR's Plan to Address Suicide Trends in Administrative Segregation

Every institution reported its performance on at least some aspects of CDCR's plan to address suicide trends in administrative segregation.  Over half of institutions continued to use retrofitted or designated cells with placards for newly-arriving inmates in administrative segregation.  CSP/Solano, HDSP, KVSP, PBSP, PVSP, SQ, VSPW, and WSP reported that retrofitted cells were used but also filled most of the time, and that non-retrofitted cells were also used.  CMC used only one retrofitted cell.  DVI reported that it utilized cells that were only partially retrofitted.  SVSP reported that it used placard identifiers but these were not routinely placed on cell doors, while NKSP reported that it did not utilize any identifiers for these inmates.  CIM, CIW, Calipatria, Centinela, CCWF, CVSP, ISP, and RJD did not provide information on placements in administrative segregation.

Sixty-six percent of the institutions documented that daily meetings between mental health and custody staff in administrative segregation were occurring.  Those institutions were ASP, CCI, CIM, CMF, CMC, CSP/Corcoran, CSATF, CTF, CCWF, CVSP, DVI, Folsom, PBSP, HDSP, ISP, KVSP, MCSP, PVSP, RJD, SVSP, SQ, and WSP.  CCC, CIW, CSP/LAC,

---

[11] In response to the draft of this report, defendants stated that data concerning five-day follow-up was provided by CRC in the proof-of-practice binder, but the monitor reports that this material was not provided.

CSP/Sac, Calipatria, Centinela, NKSP, SCC, and VSPW did not provide documentation of these morning meetings.  CSP/Solano implemented these meetings late in the monitoring period, in November, 2010.

Documented daily PT rounds in administrative segregation were being conducted at nearly 70 percent of the institutions.  These institutions included ASP, CCC, CIM, CMF, CSP/Corcoran, CSP/Sac, Centinela, CCWF, CVSP, DVI, Folsom, HDSP, ISP, KVSP, MCSP, NKSP, PBSP, PVSP, SVSP, SQ, SCC, and RJD.  CTF was noncompliant with completion of daily PT rounds in administrative segregation.  CSATF did not provide any documentation regarding daily PT rounds, and there were problems with documentation at CCI, CIW, and Calipatria.  CSP/LAC did not provide any PT rounds for overflow units.

Seven institutions – CMC, CSP/Sac, Centinela, CCWF, CVSP, PVSP, and VSPW -- were compliant with completion of pre-placement screens in administrative segregation, with supporting documentation.  CCI, ISP, and MCSP reported compliance but without supporting documentation.  CSP/Corcoran was compliant with pre-placement screens for 3CMS inmates but not for EOP inmates.  ASP, CIM, and Folsom were nearing compliance, while CSP/Solano, DVI, HDSP, KVSP, PBSP, RJD, and SCC were noncompliant.  CCC, CCI, CIW, CMF, CSATF, CTF, Calipatria, ISP, MCSP, NKSP, SQ, and WSP did not provide data relative to pre-placement screens.

There was a significant decrease in compliance with completion of confidential 31-question post-placement screens of newly-arriving inmates in administrative segregation. Only 33 percent of the institutions, as compared to 70 percent during the preceding monitoring period, completed these screens in a confidential setting.  Institutions which documented compliance included ASP, CMF, CSP/Corcoran, CSP/Sac, Centinela, CCWF, Folsom, KVSP, PBSP, SVSP, and SQ.  CVSP and ISP reported compliance but did not provide verifying

documentation.  VSPW was close to compliance.  CMC and CTF reported nearing compliance, but failed to document confidentiality.  MCSP continued to conduct these screenings cell-front due to high refusal rates, and DVI continued to conduct them in the presence of the facility captain, compromising confidentiality.  CSP/LAC did not complete screenings in the overflow units.  CCC, CIW, CSATF, Calipatria, NKSP, and WSP did not provide documentation relative to the 31-question screens.  CCI, CIM, CSP/Solano, HDSP, PVSP, and SCC, were noncompliant.

Only five or 15 percent of institutions -- CCC, PVSP, NKSP, CVSP and CCWF – correctly completed 30-minute custody wellness checks in administrative segregation.  SCC reported compliance but did not provide supporting data.[12]  Centinela utilized the Guardian One Plus electronic system to document custody wellness checks, but also did not provide any data relative to compliance.  A number of institutions – ASP, CCI, CMF, CSP/Corcoran, CSP/Solano, CSATF, DVI, HDSP, KVSP, PBSP, RJD, SQ, VSPW, and WSP -- did not adequately stagger the checks.  At KVSP and RJD, the duration of documented time in which the checks were conducted appeared to be inadequate.  CSP/LAC, Calipatria, Folsom, ISP, MCSP, and SVSP were noncompliant with completion of the required wellness checks.  CIW, CMC, and CTF did not provide documentation regarding custody wellness checks.

Only one third of the institutions consistently provided access to ten hours or more of yard time in administrative segregation, representing a decrease from the 40 percent rate reported during the preceding monitoring period.  Compliant institutions included CMF, CMC, CSP/Sac, CSP/Solano, DVI, Folsom, HDSP, MCSP, NKSP, RJD, and SVSP.  CCC, Calipatria, CCWF, SQ, and SCC reported compliance, but did not provide supporting data.  CSP/LAC did not provide yard access for inmates housed in overflow units.  PBSP reported that it did not have

---

[12] In their response to the draft of this report, defendants stated that supporting data was provided in the proof-of-practice binder.  However, the monitor reports that this data was not provided.

sufficient small management yards (SMYs) to accommodate its population.  ASP, CCI, CIM, PVSP, VSPW, and WSP were noncompliant with provision of yard time.

Availability of electronic entertainment devices in administrative segregation, which is recommended but not required, remained unchanged since the preceding monitoring period.  CIW, CSP/Corcoran, CSATF, CTF CCWF, DVI, ISP, MCSP, and SVSP continued to permit them.  PVSP continued to allow them in units which had the capability, and KVSP allowed them in ASUs other than the stand-alone.

**Medication Management:**

Medication Continuity for Newly-Arriving Inmates

Institutions that were compliant with providing medications for newly-arriving inmates within 24 hours of arrival included CIM, CRC, CSP/Sac, ISP, PBSP, SVSP, SQ, and SCC.  ASP was approaching compliance, with a compliance rate of 86 percent.  DVI and VSPW reported compliance for RC inmates and other newly-arriving inmates.  CSP/Solano reported compliance but staff and inmates indicated continuing problems.  WSP reported that inmates from other CDCR institutions received medications by the end of the day following arrival.  Audit results from CMF indicated varying levels of compliance.  NKSP reported that medications for newly arriving inmates were generally ordered within eight hours of their arrivals.

