**APPENDIX A**

**<u>INSTITUTIONAL SUMMARIES</u>**

## California State Prison, Sacramento (CSP/Sac)
March 7, 2011 – March 10, 2011

Census:

        As of March 7, 2011, the census at CSP/Sac was 2,788 inmates, a decrease by 121 since the census of 2,909 at the time of the monitor's[14] preceding site visit on April 9, 2010.  The MHSDS census was 1,534 inmates, representing 55 percent of the population, which was virtually unchanged from the 1,535 MHSDS inmates at the time of the preceding visit.

        The EOP mainline census was 374 inmates, a small decrease from the census of 382 reported during the preceding monitoring period.  In the PSU, there were 235 inmates, slightly fewer than the 240 there during the last site visit.  Nine EOP inmates with SHU terms were pending transfer to the PSU.

        There were 698 inmates in the mainline 3CMS program.  The SHU program housed 92 inmates, including 21 inmates who were at the 3CMS level of care.

        The total census for administrative segregation was 315.  Of these, 62 were in the EOP hub, down by only one from the 63 inmates who were in the hub on April 7, 2010.  The administrative segregation census also included 96 inmates at the 3CMS level of care, as compared to the 101 3CMS inmates in administrative segregation during the preceding monitoring period.

        There were 39 inmates in crisis beds at CSP/Sac on March 7, 2011.

---

[14] Although the collected data and findings discussed in this Report are the product of members of different monitoring teams, the various monitors are referred to as "the monitor."  Likewise, clinical judgments of the special master's experts are attributed to "the special master's expert."

Staffing:

   The total number of established mental health positions, including PTs and clerical staff, was 234.50, for an increase of 1.5 FTE positions since the preceding monitoring period. Of these established positions, 204.78 were filled, for a vacancy rate of 13 percent. With use of registry staff to cover vacancies, the overall functional vacancy rate in mental health was six percent.

   The chief psychiatrist position and one of the two senior psychiatrist positions were filled. One of the two chief psychologist positions was filled, and the other was vacant due to a hiring freeze. Of the ten senior psychologist positions, nine were filled, with the one vacancy again due to the hiring freeze.

   Fourteen of the 22 staff psychiatrist positions were filled, yielding a vacancy rate of 36 percent. Utilizing six contract psychiatrists, the functional vacancy rate in psychiatry was reduced by two or nine percent. Among the line psychiatry vacancies were 1.5 positions that could not be filled due to the hiring freeze.

   There were 47.74 established staff psychologist positions, of which 40.24 were filled. These established psychology positions included 5.5 positions which had been allocated on December 31, 2010 that were not filled due to the hiring freeze. The established position vacancy rate was reduced to a 0 percent functional vacancy rate utilizing contractors. The supervising social worker position was filled, along with 24 of the 27.33 established social work positions. The functional vacancy rate in social work positions was eliminated by using 3.33 FTE contractors. All seven senior psychiatric technician positions were filled, as were 69 of the 73.39 allocated licensed psychiatric technician positions. There was a functional vacancy rate of six percent for this category.

There were 16.04 established RT positions, including 2.5 positions that had been allocated on December 31, 2010, which were subject to the hiring freeze. The functional vacancy for RTs was 16 percent. There were 22 vacancies in the 25 allocated clinical positions yielding a functional vacancy rate of 12 percent.

Quality Management:

The institution continued to maintain functional quality assurance processes during this review period. The local governing body met monthly. The quality management committee met weekly during most of the review period, except in November 2010. Attendance was appropriate, with direct attention to health care, including mental health care. The mental health subcommittee met weekly. Minutes documented regular attendance by required attendees and attention to mental health issues according to Program Guide standards.

In addition to ongoing QITs, another six QITs were chartered during the review period. Appropriate methodology and objectives were generally employed.

Revision of the institution's peer review processes, which was in progress at the time of the preceding site visit, was completed and implemented. PC peer review was in place at the time of the monitor's visit, as was a psychiatry peer review process.

Suicide Prevention:

There was one completed suicide during the review period.

The local SPRFIT continued to meet monthly, with appropriate attendance and adequate minutes. It continued to examine incidents of self-harm, make recommendations, and report to the mental health subcommittee.

CSP/Sac reported that it did not complete all required five-day clinical follow-ups, with a 91-percent rate of compliance. The institution also reported that it did not complete all custody wellness checks following discharges from inpatient stay. The reported compliance rate in this area was 97 percent.

It was documented that emergency response drills were also completed monthly for all shifts during the review period and that all custody staff assigned to administrative segregation had received CPR training and refresher training had occurred as scheduled. Cut-down tools were available for inspection at the time of the site visit. Spot checks showed custody officers had micro-shields on their person, as required.

The institution was noncompliant with some aspects of the plan to address suicide trends in administrative segregation. CSP/Sac completed all pre-placement medical screenings prior to transfers to the EOP hub, but it did not complete all screenings prior to placement in 3CMS administrative segregation, reporting a compliance rate of 93 percent. CSP/Sac reported a compliance rate of 100 percent for mental health screening of non-MHSDS inmates in private placements in administrative segregation. The institution reported that it generated and dispatched inmate suicidality profiles for 100 percent of inmates transferring out of administrative segregation, but received profiles for only ten percent of inmates transferring into administrative segregation.

Daily PT rounds in administrative segregation were observed at the time of the site visit. Audits verified a compliance rate of 100 percent.

Staff reported that administrative segregation inmates were offered ten to 12 hours of outdoor recreation time per week.

<u>Medication Management</u>:

CSP/Sac was not a pilot institution for the new medication management audit tool during the review period.  Audits were conducted by nursing during the review period.

The aggregate sizes of samples on which reported percentages were based for the various medication management audits appeared adequate.  Audit reports were collapsed together across medications prescribed by general medicine staff and psychiatrists, which in some cases made it difficult to determine whether compliance varied across medications prescribed by these two groups of prescribers.

Audits verified that 97 percent of newly-arriving inmates with documented prescriptions receive their medications within 24 hours of arrival.  Medication continuity for inmates who transferred between programs was found to be compliant, with a rate of 98 percent.

The institution was noncompliant with administering newly-ordered or changed medication within 24 hours of the order, with a compliance rate of 83 percent.  Medication renewal prior to expirations was also compliant, with a rate of 100 percent.  Audits found appropriate documentation in progress notes regarding inmates who had new, changed, or discontinued medications at the rate of 92 percent.

Medication management audits found that the institution appropriately documented medication refusals or "no-shows" in 93 percent of cases.  CSP/Sac reported that according to its audits, scheduling of psychiatry appointments for cases of medication noncompliance occurred in 100 percent of cases.

CSP/Sac was compliant with filing MARs from the prior month in the health care record at the rate of 92 percent, but was noncompliant with obtaining all necessary signatures and staff initials, which audits showed to occur at the rate of 83 percent.

Laboratory test order protocols remained in place at the time of the site visit, and covered lithium, Depakote, valproic acid, and Tegretol. Audits of orders and completion of laboratory testing for inmate blood levels of these medications found 89 to 100 percent of laboratory samples were drawn within timeframes, and 78 to 100 percent of documentation met requirements. Compliance with statewide policy regarding laboratory studies for those inmates prescribed clozapine was reported in the range of 82 to 100 percent.

It was reported that the institution was compliant with Keyhea medication standards. During the review period, there were 44 Keyhea petitions initiated and 280 petitions renewed. Applications for 47 renewal petitions were denied and one petition was rescinded. Staff reported that there were 88 petitions pending on January 28, 2011.

Compliance with HS medication protocols was also reported.

Paroling inmates who were prescribed medications received supplies of their medications in 94 percent of cases.

Sexual Misconduct:

During the review period, 85 RVRs relating to sexual misconduct were issued. CSP/Sac completed required screenings in only 65 of these cases. As a result of the screenings, there were 53 new IDTT reviews. Fifty-one incidents of sexual misconduct were referred to the local district attorney.

CSP/Sac identified nine inmates for comprehensive evaluations.  At the time of the site visit, five of the evaluations had been completed, with one inmate diagnosed with Exhibitionism or Paraphilia NOS.  The diagnosed inmate was subsequently transferred to an exhibitionism treatment program at another institution.

From April 2010 through December 2010, 32 inmates had participated in Exhibitionism psychotherapeutic groups at CSP/Sac, which was one of the designated Exhibitionism treatment institutions.  Facilitators in the program used CDCR's Exhibitionism treatment manual and group therapy.  As reported during the preceding monitoring period, there were two active Exhibitionism groups in the program.

Transfers:

At the time of the site visit, a clinician was assigned as the full-time DMH coordinator.  There was a functional Vitek hearing process in place at the time of the site visit.

The institution had fully implemented Form 7388.  An observed IDTT meeting during the site visit indicated that staff used the Form for discussion of whether the referral of the inmate to DMH was warranted.  Access to data on multiple crisis care admissions was available during IDTT meetings.  However, inmates placed into alternative housing pending MHCB admission but not ultimately admitted into an MHCB were not included in this database.  Information regarding multiple RVRs for EOP inmates was also accessible during IDTT meetings.  The institution reported that it had initiated a process for collecting RVR data for 3CMS inmates.  Access to data regarding less than 50 percent program participation was problematic primarily due to limitations in MHTS.net.  Case factor sheets were completed by correctional counselors attending the

IDTT meetings.  A review of a sample of Form 7388s for inmates who were not referred to DMH revealed that generally clinicians' rationales for not referring were clinically appropriate.  The DMH coordinator was responsible for monitoring the documentation of decisions not to refer.

In comparison to the preceding monitoring period, CSP/Sac referred only 55 inmates to DMH during the current monitoring period, compared to 154 during the preceding monitoring period.  Staff reported that among the reasons for the decline was the number of inmates already in various stages of the DMH referral process, including being on the wait list, and that the institution had a fairly stable MHSDS population with little movement.  In addition, clinicians generally were not re-referring inmates back to DMH after their returns to the institution with little change.  Reportedly, there was also a high level of dissatisfaction with the Coordinated Clinical Assessment Team (CCAT) process.

As reported for the preceding monitoring period, a significant number of inmates referred to DMH remained on the wait list for long periods of time.  Timelines for completing referral packages for acute and intermediate care were not met.  According to institutional audits, 53 percent of acute care referral packages and 44 percent of intermediate care packages were not submitted within required timeframes.

DMH did not meet timelines for deciding to accept referrals once it had received the packages.  The institution reported that it also experienced major difficulties with receipt of acceptance date chronos from DMH after the acceptance decision had been made.  This affected the institution's ability to appropriately track DMH referrals and maintain required logs.  Audits showed that of the 19 intermediate care referrals to

SVPP during July 2010 to December 2010, the institution had received five acceptance chromos by the time of the site visit. All of these 19 inmates were on the wait list at the time of the site visit. Also during July 2010 to December 2010, there were 43 referrals to acute care, of which 14 actually transferred to DMH. These inmates' stays at DMH ranged from 13 to 99 days. There were eight rescissions of referred inmates during the review period.

CSP/Sac reported that it did not consistently meet transfer timelines following acceptance and notification by DMH. As of March 4, 2011, CSP/Sac reported that there were eight referred inmates on the acute care wait list and 38 inmates on the intermediate care wait list.

CSP/Sac reported that it was in compliance with procedures for notifying DMH coordinators about referrals to DMH for transferring inmates. However, the institution also reported that it was not consistently notified about inmates who had been referred to DMH and were transferring into the institution.

The SharePoint information-sharing system was functional at CSP/Sac at the time of the site visit. Discharge information consisting of PC discharge notes was available, but recreation therapy notes and laboratory findings were not consistently current. Staff indicated that the institution was being notified by DMH via email when a packet was updated on SharePoint. Clinical staff at the institution reported that they were notified by the DMH coordinator when DMH discharge information was available on the intra-institutional shared drive, but discharge information was not consistently filed in UHRs.

As part of its DMH return process, CSP/Sac routinely held IDTT meetings for inmates following their returns from DMH.  The institution reported that it maintained non-formulary prescriptions for a time after these returns.

CSP/Sac had in place at the time of the site visit a positive behavioral assessment team, which was directed toward behavioral treatment for selected inmates returned from DMH and/or on the DMH wait list.  The institution had also commenced planning for the proposed extended EOP care plan.

CSP/Sac had 26 licensed MHCBs at the time of the site visit, with 15 beds in CTC-1 and 11 in CTC-II, in addition to 20 beds in the unlicensed MHCBs unit, for a total of 46 crisis beds.  Each of the licensed CTC units included a single cell which was equipped for placing inmate-patients into five-point restraint.  CTC I additionally had a single "safety" cell.  Use of crisis beds was robust at CSP/Sac during the monitoring period, with the overwhelming number of admissions originating within the institution.  MHCBs were reported to be fully staffed during the review period.

Staff indicated that the 26 MHCB beds were shared between medical and psychiatric inmates.  Institutional admission regulations provided that five beds in CTC-1 may be occupied by medical inmates and in CTC-II two beds may be occupied by medical inmates.  The chief psychiatrist had to approve use of any further licensed MHCB's for medical patients' use.

From July 1, 2010 through December 31, 2010, there were 212 admissions to MHCBs, including 38 admissions for referrals to acute care.  Lengths of stay ranged from less than one day to 82 days, with an average length of stay for psychiatric patients at 14 days.  There were 107 admissions with lengths of stay greater than ten days in the

review period.  The institution reported that during the period, two to seven beds in the licensed MHCBs were generally occupied with medical patients.

During the review period, there were 288 referrals and admissions into the unlicensed MHCB.  Lengths of stay there ranged from one to 90 days, with the average stay lasting 13 days.  There were 130 admissions with lengths of stay greater than ten days. No unlicensed unit beds were occupied by long-term medical patients during the monitoring period.

Even after substantial modifications, the unlicensed unit remained inadequate for treatment of crisis patients.  Treatment space was extremely limited, with three therapeutic modules located on the side of the day room floor which did not provide adequate confidentiality.  It also did not appear that any confidential interview space was available on the unit.  It also utilized four therapeutic modules which were located in an adjoining dining room, with an active kitchen.  This limited the times during which the modules could be used.  The unit also lacked adequate staff office space.  Treatment team meetings were held in a room located off the kitchen in a space that did not adequately accommodate the number of staff who attended these meetings.

Observed MHCB and unlicensed IDTT meetings were appropriately attended. Healthcare records and in-patient records were present.  C-files were not present, but the correctional counselor who attended the meeting appeared to have useful custody information regarding the inmates who were discussed.  Discussions within the IDTT meeting were meaningful and thorough, including consideration of DMH referral.

CSP/Sac no longer had an MOHU at the time of the site visit, although it had been operational during part of the monitoring period.  Inmates in mental health

119

crises were placed into available medical OHU beds when an MHCB was not available. Audits found that there were 175 referrals and admissions. There were 20 placements that exceeded 20 hours in duration. All 175 OHU admissions were referred to MHCBs, resulting in 102 MHCB admissions from the OHU in an earlier part of the monitoring period.

CSP/Sac reported that before the de-activation of the OHU, no inmates were housed "outside of medical settings pending placement" in an MHCB. After the de-activation, inmates waiting for MHCBs "were regularly housed in non-medical alternative housing settings." Audits found that during the review period, 682 inmates were housed in a non-medical setting pending admission to a crisis bed. The average length of stay in alternative housing pending admission into a crisis bed was 2.1 days, with a range of .5 to 11.5 days.

Other Issues:

SHU

CSP/Sac's audits reported 30-day contacts for PCs at the rate of 100 percent for each month during the period. Thirty-day contacts with psychiatry had a compliance rate ranging from 95 to 100 percent. PT daily rounds for 3CMS inmates in the SHU occurred as required during the review period.

PSU

CSP/Sac reported that 61 inmates were transferred to its PSU during the reporting period. This included 37 EOP inmates from CSP/Sac and 24 inmates from other institutions. The institution reported that it did not track, or have available at the time of the site visit, information on the number of days between referral to CSR for PSU

120

endorsement and the date of endorsement for inmates from other institutions.  Staff

reported that the average time between these events for CSP/Sac EOP inmates was

generally about four weeks and not more than eight weeks.

   The average number of days between endorsement of CSP/Sac EOP

inmates to the PSU and transfer to the PSU was 24 days.  The shortest time was the same

day and the longest was 134 days.  Staff indicated that part of the reason for some long

transfer delays was related to inmates who were endorsed and then sidelined for out-to-

court or DMH transfer reasons.

   Institutional audits found that in the PSU, the institution complied with

completing mental health evaluations within ten days of an inmate's arrival or referral

into the unit. There was also compliance with completion of initial treatment plans within

14 days of arrival in the unit.  Audits verified that IDTT meetings and completion of

initial treatment plans occurred within 14 days of arrival, and that discharge plans were

included in treatment plans.  The IDTT's actions and decisions were documented on

progress notes.  Follow-up meetings occurred every 90 days and treatment plans were

also updated.  During the site visit, observed IDTT meetings in the two PSUs were

appropriately attended.  There were variations on these meetings that involved a

combination of the ICC and IDTT processes. Inmates' attendance was determined based

on clinical discretion and/or inmate preference.  Clinical presentations and discussion

were observed to be complete.  Use of the Form 7388 and consideration for referral was

evident for each of the cases presented.

   Each inmate had at least one psychiatric contact every 30 days, with

multiple inmates seen more frequently for crisis and follow-up medication evaluations.

Weekly clinical contacts occurred and were documented, as required.  Audits found that the average rate of compliance over the monitoring period ranged from 90 to 100 percent. For four of the six months under review, group therapy requirements were met.  In July and September 2010, less than the required ten hours were offered because of scheduling, cancellations, and staffing issues.

<u>EOP</u>

CSP/Sac conducted monthly audits of appropriate completion of initial IDTT meetings within 14 days of inmates' arrivals in the EOP program, quarterly IDTT meetings, and weekly PC contacts.  They found compliance rates of 99 to 100 percent. All required participants were present for EOP IDTT meetings observed on Yard A during the site visit.  Clinical discussions, including DMH consideration, were appropriate and the treatment plans were discussed with the inmate.  When deemed clinically appropriate, case presentations were held prior to the inmate's participation in the IDTT process.

Psychiatry contacts were reported to have compliance rates ranging from 85 to 100 percent, with an average rate of 92 percent.

The institution reported that it offered five to 13 hours of structured therapeutic activity per week. Staff attributed lower hours during certain weeks to weather and staff absences.

<u>Administrative Segregation EOP</u>

In administrative segregation, for every month of the review period, the institution completed 30-day reviews of those EOP inmates whose stays in administrative segregation exceeded 90 days.  There were 25 of the 72 EOP inmates, or 35 percent,

whose stays exceeded 90 days at the time of the regular 30-day review on January 28,

2011.  The average length of stay for EOP inmates was 82 days, with a range of two to

378 days.  By contrast, of the 129 non-MHSDS inmates in administrative segregation on

January 28, 2011, 68 or 53 percent of inmates had been in administrative segregation

over 90 days.  The average length of stay was 141 days with a range of two to 578 days.

Generally, the 30-day reviews found that those inmates who remained in

administrative segregation over 90 days were awaiting transfers following endorsement

to other prisons, the findings of pending investigations or district attorney referrals,

and/or further custody or ICC actions.

In the CSP/Sac administrative segregation hub, the institution met or

exceeded Program Guide treatment requirements regarding initial IDTT meetings,

subsequent IDTT meetings, and weekly PC contacts.  Required psychiatry contacts every

30 days for EOP hub inmates were compliant during July 2010 to November 2010, with a

compliance range of 90 to 100 percent, but in December 2010, audits found a compliance

rate of 60 percent.  The average compliance rate for initial IDTT meetings was 99.5

percent, with a range of 97 to 100 percent.  All subsequent IDTT meetings were

completed as required.  The rate of compliance for weekly PC contacts was on average

98 percent, with a range of 97.7 to 99.6 percent.  The institution reported that it offered

an average of 8.24 hours of group programming each week during the review period, not

meeting compliance requirements in this area, and did not consistently meet the standard

for structured therapeutic activities over the review period.

In general, the institution reported that it offered a confidential setting for

PC contacts in 87 to 98 percent of cases.  However, only 58 to 67 percent of PC contacts

actually occurred in a confidential setting. Similarly, a confidential setting was offered for psychiatry contacts in a range of 75 to 100 percent of cases, but contacts actually occurred in a confidential setting in 17 to 35 percent of psychiatric contacts.

3CMS

An institutional audit of completion of initial IDTT meetings within 14 days of inmates' arrivals found that in 86 to 100 percent of cases, or on average 94 percent of cases, initial IDTT meetings were completed timely. A third institutional audit, covering conduct of annual IDTT meetings for 3CMS inmates, found a compliance rate of 98 to 100 percent, or an average of 99 percent.

From July 2010 through December 2010, the rate of psychiatry contacts with 3CMS inmates at least every 90 days ranged from 57 percent in August 2010 to 94 percent in November 2010.

A CSP/Sac audit of quarterly PC contacts for 3CMS inmates found compliance at the rate of 96 to 100 percent, or an average of 98 percent.

IDTT meetings for general population 3CMS inmates were observed. At these meetings, all required participants were present. Form 7388 and appropriateness of referral to DMH were discussed. Treatment plan discussions were appropriate. Clinical staff appeared to be knowledgeable about the inmates.

Administrative Segregation 3CMS

On January 28, 2011, among the 90 3CMS inmates in administrative segregation, 35, or 39 percent of, inmates had been in administrative segregation beyond 90 days. The average length of stay for inmates at that LOC was 109 days, with a range of one to 860 days.

Institutional audits found that seven-day PC contacts were occurring 96 to 100 percent of the time, with an average rate of compliance of 99 percent. The institution reported that although 3CMS inmates in administrative segregation were offered confidential settings for nearly all of their PC contacts, most of these contacts occurred cell-front because inmates routinely declined the offers. Audit data indicated that from July 2010 to December 2010, 3CMS inmates in administrative segregation were offered a confidential setting by their PCs in 92 percent of instances, with a range of 73 to 99 percent. However, inmates were seen in a confidential setting in only 34 percent of cases on average, with a range of 24 to 44 percent.

Quarterly IDTT meetings were reported to have occurred in 100 percent of cases for each month during the review period.

Audits of completion of 30-day psychiatry contacts for 3CMS inmates in administrative segregation found that these contacts were compliant in 62 percent of cases in July 2010, and rose to 100 percent compliance in November and December 2010. According to audits, psychiatrists offered confidential settings for 3CMS contacts in 87 to 100 percent of cases, or at an average rate of 96 percent. However, they actually saw inmates in confidential areas in only 47 percent of cases on average, with a range of 39 to 59 percent.

<u>Referrals</u>

CSP/Sac had an adequate system for triaging referrals. According to documents submitted by the institution, self-referrals submitted through nursing were triaged by nursing staff and entered into a mental health request log. Nursing staff then determined whether the referral was emergent or routine. CSP/Sac did not use an urgent

referral option for mental health referrals.  Self-referrals sent directly to clinicians were handled by the assigned clinician, who completed the referral and submitted it to the health program specialist for tracking.

The institution did not track emergency referrals due to limitations with the tracking system, although staff reported that all emergency referrals were seen on the same day.  There were 538 routine referrals during the monitoring period.  According to data provided by the institution, the average response time to routine referrals was 3.07 days.

Heat Plan

CSP/Sac was compliant with its heat plan requirement.  During the heat season, indoor and outdoor temperatures were logged and forwarded to the litigation coordinator who submitted a monthly report to headquarters (HQ).  During the monitoring period, there were 22 stage I heat alerts in July 2010, 17 in August 2010, 14 in September 2010, and three in October 2010, for a total of 56 stage I heat alerts.  There was neither stage II or stage III heat alerts, nor any heat-related incidents during the monitoring period.

Staff reported that inmates taking heat-sensitive medications were issued heat cards.  A list of inmates taking heat-sensitive medications was reported to be produced weekly by the pharmacy and distributed to the housing units.

RVRs

There were 109 RVRs issued to EOP and MHCB inmates during the monitoring period.  All EOP and MHCB inmates who received RVRs received a mental health assessment.  RVRs were issued to 115 3CMS inmates, eight of whom were

referred for a mental health assessment.  No RVRs were issued for self-injurious or suicidal behaviors during the monitoring period.

The institution reported that when a mental health assessment indicated that mental illness may have influenced the inmate's behavior, the hearing officer typically mitigated the penalty by imposing the least amount of credit loss.

**Folsom State Prison (Folsom)**
January 11, 2011 – January 13, 2011

Census:

On January 11, 2011, Folsom housed 3,419 inmates, which represented a six percent reduction in the total inmate population since the preceding monitoring period.  There were 748 MHSDS participants, with 704 mainline3CMS inmates and two mainline EOP inmates.  The administrative segregation population of 142 included 41 3CMS inmates and one EOP inmate pending transfer to an EOP hub.  No MHSDS inmates were housed in alternative or temporary housing.

Staffing:

There were 7.25 vacancies among the 28.25 allocated mental health positions, for a 26 percent vacancy rate in mental health.  Two of three staff psychiatrist positions were vacant, but contractors provided .8 FTE coverage, and two psychiatrists from CSP/Sac provided additional coverage.

Two senior psychologist and six staff psychologist positions were filled. Positions for three social workers were filled.

The senior PT position and four of six PT positions were filled.  The .75 RT position was vacant.  Four of 5.5 office tech (OT) positions were filled, as was the health program specialist I position.

Quality Management:

Folsom's quality management program included active participation by nursing, custody, and mental health supervisory and line staff.

The quality management committee was chaired by the CEO.  It did not meet weekly as intended.

The mental health subcommittee met monthly.  It was chaired by the chief of mental health and reported to the quality management committee.  Both committees kept meeting minutes, but some mental health subcommittee meetings were conducted without a quorum.

Twenty-two QITs, including five *ad hoc* QITS, were ongoing during the monitoring period.  QITs addressed topics including mental health evaluations in cases of IEX, suicide risk assessment checklists, treatment plans, MHTS.net-related issues, RVRs, 3CMS UHR reviews, referrals to higher levels of care, and working relationships among custody, mental health, and nursing staff.  QITs met regularly and communicated recommendations to the quality management committee and to mental health staff.  However, many QITs failed to develop and implement new procedures.   Seven QITS chartered between March 2006 and May 2009 remained open.

Psychiatry peer review met three times, and PC peer review generally met monthly.  Psychiatry peer review focused on response to referrals for medication noncompliance, orders for laboratory testing of inmate blood levels of psychotropic

medications, informed consent forms, and assessments utilizing the Abnormal

Involuntary Movement Scale (AIMS).  PC peer review revealed deficiencies in treatment

plans. Peer review findings were communicated to individual psychiatrists and PCs.

Suicide Prevention:

   There were two completed suicides during the monitoring period.

   The SPRFIT met monthly.  It was chaired by the supervising psychologist

and kept meeting minutes.  Four of six meetings did not have a quorum.  SPRFIT

meetings addressed suicide corrective action plans (CAPs), suicide attempts, MHCB

placements, and mental health and custody follow-up.

   The ERRC generally met monthly.  Meeting minutes reflected attendance

by a quorum.  Appropriate information was provided on reviewed cases.  Audits

confirmed that Folsom conducted monthly emergency response drills, with results

reported to the quality management committee.  CPR refresher training was scheduled

regularly.  Cut-down tools and micro-shields were readily observed in the ASU.

   Folsom was compliant with Program Guide requirements for completion

of suicide risk assessments.

   Logs indicated 100-percent compliance for clinical five-day follow-up for

inmates discharged from alternative housing.

   In administrative segregation, there were daily morning meetings between

custody and mental health staff to discuss new arrivals and inmates with special concerns.

   Audits of pre-placement screens found 86-percent compliance, an

improvement over the preceding monitoring period.  Audits of the 31-item screen

indicated compliance rates between 96 and 100 percent.

Eight intake cells were retrofitted with suicide-resistant beds.  Retrofitted doors increased visibility into the cells.  Efforts were made to reserve these cells for new intake inmates.

For daily PT rounds, audits found a 94-percent compliance rate. A July 2010 quarterly audit found compliance with 30-minute welfare checks ranged from three to 20 percent.  Subsequent data provided by Folsom indicated a compliance rate of 63percent.

Administrative segregation cells did not have electrical outlets.  Custody reported that inmates were offered yard, by tiers, between 9:00 a.m. and 2:00 p.m. every other day.

Medication Management:

Audits of continuity of medication for newly-arriving inmates found a 79-percent compliance rate.

Medication continuity audits following intra-institutional transfers indicated that 80 percent of inmates received medication without interruption, 15 percent missed one dose, three percent missed two doses, and two percent missed three doses.

It was reported that clinical nursing staff conducted weekly MAR reviews to obtain medication noncompliance information.  However, staffing vacancies affected compliance with routine follow-up and medication expiration appointments, and the scheduling of psychiatry medication noncompliance appointments.

Folsom did not audit pill line lengths or waiting times.  Audits of the presence of informed consent forms in UHRs for psychotropic medications indicated compliance rates between 91 and 98 percent.

Monthly audits of laboratory tests for inmate blood levels of psychotropic medications found compliance rates ranging from 74 to 90 percent.

Approximately 68 percent of Folsom's MHSDS inmates were prescribed psychotropic medications. Among them, 468 or 86 percent of these inmates received these medications DOT.

No inmates were on Keyhea orders. At the time of the site visit, 211 inmates were prescribed medications at HS.

Parole medication audits found that 100 percent of paroling inmates received a 30-day medication supply.

Sexual Misconduct:

There were five RVRs issued for sexual misconduct, with one inmate receiving two of them. None of these inmates were MHSDS participants. All four inmates had mental health screenings and IDTT reviews. None of the cases were referred for a comprehensive evaluation. All inmates received SHU terms and the cases were referred to the DA.

Folsom utilized a custody-driven sexual misconduct protocol, including placement of yellow placards on cell doors and use of exposure-control jumpsuits. During the site visit, it was observed that the required yellow placard was not placed on the cell of an inmate who was in administrative segregation because of a sexual misconduct RVR.

Transfers:

Folsom's DMH coordinator was also the supervising senior psychologist. The institution reported that no inmates were referred to or returned from DMH during the monitoring period.

A Form 7388 was completed by the PC for each MHSDS inmate, after discussion of qualifying criteria for DMH referral during the IDTT meeting.

Folsom did not have an MHCB unit. Thirty-six inmates were referred to MHCBs, with two referred twice. Twenty-seven inmates referred to MHCBs were on suicide watch. Of the referred inmates, 11 were transferred to an MHCB unit. All but one inmate referred to an MHCB unit were temporarily housed in alternative housing cells in the ASU prior to MHCB transfer. The average time between MHCB referral and transfer was one to three days. One MHCB transfer took eight days. Folsom clinicians contacted CSP/Sac and HCPOP to expedite MHCB transfers.

Folsom reported that 26 EOP inmates were transferred to institutions with EOP programs. All but one were transferred within 60 days of EOP designation. Folsom reported an average of 13 days from EOP designation to endorsement, and an average of 17 days from endorsement to transfer.

Other Issues:

Administrative Segregation

At the time of the monitor's visit, Folsom housed one EOP and 41 3CMS inmates in administrative segregation. During the monitoring period, there were no EOP inmates in administrative segregation with lengths of stay greater than 90 days. Thirteen

of the 41 3CMS inmates had lengths of stay greater than 90 days.  Seven of the 13 had

safety concerns and were awaiting transfer to an SNY.

EOP

At the time of the monitor's visit, there were two newly-placed mainline

EOP inmates.  EOP inmates awaiting transfer to institutions with EOP programs were not

housed in any particular housing unit but co-mingled with mainline general population

and 3CMS inmates.  Reportedly, these EOP inmates were closely monitored through

weekly PC contacts and frequent psychiatry contacts.

Administrative Segregation EOP

The one administrative segregation EOP inmate at the time of the site visit

was designated at EOP LOC on January 6, 2011, and placed in the ASU on the following

day for safety concerns, while he awaited transfer to an EOP hub.  He was seen in IDTT

and ICC meetings.  PC contacts were compliant.

3CMS

At the time of the site visit, Folsom had 704 3CMS inmates.  As of

December 2010, four psychologists and two clinical social workers worked as mainline

PCs.  Caseloads ranged from 105 to 132 inmates, representing an increase in clinicians'

caseloads since the preceding monitoring period.

UHR audits of clinical and psychiatry contacts and timeliness of annual

IDTT meetings found compliance rates from 92 to 99 percent.  Audits found that inmates

attended IDTT meetings in 82-percent of cases in July and August 2010, and in 66-

percent of cases in September, October, and November 2010.  Non-attendance was

reportedly the result of lockdowns, inmate refusals, conflicting ducats, or the failure to

issue ducats. UHR audits also found noncompliance for completion of initial intake evaluations within ten working days and for psychiatry attendance at IDTT meetings.

PCs and psychiatrists held individual and group sessions with inmates in private confidential offices located in the mental health building. A review of treatment plans found deficiencies in documentation of discharge planning during the initial IDTT meeting, incorporation of C-file information into the treatment plan, and documentation of appropriateness of group therapy.

Sixteen therapeutic groups were offered to inmates. Offered groups included anger and mood management, cognitive coping and restructuring, and parenting.

Folsom conducted quarterly audits of documentation of inmate pre-parole contacts with the TCMP worker. Two audits indicated, respectively, that eight percent and 11 percent of paroling inmates had chronos for pre-release needs assessments in their UHRs. The chief of mental health reported that a permanent TCMP worker was not assigned to Folsom until October 2010.

Administrative Segregation 3CMS

Two psychologists, one clinical social worker, one senior PT, and five PTs were assigned to the ASU. PCs reviewed UHRs for compliance on a quarterly basis. Audits found poor compliance as to clinicians' C-file use in formulating discharge planning during the initial mental health evaluation.

Audits of weekly PC contacts, monthly psychiatrist contacts, and quarterly IDTT meetings indicated compliance rates of 97, 91, and 100 percent, respectively. Audits found compliance for attendance by correctional counselors at IDTT meetings, which was an improvement over the preceding monitoring period.

PCs had individual offices that allowed for confidential interviews with inmates. It was reported that due to inmate refusals, 100 of 1,433 individual contacts were conducted at cell front.

The administrative segregation 3CMS program lacked group treatment space.

Referrals

Folsom reported that MHTS.net did not distinguish the three types of referrals, so the institution established manual and electronic systems to assist in referral tracking. During the monitoring period, there were 65 emergent and urgent referrals, with 100-percent compliance with Program Guide timelines for response to these referrals. There were 992 routine referrals. Of these, 879 were completed within five working days, for an 89-percent compliance rate.

Medical Records/MHTS.net

PTs utilized the MHTS.net inmate profile for inmates at the 3CMS LOC, and for non-MHSDS inmates upon arrival in administrative segregation.

Heat Plan

Thermometers were located on the top tiers of housing units. Correctional officers reported temperature readings hourly to the officer station on the first floor. Temperatures were recorded in heat logs maintained in each building. It was reported that there were no heat activations above stage one and there were no heat-related incidents. As pill lines were inside housing units, they were not affected by heat alert plans.

RVRs

Folsom neither reported the total number of RVRs nor the number of RVRs issued to MHSDS inmates. The institution also did not report the number of RVRs referred for a mental health assessment or the number of cases in which hearing officers mitigated penalties based on mental health considerations.

During the monitoring period, one RVR was issued to a 3CMS inmate for unauthorized medication possession relating to hoarding or cheeking. No RVRs were issued for self-injurious or suicidal behavior.

Access to Care

Folsom reported that all custody access-to-care positions were filled at the time of the site visit. The institution reported 93-percent compliance for MHSDS-scheduled appointments for October 2010. Of 1,515 scheduled inmate appointments, 1,413 took place. It was reported that effort was made to arrange a contact for all inmates who asked to see the PC, even if they did not have an appointment. None of the eight mental health appeals for this period involved access-to-care issues.

**Pelican Bay State Prison (PBSP)**
January 4, 2011 – January 6, 2011

Census:

On January 4, 2011, PBSP housed 3,213 inmates, of whom463were in the MHSDS. There were 175 mainline 3CMS and 59 mainline EOP inmates. There were 122 inmates housed in the PSU, including in administrative segregation EOP inmates pending transfer to an EOP administrative hub. The SHU population of 1,118 included nine 3CMS inmates, and the administrative segregation population of 392 included 86 3CMS inmates. The MHCB unit housed 12 inmates.

Staffing:

There were 8.5 vacancies among the 96.7 allocated mental health staff positions, for a nine-percent institutional vacancy rate in mental health. Contractors provided an additional 4.9 FTE coverage, reducing the institutional functional vacancy rate to four percent.

The positions for a chief psychiatrist, chief psychologist, six senior psychologists, and 18 of 18.5 psychologists were filled. The senior psychiatry position, which was vacant, was recently "lost" by the institution. Although three of seven staff psychiatry positions were vacant, contractors provided an additional two FTE coverage, reducing the psychiatry functional vacancy rate to 14 percent.

The supervising social worker position was filled, as were ten of 11 social worker positions; contractors provided an additional 1.5 FTE coverage. Positions for all three senior PTs, and for 26.5 of 29.5 PTs, were filled; PT contractors provided an additional 1.2 FTE coverage.

All 3.7 RT positions and all nine MHSDS clerical positions were filled, as were one position each for a health program specialist I, nurse practitioner, unit supervisor, RN, and senior RN II. Although PBSP did not utilize psychiatry telemedicine services, it was exploring potential future use.

Quality Management:

PBSP had a well-developed and active quality management program. The local governing body was chaired by the CEO. It addressed appropriate topics and included mental health representation.

The quality management committee met 20 times.  With use of designees, required participant attendance was 98 percent.  The quality management committee reviewed committee reports, QITs, CAP-related logs, key indicator reports, contracts, and budgetary issues.

The mental health subcommittee met bi-weekly, maintained minutes, and was chaired by the chief psychologist until September 2010.  The chief of mental health assumed mental health subcommittee leadership in October 2010.  Custody staff attended 90 percent of meetings.  Topics addressed by the mental health subcommittee included DMH referrals and IDTT screenings, medication continuity, use of informed consent forms, HS medication administration, MHCB safety room use, nursing documentation of self-injurious behavior, use of the 31-item mental health screen, and reviews of difficult cases.

PBSP  liberally used QITs to address issues related to the delivery of mental health care.  The QITs were interdisciplinary and had suitable compositions.  Completed QITs addressed parole medications, medication continuity for inmates placed in SHU observation cells, documentation of inmates' treatment refusal while in the CTC, communication between clinical and custody staff following inmate treatment refusal, and psychology peer review.

Peer review remained active at PBSP. It was divided by discipline, and contained quantitative and qualitative elements.  Psychiatry, clinical social worker, and psychology peer review met monthly.  Psychology peer review attendance was problematic, and a QIT was charted to make recommendations to improve attendance.  Attendance at PT peer review was also problematic.

Suicide Prevention:

There were no completed suicides at PBSP during the reporting period.

The SPRFIT met monthly.  There was only one occasion when a required attendee or designee failed to attend.  Substantive areas addressed included establishment of procedures for five-day follow-up and custody wellness checks following inmates' returns from DMH acute care, DMH referral process issues, improvement in procedures for tracking incidents of self-injurious behavior, high-risk inmate case presentations, and the role of the coordinator for higher levels of care, which was a new position at PBSP.

The ERRC met regularly and reviewed relevant incidents.  Emergency response drills included "man-down" scenarios and mass casualty incident drills.  PBSP provided CPR refresher training to staff. Spot checks found the presence of personal protective equipment (PPE), cut-down tools, and micro-shields.

An audit of five-day follow-up indicated 100-percent compliance.

There were delays in the completion of suicide risk assessments upon MHCB admission for some inmates admitted during evening hours.  Some evening psychiatrists were not aware of the requirement to complete suicide risk assessments upon MHCB admission.  This resulted in psychologists completing the assessments the following morning.  The majority of MHCB non-admission logs related to reported suicidal ideation followed by what staff assessed were credible retractions of the ideation.

There was an increase in the number of self-injurious behaviors, which was attributed to improved nursing tracking and logging, and not to increased instances of such behavior.

The administrative segregation custody log documented daily morning meetings between mental health and custody staff.  PBSP audits indicated noncompliance for completion of pre-placement screens prior to administrative segregation placement.  Audits indicated compliance for four of six months for the confidential completion of the 31-question screen for all non-MHSDS inmates.  There were compliance rates of 87 and 98 percent for completion of the31-question screen for the stand-alone and non-stand-alone units, respectively.  There was 100-percent compliance for daily PT rounds.

Cells were modified as intake cells and retrofitted with appropriate vents, cement beds, and other features.  However, newly-arriving inmates were not housed in retrofitted cells as standard practice.  Cells were equipped with electrical outlets.

Newly-arriving inmates' identification cards were placed on cell doors and marked to indicate their new-arrival status.  Although audits indicated a 96-percent compliance rate for custody welfare checks, neither the compliance rate nor the audit methodology could be verified.  Custody officers accompanied on welfare checks performed adequately.  Although welfare checks generally occurred every 30 minutes, they were not always staggered; many began exactly on the hour or half-hour.  The lengths of time for welfare checks appeared sufficient to allow for quality checks.

Custody staff reported that inmates were not receiving sufficient yard time, which was generally limited to two to three hours weekly.  An insufficient number of SMYs were cited as a major reason for the lack of yard time.

<u>Medication Management</u>:

PBSP's medication management process was generally excellent.  The institution also conducted methodologically sound and well-written medication continuity audits.

On November 10, 2010, there were 435 MHSDS inmates receiving psychotropic medications.  An audit of 589 new arrivals indicated a 92-percentcompliance rate for timely medication continuity.

A monthly medication renewal audit indicated 99-percent compliance for appropriate renewals, with 99 percent having no missed doses.

A medication refusal audit of 35 inmates indicated 100-percent compliance for psychiatrist follow-up.  However, eight inmates were not seen within five days of referral.  No inmate was seen beyond eight days of referral.

Custody lockdowns and modified programs prevented the routine use of pill lines. Medication was generally delivered to inmates' cells, except for a pill line in a Level 1 gymnasium and for morning and mid-day medications for general population EOP inmates.

Psychiatrists reported no significant problems with the timely processing of medication orders.

Audits of informed consent requirements for psychotropic medications indicated 91-percent compliance.  All informed consent forms were scanned into eUHRs, and 86 percent were filed in UHRs.

PBSP conducted audits to assess compliance with laboratory and Abnormal Involuntary Movement Scale (AIMS) monitoring requirements.  Laboratory

testing audits for certain antipsychotic medications indicated a 93-percent compliance rate. Eighty-eight percent of audited cases contained AIMS assessments upon the initiation of antipsychotic medications; 93 percent indicated ongoing AIMS reassessments every six months. No medications were discontinued as a result of AIMS assessments.

All psychotropic medications were ordered DOT.

Between 58 and 69 inmates received psychotropic medications monthly by way of a Keyhea order. During the monitoring period, 48 Keyhea orders were renewed, 12 were initiated, and seven expired or lapsed following a determination that they were no longer needed. No Keyhea orders were lost for not being timely renewed when deemed clinically necessary. None were denied at the certification level or were not pursued on the advice of counsel. Two desired Keyhea orders were lost upon renewal.

During June 2010, 114 inmates were prescribed medications at HS. Audits found compliance with HS medication standards.

An audit of paroling inmates indicated that 95 percent had parole medication orders in place, and pharmacy verification of dispensed medications documented.

Sexual Misconduct:

PBSP was one of the designated sexual misconduct treatment centers in the CDCR. Overall, the program worked well.

During the reporting period, there were 33 RVRs for sexual misconduct involving 15 inmates. Six inmates accounted for 23 RVRs. Thirty-one incidents resulted

in mental health screenings and IDTT reviews. Although three cases were referred for comprehensive evaluations, none yielded Exhibitionism or Paraphilia NOS diagnoses.

All inmates with Exhibitionism or Paraphilia NOS diagnoses were offered voluntary individual and group therapy through the IEX treatment program in the PSU. Inmates referred for sexual misconduct behavior who did not receive positive mental health screens were offered voluntary program participation. Overall, inmate group therapy participation was less than 50 percent. Custody-driven behavioral modifications included the use of IEX jumpsuits, placement of yellow placards on inmates' cell doors, loss of canteen privileges, property restrictions, and SHU terms.

All sexual misconduct RVRs were referred to the DA.

Transfers:

There were 23 referrals to DMH acute care. PBSP subsequently rescinded ten of them, and DMH accepted the remainder. All acute care referrals complied with referral timeline requirements. Five of 15 acute care transfers during the monitoring period complied with transfer timeline requirements. The average transfer time was 16 days, with a range of four to 39 days. Fourteen of 15 acute care transfers occurred within 72 hours of a bed assignment.

Of 25 referrals to DMH intermediate care, 15 exceeded referral timeline requirements. Four of seven intermediate care referrals that required a Vitek hearing complied with required timelines for referral packet submission.

Form 7388s completed during the early part of the reporting period were often inaccurate and/or incomplete. However, the assignment of a new DMH coordinator

with broader responsibilities led to improved documentation, better coordination among clinicians, and overall improved management of high risk cases.

There were 21 PSU transfers to DMH intermediate care. PBSP initiated 16 of these referrals, and five were referred by other institutions prior to inmates' arrivals at PBSP. Nineteen of the 21 transfers went to SVPP; the remaining two were internal transfers from acute to intermediate care at CMF. All transfers to DMH intermediate care exceeded 30 days, indicating noncompliance. No transfers occurred within 72 hours of a bed assignment, but excluding holidays and weekends, all transfers occurred within three working days of a bed assignment.

Eleven inmates returned to PBSP from acute care. Although none were directly admitted to the CTC upon return, three were admitted for clinical stabilization within 15 days of acute care discharge. Of the 16 inmates who returned to PBSP from SVPP, three were admitted to the CTC within 48 hours of returning to PBSP.

There were 190 referrals to the MHCB, involving 141 individual inmates among whom there were165 admissions of 118 inmates. Twenty-nine MHCB admissions were from other institutions. Thirty-two inmates had multiple MHCB admissions. Eighteen percent of MHCB admissions exceeded ten days; lengths of stay ranged from less than one day to 107 days.

All MHCB admissions occurred within 24 hours of referral. In cases of bed unavailability in PBSP's ten-bed MHCB unit, inmates were temporarily housed in an unlicensed housing unit adjacent to the MHCB. There were 12 instances when this alternate site was used for MHCB inmates. Lengths of stay averaged 3.9 days, and ranged from less than one day to eight days.

PBSP reported significant delays in its ability to transfer inmates out of the PSU. As of September, 2010, there were 119 inmates in the PSU, with an average length of stay of 238 days.

Other Issues:

### Administrative Segregation

As of September 30, 2010, the 421 inmates in administrative segregation had an average length of stay of 210 days. There were 115 inmates with lengths of stay than exceeded 200 days, 52 that exceeded 400 days, and four with lengths of stay exceeding800 days. Of these inmates, 411 were endorsed, including 12 endorsed for the general population, 63 endorsed for the SNY, and 336 endorsed for the SHU.

### MHCB

Despite 80-percent turnover in staff since the beginning of 2010, the MHCB unit generally provided attentive care. Clinical documentation was detailed and informative.

Audits indicated compliance with many MHCB protocols, including 100-percent compliance for the conduct of IDTT meetings within three days of MHCB admission, completion of a treatment plan within three days of the initial IDTT meeting, daily documented clinical contacts, psychiatrist IDTT meeting attendance, documented DMH referral consideration for inmates with three or more MHCB admissions within the preceding six months, and completion of suicide risk assessments upon MHCB discharge. Audits indicated noncompliance for completion of suicide risk assessments upon MHCB admission, and for correctional counselor IDTT meeting attendance. A log review indicated that C-files were available for only 23 of 149 IDTT meetings.

Files generally contained documented rationales for inmates who remained in the MHCB for more than ten days or who had multiple MHCB admissions, but were not referred to DMH. Many inmates with extended MHCB stays were awaiting DMH placement. Others had special treatment plans which staff did not assess as warranting inpatient care.

Many inmates referred to the MHCB but not admitted expressed suicidal ideation but were assessed by staff as being of low risk for suicide. A review of a sample of these cases indicated that suicide risk assessments and detailed progress notes outlining the rationale for non-admission were completed.

Use of restraints declined appropriately during the monitoring period. In May 2010, there were 47 orders for four-point restraints attributable to six inmates, five of whom were restrained for more than 24 hours, and 25 orders for five-point restraints attributable to four inmates, two of whom were restrained for periods exceeding 24 hours. In September and October 2010, by comparison, one inmate each month was placed in four-point restraints, no instance exceeded 24 hours, and no inmates were placed in five-point restraints.

Certain areas relating to restrictions placed on inmates receiving MHCB treatment required attention. During the preceding monitoring period, inmates with MHCB lengths of stay exceeding ten days were not provided yard and were not given the opportunity to attend their IDTT meeting. During the monitor's visit, staff reported that individual determinations were made as to inmates' yard eligibility. Moreover, between August 12 and October 28, 2010, 39 percent of MHCB inmates attended their IDTT meeting. An additional 12 percent were offered the opportunity to attend, but refused.

All inmates who attended their IDTT meetings were placed in therapeutic modules and were handcuffed.

At the time of the site visit, all but one MHCB inmate had a mattress, but none had beds. MHCB documentation indicated that clinicians and the IDTT process reviewed inmates as to allowances for clothing and personal items.

SHU

There were nine 3CMS inmates housed in the SHU in June 2010 and four on October 31, 2010. There were no new arrivals to the SHU 3CMS program during the monitoring period.

Audits found 100-percent compliance for confidential one-to-one clinical contacts with MHSDS caseload SHU inmates at least every 30 days. The assigned SHU 3CMS case manager was available for more frequent contact if necessary. There were weekly PT rounds for all SHU 3CMS inmates. Psychiatric services were adequate due to the SHU's limited caseload population.

Either the mental health case manager assigned to the SHU, or a senior supervising psychologist, attended all ICC meetings to provide mental health input and determine whether or not evaluation referrals were needed. Inmates' ICC meeting attendance was documented and scanned into the eUHR.

PSU

The PSU census averaged 120 inmates during the reporting period. This program had an inmate capacity of 127 SHU or administrative segregation inmates who required either an EOP LOC or SHU 3CMS LOC pending transfer to another treatment setting. Relevant audits and reports indicated compliance for PSU clinical case manager

and psychiatrist contacts.  Case managers also offered inmates an increased number of group activities, as opposed to recreational therapies.  Weekly offered structured group time ranged from 8.4 to 11.1 hours.  Inmates generally confirmed being offered ten hours of weekly group activities and ten hours of weekly yard.  The group treatment refusal rate was nonetheless reported to be 39 percent.

The institution reported a shortage of escort officers.  Staff indicated that the major effect of this shortage was a decrease in timely access to inmates.  Although funding to remodel a dining area into a mental health treatment center had been approved since at least the preceding site visit, renovations had yet to be initiated.

EOP

At the end of the reporting period, 64 general population EOP inmates were receiving mental health services, up to the program's capacity.  PBSP complied with case manager and psychiatrist contacts, IDTT requirements, and EOP documentation requirements.  It was reported that weekly group activities offered to EOP inmates ranged from 8.1 to 15.8 hours.  The reported 33-percent group refusal rate was an improvement over the preceding monitoring period's group refusal rate of 39.5-percent.

Interviewed EOP inmates expressed dissatisfaction with perceived minimal variation in available programming, and with correctional officers' disrespectful attitude.  Other concerns included large group size, restrictions in weekend yard and dayroom access, and the fact that the dayroom television in A section had not worked for over one year.  Of PBSP's mental health programs, the EOP program was reported to have the least amount of treatment space.

<u>3CMS</u>

Facility A had four confidential offices for mental health staff use.  All were constructed since the preceding monitoring period.  Facility B had two confidential offices for case managers and one for a psychiatrist.

Overall, clinical documentation and treatment planning had improved since the preceding monitoring period.  Mental health staff scheduled 3CMS inmates for case management contacts as clinically indicated.  Sometimes these contacts occurred more frequently than every 90 days.

Although PBSP psychiatric staffing remained problematic, psychiatry saw 3CMS inmates at least every 90 days for every month except for October, 2010.  An audit of inmates receiving mainline 3CMS LOC indicated compliance for annual IDTT meeting completion, psychiatrist and correctional counselor IDTT attendance, presence of a current suicide risk assessment in the record, and either inmates' IDTT meeting attendance or refusal.  The monitor's expert observed 3CMS IDTT meetings, which were brief but adequately conducted.  Although C-files were not available, PBSP was reportedly electronically scanning them.

Group treatment for mainline 3CMS inmates remained challenging at PBSP.  It barely functioned on Facility A, while ongoing lockdowns and modified programs precluded any group treatment on Facility B.

<u>Administrative Segregation 3CMS</u>

PBSP operated a court-ordered pilot program that provided enhanced mental health services to 3CMS inmates in the Facility A ASU.  This program remained successful despite recent pressures caused by an increase in the overall administrative

149

segregation population.  This pilot program was originally designed to house 96 inmates in housing unit A-1.  Housing unit A-2 served as an overflow unit.  During the monitoring period, the administrative segregation 3CMS population ranged from 72 to 89 inmates.  However, the total administrative segregation population in Facility A averaged 315 inmates.  This increased total administrative segregation population drained resources from the pilot program.  For instance, pilot program participants had less group therapy and as little as three hours of weekly yard access due to an insufficient number of walk-alone yards.

During the reporting period, there was 100-percent IDTT meeting attendance by the supervisor, case manager, psychiatrist, and correctional counselor I (CC I).  Additionally, all 90-day treatment plan reviews were in compliance, and all suicide risk assessment checklist forms were appropriately completed within required timelines.

Two audits indicated that weekly case manager contacts occurred 100 percent of the time.  The working relationship between mental health and custody staff appeared to be good.  Mental health and custody also routinely met daily.

There was 100-percent compliance for daily PT rounds.  PT summaries were forwarded monthly to the chief of mental health and the CEO for review.  The monitor's expert observed PT rounds and found them to be conducted in a competent manner.

Referrals

PBSP reported compliance for the one EOP emergent and 17 EOP urgent referrals.  Of 81 EOP routine referrals, all but eight were seen within five working days.

There was compliance for all ten 3CMS emergent referrals.  Case managers handled

twelve 3CMS urgent referrals within 24 hours.  Psychiatrists handled four3CMS urgent

referrals by the following day.  Case managers also handled all but ten of 189 3CMS

routine referrals within five working days.  Of 170 routine psychiatrist referrals for

3CMS and general population inmates, all but six were seen within five working days.

RVRs

PBSP issued 830 RVRs.  Of these, 189 were issued to EOP inmates and

seven were issued to 3CMS inmates exhibiting "bizarre, unusual or uncharacteristic

behavior."  Mental health assessments were conducted for all seven of the 3CMS inmates

and for all but three of the EOP inmates.  Assessments were not performed on two EOP

inmates who transferred to DMH, while the other EOP assessment was scheduled for

completion beyond the monitoring period.  Hearing officers mitigated penalties based on

inmate mental health considerations in 17 percent of cases.

Access to Care

Access to care reports indicated an inmate rate of refusal of 19 to 25

percent.  Several factors appear to have contributed to this refusal rate.  Among them,

access to care correctional officer (CO) allocation shortages limited the availability of

correctional officers for escort purposes.  Negative interactions between correctional

officers and inmates, difficult working relationships between housing and access to care

correctional officers, and inappropriate CO interference with clinical encounters, may

also have contributed to increased inmate refusals.  There was also concern that some

inmate "refusals" may have resulted from inmates not having been informed of certain

appointments.

**High Desert State Prison (HDSP)**
April 26, 2011 – April 28, 2011

Census:

On April 19, 2011, HDSP housed 4,190 inmates, which represented a six-percent decrease in the institution's total population since the preceding monitoring period. HDSP's MHSDS population of 883 represented a five percent decrease in its mental health caseload population. There were seven mainline EOP inmates, one EOP inmate with a SHU term pending PSU transfer, and 701 mainline 3CMS inmates. There were eight inmates in the MHCB. The administrative segregation population of 292 included five EOP inmates and 66 3CMS inmates. The RC population of 583 included ten EOP inmates and 95 3CMS inmates. There were 283 parole violators in RC, among whom eight were EOP inmates and 58 were 3CMS inmates.

Staffing:

Of 53.65 allocated mental health positions, 44 were filled, leaving 9.65 vacancies, for an 18-percent institutional vacancy rate in mental health. Contractors provided an additional 3.9 FTE coverage, reducing the overall institutional functional vacancy rate in mental health to 11 percent.

Positions for a senior psychiatrist and chief psychologist were filled, as were two of 2.5 senior psychologist positions.

All four staff psychiatrist positions were vacant. Contractors provided an additional 2.9 FTE coverage, reducing the functional vacancy rate in psychiatry to 28 percent. Although all 16 staff psychologist positions were filled, two staff psychologists were on long-term sick leave. Contractors provided an additional one FTE coverage. Six of seven social worker positions were filled, for a vacancy rate of 14 percent.

152

The senior PT position was filled, as were eight of nine PT positions. One of 1.65 RT positions was filled, as were eight of 10.5 MHSDS clerical positions.

HDSP reportedly used a weekly average of 60 hours of psychiatry telemedicine services.

Quality Management:

The local governing body met six times. It restructured its membership in January 2011 to decrease the number of participants.

The quality management committee was chaired by the CEO for healthcare. It met weekly, kept meeting minutes, and reportedly always had a quorum.

The mental health subcommittee was chaired by the chief psychologist. It met monthly, maintained minutes, and reportedly always had a quorum. The mental health subcommittee addressed a range of standing agenda item issues, including personnel/staffing, telepsychiatry, MHCB admissions and discharges, RVRs, and mental health appeals. It also addressed *Coleman* compliance items, including audits of mental health referrals, access to care, PC weekly contacts, 3CMS and administrative segregation IDTT meetings, IEX, and EOP UHR reviews.

HDSP chartered two QITs, which addressed RC timelines and weekly PC contacts in administrative segregation. The former QIT was ongoing, but the latter concluded after audits found that compliance rates had improved from 52 percent for November and December 2010 to above 96 percent for January and February 2011.

Peer review was in a process of transition. Whereas in the past it had consisted of chart review, it now consisted of a more qualitative process that also included case presentations, qualitative review of inmate care, clinician peer support, and

presentations on topics of relevance to the inmate population.  There was no peer review

for psychiatry.   There were 11 social worker and psychologist peer review sessions

during the monitoring period.

Suicide Prevention:

There were no completed suicides during the monitoring period.

The SPRFIT met monthly and maintained meeting minutes.  SPRFIT

membership reportedly included all required participants as well as additional appropriate

mental health, nursing, and custody staff.  Standard SPRFIT agenda items included

problems addressed within suicide CAPs, five-day clinical follow-up, MHCB admissions

and discharges, DOT, and review of EOP inmates housed in administrative segregation.

HDSP reported a high rate of attendance by clinical staff at monthly

suicide prevention videoconferences conducted by headquarters.

The ERRC met nine times and maintained extensive minutes.  Meetings

were generally well-attended and appeared to thoroughly review responses to

emergencies.  Spot checks of custody officers indicated the presence of micro-shields.

There were cut-down tools and PPE in the ASUs.

Data indicated 95-percent compliance for clinical five-day follow-up

following MHCB release; there was 97-percent compliance for custody five-day follow-

up.

In administrative segregation, daily morning meetings were occurring

between mental health staff and the administrative segregation sergeant and/or lieutenant.

These meetings addressed suicide trends, mental health concerns, new arrivals, and

mental health programming issues.

UHR audits indicated compliance rates of 32 percent and 50 percent for the conduct of pre-placement screens prior to placement of inmates in administrative segregation.

For compliance with completion of the 31-item screen, UHR audits indicated rates of 50 percent and 63 percent.

Although certain administrative segregation cells were retrofitted as new intake cells, custody reported that new intake inmates were not routinely placed in them. However, cells with new intake inmates were appropriately marked.

Review of documentation of 30-minute welfare checks indicated that the start times of welfare check rounds were recorded, but not the times when they ended. These rounds also did not appear to be staggered, with many recorded as beginning exactly on the half-hour and on the hour.

Review of an isolation log confirmed daily PT rounds, with only one day when they were not conducted, according to an audit. UHR audits indicated compliance rates of 91 percent and 96 percent for documentation of daily PT rounds on interdisciplinary progress notes.

Virtually all administrative segregation cells had electrical outlets.

A review of 114s indicated that inmates received yard several times per week. This was corroborated by inmate reports. There appeared to be a sufficient number of SMYs.

Medication Management:

HDSP reported that 613 inmates received psychotropic medications.

For newly-arriving inmates, audits indicated an 82-percent compliance rate for re-ordering of medications within eight hours of arrival for inmates already on prescription medications.  For newly-arriving inmates who had medications ordered during their initial screenings, there was 73-percent compliance rate for medication administration within 24 hours of those ordered.

Following intra-institutional moves, medication administration was timely in 83 percent of cases, according to nursing audits.  According to the institutional management report, audits indicated a 63-percent compliance rate for MARs accompanying inmates who were transferred to administrative segregation. Medication continuity following MHCB discharges was not audited.

Nursing audits found 100-percent compliance for medication renewals prior to expiration.  Due to staffing shortages in psychiatry, brief bridge orders were sometimes necessary to maintaining medication continuity until a face-to-face appointment was completed.  Audits further indicated that for new medication orders or dosage changes, there was an 84-percent compliance rate for providing medication within 24-hours of the order being written.

Audits of response to medication noncompliance audits found improvement with legibility and documentation of medication refusals and no shows, with compliance rates ranging from 92 to 100 percent.  However, identification of cases of medication noncompliance did not sufficiently prompt appropriate notification and follow-up.  A nursing audit of follow-up documentation for medication no-shows found a compliance rate of 54 percent.

Although the institution reported no significant problems with pill lines, inmate reports indicated otherwise. Data on pill line audits was not provided.

Audits found a 54-percent compliance rate for presence of current informed consent forms in UHRs.

HDSP did not provide audit data as to laboratory testing of inmate blood levels of psychotropic medications.

The institution reported that on average 20 inmates were prescribed psychotropic medications DOT and that all others on psychotropic medications received them nurse-administered. No audit information was available as to whether DOT protocols were implemented properly.

During the monitoring period, one inmate arrived at HDSP with an active Keyhea order, one inmate had a Keyhea petition initiated, and one inmate's Keyhea order expired. It was reported that there was one inmate for whom a Keyhea order was not pursued on the advice of counsel. No inmates were on active Keyhea orders at the time of the site visit.

HDSP data indicated that there were 117 prescriptions for HS medications among 97 inmates. There were reports that HS medication protocols were not being appropriately followed.

It was reported that of 208 mental health inmates scheduled to parole, 103 were given parole medications. However, small sample sizes in audits made it difficult to determine whether these medications were distributed appropriately.

Sexual Misconduct:

There were nine cases of IEX.  All inmates were screened and had IDTT meetings, but none were referred for comprehensive evaluations.  There were no findings of Exhibitionism or Paraphilia NOS.  All of the cases were referred to the DA's office.

No inmates received multiple RVRs for IEX.


Transfers:

HDSP had a senior psychologist supervising the DMH referral process on a part-time basis.  More recently, some of the duties had been shifted to a staff psychologist, who conducted the DMH audits and maintained the DMH referral log as part of her other duties.

HDSP used the DMH referral log to track the DMH referral process, with tracking of each case beginning on the date the IDTT made the referral. It was reported a copy of the Form 7388 was provided to the DMH coordinator for any inmates who met DMH referral criteria but were not referred.  However, a review of the non-referral log suggested that the Form 7388s were either not fully completed or were not provided to the DMH coordinator.

Given that HDSP did not have an EOP program, the majority of DMH referrals were made when inmates were housed in the MHCB.  It was reported potential DMH referrals were discussed during daily morning meetings with clinical staff in the MHCB.  Staff in the MHCB reported that for inmates from other institutions who were placed in the MHCB, they did not always receive documentation or information on these inmates' DMH referral status.

Referral logs indicated that there were a total 15 DMH acute and intermediate referrals that were identified as having been initiated at HDSP.  However, other information from the institution indicated that there were 15 acute care referrals and four intermediate care referrals, for a total of 19 DMH referrals during the monitoring period.  Referral packets were timely completed in all but one case, for a compliance rate of 95 percent. Review of the DMH referral log indicated that, with two exceptions, it was well maintained up to the date the referral packet was sent.  However, tracking information after completion of the referral packet was not as well maintained.  Dates of acceptance, bed assignment, transfer, and other matters were incomplete, which may have led to some inconsistencies in the information reported.

It appeared that eight inmates transferred to acute care and four inmates transferred to intermediate care.  Two of the intermediate care referrals were to DMH at CMF, and two were to ASH.   All four intermediate care referrals transferred within timelines, with an average transfer time of 14 days.  However, the compliance rate for timeliness of transfers to acute care was only 25 percent, with times ranging from eight to 95 days and averaging 28 days. Information provided for four of the 12 total inmates transferred to DMH indicated compliance with the 72-hour transfer timeline once a bed assignment was made.

No inmates were discharged from DMH to HDSP during the monitoring period.  Because it was rare for inmates to be discharged from DMH to HDSP, the institution was not always aware of inmate discharges or which institutions such inmates were sent to, making it difficult to "close out" referral logs.

There were no HDSP inmates on the SVPP waitlist at the time of the monitor's visit.

No Vitek hearings were held during the monitoring period.

Observation of IDTT meetings for general population3CMS inmates indicated that generally there was discussion of whether the inmate met the criteria for DMH referral, although specific criteria were not usually discussed. Staff reported that prior to IDTT meetings, clinicians used MHTS.net to assess whether an inmate had three or more MHCB placements.  A review of the list of inmates with multiple MHCB admissions indicated that all who had multiple MHCB admissions had been identified and considered for DMH referral on the Form 7388.

HDSP had difficulty adhering to other transfer timelines.  The institution reported a total of 16 RC EOP inmates, of who five transferred within 60 days, but 11 transferred after spending more than 60 days in the RC.  The lengths of these stays for over 60 days ranged from 65 to 211 days.

Twelve mainline EOP inmates transferred to an EOP program.  Seven of these EOP inmates transferred in less than 60 days.  The five EOP inmates who transferred after more than 60 days had been housed in mainline from 231 to 422 days.

There were also 17 administrative segregation EOP inmates who transferred.  Of these, 11 transferred within 30 days and six transferred after more than 30 days in administrative segregation.

Of the 125 RC 3CMS inmates who transferred from the RC, only 38 percent transferred within 90 days of RC placement or 3CMS designation.

Other Issues:

### Reception Center

Limited audits indicated that all initial screens were completed within 24-hours of inmate arrival, and that all required mental health evaluations were completed within 18 days of inmate arrival.

A reported average of 42 percent of RC clinical contacts occurred cell-front.  Approximately 51 percent of cell-front contacts were attributed to inmate refusal, while lack of custody escort and lack of space were cited as reasons for only three percent of refusals.

Limited group therapy was available for EOP inmates, with inmates not consistently receiving five hours of out-of-cell therapeutic activity per week.  No group therapy was available for 3CMS inmates.

### Administrative Segregation

During the monitoring period, eight EOP inmates were housed in administrative segregation for more than 90 days, with stays ranging from 99 to 225 days.  Ninety-nine 3CMS inmates were housed in administrative segregation for more than 90 days.

HDSP reported that 50 to 60 percent of administrative segregation inmates were seen out of cell.  Two audits indicated that 52 percent and 96 percent, respectively, of administrative segregation MHSDS inmates were offered weekly clinical contacts.

HDSP's administrative segregation facility lacked appropriate group treatment space.  Available group therapy was very limited.  Two groups were in operation at the time of the monitor's visit.

Audits of attendance at IDTT meetings found 100-percent compliance for PCs, 92-percent compliance for psychiatry, and 80-percent compliance for CCIs. At an observed IDTT meeting, case reviews were adequate, inmates participated, and UHRs were present, although staff reported that access to C-files was inconsistent. The room for the IDTT meeting was adequately private but too small.

MHCB

HDSP had ten MHCB beds within a 32-bed licensed CTC. Three safety cells were also used for inmates assigned to the MHCB beds on a few occasions when the crisis care census exceeded ten inmates. HDSP reported that there was no use of temporary space pending transferred to the MHCB unit.

There were 147 MHCB admissions, of which approximately 55 percent were from HDSP. Many of the 30 admissions which exceeded ten days were for inmates awaiting DMH transfer. With one exception, inmates were physically discharged from the MHCB on the same day as clinical discharge.

HDSP reported that 76 to 100 percent of inmates admitted to the MHCB were placed on suicide watch or suicide precaution. On average, one to two inmates were placed in the MHCB following a serious suicide attempt, per month. Restraints were not used during the monitoring period.

MHCB audits indicated 100-percent compliance for initial screenings, completion of suicide risk assessments, and weekly updates of treatment plans. The compliance rate for conduct of initial IDTT meetings within 72 hours of admission was 83 percent. It appeared that required participants regularly attended IDTT meetings. At an observed IDTT meeting, all required members were in attendance. Clinicians were

162

familiar with the inmates under review.  The psychiatrist chairing the meeting provided

the inmate with a thorough explanation of planned treatment.  Inmates in attendance were

seated in a chair and participated meaningfully in the process, although they were

generally restrained.

3CMS

HDSP reported that a majority of 3CMS inmates were placed in MHSDS

as medical necessity in order to treat them for suspected mental illness.  IDTT meetings

were scheduled every six months to determine whether inmates should be continued in

the 3CMS program as medical necessity or removed from the 3CMS program.

Access to consistent psychiatric coverage remained problematic.  HDSP

provided telemedicine psychiatry services for three of its four facilities and was

expanding services to the fourth facility.  Except for a senior psychiatrist, all others were

registry psychiatrists.

Confidential treatment space for clinical contacts and access to care

remained problematic.  Most general population 3CMS clinical contacts occurred in non-

confidential settings. Staff further reported that only three custody escort officers, who

were utilized on all yards, were assigned to the mental health program.  Their availability

was largely absorbed with escorting inmates to IDTT meetings and telemedicine

psychiatry appointments.  Staff relied on relationships with housing officers to assist with

clinical contacts.

Lack of space and lack of escort officers were also problematic for

provision of groups.  During the site visit, there were no groups for general population

3CMS inmates.

163

Methodologically sound audits found a compliance rate of 34 percent for completion of initial evaluations within ten working days of inmate arrival.

Audits found 78-percent and 91-percent compliance rates for timely completion of initial IDTT meetings. Annual IDTT meetings were held timely. The rate of participation by psychiatry improved from 17 percent to 87 percent, although the psychiatrist at IDTT meetings was not always the treating psychiatrist. Participation by CCIS averaged 88 percent. Inmate participation averaged 90 percent. At observed IDTT meetings, clinicians appeared to be knowledgeable about their patients. However, there was little or no discussion of treatment plans or goals.

Audit data indicated compliance rates of 71 percent and 83 percent for quarterly PC contacts. For inmates on psychiatric medications, quarterly appointments with the psychiatrist took place in 90 to 99 percent of cases.

Audits of treatment plans found that treatment modalities were identified in 70 percent of cases. However, review of UHRs indicated that not all contained specific treatment plans or that treatment goals were lacking. Many progress notes were minimal, lacked clinical information, evidenced little variation over time, and were not related to treatment objectives.

Inmates expressed concerns with lack of access to psychiatry, unavailability of groups, brevity of contacts, lack of confidentiality, and problems with pill lines and lateness of HS medications.

Referrals

HDSP calculated times for response to referrals from the date when mental health received the referral, and not from the date that the referral was written.

164

From August through October 2010, there were 1,400 referrals, including psychiatric referrals. For this three-month period, HDSP reported 100-percent compliance for response to emergent referrals, 74-percent compliance for response to urgent referrals, and 82-percent compliance for response to routine referrals.

There were 1,681 referrals from November 2010 through January 2011, including psychiatric referrals. During this three-month period, HDSP reported a compliance rate of 87 percent for response to emergent referrals, 79 percent compliance for urgent referrals, and 81 percent compliance for routine referrals.

Medical Records/MHTS.net

Anecdotal reports at the time of the monitor's visit suggested that UHR availability for non-reception center inmates remained at approximately the 80 percent level which was found during the preceding monitoring period. Availability of UHRs, or even a partial record, or a "flimsy," for RC inmates was more problematic. Staff reported that a "flimsy" might not be available for several weeks after an inmate's arrival. Loose filing delays remained a concern.

RVRs

HDSP reported that for the four-month period of September 1 through December 31, 2010, 759 RVRs were issued. It did not report the total number of RVRs issued during the monitoring period, the number of RVRs issued to MHSDS inmates, and the number of inmates who received three or more RVRs.

Data indicated that during the monitoring period, the institution conducted a total of 59 mental health assessments, including ten of MHCB inmates, 11 of EOP inmates, 36 of 3CMS inmates, and two of general population inmates. An institutional

audit of whether hearing officers documented consideration of assessments in their findings or case dispositions found a compliance rate of 82 percent. There were no audits of the percentage of cases in which mental health considerations resulted in a mitigation of penalties.

<strong><u>California Correctional Center (CCC)</u></strong><br>(Paper Review)

<u>Census</u>:

At the time of reporting, there were no MHSDS inmates housed at CCC.

<u>Staffing</u>:

Because CCC no longer had an established psychiatry position, any provision of psychiatric services was by telemedicine. CCC reported receiving assistance from the HDSP psychiatrist when needed.

The senior psychologist position remained filled, as did the two established psychologist positions. Four of the 4.25 PT positions and the half-time clerical position were filled.

<u>Quality Management</u>:

CCC's local governing body continued to meet monthly throughout the monitoring period. The quality management committee met weekly.

A consolidated medical/dental/mental health subcommittee met monthly. It did not forward any recommendations. There were no chartered or ongoing mental health QITs during the reporting period.

CCC did not have a peer review process in place.

<u>Suicide Prevention</u>:

The SPRFIT met monthly, but the achievement of a quorum remained

166

problematic.  Minutes reflected discussion of statewide suicide prevention topics, discussion of MHSDS inmates, and local suicide prevention efforts.

        The emergency response review committee continued to meet monthly. Minutes indicated discussions regarding emergency response and emergency drills.  CCC reported that all custody staff carried micro-shields. No information was provided regarding the provision of CPR refresher training.

        CCC reported compliance with five-day clinical follow-up and custody follow-up.

        In administrative segregation, CCC reported that nursing completed pre-placement screens, and remained compliant with completion of mental health screens within 72 hours.  The inmate suicide profile was included in the screening process.

        Intake cells were identified and retrofitted. They were located directly in front of the control booth officer and were visible to all staff in the unit.

        Thirty-minute welfare checks were performed by custody staff as required during the review period.

        All cells except the new intake cells were equipped with electrical outlets. Television and/or radio usage was decided after the initial ICC meeting.

        The facility reported that all inmates in administrative segregation were offered at least ten hours of yard per week.  No supporting documentation was provided.

Medication Management:

        CCC reported compliance with medication continuity following housing transfers within the institution.

        Institutional audits indicated compliance with timely administration of

medications following new or changed orders. Results of medication management audits generally did not include sample size, methodology, or documentation supporting any findings.

There were no reported instances of medication noncompliance during the review period.

CCC did not audit the length of pill lines.

As in the preceding monitoring period, it was not possible to determine whether the appropriate laboratory testing for blood levels of mood stabilizing medications and atypical antipsychotic medications was completed. Of the five reported inmates on prescribed psychotropic medications, two had laboratory testing that was ordered by the telemedicine psychiatrist.

CCC was compliant with DOT protocols.

There were no inmates on Keyhea orders throughout the monitoring period.

At the time of reporting, there were no inmates for whom HS medications were prescribed. CCC reported that the telemedicine psychiatrist did order HS medications occasionally during the review period.

No MHSDS inmates paroled from CCC during the monitoring period.

Sexual Misconduct:

Two RVRs were issued for sexual misconduct during the monitoring period. While both inmates were screened, neither inmate was afforded IDTT review, or referred for a comprehensive evaluation. Both inmates were not diagnosed with Exhibitionism or a Paraphilia NOS. One inmate received a five-month SHU term. The

other case was pending at the time of reporting.

Custody-driven behavioral modifications included placement of a yellow placard on the cell door in administrative segregation and the wearing of exposure-control jumpsuits when inmates were escorted outside of the cell.

Transfers:

There were no referrals to DMH and three referrals to the MHCB during the monitoring period.  One of the inmates referred to the MHCB accounted for two of those referrals.  The MHCB transfers took approximately one day.

CCC continued to operate a 19-bed OHU during the monitoring period. There were 11 inmates placed in the OHU for mental health reasons.  Three inmates accounted for seven admissions.  Apart from two inmates awaiting EOP placement, the average length of stay in the OHU improved from four days to one day.  CCC did not utilize holding cells pending placements in the OHU during the monitoring period.

Of two inmates assigned to the EOP LOC, one transferred to an MHCB within three days of identification.  The other was endorsed to an EOP within three days of identification and transferred 11 days after endorsement.

Inmates identified as requiring mental health services while at CCC were transferred.  Conflicting information indicated that transfers took 13.6 or 17 days, on average, for seven or eight such inmates.  Other conflicting information indicated that seven MHSDS inmates who were inappropriately transferred to CCC were transferred in 16 or 22 days, on average.

Other Issues:

Administrative Segregation

Throughout the monitoring period, CCC housed two 3CMS inmates and no EOP inmates in administrative segregation. CCC reported that all PC contacts were conducted in a confidential setting, but did not report the frequency of clinical contacts in the unit. PT rounds were completed daily, except during July 2010 due to staffing shortages. Logs were maintained. There were no overflow ASU activated during the review period.

Referrals

CCC did not provide documentation regarding response to referrals throughout the monitoring period.

Heat Plan

CCC reported that there were no instances when the temperature reached 90 degrees or above during the review period.

RVRs

There were no RVRs issued to EOP or MHCB inmates throughout the monitoring period. One RVR was issued to a 3CMS inmate, for whom a mental health assessment was completed.

**Mule Creek State Prison (MCSP)**
January 24, 2011 – January 27, 2011

Census:

On January 26, 2011, MCSP housed 3,552 inmates, which was a six percent decrease in the inmate population since the preceding monitoring period. The institution's mental health population of 1,898 was five percent less than it was during

170

the preceding monitoring period.  There were 499 mainline EOP and 1,261 mainline

3CMS inmates.  The MHCB housed five inmates and the MHOHU housed one.  The

administrative segregation population of 165 included 40 EOP inmates and 92 3CMS

inmates.

Staffing:

        Of 107.15 allocated mental health positions, 101 were filled and 6.15 were

vacant, for a six-percent vacancy rate in mental health.  Contractors provided an

additional 5.4 FTE coverage, reducing the institutional functional vacancy rate in mental

health to less than one percent.

        Positions for the chief psychiatrist and chief psychologist were filled, as

were all five senior psychologist positions and one of two senior psychiatrist positions.

Of 11.5 staff psychiatrist positions, 9.5 were filled, and contractors covered one

additional position.  Of 24 staff psychologist positions, 22 were filled, with contract

coverage for an additional .6 FTE.

        All 8.5 social worker, one unit supervisor, two senior PT, and 26 PT

positions were filled.  Social worker contractors provided an additional 1.8 FTE coverage

and PT contractors provided an additional two FTE coverage.

        Eight of 8.15 recreational therapist positions were filled, as were 14 of 15

MHSDS clerical positions, and the health program specialist I and office services

supervisor II positions.

Quality Management:

        MCSP had a mature and well-functioning quality management process.

The local governing body met monthly.  Minutes were maintained and meetings were

adequately attended.  The quality management committee met two to three times monthly during the first half of the monitoring period and began meeting monthly in September 2010.

The mental health subcommittee met twice monthly from June to September 2010, and met monthly during October and November 2010.  Meetings were comprehensive and responsive to issues.  Minutes were maintained.  Matters addressed included five-day follow-up, DMH referrals, RVR reports, IEX screens, access to care, referrals, active QITs, and staffing updates.

MCSP chartered four QITs, of which two were concerned with EOP groups, one was tasked with streamlining the mental health referral process, and one focused on developing a better system for scheduling psychiatry appointments.  A FIT addressed administrative segregation mental health programs.

Psychiatry and PC peer review were limited in scope and unlikely to effectuate improvements in individual performance or the mental health program overall. Psychiatry peer review focused on only two questions and was limited to 12 case studies during a one-year period.  Peer review for PCs was primarily focused on progress note documentation, looking at, for example, the presence of date/time, signature, and legibility. It had yet to evolve into a process that examined the quality of treatment, for example, identification of appropriate clinical interventions and measureable goals, and consistent documentation of an inmate's progress toward identified treatment goals.

Suicide Prevention:

There were no completed suicides during the monitoring period.

The SPRFIT met monthly and maintained meeting minutes.  Standing agenda items included completed suicide reviews and QIP status, staff training initiatives, emergency/death review meetings, lengths of stay in administrative segregation, clinical five-day follow-up, DMH referrals, and other suicide-related issues.

Documentation indicated that custody officers participated in monthly emergency drills.  IST reports indicated that nearly all staff had completed CPR training during the preceding couple of years.

Audits indicated 90-percent compliance for five-day clinical follow-up after discharges from the MHCB, MHOHU, or observation cells, a modest improvement over the 85-percent compliance rate reported during the preceding monitoring period.  Data on five-day custody follow-up was not provided, as in the preceding monitoring period.

In administrative segregation, custody staff and PTs met daily to discuss new arrivals and difficult cases.  Staff reported, audits showed, and reviewed isolation logs indicated that daily PT rounds occurred on a routine basis.

Staff reported that inmate screens included questions about suicidal feelings.  However, audit data was not provided.  Although non-MHSDS inmates were offered the 31-item screen, 92 percent refused it and signed a pre-completed refusal form.  Inmate refusals of the 31-item screen may have been indirectly encouraged by a practice of giving them an opportunity to sign the refusal form and then giving the 31-item screen to only those inmates who requested it or exhibited behavior that merited the screen.

New intake placards which identified completion dates for the 21-day intake period were attached to cell doors. They remained there throughout inmates' administrative segregation stays.

Review of 30-minute welfare check documentation indicated pre-printed start times and uniform completion times, with very little time indicated for each check. Review of the forms also found gaps of up to eight hours when rounds were not documented.

Inmates typically had access to ten hours of weekly yard and to in-cell electrical appliances.

Medication Management:

According to audits, continuity of medication for newly-arriving inmates regressed since the preceding monitoring period. Twenty-two percent of new arrivals received their mediations within 24 hours of arrival, compared to 41 percent during the preceding monitoring period.

For medication continuity following intra-institutional moves, the compliance rate was 96-percent.

Incidents of medication noncompliance were noted in 93 percent of cases, but referral and follow-up by mental health providers were compliant in only at 78 and 19 percent of cases, respectively.

Audits found that pill line wait times lasted for several minutes, but interviews of 3CMS inmates indicated extended wait times.

All psychotropic medications were administered DOT. The ASU also maintained an "enhanced DOT" list for inmates who had known histories of medication hoarding or cheeking.

As of November 30, 2010, 58 inmates were subject to Keyhea orders. During the monitoring period, five Keyheas were initiated, 41 were renewed, one was not pursued on the advice of counsel, and two were denied in court. No Keyhea orders lapsed or expired.

HS medications appeared to be administered no later than 8:00 p.m.

Sexual Misconduct:

There were three RVRs issued for IEX and two other RVRs for sexual misconduct that did not constitute IEX. All three IEX cases resulted in a screen and IDTT review, but none were referred for a comprehensive evaluation. There were no diagnoses of Exhibitionism or Paraphilia NOS. All three IEX cases were referred to the DA and all resulted in SHU terms. One of the two non-indecent exposure cases resulted in a screen. Neither of these cases was referred to the DA, nor did they result in SHU terms.

The monitor's expert observed that the cell door of an inmate who received a sexual misconduct RVR was partially covered with a yellow cloth. Reportedly, if an inmate committed IEX outside of his cell, he was required to wear an exposure-control jumpsuit.

Transfers:

Because the DMH coordinator was on leave during most of the monitoring period, DMH coordination responsibilities were transferred to the chief psychiatrist, who

also maintained other duties.  The institution maintained referral and non-referral logs, but there were discrepancies between the institution's and headquarters' logs.  Non-referral rationales were often insufficient.

The institution referred seven inmates to acute care at DMH.  Three referrals were rescinded and four inmates were transferred to acute care at VPP. Times from referral to transfer ranged from eight to 45 days.  Two of the four transfers complied with transfer timelines.

MCSP referred 32 inmates to intermediate care at DMH.  Of these, two inmates paroled, one transferred to another institution, and four referrals were rescinded. Ten inmates transferred, with five going to ASH, and five to VPP.  At the time of the site visit, two referred inmates were awaiting a decision by DMH decision, and 13 were on the wait list.

Compliance with time requirements for completion of DMH referral packets improved substantially during the monitoring period.  During the initial three months of the monitoring period, 70 percent of packets took over ten days to complete, and 43 percent required 30 days or more.  By November 2010, none of the referral packets required more than seven days to completion.

Availability of data necessary for IDTT consideration for referral to DMH was problematic.  Even when available, IDTT use of such data was inconsistent.  While records identified 18 inmates who had three or more MHCB and/or MHOHU admissions, a review of eight of these inmates indicated that only three of them appeared on DMH referral or non-referral logs.  Similarly, although data indicated that eight EOP inmates

received three or more RVRs within a 90-day period, the referral/non-referral log indicated that only two of them had been considered for DMH referral.

Inmates who returned from DMH arrived with their discharge summaries. DMH treatment recommendations were typically limited to a report of the medication regimen at the time of discharge.  In the cases reviewed, the DMH medication protocol was continued when the inmate returned to CDCR.

There were 83 MHCB admissions.  Monthly average lengths of stay ranged from nine to 19 days, and exceeded ten days for five of the six months reviewed. Individual lengths of stays ranged from one to 55 days.

MCSP referred 17 inmates to the PSU.  Thirteen were endorsed and eight transferred.  The average number of days from PSU referral to endorsement was 15, with a range of one to 22 days.  The average number of days from endorsement to transfer was 25, with a range of six to 59 days.  Five inmates transferred to the PSU within five days of endorsement, and all transferred within 60 days of endorsement.  Of the nine inmates referred to the PSU who did not transfer, five had limited SHU terms.   As of November 30, 2010, two EOP inmates with SHU terms were pending endorsement and/or transfer.

Other Issues:

Administrative Segregation

MCSP reported that a total of 750 inmates, including 244 EOP, 290 3CMS, and 216 non-MHSDS inmates, were placed in administrative segregation.  A full-time psychiatrist and five PCs were assigned to the unit.   Audits found compliance with weekly PC contacts. They also indicated 63-percent compliance for the offering of ten hours of structured therapeutic activities per week for EOP inmates

Audits found compliance with initial and quarterly IDTT meetings.  The monitor's expert attended administrative segregation IDTT meetings. Necessary participants were in attendance, medical records and C-files were available, and there was good interdisciplinary discussion.  There was discussion of referral to higher levels of care.

Group therapy was provided in two dayroom floor areas.  Each area consisted of nine therapeutic modules arranged in a semi-circle.  An observed therapy group conducted by a recreational therapist engaged all participants while maintaining structure.  However, the setting was problematic as the dayroom floor was very noisy. MCSP staff had difficulty with tracking inmate participation in group therapy.

Inmates awaiting an SNY bed did not have access to yard, regardless of the duration of their administrative segregation stays.

MHCB

Given the size of MCSP's mental health population, there were an insufficient number of licensed crisis care beds, with ten MHCBs, six MHOHU beds, and five MHOHU overflow beds.  MCSP did not typically access MHCB placements at other institutions.

UHR audits that examined ten parameters of the MHCB clinical process, including completion of suicide risk assessments, daily clinical contacts, and consideration of DMH referrals, typically indicated compliance levels consistently near 100 percent, except during one quarter when there was an issue with pre-admission suicide risk assessments.

Observed MHCB inmates had blankets, smocks, and mattresses, and many had reading materials. However, MHCB mental health inmates were generally not provided yard access.

There was concern with the practice of handcuffing all MHCB inmates during escort to and from IDTT meetings. During IDTT meetings, inmates were placed in therapeutic modules and their handcuffs were removed.

There were five applications of five-point restraint use, with one exceeding 24 hours. There were five incidents of seclusion. Durations ranged from 1.5 hours to 27 hours and ten minutes.

OHU/MHOHU

There were 159 admissions to the MHOHU and MHOHU overflow. Staffing included 24-hour nursing. Administrative segregation-type property restrictions were enforced.

The monthly percentage of inmates who remained in the MHOHU for more than 72 hours ranged from zero to 22 percent. Stays lasted as long as 57 days during the first three months of the monitoring period, but did not exceed five days during the last three months.

Clinical contacts in the MHOHU occurred in holding cells that provided marginal sound but not visual privacy. Inmates were not considered for DMH referral in IDTT meetings. Staff reported that no therapeutic or recreational groups and no yard time were offered. MHOHU and overflow cells had been retrofitted.

<u>3CMS</u>

MCSP's large SNY 3CMS program met most Program Guide requirements, although missing UHR documentation sometimes made it difficult to confirm compliance. Audits of 100 UHRs for the second quarter of 2010 indicated a 63-percent compliance rate for completion of initial mental health evaluations within ten days of inmate arrivals and an 18-percent compliance rate for documentation of initial evaluations in progress notes. Compliance rates for completion of initial IDTT reviews and treatment plans within 14 days of inmate arrival were 98 and 96 percent, respectively. Compliance rates for completion of annual IDTT reviews and annual treatment plan updates were 86 and 83 percent, respectively.

A QIT was formed to improve the 75-percent compliance rate for 3CMS psychiatric contacts.

A large number of 3CMS inmates participated in therapeutic groups. Wait lists were long. The percentages of inmates participating in groups from April to November 2010 were 15 percent on A Facility, 22 percent on B Facility, and 43 percent on C Facility. All three yards had an average of more than 100 inmates on group waitlists.

<u>Referrals</u>

MCSP's referral compliance was problematic. Overall, the institution reported timely compliance for 86 percent of emergent referrals but reported 61-percent compliance for urgent referrals, and 52-percent compliance for routine referrals. MCSP also audited psychiatry referrals for administrative segregation inmates. For the second quarter of 2010, the sole emergent referral was timely, but there was only 20-

percent compliance for urgent referrals, and 53-percent compliance for routine referrals. For the third quarter of 2010, audits indicated 100-percent compliance for emergent referrals, 63-percent compliance for urgent referrals, and 75-percent compliance for routine referrals.

Audits of psychiatry responses to all routine referrals indicated 50-percent compliance for the second quarter of 2010, 47-percent compliance for the third quarter, and 65-percent compliance for October/November.

RVRs

There were 281 RVRs issued to EOP inmates. Twenty-seven EOP inmates received three or more RVRs, 17 EOP inmates received three, four received four, one received five, two had six, two had seven, and one had nine. A review of EOP inmate C-files indicated that RVR protocols were typically followed. Hearing officers' consideration of mental health input was documented. Of eight reviewed cases, there were two in which hearing officers accepted clinical assessments that EOP inmate penalties should be mitigated due to mental health considerations.

All three 3CMS inmates who were issued RVRs were referred for a mental health assessment.

Pre-Release Planning

Many staff reported that they incorporated parole planning into their work with inmates. Such efforts included providing information on housing assistance, applying for benefits, and communicating with outside institutions to make sure that paroling inmates had a place to live.

Access to Care

During May and June 2010, there were 19,223 mental health ducats for individual interviews, IDTT reviews, and group sessions.   Eighty two percent of these were successfully completed.  Of 3,507 missed appointments, 47 percent were inmate refusals, 38 percent were cancellations by the provider, six percent were cancelled due to custody staff, and nine percent were described as "other."

During July, August, and October 2010, there were 12,636 mental health ducats, of which 87 percent of them were successfully completed.  Of the 1,602 missed appointments, 39 percent were inmate refusals, 45 percent were cancellations by the provider, .4 percent were cancelled due to custody staff, and 15 percent were described as "other."

## Sierra Conservation Center (SCC)
Paper Review

Census:

In January 2011, SCC's total population was 5,264 inmates, including inmates housed at the institution's camps.  There were 602 MHSDS inmates.  Three EOP inmates were housed in the general population.  There were 579 mainline 3CMS inmates. The administrative segregation population of 158 included three EOP and 173CMS inmates.

Staffing:

SCC's mental health staffing vacancy rate decreased from 6.5 percent during the preceding monitoring period to 4.5 percent.

All 2.5 psychiatry positions were filled, with one FTE position filled by a permanent intermittent employee.  Positions for a chief psychologist and senior

182

supervising psychologist were filled.

Eight of nine psychologist positions were filled. Contractors provided an additional one FTE coverage, reducing the functional vacancy rate for psychologists to less than one percent. Positions for a social worker and RT were filled.

The six OT positions were filled, as was the one health program specialist I position. Although SCC reported two PT positions, it did not report whether the positions were filled.

Quality Management:

There were no local governing body meetings during the monitoring period.

From July through November 2010, the quality management committee met monthly. There was a lack of mental health representation as well as a lack of documentation that mental health issues were being addressed. December 2010 quality management committee meeting minutes indicated mental health presence.

The mental health subcommittee met monthly and maintained minutes. While there was discussion of mental health issues, mental health subcommittee meetings primarily served as a conduit of information rather than a means by which to address quality improvement in mental health.

SCC reported ongoing QITs on medication delivery and appointment rescheduling.

Psychiatry peer review was based on UHR reviews, and was both qualitatively and quantitatively adequate. Peer review for PCs remained predominantly quantitative.

Suicide Prevention:

There were no suicides at SCC during the reporting period.

The SPRFIT met monthly but attendance remained problematic.  SPRFIT discussions focused on the statewide suicide prevention video conference and addressed issues such as clinical five-day follow-up and OHU admissions.

Emergency response review committee minutes indicated that on a monthly basis, SCC reviewed medically-related incidents and deaths.  SCC performed emergency response drills on a rotating basis throughout the institution, including in administrative segregation.  CPR training was provided to all correctional staff every two years with an annual refresher course thereafter.  The institution indicated that it was compliant with appropriate placement of cut-down tools. It reported that custody officers carried micro-shields.

SCC reported 100-percent compliance with clinical five-day follow-up and custodial follow-up after OHU discharges.  However, supporting documentation was not provided.[15]

SCC did not provide documentation of daily morning meetings between mental health staff and custody officers.

In administrative segregation, the institution was partially compliant with completion of pre-placement screens.

However, SCC reported 73-percent compliance for completion of the 31-item screen.  It did not report whether screens were completed in a confidential setting. There was no documentation of whether inmate suicide profiles were used as part of the

---

[15] In defendants' response to the draft of this report, they stated that documentation concerning clinical five-day follow-up and custodial follow-up was provided in the proof-of-practice binder.  However, the monitor reports that this material was not provided.

screening process.

SCC retrofitted two administrative segregation cells for new intake inmates. The cells were reportedly selected for their optimal visibility for custody staff into the cells.

The institution reported that it was compliant with completion of 30-minute welfare checks, but supporting documentation was not provided.

Daily PT rounds were conducted and documented in weekly summaries.

Cells in administrative segregation did not have electrical outlets. SCC did not report the number of SNY inmates in administrative segregation for non-disciplinary reasons awaiting transfer to an SNY program.

SCC reported that ten hours of yard time were offered weekly, but it did not provide supporting documentation.

Medication Management:

Medications were provided to newly-arriving inmates within 24 hours of their arrivals.

Audits of medication delivery following all institutional housing transfers, including OHU discharges and administrative segregation transfers, indicated compliance.

SCC reported that psychotropic medications were renewed timely and that accompanying progress notes were documented. Medication orders had a maximum length of 90 days. Bridge orders did not exceed 14 days.

Reportedly, MARs were audited twice per month, and mental health follow-ups with inmates were timely in 70 percent of cases. SCC was compliant with

documentation of medication administration, including appropriate notation of refusals and no-shows.

Pill lines were audited but the raw data was not analyzed, rendering the findings unclear.

Informed consent forms for current prescriptions were present in UHRs.

SCC audited timeliness, but not appropriateness, of ordered laboratory studies of medication blood levels of inmates who were prescribed certain psychotropic medications.

The institution did not provide a centralized list of inmates with DOT orders outside of the MHCB. Provided data was conflicting, and it was unclear whether all or only selected psychotropic medications were administered DOT.

No inmates were on active Keyhea orders.

HS medications were given to 117 MHSDS inmates, but no related audits were conducted.

Paroling inmates were appropriately provided with a supply of their medications.

Sexual Misconduct:

Seven inmates received sexual misconduct RVRs. Although all were referred for mental health screens, they were not completed within 24-hours. Six inmates had IDTT meetings.

Three inmates were referred for comprehensive evaluations, all resulting in diagnoses of Exhibitionism. None were referred to an Exhibitionism treatment program. Reportedly, these inmates' treatment plans were modified and they were

retained at SCC.  Two of the inmates were assessed SHU terms.

Custody-driven behavior modifications included the placement of yellow placards on cell doors and the use of exposure-control jumpsuits.

Transfers:

SCC had a DMH coordinator who reportedly attended every IDTT meeting.  The institution did not report whether the DMH coordinator also carried other duties.

Monthly audits found 100-percent compliance with use of Form 7388, the checklist for DMH referral.

Although SCC referred one inmate to DMH, the DMH referral log was incomplete and did not indicate details or outcome of the referral.

Between July and December 2010, SCC referred 21 inmates to MHCBs. The institution reported that average time from referral to transfer was 24 hours or less.

SCC operated a 12-bed OHU that was used by medical and mental health patients.  Between July and December 2010, there were 89 OHU admissions for mental health reasons.  During a reported three-month period, the average daily census of mental health patients in the OHU was 1.6.  Half of OHU admissions exceeded 72 hours, with an average stay lasting five days.  Five inmates' OHU stays exceeded ten days, ranging from 11 to 33 days.  No inmates had more than three OHU admissions.

Although SCC reported that no inmates were placed in holding cells pending OHU admission, institutional documentation indicated that 20 inmates were placed in holding cells pending OHU admission.  Logs indicated that the average stay in a holding cell was 1.7 hours.

There were no PSU referrals.

During the monitoring period, 33 EOP inmates were housed at SCC. The log contained complete information for 25 of them. The average number of days from EOP referral to endorsement improved from 15 during the preceding monitoring period to 11. The average number of days from endorsement to transfer was 26. Two inmates awaited transfer to an EOP administrative segregation hub for 63 and 120 days.

Other Issues:

Administrative Segregation

SCC was not designated as an EOP administrative segregation hub institution and provided only 3CMS LOC services. PC contacts were conducted, with 85 percent occurring in a confidential setting. Quarterly psychiatric contacts took place.

SCC did not report whether the assigned psychiatrist or PC attended ICC meetings, or whether these meetings took place before initial IDTT meetings. SCC reported that IDTT meetings were held as required, with all required disciplines in attendance.

Group therapy was offered for some administrative segregation 3CMS inmates. Groups were facilitated by a RT or PT, who reportedly offered one to two weekly groups.

OHU

Psychiatry contacts occurred three times per week, and PC contacts occurred seven days per week. Eighty-nine percent of clinical contacts occurred in a confidential setting.

<u>3CMS</u>

3CMS inmates received timely initial and annual IDTT meetings, and confidential psychiatric contacts. The institution reported compliance with provision of PC contacts and composition of IDTT meetings, although supporting documentation was not provided.[16]

At the time of reporting, SCC offered 40 psychotherapeutic groups in which 405 inmates participated.  RTs and PTs facilitated groups.  There were 239 inmates on the group wait list.

<u>Referrals</u>

SCC responded to 719 referrals, which included 12 emergent, 28 urgent, and 679 routine referrals.  SCC was compliant with responding to emergent referrals. Response times for urgent and routine referrals averaged, 1.75 days and five days, respectively.

<u>Heat Plan</u>

There were 62 stage-two heat alert activations and 22 stage-three heat alert activations.  Medical rounds were completed and no inmates suffered heat-related pathologies.

<u>RVRs</u>

SCC issued 843 RVRs. Of these, 123 were issued to MHSDS inmates, including ten to EOP inmates, three to inmates housed in the OHU, and 110 to 3CMS inmates.  SCC reported a 92-percent compliance rate for completion of mental health assessments for EOP and OHU inmates who were issued RVRs, but assessments were

---

[16] In their response to the draft of this report, defendants stated that relevant documentation was provided in the proof-of-practice binder.  However, the monitor reports that this documentation was not provided.

completed for only 13 of the 110 3CMS inmates who were issued RVRs.  No information was provided with regard to processes used in completion of these assessments.

SCC did not provide information as to whether RVRs were issued for self-injurious behavior.

**California Medical Facility (CMF)**
January 31, 2011 – February 2, 2011

Census:

On January 28, 2011, CMF's total inmate population was 2,606 and its total MHSDS population was 1,265.  The EOP mainline population was 505 and the 3CMS mainline population was 518.  There were 46 inmates in the 50-bed stand-alone MHCB in administrative segregation.  Of the 156 inmates in the OHU, 68 were MHSDS inmates.  The total administrative segregation population was 147, including 32 EOP and 48 3CMS inmates.

Staffing:

The chief psychiatrist position and two chief psychologist positions were filled.  One of 2.5 senior psychiatrist positions was filled, for a 60-percent vacancy rate, and nine of the 10.5 senior psychologist positions were filled, for a 14-percent vacancy rate.

Among staff psychiatrists, 15.5 of the 21.5 positions were filled.  Contractors covered four psychiatry positions, reducing the functional vacancy rate to nine percent.  Thirty-three of the 41 staff psychologist positions were filled.  With contract coverage of two vacancies, the functional vacancy rate in psychology was reduced to 22 percent.  Only one of the three supervising social worker positions was filled.  Among line social workers, 18 of the 22 positions were filled.

190

The senior PT position and 45 of the 50 line PT positions were filled. Contractors covered all five line PT positions. Of the 14.3 RT positions, 11.5 were filled.

Sixteen of the 20.5 MHSDS clerical positions were filled, leaving a 22-percent vacancy rate.

Quality Management:

CMF had a separate local governing body for each of the three separately licensed areas of the institution: the institution itself, the hospice, and the MHCB. Every month during the monitoring period, these three local governing bodies met and maintained minutes. The institution reported consistently good attendance at these meetings.

The quality management committee met weekly throughout the monitoring period and minutes were maintained. The chief medical executive served as chair. CMF reported consistent attendance by custodial, medical, and mental health staff at these meetings.

The mental health subcommittee met weekly during the monitoring period and minutes were maintained. The institution's management report indicated that the mental health subcommittee focused on providing weekly monitoring of program status, compliance, progress, and needs. CMF prepared an annual schedule of reports and audits, of which the mental health subcommittee addressed 117 during the monitoring period. Standing agenda items included quality management audits, training, QITs, program and treatment performance indicators, and committee reports.

There were three ongoing QITs during the monitoring period. An intake process improvement QIT was chartered to improve the quality of the intake

191

documentation in both inpatient and outpatient settings. An MHSDS/DMH coordination QIT was chartered to improve continuity of care between inpatient and outpatient levels of care. A computer systems QIT was chartered to upgrade the current computer system and to manage the transition to MHTS.net.

Suicide Prevention:

There was one completed suicide at CMF during the reporting period.

The SPRFIT met on the third Wednesday of each month and reported to the quality management committee. There were six meetings during the monitoring period, with minutes maintained. As in the preceding monitoring period, CMF did not attain a quorum for any of its meetings. Some members were reported absent without excuse for all or most of the meetings.

Institutional audit data indicated that the institution had difficulties with the procedure for five-day follow-up and fell short of 100-percent compliance. In some instances, custody staff reported that they were unaware that a five-day follow-up period had commenced.

In administrative segregation, institutional audits found that PT rounds were completed 100 percent of the time. PT rounds observed by the monitor's expert were conducted adequately overall. The PT appeared to have sufficient rapport with the inmates.

Morning meetings of clinical and custody staff in administrative segregation were reportedly held each weekday at 8:15 a.m. in the R2 group room. Staff reported a good working relationship between clinical and custody staff.

CMF reported that non-MHSDS inmates placed in administrative segregation were offered a mental health screening within 72 hours of placement. The monthly audit data provided indicated that the screening was offered 100 percent of the time each month of the reporting period except July, when 89 percent of inmates were offered the screening.

New intakes in administrative segregation were identified by signs on their cell doors for the first 21 days of their stays. The monitor's expert reviewed documentation of 30-minute welfare checks and found them to be occurring regularly but insufficiently staggered, particularly on first watch.

Custody staff indicated, and review of logs confirmed, that inmates were offered ten hours of yard time per week. The monitor observed 20 walk-alone yards, including four ADA yards equipped with bars and wider doorways.

Medication Management:

CMF reported that its quarterly audits found 100-percent compliance for continuity of medications for newly-arriving inmates from April through June 2010. Medications were ordered within eight hours of arrival and delivered by the following day. From July through September 2010, percentages dropped to 88 percent of medications ordered within eight hours of arrival, and 60 percent delivered by the following day.

For inmates transferred between housing units at CMF, audits for the quarter ending in June 2010 found an 83-percent compliance rate for continuity of medications. However, for the quarter ending in September 2010, the compliance rate

fell to 44 percent, but by the end of the last quarter of 2010, it recovered somewhat to a rate of 72 percent.

An institutional audit of MARs in September 2010 found, and the monitor's expert's review confirmed, that a number of records contained blank spaces for multiple medications, medication orders that appeared to overlap without discontinuation of previous orders, and illegible signatures. MARs were filed in the record in 90 percent of cases.

An institutional audit within psychiatry peer review found that 80 percent of the charts audited contained medication informed consent forms signed within the previous year. The monitor's expert's audit of records found a compliance rate of 85 percent.

The management report indicated that reports of laboratory blood level studies were initialed by a physician and found in the chart 86 percent of the time. Laboratory baseline results were found in the charts 90 percent of the time. Specific laboratory study results for thyroid and renal functioning of inmates taking Lithium were present in 73 percent of the charts. Only a few of the records reviewed by the monitor's expert were those of inmates taking mood stabilizers such as Lithium, Tegretol, and Depakote. In those few cases, blood level tests were being requested and monitored.

The management report indicated that on average 63 inmates per month were on Keyhea orders. At the end of the reporting period, 66 inmates were on Keyhea orders. These orders were initiated in DMH facilities or the MHCB. For those inmates in outpatient programs within CMF, ten Keyhea orders were not pursued on the advice of counsel. Of these, six of the inmates had improved sufficiently to no longer meet Keyhea

criteria, and four were elderly demented patients who were determined to need a conservator.

CMF's management report indicated that there were three medication passes per day, with the last at 7:30p.m. HS medications were generally provided at or after 8:00 p.m., although it was unclear from a review of MARs exactly what time HS medications were actually administered. CMF indicated that the pharmacy would follow HS orders but requested they be written as "p.m." and not HS, although some psychiatrists continued to write HS medications for reasons that were not clinically apparent.

Sexual Misconduct:

The institution reported that 14 RVRs related to sexual misconduct were issued during the reporting period. Eight of these were issued to inmates in MHCBs, all of whom received a screening and were evaluated by an IDTT for Exhibitionism or Paraphilia NOS. One inmate was referred for a comprehensive evaluation and found to meet the criteria for Exhibitionism. Of the other six, three received a mental health screening and three did not due to late notification by custody. All of the inmates were seen by an IDTT except one for whom the screening indicated that no further evaluation was warranted. Two inmates received comprehensive evaluations but neither met the criteria for Exhibitionism.

CMF reported that in 13 of the 14 IEX cases, the inmate was found guilty and given a SHU term.

<u>Transfers</u>:

DMH operated acute and intermediate care beds within CMF, known as the APP, and the Vacaville Psychiatric Program (VPP), respectively. The acute care units were P-1, P-2, Q-1, Q-2, Q-3, S-1, and S-2, with a total of 198 single cells. Intermediate care units were single cells in P-3, and 84 dormitory beds in A-2 and A-3. Unit S-2 also contained 20 MHCBs run by DMH for the use of CMF. This unique arrangement created some difficulties with tracking, such that MHCB patients in S-2 who were transferred to acute care did not require full referral packets and were not fully captured in state or local databases for acute care referrals.

The monitor's expert reviewed the DMH referral logs at CMF and found them to be well maintained. There continued to be discrepancies between the local DMH logs with those provided by headquarters with regard to identifying patients currently on the SVPP waitlist. Data provided by CMF indicated that it had completed 77 referrals to acute care, including nine from outpatient programs and 68 from the MHCB. Acute care referral packets were completed within timeframes in only 26 percent of these cases. Once a bed was assigned, available data indicated that in 67 percent of cases, the transfer to DMH occurred within 72 hours.

There were 77 intermediate care referrals listed in the logs, although tracking problems on unit S-2 made this figure unreliable. Intermediate care referral packets were prepared and submitted within timeframes in only 40 percent of cases. Delays were attributed largely to completion of custody screens for inmates referred to DMH from the 50-bed CTC (sometimes referred to as the MHCBF), all of whom were from institutions other than CMF. Inmates referred to VPP and ASH were routinely

transferred within 30 days, but access to SVPP remained slow.  Staff reported that SVPP staff typically took four weeks to review and decide a referral, causing the transfer deadline to be missed by that time.  A third of intermediate care transfers to SVPP did not occur within 72 hours of a bed assignment.

There were 13 Vitek hearings held during the monitoring period, with referral to DMH upheld in all cases.  There were four DMH rejections during the monitoring period, three of which were upheld by CCAT.  One referral was rescinded because of clinical improvement.

Data presented by the institution reflected that from April through September 2010, there were 216 discharges from DMH to CMF outpatient programs, and five discharges to the MHCB for parole purposes.  CMF reported that the availability of discharge summaries from DMH had improved, although a review of the summaries in UHRs indicated that quality of these summaries ranged from adequate to poor.  The institution reported that all except two inmates were seen within 24 hours of return from DMH.  Staff reported that any inmate who returned on non-formulary medications had his medications automatically continued by CMF for 30 days.

Because audit data for the S-2 MHCB unit was not provided by DMH, information on lengths of stay, transfers, etc., was not available.  A spreadsheet provided by CMF indicated that there had been 134 admissions to the S-2 unit during the monitoring period, with 15 inmates having had two admissions and one inmate having had three admissions.  The monitor's expert noted during an IDTT meeting that several patients had been in S-2 longer than ten days.

The monitor's expert's review of UHRs and observation of IDTT meetings indicated that Form 7388s were being utilized and that clinicians had access to information on the number of MHCB admissions, treatment participation, and RVRs. Rationales for non-referrals were generally documented and appropriate. However, the monitor's expert encountered at least one case of an inmate who met criteria for DMH referral but was not considered for it.

The 50-bed MHCB had two wings with 25 beds in each wing. Office space was available for staff separate from the housing areas. There was no use of alternative housing for those awaiting placement in the unit. Data for the period of June 1 to November 30, 2010 indicated a total database of 371 admissions. Forty five of those inmates had repeat admissions, accounting for a total of 104 or 28 percent of all admissions. One patient had six admissions, three inmates had four admissions, four inmates had three admisisons, and 37 inmates had two admissions.

The average length of stay from admission to clinical discharge or DMH referral was 8.2 days. However, the average total length of stay, from admission date to the date the patient was transferred out, was 21.7 days. The number of inmates whose total lengths of stay exceeded ten days was 287. There were 81 inmates whose clinical lengths of stay were greater than ten days. There were 121 inmates whose stays from the time of clinical discharge to transfer exceeded ten days. Among those 121 inmates, 86 or 71 percent were waiting for DMH transport, 16 or 13 percent were referred to HCPOP for determination of a placement, 15 or 12 percent were waiting to go back to the sending institution, and three or 2.4 percent were waiting to parole.

Access to DMH from the 50-bed MHCB was slow.  There were 116 referrals to DMH from the 50-bed MHCB, resulting in 90  transfers to DMH.  On average, referrals to DMH were made 9.2 days after admission to the MHCB.  Of those 116  referrals, 26 or 22 percent were rescinded, with 12 parolling before DMH transfer and 14 having sufficiently improved clinically while waiting. The average total length of stay for those inmates who transferred to DMH was 39.9 days.  For those inmates whose DMH referrals were rescinded due to clinical improvement, the average total length of stay was 49 days.

Other Issues:

Administrative Segregation

Institutional pre-site visit material accurately described a number of concerns related to the provision of mental health care in the ASUs.  These included inmates on the intermediate care waiting list remaining in administrative segregation while awaiting transfer, which led to insufficiency of clinical staff and redirection of custody staff.  Institutional audits found difficulties with CC I attendance and discharge planning at IDTT meetings.  CMF correctly identified lack of adequate treatment space as an obstacle to the provision of care.

Some inmates at the EOP LOC remained in the ASU for considerable periods of time, challenging the ability of mental health staff to manage these patients clinically. During the reporting period, 18 EOP inmates were housed in administrative segregation with lengths of stay greater than 90 days.  The longest stay was 529 days.

The monitor's expert observed IDTT meetings on M3.  Case presentations were adequate.  The staff used Form 7388, and although it was not completed during the

meeting, staff discussed specific issues which would prompt consideration for DMH referral. Institutional audits indicated that attendance of the CC I at IDTT meetings ranged from 19 to 52 percent, with a 45-percent attendance rate across the reporting period. On the day of the monitor's expert's observation, all required disciplines were present, but C-files were not available for all inmates reviewed.

Generally, treatment plans were adequately individualized, but subsequent progress notes did not regularly relate to the specific treatment goals. Some notes of daily contacts were lumped into summary notes encompassing an entire week. Because group assignments were not clinically driven, there was minimal correlation between the treatment plan and subsequent group treatment.

Information provided by CMF indicated that at the time of the monitor's visit, eight EOP inmates in administrative segregation were on alternate treatment plans. Five called for increased clinical contacts, two for decreased contacts, and one for decreased individual contacts but increased group contacts. Treatment plans generally reflected that increased contacts were planned when appropriate, but the administrative segregation environment provided limited options for milieu-based efforts to engage inmates who were inadequately participating in mental health treatment.

A review of records suggested that inmates generally received PC and psychiatry contacts within Program Guide required timeframes. Inmates who participated in less than 50 percent of their scheduled therapeutic activities were scheduled to be seen daily by their PCs. Those on the DMH wait list were seen at least bi-weekly for PC contacts and for IDTT meetings every 30 days. Facility audits and interviews of inmates and staff indicated that CMF had some difficulty in providing weekly PC contacts in a

200

confidential setting.    Audits across the reporting period found that 85 percent of these contacts occurred in a confidential setting, but the most recent audit found that only 67 percent were in a confidential setting.

While the frequency of prescribed contacts was generally maintained, there were disruptions in mental health staffing, with an adverse effect on continuity of care.  Staff and inmate interviews, supported by record review, indicated that some inmates in administrative segregation were seen by various clinicians.  This was particularly problematic for inmates who were refusing or inadequately engaging in treatment activities.

CMF reported that inmates were offered two to three hours of out-of-cell structured therapeutic activities daily.  During the reporting period, this alternated between the rehabilitation therapy yard program and clinical groups.  Pre-site visit material showed that during the reporting period, 16 percent of EOP inmates in administrative segregation refused more than 50 percent of their scheduled out-of-cell therapeutic activities.

There was a constellation of concerns related to the provision of group treatment in the ASUs.  Group treatment in M3 and I3 was conducted in day rooms with insufficient confidentiality.  Offices located behind each of the group rooms required staff to interrupt sessions in order to gain access to their offices. Additionally, both rooms had broken windows on the wall abutting the officers' station, further reducing auditory privacy.  Inmates reported that this impeded their willingness to speak openly during group sessions.

Group composition was not clinically driven. Instead, groups were assigned according to cell location, rather than clinical need or LOC. This was reflected in treatment plans which assigned group treatment generically rather than specifics group with relevant clinical focus. Group leadership fluctuated, particularly during periods of staff shortages.

The monitor's expert observed a group on M3 and one on I3. Both were competently run. The inmates appeared to welcome the opportunity to participate in a group. Following the session, the monitor's expert met privately with the members. Inmates noted the lack of confidentiality and voiced concerns about the limited number of activities. One reported that he had been waiting for 15 months for DMH placement, and that during that time he required six admissions to the MHCB.

EOP

The mainline EOP program consisted of eight units that provided treatment services to approximately 470 to 500 patients. Services included psychiatric services, medication management, case management, group therapy, recreational therapy, occupational therapy, mental health evaluations, SREs, and IDTT meetings. The management report stated that approximately 400 patients had been served by the EOP program from June 1 through November 30, 2010.

CMF consistently completed initial IDTT meetings within 14 days of the inmate's arrival at an EOP unit at the rate of 95 percent. IDTT meetings were scheduled at 30, 60, or 90-day intervals, depending on the inmate's treatment plan. Institutional audits found 99-percent attendance at IDTT meetings by PCs and patients, and 87 percent by psychiatrists. CCIs attended approximately 45 percent of the time. Compliance rates

for completion of treatment plan updates averaged 95 percent.  CMF used a modified

treatment plan update form entitled "Addendum to 7388 Form" which included

diagnoses, a brief mental status, the inmate's progress, and recommendations.  However

it did not provide any information on the inmate's medication changes or compliance.[17]

Because of limited space on the EOP units, the institution had difficulty

offering ten hours of structured therapeutic activity per week.  Groups and IDTT

meetings were conducted in the dayroom on each EOP unit.  PC and psychiatric

appointments were conducted in private offices located on each of the units.

CMF continued to supplement structured therapeutic activities with

therapeutic work activities and its occupational therapy program.  During the monitoring

period, an average of 151 inmates participated in therapeutic work activities each week,

and approximately 80 patients were being served in the occupational therapy program, as

per CMF's management report. CMF performance indicator summary reports indicated

that inmates were scheduled for structured therapeutic activities on the units anywhere

from an average of 9.1 to 18.4 hours.  However, the average number of hours of

structured therapeutic activity delivered per inmate per week ranged from 7.6 to 13.8

hours.

CMF had a designated EOP unit, N1, for inmates who have an Axis I

diagnosis with active symptoms and are routinely referred to a higher LOC within DMH.

Census was capped at 48, unlike the other EOP units which house 78 to 85 inmates.  At

---

[17] Defendants requested that this statement be clarified, stating that "clinical staff report that when medication changes or compliance are relevant, comments are included in this abbreviated form." However, unlike the full Form 7388, the abbreviated or modified Form 7388 does not contain any space specifically dedicated to notation of medication changes or compliance.  The modified Form 7388s reviewed by the monitor's expert did not contain any information on medications, including medication changes and/or medication noncompliance, when the progress notes documented such changes.

the time of the site visit, there were 40 inmates on the unit. This reduced census was approved by institutional administration and included the provision of single cells for a number of their inmates. Enhanced staffing included a PC, a social worker, a psychiatrist responsible for all of N1 and half of N2, a RT who was on the unit two times per day, and more consistently-based custody staff. N1 had two group treatment spaces, unlike the other units which typically had to conduct treatment activities in the day room.

Referrals

According to the management report, a total of 369 mental health referrals were received during the monitoring period. Of those, four were designated as emergent, 124 as urgent, and 232 as routine. The proof-of-practice data provided by CMF indicated that all emergent and urgent referrals were seen on the same day. The average response time for routine referrals was 1.55 days.

RVRs

According to information provided by the institution, approximately 467 RVRs were issued to MHSDS inmates during the reporting period. There were 285 mental health assessments completed, which was comprised of 196 for EOP inmates, 39 for MHCB inmates, 26 for 3CMS inmates, 22 for DMH inmates, and two for mainline inmates. CMF reported that in most cases, the hearing officer considered the results of the mental health assessment. There were six cases in which the inmate was found guilty without the hearing officer's referencing any consideration of clinical input.

**California State Prison, Solano (CSP/Solano)**
March 22, 2011 – March 24, 2011

Census:

On March 21, 2011, the total prison population at CSP/Solano was 5,060, comparable to the total reported population of 5,102 at the time of the preceding monitoring visit. There were 1,509 MHSDS inmates, including three in the MHCB, six in the EOP mainline, and 1,393 in the 3CMS mainline. The total administrative segregation population was 278, of whom four were EOP inmates pending transfer to a hub institution, and 100 were 3CMS inmates.

Staffing:

Positions for the chief psychiatrist and two senior psychologists were filled. The five staff psychiatrist positions were filled. Of the 15.5 staff psychologist positions, 12.5 were filled, leaving a 19-percent vacancy rate. Contractors covered the three vacancies, reducing the functional vacancy rate to zero.

Five of six social worker positions were filled. The senior PT position and 8.5 line PT positions were filled. Positions for the two RTs and the health program specialist were filled. Eight of 9.5 OT positions were filled, leaving a 16-percent vacancy rate.

Quality Management:

The local governing body met monthly, with minutes maintained. The quality management committee was scheduled to meet quarterly, but during the monitoring period it met approximately twice per month. Minutes were maintained, and attendance was good, with a quorum present at every meeting.

The mental health subcommittee was scheduled to meet monthly during the reporting period, but starting in November it began meeting twice per month.  It was chaired by the chief of mental health and reported to the quality management committee.

There were two QITs chartered during the monitoring period, one on mental health quality management audits and MHTS validation, and the other on the 31-question screen in administrative segregation.  The two QITs on peer review and group therapy that were operating during the preceding monitoring period remained ongoing.

The psychiatry peer review met once during the reporting period.  No psychiatrists were reviewed during the monitoring period.  Peer review for psychologists and social workers occurred monthly.  Three clinicians were reviewed during the monitoring period.

Suicide Prevention:

There were no completed suicides during the reporting period.

The SPRFIT reported to the mental health subcommittee.  It met monthly except in October 2010. The institution reported problems with attendance at SPRFIT meetings during the reporting period, with only 25 to 50 percent of required attendees present at times.  Starting in January 2011, a full-time psychologist assumed the role of chair.  Staff reported that minutes were not regularly maintained.  Regular agenda items included LOP updates, suicide prevention training, suicide watch and precautions, suicide behavior tracking, and review of five-day clinical follow-ups.

SPRFIT reported to the mental health subcommittee.  The institution reported that it was implementing a procedure for tracking attempted suicides and self-harm using MHTS.net.

Review of the provided data indicated that the institution did not achieve 100-percent compliance with clinical five-day follow-up during the monitoring period.

In administrative segregation, the monitor's expert attended the morning custody-mental health meeting. It was attended by the psychiatrist, PCs, PTs, and the sergeants. Documentation indicated that these meetings had not been consistently conducted formally until November 2010 when they began to occur consistently.

Audits of completion of mental health screens indicated only 20-percent compliance. These screenings were routinely conducted at cell-front, although this was later changed to out-of-cell. Audits regarding the presence of pre-placement screening chronos in medical record found only 69-percent compliance.

Five cells each in buildings nine and ten were converted for use as intake cells. However, due to the high number of intakes, all cells were utilized for that purpose.

There was documentation of the completion of 30-minute welfare checks, but some of the officers failed to stagger the checks.

A review of isolation logs and facility audits indicated compliance with daily psychiatric technician rounds. Conduct of PT rounds was found to be 100- percent compliant. Compliance with weekly records documentation of these rounds was 77 percent. .[18]

Administrative segregation cells were equipped for electricity, but televisions or radios were not permitted.

---

[18] Defendants requested that this statement be revised to indicate 100-percent compliance, based on audits of weekly summaries which were documented in the proof of practice binder. The institution was found fully compliant with conduct of weekly psych tech rounds; the 77 percent compliance rate refers to the documentation of weekly records of these rounds.

The institution provided documentation that inmates received at least ten hours of yard per week. There were sufficient SMYs to provide the required yard access.

Medication Management:

Audits conducted by the institution indicated over 95-percent compliance with continuity of medications for new arrivals to CSP/Solano. Following intra-institutional moves, audits found 100-percent compliance for continuity of medications. However, staff and inmate reports indicated continuing problems medication continuity overall.

An audit of timeliness of medication renewals yielded an 89-percent compliance rate.

CSP/Solano did not audit aspects of medication noncompliance but acknowledged that it was problematic. Procedural changes were underway at the time of the monitor's visit.

Nursing supervisory staff audits of the morning and noon pill lines indicated that inmates waited for ten minutes or less. This information was corroborated by inmate interviews. The p.m. and HS pill lines were not audited and remained the more problematic ones.

Audits found 70-percent compliance with signed informed consent forms in UHRs.

Audits were conducted on ordering of laboratory studies of inmate blood levels of mood stabilizing and atypical antipsychotic medications and found a compliance rate of 84 percent. Psychiatrist reviews of study results and documentation of clinical interventions were compliant in 77 percent of cases, according to institutional audits.

All psychotropic medications were administered by DOT. No audits were performed during the monitoring period.

One inmate was on a Keyhea order at the time of the monitor's visit, and one Keyhea order was initiated during the monitoring period. Although the institution reported six instances of administration of involuntary medications, it acknowledged that there was no consistent process in place to the use of involuntary medication for inmates in the general population.

There were 519 MHSDS inmates who were prescribed HS medications. While there were no audits of proper timing of HS pill lines, inmates reported that the HS pill line consistently occurred after 8:00 p.m.

CSP/Solano began monitoring and auditing whether paroling inmates received their prescribed medications. Audits found compliance in fewer than half of cases.

Sexual Misconduct:

During the reporting period, one RVR was issued for sexual misconduct and three RVRs were issued for IEX. All resulted in a mental health screening. There were no comprehensive evaluations performed during the monitoring period.

No inmates were diagnosed with Exhibitionism, and two were diagnosed with Paraphilia NOS.

CSP/Solano reported that there were no inmates transferred to Exhibitionism treatment programs during the monitoring period.

Transfers:

During the monitoring period, there were two referrals to DMH acute care and six referrals to DMH intermediate care. Three referrals failed to conform to Program Guide timeframes. No reasons for these delays were provided. There were no significant problems with documentation of histories and physicals, or with Vitek hearings.

Of the eight inmates referred, six were accepted and two were rescinded, one due to parole and one due to improvement. At the time of the site visit, there were two inmates were awaiting acute care placement, and one each on the wait lists for ASH, intermediate care at CMF, and SVPP.

A total of five inmates transferred to DMH during the monitoring round. Two of these were not transferred within 72 hours, although one was transferred on the fourth day and the other was transferred on the sixth day.

The DMH coordinator position was filled by at least one person at all times. Compliance with the completion of Form 7388s improved notably toward the end of the reporting period. Tracking data for MHCB admissions and RVRs was routinely available to clinicians and was used to complete Form 7388s. However, rationales for non-referred cases were not always provided, and were frequently inadequate when they were provided.

At the time of the site visit, CSP/Solano had a 15-bed CTC with nine beds set aside as MHCBs. During the monitoring period, there were 120 admissions to the MHCB with an average length of stay of 9.4 days. Fifty nine or 41 percent were admissions from other institutions. Forty five or 38 percent of admissions had stays that exceeded ten days. Less than ten percent of the DMH referrals generated by MHCB

staff were initiated before the tenth day of patients' admissions, and 67 percent of all submitted referral packets were prepared timely.

MHCB staff reported that they sometimes housed EOP inmates in the MHCB because the inmate was unable to function on the yard awaiting transfer to an EOP facility. Staff reported 26 cases of administrative delays in the physical discharge of the inmate from the MHCB. The most common reason for delay was lack of readily available transportation and housing back at the sending institution.

In the MHCB from August through October 2010, the MHCB was noncompliant with pre-admission screening, with only 28 of 36 cases or 78 percent completed.

For the period of August 2010 to October 2010, use of the IDTT process in the MHCB did not achieve compliance for a number of parameters. Timeliness of initial IDTT meetings was compliant in only 41 of 50 or 82 percent of cases. For attendance at IDTT meetings, 88 percent of meetings had attendance by a psychiatrist, and 82 percent had attendance by correctional counselors. Information from the inmate's C-file was used in 41 of 49 or 84 percent of cases. Treatment plans were updated in 29 of 45 or 64 percent of cases. Five of the six cases who had three or more MHCB admissions were considered for DMH referral, for an 83 percent compliance rate. Only one of the 16 MHCB inmates referred to DMH was referred before the tenth day of his MHCB stay. Lengths of stay in the MHCB that were no longer than ten days occurred in 29 of 46 or 63 percent of admissions.

In the MHCB from November 2010 through January 2011, completion of informed consent forms was done in 14 of 23 or 61 percent of cases. Lengths of stay in

the MHCB were no longer than ten days in 16 of 31 or 52 percent of cases. Referral to DMH before the tenth day into the stay occurred in only one of 14 stays. Document completion, timeliness of IDTT meetings, attendance at IDTT meetings, and updating of treatment plans all improved significantly. However, stays lasting longer than ten days, and failure to consider inmates for referral to DMH or waiting too long to do so remained problematic.

According to information provided by the institution, 55 EOP inmates, including 35 in mainline and 20 in administrative segregation, transferred during the reporting period. Of the 35 mainline EOP inmates, transfer timelines were met in 23 or 67 percent of cases. The shortest stay was two days, and the longest was 125 days, with an average of 52 days from referral to transfer.

Of the 20 administrative segregation EOP inmates, transfer timelines were met in seven cases, for a compliance rate of only 35 percent. The shortest stay was six days and the longest was 116 days. CSP/Solano reported that bed availability was the most common reason for delay in transferring EOP inmates.

Other Issues:

Administrative Segregation

All of the treatment provided in the ASU occurred on the dayroom floor. Treatment in this setting was extremely difficult due to poor confidentiality of sight and sound, lack of appropriate therapeutic modules and loud ambient noise.

Audits of weekly PC contacts found 91-percent compliance. However, timeliness of psychiatric contacts was 54 percent compliant. There were also difficulties

212

with timeliness of IDTT meetings, with a compliance rate of only 66 percent.  Audits of

the composition of IDTT meetings found that necessary participants were attending.

The monitor's expert attended an IDTT meeting in the ASU. The meeting

was conducted in an area of the dayroom that was partitioned from the remainder of the

area.  It was attended by the necessary disciplines and involved discussion of pertinent

clinical issues.

On the opposite site of the ASU, PCs utilized an area that was partitioned

for offices and individual interview space. There were at least four therapeutic modules

utilized for individual clinical contacts, but they did not conform to specifications.  The

staff placed chairs in these modules which lacked seats.

Inmates awaiting transfer to an EOP hub were provided weekly PC

contacts, but did not receive group therapy.  The institution reported that none of the

MHSDS inmates participated in less than 50 percent of their programming.  At that time,

MHTS.net did not track whether PC contacts occurred cell-front or out-of-cell.

MHCB

Treatment in the MHCB appeared to consist primarily of medication

management.  A RT provided limited services to medical and mental health inmates.

Space constraints limited services to MHCB inmates, as there was only one appropriate

private area for treatment which was also used for IDTT meetings and shared office or

work space.  Treatment plans lacked individualization and true therapeutic interventions.

MHCB inmates were not provided with outdoor recreation therapy.

There was no use of restraints or seclusion during the months of August

and September 2010.  No log was provided for January 2011.  For the other months, data

indicated that clinical restraints were never used, but there were five incidents of seclusion. Logs were missing pertinent information, impeding analysis of portions of program compliance including average length of time spent in the seclusion cell.

3CMS

CSP/Solano remained noncompliant with timeframes for newly arriving 3CMS inmates, initial and follow-up IDTT meeting, and ongoing psychiatry and PC contacts. Toward the end of the monitoring period, improvement was noted. Supervisory staff also outlined a plan for improvement.

Referrals

CSP/Solano reported that 962 mental health referrals were received during the reporting period. Response times were reported for 863 of these referrals without regard to their level of urgency. However, because the management report indicated that urgent and emergent referrals were not always collected in paper form, the total number of those referrals was likely underreported.

Of the 863 referrals, one was designated as emergent, 11 as urgent, and 851 as routine. The average response time for emergent referrals was one day, for urgent referrals if was 1.7 days, and for routine referrals it was 13 days. CSP/Solano reported that only 41 percent of routine referrals were seen within five working days.

Heat Plan

CSP/Solano appeared to be compliant with heat plan policies and procedures. According to information provided by the institution, there were 24 Stage I heat alerts, seven Stage II heat alerts, and no Stage III heat alerts during the reporting period.

RVRs

No RVRs were issued to MHCB inmates during the monitoring period. While the reported number of RVRs issued to EOP inmates was ten, the number of reported mental health assessments completed during the reporting period was 11. There were 414 RVRs issued to 3CMS inmates. Of these, 11 mental health assessments were requested and completed.

### San Quentin State Prison (SQ)
March 28, 2011 – March 30, 2011

Census:

On March 25, 2011, SQ housed 5,014 inmates, which represented a one-percent increase in the institution's total population since the preceding monitoring period. SQ's MHSDS population of 1,239 inmates was roughly unchanged. There were 26 mainline EOP inmates, three EOP inmates with SHU terms pending PSU transfer, and 559 mainline 3CMS inmates. The total SHU population of 82 included 13 3CMS inmates. There were ten inmates in the MHCB and 13 in the OHU. The administrative segregation population of 413 included 32 EOP inmates and 101 3CMS inmates. The RC population of 2,163 included 60 EOP inmates and 430 3CMS inmates. Of the 224 inmates in the RC as parole violations, 29 were EOP inmates and 195 were 3CMS inmates.

Staffing:

Of 132.4 allocated mental health positions, 102.5 were filled, leaving 29.9 vacancies, for a 23-percent institutional vacancy rate in mental health. Contractors provided an additional 12.75 FTE coverage, reducing the institutional functional vacancy rate to 13 percent.

215

Positions for the chief of mental health, chief psychiatrist, and senior psychiatrist were filled, as were 6.5 of seven senior psychologist positions.

Of 15.05 staff psychiatrist positions, 7.55 were filled. Contractors provided an additional four FTE coverage, for a functional vacancy rate of 23 percent.

Of 41.85 psychologist and psychometrist positions, 35.6 were filled. Contractors provided an additional 5.75 FTE coverage, reducing the functional vacancy rate to one percent. Nine of 10.7 social worker positions were filled. Contractors provided an additional one FTE coverage.

The senior PT position was filled, as were 22.6 of 25.6 line PT positions. Contractors provided an additional one FTE coverage.

All three RN positions were filled, as were four of 5.85 RT positions. Contractors provided an additional one FTE coverage.

Only one of four clerical supervisor positions was filled, and only 8.75 of 15.85 MHSDS clerical positions were filled.

There were 152 hours of psychiatry telemedicine provided.

Quality Management:

The local governing body and quality management committee were chaired by the CEO for health care. The quality management committee met monthly.

The mental health subcommittee was chaired by the chief of mental health. It met weekly, maintained minutes, and reported to the quality management committee. The committee addressed substantive areas including clinical care, custody/mental health coordination, and compliance with *Coleman* court orders. Mental

216

health subcommittee membership included key mental health administrative and supervisory staff and custody representation.

The mental health subcommittee chartered seven QITs and six FITs.  Line staff participated in QITs.  Recommendations were forwarded up the chain of command. QITs addressed clinical documentation in UHRs, identification and tracking of high risk inmates, treatment refusal rates among EOP inmates in administrative segregation, and timeliness of response to referrals.  FITs addressed medication continuity, effective communication, IDTT compliance, among other things.

There was one peer review process for psychiatry, and another for psychologists and social workers.  Membership of peer review committees was appropriate.  Five psychiatry and 19 psychologist and social worker peer reviews were completed.  Reviewers provided written feedback. Focus areas for psychiatrists included medication management, and focus areas for psychologists and social workers included documentation, diagnosis, assessment, treatment planning, treatment delivery, and consultation and referral.

Suicide Prevention:

There were two completed suicides during the review period.

SPRFIT attendance ranged from 25 to 32 clinical staff for all but one meeting.  Custody staff seldom attended.  Agenda items included inmates on the high-risk list, completed suicides, statistical data on suicides, recordkeeping, and policy changes relevant to suicide prevention.

There was documentation of monthly emergency response drills and quarterly evacuation drills.  Suicide prevention training for custody occurred during

217

August and September 2010.  Spot checks revealed that custody officers had micro-shields.  There were cut-down tools and PPE in the units. Attendance at the monthly suicide prevention videoconference was poor.

Audits found compliance rates of 96 to 99 percent for clinical five-day follow-up documentation. Rates of completion of custody follow-up ranged from 95 to 100 percent.

In administrative segregation, SQ reported daily morning meetings between mental health and custody staff.

Audits indicated compliance rates of 90 to 100 percent for timeliness and accuracy of suicide risk assessment completion.  SQ reported 100-percent compliance with completion of the 31-item screen in confidential settings.

Administrative segregation had new intake cells that were retrofitted with solid doors with double windows which increased cell visibility, and other suicide-resistant features.  However, custody officers reported that new intake cells were typically used for inmates on five-day follow-up and for EOP inmates, and not for new intake inmates.

A custody officer accompanied on 30-minute welfare checks conducted the checks adequately.  However, welfare checks were not necessarily staggered.

Daily PT rounds were reportedly completed and documented in weekly summaries.  Audits indicated 100-percent compliance for all aspects of these rounds for all months except September, when compliance for one aspect dropped to 90 percent but remained at 100percent for all other aspects.

ASUs typically did not contain electrical outlets.

218

Custody staff reported that inmates received yard for several hours per day, several times per week.  However, a review of 114s could not corroborate this as some of the forms were filled out incorrectly and others did not identify yard as an activity.

Medication Management:

Medication continuity was maintained for new arrivals in 97 percent of cases.

Audits for medication continuity with intra-institutional transfers combined all intra-institutional moves, including transfers to and from the MHCB and administrative segregation.   Compliance rates exceeded 90 percent.

Audits indicated 85-percent compliance with certain protocols regarding medication noncompliance, but did not address issues with regard to response to referrals for medication noncompliance, appointments following such referrals, or documentation regarding referrals to psychiatry.

Waits in pill lines were approximately ten to 15 minutes.

SQ did not audit the processing of medication orders.

Informed consent audits indicated a 68-percent compliance rate, but the extent to which this reflected failure to obtain consent or failure to file consent forms in UHRs was unclear.

Audits of appropriate laboratory testing for metabolic syndrome related to the use of antipsychotic medications indicated monthly compliance rates that ranged from 53 to 100 percent.

There were 130 inmates on the latest list of inmates with DOT medication orders outside of the MHCB. All inmates on Keyhea orders received their medications DOT. Nursing staff administered DOT medications properly.

Sixteen Keyhea petitions were initiated and 14were renewals. Only one Keyhea petition was not initiated on advice of counsel. Thirty-nine inmates received medications through the Keyhea process during the monitoring period.

Only 20 inmates were prescribed HS medications.

Over 96 percent of paroling inmates on psychotropic medications received a supply of them at the times of their discharges.

Sexual Misconduct:

There were 12 sexual misconduct RVRs issued. Four sexual misconduct incident reports did not result in RVRs. All16 cases were screened. Five of these resulted in referrals for comprehensive evaluations. These five cases involved four inmates, three of whom were diagnosed with Exhibitionism or Paraphilia NOS.

Of the three inmates diagnosed with Exhibitionism, one transferred from SQ and another paroled. Transfer of the third inmate for Exhibitionism treatment was delayed due to his receipt of multiple RVRs and consecutive SHU terms.

SQ reported that inmates diagnosed with Exhibitionism were provided with individual treatment, which varied on a case-by-case basis. SQ trained PCs to incorporate findings from sexual misconduct comprehensive evaluations into treatment plans.

Yellow markers were placed on the cell doors of inmates who exhibited sexual misconduct. Inmates who committed IEX outside of their cells were provided with exposure-control jumpsuits.

Four sexual misconduct RVR cases were referred to the DA.

Transfers:

Three staff members shared one full-time DMH coordinator position.

At SQ, there was limited availability of the information needed to identify inmates who should be considered for referral to DMH.  For example, data on inmate participation in offered programs was only available in weekly group attendance reports that were typically not aggregated to identify specific inmates. Staff reported that no audits had examined whether inmates with low participation rates had been considered for DMH referral.  There was no database that captured all RVRs issued to mental health inmates.  However, by the time of the site visit, SQ was able to prepare monthly reports that summarized inmate crisis care during the preceding six months.  These reports were distributed to clinicians.

SQ referred 22inmates to acute care.  Of these, 17 were transferred.

Eighteen inmates were referred to intermediate care. Of these, four were transferred to SVSP, two were transferred to ASH, and four were transferred to VPP.

Audits indicated that33 to 78 percent of DMH referral packets were completed timely.  Mental health staff reported that inmates on the DMH wait list received quantitatively more services but not necessarily enhanced services.

For any given month during the monitoring period, 34 to 56 percent of RC EOP inmates were housed in the RC for more than 60 days.  During the monitoring

period, 73 percent of RC EOP inmates who transferred spent more than 60 days in the RC.

Three EOP inmates transferred to the PSU since the preceding monitoring visit. At the time of the monitor's visit, three other EOP inmates were awaiting PSU transfer.

For any given month during the monitoring period, 38 to 42 percent of RC 3CMS inmates were housed in the RC for more than 90 days. On a monthly basis, 53 to 76 percent of 3CMS inmates who transferred from the RC did so after being there for more than 90 days.

Other Issues:

Reception Center

Audits found that confidential mental health screens were regularly completed within 24hours of inmate arrival. Both custody and mental health staff reviewed databases to determine whether inmates were designated as EOP or 3CMS during prior incarcerations. Mental health staff had access to inmate suicide risk assessments.

Inmates with positive findings on initial mental health screens, previous EOP or 3CMS designations, or who presented with mental health symptoms upon intake or arrived with psychotropic medication prescriptions were referred for mental health evaluations. Audits found a 94-percentcompliance rate for timely conduct of such evaluations.

For initial IDTT meetings for inmates who arrived with prior EOP designations, audits found a 71-percent compliance rate. Compliance rates ranged from

222

69 to 100 percent for subsequent IDTT meetings for RC EOP inmates.  Mental health staff expressed concern that inmates who reportedly refused to attend IDTT meetings had not been offered the opportunity to attend.

Audits found a 94-percent compliance rate for weekly PC contacts for RC EOP inmates.  Sixty-three percent of these were completed in a private setting.

Data indicated that RC EOP inmates were consistently offered and scheduled for at least five hours of out-of-cell structured activities per week.  Actual group attendance ranged from 45 to 71 percent.  Inmate refusals and escort/custody issues were cited as the primary obstacles to higher group attendance rates.

Pre-release planning was integrated into clinical care. Progress notes reflected good attention to pre-release planning as a focus of clinical treatment as inmates approached release.

Administrative Segregation

SQ's monthly administrative segregation population ranged from 293 to 348 inmates.  The monthly administrative segregation EOP population ranged from 32 to 40 inmates.  Per month, ten to 18 EOP inmates were housed in administrative segregation for more than 60 days.

For 3CMS inmates in administrative segregation, the monthly census ranged from 74 to 102 inmates.  Per month, 29 to 35 3CMS inmates were housed in administrative segregation for more than 90 days.

MHCB

There were 371 referrals to the MHCB.  Monthly referrals ranged from 47 to 74.  There were 350 MHCB admissions.  Admissions per month ranged from 43 to 73.

The average MHCB length of stay was 8.9 days.  There were 95 admissions that exceeded ten days.

Thirteen inmates had three or more MHCB admissions.  There were three reported uses of seclusion and no reported uses of restraints. MHCB inmates were generally treated as administrative segregation inmates regardless of their actual classification status.

Beds in the MHCB had frames.  The default clothing issue was smocks, and it was unusual for inmates to receive additional clothing.

Audits found 79 to 81-percent compliance rates for the conduct of history and physical exams within 24-hours of MHCB admission.  For conduct of initial IDTT meetings within 72 hours of admission, the compliance rate ranged from 62 to 98 percent. Audits indicated that completion of SREs remained problematic.

Three OHU beds were used for alternate/temporary housing when the number of MHCB inmates exceeded 17.  There were 21 such placements during the monitoring period.  OHU census typically ranged from zero to two inmates.  With one exception, lengths of stay were less than 72 hours.  Treatment provided to inmates housed in the OHU was similar to that provided to MHCB inmates.

Administrative Segregation EOP

Staff audits and record review indicated just under 100-percent compliance for weekly PC contacts.  Fifty-four percent of contacts were in confidential settings.  According to staff, many cell-front contacts were attributed to erroneous reports of refusals or to inmate unwillingness to wait in holding cells for extended time periods before confidential contacts.

Audits indicated that 75 to 100 percent of IDTT meetings were completed within required timeframes.

While inmates were regularly offered and scheduled for ten hours of therapeutic out-of-cell activities per week, rates of actual group attendance ranged from 12 to 50 percent. Typically, groups were not cancelled but attendance was sporadic. Although inmates spoke favorably of group treatment, they expressed frustration with long waits in overcrowded holding cells and inaccurate custody reports of refusals to attend groups. An observed holding cell held 16 inmates for what was described as "hours."

Overall, clinical documentation was clear, informative, and individualized.

3CMS

MHTS.net indicated that PC contacts occurred timely over 99 percent of the time. Audits of timeliness of IDTT meetings indicated compliance rates of 94 to 97 percent.

SQ reported that it was providing group treatment to 3CMS inmates.

Administrative Segregation 3CMS

Audits indicated compliance rates of 85 to 90 percent for timeliness of initial and subsequent IDTT meetings. Observed IDTT meetings were attended by required participants and the inmate, and were clinically meaningful. UHRs were available but C-files were not present.

Review of treatment plans for administrative segregation 3CMS inmates found that all were of adequate to good quality.

Observed mental health rounds in administrative segregation were performed adequately.

Administrative segregation's single-celled housing units were problematic due to their very small size and the decrepit condition of the building.

Referrals

Of 3,979 referrals, 353 were emergent, 228 were urgent and 3,398 were routine. SQ reported overall rates of 97 to 100 percent for responding to all referrals within five working days, but it did not separately audit response times to emergent, urgent, and routine referrals. Consequently, compliance could not be determined for response to emergent or urgent referrals.

Mental health staff reported that they handled all referrals within one day of receipt, but also indicated that referrals were in transit to mental health for 2.5 to 3.4 days after the referral was written.

Beginning in December 2010, MHTS.net calculated referral response times to mental health referrals. These time calculations did not take into account the average 2.8 days while the referral was in transit to mental health, but only from the time of receipt by mental health to completion of the response. For December 2010 and January 2011, the reported response times were .06 days for emergent referrals, .14 days for urgent referrals, and .3 days for routine referrals, from receipt at mental health to completion of the response.

RVRs

A total of 407 RVRs were issued to MHSDS inmates. This included 117to EOP inmates and 290to 3CMS inmates. Of these, 168 mental health assessments

were conducted, including nine for MHCB inmates, 128 for EOP inmates, 29 for 3CMS inmates, and two for general population inmates.

Generally, SQ appeared to follow RVR protocols. The institution reportedly did not issue RVRs for self-injurious or suicidal behavior.

SQ did not provide data on the number of cases in which hearing officers mitigated penalties based on clinical assessment that mental health factors may have influenced the behavior resulting in the RVR.

Data from November 2010 through January 2011 indicated that 14 inmates received three or more RVRs, but did not identify these inmates' mental health LOC. For five inmates, there was no indication of the total number of multiple RVRs received. Of the remaining nine inmates, five received three RVRs, two received four, one received five, and one received six.

Access to Care

Delivery of mental health services at SQ was negatively affected by problems with access to care. Although mental health staff remained on-site throughout the afternoon, early evening, and on weekends, the work shift of officers who provided escorts ended at 2:00 p.m. There was also an insufficient number of access-to-care officers and holding cells. This resulted in inmates being placed into holding cells for four to six hours in order to attend a 20-minute clinical contact or a two-hour group therapy session. Holding cells were overcrowded and uncomfortable. Because of such conditions, inmates often refused clinical contacts.

<u>Adjustment Center</u>

SQ's adjustment center was the only CDCR administrative segregation placement that included condemned inmates. At the time of site visit, there were three EOP and 14 3CMS inmates in the adjustment center. Twelve of these inmates were condemned.

EOP and 3CMS inmates programmed together. Staff reported offering daily groups in the adjustment center. EOP inmates were also generally offered daily one-to-one clinical contacts while 3CMS inmates were offered clinical contacts several times weekly.

Observed IDTT meetings in the adjustment center were attended by required participants. Inmates were present and participated in these meetings. UHRs were present but C-files were not available.

**Deuel Vocational Institution (DVI)**
February 8, 2011 – February 10, 2011

<u>Census</u>:

On February 8, 2011, DVI reported a total inmate population of 3,818, including 715 MHSDS inmates. There were 48 3CMS mainline inmates and 12 inmates in the OHU. Of the 325 inmates in administrative segregation, 89 were 3CMS and nine were EOP inmates pending transfer to a hub institution. The inmate population in the RC totaled 2,824, of whom 501 were 3CMS and 43 were EOP. The overall population and relative size of the mental health caseload was essentially unchanged since the last site visit.

Staffing:

During the monitoring period, mental health positions at DVI were generally filled by full-time employees or covered by contractors.  The chief psychiatrist and chief psychologist positions were filled, as were the 3.5 senior psychologist positions.  Five of the 5.75 staff psychiatrist positions were filled, with contractors covering approximately two positions, resulting in no functional vacancies.  Of the 29.5 staff psychologist positions, 28.5 were filled, although two staff members were out on extended sick leave.  Contractors covered three of these positions, resulting in a functional vacancy rate of zero.

The six social worker positions were covered, with a contractor covering the position for a social worker out on extended sick leave.  The senior PT position and seven of the 13.5 PT positions were filled.  The .65 RT position was filled.  There were two mental health RNs in 2.8 positions.  All clerical support positions were reported to be filled by full-time employees.

Quality Management:

The institution reported that there was no local governing body.  The quality management committee met every two weeks and was chaired by the chief medical officer.  Minutes were maintained.  Agenda items included updates in health care program areas in addition to reports on audit results, subcommittee updates, as well as any other relevant issues.

The mental health subcommittee met every other week, alternating with meetings of the mental health executive staff.  There were 12 meetings held during the reporting period.  Minutes were maintained.  Agendas and meeting format were improved

since the preceding monitoring period, returning to a quality improvement focus rather than simply an administrative staff meeting.  Activities included review and revision of LOPs, chartering and review of results and recommendations of QITs, review of audit results related to compliance with Program Guide timeframes and criteria for mental health services, and the DMH referral process.

There were nine QITs chartered to address clinical concerns during the monitoring period.  Seven of these concluded with recommendations related to the DMH referral process, among other things.  One ongoing QIT addressed mental health notification by custody of IEX incidents, and another addressed updating of the ICC form used by clinicians in administrative segregation.  Line staff was called upon to participate on teams as appropriate. At the time of the site visit, a committee was reviewing those cases in which DMH referral was considered but not made.  Charts were reviewed to ensure that the clinical rationale was documented and alternative interventions were incorporated into the treatment plan.

DVI's peer review processes continued to evolve.  Each peer review committee was composed of clinicians working in the distinct areas of RC, special processing unit, and administrative segregation conducting their own peer reviews.  PCs reviewed each other's work while psychiatrists had a separate process.

During the reporting period, the records of eight clinicians and 13 psychiatrists were the subject of peer review.  Meetings included the actual peer chart reviews, immediate feedback, and discussion.  Redacted summarized information was provided to supervisory staff so that they could look for trends and patterns to target areas needing additional attention for improvement.

230

Suicide Prevention:

There were no suicides at DVI during the reporting period.

The SPRFIT met monthly to discuss local procedures and events related to suicide prevention and response.  Minutes were maintained.  The committee sought representation by nursing, custody, compliance, administrative staff, and representatives of all mental health departments. However, nursing attendance during the monitoring period was sporadic.  Audits related to various aspects of suicide prevention were ordered, and trends and patterns were analyzed.

The SPRFIT reviewed suicide attempts and self-harming behavior to identify areas of suicide prevention that need improvement.  This led to the development of a new procedure by which all inmates returning from DMH and/or MHCB are closely examined and taken to CCAT or re-referred to MHCB immediately if they do not appear improved and stable upon return.

Clinical data and custody logs of five-day follow-up for inmates discharged from OHU were audited monthly.  All cases were reviewed.  There was no calculation of the overall compliance rate for clinical follow-up, but a review of the logs indicated that compliance was less than 100 percent.  Noncompliance was most often due to deficiencies such as failure to document the plan or note the reason the follow-up was initiated, rather than actual missing of follow-up contacts.

In administrative segregation, discussions with staff and review of the isolation log indicated that morning meetings between custody and mental health staff were occurring regularly.  Staff reported these to be a useful conduit for communication about inmates and a good forum for problem resolution.

231

Rates of completion of administrative segregation pre-placement screens ranged from 48 to 70 percent during the reporting period. The SPRFIT was contemplating a recommendation that a QIT be chartered to address this process, as low compliance in this area has been a long-standing issue at DVI.

Institutional audits showed that 100 percent of administrative segregation inmates were offered a confidential mental health screen utilizing the 31-question screen. Overall, 82 percent were reported to have been screened out-of-cell. More specific audits concerning the reasons for cell-front screenings found that the most common reason for cell-front contact was inmate refusal. The unit captain was routinely present during these screenings.

Staff in the ASUs identified new admissions with placards on the doors, and attempted to house them in new-intake cells. However, none of those cells had good lines of sight into the cells because of their construction design. Further, only some of these cells were partially retrofitted. On K unit, the monitor's expert observed newly-admitted inmates placed into cells with poor lines of sight and located a considerable distance from the officer's station. The only cells in the ASU which were fully retrofitted were cells 138-148 on L-1, which were used for OHU overflow and administrative segregation overflow.

The overall compliance rate for completion of 30-minute welfare checks in administrative segregation during the reporting period was 98 percent. However, there were some concerns related to insufficient staggering of these checks and the need for clearer identification of newly-admitted inmates and those who require five-day follow-up.

A review of the documents and interviews with staff indicated that administrative segregation inmates were generally offered ten hours of yard time per week. Refusals among caseload inmates were high. Staff indicated that there generally were a sufficient number of walk-alone yards.

Medication Management:

The procedure at DVI was for newly-arriving inmates who were on prescription medications to be seen within eight hours of arrival so as to have their medication orders written. The completed nursing audit instruments were provided in the proof-of-practice binders, but no summary information was available. However, review of the individual instruments indicated that the vast majority of records audited did not include inmates on medications at the time of their arrivals. The monitor's expert's review of RC inmate charts indicated that for inmates arriving on prescription medications, orders were written within eight hours of their arrival, and they received their first dose of medication within 24 hours of arrival.

For ongoing medication orders, if a prescription had expired, staff was expected to obtain 14-day bridge order by telephone. DVI implemented a system in which providers were notified of expiring medications through a process involving the Inmate Medical Scheduling and Tracking System (IMSATS). Also, expiring medications were listed weekly on a Maxor Guardian link, but it had limited usefulness because the list could not be sorted by provider.

Institutional information indicated that protocols to deal with medication noncompliance were being followed. Raw data from medication audits was provided but not summarized. The audit covered only nursing tasks such as noting noncompliance and

referring to the prescribing doctor, but did not cover whether the inmate was seen as a result of the referral.

No audit information was available on the presence of informed consent forms in UHRs. Reviews of UHRs found informed consent forms present in almost every file, although not always in the appropriate location. They were sometimes filed in the mental health section of the record rather than with the physician orders.

Mental health staff continued to audit laboratory testing with one of the institution's CAP items. They monitored atypical medications and initial laboratory assays, and protocols for lithium, valproic acid, and Tegretol. Compliance rates ranged from 50 to 100 percent, with rates highest for lithium and lowest for Tegretol.

Since the preceding monitoring visit, DVI psychiatrists modified their prescribing practices so that DOT medication administration was reserved for select inmate-patients with a history of noncompliance or as recommended by the pain management committee, rather than as the default practice for all psychotropic medications. A list of inmates on DOT was maintained. Raw data from DOT audits indicated that DOT procedure was being carried out properly.

During the reporting period, there were 34 cases of inmates on Keyhea orders arriving at DVI. Four orders were renewed during the reporting period, and three were withdrawn or denied. No new orders were initiated. At the time of the site visit, three inmates had current Keyhea orders. One hearing resulted in a decision not to issue an order for involuntary medication. Of the three inmates who left the institution before their scheduled Keyhea hearings, two were transferred to MHCBs and one was sent to

CMF where his Keyhea hearing was held. There were no instances in which a petition was not pursued on the advice of counsel.

There were over 1,000 medication orders for HS meds. No HS audits were conducted. HS medications were delivered to the housing units, and consequently, the average length of time for an inmate to move through the line and receive his medication was only three to five minutes.

The custody health operations staff services analyst routinely audited the parole medication process. Data and recommendations were reported at the monthly SPRFIT meetings. During the reporting period, 283 parole medications were packed monthly. Approximately four percent of the inmates for whom these medications were packaged did not parole. Nine percent of the medications were mailed to parolees.

Sexual Misconduct:

The institution reported that eight RVRs related to sexual misconduct were issued during the reporting period. The institution further reported that all eight cases received a mental health screening but none were found to meet the criteria for a comprehensive evaluation. However, a review of the material provided in the proof-of-practice binders showed that one inmate had in fact been referred for a comprehensive evaluation which did not occur. The institution reported that the inmate had been transferred to another institution before the evaluation could take place. No inmates were diagnosed with Exhibitionism or Paraphilia NOS.

Transfers:

DVI's process for referrals to DMH improved substantially since the preceding monitoring period. By the time of the site visit, the institution had a full time

DMH coordinator who monitored referrals and maintained the required database records, including referral and non-referral logs.  Additions to these logs and alternative logs included information which enabled measurement of the timeliness of referral completion among other things.

Examination of the referral database found recording to be somewhat inconsistent, especially during the early portion of the monitoring period.  In many instances, the status of the referral could not be determined from reference to the log.  It was only through a painstaking process of reference to a working log of extensive narrative entries regarding the course of the referrals that this information could be culled out.  In a number of instances it was apparent that DVI clinicians and staff in CDCR central office had differing impressions of the status of the referrals.

Eleven inmates were referred to acute care during the monitoring period.  Of these, five appeared to have been transferred to acute care, four were transferred to intermediate care, one paroled prior to transfer, and data regarding the outcome for one inmate was missing. Database entries on timeliness of referrals to acute care were available for eight of the acute care referrals indicated that none were completed within timeframes.  For all inmates transferred to acute care, the time from IDTT referral to transfer exceeded ten days.  Although data regarding date of transfer was missing in some cases, the times from referral to authorization or transfer ranged from 13 to 89 days.

The referral log included a total of 42 intermediate care referrals, one of which appeared to be a duplicate.  It appeared that a total of 19, or 46 percent of, inmates referred to intermediate care eventually received DMH treatment.  Database entries regarding timeliness of referral completion for 33 of the intermediate care referrals

indicated that 20 or 61 percent were completed within required timeframes.  Ten, or 24 percent of, inmates paroled while on the SVPP wait list, three inmates transferred to other prisons during the referral process, two referrals were rescinded, and one inmate paroled prior to acceptance.  Of the 18 inmates who were accepted at SVPP, only two or 11 percent received treatment there.  At the time of the site visit, the DMH coordinator reported some recent success with requesting expedited referrals for some people on the wait list.  Nonetheless, six of the inmates referred to SVPP, which was 15 percent of all intermediate care referrals, remained on the wait list at the time of the site visit.  The average time from acceptance to transfer was 172 days, with a range of 112 to 210 days.

        The institution reported a total of 49 EOP inmates waiting for placement in an EOP program at the time of the site visit.  The institution indicated that it requested priority transfer for inmates in the ASU.  Fifteen of the 49 inmates were endorsed to an EOP hub, some recently and some as far back as October 2010.  A review of the chronos for those awaiting endorsement indicated inmates with EOP chronos from April 2010 who had yet to be endorsed to a hub institution.  Some of these inmates had parole dates in March or April of 2011, indicating little likelihood that they would be transferred prior to paroling.    The institution reported that it sent weekly memos to the classification and parole representative (C&PR) noting the EOP inmates who required transfer.  A review of these lists indicated that typically there were 40 to 50 inmates requiring transfer to an EOP setting.

        DVI continued to experience considerable difficulty with tracking and providing basic data with respect to RC.  Accurate data about transfer timelines was not available despite ongoing efforts during the site visit and consultation with staff.  A

targeted audit conducted by the facility during the reporting period indicated that 57 of 81, or 70 percent of, RC EOP inmates, and 340 of 499, or 68 percent of, RC 3CMS inmates transferred within required timelines.

DVI provided a "snapshot" which showed that as of February 4, 2011, 38 of 42, or 90 percent of, RC EOP inmates were there less than 60 days, while four inmates or ten percent had lengths of stay over 60 days. Four hundred twenty two of the 515 or 82 percent of inmates in the RC 3CMS program had been there for less than 90 days, while 18 percent stayed there longer than 90 days.

Other Issues:

Reception Center

RC staff conducted mental health screenings on the next business day following the inmate's arrival. The monitor's expert observed screenings which were conducted appropriately by the clinicians. Staff returned to previously-damaged office space which permitted these initial interviews to take place in confidential offices. The institution had a strike team which handled crises upon admissions and worked on obtaining clinical information from county jails or community providers, which improved continuity of care. Particular attention was given to obtaining information concerning inmates who reported the prescription of psychotropic medications within the preceding two to four weeks.

The institution reported an overall 99-percent compliance rate for completing screenings by the day after arrival. Occasional lockdowns accounted for the small number of cases in which this did not occur. Institutional audits found that inmates who screened positive were seen for a full mental health evaluation within required

timeframes in 97 percent of cases.  Audits indicated that EOP screenings occurred within

24 hours of arrival 100 percent of the time, and that intake evaluations were completed

within seven days of arrival for inmates with EOP histories at the rate of 70 percent in

April, 89 percent in May, 89 percent in June, 100 percent in July, 88 percent in August,

and 100 percent on September.

The monitor's expert observed a RC EOP IDTT meeting.  Because IDTT

meetings did not typically occur for RC 3CMS inmates, decisions to assign an inmate to

the EOP were typically made by the EOP treatment team.  Cases involving 3CMS

inmates were "referred" to the EOP treatment team for consideration for elevation to the

EOP LOC or referral to DMH.

Administrative Segregation

Inmates in the ASUs at DVI were housed on K1, K2, K3, L1, and L2.

When overflow was required, those inmates were housed in J unit.  The facility

prohibited placement of MHSDS inmates in K units management cells and reported that

they moved MHSDS inmates out of those cells if they discovered mistaken placement of

them there.

Overall, treatment space in administrative segregation was insufficient.

The K-1 and K-2 treatment areas were small and not confidential as they were used by

custody for a variety of other activities.  The treatment space in K-3 was small and was

used by other treatment disciplines as well as by mental health staff.  As a result, inmates

had to be transported to different units to accommodate scheduled appointments.  There

were no therapeutic modules present on K unit, so that inmates requiring group treatment

had to be transferred to other units in order to receive it.  Staff reported limited success

239

with efforts to effectuate these transfers.  In effect, L unit had five therapeutic modules, which permitted some group treatment to occur for inmates housed on that unit.  L-2 had one small office, reported to previously have been a closet.  L-2 had a treatment area which was used for groups.

The institution reviewed 38 cases to examine whether the initial IDTT meeting occurred prior to the initial ICC.  In only 18 or 47 percent of cases, the IDTT meeting occurred before the ICC meeting.  Treatment plans were present in UHRs, as required.

3CMS inmates in administrative segregation were seen weekly by their PCs.  DVI audited the number and location of PC contacts per month, and if they were cell-front, the reason was also tracked.  Institutional data found that 61 percent of contacts occurred out-of-cell during the monitoring period.  Cell-front contacts occurred due to inmate refusal in 74 percent of cases, and unavailability of escort officers in 20 percent of cases.  The lack of space accounted for only 1.5 percent of contacts occurring cell-front.

Daily PT rounds were conducted in administrative segregation.

OHU

DVI's OHU consisted of 26 beds, 14 of which were designated for mental health patients.  Four of these beds, located in an alcove off the main hall in the OHU, were to be used only with a one-to-one observer, per a LOP.  The remaining ten beds could be used for suicide precaution or suicide watch.  Expanded use of the OHU for medical cases had, at times, resulted in decreased availability of OHU bed space for mental health patients.  An analysis completed during the monitoring period suggested

that mental health had access to eight or more OHU beds, 39 to 54 percent of the time. To supplement OHU bed space, overflow beds in L wing were often used, and beds in K wings were used at times.

The average length of stay in the OHU increased from 1.93 days in April 2010 to three days in August and September 2010. By late in the monitoring period, 37 percent of the OHU stays exceeded three days. Concomitant with longer stays in OHU beds, the use of overflow beds increased. During the reporting period, the number of overflow placements increased by nearly four-fold, and the average length of stay doubled, rising from 36 to 72 hours.

During the monitoring period, there were 927 OHU admissions, or an average of 155 per month. There were an additional 275 admissions into overflow areas. It is important to note that many inmates admitted to overflow areas were subsequently moved to the OHU, and may thus have been counted as "admissions" in both areas. Less than 45 percent of all OHU and/or OHU overflow admissions resulted in referrals to MHCB. Of those who were referred to the MHCB, approximately 67 percent were, in fact, transferred to MHCBs.

DVI employed a practice that was of some concern. All mental health inmates placed into the OHU or overflow areas were handcuffed when out of cell and experienced restrictions in property. This was in contrast to the handling of inmates placed in the OHU for medical reasons, who were not cuffed when out of cell unless they were on administrative segregation status.

3CMS

There was a relatively small mainline 3CMS program at DVI.  At the time of the site visit, there were 48 inmates in the program.  Institutional audit information and UHR reviews demonstrated that PC contacts occurred at least quarterly, but generally more often at intervals of one or two months.  If the inmate was prescribed medication, contacts with the psychiatrist occurred every two or three months.  Treatment plans were present in the UHRs, although they remained quite generic in terms of interventions and goals that could not be measured.

Contacts occurred in confidential spaces.  At the time of the site visit, there were two weekly group offerings in 3CMS.  One incorporated elements of dialectical and cognitive behavioral therapies to explore emotional factors related to criminality and to build more pro-social skills.  The other group was for inmates preparing for hearings before the board of prison terms (BPT).  Each group was offered weekly.  The groups were due to end and be replaced by two other group offerings in mid-February 2011.  One of the new groups would be an activity therapy group.  There was no wait list to participate in group therapy.

Referrals

DVI created a strike team consisting of one psychiatrist, four clinical case managers, and a psychiatric nurse to ensure timely response to referrals and improving continuity of care.  The team processed inmates from reception who reported having taken psychotropic medications before coming to prison, responded to all emergency situations in reception, conducted SREs, and responded to all self and staff referrals.

242

During the monitoring period, the strike team handled approximately 2,700 referrals.  The strike team tried to respond to every referral on the day it was received, but due to volume, that was not always possible.  The average number of days between receipt of a written referral and response was one day.  Log data indicated that 97 percent of the time, responses occurred within Program Guide timeframes for emergency, urgent, and routine referrals.  Outliers in response were generally due to factors beyond the control of mental health.

Heat Plan

Weekly lists of inmates receiving heat risk medications were distributed to work sites and housing units.  Outdoor temperatures were recorded hourly by the stationary engineer.  Housing unit temperatures were monitored and recorded every three hours at a minimum.  There were 25 activations of the heat plan during the monitoring period.  Clinical rounds in the housing units were required in 21 instances.  There were no instances of inmates suffering heat-related illnesses.

RVRs

Though custody consideration of mental health issues in the course of RVR adjudications improved somewhat during the monitoring period, this remained an area of concern.  The institution's management report indicated that from April through September 2010, a total of 798 RVRs were written.

Mental health staff completed mental health assessments for 47 EOP inmates and 17 3CMS inmates.  A single audit of all mental health assessments revealed that the hearing officer documented consideration of mental health input into findings only 50 percent of the time, and documented consideration of mental health input into

disposition of the RVR only 25 percent of the time.  The institution did not maintain logs

of the outcome of the RVR process.  Information from the IST tracking system indicated

that no training relevant to the RVR adjudication process occurred during the monitoring

period.

### California State Prison, Corcoran (CSP/Corcoran)
December 13, 2010 – December 16, 2010

<u>Census</u>:

On December 15, 2010, there were 4,994 inmates at CSP/Corcoran,

compared to 5,542 inmates on March 8, 2010, during the preceding site visit,

representing an approximate ten percent decrease in the institution's census. The MHSDS

population remained virtually unchanged at 1,467 inmates, compared to 1,474 inmates at

the time of the preceding site visit. EOP mainline census decreased from 140 to 120

inmates, and 3CMS inmates increased from 519 to 535 inmates. EOP inmates pending

PSU transfer increased from 22 to 26. There was a small decline from 79 to 73 inmates in

the EOP hub, as of December 15, 2010. The total number of inmates in administrative

segregation increased from 381 to 417 inmates since the preceding site visit.

The number of inmates in the 3CMS administrative segregation program

increased from 123 to 159.  The total number of inmates in SHU decreased from 1,431 to

1,375.  This included the number of inmates in 3CMS SHU, which decreased from 551 to

534 inmates.  There were 20 inmates in the MHCB, and 39 MHSDS inmates in the

General Acute Care Hospital (GACH), which included six EOP and 33 3CMS inmates.

<u>Staffing</u>:

There were 156.74 FTE mental health positions allocated to

CSP/Corcoran, with an overall functional vacancy rate of approximately nine percent at

the time of the site visit.  There had been some fluctuation in staffing during the reporting

period; however, the overall effect was negligible except in psychiatry where the need

was critical. The positions of chief psychiatrist and chief psychologists were both filled,

as were the single senior psychiatrist position and four senior psychologist positions.

For supervising social workers, three of the 3.79 allocated positions were

filled. For staff psychologists, 33.75 of 37.21 positions were filled as were 15 of 17.4

social work positions. With the use of contractors, psychologist and social worker

functional vacancy rates were three and four percent, respectively.  All senior PT and PT

positions were filled.  There was a 24 percent vacancy rate for RTs. Vacancies in OT and

office assistant positions were low.

The most critical vacancy rate was among psychiatrists.  CSP/Corcoran

had only 6.5 of 17.8 FTE psychiatry positions filled, resulting in a 63 percent staff

psychiatry vacancy rate.  The 11.3 FTE vacancies were being covered by 4.5 FTE

contractors and a 0.75 FTE dual appointment, leading to a functional vacancy rate of 34

percent for psychiatrists. In addition to the unfilled positions, the facility had at least three

current psychiatrists who reportedly will retire during the coming months, which staff

indicated will further exacerbate the psychiatric staffing problem.  The supervisory staff

reported that they had begun to shift some psychiatric duties to psychologists, including

MHCB admissions and discharges, and five-day follow-up.  There were plans to increase

the usage of telepsychiatry.  The institution used 17.5 hours of telepsychiatry to address

some of the need for greater psychiatry coverage.

Quality Management:

The local governing body met monthly during the reporting period, with appropriate attendance. Minutes were maintained and showed that the local governing body considered pertinent issues related to health care at the institution. The quality management committee met twice a month, with required attendance. Minutes showed that it considered subjects related to the various health care disciplines and departments, including mental health.

The mental health subcommittee met twice monthly, with required attendance during the review period. Minutes indicated that the subcommittee dealt with relevant topics related to mental health care at the institution. It regularly reported to the quality management committee and provided information to the local governing body as required. It was unclear whether mental health line staff was involved in quality improvement activities or were fully informed about them.

At the time of the site visit, there were six ongoing QITs. These included a QIT focused on medication management and one tasked with troubleshooting problems that could arise from the initial planning and operation of alternative MHCB overflow housing in Facility 3A. A QIT examined the application of restraints in the MHCB consistent with *Coleman* Program Guide requirements, and another looked at sexual misconduct in the EOP hub and MHCB. Two additional QITs were focused on the EOP hub to address timelines for transfers from the unit.

Peer review processes were in varying stages of development at the time of the site visit. Psychology peer review met monthly to review charts using an instrument developed at the institution. The social work peer review committee had

246

recently reformed and was in the initial stages of developing its process.  Psychiatry peer review had been reconfigured in September 2010 to include only staff psychiatrists.  It met twice in October 2010 using an instrument that included both quantitative and qualitative items.

Suicide Prevention:

There were no completed suicides at CSP/Corcoran during the reporting period.

The SPRFIT met monthly with appropriate attendance. Remedying problems identified during the preceding monitoring period, the SPRFIT addressed post-inpatient discharge follow-ups and reported to the mental health subcommittee. The institution was 82 percent compliant during the reporting period with documenting completion of clinical follow-ups in the UHR.  The institution continued to struggle with consistently meeting the custody follow-up requirements, with audits demonstrating an average compliance rate of 78 percent, in a range of 63 percent to 91 percent, which was lower than the average compliance rate of 87 percent in the preceding monitoring period.

The ERRC met monthly with appropriate attendance, and addressed appropriate issues.  Monthly medical emergency drills occurred during the reporting period and were documented. Cut-down tools and ambu bags were present and accessible in the ASUs. All interviewed officers had micro-shields in their possession.

CSP/Corcoran was compliant with prescreening 3CMS inmates at a rate of 94 percent, but noncompliant with prescreening EOP inmates, reporting a rate of 69 percent during July 2010 to September 2010. Internal audits demonstrated compliance with the daily mental health-custody meeting, PT rounds, and completion of the 31-

question assessment for required inmates placed in administrative segregation, representing significant improvements over findings in the preceding monitoring period.

Cells used for newly arriving inmates in administrative segregation were appropriately placarded for the first 21 days. Custody wellness checks were completed and signed by supervisors, but were not done in staggered timeframes.

Cells in the ASUs continued to be equipped with electricity and inmates were permitted to have in-cell appliances.

Medication Management:

Internal audits yielded a 95-percent compliance rate for ordering medications within eight hours of inmates' arrivals at the institutions. Compliance rates for receipt of ordered medications within 24 hours of arrival ranged from 53 to 82 percent.

The compliance rate for continuity of medications upon intra-institutional moves was 91 percent. Documentation of missed doses with these moves was completed at the rate of 53 percent. Continuity of medications following discharges from the MHCB showed a 95-percent compliance rate. For those cases in which medication continuity lapsed following MHCB discharge, the reason for the lapse was documented in 25 percent of cases.

Audits of medication continuity after moves from SHU or administrative segregation demonstrated a rate of 94 percent compliance. Documentation of the reason for medication discontinuity following such moves yielded less than 30 percent compliance.

CSP/Corcoran's local policy regulating medication noncompliance was consistent with statewide requirements. CSP/Corcoran was one of the pilot institutions involved in the Medication Administration Process Improvement Plan (MAPIP), which was initiated at the institution in May 2010.  However, it was unclear whether the institution had properly followed MAPIP methodology for auditing medication noncompliance.  Institutional audits of documentation of medication noncompliance in the MAR and referral to psychiatry yielded a 25 percent compliance rate, while documentation of referrals for medication noncompliance on the required forms (CDCR 128 C or MH-5) found a compliance rate of 13 percent. Documentation of timely psychiatric follow-up in a physician's progress note within seven days of referral was found by internal audits to have a 25 percent compliance rate.

Pill line audits were performed as required during the review period. However, it appeared that there was a methodological flaw in this area of the MAPIP tool, which was brought to the attention of the MAPIP administrator.

Audits of compliance with informed consent requirements demonstrated a compliance rate of 73 percent.

CSP/Corcoran did not consistently obtain sufficient numbers of applicable UHRs to conduct audits of laboratory testing of inmate blood levels of psychotropic medications during the review period. In those months when UHR sample sizes were appropriate, audits yielded a range of compliance rates of 57 to 80 percent for obtaining necessary laboratory studies. Analysis of the audit findings indicated that inmate refusals and failure of staff to obtain ordered studies were the primary reasons underlying the low compliance rates in this area.

249

The institution reported that unless clinically indicated, psychotropic medications at CSP/Corcoran were ordered nurse-administered. For those medications ordered DOT, audits found 100 percent compliance. On November 16, 2010, there were 82 inmates at CSP/Corcoran with active Keyhea orders. During May 2010 to October 2010, 36 Keyhea orders were initiated and 76 Keyhea orders were renewed. As a result of Keyhea inmates refusing medications, 51 involuntary medication administrations occurred during the review period. The institution reported that no Keyhea petition was denied in a certification hearing, and no Keyhea orders lapsed during the review period, even as a result of transfers to DMH. CSP/Corcoran reported ongoing problems obtaining reliable lists of inmates with Keyhea orders.

Audits of HS medications yielded 100 percent compliance rates with prescription and administration standards.

Parole medication audits revealed that 90 percent of paroling inmates on medications received their medications and signed confirming receipts.

Sexual Misconduct:

CSP/Corcoran continued to comply with sexual misconduct protocols. The institution also remained one of the sites of the Exhibitionism Treatment Program in CDCR. During the review period, the census ranged from 11 to 17 inmates.

Transfers:

Since the preceding monitoring visit, CSP/Corcoran made significant progress with implementing new protocols designed to prompt routine consideration for referral to DMH. The institution's data showed that CDCR 7388, the DMH criteria form, was completed more consistently in IDTT meetings. Examination of a sample of inmates

who met the criteria but had not been referred indicated that the rationale for decisions not to refer appeared to be more clinically based. The monitor's observation of several IDTT meetings confirmed that team members were aware of the referral process, even though each IDTT did not necessarily address the indicated criteria during the meeting.

The institution had an assigned part-time DMH coordinator at the time of the site visit. Tracking of referrals commenced at the time the IDTT made the referrals, as required. With a few exceptions in which an inmate refused history and physical examinations, CSP/Corcoran reported that it was consistently compliant with completing referral packages within the five-day timeline. SharePoint had not yet "gone live" at the institution at the time of the site visit.

At the time of the site visit, inmates who had three or more crisis bed admissions were consistently identified. This criterion for referral was routinely checked on the Form 7388s. Data representing participation in less than 50 percent of offered therapeutic services was manually calculated by supervisors and provided to treating clinicians, as MHTS.net was still in its initial stages of implementation and was not providing reliable data. The institution continued to struggle with the availability of data related to the number of RVRs during IDTT meetings.

The DMH referral log at the institution was inaccurate and incomplete. There was lack of concurrence between all referred inmates who were identified on referral logs at central office or from UHR reviews and those on the institutional DMH referral log. The log provided for the monitor's review indicated 45 DMH referrals from May 2010 to October 2010, with 26 to acute care, four to ASH, one to intermediate care at DMH at CMF, and 14 to SVPP. Six of the referrals to SVPP had been made to DMH

while the inmate was at a prior institution, and six referrals were generated at CSP/Corcoran, but the inmates were transferred to other CDCR institutions before placement in a DMH bed had occurred. The institution also reported that one referred inmate had paroled, that another referral had been rescinded, and that there had been no referral rejections by DMH during the monitoring period. The monitor was unable to verify the accuracy of this information, given that information was incomplete.

The institution reported that earlier in the review period, there had been difficulties relating to appropriate notification of DMH returns and receiving DMH discharge summaries, but that this had improved during the latter part of the review period. Clinical staff was unaware that the entire inpatient record of inmates discharged from SVPP or any DMH acute care program was scanned onto CDs and sent to the receiving CDCR institution. Medical records staff agreed that they did receive CDs with the records of discharged inmates from SVPP, but did not store them in the UHR with other inpatient records, making the information unavailable to treating clinicians.

Staff reported that established procedures for DMH returns were not followed consistently. Clinical staff was not always appropriately notified of inmates' returns from DMH, did not receive all discharge summaries, and were not made aware of inmates who had been referred to DMH but were on the waitlist and were transferred to CSP/Corcoran prior to their DMH admissions. DMH summaries which were received were not consistently filed in UHRs, as required.

The DMH coordinator expressed concern that certain patients were discharged from DMH in clinically unstable conditions. Prior to the site visit, a new policy was initiated to make CDCR-DMH clinician-to-clinician contact part of the

discharge procedure. In addition, mental health management indicated that it was considering revising its DMH return procedures to receive psych and returns directly into the CTC for assessments prior to housing placements. At the time of the site visit, CSP/Corcoran continued to see inmates returning from DMH in IDTT meetings and placed them on five-day clinical follow-up.

During the review period, the institution modified its Vitek hearing process by changing the designated hearing officer from a correctional counselor to a supervisory clinician who had no clinical affiliation with the inmate. There were 16 Vitek hearings during the review period, all of which rejected the inmates' refusals to transfer to DMH.

Access to MHCBs from CSP/Corcoran continued to be good. The number of MHCBs in the 99-bed GACH remained at 23. Alternative holding areas were not used to monitor inmates waiting for MHCBs at CSP/Corcoran. When the need for crisis beds exceeded 23, the adjoining medical wing was used for MHCB overflow.

The number of MHCB admissions from CSP/Corcoran increased by more than 100, rising from 320 admissions during the preceding monitoring period to 422 admissions during the current reporting period, representing a 25 percent increase. This included admissions from other CDCR institutions.

Taking into account those inmates who were held in the MHCB for non-clinical reasons following clinical discharge, CSP/Corcoran was compliant with meeting length-of-stay requirements in the MHCB. Reasons why inmates remained in the MHCB after clinical discharge included waiting for bed availability, transfer to DMH, or completion of Keyhea proceedings.

The institution did not have an OHU or MHOHU. Staff reported, however, that a QIT was recently chartered to plan for the conversion a number of cells in housing unit 3A03 to serve as alternate temporary housing for MHCB overflow patients.

Access to the PSU from CSP/Corcoran continued to be slow. At the time of the site visit, 14 inmates had been endorsed to the CSP/Sac PSU, with the earliest in March 2010.  Five of the 14 inmates were endorsed during the preceding 90 days, with the remaining eight inmates holding endorsements exceeding 90 days. Institutional data showed that 15 inmates were endorsed to the PBSP PSU, with the earliest in June 2010. About half of the PBSP PSU endorsees were endorsed in December 2010, and the remaining half had been endorsed earlier. There were also 12 inmates endorsed to EOP SNY who were waiting for transfer.

Other Issues:

MHCB

Intake assessments for the MHCB were completed in the emergency room by the admitting clinician. History and physical examinations were completed within 24 hours of admission.  Admitted inmates were assessed daily by a member of their treatment team.

Institutional data showed that initial IDTT meetings routinely occurred within 72 hours of admission and weekly thereafter. An observed IDTT meeting during the monitor's visit had appropriate attendance and participation by the team.  Input from inmates was solicited and encouraged.  Recreational therapy was available up to three times per week, depending on the inmate's condition and willingness to participate. Outdoor sessions were also available, as weather permitted.

CSP/Corcoran's MHCB did not have beds with frames.  Mattresses were placed on the floor. Staff reported that in some cases of inmates who had mobility problems and were likely to remain for extended periods in the MHCB, these inmates were housed in the medical wing or a medical bed was moved into the MHCB cell. Staff further reported that clothing for inmates in the MHCB was limited to a Ferguson safety smock. The MHCB did not have a designated seclusion room.

During the course of the monitor's visit, CSP/Corcoran modified its institutional policy in the MHCB regarding handcuffing inmates when out of cell, changing from the default of keeping every inmate in handcuffs to a joint clinical-custody decision to be made on a case-by-case basis.

In general, when five-point restraints were employed, the room adjacent to, and fully visible from, the nursing station was utilized. Audits showed that during the review period, there were 27 instances of restraints involving 19 inmates. The average duration was 10.9 hours and the median duration was 7.5 hours.

Compared to the preceding monitoring period, when 85 percent of MHCB discharges were released within 24 hours of the discharge order, data showed that 77 percent of discharges from the MHCB were released within 24 hours of the discharge order. Staff reported that the major reason for the increase in delayed releases was the lack of appropriate outpatient beds, particularly when the inmate was being released to a LOC higher than his admission level.

SHU

The institution's data for July to September 2010 reported noncompliance with completion of intake screenings following SHU admission, with a compliance rate

of 47 percent.  The rate improved to 71 percent in October 2010. Compliance with initial

IDTT meetings ranged from 53 to 67 percent during July to October 2010.  For

subsequent IDTT meetings, the compliance rate for the same period was 72 to 80 percent.

The rate of compliance with proper use of Form 7388 reached 81 percent during July

2010 to September 2010, and 100 percent in October 2010.

Compliance rates for clinical contacts dropped from 65 percent in July

2010 to September 2010, down to 27 percent in October 2010.  Staff indicated that this

was due to lack of sufficient escort officers. PTs' weekly rounding, as documented in

monthly summaries, ranged between 80 and 88 percent during July 2010 to October

2010. Attendance of correctional counselors at SHU IDTT meetings was reported at 80

percent during this period. Psychiatry participation in IDTT meetings during July 2010 to

October 2010 was consistently compliant in the range of 92 to 100 percent. The

institution was consistently noncompliant with SRE requirements in SHU, achieving a

rate of compliance ranging from 68 to 73 percent.

Staff reported that newly arriving inmates into the SHU, including 3CMS

inmates, were sometimes housed in temporary holding cells in the rotunda of the

building, in several instances for up to four days. The cells in this area were inadequate

for overnight use. The rotunda holding cells had seating but they were small and did not

have beds or toilets. Inmates were provided mattresses and blankets. One inmate who

was interviewed during the site visit reported that he had been in the rotunda cell for two

days. The cell area was observed to be cold and noisy.

At a time of the site visit, there were 25 designated escort officers for

healthcare. Staff reported significant problems with availability of escort officers, as

housing officers were no longer routinely available for escorting SHU inmates to mental

health programs. According to staff, the lack of escorts severely limited their ability to

provide confidential clinical contacts in a timely fashion.  Even cell-front contacts had

been affected. Staff indicated that at a point in the monitoring period, there were no

therapeutic groups occurring in the SHU. Groups had resumed by the time of the site

visit, but were reported to have decreased by more than 50 percent.  Exhibitionism

treatment groups were not affected.

<u>EOP</u>

CSP/Corcoran's mainline EOP had a census of 120 inmates on December

15, 2010. PC caseloads at that time ranged from 12 to 20 inmates per clinician. In

addition to staffing of eight FTE PCs who were providing clinical services, there were 1.5

FTE psychiatrists and three FTE RTs. The teacher was providing instruction one day per

week for up to two hours for inmates preparing for their GED examination. A licensed

PT conducted up to 12 groups. Between May 2010 and October 2010, inmate refusals to

participate ranged from 81 to 96 percent. Staff indicated that even though clinical staff

had worked on improving group topics and the quality of the sessions, and addressed

group attendance in individual clinical sessions, a trend analysis over the six-month

reporting period showed that the refusal rate had remained relatively stable.

Audits found that the mainline EOP program was compliant with initial

and subsequent IDTT meetings during May to October 2010, with a compliance rate of

100 percent each month for initial IDTT meetings and a compliance rate ranging from 85

to 92 percent for subsequent IDTT meetings. Case manager contacts in May, June, and

September 2010 were complaint, ranging from 93 to 100 percent, and were near

compliant in July, August, and October 2010, with rates ranging from 86 to 88 percent.

The monitor observed a social skills development group led by a PT.  It

was appropriate for the participants' level of functioning and was adequately led. A

parole planning group that was also observed by the expert did not appear to be helpful.

<u>Administrative Segregation EOP</u>

CSP/Corcoran had three ASUs for MHSDS inmates. The EOP hub was

located in sections A and B in building 3A03. Administrative segregation-status 3CMS

inmates were housed in all sections of building 3A04 and parts of Section C of 3AO3.

Section C of this was also used occasionally as an EOP hub overflow during the

monitoring period.

CSP/Corcoran appropriately conducted 30-day reviews after 90-day stays

in administrative segregation. On December 13, 2010, CSP/Corcoran reported 64 EOP

inmates were in administrative segregation over 90 days. The formal review for

November 2010 reported lengths of stay over 90 days, with stays lasting a range of 93 to

574 days. Excluding the 14 inmates endorsed to the CSP/Sac PSU, the 15 inmates

endorsed to the PBSP PSU, and the 12 inmates endorsed to EOP SNY, the remaining 23

inmates were held in the EOP hub over 90 days for reasons including waiting for CSR

action, outcomes of disciplinary matters, completion of the director's review board

(DRB) processes, and pending investigations into safety concerns.

The EOP hub had an authorized capacity of 99 for EOP administrative

segregation inmates. In addition, the institution was mandated to maintain a 150 percent

administrative segregation compaction rate, which it was unable to maintain. In part, the

institution was not able to meet this mandate because of the ebb and flow into administrative segregation as a result of moving inmates with expired MERDs out of the SHU and into administrative segregation. Staff reported that access to EOP programs was not affected by movement of EOP hub inmates into the overflow unit.

Audit data for July 2010 to October 2010 showed compliance with completion of initial evaluations within five days, with a compliance range of 91 to 100 percent; completion of comprehensive evaluations within 14 days, with a range of 89 to 100 percent; and timely completion of initial IDTT meetings, with a range of 94 to 100 percent. Subsequent IDTT meetings were completed as required during the period of July 2010 to September 2010, achieving a compliance rate of 91 percent, but that compliance was not sustained during October 2010. Audit reports also showed a compliance rate of 90 percent with completion of Form 7388s by IDTTs during July 2010 to September 2010, but with slippage to 83 percent in October 2010. During the site visit, the monitor attended IDTT meetings for a number of inmates in the EOP hub. Required participants were present and interdisciplinary discussions occurred. It was notable, however, that consideration of referrals to higher levels of care was not routinely discussed, even for those inmates for whom it was indicated.

The compliance rate for weekly clinical contacts remained in the range of 83 to 84 percent during July 2010 to October 2010. Staff reported that the rate of out-of-cell contacts ranged from 44 to 56 percent. The range of cell-front contacts among clinician-initiated contacts was 14 to 26 percent.

PTs' daily rounds, as documented in weekly summaries, had a compliance rate ranging from 97 to 100 percent during July 2010 to October 2010. PT rounds that

were observed in the EOP hub building were conducted appropriately. Psychiatry attendance at IDTT meetings was compliant in 94 to 96 percent of cases. Attendance by correctional counselors at IDTT meetings was also compliant during the same period, with a compliance range of 94 to 96 percent. The institution was close to achieving compliance with SRE requirements in the EOP hub during July 2010 to October 2010, reaching compliance rates of 83 to 88 percent.

At the time of the monitor's visit, due to census pressures, there were 17 EOP hub inmates housed in the EOP mainline 3B01 building, as well as Level I general population inmates on administrative segregation status. Staff reported that this population mix stymied EOP hub inmates' access to care. Under these conditions, EOP hub inmates were seen daily at cell front by their clinicians, with the resulting adverse effect on confidentiality. Moreover, these inmates were not provided with therapeutic groups. Staff further reported that movement and access were limited in this program because the number of transports officers was insufficient, affecting primarily clinicians' and PTs' ability to provide programming.

EOP inmates continued to receive their programming in individual therapy in the converted gymnasium across the yard from the EOP hub building.  There was adequate space for both group therapy and clinical offices. One of the groups observed by the monitor was clinically meaningful and well organized. The therapeutic modules were appropriately arranged in all rooms.  The institution reported that it was unable to provide data on the number of group therapy hours that inmates in the EOP hub were offered and received.

<u>3CMS</u>

The mainline 3CMS was located in parts of Yards 3A and 3B, and all of Yard 3C. There were five FTE staff assigned to provide services to a 3CMS mental health population of 535 across the three yards.

Institutional audits showed that the program was compliant with PC contacts in Facility 3A, with a rate of 97 percent, very near compliant in Facility 3B and 89 percent, and noncompliant in Facility 3C, with a rate of 46 percent. Compliance was achieved with regard to IDTT meetings in Facilities 3A and 3B, at 91 and 94 percent respectively, but non-compliant in Facility 3C at 75 percent. Staff reported more consistency with psychiatric coverage for Facilities 3A and 3B, and telepsychiatry occurring in Facility 3C.

Group offerings varied with five different therapeutic groups in Facility 3A and one each in Facilities 3B and 3C. At the time of the site visit, there were 70 inmates on the waitlist for groups in Facility 3A and seven inmates waiting for groups in Facility 3B. Staff reported a plan to reassign two escort officers away from Facility 3B to the 3CMS SHU program.

<u>Administrative Segregation 3CMS</u>

Administrative segregation status 3CMS inmates were housed in the 3A04 building, with overflow into the 3A03 building, section C. According to staff, group therapy was not provided to inmates in this program due to insufficient availability of escort officers.

During July 2010 to September 2010, CSP/Corcoran was 83 percent compliant with the brief initial evaluations of 3CMS inmates arriving into administrative

segregation within the first ten days.  In October 2010, the institution attained a compliance rate of 93 percent. The compliance rate for initial IDTT meetings from July 2010 to October 2010 was 80 to 81 percent. The institution achieved compliance with subsequent IDTT meetings in October 2010, with a rate of 100 percent. Audits reported sustained compliance during July 2010 to October 2010 regarding the utilization of Form 7388s at IDTT meetings in this program, with a compliance rate ranging from 95 to 100 percent.

PTs' daily rounds, as documented in their weekly clinical summaries, maintained compliance during the July to October 2010 period in the range of 96 to 100 percent compliance. Correctional counselors' attendance at IDTT meetings improved from 55 percent in the July to September 2010 period, to 93 percent in October 2010. Psychiatrists' participation in IDTT meetings similarly grew from 84 percent during the period of July 2010 to September 2010, up to 100 percent in October 2010. Completion of SREs for administrative segregation status 3CMS inmates remained compliant in July 2010 to October 2010, with a range of 91 to 100 percent compliance.

The institution reported that on average, 70 percent of clinical contacts occurred cell-front.

Referrals

Staff reported that due to limitations related to MHTS.net, no data was available regarding referrals, but that the institution was meeting emergent referral timelines.  Staff also reported that because of the shortage of psychiatrists, the institution was noncompliant with responses to routine referrals.

MHTS.net

The institution reported initial problems with the implementation of MHTS.net, including the inability to create *ad hoc* reports and the receipt of disparate results when comparing data collected via chart audits versus. Staff also reported that there were ongoing questions regarding the validity of the information in MHTS.net and problems with the reliability of the data entry.

Heat Plan

CSP/Corcoran reported that temperatures were not read as required in all housing units and staff did not consistently follow recording procedures. The institution indicated that medical rounding had occurred in one housing unit when the indoor temperature exceeded 95 degrees.

RVRs

During the review periods, 76 3CMS inmates, 158 EOP inmates, and seven MHCB inmates were referred for mental health assessments. Penalty mitigation was applied in a limited number of cases.

Use of Force

CSP/Corcoran continued to conduct required institutional executive use-of-force reviews in a generally timely manner. At the time of the site visit, the institution reported that all but 19 of the 121 executive reviews of use-of-force incidents occurring May 1, 2010 to October 31, 2010 had been completed. Of the remaining 19, four were in the investigatory process and 15 were pending completion of facility level reviews. The institution continued to appropriately track use-of-force incidents. Institutional data reported that of the total 121 use-of-force incidents, 94 or 77.7 percent involved MHSDS

inmates. The institution noted that the proportion of use-of-force incidents involving MHSDS inmates surpassed the 58-percent proportion that was found during a prior audit.

As required, clinical interventions occurred for those incidents involving cell extractions.  Ongoing health staff training in clinical intervention continued during the monitoring period.

Among the total 330 non-use-of-force incidents that occurred during the monitoring period, 209 or 63.3 percent involved MHSDS inmates.

Modified Programming

The institution reported modified programming occurred at CSP/Corcoran at various points in the monitoring period in August, September, and October 2010, due to riots, disturbances, battery, threats, or discovery of weapons, but did not affect access to health care.

**California Substance Abuse Treatment Facility (CSATF)**
November 29, 2010 – December 2, 1010

Census:

On December 2, 2010, CSATF housed 6,349 inmates, which represented a five-percent decrease in the institution's total inmate population since the preceding monitoring period.  However, CSATF's MHSDS population of 1,840 inmates represented an 11 percent increase in the mental health population.  There were 275 mainline EOP inmates and 1,417 mainline 3CMS inmates.  The institution reported that its MHCB unit housed 25 inmates.  The total administrative segregation population of 310 included 106 3CMS inmates and 17 EOP inmates pending transfer to an EOP hub institution.  CSATF reported housing 64 3CMS and six EOP inmates in administrative segregation for non-disciplinary reasons.

Staffing**:**

Leadership changes and filling of allocated positions, particularly in the growing EOP programs, remained the primary staffing issues.  Of 106.87 allocated mental health positions, 93.25 were filled, leaving 13.62 vacancies, for a 13-percent institutional vacancy rate.  Contractors provided an additional 4.25 FTE coverage, reducing the institutional functional vacancy rate to nine percent.  Positions for a chief psychiatrist, chief psychologist, three senior psychologists, and 15.75 of 15.77 staff psychologists, were filled.  There were 3.5 vacancies among the 7.5 staff psychiatrist positions; contractors provided an additional 3.5 FTE coverage.

One of two supervising social worker positions was vacant, and contractors provided .25 FTE coverage.  Of 16 social worker positions, 14.5 were filled.  Contractors provided additional .5 FTE coverage for these positions.  Positions for three of four senior PTs were filled, as were 37 of 39 PT positions.  Of 4.1 RT positions, three were filled.  Ten of 12.5 MHSDS clerical positions were filled, as was the one Health Program Specialist I position.

Quality Management:

There were setbacks to CSATF's quality management program.  The inability to extract data from the MHTS.net system, to which CSATF converted in March 2010, led to an inability to audit many areas.  Staff turnover interrupted audits in other areas.

The local governing body met once.  Attendance was good and relevant departments presented updates.  The quality management committee met two to three times monthly.  Minutes were maintained, attendance was adequate, and mental health

was represented.  Quality management committee meetings included standing reports on issues such as medication continuity, activation of the Level II EOP/SNY program, and the status of EOP inmates pending transfer.  There were also periodic reports on matters such as healthcare appointment access, five-day follow-up, parole medications, and pill lines.

The mental health subcommittee met monthly.  Meetings provided a forum to monitor performance, introduce new policies and requirements, and discuss issues affecting mental health services.

Charted QITs were tasked with improving mental health referral response times and developing reliable auditing processes for five-day follow-up.  Psychiatry and PC peer review were scheduled to begin in the future.

Suicide Prevention:

There was one completed suicide during the monitoring period.

The SPRFIT, which met five times, focused on attempted and completed suicides and five-day follow-up.  Meeting minutes did not list attendees or indicate the presence of a quorum.  It was unclear whether SPRFIT meeting minutes presented a complete accounting of all attempted suicides.  Suicide report recommendations included a request to investigate nursing staff and first responders' failure to initiate CPR, incident report inconsistencies, and the need for additional staff training.

Emergency medical response drills were conducted monthly.CPR refresher training was provided to administrative segregation staff.

CSATF completed a QIP for a suicide that occurred in September 2009.

CSATF did not track compliance with clinical five-day follow-up.  A QIT chartered to develop five-day follow-up auditing mechanisms had yet to issue recommendations.

There were daily morning meetings between custody and mental health staff.  Pre-placement and 31-item screens were reportedly conducted but audits were not provided.  Most inmates reportedly requested that 31-item screens be conducted at cell front.

Daily PT rounds were routinely conducted and documented in isolation logs.  Although CSATF reported 100-percent compliance, audits were not provided. Observed PT rounds were competently performed.  Seventy five percent of PT weekly summaries noted daily contact with MHSDS inmates.

There were designated intake cells, which were retrofitted with new doors, cement bunks, and suicide-resistant vents.  Retrofitted doors allowed for increased visibility into cells. Audits indicated 80-percent compliance for PTs seeing MHSDS inmates within 24 hours of arrival into administrative segregation arrival.  Cells of new intake status inmates were clearly marked with door placards.  Although log reviews indicated that welfare checks occurred every half-hour, they were not necessarily staggered, but otherwise, custody staff adequately performed welfare checks.

Administrative segregation cells were equipped with electrical outlets. PPE, cut-down tools and micro-shields were produced on request.

Custody staff and inmates generally reported adequate inmate yard access, but a log review indicated less than ten hours of weekly yard time. There was no yard access for inmates housed in the administrative segregation overflow unit.

Medication Management:

It was difficult to assess CSATF's medication management process. Pre-site information was misleading and much of the provided information was very similar, if not identical, to pre-site data provided prior to the preceding monitoring visit. This data was nonetheless presented as if it had been generated during the current monitoring period. Audits also did not adequately describe methodology, or analyze results and planned corrective actions. Despite these concerns, staff provided relevant medication management information.

Medication continuity following inter-institutional moves was problematic. Audits indicated that medications arrived with inmates transferring to CSATF 62 percent of the time. Next-scheduled medication doses were delivered to transferring inmates in 45percent of audited cases.

Audits indicated a 90-percent medication continuity compliance rate for intra-institutional transfers, including moves of inmates transferred between yards, discharged from the MHCB, and transferred to or from administrative segregation. An audit of 654 intra-facility transfers of inmates with medication orders indicated that 94 percent were completed without a medication interruption.

Although CSATF did not conduct medication renewal audits, EOP inmates reported untimely renewals.

A pill line audit indicated wait times of 15 to 25 minutes.

It was reported that it often took several days for the pharmacy to receive prescriptions written by psychiatrists. An audit indicated that a third of medication orders were not timely processed by the pharmacy and dispensed to

inmates.  Line staff reported that it frequently took two to three days for the pharmacy to process medication orders.

Psychiatrists reported continuing problems obtaining timely laboratory results.

All psychotropic medications were administered DOT.  The pharmacy had a central list of all inmates receiving these medications.  DOT protocols were reportedly followed.

Sixteen inmates received medication by way of a Keyhea order. Twelve of 13 Keyhea hearings resulted in a Keyhea order.  The Keyhea coordinator generally received timely notification of new arrivals subject to a Keyhea order.

Audits indicated a 98-percent compliance rate for parole medication distribution.

Sexual Misconduct:

CSATF averaged two to three monthly IEX incidents.  The institution was generally compliant with IEX protocols, but not with the 72-hour timeline to complete screens to rule out Exhibitionism.

There were 15 RVRs involving 12 inmates; all had mental health screens and IDTT reviews.  None of the cases were referred for a comprehensive evaluation, and none of the inmates were diagnosed with Exhibitionism.  Only one of the screens was completed within 72 hours of the incident.  Time lapses between incidents and screens ranged from one to 39 days, and averaged 15 days.  Eight cases took two weeks or longer to screen.

269

<u>Transfers</u>:

At the time of the site visit, aggregate data identifying inmates who met objective criteria for DMH referral consideration was not available from the MHTS.net system.  There was no such information as to inmate crisis care placement, RVR history, or participation in offered mental health activities.  No alternative report containing this data was routinely completed and made available to staff.  Staff reported relying on informal systems to attempt to obtain such information.

Fifty-seven inmates met one or more criteria for DMH referral consideration but were not referred.  It did not appear that they were consistently tracked on the non-referral log.  Twenty-five of these inmates were referred to the EOP.  A review of the records of inmates who were on the DMH wait list or who had been considered for DMH but not referred indicated that treatment plans were not consistently altered to address the issues cited as reasons for DMH referral consideration.

CSATF inconsistently received information as to inmates who transferred to the institution with a pending DMH referral.  The DMH coordinator, who maintained a full work load as a clinician and completed RVR and IEX evaluations in addition to tracking DMH referrals, also reported not consistently receiving information as to upcoming inmate transfers with referrals initiated at CSATF.

CSATF's referral log identified 58 DMH referrals.  However, DMH referral data indicated uncertainty as to the number and status of referrals.  Comparisons of the referral log and a bed utilization management report, for example, found instances of cases reported as "rescinded" remaining on the DMH wait list.  Referral packets were

reportedly timely completed for 16 referrals, but 26 of 42 non-compliant referrals were delayed due to untimely receipt of custody information.

Of 29 referrals to the acute care program at CMF, eight were subsequently rescinded. Of the remaining referrals for which data was available, there was an average of 32.5 days from the IDTT referral initiation to inmates' transfers to DMH. Transfer times ranged from eight to 64 days. Eleven acute care referrals required more than 30 days from initiation to transfer.

Of 29 referrals to DMH intermediate care, two were subsequently rescinded, and two referred inmates transferred to other institutions prior to DMH transfer. Eleven referrals transferred to DMH. The average time from initiation of the referral to transfer was 44 days, with transfer times ranging from 21 to 99 days. At the time of the site visit, 11 referrals were pending or were on the intermediate care wait list.

A record review of inmates who returned to CSATF after DMH treatment indicated that although DMH discharge summaries were typically included in health care records, they generally included minimal treatment recommendations. Clinicians usually continued the medication regimen that had been initiated at DMH. In most cases, inmates were timely seen upon return to CSATF.

CSATF's MHCB unit contained 18 beds. Two of the designated 20 beds were redlined for repair. An additional four cells were available for mental health patients when the MHCB population exceeded 18 inmates.

Between April and September 2010, there were 286 MHCB admissions. The average weekly MHCB census ranged from 18 to 22 inmates. Forty MHCB

placements exceeded ten days, 22 were for 20 days or more, 13 were for 30 days or more, and seven exceeded 50 days.

At the time of the site visit, the monitor's expert noted that there were 17 inmates in the MHCB, five of whom had been referred to DMH and were awaiting transfer, and seven of whom had been in the MHCB unit for more than ten days, with MHCB stays ranging from 20 to 128 days.

Forty-one EOP inmates were transferred to other institutions. The average time from EOP referral to endorsement was 18 days. An average of 19 days elapsed between endorsement and transfer.

An apparent result of the activation of the EOP programs was that a growing number of EOP inmates waited longer periods of time to be transferred to appropriate programs. The number of EOP inmates pending transfer, which averaged 19 during April, May, June, and July, had reached 43 by December 2010. At that time, nearly three quarters of EOP inmates awaiting Level IV, Level III, or PSU beds had been waiting longer than 60 days. Over 90 percent of EOP inmates awaiting hub beds had been waiting more than 30 days. EOP inmates pending transfer or awaiting a bed in one of CSATF's EOP programs typically received only weekly PC contacts.

Other Issues:

Administrative Segregation

CSATF's administrative segregation programs were located on Facility E-1 and in a stand-alone unit. There was also an overflow unit. On November 30, 2010, CSATF housed 311 administrative segregation inmates, including 107 3CMS, 17 EOP,

and 187 non-MHSDS inmates.  All MHSDS inmates were housed in Facility E-1, with four inmates in the overflow unit.  The stand-alone unit did not house caseload inmates.

A total of 437 inmates were placed in administrative segregation during the monitoring period. The average length of stay was 46.8 days.  Nine of 135 MHSDS inmates reportedly had total treatment cooperation/participation levels below 50 percent for a three-month audited period.

Of the 17 administrative segregation EOP inmates, five had lengths of stay of 90 days or more.  A record review for November 2010 indicated nine days when inmates were temporarily housed in the overflow unit.

Of the 107 administrative segregation 3CMS inmates, 33 had lengths of stay greater than 90 days, 17 had lengths of stay between 90 and 180 days, and 14 had lengths of stay between 180 and 270 days.  Two remaining inmates had lengths of stay of 526 and 990 days.

The MHTS.net system indicated that no 3CMS inmates were erroneously placed in the stand-alone unit.  It was reported that, between April 1 and December 1, 2010, 39 inmates placed in the stand-alone unit were evaluated for MHSDS consideration.  Twenty-one of these inmates were subsequently admitted to the MHSDS program.

UHR audits indicated compliance with many administrative segregation Program Guide requirements but confidential treatment space was reported to be problematic.  Two groups operated in administrative segregation.

MHCB

MHCB programming was problematic. Of concern were the practices of handcuffing all inmates during escort from the CTC to IDTT meetings, placing inmates in therapeutic modules during IDTT meetings, handcuffing some inmates while they were in the therapeutic modules, and restricting inmate clothing to a smock or blanket during MHCB placement.

A May 2010 audit indicated that SRACs were properly completed for 89percent of MHCB admissions. Compliance with the completion of History and Physicals within 24 hours of MHCB admission improved from 80 percent in May 2010 to 89 percent in August 2010.

Group therapy was not provided in the MHCB unit, and MHCB inmates seldom received yard.

Staff reported that correctional counselors frequently were not present during IDTT meetings. Staff typically reviewed C-files, when available, as to inmates' disciplinary records.

There were 14 applications of five-point restraints. Restraint log review indicated five problematic entries, with four missing release times and one illegible.

EOP

As part of the plan to address EOP bed space shortages, CSATF had activated two EOP programs on Facilities F and G. The first phase of the initially activated program, a 176-bed Level I and II SNY EOP program, was activated on April 5, 2010, and involved filling 88 beds. The second phase of activation, with an additional 88 beds, began on June 24, 2010. The program was fully activated by August 26, 2010.

CSATF also established an 88-bed Level I/II program for inmates with a "co-occurring" axis I diagnosis of "substance abuse."  The "co-occurring disorders" EOP program represented a unique combination of EOP services and services from contract substance abuse treatment providers.  Activation of the "co-occurring disorders" EOP program began on August 9, 2010, and was ongoing at the time of the site visit.

Staff reported that for both newly-activated EOP programs, inmates were scheduled for between 4.25 and 5.25 hours of daily treatment.  However, MHTS.net could not generate compliance data for the timeliness of initial PC contacts and IDTT meetings, and for structured therapeutic activities.  Data indicated that yard time offered to EOP inmates on Facilities F and G increased from a monthly average of six hours and 30 minutes during May 2010 to just under nine weekly hours during September 2010.

Observation of EOP IDTT meetings indicated attendance by appropriate team members and representatives from the substance abuse counseling agency.  Inmates also attended and participated meaningfully.  However, most IDTT meetings occurred without UHRs.

Review of EOP inmates' records indicated mixed results.  Treatment plans generally appeared well-conceived and responsive to inmate needs.  Noted problems included occasionally sparse clinical notes, instances when treatment plans were not found in the record, and instances when clinicians were not aware that inmates had been referred to DMH.

EOP inmates reported problems with medication continuity.  They expressed difficulty with clothing exchange, and many indicated a desire for access to

"work" programs. Inmates assigned to the Facility G-1 EOP program generally commented favorably as to interactions with PCs, and as to clinicians' availability.

PC caseloads ranged from 38 to 40 inmates in the Level II SNY program and averaged 30 inmates in the F-3 dual-diagnosis program. PCs were reportedly running groups in both programs. Walden House, an outside contractor, had assigned five counselors, a clinical supervisor, and an administrative supervisor to the dual-diagnosis program.

### 3CMS

Nine PCs were assigned full-time to the 3CMS program, and an additional four clinicians were assigned part-time. CSATF reported that PC caseloads exceeded established ratios by a range of 163 to 257 percent.

PCs offered a small number of groups. They openly acknowledged that large caseloads prevented them from meeting inmate group demand. There were 106 3CMS inmates enrolled in groups. Ninety-nine inmates were on a group wait list.

CSATF reported compliance for initial IDTT meetings within 14 days of inmate arrival, meeting suicide risk assessment timelines, timely treatment plan development, maintaining of minimum quarterly contacts, maintaining of annual 3CMS treatment plan reviews, and appropriate commencement of discharge planning for required cases. Psychiatrist IDTT attendance was reported to be noncompliant.

### Referrals

CSATF was reportedly compliant with response to psychiatry's and PCs' emergent and urgent referrals, but struggled with routine referral responses. An August 2010 audit indicated that 88percent of PC routine referrals and 83percent of psychiatrist

routine referrals were compliant. Average response times for PC and psychiatry routine referrals reportedly approached six and seven working days, respectively.  However, QIT referral tracking data suggested substantially lower routine referral response rates.  It indicated that PC routine referral responses ranged from five to ten working days, and that psychiatry routine referral responses were typically one to four weeks behind. Analysis of a MHTS.net referral tracking report for September 2010 indicated 49-percent compliance rate for routine referral responses.

Medical Records

Staff reported general difficulties with medical record access.  Staff on one 3CMS yard estimated that records were unavailable for 35 to 40 percent of scheduled appointments.  It was also reported that health care records were generally unavailable for a period of a week or more after inmate placement in the mental health program.

Medical records staff struggled to absorb the increased workload associated with activation of the two EOP programs.  Staff reportedly delivered 600 to 700 UHRs daily for ducated and add-on healthcare appointments.  It was also reported that loose filing substantially increased during the reporting period.  It averaged 83 inches during April, May, and June, and reached 223 inches in August 2010.

RVRs

CSATF issued 532 RVRs to 3CMS inmates and 61 RVRs to EOP inmates. Mental health assessments were conducted for 79 RVRs; which included 12 RVRs issued to MHCB patients, 51 RVRs issued to EOP inmates, and 14 RVRs issued to 3CMS inmates.  It appeared that nearly all RVRs issued to EOP and MHCB inmates were properly referred to mental health.

Data as to RVRs issued to 3CMS inmates was not routinely forwarded to mental health staff for IDTT meeting use. Although staff reported obtaining such RVR information from C-files during IDTT meetings, C-files were reportedly only available for between 34 and 68 percent of IDTT meetings.

Access to Care

Access to healthcare appointments appeared to be good. It was reported that approximately 90 percent of ducated healthcare appointments resulted in contacts. Most missed appointments were reportedly the result of clinician cancellations or inmate refusals.

Modified Programs

Staff reported that Facility C was subject to near-continuous modified programs during the reporting period. The institution continued to use rolling blackouts to reduce personnel costs. Despite this, line staff from all MHSDS programs reported that priority mental health ducats were consistently honored, and that confidential contacts were the norm.

**Pleasant Valley State Prison (PVSP)**
November 30, 2010 – December 2, 2010

Census:

On November 29, 2010, the total prison population was 4,614, down slightly from the total reported population of 4,720 during the preceding monitoring period. There were 1,946 inmates in the MHSDS program. There were eight inmates in the MHCB unit. Among EOP inmates at the institution, six were at the EOP LOC pending transfer to a hub institution, five were in the mainline, and one was in

278

administrative segregation.  There were 1,795 mainline 3CMS inmates and137 administrative segregation 3CMS inmates.

Staffing:

       PVSP continued its recruitment and hiring activities since the preceding monitoring period.  As of September 30, 2010, the overall mental health vacancy rate was 17.7 percent, reduced to a functional vacancy rate of 9.3 percent with use of contractors.

       Positions for the chief psychiatrist and the chief psychologist (who also serves as chief of mental health) were both filled.  Of the four senior psychologist positions, 2.5 were filled, leaving a 38-percent vacancy rate.  Contractors covered one position, reducing the functional vacancy rate to 12 percent.

       Out of 6.5 staff psychiatrist positions, 5.5 were filled, for a vacancy rate of 15 percent.  Of the 20.12 staff psychologist positions, 16.5 were filled.  FTE contractors filled 3.52 psychology positions for just about full coverage. The 1.5 social work positions were filled, as were seven of eight PT positions.  The health program specialist position and 4.5 of the 5.5 RN positions were filled.  The SRN II position was vacant.

       The institution did not utilize telemedicine or recreational therapists.

Quality Management:

       The local governing body met monthly during the reporting period and addressed relevant topics.  Minutes of meetings were maintained.  The quality management committee also met monthly during the reporting period and maintained minutes.

       The minutes of mental health subcommittee meetings generally reflected attention to relevant issues, such as conducting IDTT meetings within Program Guide

requirements, location of MHSDS inmates in the stand-alone ASU, and the percentage of contacts in administrative segregation that were cell-front.

The mental health subcommittee reported to the quality management committee on issues such as department-wide challenges in placing DMH referrals, staffing, interview space, and equipment for offices, and upcoming monitoring visits.  However, the minutes did not reflect that mental health-related issues were brought to the committee for resolution, even when the issue required a higher level of authority for resolution, such as the need for available space on a regular basis for treatment activities. Overall, attendance at mental health subcommittee meetings remained problematic. A quorum was present at only half of the meetings that occurred during the reporting period.  The sole QIT initiated during the reporting period examined response time to referrals to mental health and psychiatry.

The overall quality of conducted audits was improved but continuing difficulties frustrated audit efforts.  The facility did not have access to MHTS.net during the reporting period and did not maintain global data on many measures.  Mental health staff continued to report significant problems in obtaining adequate audit information from nursing staff relative to compliance with medication management.

Interviews with line staff indicated that findings associated with quality management activities were not widely disseminated.  Some information presented in audits that should have prompted attention by supervisory staff apparently did not.

The institution reported that monthly peer review occurred for psychiatry, psychology, and social work.  As a group, staff reviewed five to ten records per month. Peer review was running well and effectively for psychiatry.  Psychologists were still

adjusting to the concept and process, and results were improving.  Peer review for social workers was combined with psychology because the facility had only 1.5 social work positions.  The reviews were weighted toward documentation-related issues, and included some qualitative practices such as appropriateness of diagnoses, doses of psychotropic medications, timely ordering of relevant laboratory tests, and comprehensiveness of obtained mental health histories.

Suicide Prevention:

The institution reported no completed suicides during the monitoring period.

The SPRFIT was scheduled to meet monthly during the reporting period.  Minutes were maintained.  During the reporting period, five of six scheduled meetings were held, with a quorum present at three.  The SPRFIT audited custody wellness checks in administrative segregation and five-day follow-ups.  Following correction of data entry errors, the compliance rate for these areas was found to be 100 percent.  A review of the minutes did not indicate that the SPRFIT systematically audited the use of suicide risk assessments.  The team reviewed non-lethal suicide attempts but did not formally track non-suicidal self-injurious behavior.

Emergency response drills were conducted monthly for all three shifts within both ASUs. Cut-down scissors were maintained in the control office.  Staff was required to keep micro-shields on their person, but a spot check by the monitor indicated that some staff was keeping these within their lunch sacks, which were not immediately accessible.

Review of documentation and interviews with staff indicated that standard procedures ensured that inmates who reported suicidal ideation or exhibited signs of elevated risk were evaluated for admission to the CTC. A review of the selected medical records found that suicide risk assessment checklists were used to evaluate candidates for admission to the MHCB and at the time of discharge. Completeness of the risk assessments varied. While most evaluations noted pertinent risk and protective factors, relevant factors were not checked on some forms. Of greater concern was the frequent omission of an actual estimate of level of risk of suicidality.

In administrative segregation, meetings between the unit PT and the unit sergeant were conducted to discuss new admissions and inmates with mental health problems. The meetings were logged by both persons. A monthly audit of these logs during the reporting period indicated a compliance rate ranging from 62 to 94 percent.

All MHSDS inmates in administrative segregation were placed into the ASU II building, apart from all other inmates in administrative segregation, who were placed into ASU I. All new administrative segregation admissions were checked within 24 hours of placement by a PT for current participation in the MHSDS. All new placements received a health care screening, including a questionnaire regarding any current suicidal ideation. PVSP had no LOP regarding inmate profiles for suicidal history, but the institution reported that the profiles were reviewed by the case manager.

All Unit I placements were given the standard 31-question mental health screening, administered in a confidential office. An institutional audit found that 73 percent of these inmates refused this screening. Per institutional policy, they all were seen by a psychologist at cell front within one week to identify the presence of any

mental health issues.  According to an institutional audit, 99 percent of these inmates were provided with a mental health orientation and education pamphlet.  The institution reported that 22 mainline inmates were added to the 3CMS program as a result of assessments in Unit I and were transferred to Unit II within an average of 13 hours, with a range of two to 24 hours.  Nine MHSDS inmates were erroneously placed into Unit I and were reported to have been transferred immediately.

MHSDS inmates placed into Unit II did not routinely receive the 31-question mental health screening.  Per policy, they were routinely seen individually in a confidential space by the Unit II psychologist.  They were to be referred for an IDTT update of their treatment needs and plan prior to initial ICC review of administrative segregation placement.  However, an institutional audit of 80 new admissions during the reporting period revealed that only 48 percent of these IDTT reviews were conducted. When they were done, it was on average 11.7 days after placement into administrative segregation.

Three new intake cells, with suicide prevention modifications, were available for new placements within Unit II.  According to the unit sergeant, these cells were almost always filled.  Other cells posted with dates of admission were utilized for new intakes when the above cells were filled.

All inmates in administrative segregation received 30-minute welfare checks throughout their first 21 days of placement. These checks were conducted on a staggered-time basis.  An institutional log of these checks conducted during the reporting period indicated a 100-percent rate of compliance.  Also, a log indicated that hourly custody welfare checks for up to five days were given to inmates who had been released

from the MHCB.  A log of the welfare checks indicated, and custody staff confirmed, that the welfare checks were being completed as required, and that they occurred routinely for the first 24 hours of release, or longer if clinically indicated.

PT rounds were conducted in both ASUs on a daily basis.  The institution conducted an audit of these rounds for each month during the reporting period and found 100-percent compliance.  The monitor's review of 15 UHRs corroborated this.

Cells within Unit II, but not those in Unit I, were equipped with electrical outlets for use of personal televisions or radios.

While all inmates within ASUs are to be offered ten hours per week of out-of-cell exercise time, the monitor's review of unit logs could not confirm that this was occurring.

Medication Management:

The institution reported that 39 percent of newly-arriving inmates received their medication on the day of arrival or the following day, that 38 percent received their medication within two days, and that the remaining 23 percent received it within three to 18 days of arrival.

An audit of 68 of 137 cases of inmates discharged from the CTC during the monitoring period found that 97 percent received their medication either on the day of transfer or the following day.    Anecdotal reports by staff and inmates indicated that continuity was frequently interrupted when inmates were moved.  The situation was better, however, for inmates moved to the ASU which housed MHSDS inmates.  An institutional audit found that 87 percent of 142 inmates with current psychotropic orders who were moved to administrative segregation received their medication within one day.

284

PVSP continued its practice of having all orders for psychotropic medication written DOT. It maintained a central list of inmates with DOT orders but no audits of DOT practices were done.

PVSP initiated three Keyhea petitions during the monitoring period. A hearing was held on a fourth petition that had been initiated prior to the monitoring period.

According to institutional documentation, there were 562 inmates with HS orders on September 30, 2010. According to staff, medication ordered HS was typically administered at or after 8:00 p.m. No audit results were reported.

Sexual Misconduct:

Since PVSP does not have an IEX treatment program, inmates diagnosed with Exhibitionism require transfers. The institution reported that six IEX RVRs were issued during the reporting period, all resulting in a screening and IDTT review. Only one case proceeded to a comprehensive evaluation, which led to a diagnosis of Exhibitionism. The monitor's expert found the review to have been thorough, with its conclusions adequately justified. This inmate was referred to the Exhibitionism treatment program, with transfer pending at the time of the monitor's visit. Review of the file with the chief of mental health showed that the referral to the treatment program had not been appropriately processed, and would likely have to be re-referred to the ICC for an appropriate transfer recommendation. The inmate's SHU term expired during his administrative segregation stay and he was released to a mainline yard, where he was placed at the 3CMS LOC. This was the only sexual misconduct violation that resulted in the imposition of a SHU term during the monitoring period.

Custody measures such as yellow covers over cell windows, warning notices on cell doors, and exposure-control jumpsuits were noted by the monitor and were reportedly utilized in all sexual misconduct cases.

Transfers:

The facility reported four referrals to DMH acute care and no referrals to DMH intermediate care during the monitoring period. One of the acute care referrals was rescinded. Timelines were difficult to track in some cases because of discrepancies and missing entries in the data provided. Based upon the available information, referrals were completed and sent to DMH the same day or the following day. In two of the three cases, transfer to DMH was made within two working days of referral. No information was available regarding transfer dates on the third case.

In the MHCB, review of provided charts and documentation, and observation of IDTT meetings, raised concern that some inmates may not have been referred to DMH when clinically warranted. The institution's documentation concerning DMH reviews and reasons for non-referral of cases which satisfied at least one criterion for referral contained some incomplete and discrepant information. A review of the form used to document consideration for DMH transfers indicated that in a number of cases, staff did not have access to information concerning RVRs and therefore could not assess whether the criterion of receiving three of more RVRs during the preceding three-month period had been met. Some forms which had positive findings for consideration for DMH referral contained no rationale for the non-referral. Of greater concern was the fact that information on some forms was inaccurate. The information erroneously showed no indicators for consideration of DMH referral when the case met at least one criterion. In

two of these cases, because the form did not contain any positive findings, the facility did

not conduct a full assessment of whether the inmate may have required DMH referral.

There were indications that staff may have misunderstood DMH referral criteria, which

may have led to non-referral of some inmates for whom referral was clinically warranted.

For example, pre-site visit material provided by PVSP stated that an inmate must first be

a patient in the MHCB before he can be referred to DMH.  One case indicated that the

treatment team made a clinical decision not to refer an inmate to DMH, based not upon

the lack of clinical need, but rather upon the clinicians' previous experience that it could

take months before a non-suicidal inmate would be transferred to DMH.  In this case, the

clinicians' assessment was that such an extended wait in what was described as the

"isolative nature of the CTC" would be counter-therapeutic, and the inmate was not

referred.

PVSP's CTC was staffed for six MHCBs and licensed for five, but staff

reported up that to 13 CTC beds could be used as crisis beds on an as-needed basis.

PVSP did not provide data regarding the number of referrals to the MHCB.  From April 1

through September 30, 2010, there were 138 admissions to the MHCB.  One in four

stays, or 33 of 138, were ten days or longer, but half of those were limited to 11 days.

Seventy five of 138, or 54 percent, of stays lasted from one to five days in duration.  The

remaining 46 of 138, or 33 percent, were six to ten days in duration.  PVSP reported that

19 inmates had multiple admissions during the monitoring period.  One of these inmates

was admitted four times and eventually transferred to an EOP program.  Administrative

delays in moving inmates who were discharged from the MHCB were reportedly rare and

short in duration.

The institution had no OHU/MHOHU.

During the monitoring period, there were a total of 23 EOP inmates at PVSP. Only five remained at the time of the monitor's visit. The levels of care of two of those five inmates had been changed from 3CMS to EOP within six weeks after the end of the review period on September 30, 2010. Both of these inmates had lengths of stay of 58 days and counting. Overall, the lengths of stay for all EOP inmates ranged from six to 104 days.

Other Issues:

Administrative Segregation

EOP inmates placed into administrative segregation, or whose LOC was elevated to EOP level following placement there, were to be transferred within 60 days to an EOP hub institution. However, this did not routinely occur, and data provided on this topic was not consistent across data sources. No EOP inmates were in the ASU at the time of the monitor's visit.

A staff audit that included all 243 MHSDS admissions to administrative segregation found that 72 percent of the initial IDTT meetings were completed within 14 calendar days. A staff audit of 53 randomly selected treatment plans found that IDTT meetings were always attended by the PC, and a psychiatrist was present at 98 percent of meetings. However, the audit found that meetings did not all have the benefit of a full treatment team. A correctional counselor was present at 87 percent of the meetings sampled, and a PT attended 49 percent of the meetings. Some areas were not audited during the monitoring period. For example, the institution did not audit weekly case manager contacts, or whether IDTT meetings were held before ICC meetings.

Chart reviews of MHSDS inmates housed in administrative segregation showed that rounds were conducted regularly.  Weekly summaries by PTs contained clinically useful observations.  The monitor's expert's observation of the PT's rounds indicated that she had a good understanding of the rounding process.  However, on the day that rounds were observed, there were significant staff shortages and the rounds were rushed.

Group space was not confidential, although the eight therapeutic modules were set up appropriately.  A number of therapeutic groups were cancelled, sometimes due to staff shortages.  During the reporting period, the facility reported that the initial six clinician-led groups had been reduced to two because of staffing issues.  Emphasis was shifted to recreational groups run by occupational therapists.

The ASU had confidential offices.  Chart reviews indicated that clinical contacts generally occurred with the required frequency. Some treatment plans were individualized and comprehensive in their approaches, while some were more generic, stating only the basic requirements such as one-to-one case management weekly rather than individualized goals and objectives.  Subsequent treatment at times did not reflect the more individualized approach to treatment planning demonstrated in some of the plans. For example, a specific clinically indicated treatment modality such as relaxation techniques or cognitive behavioral therapy might be planned, but subsequent notes did not reflect the use of these techniques.  There was significant variability among clinicians concerning the number of clinical contacts that occurred cell-front.

The institution had a practice of placing non-administrative segregation inmates in administrative segregation housing while waiting for an appropriate bed to

become available.  This typically involved SNY inmates.  During the time spent in

administrative segregation, the inmate's privileges, including access to property, were

reported to be limited to the same extent as for administrative segregation inmates. On

the day of the site visit, there were two inmates in this status, but staff reported that there

have been as many as 20 at any given time.  This practice was of clinical concern for

some of the inmates in that status, including one inmate with significant static risk factors

for suicide.

<u>MHCB</u>

PVSP did not provide all requested documentation regarding MHCB

operations, nor was all of the provided information reliable. Documents and logs

pertaining to the use of restraints and seclusion showed different tallies.  Logs indicated

that restraints or seclusion were used on five occasions, but an administrative summary

indicated only a single use of those modalities.  Staff did not maintain logs of holding cell

use in the TTA or in the yards.  Anecdotal reports of custody and clinical staff indicated

that inmates referred from the yards for evaluation for admission to the CTC rarely

waited in the holding cells located in those yards longer than two hours.  Staff reported

that the TTA was used to hold inmates for brief periods of time, but in one reviewed case,

the inmate waited overnight in the TTA pending MHCB placement.  Staff reported that

inmates in holding cells were placed on one-to-one observation.

Information provided by PVSP stated that inmates entering the MHCB

were individually evaluated as to property allowed and privileges granted.  In every case

reviewed, all inmates were placed on suicide precautions, resulting in their sleeping on

mattresses on the floor, being dressed in suicide smocks, and having no access to

290

property.  At the time of the monitor's visit, several beds had been pulled out of rooms,

reported by the administrator to have been removed from the MHCBs at the direction of

central office.  Based upon record reviews and observations, the standard course of

treatment did not involve seeing inmates out of cell except for IDTT meetings.  At the

IDTT meetings observed, all inmates were cuffed and dressed in suicide smocks.

3CMS

Audits conducted by the facility indicated that 338 of 368, or 92 percent

of, initial mental health contacts with newly arrived 3CMS inmates were completed

timely.  Staff audited a random sample of 639 3CMS IDTT meetings held in the general

population and found that a psychiatrist was present at 98 percent of the meetings.  A

staff audit found that UHRs were available for IDTT meetings in 87 percent of cases

reviewed.

Confidential treatment space for clinical interviews remained unavailable.

Anticipated infrastructure improvements had not materialized since the time of the

preceding monitoring visit.  Staff continued to report the need to negotiate for treatment

space on an ongoing basis.  Although ten groups were reported to have been functioning

over the course of the monitoring period, group treatment was curtailed by the need to

use chapels and libraries on an *ad hoc* basis.  This led to the cancelation of many groups.

The facility reported that as a result, wait list times for group treatment were lengthy.

During the reporting period, the facility experienced an influx of new

admissions which occupied staff efforts.  Their ability to manage the caseload was also

affected by a loss of psychiatric staff.  During interviews, inmates expressed concern

about the wait time for psychiatric appointments.  Staff confirmed that it took longer for inmates to be evaluated by a psychiatrist.

Heat Plan

According to the institution, the heat plan was activated at PVSP for the period from May 1, 2010 through October 31, 2010.  Heat cards were provided to all inmates on heat-sensitive medications.  Heat logs for each housing unit were collected monthly and filed with the litigation coordinator.  There were a total of 66 stage I, i.e. outside temperature exceeding 90 degrees, heat alerts during the reporting period.  Per the health program supervisor, no stage two or three alerts occurred during the monitoring period.

RVRs

Per institutional policy, all EOP and MHCB inmates issued RVRs were referred to mental health staff for completion of a mental health assessment.  3CMS inmates who exhibited bizarre, unusual, or uncharacteristic behavior were also referred for assessment.

No MHCB inmate received an RVR during the reporting period. Four EOP inmates received RVRs, with one found not guilty at the hearing, based partially upon the mental health assessment.  Per an institutional audit, 590 RVRs were issued to 3CMS inmates during the reporting period, with 49 cases being referred for mental health assessments.  A staff audit of the referred cases indicated that the assessments were completed within required timelines and were reviewed by the hearing officer, who considered the findings in the final disposition.

Mental health assessments for RVRs were assigned to all clinicians. PCs did not review their own cases.

The monitor reviewed seven RVRs in which the mental health assessment concluded that mental health factors contributed to the behavior and should be considered in the final disposition. One 3CMS inmate, who was subsequently elevated to the EOP LOC, received four RVRs during a three-day period in May 2010 and a subsequent RVR in July. In each case, the mental health assessment found that the inmate's mental disorder contributed to the behavior, and should be considered in the disposition. The inmate was nonetheless found guilty of the original charges in all cases. A second 3CMS inmate who was charged with IEX was found guilty and referred for evaluation for the Exhibitionism treatment program. A third 3CMS inmate was found guilty of resisting a peace officer, with no mitigation from the hearing officer. One 3CMS inmate received an RVR for self-mutilation for the purpose of staff manipulation. He was referred for a mental health assessment, which concluded that a mental disorder did not contribute to the behavior. The case proceeded to a hearing in which he was found guilty. There was no indication that the chief of mental health had reviewed or authorized the processing of the RVR.

Modified Programming

Institutional lockdowns were a significant impediment to the delivery of care at PVSP during the reporting period. During these periods, the provision of group therapy was complicated by the need to separate affected individuals. Individual contacts for some inmates required use of custody escorts. The lengthiest lockdowns involved non-SNY inmates in B and C yards.

Pre-Release Planning

Despite previous plans, PVSP was unable to implement a specific pre-release planning program.  No TCMP services were available for the 3CMS population at the institution.

## Avenal State Prison (ASP)
February 28, 2011 – March 2, 2011

Census:

On February 25, 2011, ASP housed 5,702 inmates, which represented a 12-percent decrease in the inmate population since the preceding monitoring period.  The institution's MHSDS population increased by eight percent, to 1,321 inmates.  There were 18 mainline EOP and 1,258 mainline 3CMS inmates, and 26 inmates in the OHU, including nine 3CMS and two EOP inmates.  The total administrative segregation population of 134 included 34 3CMS inmates.

Staffing:

Of 49.15 allocated mental health positions, 40.75 were filled and 8.4 were vacant, for a 17-percent institutional vacancy rate.  Contractors provided an additional 6.65 FTE coverage, reducing the mental health functional vacancy rate to four percent.

The position for a senior psychiatrist was vacant, as were 3.75 of five staff psychiatry positions.  Contract psychiatrists provided an additional 3.5 FTE coverage.

Positions for a chief psychologist and two senior psychologists were filled. Twelve of 15 psychologist positions were filled, and contractors provided an additional three FTE coverage.  The 2.5 social worker positions were filled.

The senior PT and ten line PT positions were filled.  One of 1.15 RT positions was filled, and the remaining .15 opening was covered by contractors. However, the RT was on extended leave, rendering this position effectively vacant.

Eight of 8.5 MHSDS clerical positions, one office services specialist II position, and one RN position were filled.

ASP used 226.2 hours of psychiatry telemedicine.

Quality Management:

ASP's local governing body was directed by the warden and the health care CEO.  During the review period, it met once, kept meeting minutes, and had a quorum at that meeting, but has since been disbanded.

The quality management committee was chaired by the health care CEO. It met monthly, maintained meeting minutes, and reportedly always had a quorum.

The mental health subcommittee was chaired by the chief of mental health.  It met 11 times, maintained meeting minutes, and reportedly always achieved a quorum.  The mental health subcommittee addressed numerous mental health issues, including pre-screens in administrative segregation, compliance with five-day follow-up, peer review, suicide risk assessments in the OHU, DMH referrals, staffing issues, and filing of inmate profiles in UHRs.  Findings of the quality management committee and the mental health subcommittee were distributed during mental health staff meetings.

Four active QITs addressed laboratory studies of inmate blood levels of psychotropic medications, group treatment, IDTT meetings, and continuity of care.  The group treatment QIT addressed the lack of EOP group treatment, among other things.

Reportedly, line staff participated actively in QITs. A FIT addressed referral completion deficits; transition to the MHTS.net system required a change in referral processing.

Psychiatry peer review was limited to mutual written audits with limited actual communication. Peer review in psychology and social work was active. The process identified problematic areas including failure of narratives in SREs to address risk factors, and lack of documentation of PC contacts in UHRs.

Suicide Prevention:

There were no suicides at ASP during the reporting period.

The SPRFIT met monthly, maintained minutes, and reportedly always had a quorum. SPRFIT agenda items and training activities included procedures for custody welfare checks in administrative segregation, five-day follow-up, completion of pre-placement screens, procedures for releases from the OHU. In November 2010, it came to light at the institution that OHU placement orders were being written for suicide precautions with 30-minute checks, rather than the required 15-minute staggered checks. It also was determined that OHU placement orders were not being consistently updated every 24 hours.

The emergency response review committee conducted and reviewed quarterly training drills on emergency response. Staff reported that CPR refresher training was provided annually. Custody officers produced micro-shields on request. Spot checks indicated the presence of cut-down tools and PPE.

An audit of clinical five-day follow-up after discharge from the MHCB, OHU, or alternative housing indicated 99-percent compliance. Five-day follow-up audits

for inmates placed in the OHU for suicide prevention or psychiatric observation indicated 98-percent and 96-percent compliance rates, respectively.

In administrative segregation, the sergeant's morning meeting with mental health staff was documented as taking place 92 percent of the time.

Another audit indicated 86-percent compliance for completion of pre-placement screens inmates admitted to administrative segregation. An audit of compliance with the 31-question screen indicated 95-percent compliance for documentation in the log book.

ASP had eight cells that were retrofitted and designated as new intake cells. These cells faced the administrative segregation control booth and allowed for more visibility into the cells. At times the new intakes outnumbered the retrofitted cells. Newly-arriving inmates were then placed in cells adjoining the designated intake cells,

For completion of 30-minute welfare checks for newly-arriving inmates in administrative segregation, an audit indicated 98-percent compliance. However, review of the documentation of these checks indicated that many began and ended at exactly the same time, and many appeared to have the same duration. A custody officer was observed to be noting welfare checks on sheets which had start-times for the entire shift already completed.

Observed daily PT rounds in administrative segregation were conducted appropriately and thoroughly. The PT appeared knowledgeable about the inmates with whom he spoke and demonstrated good rapport with them. An audit of the administrative segregation log book indicated 99-percent compliance for daily PT rounds.

Administrative segregation cells did not have electrical outlets.

297

Inmates in administrative segregation reportedly received yard several times weekly.  Review of documentation indicated that inmates were offered less than ten hours of yard time per week.  It was reported that a sufficient number of correctional officers were assigned during second watch to escort inmates to and from yard.

Medication Management:

ASP reported that on January 6, 2011, 980 inmates, or 74 percent of the MHSDS population, were prescribed a total of 2,100 psychotropic medications.  This represented a decrease from the 85 percent of MHSDS inmates who were prescribed psychotropic medications during the preceding monitoring period.

The rate of availability of medications within 24 hours for newly-arriving inmates continued at 86 percent since the preceding monitoring period.   Seventy percent of new arrivals received their medications on the day of arrival.  The reported average number of days from arrival to medication availability was .62, with the longest wait at eight days.

For availability of medications following intra-institutional moves, 94 percent overall received their medications within 24 hours.  Following transfers into or out of the OHU or administrative segregation, 99 percent received them within 24 hours.

An audit by the supervising RN of 1,620 MARs found that medications were administered as ordered and documented legibly in 78 percent of cases. Interviewed 3CMS inmates reported a lack of continuity with psychiatric care. Audits of psychiatric visits found that follow-up appointments were made in 61 percent of cases. In 58 percent of cases, the inmate had two consecutive appointments with the same psychiatrist.

Audits indicated that 98 percent of waiting times in pill lines were less than 20 minutes. The monitor's observation and inmate interviews corroborated this. However, outdoor exposure to the elements continued to be problematic.

An audit of 111 UHRs found that only 73 percent of UHRs contained current signed medication informed consent forms. Interviewed 3CMS inmates stated that contacts with psychiatrists were too brief to discuss medication-related concerns.

A UHR audit found a 79-percent compliance rate for appropriate laboratory orders for psychiatric medications. Seventy four percent of UHRs contained documentation related to laboratory test findings, and 68 percent contained documentation that test results were noted by the psychiatrist.

Psychotropic medications were administered by DOT only in cases where medication compliance or hoarding or cheeking was an issue. A nursing audit by observation of a random sample of 79 DOT medication administrations indicated that 100 percent were administered as ordered.

Only one inmate at ASP was on a Keyhea order. No new Keyhea petitions were initiated, no orders lapsed or expired, and no inmates who had hearings scheduled were discharged or transferred from ASP before the hearing date. ASP reported that there were no orders that were not renewed on advice of counsel.

An ASP audit of 270 cases found that HS medications were administered at 8:00 p.m. or later 100 percent of the time. Inmates corroborated this finding.

An audit of 257 receipts for inmate parole medications indicated that 79 percent complied with requirements for ordering and distribution of these medications.

Compliance rates ranged from a low of 47 percent in August 2010 to a high of 100 percent in December 2010.

Sexual Misconduct:

In cases of sexual misconduct, ASP utilized custody-driven measures such as the placement of yellow placards on cell doors and the use of exposure-control jumpsuits, when necessary.

The sole RVR issued for sexual misconduct resulted in a screen and an IDTT meeting. The inmate was referred for a comprehensive evaluation, which determined that the inmate did not meet the diagnostic criteria for Exhibitionism or Paraphilia NOS. The inmate received a SHU term and the case was referred to the DA. The monitor's expert reviewed the sexual misconduct evaluation and found it to be thorough and appropriately conducted.

Transfers:

A senior psychologist supervisor served as the DMH referral coordinator. Duties included maintenance of the DMH referral log, review of DMH referral packages and screening forms with positive indicators, and serving as liaison between ASP and DMH treatment facilities.

There were no referrals to acute care.

There were five referrals to intermediate care. Four of the five inmates referred were EOP inmates, and the fifth was a 3CMS inmate. All five were referred within five working days of identification. One was transferred to ASH, one was to intermediate care at VPP, two were rescinded, and one transferred to another prison.

One of the transfers to intermediate care took place within 30 days of referral and the other transferred 55 days after referral. Both occurred within 30 days of DMH acceptance and within72 hours of a bed assignment.

ASP did not have an MHCB unit. There were 25 MHCB referrals and 24 MHCB inmate transfers. Seventeen of the inmates who transferred to MHCBs did not return to ASP. They either were moved into the EOP LOC or were transferred from an MHCB to DMH.

All MHCB referrals were accepted on the same day, and 19 transfers occurred by the following day. Of the remaining five MHCB transfers, one occurred within two days, three took place within three days, and one occurred within four days. The average number of days from referral to MHCB transfer decreased from 2.59 days during the preceding monitoring period to .83 days. Inmates remained in the OHU pending MHCB transfer. The average length of stay in an MHCB was reported to be 12.6 days, with an outlier at 24 days.

There were 107 OHU admissions, with an average length of stay at 2.3 days. Although 33 inmates remained in the OHU for longer than 72 hours, it was reported that 21 of these overly-long stays were the result of OHUs placement over a weekend or during a holiday.

There were eight inmates who had multiple OHU placements. Five had three placements, two had four, and one had five. Three placements of EOP inmates in the OHU were notably long, with one lasting 62 days, and two lasting 22 days due to suicide precaution.

During the monitoring period, ASP designated 19 inmates for the EOP LOC. All but two of these inmates transferred to an EOP program within 60 days of designation. The remaining two transferred after 73 and 74 days, respectively. The average number of days from designation to transfer was reported to be 47, and the average number of days from endorsement to transfer was reported to be 26.

On December 31, 2010, ASP housed nine EOP inmates who were pending transfer to an EOP program for more than 60 days, with a range of 64 to 135 days. Bed unavailability was generally cited as the reason for transfer delays.

Other Areas:

Administrative Segregation

The ASU had eight therapeutic modules and four confidential interview rooms for mental health contacts. A group treatment room had modules arranged to permit adequate privacy and visual contact.

An audit and chart reviews generally indicated 93-percent compliance with weekly PC contacts. Are view indicated that 17 percent occurred cell-front. An audit of UHRs found that 94 percent of progress notes included justifications for cell-front contacts, of which 76 percent were attributed to inmate refusals.

Group therapy was available for caseload inmates. Seventy one percent of inmates participated in groups. The group cancellation rate was 11 percent, down from 30 percent during the preceding monitoring period. Custody limitations were not cited as a significant reason for group cancellations.

An audit of 48 IDTT meetings of caseload inmates housed in administrative segregation indicated that all of the IDTT meetings occurred within 90

days of the previous IDTT meeting.  Record review and staff interviews corroborated this

finding.   The monitor's expert observed an IDTT meeting.  The inmate was placed in a

therapeutic module, but was not handcuffed.  All required disciplines were in attendance,

and the UHR and C-file were available.  The meeting was thorough and addressed

difficult issues.

Eleven EOP inmates were in administrative segregation.  The average

length of stay was 29 days, with a range of one to 148 days.  One EOP inmate who was

placed there for safety reasons had been there for 148 days.

Ninety 3CMS inmates were placed in administrative segregation.  The

average length of stay was 108 days, with a range of one to 381 days.  Thirty-nine

percent of 3CMS inmates in administrative segregation remained there for more than 90

days.

OHU

The OHU did not have dedicated mental health beds.  OHU beds were

utilized for mental health patients as needed. There was adequate confidential interview

space on the administrative segregation side of the OHU, but not on the general

population side where mental health contacts were either cell-front or in other generally

non-confidential areas. Staff reported that MHSDS inmates were provided with full issue,

including beds and personal items, unless withheld due to concerns about self-harm or

assaultive behavior.

Inmates awaiting evaluation were placed in one of five holding cells or

two other cells near the officers' station.   Reportedly, they remained in these cells for a

maximum of four hours.  The holding cells had toilets and a bench but the other cells did

not have these features. The officer on duty indicated that mental health inmates were generally held in one of the two non-holding cells so that they could be readily observed. The senior psychologist overseeing the OHU indicated that for most of the reporting period, the OHU did not maintain alternative housing logs.

The monitor's expert observed an OHU IDTT meeting.  Relevant documents, including the UHR and C-file, were available.  The inmate was not handcuffed while in the therapeutic module.  The psychiatrist was not available to participate but two psychologists attended instead.  The staff engaged the inmate in an in-depth discussion to encourage him to help him accept mental health services.

Staff considered mental health inmates housed in the OHU for transfer to DMH.  Records also typically contained adequate rationales for non-referral of inmates who met one or more criteria for consideration for DMH referral.

At the time of the site visit, two EOP inmates were housed in the OHU awaiting transfer to an EOP hub.  Both had been housed there on a long-term basis due to difficulties with functioning outside of the OHU.  One had been housed there for over 120 days.

EOP

ASP did not have an EOP unit.  Staff reported, and chart reviews generally verified, that inmates awaiting transfer to an EOP hub were seen in accordance with Program Guide requirements.  Because inmates awaiting EOP transfer were scattered throughout the facility, they often participated in groups in which 3CMS inmates predominated.  They reported that EOP inmates were given priority for group

participation.  Staff reported difficulties with integrating EOP inmates into existing groups and attendant disruptions.

### 3CMS

Audits and chart reviews generally indicated that 3CMS inmates were seen by PCs according to Program Guide requirements.

The monitor's expert's review of treatment plans found them to be reasonably individualized. However, chart review revealed that subsequent progress notes documenting PC contacts did not routinely correspond to treatment plan goals.

ASP continued to have an active group treatment program that offered a wide range of groups.  Data indicated that a total of 5,401 group appointments, including 3,289 for 3CMS inmates, were scheduled during the monitoring period. Eighty-two percent of these appointments were completed.  Of 970 scheduled group appointments that were not completed, audits found that 43 percent were the result of inmate refusal or lack of presence for the appointment, 33 percent were cancelled by the provider, and 24 percent were cancelled for other reasons.  On February 23, 2011, there were 200 3CMS inmates on a group treatment wait list.

Interviewed 3CMS inmates typically reported adequate access to mental health staff.  Some reported feeling "rushed" in their meetings, especially with psychiatrists.  A number of 3CMS inmates with upcoming parole dates in 2011 expressed the need for pre-release planning.

<u>Referrals</u>

There were a total of 1,861 referrals. ASP reported compliance for all 19 emergent referrals, 87 of the 88 urgent referrals. The average amount of time to complete an urgent referral was .27 days.

ASP reported that 1,597 of 1,754 routine referrals were handled within five working days, for a 91-percent compliance rate. The average time to respond to a routine referral was reported to be 3.54 days.

A FIT conducted in November and December, 2010 on overall compliance with referrals found 97 to 100-percent compliance for referrals to PCs, and 80 to 90-percent compliance for psychiatry referrals.

<u>RVRs</u>

ASP issued 919 RVRs, of which five were issued to EOP inmates and 290 were issued to 3CMS inmates. One EOP inmate received two RVRs. Ten 3CMS inmates received multiple RVRs, including four who had three RVRs, and six who had four RVRs. All five EOP inmates and two of the 3CMS inmates were referred for mental health assessments.

The monitor reviewed the five RVRs issued to EOP inmates. Procedures appeared to have been followed. There was documentation of hearing officers' consideration of mental health input, including explanations of acceptance or rejection of clinicians' recommendations for mitigation of penalties due to mental health considerations. A senior hearing officer dismissed one case due to mental health factors.

**Salinas Valley State Prison (SVSP)**
March 21, 2011 – March 24, 2011

Census:

SVSP's total inmate population was 3,762, six percent higher than was reported in March 2010.  The MHSDS census was 1,513, which was 173 or 13 percent more than was reported in March 2010.  The mainline EOP population was 164 and the mainline 3CMS population was 1,094, both figures close to those reported during the preceding monitoring visit.

While the total number of segregated inmates decreased by seven percent, the number of MHSDS inmates in administrative segregation increased by seven percent, at 248 or two-thirds of the segregated population.  This included 66 EOP hub inmates and 182 3CMS inmates.  There were five inmates in MHCBs and 336 inmates in DMH intermediate care beds.  Including intermediate care patients, mental health inmates comprised half of SVSP's inmate population.

Staffing:

The overall mental health vacancy rate was reduced by half during the preceding year, falling from 22 percent to 11 percent.  Contractors reduced the overall mental health functional vacancy rate to 1.3 percent.

Five of six supervisory positions were filled, including positions for the chief psychiatrist, chief psychologist, and three senior psychologists.  One senior psychologist position remained vacant.

Of the 8.5 line psychiatrist positions, 2.5 remained vacant.  Contract psychiatrists worked four of six months during the reporting period, collectively providing coverage for the equivalent of one full-time position.

307

Among PCs, 4.5 of 37 psychologist and social worker positions remained vacant. Contract clinicians provided coverage of an average of three FTE positions during the reporting period.

Nearly half, or 2.3 of 5.3, of the allocated recreational therapy positions remained vacant, but contract LVNs covered all of these vacancies. All 24 PT positions, including two senior PT positions, were filled. Contract PTs provided additional coverage amounting to four FTE positions.

Eleven of 12 clerical positions and 11.35 of 12.35 RN positions were filled, as were positions for an HPS I, an SRN II, and an SRN III.

Relationships between custody and mental health staff, found to be problematic during preceding site visits, continued to improve.

Quality Management:

SVSP's quality assurance program continued to demonstrate improvement as a result of revamped auditing protocols.

The local governing body, scheduled to convene every other month, met only once during the monitoring period due to holiday-related absences. A quorum was present and minutes were produced. The meeting consisted of several reports presented by various groups including the quality management committee, the mental health subcommittee, the professional practices committee, and the pharmacy department, as well as a presentation by the associate warden of health care.

Weekly quality management committee meetings were scheduled but not always held due to occasional failures to meet quorum. The quality management committee reviewed subcommittee reports, new and revised LOPs, and findings and

recommendations produced by QITs and FITs.   Quality management committee recommendations were forwarded to the local governing body for final approval.

The mental health subcommittee met bi-weekly and maintained minutes. Meetings were well attended.  The subcommittee reviewed performance indices and audit results, monitored the activities of long-standing FITs, and rendered decisions regarding the formation, recommendations, and dissolution of QITs.    Substantive areas of review included suicide prevention, access to care, referrals to higher LOC, and Program Guide compliance within the various MHSDS programs.  Mental health subcommittee activities were communicated to the quality management committee and local governing body via meeting minutes and reports.

SVSP's revamped auditing protocols consisted of six stand-alone quality management reports for mainline and administrative segregation MHSDS programs, as well as for MHCB and psychiatric services. The purpose of these reports was to provide ongoing status snapshots of all of the MHSDS programs and services. The stand-alone reports covered major Program Guide requirements and included information on the purpose and frequency of the audit, sample size and methodology, audit results, obstacles to compliance, and remedial action.

SVSP continued its use of QITs to improve performance in discrete areas. Four QITs, all chartered during preceding monitoring periods, focused on compliance with suicide prevention clinical five-day follow-up and 24-hour security checks, access to care barriers for EOP inmates in administrative segregation, mental health referrals related to safety concerns, and the development of a public service announcement related to inmate access to mental health programs.  A fifth QIT, tasked with improving new-

309

arrival continuity of care, was charted during this reporting period.

SVSP also continued to use FITs to monitor performance in important areas and to recommend remedial activities as needed.  Three active FITs focused on access to care barriers for EOP inmates in administrative segregation, tracking response to mental health referrals, and suicide prevention.

SVSP had an active peer review committee for PCs which met regularly during the reporting period.  A separate peer review program for social workers was initiated in February 2011.  Peer review for psychiatrists had been formed initially to serve as a supervisory tool, but it evolved into more of a consultative process for line practitioners.  There were three psychiatry peer review meetings during the monitoring period.  The institution reported that psychiatry peer review was hampered by turnover and instability among contractors, which was complicated by the fact that the chief psychiatrist frequently covered for absent staff.

Suicide Prevention:

SVSP's SPRFIT met five times during the reporting period.  Nine to 14 participants, including three to eight custody representatives, attended the meetings. Meeting minutes were maintained, but were sparse.  Although there had been six completed suicides during the preceding two years, there was no documented discussion of internal case reviews, QIP recommendations, or related training and policy initiatives. The minutes also did not include performance data relative to attempted suicides, five-day clinical follow-up, hourly custody checks, MHCB admissions, alternative cell placements or DMH referrals.  The activities of the QIT on improving compliance with five-day follow-up protocols were the not presented or discussed during SPRFIT

meetings.

The emergency response review committee met five times during the monitoring period.  Required participants attended and minutes were maintained.   The committee evaluated the institution's responses to medical emergencies, routine training drills, and completed and attempted suicides, the latter of which were forwarded to the mental health subcommittee. Toured segregation units were equipped with cut-down tools, ambu bags, and replacement micro-shields.  Interviewed officers carried micro-shields.  Monthly emergency response drills were conducted and documented during the reporting period.

Compliance with five-day follow-up ranged from 67 to 100 percent for inmates discharged from the MHCB unit, and from 87 to 100 percent for inmates released from alternative holding cells.  Average overall compliance hovered above 90 percent, but fell short of the 100-percent threshold.

Compliance with hourly custody checks during the first 24 hours following release from an MHCB or holding cell was consistently low, averaging just 64 percent.  A QIT that was chartered by the SPRFIT during the preceding reporting period continued to focus on performance in this area.

SVSP was compliant with many but not all of the components of the Department's plan to address suicide trends in administrative segregation.  Minutes documented daily meetings during which healthcare and custody staff discussed new arrivals and other issues relevant to the operation of administrative segregation.

The most serious deficiencies in administrative segregation involved failure to follow screening and rounding requirements.  An internal audit found that pre-

screens were consistently administered to non-MHSDS but not to MHSDS inmates prior to their placements in segregation.  Non-MHSDS inmates were routinely screened by PTs within 72 hours of their placement in segregation.

In segregation units D1, D2, and D8, door placards were used routinely to identify inmates during the first three weeks of their stays in administrative segregation. However, the stand-alone ASU, known locally as unit D9, did not identify all intake-status inmates with door placards.  During the monitor's tour of D9, there were 14 intake placards on cell doors, which was less than half of the number which would be expected, given the average number of placement in the unit during the preceding months.   Inmates who reported arriving in unit D9 only days before the monitor's visit were not consistently identified with intake placards.

Documentation of 30-minute welfare checks in all segregation units was poor.   These checks were not completed at staggered intervals.  Throughout the six-month reporting period, a first watch officer assigned to unit D9 used a single photocopied log to document 30-minute welfare checks.  The entire first watch was missed on seven occasions during February and March 2011.  Most of the logs were signed by only the second watch supervisor, which may explain how failures could go undetected for months.

Internal audits and isolation logs reviewed by the monitor showed that PTs routinely completed daily rounds in all segregation units, including an overflow unit that was intermittently active.

Inmates in segregation were permitted to have in-cell entertainment appliances and were routinely provided access to ten outdoor yard hours per week.

<u>Medication Management</u>:

Newly-arriving inmates, including returnees, consistently received their medications within 24 hours of arrival.

On average, 90 percent of inmates moved within the institution, including moves into and out of segregated units, did not experience interruptions in their medications. However, for inmates discharged from the MHCB unit, audits yielded compliance rates of 56 percent, 71 percent, and 66 percent for timely continuation of these patients' medications.

Compliance rates for timeliness of medication renewals improved steadily over the reporting period, beginning at 53 percent and reaching 90 percent and above during the last two months.

Implementation of medication noncompliance protocols was poor. Nursing audits, based on small sample sizes, found compliance rates that ranged from ten to 39 percent for referral of documented cases of medication noncompliance. Problems were attributed to a high turnover among nurses.

Pill line waits were described as minimal.

New and changed medication orders were not consistently processed within 24 hours. Compliance rates for the reporting period initially were under 70 percent and improved moderately to over 80 percent toward the end.

Limited audits found, and the monitor's expert's review confirmed, that informed consent forms were in UHRs in approximately 85 percent of cases.

Audit findings on adherence to laboratory testing procedures were unreliable due to flawed audit methodology.

313

Medications were prescribed DOT for 593 inmates, including all EOP inmates.  Nursing supervisors randomly observed medication administration in to enforce compliance with protocols.

There were 71 inmates at SVSP with active Keyhea orders at the time of the site visit.  An adequate tracking system was in place.  Ten Keyhea petitions were initiated during the reporting period, of which seven were granted and implemented.  Two were withdrawn by DMH clinicians following the inmate's transfer from SVSP, and one was denied by the administrative law judge.   SVSP successfully renewed 41 Keyhea orders, while only one renewal was denied.

Delivery of HS medications at or after 8:00 p.m. improved substantially during the reporting period.  Audits indicated compliance rates of 71 and 80 percent in August and September 2010, and 100 percent for the remainder of the reporting period.  The institution was unable to provide the number of inmates taking HS medications at the time of the monitor's visit.

Distribution of parole medications was poorly documented. Internal audits found that 11 to 50 percent of paroling inmates signed receipts for a supply of medication before their releases.

Sexual Misconduct:

During the six-month reporting period, SVSP issued 27 sexual misconduct RVRs to 25 inmates, including two inmates who each received two RVRs.  All 27 incidents were reportedly referred for an initial screen, an IDTT review, and a comprehensive evaluation.   However, records reviewed by the monitor's expert indicated that cases were not screened but were given a comprehensive mental health

evaluation.  None of which included a thorough sexual history or any form of

psychometrics, and nearly all concluded that the behavior was the result of antisocial

personality factors.  No inmates were deemed to meet the diagnostic criteria for

exhibitionism and none were referred to an exhibitionism treatment program.

Yellow placards were placed over a portion of the cell windows of inmates

who were found guilty of sexual misconduct.  Exposure-control jumpsuits were used

during out-of-cell activities.  All incidents of sexual misconduct were referred to the local

district attorney's office.

Transfers:

Of the six referrals to acute care, two resulted in transfer.  The average

time from referral to transfer was 22 days, more than twice the ten-day timeframe.

The number of intermediate care referrals rose from ten during the last

reporting period to 25 during this reporting period.  Referred inmates continued to wait

for long periods, although the number on the wait list was reduced from 26 to eight

during the reporting period.  Greater use of expedited transfers was credited with this

Nine referrals were rescinded after long waits and one inmate paroled prior to transfer.

SVSP transferred 26 inmates to intermediate care programs, including 11 who were

referred during the preceding monitoring period.  The average time from referral to

transfer was 111 days, or nearly four times as long as the 30-day timeframe.  Once beds

were assigned, transfers routinely occurred within 72 hours.

A staff psychologist was the assigned DMH coordinator, devoting 50 to 75

percent of a full-time work week to these responsibilities.  The DMH coordinator

maintained all required logs, monitored the location and movement of inmates with

pending DMH referrals, managed the completion and submission of referral packets, communicated with DMH coordinators in other prisons, and worked closely with classification staff to timely identify inmates returning from DMH. The DMH coordinator also gathered clinical information from DMH clinicians regarding inmates returned to SVSP and provided written synopses of this information to the treating PCs and psychiatrists. Lastly, the DMH coordinator conducted weekly rounds on all inmates pending transfer to DMH and, in concert with the PC, initiated expedited transfers when clinically indicated.

Form 7388s were not properly completed or utilized during IDTT meetings. The content of the form was not routinely discussed by the IDTT. Information regarding issued RVRs was often incorrect.

The institution reported that 35 inmates returned to SVSP from DMH during the reporting period. The quality and availability of DMH discharge summaries was improved. However, there did not appear to be a reliable back-up system for ensuring that discharge summaries were forwarded in a timely manner to treating clinicians when the DMH coordinator was absent or off-site during non-business hours. DMH discharge medications were reportedly continued by psychiatrists at SVSP for 14 days while non-formulary medications were either continued via departmental protocols or replaced with formulary medications. No data was provided on the number of cases in which non-formulary medications were continued.

Although the number of MHCBs increased from eight to ten, SVSP continued to use four inmate waiting rooms and three small modules in the CTC to monitor inmates for whom MHCBs were unavailable. The waiting rooms were spacious

and equipped with toilets, and were used to hold inmates during non-business times. Inmates typically spent no more than one night in these rooms. They were provided with a safety mattress on the floor and a suicide-resistant smock and blanket. When additional holding space was needed, four plumbed BPT cells located on each yard were used.

Placements in the holding modules and waiting rooms were recorded on comprehensive logs that included the date and time of placement and release, the reason for placement, and the discharge disposition. According to these records, lengths of stay in the holding modules did not exceed four hours during the reporting period.

During the six-month reporting period, staff generated 434 referrals of inmates to the MHCB. Of these, 314 or 72 percent either failed to meet admission criteria or resulted in a release to housing after time in an alternative holding area. Slightly over 25 percent, 120, of the MHCB referrals resulted in admission, generating an average monthly admission rate of 20. Seven inmates had three or more admissions to the MHCB unit during the reporting period. In one instance, an inmate was placed in an outside MHCB via the HC-POP process.

The average length of stay in the MHCB unit was ten days. Longer stays were most often due to delayed DMH transfers, and in some cases were attributed to Keyhea proceedings, diagnostic clarification, and symptom stabilization.

The institution could not provide tracking data for inmates transferred to PSU programs during the reporting period. However, mental health staff reported that EOP inmates commonly waited several months for PSU beds. Monthly reports of EOP inmates in administrative segregation longer than 90 days appeared to confirm these reports. Nearly a quarter of the excessive stays in segregation were attributed to delayed

PSU transfers.

At the time of the site monitor's, there were ten inmates with current PSU endorsements, two of whom had been waiting longer than 60 days, two who had been waiting 58 days, and the remaining six had been waiting two to three weeks.

Other Issues:

Administrative Segregation

SVSP produced monthly reports of EOP inmates in segregation longer than 90 days. The number of EOP inmates in segregation for more than 90 days ranged from 23 to 36 during the reporting period. Most of the excessive stays were attributed to ongoing disciplinary action/district attorney referrals, pending CSR referrals, and PSU transfers, with each comprising about a quarter of these delays. The remaining quarter was due to court proceedings, pending investigations, and transfers to mainline and SNY EOP programs.

In the SVSP stand-alone ASU, compliance with applicable court-ordered mandates was not routinely tracked. Reportedly, an assigned social worker responded quickly to referrals from the stand-alone unit, but this could not be confirmed by local referral-tracking systems.

Information provided by the institution indicated that 29 inmates in the stand-alone unit were designated at the 3CMS LOC and removed from the unit during the six-month reporting period. However, the information provided did not indicate how long these transfers took. The monitor's review of isolation logs indicated that at least three of the transfers did not take place within 24 hours, as required, but took two, three, and four days, respectively.

The institution did not report on whether or not MHSDS inmates were mistakenly placed in the stand-alone unit during the reporting period.

MHCB

A full-time psychiatrist, psychologist, and PT were assigned to cover ten MHCBs, three of which were temporarily closed for repair at the time of the site visit. A senior psychiatrist supervised the MHCB during most of the reporting period, but this position was transferred to ASP, resulting in the chief psychiatrist assuming supervisory responsibilities.

Internal audits found consistent compliance with most of the basic Program Guide requirements for an MHCB LOC. Intake assessments were completed within 24 hours of admission 90 to 100 percent of the time. Suicide risk assessments were routinely administered to inmates with suicidal ideation upon admission and discharge. Initial IDTT meetings were held within 72 hours of admission 75 to 100 percent of the time, and weekly IDTT reviews consistently occurred thereafter. IDTT meetings were routinely attended by the MHCB clinical team, as well as by the inmate, a correctional counselor, and a sergeant.

MHTS.net tracking data yielded compliance rates ranging from 67 to 83 percent for completion of daily confidential clinical interviews. Reportedly, PTs checked on MHCB patients at cell-front several times a day, and distributed reading, writing, and drawing materials to inmates as clinically allowed. An outdoor recreation area adjacent to the MHCB unit was no longer used. Clinical restraint had not been used by MHCB staff in over a year.

Many aspects of the MHCB operation, including MHCB admissions and

holding area placements, were carefully tracked.  However, it did not appear that these data were routinely utilized to monitor admission trends and utilization patterns.  When asked by the monitor's expert to produce basic information such as average length of stay, average daily census, longest stays, and number of repeat admissions, staff consulted tracking logs and other sources of raw data to compile the data.

Inmates in the MHCB unit remained subject to segregation-like restrictions on their movement and property, regardless of classification, clinical presentation, or length of stay.  All patients were handcuffed when removed from the cell and placed in therapeutic modules during clinical appointments.  Inmates were issued a safety mattress, suicide-resistant smock, and tear-proof blanket upon admission. With improved clinical presentation, an inmate may receive "full issue" clothing which consisted of a pair of boxer shorts and a t-shirt.

EOP

While the quality of observed group treatment in the mainline EOP was noted by the monitor's expert to be excellent, the quantity of therapeutic activities fell short of Program Guide requirements.  Nearly a third of the 164 mainline EOP inmates were on a modified treatment plan or assigned to SVSP's enhanced case management program.  These options were used for inmates who failed to attend half or more of offered therapeutic activities.  For them, the number of groups was replaced with modified treatment plans, more frequent PC contacts, and monthly IDTT reviews.   The number of inmates assigned to this program increased three-fold during the first few months of 2011.

Initial IDTT meetings consistently occurred within the required timeframe, but the average compliance rate for timeliness of 90-day reviews slipped to 68 percent.  Forty-five percent of the inmates in the modified and enhanced case management programs received monthly IDTT reviews.  Noncompliance was attributed to staff absences and the increased workload associated with the rise in the number of inmates with modified treatment plans.  IDTT meetings observed by the monitor's expert were attended by all required disciplines and found to be clinically meaningful.  Higher levels of care were considered via completion of the Form 7388.  While psychiatric participation in IDTT reviews was routine, the inmate's treating psychiatrist was reportedly absent one third of the time.  Input from housing unit officers and information related to work assignments were not discussed during the observed meetings. Treatment plans reviewed by the monitor's expert were noted to be increasingly individualized.

MHTS.net data indicated that psychiatrists completed 95 percent of required monthly contacts.  Psychiatric appointments took place in private offices.  Refused appointments typically prompted cell-front contacts.

MHTS.net data yielded a 96-percent compliance rate for weekly PC contacts, while UHR-based audits tended to produce lower compliance rates for PC contacts.  The average concordance rate between MHTS.net data and UHR documentation was 85 percent.  Forty-eight percent of PC contacts did not occur in confidential settings.  Many of these non-confidential contacts were daily check-ins for inmates who had modified treatment plans and were assigned to the enhanced case management program.

Full EOP programming was available to approximately two-thirds of

mainline EOP inmates.  All were assigned jobs for which they received credit for two structured treatment hours per week.  However, these work assignments were not routinely discussed during IDTT reviews and often involved unstructured duties that were difficult to monitor and incorporate into treatment goals.  Across the monitoring period, a range of 33 to 74 percent of mainline EOP inmates were offered ten hours of structured therapeutic activities per week. The refusal rate for offered treatment ranged from 49 to 57 percent, resulting in 5.8 to 7.5 provided treatment hours per week, including the two hours of work assignments. Staff attributed the high refusal rate to inmate boredom and the relatively higher number of EOP inmates at SVSP with cognitive impairment, dementia, mobility issues and other medical problems. Groups observed by the monitor's expert were well-organized, clinically meaningful, and held in spacious, private rooms that were ventilated and adequately lit.

### Administrative Segregation EOP

SVSP's EOP hub program was compliant with many Program Guide requirements.  The quality of observed group activities was good.  However, the growing number of inmates with modified treatment plans, the substantial inmate refusal rate, the large number of non-confidential PC contacts, and sporadic compliance with monthly medication reviews were areas of continued concern.

The EOP administration segregation hub had a capacity of 72 inmates and was located in buildings one and two on D Facility.  The average hub census during the reporting period was 56 inmates or 78 percent of capacity.  Segregated 3CMS inmates were also housed in the hub and PCs typically carried caseloads that consisted of ten EOP inmates and ten 3CMS inmates.  Treatment space in the hub consisted of two private

offices for individual contacts and two group rooms. The group rooms were equipped with a total of 19 therapeutic modules, none of which conformed to specifications. The modules in both group rooms were placed such that all participants could not see one another.

Fourteen, or 21 percent, of the EOP inmates in the hub at the time of the monitor's visit were enrolled in the enhanced case management program as a result of their histories of refusing at least half of offered treatment. They were prescribed daily PC contacts and monthly IDTT reviews. Internal audits found compliance rates of 90 percent for daily contacts and 94 percent for monthly reviews.

Internal audits yielded compliance rates of 95 percent for initial clinical contacts within five days of placement, 90 percent for conduct of an initial IDTT review prior to the intake classification meeting, and 94 percent for timely completion of quarterly IDTT reviews. An IDTT review observed by the monitor's expert was attended by all required participants, with both UHRs and C-files present. Clinicians were familiar with the reviewed cases, which included EOP and 3CMS inmates. Form 7388s were present but were not always used to facilitate the intended discussions.

Compliance rates for monthly psychiatric contacts in the hub ranged from 62 to 95 percent, and averaged 80 percent during the reporting period. Internal audits found that non-enhanced case management program inmates in the hub were seen weekly by their PCs 96 percent of the time. Nearly half of these contacts did not occur in confidential settings.

Hub inmates who were not enrolled in the enhanced case management program were prescribed full EOP services. There were 40 two-hour group sessions per

week, covering coping skills, art therapy, socialization skills, medication management, anger management, pre-release planning, yoga and stress management, among other things.  A group observed by the monitor's expert was found to be well run.  Data provided by the institution indicated that non-enhanced case management program inmates were offered an average of 11.3 therapeutic activity hours per week.  Inmates attended an average of 5.6 treatment hours per week, given an overall refusal rate of 50 percent.

           <u>3CMS</u>

           Despite an 18-percent increase in the mainline 3CMS population, SVSP was able to maintain compliance with many of the key Program Guide requirements. Compliance rates ranged from 88 to 97 percent for the completion of initial evaluations within ten days of arrival.  Quarterly PC contacts were documented 86 to 99 percent of the time.  Quarterly medication reviews occurred 95 to 100 percent of the time.  These audit results were consistent with case reviews completed by the monitor's expert during the site visit.

           Compliance rates for holding the initial IDTT meeting within 14 working days of the inmate's arrival rose from 68 percent in August 2010 to 88 percent in January 2011, for an average of 78 during the reporting period.   Internal audits produced compliance rates that ranged from 78 to 100 percent for completion of annual IDTT reviews.  All required disciplines attended IDTT meetings 83 to 97 percent of the time.

           A total of 28 groups were available to mainline 3CMS inmates on all four yards at the time of the site visit.  There were 384 3CMS inmates on waitlists for groups. The groups covered anger and stress management, pain management, poetry, coping

skills, substance abuse, conflict resolution, and pre-release, among others. Treatment plans consistently documented consideration of group therapy, though specific group assignments and the underlying clinical rationale were not identified in the treatment plan or in progress notes. Institutional data indicated that 46 to 72 percent of group sessions were cancelled, and that most of the cancellations were due to modified programs and other custodial factors that restricted inmate movement.

<u>Administrative Segregation 3CMS</u>

Segregated 3CMS inmates were housed in the EOP hub and in building eight on D Facility. Building eight on C Facility was used intermittently as an overflow ASU throughout the reporting period, holding as many as 19 inmates at one point. There were three 3CMS inmates in unit C8 at the time of the monitor's visit. There were 3.5 PCs assigned to unit D8, each of whom carried a caseload of approximately 26 3CMS inmates. Treatment space in unit D8 was limited to one private office that was shared by mental health, medical, and nursing staffs, and was insufficient. Inmates were escorted to an outside area for psychiatric appointments one day per week, which increased the availability of the sole treatment room for PC contacts. Nonetheless, a significant number of contacts occurred in non-confidential modules located on the dayroom floor.

Internal audits showed that initial clinical contact occurred within five days of placement in segregation 90 percent of the time. Compliance rates for holding the initial IDTT review prior to the intake classification hearing averaged 82 percent, but fell to 59 percent during the last month of the reporting period. The average compliance rate for quarterly IDTT reviews was 85 percent.

Local audits found that weekly PC contacts occurred 97 percent of the time, but 58 percent of these contacts occurred cell-front. The large number of cell-front contacts was attributed to clinician absences and the lack of confidential treatment space in unit D8. Staff reported that UHRs were not available for 75 to 80 percent of scheduled appointments.

Compliance with monthly medication reviews ranged from 74 to 97 percent and averaged 92 percent during the reporting period.

Referrals

SVSP used its own systems to track mental health referrals of 3CMS and non-MHSDS inmates. Referrals from EOP and segregated inmates were not tracked. According to institutional data, there were no emergent or urgent referrals for psychiatry during the reporting period. PCs responded to 14 of 16 emergent referrals within the same day and to 24 of 29 urgent referrals within one day, generating compliance rates of 88 and 83 percent, respectively. Compliance rates for response to routine referrals within five days were 82 percent for PCs and 67 percent for psychiatrists.

RVRs

SVSP issued a total of 1,965 RVRs, including 880 or 45 percent involving MHSDS inmates. RVRs issued to DMH, MHCB, and EOP inmates were routinely referred to mental health. Slightly fewer than three percent of the RVRs issued to 3CMS inmates resulted in referrals to mental health.

The monitor's review of 12 RVRs completed during the reporting period confirmed that appropriate referrals to mental health were being made, and that completed mental health assessments were a part of the disciplinary process. However,

326

in four of 11 reviewed cases involving EOP, MHCB, or DMH inmates, the mental health assessment was not completed and returned to the hearing officer within 15 days, as required by the Program Guide.  In two cases, the clinician who completed the mental health assessment did not appear to know that the assignment of a staff assistant was required for EOP, MHCB, and DMH inmates.  Four of the reviewed cases highlighted incidents in which severely mentally ill inmates were given longer sentences for behavior that was clearly influenced by serious mental illness.  In some cases, the hearing officer appeared to reject mental health input based on his/her impression of the inmate's behavior during the hearing, typically held several weeks after the incident, and in one case in which the inmate did not even attend the hearing.

**Correctional Training Facility (CTF)**
December 14, 2010 – December16, 2010

Census:

As of December 13, 2010, the total prison population was 6,529.  The total mental health population was 1,119, representing an increase of 122 inmates since the preceding monitoring period.  The 3CMS mainline population was 1,057 and the EOP mainline population was seven.  There were two inmates in the OHU.  There were 51 3CMS inmates in administrative segregation.  Two administrative segregation EOP inmates were pending transfer to an EOP administrative segregation hub.  Due to the conversion of the North Facility to a SNY, the mental health SNY population had grown from approximately 375 inmates at the end of April 2010 to 500 inmates by the end of October 2010, representing an approximately 33-percent increase.

Staffing:

At the time of the site visit, the chief psychologist and 1.5 senior psychologist positions were filled.  Of the allocated 3.5 staff psychiatrist positions, 2.25 were filled.  Contractors covered .875 positions, which resulted in an 11-percent functional vacancy rate in psychiatry.

The 12.5 staff psychologist positions were filled, but two of them were on indefinite medical leave, resulting in a 16-percent vacancy rate.  The 1.5 psychiatric social worker (PSW) positions, the senior PT position, and ten line PT positions were filled.  The health program specialist position was filled.   The institution continued to have a vacant .65 recreational therapist position.

Quality Management:

The institution did not have a functioning local governing body.  The quality management committee met weekly.  Attendance was good and minutes were kept.  Each of the specialty subcommittees reported to the quality management committee and all final subcommittee audits were presented to the quality management committee for final approval.

The mental health subcommittee met bi-monthly during the reporting period, exception in September 2010, when only one meeting convened.  A quorum was present at every meeting and minutes were kept.  Substantive areas addressed by the subcommittee during the monitoring period included the increase in emergency referrals, updated office space, new SNY arrivals, pre-release counseling, and the use of the DMH referral form in IDTT meetings.

There were four QITs chartered during the monitoring period. One was on PT documentation of effective communication, another was on the types of groups offered to caseload inmates, another was on the need for additional keys to the restraint equipment, and the fourth was on the need for more clinical office space due to conversion of the Facility to an SNY and the increase of the MHSDS caseload cap. This QIT was ongoing at the time of the monitor's visit.

Suicide Prevention:

There were no completed suicides at CTF during the reporting period.

The SPRFIT met on the second Tuesday of each month. A quorum was present at each meeting and minutes were kept. Standing agenda items included discussion of the inmates on suicide watch/suicide precaution, completed suicides, suicide attempts, training issues, and suicide prevention. The SPRFIT provided information from the headquarters monthly suicide prevention videoconference to the mental health subcommittee.

CTF reported developing a system for tracking five-day clinical follow-up and custody checks. The institution reported that the five-day follow up logs were not being fully completed on some days due to confusion over procedure, and a QIT was being chartered to address the issue.

In administrative segregation, staff reported that mental health clinicians were meeting with custody staff, primarily the administrative segregation sergeant and lieutenant, for the morning meeting.

The institution reported compliance with monthly emergency response drills, but documentation was not always complete.

According to the data provided in the management report, initial screenings occurred within 72 hours only 84 percent of the time. No supporting raw numbers were provided. There was no information on whether they were conducted in a confidential setting. Mental health staff reported that caseload inmates were scheduled to be seen within five days by their PCs for the initial intake evaluation, but provided no audit or tracking data to indicate compliance levels.

Staff reported that inmate profiles were being used by PTs and that clerical staff had recently begun providing inmate profiles to the PC for use during the initial evaluation.

Medication Management:

During the monitor's visit, CTF staff reported continuing problems with medication management, including dropped medication orders with long gaps in medications for inmates. Staff reported that referrals and OHU admissions had increased as a result. The institution's management report indicated compliance in most areas but did not include audit sample sizes and methodology.

Mental health staff reported that they were compliant with referrals for medication noncompliance. However, an initial referral for noncompliance resulted in the inmate only seeing the PT and not the prescriber.

Audits of the presence of consent forms in UHRs found compliance rates ranging from 51 to 78 percent. Audits for compliance with documenting side effects of medications found compliance rates of 87 to 90 percent, but for documentation of rationale for a medication change, compliance rates were only 53 to 80 percent.

Audits found that timely orders for laboratory testing of inmate blood levels of psychotropic medications were done in only 68 percent of cases. A QIT was chartered to address the problem and corrective actions had been taken.

CTF reported that no inmates were DOT, despite numerous cases of medication noncompliance and hoarding. The institution provided all psychotropic medications as nurse-administered.

CTF reported that 470 inmates were prescribed HS medications. Institutional policy called for those medications were to be administered between 7:30 p.m. and 8:00 p.m. Inmates reported to staff that they were sometimes administered at 8:00 p.m.

CTF reported that there were no Keyhea orders initiated during the monitoring period.

The institution also reported 100-percent compliance with parole medications.

Sexual Misconduct:

According documentation provided by the institution, four RVRs were issued for sexual misconduct during the reporting period. The sole mental health screening indicated that the inmate did not meet the criteria for diagnosis or treatment for Exhibitionism.

One comprehensive evaluation performed. It resulted in a determination that the inmate met the criteria for Exhibitionism treatment. He was transferred to the program at CSP/Corcoran for treatment.

Transfers:

CTF had a LOP for referral to DMH that was implemented in October 2010.  It referenced the need for a Vitek hearing but did not provide specific timelines, processes, or personnel involved.

According to the institution's management report, tracking of DMH referrals was sometimes difficult when an inmate was housed in another institution's MHCB because CTF staff was not always informed that a referral had occurred.  The institution's referral and non-referral log was lacking information and accurate dates.

Mental health staff was regularly completing audits of the DMH referral Form 7388s, although the validity of the findings could not be verified.  Contrary to CTF's management report, the institution was not 100-percent compliant with completion of the Form 7388s.  The most frequent, although still rare, problem identified in the audits was the lack of a completed Form 7388.

The institution reported one DMH referral during the monitoring period. However, due to incompleteness of the referral log, it was unclear which DMH program he was referred to or when he was identified for referral.  According to the notes in the comments section of the log, the inmate transferred to CSATF before the completed referral was submitted to headquarters.

Seven cases were identified as meeting any criteria for referral on the Form 7388 during the reporting period.  In six of these cases, the inmate was assigned the EOP LOC.  According to institutional logs, no inmates at CTF were awaiting transfer or were returned to CTF from DMH.

During observed IDTT meetings, the Form 7388 was not discussed or worked on by the team.  Clinical staff did not ask the CC I about the number of RVRs

that the inmate received and none of the objective data, e.g. multiple OHU placements, was provided. Based on information provided in the institution's management report, it appeared that CTF was interpreting "crisis placements" narrowly to mean MHCB admissions.

At CTF, the DMH coordinator also served as the OHU coordinator. The 21-bed OHU remained in Central Facility. It had four observation beds where mental health inmates in crisis were first placed. The OHU was staffed by a psychologist during the normal work week, while psychiatrists were assigned to the OHU seven days per week.

The OHU placement and transfer log did not always contain critical contact and transfer information, limiting accurate data regarding transfers and lengths of stay. The tracking system log was problematic because it considered inmates clinically discharged even when they were maintained in the OHU for clinical reasons. The average length of stay in the OHU was 142 hours. Based on the data provided, it could not be determined if any inmates had three or more crisis stays/placements.

In March 2010, CTF approved and implemented a revised LOP regarding alternative temporary housing. The institution began maintaining a log in June 2010. According to the institution's management report, only one inmate was placed into what the institution defined as "alternative housing" during the monitoring period, but there were 13 placed into infirmary holding cells. No inmates remained in those areas for longer than two hours.

With regard to EOP transfer timelines, the data provided for review was incomplete and difficult to interpret. According to documents provided by the institution,

there were 32 EOP inmates, including two EOP administrative segregation inmates,

transferred during the reporting period. According to the information provided by the

institution, transfer timelines were met in 29 cases, for an 90 percent compliance rate.

Other Issues:

Administrative Segregation

Inmates placed in administrative segregation were housed primarily in

Central Facility O wing with a small overflow in X wing.  There were two clinicians

assigned to administrative segregation full-time and one psychiatrist assigned to

administrative segregation part-time.  As of November 15, 2010, 17 MHSDS inmates

were housed in administrative segregation for over 90 days.  The mental health

management report indicated that no EOP inmates had been housed in administrative

segregation for more than 90 days, but an EOP inmate was listed on the custody log as

having been in administrative segregation for more than 90 days.

According to the audit data provided, PT rounds were occurring daily in

administrative segregation throughout the monitoring period except for one day, but a

chart and isolation log review by the monitor's expert indicated that there were several

days when rounds were not completed.  Documentation of PT rounds was minimal.

Summaries frequently stated only "no mental health concerns."  The monitor observed

the PT interact briefly with each of the inmates.  When inmates were asked about

interactions on the rounds, response was mixed.

The only audit results concerned administrative segregation IDTT

meetings prior to ICC meetings, and on the composition of IDTTs, for part of the

reporting period.  Audits found noncompliance in both of these areas.  The institution

reported that 1,212 of 1,497, or 81 percent of, clinical contacts occurred out-of-cell in a private setting. For PC weekly contacts, 564 of 833, or 68 percent, occurred out-of-cell. No reason was given for the decreased amount of out-of-cell contacts, despite the reasonable size of caseloads of 20 to 25 for clinicians.

Mental health staff reported multiple problems with the new tracking system that was implemented in September 2010, including incorrect timeframes for PC contacts. While the institution reported the percentage of out-of-cell contacts and the total number of PC contacts during the reporting period, it did not report compliance with weekly PC contacts. A review of a small sample of medical records indicated that some weeks were missed. It also indicated that individual inmates were seen by many different clinicians.

3CMS

The most significant problem for treatment planning in the North and Central facilities 3CMS program continued to be the lack of presence of PCs and treating psychiatrists present in IDTT meetings in some cases. CTF reported having assigned clinicians to more than one program to meet the increased need for mental health services within the SNY, resulting in clinicians being assigned to a different facility on IDTT days and not attending their own inmates' IDTT meetings. No audit data was provided for timeliness of initial and ongoing IDTT meetings.

CTF reported compliance with timeliness of psychiatric and PC contacts, but did not clarify whether this pertained to both initial and ongoing contacts or to only ongoing contacts. Compliance with initial intake evaluations could not be determined from the medical records because the initial date on the yard was not available.

335

However, inmates did appear to be seen at least every 90 days, with several seen more frequently.

Mental health staff on the North Yard reported that they still had large numbers of new arrivals and referrals and that the workload was extensive. Management staff reported that an additional clinician part-time was allocated to that yard. Staff also reported that they lost several long-term contractors due to a statewide change of agency. Continuity of care was negatively affected.

Referrals

According to data provided by the institution, there were approximately 2,185 mental health referrals during the review period. Of these, 2,138 were designated as routine, 30 as emergent, and 17 as urgent. According to the institution's management report and the monitor's discussions with staff, problems with the tracking system led to inability to calculate average referral response times. A review of the raw data provided by the institution appeared to indicate that both emergent and urgent referrals prompted contacts within 24 hours or less, and that most inmates with routine referrals were seen within five days.

RVRs

According to information provided by the institution, there were 189 RVRs issued to 3CMS inmates and three RVRs issued to EOP inmates. All three EOP inmates received a mental health assessment, and nine of the 3CMS inmates were referred for a mental health assessment due to exhibiting bizarre or unusual behavior. In seven of the cases, it was determined that mental illness played a role in the behavior

resulting in the RVR. The institution reported that in all seven cases the hearing officer considered the results of the mental health assessments in assessment of a penalty.

## California Men's Colony (CMC)
Hybrid Paper Review

Census:

As of December 27, 2010, CMC's inmate population was 5,825 inmates, a significant decrease from 6,687 during the preceding monitoring period. The MHSDS population also decreased from 1,790 inmates to 1,687 inmates. There were 1,089 mainline 3CMS inmates and 444 mainline EOP inmates. There were 38 inmates in the temporary MHCB, also called the locked observation unit (LOU), and 277 inmates housed in administrative segregation, including 74 3CMS and 42 EOP inmates.

Staffing:

CMC reported 134.38 allocated mental health positions. The chief psychiatrist and chief psychologist positions remained filled during the monitoring period. One of the three senior psychiatrist positions became vacant, as did one of the four senior psychologist specialist positions. CMC utilized a .6 FTE contract psychiatrist to cover the vacant senior psychiatrist position, and a contract psychologist to cover the senior psychologist vacancy. The five senior psychologist positions remained filled during the review period.

Two of the 19.5 staff psychiatrist positions remained vacant. Only one of the 35.48 staff psychologist positions was vacant. CMC utilized a .75 FTE contract psychiatrist to cover the staff psychiatry vacancy and a contract psychologist to cover the psychology vacancy.

The seven supervising social worker positions and 12 of the 13 social worker positions were filled. A contract social worker was utilized to cover the social worker vacancy. CMC retained two of the three contract marriage and family therapists from the pilot project and utilized them for case management services.

The two senior PT positions and all but two of the 32.9 PT positions were filled.

Nine of the ten RT positions were filled, as were all of the 18.5 clerical positions and the one senior occupational therapist position.

During the preceding monitoring period, CMC reported giving 5.3 vacant mental health staff positions to DCHCS for the activation of several short-term or intermediate-term mental health programs throughout the state. Those positions included one staff psychiatrist, two staff psychologists, one licensed clinical social worker, a .8 RT, and a .5 office assistant. During the current review period, DCHCS returned the one social worker and one staff psychologist positions, but CMC reported that it had been notified that it would not be getting the staff psychiatrist position back, as it had sufficient psychiatry allocations.

CMC did not use psychiatry telemedicine during the monitoring period.

Quality Management:

CMC continued to have all of the components of a mature quality management program, including several long standing subcommittees. CMC's governing board met twice during the review period and minutes were maintained. The quality management committee met monthly and maintained minutes. The institutional CEO was the chair of the committee.

The mental health subcommittee reported to the quality management committee. It met bi-weekly during the review period, with a quorum at 11 of the 12 meetings. The committee continued to address a multitude of pertinent mental health issues, and distributed a quarterly newsletter about quality assurance activities and audit results.

There were five active QITs throughout the monitoring period. Active QITs included suicide prevention, positive reinforcement for EOP inmates to increase treatment attendance, and parole planning.

CMC had policies and procedures in place for psychiatry peer review and a committee that met quarterly. Peer review was based in the hospital-credentialing process. It was quantitative for psychiatry. CMC also had policies and procedures in place for psychology peer review. The focus of peer review during the monitoring period was utilization of psychological testing. The peer review committee also had two subcommittees, one a re-privileging subcommittee and the other a standards and quality assurance subcommittee. Social work peer review met monthly, and at times bi-monthly, during the review period. The review was both quantitative and qualitative.

Suicide Prevention:

From December 2009 through January 2011, there were eight suicides at CMC. Six of these suicides occurred in 2010, and four occurred during the monitoring period. In response to these suicides, CMC formed two committees to develop recommendations, the suicide prevention quality improvement committee and the root cause analysis committee, in addition to the existing SPRFIT.

The suicide prevention quality improvement committee identified significant issues and events that appeared to be suicide precipitants, events and stressors, including LOC changes, family issues, RVRs, adverse legal actions, medication noncompliance, and receipt of bad news. At the time of the monitor's visit, the institution was in the process of developing a mechanism to obtain information regarding these stressors and to provide it timely to the PC and pertinent custody staff. In addition, the suicide prevention quality improvement committee implemented a number of suicide-prevention measures which included ASU cell modifications, preparation of a suicide flyer, development of a video by the inmate peer support group for the inmate TV station, meetings with the men's advisory council group to obtain feedback regarding pertinent issues, establishment of open line clinics on A and B Quads for better general population access to mental health, and updated staff training.

The SPRFIT at CMC met monthly during the review period, but achieved a quorum only twice. It reviewed completed deaths and significant suicide attempts. It responded to suicide QIPs and remained active in identifying and monitoring pertinent suicide related issues. Meeting minutes were maintained and were submitted to the mental health subcommittee for review and approval. Suicide QIPs were developed for some, but not all, of the completed suicides based upon identified areas of needed improvement. CMC appeared to be responsive to the suicide QIPs on a timely basis.

CMC reported 87-percent compliance for five-day post-MHCB discharge clinical follow-up, but did not audit compliance with custody follow-up. In response to the recent suicides, CMC began implementation of a high-chronic risk program. This program included identification of high-risk inmates. Clinicians were contacted, and a

list of high risk inmates was assembled and circulated to clinical and custody staff.  The planned final process of the high-chronic risk list was the placement of a problem list in the medical record documenting this information.

CMC conducted monthly emergency response drills in administrative segregation during the monitoring period.  During the monitoring period, the ERRC met at least monthly and sometimes three times in one month.  It continued to review inmate deaths, suicide attempts, timeliness and appropriateness of responses, and the use of outside ambulance services during life-threatening situations.  The committee determined that all reviewed responses were appropriate during the review period.  The coordinator continued to report to the suicide prevention committee.  Problems were submitted to the QMC.

In administrative segregation, daily morning meetings with mental health staff and the custody sergeant continued throughout the review period.

CMC reported greater than 90 percent compliance for completion of administrative segregation pre-placement screens and placement in the UHR.  It reported 81.5 percent compliance for completion of mental health evaluations within 72 hours of placement in administrative segregation.  There was no documentation as to whether the screens were conducted in a confidential setting.

There was no change since the preceding monitoring period with CMC's 17 intake cells in administrative segregation.  Unlike in the past, the central ASU was being utilized for caseload inmates. One intake cell there was modified, and all other intake inmates were assigned to unmodified cells with yellow signs on the cell doors. The ASU captain reported that a request was submitted for the modification of an

additional intake cell in the central ASU. The captain also reported that intake inmates were double-celled when all of the intake cells were filled.

There was no data for the custody 30-minute welfare checks during the monitoring period. Audits that were presented were from the preceding monitoring period. CMC remained compliant with offering ten hours of yard per week throughout the review period.

Cells were not equipped with electrical outlets for use of electronic entertainment devices.

Medication Management:

There were no audits completed for medication continuity for new arrivals during the review period. CMC reported greater than 90 percent compliance for timely medication administration after housing moves throughout the institution, including movement into administrative segregation. CMC conducted an audit of continuity of medication for inmates who had returned from DMH. Of the eight inmates discharged from DMH on non-formulary medications, six were continued on those medications without disruption. The non-formulary medications for the other two inmates had been prescribed for sleep.

Seventy-two percent of new medication orders were administered on the next day's dose, virtually unchanged from last review period when it was 79 percent. An audit of continuity of medications upon expiration found continued compliance at 99 percent throughout the monitoring period. The maximum length of medication orders by psychiatrists at CMC remained 90 days for new and renewal orders, and the maximum length of medication bridge orders was 14 days. It was the practice at CMC for

telephone orders for inmates to last for one to three days for emergency medications, and for 14 days for newly-arriving inmates and expiring medication orders.   All remained unchanged since the preceding monitoring period.

Audits found continued compliance with MAR legibility.  Eighty nine percent of MARs were filed timely in the UHR.  During the review period, the rate of MAR completion for missed doses of medication increased from 26 to 61 percent.

CMC did not audit response to medication noncompliance.  There were no changes in applicable policies.  Inmates continued to be identified through weekly reviews of MARs by nursing staff, and post-identification interviews by nursing staff to determine the reasons for noncompliance, evaluate for decompensation, and assess potential risk of harm to self or others.

Supervisory audits of the pill lines indicated that the C and D Quad noon pill lines and D Quad morning pill line were audited.CMC continued to audit the pill lines twice quarterly.  Mental health supervisory staff reported that they had implemented a schedule for pill line supervisory monitoring that did not include monitoring of the HS or p.m. pill lines for this monitoring period, although the morning and evening pill lines were reportedly the longer ones.

CMC was 87 percent compliant with presence of informed consents for psychiatric medications in the UHR.  CMC conducted audits regarding laboratory testing for psychotropic medications for a sample of 3CMS, EOP, and Keyhea inmates during the review period.  The audit found greater than 90-percent compliance for following policies and procedures for antipsychotic and mood stabilizer policies.  CMC also examined whether laboratory studies were noted on a progress note and found

compliance in over 90 percent of cases.

CMC reported compliance with documentation of inmate weight and laboratory testing results.

No centralized list of inmates on DOT orders was maintained outside of the MHCB.  CMC reported that the only three uses of DOT were in the hospital, for Close-B custody inmates receiving HS medications, and for inmates in regular housing on depot intramuscular medications.  All other medications were nurse-administered, including in the MHCB.

During the review period, there were 87 inmates with Keyhea orders at CMC.  Thirteen Keyhea petitions were initiated during the monitoring period.  All were certified at probable cause hearings, eight were granted, two were pending, two inmates were transferred to a higher LOC, and one was denied.  In only two cases was there a decision to permit the order to expire after consultation with the treating psychiatrists and the Keyhea nursing staff.  Thirty-seven inmates had Keyhea orders renewed at CMC during the monitoring period.

There were 754 prescriptions written for HS medication administration for 456 inmates during the review period.  There were no recent audits of the HS pill line.

An audit of a two-month period found that 98 percent of the inmates who paroled from CMC received their prescribed parole medications, representing an increase since the preceding monitoring period.

Sexual Misconduct:

During the review period, CMC issued 15 RVRs for sexual misconduct.  Ten of the RVRs resulted in mental health screens within 72 hours and an IDTT meeting.

344

The remaining five inmates had previously completed comprehensive evaluations and were pending transfer to a PSU.

There were no inmates referred for a comprehensive evaluation, although five inmates were referred for mental health treatment as their RVRs were considered the result of untreated mental health issues. CMC reported that the mental health interventions stopped further sexual misconduct behaviors for those inmates. Two inmates transferred to Exhibitionism treatment programs and one inmate transferred to DMH.

CMC did not provide specialized treatment related to sexual misconduct. Inmates who were diagnosed with Exhibitionism or Paraphilia NOS and did not transfer received weekly PC contacts, monthly psychiatry contacts, 90-day IDTT meetings, and treatment plan updates.

CMC utilized exposure-control jumpsuits throughout the review period. A small, blank yellow post-it note was placed on the inmate's door for 180 days to alert staff. The IEX designation was also placed on the inmate's name and picture in the program office, in a location not visible to other inmates.

All sexual misconduct RVRs were referred to the DA during the review period. SHU terms were imposed in 13 of the cases. One term was suspended, one was voided, and one was pending return from DMH.

Transfers:

CMC had one full-time clinical staff member assigned as DMH coordinator, with one full-time clerical support person and a half-time social worker

assigned as back-up DMH coordinator who also provided therapeutic groups to inmates on the DMH waitlist.

There were significant problems with the DMH referral log. The coordinator maintained one database for the official DMH referral log required by DCHCS and another local database.  The local database did not calculate lengths of time between the various process points, e.g., from identification to completed referral, or referral to notification of acceptance/rejection.  Some information was missing, including the information required in the DCHCS's log.  The official log also had very little information.  Generally, no entries were made after the identification date was entered. In addition, the data between the two logs was inconsistent.  There were referrals listed on one log that would not be listed on the other log, and dates differed between the logs. As a result, the data regarding the specific number of referrals and average length of time to complete referrals was not reliable.

Despite the data limitations, CMC reported that during the monitoring period, there were a total of 163 referrals to DMH, with 48 to APP and 115 to ICF identified. However, only 123 referrals, including 26 to APP and 97 to ICF, were completed.  CMC reported that 32 were cancelled, usually because the inmate "improved" and eight, or two for APP and six for ICF, were still in process at the end of the monitoring period.  CMC did not adequately track cases in which an inmate may have improved sufficiently in one to seven days in order to no longer require DMH care.

Of the 123 completed referrals, 23 were ultimately rescinded by the facility due to the inmate's improved mental status or parole/release.  The facility did not report any rejections, but the monitor's expert's review found at least two cases of

rejection by DMH that were recorded as rescissions.  It was unclear whether other cases listed as rescinded had actually been rejected by DMH.  At the end of the monitoring period, 37 referrals were still awaiting a decision by DMH.

CMC reported that it did not meet timelines for referrals to APP or ICF.  Most ICF referrals took slightly over one month to complete, with one taking three months.  APP referrals appeared to take at least ten days, once identified.  Referrals generated within the MHCB did not typically occur until late in the inmate's stay and often past the ten-day point.  CMC reported that the medical clearance document completion had been an obstacle to timely completion of referrals.

During the monitoring period, 13 inmates transferred to APP and 47 to ICF.  Five from APP and four from ICF returned to CMC.  The DMH coordinator reported consistent receipt of discharge documentation and notification of an inmate's pending return.  This documentation was to be placed into the UHR, but because those records were unavailable, this could not be confirmed.

CMC completed weekly audits of use of Form 7388.  It reviewed 74 cases of inmates who met one or more of the DMH referral criteria but were not referred.  Of those, seven, or nine percent, did not have a rationale for non-referral indicated on the Form 7388.  The audit summary indicated that 32, or 43 percent, did not have alternative treatment interventions documented in the treatment plan.  Only 52, or 70 percent, had a "reasonable" clinical reason for non-referral documented on the Form 7388.  Mental health supervisory staff at CMC reported that they had repeatedly trained clinicians and given them exemplars of adequate rationales for non-referral.  Despite this, many appeared as "no referral at this time" as the reason for non-referral.  Other rationales such

as "inmate on Keyhea," "not in crisis," suggested that staff did not understand the criteria for ICF referral or confused ICF and APP levels of care.  Audit results were generally corroborated by a review of a sample of cases.

It appeared that despite high numbers of DMH referrals, CMC was still waiting too long to refer or not referring inmates who were appropriate for DMH.  In the MHCB, Form 7388s were only completed at initial IDTT meetings and every ten days.  Consequently, inmates who should have been considered for DMH referral were seen in IDTT meetings without a form 7388 checklist. Most inmates referred from CMC were eligible for ASH ICF placement, although some inmates required a case-by-case review.  According to the HCPOP data provided by DCHCS prior to the site visit, there were six inmates whose cases were referred for case-by-case review.  Of these, three subsequently were referred to ASH, one to VPP dorms, one to VPP cells, and one to SVPP.  A larger number of cases were identified by CMC for case-by-case review on the case factor sheets, but no outcome data was available.  Consequently, it was unclear whether those cases were actually reviewed and what their outcomes were.  A sample of cases from the non-referral log was reviewed to determine if the decision to not refer was clinically appropriate.  Several of those cases were actually referrals that had not been recorded as such in the DMH referral log.  There was a sub-sample of the remaining cases in which the inmate should have been referred.

CMC worked with custody to get monthly reports of all MHSDS inmates with three or more RVRs within 90 days so that staff had access to that information.  Similar to other facilities, CMC was unable to produce data on total crisis placements over six months, including at other facilities.  Instead, it monitored three or more crisis

348

placements while at CMC, including holding cell placements. Inmates on the DMH wait list were sometimes placed in additional therapeutic groups specifically developed for inmates on the wait list. Some treatment teams also saw the inmate more frequently than required by the Program Guide.

CMC reported that no inmates were transferred to another facility's MHCB during the monitoring period. As previously, when the LOU was full, more stable inmates were placed into modified or overflow cells across from the current MHCB to make room for new admissions. Those inmates placed into the overflow cells were not discharged from the LOU and received the same care and treatment as other LOU inmates. During the monitoring period, 94 inmates were placed into the overflow cells, with an average length of stay of 1.3 days. However, CMC reported significant problems with the data on MHCB lengths of stay, having converted to MHTS.net in September 2010 and undergoing a computer upgrading, both of which resulted in lost or corrupted data. Consequently, while the provided data indicated 144 inmates had MHCB lengths of stay greater than ten days, with an average of just over nine days, the institution pointed out that at least several inmates were not included in the data, including one who had a length of stay of 165 days.

CMC did not have a count of the number of EOP administrative segregation inmates eligible for PSU placement throughout the monitoring period. According to the reported data, there were 14 inmates with SHU terms at the end of the monitoring period. Twelve of those were endorsed but had not transferred. The remaining two were scheduled to return to the ICC to address CSR concerns. During the monitoring period, six inmates were transferred to PSU. None of the transfer timelines

for PSU were met, although the inmates were housed in the EOP hub.  The average number of days from referral to endorsement was 31.  There was no data on when inmates were assigned to the EOP LOC to determine if referrals to CSR were occurring timely.  The problem appeared to be due primarily to limited bed space in the PSUs.

Other than EOP inmates endorsed to the PSU, CMC reported no other EOP transfers out of the facility.  The institution had not been tracking non-PSU transfers to EOP programs, and consequently it was unknown whether any EOP inmates endorsed for transfer to another EOP facility during the monitoring round.

Other Issues:

### Administrative Segregation

CMC had two senior psychologist specialist positions funded for administrative segregation, but the institution utilized only one of those positions in the unit.  All of the senior psychologist specialist positions were filled.  A psychologist position was added for a total of eight positions, three of which were vacant.  The one supervising social worker position remained filled.  A .5 position of the 1.5 established social worker positions was vacant.  Similarly, a .5 psychiatry position of the 1.5 established psychiatry positions was vacant.  The two clerical positions and one RT position were filled.

CMC reported that IDTT meetings for both EOP and 3CMS inmates were completed within three days of placement into administrative segregation, and always prior to ICC meetings.  Inmates were seen again within 14 days, once the treatment plan was completed.  Due to MHTS.net complications, it was not possible to verify the institution's report through documentation.  Correctional counselor attendance at IDTT

meetings remained problematic throughout the monitoring period, and a July audit noted problems with psychiatrist attendance as well. Treatment plans were not audited during the review period.

There was no documentation regarding monthly psychiatric contacts. While reportedly over 90-percent compliant, CMC was not able to provide data regarding weekly PC contacts in administrative segregation, due to MHTS.net activation and associated problems with generating reports. Institutional audits found sustained 100-percent compliance with daily PT rounds. Weekly summaries were reportedly completed and in the UHRs, according to the senior supervising psychologist who reviewed them weekly.

CMC was 82-percent compliant with offering ten hours of out-of-cell therapeutic activity per week to EOP administrative segregation inmates. Numerous reasons were given for not offering ten hours weekly, including staff absences, staff attending training, four days of stage III heat alert, and lockdowns. The group space in the ASU was unchanged and remained inadequate for appropriate group interaction. When an inmate refused over 50 percent of offered therapeutic activities, a clinician was assigned to visit the inmate daily to encourage participation, and a weekly treatment team met to discuss those inmates. During such meetings, the psychiatrist addressed any medication concerns, and DMH referral was considered.

CMC continued to send its monthly report to Headquarters on EOP inmates with lengths of stay over 90 days. The senior psychologist and facility captain met weekly to review every EOP inmate in an effort to expedite transfer. Referrals were made to the CCII as needed. Also, the administrative segregation hub QIT met two times

per month.  During those meetings, inmates with lengths of stay over 90 days were discussed with the facility captain, the CCII, and the associate warden.

Inmates who had been identified as having exhibited IEX and who were housed in the ASU were placed into cells that had a yellow post-it placed on the cell door to alert staff regarding the inmate's behavior.  This did not obscure the view into the cell. The monitor's expert's observation of the custody staff on the unit found awareness of the privacy concern of these inmates.

As of March 17, 2011, there were five EOP, six 3CMS and four general population inmates in administrative segregation for non-disciplinary reasons awaiting transfer to an SNY program.

MHCB

CMC reported 100 percent compliance for timeliness of initial and bi-weekly IDTT meetings in the LOU.  Attendance by correctional counselors was problematic.  There was no documentation that Form 7388s were being utilized during the meetings.  However, an institutional audit of consideration for referral to a higher LOC for inmates who remained in the MHCB longer than ten days and for those inmates with multiple admissions found compliance rates of 75 and 86 percent, respectively. CMC was compliant with daily psychiatry contacts.

EOP

Due to difficulties with accessing reliable reports from MHTS.net, CMC completed UHR audits of 27 EOP inmates.  An audit found an 81-percent compliance rate for presence of informed consents in UHRs.  For completion of timely mental health evaluations, initial IDTT meetings, and subsequent IDTT at least every 90 days,

compliance rates exceeded 90 percent. Participation in IDTT meetings by correctional counselors remained problematic.

Only 65 percent of reviewed treatment plans had documented treatment modalities, and only 24 percent had documented discharge planning. CMC was 88-percent compliant with weekly PC contacts, and over 90-percent compliant for psychiatrist contact every 30 days. Audits were not provided for the number of hours of offered therapeutic activities.

3CMS

While there were no changes reported from the preceding monitoring period, due to the problems noted above with the MHTS.com, there was no reliable data available for the mainline 3CMS program during the monitoring period.

Administrative Segregation 3CMS

Due to significant difficulties associated with retrieval of data from the new MHTS.net, data was not available for many areas of the 3CMS program in administrative segregation. While there were no changes noted from the preceding monitoring period, it was not possible to verify compliance.

CMC reported that IDTT meetings for 3CMS inmates were completed within three days of placement into administrative segregation, and always prior to the ICC meeting.

Referrals

CMC maintained its longstanding process for responding to referrals. An audit covered all 727 mental health referrals, of which ten were emergent, 51 were urgent, and 666 were routine. One hundred percent of emergent referrals were seen

timely, 99 percent of urgent referrals were seen within 24 hours, and 96 percent of routine referrals were seen within five days.

### Medical Records/MHTS.net

MHTS.net went live at CMC on September 20, 2010. There were a multitude of problems with implementation, and CMC struggled to produce several reports for the monitoring period.

### Heat Plan

Stage II and III heat plan activations occurred during the monitoring period. Documentation was completed and medical rounds were performed in all affected areas. CMC reported that five inmates suffered from heat related illnesses during the review period.

### RVRs

CMC continued to maintain tracking of completed RVR assessments, including dates of completion, hearing decision, consideration of mental health assessments, and whether the assessments influenced the outcomes. During the review period, CMC completed 68 RVR assessments for inmates in MHCBs, 173 for EOP inmates, 27 for 3CMS inmates, and five for general population inmates. There was a total of 445 RVRs for 3CMS inmates.

CMC audited every aspect of the RVR process and determined that clinicians needed to be reminded to complete the assessments in layman's terms. It also found that while the senior hearing officer noted consideration of the mental health assessment, the language on every RVR stated "the senior hearing officer has noted and taken into consideration the LOC and the mental health assessment." There were several

cases in which the assessment influenced the outcome of the hearing.  CMC did not audit

RVRs issued for hoarding or cheeking for this monitoring period.

### Pre-Release Planning

During the first half of the monitoring period, CMC had the services of

three TCMP staff, but that dwindled to one during the remainder of the review period.

CMC continued to have one senior PSW supervisor and one half-time line staff social

worker dedicated to pre-release planning during the review period.  The institution also

offered pre-release planning groups.

### Licensed Marriage and Family Therapist Pilot Program

With no change since the preceding monitoring period, two of the five

LMFTs from the pilot program remained as contract employees at CMC and maintained

caseloads in EOP and the dual diagnosis program.

### Access to Care

CMC staff did not report problems with the availability of escort officers.

### Construction

At the time of the monitoring visit, construction at the site of the 50-bed

MHCB had begun.

**Wasco State Prison (WSP)**
October 19, 2010 –October 21, 2010

Census:

On October 19, 2010, the total prison population was 5,185, with 1,396

inmates in the MHSDS program.  Of the 149 EOP inmates, 122 were in the RC and 27

were housed in administrative segregation.  Of the 1,242 3CMS inmates, 1,184 were in

the RC, 27 were in mainline, and 31 were housed in administrative segregation.  There were five inmates in the MHCB unit.

Staffing:

At WSP, positions for the chief psychiatrist, chief psychologist, all three senior psychologists, and one senior psychiatrist were filled.  Of the 7.05 staff psychiatrist positions, 1.5 were filled, leaving 5.55 positions vacant, for a 79-percent vacancy rate.  Full-time equivalent contractors filled 3.75 psychiatric positions, resulting in a 25-percent functional vacancy rate in psychiatry.  With regard to staff psychologists, 36 of 39.52 positions were filled, leaving a vacancy of 3.52 positions, two of which were filled by contractors, resulting in a four percent functional vacancy rate in psychology.

For social workers, seven of ten positions were filled.  The three vacancies were covered by one contractor, resulting in full coverage.  The one supervising PT and seven line PT positions were filled.  All 4.82 RN positions were filled.  Two of three psychometrist positions were filled, resulting in a 33-percent vacancy rate.  One of 1.5 recreational therapist positions was filled, resulting in a vacancy rate of 33 percent.  Lastly, the one health program specialist and all 10.5 MHSDS clerical positions were filled.

Quality Management:

According to documents provided by the institution, WSP's local governing body met quarterly and the quality management committee met monthly.  Both bodies maintained records of attendance and minutes.

The mental health subcommittee was scheduled to meet monthly but convened four times in the six-month period, as meetings scheduled for July and

September 2010 were cancelled.  Nearly every meeting was attended by fewer than half of the required members.  Minutes were kept.  Staff monitored a handful of key indicators.  Quantitative results were reported regularly to the subcommittee but not beyond it.  Reports made by the subcommittee to the quality management committee did not speak to substantive mental health issues.  Minutes from the quality management committee indicated that the mental health subcommittee's standard report was typically "audits are ongoing" or listing a meeting date or two.

The mental health quality management process did not develop during the current monitoring round.  Supervisory staff continued to monitor a handful of indicators and aspired to establish a regular auditing schedule.  Although indicators of importance were audited routinely, the methodology of certain audits and the array of indicators that were subject to audit pointed to a rudimentary quality management process.  Furthermore, issues central to the delivery of mental health treatment at WSP were absent from the agendas of both the QMC and the mental health subcommittee.

The potential of the QIT process to strategically examine obstacles to treatment access was not fully utilized at WSP.  A large proportion of the QITs chartered by the QMC were charged with revising local operational procedures (LOPs).  The mental health subcommittee followed suit.  The only two active mental health subcommittee QITs during the monitoring period were charged with reconciling procedural inconsistencies among LOPs for the administration of involuntary medication and paring down the list of required subcommittee members.  The subcommittee reduced the number of required members from 14 to ten.

Peer review was on hiatus, pending direction from DCHCS.

Suicide Prevention:

The SPRFIT met monthly and covered mandatory agenda items.  The LOP that governed the SPRFIT was updated within the past year. WSP's SPRFIT was comprised of eight or nine required members; attendance by two-thirds constituted a quorum.  Attendance varied, resulting in inconsistency with attaining a quorum during the monitoring period.  However, required custody members of the SPRFIT were reliably present at meetings and high ranking custody staff who were not mandated members were often in attendance.

The SPRFIT did not appear to make use of the reports it reviewed monthly.  It forwarded them to the mental health subcommittee without comment.  The monitor observed a SPRFIT meeting during the site visit.  The meeting was attended by the required quorum and meeting agenda items related to post-MHCB follow-ups (clinical and custodial), self-injurious behavior, and multiple admissions to crisis care including alternative housing.  The one active QIT of the SPRFIT had been chartered before the monitoring period.  It was charged with examining how WSP could improve compliance with hourly custody observations of inmates who had been discharged from the MHCB within the preceding 24 hours.

Officers who were asked were in possession of micro-shields.  A cut-down tool located in the control room was accessible.

Administrative segregation inmates who needed an MHCB when none was available were retained in the ASU and placed on one-to-one observation for suicide watch until they were moved to an MHCB or deemed to no longer require one.  Inmates awaiting an MHCB were not permitted to have a mattress.

A review of the log indicated that WSP was close to achieving but did not reach full compliance with five-day clinical follow-up after MHCB discharges.

WSP was partially compliant with the CDCR's plan to address suicide trends in administrative segregation. Mental health and custody staff met daily, documented their meetings in the sergeant's log, and worked collaboratively. Staff reported and the monitor observed that staff assigned to the ASU had established a good working alliance.

WSP did not audit mental health screening of inmates newly placed in administrative segregation. No information regarding mental health screenings that pre-dated September 15, 2010 was available. Staff reported that inmates who refused to be screened in a confidential setting were interviewed cell-front. No systematic information was available regarding completion of pre-placement screenings by medical staff.

Inmates on intake status were observed via 30-minute welfare checks but those checks were not conducted at staggered intervals. Furthermore, records of 30-minute checks were incomplete in that custodial supervisors did not review them. Some cells on the first floor had been modified for use as intake cells, but at times the demand exceeded the supply. On those occasions, inmates were housed wherever space permitted and were identified with intake placards posted on the cell door.

Cells in administrative segregation did not have electrical outlets.

The monitor was not provided with records of inmates' use of recreational yards.

Medication Management:

There was limited information available regarding medication management at WSP.  Audits conducted by nursing were available for five months (April through August 2010) of the six-month period under review.  Audited subjects included new arrivals, new medication ordered or changes received in the pharmacy, renewal/discontinuation, noncompliance, intra-institutional transfers, MARs, and pharmacy supplies and medication release forms. A review of the audits revealed that one SRNII had conducted all of the audits with the majority of audited items involving a review of 50 UHRs over the current monitoring period (ten per item, per month).  Some errors were noted in the calculation of compliance rates.  The institution did not provide information on the reliability and validity of the audits.

Audits indicated that for new arrivals to WSP, medications were ordered within eight hours of arrival 100 percent of the time, and were available to the inmate by the end of the following day in 66 percent of cases.  For those inmates transferring from other CDCR institutions, audits indicated that they all arrived with their medications, but these were collected and sent to the pharmacy, and new medication orders were made out and issued.  Audits indicated full compliance with these inmates receiving their medication by the end of the day following their arrival.

For medication continuity following intra-institutional transfers, audit data reflected a 96-percent compliance rate, but staff reported otherwise.  For renewals, audits indicated timeliness in 100 percent of cases, with a progress note found in the UHR in 96 percent of cases.

The institution had a policy in place for addressing medication noncompliance but audits indicated ongoing issues.  Documentation on the MARs of no-shows, refusals, or missed medications was appropriately noted 82 percent of the time. Documentation of a subsequent referral with the primary care provider occurred 60 percent of the time.

Nursing staff reported that the length of pill lines was not audited during the monitoring period. Mental health management indicated that the institutional medication management committee continued to review concerns with pill lines that were raised during the preceding monitoring visit.

The institution reported that 1,326, or 78 percent of, psychiatric medications were ordered DOT, and 374 were nurse-administered.  The institution did not provide any information on the verification of whether DOT medications were properly administered and indicated that the issue would be addressed in a future audit.

Data provided by the institution indicated that a total of 30 Keyhea orders were initiated at WSP during the monitoring period.  The average number of inmates with Keyhea orders for each month ranged from 19 to 28. There were 25 inmates on Keyhea orders at the time of the site visit.

The institution reported that a total of 1,138 HS medications were ordered for MHSDS inmates, and that its LOP designated that HS medications were to be delivered at 8:00 p.m. or later, depending on workload and staffing.

It was difficult to assess whether paroling inmates actually received their medication, as the only audit addressing this issue consisted of determining whether a release form for pharmacy supplies and medication was signed by the inmate.

361

Sexual Misconduct:

WSP did not appear to adhere closely to protocol for evaluating inmates who may have Exhibitionism. During the monitoring period, 23 RVRs were written for sexual misconduct. In all 23 cases, referrals were made to mental health, but mental health evaluations were focused on disciplinary rather than therapeutic purposes.

Cases were discussed with supervisors rather than within IDTT meetings. Staff reported that either 12 or 17 (depending upon the source of information) cases were screened and reviewed by an IDTT for possible Paraphilia or Exhibitionism. Although WSP reported that their staff did not perform comprehensive evaluations in these cases, three inmates were diagnosed with Exhibitionism. Documentation regarding the disposition of these three cases was unclear.

According to documents provided by WSP, posted signs on cell doors and exposure-control jumpsuits were utilized by custody staff, when indicated by the ICC.

All 23 cases of sexual misconduct were referred to the DA.

Transfers:

A nearly-full time DMH coordinator was in place during most of the reporting period. However, the referral logs provided for the monitor's review were difficult to interpret due to incomplete entries and use of erroneous data. A comparison between the monthly DMH referral logs sent to headquarters and the complete log for the monitoring period provided by WSP reflected inconsistencies between what was reported to headquarters and the current master log at the institution. Nine cases identified on the composite log provided by WSP were not included in the logs sent to headquarters. There were also discrepancies within the data reported by the institution (i.e. in its logs

and in its management report) on the number of DMH referrals made, as well as within the information provided by headquarters.

According to the logs, the institution generated 33 to 36 acute care referrals, of which 28 were accepted.   There were 37 to 52 intermediate care referrals, of which 11 to 21 were accepted. Approximately 95 percent of inmates who transferred from WSP to DMH were transferred within 72 hours of receiving a bed assignment.

About 30 percent of acute care referrals were prepared and submitted within timeframes.  It took an average of 20.2 days, with a range of one to 60 days, from the day of the referral to the date a DMH bed was assigned.  However, once a bed was assigned, 95 percent of the transfers to DMH were completed within 72 hours of endorsement.

For intermediate care referrals, about 13 percent were prepared and submitted within timeframes.  The average number of days from DMH referral to the institution's receipt of notification of DMH's decision was 14.7 days, with a range of six to 32 days.  On average, for those inmates placed in a MHCB and subsequently referred to DMH, the average time from MHCB placement to the institution's decision to refer to DMH was five days.  Inmates referred to SVPP continued to be placed on a wait list.  It appeared that most of the inmates on the SVPP wait list either paroled or transferred to another institution before being sent to DMH.

Institutional audits found that Form 7388s were routinely completed. Staff reported that information regarding MHCB admissions, alternative temporary housing placements, and participation in EOP treatment was available to clinicians. However, many of the Form 7388s that were reviewed were inaccurate. In some cases,

inmates identified as meeting none of the criteria for DMH referral had participated in less than half of treatment, and in other cases inmates who had been recently admitted to the MHCB for suicidal ideation were not identified for referral consideration. There was no formal process in place for reviewing RVR histories of 3CMS inmates in mainline and RC programs.

Logs indicated that 23 Vitek hearings were held, with 22 of these resulting in the DMH referral being upheld. One referral was rescinded due to clinical improvement and two were rescinded because the inmates paroled.

All inmates returned from DMH were clinically evaluated in the treatment and triage area (TTA) of the CTC before returning to housing. The monitor's review of UHRs of inmates who had been discharged from DMH found that although IDTT documentation referred to the DMH discharge summary, it was not clear that treatment recommendations or clinical information from the discharge summary were being considered and implemented into the current treatment plan.

Documentation provided by the institution indicated that EOP inmates with SHU terms were transferred to a PSU within a week of endorsement, on average.

As of October 14, 2010, nine EOP and eight 3CMS inmates had been in administrative segregation longer than 90 days, with a range of 92 to 201 days. All nine EOP inmates had been endorsed to the CSP/Sac PSU via the CSP/Corcoran hub and were awaiting bed assignment and transfer. During the monitor's visit, mental health supervisors confirmed the accuracy of a log showing that the transfer of each of the remaining 13 EOP inmates in administrative segregation had been endorsed. They also consulted custody staff and confirmed that the retention of these inmates at WSP was due

to lack of an EOP bed at the receiving institutions.  When asked about recommending expedited transfer for clinical reasons, mental health staff responded that it would be futile, given the lack of beds elsewhere.

Other Issues:

### Reception Center

During the monitoring period, WSP reported a 20-percentincrease in the number of EOP inmates in the RC, for an average of 112 inmates per month in the RC EOP program.  Eight PCs, .5 FTE RTs, and one FTE psychiatrist were assigned to the EOP RC program.  WSP also assigned additional staff to the program during the monitoring period. Staff provided mental health evaluations, individual case management, group therapy, psychiatric medication management, and pre-release parole planning as needed.  Custody and mental health staff worked collaboratively to maximize program resources, but on occasion, group treatment offerings were reduced when officers assigned to escort EOP inmates were diverted to other assignments during the last two hours of second watch.  Efforts to improve compliance levels and satisfy treatment requirements were hampered by the number of EOP inmates at WSP, their excessive lengths of stay, scheduling parameters, limited treatment space, and the availability of only one room for group treatment.

Audits of timeliness of mental health screenings, initial mental health evaluations, and timely IDTT meetings for new arrivals yielded compliance rates of approximately 80 percent.  Audit results also indicated that approximately 17 percent of caseload inmates refused out-of-cell therapeutic activities at least half of the time.  Monthly staff audits of the provision of EOP treatment in the RC indicated that case

managers made weekly contacts with EOP inmates over 95 percent of the time, although methodology was questionable. The monitor's expert observed a series of IDTT meetings and two treatment groups for EOP inmates, all of which were of high quality.

Staff reported that they had not yet seen effects of improved discharge planning for the most seriously mentally ill inmates who had high rates of return to the RCs after being released.

Administrative Segregation

According to documents provided by the institution, as of October 14, 2010, there were 134 inmates in administrative segregation. Among these were 31 inmates at the 3CMS LOC and 22 at the EOP LOC. During the monitoring period, the number of caseload inmates in administrative segregation averaged 17 for EOP and 36 for 3CMS, but had been as high as 28 EOP and 40 3CMS inmates. The institution reported that an overflow ASU was initiated on Facility A as needed. A PT completed mental health screenings. Inmates identified with mental health needs were moved to the primary ASU in Facility D.

WSP reported that in administrative segregation there were three full-time PCs, two PTs, a .5 FTE psychiatrist, a .25 FTE recreational therapist, and a senior psychologist who provided administrative oversight. Staffing allocations were flexible, varying with the unit's census and size of the mental health caseload. When necessary, clinicians were redirected from the 3CMS RC team to augment the usual allocation.

Documentation provided by the institution stated that a PC participated in the weekly ICC review and that a recreational therapist offered five weekly groups. It also stated that IDTT meetings were held weekly, and that all referred inmates received

medical evaluations and timely follow-up.  The institution further reported that per its tracking data, both EOP and 3CMS inmates were offered mental health services 93 percent of the time, and that approximately 50 percent of clinical contacts occurred out of cell.  However, the design and arrangement of the therapeutic modules used for mental health groups undercut the delivery of adequate treatment.  Staff cited lack of line psychiatrists and the associated lack of continuity of psychiatric care as among the factors that impeded the provision of adequate treatment.

The monitor's expert observed a series of IDTT meetings, which were attended by a full team who brought C-files and available UHRs. The team knew the inmates and engaged in multidisciplinary discussion.  Roughly half of the inmates attended their IDTT meetings.  The treatment team considered DMH as a treatment option and reported that the DMH coordinator regularly provided current information regarding recent MHCB admissions, level of participation in treatment, and disciplinary incidents.

The monitor and the monitor's expert observed difficulties that a wheelchair-using EOP inmate with a nearly six-month stay in administrative segregation encountered in the course of attending mental health treatment groups.  The inmate had been endorsed to CSP/Sac's PSU via the CSP/Corcoran hub, but according to mental health supervisory staff, no beds were available at either receiving institution.  Although WSP's documentation indicated that, on average, inmates were moved to a PSU within a week of endorsement, the time to transfer to a hub exceeded 90 days in this case, far beyond WSP's reported seven-day average for transfer to a PSU.

3CMS

WSP reported that there was an average of 1,130 3CMS inmates in the RC and 34 in the mainline. Staff that treated 3CMS inmates were responsible for all intake diagnostics required to fulfill *Coleman* and *Clark* mandates, in addition to their caseload duties. They were also on call for emergencies and performed all Z-case, pre-parole, and out-of-state transfer evaluations. Staff reported that a total of 84 court-ordered and 145 disciplinary evaluations were done during the monitoring period. In addition, psychologists and social workers assigned to the RC were diverted from their regular duties to cover the EOP treatment program, the CTC/MHCB, and administrative segregation if coverage gaps occurred in those locations. Four of the clinical positions dedicated to RC duties and the 3CMS caseload were vacant. Although the size of the 3CMS caseloads was not excessive in terms of absolute numbers, the demand for mental health services exceeded the supply of clinicians.

Staff assigned to the RC reported that the competing demands of their workloads made it necessary at times for them to make difficult choices resulting in their inability to provide clinically warranted treatment to 3CMS inmates in reception in favor of meeting time-sensitive service delivery indicators. For some clinicians, these competing demands were compounded by the higher level of need associated with covering a yard that housed SNY inmates.

RVRs

According to a summary provided by the institution, 117 EOP and 11 MHCB inmates were issued RVRs during the monitoring period. Review of underlying documents showed that 11 EOP inmates accounted for 42 of those 117 RVRs. By the

time of the monitor's visit, three of the 11 had been transferred to acute care at DMH and four were wait listed for intermediate care. Logs of mental health evaluations done in connection with RVRs did not capture the findings or recommendations of mental health evaluations.

Pre-Release Planning

WSP staff reported that one full-time clinician was assigned to discharge planning. According to documentation provided by WSP, the institution's pre-release coordinator provided informal training to staff at IDTT meetings, in addition to consultation to PCs regarding available community services on a case-by-case basis. However, supervisory and management staff did not appear to have been updated on re-entry efforts by staff or contractors. The monitor's review of UHRs found some TCMP chronos, but in most cases they were not there, even in the records of the lowest functioning group of inmates. According to documentation provided by WSP, data on the number of EOP inmates released to the community was not maintained, and tracking and provision of re-entry planning services to RC 3CMS inmates was limited by current mental health staffing patterns.

**Kern Valley State Prison (KVSP)**
April 4, 2011 – April 6, 2011

Census:

On March 29, 2011, KVSP housed 4,568 inmates, which represented a five-percent decrease in the institution's total inmate population since the preceding monitoring period. KVSP's MHSDS population increased to 1,449 inmates, for a two-percent increase in the mental health population. There were 95 EOP inmates in the SNY program and 1,159 mainline 3CMS inmates. The MHCB unit housed 17 inmates. The

administrative segregation population of 442 inmates included 18 EOP inmates and 160 3CMS inmates.

Staffing:

Of 63.12 allocated mental health positions, 45.5 were filled, leaving 17.62 vacancies, for a 28-percent institutional mental health vacancy rate. Contractors provided an additional 17.375 FTE coverage, reducing the overall functional vacancy rate in mental health to less than one percent.

Positions for the chief psychiatrist and chief psychologist were filled. One of four senior psychologist positions was filled, but as of December 2010, one of these positions was removed.

Three of five staff psychiatrist positions were filled. Contractors provided an additional 5.25 FTE coverage. Of 13.5 psychologist positions, 9.5 were filled. Contractors provided an additional 11.5 FTE coverage. The supervising social worker position was filled, as were six of ten social worker positions, for a vacancy rate of 40 percent in social work. Contract social workers provided an additional 0.625 FTE coverage, reducing the vacancy rate to 34 percent.

The senior PT position was filled, as were 12 of 13.62 line PT positions. Although two of four RT positions were filled, one RT was on an extended leave. Positions for one health program specialist I, one office services supervisor II, and seven OTs were filled. One position for a health program manager III was vacant.

Psychiatry telemedicine services were not utilized.

Quality Management:

The quality management committee met regularly, with minutes maintained. Attendance varied and designees were routinely used. Mental health was consistently represented.

The mental health subcommittee typically met twice monthly. Although only 33 percent of mental health subcommittee meetings were attended by a majority of required attendees, minutes of all but one meeting indicated a quorum. However, the committee chair indicated that there was no specific standard for declaring a quorum. Minutes were sparse. Addressed issues included EOP out-of-cell activities, documentation of use of restraints, the definition of a serious suicide attempt, and review of missing items for the monitor's visit which included a completed DMH referral log for the monitoring period. Minutes and staff interviews indicated that audits were conducted but generally were not used as a tool to identify and rectify deficiencies.

There were no active QITs.

Psychiatry peer review was conducted monthly for five of six months. Reviews were both qualitative and quantitative in nature.

Suicide Prevention:

There was one completed suicide at KVSP during the monitoring period.

The SPRFIT met five times and reportedly always had a quorum with use of designees. Minutes lacked significant content but addressed case presentations, five-day follow-up, and completed and attempted suicides.

The emergency response review committee met five times. Minutes of four meetings indicated comprehensive reviews of emergency response incidents.

371

Custody officers reported receiving annual CPR refresher training and produced micro-shields on request. Spot checks indicated the presence of cut-down tools and PPE.

KVSP reported 99-percent compliance for five-day follow-up for five of six months, and 97 percent for the sixth month. Supporting documentation was not provided.

In administrative segregation, mental health staff reported that daily morning meetings with custody staff were occurring. They also reported that meetings also took place as needed, and that the relationship between custody and mental health was good.

KVSP reported 100-percentcompliance for inmate mental health screens prior to administrative segregation placement. Supporting documentation was not provided. An audit of 71 UHRs indicated a 55-percent compliance rate for pre-placement screens. PTs reported having access to inmate profiles as part of the mental health screening process.

KVSP also reported 100-percent compliance for completion of the 31-item screen, based on monthly audits of 25 to 75 administrative segregation admissions. No supporting documentation was provided. An audit of 71 UHRs found 90-percent compliance for presence of the 31-item screen.

Designated new intake cells were retrofitted and allowed for increased visibility into cells. Doors were appropriately marked with placards. However, custody reported that it was not always possible to house new arrival inmates in intake cells.

A custody officer was observed performing welfare checks properly. Review of welfare check logs indicated that they were not necessarily staggered and that time allotted for some welfare checks was insufficient.

Audits indicated 100-percent compliance for documentation of daily PT rounds.

Although several custody officers indicated that inmates received ten hours of yard time per week, others reported that it was typically no more than five hours per week.  No institutional audit results were provided.  The monitor's review of 114s found that inmates were offered yard several times per month and that refusals were common.

Except for new intake cells, administrative segregation cells contained electrical outlets.

Medication Management:

Nursing audits of medication continuity following intra-institutional moves found a compliance rate of 89 percent.

According to nursing audits of medication renewals, 93 percent of orders were renewed without interruption.

Audits of documentation of medication refusals on MARs indicated a compliance rate of 83 percent. Other audits of whether inmates were seen within seven days following three days of missed medications or 50 percent of medications over a seven-day period indicated a compliance rate of 71 percent.

KVSP did not use centralized pill lines.

Monthly nursing audits of 40 MARs for processing of medication orders found a compliance rate of 90percent compliance for medication administration within 24 hours of the order.

Monthly audits of the presence of completed informed consent forms found compliance rates of 92 to 100 percent.

Monthly audits of whether laboratory blood level studies were ordered when indicated, and whether results were reviewed and appropriate action was documented, found compliance rates in the range of 90 percent range.

KVSP reported that psychotropic medications were either ordered DOT or were nurse-administered, but did not audit this area.

Institutional data indicated that three Keyhea petitions were initiated, and 15Keyhea orders were renewed.  There were 22 inmates with active Keyhea orders.  No orders expired during the reporting period.

Although KVSP produced a 97-page printout that identified inmates who were administered HS medications, including psychotropic medications, it did not total the number of inmates receiving HS medications; medication administration times were also not audited.

The pharmacy reported that parole medications were processed and delivered to receiving and release one day prior to the inmate's parole.  It also reported that only one inmate refused parole medications upon his release.

Sexual Misconduct:

KVSP reported that there were 23 RVRs issued for IEX, all of which reportedly resulted in mental health screens.  Otherwise, the institution had little

374

additional information to report.  One inmate had a comprehensive evaluation and was referred to an Exhibitionism treatment program, but his transfer status was unknown. KVSP reportedly used custody-driven behavioral modification.

Transfers:

KVSP had two DMH coordinators.  The social worker in the MHCB covered CTC referrals, and a senior psychologist in the EOP acting as supervisor covered the rest.  Each maintained separate logs that were consolidated into a single log.

There were 11 DMH acute care referrals, of which ten resulted in transfers.  The eleventh referral was rescinded and the inmate was referred instead to intermediate care and remained on the wait list. The average time from acute care referral to DMH acceptance was 13 days, with a range of three to 26 days. From DMH acceptance to bed assignment, it took an average of 3.88 days, with a range of same-day to 15 days. Time from bed availability to DMH transfer averaged 4.23 days, with a range of two to 11 days.  There were no inmates on the acute care wait list during the site visit.

The three inmates on the intermediate care wait list had been waiting for 659, 360, and 165 days, respectively. These inmates had biweekly PC contacts, monthly psychiatrist appointments, quarterly IDTT reviews, and priority assignment to group therapy "as available."

Staff acknowledged frustration with the very long waits for Level IV inmates awaiting intermediate care.  This resulted in a tendency toward referral to acute care rather than intermediate care.  Another result was a tendency to retain inmates at the EOP LOC rather than have inmates face transfer delays of one to two years.

The DMH non-referral log identified 88 inmates. Although various reasons were cited for inmate non-referral, the reason provided for many was that there was "no need for higher level of care at this time." Institutional audits of the use of Form 7388 were regularly sent to headquarters, but the institution did not compile these into any type of report, nor was there follow-up with the non-referrals to determine whether they should have been referred.

Conflicting KVSP data indicated that there were 309 MHCB admissions, including 133 repeat admissions. Twenty inmates had three or more MHCB admissions. The average daily census in the MHCB was ten to 11. The average length of stay was seven days. Stays exceeding ten days were most often attributable to clinical reasons such as waiting for DMH acute care transfer or need of additional time to stabilize. Inmates were typically released from the MHCB on the day of clinical discharge.

KVSP reported 47 transfers to an EOP program. All but two were to KVSP's SNY-EOP. The institution did not provide useful transfer timeline data.

Other Issues:

Administrative Segregation

There were 172 MHSDS inmates in administrative segregation on February 28, 2011. Of these inmates, 14 were at the EOP LOC, and 158 were 3CMS inmates. KVSP data further indicated that on February 28, 2011, 64MHSDS inmates had been housed in administrative segregation for more than 90 days. Of these, 58 were at the 3CMS LOC, and according to conflicting institutional data, either six or 15 were at the EOP LOC.

MHCB

Weekly chart audits of treatment in the MHCB indicated compliance rates ranging from 20 to 100 percent.  Audits addressed pre-admission screens, whether mental health evaluations were reviewed and updated following MHCB admission, whether an initial IDTT meeting was conducted within 72hours of admission, daily progress notes, among other things.  Audit results were not aggregated and compiled into reports at regular intervals, and trends and patterns were not analyzed.

Inmates admitted to the MHCB were issued smocks, blankets, and a mattress placed on the floor.  As the inmate's clinical condition improved, t-shirts, boxer shorts, socks, and footwear were issued.

Audits of IDTT meeting attendance found a rate of 90 percent for attendance by correctional counselors.  Observation of an IDTT meeting in the MHCB found that the team applied an overly high threshold for referral to higher levels of care.

There were 16 instances of the use of restraints, involving nine inmates. Use of restraints averaged 7.2 hours and ranged from 1.3 to 20.7 hours.  There were 12 instances of seclusion involving nine inmates, with an average duration of 5.8 hours and a range of .6 to 15 hours. Beginning in April 2010, mental health staff and the custody sergeant met every morning to assess the need for use of restraints during movement of inmates, IDTT meetings, or recreational activities.

There were 108 admissions to alternative housing cells located in administrative segregation or the SNY.  Sixty-six were subsequently admitted to the MHCB.  Inmates in alternative housing were kept on continuous observation.  The average length of stay was .72 days or 17.5 hours.

377

EOP SNY

The EOP SNY reported that mental health staff worked at overcoming disruptions to provide services under difficult conditions.  There were long-standing restrictions caused by security lockdowns and weather conditions.  Turnover among the EOP SNY population was high, with 45 inmates admitted to the program and 43 transferred to other facilities.

Observed IDTT meetings were attended by a full complement of staff and were conducted in a spacious, confidential room.  Although UHRs and C-files were not present, it was evident that staff had reviewed them prior to the meetings. The treating psychiatrist attended most of the meetings, as did inmates, who were encouraged to participate fully.  Content was rich, with in-depth discussion of inmates, multi-disciplinary input, and excellent engagement in treatment planning.  Chart reviews found that treatment plans were somewhat individualized but generally not to the extent evidenced in the observed meetings.  Some showed a good connection between treatment goals and follow-up sessions.  KVSP reported 100-percent compliance for IDTT meeting attendance by correctional counselors from November 2010 to February 2011.Audits found that charts were available at 66 to 80 percent of meetings initial meetings and at 88 to 99 percent of quarterly meetings.

Audits indicated compliance rates of 87 to 95 percent for weekly PC contacts and 95-percent compliance for monthly psychiatry contacts in the SNY EOP. Progress notes distinguished between individual and group contacts.  Notes did not always indicate whether contacts occurred in a confidential setting or cell-front, but there were indications that many contacts were cellfront.

Data indicated that KVSP scheduled an average of 12.13 hours of weekly out-of-cell therapeutic activities. Lockdowns and inclement weather sometimes hindered these offerings. Although KVSP data indicated that EOP inmates attended an average of 8.74 hours of out-of-cell therapeutic activities per week, the data could not be verified.

There was no wait list for groups run by PTs or RTs, but there was a wait list for special-focus groups run by PCs. During the monitor's visit, groups were cancelled due to security lockdowns. According to staff, these lockdowns resulted in more contacts at cell front and cancellation of groups.

3CMS

Eight case managers provided mental health services in the 3CMS program. PC caseloads averaged 147.Data indicated 91-percent compliance for timeliness of PC contacts and 90-percent compliance for timeliness of IDTT meetings. These figures did not take into account any clinical determinations of inmate need for enhanced mental health contacts. Groups were available on all yards exception B yard, where one PC was on extended sick leave.

Observed 3CMS IDTT meetings on C yard were not attended by the correctional counselor. The psychiatrist present was not the treating psychiatrist for all cases. There were no case presentations. UHRs and C-files were not available for all inmates.

Referrals

KVSP reported a total of 2,833 referrals, of which 11 were emergent, 116 were urgent, and 2,706 were routine. The institution reported 100-percent compliance for timely response to emergent referrals, but only 45-percent compliance for response to

379

urgent referrals, and 62-percent compliance for response to routine referrals. These rates were derived using the date the referral was received by mental health and not the date it was written. The referral response process itself appeared to have adequate procedures.

Heat Plan

The institution reported implementation of year-round temperature monitoring in September 2009. Since that time, KVSP reported significant improvement in maintenance of the heat log maintenance, with fewer missed readings and missing logs. There were 132 missed readings and four missing log sheets. Units M-1 and M-2 in particular struggled with missed readings and missing log sheets.

RVRs

KVSP issued a total of 1,344 RVRs, of which four were reportedly issued to MHCB inmates, 54 were issued to EOP inmates, and 338 were issued to 3CMS inmates. KVSP reported that there were 15 mental health assessments of MHCB inmates, which contradicted the report of only four RVRs issued to MHCB inmates. There were 110 mental health assessments, including 52 of EOP inmates, 37 of 3CMS inmates, and six of general population inmates. KVSP did not report the number of inmates who received three or more RVRs, or the number of RVRs issued for self-injurious or suicidal behavior. The institution further reported that RVR logs did not routinely contain information as to whether outcomes of RVR proceedings included mitigation of penalties due to mental health considerations.

No RVRs were issued for hoarding or cheeking medication.

**North Kern State Prison (NKSP)**
January 25, 2011 – January 27, 2011

Census:

On January 27, 2011, NKSP's total inmate population was 5,260. There were 4,739 inmates in the RC. The total MHSDS population was 1,085. There were 100 EOP and 856 3CMS inmates in the RC. The 3CMS mainline population was 51, and the EOP mainline population was two. There were 11 inmates in the MHCB. The total administrative segregation population was 192, including 19 EOP and 42 3CMS inmates.

Staffing:

The newly-established chief psychiatrist position and the chief psychologist position were vacant. The senior psychiatrist position and all three senior psychologist positions were filled.

Of the 7.5 staff psychiatrist positions, 6.5 were filled. Contractors provided full coverage. Of the 37 staff psychologist positions, 34 were filled. Contractors covered all of these vacancies.

The six social worker positions were filled. Of the 7.25 PT positions, seven were filled. The two recreational therapist positions were filled.

The supervising RN II position was vacant. Eight of 8.02 RN positions were filled. Two of three psychometrist positions were filled, resulting in a 33-percent vacancy rate.

The health program specialist position and nine MHSDS clerical positions were filled.

<u>Quality Management</u>:

        The local governing body met three times during the reporting period and minutes were maintained. The new health care CEO had recently joined the local governing body.

        The quality management committee met six times during the reporting period and minutes were maintained. Agendas included regular reporting of activities and audit results in addition to reviewing new directives, policies, and other relevant topics.

        The mental health subcommittee met monthly during the reporting period and minutes were maintained. Both mental health staff and custody staff regularly attended the meetings. There were 23 different audits conducted monthly in the mental health program. The mental health subcommittee reviewed the audits as well as MHCB reports and suicide prevention committee activities.

        There were no QITs chartered during the reporting period.

        Psychiatric peer review continued to evolve at NKSP. Not all psychiatrists were actively involved. There were 37 charts reviewed from 11 psychiatrists during the reporting period. Copies of the reviews were given to the psychiatrists.

        Peer review for PCs was conducted separately. Its format was more consistent with traditional peer review, with two clinicians reviewing ten files of two of their peers, each month. Review parameters were quantitative, such as use of proper documentation format, and also qualitative. There were 57 charts reviewed during the reporting period.

Suicide Prevention:

There was one completed suicide at NKSP during the monitoring period.

The SPRFIT met monthly, but did not meet in July and August 2010 during the review period. Attendance was good and minutes were maintained. According to information provided by the institution, the SPRFIT reviewed all data on admissions to the MHCB and mental health temporary housing. It also discussed suicide reviews, five-day follow-up, and the preceding month's statewide suicide prevention videoconference. A senior psychologist served as the suicide prevention coordinator.

The tracking log data provided by the institution indicated that it was not 100-percent compliant with five-day follow-up. No audit data was provided.

In administrative segregation, custody and mental health staff indicated that regular morning meetings were held.

The institution reported that inmates were pre-screened by nursing prior to placement in administrative segregation, but no audit data was provided. Staff reported that the 31-question screen was performed on new administrative segregation inmates, but not always in a timely fashion, and again audit data was not available. Mental health staff reported that the suicide tracking/inmate profile was not being used as a part of the mental health screening process.

Intake cells were identified in the D6 ASU. New inmates in administrative segregation were identified by a paper on the cell door printed with the word "intake," the date of placement, and the inmate's name and CDCR number. However, intake cells were not identified in the A4 administrative segregation overflow

unit.  Custody staff reported that they were not aware of any specific intake cells or of the procedure for their use in the administrative segregation overflow unit.

Custody staff performed 30-minute welfare checks on inmates during their first 21 days after placement in administrative segregation.  The monitor reviewed the custody logs of the welfare checks in both ASUs.  The logs indicated that the checks were being performed and that the time allotted for the welfare checks was sufficient to allow for quality rounds.

Staff reported that inmates were offered ten hours of yard per week in administrative segregation.  A review of the logs appeared to confirm that.  There were reportedly many refusals of yard during inclement weather.

Medication Management:

All medication management audits were conducted by medical nursing staff.  No separate audits were performed for psychotropic medications.  Consequently, sample size of inmates on psychotropic medications was sometimes limited, making conclusions difficult to draw.  There were anecdotal reports from staff and inmates of improvement in the delivery of medications, with fewer lapses due to housing moves and order expirations since the advent of the Maxor Guardian pharmacy system.

One hundred thirty seven charts were reviewed for medication continuity and response to medication noncompliance.  During the reporting period, 96 percent of newly-arriving inmates had their medications ordered for them within eight hours of arrival, or had a physician's note explaining why their medications were not ordered.

The same chart review also found that all 90 inmates who had a housing move received their medication no later than the next day, for 100-percent compliance.

Six of the 137 charts reviewed indicated medication noncompliance for three consecutive days, or 50 percent or more of doses missed.  In three of those there was documentation that a referral had been made to mental health, yielding a 50-percent compliance rate.  The review did not examine whether there was a response to the referral.

The vast majority of psychotropic medications were administered once or twice per day, with the first medication administered in the morning and the second administration of all medications occurred between 8:00 p.m. and 10:00 p.m. The institution reported that pill lines were not an issue, as medications were delivered to and dispensed on the housing units.  The process was observed by SRN IIs and LVNs routinely in order to monitor timeliness.  In general, two or three inmates at a time would be released from their cells in order to receive their medications from the nursing staff, so that the waiting time was less than five minutes.

Pharmacy would not deliver a medication unless the informed consent form was faxed to it with any order for a new psychotropic medication.  A nursing audit found that informed consent forms were filed in the UHRs 98 percent of the time, which was consistent with the UHR reviews by the monitor's expert.  However, consent forms were not consistently updated or renewed annually.

Psychiatry peer review examined adherence to protocols for laboratory studies of inmate blood levels of psychotropic medications.  Charts were reviewed weekly but only 37 charts prepared by 11 psychiatrists were reviewed, making the sample size quite small. The UHRs reviewed by the monitor's expert rarely contained results of laboratory studies.

Mental health staff initially reported that DOT was used as clinically indicated, but then explained that all EOP inmates and all inmates in the CTC and mental health temporary housing received their medications by DOT.  In addition, for all inmates discharged from mental health temporary housing or the CTC, all of their medications were ordered DOT for a period of 90 days.  Since the procedure applied to "all inmates" in a given location or status, be it a recent discharge or at the EOP LOC, it clearly was not clinically driven on a case-by-case basis.

The institution demonstrated overall significant improvement with Keyhea orders.  There were 23 Keyhea orders initiated during the monitoring period, as compared to 13 during the preceding monitoring period.  At the time of the monitor's visit, there were 21 inmates on Keyhea orders, compared to only five during the preceding monitoring period.  There were no instances of lapsed or expired orders.  No cases were rejected, and in only one case was the petition denied at the hearing.

All evening medications were administered after 8:00 p.m., including any medications that were ordered HS.

Nursing staff received a list of paroling inmates and provided the information to the pharmacy.  Prescriptions were filled and taken to receiving and release where they were held in a safe until the inmate left the institution.  On the day of the inmate's departure, an RN would check the medications with the paroling inmate's identification.  The inmate would receive his medication and sign a logbook and receipt, which would then be returned to the pharmacy.  NKSP reported no problems or issues of any significance with this process.

Sexual Misconduct:

386

According to information provided by the institution, 11 RVRs related to sexual misconduct were issued during the monitoring period.  Of those 11 RVRs, seven resulted in a mental health screening and were reviewed during their administrative segregation IDTT meeting.

Two inmates received a comprehensive evaluation.  The monitor's expert reviewed both evaluations.  In one of them, the inmate was not interviewed.

No inmates were diagnosed with Exhibitionism or Paraphilia NOS during the monitoring period.

Transfers:

At the time of the site visit, a social worker was functioning as the DMH coordinator.  He was assigned to maintain the master log and completed required DMH-related audits.  He reported that he focused primarily on the intermediate care referrals, while the senior psychologist who oversaw the MHCB also oversaw the acute care referrals.  The DMH coordinator indicated that they maintained two separate logs and had no shared computer drive.   A review of the DMH log indicated that it was not complete or accurately maintained.  There were many gaps with regard to dates, where the referral was made to, acceptance, notification, or transfer dates.  In addition to missing information in the DMH log, there were referrals missing altogether.

Form 7388s were consistently completed, but were unreliable due to lack of data.  Multiple MHCB admissions and mental health temporary housing placements were recorded correctly only 70 percent of the time.  Information on inmates' participation in treatment was not readily available to IDTTs, nor was there any formal process for tracking RVRs issued to MHSDS inmates.

The institution reported that there were a total of 58 referrals to DMH, with 38 to acute care and 20 to intermediate care during the monitoring period. However, the accuracy of the data was questionable, given the log discrepancies noted above. Reportedly, completion and submission of referrals for acute care was timely, but for intermediate care it was not. Of the 38 inmates referred to acute care, it was reported that 21 inmates transferred and ten of them had returned to NKSP. Of the remaining 17, three were pending acute care transfer, and the remaining 14 stabilized, resulting in rescissions of their referrals. At the time of the monitor's visit, NKSP reported that there were six inmates pending transfer to DMH acute care.

Of the 20 inmates reported as referred to intermediate care, two had transferred to ASH, with one treated and returned, and the other treated and paroled from ASH. Of the remaining 18, one remained out to court, one was rescinded, one was pending intermediate care transfer, one paroled, and the remaining 14 were transferred to mainline prisons. The institution reported that there were five intermediate care referrals in process at the time of the site visit, although one was changed to an acute care referral reducing the number of intermediate care referrals in process to four. For the inmates awaiting an intermediate care bed, staff indicated that the services provided for all EOP inmates were available to them while still at NKSP.

It was noted that ten, or half, of the intermediate care referrals had been made during the first month of the monitoring period, June 2010, with no referrals made in November or December 2010. The DMH coordinator noted that this reduction in intermediate care referrals and reported that staff had become frustrated with completing

the referrals and then seeing the inmates placed on the wait list and either transferring to another institution or paroling.

Staff reported that two Vitek hearings concerning acute care referrals were held during the monitoring period, with one DMH placement upheld and one reversed. The DMH log, however, noted only one Vitek hearing. A Correctional Counselor II (CC II) was the hearing officer, with the PC, psychiatrist, DMH coordinator, and inmate participating.

The ten-bed MHCB had 111 admissions during the monitoring period. There were 115 discharges, out of which 101 were to the EOP LOC. Lengths of stay in the MHCB ranged from one to 80 days, with the average stay lasting 15.2 days and the median stay lasting 11 days. Lengths of stay exceeding ten days were for clinical reasons such as the need for continued stabilization or pending Keyhea proceedings. The longest stays were attributed to pending DMH transfer. The average daily census in the MHCB unit was ten, making it essentially always operating at capacity.

The mental health temporary housing, developed to meet the need for additional crisis-bed capacity, was located on the lower tier of a two-story segregated unit. It operated with its own set of operating procedures and functioned both as MHCB overflow and MHCB step-down. There were 774 admissions during the reporting period, with an overall average length of stay of 3.9 days. There were 16 inmates in the mental health temporary housing at the time of the monitor's visit. The daily census during the monitoring period ranged from six to 27. If inmates were admitted to mental health temporary housing pending MHCB admission, the average wait was 3.4 days for admission to the NKSP MHCB, and 5.3 days for MHCB elsewhere. It was also

sometimes used to house inmates awaiting DMH acute care transfer.  For inmates

pending DMH admission, the average length of stay was 24.8 days.

In the RC, there were approximately 100EOP inmates at the time of the

site visit, with a range of approximately 80 to 120 at any given time throughout the

reporting period.   The number of RC EOP inmates awaiting transfer longer than 60 days

ranged from 23 to 37 inmates at any given time, as tracked weekly by the institution.  The

longest stay during the reporting period was 175 days.  The overwhelming reason for

delays in transfers was "no vacancy at endorsed institution."  The log was reviewed in a

weekly management meeting with the warden.

Other Issues:

Reception Center

Arriving inmates with a history of EOP LOC were screened within

72hours of arrival, most often on the day of arrival.  A mental health evaluation was

completed within a week of arrival.

IDTT meetings were held for RC EOP inmates and were conducted at

required intervals and/or when clinically appropriate.  Attendance and participation by all

required disciplines was generally good.

Weekly PC contacts occurred.  A PT conducted daily rounds in the

housing units as well.  Although the vast majority of individual contacts did not occur at

cell front, neither were they held in private space due to the extreme paucity of treatment

space at NKSP.  Most interviews were conducted at a desk located in a corner of the

dayroom, with ambient noise on the housing unit used as a "sound barrier" for

confidential discussion.

The institution reported that 77 percent of RC EOP inmates were offered five hours of structured out-of-cell activity, but only 56.4 percent of them actually received it, and not necessarily on five separate days.  Five hours were not consistently offered due to the unavailability of borrowed space, clinician absence, and lockdowns.  Due to the lack of treatment space, groups were conducted in borrowed space such as the chapel, classrooms, or on the dayroom floor.  Some additional EOP escort officers had been added, improving the ability to get inmates out of their cells for individual and group contacts.  There were a total of six escort officers for RC EOP.

<u>Administrative Segregation</u>

NKSP is not an EOP hub institution.  A roster dated January 26, 2010 indicated that the census of MHSDS inmates housed in administrative segregation was 41 3CMS inmates, 22 EOP inmates, and one inmate identified as at the MHCB LOC.  This represented a marked increase over the preceding monitoring period, in which there were two EOP inmates housed in administrative segregation.  In addition to continued use of D6 as the ASU, NKSP had instituted the use of the top tier in A4 as an administrative segregation overflow, a new development since the preceding monitoring visit.

Clinical staffing in administrative segregation included a senior psychologist, 4.5 psychologists as PCs, one full-time psychiatrist, and three PTs.  It was noted that the PTs were sometimes redirected to cover other areas of the prison due to staffing shortages.

Administrative segregation mental health inmates were intermixed with mainline administrative segregation inmates in the housing units, which according to staff was a custody-driven decision.  The mental health inmates were dispersed across the two

391

wings of D6, which had 33 EOP and 12 3CMS inmates, and the one wing of A4, which had ten EOP, 12 3CMS, and one MHCB inmate.

Data indicated that the average length of stay for EOP administrative segregation inmates was 133 days, with the longest stay being 512 days as of the time of the site visit.

There was no available group space in A4 and groups were not provided there, despite the presence of EOP and 3CMS inmates housed there. The only confidential room available in A4 was used by the mental health temporary housing for IDTT meetings that were held on a daily basis. As a result, inmates were seen in treatment modules on the day room floor, with dividers utilized between them. Individual sessions in D6 utilized treatment modules on the day room floor, with partitions between the modules. There were issues with confidentiality, particularly because the treatment modules were visible to mainline administrative segregation inmates from their cells.

Presented data indicated that approximately 77 percent of clinical contacts were being held out-of-cell. Gang pressures were reported to play a role in some inmates not coming out for mental health contacts.

The monitor's expert observed an IDTT meeting conducted in the A4 unit. The IDTT members met at a dining table on the day room floor to discuss the case and then walked to a therapeutic module that was located at the corner of the day room floor by the tiers to talk with the inmate. The therapeutic module was surrounded by dividers with Lexan covering all the way around the module. However, confidentiality was lacking as administrative segregation inmates in the upper tier could easily look down

into the module and observe the IDTT process.  Good clinical discussion was noted.  The PC capably engaged the reticent inmate.

In D6, there was a confidential group treatment room with three small therapeutic modules used by the PTs to hold groups.  Plans for that room to be shared by nursing staff raised concerns that this would affect group availability.  It was reported that one hourly group was held daily by the PTs.  These group sessions involved handouts of materials and watching of videos.  Groups were primarily offered to EOP inmates because groups for 3CMS were considered "not mandatory."  The monitor's expert observed a group session which consisted of watching a movie.

Although there was no data presented with regard to the offer of five hours per week of group treatment for EOP administrative segregation inmates, it was evident that such hours were not offered, as there were EOP inmates housed in A4 with no group treatment available.  It was reported that the PTs had only recently begun to keep a running computer log on EOP inmates who refused to participate in group activities.

The monitor's expert accompanied a PT conducting rounds in D6.  The PT appeared to be knowledgeable of the inmates and asked each of them if they had any concerns that needed to be addressed.  The PT indicated that it was his practice to ensure that every inmate responded, even if minimally.  He reported that the 31-item questionnaires were completed but that a lot of inmates refused to come out to complete them.

The institution presented the results of audits conducted on 57 charts.  For many of the audited items, a large percentage of the charts were deemed "not applicable," resulting in sample sizes ranging from ten to 58 charts and averaging 37 charts.  The

institution reported 100-percent compliance in all audited areas exception for 98 percent compliance for psychiatrist attendance at IDTT meetings.  Audit results indicated compliance with initial and subsequent IDTT meetings, regular PC contacts, daily PT rounds, offering of clinically-indicated group therapy, and attendance by correctional counselors at IDTT meetings.  The monitor's expert's review of a sample of UHRs generally found documentation indicating that timelines were being met.

MHCB

There were ten MHCBs in the CTC, staffed by one psychiatrist, one psychologist, a part-time RT, and supporting medical and nursing staff.  IDTT meetings occurred on Mondays, Wednesdays and Fridays, although a Tuesday or Thursday meeting could also be accommodated if necessary.  Rounds were conducted seven days per week.  The RT conducted individual and group sessions with MHCB patients. All inmates referred for MHCB were evaluated by the on-call clinician, who was either a psychologist or a social worker, and the on-call psychiatrist on the day of referral.  The psychiatrist made the determination on whether to admit the inmate to MHCB or MHTH.

Program Guide requirements for treatment interventions were generally met or exceeded.  Histories and physicals were completed within 24 hours of admission. Daily assessments were done by a psychiatrist and/or psychologist seven days per week. SREs were completed at the times of admission and discharge.  IDTT meetings were held on Monday, Wednesday, and Friday mornings, with regular representation by nursing, psychology, psychiatry, and a correctional counselor.   Custody staff was encouraged to provide their observations and information about the inmate's sleep, activity, behavior, and meal consumption as well.

There were no actual beds in the MHCB except in the one room set aside for the application of five-point restraints.  Mattresses were used instead and were located on the floor.  Personal property was limited to smocks and blankets, regardless of the reason for admission or the duration of the stay.  By default, inmates were brought out of their cells in handcuffs, but the staff agreed to work together to review and revise this practice.

Staff was preparing to provide individual cognitive behavioral therapy to inmates in the MHCB, in addition to the other counseling and recreation therapy already in place.  Inmates were out of cell for IDTT meetings, or for individual sessions with a PC and/or the RT.  There were some group RT activities including television/videos and when the weather was not inclement, inmates were permitted some outdoor recreation just outside of the MHCB unit.

During the reporting period, eight inmates were placed into restraints for periods of time ranging from four to 22.5 hours, with an average duration of 10.9 hours.  There was a separate seclusion room that was occupied by three inmates during the reporting period, for 21.7 hours, 29.8 hours, and 108.4 hours, respectively.

The mental health temporary housing was staffed by psychiatry, psychology, nursing, and recreation therapy.  Nursing staff conducted rounds in the mental health temporary housing on each watch.  Clinical staff reported that an IDTT meeting on every inmate was held every day, but observation of these meetings showed that they were more akin to a brief out-of-cell interaction with the team members and not an actual comprehensive treatment planning session.

Although the clinical staff attempted to house the most acute inmates in the MHCB, there were often inmates on watch in the mental health temporary housing. Ten of the cells did not have beds but only a mattress on the floor. Property at the time of admission was similarly limited to quilted suicide-resistant smocks and blanket. Clinical staff reported that property was eventually issued to inmates remaining in the mental health temporary housing as clinically appropriate, but this appeared to be rare.

For purposes of consideration for referral to DMH, admission to mental health temporary housing was considered equivalent to an MHCB admission.

3CMS

During the monitoring period, one housing unit, A2, was appropriated for RC inmates, resulting in a decrease in the mainline 3CMS population by approximately half. There were roughly 50 mainline 3CMS inmates at NKSP.

Institutional audits and UHR reviews indicated that contacts with PCs occurred quarterly at a minimum. Inmates receiving psychotropic medications were seen quarterly by the psychiatrist. IDTT meetings were scheduled to occur weekly. Every inmate's treatment plan was reviewed at least annually. Psychiatrist attendance at IDTT meetings was problematic during the monitoring period due to staffing shortages and the need to divert psychiatric time to individual appointments and referral evaluations.

Treatment plans did not always accurately reflect the frequency or purpose of PC contacts, nor did the plans address discharge planning. In addition, diagnoses recorded in the treatment plan often differed from those contained in psychiatric progress notes and there were no indications in either place that there had been a clinical dialogue to reconcile those differences.

Five groups were offered.  Participants included non-MHSDS inmates, which mental health staff reported had the beneficial effects of reducing stigma associated with mental health treatment overall, and improving treatment participation among caseload inmates in particular.

Referrals

The referral data provided for review was incomplete.  The total number of mental health referrals for the reporting period as well as the average response times could not be ascertained from the data provided.  According to information provided by the institution, the implementation of MHTS.net led to NKSP's inability to calculate average times of response to referrals for the monitoring period.  However, NKSP did provide referral data for June to September 2010, which indicated that response to routine inmate referrals took, on average, from 6.5 to 14.9 days.  According to that same data, emergent and urgent referrals prompted contact within 24 hours.

Heat Plan

NKSP appeared to be compliant with the heat plan.  During the heat season, indoor and outdoor temperatures were logged and forwarded to the heat plan coordinator who kept the logs on file in his office.  The monitor reviewed a sample of the heat logs and found that temperatures were properly documented.  The monitor also reviewed the monthly heat reports that were submitted to headquarters during the reporting period.  According to the monthly heat reports, there were 101 Stage I heat alerts and no Stage II or Stage III heat alerts during the monitoring period.

RVRs

According to information provided by the institution, there were 60 RVRs issued to EOP inmates and six RVRs issued to MHCB inmates during the reporting period. Presented documentation indicated that NKSP completed mental health assessments for all EOP and MHCB inmates who were issued RVRs, which was an improvement over the preceding monitoring period. There were 154 RVRs issued to 3CMS inmates, of whom 17 received a mental health assessment.

**California State Prison, Los Angeles County (CSP/LAC)**
October 25, 2010 – October 28, 2010
January 18, 2011 - January 20, 2011

Census:

On October 25, 2010, CSP/LAC housed 4,511 inmates, including 1,638 mental health caseload inmates or 36 percent of the total institutional population. The caseload population included 728 mainline 3CMS and 271 mainline EOP inmates. There were 1,938 inmates in the RC, including 345 3CMS and 55 EOP inmates, which was a significant decrease from the RC census of 144 EOP during the preceding monitoring period. Administrative segregation housed a total of 421 inmates, including 159 3CMS and 76 EOP inmates. There were four inmates in MHCBs at the time of reporting.

Staffing:

CSP/LAC continued to struggle with psychiatry and psychology vacancies. The chief psychiatrist position was vacant. The chief psychologist position and five of the six senior psychologist positions were filled.

Among line psychiatrists, 5.5 of the 11 positions were vacant. Contractors filled 3.25 FTE positions, rendering a functional vacancy of 2.25 positions in line psychiatry.

Staff psychologist allocations increased from 33.8 to 36.8 positions, but there were 6.8 vacancies and four long-term leaves, leaving 9.8 positions uncovered. No contractors were used to fill the psychologist vacancies. Staff reported that caseloads were affected, with some PCs handling caseloads of up to 300 inmates.

Two of the nine social worker positions were vacant. With use of a .75 FTE contractor, only 1.25 social work positions were vacant.

Since the preceding monitoring period, the two vacant senior PT positions were filled. Among line PTs, 24 of the 26.25 FTE PT positions were filled, although three PTs were out on long term leave. CSP/LAC utilized five FTE contract PTs throughout the review period, leaving only a .25 FTE PT position not covered.

CSP/LAC lost one RT, with four of the 6.25 positions filled. No contractors were used to cover vacancies among RTs.

The institution reported that all 14.5 clerical positions were filled. The unit supervisor and health program specialist I positions remained filled, but one of the two office services specialist II positions remained vacant.

Quality Management:

During the monitor's visit to CSP/LAC in October 2010, identification of several significant issues in the delivery of mental health care led to a revisit in January 2011. To address these issues, CSP/LAC prepared a 38-item CAP. The primary remedial measure within the CAP was to provide training to assigned staff in the specific

program in which concerns were noted. All of these were documented as completed by the time of the monitor's revisit. Additionally, CSP/LAC reviewed existing procedures, increased supervision, and developed instructional memoranda. The institution also undertook remedial quality management actions including regular reviews of tracking logs, audits, QITs, and peer reviews. Results of this remediation are discussed throughout this summary.

The institution's local governing body met only twice during the monitoring period. The meetings were brief and were used primarily as a vehicle to review, approve, and sign various LOPs presented by the mental health, medical, and dental departments.

The quality management committee continued to meet twice monthly during the review period. A mental health representative attended seven of the nine meetings. Meeting minutes were maintained and revealed good attendance. They indicated consideration of specific issues within mental health, nursing, medication management areas, as well as broader issues that affected health care, such as escort and space.

The mental health subcommittee met regularly, on 15 occasions. Minutes were maintained and attendance was adequate. Custody staff attended all but one meeting. The meetings provided a useful forum for disseminating information, identifying areas of noncompliance, and developing strategies for implementing new program requirements. Routine agenda items included QITs, peer review findings, LOPs, and suicide prevention. Specific problem areas including MHTS.net, lack of C-files in IDTT meetings, and failure to complete DMH checklists were also addressed.

QITs on the administrative segregation EOP hub, medication management, and peer review for psychologists and social workers remained ongoing during the review period. However, there were no minutes or other documentation of specific activities undertaken by the QIT for medication management. Further, while the QIT on administrative segregation EOP continued to report data related to length of stay and inmate refusal rates, there was no documentation of any strategies developed to improve performance in these areas. The peer review QIT facilitated implementation of CDCR's newly-revised peer review audit tool and presented its audit findings to the mental health subcommittee. CSP/LAC attempted to charter a QIT regarding EOP inmate refusals of mental health activities, but it was dissolved due to "scope-of-work" complaints issued by the union representing PTs.

There continued to be no psychiatry peer review at CSP/LAC. The institution provided quarterly peer review for PCs that identified problems related to the quality, completeness, and legibility of treatment plans and progress notes.

Suicide Prevention:

Inmates continued to report a lack of appropriate or any response in some instances by custody staff when inmates reported suicide ideation. There were also reports of pressure by custody staff on PT staff to not submit referrals related to suicide ideation.

The SPRFIT met monthly during the monitoring period. Meetings were comprised of eight to 11 attendees, including four to five custody representatives. The team continued to address standing agenda items including MHCB referral and admission data, high risk inmates, and self-injurious behaviors.

401

While CSP/LAC remained compliant with completion of five-day follow-up for inmates released from CSP/LAC's MHCB, it remained noncompliant for identification and follow-up for inmates returning from MHCBs at other prisons during non-business hours. Additionally, CSP/LAC remained noncompliant with hourly custody checks for inmates returned to housing with orders for five-day follow-up.

Regular morning meetings in administrative segregation with PTs, mental health and custody staff did not occur during the review period.

Inmate profiles were not used as part of the screening process in any of the ASUs throughout the monitoring period. CSP/LAC again did not provide data regarding completion of pre-placement screens prior to placement in administrative segregation.

Audits documented compliance with administration of the 31-question screen. While staff reported 100 percent of the inmates were offered screens in holding cells on the dayroom floor, approximately half were performed cell-front. PTs were not timely apprised of inmates placed in overflow ASUs, and consequently were noncompliant with completion of the 31-question screens, or with daily PT rounds during the first several days of such placements. CSP/LAC had seven retrofitted intake cells in both ASUs; however, they were not used to monitor inmates during their first 72 hours of placement as envisioned in the department's suicide reduction plan. CSP/LAC reported that there were intake cells in the stand-alone ASU, although, custody staff in the unit was not aware of any cells set aside for intake monitoring.

Placards were placed on cell doors to identify intake-status inmates. Further, door coverings, including Lexan and sheets of quarter-inch metal with small drilled holes from top to bottom, made it difficult to see into cells.

CSP/LAC was non-compliant with 30-minute welfare checks in all ASUs during inmates' first 21 days in administrative segregation. Custody staff reported that the 30-minute welfare checks had become 30-minute security checks during which all inmates in the unit were observed to ensure that they were present and alive. Although it was reported that all administrative segregation 3CMS and EOP inmates were offered individual out-of-cell contacts, data indicated that most clinical contacts occurred at cell front. The paperwork associated with 30-minute welfare checks was the focus of an internal investigation during the review period.

No inmates in administrative segregation at CSP/LAC had access to in-cell electrical or battery powered appliances.

Except in overflow, the ASUs had an adequate number of walk-alone yards. Inmates were offered ten hours of yard per week. Inmates in overflow did not have access to outdoor yard or the dayroom or canteen, were not permitted to have paper, pens or pencils, and were subjected to clothing restrictions as well. There were also problems with adequate access to showers and laundry services in overflow. During the monitor's October 2010 visit, there were 21 inmates housed in administrative segregation overflow and two inmates on a hunger strike related to their conditions of confinement.

Medication Management:

Approximately only 50 percent of newly-arriving inmates received their psychotropic medications timely.

While there was improvement with medication continuity following intra-institutional moves, CSP/LAC did not attain compliance during the monitoring period.

CSP/LAC was not compliant with timely renewal or discontinuation of medications prior to expiration. Audits revealed only 45-percent compliance for medication dose changes or new medication orders received by the end of the following day. The maximum length of medication orders was 90 days and the maximum length of bridge orders was 14 days.

Compliance remained low at 68 percent for timely referral of instances of medication noncompliance. Nursing audits found that approximately 50 percent of referrals were appropriately documented on the MAR. CSP/LAC did not audit whether there was timely psychiatric follow-up, but staff indicated that it was problematic due to psychiatric staffing vacancies.

While CSP/LAC audited one pill line during the monitoring period and found no delays, the sample was too small for a determination of compliance.

Compliance with the presence of timely informed consent forms in the UHR remained problematic. Audits found only 59-percent compliance for appropriate laboratory testing of inmates' blood levels of mood stabilizing medications and atypical antipsychotic medications.

A centralized list of all inmates prescribed medication by DOT was maintained by the pharmacy at CSP/LAC. All inmates in administrative segregation and EOP were prescribed their medication as DOT.

HS medications were distributed after 2000 hours during the monitoring period.

On September 2, 2010, CSP/LAC housed 32 inmates on Keyhea orders. Audits found problems of noncompliance among Keyhea inmates. There was only a

four-percent rate of compliance for immediate referral of Keyhea inmates who were no-shows or refused Keyhea medication.

CSP/LAC had a process in place for the provision of parole medications. Audits found that 100 percent of inmates signed for their parole medications at the times of their releases from prison.

Sexual Misconduct:

There were 19 RVRs issued for sexual misconduct during the monitoring period. Notification to mental health was problematic, with violations as far back as April 2010 not forwarded to the mental health department until late September 2010. Only nine of the RVRs resulted in a mental health screen, and none were completed timely.

The same nine were the only inmates reviewed by an IDTT. Four comprehensive evaluations were completed, and two inmates were diagnosed with Exhibitionism. CSP/LAC did not have an Exhibitionism treatment program. The institution reported that while the inmates were awaiting transfer, their treatment plans were individualized to reflect treatment related to impulsive behavior/exposure behavior. However, the monitor's expert's review of records did not confirm this. Neither of these inmates transferred to a treatment program, even though there were no reported waitlists at the Exhibitionism treatment programs.

All inmates found guilty of IEX and/or masturbation without exposure and who also had a prior guilty verdict for a similar offense within the preceding 12 months were referred for a SHU term. During the reporting period, CSP/LAC referred 18 inmates for SHU terms. Thirteen cases were referred to the district attorney.

Custody-driven behavioral modifications included the placement of a thick yellow curtain over the entirety of the inmates' cell doors, which did not allow any sight into the cell. During the return visit by the monitors, the yellow coverings were lowered, but visibility into the cells was still not adequate. Exposure-control jumpsuits were utilized.

<u>Transfers</u>:

While there were improvements in the DMH referral process, there were also remaining challenges. During the monitoring period, one DMH coordinator reviewed submitted referral packets for completeness. All referrals to both acute and intermediate levels of care were tracked and incorporated into one database. Several logs were maintained through the database, but not all of the data was consistent across logs.

At the time of the monitor's return to CSP/LAC in January 2011, a psychologist and the health program specialist I functioned as DMH coordinators. The psychologist reviewed the referral packets to ensure clinical completeness, and the health program specialist I completed tracking, and requested histories and physicals and all other required referral information.

CSP/LAC referred ten inmates to DMH acute care during the review period. The average number of days from IDTT identification to actual transfer was 48 days during the monitoring period. The MHCB IDTT took an average of 8.6 days, with a range of one to 31 days, after admission to initiate the referral. Four of the ten inmates were referred on the ninth day or later. Referral completion and transmission averaged an additional 2.1 days, and referral submission to acceptance or rejection from DMH averaged another 2.8 days, excluding a 21-day outlier. The time from DMH acceptance

to bed number assignment averaged 33 days, and transfer took an additional 2.6 days, excluding a 12-day outlier.

Of the 16 inmates referred to intermediate care, 12 were referred to SVPP, three were referred to VPP and one was referred to ASH.  Average time from IDTT identification to completion and submission of the referral package was 11 days.

For the seven inmates referred to SVPP, the average time from submission of the referral submission to notification of acceptance was 10.5 days.  No bed numbers were assigned.  The times for transfer for the two inmates who transferred were 95 days and 135 days, respectively, from the dates of acceptance.

No data was provided regarding length of time from referral submission to acceptance at VPP/ICF, but the average time from completion of the referral package to bed assignment was 15 days.  Transfer took an additional two days.

For the one referral to ASH, the total time from IDTT identification to transfer was 20 days.  Referral package submission to bed assignment took six days, and transfer took an additional four days.

Ninety percent of APP referrals and 62 percent of ICF referrals were identified and referred by the institution.  There were no rejections and only one rescission among the APP referrals.  Three inmates' designated psychiatric programs were modified as a result of HCPOP case-by-case reviews.

Several inmates who had already been referred to DMH were transferred to CSP/LAC.  However, CSP/LAC was not consistently notified of those inmates' referral statuses.  Even when notification was given, it did not usually comply with the process of copying the pertinent portion of the referral log, as instructed by Headquarters.

Problems continued with inaccuracies in the referral tracking log, although some of them were due to the recent implementation of the SharePoint data-sharing system and the failure of some DMH programs to notify CSP/LAC by e-mail notification that a document was posted.

Vitek hearings at CSP/LAC often caused delays in the submission of referrals from CSP/LAC during the monitoring period.  The Vitek hearings were arranged between the associate warden for health care and the CC II in central records, after notification by the health program specialist I.  The health program specialist I reported delays in notifications from the PC to even begin the process, resulting in delays in notifications to the associate warden for health care.  This affected not only the timeliness of Vitek hearings, but also the scheduling of histories and physicals and completion of the case factor sheets.  Further, there were problems with the Vitek hearings not being attended by custody staff or mental health staff.

Completion of the Form 7388s improved but the institution did not achieve full compliance.  The monitor's expert's review did not confirm the institution's report of full compliance.  CSP/LAC attributed the lack of these forms in the UHRs to the 55 inches of loose filing of medical records.  Also, the Form 7388 was routinely completed prior to the IDTT meeting, and it was not always discussed in the meeting. The institution also reported that there was no mechanism in place to alert clinicians of multiple RVRs, one of the criteria for referral on the form.  Similarly, due to data accuracy issues, EOP clinicians struggled to calculate group participation levels and went by impressions rather than objective data.  Finally, because CSP/LAC's data on multiple crisis placements did not include alternative housing, any such data was an

408

underestimate.

Throughout the review period, CSP/LAC was noncompliant with scheduling IDTT meetings every 30 days for inmates on the ICF waitlist. Based on the monitor's expert's review of records, inmates on the ICF wait list were not reviewed in IDTT meetings to determine if they had improved and no longer required DMH referral, or if they had deteriorated and required expedited transfer. The record review found several cases in which expedited transfer requests were clearly justified, but no action was taken by institutional staff. While compliance levels improved toward the end of the monitoring period, interventions in the associated treatment plans were not modified and were often inadequate to address the inmate's mental health needs. Also, the treatment plans did not target the primary problem areas.

CSP/LAC maintained a log for inmates who met referral criteria, but were not referred. The monitor noted improvement with detailing of some rationales for non-referral. However the primary deficiency was CSP/LAC's failure to recognize that some inmates met criteria for referral consideration and to document serious symptomatology.

Notification of the return of inmates from DMH was problematic. CSP/LAC reported that the DMH forensic office did not contact the DMH coordinator or any other CSP/LAC staff prior to an inmate's return, or at any other time. The C&PR at the institution notified the supervisory staff of an inmate's pending return. However, it was unclear whether PCs received such notification.

Inmates remained on the same medications upon their return from DMH. They did not go through the MHCB but were given a routine bus screen and were placed in housing on the yard. There were continued delays of weeks to months for initial

psychiatrist and PC contacts upon return. Also, IDTT meetings were not timely for inmates returning from DMH during the monitoring period.

The DMH discharge packet with all required documents was located in the medical records. Staff reported that all discharge packets arrived at CSP/LAC prior to the inmates, except for the inmate discharged from ASH. The monitor's expert's review of the discharge summaries found that the DMH discharge summaries were usually limited to LOC and medication.

During the monitor's re-visit in January 2011, CSP/LAC reported additional training in initiating DMH referrals and expediting them for transfer when appropriate. Data indicated increases in both APP and ICF referrals. However, timeliness of referral packet completion remained problematic. HCPOP decisions contributed to the delays.

CSP/LAC continued to operate nine MHCBs in the 18-bed CTC. Data-tracking remained problematic. It was unclear how many MHCBs were occupied by medical patients throughout the monitoring period. MHCB admissions were again not tracked during the monitoring period. A sample of referrals culled from the treatment and triage area log indicated that 146 inmates were referred to the MHCB over three months, but only 36 inmates were admitted. Four of those admissions were from outside facilities.

The average length of stay in the MHCB was 8.6 days, excluding eight inmates with extended stays due to DMH referrals. The average daily census was five inmates. There were no administrative delays. Fourteen inmates, or 27 percent, had stays longer than ten days. Eight of those inmates had DMH referrals and one was from

VPP/ICF and was attending court. The remaining five inmates had lengths of stay averaging 17 days, with a range of 11 to 30 days. There were no justifications presented for the extended lengths of stay. Multiple admissions remained low.

During the monitor's January 2011 revisit, staff reported that they were able to move long-term chronic medical patients, thereby opening up previously occupied MHCBs. CSP/LAC reported access to ten beds plus one seclusion room. A new senior psychologist supervisor implemented an electronic tracking system for all TTA referrals. Initial data indicated that admissions from the TTA to the MHCB increased significantly to 70 percent.

CSP/LAC continued to use alternate housing in housing units, with five cells in D1 and six cells in A4. CSP/LAC did not maintain complete and accurate logs for utilization of holding cells during the monitoring period. It did not adequately track placements into these units, nor did it include these placements in aggregate referral, admission, and length-of-stay data. Multiple placements to these units were also not tracked. A tracking log was implemented during the reporting period, but it was inadequate in that it only included the inmate's name, CDCR number, and date of placement. Discharge dates, reason for placements, and discharge destinations were not included.

The cells utilized in housing unit D1, which was EOP housing, were not retrofitted for safety. They included bunks, shelves, and large-grate vents. When inmates were placed into these cells, they were put on one-to-one watch. Requests to retrofit the cells for safety were denied. The cells utilized in housing unit A4, which were administrative segregation housing, were retrofitted for intake purposes. When D1 and

411

A4 cells were occupied, the CTC "tanks" located directly in front of the officer's security station were utilized.

During the January 2011 re-visit, CSP/LAC reported implementation of a computerized tracking log for alternative housing placements. The comprehensive log included the date and time when the inmate was placed there, and followed him through either discharge to yard or admission into a crisis bed. Documentation had previously been stored separately but was now filed in the UHR.

While in alternative housing cells, inmates were considered to be awaiting MHCB placement. Staff reported that alternative housing was used only if no MHCBs were available, or if the admission was after hours and the psychiatrist on call needed to complete a face-to-face contact prior to admission. Alternative housing placements were not considered MHCB admissions until inmates were physically moved to the CTC. If the placement lasted 24 hours or more, HCPOP was notified of the MHCB need. Thus, while CSP/LAC began maintaining aggregate data regarding length of stay and repeat admissions, the information was still not included in MHCB data. When inmates remained in alternative housing overnight, one-to-one observation was provided by certified nurse assistants.

PSU transfers were problematic due to extended wait lists system wide. Only three inmates transferred to a PSU during the review period, and at the time of the monitor's visit, there were 12 inmates endorsed to a PSU. Committee referral to CSR endorsement took an average of 14 days, but most endorsements expired prior to actual transfer. It was not uncommon for MERDs to expire prior to transfer as well.

The average length of stay for EOP inmates in RC was 123 days during

the monitoring period.  Sixty eight percent remained over 60 days, 45 percent exceeded

100 days, and 20 percent exceeded 200 days.  Stated reasons for delays included pending

disciplinary action, LOC changes during the end of the endorsement process, lack of

available SNY beds, delays in medical chronos, and lack of bus seats.  Other information

indicated internal delays in processing as well.  Return-to-custody inmates with less than

60 days to serve were not processed for endorsement and paroled directly from

CSP/LAC.

The average length of stay for 3CMS inmates in the RC was 92 days.

Forty-three percent of 3CMS transfers exceeded 90 days.  Twenty-nine percent took over

200 days, and 18 took over 300 days.

Expedited transfers out of RC were not routinely processed due to

communication problems between the mental health staff and CC III.

Other Issues:

Reception Center

CSP/LAC reported 97-percent compliance with identifying inmates who

had paroled at the EOP LOC within seven days of their returns to custody.  They also

reported 100-percent compliance with completion of the comprehensive mental health

assessments as needed.  However, a sample of five UHRs did not corroborate that report.

Mental health subcommittee minutes contained compliance data regarding EOP

programming in the RC for only two of five months.  This data indicated that during one

month, 45 percent of eligible inmates were offered five activity hours per week, and that

during the other month, eligible inmates were offered 7.2 hours of activity per week, on average.[19]

CSP/LAC was noncompliant with timely initial or monthly IDTT meetings. The monitor's expert attended IDTT meetings for EOP inmates in reception and noted that treatment plans were inadequate and minimal in nature, and were never discussed with the inmate during the IDTT meeting. Treatment goals and interventions were not established or well thought out. Clinical contacts remained focused on brief check-ins with the inmates. There were numerous cases presented during IDTT meetings in which the inmates had been at CSP/LAC for several months, but little to no casework had been completed. While a CC I attended the meetings, it was not the inmate's assigned counselor. C-files were present but a significant amount of loose filing limited their usefulness.

CSP/LAC appeared to be compliant or nearly compliant with completion of weekly PC contacts.[20] The compliance data may have been negatively affected by

---

[19] Defendants requested that the original statement in this report – "that mental health subcommittee minutes indicated that only 45 percent of eligible EOP inmates in reception center were offered 7.2 hours, and 54 percent of those hours were refused" – be amended, based on MHTS.net data which they state indicates that 91 percent of reception center EOP inmates were offered five or more hours, and that the average received by an inmate was 7.1 hours. However, the institution notified the monitor at the time of the site visit that the data in MHTS.net was unreliable. Only the two months' worth of compliance data on activity hours, described above, was contained in mental health subcommittee minutes, on which the monitor relied.

[20] .Defendants state that data in MHTS.net indicates that reception center EOP weekly contacts achieved 97-percent compliance during the monitoring period. They requested that this sentence "be revised to indicate that 97 percent compliance indicates compliance, not non-compliance." At the time of the monitor's visit, however, the institution reported to the monitor that initial screenings in reception center reached 97 percent compliance, but they did not report compliance with weekly contacts for EOP inmates in reception. The monitor's examination of UHRs found that they indicated fairly good performance with weekly clinical contacts for EOP inmates in reception center, but they did not quite reach the requisite 90-percent level in order to attain compliance for such contacts. However, data presented in minutes of quality assurance meetings suggested that EOP inmates in reception center were consistently offered weekly primary clinician contacts.

problems with medical records.  Further, the institution was noncompliant with conduct of PC contact in confidential settings. [21]

During the monitor's re-visit in January 2011, there were 19 EOP RC inmates housed on B yard due to their sensitive-needs status.  While housed there, they were not afforded any group therapy, largely due to lack of programming space.  They were provided with only four hours and six hours of yard time on alternating weeks.  There was no dayroom available.  Showers were permitted every three days.  Due to these limitations, PC contacts were increased, but they were cell-front and amounted to primarily check-ins with little therapeutic utility.  Staff justified the lack of treatment in RC with the fact that the inmates would be transferring out, but due to system-wide lack of SNY EOP beds, many of these inmates' stays had lasted approximately six months.

Structured therapeutic activity was offered to EOP RC inmates on the main yard, but not to those SNY inmates on B yard.

MHCB

All inmates admitted to the MHCB were issued safety smocks and remained in them throughout their stays.  Inmates did not have beds, and were given tear-resistant mattress for the floor with a tear-resistant blanket.

CSP/LAC was compliant with completion of the brief mental health evaluation, but it was not compliant with the completion of histories and physicals within 24 hours of admission. No histories and physicals were completed for inmates in

---

[21] Defendants objected to the monitor's report of 35-percent compliance for completion of primary clinician contacts in a confidential setting, stating that MHTS.net data showed a 46-percent compliance rate for confidentiality of such contacts.  The monitor reported that the institution produced one month's worth of data which indicated the 35-percent compliance rate.  Nevertheless, regardless of whether the rate is 35 percent for 46 percent, both figures fall well below the minimum rate of 90 percent for compliance in this area.

alternative housing. While medical consultations occurred early in the inmates' admissions, it was often not within the first 24 hours, and it was usually performed by a nurse practitioner. The medical consults were narrow in scope. Suicide risk assessments were completed upon MHCB admission and discharge, but not every time they were indicated.

IDTT meetings were completed timely. All disciplines were present, including a correctional counselor with C-files, but not the inmate's assigned correctional counselor. IDTT meetings were held twice weekly. Inmates attended unless there was a particular security concern. Treatment plans were prepared by the psychologist in advance of the meeting and were minimal, often failing to address the primary reason for admission. Ninety percent of the medical records reviewed by the monitor's expert did not have a Form 7388 present. Form 7388 was not discussed in any IDTT meeting attended by the monitor's expert, even when the inmate clearly met criteria for referral to DMH.

Inmates were seen daily by the psychiatrist and psychologist, or both, but typically cell-front. Lack of space was not the reason, as the IDTT room was available for individual contacts. The primary modality for treatment in the MHCB at CSP/LAC remained medication management, although the unit that had an average population of five inmates and was staffed with a one psychiatrist and a one psychologist.

All inmates in the MHCB were treated as administrative segregation status and remained handcuffed. At least one CO was present for all out-of-cell interactions. Some staff believed that there were no other options, while other staff expressed concerns over the inmates' unpredictability and danger if they were uncuffed. Restraint and

416

seclusion logs were incomplete for date and time of termination of the restraint or seclusion.  Consequently, there was no data available for lengths of time.  There were seven instances of seclusion involving five inmates, and three instances of restraint usage involving three inmates.

The monitor's expert noted a number of instances in which inmates were believed to be using suicidal ideation or behavior to manipulate, intimidate, or otherwise affect mental health staff, but there was no supporting evidence in the progress notes.

The MHCB did not have an assigned RT and inmates had no access to yard, though space was available.

During the revisit in January 2011, several positive changes were noted in the MHCB, including the addition of a second full-time psychologist.  A new senior psychologist supervisor, on loan from another facility, provided focus and cultural change within the unit.  A RT was allocated to the unit.  However, recreation therapy was provided in-cell due to the lack of custody posted in the yard.  Form 7388s and treatment plans were completed during the IDTT meetings.  However, DMH referrals continued to be considered late in the inmates' MHCB stays.  Further, MHCB staff believed that they could only refer to APP and not to ICF.

MHCB inmates were no longer treated as administrative segregation inmates and were no longer handcuffed by default.  While all inmates were still issued paper clothing, a few inmates received their full issue of regular clothing.  Suicide resistant smocks were found to be cost-prohibitive.  Although rare, in some instances inmates had beds.

<u>Administrative Segregation</u>

CSP/LAC operated four ASUs throughout the monitoring period. Mental health caseload inmates were housed in units A-4 and A-5, non-MHSDS inmates were housed in the stand-alone unit, and unit B2 was used as overflow when needed.

Initial IDTT meetings occurred on the twentieth day of placement and rarely before the ICC meeting. Meetings included the necessary participants. C-files were present at the meetings.

CSP/LAC was compliant with completion of weekly individual PC contacts. However, confidentiality was problematic, with 62 percent of contacts completed cell-front. The out-of-cell contacts completed in therapeutic modules on the dayroom floor were not confidential, and none of the modules met design specifications. Problems were also noted with differences between correctional staff and PTs regarding the need for confidential interviews.

EOP inmates were offered ten hours of group therapy per week, but group refusal rates remained high throughout the monitoring period. Data samples revealed that 50 to 60 percent of inmates refused to participate. The monitor reported that the institution self-reported at the time of the visit that group therapy was not provided to 3CMS inmates.

PT daily rounds were compliant in all of the ASUs except the overflow unit during the review period, due to lack of notification that the unit had been activated.

The monitor's expert found that inmates' cells were dark, interfering with visibility into the cells during PT rounds. Many interviewed inmates exhibited delusional and/or disorganized thinking as well as other evidence of psychosis. The cells of inmates

418

placed in the unit due to IEX RVRs had thick yellow sheets that covered the entire front of the cell, allowing no visibility at all into the cell.

Further, inmates who twice received an RVR for refusing a roommate were placed on management status. CSP/LAC's LOP for this status was to remove all of the inmates' property except one pair of boxer shorts, one mattress, and one sheet. The LOP stated that duration of this status was no longer than three days, but many inmates had been on management status for days to weeks with no indication that an extension was authorized by the facility captain or administrative officer of the day, as required by the LOP.

During the monitor's revisit in January 2011, the yellow sheets covering the cells for inmates with RVRs for IEX were lowered, but visibility into the cells remained problematic. It was noted, however, that the placement was compliant with CDCR policy and the DOM for sexual misconduct.

The practice of placing inmates on management status was discontinued, with no inmates on that status during the monitor's January 2011 revisit. Also during the revisit, interviewed inmates reported that they were being seen weekly out-of-cell by their PCs and the psychiatrist. There were, however, reports of excessive force by custody staff, including the use of pepper spray and physical assaults.

Inmate stays in administrative segregation lasted for extended periods. The number of stays of 200 days or longer nearly tripled over the reporting period. As of September 2010, 49 percent of the EOP inmates in administrative segregation had been there for longer than 90 days, over 40 percent had been there longer than 120 days, and 28 percent had remained longer than six months. Approximately half of all delays were

due to endorsement and transfer delays, including institutional delays with RC

processing, changes in MHSDS levels of care, investigations by the investigative services

unit, and DA referrals.  Impending parole was an increasingly common reason as well.

EOP

IDTT meetings were attended by all necessary participants.  Discussion

covered consideration of referral to a higher LOC.  Treatment planning remained generic

and not individualized.  However, CSP/LAC developed a detailed and comprehensive

instrument which provided information and guidance to clinicians.

CSP/LAC offered over ten therapeutic activity hours per week to EOP

inmates, but refusals remained high at 56 to 65 percent.  Inmates often refused

participation due to the need to choose between showers, yard, canteen, and dayroom.

Late pill lines affected the start of groups, which were often comprised of 14 to 15

inmates in a room that only accommodated eight to ten chairs.  Supervisory staff

modified and updated the group curricula and types of groups for EOP mainline inmates.

Frequent lockdowns affected PC contacts, and consequently, cell-front PC

contacts remained problematic.

3CMS

Reports indicated that 3CMS inmates were seen as required by both PCs

and psychiatrists.  Group therapy was not available to most 3CMS inmates, and

lockdowns affected groups for those few inmates involved.

Referrals

CSP/LAC had a system in place for tracking mental health referrals and

follow-up.  Follow-up for emergent referrals was compliant.  However, the institution

continued to struggle with timely response, with only 62 percent of routine and 45 percent of urgent referrals followed-up within timelines.

### Heat Plan

CSP/LAC continued to maintain all appropriate heat logs. Lists of inmates taking heat sensitive medications were produced and distributed appropriately. Heat cards were distributed to inmates when heat-sensitive medication prescriptions were written.

Thermometers remained appropriately located and operable in the housing units. Cooling measures were reportedly provided during Stage II alerts. There were no Stage III heat alerts during the review period.

### RVRs

Hearing officers at CSP/LAC continued to fail to consistently consider mental health input in the RVR hearing process. During the monitoring period, there were 290 RVRs issued to EOP inmates, and 238 RVRs issued to 3CMS inmates.

All of the EOP inmates were referred to mental health for completion of an assessment. Eighty-four percent of the cases of EOP inmates resulted in findings of guilt.

Only six or 2.5 percent of the 3CMS inmates were referred for assessments. Two of these six cases were for assessments were for sexual misconduct. Tracking of RVRs issued to 3CMS inmates improved during the review period, but the report failed to record the reason for the RVR, the disposition, or the assessed penalty for the 232 cases that were not referred to mental health.

Mental health assessments were adequately completed by the mental health clinicians. There was documentation indicating that hearing officers considered some mental health input in assessing penalties, such as limiting the amount of time privileges were revoked. However, mental health input was not used as a basis for dismissing RVRs, foregoing SHU terms, or minimizing forfeiture of credit.

Pre-Release Planning

A total of 250 EOP and 872 3CMS inmates transferred or paroled from CSP/LAC. One hundred and twenty five EOP inmates were released to the community, and had not been endorsed prior to departure.

There was a general lack of formal pre-parole planning at CSP/LAC. Staff reported that informal pre-parole planning, which consisted of providing referral contact information, as opposed to linkage services, occurred when requested by inmates.

**California Correctional Institution (CCI)**
November 16, 2010 – November 18, 2010

Census:

On November 17, 2010, CCI housed 5,795 inmates, which included 1,390 MHSDS participants. There were 791 mainline 3CMS and four mainline EOP inmates. The SHU population of 846 included 164 3CMS and four EOP inmates. The OHU population of 69 included 63 3CMS and one EOP inmate. The 287 inmates housed in administrative segregation included 116 3CMS and eight EOP inmates. CCI's RC population of 1,494 included 263 3CMS and 33 EOP inmates. Of CCI's 495 RC inmates who were parole violators, 94 were 3CMS and 18 were at the EOP LOC.

Staffing:

There were 11.84 vacancies among the 86.82 allocated mental health staff positions, for a 14-percent overall mental health vacancy rate. Contractors provided an additional ten FTE coverage, reducing CCI's functional vacancy rate to two percent. Positions for a senior psychiatrist, chief psychologist, and seven senior psychologists were filled. Although 3.5 of seven staff psychiatrist positions were vacant, contractors provided an additional 3.9 FTE coverage. Although 6.34 of 30.34 staff psychologist positions were vacant, contractors provided an additional 4.1 FTE coverage. Also, there were1.34 dual appointment positions.

Positions for five social workers and two senior PTs were filled, as were 12 of 14 PT positions. PT contractors provided an additional two FTE coverage. All 2.5 RT and fifteen mental health clerical positions were filled, as were one position for a health program specialist I and a .98 RN position. Psychiatry telemedicine services were not utilized.

Quality Management:

CCI's quality management committee met bi-monthly. Quality management committee minutes indicated the presence of a quorum and reflected consideration of mental health issues.

The mental health subcommittee met bi-monthly. Minutes indicated the presence of a quorum. Mental health subcommittee agendas revealed consistent coverage of mental health issues, including provision of mental health services at the various levels of care, medication issues, inmate referrals, and transfers to higher levels of care. Senior management communicated quality management committee and mental health subcommittee results to staff.

423

CCI conducted separate peer review programs for PCs and psychiatrists. The majority of case managers participated in monthly peer review that focused on specific yards and/or programs. The institution also conducted a monthly grand round peer review process that included all mental health clinical staff. These sessions encompassed different programs and yards, and presented topics of general clinical interest.

Suicide Prevention:

CCI's SPRFIT met monthly from April through August 2010, but meeting minutes did not document whether a quorum was present. SPRFIT agenda items included medication continuity, custodial follow-up after releases from the OHU, QIPs following suicides, and monthly reviews of suicidal behavior.

The SPRFIT reported that custodial checks following MHCB or OHU releases were not adequately documented. Between April and September 2010, compliance rates averaged 80 percent and ranged from 71 to 93 percent. Audits of clinical follow-up after MHCB or OHU release indicated compliance rates between 95 and 100 percent.CCI completed monthly tracking and reporting of completed suicides, suicide attempts, and incidents of self-injurious behavior. The SPRFIT reported that QIPS from the three suicide reports that it received were completed.

The emergency response review committee met monthly. Meeting minutes did not indicate the presence of a quorum. The committee examined all response times to emergencies, potential training issues, and the appropriateness of staff compliance.CCI documentation indicated that staff was provided with CPR refresher training. Spot checks for PPE, cut-down tools and micro-shields indicated their presence.

In administrative segregation, a custody log documented daily morning meetings between mental health and custody staff.

Although CCI reported 95-percent compliance for the completion of pre-placement screens, supporting documentation was not provided. The institution reported between 91 and 100-percent compliance for completion of the 31-item screen, but did not provide supporting documentation. A review of ten non-MHSDS inmates' UHRs revealed that only two contained the 31-question screen. Although CCI reported conducting more than 90 percent of 31-question screens in a private setting, supporting documentation was not provided.

CCI data combined daily PT rounds that occurred in administrative segregation and the SHU. Because there were different compliance standards for administrative segregation and SHU PT rounds, daily PT round compliance in administrative segregation thus could not be ascertained. Although the custody log indicated that PT rounds were routinely conducted, there were days when they were not documented.

Certain cells were modified as intake cells and retrofitted with double windows, cement bunks, and other features. Yellow placards placed on cell doors identified new intake inmates. Although log reviews indicated that custody welfare checks generally occurred every 30 minutes, they were not necessarily staggered; many began exactly on the hour and half-hour.

Administrative segregation cells did not have electrical outlets.

Custody staff generally reported a weekly average of three hours of yard time for administrative segregation inmates. Among reasons for reduced yard time were

425

an insufficient number of management yards, inclement weather, several incidents involving weapons that resulted in lockdowns, and a lack of gunners. It was reported that yard often actually consisted of tier time.  Inmates reported that tier time was usually limited to 30 minutes, several times weekly.

Medication Management:

Historically, CCI had a bifurcated medication management auditing process, with responsibility for conducting audits, or audit sections, fluctuating between mental health and nursing staff.  There were also been instances when mental health and nursing staff essentially audited the same medication management issues, but reached different conclusions.  With the recent appointment of a nurse executive, CCI began transitioning the medication management auditing responsibility to nursing staff.

The institution reported noncompliance with meeting medication timelines for newly-arriving inmates and following intra-institutional transfers.  New arrival audits indicated compliance rates of 55 percent for April 2010 and 28 percent for May 2010. Medication continuity audits following intra-institutional transfers indicated compliance rates of 55, 63, and 100 percent for April, May, and June 2010,respectively.

CCI also conducted medication continuity audits for distinct populations. Audits of medication continuity that distinguished between newly-arriving EOP inmates in RC and "other" arrivals reported compliance rates of 20 percent, and 78 to 90 percent, respectively.  A medication continuity audit following OHU releases indicated compliance rates of 83 to 100 percent, with a 90-percent compliance rate achieved for four of the six months audited.

Improved psychiatry staffing resulted in a decreased need for bridge orders.  Four separate audits all indicated that 92 to 100 percent of medication renewals occurred "face to face."

Staff reported longstanding problems with completion of laboratory testing.  Offered reasons were a shortage of phlebotomists, uncertainty as to responsibility for noting laboratory orders, and difficulties with routing and reporting of laboratory test results.  An April 2010 audit found that although 82 percent of required laboratory testing orders that accompanied medication initiations were written, only 64 percent were drawn, and 27 percent were drawn timely.  Subsequent audits for the timely drawing of laboratory tests indicated 71 and 93-percent compliance rates for audits conducted in July and August 2010, respectively.

Audits conducted in April, May, and June 2010 for appropriateness of DOT medication administration found noncompliance, but later audits found compliance.

Two Keyhea orders were renewed during the monitoring period, and none were initiated.  At the time of the site visit, no CCI inmates were subject to a Keyhea order.

Available information indicated that in September 2010, 429 inmates were prescribed medications at HS.  Audit data for May indicated 100-percent compliance with HS medication protocols.  Problems with timely HS medication administration were subsequently reported in July 2010, but HS medication practices were reported to be compliant in August.

Three separate audits indicated that 77 to 92 percent of inmates who paroled or were otherwise released from CCI received a 30-day supply of mental health medications.  Compliance was found in one of the three audits.

Sexual Misconduct:

There were six RVRs for sexual misconduct during the monitoring period. All six inmates had mental health screenings, but only three had IDTT reviews.  None of the cases were referred for a comprehensive evaluation.

Custody-driven behavioral modifications included the placement of placards on inmates' cell windows and the use of the exposure-control jumpsuit.  One sexual misconduct case was referred to the DA.  Five of six inmates did not receive SHU terms, and the sixth was pending ICC action after being found guilty of the sexual misconduct RVR.

Transfers:

There were two referrals to DMH acute care and six to intermediate care between March 26 and October 30, 2010.  CCI complied with timeline requirements for the two acute care referrals; both transfers also occurred within 72 hours of a bed assignment.  For five of the six intermediate referrals, the time periods from CCI's submission of the referral until DMH acceptance ranged from seven to 24 calendar days.

Staff reported that CCI did not consider inmate OHU admissions when considering DMH referrals, which resulted in an underreporting of inmates who met DMH referral consideration criteria of three or more OHU placements.[22]  CCI was also

_____

[22] Defendants requested that this statement be deleted because clinical staff at CCI report that they have a long-standing practice of considering OHU placement as a criterion for referral to higher levels of care. However, CCI staff reported to the monitor's expert at the time of the site visit that, with regard to the criteria for consideration for DMH referral, the institution differentiated between OHU and MHCB

unable to generate reports that identified inmates who received multiple RVRs, had three or more crisis care placements within six months, or had low rates of program participation.  Staff also did not have access to information on inmates' disciplinary histories and reported reviewing UHRs to obtain inmate crisis placement history and asking correctional counselors about inmate disciplinary histories during IDTT meetings. Observation of a limited number of IDTT meetings by the monitor's expert revealed UHR unavailability and no discussion about inmate discipline history and rates of program participation.  Typically, there was no discussion of Form 7388.

CCI reported that inmates awaiting DMH acceptance or rejection and/or awaiting transfer to DMH were assigned a specialized case manager and received certain "enhancements" that included weekly case manager contacts, monthly psychiatrist reviews, monthly IDTT meetings, and increased group access. Many inmates referred and awaiting DMH acceptance or transfer continued to be maintained at the 3CMS LOC, or were lowered from the EOP LOC to 3CMS.

CCI staff reported not consistently receiving information that identified inmates transferred to CCI who had pending DMH referrals.

Staff indicated timely receipt of legible and thorough DMH discharge summaries, which was confirmed by review of inmate UHRs.

There was no MHCB unit at CCI.  During the monitoring period, CCI referred 112 inmates to the MHCB.  Of these, 94 transferred, but only 21 or 22 percent transferred within 24 hours of referral.  Average time between MHCB referral and

admissions.  This practice resulted in under-reporting of inmates who met criteria for referral consideration based on three or more OHU placements.  Further, information provided by the institution indicated that an internal policy specified that DMH placement was to be considered following three or more MHCB placements, but it did not specify that three or more OHU placements should be considered in the same manner.

transfer was 3.5 days, with a range of over 24 hours to 11 days. MHCB lengths of stay averaged 3.5 days, and ranged from one to 11 days. CCI reported compliance with inmates' timely transport to an MHCB unit once a bed assignment was obtained. During the reporting period, 52 inmates returned to CCI after referral to an MHCB.

CCI reported 374 OHU referrals and 240 OHU placements between April 1 and September 30, 2010. Eighty-eight OHU placements exceeded 72 hours.

CCI maintained a designated area in Facilities 4A and 4B that contained holding cells for inmates pending OHU admission. The institution reportedly placed 23 inmates in these cells. Three were there for less than one day, 18 were there for one day, and two remained in holding cells for two days. Eight of 23 inmates were subsequently transferred to an MHCB unit.

Other Issues:

### Reception Center

Clinical staff reported that all RC EOP inmates were seen within 14 days of arrival, and thereafter, every 30 days. However, CCI did not provide data on returning inmates who had previously paroled at the EOP LOC. CCI reported compliance at a rate over 90 percent for weekly clinical contacts and monthly IDTT meetings for RC EOP inmates, although relevant data was combined with other program data, making verification impossible. Although CCI reported five hours of weekly out-of-cell structured therapeutic activity for RC EOP inmates, date indicated that RC EOP inmates were offered a weekly average of 4.2 hours of out-of-cell structured therapeutic activity, and received a weekly average of 3.4 hours.

CCI averaged a daily census of 201 RC 3CMS inmates. The institution allocated one supervising senior psychologist, seven PCs, and one psychiatrist to this program. Screens were conducted in private settings, but as space was limited, at least some PC contacts occurred on the dayroom floor, which provided no sound or visual privacy.

Administrative Segregation

During the monitors visit, CCI's total administrative segregation was 287 inmates. Average lengths of stay for the 104 3CMS and 11 EOP inmates were 81 and 122 days, respectively. Three EOP inmates with lengths of stay exceeding 30 days had been housed in administrative segregation for 98, 180, and 751 days, respectively.

Fifty-seven percent of CCI's administrative segregation individual contacts were conducted on the dayroom floor, which was neither private nor confidential. Clinicians cited time limitations as the most common reason for not offering private contacts. Inmate refusals were reported as the most frequent reason that confidential contacts did not occur when offered.

An audit of 101 cases found a 40-percent compliance rate for holding the IDTT meeting before the ICC meeting. Another audit indicated general availability of C-files at IDTT meetings. CCI did not provide data as to the timeliness of ongoing IDTT meetings.

CCI often failed to meet required timelines for the transfer of EOP inmates to hub institutions.

Although administrative segregation EOP inmates were sometimes placed on the group therapy wait list, staff reported lack of group participation.

OHU

CCI provided crisis care within a 16-bed OHU that designated 11 beds for mental health use.  At the time of the site visit, OHU staff included two full-time psychologists, and a third psychologist assigned to respond to crises until 9:00 p.m. Psychiatrists were on call between 8:00 p.m. and 6:00 a.m.  PTs were assigned to the OHU during second and third watch.

OHU inmates were typically seen daily by a psychiatrist and/or psychologist. Audits found that 94 to 97 percent of OHU contacts were confidential.  All inmates, irrespective of custody level, were placed in therapeutic modules. Inmates were reportedly handcuffed during escorts.  With the possible exception of inmates with a history of staff assaults, handcuffs were removed once inmates were placed in modules.

Inmates in the OHU for mental health reasons were designated for suicide watch, suicide precaution, or psych observation.  Inmates designated for suicide watch or suicide precaution were typically given smocks or paper clothing, and typically only inmates given paper clothing were also given blankets.  Inmates usually slept on a mattress on the floor.  Clinicians generally reduced property restrictions as inmates' conditions improved from requiring suicide watch to requiring suicide precaution.

Audits of required 15-minute welfare checks indicated that rounds were consistently documented but occurred at exact 15-minute intervals.  Staff reported difficulty obtaining OHU inmates' health care records.  Reportedly, three inmates' health care records were unavailable for their entire OHU stays.

Overflow Cells

CCI provided crisis care overflow in four cells located within the medical clinic holding areas of housing units 4A and 4B.  At the time of the site visit, no inmates were receiving crisis care in the overflow area.  During the monitoring period, all 23 inmates admitted to holding cells pending OHU admission were initially placed on suicide watch.  Eleven of the 23 inmates were not evaluated in a private setting; four of there were because inmates refused the offer of a confidential setting.  Eight holding cell inmates were subsequently moved to a MHCB unit.

SHU

CCI reported compliance with required clinician contacts and IDTT meeting, although CCI's practice of combining data from different programs made verification of this impossible.  SHU inmates reported weekly PT contacts.

Documentation of clinical contacts from April through July 2010 erroneously classified all out-of-cell contacts, including dayroom floor contacts, as "confidential."  Lack of escorts was the primary reason for not offering SHU inmates private contacts, resulting in many contacts occurring cell front.

Administrative Segregation 3CMS

CCI reported that administrative segregation 3CMS inmates were seen weekly by PCs and at least quarterly by psychiatrists.  However, specific program compliance data was not available.  The monitor reported that at the time of the site visit, the institution self-reported that administrative segregation 3CMS inmates were not offered group therapy.

Referrals

As of September 2010, compliance rates for all mental health referrals were reported to be 78 percent, an improvement over the 60-percent compliance rate of June 2010. CCI reported that 59 to 77 percent of responses to routine referrals were timely. There was significant improvement with meeting timeframes for response to urgent referrals, at 93 percent in July 2010 and 91 percent in September 2010. Timely response to emergent referrals was sustained for all six months.

Medical Records/MHTS

Staff reported that UHRs were often unavailable for clinical contacts. Delays in re-shelving of charts led to the inability to pull the same chart two days in a row.

RVRs

CCI issued 311 RVRs to 3CMS inmates. Two of these were referred for a mental health assessment. Sixteen EOP inmates received a total of 17 RVRs. Of these, EOP inmates were found guilty of ten RVRs, with two dismissals. The institution reported not knowing the outcome of the remaining five RVRs.

**California Institution for Men (CIM)**
January 10, 2011 - January 13, 2011

Census:

CIM reported that on January 7, 2011, it housed 5,590 inmates, for a nine percent increase in census since the preceding monitoring period. CIM's MHSDS population was 1,641 inmates, which was a 23-percent increase in the caseload population. There were 915 mainline 3CMS and 23 MHCB inmates.

434

The administrative segregation population of 374 included 84 3CMS and 17 EOP inmates.  One administrative segregation inmate was awaiting transfer to an EOP hub.  The RC population of 2,134 included 196 EOP and 530 3CMS inmates.  Of the 1,925 parole violators in RC, 157 were at the EOP LOC and 429 were 3CMS inmates.

Staffing:

Of 109.5 allocated mental health positions at CIM, 104.9 were filled. With use of one FTE contractors, CIM's functional vacancy rate in mental health was three percent.

Positions for the chief psychiatrist, chief psychologist, four senior psychologists, and 12.8 of 16 staff psychiatrists were filled.  A contractor covered one psychiatry position.

Of the 40 staff psychologist positions, 39.6 were filled.  The supervising social worker position was filled, as were 11 of 12 social worker positions.

The positions for two senior PTs, 16.5 PTs, four RTs, and 12 clerical staff were filled.

Quality Management:

CIM's quality management committee typically met weekly. A quorum was reach from 65 to 93 percent of the time.

The mental health subcommittee met monthly; required participants attended between 68 and 85 percent of meetings.  Mental health subcommittee agenda items included consideration of existing CAPs, audit reports, DMH referral reviews, use-of-force matters, staff training, medication errors, and physical plant issues.

Two QITs were chartered during the monitoring period. One addressed clinician-to-clinician contact and continuity of treatment, and the other addressed compliance with mental health treatment in administrative segregation.

CIM recently implemented a peer review process. It had a peer review committee that reviewed every clinician quarterly. By the time of the site visit, the committee had reviewed 16 psychiatrists, 26 psychologists, and eight licensed clinical social workers.

Suicide Prevention:

There were no completed suicides at CIM since the preceding monitoring visit.

The SPRFIT coordinator was appointed in July 2010. The SPRFIT met five times and reported to the mental health subcommittee and chief of mental health. Meeting minutes were kept but a quorum was never attained. The SPRFIT addressed suicide attempts, suicide watch issues, suicide risk assessments, and temporary bed housing, among other things. It also reviewed administrative segregation welfare checks, audited five-day follow-up procedures, and provided SRE training to nursing staff. The SPRFIT identified inmates not to be provided with "keep on person" medications

Suicide attempts and instances of serious self-injury were tracked. Emergency medical response drills were conducted monthly. CPR refresher training was at least provided bimonthly.

An audit of custody five-day follow-up after MHCB or TBH release found a compliance rate of 43 percent. Audits of clinical five-day follow-up found a compliance rate of 94 percent.

In administrative segregation, the lieutenant conducted weekday morning meetings with mental health staff.

Pre-placement screens were completed for 80 to 90 percent of new intake inmates. The suicide tracking/inmate profile was used as part of the screening process. However, reviewed UHRs often contained neither the pre-placement screen nor the 31-item screen.

Observed daily PT rounds in administrative segregation were appropriately performed and recorded in isolation logs and documented in UHRs. New intake inmates were placed in designated suicide-resistant cells. Documentation of 30-minute welfare checks indicated completion at staggered intervals, although intervals frequently exceeded 30 minutes.

Administrative segregation cells were not equipped with working electrical outlets.

Inmates received less than ten hours of weekly yard.

Some custody officers announced mental health appointments as "psych appointments," while others referred to them as "healthcare appointments."

Medication Management:

Audit results found 100-percent compliance with medication continuity for newly arriving inmates.

Following intra-institutional moves, medication continuity had a compliance rate of 74 percent. For inmates discharged from the MHCB, the rate of compliance was 91 percent.

Response to cases of medication noncompliance was appropriate in 99 percent of cases.

Audits indicated 100-percent compliance for pill lines.

There was 97-percent overall compliance for the presence of informed consent forms for prescribed psychotropic medications, except in UHRs for EOP inmates in administrative segregation.

Audited UHRs indicated 100-percent compliance for laboratory studies when psychiatrists ordered Depakote, but only 77-percent compliance for Lithium orders.

DOT protocols were appropriately followed.

It was reported that 23 Keyhea petitions were initiated. Three expired and one failed to meet timelines. Fourteen to18 inmates were on Keyhea orders at any given time. Audits indicated 100-percent compliance for appropriate use of the Keyhea process.

HS medications were prescribed for 270 inmates. Audits found that they were administered after 8:00 p.m.

Audits further indicated 99-percent compliance with parole medication.

Sexual Misconduct:

Record reviews indicated nine IEX incidents. Instead of conducting initial screens, inmates were given comprehensive evaluations for Exhibitionism. Seven of the nine cases received comprehensive evaluations. The evaluations were well-written. Three of the seven inmates met the criteria for Exhibitionism, but none were transferred to an Exhibitionism treatment program. It was not clear whether these transfers had been initiated.

Transfers:

Establishment of a full-time DMH coordinator position in September 2010 led to improved DMH referral tracking and completion.

CIM initiated 13 referrals to acute care, out of which four transferred. Of the 84 referrals to intermediate care, 19 transferred to ASH, four to SVPP, and nine to intermediate care at VPP. Thirty-one referred inmates paroled or transferred to other prisons prior to DMH transfer. Five referrals were rescinded, two were rejected, eight inmates were on wait lists, and 15were pending completion at the time of the site visit. Times from initiation to submission of referral packets were non-compliant.

CIM clinicians had partial access to information needed to determine whether inmates met objective criteria for consideration for DMH referral. Data of inmates who participated in less than 50 percent of offered activities was not available from MHTS.net. Staff relied on familiarity with inmates or communicated with other clinicians. Reports that identified inmates who received three or more RVRs within a 90-day period did not specifically identify those who were MHSDS inmates. Reports that identified inmates with multiple MHCB admissions did not include inmates placed in temporary bed housing but not subsequently transferred to the MHCB unit, thus increasing the chances of under-reporting the number of inmates who should have been considered for DMH referral.

Audits of completion of the Form 7388 indicated variability in compliance levels among different areas of the prison. In RC East, for example, Form 7388 completion was non-compliant for five of six months, with compliance rates ranging from 38 to 60 percent during the non-compliant months. RC Central's monthly

compliance rates ranged from 14 to 55 percent.  In CIM I and the MHCB unit, completion of Form 7388 exceeded 90 percent for five of six months.

The SharePoint system was operational at CIM since January 1, 2011. Since CIM lacked the capacity to scan referral packets, it sent them to CDCR headquarters, where they were scanned and placed on the SharePoint system. DMH used it to transmit discharge summaries.

The DMH coordinator reported improvement with receipt of information on new arrivals with pending DMH referrals. CIM routinely sent information to receiving institutions on inmates with pending referrals.  Though CIM reported providing enhanced services to inmates awaiting DMH transfer, a review of inmate treatment plans and clinical notes generally did not corroborate this.

There were 950 MHCB admissions out of 1,020 referrals.  Monthly admissions ranged from 139 to 181 inmates.  The MHCB unit's average daily census was 31.57 inmates, with an average stay of 6.27 days.  Twelve percent of admissions had stays exceeding ten days.  Fifty four inmates in MHCBs were referred to DMH.

The MHCB multiple admission rate was 40 percent, with 377 admissions among 121 inmates.  Fifty nine of these 121 inmates who had three or more MHCB admissions were referred to DMH.

Twelve temporary bed housing cells with suicide-resistant beds handled MHCB overflow.  Stays in temporary bed housing reportedly lasted one to two days. Eighty-nine percent of temporary bed housing admissions were ultimately transferred to the MHCB unit.

CIM maintained holding cells in RC Central, RC East and CIM I, and tracked holding cell use for MHSDS inmates. Data indicated average stays in holding cells of three hours and two minutes. Holding cell stays exceeding four hours declined to eight percent of stays, down from 28 percent during the preceding monitoring period.

Data on EOP transfer times was confusing, often mislabeled, inaccurate, and missing for some months. Data problems were attributed at least in part to loss of some staff.

CIM reported that 165 RC EOP inmates transferred. Average RC EOP transfer times reportedly improved from 111 days during the preceding monitoring period to 65 days. Forty-eight percent of these transfers complied with Program Guide transfer timelines, although errors in data led to concern as to the accuracy of these figures. Data indicated 16 RC EOP inmates in various stages of PSU transfer.

There were 22 administrative segregation EOP inmates on November 30, 2010. On January 11, 2011, it was reported that four EOP inmates had administrative segregation stays exceeding 90 days. CIM data was conflicting with regard to the number of EOP inmates who had administrative segregation stay in excess of 90 days during the course of the monitoring period. CC IIs appeared knowledgeable as to required procedures for these inmates.

CIM reported slight improvement with RC 3CMS inmate transfers, from 110 days for the preceding monitoring period to 102 days as of January 11, 2011.

Other Issues:

### Reception Center

The RC housed from 120 to 170 EOP inmates during the reporting period. Audits indicated that these inmates were scheduled for an average of 4.3 to 5.3 hours of weekly group, but data was not provided as to the number of inmates to whom five hours was actually offered weekly.

Audits of clinical contacts indicated that 66 to 96 percent of inmates were seen weekly. Compliance rates exceeded 90 percent for three of the five audited months. Audits found compliance for out-of-cell activity and monthly psychiatry contacts, but indicated noncompliance for scheduling IDTT meetings within 14 days of inmate arrival, for psychiatry and correctional counselor attendance at IDTT meetings, and for beginning parole planning within 120 days of inmate release.

Required clinical and custody participants attended observed RC EOP IDTT meetings. C-files and UHRs were present. Inmates were present and participated in a meaningful fashion.

### Administrative Segregation

On January 11, 2011, CIM's ASU housed 374 inmates, including eight SNY 3CMS inmates housed for non-disciplinary reasons. There were an average of 28 EOP and 108 3CMS inmates in administrative segregation during the monitoring period.

Mental health staffing included six psychologists and a psychiatrist who provided services three days per week. Psychiatric contacts generally occurred monthly for administrative segregation EOP inmates. PCs had weekly contacts with 97 percent of administrative segregation EOP inmates, but with less than 90 percent of 3CMS inmates.

Approximately 70 percent of PC encounters with EOP and 3CMS inmates were cell-front.

Chart reviews indicated compliance for conducting the initial IDTT meeting within 14 working days of the inmate's arrival.  With the exception of psychiatry, required disciplines generally participated in IDTT meetings.  C-files were not utilized.  There was a 75-percent refusal rate for inmate IDTT participation.

Observation of ICC meetings indicated a lack of UHRs, unfamiliarity with inmates, and time pressures due to the number of inmates being reviewed, resulting in limited mental health input.  All but one of ten inmates refused ICC meeting attendance.

Inmate refusals of group participation were high.  There were insufficient access-to-care officers.

Auditory privacy for out-of-cell clinical interventions was lacking.

<u>MHCB</u>

The MHCB was a 36-bed unit staffed by four clinical teams.  Although a full clinical complement was generally maintained, there was significant turnover in psychiatry and psychology.  Furloughs and activations of temporary bed housing further affected consistency with the clinical teams.

MHCB cells had beds, and inmates were provided with a mattress, blanket, and smock. No yard was provided.

MHCB logs were adequately maintained.  There was compliance with completion of suicide risk assessments upon MHCB admission.  Suicide watch observations were documented every 15 minutes.  MHCB staff conducted weekday

morning meetings during which custody, nursing, and mental health staff reviewed

inmate status and discussed consideration for DMH referrals.

All MHCB inmates were offered daily out-of-cell confidential clinician

contacts, but staff reported that space limitations restricted individual contacts and

groups. Reportedly, access to treatment had improved with the installation of seven new

therapeutic modules.

Audits of MHCB documentation found noncompliance in many areas

including attendance at IDTT meetings by correctional counselors, IDTT utilization of C-

file information, completion of daily progress notes by PCs and psychiatrists, treatment

plan updates, DMH referral prior to the inmate's tenth day in the MHCB for stays

exceeding ten days, and inmate discharge or transfer from the MHCB unit within ten

days of admission.

IDTT meetings were held within 72 hours of inmate MHCB admission but

thereafter were not held weekly. While treatment plans were developed during the initial

IDTT meeting, fewer than 80 percent were updated every seven days. IDTT meetings

addressed DMH referral consideration. Observed IDTT meetings were competently

conducted but attendance by CC Is, custody, and nursing staff was lacking.

Unavailability of UHRs and C-files affected IDTT effectiveness

Staff reported improvement since the preceding monitoring period with

relations between mental health and custody, as well as among the various treatment

teams. However, the red tag/white tag system to determine the privilege level for inmates

in the MHCB remained unchanged throughout the monitoring period, with decisions

being solely custody-driven, with no clinical input.   Restraints were used for two inmates, with CDCR restraint protocols followed.

3CMS

UHR audits indicated compliance with conducting IDTT meetings within 14 working days of inmate arrivals, but indicated noncompliance with use of C-files and initiation of pre-release planning. Audits indicated compliance for the conduct of annual IDTT meetings, IDTT meeting attendance by PCs, and quarterly psychiatry contacts for inmates prescribed psychotropic medications.

Audits indicated compliance in some housing units but not in others for quarterly PC contacts, and psychiatry and inmate IDTT attendance.  Attendance by correctional counselors at IDTT meetings was non-compliant.

Group treatment was reportedly offered on CIM I but not on CIM II.

Referrals

CIM updated its LOP on referrals in October 2010.  For tracking purposes, all referrals were entered as routine referrals.  Nurses referred urgent and emergent referrals directly to either the inmate's clinician or to a PT for immediate follow-up.  Data indicated that routine referral follow-ups typically occurred within two days of mental health's receipt of the referral.  CIM reported that 90 percent of psychiatry referrals were seen within recommended timeframes but audit data was not provided.

Medical Records/MHTS.net

The records supervisor's report of a two-week medical records backlog was inconsistent with staff reports.  A UHR review indicated up to one month of unfiled

reports.  Review of UHRs found that some filing was up-to-date, while others were not updated for almost one month.

RVRs

CIM issued 1254 RVRs.  Of these, eight were issued to MHCB inmates, 123were issued to EOP inmates, and 51were issued to 3CMS inmates.  Dispositions of 29 RVRs were mitigated based on mental health assessments, more than the ten that were mitigated during the preceding monitoring period.  The institution attributed this change to training of mental health and custody staff involved in the RVR process.

Pre-Release Planning

CIM reported providing timely pre-release planning for all EOP and endorsed 3CMS inmates, but not for RC 3CMS inmates.  The only audit of pre-release planning for EOP inmates covered the period of November 2010, and indicated a compliance rate of 92 percent.

An audit indicated 93-percent compliance for providing 3CMS inmates approaching parole with support from the TCMP and/or the Parole Outpatient Clinic. Another audit found that 13 of 14 3CMS inmates' UHRs contained initial parole planning assessments.

Access to Care

Custody and mental health staff reported improved access to care but shortages of necessary staff.  However, rates of out-of-cell clinical contacts for mental health inmates in administrative segregation ranged from 25 to 39 percent.  Custody coded a significant percentage of cell-front clinical contacts as inmate refusals, but clinical staff and inmates indicated that other reasons may account for these refusals.

### California Rehabilitation Center (CRC)
February 15, 2011 – February 17, 2011

Census:

        CRC's total inmate population declined by four percent and its 3CMS census dropped by three percent since the preceding monitoring visit.  There were 4,110 inmates, which included 1,040 3CMS inmates or a quarter of the prison's population. There were 396 civil addicts at CRC, 88 of who were 3CMS.  There were 14 civil addicts in CRC's small RC, all of whom were 3CMS.  There were two 3CMS inmates in the OHU, both for medical reasons.

        There were 146 CRC-endorsed inmates temporarily housed at the California Institute for Men (CIM), which was 44 percent fewer than were reported in April 2010. The precipitous drop in the number of inmates sent to CIM was the result of new policies initiated by CRC managers.  Candidates for SNY placement were no longer sent to CIM pending completion of the review process.   Rather, these inmates remained at CRC until either approved or denied for SNY placement. Additionally, inmates placed in EOP remained at CRC until transferred to an appropriate program, rather than being temporarily placed in the RC at CIM to await endorsement and transfer.

Staffing:

        CRC's overall staffing vacancy rate increased from 1.3 percent in April 2010to 17.6 percent in February 2011.  The increased vacancy rate was largely attributed to recent staffing allocations and the loss of three clerical workers to retirement and transfer.

        Among supervisors, positions for the chief psychologist, senior psychiatrist, and senior psychologist were filled.  Two newly-created supervisory

447

positions, a senior psychologist specialist and a supervising social worker, remained

vacant.  Two of 2.25 psychiatrist positions were filled, as were positions for 16 staff

psychologists, two social workers, three PTs, and a health program specialist.  Three of

7.5 clerical positions were vacant, as were positions for a health program Manager III

(also a newly-identified position) and a half-time recreational therapist.

Thirteen psychologists carried 3CMS caseloads that ranged from 62 to 99

inmates.  Both social workers provided parole planning and groups to 3CMS inmates.

Quality Management:

The governing body, chaired by the institution's newly appointed CEO,

adopted a monthly meeting schedule in September 2010.  Minutes indicated that

attendees included the warden and chief medical executive, among others, and that

quorum was met.  Standing agenda items included review and approval of LOPs related

to dental, medical, and mental health services. The governing body reportedly presented

finalized directives and recommendations to the quality management committee on a

monthly basis, although this communication was not clearly documented in quality

management committee meeting minutes.

The quality management committee met three times in July 2010 and

monthly thereafter.  The committee was chaired by the health care manager during earlier

months, and then by the CEO during the latter part of the monitoring period.  Other

regular attendees included the CME, the associate warden for healthcare, the chief

physician and surgeon, the health program manager III for dental services, the chief of

mental health, the CHSA-I and the director of nursing.  Each meeting met quorum and

minutes were kept.

The mental health subcommittee met monthly and maintained adequate minutes. The meetings were attended by seven to ten individuals, including one to four representatives from custody. Standing agenda items included DMH referrals/non-referrals, OHU placements, and MHCB transfers. Staff presented a brief case review for each inmate placed in the OHU and/or referred to an MHCB unit during the preceding month. Other topics of discussion included five-day follow-up protocols, correctional counselor attendance at IDTT meetings, tracking requirements for 3CMS inmates eligible for non-revocable parole, heat plan protocols, revised procedures for EOP transfers, and RVR protocols. The meetings appeared to provide an adequate forum for tracking performance in vital areas and initiating efforts to resolve identified problems.

CRC continued to convene monthly peer review sessions for psychologists. Using the five-point Likert scale to rate results from "unacceptable" to "outstanding," each psychologist reviewed five randomly selected UHRs and provided feedback to fellow clinicians prior to the peer review meeting. The completed peer review forms were forwarded to the health program specialist for confidential filing.

Development of a peer review process for psychiatrists began in September 2010 and was nearly finalized as of February 2011. Peer review was not available to social workers.

No QITs were active or chartered during the reporting period.

Suicide Prevention:

There were no completed suicides at CRC during the reporting period.

The SPRFIT, which was folded into the MHQMS, met monthly throughout the reporting period. Discussion of individual inmates placed in the OHU and

transferred to an MHCB unit for suicidal reasons was a fixed agenda item at the joint meetings.

The Emergency Response Review Committee met monthly during the reporting period. Eight to 11 individuals attended the meetings and minutes were maintained. The committee reviewed emergency responses related to inmate deaths, final coroner reports and the results of staff training drills.

Inmates who expressed suicidal ideation were placed in the OHU for observation. Such inmates were placed in a room with a tear-proof smock, blanket, and mattress. The door to the room remained open and a nurse or custody officer was assigned to provide continuous observation, 24 hours a day, until the inmate was either transferred to an MHCB or returned to housing.

The institution did not provide performance data relative to clinical five-day follow-up or hourly custody checks for inmates released from the OHU or returned from outside MHCB units.[23] Consequently, reported compliance with five-day follow-up could not be confirmed, and the degree of reported noncompliance with custody checks could not be gauged. In addition, staff reported that, contrary to CDCR policy, custody checks were not required for all cases in which an inmate was released from the OHU with orders for five-day clinical follow-up.

Medication Management:

Nursing staff conducted monthly audits covering 15 discrete areas within medication management. The audits, which appeared to be based on adequate sample sizes, found mixed compliance.

---

[23] In their response to the draft of this report, defendants stated that it provided performance data concerning clinical five-day follow-up and hourly custody checks in the proof-of-practice binder. However, the monitor reports that this data was not provided.

Internal audits showed that medications were timely ordered for and administered to inmates upon their arrival at CRC.  Audits related to medication continuity following moves within the institution were inconclusive due the absence of current MARs in UHRs.

The institution's review of timely renewals found an overall compliance rate of 70 percent.  Poor performance in this area was attributed to glitches associated with the institution's transition to the Guardian Maxor pharmacy system.

Documentation of MARs was erratic. Internal audits found that MARs were not timely filed, with only half of the reviewed UHRs containing current MARs during three of six months.  This appeared to be the byproduct of chronic filing backlogs. Only 60 percent of reviewed MARs properly recorded medication noncompliance and no-shows during some months. However, the institution consistently required completion of refusal forms and had implemented protocols for tracking clinical follow-up. Information provided by the institution indicated that inmates refused medications on 320 occasions during the second half of 2010.  Each of the involved inmates was interviewed by a PT shortly after signing a refusal form and, if necessary, referred to a psychiatrist. Psychiatrists did not always respond timely to PT referrals related to inmate refusals.  In an effort to encourage medication compliance, PTs conducted medication education groups.  The institution reported that 271 inmates participated in such groups during the second half of 2010.

Pill line audits were flawed in that they recorded the duration of pill lines as opposed to wait times for individual inmates in pill lines.  Consequently, it could not

be ascertained from the data provided how long inmates waited in pill lines to receive prescribed medications.

Audits found that the overall six-month compliance rate for informed consent forms in UHRs was 80 percent for psychotropic medications and 77 percent for heat medications.

The LOP for ordering laboratory testing, reviewing results, and responding to abnormal levels was consistent with statewide protocols. A log provided by the institution indicated that ordered laboratory tests were timely processed. However, the institution did not audit whether tests were appropriately ordered when clinically indicated, nor did the institution review psychiatric response to abnormal test results.

One inmate at CRC was required to take psychotropic medications pursuant to an active Keyhea order. The order was initiated in November 2010, one month prior to this inmate's arrival at CRC, and was due to expire in May 2011. CRC did not initiate any Keyhea petitions during the reporting period.

Internal audits showed that 96 percent of paroling inmates received ordered medications before leaving prison during the first quarter of 2010. Audits covering the second quarter of 2010 and the first two weeks of December 2010 found compliance rates of 89 and 90 percent, respectively.

Sexual Misconduct:

Despite the small number of RVRs issued for sexual misconduct, exhibitionism protocols were not consistently followed. During the second half of 2010, CRC issued three RVRs for sexual misconduct, two of which were referred to mental health for completion of an exhibitionism screen. Neither of the two completed screens

concluded that the inmate met the diagnostic criteria for exhibitionism. None of these cases were reviewed by an IDTT, as required by CDCR policy.[24]

All three of the involved inmates were transferred to the ASU at CIM immediately following the incidents. Two of these were referred to the local district attorney's office. None were referred for a SHU audit.

Transfers:

There were no DMH referrals or transfers during the reporting period. The continued absence of DMH referrals appeared to be the result of a practice of transferring 3CMS inmates deemed to require higher levels of care to EOP programs or MHCB units in other institutions. Such inmates rarely returned to CRC.

DMH referral checklists were appropriately completed during IDTT reviews and filed with treatment plans in UHRs. Interviewed staff reported having access to all information needed to accurately complete the DMH checklist. All RVRs issued to MHSDS inmates were reportedly forwarded to the mental health department and distributed to the appropriate PC. Information regarding OHU placements and MHCB admissions were reportedly available to staff through the MHTS.net.

According to the institution's non-referral list, during the last six months of 2010, 22 inmates met one or more of the criteria for trigger of consideration for DMH referral. A small number of the non-referred inmates were recommended for the substance abuse program at CRC in order to receive more frequent individual contact and

---

[24] Defendants requested that this sentence be removed, as the *Coleman* Program Guide does not require IDTT review for an inmate who receives an RVR for "indecent exposure or intentionally sustained masturbation without exposure." However, CDCR's Paraphilia Plan of October 10, 2004 requires that in such cases, there shall be an initial mental health screen that is to be reviewed by an IDTT. *See* Exhibit C, Paraphilia Plan, "Assessment," Part I, p. 4. The Paraphilia Plan was completed by CDCR to comply with the *Coleman* court order of July 27, 2004

additional group treatment.  The remaining inmates, all of whom were identified as possibly benefiting from a more structured treatment environment, were deemed by an IDTT to be clinically appropriate for the 3CMS program at CRC.

Mental health staffs reported adequate access to the local OHU and to MHCB units in other institutions, although information provided by the institution indicated that MHCB transfers did not always occur within 24 hours of referral.  Case reviews presented during mental health subcommittee meetings indicated that at least three of nine inmates referred to an MHCB were not transferred within 24 hours of referral.  One inmate waited two days, another waited four days, and the third waited five days.

There were 46 OHU placements during the second half of 2010or an average of seven to eight placements per month.  Nine OHU placements resulted in transfer to an MHCB unit and the remaining 37 were returned to housing.  Ten of 46 OHU placements, or 21 percent, exceeded 72 hours, with the longest lasting six days.  Half of the excessive stays involved inmates who were transferred to MHCB units.  Most of the other excessive stays involved inmates who, per local policy, could not be released from the OHU during weekends or holidays. One inmate was placed in the OHU three times during the monitoring period, each time for suicidal ideation related to his poor adjustment to dorm living.  He was later transferred to another institution.

At the beginning of this reporting period, CRC ended its long standing practice of transferring EOP inmates to the RC at CIM to await endorsement and transfer.  Rather, inmates placed at the EOP LOC remained at CRC until transferred to an appropriate program.  This changed policy, still only months old, had not yet

substantially increased the number of EOP inmates at CRC, overburdened mental health staff, or notably increased the number and length of OHU placements.

CRC continued to comply with EOP transfer guidelines. During the second half of 2010, CRC referred 11 inmates to EOP programs, one of whom paroled from prison within 23 days of referral, and the remaining ten were transferred to EOP programs within 60 days of referral. There was one EOP inmate at CRC at the time of the site visit. UHR documentation indicated that this inmate, only recently placed in EOP, was seen weekly by his PC and monitored closely by a psychiatrist.

CRC operated a small RC for male civil addicts. Civil addicts, including those placed in the MHSDS, were routinely processed and released from the RC within 30 days of arrival.

Other Areas:

Reception Center

Performance data for CRC's small RC for civil addicts indicated that 31-question screens were timely completed on a consistent basis. However, inmates referred for a mental health evaluation were not always assessed within 18 calendar days of arrival, as required.

During the last six months of 2010, 280 civil addicts were processed through the RC. Of these inmates, 81 or 29 percent were referred for a mental health evaluation and 51 or 18 percent were placed in 3CMS as a result of the evaluation. Four of 280 31-question screens were not completed within seven days of arrival, for a compliance rate of 99 percent. Of the 81 cases referred for further evaluation, 64 or 79 percent were completed within the Program Guide timeframe.

OHU/MHOHU

CRC's OHU was staffed on all shifts with a supervising nurse, a RN, a LVN, and a certified nurse's assistant. An assigned OHU coordinator monitored all OHU placements and MHCB referrals. Daily clinical contact was provided during weekdays by the referring PC or psychiatrist. An on-call psychiatrist interviewed all mental health patients in the OHU during weekends and holidays. Clinicians typically entered the inmate's room in order to complete confidential, one-to-one interviews.

Within 24 hours of placement in the OHU, the referring clinician/psychiatrist consulted with the OHU coordinator to determine if an MHCB referral was indicated. Decisions to release an inmate to housing were also rendered through consultative meetings between the referring clinician/psychiatrist and the OHU coordinator. During weekends, the on-call psychiatrist could initiate referral to an MHCB but could not authorize an inmate's return to housing.

Nearly all mental health placements in the OHU involved suicidal ideation. All inmates placed in the OHU for mental health reasons were provided a tear-proof smock, mattress, and blanket. In all cases, the door to the room was left open and a nurse or CO provided continuous observation while seated in a chair positioned in or near the threshold. Continuous observation was maintained until the inmate was either transferred to an MHCB unit or returned to housing.

Local policy permitted the use of clinical restraint in the OHU for mental health reasons, but required that the chief of mental health contact HCPOP so that a restrained inmate could be moved to the top of the MHCB transfer list. MHQMS meeting minutes indicated failure of nursing staff to document 15-minute checks in one

case of restraint for severe agitation.  Follow-up training was reportedly provided to all nursing staff in September 2010.

3CMS

Quarterly audits, focused exclusively on quantitative measures, indicated that CRC was compliant with most of the basic Program Guide requirements for 3CMS. Mental health evaluations and initial IDTT reviews for newly-arriving inmates were completed timely.  Inmates new to the prison were consistently seen by a psychiatrist within 30 days of arrival.

Institutional audits continued to show that compliance with annual IDTT reviews hovered slightly below the 90 percent threshold, averaging 86 percent during the reporting period.  At nearly all IDTT meetings, the UHR was present and the inmate, the PC, and a psychiatrist attended.  Correctional counselors attended only 70 percent of the IDTT meetings held during the monitoring period, reportedly due to staff absences and supervisory turnover.  In addition, correctional counselors were not required to bring central files or case factor sheets to IDTT meetings.  Consequently, correction counselor input was usually limited to custodial generalities.  An IDTT meeting observed by the monitor's expert generally corroborated the information provided by the institution.  All of the reviewed cases were well-presented by the assigned PC.  Treatment plans and DMH checklists were completed prior to the meeting and shared with the team.

Internal audits, UHRs reviewed by the monitor's expert, and inmate interviews indicated that quarterly PC and psychiatric contacts occurred routinely and that more frequent contact was common.  Office space for confidential interviews was reportedly adequate on all facilities.

Over 20 percent of the institution's 3CMS population participated in one or more of 27 groups offered during the reporting period. Groups facilitated by psychologists, social workers, and PTs focused on depression, anger management, relationships, PTSD, medication education, social skills, and parole, among other things. 3CMS civil addicts were enrolled in an intensive substance abuse program provided by an outside contractor. A "healthy relationship" group observed by the monitor's expert was well managed by the clinical leader and solicited excellent inmate participation and interaction. Group space at CRC was reported to be adequate.

Referrals

The audits indicated that compliance rates approached 90 percent for responding to routine referrals within five workings days, remained at 75 percent for responding to urgent referrals within 24 hours, and had reached 100 percent for responding to emergent referrals within four hours. However, the methodology for auditing compliance with referral timeframes was flawed in that the calculation started upon receipt of the referral, which likely inflated compliance rates.

Heat Plan

CRC had taken steps to improve compliance with the institutional heat plan. Custody staff had installed exterior thermometers in various locations in order to identify the most accurate placement for initiating Stage I heat alerts. PT audits in June 2010 found that 17 percent of interviewed heat-risk inmates did not have heat cards. Thereafter, all heat-risk inmates were interviewed and issued a heat card if necessary. Two nurses were hired specifically to conduct medical rounds during Stage III heat alerts. These individuals were given keys to access dorms and were issued radios to improve

coordination and communication.  Finally, the LOP was revised to permit heat-risk inmates to go to yard one hour following discontinuation of a Stage I heat alert, even when indoor temperature continued to exceed 90 degrees.

RVRs

CRC issued 1,018 RVRs during the last six months of 2010.  Of these, 215 or 21 percent were issued to MHSDS inmates. Four or two percent of the RVRs issued to MHSDS inmates were referred to mental health for completion of an evaluation to be used in the disciplinary process.

During the preceding site visit, the monitoring team noted concerns regarding the local practice of issuing RVRs for cheeking and failure to attend pill line. Information provided by the institution indicated that this practice continued. However, the number of these incidents was small and the overall impact on the MHSDS population appeared to be negligible.

During the second half of 2010, four RVRs were issued for cheeking, attempting to hide medication, and unauthorized possession of psychiatric medications. Three of four cases involved MHSDS inmates.  Three inmates were assessed 30 days forfeiture of credit and ten weekends confined to quarters, and the fourth inmate was assessed 30 days' loss of yard and phone privileges.  Of the seven RVRs issued for failure to attend pill line, four involving MHSDS inmates.  Two of the seven RVRs were dismissed and the remaining five incidents were reduced to administrative chronos.

**Richard J. Donovan Correctional Facility (RJD)**
February 28, 2011 – March 3, 2011
May 9, 2011 – May 10, 2011

Census:

On March 3, 2011, RJD's census was 4,279, which included 1,956 MHSDS inmates. Although the institution's overall population decreased by 419, or nine percent, the MHSDS population increased by 93, or five percent, since the preceding monitoring period. A new EOP SNY program was instituted at the facility and was filled to its capacity of 150 inmates by December 2010.

The MHCB had seven caseload inmates and nine caseload inmates were in the CTC for medical reasons.

There were 613 EOP inmates at the time of the visit, with 451 in mainline, including 150 in SNYs, 37 in administrative segregation, and 125 in the RC including eight in administrative segregation.

There were 1,327 3CMS inmates, including 309 in mainline, 523 in SNYs, 97 in administrative segregation, and 398 in the RC including 21 in administrative segregation.

Staffing:

Staffing continued to improve during the monitoring period. Of the 114.85 established clinical positions, there were only 4.8 vacancies including two among PTs, one for a staff psychologist, a .5 staff psychiatrist position, and a .2 senior psychologist position. The overall vacancy rate for clinical positions was four percent. The vacancy rate for all mental health positions was 6.7 percent.

Clerical positions had a vacancy rate of 18 percent, with 2.7 of 14.7 established positions vacant.

At the monitor's re-visit to the institution on May 9-11, 2011, the institution announced that its CEO assumed the role of acting chief of mental health, and that a senior psychologist was appointed as acting chief psychologist. A new head pharmacist was hired, and several new psychologist appointments had been made.

Quality Management:

The local governing body met quarterly. Minutes indicated that quorums were present and that discussions included LOPs, psychiatry credentialing, and peer review.

The quality management committee met quarterly, a change from the monthly meetings reported during the preceding monitoring period. Minutes indicated that quorums were present with appropriate representation at the meetings. Topics included the institution's mental health management report, DMH referrals, utilization management, the MHARP ICF Pilot Program and a compliance report regarding outstanding CAP items.

The mental health subcommittee was scheduled to meet twice each month but the required attendance was not consistently achieved during the monitoring period. Quorums were often lacking. Minutes of the meetings showed that the subcommittee examined DMH transfers, RVRs, medical records, and other pertinent mental health issues. The subcommittee forwarded reports and recommendation to the quality management committee regarding suicide prevention, transfer timeframes, referrals,

461

responses to decompensating inmates, and logs for alternative housing used prior to placement in the MHCB.

   The institution reported three active QITs during the reporting period. One examined group participation by EOP inmates in the RC, another covered conflicting ducats, and the last one covered correctional counselor participation and duties in IDTT meetings.

   Psychiatry peer review continued during the reporting period. Staff reported improved documentation from psychiatry. The psychiatry peer review committee, which included two full-time psychiatrists, was responsible for reviewing all psychiatrists. Issues identified regarding individual psychiatrists were handled through the existing medical staff structure.

   The peer review instrument for PCs was operational at the time of the visit but did not meet objectives. A new review instrument was developed and submitted to the mental health subcommittee.

   At the monitor's May 2011 re-visit, the institution reported that it had compiled its own 2010 action item lists from areas of concern noted in the Special Master's Twenty-Second Monitoring Report, and its 2011 action item list from the monitor's preliminary findings announced at the monitor's regular site visit three months earlier. These lists laid out specific remedial actions taken or to be taken. The institution also submitted CAPs for each of the mental health program areas identified in its 2011 action item list. Included among these were plans to finish filling the remaining open half-position in psychiatry, end the scheduling of psychiatry treatment lines while IDTT meetings were in progress, cancel prescriptions for psychotropic medications that

exceeded 90 days, and train psychiatrists to write prescriptions for no longer than 90 days.

Suicide Prevention:

The SPRFIT met monthly during the reporting period except in July 2010. A quorum was achieved at three of the five meetings. The team addressed matters related to clinical five-day follow-up and custody follow-up, suicidal behavior, and the triage and treatment area.

Training of all psychiatrists, medical staff, and custody staff in CPR was tracked.   Emergency medical response drills were conducted at least twice per month in the ASUs.  The emergency response review committee met regularly.  Minutes indicated that quorums were present and appropriate issues were addressed.

The institution was non-compliant with both clinical and custodial follow-ups, with compliance rates of 91 percent and 94 percent, respectively.

The institution tracked instances of suicidal ideation, suicide attempts, and self-injurious behavior.  With implementation of the Suicide History Tracking Operation Plan in September 2010, staff reported that inmate profiles were generated for each arriving inmate.  The "high suicide risk" alert was operational on MHTS.net and staff was able to generate these alerts on the system.

RJD reported that in administrative segregation, daily meetings between custody and mental health staff were occurring.  The institution was non-compliant with completing pre-placement screens for new arrivals.  Thirty-one question screens were completed within 72 hours of arrival in administrative segregation, but confidentiality was lacking.  During inmates' first three weeks in administrative segregation, their cells

were identified by pink signs on the cell doors.  Conduct of 30-minute welfare checks continued to be problematic, with times and durations of the checks not staggered. Cells were not equipped with electrical outlets.  Inmates in administrative segregation were offered five hours of yard time twice per week.

Medication Management:

An audit indicated only 65-percent compliance with medication continuity for inmates transferring in from other CDCR facilities.

Following intra-institutional transfers of inmates on psychotropic medication, there was an 83-percent compliance rate for continuity of medications. However, audits of medication continuity after MHCB discharge found a compliance rate of only 67 percent.

It was reported that renewals of medications were difficult due to issues with Guardian system.  It was not uncommon for the pharmacy to run out of medications for several days.

Medication noncompliance by inmates was not audited.   Polypharmacy was not problematic at RJD.

The majority of medications were administered to inmates through pill lines based on housing units, which made wait times minimal.

The institution reported compliance with obtaining informed consent form from inmates.

Audits of laboratory tests demonstrated a compliance rate of 75 percent for testing of blood levels of mood-stabilizing medications.

Staff reported that the DOT process was periodically monitored by a psychiatrist and that nurses received periodic training on the DOT process.

As of December 31, 2010, there were 38 inmates on Keyhea orders. The average time from initiation of the petition to hearing was 29 days. Only one Keyhea petition was initiated but was dropped prior to a hearing. Of the 14 inmates who came to RJD on Keyhea orders during the last quarter of 2010, four were transferred prior to a court hearing. Of the six hearings that occurred between October and December 2010, five were for renewals and one was denied at the hearing. Six inmates transferred to other institutions while on Keyhea orders. Nine Keyhea orders were not renewed due to stabilization of symptoms, and two were dropped due to clinician error.

It was reported that HS medications were administered after 8:00 p.m.

Results of an audit were consistent with parole medications being provided to inmates upon release.

Sexual Misconduct:

During the review period, there were 19 RVRs written for sexual misconduct. All of these inmates received screens, but the institution did not complete the process or conduct IDTT meetings within ten working days of the incident. Only 49 percent of inmates were seen within 72 hours of the incident.

Based on the documents provided by the institution, four screens resulted in referrals for comprehensive evaluations, diagnoses of Exhibitionism or Paraphilia NOS, and referrals to treatment programs at another facility as RJD did not provide treatment for Exhibitionism. However, during the reporting period, no inmates transferred to treatment programs.

The institution utilized custody-driven behavior modifications including placards on cell windows for inmates who received sexual misconduct RVRs. Inmates whose offenses occurred out of cell wore exposure-control jumpsuits while outside of the cell.

Eleven inmates were found guilty of their RVRs. All RVRs for sexual misconduct were referred to the DA.

Transfers:

The DMH referral logs provided by the institution were incomplete and did not allow for a thorough assessment of institutional compliance.

From July to December 2010, nine inmates were identified for referral to acute care. Of these, three transferred to VPP. Referrals for four inmates were rescinded due to patient improvement. One inmate transferred to another institution prior to completion of his packet. There was no data available for one inmate after completion of his referral packet.

For those inmates who transferred to VPP, the average number of days to complete the referral packet was six, the average number of days from referral to acceptance was eight, and the average number of days from acceptance to transfer was 15.

The two Vitek hearings held during the reporting period were both lost by the inmates.

There were 41 inmates identified for referral to intermediate care during the reporting period. Of the 37 inmates who were actually referred to intermediate care, 18 were referred to SVPP, 13 to ASH, two to VPP, and four had no referral locations

provided in the logs.  Seventeen, or 46-percent, resulted in transfers to intermediate care.

Five inmates transferred to SVPP, ten transferred to ASH, and two transferred to VPP.  It

took an average of 19 days from identification to package completion, and an average of

32 days from referral to acceptance.  Transfer times took an average of 11 days following

acceptance by DMH, resulting in an overall average of 45 days from referral to transfer to

intermediate care.

　　　　　　Times for transfer to ASH increased since the preceding monitoring

period, from an average of 34 days to an average of 43 days from identification to

transfer.  The average time from referral to transfer was 23 days.  There were two

rejections from ASH during the reporting period, both involving the same inmate and the

lack of a Keyhea order.

　　　　　　For the two inmates who transferred to intermediate care at VPP, although

the average time from identification to referral was 20 days, the average time from

referral to transfer was 112 days.  There were no rejections from VPP.

　　　　　　Transfer timelines were met for only one of five inmates transferred to

SVPP intermediate care.  Transfers for the other four took an average of 79 days after

identification for referral.  The time from referral to transfer took an average of 60 days.

There were no rejections from SVPP during the monitoring period.

　　　　　　The MHCB unit at RJD consisted of 15 beds.  Unlike in the preceding

monitoring period, the average daily census was generally within the 15-bed limit,

although the institution no longer tracked this information.

　　　　　　RJD had 319 admissions to the crisis bed unit during the reporting period.

The average length of stay was 6.5 days, unchanged since the preceding monitoring

period.  Of the 319 admissions, 53, or 17 percent, had stays in excess of ten days, for an average of 17.3 days among these overly-long stays.

Repeat MHCB admissions decreased, with 17 inmates admitted to the MHCB three times or more over a six-month period.

Alternate housing was not utilized for inmates pending admission to the crisis bed unit.  Inmates were provided new "tear-resistant" mattresses for sleeping on the floor.

The institution remained noncompliant in the area of transfers of EOP RC inmates. The transfer list for EOP RC inmates was only established in November of 2010, making the audit period abbreviated.  As of February 16, 2011, the institution reported 88 EOP inmates awaiting transfer. Wait times ranged from 12 to 224 days, with an average wait time of 73 days.  Forty-three, or 49 percent, of these inmates waited in excess of 60 days.  Twenty-three of the inmates waiting longer than 60 days were endorsed.  RJD reported that from October 29, 2010 through December 31, 2010, a total of 49 EOP inmates transferred from the RC, and another 24 paroled or left the institution prior to transfer.

Institutional data regarding 3CMS RC transfers was confusing.  On December 13, 2010, RJD reported that there were 335 3CMS inmates awaiting transfer, with waits ranging from 33 to 375 days, and one outlier of 776 days.  Of these, 253 or 76 percent of these inmates had stays in excess of 90 days.  However, data from December 31, 2010, just two weeks later, indicated that there were only 64 3CMS inmates with waits in excess of 90 days and lengths of stay ranging from 92 to 591 days.  For the

period of October 1, 2010 through December 31, 2010, RJD reported that 91 3CMS inmates with stays in excess of 90 days transferred out of the RC.

During the monitor's May 2011 re-visit, the institution announced that it appointed a new DMH coordinator. The institution also reported that it had completed training on DMH referrals and had established a strike team to monitor and assess its adherence to *Coleman* Program Guide requirements on DMH referral timelines. The institution also reported that it would institute improved audits of its DMH referral process.

Other Issues:

Reception Center

Bus screenings were occurring in the RC but confidentiality was problematic. At the time of the monitor's visit, there were 101 EOP inmates in the RC. The RC was staffed with seven full-time psychologists and two full-time PTs.

The institution reported a 98-percent compliance rate for screening EOP inmates within 72 hours of arrival. Institutional data for the last quarter of 2010 indicated that RJD was only 58-percent compliant with conduct of initial IDTT meetings and 80-percent compliant with conduct of 30-day IDTT meetings in the RC.

The monitor attended IDTT meetings for several EOP inmates in the RC. The meetings were well-attended by a full complement of staff but they were brief and, at times, the inmates' inquiries were not addressed by the team.

PC contacts were provided at a compliance rate of only 66 percent. Cell-front contacts for EOP inmates were not routinely tracked during the monitoring period, and no data was provided to assess compliance. Institutional data indicated that EOP

469

inmates in the RC were offered an average of 4.6 hours of structured activities per week. For the last quarter of 2010, the institution reported an average refusal rate of 62 percent for participation in programming and treatment.

The institution reported a compliance rate of 85 percent for clinical contacts for 3CMS inmates during the monitoring period. Three percent of all contacts were cell-front, due to inmate refusals. Two groups were offered to 3CMS inmates in the RC, but they were suspended in October 2010.

### Administrative Segregation

There were 288 inmates in administrative segregation as of February 25, 2011. Fifty-eight percent were MHSDS inmates, with 44 at the EOP LOC and 123 at the 3CMS LOC. Twelve percent of the EOP inmates and 16-percent of the 3CMS inmates had lengths of stay in excess of 90 days in administrative segregation. Thirty-day reviews for EOP administrative segregation hub inmates with lengths of stay over 90 days were discontinued as of September, 2010, and did not resume until after the monitoring period in 2011. Staff reorganization was the noted reason for the discontinuation.

RJD was non-compliant with timely IDTT meetings for EOP inmates in administrative segregation. Audits indicated a compliance rate of 47 percent for attendance by psychiatrists at IDTT meetings, and a 43-percent attendance rate by inmates at ICC meetings. PCs and correctional counselors regularly attended IDTT meetings, although the correctional counselors were not always those for the inmates being reviewed. Observed IDTT meetings had minimal discussion of treatment plans.

For EOP inmates in administrative segregation, as well as in general population, audits indicated that RJD was non-compliant with monthly psychiatry contacts.

Institutional audits indicated 99-percent compliance with weekly PC contacts for EOP inmates, although a review of UHRs indicated otherwise. Confidentiality of clinical contacts was problematic, with 49 percent of all contacts conducted cell-front, reportedly due to inmate refusal in most cases.

PT rounds were occurring and were properly documented in weekly summaries.

Although the number of hours of out-of-cell therapeutic activity was under-reported due to tracking issues, the number of hours offered in the fourth quarter was 7.9, after re-calculating for this error. One audit found a 60-percent attendance rate by inmates in therapeutic activities. Cited reasons for non-participation included preference for sleep, safety concerns, and exclusion from groups due to disruptive behavior. The institution reported that the EOP inmates were offered eight groups within four days, and that all the same inmates attended the groups with the same clinician. The placement of the treatment modules compromised confidentiality, and the design of the modules did not comply with current specifications.

Institutional audits found compliance rates for attendance at 3CMS IDTT meetings at the rates of 80 percent for psychiatrists, 100 percent for PCs and correctional officers, and 70 percent for inmates. An IDTT meeting observed by the monitor had problems with both sound and visual privacy on the dayroom floor, making participation

problematic.  All required disciplines attended the IDTT meetings with the exception of the PT, who reportedly never attended.

For 3CMS inmates in administrative segregation, RJD reported that 46 percent of clinical contacts occurred cell-front.  Staff cited gang dynamics and concern over cell searches as some of inmates' reported reasons for refusing to leave cells.

At the monitor's re-visit in May 2011, it was reported that group treatment was in the process of being re-designed to address the high rate of group refusals.  The monitor also observed that the ASUs had been repainted and were being cleaned on regular schedules.

MHCB

Inmates in the MHCB slept on new tear-resistant mattresses.  Alternate housing was not utilized pending admission to the MHCB.

The monitor's expert attended IDTT meetings in the MHCB.  C-files were never present and correctional counselors were unfamiliar with important information such as discharge dates.  The therapeutic modules did not comply with current design specifications, and seats were removed due to alleged safety concerns.  Two of seven inmates attended the IDTT meetings.  Discussion regarding treatment planning was minimal.  Staff indicated that if the inmates refused to attend the IDTT meeting, they rarely met with these inmates following the IDTT meeting.  There were gaps in communication between mental health staff in the CTC and mental health staff from the various housing units who did not attend IDTT meetings in the CTC.  MHCB inmates were treated as administrative segregation inmates in many settings, including IDTT

meetings, when they were placed in therapeutic modules and remained handcuffed behind their backs.

Approximately 40 to 50 percent of MHCB inmates received out-of-cell time with the RT. These sessions lasted for 45 minutes each. The inmates were not handcuffed during those times.

At the monitor's May 2011 re-visit, the institution reported that it had re-designed the MHCB clinical programs and had developed a new model for its MHCB unit. Staff also reported that the institution had begun the process of implementing the revised policies concerning the use of mechanical restraints and escorts in the MHCB unit, as per instruction in a memorandum from the Division of Adult Institutions dated March 15, 2011.

EOP

There were disparities between the two mainline EOP facilities at RJD, in the areas of quality of treatment plans, variety of groups offered, availability of choices for inmates receiving care, and ongoing documentation by PCs. The SNY EOP program, which was activated in September 2010, had higher quality programming. While the institution reported compliance with multiple program areas in the SNY EOP including weekly clinician contacts and timely ongoing IDTT meetings, the lack of valid audit data for either of these areas did not allow for an assessment of the methodology and validity of the findings. The institution provided only audit data for open CAP items, and none for SNY EOP Program

For the mainline EOP program, RJD only provided data on the number of hours of structured therapeutic activities and initial IDTT meetings. Audits indicated a

90-percent compliance rate with initial IDTT meetings, but the audit methodology did not allow for proper assessment of the validity of the data or determination of an accurate compliance rate.   The same shortcoming existed for the data regarding the number of hours of structure therapeutic activities offered to inmates, an area in which the institution was noncompliant.

Neither EOP program provided details regarding treatment plans, types of groups assigned to individual inmates, the number of group hours, or the names and disciplines of the facilitators.  RJD reported that overall across the monitoring period, 42 percent of treatment hours were attended by inmates.  The lack of available treatment space contributed to the limited amount of activities provided.  There appeared to be some meaningful structured activity that occurred during time in the dayroom for some inmates, but not during outside yard time.

At the monitor's May 2011 re-visit, the institution reported that it had acquired additional space and supplies for its recreation therapy program.

3CMS

Seventy six percent of initial IDTT meetings for 3CMS inmates were timely.  Annual IDTT meetings were provided. Correctional counselors attended IDTT meetings but frequently did not have C-files present and were not familiar with the inmates.

An audit of a random sample of 80 inmates indicated a compliance rate of 90 percent for the timely completion of quarterly psychiatric contacts. However, RJD did not attain compliance with completion of quarterly PC contacts in a timely manner during the reporting period.

3CMS inmates were offered 12 groups on such topics as anger management, support, stress management, depression, and a group for inmates serving life sentences.  While there were only three inmates awaiting groups during the third quarter of 2010, there were 106 in the fourth quarter and at the time of the monitor's visit.

Referrals

The institution was noncompliant throughout the reporting period with response to emergent, urgent and routine referrals.  Compliance rates were 59 percent, 64 percent, and 45 percent, respectively.

Heat Plan

The institution reported only two heat-alert days during the reporting period.  This was confirmed by a review of the heat logs for each unit and the monthly report sent to headquarters.

RVRs

During the review period, RJD issued 205 RVRs to MHSDS inmates, including 12 to MHCB inmates, 162 to EOP inmates, 29 to 3CMS inmates, and two general population inmates.  Mental health assessments were completed for all of the MHCB and general population inmates, 26 of the 29 3CMS inmates, and 132 or 81 percent of the 162 EOP inmates.

Institutional audits indicated that in only ten percent of reviewed RVRs was the mental health assessment noted by the senior hearing officer in his findings, and in only 15percent of reviewed RVRs was the mental health assessment noted in the disposition.

No RVRs were issued for self-injurious or suicidal behavior during the monitoring period.

Pre-Release Planning

The institution has a re-entry PC who is responsible for identifying EOP inmates in the RC who are within 90 days of release and adds them to the caseload. This clinician attends IDTT meetings and meets individually with these inmates. RJD reported that there were four re-entry groups for EOP inmates in the RC. The monitor observed one that was well-attended, with active participation for the entire hour. The facilitator, a social worker, provided useful information on how to access resource and support after paroling.

RJD reported that 3CMS inmates in the RC were offered pre-release planning if it was requested during 30-day and 90-day contacts. One 3CMS group in the RC addressed re-entry issues, among others.

## Ironwood State Prison (ISP)
Paper Review

Census:

As of November 2010, the total inmate population at ISP was 4,000 inmates. The total reported MHSDS population was 23 inmates, including one EOP and 16 3CMS inmates housed in the general population. The total administrative segregation population was 133 inmates, including six 3CMS inmates.

Staffing:

In November 2010, ISP reported that all of the 1.5 psychiatry positions were vacant.ISP reported utilization of a contract psychiatrist one day per week, although documentation did not specify any time period during which the contractor worked,

leaving a functional vacancy rate in psychiatry of 100 percent.

The sole allocated senior psychologist position became vacant during July 2010. Of the 2.62 psychologist positions, and .12 were vacant, for a functional vacancy rate of only five percent.

The one senior PT position remained filled.  In addition to the longstanding .14 vacancy, ISP lost a PT.  As a result, 1.14 of the 4.14 PT positions were vacant, leaving a vacancy rate of 28 percent.  Further, another PT was out on extended sick leave.ISP hired two OTs, rendering all of the 3.5 clerical positions filled.

As during the preceding monitoring period, ISP did not utilize telemedicine.

Quality Management:

During the monitoring period, there was only one meeting of the local governing body at which various LOPs were approved.

The quality management committee met monthly and attained a quorum, except during August 2010.  Minutes were maintained.

During the monitoring period ISP's mental health subcommittee met monthly, except during August and November 2010.  Minutes revealed discussions regarding mental health quality management audits, RVRs, five-day follow-up, and administrative segregation mental health issues.  There were no recommendations to the quality management committee.  No QITs were chartered during the review period.

ISP did not have a formal peer review committee.

Suicide Prevention:

There were no completed suicides during the monitoring period.

ISP did not provide documentation of monthly SPRFIT meetings. It reported difficulty with conducting these meetings as required.

The emergency response review committee met monthly except during July and October, 2010. Minutes reflected ongoing review of emergency response. Emergency medical drills were completed monthly in the ASU, except during July 2010, and were reviewed during the emergency response review committee meetings. ISP did not provide any information regarding CPR training.

It remained unclear from the provided documentation how many inmates were returned from an OHU or MHCB and required five-day follow-up. ISP reported that it completed nine five-day follow-ups, but did there was no documentation verifying this report. There was also no documentation provided with regard to custody checks.

In administrative segregation, morning meetings between custody and mental health staff occurred daily. ISP reported that pre-placement screens were completed prior to inmate placement into administrative segregation, but no supporting documentation was provided. Similarly, ISP also reported that mental health assessments in administrative segregation were completed timely, but again no supporting documentation was provided. ISP reported difficulties with the provision of 30-minute welfare checks during the first 21 days for new intake inmates. Inmates in administrative segregation were permitted electrical appliances, except in the designated intake cells. ISP reported that its policy was to provide at least ten hours of yard per week, but the institution acknowledged the lack of verifying documentation.

478

Medication Management:

In contrast to the preceding monitoring period, ISP audited the various aspects of medication management.  Sample sizes and methodology were explained.  ISP reported that due to the small number of MHSDS inmates, it reviewed all mental health inmates monthly, thus using a 100-percent sample size.

ISP provided timely medication for newly arriving inmates, although its report did not include inmates arriving from other CDCR institutions.

The institution reached 100-percent compliance for continuity of medications following intra-institutional transfers.

ISP was only 63-percent compliant with timely delivery of new medication orders, and only 50-percent compliant with renewing medications prior to expiration.  The maximum length of medication orders written by the psychiatrist remained 90 days, and the maximum length of bridge orders was 14 days.

Institutional audits demonstrated a compliance rate of 86 percent for appropriate identification of medication noncompliance.  ISP reported that once these cases were identified, all were followed-up by a psychiatrist within seven days.

The institution's review of pill line lengths found wait times that ranged from one to three hours.

ISP was 100-percent compliant with the completion of timely informed consent forms.

Although laboratory testing of inmate blood levels was audited, it was not possible to determine whether the appropriate laboratory testing was conducted as clinically indicated.

All psychotropic medications were administered DOT throughout the review period.  ISP did not maintain a centralized list of the inmates involved, but it reported that nursing supervisors reviewed MARs monthly and performed weekly audits that included medication administration.

There were no inmates on Keyhea orders during the monitoring period.

ISP reported that there were six MHSDS inmates who were prescribed HS medications, but there was no audit provided regarding timeliness of administration.

ISP reported that no inmates on psychotropic medications paroled during the monitoring period.

Sexual Misconduct:

ISP issued seven RVRs for sexual misconduct during the monitoring period.  All resulted in screens but were not timely.  Only one inmate was afforded an IDTT review.  No inmates were diagnosed with Exhibitionism or Paraphilia NOS, and there were no referrals to treatment centers.  The institution reported that it had problems with tracking RVRs for sexual misconduct throughout the monitoring period.

Custody-driven behavioral modifications included Lexan covers and yellow placards on the cell doors, and exposure-control jumpsuits for use while inmates were being moved within the institution.

Three of the RVRs resulted in referrals to the DA, two were not referred, and two were under review at the time of reporting.  ISP imposed two SHU terms which were both suspended.

<u>Transfers</u>:

There were no referrals to DMH during the monitoring period.

From June to September 27, 2010, ISP transferred all five inmates in need of MHCBs to the OHU at CVSP pending transfer.

On September 27, 2010, ISP opened a 14-bed, plus one safety cell, OHU and began housing its own inmates awaiting transfer to an MHCB.  It did not maintain a comprehensive log that tracked these transfers, but through multiple data sources, it identified seven inmates who were housed in the OHU awaiting transfer to a crisis bed and captured data regarding six of the seven.  Although ISP reported lengths of stay in the OHU of less than 72 hours, it also provided conflicting data which indicated that all of these stays exceeded 72 hours.  ISP reported that it did not use any holding cells while inmates awaited placement in the OHU.  It also reported that clinical contacts occurred in the inmates' cells in the OHU.

Restraints and/or seclusion were not used during the monitoring period.

Tracking of MHSDS inmates was problematic at ISP.  As a result, no documentation was provided to confirm follow-up of inmates who returned from MHCB.

From a review of conflicting data, it appeared that ISP identified78 inmates for placement into the MHSDS, including 12 inmates referred to MHCBs, six EOP inmates, and60 3CMS inmates.  The institution reported that these inmates transferred to appropriate institutions within timeframe guidelines. There did not appear to be any tracking of MHSDS inmates who were inappropriately transferred to ISP during the review period.

Other Issues:

### Administrative Segregation

ISP was compliant with psychiatric contacts, weekly PC contacts, and daily PT rounds, with appropriate documentation. Initial IDTT meetings were provided timely and regularly included all required disciplines. The institution did not provide specific information regarding the confidentiality of clinical contacts.

### PSU

ISP did not transfer any inmates to a PSU during the monitoring period.

### Referrals

The institution reported that urgent and emergent referrals were seen timely, but no supporting documentation was included. There was also no information provided regarding routine referrals.

### Heat Plan

Temperatures in housing units at ISP did not reach 90 degrees during the review period. There were no heat-related incidents during the monitoring period.

### RVRs

There were seven RVRs issued to MHSDS inmates during the review period, including three to EOP and four to 3CMS inmates. ISP completed mental health assessments for all of these inmates. Audits reflected that only two of the RVRs indicated that the senior hearing officers considered and documented mental health input at the time of the hearing.

## Calipatria State Prison (Calipatria)
Paper Review

Census:

During January, 2011, Calipatria's total inmate population was 4,091, including 18 3CMS mainline inmates and one mainline EOP inmate. There were 367 inmates housed in administrative segregation, including one EOP inmate and ten 3CMS inmates. There were 15 inmates in the OHU, including one 3CMS inmate and one inmate awaiting transfer to an MHCB.

Staffing:

Calipatria had an eight percent vacancy rate in mental health during the monitoring period and did not utilize contractors to cover any vacancies. Only .25 of the two psychiatry positions were vacant during the monitoring period, for a vacancy rate of 13 percent. Calipatria did not have an established senior psychologist position, but had a psychologist on loan from Centinela in an acting position. Five of the six staff psychologist positions were filled, for a vacancy rate of 17 percent. Nine of the 9.5 PT positions were filled, for only a five percent vacancy rate. The senior PT and all of the 3.5 clerical positions remained filled.

Calipatria did not utilize any telemedicine during the review period.

Quality Management:

Calipatria reported having a local governing body comprised of the warden and the CEO. Minutes were not maintained.

The quality management committee met monthly and maintained minutes.

The mental health subcommittee met at least monthly, although a quorum was not always present. Minutes revealed that the committee discussed pertinent mental

health treatment issues.  There were no QITs during the monitoring period, and no recommendations forwarded to the quality management committee.

Peer review did not begin until late December 2010.

Suicide Prevention:

During the monitoring period, the SPRFIT met monthly, except during September and October 2010.  However, a review of the minutes revealed that substantive meetings occurred during November and December only.  The minutes reflected that relevant suicide related issues were discussed during those meetings.

Calipatria's emergency response review committee met monthly during the monitoring period, and minutes were maintained.  Minutes indicated that the committee reviewed various aspects of emergency response including emergency drills and evaluation of responses to emergencies.  Monthly medical emergency drills were conducted in administrative segregation.  The institution did not provide documentation nor report on CPR refresher training.  It was reported that custody staff carried micro-shields and that cut down tools were present in all housing units.

The institution was not compliant with the completion of five-day follow-up after discharges from the OHU, nor did it audit or report on custodial follow-up.

Calipatria reported that there were problems with documentation of daily PT rounds.

In administrative segregation, the institution had difficulties with daily morning meetings with mental health and custody staff.

There were no audits of compliance with pre-placement screening or completion of mental health screenings within 72hours of placement into administrative

segregation.

Calipatria did not provide adequate documentation demonstrating compliance with conduct of 30-minute welfare checks during inmates' first 21 days in administrative segregation.

While some cells were equipped with electrical outlets, inmates in administrative segregation were not allowed to use electrical appliances.

The institution reported that it offered ten hours per week of out of cell activity, but no verifying data was included.

Medication Management:

Calipatria did not report on or provide documentation regarding timeliness of medication renewals.

The institution reported that it performed audits of response to medication noncompliance by utilizing UHRs and MARs, but it was unclear from the documentation what area was audited.

The institution reported compliance with the timely processing of new orders, but it did not provide any supporting documentation.

Calipatria did not provide documentation of the length of pill lines during the monitoring period.

According to the institution, informed consent forms for all ordered medications ordered were present in UHRs.  No documentation was provided.

 The institution reported its procedures regarding laboratory studies for mood stabilizing medications and atypical antipsychotics, but compliance levels were not reported.

Calipatria maintained a centralized list for inmates who were prescribed medications to be administered DOT. All psychotropic medications were ordered for DOT administration. While the institution reported compliance with DOT administration, no verifying documentation was provided.

There were no inmates on Keyhea orders during the review period.

There were no inmates for whom medications were prescribed HS.

While the institution reported compliance with the distribution of parole medications upon release, there was no documentation provided.

Sexual Misconduct:

Calipatria issued eight RVRs for sexual misconduct during the review period. Only three of the RVRs resulted in a screening within 72 hours. The inmates were reviewed by an IDTT. None of the inmates were referred for comprehensive evaluations or diagnosed with Exhibitionism or Paraphilia NOS.

Custody-driven behavioral modifications included a yellow placard on the cell door and exposure-control jumpsuits.

All eight cases were referred to the DA. SHU terms were imposed against three inmates.

Transfers:

There were no transfers to DMH during the monitoring period.

All inmates awaiting transfer to MHCBs were placed in the OHU at Calipatria, where four beds were designated for mental health care. During the review period, there were 44 referrals to MHCBs. Only 14 inmates ultimately transferred to MHCBs, 23 transferred back to general population or administrative segregation, and six

inmates transferred as regular transfers and were on out-to-court status. Data regarding length of stay was provided for only the 14 inmates who transferred to MHCBs. Of those 14, lengths of stay exceeded 72 hours in 86 percent of cases.

While in the OHU, inmates were seen daily by the psychiatrist and psychologist in the inmates' cells. Calipatria did not utilize holding cells awaiting placement into the OHU.

During the monitoring period, Calipatria identified 123 inmates for placement into the MHSDS, including 42 MHSDS inmates who had been inappropriately transferred from other CDCR institutions. There were 14 MHCB inmates, five EOP inmates, and 104 3CMS inmates. Transfers of EOP inmates to appropriate institutions were timely, but transfers of 3CMS inmates were not.

Other Issues:

Administrative Segregation

Calipatria did not provide adequate audits of IDTT meetings, psychiatric contacts, or weekly PC contacts.

Referrals

Calipatria responded to 536 referrals, including six urgent, 49 emergent, and 481 routine referrals. Response to urgent and routine referrals was compliant. No adequate audit of responses to emergent referrals was provided.

Behavior Modification Unit

Calipatria did not operate a BMU during the monitoring period.

Heat Plan

There were no instances of indoor temperatures exceeding 90 degrees

during the monitoring period.

RVRs

In addition to the RVRs issued for sexual misconduct, Calipatria issued RVRs to one EOP and three 3CMS inmates during the reporting period.  There was no documentation provided as to whether the EOP inmate received a mental health assessment.  One of the 3CMS inmates received a mental health assessment.  After a review of the RVRs, Calipatria was unable to verify whether mental health assessments were considered by the senior hearing officers.

**Centinela State Prison (Centinela)**
(Paper Review)

Census:

On December 31, 2010, Centinela housed 4,045 inmates, including 14 3CMS inmates. Five of the 3CMS inmates were in administrative segregation, which held a total of 297inmates.

Staffing:

Of 18.87 allocated mental health positions, 17.5 were filled, leaving 1.37 vacancies, for a seven-percent institutional vacancy rate.  The use of contractors and loaned staff from other CDCR institutions reduced the functional vacancy rate to zero.

Positions for one of 1.5 psychiatrists, a senior psychologist, and a social worker were all filled.  Of the 4.87 staff psychologist positions, four were filled, for a vacancy rate of 18 percent.

Positions for a senior PT, six PTs and a RT were filled, as were all 2.5 clerical positions.

Quality Management:

Centinela maintained a well-established, organized, and effective quality management program. The local governing body met three times and always achieved a quorum. Meeting minutes addressed medication management and approval of LOPs.

The quality management committee met monthly, maintained minutes, and included mental health representation.

The mental health subcommittee at least met monthly, and on some occasions it met twice monthly. It maintained meeting minutes and always achieved a quorum. Minutes indicated that the committee addressed staffing vacancies, CTC issues, and audits of mental health key indicators. Mental health subcommittee recommendations were forwarded to the quality management committee.

Centinela did not charter any QITs but used an "action item" method to identify and address areas in need of improvement.

Peer review was somewhat limited, given the low number of clinicians at the institution. Although the clinician peer review process was comprehensive insofar as criteria it encompassed, it was more quantitative than qualitative.

Suicide Prevention:

The SPRFIT met monthly, maintained minutes and achieved a quorum for all months except November 2010. The SPRFIT monitored and reviewed numerous suicide-related issues.

The emergency response review committee met monthly and maintained minutes. It addressed responses to CPR, and responses to suicide attempts and deaths. Monthly emergency drills and annual CPR refresher training for staff were occurring.

The institution was compliant with clinical five-day follow-up for inmates discharged from MHCBs and with completion of SREs on the fifth day of follow-up. Custody five-day follow-up audits were problematic for two of five cases.

In administrative segregation, Centinela was 92-percent compliant with completion of pre-placement screens.

There was 100-percent compliance with completion of the 31-item screen completion, and most occurred in a confidential setting.

In June 2010, Centinela began using the Guardian One Plus electronic system to document 30-minute welfare checks. Information on compliance with these checks was not provided.

The institution reported 100-percent compliance with conduct and documentation of daily PT rounds.

Medication Management:

Five of the six or 83 percent of newly-arriving inmates on current psychotropic medication prescriptions received their medications within 24 hours.

No inmates who on psychotropic medications were moved within the institution.

The institution reported 93-percent compliance with timely renewal of medications.

Audits indicated 73-percent compliance for timely administration of newly-ordered medications, and 100-percent compliance for writing of medication orders as per clinical contacts.

MARs indicated a 35-percent compliance rate for appropriate

documentation of medication refusals and no-shows for inmates prescribed psychotropic medications.

Pill line length was not audited.

Audits indicated 100-percent compliance for the presence of informed consent forms in UHRs.

Centinela did not perform laboratory studies of blood levels for inmates on psychotropic medications.

The institution ordered psychotropic medications as nurse-administered for general population inmates, and as DOT for inmates housed in the CTC and administrative segregation. Centinela did not audit adherence to DOT protocols.

There were no Keyhea orders during the monitoring period.

Centinela reported that 201 HS prescriptions were written, but it was not clear whether that included both psychotropic and non-psychotropic medications. The institution's local policy permitted HS medications to be delivered one hour before 8:00 p.m., which was problematic.

Audits indicated that two MHSDS inmates paroled on medications but only one signed an acknowledgement of receipt of a supply of his medication at the time of parole.

Sexual Misconduct:

Two inmates received RVRs for sexual misconduct. Both were screened, but only one screen occurred within 24 hours. Both inmates had IDTT meetings but neither was referred for a comprehensive evaluation. Both were placed in the MHSDS at the 3CMS LOC.

There were no reports of custody-driven behavioral modifications for sexual misconduct.

One case was referred to the DA and the other case was under review. No SHU terms were imposed.

Transfers:

Inmates who were awaiting MHCB placement were admitted to the institution's CTC. Although the CTC was licensed only for medical use, it had 24 mental health admissions, of which 14 resulted in transfers to an MHCB. The average length of stay for a mental health admission to the CTC was 3.7 days, with a range of 24 hours to eight days. Extended CTC stays were largely due to the lack of available MHCBs. The CTC had a seclusion room and was equipped for restraint use, but neither seclusion nor restraints were used. No holding cells or alternative housing areas were utilized.

In addition to the 14 inmates referred to an MHCB, Centinela identified seven EOP inmates, all of whom were transferred within 60 days of identification. EOP inmates were seen weekly by PCs while awaiting transfer.

The institution also identified 115 3CMS inmates, all of whom were transferred within 90 days. It was reported that 3CMS inmates were usually seen weekly, unless more frequent contacts were clinically indicated. Centinela inappropriately received nine 3CMS inmates from other CDCR institutions. It met transfer timeline requirements for all but two of these inmates, with their transfer times exceeding timelines by two and four days, respectively.

Other Issues:

### Administrative Segregation

Centinela was compliant with providing confidential PC contacts each week.  Psychiatric contacts were not reported.  The institution reported that IDTT meetings were held with all required disciplines present.

The institution provided group therapy for both MHSDS and non-MHSDS inmates.

### Referrals

There were 2,067 referrals, including 29 emergent, 125 urgent, and 1,913 routine referrals.  Audits indicated 96-percent compliance for timeliness of responses to referrals.

### Heat Plan

Centinela reported two instances of temperatures exceeded 90 degrees in housing units.  There were no MHSDS inmates in the housing units at those times.

### RVRs

No RVRs were issued to EOP inmates, and two were issued to 3CMS inmates. None of these inmates received mental health assessments.

**Chuckawalla Valley State Prison (CVSP)**
Paper Review

Census:

During November 2010, CVSP housed 3,065 inmates, which included 15 MHSDS inmates.  There were one EOP mainline inmate and 13 3CMS mainline inmates. The administrative segregation population included one 3CMS inmate.

Staffing:

One of 1.5 psychiatry positions was vacant.  From June through October, contractors provided an additional .75 FTE coverage, for a functional vacancy rate of 17 percent.  Positions for a senior psychologist, and four of 4.5 staff psychologists were filled, for a functional vacancy rate of 11 percent in psychology.

Positions for the senior PT and 5.5 line PTs were filled.

All three clerical positions were filled.

CVSP did not use psychiatry telemedicine.

Quality Management:

The local governing body met monthly with the exception of August 2010. Attendance was problematic.

The quality management committee met at least monthly and sometimes met weekly.

The mental health subcommittee met monthly but did not always achieve a quorum.  Meeting minutes indicated that the committee addressed mental health audits, and admissions and transfers to the MHSDS program.  Mental health subcommittee recommendations were not reported to the quality management committee.

There were no QITs during the monitoring period.

In November 2010, the mental health subcommittee initiated a formal peer review process.

Suicide Prevention:

There were no suicides at CVSP during the monitoring period.

The SPRFIT met monthly, except during August 2010, but never achieved

494

a quorum.  SPRFIT meetings primarily functioned as mental health staff meetings, addressing staffing vacancies, mental health assessments for inmates who received RVRs, MHCB admissions, five-day follow-up, and medication compliance.

Although the emergency response review committee reportedly met monthly, minutes reflected meetings for only three months.  There was documentation of CPR certification for administrative segregation staff but not of monthly emergency response drills.  Custody staff carried micro-shields.

CVSP indicated that the sole inmate who required five-day clinical follow-up received it.  No confirming documentation was provided.

In administrative segregation, morning meetings between custody and mental health staff were occurring.  Documentation of these meeting was being maintained.

The institution reported that pre-placement screens were completed and filed in UHRs.

PTs reportedly conducted 31-item screens, but it was not possible to determine timeliness or confidentiality of these screens.

The institution reported that 30-minute welfare checks were conducted as required, at appropriate staggered intervals.  Daily PT rounds were documented.

Inmates in administrative segregation were not permitted to use electrical appliances.

The institution did not provide documentation of inmates' receipt of ten hours of weekly yard time.

Medication Management:

CVSP audits indicated that 83 percent of newly-arriving inmates received their medications within 24 hours of arrival.  For inmates arriving from another CDCR facility, however, medications were received timely in only 33 percent of cases.

Audits indicated an 80-percent compliance rate for timely receipt of medications following intra-institutional housing moves.

CVSP reported that medications were being renewed prior to expiration in 85 percent of cases.

Audits found that medication noncompliance was documented in MARs at the rate of only 31 percent.  The rate of completed mental health follow-up after medication noncompliance was reported to be 67 percent.

The institution did not audit pill lines.

Signed informed consent forms were obtained timely and filed in UHRs.

The institution reported that it was noncompliance with laboratory testing of inmate blood levels of psychotropic medications, although the parameters of the audit were unclear.

All psychotropic medications were administered DOT, but no audits were conducted as to whether DOT protocols were followed.  The pharmacy maintained a centralized list of inmates receiving DOT medications.

No inmates were on Keyhea orders.

During November 2010, six inmates received HS medications.  There were no audits of proper timing of HS medication administration.

CVSP reported that paroling inmates were provided with a supply of their

medications.

Sexual Misconduct:

Six inmates received RVRs for sexual misconduct.  All were referred for mental health screens, but the screens were not timely.  All were also afforded IDTT meetings.  One inmate was referred for a comprehensive evaluation, diagnosed with Exhibitionism, and referred to an Exhibitionism treatment program.  SHU terms were not assessed for five of the six inmates.  The sixth case was pending at the time of reporting.

Custody-driven behavioral modification measures included placement of Lexan covers and yellow placards on cell doors, and the use of exposure-control jumpsuits.

Transfers:

CVSP did not refer any inmates to higher levels of care at DMH.

CVSP did not have an MHCB unit.  Fourteen inmates who had been referred to MHCBs were in the institution's OHU.  The average time from MHCB referral to transfer increased from 1.5 days during the preceding monitoring period to 3.6 days, with a range of zero to 11 days.  One inmate returned to CVSP after MHCB discharge.   CVSP did not report an average daily OHU census.

There were no PSU referrals.

There were two placements into holding cells, with a reported average length of stay under an hour.

The institution identified seven inmates who required EOP LOC.  They remained at the institution an average of 29 days before transferring out, with a range of one to 48 days.  The institution also identified 73 inmates who required the 3CMS LOC.

Forty-seven transferred to a 3CMS program in an average of 40 days, with transfer times ranging from six to 69 days.  As of the time of reporting, transfer times for seven inmates exceeded timelines.  Of the remaining inmates, ten paroled, eight had a level-of-care change, and one was out of the institution on a medical hold.

Ten MHSDS inmates, including six who were on prescribed medications, were inappropriately transferred to CVSP.  Seven of them were transferred out in an average of 41 days, with a range of 24 to 58 days.  The remaining three inmates had not transferred as of the reporting time, but transfer timelines had not yet been exceeded.

Other Issues:

Administrative Segregation

IDTT meetings were completed timely and included all required disciplines.  Inmates continued to receive psychiatric contacts and weekly contacts with PCs.  Confidentiality of contacts could not be determined.

OHU

No specific mental health staff was assigned to the OHU.  The institution reported that inmates were seen in their cells for clinical interviews.

EOP

The institution reported timely initial IDTT meetings with all necessary disciplines present.   CVSP reported that while inmates awaited transfers to EOPs, they were seen weekly by PCs and at least monthly by psychiatry, if prescribed psychotropic medications.

3CMS

Initial IDTT meetings were completed timely and included all necessary

participants. CVSP reported that while awaiting transfer, 3CMS inmates were seen quarterly by PCs and psychiatry.

Referrals

There were 538 mental health referrals, including 11 emergent referrals, 112 urgent referrals, and 415 routine referrals. All responses were compliant.

Heat Plan

There were no instances of temperatures inside of housing units reaching 90 degrees.

RVRs

CVSP provided conflicting data as to the total number of RVRs issued to MHSDS inmates. Different logs provided by custody and mental health indicated that the number of RVRs ranged from seven to ten, and included EOP and 3CMS inmates. There were also discrepancies as to inmates' levels of care at the time of RVRs were issued.

It could not be determined whether these inmates received mental health assessments as appropriate. Audits indicated that hearing officers considered mental health input during RVR hearings.

There were no RVRs for self-injurious or suicidal behavior.

**California Institution for Women (CIW)**
Hybrid Paper Review

Census:

In November 2010, CIW's census was 1,988 inmates, for a decrease from the preceding monitoring period when it reached 2,310 inmates. The MHSDS population was 717 inmates. The percentage of inmates receiving mental health services during the

499

monitoring period remained constant, at 36 percent. Seventy-seven inmates were in the mainline EOP and 454 inmates were in the mainline 3CMS program. There were an additional 17 EOP inmates and 121 3CMS inmates in the RC. Five inmates were in the MHCB, nine inmates were in the PSU, and one 3CMS inmate was in the OHU for medical reasons. There were 45 inmates housed in administrative segregation, including 17 3CMS inmates and 16 EOP inmates. Six of the 16 EOP inmates housed in administrative segregation were awaiting placement into a PSU bed.

Staffing:

The functional vacancy rate increased from less than one percent to seven percent during the monitoring period. Use of contractors increased during the review period.

The chief psychiatrist position remained vacant, with the senior psychiatrist filling in as acting chief, and the senior position covered by another psychiatrist. The chief psychologist and five senior psychologist positions remained filled. Two and one half of the 8.5 staff psychiatrist positions were vacant but all were covered by contractors.

One half-time staff psychologist position of the 26 staff psychologist positions was vacant. Registry staff was not utilized to fill the position for a 1.92 percent functional vacancy rate. The supervising social worker position remained filled, but one of the 7.5 line social worker positions was vacant. No contractors covered this vacancy, leaving a vacancy rate of 13.33 percent.

The two senior PT positions and 17 PTs, including 15 allocated positions and 2 overage or "blanket" positions, remained filled. One of the four RT positions was

vacant, and with no contract coverage, the functional vacancy rate was 25 percent.

The 12 RN positions were filled, as were the one unit supervisor, one health program specialist I, one office services supervisor II, and three office assistant positions. One of the seven OT positions was vacant, for a vacancy rate of 14.29 percent. The medical transcriber's position was converted to a medical 213 position, but this transcriber continued to work for the mental health department.

CIW did not utilize telemedicine during the monitoring period.

Quality Management:

CIW's local governing body was comprised of the warden and the CEO. Meeting minutes were maintained. The quality management committee continued to meet monthly, and minutes were provided.

The mental health subcommittee met twice monthly and meeting minutes were maintained. This committee continued to identify issues and reported them to the quality management committee. It continued to review a wide range of program areas including results of mental health-related quality assurance audits, EOP group attendance, IDTT attendance, and review of RVRs.

The two active QITs during the monitoring period were on EOP group attendance and five-day follow-upon return from outside facilities. There was one ongoing FIT for the administrative segregation EOP hub. CIW continued to invite line staff to participate in QITs, but few attended regularly. Written results were produced and recommendations were forwarded to the mental health subcommittee and then to the QMC.

CIW continued the peer review process for psychiatrists, psychologists, and social workers. Chart audits were conducted on a monthly basis. Psychiatric peer review was significantly curtailed as a result of psychiatric staffing limitations during the monitoring period. Some peer review audits regarding mood stabilizing medication were conducted during the review period. These reviews were solely quantitative in nature. Social work review also continued to be quantitative, while psychology peer review remained both qualitative and quantitative.

Suicide Prevention:

There were no suicides at CIW during the monitoring period.

The SPRFIT continued to meet monthly during the review period, but achievement of a quorum remained problematic. Minutes were maintained throughout the review period, reflecting discussion of various components of suicide prevention as well as implementation of corrective actions.

The emergency response review committee continued to meet monthly, reviewing attempted and completed suicides to identify and address issues.CIW reported that all custody staff and clinical staff were required to maintain CPR certification. IST tracked custody certification, and the mental health department tracked mental health clinician certification.

Five-day post MHCB follow-up remained noncompliant. Custody again did not monitor compliance with hourly custody checks.

CIW continued to maintain LOPs regarding suicide precautions and watches as well as data entry, transfers, and receipt of inmate profiles and their use in administrative segregation screening.

502

Medication Management:

As a result of some problems with auditing medication management, audit results were not available for all aspects of medication management.  However, supervisory staff began consistent auditing after the monitoring period.

Rates of compliance for continuity of medication for newly arriving inmates dropped from 18 percent to only two percent of new arrivals receiving their medication within 24 hours.  This included inmates arriving from county jails, CDCR institutions and DMH.  Noncompliance was attributed to the timing of bus screens at CIW.

Continuity of medication following movement within CIW dropped from 92 to 52 percent during the monitoring period.  Compliance upon transfers to and from administrative segregation, MHCB, and PSU was not separately reported.

There was no change with renewals of expiring medications.  CIW had a process in place, but did not provide any audits.  CIW neared compliance for new medication orders, with 87 percent of new orders processed within 24 hours.  There was no change in CIW's policies and procedures regarding duration of medication orders and bridge orders.

Although CIW reported compliance with legibility of MAR documentation, a review of the audits revealed a decrease from a consistent 100 percent to only 64 percent compliance during one month.

CIW again performed a limited audit for only the 3CMS and RC overflow population regarding response to referrals for medication noncompliance.  However, the audit failed to determine whether nursing staff appropriately referred cases of medication

noncompliance. CIW reported that once identified by nursing staff, it took an average of three days for a referral to reach the mental health department. Follow up by the psychiatrist then took an average of five additional days.

The institution continued to run seven pill lines but did not to audit them.

Compliance with presence of informed consent forms improved to 83 percent from 73 percent.

CIW again failed to provide audits for laboratory testing of inmates' blood levels of psychotropic medications during the monitoring period.

A centralized list of inmates with DOT orders outside of the MHCB was maintained. All psychotropic medications were prescribed DOT during the monitoring period. CIW continued to perform monthly audits of medication administration to verify that the staff administering the medication consulted the DOT list or MAR and followed DOT procedure as indicated.

During November 24, 2010, before the monitoring period, there were 302 MHSDS inmates for whom HS medications were prescribed. This was an increase of over 100 inmates from the previous reporting period. HS medication administration was not audited by the facility.

During the review period, 11 Keyhea petitions were initiated and five were renewed. Fifteen petitions were granted for cause, one was denied, and none were pending administrative law judge hearings at the time of reporting. No order expired because the treatment team did not pursue a renewal.

<u>Sexual Misconduct:</u>

Two inmates received the total of three RVRs related to sexual misconduct. They were screened and reviewed by an IDTT for all three incidents. Neither of the inmates received a diagnosis of Exhibitionism. None were referred for a comprehensive evaluation. Two of the three RVRs were referred to the district attorney. None resulted in a SHU term.

CIW did not offer treatment related to sexual misconduct. It had a draft LOP regarding sexual misconduct.

<u>Transfers:</u>

CIW referred 12 inmates to intermediate care at PSH. Seven were accepted and transferred, and five were rejected due to "a history of excessive violence." All rejections were upheld by CCAT.   All were referred from the EOP except one who was referred from the MHCB. The referral was made within two days of admission to the MHCB.

CIW took an average of approximately eight days to complete and send the referral package to DMH, once identified by the IDTT. Acceptance or rejection notification from DMH took an average of an additional 27 days. Actual transfer upon notification of acceptance took an average of two days. There was one outlier that took 16 days, due to transfer back to CCWF while awaiting a bed at DMH.

During the monitoring period, there were four *Vitek* hearings; all were lost by the inmates. No DMH transfers were delayed by Vitek hearings.

CIW continued to utilize the DMH referral consideration form 7388 during IDTT meetings in the MHCB. It maintained a tracking system for 3CMS, EOP,

and general population inmates who received three or more RVRs in three months. The list was updated weekly and available at all MHCB IDTT meetings. Further, multiple admissions to the MHCB and information regarding participation in therapeutic activities and medication noncompliance was addressed in MHCB IDTT meetings during the monitoring period. CIW continued to maintain a log of reasons for non-referrals of inmates who met referral criteria. That information was also noted on the form 7388.

The chief psychiatrist continued to serve as the DMH coordinator throughout the monitoring period. Receipt of discharge summaries improved over the monitoring period, as did communication from the clinicians at PSH.

There were 66 EOP inmates endorsed for transfer from the CIW RC, with an average time to endorsement of 55 days, and average time to transfer of 56 days. Twenty-three inmates or 35 percent had stays that exceeded 60 days, with an average length of stay of 77 days.

During the review period, there were 18 requests to the C&PR for expedited referrals of EOP inmates. However, CIW did not provide documentation of any inmates whose transfers were accelerated. In August 2010, the unendorsed EOP population was moved into the north hall of the mainline EOP and remained until either endorsed or paroled.

During the monitoring period, CIW endorsed 262 3CMS inmates from the RC. The average time to endorsement was 61 days, and the average time to actual transfer was 64.8 days. Thirty-three 3CMS inmates, or 5.5 percent, did not transfer within 90 days and had an average length of stay of 119.82.

Other Issues:

### Reception Center

The RC EOP was staffed with a .25 psychiatrist, 1.75 staff psychologists, and one clinical social worker who also provided care to 3CMS inmates in RC.  There were no vacancies.

CIW continued its compliance with the screening within 72 hours those new arrivals who had a history of EOP treatment.  Additionally, evaluations were completed within seven days, and IDTT meetings were held within 14 days of arrival. CIW reached compliance for weekly PC contacts.  All contacts occurred out-of-cell during the monitoring period.

Inmates were offered more than five hours per week of structured out-of-cell activities, and received an average of 7.87 hours per week.  Inmates continued to receive two hours of yard time per day for out-of-cell, non-therapeutic activities. Notably, unendorsed RC EOP inmates at CIW received the same LOC as endorsed mainline EOP inmates during the review period.

CIW continued re-entry planning for EOP inmates due to be released in 60 to 120 days.  During the review period, 86 EOP inmates were released to the community from CIW.

### Administrative Segregation

During the monitoring period there were 18 EOP inmates in administrative segregation over 90 days.  There was documentation of 30-day reviews of the inmate by the facility captain and CCII.

CIW reported 71 percent compliance for completion of the pre-placement

507

screens and reached over 90 percent compliance for completion of mental health screens within 72 hours of administrative segregation placement. An institutional audit of 33 UHRs revealed only 81 percent compliance for mental health screens filed in the UHRs.

IDTT meetings for EOP and 3CMS inmates were timely. However, correctional counselor presence at IDTT meetings for both EOP and 3CMS inmates remained problematic.

Custody did not monitor or audit completion of 30-minute welfare checks in administrative segregation for new intakes. Additionally, no documentation was provided verifying daily meetings between the sergeant and mental health staff in the unit. While CIW reported compliance with completion of daily PT rounds, supervisory staff acknowledged continued problems with appropriate documentation.

CIW was compliant with weekly PC contacts for EOP inmates. Individual contacts were often increased when psychotherapeutic groups were unavailable. CIW reported that cell-front contacts increased from 20 to 30 percent. There were several weeks throughout the monitoring period, including the entire month of June 2010, when documentation was not available to audit compliance with weekly PC contact for 3CMS inmates.

There was no change regarding the availability of psychotherapeutic groups to EOP inmates from the previous monitoring period. CIW offered five hours of psychotherapeutic groups per week to EOP inmates, but space issues and a lack of therapeutic modules limited the provision of groups.

Provision of recreation therapy was limited due to the lack of supplies and physical plant issues. EOP and 3CMS inmates housed in administrative segregation were

offered ten hours per week of yard time, usually at three hour intervals.

CIW completed monthly medical emergency drills in administrative segregation. No administrative segregation overflow unit was operated during the monitoring period.

MHCB

CIW continued to operate an 18-bed licensed CTC including ten MHCBs and eight swing beds. During the review period, there were 302 referrals and 271 admissions to the MHCB. Long-term medical patients utilized two MHCBs during the monitoring period. One inmate had two medical admissions, with the first lasting approximately 35 days and the second lasting approximately 68 days. Average length of stay remained constant since the last monitoring period at 4.73 days. There were 15 admissions, or approximately six percent, with lengths of stay greater than ten days. No administrative delays were noted. There were 28 inmates, or less than one percent, with three or more admissions in a six-month period.

CIW maintained compliance with completion of suicide risk assessments at the times of admission and discharge. It continued to provide safety gowns, safety mattresses and bedrolls as determined upon admission on a case by case basis. Compliance with daily psychiatric contact was maintained, as well as the timeliness of IDTT meetings that were conducted twice weekly throughout the monitoring period. Correctional counselor presence at the IDTT meetings remained problematic.

CIW had difficulty managing problem inmates resulting in the extended use of seclusion and restraint in the MHCB. Restraints and/or seclusion usage remained high during the monitoring period, with an average time of restraint of nine hours. This

figure included three months for which there was no documented restraint usage.  One inmate had documented restraint usage for six instances, with one episode lasting 46 hours and 25 minutes.  Another inmate had four documented instances of restraint usage, with one episode lasting 111 hours and 40 minutes.  Average length of seclusion was 18 hours and 32 minutes.  Also, there were significantly long episodes of seclusion, including inmate who had ten instances of seclusion, with the longest at 146 hours and 20 minutes.  She also had episodes of 97 hours and 80 hours.  Another inmate had six episodes of seclusion, including 48 hours 50 minutes, and 71 hours and 45 minutes.

The OHU at CIW was utilized only for medical patients and alternative housing was not utilized during the review period.

PSU

CIW continued to operate a ten-bed PSU.  The unit was full throughout monitoring period, with a waitlist of ten inmates at the time of reporting.

Eighty-four percent of IDTT meetings in the PSU were timely, while psychiatric contacts were only 76 percent complaint.  Ninety-five percent of the psychiatric contacts were conducted in a confidential setting.  The institution was compliant with providing individual weekly PC contacts, but only 80 percent were conducted in a confidential setting.  Inmate refusals were the large reason for the decrease in compliance.  Supervisory staff reported compliance for completion of daily PT rounds, although there were documentation problems for two of the months.

CIW remained compliant with the offering of ten hours of structured therapeutic activities weekly throughout the monitoring period.  It was also compliant with the provision of ten hours of weekly out-of-cell exercise during the monitoring

period.

EOP

CIW remained compliant with weekly confidential PC contacts. Psychiatry contacts were conducted at least monthly. IDTT meetings continued to be completed timely, although team composition continued to lack correctional counselors.

The institution offered an average of 12.29 hours of structured therapeutic activities. Inmates actually received 7.96 hours, an increase from 5.6 hours during the last review period.

CIW assigned one full time social worker for pre-parole and pre-release planning for EOP inmates.

3CMS

CIW remained compliant with quarterly contacts by PCs as well as with psychiatry contacts. Problems with confidentiality of contacts continued in Walker B converted cells. IDTT meetings were completed timely, although attendance by psychiatrists and correctional counselors were problematic.

Groups

CIW ran 11 groups during the monitoring period. Participants included 365 3CMS inmates. There was only one wait list, with 31 inmates waiting for the anger management group.

Referrals

CIW maintained a mechanism for collecting, triaging, assigning, responding to and logging mental health referrals and remained compliant with meeting timeframes for response to all referrals.

Medical Records/MHTS.net

The rate of access to medical records remained at 84 percent.

CIW converted from the old MHTS to MHTS.net on September 13, 2010. There were reported difficulties during the transition period, resulting in a lack of auditing in some areas during the month of September 2010.

Heat Plan

Heat plan implementation was problematic during the review period. Medical rounds were not routinely completed during stage III heat alerts, and documentation was often conflicting or missing.

RVRs

CIW issued 75 RVRs to EOP and MHCB inmates, all of whom received mental health assessments.

There were 164 RVRs issued to 3CMS inmates, of whom only seven received mental health assessments due to exhibition of bizarre, unusual, and/or uncharacteristic behavior. CIW's mental health department had a system in place for reviewing RVRs issued to 3CMS inmates, but clerical data input was lagging and hearings were often completed prior to the clinician's opportunity to request an assessment.

CIW utilized the 3CMS RVR tracking for DMH referrals. While CIW attempted to determine hearing officers' consideration of mental health assessments, they discovered deficiencies with the tracking of this data and have since corrected for future monitoring.

512

One inmate received an RVR for self-mutilation with serious injury, which was immediately voided.

<u>Construction</u>

The new 20-bed PSU opened and received the first inmate on February 14, 2011. By the time of the monitoring visit on March 14, 2011, the unit was filled. There were 18 inmates housed in the PSU. One inmate was out to court, and another bed was on hold for an admission expected on March 16, 2011. There were four SMYs in the PSU, all of which were shaded from the sun. The PSU included a treatment area with a large room utilized for IDTT and ICC meetings. There were two therapeutic modules located in the IDTT meeting room. A large office was provided for the RTs and PTs and additional individual offices were provided for the psychiatrist and psychologists. Each of these included therapeutic modules for individual clinical contacts. Two group rooms were also present in the treatment area, with each room having five therapeutic modules with televisions for video presentations during groups. There was also a large security area in the center of the treatment area, as well as an office for physical examinations.

On the opposite side of the PSU was the PSU housing area which had 20 individual cells. All of the cells had smaller air vents with small holes to reduce the likelihood of using them to tie a ligature for self-harm. The cells also had beds with areas for storage underneath, controls for lights inside the cell, and ledges for desks with modifications to prevent tie-offs. There were two showers.

Construction of the 45-bed inpatient unit was ongoing and on schedule for completion during November 2011. The supervisory staff and CEO reported that the pre-activation team was in place at a regional office, and that a local guidance council at CIW

was tasked with developing and implementing the action plan for the facility. The monitoring team was unable to enter the construction site, but did observe the exterior of the facility where construction was underway.

### Central California Women's Facility (CCWF)
November 8, 2010 – November 10, 2010

Census:

On October 4, 2010, the total prison population was 3,771, up from the total reported population of 3,705 during the preceding monitoring period. There were 1,213 inmates in the MHSDS program. Fifty-four inmates were at the EOP LOC, with 51 in mainline and three in administrative segregation. There were a total of 950 inmates in 3CMS mainline, with 176 in RC, 16 in administrative segregation, and 11 on condemned row. Six inmates were in the MHCB unit.

Staffing:

Staffing at CCWF remained essentially constant since the preceding monitoring period. The chief psychologist and senior psychiatrist positions were filled but one vacant supervising senior psychologist position remained open.

The 8.5 staff psychiatrist positions were filled. Of the 28.74 staff psychologist positions, 26.5 were filled, leaving a 7.8 percent vacancy rate. FTE contractors filled 1.25 positions, leaving a functional vacancy rate of 3.44 percent. The supervising social worker position and eight social worker positions were filled. The supervising RN II position was filled as were seven of nine RN positions, leaving a 22.2 percent vacancy rate. The senior PT position and all eight line PT positions were filled. Of the 5.15 recreational therapist positions, five were filled.

Quality Management:

CCWF had an active quality management program.  The quality management committee met monthly and was attended by all required.  The mental health subcommittee met every two weeks and reviewed audits and reports from each program and service area, in addition to other relevant matters including staffing.  Minutes were maintained.  Any recommendations from the mental health subcommittee were forwarded to the quality management committee.  Information was shared with mental health staff at daily morning meetings within each program area and at a monthly all-staff meeting.

Two mental health QITs were chartered during this reporting period.  One was to address the institution's recent designation as a Clozapine initiation and maintenance facility, and the other was to address five-day clinical follow-up procedures.

There were two active peer review processes at CCWF.  Psychiatrists conducted a targeted review of a specific psychiatric intervention and examined three charts per month.  There was also a psychologist/social worker peer review process in which each participant reviewed one chart monthly and examined the course of treatment over a six-month period.  Approximately 50 psychiatric notes and 50 psychologist/social work files were peer-reviewed monthly.[25]

---

[25] Defendants requested that the approximate numbers of psychiatric notes and psychologist/social work files reviewed monthly be revised to 75 and 85, respectively.  However, the institution's management report given to the monitor at the time of the site visit stated that the average monthly number of psychiatric notes and psychologist/social work files that were peer-reviewed was approximately 50 for both categories.

Suicide Prevention:

There were no suicides during the monitoring period at CCWF.

The local SPRFIT met monthly.  Membership was comprised of representatives from mental health, medical, and custody, including the chief of mental health, senior psychologists, senior psychiatrist, mental health program bed psychologists, the associate warden for health care, and health care and facility captains. Audit findings and reports on the institution's suicide prevention efforts were standard agenda items.  Minutes from the meetings were maintained and were available for review during the site visit.

The institution was nearing, but had not yet achieved compliance with required SREs, custody rounds, and five-day follow-ups after MHCB discharges.  The compliance rate for completing and documenting five-day follow-up was 92 percent. The institution reported lower monthly rates but issues were identified with the manner in which such rates were calculated.  A QIT was chartered in September 2010 to study the process and make recommendations for improvement.  During the preceding monitoring visit, some deficiencies were identified with respect to custody rounds in the ASU.  These included coverings on cell windows, some missed rounds, and questionable accuracy of times on logs.  These problems were corrected and continued to be monitored internally by the institutional staff.

Interviews with custody and clinical staff confirmed that morning check-in sessions between treatment staff and the unit sergeant were conducted in the ASU.  They discussed new arrivals and any difficulties noted with MHSDS inmates.

An institutional audit of 257 cases and the monitor's review of a random sample of cases indicated that pre-placement screens for suicide risk, safety concerns, and mental health problems, were completed on 100 percent of admissions to administrative segregation during the monitoring period, with 128-MH7 forms found in UHRs. Inmates who screened positive were referred for a mental health evaluation on an emergent, urgent, or routine basis.

CCWF reported that that the 31-question mental health screenings were conducted within 72 hours of placement in administrative segregation and that 232 such screenings were completed during the monitoring period. Audit data regarding compliance rates for completion of the screening were not provided, but data was provided indicating that 80 percent of these screenings were completed out-of-cell.

The monitor reviewed a log of monthly emergency response training session conducted in the unit during all three shifts and found that they included mental health related issues, including suicide attempts. Staff in the unit reported that they had completed annual CPR training.

Welfare checks were completed at staggered 30-minute intervals, with results logged, checked, and maintained by the unit lieutenant. The log and individual welfare check summaries were reviewed by the monitor, and were found to be compliant. Inmates released from an MHCB to administrative segregation after a suicide attempt received hourly observations by custody staff for 24 hours, with a log of these checks returned to clinical staff upon completion.

Although institutional staff reported that all inmates in administrative segregation were offered ten hours of exercise per week, this could not be verified by the

monitor in a review of isolation logs in the unit. An interview conducted with two inmates indicated that they felt they were routinely offered the required ten hours.

Medication Management:

Among inmates who were prescribed medications, approximately 740 or 42 to 45 percent received psychotropic medications during the review period.

Several times per week, PTs continued to randomly observe medication administration in various areas of the institution, ensure that a custody officer was present, and to monitor wait times, which ranged from a few minutes to approximately 15 minutes.

There were some problems with achieving compliance with laboratory testing of inmates' blood levels of psychotropic medications. These were attributed to problems with the process through which the testing was ordered and results were received and filed. CCWF revised the process to have a PT track orders, results, and psychiatric review of results prior to filing, which led to some improvement.

CCWF changed the institutional policy requiring that all psychotropic medications be administered DOT, to permit consideration of clinical factors and the possibility of nurse-administered medication. The new institutional policy made DOT administration mandatory for inmates in administrative segregation, the EOP, and MHPBs. All other housing areas permitted the psychiatrist to determine whether to order DOT or NAM.

There were eight inmates on Keyhea orders during the reporting period. Three were initiated and approved, three were renewed, one was not renewed at the discretion of the treatment team, and one was on the order continuously during the six-

month reporting period.  In addition, three others were initiated and upheld at the

certification review hearing and were awaiting hearing before an administrative law

judge.

Psychotropic medications ordered for HS administration constituted

approximately one-third of all HS medication orders.Post-8:00 p.m. administration was

verified by the entries on MARs, nursing audits, and inmate reports.

The availability of parole medication was audited monthly by nursing

staff.

CCWF was one of the institutions for the joint pilot project of the *Plata*

Receiver's and *Coleman* Special Master's medication administration audit tool.  The pilot

was underway at the time of the monitor's visit.  Audits were provided with the proof-of-

practice documents but no summary of information was available.  The institution

explained that the audit instruments and criteria for this project were still in the revision

process.

The institution reported that there were no current audits of MAR

legibility but that MARs were checked monthly by nursing to ensure appropriate

documentation of administration, refusals, and other information.

Transfers:

There continued to be no acute care placements available for female

inmates.  All DMH referrals were to intermediate care.

The current DMH coordinator had been serving in that capacity for several

months and was primarily responsible for conducting audits of Form 7388s.  These forms

were not consistently discussed by the IDTT observed by the monitor.  Multiple MHCB

admissions were tracked and recorded reliably on Form 7388s, but participation in treatment was not. In addition, MHTS.net identified 25 inmates as participating in less than 35 percent of offered treatment. However, only one Form 7388 among those 25 cases was properly completed. Further, none of the checklists for the 32 women identified as having three or more RVRs was properly completed.

CCWF had previously maintained multiple DMH logs but had recently begun utilizing one log, which was maintained in the MHCB. The log was found to be problematic, as it was not maintained in a consistent manner and contained omissions and inaccuracies, making assessment of timeliness of referral completion difficult. Additionally, a review of a non-referral log indicated that it covered only inmates who had been in the MHCB and not referred to DMH.

It was noted that referral packets were not being sent to DMH as a whole package when completed. Staff reported that DMH was not providing notice of an acceptance but only when a bed became available. When CCWF was notified that a bed was available, the inmate was initially transferred to CIW prior to placement in DMH. Similarly, it was reported that all discharges from DMH went to CIW before being transferred to CCWF. This sometimes resulted in an MHCB-to-MHCB transfer, as some individuals returning from DMH would require MHCB placement.

The logs indicated that CCWF made 19 referrals, or an average of three per month, to DMH during the monitoring period. It appeared that three to four referrals were rejected by DMH, although this was not entirely clear. Four Vitek hearings were held during the current monitoring period, resulting in the inmate winning in one case.

Institution staff reported ongoing concern regarding the lack of available DMH placement for women with a history of, or potential for, violence.  One inmate remained at CCWF while awaiting a PSU placement, as her history of violence rendered her ineligible for DMH placement, despite mental health staff belief that she required a higher LOC.

DMH discharge summaries were routinely e-mailed to CCWF, but the monitor's review of UHRs indicated that the summaries did not include all of the information required by the MOU.  Observation of IDTT meetings indicated that upon inmates' returns from DMH, treatment plans developed for these inmates did not incorporate recommendations and clinical information in the discharge summary.  The institution did report that non-formulary medications were continued, at least for a brief period of time, upon an inmate's return to CCWF.

There were no OHUs, MHOHUs, or use of holding cells or other areas pending MHCB admission at CCWF.

Other Issues:

Reception Center

CCWF reported that as of November 8, 2010, there were 684 inmates in the RC.  The institution placed RC EOP inmates into the EOP mainline, giving them access to regular EOP programming. CCWF reported that psychiatry evaluation rates were above 90 percent, although they did not elaborate on the timeliness of these.  There were two clinical groups available. Staff reported that there were three recreation therapy groups available to all inmates in the RC as well as a one-session sleep hygiene class which was offered to 20 to 25 inmates.  Out-of-cell contacts had not been tracked but

were reportedly not problematic. The institution reported there was a plan to track all out-of-cell contacts across all mental health programs.

Mainline RC and 3CMS inmates were housed on Yard A. CCWF further indicated that, during the monitoring period, there were 357 RC inmates identified as appropriate for the 3CMS LOC. The data indicated a compliance rate of 70 percent for initial clinician contact within the first 30 days of inmate placement at the 3CMS LOC. CCWF was largely compliant with transfer timelines for 3CMS inmates, with 24 of the 357, or seven percent, waiting longer than 90 days to transfer to a mainline program. Of those 24 3CMS inmates, 83 percent were seen for a second clinical contact within the 90-day timeline. The institution reported that no 3CMS inmates required expedited transfer from the RC.

Administrative Segregation

Building A504 was utilized for both EOP and administrative segregation, each occupying one-half of the building. The institution maintained a 3CMS ASU. At the time of the site visit, 23 3CMS inmates and three EOP inmates were in administrative segregation. Clinical staff included a quarter-time psychiatrist, a quarter-time senior psychologist, one full-time staff psychologist, and one full-time social worker. The condemned row section, which was separated by wired fencing, held 18 inmates, 11 of whom were designated at the 3CMS LOC.

The EOP unit was used for administrative segregation overflow, and held five administrative segregation inmates at the time of the site visit. Staff reported that IDTT meetings were completed prior to the ICC meeting. However, a review of the

available data indicated that this did not always occur and that ICC hearings were sometimes completed prior to inmates' initial IDTT meetings.

Although compliance data was not provided, the IDTT meeting observed by the monitor's expert included all of the required participants. The clinicians were knowledgeable regarding the inmates, although information available in the UHRs was limited. They indicated that medication monitoring was completed once every 90 days, at minimum, but did not provide compliance data.

CCWF reported that inmates were seen at least weekly, but no tabulated compliance audit was provided. The PT conducted daily rounds of all administrative segregation inmates, at a completion rate of 91 percent. From 66 to 83 percent of clinical contacts were out-of-cell. Staff said that inmates were reluctant to come out of their cells, particularly during the summer months, as doing so required a change of clothing. Weekly individual therapy was provided for all inmates within the one small confidential treatment room. Holding cells partitioned off by privacy screens remained the primary venue for mental health contacts.

Due to lack of treatment space, no therapeutic groups were conducted within administrative segregation for any LOC.

All EOP inmates held in administrative segregation for more than 30 days were referred for transfer to an EOP administrative segregation hub institution at either CIW or VSPW. The institution log showed 14 inmates in this category during the monitoring period, all of whom had been referred for transfer, although six had been retained due to lack of bed availability. At the time of the site visit, three inmates were awaiting transfer to the VSPW EOP administrative segregation hub.

An institutional audit conducted on October 20, 2010, indicated that 22 of 44 inmates in administrative segregation as of that date had been placed there for personal security rather than disciplinary reasons.  The average time in administrative segregation for these inmates was 52.8 days, due at least in part to the lack of availability of SNY placements for female inmates.

MHCB

MHCBs at CCWF were located in and licensed as Skilled Nursing Facility beds.  Because the designation of "MHCB" requires a separate licensure, CCWF referred to the SNF beds used for mental health as "Mental Health Program Beds" or MHPBs. There were 12 possible MHPBs, but that included using three rooms to house two inmates, plus consideration of use of the modified safety room as a room assignment.  All 90 referrals to crisis beds during the monitoring period were admitted to the MHPB. There were 11 inmates with two or more crisis bed admissions. The daily census generally ranged from three to six patients, with the average length of stay at 11 days in a range of three to 56 days.  The outlier at 56 days was a DMH referral who was initially accepted but then rejected.  There were no discharge delays for administrative reasons.

Programming in the MHPB met or exceeded Program Guide specifications.  An initial IDTT meeting was conducted within 72 hours of admission and then weekly thereafter. The psychiatrist, psychologist, RT, nursing, and correctional officers conducted rounds on a daily basis.  All other interventions occurred out-of-cell, except for administrative segregation inmates who were seen individually at the cell front or in the shower area. Inmates were able to go to recreation. Neither restraints nor seclusion were utilized in the MHPB.

Given patient separations for security and clinical reasons, double-celling in the MHPB was rarely an option. Functionally, there were only eight rooms/beds for crisis stabilization, which were actually mattresses on the floor rather than actual beds. Inmates' property was restricted according to clinical condition. Generally, the women were given safety gowns for the duration of their stays in the MHPB, although other types of clothing were permissible if approved by clinical staff. All inmates admitted to the MHPB were placed on mandatory five-day follow-up, and were given hourly checks for a minimum of 24 hours after MHPB discharge

EOP

On November 8, 2010, there were 46 mainline EOP inmates at CCWF. The EOP program was staffed with five psychiatrists, four psychologists, one social worker, and two recreational therapists. PCs had an average caseload of 14. Staff indicated that when the EOP program capacity of 54 was reached, inmates were placed on a waitlist for placement in EOP. Inmates awaiting such placement could be placed on the mainline for up to 60 days, but staff indicated that placement into the EOP rarely took more than one week after referral, and that most EOP placements were made on the same day of the referral.

The institution reported a compliance rate of 99 percent for weekly PC contacts and monthly psychiatry contacts, and 100 percent compliance rates with the timelines and required participation in IDTT meetings. CCWF held pre-IDTT meetings a day in advance of the actual IDTT meeting, attended solely by mental health staff to discuss the inmates scheduled for the actual IDTT meeting. Discussions at the actual IDTT meetings focused primarily on the inmate portion of the meeting.

Documents indicated that CCWF provided an average of 24 hours of structured therapeutic activities on a weekly basis, which is commendable. Inmates were participating in an average 12 hours of group therapy per week. CCWF reported that inmates who consistently refused groups were seen in the IDTT meeting, with a modified program in which a PC may meet with these inmates on a daily basis. If group attendance did not improve and the inmate was not attending a minimum of ten hours of structured activity, referral to DMH was considered by the IDTT.

The monitor's expert observed a recreational therapy group held on the EOP dayroom floor. This was the setting in which most groups were conducted, except for small groups that could be held in a room on the unit that was walled off from the dayroom. Use of the dayroom floor for group work was problematic for several reasons including administrative segregation overflow inmates housed in EOP, ambient noise on the unit from women opting out of participation and/or disrupting the activity intentionally, the lack of confidentiality, and the configuration of all seats facing forward, which impeded communication among the participants.

3CMS

On November 8, 2010, there were 976 mainline 3CMS inmates housed on Facilities B, C, and D. It was reported that staffing for the 3CMS GP program included four psychiatrists, 14 psychologists, 4.5 psych social workers, and two RTs. The average caseload for PCs ranged from 70 to 80 inmates. Staff was assigned to four treatment teams, each consisting of one psychiatrist and three psychologists/social workers. The rich staffing ratios at CCWF allowed for the continuing practice of having one clinician dedicated on each mainline facility to perform a variety of

duties, including addressing crisis situations and providing immediate interventions for emergent situations.  It was reported that the assignment of clinicians to each yard successfully facilitated immediate inmate access to care within the larger 3CMS program.

CCWF reported that timelines for initial clinical assessments were consistently completed within ten working days of an inmate's arrival at mainline 3CMS.  Audits of a sample of 230 inmates placed into the 3CMS program between April 1 and September 30, 2010 were completed by the institution, finding a compliance rate of 91 percent for initial evaluations.  For subsequent routine PC contacts at least every 90 days, the compliance rate was 93 percent.

The institution reported that conversion to MHTS.net had occurred on March 1, 2010 but that there were difficulties with some compliance reports.  As a result, reporting of specific data was limited.  It was not entirely clear why a differentiation was made between "individual therapy sessions" and "case management sessions," but when the contacts coded as individual therapy were included, compliance rates reached 98 percent.

Pre-IDTT meetings were scheduled approximately one week before the regularly scheduled meetings.  UHRs were not always available for IDTT meetings, but a review of available data indicated that this had improved during the monitoring period from a low of 72 percent to a high of 82 percent.  IDTT participation generally met Program Guide requirements and included, at minimum, the psychiatrist, the senior psychologist supervisor, the PC, and a CCI or CCII.  Inmate attendance ranged from 80 to 91 percent on a monthly basis.

The institution reported that each 3CMS inmate on psychotropic medications was seen approximately every 45 days. The institution reported an average completion rate of 86 percent for psychiatry appointments. CCWF indicated that non-completed appointments were due to a variety of reasons but did not provide a breakdown of them.

CCWF reported that approximately 40 clinical groups, ten to 15 recreation therapy groups, and 25 wellness program groups were offered to 3CMS and mainline inmates during the monitoring period. Each full-time clinician completed a minimum of two groups on a weekly basis. Approximately ten to 15 groups (not including wellness program groups) were completed by RTs. On average, there were 182 3CMS inmates on the group waitlist per month, and 92 mainline inmates on the waitlist per month. Waiting periods before placement in a group ranged from 62 to 83 days.

Referrals

During the reporting period, a total of 1,675 referrals were received, with 62 designated as emergent, 100 as urgent, and the remaining 1,513 as routine. The institution reported, and the monitor's review of the log confirmed, that timelines were satisfied for 97 percent of referrals. Even most of the routine referrals received a contact on the same day, and all but 48 of the 1,513 cases were seen within five days. Contacts were made by the yard clinicians receiving the referrals, with follow-up appointments with PCs being made if necessary.

CCWF appeared to have an excellent system for collecting, triaging, assigning, and tracking both staff and inmate self-referrals. Referrals were collected by yard clinicians, who immediately assigned a priority for response. A log of all referrals,

including date written, date received, date completed, and level of priority was maintained by the mental health office.

Heat Plan

Copies of all of the heat logs, by month and facility, for indoor and outdoor temperatures were kept in the heat plan coordinator's office. The coordinator reviewed all of the original indoor and outdoor logs for completeness and consistency and sent a monthly report to headquarters summarizing all heat-related activity for the month. According to information provided by the institution, there were 74 days in which the institutional heat plan was activated during the monitoring period. There were no housing units where the inside temperature reached 90 degrees, nor any inmates reported to be suffering from heat-related illness during the monitoring period.

RVRs

When an RVR was issued at CCWF, custody staff noted the housing assignment of the inmate receiving the RVR, and requested a mental health assessment if the housing was within the EOP unit. Mental health staff also conducted an independent search of the RVR log for inmates in the EOP LOC. Any 3CMS inmate who met referral criteria was also referred by custody staff for an assessment. This dual referral and logging process led to inconsistent reporting of numbers of completed assessments. Utilizing mental health statistics, a total of 58 or 100 percent of mental health assessments were completed for referred EOP inmates, and 22 or five percent of 3CMS inmates were referred during the reporting period.

The monitor completed a review of all seven cases in which the evaluation concluded that mental illness contributed to the behavior and should be considered by the

529

hearing officer in assessing a penalty.  Three of these RVRs were not included in the

SOMS record, although according to the senior hearing officer's log, two of these

resulted in a guilty finding and the third resulted in a finding of not guilty.  In the four

cases found in the SOMS record, one was dismissed at the hearing, with no indication

that the mental health finding was a basis for that decision.  Another recorded a guilty

finding, with no mention of the evaluation, and the remaining two mentioned the

assessments in the guilty finding but gave no indication that mitigation in the penalty was

based upon the positive mental health findings.

<u>Pre-Release Planning</u>

A pre-release unit had been established.  The monitor's review of the LOP

found that assigned clinicians were to perform various pre-release services for inmates

within 90 days before their release.  Staff assigned to this unit were tracking inmates who

participated in these services to assess whether the process ultimately leads to a reduction

of recidivism.

**<u>Valley State Prison for Women (VSPW)</u>**
April 5, 2011 – April 7, 2011

<u>Census</u>:

As of April 7, 2011, VSPW's total population was 3,230, including 589

inmates in the RC and 63 inmates in administrative segregation.  The total mental health

population was 1,256.  In the RC, there were ten EOP inmates and 157 3CMS inmates.

There were ten inmates in the OHU and two in the MHOHU.  The 3CMS mainline

population was 995 and the EOP mainline population was one.   There were 35 3CMS

inmates in administrative segregation and five EOP inmates in the hub.  There were 57

inmates in the SHU, including 37 3CMS inmates and seven EOP inmates.

Staffing:

The chief psychologist and all four senior psychologist positions were filled.  The 6.5 staff psychiatrist positions were filled.

Of the 27.7 staff psychologist positions, 25.5 were filled, for an eight percent vacancy rate.  Of the 5.3 social worker positions, 4.5 were filled, leaving a vacancy rate of 15 percent.

The senior PT position and 14 of 14.66 line PT positions were filled.  Of the 3.75 RT positions, three were filled.

The Health Program Specialist position, all 7.5 OT positions, and the office assistant position were filled.

Quality Management:

VSPW's local governing body met on a quarterly basis.  Minutes were maintained.  Attendance was good, with a quorum present at both meetings held during the reporting period.  The quality management committee met monthly throughout the monitoring period.  Minutes reflected consistent attendance by medical, mental health, and custody staff.

The mental health subcommittee met monthly during the monitoring period and maintained minutes.  The chief of mental health served as chair.

Findings of both the quality management committee and the mental health subcommittee were communicated to staff via e-mail, monthly staff meetings, and memoranda.

During the monitoring period, there were two ongoing QITs which addressed medication noncompliance and administrative segregation mental health

treatment.  The medication noncompliance QIT was expanded in December 2010 to

address the issue of a high percentage of patients missing medication doses after OHU

discharge.

      VSPW had two peer review groups, one for psychiatrists and the other for

PCs.  Both peer review groups met monthly.  For PC peer review, 11 PCs and 60 UHRs

were reviewed.  For psychiatry peer review, six psychiatrists and 77 UHRs were

reviewed.  All statistics generated by monthly peer review were submitted to the quality

management committee.

Suicide Prevention:

      There were no completed suicides at VSPW during the reporting period.

      The SPRFIT reported to the mental health subcommittee.  It met monthly

on the last Tuesday of the month.  Minutes were maintained.  Attendance was good, with

a quorum present at all six meetings held during the reporting period.

      VSPW reported two changes of LOPs in the area of suicide prevention.

One was that the determination of a suicide attempt was to be made the day after the

event during the OHU IDTT meeting.  The other was that non-suicidal self-injurious

behavior was to be included as suicidal behavior for classification of cases.

      According to the institution's management report, VSPW did not achieve

100-percent compliance with five-day follow-up during the reporting period.  Five-day

clinical follow-up was conducted for seven of the eight inmates returned from MHCB

placements.  Institutional data indicated 100-percent compliance with five-day follow-up

in those seven cases.

In administrative segregation, there was a lapse in the occurrence of morning meetings between custody and mental health staff during the reporting period.

Facility audits indicated greater than 90-percent compliance with the completion of administrative segregation pre-placement chronos and their presence in medical records, indicating completion of these pre-placement screenings. The completion of mental health screenings within 72 hours of arrival at the ASU was audited. Results indicated a compliance rate of 82 percent.

Two administrative segregation cells had been modified for intake purposes, but additional cells were utilized due to the number of intakes in the unit. An issue of continued concern was the practice of allowing inmates on the unit to entirely cover their cells with sheets or paper. The monitor's expert observed PT rounds and noted that several cells were entirely covered, preventing visibility into the cells.

Review of the logs for 30-minute welfare checks indicated some continuing problems with non-staggered rounds. Training was implemented, and a review of subsequent logs found significant improvement with appropriate documentation.

Inmates housed on the unit were allowed some electrical appliances.

EOP inmates in administrative segregation were not consistently offered at least ten hours of yard time. A review of the hours offered revealed that on average only eight hours were offered to EOP inmates.

Medication Management:

VSPW audits of continuity of medications for newly-arriving inmates in RC found that in over 90 percent of cases, they were seen timely upon their arrivals and

received medications within 24 hours.  Audits of new arrivals into general population found a compliance rate of 86 percent.

Institutional audits of medication continuity following intra-facility transfers indicated 100-perent compliance.  Review of these audits found that an appropriate sample was obtained, and that transfers into and out of the ASU and the OHU were included in the audit.

Audits of MARs indicated that nurses appropriately noted and referred inmates who were noncompliant with their medications.  These audits covered all medication distribution areas and found a compliance rate of 95 percent.  Audits also found that in 85 percent of cases, inmates were seen timely after referrals for medication noncompliance.

Audits of all four pill lines found average wait times of ten to 15 minutes.

Although institutional audits found that 95-percent of medication prescriptions were renewed timely, inmates consistently reported lapses in the ASU.

Current signed informed consent forms were found in over 90 percent of UHRs, according to audits.

Audits of laboratory studies of blood levels of mood stabilizing medications indicated compliance with response to abnormal test result, including medical intervention and follow-up.   No audits were conducted with regard to ordering of laboratory studies when clinically indicated.

There was no change in the DOT process at VSPW, where all psychotropic medications were administered DOT.  The pill line audits did not cover review of the DOT medication distribution process.

No Keyhea orders were initiated at VSPW during the reporting period. Two petitions were renewed.

HS medications were prescribed for 481 inmates. Timeliness of the HS pill lines was not audited.

Monthly audits indicated greater than 90-percent compliance with inmates receiving medications at the time of parole.

Sexual Misconduct:

There were no RVRs issued for sexual misconduct during the reporting period.

Transfers:

DMH referral logs at the institution did not include critical information. For example, for two of the three inmates sent to DMH, transfer dates were not recorded, and in the third case there was conflicting information as to whether the inmate actually transferred.

The logs indicated a total of five referrals to DMH during the monitoring period, with one of those referrals having begun at CCWF. Timelines for completion and submission of the referral packets for three out of the five referrals were not met.

One of the five referrals was rejected by PSH. The rejection was upheld by CCAT, but this inmate was transferred to the recently-opened PSU at CIW, along with several other inmates who had previously been rejected by PSH. One referred inmate paroled prior to placement at PSH. The sole Vitek hearing held during the monitoring period upheld the DMH referral.

In connection with use of Form 7388, information on the inmate's receipt of multiple RVRs was available and accurately recorded on the Form during IDTT meetings. Information on multiple OHU and MHCB placements was available, but was not consistently recorded on the Form 7388s, nor was it available for IDTT meetings on the yards.

Staff reported that access to the MHCB unit at VSPW had improved greatly during the reporting period. The institution reported that 15 inmates had been transferred to the MHCB at CCWF. Eight of these returned to VSPW and the remaining seven were retained at CCWF. It was reported that the 24-hour timeline for transfer to an MHCB was met in 12 of 15, or 80 percent, of these cases. Inmates returning from an MHCB placement were reported to be initially placed in the OHU for assessment.

The OHU at VSPW consisted of 20 rooms and three safety cells. One of the safety cells was reportedly used as an "overflow" cell. During the monitoring period, there were 395 admissions to the OHU, with 229 placements in safety cells and 166 placements in the observation rooms. Among the 229 inmates placed in safety cells, 60 percent were returned to their housing units, 34 percent were subsequently placed in observation cells, and the remaining 13 inmates were transferred to an MHCB. Of the 229 placements in safety cells, ten remained in the safety cells for over 72 hours, with the longest stay at 144 hours or six days. For those inmates placed into observation cells, the average length of stay in the OHU was three days, with the longest at 24 days.

VSPW reported a total of 42 EOP transfers during the current monitoring period, with 39, or 93 percent, completed within required timeframes. The average length of time to complete the transfer was 18 days.

There were 24 3CMS inmates transferred from the RC during the reporting period. Timeframes for these transfers were not tracked.

Other Issues:

### Administrative Segregation

Institutional audits indicated an over 90-percent compliance rate for the provision of weekly PC contacts for both SHU and administrative segregation inmates. However, there was some backsliding during January 2011 when the overflow unit was utilized. There were continued instances of contacts being cell-front, due to lack of confidential space available on the unit and the workload of the assigned escort officers. Both inmates and clinical staff reported that confidentiality was compromised as a result of these contacts being conducted at cell-front.

Composition of IDTT meetings was audited. Findings indicated consistent attendance by the psychiatrist and PC, CC Is did not consistently attend.

The number of therapeutic modules on the unit was insufficient to meet demand. The A3 overflow unit did not have a therapeutic module for most of the monitoring period, resulting in the need for transfer of MHSDS inmates to the main A4 unit for treatment.

Audits performed by the institution indicated that EOP inmates were offered 17 hours of structured therapeutic activities and received seven hours. Group therapy was provided to EOP and some 3CMS inmates housed in the SHU and ASU. The room utilized for group therapy contained five therapeutic modules which did not meet specifications.

PTs distributed medical and mental health medications in the unit. There were lapses in the documentation of daily PT rounds.

The institution reported that of 110 EOP inmates, five or 4.5 percent had lengths of stay in administrative segregation exceeding 90 days during the reporting period. The average length of stay for administrative segregation EOP inmates was 22 days. Of the 339 3CMS inmates who stayed in administrative segregation during the reporting period, the average length of stay was 35 days. Forty-one or 12 percent of 3CMS inmates stayed longer than 90 days.

3CMS

VSPW had 10.5 PC staff positions assigned to the 3CMS program. In addition, it had one clinician manage the group therapy program and clinical education, while two clinicians were assigned to the pre-release program.

Information provided on the number and types of contacts during the monitoring period and on composition of IDTT meetings indicated compliance rates of 100 percent. A review of UHRs and discussions with inmates and staff indicated that, in general, PC contacts were made at least every 90 days with many contacts occurring more frequently.

The monitor's expert observed several IDTT meetings. Overall, the meetings were well run and had good clinical discussion and participation with all required participants present.

Groups

VSPW had an active group process for the 3CMS mainline population. It provided 34 psychotherapeutic groups and 26 recreational therapy groups during the

current monitoring period, for a total of 60 groups. This was a significant increase since the preceding monitoring period when there were 22 groups. There were 6,236 group contacts for the 3CMS mainline population, including 3,086 therapeutic group contacts and 3,150 recreation therapy group contacts.

Several therapeutic and recreational groups were observed. Overall, the groups were well run with active participation. Space for conduct of groups remained somewhat problematic at VSPW. Several groups were run simultaneously in the visiting area where confidentiality was lacking and ambient noise was distracting.

Referrals

VSPW categorized referrals as crisis or routine. According to summary data provided by the institution, there were approximately 2,715 mental health referrals received during the review period. Of these, 377 were crisis referrals and 2,338 were routine. The summary data indicated that crisis referrals were seen within 24 hours and that most routine referrals were seen within five working days.

Medical Records/MHTS.net

VSPW as well as the other women's institutions piloted the medical records project to electronically scan medical records for purposes of creating an electronic health record or e-UHR. This process began the week prior to the monitor's visit. All medical documentation created since that time has been scanned and the pre-existing paper medical records have been closed to new paper documentation. The process of scanning was conducted by four medical records staff. At the time of the monitoring visit, clinicians were utilizing the paper medical records and referring to the e-UHRs for the most recent documentation.

Heat Plan

VSPW appeared to be compliant with heat plan policies and procedures. There were no instances requiring heat plan activation during the reporting period.

RVRs

During the reporting period there were 639 RVRs issued to MHSDS inmates, including 623 to 3CMS inmates and 16 to EOP inmates. All 16 EOP inmates and 11 3CMS inmates received mental health assessments. In 17 cases it was determined that mental health played a role in the behavior resulting in the RVR, and in 12 of the 17 cases penalties were mitigated as a result.