**APPENDIX B**

**CASE REVIEWS**

EXHIBIT A
California State Prison, Sacramento (CSP/Sac)
March 7, 2011 – March 10, 2011

**Inmate A**

This PSU EOP inmate was referred to DMH on 1/27/10 as he met three of the criteria for higher level of care referral consideration. The DMH referral was rescinded on 8/10/10. The inmate was on a Keyhea order due to dangerousness to self.

It appeared that the inmate arrived at CSP/Sac from the CMF DMH on 11/10/08. A review of the medical record indicated that he had a long history of hospitalizations at DMH and the MHCB; he had a history of suicide attempts that included hanging and cutting his wrist. He also had a history of indecent exposure but this behavior had reportedly discontinued. The inmate reported that he had been assaulted by his cellmate in the past, and there was documentation that he had symptoms of Post-Traumatic Stress Disorder. It was reported that he attempted to avoid sleeping when his cellmate was in the room.

A review of the medical record indicated that the inmate had a history of psychotic symptoms with paranoia; he had previously received an RVR for grabbing a custody officer's shirt. An IDTT held on 8/3/10 documented his attendance at scheduled group therapy. More recent progress notes raised concerns as to his level of functioning. Progress notes indicated that he presented with periods of pressured and disorganized speech and evidence of delusional thinking as to the custody officers.

At a follow-up psychiatric appointment on 2/17/11, the psychiatrist indicated that the inmate believed that custody officers could hear his thoughts; he was experiencing auditory hallucinations as to the officers. On that date, the primary clinician expressed similar observations and concerns, describing the inmate as fearful and presenting with behaviors that might lead to harm from others.

On 2/24/11 the primary clinician indicated that the inmate would be seen weekly with a plan for him to transfer to a mainline EOP. The clinician reported that the inmate appeared to be stable, but his group participation had decreased.

The psychiatrist indicated that on 3/2/11the inmate remained psychotic; plans were made for an increase in the Thorazine dosage and the addition of another antipsychotic medication if necessary. Psychiatric follow-up was scheduled for two weeks.

<u>Findings</u>

Although this inmate's DMH referral had been rescinded, medical record documentation indicated that he continued to exhibit psychotic symptoms, with paranoid delusional thinking and demonstrated behavior that could endanger him. His participation in treatment, particularly with regard to groups, remained problematic. The inmate should have remained on the DMH wait list while attempts at stabilization and improvement in treatment participation continued.

**Inmate B**

This mainline EOP inmate was referred to DMH during the MHARP process; the referral was submitted to DMH on 7/1/10. An IDTT conducted on 12/15/10 rescinded the DMH referral. The inmate was on a Keyhea order until April 2011. He was assessed with a very low score of 1.7 on the test of adult basic education (TABE).

Documentation in the medical record indicated that the inmate had a history of crisis interventions and DMH hospitalizations due to self-injurious behavior and suicide attempts that included hanging attempts, self-cutting and overdoses. He reportedly was assaulted by a cellmate in the past and avoided sleeping when his cellmate was in the cell; the inmate reportedly attempted to stay awake by drinking coffee and pacing. He attempted to sleep while at work in the kitchen or when his cellmate was not in the cell. The lack of sleep further exacerbated his depressed mood which, in the past, had resulted in suicide attempts.

The inmate was receiving treatment for symptoms related to depression and psychosis. He was described as cooperative and oriented with occasional stuttering; his mood was generally dysphoric and his affect was restricted. He did not present with evidence of a thought disorder. His insight and judgment were described as poor. Documentation indicated that he participated in greater than 50 percent of his scheduled activities. He was provided with diagnoses of Schizoaffective Disorder and Antisocial Personality Disorder.

The IDTT agreed to the inmate's removal from the DMH wait list as they opined that he no longer presented symptoms that suggested a serious and persistent mental illness. The treatment team recommended that he continue to receive twice weekly clinical contacts to focus on positive coping skills, monitor depressive symptoms and manage medication side effects. The plan indicated that the psychiatrist would continue to address medication issues by prescribing non-formulary psychotropic medications; additionally, the treatment team would advocate with custody to possibly obtain single cell status for the inmate.

Findings

This inmate continued to demonstrate significant paranoia and difficulty in social interactions; however, he appeared to have shown improvement in his group participation. He had not developed appropriate coping mechanisms to manage social situations but the treatment team was of the opinion that he did not have a serious and persistent mental illness. Nonetheless, they recognized that he had sufficient difficulty interacting with peers; for this reason, the treatment plan included one-to-one interaction with a recreation therapist to decrease his fears of going to the yard for recreation. The inmate could benefit from increased services to help him develop more appropriate coping skills and address his underlying fear and paranoia. It appeared that the decision to rescind the DMH referral was premature.

**Inmate C**

This mainline EOP inmate was referred to DMH on 8/12/09, from SVSP, as he was identified as meeting one of the criteria for higher level of care referral consideration. He arrived at CSP/Sac on 9/19/09. His mental health history was significant for symptoms of paranoia, delusional thinking, auditory and visual hallucinations, and reported exaggeration of symptoms for secondary gain. He had a history of at least four suicide attempts. He was most recently provided with a diagnosis of Schizoaffective Disorder.

The IDTT rescinded the DMH referral on 11/30/10; it was rescinded at the inmate's request with the agreement of the IDTT. The inmate's participation in group and individual contacts had reportedly improved; improvement was also noted in his depression and agitation.

Progress notes indicated that the inmate remained with anxiety in large group settings and he requested removal from the IDTT; this active request was viewed as implementation of a coping skills strategy that was outlined in the treatment plan. The treatment plan outlined as therapeutic interventions the need for continued participation in group therapy, primary clinician contacts and medication management.

Findings

This inmate had been referred to DMH due to his lack of participation in treatment. Recent progress notes indicated that although he continued to experience paranoia and auditory hallucinations, he was actively working with his primary clinician and was participating in treatment. The inmate had a reported increase in his depression; this was addressed by the psychiatrist who initiated treatment with an antidepressant medication. As the inmate had exhibited improvement in his target symptoms, the decision to rescind the DMH referral appeared to be clinically appropriate.

**Inmate D**

This PSU EOP inmate was referred to SVPP on 2/23/10, from CMC. He transferred to SVPP on 8/17/10 and discharged on 11/2/10, when he transferred to CSP/Sac.

The SVPP discharge summary was dictated on 10/25/10. The inmate was first hospitalized at Patton State Hospital at age 16 due to a suicide attempt. He reported that he attempted suicide two times in the community by jumping out of a window and cutting his wrist. He had multiple MHCB hospitalizations and suicide attempts by hanging, cutting and overdose while incarcerated. His last MHCB admission due to suicidal ideation occurred during February 2010. He was on a Keyhea order due to a history of medication noncompliance. He was admitted to DMH VPP during 2003 after a suicide attempt by repeatedly hitting his head. His course of treatment at SVPP was deemed to be unsuccessful as he refused to participate in the program and insisted that he wanted to return to the CDCR. After the inmate returned from DMH, he acknowledged

that he wished to return to prison and did not participate in DMH programming so that he would be returned to the CDCR.

He was provided with a diagnosis of Bipolar Disorder. He was prescribed Risperdal, Effexor, Remeron, and Lithium.

An IDTT was conducted on 11/8/10; documentation from the IDTT meeting and subsequent clinical contacts indicated that the inmate remained stable and participated in treatment. Prior to DMH transfer, he had not participated in group therapy. He remained with poor insight as to his mental illness and the need for medication treatment. He was, however, compliant with taking his medications with the assistance of the Keyhea order.

Findings

This inmate was considered a treatment failure by DMH as he did not participate in treatment there. He reported that he found the DMH environment to be overly restrictive and had acted out there for the purpose of returning to the CDCR. Upon his return, he remained with limited insight as to his mental illness; however, he remained stable and active in treatment. He appeared to be receiving mental health services at the appropriate level of care in the EOP.

**Inmate E**

This PSU EOP inmate was referred to SVPP on 11/30/10 after it was determined that he met at least four of the criteria for DMH referral consideration.

The inmate did not have a reported history of mental health treatment prior to incarceration, but had a long history of mental health related difficulties after his transfer to the CDCR. He reportedly did not attend group or individual therapy and refused to attend yard. He had multiple MHCB admissions. He was provided with diagnoses of Schizophrenia undifferentiated type and Antisocial Personality Disorder.

The inmate's treatment plan was revised as a result of a review by the Chief of Mental Health, and a request was submitted to expedite his transfer to DMH intermediate care; the inmate was reportedly refusing all treatment and had a worsening of symptoms, with muteness and a decrease in his overall level of functioning. The revised treatment plan included twice weekly cell-front visits to attempt to engage him. The inmate was also offered reduced programming in an attempt to motivate him. He continued to exhibit negative symptoms of Schizophrenia, with minimal movement and muteness. He reportedly spent 90 percent of each day in bed and was inattentive to his personal care.

The inmate received his medications as a result of a Keyhea order. He was prescribed Clozaril, Lamictal, Effexor, and Geodon.

<u>Findings</u>

The inmate was appropriately referred to DMH for intermediate level care. It also appeared that treating clinicians had attempted to address his severe psychotic symptoms. He was appropriately placed on a Keyhea order and he was prescribed Clozaril, a psychotropic medication utilized for treatment-resistant psychotic symptoms. The treatment plan indicated that the inmate would be seen at cell front twice weekly to attempt to establish therapeutic rapport. The most recent documentation suggested that he may have been more responsive to clinician cell-front visits.

**Inmate F**

This EOP inmate was housed in administrative segregation. He had a history of surgery for treatment of a left-sided acoustic neuroma, which was benign. He was serving a life sentence and had multiple RVRs for various infractions, including at least four incidents of indecent exposure. A review of the medical record indicated that he also had a history of self-injurious behavior including cutting, as well as mood instability and auditory and visual hallucinations.

A treatment plan dated 7/21/10 indicated that he was enrolled in dialectical behavior therapy (DBT) and was working on emotional regulation. Medical record documentation indicated that it appeared that he had some improvement in symptoms as a result of the therapy. Although there were frequent medical record references regarding DBT, the medical record did not document the sessions. In fact, a progress note dated 11/05/10 indicated that there were no DBT groups at that time. At the time of the site visit, DBT groups were also unavailable; however, this treatment intervention remained in the inmate's treatment plan.

A review of progress notes in the medical record revealed that the majority contained the same information; only the subjective portion of the progress note changed somewhat with each clinical encounter. Furthermore, the remainder of the progress notes from one clinician presented essentially the same plan with each encounter.

The Form 7388, the checklist for DMH referral, dated 10/6/10 indicated that the inmate met one of the criteria for higher level of care referral consideration. The rationale provided for non-referral was the inmate's participation in treatment, including DBT groups that were apparently not available at that time.

It appeared that a primary clinician saw the inmate weekly. The inmate generally presented with dysphoric mood. There was documentation that he complained of frequent changes in his primary clinician, as well as of problems with cancelled groups. Documentation of group therapy participation was not located in the medical record. However, the institution reported that CDCR Form 7399 dated 2/10/10 indicated that the inmate's "overall program attendance decreased from 75 to 67 percent over the last 3 months and group participation stayed the same at 71 percent." The institution also reported that this inmate's quarterly IDTT treatment plan was updated on 3/9/11,

although it did not appear to be in the file at the time of the monitor's visit. The IDTT treatment plan indicated that the inmate participated in 50 percent of group therapy and 75 percent of structured leisure activity during the preceding 90 days.

Findings

This inmate appeared to be receiving mental health services at the appropriate level of care. He reportedly presented consistently with threats of self-injury; this behavior often presented in individuals with personality disorders, such as Borderline Personality Disorder. Although the treatment plan specified DBT as a treatment intervention, this group was apparently not available for several months (after 9/29/10), and there was no subsequent modification to the treatment plan. The medical record did not contain documentation of group participation; however, there was documentation of weekly primary clinician contacts. Clinical progress notes were often repetitive and clinically uninformative.

**Inmate G**

This EOP inmate was provided with a diagnosis of Schizophrenia paranoid type. A treatment plan dated 11/10/10 indicated that he presented with a fixed delusion that he was the victim of a conspiracy involving the state confiscating his driver's license and social security number. He had been provided with single cell status. It appeared that the primary clinician generally saw him weekly. A clinical note dated 11/24/10 indicated that he had been referred to DMH. A note dated 12/8/10 indicated that he met one of the criteria for DMH referral consideration and had already been referred to DMH. However, a note dated 1/6/11indicated that the IDTT had rescinded the DMH referral. The treatment plan was altered on that date to address the inmate's continued delusional thinking.

A new primary clinician saw the inmate on 1/27/11; this clinician was apparently not aware of his DMH referral status. Yet another primary clinician saw the inmate the following week.

Findings

The inmate exhibited evidence of a chronically fixed delusional system. Despite this, he appeared to function adequately but with some paranoia that was expressed in periodic comments. There was documentation that the primary clinician, psychiatrist and IDTT saw him timely. Documentation of clinical contacts was relevant and clinically informative. There was, however, no documentation of group attendance or participation. The treatment plan was appropriately amended when the decision was made to rescind the DMH referral.

The inmate appeared to be receiving mental health services at an appropriate level of care. There was, however, concern regarding frequent primary clinician changes; this was problematic for this inmate with symptoms of paranoia, and it affected his continuity

of care.  The treatment plan revision and the rationale for DMH referral rescission were clinically sound.

**Inmate H**

This EOP inmate had been housed in administrative segregation since 1/25/08.  He had been placed in that unit as a result of a pending RVR and district attorney referral for attempted murder, attempted escape and attempted battery on a peace officer.  The inmate was on a Keyhea order due to grave disability and dangerousness to others; the Keyhea order would expire on 12/29/11.  The inmate had apparently returned to the administrative segregation EOP unit during May 2009, from SVPP.  The treatment plan indicated that he had been housed in administrative segregation for more than 650 days.

The Form 7388 indicated that he had been referred to DMH for intermediate level of care on 6/3/10.  Other subsequent Form 7388s indicated that he was awaiting transfer; a Form 7388 dated 12/30/10 documented a request to increase the inmate's wait list placement priority.

A progress note dated 6/18/10 described the inmate as grossly psychotic with persecutory delusional thinking.  Although he did not attend group therapy sessions, he attended primary clinician sessions.  When seen on 10/25/10, he was described as presenting with grandiose delusional thinking, unkempt appearance, disorganized thinking, and unusual chanting.

Progress notes indicated that the inmate had a worsening of psychotic symptoms.  On 12/3/10, he was observed chanting loudly and shouting that his food had been poisoned.  Ten days later, there was documentation that he would be considered for DMH acute care.  A Form 7388 dated 12/16/10 indicated that he had been referred to DMH acute care; however, a progress note dated 2/27/11 documented a recommendation for increasing his priority placement on the intermediate care wait list.

Findings

The inmate apparently remained housed in the administrative segregation EOP unit for more than 600 days; this was reportedly due to a pending RVR and district attorney action.  He had remained on the DMH wait list for at least nine months.  As the inmate remained with serious and significant psychotic symptoms, a DMH acute care referral appeared to be indicated.

It appeared that the medical record was missing some documentation of weekly primary clinician contacts.  At least one Form 7388 indicated that the DMH referral would be changed from an intermediate care to acute care referral; however, it appeared that this recommendation was not implemented.  The inmate remained on the wait list for intermediate care placement.  Treatment plans were generic in content and did not address his clinical deterioration or wait list status.

**Inmate I**

This EOP inmate had been housed in administrative segregation for 188 days as of December 2010.  He was apparently placed in administrative segregation after attempting to pull an officer's arm through the cuff port on 6/30/10.  He had a significant history of MHCB admissions with four hospitalizations between 6/5/10 and 11/1/10.

The Form 7388 dated 9/2/10 indicated that he met two of the criteria for DMH referral consideration; the documentation also indicated some confusion as to whether the inmate had already been referred to DMH.  The same information was present on another Form 7388 that was dated 9/9/10.  A treatment plan dated 9/30/10 indicated that he would be involved in cognitive behavior therapy (CBT) and individual and group therapies.  He was provided with a diagnosis of Schizoaffective Disorder NOS.  A Form 7388 dated 9/30/10 contradicted the previous Form 7388s; it indicated that the inmate had not met any DMH referral criteria.  Subsequent Form 7388s dated 10/11/10 and 10/18/10 indicated that he met at least one DMH referral consideration criteria but did not provide rationale for not referring him to DMH.

Documentation indicated that the primary clinician consistently followed the inmate although the inmate declined to attend some contacts.  Progress notes indicated that he was medication compliant without overt evidence of psychosis or suicidal ideation.  The Form 7388 dated 12/23/10 indicated that the inmate had met one of the DMH referral criteria and included appropriate rationale for non-referral.

It appeared that on 2/11/11 the inmate was endorsed for transfer to the PSU at PBSP.  He was admitted to the MHCB three days later after reporting suicidal ideation; he also reportedly consumed large amounts of coffee and did not sleep for four days.  After this hospitalization, he declined out-of-cell contacts and was minimally cooperative with clinician cell-front interviews.

Findings

The inmate had a history of several MHCB admissions during September and November 2010.  It appeared that the primary clinician saw him weekly between September and December 2010 and the inmate reportedly participated in therapy.  Although the treatment plan indicated that he would be provided with CBT, documentation did not indicate that this actually occurred.

Documentation on the Form 7388 located in the medical record was often incomplete.  The inmate's primary clinician changed during early January 2010; the inmate began to decline out-of-cell contacts more frequently and was admitted to the MHCB on 2/14/11.  He appeared to have been unstable for an extended period of time and may have benefited from DMH referral.

EXHIBIT B
Folsom State Prison (Folsom)
January 11, 2011 – January 13, 2011

**Inmate A**

This 3CMS inmate was placed in administrative segregation on 3/26/10 as he was a gang dropout. Attempts were made to transfer him to the SNY at CSATF after CSR endorsement in May 2010, and again in August 2010. Most recently, on 11/17/10, he was endorsed to the SCC III SNY. At the time of the site visit, the inmate was awaiting endorsement to PVSP or the CTF III SNY. His earliest possible release date was 2/17/15.

The inmate was transferred to DVI from the California Youth Authority (CYA) for his first prison term in February 2009; he had been convicted of an assault with great bodily injury and received a seven year prison term. His mental health history was significant for treatment of Attention Deficit Hyperactivity Disorder during childhood; he also had a significant history of methamphetamine, marijuana and alcohol use. The inmate had a history of a suicide attempt by hanging during 2000.

The inmate was provided with diagnoses of Adjustment Disorder with mixed anxiety and depression, and Mood Disorder NOS. He was assessed as having a global assessment of functioning (GAF) score of 63. He was prescribed Vistaril and Remeron.

Medical record documentation indicated that primary clinicians saw the inmate weekly. The focus of the individual contacts was impulse control and frustration tolerance through psychoeducation and relaxation therapy. There was also documentation that the inmate's primary clinician worked with the CCII as to the inmate's transfer, and the inmate was made aware of these discussions. There was also documentation of the completion of suicide risk evaluations when indicated.

Findings

This inmate had been confined to administrative segregation since March 2010. He had not been transferred to a SNY bed due to the lack of SNY level III bed availability. A review of the medical record revealed the inmate's positive response to regular and frequent individual contacts. The inmate appeared to be functioning well in his current setting with individual therapy and medications. However, in light of the inmate's history of poor impulse control, depression and anxiety, Folsom should have made every effort to expedite his transfer to an appropriate SNY bed.

**Inmate B**

This 3CMS inmate was placed in administrative segregation on 5/2/10 due to safety concerns. He was provided with a diagnosis of Depressive Disorder NOS and was assessed as having a GAF score of 68. He was prescribed Prozac and Remeron.

The inmate was endorsed to CSP/Solano III during August 2010 but remained housed in Folsom's ASU; this was due to an active court case with an ongoing investigation of a disciplinary infraction for distribution of controlled substances and enemy concerns.

The inmate had a history of intermittent suicidal ideation. A suicide risk evaluation dated 11/2/09 indicated that the inmate presented with low risk of self-harm. The inmate was followed consistently by the primary clinician and IDTT. Progress notes indicated that he was doing well; he had good relations with his cellmate and a positive attitude as to his mental health treatment.

Findings

It appeared that the inmate was receiving mental health services at the appropriate level of care. He was seen weekly by his primary clinician and there was reported compliance with medications and treatment recommendations.

**Inmate C**

This general population inmate was not a participant in the MHSDS. He had been referred to the MHCB on 12/8/10 and was discharged on the following day. The inmate was referred to the MHCB due to reporting feelings of sadness related to the loss of his brother. It appeared that he may have been monitored in an alternative housing cell. Upon release to his regular housing, he received five-day follow-up with a recommendation for monthly suicide risk evaluations for one year.

The inmate was transferred to Folsom from SQ during July 2010; he was not a participant in the MHSDS at the time of transfer. He was seen by the IDTT at Folsom on 12/15/10; the IDTT determined that the inmate did not meet MHSDS inclusion criteria. He was assessed as having a GAF score of 70. At that time, the inmate denied suicidal ideation, auditory and visual hallucinations or suicidal and homicidal ideations. He was not prescribed psychotropic medications.

Findings

There was documentation that the inmate was evaluated and monitored by his assigned clinician due to potential suicidal intent after his brief placement in the alternative housing cell in December 2010. The IDTT determined that the inmate did not meet the clinical criteria for inclusion in the MHSDS. The inmate was involved in parole planning as he had an upcoming parole date.

**Inmate D**

This EOP inmate was housed in administrative segregation. He had been receiving mental health services in the EOP since 1/6/11. He had been housed in administrative segregation since 1/7/11 due to safety concerns. He had one admission to the MHCB at HDSP from 12/30/10 to 1/5/11 for suicidal ideation. He was seen for five-day follow-up after this MHCB discharge. A review of the most recent suicide risk evaluation indicated that the inmate was assessed as presenting with low risk of suicide. He was provided

with a diagnosis of Schizoaffective Disorder; he was assessed as having a GAF score of 50.

Findings

Review of the medical record indicated that the inmate was stable and receiving adequate mental health care while awaiting transfer to an EOP.  CDCR headquarters provided prompt assistance in this inmate's placement in an MHCB during December 2010.

**Inmate E**

This inmate was housed in the general population.  His level of care was changed from 3CMS to EOP on 12/29/10 after he experienced auditory and visual hallucinations and depression after the loss of a family member.  He was prescribed Abilify 15 mg/day and Remeron 45 mg/day.  Progress notes indicated that the inmate exhibited improvement over time, denying suicidal and homicidal ideation; however, he continued to report auditory hallucinations.  There was documentation in the medical record that indicated that the inmate was compliant with weekly primary clinician contacts.  Medical record documentation also noted observations provided by custody officers in the inmate's housing unit.  The inmate was awaiting transfer to an EOP.

Findings

Documentation in the medical record indicated that adequate mental health services were provided for this inmate awaiting transfer to an EOP.

**Inmate F**

This inmate had been a participant in the MHSDS at the 3CMS level of care from April 2010 until 12/24/10, when his level of care was changed to EOP; he was assessed as having a GAF score of 48 at that time.  He was provided with a diagnosis of Psychotic Disorder NOS.

The inmate denied experiencing suicidal and homicidal ideations or auditory and visual hallucinations.  He was reportedly compliant with medications and weekly individual contacts with his primary clinician.

Findings

Documentation in the medical record indicated that adequate mental health services were provided for this inmate awaiting transfer to an EOP.

EXHIBIT C
Pelican Bay State Prison (PBSP)
January 4, 2011 – January 6, 2011

**Inmate A**

This inmate was provided with a diagnosis of Schizoaffective Disorder.  He was prescribed Zyprexa (Zydis) 20 mg/day and received medications as a result of a Keyhea order.  He was housed in the MHCB during the site visit.  The inmate's mental health history was significant for four MHCB admissions during 2010.  He also had a history of DMH hospitalization for intermediate and acute levels of care.  Also significant was the inmate's history of threatening and assaultive behavior toward staff when not stabilized on psychotropic medications.

The inmate had been referred to DMH for intermediate level of care; however, this transfer had not occurred due to a pending medical clearance request.  The inmate had unresolved medical issues that included a new onset seizure disorder that was thought to be related to significant hyponatremia.  A Vitek hearing was conducted as the inmate did not agree to DMH hospitalization, but the inmate did not prevail.  He was hospitalized at SVPP for intermediate care from 7/22/10 to 8/4/10.

The inmate presented with symptoms that included paranoid delusions as to a custody officer who had been absent from the institution for months; he believed that the officer was threatening to kill him.  The inmate also had sporadically refused to eat, believing that his food had been poisoned, and had periods of refusing his psychotropic medications and salt tablets (for treatment of the hyponatremia).

Mental health staff requested numerous medical evaluations in an attempt to assess the extent to which psychotropic medications may have contributed to the inmate's uncontrolled medical symptoms.  As recently as 12/22/10, the inmate was found unresponsive and was transferred to Sutter Hospital due to seizures.  He returned to PBSP on the following day but was readmitted to Sutter Hospital from 12/25/10 to 12/29/10.

IDTT meetings were consistently conducted during the MHCB hospitalization, and there was documentation that attempts were made to determine the etiology for the inmate's complex and unstable medical situation.  Psychiatrists and other mental health staff consistently evaluated him.  He was not approved to participate in yard activities due to his decompensation and treatment noncompliance.  At the time of his initial IDTT meeting, it was determined that he did not present with suicidal risk; however, a subsequent progress note made reference to the presence of suicidal ideation.  No suicide risk evaluation was located in the medical record; subsequent notes did not indicate that the inmate presented with suicidal ideation. Documentation by a senior psychologist suggested that the reference to the suicidal ideation may have been entered in error.  An IDTT meeting held on 11/22/10 discussed the difficulty of controlling the inmate's water intake, which was related to his hyponatremia, on an outpatient basis; it suggested that an acute care referral might be indicated but, as with the intermediate care referral, it also required medical clearance.

Findings

The psychiatrist, primary clinician and IDTT consistently and timely followed the inmate.  There was documentation that mental health staff was diligent in their attempts to control inmate behavior that led to his medical condition and to understand the etiology of his significant symptoms.  The inmate clearly required treatment in a hospital setting, but his transfer to DMH for intermediate level of care and the completion of an acute care referral were hindered by the difficulty in stabilizing his medical condition.  Although staff could not eliminate a medical basis as the cause of some of the inmate's symptoms, he was not prescribed psychotropic medications between 11/29/10 and 12/9/10; during this time, he presented with significant deterioration in his mental status.

**Inmate B**

This inmate was provided with diagnoses of Psychotic Disorder NOS and Personality Disorder NOS.  He was treated with Celexa.  He transferred to the PSU at PBSP on 1/20/10, from CSP/Corcoran at the EOP level of care with a referral to DMH for intermediate care placement.  He was housed in the MHCB at the time of the site visit; this was his fifth MHCB admission during 2010.

The inmate's history was significant for multiple MHCB and DMH admissions; he also had been treated at both the EOP and 3CMS levels of care.  Notable symptoms included hallucinations, suicidal ideation and behavior, depression, and indecent exposure.  The current MHCB admission was precipitated by suicidal ideation, hopelessness and depression related to what the inmate perceived as delays in his transfer to DMH.

MHCB documentation indicated that there were concerns as to the authenticity of some of the inmate's reported symptoms.  Laboratory studies indicated lack of compliance with previously prescribed Abilify and Celexa.

A completed suicide risk evaluation indicated that the inmate presented with moderate to high risk of self-harm.  Medical record documentation indicated that staff increasingly viewed the inmate's symptoms as a consequence of personality disorder symptoms rather than a major mental illness.

Findings

There was documentation that the inmate was provided with adequate mental health care; this, despite the difficulties that the case presented for the mental health staff.  DMH referral was appropriately determined to no longer be required as psychological testing could be provided in an outpatient setting.  There was documentation that the inmate was assessed for suicide risk as clinically indicated.  He was consistently followed during his MHCB hospitalization.  There was documentation that, with the exception of one meeting which occurred during a clinical emergency, the necessary participants were in attendance at the IDTT.

557

**Inmate C**

This inmate transferred to the MHCB at PBSP on 12/29/10, from DVI, due to agitation and psychotic symptoms. He was provided with a diagnosis of Schizoaffective Disorder. He was prescribed Abilify, Haldol Decanoate, Haldol, and Lithium Carbonate. His mental health history was significant for a four month hospitalization at ASH following his parole from PBSP. He returned to prison on 7/27/10 and was scheduled for release on 3/8/11. The inmate had recent significant stressors that included the death of his father, who had died four months prior, and his son's murder in a gang-related shooting two months later. Progress notes described the inmate as presenting with paranoid thinking and symptoms of hypomania; however, the inmate reportedly had some improvement in symptoms at the time of the initial MHCB evaluation.

Findings

The inmate was evaluated promptly upon MHCB admission. The IDTT was attended by the necessary participants. The treatment plan included clinically appropriate objectives for MHCB discharge and return to DVI, which was the inmate's sending institution. The treatment plan also appropriately noted the need for reentry planning referral (TCMP) as the inmate had an upcoming parole date.

**Inmate D**

This inmate was transferred to the MHCB at PBSP from the OHU at DVI due to suicidal ideation, decompensation and agitation. Several different diagnoses were present in the medical record including Bipolar Disorder, Psychotic Disorder NOS, possible Schizoaffective Disorder and Mood Disorder NOS. The inmate had been treated alternately with Strattera, Lithium, Zyprexa, Risperdal Consta, and Thorazine. Upon MHCB discharge on 1/4/11, he was treated with Risperdal Consta, Zyprexa (Zydis), Lithium, and Remeron.

The inmate's history was significant for multiple MHCB, OHU and DMH admissions. Prior to the current admission, the most recent MHCB admission occurred between 4/3/10 and 4/16/10 due to head banging and self-mutilation. The admission note indicated that the inmate required the use of restraints and had smeared feces. During the time that he was placed in seclusion, he was observed performing backflips and presented with manic symptoms. Despite these symptoms, the inmate paroled.

The inmate returned to prison in October 2009; he was reportedly readmitted to DMH acute care in February 2010. The inmate was scheduled to parole on 4/30/11 and his Keyhea order expired one week prior to his parole date.

Findings

The inmate stabilized during the course of his brief MHCB hospitalization, where he received intensive and well-documented treatment. His recent history of unsuccessful

parole, significant psychiatric disabilities and reported lack of housing upon release required intensive reentry planning.

**Inmate E**

This 3CMS inmate was provided with a diagnosis of Adjustment Disorder with mixed anxiety and depressed mood. Medical record documentation indicated that his primary mode of therapy was primary clinician clinical contact. Additional issues identified as foci of treatment included feelings of helplessness and hopelessness, safety concerns and the effects of lockdowns.

Although the inmate reportedly experienced suicidal ideation in the past, he had no reported history of mental health treatment prior to his CDCR arrival in July 2010. A treatment plan dated 12/22/10 outlined plans to monitor his adjustment to his general population yard and discharge from the MHSDS if he remained symptom-free. The inmate's stated concerns included his desire for removal from the MHSDS and for contact with his family.

Findings

There was documentation of adequate treatment planning for this inmate. There was also documentation that the primary clinician and IDTT saw him timely.

**Inmate F**

This 3CMS inmate was provided with a diagnosis of Major Depression, recurrent with psychotic features. He was prescribed Remeron and Abilify. His mental health history was significant for reported auditory command hallucinations to perform violent acts during periods of stress. Although there was documentation that the inmate lacked work skills, he worked in support services at PBSP.

Documentation indicated that the inmate had expressed concerns of homelessness upon his release from prison and was subsequently referred to the TCMP. He was evaluated by mental health staff at greater frequency (monthly) than the treatment plan outlined; the psychiatrist saw him every 60 days. Documentation indicated that clinical contacts occurred out of cell with the exception of one contact that occurred at cell front. The treatment plan appropriately focused on post-release plans and the use of cognitive behavioral treatment to address depressive symptoms.

Findings

The inmate was seen at clinically appropriate intervals which were more frequent than the treatment plan outlined. The treatment plan was individualized and addressed pertinent issues with appropriate modalities of treatment.

**Inmate G**

This 3CMS inmate had been incarcerated in the CDCR since 1993. He was provided with a diagnosis of Mood Disorder NOS. He was prescribed Effexor. He had been designated as a gang drop-out and was awaiting an SNY yard at MCSP.

The most recent IDTT meeting occurred on 10/13/10; the previous IDTT meeting took place on 6/2/10. Documentation indicated that the inmate reported symptoms of depression and difficulty sleeping. His mood at times was described as so morose that his cellmate requested cell relocation. The treatment plan described the inmate as insight-oriented and as a good candidate for individual treatment. In addition to depression, issues related to his wife's medical condition were a focus of treatment. The treatment plan outline included weekly clinical contacts with a reduction to monthly sessions after sufficient progress was obtained.

Various progress notes from June 2010 through the summer of 2010 indicated that clinical contacts were cancelled or postponed due to a lack of escort officers, security precautions and other custody-related issues.

The treatment plan indicated that the psychiatrist would see the inmate every 90 days. The psychiatrist saw him in August 2010; the next documentation of psychiatric contact in the medical record indicated contact by a psychiatry nurse practitioner on 10/11/10.

<u>Findings</u>

The inmate's treatment planning was clinically relevant and individualized for his specific treatment needs. It appeared that custody-related issues and limited psychiatry staffing at PBSP may have impaired implementation of the treatment plan.

**Inmate H**

This 3CMS inmate was initially provided with a diagnosis of Bipolar Disorder; the diagnosis was later changed to Adjustment Disorder with anxiety. The inmate returned to PBSP on 11/17/08 after receiving treatment at SQ for an oral surgery-related condition. His history was significant for a head trauma in 2001; he also had five suicide attempts, including one attempt which resulted in him remaining in a coma for a period of time. The inmate also had a significant family history of suicide, which included his mother, father and brother. He had been hospitalized at DMH.

On 9/15/09 the inmate reportedly informed the psychiatrist that he did not wish to continue on psychotropic medications and requested removal from the MHSDS. He simultaneously reported that he was "bi-polar all (his) life." He was returned to the MHSDS on 12/15/10 due to anxiety related to his upcoming parole on 3/23/11 and was referred to the TCMP.

<u>Findings</u>

The inmate appeared to be stable and the mental health care that he received appeared to be appropriate.  He recently returned to the MHSDS for treatment of situational stressors; with his symptoms resolved, he requested removal from the MHSDS.  He was appropriately referred to the TCMP for discharge planning.  In light of the inmate's significant history of suicidal behavior and his family history of the same, the expert advised mental health supervisory staff that the inmate required additional evaluation as to his anxiety level.

**Inmate I**

This inmate had been housed at PBSP since 2006; he was not scheduled for release from prison until 2017.  He was provided with a diagnosis of Bipolar Disorder, most recent episode manic.  His medication regimen included treatment with Seroquel, Abilify and Thorazine.

The inmate had received his medications as a result of a Keyhea order since 3/2/10 due to danger to others when not medication compliant.  A medical record review indicated that he was usually not cooperative with primary clinician contacts and only agreed to see the psychiatrist on occasion.  There was documentation that he had received four or five disciplinary infractions during the preceding one year period.  Custody referred him to mental health in December 2010 after he exhibited seclusive behavior following his sister's death.  Medical record documentation indicated that, due to security restrictions, the inmate was only seen at cell front during July 2010.

A Form 7388, the checklist for DMH referral, dated April 2010, as to higher level of care referral consideration was located in the medical record.  It indicated that the inmate did not meet any criteria for DMH referral consideration; nonetheless, the treatment plan of the same date accurately reported that the inmate required a Keyhea order for medication continuity and that he refused to participate in primary clinician contacts.

<u>Findings</u>

The inmate appeared to be stable on medications which he received pursuant to a Keyhea order. Of concern was documentation that he was only seen at cell front for clinical contacts during the summer of 2010, and the lack of documentation of possible criteria for higher level of care referral consideration.

EXHIBIT D
High Desert State Prison (HDSP)
April 26, 2011 – April 28, 2011

**Inmate A**

This EOP inmate was housed in the reception center at the time of the site visit. He had a history of MHCB treatment during 2008 after reportedly experiencing decompensation as a result of not receiving his medications for seven days. At that time, he was provided with a diagnosis of Schizoaffective Disorder bipolar type. Documentation indicated that the inmate gradually stabilized; at the time of discharge on 1/26/09, he was described as "emotionally frail and anxious."

The inmate was seen at cell front on 1/12/11 when he was described as having a clean appearance; his cell was reportedly "organized." He was seen on several additional occasions during January 2011; these contacts occurred primarily at cell front. Progress notes indicated that he was functioning adequately during this period. During early February 2011, the inmate attended approximately half of his offered groups. There was documentation that the primary clinician saw him more frequently than weekly.

The inmate apparently paroled during early March 2011 and returned to prison within several weeks. He was most recently provided with diagnoses of Schizoaffective Disorder and Alcohol Abuse. The most recent treatment plan dated 3/24/11 included group therapy as a treatment intervention. There appeared to be a problem with the provision of confidential clinical contacts. Many of the clinical contacts that occurred during March and April 2011 were conducted at cell front; medical record documentation indicated that these cell-front contacts occurred for various reasons, including the lack of available staff and space. It appeared that many of the out-of-cell contacts occurred in the dayroom.

Findings

This inmate had a history of repeated parole violations and reincarceration. It appeared that he had remained stable since the time of his most recent return to prison. Of concern was the frequency of cell-front contacts, which were reportedly due to insufficient staff and space to provide for confidential contacts. Some progress notes even indicated that the inmate requested to be seen confidentially but was informed that this would not be possible. The inmate was not seen out of cell between 3/22/11 and 4/11/11.

**Inmate B**

This 3CMS inmate was housed in administrative segregation. He had been receiving mental health services in the 3CMS program since at least December 2010. He was apparently hospitalized in the MHCB during mid-January 2011 and again from 4/5/11 to 4/14/11. He was provided with a diagnosis of Depressive Disorder NOS.

The most recent treatment plan dated 12/21/10 described the inmate as stable and indicated that he was participating in treatment at the EOP level of care. He was

provided with a diagnosis of Depressive Disorder with anxiety.  There was documentation that necessary participants were in attendance at the IDTT meeting.  There was no treatment plan located in the medical record that addressed the inmate's care at the 3CMS level.

Weekly psych tech notes during early to mid-February 2011 described the inmate as medication compliant with normal functioning.  Subsequent psych tech notes indicated that he maintained the previously described behavior.

The inmate was placed in administrative segregation on 3/24/11.  A progress note on that date indicated that he was fearful and felt threatened by other inmates because he was a peace officer prior to incarceration.  There was no mental health documentation in the medical record from 3/24/11 until the date of the site visit on 4/27/11.

Findings

The inmate was maintained at the 3CMS level of care.  The medical record indicated that he had previously received services at the EOP level of care and had participated in treatment.  He was admitted to the MHCB twice within approximately a three month period and EOP level of care should likely have been considered.  There appeared to be problems as to timely filing of information in the medical record as it was missing information.

**Inmate C**

This inmate was receiving mental health services at the EOP level of care and was designated as requiring SNY placement.  It appeared that he was placed in the EOP during the intake process at the SQ reception center.  Although he was designated as requiring EOP level of care, he was transferred to HDSP on or about 2/25/11.  Clinical notes dated 2/25/11 indicated that the inmate should not have been transferred to HDSP due to his EOP designation and the lack of an EOP at HDSP.  The clinician documented that the inmate was told that he would be placed "on the first bus" back to SQ.

The treatment plan dated 3/2/11 again indicated that the inmate was mistakenly transferred from SQ.  The inmate was provided with a diagnosis of Substance Induced Psychotic Disorder at that time.

Progress notes indicated that the inmate was seen approximately weekly by a psychologist and was seen on at least three occasions for medication management.  The treatment plan did not address the provision of EOP treatment.  The most recent progress notes indicated that the inmate had been endorsed to KVSP and was awaiting transportation.

Findings

This EOP inmate was mistakenly transferred to HDSP as an EOP inmate. He was seen by a treatment team and a plan was developed on 3/2/11. There was no indication, however, that the IDTT or CDCR headquarters acted to expedite the inmate's transfer to an EOP. Consequently, the inmate remained in an inappropriate placement for more than two months and was not receiving the necessary level of care. Clinical contacts appeared to focus on the inmate's inappropriate placement.

**Inmate D**

This inmate was receiving mental health services at the EOP level of care during July 2010 at the DVI reception center; it appeared that his level of care was changed during August 2010 to the 3CMS program. The inmate was housed in administrative segregation at HDSP at the time of the site visit.

A treatment plan dated 10/21/11 stated that the inmate was a new arrival at HDSP with "questionable mental health symptoms." A progress note dated 11/17/10 indicated that the inmate had reported symptoms of depression but stated that he did not exhibit evidence of this condition. These same observations were noted on 1/10/11. The inmate was placed in administrative segregation on 2/28/11 as he was the victim of a battery. An updated plan written on 3/9/11 provided a diagnosis of Polysubstance Dependence. The plan included as treatment interventions weekly primary clinician contacts and medication management. During the month prior to the site visit, the inmate submitted several self-referrals complaining of severe depression and nightmares. However, clinicians did not determine that the inmate's presentation was consistent with depression symptoms.

Findings

This inmate reportedly presented with reports of mental health symptoms that treating clinicians did not view as consistent with his clinical presentation. Weekly progress notes did not indicate that the treatment plan was re-evaluated and amended during the periodic clinical contacts. The inmate did not appear to require a higher level of care at the time of the site visit. There was documentation that necessary participants were in attendance at IDTT meetings.

**Inmate E**

This EOP inmate was housed in administrative segregation. He was hospitalized in the MHCB from 5/1/10 until 6/17/10, and at that time was provided with a diagnosis of Bipolar I Disorder, with psychotic features. This hospitalization occurred after the inmate exhibited bizarre, agitated and disorganized behavior that was consistent with a manic episode. The inmate was previously hospitalized on 4/30/10.

The inmate was described as exhibiting significant psychotic symptoms during early January 2011.  A psychologist progress note at that time documented the plan to conduct an IDTT meeting; the Form 7388, the checklist for DMH referral, that was completed at that time failed to note the presence of any criteria for higher level of care referral consideration.

The most recent treatment plan, which was dated 3/29/11, included as treatment interventions cognitive behavioral therapy (CBT), supportive psychotherapy and medication management. Subsequent clinical notes did not indicate that CBT was provided.

Since January 2011, the inmate generally declined out-of-cell clinical contacts.  He was described as disheveled and was frequently noted to be asleep when his cell was approached.  He was reportedly compliant with prescribed medications.  His cell was reportedly disorganized and littered with paper bags.  During early February 2011, the inmate was observed with possible response to auditory hallucinations.  He objected to accepting a cellmate during February 2011, stating that "there are already so many of us in here;" the inmate was in fact single-celled.

<u>Findings</u>

This inmate had exhibited significant psychotic symptoms for at least three months.  It was not clear why he had remained at the EOP level of care through this period and why clinicians had not considered referring him to DMH for acute or intermediate care.  Of additional concern was the fact that the inmate had actually paroled and returned to HDSP even though he remained at the EOP level of care.  Clinicians failed to consider this inmate for higher level of care referral even though he refused all out-of-cell contacts, exhibited consistent hygiene and cell maintenance problems, and remained with significant psychosis.  The treatment plan developed on 3/29/11 was not responsive to the inmate's mental health needs.

**Inmate F**

This 3CMS inmate was housed in administrative segregation.  He had been a participant in the 3CMS program since at least December 2010.  He was provided with a diagnosis of Major Depressive Disorder.  On December 20, 2010, he murdered his cellmate and subsequently reported that he "blacked out."  The resulting RVR evaluation alluded to the possible contribution of an existing psychosis.

A treatment plan dated 3/16/11 included a diagnosis of Major Depressive Disorder recurrent.   The plan prescribed weekly primary clinician contacts and psychiatric services.  The inmate was hospitalized in the MHCB during August 2010.

The inmate was offered weekly clinical contacts but declined these confidential contacts and was seen at cell front.  Clinical progress notes did not document the presence of psychotic symptoms.

Findings

There was documentation that the IDTT, primary clinician and psychiatrist timely saw the inmate.  He was provided with a diagnosis of Major Depressive Disorder prior to the murder of his cellmate; this diagnosis remained unchanged, although the RVR evaluation included references to psychotic influences on the inmate's behavior accompanying the murder.  The inmate had not been considered for DMH referral despite his refusal of all out-of-cell clinical contacts.  The Form 7388, the checklist for DMH referral, located with the most recent treatment plan was blank.

EXHIBIT E
Mule Creek State Prison (MCSP)
January 24, 2011 – January 27, 2011

**Inmate A**

This EOP inmate was housed in the Level IV EOP housing unit on the A yard.  He was provided with diagnoses of Schizoaffective Disorder bipolar type and Polysubstance Dependence in institutional remission.  He was treated with Abilify 30 mg/day, Cogentin 6 mg/day, Haldol 2.5 mg/day, Zoloft 50 mg/day, Keppra 500 mg/day and Eltroxin 50 mcg/day.

The inmate had a long history of treatment at the EOP level of care.  Progress notes indicated that he presented with chronic auditory hallucinations and occasional self-harm resulting in MHCB admissions.  He was hospitalized in DMH acute care from 6/10/09 to 7/28/09.  A review of DMH materials in the medical record indicated that he had a history of multiple DMH hospitalizations; there were seven DMH admissions since 1998.  After an MHCB admission during 2009, he was referred to DMH for initiation of Clozaril.  It appeared that the inmate was discharged on Clozaril on 9/28/09.  Although it appeared that this medication was discontinued in October 2009, the reason for its discontinuance was unclear from the medical record.

The most recent progress notes indicated that the inmate was more than 90 percent compliant with group therapy attendance and with taking prescribed medications.  He reportedly remained with chronic auditory hallucinations.  The most recent progress notes indicated that he was without psychotic symptoms or recent mood instability.

Findings

Documentation based on MHTS.net indicated that the primary clinician saw the inmate weekly in group or individual therapy.  The psychiatrist saw him monthly with the exception of November 2010, when there was a lapse in contact.  This lapse did not appear to result in medication discontinuity.  Treatment planning was somewhat generic and progress notes were minimal in the provision of relevant clinical information.  There was documentation of completion of the Form 7388, the checklist for DMH referral, for higher level of care referral consideration.  Assessment of the composition of members at the IDTT meeting was difficult to determine based on medical record information.

**Inmate B**

This 65 year old EOP inmate was housed in the Level IV EOP housing unit on the A yard.  He was provided with diagnoses of Bipolar Disorder with psychotic features and Dementia by history.  He was treated with Risperdal Consta 37.5 mg intramuscular every other week, Benadryl 25 mg/day, Buspar 60 mg/day and Artane two mg/day.

The inmate had reportedly transferred to MCSP in 2006.  A medical record review indicated that he had been in the EOP throughout the review period.  The primary clinician and psychiatrist consistently followed the inmate.  MHTS.net and the medical record indicated that he was consistently involved in group therapy and education.  A MAR review revealed that he was compliant with prescribed medications.

<u>Findings</u>

Documentation indicated that the psychiatrist and primary clinician consistently saw the inmate.    Documentation also indicated that the inmate was actively involved in group therapy and education, and that the Transitional Case Management Program (TCMP) social worker contacted him on at least two occasions for discharge planning.

**Inmate C**

This EOP inmate was housed in the Level IV EOP housing unit on the A yard.  He was provided with a diagnosis of Impulse Control Disorder NOS.  He was treated with Risperdal 1 mg/day and Prozac 10 mg/day.

At the beginning of the monitoring period, the inmate was prescribed Risperdal, Remeron, Artane, and Inderal.  A medical record review indicated that he had a history of medication noncompliance, impulsivity and paranoia.  The inmate continued to report impulse control difficulties and was started on Depakote during October 2010; however, several chronos indicated that the inmate was not compliant with medications during that month.  Subsequent progress notes indicated that the primary clinician and psychiatrist consistently followed the inmate.

<u>Findings</u>

Documentation indicated that the IDTT meeting occurred timely, but it did not appear that a psychiatrist was present at the September 2010 IDTT meeting.  The Form 7388, the checklist for DMH referral, as to higher level of care referral consideration was completed and did not indicate that the inmate met referral criteria.  Although the inmate reportedly had periods of significant medication noncompliance, the lack of documentation or acknowledgement as to such noncompliance made it unclear if the psychiatrist was aware of this issue.  Documentation indicated that the primary clinician at least saw the inmate weekly in group or individual therapy and that the psychiatrist saw him monthly.

**Inmate D**

This Level IV EOP inmate was housed in the A yard EOP unit.  He was diagnosed with Bipolar I Disorder with psychotic features and Post Traumatic Stress Disorder.  He was treated with Abilify 20 mg/day and Effexor 112.5 mg/day.  He transferred to MCSP on 6/16/10, from CTF; he was transferred at the EOP level of care.  Progress notes indicated that the primary clinician consistently followed the inmate in the EOP, where he reportedly was stable on medications.  The psychiatrist also consistently followed the inmate.  The inmate was reportedly compliant with group therapy attendance.

Findings

Psychiatrists and the primary clinician saw the inmate according to Program Guide requirements. The medical record contained an updated treatment plan, but it appeared to be generic with few individualized interventions noted. There was documentation of completion of the Form 7388, the checklist for DMH referral, as to higher level of care referral consideration.

**Inmate E**

This EOP inmate was housed in administrative segregation. He was provided with a diagnosis of Schizophrenia paranoid type. He had been prescribed psychotropic medications (depot antipsychotic medications) but had been refusing them for at least one month prior to the site visit. The inmate was on the SVPP wait list.

The inmate had a long history of mental health treatment in the CDCR and DMH with multiple hospitalizations. He was hospitalized in the MHCB or OHU on at least two occasions between September and November 2010 due to psychotic behavior. When he was last placed in the OHU, he was evaluated for a Keyhea order but reportedly did not meet the Keyhea criteria and began taking his medications.

The inmate was transferred to administrative segregation where he remained at the time of the site visit. In administrative segregation, he was housed in a management cell; these cells were separated from the other administrative segregation cells by double doors to prevent inmates in them from disrupting unit activities. Progress notes indicated that the inmate made repeated threats to harm staff members. His thinking was described as very disorganized. The inmate also presented with chronic auditory hallucinations, loud yelling, pressured speech, and agitated behavior.

The inmate was observed during an administrative segregation EOP treatment group. He presented as was previously described with threatening speech, disorganized thinking, poor impulse control and loud, intrusive difficult to understand speech. The group facilitator placed him in a cell at the end of the group semi-circle with an empty cell separating him from other inmates due to his psychosis and behavior.

Findings

The primary clinician in the ASU appropriately saw the inmate weekly. It also appeared that staff had attempted to engage him and the inmate was involved in group therapy. He was appropriately referred to DMH intermediate care due to his chronic symptomatology. It was of concern that the inmate was noncompliant with psychotropic medications, and he presented with severe psychotic symptoms including auditory hallucinations, disorganized thinking and threats to harm staff.

This case was presented to the mental health supervisory staff who reported that the inmate would be evaluated in the triage treatment area (TTA).  Consideration should be given for the initiation of a Keyhea order or referral to the MHCB or DMH acute care.

**Inmate F**

This EOP inmate was housed in the Level IV EOP on the A yard.  He was provided with diagnoses of Psychotic Disorder NOS and Depressive Disorder.  He was treated with Lithium 900 mg/day, Zyprexa 30 mg/day, Inderal 10 mg/day and Zoloft 100 mg/day.  The inmate was in the EOP throughout the monitoring period.  Progress notes described him as having chronic auditory hallucinations of a derogatory nature and anxiety.  The primary clinician and psychiatrist followed the inmate consistently.

Findings

The inmate's primary language was Spanish.  Although an interpreter was utilized during the IDTT meeting, interpreters were sporadically and infrequently utilized during psychiatric and primary clinician contacts.  The expert observed this inmate during the inmate's EOP IDTT meeting.  It was reported that he had murdered a cellmate in the past due to auditory hallucinations.  Although the primary clinician stated that he did not believe that the inmate required transfer to a higher level of care, it was acknowledged that he met some of the referral criteria.  The primary clinician's progress notes, which described the inmate as "stable," directly conflicted with other progress notes that described him as disorganized with auditory hallucinations, with insomnia and restlessness.  Although the inmate reported to the IDTT that he was hearing voices telling him to kill his teacher and the clerk, none of this information was documented in the IDTT note located in the medical record.  Treatment planning also did not address the inmate's severe symptoms or provide clinically appropriate treatment interventions.

Although some progress notes and the IDTT note over a several month period mentioned "possible DMH referral," no documentation indicated that such a referral occurred.  The inmate clearly met the criteria for DMH referral consideration for stabilization and should have been referred.

Documentation indicated that appropriate laboratory testing for treatment with Lithium was conducted.  Of concern was an elevated TSH level that was obtained on 1/10/10.  However, there was no documentation as to this abnormal level in the psychiatric progress note dated 1/24/10, evidence of referral to medical, or an order for repeat blood levels.

**Inmate G**

This inmate was referred to DMH on or about 8/5/10.  He transferred to DMH on 8/27/10 and returned to MCSP on 9/27/10.  A medical record review indicated that he had a history of at least one prior psychiatric hospitalization.

A progress note dated 8/16/10 indicated that the inmate had been issued a chrono that allowed him to receive meals in his cell as he refused to leave his cell for meals. Other medical record information suggested that the inmate feared other inmates. He reportedly exhibited paranoia and evidence of delusional thinking.

At the time of the DMH admission he was provided with a diagnosis of Schizophrenia paranoid chronic type. DMH discharge summary information indicated that while at DMH the inmate refused to attend groups, refused medications and requested to be returned to prison. On 9/22/10 he became verbally aggressive toward a staff member and pushed the staff member with both hands. He subsequently threatened to assault other staff members and was placed on "in-room seclusion." Documentation indicated that the inmate had refused medications throughout his DMH hospitalization. Information from DMH indicated that the inmate was discharged as he was deemed "not appropriate" for ASH due to "a history of assault or threatened assault." He was described as "resistive to treatment." DMH recommendations were limited to discharge medications, which included Zyprexa and Risperdal. The medication orders were continued after the inmate returned to the CDCR. He was provided with a discharge diagnosis of Adjustment Disorder. The medical record contained the DMH discharge summary.

The inmate was discharged from DMH to CMC East but subsequently returned to MCSP. It appeared that he was seen weekly during the period when he was housed at CMC; progress notes indicated that he was stable at that time. Upon his return to MCSP, the previous diagnosis of Schizophrenia was continued. A progress note dated 10/20/10 indicated that the inmate was "psychotic but not in acute distress." He remained medication noncompliant during November 2010. Various medical record entries described the inmate as stable, while other documentation indicated that he remained delusional with paranoia and hostility. A Form 7388, the checklist for DMH referral, dated 12/15/10 indicated that the inmate met no criteria for higher level of care referral consideration. The most recent MCSP progress notes indicated that he was stable, but with some residual symptoms of paranoia and delusional thinking. It did not appear that return to DMH was actively pursued.

Findings

This inmate was briefly and unsuccessfully treated at DMH and was discharged as a result of behavioral issues. The medical record contained the discharge summary, but the summary only included medication regimen recommendations. These medications were continued at the time of the inmate's return to CDCR, where he continued to exhibit symptoms of paranoia and delusional thinking and remained medication noncompliant.

**Inmate H**

This EOP inmate's medical record was reviewed as he had attended less than 50 percent of his scheduled activities. He was not included on the DMH referral log or the list of inmates for whom DMH referral was considered but not referred.

573

The inmate reportedly only attended 25 percent of offered structured therapeutic activities between 6/1/10 and 11/30/10.  Two Form 7388s -- the checklists for DMH referral -- that were completed on 6/17/10 and 9/9/10 did not indicate that he met criteria for DMH referral consideration.  He was provided with a diagnosis of Major Depressive Disorder recurrent, severe with psychotic features.

A current treatment plan was not located in the medical record, although it did contain several undated IDTT notes.  A primary clinician progress note dated 8/24/10 indicated that the inmate had been provided with the previously mentioned diagnosis of Major Depressive Disorder as well as a diagnosis of Post-Traumatic Stress Disorder.

The psychiatrist saw the inmate on 10/12/10 and the primary clinician saw him on 10/19/10, 11/2/10 and 11/18/10; these contacts occurred out of cell.  The inmate was seen at cell front on 11/8/10 as a result of an MCSP quarantine; he was also seen at cell front on 11/23/10, 12/2/10 and 12/6/10 reportedly due to custody's refusal to open the inmate's cell door.  The primary clinician cancelled two appointments with the inmate.

Findings

Although the psychiatrist and primary clinician saw the inmate timely, the primary clinician had cancelled several recent appointments.  Although documentation indicated that the inmate had not attended most offered programming, no documentation indicated that the staff considered the inmate for referral to a higher level of care.  A current treatment plan was not located in the medical record.

**Inmate I**

The IDTT referred the inmate to DMH on 10/6/10 and the referral was submitted to DMH on 10/26/10.  The inmate was awaiting DMH placement at the time of the site visit.

A progress note dated 10/22/10 noted that the inmate met the criteria for grave disability and indicated that he should be considered for a Keyhea order if he remained medication noncompliant.  It appeared that the inmate was prescribed Risperdal intramuscular injections and he reportedly accepted this medication.

The inmate was admitted to the MHCB, where he was hospitalized from 10/22/10 to 11/15/10; he was admitted after exhibiting an unkempt, filthy appearance with significant deterioration in his level of functioning.  Progress notes indicated that a previous DMH referral had been rescinded due to the inmate's "misuse of (the) mental health system." He also had a reported weight loss of ninety pounds during one year, and he was observed "speaking (in) tongues" on occasions.

The primary clinician saw the inmate out of cell on 11/19/10.  The clinician reported that the inmate was more engaging, but possibly appeared to be experiencing auditory hallucinations.  The clinician appeared to be unaware of the inmate's referral to DMH as he indicated that "he does not seem to meet criteria for DMH referral and LOC (level of

care) change at this time." This statement was made despite the inmate's history and a statement in the same note that the inmate "appeared to be semi coherent, poorly groomed, poor hygiene, unkempt and unshaved."

A progress note dated 11/21/10 indicated that the inmate had been seen at cell front; the note stated that food was seen in the inmate's toilet and multiple milk cartons littered the floor of his cell. At that time, due to the inmate's refusal, his medications had been discontinued.

A progress note dated 11/30/10 described the inmate's condition as improved, although he remained with psychotic symptoms. A progress note dated 12/22/10 stated that the inmate had participated in group treatment, but remained with bizarre behavior, talking to himself, banging on the door of his cell and the holding cell during treatment. This progress note indicated that a DMH referral had been generated. A progress note dated 12/23/10 stated that the inmate was on a modified treatment plan.

A progress note dated 1/4/11 reported that the inmate was compliant with his intramuscular medication and was described as less psychotic. Psych tech observations during the weeks of 1/2/10 and 1/9/10 noted that the inmate's hygiene was fair to poor. Some notes described the inmate as presenting in a trance-like state with disorganized speech and periods of muteness.

A treatment plan dated 1/19/11 indicated that the inmate had been referred for a Keyhea order but did not meet the criteria for a Keyhea order. The treatment plan contained individualized elements to address the inmate's decompensated state but mentioned treatment plan modifications did not appear to have occurred. The most recent progress notes described the inmate as incoherent with poor grooming and hygiene.

Findings

This inmate was referred to DMH and remained on the wait list for approximately three months. During that period, he remained with significant psychotic symptoms as were previously described. Although it appeared that the inmate was gravely disabled, it was determined that he was not appropriate for a Keyhea order. Fortunately the inmate was amenable to taking his medications and his symptoms somewhat improved.

This inmate required DMH referral for intermediate care; DMH acute care referral should also have been considered in light of the inmate's symptomatology. It was unclear if the treatment plan had been modified to address the inmate's needs while he awaited DMH transfer.

**Inmate J**

This inmate was transferred to DMH on 7/19/10 for inpatient treatment. His medical record indicated that he had an extensive history of ingesting foreign objects, with multiple MHCB admissions and thirty incidents of suicidal gestures. A psychological assessment dated 10/12/10 provided a primary diagnosis of Borderline Personality Disorder and an additional diagnosis of Dysthymic Disorder. The inmate reportedly had

no incidents of self-injurious behavior from the time of DMH admission until 10/26/10. The DMH discharge recommendations were limited to medication management, which included Zyprexa and Cogentin. These medication orders were continued upon the inmate's return to MCSP.

A treatment plan dated 11/3/10 indicated that the inmate was provided with a diagnosis of Schizoaffective Disorder bipolar type. A note dated 11/3/10 documented the inmate's compliance with individual and IDTT meetings and group therapy. A Form 7388, the checklist for DMH referral, dated 11/3/10 noted that the inmate met none of the criteria for DMH referral consideration.

Progress notes dated 11/8/10 and 11/9/10 described the inmate as stable. The psychiatrist saw him on 11/10/10 when he reported experiencing ongoing anxiety and his Zyprexa was increased. An updated plan on that date provided an additional diagnosis of Dysthymic Disorder. The Form 7388 again noted that the inmate did not meet any criteria for higher level of care referral consideration.
The inmate was hospitalized in the MHCB from 11/23/10 to 11/25/10 after reporting thoughts of self-harm. A psych social worker note dated 1/19/11 indicated that the inmate was stable and involved in outdoor volleyball.

Findings

The inmate had an extensive history of self-injurious behavior; much of this behavior was consistent with a primary diagnosis of Borderline Personality Disorder. The inmate apparently functioned well while hospitalized at DMH and it appeared that his behavior had improved and stabilized since his return from DMH. DMH treatment recommendations were limited to medication recommendations, which were continued after the inmate's return to CDCR. He appeared to be receiving mental health services at the appropriate level of care.

**Inmate K**

This inmate had a history of inpatient treatment at Patton State Hospital as he was deemed incompetent to stand trial. His medical record was reviewed as he had participated in less than 50 percent of offered activities. A treatment plan dated 12/14/10 indicated that the inmate had been provided with a diagnosis of Bipolar Disorder NOS. The Form 7388, the checklist for DMH referral, noted that the inmate did not meet any criteria for higher level of care referral consideration; however, a review of the medical record revealed that the inmate had only attended approximately 33 percent of offered activities.

Progress notes during November 2010 described the inmate as exhibiting irritability, labile mood, pressured speech and paranoid ideation. It appeared that he was maintained at the 3CMS level of care for a significant period of time, but was changed to the EOP level of care on or about 11/30/10. He was provided with a diagnosis of Depressive Disorder NOS at that time.

Findings

Although available data indicated that the inmate attended less than 50 percent of offered activities, there was no indication that this information was recognized by the IDTT as this was not noted when the IDTT considered whether the inmate met referral criteria. Documentation indicated that staff was responsive to the inmate's clinical presentations and, consequently, the inmate was maintained successfully at the 3CMS and ultimately the EOP levels of care.

EXHIBIT F
California Medical Facility (CMF)
January 31, 2011 – February 2, 2011

**Inmate A**

This inmate was housed in the administrative segregation EOP unit.  He was a transgendered individual who arrived at CMF on 3/8/10.  He had a history of two self-injurious incidents by cutting; the last occurred in 2007.  The inmate was provided with diagnoses of Major Depressive Disorder, severe, recurrent with psychotic features, Cocaine Dependence, Attention Deficit Hyperactivity Disorder, Antisocial Personality Disorder, Borderline Personality Disorder, and Gender Identity Disorder.

The inmate was housed in administrative segregation due to two assaults on correctional officers;   one of the assaults occurred in the ASU.  The inmate was serving a SHU term that expired in February 2012.

An updated IDTT meeting that took place on 11/3/10 determined that the inmate met at least four criteria for consideration of referral to a higher level of care; this was documented on the Form 7388, the checklist for DMH referral.  It appeared that the inmate's mental status was negatively affected by prolonged administrative segregation isolation; he had been housed in administrative segregation for 17 months at the time of the site visit, and had 15 months remaining.  The inmate had reportedly exhibited gradual decline in his level of functioning during the prior six months, as well as increased delusional thinking, lability and impulsivity, having thrown a substance at a nurse during a medication pass in October 2010.  An 11/3/10 IDTT meeting referred the inmate to SVPP.

Although the inmate was previously referred to DMH, a 12/24/09 IDTT meeting rescinded the referral.  The primary clinician's note stated the following:  "I have worked with this patient since 11/4/09 in ASU and have never seen him in distress or manifesting an Axis 1 condition.  Chart indicates he was previously psychotic and delusional as a result of depression.  PT has reported on several occasions that he is calm in ASU as he is away from the politics and boyfriends which destabilize him.  Reports that he typically goes to DMH to effect a housing move, either to flee or get closer to a boyfriend.  Axis 2 issues are prominent – consulted with psychiatrist who was in general agreement to remove this patient from the SVPP waitlist where he is #211. The patient had requested to be removed from the list several weeks ago and remains in favor of being removed."

A subsequent IDTT meeting on 9/14/10 did not identify any DMH referral consideration criteria on the Form 7388.  At that time the inmate was described as presenting with dramatic and loud behavior, with euphoric mood with occasional auditory hallucinations.  It was additionally noted that the inmate had difficulty appropriately dealing with other inmates as to his sexuality.

An addendum Form 7388 completed on 11/30/10 indicated that the inmate had presented earlier in the month with markedly disorganized speech and paranoia.  He was referred to SVPP ICF due to gradual decompensation after he threw a substance at a female staff member.

The primary clinician's progress notes dated 1/7/11 documented that the inmate reported that his grandmother knew Al Capone, as well as other improbable statements. The primary clinician opined that the inmate was doing well and may have been using grandiose delusions as an escape or fantasy. Neuropsychological testing was ordered to help rule out neurological deficits, memory loss or amnesia due to multiple head injuries as a source of the inmate's condition; the test results were pending at the time of the site visit.

The primary clinician documented on 1/14/11 that the inmate was stable and that the inmate's prominent issues were due to personality disorder symptoms. Although the progress note dated 1/7/11 indicated that the inmate presented with grandiosity, it was difficult to determine the extent of the symptoms as there was an element of truth in his statements. He reportedly had refused to attend groups and was noted pacing in his cell.

The inmate was consistently followed by the primary clinician who reported that he had sporadic group attendance, problems interacting with peers in the unit, and paced in his cell but there was no evidence of psychosis noted. He was described as stable in the administrative segregation EOP after 28 months, and his mental health difficulties were believed to be a function of long administrative segregation isolation.

Psych tech notes were documented in the medical record for 1/10/11 to 1/14/11, 1/18/11, 1/19/11, 1/20/11, and 1/21/11.

<u>Findings</u>

This inmate had a long administrative segregation term for assaulting staff and was referred to SVPP during 2009, but the referral was rescinded on 12/24/09. As of 11/30/10, he had again been referred to SVPP. The inmate was followed twice weekly by the primary clinician, and there were daily psych tech rounds and monthly IDTT meetings. The inmate was receiving appropriate mental health services at the EOP level of care, and a medical record review indicated that he had received increased clinical contacts and IDTT meetings as a result of his DMH wait list placement. Primary clinician notes also suggested that personality disorder issues were primary in the inmate's clinical presentation.

**Inmate B**

This EOP inmate was housed in the ASU. He had multiple MHCB admissions due to superficial cutting and overdosing incidents. He reportedly threatened to harm someone and had a history of throwing substances at staff, which resulted in multiple disciplinary infractions. The inmate also had a long history since childhood of mental health treatment and substance abuse. He overdosed while at KVSP, at first stating that it was intentional and subsequently reporting that it was accidental. He was admitted to DMH during 2005, including one admission that occurred after an overdose, and had multiple MHCB admissions at NKSP. The inmate also presented with delusional thinking; he

believed that a piece of metal lodged in his hand was utilized by former gang members to monitor his behavior and thoughts.

The inmate's most recent MHCB admissions occurred between 1/30/10 and 2/17/10 and between 2/19/10 and 3/15/10. The DMH discharge summaries opined as to the presence of Malingering and questioned the presence of a mood disorder. His discharge diagnoses were Polysubstance Dependence and Antisocial Personality Disorder.

A review of the inmate's medical record documented that he was seen for clinical contacts twice weekly pending ICF referral, and was reportedly stable in the administrative segregation EOP unit during that time. An undated Form 7388, the checklist for DMH referral, noted that the inmate had met one of the criteria for higher level of care referral consideration; it also indicated that the inmate had been referred to SVPP ICF and had been on the wait list for approximately 14 months. The inmate had six or seven MHCB admissions during 2009. At the IDTT meeting update that occurred on 1/5/11, there was discussion as to removing the inmate from the SVPP ICF wait list.

The inmate was not treated with psychiatric medications at the time of the site visit. Primary clinicians saw him twice weekly. There was documentation of daily psych tech rounds and monthly IDTT meetings.

<u>Findings</u>

This inmate had been on the SVPP wait list for approximately 14 months, and the IDTT was considering rescission of the DMH referral. Although medical record documentation indicated that the inmate appeared to be stable, there was the potential for impulsivity due to the inmate's low frustration tolerance, paranoia and irritable mood. The inmate was not treated with psychotropic medications. Documentation indicated that he was seen twice weekly by the primary clinician and there were monthly IDTT meetings. There was also documentation of daily psych tech rounds.

**Inmate C**

This EOP inmate was housed in an EOP housing unit. He had a significant and long history of methamphetamine abuse with auditory and visual hallucinations prior to his CDCR incarceration. He also had a history of suicide attempts during 2003 and 2007.

The inmate was admitted to ASH on 8/11/10 and was discharged on 9/15/10. Prior to his DMH admission, he had reportedly lost weight and had poor hygiene. The inmate also presented with auditory hallucinations, mood instability, racing thoughts and delusional thinking, believing that others could read his mind. The inmate had been poorly compliant with medications due to probable medication side effects.

The DMH discharge summary indicated that the inmate did not have a qualifying mental illness requiring treatment in ASH at the inpatient level. The discharge summary further stated that the inmate was functioning adequately. DMH discharge diagnoses included

Amphetamine Induced Psychotic Disorder with hallucinations, Polysubstance Dependence, Malingering and Antisocial Personality Disorder.

An IDTT meeting was conducted on 10/13/10 following the inmate's return from DMH. CMF clinicians noted that the inmate presented with confusion as to his orientation to place, paranoia, auditory hallucinations and depression with anxiety. The inmate was provided with diagnoses of "Substance-induced psychotic disorder with hallucinations," Major Depressive Disorder, recurrent, moderate, Amphetamine Dependence, and Antisocial Personality Disorder.

A primary clinician progress note dated 12/15/10 documented psych tech observations that the inmate had very poor hygiene and self-care; the inmate did not shower or leave his room to eat without custody prompting. The progress note further stated that the primary clinician assessed the inmate's condition as unchanged, and it was recommended that he remain at the EOP level of care.

On 1/5/11 the inmate was seen in the IDTT when he reportedly presented with poor hygiene and mildly disorganized thinking. The Form 7388, the checklist for DMH referral, identified one of the criteria for higher level of care referral consideration. The IDTT note stated that the inmate appeared at baseline and there was consideration of placement at CSATF. The inmate was retained in the EOP.

The primary clinician documented in a progress note dated 1/12/11 that the inmate reported a worsening of auditory hallucinations and of seeing insects in his television.

<u>Findings</u>

The inmate did not appear to be functioning well since his return from ASH, where he had been hospitalized for one month. CMF clinicians documented that the inmate remained with auditory and visual hallucinations, poor activities of daily living (ADLs), poor group participation, and tangential thought processes. His hygiene was poor and his filthy cell required disinfection. Of concern was the ASH discharge summary which stated that the inmate did not have a mental illness other than symptoms related to his history of substance abuse; the ASH discharge summary conclusions should have been questioned or challenged given the inmate's poor level of functioning following his return from ASH. It appeared appropriate that the IDTT provided an additional diagnosis of Major Depressive Disorder.

**Inmate D**

This EOP inmate had a second SVPP admission from CMF following a CCAT hearing. His Keyhea order expired while he was hospitalized at DMH due to a lack of communication; DMH reportedly thought that the Keyhea order had previously expired.

The inmate had a history of multiple DMH admissions. He was admitted to Patton State Hospital from December 2004 to May 2005 for restoration of competency to stand trial.

He had also been admitted to the DMH APP at Vacaville from RJD where he presented with disorganization, flat affect and uncooperative behavior (he refused to eat, shower or respond to questions). After his transfer to the hospital, his symptoms continued and treating clinicians questioned whether he was compliant with his medications. The treatment team also questioned the validity of his symptom presentation. He was discharged from the APP to an MHCB.

The inmate had a prior SVPP hospitalization that occurred during much of 2009. The discharge summary indicated that he had been discharged to CDCR after "having reached maximum benefit." A Keyhea order for grave disability remained active until 6/16/10. Discharge diagnoses included Schizophrenia, undifferentiated type, Polysubstance Abuse, Personality Disorder NOS, and possible Developmental Disorder.

CMF presented the inmate's case to the CCAT hearing on 1/26/10 after the inmate was discharged from SVPP. After his return to CMF, he was unable to adequately function in the EOP. He rarely attended groups, and presented with isolative behavior, volatility with impulsivity, unpredictable and odd behavior, and poor hygiene. He also made inappropriate sexual comments. The second referral requested neuropsychological testing to evaluate the inmate for possible developmental deficiencies and for a trial of Clozaril. The CCAT decision was to again refer the inmate to SVPP.

The inmate was admitted to SVPP and was hospitalized there between 3/9/10 and 7/26/10. The SVPP discharge summary stated that neuropsychological testing demonstrated that the inmate's pre-morbid level of global cognitive functioning was estimated to be in the below average range, and his neuropsychological functioning was described as moderately impaired. The inmate refused laboratory testing necessary for Clozaril treatment. He had poor medication compliance during his DMH hospitalization, and, as previously stated, his Keyhea order lapsed during this hospitalization. He also exhibited poverty of speech, inappropriate affect with disruptive behavior. His discharge diagnoses were Psychotic Disorder NOS, Polysubstance Dependence and Antisocial Personality Disorder. He was discharged with the following medications: Risperdal Consta 50 mg intramuscular every two weeks and Thorazine 100 mg orally as needed for agitation.

After his return to CMF on 8/25/10, the inmate initially refused treatment and continued to display bizarre behavior. However, after a medication adjustment and other therapeutic interventions including increased clinical contacts and staff prompting, the inmate's group attendance increased by 50 percent during the most recent three months. A primary clinician noted on 12/29/10 that the inmate presented with matted hair with an overall unkempt appearance. The inmate reported auditory hallucinations, but exhibited no evidence of delusional thinking. He was reportedly compliant with medications. It was recommended that the inmate remain at the EOP level of care.

The IDTT meeting note dated 12/29/10 indicated that the inmate had a pending release date of 9/4/12 and would require a Mentally Disordered Offender (MDO) evaluation. Although the inmate remained with residual symptoms of mental illness and required prompting, he exhibited improved self-care and attended his primary clinician sessions

and some groups. The Form 7388, the checklist for DMH referral, indicated that the inmate did not meet any criteria for higher level of care referral consideration. However, he continued to exhibit chronic psychiatric symptoms. The IDTT meeting determined that the inmate no longer required an alternative treatment plan at that time.

Findings

This inmate had two recent DMH placements and was subsequently discharged to the specialized EOP located in the N-1 housing unit. The CMF mental health staff appropriately utilized the CCAT process, as they were concerned that the inmate had been prematurely discharged from DMH. This resulted in a second DMH admission, and some neuropsychological testing was conducted during this admission.

The inmate appeared to have benefitted more from the specialized EOP at CMF when compared to his functioning while in DMH as he attended group therapy and had improved self-care at the specialized EOP. He appeared to be receiving care at the appropriate level in the specialized EOP at CMF. Although the Form 7388 indicated that the inmate did not meet higher level of care referral consideration criteria, the inmate continued to exhibit chronic symptoms of mental illness.

**Inmate E**

This inmate was housed in L-1, a mainline EOP unit. He had diagnoses of Schizophrenia disorganized type, Amphetamine Abuse and Alcohol Abuse. He was prescribed Haldol 10 mg/day and Remeron 45 mg/day. A quarterly IDTT meeting conducted on 1/12/11 was clinically relevant and informative. A review of inmate activities indicated that during September 2010, he was scheduled for 59 hours of structured therapeutic activities, of which 50 hours were offered and 40 hours were received. During November 2010, the inmate was scheduled for 41 hours, of which 28 hours were offered and 23 hours were received.

Findings

The inmate's IDTT, diagnoses and medication management were clinically appropriate. He timely received his medications, including Remeron, which were administered at HS. However, the provision of structured therapeutic activities was inadequate for November 2010 as treatment or custody staff cancelled 13 hours. As such, the inmate was not offered the required ten hours of weekly structured therapeutic activities during November 2010.

**Inmate F**

This inmate was provided with diagnoses of Schizophrenia paranoid type, Paraphilia NOS and Antisocial Personality Disorder. He was prescribed Remeron 25 mg/day and Risperdal 5 mg/day. He had had a stroke 15 years ago. A primary clinician progress note dated 12/28/09 stated that the inmate had three past suicide attempts; the last attempt

occurred in 1997. However, a suicide risk evaluation dated 11/10/10 only documented two past suicide attempts by hanging, with the last one occurring in 1996. A review of structured therapeutic activities for November 2010 documented that 56 hours had been scheduled, of which 41 hours were offered and 35 hours were received. This information indicated that the inmate received 85 percent of his structured therapeutic activities but it was noted that 30 percent of structured therapeutic activities had been cancelled.

Findings

The mental health care and treatment provided to the inmate appeared to be adequate although there were medical record discrepancies as to the number of past suicide attempts. The inmate appeared to be clinically stable. The abbreviated IDTT form provided minimal information and did not document the reasons for a medication change from Remeron to Vistaril.

**Inmate G**

This EOP inmate entered the CDCR in November 1979 and was transferred to CMF during November 2008. He had been an EOP participant since December 1997. His most recent IDTT meeting was dated 11/10/10. His provided diagnoses included Schizophrenia, paranoid type in partial remission, Alcohol Dependence, Depressive Disorder NOS, and Personality Disorder NOS. The medical record also documented that the inmate had a nephrectomy on 12/10/10. The inmate had previously been treated with Clozaril but experienced complications and his medication was changed to Risperdal in November 2010. A general mental health chrono documented the inmate's participation in the Lifer's group from January 5, 2010 through October 28, 2010. His structured therapeutic activities for November 2010 documented that 59 hours were scheduled, of which 44 hours were offered, 40 hours were received, and 12 hours were excused.

Findings

This inmate's care and treatment appeared to be adequate for his mental health needs. The medical record described him as stable. However, there was little information as to his actual participation in or the content of the Lifer's group.

**Inmate H**

This EOP inmate was housed in the M-1 housing unit. He was admitted to the CDCR on 7/31/03 and was transferred to CMF on 9/20/05. He was placed in the EOP level of care on 9/17/09. A mental health evaluation dated 11/19/10 reported diagnoses of Psychotic Disorder NOS and Antisocial Personality Disorder; he was evaluated as having a global assessment of functioning (GAF) of 38. The inmate was prescribed Prozac 10 mg/day, Thorazine 40 mg/day, Cogentin 3 mg/day and Vistaril 50 mg/day. The IDTT indicated that the inmate was only involved in 60 percent of his structured therapeutic activities and was referred to a higher level of care.

Findings

This inmate's care and treatment appeared to be adequate for his mental health needs. The treatment team had determined that the inmate would benefit from referral to a higher level of care and he was awaiting transfer at the time of the site visit.

**Inmate I**

This EOP inmate was housed in the administrative segregation EOP unit in the I-3 housing unit. The inmate transferred to CMF on 10/20/09 and to the administrative segregation EOP unit on 9/27/10. His mental health history was significant for seven suicide attempts; the last occurred in 2005. He was treated with Haldol 2.5 mg/day, Geodon 160 mg/day and Celexa 10 mg/day. The inmate reportedly had sporadic medication compliance. He took no medications during August or September 2010. A review of the medication administration record documented blank spaces for two medications in December 2010 but there was no documentation of whether these compliance issues were addressed.

The inmate was provided with diagnoses of Psychotic Disorder NOS and Depressive Disorder NOS in remission as noted by the IDTT meeting on 9/22/10. Although the medical record was very difficult to interpret, it appeared that the inmate was receiving mental health services at the 3CMS level of care from 3/25/08 through 12/12/09. He was transferred to the MHCB for suicidal ideation and auditory hallucinations and his level of care was subsequently changed to EOP on 1/21/10.

The inmate's structured therapeutic activities for June 2010 indicated that he had 46 hours scheduled, of which 29 hours were offered and 17 hours were received. During July 2010, 35 hours were scheduled, of which 27 hours were offered and 21 hours were received.

On 8/13/10 the primary clinician documented that the inmate had complaints of hearing voices and transient suicidal ideation with loud and pressured speech. However, he exhibited no evidence of a thought disorder and was referred to the IDTT for a change from EOP to 3CMS level of care. A psychiatrist who saw the inmate on 8/18/10 stated that he would reorder the inmate's medications with administration at HS because the inmate had been refusing medications during the daytime due to Ramadan. On 9/22/10 the inmate was seen by the EOP treatment team as his level of care had been changed to 3CMS; at that time he reportedly experienced decompensation. The inmate was transferred to the administrative segregation EOP unit on 9/27/10 where he remained at the time of the site visit. No treatment plan update since the inmate's administrative segregation placement was located in the medical record.

Findings

This inmate's care and treatment appeared to have been inadequate as his level of care had been changed from EOP to 3CMS and back to EOP because of decompensation at

the 3CMS level of care. His history and functioning from December 2009 included admission to the MHCB, change in level of care to EOP, change back to the 3CMS level of care, and change again to the EOP level of care with placement in the administrative segregation EOP unit. It was unclear from the medical record why the inmate was placed in the ASU and whether this placement was due to his deterioration in mental health functioning. Although the MAR reflected medication noncompliance, there was a lack of documentation of whether this noncompliance was noted or referred to mental health for follow-up.

**Inmate J**

This EOP inmate was housed in the administrative segregation EOP in the I-3 housing unit. The inmate had been admitted to the CDCR on 4/15/08 and had been placed in the ASU on 9/18/10 for breaking window glass, some of which went into a correctional officer's eye. The inmate also reportedly had been observed urinating in public and defecating in the yard and had been referred to the SVPP ICP for diagnostic clarification and neuropsychological testing to rule out dementia. He was number 189 on the SVPP waitlist. Although several diagnoses were under consideration at CMF, he had been provided with diagnoses of Major Depressive Disorder, severe with psychotic features and Personality Disorder NOS.

A 115x chrono dated 8/20/10 noted that the inmate had a mental illness that was not treated with medications and that the illness contributed to his disciplinary infraction. At an IDTT meeting on 10/26/10, the treatment team determined that the inmate should remain at the EOP level of care. Plans were also outlined for the inmate to be seen two times weekly by his primary clinician and also on the third watch by a psych tech. On 12/28/10 an alternative treatment plan noted that the inmate had been referred to SVPP three months prior, and that he continued to see his primary clinician two times weekly with monthly IDTT meetings. The IDTT revised the reasons for ICF referral; the modified referral indicated that the inmate was unable to adequately function at the EOP level of care and would benefit from a comprehensive treatment program.

A review of the inmate's MARs noted blank spaces from 12/30/10 through 1/3/11 for Celexa.

<u>Findings</u>

The inmate's care and treatment appeared to be inadequate largely due to the need for diagnostic clarification and the inmate's inadequate treatment activity participation. He was reportedly unable to function at the EOP level of care and was placed in administrative segregation. A 115x indicated that the inmate's mental state contributed to the disciplinary infraction that resulted in his administrative segregation placement. The inmate remained on the SVPP ICP transfer wait list. Review of the MAR revealed blank spaces, indicating possible medication noncompliance.

**Inmate K**

This inmate was receiving mental health services at the EOP level of care in the N-1 housing unit.  He had recently returned from the DMH VPP.  The inmate had a significant history of transfers between the EOP level of care and DMH programs.  He had been admitted to ASH from 2/5/10 through 9/9/10; he was provided with diagnoses of Generalized Anxiety Disorder, Amphetamine Dependence and Borderline Personality Disorder.  He had a history of three past suicide attempts; the last incident occurred during the ASH admission.  The inmate was returned to the CMF N-2 housing unit for approximately three weeks and was subsequently admitted to the DMH VPP.  This admission lasted from 9/29/10 through 11/9/10.  His diagnoses at that time were Psychotic Disorder NOS, Anxiety Disorder and Borderline Personality Disorder.  A review of his laboratory studies for valproic acid levels indicated levels of 55 mcg/mL on 12/30/09 and 53 mcg/mL on 1/15/10.

After the inmate's discharge from the DMH VPP on 11/9/10, he was admitted to the N-1 housing unit.  An IDTT meeting on 11/19/10 described the inmate as having anxiety, recent suicidal ideation and poor coping skills.  He was provided with diagnoses of Substance Induced Psychotic Disorder with hallucinations, Generalized Anxiety Disorder and Polysubstance Dependence.  He was prescribed Risperdal and Depakote.

<u>Findings</u>

It was unclear from the medical record whether the inmate was considered for transfer to an ICF program.  His treatment history was significant for placement at the EOP level of care in the N-3 housing unit, transfer to ASH, transfer back to the EOP program in the N-2 housing unit, transfer to DMH VPP, and ultimately, transfer to the N-1 EOP program where he remained at the time of the site visit.  The inmate's care and treatment appeared to be adequate for his current mental health needs as of November 2010; however, he remained with significant symptoms and his diagnoses essentially changed with each transfer.  The most recent diagnosis of Substance Induced Psychotic Disorder did not appear appropriate given his incarceration history.

**Inmate L**

This EOP inmate was housed in the ASU.  He was incarcerated in the CDCR on 3/24/08 and was transferred to CMF on 10/14/10.  The inmate was referred by CMC to the SVPP ICP on 9/22/10, prior to his transfer to CMF.  He had MHCB admissions on 7/30/10 and 8/19/10 for agitation and received three 115 disciplinary infractions for fights during January, June and December 2010.  An IDTT on 12/21/10 indicated that the inmate was provided with the diagnoses of Schizophrenia disorganized type and Personality Disorder NOS.  He began refusing his Trilafon and he was again referred to DMH on 12/20/10.

The inmate had an alternative treatment plan in place which indicated that he was to see his primary clinician two times weekly, with psych tech checks on the third watch and monthly IDTT meetings.  A suicide risk evaluation on 12/22/10 estimated the inmate's

level of suicide risk as low for acute risk factors and moderate for chronic risk factors. The inmate's structured therapeutic activities for November 2010 included 44 hours of scheduled activities, of which 34 hours were offered and 14 hours were received.

<u>Findings</u>

This inmate's care and treatment were inadequate because he had not been transferred to DMH despite two referrals. He was initially referred due to assaultive behavior and because his mental status had deteriorated. He was transferred from CMC to CMF. A second referral was initiated because of the inmate's continuing deterioration and medication refusal. The inmate was on the DMH wait list for SVPP ICF.

**Inmate M**

This EOP inmate was housed in the N-1 enhanced EOP unit, where he had been housed for approximately four months. He was diagnosed with Post Traumatic Stress Disorder, Schizoaffective Disorder and Polysubstance Dependence. He was treated with Abilify.

The inmate had significant psychosocial stressors that included his mother's illness and a recent denial of the appeal of his substantial sentence. He exhibited symptoms that included a belief that the walls had cameras and that someone under his bed was talking to him. The inmate's history was significant for inpatient psychiatric hospitalizations and abuse by his brother. He also had five prior suicide attempts; the most recent occurred in 2000.

The inmate's treatment plan included group therapy, which was viewed as a means to assist in reality testing. However, the inmate refused to attend the Lifer's group, which was consistent with his paranoia symptoms. He was followed consistently by his primary clinician. During October 2010 the inmate's group attendance decreased to 61 percent. He also reported command hallucinations to kill himself but denied suicidal plans; the inmate's suicide risk was nonetheless evaluated as low risk. Staff determined that the inmate was possibly at his baseline with the assistance of medications; they also noted his agitation but reported that he had relatively good impulse control.

On 11/19/2010 the inmate reported experiencing an increase in paranoia, but stated that he did not want to be transferred to DMH and would attempt to attend groups.

<u>Findings</u>

The inmate was paranoid with delusional thinking and limited programming. His significant suicidal history and current mental status made his management in an outpatient setting difficult. The staff's assessment of his suicide risk may have underestimated his risk of self-harm. Although his treatment plan viewed groups as potentially useful, it was possible that the inmate was at times too paranoid to participate without a resulting exacerbation of his symptoms.

**Inmate N**

This EOP inmate arrived at CMF during June 2010. He was housed in the N-1 housing unit at the time of the site visit. He had previously been treated at the 3CMS, EOP and ICF levels of care. He was diagnosed with Bipolar Disorder, most recent episode manic, Dementia NOS and Alcohol Dependence. He was treated with Geodon. The inmate also had a hearing impairment.

The staff had recently assessed this inmate as having a dysphoric mood, and commented that he spoke loudly secondary to his hearing impairment. His poor attendance in groups was also noted. He only attended 17 percent of his groups; staff reported that the inmate "claimed" not to hear the officer.

A 12/3/10 progress note indicated that the inmate would be referred to ICF at an upcoming IDTT meeting. A progress note dated 12/17/10 quoted the inmate as saying that he did not "want to go to a higher level of care." Progress notes from July 2010 documented the inmate's poor group attendance and possible IDTT referral.

Findings

This inmate with multiple impairments was followed consistently while he was housed in the EOP in the N-1 housing unit. The progress notes indicated staff and inmate reluctance to initiate a DMH referral, which appeared to be clinically warranted.

**Inmate O**

This EOP inmate was housed in the N-1 housing unit. He arrived at CMF in 2000 and had a history of four DMH hospitalizations due to suicidal ideation. He was hospitalized at DMH from 7/1/10 to 7/26/10 after he reported suicidal ideation and was found with razors in his cell.

His history was also significant for a history of auditory hallucinations of his mother's voice, command hallucinations to hurt himself and nightmares associated with childhood abuse. Prior to his incarceration, he was involuntarily committed three times to a psychiatric hospital. The inmate was also HIV positive. Staff indicated that they believed that he would benefit from more frequent clinical contacts and the smaller environment of the N-1 housing unit.

Findings

Mental health staff consistently followed this inmate during his EOP treatment in housing unit N-1. The inmate also appeared to benefit from the environment of N-1, which housed severely mentally ill inmates more commonly seen in an inpatient psychiatric unit than in the typical prison-based EOP.

EXHIBIT G
California State Prison, Solano (CSP/Solano)
March 22, 2011 – March 24, 2011

**Inmate A**

This 3CMS inmate was housed in the general population. He was provided with a diagnosis of Major Depressive Disorder, recurrent, mild; an alternative diagnosis of Schizoaffective Disorder was also present in the medical record. He was not treated with psychotropic medications at the time of the site visit. His medical record was reviewed as he had been considered for DMH referral due to criterion five (less than 50-percent participation); however, he was not referred to DMH.

The inmate had been housed at CSP/Solano since December 2009 and was a participant in the 3CMS program since that time. At the beginning of the monitoring period, he was treated with Trilafon, Remeron and Paxil. Progress notes indicated that the primary clinician and psychiatrist consistently followed him; he was also involved in group therapy that the recreation therapist conducted. He was described as calm without evidence of depression or psychosis. An IDTT meeting conducted on December 8, 2010 documented that he reported medication noncompliance and mild depressive symptoms. The Form 7388 indicated that he met DMH referral consideration criteria as to less than 50-percent participation; however, it was determined that he did not require referral.

Findings

It appeared that the inmate was appropriately continued in the 3CMS program; it did not appear that DMH referral was indicated at the time of review. The treatment team considered DMH referral criteria and completed the Form 7388, the checklist for DMH referral. They noted that the inmate was noncompliant with medications; he was seen by the psychiatrist outside of the monitoring period for follow-up when his medications were discontinued.

There was documentation that the primary clinician and psychiatrist at least saw the inmate quarterly. Although the treatment plan included individualized elements, it did not include as a problem the issue of medication noncompliance, which appeared to be a chronic issue for the inmate.

**Inmate B**

This 3CMS inmate was housed in administrative segregation. He was provided with a diagnosis of Mood Disorder NOS with possible borderline intellectual functioning. He was not treated with psychotropic medications at the time of the visit. His medical record was reviewed at plaintiffs' attorneys' request as to his appropriate level of care.

The inmate transferred to CSP/Solano on 2/11/10, from CMF; he had been receiving EOP level of care in the past and was downgraded to 3CMS prior to transfer. At the time of the site visit, he was housed in a general population unit and, due to victimization concerns, had been granted a single cell chrono in February 2011; he had a history of prison rape and possible cognitive deficiencies. The most recent primary clinician

progress note indicated poor adaptation to the general population and disruptive behavior. A Clark evaluation was not located in the medical record.

<u>Findings</u>

The inmate required a Clark evaluation. The treatment plan did not address his difficulties managing in the general population with his current symptoms. A Form 7388 was completed and did not indicate any DMH referral consideration criteria. This case was discussed with supervisory staff for further evaluation.

**Inmate C**

This 3CMS inmate was not prescribed psychotropic medications at the time of the site visit. He had been housed at CSP/Solano since 8/13/09 and was receiving mental health services at the 3CMS level of care since that time. The IDTT timely saw the inmate. Although he was maintained in the MHSDS, the treatment plan indicated that he did not have a major mental illness. The treatment plan was not completed appropriately and did not include a rationale for maintaining the inmate at the 3CMS level of care. A Form 7388 was located in the medical record.

The primary clinician and psychiatrist did not see the inmate timely. Clinical contact documentation indicated that the treatment provided to him was consistent with his level of stability; however, the clinician indicated that he would benefit from certain therapeutic interventions that were not utilized.

<u>Findings</u>

The IDTT timely saw the inmate, but he was not seen timely by his primary clinician and psychiatry. The most recent treatment plan was inadequate in addressing the inmate's specific clinical needs and the primary clinician had not utilized interventions that might have benefitted him. Despite these issues, it appeared that the inmate was stable at the time of the site visit.

**Inmate D**

This 3CMS inmate arrived at CSP/Solano on 10/16/09. He was provided with a diagnosis of Schizoaffective Disorder. He was prescribed Thorazine 200 mg/day and Remeron 30 mg/day. Although he was seen by the IDTT, the meeting was not timely. All necessary participants attended the IDTT meeting. The primary clinician saw the inmate timely but the content of primary clinician progress notes indicated that the contacts lacked significant therapeutic value. Also of concern was the repeated content of the progress notes; they were unchanged even when the inmate reported an exacerbation in symptoms. The psychiatrist saw the inmate timely; the content of the notes indicated that therapeutic interactions occurred.

Findings

The inmate was seen timely by psychiatry and his primary clinician. Documentation of primary clinician contacts indicated a lack of significant therapeutic intervention. The IDTT did not see the inmate timely. The treatment plan inadequately addressed the inmate's symptoms and diagnosis.

**Inmate E**

This inmate had been referred to DMH acute care. The MHCB IDTT determined that he met seven of the criteria for DMH referral consideration; however, the referral was rescinded. The inmate had been provided with a diagnosis of Schizoaffective Disorder bipolar type.

There was documentation in the medical record that indicated that the inmate had a history of exaggerating symptoms and he conveyed this information to MHCB staff. They indicated that he tended to exaggerate his symptoms, although the inmate experienced genuine psychosis. The inmate also reported that he had been attempting to gain admission to DMH following his reincarceration.

Although IDTT meetings were conducted timely, a CCI was not always in attendance. Treatment plans were generally clinically relevant but treatment options appeared to be limited to medication management and recreation therapy. After the MHCB IDTT rescinded the DMH referral, the inmate was subsequently referred to the EOP level of care.

Findings

This DMH referral was appropriately rescinded. The inmate received MHCB services in accordance with the Program Guide; however, actual therapeutic interventions appeared to be limited.

**Inmate F**

This inmate's case was reviewed at plaintiffs' attorneys' request, who reported that he had experienced medication and treatment problems that had negatively impacted his mental health. He was provided with a diagnosis of Mood Disorder NOS. A review of the medical record revealed that psychiatric contacts occurred timely with good documentation of clinical contacts. The inmate had multiple complaints as to possible medication side effects; the psychiatrist addressed these concerns. The primary clinician generally saw the inmate weekly except for a period between mid-February 2011 and mid-March 2011; however, the contacts usually occurred at cell front and documentation did not indicate that relevant clinical interaction occurred.

The treatment plan was inadequate as it did not address the inmate's specific treatment needs. Psych tech notes contained the same information for each note, despite the

inmate's repeated medication complaints and sporadic medication refusals. The notes appeared to have been preprinted, bringing into question the documentation's validity. At the time of the site visit, except for medication side effect concerns, the inmate was reportedly stable from a mental health standpoint.

<u>Findings</u>

There was adequate documentation that the psychiatrist saw the inmate timely, with appropriate medication management. However, the treatment plan was inadequate as it did not address the inmate's specific treatment needs. Primary clinician contact documentation indicated that little therapeutic intervention occurred; despite this, it appeared that the inmate was stable. There was a need for the development of clinically appropriate treatment planning; this plan might include group therapy, which could benefit the inmate.

**Inmate G**

This inmate was admitted to the MHCB on 3/3/11. He was provided with a diagnosis of Psychotic Disorder NOS. He was prescribed Risperdal 3 mg/day and Cogentin 2 mg/day. He exhibited disorganized and agitated behavior with crying at the time of MHCB admission. He also exhibited evidence of auditory hallucinations and delusional thinking during his MHCB hospitalization. All necessary evaluations were completed timely. The IDTT saw the inmate timely and the Form 7388 was completed. Despite the presence of documentation that five of the criteria for DMH referral consideration were noted, the inmate was not referred to DMH and no rationale for non-referral was provided.

Despite the significant psychiatric symptoms that the inmate presented, treatment interventions appeared to be limited to medication management. Psychiatry and the primary clinician saw the inmate timely; however, documentation of clinical contacts with the psychologist indicated that little therapeutic interaction occurred. The inmate was not referred to DMH, but was referred to the EOP level of care.

<u>Findings</u>

It appeared that the inmate was evaluated timely; however, there were concerns as to the care provided to him. The Form 7388 was not completed accurately and MHCB staff did not refer the inmate to DMH when it was clinically appropriate.

**Inmate H**

This inmate was admitted to the MHCB on 2/25/11. He was eventually admitted to DMH; however, the DMH referral did not occur until 11 days after the MHCB admission. Documentation in the medical record indicated that he presented with symptomatology that required referral earlier in the MHCB hospitalization. The inmate was actively psychotic and had exhibited evidence of significant deterioration, including

yelling at others, talking to himself, and presenting with frank delusional thinking.  He was provided with a diagnosis of Psychotic Disorder NOS.

The inmate was prescribed Risperdal, with a Geodon intramuscular injection provided if the Risperdal was refused.  He had a Keyhea hearing scheduled for 4/21/11.  The treatment plan relied heavily on medication management.  The inmate had not been provided with outside recreation yard during the month that he was housed in the MHCB awaiting a DMH acute care bed.

Findings

There was an inappropriate delay in referring this inmate to DMH acute care.  The treatment plan was inadequate in addressing his specific treatment needs, and the accompanying Form 7388 did not indicate appropriate reasons for DMH non-referral prior to the actual referral.  The primary modality of treatment was medication management; this inmate could possibly have benefitted from additional therapeutic interventions.

EXHIBIT H
San Quentin State Prison (SQ)
March 28, 2011 – March 30, 2011

**Inmate A**

This EOP inmate was housed in administrative segregation.  His primary psychiatric diagnosis was Depressive Disorder NOS; the medical record also mentioned an additional diagnosis of Impulse Control Disorder.  He was not treated with psychotropic medications at the time of the site visit.  He had been placed in administrative segregation as a result of assaulting his cellmate and increased violent ideation towards others.

The inmate apparently paroled from prison in June 2010 but returned to custody in September 2010.  Upon entry to SQ, he received a medical screening on 9/22/10 when he reported a history of depression.  His mental health history was remarkable for suicide attempts, as well as several family members who had also attempted suicide.  At the time of his mental health screening on 9/27/10, he reported suicidal ideation.  He also reported that he was treated with Seroquel in Alaska, where he reportedly lived in violation of the terms of his parole.  He reportedly exhibited symptoms of a mood disorder, including depressive and manic symptoms.  He was placed in the EOP on 10/2/10 and a placement chrono was submitted on that date.

The inmate exhibited depressive symptoms as a result of his return to prison and was hospitalized in the MHCB for stabilization following his arrival at SQ.  The Form 7388 that was completed on 1/7/11 indicated that he did not meet criteria for higher level of care referral consideration.  With few exceptions, the inmate had weekly contacts with the primary clinician.

The inmate expected to parole again on 4/1/11 and progress notes for March 2011 documented pre-release planning.  For example, on 3/18/11 the clinician noted the inmate's ambivalence as to his plans following prison release; he noted that the inmate expressed plans to engage in a treatment program but also noted that he had thoughts of absconding.  On 3/23/11, the primary clinician noted that the inmate was involved in the EOP and expressed excitement about his release planning.

There was also documentation that the psychiatrist was attentive to the inmate's post-release concerns; a progress note dated 3/4/11 discussed the inmate's diagnosis of Impulse Control Disorder, his social security income (SSI) application and post-release living arrangements.

Psych tech notes documented psych tech rounds and contained useful clinical information.
The treatment plan was generic in content.  Primary clinician progress notes were descriptive and adequately described treatment issues including depression, suicide risk, impulsivity and aftercare planning.

The inmate was interviewed.  He expressed appreciation to the mental health staff for assisting in his pre-release planning and for TCMP assistance in having his SSI reinstated.

Findings

The primary clinician, psychiatrist and IDTT consistently followed the inmate after his return to prison. He was appropriately stabilized in the MHCB during a crisis event. The inmate also received pre-release planning that was attentive to relevant clinical issues such as his treatment ambivalence and need for SSI reinstatement. Although the inmate's treatment plan was somewhat generic in content, the care that he actually received addressed relevant and individual clinical issues.

**Inmate B**

This EOP inmate was housed in administrative segregation. He was provided with diagnoses of Polysubstance Abuse, Psychotic Disorder NOS and Bipolar Disorder. He was prescribed Risperdal, Depakote and Remeron. He had an anticipated prison release date of the spring of 2011.

The inmate was hospitalized in the MHCB from 3/9/11 to 3/16/11. His admitting diagnosis was Psychotic Disorder NOS. He was admitted due to suicidal ideation with a plan to cut his neck with a razor; he also presented with homicidal ideation and auditory and visual hallucinations. He had a history of a suicide attempt that occurred on 12/24/09.

A progress note dated 3/15/11 stated that the inmate was homeless and without social supports when not incarcerated. He reportedly only remained in the community for six days prior to reincarceration. On the following day, a clinician noted that he was fearful about paroling in two weeks. Documentation indicated that staff had explored housing options with the inmate's parole agent on 3/21/11.

There appeared to be confusion as to the inmate's actual level of care; a progress note indicated that he was receiving mental health services at the 3CMS level of care and that IDTT meetings would occur at 90 day intervals. However, the only documentation of an IDTT meeting was the one conducted when the inmate was hospitalized in the MHCB.

Findings

There was a need for the inmate's diagnostic clarification. There also appeared to be some confusion as to his level of care. Despite these issues, the primary clinician and psychiatrist consistently followed the inmate. There was good documentation of clinically indicated pre-release planning.

**Inmate C**

This EOP inmate was housed in administrative segregation. He was provided with a diagnosis of Bipolar I Disorder and was prescribed Abilify and Depakote. He was scheduled to parole on 7/14/11. His mental health history was significant for a hospitalization at Napa State Hospital.

The inmate was reportedly originally scheduled to parole on 11/6/10. However, according to a 3/24/11 progress note, he was penalized and his parole date was extended for 360 days when, during a manic episode, he threw a tray of feces at a custody officer.

Progress notes indicated that mental health staff consistently followed the inmate for individual and group sessions. There was clinically relevant documentation of group therapy participation. Documentation also indicated that the staff addressed periods of poor individual and group therapy attendance during cell-front contacts. The inmate expressed concern with security procedures required to attend confidential out-of-cell sessions; he indicated that this influenced his refusal of mental health services.

Documentation indicated that mental health staff contacted the inmate's parole agent to discuss his need for housing upon release and to inform the agent of the inmate's difficulty in adequately functioning in supervised community settings. The inmate had reportedly attempted to hit a fellow resident at a residential facility; he thought that this person had given him a cold. Progress notes documented the inmate's failed attempts to apply for SSI and implied that he required assistance with this procedure; the notes did not indicate whether he had been referred to TCMP for assistance.

Findings

The primary clinician, psychiatrist and IDTT consistently followed the inmate. Documentation indicated that mental health staff had begun the process of assisting him with pre-release planning. However, documentation did not indicate that he had been referred to TCMP for assistance with the SSI application process.

**Inmate D**

This EOP inmate was provided with a diagnosis of Bipolar I Disorder, most recent episode depressed, moderate. He was prescribed Risperdal, Effexor and Remeron. He was scheduled for parole on 4/15/11. His mental health history was significant for homelessness, hospitalization at ASH from January 2010 to September 2010, bulimia, and a suicide attempt in 2006.

There was medical record documentation that the psychiatrist and primary clinician at times saw the inmate at cell front; it appeared that he was not brought to the clinic for these appointments although he had been ducated.

The inmate expressed considerable anxiety as to his pending prison release; this was a primary treatment focus as his parole date approached. He expressed concern that he would return to homelessness upon release from prison and resume his abuse of alcohol; he thus expressed the desire to remain in prison rather than returning to the community without a place to live. Although the inmate had received SSI benefits when in the community, he required assistance with their reinstatement. Documentation indicated that the inmate's parole agent was contacted on 3/21/11 to engage him in the inmate's parole planning; previously, on two prior occasions, the agent had been unsuccessfully

contacted.  There was no documentation of referral to TCMP for assistance with SSI reinstatement.

The Form 7388 completed at the most recent IDTT meeting indicated that the inmate did not meet criteria for higher level of care referral consideration.  The IDTT decided to retain the inmate at the EOP level of care as he had adjusted adequately with the services provided.

Documentation indicated weekly primary clinician contacts; with the exception of the lack of psychiatric contact in March 2011, the psychiatrist saw the inmate timely.

Findings

The primary clinician, psychiatrist and IDTT consistently followed the inmate, with the exception of a lapse in psychiatric contact in March 2011.  There was documentation that mental health staff appropriately focused, with limited success, on the inmate's pre-release planning issues; the inmate had an upcoming prison release date.

**Inmate E**

This EOP inmate was housed in the reception center.  He arrived at SQ on 12/9/10 and was screened on the day of arrival.  The mental health screen was also completed on 12/9/10; it noted that the inmate had a history of a suicide attempt and had been prescribed Remeron and Zoloft.  A suicide risk assessment dated 12/21/10 noted a number of risk factors and indicated that the inmate presented with low acute and moderate chronic risk for suicide.

Other progress notes indicated that the inmate had previously been treated at the 3CMS level of care.  He was previously provided with a diagnosis of Depressive Disorder NOS. It also appeared that he had only remained out of prison for two weeks before being rearrested in August 2009.

Documentation indicated that, due to custody restrictions of movement, mental health staff had difficulty evaluating the inmate in a confidential setting.  For example, the psychiatrist noted on 12/28/10 that the inmate had been scheduled for his first clinic visit; however, there was no movement on the inmate's housing tier due to a flood.

Progress notes documented that staff had addressed pre-release planning issues including a 1/25/11 psychiatric progress note that documented a discussion of housing, rehabilitation and recidivism topics.  Documentation also indicated that the psychiatrist and primary clinician consistently followed the inmate; however, documentation did not indicate that an IDTT meeting had occurred as of the time of the site visit.

<u>Findings</u>

The primary clinician, psychiatrist and IDTT consistently followed the inmate.  There also was pre-release planning documentation for the inmate, who had an upcoming release date.  However, at the time of the site visit, there was a lack of documentation as to an IDTT meeting.

EXHIBIT I
Deuel Vocational Institution (DVI)
February 8, 2011 – February 10, 2011

**Inmate A**

This inmate's case was reviewed as he had been considered for DMH hospitalization but was not referred. A treatment plan dated 12/28/10 provided diagnoses of Psychotic Disorder NOS and Polysubstance Abuse. The treatment plan indicated that the inmate would be seen weekly by the primary clinician and monthly by the psychiatrist. The inmate had been receiving mental health services at the 3CMS level of care since at least October 2010.

It appeared that the inmate was placed in the OHU until approximately 11/1/10. A progress note dated 11/9/10 described the inmate as presenting with irritability; at that time, he denied suicidal ideation. A psychologist progress note dated 11/29/10 documented the inmate's report that he wanted to be placed in the EOP. The clinician noted that the inmate appeared relatively stable, and the psychologist indicated that he/she did not concur with the opinion that the inmate required EOP level of care. The inmate was seen by a psychiatrist on 11/29/10. Psych tech notes from 12/4/10 to 12/10/10 contained little relevant clinical information and most of the notes were incomplete. Psych tech notes from 11/27/10 to 12/3/10 described the inmate's appearance and grooming as normal and stated that he appeared to be stable.

The inmate was placed in the OHU due to suicidal ideation on 12/3/10 and was released on 12/8/10. During this time, he reportedly received bad news regarding his mother's health. At that point, he reported auditory hallucinations instructing him to kill himself. He was placed in the OHU again from 12/30/10 to 1/1/11 after reporting suicidal ideation regarding the above- mentioned issues. The inmate was described as stable two days after this admission.

An additional OHU placement occurred between 1/8/11 and 1/10/11. Progress notes at that time documented the inmate's report of significant depression. He was prescribed Risperdal and Effexor at that time. Progress notes again indicated that the inmate was concerned about his mother's health. A psychologist progress note dated 12/17/10 described the inmate as stable; he was evaluated again on 1/7/11 by a psychologist who also reported the inmate to be stable.

The Form 7388, the checklist for DMH referral, was completed on 12/28/10; at that time the inmate met one of the criteria as to higher level of care referral consideration as he had three or more MHCB admissions during a six month period. The rationale provided for non-referral was the report that the inmate was attempting to gain entry to the EOP for "perceived secondary gains regarding SSI and more therapeutic treatment." Documentation further indicated that clinicians believed that the inmate did not have a serious mental illness but was motivated to "gain access to (the) EOP."

Findings

The inmate had a relatively recent history of repeated OHU placements as a result of his report of suicidal ideation; these symptoms reportedly resolved quickly following OHU

placement. Medical record documentation indicated that the clinical impression of this inmate was that his behavior was the result of secondary gain and that he did not present with evidence of a major mental illness. Primary clinicians and psychiatrists consistently followed the inmate. The IDTT appropriately considered DMH referral and determined that such placement was not warranted. The inmate appeared to be receiving mental health services at the appropriate level of care at the time of the site visit.

## Inmate B

This inmate was referred to SVPP for intermediate level of care on 7/20/10. He was accepted for admission on 7/30/10 and was included on the SVPP wait list at the time of the site visit.

Medical record documentation indicated that the inmate had a history of engaging in self-injurious behavior since February 2009. His clinical presentation usually included a blunted affect and concrete thinking.

The medical record provided documentation that the inmate was housed in the OHU from 5/3/10 to 5/6/10 due to suicidal ideation. At that time he was provided with a diagnosis of Psychotic Disorder NOS. On 5/6/10 a progress note indicated that the inmate had been referred to the MHCB due to grave disability.

The inmate was admitted to the MHCB on 11/16/10 and again on 12/13/10. At the time of the 12/13/10 admission, he was refusing medications; he presented with blunted affect, but it was determined that he was not suicidal or exhibiting evidence of psychosis. The inmate was most recently hospitalized in the MHCB from 12/19/10 to 12/21/10 when he was provided with a diagnosis of Psychotic Disorder NOS.

Medical record progress notes from September 2010 did not mention the inmate's DMH referral and acceptance. These notes described the inmate as presenting with flat affect, but with no other significant mental health symptoms. Psych tech notes from October 2010 stated that the inmate was stable and his mental status was described as normal. Although the inmate was offered group therapy during October 2010, he did not attend the offered groups. A psych tech note dated 11/3/10 described the cleanliness of the inmate's cell as poor; however, notes from 11/5/10 described the cell as clean and well-organized.

A progress note dated 12/14/10 described the inmate as "wide eyed, odorous, unkempt, flat affect." On 12/22/10, medical record documentation indicated that the inmate continued to refuse out-of-cell activities and was described as presenting with a vacant stare and poverty of speech. Psych tech notes from the week of 12/25/10 described the inmate as disheveled and guarded. He reportedly refused most out-of-cell contacts during December 2010.

A treatment plan dated 1/18/11 indicated that the inmate presented with significantly disorganized behavior and thinking, unkempt appearance and blunted affect. Progress

notes during January 2011continued to indicate that the inmate remained with significant decompensation; he was described as guarded, suspicious, bizarre, unkempt and presenting with a vacant stare.  He continued to refuse to attend out-of-cell activities during this period.

Findings

The inmate had a history of several MHCB admissions.  Progress notes documented the inmate's decline in functioning with an increase in psychotic symptoms since the fall of 2010.  Although he was referred and accepted for DMH transfer during July 2010, the referral and pending transfer documents were not located in the medical record or referenced in the most recent treatment plan dated 1/18/11.  Of concern was the inmate's presentation of significant psychotic symptoms at the most recent IDTT meeting; however, there was no documentation that the IDTT was aware that the inmate had been referred to DMH.  There was also no documentation to indicate that there was discussion of the need for higher level of care referral consideration for this inmate who presented with decompensation.  The treatment plan was generic in content and did not offer the individualized interventions that were necessary for this inmate awaiting SVPP transfer.

EXHIBIT J
California State Prison, Corcoran (CSP/Corcoran)
December 13, 2010 – December 16, 2010

**Inmate A**

This EOP inmate was housed in the administrative segregation EOP hub.  He was provided with a diagnosis of Schizophrenia paranoid type, Polysubstance Dependence and Antisocial Personality Disorder.  He was treated with Risperdal M tabs 3 mg/day, Zyprexa 30 mg/day, Cogentin 2 mg/day, Depakote 1500 mg/day and Benadryl 50 mg/day.  He was on a Keyhea order that would expire on 1/16/11.  The inmate was classified as DD1.

The inmate arrived at CSP/Corcoran on 11/1/10, from DMH.  At the time of DMH discharge, he was reportedly calm, without agitation or self-injurious behavior.  Discharge diagnoses included Schizoaffective Disorder bipolar type and Antisocial Personality Disorder.  His discharge medications included Zyprexa 40 mg/day and Depakote 3000 mg/day.

The inmate had a long history of mental health treatment, which included hospitalizations at Napa State Hospital (NSH), ASH and Patton State Hospital (PSH).  He also had a long history of assaultive behavior, fecal smearing and suicide attempts, as well as a hunger strike during which he was tube fed.  He was transferred to the CDCR on 1/8/08 after he killed his cellmate at PSH; he was immediately placed on a Keyhea order after this incident.  He was hospitalized at DMH acute care from 8/9/10 to 10/25/10; he was referred from the MHCB to DMH after presenting with poor impulse control and self-injurious behavior.

The inmate was again admitted to the MHCB on 11/3/10 after presenting with head-banging behavior, resulting in self-injury.  This behavior resulted in the use of five-point restraints; the inmate then presented with open masturbation when not in restraints.  It was determined that his masturbation was not due to a diagnosis of Exhibitionism.  Although MHCB documentation for this admission was not located in the medical record, psych tech notes indicated MHCB admission from 11/12/10 to 11/17/10.  It appeared that the inmate was subsequently returned to the EOP hub, where he continued to present with poor impulse control and intermittent suicidal ideation requiring assessment and evaluation.  Psychiatrists and the primary clinician consistently followed the inmate and there were crisis evaluations when necessary.

Findings

The medical record contained documentation as to the DMH discharge summary.  The inmate was appropriately referred to DMH acute care due to his multiple MHCB admissions and need for psychiatric stabilization.  He was appropriately admitted to the MHCB shortly after his return to CSP/Corcoran due to self-injurious behavior although information from this admission was not located in the medical record.

There was documentation of psych tech daily rounds and weekly primary clinician contacts.  The psychiatrist consistently followed the inmate.  There was also

608

documentation of continuity for prescribed psychotropic medications, including Zyprexa, a non-formulary medication, upon the inmate's return to CSP/Corcoran.

The inmate should be considered for referral to DMH intermediate care due to the chronic nature of his psychopathology.

**Inmate B**

This EOP inmate was housed in the EOP hub. He was diagnosed with Schizophrenia paranoid type and Exhibitionism. He was treated with Zyprexa 20 mg/day and was prescribed medications on an as needed basis for medication refusal. The inmate was on a Keyhea order that would expire on 3/22/11.

The inmate transferred from the MHCB at CSP/Corcoran to DMH acute care on 8/13/10 following a suicide attempt when he placed a sheet around his neck; he transferred to DMH following a Vitek hearing. Due to suicidal behavior, he had remained in the MHCB for approximately two months. The inmate had a history of multiple disciplinary difficulties, including indecent exposure and gassing. He also had a history of a past ASH hospitalization, where he assaulted a female employee. He initially presented at DMH with agitation and head banging; Keyhea proceedings were initiated at that time. The inmate was discharged from DMH on 9/29/10 on Zyprexa, to return to CSP/Corcoran, with a recommendation for transition to depot antipsychotic medication. The DMH discharge summary indicated that the inmate reported harassment at CSP/Corcoran.

It appeared that the inmate returned to the administrative segregation/SHU unit due to 115s for refusing a cellmate, where he remained due to reported "continuous" inappropriate sexual behavior.

A review of subsequent progress notes indicated that the inmate had sporadic group attendance. He was followed consistently by the primary clinician and psychiatrist. It appeared that he was evaluated in the MHCB on 11/2/10 after presenting with suicidal ideation but no information as to this MHCB admission was located in the medical record; it was thus unclear if the inmate was actually admitted to the MHCB. The most recent progress notes indicated that the inmate was essentially functioning at baseline.

Findings

There was documentation of completion of an administrative segregation pre-placement chrono on the day of arrival at CSP/Corcoran, as well as documentation that a non-formulary medication, Zyprexa, was continued upon return from DMH. There was also documentation of daily psych tech rounds, weekly primary clinician contacts and completion of the Form 7388, the checklist for DMH referral. Although the most recent treatment plan included an appropriate listing of problems, interventions appeared somewhat ineffective in addressing the inmate's specific needs.

**Inmate C**

This EOP inmate was housed in the administrative segregation EOP hub.  He was provided with a diagnosis of Bipolar Disorder, mixed type with psychotic features.  He was also treated for a seizure disorder.  He was treated with Inderal 40 mg/day, Effexor 150 mg/day and Risperdal Consta 50 mg injection every two weeks.
The inmate transferred to CSP/Corcoran on 3/6/09, from CCI.  He was receiving mental health services at the 3CMS level of care at the beginning of the monitoring period (May 2010) when he was housed in the SHU.  He was changed to the EOP level of care on 6/8/10 as a result of continued psychotic symptoms with auditory hallucinations and delusional thinking.  The inmate was moved to the EOP hub after placement at the EOP level of care.

The primary clinician consistently saw the inmate on a weekly basis.  Progress notes indicated that he remained with auditory hallucinations and delusional thinking.

Findings

The inmate received mental health services at the appropriate level of care in the EOP.  There was documentation of the completion of the Form 7388, the checklist for DMH referral.  There was also documentation that necessary participants attended the EOP IDTT meeting, and of daily psych tech rounds in the EOP hub.

**Inmate D**

This 3CMS inmate was housed in administrative segregation.  He was diagnosed with Schizophrenia paranoid type and treated with Risperdal M tabs 6 mg/day.  The inmate was transferred to CSP/Corcoran on 11/30/07, from NKSP.  At the time of transfer, the bus screen did not indicate that the inmate was a participant in the MHSDS.  A chrono dated 1/26/10 indicated that the inmate had been screened for SHU placement and stated that he was not in the MHSDS.  A psych social worker saw the inmate on 9/23/10, when he was transferred to the freestanding ASU; the inmate was referred after he was observed placing water in a light fixture, which could result in electrocution.  The inmate also presented with paranoid thinking, believing that staff was taking his mail, disorganized thinking and unsanitary cell conditions.

The next documentation of clinical contact contained in the medical record was dated 11/4/10 when an unidentified clinician or psych tech indicated that the inmate continued to present with paranoia regarding custody staff, cell flooding and setting fires in his cell.  The inmate also reportedly presented with probable auditory hallucinations.  A cell extraction was performed as the inmate refused to leave his cell.

The inmate was hospitalized in the MHCB from 11/4/10 to 11/10/10 although no MHCB notes were located in the medical record.  It appeared that the inmate was placed in the 3CMS program during this hospitalization.  Although progress notes indicated that a Keyhea order was considered, it did not appear that it was pursued.

Subsequent progress notes indicated that the psychiatrist and primary clinician consistently followed the inmate after his transfer to administrative segregation. The inmate continued to refuse out-of-cell contacts and was not cooperative with interview questioning.

Findings

The medical record did not contain any information as to the inmate's MHCB hospitalization, which made it difficult to evaluate the rationale for not pursuing a Keyhea order. There was documentation of weekly primary clinician cell-front contacts for the inmate, who refused out-of-cell clinical encounters, as well as of consistent psychiatric contacts. Treatment planning included problems such as medication noncompliance and lack of programming, and listed interventions were generic in content. The IDTT meeting did not include a CCI.

Although there was documentation of completion of the Form 7388, the checklist for DMH referral, and several indicators were marked affirmatively, the inmate was not referred to a higher level of care. In light of the inmate's treatment refusal and continued paranoid symptoms, however, he should have been considered for higher level of care referral.

**Inmate E**

This inmate had recently returned to CSP/Corcoran from DMH acute care, where he had been hospitalized from 8/4/10 to 10/27/10. He was admitted to DMH after reportedly destroying his television and throwing away his property; this behavior resulted in MHCB admission.

After the inmate returned to CSP/Corcoran, he presented with significant psychotic symptoms, including disorganized and paranoid delusional thinking as to themes of thought insertion, and a belief that relatives were spying on him and implanting computer chips in him. He was provided with a diagnosis of Schizophrenia paranoid type. He was prescribed Risperdal Consta, Zyprexa, Lithium, and Thorazine.

The DMH discharge summary indicated that the inmate had been on a hunger strike at the time of DMH admission. He was placed on a Keyhea order due to grave disability and danger to self. The DMH discharge summary further indicated that the inmate had been referred to SVPP; however, he was discharged to the EOP while awaiting an available bed at SVPP.

Findings

The inmate had been referred to DMH acute care from the MHCB at CSP/Corcoran due to agitation, psychosis and possible suicidal ideation. He had a history of ongoing paranoia and delusional thought processes. The acuity of his symptoms was somewhat

611

reduced after his DMH acute care hospitalization, and he was appropriately referred to SVPP.  It was of concern that he was returned to the EOP level of care while awaiting SVPP placement and that CSP/Corcoran staff were unaware of the SVPP referral, as this information was in the DMH discharge summary; this raised questions as to the thoroughness with which DMH discharge summaries were reviewed.

**Inmate F**

This EOP inmate was on the SVPP wait list; he was on wait lists from CDCR headquarters and CSP/Corcoran.  He had a history of psychosis and polysubstance abuse.  He was referred to DMH for a trial of Clozaril.
An IDTT meeting conducted on 12/24/10 indicated that the inmate continued to exhibit chronic, severe psychotic symptoms including constant auditory hallucinations and delusions of persecution, which were incapacitating to him.  As a result, he spent most of his time in bed and refused to attend most of his assigned groups and individual clinical contacts.  His appearance was described as unkempt; he was malodorous with long nails and hair.  He also only ate dinner, missing other meals.

The inmate was provided with a diagnosis of Schizophrenia paranoid type.  The treatment plan indicated that he was awaiting DMH placement and it sought to transfer him sooner than he was scheduled to transfer.  Progress notes indicated that he was seen weekly by his most recent primary clinician, with contacts occurring on 11/12/10, 11/18/10, 11/23/10, and 11/30/10.  The progress note dated 11/23/10 documented that the inmate was not eating and the progress note dated 11/30/10 documented an urgent psychiatry referral.  The inmate was on a Keyhea order due to grave disability.  He was treated with Vistaril and Effexor.

Findings

The inmate was on the SVPP wait list and remained clinically unstable with auditory hallucinations and delusional thinking.  His hygiene was poor and he appeared to be experiencing a worsening of symptoms at his current level of care.  Although the inmate was on a Keyhea order, his current treatment was not adequate to address his severe symptoms.  The treatment plan was also inadequate, as it indicated merely "wait(ing) for DMH placement."  Consideration of DMH re-referral for acute care hospitalization and advancement on the intermediate care wait list should have been vigorously pursued.

**Inmate G**

This inmate's case was reviewed at plaintiffs' attorneys' request as he reportedly had been removed from the DMH acute care wait list.  The inmate's name was included on the DMH wait list maintained by CSP/Corcoran but was not included on CDCR headquarters' wait list.

The inmate was admitted to the MHCB on 3/1/10 and remained there until 4/20/10 due to suicidal intention to hang himself.  He reportedly stated that he had been removed from

the EOP and felt suicidal as a result of this decision. At that time, a referral was made to DMH acute care; DMH acute care accepted the inmate on 3/24/10 and placed him on the acute care wait list. He was discharged from the MHCB on 4/20/10 "to the EOP hub with expectation that he will eventually go to a higher level of care, either PSU or DMH Vacaville program."

The inmate was provided with a diagnosis of Schizoaffective Disorder and was treated with Vistaril, Abilify and Remeron. After his discharge from the MHCB, he was reportedly doing well and without evidence of psychosis or suicidal ideation. There was documentation of daily psych tech rounds and five-day follow-up and the inmate was reportedly compliant with prescribed medications.

Progress notes documented the inmate's participation in anger management groups. Subsequent progress notes indicated that he was stable and documented the inmate's questioning of his need for DMH hospitalization. The primary clinician indicated that the DMH referral would be reviewed at the next IDTT meeting.

The most recent psychiatric and primary clinician progress notes indicated that the inmate was stable, cooperative and pleasant, with appropriate hygiene and grooming. The most recent Form 7388, the checklist for DMH referral, did not identify any criteria for higher level of care referral consideration.

Findings

The inmate was referred to DMH acute care while hospitalized in the MHCB due to suicidal ideation and poor adjustment to a level of care change from the EOP to the 3CMS program. He was subsequently discharged to the administrative segregation EOP hub, and his DMH acute care referral remained in place. A medical record review indicated that the inmate remained clinically stable and compliant with medications, and with individual and group therapy. Psych tech rounds were documented and also reflected good cooperation with treatment and denial of mental health concerns. The inmate stated that he did not think a DMH referral was necessary; the treatment team agreed and rescinded the referral. This DMH rescission was appropriate. A medical record review indicated that the inmate was provided with weekly primary clinician contacts, monthly IDTT meetings and group therapy.

**Inmate H**

This EOP inmate was housed in the administrative segregation EOP hub. He had returned to CSP/Corcoran on 11/10/10 from DMH acute care, where he had been hospitalized on 9/24/10 due to suicidal ideation. The available DMH discharge summary was incomplete and did not include treatment recommendations. The inmate reportedly had multiple DMH hospitalizations, which included stays at APP, VPP, ASH, and SVPP.

The first clinical contact at CSP/Corcoran following the inmate's return from DMH occurred on 11/12/10, when he received a mental health screening. Although there was

an IDTT meeting on 11/17/10, documentation as to this IDTT was not in the medical record; this precluded an assessment as to treatment planning following the inmate's DMH discharge.

The only clinical note following the inmate's return from DMH located in the medical record was a psychiatric progress note dated 11/26/10. This note documented the inmate's belief that the DMH stay was not beneficial. The psychiatrist continued the inmate's medications and provided diagnoses of Bipolar Disorder NOS and Antisocial Personality Disorder.

The DMH discharge summary was not located in the medical record. The DMH social work discharge summary indicated that the inmate should remain at DMH acute care until placement at SVPP as it was likely that he would engage in self-injury, requiring return to DMH acute care.

Findings

According to the DMH social work discharge summary, the inmate was referred to SVPP. Of concern was the omission of the inmate from the CDCR headquarters' DMH wait list or the CSP/Corcoran DMH wait list for referral to SVPP. The DMH discharge summary was available electronically but was not in the medical record. The DMH discharge summary also was incomplete as it did not include a summary and recommendations. The inmate had approximately 18 DMH referrals and hospitalizations since 1999 including a hospitalization due to incompetency to stand trial. No current treatment plans were located in the medical record to ascertain whether DMH hospitalization was considered in determining the provision of follow-up treatment. There appeared to be some confusion and lack of information as to whether the inmate had been referred to SVPP, which was reported in the DMH social work discharge summary.

**Inmate I**

The inmate's medical record was reviewed as he was on the institutional wait list log for DMH acute care. However, the inmate's name did not appear on the DMH wait list supplied by CDCR headquarters.

The inmate arrived at CSP/Corcoran on 3/9/10, from CSATF. A 4/26/10 IDTT meeting referred the inmate to DMH VPP for acute care after he met the following screening criteria: the inmate could not function adequately at the EOP level of care; required structured inpatient care; would benefit from a more comprehensive treatment program; displayed chronic psychiatric symptoms; had three MHCB admissions in six months; and was unable to stabilize in the MHCB. The DMH log indicated that the inmate was approved for DMH acute care admission but was discharged to the EOP level of care on 5/5/10 after reportedly exhibiting improvement. He continued to receive mental health services at the EOP level of care and in July 2010 the IDTT determined that he no longer required DMH hospitalization. The treatment team rescinded the DMH referral on

7/7/10, but the rescission was not recorded on the DMH institutional log. Documentation from a September 2010 IDTT meeting also indicated that the inmate was not considered for DMH referral although the institutional DMH coordinator was unaware of this change as of mid-December 2010.

The primary clinician saw the inmate weekly and the inmate attended some groups. He was compliant with his prescribed medication, Haldol Decanoate, a long-acting intramuscular antipsychotic medication. He was provided with a diagnosis of Delusional Disorder; there also appeared to be consideration of differential diagnoses of Schizophrenia or Bipolar Disorder, but there was no clear documentation to indicate that the inmate presented with symptoms of any of these disorders. The inmate was never prescribed an antidepressant or mood stabilizing medication. He reportedly believed that he had been held in prison past his release date; this belief was viewed as evidence of delusional thinking as the inmate had a lengthy prison sentence. It should also be noted that English was not the inmate's primary language; it was thus unclear whether his belief was delusional or due to communication issues.

A signed informed consent form for treatment with psychotropic medications dated 6/4/10 was located in the medical record. Laboratory studies from October 2009 indicated mild elevation of fasting blood sugar and triglyceride levels, but there was no documentation of medical follow-up as to these abnormalities. The inmate refused to allow any blood work during his MHCB hospitalization earlier in 2010.

Findings

This case illustrated the issues involved in the accurate maintenance of the DMH referral log. The inmate did not appear to require DMH referral at the time of the site visit and was reportedly functioning adequately at the EOP level of care. The provided mental health diagnosis required clarification and the inmate's clinical symptoms were not consistent with the listed diagnoses. The mental health care provided may have been complicated by the inmate's limited comprehension of English, as Spanish was his primary language.

**Inmate J**

This inmate's case was reviewed as he was on the CSP/Corcoran wait list for DMH intermediate level of care but was not listed on the wait list supplied by CDCR headquarters. The CSP/Corcoran DMH log indicated that the inmate was housed in the MHCB and a 9/22/10 IDTT meeting referred him to SVPP for intermediate level of care. A review of the Form 7388, the checklist for DMH referral, indicated that the IDTT determined that the inmate met at least five criteria for DMH referral consideration. The referral packet was submitted to DMH on 10/18/10; the inmate consented to DMH transfer. The CSP/Corcoran DMH log indicated that he was accepted by DMH but the DMH acceptance date was not provided. The inmate was subsequently discharged to the administrative segregation EOP hub and transferred to KVSP on 11/8/10.

The inmate returned to CSP/Corcoran on 11/10/10 when it was discovered that he had an enemy at KVSP. Upon return to CSP/Corcoran, he was placed in the MHCB after a verbal altercation with custody staff when he refused to accept a cell assignment because fecal material was reportedly on the walls. He was sent to the MHCB late on 11/10/10 and was discharged on the following morning. The inmate had a total of four MHCB hospitalizations during 2010; the first stay was due to suicidal intent after a Tylenol overdose. The following two admissions occurred due to suicidal ideation.

The inmate remained at the EOP level of care at the time of the site visit. He was compliant with prescribed medications that included antidepressant, antipsychotic and mood stabilizing medications. The inmate also had hypothyroidism, which was treated by medical staff with a thyroid supplement; documentation of coordination between medical and mental health staff as to this treatment was not apparent in the IDTT treatment plan, or in psychiatric or medical progress notes. This level of coordination was important as hypothyroidism may present with mood symptoms such as depression, which was noted in this case, and resolution of symptoms might require additional thyroid supplements rather than or in addition to antidepressant medication. The treatment plan indicated that the inmate would be retained at the EOP level of care until DMH intermediate care transfer. There was no documentation that the inmate had received additional or supplemental mental health care while awaiting DMH transfer.

Findings

This case illustrated discordance between institutional and CDCR headquarters' documentation as to inmates awaiting DMH transfer. Furthermore, although the institution had identified the inmate as requiring a higher level of care, he had not received supplemental services while awaiting transfer. His medical and mental health care required better coordination to ensure that both providers were aware of his medical illness and its potential impact on his psychiatric condition.

**Inmate K**

This inmate's medical record was reviewed as he was on the institutional wait list log for DMH acute and intermediate levels of care. He had seven MHCB admissions during 2010 for depression, suicidal ideation and psychosis; these admissions began in January 2010 and the last one occurred between 9/30/10 and 10/2/10. All admissions were precipitated by the inmate's report of severe depression and suicidal ideation although no vegetative signs of depression were observed.

The inmate was on a Keyhea order and was reportedly compliant with prescribed mood stabilizing and long-acting antipsychotic medications. According to medical record documentation, although he had originally been referred to DMH acute care, his condition showed some improvement, and the referral was modified for intermediate level of care in August 2010. The Form 7388, the checklist for DMH referral, documented IDTT determination that the inmate met at least three criteria for higher level

of care referral consideration. He was accepted for admission to SVPP for intermediate care.

The inmate was not listed on CDCR headquarters' DMH wait list but was listed twice on the institutional DMH wait list. Although the original DMH acute care referral had not been eliminated on the log, medical record documentation was clear that the IDTT no longer believed that an acute care referral was indicated.

The inmate had been maintained at the EOP level of care since his last MHCB admission in October 2010. Provided diagnoses included Major Depressive Disorder with psychotic features and Schizoaffective Disorder. He was treated with an antidepressant medication when he arrived at CSP/Corcoran after transfer on 1/25/10, from CSP/LAC. The inmate had a history of indecent exposure and although "counseling and education to reduce incidents" was listed on the treatment plan, the actual progress notes did not document such counseling. Nonetheless, incidents of masturbation had decreased in frequency. The inmate also complained that his psychotropic medication caused erectile dysfunction, but treating clinicians had not addressed this complaint nor was there documentation of a correlation between erectile dysfunction and decreased incidents of public masturbation.

The inmate was functioning in the EOP and participating in treatment. Other than a monthly IDTT review, additional or supplemental treatment interventions were not provided while the inmate awaited transfer to DMH intermediate care. Institutional EOP hub staff confirmed that the inmate did not require DMH acute care treatment at the time of the site visit, but indicated that he should remain on the intermediate care wait list.

<u>Findings</u>

This case illustrated the lack of agreement between institutional wait lists and those maintained by CDCR headquarters. Furthermore, the institutional wait list was neither updated nor accurately maintained. The DMH coordinator was made aware of this situation in order to update the DMH log. The inmate appeared to be functioning in the EOP but had not received additional treatment interventions while awaiting DMH intermediate care transfer.

**Inmate L**

This EOP inmate's medical record was reviewed as he had returned to CSP/Corcoran from DMH acute care. He was housed in the administrative segregation EOP hub during the site visit. The medical record contained the DMH discharge summary, which indicated that the inmate was hospitalized at DMH VPP between 4/16/10 and 6/17/10. Although the DMH discharge summary was dictated on 6/8/10, the CDCR medical record clearly documented that the inmate had returned to CSP/Corcoran on 5/28/10. This was of concern as the inmate had returned to CSP/Corcoran nearly three weeks prior to the listed DMH discharge date and ten days before dictation of the DMH discharge summary.

Soon after returning from DMH acute care, the inmate was admitted to the MHCB between 6/16/10 and 7/6/10 following medical treatment for a self-inflicted penis laceration.  He reportedly had converted to Judaism and wanted to circumcise himself.  The DMH discharge summary did not note his religious conversion, nor was the recent return from DMH noted at the time of the June 2010 MHCB admission.  The inmate was also admitted to the MHCB between 9/1/10 and 9/7/10 due to religious preoccupation and threats to perform his own circumcision.  This procedure was subsequently performed surgically and the inmate healed well without complications.

Although the inmate's CDCR medical record documented a long history of psychosis, a 2005 DMH admission following a serious self-inflicted wrist laceration and a Risperdal overdose in February 2010 that necessitated a three-day community hospital stay, the DMH discharge summary only provided discharge diagnoses of Adjustment Disorder with depressed mood and Polysubstance Dependence.  The inmate was discharged with a recommendation for EOP level of care after he reportedly had "obtained maximum benefit from this treatment program" as per the DMH discharge summary.

Findings

The DMH acute care hospitalization and accompanying DMH discharge summary did not appear to be beneficial in the provision of the inmate's mental health care.  The inmate returned to CSP/Corcoran from DMH several weeks before the discharge summary arrived.  Of concern was the DMH notation that the inmate's discharge date was 6/17/10 when he actually returned to CSP/Corcoran at the end of May 2010 and was readmitted to the MHCB on 6/16/10.

EXHIBIT K
California Substance Abuse Treatment Facility (CSATF)
November 29, 2010 – December 2, 2010

**Inmate A**

This EOP inmate was on the institution's SVPP wait list. A treatment plan dated 10/1/10 documented the inmate's level of care but did not indicate whether he had been referred to DMH. Medical record progress notes indicated that the treatment plan was written without the medical record's availability.

The inmate was housed in the MHCB during May 2010. It appeared that he was transferred to the EOP level of care on 6/15/10. Progress notes described the inmate as stable during evaluations that occurred on 6/15/10 and 7/2/10. On 7/6/10 the inmate was placed on suicide watch when he threatened to hang himself. He was apparently discharged from the MHCB on 7/12/10. A psychiatric progress note dated 7/12/10 included a recommendation that the IDTT consider him for referral to DMH intermediate care. A treatment plan dated 7/20/10, while the inmate was housed at WSP, indicated that he was returning from DMH after incurring a rules violation. The plan noted the inmate's history of multiple MHCB admissions and multiple suicide attempts. The treatment plan again recommended DMH intermediate care referral. Progress notes documented the inmate's participation in offered structured therapeutic activities during the third week of July 2010.

The inmate apparently arrived at CSATF during late September 2010; an initial IDTT was conducted on 10/7/10. The Form 7388, the checklist for DMH referral, was completed on 10/7/10 and indicated that the inmate met none of the criteria for higher level of care referral consideration. There was no documentation on the Form 7388 that the inmate had been referred to DMH for intermediate care. Psych tech notes indicated that the inmate exhibited adequate hygiene, maintained his cell appropriately and interacted with psych techs. However, there were no primary clinician notes located in the medical record that occurred after the IDTT note dated 10/7/10.

Findings

This inmate had a history of several MHCB admissions and was included on the institution's SVPP wait list. However, there was no medical record information indicating that the inmate had been identified as requiring DMH referral, and no documentation indicated that a referral had been completed or that staff was aware of the referral. The inmate did not appear on the existing DMH referral log. There was no documentation that the IDTT considered additional treatment interventions in light of the pending SVPP referral. Little relevant clinical documentation was located in the medical record after 10/7/10.

**Inmate B**

This EOP inmate was on the SVPP wait list. Information from the wait list log indicated that the IDTT had identified him for DMH intermediate care referral on 12/17/09. DMH accepted the inmate for admission on 1/29/10; he was awaiting bed space and transfer at the time of the site visit.

A clinical progress note dated 12/7/09 documented the inmate's diagnosis of Major Depressive Disorder recurrent. The progress note further described the inmate as being oriented, depressed, irritable, and paranoid.

The Form 7388, the checklist for DMH referral, dated 2/15/10 indicated that the inmate met one of the criteria for higher level of care referral consideration; the Form 7388 further noted that the inmate had already been referred to DMH. An IDTT meeting on 5/3/10 confirmed the diagnosis of Major Depressive Disorder and provided an additional diagnosis of Antisocial Personality Disorder. A progress note dated 7/23/10 documented that the inmate was on the SVPP wait list.
A Form 7388 dated 7/27/10 noted that the inmate met one of the criteria for higher level of care referral consideration and was on the SVPP wait list.

The inmate was housed at MCSP on 8/4/10. He arrived at CSATF between 8/22/10 and 9/9/10. Progress notes from an initial IDTT meeting that occurred on 9/9/10 indicated that the inmate was still pending DMH intermediate care transfer. A clinical contact on 9/3/10 documented that the inmate's presentation was essentially normal as to mood, hygiene, appearance, and speech.
The inmate reportedly attended some of his assigned groups. A progress note dated 9/24/10 noted that the inmate was doing well and was considered to be stable at that time. On 10/15/10 the inmate was described as depressed with mild irritability. On 10/21/10 he was again described as stable; the clinician indicated that the inmate did not appear to require intermediate care referral at that time and recommended that the IDTT rescind the referral.

DMH referral log documentation and an IDTT note dated 10/28/10 confirmed that the DMH referral was in fact rescinded. This information conflicted with CSATF's data, which indicated that the inmate was on the SVPP wait list.

Findings

There was confusion as to the inmate's DMH referral status. He was apparently referred, accepted and on a DMH wait list upon his arrival at CSATF. In fact, it appeared that the inmate remained on the SVPP wait list at the time of the site visit. The medical record, however, contained documentation that the inmate's DMH referral had been rescinded.

The most recent clinical progress notes were informative and appeared to indicate that the inmate was receiving adequate EOP treatment at CSATF.

**Inmate C**

This inmate was admitted to the MHCB on 6/8/10 due to suicidal ideation and remained there until 6/25/10. He was provided with a diagnosis of Dysthymic Disorder at the time of his MHCB discharge; there was no recommendation as to DMH referral. He was readmitted to the MHCB on 7/19/10 after he again reported suicidal ideation. According to the institutional log, the inmate was identified for DMH acute care referral on 7/22/10,

the referral was submitted on 7/27/10 and DMH accepted him and placed him on the wait list on 7/30/10. Although the log indicated that the referral was subsequently rescinded, there was no documentation as to the rescission date. During the site visit, the DMH coordinator reported that it was her belief that the referral remained in place and that CSATF was awaiting a decision as to DMH acceptance or rejection.

A progress note dated 7/29/10 described the inmate as frail and lethargic with slow speech and constricted affect. Other medical record notes during this period indicated that he had been refusing food and continued to present with significant depressive symptoms. An IDTT meeting was conducted on 8/12/10; the Form 7388, the checklist for DMH referral, completed at that time noted that the inmate met at least three of the criteria for higher level of care referral consideration. The Form 7388 also documented the inmate's DMH acute care referral.

It appeared that the inmate remained housed in the MHCB until mid-August 2010. He was prescribed Celexa at the time of discharge. That medication order was discontinued on 9/20/10, and the inmate was apparently followed without medications until 11/4/10, when Geodon was initiated.

It appeared that the inmate was retained at the 3CMS level of care when not hospitalized in the MHCB. A progress note dated 8/26/10 documented that the inmate was seen for his routine primary clinician contact; he was described as angry and depressed with frustration as to the length of the wait for DMH transfer.

A treatment plan dated 9/7/10 indicated that the inmate was still awaiting DMH transfer. None of the interventions listed in the treatment plan had been implemented at that time. The inmate was seen twice monthly by the primary clinician and was involved in weekly group therapy. A Form 7388 dated 9/21/10 indicated that the inmate met at least three of the DMH referral criteria and noted that he was awaiting DMH transfer.

A mental health progress noted dated 10/11/10 indicated that the inmate remained at the 3CMS level of care. The note also stated that the inmate's cellmate had agitated him. A progress note dated 10/15/10 reported that the inmate was doing well but continued to express frustration with his cellmate. On 10/19/10, the inmate again reportedly expressed agitation with his cellmate. Medical record documentation stated that the inmate murdered his cellmate on 10/20/10; the inmate was reportedly found in his cell wearing "war paint," and told officers that he had "sent his cellie to the spirit world." The inmate reportedly showed no remorse for the murder. When evaluated upon his administrative segregation arrival on 10/22/10, the inmate was described as exhibiting normal and fluent speech and showed no evidence of suicidal or delusional ideation thinking.

On 10/27/10, the Form 7388 documented that the inmate met at least five of the criteria for higher level of care referral consideration. It was again noted that the inmate was on the DMH wait list for intermediate level of care.

A treatment plan dated 10/27/10 stated that the inmate would be seen twice weekly for the following three weeks. The plan also indicated that he would see a psychiatrist monthly and would be provided with the opportunity to attend group therapy.

On 10/26/10 an ASU clinician saw the inmate, who noted that he presented with depression; the inmate reportedly denied suicidal ideation. The inmate was seen again 10/29/10, but refused clinical contacts on 11/2/10, 11/3/10, 11/4/10, 11/5/10, 11/15/10, 11/22/10, and 11/29/10. Progress notes based on cell-front contacts during this period described the inmate as stable.

Findings

This inmate had a history of at least two MHCB hospitalizations; at least one of the admissions was of significant duration. There was considerable confusion as to the status of the inmate's DMH referral. According to the existing log, the inmate was identified for DMH acute care referral on 7/22/10, DMH accepted the referral, and the inmate was subsequently placed on the DMH wait list. The log also indicated that the referral had been rescinded, but the rescission date was not noted. The DMH coordinator's documentation indicated that a decision as to DMH acceptance or rejection was pending. It appeared that the referral was changed from acute to intermediate level of care, but there was no information in the inmate's medical record to document when this occurred.

Although the inmate presented with significant depressive symptoms and possible suicidal thinking for a period of time, it did not appear that any attempt was made to expedite the DMH referral. The IDTT should have expedited this referral. Furthermore, the treatment team should likely have acted more expeditiously to increase the level of care from 3CMS to EOP based on the inmate's recurrent MHCB admissions.

The inmate's antidepressant medication was discontinued on 9/20/10. Progress notes from early October 2010 indicated that he made repeated comments as to conflicts with his cellmate, who he murdered on 10/20/10.

Recent information contained in the medical record indicated that the treatment team had modified the inmate's treatment plan in light of the murder, and possibly to provide additional care while he awaited DMH transfer. At the time of the site visit, the inmate was number 215 on the SVPP wait list.

**Inmate D**

This inmate was included on the institution's list of inmates who had been considered for DMH referral but had not been referred. The Form 7388, the checklist for DMH referral, dated 8/19/10 indicated that the inmate had met at least three of the criteria for consideration of referral to a higher level of care. Progress notes from September and October 2010 indicated that the inmate refused out-of-cell clinical contacts. A chrono dated 10/18/10 noted that the inmate received mental health services at the 3CMS level of care; he was apparently moved to the EOP level of care on 10/22/10.

623

A progress note dated 10/22/10 documented the inmate's noncompliance with group therapy attendance; the inmate also reportedly presented with delusional thinking as to receiving electric shocks from other inmates.

A Form 7388 completed on 10/22/10 again noted that the inmate met several criteria for DMH referral consideration. The rationale provided for non-referral was the inmate's status of awaiting transfer to an administrative segregation EOP hub bed. The accompanying treatment plan listed the following treatment interventions: weekly individual primary clinician contacts, medication management (when needed), progressive muscle relaxation, and physical exercise.

A progress note dated 10/27/10 documented the inmate's refusal to leave his cell; he presented with delusional thinking at that time, indicating his belief that the CDCR was sending brain waves to him and reading his thoughts. He was provided with a diagnosis of Schizophrenia paranoid type. The inmate refused medications at that time.

Findings

This inmate refused most contact with mental health clinicians for a prolonged period of time, and presented with significant delusional thinking. The 10/22/10 treatment plan was inadequate as it failed to address the inmate's lack of treatment participation and medication noncompliance. A Form 7388 noted that the inmate met several criteria for possible DMH referral. The IDTT should have formally considered the inmate for DMH referral as the non-referral rationale was inadequate.

**Inmate E**

This inmate was referred to DMH VPP for intermediate care on 5/25/10 and DMH accepted him on 5/28/10. On 11/1/10, the SVPP wait list indicated that he was awaiting transfer to SVPP. He was included on the 11/17/10 Bed Utilization Management report as number 184 on the wait list.

The institution's DMH coordinator reported that the inmate arrived from NKSP with a pending DMH referral. Medical record information suggested that CCAT had reviewed and rejected the case. It appeared, however, that this information was inaccurate as the inmate was included on the Bed Utilization Management report with a wait list number.

The inmate was hospitalized from 2/25/10 to 3/08/10 and again from 8/21/10 until approximately 8/30/10. He was described as "gravely disabled" at that time. At the time of admission, he was reportedly exhibiting significant psychotic symptoms. However, his condition appeared to have improved with medication treatment and he was discharged approximately 11 days after admission. A progress note dated 8/30/10 noted that the inmate had been housed in the OHU at NKSP on four occasions.

A Form 7388, the checklist for DMH referral, completed on 9/9/10 noted that the inmate met at least three of the criteria for higher level of care referral consideration. The Form 7388 also indicated that a referral to DMH intermediate care had already been initiated.

The inmate was seen by an EOP clinician at CSATF on 9/28/10 and was described as articulate with fair hygiene and exhibiting normal thought processes. On 10/6/10, it was stated that he was stable and reportedly participated in offered program activities.

Findings

This inmate had been referred to DMH SVPP and on 11/17/10 was number 184 on the wait list. At the time of the site visit, the inmate was housed in the recently activated G1 EOP unit at CSATF. Staff members appeared uncertain whether the inmate remained on the active wait list as there were reports that the referral had been rescinded; however, the Bed Utilization Management report noted that at the time of the site visit, the inmate remained on the SVPP wait list.

No current treatment plan was located in the medical record. Despite this omission, reviewed progress notes were informative and clinically relevant. The inmate appeared to be stable at the time of the site visit.

**Inmate F**

This EOP inmate was included on the institution's list of inmates who had been considered for DMH referral but had not been referred.

A progress note dated 8/17/10 indicated that the inmate presented with flat affect and reported command auditory hallucinations; an emergency referral was submitted on that date. A progress note dated 8/18/10 documented that the inmate approached a psych tech and stated that people were threatening his life; he reportedly was disheveled and agitated. On 8/20/10 the inmate was also described as agitated and nervous. Progress notes for August 2010 documented the inmate's participation in some offered group therapy.

A progress note dated 9/8/10 again described the inmate as disheveled, agitated, depressed, and anxious. A Form 7388, the checklist for DMH referral, completed on 9/9/2010 noted that the inmate met one of the criteria for higher level of care referral consideration as he participated in less than 50 percent of offered groups. However, the IDTT determined that he would not be referred to DMH at that time. Interventions that the treatment plan listed to address the inmate's difficulties included plans to increase group attendance and participation by 25 percent but methods to accomplish this goal were not elaborated.

The inmate was seen on 9/20/10, 10/14/10 and 11/29/10. Medical record documentation described the inmate as exhibiting more cooperation, less agitation and some improvement in his mood over the course of these evaluations. Progress notes documented improvement in the inmate's treatment participation; this improvement was clearly evident by late November 2010.

<u>Findings</u>

This inmate was identified as meeting at least one of the criteria for DMH referral consideration based on less than 50 percent participation in offered activities but was not recommended for DMH referral.  The treatment plan did not appear to be responsive to the Form 7388 noting the IDTT objective of increasing the inmate's group participation. Despite this, the primary clinician consistently saw the inmate; by 11/29/10, the inmate was described as more amenable to therapeutic interventions.

**Inmate G**

This inmate was admitted to DMH on 8/3/10 after he reported command auditory hallucinations telling him to kill himself.  He returned to CSATF on 9/23/10, from DMH.

The CDCR medical record contained the DMH discharge summary.  The inmate had a history of two serious suicide attempts; the most recent attempt occurred on 7/20/10.  He was provided with a diagnosis of Schizoaffective Disorder; an alternative differential diagnosis of Methamphetamine Induced Psychotic Disorder was also included in the DMH discharge summary.

The DMH discharge summary included no treatment recommendations with the exception of medication recommendations which included the following medications: Risperdal, Vistaril, Lithium, Zyprexa, and Buspar.  The receiving psychiatrist at CSATF continued all of the recommended medications, with the exception of Zyprexa, when the inmate returned to CSATF.  A psychiatric progress note dated 11/8/10 reported that Haldol, Cogentin and Remeron were also prescribed.

The most recent treatment plan located in the medical record was dated 4/7/10; documentation as to two IDTT meetings that occurred on 10/7/10 and 11/10/10 was not located in the medical record.

<u>Findings</u>

DMH discharge summary recommendations provided as a result of the inmate's DMH inpatient treatment were limited to medication management.  The discharge summary was apparently reviewed by CSATF staff and medications were continued as per DMH recommendations.  There was no documentation of a current treatment plan, while recent documentation of IDTT higher level of care referral consideration was not located in the medical record.

**Inmate H**

This inmate was initially referred to DMH for intermediate care, but in the interim was transferred to DMH acute care with a pending intermediate care referral.  However, he apparently returned to CSATF and was not transferred from DMH acute care to DMH intermediate care; the inmate was admitted to DMH acute care at Vacaville on 8/3/10 and

returned to CSATF on 10/1/10. A Form 7388, the checklist for DMH referral, noted that the inmate met at least three of the criteria for higher level of care referral consideration; the inmate was again in the process of referral to DMH intermediate care.

The inmate's DMH discharge summary was present in the medical record; recommendations made at the time of the inmate's return to CSATF were limited to recommendations of discharge medications. Discharge medications included Thorazine, Prozac, Vistaril, Remeron, and Geodon. These medications were continued at the time of the inmate's arrival at CSATF. The inmate was provided with diagnoses of Schizoaffective Disorder bipolar type and Borderline Personality Disorder at the time of DMH discharge.

The most recent treatment plan was dated 10/7/10. A social worker progress note written on 10/6/10 indicated that the inmate was programming appropriately; this note contradicted a note two days earlier that stated that the inmate required DMH intermediate care referral.

Documentation indicated that the primary clinician consistently followed the inmate.

Findings

This inmate was initially referred to DMH for intermediate care but was subsequently transferred to DMH for acute care. However, the intermediate care referral remained active. The inmate was not transferred by DMH from acute to intermediate care but instead was returned to CSATF. This resulted in unnecessary delays for the inmate, who required reinitiation of the DMH intermediate care referral by CSATF staff. Although some medical record documentation indicated that the inmate was stable, other documentation indicated that he was being referred to DMH for intermediate care. DMH treatment recommendations at the time of discharge were limited to medication recommendations; these medications were continued when the inmate returned to CSATF.

EXHIBIT L
Pleasant Valley State Prison (PVSP)
November 30, 2010 – December 2, 2010

**Inmate A**

This inmate had been included in the MHSDS at the EOP level of care since 9/23/10; he was awaiting transfer to an EOP at the time of the site visit.  He had a long history of incarceration; he had previously been released from the CDCR in 2008 after serving a 15 year sentence.  He had a history of treatment at both the 3CMS and EOP levels of care.

Various diagnoses were provided for this inmate, including Psychotic Disorder, Cognitive Disorder NOS, Depressive Disorder NOS, Borderline Intellectual Functioning, Schizoaffective Disorder and Schizophrenia.  The most recent medication regimen included treatment with Zoloft, Abilify and Vistaril.

The Form 7388, the checklist for DMH referral, was completed on 8/26/10.  It indicated that the inmate met one of the criteria for higher level of care referral as it was thought that he would benefit from a more comprehensive treatment program.  There was no documentation provided as to the clinical rationale for not referring him to DMH.  Of note was a Form 7388 dated 9/22/10, the day prior to the inmate's EOP designation, that indicated that he did not meet criteria for higher level of care referral consideration.

A mental health chrono dated 9/23/10 noted the inmate's placement in the EOP.  However, the treatment plan dated 9/25/10, which was apparently signed by the same primary clinician, made no mention of EOP placement and indicated that the inmate remained at the 3CMS level of care.  The documentation accompanying this treatment plan documented the inmate's report of having missed medications, his history of head trauma, worsening auditory hallucinations and significant memory impairments with worsening ADLs.  A mental status exam conducted on that date described the inmate as presenting with confusion, disorientation, and depressed and anxious mood.  The treatment plan included as interventions quarterly primary clinician contacts, supportive psychotherapy and group therapy as available.

Subsequent progress notes described the inmate as presenting with significant difficulties, including disorganized thinking and behavior, auditory hallucinations, memory difficulties and depression.  The psychiatrist initiated treatment on 10/6/10 with Zoloft, Abilify and Vistaril due to his continued depression and memory problems.

It was noted on 10/14/10 that the inmate was "out of medicine;" however, he was not seen until the following day when he was described as unstable and psychotic.

On 10/21/10 a different psychologist saw the inmate when he reported that his medications had been discontinued.  He reportedly remained with auditory hallucinations and depression.  He was referred to the psychiatrist at that time.  The primary clinician saw him one week later when he continued to report auditory hallucinations that threatened him, and depressed mood.  The clinician assessed the inmate as stable but seriously mentally ill.  The progress note did not mention the medication discontinuity issue or the psychiatry referral.

A primary clinician's progress note dated 11/10/10 indicated that the inmate reported that the voices were "frustrating." The clinician again described the inmate as stable but seriously ill. The progress note indicated that the inmate had been referred to the psychiatrist. At the time of review, there was no documentation of primary clinician contact from 10/28/10 to 11/10/10.

The psychiatrist saw the inmate on 11/15/10, three weeks after referral. The psychiatrist indicated that the inmate reported improvement and requested to receive his Abilify in the morning.

A progress note by a different primary clinician dated 11/17/10 documented the inmate's continued complaints that voices and shadows were bothering him. The inmate's general mental status was reportedly improved.

Findings

Although the documentation at the time of the inmate's EOP placement was contradictory, with one exception, the primary clinician saw the inmate timely. However, concerns were noted as to the care provided to the inmate. It did not appear that he was adequately evaluated for higher level of care referral consideration. Although the inmate appeared to exhibit some recent improvement, his documented downward course while awaiting transfer was not addressed timely. The inmate reported that his medications had lapsed, and this issue was not addressed timely. It appeared that he was not seen for a psychiatric referral for three weeks; this delay in evaluation was of concern and not consistent with Program Guide requirements. The inmate was also provided with multiple diagnoses and there was a need for diagnostic clarification. There was also a lack of documentation of adequate treatment planning to address the inmate's worsening mental health symptoms.

**Inmate B**

This 3CMS inmate was housed in administrative segregation. It appeared that he transferred to KVSP on 9/22/10, from the CTC at PVSP. He was hospitalized in the CTC at PVSP due to a suicide attempt one week prior, which required hospitalization. The inmate had another suicide attempt by hanging one month earlier. He had a mental health history that was significant for treatment of a mood disorder, a family history of suicide (uncle) and a history of noncompliance with outpatient mental health treatment. At PVSP he was provided with a diagnosis of Bipolar Disorder NOS; a provisional diagnosis of Borderline Personality Disorder was also provided. The inmate was most recently diagnosed with Major Depressive Disorder, single episode, in partial remission. He was prescribed Abilify.

After the inmate's return to PVSP, a progress note dated 10/15/10 indicated that the Abilify order did not follow him. The treating psychiatrist indicated that there were concerns as to the rationale for treatment with this medication. The psychiatrist provided

a provisional diagnosis of Mood Disorder NOS; however, an alternative diagnosis of Malingering was also considered.

Subsequent progress notes indicated that the inmate was seen at cell front, and that he was requesting the Abilify. A progress note dated 9/28/10 indicated that he was to be evaluated for a disciplinary infraction that was incurred after he reportedly struck an officer in the face while resisting efforts to cut him down during a recent suicide attempt. The treatment plan dated 10/22/10 indicated that the inmate was placed in administrative segregation due to the RVR incurred during the serious suicide attempt; he reportedly received 90 days loss of credit. This treatment plan documented the inmate's history of four suicide attempts, including overdoses at ages 17 and 19, which resulted in hospitalizations. The plan included as treatment interventions weekly primary clinician contacts and group therapy; therapy goals included increasing coping skills through cognitive behavioral therapy (CBT).

On 8/29/10 the inmate transferred to the PVSP CTC due to suicidal ideation thought at the time to be connected to an effort to avoid transfer to KVSP. On 9/1/10 he was returned to the general population but was readmitted to the CTC on 9/19/10 after he reportedly made a serious suicide attempt. On 9/22/10 he was transferred to KVSP, but according to a medical record progress note was not designated as a MHSDS participant. When mental health staff became aware of his transfer to KVSP on 9/23/10, they alerted KVSP. The KVSP staff saw the inmate on 9/24/10 when his mental health status was clarified as 3CMS.

On 9/29/10, the inmate returned to the PVSP CTC for unclear reasons. On 10/7/10 he was transferred to the PVSP ASU, where he remained housed at the time of the site visit.

Findings

There appeared to be ambiguity as to the inmate's accurate diagnosis as well as the degree of suicide risk that he posed. Some staff appeared to view him as significantly impaired and noted his recent, serious suicide attempts, while others emphasized his efforts to avoid transfer as a means of manipulation and malingering. There was a lack of documentation of adequate treatment planning or a unified approach to the inmate's treatment.

The expert discussed this case with mental health supervisory staff due to concerns as to the pursuit of disciplinary action against the inmate that occurred during a serious suicide attempt as well as the use of force. Documentation as to the circumstances surrounding this inmate's transfer to KVSP was confusing and difficult to evaluate.

**Inmate C**

This 3CMS inmate was housed in administrative segregation. He had been receiving mental health services at the 3CMS level of care since 2005 due to depression and a history of several suicide attempts. He was provided with diagnoses of Mood Disorder

NOS and Polysubstance Dependence.  An annual treatment plan review on 7/1/10 contained pre-printed information, suggesting a lack of individualized treatment planning.  Treatment interventions included primary clinician contacts, psychiatric medication as needed, group therapy as available, and vocational placement as available.  The treatment plan on 9/24/10 included recommendations for substance abuse groups with weekly primary clinician contact and supportive services.  The Form 7388 indicated that the inmate met two of the criteria for higher level of care referral consideration.  No specific documentation was provided as to the rationale for not referring the inmate to DMH.  However, earlier screening forms had not indicated that the inmate met referral criteria.

A progress note dated 11/16/10 indicated that the inmate was experiencing mood swings with the upcoming Thanksgiving holiday.  There was no documentation of specific treatment interventions to address this issue or evidence of subsequent clinical contact at the time of the site visit.

Findings

Mental health timely evaluated this inmate.  However, treatment planning was insufficiently individualized and did not reflect a response to the inmate's increased symptoms approaching the holiday season.  Although the medical record did not contain significant indications of the need for DMH referral, one Form 7388 suggested that the inmate met two criteria for DMH referral consideration; however, rationale for non-referral was not provided.

**Inmate D**

This 3CMS inmate received five RVRs during the period of 7/2/10 to 9/29/10.  He reportedly had a history of multiple suicide attempts beginning at age seven, as well as inpatient psychiatric treatment. He was provided with a diagnosis of Mood Disorder NOS; he was prescribed Celexa and Lithium.

A progress note dated 8/24/10 indicated that the inmate's father had died one year prior and that he was admitted to the CTC as a result of the anniversary of this event.  There was documentation that the inmate had difficulty interacting with some custody staff.  The treatment plan dated 8/26/10 was individually focused; it noted the types of groups that the inmate required, cognitive behavioral interventions aimed at identifying and decreasing cognitive distortions, and deep breathing and relaxation techniques.  The Form 7388 was completed and indicated that the inmate did not meet criteria for higher level of care referral consideration; this, despite the fact that he had received four RVRs during the month prior to the treatment plan's completion.  There was no documentation indicating that the inmate had been referred for a mental health evaluation after incurring these infractions.  Although the treatment plan was focused on the inmate's symptoms and his specific behavioral and environmental concerns, subsequent progress notes lacked documentation of implementation of these treatment modalities.

A progress note dated 7/20/10 stated that the inmate was having difficulty with custody staff.  As he had less than one year remaining in prison, he was concerned about jeopardizing his release date due to a conflict.  This progress note reiterated concerns expressed in previous documentation in the medical record.  It appeared that the inmate was placed in administrative segregation during early October 2010 due to the RVRs.

Findings

Mental health staff generally saw the inmate at intervals that were consistent with the Program Guide.  Despite receiving multiple RVRs, he was not referred to mental health for a mental health evaluation, and it appeared that these infractions did not result in higher level of care referral consideration.  The treatment plan was well-developed and individualized; however, follow-up interventions did not describe implementation of the clinical methodologies that it delineated or progress toward the goals discussed.

EXHIBIT M
Avenal State Prison (ASP)
February 28, 2011 – March 2, 2011

**Inmate A**

This 3CMS inmate's medical record was reviewed to assess the treatment provided to him while he awaited transfer to an EOP.  At the time of review, he was housed on an SNY yard.  He was diagnosed with Schizoaffective Disorder depressed type.  He was treated with Celexa 30 mg/day, Vistaril 50 mg as needed, Trileptal 500 mg/day and Geodon 60 mg at noon and 80 mg at night.

The inmate arrived at ASP on 10/4/10 from NKSP, where he was provided with a diagnosis of Schizoaffective Disorder and received mental health services at the 3CMS level of care.  He was treated with Abilify and Remeron at NKSP.  His mental health history was significant for an involuntary psychiatric hospitalization that occurred during 1977.  He was scheduled for parole on 9/25/11.

Since his arrival at ASP, the inmate had experienced paranoid thoughts.  He also reported hearing voices telling him that he was not going to parole and that other people were going to harm him.  On 2/3/11 during an interview with his primary clinician, he requested that his level of care be changed to EOP.  At that time he reported symptoms of depression and increased auditory and visual hallucinations.

On 2/8/11 he was seen in an IDTT meeting convened to assess his level of care.  His C-file was not available for review at that time.  He was recommended for transfer to the EOP level of care.

A progress note dated 2/16/11 indicated that the inmate slept during medication calls between 2/7/11 and 2/9/11.  On 2/17/11 he requested that his EOP designation be removed.  A progress note dated 2/23/11 documented the inmate's request for a medication evaluation; at that time, the clinician stated that the inmate was stable and compliant with prescribed medications.  A progress note dated 2/24/11 by the same clinician stated that the inmate was in the 3CMS program and that he reported moderate symptoms of depression, anxiety and hallucinations.  A subsequent note on 2/28/11 correctly noted the inmate's EOP status and addressed his reluctance to transfer to the EOP.  As of 2/28/11 the medical record did not include a response to the 2/23/11 referral to psychiatry for medication evaluation.

The Form 7388, the checklist for DMH referral, apparently completed at the time of the 2/8/11 IDTT meeting indicated that the inmate did not meet the criteria for referral to a higher level of care.  The IDTT progress note that was completed on the same date indicated that the inmate's C-file was unavailable for review.  It was not clear how the question on the Form 7388 as to disciplinary history was reviewed without the assistance of the C-file.  The 2/8/11 IDTT meeting appropriately noted groups and cognitive behavioral treatment (CBT) as treatment interventions to address symptoms of isolation and anxiety.  Although this inmate was screened for group therapy, progress notes after the IDTT meeting did not mention CBT treatment.

635

Findings

Clinicians consistently followed this inmate at increased frequencies following the appropriate decision to change his level of care to EOP status. However, treatment plan goals were not reflected in subsequent progress notes. The inmate was screened for DMH placement during his IDTT meeting and apparently did not meet any criteria for referral consideration, but his C-file was not available; this brought into question how the staff could appropriately respond to the question on the Form 7388 as to the number of recent RVRs as a referral criterion. Although the inmate expressed concern as to his parole later in 2011, at the time of review the medical record did not contain parole planning documentation.

**Inmate B**

This SNY inmate was transferred to ASP on 6/16/10, from CIM. He was scheduled to parole on 12/19/11. He was awaiting transfer to the EOP level of care. He was diagnosed with Major Depression, severe with psychotic features. His diagnosis was changed to Schizophrenia paranoid type on 10/9/10. His medical history was significant for treatment of valley fever. He was prescribed the following psychotropic medications: Thorazine, Zoloft and Geodon. Recent progress notes documented that the inmate had a decreased ability to complete his ADLs, depression and impaired sleep.

A psychiatric progress note dated 6/18/10 indicated that the inmate refused to continue taking prescribed psychotropic medications based on his belief that he no longer required them; the psychiatrist indicated that the inmate would be seen in one month for follow-up. An IDTT progress note dated 6/29/10 documented that a suicide risk assessment checklist was completed but did not mention the medication compliance issue.

A psychiatric progress note dated 8/13/10 indicated that the inmate was not seen because he was housed in the OHU for medical reasons. However, the inmate was seen by his primary clinician on 8/31/10 when he reported increased paranoia, auditory hallucinations and the experience of seeing images coming out of the walls. He was encouraged to resume his medications.

The psychiatrist saw the inmate on 9/3/10, when he reported visual hallucinations of skulls and skeletons as well as increased depression and auditory hallucinations telling him to harm others. At that time, he consented to a trial of Abilify starting at 10 mg/day with follow-up planned for three weeks. It was determined that the inmate would remain at the 3CMS level of care.

The inmate was next seen by psychiatry on 10/9/10 when he reported continuing to hear voices with persistently depressed mood. Abilify was increased to 20 mg/day but it was unclear whether the inmate was medically compliant at that time.

636

On 11/3/10 the primary clinician saw the inmate for follow-up. The progress note did not indicate that the primary clinician was cognizant of the psychiatrist's change in diagnosis; it described an unremarkable mental health status examination.

The inmate was next seen by the psychiatrist on 1/28/11. The progress note indicated that the inmate continued to experience hallucinations. His diagnosis was changed to Schizoaffective Disorder bipolar type. Medication changes included the addition of Geodon and Thorazine, and discontinuation of Remeron. The psychiatrist also stated that the inmate needed to be seen in follow-up for consideration of EOP level of care in a dormitory setting.

On 2/3/11 the primary clinician saw the inmate in response to a staff referral. The clinician documented that the inmate continued to have symptoms of depression and psychosis. Although an IDTT progress note dated 2/8/11 stated that the inmate had received three RVRs for refusing to go to his school assignment and required a change to the EOP level of care, the Form 7388, the checklist for DMH referral, documented negative responses for all criteria for DMH referral consideration.

The inmate was seen on 2/24/11 for primary clinician follow-up, when his mental status examination was described as "within normal limits." Medical record documentation indicated that the inmate participated in a medication management group.

Findings

This inmate was not consistently seen by psychiatry in accordance with the psychiatrist's plan for more intensive monitoring which was indicated in light of the inmate's clinical presentation and medication compliance issues.[26] There appeared to be a lack of

---

[26] Defendants requested deletion of the statement that psychiatry did not see the inmate timely, based on the *Coleman* Program Guide requirement that a psychiatrist evaluate a patient at the 3CMS level of care once every 90 days (P.G. 12-3-11, 12-3-15). However, the actual language of the Program Guide is that each 3CMS inmate-patient "shall be reevaluated by a psychiatrist *a minimum of* every 90 days" [P.G. 12-3-11], and "Face-to-face individual contacts between the primary clinician and the 3CMS inmate-patient in a GP setting shall occur *as often as clinical needs dictate but at least every 90 days*." [P.G. 12-3-15] (emphasis added). The special master's expert's concern regarding the frequency of psychiatric contacts in this case was based on this inmate's troubling presentation, medication compliance issues, and the psychiatrist's own determination on two occasions that the inmate required more frequent contacts. Increased frequency was not accomplished. The patient was seen on 6/18/10 in conection with his refusal of psychotropic medications, and the plan was to re-evaulate him in one month. While there was an interdisciplinary note on 6/29/10, in no respect did it address the noncompliance issue. There was a note by the psychiatrist on 8/13/10 stating that the inmate was not seen because he was in the OHU for medical reasons, indicating an attempt to see the inmate, albeit an untimely one. There was also a case management note dated 8/31/10 stating that he was seen for 90-day follow-up and that he exhibited increased paranoia, indicating that the inmate was out of the OHU by then and that he was still clinically unstable. The inmate was seen again by psychiatry on 9/3/10. At that time, he reported hallucinations telling him to harm others and consented to a trial of medications. While he was considered appropriate to remain at the 3CMS level of care, the psychiatrist's plan was to see him again in three weeks, i.e. 9/24/10. That decision was supportable, given the plan to reassess sooner than 90 days. However, the inmate was not seen again until 10/9/10, or 15 days beyond the planned three-week interval. At that time, he still reported hearing voices and pervasive depression, and his medication was increased. To summarize, the point is not whether this inmate was seen

coordination between the primary clinician and the psychiatrist. Despite the presence of documentation in other areas of the medical record indicating that the inmate met criterion for higher level of care referral consideration, the Form 7388, the checklist for DMH referral, did not reflect this consideration and conflicted with the treatment plan.

**Inmate C**

This inmate was awaiting transfer to an EOP. His recent history was significant for a sexual assault during late 2010; however, some medical record entries suggested that the inmate's belief that he had been sexually assaulted might be due to delusional thinking. The inmate was provided with a diagnosis of Bipolar Disorder and Post Traumatic Stress Disorder (PTSD) related to the possible sexual assault.

An 11/08/10 progress note documented that the inmate had two recent OHU admissions. These admissions were believed to be the result of possible delusional thinking as to the sexual assault, as opposed to an actual assault. On the following day, the Form 7388, the checklist for DMH referral, screening was completed; this screening documented the determination that the inmate would benefit from a comprehensive treatment program but also noted that he should stabilize at the EOP level of care.

On 11/18/10 the inmate was seen due to medication noncompliance but the medical record was not available for this encounter. Progress notes indicated that the inmate was followed consistently while housed in administrative segregation and after EOP placement.

A psychiatrist saw the inmate at cell front on 12/3/10; no explanation was provided for this non-confidential visit. The progress note of this contact indicated that the inmate did not exhibit evidence of acute psychopathology and was described as being stable on medications. On 12/9/10 the inmate was transferred from administrative segregation to an SNY yard. A progress note dated 12/10/10 documented the inmate's refusal to leave his cell and suggested that he might not require EOP placement.

There was no documentation as to clinical contacts that occurred between 2/9/11 and 2/22/11. The inmate was a group therapy participant.

Findings

Although there were some lapses in clinical contacts during February 2011, this inmate was generally seen timely by the primary clinician, psychiatrist and the IDTT. He was involved in group therapy after his EOP placement.

**Inmate D**

---

"timely" according to literal minimum Program Guide time requirements, but that he was not seen in accordance with the clinically appropriate plan to see him more frequently in response to specific indicia – depression, hallucinations, and medication noncompliance.

This 3CMS SNY inmate arrived at ASP during February 2010. Several diagnoses were present in the medical record, including Polysubstance Dependence and Schizophreniform Disorder; differential diagnoses of Major Depressive Disorder with psychotic features and Schizophrenia were also present in the medical record. Despite the consideration of these various diagnoses of severe mental illness, the inmate was primarily treated without psychotropic medications. His clinical presentation included delusional thinking that chips were planted in his teeth and safety concerns resulting in his desire to change institutions. His mental health history was negative for psychiatric treatment while in prison or in the community.

It appeared that the inmate was initially transferred to the OHU from 8/2/10 to 8/19/10. It further appeared that he was placed in administrative segregation following OHU release. On 8/20/10 the inmate reported suicidal ideation and stated that he believed that chips were implanted in his teeth. The Form 7388, the checklist for DMH referral, was completed on 8/23/10; it indicated that the inmate met one of the criteria for DMH referral consideration as he would benefit from a comprehensive treatment program. The rationale provided for non-referral was the inmate's subsequent transfer to the MHCB at CMF; it appeared that he was transferred to the MHCB at CMF due to potential danger to self.

The inmate was placed in the MHCB from 9/9/10 until approximately 9/13/10. A progress note dated 9/20/10 stated that the inmate had returned to ASP from the MHCB and that he no longer believed that chips were planted in his teeth. The plan outlined in the progress note included placement in the 3CMS program and on the coping skills group therapy wait list. The inmate was returned to the general population with five-day follow-up ordered.

The inmate was followed consistently by the psychiatrist and primary clinician following his return to ASP. However, documentation indicated that the medical record was not available for clinical encounters on multiple occasions.

Findings

This inmate was appropriately placed in the OHU and transferred to the MHCB, as clinically indicated. It appeared that these interventions stabilized the inmate's presenting mental health symptoms. After his return to ASP, five-day follow-up occurred as required. Although the inmate was not referred to DMH, it appeared that the IDTT considered this option, and the decision appeared to be clinically appropriate. However, the medical record did not reflect sufficient efforts to reconcile the widely disparate diagnostic considerations. This task may have been made more difficult by multiple occasions during which clinicians evaluated the inmate without a medical record.

**Inmate E**

This 3CMS inmate was provided with a diagnosis of Depressive Disorder NOS. He was treated with Prozac 20 mg/day. His recent mental health history was significant for OHU

placement from 10/14/10 to 10/18/10 and from 10/27/10 to 10/28/10 due to the possibility that he presented a danger to himself.  The inmate was involved in group therapy but his compliance was sporadic.

Findings

This inmate was seen timely by the psychiatrist, primary clinician and the IDTT.  Suicide risk assessment checklists were completed as clinically indicated.  The inmate was housed in the OHU when he presented with possible suicidal ideation.

**Inmate F**

This EOP inmate was provided with a diagnosis of Major Depressive Disorder, recurrent, severe with psychotic features.  Psychotropic medication treatment included Buspar, Abilify, Geodon, Haldol and Celexa.  His history was significant for extensive alcohol abuse with resulting evidence of dementia.

The inmate was referred to DMH and housed in the OHU for over 120 days although there were brief time periods when he was transferred to the yard.  Although the staff also periodically attempted to transfer him within the OHU from a single cell to one of the dorms, all such transfer efforts failed as the inmate quickly decompensated.  The inmate had periods of medication noncompliance with subsequent symptoms of rocking behavior and urine incontinence.  The inmate also reported experiencing violent dreams, stated that he felt "dead inside," and expressed a desire for transfer to a higher level of care.

During his OHU stay, the inmate's DMH referral was rescinded due to his reported improvement in symptoms.  A medical record review indicated that on 11/20/10 the staff began discussing with this inmate a change in disposition to an EOP rather than to DMH.  However, the inmate's transfer to the EOP was significantly delayed.

Findings

This inmate was followed consistently by mental health clinicians during his extended OHU stay.  Although the decision to transfer the inmate to the EOP rather than the DMH appeared to be appropriate, the transfer delay was of concern.  It appeared that the delay was a result of the inmate's referral to the dual diagnosis program at CSATF, and to bed space issues.  The inmate was reasonably stable during his OHU stay, but the lack of adequate confidential OHU treatment space made it difficult to provide him with more than basic treatment while he awaited transfer to a more appropriate setting.

**Inmate G**

This EOP inmate was housed in the OHU and was awaiting transfer to an EOP.  His primary diagnoses were Depressive Disorder NOS and Schizophreniform Disorder.

The inmate had MHCB hospitalizations during June and July 2010. He was transferred to the MHCB at HDSP on 7/2/10 due to persistent depressive symptoms with psychosis; these psychotic symptoms included thought reading, hypervigilance and suicidal impulses. Although an IDTT meeting on 7/7/10 indicated that the inmate had returned from the MHCB, his mood reportedly remained dysphoric. The inmate was placed in the 3CMS program at that time.

At the time of review, the inmate had been housed in the OHU since 11/21/10 or 11/23/10 due to a worsening of his thought processes and mood disturbance. This placement coincided with the inmate's most recent episode of medication noncompliance. Progress notes indicated that the inmate was followed consistently by mental health clinicians while he was in the OHU awaiting transfer; he did not appear to show significant improvement or decompensation while awaiting transfer.

Findings

Mental health clinicians consistently followed this inmate while he was housed in the OHU awaiting transfer to an EOP. There was a lack of documentation regarding the IDTT decision as to the possible need for DMH referral, and it appeared that the inmate may have met DMH referral consideration criteria because of the number of OHU and MHCB admissions.

**Inmate H**

This inmate's medical record was reviewed at plaintiffs' attorneys' request, who reported that he had decompensated due to housing conditions. The inmate was provided with diagnoses of Dysthymic Disorder and Polysubstance Abuse. The inmate was evaluated by the psychiatrist on 1/29/11, and was prescribed Paxil and Vistaril. He reported no concerns at that time, and his mood was described as euthymic.

Progress notes during December 2010 indicated that the inmate was essentially stable. On 12/5/10, the psychiatrist discussed the possibility that the inmate's medications would be decreased at the next visit. On 2/28/11, the psychiatrist indicated that the inmate's depression had improved and he was described as stable. A review of the medical record indicated that the inmate was followed consistently by mental health staff and was involved in group therapy.

Findings

Mental health staff consistently followed this inmate, who appeared to be stable. The mental health care provided to this inmate appeared to be appropriate.

**Inmate I**

This 3CMS SNY inmate's medical record was reviewed due to his report of psychiatric medication management problems, which included issues with timely renewals.

The inmate had been provided with a recent diagnosis of Schizoaffective Disorder bipolar type. He was treated with Geodon, Paxil and Prozac. Progress notes dating back to 2008 and 2009 indicated both sporadic lapses in his receipt of medications and the inmate's ongoing frustration and preoccupation with these incidents. The institution reported that there was a lapse in the inmate's receipt of Geodon from 4/4/10 to 4/19/10. A progress note dated 2/7/11 stated that the inmate reported that he was medication compliant and was consistently receiving his medications.

More recently, the inmate saw a psychiatrist on 11/19/10, when it was reported that he had received benefits from treatment with Prozac. Laboratory studies were ordered at that time. The inmate was next seen on 12/17/10, when he was reported to be stable.

Findings

There were documented instances of medication lapses for this inmate, who filed a grievance due to the effects of not receiving his prescribed medications. This issue appeared to have been resolved, and the inmate appeared to be stable at the time of the site visit.

EXHIBIT N
Salinas Valley State Prison (SVSP)
March 21, 2011 – March 24, 2011

**Inmate A**

The medical record of this mainline EOP inmate was reviewed, with a focus on mental health documentation generated during the monitoring period.  The initial IDTT was dated 2/14/11.  The Form 7388, the checklist for DMH referral, was completed; two problems that the Form 7388 identified included "adjust to EOP" and "manage psychotic symptoms."  The inmate's diagnoses were listed as Schizoaffective Disorder depressive type and Antisocial Personality Disorder.

Comprehensive, typed notes were present in the medical record from PBSP, where the inmate had been receiving medications by way of a Keyhea order.  He was provided with diagnoses that included Psychotic Disorder NOS and Depressive Disorder NOS. Schizoaffective Disorder was also periodically included in the medical record as an additional diagnosis.

A progress note dated 2/8/11indicated that the inmate had recently been transferred from NKSP to SVSP.  However, a progress note dated 2/15/11 indicated that he had been transferred in January 2011 from PBSP.  Based on a 1/24/11 progress note from PBSP, the transfer to SVSP from PBSP appeared to have been confirmed.  The inmate remained on a Keyhea order.  He was prescribed Haldol Decanoate, Cogentin and Remeron.

The medical record did not document weekly primary clinician contacts.  There was a psychiatric progress note from March 3, 2011.  It appeared that the inmate had minimal group therapy participation.

Findings

It was too early for an adequate assessment as to the inmate's treatment in the EOP.  The summarization of the PBSP course of treatment in the medical record would facilitate development of a more relevant treatment plan.  The inmate's current participation in the EOP was problematic due to his lack of regular attendance at scheduled therapies.

**Inmate B**

The medical record of this mainline EOP inmate was reviewed, with a focus on mental health documentation generated during the monitoring period.

On 1/25/11, the inmate was described as floridly psychotic.  On 2/1/11, the treatment plan was to be reviewed by the IDTT, and the inmate was to be transferred to the Enhanced Case Management Program (ECMP).  An IDTT that occurred the following day indicated that the inmate had acutely decompensated, which resulted in a change in his level of care from 3CMS to EOP.  A possible referral to DMH was mentioned if the inmate's symptoms did not remit.  The plan was to conduct another IDTT in 30 days.  A progress note dated 2/10/11 indicated that the inmate's sexually harassing behaviors appeared to be unrelated to his current psychotic symptoms.

Weekly ECMP progress notes were documented by way of the CDCR 7230-MH form; however, minimally useful information was presented due to the form's structure. The inmate did not attend groups during the week of 2/22/11.

Another IDTT meeting occurred on 3/2/11. Since the previous IDTT, the inmate had not met with his primary clinician. He continued to demonstrate signs of delusional thinking and presented with limited insight as to his need for mental health services. He did not attend any group therapy sessions. A DMH referral was not generated. A 115 X assessment that occurred on 3/4/11 indicated that there were mitigation factors related to his mental illness. Based on a 3/7/11 psychiatry note, it appeared that the inmate was housed in administrative segregation.

There appeared to be little change in the inmate's symptomatology based on documentation from a 3/14/11 cell-front contact with the primary clinician.

Findings

The inmate presented with poor mental health functioning. He did not participate in either provided individual or group therapies. It was unclear why he was not referred to DMH for stabilization.

**Inmate C**

The medical record of this mainline EOP inmate was reviewed, with a focus on mental health documentation generated during the monitoring period.

The most recent IDTT was dated 12/30/10. The previous IDTT occurred during February 2010. The inmate was provided with a diagnosis of Schizophrenia paranoid type. The medical record contained documentation of group therapy participation. However, these forms were not particularly informative from a clinical perspective. They indicated, however, that religious services were included for as much as two hours per week of structured therapeutic activities in addition to two credit hours for work and two hours for education.

A psychiatric progress note dated 10/6/10 indicated that the inmate's clinical condition was stable. The plan outlined included follow-up within 30 days. The psychiatrist noted little change during the subsequent 11/3/10 follow-up appointment.

Primary clinician progress notes indicated that the inmate had chronic auditory hallucinations and delusional thinking. The primary clinician saw the inmate consistently.

Findings

With the exception of the issue of inclusion of religious services as a structured therapeutic activity, the inmate received treatment consistent with Program Guide

requirements. The psychiatrist, IDTT and primary clinician consistently followed him. The inmate appeared to be stable and receiving mental health services at the appropriate level of care.

**Inmate D**

This transgendered inmate's medical record was reviewed at plaintiffs' attorneys' request due to concern as to possible decompensation and access to mental health treatment as to gender issues.

The most recent IDTT was dated 3/17/11. The inmate was provided with the following diagnoses: Gender Identity Disorder, attracted to males; Adjustment Disorder, mixed disturbance of emotions and conduct, chronic; and Borderline Personality Disorder. The treatment plan indicated that he would continue to receive services at the EOP level of care. IDTT documentation made no reference to evidence of the inmate's decompensation.

A psychiatric examination on 3/11/11 documented that the inmate did not exhibit evidence of florid psychotic symptoms. There was documentation that he received education as to the importance of remaining medication adherent; primary clinician documentation from the previous day indicated that the inmate was doing well. However, his participation in individual and group therapies during that week was minimal; this was related in part to facility lockdowns.

It appeared that the focus of individual therapy was to assist the inmate in maintaining personal boundaries. A psychiatric assessment that occurred on 1/7/11 was consistent with the previously referenced assessment.

Findings

A review of the medical review indicated that the inmate did not exhibit evidence of decompensation. A review of the current treatment plan indicated that it was clinically appropriate.

**Inmate E**

The inmate was in the modified EOP program. He was provided with diagnoses of Schizophrenia paranoid type, Polysubstance Dependence and Antisocial Personality Disorder. The most recent IDTT was dated 2/3/11; the previous IDTT was dated 12/2/10. The inmate was receiving medications by way of a Keyhea order. He refused to attend his monthly psychiatric appointment on 1/13/11 but the psychiatrist saw him at the cell front.

The psychiatrist saw the inmate again on 1/27/11. He had been referred after refusing his morning dose of Zoloft. He continued to refuse his weekly individual contacts with the primary clinician.

646

Findings

This inmate was not receiving treatment consistent with Program Guide requirements based on the lack of monthly IDTT meetings. The treatment plan was also ineffective given the inmate's lack of participation in the EOP.

**Inmate F**

This inmate was seen and his medical record was reviewed at plaintiffs' attorneys' request due to concerns as to his housing in administrative segregation since August 2010, his placement in safety cells for extended periods and concerns as to whether he was receiving adequate mental health care.

The most recent treatment plan was dated 3/3/11. The inmate was included in the ECMP in the administration segregation unit. He was classified as Level IV with 586 points, and was serving a life sentence. He had an extensive disciplinary history. He was provided with diagnoses that included Bipolar I Disorder, most recent episode depressed with psychotic features, possible Psychotic Disorder NOS and Antisocial Personality Disorder. Prior to 1/5/11, he received psychotropic medications as a result of a Keyhea order. He was treated with Invega.

The inmate was previously housed in the PSU at PBSP. He was subsequently transferred to the ASU at SVSP on 8/9/10 on out-to-court status. He generally refused to attend group therapy. His treatment plan included offering weekly out-of-cell individual sessions with daily primary clinician mental health rounds. On 9/9/10, the inmate requested placement at SVPP. An IDTT on 9/15/10 indicated that he would continue to receive services in the ECMP EOP. The primary clinician reported on 9/28/10 that the inmate's mental health condition was essentially unchanged.

The inmate refused to attend a psychiatric appointment on 10/25/10; it appeared that he also had been refusing medications during early October 2010.

Another IDTT was conducted on 10/13/10. The inmate continued to refuse group therapy or attend the IDTT meeting. He expressed his desire for a level of care change to the 3CMS program. The psychiatrist saw him at cell front, because he refused out-of-cell visits during January 2011.

An IDTT review that occurred on 3/3/11 indicated that the inmate would remain at the EOP level of care (i.e., ECMP) until he began attending EOP treatment groups. No psychotropic medication changes were made at that time. Although the inmate had been prescribed Invega, it appeared that the medication was discontinued after February 2011 due to medication noncompliance.

Findings

This inmate appeared to have been offered appropriate mental health care; however, he essentially refused all treatment except weekly primary clinician contacts, many of which he also declined. At the time of the site visit, he appeared to be clinically stable; however, his refusal of treatment, especially of psychotropic medications, made him a high risk for clinical deterioration.

**Inmate G**

This 3CMS inmate was serving a life sentence after his third strike. Earlier in his prison sentence, he was receiving mental health services at the EOP level of care. He was prescribed Buspar, Abilify, Lithium, and Remeron. The medical record contained current informed consent forms for medications. The inmate's Lithium level was checked during December 2010, and it was in the therapeutic range; thyroid studies were also obtained at that time.

The primary clinician saw the inmate on 3/8/11, 11/18/10 and several times during October 2010. There was no documentation of primary clinician contacts between March 2010 and October 2010. The last documentation of psychiatric contacts occurred on 1/5/11. An IDTT meeting was conducted on 12/30/10; the treatment interventions that were outlined in the treatment plan were generic in content and not specific to the inmate's identified problems. For example, although group therapy was recommended, there was no specification as to the type of groups or the frequency of contacts. No documentation indicated that the inmate was involved in group therapy. Progress notes also did not include information correlating to what was outlined in the treatment plan or with identified problems. The inmate requested removal from the mental health caseload, despite treatment with four psychotropic medications.

Findings

Psychiatry and the primary clinician did not see the inmate quarterly as required by the Program Guide. The treatment plan was generic in content. Progress notes and interventions did not correlate with the treatment plan or identified mental health symptoms.

**Inmate H**

This 3CMS inmate was included on the mental health caseload as a result of obsessive compulsive behaviors. He reportedly washed his hands ten times daily. Conflicting information was provided as to the presence of compulsive or ritualistic behaviors or the presence of a specific phobia. Differential diagnoses that were considered for him included Obsessive Compulsive Disorder and Obsessive Compulsive Personality Disorder. He had been treated with antidepressant medication in the past; however, this medication was discontinued in April 2010 at the inmate's request.

The most recent primary clinician appointments occurred on 7/15/10, 9/16/10 and 1/31/11. At a psychiatric appointment on 9/28/10, the psychiatrist offered medication

treatment but the inmate declined treatment with the antidepressant medication. The treatment plan was dated 9/22/10; anxiety was listed as a problem. The only interventions listed were quarterly contacts with the psychiatrist and primary clinician. No specific interventions or goals were identified, nor were any specific treatment interventions for phobias or obsessive compulsive disorders identified or provided.

Findings

The treatment plan was generic in content and did not address the inmate's diagnosis and identified problems. The treatment outlined was similarly generic; it consisted only of clinical contacts but no actual treatment for anxiety, phobias or compulsive behaviors. The primary clinician did not see the inmate quarterly as was minimally required by the Program Guide.

**Inmate I**

This 3CMS inmate had been treated for depression and anxiety according to the treatment plan dated 8/11/10. Interventions included quarterly contacts with psychiatry and the primary clinician, and group therapy and education.

The inmate transferred from NKSP during early August 2010 and was seen by his primary clinician on 8/6/10, 10/18/10 and 1/7/11. The psychiatrist also saw him on 8/23/10 for a medication evaluation. He had been treated with Effexor, an antidepressant, for more than a year, and this medication was continued. During September 2010, the inmate requested another psychiatric appointment to discuss his medications, and he was seen on 9/14/10. He was described as drug-seeking and "slightly menacing" when requesting Wellbutrin rather than Effexor. Given his history of stability on Effexor, the lack of side effects and the lack of clinical indication for a substitution, his request was denied. He subsequently refused continued medication treatment with Effexor.

Findings

The inmate was seen at the minimally required intervals by the psychiatrist, IDTT and the primary clinician and was evaluated in response to his request. His request for a medication that was frequently abused in correctional facilities was not honored, and the clinical rationale for denial was documented and clinically appropriate. The treatment plan was generic in content and the interventions identified were not specific to the inmate's listed problems.

**Inmate J**

This 3CMS inmate was serving his first prison term. He was referred for a mental health assessment during the reception center intake process after he reported a history of treatment for depression in the community. A comprehensive mental health evaluation was conducted on 12/14/09 and he was provided with diagnoses of Panic Disorder with agoraphobia, Opioid Dependence and Cannabis Dependence. He was included on the

mental health caseload at the 3CMS level of care. He was referred to psychiatry and was prescribed Remeron and Buspar.

The inmate was evaluated for a treatment plan update on 2/1/11 after he was transferred to the ASU. On that unit, he was seen daily during psych tech rounds. Psychiatry saw the inmate on 2/8/11 and the primary clinician made attempts to see him weekly; however, the inmate often refused to leave his cell for appointments and was seen at cell front. He requested removal from the MHSDS; his treatment plan indicated that he would be discharged after six months of stability without medications.

Findings

The mental health care that the inmate received appeared to be clinically appropriate. His treatment plan was updated appropriately when he was placed in administrative segregation. He was consistently seen during daily psych tech rounds and the primary clinician saw him weekly. He requested removal from the MHSDS; documentation indicated that the IDTT developed a plan to honor his request after six months of demonstrated stability that was consistent with Program Guide requirements.

**Inmate K**

This inmate had been a participant in the mainline EOP since at least 8/5/10. He worked on the landscape crew and attended education services with the goal of obtaining his high school equivalency diploma. He reportedly had no disciplinary infractions or MHCB admissions since his last IDTT meeting. He also reportedly had good group therapy attendance and appeared to be responding well to the structure of the EOP level of care. He was medication compliant. His primary symptom was noted to be paranoia that manifested itself in concerns that he would be removed from the EOP. He was provided with a diagnosis of Schizophrenia paranoid type. He was prescribed Gabapentin, Risperdal and Trazodone.

The inmate actively participated in treatment with the primary clinician; progress notes indicated that issues of self-esteem and cognitive distortions were addressed. Cognitive behavioral techniques were described as the primary therapeutic intervention.

Findings

This inmate actively participated in the EOP program. Clinical progress notes documented that there was an appropriate focus on identified problem areas. The inmate appeared to be receiving mental health services at the appropriate level of care in the EOP.

**Inmate L**

This 3CMS inmate was referred to DMH acute care from the MHCB on 1/18/11. He was admitted to the MHCB on 1/6/11 due to suicidal ideation; the medical record indicated

that two inmates had recently assaulted him on the yard. The MHCB discharged him on 1/27/11 to administrative segregation, where he was placed in the EOP. The DMH referral was withdrawn prior to the initiation and submission of the DMH referral packet.

A review of the medical record indicated that the inmate attended groups in administrative segregation. Psych techs conducting daily rounds described him as cooperative and stable.

The most recent primary clinician progress note indicated that the inmate did not want to leave his cell for a confidential interview; he denied current difficulties at that time. He also refused his prescribed psychotropic medications; he indicated that he had concerns as to possible medication side effects and the amount of medications that he was prescribed. He denied suicidal ideation and his ADLs were described as appropriate. He presented with dysthymic mood at that time. He was provided with a diagnosis of Mood Disorder NOS. He was instructed to submit a request to see the psychiatrist if he had psychiatric medication concerns.

Subsequent documentation in the medical record indicated that the inmate continued to report medication side effects; the primary clinician again instructed him to request to see the psychiatrist. Although no psychiatric progress notes were located in the medical record, documentation suggested that psychiatric contacts possibly occurred.

Findings

This inmate had been hospitalized in the MHCB due to thoughts of self-harm and safety concerns. A referral to DMH acute care was initiated; however, the referral was never formalized as the paperwork was not completed and the DMH referral was rescinded. The inmate was subsequently discharged to the administrative segregation EOP unit.

The primary clinician saw the inmate weekly. Documentation indicated that the inmate reported medication-related difficulties to the primary clinician for two weeks; however, he was instructed to submit a request to see the psychiatrist. It may have been more clinically appropriate for the primary clinician to have notified psychiatry or to have submitted a staff referral for the inmate while providing him with information as to the process for seeking psychiatric consultation.

The inmate participated in group therapy. Documentation indicated the completion of daily psych tech rounds. MARS and MHTS.net generated history indicated that a psychiatrist saw the inmate after he reported medication concerns; however, psychiatric progress notes were not located in the medical record.

**Inmate M**

This inmate was housed in administrative segregation. An IDTT on 2/23/11 changed his level of care to EOP. The IDTT further noted that he had exhibited evidence of decompensation during the previous three months while housed in administrative

651

segregation. During the preceding month, he had lost a significant amount of weight. He also had symptoms of apathy, anhedonia, depressed affect, social isolation, poor self-care, decreased appetite and insomnia. His memory, concentration and ability to focus were also impaired. Despite this clinical presentation, the Form 7388, the checklist for DMH referral, indicated that he did not meet any of the criteria for higher level of care referral consideration.

The previously described presentation was markedly different from the medical record description provided by the psych techs. These notes consistently indicated that the inmate was cooperative with appropriate mood, hygiene and grooming.

A progress note dated 3/4/11 indicated that the inmate was seen at cell front due to the assigned primary clinician's absence. The inmate denied having any significant mental health concerns. He stated that he did not take medications but attended EOP groups. He was described as presenting with a dysthymic mood.

A progress note dated 3/8/11 indicated that the primary clinician saw the inmate for an out-of- cell clinical contact. This progress note stated that he reported improvement due to group therapy attendance. Despite this, the inmate remained with anxiety and depression as to his administrative segregation placement. The clinician indicated that anxiety reducing skills and reframing techniques were discussed with the inmate. The most recent group therapy notes indicated that he had attended and participated in groups.

Findings

This inmate reportedly experienced a major depressive episode and there was documentation that he had clinical deterioration during his administrative segregation housing. He was not prescribed psychiatric medications and his level of care was increased to EOP. Subsequently, he began to participate in groups. Although a recent occurrence, it appeared that he benefitted from group participation.

It was of concern that there was a lack of documentation as to the need for medication treatment for the inmate's severe depressive symptoms. Consideration should also have been given for referral to a higher level of care (DMH or MHCB); this was true particularly in light of the significant depressive symptoms that the inmate exhibited, which increased his risk of suicide or self-harm. It appeared that he met several of the criteria for higher level of care referral consideration; this information was not accurately documented on the Form 7388.

There was also concern of conflicting documentation presented by the psych techs, whose inmate descriptions directly contradicted other clinical documentation; this raised questions as to the validity of the psych tech documentation.

**Inmate N**

This inmate's level of care was changed from EOP to 3CMS on 1/6/10; he was since removed from the MHSDS on 2/3/11. He had been referred to DMH in December 2009 for diagnostic clarification and was reportedly highly resistant to treatment at that time.

The inmate had requested discharge from the 3CMS program since July 2009 and had expressed frustration with his continued mental health treatment. Due to the unkempt condition of his cell, custody staff had initially referred him to mental health on 6/17/09. He reportedly had a long history of irritable mood with hostility and at times hypomanic symptoms; he also had interpersonal difficulties and noncompliance with the mental health services offered.

Custody staff reported that the inmate was able to care for himself and that he behaved appropriately. He worked as a porter, but stated that he did not enjoy this and wished to be left alone. He had no reported history of suicide attempts. Psych tech notes described him as cooperative and appropriate with normal ADLs. IDTT notes indicated that the treatment team was unable to provide a diagnosis for him due to his lack of cooperation with treatment.

Findings

Custody staff had initially referred the inmate to mental health in 2009; since that time he had remained uncooperative with treatment and regularly requested removal from the MHSDS. He had been referred to DMH during 2009 for diagnostic clarification, but this referral was rescinded. He was removed from the MHSDS on 2/3/11.

Reports indicated that the inmate remained with irritability; however, he reportedly was able to adequately function in a general population environment without suicide attempts or MHCB hospitalizations. The decision to rescind the DMH referral appeared to be clinically appropriate.

EXHIBIT O
Correctional Training Facility (CTF)
December 14, 2010 – December 16, 2010

**Inmate A**

This 3CMS inmate was housed in the ASU. He was provided with a diagnosis of Depressive Disorder NOS. He was prescribed Remeron 15 mg/day. The most recent treatment plan dated 11/3/10 did not contain specific treatment interventions; the plan also included group therapy as a treatment intervention even though it was not available to administrative segregation inmates. It appeared that the entire IDTT did not develop the treatment plan as the plan was signed only by the primary clinician. The most recent treatment plan, including the sole signature of the primary clinician, was exactly identical to the two prior treatment plans. The treatment plan also was not completed in entirety and lacked updated information as to the inmate's course of treatment. None of the treatment plans included treatment goals. The IDTT progress note indicated that the inmate was receiving mental health services at the 3CMS level of care for medical necessity despite his inclusion in the MHSDS since 2000. The placement chrono of that date did not indicate 3CMS program placement for medical necessity.

Psych tech round documentation was minimal in content as to inmate observations and indicated several days when psych techs did not see the inmate. There were two weeks for which psych tech round documentation was not located in the medical record.

During the most recent months prior to the site visit, medical record documentation indicated that the inmate was seen by several different clinicians; there was a lack of documentation as to the reasons for this discontinuity. Many of the typed progress notes were unchanged except for the subjective section, which was different for each progress note.

The inmate reportedly refused out-of-cell clinical contacts; there was no documentation that efforts were made to encourage him to leave his cell for confidential contacts.

Findings

The inmate was provided inadequate mental health care as documented by the vague and incomplete treatment plan that lacked specific goals and interventions, and the poor documentation of clinical contacts. Treatment plans were not modified to address the inmate's failure to engage in treatment and continued to include group therapy even though it was not available to the inmate. Treatment plans also did not include information as to the inmate's treatment progress or lack of progress. Progress notes appeared to be duplicated and included the same information for subsequent notes, suggesting a lack of significant therapeutic activity.

The inmate was seen timely by the psychiatrist and primary clinician. There was a lack of documentation of the occurrence of daily psych tech rounds and the documentation was lacking in significant clinical content.

**Inmate B**

This 3CMS inmate's case was reviewed at the request of plaintiffs' attorneys. The inmate was housed in the general population. The treatment plan, which was updated on 2/16/10, indicated that the inmate was functioning well although he reportedly had occasional difficulties with depression, mood swings and dealing with authority figures; cognitive behavioral therapy was identified as a treatment intervention to address these issues.

The inmate was provided with a diagnosis of Mood Disorder NOS. He was prescribed Prozac 40 mg/day. A primary clinician progress note dated 11/1/10 documented the inmate's belief that his psychiatric medication caused him to feel passive; he feared that this would make him a target of other inmates. During the months preceding the site visit, the inmate had several episodes of medication noncompliance; however, an unsigned progress note dated 11/19/10 indicated that he stated that he would resume taking his medications. Although there was documentation that the primary clinician worked with the inmate to address his negative thoughts and ruminations, the psychiatric progress note dated 12/2/10 did not address the inmate's medication concerns. Most of the psychiatric progress notes in the medical record were also of concern, as they essentially repeated the same information with the exception of the psychiatric follow-up recommendations. The psychiatric progress notes did not acknowledge the inmate's reported medication noncompliance.

The primary clinician saw the inmate more frequently than quarterly. Psychiatric decompensation reportedly occurred during September 2010. The primary clinician again saw the inmate approximately six weeks later when a psychiatry referral for a medication reevaluation resulted in an order for an increase in Prozac. The inmate reported that the medication increase resulted in a positive therapeutic effect.

Findings

The primary clinician, psychiatrist and IDTT consistently and timely followed the inmate. Based on the generic content of psychiatric progress notes and the lack of psychiatric documentation that medication noncompliance issues were addressed with the inmate, his medication noncompliance did not appear to be adequately addressed. The inmate was appropriately referred to the psychiatrist when he was noted to be noncompliant with medications.

**Inmate C**

This transgendered inmate's case was reviewed at plaintiffs' attorneys' request. Although the inmate was housed in the SNY and had been treated at the 3CMS level of care, he was removed from the MHSDS on 8/18/10.

The inmate arrived at CTF on 5/25/10, from SCC, where he reportedly had been assaulted. According to custody staff, the assault allegation was proven false. After his arrival at CTF, the inmate had adjustment difficulties. Custody staff described him to be

656

difficult, with irritability and poor social skills relating to other inmates, which resulted in the inmate's social isolation. He requested single cell status due to safety concerns; custody granted this status for 90 days pending review.

The inmate complained about his desire to shower alone. Although the custody supervisor reported that the inmate had appropriately utilized the grievance process, his request that the entire unit be locked down while he showered was impossible as it would be too disruptive to the unit. The inmate was upset that his request was not accommodated. However, custody attempted to accommodate him by allowing the inmate to shower at the end of the shower period, minimizing the number of other inmates showering at the same time.

The inmate was receiving estrogen injections but was not treated with psychotropic medications. According to a physician note dated 9/22/10, he had not been taking estrogen for several months prior to the note's date.

The inmate was placed in the 3CMS program on 2/23/10, while housed at SCC. The treatment plan from that date documented that he had been provided with diagnoses of Generalized Anxiety Disorder, Polysubstance Dependence and Antisocial Personality Disorder. Subsequent CTF placement chronos included information that the inmate was classified in the 3CMS program, while other chronos indicated that he was in the MHSDS program due to medical necessity. There was no documentation as to an IDTT change to medical necessity status.

The most recent treatment plan dated 6/4/10 included a diagnosis of Anxiety Disorder. The inmate had not been prescribed psychiatric medications during the past year. A psychiatrist progress note dated 6/23/10 included only diagnoses of Cannabis Abuse and Amphetamine Abuse. During that contact, the inmate reported suicidal ideation, which resulted in his placement in the OHU. The inmate reportedly stated that he believed that his statements as to suicidal ideation would result in his obtaining single cell status. The inmate also reported that he was harassed due to his transgendered status.

A progress note dated 8/12/10 indicated that the inmate wanted to be removed from the 3CMS program so he could transfer to an out-of-state correctional facility in Arizona, where his family resided. A removal chrono incorrectly indicated that the inmate had been included in the MHSDS due to medical necessity status. An 8/18/10 IDTT note did not provide a clinical rationale for the inmate's removal from the MHSDS, and there was no documentation of completion of the treatment plan. The inmate was seen twice at his request by mental health staff after his removal from the MHSDS due to situational stressors; despite these contacts, he continued to state that he did not want to be included in the MHSDS.

Findings

657

There appeared to be confusion as to the inmate's level of care while at CTF. The documentation of and rationale for the inmate's removal from the MHSDS were inadequate; documentation indicated that he was removed due to his medical necessity status and to enable him to transfer to an out-of-state facility. The inmate sought mental health services twice after his MHSDS removal and continued to experience safety concerns and difficulties in the general population.

The inmate should have been evaluated by mental health staff and brought to the IDTT. This was important as his single cell status would possibly prevent out-of-state transfer and it was unclear if the inmate would actually transfer to his desired location in Arizona. The IDTT should have reviewed these issues with the inmate and assessed his safety concerns. If the inmate did not meet MHSDS criteria, a removal chrono documenting the absence of mental health symptoms and no medication treatment should have been generated. If the inmate demonstrated psychiatric symptoms, he should have been returned to the MHSDS to receive appropriate care.

**Inmate D**

This 3CMS inmate was housed in the SNY. His case was selected for review at plaintiffs' attorneys' request. The inmate had a history of intravenous drug use of heroin and amphetamines. He had been prescribed morphine, which was discontinued on 12/7/10 after he hoarded the medication and overdosed by injection. There was no documentation that this medication was appropriately weaned or that a substitute medication was provided. On 12/9/10 the inmate submitted a medical request indicating that he was suffering "severe withdrawal," including cold sweats, diarrhea, anxiety, insomnia, and pain. He was routinely referred to a medical physician; the inmate had not been seen for a medical evaluation at the time of the site visit.

The inmate was prescribed Wellbutrin 375 mg/day and Vistaril 50 mg/day. He was provided with a diagnosis of Major Depressive Disorder and Post Traumatic Stress Disorder. His most recent treatment plan dated 11/7/10 identified problems of depression and anxiety; however, the only interventions listed were contacts with the psychiatrist and psychologist, and the only goal listed was to decrease symptoms. The diagnosis included in the treatment plan was Mood Disorder mixed. There was also minimal information in the treatment plan and it did not include documentation that the necessary participants were included in its development and implementation. The treatment plan addendum attached to the Form 7388, the checklist for DMH referral, was preprinted; this was consistent with treatment plan addendums located in other inmate medical records at CTF.

The inmate was last seen by the psychiatrist and his primary clinician prior to his overdose. Although the inmate allegedly reported to custody staff that the overdose was not a suicide attempt but rather an effort to get intoxicated, the medical record did not contain documentation that indicated that mental health staff was informed of this information. The inmate had been treated at the 3CMS level of care for several years, but

658

inexplicably on 11/10/10 a placement chrono was generated indicating that he was receiving mental health services in the 3CMS program due to medical necessity. There was no medical record documentation to support or explain this change in status. Although the primary clinician and psychiatrist saw the inmate more often than quarterly, there was a lack of documentation that therapy other than medication management was provided.

Findings

This inmate was seen timely by the IDTT, psychiatrist and primary clinician. It appeared, however, that there was confusion as to his mental health status. He was inappropriately designated for inclusion in the MHSDS for medical necessity after years of treatment at the 3CMS level of care. The most recent treatment plan was not individualized and staff had not seen the inmate since his recent overdose. This inmate should have been evaluated and received an updated individualized treatment plan.

**Inmate E**

This inmate was placed in the EOP on 10/19/10 and was housed in administrative segregation at the time of the site visit. A Form 7388, the checklist for DMH referral, completed on 10/19/10 indicated that he had chronic mental health symptoms that had not responded to treatment. The inmate had not been referred to DMH, as staff indicated that the change to the EOP level of care with additional treatment would be more beneficial for him. Documentation further indicated that he would be considered for DMH referral if he did not exhibit improvement. The treatment plan documented the inmate's symptoms of increased psychotic symptoms, with auditory hallucinations of a negative content and paranoia.

The inmate was housed in administrative segregation as he had been found with an inmate-manufactured weapon that he reported making due to safety concerns. He subsequently made another weapon for the same reason. He was classified as an SNY inmate. According to the October 2010 treatment plan, he was provided with a diagnosis of Major Depressive Disorder with psychotic features. He was treated with Abilify 15 mg/day, Lithium 750 mg/day, Thorazine 100 mg/day, Vistaril 150 mg/day, and Remeron 15 mg/day. There was a lack of documentation that necessary participants were in attendance at the IDTT meeting.

The inmate was housed in the OHU from 9/7/10 to 9/8/10; the ASU custody staff submitted a referral indicating their belief that he was deteriorating from a mental health standpoint. The admitting psychiatrist indicated that the inmate required further evaluation and a medication adjustment. The inmate was housed in the OHU for less than 24 hours.

Documentation of daily psych tech rounds for approximately two weeks during August 2010 and two weeks during September 2010 was not located in the medical record. According to multiple primary clinician progress notes, the inmate continued to refuse

out-of-cell clinical contacts.  However, this issue was not included in the treatment plan as a problem area.  A progress note dated 10/18/10 provided documentation that the inmate exhibited high levels of fear and paranoia that interfered with his ability to function in the general population.  He continued to experience these symptoms even though he had no cellmate at that time and was separated from other inmates as part of the normal administrative segregation procedures.  The inmate disclosed to the primary clinician that he was afraid to return to the general population as he had reportedly almost stabbed someone due to his fear and paranoia.  The inmate reportedly believed that he was in danger due to SNY gang issues.

The inmate's diagnosis fluctuated over time from Major Depressive Disorder with psychotic features to Psychotic Disorder NOS.  After he was placed in the EOP, he was seen by multiple clinicians, which impacted continuity of care and possibly increased his reluctance to meet for confidential interviews.  According to the medical record, the inmate was seen weekly while housed in administrative segregation and was seen timely by the IDTT, although all required members were not present at the IDTT.  The treatment plan was minimal in content, listing only medication treatment, primary clinician contacts and group therapy as therapeutic interventions.

Findings

Although the inmate's level of care was appropriately increased to EOP, he had not transferred timely to an EOP hub.  If the inmate continued to exhibit deterioration prior to transfer to an EOP hub, he should have been reconsidered for DMH referral.  Although the inmate was seen timely by the psychiatrist and primary clinicians, he was frequently seen by different clinicians.  This had a negative impact on continuity of care and limited the implementation of needed therapeutic interventions.  Psych techs did not see the inmate daily.  The mental health care that was provided appeared to be minimally adequate as exemplified by the treatment plan; the treatment plan was not individualized for this inmate's specific treatment needs.  Although the IDTT saw the inmate timely, necessary participants were not present.

**Inmate F**

This 3CMS inmate had been housed in administrative segregation for more than 90 days.  He was prescribed Zoloft 50 mg/day and Vistaril 50 mg/day.  He was provided with diagnoses of Adjustment Disorder with mixed anxiety and depressed mood, and Polysubstance Dependence.

The initial CTF treatment plan was completed on 7/26/10 at the time of the inmate's administrative segregation placement.  A current treatment plan was not located in the medical record.  There was documentation of daily psych tech rounds with the exception of one day in November 2010.  Primary clinicians saw the inmate weekly, but he was seen by several different clinicians and some clinical progress notes were not completed in their entirety.  Many progress notes also did not indicate if the contact occurred in a confidential setting, and included identical information in each note.  The content of the

progress notes was also minimal; it appeared that many of the contacts were superficial with little actual treatment provided. When information as to the location of contacts was provided, staff reported that the inmate "didn't request" a confidential contact.

Findings

This inmate did not appear to be receiving confidential clinical contacts consistent with Program Guide requirements and there was a lack of documentation that staff encouraged confidential clinical contacts. A current treatment plan was not located in the medical record and the inmate was not seen timely by the IDTT. Although the inmate was seen timely by psychiatry and primary clinicians, he was seen by numerous clinicians. This made it difficult to determine who the assigned primary clinician was, which presented problems as to continuity of care. Documentation as to primary clinician contacts was minimal in content, as it lacked evidence of the implementation of necessary clinical interventions. In fact, all of the clinical notes were minimal in content, with duplication of the same note repeated for subsequent contacts. The primary modality of treatment for the inmate appeared to be medication management.

**Inmate G**

This 3CMS inmate had a history of placement in the OHU and administrative segregation. A review of the EOP transfer log indicated that he had been placed in the EOP and was subsequently downgraded to the 3CMS level of care within a short period of time.

The inmate was housed in the MHCB at HDSP from 8/21/10 to 8/27/10 after an admission to the CTF OHU on 8/17/10. Medical record OHU and MHCB documentation did not document the reasons for placement; medical record OHU documentation also was not well-organized. It appeared that the inmate had a brief OHU placement on 10/14/10 for "observation, documentation of activity, restlessness and sleep pattern." A psychiatric progress note indicated that EOP level of care was recommended due to the inmate's decompensation and increasing mood disorder symptoms.

The inmate was prescribed Cogentin 2 mg/day, Tegretol 200 mg/day and Strattera 460 mg/day. Although a placement chrono dated 9/14/10 indicated that he was placed in the 3CMS program at that time, this chrono did not coincide with an IDTT meeting. This brought into question whether the decision to change the inmate's level of care was an IDTT decision.

Documentation included in a treatment plan on 9/9/10 indicated that the inmate was admitted to the OHU during August 2010 after he drank a self-made alcohol concoction based on hand sanitizer and his prescribed morphine. The inmate subsequently cut his neck, wrists and ankles. Staff stated that he denied suicidal intent and reported having no recollection of the event. At that time he reported experiencing significant anxiety as to his upcoming parole board hearing; he further stated that he would harm himself if the

hearing's outcome was not favorable. A treatment plan completed on that date did not address the inmate's suicidal behavior, pain medication misuse or alcohol consumption.

Although the medical record contained a placement chrono that placed the inmate in the EOP on 8/31/10, a corresponding treatment plan was not located. On 9/14/10 the inmate's level of care was reduced to 3CMS; although the medical record contained a signed IDTT progress note, it did not contain a treatment plan. The inmate submitted several requests to mental health indicating his concern as to the change in his level of care as he reportedly did not want to be transferred from CTF.

A 9/21/10 progress note documented the confusion as to the inmate's level of care. During September and October 2010, he was simultaneously described as marginally stable and as reporting an increase in mental health symptoms. A psychiatric progress note dated 10/17/10 "strongly recommend[ed]" EOP level of care. The inmate was provided with a diagnosis of Attention Deficit Hyperactivity Disorder on occasion by some clinical staff. He was seen by several different clinicians and psychiatrists. The most recent psychiatrists treating the inmate documented their opinions that he did not exhibit evidence of Attention Deficit Hyperactivity Disorder; they hypothesized that some of the prescribed medications may have resulted in the inmate's worsening of symptoms and increase in his Bipolar Disorder symptoms.

On 12/8/10 the inmate informed his primary clinician that he had received a denial from the BPT and had three years until his next hearing. The clinician did not assess the inmate's risk of self-harm and appeared unaware of his prior statements. The inmate stated that he planned to appeal the Board's decision.

Findings

This inmate appeared to have been inappropriately downgraded from EOP to 3CMS level of care. Given medical record documentation, he met the criteria and would likely have benefitted from EOP treatment despite his expressed desire to remain at CTF, which did not have an EOP. There was concern of the primary clinician's lack of recognition of the potential increased risk of inmate self-harm after denial of his parole in light of his previous statements that he would harm himself if his parole was denied.

The treatment plan was inadequate as it was generic in content and did not address the inmate's most significant clinical concerns. His level of care was changed without adequate documentation of the rationale for this change, while an IDTT meeting may not have occurred on at least one occasion. Because the inmate was seen by many different psychiatrists and primary clinicians, his care was adversely affected; this negatively impacted his mental health treatment with frequent medication changes and poor continuity of care.

EXHIBIT P
Wasco State Prison (WSP)
October 19, 2010 – October 21, 2010

**Inmate A**

This EOP inmate was released from prison on parole on 6/6/10, but returned to prison within one month. He was readmitted to WSP on 7/6/10 for his third incarceration during 2010.

He was provided with a diagnosis of Schizoaffective Disorder; he had a global assessment of functioning (GAF) score of 45. He was housed in the reception center and was slated to parole on 11/18/10. The expert observed an IDTT meeting on 10/19/10. Necessary participants were in attendance, required records were available and the treatment team engaged in relevant interdisciplinary discussion as to the inmate's treatment.

Despite his upcoming release date, WSP staff sought and obtained a renewal of his Keyhea order. Institutional Keyhea tracking documents indicated that his Keyhea order was valid until 5/10/11. Soon after he arrived at WSP in July 2010, he presented in crisis and was treated in the MHCB.

According to MHTS.net information, EOP treatment provided during April and May 2010 included weekly primary clinician contacts, monthly psychiatric contacts and monthly IDTT meetings. Subsequent to his MHCB release in July 2010, an IDTT meeting was conducted within ten days of discharge, and the primary clinician saw the inmate weekly. Documentation indicated that the psychiatrist saw the inmate monthly.

A medication reconciliation form indicated that he had current orders for Depakote, Geodon and Cogentin, with intramuscular medications ordered in the event of medication refusal. Medications were ordered to be administered DOT, which was necessary given his Keyhea status; however, the staff indicated that, by default, all psychotropic medications were automatically administered DOT at WSP.

Findings

It appeared that the inmate received appropriate mental health treatment. An area of concern included the adequacy of discharge planning, which apparently did not prevent his cycle of repeated incarcerations.

The inmate's EOP treatment included monthly IDTT meetings and treatment plan updates; the primary clinician also at least saw him weekly and the psychiatrist at least saw him monthly. There was documentation of his group therapy participation. Clinical staff appropriately renewed the inmate's Keyhea order to ensure medication continuity.

**Inmate B**

This EOP inmate had been housed at WSP since 3/24/10, a period of seven months; he had been in administrative segregation for approximately five months at the time of the site visit. He utilized a wheelchair and had a history of traumatic brain injury with

resulting injuries; this affected his ability to perform ADLs and required use of other medical appliances.

A pending RVR that had recently been adjudicated resulted in the imposition of an 11-month SHU term with a MERD of 2/3/11. The inmate was endorsed for transfer to the PSU at CSP/Sac by way of the CSP/Corcoran administrative segregation EOP hub. Annotations in a log provided by WSP referred to a transfer delay associated with a medical issue and noted the requirement of HC-POP approval. Staff reported, however, that the previously stated obstacles were no longer impediments to transfer. They maintained that the only obstacle to transfer was the lack of suitable beds at other prisons.

The inmate was scheduled to parole in January 2011, which was a short time prior to the expiration of his SHU term. Staff indicated uncertainty whether he would be transferred to a receiving institution before his release date or would spend the remainder of his time in administrative segregation.

The expert attended an IDTT meeting on 10/21/10. Discussion of the inmate's case factors and review of his C-file and medical record indicated that within a short time of arriving at WSP, he was involved in an argument with a housing officer in the reception center; it was about the urgency of his need to obtain medical supplies for an appliance that he used due to a bladder injury. A mental health evaluation performed in connection with the RVR found that he did not require a staff assistant and mental health factors were not involved in the incident.

A chrono signed by a facility captain indicated that the inmate was placed in administrative segregation during May 2010 due to the alleged battery on a peace officer. At the time of the site visit, he was housed in an accessible cell in administrative segregation. It appeared that custody staff had implemented an accommodation early in his administrative segregation stay that allowed him to utilize a therapeutic module for group therapy; this temporary accommodation took the form of a shower chair placed in a group module.

The October 2010 IDTT meeting observed by the expert was attended by necessary participants and appropriate records were provided. The treatment team discussed his SHU term and the reasons that he had been housed at WSP for over six months and in segregation for several months, as well as his accessibility issues in administrative segregation. The inmate participated actively in the IDTT discussion and expressed concerns as to accessibility issues. These issues were discussed with custody and mental health supervisory staff.

Findings

On the whole, this EOP inmate received mental health treatment that was consistent with Program Guide requirements. The IDTT met monthly and there were treatment plan updates. Documentation indicated that the inmate was considered for DMH referral. He was seen daily during psych tech rounds and associated documentation contained

pertinent information. There was documentation that he was offered the opportunity for out-of-cell individual and group contacts. The primary clinician saw him weekly and documentation indicated whether the contacts were cell front or out of cell.

The IDTT was attentive to the inmate's mobility and access issues and his need for accommodation in connection with mental health treatment groups. Nonetheless, nothing more than temporary accommodation was provided.

The inmate's administrative segregation length of stay exceeded 90 days and he was not timely transferred to a hub institution. Although PSU transfer had been endorsed, the inmate remained housed in administrative segregation. If a suitable bed was not available, there was a chance that he would spend all ten months of his term in the WSP reception center; eight of those months would be spent in administrative segregation.

**Inmate C**

This EOP inmate was housed in administrative segregation. He had been admitted to the MHCB on at least two occasions during September 2010. According to an institutional log, he arrived at WSP and was placed in administrative segregation on 6/11/10; his length of stay had exceeded 120 days at the time of the site visit.

The institutional log of DMH referrals indicated that the inmate was referred to DMH for acute care on 9/26/10; he had been discharged from DMH intermediate care and returned to WSP on or about 4/29/10. The expert located and reviewed a copy of the DMH discharge summary.

He was again referred to DMH for intermediate care on 7/22/10; a Vitek hearing was conducted and DMH placement was upheld. The inmate was placed on the DMH wait list.

According to documentation in the medical record, he was provided with a diagnosis of Schizophrenia undifferentiated type. He presented with a very low level of functioning; he was typically disheveled and uncommunicative with flat affect. At times he exhibited insight into his circumstances and voiced suicidal ideation. For example, a progress note dated 8/30/10 indicated that when he was seen for a weekly EOP contact, he stated that he had "been doing this for five or ten years" and knew that he would be cycling in and out of prison "until he died." He voiced explicit suicidal ideation a few days later, which resulted in MHCB placement.

The inmate was discharged from the MHCB on 9/8/10 with planned five-day follow-up. He was transferred to the MHCB again on 9/14/10; he was again admitted due to suicidal ideation.

The medical record contained a DMH discharge summary that indicated that the inmate was discharged to WSP from DMH intermediate care because he had an imminent parole date. No discharge summary from DMH acute care was located in the medical record.

666

The inmate had a 12 month Keyhea order that would expire on 10/27/10; a Keyhea hearing was scheduled for 10/27/10.

There was documentation of monthly IDTT meetings during the inmate's administrative segregation stay. Necessary participants were in attendance at the most recent IDTT meeting, which was conducted on 9/16/10.

<u>Findings</u>

It appeared that the inmate would have benefitted from transfer to DMH intermediate care. Although he had recently been hospitalized at DMH and treated at both the acute and intermediate levels, he probably should have been transferred to intermediate care for a second hospitalization.

The DMH discharge summary was not readily available to his treatment providers and was not filed in the medical record. He had been diagnosed with polydipsia; while at ASH he was found unresponsive in his room as a result of low sodium levels associated with water intoxication. The WSP staff was apparently unaware of that diagnosis although it was a life-threatening incident.

Treatment in administrative segregation conformed to Program Guide requirements as to timely contacts and IDTT meetings. However, administrative segregation treatment providers did not have ready access to records of treatment provided to the inmate during crises; it did not appear to be standard WSP procedure to file documentation of MHCB treatment in medical records.

WSP staff was attentive to the Keyhea process for the inmate but the log was incomplete. His administrative segregation length of stay exceeded 120 days. He should have been transferred to an institution with an EOP.

**Inmate D**

This EOP inmate was readmitted to the reception center in September 2010. He was provided with a diagnosis of Bipolar I Disorder, most recent episode depressed, moderate. The initial IDTT meeting was conducted on 9/21/10. He was prescribed Buspar and Effexor.

<u>Findings</u>

A review of the medical record indicated that the inmate was receiving appropriate mental health services in the EOP. The initial mental health contact and IDTT meetings occurred timely. Weekly primary clinician contacts were documented. An IDTT meeting that was observed included necessary participants and required records, and the treatment team engaged in relevant multidisciplinary discussion.

**Inmate E**

This EOP inmate's monthly IDTT meeting was observed on 10/19/10. He had recently been released on parole and within two weeks incurred a violation. He reportedly experienced a depressive reaction to his return to custody. The treatment team decided to retain him at the EOP level of care.

The inmate was provided with a diagnosis of Mood Disorder NOS. He had been assessed with a GAF score of 53. He was prescribed Prozac, Buspar and Abilify. Documentation indicated that the initial mental health contact and IDTT meetings were conducted timely. The primary clinician saw the inmate weekly during incarceration and a psychiatrist saw him twice during September 2010. There was documentation of group therapy participation.

Findings

The mental health treatment provided for this EOP inmate included a timely initial mental health contact and documented weekly primary clinician contacts. IDTT meetings were conducted timely; the IDTT meeting observed included necessary participants and required records were available.

**Inmate F**

This EOP inmate arrived at WSP on 9/13/10. The initial monthly IDTT meeting occurred on 10/19/10; necessary participants attended the IDTT and medical records and C-files were available.

A bus screening dated 9/13/10 and completed at WSP indicated that he had a long history of mental health treatment. He had received mental health treatment at WSP since 9/17/2001; he was treated at the EOP level of care from April 2008 to May 2009, when he paroled. He returned to WSP 16 months later in September 2010.

At the time of the review, he was provided with a diagnosis of Mood Disorder NOS. He was assessed with a GAF score of 41.

When the inmate arrived at WSP, he was reportedly assaulted by his cellmate. He was recently classified as SNY.

Against medical advice, the inmate was not prescribed psychotropic medication. Staff indicated that although he had been stable without medication, his level of functioning remained inadequate for normal functioning in prison. He participated in EOP treatment groups and attended a weekly parole planning group as he was scheduled for release soon.

The treatment team retained the inmate at the EOP level of care despite his request to be removed from the MHSDS.

<u>Findings</u>

There was documentation that the initial mental health contact occurred timely. Documentation also indicated that weekly primary clinician contacts and monthly psychiatric contacts occurred.

IDTT meetings were conducted timely; necessary participants attended the IDTT that was observed and the C-file and medical record was available.

**Inmate G**

This inmate was housed at WSP since 6/10/10. He was on the wait list for SVPP placement. He had a diagnosis of Schizophrenia paranoid type. Documentation indicated that he had significant mental health-related difficulties since his return to WSP as a parole violator. His symptoms and behavior necessitated several MHCB admissions for bizarre and psychotic behaviors. He often presented with manic symptoms, hallucinations and delusional thinking. He had a history of behavioral problems which resulted in several disciplinary infractions. He was prescribed Lithium, Risperdal and Cogentin.

<u>Findings</u>

The inmate had been housed at WSP since 6/10/10; however, the medical record only consisted of a temporary record that did not include all of his medical and mental health information. The clinical information that was available indicated that he was on the wait list for DMH transfer and had presented with behavioral instability that required several MHCB admissions. The current treatment efforts had not resulted in the inmate's stabilization. As he remained clinically unstable with multiple MHCB admissions, DMH acute care referral should have been considered.

**Inmate H**

This 3CMS inmate was housed in administrative segregation. An IDTT that should have occurred in September 2010 was not located in the medical record.

He was provided with a diagnosis of Psychotic Disorder NOS. Recent progress notes indicated that he presented with normal behavior without disturbances in sleep or appetite; however, he reportedly experienced periodic auditory hallucinations with mild paranoia. He was reportedly compliant with Effexor and Buspar, his prescribed medications. A psychiatric progress note dated 10/5/10 indicated that he reported benefitting from medication treatment. He was described as presenting with a dysthymic mood, but his mental status examination was otherwise normal.

<u>Findings</u>

It appeared that the inmate was medication compliant and was clinically stable at the time of the site visit. There was documentation of timely primary clinician and psychiatric

contacts. However, there was a lack of documentation that IDTT meetings occurred timely.

**Inmate I**

This inmate was housed in administrative segregation. He had been removed from the 3CMS level of care on 9/1/10. He had been provided with a diagnosis of Bipolar Disorder; however, this diagnosis was later removed. He was not provided with a psychiatric diagnosis at the time of the site visit.

He had been provided with a prior diagnosis of Adjustment Disorder and Attention Deficit Hyperactivity Disorder. He had been placed in the MHSDS for medical necessity on 6/9/10. He was reportedly symptom free for the prior six months. He had not been prescribed psychotropic medications.

The inmate requested to be removed from the 3CMS program on 8/4/10. Progress notes indicated that he had not been cooperative with treatment and had refused to leave his cell for clinical interviews. He had been involved in an altercation, and, as a result, had been provided with single cell status.

Progress notes indicated that he had a history of prior EOP placement due to a long history of impulsivity, anger issues and treatment noncompliance. He was included in the EOP at RJD during 2007; he was moved to the 3CMS program as he reportedly did not participate in EOP treatment. He was discharged from the MHSDS by RJD in 2008.

Findings

It was of concern that this administrative segregation inmate had been placed in the EOP and 3CMS programs, but his level of care had been decreased to the extent that he was ultimately removed from the MHSDS for treatment noncompliance. He had been provided with several diagnoses; it appeared that there was general uncertainty as to his actual diagnosis and there was a need for diagnostic clarification. It was important that psych techs closely monitored him during administrative segregation rounds; this was necessary to ensure that he did not require return to the MHSDS, despite his requests for removal.

EXHIBIT Q
Kern Valley State Prison (KVSP)
April 4, 2011 – April 6, 2011

**Inmate A**

This EOP inmate had recently returned from DMH acute care. He was transferred from KVSP to DMH on 9/3/10. Upon discharge from DMH, he was transferred to the MHCB at CMC from 1/6/11 to 1/21/11. He returned to KVSP on 1/21/11. No information as to the DMH hospitalization was located in the medical record.

The first documentation of KVSP clinical contact was by a psychiatrist on 2/2/11. A mental health treatment plan was completed on the same date. Inmate problems listed in the treatment plan included depression, self-abuse, hallucinations, paranoid delusions, and a history of substance abuse. Listed treatment plan interventions included individual clinical contacts for supportive therapy, psychopharmacology and group therapy, including relaxation, recreation, pre-parole and substance abuse groups, if available. The inmate was provided with diagnoses of Schizoaffective Disorder and Attention Deficit Hyperactivity Disorder.

The inmate was seen for individual sessions on 2/4/11, 2/14/11, 2/18/11, 2/25/11, 3/4/11, 3/11/11, 3/16/11, and 3/25/11. He was also seen by the psychiatrist on 3/7/11. Additional documentation indicated that although the inmate attended groups, the groups attended were not those outlined in the treatment plan.

Findings

Review of the inmate's medical record revealed problems with continuity of care and communication following his return from DMH. Following DMH discharge, the inmate was briefly housed at CMC before returning to KVSP. He was housed at KVSP for two weeks before being seen by mental health staff.

No documentation was located in the medical record as to the inmate's DMH hospitalization. Treatment plans were generic in content; listed treatment interventions were non-specific and treatment goals lacked objective measures. Despite these omissions, the inmate appeared to be functioning adequately at the EOP level of care at the time of the site visit.

**Inmate B**

This EOP inmate had recently returned from DMH acute care. He had seven MHCB admissions prior to his DMH referral. These MHCB admissions occurred from 10/16/10 to 10/18/10, 11/15/10 to 11/19/10, 11/21/10 to 11/24/10, 11/27/10 to 11/29/10, 12/4/10 to 12/9/10, 12/12/10 to 12/13/10 and 12/15/10 to 12/23/10. The inmate transferred from the MHCB at KVSP to DMH acute care on 12/27/10. He was discharged from DMH acute care on 2/7/11 with a recommendation for EOP level of care.

The medical record contained DMH discharge information. The inmate was provided with the following diagnoses at the time of DMH discharge: Depressive Disorder NOS, Cannabis Abuse in institutional remission, Alcohol Abuse in institutional remission, and

Personality Disorder NOS with antisocial traits. The discharge summary indicated that the inmate had been discharged after having "reached maximum benefit of APP." Discharge medications included Risperdal, Effexor, Remeron, and Cogentin.

The inmate was seen for his initial clinical contact with mental health staff on 2/17/11, which was ten days after returning to KVSP from DMH. This contact occurred at cell front. The psychiatrist saw him on 2/21/11 when the inmate told him that he had refused Effexor for two weeks because of the medicine's sexual side effects. Another antidepressant, Zoloft, was substituted. Additional primary clinician contacts occurred on 2/22/11, 3/7/11 and 3/22/11; two of these contacts occurred at cell front.

The inmate was placed in the EOP on 3/1/11. Of note was medical record documentation that described the inmate's participation in group therapy on 1/21/11, a date when he was not housed at KVSP. MHTS.net information indicated that the inmate had been seen on the C Yard for individual sessions on 1/5/11 and 1/12/11. However, there were no progress notes located in the medical record to correspond to these MHTS.net entries, while the inmate was still hospitalized at DMH on those dates.

Findings

The CDCR medical record contained the DMH discharge summary. The inmate was discharged with a recommendation for EOP level of care, but was not placed in the EOP until several weeks after returning to KVSP. There was a group therapy progress note that indicated that the inmate had participated in a group at KVSP when he was clearly not housed at the institution. Also of concern were two MHTS.net entries that noted individual contacts that could not have occurred as the inmate remained at DMH on those dates. Both of these types of errors or inaccuracies raised serious concerns.

The provision of mental health care, including continuity of care and treatment, was poor for this inmate. His most recent CDCR treatment plan was dated 11/17/10; the inmate had since transferred and returned from DMH and had been placed in the EOP without a treatment plan update.

**Inmate C**

This inmate's medical record was reviewed at the request of plaintiffs' attorneys due to concerns as to possible decompensation in his present setting and level of care. The inmate was housed in administrative segregation and was included in the MHSDS at the 3CMS level of care.

The medical record contained a quarterly mental health treatment plan review dated 1/5/11. The plan provided diagnoses of Mood Disorder NOS and Antisocial Personality Disorder. The review also indicated that there was "some concern among IDTT members that (the inmate's) IDTT presentation was somewhat dramatic and contrived."

The inmate had been prescribed Effexor and Risperdal, but had discontinued these medications for several months when he was housed in the general population. He was reportedly involved in a race riot on one of the yards and was subsequently transferred to administrative segregation. He reported that he began experiencing auditory hallucinations and requested to resume his medications.

The primary clinician saw the inmate out of cell every two weeks. The inmate's psychotropic medications were resumed. For unknown reasons, the inmate refused to allow basic baseline laboratory studies and a serum lithium level.

Findings

Medical record documentation and the inmate's level of functioning did not indicate that he required higher level of care referral at the time of review. He was prescribed medications to address his reported symptoms. Documentation indicated daily psych tech rounds and that the primary clinician consistently followed the inmate.

**Inmate D**

This EOP inmate was housed in administrative segregation. He arrived at KVSP on 2/25/08, from CSP/Corcoran. A progress note indicated that the inmate was placed in the EOP after his third MHCB admission due to suicidal thoughts and behaviors during January 2011.

The medical record contained a comprehensive treatment plan dated 1/26/11. The treatment plan only listed depressed mood as a problem area for the inmate. The only interventions listed in the plan were weekly individual primary clinician contacts and cognitive behavioral therapy. There was no mention of participation in group treatment or medication management. The inmate was prescribed three medications, namely, an antipsychotic, an antidepressant and a mood stabilizing medication. The goals outlined in the treatment plan were to stabilize the inmate's mood, increase coping strategies and decrease depressed symptoms. There was no documentation as to how goal attainment would be assessed or measured. The inmate was provided with a diagnosis of Schizoaffective Disorder bipolar type. A treatment plan update on 3/2/11 indicated that the inmate's diagnosis was Mood Disorder NOS.

Findings

Documentation indicated that a clinical psychologist saw the inmate weekly. Progress notes did not document the provision of cognitive behavioral therapy, techniques or concepts. The progress notes also did not indicate whether the contacts occurred at cell front or out of cell. Psych techs saw the inmate daily during rounds in administrative segregation. The medical record did not contain documentation of inmate group therapy involvement. The treatment plan was incomplete as it did not accurately reflect all treatment interventions. Of concern were the criteria utilized for EOP referral

consideration, as the inmate was not referred to EOP level of care until after his third
MHCB admission.

**Inmate E**

This 3CMS arrived at KVSP on 3/2/09, from CCI.  His original medical screening
indicated a long history of mental health treatment in the community for Bipolar Disorder
and Attention Deficit Hyperactivity Disorder.  He refused treatment with any medications
in prison.  Early in his prison stay, he was found in his administrative segregation cell
with a towel wrapped tightly around his neck.  Although the inmate denied that this was a
suicide attempt, he suffered serious muscle damage (rhabdomyolysis) which led to acute
kidney failure.  He was medically hospitalized for two weeks during 2008.

Following his transfer to KVSP, the inmate was seen by mental health staff on 3/5/09 and
referred to the psychiatrist.  He was prescribed Prozac in May 2009.  He continued to
take this medication and was seen quarterly by his primary clinician and the psychiatrist
until January 2011.  At that time he began to refuse his medication in order to be removed
from the MHSDS because he would parole in 2012.  The medication order was
subsequently discontinued at his request.  He continued to be seen at one to three month
intervals and remained stable.  MHSDS discharge was planned if his condition remained
stable.

Findings

The treatment plan was generic in content with no objective goals or measures.  It had not
been updated in spite of the plan change as to the inmate's discharge from the MHSDS.
The only informed consent for psychotropic medications located in the medical record
had been obtained in 2009 and was expired.

Clinicians saw the inmate at intervals that met or exceeded Program Guide requirements.
Medical record documentation indicated that the inmate was clinically stable at the time
of the site visit.

**Inmate F**

This 3CMS inmate was housed in administrative segregation.  He transferred to KVSP on
8/12/08, from HDSP.  The inmate reported no history of mental health problems,
treatment or concerns at his screening.  The inmate requested mental health services
during October 2010 due to complaints of depressed mood and insomnia; he requested an
evaluation for psychiatric medications.

A comprehensive mental health evaluation was completed on 10/26/10 and included a
suicide risk evaluation; the inmate was assessed as presenting with low risk of suicide.
He was referred to the psychiatrist, who saw him on 11/15/10.  No psychotropic
medications were prescribed, but the inmate was placed on the mental health caseload at
the 3CMS level of care.  The IDTT plan was dated 11/16/10.  The primary clinician saw

675

the inmate on 1/28/11 and he was again referred to psychiatry for a medication evaluation.  The psychiatrist saw the inmate again on 2/9/11; the psychiatrist again determined that psychotropic medications were not indicated for him.  The inmate was not provided with the diagnosis of a major mental illness.

Findings

The psychiatrist's decision not to treat the inmate's vague reports of mildly depressed mood and occasional anxiety with psychotropic medications appeared to be clinically justified.  However, more frequent contact and interventions with the psychologist and/or participation in some therapeutic group activities appeared to be indicated but not implemented.  The inmate was seen timely by clinicians, but adjustments in treatment planning to include increased clinical contacts and other therapeutic interventions appeared to be indicated.

**Inmate G**

This EOP inmate was housed in administrative segregation.  His mental health treatment plan dated 7/21/10 indicated that he was placed in administrative segregation on 6/23/10 as result of safety concerns and his involvement in a physical altercation.  He was provided with a diagnosis of Schizophrenia.  Other diagnoses that were present in the medical record included Schizophreniform Disorder and Psychotic Disorder NOS. The inmate was prescribed Abilify.

The inmate's treatment plan was lacking in specificity and only noted depression and psychotic processes as the primary foci of treatment.  The intervention listed in the plan was symptom management with the goal of lowering these symptoms through primary clinician contacts.  The inmate's initial evaluation dated 1/8/10 indicated that his mental health history was significant for multiple suicide attempts; the most recent occurred two years prior by attempted hanging.  Additional significant history included sexual abuse as a child with accompanying symptoms of Post Traumatic Stress Disorder and multiple psychiatric hospitalizations.

The inmate was endorsed to the RJD EOP SNY on 8/3/2010.  Progress notes documented his increasing difficulty in coping with the delay in his transfer to an EOP hub.  The primary clinician followed him consistently during January 2011.  Progress notes during February 2011 documented that the inmate experienced significant symptoms including auditory and visual hallucinations, paranoia and nightmares.  A progress note dated 2/2/11 documented planned weekly primary clinician contacts; however, at the time of site visit there was a lack of documentation of these weekly contacts until March 2011.  Although psychiatry saw the inmate, there were lapses in the frequency of required contacts, such as during October 2010, when there was no documentation of psychiatry contacts.

During August 2010, apparently due to gang pressure, the inmate refused psychotropic medications.  He was described as withdrawn and anxious; the plan was to utilize

cognitive behavior treatment to alleviate depression and anxiety symptoms. Subsequent progress notes did not reveal documentation of follow-up with this planned treatment modality. There was also no documentation of psychiatry referral to address the inmate's medication refusal.

A 3/9/11 progress note stated that the primary clinician would see the inmate quarterly despite his EOP status, which required monthly contacts. The treatment plan did not contain the Form 7388, the checklist for DMH referral, as to higher level of care referral consideration.

Findings

There were significant issues as to the mental health care provided to this inmate. There were lapses in the follow-up provided by the primary clinician and psychiatrist. There was also a lack of documentation that the inmate was referred to the psychiatrist after he was noted to be medication noncompliant. There was a delay in the transfer to the EOP at RJD. Treatment planning was not individualized for this inmate's specific mental health needs.

**Inmate H**

This EOP SNY inmate was provided with diagnoses of Major Depressive Disorder, Polysubstance Abuse and Borderline Personality Disorder. He had been treated with several different antidepressant medications and dialectical behavioral therapy (DBT) techniques. He had been receiving mental health treatment at the EOP level of care since February 2010. He was also treated in the EOP during 2009; between 2004 and 2009 he was treated at the 3CMS level of care.

The inmate's mental health history was significant for multiple instances of self-injurious behavior that last occurred during September 2010, several MHCB admissions, and a history of head trauma with loss of consciousness. There was also a strong family history of psychiatric difficulties including suicides of uncles and cousins and hospitalization of the inmate's son at PSH.

There was documentation that the primary clinician consistently followed the inmate, and that these sessions included the use of DBT techniques. A progress note dated 1/20/11 indicated that the inmate was seen at cell front due to a lockdown. IDTT meetings were conducted as required and treatment plans documented good individualization of treatment goals. The most recent IDTT meeting on 3/16/11 indicated that the next IDTT meeting would occur in one year despite the inmate's placement at the EOP level of care. There was documentation of the completion of the Form 7388, the checklist for DMH referral, that appropriately assessed the inmate for higher level of care referral consideration.

Findings

Mental health staff consistently followed the inmate.  There was good documentation that treatment outlined in the treatment plan was implemented.  The most recent IDTT note erroneously indicated that the next treatment plan was due in one year; this was incorrect given the inmate's EOP placement.

**Inmate I**

This EOP inmate had recently been discharged from the MHCB where he was hospitalized from 3/6/11 to 3/21/11.  He was provided with a diagnosis of Schizoaffective Disorder bipolar type.  He was treated with Remeron, Depakote, Effexor, and Prozac.  The inmate had a recent history of reporting command hallucinations telling him to kill himself, as well as symptoms of paranoia and depression.

Medical record documentation indicated that the inmate had four MHCB admissions during the preceding six months.  Information on the Form 7388, the checklist for DMH referral, indicated that the rationale provided for not referring the inmate to DMH was that he would benefit from EOP level of care.  Staff further indicated that the inmate would be referred to DMH if he did not improve at the EOP level of care.

The inmate was previously hospitalized in the MHCB between 2/28/11 and 3/5/11; he was discharged at the 3CMS level of care.  Although it was unclear from medical record documentation, it appeared that the inmate made a suicide attempt during February 2011 which appeared to have occurred between MHCB admissions.  Review of the medical record, information from MHTS.net and discussions with mental health supervisory staff failed to clarify this issue.  A MHTS.net entry indicated that primary clinicians saw the inmate on 3/30/11; although the medical record was reviewed with mental health supervisory staff, no corresponding entry was located in the record.

Findings

The inmate exhibited significant symptoms and signs of suicide risk.  He was eventually placed in the EOP, which appeared to be clinically appropriate.  The inmate had previously been discharged from one of his multiple MHCB admissions to the 3CMS level of care; this was of concern as it indicated the possibility that there was a lack of recognition among mental health staff at the facility as to the criteria for higher level of care referral consideration.  Medical record documentation was unclear as to the existence of a possible suicide attempt in February 2011.  There appeared to be disagreement between MHTS.net information and medical record entries.

**Inmate J**

This EOP inmate's medical record was reviewed at the request of plaintiffs' attorneys due to concern as to the possible lowering of his level of care to 3CMS and his perceived lack of adequate EOP programming.  The inmate's primary diagnosis was Schizoaffective Disorder bipolar type.  He was treated with Trilafon.

A suicide risk evaluation dated 1/4/11 documented numerous chronic risk factors including two overdose attempts with hospitalizations at Napa State Hospital. The evaluation documented a negative response for suicide attempts even though there was documentation of previous attempts. The overall chronic suicide risk evaluation was determined to be low, despite documentation of each chronic risk factor with the exception of family history and sex offender history.

Progress notes indicated the inmate's reported distress as to the level of care change to the 3CMS program; the inmate reportedly indicated that he found the structure of the EOP helpful in controlling his violent behavior.

The primary clinician consistently followed the inmate, except on 3/22/11, when security restrictions prevented the primary clinician from seeing him, even for a cell-front visit. Psychiatric contacts were well-documented, with the exception of at least one missed contact in March 2011.

The expert attended an IDTT meeting conducted during the site visit. It was noted that custody and nursing staff indicated that the inmate could be adequately treated at the 3CMS level of care; however, the decision was made to retain him at the EOP level of care due to his potential suicide risk.

<u>Findings</u>

With the exception of missed psychiatric and primary clinician contacts in March 2011, during the monitoring period the inmate was seen timely by mental health staff. Clinicians addressed the inmate's concerns as to the possible lowering of his level of care, which was a position apparently advocated by custody and nursing staff. Despite some ambiguities in his suicide risk evaluation, staff ultimately acknowledged the inmate's degree of suicide risk by retaining him at the EOP level of care based predominately on their assessment of his level of suicide risk.

EXHIBIT R
North Kern State Prison (NKSP)
January 25, 2011 – January 27, 2011

**Inmate A**

This inmate arrived at NKSP on 6/7/10. He was on the wait list for transfer to DMH for intermediate level of care at the time of the site visit. The inmate had a history of suicidal behavior including six reported attempts; the last attempt occurred in March 2010. On 8/7/10 he transferred to the MHCB at CMF due to increasing psychotic symptoms and remained there until 8/17/10. The inmate was described as exhibiting disorganized behavior with paranoid delusions, talking to the cell walls, using neologisms in speech, and threatening the staff. He also reportedly made several choking gestures but denied suicidal ideation; he stated that he was applying pressure to his carotid arteries because he enjoyed the way that it made his head feel. A Keyhea order was initiated, as was a referral to DMH. The Keyhea order was upheld based on the inmate's grave disability and dangerousness to others.

The inmate's clinical symptoms improved while he was awaiting DMH transfer; the DMH referral was rescinded and the inmate was discharged to the EOP. However, he remained housed in the MHCB pending the Keyhea hearing. During this period, he again experienced deterioration and a DMH acute care referral was submitted. The inmate complied with medication orders and following some medication adjustment, exhibited improvement in his symptoms. He was described as less paranoid and aggressive with more organized behavior and thinking. He was discharged to the EOP with a diagnosis of Schizoaffective Disorder bipolar type and Personality Disorder NOS. MHCB discharge medications included Cogentin, Zyprexa, Effexor and Haldol.

The inmate was subsequently admitted to the A-4 housing unit, which was known as the Mental Health Temporary Housing unit (MHTH), due to suicidal ideation.

Although the medical record indicated that the inmate had been referred to intermediate care and that a completed referral packet had been sent to CDCR headquarters on 1/10/11, he was not listed on the institutional DMH referral log.

IDTT meetings were conducted on 10/28/10 and 11/18/10. Meeting documentation indicated that the inmate met at least three of the criteria for DMH consideration and that the intermediate care referral was in process at that time. Documentation as to an IDTT meeting on 12/16/10 also indicated that the intermediate care referral was in process. It was further noted that the inmate had decreased group therapy attendance due to his paranoia of others.

A medical record review indicated that the primary clinician saw the inmate weekly and that there were monthly IDTT meetings. Progress notes consisted of checklists, which were not clinically informative.

<u>Findings</u>

The inmate was on a Keyhea order and exhibited continued psychotic symptoms resulting in MHCB/MHTH placements. Although medical record notes indicated that the IDTT

had initiated a referral to DMH for intermediate level of care in October 2010, the referral packet was not completed and forwarded to CDCR headquarters until 1/10/11. The most recent institutional DMH logs did not indicate that the inmate had been referred to DMH. Although the primary clinician saw him weekly and there were monthly IDTT meetings, treatment plans were unchanged from 7/1/10. Progress notes were also in a checklist format with little relevant clinical information.

**Inmate B**

This inmate arrived at NKSP on 9/8/10. He had been assessed with a developmental disability and was classified as DD2. He was hospitalized in the MHCB at CTF from 10/26/10 to 10/28/10. The discharge summary provided a diagnosis of Adjustment Disorder. Additional diagnoses present in the medical record included Mood Disorder NOS, Psychotic Disorder NOS and Alcohol Abuse. The discharge summary also noted that the inmate exhibited anxiety and paranoid symptoms and that he "tended to exaggerate mental retardation." The medical record indicated that he had a primary concern for his safety due to his history of a sex offense.

The inmate had a history of two assaults on custody officers on 11/18/10 and 11/20/10. He was again referred to the MHCB on 11/22/10 due to severe agitation and dangerousness to others.

The Form 7388, the checklist for DMH referral, dated 10/23/10 indicated that the inmate met three of the criteria for higher level of care referral consideration, and indicated that a DMH referral was in process. However, a Form 7388 dated 11/13/10 indicated only one criterion for DMH referral consideration, and no DMH referral was noted. The DMH log indicated that a DMH referral was submitted on 1/3/11 although it was unclear whether the referral was for acute or intermediate level of care.

Findings

The DMH log indicated that the inmate was referred to DMH. However, there was contradictory information on the Form 7388s as to whether a referral had actually been submitted. It was also unclear whether the DMH referral was for acute or intermediate care. It was evident that the inmate had several MHCB/MHTH admissions and needed a higher level of care.

**Inmate C**

This EOP inmate had been housed in administrative segregation since 7/15/10 due to battery on a peace officer. He initially received mental health services at the 3CMS level of care. However, he was admitted to the MHCB on 12/27/10 and discharged back to administrative segregation on 1/10/11 at the EOP level of care. The MHCB discharge summary indicated that the inmate had been provided with diagnoses of Bipolar Disorder NOS and Alcohol Abuse. The discharge summary indicated that his symptoms of delusional thinking, auditory hallucinations and poor hygiene had improved with

medication treatment, but he continued to lack insight as to his mental illness; the inmate denied the existence of a mental illness or the need for medication therapy. A Keyhea order was initiated. A medical record review did not indicate documentation of clinical contacts or treatment planning following the inmate's MHCB discharge.

Findings

The inmate's symptoms improved following his MHCB hospitalization and initiation of Keyhea proceedings. It would be important to monitor the inmate's medication compliance with the Keyhea order in place given his apparent lack of insight as to his mental illness and perception that medications were not needed. It was of concern that there was no medical record documentation as to subsequent clinical contacts or IDTT meetings following the inmate's MHCB discharge.

**Inmate D**

This EOP inmate was housed in the ASU. He was provided with diagnoses of Bipolar Disorder NOS with psychosis, Amphetamine Dependence and Alcohol Dependence. He reported experiencing moderate levels of depression as well as auditory hallucinations and anxiety. The IDTT noted that there had been no change in the inmate's level of anxiety.

Primary clinician progress notes documented that the clinician addressed the inmate's medication resistance during treatment sessions. There was also documentation that the primary clinician at least saw the inmate twice weekly. The Form 7388, the checklist for DMH referral, indicated that one of the criteria for higher level of care referral consideration was met, and a sound explanation for the lack of referral was provided.

Findings

This inmate was receiving mental health services at the EOP level of care and the primary clinician at least saw him twice weekly. The primary clinician's progress notes provided documentation that coincided with the treatment outlined in the treatment plan.

**Inmate E**

The inmate arrived at NKSP on 7/1/10, from the Los Angeles County Jail. Transfer information from the county jail indicated that he had no medical problems but had been seen by jail mental health staff for depression. He was not prescribed medications while at the county jail.

A psychologist saw the inmate in the NKSP receiving and reception area on the day of arrival; the inmate denied any past or current mental health difficulties or treatment. He was not included in the MHSDS at that time. On 7/3/10, the inmate reported suicidal ideation and a plan. He was admitted to the MHCB but was discharged within a few days. Upon returning to the general population, he again reported suicidal thoughts and a

plan to hang himself. He was again referred to the MHCB; this cycle was repeated several times. The inmate was eventually referred to DMH for acute care and was accepted and admitted to DMH VPP on 8/17/10.

At DMH, the inmate was initially prescribed Zoloft, although he consistently denied mental health problems while hospitalized there. The inmate participated in programming and the medication was discontinued after he began to refuse it, stating that he did not need it. His condition remained stable and he was discharged from DMH to return to NKSP on 11/8/10.

The medical record contained DMH information, including a discharge summary, social work assessment, copies of progress notes, and medication information. The inmate was provided with a discharge diagnosis of Adjustment Disorder and was recommended for the EOP level of care. He was initially placed in the MHTH, which was the protocol at NKSP for inmates returning from DMH to ensure continuity of care. In this particular case, however, the inmate remained there continuously as he threatened to hang himself if released from mental health housing.

Documentation indicated that the inmate was extremely fearful of placement on any yard with other inmates because he had been convicted of a sex offense. As he remained housed in the MHTH, he did not participate in EOP treatment. Mental health staff essentially saw him daily. Zoloft was resumed. The inmate consistently requested return to the hospital rather than remaining in prison.

Findings

The medical record did not support the presence of a serious mental illness for this inmate although he presented with an incapacitating fear that other inmates would harm him due to his sex offender status. Antidepressant medication and continued housing in an intensive mental health treatment bed were unlikely to address his concerns or improve his situation. Other measures, such as placement in SNY housing and safety assurances by correctional counselors and other custody staff, were more appropriate.

**Inmate F**

This 3CMS inmate arrived at NKSP on 4/14/09. Initial medical screening at the time of reception indicated no current or past history of treatment for mental health concerns. A physical examination completed on 4/20/09 documented no indications of mental health referral. A mental health screening completed on 4/20/09 did not indicate that further evaluation was warranted.

The inmate was referred to mental health in February 2010 after a CCI noted that he had received five disciplinary infractions in less than two months; the inmate had not received any infractions during his previous seven months of incarceration. Mental health staff met with him and learned that he was having difficulty coping in prison after learning of

the death of his grandmother. He was provided with a diagnosis of Bereavement, and, on 2/16/10, was included in the 3CMS caseload.

The initial IDTT meeting was conducted on 2/17/10 and the treatment plan was updated on 9/30/10. The treatment plan included weekly individual therapy as the intervention; however, the inmate was never seen on a weekly basis but was occasionally seen twice monthly. Despite this, he reported that the therapy sessions were beneficial. The inmate received no further disciplinary infractions and was provided with a job assignment that he enjoyed.

Findings

The interventions and treatment provided were consistent with 3CMS Program Guide requirements, but the treatment plan did not accurately reflect the treatment provided. In fact, the inmate appeared ready for discussions as to discharge from the MHSDS based upon his level of functioning and the infrequency with which mental health saw him. The case represented a good example of referral by an attentive correctional counselor and early intervention resulting in the inmate's rapid improvement and return to prior optimal levels of functioning.

**Inmate G**

This 3CMS inmate was housed in the general population. He was transferred to prison in 2005 but did not require mental health services until October 2008 when he requested evaluation for a sleep disturbance. A mental health evaluation conducted in response to this request provided a diagnosis of Depressive Disorder NOS. The inmate was included in the MHSDS at the 3CMS level of care. He was not referred for a psychiatric evaluation but was encouraged to participate in group sessions and weekly primary clinician contacts. The inmate participated in group therapy and his primary clinician saw him once or twice monthly. The most recent annual IDTT was conducted in October 2010 and continued to include recommendations for weekly individual therapy. Primary clinician sessions were never conducted weekly nor did it appear necessary to increase the frequency or intensity of clinical contacts.

Findings

The primary clinician saw the inmate at intervals that met or exceeded Program Guide minimum requirements. The inmate appeared to be functioning well and did not require referral to a higher level of care.

**Inmate H**

This 3CMS inmate arrived at NKSP on 6/1/98. However, he was not included in the MHSDS until 7/21/09 when he was evaluated for his complaints of insomnia and depression. At that time, he was included in the MHSDS at the 3CMS level of care. The

inmate reported that his insomnia and depression began after losing visiting privileges for allegedly pushing his wife. He did attend group therapy.

The most recent IDTT plan update was dated 7/22/10 and stated that the inmate reported symptoms of agitation, depression and poor appetite after learning that he was being transferred from NKSP to allow the transfer of reception center inmates to the facility. The inmate had been housed at NKSP since 1998 and its location allowed for family visits.

The inmate was provided with diagnoses that included Dysthymic Disorder, Mood Disorder NOS and Antisocial Personality Disorder. He was not prescribed psychotropic medications. The Form 7388 was completed at the IDTT and indicated that the inmate did not meet criteria for higher level of care referral consideration.

Findings

There was documentation that the primary clinician, psychiatrist and IDTT saw the inmate timely. There was a need for diagnostic clarification, which could be accomplished on an outpatient basis. The inmate's symptoms appeared to be caused by situational factors; future treatment planning might benefit him if it assisted in developing better coping mechanisms.

**Inmate I**

This 3CMS inmate arrived at NKSP on 6/27/08 and was referred for further mental health evaluation in the reception center due to his report of depression and history of suicide attempts; he had cut his wrists in a suicide attempt six months prior to incarceration and had reported another suicide attempt.

As a result of the mental health evaluation, the inmate was provided with a diagnosis of Psychotic Disorder NOS. He reported experiencing auditory hallucinations since the 1980s. His most recent treatment plan was dated 1/13/11. His diagnosis was amended to Schizoaffective Disorder depressive type. He was prescribed Geodon, Zoloft and Benadryl. The psychiatrist saw the inmate at two to three month intervals and the primary clinician saw him at three month intervals.

Findings

A signed informed consent form for Geodon dated January 2009 was located in the medical record but it was outdated; no updated informed consent forms were located. The Zoloft informed consent form was dated 9/28/08. Some laboratory studies were located in the medical record but they had been obtained and monitored by the medical department and were not pertinent to prescribed mental health medications. There was no documentation that psychiatrists reviewed the laboratory studies. Body weight, abdominal girth and blood glucose levels were monitored according to recommended guidelines for the use of atypical antipsychotic medications.

686

Although there were no documented risk factors noted for DMH referral consideration, the inmate would benefit from diagnostic clarification which could be accomplished on an outpatient basis.

**Inmate J**

This reception center EOP inmate arrived at NKSP on 8/27/10 and the medical screening process referred him to mental health. He was identified as having a history of treatment for Schizophrenia. A comprehensive mental health evaluation was timely completed on 9/13/10.

As a result of the mental health evaluation, the inmate was admitted to the MHTH. He was subsequently assessed in the IDTT conducted in the MHTH and a determination was made to refer him to DMH for stabilization. A referral packet was submitted to DMH for intermediate level of care in October 2010 but the packet was reportedly lost. When the loss was identified, a second referral packet was submitted to DMH in December 2010. There was no documentation of the second referral packet's submission on the DMH log maintained by the institution, but medical record documentation and staff reports indicated that the second packet had been submitted.

The inmate appeared on the wait list log received from CDCR headquarters indicating that DMH had accepted him. The inmate remained housed in the MHTH. Property allocation was limited, and he remained on a mattress on the floor with only a suicide smock and blanket. Mental health treatment staff saw him briefly out of cell in daily meetings which were referred to as an IDTT; however, operationally the meetings were more akin to clinical rounds with the exception that the inmate was in attendance. There was no opportunity for outdoor recreation.

<u>Findings</u>

This case illustrated the difficulty in maintaining accurate and comprehensive logs and communication for inmates pending DMH admission, delays in accessing intermediate level of care, and the restrictiveness of the MHTH at NKSP.

EXHIBIT S
California State Prison, Los Angeles County (CSP/LAC)
October 25, 2010 – October 28, 2010
January 18, 2011 – January 20, 2011

**Inmate A**

This EOP inmate was housed in the A-4 ASU.  He was diagnosed with Delusional Disorder paranoid type.  He was on a Keyhea order for danger to others that would expire on 1/17/11.  The inmate was seen at plaintiffs' attorneys' request due to the nature of his high profile case and concern as to the need for a higher level of care.  He was treated with Zyprexa 15 mg/day, Haldol 5 mg/day and Benadryl 50 mg intramuscular for refused oral doses.  The inmate reportedly was HIV positive.  At the time of the site visit, he had recently been discharged from the MHCB following a serious suicide attempt by hanging and the making of superficial cuts to his wrists while out to court in a holding cell.

He was admitted to the MHCB at CSP/LAC on suicide watch on 10/15/10 after attempting suicide while out to court.  Progress notes indicated that he showed improvement during the course of admission; there was a downgrade in monitoring of suicide precautions and an eventual discharge back to administrative segregation with a recommendation for five-day follow-up.  Treatment plans identified self-injurious behavior and Delusional Disorder as problems/target symptoms with medications, and the MHCB as treatment intervention.

Progress notes as to the inmate's administrative segregation stay indicated that he refused many of his groups as well as most out-of-cell clinical contacts.  Psych tech notes of daily rounds and some primary clinician progress notes did not document the presence of delusional thinking that was clearly documented in the psychiatric progress notes.  The most recent IDTT meeting that occurred on 9/8/10 indicated that the inmate presented with grandiose delusional thinking, did not attend the IDTT meeting and that the primary clinician would "consider a level of care change if appropriate."  It was unclear if this statement meant a downgrade to the 3CMS program.  The mental status examination indicated that the inmate did not exhibit delusional thinking, but rather noted that "although being reported in medical record (delusions), I/P may indeed has overvalued ideas rather than delusionary process."

Findings

This EOP inmate, who was on a Keyhea order, presented with chronic delusional thinking of bizarre, paranoid and grandiose content.  He firmly believed that he was raped by correctional staff after he was injected with an unknown substance.  He attempted suicide by hanging and cutting his wrists due to his delusional thinking and belief that his martyrdom would somehow help other inmates.  Supervisory staff reported that the inmate had been going to court and the possibility that he would face the death penalty had become more acute for him.  Despite the assessment by the MHCB IDTT that he did not warrant transfer to DMH for a higher level of care, it appeared that transfer for intermediate care was warranted for him.  His delusional thinking, if untreated, would probably continue and possibly worsen if he was transferred to another CDCR facility.  The risk of the inmate's further self-harm was a chronic issue that appeared to have worsened due to recent stressors related to his legal case.  He met the criteria for DMH transfer consideration due to his lack of participation in at least 50 percent of therapeutic

689

activities (criterion five), his need for stabilization of refractory psychiatric symptoms (criterion two), and his inability to function within the structure of the EOP level of care (criterion one). An RVR log review indicated that the inmate received his last RVR on 7/6/10; two prior RVRs occurred on 4/22/10.

It was of additional concern that the primary clinician did not document the presence of psychosis in this inmate; other clinicians clearly believed he exhibited psychotic symptoms. It appeared that many of the clinical interventions occurred at cell front in a non-confidential setting, which made adequate assessment of this paranoid inmate impossible. Treatment planning for the inmate was also very poor and did not identify specific problems (only anger) or needed interventions.

## Inmate B

This EOP inmate was housed in the mainline EOP program on the D facility. He was provided with a diagnosis of Schizophrenia paranoid type. He was treated with Haldol 7.5 mg/day, Cogentin 2 mg/day and Effexor ER 150 mg/day. The inmate's medical record was reviewed after he was observed exhibiting bizarre and disorganized behavior with probable auditory hallucinations, unkempt appearance and poor self-care.

A review of the inmate's medical record indicated that he had been placed on a Keyhea order since 9/17/08 due to danger to others and grave disability. Although the Keyhea order was scheduled for possible renewal on 10/15/10, a psychiatric progress note dated 10/13/10 indicated that the appropriate documentation had not been timely completed. As a result, the judge decided to postpone the hearing until 11/10/10, and the involuntary medications were discontinued. A nurse reported that the inmate had not been compliant with prescribed medications for three days prior to the site visit.

A primary clinician progress note dated 10/20/10 indicated that the inmate's behavior during groups was "not appropriate." A separate chrono indicated that he aggressively blew his nose, expelling mucus from his nostrils; the inmate was also described as angry and he abruptly left the group session. Previous progress notes described the inmate as exhibiting response to auditory hallucinations, with poor hygiene and foul body odor. A treatment plan dated 9/8/10 listed hallucinations, delusions and ADLs as problem areas. The Form 7388, the checklist for DMH referrals, was completed and indicated that he met criterion four (demonstrating chronic psychiatric symptoms that had not responded sufficiently to at least six months of treatment). The rationale provided for non-referral was that the inmate functioned adequately in the EOP.

Findings

The inmate appeared to have been noncompliant with medications for several days prior to the site visit with an apparent worsening of symptoms. It was of concern that his Keyhea order was allowed to lapse due to poor documentation. It also did not appear that appropriate monitoring and intervention had occurred for this inmate with a long history of placement on a Keyhea order; this omission resulted in the inmate's further

decompensation with disorganized and possibly dangerous behavior.  In fact, the primary clinician documented that he was advised that his group behavior was not appropriate and a 128C chrono was submitted, in spite of the lapse in his Keyhea order and subsequent medication noncompliance due to staff error.  The treatment plan should have been updated to reflect the need for greater monitoring until the return to court for renewal of the Keyhea order.  The expert's recommendation for the inmate's evaluation through stabilization in the MHCB was discussed with mental health supervisory staff.

**Inmate C**

This EOP inmate was housed in administrative segregation in housing unit A-4.  He was provided with a diagnosis of Psychotic Disorder NOS.  He was prescribed Wellbutrin 150 mg/day, Risperdal 6 mg/day (oral solution) and Benadryl liquid as needed.  The inmate arrived at CSP/LAC on 7/20/10, from a county jail.  A medical record review indicated that he had a history of a Keyhea order due to danger to others that expired on 7/20/09.  A review of the August and September 2010 medication administration records (MARs) indicated that he had numerous instances of medication noncompliance.  Medical record progress notes indicated that he attended most of his groups and individual sessions, but there were consistent refusals.  On 10/20/10, the primary clinician documented that the inmate exhibited delusions as to telekinesis and had made threats to custody staff.  He also exhibited thought broadcasting and paranoid delusional thinking with poor insight and auditory hallucinations.  A sign on his cell door indicated that he was assaultive to the staff.

Although most progress notes described the inmate as exhibiting severe psychotic symptoms, one psychologist consistently stated that the inmate did not exhibit psychotic symptoms.  A recent treatment plan was not located in the medical record.

Findings

The inmate was seen by the expert during psych tech rounds.  He presented with significant evidence of paranoid delusion thinking and auditory hallucinations.  As a treatment plan was not located, it could not be determined whether the inmate was considered for referral to a higher level of care.  It was of concern that some of the primary clinician notes were inconsistent with descriptions presented by the psychiatrist and other clinicians.  The inmate required evaluation as to his medication compliance, the need for medication adjustment and/or higher level of care referral consideration.

**Inmate D**

This 3CMS inmate was housed in the general population.  He was diagnosed with Major Depressive Disorder, recurrent with psychotic features.  He was treated with Abilify, Depakote and Paxil.  The inmate was classified as DDI.  His medical record was reviewed due to his report of medication expiration and increased auditory hallucinations.

The inmate had previously been in the EOP. He was transferred to administrative segregation due to fighting and was subsequently downgraded to the 3CMS level of care. The inmate expressed concerns as to his treatment by correctional officers.

Findings

A review of the medication profile indicated that all psychotropic medication orders were current and the psychiatrist last saw the inmate during the week of the site visit. Mental health supervisory staff was informed of concerns as to the inmate's functioning, and staff indicated that he would be seen for follow-up.

**Inmate E**

This inmate was on the wait list for transfer to DMH intermediate care. He was referred in May 2009 and was reportedly accepted in September 2009. Progress notes, including a treatment plan, did not indicate that he had been referred to DMH. It appeared from a treatment plan dated 5/14/10 that the DMH referral may have occurred as a result of the MHARP process. The inmate was number 33 on the SVPP wait list.

The inmate received psychotropic medications due to a Keyhea order as a result of his grave disability. A progress note from April 2010 indicated that he continued to demonstrate poor functioning, poor treatment compliance and grave disability. A medical record review did not reveal evidence that the inmate was provided with enhanced or special care while awaiting DMH transfer. He frequently refused to attend group therapy, and was described as malodorous with disorganized thinking on the occasions when he attended individual treatment.

Due to the medical record's poor condition, it was unclear if the IDTT saw the inmate monthly. The Form 7388 was not located in the medical record. Treatment plans were largely inadequate as they did not address the inmate's functional needs. During October 2010, the inmate was primarily seen at cell front for short periods of time. He was prescribed Cogentin 4 mg/day, Haldol 20 mg/day and Risperdal 6 mg/day; as per the Keyhea order, intramuscular injections of Haldol were provided if the inmate refused oral medications.

Findings

The inmate had been on the DMH SVPP wait list for an extended period of time, but was not provided with any additional services or treatment plan modifications in an effort to minimize his continued decompensation. The psychiatrist saw him timely but he was not seen timely by his primary clinician. Treatment planning was also problematic; treatment plans did not adequately address the inmate's mental health needs and should have been modified to better meet his functional level and treatment noncompliance. Although there were progress notes referring to monthly IDTT meetings, corresponding treatment plans were not located in the medical record. It also appeared that Form 7388s were not completed as required. There was documentation of quarterly IDTT meetings. However,

the medical record was in disarray; there were items that were not filed chronologically or correctly, making it difficult to determine compliance with many Program Guide elements.

**Inmate F**

This inmate was on the DMH wait list for intermediate level of care. He was referred to DMH on 6/15/10 and was accepted for admission on 7/8/10. The IDTT saw him during June, September and October 2010. All of the accompanying treatment plans were essentially unchanged and were not modified to address the inmate's failure to attend group and individual treatment or to address his active psychotic symptoms.

The inmate was treated with Prozac 60 mg/day, Remeron 15 mg/day, Haldol Decanoate 200 mg intramuscular every two weeks, Risperdal 8 mg/day and Cogentin 4 mg/day. He was provided with diagnoses of Schizophrenia, paranoid, chronic type and Polysubstance Dependence in institutional remission. He was repeatedly described as dirty, disheveled, disorganized and delusional with active response to auditory hallucinations. His cell reportedly smelled of urine and unwashed clothing. There was no documentation to indicate that the psychiatrist saw him monthly. There was, however, documentation of weekly contacts with the primary clinician.

Findings

The inmate received basic services that were routinely provided to EOP inmates while he awaited transfer to SVPP; he was, however, seen during two consecutive months by the IDTT. His treatment plan was inadequate in addressing his level of functioning and should have been revised to reflect his failure to progress. The psychiatrist did not timely see the inmate.

**Inmate G**

This inmate was on the DMH SVPP wait list. He was referred on 6/15/10 and was accepted for admission on 6/24/10. The IDTT saw the inmate monthly since his referral to DMH; however, the accompanying treatment plans remained essentially unchanged with few clinically relevant treatment interventions listed.

The inmate reportedly presented with poor ADLs, refusal to shower, irritability, guardedness, poverty of speech and response to auditory hallucinations. His cell was described as dirty and he reportedly had little to no participation in treatment.

The inmate had been on a Keyhea order that expired on 7/16/09. It was unclear from the medical record whether a renewal was attempted or if the Keyhea order was allowed to expire. Documentation indicated, however, that there had been a significant decline in the inmate's level of functioning since the expiration of the Keyhea order. He was prescribed Risperdal 3 mg/day, Geodon 20 mg intramuscular if Risperdal was refused and Cogentin 1 mg/day. The order for alternative intramuscular medication suggested

that there may have been another Keyhea order initiated or that the psychiatrist believed that the inmate remained on a Keyhea order. This issue was not resolved prior to completion of the site visit. The inmate was reportedly compliant with taking his medications; however, compliance could not be verified, and there was a significant decline in the inmate's level of functioning.

The inmate initially refused DMH treatment but at the time of his Vitek hearing, he changed his mind and agreed to the referral. There was a lack of documentation of clinical contacts for August 2010. Medical record documentation indicated that the inmate had a progressive worsening of his symptoms during September and October 2010. He was initially seen in a confidential setting for individual contacts but as he worsened, he gradually refused to leave his cell at all and was seen at cell front. He reportedly presented with psychotic symptoms on a continual basis. There was no documentation that a request was made to expedite his transfer to DMH despite what appeared to be a clearly negative progression in his functional level.

<u>Findings</u>

The inmate appeared to be very ill with a worsening of his psychotic symptoms while he awaited transfer to SVPP. Other than monthly IDTT meetings, his care was neither modified nor enhanced following his DMH referral; this despite his worsening of symptoms and treatment noncompliance. As the treatment provided to the inmate did not appear to address his significant difficulties, his treatment plan should have been modified to specifically address his decrease in functioning. The inmate was also not timely seen by psychiatry or his primary clinician. This case was referred to the CDCR headquarters' staff present during the site visit to review for possible expedited transfer consideration.

**Inmate H**

This inmate was on the DMH SVPP wait list. He was referred to DMH on 4/30/09 and was accepted for admission on 6/12/09. Due to his refusal, he was not prescribed psychotropic medication. He was provided with a diagnosis of Delusional Disorder, grandiose and persecutory type.

The treatment plan dated 9/23/10 included a Form 7388 that had all of the items as to higher level of care referral consideration marked positively. The inmate was not under a Keyhea order. The primary clinician reported that he refused to attend all groups and would not leave his cell to meet with her. He was described as guarded, paranoid and actively delusional. The inmate was not seen by the IDTT throughout the time that he was on the wait list, but was seen during July, August and September 2010.

Medical record documentation indicated that the inmate's primary clinician changed several times. Treatment plans appeared to only state Program Guide requirements and failed to address the inmate's refusal to participate in treatment. A number of the treatment plans did not include the Form 7388 as to higher level of care referral

consideration; however, this improved over time and the most recent treatment plans included the Form 7388.

The inmate was consistently described as disheveled with a foul odor, agitated, disorganized and odd. He reportedly believed that he had psychic powers and experienced auditory hallucinations. He had no insight as to his mental illness. The most recent psychiatric contact which occurred on 6/17/10 was conducted at cell front. Minimal information was provided as to this contact and there was a lack of documentation as to discussions regarding the inmate's medication noncompliance. The primary clinician did not see the inmate weekly.

<u>Findings</u>

The inmate was not seen in compliance with Program Guide requirements as to the frequency of contacts with his primary clinician and psychiatry. The treatment plans were clinically inadequate and the inmate had not received adequate care for his mental illness. This case should have been considered for expedited transfer in light of the inmate's lengthy time on the wait list and the most recent Form 7388, which indicated the presence of all factors for higher level of care referral consideration. This case was referred to the CSP/LAC's mental health supervisory staff for remedy.

**Inmate I**

This inmate arrived at CSP/LAC on 3/19/10. He had been referred to DMH but the referral was subsequently rescinded; PBSP referred the inmate to DMH in 2009. CSP/LAC was not initially notified of the referral and the inmate was treated based on his presentation and EOP level of care upon arrival. The inmate was moved to the 3CMS program on 7/15/10 as his mental status had improved without medication treatment. On 9/27/10, a psychologist saw the inmate after notification that he was on the SVPP wait list. At that time, the psychologist believed that he had further improved and did not require DMH hospitalization. The medical record contained confusing information as to the inmate's level of care. Documentation dated September 2010 indicated that the inmate had refused to attend EOP groups. There was, however, a lack of documentation indicating that the inmate was seen monthly by psychiatry or weekly by his primary clinician.

<u>Findings</u>

Based upon the change in level of care to the 3CMS program, the primary clinician saw the inmate timely. However, he was not seen timely for the initial and ongoing psychiatric contacts, or by the IDTT. A current treatment plan was not located in the medical record, and appropriate treatment documentation should have clarified the inmate's level of care. There was a need for improved documentation of clinical encounters for all disciplines as to the mental health care provided for this inmate.

**Inmate J**

This inmate was identified on 9/1/10 in his initial administrative segregation IDTT as meeting criteria for DMH referral consideration but was not referred to DMH. He was prescribed Buspar 30 mg/day, Remeron 15 mg/day and Effexor 150 mg/day. He was provided with diagnoses of Mood Disorder NOS and Antisocial Personality Disorder.

The clinician provided justification for not referring the inmate to DMH by citing that he was a new admission to the ASU and was new to the treatment provider. She indicated that she needed additional time to assess him. Prior clinical documentation in the medical record supported this rationale.

The inmate participated in at least 50 percent of his group treatment; his primary clinician saw him in a confidential setting for approximately 50 percent of the contacts. There was a lack of documentation that indicated that the psychiatrist saw that the inmate on a monthly basis.

Findings

Based on the review of the medical record, it appeared that the decision not to refer the inmate to DMH was clinically appropriate. There was documentation that he was seen timely by his primary clinician; however, his initial IDTT meeting was not conducted prior to his ICC hearing. It also appeared that psychiatry did not see the inmate monthly, as required.

**Inmate K**

This inmate had been identified in a quarterly IDTT meeting that was conducted on 9/21/10 as meeting four of the criteria for DMH referral consideration. The justification that was provided for not referring him to DMH was a report that he had been stable with periods of decreased functioning, primarily poor ADLs due to medication noncompliance.

The inmate was provided with diagnoses of Bipolar Disorder, most recent episode mixed and Alcohol Dependence. There was medical record documentation that described the inmate as disheveled with disorganized speech, paranoia and with probable auditory and visual hallucinations. There was contradicting information provided as to the inmate's medication compliance.

After the IDTT meeting on 9/21/10, the inmate appeared to exhibit further decompensation, smelling of urine, with mumbling speech, response to auditory hallucinations, poor ADLs and confusion with poor memory.

The inmate was neither seen weekly by his primary clinician nor monthly by psychiatry. It was unclear if the inmate was compliant with group therapy attendance. The content of clinician progress notes suggested that little actual therapeutic interventions occurred

during individual contacts.  The treatment plan was inadequate; the plan was vague in content and did not outline specific therapeutic goals or planned interventions.

Findings

The failure to refer this inmate on 9/21/10 was clinically inappropriate and the provided justification was inadequate.  The inmate did not receive appropriate mental health care based on the failure to implement interventions targeting his symptoms.  He was also not seen by his primary clinician and psychiatry in accordance with Program Guide requirements as to the frequency of clinical contacts.  After discussion with CSP/LAC staff regarding this case, the inmate was reportedly referred to DMH; the referral package was submitted on 10/26/10.

**Inmate L**

This inmate had been identified in a quarterly IDTT meeting that was conducted on 9/14/10 as meeting two of the criteria for DMH referral consideration.  The rationale provided for not referring the inmate to DMH was that he had improved medication compliance and functioning during the preceding three months.  The inmate had been provided with a diagnosis of Schizophrenia paranoid type.  He reportedly had a history of experiencing somatic delusions and possible tactile hallucinations.  The treatment plan did not mention group therapy as a treatment intervention, despite the inmate's EOP status.  Progress notes suggested that the inmate's clinical encounters were brief with minimal treatment provided.  Despite this, existing documentation supported the decision not to refer him to DMH intermediate care.  There were periods of time when the primary clinician did not see the inmate weekly and psychiatry did not see him monthly.

Findings

The decision not to refer the inmate to DMH appeared to be clinically appropriate.  The treatment plan was not individualized to address his specific mental health needs.  There was a lack of documentation to verify that the primary clinician and psychiatrist saw the inmate timely.

EXHIBIT T
California Correctional Institution (CCI)
November 16, 2010 – November 18, 2010

**Inmate A**

This 3CMS inmate was housed in the Level II ASU.  He was provided with a diagnosis of Depressive Disorder NOS, Cannabis Dependence and Antisocial Personality Disorder.  He was prescribed Effexor.

Nursing staff completed a pre-placement screen when the inmate was initially housed in the 4-A housing unit.  The inmate was placed in administrative segregation on 7/17/10.  The medical record lacked documentation that a timely administrative segregation initial intake evaluation occurred, as well as documentation of daily psych tech rounds and weekly summaries.  Information contained on psych tech documentation also appeared to be primarily based on observations, which suggested minimal inmate interactions.

The initial administrative segregation IDTT meeting did not occur until 8/6/10 but the Form 7388, the checklist for DMH referral, was fully completed and indicated that no referral criteria were met.  Documentation indicated that psychiatry timely saw the inmate but there was a lack of documentation that the primary clinician saw the inmate weekly.  The medical record indicated that the inmate had a significant history of medication refusal.  The treatment plan essentially restated Program Guide requirements and did not appear to adequately meet the inmate's mental health needs.

<u>Findings</u>

The treatment plan and medical record progress notes indicated that the care provided to the inmate appeared to be primarily focused on medication management.  The treatment plan was generic and not specific to the inmate's clinical needs.  The inmate was not seen timely by the IDTT or his primary clinician.  Psych tech and primary clinician documentation indicated that therapeutic interaction was minimal.  There was also a lack of documentation of daily psych tech rounds.

**Inmate B**

This EOP inmate's care was reviewed at plaintiffs' attorneys' request to evaluate his functioning and mental health care.  He was provided with a diagnosis of Bipolar Disorder NOS, Polysubstance Dependence and Personality Disorder NOS.  He was treated with Depakote 1500 mg/day and Remeron 30 mg at night.

The inmate had been housed in the SHU with an indeterminate SHU term.  He was placed in administrative segregation on 9/9/10 following expiration of the SHU term.  At the time of the site visit, he was awaiting CSR review and endorsement to a Level IV EOP SNY.  The Form 7388, the checklist for DMH referral, indicated that the inmate did not meet DMH referral consideration criteria.  He was seen timely by the IDTT, and was consistently followed by his primary clinician.  Medical record documentation indicated that prior to August 2010, treatment planning was clinically specific and consistent with the inmate's clinical needs.

There was a lack of documentation of weekly rounds during the inmate's SHU stay and of daily rounds when he was housed in administrative segregation. Based on minimal available documentation, the inmate began experiencing increased anxiety and agitation due to several events, including a false allegation of rape against him, the departure of his cellmate, fears of a future cellmate, and a pending transfer. This resulted in the treatment team increasing the inmate's level of care to EOP, which was indicated by a chrono dated 10/22/10. Because the inmate continued to exhibit signs of decompensation, the primary clinician responded with increased individual contacts.

At the time of the site visit, CCI did not provide group therapy for administrative segregation EOP inmates not on reception center status but the inmate was placed on a group wait list. He had recently received an RVR for refusing a cellmate, and expressed concern that he would be returned to the SHU on indeterminate status. Despite his concerns, the C-file did not indicate that these concerns were valid.

Findings

This inmate was seen timely by the IDTT, psychiatry and his primary clinician. The treatment plan completed at the 10/22/10 IDTT meeting was clinically specific for the inmate's treatment needs. Although there was a period during which primary clinician contacts were minimal, the inmate generally received adequate treatment that was modified to meet his increased needs. However, the inmate was not timely seen by psych techs during his stay in the SHU and administrative segregation. There was also no documentation of weekly summaries of psych tech rounds in administrative segregation.

**Inmate C**

This 3CMS inmate's care was reviewed at plaintiffs' attorneys' request to evaluate his functioning and mental health care. He was provided with a diagnosis of Mood Disorder NOS and a provisional diagnosis of Psychotic Disorder NOS; at the most recent IDTT meeting that occurred on 7/9/10, Antisocial Personality Disorder was identified as the primary diagnosis. He was prescribed Abilify 15 mg/day and Remeron 15 mg/day.

The inmate was transferred to administrative segregation on 12/31/09, went out to court on 5/13/10, and returned to administrative segregation on 5/14/10. . The inmate refused to communicate with his primary clinician for months, and only began interaction with a primary clinician when he was assigned a different one in September 2010. There was no documentation of weekly primary clinician contacts. The inmate's documented paranoia and distrust of prior clinicians appeared to have had a very negative impact on the staff's ability to develop rapport with him and to successfully convince the inmate to come out of his cell for individual contacts. Psychiatric contacts appeared to have occurred timely and there was documentation that the inmate interacted with his psychiatrist.

Findings

The inmate was not seen in accordance with Program Guide timeline requirements by his

primary clinician or the IDTT, and his treatment plan was outdated. Available documentation as to psych tech and primary clinician contacts suggested that very little interaction and therapeutic activity occurred. The inmate should have been seen upon his return to administrative segregation from out to court, as this is a very high-risk time and an evaluation would be clinically indicated. Also, the inmate should have been assigned a new primary clinician much earlier than September 2010. However, it appeared that the inmate was timely seen by the psychiatrist. The treatment plan was generic and merely stated Program Guide minimum requirements for the various types of clinical contact. Treatment goals were not specific. .

**Inmate D**

This 3CMS inmate was housed in administrative segregation. Diagnoses provided in the medical record included differential diagnoses of Major Depressive Disorder, Mood Disorder NOS and Attention Deficit Hyperactivity Disorder (ADHD). He was treated with Remeron 15 mg/day and Strattera 20 mg/day.

The inmate had dropped out of a gang and was awaiting SNY placement. He was placed in administrative segregation on 9/5/10, but was not seen in an IDTT meeting until 10/27/10. There was no documentation of pre-placement screen completion. A completed Form 7388, the checklist for DMH referral, identified no criteria for higher level of care referral consideration. The inmate had an imminent release date, and prior to his administrative segregation placement, the staff was working with him as to pre-release planning. The inmate was experiencing significant anxiety and increased paranoia as to his pending release.

A medical record review indicated that psych tech progress notes contained inaccurate information as to the inmate's medication; they appeared to primarily be based upon inmate observations and did not indicate that clinical interaction had occurred. The medical record was not filed chronologically, making it difficult to confirm daily psych tech rounds; there were also several weeks without any psych tech documentation while the medical record did not contain any weekly summaries. While psychiatry saw this inmate timely, there were continuity of care issues; different psychiatrists made medication changes that contradicted other orders and failed to write orders for medication changes. On at least one occasion, the lack of a physician's order resulted in the inmate not receiving a medication for one week.

The medical record's poor condition made compliance with weekly primary clinician contacts and their confidentiality difficult to determine. It appeared, however, that the inmate was seen weekly. The content of progress notes indicated that the contacts lacked documentation of treatment interventions. There was documentation of parole planning in administrative segregation but staff noted housing and employment concerns.

<u>Findings</u>

Based on medical record documentation, it appeared that medication management was the primary mode of treatment provided to the inmate. Although psychiatry saw the inmate timely, a different psychiatrist saw him every time. There were also significant continuity of care issues, including a medication administration failure after the psychiatrist did not write an order. Although it appeared that primary clinicians' saw the inmate timely, IDTTs were not timely, and the treatment plan was inadequate. Psych tech rounds were not documented daily and psych tech weekly summaries were not completed. There was also a need for diagnostic clarification as the medical record contained several provisional diagnoses.

**Inmate E**

This EOP inmate was housed in administrative segregation. He had received an RVR for sexual misconduct. Although the inmate's status was difficult to determine, he appeared to be on reception center status after returning to the prison following being out to court. A bus screen dated 3/1/10 indicated that the inmate returned to CCI after he was sent out to court.

Although the inmate was prescribed Geodon 40 mg at night, the psychiatrist reduced the prescribed Geodon due to the inmate's request and complaints of excessive sedation. The inmate was provided with a diagnosis of Mood Disorder NOS. There appeared to be discrepancies as to diagnostic clarification between members of the IDTT; for example, the psychiatrist provided a diagnosis of Schizoaffective Disorder, which contrasted with the primary clinician's diagnosis of Mood Disorder NOS.

Although it appeared that the primary clinician saw the inmate weekly, the content of the contacts was not consistent with what the treatment plan outlined. Although treatment plans repeatedly described the inmate as manipulative with "inauthentic" relationships, there was no further explanation of this description or attempts to provide treatment aimed at developing problem-solving or other coping strategies to address these issues. The inmate was timely seen by psychiatry. Medical record documentation did not indicate compliance with daily psych tech rounds in administrative segregation. Weekly summaries of daily psych tech rounds were not documented.

<u>Findings</u>

There was documentation that the inmate was questioned as to the receipt of bad news upon arrival in administrative segregation. However, there was no documentation of the completion of an initial intake evaluation within five days of administrative segregation placement. A review of progress notes and the treatment plan indicated that it appeared that the care provided primarily consisted of medication management. Treatment planning was inadequate with incomplete forms, minimal interventions outlined, and poor individualization of the inmate's treatment needs. Better communication between the psychiatrist and primary clinician was indicated for diagnostic clarification. The

702

September 2010 IDTT meeting did not document the presence of necessary participants. Suicide risk assessment checklists were not always completed when clinically indicated. The medical record lacked documentation of daily psych rounds and weekly summaries.

**Inmate F**

This inmate arrived at CCI on 10/5/10 and was placed in administrative segregation because he had paroled at the maximum custody level. A medical records review did not indicate the inmate's level of care; the most recent treatment plan dated 10/15/10 revealed that the inmate was receiving mental health services at the 3CMS level of care. However, a placement chrono completed on 10/18/10 by a clinician who was not on the inmate's treatment team indicated that he was not an MHSDS participant. As the inmate had been receiving mental health services and was listed on the mental health roster as a 3CMS inmate, it appeared that the placement chrono was inaccurate.

The inmate was provided with diagnoses of Psychotic Disorder NOS, Polysubstance Dependence and Alcohol Dependence. He was treated with Thorazine 100 mg/day and Zoloft 100 mg/day. He was not seen timely by psychiatry, and multiple referrals were submitted prior to the actual medication management evaluation. Despite medical record descriptions that the inmate presented with paranoid and delusional thinking, the psychiatrist who saw him on 10/25/10 in response to a referral did not order medications nor provide a rationale for non-treatment. Progress note documentation appeared to indicate that the psychiatrist had delayed decision-making for a subsequent psychiatric contact. There was no documentation that an actual medication evaluation occurred on 10/25/10 although the psychiatrist clearly documented the inmate's desire for treatment with medications.

The initial IDTT was not timely and was conducted after the administrative segregation ICC. Although psych techs saw the inmate daily, weekly summaries were not completed. The inmate was not seen by his primary clinician weekly after the IDTT meeting.

Findings

The inmate did not receive a timely initial evaluation and was not seen timely by the IDTT. The treatment plan developed by the IDTT was inadequate in light of the inmate's documented symptoms and was generic in content. There was a need for clarification of the probably inaccurate placement chrono that stated that the inmate was not in the 3CMS program. The inmate was not seen by psychiatry or his primary clinician timely. Psych tech daily round documentation lacked completed weekly summaries.

**Inmate G**

This EOP inmate arrived at CCI during March 2009. He was housed in administrative segregation. He was hospitalized in the CMF MHCB from 5/26/10 to 6/9/10 due to suicidal ideation after receiving news that he was possibly facing additional charges. He was provided with a diagnosis of Adjustment Disorder with depressed mood, although

alternative differential diagnoses of Depressive Disorder NOS and Antisocial Personality Disorder were also considered. He was treated with Vistaril 100 mg/day and Zoloft 200 mg/day.

After returning from the MHCB, the inmate was housed in administrative segregation. The IDTT saw the inmate 12 days after his return from the MHCB. Although he was placed at the EOP level of care on 8/25/10, there was no documentation of an IDTT meeting note or treatment plan in the medical record. The inmate had increased anxiety due to the possible additional criminal charges and fear of receiving a life sentence. He made a statement to a clinician while he was out to court that he was going to kill himself if he was given additional time, but it was unclear if this information was communicated to the appropriate parties. The inmate continued to decompensate over time, with new reports of tactile hallucinations during October 2010 that were very disturbing to the inmate. Progress notes consistently documented that the inmate was experiencing significant depressive and anxiety symptoms but his diagnosis was not changed from Adjustment Disorder, which was of lesser severity and duration.

Although the primary clinician saw the inmate weekly, available documentation did not appear to recognize the severity of the inmate's symptoms and his risk of self-harm. Therapeutic interventions lacked clinical relevance. There was a lack of documentation that daily psych tech rounds occurred as required, and the medical record did not contain weekly summaries. Psychiatry did not timely see the inmate, even when referrals were completed.

Findings

The inmate's treatment was inadequate in light of his documented symptoms and continued decompensation. Although he was seen timely by his primary clinician, documentation of these contacts suggested that the clinician did not fully recognize the severity of the inmate's symptoms and deterioration and the degree of risk of self-harm. The inmate was not seen timely by the IDTT, and his level of care appeared to have been changed separate from the IDTT process. Psychiatric contacts were also not timely, and there was a lack of documentation to indicate that the psychiatrist recognized the consistent deterioration in the inmate's mental status. The inmate's diagnosis was not appropriately amended in light of the serious nature of his mental health symptoms. Daily psych rounds were not documented and when there was documentation, there were no weekly summaries.

**Inmate H**

This 3CMS inmate was referred to DMH as a result of a CCI policy that required DMH referral following two OHU placements; the OHU placements were due to suicidal ideation. The inmate's medical record included documentation that the case was reviewed by a primary clinician who had been specifically assigned to follow DMH wait list cases. An "enhanced" treatment plan, written on 11/12/10, included recommendations for weekly primary clinician contacts and psychiatry review every 30

days.  The plan did not include a group therapy recommendation as the inmate reportedly experienced anxiety in group settings.

<u>Findings</u>

This inmate was one of several who were referred to DMH due to a CCI policy that directed DMH referral following two OHU placements despite any IDTT meeting recommendations to the contrary.  Although the referral was made, the IDTT determined that the inmate only required mental health care at the 3CMS level of care.  However, it appeared likely that this inmate could have benefitted from treatment at the EOP level of care.  The "enhanced" plan developed for this inmate appeared to be adequate.  At the time of the site visit, the plan had only been in place for a few days; evaluation of its implementation and effectiveness was thus not possible.

**Inmate I**

This inmate was referred to DMH due to a CCI policy that required DMH referral following two crisis care placements.  On 10/14/10, following initiation of the DMH referral, the treatment team reduced the inmate's level of care from EOP to 3CMS.  The inmate's case management was assigned to a specific primary clinician who was tasked with tracking and developing treatment plans for inmates on the DMH wait list; a specialized treatment plan was written on 11/10/10.  The treatment plan required weekly contact with the primary clinician, IDTT consideration and psychiatry visits every 30 days, and daily groups.  Medical record review did not reveal documentation of daily group participation.

<u>Findings</u>

This inmate was referred to DMH due to CCI's internal policy requiring DMH referral following two crisis care placements.  The treatment team's decision to lower the inmate's level of care after initiation of the DMH referral suggested that the treatment team did not support the DMH referral decision; it also invited the question of whether EOP referral would have been a more appropriate option.  Medical record documentation following DMH referral was not sufficient to evaluate the implementation and effectiveness of the specialized treatment plan.

**Inmate J**

This 3CMS inmate was housed in the SHU.  He had been referred to DMH and was awaiting transfer.  The medical record indicated that the inmate had not received mental health treatment prior to incarceration.

He had arrived at CCI on 5/12/10 after being discharged from an MHCB.  Upon arrival, he was provided with a diagnosis of Schizophrenia.  He was apparently placed in administrative segregation for possession of a weapon.  He was placed in the OHU on

6/8/10 when he presented with depressed mood and reported auditory hallucinations but was discharged two days later.

The inmate was characterized as having normal daily living skills and reported no mental health concerns during early July 2010.  He was reportedly stable on medications during early August 2010.  When the inmate was seen by a primary clinician on 8/18/10, he appeared to have appropriate grooming, speech and mood.  However, he reported daily auditory and visual hallucinations but indicated that he was tolerating these symptoms.  He also reported two prior suicide gestures.

The inmate was seen on 9/27/10 for routine follow-up but the medical record was not utilized for the clinical encounter.  The inmate's medication had reportedly been discontinued due to medication side effects.  The inmate reported some mood disturbance as well as auditory and visual hallucinations at that time.  When seen by a psychiatrist on 10/2/10, the inmate was described as dysphoric, but his mental status otherwise appeared to be within normal limits.  Although he was admitted to the OHU on or about 10/5/10, the medical record did not contain a progress note documenting this incident.  A subsequent progress note dated 10/10/10 indicated that the inmate reported that he "tripped out, voices started telling me to kill myself."  The inmate appeared to have stabilized by 10/10/10.  A treatment plan dated 11/4/10 indicated that the inmate was being referred to DMH due to three OHU admissions during a six-month period.

Findings

The inmate was referred to DMH due to three OHU placements.  Despite the DMH referral, the inmate remained at the 3CMS level of care at the time of the site visit.  He was also referred for the development of a specialized treatment plan.  The medical record did not include information that verified that this plan had been implemented or that addressed its effectiveness.

**Inmate K**

This inmate was admitted to DMH on 2/17/10.  He returned to CCI on 7/5/10.  The discharge summary was apparently received and placed in the medical record by the DMH coordinator.  The inmate was transferred to CSATF on 7/7/10, where he remained until 10/13/10.

The inmate apparently returned from DMH with a Keyhea order in place.  The DMH discharge information suggested that at the time of discharge the inmate exhibited inappropriate affect and bizarre posturing.  He was prescribed Geodon and Depakote.  The discharge summary provided no recommendations for treatment except for the medication orders.

It appeared that the Geodon order was continued at the time of the inmate's return to CCI.  It also appeared that Geodon was discontinued, and Risperdal was prescribed,

during October 2010. However, medication administration records were not available for review at the time of the site visit.

The medical record contained no documentation that clinical contact occurred between the inmate's return to CCI on 7/5/10 and 7/13/10. On 7/13/10, the inmate was described as overtly psychotic, disoriented and smelling of urine, with a disheveled appearance and pacing in his cell. The cell was in disarray and there was trash on floor. A psych tech note indicated that a ripped sheet made into a noose was seen in the cell; the psych tech informed custody officers, who subsequently contacted the primary clinician. A subsequent psych tech note indicated that the primary clinician had the inmate re-housed after this incident but there was no documentation in the medical record from the primary clinician as to this incident. A second psych tech note dated 7/14/10 indicated that the inmate was in essentially the same condition as had been reported on 7/13/10. On 7/15/10, a psychologist saw the inmate and reported that the inmate's presentation was within normal limits.

The inmate was apparently placed in crisis care on approximately 7/25/10 as he was seen for five-day follow-up beginning on 7/27/10 but there was no documentation in the medical record. Psych tech notes during August 2010 suggested that the inmate's condition had improved somewhat; a social worker's progress note dated 8/9/10 indicated that the inmate was stable. A Form 7388, the checklist for DMH referral, dated 8/18/10 indicated that the inmate was "unable to function adequately within CDCR." There was no indication, however, that the IDTT meeting discussed the Form 7388 or made recommendations as to re-referral to DMH. There was no documentation to suggest that the inmate attended groups.

It should be noted that despite the fact that this inmate had been housed at CCI since July 2010, he only had a temporary medical record at the time of the site visit in November 2010.

Findings

This inmate was apparently in a decompensated state after returning from DMH to CCI. Primary clinician progress notes were sparse, and there was no documentation of primary clinician follow-up after the inmate had reportedly been found with a noose in his room. There was no documentation indicating that the IDTT considered the possible need to re-refer the inmate back to DMH, despite documentation at the time of his return and again on 8/18/10 that clearly indicated that the inmate was not stable. It appeared that the limited treatment recommendations made by DMH, which consisted only of medication orders, were continued at the time of the inmate's return to CCI.

EXHIBIT U
California Institution for Men (CIM)
January 10, 2011 – January 13, 2011

**Inmate A**

This inmate had a history of Schizophrenia chronic undifferentiated type and recurrent DMH hospitalizations that included at least 12 placements between 1978 and 2009.  He was housed in the MHCB and was pending DMH transfer.  Although the inmate was referred to ASH for intermediate care on 11/1/10, he had been discharged from DMH during October 2010.

The medical record contained the DMH discharge assessment dated 10/1/2010.  Discharge recommendations were limited to a listing of suggested medications and a recommendation that the inmate be placed at the EOP level of care upon return to CDCR.  ASH discharge medications included Seroquel; it appeared that CIM continued this medication following the inmate's arrival.

The inmate was hospitalized in the MHCB on 12/28/10 and 12/29/10.  Inpatient medical record documentation indicated that he was again referred to DMH at that time.  The treatment plan also indicated that the inmate had a significant history of reporting suicidal ideations.

The medical record contained several Form 7388s, the checklist for DMH referral, as to higher level of care referral consideration; the Form 7388 dated 12/29/10 documented that the inmate had already been referred to DMH.  The most recent treatment plan documented interventions to address the inmate's history of repeated DMH intermediate care referrals.

<u>Findings</u>

The inmate had returned from DMH hospitalization but was pending return to DMH at the time of the site visit.  Although DMH discharge recommendations did not include stabilization in an EOP program, they included an EOP placement recommendation.  The treatment plan did not address the pattern of repeated DMH hospitalizations for intermediate level of care.  The inmate was appropriately maintained in the MHCB pending DMH transfer.

**Inmate B**

This inmate was awaiting DMH transfer for inpatient treatment.  The IDTT meeting referred him for intermediate care on 11/2/2010 and the referral was submitted on 11/8/10.  It was reportedly awaiting approval at the time of the site visit, which suggested that it had been in process for more than two months.

A progress note dated 10/14/10 documented that the inmate was in the reception process.  He reportedly had a history of Keyhea order placement and ASH hospitalization.  According to a 5/30/10 Keyhea order, the inmate was prescribed Prolixin and Cogentin at the time of parole.  However, upon his subsequent return to CDCR, the inmate was not

prescribed psychotropic medications.  He was placed in administrative segregation upon return to prison as a result of an incident that occurred prior to his parole.

The medical record did not contain a current treatment plan.  The inmate was apparently hospitalized in the MHCB from approximately 12/14/10 until early January 2011.  Progress notes from early in this period indicated that the inmate had decompensated, as he had refused food and medications, exhibited poor hygiene and was dehydrated due to a hunger strike.
No information was located in the medical record as to the initiation of the 11/2/10 DMH referral.  It appeared that the inmate was placed on a Keyhea order during the 12/14/10 MHCB hospitalization.

Findings

This inmate had a history of recent reincarceration after he had paroled.  He was prescribed psychotropic medications at the time of parole.  Upon return to CDCR, he was not prescribed medications; the inmate subsequently decompensated, resulting in MHCB admission from mid-December 2010 until early January 2011.  Although the inmate had been referred to DMH for intermediate level of care, documentation of this DMH referral and of the Keyhea order were not located in the medical record.  The medical record also did not contain a current treatment plan.  There was also no documentation that the inmate was provided with additional care pending DMH transfer.  DMH database information suggested that the referral had been awaiting DMH action for approximately two months.

**Inmate C**

This inmate was referred to DMH on 10/12/10 and was accepted for admission on 10/19/10.  He was awaiting transfer to SVPP for intermediate level of care.  He was admitted to the MHCB on 10/16/10 after reporting suicidal ideation.  Progress notes documenting five-day follow-up indicated that the inmate was stable after this hospitalization.

The inmate was again hospitalized in the MHCB between 10/28/10 and 11/1/10, where he had reportedly been referred due to agitation and housing concerns.  At that time, he was provided with diagnoses of Schizophrenia paranoid type and Antisocial Personality Disorder.  Although the inmate was described as experiencing auditory hallucinations and presenting with blunted affect and "vague speech," progress notes at the time of this hospitalization indicated that the inmate did not exhibit evidence of an acute mental illness.

The inmate reported on 11/2/10 that he was experiencing delusional thinking and was again admitted to the MHCB.  Although he was discharged from the MHCB on 11/16/10, it appeared that he was readmitted that same day and remained there until his discharge on 11/24/10.  Progress notes during these hospitalizations suggested that the inmate was primarily anxious as to his administrative segregation housing although he also reported

710

experiencing auditory hallucinations.  The discharge note dated 11/24/10 documented the inmate's desire to remain in the hospital to avoid getting into trouble prior to his upcoming parole.  He was provided with diagnoses of Schizoaffective Disorder, Antisocial Personality Disorder and "Malingering for housing."

A Form 7388, the checklist for DMH referral, completed on 12/21/10 indicated that the inmate met at least three of the criteria for higher level of care referral consideration; it appeared that the inmate had already been referred to DMH at that time.  A treatment plan dated 12/7/10 noted the pending SVPP referral and indicated that the inmate remained at the EOP level of care but did not indicate that he would receive enhanced services pending DMH transfer.

Findings

After DMH referral, the inmate spent the majority of time hospitalized in the MHCB. The most recent treatment plan did not document the provision of additional services, including increased clinical contacts or IDTT meetings, prior to DMH transfer.  It appeared that the inmate experienced significant anxiety as to his upcoming parole; the anxiety was complicated by his commitment offense, which included a sex offense.

**Inmate D**

This inmate arrived at CIM during late September 2010.  He was referred to DMH on 10/26/10 and accepted by SVPP on 11/4/10.  The inmate was awaiting transfer to SVPP at the time of the site visit.

The medical record indicated that the inmate was evaluated on 12/9/10, when he denied any mental health symptoms.  He was apparently hospitalized in the MHCB on 12/24/10 after he reported experiencing persecutory auditory hallucinations and exhibited flat affect.  He was provided with a diagnosis of Mood Disorder NOS at that time.  Although he was discharged from the MHCB on 12/29/10, no discharge summary as to this hospitalization was located in the medical record.

The Form 7388, the checklist for DMH referral, was completed on 12/27/10.  It indicated that the inmate met three of the criteria for DMH referral consideration and also noted that he had been referred to DMH.  The most recent treatment plan was completed on 9/14/10; no updated or current treatment plan was located in the medical record.

Findings

The inmate had a recent history of MHCB hospitalization and was referred to SVPP. Medical record information indicated that, following the MHCB discharge on 12/29/10, the inmate was seen on 12/30/10 for day one of five-day follow-up.  He reportedly appeared stable at that time.  There was no updated treatment plan or any documentation that indicated that the inmate received any additional or enhanced mental health services while awaiting SVPP transfer.  The medical record appeared to be missing some

documentation of more recent clinical contacts.  CIM staff reported a three week backlog in medical records filing.

**Inmate E**

The CIM reception center process screened this inmate and he was placed in the EOP in July 2010.  He was referred to DMH on 8/13/10 after a reportedly near lethal suicide attempt that occurred on 8/10/10.  He was transferred to DMH acute care on 9/3/10 and returned to CIM on 11/9/10.
The DMH discharge summary dated 10/29/10 indicated that the inmate was hospitalized at DMH from 9/3/10 to 10/29/10.  The provided discharge diagnoses included Depressive Disorder NOS and Antisocial Personality Disorder.  The discharge summary included recommendations as to level of care and the need for substance abuse groups and gastrointestinal evaluation.  Recommended medications at the time of DMH discharge included Effexor and Benadryl; Effexor was continued after the inmate's return to CIM.

The inmate was again admitted to the MHCB on 11/9/10 and 11/10/10.  He was provided with a diagnosis of Depressive Disorder NOS at that time.  A treatment plan dated 11/10/10 indicated that the inmate was stable in the EOP and was receiving five-day follow-up.  The progress notes documenting the five-day follow-up indicated that the inmate remained stable with normal mental status, with the exception of reports of anxiety and anger episodes.

A progress note dated 11/22/10 documented the inmate's request for Neurontin for complaints of pain.  He was described as clinically stable at that time.  Progress notes also documented the inmate's group attendance during late November 2010.  A treatment plan dated 11/24/10 indicated that he was to be monitored weekly; one of the goals outlined included removal from the EOP.  The diagnosis that was provided at that time was Bipolar I Disorder, most recent episode, depression with psychotic features.

The Form 7388, the checklist for DMH referral, dated 11/24/10 indicated that the inmate did not meet any of the criteria for DMH referral consideration.  On 12/22/10 the IDTT reviewed the inmate's case and again documented on the Form 7388 that he did not meet DMH referral criteria.

<u>Findings</u>

The inmate had a reported history of a near lethal suicide attempt and a short-term DMH acute care admission.  Progress notes indicated that the inmate had stabilized in the EOP.

**Inmate F**

This inmate was initially referred to DMH on 6/15/10 and was on the DMH wait list. There was a significant delay in the preparation of his referral packet, which was not submitted until 9/3/10.  The wait list on 12/16/10 indicated that the inmate was pending DMH placement.

The inmate was hospitalized in the MHCB on 3/4/10 and was discharged on 3/16/10. At that time, he was provided with a diagnosis of Major Depressive Disorder recurrent. He was readmitted to the MHCB on 3/30/2010.

A treatment plan dated 11/10/10 indicated that the inmate was pending DMH referral. A mental status examination at that time indicated that the inmate exhibited poor hygiene, mood lability and impaired concentration. He was provided with a diagnosis of Schizoaffective Disorder. Progress notes documented the inmate's group therapy participation at that time. The treatment plan did not specifically address the provision of additional services while he was awaiting DMH transfer.

A primary clinician's progress note dated 10/26/10 described the inmate as doing well with good group attendance. Psych tech daily round documentation described the inmate as having average hygiene and medication compliance, as well as friendly and cooperative behavior. A progress note dated 11/2/10 documented impressions that the inmate remained stable with appropriate grooming but with circumstantial thinking.

The inmate refused to attend groups during the week of 11/17/10. A progress note dated 11/23/10 indicated that he refused group attendance because he was "cold." The inmate was also described as mildly anxious at that time. A progress note dated 12/2/10 documented the inmate's agitation as to a cell move and associated property concerns. He was seen on 12/4/10 when he reported that he was coping with a lockdown by sleeping. Clinical contacts that occurred on 12/23/10 and 12/28/10 described the inmate as relatively stable.

<u>Findings</u>

This inmate was referred to DMH in June 2010 and had been pending transfer for several months at the time of the site visit. During the past several months, he was reportedly stable, with adequate functioning. The most current treatment plan did not address the provision of additional services pending DMH transfer. The inmate was seen weekly by the primary clinician and with the exception of one or two weeks during December 2010, he appeared to attend most of the groups offered to him.

713

EXHIBIT V
California Rehabilitation Center (CRC)
February 15, 2011 – February 17, 2011

**Inmate A**

This 3CMS inmate arrived at CRC in August 2009. His estimated date of release from prison was 8/12/11. He worked as an inmate porter.

The inmate had received CDCR mental health treatment since at least August 2007 when he was treated at CSP/LAC. He was transferred to CIM in February 2010 and returned to CRC in August 2010. The medical record did not clearly document the reason for the CIM transfer. During May 2010 while he was housed at CIM, the inmate's level of care was changed from 3CMS to EOP; he was provided with the diagnosis of Schizoaffective Disorder at that time.

During September 2010, soon after the inmate's return to CRC, he was returned to the 3CMS level of care; at that time he was assessed as having a global assessment of functioning (GAF) score of 64. On 10/1/10 a psychiatrist documented in a progress note that the inmate had been provided with a diagnosis of Mood Disorder NOS. A primary clinician provided the following alternative diagnoses on 11/24/10: Depressive Disorder NOS, Psychotic Disorder NOS in remission and Polysubstance Dependence. Interdisciplinary progress notes consistently documented that the inmate presented with anxious mood, poor sleep and denial of auditory/visual hallucinations and suicidal/homicidal ideation. He was also described as stable, pleasant and cooperative, but presented with an indifferent attitude. He was prescribed Buspar, Remeron and Vistaril.

Findings

There was documentation that the psychiatrist and primary clinician consistently followed the inmate. Medication renewals were completed timely. There was, however, a need for diagnostic clarification as the medical record contained multiple diagnoses. Recent Form 7388s, the checklist for DMH referral, as to higher level of care referral consideration and suicide risk evaluations were not located in the medical record. Some of the mental health placement chronos and mental health evaluations were undated. Problems were also noted as to the appropriate filing of materials in the medical record.

**Inmate B**

This 3CMS inmate transferred to CRC on 12/23/10. He was receiving psychotropic medications under a Keyhea order that had been initiated on 11/14/10 by the sending institution. Progress notes indicated that the inmate would be reevaluated two months prior to the Keyhea order's expiration; it expired on 5/14/11. The inmate was prescribed Risperdal; due to medication side effects, Cogentin was discontinued on 1/21/11. The inmate was provided with diagnoses of Schizoaffective Disorder, Alcohol Abuse and Cocaine Abuse. A psychiatric progress noted dated 1/21/11 indicated that the inmate was assessed with GAF scores that ranged from 60 to 80.

The psychiatrist reported on 1/3/11 that the inmate was cooperative with appropriate behavior. He stated that the inmate had admitted lying about having suicidal ideation and hallucinations in order to be removed from administrative segregation. The inmate also reportedly exhibited bizarre behavior, such as throwing himself on the floor. However, he denied delusional thinking and reported improvement in his previously dysphoric mood. The inmate was seen in an IDTT meeting on 1/5/11 when he reportedly presented in a stable condition.

Findings

The inmate appeared to be stable and receiving mental health services at the appropriate level of care. He reportedly showed improvement in his mood and did not exhibit evidence of psychosis. The medical record documented individual contacts with the psychiatrist and primary clinicians, and the inmate was followed timely. The IDTT and Keyhea coordinator closely monitored the Keyhea order's expiration date.

**Inmate C**

This EOP inmate transferred to CRC on 7/1/10, from CSP/LAC. He had a long history of incarceration dating back to 1996 and his earliest possible release date (EPRD) was 7/31/11. He subsequently transferred to CIM and returned to CRC on 1/21/11. The medical record did not clearly document the reason for the CIM transfer or the transfer date. Because a mental health placement chrono was not located in the medical record, it was also unclear when the inmate was placed in the EOP; prior to EOP placement, the inmate had been receiving mental health services at the 3CMS level of care.

CRC IDTT meeting progress notes dated 2/9/11 described the inmate as presenting with very guarded, aggressive and oppositional behavior. The treatment team decided to retain the inmate in the EOP at that time. A suicide risk evaluation and a Form 7388, the checklist for DMH referral, were also completed.

The psychiatrist documented on 2/16/11 that the inmate had refused all of his psychotropic medications except Remeron; the psychiatrist discontinued Abilify, Depakote and Effexor at that time. The psychiatric progress note also described the inmate as exhibiting continued guardedness, dysphoric mood and flat affect. The inmate also reported experiencing auditory hallucinations. He was provided with a diagnosis of Mood Disorder NOS. His GAF score was evaluated at below 50.

Findings

There was inadequate documentation located in the medical record as to the inmate's level of care changes. Some progress notes were undated; psychiatric progress notes did not specifically address the inmate's medication compliance. Although it appeared that the psychiatrist and primary clinician timely saw the inmate, documentation as to these contacts was minimal in content.

716

**Inmate D**

This inmate transferred to CRC on 11/18/10, from CSP/LAC. His EPRD was scheduled for 9/17/11. The inmate had a history of auditory hallucinations and mood instability. He was prescribed Effexor and Geodon. The inmate was provided with diagnoses of Psychotic Disorder NOS, Mood Disorder NOS and Polysubstance Dependence. He was assessed as having a GAF score of 57.

On 12/2/10 the psychiatrist documented the inmate's report of auditory hallucinations. Progress notes indicated that the inmate was noncompliant with prescribed psychotropic medications. The psychiatrist ordered laboratory testing on 12/21/10; the results were received on 12/22/10.

The primary clinician saw the inmate on 12/7/10 and the initial IDTT meeting was conducted on 12/8/10. The inmate attended a pre-release group on 1/17/11. The Form 7388, the checklist for DMH referral, was completed and located in the medical record.

Findings

The inmate reported auditory hallucinations but had reportedly been noncompliant with prescribed medications. The psychiatrist noted that the inmate's mood was dysphoric and irritable. The inmate required close monitoring to prevent further decompensation and to determine if a higher level of care was required. The initial intake evaluation and IDTT meeting were not conducted timely. The inmate was involved in discharge planning which was clinically appropriate in light of his impending release from prison.

**Inmate E**

This 3CMS inmate transferred to CRC on 9/8/10, from the NKSP reception center. He was provided with a diagnosis of Mood Disorder NOS with chronic and recurrent symptoms of anxiety and depression. He was assessed as having a GAF score of 55. He was prescribed Effexor 225 mg/day, Buspar 40 mg/day and Remeron 30 mg/day.

An IDTT meeting was conducted on 9/27/10. The primary clinician saw the inmate on 12/15/10 and the inmate was referred to psychiatry for medication review. On 1/18/11 the psychiatrist adjusted the inmate's medications and scheduled a one month follow-up. A suicide risk evaluation was completed and assessed the inmate as presenting with low risk of self-harm. The inmate denied auditory/visual hallucinations and suicidal/homicidal ideations. It appeared that a scheduling error resulted in the inmate not being seen timely for his one month psychiatric follow-up appointment.

Findings

Psychiatric progress notes did not specifically address the inmate's medication compliance. Although the primary clinician appropriately referred the inmate to the

717

psychiatrist for medication review, a scheduling error resulted in the psychiatric follow-up appointment not occurring timely.

EXHIBIT W
Richard J. Donovan Correctional Facility (RJD)
February 28, 2011 – March 3, 2011
May 9, 2011 – May 10, 2011

**Inmate A**

This Level III EOP inmate arrived at RJD on 9/24/10, from Folsom.  He was provided with diagnoses of Schizophrenia undifferentiated type, Dysthymic Disorder and Cannabis Abuse; an additional diagnosis of Anxiety Disorder NOS was also under consideration.  The inmate was prescribed Thorazine 300 mg/day, Benadryl 20 mg/day and Zoloft 150 mg/day.

A Form 7388 dated 12/29/10 indicated that although the inmate met two of the criteria for higher level of care referral consideration, he was not referred; staff indicated that the inmate was improving and would continue to receive monitoring.  The IDTT meeting did not occur timely.  The treatment plan alternately listed the inmate's level of care as 3CMS and EOP; however, the placement chrono of that date placed the inmate at the EOP level of care.

The inmate had a history of inpatient psychiatric treatment, including hospitalization at Patton State Hospital for incompetency to stand trial in 1997.  He had been receiving social security disability assistance since 1998.  He had a seventh grade education and presented with slow, impoverished speech and delayed cognitive processing.  Additional symptoms included auditory and visual hallucinations with depression, which was especially problematic for the inmate.  He was not included in the developmental disability program.

During October 2010, the inmate requested discontinuation of his antipsychotic medication.  He experienced a subsequent increase in hallucinations and the psychiatrist prescribed Thorazine. Despite the medication change, the inmate reported continued auditory and visual hallucinations that interrupted his sleep at night

Group therapy notes that were located in the medical record contained minimal relevant clinical information.  The inmate reportedly had some improvement in his group attendance; however, he did not participate during group sessions and appeared to lack understanding of group therapy content.  The inmate's affect was consistently described as flat and he reportedly lacked motivation to participate in activities.  He remained with depressive symptoms, and during December 2010 exhibited what were described as speech irregularities.  During January 2011, he reported that he was experiencing racing thoughts; these symptoms continued, as well as a worsening of hallucinations that interfered with his group therapy participation.

<u>Findings</u>

The inmate should have been referred to DMH for stabilization.  He had not responded to mental health interventions and continued to present with significant depressive symptoms and intrusive hallucinations.  As he was classified as a Level III inmate, it appeared that he may have been appropriate for hospitalization at ASH.

The inmate was not seen timely by the IDTT and the treatment plan was inadequate in addressing his significant psychiatric symptomatology. Medical record documentation was limited in relevant content; this made it difficult to determine whether appropriate clinical mental health care occurred during individual and group therapy sessions.

**Inmate B**

This inmate arrived at RJD on 6/23/10. He was prescribed Benadryl 100 mg/day, Zyprexa 30 mg/day and Depakote 3000 mg/day. He was provided with a diagnosis of Bipolar Disorder NOS. He consistently refused to allow laboratory studies to be obtained. It appeared that his medications had been discontinued during September 2010; he subsequently deteriorated in mental status. He was hospitalized in the MHCB from 10/7/10 to 10/14/10, where the IDTT determined that he met two of the criteria for higher level of care referral consideration. However, the inmate was not referred to DMH as MHCB staff indicated that the MHCB had met his mental health needs. MHCB documentation indicated that he was administered psychotropic medications on an involuntary basis for 72 hours due to danger to others; however, there was limited documentation as to this incident.

The inmate was receiving mental health services at the 3CMS level of care prior to MHCB admission, but was discharged from the MHCB at the EOP level of care. During the MHCB hospitalization, he was described as irritable and manic, with mood instability and suicidal ideation. He also was reportedly observed handling his feces.

Custody staff referred the inmate to mental health on 12/10/10, as he was reportedly exhibiting confusion, disorientation, hostility, poor self-control, poor attention, and difficulty following directions with bizarre behavior. Custody staff escorted him to the TTA for an emergency evaluation on 12/12/10. On the following day, the inmate was evaluated again when he remained with paranoia, tangential thinking, rambling speech, restricted affect and reported insomnia. Throughout December 2010, he remained with the previously described symptoms. During January 2011, he was seen by a different primary clinician; these progress notes provided less detail and the inmate was described as stable. It appeared that these contacts occurred at cell front.

The inmate was apparently admitted to the MHCB again on 12/15/10, although documentation of this hospitalization was not available. He was seen by another clinician at the end of January 2011 when he was described as disheveled with little eye contact and latency of response. Medical record documentation suggested that the inmate was housed in temporary housing from 2/2/11 to 2/4/11 due to MHCB referral for grave disability. He remained with grandiose delusional thinking, paranoia and pressured speech. The Form 7388 completed during December 2010 and February 2011 incorrectly stated that he did not meet several referral consideration criteria. The treatment plans were generic in content and inadequate in addressing the inmate's severe symptomatology.

Findings

The inmate presented with significant psychotic symptoms including grandiose delusional thinking, paranoia, disorganized and pressured speech, disorientation, and poor sleep. Although several Form 7388s indicated that he did not meet DMH referral consideration criteria, he clearly met several criteria (including criteria five and nine). The inmate should have been referred to DMH for intermediate level of care. Treatment plans were inadequate in addressing his severe symptomatology.

**Inmate C**

This inmate was provided with diagnoses of Schizoaffective Disorder bipolar type and Impulse Control Disorder NOS. He was on a Keyhea order due to grave disability; he was prescribed Haldol 20 mg/day, Lithium 900 mg/day and Cogentin 4 mg/day with intramuscular injections ordered for medication refusal.

A review of the Form 7388 indicated that several criteria were noted indicating higher level of care referral consideration; however, the inmate was not referred to DMH. Staff noted that he would soon parole from prison and he was not referred. Some of the Form 7388s did not appropriately identify referral criteria, such as the inmate's multiple MHCB admissions.

Based upon medical record documentation, it appeared that he was briefly hospitalized at ASH; he subsequently returned to RJD to parole. No DMH documentation was located in the medical record as to this admission. At the time of his return to RJD, the inmate was described as unstable and psychotic. He had 120 days added to his sentence after exposing his genitals in December 2010. During mid-December 2010, he was placed on indefinite hold for group and individual therapy after he presented with disruptive behavior and stated that he would spit on others.

The primary clinician described the inmate's mental status as improved; this assessment contradicted a suicide risk evaluation completed at the same time by another clinician. The inmate was consistently described as disorganized and delusional with bizarre behavior. His cell was dirty. The inmate had a history of exposing his genitals, requesting sex from others and making nonsensical remarks.

During January 2011, the primary clinician stated that the inmate had "reached a baseline of functioning;" however, this assessment was not substantiated by medical record documentation. The inmate continued to exhibit labile affect and pervasive delusional thinking.

Findings

The Form 7388s as to higher level of care referral consideration were not properly completed. The treatment plans were generic in content and inadequate in addressing the inmate's significant psychiatric symptoms. He was not provided with group or individual

therapy on an indefinite basis without documentation of adequate clinical rationale. The inmate should have again been referred to DMH after his return from ASH due to his psychiatric instability.

## Inmate D

This EOP inmate was provided with diagnoses of Major Depressive Disorder, recurrent, without psychotic features, Post-Traumatic Stress Disorder, Polysubstance Dependence, and Personality Disorder NOS. He was not prescribed psychotropic medications due to his refusal. He had been assaulted while housed at SVSP and had permanent damage to his right leg and foot.

The inmate was identified for DMH referral on 6/18/10 as he met three of the criteria for referral consideration. The referral was submitted to CDCR headquarters on 7/7/10; DMH rejected the inmate on 7/21/10, stating that he would not benefit from DMH treatment. The CCAT was conducted on 7/27/10 and the rejection was upheld.

The inmate refused several primary clinician groups and it appeared that he also was not seen for individual therapy sessions. The most recent treatment plan dated 2/25/11 indicated that he was only scheduled for eight hours of weekly group therapy. Documentation did not indicate that a psychiatrist was present at the IDTT meeting.

An undated Form 7388 -- the checklist for DMH referral -- that was associated with the treatment plan indicated that the inmate met three of the criteria for referral consideration. However, he reportedly was not referred due to his past unsuccessful treatment at ASH. The DMH rejection letter indicated that he had been discharged on 9/23/09 and that the reason for referral was that there was no evidence to support a diagnosis of Major Depressive Disorder and that he could ambulate without the wheelchair. DMH staff indicated that the inmate would not benefit from intermediate level of care and indicated that "ICF treatment at ASH does not offer the patient treatment options which are not presently available at RJD."

The treatment plan dated 12/3/10 indicated that the inmate was reportedly depressed with flat affect, anhedonia and hypersomnia. He had refused to attend all but six groups within the past year and had not seen psychiatry since March 2010. Despite these depressive symptoms, there was discussion of reducing his level of care to the 3CMS program if he did not participate in EOP activities. His individual contacts with the primary clinician were increased to weekly in an effort to encourage more participation. The most recent IDTT that occurred on 2/25/11 did not document the presence of a psychiatrist. That treatment plan again indicated that he met several criteria for DMH referral consideration. It also stated that he had been removed from primary clinician groups due to fear of attack by other inmates.

The progress notes indicated that the inmate was of Syrian heritage; cultural issues may have impeded his cooperation with mental health treatment. He was usually seen at cell front, which minimized the possibility of conducting a confidential interview. He was

routinely described as disheveled but not malodorous. He also exhibited significant latency of response to questioning.

During November 2010, documentation indicated that the primary clinician believed that the inmate might benefit from DMH treatment, but the DMH coordinator and program supervisor suggested that he should instead be encouraged to participate in the EOP. Many progress notes contained the same minimal information making it difficult to determine the inmate's status. Progress notes also indicated that he was experiencing paranoia. Psychiatric appointments were not scheduled timely and the inmate repeatedly refused to attend them. On 2/1/11, there was documentation that he stated that he did not care if he died on the following day. There was no documentation of completion of a suicide risk evaluation and progress note information did not adequately address his suicide risk. He attended a psychiatry appointment on 2/25/11, but there was no documentation as to an assessment of his past treatment refusal.

Findings

Although the IDTT saw the inmate timely, all required participants were not in attendance. Treatment plans did not adequately address his refusal to participate in treatment or address cultural issues that may have negatively impacted his treatment participation.

The primary clinician saw the inmate timely, but there was no assessment to identify reinforcement measures that might positively impact his treatment participation. It did not appear that psychiatric appointments were scheduled timely and the inmate refused all appointments except for one that occurred on 2/25/11.

The inmate appeared to have experienced depression symptoms without improvement for many months. He met several of the criteria for higher level of care referral consideration and should have again been referred to DMH.

**Inmate E**

This inmate was identified for DMH referral for intermediate level of care on 9/20/10; the referral was subsequently changed to a DMH acute care referral. He was hospitalized in the MHCB from 9/16/10 to 10/21/10. He was transferred to the MHCB after he was observed nude in his housing unit; he also refused to bathe, had trash strewn around his cell and had failed to respond to questions. Immediately prior to the MHCB placement, the inmate was found lying under his bunk and had been removed from his cell unresponsive to questioning. After his transfer to the MHCB, his MHCB cell had to be cleaned for him due to its filthy condition. At the time of discharge, medical record documentation indicated that the acute care referral had been rescinded because the inmate had improved. There was no further documentation located in the medical record as to the intermediate care referral.

A 7/13/10 treatment plan stated that the inmate appeared to be exaggerating symptoms. Despite his lengthy MHCB stay during September and October 2010 and his multiple MHCB admissions, documentation suggested that the inmate was perceived as malingering. He was provided with a diagnosis of Psychotic Disorder NOS. On 10/7/10, he presented with more cooperative and coherent thinking; he reported to the psychiatrist that the medications were beneficial and that he would accept antidepressant medication.

On 10/19/10 a psychiatric notation indicated that the DMH intermediate care referral should continue and that the DMH acute care referral should be discontinued. The psychiatrist also provided diagnoses of Psychotic Disorder NOS, Polysubstance Abuse and Antisocial Personality Disorder. However, the psychiatrist indicated that the inmate was doing much better; he was taking showers, maintaining the cleanliness of his cell and had improved sleep and appetite.

The most recent Form 7388 dated 11/9/10 indicated that the inmate did not meet any criteria for higher level of care referral consideration. A provisional diagnosis of Schizoaffective Disorder bipolar type was provided on the treatment plan; the plan also noted that the inmate was included on the high risk list. On 11/23/10, he was described as highly manipulative; the progress note also indicated that the inmate's cell and hygiene needed improvement. The progress note stated that the DMH intermediate care referral had been rescinded.

Medical record progress notes contained minimally relevant clinical information which was repeated with subsequent clinical contacts. The inmate was seen at cell front because he reportedly refused out-of-cell contacts. Medical record documentation made it difficult to determine if he attended group therapy; however, a reference on 1/21/11 indicated that the inmate had been refusing groups and yard. On 1/26/11, he reported that he was not doing well and was experiencing auditory hallucinations. On 2/2/11, he was described as pale and disheveled with blunted affect and dysphoric mood. On 2/9/11, a different clinician indicated that the inmate required an assessment for possible DMH referral; it appeared that the clinician was unaware that he was on the SVPP wait list.

Findings

The inmate's DMH referral status was clearly uncertain to the mental health staff, including the DMH coordinator. The log maintained by the DMH coordinator indicated that both the intermediate and acute care referrals had been rescinded; conversely, the MHCB psychiatrist stated in October 2010 that the intermediate care referral should continue. The multiple clinicians who followed the inmate after his return to the general population were also confused as to his DMH referral status. Primary clinician changes also negatively impacted the inmate's continuity of care.

The IDTT did not see the inmate timely and necessary participants were not in attendance as the CCI was absent. Treatment plans were not adequate in addressing the inmate's specific treatment needs and the most recent plan did not include the Form 7388. One

clinician's progress notes merely repeated the same information contact after contact, providing little information about the inmate's actual mental status.

In light of the inmate's continued treatment refusal, ongoing hygiene problems, multiple crisis placements and chronically decompensated mental state during late September 2010, referral to DMH for intermediate care was indicated and should have occurred.

**Inmate F**

This inmate arrived at RJD on 12/23/10, but the IDTT did not see him until 1/21/11; the Form 7388 was not completed until 1/25/11. A treatment plan from that date provided diagnoses of Psychotic Disorder NOS and Adjustment Disorder unspecified. The Form 7388 indicated that the inmate did not meet any criteria for DMH referral consideration; however, a review of documentation provided by RJD indicated that he met at least three of the criteria for higher level of care referral consideration (criteria five, six and nine). The inmate had received three or more RVRs during the preceding three months. He was not identified on the DMH non-referral log but was listed on the RVR tracking log. A medical record review indicated that he also had multiple MHCB admissions although this was not noted on the multiple MHCB admission log provided on-site. The treatment plan indicated that he had previously been hospitalized at Patton State Hospital. He also had a history of exposing himself to staff.

MHCB documentation from CMF indicated that he had intermittent psychotic episodes and multiple incidents of self-injurious behavior. He was discharged from the MHCB at CMF at the EOP level of care. During his MHCB hospitalization, he repeatedly hit himself in the nose, which resulted in bleeding and his eventual placement in restraints. The inmate reported that this behavior was an attempt to bleed to death.

The medical record indicated that the inmate was repeatedly seen in the TTA for suicidal ideation. It appeared that he subsequently denied suicidal ideation, indicating that he felt better, following an evaluation by clinical staff. A treatment plan completed in January 2011 did not address this behavior nor was the treatment plan updated as the behavior continued. He was prescribed Haldol 10 mg/day and Cogentin 2 mg/day; there was no documentation that the psychiatrist saw the inmate monthly.

Findings

A medical record review indicated that the inmate might benefit from DMH treatment. At a minimum, the treatment plan should have been updated to include interventions specifically aimed at addressing his poor coping skills and chronic suicidal thinking. Although the clinician timely saw the inmate, the content of the progress notes did not document actual therapeutic interventions. Psychiatry and the IDTT did not see the inmate.

**Inmate G**

This inmate was admitted to DMH acute care on 5/20/10 and returned to RJD on 7/14/10. Although the DMH discharge summary was located in the medical record, it could not be determined if the packet was received prior to the inmate's arrival at RJD.  The inmate was referred to DMH due to withdrawn behavior, depressed mood, auditory hallucinations, medication refusal, and suicidal ideation.  At the time of DMH discharge, DMH staff described him as remaining with bizarre and inappropriate behavior toward female staff.  Despite these observations, no documentation indicated consideration of intermediate care referral.  DMH discharge recommendations only addressed dietary issues, discharge medications and the recommended level of care.  Discharge diagnoses included Schizoaffective Disorder depressed, Exhibitionism, Polysubstance Dependence, and Antisocial Personality Disorder.

The IDTT saw the inmate at RJD on 8/3/10, but the treatment plan did not specifically address his problems with impulsivity and anxiety.  There was also no mention in the treatment plan of his prior referral from KVSP to the indecent exposure program at CSP/Corcoran.  Documentation did not indicate whether a CCI was in attendance at the IDTT meeting.  RJD clinicians changed the DMH provided diagnosis of Schizoaffective Disorder to Bipolar Disorder with psychotic features.

A treatment plan dated 9/21/10 indicated that the inmate was receiving mental health services at the EOP level of care; however, the next treatment plan, which was dated 2/8/11 (and was delayed), indicated that he was at the 3CMS level of care.  Despite the lack of documentation of a rationale for the change to the 3CMS level of care on 9/21/10, a placement chrono was completed on that date indicating a change to the 3CMS level of care.

Findings

The primary clinician and IDTT appropriately evaluated the inmate upon his return from DMH acute care; however, the psychiatrist did not see him until 10/8/10.  After 9/21/10, psychiatry and the IDTT did not timely see the inmate; as his level of care was unclear, it was difficult to determine whether the primary clinician saw him timely.  The inmate did not meet criteria for DMH referral to intermediate level of care.

**Inmate H**

Institutional documentation indicated that this inmate returned from DMH on 8/20/10. However, a medical record review indicated that he had actually been hospitalized in the MHCB at CMF and his placement on the DMH return list was erroneous.  A treatment plan completed on 9/8/10 included the Form 7388, which indicated that he met one of the criteria for DMH referral consideration; a medical record review indicated that he also met criterion nine as he had more than three crisis placements within the prior six months.  Despite the multiple MHCB admissions and prior EOP placement during April 2010, the inmate was identified during June 2010 as receiving care at the 3CMS level of

care.  He was provided with a diagnosis of Major Depressive Disorder, recurrent, severe, with psychotic features, Polysubstance Dependence and Personality Disorder NOS.

Although the most recent treatment plan dated 9/8/10 indicated that the inmate was receiving care at the EOP level, a corresponding placement chrono was not located in the medical record.  The treatment plan did not provide specific treatment interventions, did not address his frequent MHCB admissions and did not include specific group therapy interventions.  During December 2010, the clinician indicated that the inmate would be considered for the 3CMS level of care; however, no documentation was located in the medical record to support the rationale for this level of care change.

<u>Findings</u>

The inmate did not meet the criteria for DMH referral at the time of the site visit.  The Form 7388 dated 9/10/10 was not appropriately completed and failed to acknowledge that he met one of the referral criteria at that time.  His level of care was unclear due to missing placement chronos.  He was also inappropriately changed to the 3CMS program during June 2010 when he should have been maintained at his prior EOP level of care based on documentation of symptoms and repeated MHCB hospitalizations.  The most current treatment plan was clinically inadequate and not completed timely.

**Inmate I**

This inmate was included on the multiple RVR list, but was not included on the identified but non-referred DMH log.  The IDTT saw him on 2/2/11 but the Form 7388, the checklist for DMH referral, did not accurately note that he had incurred three or more RVRs.  The inmate had been hospitalized in the MHCB at RJD for 16 days with a diagnosis of Mood Disorder NOS.  A treatment plan completed on 1/18/11 listed no actual treatment interventions other than MHCB housing.  The Form 7388 dated 1/19/11 indicated that the inmate met two referral consideration criteria, but he was not referred as staff indicated that the MHCB had met his treatment needs.  MHCB staff did not complete any subsequent Form 7388s, and it did not appear that there was consideration of the inmate's MHCB length of stay when determining whether DMH referral was indicated.

Documentation from early February 2011 indicated that the inmate had discontinued his medication; he stated that the medication caused his depression to worsen.  The inmate's affect was described as blunted with poor eye contact.  He was placed on the high risk follow-up list but DMH referral was not pursued.

<u>Findings</u>

Although the inmate met several of the criteria for higher level of care referral consideration, he was not appropriately reviewed to determine whether he should be referred.  The Forms 7388 were not completed timely or during the IDTT as required.

**Inmate J**

This inmate was included on the DMH return list with a return date of 10/14/10. Based upon the bus screen, he was hospitalized at ASH. The medical record included the DMH discharge summary. It appeared that he was admitted to ASH on 8/25/09. He was described as exhibiting paranoid and grandiose delusional thinking with probable auditory hallucinations. He was provided with a discharge diagnosis of Schizophrenia paranoid type with a provisional diagnosis of Delusional Disorder. Discharge medications included Risperdal and Geodon. There was some confusion as to the medications that were provided at RJD; the medication reconciliation form only noted Benadryl, but the psychiatric progress notes indicated that he was also prescribed Geodon. It was unclear why Risperdal was discontinued.

The inmate was included in the EOP following his return to RJD. He was not seen for three weeks after his arrival at RJD from DMH and was not seen timely by psychiatry in the EOP. He had a long history of chronic psychosis but DMH staff stated that he positively responded to the medication regimen that he was prescribed at the time of DMH discharge.

A custody staff referral during December 2010 stated that the inmate had not gone to meals for two to three weeks and seldom left his cell. During that time, he was described as presenting with delusional and disorganized thinking, rambling and perseverative speech, ideas of reference, and poor concentration and attention. He believed that his cellmate would harm him and his hygiene worsened. During January 2011, the clinician documented that he was being taken advantage of by other inmates. The most recent treatment plan was completed on 1/7/11; it indicated he did not meet any criteria for DMH referral consideration; however, a medical record review indicated that he met at least four DMH referral criteria.

Findings

The inmate was not adequately evaluated and reviewed for higher level of care referral consideration. Psychiatry did not see him timely and he was not maintained on the same medications as those he was discharged with from ASH. No explanation or rationale was provided for the medication discontinuation. The inmate appeared to have experienced deterioration during the most recent months and would meet DMH referral criteria. The IDTT saw him timely although treatment plans were clinically inadequate in addressing his symptoms.

**Inmate K**

This EOP inmate was housed in the mainline EOP. He had been housed at RJD since 6/23/09. He was provided with diagnoses of Depressive Disorder NOS and Polysubstance Dependence in institutional remission. He reported that the psychiatrist had not seen him for more than six weeks despite the inmate's request for evaluation. The inmate stated that he had repeatedly been scheduled to see the psychiatrist but the

psychiatrist had not shown for the appointments. Medical record documentation substantiated this report; the psychiatrist saw the inmate on 9/1/10, 11/3/10 and 2/18/11.

The inmate reported that he had experienced increased depression as a result of treatment with interferon. The psychiatrist saw him during February 2011 when the antidepressant medications Prozac and Remeron were increased, Risperdal was discontinued and Abilify was initiated. He was provided with a diagnosis of Major Depressive Disorder, with psychotic features. An IDTT meeting was conducted on 12/16/10 but documentation did not indicate that the psychiatrist was present at this meeting. The treatment plan lacked specific treatment interventions.

Although the IDTT meeting saw the inmate timely, the Form 7388s, the checklists for DMH referral, were not always completed. For those Form 7388s that were completed, there was no indication whether or not the inmate met referral consideration criteria. The primary clinician did not timely see the inmate; medical record documentation also indicated that the contacts were superficial and lacked real therapeutic value. The content of progress notes was minimal; the same information was often repeated in subsequent notes.

Findings

Psychiatry did not see this inmate timely for evaluation of possible medication side effects despite the inmate's repeated requests. His primary clinician also did not see him timely but there was documentation that IDTT meetings were conducted timely. Treatment plans were generally inadequate as they did not contain meaningful clinical interventions and did not always include the Form 7388. Primary clinician progress notes were minimal in content, repetitive and did not document that meaningful treatment activity occurred.

EXHIBIT X
Central California Women's Facility (CCWF)
November 8, 2010 – November 10, 2010

**Inmate A**

This inmate had a prior history of hospitalization at Patton State Hospital (PSH) during 1999 and 2007, as well as a more recent admission on 3/9/10.  She also had a history of two prior suicide attempts.  She was referred to DMH for psychological testing and diagnostic clarification.  Prior to the DMH referral, the inmate had reportedly exhibited poor functioning; she had not eaten for several days, had urinated on the floor, and had not taken care of her personal hygiene.  There was also a history of depression and medication noncompliance with poor insight as to her illness.  She reportedly had been placed on a Keyhea order but documentation as to the Keyhea order was not located in the medical record.

The inmate was provided with the following diagnoses at the time of PSH discharge: Major Depressive Disorder, recurrent, moderate with atypical features and Schizotypal Personality Disorder.  She was prescribed Prozac and Risperdal upon discharge.

After returning to the CDCR, the inmate was downgraded to the 3CMS level of care.  Although primary clinician progress notes indicated that she was stable, she remained with poor insight as to her mental illness.  Her medication compliance was also dependent upon continuation of the Keyhea order.

<u>Findings</u>

The inmate had a history of multiple DMH admissions, treatment noncompliance and suicide attempts.  She had recently returned from DMH with treatment recommendations that included the need to address her lack of insight as to her mental health issues.  She was placed on a Keyhea order that assisted with medication compliance.  The inmate had recently been changed from the EOP to the 3CMS level of care; this was of concern given her poor insight as to her mental illness and her recent return from DMH.  Review of the most recent treatment plans indicated that they did not address the inmate's lack of insight as to her mental illness.

**Inmate B**

This inmate had a long history of mental health treatment and incarceration for much of her adult life.  She had a history of learning disabilities and deafness since childhood, as well as a history of impulsivity and aggression.  She had prior hospitalizations at PSH during 2004 and 2006, as well as a recent hospitalization from 3/26/10 to 4/2/10.  The inmate was provided with the following diagnoses upon discharge from PSH: Schizophrenia paranoid type, Polysubstance Dependence, Impulse Control Disorder NOS and Borderline Intellectual Functioning.  Her discharge medications included Haldol Decanoate injections, Depakote, Thorazine and Benadryl.

The IDTT treatment plan dated 4/21/10 noted that the inmate had been discharged from PSH after she reportedly bullied other patients, threatened staff and assaulted two patients on separate occasions.  Due to her poor ADLs, paranoia, impulsivity, isolation and

difficulty following staff directives, she was placed in the EOP. Despite identifying several problem areas including assaultive behavior, auditory hallucinations and poor self-care, the 4/28/10 IDTT meeting indicated that the inmate did not meet any criteria for higher level of care referral consideration on the Form 7388, the checklist for DMH referral.

The most recent IDTT meeting on 8/31/10 identified the inmate's physical aggression but did not identify any treatment interventions. The Form 7388 did not identify referral criteria. Primary clinician progress notes did not include documentation that problem areas were substantively addressed.

Findings

Although the IDTT meeting identified significant problem areas, treatment plans and progress notes did not meaningfully address them. Treatment efforts also did not appear to correspond to identified problems. The Form 7388 did not appropriately document possible referral criteria. Although PSH discharged the inmate to CCWF due to aggressive behavior, she continued to exhibit impulsivity, aggression and poor ADLs following her return. No documentation indicated that there was consideration of initiating Keyhea proceedings due to the inmate's potential danger to others.

**Inmate C**

This EOP inmate had been hospitalized at PSH after she was found incompetent to stand trial for an assault charge in 2006. She was transferred to the CDCR after an assault on a PSH staff member. Medical records indicated that the inmate had a long history of persecutory and/or paranoid delusional thinking and inpatient psychiatric care. She reported one suicide attempt by overdose that occurred at least 20 years ago.

The inmate arrived at the CDCR on 3/2/10. An IDTT treatment plan dated 9/29/10 indicated that she was programming adequately on the unit and regularly exceeded the expected ten hours of weekly group attendance. The plan also described the inmate's symptoms of psychosis, which included fixed, bizarre persecutory and grandiose delusions; the content of the delusions had reportedly improved somewhat. She remained with poor insight as to her mental illness. Although she was involved in an altercation immediately after her return to the CDCR, she reportedly had not exhibited other assaultive behavior. She was provided with a diagnosis of Schizophrenia paranoid type; an alternative diagnosis of Delusional Disorder was also under consideration. She was treated with Haldol, Risperdal, Trileptal, Artane, and Effexor.

The treatment plan dated 6/30/10 indicated that the inmate was compliant with her prescribed medications. She also attended EOP groups, met consistently with her primary clinician and exhibited improved impulse control. Despite these improvements, she remained with persistent delusional thinking, depression and anxiety. The Form 7388, the checklist for DMH referral, did not identify any criteria for higher level of care consideration. The most recent progress note dated 10/25/10 indicated that the inmate

exhibited some evidence of instability with worsening disorganization and delusional thinking.

Findings

This inmate was hospitalized at PSH due to a finding of incompetence to stand trial for a 2006 assault charge. As a result of an altercation at PSH, she was transferred to CCWF in March 2010. She continued to exhibit delusional thinking and disorganized thought processes, flights of ideas, anxiety, and paranoia. However, the inmate was cooperative with treatment. The Form 7388 did not identify higher level of care referral criteria, but the medical record included documentation of ongoing symptomatology that had not responded to treatment which should have been considered. Higher levels of care referral should also have been considered although it was possible that DMH would reject this inmate due to her history of violence. However, it should be noted that the medical record suggested that the inmate had been hospitalized at PSH for several years prior to her discharge. It may have been beneficial for the treatment team to obtain prior DMH treatment plans and discharge summaries for review and ongoing treatment planning.

**Inmate D**

This EOP inmate was provided with a diagnosis of Schizoaffective Disorder bipolar type. She was treated with Depakote, Celexa, Haldol, Risperdal, and Artane. Her history was significant for head trauma and impaired intellectual functioning. Medical record documentation indicated that she was compliant with her prescribed medications.

The inmate's treatment plan focused on ameliorating symptoms of psychosis, self-harm ruminations, suicidal ideations, mood instability, and aggression. She was described as treatment compliant, stable and functioning well on psychiatric medications and adjunctive psychosocial care. It was indicated that she was responsive to psycho-educational interventions and cognitive restructuring as evidenced by regular and meticulous completion of home assignments and internalization of learned material.

Findings

This inmate appeared to be participating in and benefitting from EOP level of care treatment. She was reportedly compliant with treatment interventions and was stable from a mental health standpoint. It appeared that the inmate was receiving mental health services at the appropriate level of care.

**Inmate E**

This inmate's medical record was reviewed as she had been hospitalized at PSH. The inmate made a serious suicide attempt by lacerating herself with a razor in December 2009. After an initial MHCB hospitalization that occurred between 12/18/09 and 1/14/10, she was housed in the EOP. The IDTT submitted a DMH referral for intermediate level of care on 1/12/10; DMH accepted the inmate for admission on 2/5/10,

734

and she transferred to PSH on 3/26/10.  Although the inmate had returned to CCWF several months prior to the site visit, there was no other information on the institutional DMH log as to this case.

A medical record review indicated that the inmate returned to CCWF on 6/9/10; a mental health chrono for that date identified her as receiving EOP level of care.  There was no DMH discharge summary in the medical record or any indication of communication between PSH and CDCR (CIW or CCWF) prior to her return.  CCWF staff reported that interagency communication about specific cases was often transmitted by email and was never included in the medical record.  Until recently, medical records' staff was also not filing DMH discharge summaries in medical records; a directive from CDCR headquarters corrected this problem.

A CIW psychiatrist progress note indicated that the inmate was discharged from PSH on 5/24/10.  The CIW psychiatrist continued the medications and dosages ordered at PSH.  The next medical record progress note was dated 6/7/10 and indicated that the inmate had returned to CCWF.  The initial IDTT meeting upon return from PSH did not occur until 8/11/10.  On 10/13/10 the inmate was discharged from the EOP to the 3CMS level of care.  On 10/22/10 she was seen for triage after threatening to kill herself if she was not moved out of her general population housing unit.  She remained at the 3CMS level of care at the time of the site visit.

Findings

This inmate's care illustrated many of the ongoing problems with the DMH referral, admission and discharge processes.  The institutional DMH log was incomplete and did not contain required information; consequently, the data supplied to CDCR headquarters was also incomplete.  No action had been initiated to date to address this deficiency.  There also appeared to be difficulties in conveying clinical care information from PSH to CCWF as the medical record did not contain necessary information.  Clinical information from DMH inpatient hospitalization also was not incorporated into the CCWF treatment plan.  This lack of information resulted in problems with continuity of care and clinical decision making.

**Inmate F**

This inmate's medical record was reviewed as she had been hospitalized at PSH.  Despite her referral from CCWF and subsequent return to CCWF by way of CIW, the DMH referral log contained no information as to this case.  Due to this omission, time frames between referral, acceptance and admission could not be determined.

The medical record indicated that the inmate was referred to DMH on 12/16/09 and was admitted to PSH on 2/9/10.  She remained at PSH until 9/2/10.  The medical record did not contain a discharge summary, but the DMH coordinator at CCWF maintained a separate file that included discharge summaries that were obtained from email communications.  Although a DMH psychological testing summary report indicated that

the inmate was Malingering, she was prescribed significantly high doses of three antipsychotic medications simultaneously through much of her PSH hospitalization. There was also documentation that a trial of Clozaril was considered for apparent treatment-resistant auditory hallucinations prior to the psychological testing results. Subsequent to the testing, all antipsychotic medications were abruptly discontinued, and the inmate was discharged back to prison. The DMH discharge diagnoses were Malingering and Mood Disorder NOS. Prozac, an antidepressant medication, was the only medication prescribed at the time of discharge.

After a short layover at CIW, on 9/14/10 the inmate returned to a MHCB at CCWF. CCWF mental health staff indicated that DMH often recommended a return to the MHCB for inmates determined to be Malingering as a means of limiting property and the opportunity to engage in self-harm upon return to prison. The inmate was discharged from the MHCB to the EOP on 9/28/10 and was an EOP program participant at the time of the site visit. Her initial EOP IDTT meeting that occurred upon return from PSH took place on 10/6/10. Her medications were changed to Lithium, a mood stabilizer, and Risperdal, an antipsychotic, and the antidepressant medication was discontinued. Her diagnosis was not revised or updated. The medical record contained baseline laboratory studies, including blood chemistries, thyroid functioning tests, a complete blood count and a current Lithium level. The inmate was an active EOP group participant.

Findings

This case illustrated the myriad of problems associated with the institutional DMH referral log and discontinuity of care between agencies, including DMH, CDCR prisons and headquarters.

**Inmate G**

This inmate returned from PSH to CCWF in August 2010. Information as to DMH referral was not available as she was not listed on the DMH log; information also was not available from the DMH coordinator. A mental health clinician progress note dated 12/2/09 indicated that the inmate was scheduled to transfer to PSH on 12/3/09. The next progress note, dated 8/24/10, was by a CIW psychiatrist and indicated that the inmate had been discharged from PSH and returned to CDCR. It was not clear when the inmate was transferred from CIW back to CCWF, but the first progress note by a CCWF psychologist was dated 9/2/10. This note did not contain any information or reference to the inmate having returned from DMH. A CCWF psychiatric progress note dated 9/3/10 referenced the inmate's return from PSH, but also noted that the inmate was being seen without the medical record.

In spite of having no collateral information, the CCWF psychiatrist made substantial medication changes; the Remeron dosage was increased, Benadryl and Zoloft were initiated and Wellbutrin was discontinued. Risperdal was continued without a dosage change. The CDCR treatment plan identified the inmate's diagnosis as Schizophrenia;

736

depression was not included as a diagnosis or problem despite the prescription of two antidepressant medications.

Findings

This inmate's name did not appear on the DMH referral log. The medical record or the discharge summary file folder maintained by the DMH coordinator also did not contain a DMH discharge summary. Mental health staff confirmed that the inmate had been sent to DMH by virtue of a CCWF referral in spite of the log deficiencies.

It appeared that the only reason for the discontinuation of Wellbutrin after the inmate had received treatment with it at PSH was the medication's exclusion in the CDCR formulary. However, the CIW psychiatrist requested non-formulary drug authorization for Wellbutrin and received a six-month approval that was apparently disregarded by the CCWF psychiatrist.

This case illustrated a number of issues. These issues included the serious problems with institutional and CDCR headquarters' tracking of the DMH referral process, the failure to consider DMH information upon return to CDCR and/or to incorporate it into the CDCR treatment plan, the unavailability of the medical record for psychiatry appointments, poor interagency coordination and continuity of care, and continued problems as to differences in DMH and CDCR formularies.

**Inmate H**

This 3CMS inmate was housed in the ASU. She entered CCWF from a county jail in early October 2010. She had been prescribed Zoloft in the county jail and reported a history of mental health treatment for Bipolar Disorder in the community many years prior to her arrest. Zoloft was prescribed at CCWF without interruption, and she was referred for a mental health evaluation within days of arrival. The mental health clinician indicated that the inmate's history and presentation were inconsistent with the diagnostic criteria for Bipolar Disorder; the inmate was provided with diagnoses of Amphetamine Dependence, Attention Deficit Hyperactivity Disorder (ADHD) and Antisocial Personality Disorder. Although the clinician indicated that the inmate did not meet the criteria for Bipolar Disorder, the clinician failed to provide evidence to support the diagnoses of ADHD and Antisocial Personality Disorder.

A referral was submitted for a psychiatric evaluation that was completed within seven days of the referral, on 10/25/10. The psychiatrist provided a diagnosis of Depressive Disorder; Zoloft was continued at that time. There was a notation that the psychiatrist did not have the medical record at the time of the psychiatric evaluation.

Findings

The IDTT that occurred on 11/9/10 did not address the disparate diagnoses or clearly articulated problems, specific treatment interventions, or focus of treatment. The

treatment plan was generic and simply listed "continuing medications and meetings with the primary clinician" as treatment interventions.

There was good medication continuity upon transfer to CCWF, and adequate screening and referral processes were in place at the time of reception. Areas in need of improvement included the unavailability of the medical record for the psychiatric evaluation, failure to reconcile diagnostic impressions and generic treatment plans.

## Inmate I

This 3CMS inmate was maintained on the mental health caseload to "work on situational stress and family concerns." An IDTT meeting form dated 9/30/10 included the Form 7388, the checklist for DMH referral; no risk factors were identified at that time. Although the inmate's diagnosis of "substance-induced psychotic disorder, amphetamine with hallucinations" was continued, there was no documentation to support the current applicability of this particular diagnosis. The inmate was not prescribed any medications and was not followed by the psychiatrist. Treatment plan intervention listed "monthly contact or as needed," but there was no documentation of individual contact after 8/19/10.

Findings

The rationale for continuing to include this inmate on the mental health caseload was not apparent from the information included in the progress notes or treatment plan.

## Inmate J

This inmate had a long history of mental health treatment in prison and was usually maintained at the EOP level of care. She was admitted to an MHCB on 9/25/10 after attempting to hang herself. As this was her second MHCB admission related to suicidal thoughts in one month, a referral to the DMH intermediate level of care was generated. However, her admission was denied and the case was appealed through the CCAT process. CCAT upheld the decision not to admit her to DMH; the rationale for the initial DMH denial and subsequent CCAT denial was unclear from medical record documentation. It appeared, however, that the denials were based on the inmate's diagnosis of Borderline Personality Disorder; a determination was made that the inmate was not suicidal or depressed but was using self-harm threats as a coping strategy, which was her long-standing pattern. Besides poor coping mechanisms, the inmate also reportedly had limited intellectual functioning.

Following the CCAT denial, on 10/12/10 the MHCB discharged the inmate to the EOP, where she resumed treatment program participation. Her EOP treatment plan upon return was completed on 10/20/10 and indicated that she was participating in more than ten hours of weekly groups, was compliant with prescribed medications, and was seen at least weekly by her primary clinician for individual sessions.

The most recent progress notes indicated that the inmate desired to be discharged to the general population and maintained at the 3CMS level of care. The clinician appeared to support the patient's desire and agreed to present it at the IDTT meeting.

Findings

The primary clinician appeared to support the inmate's request to be changed to the 3CMS level of care. However, insufficient documentation supported that the inmate's condition had changed over the course of thirty days from requiring referral to DMH intermediate level of care to improvement and discharge to the 3CMS level of care. Treatment planning was also inadequate; although specific inmate problems were identified, listed interventions were generic and lacked individualization.

**Inmate K**

This 3CMS inmate transferred to CCWF on 8/25/10. She reported a history of mental health treatment prior to incarceration. She had a mental health evaluation on 9/1/10 and was provided with diagnoses of Mood Disorder NOS, Cocaine Dependence and Cocaine Abuse. A diagnosis of Major Depression, recurrent, severe with psychotic features was also under consideration.

The inmate was referred to the psychiatrist, who evaluated her on 9/8/10. The psychiatrist amended her diagnoses to include Anxiety Disorder NOS and Cocaine/Cannabis/Benzodiazepine Dependence, with differential diagnoses that included symptoms related to drug use and a medical condition. The psychiatrist prescribed Celexa, an antidepressant.

The inmate was not seen again until 10/4/10 when she submitted a request to discontinue Celexa. The yard clinician evaluated her on that date in response to the request and her primary clinician saw her on 10/6/10 and scheduled a psychiatric appointment. The psychiatric evaluation occurred on 10/11/10; the psychiatrist reported that the inmate's "diagnosis of anxiety is resolved." The psychiatrist further elaborated that the inmate's initial condition was likely due to a Benzodiazepine withdrawal which had since resolved. The psychiatrist agreed with the inmate that she no longer required treatment with psychotropic medication. A treatment refusal was signed by the inmate and placed in the medical record.

Findings

The inmate appeared to be receiving mental health care at the appropriate level in the 3CMS program. She was consistently followed by the primary clinician and psychiatrist. Of concern if the psychiatrist's assessment and conclusion were correct was the diagnosis and lack of treatment for Benzodiazepine withdrawal, a potentially serious problem that could result in fatality. A less serious concern was the psychiatrist having the inmate sign a treatment refusal form when there was agreement between the psychiatrist and inmate that no further medication treatment was indicated.

EXHIBIT Y
Valley State Prison for Women (VSPW)
April 5, 2011 – April 7, 2011

**Inmate A**

This EOP inmate was housed in the ASU/SHU on administrative segregation status.  She was provided with a primary diagnosis of Borderline Personality Disorder; she was also diagnosed with Adjustment Disorder with mixed anxiety and depression. The medical record also contained an alternative diagnosis of Post-Traumatic Stress Disorder.  She was treated with Risperdal 4 mg/day, Paxil 40 mg/day and Cogentin 1 mg/day.

The inmate was housed in the ASU due to a charge of staff manipulation.  She was initially transferred to VSPW on 12/23/10.  At the time of transfer, she was receiving care at the 3CMS level.  She had a significant history of self-injurious behavior and suicide attempts.  She also had a history of an MHCB admission during September 2010 due to suicidal ideation with plan.  After her arrival at VSPW, she stopped taking her medications and reported safety concerns; she made a laceration to her forearm in a suicide attempt resulting in admission to the OHU from 12/30/10 to 12/31/10.  She was discharged to the ASU.  She exhibited continued anxiety and depression and was placed in the EOP on 1/27/11 due to decompensation concerns.

Findings

Documentation indicated that the primary clinician saw the inmate weekly in administrative segregation.  The IDTT meeting included the necessary participants.  The inmate was involved in group therapy, but medical record documentation made it difficult to quantify the numbers of hours offered weekly.  Documentation indicated that group therapy was not conducted on several occasions due to the lack of space or escort issues.  There was documentation of completion of the Form 7388, the checklist for DMH referral, as to higher level of care referral consideration.  The treatment plan did not address as an identified problem the inmate's long history of self- injurious behavior and fears for her safety.

**Inmate B**

This EOP inmate was housed in the ASU/SHU; she was serving a SHU term.  She was provided with a diagnosis of Schizoaffective Disorder; an alternative diagnosis of Schizophrenia paranoid type was also present in the medical record.  She was treated with Haldol Decanoate 100 mg intramuscular every three weeks, Cogentin 2 mg/day and Oxcarbazepine 300 mg/day.

The inmate transferred to VSPW on 4/9/10, from CCWF.  She was transferred briefly to CCWF and returned to VSPW on 2/11/11 for placement in the SHU.  Progress notes indicated that she presented with sporadic medication compliance resulting in discontinuation of Risperdal.  She was treated with Haldol Decanoate and refused her injection during February 2011 when she reportedly exhibited disorganized and delusional thinking.  She later accepted the injection.

Findings

There was documentation of weekly primary clinician contacts in the SHU and the psychiatrist consistently followed the inmate. Documentation also indicated group therapy involvement; however, there were some sessions that the inmate did not attend due to the lack of space. The IDTT meeting included the necessary participants and treatment planning was individualized.

**Inmate C**
This 3CMS inmate was housed in the SHU. She was provided with a diagnosis of Schizoaffective Disorder bipolar type. She was treated with Geodon 160 mg/day. She had a seizure disorder for which the medical department followed her.
She transferred to VSPW on 8/17/10, from CCWF. She was receiving mental health care at the 3CMS level at the time of transfer.

At the beginning of the monitoring period, the inmate was housed in the general population where the psychiatrist and primary clinician consistently followed her. She was transferred to the ASU/SHU in December 2010 pending an investigation. Progress notes indicated that she presented with mood swings and irritability resulting in changes in medications. She had a seizure episode with respiratory distress; this coincided with the death of her son. She refused many of her out-of-cell clinical contacts and elected to be interviewed at cell front. Her medications were adjusted to address her mood instability and recent increases in auditory hallucinations.

Findings

Documentation indicated the completion of the administrative segregation pre-placement chrono with the inmate's transfer to the ASU. The primary clinician and psychiatrist saw her timely. The treatment plan did not address the inmate's treatment resistance.

**Inmate D**

This 3CMS inmate was admitted to Patton State Hospital (PSH) on 9/9/10. She was provided with the following diagnoses at the time of discharge from PSH: Depressive Disorder NOS, Methamphetamine Dependence in institutional remission and Antisocial Personality Disorder. Discharge medications included Wellbutrin and Trazodone. There was a recommendation for her to continue her current medication regimen as it had been successful in targeting symptoms of irritability and insomnia. It was further reported that, over the course of her DMH hospitalization, she was believed to have developed close relationships with a group of inmates who then targeted more vulnerable inmates. During an incident on 10/3/10, she was apprehended on the PSH grounds after she and a peer assaulted another inmate. The discharge summary indicated that she had been "slowly building a gang on the unit comprised of higher functioning patients with antisocial tendencies."

Since returning to VSPW from PSH, the inmate had two OHU placements that occurred from 11/15/10 to 11/16/10 and from 11/30/10 to 12/1/10; she was also hospitalized in the MHCB at CCWF from 11/4/10 to 11/9/10.

This inmate's medications were changed to Risperdal and Zoloft during October 2010. Documentation of an IDTT that occurred at VSPW on 12/9/10 indicated that the inmate was housed in the SHU upon her return from PSH. She continued to report depression, racing thoughts and paranoia; she also reported and displayed impaired insight and judgment. The focus of treatment developed by the IDTT included assisting her in developing positive coping skills and addressing interpersonal problems and emotional instability. The plan outlined included weekly primary clinician contacts. The diagnoses provided by the IDTT included Mood Disorder NOS, Depressive Disorder NOS, Polysubstance Dependence, Borderline Personality Disorder and Antisocial Personality Disorder.

Progress notes indicated that the inmate had received a letter on 12/19/10 informing her that her mother had died a few weeks earlier. Subsequent progress notes in the medical record indicated that she was released from administrative segregation on 12/22/10. She was transferred to the general population where she was assigned to art, anger management and dual diagnosis groups.

Documentation indicated that prescribed psychotropic medications were discontinued due to the inmate's medication noncompliance. A psychiatric progress note dated 3/2/11 indicated that prior psychiatric providers had decided not to prescribe the inmate psychotropic medications. The inmate was in agreement with this decision as she indicated that she did not wish to take medications.

The inmate was on a group therapy wait list. There was documentation that she was involved in education and expected to parole in August 2013. She reportedly functioned adequately in the general population and was described as calm, alert and cooperative with good hygiene and normal speech. She denied any suicidal or homicidal ideation. There was documentation that the inmate was seen for a crisis evaluation on 3/22/11 when she was disruptive in education; she reportedly felt anxious and irritable due to the loss of her mother. She acknowledged frequent symptoms of anger, poor impulse control and depression. She indicated an interest in medication treatment; however, she noted her history of feigned symptoms which she indicated might result in medication denial.

Findings

The inmate was discharged from PSH after a brief hospitalization due to reported antisocial behavior. After her return to VSPW, her medication regimen was changed; medications were subsequently discontinued due to her noncompliance. She presented with behaviors consistent with personality disorders. The inmate did not appear to be stable and psychiatric reevaluation for medication management appeared to be indicated.

**Inmate E**

This EOP inmate was released from administrative segregation on 4/1/11 and was placed in the OHU.  The medical record did not contain the most recent clinical documentation due to the initiation of the medical record scanning process.  She was provided with a diagnosis of Schizophrenia.

The inmate was evaluated in the reception and release area on 3/14/11; two days later, the primary clinician indicated that she had refused to talk with clinicians and had an unpleasant body odor.

The Form 7388 indicated that she returned to the OHU due to a worsening of symptoms as a result of intermittent medication compliance.  She was prescribed a long-acting depot intramuscular medication on 4/1/11 to assist in treatment compliance.

The medical record contained a discharge summary from PSH on 6/24/10; it indicated that the inmate was hospitalized at PSH from 1/2/09 to 6/24/10 as she had been classified as a mentally disordered offender (MDO).  She reportedly had a long history of Cocaine Dependence and Schizophrenia; the DMH discharge summary provided an additional diagnosis of Antisocial Personality Disorder.  She was prescribed Seroquel on an involuntary basis at that time.

Findings

The inmate recently returned to prison from the community.  She was transferred to administrative segregation where she was uncooperative with mental health staff; this resulted in her placement in the OHU.  She had a history of involuntary medication administration while hospitalized at PSH.

The inmate should have been considered for another Keyhea order.  As it appeared that she was clinically unstable, appropriate medication management by way of a Keyhea order would assist in stabilization.  It was difficult to determine whether adequate treatment was provided in administrative segregation due to the lack of relevant medical record documentation as a result of the scanning initiative.

**Inmate F**

This 3CMS inmate arrived at VSPW on 11/12/08.  The treatment plan on 5/5/10 provided diagnoses of Mood Disorder NOS, Methamphetamine Dependence and Borderline Personality Disorder.  Treatment issues identified in the treatment plan included mood symptoms, chronic anger and self-mutilating behavior.  This inmate expected to parole in April 2012.

A review of clinical documentation in the medical record indicated that the primary clinician saw the inmate monthly.  She was described as presenting with essentially normal mental status with the exception of transient stress related to paranoid ideation

and impulse control difficulties with irritability and anxiety. She was provided with diagnoses of Borderline Personality Disorder, Mood Disorder NOS and Methamphetamine Dependence. There was documentation that she was actively involved in education.

Psychiatric progress notes indicated that the psychiatrist consistently followed the inmate. The most recent psychiatric progress note indicated that the inmate reported improvement in depressive symptoms after the institution of Celexa; however, she remained with symptoms of anxiety.

Findings

The inmate was clinically stable and receiving appropriate treatment at the 3CMS level of care. A review of the medical record indicated that the primary clinician at least saw her monthly. Documentation also indicated that the psychiatrist saw her timely with consistent monitoring and medication adjustments.

**Inmate G**

This inmate arrived at VSPW on 3/11/11. She had previously paroled on 2/25/11 but had violated her parole and was returned to prison. She was described as presenting with minimally cooperative behavior, auditory hallucinations and paranoia; she was a poor historian. The problem list in the inmate's treatment plan included the following issues: distractibility, auditory hallucinations, aggression and paranoia. She was provided with diagnoses of Schizophrenia undifferentiated type and Alcohol Abuse.

An IDTT was conducted on 2/7/11 in the reception center prior to her parole on 2/25/11. She was prescribed Risperdal and Vistaril.
A primary clinician contact occurred on 3/17/11 after the inmate returned to prison. She was described as presenting with relative stability, but also presented with psychotic symptoms. It was noted that she attended groups on 3/15/11, 3/16/11 and 3/18/11.

Findings

It appeared that the inmate had frequent incarcerations with parole violations and returns to prison. She was reportedly stable with group therapy participation, but continued with psychotic symptoms. The primary clinician saw her weekly after her return from parole.