PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
ALISON HARDY, Bar No. 135966
SARA NORMAN, Bar No. 189536
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
ERNEST GALVAN, Bar No. 196065
LISA ELLS, Bar No. 243657
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>    Plaintiffs,<br>vs.<br>ARNOLD SCHWARZENEGGER, et al.,<br><br>    Defendants | No. Civ S 90-0520 LKK-JFM P<br>**THREE-JUDGE COURT**<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION FOR AN ORDER REQUIRING DEFENDANTS TO DEMONSTRATE HOW THEY WILL ACHIEVE THE REQUIRED POPULATION REDUCTION BY JUNE 2013** |
| MARCIANO PLATA, et al.,<br><br>    Plaintiffs,<br>vs.<br>ARNOLD SCHWARZENEGGER, et al.,<br><br>    Defendants | No. C01-1351 TEH<br>**THREE-JUDGE COURT** |

Defendants confirm that they do not expect to comply with the Court's January 2010 Order. Opp. Br. at 7. They claim that it would be "counterproductive" for them to take the necessary steps to comply since they "intend" to seek a modification of the Order at some undefined future date. Opp. Br. at 3. Unless and until the order is modified, Defendants must comply with it, and that means having a plan in place now to enable them to avoid default in a year's time.

Defendants assert that they do have a "revised plan." Opp. Br. at 6, 8. But the plan to which they refer is not a plan to comply with the Court's Order, it is a plan to *not* comply with the Order based on the hope that this Court will relieve them of their obligation to do so. Opp. Br. at 6 (citing Hoshino Decl. Exh. 2 at 50) ("The Future of California Corrections"); Opp. Br. at 8 (same). A copy of the vague and conclusory "plan" to which Defendants refer is attached hereto as Appendix A.

Should Defendants bring a motion to modify this Court's order to allow them to crowd the prisons at 145% of capacity, they bear a heavy burden. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992) ("party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree"). While the Supreme Court noted generically that the State could move to modify the crowding cap, it stated that such motion must be based upon a "showing" by the State that "further population reductions are not necessary." *Plata v. Brown*, 131 S.Ct. 1910, 1947 (2011). Such showing must overcome the specific finding by this Court that "145% [of capacity] clearly exceeds the maximum level at which the state could provide constitutionally adequate medical and mental health care in its prisons." Aug. 4, 2009, Order at 130. To date, Defendants have not even attempted to make the necessary evidentiary showing.[1]

---

[1] Moreover, reopening the crowding cap could lead to the opposite result; further review may well reveal the need for a lower level of crowding in the system as a whole, or at particular prisons. *See, e.g.*, Aug. 4, 2009, Order at 131 ("Should the state prove unable to provide constitutionally adequate medical and mental health care after the prison population is reduced to 137.5% design capacity, plaintiffs may ask this court to impose a lower cap."); *Id.* at 131 n. 64 ("We recognize that certain institutions and programs in the system require a population far below 137.5% design capacity. We trust that any population reduction plan developed by the state in response to our opinion and order will properly account for the particular limitations and needs of individual institutions and programs.")

Defendants' opposition points to recent improvements in prison healthcare, and Defendants tie these improvements to the significant decline in prison population experienced to date. Opp. Br. at 6 ("As the population continues to drop, the quality of prison health care continues to improve.") They draw from that the lesson that they do not need to continue reducing the prison population as ordered by the Court. The contrary is true: reducing the prison population was necessary to achieve these improvements, but the work is far from done. Health care remains inadequate, and further population reduction is essential for the State to achieve a constitutionally adequate health care system.

Defendants recently conceded that judicial oversight over medical care continues to be necessary now and likely for the next year, *Plata* Joint Statement at 36 (Doc. No. 2433), thus conceding that they do not expect care to have improved sufficiently to comply with the Eighth Amendment standard in that timeframe. Even that is an optimistic assessment; while the State's Office of Inspector General (OIG) has given an average score of 79.6% compliance with the *Plata* policies and procedures, that average masks significant ongoing access to care problems at prisons across the state. For example, the OIG measures of the timeliness of primary care visits for prisoners enrolled in the Chronic Care Program (i.e., some of the most medically fragile prisoners) show that just one prison achieved a score over 75%, while 12 scored below 50%. For prisoners who are referred to see a primary care provider after being triaged by a nurse, the majority of the prisons scored below 75%, with ten prisons scoring at 50% or below. The scores for delivering medications were likewise dismal. Over two-thirds of the prisons scored below 75% for delivering timely chronic care medications. Twenty-four prisons scored below 75% for timely delivery of medications to patients newly discharged from the hospital, with 13 scoring at 50% or below.

