DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
JANE E. KAHN – 112239
LISA ELLS – 243657
AARON J. FISCHER – 247391
LAURA BOYSEN-ARAGON – 248083
ROSEN, BIEN & GALVAN, LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California 94104-4244
Telephone: (415) 864-8848

WARREN E. GEORGE – 053588
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, California 94111-4066
Telephone: (415) 393-2000

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>EDMUND G. BROWN, Jr., et al.,<br><br>  Defendants. | Case No. Civ S 90-0520 LKK-JFM<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' EX PARTE REQUEST RE: REVISED LONG-TERM MENTAL HEALTH BED PLAN**<br><br>Judge: Hon. Lawrence K. Karlton |

Plaintiffs agree that reductions in the CDCR population due to the three-judge court overcrowding order and Criminal Justice Realignment require significant adjustments in the existing bed plan.  Plaintiffs therefore support Defendants' request to modify numerous previously Court-ordered bed projects, including the cancellation of two major projects, Stark and Estrella, which were to provide 765 EOP beds and 20 MHCB beds.  Defendants' Ex Parte Request Re: Revised Long-Term Bed Plan ("Revised Bed Plan"), however, goes too far and seeks this Court's premature approval for three changes that Plaintiffs must oppose on this record:  (1) Defendants' request to modify this Court's long-standing orders requiring the Department of Mental Health ("DMH") to provide a minimum of 256 ICF beds at Atascadero State Prison ("ASH"); (2) Defendants' plan to provide less EOP ASU beds than their own projections anticipate needing; and (3) Defendants' request that this Court adopt the problematic "trueing" methodology introduced into the bed plan projections for the first time.

## I. Defendants' Request to Modify Court Orders Requiring DMH to Provide 256 ICF Beds at Atascadero State Hospital Should Be Denied

Defendants' Ex Parte Request seeks to modify this Court's long-standing orders requiring DMH to provide a minimum of 256 ICF beds at ASH "because the updated population projections show a reduction in the need for ICF low-custody beds."  Ex Parte Req. at 9.  Their request plainly ignores the long history of Defendants' attempts to deny *Coleman* class members access to DMH beds, particularly at ASH, and the many, many remedial orders this Court has been forced to enter requiring Defendants to remove the artificial barriers to DMH care.  Moreover, Defendants do not request this reduction based on evidence showing the beds are not currently needed, but instead based on the supposition that they may not be needed sometime in the future.  This request is plainly premature and simply unwarranted at this juncture.  It must be denied.

This Court's specific orders directing Defendants, including DMH, to make available to *Coleman* class members inpatient psychiatric hospital beds in the state hospital system were based on findings of artificial and unnecessary barriers and governmental

indifference resulting in wrongfully delayed and denied access for the most seriously and acutely ill patients. *See, e.g.*, June 28, 2006 Order, Docket No. 1855 (adding DMH as defendant because it had become "apparent that, for multiple reasons, DMH is failing to address specific court-ordered remedies," including access to ASH); May 23, 2007 Order, Docket No. 2236 (requiring Defendants to file a plan to augment DMH clinician salaries to ensure sufficient staffing to support treatment of CDCR prisoners in all 256 beds promised in their December 2006 bed plan, and to report on ways to remove other artificial limitations on ASH admissions); June 28, 2007 Order, Docket No. 2301 (ordering Defendants to implement higher DMH pay scales, finding Defendants' response to May 23, 2007 Order insufficient because of "defendants' failure to comprehend the urgent need present in the plaintiff class for access to intermediate care beds," noting Defendants were utilizing only 26% of ASH beds available for class member care, and ordering Defendants to issue plans to ensure all ASH ICF beds were made available to class members); August 2, 2007 Order, Docket No. 2343 (ordering Defendants to implement plan to raise population of class members in ASH beds to 125 within four months, and to report on progress in the interim); June 18, 2009 Order, Docket No. 3613, at 3-4 (finding, despite earlier orders, Defendants were still denying acutely ill class members access to ASH beds, and ordering DMH to convert all 256 ASH beds to ICF level of care and to fill the beds with class members at a rate of no less than 10 per week until all 256 beds were full); *see also* June 13, 2011 Special Master Report, Docket No. 4020, at 1-23 (tracing lengthy history of Defendants' failures to make DMH beds accessible for class members needing inpatient care, including at ASH, despite long-standing crisis-level need for such beds).

Because of DMH's long-standing resistance to admitting and treating *Coleman* class members at state psychiatric hospitals in spite of the chronic shortage of ICF beds system-wide, the *Coleman* Court has issued three orders clearly directing Defendants to fill and maintain the 256 ASH beds for CDCR patients. *See* June 18, 2009 Order, Docket No. 3613; November 2, 2009 Order, Docket No. 3720; January 27, 2010 Order, Docket No.

