**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**

    **Plaintiffs**

      **v.**                   **No. CIV S-90-0520 LKK JFM P**

**EDMUND G. BROWN, JR., et al.,**

    **Defendants**

**TWENTY-FOURTH ROUND MONITORING REPORT OF THE**
**SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH**
**PROVISIONALLY APPROVED  PLANS,**
**POLICIES, AND PROTOCOLS**

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE, LOPES, DEVEREAUX, &WEST LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
(401) 824-5100
Fax: (401) 824-5123
July 2, 2012

## ACRONYMS and ABBREVIATIONS

| | |
|---|---|
| 3CMS: | Correctional Clinical Case Management System |
| AIMS: | Abnormal Involuntary Movement Scale |
| ADLs: | Activities of Daily Living |
| AED: | Automatic Electronic Defibrillator |
| Ambu bag: | Ambulatory Bag Used for CPR |
| APP: | Acute Psychiatric Program at Vacaville |
| ASH: | Atascadero State Hospital |
| ASP: | Avenal State Prison |
| BMU: | Behavioral Modification Unit |
| BPT: | Board of Prison Terms |
| C-file: | Case File |
| C&PR: | Classification and Parole Representative |
| Calipatria: | Calipatria State Prison |
| CAP: | Corrective Action Plan |
| CC I: | Correctional Counselor I |
| CC II: | Correctional Counselor II |
| CCAT: | Correctional Clinical Assessment Team |
| CCC: | California Correctional Center |
| CCI: | California Correctional Institution |
| CCWF: | Central California Women's Facility |
| CDCR: | California Department of Corrections and Rehabilitation |
| Centinela: | Centinela State Prison |

CIM:                    California Institution for Men

CIW:                    California Institution for Women

CMC:                    California Men's Colony

CMF:                    California Medical Facility

CMO:                    Chief Medical Officer

CO:                     Correctional Officer

CPR:                    Cardiopulmonary Resuscitation

CRC:                    California Rehabilitation Center

CSATF:                  California Substance Abuse Treatment Facility

CSP/Corcoran:           California State Prison/Corcoran

CSP/LAC:                California State Prison/Los Angeles County

CSP/Sac:                California State Prison/Sacramento

CSP/Solano:             California State Prison/Solano

CTC:                    Correctional Treatment Center

CTF:                    Correctional Training Facility

CVSP:                   Chuckawalla Valley State Prison

DAI:                    Division of Adult Institutions

DCHCS:                  Division of Correctional Health Care Services

DMH:                    Department of Mental Health

DON:                    Director of Nursing

DOT:                    Direct Observation Therapy

DTP:                    Day Treatment Program

DVI:                    Deuel Vocational Institute

EECP:               Extended Enhanced Outpatient Program Care Program

EOP:                Enhanced Outpatient Program

ERRC:               Emergency Response Review Committee

FIT:                Focused Improvement Team

Folsom:             Folsom State Prison

FTE:                Full-time Equivalent

GACH:               General Acute Care Hospital

GAF:                Global Assessment of Functioning

HDSP:               High Desert State Prison

HPS I:              Health Program Specialist I

HQ:                 Headquarters

HS:                 *Hora Somni*/Hour of Sleep

ICC:                Institutional Classification Committee

ICF:                Intermediate Care Facility

IDTT:               Interdisciplinary Treatment Team

IEX:                Indecent Exposure

ISP:                Ironwood State Prison

KVSP:               Kern Valley State Prison

LOC:                Level of Care

LOP:                Local Operating Procedure

LOU:                Locked Observation Unit

LPN:                Licensed Practical Nurse

LVN:                Licensed Vocational Nurse

iv

| | |
|---|---|
| MAPIP: | Medication Administration Process Improvement Project |
| MAR: | Medication Administration Record |
| MCSP: | Mule Creek State Prison |
| MHCB: | Mental Health Crisis Bed |
| MHOHU: | Mental Health Outpatient Housing Unit |
| MHSDS: | Mental Health Services Delivery System |
| MHTH: | Mental Health Temporary Housing |
| MHTS.net: | Mental Health Tracking System |
| MOD: | Medical Officer of the Day |
| MOU: | Memorandum of Understanding |
| MPIMS: | Madrid Patient Information Management System |
| MTA: | Medical Technical Assistant |
| NKSP: | North Kern State Prison |
| NOS: | Not Otherwise Specified |
| OHU: | Outpatient Housing Unit |
| PBSP: | Pelican Bay State Prison |
| PC: | Primary Clinician |
| PHU: | Protective Housing Unit |
| PIA: | Prison Industries Authority |
| PPE: | Personal Protective Equipment |
| PPEC: | Professional Practice Executive Committee |
| PSH: | Patton State Hospital |
| PSU: | Psychiatrist Services Unit |

| | |
|---|---|
| QIP: | Quality Improvement Plan |
| QIT: | Quality Improvement Team |
| R&R: | Reception and Receiving |
| RJD: | Richard J. Donovan Correctional Facility |
| RN: | Registered Nurse |
| RVR: | Rule Violation Report |
| SCC: | Sierra Conservation Center |
| SHU: | Segregated Housing Unit |
| SMY: | Small Management Yard |
| SNF: | Skilled Nursing Facility |
| SNY: | Sensitive Needs Yard |
| SPRFIT: | Suicide Prevention and Response Focused Improvement Team |
| SQ: | San Quentin State Prison |
| SRE: | Suicide Risk Evaluation |
| SSI: | Supplemental Security Income |
| SVP: | Sexually Violent Predator |
| SVPP: | Salinas Valley Psychiatric Program |
| SVSP: | Salinas Valley State Prison |
| TCMP: | Transitional Case Management Program |
| THC: | Temporary Housing Cell |
| TLU: | Transitional Living Unit |
| TPU: | Transitional Program Unit *or* Temporary Protective Unit |
| TTA: | Triage and Treatment Area |

UCC:                    Unit Classification Committee

UHR:                    Unit Health Record

UNA:                    Unidentified Needs Assessment

VSPW:                   Valley State Prison for Women

VPP:                    Vacaville Psychiatric Program at CMF

WSP:                    Wasco State Prison

# TABLE OF CONTENTS

**TABLE OF ACRONYMS AND ABBREVIATIONS**                                 ii.

**SPECIAL MASTER'S TWENTY-FOURTH ROUND MONITORING
REPORT**                                                                  1

**APPENDIX A -  INSTITUTIONAL SUMMARIES**

    **Service Area B**

        High Desert State Prison (HDSP)                             69

    **Service Area C**

        Mule Creek State Prison (MCSP)                              78

    **Service Area D**

        California State Prison, Solano (CSP/Solano)                90

    **Service Area E**

        California State Prison, Corcoran  (CSP/Corcoran)           99

    **Service Area F**

        Salinas Valley State Prison (SVSP)                         112

    **Service Area G**

        Wasco State Prison (WSP)                                    133

        Kern Valley State Prison (KVSP)                             146

        North Kern State Prison (NKSP)                              156

    **Service Area H**

        California State Prison, Los Angeles County (CSP/LAC)       172

        California Correctional Institution  (CCI)                  189

**Service Area I**

    California Institution for Men (CIM)        200

**Service Area J**

    Richard J. Donovan Correctional Facility ( RJD)        212

**APPENDIX B - CASE REVIEWS**

    Exhibit A -   High Desert State Prison (HDSP)        225

    Exhibit B -  Mule Creek State Prison (MCSP)        230

    Exhibit C -  California State Prison, Solano (CSP/Solano)        237

    Exhibit D -  California State Prison, Corcoran (CSP/Corcoran)        245

    Exhibit E -  Salinas Valley State Prison (SVSP)        254

    Exhibit F -  Wasco State Prison (WSP)        263

    Exhibit G -  Kern Valley State Prison (KVSP)        271

    Exhibit H -  North Kern State Prison (NKSP)        279

    Exhibit I -  California State Prison, Los Angeles County (CSP/LAC)        287

    Exhibit J-  California Correctional Institution (CCI)        295

    Exhibit K -  California Institution for Men (CIM)        305

    Exhibit L -  Richard J. Donovan Correctional Facility (RJD)        316

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs

        v.                                No.  CIV S-90-0520 LKK JFM P

EDMUND G. BROWN, JR., et al.,

    Defendants

## TWENTY-FOURTH ROUND MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS

## INTRODUCTION

This report covers the special master's twenty-fourth review of the defendants' compliance with the plans, policies, and protocols that were provisionally approved by this Court in mid-1997, subsequently revised and re-approved by this court on March 3, 2006 (Order, Docket No. 1773), and are currently known as the Revised *Coleman* Program Guide (Program Guide).  The Twenty-Fourth Monitoring Round began on July 25, 2011 and ended on January 26, 2012.  Institutional mental health staff and administrators of the California Department of Corrections and Rehabilitation (CDCR) continued their ongoing full cooperation with the special master's monitoring staff at institutional site visits.

The monitor's[1] site visits during the Twenty Fourth Round were limited to only 12 of CDCR's 33 institutions.  Occasional conducting of an abbreviated monitoring round is not a new practice; it was also done for the second, fourteenth, and nineteenth

---

[1] Although the collected data and findings discussed in this Report are the product of members of different monitoring teams, the various monitors are referred to as "the monitor."  Likewise, clinical judgments of the special master's experts are attributed to "the special master's expert."

monitoring periods.  Generally, the reasons for abbreviated monitoring have been to allow for focused dedication of the special master's resources to work on particular issues or concerns which may appear more prominently at some institutions, or to lighten CDCR's workload in the monitoring process during periods of time when it is also dedicating its resources to particular projects or focused efforts, or both.  For the Twenty-Fourth Round, a reduced number of institutions were monitored on-site to enable dedication of both the special master's and CDCR's resources to work on defendants' development of a plan to reduce or eliminate the wait list for inpatient care for seriously mentally ill inmates, and a plan regarding a sustainable self-monitoring process.

This report was distributed in draft form to the *Coleman* parties on April 9, 2012.  The only comments and objections to the draft report were submitted by defendants on May 9, 2012.  Several of their objections concern specific findings reported by the special master in the institutional summaries in Appendix A to this report.  Those objections are addressed below, within the relevant institutional summaries in Appendix A.

Defendants also interposed various general objections to the report, namely to the "scope, length, and timeliness of the monitoring report," as well as to an alleged "overlap with the *Plata* receiver's oversight of staffing and hiring issues, medication management, medical record-keeping, and use of information technology" and to an alleged "lack of clear benchmarks and qualitative analysis designed to assist Defendants in achieving program guide requirements."  In addition, defendants objected to "the Report's criticism of the quality of document production of the institutions on paper review as there was no substantive reporting of those institutions.  These general objections are also addressed below in this report.

A.      **Update on Defendants' Plan to Address Access to Inpatient Care**

A mere three weeks into the Twenty-Fourth Monitoring Round, the *Coleman* court ordered defendants to work with the special master over the ensuing 90-day period to "develop a supplemental plan to reduce or eliminate the inpatient wait list and to better serve the treatment needs of the inmates on the wait list," and to "implement any step approved by the special master that will make hospital beds immediately available to inmates on the wait list."  Defendants were also ordered to "work with the special master so that an assessment process that meets his approval has been conducted and completed by December 9, 2011."  Order, August 15, 2011, Docket No. 4069.  The special master considered the attainment of lasting and sustainable improvement in the area of access to inpatient care to be so important that he offered to suspend all regular *Coleman* monitoring for the Twenty-Fourth period until the 90-day period had concluded. Defendants elected to proceed with the institutional monitoring during that timeframe.[2]

The significance of this order and the work that followed from it are most apparent when viewed in the historical context of the problem they addresses.  The problem of access to inpatient care was one of the issues that set the stage for the *Coleman* litigation.  Evidence at the trial in the mid-nineteen nineties showed that there was a "major problem" with wait times of several months for inmate transfers to Atascadero State Hospital (ASH) for inpatient hospitalization.  *Coleman v. Wilson*, 912 F.Supp. at 1309 (citing "Final Report of Scarlett Carp and Associates, Inc.," California Department of Corrections, Mental Health Delivery System Study, February 16, 1993). The problem persisted for several years into the remedial phase, leading the special

---

[2] Initially, the twenty-fourth round was to cover 13 on-site visits, including Deuel Vocational Institution (DVI), but later in the monitoring period the special master removed DVI from the schedule in order to allow greater focus of effort on the progress with improving access to inpatient care.

master to recommend in September 2004 that the defendants, in consultation with the special master's experts, design and conduct a study of DMH bed needs.[3]  The *Coleman* court then ordered the defendants to conduct the study, now known as the Unidentified Needs Assessment (UNA).  Order, October 5, 2004, Docket No. 1607.

In March 2005, defendants submitted their report which indicated that their study had identified 400 inmates who needed but otherwise would not have been referred to inpatient care.  The report also stated that their plan to address the problem of inpatient bed needs would involve management of the DMH wait list with provision of level-of-care (LOC) services to those inmates awaiting transfer to an inpatient bed; active participation by DMH management and staff; utilization of standard admission and discharge criteria; utilization oversight; conversion of beds at other programs for inpatient use; and exploration of new treatment programs or designations that are necessary for providing appropriate treatment for inmate-patients identified as a result of the UNA study.[4]

Defendants submitted successive revised bed plans in 2006, 2007, and 2008, but the problem of access to inpatient care continued unabated.  In late 2008, the trial before the three-judge panel in the *Coleman* and *Plata* plaintiffs' overcrowding litigation took place.  Evidence at that trial showed that the shortage of intermediate care inpatient beds persisted, with a lack of 166 such beds, a wait list that reached as high as 173, and wait times that lasted up to a year.

In early 2009, the *Coleman* court granted plaintiffs' request for an evidentiary hearing on the status of the defendants' bed plan.  On February 17, 2009, it

---

[3] Special Master's Final Recommendation on Methodology for Defendants' Unmet Inpatient Bed Needs Assessment, Docket No. 1602.
[4] UNA Report at 2-3.

4

ordered defendants to file a statement of their bed plan within 15 days and scheduled an evidentiary hearing one week later. Order, Docket No. 3515. Shortly thereafter, the *Coleman* court denied a request by defendants for additional time, and directed them to work on the development of a bed plan and to provide a written progress report within ten days. It also re-purposed the scheduled evidentiary hearing to take up what further steps would be required to ensure timely compliance with outstanding bed plan orders. Order, March 5, 2009. Docket No. 3540. That evidentiary hearing, which took place on March 24, 2009, resulted in the entry of a comprehensive order which set deadlines for compliance with all existing *Coleman* bed plan orders and required defendants to develop and file concrete proposals to meet all remaining short-term, intermediate, and long-range bed needs of the *Coleman* plaintiff class. Order, March 31, 2009, Docket No. 3556.

As part of this comprehensive effort to finally resolve mental health bed issues, the court also ordered CDCR and DMH clinicians to jointly conduct a modified assessment, later known as the Mental Health Assessment and Referral Project (MHARP), to determine the extent of unmet inpatient bed needs among the *Coleman* plaintiff class, and to refer on an expedited basis any inmates identified in this assessment process for inpatient care. The prototype utilized for MHARP was the earlier UNA study. The immediate reason for MHARP was to identify those inmates who were potentially in need of inpatient levels of care, and to facilitate their prompt referral to such care. The broader goal of it was to clarify and re-define the landscape of mental health care and ongoing need such that it would shape the future of mental health bed construction from an informed and meaningful perspective.

By June 16, 2009, MHARP had identified 561 inmates at 12 selected institutions for referral to inpatient care. The court then approved the continuation and

expansion of MHARP to all other non-desert CDCR institutions.  Order, June 18, 2009, Docket No. 3613.  The MHARP process then went forward throughout the rest of 2009.

Following a status conference on March 31, 2010, the *Coleman* court directed defendants to work under the guidance of the special master "to develop a plan to reduce or eliminate the waitlists for inpatient care and, in the interim, to better serve the treatment needs of the *Coleman* class members placed on such lists."  Order, Docket No. 3831.  The court ordered the plan because the numbers of inmates on wait lists for inpatient care had swelled to 574 men awaiting intermediate level care, 64 men requiring acute level care, and a lesser number of women awaiting inpatient care as well.  Short of admission to a DMH program, these seriously mentally ill inmates on wait lists often languished and further decompensated, with no alternative source of appropriate treatment during the interim.  Defendants submitted their plan to address the wait list on November 24, 2010 (Docket No. 3962).

The *Coleman* court ordered the special master to review the defendants' plan and to submit his recommendations.  Order, April 27, 2011, Docket No. 4004.  In June 2011, the special master submitted his report, wherein he recommended to the court that the defendants' plan be approved and that further action be taken immediately.  Among other things, the special master recommended that defendants be ordered to conduct a further assessment of unmet need for inpatient care, to be modeled after MHARP, at the original 12 institutions for men and at two of the women's institutions.  In the meantime, defendants had developed an alternate assessment process that varied from the process that was developed in MHARP.  The court ordered an evidentiary hearing on the adequacy of the defendants' new process.  Order, July 22, 2011, Docket No. 4045.  Defendants moved to vacate the evidentiary hearing and requested that instead

they be granted a 90-day period in which to work with the special master on a

supplemental plan to reduce the wait list for inpatient care and to present their alternate

assessment process to the special master for evaluation.  Defendants recommended that if

the special master did not agree with the defendants' alternate plan, then the evidentiary

hearing may be reinstated.

        In its order of August 15, 2011, Docket No. 4069, the *Coleman* court

granted defendants' request and deferred the evidentiary hearing until December 14,

2011.  It ordered defendants to work with the special master over the ensuing 90 days to

develop a supplemental plan to reduce or eliminate the wait list and to better serve the

treatment needs of inmates on the wait list, and to implement any step approved by the

special master that would make hospital beds immediately available to inmates on the

wait list.  Defendants were also ordered to work with the special master so that an

assessment process that met his approval would have been conducted and completed by

December 9, 2011.  During that 90-day period, defendants met regularly with the special

master and his experts to work on developing a workable process to carry out that charge.

As part of the process, the special master's experts toured 14 CDCR facilities with a

multi-disciplinary group of CDCR staff.

        By mid-December 2011, defendants had taken several important steps and

made considerable progress toward significant reduction of the inpatient wait list, and

had completed the assessment process that was ordered on August 15, 2011.  As reported

by the special master to the court, he and the parties agreed that the previously-ordered

December 14, 2011 should be deferred for several months in view of these

accomplishments and the positive momentum of the entire effort.  Because of this

significant progress, the *Coleman* court continued the evidentiary hearing to July 13, 2012.  Order, December 12, 2011, Docket No. 4131.

On December 13, 2011, defendants submitted their plan for a sustainable self-monitoring process to ensure that inmates in need of inpatient care are timely identified, referred, and transferred to such care.  Its broadest objectives are two-fold:  (1) to ensure that inmates are treated at the appropriate level of care (LOC), or, if deemed clinically necessary, referred and transferred to facilities of the Department of Mental Health (DMH) in a timely manner; and (2) to develop a sustainable, internally monitored, quality improvement process designed to meet the first objective while simultaneously providing feedback to refine existing policies and procedures, improve data management systems, enhance ongoing training of institutional staff, and take appropriate corrective action when warranted.   The plan is richly detailed with processes to ensure that these objectives are met.  They consist of three broad categories of review --monthly, quarterly, and annual procedures – in which both CDCR headquarters'(HQ) staff and institutional staff will be involved on an ongoing basis.  The quality improvement aspect of the plan is based on an ongoing commitment to refining existing policies and procedures, improving data management, and enhancing ongoing training.  *See* Defendants Report on Assessment Process and Plan Re: Sustainable Self-Monitoring, filed December 13, 2011, Docket No. 4132.

On December 15, 2011, the parties reached an agreement on a process for reporting, meeting, and conferring every 45 days, from January 2012 to July 13, 2012, on the status and progress of defendants' ongoing effort to reduce the inpatient wait list.  Within ten days after each such session, defendants shall file a status report on their progress with implementation of their plan to reduce or eliminate the inpatient wait list,

the referral review process, and, as needed, any other issues and developments related to

inpatient access.  Stipulation and Order, Docket No. 4134.

   Thus far, defendants have met either in person or telephonically with

plaintiffs' counsel and the special master and his experts on several occasions in 2012, as

the plan unfolds with real results.  As July 2, 2012, the latest numbers reported by

defendants for the wait lists for admission to acute and intermediate levels of care

indicate reductions to 15 and 0 inmates, respectively.  This is a dramatic improvement

that is unprecedented in the history of the *Coleman* remedial effort.  It is attributable to

defendants' work being done simultaneously on several fronts.  They have made

substantial progress in finalizing and using their modified intermediate care pilot program

to expand access to intermediate care.  This pilot involves review of custody criteria of

individual inmates currently on the wait list for the Salinas Valley Psychiatric Program

(SVPP) and allows for movement of inmates between DMH programs such as ASH or

dormitory housing at the Vacaville Psychiatric Program at California Medical Facility

(CMF), for the ultimate purpose of more efficient use of single-celled housing.  Another

aspect of the progress with reducing the wait lists has been the re-opening of 50 beds at

Coalinga State Hospital (CSH) to Coleman class members.

   The new mental health beds that are coming on line also offer a great deal

of relief from the long waits for bed admissions.  The 64-bed intermediate care facility

(ICF) at CMF has been completed and is occupied.  In the meantime, defendants are

converting 113 EOP cells on L-wing at CMF to 110 temporary unlicensed intermediate

care cells, plus three observation rooms for high-custody inmates on the SVPP wait list.

This conversion is ongoing, with admissions to begin early in the week of July 2, 2012.

Construction of the 45-bed facility at California Institution for Women (CIW) is virtually

complete, with patient admissions expected to begin on July 2, 2012.  This facility will be

the first in which CDCR rather than the DMH will be the provider of acute and

intermediate inpatient levels of care to CDCR inmates.  These higher levels of care have

traditionally been provided to CDCR inmates only by DMH.  CDCR has indicated in its

plan for staffing the facility that it intends to operate and staff this new facility similarly

to the DMH intermediate care program at SVSP, except that it will employ psych techs,

registered nurses (RNs), and licensed vocational nurses (LVNs) rather than medical

technical assistants (MTAs), which DMH uses.  CDCR has also indicated that that it

intends to secure accreditation by the Joint Commission on Accreditation of Healthcare

Organizations (JCAHO) and licensing by the State of California.  DMH is expected to

participate in this project as a consultant to CDCR.

> The longer-term medical and mental health bed construction project

known as the California Health Care Facility (CHCF), in conjunction with the *Plata*

receiver, will provide an additional 43 acute care beds and 432 high-custody intermediate

care beds.  Construction of this project is now underway, and is projected for full

activation as of December 13, 2013.

> The work that has been done and the progress that has been made so far

with identifying and moving seriously mentally ill CDCR inmates into inpatient beds

offer genuine hope that the problem of access to inpatient care is being resolved, and that

inpatient care will remain accessible on a consistent and lasting basis.  Again, defendants

are to be commended for the effort they have brought to overcoming this problem, as

reflected in the sharp declines in numbers in the wait lists.  With continued commitment

to this goal, they will have reached another milestone on the way toward resolution of

this key aspect of the *Coleman* remediation effort.

**B.**     **Update on Mental Health Beds and Treatment and Office Space Construction Projects**

Since the filing of the Special Master's Twenty-Third Round Monitoring Report on December 1, 2011, there have been significant developments in the area of construction of mental health beds and treatment and office space.

As noted above, the 64-bed high-custody intermediate care project at CMF has been completed.  Patient admissions began on February 13, 2012, and the facility is now fully occupied.  Treatment and office space to service the 192-bed EOP at CSP/Sac was completed as of March 16, 2012, and was activated on March 19, 2012.

Defendants have reported completion of the conversion of 113 cells in CMF's L-Wing from EOP beds to 110 temporary unlicensed ICF beds and three observation rooms to house high-custody inmates on the SVPP wait list.  The temporary cooling system for that wing is reported to be now operational, and patient admissions are expected to begin during the early part of the week of July 2, 2012.

As of this writing, the licensed 45-bed acute and ICF facility at CIW is reported by defendants to be 99 percent complete. Licensing activities began on May 3, 2012 and are continuing.  Patient admissions are expected to begin on July 2, 2012, with admissions to be phased in by wing.  The 24-bed side of the facility will be activated first, followed by the balance of 21 beds within six months.

Construction delays have deferred completion of the licensed 50-bed Mental Health Crisis Bed (MHCB) unit at CMC to November 5, 2012.  Patient admissions are now expected to begin no earlier than December 11, 2012 and be completed no later than January 31, 2013.

11

Ongoing construction of the office and treatment space project for the 45-bed administrative segregation EOP at CSP/Corcoran is presently scheduled for activation on February 14, 2013.

On June 12, 2012, defendants filed an *ex parte* request to modify existing court orders relating to their long-range mental health bed plan that was filed during a two-year period spanning 2009 and 2010.  The basis for their request was the reduced prison population under ongoing realignment of that population, and their newly-revised mental health bed plan which is based on the recent Spring 2012 updated mental health population projections by McManis Consulting (formerly known as Navigant Consulting) out to 2013.  Defendants' pre-existing plan had been based on Navigant's Spring 2009 projections out to 2013.  Due to the ongoing realignment, the consultant's Spring 2012 population projections forecast reductions in the mental health population in 2013.  Defendants requested that they be permitted to substitute the 2012 projections for the 2009 projections, as well as to make plan modifications that were tied to the corresponding reduced projected mental health bed need.

On June 15, 2012, the defendants' request was approved in part to allow substitution of the Spring 2012 population projections.  Order, June 15, 2012, Docket No. 4199.  Defendants' request to modify various court orders, and in turn their existing bed plan, was granted to allow the following changes to their plan:

- SVSP.  Reduce 27 EOP administrative segregation beds to 19 EOP administrative segregation beds.

- CMF.  Revise the project to construct treatment and office space for EOP general population and EOP administrative segregation populations, and covert existing housing for 67 EOP general population beds, to a project to construct treatment and office space only.

- <u>CSP/Sacramento</u>.  Revise the project to construction treatment and office space and covert housing for 152 PSU male inmates to a project to construct treatment and office space and convert housing for 128 PSU inmates.

- <u>SVSP</u>.  Revised the project to construct treatment and office space for 300 EOP general population inmates and covert existing housing for 108 EOP general population inmates to a project to construct treatment and office space only.

- <u>CHCF</u>.  Revise the project to construct 137 MHCBs, 43 acute care beds, and 432 ICF beds to a project to construct 98 MHCBs, 82 acute care beds, and 432 ICF beds.

- <u>Estrella</u>.  Eliminate this project to construct 150 EOP general population beds and 40 EOP administrative segregation beds.

- <u>Stark</u>.  Eliminate the project to construct 30 MHCBs.

- <u>Dewitt Nelson Juvenile Justice Facility (Dewitt)</u>.  Extend deadline for full occupation from the end of 2013 to May 31, 2014, and require the filing of an activation schedule consistent with the order of June 15, 2012 as well as with prior orders.

- <u>CCWF</u>.  Revise project to construct treatment and office space and convert existing housing unit beds to 70 EOP general population beds to a project to construct treatment and office space for the existing 54 EOP general population beds.

- <u>CSP/LAC</u>. Revise project to construct treatment and office space and convert housing for 150 EOP general population inmates, to project to construct treatment and office space for 100 EOP administrative segregation inmates only.

- <u>CSP/LAC</u>.  Make the short-term project to add 20 temporary EOP administrative segregation beds permanent.

- <u>RJD</u>.  Make the intermediate-term project to create the 150-bed Level IV EOP SNY program permanent.

Among other things, the June 15 order also addressed certain concerns raised by the special master and the Coleman plaintiffs with defendants' request.  One had to do with the use of a method referred to as "truing" of projections that was

employed in the calculation of the 2012 projections. The use of "trued" figures in the Spring 2012 projections resulted in population projections and related bed needs which are lower than non-"trued" projections.  Defendants were ordered to continue working with the special master to clarify the use of "trued" projections.  Plaintiffs are to be included in this process as appropriate.

An additional concern involved the insufficient number of male EOP administrative segregation beds in defendants' revised plan to meet the need for such beds that appears in their Spring 2012 projections.  To address this concern, defendants were ordered to ensure that sufficient EOP administrative segregation beds are planned, as part of the above-referenced process of clarifying the use of "trued" projections.

Lastly, the June 15 order requires defendants not to decommission any currently operating temporary mental health program unless there is adequate alternative capacity to accommodate future need at the same level of care, and to give at least 30 days' notice to the special master of any intent to decommission such a program, with a copy of that notice to plaintiffs.

As referenced above, one of the construction projects in conjunction with the *Plata* receiver is the California Heath Care Facility (CHCF) project in Stockton.  It will provide an additional 82 acute care beds and 432 high-custody intermediate care beds.  The number of MHCBs planned for the CHCF has been reduced from 137 to 98, per reductions in CDCR population projections and an *ex parte* request by defendants to modify outstanding bed plan orders, discussed below.  Again, construction of this important facility continues, with projected full activation now extended out to December 31, 2013.  Among the other three originally-planned coordinated bed projects – Dewitt, Stark, and Estrella – only Dewitt remains on the board, for 50 EOP administrative

14

segregation beds and 375 EOP general population beds, to be occupied no later than May 14, 2014.

C.        **Coordinated Activities With the *Plata* Receiver**

On the subject of coordination between the receiver and the special master, it must be kept in mind that the scope of their related activities is broader than only the planning and construction of bed and treatment space.  Some of the special master's recent semi-annual compliance reports have elicited questions from defendants as to whether the institutional functions of medication management, information technology, and record-keeping should be monitored any longer within *Coleman* because they are also within the purview of the *Plata*[5] receivership.

One of defendants' overall objections to the draft Twenty-Fourth Round Monitoring Report is to the scope of the report.  They state, "Defendants specifically object to: (1) areas of monitoring and reporting that overlap with the Plata Receivership's oversight of staffing and hiring issues, medication management, medical record-keeping, and use of information technology, to the extent that the Special Master's monitoring is duplicative."  There is undoubtedly some degree of overlapping between the *Plata* and *Coleman* cases.  However, defendants' objection overlooks the fact that staffing, medication management, information technology, and record-keeping are integral elements of adequate systems for the delivery of *both* medical and mental health care, and therefore they occupy an important role in both cases.

Several years ago, the *Plata* and *Coleman* courts recognized the need to avoid these cases taking redundant or conflicting paths toward the solutions to their inter-related problems, and the need to maximize efficiency of expense and effort.  On January

_____

[5] *Plata v. Brown*, No. C 01-1351 TEH (N.D. Cal.)

25, 2007, the *Coleman*, *Plata*, and *Perez*[6] courts ordered the special master, the receiver, and the court representatives to "hold monthly meetings for the purpose of working collaboratively on issues related to coordination of the remedies in each of the . . . actions."  Order filed January 25, 2007, Docket No. 2119.

        The coordination process has been ongoing since that time.  It has proven fruitful for realization of the courts' intent in ordering the coordination process.  The importance of an audit tool to a well-functioning medication management system for both medical and mental health care in the prisons is obvious.  Through the coordinated work of the *Plata* receiver's medical staff, the *Coleman* special master's psychiatric experts, and CDCR staff on the Medication Administration Process Improvement Project (MAPIP), there is now a completed tool for auditing medication management.  The audit tool is designed for application with regard to management of all medication administration, including mental health.  It has been successfully piloted at CIM, CSP/Corcoran, and CCWF, but it will not be rolled out at the institutions until the end of 2012, at the earliest.  This tool promises to not only greatly enhance CDCR's ability to distribute and administer medications, but also to significantly upgrade its capacity to self-monitor for potential system failures in medication administration and to promote early and efficient interventions to restore system capabilities.  The implementation of this system for auditing medication management throughout CDCR institutions should, in the future, make information on medication management readily available in an organized format, and thereby significantly streamline upcoming *Coleman* monitoring of institutional medication management.  It represents a major step in the process of an

---

[6] *Perez v. Brown*, No. C 05-05241 JSW (N.D. Cal.)

eventual merger and ultimately a resolution of the receiver's and the special master's respective roles in the area of medication management.

Other accomplishments within the coordination process have been in the area of information technology and record-keeping. One of these is the conversion from paper to electronic unit health records (eUHRs), which has been completed and is now in place for use at the institutions. Electronic UHRs contain records of both medical and mental health treatment of inmates within CDCR, and are also electronically accessible to care providers. This will avoid the all too common problem of absence or misplacement of treatment files during clinical appointments and treatment planning interventions. Another significant accomplishment within the coordination process has been the receiver's development and implementation of an internet-based tracking system for the care of *Coleman* plaintiff class members (known as MHTS.net), MHTS.net and eUHRs are completed projects and are in place for use at the institutions. The predecessor to MHTS.net, known as the mental health tracking system (MHTS), was the pre-existing system that was developed by CDCR prior to the appointment of the receiver. It has been developed and refined into MHTS.net so that it has the technical capability to provide streamlined tracking via a one-stop electronic tool, with system-wide application, that is designed for rapid navigation of the mental health system for the clinical user who needs to determine an inmate's status, location, and scheduled clinical appointments, among other things, in real time. Currently, the focus on MHTS.net at the institutions should be on raising levels of staff proficiency with this tool so that its great benefits to the delivery of mental health care can be more fully realized.

Undoubtedly, these projects reflect significant involvement by the receiver in medication management, information technology, and record-keeping in CDCR

prisons.  However, that does not relieve the special master of his duty to keep the

*Coleman* court apprised of the state of medication management, information technology,

and record-keeping within CDCR's mental health program.  Their fundamental role in

the *Coleman* remedial plan is rooted in the remedial order itself, *Coleman v. Wilson*, 912

F.Supp. 1282 (E.D. Cal. 1995), wherein the court stated that "administration of

psychotropic medication only with appropriate supervisions and periodic evaluation" and

"maintenance of accurate, complete and confidential mental health treatment records" are

two components of a minimally adequate prison mental health care delivery system.

*Coleman*, 912 F.Supp. at 1298 n.10 (citing *Balla v. Idaho State Board of Corrections*,

595 F.Supp. 1558, 1577 (D.Idaho 1984)).

   Finally, following the appointment of the special master in 1995, he was

tasked with reporting to the court on the defendants' levels of compliance with the

elements of the remedial plan:  "The principal responsibilities of the special master, as

previously described by this court, are to provide expert advice to defendants to ensure

that their decisions regarding the provision of mental health care to class members

conforms to the requirements of the federal constitution ***and to advise the court***

***regarding assessment of defendants' compliance with their constitutional obligations***."

Order of Reference, filed December 11, 1995, Docket No. 640 at 2 (emphasis added).

Consequently, the special master is still court-ordered to report on all aspects of the

defendants' levels of compliance with mental health directives.  The advent of the *Plata*

receivership and the court-ordered coordination process did not relieve the special master

of his ongoing reporting duties.

   When the *Coleman*, *Plata*, and *Perez* courts ordered the coordination

process in early 2007, they expressly preserved all existing and yet-to-be ordered

reporting duties of the special master, the receiver, and the court representatives to their respective courts:  "Attendance of the parties at (coordination) meetings will not be required or permitted except at the discretion of the special master, the receiver, and the *Perez* court representative; nor will the special master, the receiver, or the *Perez* court representative be required to prepare or file written reports of said meetings*.  **Nothing in this order shall be construed to alter or amend such other reporting requirements as may presently exist or be created by subsequent court order** . . .*"  Order, filed January 25, 2007, Docket No. 2119 (emphasis added).  Defendants' insistence on continuing to object to the scope of the special master's compliance reports – which cover defendants' compliance with Program Guide stipulated standards, as well as with other court orders – continues to ignore the afore-cited order and would have the special master breach his court-ordered reporting duties.  Until and unless the *Coleman* court modifies or vacates its orders setting the special master's reporting duties, he remains obligated to continue to fulfill them, defendants' repeated objections notwithstanding.  Accordingly, the special master continues to monitor and report on the state of staffing, medication management, information technology, and record-keeping in the area of mental health within CDCR institutions for the Twenty-Fourth Monitoring Period.  These areas are covered in this report because they remain elements that are essential to a well-working system of mental health care delivery in the correctional setting.

>        D.        **Paper Review Institutions**

Before this report concludes, a word is in order with regard to the monitor's review of certain institutions by means of paper review.  There are presently six institutions – Calipatria State Prison (Calipatria), California Correctional Center (CCC), Centinela State Prison (Centinela), Chuckawalla State Prison (CVSP), Ironwood

19

State Prison (ISP), and Sierra Conservation Center (SCC) – which are monitored by paper review.  For these six paper review institutions, there will continue to be no on-site examination during the upcoming Twenty-Fifth Monitoring Round.  Their compliance levels will continue to be gauged exclusively based on these institutions' documentary reports to the monitor, which is significantly different from what has been the special master's normal and usual on-site monitoring process.  Calipatria and CCC have been on paper review status since the ninth monitoring round, and Centinela has been on it since the sixteenth monitoring round.  CVSP was placed on paper review status as of the ninth monitoring round, but was monitored on site for the tenth and fifteenth monitoring rounds, after which it was returned to paper review status.  ISP was placed on paper review status for the ninth monitoring round, but was reviewed on site for the tenth through the fifteenth rounds, and was then returned to paper review status as of the sixteenth monitoring round.  SCC has been on paper review status since the Twenty-Second Monitoring Round.  Four additional institutions – CIW, CMC, CSP/Sac, and Folsom State Prison (Folsom) – will receive a hybrid review, which involves an abbreviated on-site visit plus a paper review.

The special master will rely on these ten institutions' own documentation of their adherence to the Program Guide and applicable court orders for his assessments and reports on their levels of compliance.  Consequently, the quality of the reviews these institutions receive will be only as good as the documentation that they produce.  Documentation that is thorough, clear, organized, and responsive is essential to a meaningful review of their performance levels.  While some of the institutions on paper review status such as CCC, Centinela, and Calipatria have been supplying the special

master with appropriate documentation, the quality of documentation that has been
provided by others has been uneven, as noted below.

• *SCC*   SCC provided no documentation on daily morning meetings
between clinical and custody staffs in administrative segregation, 30-day reviews for
EOP inmates housed in administrative segregation for more than 90 days, receipt of
medications within 24 hours of inmate arrivals, or auditing of waiting times in pill lines.
It did not provide adequate documentation on completion of custody wellness checks and
completion of clinical five-day follow-ups after inmate discharges from crisis care.  With
regard to completion of 30-minute welfare checks during inmates' initial three weeks in
administrative segregation, the institution's response stated that these checks were
completed, but there was no data verifying that conclusion.  Instead, the provided proof-
of-practice merely directed the reader to the OHU log for verification.  SCC's audit of
medication noncompliance stated that the institution was "100 percent compliant" with
medication administration within 24 hours following inmate moves.  However, it appears
that SCC may have used the wrong audit data in arriving at that conclusion.  Its
information on institutional compliance with administration of HS medications may be
unreliable, as it appears that three of the HS pill lines begin earlier than 8:00 p.m. There
was also a statement in the institutions' management report that there were ten beds in the
institution's OHU, while the material in the binder indicated 12 OHU beds.

• *CVSP*   The approximately 3,000 pages of documentation produced by
CVSP were disorganized, with no tabs in the management report or in the electronic
binder.  The information presented in the electronic binder was not organized according
to the document request, and did not appear to be in any other discernible order.  No
summaries of any audits were included in the provided materials.

21

•*ISP*   This institution's performance was very difficult to assess because of the poor quality of its documentation.  Like CVSP's documentation, the material was voluminous and disorganized, making it difficult to cull relevant data from the massive amount of paper that was produced.  It also lacked summaries of the data submitted and of any audits that had been conducted.

The inconsistencies among the paper review institutions' documentation indicate a need for greater organization, consistency, and responsiveness.  Paper review data presented to the special master should follow the format of his document request so that there is no ambiguity in the institution's response, and the reader can readily find what he is looking for.  The documentation should be presented in a format that is consistent across institutions.  Most importantly, the documentation should fulfill the purpose of a paper review, which is to alleviate the need for on-site monitoring and allow those institutions who have demonstrated good compliance levels to self-monitor and report their compliance to the special master without the need for his in-person examination.  The goal is to eventually have all institutions attain paper review status as on-site monitoring is phased down.  However, that goal cannot be reached unless the documentation produced by each institution is organized, thorough, accurate, and responsive to the document request in a clear and consistent format.

In response to the draft version of this report, defendants objected to "the Report's criticism of the quality of document production of the institutions on paper review as there was no substantive reporting of those institutions."  The special master has been conducting at least some of his regular institutional review via paper review for years, with  inconsistent and unsatisfactory document production by some institutions that has also been going on for years.  The special master's review and commentary on

22

the problems with three of the paper review institutions' documentation does not exceed the scope of his monitoring authority.  From the outset of court oversight in this case, the *Coleman* Order of Reference has accorded the special master wide berth in his access to defendants' records, files, and papers.  Among other powers, the special master has the power to examine

> B.      Powers of the Special Master
>
> IT IS FURTHER ORDERED that the powers of the special master are and shall be limited to the following:
>
> *   *   *
>
> 5.  To have unlimited access to the records, files and papers maintained by defendants to the extent that such access is related to the performance of the special master's duties under this Order of Reference.  Such access shall include all departmental, institutional, and inmate records, including but not limited to, central files, medical records, and mental health records.  The special master may obtain copies of all such relevant records, files, and papers.

Order of Reference, December 11, 1995, Docket No. 640.  .

Defendants apparently overlook the significance of the special master's comments on the quality of three paper review institutions' documentation.  As stated above, the transition of CDCR institutions from on-site review to paper review is the next step in the progression toward eventual self-monitoring and cessation of court oversight.  However, to move in that direction, institutional documentation must be adequate and responsive to its purpose.  It is ironic that, on the one hand, defendants object to the Twenty-Fourth Round Monitoring Report's alleged "lack of clear benchmarks and qualitative analysis designed to assist Defendants in achieving program guide requirements," yet they balk when offered the practical direction that three of the six institutions on paper review status need to improve their document production to help

them achieve compliance.  It seems to be lost on defendants that the special master is

willing to work with them to achieve that goal, and why, as discussed below, the special

master is recommending that a quality improvement project be ordered by the court.

        In addition, it is important to note that Twenty-Fourth Round review was

not strictly limited to the 12 on-site visited institutions, as defendants imply.  The absence

of on-site visits at some institutions did not preclude the special master's examination and

commentary on the quality of three of the six paper review institutions' documentation.

Although site visits were abbreviated to 12 of the 33 institutions, and the resulting report

contains institutional summaries for only those 12 institutions, it was also agreed and

understood by the special master and defendants that the paper review institutions

remained obligated to produce their usual documentation of their compliance levels for

his review.  There were both in-person and telephonic meetings between defendants and

the special master's staff dealing with the paper review documentation to be produced.

Defendants were thus on notice that the paper review institutions were being examined in

the Twenty-Fourth Round.  If the special master's Twenty-Fourth Round institutional

examination had truly been limited to only the 12 visited institutions, then no

documentation would have been requested of *any* institutions but those 12.  Accordingly,

defendants' objection that this report should have excluded discussion of shortcomings in

three of the six paper review institutions' documentation is lacking in merit and should be

rejected.

        Defendants also objected to the length of this report.  The special master

takes particular issue with this objection.  He has maximized the utility and readability of

his compliance reports by streamlining their format, beginning with his Twenty-Third

Round Monitoring Report. That report was thorough yet manageably succinct at 78 pages in length, covering all 33 CDCR institutions in summary fashion, plus the individual institutional summaries and clinical case reviews. Defendants initially objected to the length of the draft Twenty Third Round Monitoring Report, but then subsequently withdrew that objection before the final report was filed with the court. Why they would choose to revive that objection in response to this report, which is 76 pages in length, plus 255 pages of appendices for a total of 331 pages, evades comprehension.

        The length of this report is reasonable and necessary in view of the enormity of the task to be done and the objectives to be served. *Coleman* monitoring of mental health care within CDCR prisons covers a vast penal system of 33 separate prisons. The institutional monitoring visits behind this report spanned a six-month period. The scope of the subject matter to be covered is wide and deep, as the delivery of mental health care is a complex and multi-faceted system in CDCR prisons. These many elements then have to be examined and evaluated through the prism of the Program Guide – a compendium of 195 pages of standards and benchmarks for mental health care delivery, plus 110 pages of attachments. In addition, institutional compliance with relevant court orders also must be examined and reported on. As of this writing, the *Coleman* docket alone has 4,204 entries, a vast number for one case, and indicative of its breadth and complexity. Among these 4,204 filings are 302 orders. One of the objectives of the monitoring reports is for the individual institutions to gain insight and guidance on their own performance levels. This is why monitoring reports include individual institutional summaries that are dedicated to the monitor's findings specific to each institution. The institutional summaries, which by themselves total 154 pages, were

distilled from reams of information prepared and submitted to the special master by the Coleman monitors.  This is the magnitude of the special master's reporting duties, and it is why the defendants' compliance levels simply cannot be reported thoroughly and competently in a mere few pages.

The larger context of *Coleman* compliance reports must also be taken into consideration as part of this discussion.  The special master's *Coleman* monitoring reports are the core of the evidentiary record of the remedial phase of the *Coleman* litigation.  The creation of that record is no mere academic exercise.  The *Coleman* court – at whose direction the reports are prepared – has never ordered or even suggested that the special master curtail the length of his reports.

This case, together with the *Plata* case, was reviewed by the three-judge panel in the *Coleman v. Brown/Plata v. Brown* litigation on the problem of overcrowding within CDCR prisons and its causative role in the defendants' ongoing challenges with the delivery of mental health and medical care in the prisons.  The special master's monitoring reports were a mainstay of the evidentiary record on which the three-judge panel based its landmark decision to order CDCR to reduce the overcrowding in its prisons to 137.5 percent design capacity.  That decision, supported by the record preserved in the 20 *Coleman* monitoring reports on file as of the time of the trial in late 2008, as well as by testimonial and other documentary evidenced admitted at trial, withstood challenge in the United States Supreme Court.  Had the special master's reports been cursory and not provided the thorough and comprehensive review that they did, the three-judge panel would not have had the benefit of an appropriately thorough record on which to base its decision.

It is noteworthy that CDCR's own significant reports in *Coleman* are comparable in length to the special master's monitoring reports.  For example, CDCR's recent report on its proposed revised bed plan, "The Future of California Corrections: A Blueprint to Save Billions of Dollars, End Federal Court Oversight and Improve the Prison System," ("the Blueprint") was distributed on April 23, 2012.  That report is comprised of a 60-page executive summary and full report on the plan, plus 184 pages of appendices covering individual institutions, for a total length of 244 pages.  Unlike the special master's compliance reports, it covers only one subject- the bed plan – while the special master's compliance reports cover the broad range of elements of the delivery of mental health care in the prisons.  The point of this discourse is not to impugn the Blueprint in any way, as its volume is undoubtedly necessary in order to cover the important subject of the mental health bed plan.  Rather, the point is to underscore that there is simply no shortcut when it comes to reporting on far-reaching aspects of mental health care in CDCR prisons.

When viewed in the larger scheme of court supervision throughout the remedial phase of this case, defendants' objection that the special master's monitoring reports are too long is a gratuitous attack that amounts to a mere red-herring.  The special master will continue to make every effort to produce reports that are as succinct and comprehensible as possible.  However, given the breadth of his charge, he will not compromise his reporting responsibilities and will continue to submit reports to the court that he believes satisfy his reporting duties.  Accordingly, the special master disagrees with defendants' objection that his Twenty-Fourth Round Monitoring Report is overly long.

Defendants also objected to the timeliness of the Twenty-Fourth Round Monitoring Report.  First of all, there is no time limitation for distribution or filing of the special master's compliance reports; the only requirement is that they be submitted semi-annually. Order, December 24, 1997, Docket No. 905.  The draft Twenty-Fourth Round Monitoring Report was distributed to the Coleman parties on April 9, 2012, which was 74 days after the final institutional site visit for that monitoring round.  The Twenty-Fifth Monitoring Round began on May 1, 2012, which was 22 days after the draft Twenty-Fourth Round Monitoring Report was distributed.  Thus, defendants had over three weeks to examine the draft report before the next round of *Coleman* monitoring began at the first institution.  Most institutions had far more than 22 days of lead time before their Twenty-Fifth Round site inspection even began.

As for all past rounds, the special master prepared this report based upon the reports he received from his monitoring team at each of the various prisons that were visited, plus reports based on the documentation from each of the six institutions which were examined reviewed by paper review.  From these various reports, the special master synthesized and analyzed all of the assembled findings and data to produce his compliance report and determine whether he will recommend any court orders.  Given the amount of information that must be assembled and analyzed, a statement on future efforts and directions to be taken, and any recommendations for further orders of the court, a period of 74 days from the end of monitoring to distribution of the draft report is a brief period.

In addition, it must be remembered that while the Twenty-Fourth Monitoring Round was in progress, the special master's staff was engaged in additional activities other than institutional monitoring.  Twenty-Fourth Round on-site prison

monitoring began on July 25, 2011.  Three days prior to that, on July 22, 1011, the

*Coleman* court ordered an evidentiary hearing on the adequacy of defendants' new,

alternate process for assessment of unmet need for mental health inpatient care among

CDCR inmates.  As discussed above, defendants then moved to vacate this evidentiary

hearing and requested the allowance of a 90-day period in which to work with the special

master to develop a supplemental plan to reduce the inpatient wait list and present an

alternate assessment process to the special master for his evaluation.  This prompted the

entry of an order on August 15, 2011 – a mere three weeks into the Twenty-Fourth

Monitoring Round – requiring the special master and the defendants to work over the

next three months to develop a supplemental plan to reduce or eliminate the wait list and

to better serve the treatment needs of inmates on the wait list, and to implement any step

approved by the special master that would make hospital beds immediately available to

inmates on the wait list.  Defendants were also ordered to work with the special master so

that an assessment process that met his approval would have been conducted and

completed by December 9, 2011.  As described above, during that 90-day period,

defendants met regularly with the special master and his experts to carry out this charge,

and toured a number of CDCR facilities with a CDCR work group.  The work, as

described above, culminated in an agreement on a process for reporting and conducting

meet-and-confer sessions every 45 days, from January 2012 to July 2012.  Without

reiterating the details of that process, it has necessitated several in-person and telephonic

meetings, and a continuation of the assessment process as of this writing.

       Other ongoing activities from the time of the Twenty-Fourth Monitoring

Round until the draft report was issued included two in-person *Coleman* policy meetings,

and five four-court coordination meetings via telephone or in-person.

On a final note, defendants' objection should also be considered in the context of this report among the many preceding reports. Monitoring by the special master and the resulting compliance reports have been ongoing since the inception of the special mastership, with the first monitoring report submitted on November 4, 1996. Thus, defendants have been receiving reviews and reports from the special master on a rolling basis for over 15 years. They can hardly claim that a lack of reports has kept them in the dark for any period of time, without feedback on what they should be doing to achieve compliance. Accordingly, the defendants' objection that the Twenty-Fourth Round Monitoring Report was not issued timely is also groundless and should be rejected.

## SUMMARY OF THE MONITOR'S FINDINGS

Because Twenty-Fourth Round monitoring was abbreviated, the general observations in this report on compliance levels and observed trends within the monitoring focus areas are limited in application to the 12 on-site monitored institutions. Consequently this report is less comprehensive in scope than the special master's compliance reports which cover all 33 CDCR institutions. The general statements in this summary of compliance levels during the Twenty-Fourth Monitoring Period should not be read out-of-context as broad observations regarding all CDCR institutions.

The primary monitoring focus areas remained institutional mental health staffing levels, quality management, suicide prevention, medication management, inmate sexual misconduct, and transfers to higher levels of care. The monitor continued to examine the institutions' provision of mental health services in the enhanced outpatient program (EOP), administrative segregation units, reception center, and the Correctional Clinical Case Management System (3CMS). The monitor also examined the institutions'

use of outpatient housing units (OHUs) for mental health purposes, treatment records and

the internet-based mental health tracking system (MHTS.net), as well as inmates' access

to mental health appointments, relationships between custody and mental health, and

other functions in the institutions which have an impact on the delivery of mental health

care to inmates.

        The 12 institutions at which on-site tours were conducted were California

Correctional Institution (CCI), California Institution for Men (CIM), California State

Prison, Los Angeles County (CSP/LAC), California State Prison, Solano (CSP/Solano),

California State Prison, Corcoran (CSP/Corcoran), High Desert State Prison (HDSP),

Kern Valley State Prison (KVSP), Mule Creek State Prison (MCSP), North Kern State

Prison (NKSP), Richard J. Donovan Correctional Facility (RJD), Salinas Valley State

Prison (SVSP), and Wasco State Prison (WSP).  Counsel for plaintiffs and defendants

accompanied the special master's monitoring staff on their tours of CSP/LAC, HDSP,

SVSP, KVSP, and RJD.  In addition, the other 15 institutions which are ordinarily

monitored via an on-site visit were asked to respond to the special master's usual

document request, and the institutions which are ordinarily monitored by means of paper

review were once again reviewed in that manner.

        As in the Special Master's Twenty-Third Round Monitoring Report, filed

in December 2011, a summary of each visited institution's performance appears in this

report as Appendix A.  The clinical case reviews prepared by the special master's experts,

organized institution-by-institution, appear once again as Appendix B.

A.    **Mental Health Staffing**:

All Mental Health Positions[7]

As of December 31, 2011, the number of all established mental health positions for chief, senior, and staff psychiatrists; chief, senior, and line psychologists; clinical social workers; psych techs; office technicians; and recreation therapists was 1,066.18[8].  Of these established positions, 880.7 were filled with full-time employees. The collective vacancy rate for all of these mental health positions was 17.4 percent.  The use of contractors reduced the functional vacancy rate among all mental health positions to 8.5 percent.

Among the 871.16 total non-supervisory or line mental health staff positions, who directly serve the mental health population in the prisons, there were 148.91 unfilled positions, yielding a vacancy rate of 17.1 percent.  Use of contractors reduced the functional vacancy rate to 6.2 percent.

Chief Psychiatrists

Of the 12 institutions that were visited across the monitoring round, nine had established chief psychiatrist positions.  The vacancy rate for these allocated chief psychiatrist positions was 55.6 percent.  Registry was not utilized for any of the vacant positions.  CSP/Corcoran, CSP/LAC, CSP/Solano, MCSP, and RJD were operating without full-time chief psychiatrists.  This was the third consecutive monitoring period in which the chief psychiatrist position at CSP/LAC was vacant.

---

[7] The numbers and rates of staffing vacancies reported herein are limited to the 12 institutions which were visited during the twenty-fourth round of monitoring.

[8] Source of staffing data (excluding psych techs) reported in this section: CDCR Secured Website for Monthly Reports, posted February 2, 2012, covering the month of December, 2011.  Staffing data for psych techs was not included in the monthly report and data was obtained from each site visit during the monitoring period.

Senior Psychiatrists

Of the 12 monitored institutions, eight of them each had one allocated
senior psychiatrist position. Registry was not used to fill any vacancies, which left a
vacancy rate of 37.5 percent among the eight institutions. CSP/Corcoran, MCSP, and
RJD were all operating without full-time senior psychiatrists.

Staff Psychiatrists

The 109.85 allocated staff psychiatry positions were also not immune
from vacancies, with an overall vacancy rate that exceeded 39 percent. The use of
contractors reduced the functional vacancy rate to nine percent. None of the 12
institutions filled all of their line psychiatry allocations with full-time psychiatrists. For
the second consecutive monitoring period, HDSP had a vacancy rate of 100 percent in
psychiatry, but contractors at that institution reduced the functional vacancy rate to 43
percent. Five of the twelve institutions had vacancy rates ranging from four percent to 29
percent. CSP/Solano, KVSP, and RJD all had functional vacancy rates of zero percent.
NKSP was the only other institution with a vacancy rate below ten percent.

Chief Psychologists

Each of the twelve institutions had one allocated chief psychologist
position. Across the 12 institutions monitored during the Twenty-Fourth Round, there
was an overall vacancy rate of 33.3 percent for chief psychologists. None of the
institutions used contractors. CSP/Solano, MCSP, NKSP, and RJD did not have full-time
chief psychologists.

Senior Psychologists

Of the 51.2 allocated senior psychologist positions in the 12 institutions,
42 were filled, leaving a vacancy rate of 18 percent. No contractors were used to cover

senior psychologist positions at any of the twelve institutions. CSP/Corcoran, CSP/Solano, HDSP, KVSP, and WSP filled all of their senior psychologist positions. CCI, CSP/LAC, and MCSP had vacancy rates ranging from 14 percent to 20 percent, while CIM, NKSP, RJD, and SVSP had vacancy rates ranging from 24 percent to 40 percent.

Primary Clinicians

The vacancy rate among primary clinicians (PCs), whose ranks are made up of both psychologists and social workers, was 17.3 percent. With the use of contract coverage, the functional vacancy rate was reduced to 6.9 percent.

Staff Psychologists

For the twelve institutions, the vacancy rate for line psychologists was 17.4 percent, with 303 of the 366.69 allocated positions filled. None of the institutions had a vacancy rate of ten percent or less. CCI and KVSP had vacancy rates of 34 percent and 48 percent, respectively, and the remaining institutions had vacancy rates ranging from just over ten percent to 18.4 percent. Contractors reduced the overall vacancy rate to 6.2 percent, and provided full coverage at MCSP, RJD, and SVSP.

Social Workers

CSP/LAC, NKSP, and RJD filled all of their social worker positions. CIM, CSP/Solano, HDSP, MCSP, and WSP had vacancy rates ranging from 0.8 percent to 20 percent. CSP/Corcoran, KVSP, and SVSP had vacancy rates ranging from 25 percent to 32 percent, while CCI had the highest vacancy rate at 60 percent. The overall vacancy rate for social workers was 17 percent, with a functional vacancy rate of nine percent.

34

Psych Techs

The vacancy rate for psych techs was the lowest among all of the mental health staff at 3.5 percent, with a functional vacancy rate of 0.9 percent. Of the 226.52 allocated positions, 218.25 were filled. CCI, CIM, CSP/Corcoran, and CSP/Solano had no vacancies. The remaining institutions had vacancy rates ranging from four percent to 12 percent.

Recreation Therapists

Of the 56.31 allocated recreation therapist positions across the 12 monitored institutions, 42 were filled, for a vacancy rate of 25 percent. Use of 5.03 contractors reduced the functional vacancy rate to 17 percent. CIM and HDSP filled all of their recreation therapist positions, whereas CCI had the highest vacancy rate at 60 percent. KVSP, NKSP, and SVSP each had a 50 percent vacancy rate. CSP/Solano, MCSP, and RJD had vacancy rates below ten percent, while CSP/Corcoran, CSP/LAC, and WSP had vacancy rates of 28.6, 35, and 33 percent respectively.

Office Technicians

Of the 114.82 allocated office tech positions, 99.45 were filled, for a vacancy rate of 13 percent. No contractors were utilized to fill any vacancies. CSP/Solano, KVSP, MCSP, and SVSP filled all of their office tech positions with full-time employees. CCI and CIM had vacancy rates of ten percent or less. CSP/LAC, NKSP, RJD and WSP had vacancy rates ranging from 16 percent to 20 percent, while CSP/Corcoran and HDSP had the highest vacancy rates, at 26 and 37 percent, respectively.

**B.**     <u>**Quality Management:**</u>

Progress was generally found in institutional quality management processes.  However, on the general subject of institutional quality management committees, it bears re-emphasizing in this report that attendance and participation by required members at the various committee meetings is crucial to their effectiveness. Committee meetings without the presence and participation of appropriately authorized personnel are mere formalities that do not serve the objectives of a functioning quality management program.  To be effective, any quality management committee must have the active participation of those CDCR officials who have the authority to order follow-through of corrective actions and to oversee and supervise their completion.  The presence and input of both mental health and custody personnel are important.  They bring their own distinct perspectives and need to be aware of the other's roles and responsibilities to carry out their duties efficiently and collaboratively. A degree of interdisciplinary exchange across the meeting table can go a long way toward avoiding a break in the chain of delivery of care to the patient.

With respect to quality management activities at specific institutions, CSP/Solano created performance indicators and convened its mental health subcommittee more frequently.  The institution also reported performing monthly audits of all Mental Health Services Delivery System (MHSDS) programs.  WSP was able to identify deficiencies via its peer review process and implement solutions which led to improvements in the areas where deficiencies had been found.  CSP/LAC's quality management program provided an effective device for monitoring and managing mental health care services.

36

Some noted concerns in quality management included poor attendance at mental health subcommittee meetings and sparse meeting minutes at SVSP, making it difficult to detect what had been done to address identified problems.  Other noted concerns included the need for improvement in NKSP's quality management program in the areas of peer review and development of meaningful meeting agendas, and the lack of assessment of results and corrective actions in RJD's quality improvement reports.

There were functioning local governing bodies at CSP/Corcoran, CSP/LAC, CSP/Solano, HDSP, KVSP, MCSP, NKSP, RJD, SVSP, and WSP.  The local governing body at CIM was disbanded by the health care CEO.  The majority of the local governing bodies met regularly.  Meetings were scheduled at the various institutions on a monthly, every other month, or quarterly basis.  The local governing body at SVSP and CSP/Solano did not meet during the reporting period.  At RJD, the local governing body met once.

Quality management committees existed at CCI, CIM, CSP/Corcoran, CSP/LAC, CSP/Solano, HDSP, KVSP, MCSP, NKSP, RJD, SVSP, and WSP.  All held regular meetings on a twice per month or monthly basis.  Meeting attendance was reported to be generally good except at SVSP, where nearly half the meetings held during the reporting period did not have a quorum.  HDSP reported forming a quality management executive committee in March 2011.  The executive committee was typically scheduled to meet monthly, within one week of the quality management committee.  Membership included all quality management committee subcommittee chairpersons, the associate warden for healthcare, the healthcare captain, and a representative from healthcare education.  The executive committee addressed audits,

surveys, corrective action plans (CAPs), quality initiatives, and scheduled quality improvement teams (QITs).

CCI, CIM, CSP/Corcoran, CSP/LAC, CSP/Solano, HDSP, KVSP, MCSP, NKSP, RJD, SVSP, and WSP all had mental health subcommittees scheduled to meet twice per month or monthly.  Attendance was generally good, with CCI, CIM, CSP/Corcoran, CSP/LAC, CSP/Solano, HDSP, KVSP, MCSP, RJD, and WSP regularly achieving a quorum at meetings.  Although scheduled to meet monthly, NKSP met just three times during the reporting period.  SVSP's mental health subcommittee reported meeting three to four times per month, but attendance was poor, with a quorum at only one meeting out of 24 held during the reporting period.

QITs were chartered and used appropriately by several institutions throughout the monitoring period.  CCI, CIM, CSP/Corcoran, CSP/LAC, CSP/Solano, HDSP, MCSP, NKSP, RJD, SVSP, and WSP all had active QITs during the reporting period.  CCI had one ongoing QIT on untimely response to clinical referrals and had finalized and closed two other active QITs.  CIM had three ongoing QITs, one of which was chartered to increase inmate compliance with treatment in administrative segregation.

CSP/Corcoran chartered a QIT to address concordance between MHTS.net and unit health records (UHRs).  CSP/Solano chartered a QIT on delivery of parole medications; HDSP chartered three QITs and had two others ongoing.  MCSP had five ongoing QITs; NKSP chartered a QIT in June 2011 to review an inmate suicide. RJD had two active QITs.  SVSP had one ongoing QIT to refine the referral process for assault victims and inmates with safety concerns, and also had three ongoing focused improvement teams (FITs).  WSP chartered two QITs, one of which was to address

concerns related to emergency medication administration.  KVSP did not have any active QITs.

Peer review in some form was in place at CCI, CIM, CSP/Corcoran, CSP/LAC, CSP/Solano, HDSP, KVSP, MCSP, NKSP, RJD, SVSP, and WSP.  At CCI, peer review for psychologists, which had primarily consisted of critiquing difficult cases, was being overhauled.  Due to the limited number of social workers at CCI, there was no social worker peer review.  At CIM, all staff clinicians were reviewed quarterly by other clinicians within their respective disciplines.  CSP/LAC had organized and meaningful peer review for psychologists and social workers, consisting of quarterly peer review sessions and monthly peer review QIT meetings, but no peer review program for psychiatrists had been established.  Peer review for psychiatry at CSP/Solano met quarterly, using a revised audit tool to provide feedback.  Peer review for psychologists and social workers was scheduled to meet monthly and continued to use a case review format.

At MCSP, peer review for psychologists, social workers, and psychiatrists was qualitative in nature, covering, for example, whether diagnoses were consistent with documented findings and whether medications were appropriate for diagnoses.  NKSP reported that peer review for psychologists and social workers was being developed and would be implemented in September 2011.  At RJD, psychiatry peer review remained unchanged since the preceding monitoring period.  However, the peer review process for psychologists and social workers had been redesigned and a new peer review instrument was developed to be used during the next monitoring period.  The psychologist peer review process at SVSP revealed insufficient justification for changes in levels of care,

prompting staff training.  WSP psychiatry peer review identified certain deficiencies, which the institution reported had improved by June 2011.

### C.   **Suicide Prevention**:

An important purpose of the Division of Correctional Health Care Services (DCHCS) suicide review process is the creation of CAPs that are derived from the reviews of individual CDCR inmate suicide cases.  The objective, obviously, is to avoid repeating the miss-steps of the past that may have contributed to past suicides and thereby reduce the risk of future suicides.  The institutional Suicide Prevention and Response Focused Improvement Teams (SPRFITs) are the means by which these CAPs are implemented at the institutions.  It is vitally important that designated institutional staff attend SPRFIT meetings.  Without the presence of authorized officials to order and supervise follow-through on the CAPs, the work of the suicide review process is wasted and the benefits of the CAPs remain unfulfilled.

All 12 monitored institutions had well established SPRFITs, but only CSP/LAC, HDSP, MCSP, and WSP held monthly meetings with relevant agenda items and appropriate attendance pursuant to Program Guide requirements.  Over half of the institutions (CIM, CSP/Corcoran, CSP/LAC, HDSP, KVSP, MCSP, RJD and WSP) held monthly meetings and four institutions (CCI, CSP/Solano, NKSP and SVSP) missed only one monthly meeting during the monitoring period.  Minutes of meetings were maintained by all institutions except for RJD.  Notably, the minutes at CIM were identical for three consecutive months.  Proper attendance was documented at 50 percent of the institutions (CSP/LAC, HDSP, MCSP, NKSP, SVSP, and WSP).  Relevant agenda items were discussed by all of the monitored institutions.

CCI, CSP/Solano, HDSP, MCSP, NKSP, RJD, and WSP had established emergency response review committees (ERRCs). CSP/Solano, NKSP, and WSP provided minutes for the meetings. Monthly emergency medical response drills were completed by CCI, CIM, CSP/LAC, HDSP, and MCSP. RJD reported completion of emergency medical response drills quarterly. Cardiopulmonary Resuscitation (CPR) training was completed at CIM, MCSP, RJD, and WSP. All institutions except CSP/Corcoran, HDSP, and RJD were compliant with access to cut-down tools. CIM, CSP/Solano, MCSP, NKSP, and WSP were compliant with custody officers' on-person possession of micro-shields for CPR.

Only MCSP and WSP were compliant with five-day clinical follow-up upon discharge from crisis care. CSP/LAC, CSP/Solano, HDSP, KVSP, and NKSP approached compliance with typically only one day missed. CCI, CIM, and RJD remained noncompliant.

HDSP was the only institution compliant with custody checks after discharges from crisis care, and CSP/Solano was very close to compliance. CIM, CSP/Corcoran, CSP/LAC MCSP, RJD, and SVSP showed improvement but remained noncompliant. KVSP did not provide information relative to compliance with post-crisis care custody checks.

All of the institutions implemented most or all of the components of CDCR's suicide Plan to Address Suicide Trends in Administrative Segregation. All of the institutions utilized retrofitted or designated intake cells for newly placed inmates in administrative segregation when available. Further, all of the institutions utilized cell door placards identifying the new-arrival status for all of the recently-arrived inmates for

41

21 days.  SVSP did not utilize new intake cells for their overflow or stand-alone segregation unit.

CCI, CSP/LAC, CSP/Solano, MCSP, and RJD were compliant with documented daily meetings between custody and mental health staff in administrative segregation.  While NKSP and WSP were compliant with the requirement of daily meetings, documentation was problematic.  CIM and HDSP were close to compliant for documented daily meetings throughout the review period.

Seven institutions (CSP/Corcoran, CSP/LAC, CSP/Solano, HDSP, KVSP, MCSP and RJD) were compliant with documented daily psych tech rounds in administrative segregation.  SVSP was compliant with daily psych tech rounds in the main administrative segregation unit, but there were documentation problems in the overflow unit.  Similarly, CCI and CIM missed compliance due to documentation issues.

Generally, the 12 monitored institutions continued to struggle with reaching compliance with completion of pre-administrative segregation placement screens.  Only KVSP and CIM demonstrated compliance throughout the monitoring period and the remainder of the institutions were noncompliant.  CSP/Solano, NKSP, SVSP, and WSP hovered in the 70-percent range of compliance, while HDSP, MCSP, and RJD were below 50 percent compliance.

Institutions also continued to struggle to achieve compliance with completion of post-placement 31-question screens in a confidential setting for newly arrived inmates in administrative segregation.  Over half of the institutions reviewed (CCI, CSP/Corcoran, CSP/Solano, HDSP, MCSP and RJD) were noncompliant.  NKSP was close to compliance, with 87 percent of 31-question screens completed within 72 hours of placement.

Only two institutions (CSP/LAC and WSP) demonstrated completion of 30-minute staggered custody wellness checks in administrative segregation.  CIM improved but the checks often exceeded 30-minute intervals.  CCI, CSP/Corcoran, and NKSP did not complete the wellness checks at staggered intervals.  HDSP, MCSP, RJD, and SVSP were not compliant with completion of the required checks.

Four of the 12 institutions (CIM, CSP/Solano, HDSP and MCSP) provided access to ten hours or more of yard per week in administrative segregation.  CSP/LAC was close to compliance at 88 percent.  CCI, KVSP, NKSP, SVSP, and RJD were not compliant.

Allowance of electronic entertainment devices remained unchanged.  CSP/Corcoran, HDSP, MCSP, and SVSP continued to permit electronic devices.  KVSP allowed electronic devices in administrative segregation units except in the stand-alone unit.

### D.    <u>Medication Management</u>:

As noted above, a medication management audit tool has been developed through the coordinated work of the *Plata* receiver's staff, the *Coleman* special master's psychiatric experts, and CDCR staff via the MAPIP.  It is designed to encompass all medication administration, including mental health.  The audit tool has been completed, successfully piloted, and should be rolled out system-wide by the end of 2012, at the earliest.  The benefits of the MAPIP audit tool should be apparent once it is in place, institution by institution, given its capacity to greatly support proper distribution and administration of medications.  The tool will help CDCR detect potential system failures in medication administration and to intervene early and efficiently to restore system capabilities.  Another imminent benefit should be the availability of up-to-date relevant

data on medication administration in an organized format, which should thereby streamline upcoming *Coleman* monitoring in this area. Looking ahead, the MAPIP audit tool should also advance CDCR's capacity to take over responsibility for self-monitoring of medication management, which should eventually alleviate the need for outside monitoring in this area.

In the meantime, pending the imminent system-wide roll-out of MAPIP, the monitor and the special master's experts reviewed existing medication management processes in the 12 monitored institutions.  Their findings are summarized as follows.

Medication Continuity for Newly-Arriving Inmates

CIM and HDSP were compliant with providing medications for newly-arriving inmates within 24 hours of their arrivals.  WSP reported that new arrivals received all medical medications by the following calendar day.  Four of five CCI audits indicated that in 100 percent of cases inmates received medications by the next day.

CSP/LAC was noncompliant with medication continuity for newly-arriving inmates.  RJD was noncompliant for inmates transferring in from other CDCR facilities.  CSP/Solano did not audit medication continuity.

Medication Continuity Following Intra-Institutional Transfers

CSP/Corcoran, MCSP, SVSP, and WSP were compliant with medication continuity following intra-institutional transfers.  CSP/Corcoran and HDSP were compliant following MHCB discharges.  CCI indicated that inmates leaving crisis care continued to receive their medications without interruption.  CIM was compliant following moves within administrative segregated housing units, (SHU), or into special housing units, and for transfers out of reception center.  Its overall compliance rate was

87 percent.  NKSP reported that inmates received their medications by the day following their moves.  CSP/LAC, KVSP, and CSP/Solano were nearly compliant.

HDSP and RJD were noncompliant with medication continuity following intra-institutional transfers.  RJD was also noncompliant following MHCB discharges.

Medication Orders

Medication renewal orders were timely at CCI, CSP/Solano, KVSP, RJD, and WSP.  MCSP reported compliance based on a sampling that included EOP, 3CMS, and administrative segregation inmates.  HDSP reported compliance for medication renewals based on completed psychiatry appointments, but staff and inmates reported problems with continuity.  NKSP reported that inmates received new medications by the following day, but the report was not specific to psychotropic medications.  KVSP reported that 87 percent of inmates were provided medications no later than the next business day following a change in medication or dosage.

CSP/LAC was noncompliant with timely medication renewal orders. MCSP indicated noncompliance for receipt of new or changed medications by the following day.

Medication Noncompliance

CSP/LAC reported that referrals and psychiatric follow-up in cases of medication noncompliance satisfied timeframes.  HDSP reported compliance with follow-up of referrals for medication noncompliance.  At SVSP, psychiatrists responded to referrals in a timely manner, but audits indicated that they were not routinely documented on medication administration records (MARs).

Appropriate identification, documentation, referral, and response to inmate medication noncompliance were problematic at many institutions.  CCI, CSP/Corcoran,

CSP/Solano, KVSP, MCSP, NKSP, and WSP were all noncompliant.  CSP/Solano reported that only 14 percent of cases resulted in timely follow-up appointments with a psychiatrist.  RJD did not audit medication noncompliance.

Pill Lines

Pill line lengths and wait times were appropriate at CCI, CIM, HDSP, MCSP, NKSP, and SVSP.  At WSP, waiting times in pill lines ranged from 24 to 95 minutes, and at CSP/Corcoran they lasted up to two hours.  Because CSP/LAC and RJD audits were flawed, pill line waits at these institutions could not be assessed.  KVSP did not use centralized pill lines.

Processing Orders

CSP/LAC and HDSP were nearly compliant with timely processing of orders.  CSP/Solano indicated that 82 percent of orders were filled by the first working day after receipt.

Informed Consent

At CIM, MCSP, and NKSP, patient informed consent forms were present in UHRs.  CSP/Solano reported compliance but there was a lack of information by which to gauge the institution's audit reliability.

CCI, CSP/LAC, and HDSP were noncompliant.  At SVSP, audits indicated noncompliance.  RJD did not conduct audits.

Laboratory Testing

CIM was compliant with ordering of laboratory testing of inmate blood levels for inmates prescribed Depakote and Lithium.  At NKSP, laboratory tests were ordered when clinically indicated for 84 percent of inmates.  CSP/LAC laboratory studies examined blood levels for mood stabilizing medications but not for others.

46

Laboratory testing was noncompliant at CSP/Solano, HDSP, KVSP, and WSP. CCI reported noncompliance with ordering, notation, and scheduling of laboratory studies, but once orders were noted and scheduled, 99 percent of studies were completed. SVSP indicated noncompliance with ordering of blood studies for inmates taking mood-stabilizing medications. RJD did not conduct audits.

<u>Direct Observation Therapy (DOT) Medication Administration</u>

CCI and MCSP were compliant with DOT medication administration protocols, and HDSP was nearly compliant. RJD audits indicated noncompliance. WSP did not provide audit information.

CSP/Solano and MCSP administered all psychotropic medications DOT. At KVSP, all psychotropic medications were prescribed DOT unless they were ordered nurse-administered. HDSP provided conflicting information as to whether all psychotropic medications were prescribed DOT.

MCSP maintained an "enhanced DOT" list for inmates with known histories of medication hoarding or cheeking. At NKSP, DOT was ordered for all inmates in the MHCB unit and mental health temporary housing (MHTH) and during the 90-day period following discharge therefrom, as well as for all inmates on Keyhea orders or at the EOP LOC. At SVSP, all non-formulary medications and any medications deemed to have high potential for abuse were administered DOT, in addition to those medications ordered DOT by the psychiatrist. At CSP/LAC, medications were prescribed DOT for inmates in the EOP or in the MHCB unit, and for 3CMS inmates for whom it was clinically indicated, but no audits of the DOT process were conducted.

NKSP maintained a centralized list of inmates prescribed DOT medications, but MCSP did not.

47

<u>Keyhea Process</u>

The Keyhea process was implemented appropriately at CIM, CSP/Corcoran, MCSP, NKSP, RJD, and SVSP.  At HDSP, Keyhea orders were initiated only in the MHCB unit.

At KVSP, four Keyhea orders were improperly served or contained administrative errors.  At CSP/LAC, three Keyhea petitions were erroneously not completed, and in some instances the Keyhea coordinator was not informed of inmates on Keyhea orders who were entering or leaving the institution.  It was not possible to determine the number of Keyhea petitions that were initiated at WSP based on data provided by the institution.  No Keyhea petitions were initiated, renewed, or expired at CCI.

<u>*Hora Somni/* Hour of Sleep (HS) Medications</u>

Administration of HS medications was compliant at CCI, CIM, CSP/Corcoran, HDSP, MCSP, and SVSP.  RJD and NKSP were noncompliant with HS medication protocols.  CSP/LAC, CSP/Solano, and WSP did not provide information on HS medication administration.

<u>Parole Medications</u>

CIM, CSP/Corcoran, CSP/LAC, HDSP, KVSP, MCSP, RJD, and WSP were compliant with provision of parole medications.  NKSP reported compliance but did not track psychotropic parole medications separately.  CCI reported compliance rates of 80 to 100 percent.

CSP/Solano was noncompliant.  SVSP did not provide audit data.

E.   **Sexual Misconduct:**

The monitored institutions issued 244 rule violation reports (RVRs) related to sexual misconduct during the review period.  Compliance with protocols as to sexual misconduct and indecent exposure (IEX) violations varied.

Mental Health Screens

Mental health screens of all inmates who received sexual misconduct RVRs were completed at CCI, CIM, HDSP, KVSP, MCSP, and RJD.  Ninety-six percent of inmates at CSP/LAC who received sexual misconduct RVRs had screens, as did 83 and 82 percent of NKSP and WSP inmates, respectively.  At CSP/Solano, only two of eight sexual misconduct RVRs were screened.  SVSP did not conduct screens.  All HDSP screens were timely, as were six of seven screens at CIM.  CSP/LAC and KVSP screens were generally not timely.

Interdisciplinary Treatment Team (IDTT) Reviews

IDTT reviews were completed for all inmates who received RVRs for sexual misconduct at CCI, CIM, CSP/LAC, HDSP, RJD, SVSP, and WSP.  MCSP conducted IDTT reviews for only 25 percent of inmates who received mental health screens.

Comprehensive Evaluations

Comprehensive evaluations were completed at CIM, CSP/LAC, MCSP, NKSP, and WSP.  At SVSP, mental health staff evaluated all inmates who received RVRs for IEX to determine whether they met the diagnostic criteria for Exhibitionism.  CSP/Solano diagnosed an inmate with Paraphilia NOS (not otherwise specified) without conducting a comprehensive evaluation.  At CIM and MCSP, the special master's expert reviewed the comprehensive evaluations and found them to be completed adequately.

49

RJD referred three inmates for comprehensive evaluations, but none were completed at the time of the site visit.  One NKSP inmate was awaiting a comprehensive evaluation at the time of the monitor's visit.

Use of Custody-Driven Measures

Numerous institutions continued to employ custody-driven measures, including placards on cell doors and windows, window coverings, and exposure-control jumpsuits.  CCI, CIM, CSP/LAC, HDSP, KVSP, MCSP, NKSP, RJD, and SVSP all reported the routine use of custody-driven measures.  At CSP/Corcoran there was inconsistent use of custody-driven measures.

Referrals and Transfers to Institutions with Exhibitionism Treatment Programs

A total of 18 inmates were referred to Exhibitionism treatment programs. CSP/LAC made seven referrals, NKSP made four, KVSP and MCSP each made three, and SVSP made one.  One WSP inmate who had previously been referred to a treatment program was awaiting transfer at the time of the site visit.  One CSP/LAC inmate with an Exhibitionism diagnosis transferred into a treatment program during the review period.

During the site visit, CSP/Corcoran's Exhibitionism treatment program for SHU inmates included eight 3CMS inmates.  Three EOP inmates who had been identified for treatment were awaiting transfer to programs at CSP/Sac or Pelican Bay State Prison (PBSP).  Group attendance at the CSP/Corcoran Exhibitionism treatment program was sporadic.  One CSP/Solano inmate who was diagnosed with Exhibitionism had transferred from CSP/Sac, where he had completed the treatment program.

Other Treatment

While NKSP did not have a treatment program for Exhibitionism, it provided treatment consisting of weekly clinical contacts provided by a clinician in administrative segregation to inmates awaiting transfer to a treatment program.

District Attorney Referrals

CSP/LAC, RJD and SVSP referred all sexual misconduct RVRs to the district attorney. CSP/Corcoran made 70 referrals, but some of the offenses occurred during the preceding monitoring period. At WSP, all screened sexual misconduct RVRs were referred to the district attorney. NKSP referred 20 percent of screened sexual misconduct RVRs, while two other inmates were pending district attorney referral. CCI did not refer sexual misconduct RVRs to the district attorney.

**F.    Access to Higher Levels of Care:**

In the area of access to higher levels of care, the special master's work during the Twenty-Fourth Round proceeded simultaneously on two distinct but parallel tracks. As noted above, the special master and three of his experts were engaged in the defendants' development of their plan for addressing access to inpatient care and for a sustainable process of self-monitoring. The considerable progress of that project is discussed above on pages 3 through 10. As that project was proceeding, Twenty-Fourth Round monitoring went forward, with conduct of the usual on-site examination of the institutions' movement of seriously mentally ill inmates into necessary higher levels of care.

Preliminary indications are that access to inpatient care has generally improved significantly since the time when the monitor was gathering the information the findings discussed below. While reading the discussion below on the monitor's findings

51

on access to inpatient care at the visited institutions, the reader should keep in mind that the defendants' plan was being developed at the same time that the monitor was conducting his examination.  Plan strategies had not yet taken root in institutional practices.

   With that said, during the Twenty-Fourth Monitoring Period, the monitor found that defendants' compliance with protocols designed to encourage more consistent consideration of DMH intermediate care services improved overall but continued to show some unevenness.

   All visited prisons had assigned at least one person to assume the responsibilities of DMH coordinator.  DMH coordinators typically focused on maintaining DMH referral logs, assisting with the completion of referral packets, and completing performance audits.

   Compliance with DMH logging requirements was adequately maintained or notably improved at nine prisons (CCI, CIM, CSP/LAC, HDSP, KVSP, SVSP, WSP, RJD and CSP/Solano).  DMH referral and/or non-referral logs at CSP/Corcoran, MCSP, and NKSP were incomplete or inaccurate.

   Completion of Form 7388-B and its inclusion in the IDTT review process had become routine at all of the visited prisons.  However, the forms were often incomplete and/or inaccurate, thereby limiting their utility as prompts for considering referral to DMH.  Form 7388-Bs at CIM, CSP/Corcoran, CSP/LAC, NKSP, RJD, and WSP frequently did not accurately reflect available information related to MHCB admissions, alternative housing stays, EOP program participation, and RVR activity. Clinical rationales for non-referred cases were not consistently documented at HDSP, MCSP, and RJD, and the recorded rationales at CIM were inadequate.  Alternative

clinical interventions for non-referred cases were not routinely identified at CCI, HDSP, KVSP, MCSP and RJD, and interventions documented on Form 7388-B at CSP/Corcoran often were not carried over to treatment plans.

Most prisons had difficulty meeting the timeframes for completing acute and intermediate care referrals.  CIM, CSP/Corcoran, CSP/LAC, CSP/Solano, KVSP, MCSP, RJD, and SVSP did not consistently complete acute care referrals within two days. Two prisons, HDSP and NKSP, routinely met the deadline for completing acute care referrals.  CIM, CSP/Corcoran, CSP/LAC, HDSP, MCSP, NKSP, RJD, and SVSP did not consistently meet the five-day timeframe for completing intermediate care referrals.  CCI, CSP/Solano, and KVSP routinely completed intermediate care referrals within five days.

The number of acute care referrals varied considerably among the 12 visited institutions.  WSP generated the most with 48, followed by 28 at CSP/LAC, 19 at NKSP, and 16 at KVSP.  CIM, MCSP, and RJD produced ten to 15 acute care referrals, followed by six at HDSP, four at CSP/Solano, three at CSP/Corcoran, and two at SVSP. CCI did not generate any acute care referrals during the reporting period.

The number of rescinded referrals declined in most prisons, but comprised 62 percent of all acute care referrals at RJD.  Access to acute care beds continued to be slow in many cases.  The percentage of acute care referrals that transferred to DMH within ten days of referral reached a low of 15 percent at KVSP, followed by 40 percent at HDSP and 55 percent at MCSP.  The average time elapsed between referral and transfer to acute care was 17 days at RJD.  Referrals involving gravely disabled inmates who were not suicidal were considered low priority and typically languished for several weeks on the acute care waiting list.  There were three inmates at WSP waiting for acute

hospital beds, all of whom had been waiting about 100 days at the time of the monitor's visit. Similarly, there were three inmates at HDSP at the time of the site visit who had been awaiting transfer to DMH acute care for 98 days, 35 days, and 28 days, respectively.

The number of intermediate care referrals also varied widely among the monitored prisons. CIM and RJD generated the most intermediate care referrals, with 62 and 57, respectively. WSP produced 37 intermediate care referrals, followed by 16 at CSP/LAC, 15 at NKSP, 12 at MCSP, ten at SVSP, eight at HDSP, six at HDSP, and two at KVSP and CSP/Solano. Access to the low-security intermediate care beds at CMF and ASH was adequate in most cases. The number of inmates on SVPP's wait list declined from a high of 187 in June 2011 to a low of 128 in November 2011, for a 16-percent drop. Nonetheless, the average number of inmates on SVPP wait list remained high, at 159, and slow access to intermediate care for high security inmates was a serious and stubborn area of noncompliance during the time of the Twenty-Fourth Monitoring Round.

Due to prolonged waits for high security intermediate care beds and the likelihood of intervening events (e.g., parole, transfer to another prison, admission to acute care, clinical stabilization), DMH logs often failed to record the disposition of pending SVPP referrals. Transfer data from the few prisons that managed to maintain complete logs confirmed continued poor compliance in this area. The percentage of intermediate care transfers that occurred within 30 days of referral was 41 percent at RJD, 50 percent at MCSP, and 66 percent at HDSP. None of the six SVPP transfers from CCI met the 30-day deadline.

A substantial decline in the number of DMH referrals from some prisons was reported, to varying degrees, to be the byproduct of clinician frustration with SVPP's

long wait list.  When compared to reports from the Twenty-Third Monitoring Round, the number of DMH referrals was down 83 percent at CSP/Corcoran, 61 percent at SVSP, and 40 percent at NKSP.  The number of intermediate care referrals generated by KVSP dwindled from 24 during the Twenty-Second Reporting Period to a total of three during the Twenty-Third and Twenty-Fourth Reporting Periods, none of which resulted in transfer to DMH.

Ten of the 12 visited prisons had licensed MHCB units.  CIM had a temporary MHCB unit with 36 mental health crisis beds, and CCI had an OHU with 11 mental health beds.  Among the ten prisons with licensed MHCB units, CSP/Corcoran, CSP/Solano, HDSP, and SVSP had more than enough capacity to accommodate their local inmate populations, as exemplified by their lack of use of alternative holding areas pending MHCB admission.  More than half of the MHCB admissions at HDSP and SVSP were from outside prisons, followed by 43 percent at CSP/Solano and eight percent at CSP/Corcoran.

MHCB units at CSP/LAC, KVSP, MCSP, NKSP, RJD, and WSP were too small to accommodate local demand for acute crisis care. These prisons used alternative holding areas to monitor inmates for whom crisis beds were unavailable.  Placements in alternative holding areas were reported to number 658 at NKSP, 406 at WSP, 145 at MCSP, 128 at CSP/LAC, 99 at KVSP, and 81 at RJD.  The alternative holding area at NKSP was so busy that a ten-bed overflow unit was activated in April 2011.  It held as many as seven inmates during the review period.  Average length of stay in the alternative holding areas ranged from one to two days, though stays of one to two weeks were not uncommon.

The 36-bed temporary MHCB unit at CIM was also too small to accommodate the local demand for crisis care. Inmates for whom MHCBs were unavailable were placed in an alternative holding area, known locally as Transitional Bed Housing (TBH). The number of TBH placements fell by 52 percent to 147 during this monitoring period, and 83 percent of the TBH placements were transferred to a bed within CIM's temporary MHCB unit.

CCI used an unlicensed OHU to monitor suicidal and psychiatrically unstable inmates. Inmates deemed after a period of observation to require acute crisis care were transferred to outside MHCB units. There were 191 OHU placements during the review period, 35 percent of which lasted longer than 72 hours. Most, or 82 percent, of the excessive OHU stays involved inmates who were waiting for placement in an outside MHCB unit. There were 79 instances in which inmates were transferred from the OHU to outside MHCB units. CCI used four alternative holding cells located in the SHU to monitor inmates for whom OHU cells were not available. There were 26 instances in which inmates were placed in these cells for crisis monitoring that consisted of continuous, one-to-one observation.

CSP/Corcoran, CSP/LAC, MCSP, RJD, and SVSP operated EOP hubs, and EOP inmates in these institutions had timely access to these programs. The remaining prisons – CCI, CIM, CSP/Solano, HDSP, KVSP, NKSP, and WSP - had poor access to EOP hubs. Only four of 25, or 16 percent of, hub transfers from CIM and three of 12, or 25 percent of, hub transfers from CSP/Solano occurred within 30 days of placement in segregation. The average lengths of stay of EOP inmates in segregation at NKSP and WSP were 103 days and 154 days, respectively. Twenty of 35 EOP inmates in segregation at KVSP at the time of monitor's visit had been there longer than 90 days.

HDSP and CCI did not reliably track lengths of stay or transfers for EOP inmates in segregation.

MCSP was the only prison that consistently met the Program Guide timeframe for PSU transfers, with ten of 11 transfers occurring within 60 days of endorsement. CCI and WSP reported a combined total of four PSU transfers, none of which occurred within 60 days of endorsement. There were 20 PSU transfers from CSP/LAC, which took place, on average, within 99 days of endorsement. At the time of the monitor's visit, CCI and SVSP had a combined total of 18 inmates with current PSU transfer endorsements, all of whom had been waiting longer than 60 days.

Two prisons without mainline EOP programs – CSP/Solano and HDSP – transferred a combined total of 127 EOP inmates, 119, or 94 percent, of whom waited 60 days or less. Prisons with EOP programs did not fare as well. Five of 14, or 36 percent of, EOP inmates transferred from MCSP and eight of 15, or 53 percent of, EOP inmates transferred from SVSP waited longer than 60 days, often in non-EOP or SHUs.

Seven of the 12 visited prisons operated reception centers, none of which consistently transferred MHSDS inmates within Program Guide timeframes. The percentage of EOP inmates who waited longer than 60 days to be transferred from a reception center reached 64 at CSP/LAC, followed by 44 at NKSP, and 23 at HDSP. The average length of stay of EOP inmates transferred and paroled from CIM's reception center was 93 days. At the time of the monitor's visit, 64 percent of the EOP inmates in the reception center at CSP/LAC had been there longer than 60 days, followed by 49 percent at WSP, and 46 percent at NKSP. RJD did not reliably track length of stay or transfers for EOP inmates in its reception center.

A quarter of the 3CMS inmates transferred from the reception centers at HDSP and WSP waited longer than 90 days.  At the time of the monitor's visit, 65 percent of the 3CMS inmates in the reception center at WSP had been there longer than 90 days, followed by 37 percent at CSP/LAC.  CCI and CIM reported average reception center stays of 72 days and 76 days, respectively, for 3CMS inmates.  NKSP and RJD did not provide transfer or length of stay information for 3CMS inmates in their reception centers.

Six of 12 visited prisons had difficulty providing accurate and complete mental health referral tracking reports.  HDSP provided two sets of tracking reports, each with different compliance rates for routine, urgent, and emergent referrals.  CIM and CSP/Corcoran reported that MHTS.net referral data were unreliable, and WSP reported a discrepancy between MHTS.net data and separately maintained referral tracking logs.  KVSP reported that performance was under-reported because MHTS.net used calendar days instead of working days to produce compliance rates.  NKSP acknowledged that referral data were not routinely entered in MHTS.net prior to August 2011.  In contrast, referral tracking at RJD and SVSP was notably improved.

Referral data, while flawed in many instances, indicated that seven of 12 prisons struggled to respond to routine referrals within five working days.  WSP reported the lowest compliance rate, responding to 43 percent of routine referrals within five working days, followed by CSP/Corcoran with 44 to 58 percent, CSP/Solano with 50 percent, NKSP with 57 percent, CSP/LAC with 58 percent, KVSP with 65 percent and MCSP with 67 percent.  CCI, CIM, RJD, and SVSP responded timely to more than 80 percent of routine referrals.  HDSP was the sole prison to reach a compliance rate of 90 percent.

Three of the 12 prisons – CSP/Corcoran, RJD and SVSP – reported compliance rates of 90 percent or above for responding to urgent referrals within 24 hours.  CIM reported a compliance rate of 81 percent, followed by CCI, HDSP, and KVSP with 70 to 79 percent, CSP/Solano and MCSP with 68 and 63 percent, respectively, CSP/LAC with 59 percent, and WSP with the lowest reported compliance rate of 38 percent.

CSP/Corcoran did not provide performance data for emergent referrals. NKSP reported receiving no emergent referrals during the review period.  Of the remaining ten prisons, six (CSP/LAC, CSP/Solano, KVSP, MCSP, RJD, and WSP) responded within four hours to more than 90 percent of emergent referrals.  The remaining four institutions (CCI, CIM, HDSP, and SVSP) reported compliance rates of 80 to 89 percent.

## **CONCLUSION**

During the Twenty-Fourth Monitoring Period, there continued to be significant developments affecting the delivery of mental health care to CDCR inmates, some producing imminent results, and some having far-reaching implications.  One such notable development is the realignment of the prison population that is occurring through use of the county jail facilities.  There have been preliminary indications that one of the effects of realignment has been declines in the census at the institutional reception centers.  The population reductions brought about by realignment should allow for more rapid movement of incoming inmates at the EOP LOC into the EOPs in the CDCR system.  The time may be approaching when monitoring of defendants' reception center EOP will no longer be needed, if inmates at the EOP LOC can be consistently transferred to EOPs within Program Guide timeframes.  The reception center EOP was originally

conceived to close the gap in treatment for EOP inmates who needed care but were languishing for long periods of time in reception centers while waiting for transfer to an EOP.  If these transfers can be made consistently within Program Guide timeframes, the rationale for monitoring reception center EOPs may no longer exist, and the defendants' clinical and administrative resources that have been devoted to it can be redirected to other areas that remain in need.  The special master will examine the timeliness of EOP transfers from reception centers in the upcoming monitoring period, from the perspective of potentially ending monitoring of the reception center EOP.

Because of this effect of realignment, for example, as well as others, it is time to consider a departure from the past monitoring format that has been in place for years.  This shift should be toward streamlining monitoring by the special master, as CDCR institutions begin to take on an increasing role in self-monitoring and begin their move toward assuming responsibility for all of it.

In addition, Twenty-Fourth Round monitoring found that the progress noted in some of the focus areas during recent monitoring rounds was being sustained. One of these areas was institutional response to inmate sexual misconduct.  Overall, institutional adherence to protocols in this area has reached a level which indicates that monitoring of institutional response to cases of inmate sexual misconduct need not continue as part of regular *Coleman* monitoring.  Appropriate mental health screens, IDTT reviews, comprehensive evaluations, and referrals to Exhibitionism treatment programs are generally being provided as needed.  Accordingly, the monitor will not be reviewing institutional response to inmate sexual misconduct in the upcoming Twenty-Fifth Round of monitoring.

An area that remains troubling, however, is the apparent ongoing proliferation of alternate treatment settings for inmates who require the level of crisis care that is normally provided in an MHCB.  Inmates who need placement in an MHCB require a high LOC, as it is most often signs of suicidality which prompt the referral to an MHCB.  Typically, the alternate treatment setting is an OHU or mental health outpatient housing unit (MHOHU).  Other examples of such alternate settings are the CIM transitional bed housing (TBH) unit, which is alternate housing for patients for whom there is no bed available in the CIM temporary MHCB unit, and the NKSP mental health temporary housing unit (MHTH), where patients who were referred to the MHCB unit may be placed if they are not admitted to the MHCB.  Care provided in alternate treatment settings does not meet the LOC that is given in an MHCB.

The special master's concern with use of these types of placements in lieu of an MHCB is not new.  In 2008, in the special master's Twentieth Round Monitoring Report, Part A, he requested and was granted the entry of an order concerning the tracking and follow-up of inmates placed in alternate housing, who often languish in such units while they need – and await – care in an MHCB.  *See Special Master's Twentieth Round Monitoring Report, Part A*, p. 364, filed September 12, 2008, Docket No. 3029. Since that time, monitoring during the ensuing Twenty-First through Twenty-Fourth rounds has not found that alternate treatment settings are being reduced or phased out, but if anything, their use may be increasing.  In light of the significant potential for dangerous gaps in crisis-level care that is posed by placements in these alternate settings, the special master is going to examine them closely during his upcoming Twenty-Fifth Round of monitoring.

In its June 15, 2012 order concerning modification of existing mental health bed plan orders, the *Coleman* court noted the concern raised by the special master and plaintiffs with regard to defendants' use of alternative placements and OHUs for inmates who require crisis-level care.  Among the things ordered by the court, as summarized above, defendants are required to continue working with the special master to address the issue of incorporating defendants' use of OHUs and alternative placements for patients who may need crisis-level care into the projections of need for MHCBs.  The court ordered that, to the extent that this process identifies increased MHCB need above the Spring 2012 projections, defendants must ensure that adequate MHCBs are provided to meet such need, and may use excess capacity in their revised bed plan to satisfy that need.  Plaintiffs are to be included in this process as appropriate.

As referenced above, the subject of paper reviews needs to be revisited in the context of its larger purpose.  The ultimate goal of *Coleman* monitoring is to eventually render itself obsolete as more and more institutions attain adequate compliance levels and are prepared to assume self-monitoring responsibilities.  CIW and CMC have made progress toward that goal and are currently on hybrid review status.  If they continue to perform well, they will be moved onto full paper review status.  The hope is that as more institutional mental health programs progress toward adequately higher levels of functioning, they too will be shifted to a self-monitoring and reporting status.  If their progress proves to be stable and maintainable, the special master's oversight will no longer be needed, and monitoring and review of institutional performance will eventually be turned back over to CDCR.  Development of a good sustainable paper review process is an important step toward that goal.  In the meantime,

pending further progress with the paper review process, no additional institutions will be placed on hybrid or paper review status at this time.

In the area of quality management, it has become apparent over the past several monitoring periods that CDCR institutions have generally succeeded with establishing and maintaining the foundations of the quality management framework that was conceived early in the remedial process. The initial goals of establishing the basic infrastructure of quality management appear to have been realized. Across institutions, local governing bodies, quality management committees, and mental health subcommittees are in place and are generally meeting regularly and drawing good attendance. QITs are being chartered and used appropriately. Peer review is generally taking place.

One important aspect of quality management which needs more work is the institutions' ability to use MHTS.net. Although MHTS.net itself is completed and in place, the monitor's reports continue to indicate that the great capabilities of this web-based information management system are still under-utilized and continue to elude system users.[9] Mastery of this electronic tool should be a priority for the defendants. When used to its full potential, it can be an indispensible aid in the attainment of a sustainable quality improvement program on a going-forward basis. The special master urges defendants to undertake whatever training programs may be necessary so that full advantage can be taken of this important tool.

---

[9] For example, CDCR developed an auditing tool to measure institutional rates of concordance between UHRs/eUHRs and MHTS.net. While CDCR should be commended for this effort, it was discovered in the course of the assessment of the DMH referral process that results of this audit were not reliable. Consequently, defendants suspended this audit, and its results during the twenty-fourth monitoring period are not reported herein.

In their comments and objections to the draft Twenty-Fourth Round Monitoring Report, defendants objected on the ground that the report "lacks clear benchmarks and qualitative analysis designed to assist Defendants in achieving Program Guide requirements."  This criticism is somewhat difficult to reconcile with the record of defendants' tepid implementation of past feedback and recommendations from the special master.  On the one hand, defendants complain that they do not know what is required of them in clear and practicable terms, and that the special master is not giving them the kind of analysis which can show them why they are falling short of benchmarks.  Yet, year after year, they continue to resist implementation of the practices recommended by the special master and his staff which are geared to bring them into compliance.  Simply stated, defendants cannot have it both ways.

Insofar as "clear benchmarks," defendants need not await the issuance of the special master's compliance reports to learn the standards of mental health care which they are required to meet.  These benchmarks are well-known to them, as they are found in the Program Guide and in relevant orders of the *Coleman* court.  If the Program Guide and the orders are not enough by themselves to set the benchmarks, the record of *4,204* docket entries in this case, including *302* orders, and *107* reports by the special master, certainly provide a wealth of information by which defendants can be guided.  Thus, what defendants mean by their complaint of a "lack of clear benchmarks" is mystifying.

Defendants' objection and criticism that the special master's report lacks "qualitative analysis designed to assist Defendants in achieving Program Guide requirements" is equally impenetrable.  As stated above, the special master and his experts have been examining defendants' practices with the delivery of mental health care in CDCR for years and telling defendants where they are falling short.

64

If there is a positive side to this objection, it perhaps implies a tacit acknowledgment that a more qualitatively-oriented, rather than quantitatively-oriented, form of CDCR's own quality management function is called for at this stage of the remedial process.  It is consistent with the special master's recommendation, set forth below, that defendants be ordered to review and assess their existing quality assurance process and to develop, under the guidance of the special master and his staff, a quality improvement process designed to detect and address issues with the quality of mental health care that is being delivered in CDCR institutions.  An important goal of the remedial phase of this case is, after all, for CDCR itself to assume the mantle of ultimate responsibility for diagnosing of its own problems, i.e. conduct its own "qualitative analysis," and create a quality improvement process that it can use to achieve and maintain compliance, and move on to eventual removal from federal court oversight.

It is now time for the quality management function within CDCR institutions to begin moving in the direction of being monitored by the CDCR Division of Correctional Health Care Services.  The goal should be the creation of a quality management process that can detect and address issues in mental health care from a quality *improvement* perspective, in contrast to merely a quality *assurance* perspective, which is what it has been.  While quality assurance is an important component of a quality improvement process, it generally focuses on the presence or absence of various elements -- for example, what percentage of Form "Xs" were completed, or how many inmates received a mental health screening within 24 hours of admission, etc.  That is to say, it tends to quantify deficiencies in performance.  Quality improvement, on the other hand, focuses on identifying not only problem areas but also on improving current health care to make it more effective and efficient.  The quality improvement process might well

65

benefit from being coordinated at the CDCR HQ level for a variety of reasons, including

systems-planning purposes and general systems-management and systems-supervision

issues.  The transition should be viewed as a next step in the evolution of a sustainable

quality management process that CDCR can eventually use to assess its own levels of

functionality, detect problems early, and resolve them efficiently, i.e. as the backbone of

its own future self-monitoring process.  With its own quality improvement process in

place, CDCR will undoubtedly enhance its ability to maintain and continue the progress

that it has made in the delivery of mental health care over the past several years.

## <u>RECOMMENDATIONS</u>

In view of the foregoing, the special master recommends that the *Coleman*

court enter an order requiring defendants to review and assess their existing quality

assurance process, and to develop an improved quality improvement process by which it

can detect and address issues with the quality of the care that is delivered, as described

above.  The quality improvement process should be developed from the standpoint of it

being the beginning of a transition by CDCR into self-monitoring by its own DCHCS.  It

should include, but not be limited to, the development of a process for improved

document production for institutional paper reviews, so that the provided information is

clear, consistent, responsive to the special master's document request, and useful for the

assessment of institutional levels of compliance.  The defendants' review and assessment

of their existing quality assurance process, and the development of an improved quality

improvement process, should be carried out under the guidance of the special master and

his staff, with participation and input of the *Coleman* plaintiffs, during the six-month period following the entry of such order.[10]

As discussed above, the special master vigorously disputes the defendants' general objections to this report.  The time and effort consumed in having to respond to these extraneous objections serves no purpose other than to needlessly increase the size of a report which defendants already contend is too long, delay the filing of this report which defendants already contend is too late, and waste the court's time in having to entertain and rule on these objections.  With a view toward avoiding such needless repetition and waste of resources in the future, the court may wish to acknowledge these objections as an effort by defendants to preserve them for the record *pro forma*, thereby alleviating any perceived need for them to be reasserted in the future.  It is now time for defendants to direct their energy away from crafting unnecessary objections and toward focusing on attaining compliance in this case.  At this late stage in the remedial process, defendants would be remiss to do anything less.

Respectfully submitted,

Date: July 2, 2012

_____
Matthew A. Lopes, Jr., Esq.
Special Master

---

[10]In defendants' comments and objections in response to the draft version of this report, they "invite the Special Master to review the (*Plata* receiver's) revised quality assurance process in coordination with CDCR and the Receiver.  This coordination will allow the quality assurance process to be evaluated without duplicating planned revisions or creating conflicting systems."  The Special Master intends to utilize the coordination process to the fullest extent possible to facilitate the creation of a quality improvement process for mental health that is consistent and harmonious with the receiver's quality assurance process and in no way unnecessarily duplicates it or conflicts with it.

**APPENDIX A**

## <u>INSTITUTIONAL SUMMARIES</u>

**High Desert State Prison (HDSP)**
September 27, 2011 – September 29, 2011

Census:

HDSP reported that on September 27, 2011, it housed 4,279 inmates, for a two-percent increase since the preceding monitoring period. HDSP's mental health caseload population was 953 inmates, which was an eight-percent increase in the mental health population. There were nine mainline EOP inmates and 706 mainline 3CMS inmates. The MHCB unit housed four inmates. The administrative segregation population of 289 included seven EOP and 71 3CMS inmates. The reception center population of 575 included seven EOP and 149 3CMS inmates.

Staffing:

There were ten vacancies among the 52 allocated mental health positions, for a 19-percent institutional vacancy rate in mental health. Contractors provided an additional 4.5 full-time equivalent (FTE) coverage, reducing the functional vacancy rate in mental health to 11 percent.

Positions for the senior psychiatrist and chief psychologist were filled, as were both senior psychologist positions. All five staff psychiatrist positions were vacant. Contractors provided an additional 3.5 FTE coverage, reducing the functional vacancy rate to 30 percent.

Fifteen of 16 staff psychologist positions were filled. Use of contractors reduced the staff psychologist functional vacancy rate to zero. Six of seven social worker positions were filled.

Positions for the senior psych tech and all nine psych techs were filled. The one recreation therapist position was filled, as were six of nine mental health clerical positions.

HDSP utilized a weekly average of 48 hours of psychiatry telemedicine.

Quality Management:

The local governing body met six times, was chaired by the CEO, and always had a quorum.

HDSP reported forming a quality management executive committee in March 2011.  The executive committee was typically scheduled to meet monthly, within one week of the quality management committee meeting.  Membership included all quality management committee subcommittee chairpersons, the associate warden for healthcare, the healthcare captain, and a representative from healthcare education.

The quality management committee was chaired by the CEO and always had a quorum.  It met ten times and its executive committee met four times.  The quality management committee reviewed mental health statistics, personnel appeals and vacancies, contract psychiatry hours, mental health audit results, and MHCB admissions and statistics.  Its executive committee addressed audits, surveys, CAPs, and quality initiatives, and chartered QITs.  Staff reported that quality management information was disseminated to line staff at staff meetings.

The mental health subcommittee met six times.  It was chaired by the chief of mental health and always had a quorum.  The mental health subcommittee routinely addressed personnel issues, telemedicine, MHCB admissions, mental health audit compliance, QITs, medication management, custody issues, peer review, and training.  Mental health subcommittee meeting minutes were submitted to the quality management committee.

There were five QITs, three of which were chartered during the review period.  Of these three, one investigated the high number of psychotropic medication

refusals, another QIT evaluated and revised institutional mental health audits, and the third addressed concordance between data from the MHCB unit that was entered into MHTS.net and data found in UHRs.  The two QITS chartered prior to the review period addressed noncompliance in the reception center EOP and 3CMS programs and PC contacts in administrative segregation.

Peer review was co-chaired by a psychologist and social worker.  It met five times and reviewed ten clinicians.

Suicide Prevention:

There was one completed suicide at HDSP during the review period.

The SPRFIT met monthly, had good attendance, and maintained meeting minutes.  SPRFIT agenda items included completed suicides and CAPs, suicide attempts, five-day follow-up, MHCB admissions and discharges, DOT, and review of EOP inmates housed in administrative segregation.  Actions undertaken by SPRFIT included training and the monthly suicide prevention video conference.

The ERRC met eight times.  Emergency medical response drills were also conducted.

A hand-written log of clinical five-day follow-up, and the institution's management report, indicated compliance for all but one day during the review period.  Because clinicians did not complete MHTS.net tracking sheets, MHTS.net data reflected a 22-percent compliance rate for clinical five-day follow-up.  The chief of mental health also monitored and tracked custody checks and noted compliance for the review period.

In administrative segregation, documentation indicated 86-percent compliance for daily morning meetings between mental health staff and custody supervisors.

71

UHR audits indicated a 44-percent compliance rate for completion of pre-placement screens, and a 45-percent compliance rate for completion of the 31-item screen.

Staff reported that administrative segregation inmates were placed in cells that had been retrofitted to be suicide-resistant, and in other available cells when retrofitted cells were already occupied.  Cells of newly-arrived inmates were appropriately marked for three weeks.

Documentation of 30-minute welfare checks was problematic.  Many forms contained blank spaces.  These checks did not appear to be appropriately staggered.  There was documentation of daily psych tech rounds.

Administrative segregation cells were equipped with electrical outlets.

Inmates in administrative segregation were offered approximately 3.5 hours of yard three times per week.  Review of 114D forms indicated many refusals.

<u>Medication Management</u>:

At the end of the review period, 608 mental health caseload inmates were receiving psychotropic medications.  Audits found a 93-percent compliance rate for medication continuity for newly-arriving inmates, and an 84-percent compliance rate for medication continuity following intra-institutional moves.  HDSP reported compliance with medication continuity after MHCB discharges.

The institution reported 100-percent compliance for timely medication renewals, but staff and inmate interviews indicated difficulties with them.

HDSP reported an average of 6.5 notifications of medication noncompliance per week.  It further reported that 99 percent of these cases were seen

within seven days of referral for follow-up.  Although some MARs noted medication noncompliance, there was no documentation of mental health referral and follow-up.

Audits indicated average pill line waits of ten minutes on yard A, three minutes on yard B, and two minutes on yards C and D.

According to audits, there were compliance rates of 88 percent for timely processing of medication orders, and 67 percent compliance for timely obtaining of informed consent forms.

Audits confirmed that appropriate laboratory testing of inmate blood levels of mood stabilizing and antipsychotic medications occurred 73 percent of the time. Psychiatrists reviewed laboratory results and documented clinical action in only 45 percent of cases which had significant laboratory test results.

DOT protocols were followed in 86 percent of cases.  Information was conflicting as to whether all psychotropic medications were prescribed DOT.

Inmates were placed on Keyhea orders only in the MHCB unit.  During the monitoring period, one inmate was on an active Keyhea order and another arrived while on an active order.

At the end of the review period, 221 mental health caseload inmates had prescriptions for HS medications.  HDSP reported compliance with HS medication time requirements, but inmate interviews did not confirm this.

Seventy-six inmates paroled with psychiatric medication prescriptions. Ninety-five percent of existing medication orders were renewed for 30 days, and 98 percent of paroling inmates who received parole medications signed receipts.

73

Sexual Misconduct:

Twelve inmates received sexual misconduct RVRs.  All received mental health screens within 72 hours of the incident, and IDTT reviews.  None of the cases were referred for a comprehensive evaluation.

There were no diagnoses of Exhibitionism or Paraphilia NOS.  HDSP did not provide individual or group treatment related to sexual misconduct for inmates who did not meet the diagnostic criteria for Exhibitionism.

Custody-driven behavioral modifications included yellow placards on cell doors and exposure-control jumpsuits.

Transfers:

A psychologist served as the DMH coordinator and supervised the DMH referral process.  This was a part-time position that consumed approximately 25 percent of the DMH coordinator's time.

Of the 42 inmates who had one or more indicators for consideration for higher LOC, 11 were referred to DMH.  Six were referred to acute care and five were referred to intermediate care.  All six acute care referrals and three of the intermediate care referrals were timely.  No referrals were rejected.  Two were rescinded.

Five of the six acute care referrals resulted in transfers, with two of them timely.  At the time of the site visit, there were three inmates who had been awaiting transfer to acute care for 98 days, 35 days, and 28 days, respectively.  Although gravely disable, these inmates were not actively suicidal and therefore were considered lower priority for transfer to acute care.  Three of the five intermediate care referrals resulted in transfers, with two of them timely.  At the time of the visit, there were three inmates at

HDSP who had been awaiting transfer to intermediate care for 120 days, 73 days, and 59 days, respectively.  There were no Vitek hearings.

The DMH coordinator reviewed the non-referral rationales of all inmates who were not referred to DMH.  Review of the non-referral log indicated that it was well-maintained and included rationales for non-referrals.  An audit of 25 non-referred cases found that reasons for non-referral were documented on the Form 7388-B in 73 percent of cases.  In 34 percent of cases, clinical interventions were documented.

There were three institutional audits of Form 7388-Bs for accuracy of completion.  They found accuracy rates of 67, 68, and 87 percent, respectively.

One inmate returned from DMH during the monitoring period.

HDSP had ten MHCBs and three safety cells.  No MHCBs were used for long-term medical patients.  There were 142 MHCB admissions, with 70 from HDSP and 72 from other institutions.  The MHCB unit had an average daily census of 6.2 inmates and an average stay of just over 8.5 days.  Nineteen stays in the MHCB unit exceeded ten days, with the average stay lasting 30.68 days.

The institution did not report any delays in MHCB access.  Sixty-two of the 65 cases of administrative delays following MHCB discharge were due to transportation issues.  Fifty-seven were delayed by one day and five were delayed by two days.

One EOP inmate was awaiting PSU transfer during the review period.

Reports regarding the lengths of stay and transfer of MHSDS inmates in the reception center were difficult to decipher.  It appeared that HDSP's reception center processed approximately 90 EOP inmates during the reporting period, a quarter of whom waited longer than 60 days to be transferred.  The reception center processed 626 3CMS

75

inmates, of whom 479 were transferred to 3CMS programs and 147 were released from prison. Approximately 20 percent of the inmates transferred to 3CMS programs waited longer than 90 days, and about 43 percent of the inmates released from prison had reception center stays that exceeded 90 days.

Another 103 EOP inmates appeared to have been transferred from mainline during the reporting period. Six of these inmates waited longer than 90 days.

Other Issues:

Reception Center

Reception center EOP inmates were clustered in designated housing units. Audits found compliance rates of 82 percent for initial IDTT meetings, 100 percent for initial psychiatry contacts, and 78 percent for initial PC contacts. Other audits found compliance rates of 96 percent compliance for subsequent IDTT meetings, and 92 and 80 percent for subsequent psychiatry and PC contacts, respectively.

There were no weeks during the review period when reception center EOP inmates were offered or attended an average of at least five hours of weekly structured therapeutic activity.

For 3CMS inmates in reception center, audits found compliance rates of 76 percent for initial assessments, 100 percent for initial psychiatry contact, and 24 percent for initial PC contacts. Other audits found compliance rates of 99 percent and 53 percent for subsequent psychiatry and PC contacts, respectively.

Administrative Segregation

Audits found that IDTT meetings were timely and well-attended. Inmates were seen weekly by PCs, in confidential settings 65 percent of the time. Some group therapy conducted by psych techs was offered.

HDSP did not track lengths of stays or transfer times to hub institutions.

MHCB

Patients had daily contact with the psychiatrist and psychologist.  Initial IDTT meetings were conducted with necessary participants present.  Recreation therapy was provided.  Access to yard and the dayroom was unclear.  Inmates were handcuffed during IDTT meetings and movement to and from them.

3CMS

As of July 31, 2011, HDSP housed 725 3CMS inmates in mainline.  The compliance rate for initial IDTT meetings was 83 percent.  Annual IDTT meetings were compliant.  Psychiatrists and PCs generally attended meetings.  The rate of inmate attendance was 76 percent.  Audits did not document attendance by Correctional Counselor Is (CC Is).  Treatment plans were variable in quality.

Institutional audits, inmate interviews, and UHR reviews indicated a compliance rate of at least 95 percent for quarterly PC contacts. Contacts frequently occurred in the dayroom or sergeant's office, limiting privacy.

Space for group therapy was limited.  Some 3CMS inmates housed on A-yard received group therapy, but some housed on C-yard did not.

Referrals

HDSP data indicated that there were approximately 2,560 referrals. Conflicting data indicated compliance for 77, or 83 percent of, emergent referrals; 74, or 77 percent of, urgent referrals; and 87, or 92 percent of, routine referrals.

Heat Plan

HDSP maintained heat logs that documented virtually all housing units' inside temperatures for May, June, and July 2011.  It reported no days during these three

months when the temperatures inside any of the units were 90 degrees or higher.  HDSP

provided a list of inmates who were taking heat-sensitive medications and issued them

heat cards.

RVRs

HDSP reported issuing a total of 975 RVRs.  Among RVRs issued to

caseload inmates, four were to inmates in the MHCB unit, 18 were to EOP inmates, and

224 were to 3CMS inmates.  Mental health reported that custody provided information on

RVRs for only cases in which a mental health assessment was done.  All four MHCB and

18 EOP inmates, 49 3CMS inmates, and four non-MHSDS inmates received assessments.

HDSP did not audit whether penalties were mitigated due to mental health

considerations.

Pre-Release Planning

HDSP reported that staff often called parole agents to discuss pre-release

planning and inmate needs such as transportation, housing, and continued treatment.

Inmates were provided with a list of local resources.  Transitional Case Management

Program (TCMP) was often contacted to assist paroling inmates.

**Mule Creek State Prison (MCSP)**
January 23, 2012 – January 25, 2012

Census:

MCSP reported that on January 20, 2012, it housed 3,399 inmates, for a

four-percent decrease since the preceding monitoring period.  MCSP's mental health

caseload population was down by three percent, at 1,837.  There was one inmate in the

MHCB unit and five in the MHOHU.  There were 499 mainline EOP inmates and 1,182

mainline 3CMS inmates.  The administrative segregation population of 187 included 63

EOP hub inmates and 87 3CMS inmates.

78

Staffing:

Of 126.77 allocated mental health positions, 106.12 were filled and 20.65 were vacant, for a 16-percent vacancy rate in mental health. Contractors provided an additional 9.75 FTE coverage, reducing the functional vacancy rate in mental health to nine percent.

The chief psychiatrist position was vacant. Positions for the chief psychologist, senior psychiatrist, five senior psychologists, and two senior psych techs were filled.

Of 11.5 staff psychiatrist positions, 7.5 were filled. Use of contractors reduced the functional vacancy rate in psychiatry to nine percent. Of 31 staff psychologist positions, 20 were filled. Contractors covered 4.25 psychologist positions, reducing the staff psychologist functional vacancy rate to 22 percent.

Eight of 9.5 social worker positions were filled, and contractors covered the other 1.5 positions. Positions for 25 of 26 psych techs were filled. A contractor covered the sole vacant psych tech position.

Eight of 8.15 recreation therapist positions were filled, as were 12 of 14 MHSDS clerical positions. Positions for one unit supervisor, one health program specialist I, one office services supervisor II, and one associate government program analyst were filled.

Psychiatry telemedicine services were not utilized.

Quality Management:

MCSP had a robust quality management program. The local governing body met monthly. It maintained minutes and reported always having a quorum.

The quality management committee was chaired by the chief medical executive.  It met six times, with a quorum at each meeting.  Agenda items included suicide watch, access to care, mental health appeals, personnel vacancies, and audits.

The mental health subcommittee was chaired by the chief of mental health or designee.  It met twice monthly and always had a quorum.  Extensive meeting minutes addressed MHCB and MHOHU admissions, five-day follow-up, DMH referrals, access to care, staffing, the EOP program, space, psychiatry audits, QITs, and peer review.

There were five QITs.  One evaluated correlation between MHTS.net and UHR/eUHRs.  Another addressed administrative segregation pre-placement screening for inmates subject to Keyhea orders.  Three other QITs addressed mental health productivity standards, psychiatric appointment management, and establishment of efficient referral processes.

Peer review of psychiatrists, psychologists, and social workers who worked in the EOP, 3CMS, and administrative segregation reviewed four psychiatrists, eight psychologists, and four social workers, each in two quarterly sessions, for a total of 32 reviews.  Peer review of psychiatrists and psychologists who worked in the Correctional Treatment Center (CTC) was completed for a total of two individuals from each discipline.  Peer review included qualitative matters such as whether progress notes addressed inmate suicidality and danger to others, and whether any Axis I diagnoses were consistent with documented findings.  Psychiatrist peer review also addressed whether medications were appropriate for diagnoses, and whether justifications for medication changes were documented.

Suicide Prevention:

There were no completed suicides at MCSP during the review period.

80

The SPRFIT met monthly, had good attendance, and maintained meeting minutes.  It addressed emergency response, administrative segregation, suicide watch and precautions, DMH referrals, five-day follow-up, among other things.

The ERRC met monthly.  Emergency response drills were conducted. Officers in the units carried micro-shields.  Cut-down tools and personal protective equipment (PPE) were accessible in the control booth.  CPR refresher and first aid training was provided to staff.

MCSP reported a compliance rate of 100 percent for five-day clinical follow-up.  Sixty-five-percent compliance was reported for custody wellness checks.

In administrative segregation, there were daily morning meetings between mental health staff and custody supervisors.  Monthly audits indicated a 48-percent compliance rate for completion of pre-placement screens.

MHTS.net audits indicated 50-percent compliance for timely completion of the 31-item screen for non-MHSDS administrative segregation placements, and 34-percent compliance for non-MHSDS administrative segregation inmates who had histories of mental health treatment.

Thirteen administrative segregation cells were retrofitted to be suicide-resistant and were in a visible location.  However, custody staff reported that administrative segregation inmates who were not deemed to be a danger to themselves were placed in any available cell upon arrival.  Cells of newly-arrived inmates were appropriately marked for the 21-day intake period.

While documentation of 30-minute welfare checks contained few blanks, the checks were not completed at staggered intervals.  Many began exactly on the hour or

81

half-hour, or at identical times several minutes after the hour or half-hour.  Document review and audit data indicated 100-percent compliance for daily psych tech rounds.

Except for the intake cells, administrative segregation cells were equipped with electrical appliances.

Inmates routinely had access to ten hours of weekly yard time.

Medication Management:

The new medication management audit tool had yet to be implemented at MCSP.

Audits indicated 100-percent compliance for medication continuity following intra-institutional transfers.  There was 100-percent compliance for timely medication renewals, based on a sampling that included EOP, 3CMS, and administrative segregation inmates.

Audits indicated 54-percent compliance for receipt of new or changed medications by the following day.  Anecdotal reports indicated that they were usually received within 48 hours.

MCSP reported that 79 percent of medication noncompliance cases were referred to mental health.  Audits of mental health follow-up after referral indicated a compliance rate of 40 percent.

Pill line audits indicated wait times of less than four minutes.

There was a 90-percent compliance rate for timely obtaining of informed consent forms.

Although audits of laboratory studies were conducted, they were unreliable because sample sizes were too small and appropriate clinical parameters were not examined.

All psychotropic medications were administered DOT.  Audits indicated compliance with DOT protocols.  There was no centralized DOT list at MCSP.  The institution maintained an "enhanced DOT" list for inmates with known histories of medication hoarding or cheeking.

As of January 2, 2012, 50 inmates were subject to Keyhea orders.  During the review period, three Keyhea petitions were initiated, four were renewed, one was denied in court, and one inmate transferred before his court date.  No Keyhea orders lapsed, expired, or were not pursued at the request of counsel.  Mental health staff did not seek renewals for 13 cases.

At the end of the review period, 782 mental health caseload inmates had prescriptions for HS medications.  Audits indicated compliance with administration after 8:00 p.m. in all audited delivery areas.

MCSP reported that 153 inmates paroled with prescribed psychotropic medications.  Ninety-nine percent of paroling inmates signed receipts for parole medications.

Sexual Misconduct:

Sixteen RVRs were issued for sexual misconduct.  All received mental health screens and four received IDTT reviews.  Two inmates were referred for comprehensive evaluations.  The special master's expert reviewed the two comprehensive evaluations and found them to have been completed adequately.

There were two diagnoses of Exhibitionism and referrals to Exhibitionism treatment programs, but no transfers.

Custody-driven behavior modifications included exposure-control jumpsuits and yellow placards on cell doors.

<u>Transfers</u>:

MCSP's DMH coordinator also served as the SPRFIT coordinator.

Of the 338 inmates who had one or more indicators for consideration for a higher LOC, 23 were referred to DMH.  Eleven were referred to acute care and 12 were referred to intermediate care.  Eight acute care referrals and one intermediate care referral packages were prepared timely.  Three intermediate care referrals were rescinded.

All acute care referrals resulted in transfers, with six of them timely. Eight intermediate care referrals resulted in transfers, with four of them timely.  There was one Vitek hearing.

IDTTs had access to information on inmates who met indicators for DMH referral consideration.  However, observation of IDTT meetings indicated that referral to a higher LOC was not always considered when it should have been.

The institution maintained DMH referral and non-referral logs.  The non-referral logs did not include non-referral rationales but instead referenced the Form 7388-Bs.  Comparison of MHTS.net tracking with the referral and non-referral logs indicated that some inmates met indicators for consideration for DMH referral but were not included on either log.

At the time of site visit, the DMH coordinator, along with CDCR HQ staff, had initiated a process of monthly reviews of documented non-referral rationales.  Audits of the Form 7388-Bs found that 71 to 100 percent included non-referral rationales, and 75 to 92 percent documented interventions to address issues which had resulted in identification for DMH referral consideration.

During the review period, two inmates returned to MCSP after DMH stays of 48 and 60 days, respectively.

There were 77 MHCB admissions.  Clinical stays exceeded ten days for 35, or 45 percent of, MHCB admissions and ranged from 11 to 81 days.  There was a delay in physical discharge from the MHCB unit for 23, or 30 percent of, inmates. Delays ranged from one to 35 days.  Record review indicated two requests to transfer inmates to MHCB facilities outside of MCSP.

There were 147 MHOHU referrals and 145 MHOHU admissions. Twenty-three, or 16 percent of, MHOHU admissions were transferred to the MHCB unit. MHOHU stays averaged two days and ranged from zero to nine days.

Four inmates were placed in alternate housing while awaiting an MHCB. One inmate transferred to the MHCB unit.  Stays in alternate housing averaged 3.5 days and ranged from one to six days.

MCSP referred 21 inmates to the PSU.  Sixteen were endorsed and 11 transferred.  The average number of days from PSU referral to endorsement was 22, with a range of 11 to 41 days.  The average number of days from PSU endorsement to transfer was 36, with a range of five to 63 days.  Ten inmates transferred within 60 days of endorsement.

There were 22 EOP referrals.  Of these, 14 transferred to outside institutions, with five transferring within 60 days.  At the time of the site visit, 20 EOP inmates were pending transfer, including one who had been waiting longer than 60 days.

During the reporting period, 25 EOP inmates were housed in administrative segregation over 90 days.  Stays ranged from 95 to 325 days.  The Classification and Parole Representative (C&PR) reviewed inmate status monthly and prepared written reports.

Other Issues:

### Administrative Segregation

Audits of the completion of initial mental health evaluations prior to initial IDTT meetings indicated 68-percent compliance for 3CMS inmates, but zero-percent compliance for EOP inmates.  Compliance rates for completion of initial IDTT meetings for EOP and 3CMS inmates were 88 and 87 percent, respectively.  Audits found compliance with quarterly IDTT meetings, with all required disciplines in attendance.

Audits indicated compliance for monthly psychiatrist contacts for EOP inmates and for quarterly psychiatrist contacts for 3CMS inmates.  The compliance rate for weekly PC contacts for EOP inmates was 73 percent.  For 3CMS inmates, it ranged from 63 to 71 percent.  Physical plant limitations resulted in no clinical contacts occurring in confidential settings.  Twenty-three percent of 3CMS contacts and ten percent of EOP contacts occurred cell-front.

MHTS.net indicated that EOP inmates were offered a weekly average of 8.16 hours of structured therapeutic activity and received a weekly average of 5.45 hours.

Group therapy was provided in two dayroom floor areas.  Each area consisted of nine therapeutic modules arranged in a semi-circle.  However, the location was noisy and lacked auditory confidentiality.

### MHCB

The MHCB unit was an eight-bed unit within a ten-bed CTC.  MHTS.net data indicated compliance for initial IDTT meetings, and psychiatry and PC contacts. However, there was only 32-percent compliance for ongoing daily clinical contacts. Available data indicated appropriate completion of suicide risk evaluations (SREs).

Inmates were escorted to IDTT meetings in handcuffs.  They were either seated in a chair, or were placed in therapeutic modules with handcuffs removed.  Staff reported that all mental health inmates were handcuffed while out of cell, but medical inmates without segregation designations were typically not handcuffed while out of cell. Custody officers who escorted inmates to IDTT meetings routinely remained in the room during the IDTT meeting.

Inmates on suicide precaution or suicide watch were issued smocks, blankets, and mattresses, but were not provided with beds.

There were three applications of five-point restraints, lasting .75, 3.3, and 13.4 hours, respectively.  There were four instances of seclusion which averaged 49 hours and ranged from 19.5 to 96 hours.

MHOHU

Due to lack of MHCBs, MCSP provided a substantial portion of its crisis care in an unlicensed MHOHU.  Placements in the MHOHU were also made when staff estimated that the stays would be short-term.  Staff reported that when neither MHCB nor MHOHU beds were available, crisis care was provided in alternate cells located near the MHOHU.

The MHOHU clinical processes were significantly different from those used in the MHCB unit.  Treatment was reviewed by a team of two clinicians, or a clinician and a nurse, rather than a full IDTT.  SREs were completed for five percent of MHOHU placements and 45 percent of releases.  IDTT review, including completion of Form 7388-B, did not consistently occur upon or within 14 days of release from the MHOHU.

87

EOP

Audits indicated compliance for initial and quarterly IDTT meetings. Quarterly updates of treatment plans approached compliance at 87 percent. Audits of IDTT meeting composition were not provided.

MHTS.net indicated compliance rates of 87 percent for weekly PC contacts and 92 percent for monthly psychiatrist contacts.

EOP inmates were offered a weekly average of 7.32 hours of structured therapeutic activity and received a weekly average of five hours.

MCSP maintained an extended EOP care program (EECP) which was in effect a program within the EOP. It provided enhanced treatment for 12 inmates who were identified as requiring additional services. PCs individually saw EECP inmates weekly. Record reviews indicated that EECP participants benefited from the additional services.

3CMS

There was 79-percent compliance for initial IDTT meetings, and 94 to 97-percent compliance for follow-up IDTT meetings. IDTT meetings generally included necessary participants. Inmates attended 98 percent of the time.

There was a compliance rate of 60 percent for initial clinical intake assessments. Ongoing psychiatry contacts were reported to have been 90 to 100 percent compliant, and PC contacts were reported to have been 83 to 90-percent compliant.

Inmates remained on wait lists for group therapy for extended periods. An average of 312 3CMS inmates participated in groups on a monthly basis. In November 2011, there were 343 3CMS inmates on wait lists for groups.

Referrals

MCSP reported a total of 1,780 referrals.  There were 31 emergent, 43 urgent, and 1,706 routine referrals.  MHTS.net data indicated compliance for 94 percent of emergent referrals, 63 percent of urgent referrals, and 67 percent of routine referrals. Monthly audits indicated that urgent and routine referrals to psychiatrists were noncompliant.

RVRs

MCSP issued 1,260 RVRs, including one to an MHCB inmate, 331 to EOP inmates, 532 to 3CMS inmates, and 396 to non-MHSDS inmates.  Mental health assessments were conducted for all of the MHCB inmates, as well as for 328 of the 331 (99 percent) of EOP inmates, 106 of the 532 (20 percent) 3CMS inmates, and nine of the 396 (two percent) of the non-MHSDS inmates who received RVRs.  There were 38 RVRs related to cheeking or hoarding of medications.

RVR protocols were followed appropriately.  Eighty-five mental health assessments indicated that hearing officers should consider mitigating factors in assessments of penalties.  Of these, there were 17 cases in which penalty mitigation resulted.

Pre-Release Planning

MCSP's two full-time TCMP employees received a list of paroling inmates no later than 120 days prior to parole dates.  Pre-release planning primarily consisted of providing housing assistance and completion of on-line Supplemental Security Income (SSI) applications.

Access to Care

There were 26,682 mental health appointments scheduled during the review period. Of these, 23,022 or 86 percent were successfully completed. Of 3,660 missed appointments, 29 percent were inmate refusals. Of the 2,619 missed appointments from June to September 2011, 712 or 27 percent were due to inmate refusals, 1,413 or 54 percent were cancelled by the provider, and 494 or 19 percent were cancelled by custody staff or did not occur due to other reasons.

**California State Prison, Solano (CSP/Solano)**
September 27, 2011 – September 29, 2011

Census:

On September 26, 2011, the total prison population at CSP/Solano was 5,009. There were 1,312 inmates in the MHSDS. The 3CMS mainline population was 1,274 and the EOP mainline population was five. There were five inmates in the MHCB unit. The total administrative segregation population was 230. There were 87 3CMS inmates in administrative segregation and three EOP inmates pending transfer to a hub institution.

Staffing:

The chief psychiatrist position and the two senior psychologist positions were filled. Three of five staff psychiatrist positions were filled, resulting in a 40-percent vacancy rate. FTE contractors covered two positions, resulting in a vacancy rate of zero for staff psychiatry.

Of the 15.5 staff psychologist positions, 12.5 were filled, leaving a 19-percent vacancy rate. FTE contractors filled 3.5 positions, resulting in a functional vacancy rate of zero. Four of the six social work positions were not filled, for a 33-percent vacancy rate. FTE contractors covered both vacant positions.

90

The senior psych tech position and 8.5 psych tech positions were filled. Two of 2.2 recreation therapist positions were filled.

The health program specialist position and 10.5 clerical positions were filled.

Quality Management:

CSP/Solano took significant steps to improve its quality management process. Efforts to improve self-monitoring included more frequent meetings of the mental health subcommittee, the creation and monitoring of performance indicators, and monthly audits of all MHSDS programs.

The local governing body was scheduled to meet quarterly but no meetings were held during the reporting period. The quality management committee held five meetings during the reporting period. Attendance was good with a quorum at each meeting. The committee heard regular reports from each program area.

The mental health subcommittee met twice per month, holding 12 meetings during the reporting period. Minutes were kept regularly. Attendance was good with a quorum achieved at each meeting.

One QIT, on documentation of delivery of parole medications, was chartered during the monitoring period. Four ongoing QITs addressed peer review, the administrative segregation 31-item questionnaire, MHTS.net-UHR concordance, and group therapy.

Although peer review for psychiatry was scheduled to meet quarterly, only one meeting was held during the reporting period. Peer review for psychologists and social workers was scheduled to meet monthly. It continued to use a case review format.

The institution reported that no practice deficiencies were identified during the reporting period, but it did not provide information on the number of psychologists reviewed.

Suicide Prevention:

There were no completed suicides during the monitoring period.

The SPRFIT was scheduled to meet monthly and held five meetings during the reporting period.  Attendance continued to be problematic, with none of the meetings during the reporting period attaining a quorum.  Staff reported that the problem of SPRFIT attendance had been taken to the mental health subcommittee.  Unlike during the preceding monitoring period, SPRFIT meeting minutes were regularly maintained.

The ERRC met regularly during the monitoring period.  Minutes were maintained and were available for review during the site visit.  Officers carried micro-shields and the cut-down kits were located in the control booth.

The institution did not utilize the MHTS.net report to track SREs, as it was reported to be "grossly inaccurate."  Instead, CSP/Solano relied on an audit of 46 charts in which 95 percent indicated a SRE completed at both admission and discharge.  However, review of UHRs indicated lower compliance rates.

CSP/Solano was nearly compliant with five-day follow-ups with a compliance rate of 96 percent.  CSP/Solano reported 87-percent compliance for custody wellness checks.

In administrative segregation, CSP/Solano made considerable improvement in conducting daily morning check-in meetings.  The institutional audit found 99-percent compliance.

An audit on pre-placement screenings found little or no change since the preceding monitoring period, remaining noncompliant at 70 percent.  Conduct of the 31-

item screening for all non-MHSDS inmates improved but remained noncompliant.

All intake cells were clearly labeled in Buildings 9 and 10.  Thirty-minute welfare checks in these buildings were 30-percent and 69-percent compliant, respectively.

Psych tech daily rounds and documentation of the weekly summary in the UHR were found to be 100-percent compliant.

Staff reported that inmates received ten hours of yard time weekly.

Medication Management:

CSP/Solano indicated that unless otherwise noted, the data reported for medication management was derived from UHR audits of 259 randomly selected inmates.  However, the maximum sample utilized was 259, with some audit sample sizes as small as 15.

Medication continuity for new arrivals was not audited during this review period.  Medication continuity following transfers within the institution was audited, with compliance reported at 87 percent of inmates, in 13 of only 15 audited cases.  While the actual number of transfers was not known, staff acknowledged that it was likely far greater than 15, making the audit result unreliable due to small sample size.

During the reporting period, 200 inmates had psychotropic medications that required renewal.  An audit of timeliness of renewals yielded a 98-percent compliance rate.

Of 259 audited UHRs, 100 contained evidence of medication noncompliance.  Of these, 14 percent had documented follow-up appointments with a psychiatrist within seven days of referral.

CSP/Solano conducted several audits of morning pill lines and found no excessively long wait times.  Pill lines at other times were not audited.

Audits of timelines of medication order processing found that 82 percent of orders were filled by the first working day after their receipt, and 98 percent were filled by the second working day.

For inmates on psychiatric medications, audits found that 90 percent of UHRs contained up-to-date consent forms.  However, information by which to gauge reliability of these audits was lacking.

Of 108 randomly selected MHSDS inmates on psychotropic medications, 83 percent had laboratory tests ordered when clinically indicated.  Clinical action following test results was documented in 83 percent of cases.  However, the institution remained noncompliant with ordering necessary laboratory tests, reviewing test results, taking appropriate action, and completing the abnormal involuntary movement scale (AIMS).

During the monitoring period, all psychotropic medications were administered DOT.

CSP/Solano reported that there were 449 MHSDS inmates receiving HS medications at the end of the monitoring period.  Delivery of HS medications was not audited.

From March 2011 through July 2011, 361 inmates paroled with active medication prescriptions.  Signed receipts were documented in 66 percent of cases, although the data did not distinguish MHSDS inmates from others.

Sexual Misconduct:

There were eight RVRs related to sexual misconduct issued during the reporting period. Among those, two resulted in a mental health screening. There were no comprehensive evaluations performed during the monitoring period.

One inmate was diagnosed with Exhibitionism and one inmate was diagnosed with Paraphilia NOS. The one diagnosed with Exhibitionism had transferred from CSP/Sac and already completed the treatment program; he was not one of the RVR recipients during the monitoring period. No inmates were transferred to Exhibitionism treatment programs during the monitoring period.

Transfers:

CSP/Solano continued to have a half-time DMH coordinator. Use of Form 7388-B increased since the preceding monitoring period.

Although there were some lingering issues with use of the Form 7388-B, generally it did not appear that CSP/Solano was underutilizing DMH. During the monitoring period, the institution identified 44 inmates who met indicators for consideration for referral to DMH. Of these, the institution referred six, including four to acute care and two to intermediate care. Timelines for completion of referral packets were met for the intermediate care referrals, but not for the acute care referrals. All referrals were accepted, but three of the four acute care referrals were rescinded, two due to patient improvement and one due to the inmate paroling.

No inmates returned from DMH to CSP/Solano during the monitoring period.

CSP/Solano continued to operate nine MHCBs in the 16-bed CTC during the monitoring period. No MHCBs were occupied by long-term medical patients. The

MHCB unit admitted patients from within the institution as well as from other institutions.  There were 108 admissions to the MHCB unit, including 46, or 43 percent, from other institutions.  The average length of stay was nine days, with a range of one to 29 days.  For the five admissions who were subsequently referred to DMH, the average length of stay was 13.6 days, with a range of one to 21 days.  Actual lengths of stay for inmates who had been clinically discharged from the MHCB unit averaged 9.7 days for non-DMH referrals and 31 days for DMH referrals.  Forty-four or 40 percent of MHCB stays exceeded ten days.  This included all five patients who were referred to DMH.  The management report indicated that CSP/Solano did not utilize alternative housing pending MHCB admissions during the monitoring period.

The institution reported that 45 EOP inmates, including 26 mainline EOPs and 19 administrative segregation EOPs, were referred for transfer during the monitoring period.  Of the 26 mainline EOPs, 24 transferred, with 22, or 94 percent, transferred within 60 days.  The average number of days from referral to transfer was 44.5, with a range of 14 to 84 days.  Of the 19 administrative segregation EOP inmates, 12 were transferred during the monitoring period, but within timeframes in only three or 25 percent of cases.  Stays ranged from 22 to 52 days.  Unavailability of beds was the predominant reason for the delays.

Other Issues:

Administrative Segregation

At the time of the site visit, there were two EOP and 83 3CMS inmates housed in administrative segregation.  No administrative segregation overflow units were used to house MHSDS inmates during the monitoring period.

96

Initial intake evaluations of MHSDS inmates placed in administrative segregation were timely.  Initial IDTT meetings were timely in 76 percent of cases for EOP inmates and 58 percent of cases for 3CMS inmates.  Follow-up IDTT meetings were timely in 100 percent and 97 percent of cases, respectively.

Mental health services in administrative segregation continued to be adversely affected by physical plant and treatment space limitations.  All therapeutic modules except one were placed in the dayroom in full view of other inmates.

For psychiatry contacts, the compliance rate was 91 percent for EOP inmates and 95 percent for 3CMS inmates.  The compliance rate for weekly PC contacts for all levels of care was 97 percent.  An institutional audit found that 46 percent of the individual PC contacts were cell-front, and that only two percent of all out-of-cell contacts were in a confidential setting.

Pre-release planning services were available to inmates in administrative segregation as part of clinical services.

MHCB

An audit of 46 of the 108 MHCB admissions found that pre-admission screening was conducted in 93 percent of cases.  Conduct of initial IDTT meetings was timely in 84 percent of cases.  CSP/Solano reported a compliance rate of 96 percent for follow-up IDTT meetings.  Daily clinical contacts were 100-percent compliant during the monitoring period.

Since the preceding monitoring period, the outside yard was made available to MHCB inmates.  A recreational therapist was assigned to the unit and was a positive addition to the treatment team.

At the time of the site visit, CSP/Solano had still not implemented the memorandum of March 2011 on MHCB restraints.  Provided data indicated that one inmate was placed into restraints for approximately 19.5 hours, and one inmate was placed into seclusion for approximately 43 hours.  Records were not available for further review to determine compliance with restraint and seclusion protocols.

3CMS

Timeliness of initial intake evaluations and IDTT meetings remained noncompliant at below 80 percent, although this was an improvement over the preceding monitoring period.  According to institution audits based on combined UHR review and MHTS.net data, the compliance rates for timeliness of annual IDTT meetings and quarterly PC contacts were 98 percent and 95 percent, respectively.

The quality of treatment services and documentation in the UHR remained problematic.  According to an audit summary provided by the institution, treatment plans did not include discharge planning in 65 percent of UHRs reviewed.  In approximately 40 percent of the charts reviewed, parole planning or aftercare documentation for inmates within three months to a year from parole date was not included.  Group therapy was offered.  In about half of charts reviewed, discussions of group therapy did not appear.  In 56 percent of reviewed charts, there was no documentation of possible removal from the MHSDS for inmates in remission for six months without medication.

Referrals

According to data provided by the institution, there were 1,663 mental health referrals during the review period, including 12 emergent referrals, 56 urgent referrals, and 1,595 routine referrals.  Of the 12 emergent referrals, 11, or 92 percent, were

seen within four hours.  Of the 56 urgent referrals, 38, or 68 percent, were seen within 24 hours.  Of the 1,595 routine referrals, 801, or 50 percent, were completed within five days.

Heat Plan

Training on implementation of the heat plan started in August 2011 and was completed by 1,045 employees.  Indoor and outdoor temperature logs were maintained, and a monthly heat report was submitted to HQ during the heat season.  The pharmacy updated the list of inmates on heat-risk medications daily.  The list was distributed to each facility.  There were no inmates reported to be suffering from heat related illness during the monitoring period.

RVRs

During the reporting period there were 431 RVRs issued to MHSDS inmates, including 413 to 3CMS inmates, three to inmates in the MHCB unit, and 15 EOP inmates.  Thirty eight of the 413 3CMS inmates, and all of MHCB and EOP inmates received mental health assessments.   According to the institution's management report, 14 of the mental health assessments indicated that mitigating factors should be considered in penalty determination.  In four of those cases, the hearing officer did not reference the results of the assessment.

**California State Prison – Corcoran (CSP/Corcoran)**
August 29, 2011 – September 1, 2011

Census:

CSP/Corcoran reported that on August 31, 2011, it housed 4,911 inmates, for a two-percent decrease since the preceding monitoring period.  The institution's mental health caseload population was 1,419 inmates, which was a three-percent decrease in that population.  The MHCB unit housed 25 inmates.  There were 86 EOP hub inmates.  There were 92 mainline EOP inmates and 516 mainline 3CMS inmates.  The

administrative segregation population of 464 included 185 3CMS inmates.  The SHU

population of 1,376 included 19 EOP inmates pending PSU transfer and 465 3CMS

inmates.

Staffing:

There were 29.4 vacancies among the 157.13 mental health positions, for a

19-percent institutional vacancy rate in mental health.  Contractors and dual appointments

provided an additional 14.99 FTE coverage, reducing the functional vacancy rate in

mental health to nine percent.

The chief psychiatrist position was filled, but the senior psychiatrist

position was vacant.  The chief psychologist position was filled, as were all four senior

psychologist positions.  Three of 3.79 supervising social worker positions were filled, and

with .79 dual appointments, the supervising social worker functional vacancy rate was

reduced to zero.

Of 15.3 staff psychiatrist positions, 7.5 were filled.  Contractors provided

an additional 5.0 FTE coverage.  With .5 dual appointment positions, the staff psychiatry

functional vacancy rate was reduced to 15 percent.

Of 39.21 staff psychologist positions, 33 were filled.  With an additional

4.74 FTE coverage by contractors, plus .21 dual appointments, there was a three-percent

functional vacancy rate among staff psychologists.

Fifteen of 19.9 social worker positions were filled.  Contractors provided

an additional 3.75 FTE coverage, reducing the social work functional vacancy rate to six

percent.

100

Positions for four senior psych techs and all 38 line psych techs were filled.  Eight of 13.71 recreation therapist positions were filled.  Of 16.22 MHSDS clerical positions, 13.22 were filled.

CSP/Corcoran utilized a weekly average of 13.36 hours of psychiatry telemedicine.

Quality Management:

The local governing body met three times, with a quorum at two of those meetings.  It reviewed minutes of its previous meetings and those of the quality management committee, and addressed health care issues.

The quality management committee and mental health subcommittee each met 12 times, with a quorum present at all meetings.  The committee addressed relevant issues.

Five QITs were active during the review period.  One that had resolved produced its final recommendations to the quality management committee.  Three others, which addressed EOP hub double-celling, medication management, and EOP hub treatment improvement, continued since the preceding monitoring period.  A new QIT was chartered during the review period to address concordance between MHTS.net and UHRs.

At the time of the site visit, there was active peer review for psychiatry, psychology, and social work.

Suicide Prevention:

There were no completed suicides at CSP/Corcoran during the review period.

101

The SPRFIT met monthly, maintained minutes, and reported monthly quorums, although mental health staff was unclear about what constituted a quorum. Required participants and/or designees were often not in attendance at SPRFIT meetings. Agenda items included suicide attempts, high-risk inmates, monthly MHCB admissions, and five-point restraint.

A report on custody follow-up after MHCB discharge indicated completion rates ranging from 60 to 100 percent.

In administrative segregation, UHR audits indicated that newly-arrived EOP and 3CMS inmates received pre-placement screens 51 percent and 83 percent of the time, respectively. The screens were generally conducted in confidential settings.

Approximately 81 percent of inmates were reviewed for MHSDS status within one day of administrative segregation placement and prior to the initial 114D hearing. Audits indicated that 73 to 83 percent of non-MHSDS inmates placed in administrative segregation received the 31-item screen timely.

Cells in A-yard administrative segregation housing and the stand-alone unit contained new arrival placards. Some placards in A-yard were not removed by the end of the first 21days.

Documentation of 30-minute welfare checks indicated compliance rates of 89 to 99 percent. Welfare checks in the three-yard administrative segregation buildings were not staggered, although in the stand-alone administrative segregation unit they were somewhat staggered. Record review and audit data indicated that psych techs consistently performed daily rounds.

<u>Medication Management</u>:

CSP/Corcoran was one of the original pilot institutions for the MAPIP and had continuously used the MAPIP audit instrument since May 2010.

The institution reported medication continuity compliance rates of 73 to 100 percent for ordering of medications within eight hours for new arrivals.  However, this report was not specific to psychotropic medications.

Audits indicated compliance rates of 94 to 100 percent for medication continuity following intra-institutional moves and MHCB discharges.

An audit indicated compliance rates of 54 to 70 percent for referrals of cases of medication noncompliance within 24 hours, documentation of the referral in the UHR, and prescriber response to the referral.  The audit required satisfaction of all three of these elements order for the referral to be deemed compliant.

Pill lines lasted as long as two hours, although inmates were provided with shade and shelter from inclement weather.  There were 528 inmates, or approximately 37 percent of the MHSDS caseload, with DOT administration orders at the end of the review period.

Audits indicated 95 to 100-percent compliance with the Keyhea process. These audits examined whether the Keyhea order was in the UHR, whether the prescriber's order reflected the Keyhea order, whether the MAR specified which medications were Keyhea, and whether inmates on Keyhea orders were immediately referred if they refused a Keyhea medication or were a no-show.  Thirty-three Keyhea orders were initiated during the monitoring period and 71 were renewed.  Keyhea logs and tracking were accurate and well-maintained.

An audit of HS medication administration consistently indicated 100-percent compliance.

Audits indicated compliance rates of 92 to 100-percent for providing paroling inmates with a 30-day medication supply and obtaining of signed receipts.

Sexual Misconduct:

Sixty-seven sexual misconduct RVRs were issued to 59 MHSDS inmates. None of the inmates who were screened were referred for a comprehensive evaluation.

During the site visit, CSP/Corcoran's Exhibitionism treatment program for SHU inmates included eight 3CMS inmates. Three EOP inmates who had been identified for treatment were awaiting transfer to programs at CSP/Sac or PBSP. Group attendance at the Exhibitionism treatment program was sporadic. During a four and one-half month period, the program was scheduled to meet 15 times, but actually met on nine occasions with three or more inmates in attendance as required by policy.

Staff reported inconsistencies with the placement of placards on cell doors and the use of exposure-control jumpsuits.

There were 70 district attorney referrals for IEX or sexual misconduct, but some of the offenses had occurred during the preceding monitoring period.

Transfers:

A senior psychologist served as the DMH coordinator on a part-time basis until leaving the institution, when a staff psychologist was assigned DMH coordinator duties on a half-time basis. An office technician was assigned to maintain the DMH log. However, the DMH log lacked information on bed assignments, transfer dates, placement of inmates transferred to DMH, and returns from DMH. Staff also reported that the DMH non-referral log did not account for a two-month period.

There were three referrals to acute care and eight to intermediate care, reflecting a significant decrease from the 67 DMH referrals during the preceding monitoring period.  Staff attributed the decrease in referrals to several factors, including transition of the general population EOP yard to a Level IV yard and staff dissatisfaction with the clinical outcomes of inmates discharged from DMH.

All three acute care referrals, but only five of the eight intermediate care referrals, were completed.  Only two of the intermediate care referrals were completed timely.  The DMH log indicated that three of the five completed intermediate care referrals transferred to other institutions prior to DMH placement.  Referral packets were completed timely for one of the three acute care referrals.  No referrals were rejected.  Three intermediate care referrals were rescinded.  All three Vitek hearings upheld DMH placement.

Review of UHRs and observation of IDTT meetings indicated that although staff generally discussed the appropriateness of DMH referral, specific referral indicators were not consistently discussed during IDTT meetings.  Review of Form 7388-Bs indicated that screening indicators were not consistently and accurately noted.  Inmates who had multiple MHCB admissions, multiple RVRs, difficulty with activities of daily living (ADLs), or did not participate in groups were often not identified on Form 7388-Bs.

The institution reported that DMH discharged 30 inmates to CSP/Corcoran.  Of these, 15 had been referred from CSP/Corcoran and the other 15 had been referred from other institutions.  Staff reported that they relied on SharePoint for information on returning inmates.  It was reported that clinicians reviewed all inmates returning from DMH, but that they were not routinely notified of returns from DMH.

Information on five-day follow-up after return from DMH was not provided.  Staff reported that CSP/Corcoran continued non-formulary medications that had been initiated at DMH but did not provide audit data.

CSP/Corcoran had a 24-bed MHCB unit.  There were 386 MHCB admissions, including 354 from CSP/Corcoran and 32 from other institutions.  MHCB stays ranged from zero to 85 days and averaged eight days.  Eighty-one stays in the MHCB unit exceeded ten days.  An audit indicated a 57-percent compliance rate for identifying inmates housed in the MHCB unit longer than ten days.  In 53 percent of cases, delays were due to bed unavailability.  Staff reported using an adjoining medical wing for MHCB overflow.

Other Issues:

MHCB

The MHCB unit had thin mattresses on the floor.  Inmate clothing was routinely restricted to safety smocks, regardless of length of stay or clinical condition.

The compliance rate for daily assessment by a psychiatrist or psychologist was 97 percent.  Audits found 100-percent compliance for timeliness of initial IDTT meetings and 93-percent compliance for weekly IDTT meetings.  All disciplines were present at three IDTT meetings observed by the special master's expert.  The correctional counselor had access to inmates' RVR histories but not to information on their MHCB stays.  Inmate participation at IDTT meetings was encouraged.  Inmates were escorted in handcuffs, based on their custody levels.  During observed IDTT meetings for three inmates, they remained handcuffed and in therapeutic modules during the meetings.

Inmates received individual treatment and recreational therapy in therapeutic modules located in private areas of the MHCB unit.

There were 29 episodes of five-point restraint involving 25 inmates. Instances of restraint used ranged from 1.5 to 67 hours and averaged just under 22 hours and 55 minutes.

SHU

Data indicated compliance rates of 87 to 97 percent for timeliness of initial IDTT meetings, with four months of the review period exceeding 90 percent.

The special master's expert observed IDTT meetings. Psychiatrists, PCs, and inmates were present; correctional counselors were not. Escort officers remained in the meetings during discussions. Interactions between clinicians and inmates were generally positive. Clinicians did not have access to MHTS.net data on objective indicators for consideration for DMH referral. Relevant custody information was unavailable. Inmates were thus asked to provide information on their histories of MHCB placement and RVRs. Information as to inmate participation in offered programs was available through record review. Discussions of actual treatment plans were minimal. Approximately one-third of 3CMS inmates in the SHU were seen at least twice monthly.

Access for 3CMS inmates to clinical activities was limited by a shortage of custody escort officers. Staff reported that lack of escorts resulted in the discontinuation of SHU 3CMS groups. Clinicians reported that this resulted in a significant increase in the percentage of clinical contacts occurring cell-front.

High outdoor temperatures often prevented access to yard time.

EOP

The mainline EOP program was transitioned from Level III to Level IV since the preceding site visit. The population was capped at 150 and averaged 80 to 90 inmates. Unused space in the EOP unit housed administrative segregation 3CMS and

107

non-MHSDS inmates. This had a negative effect on out-of-cell and programming time for EOP inmates because the different populations could not be mixed or out of cell at the same time. Clinicians expressed frustration with their resulting inability to conduct groups and/or individual out-of-cell contacts.

MHTS.net indicated that 67 percent of initial IDTT meetings and 91percent of follow-up IDTT meetings were timely. The compliance rate for assessment of new mainline EOP inmates by PCs was 99 percent. Weekly contacts with PCs occurred 94 percent of the time. However, there were reported problems with accuracy of data in MHTS.net.

The institution reported that mainline EOP inmates were offered 12.8 hours of structured therapeutic activity per week. However, data in MHTS.net indicated the percentage of mainline EOP inmates who were offered ten or more hours of structured therapeutic activity per week ranged from 33 to 92 percent. The refusal rate was reported to be 35 to 54 percent.

The special master's expert observed a mainline EOP group which focused on anxiety, panic, and coping mechanisms and found it to be well-run and clinically meaningful. Thirteen of the sixteen enrolled inmates attended the session and appeared to be engaged in it.

Administrative Segregation EOP

Audits indicated that 88 percent of inmates entering the administrative segregation EOP program received a timely initial mental health evaluation. Eighty-four percent of initial IDTT meetings were timely, as were 95 percent of follow-up IDTT meetings. CSP/Corcoran reported rates of attendance at IDTT meetings at 93 percent for

psychiatrists, 100 percent for PCs, 91 percent for correctional counselors, and 64 percent for inmates.

There was a compliance rate of 89 percent for 90-day psychiatric contacts with inmates who were prescribed psychotropic medications.  Ninety six percent of EOP inmates in administrative segregation received weekly PC contacts, but only 55 percent of contacts occurred in a confidential setting.  Daily psych tech rounds were documented in progress notes 94 percent of the time.

A weekly average of 8.8 hours of structured activity was offered to administrative segregation EOP inmates, but 59 percent of inmates refused more than 50 percent of offered treatment during a given week.  Inmates who refused more than 50 percent of offered treatment were documented as receiving daily PC contacts 100 percent of the time.

During the review period, the number of EOP inmates housed in administrative segregation for more than 90 days ranged from 48 to 74.  As of the end of the review period, 71 percent of administrative segregation EOP inmates had stays longer than 60 days, and 56 percent had stays longer than 90 days.

3CMS

The institution reported that there were 248 new admissions to the 3CMS program during the review period.  MHTS.net data indicated a compliance rate of 61-percent for initial inmate assessments, while an audit of 80 charts found a compliance rate of 83 percent for these assessments.

According to MHTS.net, there was a compliance rate of 51-percent for timeliness of initial IDTT meetings, as compared to the chart audit which found a compliance rate of 86 percent.  MHTS.net also showed an 89-percent compliance rate for

follow-up IDTT meetings, while the chart audit found a compliance rate of 75 percent. Both MHTS.net and the chart audit revealed a compliance rate of 88 percent for psychiatry attendance at IDTT meetings, and an 87-percent compliance rate for correctional counselor I attendance at IDTT meetings. Inmates attended IDTT meetings in 98 percent of cases, according to MHTS.net.

MHTS.net data showed an 84-percent compliance rate for timely psychiatry contacts with inmates who were prescribed psychotropic medications. It also showed a 92-percent compliance rate for PC contacts, which was generally corroborated by the 91 percent rate for quarterly clinical contacts found by the chart audit.

Administrative Segregation 3CMS

During the review period, CSP/Corcoran housed an average of 161 3CMS inmates in administrative segregation. There was 77-percent compliance for timeliness of initial IDTT meetings, but follow-up IDTT meetings were timely in 96 percent of cases. Audits indicated attendance rates of 95 percent for psychiatrists and 100 percent for PCs, but only 24 percent for correctional counselors. Inmate attendance was reported to be 72 percent.

The rate of compliance for psychiatry contacts every 90 days with inmates on psychotropic medications was 92 percent. For PC contacts, the compliance rate was greater than 90-percent.

Custody escorts were limited, resulting in staff seeing inmates for approximately only half the work day. Group treatment space was lacking. At the time of the site visit, 3CMS groups had been discontinued.

Referrals

There were 320 to 482 mental health referrals per month during the review period.  CSP/Corcoran provided MHTS.net reports which indicated compliance rates of 80 to 97 percent for timeliness of response to urgent referrals, but only 44 to 58 percent for timeliness of response to routine referrals.  The institution indicated, however, that these reports were unreliable.

RVRs

The institution issued a total of 1,323 RVRs.  Of these, 185 were issued to MHCB or EOP inmates, 480 were issued to 3CMS inmates, and 658 were issued to non-MHSDS inmates.  There were a total of 269 mental health assessments, including assessments of all 185 MHCB and EOP inmates, plus 71 in connection with RVRs issued to 3CMS inmates, and 13 in connection with RVRs issued to non-MHSDS inmates.

Use of Force

CSP/Corcoran continued to conduct generally timely executive review of use-of-force incidents, with further improvement during the monitoring period.  At the time of the monitor's visit, all but 12 of the 120 executive reviews of incidents which occurred from January 1, 2011 to June 30, 2011 had been completed, as compared to 19 that were uncompleted during the preceding monitoring period.  Seven of the 12 uncompleted reviews required further examination as a result of inmate appeals, and four were pending completion of facility level reviews.  During the preceding monitoring period, 15 of the 19 reviews that were pending completion were awaiting facility reviews.  One case required clarification in order to complete the executive review process.

Required clinical interventions occurred for those incidents involving cell extractions.  Staff training on clinical interventions continued.

111

The institution maintained appropriate tracking of use-of-force incidents.

Institutional data reported that of the total 120 use-of-force incidents, 89 or 74 percent involved MHSDS inmates, for a slight decrease from the 77.7 percent of the preceding monitoring period.

There were 233 total non-use-of-force incidents during the monitoring period, including 125 or 57.9 percent involving MHSDS inmates.  This was a decline in both the number of such incidents and the proportion involving MHSDS inmates.  During the preceding monitoring period, there were 330 non-use-of-force incidents of which 63.3 percent involved MHSDS inmates.

**Salinas Valley State Prison (SVSP)**
October 18, 2011 – October 21, 2011

Census:

Since March 2011, SVSP's inmate population grew by six percent to 3,975, and its MHSDS population grew by a half-percent to 1,522.  Mental health caseload inmates, including those in intermediate care beds, comprised 47 percent of SVSP's inmate population.  There were 178 mainline EOP inmates and 1,078 mainline 3CMS inmates.  Six inmates were in MHCBs and 349 inmates were in DMH intermediate care beds.

The total number of segregated inmates grew by 37 percent from 378 in March 2011 to 519 in mid-October 2011.  This included 69 EOP hub inmates and 203 3CMS inmates.  The institution used overflow beds to absorb the growing number of segregation inmates.  As of October 19, 2011, there were 31 segregation inmates held in temporary overflow beds throughout the prison.

112

<u>Staffing</u>:

Staffing was essentially unchanged since the preceding monitoring visit. No mental health positions were lost. The vacancy rate in mental health was approximately 13 percent. Use of contractors, dual positions, and limited-term employees reduced the functional vacancy rate in mental health to four percent.

Of the six supervisory positions, the chief psychiatrist, chief psychologist, and three senior psychologist positions were filled. One senior psychologist position remained vacant but was covered by a full-time contractor.

Three of 8.5 psychiatrist positions remained vacant. Contract psychiatrists provided an average of 1.4 FTE coverage during the six-month reporting period, reducing the functional vacancy rate to 19 percent.

Among PCs, 5.5 of 37 psychologist and social worker positions were vacant, for a vacancy rate of 15 percent. A full-time psychologist was on long-term medical leave. Contractors, dual appointments, and limited-term employees provided an average of 5.0 FTE coverage, reducing the functional vacancy rate for PCs to four percent.

Both senior psych tech positions were filled, as were 21 of 22 psych tech positions. Of 5.3 allocated recreation therapy positions, 2.3 were vacant. Use of contract LVNs and psych techs to cover these vacancies reduced the functional vacancy rate to 15 percent. A positions for a health program specialist I (HPS I) was filled.

All 12 clerical positions were filled.

<u>Quality Management</u>:

The local governing body was scheduled to convene every other month but did not meet during the monitoring period.

The quality management committee was scheduled to meet twice per month and convened ten times during the reporting period, with two meetings cancelled. Nearly half of the meetings were attended by less than a quorum, which was defined at SVSP as 75 percent of the required participants.  Representatives from mental health attended all quality management committee meetings and reported on a variety of issues, including transfers to higher levels of care, the development of an updated operating procedure for suicide prevention, and analysis of data discrepancies related to EOP treatment hours.

The mental health subcommittee met three to four times per month. Attendance was poor, with a quorum met in only one of 24 meetings.  Meeting minutes were well organized but sparse, making it difficult to discern what had been done to address identified problems.  The mental health subcommittee routinely discussed performance data from the key program areas and addressed other issues as they arose. The special master's expert attended a mental health subcommittee meeting and found it to be well-attended by a full complement of disciplines.  Reports were presented on a variety of relevant topics, although not all key service areas were prepared to provide compliance updates.

Routine audits of compliance with Program Guide requirements in all service areas were increasingly based on MHTS.net data.  Audit methodologies appeared sound but reliability of MHTS.net data remained unclear.  Documentation in charts in the MHCB unit and MHTS.net data were consistent 81 to 100 percent of the time for treatment plans and discharge summaries, 60 to 94 percent of the time for SREs, and an average of 73 percent of the time for progress notes.

A QIT to refine the mental health referral process for assault victims and inmates with safety concerns was active at the time of the site visit.  After issuing their final recommendations to the quality management committee, three QITs were disbanded.  These three QITs had focused on improving continuity of care for new arrivals, developing a public service announcement regarding access to mental health services, and refining procedures for five-day clinical follow-up and 24-hour custodial monitoring.

Three already-active FITs were tasked with minimizing access-to-care barriers for EOP inmates in segregation, improving tracking for mental health referrals, and monitoring/initiating efforts to manage suicide risk.  No new FITs were chartered during the reporting period.

The psychiatry peer review committee met six times during the reporting period, with 12 to 31 UHRs reviewed during the meetings.  None of the record reviews identified a need for corrective action.  The institution did not have a local operating procedure (LOP) for psychiatry peer review and reported no plans to develop one.

Peer review for psychologists was active and functional.  At the three meetings during the reporting period, 15 UHRs were reviewed and confidential peer-to-peer feedback was provided.  Analyses were both quantitative and qualitative.  The predominant identified concern was insufficient justification for changes in LOC, which prompted staff training.

Suicide Prevention:

The institution's SPRFIT met five times during the reporting period.  Nine to 13 standing members and one to two guests attended the meetings.  Routine agenda items included compliance with screens and rounds in segregation, review of completed

115

and attempted suicides, review of tracking logs for five-day clinical follow-up and 24-hour custodial checks, compliance with DOT protocols, and identification of staff training needs.  Added topics included revision of the LOP for suicide prevention and the development of a protocol for blood draws from inmates who claimed to have overdosed. Meeting minutes contained more data and documentation of discussions.  However, there appeared to be a need for more aggressive follow-through on issues taken up at meetings. Identified deficiencies such as non-staggering of welfare rounds, poor compliance with hourly custody checks, lack of useable/analyzed data for attempted suicides, and open questions about whether to require blood draws for self-reported overdoses and DOT for suicidal inmates were discussed from one meeting to the next without any apparent corrective action or resolution.

Cut-down tools were stored in the control rooms of all segregation and overflow units.

Compliance rates for completion of SREs upon admission and release from the MHCB unit and alternative holding areas ranged from 88 to 100 percent and averaged above 90 percent during the six-month reporting period.

Proper initiation, completion, and documentation of clinical five-day follow-up after discharges from the MHCB unit and alternative holding areas improved during the reporting period and reached a compliance rate of nearly 100 percent by July 2011.  Ninety-six percent of five-day follow-up forms were fully completed, and 100 percent were returned to the mental health department.

Local audits continued to show noncompliance with 24-hour custodial monitoring following release from an MHCB or holding area.  From 44 to 91 percent, or an average of 69 percent, of 24-hour custody check forms were returned to the mental

health department.  The percentage of submitted 24-hour custody check forms that were fully completed ranged from 38 to 80 percent, and averaged 55 percent.

SVSP was compliant with many, but not all, of the components of CDCR's Plan to Address Suicide Trends in Administrative Segregation.  Nursing pre-screens were completed in 78 to 85 percent of cases.  Audits found that 31-question screens were offered routinely and timely.  From 90 to 97 percent of inmates agreed to participate in the screens during five of six months.  In June 2011, the number dipped to 43 percent, which was attributed to staff turnover.

Audits indicated that psych tech rounds were completed daily and were properly documented in all segregation and overflow units during the reporting period. However, the isolation log in unit C8, which was an overflow unit that held up to 20 segregation inmates following the reporting period, did not consistently document daily rounds during August and September 2011.  Staff reported that daily rounds were completed, but were not documented in the isolation log.  This was attributed to some psych techs being unaware during the first couple of months after activation of C8 that an isolation log existed.

Intake cells in segregation units D1, D2, and D8 had been retrofitted to reduce the risk of suicide.  Electrical outlets and wall-mounted desks and shelving were removed from the intake cells, and cement lower bunks were installed.  However, upper bunks were not removed.  It appeared that efforts had been made to use the intake cells for new arrivals in segregation.  Intake cells in unit D9, the stand-alone building, were not physically or functionally different from other cells.  There were no designated intake cells in overflow segregation units.

117

As evidenced by logs in segregation units, 30-minute welfare checks were not conducted at staggered intervals.  In one case, an officer routinely used a computer to pre-print all start and stop times for the entire watch.  There continued to be gaps in documentation, some of which spanned entire watches.  Supervisor signatures were often missing.  SPRFIT minutes documented chronic noncompliance in this area.

Cells in segregation units D1, D2, and D8 were equipped with electrical outlets, permitting inmates in these units to have in-cell televisions or radios.  Inmates in D9, the stand-alone building, had access to electrical outlets in pipe chases located between cells and were permitted to have in-cell radios.  Inmates in the various overflow segregation units were reportedly permitted to have in-cell appliances following an initial institutional classification committee (ICC) review.  However, interviewed inmates consistently complained about poor access to property including appliances, legal material, and writing supplies.

Inmates in segregation units D1, D2, D8, and D9 reported having access to six to ten outdoor hours of yard per week.  Inmates in overflow segregation units were not offered outdoor yard.

Medication Management:

An average of 98 percent of inmates moved within the institution did not experience an interruption in medications.

Adherence to local protocols for medication noncompliance was mixed.  Psychiatrists responded timely to referrals for noncompliance, but audits found that these referrals were not routinely documented on MARs.

Three institutional audits found that an average of 83 percent of reviewed UHRs contained current informed consent forms.

The institution's review of 18 UHRs yielded compliance rates of 14 to 43 percent for ordering of recommended blood studies for inmates taking mood-stabilizing medications. Compliance with the laboratory protocols applicable to other classes of psychotropic medications was not audited during the reporting period.

All psychotropic medications at SVSP were administered via short pill lines in the individual housing units. There were no reported problems with this arrangement. DOT medication administration was automatically ordered for non-formulary medications and for medications with high potential for abuse, and when deemed clinically appropriate by the psychiatrist. At the time of the site visit, there were 507 inmates with DOT orders. Nursing supervisors randomly observed medication administration, noted findings on review forms, and provided staff training as needed.

There were 64 inmates at SVSP with current Keyhea orders as of the end of July 2011. During the reporting period, 43 Keyhea orders were renewed, six new orders were initiated, and none lapsed. One renewal petition was rejected. No inmates with pending Keyhea hearings were transferred from the institution.

There were 579 MHSDS inmates with HS medication orders. Audits found that HS medications were consistently administered at or after 8:00 p.m.

The pharmacy regularly generated lists of inmates with impending parole dates and prepared medication packages for inmates immediately prior to their releases. Signed receipts were requested from all paroling inmates who received medications. Audit data from the reporting period was not available at the time of site visit.

<u>Sexual Misconduct</u>:

Review of records by the special master's expert indicated that initial screens for Exhibitionism were not conducted following issuance of RVRs for sexual

119

misconduct.  Rather, all inmates who received RVRs for IEX were evaluated by mental health staff to determine whether they met the diagnostic criteria for Exhibitionism, and then were reviewed by an IDTT.

Of the 21 sexual misconduct RVRs issued during the reporting period, one resulted in a diagnosis of Exhibitionism and referral to an Exhibitionism treatment program.  None of the evaluations completed during the reporting period included laboratory testing or psychometrics.  In one case, the evaluation of an inmate recently diagnosed with Exhibitionism concluded that the inappropriate sexual behavior was attributable solely to antisocial traits.

UHRs reviewed by the special master's expert indicated that treatment plans and clinical follow-up did not adequately address inappropriate sexual behavior.  In two cases in which EOP inmates received two RVRs for IEX within a short period of time, treatment plans completed immediately following the incidents failed to list inappropriate sexual behavior as a problem and failed to identify targeted clinical interventions.  When follow-up treatment plans identified IEX as a problem and prescribed case management as an intervention, subsequent progress notes failed to document discussion of the behavior.

A yellow placard was placed over a portion of the cell window of an inmate found guilty of sexual misconduct.  Exposure-control jumpsuits were used during out-of-cell activities.  SVSP was compliant with CDCR policies that limited the duration of these security interventions.

All incidents of sexual misconduct were referred to the local district attorney's office.

<u>Transfers</u>:

A staff psychologist was the assigned DMH coordinator, devoting approximately 75 percent of the full-time work week to these responsibilities.  The DMH coordinator maintained required logs, all of which were complete and current.  The coordinator also communicated regularly with PCs on whether waitlisted inmates still required transfer, conducted a weekly round of waitlisted inmates, kept PCs apprised of MHCB admissions and RVRs that involved waitlisted inmates, monitored the location and movement of inmates with pending DMH referrals, managed the completion and submission of referral packets, communicated with DMH coordinators in other prisons, and worked closely with classification staff to timely identify inmates returning from DMH.

During IDTT meetings, Form 7388-Bs were routinely used in conjunction with consideration of referrals to higher levels of care.  Records maintained by the DMH coordinator indicated that 77 inmates met one or more of the DMH referral indicators during the reporting period.  The number of DMH referrals fell to 12 during the monitoring period, down from the 31 referrals of the preceding monitoring period.  There were two referrals to acute care at the acute psychiatric program (APP) at CMF, one of which was rescinded by the institution.  One of the two APP referral packets was completed within two working days.

There were ten intermediate care referrals, three of which were rescinded by the institution.  Four inmates remained on the intermediate care waitlist at the time of the site visit.  One of the ten intermediate care referral packets was completed within five working days.  No DMH referrals were rejected.

Psych and return protocols were consistently followed.  SVSP received 34 inmates from DMH during the reporting period, all with discharge summaries that were immediately accessible via SharePoint.  Clinician-to-clinician contact occurred within five working days of an inmate's return.  Five-day clinical follow-up was ordered for all inmates returned from DMH, and internal audits showed that 91 percent of these contacts were completed.

SVSP had ten licensed MHCBs, all of which were operational and used by mental health patients throughout the reporting period.  There were 123 MHCB admissions during the reporting period, of which 66 were from other institutions.  SVSP generated approximately 190 MHCB referrals, of which 57, or 30 percent, were admitted.  Length of stay exceeded ten days for 46 of 123, or 37 percent of, admissions.  Three-quarters of the overly-long stays involved inmates who were awaiting transfer to DMH, pending transfer to another prison, or waiting for an empty bed at SVSP.  About a quarter of the overly-long stays were attributed to clinical factors such as medication adjustments, Keyhea proceedings, and symptom stabilization.

SVSP continued to use four inmate waiting rooms and three small modules in the CTC to monitor inmates for whom MHCBs were unavailable.  The waiting rooms were used to hold inmates overnight, during non-business hours, and during weekends.  They were equipped with sinks and toilets.  Inmates were provided with a safety mattress on the floor and a suicide-resistant smock and blanket.  When additional holding space was needed, four plumbed Board of Prison Term cells located on each yard could be used.

Placements in the holding modules and waiting rooms were recorded on separate logs that included the date and time of placement and release, the reason for

placement, and the discharge disposition.  These records indicated that inmates did not

spend more than four consecutive hours in the holding modules.  However, inmates were

often shuttled back and forth between the holding modules and waiting rooms before

being released to housing or admitted to the MHCB unit.  For these cases, total length of

stay in alternative holding areas could not be readily calculated and was not tracked by

the institution.

Access to outside EOP/Sensitive Needs Yard (SNY) programs was often

slow.  Eight of 15 inmates transferred to outside EOP/SNY programs waited longer than

60 days.  Three inmates were in non-EOP settings pending transfer, waiting 155 days,

100 days, and 150 days, respectively.  At the time of the monitor's visit, there were four

inmates awaiting transfer to outside EOP/ SNY programs, all of whom were housed in

non-EOP settings.  One inmate had been waiting five months.

Access to PSU beds was also slow in many cases.  Eleven inmates were

referred to PSUs during the reporting period.  In one case, the inmate's LOC was reduced

from EOP to 3CMS and the PSU endorsement was cancelled.  The remaining ten inmates

were endorsed and transferred.  The number of days from endorsement to transfer

exceeded 60 days in four of the ten cases, with delays among these four cases of 85, 90,

143, and 162 days.  At the time of the site visit, there were ten inmates with PSU transfer

endorsements, all of whom had been waiting longer than 60 days.  Four inmates had been

waiting several months.

Access to local segregation and 3CMS beds was often slow.  As of mid-

October 2011, there were nine 3CMS inmates housed within the mainline EOP program.

Five of these inmates had been awaiting transfer for about a month, and three had been

waiting for several months.  There were 15 segregation-status 3CMS inmates in overflow

beds, four of whom had been inappropriately housed for more than a month.

Other Areas:

MHCB

A full-time psychologist/clinical director, 1.5 FTE psychiatrists, a full-time psych tech, and a full-time RN were assigned to cover ten MHCBs.  This was reportedly 2.5 FTE positions short of the staffing coverage required by Title 22 for MHCB units with six to ten beds.  The appointment of a full-time clinic director had improved MHCB unit management.  Collected data was routinely reviewed and analyzed for  trends and compliance with Program Guide requirements.  Intake assessments were consistently completed within 24 hours of admission.  MHCB referrals were evaluated by a psychiatrist during regular business hours.  Initial IDTT meetings were routinely convened within 72 hours of admission, and weekly IDTT reviews occurred consistently. Required disciplines attended 91 to 100 percent of the IDTT meetings, all of which were held in a private conference room that was equipped with a therapeutic module.

An IDTT meeting observed by the special master's expert was attended by all required disciplines.  All reviewed inmates were cuffed during escort to and from the meeting and placed in a therapeutic module during the meeting.  Custody staff reported that the LOP governing MHCB services had been updated to give the treatment team the authority to recommend relaxed security protocols for general population inmates when clinically appropriate.  However, the revised operating procedure could not be located. Staff assigned to the MHCB unit did not have a clear understanding of the new policy and did not routinely assess an inmate's security status during IDTT reviews.

Compliance with daily clinical contacts improved notably during the reporting period, rising from a low of 68 percent in March to a high of 97 percent in June

124

2011.  Individual contacts were routinely held in a private conference room.  The assigned psych tech frequently interacted with MHCB inmates at the cell front, providing reading materials and writing supplies to eligible inmates.  A small recreation area adjacent to the MHCB unit was not used, thereby limiting out-of-cell time to IDTT meetings and clinical contacts.

Restraint had not been used in the MHCB unit for more than a year a half.

All inmates admitted to the MHCB unit, regardless of their diagnosis and presentation, were issued suicide-resistant smocks and blankets and slept on safety mattresses placed on the floor.  If deemed clinically appropriate after a period of observation, they were given T-shirts, boxer shorts, and socks.  Regardless of an inmate's length of stay in the MHCB unit, additional clothing was not permitted.  As during the previous monitoring visit, staff reported that hospital beds could be provided when clinically warranted, when discharged inmates were waiting to return to local housing or an outside prison, or when low-risk inmates were waiting for a DMH bed.  Although there were MHCB patients who met these criteria during the monitor's visit, none had been provided hospital beds.

EOP

The institution reported compliance rates of 92 to 100 percent for completion of initial IDTT meetings within 14 days, and 95 to 98 percent for completion of quarterly IDTT reviews.  An IDTT meeting observed by the special master's expert was attended by all required disciplines, although not always by the treating psychiatrist.  UHRs and central files were available.  PCs demonstrated a good understanding of the inmates on their caseloads.  Referral to DMH was considered by the IDTT and discussed with the inmates.  However, many of the case reviews observed by the special master's

expert were cursory.  Form 7388-Bs were completed prior to IDTT meetings and were not discussed in most cases.  Input from custody staff was not discussed.  UHRs and central files were consulted infrequently.  Information related to the inmate's work/educational assignments was not presented.

Proof-of-practice materials indicated compliance rates of 74 to 87 percent or an average of 85 percent for monthly psychiatric contacts during the reporting period. Problems in this area were largely attributed to inmate refusals and the lack of confidential interview space, and was to be addressed with increased use of cell-front contacts.

Compliance with weekly PC contacts was not consistently captured by MHTS.net.  More reliable data gathered during June and July 2011 yielded compliance rates of 74 to 98 percent or an average of 90 percent.  Data provided by the institution indicated that 53 percent of PC contacts were completed in non-confidential settings, attributed largely to limited treatment space and inmate refusals.  Records reviewed by the special master's expert indicated that clinician cancellations were a factor in the number of cell-front contacts.

Institutional data indicated that mainline EOP inmates were offered an average of 8.4 hours of therapeutic activity per week and completed an average of 5.3 hours per week, for a refusal rate of 37 percent.  The institution's inability to routinely offer ten or more hours was largely the result of group cancellations, 80 percent of which were attributed to clinicians.  A substantial proportion of the offered therapeutic activities were loosely structured and seemingly unrelated to identifiable treatment goals. However, core groups, such as stress management, communication, and health and wellness, and some focused elective groups such as diabetes management and parole

126

planning, had clear therapeutic objectives.  Most mainline EOP inmates had jobs and/or

educational assignments for which they were credited up to four hours of structured

treatment per week.  The work assignments were not routinely discussed during IDTT

reviews and in many cases involved unstructured duties that were difficult to monitor and

to incorporate into treatment goals.  Due to a shortage of indoor group space,

approximately half of all EOP groups were held outdoors.

          Use of modified treatment plans in the mainline EOP program was

reportedly phased out during the monitoring period.  However, the institution continued

to refer mainline EOP inmates to the EECP, which was essentially an EOP program for

low-functioning and chronically mentally ill inmates who were unable to fully participate

in regular EOP programming.  Monthly IDTT reviews were required for all EECP

inmates.  Compliance with monthly IDTT reviews ranged from 47 to 88 percent, and

averaged 76 percent during the reporting period.  EECP inmates were also assigned to

traditional groups within the mainline EOP.  At the time of the monitor's visit, there were

two PCs and a psych tech assigned to cover 28 inmates in the EECP.  According to local

policy, these inmates were to be seen by their PCs at least twice per week, once

individually and once in group therapy.  If an inmate failed to attend his PC's group, the

clinician was required to talk with the inmate.  The assigned psych tech was responsible

for providing daily guidance and prompts to EECP inmates regarding hygiene,

medication compliance, and treatment activity schedules.  EECP inmates were offered an

average of 6.7 therapeutic activity hours a week, and refused 48 percent of these

activities.

Administrative Segregation EOP

SVSP produced weekly reports on EOP hub census and lengths of stay for five of six months of the reporting period, except for April due to staff turnover.  The reports indicated that the number of EOP inmates in segregation ranged from 59 to 67, well under the hub's capacity of 72 inmates.  On average, 53 percent of the EOP inmates in segregation at any given time had been there longer than 90 days.  It was not clear from the reports what, if anything, the institution did to shorten lengths of stay or explore alternative housing arrangements.

MHTS.net data showed that 87 percent of EOP inmates placed in segregation received a brief mental health intake assessment within five working days and that 95 percent of initial IDTT reviews were held prior to the intake ICC hearing.

Compliance rates for quarterly IDTT reviews ranged from 95 to 100 percent.  An IDTT meeting observed by the special master's expert was attended by all required participants.  It appeared that referral to intermediate care was discussed when clinically indicated.  There was meaningful discussion among the team members.  UHRs and/or eUHRs were available for all reviewed cases.  The correctional counselor was not familiar with a number of the reviewed inmates.  However, while Form 7388-Bs were present, the information on them was not discussed in all cases.  It did not appear that information about RVR histories was always available.

MHTS.net data yielded compliance rates of 86 to 100 percent for the completion of weekly PC contacts in administrative segregation.  However, 40 to 62 percent of these contacts occurred in non-confidential settings.  The high rate of non-confidential contacts was attributed to inmate refusals, space limitations, lockdowns, and lack of adequate coverage for clinician absences.  UHRs reviewed by the special master's

expert indicated that cell-front contacts were frequently the result of clinician absences, staff cancellations related to mandatory meetings and training sessions, and the lack of confidential treatment space.

Inmates were reportedly offered an average of 9.7 hours of therapeutic activity per week, and refused just over 40 percent of the activities. Various remedial actions to address poor group participation during the reporting period yielded uneven results. The appointment of new group facilitators and changes in group structure had no discernable impact on attendance, while the creation of groups geared toward higher-functioning inmates and the availability of Spanish-speaking groups had increased participation. Hub inmates interviewed by the special master's expert consistently complained of demeaning behavior on the part of custody officers. Reportedly, this was a factor that dissuaded some inmates from attending out-of-cell activities.

At any given time during the monitoring period, there were eight to 12 EOP inmates in segregation who refused more than half of all offered mental health treatment. They were given modified treatment plans that prescribed daily PC contacts and monthly IDTT reviews. Audits yielded compliance rates of 98 percent for daily contacts and 76 percent for monthly IDTT reviews. Data collected by the institution indicated that inmates with modified treatment plans were offered an average of 10.4 hours of therapeutic activity per week, but participated in only 3.7 hours a week, for an overall refusal rate of 64 percent.

Treatment space was substandard. There were two group rooms that were equipped with a total of 19 therapeutic modules, none of which conformed to requirements. In addition, the modules in both group rooms were configured so that participants could not see one another.

129

3CMS

MHTS.net-based audits found that the compliance rate for contacts within ten days of arrival rose from 84 percent in February 2011 to 98 percent in July 2011. Compliance rates for completion of IDTT reviews within 14 working days for inmates from other prisons, and within 30 calendar days for inmates transferred to mainline from segregation, ranged from 78 percent to 97 percent and averaged 88 percent. Noncompliance early in the reporting period was attributed to scheduling problems.

MHTS.net tracking reports generated compliance rates of near 100 percent for the timely completion of quarterly PC contacts and annual IDTT reviews. Monthly UHR audits found that 80 to 93 percent of reviewed treatment plans were individualized in that there were documented treatment goals, methods, and outcome measures for each identified problem. Just over 90 percent of the reviewed treatment plans indicated that group therapy was offered to the inmate during the IDTT meeting. The same audits indicated that 73 to 93 percent of IDTT meetings were attended by a clinician, psychiatrist, and CC I, but it was not clear if these persons were assigned to the specific inmate under review.

An IDTT meeting observed by the monitor on C-facility was attended by all required disciplines and the inmates. UHRs were available. The reviewed cases were all well presented by the PC. Staff reported that they had access to the information needed to fully complete Form 7388-Bs and did so, but these forms were not discussed during the IDTT meeting observed by the monitor.

The institution reported that ducated 3CMS appointments were completed 81 to 89 percent of the time, and that only one percent of ducated appointments were refused by inmates.

130

Twenty groups were offered to 3CMS and non-MHSDS inmates, but only A-facility was able to offer programming regularly during the reporting period. Frequent lockdowns on the other yards rendered it impossible to offer groups with meaningful regularity. Data provided by the institution indicated that staff scheduled 60 to 92 groups a month, 42 percent of which were cancelled. Fifty-six percent of the cancellations were due to lockdowns, and 31 percent were attributed to mental health staff.

Administrative Segregation 3CMS

There were 203 segregated 3CMS inmates at SVSP. Of these, 188 were housed in the EOP hub and in Unit D8, and another 15 were housed in overflow beds on facilities A, B, and C. 3CMS inmates housed in the hub were assigned to PCs with mixed caseloads of EOP and 3CMS inmates. Treatment space in unit D8 was limited to one private office that was shared by mental health, medical, and nursing staffs, and was insufficient. Consequently, a significant number of clinical contacts occurred in non-confidential modules located on the dayroom floor.

Internal audits found that 74 to 91 percent of the time, initial clinical contacts occurred within five days of placement in segregation. Initial IDTT meetings were routinely held within two weeks of placement in segregation or prior to the first ICC hearing. Compliance rates for quarterly IDTT reviews approached 100 percent.

Internal audits showed nearly full compliance with weekly PC contacts, but 55 percent of the contacts occurred in non-confidential settings. Cited reasons for non-confidential interviews were inmate refusals, lockdowns, staff shortages, and lack of confidential space. Inmates interviewed by the special master's expert stated that the non-confidential nature of most contacts was a disincentive for accepting offered out-of-cell appointments. 3CMS inmates in segregation were not offered group therapy.

131

A significant number of 3CMS inmates who were on psychotropic medications were not seen monthly by a psychiatrist, with compliance rates ranging from 68 to 77 percent during the reporting period.  The institution reported that EOP inmates were given priority over 3CMS inmates as a result of inadequate psychiatric coverage in segregation units.

SVSP did not routinely track compliance with court-ordered mandates applicable to the stand-alone administrative segregation unit known as D9.  The institution reported that eight inmates from D9 were designated 3CMS and removed from the unit during the six-month reporting period, but did not indicate whether they were removed within 24 hours.  The institution did not report on whether MHSDS inmates were mistakenly placed into unit D9, nor did it separately track response times for referrals from unit D9.

Referrals

Tracking of referrals improved as response data was captured for all referrals, including those from segregation and those among EOP inmates.  Provided data indicated that from January 30, 2011 to July 30, 2011, there were 27 emergent referrals, of which 24, or 89 percent, resulted in a response within four hours.  There were 144 urgent referrals during this period, of which 134, or 93 percent, triggered a response within 24 hours.  During the same time period, inmates and staff generated 703 routine referrals, of which 581, or 83 percent, prompted a response within five working days.

Medical Records

The eUHR system was activated at SVSP on July 19, 2011, during the last month of the reporting period.  Staff reported that the new system was an improvement over paper UHRs and that documents were continually being scanned more quickly.

132

Mental health staff believed that more tabs were needed and that critical historic documents such as past assessments, the most recent treatment plan, and relevant chronos needed to be scanned into the eUHR.

RVRs

Of the total 1,764 RVRs issued during the six-month reporting period, 865 were issued to MHSDS inmates, including four to MHCB patients, 154 to EOP inmates, and 707 to 3CMS inmates.  The institution reported that all RVRs issued to MHCB and EOP inmates were referred for assessments that were used as part of the disciplinary process.  The institution did not report the number of RVRs involving 3CMS inmates who were referred to mental health.  It did report that no RVRs were issued for suicidal or self-injurious behavior during the reporting period, nor were any RVRs issued for cheeking/hoarding medications.

As of mid-October 2011, SVSP had not implemented the new RVR protocol for 3CMS inmates, citing inadequate staffing ratios.

**Wasco State Prison (WSP)**
September 19, 2011 – September 21, 2011

Census:

On September 16, 2011, the total population at WSP was 5,791.  There were 5,317 inmates in the reception center.  The total MHSDS population was 1,185, including 108 EOP and 954 3CMS inmates in the reception center.  The 3CMS mainline population was 28.  There were eight inmates in the MHCB unit.  The total administrative segregation population was 171, which included 36 EOP inmates and 46 3CMS inmates.

Staffing:

WSP did not distinguish between use of contractors and use of dual appointments to cover staffing vacancies.  The chief psychiatrist and senior psychiatrist positions, the chief psychologist position, three senior psychologist positions, and the senior psychologist specialist position were all filled.

Of the 7.05 staff psychiatrist positions, 1.5 were filled, leaving a 79-percent vacancy rate.  Coverage was provided for 5.5 of the vacant positions, resulting in a one-percent functional vacancy rate in psychiatry.

For the 39.52 staff psychologist positions, 32.25 were filled, for a vacancy rate of 18 percent.  Two positions were covered, reducing the functional vacancy rate for staff psychologists to 13 percent.

Eight of the ten social work positions were filled, leaving a 20-percent vacancy rate.  With one vacancy covered, the vacancy rate was reduced to ten percent.

The senior psych tech position and six of seven psych tech positions were filled.  A FTE contractor filled one psych tech position, resulting in full coverage for psych techs.

One of 1.5 recreational therapist positions was filled.  Of the three psychometrist positions, two were filled, resulting in a 33-percent vacancy rate.  The health program specialist position and 8.5 of 10.5 clerical positions were filled, resulting in a 19-percent clerical vacancy rate.

Quality Management:

WSP's local governing body met three times during the reporting period.  Minutes were maintained.  The local governing body provided final approval for all LOPs.

The quality management committee met six times during the reporting period, with a quorum present at all meetings.  It collected reports from each service area and heard regular reports from the various subcommittees.

The mental health subcommittee met monthly during the monitoring period.  Minutes were kept.  A quorum was present at all meetings.  The chief of mental health served as chair.  Regular duties of the mental health subcommittee included overseeing mental health services and reviewing program performance.

Two QITs were chartered during the monitoring period.  One was chartered in March 2011 to address concerns related to emergency medication administration, medication noncompliance referrals, and HS and DOT medications.  The other was chartered by the SPRFIT in May 2011.

Psychiatry peer review was conducted quarterly, with two reviews during the monitoring period.  Seven psychiatrists and 35 UHRs were reviewed.  Deficiencies were found in notation of psychiatric symptoms, documentation of AIMS results, obtaining of medication consent forms, and reviewing of laboratory test results.  WSP reported improvements in all of these areas by June 2011.

Peer review for PCs was organized in October 2010.  Four meetings were held during the reporting period, with 14 clinicians and 57 UHRs reviewed.  Identified deficiencies were clinicians' failure to complete the functional impairment sections on Form 7388-Bs, and failure to note all factors on the SRE.

Suicide Prevention:

There were no completed suicides during the monitoring period.

The SPRFIT met monthly with six meetings during the reporting period.  It reported to the mental health subcommittee.  Attendance was good, with a quorum

135

present at each meeting.  Agenda items included discussion of inmates placed into alternative temporary housing, review of MHCB admissions data, and welfare checks for inmates discharged from MHCBs or returned from DMH facilities.

The emergency response review committee met six times during the reporting period.  Minutes were provided for review in the proof-of-practice binders.  The monitor's check found that the cut-down kit was available in the control booth and that all queried officers were carrying micro-shields.  Staff received annual CPR refresher training.

WSP reported a compliance rate of 100 percent for clinical five-day follow-ups.

According to the institution's report, SREs were performed 87 percent of the time prior to MHCB admissions, and 53 percent of the time upon discharges.  Follow-up evaluations were performed in 82 percent of cases.

In administrative segregation, interviews with custody staff indicated that morning meetings between custody and mental health staff occurred daily.  There was a discrepancy in the institution's management report with regard to documentation of those meetings, but the institution reported that an alternative documentation and auditing process had been developed to correct it.

Audits of pre-placement screening in administrative segregation indicated a compliance rate of 73 percent for the monitoring period.  The institution reported 98-percent compliance with completion of the 31-question screen within 72 hours of placement in administrative segregation.

Newly-placed administrative segregation inmates were identified by cell door placards.  WSP reported 100-percent compliance with completion of 30-minute

custody welfare checks.  The monitor's review of the custody logs confirmed compliance.

Staff reported that administrative segregation inmates were offered ten hours of yard per week.

WSP reported that inmate profiles were generated and sent with the inmate upon transfers to other institutions.

Medication Management:

Medication management audits were completed on a monthly basis, based on a randomly selected sample of ten or more UHRs.

The institution reported that on August 25, 2011, there were 1,793 active prescriptions for psychiatric medications.  Staff indicated that it was not possible to determine from the database the number of individual inmates receiving multiple prescriptions.

WSP reported that 98 percent of new arrivals received medications by the next calendar day.  Following inmate transfers within the institution, 90.74 percent of inmates received their prescribed medications without interruption.  No audit information was provided regarding compliance with continuity of medications after discharge from the MHCB unit.

Audits found that 100 percent of inmates received timely renewals of their psychiatric medications.

Based on audits of 31 charts, 63 percent of inmates who were noncompliant with medications had follow-up appointments with a psychiatrist within seven days of the referral.

The institution reported that length of time for medication delivery for the facility A clinic window averaged 24 minutes for an average of 30 inmates.  For cell-to-cell delivery in administrative segregation, the average time was 40 minutes for an average of 85 inmates.  For facility B in housing unit three, the average time was 95 minutes for an average of 194 inmates.  WSP reported that a follow-up review in August 2011 showed a decrease in the three pill lines in facility B housing to an average of 45 minutes.

The institution reported that an audit of 37 randomly selected UHRs indicated that 62 percent of ordered laboratory tests were correctly noted when clinically indicated and that the AIMS evaluation was completed 72.97 percent of the time.

There were 1,339 active prescriptions for DOT psychiatric medications reported by the institution.  No audit information was available to determine compliance with DOT administration procedure.

A review of the MHTS.net data that was provided indicated that there were 15 active Keyhea petitions at the time of the monitor's visit.  Data on hearing dates did not lend itself to interpretation as to whether the Keyhea petition was being initiated or continued.  Consequently, it was not possible to gauge the number of Keyhea petitions initiated during the monitoring period.

The institution reported 1,047 HS orders for psychiatric medications.  No audit information was available to determine the percentage of HS medications that were administered after 8:00 p.m.

With regard to parole medications, the institution reported that a review of 30 UHRs found that 100 percent of paroling inmates had signed receipts for their medications.

138

Sexual Misconduct:

According to information provided by the institution, 34 RVRs related to sexual misconduct were issued during the reporting period, and 28 were referred for a mental health screening.  An IDTT review was conducted for 27 inmates, and one inmate was transferred prior to screening.  Seven inmates were referred for comprehensive evaluations.

No inmates were diagnosed with Exhibitionism or Paraphilia NOS during the reporting period.  One inmate who had previously been diagnosed with Exhibitionism and referred to a treatment program was awaiting transfer at the time of the site visit. WSP did not provide any treatment for Exhibitionism or Paraphilia NOS.

Five RVRs had resulted in SHU terms at the time of the site visit, while others were still pending evaluation.  During the monitoring period, 28 sexual misconduct RVRs were referred to the district attorney.

Transfers:

WSP had a clinician who served as a full-time DMH coordinator during the monitoring period.  Maintenance of the DMH referral and non-referral logs improved. The acute care and intermediate care logs were combined into one log for which the DMH coordinator was responsible for entering all of the data.  A review of these logs indicated that they were well maintained.

The institution reported that there were 81 referrals to DMH, including 43 to acute care and 37 to intermediate care.  Timelines for completing the referrals were not met, with only 35 percent of the acute care referrals completed within two days and 50 percent of the intermediate care referrals completed within five days.  WSP reported several rejections from DMH.

The institution reported that there had been 26 inmates discharged from DMH to WSP during the monitoring period.  Discharge summaries were regularly received prior to the discharges.  In 67 percent of cases, follow-up clinician-to-clinician contacts occurred within five working days.

WSP had six designated MHCBs in the CTC and one observation room. According to internal logs, there were 239 admissions to the MHCB unit during the monitoring period.  The average length of stay was 6.6 days, with a range of one to 46 days.  There were 45 inmates whose lengths of stay were greater than ten days.  The institution reported that the reasons for the longer stays included reports of suicidal intent by 37 inmates, instability of six inmates, treatment-resistance of one inmate, and a new treatment program for one inmate.  Inmates were not retained in the MHCB unit while awaiting DMH placement.

The institution reported 406 placements into alternative temporary housing during the monitoring period.  The average length of stay was 1.92 days. WSP reported that 100 percent of the inmates there were placed on suicide watch while awaiting assessment or MHCB placement.  Of the 406 placements, 141 were admitted to the MHCB unit.

Two inmates were transferred to a PSU during the reporting period. Neither inmate was transferred within 60 days.  No data was available with regard to PSU inmates awaiting transfer at the time of the site visit.

There were 61 inmates referred to administrative segregation hub institutions during the reporting period.  The average length of stay for those inmates was 103 days, with a range of seven to 306 days.  Data was not available regarding the percentage of those inmates who were transferred within 30 days.

WSP reported that 44 EOP inmates transferred during the reporting period.  No data was reported with regard to the number of days from referral to endorsement, or the number of days from endorsement to transfer.  As of September 16, 2011, of the 128 inmates pending transfer to an EOP program, 63 had been awaiting transfer longer than 60 days.

According to information provided by the institution, 54 3CMS inmates transferred from the reception center during the monitoring period.  Of those, 14 had lengths of stay exceeding 90 days.  At the time of the site visit, 1,280 3CMS reception center inmates were pending transfer.  Their stays ranged from five to 924 days, with 832 inmates experiencing stays in excess of 90 days.  Bed availability at receiving institutions was cited as the most common reason for delayed transfers.

Other Issues:

Reception Center

Pre-site visit material from the institution indicated a range of 131 to 137 EOP inmates, or a monthly average of 134 EOP inmates in reception center, including those housed in administrative segregation.  Reception center EOP inmates were clustered in facility B.  They were provided with mental health evaluations, individual case management, group therapy, psychiatric medication management, and pre-release parole planning as needed.  IDTT meetings and treatment were conducted in the chapel space.  Only one confidential space was available for groups.

MHTS.net data provided by the institution showed that monthly psychiatric contacts occurred in 97 percent of the time, and weekly PC contacts occurred 96 percent of the time.  While MHTS.net data indicated that PC contacts were in

confidential settings in 96 percent of cases, staff indicated that during some months the rate was closer to 40 percent.

The institution reported that its compliance rate for offering reception center EOP inmates at least five hours of structured activities per week was 79 percent during the reporting period. Inmates were assigned to groups based upon clinical need and compatibility. EOP reception center inmates reported that access to groups was reasonably good, and that they were offered outside recreation on a regular basis.

The average monthly census of 3CMS inmates in reception center was 1,163, with a range of 1,062 to 1,230 inmates. Reception center 3CMS inmates were housed throughout the institution.

For 3CMS inmates on prescribed psychotropic medications, quarterly psychiatry contacts occurred in 97 percent of cases. According to audit data provided by the institution, initial PC contacts for 3CMS inmates were timely in 75 percent of cases, and were compliant with 90-day follow-up contacts.

Administrative Segregation

Initial IDTT meetings for EOP inmates in administrative segregation were reported to occur within 14 days in 84 percent of cases. Inmates participated in slightly more than half of meetings. Information from data provided by the institution, chart reviews, and staff and inmate interviews all indicated that follow-up IDTT meetings occurred at least every 30 days.

MHTS.net data provided by the institution indicated that EOP inmates placed in administrative segregation received timely required psychiatry contacts 83 percent of the time, and timely individual PC contacts 77 percent of the time. MHTS.net data also indicated that 96 percent of contacts took place in a confidential setting, but the

142

institution noted that this figure was inaccurate due to coding problems with MHTS.net.

Alternative sources of accurate data were not available on the number of confidential

contacts, but staff acknowledged that many weekly PC contacts did not occur in a

sufficiently confidential setting.

WSP reported that 70 percent of the EOP inmates in administrative

segregation were offered at least five hours of structured therapeutic activities per week.

MHTS.net data and discussions with staff indicated that refusal of groups by EOP

inmates was problematic.  According to MHTS.net data, on average, 37 percent of

inmates refused more than 50 percent of offered activities during any given week.

However, chart reviews indicated that at times inmates who were noted to have refused

activities were actually not present on the unit, for example, having been transferred to

the MHCB unit.

Inmates were assigned to groups based upon cell location rather than

clinical need.  Group attendance was inconsistent, making it difficult to establish a sense

of group cohesion and otherwise conduct effective groups.  Staff noted that on the day of

the special master's expert's tour of the unit, there were 37 EOP inmates housed in

administrative segregation.  The five available treatment modules did not meet

specifications and were arranged in a straight row.  Without apparent difficulty, an EOP

inmate using a wheelchair attended and participated in a group that was observed by the

special master's expert.

MHCB

Compliance data generated by MHTS.net indicating noncompliance with

timeliness of initial and weekly IDTT meetings for MHCB admissions was disputed by

staff.  However, because the institution had not maintained internal logs for MHCB

timelines, it was unable to provide alternative data on compliance levels.

The special master's expert observed an IDTT meeting.  It was well

attended, with good, thorough, interdisciplinary clinical exchanges.  There was regular

discussion and consideration of referral to DMH for those inmates who had not stabilized

sufficiently within the ten-day period or who had had multiple MHCB admissions.  Both

observation of the meeting, and analysis of available data, indicated that staff regularly

considered DMH referrals, but the Form 7388-B was not necessarily accurately

completed or discussed during the IDTT meeting.  A review of the audits of the Form

7388-B indicated some concerns with correct notation of indicators for consideration for

DMH referral, and documentation of the rationale for non-referral to a higher LOC.

Inmates attended IDTT meetings cuffed or uncuffed, based on clinical and custodial

determinations, and sat in a chair in the meeting room.

Five-point restraints were used three times during the monitoring period.

Durations ranged from two hours and six minutes to four hours and 15 minutes, or an

average of three hours.  Review of the restraint log indicated that waist chains were used

on one inmate three times for the purposes of medical restraint.  Durations of time in

waist chains ranged from 26 hours and 22 minutes to 347 hours and 50 minutes, with an

average of 139 hours.

The seclusion room was utilized on 66 occasions.  WSP reported that one

inmate had been placed in the seclusion room on ten different occasions.  Durations in the

seclusion room ranged from 40 minutes to 34 hours and 45 minutes.

One of the MHCBs was designated for inmates with disabilities.  The

MHCB unit continued to use mattresses on the floor.

144

3CMS

The institution reported an average of 31 inmates in the mainline 3CMS program during the reporting period.  Initial assessments were timely in 75 percent of cases.

Initial IDTT meetings were timely in only 44 percent of cases, but timeframes for follow-up IDTT meetings were met.  Psychiatry was present at 79 percent of IDTT meetings.  Participation by CC Is was not tracked.

Timeframes for clinical contacts were met.  The three groups that were offered during the beginning of the monitoring period had since been cancelled due to both lack of staff and preference among 3CMS inmates for work assignments.  Participants in the groups that were run were predominantly mainline inmates not involved in the MHSDS.

Referrals

There were discrepancies between MHTS.net data and internal logs with regard to the number of referrals generated during the monitoring period.  MHTS.net data indicated that the timelines for response to urgent and routine referrals were not always met, but it was impossible to get definitive data.  According to the MHTS.net data, 99 percent of the 973 emergent referrals were seen on the same day.  Of the 102 urgent referrals, 38 percent were seen within 24 hours.  Of the 7,196 routine referrals, 43 percent were seen within five working days.

MHTS.net

Staff reported that they had difficulties with the accuracy of compliance data generated from MHTS.net and that discussions with HQ to resolve the problem were ongoing.

145

Heat Plan

The institution was compliant with the heat plan.  Indoor and outdoor temperatures were being logged in the facilities and forwarded to the heat plan coordinator.  A monthly heat report was submitted to HQ during the heat season.  The pharmacy prepared a weekly list of all inmates taking heat-sensitive medications.  There were no heat-related incidents reported during the monitoring period.

RVRs

WSP reported a total of 1,282 RVRs issued to inmates during the reporting period.  Discrepancies between the data in the mental health and custody logs made it difficult to accurately determine the numbers of RVRs issued according to LOC. However, according to the custody logs, two RVRs were issued to inmates in the MHCB unit and 106 were issued to EOP inmates.  The number of RVRs issued to 3CMS inmates during the reporting period was not available, but it was known that 25 3CMS inmates who received RVRs were referred for mental health assessments.

Pre-Release Planning

The institution retained a clinician who had expertise in pre-release planning.  The data provided was not entirely consistent, although WSP indicated that it was dealing with this issue.  The LOP dated August 2011 appeared to adequately provide for pre-release planning.  There was no formalized staff training on re-entry planning, but it was reportedly being done on an individual basis.

**Kern Valley State Prison (KVSP)**
November 15, 2011 – November 17, 2011

Census:

KVSP reported that on November 14, 2011, it housed 4,505 inmates, for a one-percent decrease since the preceding monitoring period.  KVSP's mental health

caseload population was down by one percent, at 1,429.  There were 12 inmates in the

MHCB unit.  There were 80 EOP inmates in the SNY program and two EOP inmates

housed elsewhere.  There were 1,140 mainline 3CMS inmates.  The administrative

segregation population included 35 EOP and 158 3CMS inmates.

Staffing:

There were 17.62 vacancies among the allocated 56.12 mental health

positions, for a 31-percent vacancy rate in mental health.  Contractors provided an

additional 14.5 FTE coverage, reducing the functional vacancy rate in mental health to

six percent.  Positions for the chief psychiatrist, chief psychologist, one senior

psychologist, and one supervising social worker were all filled.  Two of five staff

psychiatrist positions were filled.  Use of contractors reduced the functional vacancy rate

in psychiatry to zero.

Of 12.5 staff psychologist positions, 6.5 were filled and all remaining

vacancies were covered by contractors.  Six of nine social worker positions were filled,

and contractors covered all of the remaining vacancies.

The senior psych tech position was filled, as were 12 of 13.62 line psych

tech positions.  Two of four recreation therapist positions were filled, as were positions

for five of seven office technicians.

Quality Management:

The local governing body met six times.  Minutes were provided for four

of those meetings, all of which achieved a quorum.

The quality management committee met seven times, with a quorum at

each meeting.  Meeting minutes were generally sparse with mental health information.

The chief of mental health chaired the mental health subcommittee, which met 11 times, with a quorum present at all meetings.  Extensive minutes were maintained. The committee addressed IDTT meetings, psychiatry and PC contacts, administrative segregation, clinical five-day follow-up, medication management, peer review, MHCB admissions, DMH referrals, the EOP SNY program, and SharePoint.

There were no active QITS.

Psychiatry peer review consisted of five sessions of examining UHRs. Psychologist and social worker peer review met five times and generally consisted of instructional sessions on such topics as SREs, group curriculum, positive inmate interventions, and confidentiality issues, plus a chart review which examined clinical performance.

Suicide Prevention:

There were no completed suicides at KVSP during the review period.

The SPRFIT met monthly and maintained meeting minutes, but attendance was poor.  SPRFIT agenda items included five-day follow-up, completed suicides, self-injurious behavior, suicide watches, and SRE training.

Control rooms in all administrative segregation units had cut-down tools.

KVSP reported a compliance rate of 92 percent for clinical five-day follow-up for inmates released from the MHCB unit or alternative housing cells.  The institution was unable to report on compliance with custody checks.

Efforts to improve staff competency with SREs were initiated.  Two clinicians were already trained, and a third was in the process of being trained, on how to conduct more effective evaluations.  Reports by clinicians and inmates, and review of records, indicated improvements in the quality of the evaluations, although it was not

148

clear that information from these evaluations was routinely incorporated into treatment plans.

In administrative segregation, UHR audits indicated a 90-percent compliance rate for completion of pre-placement screens.  Cells of newly-arrived inmates were appropriately marked for three weeks.  While documentation of 30-minute welfare checks contained few blanks, the checks were not completed at staggered intervals. Audits indicated compliance for daily psych tech rounds.

Except for a handful of new intake cells, administrative segregation cells were equipped with electrical outlets.  Mental health caseload inmates in administrative segregation were offered approximately five hours of yard two times per week.

Medication Management:

Review of MARs indicated a compliance rate of 86 percent for medication continuity following housing moves of inmates prescribed psychotropic medications.

Audits of medication orders being renewed, substituted, or discontinued found an aggregate compliance rate of 91 percent.  Medications were provided to inmates no later than the next business day following a change in medication or dosage in 87 percent of cases.

Audits of ten MARs per week for documentation of inmate medication refusals of psychotropic medications for three or more consecutive days found a compliance rate of 90 percent for documentation in the MAR.  In cases of inmate refusals for three consecutive days or for 50 percent of prescribed medications during a seven-day period, the compliance rate for contacting the provider within seven calendar days of the last missed dose was 61 percent.

The institution did not use centralized pill lines.

An audit indicated that of 102 ordered laboratory studies, 70 percent were completed, three percent were not completed, and 27 percent were refused by inmates.

During the review period, 60 Keyhea orders were granted, 23 were denied, four were improperly served or contained administrative errors, and two were dropped. The chief psychiatrist deferred to the administrative law judge on decisions to terminate Keyhea orders.

Ninety-seven inmates paroled with prescriptions for psychotropic medication.  All existing medication orders were renewed for 30 days.  Ninety-two percent of paroling inmates signed receipts for parole medications.

Sexual Misconduct:

Fifteen inmates received 17 IEX RVRs.  All were referred for mental health screens.  Apart from one unrecorded screen date, 12 of the remaining 16 or 75 percent were not completed within 72 hours of the incident.  There were three diagnoses of Exhibitionism and referrals to Exhibitionism treatment programs.

Yellow placards were on the cell windows for inmates who received IEX RVRs.

Transfers:

The institution had one DMH coordinator for the CTC, and another for the remainder of the institution.

There were 16 referrals to acute care.  Of these, 11 were completed timely. Thirteen of the 16 acute care referrals resulted in transfers, with two of them timely. DMH rejected one acute care referral.

There were two referrals to intermediate care.  Both were completed timely.  Neither intermediate care referral resulted in a transfer.  Staff reports and records

150

indicated frustration with waiting times for intermediate care referrals, resulting in referrals to acute care or discharges from the MHCB unit to the EOP or 3CMS levels of care.

There were 220 entries on the DMH non-referral log.  Rationales for non-referrals improved since the preceding monitoring period, although some continued to merely repeat the indicators for consideration for referral.  Audits of Form 7388-Bs generally examined whether these forms were present and whether all fields were complete.

The special master's expert observed IDTT meetings for both the MHCB and EOP SNY programs.  Staff had access to data relevant to indicators for consideration of inmates for referral to DMH.  Inmates were appropriately referred from the MHCB unit to acute care, although referral was not discussed during IDTT meetings for all inmates who met referral indicators.

Three inmates returned from DMH.  Notice of these discharges arrived via MHTS.net as new arrivals.  The compliance rate for clinical five-day follow-up after returns from DMH was 33 percent.

KVSP had a 12-bed MHCB unit.  There were 284 MHCB referrals and 231 admissions.  MHCB stays ranged from zero to 58 days and averaged 7.1 days. Excluding inmates on the DMH wait list, the average stay for MHCB inmates was 5.4 days.  Seven stays ranged from 40 to 58 days, and 50 stays exceeded ten days.  The average stay for MHCB inmates with stays longer than ten days was 19.46 days. Nineteen inmates had three or more MHCB stays.

There were 99 placements in alternative housing, of which 64 were ultimately placed in the MHCB unit.  The average stay lasted 1.8 days, and ranged from

zero to five days.  Ninety-five percent of inmates placed in alternative housing for suicidal or self-injurious behaviors were administered a SRE prior to placement.

Three inmates transferred to the PSU.  Two EOP inmates with SHU terms were pending PSU endorsement or transfer.  A reviewed of C-files indicated that administrative errors delayed access to the PSU.

Reports completed every other week that tracked administrative segregation EOP inmates indicated that 20 to 28 EOP inmates were housed in administrative segregation at any given time during the review period.  Access to EOP hub beds was problematic.  As of mid-November 2011, 20 of 35 EOP inmates in administrative segregation had been there for 90 days or longer.

Other Issues:

Administrative Segregation

MHTS.net data indicated that compliance rates for timely completion of initial IDTT meetings were 62 percent for EOP inmates and 79 percent for 3CMS inmates.  Combined data for timeliness of initial and follow-up IDTT meetings for EOP and 3CMS inmates indicated compliance.  Completion of timely initial and follow-up treatment plans was 75-percent compliant for EOP inmates and 69-percent compliant for 3CMS inmates.

IDTT meetings were attended by all required disciplines.  However, UHRs were not present and eUHRs could not be accessed.  Meetings were not held in confidential settings.  Although discussions were fairly cursory, treatment issues were being resolved.

Timeliness of initial psychiatry contacts was compliant for both EOP and 3CMS inmates.  Timeliness of initial PC contacts was compliant for 3CMS inmates, but

152

was 65-percent compliant for EOP inmates.  Despite large caseloads, staff reported that most inmates were routinely seen weekly.  KVSP reported that about half of all PC contacts occurred at cell front.  Out-of-cell contacts took place in non-confidential holding cells in the dayrooms.

Therapeutic groups utilized six treatment modules, two of which were wheelchair-accessible.  Each PC ran a weekly one-hour group.  Staff also reported that recreation groups were offered, but frequency and number of participants were not reported.

MHCB

Inmates in the MHCB cells were provided with mattresses but not beds, and those admitted to MHCB safety cells were not provided with mattresses.  MHCB inmates initially received smocks and blankets, and potentially additional clothing and footwear as they stabilized.  The MHCB unit contained confidential space for IDTT meetings and one-to-one clinician contacts.

All inmates admitted to the MHCB unit during working hours received a pre-admission screening.  The institution reported full compliance for daily contact with a psychiatrist or psychologist but MHTS.net indicated a compliance rate of 83 percent.

Initial IDTT meetings were timely in 93 percent of cases according to MHTS.net, while audits indicated 100-percent compliance.  In all cases, inmates were offered an IDTT meeting twice per week.  Audits found IDTT attendance rates of 95 percent for psychiatrists, 90 percent for PCs, 100 percent for nurses, and 60 percent for correctional counselors.  Observed IDTT meetings were attended by a full complement of staff.  No inmates were handcuffed.  UHRs were available.

Mental health staff and custody reviewed inmates on level of clinical risk, and the need for, and extent of, use of restraints.  There were 13 applications of five-point restraint involving nine inmates, including one who had four applications and another who had two.  One application exceeded 24 hours.  There were five incidents of seclusion, with durations ranging from two to 90.9 hours.

EOP SNY

For EOP SNY inmates, MHTS.net indicated a compliance rate of 73 percent for timeliness of initial IDTT meetings and 92 percent for timeliness of quarterly IDTT meetings.  Psychiatrists, PCs, and inmates were all in attendance at IDTT meetings 93 percent of the time.  Treatment plan updates were timely in only 24 percent of cases.  UHRs were not accessible but staff in attendance appeared to have sufficient familiarity with inmates' cases.

3CMS

MHTS.net data indicated a 46-percent compliance rate for timeliness of initial IDTT meetings.  Follow-up annual IDTT meetings were compliant.

Compliance rates for timeliness of initial psychiatry and PC contacts were 99 percent and 67 percent, respectively.  Quarterly psychiatry and PC contacts were compliant.

Groups were offered on all yards.

Referrals

KVSP indicated that response to 46 of 47, or 98 percent of, emergent referrals was timely.  For urgent referrals, response to 69 of 92, or 75 percent, was timely, and for routine referrals, response to 1,565 of 2,424, or 65 percent, was timely.  It was reported that MHTS.net calculated timeliness of response to routine referrals based on

154

calendar days rather than working days, which would understate the rate of compliance for response to routine referrals.

### Heat Plan

KVSP's heat plan was well managed, with missing heat logs and readings in only a minimal number of cases.  Custody supervisors conducted annual heat plan training which included education on heat-related pathologies.  There were numerous stage-one heat alerts, but no stage-two or stage-three heat alerts during the review period.

### RVRs

KVSP issued 226 RVRs to MHSDS inmates.  Of these, 17 were to MHCB inmates, 64 were to EOP inmates, and 145 were to 3CMS inmates.  Mental health assessments were conducted for all of the MHCB and EOP inmates, and for 79, or 54 percent of, 3CMS inmates who received RVRs.

RVR processes were followed appropriately.  Clinical input was accurately referenced in disciplinary reports.

### Lockdowns

KVSP reported 23 lockdowns including two ongoing at the end of the review period.  Mental health staff reported that EOP groups and psychiatrist and PC contacts routinely occurred during lockdowns, but that 3CMS and general population groups were usually cancelled.  Inmates required an escort to leave their cells during lockdowns.

### Pre-Release Planning

All 12 EOP inmates who paroled from KVSP received pre-release planning, as did 24 of 43, or 56 percent of, 3CMS inmates.  The pre-release planning group leader was assigned primarily to the 3CMS program but reported discussing other

cases with PCs and maintaining communication with TCMP.  An observed pre-release planning group for EOP SNY inmates followed a set curriculum and was conducted competently.

### North Kern State Prison (NKSP)
September 7, 2011 – September 9, 2011

Census:

On September 6, 2011, NKSP's total inmate population was 5,154.  There were 4,567 inmates in the reception center.  The total MHSDS population was 1,161.  There were 99 EOP and 950 3CMS inmates in the reception center.  The 3CMS mainline population was 42 and the EOP mainline population was four.  There were nine inmates in the MHCB unit.  The total administrative segregation population was 185.  There were seven EOP and 39 3CMS inmates in administrative segregation.

Staffing:

There were significant changes in the mental health leadership during the reporting period after the chief psychologist/chief of mental health left NKSP in December 2010.  There were three acting chiefs of mental health since his departure.  There was also a transition of the health care CEO during the reporting period, after one left in June 2011 and the new permanent CEO started in August 2011.

The chief psychiatrist position was vacant.  The chief psychologist position was filled in an acting capacity.  The senior psychiatrist position was filled, as were the three senior psychologist positions.

Of the 7.5 staff psychiatrist positions, 6.5 were filled, leaving a 13-percent vacancy rate which was fully covered by contract staff.

Of the 37 staff psychologist positions, 34 were filled, for an eight-percent vacancy rate.  Contractors covered three positions, resulting in a functional vacancy rate of zero.  The six social work positions were filled.

Of the 7.25 psych tech positions, seven were filled.  The two recreational therapist positions were filled.

Two of three psychometrist positions were filled, resulting in a 33-percent vacancy rate.

With regard to office support staff, the health program specialist position and eight of nine MHSDS clerical positions were filled, resulting in an 11-percent clerical vacancy rate.

Quality Management:

In general, some components of the quality management program, such as regular attendance and investment in the committee meetings by custody and health care administrative staff, appeared to be functioning fairly well.  Other components such as meaningful agendas and projects of the quality management committee and mental health subcommittee, and peer review, needed improvement.

Local governing body meetings were held quarterly at NKSP.  There were two meetings during the reporting period.  Minutes were maintained and presented for review during the site visit.  There was good participation by medical, mental health, the warden, and custody administration.  Monthly quality management committee meetings were held during the reporting period and were chaired by the health care CEO.

The mental health subcommittee was scheduled to meet monthly during the reporting period but met only three times.  Results of monthly chart audits were reviewed.  There were quantitative audits of 3CMS, administrative segregation, reception

center, and EOP charts for the presence and timeliness of documentation of evaluations, case management notes, psychiatrist appointments, and IDTT meetings. Other audits covered medication management and responses to referrals.

Information on site indicated that one QIT was chartered in June 2011, to review an inmate suicide.

Psychiatry peer review was conducted monthly except for one month during the reporting period. It consisted of one psychiatrist reviewing at least one chart of each of the other psychiatrists, with 55 charts from 13 psychiatrists reviewed. Photocopies of the findings were provided to the psychiatrist under review. If any glaring problem was identified, it was brought to the attention of the senior supervising psychiatrist. There was no peer review of psychologists or social workers during the reporting period, but it was reported that peer review for psychologists and social workers was being developed and would be implemented in September 2011.

Suicide Prevention:

There were no completed suicides during the monitoring period.

The SPRFIT was scheduled to meet monthly. It held five meetings during the monitoring period, but no meeting in May 2011. Attendance was good with a quorum present and minutes maintained at all meetings. Agenda items included MHCB and mental health temporary housing admissions data, 2010 CTC statistics, the approval of minutes from previous meetings, and the offering of yard time to EOP inmates pending DMH placement. The SPRFIT finalized one quality improvement plan (QIP) during the monitoring period for a suicide which had occurred in October 2010.

A check revealed that a cut-down kit was available in the control booth and that all queried officers were carrying micro-shields. Documentation with regard to

158

emergency response review committee meetings was provided for review in the proof-of-practice binders.

The tracking log data provided by NKSP indicated that the institution was nearly compliant with clinical five-day follow-ups, with a compliance rate of 96 percent.

During the site visit, the monitor interviewed custody staff who indicated that morning meetings between custody and mental health staff in administrative segregation were very useful.  Good rapport between custody and mental health staff facilitated communication.  However, there was conflicting information regarding the documentation of those meetings.

The institution reported 76-percent compliance with screening prior to placement in administrative segregation.  The institution reported 87-percent compliance with completion of the 31-question screen within 72 hours of placement in administrative segregation.

New inmates in administrative segregation were identified by cell door placards.  NKSP reported 100-percent compliance with completion of 30-minute custody welfare checks for new inmates.  The monitor reviewed a sample of the custody logs of the welfare checks for the monitoring period, which indicated that at times the checks were not sufficiently staggered.  In other instances, the times documented in the logs did not appear to be sufficient to actually perform the checks.

Cells in administrative segregation were not equipped for electrical appliances.

Staff reported that inmates in administrative segregation were offered ten hours of yard per week.

The institution reported that the suicide tracking/inmate profile was printed for inmates transferring to other institutions.

The institution reported that training of clinicians to train others on improving clinical competency in conduct of SREs was completed in August 2011. Clinicians to serve on the training team had been identified and were scheduled to conduct their training after the conclusion of the monitor's visit.

Medication Management:

Results of medication management audits were not specific to psychotropic medications.  An audit of 145 charts indicated that 99 percent of inmates arriving on prescription medications had orders written for those medications within eight hours of arrival at the institution.  Ninety-eight percent of inmates with new medication orders received the new order the following day.

Following intra-institutional housing moves, 100 percent of inmates received their medication by the day following the move.

Of the 145 charts audited, 68 contained documentation of medication refusals.  Of these, the refusal was accurately documented in the MAR in 63 percent of cases.  There was documentation of a referral to mental health for refusals in 48 percent of the cases, and documentation that the inmate was seen by a provider within seven calendar days in 47 percent of the cases.

Pill lines were not problematic at NKSP.  Medications were taken to each housing unit and distributed by nursing staff at a podium.

An institutional audit found 100-percent compliance with the presence of informed consent forms in the medical records.

160

The institution reported that it followed CDCR protocols for laboratory testing of blood levels of psychotropic medications. An audit of 35 randomly selected charts of inmates on psychotropic medications indicated that 84 percent had laboratory tests ordered when clinically indicated. In all nine cases of significant laboratory test results, there was documentation that the psychiatrist reviewed them and took clinical action.

A centralized list of inmates on DOT outside of the MHCB unit indicated that 685 inmates were on DOT for psychotropic medication. The vast majority of use of DOT was not clinically-driven or considered on a case-by-case basis. In practice, DOT was ordered for all MHCB, MHTH, Keyhea, and EOP inmates, and for anyone discharged from the MHCB unit or MHTH for a period of 90 days. Occasionally, a 3CMS inmate might be considered for DOT if there was a history of noncompliance.

During the reporting period, 16 Keyhea petitions were initiated and seven were renewed. There were 17 inmates on Keyhea orders at the time of the site visit. One petition was denied at the hearing, and psychiatrists rescinded three petitions after the cases were reviewed with the legal department. The Keyhea coordinator maintained a comprehensive log which tracked the process on new and renewed orders and expiration dates. It was distributed weekly to all psychiatrists plus some other mental health staff at NKSP.

There were 281 psychiatric prescriptions for HS medications at the time of the monitor's visit. Although medications could be ordered HS, it was discovered that they were being delivered with the last afternoon medication pass of the day between 6:30 p.m. and 8:30 p.m. The error was identified and correction was planned to begin in September 2011.

161

During the reporting period, 943 inmates paroled with active prescriptions. Of these, 97 percent signed acknowledgments of receipt of their prescription medications when leaving the institution.  Psychotropic medications were not tracked separately from other medications, although there were plans to do so in the future.

Sexual Misconduct:

According to information provided by the institution, 18 RVRs related to sexual misconduct were issued during the monitoring period.  Of those, 15 resulted in mental health screenings and six inmates were referred for comprehensive assessments. At the time of the site visit, five of the comprehensive assessments had been completed and one was still pending.

Four inmates were diagnosed with Exhibitionism or Paraphilia NOS and were referred to a treatment program.  The treatment provided to inmates awaiting transfer to a treatment program consisted of weekly clinical contacts provided by a clinician in administrative segregation.

The institution continued to utilize a yellow lock attached to the cell door food port and a placard to identify "IEX" inmates for the duration of their stays in administrative segregation.

During the monitoring period, three sexual misconduct RVRs were referred to the district attorney, and two others were pending referral.

Transfers:

During the monitoring period, NKSP continued to maintain a half-time DMH coordinator whose DMH duties included maintaining the master DMH log.  The other half of the coordinator's responsibilities related to clinical EOP case management. There were several different DMH logs maintained during the monitoring period.  A

162

review of the DMH log revealed that it was not accurately completed, with missing dates and other information.

The institution reported that 34 referrals were made to DMH during the monitoring period. There were 19 to acute care and 15 to intermediate care, representing a decrease from the 38 acute care referrals and 20 intermediate care referrals of the preceding monitoring period. Timelines for completion of the referrals were reported to have been met for the acute care referrals, but not met for any of the intermediate care referrals. The DMH log information regarding these timeframes was not accurately entered. The institution reported that it had recently initiated a QIT to address the delay in completion of referrals.

The institution reported that five inmates were awaiting DMH placement at the time of the site visit. There were no DMH rejections. There were three Vitek hearings held, with two upholding placement at DMH. Institutional staff reported that two correctional clinical assessment teams (CCATs) were held during the monitoring period. Five intermediate care referrals and one acute care referral were rescinded by the institution. Two inmates had clinically improved, one intermediate care referral was changed to acute care, and three inmates had paroled prior to completion of the DMH referral and transfer.

NKSP maintained the practice of discharging inmates from the MHCB unit to MHTH while awaiting DMH placement. MHTH was developed to meet the need for additional crisis-bed capacity. A record review by the special master's expert raised concern whether inmates placed in the MHTH were sufficiently stabilized such that referral to a higher LOC was deemed no longer appropriate.

163

Unlike during the preceding monitoring period, staff reported that several referred inmates had been placed in DMH intermediate care programs prior to transfers to another institution or paroling.

During the monitoring period, 16 inmates were discharged back from DMH to the institution.  The institution reported that clinician-to-clinician contact between DMH and CDCR clinicians occurred within five days 100 percent of the time, and that five-day follow-up was provided in 100 percent of cases.  Audit data was not provided.  The DMH coordinator reported that a copy of the discharge summary for each returning inmate was provided to the inmate's PC and a copy was placed into his medical record.

There was a ten-bed MHCB unit at NKSP.  Ten inmates experienced delays in access to an MHCB during the reporting period due to a full MHCB unit.  There were 85 admissions during the reporting period, with an average daily census of nearly always ten.  No MHCBs were used to house medical inmates.  The ten-day length of stay in the MHCB unit was exceeded for 60 inmates, with the range of length of stay being 11 to 64 days.  Stays were extended for 20 inmates due to DMH waits, nine for Keyhea proceedings, eight for psychotropic medication issues including Clozapine and medication noncompliance, seven for change in LOC, and four for parole, as well as other clinical issues.  There were two delays for bed space, with both inmates retained in the MHCB unit for less than one day each while awaiting administrative segregation beds.

 The ten-bed MHTH unit was located on the lower range of a two-story administrative segregation overflow housing unit, Building A4.  The MHTH was used to house inmates referred for assessment for admission to the MHCB unit, inmates returning

from DMH, inmates returning from another institution's MHCB unit, and inmates on the waitlist for DMH admission.  There were 658 admissions or more than 100 per month to MHTH during the reporting period.  Lengths of stay ranged from 0.7 to 39.3 days, but the overwhelming majority of inmates stayed fewer than ten days.  The census ranged from ten to 19 with the average of 16.

In April 2011, housing unit B4 (the EOP unit) was opened to accommodate inmates in crisis who could not be housed in A4 due to space limitations. There were ten designated cells with food ports on B4 used for MHTH overflow, which was used only intermittently during the reporting period with a census range from zero to seven.  All inmates placed into these cells were placed on watch.  There were no overflow inmates on the unit at the time of the site visit.

Of the 202 EOP inmates who transferred from the reception center during the monitoring period, 89, or 44 percent, had lengths of stay longer than 60 days.  At the time of the site visit, there were 125 EOP inmates pending transfer.  Fifty-seven, or 46 percent, had been at NKSP longer than 60 days.

The institution did not provide any data for 3CMS inmates who transferred from the reception center during the monitoring period.  No data was provided on whether inmate transfers were expedited when clinically indicated.

EOP inmates in segregation were rarely transferred to a hub within 30 days.  Four of seven EOP inmates in segregation had been there longer than 90 days.  The average length of stay among the seven inmates was 154 days.

Other Issues:

Reception Center

The institution reported that mental health screenings were completed in a semi-private setting with partitions provided in classrooms.  For those inmates referred for a mental health evaluation, the institution reported that the timeline was met 84 percent of the time.  NKSP indicated that there was a backlog in June 2011 due to staffing issues.

Reception center EOP inmates were primarily clustered in housing unit B4 with the exception of SNY inmates who were housed in building D4.  The institution reported having 99 reception center EOP inmates at the time of the site visit.  Institutional audits derived from a log maintained by the senior psychologist indicated that NKSP was compliant with weekly PC contacts at 99.5 percent, monthly psychiatry appointments at 89 percent, and monthly IDTT meetings at 99 percent.

NKSP staff reported 85-percent compliance with offering of structured therapeutic activities including group therapy, pre-release planning, hours of recreational therapy, and limited education programs.  This information was not tracked in MHTS.net during the reporting period, but data regarding EOP participation was available in the proof-of-practice binder.  NKSP reported that group space was limited to availability of the chapel, which forced groups to be split and offered every other day.

The institution reported 950 reception center 3CMS inmates at the time of the site visit.  They were housed throughout the institution with 13 PCs assigned.  Of the 13 clinical staff, two were assigned to cover diagnostics on a rotational basis and one clinician, also on a rotational basis, was assigned to be on-call for urgent and emergent clinical issues.

Confidential treatment space was reported to be very limited, and a QIT was chartered to address that issue.  Institutional audits indicated that initial contacts with a PC were within timeframes in 60 percent of cases.  For 90-day contacts with PCs, timeframes were met in 87 percent of cases, and for 90-day contacts with psychiatry, timeframes were met in 91 percent of cases.  Whether contacts were cell-front versus out-of-cell was not tracked.

Administrative Segregation

The institution reported that at the time of the site visit, there were seven EOP and 39 3CMS inmates in administrative segregation.  It also reported a monthly average of 14 MHSDS inmates placed in the A4 overflow building during the monitoring period.  Administrative segregation mental health patients were intermixed with mainline administrative segregation inmates in the two wings of D6 and the one wing of A4.

The institution reported that on average, 3CMS inmates remained in administrative segregation for 120 days, with 53 percent staying over 90 days.  For EOP inmates, the average stay was 154 days, with 56 percent staying longer than 90 days.

Since the preceding monitoring period, three treatment modules with partitions were placed in the A4 unit to allow for groups.  Additionally, the solid metal sides of the three holding cells utilized in the group room in D6 had been replaced to allow for more interaction/visibility among group participants.  However, continued use of treatment modules on the dayroom floor did not afford confidentiality for contacts taking place there.

Presented data indicated compliance rates of 84 percent for initial IDTT meetings for 3CMS inmates, and 86 percent for EOP inmates.  Ninety-day psychiatry contacts were timely in 75 percent of cases.  For subsequent PC contacts, NKSP reported

167

compliance rates of 99.6 percent for 3CMS inmates and 90 percent EOP inmates. Follow-up IDTT meetings were timely in 93 percent of cases for 3CMS inmates, and in 96 percent of cases for EOP inmates. Seventy-five percent of the weekly 3CMS daily contacts were held out-of-cell. The institution did not track out-of-cell contacts for EOP inmates.

The data provided by the institution indicated 100-percent compliance for psychiatry participation in IDTT meetings for 3CMS inmates in administrative segregation, and 96 percent for CC Is. There was 80 percent attendance by inmates at their IDTT meetings. IDTT meeting participation was not tracked for EOP administrative segregation inmates.

The institution did not track the number of EOP administrative segregation inmates who refused more than 50 percent of treatment.

MHCB

All inmates referred for MHCB placement were screened by the on-call psychiatrist and either the on-call psychologist or social worker to determine whether MHCB or MHTH admission was appropriate. Admission histories and physicals were conducted within 24 hours of admission.

IDTT meetings were conducted at least weekly for each inmate. Rounds were conducted by either psychiatry or psychology and occurred on a daily basis, including weekends and holidays. The MHCB unit treatment team appropriately considered and made referrals to DMH LOC. The special master's expert attended a meeting of the treatment team in the MHCB unit. The psychiatrist led the meeting, with all disciplines represented. Inmates were encouraged to participate in the discussions. Since the monitor's last site visit, the MHCB unit acquired an individual treatment

168

module in the treatment room, but the special master's expert was advised that it was rarely utilized.

Most of the inmates in the MHCB unit were in cells with mattresses on the floor. The acting chief of mental health reported that additional beds were being acquired for use in the MHCB unit as necessary and as clinically appropriate.

Nearly all inmates continued to be escorted and remained in cuffs for IDTT meetings regardless of their custody levels or clinical status. There were seven episodes of use of restraints during the reporting period, ranging from four hours to 96.6 hours in duration, with an average duration of 33.8 hours, and a median of 22.3 hours. Two inmates were placed in seclusion in the safety cell. One placement was for 8.2 hours, and the other stayed for 222.8 hours or 9.3 days.

All discharges received clinical five-day follow-up and custodial three-day follow-up as well.

MHTH

Inmates admitted to MHTH were assessed at the time of admission to determine whether to initiate custody observations or suicide watch precautions. During the reporting period, 13 percent of admissions to MHTH were started on suicide watch, and the other 87 percent were placed on custody observation with 30-minute staggered checks at the time of admission.

All admissions were seen by psychiatry and psychology on the day after admissions, when their levels of risk were reassessed. Each case was presented at an IDTT meeting and mental health treatment plans were developed. There were daily individual contacts with the psychiatrist or the PC, as well as recreation therapy every

169

other week.  Inmates were permitted full-issue clothing as clinically appropriate.  There were no beds in the MHTH cells, and inmates slept on mattresses on the floor of the cell.

The special master's expert attended an IDTT meeting in MHTH.  All disciplines were present and participated in the discussion with the inmate.  Inmates were escorted to the meeting in cuffs and remained in them for the duration of the meeting, although the psychiatrist said that decisions to keep inmates cuffed were made on a case-by-case basis.  Staff added that because it is an administrative segregation overflow unit, all inmates were escorted in cuffs, even if they were not administrative segregation inmates.

### 3CMS

There were 42 inmates in mainline 3CMS at the time of the site visit.  Institutional data indicated noncompliance rates of 71 percent with timeframes for both initial evaluations and initial IDTT meetings.  The compliance rate for psychiatry attendance at IDTT meetings was 100 percent.  Participation by CC Is in IDTT meetings was not tracked.

The data also indicated that subsequent contacts with PCs were timely in 99 percent of cases, and annual follow-up IDTT meetings were timely in 100 percent of cases.  NKSP had a 37-percent compliance rate for 90-day psychiatry follow-up appointments.

Staff reported that four groups run in the education classrooms were provided to mainline 3CMS inmates during the monitoring period.  The roster indicated that groups were comprised of both non-MHSDS inmates and 3CMS inmates.

Referrals

The institution was not consistently entering information about referrals into MHTS.net prior to August 2011. An MHTS.net report showed that during the reporting period, there were one urgent referral, no emergency referrals, and 5,713 routine referrals. Forty-seven percent of the routine referrals drew a timely response, but the urgent referral did not. However, without consistent tracking and monitoring of referrals, it was not possible to determine what obstacles there were to timely responses.

MHTS.net

Summarized institutional data indicated that audits were conducted for the months of February, April, May, and June 2011 for reception center EOP and 3CMS programs.

Heat Plan

As in the preceding monitoring period, NKSP appeared to be compliant with the heat plan. During the heat season, indoor and outdoor temperatures were logged and forwarded to the heat plan coordinator who kept the logs on file. The monitor reviewed a sample of the heat logs and found that temperatures were properly documented. According to the monthly reports, there were no heat-related incidents during the monitoring period. The pharmacy continued to prepare a daily list of all inmates taking heat-sensitive medications which was distributed to the different facilities.

RVRs

According to information provided by the institution, there were four RVRs issued to MHCB inmates, and 61 RVRs issued to EOP inmates during the reporting period. NKSP reported that all MHCB and EOP inmates who were issued RVRs were referred for and received a mental health assessment.

171

Of the 249 RVRs issued to 3CMS inmates, 27 resulted in a mental health assessment.  As of June 1, 2011, any 3CMS inmate who received an RVR categorized as division A, B, or C received a mental health assessment.

NKSP reported that it did not issue RVRs to inmates for self-injurious or suicidal behaviors.

**California State Prison, Los Angeles County (CSP/LAC)**
July 25, 2011 – July 28, 2011

Census:

On July 25, 2011, CSP/LAC's total inmate population was 4,233 inmates. There were 1,614 inmates in the reception center.  The total MHSDS population was 1,620.  There were 34 EOP and 267 3CMS inmates in the reception center.  The mainline EOP population was 241 inmates and the mainline 3CMS population was 851 inmates.

The total administrative segregation population was 373.  There were 55 EOP inmates including 12 pending transfer to PSU, and 160 3CMS inmates in administrative segregation.  There were 12 inmates in the MHCB unit and six inmates in alternative housing, all of whom were included in the EOP and 3CMS population numbers above.

Staffing:

The longstanding vacancy for chief psychiatrist continued, but a staff psychiatrist was appointed as acting chief in March 2011.  At CSP/LAC, the chief psychologist/chief of mental health moved to another institution to serve in the same capacity.  Consequently, a senior psychologist served as the acting chief psychologist/chief of mental health as of February 15, 2011.

Five of the six senior psychologist positions were filled.  To enhance supervisory oversight, three staff psychologists were appointed as acting senior psychologist supervisors in March 2011.

Of 11 staff psychiatrist positions, 5.5 were vacant.  Contractors covered 3.25 FTE positions, for a functional vacancy rate of 20.5 percent in psychiatry

Of the 34.8 staff psychologist positions, 3.8 were vacant.  However, with three psychologists appointed as acting senior psychologist supervisors and one staff psychologist on military leave throughout the entire review period, there were in effect 7.8 vacancies.  CSP/LAC utilized two contractors, which reduced the functional vacancy to 22 percent.

All of the nine social worker positions were filled.

The two senior psych tech positions remained filled, and two of the 26.25 psych tech positions remained vacant.  Additionally, two psych techs were out on long-term leave.  CSP/LAC utilized five contractors, resulting in full coverage of psych tech positions.

Among CSP/LAC's 6.25 recreation therapist positions, four positions were filled, and no contractors were used, resulting in a vacancy rate of 37 percent.  The 14.5 clerical positions, the unit supervisor position, the HPS I position and one of the two office service specialist positions remained filled.

Quality Management:

CSP/LAC had a well-developed quality management program that provided an effective mechanism for monitoring and managing mental health services. Required committees convened regularly.  Meetings were well attended and minutes were maintained.

173

The local governing body met six times during the reporting period. Attendance was good, with a quorum present at all meetings. During the reporting period, the local governing body approved revisions to LOPs governing the DMH referral process, the duty-to-warn guidelines, and CTC policies and procedures.

The quality management committee met 14 times during the monitoring period. Attendance was good, with a quorum present at all meetings. Department chiefs presented compliance reports for their respective program areas. Policy initiatives and issues affecting health care services were discussed.

The mental health subcommittee met a total of 13 times during the monitoring period. Attendance was adequate. Various compliance reports were routinely presented to the committee. Areas of discussion included completion of informed consent forms, compliance with mental health referrals from administrative segregation, compliance with DMH referral timelines, compliance with daily psych tech rounds, status of conditions in administrative segregation, revisions to management status protocols, and the use of door coverings in administrative segregation to deal with cases of IEX.

QITs and FITs were appropriately chartered, met routinely, and maintained minutes. All of the major program areas were monitored via regular audits and routine tracking reports, most of which were methodologically sound and reliable. There were several chartered and ongoing QITs during the monitoring period. A peer review QIT, first chartered in February 2010 and then re-chartered with a new chairperson in October 2010, was largely tasked with ensuring that local peer review practices conformed to guidelines promulgated by HQ.

QITs that were chartered in January 2011 addressed the following issues: review and revision of policies and procedures governing the use of alternative holding areas, review of concordance between UHRs and MHTS.net data, and development and implementation of a plan to provide out-of-cell therapeutic activities to reception center inmates housed in the EOP transitional placement unit (D4).  In February 2011, a QIT was chartered to increase EOP group attendance rates.  Another to develop and implement a program for EOP inmates temporarily housed in non-EOP areas pending transfer issued its final recommendations in late February 2011.

An administrative segregation FIT, chartered in September 2009, met weekly during the monitoring period.  The FIT was tasked with maximizing out-of-cell activity for segregation inmates, addressing the cleanliness of group modules, and evaluating housing for inmates pending referrals to the district attorney.

CSP/LAC had not established a peer review program for psychiatrists. Peer review for social workers and psychologists appeared to be organized and meaningful.  It consisted of quarterly peer review sessions and monthly peer review QIT meetings.  All clinicians were required to attend the quarterly peer review sessions.  Each clinician was assigned to review one peer by reviewing four UHRs.  During the reporting period, two peer review sessions were held.  Eight social workers and 26 psychologists attended the initial session and collectively reviewed 136 UHRs.  The second session was attended by five social workers and 24 psychologists who reviewed a total of 116 UHRs. Increased focus on UHR documentation through the peer review process appeared to have contributed to overall improvement in this area.

Suicide Prevention:

There were two completed suicides at CSP/LAC during the reporting period.

The SPRFIT met monthly during the monitoring period.  The number of attendees ranged from nine to 15, including one to five custody representatives.  Meeting minutes were thorough and indicated that the SPRFIT provided an adequate forum for monitoring, initiating, and advancing institutional efforts to reduce suicide risk.

Documentation provided by the institution indicated that monthly medical emergency response drills were completed on all watches in all segregation units during the reporting period.  Information provided by the institution indicated that from May 31, 2010 to May 31, 2011, a total of 773 CSP/LAC employees completed a four-hour training class entitled First Aid/CPR.  Functioning cut-down tools were available in all segregation units, as well as in some mainline units toured by the monitor.

Compliance rates for clinical five-day follow-up after discharge from the MHCB unit ranged from 86 to 100 percent.

Compliance with hourly custody checks for the first 24 hours after discharge from the MHCB unit improved during the reporting period, but continued to fall short of the 100-percent threshold.

CSP/LAC complied with most, but not all, of the components of CDCR's Plan to Address Suicide Trends in Administrative Segregation.  Morning meetings between mental health and custody staff were documented in the isolation log and the lieutenant's log in A4 and A5.  Custody officers and mental health staff reported that the morning meetings were meaningful and useful.

The institution did not track or audit completion of pre-placement screens. Consequently, compliance in this area could not be assessed.

Audit data, as well as staff and inmate interviews, confirmed that 31-question screens were routinely completed within 72 hours of an inmate's placement in administrative segregation or administrative segregation overflow. Inmates who refused offers to complete 31-question screens in therapeutic modules located on the dayroom floor were interviewed at cell front.

All administrative segregation units had designated intake cells. In A4 and A5, the intake cells were located on the first tier directly in front of the control booth. There were eight intake cells in A4 and nine intake cells in A5. Door placards were used in all segregation units to identify intake-status inmates.

Compliance and documentation improved with regard to 30-minute wellness checks for inmates during their first 21 days in administrative segregation. Logs were well maintained and routinely signed by shift supervisors.

Monthly audits found that daily psych tech rounds were conducted and documented in all administrative segregation units during December 2010, February 2011, March 2011, April 2011, and May 2011, as well as in the overflow unit during December 2010 and January 2011.

None of the cells in administrative segregation units had working electrical outlets.

All administrative segregation units except the overflow unit were equipped with walk-alone exercise yards. The average number of offered yard hours was nine or greater during 21 of 24 weeks, indicating that the ten-hour standard was met or nearly met 88 percent of the time.

177

Medication Management:

CSP/LAC reported that the auditing of medication management underwent changes during the monitoring period.  There was acknowledgement of some problems with the methodology and monitoring of several items under review.

The institution reported that at the end of the monitoring period, a total of 1,419 MHSDS inmates were prescribed psychotropic medications.  CSP/LAC audits indicated that 70 percent of newly-arriving inmates were provided with a three-day supply of medications, but also indicated that only 45 percent of newly arriving inmates received their medications by the next calendar day.  This finding was identical to the compliance rate reported during the preceding monitoring period.

With regard to medication continuity following intra-institutional transfers, institutional audits indicated near-compliance at a rate of 87 percent.

Medication orders were routinely written for no longer than 90 days, and bridge orders were written for a maximum of 14 days.  Institution audits also indicated that inmates received their renewed medications timely in 77 percent of cases.

An institutional audit indicated that there were 48.5 notifications of medication noncompliance during the review period.  The institution indicated that 100 percent of these cases were referred timely, and that 100 percent were seen timely for psychiatric follow-up.  The pill line audit was flawed in that it measured only the amount of time that it took for an inmate to take his medications, which averaged 1.5 minutes.

An audit regarding the timely processing of medication orders examined a sample of inmates who were prescribed psychotropic medications.  It indicated a compliance rate of 84 percent for timely processing of orders.

178

The institution's audits indicated 75-percent compliance with obtaining timely informed consent forms.

There were problems with audits of laboratory studies of blood levels of psychotropic medications.  Institutional audits examined only blood levels for mood stabilizing medications but not others, and did not obtain a sufficient sampling of records.

CSP/LAC reported that 418 inmates were prescribed DOT psychotropic medications.  DOT was ordered for those inmates housed in the MHCB unit and EOP as well as those 3CMS inmates for whom it was clinically indicated as a result of documented instances of hoarding or cheeking.  The DOT process was not audited.

There were 31 inmates with Keyhea orders housed at CSP/LAC.  During the monitoring period, 21 Keyhea orders were initiated or renewed, with two cases pending.  The administrative law judge denied two petitions, and three were erroneously not completed.  There were occasional incidents of the Keyhea coordinator not being informed of inmates on Keyhea orders arriving at or leaving the institution.

There were 926 MHSDS inmates who were prescribed HS psychotropic medications.  HS pill lines were not audited.

CSP/LAC tracked the provision of parole medications by noting whether the inmates signed receipts.  Audits found a compliance rate of 90 percent.

Sexual Misconduct:

There were 27 RVRs related to sexual misconduct issued during the monitoring period.  Of those, 26 resulted in a sexual misconduct screening and IDTT review.  However, the mental health screenings were not completed within 72 hours of the incidents, as problems persisted with timely notification from custody staff that an RVR was issued for sexual misconduct.

Seven sexual misconduct RVRs resulted in comprehensive evaluations. All of the evaluated inmates were diagnosed with Exhibitionism and were recommended for the Exhibitionism treatment program.  One inmate was transferred to the program at CSP/Corcoran, two inmates transferred from CSP/LAC for other reasons, and four inmates remained at CSP/LAC awaiting transfer.

Custody-driven behavioral modifications included exposure-control jumpsuits.  Additionally, CSP/LAC continued to use yellow curtains to cover the cell doors in administrative segregation.

During the monitoring period, six sexual misconduct RVRs resulted in SHU terms.  All 27 RVRs were referred to the district attorney.

Transfers:

There was a senior supervising psychologist serving as a half-time DMH coordinator who was also supervising the reception center 3CMS and mainline 3CMS. An HPS I continued to provide clerical support.  Several logs were maintained to facilitate tracking in a user-friendly manner, according to staff.  Consistency across logs was vastly improved since the preceding monitoring period.

There were a total of 44 completed referrals, with 28 to acute care and 16 to intermediate care.  The institution reported that timelines for completion of the referrals were not met, citing delay in receipt of case factor forms as the primary reason for delays.  During the monitoring period, CSP/LAC reported no DMH rejections, and one rescission as the result of a CCAT conference.

There were 25 DMH transfers during the review period, 22 of which were within timelines.  Forty one inmates returned to CSP/LAC from DMH.  Discharge summaries were received 90 percent of the time.  The institution did not report

compliance regarding timeliness of IDTT meetings or psychiatric contacts following return of these inmates.  Four of 41 returning inmates were readmitted to DMH acute care within 90 days.

At the time of the site visit, 13 inmates were awaiting DMH placement, with three waiting for acute care and ten waiting for intermediate.  CSP/LAC did not report the number or outcomes of Vitek hearings.  The longest wait among the 13 had been ongoing since December 2, 2010.  Three inmates paroled while awaiting DMH placement during the monitoring period.

Institutional audits found that use of the Form 7388-B had increased, and that CSP/LAC was more than 90 percent compliant with use of the form during the latter part of the monitoring period.  However, placements in alternative housing cells and RVRs issued to 3CMS inmates were not tracked and therefore were not routinely documented on Form 7388-Bs.  In addition, there remained instances in which the stated reason for non-referral was inadequate.  The audits indicated that all cases of non-referral to DMH received alternative interventions that were documented in the treatment plan. However, review of medical records indicated otherwise.

Tracking of MHCB and alternative housing referrals and admissions markedly improved over the reporting period.  As of January 2011, logs for the MHCB unit, alternative housing, triage and treatment area (TTA) referral, and clinical five-day follow-up were tracked electronically and captured all necessary and appropriate data.

During the monitoring period, CSP/LAC operated a 12-bed MHCB unit consisting of 11 beds and one safety cell.  The number of MHCBs occupied by long-term medical patients averaged .76 per day.

There were 210 referrals to the MHCB unit, including five from outside institutions. One hundred thirteen, or 53 percent, resulted in admission to the MHCB unit. Lengths of stay ranged from two to 92 days, and averaged nine days, although 50 percent of all admissions had lengths of stay over ten days. Forty-six percent of delays were attributable to DMH referrals awaiting beds. Forty five inmates were retained in MHCBs for clinical reasons. No administrative delays were reported.

CSP/LAC continued to utilize five cells in housing unit D1 and seven cells in administrative segregation unit A4 as alternative housing for inmates awaiting placement in an MHCB. During the monitoring period, 128 inmates were placed in alternative housing, for an average length of stay of 1.3 days, with a range of one to six days. There were five inmates with stays over 72 hours while awaiting MHCB placement. Thirteen percent of inmates released from alternative housing received clinical five-day follow-up.

CSP/LAC transferred 20 inmates to the PSU during the reporting period. This was a marked increase over the three transfers during the preceding monitoring period. The average number of days from ICC referral to endorsement to the PSU was 28 days, and the average number of days from endorsement to transfer was 99 days. At the time of reporting, there were 12 inmates pending endorsement and/or transfer to the PSU.

On July 25, 2011, there were 34 reception center EOP inmates housed in D facility at CSP/LAC. The average length of stay for reception center EOP inmates was 116 days, with 64 percent of EOP inmates remaining in reception center longer than 60 days.

The average length of stay for reception center 3CMS inmates remained constant at approximately 91 days.  The average number of inmates with stays over 90 days decreased from 43 percent to 37 percent.

Other Issues:

Reception Center

During the reporting period, 3,623 inmates were processed through the reception center.  Except for nine EOP inmates in the temporary protective unit (TPU) in D4, the remaining reception center EOP inmates were housed with mainline EOP inmates in D2.

The institution remained compliant with timely completion of all screens, including the bus screen, 31-question mental health screen, and mental health evaluation when indicated.  Eighteen percent of the inmates processed through the reception center were ultimately placed in the MHSDS.

The institution reported compliance with identifying prior EOP inmates and evaluating them within seven days.  Screenings and evaluations were completed in confidential settings.  CSP/LAC reported that inmates who arrived on psychiatric medications had their orders renewed within seven days 100 percent of the time.  The institution did not provide compliance data on psychiatry review within 24 hours.

Initial IDTT meetings were timely in 66 percent of cases.  Compliance rates for initial psychiatry and PC contacts were 83 and 87 percent, respectively.

The compliance rate for conduct of timely follow-up IDTT meetings was 43 percent, according to MHTS.net data, but the institution's management report indicated that monthly IDTT meetings were scheduled timely 100 percent of the time.  The cause of this discrepancy was unclear.  Staff theorized that it was due to inaccuracy

of MHTS.net data.  Record review appeared to indicate that IDTT meetings occurred

timely in greater than 43 percent of cases.  Treatment plans for reception center EOP

inmates improved but still required greater individualization regarding specific clinical

interventions to be utilized.

The compliance rate for follow-up psychiatry contacts increased slightly

to 86 percent.  Follow-up PC contacts were compliant.  They occurred in a confidential

setting 59 percent of the time, with inmate refusals accounting for 71 percent of cell-front

contacts.  PCs reported that caseload size dropped from approximately 35 to 18 inmates.

During the monitoring period, CSP/LAC offered 8.9 hours of structured

therapeutic activity.  An average of 5.8 hours was received.  Inmates in the TPU and

SNY inmates continued to be scheduled for eight hours of structured therapeutic activity.

The institution did not report the number of hours offered or received.

Administrative Segregation

CSP/LAC operated three administrative segregation units, including a

stand-alone unit and buildings A4 and A5.  When needed, building B2 was used for

overflow.  Audits indicated that B2 housed overflow segregation inmates only during

most of December 2010 and the first nine days of January 2011.

As of July 25, 2011, 54 EOP inmates were housed in A4, and a total of

163 3CMS inmates were housed in A4 and A5.  During the monitor's visit on July 27,

2011, there were no MHSDS inmates housed in the stand-alone unit.  MHSDS inmates

comprised 57 percent of the administrative segregation population.  Approximately 161

non-MHSDS inmates were distributed among all three administrative segregation units,

bringing the total administrative segregation census to 378.  From 64 to 84 inmates, or an

average of 76 inmates, were in CSP/LAC's administrative segregation EOP hub during

184

the reporting period.  However, by July 25, 2011, the EOP hub population had dropped to 54 inmates.

Approximately 41 percent of the EOP inmates placed in administrative segregation during the reporting period stayed there longer than 90 days.  Institutional audits indicated compliance with offering EOP inmates psychiatric contacts, IDTT meetings, and ten hours of structured therapeutic activity per week.  The compliance rate for weekly PC contacts was 73-percent, with an average of 68 percent of contacts occurring cell-front.

3CMS inmates were housed primarily in A5 with some in A4.  Inmates in A5 were not afforded group therapy.  Institutional audits indicated compliance with conduct of timely IDTT meetings, psychiatry contacts, and PC contacts.  Psychiatry and PC contacts were conducted in therapeutic modules located on the dayroom floor, affording little confidentiality.  Also of concern was a high rate of cell-front contacts. The special master's expert attended an IDTT meeting in A5.  All necessary participants attended the meeting.  The meeting was held on the dayroom floor, where confidentiality was compromised.

Interviewed inmates reported improved custody-mental health relations and better access to mental health staff.

MHCB

Operations within the MHCB unit continued to show improvement. During the monitoring period, all 12 allocated beds were utilized.  Histories and physicals were completed timely, although they continued to be done partially by the psychiatrist with a follow-up medical consult.

CSP/LAC reported conflicting data on compliance regarding IDTT meetings. MHTS.net data indicated that initial IDTT meetings were timely 78 percent of the time, while the management report indicated a compliance rate of 93 percent. At an observed IDTT meeting during the site visit, all required members were present, although the CC I present was not the assigned counselor. Treatment plans continued to be comprised of primarily medication management, without sufficient individualization and specific treatment interventions apart from medications.

There was an increase in DMH acute care referrals, all of which were appropriate. Inmates placed on suicide watch status were monitored according to Program Guide requirements.

Contacts with psychiatry and/or the PC occurred timely, albeit either at cell-front or with mental health and custody staff as a group. The recreation therapist provided daily opportunities for recreational therapy for MHCB inmates, conducted recreation therapy evaluations, and was an active participant in IDTT meetings.

Inmates in the MHCB unit were not provided with beds and slept on mattresses on the floor. There was an ADA-compliant cell that could be used for MHCB inmates when necessary.

Decisions concerning use of restraints and inmates' property were made on an individual basis for those inmates not on segregation status. The restraint and seclusion log remained incomplete, and at times inaccurate when compared to UHRs. During the review period, there were 14 instances of seclusion among 12 inmates. Four instances lasted under 24 hours, three lasted 24 hours, one lasted 48 hours, one lasted 72 hours, and one lasted four days. There were four incidents of restraints involving three

inmates during the review period.  Lengths of time in restraints ranged from approximately four hours to almost 24 hours and averaged 13 hours.

EOP

Audits indicated that initial and quarterly IDTT meetings were held timely.  Audits of attendance at IDTT meetings indicated that psychiatrists and PCs were present, but did not look at attendance by CC Is.

Facility audits indicated a 99-percent compliance rate for EOP inmates being seen weekly by their PCs.  They also indicated that mainline EOP inmates were offered 12 hours of group therapy per week.

3CMS

Audits indicated compliance at the rates of 95 and 99 percent for timely initial and annual follow-up IDTT meetings, respectively, for 3CMS inmates. Psychiatrists and PCs attended, but attendance by CC Is was not audited.

Institutional audits and inmate interviews indicated that quarterly PC contacts for 3CMS inmates occurred in greater than 95 percent of cases.  Group therapy was provided for some 3CMS inmates who were housed on A yard, but not on C yard, reportedly due to space issues.

Referrals

The institution reported receiving 2,579 mental health referrals during the six-month reporting period.  Of these, 2,574 or 99.8 percent were "closed" by the end of the monitoring period.  Provided data indicated that rates of timely response to referrals were 95 percent for emergent referrals on the day of receipt, 59 percent for response to urgent referrals within 24 hours of receipt, and 58 percent for response to routine referrals within five working days.

Heat Plan

CSP/LAC was largely compliant with heat plan protocols.  Temperature logs were maintained, ceiling-mounted thermometers appeared to be functioning properly, monthly reports were prepared and submitted to HQ, and staff and inmates independently verified that yard recall requirements were strictly enforced.  The litigation coordinator collected and reviewed all temperature logs and reported incomplete logs and late submissions.

Lists of inmates taking heat-sensitive medications were updated daily, but appeared to be distributed to housing units and services areas on a weekly basis.  All interviewed officers were familiar with heat plan protocols, and all interviewed inmates confirmed that inmates taking heat sensitive medications were monitored and kept indoors during Stage I heat alerts.

According to the monthly reports, there were no Stage II or Stage III heat alerts or heat-related incidents during May 2011 or June 2011.

RVRs

During the reporting period, CSP/LAC issued a total of 1,467 RVRs.  Of these RVRs, 301 were issued to EOP inmates, 20 were issued to MHCB patients, and 384 were issued to inmates in segregation.  The institution did not track the number of RVRs issued to mainline 3CMS and non-MHSDS inmates.  Mental health assessments were completed for 301 EOP inmates, seven 3CMS inmates, and one non-MHSDS inmate.

The institution reviewed 123 RVRs issued to EOP inmates.  It reported that in 111 or 90 percent of these cases, the mental health assessment recommended that the hearing officer limit any resulting loss of privileges.  The hearing officer followed that recommendation in 92, or 83 percent of, cases, usually revoking ten to 14 days of

outdoor yard.  Three, or two percent of, RVRs were dismissed based on mental health input provided by the clinician, and one RVR was dismissed by the hearing officer for reasons unrelated to mental health.  In two additional cases, the hearing officer elected to impose a lower range penalty, taking into consideration the mental health assessment submitted at the hearing.

The monitor's review of 20 completed RVRs issued to seven EOP inmates during the reporting period revealed a somewhat mixed picture.  RVR protocols were routinely followed, but input provided by clinicians had a limited and superficial impact on case dispositions.

### California Correctional Institution (CCI)
September 13, 2011 – September 15, 2011

Census:

CCI reported that on September 12, 2011, it housed 5,666 inmates, for a two-percent decrease since the preceding monitoring period.  CCI's mental health caseload population was 1,301, which was a six-percent decrease in the mental health population.  There were eight EOP inmates awaiting transfer to a mainline EOP program and nine EOP inmates with SHU terms pending PSU transfer.  The mainline 3CMS population decreased by 19 percent, to 642.  Three inmates were awaiting transfer to an MHCB unit.  The OHU housed 13 inmates.

The SHU population of 1,219 represented a 44-percent increase since the preceding monitoring period.  It included 254 3CMS inmates.  The administrative segregation population of 401 included 13 EOP and 111 3CMS inmates.  The reception center population of 1,410 included 31 EOP and 217 3CMS inmates.  Of the 446 parole violators in reception center, 13 were at the EOP LOC and 77 were at the 3CMS LOC.

Staffing:

189

Total allocated mental health positions at CCI increased by one to 87.82, of which 75.82 were filled.  Contractors and dual appointments provided an additional 6.86 FTE coverage, reducing the institutional functional vacancy rate in mental health to 5.8 percent.

Positions for the senior psychiatrist, chief psychologist, supervising psychiatric social worker, and all seven senior psychologist positions were filled.

Of seven allocated staff psychiatrist positions, 5.5 were filled.  Contractors provided an additional one FTE coverage, reducing the staff psychiatry functional vacancy rate to nine percent.

Of 30.34 staff psychologist positions, 23.84 were filled.  Contractors provided an additional 4.31 FTE coverage and there were .84 dual appointment positions, for a four-percent functional vacancy rate among staff psychologists.  Three of five clinical social worker positions were vacant.

Positions for two senior psych techs and all 14 psych techs were filled. Contractors provided an additional .71 FTE psych tech coverage.

The 2.5 recreation therapist positions were filled, as was the sole health program specialist position.  Fourteen of 15 mental health clerical positions were filled.

Quality Management:

The quality management committee met monthly and was chaired by the CEO.  It reported always having a quorum and maintained meeting minutes.  Agenda items included medication continuity, new inmate intake, and psychiatry and PC contacts. The quality management committee also reported CAP reviews and QIT initiatives.

The mental health subcommittee met twice monthly.  It reported always having a quorum and maintained extensive meeting minutes.  The mental health

subcommittee addressed a range of issues including medication continuity and

noncompliance, referral timeliness, MAR accuracy and legibility, HS medications,

psychiatry backlogs, five-day clinical follow-up, privacy of OHU contacts, suicide

reports, and self-injurious behavior.  Communication was well-established between the

mental health program and the quality management committee.

Two of three active QITs closed during the review period.  One addressed

durations of psychiatric medication prescriptions and another addressed medication

continuity.  A third QIT on untimely response to clinical referrals remained active.

Psychiatry peer review met quarterly to review charts and provide

feedback on psychiatric treatment.  Psychologist peer review was being revamped as it

had consisted of primarily critique of difficult cases.  There was no social worker peer

review due to the limited number of social workers.

Suicide Prevention:

There was one completed suicide at CCI during the review period.

Five of six monthly scheduled SPRFIT meetings were documented to have

occurred.  The SPRFIT addressed completed and attempted suicides, MHCB and OHU

referrals and multiple admissions, clinical five-day follow-up, and the Keyhea process.

The ERRC met six times.  Emergency medical response drills were also

conducted.  Custody staff routinely identified cut-down tools and PPE, which were easily

accessible.

CCI reported a compliance rate of 46 percent for documentation of clinical five-day follow-up for inmates returning to regular housing following discharges from the MHCB unit or the OHU.[11]

In administrative segregation, there was improved documentation of consistent morning meetings between clinical and custody staff.

CCI reported compliance for timely completion of pre-placement screens but provided insufficient information to evaluate their accuracy.  It was noncompliant with completion of 31-item screens.

While documentation of 30-minute welfare checks had improved, they were not routinely completed at staggered intervals and typically recorded the same amount of time, irrespective of the number of cells monitored.

CCI audits indicated 100-percent compliance for daily psych tech rounds, but examination of isolation logs and UHRs indicated lower compliance levels.

Medication Management:

The Medication Administration Process Improvement Project ("MAPIP") audit procedure was not in place during the monitoring period.  At times, audits that addressed similar issues for comparable time periods produced different results.  Some audits also combined information as to the delivery of psychotropic medications with data on non-psychotropic medications.

Four of five audits on medication for newly-arriving inmates indicated that medications were received upon arrival or on the following day in 100 percent of cases.

---

[11] Defendants requested deletion of the statement in the draft report that CCI reported a compliance rate of 46 percent for clinical five-day follow-up for inmates returning to regular housing following discharges from the MHCB unit or the OHU. The statement in this report has been revised to reflect the statement by CCI on page 19 of its pre-site visit management report: "On return to regular housing from a MHCB or MHOHU, 5-day follow-up was documented (#46)% of the time."

Audits indicated that 97 to 98 percent of inmates leaving crisis care continued to receive medications without interruption.

Timely medication renewals occurred 98 percent of the time.  Audits of psychiatric contacts following medication refusals indicated compliance of 50 to 92 percent.

CCI reported that inmates routinely stood in pill lines for less than ten minutes.  An institutional audit of a sample of UHRs of inmates on psychotropic medications indicated that 85 percent contained up-to-date informed consent forms.

An audit of 32 cases for timeliness of ordering of laboratory studies of inmate blood levels of psychotropic medications found a 50-percent compliance rate. CCI further reported that up to 66 percent of laboratory orders written by psychiatrists were neither noted nor scheduled.  However, once orders were noted and scheduled, the completion rate was 99 percent, and follow-up after blood draws was consistently documented in UHRs.  AIMS testing was done in 50 percent of applicable cases.

At the end of the monitoring period, 465 inmates were receiving psychotropic medications DOT.  Audits found 100-percent compliance for adherence to DOT protocols.

During the monitoring period, no Keyhea orders were initiated or renewed.  No Keyhea orders expired while inmates were housed at CCI.

At the time of the site visit, 282 inmates were on medications prescribed HS.  CCI reported that HS medications were consistently delivered after 8:00 p.m.

Several audits of parole medications indicated compliance rates ranging from 80 to 100 percent.

Sexual Misconduct:

Two 3CMS inmates received sexual misconduct RVRs.  Both received mental health screens and IDTT reviews.  Neither inmate was referred for a comprehensive evaluation or to the district attorney.  During the site visit, it was reported that both cases were pending completion of the RVR process.  CCI placed placards on the cell doors of inmates who received sexual misconduct RVRs.

Transfers:

CCI had a primary DMH coordinator who also had a half-time clinical appointment, plus a back-up DMH coordinator.

Of the 15 inmates who met one or more indictors for DMH referral, seven were referred to DMH.  All seven referrals were to intermediate care.  Although six of the seven referrals were timely, none of the transfers were timely.  One referral was rescinded.  Audits of the DMH referral process generally indicated that Form 7388-B was being used.  For seven of the eight inmates who met indicators for consideration for DMH referral but were not referred, the Form 7388-Bs stated reasons for non-referral. Documentation of alternative interventions was inconsistent.

CCI did not have an MHCB unit.  There were 292 referrals to the OHU and 191 admissions.  Of the admissions, 166, or 87 percent, were admitted for suicidality. OHU stays ranged from zero to nine days and averaged 3.2 days.  Sixty-six, or 35 percent of, OHU admissions were housed in the OHU for more than 72 hours.  Approximately 82 percent of stays exceeding 72 hours were awaiting MHCB transfer.  During the site visit, staff reported that the OHU mental health census had recently been near capacity due to a statewide shortage of MHCBs.  Ninety-three or approximately half of inmates admitted

to the OHU were subsequently referred to the MHCB unit at another institution. Seventy-nine of the 93 referrals to an MHCB unit resulted in an admission.

There were four crisis care overflow cells located in the two medical clinic holding areas of housing units 4A and 4B. These cells were used to monitor inmates for whom OHU beds were not immediately available. Staff reported that, according to policy, all inmates in crisis care overflow cells were maintained on suicide watch with one-to-one observation. From February 16, 2011 to June 21, 2011, 26 inmates were placed in overflow cells.

There were two PSU transfers from CCI based on referrals that preceded the review period. Another eight EOP inmates referred to a PSU remained at CCI at the end of the monitoring period. All of these referrals exceeded PSU transfer timelines.

In administrative segregation, there were 1,082 inmates, including 33 EOP inmates and 365 3CMS inmates. CCI did not report lengths of stay or the number of percentage or number of inmates housed in administrative segregation for non-disciplinary reasons.

CCI provided conflicting data on EOP transfers. Some data indicated that 53 EOP inmates transferred from CCI, mostly from the reception center, and that19 of these transfers were timely. However, other institutional data indicated 74 EOP transfers, of which 47 were from the reception center. Stays of EOP inmates in the reception center averaged 97 days.

CCI reported that 154 3CMS inmates transferred from the reception center from December 1, 2010 to June 30, 2011, with an average stay of 72 days in reception center. Supporting documentation was not provided.

Other Issues:

### Reception Center

CCI reported 100-percent compliance for initial mental health screens for reception center inmates who had MHSDS histories, but it did not break out compliance rates for intake evaluations for inmates who had histories of EOP LOC. The institution reported 99-percent compliance for initial mental health evaluations.

MHTS.net data indicated 90-percent compliance for initial IDTT meetings for reception center EOP inmates. No data was provided for follow-up IDTT meetings.

Eighty-eight percent of reception center EOP initial psychiatrist contacts were reported to be compliant, as were 96 percent of subsequent contacts. CCI reported 93-percent compliance for initial PC contacts for reception center EOP inmates, and 91-percent compliance for subsequent PC contacts.

CCI reported having 21 therapeutic groups for reception center EOP inmates. The institution provided a weekly average of 5.25 hours of structured therapeutic activity.

### OHU

CCI had a 16-bed OHU with 11 beds designated for mental health. Inmates placed in the OHU who were on suicide watch or suicide precaution were provided with paper clothing, a mattress, and a blanket. Those admitted on psychiatric observation status were generally provided with boxer shorts and t-shirts. It did not appear that inmates were allowed more personal property as their stays went on.

Suicide risk assessments were consistently completed in the OHU. In 96 percent of cases there was daily contact with a psychologist. By the end of the monitoring period, 15-minute checks were occurring at staggered intervals.

196

SHU

CCI converted several mainline housing units to SHU housing in December 2010.  Initial IDTT meetings were untimely, which staff attributed to the influx of caseload inmates.  CCI reported 96-percent compliance for follow-up IDTT meetings.  Review of records indicated a lower compliance rate as well as generic or missing treatment plans.  The institution reported IDTT attendance rates of 100 percent for PCs and correctional counselors, 97 percent for psychiatrists, and 88 percent for psych techs, which were confirmed by record reviews.

CCI did not report compliance rates for initial contacts with the psychiatrist and PCs, but reported compliance rates of 93 and 96 percent, respectively, for follow-up contacts.  Therapeutic groups were not offered.

The institution reported 100-percent compliance for weekly documentation of psych tech rounds, but this was not consistently verified by record review. On housing unit 4A, health care escort officers handled all mental health ducats. Inmates were typically ducated to the non-contact visiting area, which appeared to be a private area.  On housing unit 4B, health care escort officers conducted escorts for only psychiatry and IDTT meeting ducats.  PCs had to rely on building staff for escorts, which resulted in clinical contacts taking place in non-confidential areas.

Administrative Segregation EOP

Institutional compliance data indicated noncompliance for timely initial IDTT meetings for non-reception center inmates.  For non-reception center EOP inmates in administrative segregation, the institution reported 100-percent compliance for subsequent IDTT meetings, although this was not supported by record review.  CCI reported that psychiatrists, PCs, and correctional counselors attended IDTT meetings 100

197

percent of the time.  There was 80-percent compliance for follow-up psychiatry contacts, and 96-percent compliance for weekly PC contacts, with a 65-percent rate for occurrence in confidential settings.  Cell-front contacts were reportedly due to inmate refusals.  Although reception center EOP inmates in administrative segregation received group treatment, space was inadequate and lacking in privacy.

### 3CMS

CCI reported that 94 percent of mainline 3CMS inmates had clinical intake assessments within ten days of arrival.  Sixty-nine percent had an initial IDTT meeting within 14 days of arrival, and 100 percent had annual IDTT follow-up meetings.  CCI reported 100-percent compliance for attendance by psychiatrists and PCs at IDTT meetings but did not provide data as to correctional counselor attendance.

Compliance rates for quarterly psychiatrist and PC and contacts were 98 percent and 100 percent, respectively.

### Administrative Segregation 3CMS

CCI reported noncompliance for initial IDTT meetings and contacts with the psychiatrist and PCs. Follow-up IDTT meetings and psychiatry contacts were compliant.  Treatment plans and Form 7388-Bs were completed but were often vague.

### Referrals

CCI data indicated that there were approximately 7,000 referrals.  Compliance rates for response to referrals were 88 percent for emergent referrals, 79 percent for urgent referrals, and 81 percent for routine referrals.

### MHTS.net

Staff indicated that during much of the monitoring period, the MHTS.net report used to identify inmates with multiple OHU placements did not differentiate

between mental health and medical placements.  Staff also reported that MHTS.net counted inmates who were placed in the OHU and subsequently transferred to the MHCB unit as having two crisis care placements which should have been counted as one.  It was also reported that staff used alternative data sources to identify inmates who refused participation in therapeutic activities.  Because MHTS.net tracked only RVRs issued to EOP but not 3CMS inmates, inmate disciplinary histories were generally obtained from correctional counselors during IDTT meetings.

  Heat Plan

    CCI maintained lists of inmates who were prescribed heat-sensitive medications.  There were several stage-one and one stage-two heat alerts during June 2011, resulting in hydration and cooling measures being taken in response to the stage-two alert.

  RVRs

    CCI issued a total 953 RVRs.  Of 290 RVRs issued to mental health caseload inmates, 20 were to EOP inmates and 270 were to 3CMS inmates.  Mental health assessments were conducted for all 20 EOP inmates, for 24 3CMS inmates, and for one non-mental health caseload inmate.  Although 28 mental health assessments indicated that hearing officers should consider mitigating factors in inmate penalty assessment, CCI did not report the number of cases in which penalty mitigation resulted.

  Pre-Release Planning

    CCI referred EOP inmates within 180 days of parole to the TCMP, which conducted most reentry planning, including benefit applications.  PCs also provided pre-release planning to EOP and 3CMS inmates.  Supervisor notes estimated that 90 percent of paroling mainline 3CMS inmates received pre-release planning.

## California Institution for Men (CIM)
August 23, 2011 – August 26, 2011

Census:

CIM reported that on August 21, 2011, it housed 6,045 inmates, for an eight-percent increase since the preceding monitoring period.  CIM's mental health caseload population was 1,770 inmates, which was an eight-percent increase in the mental health population.  There were 31 inmates in the MHCB unit.  The mainline 3CMS population increased by 19 percent, to 1,088.

The administrative segregation population of 327 included 24 EOP inmates awaiting transfer to an EOP hub and 53 3CMS inmates.  The reception center population of 2,526 included 204 EOP and 469 3CMS inmates.  Of the 1,985 parole violators in reception center, 182 were at the EOP LOC and 431 were at the 3CMS LOC.

Staffing:

Total allocated mental health positions at CIM increased from 109 to 119, of which 110 were filled.  Contractors provided an additional 1.5 FTE coverage, reducing the institutional functional vacancy rate in mental health to six percent.

Positions for the chief psychiatrist, senior psychiatrist, and supervising social worker were filled, and four of five senior psychologist positions were filled.  The chief psychologist position was vacant.

Thirteen of 14.5 allocated staff psychiatrist positions were filled.  Contractors covered 1.5 psychiatry positions, reducing the staff psychiatry functional vacancy rate to zero.

Of 41.5 staff psychologist positions, 38.5 were filled, for a seven-percent functional vacancy rate.  All 12 social worker positions were filled.

Positions for one psych tech supervisor and two senior psych techs were filled.  All 13.5 psych tech positions were filled, as were three additional psych tech positions provided by the Department of Juvenile Justice.

The four recreation therapist positions were filled but the health program specialist position was vacant.

All nine mental health clerical positions were filled.  Three additional medical transcribers were utilized.

Quality Management:

CIM's quality management program generally improved since the preceding monitoring period.

The CEO disbanded the local governing body.  The quality management committee generally met twice monthly and was chaired by the CEO.  Sign-in sheets documented attendance by committee members.  Agenda items included subcommittee monthly reports and QIT report updates.

The mental health subcommittee was chaired by the chief of mental health.  It met monthly and attained a quorum for five of its six meetings.  It received monthly reports on SPRFIT, DMH, administrative segregation, access to care, QIT status, and new business, as well as quarterly mental health management reports and audits. Quality management committee and mental health subcommittee findings were communicated to line staff.

CIM used QITs effectively.  One QIT addressed the problem of lack of timely access to newly-admitted inmates' past medical records.  Another QIT was charged with establishing effective clinician-to-clinician contact between facilities and

programs.  A third QIT was chartered to increase inmate compliance with treatment in administrative segregation.

CIM had one peer review committee that was composed of psychiatrists, psychologists, and social workers, and met monthly.  All staff clinicians were reviewed quarterly by other clinicians within the same discipline.  The peer review coordinator provided written feedback to the clinicians under review.

Psychiatry peer review indicated areas needing improvement in service delivery, while feedback from psychology and social work peer review was generally positive.  Staff described the peer review process as useful.

Suicide Prevention:

There was one completed suicide during the monitoring period.

The SPRFIT met monthly and maintained meeting minutes.  A quorum was not met for two meetings, and minutes were identical for three meetings.  The SPRFIT addressed suicide attempts, keep-on-person medication lists, suicide prevention video conferences, clinical five-day follow-up, custody wellness checks, and transitional bed housing.  Results were communicated to the mental health subcommittee and to staff.

Emergency medical response drills were conducted monthly.  CPR refresher training was provided to staff.  All mental health staff were trained on completion of SREs.  Officers in the units carried micro-shields, and cut-down tools were readily available in the control booth.

SREs were completed upon MHCB admissions and discharges of inmates exhibiting suicidal ideation or behavior, and within 72 hours of inmates' returns from DMH.  Compliance rates for clinical five-day follow-up after discharge from an MHCB

improved from 42 to 88 percent.  The institution reported a compliance rate of 72 percent for custody wellness checks.

In administrative segregation, CIM reported an 84-percent compliance rate for documented morning meetings between custody and mental health staff.

CIM utilized the bus screen that included a question about recent bad news.  It reported a compliance rate of 100 percent for timely completion of pre-placement screens and 31-item screens, which was corroborated by the monitor's chart reviews.  The screens were completed in a confidential setting.

Sixteen cells on the first tier of the administrative segregation units were used as new intake cells and were identified by door placards.

Documentation of 30-minute welfare checks indicated that they were completed at staggered intervals, but intervals often exceeded 30 minutes.  While logs of welfare checks were available for review, there was no audit mechanism to measure compliance.

Although CIM reported 100-percent compliance for daily psych tech rounds, the monitor's review of isolation logs identified missing days.

Administrative segregation cells were not equipped with working electrical outlets.

Inmates in administrative segregation were offered five to seven hours of yard time twice per week.

Medication Management:

CIM utilized the methodology derived in the MAPIP to audit medication management.  Audits found 100-percent compliance with medication continuity following arrivals at the institution.

203

Audits also found an overall 87-percent compliance rate for medication continuity following intra-institutional moves. The rate was 100 percent following transfers out of reception center, and 95 percent following moves within administrative segregation or the SHU.

Ninety-eight percent of inmates who refused psychotropic medications were appropriately identified by nursing staff.

The institution was compliant with conduct of pill lines, presence of medication informed consent forms, ordering of laboratory testing for inmates prescribed Depakote and Lithium, use of the Keyhea process, administration of HS medications, and provision of parole medications.

Sexual Misconduct:

Seven RVRs were issued for sexual misconduct. All resulted in mental health screens and IDTT reviews. Six of the seven screens were completed within 72 hours of the incident. Two inmates were referred for a comprehensive evaluation, but there were no diagnoses of Exhibitionism or Paraphilia NOS. The special master's expert reviewed the two comprehensive evaluations and found them to be completed adequately.

CIM placed placards on the doors of inmates who received sexual misconduct RVRs but did not utilize custody-driven behavioral modifications.

Transfers:

CIM had a full-time DMH coordinator who provided quarterly training to mental health staff. The DMH log continued to improve, with few errors or omissions.

Of the 166 inmates who met one or more indicators for DMH referral, 72 or 43 percent were referred to DMH. There were ten referrals to acute care and 62 referrals to intermediate care. No referrals were rejected; two were rescinded. CIM was

noncompliant with timeframes for completion of referral packets, but once bed assignments were completed, the institution met timeframes for transfers.

Record reviews indicated that some inmates who were not referred should have been.  Although use of Form 7388-B completion had improved, it remained noncompliant for consideration of inmates in MHCBs and in the reception center.  Identification of inmates who received multiple RVRs, did not participate in treatment, or had multiple crisis bed placements was problematic.  IDTT members reported that HQ had directed them to not refer inmates who had pending parole dates.  In cases of non-referral to DMH, rationales were often inadequate.

Thirteen inmates returned to CIM from DMH.  Discharge summaries were received for all of them.  Returning inmates were seen within 24 hours of return, and suicide risk assessments were completed.  However, their IDTT meetings did not meet timeframes, and treatment plans did not incorporate DMH recommendations.

There were 986 MHCB admissions.  The temporary MHCB unit had 36 beds, with an average daily census of 28 inmates, and an average stay lasting 5.6 days.  Eleven percent of stays exceeded ten days; 57 percent of these inmates were referred to DMH.  The average length of stay for inmates in MHCBs who were referred to DMH was 28.4 days.  The number of inmates with multiple MHCB admissions decreased from 39 to 29 percent of MHCB admissions.  Thirty-four percent of inmates with multiple admissions were referred to DMH.

Transitional bed housing admissions decreased since the preceding monitoring period, from 304 to 147 admissions.  Eighty-three percent of these admissions were ultimately placed in the MHCB unit.  Ninety-eight percent of inmates released from transitional bed housing units received clinical five-day follow-up.  The average stays

lasted 1.97 days.  Multiple admissions to transitional bed housing were not tracked.

Inmates on suicide precaution or watch were not placed into transitional bed housing

cells, as they had not been renovated to be suicide-resistant.

   CIM reported two PSU endorsements but no PSU transfers.

   Holding cell logs were adequately completed but did not aggregate data to

indicate average length of stay nor compliance with 15-minute checks.  The monitor's

review of holding cell logs noted a decrease in times spent in holding cells.  Inmates in

holding cells did not receive treatment.

   CIM referred 34 administrative segregation EOP inmates to an EOP hub

but only four of the transfers were timely.  Two other EOP inmates paroled within 30

days of administrative segregation placement.  Twenty-five administrative segregation

EOP inmates transferred from the reception center, and 24 administrative segregation

EOP inmates paroled from the reception center.  The average stay for both groups

combined was 88 days.  Twenty-four of 92, or 26 percent of, EOP administrative

segregation stays in reception center exceeded 90 days.

   Eighty-eight administrative segregation 3CMS inmates transferred from

the reception center and 24 administrative segregation 3CMS inmates paroled from the

reception center.  The average stay for both groups combined was 122 days.  Of 248

3CMS administrative segregation inmate stays, 135, or 54 percent, exceeded 90 days.

   CIM reported that 90 reception center EOP inmates transferred.  The

average EOP stay in reception center was 64 days in Reception Center Central and 112

days in Reception Center East.  There were 262 reception center EOP inmates who

paroled.  The average EOP stay in reception center before parole was 76 days in

Reception Center Central and 118 days before parole in Reception Center East.

There were 502 3CMS inmates who transferred from the reception center. Another 898 3CMS reception center inmates paroled. 3CMS inmates were housed in Reception Center Central for an average of 57 days before transfer or parole. The average stay for 3CMS Reception Center East inmates lasted 94 days.

Other Issues:

Reception Center

CIM reportedly screened over 7,000 inmates and evaluated more than 1,600 inmates. An institutional audit of one month of reception center admissions indicated 98-percent compliance with the 31-item mental health screen and 18-day mental health evaluation. All initial evaluations were reportedly completed in a confidential setting.

The screening and initial evaluation of EOP inmates who had previously been released from an institution at the EOP LOC was not tracked. Data for one month indicated 98-percent overall compliance for the screening and initial evaluation of reception center EOP inmates who were not previously identified as EOP. CIM reported 59-percent compliance for follow-up IDTT meetings for reception center EOP inmates.

Psychiatry contacts for EOP inmates in reception center did not meet timeframes. Progress notes for PC contacts for EOP inmates contained little therapeutic information. Staff reported noncompliance with the provision of five hours of weekly structured therapeutic activity for EOP inmates.

Observed IDTT meetings for reception center EOP inmates did not include discussion of inmate treatment plans, groups in which inmates should participate, and other relevant topics. An EOP therapeutic group observed during the site visit was

well run.  Group participants reported positive opinions about the group.  Staff attributed

inmate refusals of group participation to "gang politics."

   Of the 841 initial PC contacts for 3CMS inmates, 685 or 81 percent

occurred within 30 days.  An audit of 50 charts found a compliance rate of 94 percent.

The psychiatrist saw 98 percent of 3CMS inmates quarterly.  Ninety-two percent of

reception center 3CMS inmates were seen quarterly.  3CMS inmates were included in

group therapy, as space permitted.

   <u>Administration Segregation</u>

   There was conflicting data as to the number of administrative segregation

inmates housed at CIM during the monitoring period, indicating 92 or 158 EOP inmates,

and 248 or 444 3CMS inmates.  Staff suggested that this discrepancy was due to the

inclusion of California Rehabilitation Center (CRC) inmates housed in the CIM

administrative segregation unit.

   Initial IDTT meetings for caseload inmates were not timely, but follow-up

IDTT meetings were timely in 91 percent of cases.  CIM reported a 96-percent

compliance rate for attendance of PCs at IDTT meetings, but a compliance rate of 74

percent for attendance of both psychiatrists and correctional counselors.  The rate of

inmate attendance was reported to be 38 percent.

   Review of medical records indicated that administrative segregation EOP

inmates received weekly clinical contacts.  Ongoing psychiatry and PC contacts were

reported to have been 88 and 89-percent compliant, respectively.  Sixty nine percent of

contacts reportedly occurred cell-front.

   CIM offered therapeutic groups for EOP inmates, but the number of

groups dropped due to reduced staff allocations.  EOP inmates in administrative

segregation were offered a weekly average of 5.7 hours of structured therapeutic activity, and received a weekly average of 5.6 hours.

MHCB

The MHCB unit had 36 beds.  Inmates in the unit slept on beds.  There was one ADA-compliant cell.

All inmates referred to the MHCB unit were evaluated upon arrival by the psychiatrist-on-call.  UHR reviews indicated that in over 90 percent of cases, an initial IDTT meeting was conducted, a history and physical were completed within 24 hours, and an updated or new mental health assessment and SRE were completed and filed. However, MHTS.net data indicated a compliance rate of 19 percent for conduct of an initial IDTT meeting within 72 hours of admission.

Forty percent of MHCB inmates were offered weekly IDTT meetings.  CIM reported that psychiatrists and PCs attended IDTT meetings 100 percent of the time, CC Is attended 40 percent of the time, and nurses did not attend.  Daily psychiatrist and psychologist contacts occurred 72 and 38 percent of the time, respectively.  Clinical contacts were conducted in a confidential setting.  Access to care was improved with increased correctional officers.

Review of medical records indicated that 100 percent of inmates admitted to the MHCB unit due to suicidality or self-injurious behavior received a SRE upon both MHCB placement and release.  However, conduct of suicide watch and suicide precautions did not comply with Program Guide requirements.

Out-of-cell therapies included daily individual clinical contacts and limited access to recreation therapy groups.  Limited in-cell activities were provided. Outdoor yard was not available for MHCB inmates.

209

Inmates were not handcuffed while in therapeutic modules but were handcuffed when out of cell.  Use of handcuffs, bedding, and restrictions on inmates' property and movement were not reviewed timely.  The sole instance of use of restraints lasted less than four hours.

MHCB discharge summaries were completed timely.

3CMS

Audits based on UHR reviews found greater than 90 percent compliance with conduct of initial and follow-up IDTT meetings, attendance by psychiatrists and PCs at IDTT meetings, and quarterly contacts with psychiatrists and PCs.

Audits of UHRs indicated less than 80-percent compliance for attendance by correctional counselors and inmates at IDTT meetings, and initiation of discharge planning.  According to inmate reports, access to psychiatrists and PCs was good.  Useful therapeutic groups were offered.  There were 200 to 300 inmates on the wait list for groups in CIM I, and approximately 300 on the wait for groups in CIM II.

Referrals

CIM data indicated that there were nine emergent, 33 urgent, and 2,961 routine referrals.  Non-MHTS.net data indicated compliance for 80 percent of emergent referrals, 81 percent of urgent referrals, and 82 percent of routine referrals.  It was reported that MHTS.net did not accurately apply mental health referral timeframes and thus did not accurately reflect the CIM referral rate.

MHTS.net

A four-month audit of UHR-MHTS.net concordance found a compliance rate of 63 percent for both December 2010 and January 2011, 92 percent for February 2011, and 93 percent for May 2011.  Timeframes were not measured in the audit.

Timeframe results generated by MHTS.net were accurate for administrative segregation information and for repetitive processes for any given inmate over longer periods of time.

The institution attributed shortcomings with MHTS.net to staffing vacancies and certain issues with the Distribute Data Program System.  Staff in the reception center reported concerns with data accuracy and questioned reliability of MHTS.net data.

Heat Plan

Custody officers received lists of inmates on heat-risk medications every few days.  Housing units maintained heat logs, but during the site visit, the monitor observed several housing units where thermometers were not located in the units' potentially hottest areas, while some units lacked hand-held thermometers.  Although Pine Hall had a recorded temperature of less than 90 degrees 90 minutes prior to the monitor's arrival, a hand-held thermometer indicated temperatures above 95 degrees in three different locations where mental health inmates were housed.

RVRs

CIM issued a total of 1,288 RVRs.  Of 318 RVRs issued to mental health caseload inmates, it issued two to MHCB inmates, 53 to EOP inmates, 254 to 3CMS inmates, and nine to MHSDS inmates who were not identified by LOC.  Forty-one RVRs were related to hoarding or cheeking medications but none were reportedly issued for self-injurious or suicidal behaviors.

Mental health assessments were conducted for one of the two inmates in an MHCB unit, all but three of the EOP inmates, and three of the 3CMS inmates.  RVR

processes were followed appropriately.  CIM reported 36 instances of mitigation of RVR penalties based on consideration of mental health factors.

Pre-Release Planning

Staff reported that all reception center EOP inmates and some reception center 3CMS inmates received pre-release planning services.  CIM reported a compliance rate of 96 percent but did not indicate methodology and other supporting documentation.

3CMS inmates housed in mainline and in the secure SNY program received pre-release planning services.  TCMP provided inmates with SSI applications but did not provide a consistent list of inmates who had applications in progress.

**Richard J. Donovan Correctional Facility (RJD)**
January 23, 2012 – January 26, 2012

Census:

On January 21, 2012, RJD's census was 3,755, which included 1,851 MHSDS inmates.  Although the institution's overall population decreased by 524, or 12 percent, since the preceding monitoring period, the MHSDS caseload only decreased by 105, or five percent.  There was a decrease in the number of caseload inmates in the reception center by 243, or 54 percent, since the preceding monitoring period.

There were 1,270 3CMS inmates, with 992 in mainline (including SNY), 96 in administrative segregation and 182 in the reception center.  There were 556 EOP inmates, with 310 in mainline, 149 in SNYs, 46 in administrative segregation, and 61 in the reception center.  There were 15 inmates in the MHCB unit.

Staffing:

Mental health clinical staffing vacancies increased slightly from the preceding monitoring period, with the vacancy rate increasing from 6.7 percent to 9.6 percent.  Of the 128.29 established clinical positions, there were 12.35 vacancies

including the chief psychiatrist, chief psychologist, senior psychiatrist, and 2.2 senior

psychologists.  Additional vacancies included a 0.5 staff psychiatrist position, four staff

psychologists, one psych tech, and a 0.65 recreation therapist position.

      Non-clinical mental health positions had a vacancy rate of 26 percent, with

6.1 of 23.8 established positions vacant.  Vacant positions included three office

technicians, one office service supervisor, one correctional health administrator, one

supervising program technician and a .1 correctional counselor position.

Quality Management:

      The local governing body met only once during the monitoring period.

      The quality management committee met monthly during the monitoring

period.  The meetings were attended by the appropriate disciplines.  Reviewed minutes

included relevant information.

      The mental health subcommittee met six times during the reporting period

and was chaired by the health program specialist.  Reviewed minutes included pertinent

information and data.

      The institution reported two active QITs during the reporting period.  One

examined a fence proposal for the mainline EOP yard, another covered IDTT correctional

counselor assignments and duties.[12]  RJD also tracked 41 action items on a spreadsheet.

      Psychiatry peer review was unchanged from the preceding monitoring

period and was more quantitative than qualitative in nature.  The lack of a chief

psychiatrist hindered any further development of this process.

---

[12] Defendants requested that this report be modified to add that RJD tracked 41 QITs on an action item
spreadsheet which was provided to the monitor.  The report is revised as shown above.  The institution's
management report was silent with regard to these 41 QITs.  Insofar as active QITs, the management report
stated that "there were a total of two Mental Health QITs active in the last reporting period," i.e. the QITs
on the fence proposal for the EOP yard and the IDTT correctional counselor assignments and duties, which
were referenced in the draft report, and above.

The peer review process had been redesigned and included a new peer review instrument for PCs to be utilized in the next reporting period.  The new process appeared to be comprehensive in scope.

Audits contained useful results, but frequently lacked any assessment of the results and corrective actions.

Suicide Prevention:

The SPRFIT met monthly during the reporting period with a quorum achieved at four of the six meetings.  The turnover among office technicians at the institution resulted in lost minutes or no record of discussions at meetings where no quorum was met.

An independent company provided CPR certification classes to health care staff, and in-service training continued to track custody staff for CPR certification.  The emergency response review committee met monthly during the reporting period.  Minutes indicated that quorums were present.  Issues addressed included emergency response times, response documentation, access to telephones for emergency calls, and emergency medication administration.  Emergency medical response drills were conducted quarterly.

The institution remained just shy of compliance with both clinical and custody follow-ups, with compliance rates of 89 percent and 88 percent, respectively.  The compliance rate was 96 percent for clinical five-day follow-up for those inmates released from alternative housing without an MHCB admission.

Of the 57 instances of self-injurious behavior reported during the monitoring period, 26, or 46 percent, were referred and admitted to crisis beds and 11 of those were ultimately referred to DMH.

214

The institution conducted daily reviews of profiles for newly arriving inmates. The senior psychologist assigned a PC to see those inmates whose profile contained a high suicide risk alert.

Daily meetings between custody and mental health staff occurred throughout the monitoring period. The institution remained noncompliant with completion of pre-placement screens before inmates were moved into administrative segregation. None were completed in a confidential setting.

Placards were observed on the cells designating new arrivals.

Compliance with 30-minutes welfare checks remained problematic but improvement with staggered rounds was noted.

Medication Management:

An audit indicated 75-percent compliance with medication continuity for inmates transferring in from other CDCR facilities.

The compliance rate for medication continuity following intra-institutional transfers decreased from the preceding monitoring period to 77 percent. Medication continuity following discharge from the MHCB unit remained noncompliant at 83 percent, but compliance was achieved for timely renewals of medications.

Audits for medication noncompliance, informed consent, and laboratory tests were not performed during the monitoring period. Audits regarding administration of medication DOT indicated a compliance rate of 76 percent.

During the reporting period there were an average of 72 inmates on Keyhea orders. Of the 18 hearings conducted, 16 petitions were upheld by the administrative law judge.

215

Based on institutional audits, the compliance rates for the provision of HS medications after 8:00 p.m. and for the provision of parole medications were 78 percent and 98 percent, respectively.

Audited UHRs/eUHRs found that MARs from the previous month were present 94 percent of the time, with 76 percent complete and legible.

Institutional audits indicated that pill line duration averaged 1.5 hours but no audit examined individual inmates' lengths of time in lines.

Sexual Misconduct:

During the review period, there were 15 RVRs written for sexual misconduct.  The institution was compliant with notifying mental health and completing the screen within 24 hours to rule out intoxication or decompensation.  RJD was also compliant with completion of mental health assessments and IDTT meetings within ten working days.  The institution had implemented an assessment team to complete the mental health screens and assessments, and to interview the inmate, clinician, and custody staff as well as review the UHR.

Three inmates were referred for comprehensive evaluations but none had been completed at the time of the site visit.  There were no diagnoses of Exhibitionism or Paraphilia NOS.

The institution continued to utilize custody-driven modifications including placards on cell windows and exposure-control jumpsuits.

All sexual misconduct RVRs were referred to the district attorney.

Transfers:

The institution had a full-time DMH coordinator.  RJD showed marked improvement in the collection and reporting of data in the DMH referrals logs, but

remained noncompliant with transfer timelines for both acute and intermediate care referrals.

From June to November 2011, 15 inmates were identified for referral to acute care at Vacaville psychiatric program at CMF (VPP). Of those, 13 transferred and two were rescinded and referred to an intermediate LOC. For those inmates who transferred to VPP, the average number of days to complete the referral packet was four, the average number of days from referral to acceptance was less than five and the average number of days from acceptance to transfer was 12. The overall average number of days from referral to transfer was 17 days.

There were 57 inmates identified for referral to intermediate care during the reporting period. Of the 57 inmates, 37, or 65 percent, transferred to intermediate care, seven transferred to VPP, 15 transferred to ASH, and 15 transferred to SVPP. It took an average of 11 days from identification to packet completion, and an average of seven days from referral to acceptance. Without counting one outlier of 92 days, the average number of days from referral to acceptance was five. Transfer times took an average of 35 days following acceptance by DMH, resulting in an overall average of 42 days from referral to transfer to intermediate care. Forty-one percent of intermediate care transfers met Program Guide timelines. Of those inmates who were referred to intermediate care but did not transfer, four were rescinded, one was referred to acute care, four paroled prior to transfer, five were rejected, three transferred to other institutions prior to transfer and three remained at the institution waiting transfer.

RJD received 37 inmates from DMH during the reporting period, with discharge summaries for 97 percent of them. Clinician-to-clinician contact occurred

within five days only 57 percent of the time.  Clinical five-day follow-up had a 97-percent compliance rate.

During the reporting period, RJD identified 608 inmates who met one or more of the DMH referral indicators.  Monthly audits of 25 samples of Form 7388-Bs indicated that the institution was noncompliant with documentation of reasons for non-referral and alternative interventions. Reasons for non-referral were vague and did not contain adequate clinical rationales.  During observed IDTT meetings, the 7388-B form was discussed but was usually completed prior to the meeting.

The MHCB unit at RJD consisted of 16 beds, 14 mental health beds and two swing beds routinely used as crisis beds.  The institution had 405 admissions to the crisis bed unit during the reporting period.  The average length of stay was 7.19 days which included 6.88 clinical days and .31 administrative days.  Of the 405 admissions, 81 inmates, or 20 percent, had stays in excess of ten days for an average overly-long stay of 18 days.

Repeat MHCB admissions increased with 46 inmates admitted to the MHCB unit three times or more over a six-month period, compared to 17 during the preceding monitoring period.

RJD did not maintain an OHU during the monitoring period but did have temporary housing cells (THCs).  Of the 81 inmates placed in THCs across the monitoring period, 62, or 60 percent, were awaiting crisis beds.  Of these 62 inmates, 60 percent were subsequently admitted to the crisis unit and 40 percent had their crises resolved before formal admission to the unit.  The average length of stay in the THC was 1.98 days, with a range from less than one day to 13 days.

218

The institution did not have credible data relative to the lengths of stay for caseload inmates in the reception center during the reporting period.  This was the result of a personnel issue that was addressed by the institution.

Other Issues:

Reception Center

The reception center was staffed with six psychologists, one social worker and two full-time psych techs.  Bus screenings were occurring for reception center inmates.  Confidentiality was no longer a problem.

The institution remained compliant at a rate of 96 percent for screening of EOP inmates within 72 hours of arrival.  It was also compliant with evaluation of inmates with EOP histories within seven days.

RJD achieved compliance for confidential PC contacts for EOP inmates, with rates of 100 percent for initial contacts and 97 percent for weekly contacts.  Both initial and routine IDTT meetings were timely 99 percent of the time.  Monthly psychiatry contacts occurred 92 percent of the time.

Institutional data indicated that EOP inmates in the reception center were offered an average of 6.58 hours of structured activities per week and 63 percent attended five or more hours per week.  Staff reported that the average group consisted of 15 inmates.

The institution also achieved compliance for confidential PC contacts for 3CMS inmates with 96 percent for initial contacts and 99 percent for quarterly contacts.

Administrative Segregation

There were 258 inmates in administrative segregation as of January 9, 2012.  The mental health caseload remained unchanged from the preceding reporting

period at 58 percent.  RJD was compliant for 30-day reviews of inmates with stays in excess of 90 days.  The institution reported that these meetings with the facility captain and senior psychologist to review the cases occurred weekly rather than monthly.

The institution was noncompliant with holding timely initial IDTT meetings, but was compliant with holding IDTT meetings every 90 days thereafter.  The meetings were attended by the appropriate disciplines.

Compliance was achieved with providing inmates with weekly individual clinician contacts, but none were conducted in a confidential setting due to physical plant limitations.

MHTS.net data indicated that 89 percent of EOP inmates prescribed psychotropic medications were seen by a psychiatrist every 30 days.  EOP inmates were offered an average of 8.6 hours of structured treatment per week, with an average of 5.3 hours attended and 3.34 hours refused.  Only 39 percent of all EOP inmates who were not on modified treatment plans were offered ten or more hours per week.

Observed IDTT meetings for 3CMS inmates had improved since the preceding monitoring period.  However, several of the treatment plans reviewed did not address pertinent issues.

Institutional data indicated that 83 percent of 3CMS inmates prescribed psychotropic medications were seen by a psychiatrist every 30 days.  Daily psych tech rounds were occurring and documented.

3CMS inmates in administrative segregation were not offered group therapy.

MHCB

Approximately 40 to 50 percent of MHCB inmates received out-of-cell time with recreational therapists in an outside yard and in a multi-purpose room. They were not cuffed during these sessions.

RJD was compliant with providing initial IDTT meetings within 72 hours of admission, but was noncompliant for daily contacts with a psychiatrist or psychologist based on institutional audits. Weekly IDTT meetings occurred 89 percent of the time and were attended by the appropriate disciplines

The special master's expert attended an MHCB IDTT meeting. Good interdisciplinary input was provided. Many of the issues leading to the MHCB admission appeared to have been related to custody issues within the administrative segregation unit. Discussions included whether or not restraints were required for the IDTT. Inmates placed in the modules were still in restraints, which was later remedied by a lieutenant.

The clinical care provided in the MHCB appeared to have improved since the monitor's last site visit. Despite difficulties with the MHTS.net data related to a variety of issues such as office tech staffing and new staff training, RJD managed to produce useful quality assessment audits relevant to the MHCB. Identified issues included compliance with completion of suicide risk assessments, five-day clinical follow-up, and daily primary clinician contacts, although review of monthly audits demonstrated increased compliance over time.

EOP

The disparity in programming between the two mainline EOP programs at RJD -- SNY and non-SNY -- continued during the reporting period. Consolidated data

221

for both programs was reported for initial and monthly psychiatry contacts which were both noncompliant.

The institution achieved compliance with initial PC contacts and completion of initial evaluations for both EOP programs.  Initial IDTT meetings were held within Program Guide timelines for SNY EOP inmates but not for non-SNY EOP inmates.  Both programs were compliant with weekly PC contacts and quarterly IDTT meetings.  SNY EOP inmates were offered an average of 15.7 hours of structured activities per week and received an average of 12.4 hours.  Sixty-five percent of non-SNY EOP inmates were offered ten or more hours of structured activities per week and received an average of 7.4 hours.

Treatment plans lacked individualization and at times contained boilerplate language for multiple inmates with no modifications.

3CMS

The institution was compliant with provision of initial evaluations, PC contacts, and both initial and follow-up IDTT meetings.  The required disciplines were generally present at all IDTT meetings.  The compliance rate was 89 percent for initial psychiatry contacts.  Quarterly psychiatry contacts were compliant.

Referrals

Data for mental health referrals was significantly improved since the preceding monitoring period.  The institution was compliant with response to both emergent and urgent mental health referrals, and was approaching compliance with routine referral timelines, with a compliance rate of 84 percent.

222

Heat Plan

The institution prepared monthly summaries of heat-related activity and forwarded the summaries to HQ.  The summaries indicated the dates and times of heat alert stages and which inmates, if any, were affected.

RVRs

During the review period, RJD issued 645 RVRs to MHSDS inmates, including 220 to EOP inmates, 418 to 3CMS inmates, and seven to MHCB inmates. Mental health assessments were completed for 99 percent of the EOP and MHCB inmates who were issued an RVR.  Mental health assessments were also completed for 73 3CMS inmates who received a Division A, B, C, or F RVR.  Hearing officers' consideration of the mental health assessments varied throughout the reporting period. Discussions with staff revealed that clarification was needed to determine if the recent training on the revised RVR process provided guidance as to the extent of the hearing officer's discretion to mitigate penalties.

**Appendix B**

**CASE REVIEWS**

EXHIBIT A
High Desert State Prison (HDSP)
September 27, 2011 – September 29, 2011

**Inmate A**

This EOP inmate was housed in general population.  He was provided with a diagnosis of Psychotic Disorder NOS.  He was not prescribed psychotropic medications.

At the beginning of the monitoring period, the inmate was receiving mental health services at the 3CMS level of care; he was not prescribed psychotropic medications at this time.  He had a history of treatment on a Keyhea order in the past, as well as treatment at the EOP level of care during 2007.  Progress notes indicated a history of delusional thinking.  During sessions with the primary clinician in March and April 2011, he at times presented with delusional thinking, believing that he was "pseudo-Russian," as well as periods of agitation and poor impulse control.  Subsequent progress notes indicated continued psychosis and poor insight as to the need for mental health treatment.  A review of the inmate's requests for services indicated that they were written in nonsensical language.

A progress note by the primary clinician dated 7/26/11 indicated that the inmate worked as a porter, and that other inmates tolerated his psychotic behavior.  The note indicated that the inmate would be brought before the IDTT for EOP consideration.  After the review period, he was next seen on 8/15/11, when he was agitated and psychotic.  The plan continued to indicate that the inmate would be brought to the IDTT for EOP consideration.  A telemedicine IDTT was conducted on 8/31/11; the inmate was provided with a diagnosis of Schizophrenia paranoid type and was referred to the EOP.  The note indicated that he refused psychotropic medications.  A treatment plan completed on 8/31/11 recommended EOP level of care.

Findings

Although the inmate presented with months of psychosis, poor insight as to his mental health issues, and periods of agitation, he was not referred to a higher level of care for stabilization until months later.  This referral was appropriate, but it should have occurred sooner; the inmate was at least seen monthly during this period.  It did not appear that the inmate would meet the criteria for a Keyhea order, but he should have been closely monitored for decompensation.  There was also no documentation of a current treatment plan, which was necessary for this inmate.  There was documentation of the presence of the necessary participants at the IDTT.

**Inmate B**

This EOP inmate was housed in the administrative segregation unit.  He was transgendered and was treated with hormonal therapy.  He was provided with a diagnosis of Adjustment Disorder with anxiety.  He was treated with Buspar 45 mg/day, Risperdal 2 mg/day, and Artane 10 mg/day.

The inmate transferred from the NKSP reception center on 6/23/11.  He had previously received mental health care at HDSP at the 3CMS level of care during late 2010.  He transferred to the CSP/Corcoran SHU where he was changed to the EOP level of care and subsequently transferred to the PBSP PSU.  It appeared that the inmate may have paroled

and was subsequently reincarcerated at NKSP.  It was unclear why he was transferred to HDSP when receiving care at the EOP level.  A review of the medical record indicated that he had a history of suicide attempts and difficulty adjusting due to treatment by others regarding his transgender issues.

The inmate received an RVR on 7/19/11 for possession of a weapon.  An RVR report completed on 7/31/11 indicated that his mental disorder was not contributory, and there were no mitigating factors for the hearing officer to consider.

Findings

There was documentation of the completion of the pre-placement chrono mental health screening upon arrival in administrative segregation, as well as documentation of weekly psych tech rounds.

The treatment team should have reconsidered the inmate's provided diagnosis, which was inconsistent with the medication treatment provided.  There was a treatment plan, but it was generic in content; it identified mood disturbance, safety, and acting out behaviors as problem areas.  It appeared that the primary clinician saw the inmate weekly.  There was documentation of suicide risk evaluation completion when clinically appropriate.  The IDTT did not document the presence of a CC I at the IDTT meeting.

**Inmate C**

This EOP inmate was housed in the administrative segregation unit.  He was provided with a diagnosis of Bipolar I Disorder, severe with psychotic features and Attention Deficit Hyperactivity Disorder, predominantly inattentive type.  He was also classified as DD2.

Based upon medical record information, the inmate received a reception center screening on 5/9/11.  Screening documentation indicated that he refused to participate in the MHSDS program.  On 5/17/11 a psychologist saw him following a custody officer's referral due to the inmate's bizarre behavior, poor grooming/hygiene, and inability to program and appropriately interact with other inmates.  The inmate continued to refuse treatment, yet reported auditory hallucinations.  He was seen on the following day when he was provided with a provisional diagnosis of Schizophrenia undifferentiated type.  It appeared that the psychiatrist in the MHCB also evaluated him at that time; the psychiatrist indicated that a diagnosis of Schizophrenia was questionable and that the inmate's symptoms might be the result of his first term status.  The inmate continued to refuse treatment, and was not prescribed psychotropic medications.  It did not appear that the inmate was actually admitted to the MHCB.

The inmate was seen for a reception center intake evaluation on 6/6/11.  At that time, information was obtained from his family confirming a significant history of mental health treatment.  He was placed in the MHSDS at the EOP level of care at that time.

A Form 7388-B completed on 6/9/11 inaccurately identified the inmate as a participant in the 3CMS program.  No referral indicators were identified.

227

Subsequent progress notes indicated that the inmate remained unable to program or interact appropriately with other inmates, and exhibited poor grooming and disorganized thinking. The inmate was transferred to the administrative segregation unit after he incurred a 115 for indecent exposure.

Findings

This inmate presented with clear evidence of psychosis and inability to function at HDSP. However, despite staff referral and reports of severe decompensation, he was not adequately evaluated nor were attempts made to stabilize his psychotic symptoms. The inmate should have been treated in the MHCB or referred to DMH for acute care. The inmate also was not assessed for grave disability, which might have allowed for involuntary treatment with psychotropic medications.

The Form 7388-B was erroneously completed and did not address the inmate's inability to function at his current level of care. The treatment plan was incomplete and did not identify the inmate's treatment resistance, lack of insight, and other specific treatment needs.

The inmate received a 115 for indecent exposure after he presented with significant psychosis and was not treated. A comprehensive evaluation was not completed. Mental health reasons appeared to have contributed to this incident.

**Inmate D**

This EOP inmate was housed in the administrative segregation unit. He was provided with a diagnosis of Schizoaffective Disorder bipolar type. He was treated with Invega Sustenna 156 mg intramuscular monthly.

The inmate had a history of multiple parole violations and subsequent returns to prison. He had a significant history of multiple hospitalizations and cutting behaviors. He arrived at HDSP for this incarceration in May 2011. He was initially housed in general population, but was subsequently transferred to administrative segregation on 5/20/11 following battery on a peace officer. Progress notes indicated that the psychiatrist saw the inmate on 5/27/11 when he continued to present with irritability, disorganized thinking, guardedness, and paranoia; the psychiatrist indicated that follow-up would occur in one month. Psych tech notes during this time consistently documented that the inmate presented with manic symptoms, including delusional thinking and hostility. His cell was described as malodorous, and he subsequently refused medications. A progress note dated 6/7/11 stated that the primary clinician indicated that a new DMH referral packet would be completed; the inmate had previously been referred to DMH for acute care, but now met the indicators for intermediate care. The inmate was admitted to the MHCB on 6/10/11 for stabilization.

On 6/28/11 the inmate was seen for a RVR mental health evaluation. The clinician indicated that his mental illness was a contributing factor and that his behavior may have been caused by his mental illness.

The inmate presented with possible suicidal ideation on 7/5/11; there was documentation of the completion of a suicide risk evaluation, which indicated low risk.  The Form 7388-B completed on 7/20/11 indicated that the inmate met at least three of the referral indicators.

Findings

There was documentation that the appropriate testing for Lithium was conducted.  Psychiatric evaluation indicated that the inmate was psychotic and not functioning well in general population, but was ordered follow-up for another month without other treatment interventions.  This was not clinically indicated for an EOP inmate who had been referred to DMH and was awaiting transfer.  He subsequently required MHCB admission on 6/10/11 due to grave disability.

There was documentation that five-day follow-up occurred after MHCB discharge for possible suicidal reasons, as well as documentation of weekly primary clinician contacts and psych tech rounds.  There was documentation of the completion of a suicide risk evaluation when clinically indicated.  There was no documentation of CC I attendance at the administrative segregation IDTT meeting on 7/20/11.

**Inmate E**

This EOP inmate was housed in general population.  He was provided with a diagnosis of Major Depressive Disorder, recurrent with psychotic features and Borderline Personality Disorder.  The inmate was transgendered.

The inmate was transferred to HDSP on 8/16/11, from MCSP, where he had been receiving mental health services at the 3CMS level of care.  It appeared that he was admitted to the MHCB shortly after arrival to the institution due to suicidal ideation.  He was discharged from the MHCB on 8/25/11.

The Form 7388-B that was completed on 8/31/11 indicated that the inmate met some indicators for referral to a higher level of care; he was transferred to the EOP at that time.

Findings

There was documentation of an individualized treatment plan that was completed on 8/31/11, and that the necessary participants were in attendance at the IDTT meeting.  A Form 7388-B was completed.  There was also documentation of the completion of five-day follow-up after MHCB discharge.

EXHIBIT B
Mule Creek State Prison (MCSP)
January 23, 2012 – January 25, 2012

**Inmate A**

This inmate was housed in the C-12 administrative segregation unit.  He was not a participant in the MHSDS.  His medical record was reviewed due to his presentation during psych tech rounds when he exhibited marked paranoid ideation, hostility, and use of profanity.  Staff reported that he consistently presented with this behavior and refused treatment interventions.

On 8/31/11, the psych tech submitted a mental health referral chrono due to the previously described behavior.  No other mental health-related information was present in the eUHR.

Previous volumes of the medical record indicated that he had participated in the MHSDS at the EOP and 3CMS levels of care, but was removed from the MHSDS in 2007.  Documentation consistently indicated that he presented with hostile, paranoid behavior and refused treatment interventions.

Findings

The inmate clearly presented with hostile, uncooperative, and paranoid behavior, and had a history of violence.  It was unclear if psychotic symptoms of a major mental illness were present.  It was unlikely that he would participate in mental health treatment, and he did not appear to meet the criteria for a Keyhea order at the time of the site visit.

**Inmate B**

This EOP inmate was housed in the administrative segregation unit.  At the time of the site visit, he had returned from the CMF MHCB.  He was treated with Clozaril 250 mg twice daily, Haldol 10 mg/day, and Cogentin 3 mg/day.

The inmate had been housed at NKSP.  At that time, he was recommended for the EOP level of care.  A treatment plan dated 8/13/11 indicated that he would be referred to the CMF MHCB at that time as he met several of the indicators for higher level of care referral consideration.  A mental health placement chrono dated 8/19/11 indicated that he was placed in the MHCB at CMF for psychiatric treat and return.

A healthcare transfer information form indicated that he was prescribed Clozaril and had a history of suicide and treatment at the EOP level of care.  He was seen in the TTA on 1/23/12 due to clearance for placement in administrative segregation when the above information was noted.  The administrative segregation pre-placement screening chrono (MH7) indicated that he had thoughts of self-harm and harm to others, and that he reported suicidal ideation.  He was then referred to a psychologist.  A completed suicide risk evaluation was completed and indicated that he had low acute risk and low to moderate chronic risk of self-harm; it also noted that he had been transferred to CMF due to homicidal ideation and attempting to jump the fence.  He was cleared for placement in administrative segregation and was placed on five-day follow-up.  The clinician noted that the inmate did not require monitoring in the MHCB or the MHOHU.

<u>Findings</u>

The inmate had been placed in administrative segregation upon his return from the MHCB at CMF, but the reasons for placement were unclear.  Of concern was his placement in so-called management cells that provided poor to no visualization for custody staff.  These cells were separated from the remainder of cells on the unit, while therapeutic modules for group therapy totally obstructed their view from custody officers. In light of the inmate's recent instability and history of suicidal ideation, it was imperative that he receive monitoring in a cell with adequate visualization for custody staff.

The inmate appropriately received a pre-placement screening and follow-up assessment by a mental health clinician prior to administrative segregation placement.  There was also documentation of the continuation of prescribed psychotropic medications and appropriate laboratory studies.  No documentation from the MHCB at CMF was located in the medical record.

**Inmate C**

This EOP inmate was housed in the administrative segregation unit.  He was provided with a diagnosis of Schizophrenia paranoid type.  He was prescribed Abilify 5 mg/day, but MARs indicated chronic and consistent medication refusal.

Progress notes indicated that the inmate had been housed in administrative segregation since at least July 2011.  He was consistently described as lethargic with flat affect, limited movements, and fixed gaze, and refused to leave his cell.  He generally did not respond to questions posed by questioners.  Clinicians documented his behavior, and instituted daily cell-front contacts due to his less than 50 percent participation in scheduled activities.  The most recent psychiatric progress note indicated that he did not meet criteria for a Keyhea order.

A review of the inmate's medical record indicated that he had a significant history of serious suicide attempts by hunger strike and hanging in 2010 and 2011.  His primary language was Spanish.  It appeared that he transferred to the administrative segregation unit at MCSP on 10/13/11.  He refused to accept a cellmate.  His insight was very poor.

On 12/8/11 the inmate was cleared for placement in the B EOP by the ICC.  However, he presented with delusional thinking as to his family, and refused to leave the administrative segregation unit.  He also reportedly presented with possible response to auditory hallucinations.

A Form 7388-B completed on 11/22/11 indicated that he met several indicators for DMH referral consideration (indicator one, two, three and six), but there was no indication that he was referred to DMH for stabilization.

<u>Findings</u>

The inmate was erroneously not appropriately considered for DMH referral.  He consistently refused medications, refused to leave his cell, and remained with significant psychotic symptoms.  He was not included on either the DMH referral or non-referral lists.  He should have been considered for referral to DMH for ICF level of care.

**Inmate D**

This EOP inmate was housed in the administrative segregation unit.  His medical record was reviewed as staff identified him as not participating in EOP programming.  He was provided with a diagnosis of Schizoaffective Disorder.  He was only prescribed Benadryl 100 mg/day, for which he was compliant.

The inmate had a history of multiple admissions to the MHCB and DMH.  A PSU term was imposed at his last ICC meeting.  He consistently refused to leave his cell, including for participation in yard, showers, or programming.

The most recent treatment plan was completed on 1/4/12.  The Form 7388-B indicated that he met indicators one and three for DMH referral consideration.  It also indicated that he had requested DMH referral, but this was denied by the IDTT.  He was placed on modified programming, which included cell-front contacts four times per week.  It appeared that he presented with paucity of speech and interaction, isolation in an empty cell except for a mattress, and with auditory hallucinations and delusional thinking, including some of paranoid content.

An RVR mental health assessment request was completed on 11/1/11 due to a charge of obstructing a peace officer/refusing assigned housing.  It noted that he was "severely psychotic" with major mental illness, limited insight, and impaired judgment.  It noted that mental illness contributed to his charge and that the hearing officer should consider this in assessing a penalty.

A Form 7388-B completed on 11/16/11 also noted that the inmate met indicator five (multiple MHCB placements), but noted that he was placed on modified programming with further assessment planned for later.

The inmate reportedly returned from DMH in June 2011 where he was hospitalized for ICF care.  Staff reported that he remained with the previously described symptoms after his return from the hospital.

<u>Findings</u>

This inmate presented with significant psychotic symptoms, treatment refusal, poor insight and lack of programming, and refused to leave his cell.  It did not appear that modified programming had been effective in improving his symptoms and behavior.  He should have been considered for return to DMH for ICF level of care, with CCAT involvement as indicated.

233

**Inmate E**

This inmate was housed in the mainline EOP and was a participant in the Extended EOP Care Plan (EECP). He was provided with a diagnosis of Schizophrenia disorganized type. He was prescribed Paxil 20 mg/day and Abilify 30 mg/day. He was on a Keyhea order that would expire on 4/10/12 due to danger to others.

The most recent progress notes indicated that the inmate remained with ongoing auditory hallucinations of a persecutory and command nature, but with decreased intensity and frequency. He was reportedly compliant with his prescribed medications. He had recently received a pacemaker after initially refusing the procedure.

A Form 7388-B completed on 12/21/11 indicated that he met indicator seven (meets screening for EECP) and eight (EOP for one year). The plan noted that he had benefitted from involvement in the EOP with enhanced services and that referral was not indicated.

Findings

This inmate did not require DMH referral at the time of the site visit.

**Inmate F**

This EOP inmate participated in the EECP. A Form 7388-B dated 7/21/11 indicated that he met several indicators for DMH referral consideration (criteria one, three, six and seven). However, it also included appropriate non-referral rationale, and indicated that the inmate would be referred to the EECP at that time.

A treatment plan dated 9/28/11 indicated that the inmate was provided with a diagnosis of Schizophrenia undifferentiated type. A mental status examination at that time revealed that he primarily presented with paranoia and delusional thinking. His symptoms were described as adequately controlled; he functioned independently with only occasional prompting as to completion of self-care. Clinicians documented that his group attendance was negatively impacted by his paranoia.

Several Form 7388-Bs completed after 7/21/11 found that he met no indicators for DMH referral consideration, but noted that he had been considered for EECP participation.

Documentation indicated that treatment plans were appropriately modified to address pertinent symptoms, such as the inmate's poor group attendance. These modifications included changing the group size to improve his group attendance. The inmate apparently also received additional clinical contacts and recreation therapy. Group attendance appeared to be adequate as of 12/21/11.

Findings

This inmate met indicators for DMH referral consideration based upon his poor group attendance. It appeared that the treatment team made appropriate adjustments to his program and treatment planning, including increased frequency of clinical contacts and

changes to group formats.  It did not appear that he required DMH referral at the time of the visit.

**Inmate G**

This inmate was a participant in the EECP.  He had a long history of mental health difficulties, including paranoia, depression, and suicidal ideation.  He had an additional, and more recent, history of chronic medical conditions, including end stage liver disease (hepatitis B), diabetes, and rectal bleeding.  He also had undergone several blood transfusions due to low platelet levels, and several hospital visits during recent months.

Documentation indicated that the inmate was generally compliant with mental health treatment.  However, his medical condition prevented treatment with psychotropic medications.

The inmate's group attendance was reportedly poor.  A mental status examination on 9/14/11 indicated that he was depressed with irritability, insomnia, and impaired judgment, but had goal-directing thinking.  He was provided with diagnoses of Schizophrenia and Mood Disorder secondary to a medical condition.

A progress note dated 8/11/11 indicated that he exhibited frequent mood fluctuations, but noted that he was not prescribed psychotropic medications.  He reportedly had missed groups due to his poor health.  Documentation from December 2011 and January 2012 indicated that he presented primarily with anxiety and mood disturbance associated with his medical condition.  Treatment of mental health issues including delusions and paranoia was complicated by the inmate's reaction to the medications, which included a significant decrease in blood pressure.

Findings

The primary clinician saw the inmate on a weekly or biweekly basis.  Documentation also indicated that he received prompting from mental health staff to facilitate attendance in EECP groups.  Although he remained with depressive symptoms likely due to his medical condition, it appeared that he was receiving mental health services at the appropriate level of care, and did not require referral to DMH ICF.  The inmate's mental health symptoms appeared to be stable, despite the absence of treatment with psychotropic medications.

**Inmate H**

This EOP inmate was an EECP participant.  He was serving a life sentence for killing his stepson.  Medical records revealed that he had a history of decompensation associated with medication refusal.  He was admitted to the MHOHU due to grave disability on 1/1/11; he had reportedly stopped eating and drinking, smelled of urine, was observed yelling illogical statements, and reported hearing the voice of God, Jesus, and the devil.  Involuntary medication was apparently initiated on 3/17/11.

A progress note dated 7/28/11 indicated that his functioning was slowly improving, but he continued to exhibit poor grooming, delusional thinking, memory deficits, and grandiosity.  Documentation further indicated that he was referred to the EECP at that time.

A progress note dated 10/10/11 revealed that the inmate's group participation had improved since his involvement in the EECP, but an entry dated 10/21/11 stated that he had isolated behavior and delusional thinking regarding the devil.  On 12/2/11 he was described as delusional with religious preoccupation.

Findings

This inmate apparently exhibited significant psychotic symptoms during early 2011.  He was referred to the MHOHU where he remained until approximately April 2011.  He was placed on a Keyhea order and apparently improved slowly.  Of some concern was his referral to the EECP during a period when he was acutely ill, rather than DMH referral for acute or ICF level of care.  As the inmate remained with isolated behavior, delusional thinking, and minimally adequate grooming, DMH referral should have remained a treatment option for him.

EXHIBIT C
California State Prison, Solano (CSP/Solano)
September 27, 2011 – September 29, 2011

**Inmate A**

This inmate was selected for review because he had been identified as meeting an indicator for DMH referral (criterion one), but was not referred to DMH. Staff indicated that he had been housed in general population and suggested the possibility of acute methamphetamine use as the reason for MHCB admission. The inmate was housed in the MHCB from 6/30/11 to 7/7/11 with an admission diagnosis of Bipolar Disorder. At the time of MHCB discharge, his diagnoses had been refined to Bipolar Disorder, most recent episode manic, and Polysubstance Dependence. The inmate was discharged at the 3CMS level of care.

The inmate revealed to staff that previously he had been diagnosed with Bipolar Disorder and had sought assistance after arrival because he was not receiving his psychotropic medication (Seroquel). This was supported by an evaluation on 1/26/11 completed at a prior facility that concluded that he met no MHSDS criteria despite reporting symptomatology. It appeared that the inmate subsequently decompensated without medications to such an extent that custody staff referred him to mental health due to irritability, disruptive behavior, tangential speech, and hyperactivity, resulting in his MHCB admission. A urinalysis completed at the time of MHCB admission was negative for illicit drugs or alcohol. It was also determined that there were no medical issues that contributed to his altered mental status.

It appeared that the inmate was admitted to the MHCB and seen by the IDTT on the same day. The CC 1 was not present at the IDTT. An incomplete Form 7388 was located in the medical record in addition to the above-referenced Form 7388-B. There was no documentation of subsequent treatment planning or indication that the IDTT had seen him again prior to his 7/7/11 MHCB discharge, but there was a Form 7388-B completed on 7/7/11 that indicated that no DMH referral indicators had been met. The inmate was prescribed Lithium and Zyprexa.

During the MHCB hospitalization, the inmate was described as tangential with loose associations, pressured speech, rambling, and irritability. He reported auditory and visual hallucinations with paranoia and delusional thinking. He was seen daily by mental health staff while in the MHCB. When he was discharged, plans were implemented for five-day follow-up based on discharge orders. However, medical record review indicated that he was only seen on 7/8/11, the first post-discharge date. There was insufficient information in that progress note to determine the inmate's functioning. An IDTT conducted on 7/13/11 included all required participants. The 7388 treatment plan of that date was incomplete and did not reference the recent MHCB stay, although the Form 7388-B briefly mentioned it. The treatment plan was inadequate in light of the serious symptomatology that this inmate presented.

<u>Findings</u>

This inmate was not properly identified upon arrival as requiring MHSDS placement and services. He subsequently decompensated, requiring MHCB admission. While in the MHCB, he was seen timely by medical, psychiatry, and his primary clinician. He was not seen timely by the IDTT, and a 7388 treatment plan was not always completed. The

inmate was properly assessed for suicide risk during MHCB admission and discharge, but was not properly monitored for five-day follow-up after discharge.  The initial treatment plan completed for the 3CMS program in general population was incomplete and inadequate in light of the inmate's observed symptoms.  The rationale for DMH non-referral was inappropriate as it implied that the inmate was under the influence of illicit substances, which was not proven.

## Inmate B

This inmate's medical record was reviewed because he had been housed in the MHCB from 6/22/11 to 7/7/11 and had been identified as meeting DMH referral indicators, but was not referred because his symptoms were reportedly secondary to a medical condition (delirium secondary to pain medications) and not due to his mental health condition.  He was receiving treatment for metastatic cancer and was prescribed morphine, Klonopin, and Seroquel at the time of admission.  He was admitted due to sudden onset of confusion, hallucinations, paranoid ideation, and suicidal ideation.  His admission diagnosis was Major Depressive Disorder.  The inmate was seen timely by medical and mental health staff.  Seroquel and Klonopin were discontinued, and the inmate's mental status improved with an extended stay in the MHCB for stabilization.  His prescribed level of morphine was reduced, and he was prescribed Zyprexa.  The psychiatrist recommended that he receive no other psychotropic medications.

According to medical records, the inmate was placed in the MHSDS following his diagnosis of terminal cancer, when he presented with symptoms of anxiety and depressed mood.  His diagnosis varied based on the provider, but the most recent psychiatrist in general population had prescribed Seroquel because the diagnosis was thought to be Psychotic Disorder NOS.

There appeared to be little coordination between the treating psychiatrist and primary clinician as to the mental health treatment provided for this inmate, based upon differing diagnoses and treatment approaches.  The inmate was seen timely by his primary clinician and psychiatrist while he was housed in general population at the 3CMS level of care.

Findings

The inmate was seen timely by all staff while housed in the MHCB.  Mental health worked closely with medical staff to determine if the inmate's admitting symptoms were due to mental illness or medical issues and all appropriately concluded that there was a medical basis for the symptoms.  The inmate's treatment was appropriately modified, and he was appropriately not referred to DMH.  He was also appropriately maintained in the MHCB/CTC until he was stable.

While in general population, he was seen timely by his primary clinician.  During the monitoring period, he was seen by one psychiatrist but had previously been seen by a different psychiatrist with a different diagnostic impression.  There appeared to be poor coordination of treatment between the treating psychiatrist and primary clinician as they each had very different diagnostic impressions and treatment objectives.  Diagnostic

clarification would be beneficial for this inmate and would help to ensure proper care in light of his medical issues.

**Inmate C**

This inmate's case was selected for review because he had been placed in the MHCB during the monitoring period.  He had a clinical length of stay that exceeded ten days (12 days) yet the diagnosis listed on the MHCB log was Adjustment Disorder.  He was admitted to the MHCB on 5/26/11 with diagnoses of Adjustment Disorder with depressed mood and Mood Disorder NOS by history.  MHCB discharge documentation provided conflicting information as to the appropriate discharge diagnoses.  The inmate was prescribed Abilify, Lithium, and Zoloft.  A mental health summary completed at discharge by the psychologist indicated that he had been admitted to the MHCB while being housed in administrative segregation for possession of a weapon and marijuana.  He had expressed suicidal thoughts and threats after he was charged with these infractions.  He had reported depressed mood, auditory hallucinations, and unstable mood.

The inmate was erratically compliant with medications during his stay, but was discharged on the same medications.  The history and physical examination and the medication consent form were completed timely.  Progress notes from the MHCB were often illegible.  The inmate was not seen by psychiatry or a psychologist on 5/31/11 or 6/1/11, although he was seen by a social worker.  He began reporting improvement on 5/29/11.  It was not clear from the records why the inmate was maintained in the MHCB beyond ten days.  There was an IDTT progress note dated 5/27/11 and an associated 7388 treatment plan with a completed Form 7388-B present in the medical record, but these documents contained little helpful clinical information.

The next IDTT was conducted eight days later; this IDTT was not timely and did not include an updated 7388 treatment plan, but a Form 7388-B was completed.  The 7388 treatment plan did not document the presence of the CC 1 at the IDTT.  The final Form 7388-B completed at the MHCB discharge on 6/7/11 did not properly identify the inmate as meeting indicator four for DMH referral consideration.  The inmate was cleared for and participated in recreation therapy on 5/27/11.  A suicide risk evaluation was completed at the time of admission; another suicide risk evaluation was also completed, but it was unclear when this evaluation occurred.

<u>Findings</u>

The nursing assessment, history and physical examination, and admission suicide risk evaluation were completed timely.  Documentation of treatment planning was poor.  There was a lack of documentation that the necessary participants were present at IDTT meetings, and the inmate was not seen by appropriate mental health staff for daily rounds on two days.  He remained in the MHCB beyond the ten-day maximum period without any real clinical rationale provided; this may have been reflective of the lack of treatment planning.

240

The inmate was not appropriately identified as meeting criteria for DMH referral consideration (criterion four) and was not appropriately considered for DMH referral. He was reportedly maintained in the MHCB for diagnostic clarification, but this clarification never occurred. Diagnostic clarification was indicated for this inmate, in addition to at least brief cognitive-behavioral intervention to address his mood symptoms and stressors. Diagnostic clarification and medication re-evaluation were also indicated in light of his provided diagnosis of Adjustment Disorder and treatment with antipsychotic, antidepressant and mood stabilizing medications, which were not indicated for the treatment of this diagnosis.

**Inmate D**

This inmate had been admitted to the MHCB during the monitoring period and had three or more crisis placements. He was admitted to the MHCB on 8/26/11 with a diagnosis of Major Depressive Disorder, recurrent, moderate with psychotic features. He was discharged on 9/1/11 with a diagnosis of Mood Disorder NOS, Psychotic Disorder NOS, and Alcohol Dependence in remission. He was prescribed Risperdal, Celexa and Vistaril for symptoms that included auditory hallucinations, depression, and sleep disturbance.

The inmate had reportedly attempted to hang himself one month prior to the MHCB hospitalization. He reported to staff that he drank pruno (inmate manufactured alcohol) at least monthly while incarcerated and had attended several substance abuse programs without success. He was seen daily by psychiatry following admission. The nursing assessment and history and physical examination were completed timely. There was an IDTT progress note that indicated that a timely IDTT was conducted on 8/29/11. However, no CC 1 was present at the IDTT, and the Form 7388-B did not correctly indicate that the inmate met criterion five and should have been considered for referral to a higher level of care. Instead, the inmate was discharged to the 3CMS program, and was returned to DVI, his sending facility.

The inmate reported during his MHCB stay that his behaviors were in response to his father's death and sister's diagnosis of cancer. The initial treatment plan was incomplete and did not contain all necessary pages; it was minimal in content and did not include information as to suicidal or homicidal ideation despite them being primary factors in his repeated MHCB admissions. No treatment plan was completed during the 9/1/11 IDTT, and the Form 7388-B again failed to note the repeated MHCB admissions requiring consideration of referral to a higher level of care. The recreation therapist completed an assessment that well-documented the inmate's participation in recreation therapy during his MHCB admission.

<u>Findings</u>

While this inmate was seen timely by psychiatry and the IDTT, documentation was poor and treatment goals and interventions were unclear. He was not properly identified as meeting indicators for consideration of referral to a higher level of care. Documentation completed during his admission was minimal and did not provide enough information to determine if a referral to DMH would have been appropriate. In light of the inmate's stated stressors, grief counseling and brief cognitive-behavioral therapy were clearly

indicated.  This inmate's care while housed at the MHCB at CSP/Solano was substandard and increased the likelihood of additional MHCB admissions.

**Inmate E**

This inmate was admitted to the MHCB on 4/10/11 with a diagnosis of Depressive Disorder NOS, and was discharged to the 3CMS program on 4/19/11 with diagnoses of Adjustment Disorder with mixed anxiety and mood, Polysubstance Dependence, and Personality Disorder NOS with antisocial traits.  Medications at the time of discharge included Risperdal, an antipsychotic medication.  It was unclear why the inmate was prescribed an antipsychotic medication with a diagnosis of Adjustment Disorder, and it was noted that the provider appeared to also question the presence of psychosis by actually placing a question mark after the word 'psychosis' in the medical record.  The inmate was also prescribed Remeron.

The inmate was admitted to the MHCB due to suicidal ideation, and was described as depressed and despondent at the time of admission.  There was documentation that MHCB staff provided cognitive restructuring and supportive therapy in addition to medication management in an attempt to address his current stressors.  Staff documented that as the inmate began to speak more openly about his stressors and engage in therapy, his mood improved.  He was not seen by psychiatry or psychology on 4/14/11.  Suicide risk evaluations were completed within 24 hours of admission and at the time of discharge.  A mental health evaluation was completed timely.  An IDTT was conducted on 4/12/11, but there was no documentation of the presence of a CC 1 at the IDTT.  The 7388 treatment plan of that date was generally adequate, but the update was not informative.  There were also accurate Form 7388-Bs completed on those dates.  The nursing assessment and history and physical examination were completed timely.  The inmate participated in recreation therapy during his MHCB hospitalization.

Findings

There was documentation that clinical contacts occurred timely for this MHCB inmate.  It also appeared that he received care that was specific to his treatment needs.  Although there was a lack of documentation of daily rounds on one day, there was good documentation of beneficial therapeutic interactions with the primary clinician.  The inmate received appropriate treatment while in the MHCB, despite the fact that treatment planning documentation was less than adequate during his final IDTT.

**Inmate F**

The inmate was admitted to the MHCB on 7/6/11 with a diagnosis of Psychotic Disorder NOS.  He was discharged the following day with diagnoses of Schizoaffective Disorder and Polysubstance Dependence.  He was previously discharged from the MHCB on 6/30/11.  At that time, he was restarted on psychotropic medication (Risperdal, Depakote, and Cogentin), and, according to psychiatric documentation, responded well.  In contrast, the psychologist noted that the inmate had complained that his medications were not working, he was having problems with his cellmate, and he exhibited symptoms of anxiety.  Despite the disparate views, the inmate was discharged.  He was directed to

contact his yard lieutenant and to complete a request to see his primary clinician and psychiatrist.  He was placed on five-day follow-up.

Despite being seen by psychiatry while in the MHCB, progress notes did not indicate that the inmate's concerns were addressed or that he was provided with any education as to his medication issues.  Because of his brief stay, only one suicide risk evaluation was completed.  A nursing assessment and history and physical examination were completed.  The inmate reportedly told staff that he would cause harm to his cellmate if he was returned to his prior cell.

Findings

The inmate did not appear to have been appropriately evaluated or treated while in the MHCB and was not appropriately discharged.  It was unclear whether or not he was appropriate for discharge in light of his threats to harm others and expressed fears regarding his cellmate.  Psychiatry should have addressed his medication concerns while he was housed in the MHCB.  Custody management should have been alerted to his housing concerns and threats of harm prior to discharge so that appropriate housing could be arranged.  The inmate was appropriately assigned to five-day follow-up.

**Inmate G**

This inmate's record was selected for review because he had four MHCB admissions during the monitoring period and within a two-month timeframe.  However, medical record review indicated that he had been admitted three times for medical reasons (end stage liver disease), and was not actually admitted to the MHCB on these occasions.  When reviewing all of the admissions, it became clear that his mental status was negatively impacting his physical status; he was refusing medications and proper medical monitoring.  Unfortunately, when admitted for medical reasons, medical staff did not initiate a referral to mental health for evaluation and possible treatment to address medical noncompliance and self-harm as a result of that noncompliance.  When housed in the MHCB, the mental health staff did not work collaboratively with medical staff to create a combined treatment plan.  Documentation indicated that the inmate was viewed as presenting with antisocial traits and no significant interventions occurred.

Findings

The inmate did not receive an appropriate evaluation or adequate treatment by mental health staff in light of his mental and physical health issues.  Mental health staff did not work with medical staff to develop a comprehensive treatment plan that would minimize noncompliance and repeated hospitalizations.

**Inmate H**

This inmate's medical record was selected for review because he had been identified as meeting one or more indicators for consideration of referral to a higher level of care.  He was receiving mental health services at the 3CMS level of care, and it appeared that he was seen timely by mental health staff.  He was provided with a diagnosis of Psychotic

Disorder NOS and had been treated with antipsychotic medication, but it was discontinued due to his complaints about side effects.  He was then placed on Desyrel.  The inmate had a current 7388 treatment plan.  A Form 7388-B present in the medical record did not accurately reflect the positive referral indicator, although that information was available to staff.

Findings

This inmate should have been appropriately considered for referral to a higher level of care; EOP level of care should have been considered at a minimum.  In addition, it was unclear why the inmate was seen so infrequently despite the presence of a serious mental illness.  Documentation was poor in this case and provided very little relevant clinical information.

EXHIBIT D
California State Prison, Corcoran (CSP/Corcoran)
August 29, 2011 – September 1, 2011

**Inmate A**

This inmate's medical record was selected for review after observation of his condition during an EOP group treatment session.  He appeared highly preoccupied and had difficulty focusing attention on the group topic, with grandiose delusional thinking.  Discussions with his primary clinician revealed that DMH referral had not been considered due to continuity of care concerns and the belief that he would not improve at DMH.

The inmate transferred to the CSP/Corcoran Level IV EOP in early April 2011.  The medical record frequently documented his delusional thinking, treatment refusal, and poor insight.  He had sporadic group attendance and refused to leave his cell for individual therapy sessions.  Clinical contacts primarily occurred at cell front due to his refusal to leave his cell.  Although documentation indicated that staff recognized his psychotic symptoms, the psychiatrist indicated that he did not meet criteria for a Keyhea order at that time.  Medical record documentation also was contradictory; some cell-front contacts with the primary clinician indicated that he exhibited no evidence of psychosis and appeared to be functioning at baseline.

A treatment team progress note dated 6/29/11 indicated that the inmate qualified for EECP participation.  All referral indicators on the Form 7388-B were noted as negative despite the inmate's ongoing overt psychosis and lack of programming.

Findings

This inmate met indicators for consideration of referral to a higher level of care in light of his poor treatment participation, continued psychosis, and failure to improve in the EOP.  It was of concern that treatment team documentation did not reflect appropriate assessment of symptoms (cell-front contacts) or appropriately determine whether he met referral criteria consideration.  At a minimum, he should have received appropriate assessment for the pursuit of a Keyhea order.

**Inmate B**

This EOP inmate arrived at CSP/Corcoran in early 2011.  He underwent a comprehensive mental health evaluation on 3/7/11.  He was provided with diagnoses of Schizophrenia disorganized type, Pervasive Developmental Disorder, and Asperger's Disorder.  He was also classified as DD2.  He was prescribed Prozac, Geodon, and Zyprexa.  During the evaluation, the reviewer noted that he appeared to be inappropriate for a prison setting given his pervasive developmental disorder.  An IDTT note dated 5/12/11 stated that he was "naïve and unable to relate in a meaningful manner."  He had poor activities of daily living skills and reportedly exhibited little to no improvement in the EOP.  However, the plan outlined by the IDTT was for him to remain in the EOP as it was believed that this program was meeting his needs.

The Form 7388-B completed at the IDTT indicated several positive responses as to DMH referral indicators, including inadequate functioning, EOP placement for more than one year, EECP screening, and chronic symptomatology.  However, several of the Form

7388-B's affirmative responses were changed to negative; no explanation was provided for these changes or the rationale for not referring him to DMH.

The medical record contained an EECP recommendation packet. Ultimately, however, the inmate was refused admission to the EECP with the following statement: "For Asperger's he may not need EOP at some point. He does not qualify for EECP program."

Findings

Descriptions in the progress notes concerning the inmate's poor level of functioning were quite illustrative of his lack of social skills and prominent Asperger's presentation and functioning. It was clear that he had not improved during more than one year in the EOP. A referral for ICF level of care was warranted, and the rationale for not doing so appeared to have been a decision to refer to the EECP. But there was no EECP available for this inmate, and even if a functioning program had been in place, he was denied admission. There was no reconsideration of DMH referral after EECP denial.

**Inmate C**

This inmate had a long history of community mental health treatment for Schizophrenia. He was serving time for second degree murder involving the death of his father. This was his first and only prison sentence. He entered prison in 2009. He was on a Keyhea order that would expire on 7/20/12. He had a history of treatment at DMH for acute care, and returned to CDCR on or about 10/12/10. Shortly thereafter, he required MHCB placement at NKSP where he remained from 1/8/11 to 2/16/11. A referral to DMH ICF level of care was made at that time.

The inmate was transferred to CSP/Corcoran from NKSP on 4/4/11 and placed in an EOP bed to await DMH transfer. A CSP/Corcoran treatment team that met on 6/22/11 rescinded the DMH ICF referral because the inmate had not been hospitalized in the MHCB since February 2011, was compliant with medications with the assistance of the Keyhea order and treatment with long-acting injectable medications, and had received no RVRs since 6/1/10.

The inmate was described as presenting with flat affect and prominent negative symptoms, including psychomotor retardation. With prompting, he began to attend some groups, although his participation was described as minimal.

Findings

The decision to cancel the inmate's DMH ICF referral was premature. It was essentially solely based on the lack of MHCB admissions for several months rather than his clinical condition and need for treatment.

**Inmate D**

This inmate's medical record was reviewed at the request of plaintiffs' attorneys due to concerns regarding his difficulty dealing with placement in segregated housing.  He told plaintiffs that he began a hunger strike over issues related to his extended segregation placement.  He had been housed in segregation for at least five years prior.

The inmate was housed in the EOP hub.  He was transferred to the EOP level of care in April 2011 from the 3CMS program.  At that time, he was provided with a diagnosis of Major Depressive Disorder.  He reported multiple situational stressors, including the death of a family member, the failing health of his mother, and concerns regarding his attempts to discontinue his gang affiliation status.  He was serving a life sentence for murder.  At that time, he was prescribed antidepressant medication and the primary clinician saw him weekly.

Since early May 2011, he was seen in individual and group sessions.  Progress notes indicated that he utilized information garnered during those individual and group sessions.  He no longer appeared to be clinically depressed or anxious.  He reported disappointment after a recent decision not to drop his gang affiliation; he stated that he had no gang affiliation.  He told mental health staff that he was going to continue a hunger strike as to his continued indefinite SHU placement.  However, it was unclear from the medical record whether or not he actually participated in a hunger strike.

Findings

The inmate appeared to be receiving mental health services at the appropriate level of care.  When his level of clinical need exceeded that which could be provided at the 3CMS level of care, he was transferred to the EOP.  He did not meet criteria warranting DMH referral consideration at the time of review.  His report of participation in a hunger strike was related to denial of his request to invalidate his gang affiliation, and not due to mental health concerns.

**Inmate E**

This 3CMS inmate's medical record was reviewed at plaintiffs' attorneys' request due to concerns as to his need for psychiatric stabilization.  He had been housed in the CSP/Corcoran SHU since 12/28/05.  He was provided with a diagnosis of Schizophrenia paranoid type.  He was not prescribed psychotropic medication as for several years he had consistently refused to take medication.

Medical record documentation indicated that the primary clinician saw the inmate monthly, but that all contacts occurred at cell front because he refused to leave his cell.  Episodically, the psych techs referred him to mental health based upon his bizarre paranoid delusions as to the government and conspiracies.  Mental health's attempts for evaluation in an appropriate confidential setting were unsuccessful.  The inmate's annual treatment team meeting was conducted in absentia.

The special master's expert approached the inmate's cell and asked him to leave it in order to discuss concerns noted in the plaintiffs' letter to the Special Master. His clothing and cell were neat and clean, and his property was neatly organized. He agreed to meet outside of his cell, and he was cooperative with the escort team. The interview was conducted in a confidential setting. After initial suspicion and expression of paranoid delusional thinking as to the motive for the interview, he was conversant and cooperative. He also agreed to regular contacts with mental health staff out of cell, but continued to express delusional thinking of paranoid and grandiose content.

Findings

The inmate was extremely delusional with grandiose and paranoid content. Despite this, his speech and thinking were organized, and his behavior was non-threatening. His personal grooming and cell hygiene were very good. He reportedly was not a management problem in the SHU, and was cooperative with correctional staff.

The inmate appeared to be functioning adequately at the 3CMS level of care, and did not require transfer to a higher level of care. Additionally, given the long-standing nature of his delusional belief system and the fact that delusions were generally refractory to treatment with antipsychotic medications, and that he was functioning adequately and refused medication, there was no clinical rationale to attempt a Keyhea order at the time of review. The inmate appeared to be receiving mental health services at the appropriate level of care in the 3CMS program, but required consistent monitoring as his condition could change. The risks and benefits of medication treatment should be reevaluated if a change in his mental status occurred.

**Inmate F**

This inmate transferred to CSP/Corcoran from DVI and was on a Keyhea order due to danger to self and others. He was provided with diagnoses of Schizophrenia paranoid type and Polysubstance Dependence. While housed at DVI, he had three MHCB placements, poor medication compliance, and exhibited paranoid thinking with delusions of persecution and mind control. He also reportedly experienced auditory and visual hallucinations and depression. He reportedly would not leave his cell for individual sessions or group therapy.

An IDTT meeting held on 2/2/11 indicated that he had a history of depression and persecutory delusions. He had been refusing medication and was restarted on medication. He had been cooperative with cell-front interviews, but refused to leave his cell for mental health appointments in the treatment building as he worried about retaliation from other inmates on the yard while he was escorted in handcuffs. He appeared depressed and distressed. The IDTT was held to discuss his poor attendance in the EOP hub program.

An IDTT meeting conducted on 8/17/11 lacked CC I participation. Documentation indicated that the inmate participated in less than 50 percent of treatment. He was described as exhibiting a flat affect and having limited verbal interaction with some angry outbursts when he did talk. He reportedly had been participating in the EOP for almost

one year without improvement and continued to express chronic suicide ideation with no specific plan. He had recently been referred to DMH. A progress note dated 8/23/11 indicated that he stated that he viewed DMH referral as punishment; this comment was unusual for this inmate with poverty of speech. He continued to present with flat affect, depressed mood, and angry outbursts with paranoid and persecutory delusions. The psychiatrist saw him on 8/22/11 when he was prescribed Invega Sustenna.

Findings

This inmate was referred to DMH after consideration for EECP placement. He was not participating in treatment, not coming out of his cell, and had multiple MHCB placements. DMH referral appeared to be appropriate for him. An IDTT meeting lacked CC I participation.

**Inmate G**

Medical record review indicated that the inmate arrived at CSP/Corcoran on 4/4/11 from NKSP. He was on a Keyhea order and had an active referral to DMH ICF. The referral was made due to poor program participation at the EOP level of care and a history of multiple MHCB admissions. An IDTT meeting on 6/22/11 indicated that he demonstrated some clinical stability since arrival at CSP/Corcoran with at least 50 percent treatment participation and no recent MHCB placements or RVRs. His medication regimen was changed to injectable medications in January 2011; he was reportedly medication compliant although he remained with little insight as to his need for mental health treatment. The IDTT rescinded the DMH referral.

The inmate was on a Keyhea order due to grave disability. The Keyhea order was upheld at a hearing on 7/20/11.

Primary clinician progress notes dated 8/11/11 reportedly indicated that he was doing well. He was involved in group therapy. His mood was described as dysphoric with psychomotor retardation and blunted affect, but his thought processes were linear and goal-directed.

Findings

The inmate was erroneously identified as being placed on the EECP referral list. Documentation indicated that he had been referred to ICF at NKSP due to nonparticipation and multiple MHCB placements. The DMH referral was rescinded on 6/22/11 as he was placed on a Keyhea order, and reportedly participated in treatment and was more stable. The DMH rescission appeared to be appropriate.

**Inmate H**

An IDTT from CSP/Sac dated 5/12/10 indicated that the inmate had returned from a one-year hospitalization at DMH ICF on 4/29/10. He had a long history of a diagnosis of Schizophrenia undifferentiated type. His symptoms included persecutory and grandiose delusions (hearing voices from the dead telling him to uncover them, being put to death

250

107 times, being unjustly incarcerated, fearing attacks from custody and other inmates, stating he was an FBI or CIA agent, etc.).  The inmate wrote letters to express his thoughts, and they revealed increasing incoherence and disorganization with mental decompensation.  He reportedly had a long history of isolative behavior and treatment refusal.  Documentation indicated that he responded well to Seroquel, a non-formulary medication.  DMH had also recommended Seroquel.

A primary clinician progress note dated 6/29/11 documented the inmate's belief that his food contained human body substances.  Despite this, he was described as oriented with more lucid and engaging conversation, and was stable without medications.  The plan outlined was for the inmate to continue treatment in the EOP.  An IDTT meeting on 7/6/11 indicated that he had returned from DMH on 2/9/11.  Unfortunately, there had been little or no progress in the treatment team's goal of increasing participation to 25 percent, and increasing positive activities and thoughts 25 percent of time.  The inmate was described as withdrawn, not cooperative, poorly oriented, and with speech that was rapid and sometimes high-pitched with delusional content.

A Form 7388-B dated 7/6/11 revealed that the inmate met indicators one, three, six, seven and eight for DMH referral consideration.  The intervention listed on the 7388 treatment plan was to provide him with his list of groups and encourage involvement in weekly individual sessions.  The clinician referred him to the psychiatrist for medication evaluation, but the inmate did not attend the appointment.

As the medical record noted, the inmate continued to refuse group attendance.  A psychiatry progress note dated 7/7/11 indicated that he had refused an escort, refused to come out of his cell for an interview, was agitated and angry, and refused to talk to the psychiatrist.  He was described as having an unkempt beard and wearing a stocking cap in 100 degree weather.  The interview was aborted when the inmate rapidly escalated and began shouting at the psychiatrist.  He was not prescribed psychotropic medications at that time due to refusal.

The inmate was placed on a Keyhea order on 8/23/11 for grave disability.  The C-file indicated that he had been on a Keyhea order as early as 1987 and had also been hospitalized at DMH as a psych, treat and return to SVSP on 3/3/09.  A review of the non-referral log during the monitoring period indicated that he had not been identified as meeting any referral criteria.

The special master's expert observed an IDTT meeting during the monitoring visit when it was reported that the inmate had just returned from another DMH hospitalization.

Findings

The inmate had multiple DMH hospitalizations with little noted improvement.  He had an active Keyhea order with little change in his level of participation.  Although described as meeting multiple criteria for DMH referral consideration, he was not listed on the DMH non-referral log.

**Inmate I**

This inmate was on a Keyhea order for grave disability.  He was primarily Spanish-speaking and was designated as DD2.  His prescribed medications included Risperdal Consta, Risperdal, and Cogentin, as well as intramuscular injectable medications in the event of medication refusal.  He was identified by custody staff as not doing well; he had reportedly returned from DMH, but a CCAT to return him to DMH had not been completed in a timely manner.

A 5/25/11 IDTT meeting described him as disheveled, cooperative, and calm.  The Form 7388-B indicated that he only met criterion eight (EOP treatment for greater than one year).  The prior IDTT on 3/2/11 described him as having disorganized thinking, disorientation, poor concentration, memory and executive functioning.  The Form 7388-B did not note any affirmative referral indicators.  A primary clinician progress note dated 7/7/11 indicated that he declined individual contacts.  Although he attended a Spanish speaking group, the group notes indicated that he appeared distracted with no participation and appeared quiet and preoccupied.  He denied auditory or visual hallucinations and paranoid thinking.

A DMH discharge summary dated 7/22/10 from the VPP APP was available in the medical record and indicated that the inmate had been referred due to severe social withdrawal and impaired activities of daily living as evidenced by his urinating on the floor and defecating in his pants.  He also refused showers, or would barely get wet while in the shower.  In addition to being considered gravely disabled, he was described as extremely negative and would spend his time staring at staff through the window while saying nothing.  He stopped attending groups and taking his medications.  He was placed on a Keyhea order prior to his DMH admission.  He remained at DMH for four months and three weeks.  He initially presented with disorganization, but exhibited gradual improvement until he appeared less disorganized and more spontaneous in response to questions, although negative symptoms of Schizophrenia continued.  Discharge notes indicated "although he has made improvements in his general appearance and his ability to communicate, one would not call this a robust response to treatment.  Persisting symptoms of chronic Schizophrenia continue to be manifested."  Discharge recommendations included continued pharmacotherapy and limited demands on this inmate who exhibited signs of decompensation at times of increased pressure.

Primary clinician progress notes at CSP/Corcoran were similar in content, indicating that the inmate denied symptoms but presented with isolation, refusal to participate in individual sessions, and functioning at an exceptionally limited level.  He reportedly received assistance through the DDP program.  The most recent medical record progress notes indicated that he was not oriented, with poverty of speech.  A psychiatrist note dated 7/20/11 indicated that he was low functioning and should be considered as a candidate for the EECP program.

Findings

This inmate was low functioning and continued to exhibit signs of Schizophrenia disorganized type with prominent negative symptoms.  He did not consistently participate

in individual sessions, was monolingual (Spanish speaking only), was classified as DD2, and required assistance with his activities of daily living.  He had limited cognitive functioning, occasionally attending Spanish speaking groups, but did not participate in programming and spent much of his time alone in the day room.

He had a DMH APP hospitalization for four months during 2010 due to his disorganization, with urinary and fecal incontinence.  Attempts to encourage him to participate in treatment were met with little success.  He also appeared to be an appropriate candidate for a long-term ICF program as he was minimally functioning and required greater structure.  The Form 7388-B did not identify him as meeting any referral indicators (with the exception of EOP placement for greater than one year), and there was no discussion of the appropriateness of DMH referral.

**Inmate J**
A progress note dated 7/19/11 indicated that this inmate had been seen as a new arrival subsequent to return from DMH after a one year hospitalization there.  A referral documentation review indicated that he had been referred to DMH during the MHARP process.  He arrived at CSP/Corcoran on a Keyhea order with documentation indicating that his last suicide attempt by hanging occurred while he was housed at DMH in July 2010.

Upon his return to CDCR, he was placed on five-day follow-up.  He reported that he had improved since his return, but remained with poor insight as to his mental health difficulties, and the need for psychotropic medication treatment or EOP placement.  A psychiatric progress note dated 8/22/11 listed his prescribed medications, which included Risperdal Consta, Cogentin, Depakote, Prozac, Haldol, and Vistaril.  The inmate was described as hyperverbal and pleasantly dismissive.

The most recent primary clinician contact on 8/24/11 indicated that he did not respond to requests for an out-of-cell contact.  He denied any mental health symptoms.  His hygiene was described as normal, with guarded behavior and coherent, goal-directed speech.  He was described as stable, calm, and compliant with his Keyhea order.

Findings

This inmate had recently returned from DMH and appeared stable and appropriate for EOP level of care.  CSP/Corcoran protocol required every inmate returning from DMH to have five-day follow-up immediately upon return and discharge to the yard.  This protocol was not followed in this case as the inmate did not receive this follow-up until approximately one month after his return to CSP/Corcoran.

EXHIBIT E
Salinas Valley State Prison (SVSP)
October 18, 2011 – October 21, 2011

**Inmate A**

This medical record was randomly selected for review from a list of inmates participating in the Extended EOP Care Plan (EECP).  It indicated that the inmate had participated in the EECP for at least two years.

The inmate arrived at SVSP in July 2007, from DMH SVPP.  He was placed at the EOP level of care, but did not participate in groups or other activities.  Most of the time, he was described as socially isolated and withdrawn.  He was also described as presenting with negative symptoms of poverty of speech and an odd affect.  According to a treatment team summary note, he was placed in the EECP on 9/10/09.

He was provided with a diagnosis of Schizophrenia undifferentiated type.  During the reporting period, the IDTT saw him monthly and the primary clinician saw him twice weekly.  The psych tech provided supportive services by assisting with showering, grooming, and laundry.  The inmate continued to display prominent negative symptoms.

In 2009, he was referred to DMH during the MHARP process.  At his Vitek hearing, he represented himself and presented a coherent argument for not sending him to DMH and for continued treatment at SVSP.  He prevailed and was not transferred to DMH.  He had not received any RVRs or been hospitalized in the MHCB for several years.

Documentation as to DMH referral consideration that was completed during an IDTT meeting in December 2010 noted that he met one indicator for referral as he "would benefit from more comprehensive treatment;" however, he was not referred to DMH.  The rationale provided for non-referral was his noted progression in programming at his current level of care; he had reportedly attended 70 percent of his groups and individual appointments.  A subsequent review in February 2011 noted that he met no screening indicators for DMH referral consideration.  Documentation from May 2011 indicated that he had less than 50 percent participation.  In June 2011, the decision was made to retain him in the EECP.  He was prescribed Remeron and Prolixin Decanoate injections.

Findings

As implemented, the EECP appeared to function as an alternative to DMH referral.  The inmate continued to participate in the EECP, despite meeting several indicators for DMH referral consideration, including failure to improve and low programming participation.  He was placed in the EECP for more intensive programming, yet did not participate in this programming.  The IDTT should have reevaluated treatment planning to address the inmate's lack of programming, and should have considered DMH ICF referral.

**Inmate B**

This medical record was randomly selected for review from a list of inmates enrolled in the EECP.  The inmate had been in prison for 21 years for a conviction of second degree murder.  He was admitted to SVSP on 6/28/11 upon discharge from the DMH ICF level of care.  He had been hospitalized at DMH ICF for approximately 14 months.  He was on a Keyhea order initiated at DMH on 7/8/10.  Psychotropic medications included

Risperdal, Depakote, Benadryl, and Haldol (short acting injections), if Risperdal was refused.

The initial IDTT was conducted on 6/30/11, within two days of the inmate's arrival.  The first psychiatrist appointment did not occur until 7/5/11, which was within a week of arrival, but not before the treatment team meeting.  There was documentation of individual primary clinician contacts on 7/13/11 and 7/15/11.  Due to the rollout of the eUHR scanning project, additional progress notes were not available in the paper medical record.  Database information indicated that the inmate was placed in the EECP on 8/18/11.  His services at that level of care were not reviewed as they occurred outside of the review period.

<u>Findings</u>

The inmate was returned to SVSP from DMH ICF level of care in late June 2011.  By mid-August 2011, SVSP placed him in the EECP track of the EOP.  There was no documentation indicating that consideration was given to return him to DMH in July 2011 when it was clear that he was not participating in EOP treatment; nor was there any indication that information received as to the 14-months of DMH treatment was reviewed.  There was also no documentation that recommendations and interventions successful at DMH were continued following his return to the EOP.

**Inmate C**

This medical record was randomly selected for review from a list of EECP inmates.  The inmate was serving a life sentence for murder.  He was transferred to DMH from CSP/Sac; he was hospitalized from 1/16/10 to 3/26/10.  He returned to CSP/Sac at the EOP level of care and was subsequently transferred to SVSP where he was continued at the EOP level of care.

The inmate was provided with diagnoses of Schizophrenia undifferentiated type and Polysubstance Dependence.  Progress notes also indicated concern that he might also have some form of dementia due to noted cognitive deficits.  He was also treated for Parkinson's disease, and was on a Keyhea order for grave disability.  He was prescribed Zyprexa, Thorazine, Cogentin, and Haldol short-acting injectable for antipsychotic medication refusal.

The inmate had severe bilateral cataracts that profoundly impacted his vision.  He was reportedly blind and, as a result, had significant impairment with mobility; he walked and collided into objects, resulting in lacerations and abrasions to his head.  He required the assistance of another inmate to mobilize around SVSP, and his cellmate assisted with all activities of daily living, including eating, showering and getting into and out of bed.  He had been referred to a DPV institution several months earlier, but this transfer remained pending.  The inmate reported that onset of his visual impairment was fairly acute, but during the course of an ophthalmological evaluation of the cause, he refused to complete the assessment.

At an IDTT on 6/3/10, the inmate was placed in the EECP. Screening indicators for DMH referral indicated less than 50 percent participation in activities, but it was thought that his limited participation was due to his visual impairment and inability to attend groups unless his cellmate escorted him. The record indicated that he was placed in the EECP due to his inability to program, long-standing mental health issues, and current cognitive deficits.

Findings

In this instance, EECP appeared to be an accommodation to the inmate's condition (blind, Parkinson's disease, limited access to group programming due to issues related to visual impairment, chronic mental illness, and onset of dementia). This appeared to be a clinically appropriate modification to his treatment plan while awaiting transfer to an appropriate facility for his visual impairment. He did not appear to require DMH level of care at the time of review. Instead, he required more appropriate housing and assistance with learning to cope with his visual disability rather than having to rely on other EOP inmates.

**Inmate D**

This medical record was randomly selected from a list of 3CMS inmates housed in administrative segregation. The inmate arrived at SVSP from PVSP, on 12/13/07. He was prescribed Effexor upon arrival, and this medication was continued.

He had a long history of treatment for chronically depressed mood and substance abuse. He was placed in administrative segregation on 6/23/11 for assault with a deadly weapon. He was seen daily during psych tech rounds and weekly by his primary clinician. These contacts occurred at cell front as he refused to leave his cell for confidential interviews. An initial treatment plan dated 6/29/11 was present in the medical record. He remained on Effexor for his depressive symptoms.

Findings

This inmate appeared to be receiving mental health services at the appropriate level of care in the 3CMS program. There was documentation that mental health staff followed him consistently and timely. He appeared to be functioning adequately at this level of care. However, the primary clinician should have continued to encourage out-of-cell clinical contacts in order to conduct more comprehensive assessments than could be performed at cell front.

**Inmate E**

This medical record was selected for review from a list of inmates on the DMH wait list. According to the treatment plan, the inmate was provided with diagnoses of Delusional Disorder and Antisocial Personality Disorder. The psychiatrist provided an alternative diagnosis of Schizophrenia undifferentiated type. The inmate had been receiving mental health services at the EOP level of care since 11/23/10. He was referred to DMH ICF on 4/7/11 after consideration of his low program participation. He was enrolled in the EECP

track of the EOP at the time of the referral and while awaiting acceptance/transfer to DMH.

Since his referral, the inmate's condition was unchanged; he did not attend groups or leave his cell for individual appointments.  He exhibited delusional thinking, including persecutory, grandiose, and erotomanic delusions.  He had no RVRs or MHCB admissions.  According to the DMH coordinator's log, a Vitek hearing was held on 5/15/11, and he was to be transferred to DMH.  Information as to the hearing was not reflected in monthly treatment plan updates or in the primary clinician's progress notes.  The inmate had been prescribed Risperdal, but consistently refused to take it.  The medication was subsequently discontinued.  The psychiatrist indicated that the inmate did not meet criteria for a Keyhea order.

<u>Findings</u>

Although the inmate was not participating in any EECP treatment, the primary clinician saw him twice weekly at cell front while he awaited transfer to DMH.  Frequent checks were an appropriate modification to his treatment plan while he awaited DMH transfer.  However, the primary clinician's awareness of his status as to DMH transfer should have been better reflected in medical record documentation.  The DMH coordinator's log indicated that the Vitek hearing was conducted and that the inmate had been accepted to DMH ICF level of care.  These facts were not reflected in the primary clinician's notes or treatment plan updates.  In fact, some updates appeared to reflect only that he was to be retained in the EECP.  This, however, was misleading because he was awaiting DMH transfer while participating in the EECP.

**Inmate F**

This medical record was randomly selected for review from a list of inmates referred to DMH but later rescinded.  The inmate arrived at SVSP from CMF.  The DMH coordinator's log indicated that he was referred to DMH by CMF and accepted following a CCAT on 7/23/10.  It was unclear from the log when he actually arrived at SVSP because no notification was provided about his arrival, but the DMH coordinator later noted the arrival.  The inmate was placed at the EOP level of care.

The IDTT screening checklist dated 11/17/10 documented the plan to monitor him for possible DMH referral; it also indicated that DMH was pending due to the inmate's inability to function at the EOP level of care and because he would benefit from a comprehensive treatment.

The inmate remained at the EOP level of care and participated in treatment.  At his IDTT meeting on 4/21/11, the DMH referral was rescinded; the rationale provided for non-referral was the lack of evidence of response to or preoccupation with auditory hallucinations.  It was also noted that he was on a Keyhea order with probable response to medications, had no display of religiosity or impulsivity, and had good group participation.  For these reasons, it was believed that DMH referral was not warranted.

On 4/29/11, the inmate asked to see psychiatry due to concerns about his medications; he was prescribed Trilafon, Buspar, Cogentin, and Strattera at the time. On 5/13/11, he reported hearing voices through the air vent and was involved in a fight on the yard with another inmate. He was then placed in administrative segregation. Of note was his known history of dangerousness to others when decompensated; he was involved in physical altercations with others on 10/4/09, 4/27/10, and 2/7/11.

The psychiatrist saw him on 5/24/11 in response to an urgent referral from the primary clinician due to an increase in auditory hallucinations. He was believed to be in a state of early decompensation due to a change from intramuscular long-acting injectable medications to oral Trilafon two months earlier, and situational stressors. He was again prescribed long-acting injectable medications consistent with the Keyhea order.

On 6/9/11, the inmate was involved in another fight. His primary clinician documented that he was experiencing a psychotic state at the time that contributed to his assaultive behavior. The primary clinician also indicated that he might be appropriate for DMH referral, but a referral was not initiated. The inmate was assigned a new primary clinician in July 2011. An IDTT note dated 7/13/11 documented that he had been at the EOP level of care for more than 365 days, was unable to function at a lower level of care, and had been referred to DMH. The note further indicated that the previous primary clinician had rescinded the DMH referral. There was also a notation that custody staff reported that his activities of daily living were adequate, but he continued to display bizarre behavior (not defined), and had eight different cellmates due to conflicts. There was no documentation that an RVR review occurred or that consideration was given for inmate re-referral to a higher level of care.

Findings

This inmate with a history of assaultive behavior when psychotic received RVRs for such behavior on 10/4/09, 4/27/10, and 2/7/11. He was referred for ICF level of care following an APP hospitalization. He was placed on a Keyhea order due to danger to others during his APP hospitalization and was transferred to SVSP for EOP level of care on 8/13/10 pending ICF placement. He was permitted to begin oral rather than long-acting injectable medications during March 2011. He participated in treatment and denied symptoms. During April 2011, the treatment team rescinded the request for DMH transfer. In late April and early May 2011, the inmate reported a recurrence of symptoms. He was involved in two additional assaults during May and June 2011, resulting in administrative segregation placement. Although his mainline EOP primary clinician thought that a DMH referral may have been appropriate, it was not completed. The inmate's new IDTT and primary clinician did not refer him to DMH.

Rescinding the referral may have been premature given the change in the inmate's medication and psychosocial stressors; a new referral could have been generated based upon his mental health deterioration. The inmate decompensated and was involved in two more altercations resulting in administrative segregation placement. It did not appear that he was appropriately considered for DMH referral. He should have been considered for higher level of care referral based upon these occurrences.

**Inmate G**

This inmate's medical record was reviewed because he was receiving treatment at the EOP level of care in a mainline housing unit.  He was also housed in administrative segregation at the EOP level of care during the review period.  Medical record review was confounded by its significantly deteriorated and disorganized state, which also contained notes pertaining to another inmate.

The inmate was diagnosed alternately with Psychotic Disorder NOS or Schizophrenia depressed type.  He was prescribed Prolixin and Remeron.  Ongoing stressors included lack of family contact, as they lived outside the county.

Mental health staff consistently followed the inmate throughout the reporting period, at times as frequently as twice weekly.  His sporadic group attendance was at times attributed to his refusal, but at other times was noted to be the result of group cancellation.  For example, a progress note dated 5/19/11 indicated that he was seen at cell front because he did not attend his regularly scheduled group, when in fact the group had been cancelled.

The Form 7388-B dated 5/26/11 indicated negative responses for DMH referral consideration indicators.  It was unclear if this was accurate given the frequent references to his refusal to attend groups and staff's encouragement of him to attend.  Some of the refusals appeared to be related to cancellations.  There was a notation listing his attendance as ranging from 60 to 82 percent for the time period of December 2010 through February 2011.

Findings

This inmate was generally seen in accordance with Program Guide requirements during the reporting period.  The physical condition of the medical record and intermingling of another inmate's records within it made review more difficult.  While group attendance was an issue, it was unclear whether this reached the level which should have prompted review for possible DMH referral.

**Inmate H**

This inmate's medical record was reviewed because he was treated at the EOP level of care while housed in administrative segregation.  Medical record review was complicated by its severely deteriorated state.

An initial assessment dated 10/20/10 contained relevant history.  The inmate reported first receiving mental health treatment at age 12, and had a suicide attempt in 2005.  There were unconfirmed diagnoses of Bipolar Disorder and Schizophrenia.  His reported medication history included Prozac, Depakote, Lithium, Zyprexa, and Abilify.  He was more recently diagnosed with Adjustment Disorder with depressed mood.

Some progress notes indicated difficulty in providing meaningful coverage during the primary clinician's absence.  The covering primary clinician on 7/6/11 used what

appeared to be a pre-printed form noting that the inmate was seen at cell front due to the primary clinician's absence.  The form indicated that he was asked if he was in any distress and if he needed to be seen that week.  If the inmate stated "yes" or appeared to be in distress, he was seen outside of the cell.  If he stated "no," a cell-front assessment was completed.  However, a note of the previous day included the same subjective findings and stated that he reported that he was not doing well; it indicated that an out-of-cell session would be conducted the following day to further assess this issue.

A progress note dated 6/2/11indicated that the inmate requested EOP placement, and was saddened by his SNY designation.  At that time, he endorsed suicidal ideation but not intent.  A 6/27/11 progress note stated that he was benefitting from 3CMS care, but that he was crying, reported recurring thoughts of hanging himself, reported negative thoughts, felt lonely and hopeless, and was estranged from his girlfriend.

A suicide risk evaluation dated 4/18/11 indicated that on 9/20/10 he overdosed on medication and was transferred to the CTC.  The Form 7388-B indicated all negative responses to DMH referral indicators.

Findings

This inmate was generally seen in accordance with Program Guide requirements, but his follow-up lacked continuity during his primary clinician's absence.  The treatment team should have continued to closely monitor him with recurrent and chronic suicidal ideation as to the need for additional services.

## Inmate I

This inmate's medical record was reviewed because he was housed in administrative segregation at the 3CMS level of care.  He was provided with differential diagnoses of Substance Induced Psychotic Disorder versus Psychotic Disorder NOS.  He was prescribed Risperdal and Remeron.

The mental health treatment plan dated 6/8/11 noted his transfer from DVI and listed his current problems as hallucinations and drugs.  Group therapy was recommended, and he was placed on the group therapy wait list.

Other progress notes provided some elaboration as to his substance use.  He had a history of use of multiple substances including PCP and LSD.  Other relevant history included a documented history of head trauma from a car accident in 2005.

The inmate was seen on 6/2/11.  The progress note indicated that he had transferred from DVI in February 2011, and was in mental health treatment for auditory hallucinations and depression with an onset during his teens.

A psychiatry note dated 6/6/11 indicated that he was seen for three-month follow-up.  He was seen out of cell.  The psychiatrist noted that he exhibited ideas of reference, paranoia, and auditory hallucinations.  The outlined plan was for the inmate to be seen for follow-up in three months.

261

The administrative segregation pre-placement chrono dated 3/9/11 showed no positive findings.  The IDTT evaluation on 6/8/11 placed the inmate in the 3CMS program.  However, the suicide risk evaluation indicated multiple risk factors including two suicide attempts in 2001 and 2008, a family history of suicide, history of physical abuse, single-cell placements, and a history of psychiatric disorder.  The inmate was viewed as having high chronic risk and low acute risk of suicide.

Findings

At the time of the site visit, there were no mental health notes present in the record beyond June 2011 that indicated insufficient follow-up during the inmate's administrative segregation housing.  There should have been consistent monitoring and follow-up for this inmate who had been assessed with high chronic risk for suicide.

EXHIBIT F
Wasco State Prison (WSP)
September 19, 2011 – September 21, 2011

**Inmate A**

This EOP inmate was housed in the reception center.  He was alternately provided with several diagnoses that included Major Depressive Disorder, recurrent, severe with psychotic features, and Bipolar Disorder.  His medications included Zyprexa (Zydis), Risperdal, Remeron, Prozac, and Neurontin.  He received his medications as a result of a Keyhea order.

Progress notes indicated that he returned from DMH VPP on 1/6/11.  Subsequent notes documented consistent primary clinician follow-up.  The notes contained ongoing references to various treatment modalities and theoretical approaches, but showed minimal change in content from week-to-week and did not include specific indications that these modalities had been employed.

A progress note dated 5/26/11 indicated that the inmate was a participant in the extended EOP care program (EECP); the plan outlined was to see him twice weekly.  The inmate required MHCB hospitalization from 6/2/11 to 6/29/11.  Suicide risk assessments indicated that he posed either moderate or high chronic and acute risk of self-harm.

Progress notes documented the inmate's ongoing refusal to attend groups.  Despite multiple refusals, review of Form 7388-Bs indicated that he met no indicators for DMH referral consideration.  On 7/6/11, the IDTT noted his recent MHCB stay beyond ten days, but did not reflect what appeared to be frequent group treatment refusals.

The inmate was referred to DMH APP on 6/7/11, following an apparent suicide attempt.  At the time of the site visit, the medical record contained no information as to the status of this referral.  Upon inquiry, staff reported that the referral was rescinded on 8/10/11 due to the inmate's improved functioning.

Psych tech notes, while occasionally noting that rounds did not occur because the provider was unavailable, generally contained useful summaries regarding the inmate and his specific concerns.  On at least one occasion, however, his level of care was erroneously listed as 3CMS.

<u>Findings</u>

This high risk inmate was seen regularly by mental health staff and was eventually stabilized.  However, progress notes contained minimal specific detail about him or his progress in relation to treatment plan objectives, and reviews did not accurately capture all indications for DMH referral consideration.  There were indications of some discrepancies in medical record documentation as to group attendance and refusal.

**Inmate B**

This SNY inmate's medical record was reviewed because of his placement in the reception center at the EOP level of care.  He was diagnosed with Major Depressive Disorder, recurrent, severe with psychotic features; his prescribed psychotropic medications included Geodon, Effexor, and Buspar.

The inmate arrived at WSP from the county jail on 3/1/11.  He required MHCB hospitalization from 5/11/11 to 5/16/11 and from 6/21/11 to 6/25/11 due to suicidal ideation.  He also required emergency psychiatric attention on 5/9/11, 5/21/11, and 6/20/11, in addition to multiple crisis visits with a primary clinician.

A suicide risk evaluation conducted soon after the 6/25/11 MHCB discharge indicated a low acute and chronic risk of self-harm, despite multiple risk factors.  For example, the same assessment noted a reported history of significant cutting behavior, and the MHCB admission was due to suicidal ideation and severe anxiety in the context of a diagnosis of Major Depressive Disorder, recurrent, severe with psychotic features.  This issue was discussed with the mental health supervisor, who indicated that a more accurate assessment of suicide risk based upon the assessment might be determined as medium risk.

Between 5/25/11 and 9/15/11 the inmate missed approximately 29 mental health related appointments, over 20 of which were due to refusal.  Most, but not all, of these were group appointments.  The inmate was also seen by the psychiatrist on 6/13/11 due to poor adherence to prescribed psychotropic medication.  An IDTT on 6/29/11 determined that he met no indicators for DMH referral consideration; despite the inmate's poor attendance in group therapy, "N/A" was the response to the criterion regarding refusal of at least 50 percent of treatment.

The inmate was observed briefly by the special master's expert during the site visit as part of a group.  He could not tolerate the group interactions and left promptly.

Findings

This inmate was followed consistently by mental health staff during this incarceration.  It was questionable that he did not meet any criterion for DMH referral consideration when reviewed on 6/29/11 in light of his multiple recent group treatment refusals, poor medication adherence, and recent MHCB hospitalization.

**Inmate C**

This inmate's medical record was reviewed because of his placement at the EOP level of care within the administrative segregation unit and because he was awaiting transfer to DMH where he had been accepted since 6/12/11.  He was provided with a diagnosis of Schizophrenia, disorganized type.  He was prescribed Risperdal and Remeron.

The inmate's symptomatology was notable for reports of command hallucinations telling him to harm himself, poor hygiene, poor medication adherence, delusional thinking, disorganized and assaultive behavior, and reports from custody that he was defecating on himself and making "cupcakes" with his feces.  Also of note were his three MHCB admissions that occurred between March and May 2011; the MHCB admissions were from 3/29/11 to 4/7/11, 4/9/11 to 4/19/11, and 5/22/11 to 5/25/11.

A progress note dated 5/11/11 noted the inmate's endorsement of intentionally defecating in his pants.  The clinician expressed the opinion that the inmate did not meet the

definition of grave disability at that time because he was willing to clean himself and was not eating or smearing his feces.  Progress notes throughout May 2011 indicated that he exhibited suicidal ideation and regressed behavior.  A primary clinician note on 5/26/2011 noted, among other things, that he could not function adequately in CDCR and that he was scheduled for an IDTT on 6/8/11 to determine if he met indicators for DMH ICF.  The inmate required approximately ten emergency contacts with psychiatry during this incarceration.

Notes dated 5/31/11 and 6/2/11 documented that the inmate had better hygiene and group attendance, but the interviews were conducted in a holding cell and at cell front, respectively.
An IDTT note dated 7/6/11 stated that he would be placed in the EECP with additional mental health contacts pending DMH transfer; however, the following page stated that he was not eligible for the EECP because of his administrative segregation status.

Findings

This severely regressed inmate was eventually referred to and accepted by DMH and was marginally stabilized, but he should have been considered for DMH transfer earlier.  He proved difficult for the facility to treat while awaiting transfer to DMH and/or an EOP hub.  He should have been the subject of efforts to expedite his placement; this issue was discussed with mental health supervisory staff.

**Inmate D**

This inmate's medical record was reviewed because he was receiving treatment at the EOP level of care in the administrative segregation unit.  He was provided with a diagnosis of Schizophrenia undifferentiated type.  He was prescribed Haldol, Zyprexa (Zydis), and Buspar.

The inmate's recent history was significant for a one week hospitalization in the MHCB from 8/4/11 to 8/11/11 due to suicidal ideation, and a period during May 2011 when he reported increased auditory hallucinations and was observed with disorientation and confusion.  At that time, he was maintained at the 3CMS level of care in administrative segregation.  During this period, primary clinician notes described him as stable, while the psych tech noted a musty smell in his cell, a disheveled appearance, and commented that he had been asking sexually inappropriate questions.  By 6/1/11 the primary clinician noted that the inmate exhibited tangential and circumstantial thinking, confusion, disorientation, and was malodorous, with a filthy cell.  At that time, the clinician determined that he required a higher level of care, which was to be discussed with the treatment team.

A 6/15/11 progress note indicated that the inmate was seen for a sexual misconduct evaluation related to exposing himself to a nurse who was conducting a suicide watch. He was described as "unstable."  A 6/16/11 progress note stated that although his cell was clean, he required EOP level of care.  A 6/29/11 note described him as agitated with auditory hallucinations and noted the need for DMH referral consideration.

A 6/8/11 IDTT indicated that the treatment team would attempt to stabilize him in the structured environment of administrative segregation with increased mental health contacts and would refer him to a higher level of care if he did not stabilize within 90 days. A 7/7/11 note stated that he refused to interact and was seen at cell front. It further noted that an IDTT was conducted on 7/6/11 when he was placed at the EOP level of care. It suggested consideration of EECP care. The Form 7388-B noted that the inmate was unable to function adequately and indicated his chronic psychiatric condition. The rationale for not referring him to DMH was that staff would increase the frequency of mental health contacts and refer him at the next IDTT if he did not improve.

Findings

This inmate was followed consistently during the review period by mental health staff. There was some evidence of insufficient communication between the psych tech and the primary clinician when the psych tech noticed signs of decompensation at an earlier stage than the primary clinician. Consideration of transfer to higher levels of care (first EOP, then DMH) were mentioned but not implemented for a period of time during which the inmate exhibited significant signs of mental health decompensation.

**Inmate E**

This inmate's medical record was reviewed because he was receiving treatment at the EOP level of care in the reception center and at times in administrative segregation. His case was also reviewed at the request of plaintiffs' attorneys.

This EOP inmate was provided with a diagnosis of Schizoaffective Disorder. He was prescribed Abilify and Effexor. An alternative diagnosis that was present in the medical record was Psychotic Disorder NOS. There was documentation in the medical record that frequent contact or attempts at contact were made by mental health staff. There was also documentation that the inmate had multiple and repeated refusals, particularly of groups. An IDTT dated 3/30/11 indicated that he stopped taking his medications for a 30-day period.

The inmate required at least two MHCB hospitalizations during the reporting period, namely, from 7/14/11 to 7/17/11 and from 9/7/11 to 9/11/11. Both of these admissions were due to suicidal ideation. In addition, he was seen by the psychiatrist on multiple occasions in response to emergency referrals. The medical record documented his affective instability and ongoing behavioral difficulties including a 5/31/11 placement in a holding cell after an episode of cutting behavior related to reported command auditory hallucinations. Other notes documented his threats to custody staff, as well as his ongoing paranoia.

Progress notes, supported by inmate interview and observation of the inmate's IDTT meeting, documented staff difficulty maintaining him while he awaited transfer to either a mainline EOP program or DMH ICF. The medical record indicated that he had remained on the wait list since 7/15/11.

267

Findings

This inmate experienced significant difficulties while housed at WSP. These difficulties included poor adherence to medication and group treatment, incidents of threatening behavior, self-injurious behavior, and periods of increased psychotic symptoms. Overall, staff attempted to respond appropriately by, for example, increasing the frequency of contacts and placing him in the MHCB. Despite these interventions, medical record review, inmate interview, and IDTT observation reflected the difficulty that mental health had in managing him in this setting while he awaited transfer to either a mainline EOP or DMH ICF program, which he required. The staff might consider renewed efforts at expediting these placements.

## Inmate F

This inmate was discharged from DMH APP on 2/1/11, and was on the wait list for transfer to DMH ICF. He was admitted to the MHCB on 1/6/11 due to suicidal ideation, hostile/assaultive behavior which included spitting at staff, command auditory hallucinations, poverty of speech, lethargy, paranoia, thought blocking, and psychotic ambivalence. His behavior and symptomatology in the MHCB fluctuated from gross impairment with total withdrawal to exhibiting insight with cooperative behavior and medication compliance. His diagnosis was Schizophrenia paranoid type.

The DMH discharge summary dated 2/2/11 indicated that he was placed on a Keyhea order on 1/17/11 due to danger to self and grave disability. He had a history of mental illness and poor insight as to the need for psychotropic medication treatment with resulting medication noncompliance. He had been hospitalized at Patton State Hospital from 4/16/09 through 10/19/09 due to incompetency to stand trial. He attempted suicide on 12/22/08 by jumping from a second floor tier. He had multiple attempts of self-harm of hitting his head on walls or doors. He was discharged on a Keyhea order with a medication regime that included Abilify, Cogentin, Celexa, Depakote, and Vistaril. The discharge summary indicated that the team had decided that he would likely not benefit from the intermediate level of care as he refused to attend groups while on the APP unit, and only occasionally left his room for solo television programs. He did leave his room for showers.

Psych tech weekly notes during July 2011 indicated that the inmate was medication compliant, but continued to pace in his cell and was minimally interactive with others. His cell appeared to be tidy with no odor. He was double-celled, and his self-care was reportedly good. An IDTT note on 6/29/11 indicated that he continued to demonstrate grossly disorganized behaviors with auditory hallucinations. However, the Form 7388-B did not note any positive indicators for DMH referral consideration. Although the inmate had not participated in any groups and had refused to see his psychiatrist, the criterion for non-participation was marked negative.

Findings

Although this inmate was not participating in groups and not leaving his cell, the Form 7388-B was incorrectly completed, and referral indicators were not acknowledged.

268

MHTS.net did not accurately capture his less than 50-percent treatment participation. The IDTT meeting did not document the presence of necessary participants; the CC I was not present at the IDTT.

**Inmate G**

This inmate was hospitalized at DMH from 7/5/11 to 9/15/11.  He reportedly had a long history of mental illness and medication noncompliance.  He was provided with a diagnosis of Schizoaffective Disorder.  He exhibited somatic delusions in which he believed that he had AIDS, and stomach and brain cancer.  He also exhibited expansive mood and persecutory delusions in which he believed that gang members were trying to harm him, and experienced depressive symptoms.

The DMH discharge summary indicated that he was not successful in his programming and was not able to engage in individual or group treatment.  He continued to demonstrate behavioral problems and was noncompliant with recommended treatment, including medications, laboratory studies, and other diagnostic testing.  There was documentation stating that he had "reached maximum benefits" in the program, and the IDTT recommended that he transfer back to the referring institution for further evaluation and treatment.  The inmate's mental status examination at discharge indicated that he was essentially unchanged, with loud, tangential speech, delusional and disorganized thinking, and impaired judgment.

A review of the medical record indicated that the inmate had a prior history of placement on a Keyhea order on 1/27/10 due to danger to self.  It was reported that he had a history of hospitalization in the community and was hospitalized at Patton State Hospital for incompetency to stand trial.  He had previous suicide attempts by hanging and cutting, and a history of auditory hallucinations that yelled and screamed at him, although he was unable to understand the content.  The IDTT clinical summary only indicated that the "inmate is appropriate for EOP level of care."

The inmate arrived at WSP on 4/25/11 after previously paroling from that institution on 4/11/11.  He was referred to DMH on 6/2/11; the Form 7388-B indicated that he met indicators one, two, three, six, and eight.  The referral indicated that he had been provided with a diagnosis of Schizoaffective Disorder bipolar type and that he demonstrated persistent affective symptoms such as withdrawal from all activities including groups, therapy sessions, and day room attendance, with social isolation.  In addition, the referral noted his hypersomnia and very poor self-care.

The inmate was seen at cell front by the primary clinician; he was seen biweekly, and was placed in a DMH group.  Subsequent progress notes by the primary clinician documented continued disorganization, lability, and poor self-care and hygiene with a malodorous cell.

Findings

This inmate was referred to DMH soon after violating parole and returning to WSP.  He continued to exhibit agitated and bizarre behavior and was referred to DMH.  After

269

transfer to SVPP, he was returned after two months essentially unchanged; discharge information indicated that he was discharged for "not participating in treatment and reaching maximum benefits."  This was of concern as the clinicians could legitimately question the benefit of referring him to DMH, as DMH hospitalization appeared to do little to address his mental health needs.  The inmate had a history of a Keyhea order in the recent past, but there was apparently no consideration either at DMH or WSP to pursue this course in an attempt at psychiatric stabilization.  He was scheduled to parole on 9/23/11, but this should not have been a reason for premature DMH discharge.

EXHIBIT G
Kern Valley State Prison (KVSP)
November 15, 2011 – November 17, 2011

**Inmate A**

This inmate's medical record was reviewed because KVSP identified him as remaining on the DMH ICF wait list since 7/15/11. During the monitoring period, he was placed alternately in general population, MHCB, and administrative segregation housing. He was generally treated at the MHCB or EOP level of care, but there was a brief period during May 2011 when he received treatment at the 3CMS level of care. All of the inmate's mental health contacts since DMH referral occurred in either the MHCB or administrative segregation. He was provided with a diagnosis of Schizoaffective Disorder. His prescribed medications included Abilify, Prozac, and Zoloft. He reportedly participated in a hunger strike in June 2011.

The medical record during the reporting period was also remarkable for numerous MHCB admissions and reports of suicidal ideation. Reported problems included paranoia, mood instability, depression, anxiety, agitation, and command hallucinations to commit suicide. The prominence of the inmate's Diagnostic and Statistical Manual for Mental Disorders (DSM) IV Axis II (personality disorder) features was periodically emphasized by clinicians, although some assessments deferred the Axis II diagnosis. The 7/13/11 progress note reported a TABE score of zero and limited cognitive functioning. Although there were notations indicating cell-front contacts and a week during June 2011 that showed missed appointments due to the clinician's unavailability, overall the inmate had regular contacts with mental health during the monitoring period. However, he was seen by a number of different psychiatrists and clinicians, limiting continuity of care. The possibility of DMH referral was an active issue during the monitoring period. A review on 2/2/11 noted three positive indicators for DMH referral consideration on the Form 7388-B and that he was unable to function adequately in the 3CMS program. As a result, EOP level of care was recommended. However, a Form 7388-B dated 2/17/11 noted no affirmative referral indicators despite six documented MHCB admissions. This review noted the inmate's frustration with custody and the assessed prominence of "Axis II" features. An IDTT meeting on 6/22/11 noted that he met various indicators for consideration of possible DMH referral, including multiple MHCB admissions and MHCB stays exceeding ten days, but he was assessed as stable. At that time, the plan was to provide weekly mental health contacts, medication monitoring, and cognitive behavioral treatment. The plan of a month earlier included twice weekly primary clinician contacts; the reason for this change was not addressed.

Progress notes from July 2011 indicated that the MHCB referred the inmate to DMH APP in March 2011, but the referral was rejected; ICF level of care was recommended. A Form 7388-B dated 5/24/11 apparently undertaken as part of an IDTT on that date indicated that he would benefit from a more comprehensive treatment program, had chronic psychiatric symptoms, and had three or more MHCB admission during the past six months. It stated that he would benefit from the EOP program and that DMH was not required. The inmate's motivation for treatment was noted in support of this decision, as well as the treatment team's emphasis on his "Axis II" features.

A progress note dated 6/9/11 indicated the opinion of the mental health clinician that a mental disorder was not a factor in the inmate's behavior. This was an apparent reference to his receipt of an RVR for fighting.

272

Suicide risk evaluations varied during this period as to the degree of chronic risk discerned. A suicide risk evaluation dated 4/24/11 did not indicate the level of either chronic or acute risk assessed. A suicide risk evaluation dated 4/25/11 indicated a low acute risk and moderate chronic risk, while an evaluation dated 5/6/11 indicated low chronic and acute risk. A psychiatry note dated 5/5/11 indicated that the inmate was depressed and suicidal; he was then placed in alternative MHCB housing. An additional suicide risk evaluation was entirely blank.

Findings

This inmate was consistently followed by mental health staff during the monitoring period and periodically assessed as to the need for DMH care. While he was referred and rejected for DMH APP, and eventually referred to DMH ICF, assessments were characterized by limited consideration of preceding assessments as to the degree of suicide risk or the need for possible DMH referral. His multiple MHCB admissions and varying levels of care and placement likely made continuity of care more difficult, and suggested that earlier referral to DMH ICF might have been warranted.

**Inmate B**

This inmate's medical record was reviewed because he was recently referred to DMH. At the time of review, he was receiving mental health services at the EOP level of care. He was provided with a differential diagnosis of Psychotic Disorder NOS versus Schizoaffective Disorder. He was prescribed Thorazine.
A psychiatric progress note dated 7/15/11 documented that he heard the "voice of god and of evil." The psychiatrist also indicated that he exhibited delusional thinking with hallucinations and dysphoric mood. The inmate consistently refused treatment, particularly attendance in groups. Clinical progress notes indicated that he was consistently followed by primary clinicians and psychiatrists. He reportedly presented with continued mental health symptoms, but was described as reasonably stable.

Findings

This inmate was considerably symptomatic but reasonably stable during the reporting period. He refused a high percentage of activities, especially groups. The DMH referral was appropriate.

**Inmate C**

This inmate's medical record was reviewed as he had returned from DMH during August 2011. He was admitted to the MHCB in August 2011, where he was provided with diagnoses of Mood Disorder NOS, Major Depressive Disorder severe recurrent and "Self-Mutilation Syndrome." He was evaluated with a GAF score of 20. He was prescribed Remeron.

The referral to DMH APP was initiated on 8/9/11 after what was described as a significant suicide attempt which required hospitalization for treatment of a laceration to the left antecubital region. He was transferred to DMH on or about 8/22/11, where he

273

remained for approximately six weeks.  Discussions with staff and IDTT observation indicated that staff considered him to be at elevated risk for suicide.  His suicide risk evaluation on 9/16/11 noted various risk factors including a family history of overdose and a history of abuse.  He was assessed as having moderate chronic risk and low acute risk for suicide.  Observation of the IDTT and discussions with staff indicated that he had an ongoing desire to commit suicide.  He was reluctant to add antipsychotic medications to his medication regime, but was convinced to do so after the possibility of the initiation of a Keyhea order was discussed.

Findings

The inmate was appropriately referred to DMH APP.  Although he appeared to benefit from this hospitalization and was apparently more stable as a result, he remained at high chronic risk for suicide.  The consideration of a Keyhea order for him appeared to be clinically appropriate, and continued close monitoring was indicated in light of his chronic suicide risk and the possibility of decompensation.

**Inmate D**

This inmate's medical record was reviewed because he met criteria for DMH referral consideration but was not referred.  Primarily, he had multiple MHCB admissions and poor adherence to treatment.

The inmate was diagnosed with Schizoaffective Disorder, and was primarily treated at the EOP level of care.  During the reporting period, his medical record was remarkable for symptoms of depression, mood lability, and a delusion that custody was poisoning his food.  His history was also significant for multiple "gassing incidents" while he was housed in the MHCB.  A 4/28/11 progress note indicated that he was placed in administrative segregation for refusing a cellmate.

A progress note dated 1/20/11 acknowledged the inmate's multiple MHCB admissions, but formulated the plan of attempting clinician interventions before considering DMH referral.  A note dated 1/23/11 documented his belief that someone had placed a substance in his food.  A Form 7833-B dated 2/10/11 noted his fourth MHCB admission, but did not refer him to DMH because "clinical interventions" were still being attempted.  A suicide risk evaluation dated 3/4/11 noted his depressive and psychotic symptoms and belief that custody was poisoning his food.

A progress note dated 3/22/11 indicated that the inmate had a Keyhea hearing on the previous day.  An IDTT held on 4/6/11 described his continued paranoia and multiple MHCB admissions.  It also outlined the plan to allow the Keyhea order of 3/23/11 and change in his status to EOP time to improve his condition before referring him to DMH.  A progress note dated 4/28/11 indicated that he was placed in administrative segregation for refusing a cellmate, noted his level of care to be 3CMS, and indicated that he did not meet DMH referral criteria; however, no rationale for non-referral was provided.  Progress notes dated 6/7/11 and 6/16/11 documented his refusal to leave his cell for confidential clinical interventions.

274

Findings

Staff noted that the inmate had significant psychiatric symptoms and multiple MHCB admissions. He was seen regularly while in EOP treatment in an attempt at stabilization prior to DMH transfer consideration; the initiation of a Keyhea order in March 2011 was also an attempt to assist in this effort. However, it did not appear that appropriate monitoring of his response to medications and adequate assessment for the possible need for DMH transfer occurred after his transfer to administrative segregation for an RVR that was possibly related to his paranoia.

**Inmate E**

This inmate's medical record was reviewed because he was identified by KVSP as having met DMH referral consideration criteria, but was not referred. He transferred to KVSP on or about July 2011. Since that time, he was housed in both administrative segregation and general population. He was housed at the EOP level of care, and later at the 3CMS level of care. He was diagnosed alternatively with Bipolar Disorder with mixed psychotic features, Depressive Disorder with chronic medical illness, Mood Disorder, and at times with Schizoaffective Disorder. He was prescribed Remeron and Lithium.

Significant symptoms that were documented included hopelessness, increasing interpersonal isolation, suicidal ideation, and reported homicidal ideation. On at least one occasion, his desire to die was documented. Also of note was a pending parole date, although disparate parole dates were noted in the medical record.

In June 2011, prior to his transfer to KVSP, progress notes indicated an emphasis on parole planning and concern with his social security income application. It was also noted that he was a victim of a battery while housed at CSP/LAC. KVSP clinicians noted his upcoming parole date. However, there was no indication that KVSP addressed the parole planning concerns that were begun at CSP/LAC.

The medical record documented at least two MHCB admissions during September 2011. During an admission from 9/4/11 to 9/12/11, the inmate was provided with a diagnosis of Bipolar Disorder, with mixed psychotic features. At that time, he was described as extremely agitated with hypomanic behavior and symptoms. Following MHCB discharge after a second admission on 9/21/11, the medical record indicated that he was scheduled for parole in October 2012; this was inconsistent with other closer dates presented elsewhere in the record.

On 11/2/11 a psychiatric note indicated that he had transferred to the TTA after reporting homicidal ideation; a history of four inpatient stays and two suicide attempts was also noted. He was placed in alternative MHCB housing on 11/2/11 as he was assessed as impulsive and unpredictable. A psychiatry note dated 11/3/11 provided a diagnosis of Schizoaffective Disorder bipolar type and noted that he was receiving mental health services at the 3CMS level of care. The plan was to reevaluate him in ten days, but the inmate was apparently discharged before that time elapsed.

<u>Findings</u>

The inmate transferred to KVSP on or about July 2011.  There was confusion as to his parole date, with varying dates noted in the medical record.  Although he was lowered to the 3CMS level of care, he required at least three admissions to the MHCB and/or TTA while at KVSP and should have been considered for possible DMH referral.  He discharged while awaiting psychiatric follow-up after a TTA admission due to homicidal ideation.  The medical record at the time of review did not include an indication of follow-up with respect to his significant discharge planning needs.

**Inmate F**

This inmate's medical record was reviewed because he was treated at the EOP level of care in the administrative segregation unit, and had recently returned from DMH.  He was diagnosed with Schizoaffective Disorder depressed type, Antisocial Personality Disorder, pain associated with psychological factors and a general medical condition, and Hypothyroidism.  He was treated with Prolixin and Trilafon.

The inmate was transferred to KVSP on or about 6/6/11 from CSP/Corcoran.  A progress note dated 6/29/11 indicated that he had less than 50 percent overall participation in mental health treatment and had been on the DMH referral list since October 2010.  It was noted that he was not able to function in the 3CMS program and that the psychiatrist had referred him to DMH for a trial of Clozapine.  A progress note dated 6/27/11 indicated recent MHCB admissions; although the note was entirely illegible, in parts it appeared to indicate a DMH referral.

A suicide risk evaluation on 6/30/11 noted many chronic risk factors for suicide including major depression and some acute factors mostly related to psychotic and depressive symptoms.  It was determined that he posed low acute and moderate chronic suicide risk.  A second suicide risk evaluation noted additional chronic risk factors such as sex offender status and a history of abuse, and a possible family history of mental illness.

However, it did not mark any positive or negative findings under acute risk and failed to document whether the inmate desired to die or had a plan to kill himself.  A suicide risk evaluation on 10/26/11 noted that he had recently returned from SVPP and was stable on medication.  The chronic suicide risk was noted to be moderate while the acute risk was evaluated as low.

A number of scheduled mental health contacts, particularly during June 2011 and early July 2011, did not occur as planned.  The reasons provided included conflicting ducats, provider unavailability, and inmate refusal.

<u>Findings</u>

This inmate waited a considerable period of time for transfer to DMH.  He was eventually transferred to SVPP and returned in stable condition.  Prior to transfer, he was scheduled for regular contact with mental health, but issues such as conflicting ducats, refusals, and unavailable providers interfered.  When he transferred to DMH, he appeared

to return in stable condition and seemingly benefitted from the hospitalization.  Some suicide risk evaluations were incomplete.

## Inmate G

This inmate's medical record was reviewed because he was reported by KVSP to have had three or more MHCB admissions.  The inmate was generally housed in general population, and was treated at the EOP level of care.  He was provided with a diagnosis of Schizoaffective Disorder.  He was prescribed Prolixin, Buspar, and Zoloft.

The inmate's history was significant for self-report of suicide attempts, ten MHCB admissions for suicidal ideation, auditory hallucinations since age 19 telling him to hurt himself or others, and receipt of mental health services while living in the community.

Later in the reporting period, the inmate was changed from EOP to the 3CMS level of care.  A suicide risk evaluation dated 11/9/11, apparently conducted while he was treated in the 3CMS program, indicated multiple risk factors and assessed him as having moderate to high chronic and acute suicide risk.  It noted that he reported feeling suicidal because he viewed his mother's death as imminent.  The plan was to see him twice weekly until he was stable and to "monitor continuously" until stable.

Findings

During the reporting period, the inmate was lowered from EOP to the 3CMS level of care.  While receiving care in the 3CMS program, he was assessed as having moderate to high acute and chronic suicide risk.  The plan for intensive follow-up was effectuated but indicated a high tolerance of suicide risk for an inmate treated at the 3CMS level of care; this was particularly true in the context of his multiple MHCB admissions and significant reported psychiatric history.

## Inmate H

This inmate's medical record was reviewed at the request of plaintiffs' attorneys due to his level of care, which had recently been changed from EOP to 3CMS.  His medical record had also been reviewed during the Twenty-Third Round site visit.

The inmate's history remained significant for multiple instances of self-injurious behavior, multiple MHCB admissions, a reported history of head trauma with loss of consciousness, and a reported strong family history of psychiatric difficulties.  Also potentially significant was a diagnosis of Hypothyroidism.  Past evaluations raised the possibility of what was referred to as "creative reporting," suggesting the possibility that symptoms were not accurately reported for secondary gain.

The inmate was provided with a differential diagnosis of Schizoaffective Disorder versus Major Depressive Disorder.  He was prescribed Risperdal and Buspar.  During the course of his incarceration, his level of care fluctuated between 3CMS and EOP.

From March 2011 through his MHCB admission in late April or early May 2011, and again following his MHCB discharge until his transfer to the 3CMS level of care in early June 2011, he was seen for regular sessions with his primary clinician.  By early July 2011, he again required transfer to the MHCB.  Although he was treated at the 3CMS level of care, between his MHCB discharge in June 2011 and his readmission in July 2011, he required intensive monitoring by mental health staff.  Psychiatric and primary clinician progress notes during May 2011 indicated the need for treatment at the EOP level of care.

The rationale for changing his level of care to 3CMS was described in a progress note dated 6/8/11.  At that time, he was described as improving, and his depressive symptoms were viewed as being in remission.  Progress notes in early July 2011 documented his displeasure with transfer to the 3CMS program.  A progress note dated 7/1/11 indicated that he had been missing groups and some individual sessions.

A suicide risk evaluation dated 7/5/11 noted a number of acute risk factors including suicidal ideation, a current depressive episode, feelings of hopelessness and helplessness, and a recent loss.  Protective factors were not documented.  Positive responses were documented as to a plan to kill himself and a desire to die.  Moderate chronic and acute suicide risks were noted; at that time, the plan was to refer him to the TTA.  The inmate's complaints of difficulty in adjusting to 3CMS status were also documented.

A 7/20/11 suicide risk evaluation continued to identify numerous chronic and acute risk factors.  At that time, the acute risk was assessed to be low and the chronic risk was assessed to be moderate.  A follow-up suicide risk evaluation on 8/8/11 determined the risk for suicide in both acute and chronic areas as being between moderate and high, and weekly follow-up was planned until the inmate stabilized.  A 7/21/11 mental health evaluation documented his report of multiple head traumas; he was described as exhibiting dysphoric mood and reported auditory command hallucinations to hurt himself.

A progress note dated 9/13/11 documented that the inmate was stable and reported that he stated that he "tried to get to DMH by stating that [he] was suicidal but it didn't work."  At that time, he was reportedly compliant with prescribed medications and was stable.  A psychiatric progress note on 10/22/11 indicated that he was stable, calm, and cooperative.  His mental health symptomatology was described as being in remission.

Findings

This inmate appeared to undergo a period of turmoil following his transfer from the EOP to the 3CMS program.  Later documentation indicated the possibility that some symptoms were presented for secondary gain in an attempt to obtain transfer to DMH; at the time, he was determined to pose significant risk for suicide and required intensive follow-up while in the 3CMS program.

EXHIBIT H
North Kern State Prison (NKSP)
September 7, 2011 – September 9, 2011

**Inmate A**

This EOP inmate's medical record was selected at random from the roster of inmates housed in the Mental Health Temporary Housing (MHTH) unit.  It was subsequently learned that he was housed in the MHTH pending DMH APP bed assignment.

The inmate had a history of treatment for Bipolar Disorder.  He was admitted to the MHCB on 5/20/11 after correctional officers noted him to be awake all night and drinking water out of his toilet.  Clinically, he was described as manic, delusional with loose associations, and nearly incoherent.  He was treated with antipsychotic and mood stabilizing medications, but his condition was very slow to improve.  The IDTT made a referral to DMH APP based on his lack of clinical improvement, need for highly structured inpatient care, placement in the MHCB for more than ten days, and three MHCB admissions within six months.  He was accepted for DMH APP care.  He was transferred to the MHTH on 6/22/11 to await transfer.  At the time of transfer from the MHCB to the MHTH, he reportedly remained with grandiosity and affective lability.

In the MHTH, the inmate was initially placed on 30-minute observations.  Nursing staff evaluated him daily and wrote progress notes in the medical record.  At the beginning of his stay, he was seen daily by the psychiatrist and psychologist during a "modified" IDTT; this consisted of a short meeting to assess status but was not used to discuss an actual treatment plan.  During August 2011, the MHTH procedures were changed, and subsequently he was seen daily on rounds by the psychiatrist or psychologist, and weekly in an actual IDTT meeting.  He was reportedly compliant with taking his prescribed medications.

<u>Findings</u>

This inmate was appropriately referred to the MHCB by custody staff after they noted a change in his condition and behavior.  The MHCB IDTT timely referred him to a higher level of care based upon his failure to improve and other objective indicators such as multiple MHCB admissions.  The inmate was stepped down to the MHTH to await DMH APP bed availability, but was monitored closely by the treatment team while on the wait list.  With ongoing treatment, it may be necessary for the MHTH IDTT to reevaluate the appropriateness of DMH APP versus ICF level of care.

**Inmate B**

This inmate's medical record was selected at random from a list of inmates housed in the MHTH unit.  The MHTH admission information was not included in the medical record due to the proximity of this admission to the site visit.

The inmate arrived at NKSP on 3/17/11 due to a parole violation.  He reported a history of mental health treatment, including EOP level of care and a suicide attempt by hanging in 2008 while incarcerated at WSP.  Psychotropic medication orders were written on 3/18/11.  He was placed at the EOP level of care as he had paroled from that level of care earlier during 2011.

The inmate was provided with a diagnosis of Schizophrenia paranoid type.  He was transferred to administrative segregation after having been found guilty of battery on a peace officer, but was maintained at the EOP level of care.  An RVR mental health assessment indicated that his mental condition did not play a role in the behavior resulting in the RVR.  He was seen daily during psych tech rounds in administrative segregation.  He was placed in the MHTH for several days after reporting suicidal thoughts.  Upon discharge, he was seen for five-day follow-up.  He attended groups, met with his primary clinician for individual sessions, and was seen monthly by the psychiatrist.  Monthly IDTT meetings were well-documented.  Medical record documentation indicated that he did not meet indicators for consideration of referral to a higher level of care.

Findings

This inmate appeared to be receiving mental health services at the appropriate level of care.  Treatment plans were detailed and specific to his symptoms and condition.

**Inmate C**

This administrative segregation EOP inmate arrived at NKSP reception center on 3/25/11.  He was returned to prison due to a parole violation.  At the time of his screening, he reported a history of treatment for Schizoaffective Disorder and of being prescribed Geodon and Artane.  Psychiatry evaluated him on the day of arrival, but it appeared that his psychotropic medications were not ordered until 3/28/11, which was three days later, and were administered for the first time on 3/29/11.

The mental health evaluation was conducted on 4/4/11.  The following diagnoses were provided: Psychotic Disorder NOS, Mood Disorder NOS, and Cocaine Dependence, early partial withdrawal due to controlled environment.  He was placed at the EOP level of care.  The initial treatment plan listed medication monitoring by psychiatry, EOP groups, and weekly case management as therapeutic interventions.  The inmate was housed in administrative segregation.

The inmate refused all out-of-cell contacts including group treatment stating, "you people don't care.  There is nothing you can do for me.  It is not benefitting me."  He expressed a desire to be discharged from the EOP level of care.  He continued to be seen daily on psych tech rounds and weekly at cell front by his primary clinician.  Psychiatric contacts occurred monthly.  IDTT meetings were conducted in absentia as the inmate would not attend.

Findings

This inmate appeared to be receiving mental health services at the appropriate level of care in the EOP, but refused out-of-cell participation in weekly contacts with his primary clinician and groups.  Although he remained on the EOP caseload, there were no apparent plans or interventions documented in the medical record to address this issue or to provide additional contacts.

281

**Inmate D**

This 3CMS inmate arrived at NKSP on 4/26/11.  At the time of intake, he reported a history of treatment for Schizophrenia and past treatment with Effexor.  He was referred to psychiatry and was seen on 5/3/11 when diagnoses of Major Depressive Disorder recurrent and Anxiety Disorder NOS were provided.  He was prescribed Buspar and Celexa.  The psychiatrist saw him on 5/30/11.  The mental health evaluation was not completed until 6/14/11.  No primary clinician contact progress notes, group notes, or evidence of an IDTT were located in the medical record.

Findings

Based upon available information, this inmate appeared to be receiving mental health services at the appropriate level of care in the 3CMS program.  However, the primary clinician did not complete the full mental health evaluation timely, and there was no initial IDTT located in the medical record.

**Inmate E**

The 3CMS inmate arrived at NKSP reception center on 4/25/11.  He had a history of past CDCR incarcerations.  During his screening, he reported having a seizure disorder and of being treated with Zoloft and Benadryl for depression and anxiety.  Psychiatry evaluated him on the day of arrival when Zoloft was ordered.  He was placed at the 3CMS level of care.

A mental health evaluation was not completed until 5/17/11.  An additional "health care progress note" by the primary clinician was present in the medical record; this form was locally generated and did not document the actual content of the interaction, nor was there documentation of a mental status examination or assessment of the inmate's condition.  The inmate had another psychiatric appointment on 6/26/11.  A treatment plan was not located in the medical record.

Findings

Based upon available information, this inmate appeared to be receiving mental health services at the appropriate level of care in the 3CMS program.  However, the primary clinician did not complete the full mental health evaluation within the required time period, and the initial IDTT was not documented.  The primary clinician's "health care progress note" was clinically uninformative.

**Inmate F**

This 3CMS inmate was received at NKSP on 4/29/11.  At the time of his receiving screening, he reported a history of treatment for Bipolar Disorder, and of treatment with Risperdal and Effexor.  He was referred to psychiatry and was seen on the day of arrival.  Antidepressant and antipsychotic medications were ordered, and he was placed at the 3CMS level of care.

A mental health evaluation was not located in the medical record. However, there was documentation dated 6/20/11 indicating that he was refusing his psychotropic medications and psychiatric evaluation. This attempt to engage him appeared to have been done in response to nursing notification of three consecutive days of medication refusal. There were no subsequent mental health notes in the medical record.

Findings

Based upon his history of mental illness and the psychiatric assessment, the inmate appeared to be clinically appropriate for the 3CMS level of care. However, there was no completed mental health evaluation or evidence of treatment planning located in the medical record.

**Inmate G**

This inmate was housed in the MHTH awaiting DMH APP transfer; he was originally referred on 5/18/11. He was provided with a diagnosis of Schizoaffective Disorder. He was prescribed Thorazine, Lithium, Remeron, and Vistaril. An IDTT note dated 6/16/11 indicated that he had returned from the MHCB; at that time, he was reportedly stable but with non-intrusive auditory hallucinations. He was reportedly medication compliant, but was described as gravely disabled. He had a long history of mental health treatment due to psychosis and mood instability.

The MHCB discharge summary dated 6/14/11 indicated that the inmate had been admitted to the MHTH from reception and receiving on 4/7/11 due to grave disability, auditory hallucinations, delusions, and bizarre behavior. He continued to exhibit manic and psychotic symptoms, sleeping only two hours at night with continued grandiose delusions and hallucinations. A referral to DMH APP was initiated, and he was transferred to the MHTH while awaiting a DMH bed. At the time of MHCB discharge, he continued to exhibit grandiose delusions and irritability. IDTT notes indicated that he showed improvement while housed in the MHTH; he wrote letters to family members and was cooperative without report of hallucinations.

Findings

This inmate had been referred several months prior to DMH for acute care treatment. He was placed in the MHTH, and progress notes indicated that he was stable and not in distress. He was seen regularly in the IDTT, but there was no documentation of primary clinician contacts (a process in the MHTH which has since changed). As the inmate appeared to have improved, it would be appropriate for the IDTT to reevaluate the DMH referral to determine whether an APP referral remained appropriate or whether an ICF referral or EOP placement would be more suitable.

**Inmate H**

This 3CMS inmate arrived at NKSP on 3/15/11. He was housed in the administrative segregation unit. A mental health screening was completed on 3/17/11, but it was not

completed timely. The mental health evaluation was also delayed; it was completed on 4/4/11. A suicide risk evaluation was also completed on 4/4/11.

The inmate was provided with a diagnosis of Major Depressive Disorder. He had been treated with a variety of medications; he was initially treated with Wellbutrin, which was subsequently changed to Zoloft. The inmate was unhappy with this medication change. The plan outlined in the medical record included tapering of Zoloft and initiation of Prozac.

A progress note dated 7/21/11 described the inmate as irritable and anxious regarding his Prozac; he expressed a desire to try Effexor. On 6/28/11 the primary clinician indicated that the inmate had reported increased symptoms including mood lability, irritability, and anxiety. The inmate denied improvement with current medications and presented with increased agitation and tangential speech. The plan was to continue 3CMS level of care and to refer him to the psychiatrist. The inmate reported weight loss and memory lapses; persecutory delusions were also noted. The plan was to follow-up in 30 days, continue 3CMS level of care, and refer him to the psychiatrist. No subsequent 30-day primary clinician contacts were located in the medical record.

An IDTT that occurred on 8/3/11 outlined a plan to address the inmate's paranoia and poor activities of daily living with weekly individual contacts. The IDTT recommended change to the EOP level of care, but the Form 7388-B did not note any higher level of care consideration indicators.

Findings

This inmate was appropriately changed from the 3CMS to the EOP level of care. Initial assessment timelines were not met.

**Inmate I**

This EOP inmate had a history of multiple psychiatric hospitalizations including 5150 commitments (welfare and institution involuntary psychiatric placements) and two suicide attempts during 1994 and 1997. He had previously been a participant in the 3CMS program but was transferred to the EOP level of care on 7/17/11.

A new arrival psychiatric assessment that was completed on 6/23/11 indicated that he had transferred from the county jail where he had been treated with Wellbutrin and Seroquel. The inmate reported depressed mood and auditory hallucinations. The psychiatrist indicated plans to titrate him from his current medications, increase Haldol, and add Effexor to the medication regime.

An initial IDTT was not located in the medical record. It appeared that the initial IDTT may have occurred during the process of placement in the MHTH on 7/7/11. Form 7388-Bs dated 7/10/11 and 7/16/11 indicated that he did not meet DMH referral consideration indicators. A suicide risk evaluation completed on 7/5/11 indicated that he had 14 inpatient psychiatric hospitalizations.

284

The inmate was placed in the MHTH on 7/7/11 due to suicidal ideation.  He was prescribed Haldol, Cogentin, Effexor, Buspar, and Seroquel.  He was provided with a diagnosis of Schizophrenia paranoid type.  The plan was to discharge him to the EOP level of care as he was stable.

Findings

Timelines for the initial IDTT were not met.  The IDTT forms used during the MHTH placement were not clinically beneficial and, with the exception of medication compliance issues, did not describe treatment plans.  The inmate was appropriately placed at the EOP level of care.

**Inmate J**

This EOP inmate was placed in the administrative segregation unit on 9/20/10 due to his prior maximum custody status.  He had recently returned to NKSP after hospitalization at DMH APP due to decompensation, suicidal ideation, and grave disability.  He had a history of MHCB admissions during December 2010, January 2011, and April 2011.

The inmate was admitted to the MHCB on 4/7/11 due to poor medication compliance and poor self-care.  He was initially placed on suicide precautions with a later downgrade in monitoring to psychiatric observations.  He was compliant with medications and showed clinical improvement.  The treatment team decided not to pursue DMH referral or a Keyhea order, and he was discharged back to the yard on 4/11/11.

The inmate had a history of delusional thinking with disorganization, impaired insight, and poor self-care (he refused to shower or maintain cleanliness in his cell).  Custody staff reported continuing struggles to convince him to leave his cell for showers.  The treatment plan indicated that he had poor medication compliance and noted his refusal to leave his cell.  He was provided with diagnoses of Schizophrenia undifferentiated type, Alcohol Dependence, and Cocaine Dependence.

The Form 7388-B indicated that he did not meet any indicators for DMH referral consideration.  He was prescribed psychotropic medications, and there was documentation that a Keyhea order should be considered due to grave disability.  He did not attend groups.  Progress notes continued to document his poor and malodorous hygiene, auditory hallucinations, and constricted affect.  The plan outlined the need for follow-up in seven days, and the goals of the inmate showering every other day and increasing yard participation to weekly.

A clinical note dated 6/6/11 indicated that the inmate was approached at the cell door where he appeared disoriented and refused out-of-cell primary clinician contact.  His voice was very faint, and it was reported that he was not medication compliant and appeared gravely disabled.  A progress note dated 6/29/11 indicated that he had left his cell for the first time in three months to shower.

The most recent IDTT on 8/24/11 indicated that the inmate continued to refuse to leave his cell on a regular basis, but noted "discussed possible referral to higher level of care –

285

however IM does not appear to meet criteria at this time." The notes indicated that the inmate continued with poor medication compliance and was not interested in group therapy. The Form 7388-B indicated that he did not meet DMH referral indicators.

<u>Findings</u>

This poorly functioning inmate exhibited little improvement in his clinical presentation during the monitoring period. The medical record was replete with notations indicating that he was gravely disabled and a good candidate for a Keyhea order, but no action was taken to pursue this course of action.

The inmate appeared to be appropriate for a Keyhea order and/or DMH referral but these therapeutic interventions were not pursued by the IDTT. The Form 7388-Bs as to DMH referral consideration were not appropriately completed.

EXHIBIT I
California State Prison, Los Angeles County (CSP/LAC)
July 25, 2011 – July 28, 2011

**Inmate A**

This mainline EOP inmate was seen by the IDTT three times during the monitoring period.  Tracking documentation indicated that during March 2011, he was noted to have also met indicators six and eight for DMH referral consideration, but the Form 7388-B revealed that he only met indicator five.  A subsequent Form 7388-B indicated that he met no indicators when in fact he met indicator five.  Alternative treatment interventions were also included in the treatment plan, but the treatments were not available at CSP/LAC.

The inmate was provided with diagnoses of Bipolar I Disorder and Polysubstance Dependence.  He was described as low functioning and it was believed that he might be exploited in the 3CMS program and that he should continue in the EOP despite his low participation rate.  Staff reported that he had poor participation due to polyuria.

The inmate had a history of mood disturbance, grandiose delusional thinking, hyperverbal speech, and racial preoccupation with poor insight and judgment.  He was prescribed Thorazine and Remeron.  Of concern was the lack of documentation of psychiatric contact during the monitoring period.

Medical record progress notes described him as labile and paranoid.  He was noncompliant with antipsychotic medication during the early months of the monitoring period, and appeared to have shown decompensation with weight loss, disorientation, delusional thinking, and odd speech.  He also appeared to be preoccupied with physical complaints, although his primary physician described him as stable with relatively few medical issues.  The inmate reported to mental health staff repeatedly that he had prostate cancer, but there was no supporting information in the medical record and test results did not support that belief.  He refused all groups and did not attend his IDTT meetings.

While most of the notes in the medical record did not indicate where he was seen for clinical encounters, it appeared that he was seen at cell front.  Despite his failure to actively participate in treatment beyond cell-front contacts, treatment plans did not change during the monitoring period nor was there any evidence that mental health staff communicated with medical staff to address/verify his concerns and develop accommodation strategies.  It also appeared that he may have been delusional as to his physical complaints.

Findings

It appeared that the inmate was seen timely by the IDTT and primary clinician.  Progress notes did not document the location of clinical contacts, but it appeared that they occurred at cell front.  The inmate's mental health treatment was inadequate in light of his observed symptoms and mental health staffs' failure to confirm medical conditions and develop methods of accommodation.  The inmate also was not correctly identified as meeting indicator five for DMH referral consideration.  Medical record review indicated that the rationale provided for DMH non-referral was inadequate.  No alternative treatment interventions were provided, and it appeared that he should have been referred for DMH level of care.

**Inmate B**

This EOP inmate was provided with a diagnosis of Schizophrenia undifferentiated type. He was prescribed Trilafon and Risperdal. He was identified as meeting indicators six and eight for DMH referral consideration. The Form 7388s indicated that he only met indicator five. The inmate had a long history of psychiatric hospitalizations due to psychosis, poor self-care, disorganized thinking, and religious delusions.

The treatment plan was not modified despite audit results indicating that alternative interventions were included. The goals for the inmate were changed to reflect a lower expectation of group participation due to medical issues. However, there was no collaboration with medical to verify/share the inmate's complaints or develop an appropriate plan or accommodation. The inmate was consistently seen by psychiatry, but progress notes were only partially legible.

The inmate had experienced medical issues that resulted in weakness and fatigue that contributed to his lack of treatment participation. He refused many groups and IDTTs. However, he was generally consistently seen by his primary clinician, but it was unclear if these contacts occurred at cell front. During this time, he was described as demonstrating poor and unkempt grooming, and he appeared to be delusional although he denied any symptoms of psychosis.

Medical record review indicated that while he had genuine medical issues (diabetes, colostomy), he also had delusional beliefs about his physical health. He did not appear to be benefitting from treatment and was not seen more than once per week despite the clinician's reference to his medical issues.

Findings

This inmate was seen timely by the IDTT, his primary clinician, and the psychiatrist. However, psychiatric contact notes were often illegible, and primary clinician notes did not reflect any change in treatment interventions due to the inmate's failure to improve. The treatment plans did not include alternative interventions as audit results indicated, and the inmate did appear to be a candidate for DMH level of care. The treatment that was provided did not appear to address his serious symptomatology. The rationale provided for DMH non-referral was not well-documented.

**Inmate C**

This administrative segregation EOP inmate was referred to DMH for ICF level of care. The most recent Form 7388 did not include the inmate's lack of treatment participation, and only noted that he had chronic symptoms that had not responded positively to treatment. The previous Form 7388 also failed to acknowledge the lack of participation indicator, but noted that he met several other referral indicators. Staff indicated in treatment planning documents that he required a diagnostic evaluation from DMH. Staff also indicated that he had been referred to DMH since October 2010 or December 2010. However, the DMH log indicated that he had not been identified for referral until 1/5/11.

The inmate was transferred to the MHCB at CMF on 5/16/11, but consideration of DMH placement/referral was not documented.  CSP/LAC staff further did not address how the MHCB placement impacted the current DMH referral (such as request for expedited transfer or referral to APP).

The inmate's medical record was in complete disarray.  Consequently, it was difficult to determine if he had been seen weekly by his primary clinician or consistently by the psychiatrist.  Based on MHCB discharge documents, the inmate was prescribed Haldol and Cogentin.  The inmate had been accepted to DMH for housing in the VPP dorm cells.

Findings

It was unclear if the inmate was seen timely by his initial IDTT, primary clinician or psychiatrist.  Treatment plans were not modified and were inadequate in light of observed symptoms.  Appropriately, the inmate was referred to DMH, but the actual referral date was unclear.  The inmate appeared to meet requirements for an expedited transfer to DMH and should have been considered for APP referral.

**Inmate D**

This EOP inmate was provided with a diagnosis of Mood Disorder NOS.  Group participation documentation indicated that he had very low treatment participation rates.  However, this lack of participation had not been noted at the past two IDTT meetings during DMH referral consideration.  It was noted during the most recent IDTT that he had three or more MHCB placements.  Of note was the assertion that he was functioning adequately in the EOP as the rationale for DMH non-referral, as there was documentation that contradicted this rationale.  There was also a lack of documentation of parole planning or its mention in the treatment plan, despite the inmate's upcoming parole release date of 4/22/11.  Due to subsequent disciplinary infractions, he was not released on that date.

Although primary clinician notes tended to be minimal in content and indicated that he was not experiencing any difficulties, a psychiatric note indicated that he was disheveled and malodorous.  The psychiatrist also indicated that it was thought that the inmate may have been minimizing psychiatric symptoms to avoid treatment.  He refused all antipsychotic medications with the exception of Remeron.  Medical record documentation made it difficult to track contacts and verify compliance with weekly primary clinician contacts.  The generic nature of group progress notes also made it difficult to determine if the inmate participated in groups.  Due to the documentation in the medical record and the generic nature of group notes, it was unclear if he had actually attended any groups.

Findings

This inmate was seen timely by psychiatry, but timeliness could not be determined for primary clinician contacts.  With 67-percent compliance, ongoing IDTT meetings were not timely.  IDTT staff did not accurately note that the inmate met some DMH referral

criteria, and inadequate non-referral rationale was provided with no alternative interventions recommended.  Treatment plans were inadequate in light of his symptoms and ongoing refusal to participate in treatment.  The inmate should have been considered for possible DMH ICF referral.

**Inmate E**

This EOP inmate's care was reviewed as he had been referred to the enhanced EOP care program (EECP).  He was provided with a diagnosis of Schizoaffective Disorder bipolar type.  He was prescribed Haldol, Abilify, Buspar, Remeron, and Cogentin.  During the most recent IDTT, staff reported that he continued to experience auditory hallucinations, depression, and paranoia.  The Form 7388-B was not located in the medical record, but the inmate's poor group participation due in part to ongoing paranoia was reported.  He reportedly had false beliefs about his medicines that negatively impacted his medication compliance.  A March 2011 Form 7388 described his deteriorating mental status and ineffective coping that reinforced his decompensation.  The clinician noted that he responded well to individual contacts, but required significant structure and supervision.

The IDTT did not timely see the inmate.  He had somatic delusions and reported insomnia and difficulty with auditory hallucinations, particularly at night.  He had concerns that he had been poisoned, at times through his medications.  Although documentation from an IDTT dated 2/22/11 indicated that alternative treatment strategies were provided, there was no corresponding 7388 treatment plan located in the medical record.  The only documentation located included a progress note that indicated that he was not referred to DMH without a rationale provided.  It appeared that he was seen weekly by his primary clinician.  There was also a lack of documentation that the psychiatrist timely saw the inmate.

Findings

This inmate was not seen timely by psychiatry or the IDTT.  It appeared that he was placed in the EECP instead of being referred to DMH.  The inmate met indicators for DMH referral consideration and should have been referred for ICF care; this finding was consistent with the documentation on the Form 7388-B.  Treatment plans were inadequate in light of his symptoms and placement in an enhanced program.  The inmate was not receiving adequate mental health care.

**Inmate F**

This mainline EOP inmate was identified by his most recent IDTT as meeting indicators three and six on the Form 7388-B but was not referred to DMH.  Audit results revealed that there were alternative interventions added to the treatment plan.

The inmate was provided with a diagnosis of Schizoaffective Disorder bipolar type.  His medications included Depakote, Paxil, and Abilify.  He had a history of auditory and visual hallucinations, suicidal ideation and attempts, and psychiatric hospitalizations that included DMH.  Early in the monitoring period, he reported hypersomnia, and requested a psychiatric appointment for medication evaluation.  He was seen by the psychiatrist and

his medications were modified; within approximately five weeks he reported improved sleep. Approximately two weeks later, in April 2011, he reported experiencing profound depression with Anergia and Anhedonia. His group participation, although previously less than optimal, discontinued. He reportedly continued to attend yard.

During May 2011, the inmate exhibited grandiose and paranoid delusional thinking with an increase in auditory hallucinations. He reportedly had difficulty maintaining his activities of daily living and exhibited tangential speech. He was seen by the psychiatrist, but no medication changes were noted. He reportedly did not want to go to DMH due to concerns that it would be difficult for his family to visit him there. He also agreed to improve his treatment participation in order to avoid DMH referral. The medical record indicated that he remained medication compliant during this period. While he slightly increased his group attendance, he remained delusional and paranoid with evidence of auditory hallucinations and difficulty maintaining his activities of daily living.

<u>Findings</u>

The inmate was seen timely by the primary clinician, psychiatrist, and the IDTT. While the content of these clinical contacts appeared appropriate, the most recent treatment plan was clinically inadequate, particularly in light of the inmate's increasing symptomatology. Mental health staff failed to recognize his ongoing decompensation. The inmate should have been referred to DMH, and the treatment team should have worked to assist him in accepting this treatment decision.

**Inmate G**

This administrative segregation EOP inmate was reviewed because he was on the DMH ICF wait list, having been referred in October 2010. Documentation indicated that CSP/LAC was unaware of his wait list status until March 2011, as the institution had not been notified by the sending facility. The inmate was housed in administrative segregation due to enemy concerns. He was also described as exhibiting paranoia. He was provided with a diagnosis of Schizophrenia paranoid type. He was prescribed Risperdal and had a reported history of poor treatment compliance. He was described as experiencing chronic suicidal ideation, disorganized thinking, and auditory hallucinations. During two IDTT meetings that occurred on 4/6/11 and 5/11/11, the clinician not only did not note that he was on the DMH wait list, but stated that he did not meet DMH referral criteria. These statements were made despite the inmate's refusal to participate in almost all treatment. It also appeared that he met some of the subjective criteria for DMH referral consideration.

The inmate was described at times as unkempt, paranoid, and delusional, and his cell was disorganized. Despite his refusal to speak to his primary clinician, that clinician described him as clear and stable. When seen by another clinician, the description of the inmate and his cell differed significantly. There was a lack of documentation of psychiatric contact for a five-month period. Treatment planning was generic, and treatment plans did not adequately address the symptoms observed.

Findings

This inmate was seen timely by his primary clinician and the IDTT, but not by psychiatry.  The primary clinician was only able to view the inmate through the cell window as he typically refused to communicate.  The mental health care provided to him was inadequate in light of the lack of timely psychiatric contact, the lack of adequate clinical assessment by the primary clinician, the inadequate quality of the treatment plan, and the failure to recognize decompensation.  The inmate continued to meet DMH ICF referral criteria and needed to remain on the DMH wait list.

**Inmate H**

This reception center EOP SNY inmate transferred to CSP/LAC on 3/22/11.  He was provided with a diagnosis of Schizoaffective Disorder.  He was prescribed Risperdal and Depakote.  Until June 2011, he had not been taking psychotropic medications.

The inmate was described as exhibiting inappropriate affect, bizarre ideation, and cognitive impairments.  The clinician described him as disheveled and disoriented, with a foul body odor.  During a group interview of inmates during the site visit, the other inmates reported that he was not doing well, and was not eating, showering, or otherwise leaving his cell.  His cellmate reported that he required prompting for all activities of daily living and that he could not even clean the cell.  Despite his poor compliance with treatment and continued bizarre behavior, including a staff referral for bizarre behavior, he was not referred to DMH.  Documentation of clinical contacts was also minimal in content, and contacts typically occurred at cell front.  The inmate attended his IDTT.

The most recent treatment plan did not provide individualized information as to the inmate's treatment needs.  While in administrative segregation, his level of care was changed to EOP from the 3CMS program.  The most recent primary clinician appeared to attribute his reclusive behavior to safety concerns rather than mental illness.

Findings

This inmate was seen timely by his primary clinician, psychiatrist, and the IDTT.  However, the treatment plan was inadequate in light of the severity of observed symptoms.  Documentation of primary clinician contacts provided little therapeutic value.  The inmate should have been referred to DMH for treatment and stabilization.

**Inmate I**

This MHCB inmate recently returned from DMH.  His behavior in the MHCB included hitting his head against the wall/door when no one was observing him.  He had prior DMH hospitalizations.  He was repeatedly placed in seclusion and restraints.  He was provided with a diagnosis of Mood Disorder NOS.  One clinician indicated that he had a diagnosis of Schizophrenia and questioned a possible DMH referral, but his diagnosis was downgraded to Adjustment Disorder.  During a 7/25/11 IDTT meeting that occurred 11 days after admission, staff finally decided to refer him to DMH APP.

During his MHCB admission, the inmate was prescribed Cogentin, Benadryl, Haldol, Depakote, Thorazine, Remeron, and Effexor.  The treatment plan was not individualized and focused on medication management.

Findings

This inmate clearly had significant mental illness, and it could have been determined early in his MHCB stay that he required an APP referral.  He exceeded the Program Guide timelines for MHCB length of stay.  He was seen timely by the psychiatrist, primary clinician, IDTT, and physician (for History & Physical), but treatment was inadequate in light of his very serious self-injurious behavior.  He was finally referred to DMH eleven days after his admission.  The inmate would also benefit from a comprehensive diagnostic evaluation because the diagnosis of Adjustment Disorder was not appropriate in light of his symptomatology.

## Inmate J

This MHCB inmate was seen in the IDTT during the monitoring visit.  He was provided with a diagnosis of Psychotic Disorder NOS.  He was prescribed Thorazine, Vistaril, and Risperdal.  However, he was not compliant with his medications because he believed that they would blind him.  He was described as disheveled, with hyperverbal and tangential speech, flat affect, lability, and frequent agitation.  He had been prescribed psychiatric medication prior to MHCB placement, but the prescriptions expired and he quickly decompensated.  This decompensation continued while he was housed in the MHCB.  He was finally referred to DMH on the tenth day of his stay.  He was seen regularly by his psychiatrist, primary clinician, and the IDTT, but treatment primarily consisted of medication management.

Findings

While this inmate was seen timely by his clinicians, treatment was inadequate.  He should have been referred to DMH earlier in his MHCB admission.  He would have benefitted from treatment at DMH for acute care, with subsequent transfer to the ICF.

EXHIBIT J
California Correctional Institution (CCI)
September 13, 2011 – September 15, 2011

**Inmate A**

This SNY 3CMS inmate apparently entered the CDCR by way of the DVI reception center during late January or early February 2011. He was serving a first term with a two year commitment that included a sex offense. His case was reviewed as he was identified by MHTS.net as having three or more crisis placements. However, his name did not appear on either the institutional referral or non-referral log at the time of the site visit. After an initial evaluation at the DVI reception center, the inmate was cleared for general population. He was referred for a mental health assessment on 2/4/11 after he reported suicidal ideation. He was placed in the 3CMS program on approximately 2/15/11; a suicide risk evaluation completed at that time indicated that he had a history of hospitalization within the preceding year due to suicidal ideation.

A progress note dated 2/17/11 indicated that he had been provided with differential diagnoses that included Bipolar II Disorder and Major Depressive Disorder recurrent. A psychiatric progress note written on 3/17/11 indicated that he had been prescribed Zoloft. The note further indicated that he was not psychiatrically stable and had increased suicidal ideation.

On 3/22/11 the inmate reported an assault perpetrated by another inmate; he was increasingly fearful that he would be attacked by other inmates as well. On 3/28/11 he was interviewed by a psychologist who characterized him as withdrawn. Several mental health referrals during April and May 2011 indicated that he was noncompliant with prescribed medications. He was placed in the OHU at DVI, but was subsequently transferred to the MHCB at HDSP on 4/4/11. Progress notes indicated that he was believed to be experiencing adjustment difficulties and had safety concerns as a result of his commitment offense. He was returned to CCI upon his release from the MHCB at HDSP; it appeared that he was placed in the OHU at CCI upon his return. A suicide risk evaluation was completed on 4/14/11. This evaluation determined that he had a moderate to high risk of suicide.

A subsequent suicide risk evaluation completed on 5/5/11 indicated that the inmate posed low risk of self-harm. A progress note dated 5/5/11 described him as increasingly anxious and depressed after learning that his criminal record would include a crime against a minor; he was characterized as possibly suicidal at that time. An IDTT meeting held on 5/12/11 determined that he would remain at the 3CMS level of care. He was subsequently evaluated by a psychiatrist on 5/25/11 due to medication noncompliance. He was also evaluated on 6/8/11 in response to a self-referral; medical record documentation indicated he was psychiatrically stable at that time.

Findings

This inmate was included in the MHTS.net list of inmates with multiple OHU placements. In fact, it appeared that he was transferred from the OHU to the MHCB and back to the OHU within approximately 14 days. Although he likely did not require DMH referral consideration based on multiple OHU placements, he required consideration of referral to a higher level of care based on the length of crisis bed placement, which was approximately 14 days. The inmate should likely have been considered for transfer to the EOP level of care.

**Inmate B**

This inmate had an extensive history of drug use.  He reportedly had at least two suicide attempts prior to incarceration; he jumped from the tier in a county jail and crashed his motorcycle into a tree.

Information from the most current reception center processing data from September 2009 indicated that he was in the 3CMS program at that time.  He appeared to remain at that level of care.  There was also documentation of at least two inpatient placements while he was incarcerated during 2003 and 2005.

A treatment plan dated 9/2/10 provided diagnoses of Bipolar Disorder and Polysubstance Abuse.  The Form 7388-B that was completed on 11/1/10 indicated that he did not meet any of the indicators for DMH referral consideration.  A primary clinician's progress note dated 1/18/11 indicated that he reported irritability and mild depression.  On 3/9/11 he was described as anxious and disheveled with minor cognitive impairments.  In contrast, when he was evaluated on 3/29/11, he was described as smiling with broad affect.  He was provided with a diagnosis of Bipolar I Disorder.  On 4/14/11 the primary clinician reported that the inmate presented as tense and anxious, but reportedly smiled readily with laughter.

The Form 7388-B dated 5/11/11 did not indicate that the inmate met DMH referral consideration indicators, but the Form was not completely in entirety.  The treatment plan of the same date indicated that he presented with pressured speech; he was again provided with a diagnosis of Bipolar I Disorder.

The inmate was placed in the OHU from 5/15/11 to 5/17/11.  He apparently was placed on suicide precaution after he reported suicidal ideation; at that time he was described as agitated and confused with threats of self-harm.  Progress notes indicated that he began refusing medications on approximately 5/31/11.

The Form 7388-B completed on 6/6/11 again found no positive indicators requiring DMH referral consideration.  The treatment plan completed at that time indicated that he had been transferred to administrative segregation after an altercation with another inmate that resulted in charges of battery with a weapon and great bodily harm.  The IDTT meeting also determined that he did not meet indicators for DMH referral consideration; documentation from this meeting included appropriate rationale as to the reasons for non-referral.

A primary clinician's progress note dated 6/16/11 indicated that the inmate was stable with mild concerns as to the imposition of a SHU term.  He was again placed in the OHU from 6/26/11 to 6/28/11 after he fashioned a noose and threatened to harm himself or his cellmate.  He was apparently released from the OHU on 6/28/11, but returned the following day, and was released again on 6/30/11.  A Form 7388-B completed on 7/18/11 also indicated that he met none of the indicators for DMH referral consideration.

Findings

This inmate had three OHU placements that occurred between 5/15/11 and 6/30/11. He was evaluated weekly by the primary clinician as required while housed in administrative segregation. He was placed in the SHU following the assault with great bodily harm of another inmate. He was considered for DMH referral on 6/6/11. However, there was no documentation that the inmate was considered for DMH referral following the third OHU placement that occurred from 6/29/11 to 6/30/11. He was not included on the DMH non-referral log but should have been, as he was not referred to DMH but met some of the referral indicators.

**Inmate C**

This case was reviewed at the request of plaintiffs' attorneys to review the inmate's level of care. The inmate arrived at CCI from WSP at the 3CMS level of care during November 2009. His most recent treatment plan was completed on 12/14/10; the treatment plan was one month overdue. The Form 7388-B checklist was completed at that time. It indicated that he did not meet any of the indicators for DMH referral consideration. He was provided with diagnoses of Major Depressive Disorder, mild in partial remission and Personality Disorder NOS with cluster B traits. He was prescribed Zoloft 100 mg/day and Buspar 60 mg/day.

The inmate had two prior DMH hospitalizations. During the most recent hospitalization, the evaluating psychiatrist indicated that he did not believe that the inmate was malingering. Rather, he attributed reports of auditory hallucinations as being consistent with feelings of guilt and not with psychosis. In addition, the psychiatrist indicated his belief that the inmate truly experienced mood symptoms.

The inmate had been receiving mental health services at the EOP level of care, but was placed in the 3CMS program during August 2009. There was subsequent documentation that he repeatedly complained about the decreased clinical contact and group therapy provided at CCI. Although individual progress notes referenced participation in one therapeutic group, there was no group therapy documentation and group treatment was not included in the treatment plan. The inmate was evaluated timely by psychiatry and his primary clinician. Mental health supervisory staff attempted to assist him as to realistic expectations as to his current level of care. The most recent progress notes indicated that he was stable and had few, if any, complaints.

Findings

The inmate was seen timely by his psychiatrist and primary clinician. He appeared to be functioning adequately at his current level of care, despite his preference for increased clinical contacts. He was not seen timely by the IDTT. His treatment plan was inadequate as it did not address his specific treatment needs, but merely restated Program Guide requirements.

**Inmate D**

This 3CMS inmate was housed in 4B SHU.  The most recent treatment plan was dated 7/7/11 and included a diagnosis of Major Depressive Disorder.  The inmate was prescribed Zoloft 200 mg/day.  Progress notes indicated that he had benefitted from medication therapy and ongoing treatment, resulting in stable functioning.  The treatment plan was clinically appropriate and included a completed Form 7388-B, the checklist for DMH referral.  All required attendees were present at the IDTT meeting.  The inmate had repeatedly refused opportunities to meet with his primary clinician in a private setting, so individual treatment was limited with a focus on encouraging treatment participation in confidential settings.  The inmate had been seen timely by the IDTT, psychiatrist and primary clinician.  Although the primary clinician indicated that contacts were non-confidential, the psychiatrist did not document whether clinical contacts occurred at cell front or in a private setting.

Findings

The inmate appeared to be functioning adequately at his current level of care.  Despite repeatedly refusing confidential primary clinician contacts, he participated in cell-front contacts and appeared to be psychiatrically stable.  He was seen timely by the IDTT, psychiatrist and primary clinician, and his treatment plan was clinically adequate.

**Inmate E**

This 3CMS inmate was housed in 4B SHU.  Although provided census data dated 9/12/11 indicated that he was placed at the EOP level of care, an EOP placement chrono was not located in the medical record.

Following arrival at CCI, he was evaluated by a primary clinician on 2/20/11 and a psychiatrist on 2/22/11.  Psychiatric progress notes were minimally legible.  Although progress notes made references to IDTT meetings (one undated note apparently occurred in February 2011 prior to the inmate's initial ICC and another was dated 5/12/11), no treatment plans were located in the medical record.  A Form 7388-B dated 5/12/11 indicated that he would remain at the 3CMS level of care at that time.

Based on available documentation, the inmate was not seen weekly for psych tech contacts.  He was provided with diagnoses of Major Depressive Disorder, recurrent, mild and Polysubstance Dependence.  He was prescribed Buspar 30 mg/day, Risperdal 1 mg/day and Effexor 225 mg/day.  He was seen timely by the psychiatrist and his primary clinician.  There was no documentation by these clinicians as to a level of care change to EOP.  There was only one progress note in the medical record that documented psych tech rounds; this was in February 2011, at the time of the inmate's arrival at CCI.

Findings

The inmate's level of care was a source of confusion.  Although he was listed in census data as an EOP participant, he actually appeared to be receiving mental health services at the 3CMS level of care.  No CCI treatment plans were located in the medical record,

although one Form 7388-B, the checklist for DMH referral, was present.  The inmate was seen timely by the psychiatrist and primary clinician.  There was, however, a lack of documentation as to weekly psych tech rounds.

This inmate required an individualized treatment plan that clearly specified his level of care and ensured that census data accurately reflected that level of care.  He should have been seen weekly by psych techs, with appropriate documentation.  Despite several areas of noncompliance, however, he appeared relatively stable and the 3CMS level of care appeared to be clinically appropriate.

**Inmate F**

This inmate arrived at CCI on 7/8/11, from the MHCB at KVSP.  Medical record documentation indicated that this was his third MHCB placement in three months.  After his return to CCI on the most recent occasion, KVSP MHCB staff recommended that he be considered for EOP level of care.  The census roster indicated that this 4B SHU inmate was receiving mental health services at the EOP level of care; however, the most recent placement chrono and treatment plan dated 6/5/11 indicated that he was receiving services at the 3CMS level of care.

It did not appear that he was seen timely upon return from the MHCB as the eUHR did not include any scanned information until approximately two weeks later.  There was also no timely IDTT documentation.  The inmate was seen by a clinician upon his return, but the clinician did not indicate whether the KVSP MHCB documentation was available for review.  The progress notes addressed neither the EOP level of care nor the IDTT meeting.  It was unclear from the medical record whether the psychiatrist or primary clinician had timely seen the inmate during his CCI housing placement during the review period.

Findings

The inmate was not appropriately identified for DMH referral consideration.  He was not seen timely by the IDTT, and it could not be determined whether the psychiatrist or primary clinician contacts were timely.  Given his repeated MHCB placements, suicidal ideation and self-injurious behavior, he should have been considered for DMH referral.  The inmate's level of care also required clarification.

**Inmate G**

This inmate arrived at CCI on 2/14/11, from CSP/Corcoran.  The placement chrono was not located in the CCI medical record.  However, a prior placement chrono from January 2011 from CSP/Corcoran indicated that he was receiving mental health services at the 3CMS level of care.  The CCI census dated 9/12/11 indicated that he received services at the EOP level of care.  However, the most recent treatment plan dated 5/12/11 indicated that he was receiving mental health services at the 3CMS level of care.  That treatment plan included clinically appropriate treatment goals, but only listed Program Guide requirements as clinical interventions.  The Form 7388-B completed at that time indicated that the inmate did not meet any indicators for DMH referral consideration.  No

treatment plan was located in the medical record from the time of his arrival at CCI until the completion of the 5/12/11 treatment plan.  However, a progress note indicated the conduct of an IDTT meeting on 2/15/11.

According to the Form 7388-B dated May 2011, the inmate was provided with a diagnosis of Major Depressive Disorder, recurrent, severe with psychotic features; he was prescribed Remeron 15 mg/day, Effexor ER 225 mg/day and Risperdal 2 mg/day.  Psych tech round documentation was only present for portions of February and June 2011.  The inmate was seen timely by the psychiatrist and primary clinician.  Documentation generally did not indicate whether these contacts occurred in a confidential setting although one progress note indicated that the inmate had been refusing confidential contacts.  The content of progress notes suggested minimal therapeutic interaction and did not provide enough information to evaluate the inmate's stability.

Findings

The inmate was not seen timely by the IDTT or psych techs.  The sole treatment plan that existed was clinically inadequate as to therapeutic interventions.  Although the inmate was seen timely by the psychiatrist and primary clinician, documentation of the content of these contacts was minimal.  The inmate's current level of functioning could not be properly assessed due to the limited clinical information in the medical record.  The inmate's level of care had to be properly identified and reconciled with census data.

**Inmate H**

This inmate arrived at CCI on 3/2/11 from another prison at the 3CMS level of care and was housed in 4A SHU.  He subsequently transferred to administrative segregation when his SHU term was completed.  There was a current treatment plan dated 7/11/11 in the medical record.  This contact appeared to be the first time that the IDTT saw him while housed at CCI.  A progress note dated 6/17/11 indicated that an IDTT meeting was conducted and that the treatment plan had been updated.  However, no other treatment plan was located and the current treatment plan was marked as "initial."  The Form 7388-B, the checklist for DMH referral, was present.  The most recent treatment plan provided the inmate with diagnoses of Mood Disorder NOS and Polysubstance Dependence.  He was prescribed Depakote ER after he refused treatment with Paxil in July 2011.

The inmate was seen by a clinician on the day of his arrival at CCI and timely thereafter.  However, he was not seen timely by psych techs throughout his stay in the SHU and administrative segregation.  Documentation that existed was minimal in content and not clinically beneficial.  Although psychiatrists saw him timely, the documentation was generally illegible.  Some primary clinician contacts documented therapeutic interventions which were beneficial in the inmate's ongoing functioning while other contacts appeared to be minimal and superficial with little therapeutic benefit.  The inmate was sporadic in his compliance with individual/private clinical contacts, which also impacted the content of these contacts.

301

Findings

This inmate was not seen timely by the IDTT following his arrival at CCI. Documentation of the completion of an adequate treatment plan was dated four months after his arrival, following his transfer from the SHU to administrative segregation. Psych tech rounds were not adequately documented. The inmate was seen timely by psychiatry and his primary clinician; primary clinician contacts documented some therapeutic interventions. Documentation of psychiatry contacts was poor. However, the inmate appeared to be stable and functioning adequately at the 3CMS level of care given the increased contacts as a result of the SHU and administrative segregation placements.

**Inmate I**

This inmate arrived at CCI on 9/22/10, from MCSP. The only placement chrono generated at CCI was dated 3/9/11 and indicated that he was receiving mental health services at the 3CMS level of care. The only placement chrono prior to that indicated MHCB placement, so it was unclear what level of care he was placed at upon arrival at CCI. However, the census data provided during the site visit indicated that he was receiving services at the EOP level of care. The most current treatment plan was dated 3/9/11 and included the Form 7388-B, but did not clarify the level of care.

The inmate was seen timely by the IDTT upon arrival but not throughout the review period. It also appeared that he had been transferred from administrative segregation to the SHU, but precise placement dates could not be adequately determined from the medical record. It appeared that he had been housed in administrative segregation during March 2011, but was housed in the SHU at the time of the site visit. He was provided with diagnoses of Psychotic Disorder NOS and Mood Disorder NOS. He was prescribed Zoloft 100 mg/day. This medication regimen, and lack of treatment with an antipsychotic medication, appeared to be due in part to the inmate's fear of being "overmedicated" and reluctance to take additional medications despite the presence of auditory hallucinations.

On 6/12/11 the inmate wrote a letter to mental health requesting transfer to the EOP level of care due to increasing depression; he also indicated that he needed more contact and group treatment to maintain stability while on indeterminate SHU status. He reportedly had an indeterminate SHU term due to assaulting staff, which he denied. He indicated that he refused out-of-cell contact at times because he wanted to minimize his contact with correctional staff for fear that they would "set him up." At the time of his request for services, he indicated that he had not received his property, which he believed contained information that might assist him in fighting his indeterminate SHU term. The inmate reported relying heavily on his cellmate for assistance in the completion of paperwork and other writing tasks. He also feared that he would be pressured by other inmates resulting in a negative outcome for him.

The inmate was described in June 2011 as malodorous, anxious, frustrated, sad, and tearful. He exhibited difficulty expressing himself at that time. The description of his presentation was very different when he was interviewed confidentially than when he was interviewed at cell-front, and there was more description of psychopathology when he

was interviewed in a confidential setting. The inmate generally appeared to have been seen timely by his primary clinician when he was housed in the SHU, and by his psychiatrist throughout the review period. However, his level of functioning appeared to be decreasing and required a level of care review.

Findings

This inmate was not seen timely by the IDTT and did not have a properly completed treatment plan and Form 7388-B. He did not have a current treatment plan, and the prior treatment plan was inadequate in light of his significant psychopathology. He was not seen timely by psych techs during the monitoring period. His current level of care required clarification and the EOP level of care appeared to be clinically appropriate. He appeared to be experiencing decompensation, and was in need of review for a higher level of care. He also demonstrated several subjective indicators for DMH referral consideration and should have been reviewed for possible DMH referral.

**Inmate J**

This administrative segregation EOP inmate was reviewed at the request of plaintiffs' attorneys as to concerns about his mental health treatment. A current treatment plan in the medical record indicated that he was receiving mental health services at the EOP level of care. He had been housed in the SHU but was released to administrative segregation in May 2011, although the exact date of transfer was unclear from the medical record. A treatment plan completed on 5/23/11 provided a diagnosis of Bipolar I Disorder, most recent episode hypomanic. The inmate was then prescribed Buspar 30 mg/day.

Although the IDTT changed his level of care from 3CMS to EOP, the clinical rationale for this decision was unclear as the treatment plan otherwise suggested mental health stability. There was no Form 7388-B completed during that IDTT, but the Forms 7388-B were completed for prior treatment plans. Psychiatric progress notes were minimally legible. The inmate was included in reception center EOP groups in administrative segregation; this therapy was not included in the treatment plan, while no other administrative segregation EOP inmates received group therapy.

The inmate was interviewed during the site visit and presented as a high functioning individual. He was reportedly a gang dropout who was awaiting SNY placement. He had been incarcerated for 20 years. He exercised frequently and reported using exercise as a coping mechanism. He also reported a long history of cutting behaviors to experience a "rush" and to reduce suicidal thoughts, but stated that the cutting was no longer effective for him.

During the period when he was changed to the EOP level of care, he reported feeling anxiety toward mental health staff. At that time he was prescribed anti-anxiolytic medications after having been medication-free for one and one-half years. He was released from his indeterminate SHU term on 4/5/11; this may have resulted in an increase in his anxiety symptoms as he was originally scheduled for transfer to KVSP. This endorsement was subsequently rescinded, and he was transferred to an SNY EOP yard.

303

There was no documentation indicating that psych techs saw the inmate daily since his transfer to administrative segregation.  There was also a lack of psych tech round documentation during a five-week period when he was housed in the SHU.

Findings

The inmate was seen timely by the IDTT.  The psychiatrist and primary clinician saw him timely but psychiatric progress notes were illegible.  Treatment plans were somewhat generic and the inmate might have benefitted from more individualized treatment planning.  He was not seen by psych techs in accordance with Program Guide requirements for a five week period.  He received EOP group treatment while housed in administrative segregation at CCI at a time when no other administrative segregation EOP inmates received such care.  The clinical justification for this exception was unclear, while the clinical justification for his increased level of care from 3CMS to EOP also was not documented.  The inmate appeared to be receiving adequate mental health treatment, and he appeared to be stable and satisfied with the services provided.  It was unclear why he was not transferred to an EOP hub.

**Inmate K**

This inmate was receiving mental health services at the 3CMS level of care.  His psychotropic medications, Buspar and Vistaril, were discontinued on 6/9/11.  No documentation indicated that he was seen for evaluation at the time of medication discontinuation.  He reportedly had not shown for pill line for 30 days.  He was seen by the psychiatrist on 6/14/11 when he reported that he did not like the medication's effect.  The psychiatrist indicated that the inmate was medication-seeking in light of his history of substance abuse.

The inmate had been provided with diagnoses of Psychotic Disorder NOS, Polysubstance Dependence, and Antisocial Personality Disorder.  The most current treatment plan dated 5/4/11 was not individualized for his specific treatment needs and simply restated Program Guide requirements.  The psychiatrist and primary clinician timely evaluated him, but there appeared to be confusion as to the existence of mental illness as opposed to drug-seeking behavior.

Findings

Medical record documentation tended to support the contention that the inmate exaggerated his symptoms, possibly in an effort to obtain medications.  He was evaluated timely by the IDTT, psychiatrist, and primary clinician.  However, the treatment plan was clinically inadequate.  No documentation indicated that mental health staff directly addressed the inmate's perceived secondary gain, substance abuse issues, or coping skills.

EXHIBIT K
California Institution for Men (CIM)
August 23, 2011 -- August 26, 2011

**Inmate A**

This EOP inmate, who arrived at CIM on 1/14/11, was interviewed in a group setting that consisted of six administrative segregation EOP inmates.  He was difficult to understand and appeared to be responding to internal stimuli.

The inmate's medical record was reviewed.  Documentation was present as to daily rounds by the primary clinician and the offering of weekly out-of-cell clinical contacts.  The last two meetings with a psychiatrist were dated 7/13/11 and 4/22/11.

The inmate had been provided with various diagnoses including Schizophrenia, Schizoaffective Disorder, and Psychotic Disorder NOS.  His prescribed medications included Risperdal and Vistaril.  A Form 7388-B was completed on 5/24/11, and a treatment plan was dated 3/2/11.

<u>Findings</u>

It was unclear why the inmate remained at CIM, a reception center.  He required EOP level of care.  His psychiatric contacts were not timely based upon his current clinical needs.

**Inmate B**

This EOP inmate was interviewed in a group setting that consisted of six other administrative segregation EOP inmates.  He was fairly quiet throughout the group interview.

His electronic medical record was reviewed.  His prescribed medications included Risperdal and Depakote.

A 7/22/11 brief mental health evaluation was reviewed.  The inmate was seen as a result of a staff referral after he had been referred by an LVN due to "bizarre behavior" consisting of growling and appearing confused and hostile.  He was also described as disoriented.  He had recently been discharged from the MHCB.  His presentation was consistent with the diagnosis of Psychotic Disorder NOS.  It was recommended that he return to the MHCB.

The inmate apparently was treated in the MHCB based on subsequent five-day follow-up progress notes that were reviewed; the notes were dated from 8/5/11 to 8/10/11.

A 8/11/11 weekly administrative segregation progress note, based on an ICC interview, was reviewed.  Although the inmate demonstrated symptoms consistent with psychosis, the progress note indicated that he was known on the East Yard to embellish his mental health symptoms with the intention of remaining at DMH or at an EOP hub as he was serving a life sentence.  The plan included subsequent psychiatric evaluation for him.

<u>Findings</u>

The paper medical record was not available for review.  Further assessment was obviously indicated for this inmate, including review of his MHCB records.  At the time of the site visit, he had not received the recommended extended evaluation by the psychiatrist.

**Inmate C**

This EOP inmate was interviewed in a group setting that consisted of six other administrative segregation EOP inmates.  He arrived at CIM on 8/19/11.  His eUHR was reviewed.

The inmate had been prescribed Thorazine, Effexor, and Depakote at CSP/LAC on 8/4/11.  He was diagnosed with Schizoaffective Disorder and Bipolar Disorder.  A 7/29/11 transfer note from CSP/LAC included similar diagnoses.  A 7/28/11 psychiatrist routine follow-up note also provided a diagnosis of Bipolar Disorder by history.  Prescribed psychotropic medications included Depakote and Effexor.  All the mental health progress notes were written by clinicians at CSP/LAC.

<u>Findings</u>

There was a lack of documentation of any assessments or progress notes written by clinicians at CIM.  This was of concern in light of the inmate's history of mental illness and recent treatment at CSP/LAC.

**Inmate D**

This EOP inmate was interviewed in a group setting that consisted of six other administrative segregation EOP inmates.  He arrived at CIM on 7/19/11.  His eUHR was reviewed.

The initial medical screening form was completed timely.  Medications prescribed on the day of arrival included Vistaril, Effexor, and Remeron.  There was documentation that the inmate would be scheduled for psychiatric follow-up in five to seven days; however, he was admitted to the MHCB that same day.

Medications were again renewed on 7/25/11 with a plan for psychiatric follow-up in five days.  Suicide precautions were discontinued that day.  The inmate was provided with a diagnosis of Mood Disorder NOS.

A 7/27/11 brief mental health evaluation included the following information:

> Inmate was referred due to history of EOP level of care.  He paroled in January 2011, came back in March, left in May and is back on violation yet again.  His previous violations included absconding, smoking pot and leaving the designated area.  This inmate was admitted to the MHCB right after his latest return to custody, most likely due to placement issues.  He

denied hearing voices at this time, says he does not need medications anymore and apparently has been refusing his meds.  According to MHCB staff, he was demanding, entitled, and noncompliant with meds and therapy treatment.

Nursing notes were present in the medical record for this MHCB admission.  Numerous suicide risk evaluations were also present.  The plan outlined was for referral to psychiatry for a medication evaluation and parole planning with the social worker.

The inmate was seen by the psychiatrist on 8/1/11.  His medications were continued and he was scheduled for follow-up again in four weeks.  He was housed in the administrative segregation unit at that time.  Progress notes were documented by the psychologist and recreation therapist on a regular basis since his placement in administrative segregation.  A treatment plan was not located in the medical record.

<u>Findings</u>

There was no documentation of adequate treatment planning for this inmate who presented with symptoms consistent with a serious mental disorder.  His prognosis was very guarded based on his past history.

**Inmate E**

This EOP inmate was interviewed in a group setting that consisted of six other administrative segregation EOP inmates.  His eUHR was reviewed.  He arrived at CIM on 7/12/11.  On 7/18/11, he was prescribed Abilify and Depakote.

A suicide risk evaluation was completed on 7/20/11.  The inmate was placed at the EOP level of care.  A brief mental health evaluation was completed on 7/29/11 by the psychiatrist.  At that time, the inmate was provided with a diagnosis of Mood Disorder NOS.  His medications were continued, and he was scheduled for follow-up in four weeks.

Progress notes were written on a regular basis during the inmate's stay in administrative segregation, but no treatment plan was located in the medical record.

<u>Findings</u>

A treatment plan was lacking for this inmate who was assessed to require mental health services at the EOP level of care.

**Inmate F**

This inmate arrived at CIM on 6/24/11.  The initial bus screen indicated that he had been provided with a diagnosis of Schizophrenia and that he had been treated with Zyprexa, Stelazine, Artane, and Buspar.  There was documentation that a medication order was written on the day of arrival; however, there was a notation that indicated that the medications would be held until the inmate was evaluated by the psychiatrist.  There

were no subsequent medication orders.  MARs available for review for June and July 2011 were incomplete, making it difficult to determine medication continuity.

The inmate was referred for further mental health evaluation soon after arrival; subsequently, he was referred on 6/27/11 by administrative segregation custody staff due to confusion, bizarre behavior, hearing voices, and incoherent speech.  A placement chrono indicated that he was transferred to the MHCB on 6/29/11.  The medical record contained two unsigned progress notes dated 6/27/11 and 6/29/11, as well as a brief evaluation also dated 6/29/11 that were essentially illegible.

The inmate was housed in the MHCB for 20 days (6/29/11 to 7/19/11).  He was provided with a discharge diagnosis of Schizophrenia paranoid type, Opioid Dependence, and Personality Disorder NOS.  He had a history of multiple psychiatric hospitalizations in numerous states.  While housed in the MHCB, he refused to shower and had an abscess on his elbow.  He was described as having poor eye contact, poor concentration, and easy distractibility with psychomotor retardation.  It appeared that he was seen daily by the psychiatrist or social worker.  Although there was no documentation of the completion of an initial history and physical examination, it was apparent that he was evaluated by the medical staff as the elbow abscess was addressed.  The initial treatment plan was completed timely in the MHCB, but there was no subsequent treatment plan located or a Form 7388-B for referral to a higher level of care.  There was no documentation why the inmate was not referred to DMH or clinical justification for the extended MHCB stay.

Findings

The medical record was in poor condition.  While it appeared that the inmate was seen daily while in the MHCB, many of the progress notes were illegible.  He was not seen by the IDTT timely, and the Form 7388-Bs were not properly completed.  The inmate should have been referred to DMH, but there was no documentation of such a referral.  The length of stay in the MHCB clearly exceeded timelines, and the inmate met referral consideration indicators.

**Inmate G**

This inmate's medical record was reviewed as he had at least five MHCB admissions within a six month period without documentation of DMH referral.  His medications (Haldol and Cogentin) were discontinued in May 2011 due to his request.  He arrived at CIM on 1/19/11.  Documentation from the county jail noted that while he denied mental health issues, records indicated that he had a history of psychiatric treatment.  He continued to deny mental health issues upon arrival at CIM, and was initially cleared as a non-MHSDS participant.  A parole release report dated 6/12/10 stated that he had received mental health treatment in the community during 2004, as well as during past incarcerations.  He was described as having possible frontal lobe damage resulting from a 1999 altercation.

The inmate was referred to mental health when he reported to custody staff that others were trying to kill him and that he would kill himself prior to that.  He was admitted to the MHCB at that time.  He was discharged on 2/15/11 at the 3CMS level of care.  He

was again referred to mental health by custody staff on 2/19/11 after expressing suicidal ideation.  On 2/22/11 he was placed at the EOP level of care.  On 2/25/11 he was again referred to mental health for suicidal ideation.  He was admitted to the MHCB the following day and discharged nine days later.  Eight days after MHCB discharge, he was readmitted following custody referral for suicidal ideation.  The inmate was discharged from the MHCB on the following day.

Approximately 19 days later, he was readmitted to the MHCB.  This occurred as a result of a staff referral due to a letter written by the inmate and reviewed by custody which indicated that he was suicidal.  He was discharged two days later on 4/6/11.  On 4/25/11 he was referred again by custody for the same reasons, and was readmitted to the MHCB on 4/28/11.  On 5/3/11 the inmate was discharged back to the EOP level of care.  Discharge diagnoses from his last MHCB stay included Psychotic Disorder NOS and Methamphetamine Dependence.  According to the most recent discharge summary, the inmate expressed depression and stated that he had felt in danger and threatened on the yard.  He was described as guarded and paranoid.  Staff had reportedly attempted to obtain a Keyhea order during a March 2011 MHCB hospitalization, but lost the certification hearing.

An IDTT note dated 5/11/11 indicated that the inmate met indicators for multiple crisis bed stays and multiple 115s (two for staff manipulation for "faking suicidal" and one for fighting with his cellmate).  A corresponding Form 7388-B was not located in the medical record.

There was a lack of documentation of completion of the Form 7388-Bs or suicide risk evaluations for many of the MHCB admissions.  Some 7388 treatment plans were present in the medical record for some of the MHCB admissions, but only one completed Form 7388-B was located.  The rationale for non-referral documented on the Form 7388-B indicated that the inmate was utilizing the MHCB to obtain housing changes, and his behavior was described as manipulative.  This rationale did not adequately address the reason for his repeated MHCB admissions and the fact that he did not request or receive bed/cell moves during prior admissions.  There was contradictory documentation by the psychiatrist who indicated that the inmate exhibited symptoms of paranoia.  It also appeared that he may have received a disciplinary infraction as a result of perceived malingering of suicidal symptoms.

There was documentation of the completion of history and physical examinations during most MHCB admissions.  Descriptions of the inmate in the outpatient portion of the medical record included reports that he exhibited thought blocking, and that he was unable to maintain steady eye contact but would suddenly turn back with a "staring and angry look," as well as periods of elevated mood.  These descriptions were interspersed with reports that he admitted malingering.  He was repeatedly described as hypomanic and paranoid with behavioral examples provided throughout the medical record.

It appeared that the inmate was seen timely by his primary clinician and psychiatrist.  He was not seen timely by the IDTT.  Necessary IDTT documentation was not completed at any level of care (MHCB, EOP).

Findings

This inmate was inappropriately determined to be faking suicidal ideation, and was not appropriately considered for DMH referral. The treating staff did not always accurately identify that he met multiple indicators for DMH referral consideration. Proper IDTT documentation was not completed in the MHCB or EOP. Although he was appropriately placed at the EOP level of care, his diagnostic picture was clouded by very different perceptions of different providers. This inmate should have received an IDTT attended by all of these providers (whether in the MHCB or EOP) for diagnostic clarification and adequate treatment planning.

**Inmate H**

This EOP inmate arrived at CIM on 4/27/11 from DMH APP at CMF. He was admitted on 1/21/11 with a Keyhea order that had been initiated on 1/20/11 and granted on 2/24/11 for six months. At DMH, he was provided with diagnoses of Mood Disorder NOS, Polysubstance Dependence, and Borderline Personality Disorder. He was prescribed oral Haldol, Artane, Depakote, and Effexor with injectable medications ordered for medication refusal. The DMH discharge summary was present in the medical record; the reason for referral cited was self-injurious behavior. According to DMH, the inmate was a poor historian and had a history of reporting hallucinations despite no overt evidence of psychosis and engaging in self-injurious behaviors as both a coping mechanism and to seek attention. He was also described as posing high risk of self-harm due to impulsivity, mood instability, and frequent self-injury requiring medical intervention.

During his stay at DMH, he was reportedly assaultive toward an MTA on 1/25/11. He also covered his cell door window on multiple occasions. Although intermediate care was considered, the acute care staff indicated that his intermittent participation in groups made him better suited for the EOP level of care.

The inmate arrived at CIM on 4/27/11. A suicide risk evaluation was not completed until 5/10/11, but the inmate was seen by the psychiatrist on 5/1/11. It appeared that he may have been placed in the MHCB sometime after that encounter as there was documentation in the medical record of five-day follow-up that began on 5/11/11. Unfortunately, portions of the inpatient record were placed in an earlier volume of the chart and were not accessible at the time of the site visit.

Another MHCB admission occurred from 6/13/11 to 6/29/11 due to voices commanding the inmate to harm himself. An initial treatment plan without a Form 7388-B was located in the medical record, as well as a vague reference to a DMH ICF referral in a progress note, but there was no clear documentation that he was actually referred. A review of the DMH log indicated that he was referred on 6/28/11, but DMH had not accepted or rejected him to date. A subsequent MHCB stay from 7/13/11 to 7/27/11 for similar reasons resulted in an initial treatment plan which was completed on 7/14/11, but lacked individualization. A completed Form 7388-B was present. Suicide risk evaluations were also completed at the time of MHCB admission and discharge, but no subsequent treatment plans were located. The administrative segregation treatment plan completed on 5/18/11 was comprehensive and clinically relevant. Unfortunately, none of

311

the treatment plans that were completed after the inmate's return to CDCR incorporated any DMH data or recommendations.

<u>Findings</u>

This inmate was seen timely by psychiatry upon return from DMH, but he did not receive a suicide risk evaluation timely.  He was not seen by the IDTT timely, and treatment planning did not incorporate DMH recommendations for continuity.  Although he was ultimately referred to DMH ICF, he clearly should have been referred earlier.  In light of his history at DMH and documentation as to the need for additional treatment yet uncertainty as to the appropriate setting for such treatment, DMH should have been able to process this referral more quickly.

## Inmate I

This EOP inmate returned to CIM from SVPP ICF on 6/27/11; he was admitted there on 2/22/11.  Upon his arrival at CIM, he was placed in the MHCB on suicide precautions.  He paroled on 7/4/11, but returned to CIM on 7/11/11.  He had a prior SVPP admission from 12/30/08 to 6/22/09 with diagnoses of Cognitive Disorder due to multiple factors, Polysubstance Dependence in institutional remission, Mild Mental Retardation, and Antisocial Personality Disorder.  There was also reference to another hospitalization at Patton State Hospital.  The inmate had previously been on a Keyhea order which appeared to have expired in 2009.  At that time, he was provided with a diagnosis of Schizophrenia paranoid type.

The DMH discharge summary from 6/23/11 indicated that the inmate had multiple MHCB admissions for grave disability and poor activities of daily living with observations that he appeared to be responding to internal stimuli.  His discharge diagnoses were Schizophrenia paranoid type and Antisocial Personality Disorder.  The DMH documentation indicated that he was discharged because he had reached maximum benefit.  The fact that he paroled within days (7/4/11) was not mentioned in the discharge summary, and his participation and compliance in treatment was only described as fair.

Upon return to CIM, the inmate was described as malodorous.  His medications at the time of parole were Risperdal M-tabs, Abilify, and Vistaril.  A suicide risk evaluation was completed timely following return from DMH and at the time of MHCB admission and discharge.  An initial treatment plan dated 6/28/11 provided little relevant clinical information, and the Form 7388-B was completely blank.  There was no current treatment plan in the medical record even though psychiatry saw the inmate on 7/13/11.

<u>Findings</u>

This inmate did not have a timely IDTT or current treatment plan.  He was seen timely by mental health staff and was appropriately placed in the MHCB upon his return to CIM from DMH.  The DMH discharge summary was not clinically beneficial and indicated that he had received maximum benefit at DMH, although CIM staff clearly documented that this was not the case.  It was unclear if psychiatry staff had thoroughly addressed medication noncompliance as a possible reason for his continued low level of

functioning.  This inmate should have received an IDTT that focused on appropriate treatment and possible DMH placement in light of his chronic and severe symptoms.

**Inmate J**

This EOP inmate's care was reviewed because he had been identified as having multiple crisis bed placements, but had not been identified as meeting indicator five (multiple crises placements) on the Form 7388-B.  The inmate had crisis placements in March, April, May, June, and July 2011 yet an MHCB Form 7388-B dated 7/11/11 did not note the multiple crisis bed placements, nor did it address the multiple admissions in any way.  The most recent reception center EOP treatment plan in the medical record was dated 5/18/11 and did not include a Form 7388-B.  There were no updated treatment plans following other MHCB stays.  The May 7388 treatment plan listed the inmate's diagnosis as Mood Disorder NOS, and some individualized interventions were listed.  Suicide risk evaluations were completed appropriately during the MHCB stays and when indicated while the inmate was housed in the reception center.

The inmate was described in group notes as presenting with blunted or constricted affect, and left group early for a variety of reasons.  Following one MHCB stay, he reportedly told his primary clinician that he had not been truthful regarding his suicidal ideation; he admitted that he made the statements because he and his cellmate were having problems.  This statement appeared to color the clinician's judgment regarding all MHCB placements.  A progress note dated 7/18/11 indicated that the inmate reported that he had stopped his medications (Trilafon, Vistaril, and Remeron); a review of the medical record suggested that he was decompensating.  Despite these events, DMH referral did not occur.

Findings

This inmate's repeated MHCB admissions were not appropriately considered for treatment planning purposes, including possible DMH referral.  The inmate clearly met referral indicators, but staff failed to note that and failed to address the reasons for non-referral.  Treatment plans were not updated following the inmate's MHCB stays.  The inmate required another IDTT that thoroughly documented appropriate consideration of referral to higher levels of care and ongoing treatment.

**Inmate K**

This EOP inmate arrived at CIM on 3/23/11 and was identified for review because he had multiple crisis admissions but had not been identified as meeting indicator five of the Form 7388-B.  He had an MHCB admission during March 2011, two during May 2011, one during June 2011, and one during July 2011.  During his initial May admission, a treatment plan was completed, and a Form 7388-B was partially completed.  Despite the fact that MHCB staff seemed to doubt the sincerity of his stated suicidal ideation during both May 2011 admissions, he was described as exhibiting psychomotor retardation, slowed speech and recall, poor eye contact, flat affect, and tangential speech/thoughts.

313

The 7388 treatment plan dated 5/27/11 was not fully completed and was generic in its treatment interventions; furthermore, incorrect information was present on the Form 7388-B. The June 2011 treatment plan also included clinically inappropriate therapeutic interventions, although it included more appropriate problem areas. However, the Form 7388-B did not correctly note multiple crisis admissions. The 7388 treatment plan for the July 2011 admission was fairly consistent with prior treatment plans, but the Form 7388-B was appropriately completed and indicated positive DMH referral indicators.

However, the reasons for non-referral, which included impending parole and previous placement in the CTC, demonstrated confusion on the clinician's part as to referral indicators and appropriate placement. While initial treatment plans were located for all MHCB admissions, updated treatment plans were not completed. Suicide risk evaluations were completed at the time of MHCB admission and discharge. The inmate's most recent reception center EOP treatment plan of 7/14/11 was generic and included an incorrectly completed Form 7388-B that did not note his multiple crisis bed placements. The inmate was provided with a diagnosis of Schizoaffective Disorder bipolar type. He was prescribed Abilify, Thorazine, and Effexor.

Findings

It appeared that psychiatry and the primary clinician saw the inmate timely in the MHCB and EOP, but he was not seen timely by the IDTT in the MHCB. The inmate's treatment plans were also inadequate, as they did not address his primary symptomatology and recurrent crisis placements. The Form 7388-Bs were also not completed correctly. This inmate should have been considered for DMH level of care and should have received an individualized treatment plan with objective goals and specific interventions in order to reduce his MHCB use.

**Inmate L**

This administrative segregation inmate arrived at CIM on 3/22/11 and was determined not to require mental health services at that time despite a history of treatment at the 3CMS level of care. Despite documentation that no further referral was indicated, for unknown reasons, the inmate was seen by mental health staff on 3/25/11. At that time, he was identified as requiring services at the 3CMS level of care, although there were no corresponding placement chronos.

It appeared that he was soon placed in administrative segregation. He was provided with a diagnosis of Major Depressive Disorder recurrent. He was prescribed Paxil, Remeron, and Vistaril. Lithium was added to the medication regime in July 2011, and his diagnosis was changed to Bipolar Disorder. He was seen monthly by psychiatry and timely by the IDTT. Treatment plans were minimally adequate and did not address his refusal to participate in confidential clinical contacts. Neither treatment plan included Form 7388-B. He was not seen weekly by his primary clinician; there were multiple periods when he was not seen for two weeks. Primary clinician contacts appeared cursory in content, which was probably due to the occurrence of cell-front contacts.

<u>Findings</u>

The inmate was seen by psychiatry and the IDTT timely, but was not seen timely by his primary clinician.  The treatment plan and care provided to him were inadequate as they did not address his lack of participation in treatment or adequately address his symptoms.

EXHIBIT L
Richard J. Donovan Correctional Facility (RJD)
January 23, 2012 – January 26, 2012

**Inmate A**

This inmate's medical record was reviewed as he had three RVRs during the past six months.  A 10/8/10 mental health treatment plan listed his problems as paranoid behavior, delusional thinking, and refusal of psychological treatment.

A 5/24/11 problem list included depressed mood, somatic preoccupation, and methamphetamine abuse.  The inmate was serving a life sentence and was housed in general population.

Since at least July 2011, the inmate was housed in administrative segregation.  The primary clinician saw him weekly.  He continued to deny any mental health problems.

The 8/23/11 problem list included psychosis with auditory and visual hallucinations and substance abuse.  The inmate refused psychotropic medications.  A 10/15/11 treatment plan documented his denial of any history of mental health symptoms.  He continued to refuse any kind of mental health treatment.  It appeared that his symptomatology had changed little based upon the 11/29/11 treatment plan review.

On 8/23/11, he was changed from the 3CMS to the EOP level of care.  His diagnosis was changed to Psychotic Disorder NOS.  The primary clinician consulted with a supervisor on 9/6/11 as to recommendations to more successfully engage him in treatment.  A referral for a psychiatric evaluation was also scheduled, but the inmate refused to cooperate.  A 10/1/11 note indicated that DMH referral had been considered.

The primary clinician subsequently saw him on a regular basis, but he continued to deny any mental health problems.  It did not appear that further consideration as to DMH transfer had occurred.

<u>Findings</u>

This was a difficult diagnostic case, but it appeared that the inmate had symptoms of a psychotic disorder.  It was unlikely that a therapeutic alliance with him would occur based on his history during the past six months.  The inmate's transfer to DMH was clinically indicated.

**Inmate B**

This inmate was provided with diagnoses that included Major Depressive Disorder and Antisocial Personality Disorder.  A 7/22/11 treatment plan listed depression as his only problem.  On 9/22/11, he reported that he missed his medication (Remeron) due to being "harassed" by a correctional officer.

The psychiatrist saw the inmate on 10/11/11.  The primary clinician again referred him to the psychiatrist on 12/12/11 following a clinical encounter.  The psychiatrist increased the Remeron dose three days later.

Documentation indicated that he had continuing problems obtaining his HS medication.

317

<u>Findings</u>

Documentation indicated that, consistent with Program Guide requirements, the psychiatrist and primary clinician consistently saw the inmate.  However, medication management issues appeared to be present.

**Inmate C**

This EOP inmate was housed in the administrative segregation unit.  He had a long history of indecent exposure, sexual battery, and stalking behavior.  He was seen at cell front by his primary clinician on 8/3/11, but was uncooperative with the interview.  He was provided with diagnoses of Schizophrenia paranoid type and Antisocial Personality Disorder; a differential diagnosis of Mood Disorder was also present in the medical record.  He had received disciplinary infractions for sexual misconduct and two indecent exposure charges since January 2011.  He had not taken psychotropic medication since March 2011.

The inmate had a long history of mental health treatment including several DMH hospitalizations.  He reportedly had been selectively mute and had not spoken to staff for one year.

On 8/18/11, documentation indicated that he was housed in administrative segregation on indecent exposure status.  He was seen at cell front by a psychiatrist on 8/25/11.  Progress notes indicated that little change in his clinical presentation was noted during September 2011.  He was subsequently placed on the high risk list.  He refused an appointment with the psychiatrist on 9/9/11.

A 9/15/11 CDCR 115 mental health assessment indicated that the inmate had received a disciplinary infraction after he charged toward custody officers.  The assessment indicated that his mental disorder appeared to have contributed to the alleged behavior described in the RVR.  The clinician further noted that he had decompensated and likely was paranoid.

A subsequent progress note indicated very little change and was essentially an exact replica of the previous note.  A CDCR 115 mental health assessment on 10/10/11 indicated that, as per the psychiatrist, the inmate had been referred to DMH.  He was noted to be sporadically compliant with insulin and a Keyhea motion was initiated.

Record review indicated that an uncle reported that the inmate behaved in a sexually inappropriate manner when he was not taking his medications.  He was again determined to be exhibiting psychotic symptoms.  The Keyhea motion was granted on 10/25/11.

Documentation indicated that the inmate was prescribed Haldol, Risperdal, and Artane on 10/20/11.  Based on a 10/26/11 note, it appeared that he was improving.  He reportedly was pending transfer to DMH two days later.

The inmate had been housed in the CTC from 9/16/11 to 10/25/11.  He had been noncompliant with his diabetes treatment due to his psychotic illness.

During November 2011, he refused clinical contacts with his primary clinician.  These refusals continued through December 2011.  As of 12/30/11, his transfer to DMH was still pending.  He was subsequently admitted to DMH.

<u>Findings</u>

The inmate was ultimately transferred to the appropriate level of mental health care at DMH, but the process leading to DMH admission was prolonged.

**Inmate D**

This inmate's most recent treatment plan was dated 3/30/11.  Problems listed included mood disorder and substance abuse.  A psychiatrist's note dated 9/2/11 indicated that Cymbalta, Vistaril, and Abilify were continued for the treatment of diagnoses that included Mood Disorder NOS, Psychotic Disorder NOS, and Post Traumatic Stress Disorder.

Cymbalta was decreased on 9/12/11.  A 9/22/11 primary clinician note described the presence of auditory hallucinations and paranoid thinking.  The inmate's presentation was consistent with the diagnosis of Schizoaffective Disorder.  He declined to participate in group treatment.  The psychiatrist again saw him on 10/19/11, when Remeron was restarted.

A follow-up visit by the psychiatrist on 1/9/12 documented a diagnosis of Schizoaffective Disorder depressed type.  The inmate's medications were continued.  Documentation indicated that he continued to experience intermittent auditory hallucinations.  His primary clinician reported on his 1/20/12 visit that the inmate would continue participation in the 3CMS program.

<u>Findings</u>

This inmate was receiving mental health treatment that was consistent with Program Guide requirements, including frequency of clinical contacts, treatment planning, and medication management.

**Inmate E**

This 3CMS inmate was prescribed Geodon and Vistaril.  The most recent treatment plan was dated 3/23/11.  Problems listed included depression, anxiety, and substance abuse.

Progress notes written by the psychiatrist were dated 9/14/11, 10/19/11, and 1/12/12.  Primary clinician progress notes were dated 9/9/11 and 12/1/11.  Treatment issues included problems with the inmate's pacemaker, which medical staff addressed.

Findings

This inmate was seen timely by the primary clinician and psychiatrist. He appeared to be receiving mental health services at the appropriate level of care.

**Inmate F**

This inmate was selected for review because he had been identified for DMH referral but was not referred. A eUHR review revealed that there was no treatment plan corresponding to the date in the non-referral log. The inmate was varyingly provided with diagnoses of Depressive Disorder NOS and Major Depressive Disorder with psychosis. A Form 7388-B located in the medical record confirmed that he was positive for criterion eight as indicated by the non-referral log.

The inmate was prescribed Abilify, Remeron, and Buspar. Medical record documentation did not provide information to determine whether clinical contacts occurred in a confidential setting. The inmate did not attend group therapy, but participated in individual contacts with the primary clinician. The inmate's treatment plans were not appropriately modified based on his lack of therapeutic engagement and demonstrated symptoms.

Findings

This inmate did not receive clinically appropriate mental health treatment. Although it did not appear that he required DMH referral, treatment plan modification was indicated that focused on his increased depressive symptoms and failure to engage in treatment, likely secondary to the depression. The rationale provided for DMH non-referral was vague and inadequate.

**Inmate G**

This administrative segregation EOP inmate was selected for review because he was identified as meeting indicators six and nine, but was not referred to DMH. The non-referral log indicated that he had not been referred due to "calculated behaviors for secondary gain;" however, the actual Form 7388-B provided an alternative non-referral rationale that was appropriate and clinically-based.

The inmate received his psychotropic medications as the result of a Keyhea order due to dangerousness to self. He was alternatively provided with diagnoses of Schizophrenia paranoid type and Schizoaffective Disorder. He was prescribed Abilify and Vistaril; intramuscular injections were also ordered in the event of medication refusal. The primary clinician saw him timely. Documentation indicated that he was relatively stable, and his treatment participation appeared to increase after implementation of the Keyhea order. The most recent treatment plan provided little clinically relevant information, with the exception of a listed intervention of sleep hygiene.

320

Findings

This inmate was appropriately not referred to DMH.  The non-referral log did not accurately document the reason for non-referral.  The most recent treatment plan required modification for increased individualization.

**Inmate H**

This SNY EOP inmate was provided with diagnoses of Major Depressive Disorder and Polysubstance Dependence.  He was prescribed Thorazine, Abilify, Remeron, and Zoloft.  The IDTT saw him timely during the monitoring period.  The treatment plan included goals that focused on depressive symptoms, sleep difficulties, and parole planning, but treatment plan interventions were nonspecific and not individualized.  A Form 7388-B was completed.

A review of treatment plans revealed that there was little change in the plans or in the descriptions of the inmate's mental status examinations over time.  A Form 7388-B from the November 2011 treatment plan indicated that he met indicator eight, but was appropriately not referred to DMH based on the clinically justified rationale provided.  The inmate's most recent treatment plan, which was completely identical to the two preceding plans, included a Form 7388-B that noted indicator eight as positive, but did not include a clinically adequate rationale for DMH non-referral.

Documentation as to group therapy provided little relevant clinical information beyond the inmate's group attendance.  Progress notes stated that he was relatively stable, but did not clearly indicate progress toward treatment goals; there was, however, information as to pre-release planning.  The primary clinician and psychiatrist saw the inmate timely.  The psychiatrist provided diagnoses of Psychotic Disorder NOS and Depressive Disorder NOS; these diagnoses were more consistent with the medication management provided than the previous diagnoses provided by the IDTT.  However, it was unclear why the IDTT had not resolved the differential diagnoses.

Findings

While psychiatry and the primary clinician saw the inmate timely, documentation of primary clinician contacts did not indicate that the treatment provided was consistent with treatment plan goals, beyond minimal pre-release planning.  There also appeared to be a lack of communication between the psychiatrist and the remainder of the IDTT as to diagnostic considerations.  The treatment plan was generic, nonspecific, and did not change over time regardless of changes in the clinical presentation.  Finally, two of the three Form 7388-Bs reviewed were incorrectly completed or included an inadequate non-referral rationale.  Despite this, the inmate was appropriately not referred to DMH.

**Inmate I**

This SNY EOP transgendered inmate was provided with diagnoses of Major Depressive Disorder, Polysubstance Dependence, Gender Identity Disorder, Bereavement, and

Borderline Personality Disorder.  He was prescribed hormonal therapy, Vistaril, and Effexor.

A July 2011 treatment plan included a Form 7388-B that indicated that he met indicator four for DMH referral consideration.  However, the rationale provided for non-referral was inadequate.  The subsequent August 2011 treatment plan, Form 7388-B, and mental status examination remained essentially the same as the preceding forms.  The next IDTT occurred in October 2011; interventions and goals again remained nonspecific and repetitious.  The October IDTT indicated that the inmate did not meet any criteria for DMH referral consideration.

Group progress notes primarily provided information as to the inmate's group attendance. Progress reports indicated that he struggled with issues related to being pressured sexually, depression, and grief.  It was unclear from the progress notes whether or not these issues were addressed.  The psychiatrist, primary clinician, and IDTT saw the inmate timely.

Findings

The inmate was appropriately placed in the EOP.  The mental health care provided did not appear to be clinically adequate in light of the symptoms described in documentation. Documentation was also poor, particularly for treatment plans, which were generic and repetitive despite significant events such as MHCB admission.

**Inmate J**

This reception center EOP inmate was seen by the IDTT on 1/5/12.  He was provided with diagnoses of Adjustment Disorder unspecified and Antisocial Personality Disorder; a differential diagnosis of Mood Disorder NOS was also under consideration.  The inmate also had a seizure disorder that was minimally controlled with medications.

The Form 7388-B indicated that no indicators for DMH referral consideration had been met.  The inmate was seen by psychiatry and had not been evaluated for psychotropic medications.  A mental health evaluation was not located in the eUHR at the time of the monitoring visit.  Progress notes indicated that the inmate exhibited no symptoms beyond anxiety and possibly some depression related to his seizure disorder, and irritability as a result of his EOP placement.  The inmate repeatedly requested removal from the EOP.

Findings

This inmate was placed in the reception center EOP for unclear reasons.  There was no initial mental health evaluation located in the eUHR.  The initial treatment plan did not indicate a clinical rationale for EOP placement, and the interventions listed were clinically inadequate.  Progress notes merely indicated the inmate's request to be removed from the EOP and seemed to support that removal without indicating an appropriate clinical plan.  The inmate should have received a proper evaluation, assessment of his level of care, and should have been returned to the IDTT to resolve these issues.