PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
ALISON HARDY, Bar No. 135966
SARA NORMAN, Bar No. 189536
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
ERNEST GALVAN, Bar No. 196065
LISA ELLS, Bar No. 243657
AARON J. FISCHER, Bar No. 247391
LAURA BOYSEN-ARAGON, Bar. No. 248083
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br>　　vs.<br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　Defendants | No. Civ S 90-0520 LKK-JFM P<br>**THREE-JUDGE COURT**<br><br>**PLAINTIFFS' RESPONSE TO AUGUST 3, 2012, ORDER REQUIRING FURTHER BRIEFING** |
| MARCIANO PLATA, et al.,<br><br>　　　　Plaintiffs,<br>　　vs.<br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　Defendants | No. C01-1351 TEH<br>**THREE-JUDGE COURT** |

Plaintiffs submit this response to the Court's August 3, 2012, Second Order Requiring Further Briefing.

**A. Threshold Legal Questions**

*1. "First, what is the legal basis for the motion to modify, i.e., will the motion be predicated on 18 U.S.C. § 3626(b)(4) and Federal Rule of Civil Procedure 60(b)(5), or will it be predicated on some other provision of law and, if so, what provision? Relatedly, what legal standards will govern the Court's resolution of such a motion?"*

Defendants announced in April that they were going to move to modify the injunction at some unknown future date based on changed circumstances that have not yet occurred. Until Defendants actually file the motion, Plaintiffs cannot adequately answer the Court's questions about the legal basis and governing legal standards. The basic standards for modifying an injunction are set forth below. Plaintiffs reserve the right to more fully address the legal standards when the motion is filed.

Under the Prison Litigation Reform Act, a party is permitted to seek "modification or termination" of prospective relief "to the extent that modification or termination would . . . be legally permissible." 18 U.S.C. § 3626(b)(4). Federal Rule of Civil Procedure 60(b)(5) permits a party to obtain relief from a judgment or order if "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." A party seeking relief pursuant to Rule 60(b)(5) bears the burden to show that modification is warranted. *See Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992). A party making a motion to modify must make, at a minimum, the following showings:

First, the party seeking modification has the "initial burden" of "showing a significant change either in factual conditions or in law." *Rufo*, 502 U.S. at 384. The changes to the factual or legal landscape must be so significant as to demonstrate that the fully adjudicated facts forming the basis of the existing injunction no longer apply, *see Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000) (affirming denial of defendants' motion to dissolve injunction, applying *Rufo*, based on continuing constitutional deficiencies and defendants' history of noncompliance), or would make compliance with that order more onerous, unworkable, or

1

detrimental to the public interest. *See U.S. v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005). Second, the moving party must show that "the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 391. Modification of an existing injunction "must not create or perpetuate a constitutional violation." *Id.*; *see also Horne v. Flores*, 557 U.S. 433, 450 (2009) ("federal courts must vigilantly enforce federal law").

> 2. *"Second, is the proposed motion predicated on changed circumstances that were not anticipated at the time the order was entered, see, e.g.,* Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383-85 (1992), and, if so, what are those unanticipated changed circumstances? Or, instead, will the motion involve, as defendants' represent in their June 22, 2012 Response, litigating "whether a population density of 145% prohibits Defendants from providing constitutionally adequate care"? Defs.' Response at 2. If the latter, how does that question differ from questions already litigated and decided by this Court in its August 4, 2009 opinion and order and how, if at all, do principles of* res judicata *affect the Court's consideration of such a motion?"*

Not having seen Defendants' motion, Plaintiffs are unable to answer whether the motion will be based upon changed circumstances, and if so, what Defendants will allege are the operative changed circumstances. At this time, Defendants have not yet achieved a constitutionally adequate health care system, and they apparently agree that the constitutional violations will remain when the system is crowded at 145% of capacity.

If Defendants' motion does not assert changed circumstances, and instead seeks to re-litigate whether 137.5% or 145% is the appropriate crowding cap, that matter has already been decided. This Court considered and rejected the contention that adequate care could be provided at 145% of capacity: "Plaintiffs' experts convincingly demonstrated that, in light of the wardens' failure to consider the provision of medical and mental health care to California's inmates and in light of their reliance on maximum operable capacity, which does not consider the ability to provide such care, the Panel's 145% estimate clearly exceeds the maximum level at which the state could provide constitutionally adequate medical and mental health care in its prisons." Aug. 4, 2009 Opinion & Order at 129 (*Plata* Dkt No. 2197). *See also id.* at 119 ("Although we believe that plaintiffs' request for a cap of 130% is reasonable and finds considerable support in the record, there is some evidence that a reduction in the population to a level somewhat higher than 130% of the system's design capacity but lower than 145%

might provide the relief from overcrowding necessary for the state to correct the constitutional violations at issue.").[1]

At the time of the August 4, 2009, Order, the Court well understood that "improvements [to Defendants' medical and mental health system] have been and continue to be made," and that the "*Plata* and *Coleman* courts have continued their efforts during this three-judge court proceeding" to achieve a remedy to the constitutional violations. Aug. 4, 2009 Opinion & Order at 109-10. Even with these improvements, the Court found that "it is clear that the Receiver and the Special Master cannot remedy the constitutional violations in the absence of a prisoner release order," and that capping crowding at 137.5% of capacity was necessary to remedy the violations. *Id.* at 110, 120.

