KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 703-3035
  Fax: (415) 703-5843
  E-mail: Patrick.McKinney@doj.ca.gov
*Attorneys for Defendants*

Hanson Bridgett LLP
JERROLD C. SCHAEFER, State Bar No. 39374
PAUL B. MELLO, State Bar No. 179755
WALTER R. SCHNEIDER, State Bar No. 173113
SAMANTHA D. WOLFF, State Bar No. 240280
  425 Market Street, 26th Floor
  San Francisco, California 94105
  Telephone: (415) 777-3200
  Fax: (415) 541-9366
  E-mail: pmello@hansonbridgett.com

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>        Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>        Defendants. | 2:90-cv-00520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| **MARCIANO PLATA, et al.,**<br><br>        Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>        Defendants. | C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**DEFENDANTS' RESPONSE TO AUGUST 3, 2012 SECOND ORDER REQUIRING FURTHER BRIEFING** |

**TABLE OF CONTENTS**

Page

Introduction. ................................................................................................................................ 1

Defendants' Responses to the Court's Threshold Legal Questions ............................................ 2

    I.    Rule 60(b)(5) Requires the Court to Modify the Population Reduction Order If the Facts Have Changed Sufficiently From Those That Justified Entry of the Order. ........................................................................................................ 2

    II.    Defendants' Contemplated Modification Motion Will Be Based on the Significant Changed Circumstances That Will Show That a Population Density of 145% Will Not Prohibit Defendants From Providing Constitutionally Adequate Care. ................................................................................ 3

        A.    Neither Rule 60(b)(5) Nor Supreme Court Precedent Require That Changed Circumstances Be Unanticipated at the Time the Order Was Entered. .............................................................................................. 6

        B.    The Contemplated Modification Proceedings Do Not Implicate Principles of Res Judicata. .................................................................... 7

    III.    The United States Supreme Court Instructed the Three-Judge Court to Consider Requested Modifications to the Population Reduction Order. ................. 8

Defendants' Responses to the Court's Factual Questions .......................................................... 9

    I.    It Is Premature to Commence Modification Proceedings Until the Prison Population Reaches 145%. ..................................................................................... 9

    II.    Defendants Anticipate that the In-State Prison Population Density Will Be Reduced to 145% in or Near March 2013 ........................................................... 10

    III.    Any Prisoner Release Order Must Be Supported By Current Findings that Crowding Is the Primary Cause of the Violation of a Federal Right and that No Other Relief Will Remedy the Violation of the Federal Right. ...................... 11

        A.    A Prison Release Order Is Not Warranted. ............................................... 11

        B.    The Court Should Not Interfere with the State's Plan to Effectively and Efficiently Manage CDCR Post Realignment. ................................... 12

Conclusion ................................................................................................................................ 13

i

Defendants' Response to August 3, 2012 Second Order Requiring Further Briefing
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Frew v. Hawkins*
  540 U.S. 431 (2004) .................................................................................................... 2, 3, 8

*Gonzalez v. Crosby*
  545 U.S. 524 (2005). ........................................................................................................ 7

*Horne v. Flores*
  557 U.S. 433 (2009) .............................................................................................. 3, 6, 7, 8

*Miller v. French*
  530 U.S. 327 (2000) .......................................................................................................... 7

*Plata v. Brown*
  131 S. Ct. 1910 (2011) ............................................................................................. passim

*Rufo v. Inmates of the Suffolk County Jail*
  502 U.S. 367 (1992) ...................................................................................................... 3, 7

**STATUTES**

United States Code, Title 18
  § 3626(a)(1)(A) ................................................................................................................ 3
  § 3626(a)(3)(E) ............................................................................................................... 12
  § 3626(b)(4) ...................................................................................................................... 2

**CONSTITUTIONAL PROVISIONS**

United States Constitution
  Eighth Amendment .......................................................................................................... 6

