| | |
|---|---|
| KAMALA D. HARRIS<br>Attorney General of California<br>JONATHAN L. WOLFF<br>Senior Assistant Attorney General<br>JAY C. RUSSELL<br>Supervising Deputy Attorney General<br>DEBBIE VOROUS, State Bar No. 166884<br>PATRICK R. MCKINNEY, State Bar No. 215228<br>Deputy Attorneys General<br>  455 Golden Gate Avenue, Suite 11000<br>  San Francisco, CA 94102-7004<br>  Telephone: (415) 703-3035<br>  Fax: (415) 703-5843<br>  E-mail: Patrick.McKinney@doj.ca.gov<br>*Attorneys for Defendants* | Hanson Bridgett LLP<br>JERROLD C. SCHAEFER, State Bar No. 39374<br>PAUL B. MELLO, State Bar No. 179755<br>WALTER R. SCHNEIDER, State Bar No. 173113<br>SAMANTHA D. WOLFF, State Bar No. 240280<br>  425 Market Street, 26th Floor<br>  San Francisco, California 94105<br>  Telephone: (415) 777-3200<br>  Fax: (415) 541-9366<br>  E-mail: pmello@hansonbridgett.com |

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br>                      Plaintiffs,<br>    v.<br>**EDMUND G. BROWN JR., et al.,**<br>                      Defendants. | 2:90-cv-00520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| **MARCIANO PLATA, et al.,**<br>                      Plaintiffs,<br>    v.<br>**EDMUND G. BROWN JR., et al.,**<br>                      Defendants. | C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**DEFENDANTS' RESPONSE TO SEPTEMBER 7, 2012 ORDER** |

## I. INTRODUCTION.

The Court has asked how quickly the State could develop a system for identifying prisoners who are unlikely to reoffend or who may otherwise be candidates for early release, and how quickly that hypothetical system could reduce the prison population to the final court-ordered population target. The possibility of requiring the State to develop a system for reducing the population was mentioned by the Supreme Court in its May 2011 decision: "[T]he three-judge court . . . may also consider whether it is appropriate to order the State to begin without delay to develop a system to identify prisoners who are unlikely to reoffend or who might otherwise be candidates for early release." *Brown v. Plata*, 131 S. Ct. 1910, 1947 (2011). But the premise of this Court's questions is outdated because the Supreme Court's reference to early release was made before the State took enormous strides on its own to reduce crowding. In October 2011, California began implementing public safety realignment, which dramatically reduced the prison population by more than 24,000 inmates in less than a year. Because of realignment, Defendants have successfully complied with the first two population benchmarks and CDCR's Spring 2012 projections indicate that they will comply with the December benchmark. The overcrowding level of California's prisons that existed in the record before the Supreme Court is now a distant memory.

Although the projections indicate that California will fall short of the Court's 137.5% population benchmark by June 27, 2013, releasing inmates early does not appear to be the best way to address it. While Defendants acknowledge that the Court has expressed its disinclination to entertain a motion to modify this benchmark, they nevertheless believe that such a modification will be appropriate and consistent with constitutional principles in light of the vastly improving health care system, shrinking prison population, and other improvements in prison conditions. Accordingly, Defendants will bring a motion to modify when warranted by the circumstances. Even if the Court rejects the motion and insists on the 137.5% population cap, mechanisms other than those that have been identified by the Court exist to reduce prison crowding, and these mechanisms should and must be part of any thoughtful evaluation and plan—even a plan developed under Defendants' protest. For example, Proposition 36 on the November statewide

ballot would allow inmates serving prison terms of 25-years-to-life for non-violent, non-serious "third strike" offenses to be resentenced. (*See* Declaration of Martin Hoshino, ¶ 10.) If that initiative passes, approximately 2,800 inmates could be eligible to ask courts to consider them for resentencing. (*Id.*)

Furthermore, relying too heavily on an early-release system now that realignment has been implemented is more complicated and could harm the public because the safest prison-reduction measures have already been taken. (*Id.* at ¶¶ 6 & 7.) Realignment has increased the potential dangerousness of inmates who remain in prison, making it uncertain whether it is still possible to identify remaining inmates who are unlikely to reoffend or who might otherwise be candidates for early release. (*Id.*) Nevertheless, if ordered by the Court, Defendants will endeavor to develop an additional population reduction system, and anticipate that such a system can be designed within six months of the Court's order. (*Id.* at ¶ 7.) But how and when such a system would decrease the population to 137.5% cannot be known until there has been a full evaluation. (*Id.* at ¶ 8.) As a separate matter, and as explained below, the population reduction methods identified in the Supreme Court's order cannot likely be achieved under the emergency proclamation.

