1  KAMALA D. HARRIS
   Attorney General of California
2  JONATHAN L. WOLFF
   Senior Assistant Attorney General
3  JAY C. RUSSELL
   Supervising Deputy Attorney General
4  DEBBIE J. VOROUS, State Bar No. 166884
   PATRICK R. MCKINNEY, State Bar No. 215228
5  WILLIAM H. DOWNER, State Bar No. 257644
   Deputy Attorney General
6   1300 I Street, Suite 125
    P.O. Box 944255
7   Sacramento, CA 94244-2550
    Telephone: (916) 324-5345
8   Fax: (916) 322-5205
    E-mail: Debbie.Vorous@doj.ca.gov
9  *Attorneys for Defendants*

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE EASTERN DISTRICT OF CALIFORNIA

12                   SACRAMENTO DIVISION

13

14

15  **RALPH COLEMAN, et al.,**                    2:90-cv-00520 LKK JFM P

16                              Plaintiffs,

17         v.                                     **MEMORANDUM OF POINTS AND
                                                  AUTHORITIES IN SUPPORT OF
18  **EDMUND G. BROWN JR., et al.,**              MOTION TO TERMINATE UNDER THE
                                                  PRISON LITIGATION REFORM ACT
19                              Defendants.        [18 U.S.C. § 3626(b)] AND TO VACATE
                                                  THE COURT'S JUDGMENT AND
20                                                ORDERS UNDER FEDERAL RULE OF
                                                  CIVIL PROCEDURE 60(b)(5)**

21                                                Date:         February 11, 2013
22                                                Time:         10:00 a.m.
                                                  Dept:         4
23                                                Judge:        The Honorable Lawrence K.
                                                                Karlton
24                                                Action Filed: 1990

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................... 1

Statement of the Case ............................................................................................ 4

Statement of Issues ................................................................................................ 5

Statement of Facts .................................................................................................. 6

Legal Standard ..................................................................................................... 10

I.  The Standard for Terminating the Case Under the Prison Litigation Reform Act. .......................................................................................................... 10

II.  Plaintiffs Have the Burden of Proving that Current and Ongoing Constitutional Violations Require Continued Court Supervision. ....................... 11

III.  The Standard for Vacating Injunctive Relief Under Rule 60(b)(5). ............. 13

Discussion ........................................................................................................... 14

I.  California Provides Timely Access to Mental Health Care and Is Not Deliberately Indifferent to Inmates' Serious Mental Health Needs. .................... 14

II.  California's System Meets Inmates' Serious Mental Health Needs. .................. 14

A.  The State Has Now Remedied the Six Core Constitutional Deficiencies Found by the Court, and Has Implemented Measures to Ensure that Inmates are Treated and Cared for Appropriately. ........... 15

1.  California Screens and Evaluates Inmates to Identify Those Needing Mental Health Care. ......................................................... 16

2.  California Provides Ready Access to Adequate Mental Health Care. .................................................................................... 17

3.  California Employs and Maintains Sufficient Numbers of Trained Mental Health Professionals. ............................................. 18

4.  California Maintains Accurate, Complete, and Confidential Mental Health Records. ................................................................. 19

5.  Psychotropic Medication is Administered with Appropriate Supervision and Periodic Evaluation by Trained Medical Personnel. ...................................................................................... 20

6.  California Fully Implemented Programs to Identify, Treat, and Supervise Inmates at Risk for Suicide. ................................... 21

7.  California Has Implemented Procedures for Disciplinary and Behavioral Control of Inmates with Mental Health Needs. ................................................................................................ 23

B.  California's Correctional Health Care System Meets or Exceeds the Constitutional Standards. ............................................................... 24

III.  The Court Must Vacate the Judgment and Subsequent Orders Under Federal Rule of Civil Procedure 60(b)(5) Because the Improved Prison Mental Health Care System Makes Continued Court Supervision Inequitable. ....................................................................................................... 25

Conclusion ........................................................................................................... 28

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Balla v. Idaho State Bd. of Corr.*
595 F. Supp. 1558 (D. Idaho 1984)............................................................................ 4, passim

*Belcher v. Oliver*
898 F.2d 32 (4th Cir. 1990)............................................................................................... 22

*Benjamin v. Jacobson*
172 F.3d 144 (2d Cir. 1999) ............................................................................................. 12

*Bowen v. City of Manchester*
966 F.2d 13 (1st Cir. 1992)............................................................................................... 22

*Burns v. City of Galveston*
905 F.2d 100 (5th Cir. 1990)............................................................................................ 22

*Cagle v. Hutto*
177 F.3d 253 (4th Cir. 1999)............................................................................................ 12

*Cason v. Seckinger*
231 F.3d 777 (11th Cir. 2000)........................................................................................... 11

*Castillo v. Cameron County*
238 F.3d 339 (5th Cir. 2001)............................................................................................. 11

*Coleman v. Wilson*
912 F. Supp. 1282 (E.D. Cal. 1995)............................................................................ 4, passim

*Estelle v. Gamble*
429 U.S. 97 (1976)........................................................................................................... 14

*Farmer v. Brennan*
511 U.S. 825 (1994)..................................................................................................... 14, 24

*Gilmore v. California*
220 F.3d 987 (9th Cir. 2000)........................................................................................ 11, 12

*Graves v. Arpaio*
No. CV-77-0479, 2008 WL 4699770 (D. Ariz. Oct. 22, 2008)........................................... 11

*Gray v. City of Detroit*
399 F.3d 612 (6th Cir. 2005)............................................................................................. 22

*Guajardo v. Tex. Dep't of Crim. Justice*
363 F.3d 392 (5th Cir. 2004)............................................................................................. 12

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Hadix v. Johnson*
228 F.3d 662 (6th Cir. 2000)............................................................................ 12

*Hallett v. Morgan*
296 F.3d 732 (9th Cir. 2002)................................................................... 11, passim

*Hoptowit v. Ray*
682 F.2d 1237 (9th Cir. 1982.)........................................................................ 16, 17

*Horne v. Flores*
557 U.S. 433 (2009)............................................................................... 13, passim

*Imprisoned Citizens Union v. Ridge*
169 F.3d 178 (3d Cir. 1999)............................................................................. 12

*Imprisoned Citizens Union v. Shapp*
11 F. Supp. 2d 586 (E.D. Pa. 1998) ................................................................... 12

*Laaman v. Warden, N.H. State Prison*
238 F.3d 14 (1st Cir. 2001) ............................................................................. 12

*Lewis v. Casey*
518 U.S. 343 (1996)............................................................................... 11, passim

*Loyd v. Alabama Dep't of Corr.*
176 F.3d 1336 (11th Cir. 1999)......................................................................... 12

*Madrid v. Gomez*
889 F. Supp 1146 (N.D. Cal. 1995) ............................................................... 17, 20

*Mayweathers v. Newland*
258 F.3d 930 (9th Cir. 2001)........................................................................ 11, 12

*Miller v. Harbaugh*
698 F.3d 956 (7th Cir. 2012)........................................................................... 21

*Missouri v. Jenkins*
515 U.S. 70 (1995) ...................................................................................... 13

*Para-Professional Law Clinic at SCI-Graterford v. Beard*
334 F.3d 301 (3d Cir. 2003)............................................................................ 11

*Pierce v. County of Orange*
526 F.3d 1190 (9th Cir. 2008)...................................................................... 11, 12

Mem. P.&A. Supp. Defs.' Mot. to Terminate Under the PLRA and Fed. R. Civ. Pro 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Procunier v. Martinez*
    416 U.S. 396 (1974) .......................................................................................... 12

*Rellergert v. Cape Girardeau County*
    924 F.2d 794 (8th Cir. 1991) ........................................................................... 21

*Rufo v. Inmates of Suffolk Cnty. Jail*
    502 U.S. 367 (1992) .............................................................................. 13, passim

*Ruiz v. Johnson*
    154 F. Supp. 2d 975 (S.D. Tex. 2001) .................................................. 12, passim

*Skinner v. Lampert*
    457 F. Supp. 2d 1269 (D. Wyo. 2006) ............................................................ 12

*Tittle v. Jefferson Cnty Comm'n*
    10 F.3d 1535 (11th Cir. 1994) ......................................................................... 22

*Wilson v. Seiter*
    501 U.S. 294 (1991) .......................................................................................... 14

*Woloszyn v. County of Lawrence*
    396 F.3d 314 (3d Cir. 2005) ............................................................................ 22

**STATUTES**

United States Code, Title 18
    § 3626(b) .......................................................................................................... 10
    § 3626(b)(1) ...................................................................................................... 11
    § 3626(b)(2) ...................................................................................................... 11
    § 3626(b)(3) .................................................................................................11, 12

United States Code, Title 42
    § 1983 ............................................................................................................4, 24

California Code of Regulations, Title 15
    § 3364 (2012) ................................................................................................... 21

**CONSTITUTIONAL PROVISIONS**

Eighth Amendment ......................................................................................... 3, passim

iv

Mem. P.&A. Supp. Defs.' Mot. to Terminate Under the PLRA and Fed. R. Civ. Pro 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

# TABLE OF AUTHORITIES
## (continued)

**Page**

**COURT RULES**

Fedederal Rules of Civil Procedure
Rule 60 ............................................................................................................................... 13
Rule 60(b)(5) ............................................................................................................ 3, passim

**OTHER AUTHORITIES**

H.R. Rep. No. 104-21 (1995) ........................................................................................ 13

v

Mem. P.&A. Supp. Defs.' Mot. to Terminate Under the PLRA and Fed. R. Civ. Pro 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

# INTRODUCTION

This class action was filed over two decades ago by California prison inmates to remedy significant deficiencies in the State's prison mental health care system. In 1995, the Court found that the State was violating the Constitution by failing to deliver timely and effective care to mentally ill inmates, and the Court appointed a special master to guide the State towards meeting its constitutional obligations. This case has thus been in a remedial, monitoring phase for the last seventeen years. During that time, California has dedicated the resources needed to remedy the constitutional deficiencies, and transform its prison mental health care system into one of the best in the nation. Since 1995, mental health facilities have been substantially expanded and improved, thousands of mental health care beds have been added, hundreds of mental health care professionals have been hired, and the prison population has been reduced by more than 40,000 inmates. The State now:

- provides timely mental health treatment to over 33,000 inmates diagnosed with mental disorders at all levels of care;

- conducts approximately 95,000 mental health treatment appointments each month;

- maintains 6,176 designated high-level-of-care mental health treatment beds;

- employs over 1,180 trained psychiatrists, psychologists, and social workers;

- provides appropriate medication at an annual cost of approximately $25 million;

- maintains accurate, complete, and confidential mental health treatment records;

- identifies, treats, and supervises inmates at risk for suicide; and

- considers inmates' mental health disorders in imposing discipline for inappropriate behavior.

