# EXHIBIT 1

[to Vorous Declaration]

# *Coleman v. Brown*

Case No. 90-cv-00520 LKK JFM P (Eastern District of California)

## Clinical Evaluation of California's
## Prison Mental Health Services Delivery System

By

**Joel A. Dvoskin, Ph.D., A.B.P.P.**

**Jacqueline M. Moore, R.N. Ph.D. CCHP-A**

**Charles L. Scott, M.D.**

# EXECUTIVE SUMMARY

We were asked by the Attorney General's Office as experts in the field of correctional mental health (psychiatry, psychology, and nursing) to conduct a series of site inspections of California Department of Corrections and Rehabilitation (CDCR) institutions and provide our observations and opinions of California's prison Mental Health Services Delivery System. Specifically, we conducted a comprehensive review of CDCR's policies, procedures, and practices within our areas of expertise to evaluate whether the inmate-patients in the *Coleman v. Brown* class are systemically receiving mental health care as required by the United States Constitution.

As a result of our review, it is our opinion that the California Department of Corrections and Rehabilitation (CDCR) has developed a clearly defined Mental Health Services Delivery System that diligently and successfully identifies inmates with serious mental disorders upon reception into the CDCR and during inmates' subsequent incarceration. Furthermore, the Mental Health Services Delivery System provides assessment and treatment of inmates with serious mental disorders that meets and often exceeds the standard of care for prisons in the United States based on our collective and individual experience.

Each of us has had the opportunity to observe and monitor numerous state correctional systems. In our opinion, few—if any—systems have the diligent provision and self-monitoring of mental health care that currently exists within CDCR. More importantly, the clinical care itself places CDCR in the upper echelon of state prison mental health systems.

One member of the team (Joel Dvoskin) was an expert witness in the original *Coleman v. Wilson* case in 1994. At that time, Dr. Dvoskin testified that the CDCR (then called CDC) was unconstitutional, even though he was called as a witness by the Attorney General. The improvement in CDCR's mental health service delivery system between then and now is remarkable and dramatic.

Today CDCR has comprehensive policies and procedures and follows a court-ordered Program Guide that prescribes virtually every detail of the system's operation, often requiring types and levels of care that did not exist in 1994, and do not exist elsewhere. Furthermore, the current level of service and leadership is as good as it has ever been, and is as good as or better than the majority of correctional mental health systems in the United States.

To ensure the highest level of medication monitoring for inmates, CDCR has also developed a medication-monitoring tool titled "Medication Administration Process Improvement Process." The MAPIP evaluation tool is an extremely detailed medication-monitoring tool that exceeds standard of care requirements generally found in the community.

In evaluating CDCR's approach to Quality Management, we reviewed the Quality Improvement Plans (QIPs) and met with the Quality Management Team (QMT) at each

institution visited. We have never seen a system that is more comprehensive and extensive regarding quality improvement within a correctional environment.

The CDCR does as diligent a job of investigating suicides as any system of prisons or jails in the country. Their suicide assessments and investigations result in findings that are reasonable and frequently self-critical, and the Department attempts to follow up on each and every serious recommendation. Especially impressive is the system-wide attention to suicide prevention. Suicide Prevention and Response Focused Improvement Team (SPR FIT) committees did not exist in 1994, and the Department now devotes extraordinary resources to clinical and operational investigations of completed suicides, as well as prospective efforts to prevent such acts in the future. While these efforts must continue – probably forever – and there is no "acceptable" number of suicides in any prisons system, CDCR's current efforts demonstrate a passionate interest in preventing suicides.

CDCR has also created an exceptionally detailed suicide risk evaluation instrument to document potential adverse and protective suicide risk factors with associated risk levels resulting from this analysis. This suicide risk evaluation instrument is much more detailed than the majority of prison and community mental health systems in the United States. The most crucial area for continued improvement is in ensuring that risk factors are appropriately considered and accurately documented on this instrument. To meet this goal, CDCR has already begun a comprehensive system-wide project to train, monitor, mentor, and improve the quality of suicide risk evaluations by its clinicians.

We understand that it has taken many years to achieve these improvements, and we believe that credit should fairly go to a variety of stakeholders, including past and current employees and leaders of CDCR, as well as the plaintiffs, the Special Master's office and experts, and the office of the Receiver. We also understand that no system is perfect, and have made facility-specific and systemic findings and recommendations for continued improvement. Many of these recommendations have already been accomplished by the responsive and competent leadership that is now in place.

In summary, CDCR is not acting with systemic deliberate indifference to inmates' serious mental health care needs and in fact excels in their delivery of mental health services to inmates in multiple areas.

## QUALIFICATIONS OF THE SUBJECT MATTER EXPERTS

### *Joel A. Dvoskin, Ph.D., A.B.P.P.*

Dr. Dvoskin is a clinical psychologist licensed in the State of Arizona since 1981 and the State of New Mexico since 2005.  He received his Ph.D. in Clinical Psychology in 1981, from the University of Arizona. He is a Diplomate in Forensic Psychology of the American Board of Professional Psychology.  He is a Fellow of the American Psychological Association (APA) and the American Psychology-Law Society.  He was formerly President of Division 18 of the American Psychological Association (Psychologists in Public Service) in 2000-2001, and President of the American Psychology-Law Society, Division 41 of the APA, in 2006-2007.  He holds a Certificate of Professional Qualification in Psychology from the Association of State and Provincial Psychology Boards.  He is the author of numerous articles and chapters in professional journals and texts, most dealing with the intersection of the mental health and criminal justice systems, and has been qualified as an expert witness in numerous state and federal courts throughout the United States.

In 1995, Dr. Dvoskin served as Acting Commissioner of Mental Health for the State of New York, overseeing 31 state psychiatric hospitals, 25,000 staff, and the care of more than 100,000 New Yorkers with serious mental illness.  Prior to that, for eleven years Dr. Dvoskin served as Director of Forensic Services and Associate Commissioner for Forensic Services for the New York State Office of Mental Health, in which capacity he oversaw the forensic and correctional mental health systems for the State of New York, and directly supervised three free-standing maximum security forensic psychiatric hospitals, two forensic units, and fifteen prison mental health programs.  During that time, his office created the nation's first statewide suicide prevention program for local jails and police lockups, a program that has since been exported to and emulated by many states and municipalities. The office also created a program to teach police officers how to effectively deal with persons with serious mental illness or in emotional crisis, a program that has been required by the State of New York for all newly commissioned peace officers for more than two decades, and shared with numerous police departments all over the United States. He has trained police departments in many jurisdictions on a variety of topics, including how to successfully and safely deal with persons with apparent mental illness in the performance of their police duties. In September 2011, Dr. Dvoskin served as keynote speaker for the International Conference of (police) Crisis Intervention Teams.

Dr. Dvoskin recently served as a monitor of Federal Court settlement agreements over psychiatric hospitals in Tacoma, Washington and Pueblo, Colorado, and the Bernalillo County (NM) Detention Center, and served as a Monitor of the Federal Court settlement agreement (*MPAS v. Caruso*) regarding the Michigan Department of Corrections.  He has testified in numerous class actions regarding conditions of confinement, as well as mental health services and suicide prevention programs in prisons, jails, police lockups, and maximum-security hospitals throughout the United States.  He has consulted to state and local governments in at

least 30 states in the provision of mental health services in criminal justice settings, including persons who encounter the police in their home communities.  He has testified as an expert witness on wrongful death and tort liability cases, as well as the standard of care for police officers dealing with persons who appear to have mental disabilities or who are in psychiatric or emotional crisis.

Dr. Dvoskin currently serves as a member of the expert team for the Civil Rights Division of the U.S. Department of Justice (USDOJ) that is currently investigating the Los Angeles County Jail, and has served in a similar capacity in the past, including the USDOJ investigations of the Yavapai and Maricopa County Jails in Arizona, the Harrison County (MS) Jail and the Los Angeles County Juvenile Hall.

Dr. Dvoskin has written extensively on the subject of correctional and forensic mental health, and the intersection of mental health and criminal justice, and was one of two consultants to the APA in the development of its Guidelines for Psychiatric Services in Jails and Prisons.

Dr. Dvoskin recently served as the architectural design consultant for new construction to replace the Saint Elizabeth's Hospital in Washington, D.C., the Colorado Mental Health Institute – Pueblo, and has served in such a capacity for a number of psychiatric hospital construction projects in the U.S. and Puerto Rico.  He currently serves or has served as an architectural design consultant on projects to create mental health housing within the correctional systems of Oregon, Florida, Georgia, and Idaho.  He has provided architectural consultation to various agencies and parties on a variety of issues, including elimination of suicide hazards in the physical plants of correctional and psychiatric facilities throughout the United States.

Dr. Dvoskin provides frequent training to clinicians in the treatment of persons with serious mental illness and/or substance abuse disorders, especially those in criminal and juvenile justice settings, and has provided training throughout the United States, Canada, and the United Kingdom on assessing the risk of violence to self and others.  He has provided training on reducing the risk of violence and suicide in correctional facilities in a number of jurisdictions.  He has also provided training to many police organizations on dealing with persons with mental illness or in emotional crisis, including the National Tactical Officers Association and the International Association of (police) Crisis Intervention Teams.

