1  KAMALA D. HARRIS
   Attorney General of California
2  JAY C. RUSSELL
   Supervising Deputy Attorney General
3  DEBBIE J. VOROUS, State Bar No. 166884
   PATRICK R. MCKINNEY, State Bar No. 215228
4  WILLIAM H. DOWNER, State Bar No. 257644
   Deputy Attorney General
5    1300 I Street, Suite 125
     P.O. Box 944255
6    Sacramento, CA 94244-2550
     Telephone: (916) 324-5345
7    Fax: (916) 322-5205
     E-mail: Debbie.Vorous@doj.ca.gov
8  *Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 LKK JFM PC |
| Plaintiffs, | **DECLARATION OF TIM BELAVICH IN SUPPORT OF MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)** |
| v. | |
| **EDMUND G. BROWN JR., et al.,** | |
| Defendants. | |

I, Tim Belavich, declare:

1.  I am the Acting Statewide Mental Health Deputy Director for California Department of Corrections and Rehabilitation (CDCR). I am competent to testify to the matters set forth in this declaration and if called upon to do so, I would and could so testify. I make this declaration in support of Defendants' Motion to Terminate Under the Prison Litigation Reform Act (PLRA) [18 U.S.C. § 3626(b)] or Alternatively to Vacate the Court's Judgment and Orders Under Federal Rule of Civil Procedure 60(b)(5).

1

2. I was appointed CDCR's Acting Statewide Mental Health Deputy Director on March 12, 2012. As Deputy Director, I am responsible for and supervise the Department's mental health program and clinical support division as well as the field operations, which include mental health program support, psychology support, psychiatry support, health care placement oversight, inpatient care, regional support, and compliance with *Coleman* mandates. I am familiar with current processes in place at headquarters to address quality management and improvement and suicide prevention. In addition, I am familiar with the extensive policies and procedures that govern the prison mental health care delivery system at the institutional level and, since becoming Deputy Director, have visited and evaluated the majority of prisons with mental health care programs.

3. Prior to my appointment as Acting Deputy Director, I served as the Chief Executive Officer at California State Prison, Los Angeles County. In that capacity, I was responsible for the entire health care delivery system at the prison, which included medical, pharmacy, nursing, mental health, and dental services. Prior to my appointment as the Chief Executive Officer, I served in the capacities of Staff, Senior and Chief Psychologist and as the Health Care Manager at San Quentin State Prison and California State Prison, Los Angeles County.

4. I hold degrees in Clinical Psychology and Health Care Administration, and am a certified as a Correctional Health Professional by the National Commission on Correctional Healthcare.

5. Based on my education, my experience providing mental health services in correctional settings, and my knowledge of the State's mental health delivery system, the State is now providing inmates with access to high-quality mental health care. Adequate numbers of mental health professionals and administrators proactively diagnose and treat inmates' serious mental health needs through a continuum of services across all custody levels in both inpatient and outpatient programs. Moreover, the State has an effective quality management process, has developed the infrastructure necessary to support its mental health delivery system, proactively manages its medication program, and has implemented a thorough, standardized suicide

2

T. Belavich Decl. Supp. Defs' Mot. to Terminate Under the PLRA and Fed. R. Civ. Proc. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

prevention program. It is also my opinion that the current inmate population is not in any way inhibiting our ability to provide quality mental health care.

6. CDCR comprehensively provides inmates across all custody levels with mental health care services at three levels of care: (1) the Correctional Clinical Case Management System (outpatient clinic services for stable inmates functioning in the general population); (2) the Enhanced Outpatient Program (separate housing units and structured activities for inmates who experience adjustment difficulties in a general population setting); and (3) Mental Health Crisis Bed placement (provides 24-hour services for conditions that require short-term inpatient setting to ameliorate mental health symptoms). Inmates at the Correctional Clinical Case Management System level of care who require secured housing are generally housed in an Administrative Segregation Unit or Security Housing Unit. Enhanced Outpatient Program inmates requiring secured housing are generally housed in a designated Administrative Segregation Unit or Psychiatric Services Unit.

7. The Department of State Hospitals (DSH) provides male inmates acute and intermediate mental health treatment at two prisons (Salinas Valley State Prison and California Medical Facility) and two state hospitals (Atascadero and Coalinga), including beds for high-custody inmates who require inpatient treatment.

8. Female inmates also receive inpatient mental health treatment in a licensed 45-bed psychiatric inpatient program at the California Institution for Women. Even though CDCR runs this facility independent of DSH, there are two female inmates still housed at Patton State Hospital who will transfer to the California Institution for Women once DSH determines that they are clinically appropriate for transfer.

