KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL, State Bar No. 122626
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. McKINNEY, State Bar No. 215228
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-3035
 Fax:  (415) 703-5843
 E-mail:  Patrick.McKinney@doj.ca.gov
*Attorneys for Defendants*

Hanson Bridgett LLP
JERROLD C. SCHAEFER, State Bar No. 39374
PAUL B. MELLO, State Bar No. 179755
WALTER R. SCHNEIDER, State Bar No. 173113
SAMANTHA D. WOLFF, State Bar No. 240280
 425 Market Street, 26th Floor
 San Francisco, California 94105
 Telephone:  (415) 777-3200
 Fax:  (415) 541-9366
 E-mail: pmello@hansonbridgett.com

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| **RALPH COLEMAN, et al.,** <br><br> Plaintiffs, <br><br> v. <br><br> **EDMUND G. BROWN JR., et al.,** <br><br> Defendants. | 2:90-cv-00520 LKK JFM P <br><br> **THREE-JUDGE COURT** |
| **MARCIANO PLATA, et al.,** <br><br> Plaintiffs, <br><br> v. <br><br> **EDMUND G. BROWN JR., et al.,** <br><br> Defendants. | C01-1351 TEH <br><br> **THREE-JUDGE COURT** <br><br> **NOTICE OF MOTION AND MOTION TO VACATE OR MODIFY POPULATION REDUCTION ORDER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION** |

# TABLE OF CONTENTS

**Page**

Notice of Motion and Motion...........................................................................................1

Memorandum of Points and Authorities...........................................................................1

Introduction .....................................................................................................................1

Relevant Procedural Background .....................................................................................3

Legal Discussion ..............................................................................................................5

I.  Both the Federal Rules of Civil Procedure and the Prison Litigation
    Reform Act Require that the Population-Reduction Order Be Vacated or
    Modified................................................................................................................5

    A.  Rule 60(b)(5) requires the court to vacate or modify the population
        reduction order where, as here, facts have changed significantly
        from those on which the original order was based. ...................................5

    B.  The Prison Litigation Reform Act requires the court to vacate the
        population reduction order because crowding does not prohibit the
        state from providing adequate health care...............................................6

II. Continued Enforcement of the Population-Reduction Order Exceeds the
    Court's Authority Because the Prison Population Does Not Prevent the
    State From Providing Constitutionally Adequate Care. ......................................7

    A.  Public safety realignment has dramatically reduced the prison
        population. ..................................................................................................7

    B.  The State has substantially increased the capacity of the prison
        health care system to effectively serve inmates in need of medical
        and mental health care................................................................................8

    C.  The once necessary practice of housing inmates in gymnasiums,
        dayrooms, and other common areas, often in triple bunks, no longer
        exists.........................................................................................................10

    D.  The Inspector General has found that the current prison population
        does not inhibit the State's ability to provide effective medical care. ......13

    E.  Dr. Jeffrey Beard, CDCR's Secretary and an expert for Plaintiffs at
        trial, finds that the current inmate population density does not
        inhibit the delivery of effective health care.............................................13

    F.  Neither the *Plata* receiver nor the *Coleman* special master report
        that current population levels prohibit the state from providing
        adequate health care. ...............................................................................14

III. Overwhelming Evidence Demonstrates that California's Prison Health
     Care System Exceeds the Level of Care Required by the Constitution. .............15

    A.  CDCR provides effective and appropriate mental health care to
        inmates at the current population levels. ..................................................15

    B.  The State has achieved a quality medical care system that exceeds
        constitutional requirements......................................................................16

        1.  The Inspector General has determined that CDCR's medical
            care system exceeds constitutional requirements.........................16

**TABLE OF CONTENTS**
(continued)

Page

        2.     The system-wide medical care improvements achieved under the receivership further demonstrate that prison medical care now exceeds constitutional standards. ................... 17

IV.    The State Has Implemented a "Durable Remedy" and Further Population Reductions Would be Detrimental to Public Safety............................................. 19

Conclusion............................................................................................................ 21

1

# TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*Agostini v. Felton*
  521 U.S. 203 (1997)..................................................................... 6

5

6

*Brown v. Plata*
  563 U.S. __, 131 S. Ct. 1910 (2011)............................................ passim

7

*Coleman v. Brown*
  No. 2:90-cv-00520 LKK JFM P (E.D. Cal.) ...............................1, 8, 15, 16

8

9

*Frew v. Hawkins*
  540 U.S. 431 (2004)................................................................ 6, 19

10

*Gonzalez v. Crosby*
  545 U.S. 524 (2004)..................................................................... 6

11

12

*Horne v. Flores*
  557 U.S. 433 (2009).............................................................3, 5, 6, 19

13

14

*Madrid v. Schwarzenegger*
  No. C 90-3094 TEH (N.D. Cal.)........................................................ 19

15

16

*Perez v. Brown*
  No. C 05-05241 JSW (N.D. Cal.)....................................................... 19

17

*Rufo v. Inmates of the Suffolk Cty. Jail*
  502 U.S. 367 (1992)..................................................................... 5,6

18

19

*Schwarzenegger v. Coleman*
  130 S. Ct. 46 (2009).............................................................. passim

20

**STATUTES**

21

United States Code, Title 18 ............................................................... 1

22

  § 3626(a)(1)(A)................................................................. 1, 7, 20

23

  § 3626(a)(3)(E) ................................................................. 1, 3, 7

24

United States Code, Title 28

25

  § 2284......................................................................................... 1

26

27

28

1

**TABLE OF AUTHORITIES**
**(continued)**

2
**Page**

3
**CONSTITUTIONAL PROVISIONS**

4
United States Constitution

5
    Eighth Amendment .......................................................................................................... 4

6
**COURT RULES**

7
Federal Rule of Civil Procedure

    Rule 60(b).................................................................................................................... 6
8
    Rule 60(b)(5) ........................................................................................................ passim

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Mot. to Vacate or Modify Population Reduction Order
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

**NOTICE OF MOTION AND MOTION**

TO THE PARTIES AND ALL COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT as soon as the matter may be heard before the Honorable Thelton Henderson, Lawrence Karlton, and Stephen Reinhardt, the United States District Court Composed of Three Judges Pursuant to 28 United States Code § 2284, Defendants move the Court to vacate or modify its order requiring the State of California to reduce the prison population to 137.5% of design bed capacity.  Defendants bring this motion under Federal Rule of Civil Procedure 60(b)(5) and the Prison Litigation Reform Act (PLRA), 18 United States Code §§ 3626(a)(1)(A) and 3626(a)(3)(E).

The motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the supporting declarations of Jeffrey Beard and Robert Barton, the motion to terminate and supporting declarations and evidence filed in *Coleman v. Brown*, 2:90-cv-00520 LLK JMF P (E.D. Cal.), all pleadings, exhibits, and papers on file in this action, and any other matters properly before the Court.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

The overcrowding and health care conditions cited by this Court to support its population reduction order are now a distant memory.  California's vastly improved prison health care system now provides inmates with superior care that far exceeds the minimum requirements of the Constitution.  In the years since the Court issued the current population cap order, the State has dramatically reduced the prison population, significantly increased capacity through construction, and implemented a myriad of improvements that transformed the medical and mental health care systems.  The California Inspector General has found that the state prisons provide quality medical care to inmates, and awards outstanding evaluation scores on a regular basis.  And nationally recognized experts rate the mental health care system as one of the best in the country.  Because prison crowding has been alleviated, the prison population density no

1

1  longer inhibits the State's ability to provide adequate care.  Given the superior health care system

2  that now exists, continued enforcement of the population reduction order would be inequitable,

3  violate principles of federalism, and jeopardize public safety.  Therefore, this Court must vacate

4  the 137.5% population cap order issued when it was believed that quality health care could not be

5  provided at a higher population density.

6        The population in the State's 33 prisons has been reduced by over 24,000 inmates since

7  October 2011 when public safety realignment went into effect, by more than 36,000 inmates

8  compared to the 2008 population in the record at the evidentiary hearing, and by nearly 42,000

9  inmates since 2006 when Plaintiffs moved to convene the three-judge court.  In addition to this

10  unprecedented population reduction, the State has constructed additional capacity to meet the

11  health care needs of its inmate population, both by adding beds, and by building or renovating

12  numerous health care facilities.

13        The additional population reductions dictated in the current order cannot be achieved in a

14  manner consistent with sound penological principles or without the early release of serious and

15  violent offenders.  But just as importantly, there is simply no need for any further reductions.  The

16  independent Inspector General, nationally recognized mental health experts, and the newly

17  appointed Secretary of CDCR (who served as an expert for Plaintiffs at trial) have all concluded

18  that the current prison population does not interfere with the State's provision of quality health

19  care.  (*See, generally,* Decls. Robert Barton and Jeffrey Beard.)  Even the *Plata* receiver and the

20  *Coleman* special master no longer report that overcrowding is impeding the State's ability to

21  provide adequate care.  (*Plata,* ECF No. 2476 at 26 & 29; *Coleman* ECF No. 4205 at 60.)

22        As this Court recognized, "both the PLRA and general equitable principles require this

23  court to ensure that the population reduction sought by plaintiffs extends no further than

24  necessary to rectify the unconstitutional denial of medical and mental health care to California's

25  prisoners."  (Aug. 4, 2009 Order, ECF Nos. 2197/3641 at 124.)[1]  The Supreme Court similarly

26

27  _____

28      [1] The Electronic Case Filings refer to pleadings in both *Plata* and *Coleman.*

2

1    cautioned in this case that any inmate population reduction must be limited to that required to

2    achieve constitutionally adequate medical and mental health care systems:

3            As the State implements the order of the three-judge court, time and
        experience may reveal targeted and effective remedies that will end
4            the constitutional violations even without a significant decrease in
        the general prison population.  The State will be free to move the
5            three-judge court for modification on that basis, and these motions
        would be entitled to serious consideration.
6

7    *Brown v. Plata*, 563 U.S. __, 131 S. Ct. 1910, 1941 (2011).  The Supreme Court has emphasized,

8    unless "ongoing enforcement of the original order [is] supported by an ongoing violation of

9    federal law," relief from an injunction must be granted under Rule 60(b)(5).  *Horne v. Flores*, 557

10   U.S. 433 (2009); *see also* 18 U.S.C. § 3626(a)(3)(E) (inmate release orders must be supported by

11   "clear and convincing evidence that—(i) crowding is the primary cause of the violation of a

12   Federal right; and (ii) no other relief will remedy the violation of the Federal right").

13           The historic reductions in the prison population that have already occurred, along with the

14   significant increase in treatment space and beds, and the widespread improvements to the prison

15   health care system, all lead to one undeniable conclusion: further population reductions are not

16   needed to allow the prison system to provide constitutionally adequate health care to inmates

17   because the system already provides care that far exceeds those minimal standards.  Accordingly,

18   the Court must vacate the 137.5% population reduction order because the evidence now shows

19   that continued enforcement of the order is unfair, unnecessary, and illegal.

20                           **RELEVANT PROCEDURAL BACKGROUND**

21           On November 13, 2006, Plaintiffs moved to convene a three-judge court to reduce the

22   inmate population in the State's 33 prisons.  (ECF Nos. 561/2036.)  On July 23, 2007, both the

23   *Plata* and *Coleman* courts granted Plaintiffs' motions (ECF Nos. 780/2320), and on July 26, 2007,

24   then-Chief Ninth Circuit Judge Mary Schroeder assigned this Court to the panel.  (ECF Nos.

25   784/2328).

26           This Court held an evidentiary hearing between November 2008 and February 2009,

27   limiting the evidence to prison conditions before August 30, 2008.  (ECF Nos. 1294/2859 at 3 ¶

28

                                        3

2.e.)  On August 27, 2008, 156,352 inmates were housed in California's 33 institutions, which equaled 195.9% of design bed capacity.  (Aug. 4, 2009 Order, ECF Nos. 2197/3641, at 39.)[2]

On August 4, 2009, this Court concluded that crowding was the "primary cause" of the alleged Eighth Amendment violations regarding medical and mental health care,[3] and that no relief other than an inmate reduction order would remedy those purported violations.  (ECF Nos. 2197/3641.)  The order required the State to cap its total prison population at 137.5% within two years, and to submit a plan to meet that limit by September 18, 2009.  (*Id.*)  The State timely appealed to the Supreme Court.  *Schwarzenegger v. Coleman*, 130 S. Ct. 46 (2009).  While preserving its challenges to the order, the State timely submitted a population reduction plan.  (ECF Nos. 2237/3678.)  The Court rejected the plan and required the State to submit a plan that would rigidly comply with the 137.5% cap within two years.  (ECF Nos. 2269/3711.)  Preserving its objections, the State submitted a revised plan to satisfy the 137.5% cap within two years, but could not ensure that the public would remain safe.  (ECF Nos. 2274/3726.)