Institutions which were noncompliant with medication continuity for newly-arriving inmates included CCI, CIW, CSP/Corcoran, CSP/LAC, CSATF, Centinela, CVSP, Folsom, HDSP, MCSP, PVSP, and RJD.  Compliance rates were particularly low at CIW, MCSP, and PVSP, at two, 22, and 39 percent, respectively.  CMC did not audit medication continuity.

<u>Medication Continuity Following Intra-Institutional Transfers</u>

Institutions that were compliant with medication continuity following intra-institutional transfers included ASP, CCC, CMC, CSP/Corcoran, CSP/Sac, CSATF, ISP, MCSP, SQ, SCC, and VSPW.  CSP/Solano and WSP reported compliance with medication continuity following intra-institutional transfers, but staff indicated otherwise.  KVSP was nearly compliant. ASP, CSATF, SQ, SCC, and VSPW were compliant for transfers into and out of administrative segregation.  CMC was compliant for transfers into administrative segregation.  CSP/Corcoran attained compliance for transfers out of administrative segregation.  SVSP reported overall compliance except following MHCB discharges.  SQ was compliant for both moves into and out of the MHCB.  CIM, CSP/Corcoran, and CSATF were complaint following discharges from the MHCB.  ASP and VSPW were compliant following moves into and out of the OHU, and SCC was compliant following discharges from the OHU.  CSP/Corcoran was compliant following moves out of the SHU.  NKSP reported that inmates with housing moves received medications by the following day.  PVSP indicated that inmates discharged from the CTC received medications by the day following transfer.  PVSP staff indicated frequent interruptions with medication continuity.

Medication continuity following intra-institutional transfers was noncompliant or problematic at CCI, CIM, CIW, CMF, CSP/LAC, CVSP, Folsom, HDSP, and RJD.  CCI managed to achieve compliance following OHU release during four months of the six-month review period.  CRC medication continuity audits were inconclusive.

<u>Medication Orders</u>

Medication renewal orders were timely at CCC, CMC, CSP/Sac, Centinela, HDSP, KVSP, PBSP, SCC, and WSP.  CSP/Solano and CVSP were close to compliance.

Calipatria reported compliance for timely processing of new orders, but did not provide

supporting documentation.  CIW was nearly compliant for new medication orders.

CRC, CSP/LAC, ISP, RJD, and SVSP were noncompliant with medication

renewal orders. CMC, CSP/LAC, CSP/Sac, Centinela, HDSP, ISP, and SVSP were

noncompliant for new and/or changed medication orders.  CIW did not provide medication

renewal audits.  Calipatria did not provide documentation.  CSATF did not audit medication

renewals.

Medication Noncompliance

Appropriate identification, documentation, referral, and response to inmate

medication noncompliance was problematic at many institutions.  CRC, CSP/Corcoran,

CSP/LAC, Centinela, CVSP, Folsom, HDSP, KVSP, MCSP, NKSP, PBSP, SVSP, SQ, SCC,

and WSP were all noncompliant.  CSP/Corcoran in particular struggled, reporting compliance

rates of 13 to 25 percent.  At SVSP, only ten to 39 percent of cases of medication noncompliance

resulted in referrals.  At Calipatria, audits were unclear.  CMC, RJD, and CSP/Solano did not

conduct audits.

Only CIM and CSP/Sac reported compliance with timeliness of responses to cases

of medication noncompliance.  ISP was nearly compliant, and VSPW reported partial

compliance.  DVI audits indicated that medication noncompliance protocols were being

followed, but did not address whether inmates were seen following the referral.  CTF reported

compliance for referrals, although the inmate's first contact after being referred was with a PT.

Pill Lines

Pill line lengths and wait times were appropriate at ASP, CIM, CSATF, CCWF,

NKSP, RJD, SVSP, SQ, and VSPW.  CSP/Solano reported that some pill lines had appropriate

wait times, but the more problematic ones were not audited.  HDSP reported no significant pill

54

line problems and MCSP audits indicated wait times of only several minutes.  CSP/LAC audited

one pill line and found no delays, but the sample was inadequate.

At ISP, waiting times in pill lines ranged from one to three hours.  CRC and

CSP/Corcoran pill line audits were flawed in that they did not appropriately assess the lengths of

the pill lines.  CCC, CIW, Calipatria, Centinela, CVSP, Folsom, HDSP, and WSP did not audit

or otherwise provide pill line data.  SCC pill lines were audited, but the raw data was not

analyzed.  Custody lockdowns and modified programs generally limited pill line use at PBSP.

Informed Consent

Centinela, CVSP, Folsom, ISP, KVSP, RJD, SCC, and VSPW were compliant

with requirements for the presence of informed consent forms.  CMC and SVSP were nearly

compliant.  Calipatria reported compliance, but documentation was not provided.  CIM indicated

compliance except for UHRs of EOP inmates in administrative segregation.  NKSP indicated

compliance but informed consent forms were not consistently updated or renewed annually.

PBSP reported partial compliance.  At DVI, UHR reviews indicated the presence of informed

consent forms.  At CIW, compliance improved from 73 to 83 percent.

ASP, CMF, CRC, CSP/Corcoran, CSP/LAC, CSP/Solano, CTF, HDSP, and SQ

were noncompliant.

Laboratory Testing

The majority of institutions still struggled with obtaining appropriate testing for

psychotropic medications.  CMC and KVSP were compliant, and CIM, CMF, CSP/Sac, and

PBSP reported partial compliance.  CRC indicated that laboratory tests were processed timely,

but it did not audit whether they were ordered appropriately, nor did it review responses to

abnormal test results.  VSPW indicated compliance with responses to abnormal test results, but

did not audit whether clinically-indicated laboratory studies were ordered.

55

Laboratory testing was problematic or noncompliant at ASP, CCI, CSP/Corcoran, CSP/LAC, CSP/Solano, CCWF, CVSP, CTF, DVI, Folsom, NKSP, RJD, and SQ. CCI reported long-standing problems with laboratory testing. CSATF reported difficulty obtaining timely laboratory results. SCC audited the timeliness, but not appropriateness, of laboratory studies. SVSP audits were unreliable due to flawed methodology. CIW and HDSP did not provide audit data. It was not possible to determine whether CCC and ISP performed appropriate laboratory testing.