Defendants rest their assertion of "compliance" in *Coleman* on a claim that they have successfully reduced or eliminated the waitlist for high-custody prisoners needing inpatient mental health care. Opp. Br. at 4-5. However, Defendants' "success" came nearly eight years after the *Coleman* court recognized a systemic lack of inpatient beds for seriously mentally-ill inmates, (Order at 1-2, *Coleman* Doc. No. 1594, July 9, 2004), and only after Defendants were

faced with the threat of an imminent evidentiary hearing last summer on the "urgent need to ensure that all *Coleman* class members in need of inpatient care are properly identified and referred for such care." Order at 5, 9, *Coleman* Doc. No. 4045, July 22, 2011. Moreover, the "success" is not a lasting one, because a large percentage of the inpatient and crisis beds that are now in use are temporary, emergency beds that do not meet state licensing or health and safety standards. *See, e.g.,* Order at 2, *Coleman* Doc. No. 3929, Oct. 5, 2010 (waiving requirements of state law to allow increased admission rates at psychiatric program); Order at 1-2, *Coleman* Doc. No. 3516, Feb. 17, 2009 (ordering operation "on an emergency basis" of unlicensed mental health crisis beds); Order at 1-2, *Coleman* Doc. No. 3748, Dec. 11, 2009 (waiving certain licensing requirements for "20 temporary unlicensed Mental Health Crisis Beds"); Order at 6, *Coleman* Doc. No. 1800, May 2, 2006 (ordering Defendants to reopen "a thirty-six (36) bed mental health crisis bed unit on a temporary emergency basis."); Order at 4, *Coleman* Doc. No. 1998, Oct. 20, 2006 (approving on an interim basis "76 inpatient intermediate Department of Mental Health (DMH) beds").

Additionally, Defendants' have delayed critical construction of mental health bed projects to replace these "emergency" beds and have indicated that they will not be able to meet the *Coleman* court's order to complete these projects by December 31, 2013. *Compare* Order at 2, *Coleman* Doc. No. 3823, March 24, 2010 (ordering that DeWitt facility must be "fully occupied by 2013") *with* Hoshino Decl., Exh. 2 at 18, *Plata* Doc. No. 2434-2, May 7, 2012 (CDCR Report states that DeWitt facility will not open until summer of 2014); Defendants' Update to Court re: Construction and Funding of Defendants' Amended Stark Plan, *Coleman* Doc. No. 3941 at 7, Oct. 19, 2010 (stating that CDCR "expects a delay from the current April 2014 full occupancy date" for DeWitt project).

In addition, many other serious problems remain. As the *Coleman* Special Master recognized in his most recent report, "defendants continue to have a great many things to accomplish in order to advance the remedial phase of this case toward its eventual conclusion." Twenty-Third Round Monitoring Rpt. of Special Master, *Coleman* Doc. No. 4124 at 89, Dec. 1, 2011. Specifically, the Special Master reported that "[t]he high rate of suicides in CDCR

prisons remains a disturbing situation which needs to end." *Id.* at 26.  Mental health staffing shortages continue to exist system-wide. *Id.* at 33-37.  Defendants continue to house acutely suicidal prisoners in unlicensed infirmary beds for suicide observation, and even with these dangerous observation alternatives, "untimely access to crisis care continued to be a prevalent problem." *Id.* at 77.

In short, improvements are being made, but significant hurdles remain, and this is no time to halt the forward momentum toward compliance.

In any event, Defendants must comply with the Order unless they succeed in obtaining a modification before June 2013.  Yet Defendants' brief shows they are in no hurry to make the motion to modify; they suggest they may wait until just before June 2013 to bring such a motion.  Opp. Br. at 8 ("Assuming Defendants do not exceed these projections [to miss the June 2013 target by approximately 3,000 prisoners], they will seek a modification of the order to raise the final benchmark to 145% of design capacity."); *see also* Opp. Br. at 6 ("Defendants will move to modify the population density order" only "when Defendants and this Court have the benefit of additional evidence that will follow from further population reductions, further accomplishments by health care staff, and further implementation of Defendants' comprehensive plan for maintaining constitutionally appropriate health care systems").