3787. As Defendants themselves note, the Court has specifically stated that it would not consider a reduction in the number of ICF beds "absent a recommendation from the special master that fewer beds are required." Docket No. 2301 at 4:5-7. Not only does the Special Master not recommend a reduction in the ASH beds at this time, he strongly opposes it. *See* Ex Parte Req. at 3 (recognizing Special Master opposes the request to reduce ASH beds as premature); Declaration of Michael W. Bien In Support of Plaintiffs' Opposition to Defendants' Ex Parte Request Re: Revised Long-Range Mental Health Bed Plan ("Bien Decl.") ¶ 2.

There is no question Defendants' request to reduce the ASH beds is premature. Never in the 20-year history of this case have there been sufficient ICF beds to treat the number of prisoner-patients needing that level of care. Moreover, Defendants have repeatedly taken steps to limit class member access to DMH beds, including ASH. Because of the chronic inpatient bed shortage and consequent waitlists for inpatient care, many CDCR clinicians no longer bother to refer class members for inpatient care even when it is clinically indicated, resulting in significant unidentified additional unmet need. These serious, crisis-level deficiencies have resulted in two Court orders in the past three years requiring CDCR to fix their broken identification and referral process so that the true level of inpatient need could be known and treated. August 15, 2011 Order, Docket No. 4069; March 31, 2009 Order, Docket No. 3556; *see also* June 13, 2011, Docket No. 4020 (Special Master report outlining deficiencies in process for identifying, referring, and treating class members in need of inpatient care before and after 2009 MHARP process).

The success or failure of Defendants' most recent plan to do so is the subject of a pending July 13, 2012 hearing, and has not been fully vetted by the Special Master. *See* December 12, 2011 Order, Docket No. 4131. Moreover, Defendants' most recent status report filed the day before their Ex Parte Request shows that their sustainable process is not working very well. For example, in their headquarters-level review of 17 prisons, including follow-ups of prisons reviewed in February 2012 and additional institutions reviewed in May 2012, Defendants found that with the exception of PVSP and NKSP

(both non-EOP institutions), each of the other 15 prisons exceeded the 15% limit for "unacceptable documentation on their 7388-B," requiring additional training on the referral process. *See* Defs' 4th Status Report, Docket No. 4194, at 6:24-7:18; McGill Decl. ISO 4th Status Report, Docket No. 4194-1, ¶¶ 9-10. Unless and until the Special Master and this Court determine that Defendants have a sustainable and workable referral system that accurately identifies the level of ICF need and provides timely access to inpatient treatment, the actual demand for ICF level of care cannot be determined.

Finally, Defendants' request to reduce the ASH beds is based primarily on their new bed projections, which estimate a need for 276 low-custody ICF beds. Ex Parte Req. at 13. But those numbers are almost certainly artificially low for several reasons. *See* Bien Decl. ¶¶ 3-5. For example, the spring 2012 projections fail to consider the impact of Defendants' December 2011 Expert Panel Study of the Inmate Classification Score System, despite the fact that Defendants expect the changes associated with that report to impact the mental health population in Fiscal Year 2012/13. Ex Parte Req. Ex. 1 at 2. Those changes, which are projected to lower custody and classification scores for tens of thousands of prisoners, will almost certainly lead to increased low-custody ICF bed need. Bien Decl. ¶ 3.

Consequently, Defendant's request to reduce the number of ASH beds available to *Coleman* class members must be denied. It ignores the lengthy history of DMH's refusals to treat class members at ASH and the multiple resulting remedial orders attempting to dismantle Defendants' barriers to inpatient care. It is also premature and unwarranted due to flaws in their spring 2012 projections.

**II.   Defendants' Failure To Plan To Account for Projected EOP ASU Population Must Not Be Countenanced**

Defendants' proposed Revised Bed Plan plans to meet the "trued" and "non-trued" mental health bed need for all categories of beds except for the EOPs in administrative segregation ("EOP ASU"). Defendants plan is to provide 550 such beds in 2013, but their "trued" projections require 561 beds and their "non-trued" projections expect a need of

639. That means Defendants' proposed Revised Bed Plan expects a shortage of at best 11, and at worst 89, EOP ASU beds, meaning it is facially insufficient to meet any version of their projected need. Ex Parte Req. Ex. 2 (chart entitled "Bed Plan Numbers" in top right of Exhibit shows insufficient "Net Capacity" EOP ASU beds planned to meet either "trued" or "non-trued" projected need). This Court has in the past refused to approve long-range bed plans that anticipate shortfalls of projected mental health beds, and should do so again. *E.g.*, May 2, 2006 Order, Docket No. 1800, at 3 (rejecting EOP bed plan that failed to plan sufficient beds to meet projected need).