The Supreme Court affirmed, holding that:

> There are [] no scientific tools available to determine the precise population reduction necessary to remedy a constitutional violation of this sort. The three-judge court made the most precise determination it could in light of the record before it. The PLRA's narrow tailoring requirement is satisfied so long as these equitable, remedial judgments are made with the objective of releasing the fewest possible prisoners consistent with an efficacious remedy. In light of substantial evidence supporting an even more drastic remedy, the three-judge court complied with the requirement of the PLRA in this case.

*Brown v. Plata*, 131 S.Ct. 1910, 1945 (2011).

The doctrine of *res judicata* precludes Defendants from relitigating such matters, or any

---

[1] Defendants' own assessment found that "housing prisoners at 145% design capacity 'does not meet federal guidelines nor national standards,'" and that prison overcrowding at 145% capacity would do no more than "begin to moderate and control the department's overcrowding practices." Aug. 4, 2009 Opinion & Order at 127; *see also id.* (noting recommendation of head of Governor's Facilities Strike Team to achieve 130% cap).

other matter already decided.[2]

*Res judicata* principles underlie the Rule 60(b)(5) requirement that a party show a significant change in factual conditions or in law to obtain modification of an existing order. "Rule 60(b)(5) may not be used to challenge the legal conclusions on which a prior judgment or order rests." *Horne*, 557 U.S. at 447 (citing *Rufo*, 502 U.S. at 384); *see also Schildhaus v. Moe*, 335 F.2d 529, 530-31 (2d Cir. 1964) ("A Rule 60(b)(5) motion . . . does not permit relitigation of the merits of the underlying dispute."); *Sys. Fed'n No. 91 Ry. Employees' Dep't v. Wright*, 364 U.S. 642, 647 (1961) ("Firmness and stability must no doubt be attributed to continuing injunctive relief based on adjudicated facts and law, and neither the plaintiff nor the court should be subjected to the unnecessary burden of re-establishing what has once been decided").

3. How, if at all, does the quoted language from the Supreme Court's decision "support consideration of a modification from 137.5% to 145%, rather than solely consideration of whether to extend or modify the timeline for compliance with the existing population reduction order?"

This Court correctly notes that the Supreme Court's coda, which confirms courts' well-established authority and responsibility to consider future modifications to prospective relief, focuses on the possible appropriateness of modifying the timeline to achieve the ordered population reduction, *not* the level of population reduction itself. The quoted language refers to a motion to "extend or modify th[e] timeline" for population reduction. *Plata*, 131 S.Ct. at 1947. The surrounding paragraphs in the decision further demonstrate that the Supreme Court was suggesting that the State may move to modify the *timeline* if it could show that such

---

[2] *Res judicata* refers to the broad family of finality doctrines that includes preclusion of factual and legal issues that have already been decided (issue preclusion via collateral or direct estoppel), and preclusion of claims that could have been brought but are merged into a final judgment (claim preclusion or *res judicata* in the narrow, traditional sense). *See* 18 Wright, Miller & Cooper, *Federal Practice & Procedure*: Jurisdiction 2d § 4402 (2002). Rule 60(b)(5) creates an exception to *res judicata* for the limited purpose of allowing modification of a judgment based on changed circumstances. *See Bellevue Manor Assocs. v. United States,* 165 F.3d 1249, 1252 (9th Cir. 1999). As discussed in the cases cited above in the text, however, this limited exception allows the court to consider whether the continued application of the relief is equitable based on changed circumstances, not to re-open the issues already litigated that led to the prospective relief. *See* 11 Wright, Miller & Kane, *Federal Practice & Procedure*: Civil 2d § 2863 at 340 (1995) ("[Rule 60(b)(5)] does not allow relitigation of issues that have been resolved by the judgment.").

modification was warranted. *See id.* ("The State may wish to move for modification of the three-judge court's order to extend the deadline for the required reduction . . ." and describing the showing that may be required to warrant any such extension of time).

The Supreme Court of course recognized that Defendants may "suggest other modifications" to the Court's order. *Plata*, 131 S. Ct. at 1947. What the Supreme Court's carefully worded decision makes clear, however, is that this Court's finding that the prison population must be capped at 137.5% design capacity "is supported by the record," *id.* at 1944, and that there is "substantial evidence supporting an even more drastic remedy," *id.* at 1945. The decision does not support defendants' motion to increase the crowding cap. Such a modification would be inconsistent with providing *Coleman* and *Plata* class members a timely and efficacious remedy to the identified constitutional violations.