**COURT RULES**

Federal Rule of Civil Procedure
  Rule 60(b)(5) ........................................................................................................... passim

ii

Defendants' Response to August 3, 2012 Second Order Requiring Further Briefing
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

# INTRODUCTION.

Significant changes have occurred since this Court entered its population reduction order. The population has dropped by over 24,000 inmates since October 2011 when public safety realignment went into effect, by nearly 31,000 inmates since the Court issued its order, and by nearly 42,000 inmates since 2006 when Plaintiffs moved to convene the three-judge court. Moreover, significant accomplishments have transformed the health care system, and progress continues to be made.[1]

The unprecedented population reduction has provided California an historic opportunity to create not just a less-crowded prison system, but one that is safer, less expensive, equipped to continue to provide constitutionally adequate health care, and better promote rehabilitation. In April, the State released a plan (commonly called the Blueprint) that clearly and comprehensively describes how CDCR will substantially comply with this Court's mandate and achieve better correctional objectives – all while spending as few taxpayer dollars as possible. The Blueprint, which was adopted by the Legislature and is now being implemented, ensures that the State will continue to provide constitutionally adequate health care to inmate-patients by increasing treatment, bed, and staffing capacity.

Federal Rule of Civil Procedure 60(b)(5) requires federal courts to modify injunctive orders if changed factual circumstances make continued prospective enforcement of the order inequitable. In this case, the United States Supreme Court held that "the three-judge court's order, like all continuing equitable decrees, must remain open to appropriate modification." *Plata v. Brown*, 131 S. Ct. 1910, 1947 (2011). The Supreme Court recognized that appropriate modifications include amendments to the population reductions originally ordered by the Court. *Id.* at 1923, 1937 & 1941.

Based on the unprecedented population reduction, systemic health care improvements, and Defendants' effective and efficient post-realignment management plan, Defendants believe that continued enforcement of the population reduction order will be unnecessary and legally

---

[1] For example, Defendants have demonstrated success in the *Perez* dental care class action and, on August 16, 2012, the parties stipulated to dismiss the case.

1

1  inappropriate once the population density reaches 145%.[2]  Rule 60(b)(5) does not require that
2  changed factual circumstances were unanticipated at the time the Court entered its order.
3  Similarly, res judicata principles are inapplicable, particularly in light of the Supreme Court's
4  acknowledgement of this Court's "continuing duty and responsibility to assess the efficacy and
5  consequences of its order." *Plata*, 131 S. Ct. at 1945. The significant changes that have occurred
6  since entry of the order are precisely the changed factual circumstances that warrant Rule
7  60(b)(5) relief.

Although circumstances could change that would affect the timing of the modification motion, Defendants currently estimate that the prison population will reach 145% sometime between February and the end of March 2013. It does not make sense for expert inspections to begin until the population has actually dropped to the level that will be targeted in the modification motion. Expert investigation and discovery proceedings should not commence until the end of March 2013, which means that modification proceedings would not be resolved until a month or two after the June 2013 target date. Accordingly, compliance with the June 2013 population target should be suspended until the contemplated motion is decided.

## DEFENDANTS' RESPONSES TO THE COURT'S THRESHOLD LEGAL QUESTIONS

### I.  RULE 60(b)(5) REQUIRES THE COURT TO MODIFY THE POPULATION REDUCTION ORDER IF THE FACTS HAVE CHANGED SUFFICIENTLY FROM THOSE THAT JUSTIFIED ENTRY OF THE ORDER.

Defendants' contemplated modification motion will be based on Federal Rule of Civil Procedure 60(b)(5) and the Prison Litigation Reform Act (PLRA), including 18 U.S.C. § 3626(b)(4), which require the Court to apply the following legal standards:

Rule 60(b)(5) permits a party to obtain relief from an order or proceeding if, among other things, "the judgment has been satisfied . . . or applying it prospectively is no longer equitable." Fed. R. Civ. Proc. 60(b)(5). "The Rule encompasses the traditional power of a court of equity to modify its decree in light of changed circumstances." *Frew v. Hawkins*, 540 U.S. 431, 441 (2004); *see also Plata*, 131 S. Ct. at 1945 ("A court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the

---

[2] All percentages refer to prison design bed capacity.