II. **IF ORDERED, DEFENDANTS WILL DEVELOP A SYSTEM TO FURTHER REDUCE THE PRISON POPULATION.**

**A. A System to Reduce the Prison Population Could Be Developed in Six Months.**

The Court's September 7 order "makes clear that, at this time, it is ordering defendants neither to implement any particular plan nor to begin developing 'a system to identify prisoners who are unlikely to reoffend or who might otherwise be candidates for early release' . . . ." (9/7/12 Order at 3:19-22.) It remains inappropriate and premature to order Defendants to develop such a system. Defendants have timely complied with the first two population benchmarks, and continue to quickly and safely reduce the prison population. (Hoshino Decl. ¶ 2.)

As explained on pages 11-12 of Defendants' August 17 response, there is no basis for the Court to "consider whether it is appropriate to order the State to begin without delay to develop a system to identify prisoners who are unlikely to reoffend or who might otherwise be candidates

2

for early release." *Plata*, 131 S. Ct. at 1947. The Supreme Court made this statement based on conditions existing in 2007 and 2008, when the prison population was close to its all-time high, and health care bore little resemblance to today's vastly improved medical and mental health care systems. *Id.* at 1923-24. Since the Supreme Court issued its opinion, Defendants satisfied the intent of the Court's order by implementing public safety realignment under AB 109, which has resulted in a population reduction of more than 24,000 inmates since October 2011. (*See* 9/14/12 Report, Dkt. Nos. 2478/4241.) Overall, the State's prisons house 36,000 fewer inmates compared to the population in the record before the Supreme Court. (*See id.*)[1]

In implementing realignment and reducing the population in the State's institutions, Defendants have considered, and continue to consider, "the evidence presented at trial." (Order at 3:23-4:2; *see also* Hoshino Decl. ¶ 3.) That "evidence" included the following population reduction measures: (1) diversion of technical parole violators, (2) diversion of low-risk offenders to community corrections, (3) expansion of evidence-based rehabilitative programming, (4) early release through expansion of earned credits, and (5) sentencing reform. (8/4/09 Order at 137-157; *Plata,* 131 S. Ct. at 1943-44.)

The State has already taken action to implement four of those five measures. *See Plata*, 131 S. Ct. at 1923 (the "order of the three-judge court leaves the choice of means to reduce overcrowding to the discretion of state officials") & 1941 ("The State . . . may decide what steps to take to achieve the necessary reduction"). Two of the measures—diversion of technical parole violators and diversion of low-risk offenders to community corrections—were successfully implemented through realignment. (Hoshino Decl. ¶ 4.) And by implementing *The Future of California Corrections* (referred to as the "Blueprint"), Defendants are expanding evidence-based rehabilitative programming. (Blueprint, Adult Institutions 21-27, Appendices B [*Institution Staffing, Housing, and Programming Plan*] & D [*Division of Rehabilitative Program Capacity Changes*].) The State also already took action to expand good-time credits. In 2010, the State enacted Senate Bill 18, which reduced the prison population by expanding good-time credits.

---

[1] In the fall of 2006, CDCR projected that the population in the State's institutions would be 190,000 in 2012. The current population is more than 70,000 below that number.

(*See* January 2012 Population Report, Dkt. Nos. 2411/4141 & 1/6/12 Jay Atkinson Decl., Dkt. Nos. 2412/4142 ¶ 5.)

And with regard to further early release through expansion of good time credits and sentencing reform, it is no longer clear at this juncture that early release, or even identifying inmates that are unlikely to reoffend, can be done without jeopardizing public safety. (Hoshino Decl., ¶ 6.) Under realignment, inmates who committed non-serious, non-violent, or non-sexual offenses have been diverted to local custody and supervision. (*Id.*) These inmates would have been the most likely candidates for the system contemplated by the Court, rather than the serious, violent, and sexual offenders that remain in the State's institutions. (*Id.*)

Moreover, further sentencing reform and expansion of good-time credits would both require legislative action. The Governor's authority to waive state law under the 2006 emergency proclamation is limited to regulatory statutes. Cal. Govt. Code § 8571. Although the definition of a "regulatory statute" has not been fully examined by a California court, laws determining the availability and amount of sentence credits available to violent and serious felons would be unlikely to qualify as regulatory statutes because they describe a term of incarceration that is designed, at least in part, to serve as punishment or correction. *See* Cal. Penal Code §§ 2933.1 through 2933.6; *see also Hughes v. Bd. of Architectural Examiners,* 17 Cal. 4th 763, 784-85 (1998) (distinguishing between statutes designed to punish and regulatory statutes enacted to protect the public).