And to ensure that the system continues to provide quality mental health care for years to come, even more improvements are in the works. In 2012, the Brown Administration developed and won legislative approval for a comprehensive, post-realignment plan (the Blueprint) to

1

1    improve the prison system while making it less costly and more efficient.[1]  That extensive plan

2    adds 510 more mental health treatment beds and implements a health care facility improvement

3    program to upgrade existing prisons to further improve the treatment and diagnostic capacity of

4    those facilities.  These projects are already underway and will continue over the course of the next

5    several years.

6         Although a superior mental health care system now exists, the special master has not

7    reported to the Court that the constitutional deficiencies have been remedied and the State is no

8    longer deliberately indifferent to the serious mental health needs of its inmates.  Perhaps the

9    reason for the special master's silence on this critical point is that he is not assessing the system

10   against the minimally adequate level of care required by the Constitution.  Instead, the special

11   master monitors "all aspects" of the State's compliance with its own mental health policies and

12   procedures, no matter how trivial or attenuated their relationship may be to the core components

13   of constitutionally adequate mental health care. (*See, e.g.,* Special Master's 24th Monitoring Rep.,

14   ECF No. 4205 at 18–19.)  In doing so, the special master, over the past five years, has issued

15   yearly 575-page (on average) reports evaluating the State's performance on, among other things,

16   its responsiveness to inmate exhibitionism, the number of blood tests ordered for inmates

17   prescribed psychotropic medication, "pill line" wait times, prison officials' meeting attendance,

18   and prison staff's form completion skills.  (*See, e.g.,* Special Master's 24th Monitoring Rep., ECF

19   No. 4205 at 45-68; *see also* Special Master's 20th to 23rd Monitoring Reps., ECF Nos. 3029,

20   3638, 3990 & 4124.)  These reports assess an ever-expanding list of compliance criteria and

21   minutia having no relation to the core constitutional components of mental health, and monitoring

22   continues even after institutions are found to have complied with the State's internal procedures.

23   Of course, all of this comes at tremendous cost to the State.[2]

24   _____

25         [1] *See* http://www.cdcr.ca.gov/2012plan/
          [2] The special master and consultants bill the State an average of $380,000 per month to
26   monitor the State's compliance with its own policies and procedures, with bills exceeding
     $500,000 in certain months.  (*See, e.g.,* Orders, ECF Nos. 4151, 4161, 4173, 4174, 4189, 4202,
27   4216, 4233, 4248, 4257, 4267, 4270 for year 2012 invoices)  In Fiscal Year 2011/2012, Plaintiffs'
     counsel billed the State $1,672,769 for an average of $418,192 per quarter.  (*See* Orders, ECF
28   Nos. 4140, 4171, 4215, 4256.)

2

1   The State's mental health system *must* be evaluated using the Constitution to determine if

2   further court intervention is justified—that is, whether the prison system is deliberately indifferent

3   to the serious mental health needs of its inmates, thereby subjecting them to cruel and unusual

4   treatment in violation of the Eighth Amendment.  Last year, recognizing that the special master is

5   not monitoring to that standard, the State retained nationally recognized experts to assess its

6   constitutional compliance.  After an exhaustive review, these experts found that California's

7   prison mental health care system is one of the best in the nation and a model for other states to

8   follow.  Each day, highly competent mental health care professionals provide thousands of

9   inmates timely and effective care, from clinical and pharmaceutical therapy for inmates with

10  chronic mental health conditions to twenty-four-hour-a-day observation and care of inmates

11  contemplating suicide.  California's system is now so good that it not only meets constitutional

12  standards, but often meets and even exceeds mental health care offered in non-correctional,

13  community settings.

14  Seventeen years ago, California's correctional mental health care system lacked the basic

15  components of constitutional care.  Today, those deficiencies have been eliminated.  Far from

16  being deliberately indifferent, the State's mental health professionals and administrators

17  proactively diagnose and treat inmates' serious mental health needs.  The superior system that

18  now exists ensures that the State's prisons will deliver timely and effective mental health care for

19  years to come.  Nationally respected experts confirm that when properly evaluated for

20  constitutional compliance, the State meets and exceeds every important benchmark articulated by

21  the Court in 1995.  "The improvement in CDCR's mental health service delivery system between

22  then and now is remarkable and dramatic."  (Decl. D. Vorous Supp. Mot. to Terminate Under the

23  PLRA and to Vacate Court's Judgment and Orders Under Fed. R. Civ. Pro 60(b)(5) (Vorous

24  Decl.) ¶ 2 & Ex. 1 (Joel A. Dvoskin, Jacqueline M. Moore & Charles L. Scott, Clinical

25  Evaluation of California's Mental Health Services Delivery System 1 & 14 (Jan. 4, 2013)

26  (Clinical Exp. Rpt.)); *see also* Vorous Decl. ¶ 3 & Ex. 2 (Steve J. Martin, Report of Defendants'

27  Expert 15–16 (Jan. 4, 2013) (Martin Exp. Rpt.).)  There is no justifiable reason for the continued

28

3

Mem. P. & A. Supp. Defs.' Mot. to Terminate Under the PLRA and Fed. R. Civ. Pro. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

1    intrusive and costly oversight of California's prison mental health system.  It is time for this case

2    to end.

3                                    **STATEMENT OF THE CASE**

4            This 42 U.S.C. § 1983 class-action lawsuit concerns mental health care provided to inmates

5    with serious mental disorders who are now or who will be confined within California Department

6    of Corrections and Rehabilitation institutions.  (Lodged Stip. & Order Amending Pl. Class, filed

7    Dec. 24, 1998.)  In their 1991 amended complaint, Plaintiffs alleged that the State was not

8    providing inmates with constitutionally adequate mental health care, as required under the Eighth

9    Amendment.  (Am. Compl., Docket No. 60.)

10           In 1994, the magistrate judge conducted a bench trial at the conclusion of which he ruled

11   that the State's prison mental health system violated the Eighth Amendment.  *See Coleman v.*

12   *Wilson*, 912 F. Supp. 1282, 1296–97 (E.D. Cal. 1995).  On September 13, 1995, the Court

13   adopted the magistrate judge's findings and recommendations with modifications.  In its order,

14   the Court found the State must provide the following "basic, essentially common sense,

15   components of a minimally adequate prison mental health care delivery system": (1) proper

16   screening; (2) timely access to adequate care; (3) competent staff in sufficient numbers; (4) an

17   adequate medical record system; (5) proper administration of psychotropic medication; and (6) a

18   basic suicide prevention program.  *Id.* at 1298, *citing Balla v. Idaho State Bd. of Corr.*, 595 F.

19   Supp. 1558, 1577 (D. Idaho 1984).  The Court found that the system in place seventeen years ago

20   lacked many of these elements, and concluded that there was a systemic failure to deliver

21   constitutionally adequate care to mentally impaired inmates.  *Id.* at 1305-15. The Court did not

22   find that the State's mental health care delivery system was inadequate in itself, but that the State

23   was not providing "timely access to care."  *Coleman*, 912 F. Supp. at 1308.  The Court also found

24   that the State did not have appropriate disciplinary and behavioral control measures.  *Id.* at 1319-

25   23.

26           The Court concluded that because prison officials knew about these deficiencies but had not

27   taken reasonable steps to avert harm, they were deliberately indifferent to class members' serious

28   mental health needs.  *Coleman*, 912 F. Supp. at 1315-18.  The Court entered an order for

                                               4

injunctive relief requiring the State to develop remedial plans to remedy the constitutional

violations. *Id.* at 1323-24. To oversee the State's remedial plan, the Court appointed a special

master, defining his duties as follows:

> [T]o provide expert advice to defendants to ensure that their decisions regarding the provision of mental health care to class members conforms to the requirements of the federal constitution and to advise the court regarding assessment of defendants' compliance with their constitutional obligations. Thus, the main work of the special master in developing a remedial plan will be with the defendants to this litigation, with due regard for both the constitutional deficiencies identified by the court and the deference owed to the discretion of prison administrators in the discharge of their duties.