Dr. Dvoskin has won awards from the American Psychological Association (Division 18), the Arizona Psychological Association, the American Academy of Psychiatry and the Law, and the National Coalition for the Mentally Ill in the Criminal Justice System for his efforts to improve mental health services to criminal justice and correctional populations.

Dr. Dvoskin began his career as a psychologist with the Arizona Department of Corrections, and worked at the Arizona State Prison Complexes at Florence and Tucson, as well as the Catalina Mountain School, then called the Arizona Youth

Center.  He has also worked in or supervised maximum-security state psychiatric hospitals in Massachusetts and New York, respectively.

Dr. Dvoskin is or has been a member of the faculties in the Departments of Psychiatry at the Louisiana State University College of Medicine (inactive), the New York University Medical School (inactive), and the University of Arizona College of Medicine, where he continues to teach.  Previously, he taught on the faculty of the University of Arizona College of Law.  He maintains a consulting practice of forensic psychology, located in Tucson, Arizona.

Dr. Dvoskin is the lead Editor (with Jennifer Skeem, Raymond Novaco, and Kevin Douglas) of *Using Social Science to Reduce Violent Offending* and the co-author (with Andrew W. Kane) of *Evaluation for Personal Injury Claims*. Both books were published in 2011 by the Oxford University Press.

### Jacqueline M. Moore, R.N. Ph.D. CCHP-A

Dr. Moore is the President of Moore & Associates, and a pioneer in the field of correctional health care.  Dr. Moore was one of the two founders of Prison Health Services, Inc. (PHS) -- the first company in the United States to provide correctional health care services to state and local governments.  In 1990, she assisted her firm with a public offering having revenues of over $60 million with 42 contracts in state and county facilities on a nationwide basis.  Dr. Moore has over 33 years of experience in operating and evaluating correctional systems.

Dr. Moore then joined the Wackenhut Corporation where, as Vice President of Medical Services, she established their correctional health care division -- managing 14 detention and correctional centers, including oversight of the budgets, organizations and overall supervision of all medical services.

In 1992, Dr. Moore established a new subsidiary for Coastal Correctional Healthcare.  She was responsible for the entire marketing and development of this new health care firm.  Formulation of operating policies and procedures, supervision of budgetary and cost containment programs, coordination of administrative support services and serving as the liaison with clients were several of her responsibilities.  More recently, Dr. Moore served as the Director of Operations for National Commission on Correctional Health Care (NCCHC), where she provided technical assistance to numerous county and state municipalities and directed the NCCHC's accreditation program.

Dr. Moore has a Doctorate degree in nursing, specializing in health policy and program evaluation.  She served on the NCCHC Board of Trustees for three years, has published extensively and spoken at numerous correctional conferences on a variety of correctional topics.  She is well-versed on managed health care, cost analyses and evaluation methodologies.  In 2005, Dr. Moore wrote a chapter on privatization of inmate health care for the American Correctional Association (ACA). (A reprint of that chapter has been published by Corrections Management Quarterly.)  Dr. Moore published a text on Management and Administration in

Correctional Health Care and serves as the current editor of Correctional Health Report – a national correctional health care publication published by the Civic Research Institute.  In 2009, she was awarded the Distinguished Service Award from the American Association of Correctional Health Professionals.  She has recently written a chapter entitled "Legal Implications for Nurses".

As a former Senior Lead Surveyor for the NCCHC, Dr. Moore surveyed States in West Virginia, Arizona, Texas, Delaware, Oregon, Utah, Alabama, Connecticut and South Dakota.  She is well versed in accreditation standards.

### Charles L. Scott, M.D.

Dr. Scott is a Clinical Professor of Psychiatry at the University of California, Davis.  He is licensed to practice medicine in the state of California.  He is board certified by the American Board of Psychiatry and Neurology (ABPN) in General Psychiatry, Child and Adolescent Psychiatry with Added Qualification in Forensic Psychiatry and Addiction Psychiatry.

Dr. Scott has been the Forensic Psychiatry Fellowship Training Director at the University of California, Davis since October of 1998 and has been Chief, Division of Psychiatry and the Law at University of California, Davis since 2002.  In his role as Training Director, he is responsible for providing training to the forensic psychiatric fellows on issues in regard to malpractice and constitutional standards of care in correctional facilities.

Dr. Scott is the immediate Past-President of the American Academy of Psychiatry and the Law (AAPL) and has also served as Vice-President of AAPL and as a national Counselor of AAPL.  Since 1996, he has been one of four psychiatrists selected from the United States to provide national training for the AAPL Annual Forensic Review Course.  He has been the single national faculty member selected to provide the national training for issues related to correctional mental health care for this national annual training.

Dr. Scott has direct clinical experience working as a psychiatrist in correctional settings.  In particular, he has conducted evaluations of U.S. Army soldiers facing charges and housed in detention in his role as an Army psychiatrist, conducted evaluations of inmates in the Cuyahoga County Jail and Cuyahoga County Juvenile Detention Facility (Ohio),  provided ongoing psychiatric care for inmates at Louisiana's Hunt Correctional Facility from 1996-1998,  provided ongoing psychiatric care at the maximum security forensic psychiatric unit at Louisiana's Feliciana Forensic Facility from 1996-1998, and worked as a correctional psychiatrist at the Sacramento County Jail from 1998 through 2010.  In addition, Dr. Scott has served as the forensic psychiatric consultant to Napa State Hospital, a facility that houses pre-trial detainees for competency restoration and mentally disordered offenders.  He has served as a consultant in this capacity from 1998 until the present time.

In his role as an expert on correctional mental health, Dr. Scott has served as an expert witness on litigation issues involving standard of care in the states of Alabama, Arizona, California, Florida, Illinois, and New Mexico.

Dr. Scott has authored numerous publications related to correctional mental health care and has served as Editor of two editions of the American Psychiatric Association's *Handbook of Correctional Mental Health Care*.  He has provided numerous trainings on standards of care in correctional settings, has served on California's Judicial Action Committee, and is presently a member of the American Psychiatric Association's Council on Psychiatry and the Law.

### <u>TESTIMONY, PUBLICATIONS, AND COMPENSATION</u>

Each of the expert's qualifications, including a list of their publications in the past year, the cases they have testified in over the past four years, and the compensation for their  work, are attached in three separate attachments as follows:

Attachment A:        Expert Witness Qualifications of Joel Dvoskin, PhD.

Attachment B:        Expert Witness Qualifications of Jacqueline Moore, R.N. Ph.D. CCHP-A

Attachment C:        Expert Witness Qualifications of Charles Scott, MD

Attachment D:        Statement of Expert Witness Compensation

## OPINIONS

Opinions provided in this report are to a reasonable degree of professional (i.e., medical, psychological, or nursing) certainty according to the professional standards of the undersigned.

### Overarching Opinions:

I.  The California Department of Corrections and Rehabilitation (CDCR) has developed a clearly defined Mental Health Services Delivery System that diligently and successfully identifies inmates with serious mental disorders upon reception into the CDCR and during inmates' subsequent incarceration.

II.  CDCR has developed a Mental Health Services Delivery System that refers inmates identified with serious mental disorders for appropriate psychiatric and mental health care.  The Mental Health Services Delivery System provides assessment and treatment of inmates with serious mental disorders that meets and often exceeds the standard of care for prisons in the United States based on our collective and individual experience.

III.  CDCR has developed a Mental Health Services Delivery System that identifies and responds to inmates' mental health crises in a timely manner, even for inmates who do not have a serious mental disorder.

IV.  CDCR is not acting with systemic deliberate indifference to inmates' serious mental health care needs.

### Basis and Reasons for Opinions:

The opinions expressed are based on the information outlined above regarding expert witness disclosure and the following:

I.  The experts' experience and expertise in the field, including conducting inspections of prisons in other states, monitoring of federal court settlement agreements or orders, and providing treatment to inmates in a prison setting.

II.  Site visits (including confidential and private conversations with inmates and staff) to the following 13 CDCR institutions: California Medical Facility; California State Prison, Sacramento; Centinela State Prison; Richard J. Donovan Correctional Facility; Central California Women's Facility; California State Prison, Corcoran; California Institution for Men; California State Prison, Los Angeles County; Salinas Valley State Prison; California State Prison, San Quentin; Pelican Bay State Prison; California Men's Colony; and Substance Abuse Treatment Facility and State Prison at Corcoran.

III.  Institutional information, including mental health census, documentation of services delivered, suicide prevention and quality improvement efforts, and reports of incidents.

8

IV. Documents received from Attorney General's Office.

V. Meetings with mental health, medical, and custody staff at all levels at each site visit.

VI. Minutes from Quality Management and Suicide Prevention and Response Focused Improvement Team meetings, as well as discussion with relevant coordinators and committee members.

VII. Inmate health records recorded in the Electronic Unit Health Record, data from the Mental Health Tracking System (MHTS.net), as well as on-site medical and mental health records.