9. The State's mental health delivery system is governed by a comprehensive system for screening and evaluating inmates with mental health issues upon admission, readmission, or transfer, using standardized mental health screening forms and protocols. In addition, beginning in 2011, CDCR drafted and implemented a standardized self-monitoring process to ensure that inmates are timely identified, referred, and transferred to acute and intermediate levels of care.

3

T. Belavich Decl. Supp. Defs' Mot. to Terminate Under the PLRA and Fed. R. Civ. Proc. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

To assist in this process, CDCR now has coordinators at each institution to manage and audit the referral process.

10. The State has standardized its mental health forms to document the mental health care being provided to all inmate-patients. These forms are used to record:

- mental illness screening processes conducted both at admission and transfers to new housing assignments, including administrative segregation and security housing;
- all mental health care evaluations provided during confinement;
- suicide risk assessments;
- changes in inmates' mental heath regimens and designations (i.e., changes from Enhanced Outpatient Program status to Correctional Clinical Case Management System status);
- changes in treatment plans and treatment progress; and
- treatment discharges.

Attached as Exhibit 1 is a true and correct copy of a list identifying the Department's current mental health forms.

11. All inmates receive mental health screenings upon admission or readmission to prison. Pending transfer from a reception center, inmates identified as needing a Correctional Clinical Case Management System level of care are routinely seen by a primary clinician. In addition, initial programming is accelerated for inmates identified as needing an Enhanced Outpatient Program level of care, which includes individual clinician contact, medication management, and structured out-of-cell therapeutic activities. Inmates in crisis are referred to an inpatient mental health crisis bed or to a Department of State Hospital program.

12. Inmates at the Correctional Clinical Case Management System level of care receive an initial intake assessment, interdisciplinary treatment team appointments, primary clinician contacts, medication management, and other therapy as clinically indicated in the inmate's treatment plan. Inmates in a Secured Housing Unit are seen with increased frequency and receive weekly clinical rounds.

4

13. Enhanced Outpatient Programs provide the most intensive level of outpatient care. Inmates at this level of care receive an initial clinical assessment, individual clinical contacts at least every two weeks, medication management, interdisciplinary treatment team appointments, and structured treatment activities for approximately 10 hours per week.

14. Mental Health Crisis Bed placement is governed by California Code of Regulations, Title 15, Chapter 12, "Correctional Treatment Centers." Services include observation, continuous nursing assistance, symptom assessment, diagnosis, initial and follow-up treatment plan, therapy to alleviate psychiatric distress, and follow up on discharge. Recently, I signed two memoranda that govern the use of Outpatient Housing Units or alternative housing for inmates pending admission to a Mental Health Crisis Bed. These memoranda have been distributed to the institutions and have been implemented. Attached as Exhibits 2 and 3 are true and correct copies of the Outpatient Housing Unit and Alternative Housing Directive memoranda, respectively.

15. Before being placed into administrative segregation, inmates receive a mental health screening and are referred for a mental health evaluation on an emergent, urgent, or routine basis as deemed needed. Upon placement, inmates receive further screening for treatment. Enhanced Outpatient Program services for inmates in administrative segregation include individual clinical contacts, interdisciplinary treatment team appointments, medication management, structured therapeutic activities, and other treatment deemed necessary by mental health professionals.

16. Inmates housed in Psychiatric Services Units receive an initial mental health evaluation, interdisciplinary treatment team appointments, weekly clinician contacts, psychiatrist evaluation at least monthly, and structured therapeutic activities.

17. The State continuously trains correctional staff to recognize the signs and symptoms of mental illness among inmates. This includes both yearly and issue-specific training, such as training on the use of discipline against mentally ill inmates, and ongoing training to improve suicide risk evaluations.

18. The State has a well-planned and active quality management program, which is outlined in the State's Inmate Medical Services Program Policies and Procedures. Recently, the receiver in *Plata v. Brown* issued revised policies and procedures that, among other things,

5

T. Belavich Decl. Supp. Defs' Mot. to Terminate Under the PLRA and Fed. R. Civ. Proc. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

formally adopted essential program functions to ensure sustainability into the future. Attached as Exhibit 4 are true and correct copies of these revised policies and policies, which became effective on December 20, 2012.