On January 12, 2010, the Court approved the revised plan in its "Order to Reduce Prison Population."  (ECF Nos. 2287/3767.)  The order requires that within 24 months of taking effect, the State's system wide prison population will be reduced to 137.5%.  (*Id.*)  The State timely appealed, and the Supreme Court granted review.  On May 23, 2011, the Supreme Court affirmed the January 12, 2010 order.  *Plata*, 131 S. Ct. 1910.  But the Supreme Court directed this Court to terminate or modify the order if it becomes clear that further reductions are not needed:

> As the State makes further progress, *the three-judge court should evaluate whether its order remains appropriate*.  If significant progress is made toward remedying the underlying constitutional violation, *that progress may demonstrate that further population reductions are not necessary* or are less urgent than previously believed.  Were the state to make this showing, the three-judge court in the exercise of its discretion should consider whether it is

---

[2] All percentages refer to prison design bed capacity.  Although prison cells are generally designed to house two inmates, design bed capacity is "based on one inmate per cell, single bunks in dormitories, and no beds in space not designed for housing."  (Aug. 4, 2009 Order, ECF 2197/3641 at 39-40.)

[3] The Court prohibited the State from introducing evidence about then current conditions, and refused evidence concerning the constitutionality of medical and mental health care.  (*See* ECF Nos. 1294/2859.)

1    appropriate to extend *or modify* this timeline.

2    *Id.* at 1947 (emphasis added).

3    On June 30, 2011, this Court entered an "Order Requiring Interim Reports" that

4    implemented the January 12, 2010 population reduction order.  (ECF Nos. 2374/4032.)  The order

5    requires the State to reduce the prison population to 137.5% by June 27, 2013.  (*Id.*)  The State

6    complied with the first two benchmarks, which required a reduction to 167% by December 27,

7    2011 and a reduction to 155% by June 27, 2012.  (ECF Nos. 2411/4141 & 2453/4210.)

8    On September 7, 2012, following briefing on motions brought by Plaintiffs, the Court

9    issued an order stating that "the Court is not inclined to entertain a motion to modify the 137.5%

10   population cap based on the factual circumstances identified by Defendants."  (ECF Nos.

11   2473/4235.)  The Court further stated that it would entertain a motion to extend the deadline for

12   compliance with the June 30, 2011 order.  (*Id.* at 3.)

13   On October 11, 2012, the Court ordered the State to develop population reduction plans

14   that would reduce the prison population to 137.5% by December 27, 2013 or, alternatively, June

15   27, 2013.  (ECF Nos. 2485/4251 ¶ 1.)  On November 15, 2012, the State moved to extend the

16   final benchmark for six months to December 27, 2013.  (ECF Nos. 2494/4259.)  On December 6,

17   2012, the Court denied that motion as "premature."  (ECF Nos. 2499/4269.)

18   **LEGAL DISCUSSION**

19   I.    **BOTH THE FEDERAL RULES OF CIVIL PROCEDURE AND THE PRISON LITIGATION
         REFORM ACT REQUIRE THAT THE POPULATION-REDUCTION ORDER BE VACATED OR
20       MODIFIED.**

21        A.   **Rule 60(b)(5) Requires the Court to Vacate or Modify the Population Reduction
              Order Where, as Here, Facts Have Changed Significantly From Those on Which**
22            **the Original Order Was Based.**

23   Rule 60(b)(5) permits a party to obtain relief from an order or proceeding if, among other

24   things, "the judgment has been satisfied . . . or applying it prospectively is no longer equitable."

25   Fed. R. Civ. P. 60(b)(5).  Relief under Rule 60(b)(5) is appropriate upon a showing of "a

26   significant change either in factual conditions or law."  *Horne*, 557 U.S. at 447 (quoting *Rufo v.*

27   *Inmates of the Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)).  "[O]nce a party carries this burden,

28

5

1   a court abuses its discretion 'when it refuses to modify an injunction or consent decree in light of

2   such changes.'" *Horne*, 557 U.S. at 447 (quoting *Agostini v. Felton*, 521 U.S. 203, 215 (1997)).

3        Injunctions should neither be issued nor maintained in a vacuum. Rather, courts have an

4   ongoing responsibility to ensure the ongoing necessity of the injunctive relief ordered. Indeed,

5   the Supreme Court held in this case that "[a] court that invokes equity's power to remedy a

6   constitutional violation by an injunction mandating systemic changes to an institution has the

7   continuing duty and responsibility to assess the efficacy and consequences of its order." *Plata*,

8   131 S. Ct. at 1945. Accordingly, "*the three-judge court must remain open to a showing or

9   demonstration by either party that the injunction should be altered* to ensure that the rights and

10  interests of the parties are given all due and necessary protection." *Id.* (emphasis added).

11       The Supreme Court's admonition that this Court must be receptive to modifying its order

12  is consistent with its jurisprudence. Institutional reform decrees such as the population reduction

13  order "raise sensitive federalism concerns," and federal courts must, under Rule 60(b)(5), broadly

14  and flexibly analyze whether changed circumstances warrant relief. *Horne*, 557 U.S. at 448, 450;

15  *Rufo*, 502 U.S. at 381. Where, as here, a federal court enjoins state public officials, the Supreme

16  Court has unanimously recognized that "finality" considerations carry little weight. *Frew v.

17  Hawkins*, 540 U.S. 431, 442 (2004); *see also Gonzalez v. Crosby*, 545 U.S. 524, 529 (2004)

18  (holding that judicial policies favoring finality are substantially diminished by Rule 60(b), "a

19  provision whose whole purpose is to make an exception to finality"). A flexible analysis requires

20  a federal court to not invade local prerogatives, and to "return control to state and local officials

21  as soon as a violation of federal law has been remedied . . . ." *Horne*, 557 U.S. at 450-51; *see

22  also Frew*, 540 U.S. at 442. "If a durable remedy has been implemented, continued enforcement

23  of the order is not only unnecessary, but improper." *Horne*, 557 U.S. at 450.