<u>Direct Observation Therapy (DOT) Medication Administration</u>

ASP, CCC, CIM, CSP/Corcoran, CSATF, DVI, and SQ were compliant with DOT medication administration protocols. Calipatria reported compliance but did not provide verifying documentation. CCI indicated partial compliance. CIW performed monthly audits of DOT. HDSP and WSP did not provide audit information. Centinela, CVSP, KVSP and PVSP did not audit DOT protocol compliance.

CIW, CSP/Solano, CSATF, Calipatria, CVSP, ISP, MCSP, PBSP, PVSP, and VSPW administered all psychotropic medications DOT. SCC data was unclear as to whether all or some psychotropic medications were administered DOT.

MCSP's ASU maintained an "enhanced DOT" list for inmates with known histories of medication hoarding or cheeking. DVI typically reserved DOT medication administration for noncompliant inmates. ASP prescribed medications DOT for inmates with histories of hoarding, cheeking, or medication noncompliance. NKSP and SVSP prescribed medications DOT for EOP inmates, and NKSP also prescribed medications DOT for inmates housed in the CTC or mental health temporary housing. CSP/LAC and CCWF prescribed medications DOT for EOP inmates and all inmates in administrative segregation. CCWF also

prescribed medications DOT to MHCB inmates. Centinela prescribed medications DOT for all inmates in the CTC and in administrative segregation.

CIW, CSP/LAC, CSATF, Calipatria, CVSP, DVI, PVSP, and SQ maintained centralized lists of inmates prescribed DOT medications. ISP did not maintain a centralized list of inmates on DOT, and CMC and SCC did not maintain one for inmates outside of the MHCB.

CSP/Corcoran ordered psychotropic medications nurse-administered unless otherwise clinically indicated. CMC prescribed most medications nurse-administered. CTF reported that all psychotropic medications were nurse-administered rather than by DOT, despite cases of medication noncompliance and hoarding.

Keyhea Process

Generally, the Keyhea process has taken root at the institutions. It was implemented appropriately at ASP, CCI, CIW, CMF, CMC, CRC, CSP/Corcoran, CSP/Sac, CSATF, CCWF, DVI, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, SVSP, SQ, VSPW, and WSP.

CSP/Solano acknowledged not having a consistent Keyhea process for general population inmates. CSP/LAC audits indicated only four-percent compliance with immediate referral of Keyhea inmates who were no-shows or who refused medications. No Keyhea petitions were initiated at CTF. Two Keyhea orders were dropped due to clinician error at RJD. No inmates were on active Keyhea orders at CCC, Calipatria, Centinela, CVSP, Folsom, ISP, or SCC.

Hora Somni/ Hour of Sleep (HS) Medications

HS medication administration was compliant at ASP, CIM, CSP/Corcoran, CSP/LAC, CSP/Sac, CCWF, NKSP, PBSP, and RJD. CMF provided HS medications at or after

8:00 p.m.  PVSP did not report audit results.  DVI and CSP/Solano did not conduct HS audits.
CCI reported partial compliance.

Although SVSP was noncompliant during the first two months of the reporting
period, it was fully compliant for the remainder of the reporting period.  CTF policy called for
the administration of HS medications between 7:30 and 8:00 p.m., which was noncompliant.  At
MCSP, HS medications appeared to be administered later than 8:00 p.m., and at HDSP, HS
medication protocols were reportedly not being followed appropriately.  Centinela's local policy
permitted HS medications to be delivered one hour before 8:00 p.m., which was noncompliant.
CIW, CMC, CVSP, ISP, KVSP, SCC, and VSPW did not conduct or provide HS medication
audits.  No inmates at Calipatria were prescribed HS medications.

Parole Medications

Parole medications were appropriately provided at CIM, CSP/Corcoran,
CSP/LAC, CSP/Sac, CSATF, CTF, Folsom, PBSP, RJD, SQ, SCC, and VSPW.  A CMC audit
of a two-month period indicated compliance.  CVSP reported that paroling inmates were
provided with a supply of medications.  KVSP reported appropriate parole medication
processing and delivery.  NKSP reported no significant problems.  Calipatria reported
compliance but did not provide supporting documentation.  Two of three CRC audits indicated
compliance and the third was nearly compliant.  CCWF conducted monthly audits as to the
availability of parole medications.

Institutions that were noncompliant with provision of parole medications included
ASP, CSP/Solano, Centinela, and SVSP.  Two of three CCI audits indicated noncompliance.
Small audit sample sizes made it difficult to determine whether parole medications were
appropriately distributed at HDSP.  No inmates on psychotropic medications paroled from ISP.
No MHSDS inmates paroled from CCC.

**<u>Sexual Misconduct</u>:**

There were approximately 384 sexual misconduct RVRs issued throughout the institutions during the monitoring period. No sexual misconduct RVRs were issued at CCWF and VSPW.

ASP, CCI, CIW, CSP/Solano, Folsom, HDSP, MCSP, and SQ were compliant with CDCR-mandated sexual misconduct protocols during the review period. However, among the remainder of institutions, compliance with protocols regarding indecent exposure (IEX) and sexual misconduct violations remained somewhat variable. Assessments of SHU terms and referrals to the district attorney were routine. CCC provided conflicting information and presented no substantiating documentation regarding compliance with required protocols. At WSP, mental health assessments following issuance of an RVR for sexual misconduct were focused on disciplinary rather than therapeutic objectives.

<u>Screens</u>

Screens of all inmates who received sexual misconduct RVRs were completed at ASP, CCC, CCI, CIW, CMC, CSP/Corcoran, CSP/Solano, CSATF, CVSP, Centinela, DVI, Folsom, HDSP, ISP, KVSP, MCSP, PVSP, RJD, SVSP, SQ, SCC, and WSP. However, screens at CSATF, Centinela, CVSP, ISP, and SCC were not timely. At CMF, staff attributed lack of screenings to late notification of instances of sexual misconduct. At CSATF, times from issuance of an RVR for sexual misconduct to screenings averaged 15 days, and reached as long as 39 days.

<u>IDTT Reviews</u>

IDTT reviews were completed for all screened inmates at CIM, CIW, CMF, CSP/LAC, CSP/Solano, CSATF, Calipatria CVSP, Folsom, HDSP, MCSP, PBSP, PVSP, and RJD.