Any such delay will put Defendants on a collision course with contempt.  A motion to modify the population reduction order will not be resolved quickly.  Such a motion will require significant factual investigation, including expert evaluations and reports, and expert discovery.  It will require briefing on the facts and the law, and it will involve a hearing to resolve disputed facts.  And at the end of the day, in the likely event that the modification is denied or not decided by next June, Defendants will still have to meet the deadline set forth in the January 2010 Order.

Defendants are wrong to state that it would be "premature" to order them to create a plan to comply with the January 2010 Order.  Opp. Br. at 7.  The Court has the power to order Defendants to develop a plan to meet the constitutional requirements.  It is appropriate to do so now, because preparing and implementing a population reduction plan takes time, and

5
PLFS' REPLY ISO RENEWED MOT FOR ORDER REQ DEFS TO DEMONSTRATE HOW THEY WILL ACHIEVE REQUIRED POP REDUCT,
NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

Defendants predict that they will be approximately 3,000 prisoners short of compliance by June of next year, and that default will soon grow to more than 5,000 prisoners. Hoshino Decl., Ex. 2, Appx. G. Moreover, Defendants do not deny that these estimates of the shortfall are a "best case scenario" based on the assumption that as-yet-unfunded construction projects will be approved and built on schedule. Mot. at 5-6. If some of those facilities are not built – or if Defendants' projected number of prison admissions proves optimistic – Defendants may be facing a shortfall of more than 10,000 prisoners. *Id.*; *see also* Austin Decl., ¶¶5-6. Defendants need a plan by which they can reduce crowding to 137.5% of capacity, and they must also have a contingency plan to enable them to implement additional crowding reduction measures if their projections prove inaccurate.

For these reasons and the reasons set forth in Plaintiffs' Motion, the Court should issue an order requiring Defendants to demonstrate how they will achieve the required population reduction by June 2013.

Dated: May 31, 2012

                                  Respectfully submitted,

                                  */s/ Rebekah Evenson*

                                  Rebekah Evenson
                                  PRISON LAW OFFICE
                                  Attorneys for Plaintiffs

Appendix A

# The Future of California Corrections

*A blueprint to save billions of dollars, end federal court oversight and improve the prison system*

incremental population-reduction benchmarks at six-month intervals leading up to the final June 2013 benchmark.  California appealed the order to the United States Supreme Court.  But last year the Supreme Court upheld the order requiring the state to reduce its prison population in compliance with the court-imposed benchmarks.

Because of the shrinking prison population under realignment, the department met the first benchmark in December 2011, and has now met the June 2012 benchmark two months early.  The department's new spring projections also indicate the department will meet the December 2012 benchmark.  But according to the projections, the department will fall a few percentage points short of meeting the final benchmark of 137.5 percent of prison design capacity in June 2013.  By that time, the prison population is projected to drop to about 141 percent of design capacity.  Assuming these projections hold true, additional measures will likely be needed to satisfy the Supreme Court's order.  This plan sets forth effective alternative measures that will allow the department to satisfy the court by demonstrating that it can maintain a satisfactory health care system for a higher density prison population than is dictated in the order.

In fact, the Supreme Court specifically contemplated that modifications to the order may be warranted.  The Court explained that as the state implements the order, "time and experience" may reveal effective ways of ensuring adequate health care—other than through population reductions.  The state "will be free to move the three-judge court for modification of its order on that basis, and these motions would be entitled to serious consideration."

The reduced prison population has already aided the department's ability to provide quality health care.  And as the population continues to drop, the quality of prison health care will only improve.  New health care facilities and enhanced treatment and office space at existing prisons will enable the department to provide a quality health care system to a higher density prison population than the 137.5 percent of design capacity originally set by the court.  This plan will put the department in a strong position to demonstrate that the order should be modified to allow the department to maintain a prison population at or under 145 percent of design capacity.  Obtaining this modification will allow the state to comply with the order without having to maintain expensive out-of-state prison beds or release inmates early.

*Armstrong v. Brown,* which was filed in 1994, concerns the department's compliance with the Americans with Disabilities Act (ADA) for a class of inmates who have mobility, hearing, vision, or learning disabilities, or are on kidney dialysis.  The court is still heavily involved in the department's compliance with the many requirements of the ADA.  Currently the litigation is focused on issues related to facility compliance with the ADA.  The health care improvement projects will help meet ADA requirements.  While realignment is expected to decrease the number of disabled inmates, the number of inmates with mobility, hearing, vision, and other