While Defendants are to be commended for their modified approach to planning for the EOP ASU population that calls for dedicated units or cells, *see* Ex Parte Req. Ex. 2 at 3 of 4, they cannot be permitted to reduce existing EOP ASU beds when they are anticipating a shortage of capacity under their own plan and projections. As articulated in their Bed Plan Assumptions, *id.*, Defendants' explanation for why the planned EOP ASU shortfall is permissible is confusing and problematic. It assumes the best-case scenario that the "trued" projections are correct (meaning the shortfall is 11 rather than 89 beds), anticipates forced double-celling even when it may not be clinically indicated in order to increase bed capacity, and expects to eat into the 95% occupancy rate Mr. Misener built into his projections to account for minor demand fluctuations in order to ensure consistent bed availability when clinically indicated. *See* Ex Parte Req. Ex. 2 at 6.

In short, Defendants do not adequately address in their plan how they will meet the projected needs of the male EOP ASU population, and until they do, this Court should not permit Defendants to plan for a potentially large shortfall of beds. Instead, the Court should decline to approve the aspects of the Revised Bed Plan relating to EOP ASU reductions and instead order the parties to meet and confer further on the subject. Such an order will not affect the construction projects outlined in Defendants' proposed order, as most of the shortfall will come from Defendants' plan to decommission beds in permanent EOP ASU programs, for which they do not seek Court approval here. *Compare* Ex Parte Req. at 9-10 (outlining rescoping of projects requiring court orders), *with* Ex. 2 at 1

(showing at Table #C numerous EOP ASU reductions at locations for which Defendants do not seek court orders, including a reduction of 36 beds at San Quentin and 49 beds at Corcoran State Prison).

### III. Defendants' Request for Adoption of Problematic "Trueing" Methodology Is Premature and Should Be Rejected

The Court should refuse to grant Defendants' request for an order adopting and requiring them to meet only the lower so-called "trued" mental health bed need projections from McManis Consulting's spring 2012 population projections. Defendants' request is unnecessary, as their proposed Revised Bed Plan anticipates meeting both the "trued" and "non-trued" projections for all categories of mental health beds except for EOP ASU, discussed separately above. Moreover, the "trued" methodology, which has never been used in any prior bed planning projections in this case, is confusing, poorly explained, and appears flawed. Even Defendants concede that the "truing" methodology supporting their lower projected bed numbers needs to be clarified because the Special Master and Plaintiffs do not fully understand how and why it was employed. *See* Defs' Prop. Order at 2. Because consideration of the Revised Bed Plan changes does not require the Court to pass on the appropriateness and accuracy of the "trued" versus "non-trued" projections, and because the "trueing" methodology is confusing and appears to undercount certain types of beds, the Court should decline to adopt the "trued" numbers.

First, Defendants' request that this Court formally adopt the "trued" numbers is premature and unnecessary to consideration of the Revised Bed Plan. Defendants' proposed Revised Bed Plan actually anticipates meeting both the lower "trued" and higher "non-trued/actual" projected need for all categories of mental health beds except for EOP ASU for which it meets neither. *See* Ex Parte Req. Ex. 2 (chart entitled "Bed Plan Numbers" in top right of Exhibit shows planned "Net Capacity" exceeds both "Need to 2013" and "Need to 2013 'Trued'" projections for all levels of care except EOP ASU, for which planned capacity will fail to meet either the "trued" or "non-trued" projected need); *see also supra* Section II (discussing projected EOP ASU bed shortage).

Because it is unnecessary to resolve whether the "trued" numbers properly capture the projected need, the Court should refuse to do so in order to avoid deciding complicated questions about the accuracy and appropriateness of the methodology based on a poorly developed record. Defendants acknowledge that the Special Master and Plaintiffs are not comfortable with "trueing" and attempt to alleviate their concerns by offering to continue meeting to "clarify" the methodology after the Court adopts the lower "trued" numbers. Defs' Prop. Order at 2. But that puts the cart before the horse: Rather than adopting the new, untested method used to generate the lowered projections now, before it is fully understood and vetted, the Court should decline to do so until after the methodology is clarified, given that Defendants' Revised Bed Plan can proceed without resolving the issue now and there is good reason to be concerned about the "trued" numbers.

No population projections submitted to or adopted by the Court have ever used the "trued" bed need methodology, which discounts actual bed need data based on the "assum[ption] that beds will free up once adequate capacities are available and there are no wait lists for those levels of care." Ex Parte Req. at 8 n.8. Defendants have never explained why this methodology is suddenly appropriate for use in projecting bed need when it has never been utilized before. Bien Decl. ¶ 6. Their explanation of how "trueing" was employed is confusing and raises significant concerns that have not been fully explored, much less resolved, at this stage to the satisfaction of the Special Master or Plaintiffs. Bien Decl. ¶¶ 6-10; *see also* Ex Parte Req. at 3.