**Factual Questions**

1. *"First, how would the Court's determination of the threshold legal questions above affect the parties' assessments of when discovery should begin and how much time should be required for factual and expert discovery, depositions, and briefing? For example, if the proposed motion is predicated on changed circumstances that were not anticipated at the time the order was entered, must, as the defendants suggest, the prison population reach 145% in order for defendants to make the necessary showing in support of their motion to modify?"*

If Defendants' motion is based upon a contention that circumstances have now changed such that modification is warranted, then discovery – including expert prison visits – should commence immediately.

If, however, Defendants do *not* contend that circumstances have changed already, but instead claim that circumstances *might* change at some later date such that modification *could* then be warranted, then the matter is at this point too speculative to begin expert discovery.

In light of Defendants' claim that their motion will be based on expert testimony about prison conditions, it would be beneficial for both parties' experts to review prison conditions during the same timeframe. Once Defendants determine that they are ready to assert changed circumstances, Plaintiffs must be given sufficient time to identify and retain appropriate experts. But before Plaintiffs can do so, they need more information about the nature of

5

Defendants' motion (and, thus, the expertise required to oppose Defendants' motion). Accordingly, Defendants must be required to identify their expert(s) and the subject matter about which they will testify at least one month before the expert evaluations commence.

Plaintiffs expect that once all experts are identified, it will take approximately three months for the experts to review prison conditions and draft reports. Following completion of reports, the parties will need to review the reports and take depositions of the experts, which will likely take up to six weeks to complete.

Even if expert discovery is delayed, Plaintiffs should still be allowed to begin discovery now into background factual matters such as 1) Defendants' past and current population projections, including information related to when Defendants first became aware that the "realignment" legislation would not accomplish the full population reduction required by the Court; 2) Prison population reduction measures that the State could employ to ensure full compliance with the crowding reduction order, including the types of population reduction methods available, the timing of implementation of such methods, and the underlying data necessary to evaluate the outcome of such methods. There is no need to delay discovery on these factual matters, because Defendants have stated with certainty that they plan to move to modify the crowding cap. Starting discovery now on background factual matters will enable the parties to concentrate on expert evaluations of current prison conditions at the appropriate time.

Accordingly, the Court should adopt Plaintiffs' proposed schedule, as follows:

1) Open fact discovery immediately.

2) December 14, 2012: Defendants identify their expert(s), including the subject matter on which the witness is expected to present evidence.

3) January 14: Plaintiffs identify their expert(s).

4) April 15: Expert reports due.

5) May 30: Expert deposition cut-off.

6) July 1: Motion to modify due.

7) August 1: Opposition due.

6

8) August 15: Reply brief due.

9) [Court to set]: Hearing on motion to modify.

[Hearing may take 2-4 days, depending on nature of evidence to be presented]

2. *"Second, do defendants still expect the prison population to reach 145% by December 2012, even though the current prison population, as of the July Status Report, is 2.4% greater than was predicted by the Spring Population Projections on which the 145% expectation was based? If not, what is their revised prediction for when the prisoner population will reach 145%?"*

Defendants are already falling behind on their projected population reduction.

Defendants contend that population "[p]rojections are inherently speculative." Defs.' Opp. to Pltfs.' Mot. at 3 (Feb. 27, 2012, *Plata* Dkt No. 2423). And as this Court noted in its August 3, 2012, Order, that has proven to be true.

In April Defendants projected that by June 27, 2012, the prisons would house 118,979 prisoners, and be crowded at 149.2% of capacity.[3] Defendants now concede, however, that on June 27, 2012, the prisons actually housed 120,946 prisoners, and were crowded at 151.6% of capacity. Def.' July 2012 Status Report, Exh. A (*Plata* Dkt No. 2454-1).[4]

And while in April Defendants said that the population would be at 145% of capacity by December 27, 2012, this week Defendants told the court that the in-prison population "will be reduced to 147% of design capacity" by that date. Defs.' Aug. 2012 Status Report at 1 (*Plata* Dkt No. 2461).

There are two implications to be drawn from the inaccuracies in Defendants' projections: First, if Defendants contend that they need to wait until the population is 145% of capacity before beginning their investigation into a possible modification motion, then they may need to wait well into next year before starting such discovery. As a result, it is ever more likely that Defendants' motion will not be heard or resolved before the June 2013 crowding

---

[3] Defendants cited to the Court their "blueprint" plan, now enacted to law, entitled "The Future of California Corrections," and available at http://www.cdcr.ca.gov/2012plan/index.html. The blueprint, at Appendix G, includes the above-cited population projection for June 27, 2012.