2

Defendants' Response to August 3, 2012 Second Order Requiring Further Briefing
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

continuing duty and responsibility to assess the efficacy and consequences of its order."). Relief under Rule 60(b)(5) is appropriate upon a showing of "'a significant change either in factual conditions or law.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 384 (1992)). "[O]nce a party carries this burden, a court abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'" *Horne*, 557 U.S. at 447 (quoting *Agostini v. Felton*, 521 U.S. 203, 215 (1997)).

Because institutional reform decrees such as the population reduction order "raise sensitive federalism concerns," *Horne* and *Rufo* require federal courts to engage in a broad and flexible Rule 60(b)(5) analysis as to whether changed circumstances warrant relief. *Horne*, 557 U.S. at 448, 450; *Rufo*, 502 U.S. at 381. The flexible approach requires a federal court "to return control to state and local officials as soon as a violation of federal law has been remedied . . . ." *Horne*, 557 U.S. at 450-51; *see also Frew*, 540 U.S. at 442. "If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Horne*, 557 U.S. at 450; *see also* 18 U.S.C. § 3626(a)(1)(A) (court-ordered relief "shall extend no further than necessary to correct the violation of a federal right of a particular plaintiff or plaintiffs").

## II. DEFENDANTS' CONTEMPLATED MODIFICATION MOTION WILL BE BASED ON THE SIGNIFICANT CHANGED CIRCUMSTANCES THAT WILL SHOW THAT A POPULATION DENSITY OF 145% WILL NOT PROHIBIT DEFENDANTS FROM PROVIDING CONSTITUTIONALLY ADEQUATE CARE.

Defendants will base the contemplated modification motion on the significant factual changes resulting from systemic medical and mental health care improvements and the reduced prison population. As stated in Defendants' response to the June 7 order, these changed circumstances will support a finding that a population density of 145% does not prohibit Defendants from providing constitutionally adequate care.

The trial that supported the Court's 137.5% finding commenced on November 18, 2008. (8/4/09 Order, Dkt. Nos. 2197/3641, at 49.) The evidence considered by the Court is at least four years old, and circumstances have changed substantially since that time, and continue to improve. The changed circumstances that will support Defendants' contemplated motion include without limitation the following:

3

1      Realignment has dramatically reduced the population in the State's 33 institutions.
2 Currently the population has reached 120,139 inmates, but will be smaller by the time the
3 contemplated modification proceedings begin. (Decl. Ross Meier Supp. Response ¶ 3.)
4 Currently, there has been a reduction of 24,049 inmates since October 1, 2011, when California's
5 historic public safety realignment was implemented, and a reduction of 30,897 inmates since
6 when the Court issued its population reduction order. (*Id.* at ¶ 2; *see also* Dkt. Nos. 2461/4222.)
7      This population decrease has improved the quality of medical care, including access to
8 medications and physicians. (5/7/12 Decl. Martin Hoshino, *Plata* Dkt. No. 2434, ¶ 4.)
9 Defendants eliminated thousands of makeshift beds in gymnasiums and dayrooms approximately
10 six months ago. (*Id.*) These and other improvements are reflected in the Office of Inspector
11 General medical inspection scores, which have risen to 80.6% system wide. (7/20/12 Hoshino
12 Decl., *Plata* Dkt. No. 2458, ¶ 3, Ex. 2.) Five institutions have been inspected during Cycle Three,
13 and their average score is 83.0%. (*Id.*) Moreover, as crowding has declined, violent in-prison
14 incidents have decreased. (Meier Decl., ¶ 2.) The number of large-scale disturbances, which
15 disturb orderly prison operations and inmate care, is also declining. (*Id.*)
16      On July 13, 2012, the *Coleman* Court issued an order commending the parties and the
17 special master for the remarkable accomplishments to date in addressing access to inpatient health
18 care. (*Id.* ¶ 4, Ex. 3.) Defendants have implemented a process for systemically managing
19 referrals to higher levels of care that is operable and sustainable, which has essentially eliminated
20 the wait lists for inmate-patients needing intermediate and acute care. (*Id.*) At the most recent
21 status conference, the Court stated:

22
> I believe we are seeing something I have not seen in the 26 years
> that I've been doing this. That the administration at the very top are
23
> doing things not just because the Court ordered them but because
> they are the right thing to do, and that is a remarkable attribute to be
24
> admired and recognized.

25 (Decl. Patrick McKinney Supp. Response, ¶ 2, Ex. 1, at 4:19-24.)
26      A critical piece of Defendants' efforts is the State's clear and comprehensive Blueprint. It
27 was published in April, then legislatively approved and funded, and is now being implemented.
28 (*See* 5/7/12 Hoshino Decl., Ex. 2.) The Blueprint will enable CDCR to substantially comply with

4

the population reduction order and achieve better correctional objectives. (*See id.*) Under the plan, CDCR is improving its inmate classification system, and expanding opportunities for inmates to participate in rehabilitation programs. (*Id.* at Intro. 7.)

The State's comprehensive plan also ensures that the State will continue to provide constitutionally adequate healthcare to inmate-patients by increasing the capacity of the healthcare system. (*See id.*) In Stockton, Defendants are constructing the California Health Care Facility (CHCF), which will provide 1,722 beds specially designed to house inmates requiring long-term medical care and intensive mental health care. (Meier Decl., ¶ 5.) CDCR anticipates being able to house inmate-patients at CHCF on or before July 27, 2013, and that all CHCF beds will be occupied by December 27, 2013. (*Id.*) Its annex, the soon-to-be renovated DeWitt Correctional Facility, will open in the summer of 2014 to create a unified Stockton complex, allowing the efficient transition of inmate-patients between the two facilities. (Blueprint Intro. at 8.)

In addition, Defendants have built or are building the following new health care facilities and renovations to meet the medical and mental health care needs of the prison population:

- at San Quentin State Prison, Defendants constructed the San Quentin Central Health Services Facility, a state-of-the-art correctional health care center that was activated on November 19, 2009. Defendants also built new and improved sick call units in facility rotundas, new clinical office space, a new medical supply warehouse, and renovated triage and treatment areas;
- at Avenal State Prison, Defendants constructed a new health care facility;
- at the California Medical Facility, Defendants are constructing additional treatment and office space. (6/12/12 Chris Meyer Decl., *Coleman* Dkt. No. 4196-5, ¶ 6.) In addition, Defendants:
  - converted a general population dormitory into a 72-bed Outpatient Housing Unit. The construction added examination rooms, nurses' stations, medication dispensary, and a general storage room. Patient admissions began on August 16, 2010;
  - constructed a 64-bed Intermediate Care Facility (ICF), which began admitting patients in February 2012 (Dkt. No. 4196 at 9:14-15);
  - constructed a 50-bed Mental Health Crisis Bed (MHCB) Facility and renovated 124 cells for risk mitigation (Dkt. No. 3544 at 11);
- at Salinas Valley State Prison, Defendants constructed a 64-bed Intermediate Care Facility (ICF) and additional treatment space (Dkt. Nos. 3653 & 3656 at 5);
- at Mule Creek State Prison, Defendants built additional treatment and office space for EOP-general population (Dkt. No. 3544 at 11);