In addition, California's Constitution provides that "sentences imposed upon convicted criminal wrongdoers . . . shall not be substantially diminished by early release policies intended to alleviate overcrowding in custodial facilities." Cal. Const. art. 1, § 28(f)(5). The Governor's powers under the Emergency Services Act clearly do not extend to waiving constitutional provisions. *See* Cal. Govt. Code § 8571. And any modification to the Constitution requires approval by a supermajority of the Legislature or approval by a majority of California voters. Cal. Const. art. XVIII. Accordingly, based on the analysis Defendants conducted since the Court issued its order ten days ago, it appears unlikely that the existing emergency proclamation confers the Governor with unilateral authority to implement expansion of good time credits or sentencing

reform.[2]

If it is possible to identify inmates who are "unlikely to reoffend" in light of the remaining post-realignment population, it is unclear that Defendants would be able to implement any such plan absent action by the Legislature or court order. Attempting to identify these inmates will require a careful, individualized examination of the remaining population. (Hoshino Decl., ¶ 7.) If the Court were to order Defendants "to begin without delay to develop a system to identify prisoners who are unlikely to reoffend or who might otherwise be candidates for early release," and if such an endeavor is possible, Defendants believe they could develop such a system approximately six months after any such order is issued. (*Id.*)

### B. It Is Impossible for Defendants to Know When a Plan that Has Neither Been Developed Nor Implemented Will Reduce the Prison Population to 137.5%.

Because Defendants have not developed or implemented a particular population reduction plan apart from the historic realignment plan, they cannot state when or how such an additional plan would reduce the prison population to 137.5%. (Hoshino Decl., ¶ 8.)

### III. DEFENDANTS WILL EVALUATE WHETHER THERE ARE OTHER MEANS TO REDUCE THE PRISON POPULATION TO 137.5% WITHOUT JEOPARDIZING PUBLIC SAFETY.

The Court's second question asks: "By what other means could the prison population be reduced to 137.5% by June 27, 2013?" Less than one-year since realignment was implemented, Defendants do not know of any means that would reduce the prison population to 137.5% by June 27, 2013 that are consistent with public safety. (*See* 8/4/09 Order and Opinion at 137, acknowledging that this Court would never contemplate an order "simply throwing open the prison doors and releasing inmates early in a generic manner"; Hoshino Decl., ¶ 9.)[3] As already mentioned, if Proposition 36 on the November statewide ballot passes, approximately 2,800

---

[2] Also, because emergency proclamations must be terminated at the earliest possible date, the 2006 proclamation will not provide authority for the out-of-state program indefinitely. If the Court believes it is necessary to expand or maintain the out-of-state program in coming years, a court order may be necessary. Cal. Govt. Code § 8629.

[3] Even if the Legislature enacted changes to the current sentencing and good-time credit laws, the impact those measures would have on the prison population would take some time to be felt. (Hoshino Decl., ¶ 6.)

inmates serving life terms for non-violent, non-serious offenses could be eligible for resentencing. (Hoshino Decl., ¶ 10.) As Defendants continue to comply with the population reduction order, they will continue to evaluate this issue, and will seek relief or modification from the Court if they determine it to be warranted. (Hoshino Decl., ¶ 9.)

### IV.  THE CURRENT PROJECTIONS INDICATE THE PRISON POPULATION WILL DECREASE TO 137.5% BY DECEMBER 31, 2013 IF THE OUT-OF-STATE PROGRAM IS MAINTAINED.

Based on the Spring 2012 population projections, by increasing capacity when the California Health Care Facility in Stockton opens and maintaining the out-of-state program, the prison population will reach 137.5% by December 31, 2013. (Hoshino Decl., ¶ 9.) Defendants previously responded to this question in full, but reiterate that by reducing the prison population and implementing the Blueprint, Defendants will have remedied the Court's finding that overcrowding prohibits Defendants from providing constitutional medical and mental health care. (*See* Blueprint.) The Blueprint, which was adopted by the Legislature and is now being implemented, is the State's plan for ensuring that it will continue to provide constitutionally adequate health care, while returning inmates that the State is paying to house in other states. (*See id.*)