(Dec. 12, 1995 Order of Reference, Docket. No. 640, at 2 [internal citation omitted].)

Since the Court's 1995 ruling, the State has developed and is maintaining a comprehensive

mental health care system such that the "current level of service and leadership is as good as it

has ever been." (Clinical Exp. Rpt. at 1 & 15; and *see generally* Decls. Diana Toche, Tim

Belavich, Rick Johnson, Chris Meyer, and Laura Ceballos Supp. Mot. to Terminate Under the

PLRA and to Vacate Court's Judgment and Orders Under Fed. R. Civ. Pro 60(b)(5).) By no

definition is the State now "acting with systemic deliberate indifference to inmates' serious

mental health care needs." (Clinical Exp. Rpt. at 2 & 8.) Rather, California's mental health care

system "meets and often exceeds the standard of care for prisons in the United States" (*id.* at 1 &

8), and the "system currently in place to minimize and control unnecessary and excessive staff

use of force is among the very best of any such systems." (Martin Exp. Rpt. at 13.) Accordingly,

all prospective injunctive relief must be terminated and the case must end. The Court must also

vacate all prospective relief and dismiss the case under Federal Rule of Civil Procedure 60(b)(5)

because the circumstances requiring court-ordered relief no longer exist, and continued court

supervision under these changed circumstances is not equitable.

## STATEMENT OF ISSUES

1. Under the Prison Litigation Reform Act (PLRA), a court must terminate prospective

relief unless it makes written findings based on admissible evidence that prospective relief

remains necessary to correct current and ongoing federal rights violations. Plaintiffs must also

5

show actual widespread injury for system-wide relief to continue. California is providing inmates with timely access to adequate mental health care, and there is no evidence of any ongoing constitutional violations of Plaintiffs' rights on a system-wide basis. Because there is no current and ongoing violation of a federal right, must all relief be terminated under the PLRA and the case dismissed?

2. The violation originally justifying prospective relief—California's past failure to provide a constitutionally adequate mental health care delivery system—no longer exists. The State has complied with the Court's remedial orders and corrected the constitutional deficiencies addressed in the Court's initial judgment. Given these changed circumstances, must the Court's judgment and all remedial orders be vacated under Federal Rule of Civil Procedure 60(b)(5)?

**STATEMENT OF FACTS**

In the seventeen years following the 1995 judgment, California has corrected the constitutional deficiencies that existed and transformed its prison mental health care system. Among other projects, the State:

- built the San Quentin Central Health Services Facility, a five story, $128.3 million, 135,000 square foot correctional health care center that includes a new Mental Health Crisis Bed unit. The facility opened in November 2009. (Meyer Decl. ¶ 3 & Ex. 1.)

- is constructing the California Health Care Facility in Stockton, a $840 million, 1.2 million square foot facility, that will provide 1,722 beds, of which 1,622 will be specially designed to house inmates requiring long-term medical care and intensive mental health care. (*Id.* ¶ 5 & Ex. 3.) This facility is scheduled to open this July. (*Id.*)

- is opening in February 2014 the California Health Care Facility's annex, the soon-to-be renovated $167 million DeWitt Nelson Correctional Annex project that will add 1,133 more beds, of which 953 will be health care beds, and allow the efficient transition of inmates between the two facilities. (*Id.* ¶ 6 & Ex. 4.)

- is this month completing construction of additional treatment and office space for Enhanced Outpatient Program (EOP) inmates, a $23.8 million project, at the California Medical Facility. (*Id.* ¶ 7 & Ex. 5.) The State also built a $33.7 million 64-bed Intermediate Care Facility, which opened in February 2012 (*id.* & Ex. 6; Special Master's 24th Monitoring Rep., ECF No. 4205 at 18), constructed a $29.8 million 50-bed Mental Health Crisis Bed unit, and renovated (at a cost of $1.8 million) 124 cells for risk mitigation. (*Id.* & Ex. 7.)

6

- built a 64-bed Intermediate Care Facility and additional treatment space at Salinas Valley State Prison at a cost of $29.5 million. The State is also building a $19.7 million project for treatment and office space for 300 EOP-General Population inmates to open in September 2013. (Meyer Decl. ¶ 8 & Ex. 8.)

- built additional treatment and office space for EOP-general population inmates at Mule Creek State Prison at a cost of approximately $1.7 million. (*Id.* ¶ 9 & Ex. 9.)

- is finishing a 50-bed Mental Health Crisis Bed unit at the California Men's Colony at an estimated project cost of $38.7 million. (*Id.* ¶ 10 & Ex. 10.)

- converted 88 dual diagnosis beds for EOP/Substance Abuse inmates and 176 beds for EOP inmates with special security needs at the Substance Abuse Treatment Facility. (Defs.' Ex Parte Req. Re: Rev. Long-Range Mental Health Bed Plan, ECF No. 4196 at 5:17-18; Special Master's 23rd Monitoring Rep., ECF No. 4124 at 14.) The State also converted an additional 88 beds for EOP inmates with special security needs, which were fully occupied on Nov. 9, 2012. (Meyer Decl. ¶ 11; ECF No. 4196-2 at 2.)

- constructed a 20-bed Psychiatric Services Unit facility at the California Institution for Women at a project cost of $7.2 million, and a new 45-bed Psychiatric Inpatient Program at a cost of $36.3 million, which began admitting inmates in July 2012. (*Id.* ¶ 12 & Exs. 11 & 12.)

- converted housing at California State Prison, Los Angeles County to add 150 beds for EOP inmates with special security needs. (ECF No. 4196–2 at 2; Special Master's 23rd Monitoring Rep., ECF No. 4124 at 14.) The State has also substantially completed construction of a new treatment and office space building for the EOP at an estimated project cost of $11.5 million. (Meyer Decl. ¶ 13 & Ex. 13.)

- is building a new $10.7 million treatment and office space building for the EOP at California State Prison, Corcoran. (*Id.* ¶ 14 & Ex. 14.)

- built office and treatment space for the EOP at California State Prison, Sacramento at a project cost of $12.2 million, and at a project cost of $15.4 million is building housing, treatment, and office space for 128 inmates needing Psychiatric Services Unit treatment. (*Id.* ¶ 15 & Ex. 15; Special Master's 24th Monitoring Rep., ECF No. 4205 at 11.)

- in October and December 2012, the State Public Works Board established health care facility improvement projects at Richard J. Donovan Correctional Facility and Mule Creek State Prison respectively, that include the design and construction of a new Administrative Segregation Unit Primary Care and EOP clinic, and the State expects to seek establishment of a similar project at the California Men's Colony in February 2013. (*Id.* ¶¶ 16–18.)

7

The State has vastly increased its capacity to provide quality prison mental health care. In fact, California has improved the timeliness and quality of mental health care provided to state inmates to a level that often exceeds the mental health care provided by United States correctional systems and "few if any systems have the diligent provision and self-monitoring of mental health care that currently exists within CDCR." (Clinical Exp. Rpt. at 14 & 39.)

Despite these improvements, the special master has not advised the Court that the constitutional deficiencies that once existed have been remedied. He insists that the State must attain near perfect compliance with every internal policy and procedure (known collectively as the Program Guide), and that he must continue to monitor "all aspects" of the system for years to come. (*See, e.g.,* Special Master's 24th Monitoring Rep., ECF No. 4205 at 18–19.) Recognizing that constitutional compliance was not being assessed, and that the State was instead being held to an unattainable standard guaranteeing that this case will live on in perpetuity, the State retained four nationally recognized experts to evaluate its compliance with the key findings in the 1995 order:

**Dr. Charles Scott**, a forensic psychiatrist, Chief of the Division of Psychiatry and the Law at the University of California, Davis Medical Center, immediate-past President of the American Academy of Psychiatry and the Law, and author of several publications on prison mental health care, including *The Handbook of Correctional Mental Health Care*;

**Dr. Joel Dvoskin,** a clinical psychologist and expert in prison administration of mental health care. Dr. Dvoskin has consulted with at least thirty states and several local governments providing mental health services in public settings;

**Dr. Jackie Moore**, a registered nurse with a doctorate in nursing and more than thirty years of expertise in developing and administering health care programs in correctional settings (Clinical Exp. Rpt. at 3–7); and

**Steve Martin,** an attorney with expertise on the use of force and disciplinary measures in prisons. Mr. Martin testified on Plaintiffs' behalf on use of force issues in *Madrid v. Gomez, Gates v. Deukmejian,* and *Clark v. California.* (Martin Exp. Rpt. at 2-6.)

8

These experts inspected and evaluated thirteen institutions, consisting of ten of the thirteen institutions with Enhanced Outpatient Programs, nine of eleven designated Enhanced Outpatient Programs for inmates in administrative segregation housing, and all male Psychiatric Services Unit programs.[3]  (Clinical Exp. Rpt. at 8; Martin Exp. Rpt. at 7–9; Johnson Decl. ¶ 8.) Combined, the inmates receiving Enhanced Outpatient Program care in these prisons constitute 82% of the entire Enhanced Outpatient Program population, excluding the reception center population.  (Johnson Decl. ¶ 8 & Ex. 1.)  And these thirteen prisons contain 80% of the system's inpatient crisis beds.  (*Id.* at ¶ 9, Exs. 2 & 3.)[4]

The experts developed and used an assessment process that evaluated the six "basic, essentially common sense, components of a minimally adequate prison mental health care delivery system" to fairly and accurately determine whether the State's mental health care system remedied the constitutional deficiencies the Court identified in 1995.  *Coleman,* 912 F. Supp. at 1298; (*See generally* Clinical Exp. Rpt. & Martin Exp. Rpt.)  Under this assessment procedure, the experts interviewed inmates, clinicians, administrators, and custody staff concerning the mental health programming at the institution visited, observed interdisciplinary treatment team meetings for each level of programming offered at the institution and group therapy, audited hundreds of randomly selected inmate mental health records, and reviewed quality management subcommittee meeting minutes, peer review policies, and Suicide Prevention and Response Focus Improvement Team minutes.  (*See generally* Clinical Exp. Rpt. & Martin Exp. Rpt.)