**<u>Facts or Data Considered in Forming Opinions</u>:**

Based on the sources of information outlined above, five general areas were reviewed in analyzing CDCR's Mental Health Services Delivery System.  These five areas include the following:

- Screening/Identification of Inmates with Serious Mental Disorders;

- Access to Care;

- Medication Management, including prescription and delivery of medications and laboratory studies;

- Quality Management and Improvement; and

- Suicide Prevention

The opinions relevant to each of these areas are summarized below.

**I.** **Screening/Identification of Inmates with Serious Mental Disorders**

As highlighted above in the section titled "Overarching Opinions," CDCR has a well established and clearly defined system for screening and evaluating inmates for serious mental illness, both at the time of reception and during incarceration.

In particular, we evaluated the screening and identification process in every prison that we visited that had a reception center. We found that reception center screening was routinely completed within a reasonable period of time and inmates who were identified as seriously mentally ill received services at the appropriate level of care while they were in a reception center.

In addition, at each facility visited, there was a process in place to ensure immediate psychiatric referral for inmates deemed to need urgent or emergent psychiatric care throughout the course of their incarceration. There was also a process for routine referrals for inmates who might need a higher level of care.

II. **Access to Care**

A. **General overview:**

It is our opinion that CDCR has a reasonably functioning system for providing ready access to appropriate care once an inmate's serious mental health issues are identified. At each facility, we paid special attention to whether inmates appeared to be unidentified or underserved. Specifically, we looked for inmates who were in need of mental health services but unidentified as well as inmates who needed a higher level of care than they were receiving. We also reviewed the data from studies conducted by CDCR and the Special Master's team that determined that an extremely low number of inmates who required mental health services were unidentified or required a higher level of care.

Prior to beginning our visits, we were also aware of waiting lists for some levels of care; however, because of significant census reductions within CDCR and increased inpatient bed capacity, by the time we performed our visits, the waiting lists were dramatically reduced or non-existent. Furthermore, inmates on a waiting list for a higher level of care received appropriate services pending their transfer to the recommended level of care.

In regard to general access to care, our opinions include the following:

1. At the time of this report, the CDCR Mental Health Services Delivery System ensures reasonably speedy access to care for inmates.

2. Inmates' mental health needs are being appropriately met at their level of care or within their current housing unit.

3. CDCR has an appropriate Mental Health Services Delivery System that includes medication management, individual counseling/therapy, and group therapy.

*General and site specific comments/recommendations regarding access to care:*

1. During our visits, CDCR was involved in a challenging process of realignment and reducing the number of inmates housed in its prisons. There were some reductions in workforce, and some reassignment of staff from one location to another. As with every state, there are complicated rules that provide laid off staff members the right to transfer to open positions in other locations, a process that is unfortunately cumbersome and time-consuming. As a result, several of the prisons we visited were experiencing temporary staff shortages that were unavoidable. By the end of our facility tours, CDCR had made much progress in reassigning staff, and was in the process of hiring to fill vacant positions. In our opinion, these staffing shortages were temporary and unavoidable, and

we do not believe that they were evidence of a lack of commitment by CDCR to meeting the serious mental health needs of its inmates. Further, existing staff responded to these shortfalls by working even harder than usual to provide needed treatment. Finally, in our opinion, the CDCR mental health staffing plan will provide adequate resources to meet the mental health needs of inmates in a reasonable manner and within the standard of care.

2. We were pleased to observe generally excellent cooperation between custody staff and leadership on one hand and the mental health service delivery system on the other. Officers appeared to welcome the presence of mental health practitioners in the cell blocks, and custody staff (up to and including Deputy Wardens in some cases) were active participants in the Interdisciplinary Treatment Team meetings.

3. Throughout our visits at various institutions, inmates expressed concerns that participation in mental health treatment may adversely impact their chances for parole. We were unable to assess the accuracy of this perception; that is, do parole boards believe that <u>receiving</u> needed mental health treatment is a risk factor that argues against granting the inmate parole? If this is accurate, the Board should be encouraged to view an inmate's willingness to receive needed psychiatric treatment as a protective and positive factor in parole consideration.

4. At California State Prison-Los Angeles County, there were significant limitations on office and interview space for the mental health staff, particularly psychiatrists. While these limitations were not intentional or due to a lack of effort by CDCR, they did at times create barriers that inconvenienced staff and at times delayed the provision of routine care. To the credit of CDCR, a new mental health treatment building was under construction at the time of our review and when completed should address and abate this problem.

5. At Salinas Valley State Prison:

   - The mental health director expressed concerns regarding staffing and space shortages. In addition to the factors listed in item #1 above, these problems related to recruitment, retention, and leadership issues. We were especially concerned with the number of psychiatrists on staff there. The Department was already aware of these issues, and had already initiated steps to remedy the situation. One likely additional solution will be the introduction of tele-psychiatry to support the efforts of the on-site psychiatrists.

   - Inmates reported that there were instances where they were forced to choose between their yard time and mental health treatment groups. While there was no evidence of a systemic failure to offer treatment

12

groups, we discussed with custody staff and leadership the importance of avoiding any barriers or disincentives to receiving treatment, and they reiterated their commitment to working with mental health to maximize inmate access to groups.

6.  At Pelican Bay State Prison:

    - Concerns were expressed regarding mental health staffing shortages. (See item #A1 above.)

    - A recreational therapist reported that he was not allowed to enter the fenced-in recreation area used by Enhanced Outpatient Program inmates while providing recreational therapy to those inmates. As a result, he stood outside the fence and watched the inmates engage in unstructured recreational activities. This requirement was reportedly created by custody staff and was apparently aimed at protecting the recreational therapist from injury; however, it prevents meaningful recreation therapy and should be re-visited. CDCR addressed this issue and confirmed that this situation was rectified.

7.  At California Men's Colony, mental health staff reported mental health staffing shortages that adversely impacted their ability to provide care to inmates. (See item #A1 above.)

8.  At the Substance Abuse Treatment Facility, mental health staff reported dramatic mental health staffing shortages. Such staffing shortages were particularly apparent for recreational therapy and psychiatry. Due to significant psychiatric staffing shortages, psychiatrists were not present for many Interdisciplinary Treatment Team meetings, with the exception of the Mental Health Crisis Bed unit. Despite this lack of psychiatrists, the quality of the treatment team meetings observed at the Substance Abuse Treatment Facility was outstanding; nevertheless, psychiatrists are essential members of the treatment team and should be present. CDCR is aware of these shortages, and should continue its efforts to alleviate them as soon as possible. (See also item #A1 above.)

B. **Access to Care Relevant to Specific Level of Care**

Comparison to other systems

Each of us has had the opportunity to observe and monitor numerous state correctional systems. In our opinion, few if any systems have the diligent provision and self-monitoring of mental health care that currently exists within CDCR. More importantly, the clinical care itself places CDCR in the upper echelon of state prison mental health systems. For example, the vast majority of individual inmates we interviewed in the Enhanced Outpatient and Correctional Clinical Case Management System levels of care knew the name of their psychiatrists and primary clinician, expressed neutral or positive feelings about both their psychiatrist and their primary clinician, and knew the type and purpose of the medication they were taking for their serious mental illness. Equally impressive, the Enhanced Outpatient Program treatment teams knew their inmates well, and were able to discuss cases easily and knowledgeably.

Comparisons since the onset of Coleman

One member of the team (Joel Dvoskin) was an expert witness in the original *Coleman v. Wilson* case in 1994. At that time, Dr. Dvoskin testified that the CDCR (then called CDC) was unconstitutional, even though he was called as a witness by the Attorney General. The improvement in CDCR's mental health service delivery system between then and now is remarkable and dramatic. In 1994, there were a handful of mental health professionals, the majority housed in a very few institutions that provided some centralized care for those inmates lucky enough to be transferred there, and little or no services for everyone else. Today there are vastly more mental health professionals spread across the state.

The CDCR clinicians are supported by a large management infrastructure that did not exist in 1994. This includes the extensive quality improvement system mentioned above, which documents that care is being delivered in a timely manner.

In 1994, there were few policies and procedures to guide clinicians and custody staff in the care and management of inmates with serious mental illness. Today CDCR has comprehensive policies and procedures and follows a court-ordered Program Guide that prescribes virtually every detail of the system's operation, often requiring types and levels of care that did not exist in 1994 and do not exist elsewhere.

In what appears to be an unprecedented manner, the Special Master monitors virtually every policy and procedure contained in the Program Guide, resulting in the scrutiny not of constitutional standards but of the Department's own policies and procedures. As a result, CDCR is subject to scrutiny that is more comprehensive, detailed, and micro managerial than

any correctional mental health system that has preceded it. While this demanding scrutiny has undoubtedly resulted in a significant number and quality of system improvements, currently it has two negative consequences. First, CDCR staff spends an inordinate amount of time gathering data and preparing for visits from the Special Master's office; time that could be better spent in the provision of patient care. Second, any positive innovation that the Department wishes to employ to improve its services to inmates with mental illness becomes a criterion against which their compliance is measured. Because innovations are seldom immediately and perfectly successful, systems must have some room to innovate with less than ideal success. Thus, the current level of scrutiny can serve as a disincentive to system improvements.