19. Statewide, a Quality Management Committee coordinates and communicates efforts to sustain a high-performing mental health care system. Recently added regional-level quality management clinicians monitor the mental health care provided at prisons and regularly review mental health program data, including inmate files, to ensure that quality care is being offered and maintained. At each prison, a Mental Health Quality Management Committee coordinates corrective action plans to ensure they are consistent with statewide objectives.

20. CDCR also has a peer review process in place. Although this process is unique at each prison (accounting for differences such as the prison's mission and institutional staffing), it generally includes reviewing and assessing a clinician's treatment of several inmate-patients. If during this review lapses in treatment standards are found, the prison's health care management may refer the matter for headquarters review. There, a professional practice committee further evaluates and monitors individual clinician practice issues.

21. The State has the infrastructure needed to support its mental health delivery system. Policies and procedures govern when and how inmates' unit health records should be obtained, used, and maintained. (*See* Exhibit 5, a true and correct copy of the Inmate Medical Service Policies and Procedures, Vol. 6, Chs. 3 & 37.) In addition, the *Plata* Receiver has implemented a statewide electronic unit health record project ensuring that records are current, accurate, and available to all mental, medical, and dental health care professionals. Mental health staff has been trained to use and maintain electronic unit health records, which are being used at all prisons.

22. The State has comprehensive policies in place to ensure the timely refilling of prescriptions, to maintain continuity of medication delivery, and to minimize medication hoarding by inmate-patients. Comprehensive policies mandate accurate and timely medication management by outlining specific procedures and expectations for medication management and ensuring medication continuity. (*See* Exhibit 6, a true and correct copy of the Inmate Medical

6

T. Belavich Decl. Supp. Defs' Mot. to Terminate Under the PLRA and Fed. R. Civ. Proc. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

Service Policies and Procedures, Vol. 4, Ch. 11.)  The State has also implemented regulations and procedures for administering involuntary medication that protect inmates' due process rights and coordinate mental health and custody personnel actions.  (See Cal. Code Regs. tit. 15, § 3364 (2012).)

23. The State has fully implemented a thorough, standardized, program to identify, treat, and supervise inmates at risk for suicide.  Mental health clinicians, correctional officers, and facility management personnel collaborate and coordinate in responding to and preventing inmate suicides.

24. Mental health clinical staff conducts a face-to-face suicide risk evaluation to identify inmates at risk for suicide in multiple circumstances, ranging from a newly arrived inmate who exhibits a current or significant suicide risk to evaluating inmates upon their return from inpatient treatment programs.  Recently, the Department implemented a mentoring program at all prisons to improve clinical competency in evaluating suicide risk.

25. When an inmate expresses a suicidal ideation, or makes threats or attempts, the inmate is placed under continuous direct visual observation until a trained clinician conducts a face-to-face suicide risk evaluation.  Inmates at risk for suicide are generally referred and transferred to a Mental Health Crisis Bed or other appropriate setting for safe-keeping and treatment.  Inmates on suicide watch or precaution are directly observed or checked every 15 minutes, respectively, and suicide watch or precaution orders are updated every 24 hours.

26. In addition, multiple proactive measures exist in Administrative Segregation Units to prevent suicides, including double-celling inmates when safe, and providing electronic appliances, when feasible.  In 2009, the Department completed a project to construct new small management yards.  It also replaced ventilation screens (to minimize tie-off points) and retrofitted intake cells to eliminate attachment or tie-off points for inmates newly admitted to administrative segregation.  In addition, the Department requires mental health staff to conduct daily clinical rounds, custody and clinical staff to conduct daily morning "check in" meetings, and custody to conduct 30-minute welfare checks of every inmate during their first three weeks in segregation.

7

T. Belavich Decl. Supp. Defs' Mot. to Terminate Under the PLRA and Fed. R. Civ. Proc. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

27. In 2004, 69% of suicides occurred in Administrative Segregation Units. After implementing the measures addressed above, the rate dropped: 39% in 2008, 40% in 2009, 34% in 2010, 30% in 2011, and 34 % in 2012. This rate has dropped even though the number of suicides annually has remained substantially unchanged. In addition, the Department chartered a workgroup to analyze suicide risk factors in administrative segregation housing, and is developing quality improvement measures to reduce the lengths of stay in these units.

28. Correctional officers are trained to respond appropriately to suicide gestures and attempts, and to identify possible actions that could indicate the need for a mental health evaluation. All institutions provide mandatory annual Cardiopulmonary Resuscitation training to correctional officers and maintain emergency response tools, such as cut-down kits and micro shields for artificial respiration. In addition, the Department requires correctional officers to complete a standard incident report detailing the reasons that Cardiopulmonary Resuscitation was not undertaken in response to a suicide event. The warden and headquarters staff reviews every such incident report to ensure compliance with Department policy.