24       **B.    The Prison Litigation Reform Act Requires the Court to Vacate the Population
                 Reduction Order Because Crowding Does Not Prohibit the State from Providing
25               Adequate Health Care.**

26       The PLRA similarly requires termination of all prospective enforcement of the population

27  reduction order. Under the PLRA, court-ordered relief "shall extend no further than necessary to

28

6

1  correct the violation of a Federal right of a particular plaintiff or plaintiffs."  18 U.S.C. §

2  3626(a)(1)(A).  Prospective enforcement of a population reduction order is improper unless the

3  Court determines, based on current conditions, that "crowding is the primary cause of the

4  violation of a federal right" and "no other relief will remedy the violation of the Federal right."

5  18 U.S.C. § 3626(a)(3)(E).

6  **II.    CONTINUED ENFORCEMENT OF THE POPULATION-REDUCTION ORDER EXCEEDS THE
       COURT'S AUTHORITY BECAUSE THE PRISON POPULATION DOES NOT PREVENT THE
7       STATE FROM PROVIDING CONSTITUTIONALLY ADEQUATE CARE.**

8          The Supreme Court expressly invited the State to move to modify the order before the

9  population density reaches 137.5% if the facts have changed sufficiently from those that justified

10  entry of the order.  *Plata*, 131 S. Ct. at 1923, 1937, 1941 & 1947.  The evidence relied upon by

11  this Court in reaching its 137.5% finding was presented at a trial that began over four years ago,

12  on November 18, 2008.  (Aug. 4, 2009 Order, ECF Nos. 2197/3641, at 49.)  Much of the

13  evidence was already outdated by that time, with some facts and findings considered by the Court

14  dating back as far as fourteen years before trial.  *See, e.g., Plata*, 131 S. Ct. at 1960 (Alito, J.,

15  dissenting).  As discussed below, current evidence overwhelmingly demonstrates that the greatly

16  reduced current population levels do not prohibit the State from providing constitutionally

17  adequate medical and mental health care.

18          **A.   Public Safety Realignment Has Dramatically Reduced the Prison Population.**

19          Governor Brown's administration has done more to reduce California's prison crowding

20  than any prior administration.  (Decl. J. Beard Supp. Defs.' Mot. to Vacate or Modify Population

21  Reduction Order (Beard Decl.) ¶ 10.)  Under Governor Brown's leadership, the Legislature

22  passed historic public safety realignment legislation in April 2011, known as Assembly Bill 109,

23  which went into effect on October 1, 2011.  (*Id.*)  According to the independent Legislative

24  Analyst's Office, "the realignment of adult offenders is the most significant change undertaken to

25  reduce overcrowding" in the nation's then-largest prison system.  (Legis. Analyst Off.,

26  *Refocusing CDCR After the 2011 Realignment*, Feb. 23, 2012, at 8.)

27

28

7

1    Since realignment went into effect, the population in the State's 33 prisons has dropped by

2    24,861 inmates. (Beard Decl. ¶ 11.) As of December 26, 2012, 119,327 inmates were housed in

3    the State's 33 adult institutions, which amounts to 149.6% of design bed capacity. (*Id; see also*

4    CDCR Weekly Rpt. Population as of Dec. 26, 2012, http://www.cdcr.ca.gov/Reports_Research/

5    Offender_Information_Services_Branch/WeeklyWed/TPOP1A/TPOP1Ad121226.pdf.) The

6    current population is 31,709 fewer inmates than when the Court issued its population reduction

7    order in January 2010, and 42,734 fewer inmates than when Plaintiffs moved to convene this

8    Court in November 2006. (Beard Decl. ¶ 11.)

9

10    **B.    The State Has Substantially Increased the Capacity of the Prison Health Care
        System to Effectively Serve Inmates in Need of Medical and Mental Health Care.**

11    In its initial population-reduction order, the Court relied on a "design capacity" concept

12    "based on one inmate per cell, single bunks in dormitories, and no beds in space not designed for

13    housing." (Aug. 4, 2009 Order, ECF 2179/3641 at 39-40.) The Court found that, although the

14    infrastructure of California's newer prisons was built to accommodate inmate populations greater

15    than 100% design capacity, "no similar accommodation was made for the provision of medical

16    and mental health care in California's prisons." (*Id.* at 41.)

17    Those findings are no longer accurate because the State has invested in substantial

18    construction and renovation projects to more than adequately meet both the present and future

19    health care needs of the State's inmate-patients. (Beard Decl. ¶¶ 12 & 16; Decl. C. Meyer Supp.

20    Mot. to Terminate Under the PLRA and to Vacate Court's Judgment and Orders Under Fed. R.

21    Civ. Pro 60(b)(5) (Meyer Decl.), *Coleman v. Brown,* No. 2:90-cv-00520 LKK JFM P (E.D. Cal.)

22    ¶¶ 3-18.) The State also implemented a streamlined legislative approval process for construction

23    projects with the passage of Senate Bill 1022 on June 27, 2012. (Beard Decl. ¶ 16.) This change

24    will make construction funds not simply technically available, but actually accessible for their

25    intended purpose. (*Id.*)

26    Among other projects, the State:

27    • built the San Quentin Central Health Services Facility, a five story, $128.3 million,
        135,000 square foot correctional health care center that includes a new Mental

28

8

Health Crisis Bed unit.  The facility opened in November 2009  (Meyer Decl. ¶ 3 & Ex. 1.)

- constructed health care clinics, and administrative segregation unit clinic, an administration building, and renovated facilities, at Avenal State Prison at a cost of $18 million.  (*Id*. ¶ 4 & Ex. 2.)  These facilities opened in December 2009.  (*Id*.)

- is constructing the California Health Care Facility in Stockton, an $840 million, 1.2 million square foot facility, that will provide 1,722 beds, of which 1,622 will be specially designed to house inmates requiring long-term medical care and intensive mental health care.  (*Id*. ¶ 5 & Ex. 3.)  This facility is scheduled to open this July.  (*Id*.)