Comprehensive Evaluations

Comprehensive evaluations were completed at CIM, CMF, CSP/LAC, CSP/Sac, CSATF, CTF, CVSP, KVSP, NKSP, PBSP, PVSP, RJD, SCC, CSP/Solano, SQ, and SVSP. Comprehensive evaluations at CMF and CMC yielded diagnoses of inmates with Exhibitionism or Paraphilia NOS, but dispositions of these cases were unclear at the time of the monitor's visits. WSP diagnosed Exhibitionism or Paraphilia NOS without conducting the required comprehensive evaluations, and at the time of the site visit, it was unclear what the final dispositions of these cases were. SVSP completed comprehensive evaluations for all inmates who received sexual misconduct RVRs throughout the monitoring period, although it found no inmates met the criteria for a diagnosis of Exhibitionism. CIM completed comprehensive evaluations of all inmates seen by an IDTT as a result of a sexual misconduct. NKSP conducted a comprehensive evaluation in which the inmate was not interviewed as required. At DVI, a referral for a comprehensive evaluation which should have occurred did not occur.

Use of Custody-Driven Measures

Multiple institutions continued to employ custody-driven measures, including placards on cell doors and windows, window coverings, and exposure-control jumpsuits. The following institutions reported the routine use of these custody-driven measures: ASP, CCC, CCI, CMC, CSP/Corcoran, CSP/LAC, Calipatria, CVSP, Folsom, HDSP, ISP, PBSP, PVSP, RJD, SQ, SVSP, SCC, and WSP. Centinela did not employ custody-driven measures regarding sexual misconduct.

Referrals to Institutions with Exhibitionism Treatment Programs

CDCR continued to operate Exhibitionism treatment programs at CSP/Corcoran, CSP/Sac, and PBSP. Twenty-two inmates were referred to treatment programs. CIM made three referrals. Inmates with Exhibitionism or Paraphilia NOS diagnoses from CSP/Sac, CTF,

and CMC transferred into programs during the monitoring period. CSP/LAC, CVSP, KVSP, RJD, and PVSP also made referrals to Exhibitionism programs following positive diagnoses, but these inmates had not transferred at the time of the monitor's site visit. SQ reported that it did not refer inmates diagnosed with Exhibitionism or Paraphilia NOS to any of the CDCR treatment programs, but provided individualized treatment according to clinical needs. A referral from PVSP to an Exhibitionism program was not appropriately processed, resulting in transfer delays.

The census in the CSP/Corcoran treatment program ranged from 11 to 17 inmates. The institution reported ongoing compliance with sexual misconduct protocols throughout the monitoring period, but did not provide documentation.

During the review period, 32 inmates were enrolled in CSP/Sac's treatment program. The program utilized the Exhibitionism Treatment Manual and focused on group therapy as the primary treatment modality. There were two active Exhibitionism groups at the time of the site visit. However, CSP/Sac reported that it did not consistently follow IEX protocols. Only 65 of 85 inmates receiving sexual misconduct RVRs were screened, and not all inmates who should have been referred to an IDTT were actually referred. Of the 53 inmates referred for IDTT reviews, nine were identified for comprehensive evaluations. At the time of the site visit, five of the evaluations were completed, resulting in one diagnosis of Exhibitionism or Paraphilia NOS.

At the time of the monitor's visit at PBSP, its treatment program included voluntary individual and group therapy. Inmates referred for sexual misconduct who did not receive positive mental health screens were offered the opportunity to participate voluntarily in the program. PBSP issued 31 RVRs for sexual misconduct during the monitoring period, including several for repeat offenses. Inmates involved in 31 of these incidents were screened

61

and referred to an IDTT.  PBSP completed three comprehensive evaluations, none of which

yielded a diagnosis of Exhibitionism or Paraphilia NOS.  Custody-driven measures to deal with

sexual misconduct included door placards and exposure-control jumpsuits.

**Access to Higher Levels of Care**:

> Non-Desert Men's Institutions

There was unevenness with defendant's compliance with protocols to encourage

consistent consideration of DMH intermediate care resources.  All prisons had assigned at least

one person to assume the responsibilities of DMH coordinator.  The amount of time dedicated to

these responsibilities, as well as the scope of tasks performed by the DMH coordinator, varied

widely from institution to institution.  DMH coordinators typically focused on maintaining DMH

referral logs, assisting with the completion of referral packets, and completing performance

audits.  Failure to consistently complete one or more of these key tasks was usually attributed to

turnover in the DMH coordinator positions, insufficiency of time due to competing

responsibilities, lack of back-up coverage during planned and unplanned absences, and poor

coordination among multiple sources of DMH referrals within one prison.

Poor compliance with referral logging requirements was perhaps the most glaring

and prevalent problem.  DMH referral logs were incomplete, inaccurate, inconsistent, and

disorganized at CMC, CSP/Corcoran, CTF, HDSP, MCSP, NKSP, PVSP, RJD, SCC, and WSP.

In most of these cases, the logs did not provide a reliable accounting of the number of referrals or

their outcomes.  The non-referral logs at CTF and HDSP were notably incomplete, and the

documented rationales for non-referrals were often inadequate at MCSP and CMC.  Referral

tracking at CMF, while reliable in most cases, was sometimes compromised by DMH's failure to

provide timely information regarding the referral of crisis care patients on Unit S2.  On a more

positive note, the DMH referral logs at CIM and DVI were significantly improved, as compared to their state during the preceding monitoring period.

Problems were also noted with completion of Form 7388, which is the form listing the criteria to be used when considering referral of an inmate to a higher LOC at DMH. These forms were not properly completed and/or utilized at CCI, CIM, CSP/Corcoran, CSP/LAC, KVSP, MCSP, PVSP, and SVSP. Several prisons struggled to collect and disseminate the data needed to fully complete Form 7388. Due to limitations with MHTS.net, current treatment participation information was not routinely available at CCI, CIM, CSP/LAC, CSP/Sac, CSATF, NKSP, SQ, and SVSP. There was inconsistent access to reliable information regarding multiple MHCB admissions and/or OHU and alternative housing placements at CCI, CIM, CSP/LAC, CSP/Sac, CSATF, CTF, MCSP, NKSP, and SVSP. RVR histories were not routinely available for all MHSDS inmates at CCI, CIM, CTF, CSP/Corcoran, CSP/LAC, CSATF, MCSP, NKSP, PVSP, SVSP, SQ, and WSP.