Indeed, multiple assumptions underlying the "trued" numbers appear to be deeply flawed. First, the assumption that mental health bed utilization will be completely efficient if and when all waitlists are fully cleared ignores the reality that Defendants have historically struggled to timely place class members in the appropriate mental health bed based on a diversity of factors, including transfer delays, custody placement considerations, and transportation scheduling, among other challenges. Second, the "trued" data fails to account for class members in a mental health crisis bed ("MHCB") who are awaiting placement in an inpatient bed, even if they are appropriately housed in an

1  MHCB pursuant to Program Guide timelines for inpatient placement, as referred class
2  members often are.  *See* 2009 Program Guide at 12-6-11 (permitting 30 days from referral
3  to transfer patient to ICF bed) and 12-6-3 (permitting 10 days from referral to transfer
4  patient to acute bed).  Third, Mr. Misener told Plaintiffs, that, in calculating the "trued"
5  MHCB numbers, he assumed class members do not stay in those beds longer than 10 days.
6  Bien Decl. ¶ 9.  This assumption also is not borne out by the real world, where MHCB
7  stays routinely last much longer.  *See, e.g.*, Bien Decl. ¶ 9, Ex. C at 23-27 (showing, for
8  example, 81 CMF patients with MHCB stays ranging from 11 to 127 days in April 2012);
9  Special Master's 23rd Monitoring Report, Docket No. 4124, at 66-67.  Given the faulty
10 assumptions underlying the methodology, the "trued" MHCB bed projections Defendants
11 ask this Court to adopt appear to underestimate the true need.
12     In short, Defendants' request that this Court adopt the complicated new "trueing"
13 methodology and resulting significantly lower projected mental health bed need is
14 premature and unnecessary at this stage.  Instead, the Court should order Defendants to
15 continue to meet with the Special Master and Plaintiffs to clarify the "trueing"
16 methodology," as Defendants' suggest, and hold off on deciding whether to adopt the
17 "trued" or "non-trued" numbers until after that process is complete.

## CONCLUSION

19     Plaintiffs agree with the bulk of Defendants' request to modify numerous existing
20 Court-ordered bed projects given the drop in the prison population following the three-
21 judge court's overcrowding order and Criminal Justice Realignment.  Some aspects of
22 Defendants' Ex Parte Request and proposed order, however, are unacceptably premature
23 and unwarranted based on the existing record, including their requests to modify the ASH
24 capacity orders, the plan to provide less EOP ASU beds than their own projections
25 estimate are needed, and their request that the Court adopt the problematic "trued"
26 projections before the Special Master and Plaintiffs have had a fair opportunity to vet the
27 new methodology employed to create them.
28     Accordingly, Plaintiffs submit herewith an alternative Proposed Order reflecting the

1 following differences from Defendants' Proposed Order:

2     1.    Deleting the portion of ¶ 1(a) in Defendants' Proposed Order adopting the
3 "trued" numbers and requiring Defendants to meet those lower numbers.

4     2.    Modifying ¶ 1(b) to reflect the fact that the "trued" numbers from the spring,
5 rather than fall, 2012 projections will be the subject of Defendants' review and
6 clarification with the Special Master and, to the extent the Special Master deems
7 appropriate, Plaintiffs.

8     3.    Adding a new provision at ¶ 1(d) noting that the proposed bed plan fails to
9 meet the projected EOP ASU need, and requiring Defendants to meet and confer with
10 Plaintiffs regarding how they propose to meet that need.

11     4.    Modifying ¶ 2(b)(1) to require Defendants to complete class member
12 admissions for the already seriously delayed Dewitt project by a date certain (May 31,
13 2014) rather than permitting them to "make every effort" to do so, and requiring
14 Defendants to comply with this Court's January 4, 2010 Order to provide a detailed
15 activation schedule to meet the May 31, 2014 full occupancy date.

16     5.    Deleting ¶ 2(g) and adding a new provision at ¶ 3(a) denying Defendants'
17 request to modify its June 28, 2007 Order requiring ASH to maintain 256 beds for
18 *Coleman* class members.

19 / / /
20 / / /
21 / / /
22 / / /
23 / / /
24 / / /
25 / / /
26 / / /
27 / / /
28 / / /

6. Modifying ¶ 3(b) to remove the word "temporary." Defendants should not be permitted to decommission any existing mental health beds without notifying the Special Master and Plaintiffs unless and until they can establish sufficient alternative capacity exists to meet future need, particularly given their failure to adequately plan to meet the needs of EOP ASU class members and the other shortcomings and potential flaws in their spring 2012 bed plan projections.

DATED: June 13, 2012                Respectfully submitted,

ROSEN. BIEN & GALVAN. LLP

By: */s/ Michael W. Bien*
    Michael W. Bien

Attorneys for Plaintiffs