[4] Plaintiffs' earlier analysis showed that Defendants' population projections may have underestimated the June 2013 population by between 2900 and 6600 prisoners. Austin Decl. in support of Pltf.s' Mot. for Order Requiring Defs. to Demonstrate How They Will Achieve Required Pop. Reduction at 5 (May 9, 2012, *Plata* Dkt No. 2435-1).

7

reduction deadline. Second, the fact that the population is higher than Defendants expected makes it even more important that the State's plans to comply with the crowding reduction order take into account changing population trends.

Thus, this Court should order Defendants to submit a plan by which they can reduce crowding to 137.5% of capacity by June 27, 2013, and Defendants should be required to update their plan quarterly based on new population data and projections, to ensure that they remain on-track to comply with the Court's crowding reduction order.

3. "*Third, if the Court ordered defendants 'to begin without delay to develop a system to identify prisoners who are unlikely to reoffend or who might otherwise be candidates for early release,'* Plata*, 131 S. Ct. at 1947, by what date would they be able to do so and, if implemented, how long would it take before the prison population could be reduced to 137.5%? By what other means could the prison population be reduced to 137.5% by June 27, 2013? Alternatively, what is the earliest time after that date that defendants contend they could comply with that deadline?*"

The Court has already ordered Defendants to "take all steps necessary to comply with the Court's June 30, 2011 order, including the requirement that the prison population be reduced to 137.5% by June 27, 2013." Aug. 3, 2012 Order at 4. Yet Defendants acknowledge that they will not reduce crowding to 137.5% by June 2013, and in their most recent report to the Court they nonetheless state that "there is no need at this time to undertake additional crowding-reduction measures to achieve compliance." Defs.' Aug. 2012 Status Report at 1 (*Plata* Dkt No. 2461).

Defendants no longer have an excuse for failing to develop appropriate population reduction measures. Defendants already have a system for identifying prisoners unlikely to reoffend. They categorize all prisoners by risk level. *See* Austin Decl., ¶ 8 (May 9, 2012, *Plata* Dkt No. 2435-1). Thus, it should take no more than 30 days for Defendants to develop a system to identify low-risk prisoners for "early release," or for enhanced good time credits.

Plaintiffs have previously shown that the State has at its disposal additional means for reducing the prison population, including expanded good time credits, and both this Court and the Supreme Court have found that such measures can be implemented such that there would be no adverse impact on public safety. *Plata*, 131 S.Ct. at 1943.

Good time credits, if implemented retroactively, can have an immediate and substantial impact on the prison population. *See, e.g.,* Austin Decl., ¶¶7-9 (May 9, 2012, *Plata* Dkt No. 2435-1); Austin Aug. 15, 208 Decl., ¶¶ 62-76.[5] Similarly, Defendants could make their "realignment" legislation retroactive, immediately shifting out of prison those individuals who would have been eligible to be held in the county had they been sentenced after realignment was implemented. Together, these measures could fully accomplish the court-ordered crowding reduction. The State has announced its intent to return all prisoners from out-of-state prisons, which will increase crowding in the 33 in-state prisons; if the state follows through on this plan, it will need to adopt further crowding-reduction measures. Additional measures, including robust implementation of the State's Alternative Custody Program, commuting the sentences of prisoners with ICE holds (who are due to be deported upon completion of their sentences), and sending select prisoners to county facilities for the last 60 days of their sentences (Cal. Penal Code § 4115.56(a)), are also available.

The Governor's Prison Overcrowding State of Emergency remains in effect, giving the Governor authority to take immediate steps to reduce crowding or release prisoners without further action from the Legislature or the Court. Cal. Gov't Code § 8658 ("In any case in which an emergency endangering the lives of inmates of a state, county, or city penal or correctional institution has occurred or is imminent, the person in charge of the institution may remove the inmates from the institution. He shall, if possible, remove them to a safe and convenient place and there confine them as long as may be necessary to avoid the danger, or, if that is not possible, may release them. . . ."); *id.* at § 8571 (under state of emergency, Governor may "suspend any regulatory statute, or statute prescribing the procedure for conduct of state business, or the orders, rules, or regulations of any state agency . . ."); *id.* at § 8627 (under state of emergency, Governor has "complete authority over all agencies of the state government and the right to exercise . . . all police power vested in the state by the Constitution and laws of the State of California . . .").

---

[5] The size of that impact will depend on how many prisoners are eligible for such credits, and the amount of days of credit awarded.

Dated: August 17, 2012

Respectfully submitted,

/s/ *Rebekah Evenson*

Rebekah Evenson
PRISON LAW OFFICE
Attorneys for Plaintiffs

Respectfully submitted,

/s/ *Michael W. Bien*

Michael W. Bien
ROSEN BIEN GALVAN&
GRUNFELD
Attorneys for *Coleman* Plaintiffs