5

- at California Men's Colony, Defendants are constructing a 50-bed MHCB (Meyer Decl., Dkt. No. 4196-5, ¶ 5);
- at the Substance Abuse Treatment Facility in Corcoran, Defendants converted housing to add 88 dual diagnosis beds for EOP/Substance Abuse inmates and 176 beds for EOP inmates with special security needs (Dkt. No. 4196 at 8:16-19). In addition, Defendants are converting an additional 88 beds for EOP inmates (Dkt. No. 4196-2 at 2);
- at the California Institution for Women, Defendants constructed a 20-bed Psychiatric Services Unit facility, and a new 45-bed ICF, which began admitting patients in July 2012 (Dkt. No. 4196-3 at 2; Meyer Decl., Dkt. No. 4196-5, ¶ 3);
- at California State Prison, Los Angeles County, Defendants converted housing to add 150 beds for EOP inmates with special security needs (Dkt. No. 4196 at 15:24-16:2); and
- at California State Prison, Sacramento, Defendants constructed office and treatment space for the EOP inmate population and are constructing treatment and office space and converting housing for 128 inmates needing psychiatric services unit treatment (Dkt. No. 4196 at 8:21, 13:3-5; Meyer Decl. Dkt. No. 4196-5, ¶ 8).

The Declaration of Chris Meyer, submitted to the *Coleman* Court on June 12, 2012 in support of Defendants' Long-Range Mental Health Bed Plan (Dkt. No. 4196-5), discusses a number of additional mental health projects that are key components of the State's plan for maintaining a constitutional health care system.

These changes, and the additional improvements that will result from continuing to reduce the population below 145%, will support Defendants' motion. The critical question in the Rule 60(b)(5) inquiry will be whether these changes render continued enforcement of the current population reduction order inequitable. To decide this question, the Court must ascertain "whether ongoing enforcement of the original order [is] supported by an ongoing violation of federal law," here, the Eighth Amendment. *Horne*, 557 U.S. at 454. Specifically, Defendants' motion will demonstrate that a population density of 145% does not prohibit Defendants from providing constitutionally adequate care. Accordingly, the principles of equity embodied in Rule 60(b)(5) will require the Court to modify the order.

### A. Neither Rule 60(b)(5) Nor Supreme Court Precedent Require That Changed Circumstances Be Unanticipated at the Time the Order Was Entered.

Whether the changes that support Defendants' contemplated motion were anticipated is irrelevant; Rule 60(b)(5) does not limit relief to cases where the changed circumstances were not anticipated at the time the order was entered.

6

To the contrary, it is error for a district court to require "new and unforeseen conditions" as a prerequisite to any modification. *Rufo*, 502 U.S. at 379. Instead, Rule 60(b)(5) "permits a less stringent, more flexible standard." *Id.* at 380. Federal courts must consider whether significant changes in either factual conditions or law render continued enforcement of an order inequitable. *Horne*, 557 U.S. at 453; *Plata*, 131 S. Ct at 1947. Although *Rufo* states that "modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree" (*id.* at 385), this statement has no application here because Defendants did not enter into a consent decree nor did they agree to the relief granted in the population reduction order. Defendants believe that modification of the population reduction order will be required by Rule 60(b)(5) once the population reaches 145%, and this remains true even if some of the changed circumstances that will support the motion were anticipated.

**B.    The Contemplated Modification Proceedings Do Not Implicate Principles of Res Judicata.**

The contemplated motion to modify does not implicate res judicata concerns as a legal or factual matter. Supreme Court precedents uniformly hold that res judicata is inapplicable to institutional reform injunctions as a matter of law. In fact, the Supreme Court in this very case instructed this Court that its population reduction order "must remain open to appropriate modification." *Plata*, 131 S. Ct. at 1947. This instruction is consistent with numerous holdings establishing that judicial policies favoring finality are substantially diminished by Rule 60(b), "a provision whose whole purpose is to make an exception to finality." *Gonzalez v. Crosby*, 545 U.S. 524, 529 (2005) (interpreting Rule 60(b)(6)). Modifying a continuing injunction in light of changed circumstances does not impermissibly reopen a final judgment—rather, it faithfully implements that judgment. *See Miller v. French*, 530 U.S. 327, 344-45 (2000).