Continued enforcement of the 137.5% benchmark will come at a significant, and legally unnecessary, cost to the State, and is thus detrimental to the public interest. (*See* Blueprint.) It also interferes with the State's democratic processes, and raises federalism concerns. (*See id.*) Spending tax dollars to house California inmates in private prisons out of state is particularly concerning given the severe cuts to education, health and human services, and the courts. (*See id.*) If the Court disagrees and insists that the final benchmark cannot be increased and that additional actions must be taken to reduce the population, then Defendants will attempt to achieve the 137.5% target by seeking legislative changes related to sentencing and earned credits, among other possible other options that Defendants will evaluate, and by maintaining the out-of-state program. (Hoshino Decl., ¶ 10.) If legislative efforts were not successful, then judicial waivers of state law would be required to achieve further reductions. (*Id.*)

### V. DEFENDANTS WILL MOVE TO MODIFY THE 137.5% BENCHMARK BECAUSE THEY BELIEVE THAT AN APPROPRIATE MODIFICATION WILL NOT PREVENT THEM FROM PROVIDING CONSTITUTIONALLY ADEQUATE MEDICAL AND MENTAL HEALTH CARE.

The Supreme Court instructed this Court that its order, "like all continuing equitable decrees, must remain open to appropriate modification." *Plata*, 131 S. Ct. at 1947. The Supreme Court expressly authorized Defendants to "move for modification of the three-judge court's order to extend the deadline for the required reduction to five years . . . ." *Id.* The Supreme Court also invited Defendants to move to modify the order before the population density reaches 137.5% if the facts have changed sufficiently from those that justified entry of the order. *See id.* at 1923, 1941 & 1947.[4]

Defendants acknowledge that this Court believes it is not yet time for Defendants to bring their motion to modify the final population reduction benchmark. Defendants disagree based on, among other things, the undisputed evidence of Defendants' efforts to transform the prison system by relieving crowding and improving prison health care. Defendants' accomplishments to date include the following:

- The State reduced the inmate population in the State's prisons by more than 42,000 inmates, including a reduction of more than 24,000 inmates since October 2011 when the State implemented public safety realignment under AB 109. The population reduction has markedly enhanced Defendants' ability to maintain quality health care.

- The State developed, funded, and is implementing CDCR's comprehensive blueprint that will ensure CDCR's ability to maintain a constitutionally adequate healthcare system and improve numerous other areas including classification and rehabilitative programming.

- In *Perez v. Brown*, the dental health care class action, the State's demonstrated success resulted in the Court dismissing the case on August 20, 2012.

- In *Coleman v. Brown*, the State virtually eliminated the wait lists for inmate-patients needing intermediate and acute mental health care. At a recent status conference, the *Coleman* Court recognized that "the administration at the very top are doing things not just because the Court ordered them but because they are the right thing to do, and that is a remarkable attribute to be admired and recognized."

---

[4] Footnote 1 of the Court's September 7 order misstates Defendants' position. As explained in detail in Defendants' August 17 response to the Court's August 3 order, relief from the final population benchmark under Rule 60(b)(5) is appropriate upon a showing of "'a significant change either in factual conditions or law.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 384 (1992)). A showing of constitutional compliance is not a prerequisite to modification of the population cap. Rather, a showing of constitutional compliance would require that this litigation be ended. 18 U.S.C. § 3626(a)(1)(A) (court-ordered relief "shall extend no further than necessary to correct the violation of a federal right of a particular plaintiff or plaintiffs").

- The State has built and is building a number of new health care facilities and renovations to meet inmate-patients medical and mental health care needs.

(*Plata* Dkt. Nos. 2450, 2456 & 2472.) Based on this evidence, and the continued population reduction and improvements to health care, Defendants will bring a motion to modify the Court's final benchmark at the appropriate time based on a showing that significant changes in the underlying factual conditions no longer support continued prospective enforcement of the current final population target.

## VI. CONCLUSION.

Ordering Defendants to develop a system to identify candidates for early release is unwarranted in light of the significant population reduction in the State's institutions. Moreover, Defendants have no authority to implement a system that would expand the good time credits system or make further changes to the State's sentencing laws. Those types of changes would require either legislative action or a court order. Defendants therefore request that the Court maintain the current reporting requirements, continue to monitor the population reduction and improvements to health care, and assess whether ongoing enforcement of the population reduction order is warranted.

Dated: September 17, 2012            HANSON BRIDGETT LLP

                                     By: */s/ Paul B. Mello*
                                        PAUL B. MELLO
                                        *Attorneys for Defendants*

Dated: September 17, 2012            KAMALA D. HARRIS
                                     Attorney General of California

                                     By: */s/ Patrick R. McKinney*
                                        PATRICK R. MCKINNEY
                                        Deputy Attorney General
                                        *Attorneys for Defendants*

SF2007200670
20638228.docx