The experts found that the State's prison mental health care system far exceeds constitutional requirements and is, in fact, among the best in the United States.  (Clinical Exp.

---

[3]  The reviewed institutions were: (1) California Medical Facility; (2) California State Prison, Sacramento; (3) Centinela State Prison; (4) Richard J. Donovan Correctional Facility (5) Central California Women's Facility; (6) California State Prison, Corcoran; (7) California Institution for Men; (8) California State Prison, Los Angeles County; (9) Salinas Valley State Prison; (10) California State Prison, San Quentin; (11) Pelican Bay State Prison; (12) California Men's Colony; and (13) Substance Abuse Treatment Facility and State Prison at Corcoran. (Clinical Exp. Rpt. at 8; Martin Exp. Rpt. at 7–9.)  These 13 prisons contain 51 percent of the 28 prisons housing Correctional Clinical Case Management System inmates, not including the reception center populations.  (Johnson Decl. ¶ 7 & Ex. 1.)

[4]  The experts did not evaluate the inpatient programs operated by the Department of State Hospitals.

1  Rpt. at 1–2, 8 & 39; Martin Exp. Rpt. 10 & 15–16.)   All evidence confirms that there are no

2  system-wide deficiencies in the State's mental health care programs, or that the State

3  systematically ignores inmates' serious mental health care needs.  (Clinical Exp. Rpt. *passim*;

4  Martin Exp. Rpt. *passim; and see generally* Decls. Toche, Belavich, Johnson, Meyer, and

5  Ceballos.)  The State's prison mental health professionals identify inmates with serious mental

6  disorders on a consistent basis and provide timely, quality mental health care that appropriately

7  addresses inmates' needs.  Any conclusion that this somehow violates a constitutional duty is

8  unfounded.  Indeed, the experts found that "CDCR has developed a Mental Health Delivery

9  Services System that identifies and responds to inmates' mental health crises in a timely manner,

10  even for inmates who do not have a serious mental disorder."  (Clinical Exp. Rpt. at 8.)  In fact,

11  the experts found that instances of sub-optimal care were rare, isolated, and in some cases

12  paradoxically resulted from the State's efforts to comply with time-consuming demands and

13  reporting requirements of the special master and Plaintiffs' counsel.[5]  (*See* Clinical Exp. Rpt. at

14  11–29.)  The State's capacity to provide even better care will only increase when it is no longer

15  obligated to devote resources to responding to the numerous obligations imposed by the special

16  master that exceed constitutional requirements.  (*Id.* at 14–15; Toche Decl. ¶¶ 9–10; Belavich

17  Decl. ¶¶ 33–35 & Ex. 8.)

## LEGAL STANDARD

### I.    THE STANDARD FOR TERMINATING THE CASE UNDER THE PRISON LITIGATION REFORM ACT.

The PLRA authorizes a defendant to seek termination of prospective relief in any civil

action regarding prison conditions.  18 U.S.C. § 3626(b).  Under the PLRA, "any prospective

---

[5] For example, the experts were particularly critical of the time and resources devoted to Inter-Disciplinary Treatment Team meetings, which have arisen in response to strict compliance with the Program Guide.  (*See* Clinical Exp. Rpt. at 18 ("The treatment team appeared compelled to meet each and every mandated requirement (*e.g.*, a discussion of the specific number/s of then Department of Mental Health transfer criteria even if transfer was not indicated or under consideration).").) The experts found that "CDCR is subject to scrutiny that is more comprehensive, detailed, and micromanagerial than any correctional mental health system that has preceded it," which "level of scrutiny can serve as a disincentive to system improvements." (*Id.* at 14–15.)

10

1    relief becomes terminable, at the latest, two years after its imposition." *Gilmore v. California*,

2    220 F.3d 987, 999 (9th Cir. 2000) (citing 18 U.S.C. § 3626(b)(1)).  A court must terminate

3    prospective relief unless it "makes written findings based on the record that prospective relief

4    remains necessary to correct a current and ongoing violation of the federal right" and the

5    prospective relief is narrowly drawn, extends no further than necessary to correct the violation,

6    and is the least intrusive means to correct the violation.  18 U.S.C. § 3626(b)(2) & (3); *accord*

7    *Pierce v. County of Orange*, 526 F.3d 1190, 1206 (9th Cir. 2008); *Cason v. Seckinger*, 231 F.3d

8    777, 784-85 (11th Cir. 2000); *Castillo v. Cameron County*, 238 F.3d 339, 353 (5th Cir. 2001).

9        Courts are required to assess present circumstances when considering a termination motion,

10   not conditions that may have existed in the past.  *Pierce*, 526 F.3d at 1205; *Gilmore*, 220 F.3d at

11   1010; *see also Graves v. Arpaio*, No. CV-77-0479, 2008 WL 4699770, at *3 (D. Ariz. Oct. 22,

12   2008) ("'[C]urrent and ongoing conditions' mean actual conditions now, not historic conditions

13   when the previous termination motion had been filed five years earlier.").  Neither potential nor

14   likely future violations are sufficient to continue the litigation.  *Para-Professional Law Clinic at*

15   *SCI-Graterford v. Beard*, 334 F.3d 301, 304 (3d Cir. 2003) (potential for future violations is not

16   sufficient); *Cason,* 231 F.3d at 783-84; *Castillo* 238 F.3d at 353.  And even if constitutional

17   violations presently exist, they must be causing widespread actual injury, not isolated instances of

18   injury.  *Lewis v. Casey*, 518 U.S. 343, 359-60 (1996).  Indeed, assuring health care generally in

19   prison is not the role of the federal courts.  *Id.* at 350.

20   **II.    PLAINTIFFS HAVE THE BURDEN OF PROVING THAT CURRENT AND ONGOING**

21   **CONSTITUTIONAL VIOLATIONS REQUIRE CONTINUED COURT SUPERVISION.**

22       Under Ninth Circuit jurisprudence, the party seeking continued prospective relief has the

23   burden to show that a current and ongoing federal right violation supports continuing prospective

24   relief under the PLRA.  *See Hallett v. Morgan*, 296 F.3d 732, 743-45 (9th Cir. 2002) (affirming

25   denial of plaintiff's motion to extend consent decree absent proof of current and ongoing

26   constitutional violations); *Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001) (PLRA

27   requires a plaintiff seeking preliminary injunction to prove current and ongoing constitutional

28   violations); *but see Gilmore*, 220 F.3d at 1007-8 (holding that the party seeking termination has

11

1   burden to show that a consent decree exceeds constitutional minimum); *see also Pierce*, 526 F.3d

2   at 1206 n.16 (recognizing apparent inconsistencies between *Mayweathers* and *Gilmore* but

3   declining to resolve them).

4       Almost every court examining this issue agrees with *Mayweathers* and *Hallett* and places

5   the burden of proof on the party opposing termination.  *See Guajardo v. Tex. Dep't of Crim.*

6   *Justice*, 363 F.3d 392, 395 (5th Cir. 2004) (holding that the burden of proof shifts to inmates to

7   demonstrate ongoing violations and that the relief is narrowly drawn once party seeking

8   termination shows passage of two years); *Laaman v. Warden, N.H. State Prison*, 238 F.3d 14, 20

9   (1st Cir. 2001) (under 18 U.S.C. § 3626(b)(3), burden of proof to establish ongoing violations is

10  on inmates); *accord Skinner v. Lampert*, 457 F. Supp. 2d 1269, 1276 (D. Wyo. 2006) (relying on

11  *Hallett* to find that inmates had burden to prevent termination of a plan incorporated in prison

12  reform decree); *Ruiz v. Johnson*, 154 F. Supp. 2d 975, 984 n.12 (S.D. Tex. 2001) (inmates had

13  burden to prove ongoing constitutional violations); *Imprisoned Citizens Union v. Shapp*, 11 F.

14  Supp. 2d 586, 604 (E.D. Pa. 1998) (PLRA not unconstitutional for placing burden on inmates to

15  prove ongoing violations), *aff'd sub nom. Imprisoned Citizens Union v. Ridge*, 169 F.3d 178 (3d

16  Cir. 1999); *see also Hadix v. Johnson*, 228 F.3d 662, 671 (6th Cir. 2000) (party opposing hearing

17  entitled to an opportunity to prove current and ongoing constitutional violation);  *Benjamin v.*

18  *Jacobson*, 172 F.3d 144, 166 (2d Cir. 1999) (en banc) (holding same); *Loyd v. Alabama Dep't of*

19  *Corr.*, 176 F.3d 1336, 1342 (11th Cir. 1999) (holding same); *cf. Cagle v. Hutto*, 177 F.3d 253,

20  258 (4th Cir. 1999) (holding that court should hold a hearing if the "party opposing termination

21  alleges facts which, if true, would amount to a current and ongoing constitutional violation").