Finally, the danger of extending court oversight beyond its necessary components and duration makes it much more difficult for the Department to operate its system. There is a general perception that any decision must be reviewed and approved by the Special Master, whether it has constitutional implications or not. In our opinion, this has made it more difficult for the Department to assert the kind of leadership that the Court appropriately desires. To be frank, there was undoubtedly a time when a very high level of scrutiny was necessary because of the Department's failures to alleviate problems in its Mental Health Services Delivery System. However, in our opinion, the current level of service and leadership is as good as it has ever been, and is as good as or better than the majority of correctional mental health systems in the United States.

Especially impressive is the system-wide attention to suicide prevention. Suicide Prevention and Response Focused Improvement Team (SPR FIT) committees did not exist in 1994, and the Department now devotes extraordinary resources to clinical and operational investigations of completed suicides, as well as prospective efforts to prevent such acts in the future. While these efforts must continue – probably forever – and there is no "acceptable" number of suicides in any prisons system, CDCR's current efforts demonstrate a passionate interest in preventing suicides.

We understand that it has taken many years to achieve these improvements, and we believe that credit should fairly go to a variety of stakeholders, including past and current employees and leaders of CDCR, as well as the plaintiffs, the Special Master's office and experts, and the office of the Receiver.

**1. Correctional Clinical Case Management System (CCCMS):**

Inmates at the CCCMS level of care have been assessed with overall stable functioning, although most require and receive psychotropic medications. The CCCMS level care is generally analogous to outpatient psychiatric treatment in the community.

Although many CCCMS inmates might profit from some group therapies, group therapy for CCCMS inmates was not offered at all prisons we visited who provided CCCMS level of care.  However, the fact that an inmate might potentially benefit from group therapy does not mean that such therapy is required to meet the standard of care at the CCCMS level of care.  Nor is the absence of desirable (as opposed to necessary) care below the standard of care for correctional mental health.

At every facility we visited, we interviewed randomly selected CCCMS inmates. The vast majority of CCCMS inmates interviewed knew the name of their Primary Clinician, how to contact him or her, the name of their psychiatrist, the name of their medication, the purpose of the prescribed medication, and the process for arranging an earlier appointment with their psychiatrist or primary clinician if they wanted one.  In our experience, this is a very unusual finding, and one that speaks to the extensive efforts that have been made to have inmates seen on a timely and predictable basis by their psychiatrist and clinician.

The vast majority of cases reviewed indicated that inmates routinely received follow up care by their Primary Clinician and treating psychiatrist at least once every 90 days.  Treatment plan reviews were conducted at least annually, upon a change in the level of care, or as appropriate to the inmate's mental health needs.  In addition, inmates can be referred at any point to mental health services (including self-referral) to address any mental health needs that arise.

In summary, it is our opinion that inmates' mental health needs are being appropriately met at the CCCMS level of care.

*General and site specific comments/recommendations regarding CCCMS level of care:*

At the Central California Women's Facility, we were informed that only 15 groups were being offered to CCCMS female inmates whereas nearly 100 groups had previously been provided.  This appeared due largely to the temporary staffing shortages listed in item #A1.  CDCR has addressed this issue, and reports that there are now 75 groups being offered.

## 2. Enhanced Outpatient Program:

At every facility we visited with an Enhanced Outpatient Program (EOP) or with inmates classified as EOP, we interviewed randomly selected inmates assigned to this level of care.

In addition, we randomly selected Interdisciplinary Treatment Team meetings to observe as part of our evaluation process.  At all Interdisciplinary Treatment Team meetings attended, multiple disciplines

were represented and clinical staff were familiar with the inmate/patient and his or her mental health history.

We also randomly selected and observed scheduled group therapy that was offered to inmates on the days of our visit.

It is our opinion that CDCR's Mental Health Services Delivery System appropriately meets the mental health needs of inmates assigned to an EOP level of care. General findings from our review of the institutions with an EOP level of care include the following:

a.  Inmates are clinically assessed within a reasonable period of time following a bed placement in EOP.

b.  Decisions to refer inmates to EOP are appropriately documented and clinically reasonable.

c.  Treatment plans are uniformly present and appropriately individualized within the standard to care. The treatment plans were periodically reviewed with a rigid adherence to mandated timelines. Prisons varied regarding the level of detail or documentation regarding the individualization of treatment plans; however, all prisons visited met the standard of care in regard to treatment planning for prison mental health services. That is, the treatment plans were timely, individualized, and relevant to the treatment being provided.

d.  Inmates have appropriate contact with their Primary Clinician and the vast majority indicated a reasonably favorable relationship with their clinician. Inmates consistently reported that their Primary Clinician met with them according to the Program Guide parameters. The vast majority of EOP inmates interviewed knew the name of their Primary Clinician and how to contact him or her if they wished to do so. Inmates also reported that they could request to see their Primary Clinician in addition to the minimum required visit frequency.

e.  CDCR meets the standard of care for prison mental health services in regard to the provision of group therapy provided to EOP inmates. Of the 13 prisons we visited, we were consistently impressed with the quality of most group therapy sessions that we observed. Despite CDCR's best efforts, CDCR should continue to increase the quantity of groups that are offered. We also observed some groups that appeared to consist primarily of showing the inmate a movie or entertainment video. It is important to note that because inmates enjoy watching movies or other entertainment videos, the use of this activity may serve as a positive reinforcement to encourage inmates to participate in out of cell activities and other types of group therapy. We understand that recreation and entertainment may be an appropriate aspect of group therapy, so long as the majority of group therapy time

is devoted to psychotherapeutic, rehabilitative, skill building, and psychoeducational activities.

f.   CDCR psychiatrists evaluate EOP inmates as clinically necessary, at least once each month, to address psychiatric medication issues. Inmates routinely knew the name of their psychiatrist, the name of their medication and purpose of the prescribed medication, and the process for arranging an earlier appointment with their psychiatrist if they wanted one.

g.   When the inmate's clinician deems that a private setting is appropriate for clinical contact, each institution visited had a private setting available, and this space was utilized when needed.

h.   Despite explicitly looking for underserved inmates, we found few, if any, inmates who needed a higher level of care and were not identified.

i.   For those inmates who were identified as needing EOP level of care, we found that inmates received appropriate treatment pending transfer. Considering the generally non-therapeutic environment of administrative segregation, we applaud CDCR's efforts to expedite the transfer of EOP inmates out of administrative segregation.

*General and site specific comments/recommendations regarding EOP level of care*:

As noted above, each prison we visited met the standard of care in regards to inmates' access to EOP level of care. There were naturally some variations in some aspects of EOP care provided between prison facilities, which included the following:

a.   At CSP-Sacramento:

•   We attended several Interdisciplinary Treatment Team meetings that were combined with the Institutional Classification Committee in a laudable effort to enhance collaboration between custody and clinical staff. While combining these two meetings is in theory a good idea, in reality this process may create a less satisfying experience for the inmates. The sheer number of staff members present in the room was potentially intimidating to inmates. As a consequence, for the treatment team meetings we observed, inmates said few if any words. The treatment team appeared compelled to meet each and every mandated requirement (*e.g.,* a discussion of the specific number/s of then-Department of Mental Health transfer criteria even if transfer was not indicated or under consideration). Far more important than such mandatory requirements is the meaningful conversation with the person being evaluated and treated, which would be far better served by a meeting with fewer staff members, each of whom knows

18

the inmate.  To be fair, however, each inmate had discussed his treatment plan with his Primary Clinician prior to the treatment team meeting; thus, it is our opinion the standard of care was met in spite of the rigidly prescribed process.

- The quality of group therapy for EOP inmates was very good.  At the time of our visit, however, the <u>amount</u> of group therapy offered and received was lower than other prisons, largely because of staffing issues, which we understand were under the control of the Receiver's office.  However, at the time of this report, this issue had been resolved, additional staff had been hired, and the group therapy offered met standard of care.

b.  At California Institution for Men, there were some inmates waiting for EOP Special Needs Yard beds and reportedly housed in an Administrative Segregation Unit for their own protection; not because they posed a danger to others.  Our recommendation is that inmates with serious mental illness who are housed in an Administrative Segregation Unit while awaiting a Special Needs Yard bed be placed at the front of any waiting list.  At the time of this report, we were told that there was no longer a waiting list for transfer of inmates to an EOP program.

c.  At Corcoran, inmates reported from the EOP Special Needs Yard that their yard time was cancelled for various reasons on a relatively frequent basis.

d.  At CSP-Los Angeles County, there were 12 EOP inmates housed in a Special Needs Yard not receiving group therapy because there was reportedly inadequate staff and space available.

**3.  Mental Health Crisis Bed Unit:**

At every prison visited with a Mental Health Crisis Bed (MHCB) unit or Correctional Treatment Center serving inmates experiencing mental health crises, a member of our team assessed the program by interviewing randomly selected inmates, observing randomly selected Interdisciplinary Treatment Team meetings, conducting interviews of mental health staff, and reviewing randomly selected inmates' psychiatric and medical records.