29. Suicide prevention and response improvement teams exist both at headquarters and at each prison. These teams train prison staff on suicide prevention, response, reporting, and suicide review. In addition, each prison's suicide prevention committee is required to amend and implement local operating procedures when necessary.

30. When a suicide occurs, procedures at both headquarters and the prisons require immediate notification of the suicide and the appointment of a clinician to investigate and prepare a suicide report. Each report summarizes the event's possible distal and proximal causes, the victim's apparent mental health status before death, any mental health care provided to the victim, the emergency response measures undertaken, and, as appropriate, recommendations to correct any actions by correctional or clinical staff that may have contributed to the suicide.

31. CDCR has implemented regulations and protocols governing mental health evaluations prior to imposing inmate discipline. *See* Cal. Code Regs. tit. 15, § 3317. In 2011, it expanded the circumstances when those evaluations must be conducted. Now, inmates are evaluated when they: (a) are at the Enhanced Outpatient Program, Mental Health Crisis Bed, or

8

T. Belavich Decl. Supp. Defs' Mot. to Terminate Under the PLRA and Fed. R. Civ. Proc. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

Department of State Hospitals level of care; (2) are receiving Correctional Clinical Case Management System care and are charged with a serious rules violation or a violation that may result in being assessed a Security Housing Unit term; or (c) exhibit bizarre, unusual or uncharacteristic behavior at the time of the violation. In addition, clinical assessment must be considered during the Institutional Classification Committee hearing prior to any committee action. Attached as Exhibit 7 is a true and correct copy of the November 3, 2011 procedure. All custody and clinical staff involved in the inmate disciplinary process have received on-the-job training on this new procedure.

32. CDCR now has regulations and protocols governing the use of force and restraints by custody staff (*See* Cal. Code Regs. tit. 15, §§ 3268-3268.3 (2012) and CDCR Operations Manual [DOM] §§ 51020.1-25 (2012).) Under these regulations and procedures, correctional staff must (a) consult with a licensed health care practitioner before deploying chemical agents; (b) attempt clinical intervention by a licensed practitioner; and (c) attempt verbal counseling and persuasion through the clinician to obtain compliance with orders before using controlled force against inmates receiving Enhanced Outpatient Program services or above. (DOM § 51020.20.12.2) The protocols require documentation of the consultations and recommendations from clinical staff. (*Id.*, § 51020.15.1.) Custody and clinical staff are continuously trained on the procedures for using controlled force in incidents involving inmates with mental health issues.

33. The continued *Coleman* monitoring, which requires 90% compliance with the State's own procedures and program guides (and 100% compliance with policies and procedures related to suicide prevention), has increasingly diverted attention and resources away from the central goal of providing and maintaining a constitutional level of mental health care for inmates, and has instead saddled administrators with onerous reporting obligations. For instance, prior to the special master's site visit to a prison, the prison must gather and make available to the special master six months worth of extensive documentation regarding the institution. Attached as Exhibit 8 is a true and correct copy of the special master's document request associated with his 25th monitoring round.

9

T. Belavich Decl. Supp. Defs' Mot. to Terminate Under the PLRA and Fed. R. Civ. Proc. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

34. CDCR also provides the special master and Plaintiffs' counsel with a monthly report that includes over twenty enclosures. Last month, the report included 389 pages of material. Attached as Exhibit 9 is a true and correct copy of a December 3, 2012 cover letter to the special master identifying the enclosures. In addition, the Department provides the special master and Plaintiffs' counsel with extensive information concerning every suicide that occurs in the system (e.g., suicide report, death review, incident report, and medical records), which information generally exceeds several hundred pages. This information is uploaded to a secure electronic site that is accessible to the special master, his team members, and Plaintiffs' counsel.

35. Despite these demands and the mental health care resources that must be diverted when responding to these requests for information, I have never witnesses an incident in which CDCR personnel have intentionally ignored inmates' serious mental health needs.

I declare that the foregoing is true and correct. Executed in Sacramento, California on January 4, 2013.

*/s/ Tim Belavich, Ph.D.*
*(original signature retained by attorney)*

_____

Tim Belavich, Ph.D.

CF1997CS0003

10

T. Belavich Decl. Supp. Defs' Mot. to Terminate Under the PLRA and Fed. R. Civ. Proc. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)