- is opening in February 2014 the California Health Care Facility's annex, the soon-to-be renovated $167 million DeWitt Nelson Correctional Annex project that will add 1,133 more beds, of which 953 will be health care beds, and allow the efficient transition of inmates between the two facilities.  (*Id*. ¶ 6 & Ex. 4.)

- is this month completing construction of additional treatment and office space for Enhanced Outpatient Program (EOP) inmates, a $23.8 million project, at the California Medical Facility.  (*Id*. ¶ 7 & Ex. 5.)  In August 2010, the State also converted a dormitory into a 72-bed Outpatient Housing Unit, at a cost of approximately $725,000, which added examination rooms, nurses' stations, a medication dispensary, and a general storage room.  (*Id*.)  The State also built a $33.7 million 64-bed Intermediate Care Facility, which opened in February 2012 (*Id*. & Ex. 6; Special Master's 24th Monitoring Rep., *Coleman*, ECF No. 4205, at 18), constructed a $29.8 million 50-bed Mental Health Crisis Bed unit, and renovated (at a cost of $1.8 million) 124 cells for risk mitigation.  (Meyer Decl. ¶ 7 & Ex. 7)

- built a 64-bed Intermediate Care Facility and additional treatment space at Salinas Valley State Prison at a cost of $29.5 million.  The State is also building a $19.7 million project for treatment and office space for 300 EOP-General Population inmates to open in September 2013.  (*Id*. ¶ 8 & Ex. 8.)

- built additional treatment and office space for EOP-general population inmates at Mule Creek State Prison at a cost of approximately $1.7 million.  (*Id*. ¶ 9 & Ex. 9.)

- is finishing a 50-bed Mental Health Crisis Bed unit at the California Men's Colony at an estimated project cost of $38.7 million.  (*Id*. ¶ 10 & Ex. 10.)

- converted 88 dual diagnosis beds for EOP/Substance Abuse inmates and 176 beds for EOP inmates with special security needs at the Substance Abuse Treatment Facility. (Defs.' Ex Parte Req. Re: Rev. Long-Range Mental Health Bed Plan, *Coleman*, ECF No. 4196 at 5:17-18; Special Master's 23rd Monitoring Rep., ECF No. 4124 at 14.)  The State also converted an additional 88 beds for EOP inmates with special security needs, which were fully occupied on Nov. 9, 2012.  (Meyer Decl. ¶ 11; *Coleman*, ECF No. 4196-2 at 2.)

9

Defs.' Mot. to Vacate or Modify Population Reduction Order
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

- constructed a 20-bed Psychiatric Services Unit facility at the California Institution for Women at a project cost of $7.2 million, and a new 45-bed Psychiatric Inpatient Program at a cost of $36.3 million, which began admitting inmates in July 2012. (Meyer Decl. ¶ 12 & Exs. 11 & 12.)

- converted housing at California State Prison, Los Angeles County to add 150 beds for EOP inmates with special security needs. (*Coleman*, ECF No. 4196–2 at 2; Special Master's 23rd Monitoring Rep., *Coleman*, ECF No. 4124 at 14.)  The State has also substantially completed construction of a new treatment and office space building for the EOP at an estimated project cost of $11.5 million.  (Meyer Decl. ¶ 13 & Ex. 13.)

- is building a new $10.7 million treatment and office space building for the EOP at California State Prison, Corcoran.  (*Id.* ¶ 14 & Ex. 14.)

- built office and treatment space for the EOP at California State Prison, Sacramento at a project cost of $12.2 million, and at a project cost of $15.4 million is building housing, treatment, and office space for 128 inmates needing Psychiatric Services Unit treatment.  (*Id.* ¶ 15 & Exs. 15; Special Master's 24th Monitoring Rep., *Coleman,* ECF No. 4205 at 11.)

- in October and December 2012, the State Public Works Board established health care facility improvement projects at Richard J. Donovan Correctional Facility and Mule Creek State Prison respectively, that include the design and construction of a new Administrative Segregation Unit Primary Care and EOP clinic, and the State expects to seek establishment of a similar project at the California Men's Colony in February 2013 (Meyer Decl. ¶¶ 16–18.).

The State has vastly increased its capacity to provide quality health care in California's prisons.  These "targeted and effective" remedies have corrected the underlying constitutional violations without the need for the further population reductions dictated by the existing order.

### C.   The Once Necessary Practice of Housing Inmates in Gymnasiums, Dayrooms, and Other Common Areas, Often in Triple Bunks, No Longer Exists.

With the reduction in population and increase in capacity, the State has eliminated the use of beds in areas not designed for housing, such as in gymnasiums and dayrooms.  (Beard Decl. ¶ 12 & Exs. 1-7.)  Notably, the Supreme Court attached pictures of overcrowded gymnasiums at Mule Creek State Prison and the California Institution for Men as an appendix to its opinion.  *See Plata*, 131 S. Ct. at 1949, Appendix B.  A comparison of photographs relied upon by the Supreme Court with photos taken of the same spaces in December 2012 shows that gymnasiums are no

10

1    longer used as makeshift housing units, allowing them to be used for their intended purposes.

2    (Beard Decl. ¶ 12, Exs. 1 & 2.):



Mule Creek State Prison, August 1, 2008.  (*Plata, 131 S. Ct. at 1949, App. B.*)



Mule Creek State Prison, Dec. 2012.  (Beard Decl., Ex. 1.)

11

1



California Institution for Men, August 7, 2006.  (*Plata, 131 S. Ct. at 1949, App. B.*)



California Institution for Men, Dec. 2012.  (Beard Decl., Ex. 2.)

The combined effects of the increased capacity and decreased prison population are

significant.  Both the independent Inspector General and CDCR's newly-appointed Secretary

(who was Plaintiffs' health care expert at trial) now agree that the current inmate population has

12

access to medical care that comports with accepted standards of care. (Beard Decl. ¶ 10; Decl. R.

Barton Supp. Mot. to Vacate or Modify Population Order (Barton Decl.) ¶¶ 15-16.) Further,

neither the *Plata* Receiver nor the *Coleman* Special Master complains of crowding as a barrier to

constitutional medical and mental health care. (*See Plata*, ECF No. 2476; *Coleman*, ECF No.