Nine prisons reported noncompliance with referral preparation and submission timelines. Referrals of inmates to DMH acute care must be completed within two working days of identification. Program Guide, 12-6-3, "Referral Procedure." Referrals of inmates to DMH intermediate care must be completed within five working days of identification by an IDTT if inmate-patient consent is obtained, and within ten working days of identification if a due process hearing is required. Program Guide, 12-6-9, "Referral Procedure." The percentage of APP referrals that failed to comply with timelines reached a high of 100 percent at DVI, followed by 74 percent at CMF, 70 percent at WSP, and 53 percent at CSP/Sac. The percentage of intermediate care referrals that exceeded timelines reached 87 percent at WSP, followed by 60 percent at CMF, 44 percent at CSP/Sac, and 39 percent at DVI. CMC and CIM reported being routinely noncompliant with APP and intermediate care referral timelines, and 72 percent of the

DMH referrals generated by CSATF exceeded timeframes.  NKSP and RJD reported meeting the timeframes for APP referrals, but not for intermediate care referrals.  Compliance with referral timeframes at MCSP improved from 70 percent to 100 percent.  ASP, CSP/Corcoran, CSP/LAC, and HDSP reported timely preparation and submission of DMH referrals throughout the reporting period.

Demand for DMH services, crisis care, PSU programs, and EOP beds continued to outpace capacity at each of these critical levels of care.  As a result, needed crisis beds were filled with inmates waiting for DMH and EOP services.  Inmates in need of licensed MHCBs filled unlicensed OHU and MHOHU beds and makeshift holding areas, and seriously mentally ill inmates too often languished in RCs and segregation units.

APP shall notify the referring institution in writing of its decision to accept, deny, or defer a referral within one calendar day of the referral.  Inmate-patients who have been accepted shall be moved via special transport to DMH within 72 hours of bed assignment, and in any event all transfers shall be accomplished within ten days of the date of the referral.  Program Guide 12-6-5, "Admission Procedure."  Despite a 52-percent increase in acute care capacity following the activation of Units P-1 and P-2 at CMF, access to these services continued to be slow for many prisons.  Half or more of the inmates transferred to acute care from DVI, HDSP, MCSP, and PBSP waited longer than ten days.  The average lapse between referral and transfer to acute care ranged from 20 to 23 days at KVSP, SVSP, RJD, and WSP, was approximately 33 days at CSATF, and reached 48 days at CSP/LAC.  CMC, MCSP, PBSP, and RJD rescinded more than 40 percent of acute care referrals.  Approximately 20 percent of all acute care referrals from CSP/Sac and the 50-bed CTC at CMF were rescinded, as were 37 percent of the referrals from NKSP.

64

DMH shall review the referral packet for a referral to intermediate care within three working days of receipt, and shall immediately notify the referring institution by fax of the decision to accept or reject. Program Guide, 12-6-10, "Referral Procedure." Transfer must take place within 30 days of referral if accepted at DMH. Inmates who have been accepted to DMH intermediate care shall be transported to DMH within 72 hours of bed assignment. Program Guide 12-6-10-11, "Transfer Procedure." Available data, while often incomplete and inaccurate, showed that access to low-security intermediate care beds was adequate in most cases, while access to high security intermediate care beds remained so slow as to be nonexistent in many cases. DMH intermediate care was provided by the Vacaville Psychiatric Program (VPP), SVPP and ASH. The total number of low-security dorm beds remained constant, with 84 at VPP and 256 at ASH. These resources continued to accommodate system-wide demand, as there were no waitlists for intermediate care dorm beds during the reporting period. CMF, CSP/LAC, and HDSP reported that all transfers to ASH and VPP occurred within 30 days of referral. RJD was the sole prison that reported slow access to intermediate care dorms. It took an average of 43 days to transfer ten inmates to ASH and an average of 112 days to transfer two inmates to VPP.

The activation of Units C-5 and C-6 at SVSP increased the number of high-security intermediate care beds from 284 to 400 during the reporting period. Poor access to high security intermediate care beds continued to be problematic. The number of inmates on the SVPP waitlist declined from a high of 338 inmates in October 2010 to 196 inmates in March 2011, and to 147 as of June 30, 2011.

None of the SVPP transfers from PBSP, DVI, or CSP/LAC occurred within 30 days, and only 20 percent of the SVPP transfers from RJD were timely. CMF reported that it typically took four weeks to receive an acceptance/rejection decision from SVPP, by which time the transfer deadline was missed. Approximately 90 percent of the SVPP referrals from DVI and

NKSP did not result in transfer.  The percentage of cancelled referrals reached 83 percent at

CSP/LAC, exceeded 70 percent at RJD, and ranged from 59 to 66 percent at CIM, CMC,

CSATF, and WSP.  A quarter of the SVPP referrals from SVSP were rescinded.  The number of

inmates on SVPP's waitlist during site visits approached 40 at CMC and SVSP, hovered in the

teens at CSATF and MCSP, and stood at eight at CIM.  While KVSP had only three inmates on

the SVPP waitlist, they had been waiting 659 days, 360 days, and 165 days, respectively.

Defendants continued to stretch MHCB capacity through the use of 62 temporary

MHCBs at CMC and CSP/Sac, the operation of 36 unlicensed infirmary beds at CIM, and the

appropriation of 20 APP beds at CMF.  Despite these stop-gap measures, untimely access to

crisis care continued to be a prevalent problem.

MHCB units at CMC, CIM, CSP/Sac, KVSP, MCSP, NKSP, SVSP, and WSP

were too small to accommodate the local inmate population.  These prisons continued to use

alternative holding areas to monitor inmates for whom crisis beds were unavailable.  Placements

in alternative holding areas reportedly numbered 857 at CSP/Sac, 774 at NKSP, 159 at MCSP,

108 at KVSP, and 94 at CMC.  Utilization of alternative holding areas at CSP/LAC was not

adequately tracked.