Where a federal court enjoins state public officials, the Supreme Court has unanimously recognized that finality considerations carry little weight. *See Frew*, 540 U.S. at 441. Even if the "basic obligations of federal law . . . remain the same," the "precise manner of their discharge may not." *Id.* at 442. If there is a reason to modify an injunction, a "court should make the necessary changes." *Id.* The flexible approach required by Rule 60(b)(5) "allows a court to

7

1  recognize that the longer an injunction or consent decree stays in place, the greater the risk that it
2  will improperly interfere with a State's democratic processes." *Horne*, 557 U.S. at 453.
3       Even if res judicata did apply, Defendants are not precluded from asking the Court to
4  modify its order based on a finding that a population density of 145% does not prohibit
5  Defendants from providing constitutionally adequate care. The parties never litigated this issue,
6  nor could they have. At the time the Court determined that "overcrowding is the primary cause of
7  the unconstitutional denial of adequate medical and mental health care to California's prisoners,"
8  the level of crowding was 190% of design bed capacity. (8/4/09 Order at 55.) Moreover, this
9  Court noted that "choosing the percentage of design capacity to which the prison population
10 should be reduced is 'not an exact science.' As plaintiffs' expert Dr. Craig Haney explained,
11 'there's nothing magical' about any specific percentage . . . ." (*Id.* at 124 [internal citation
12 omitted]; *see also Plata*, 131 S. Ct. at 1945 [there are "no scientific tools available to determine
13 the precise population reduction necessary to remedy a constitutional violation of this sort. The
14 three-judge court made the most precise determination it could in light of the record before it."].)
15 The significant and wide-ranging improvements to prison health care that have occurred since
16 2006 were not considered in this Court's ruling. And certainly, it would have been impossible to
17 accurately assess the cumulative impact of these improvements on prison healthcare. The Court
18 should not refuse to examine this evidence or make equitable adjustments to its order based on
19 inapplicable notions of claim preclusion.

### III. THE UNITED STATES SUPREME COURT INSTRUCTED THE THREE-JUDGE COURT TO CONSIDER REQUESTED MODIFICATIONS TO THE POPULATION REDUCTION ORDER.

22  The passage from the Supreme Court's opinion quoted on page 3 of the order expressly
23  requires this Court to consider termination or modification of the population reduction order:

> As the State makes further progress, *the three-judge court should evaluate whether its order remains appropriate*. If significant progress is made toward remedying the underlying constitutional violation, *that progress may demonstrate that further population reductions are not necessary* or are less urgent than previously believed. Were the state to make this showing, the three-judge court in the exercise of its discretion should consider whether it is appropriate to extend *or modify* this timeline.

8

(Order 3:6-9 [quoting *Plata*, 131 S. Ct at 1947 (emphasis added)].) If the order no longer "remains appropriate" or "further population reductions are not necessary," then the Court must either modify the population targets or terminate the order.

The Court's suggestion that the Supreme Court somehow limited the relief available to an extension of time is not only contrary to the cited passage, but also a number of other statements in the *Plata* decision. "A court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order." *Plata*, 131 S. Ct at 1946. Accordingly, "*the three-judge court must remain open to a showing or demonstration by either party that the injunction should be altered* to ensure that the rights and interests of the parties are given all due and necessary protection." *Id.* (emphasis added).

Indeed, the Supreme Court expressly contemplated that Defendants could comply without reducing the population to 137.5%:

> As the State implements the order of three-judge court, time and experience may reveal targeted and effective remedies that *will end the constitutional violations even without a significant decrease in the general prison population*. The State will be free to move the three-judge court for modification of its order on that basis, *and these motions would be entitled to serious consideration*. See *infra*, at 1945-1947.

*Id.* at 1941 (emphasis added); *see also id.* at 1923 ("the [population] reduction need not be accomplished . . . in these substantial numbers if satisfactory, alternate remedies or means for compliance are devised") & 1937 ("If the State does find an adequate remedy other than a population limit, it may seek modification or termination of the three-judge court's order on that basis.").