22      Requiring the party opposing termination to prove an ongoing federal violation accords

23  with the PLRA's underlying policy of reducing prison litigation and excessive judicial intrusion

24  in state prison management.  *See Gilmore*, 220 F.3d at 996-97 (discussing Congress's reasons for

25  enacting PLRA); *see also Procunier v. Martinez,* 416 U.S. 396, 405 (1974) (admonishing that

26  "courts are ill-equipped to deal with the increasingly urgent problems of prison administration

27  and reform").  And the PLRA's legislative history supports assigning the burden to the party

28

12

Mem. P. & A. Supp. Defs.' Mot. to Terminate Under the PLRA and Fed. R. Civ. Pro. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

1  seeking to continue court involvement in prison management. *See* H.R. Rep. No. 104-21, at 25

2  (1995) (noting that "in order to continue to receive relief beyond a two-year period, the need for

3  continued remedies to alleviate actual violations of federal rights *must be proven*") (emphasis

4  added).

5  ### III.    THE STANDARD FOR VACATING INJUNCTIVE RELIEF UNDER RULE 60(b)(5).

6      Federal Rule of Civil Procedure 60(b)(5) permits relief from a final judgment or order when

7  the "judgment has been satisfied, released, or discharged," or if "applying [the judgment or order]

8  prospectively is no longer equitable."  Rule 60(b)(5); *Horne v. Flores*, 557 U.S. 433, 447 (2009).

9  Changed factual circumstances, which render continued court involvement in institutional reform

10  unnecessary or obsolete, is a ground for relief under Rule 60.  *Horne,* 557 U.S. at 447-50; *Rufo v.*

11  *Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 380-81 (1992).  Court-ordered institutional reform

12  implicates "sensitive federal concerns" because it intrudes on elected officials and the electorate's

13  ability to govern.  *Horne*, 557 U.S. at 448-50.  Although the party seeking relief bears the initial

14  burden of demonstrating changed circumstances, once it has done so, a court cannot refuse to

15  rescind an injunctive order.  *Id.* at 447.

16      The inquiry under *Horne* and *Rufo* is whether "a significant change either in factual

17  conditions or in law renders continued enforcement of the judgment detrimental to the public

18  interest."  *Horne*, 557 U.S. at 453 (quoting *Rufo*, 502 U.S. at 384.)  The public interest is

19  irreparably damaged when an order that impedes on the democratic process remains in place after

20  the relief ordered has been satisfied.  *Horne*, 557 U.S. at 448-50 (institutional orders "bind state

21  and local officials to policy preferences of their predecessors and may thereby improperly deprive

22  future officials of their designated legislative and executive powers"); *see also Missouri v.*

23  *Jenkins*, 515 U.S. 70, 131 **(**1995**)** (Thomas, J. concurring) ("A structural reform decree eviscerates

24  a State's discretionary authority over its own program and budgets and forces state officials to

25  reallocate state resources and funds.").

26

27

28

13

Mem. P. & A. Supp. Defs.' Mot. to Terminate Under the PLRA and Fed. R. Civ. Pro. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

**DISCUSSION**

1

I.   **CALIFORNIA PROVIDES TIMELY ACCESS TO MENTAL HEALTH CARE AND IS NOT**
2        **DELIBERATELY INDIFFERENT TO INMATES' SERIOUS MENTAL HEALTH NEEDS.**

3        To establish an Eighth Amendment violation, prison inmates must prove "deliberate

4   indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  To be

5   deliberately indifferent, officials must both know of and disregard an excessive risk to inmate

6   health. *Farmer v. Brennan*, 511 U.S. 825, 835-38 (1994).  "Prison officials are deliberately

7   indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere

8   with medical treatment." *Hallett*, 296 F.3d at 744 (internal quotes omitted).

9        The alleged deprivation of care must objectively be "sufficiently serious" and cause the

10   "unnecessary and wanton infliction of pain." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)*; Estelle*,

11   429 U.S. at 104.  This Court held that "the objective component turns on whether the mental

12   health care delivery system operated by defendants is so deficient that it deprives seriously

13   mentally ill inmates of access to adequate mental health care." *Coleman v. Wilson*, 912 F. Supp.

14   at 1298.

15        In addition, state officials must also act with a "sufficiently culpable state of mind" to be

16   held responsible for constitutional violations. *Farmer*, 511 U.S. at 834.  State officials must

17   subjectively know that inmates face a substantial risk of serious harm, yet disregard that risk "by

18   failing to take reasonable measures to abate it." *Id.* at 847.  Negligence, malpractice, and even

19   gross medical malpractice are insufficient to establish an Eighth Amendment violation.  *Id.* at

20   835.  Rather, nothing less than recklessness in the criminal sense is required.  *Id.* at 837-39.

21   II.   **CALIFORNIA'S SYSTEM MEETS INMATES' SERIOUS MENTAL HEALTH NEEDS.**

22        California's prison mental health system meets the serious mental health care needs of its

23   inmates.  (*See generally* Clinical Exp. Rpt. *passim*; Martin Exp. Rpt. *passim*; Decls. Toche,

24   Belavich, Meyer, Johnson, and Ceballos.)  Plaintiffs cannot plausibly argue that the State is

25   systematically violating their rights under the Eighth Amendment by purposefully depriving them

26   of adequate mental health care.  The State implemented policies to identify inmates needing

27   mental health care, ensure ready access to appropriate treatment, and administer

28

14

1   medically indicated psychotropic medication.  (*See generally* Clinical Exp. Rpt. *passim*; Martin

2   Exp. Rpt. *passim*; Decls. Toche, Belavich, Meyer, Johnson, and Ceballos.)  Nationally recognized

3   experts found that these policies and procedures are followed system-wide.  (Clinical Exp. Rpt. at

4   1–2, 8 & 39; Martin Exp. Rpt. at 10 & 15–16.)

5        The State comprehensively provides inmates with mental health care services at three care

6   levels: (1) the Correctional Clinical Case Management System (outpatient clinic services for

7   stable inmates functioning in the general population); (2) the Enhanced Outpatient Program

8   (separate housing units and structured activities for inmates who experience adjustment

9   difficulties in a general population setting); and (3) Mental Health Crisis Bed placement (24-hour

10  services for conditions that require short-term inpatient care to ameliorate mental health

11  symptoms).  (Belavich Decl. ¶ 6.)  The Department of State Hospitals[6] provides male inmates

12  inpatient acute and intermediate mental health treatment at two prisons (Salinas Valley State

13  Prison and California Medical Facility) and two state hospitals (Atascadero and Coalinga),

14  including beds for high-custody inmates who require inpatient treatment.  (*Id*. ¶ 7.)  Female

15  inmates also receive inpatient mental health treatment via a psychiatric inpatient program at the

16  California Institution for Women.  (*Id.* ¶ 8.)

17      **A.**    **The State Has Now Remedied the Six Core Constitutional Deficiencies**
                **Found by the Court, and Has Implemented Measures to Ensure that**

18                  **Inmates are Treated and Cared for Appropriately.**

19       As discussed below, the State now operates a mental health delivery system containing

20  every component of a constitutional system described in the Court's original order.[7]  Indeed, the

21  mental health care provided to California inmates meets or exceeds the care available in most

22  other correctional systems across the nation.  And California's policies and practices are among

23  the best of any correctional system to ensure that disciplinary measures are not being used on

24  ─────────────

25      [6] The Department of State Hospitals is the successor-in-interest to the Department of
Mental Health.

26      [7] The State acknowledges that the three-judge court ruled that California can only deliver
constitutionally adequate medical and mental health care by decreasing its prison population to

27  137.5 % of institutional design capacity.  But that order was premised on outdated evidence and
an assumption that the State could not provide adequate care above that population density.  This
motion and the admissible evidence supporting it shows that assumption no longer holds true.

28

15

1    mentally ill inmates for behavior over which they have no control.

2        **1.    California Screens and Evaluates Inmates to Identify Those Needing**
3             **Mental Health Care.**

4        Inmates must be able to make their problems known to prison mental health staff before

5    suffering unnecessary and wanton infliction of pain. *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th

6    Cir. 1982.)  Because severely mentally ill inmates often cannot alert staff to their mental health

7    needs, delivery of adequate mental health care to such inmates requires a system for screening

8    and evaluating inmates to identify those who require mental health treatment. *Coleman*, 912 F.

9    Supp. at 1305, *citing Balla*, 595 F. Supp. at 1577.  In 1995, the Court ordered the State to develop

10   and use standardized mental health screening forms and implement a training program to train

11   staff to recognize and identify the signs and symptoms of mental illness. *Coleman*, 912 F. Supp.

12   at 1323, *adopting* Findings and Recommendations (Findings), No. CIV 2:90-0520 LKK JFM P,

13   1994 U.S. Dist. LEXIS 20786, at *104, *106-7 (E.D. Cal. Jun. 6 1994).

14       The State has implemented a comprehensive system with standardized forms for screening

15   and evaluating inmates with mental health issues upon admission, readmission, or transfer,

16   including standardized mental health screening forms and protocols. (Belavich Decl. ¶¶ 5, 9–11

17   & Ex. 1.)  In addition, the State implemented an ongoing training program to teach staff to

18   recognize the signs and symptoms of mental illness among inmates. (*Id.* ¶ 17.)  Mental health

19   screening is completed within a reasonable period of time at reception centers. (Clinical Exp.