It is our opinion that CDCR's Mental Health Services Delivery System appropriately meets the mental health needs of inmates assigned to a MHCB level of care.  General findings from our review of the prison programs with a MHCB level of care include the following:

a.  Inmates were routinely assessed within a reasonable amount of time following admission to the MHCB unit.

b.  Treatment plans were timely and appropriately documented and updated.

c.  Inmates had appropriate contact with a Primary Clinician. The vast majority of MHCB inmates interviewed knew the name of their Primary Clinician and how to contact him or her if they wished to do so.  Inmates also reported that they could request to see their Primary Clinician in addition to the minimum required visit frequency.

d.  A psychiatrist evaluates the inmates as clinically necessary to address psychiatric medication issues.  Inmates routinely knew the name of their psychiatrist, the name of their medication, purpose of the prescribed medication, and the process for arranging an earlier appointment with their psychiatrist if they wanted one.

e.  Discharge plans were completed as appropriate.

f.  Despite explicitly looking for underserved inmates in MHCB setting, we found few, if any, inmates who needed a higher level of care and were not identified.

g.  Reasons that inmates needed restraints were appropriately documented.

*General and site specific comments/recommendations regarding MHCB level of care:*

a.  Institutions varied as to whether inmates were required to be interviewed in therapeutic modules and/or cuffed during Interdisciplinary Treatment Team meetings in the MHCB unit.  Several institutions made decisions regarding the use of therapeutic modules or handcuffs that were based on the security needs of each individual and this approach should be encouraged at all institutions.

b.  At Corcoran, there was extremely limited space to conduct Interdisciplinary Treatment Team meetings in the crisis bed unit. Despite this environmental space limitation, multidisciplinary team members were engaged and interactive with the inmate/patient and met the standard of care for prison mental health programs.

c.  Mental health staff at the Central California Women's Facility reported that inmates might be refused for transfer to a Department of State Hospitals facility if they had exhibited recent violent behavior.  In July 2012, however, CDCR opened an inpatient facility for women at the California Institution for Women, and there will no longer be a need to transfer women inmates to Department of State Hospitals facilities.

d.  At Pelican Bay State Prison, there was significant confusion about the status (*e.g.,* suicide watch, suicide precaution) of inmates who were clearly being housed on the MHCB unit to prevent suicide. Unfortunately, these inmates had not been given a Suicide Risk Evaluation before making a decision to *not* put them on suicide watch.

In this setting at Pelican Bay, the Suicide Risk Evaluation and management fell below the standard of care. Specifically, and only at Pelican Bay, decisions were made about suicidality in the absence of a Suicide Risk Evaluation, and inmates were housed in suicide watch conditions without having been placed on a suicide watch. As of the writing of this report, this situation has been rectified.

**4. Outpatient Housing Unit/Mental Health Outpatient Housing Unit:**

In some circumstances, we found that inmates were temporarily placed in an Outpatient Housing Unit for mental health reasons, typically for short-term suicide watch while awaiting transfer to an available MHCB. In these situations, we found that the inmates' mental health needs were being appropriately met.

**5. Administrative Segregation Unit (General/CCCMS):**

We conducted randomly selected interviews of CCCMS inmates housed in Administrative Segregation Units (ASU). All CCCMS inmates we identified in ASU were provided appropriate services and periodically assessed to evaluate if they needed a higher level of care. The inmates that we interviewed knew how to access unscheduled mental health or psychiatric services.

*General and site specific comments/recommendations regarding ASU level of care:*

a. Inmates who were awaiting transfer to an EOP level of care in an Administrative Segregation Unit were seen regularly while awaiting transfer despite the obvious physical plant limitations of providing services within an administrative segregation environment.

b. When a mentally ill inmate is housed in an Administrative Segregation Unit solely for his own protection, we see no appropriate reason to require that the inmate be seen only in a therapeutic module and recommend that this decision be made on an individual basis.

c. As noted in the section below addressing suicide prevention, Administrative Segregation Units had a statistical overrepresentation of completed suicides when compared to other housing units, despite CDCR's significant efforts to address this problem. Sadly, this is the case in prisons across the country, and reinforces the importance of using Administrative Segregation Units only when it is absolutely necessary to protect staff and inmates. For this reason, and because the environment is not therapeutic, we recommend that placement of inmates who require an EOP level of care be housed in Administrative Segregation Units only when absolutely necessary for the safety of staff or inmates, and only for as long as is absolutely necessary.

d. At the California Medical Facility, we observed one inmate who had been designated for transfer to an EOP Special Needs Yard for his own protection and pending transfer the inmate was housed in an Administrative Segregation Unit. While this single case had no

systemic implications, we did recommend to CDCR that any inmate housed in segregation while awaiting an EOP Special Needs Yard bed be moved to the top of the transfer list to minimize the length of time that they are housed in segregation.

e.  At the Central California Women's Facility, there was no special needs yard.  As a result, some women are housed in Administrative Segregation Units solely for their own protection, including some inmates in the mental health delivery system.  However, we note that great effort was expended to ensure that these women received the same number of treatment hours that that they would have received in an EOP program.

f.  At the California Institution for Men, the morale of the treatment team responsible for providing care to Administrative Segregation Units inmates appeared low, which may account in part for inmates' decreased willingness to participate in treatment.  We recommended that the institution develop a Quality Improvement Plan with the Captain and the Administrative Segregation Unit mental health team to evaluate interventions to increase inmate's participation in treatment.  We also recommended that a Quality Improvement Plan be initiated to improve the staff morale.  CDCR followed our recommendations, and we received confirmation that these Quality Improvement Plans were indeed initiated, with positive results.

**6. Enhanced Outpatient Program-Administrative Segregation Unit Hub:**

At the nine facilities we visited with an Enhanced Outpatient Program-Administrative Segregation Unit (EOP-ASU) Hub, we interviewed randomly selected inmates assigned to this level of care.

It is our opinion that the CDCR Mental Health Services Delivery System appropriately meets the mental health needs of inmates assigned to an EOP-ASU Hub.  General findings from our review of the CDCR prisons with inmates assigned to an EOP-ASU Hub include the following:

a.  Inmates have individualized treatment plans.

b.  Inmates have appropriate weekly contacts with a Primary Clinician. The vast majority of EOP-ASU inmates interviewed knew the name of their Primary Clinician and how to contact him or her if they wished to do so.  Inmates also reported that they could request to see their Primary Clinician in addition to the minimum required visit frequency.

c.  CDCR psychiatrists evaluated the inmates as clinically necessary (at least monthly), to address psychiatric medication issues.  Inmates routinely knew the name of their psychiatrist, the name of their

medication and purpose of the prescribed medication, and the process for arranging an earlier appointment with their psychiatrist if they wanted one.

*General and site specific comments/recommendations regarding Enhanced Outpatient Program-Administrative Segregation Unit (EOP-ASU) Hub:*

a. See recommendations regarding ASU and suicide prevention elsewhere in this report.

b. Segregation is not a particularly therapeutic environment to house inmates with serious mental disorders, even when EOP level care is provided. We realize that it is sometimes necessary to house inmates with serious mental disorders in an Administrative Segregation Unit in order to ensure the safety of the inmate, other inmates, or staff. In those cases, housing inmates with serious mental disorders should be as brief as possible and as rare as possible.

c. At the California Institution for Men, we noted an issue in regard to administrative segregation inmates' willingness to participate in treatment at all levels of treatment. For example, five administrative segregation inmates in a row refused to come out for their Interdisciplinary Treatment Team meeting, which indicates that inmates may have difficulties with forming therapeutic alliances with the treatment staff. CDCR has a policy that addresses inmates who refuse therapeutic groups and staff stated that they followed this policy and therefore inmates refusing care are appropriately monitored. As noted above, at the time of this report, we have learned that the institution initiated a Quality Improvement Plan to address this issue.

d. At Corcoran, EOP-ASU inmates attend group in a different building and are reportedly strip searched upon leaving and returning to their housing unit. This procedure can be a disincentive to group participation and should be reviewed.

**7. Security Housing Unit  [CCCMS]:**

At Corcoran, CSP-Sacramento, and Pelican Bay, the facilities we visited with a Security Housing Unit (SHU), we interviewed randomly selected inmates assigned to a CCCMS level of care and interviewed relevant custody and mental health staff.

Inmates interviewed routinely knew the name of their psychiatrist, the name of their medication and purpose of the prescribed medication, and the process for arranging an earlier appointment with their psychiatrist if they wanted one. The vast majority of CCCMS inmates assigned to a SHU who were interviewed knew the name of their Primary Clinician and how to contact him or her if they wished to do so.

23

It is our opinion that the CDCR Mental Health Services Delivery System appropriately meets the mental health needs of CCCMS inmates assigned to a SHU. In particular, we found the following:

a. Despite explicitly looking for underserved CCCMS inmates in a SHU setting, we found few, if any, inmates who needed a higher level of care and were not identified.

b. Licensed Psychiatric Technician rounds were conducted on a daily basis, which exceeds the standard of care.

c. In those situations where the inmate's clinician determined that a private setting is clinically appropriate, the SHU had a private setting available and clinicians were able to meet with inmates privately.