4205.) In light of these notable, vast, and lasting improvements, the State is without doubt

providing constitutional levels of medical and mental health care at the current population density.

Further reduction of the prison population is unnecessary, inappropriate, and unsafe.

**D.    The Inspector General Has Found that the Current Prison Population Does Not Inhibit the State's Ability to Provide Effective Medical Care.**

As discussed in detail below, according to Robert Barton, the independent Inspector

General, inmate population density is no longer a factor affecting the State's ability to provide

constitutionally adequate medical or mental health care in its prisons. (Barton Decl. ¶ 15.) As the

official mandated by state law to inspect and assess the quality of medical care at California's

prisons, the Inspector General is perhaps best-positioned to render this opinion.

**E.    Dr. Jeffrey Beard, CDCR's Secretary and an Expert for Plaintiffs at Trial, Finds that the Current Inmate Population Density Does Not Inhibit the Delivery of Effective Health Care.**

Similarly, Jeffrey Beard, the newly appointed Secretary of CDCR, former Director of the

Pennsylvania Department of Corrections, and psychologist who testified on Plaintiffs' behalf at

trial, has determined that the current prison population does not prohibit the State from providing

adequate medical or mental health care. (Beard Decl. ¶ 10.) In the past year, Dr. Beard has

visited the majority of CDCR's institutions and observed the State's medical and mental health

programs. (*Id.* ¶ 9.) According to Dr. Beard, the State currently has adequate capacity to

appropriately place inmates according to their needs. (*Id.* ¶¶ 8-14.) The State has implemented a

comprehensive system for screening and evaluating inmates at its reception centers, and

appropriately identifies inmates needing medical and mental health services. (*Id.* ¶ 13.) The

State has eliminated instances of unsanitary conditions, in turn, decreasing the risk of spreading

infectious diseases, including by eliminating nontraditional beds in gymnasiums and dayrooms

1    throughout the system. (*Id.* ¶ 12.) Moreover, Dr. Beard found that it is no longer true that

2    custody interferes with the delivery of health care; to the contrary, custody staff facilitates health

3    care services by knowing the health needs of inmates under their supervision and ensuring that

4    inmate-patients attend their appointments. (*Id.* ¶ 19.)

5        **F.    Neither the *Plata* Receiver nor the *Coleman* Special Master Report that
            Current Population Levels Prohibit the State from Providing Adequate
6            Health Care.**

7        The *Plata* receiver and *Coleman* special master no longer cite crowding as a factor

8    inhibiting the State's ability to provide adequate medical and mental health care. At the time of

9    trial in 2008, "[b]oth the Receiver and the Special Master filed reports stating that overcrowding

10   posed a significant barrier to their efforts." *Plata*, 131 S. Ct. at 1938. The fact that the receiver

11   no longer describes crowding as an impediment is significant, particularly in light of this Court's

12   previous statement that "[h]ad the Receiver reported to the Court that he did not view

13   overcrowding to be a substantial impediment to implementing the reforms required in this case,

14   the Court may well have reached a different conclusion regarding the appropriateness of

15   convening a three-judge court to consider a prisoner release order." (Aug. 4, 2009 Order, ECF

16   Nos. 2197/3641 at 46.)

17       Now, in his most recent report, the receiver commends the State's progress in reducing

18   overcrowding, and states that "[t]here are no particularly significant problems to highlight for this

19   reporting period." (*Plata,* ECF No. 2476 at 26 & 29.) The *Coleman* special master's report for

20   his 24th monitoring round, filed on July 2, 2012,[4] contains no discussion that crowding in any

21   way prohibits the State from providing adequate mental health care. (*Coleman,* ECF No. 4205.)

22   _____

23       [4] The twenty-fourth monitoring round began on July 25, 2011 and ended on January 26,
     2012. (*Coleman*, ECF No. 4205 at 1.) The report on this monitoring round is the most recent
24   received by the State from the special master, and is typical of the delay of the special master's
     reports. Site inspections for the twenty-fifth monitoring round began on May 1, 2012 and
25   concluded in early September 2012, and a draft report was only released on December 28, 2012.
     More troubling is that the special master has not issued his report on inmate suicides occurring in
26   2011. In contrast, the receiver issued his "Analysis of 2011 Inmate Death Reviews" six months
     ago, on June 7, 2012. (*See* Beard Decl., Ex. 8.) The special master's year-long delays are
27   inexcusable if he is trying to convey critical (*i.e.*, constitutional), or even important, information
     in his reports. (*See also Coleman,* "Clinical Evaluation of California's Mental Health Services
28   Delivery System" (Jan. 4, 2013) by Dvoskin, Moore, and Scott, filed on Jan. 7, 2012.))

14

1   To the contrary, the report extensively discusses the State's efforts to eliminate the wait lists for

2   inmate-patients needing inpatient mental health care.  (*Id.* at 3-10.)  The special master describes

3   the wait list reductions as "a dramatic improvement that is unprecedented in the history of the

4   *Coleman* remedial effort."  (*Id.* at 9.)  Although ensuring timely access to inpatient care is the

5   product of many State efforts, the special master specifically cited the State's population

6   reduction achievements:

7              Because of this effect of realignment, for example, as well as others,
           it is time to consider a departure from the past monitoring format
8          that has been in place for years. This shift should be toward
           streamlining monitoring by the special master, as CDCR
9          institutions begin to take on an increasing role in self-monitoring
           and begin their move toward assuming responsibility for all of it.
10

11  (*Id.* at 60.)