Stays in an MHCB may be up to ten days, but any exceptions to the length of stay

must be approved by the chief psychiatrist or his designee.  Program Guide 12-5-1, "Mental

Health Crisis Bed."  Inadequate MHCB capacity was exacerbated by excessively long

admissions, most of which involved inmates on DMH waiting lists.  Nearly 80 percent of the

admissions to the 50-bed CTC at CMF had physical lengths of stay that exceeded ten days, with

71 percent of the excessive stays involved inmates waiting for DMH beds.  Half of the MHCB

admissions at CSP/Sac lasted longer than ten days, followed by 38 percent at CSP/Solano, 27

percent at CSP/LAC and SQ, 24 percent at PVSP, and 20 percent at HDSP.  The percentage of

admissions that lasted longer than ten days ranged from 12 to 18 percent at CIM, CSATF, PBSP, and RJD. The average length of stay for MHCB admissions at NKSP was over 15 days. There were 144 admissions to the unlicensed MHCB at CMC that lasted longer than ten days.

Eight prisons – CSP/Corcoran, Solano, CSATF, HDSP, PBSP, PVSP, RJD, and SQ – had a sufficient number of MHCBs to accommodate their local inmate populations. CMF continued to use 20 beds within the APP as MHCBs, which caused a back-up for access to those beds for acute care. Access to MHCBs was reportedly adequate. However, there did not appear to be a meaningful administrative or clinical distinction between crisis and acute levels of care, and length of stay data was not provided to the monitor.

The 50-bed MHCB unit at CMF accepted an average of 62 referrals a month, all from prisons other than CMF. The average physical length of stay was 22 days, two-thirds of which was the result of transfer delays following clinical discharge. The average length of stay was 40 days for inmates removed from DMH waitlists after stabilizing.

Seven prisons did not have licensed MHCBs and relied on other prisons for crisis care. ASP, CCI, CRC, CTF, DVI, and SCC used OHUs. Folsom used segregation cells to triage inmates for possible transfer to MHCB units. Among these prisons, ASP and SCC reported having timely access to crisis beds on a consistent basis. Only a third of the 35 MHCB referrals generated by Folsom resulted in transfer. Transfers from Folsom generally occurred within one to three days of referral, although one inmate waited eight days. Approximately two-thirds of the MHCB referrals from DVI resulted in transfer, and less than a quarter of the 94 MHCB referrals from CCI were transferred within 24 hours.

Inmate patients shall not remain in OHUs or MHOUs for more than 72 hours. Program Guide 12-5-30, "Mental Health Outpatient Housing Units." For a variety of reasons, including delayed referral and transfer to MHCB units, OHU lengths of stay continued to

regularly exceed 72 hours. Half of all OHU placements at SCC exceeded 72 hours, followed by 37 percent at CCI and DVI, 31 percent at ASP, and 21 percent at CRC. The average length of stay for mental health placements in CTF's OHU was just shy of six days.

DVI used alternative holding areas on 241 occasions to monitor inmates for whom OHU cells were unavailable. The average length of stay for inmates placed in these alternative holding areas nearly doubled during the reporting period, rising from 38 to 72 hours. CCI used alternative holding areas on 23 occasions. Twenty, or 87 percent, of these placements lasted 24 to 48 hours.

Transfers of nearly all EOP inmates to mainline and SNY programs from CTF, Folsom, SCC, and ASP met the 60-day timeframe. A handful of prisons continued to struggle in this area. Three-quarters of EOP inmates transferred to mainline and SNY programs from CSATF waited longer than 60 days, followed by 42 percent at HDSP, and 34 percent at CSP/Solano. During the monitor's visit, there were 34 EOP inmates at DVI pending transfer to mainline/SNY programs, many of whom had been waiting several months.

WSP was the sole institution with data relative to transfers to EOP hubs that reported compliance with the 30-day timeframe. All of the EOP inmates transferred to hubs from SCC waited longer than 30 days, followed by 65 percent at HDSP and CSP/Solano. Ninety percent of the EOP inmates in segregation at CSATF and 27 percent of the EOP inmates in segregation at CCI had been there longer than 30 days. Nearly two-thirds of the EOP inmates in segregation at CIM had been waiting longer than 90 days. Among the 22 EOP inmates in segregation at NKSP, the average length of stay was 133 days, with the longest stay reaching 512 days. Collectively, DVI and WSP had 28 EOP inmates in segregation who were waiting for hub beds. Both institutions attributed transfer delays to a system-wide lack of hub beds.

68

CSP/Sac and PBSP, both with PSU programs, reported having timely access to PSU beds, as did MCSP and WSP. Other prisons did not fare as well. All six PSU transfers from CMC exceeded the 60-day timeframe. At the time of the monitor's visit, approximately 60 percent of the EOP inmates at CSP/Corcoran with current PSU endorsements had been waiting longer than 90 days. Twenty percent of the EOP inmates at SVSP with current PSU endorsements had been waiting longer than 60 days, and a quarter of the excessive segregation stays were attributed to delayed PSU transfers. CSP/LAC reported that PSU endorsements and SHU terms commonly expired prior to transfer.

All EOP-designated inmate-patients in a RC shall be transferred to a treatment setting within 60 days of LOC designation, or 30 days of such designation if clinically indicated. Program Guide 12-2-9, "Reception Center, Transfer Timelines." RCs throughout the state continued to struggle to meet transfer guidelines. The percentage of EOP inmates who waited in RCs longer than 60 days reached a high of 73 percent at SQ, followed by 69 percent at HDSP, 68 percent at CSP/LAC, 52 percent at CIM, and 30 percent at NKSP. Nearly half of the EOP inmates in the RC at RJD during the monitor's visit had been waiting longer than 60 days.

All 3CMS-designated inmate-patients in a RC (except parole violators with 90 days or fewer to serve) shall be transferred to a mainline institution within 90 days of LOC designation or 60 days of such designation, if clinically indicated. Program Guide 12-2-9-10, "Reception Center, Transfer Timelines." The percentage of 3CMS inmates who waited in RCs longer than 90 days reached 76 percent at SQ, following by 62 percent at HDSP, 43 percent at CSP/LAC, and 32 percent at DVI. At CIM, the average length of stay in the RC for 3CMS inmates was 102 days. More than three-quarters of the 3CMS inmates in the RC at RJD during the monitor's visit had been waiting longer than 90 days.

69

Desert Institutions

Calipatria, CCC, Centinela, CVSP, and ISP did not have MHSDS programs due to their desert locations. The MHSDS census at these prisons ranged from zero at CCC to 19 at Calipatria. The desert institutions placed a combined total of approximately 370 inmates in the MHSDS during the monitoring period. Clinical staff at CCC, Centinela, CVSP, and ISP reported meeting the 60-day transfer timeline for EOP inmates [Program Guide 12-4-5, Enhanced Outpatient Program, "Admission to Program-Referral Process"] and the 90-day transfer timeline for 3CMS inmates [Program Guide 12-3-14, 3CMS, "Transfer and Clinical Discharge"]. Calipatria's compliance with transfer timelines could not be ascertained due to inadequate tracking records.