### DEFENDANTS' RESPONSES TO THE COURT'S FACTUAL QUESTIONS

**I.  IT IS PREMATURE TO COMMENCE MODIFICATION PROCEEDINGS UNTIL THE PRISON POPULATION REACHES 145%.**

The issue to be decided on the contemplated motion to modify is whether a population density of 145% prohibits Defendants from providing constitutionally adequate medical and mental health care to inmates. Defendants continue to anticipate that each party will need one

9

expert, and that two months should be more than enough time to accommodate the necessary expert review and discovery, including depositions.

Defendants should not be required to bring the contemplated modification motion or commence the related investigation and discovery before the prison population has reached 145%. A motion based on an assessment of conditions at a higher population density would require the parties to speculate about conditions that will exist at 145% in the future. Any such evidence would be inferior to evidence stemming from the system once the 145% level is achieved. Once achieved, experts will be able to assess the actual impact the 145% population density is having on the provision of health care. It would be unreasonable, if not prejudicial to Defendants, to require Defendants to move to modify the target population density percentage to 145% before the prison population has reached that level.

Accordingly, Defendants propose the following timeline, which they have adjusted based on current population estimates discussed in the following section:

| Event | Date |
|---|---|
| Expert investigation/discovery: | March 29 – May 31, 2013 |
| Last day for Defendants to file motion to modify: | June 28, 2013 |
| Last day for Plaintiffs' counsel to file opposition: | July 12, 2013 |
| Last day for Defendants to file reply: | July 26, 2013 |
| Hearing: | To be set by Court |

Since it appears that the parties will be engaged in modification proceedings on June 27, 2013, the Court should stay enforcement of the final benchmark during the modification proceedings. Moreover, if for some reason the motion is denied, an extension of six to twelve months would be warranted to comply with the final benchmark.

**II. DEFENDANTS ANTICIPATE THAT THE IN-STATE PRISON POPULATION DENSITY WILL BE REDUCED TO 145% IN OR NEAR MARCH 2013.**

Defendants estimate, based on the current population but without the benefit of updated population projections, the in-state prison population will reach 145% between February and the

10

end of March 2013. (Meier Decl., ¶ 3.) Defendants have revised the schedule proposed in the preceding section to account for this updated projection.[3]

### III. ANY PRISONER RELEASE ORDER MUST BE SUPPORTED BY CURRENT FINDINGS THAT CROWDING IS THE PRIMARY CAUSE OF THE VIOLATION OF A FEDERAL RIGHT AND THAT NO OTHER RELIEF WILL REMEDY THE VIOLATION OF THE FEDERAL RIGHT.

#### A.  A Prison Release Order Is Not Warranted.

The January 12, 2010 population reduction order required "that the State reduce the prison population to the extent and at the times designated in this Order." (Dkt. Nos. 3767/2287 at 3.) The Court recognized its "limited role" and the need to "afford the State maximum flexibility in its efforts to achieve the constitutionally required prison population reduction." (*Id.* at 2 & 3; *see also Plata*, 131 S. Ct. at 1923 ["The order leaves the choice of means to reduce overcrowding to the discretion of state officials."] & 1940 ["The order of the three-judge court gives the State substantial flexibility to determine who should be released."].) The Court's suggestion that it may order "defendants 'to begin without delay to develop a system to identify prisoners who are unlikely to reoffend or who might otherwise be candidates for early release,'" (Order at 4:1-3 [quoting *Plata*, 131 S. Ct at 1947]), is a prisoner release order that vastly exceeds the scope of any of the Court's prior orders.