20   Rpt. at 1, 8, 10, 39.)  Once reception center inmates are identified as needing mental health care,

21   they receive individualized treatment that meets their needs while awaiting transfer to an

22   endorsed institution. (*Id.*; Belavich Decl. ¶ 11; Ceballos Decl. ¶ 5.)  The State has also

23   implemented appropriate policies and practices to identify inmates who develop a need for mental

24   health care during their incarceration. (Clinical Exp. Rpt. at 1, 8, 10–25, 39; Belavich Decl. at ¶

25   10 & Ex. 1; Special Master's 24th Monitoring Rep., ECF No. 4205 at 17 (noting as a "significant

26   accomplishment" the development and implementation of an internet-based tracking system for

27   the care of class members (known as MHTS.net) that is in place for use at the prisons).)

28

16

Mem. P. & A. Supp. Defs.' Mot. to Terminate Under the PLRA and Fed. R. Civ. Pro. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

In sum, the State has in place, and is successfully implementing, a system to screen and evaluate inmates—both at their intake and during their incarceration—and that, for "many of these inmates, services are significantly better than the inmate would have received in the community" and exceeds those in virtually every other state prison system. (Clinical Exp. Rpt. at 39.)

### 2.    California Provides Ready Access to Adequate Mental Health Care.

Prison officials must provide a system of "ready access" to adequate medical care, which is reasonably prompt access to either staff physicians or outside physicians or facilities. *See Hoptowit*, 682 F.2d at 1253. Although isolated incidents of delay do not generally give rise to liability, "regular and significant delays in the delivery of medical care may be constitutionally unacceptable." *Madrid v. Gomez*, 889 F. Supp 1146, 1257 (N.D. Cal. 1995). In 1995, the Court did not find that the State's mental health care delivery system was inadequate, but rather that it did not provide "reasonably speedy" access to care. *Coleman*, 912 F. Supp. at 1308.

The State has a comprehensive mental health system that timely delivers a continuum of services to inmates across all custody levels in both inpatient and outpatient settings. (Clinical Exp. Rpt at 1, 8 & 11–25; Martin Exp. Rpt. at 10 & 13–15; Toche Decl. ¶ 10; Belavich Decl. ¶¶ 5–16 & Exs. 2 & 3; Johnson Decl. ¶¶ 5–13 & Exs. 2 & 3; Ceballos Decl. ¶¶ 4–6.) The State also developed a comprehensive bed plan to ensure that California inmates have and continue to receive ready access to appropriate mental health care. (Defs.' Ex Parte Req. Re: Revised Long-Range Mental Health Bed Plan, ECF No. 4196; Johnson Decl. ¶ 14 & Ex. 4.) By July 2012, the State had successfully guaranteed timely access to inpatient mental health care for all class members needing hospitalization. (*See* Order, ECF No. 4214 (noting the "remarkable accomplishments" in addressing the problems in access to inpatient mental health care); July 10, 2012 Rep. on Access to Inpatient Care, ECF No. 4208 at 2 (noting that the high-custody inpatient wait list in March 2010 totaled 542 but that "today, access to care is not being delayed"); 24th Monitoring Rep., ECF No. 4205 at 9 (the reduction of wait lists for admission to inpatient care represented a "dramatic improvement that is unprecedented in this history of the *Coleman* remedial effort"); Clinical Exp. Rpt. at 18 & 20 ("[d]espite explicitly looking for underserved

17

1    inmates, we found few, if any, inmates who needed a higher level of care and were not

2    identified").)

3         The State's prison mental health delivery system does not deprive Plaintiffs of their right to

4    reasonably prompt access to appropriate mental health care, and the State "is not acting with

5    systemic deliberate indifference to inmates' serious mental health care needs." (Clinical Exp.

6    Rpt. 2 & 8.)  On the contrary, access to appropriate care and the quality of treatment delivered in

7    California's prisons often exceeds the standards of most other prison mental health care systems.

8    (*Id.* at 1–2, 8 & 39.)

9

10                **3.    California Employs and Maintains Sufficient Numbers of Trained
                          Mental Health Professionals.**

11        A constitutional mental health care system must employ sufficient numbers of staff to meet

12   the basic mental health needs of inmates.  *Hallett*, 296 F.3d at 748.  Adequate staffing requires the

13   employment of "trained mental health professionals . . . in sufficient numbers to identify and treat

14   in an individualized manner those treatable inmates suffering from serious mental disorders."

15   *Ruiz*, 503 F. Supp. at 1339.  In 1995, finding evidence of understaffing, the Court ordered the

16   state to develop and implement a professional-to-patient ratio for all institutions, fill previously

17   allocated positions and recruit new staff, and develop a quality assurance and peer review

18   process.  *Coleman*, 912 F. Supp. at 1323, *adopting* Findings at *104, *108-9.

19        The State developed a comprehensive staffing allocation plan in September 2009 for each

20   mental health program and administration function that was approved by the State Legislature in

21   the Fiscal Year 2011/2012 budget.  (Toche Decl. ¶ 6; Defs.' Staffing Plan, ECF No. 3693.)  Since

22   July 2011, the receiver appointed in *Plata v. Brown* has been responsible for recruiting and hiring

23   for mental health positions, and used the State's staffing model for hiring mental health clinicians.

24   (Order, ECF No. 2247; Toche Decl. ¶ 7.)  The State, working with the *Plata* receiver, recruits,

25   trains, and retains a well-qualified mental health workforce.  (*See generally* Clinical Exp. Rpt.;

26   Toche Decl. ¶¶ 8–10.)  Although challenges remain for both the State and the receiver to fill

27   every single position in the staffing allocation plan, the mental health staff provide excellent—

28

                                        18

1  and certainly constitutionally adequate—mental health care to the *Coleman* class.  (*See generally*

2  Clinical Exp. Rpt.; Toche Decl. ¶¶ 8–10.)  The experts conclusively found that, for example, the

3  8.5% overall vacancy rate found by the special master in his most recent monitoring report does

4  not significantly impair the level of care being provided to inmates, and that "the clinical care

5  itself places CDCR in the upper echelon of state prison mental health systems."  (Clinical Exp.

6  Rpt. at 1 & 14; *see* 24th Monitoring Rep., ECF No. 4205 at 41.)

7        Moreover, the State has a robust institutional quality assurance program in place, and health

8  care providers are periodically assessed on the quality of their clinical practices.  (Clinical Exp.

9  Rpt. at 1–2 & 30; Toche Decl. ¶ 10; Belavich Decl. ¶¶ 18–20 & Ex. 4.)  The program works to

10  sustain a high-performing health care system at the prisons across all institutions and local

11  governing bodies improve timely access to, and effectiveness of, clinical services.  (Clinical Exp.

12  Rpt. at 1–2 & 30; Toche Decl. ¶ 10; Belavich Decl. ¶¶ 18–20 & Ex. 4; Special Master's 24th

13  Monitoring Rep., ECF No. 4205 at 63 (confirming that prisons have generally succeeded in

14  establishing and maintaining the foundations of a quality management infrastructure and peer

15  review is generally taking place system-wide).)  Indeed, the experts "have never seen a system

16  that is more comprehensive and extensive regarding quality improvement within a correctional

17  environment."  (Clinical Exp. Rpt at 2 & 30.)

18          **4.    California Maintains Accurate, Complete, and Confidential Mental Health**
19                  **Records.**

20        In 1995, the Court ordered the State to create and implement a plan to promptly transmit

21  inmate mental health records between institutions, to obtain records from counties sending

22  inmates to prison, and to standardize the drafting and use of inmate mental health records.

23  *Coleman*, 912 F. Supp. at 1314-15, *adopting* Findings at *107-8.

24        The State has developed the infrastructure necessary to support its mental health system.

25  (Toche Decl. ¶ 10; Belavich Decl. ¶ 21 & Ex. 5; Ceballos Decl. ¶ 2.)  In 2007, the *Plata* receiver

26  assumed responsibility for "implementation of the long term [information technology] program to

27  include the medical, dental and mental health programs."  (Order, ECF No. 2247 at 7.)  The

28

receiver established a statewide clinical data repository to serve as the platform for custody,

disability, pharmacy, and laboratory data needs and programs. The receiver also implemented an

electronic Unit Health Record project to create an electronically-accessible medical record for

every inmate. (Receiver's 19th Rpt., *Plata v. Brown*, No. C 01-01351 TEH (N.D. Cal.), ECF No.

4145–1 at 20; Belavich Decl. ¶ 21.) Electronic Unit Health Records are now being used at all

prisons. (Receiver's 19th Rep., ECF No. 4145–1 at 20; Belavich Decl. ¶ 21; *see also* Special

Master's 24th Monitoring Rep., ECF No. 4205, p. 17 (confirming transfer of medical and mental

health records from paper to electronic data and confirming that treatment files are accessible

during clinical appointments and treatment planning).)

Mental health staff have been trained to use and maintain the electronic Unit Health

Records. (Belavich Decl. ¶ 21; Clinical Exp. Rpt. at 28.) Mental health records are current,

accurate, and available to all appropriate staff. (Belavich Decl. ¶ 21; Clinical Exp. Rpt. at 28.)

### 5.    Psychotropic Medication Is Administered with Appropriate Supervision and Periodic Evaluation by Trained Medical Personnel.