*General and site specific comments/recommendations regarding SHU/CCCMS level of care:*

We observed some variation in the quality of Licensed Psychiatric Technician rounds, and recommend that the Receiver's office consider measuring and improving the qualitative nature of these rounds. This might include interviews with inmates to assess their impressions of the psychiatric technicians conducting rounds at each prison. We understand that this has already started as part of the *Coleman* Quality Improvement process.

## 8. Psychiatric Services Unit [EOP care delivered in a secured housing environment]

At CSP-Sacramento and Pelican Bay, the facilities we visited with a Psychiatric Services Unit (PSU), we interviewed randomly selected inmates assigned to an EOP level of care and interviewed relevant custody and mental health staff. In addition, we observed Interdisciplinary Treatment Team meetings of randomly selected inmates.

It is our opinion that CDCR's Mental Health Services Delivery System appropriately meets the mental health needs of EOP inmates assigned to a PSU. In particular, we found the following:

a. Inmates' mental health needs were being appropriately met in the PSU.

b. Inmates were assessed within a reasonable amount of time following admission to the PSU.

c. Treatment plans were appropriately individualized and documented in the treatment record.

d. The inmates had appropriate contact with a Primary Clinician. The vast majority of PSU inmates interviewed knew the name of their Primary Clinician and how to contact him or her if they wished to do so.

e. CDCR psychiatrists evaluated the inmates as clinically necessary to address psychiatric medication issues. Inmates interviewed routinely knew the name of their psychiatrist, the name of their medication, the purpose of the prescribed medication, and the process for arranging an earlier appointment with their psychiatrist if they wanted one.

*General and site specific comments/recommendations regarding PSU level of care:*

a. When beginning the site reviews, we were initially skeptical of the ability to do groups in therapeutic modules. However, the inmates generally described a meaningful group experience, and our own observations were consistent with the impression that the groups were conducted in a clinically meaningful way.

b. A minority of group leaders showed movies in place of groups for that day. While the use of movies can be an important motivational step to help get inmates to attend groups, it is important make sure that none of the group leaders are relying excessively on movies as opposed to actual therapy aimed at skill acquisition or clinically meaningful issues.

### III. Medication Management

At each institution, the psychiatrist and nurse on our team evaluated relevant areas of medication management.

The evaluation of medication management included random selection of psychiatric records of inmates housed at a MHCB level, random selection of psychiatric records of inmates on various classes of medications through the Electronic Unit Health Record, review of laboratory monitoring of inmates on psychotropic medications, review of medical referrals for inmates on psychotropic medications with potential medical problems, random review of psychiatric diagnoses and associated medications through the Mental Health Tracking System (MHTS.net), interviews with psychiatric staff, pharmacy, and nursing personnel, interviews of randomly selected inmates regarding their prescribed medications, observations of medication management and informed consent through observing randomly selected Interdisciplinary Treatment Team meetings, review of medication refusals and follow up care, review of the CDCR formulary for psychotropic medications, review of written informed consents, review of quality improvement plans and programs addressing medication management, interviews with institution personnel responsible for arranging parole outpatient medications and follow up, review of involuntary medication protocols and management, review of heat medication protocols and informed consent, review of the coordination between each CDCR institution and the California Department of State Hospitals regarding transfer of inmates to a Department of State Hospitals inpatient facility when needed, and review of Medication Administration Process Improvement Project (MAPIP) audits where instituted.

Four main areas were reviewed in evaluating medication management and are summarized below:

### A. **Nursing:  Medication Management**

A review of the CDCR's general approach to medication management and a review of 13 specific facilities indicates that CDCR has medication protocols in place that address the following

1. The timely refilling of prescriptions.

2. Maintenance and continuity of medication delivery.

3. Potential hoarding of medications, including cheeking of medications.

4. Appropriate monitoring of the medical conditions of inmates on psychotropic medications.

B. **Psychiatry:  Medication Management and Laboratory Studies**

A review of CDCR's overall approach to medication management and 13 specific facilities within CDCR indicates that the CDCR meets the standard of care in medication management and laboratory monitoring.  In addition, many facilities surpass the community standard of care in their medication management approach.  Important areas reviewed that support this opinion include the following:

1. CDCR has an appropriate formulary relevant to the medication management of inmates' serious mental health care needs.

2. Medications prescribed were consistently appropriate to the inmate's diagnosis based on actual chart reviews.

3. The vast majority of records indicate that laboratory results were appropriately monitored and addressed.  One difficulty in reviewing this specific area was the implementation of the Electronic Unit Health Record (E-UHR) system whereby laboratory results were scanned into this system as of July 1, 2011.  Therefore, some lab results and other medication monitoring methods (such as electrocardiograms or vital signs) were not consistently available depending on the timing of the site review.  The E-UHR system was particularly cumbersome and time demanding in regard to tracking basic labs and progress notes.  Furthermore, laboratory and other medication monitoring results were not uniformly scanned into the system or were scanned into random sections of the E-UHR system.  Despite these obvious hurdles, individual progress notes reviewed and available labs indicated active and appropriate medication monitoring in all facilities visited.

4. Informed consent forms were generally present for medications prescribed.  However, as previously noted, the E-UHR system is limited in tracking informed consent as these forms may not have been scanned in prior to July 1, 2011, or scanned into the appropriate E-UHR section.  Nevertheless, the vast majority of records reviewed indicated that written informed consent was provided to the inmates.  Further verification of the informed consent process was supported by the consistent and accurate response by inmates when they were personally asked the name of their medications, potential side effects, and if they received laboratory monitoring as relevant to their prescribed medication.

5. CDCR psychiatrists provided necessary and appropriate monitoring of the inmate's medical condition, including blood levels where appropriate.  Although some of the institutions visited had noted shortages of psychiatrists, medications were nevertheless appropriately prescribed and monitored.

Limitations to the E-UHR system in documenting and monitoring are addressed above.

The CDCR has established detailed additional mechanisms to track medication monitoring. Two medication-monitoring systems noted included the following:

a. A medication-monitoring tool titled "Medication Administration Process Improvement Process (MAPIP)" was in the process of being implemented during the course of our site visits. The MAPIP evaluation tool is an extremely detailed medication-monitoring tool that exceeds standard of care requirements generally found in the community. During the course of our visit, some institutions had completed the MAPIP training whereas other institutions had not. At the time of this report, all institutions were to have completed the MAPIP training.

b. At the time of this report, an additional statewide electronic system referenced as the "Mental Health Registry" was in the process of being developed to track medications, potential polypharmacy, and laboratory monitoring. When implemented, this system will substantially enhance medication and laboratory monitoring throughout the CDCR system.

C. **Involuntary medication.**

There are appropriate procedures in place for involuntary administration of psychotropic medications when clinically indicated.

D. **Parole Medication/Pre-Release Issues.**

CDCR has developed a system for ensuring that paroling inmates receive medications as appropriate at the time of release. Each institution visited provided sufficient medications for the inmate and guidance as to how to continue follow up psychiatric care in their community.

*General and site specific comments/recommendations regarding medication management:*

1. During some of the initial institution visits, some mental health staff reported difficulties obtaining relevant prior prison records. By the end of our site visits, CDCR had implemented a statewide system where prior records could be requested and the records were scanned into the E-UHR system, usually within 48 hours. Earlier concerns regarding the ability to obtain prior institutional records had been addressed at the time of this report.

2. CDCR has an informed consent process that includes written documentation regarding the prescribed medication and associated side

effects, with particular focus on medication effects if an inmate is exposed to conditions that involve elevated environmental temperatures. This written documentation process meets the standard of care for informed consent of prescribed psychotropic medications.

3. At RJ Donovan, there was one mental health staff member that complained about the timely availability of medications in the pharmacy. However, chart reviews and interviews with inmates did not confirm this was a problem.

4. At Corcoran, psychiatrists reported that the staffing shortages for psychiatrists made it difficult for them to complete their Medication Administration Process Improvement Project audits and limited their ability to meet the required time frames for medication follow-up appointments. The chart reviews indicated that inmates, however, did receive their medications maintained through bridge orders when the psychiatrist could not see them within the prescribed time frame.

5. Psychiatrists at the California Institution for Men reported that they had significant staffing shortages that made it difficult for them to maintain the required follow up appointments for medication management. Chart reviews through E-UHR, however, did not indicate that inmates were adversely impacted by the staff shortages at the time of the review.

6. At the Substance Abuse Treatment Facility:

   • There were significant psychiatric staffing shortages at the time of our visit. Although inmates were able to have their psychiatric medications continued through bridge orders, these shortages sometimes limited the availability of psychiatrists to consistently meet the required time frames for psychiatric follow up. Likewise, documentation in some cases was sparse when compared to other institutions visited. We did not find, however, cases where inmates were not followed up by psychiatrists or not prescribed needed medications.