12  III.    **OVERWHELMING EVIDENCE DEMONSTRATES THAT CALIFORNIA'S PRISON HEALTH
            CARE SYSTEM EXCEEDS THE LEVEL OF CARE REQUIRED BY THE CONSTITUTION.**
13

14       A.    **CDCR Provides Effective and Appropriate Mental Health Care to Inmates
                at the Current Population Levels.**

15          In *Coleman*, the evidence submitted with the motion to terminate, filed

16  contemporaneously with this motion, proves that the State has achieved and maintains a superior

17  mental health care system.  (*See* Defs.' Motion to Terminate Under the PLRA and to Vacate

18  Court Judgment and Orders Under Fed. R. Civ. Pro. 60(b)(5), *Coleman v. Brown*, No. 2:90-cv-

19  00520 (E.D. Cal.).)  Nationally recognized experts recently completed a thorough inspection of

20  the mental health care system and found that it provides treatment matching or exceeding that

21  offered by any other state prison system.  (*Id.*)  California provides all components of a

22  constitutional system identified by the *Coleman* court:

23       •    systematic screening and evaluation of inmates, both at reception into CDCR and
               during incarceration, to identify those needing mental health treatment;
24

25       •    timely access to quality mental health treatment at all levels of care;

26       •    sufficient numbers of trained, competent mental health professionals;

27       •    accurate, complete, and confidential mental health treatment records;

28       •    proper administration of medication under appropriate supervision; and

                                          15

- systematic identification, treatment, and supervision of inmates at risk for suicide.

(*Id.*) Accordingly, further population reductions are not necessary to enable the State to provide effective mental health care to inmates because the State is already providing such care.

### B. The State Has Achieved a Quality Medical Care System that Exceeds Constitutional Requirements.

#### 1. The Inspector General Has Determined that CDCR's Medical Care System Exceeds Constitutional Requirements.

The Inspector General's inspections and assessments of the prison medical care system provide convincing proof that the system exceeds the level of care required by the Constitution. The Inspector General's medical audits were developed with Plaintiffs' counsel's extensive input and ultimate approval. (Barton Decl. ¶ 6.) The audits encompass 20 components of medical delivery, consist of up to 152 separate inquiries, and are weighted based on medical importance. (*Id.* ¶¶ 5-12.) The receiver considers an audit score of 85% or higher as evidence of "high adherence" with the policies and procedures that formed the basis of the original stipulation for injunctive relief in this case; a score between 75% and 85% is considered "moderate adherence," and a score of less than 75% is considered "low adherence." (*Id.* ¶ 8 & Ex. 1.)

Medical care in California's prisons has achieved "high adherence" under the standards for adequate care agreed upon by the parties. (*Id.* ¶ 14.) The average score of the twenty institutions recently inspected during the Inspector General's Third Cycle is 86.1% with four prisons achieving a score higher than 90%. (*Id.* & Ex. 2.) Every institution inspected during the current round scored above 75%. (*Id.*) Accordingly, all California prison are at least "moderately" adhering to the policies and procedures on which the *Plata* court's injunction is based, and over half have met the Inspector General's "high adherence" standard. (*Id.*) All of these scores—showing both "moderate" and "high" adherence to policies—prove that California's prison medical care system is providing timely and effective care far exceeding what is required under the Constitution. (*Id.* ¶ 16; *see also* Jan. 17, 2012 Order, *Plata,* ECF No. 2417 (the Inspector General's audit instrument "was designed to measure compliance with the policies and procedures that formed the basis of the original stipulation for injunctive relief in this case".)

16

Having nearly completed three full rounds of inspections at every prison, the Inspector General has found no systemic deficiencies that suggest a deliberate indifference to the serious health care needs of inmates.  (Barton Decl. ¶ 16.)  Far from it, he has found that the system and the health care professionals who run it provide timely and effective medical care, and in no way exhibit deliberate indifference to the serious health needs of California prison inmates.  (*Id.*)  Given the Inspector General's findings and conclusions that the State provides quality prison medical care that "far exceeds" constitutional minima, there is no need for further reductions in the prison population.  (*Id.*)

### 2. The System-Wide Medical Care Improvements Achieved Under the Receivership Further Demonstrate that Prison Medical Care Now Exceeds Constitutional Standards.

On January 23, 2008, the *Plata* Court appointed a second, new receiver.  (*Plata,* ECF No. 1063.)  In June 2008, the Court approved the receiver's Turnaround Plan of Action, designed to "correct constitutional deficiencies in California's prison health care system."  (*Plata,* ECF Nos. 1229 & 1245.)  The Turnaround Plan sets six goals, with associated objectives and action items, that "summarize the steps necessary for CDCR's health care program to rise to constitutionally acceptable and sustainable levels": (1) ensuring timely access to health care services; (2) establishing a prison medical program addressing the full continuum of health care services; (3) recruiting, training, and retaining a professional quality medical workforce; (4) implementing a quality assurance and continuous improvement program; (5) establishing a medical support infrastructure; and (6) providing for necessary, clinical, administrative, and housing facilities.  (*Id.*)

Each of these objectives is substantially complete, and the vast majority of the individual action items have been completed for more than a year.  (*See* 19th Tri-Annual Report, *Plata,* ECF No. 2415.)  Specifically, in September 2012, the receiver filed his 21st Tri-Annual Report, stating that more than 77% of the action items are substantially complete.  (*Plata,* ECF No. 2476 at 1.)  The items on which the receiver is still working consist primarily of state-of-the-art advances that exceed what is required by the Constitution.  For example, the receiver is developing a scheduling

17

system that will use a shared calendar displaying combined appointments from all disciplines; an improved management tool for high-risk inmate-patients; a "revolutionary approach" for reviewing adverse health care events; and mobile imaging/radiology units. (*Id.* at 5, 13, 17 & 21.) While these efforts may further improve the system, none of them is necessary to reach the minimum level of care required by the Constitution because that level has already been surpassed.

Moreover, the State has virtually eliminated unnecessary deaths in its prisons. There were only two "likely preventable" deaths in 2011, and one of those was caused by a lapse by an outside medical provider. (Beard Decl. ¶ 18, Ex. 8 at 15-16.) The single likely preventable death in 2011 in the State's prisons is consistent with the substantially reduced numbers that have been maintained since 2007:

| Year | Likely Preventable Deaths |
|------|---------------------------|
| 2006 | 18 |
| 2007 | 3 |
| 2008 | 5 |
| 2009 | 3 |
| 2010 | 5 |
| 2011 | 2 |

(*Id.* Ex. 8 at 19.) The State has thus addressed the Court's primary concern at the time it appointed the receiver that "an inmate in one of California's prisons needlessly dies every six to seven days due to constitutional deficiencies in the CDCR's medical delivery system." (Oct. 3, 2005 Findings of Fact and Conclusions of Law Re: App't of Receiver, *Plata,* ECF No. 371, at 1:26-28.)