CCC, Calipatria, Centinela, and CVSP mistakenly received a combined total of 68 MHSDS inmates during the monitoring period. Only CCC transferred all of these inmates within 30 days. Seven of nine inmates at Centinela transferred within 30 days. Length of stay for this subgroup of inmates at CVSP ranged from 24 to 58 days, and averaged 41 days. Again, Calipatria did not provide transfer data.

Transfer of an inmate referred to an MHCB must be made within 24 hours of the referral. Program Guide 12-5-3-4, "Mental Health Crisis Bed, Referral and Transfer." Access to MHCBs for desert institutions continued to be slow in many cases. Fourteen inmates referred to an MHCB unit from the OHU at CVSP (including five inmates from ISP) waited an average of 3.6 days – more than twice as long as the average wait reported during the preceding monitoring period. The average wait for fourteen transfers from Centinela to outside MHCB units was nearly four days, and reached eight days in one case. Only a third, or 14 of 44, of the MHCB referrals from Calipatria resulted in transfer, due in large part to delayed access to MHCBs. ISP

did not maintain coherent length-of-stay or transfer records for seven inmates admitted to local

OHU beds that were activated during the second half of this reporting period.

### Women's Institutions

CIW, CCWF, and VSPW had part-time DMH coordinators, who were primarily

responsible for tracking DMH referrals, supervising the completion of referral packets, and

conducting audits. CIW was substantially compliant with DMH referral protocols -- referral logs

were adequately maintained; Form 7388s were properly completed and utilized during IDTT

reviews; data relative to multiple MHCB admissions, treatment participation, and RVR histories

were readily available and accurately recorded on Form 7388s; and DMH referrals were

completed and submitted timely.

In contrast, CCWF and VSPW were largely noncompliant with DMH referral

protocols. The DMH referral logs at CCWF and VSPW were inaccurate, incomplete, and

unreliable. Both institutions routinely used Form 7388s during IDTT reviews. However, the

forms were incomplete in that information relative to treatment participation and RVR histories

was seldom recorded, despite the fact that both prisons had systems in place for tracking and

reporting these data. For example, CCWF's tracking system listed 25 inmates with treatment

participation rates of 35 percent or less, but only one of these inmates was identified on the Form

7388 as meeting the treatment participation criteria. Similarly, CCWF provided a list of 32

inmates who had received multiple RVRs in recent months, none of whom were identified on the

Form 7388 as meeting the RVR criteria. Lastly, three of five referral packets from VSPW were

not timely completed and submitted, and incomplete logs rendered it impossible to assess

compliance with referral timelines at CCWF.

Female inmates deemed to require a DMH LOC were referred to Patton State

Hospital (PSH). DMH referrals did not distinguish between the need for acute and intermediate

71

levels of care, and it remained unclear what, if any, acute care services were available to female inmates at PSH.

CIW, CCWF, and VSPW produced a combined total of 24 referrals to PSH – less than a third of the 77 referrals generated during the preceding monitoring period.  CIW, the only institution with complete records, referred 12 inmates to PSH.  Seven of these inmates were transferred and five were rejected due to histories of violent behavior.  DMH took an average of 27 days to issue acceptance/rejection decisions.  Transfers typically occurred within two days of acceptance.  Incomplete logs rendered it impossible to discern referral outcomes or assess compliance with transfer timelines at CCWF and VSPW.

CIW had a ten-bed licensed MHCB unit.  CCWF had a Skilled Nursing Facility with twelve mental health beds, known locally as mental health program beds.  Access to both units was timely and neither institution used holding areas to monitor inmates waiting for crisis beds.  CIW's MHCB unit averaged 45 admissions per month during the reporting period, with an average length of stay at less than five days.  In contrast, CCWF's mental health program beds averaged 15 admissions a month, with an average length of stay of 11 days.  Excessive stays in the mental health program bed unit, the longest of which was 56 days, were reportedly related to delayed transfers to PSH.

VSPW used three rubberized safety cells and five observation rooms in its OHU to monitor inmates in crisis.  The safety cells were inappropriately used to triage inmates referred to the OHU for routine mental health observation.  Nearly half of the inmates placed in observation rooms were first held in safety cells for a period of time. There were 229 safety cell placements and 166 observation room placements during the reporting period.  Slightly more than four percent of safety cell placements lasted longer than 72 hours, with the longest lasting

six days.  The average length of stay in observation rooms was three days, with the longest stay

lasting 24 days.

Inmates deemed to need crisis care after a brief period of observation in VSPW's

OHU were transferred to CCWF.  VSPW staff reported that access to the mental health program

beds at CCWF greatly improved during the reporting period; an improvement that was attributed

to the oversight provided by the CEO for these two institutions.  VSPW transferred 15 crisis

patients to CCWF, 12 or 80 percent of whom were sent within 24 hours of referral.

Access to mainline EOP beds at CCWF, EOP hub beds at VSPW and PSU beds at

CIW was adequate.  Thirty-five percent of the EOP inmates transferred from the RC at CIW

waited longer than 60 days, while less than six percent of 3CMS transfers exceeded 90 days.

Reception center-status EOP inmates at CCWF were housed in the mainline EOP program and

had full access to EOP treatment services pending transfer to a permanent setting.  Slightly less

than seven percent of the 3CMS inmates transferred from the RC at CCWF waited longer than

90 days.  Over 90 percent of the MHSDS inmates in the RC at VSPW were timely transferred.

<u>Routine Referrals to Mental Health Within the Institutions</u>

Referral tracking and response times improved as a whole during the reporting

period.  Over half, or 19 of 33 prisons, maintained adequate tracking systems that showed

consistent compliance with Program Guide timeframes for responding to routine, urgent, and

emergent referrals.

Nine prisons continued to struggle to meet the five-day standard for routine

referrals.  Program Guide 12-2-11, "Staff and Self Referrals".  CSP/Solano reported the lowest

compliance rate at 42 percent, followed by RJD with 45 percent, CSATF with 49 percent, MCSP

with 52 percent, CCI with 59 to 77 percent, CSP/LAC with 62 percent, and HDSP with 82

percent.  NKSP's average response times for routine referrals ranged from 6.5 to 15 days.