Moreover, the Supreme Court did not authorize the early release of prisoners, it only authorized this Court to "consider whether [such an order] is appropriate." *Plata*, 131 S. Ct at 1947. To properly consider this matter, the Court must determine based on current conditions whether "crowding is the primary cause of the violation of a Federal right" and whether "no other relief will remedy the violation of the Federal Right." 18 U.S.C. § 3626(a)(3)(E). As is the case with any prospective relief ordered pursuant to the PLRA, the relief "shall extend no further than necessary to correct the violation of a federal right of a particular plaintiff or plaintiffs." *Id.* at §

---

[3] Defendants' projections do not include additional measures that may have an impact on the State's prison population. For example, Proposition 36 on the November ballot would modify elements of California's "Three Strikes" law. (*See* Decl. Jay Atkinson, ¶ 3.) If enacted, approximately 3,000 inmates will be eligible for resentencing. (*Id.*) Moreover, CDCR's "design capacity" does not include many medical and mental health inpatient beds located within Correctional Treatment Centers, General Acute Care Hospitals, Outpatient Housing Units, and Skilled Nursing Facilities at the State's 33 institutions. (Meier Decl., ¶ 4.) Accordingly, the population density percentages reported to this Court understate CDCR's actual capacity for treating the medical and mental health needs of the State's inmate-patients. (*Id.*)

11

3626(a)(1)(A).  With all of the improvements to the health care system, Defendants believe that once the population density reaches 145%, they will be able to demonstrate that the prison population does not prohibit them from providing constitutionally adequate medical and mental health care.  Accordingly, there is no basis for the order contemplated by this question.

**B.  The Court Should Not Interfere with the State's Plan to Effectively and Efficiently Manage CDCR Post Realignment.**

By reducing the prison population to 145% and implementing the Blueprint, Defendants will have remedied the Court's finding that overcrowding prohibits Defendants from providing constitutional medical and mental health care.  By implementing the Blueprint, the State is ensuring that it will continue to provide constitutionally adequate healthcare, while returning inmates that the State is paying to house in other states.  The Blueprint also calls for the return of up to 4,992 inmates housed out-of-state by December 2013 by reducing the capacity of the California Out-of-State Correctional Facility Program.  (*See* Blueprint Intro. at 7; Meier Decl., ¶ 6.)  Returning these inmates to California will stop the flow of taxpayer dollars to other states, is expected to save the State over $300 million, and will allow inmates to be housed closer to their homes and their families.  (Blueprint Intro. at 7.)

Continued enforcement of the 137.5% benchmark will come at a significant, and legally unnecessary, cost to the State, and is thus detrimental to the public interest.  (*See* Blueprint.)  It also interferes with the State's democratic processes, and raises federalism concerns.  (*See id.*)  Spending tax dollars to house California prisoners in private prisons out of state is particularly concerning in light of the severe cuts to education, health and human services, and the courts.  (*See id.*)  If the Court for some reason disagrees and insists that the final benchmark cannot be modified, Defendants' only method of achieving the 137.5% target, without the early release of prisoners or further legislative action to shorten prison time, would be to maintain the out-of-state program.  (*See* Meier Decl., ¶¶ 5 & 6.)  If the Court were to order that the current out-of-state capacity be maintained and waived the associated state laws, the prison population should reach 137.5% by December 31, 2013.  (*Id.*)

12

Defendants' Response to August 3, 2012 Second Order Requiring Further Briefing
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

**CONCLUSION**

The population reduction order should be modified under Rule 60(b)(5) upon a showing that significant changes in the underlying factual conditions no longer support continued prospective enforcement. However, proceedings related to a motion to modify continue to be premature until Defendants have reduced the in-state prison population to 145%. Once the population is reduced to 145%, proceedings on the motion can commence, if necessary, in March 2013.

Dated: August 17, 2012

HANSON BRIDGETT LLP

By: */s/ Paul B. Mello*
PAUL B. MELLO
*Attorneys for Defendants*

Dated: August 17, 2012

KAMALA D. HARRIS
Attorney General of California

By: */s/ Patrick R. McKinney*
PATRICK R. MCKINNEY
Deputy Attorney General
*Attorneys for Defendants*

SF2007200670
20632689.doc