Medically required prescription and administration of psychotropic medication must be

done with appropriate supervision and periodic evaluation of the treatment. *Balla,* 595 F. Supp.

at 1577; *Madrid,* 889 F. Supp. at 1258. In 1995, the Court ordered the State to establish an

adequate formulary to ensure that prescriptions were timely delivered and refilled, and to monitor

inmates (if necessary, by blood testing) to determine if they were misusing psychotropic

medications. *Coleman*, 912 F. Supp. at 1323, *adopting* Findings at *104, *107. The Court also

ordered the State to develop procedures for the involuntary administration of medication. *Id.,*

*adopting* Findings at *110.

Those directives have been accomplished. The State's prison medication management

program now meets the standard of care for correctional mental health care systems, and "many

facilities surpass the community standard of care in their medication management approach."

(Clinical Exp. Rpt. at 27.)[8] An effective process exists to ensure timely refilling of prescriptions,

---

[8] An example is the medication monitoring tool now used and titled "Medication Administration Process Improvement Process" that is an "extremely detailed medication-

(continued…)

1  to maintain continuity of medication delivery, and to minimize hoarding of medications.  (*Id.* at

2  26–29; Toche Decl. ¶ 10; Belavich Decl. ¶ 22 & Ex. 6; Special Master's 22nd Monitoring Rep.,

3  ECF No. 3990 at 456 (noting that a clear majority of prisons were timely with medication

4  renewals and that appropriate use of involuntary medications was widespread).)  The State also

5  implemented regulations for administering involuntary medication that protect inmates' due

6  process rights and coordinate mental health and custody personnel actions.  Cal. Code Regs. tit.

7  15, § 3364 (2012).  In 2007, the *Plata* receiver assumed responsibility for "oversight of pharmacy

8  operations serving medical, dental and mental health programs."  (Order, ECF No. 2247 at 9.)

9  The receiver established a drug formulary for the most commonly prescribed medications to

10 standardize and improve quality of care, and established a central-fill pharmacy to manage

11 inventory and centralize distribution.  (Receiver's 21st Report, *Plata v. Brown,* ECF. No. 4239, at

12 19.)  The receiver also improved laboratory services by transitioning to a single laboratory

13 provider (Quest Diagnostic) for all prisons.  (*Id.* at 21.)

14      These improvements adequately meet inmates' mental health care needs, ensure the timely

15 refilling of prescriptions, maintain continuity of medication delivery, ensure adequate monitoring

16 of inmates' medical conditions when taking psychotropic medications, and prevent hoarding or

17 other abuse of medications.  (Clinical Exp. Rpt. at 26–29.)

18          **6.    California Fully Implemented Programs to Identify, Treat, and**
19          **Supervise Inmates at Risk for Suicide.**

20      The Eighth Amendment does not mandate that prisons eliminate all suicide risks.  *See*, *e.g.*,

21 *Miller v. Harbaugh,* 698 F.3d 956, 962–65 (7th Cir. 2012) (rejecting argument that "state officials

22 violate the Constitution when they fail to prevent the suicides of inmates who are not actively or

23 'imminently' suicidal"); *accord Rellergert v. Cape Girardeau County,* 924 F.2d 794, 796 (8th

24 Cir. 1991) (holding that tying a suicide to proof of deliberate indifference is tantamount to

25 requiring jailers to provide suicide-proof institutions, which is not required under the Eighth

26 _____

27 (…continued)
   monitoring tool that exceeds standard of care requirements generally found in the community."
   (Clinical Exp. Rpt. at 1 & 28.)

28

1   Amendment).  A constitutional duty to act arises only when circumstances show a "strong

2   likelihood" that a suicide will occur.  *See Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir.

3   2005) (inmates have no general constitutional right to suicide screenings, enhanced supervision,

4   or other prevention measures absent clear likelihood of suicide);  *accord Woloszyn v. County of*

5   *Lawrence*, 396 F.3d 314, 320-21 (3d Cir. 2005) (holding same); *Belcher v. Oliver*, 898 F.2d 32,

6   34-35 (4th Cir. 1990) (no responsibility to screen every detainee for suicidal tendencies); *Burns v.*

7   *City of Galveston*, 905 F.2d 100, 104 (5th Cir. 1990) (holding same); *Bowen v. City of*

8   *Manchester*, 966 F.2d 13, 18 (1st Cir. 1992) (holding that Eighth Amendment requires a city to

9   "train its jail personnel to recognize and deal with the *obvious* medical needs of detainees").

10      To ensure an appropriate response, prisons must establish a "basic program for the

11  identification, treatment, and supervision of inmates with suicidal tendencies" as a "necessary

12  component of any mental health treatment program."  *Balla*, 595 F. Supp. at 1577; *Ruiz*, 503 F.

13  Supp. at 1339; *see also Tittle v. Jefferson Cnty Comm'n*, 10 F.3d 1535, 1537 (11th Cir. 1994)

14  (holding that county's suicide prevention policies were not constitutionally infirm when they

15  included a medical screening and questionnaire regarding suicidal tendencies, a manual for

16  admission of psychotic prisoners and suicide prevention, and officer training).

17      In 1995, the Court found that the State had a basic program in place to identify, treat, and

18  supervise inmates at risk for committing suicide.  *Coleman,* 912 F. Supp. at 1315, *adopting*

19  Findings at *102.  Additionally, it found that CDCR's suicide prevention program of staff

20  education, prevention, and assessment were sufficient.  *Id.*  But the Court concluded that several

21  institutions failed to adequately implement the suicide watch component due to understaffing,

22  which would likely be remedied once the State improved its staffing.  *Id.*

23      The State has fully implemented and staffed a thorough, standardized program for the

24  identification, treatment, and supervision of inmates at risk for suicide, including a "suicide risk

25  evaluation instruction [that] is much more detailed than the majority of prison and community

26  mental health systems in the United States."  (Clinical Exp. Rpt. at 2, 15 & 31–32; Toche Decl. ¶

27  10; Belavich Decl. ¶¶ 23–27.)  The State also has policies and practices to ensure that employees

28

22

Mem. P. & A. Supp. Defs.' Mot. to Terminate Under the PLRA and Fed. R. Civ. Pro. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

receive effective training on suicide prevention and response.  (Clinical Exp. Rpt. at 31; Belavich

Decl. ¶ 28.)  A suicide prevention committee at each institution is tasked with implementing and

amending policies when deemed necessary.  (Clinical Exp. Rpt. at 31; Belavich Decl. ¶ 29.)  Each

institution also has adequate procedures in place to thoroughly investigate and timely report on

completed suicides and serious suicide attempts.  (Clinical Exp. Rpt. at 31; Belavich Decl. ¶ 30;

s*ee also* Special Master's 24th Monitoring Rep., ECF No. 4205 at 40 (recognizing that all

institutions monitored had a well-established suicide prevention and response focused

improvement team).)  Indeed the experts found "[e]specially impressive" the State's system wide

attention to suicide prevention and that "CDCR does as diligent a job of investigating suicides as

any system of prisons or jails in the county."  (Clinical Exp. Rpt. at 2 & 32.)

### 7.    California Has Implemented Procedures for Disciplinary and Behavioral Control of Inmates with Mental Health Needs.

In 1995, the Court ordered the State to develop and implement protocols for evaluating

mentally ill inmates placed or detained in administrative segregation or security housing units,

and governing the care of any inmate with mental health needs housed in these settings.

*Coleman*, 912 F. Supp. at 1323-24.  The State was also ordered to draft procedures for use of

tasers, 37-mm guns, mechanical restraints, involuntary medication and other behavior control

measures on Plaintiff class members.  *Id*.

The State has developed and implemented procedures for placing and retaining inmates

with mental health needs in any administrative segregation or security housing unit.  (Martin Exp.

Rpt. at 10 & 13–16; Belavich Decl. ¶ 31 & Ex. 7; Special Master's 23rd Monitoring Rep., ECF

No. 4124 at 29 (recognizing new tracking system to improve monitoring of inmates in

administrative segregation.)  When housed in these units, inmates' mental health needs are being

appropriately met.  (Clinical Exp. Rpt. *passim*.)  There is no evidence that mentally ill inmates

housed in these settings are being denied appropriate treatment.  (*Id*.)

In addition, the State complied with the Court's orders on use of force policies.  (Martin

Exp. Rpt. 10-13; Belavich Decl. ¶ 32.)  There is no pattern or practice of force being used either

23

Mem. P. & A. Supp. Defs.' Mot. to Terminate Under the PLRA and Fed. R. Civ. Pro. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

1   unnecessarily or disproportionately against class members or without accounting for class

2   members' mental health status.  (Martin Exp. Rpt. at 11.)  Rather, the State's system to minimize

3   and control unnecessary use of force is "among the very best of any such systems" in the United

4   States.  (*Id.* at 13.)

5       **B.      California's Correctional Health Care System Meets or Exceeds the
6               Constitutional Standards.**

7       Given the superior system now in place, there is no evidence that the State is acting with a

8   "sufficiently culpable state of mind" to cause harm to inmates needing mental health treatment.

9   *See Farmer*, 511 U.S. at 837.  To the contrary, the State corrected the violations identified by the

10  Court and is providing constitutional mental health care statewide.  (Clinical Exp. Rpt. *passim*;

11  Martin Exp. Rpt. *passim*.)  The State's decades-long effort to implement a system that meets or

12  exceeds constitutional standards of care indisputably shows that it is not purposefully or willfully

13  ignoring the serious mental health needs of inmates.  (Clinical Exp. Rpt. *passim*; Martin Exp. Rpt.

14  *passim*.)  Therefore, on these grounds alone, all prospective relief must be terminated and the case

15  dismissed.