   • A psychiatrist was noted during the Interdisciplinary Treatment Team meeting to have the inmate sign the informed consent medication sheet without educating the inmate about the potential side effects of the medication or giving the inmate an opportunity to read the form he was signing. This was not a system-wide problem and was noted to occur only once during our review of 13 prisons. The Chief Psychiatrist at the Substance Abuse Treatment Facility reported that this had never occurred before to his knowledge and volunteered to immediately address the situation with the staff psychiatrist.

**IV. Quality Management**

In evaluating CDCR's approach to Quality Management, we reviewed the Quality Improvement Plans (QIPs) and met with the Quality Management Team (QMT) at each institution visited. We have never seen a system that is more comprehensive and extensive regarding quality improvement within a correctional environment.  Two key aspects of Quality Management noted in the CDCR approach include the following:

A. Each institution visited had an established system for monitoring and evaluating the quality of mental health care provided.  This system included regular Quality Improvement committee meetings with multidisciplinary representation.

B. Each institution visited implemented quality improvement measures to ensure that appropriate care was provided.

C. Each institution visited had a person designated to coordinate the Quality Improvement committee.

## V. Suicide Prevention

In evaluating CDCR's approach, we reviewed randomly selected charts to evaluate Suicide Risk Evaluations for inmates prior to, during, and after their placement on suicide precautions, interviewed inmates on suicide precautions at the prisons visited, interviewed mental health staff responsible for conducting Suicide Risk Evaluations, observed Interdisciplinary Treatment Team meetings of inmates who had expressed suicidality, and interviewed the Suicide Prevention and Response Focused Improvement Team (SPR FIT) Coordinator at each site. In addition, reviews of post-mortem suicide written evaluations were conducted.

It is our opinion that CDCR has an appropriate Suicide Prevention Program that meets the standard of care. In particular, we found the following:

A. CDCR has a basic program in place for the identification, treatment, and supervision of inmates with suicidal tendencies. Examples of the CDCR Suicide Prevention Program that indicate an appropriate system includes the following:

   1. Suicide Risk Evaluations were routinely completed at the time inmates were removed from suicide watch.

   2. Behavior checks of inmates on suicide precaution were conducted at reasonably staggered intervals.

   3. Suicide watch was provided by continuous visual observation.

B. Employees receive appropriate training on suicide prevention and response. Evidence to support this statement includes the following:

   1. Staff were trained in use of emergency response equipment at each institution visited.

   2. Response equipment was available at each institution visited.

   3. The response to mental health-related emergencies was timely and appropriate at each institution.

C. Each institution has a suicide prevention committee that considers and addresses appropriate topics relevant to suicide prevention.

D. Each institution has appropriate procedures in place for thoroughly investigating and timely reporting on completed suicides and serious suicide attempts, and appropriately responding to Quality Improvement Plan issues.

*Department-Wide Findings and Recommendations regarding Suicide Prevention*

Before summarizing our findings, we wish to thank the CDCR suicide prevention experts, at the prisons and Headquarters, for their open and candid information. We have made a number of important recommendations below, all of which we regard as likely to significantly improve the Department's ability to prevent suicides going forward. However, it would be a gross injustice to conclude that we believe the Department lacks a passionate commitment to the prevention and elimination of suicides. For example, in our experience and opinion, the CDCR does as diligent a job of investigating suicides as any system of prisons or jails in the country. Their suicide assessments and investigations result in findings that are reasonable and frequently self-critical, and the Department attempts to follow up on each and every serious recommendation.

We are aware that CDCR has experienced a rate of suicide that is higher than the reported national average for state prisons for the last several years. However, CDCR has aggressively worked to prevent suicide and has embraced and acted upon reasonable recommendations received both from within CDCR and from external sources (e.g., the Special Master's experts and Plaintiffs). In our opinion CDCR has not been deliberately indifferent to this problem and continues its efforts to find new solutions toward preventing correctional suicide.

That being said, we remain convinced that our suggestions, some of which can best be described as best practices, should be seriously considered by CDCR as it continues its efforts to achieve the elusive (and sadly, probably unrealistic) goal of eliminating all suicides.

All of the Headquarters Suicide Response Team members reported that the system of suicide prevention used to be more like "silos" in the past, and there would be surprises and disagreements about particular findings. During the last two years, however, they report that the process has been much more interactive, more transparent, and more collaborative. This observation was confirmed during our thirteen site visits, where virtually all facility staff spoke highly of the suicide review system. Facility staff confirmed that each part of the organization regularly attends the exit conferences at the facility, and spoke very highly of the competence and professionalism of the Headquarters suicide evaluators. Our own review of these documents (i.e., suicide reviews) confirms this view.

That being said, we believe that the following recommendations will enhance these impressive efforts going forward:

1. Essential to suicide prevention is integration between the three parts of the organization that are most often relevant to suicide prevention at the headquarters level: Custody and operations (including capital maintenance and Internal Affairs), Mental Health, and Medical. This allows a single point of institutional accountability, which is important indeed essential in timely and accurately responding to inmate suicides and preventing their recurrence.

Best practice recommendations clearly point to a need for complete and comprehensive integration of investigative findings following a suicide or serious attempt, including all of the above-listed parties.

2. Issues that arise after the 45-day report result in a call to the facility's Warden, Chief of Mental Health, and/or Chief Executive Officer depending on the nature of the issue; serious issues result in an immediate call as soon as Headquarters becomes aware of the issue. These notifications to Wardens, Chief Executive Officers, Mental Health Directors, Internal Affairs, or the Receiver's office should be documented in a memo or an e-mail, to document that the notification had taken place, and to allow follow-up (i.e., Quality Improvement) to determine whether or not they had been followed up in a timely manner.

3. Requests for additional information and attention to recommendations should be issued directly from the Secretary's office. Indeed, suicide review should be treated as a Secretary-level function that carries the full force of the Secretary's authority. These investigations must be treated as an extremely high priority by all parts of the correctional system, including the Receiver's office.[1]

4. All recommendations should be categorized based on the seriousness of the error, whether the error was institution-specific or systemic, and whether the error was: a) unrelated to the death; b) speculatively or possibly related to the death; c) definitely related or contributory to the death; or d) directly causal to the death (alleged or confirmed). We strongly recommend avoiding use of the term "preventable" without a very specific and timely explanation of the manner in which the suicide could have been prevented.

An additional category will include errors that were post-mortem, such as documentation or notification errors. This will clarify vague terms such as "preventable," making it much more clear whether and how alleged failures may have contributed to a suicide. Further, it will allow for the Department to make positive changes even when there was no negligence or malfeasance, without fear of being "punished" for systemic improvements going forward. We also recommend that the Department request that the Special Master's Office adopt similar language in commenting on suicides within CDCR.

5. Even "informal" recommendations should be followed-up by Headquarters. The Department should have a way of ensuring that informal

---

[1] Please note that this is not intended to suggest that the Receiver's office is not dedicated to suicide prevention. The issue is one of system integration and does not reflect in any way an absence of good intentions by anyone involved.

recommendations were either implemented or were not implemented for a specific reason.

6. CDCR and the Special Master's office apparently have used "QIP" to mean two different things. It can either mean the entire corrective action plan, or they sometimes refer to each recommendation as a QIP, or Quality Improvement Plan. This causes confusion, especially when the recommendations are counted or quantified for analysis. Our recommendation, to increase clarity, is that they use two different terms: a) "Recommendation," to refer to each recommendation; and b) the "QIP," which should refer to the facility's entire response to all of the recommendations following a completed suicide, a serious attempt, or in response to other quality improvement projects.

7. Reports regarding suicide reviews should always be routed to the Receiver as well as within CDCR. Based on previous delays in getting signatures from the Receiver, there was fear that including the Receiver as a recipient of these documents would slow up the process of responding to suicides and their investigations. At the time of this report, the Receiver is receiving an information-only copy of these documents.

8. The Receiver's office reportedly does its own reviews, but those were not folded into CDCR's own Mental Health suicide review process, and they often reportedly take <u>much</u> longer. CDCR followed our recommendations on this issue and mental health staff now regularly attend the Receiver's death reviews. In addition, two mental health staff have been granted access to the Receiver's death review site. When a suicide review is underway, the mental health attendee at the death review notifies the committee if there are any medical/nursing concerns. The mental health attendee at the death review also reviews postings to the FTP site and discusses suicide cases during the death review meetings.

9. Especially in light of Dr. Patterson's long experience in reviewing suicide deaths, his feedback and questions, as well as those of the other Special Master's experts, should be made available to the Department <u>immediately</u>, as soon as the Special Master becomes aware of them. It was reported to us that there are often long delays before these findings and recommendations are communicated to CDCR. For example, we understand that the Special Master's office has not provided a report regarding suicides completed in 2011, even in draft form. Timely communication of suicide-related findings and recommendations is essential for several reasons:

a. Some of the observations, recommendations, and questions will require additional investigation, and the passage of time makes investigations more difficult or in some cases impossible.

b. To the extent that the recommendations are important, implementing them might decrease the chances that someone else might die in a similar manner during the months that elapse between the suicide death and communication of the recommendations or questions.

c. If the Special Master believes, as we do, that the Headquarters suicide review team does its work in a highly competent manner, then one wonders at the need for monitoring of this process at all.

d. The Department cannot and should not be held negligent for failing to implement a recommendation of which it was wholly unaware.

e. If indeed they are not shared immediately, the very fact that the Special Master is comfortable delaying communication of these expert findings and recommendations for months belies the belief that they are crucial to institutional suicide prevention.