Further evidence of constitutionality is shown by the receiver's favorable comparison of the prison medical care system to community health care systems. Dr. Steven Tharatt, the receiver's Statewide Chief Medical Executive, stated that the "most common lapses . . . are similar to those found in other large integrated health systems . . . ." (Beard Decl., ¶ 18 & Ex. 8.)[5] The report concluded that the system "has shown improvement in many major areas, including meaningful reductions in identified serious lapses in medical care, and reductions in the number

---

[5] Other evidence supports this favorable comparison with community hospitals. The California Department of Public Health recently issued twelve penalties to private California hospitals for noncompliance with licensing requirements that "caused, or was likely to cause, serious injury or death to patients." (Beard Decl. ¶ 18, Ex. 9.)

18

1    of preventable deaths," and attributed "these improvements to the many positive changes being

2    made in continuous quality improvement as well as the continued evolution of a primary care

3    patient centered model . . . ." (*Id.* Ex. 8 at 28.)

4    Accordingly, further population reductions are not necessary to enable the State to provide

5    effective medical care to inmates because the State is already providing such care.

6    **IV.    THE STATE HAS IMPLEMENTED A "DURABLE REMEDY" AND FURTHER POPULATION**

7    **REDUCTIONS WOULD BE DETRIMENTAL TO PUBLIC SAFETY.**

8    Under *Horne v. Flores*, the critical inquiry is whether continued enforcement of the

9    population reduction order is supported by ongoing federal law violations. "If a durable remedy

10   has been implemented, continued enforcement of the order is not only unnecessary but improper."

11   *Horne,* 557 U.S. at 450. More than three years ago, this Court found that "crowding is the

12   primary cause of the constitutional inadequacies in the delivery of medical and mental health care

13   to California inmates . . . ." (Jan. 12, 2010 Order, ECF No. 3767, at 1.) By any reasonable

14   measure, the intent of the population reduction order has been achieved and adequate medical and

15   mental health care is being provided to California's inmates. As the Supreme Court held, "when

16   the objects of the decree have been attained . . . responsibility for discharging the state's

17   obligations [must be] returned promptly to the State and its officials." *Horne*, 557 U.S. at 452;

18   *Frew*, 540 U.S. at 442.[6]

19   By achieving a quality health care system and shrinking the prison population to a level

20   that no longer interferes with the provision of care, the State has achieved a durable remedy for

21   *Coleman* and *Plata* class members. In fact, the State has gone well beyond the minimum

22   requirements of constitutional care, and implemented medical and mental health care systems that

23   are among the best in the nation. (*See Coleman*, "Clinical Evaluation of California's Mental

24   Health Services Delivery System" (Jan. 4, 2013) by Dvoskin, Moore, and Scott, filed on Jan. 7,

25   2012

26   _____

      [6] Other courts have recognized that when constitutional requirements are met, it is
27   appropriate to dismiss class action cases related to prison conditions. *See, e.g., Perez v. Brown*
      No. C 05-05241 JSW (N.D. Cal.) (prison dental care), and *Madrid v. Schwarzenegger*, No. C 90-
28   3094 TEH (N.D. Cal.) (prison use-of-force policies.)

1    Moreover, the State has ensured that the care provided to its inmates will endure into the

2    future.  Once realignment passed, the Brown Administration developed and won legislative

3    approval for a comprehensive, post-realignment plan (the Blueprint) to improve the prison system

4    while making it less costly and more efficient.  (Beard Decl. ¶ 20; *see also* Defs.' Resp. Aug. 3,

5    2012 2d Order Requiring Briefing, ECF Nos. 2463/4226 at 4-5.)  The Blueprint was issued in

6    April 2012, then legislatively approved and funded, and is now being implemented.  (*Id.*)

7    Notably, the Blueprint achieves overall savings while dedicating increased funding for infill

8    construction projects and expanding rehabilitative programming.  (*Id.*)  These accomplishments

9    are creating a less crowded, less costly prison system with better health care services and

10    rehabilitative programming.  (*Id.*)

11    Continued enforcement of the 137.5% benchmark will come at a significant, and legally

12    unnecessary, cost to the State and to public safety.  (Beard Decl. ¶ 25.)  As Defendants explain in

13    the accompanying court-ordered response regarding compliance with the existing population-cap

14    order, the population reductions currently required by the Court cannot be achieved by means that

15    are consistent with sound prison policy or public safety.  And they cannot be achieved without the

16    early release of inmates serving time for serious or violent felonies, and without a court-ordered

17    waiver or modification of numerous state laws. (*Id.*)

18    Continued enforcement of the inmate population reduction order also interferes with the

19    State's democratic processes, raises federalism concerns, and would mean that the three-judge

20    court would continue to insert itself in state fiscal and policy decisions even in the absence of any

21    federal law violations.  (Beard Decl. ¶ 25.)  Because the State has established quality medical and

22    mental health care systems, and has reduced the prison population to levels at which it no longer

23    interferes with the timely delivery of effective health care, the Court must discontinue prospective

24    enforcement of the population reduction order and end federal-court supervision over the State's

25    legislative, fiscal, and policy decisions under basic principles of federalism.

26

27

28

1

**CONCLUSION**

2

The population reduction order should be modified under Rule 60(b)(5) because continued

3

enforcement extends "further than necessary to correct the violation of the federal right of a

4

particular plaintiff or plaintiffs" (18 U.S.C. § 3626(a)(1)(A)) who have been denied needed health

5

care, and is therefore illegal under the PLRA.  The evidence proves that there are no systemic,

6

current, and ongoing federal law violations.  All evidence indicates that at the current population

7

density, inmates are receiving health care that exceeds constitutional standards.  Accordingly, the

8

Court must vacate the 137.5% population cap order.

9

Dated:  January 7, 2013                    HANSON BRIDGETT LLP

10
                                           By: */s/ Paul B. Mello*
11                                              PAUL B. MELLO
                                                *Attorneys for Defendants*
12

Dated:  January 7, 2013                    KAMALA D. HARRIS
13                                         Attorney General of California

14
                                           By: */s/ Jay C. Russell*
15                                              JAY C. RUSSELL
                                                Supervising Deputy Attorney General
16                                              *Attorneys for Defendants*

17
SF2007200670
18   20661890

19

20

21

22

23

24

25

26

27

28

21