Four prisons – CCC, CSP/Corcoran, ISP, and SVSP – did not provide reliable and/or complete tracking data for routine referrals. In the case of SVSP, referrals from EOP and segregation inmates were not tracked. Calipatria and CSP/Sac did not track response to emergent referrals, and CSP/Solano failed to track response to urgent or emergent referrals.

## **CONCLUSION**

The special master's preceding monitoring report concluded with a statement of seven general goals for the defendants:

(1)     Re-evaluation and updating of CDCR suicide prevention policies and practices;

(2)     Ensuring that seriously mentally ill inmates are properly identified, referred, and transferred to receive the higher levels of mental health care that they need and that are only available from DMH;

(3)     Review of, and compliance with, all elements of their ASU Enhanced Outpatient Program Treatment Improvement Plan, including the conduct of a review every 30 days of all EOP inmates housed in ASU hubs for over 90 days;

(4)     Completion of the construction of mental health treatment space and beds for inmates at varying levels of care;

(5)     Full implementation of defendants' new mental health staffing plan;

(6)     Training of staff for greater collaboration between custody and mental health; and

(7)     Refinement and implementation of MHTS.net to its fullest extent and benefit.

There has been progress toward some of these goals.

Defendants have made what appears to be an initial inroad on the suicide prevention strategies which they devised following their court-ordered review in 2010 of all of their suicide prevention policies and practices. With specific regard to their strategy to increase clinical competency in the conduct of SREs, defendants have developed it to the conceptual level of a process with a general framework, and a handful of general interim objectives. As described above, their proctoring/mentoring program is to be initiated as a pilot at five identified

74

institutions, and then assessed and refined by modification as necessary, and then eventually rolled out at additional identified institutions.

Inmate access to higher levels of care at the DMH-run programs continues to challenge the defendants, as discussed above. On June 13, 2011, the special master filed his report, with recommendations for court action, on the wait lists for admission of CDCR inmates to inpatient care in DMH facilities, and on the defendants' plan for management of the care of those inmates who are on the wait lists. The parties submitted their responses on July 1, 2011, as the number of inmates waiting for intermediate inpatient care remained high at 147.

On July 22, 2011, the *Coleman* court adopted in part the special master's recommendations in his June 13, 2011 report, ordering immediate implementation of parts two, three, and four of defendants' Plan Re: ICF and Acute Inpatient Wait List, which concern, respectively, utilization management strategies involving the conduct of prospective, concurrent, and retrospective reviews to optimize inpatient care; increased use of the Health Care Placement Oversight Program (HC-POP); and activation of a new inmate patient information system called SharePoint. The court also ordered the defendants to inform the court within ten days whether the Extended Enhanced Outpatient Program Care Plan (EECP) would continue, and set the matter down for an evidentiary hearing on August 17, 2011, at which time defendants were to show cause why the 50 beds at Coalinga State Hospital designated for *Coleman* class members, as well as any other vacant beds at the facility, cannot be filled with high-custody CDCR inmates. At the same hearing, the court also would take evidence on an assessment process proposed by the defendants and whether that assessment would be appropriate to adequately identify *Coleman* class members in need of inpatient care who should have been but were not identified through defendants' referral process. Order, July 22, 2011, Docket No. 4045.

Defendants then moved to vacate the August 17 hearing. On August 15, 2011, the *Coleman* court granted in part defendants' motion and re-set the evidentiary hearing to December 14, 2011. Among other things, defendants were ordered to work over the next 90 days with the special master to develop a supplemental plan to reduce or eliminate the inpatient wait list and to better serve the needs of inmates on the wait list, and to report to the court on the status of the supplemental plan every 30 days. Defendants were ordered to work with the special master so that an assessment process that meets his approval has been conducted and completed by December 9, 2011. Defendants must also report to the court on the results of the assessment process, including referrals and transfers, not later than December 14, 2011. Order, Docket No. 4069. As of this writing, the wait list assessment and review process remains ongoing.

As described above, the work of the Division of Adult Institutions to track and manage the expeditious movement of mental health caseload inmates through their stays in administrative segregation is headed in the right direction, and is encouraging.

Insofar as mental health and custody collaboration training, the plan was put into place. Since the distribution of this report in draft form on July 27, 2011, defendants have informed the special master that the training in the designated programs has been completed at the remaining two institutions – RJD and CSATF – among the seven institutions that were selected for the training. Defendants further notified the special master that the outcome evaluation of the training has been completed and that it will be provided to him. Over the next two years, the mental health and custody collaboration training will be conducted institution-wide at the selected seven institutions.

Most of the various mental health bed, treatment space, and office space construction projects continue to advance toward completion. Defendants are encouraged to proceed as expeditiously as possible with all other bed, office space, and treatment space

76

projects, for these are the most promising and realistic means to providing a reliable and sustainable source of access to higher levels of care to seriously mentally ill inmates of the CDCR.  In the meantime, it is essential that institutional resources be focused on the identification and referral of seriously mentally inmates to those existing programs which can provide them with desperately needed higher levels of inpatient care.  While most of the bed projects are moving forward, no expectation of these resources down the road can justify any slow-down or stoppage of effort to identify and refer seriously mentally ill inmates right now. Untreated mental illness and the suffering that ensues from it do not respect construction schedules or budgetary delays.

Reports from the field indicate that the start-up problems which were experienced with MHTS.net during the preceding monitoring period were beginning to abate, but more work needs to be done in order for MHTS.net to satisfy its objectives.  A well-functioning MHTS.net is an indispensible tool for defendants in a number of areas, helping them deliver direct care, assess and manage their own performance, and report on it, with the aid of current and accurate readily available information.  Defendants are urged to continue their efforts to bring MHTS.net to its fullest potential.

## RECOMMENDATION

As is evident from the foregoing, defendants continue to have a great many things to accomplish in order to advance the remedial phase of this case toward its eventual conclusion. The *Coleman* court has already ordered the various tasks which must be completed, and the Program Guide remains the negotiated compendium of benchmarks to which defendants are required to conform as they progress toward compliance with the remedial order of the *Coleman* case.  Accordingly, there is no purpose to be served by seeking further court orders at this time.

Respectfully submitted,

_____

Matthew A. Lopes, Jr., Esq.
Special Master

78