16      Additionally, there is no evidence of system-wide injuries to Plaintiffs justifying system-

17  wide relief.  *See Lewis*, 518 U.S. at 346, 349, 351.  Even if Plaintiffs were to submit piecemeal,

18  anecdotal evidence of particular class members complaining about the adequacy of their mental

19  health care, such evidence would be insufficient to demonstrate systemic injury necessary to

20  sustain a § 1983 class action.  *Lewis*, 518 U.S. at 359-60.[9]  The State has a system in place to

---

21  [9] In response to this motion, Plaintiffs may seek to propound copious discovery to justify a
22  lengthy stay of the termination proceedings.  But as the special master concedes, his monitoring is
    "wide and deep, as the delivery of mental health care is a complex and multi-faceted system in
23  CDCR prisons."  (Special Master's 24th Monitoring Rpt., ECF No. 4205, at 34.)  And his
    investigation is "examined and evaluated through the prism of the Program Guide—a
24  compendium of 195 pages of standards and benchmarks for mental health care delivery, plus 110
    pages of attachments."  (*Id.*)  In addition, CDCR provides the special master and Plaintiffs'
25  counsel a monthly report that includes over twenty attachments and, just last month, included 389
    pages of enclosures.  (Belavich Decl. ¶ 34 & Ex. 9.)  CDCR also provides them with extensive
26  information about any suicide that occurs (e.g., suicide report, death review, incident report, and
    medical records), which generally exceeds several hundred pages.  (*Id.*)  Hence, extensive
27  discovery is not warranted—as Plaintiffs and the special master have already gathered every bit
    of evidence that could possibly be generated.

28

24

provide inmates constitutionally adequate mental health care, and the system has been verified as adequate by nationally recognized experts. (Clinical Exp. Rpt. *passim*; Martin Exp. Rpt. *passim*.) In addition, further improvements are underway; the State is continuing to increase its mental health bed capacity, add to its already well-qualified mental health workforce, and improve its quality management and suicide prevention systems. (*See generally* Decls. Toche, Belavich, and Meyer.) This constitutional system will be in place long after Court oversight ends. (*See generally* Decls. Toche, Belavich, and Meyer.) The State anticipates that Plaintiffs, and perhaps even the special master, will oppose this motion because every one of the State's mental health policies and procedures has not been implemented to perfection. But policy compliance cannot be confused with constitutional compliance. Because Plaintiffs can submit no evidence of system-wide constitutional violations, the Court must terminate all prospective relief and dismiss this case under the PLRA.

### III. THE COURT MUST VACATE THE JUDGMENT AND SUBSEQUENT ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5) BECAUSE THE IMPROVED PRISON MENTAL HEALTH CARE SYSTEM MAKES CONTINUED COURT SUPERVISION INEQUITABLE.

The Court must vacate its judgment and orders for prospective relief because Plaintiff class members are receiving constitutionally adequate mental health care. As described above, circumstances within the prison mental health delivery system have changed dramatically since this Court entered its original order in 1995. California's entire prison mental health delivery system has been reinvented from one that the Court found incapable of delivering adequate mental health care to a system that meets and often exceeds the mental health care being provided in prison settings in the United States. (Clinical Exp. Rpt. at 1–2, 8, 14–15 & 39; Martin Exp. Rpt. at 10–16.) These changed circumstances require this Court to terminate this case under Federal Rule of Civil Procedure 60(b)(5).

Under Federal Rule of Civil Procedure 60(b)(5), this Court can relieve a party from any final judgment or order that has been satisfied, or if applying it prospectively is no longer fair. Rule 60(b)(5) sets forth a flexible standard. *Rufo*, 502. U.S. at 385. "A flexible approach allows

25

courts to ensure that responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant." *Horne*, 557 U.S. at 450. Moreover, courts ruling on a Rule 60(b)(5) motion "must remain attentive to the fact that federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate federal law or does not flow from such a violation." *Id.* at 450 (internal citation omitted). Courts must be especially attentive to limiting institutional reform orders that dictate state budget priorities or tie state officials to their predecessors' policy preferences. *Id.* at 448-49 (finding that federalism concerns are heightened when a federal court decree or judgment tends to interfere with a state's democratic process).

In 1995, the Court found that the State had not properly implemented the elements of a constitutionally adequate mental health care delivery system required under *Balla*. On that basis, the Court ordered widespread and far-reaching institutional reform. But now, rather than simply being required to satisfy the requirements of the constitution, the State is required to achieve 90% compliance with all prison mental health procedures and program guides and court orders (and 100% compliance with policies and procedures and court orders related to suicide prevention). (Belavich Decl. ¶ 33.) But as the State's experts observe, such onerous compliance requirements destine the State to perpetual monitoring and no end to this case. (Clinical Exp. Rpt. at 14–15.) And even the reporting on issues that may relate to the core constitutional components is sometimes misstated. (*See* Special Master's 24th Monitoring Rep., ECF No. 4205 at 32–35.) Although the special master, in his most recent report (filed nearly half a year ago), criticized the State's mental health staffing, most of the vacancies highlighted by the special master are in administrative and executive positions. (*Id.*) The experts confirm that although not every single open clinical position has been filled, the State recruits, trains, and retains a well-qualified mental health workforce sufficient to provide constitutionally adequate mental health care. (Clinical Exp. Rpt. 1, 14–15 & 39)

Similarly, the special master criticizes the State for a lack of "attendance and participation by required members at the various committee meetings," particularly meetings involving quality

assurance and improvement.  (Special Master's 24th Monitoring Rep., ECF No. 4205, at 36-40.)

Setting aside that there is no constitutional obligation for prison staff to unfailingly attend

meetings, the experts found no systemic failure of mental health staff to be trained or informed in

their respective duties.  (Clinical Exp. Rpt. at 11–31.)  Indeed, required attendance at meetings is

among the reasons why the State is prevented from providing even more effective mental health

care to inmates.  (Toche Decl. ¶ 9.)

    And the special master faults the State for failing to "achieve compliance with completion

of post-placement 31-question screens in a confidential setting for newly arrived inmates in

administrative segregation," a process by which inmates are asked a series of 31 questions to

determine risks of self-harm upon admission to administrative segregation.  (Special Master's 24th

Monitoring Rep., ECF No. 4205, at 42.)  But again, the State's nationally recognized experts

found that when housed in administrative segregation, inmates' mental health needs are being

appropriately met, and the State in no way denies these inmates appropriate treatment.  (Clinical

Exp. Rpt. at 1–2, 21–25, 39; Martin Exp. Rpt. at 10, 13–16.)

    Today, California's prison mental health delivery system meets or exceeds each of the

*Balla* requirements.  (Clinical Exp. Rpt. *passim*; Martin Exp. Rpt. *passim.*)  More importantly, the

State provides care that meets the diverse mental health care needs of Plaintiff class members.

(Clinical Exp. Rpt. *passim*; Martin Exp. Rpt. *passim.*)  These institutional changes are the result

of years of deliberate effort to reform policies and procedures and expand the State's physical and

staffing capacity.  (Clinical Exp. Rpt. *passim*; Martin Exp. Rpt. *passim*; *see generally* Decls.

Toche, Belavich, and Meyer.)  By reforming the mental health delivery system to meet

constitutional standards, the State eliminated the federal violations that sustained the Court's

judgment and remedial orders.  Accordingly, it is no longer fair or equitable for this case or the

Court's remedial orders to continue.  *Rufo,* 502. U.S. at 385; *Horne,* 557 U.S. at 447-50.

    The State's creation and implementation of a comprehensive remedial plan dictates that the

judgment and all operative orders be vacated, and this action dismissed.  *Rufo,* 502. U.S. at 385.

The State has remedied all of the deficiencies this Court found in 1995, and brought the prison

27

Mem. P. & A. Supp. Defs.' Mot. to Terminate Under the PLRA and Fed. R. Civ. Pro. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

1    mental health care system into compliance with all applicable federal and constitutional

2    standards.  (*See generally* Decls. Toche, Belavich, Meyer, Johnson, and Laura Ceballos.)

3    Nationally recognized experts confirm that the systemic reforms provide a durable remedy.

4    (Clinical Exp. Rpt. at 1–2, 39; Martin Exp. Rpt. at 10–16.)  Since "a durable remedy has been

5    implemented, continued enforcement of the order is not only unnecessary, but improper." *See*

6    *Horne*, 557 U.S. at 450.  Accordingly, the Court must terminate its jurisdiction and the remaining

7    remedial orders.

8                                                **CONCLUSION**

9            All admissible evidence proves that the State is providing timely and appropriate mental

10   health care to its prison inmates.  Far from being deliberately indifferent to these inmates' serious

11   mental health needs, the State provides a level of care that nationally recognized experts find

12   meets or surpasses that offered by any other correctional system in the nation.  After twenty-two

13   years of litigation and seventeen years of exhaustive federal court monitoring and oversight, it is

14   now time for this case to end.

15   Dated:  January 7, 2013                              Respectfully Submitted,

16                                                        KAMALA D. HARRIS
                                                          Attorney General of California
17                                                        JAY C. RUSSELL
                                                          Supervising Deputy Attorney General
18

19                                                        */s/ Debbie J. Vorous*

20                                                        DEBBIE J. VOROUS
                                                          Deputy Attorney General
21                                                        *Attorneys for Defendants*

22   CF1997CS0003

23

24

25

26

27

28