10. As is often the case, issues will arise in the course of a suicide investigation that may have relevance to employee discipline, security group issues, serious questions of institutional security, etc. When such questions arise, they are most often referred to Internal Affairs Division (IAD) or its institutional investigators.  These investigations are typically treated as extremely confidential and they can reportedly take a very long time.  We realize the importance of maintaining privacy and confidentiality for certain issues.  For example, employees may have contractual rights to privacy and a presumption of innocence regarding allegation of infractions that might result in disciplinary action up to and including termination.  Even more important, certain issues will reveal institutional security information that could endanger inmates and staff if it became widely known.  A third and common example involves the need to protect informants from exposure that could endanger their lives.  Importantly, the Suicide Review Committee cannot complete a truly comprehensive and complete assessment of the suicide and possible remedial actions when significant parts of the organization (i.e., Custody and Medical) are considered as "off limits" during the investigation.  Options were discussed with the Department to address this important issue.

11. A review of completed suicides reveals that Administrative Segregation Units (including ASU/EOP hubs) remain a high-risk environment, including

inmates who were not previously identified as mental health clients, as well as inmates who were assigned to the CCCMS and EOP levels of care. This is not unique to California, of course, but it does reinforce the importance of administrative segregation as a focus for the suicide prevention program.

a. In general, we agree with the Department's recent efforts to reduce the size of the Administrative Segregation Unit population. Specifically, we suggest a reconsideration of any "automatic" referrals to an Administrative Segregation Unit in the absence of a specific finding of danger to others or to the institution.

b. The Department has in place several measures to address the interval between admission to an Administrative Segregation Unit and first clinical contact. These include screening inmates before admission, post-admission screening, placement in retrofitted and marked intake cells, welfare checks and the ability to request a mental health referral, and priority for out-of-cell time. These are appropriate and positive measures. However, the Department may also want to consider having the former primary clinician come (if applicable, and either in person or via tele-psychiatry) to see an inmate who has been transferred to segregation status within the same institution sooner than the current policy mandates. When the transfer is to another institution, the Department could either arrange for a tele-therapy visit, or assign another clinician to make immediate contact with the newly segregated inmate.

c. As noted above, whenever an inmate is housed in an Administrative Segregation Unit pending transfer to an Enhanced Outpatient Program, that inmate should, in our opinion, be placed at the front of any waiting list for transfer to the next available and appropriate bed.

d. The Department has made a significant effort to provide Administrative Segregation Unit inmates with the possibility of televisions in their cells, which can significantly decrease the distress inmates experience in segregation.

12. When a recent Department of State Hospitals (DSH) discharge commits suicide, CDCR should notify DSH so that it can complete its own investigation of the appropriateness of DSH treatment and discharge. Of course, it is possible that such investigations take place when DSH becomes aware of such cases; however, these respective investigations should be shared. There should be a formal notification and a meeting to discuss any discrepancies between the respective Departments' findings.

13. In one case, the suicide reviewer was never able to gain access to the medical record. We would be remiss if we did not note that this problem (i.e., lost records) is the predictable result of an enormous system that still does not have a fully functional electronic medical record.

14. It was reported that in some cases employees refused to be interviewed by the suicide investigation team. Assuming this is true, the Department should find a way to compel employees to directly and timely respond to any question from a suicide reviewer or investigator.

15. As is the case in far too many prisons systems, the quality of Suicide Risk Evaluations remains an area of concern, and it is one that is an area of focus for CDCR. In our own chart reviews, too many Suicide Risk Evaluations were inadequately documented. This important observation is one to which the Department has been open and extremely responsive. To improve the quality of these evaluations, CDCR has implemented a statewide quality improvement and mentoring project that promises to dramatically improve the suicide risk assessments themselves, as well as the documentation of those assessments.

Overall, CDCR has made a massive and admirable commitment to suicide prevention. Nevertheless, the prevalence of suicide in correctional institutions remains a national concern, and these efforts must continue.

*Site specific comments/recommendations regarding Suicide Prevention:*

A. In some institutions, inmates placed on constant observation for purposes of a suicide watch were also required to wear a suicide smock. Because the removal of inmates' clothing could be perceived as punitive, this automatic practice may deter inmates from reporting their suicidal thoughts. Therefore, the decision regarding the use of a suicide smock when an inmate is on constant observation should be individualized to the inmate's risk of using their clothing as an instrument of suicide while being watched.

B. The Substance Abuse Treatment Facility did not have a SPR FIT coordinator and its SPR FIT Committee's minutes were not up to the impressive standard we observed at other prisons. Since our visit, we have learned that this issue has been addressed, that a SPR FIT Coordinator has been appointed, and that the operations of the SPR FIT Committee are being monitored closely by Headquarters.

C. We paid special attention to the issue of suicide prevention at the California Men's Colony. We noted that there were 6 suicides at the California Men's Colony in 2010, plus 4 more in 2011. After reviewing the facility's Quality Improvement Plan, we spoke with the Headquarters mental health prevention specialists, and subsequently with the Chief of Mental Health and

the SPR FIT coordinator at the institution.  After a comprehensive review, there appeared to have been relatively few commonalities among the suicides at California Men's Colony, making it more difficult to know what remedial actions are necessary.

California Men's Colony also implemented additional training for the Licensed Psychiatric Technicians who conduct rounds in administrative segregation, which was followed up with quality assurance efforts to make sure that they are doing what they have been trained (or re-trained) to do. Data from their recent management reports revealed high rate of compliance regarding the timeliness of the rounds. However, we believe that the review of the quality of the rounds currently being conducted by the Receiver's office will result in further improvement.

One commonality noted was that many of the inmates who committed suicide had received recent bad news.  When the facility mental health staff becomes aware that an inmate has received bad news, they make it the focus of treatment; however, it is not always the case that staff become aware of bad news.

Another reasonable hypothesis that was suggested had to do with the perceived desirability of remaining at the California Men's Colony, and the possibility that inmates who believed that they were going to be transferred out might be a significant and acute stressor.

Overall, we found that the staff and leadership at California Men's Colony have taken suicide prevention extremely seriously, despite the increased number of completed suicides in the past few years.  The mental health team had made significant and laudable efforts to address an increase in suicides that occurred in 2010 (six suicides) and 2011 (four suicides). Despite their laudable efforts and a thorough retrospective analysis of each case, they identified no salient preventable reasons for these suicides.  Exemplary efforts have included involving inmates in the Quality Improvement Plan process and Quality Management Team meetings and supporting an inmate produced video educating other inmates regarding signs and symptoms of depression and how to cope within a correctional environment.

## CONCLUSION

In summary, our intensive review of the Mental Health Services Delivery System, including site visits to 13 prisons, has revealed that CDCR has made impressive systemic improvements since the onset of the *Coleman* litigation. Currently, we are aware of no state that devotes more attention, resources, and self-critical analysis of its Mental Health Services Delivery System than CDCR. All newly-admitted inmates are screened to determine those with a serious psychiatric need, and a system is in place to assign those inmates to the appropriate level of care in a timely manner.

Quality of the treatment delivered meets or exceeds that of the vast majority of prison systems in the United States. Inmates at the Enhanced Outpatient level of care are offered meaningful group therapy, medication, and case management services. For many of these inmates, services are significantly better than the inmate would have received in the community.

CDCR remains appropriately concerned with suicides that have occurred at its facilities. While room for continued improvement exists, CDCR has identified those needs and is aggressively striving to meet them. The most important example of this is the quality improvement project to include the quality of Suicide Risk Evaluations. However, it is important to note that this deficit is one that exists in virtually every mental health system we have observed.

As is the case in virtually every correctional system in the United States, the most challenging environment in which to provide mental health treatment is segregation. CDCR has dealt with this in three ways. First, mental health services are delivered to segregation inmates at approximately the same level of care that the inmate would receive if not in segregation. Second, CDCR has recently engaged in a process to reduce its use of segregation generally. Finally, the creation of additional Special Needs Yard-Enhanced Outpatient Program beds has allowed some mentally ill inmates to move from segregation to a more appropriate housing assignment.

It is our opinion that CDCR is not acting with systemic deliberate indifference to inmates with serious mental health care needs.

|  |  |
|---|---|
|  | /s/ Joel A. Dvoskin Ph.D. A.B.P.P |
| Dated: January 4, 2013 | (original signature retained by attorney) |
|  | Joel A. Dvoskin, Ph.D. A.B.P.P |
|  |  |
|  | /s/ Jacqueline N. Moore, R.N., Ph.D., CCHP-A |
| Dated: January 4, 2013 | (original signature retained by attorney) |
|  | Jacqueline N. Moore, R.N., Ph.D., CCHP-A |
|  |  |
|  | /s/ Charles L. Scott, M.D. |
| Dated: January 4, 2013 | (original signature retained by attorney) |
|  | Charles L. Scott, M.D. |