KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 703-3035
  Fax:  (415) 703-5843
  E-mail:  Patrick.McKinney@doj.ca.gov
*Attorneys for Defendants*

Hanson Bridgett LLP
JERROLD C. SCHAEFER, State Bar No. 39374
PAUL B. MELLO, State Bar No. 179755
WALTER R. SCHNEIDER, State Bar No. 173113
SAMANTHA D. WOLFF, State Bar No. 240280
  425 Market Street, 26th Floor
  San Francisco, California 94105
  Telephone:  (415) 777-3200
  Fax:  (415) 541-9366
  E-mail: pmello@hansonbridgett.com

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>                  Plaintiffs,<br><br>v.<br><br>EDMUND G. BROWN JR., et al.,<br><br>                  Defendants. | 2:90-cv-00520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>                  Plaintiffs,<br><br>v.<br><br>EDMUND G. BROWN JR., et al.,<br><br>                  Defendants. | C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**DECLARATION OF ROBERT A. BARTON IN SUPPORT OF DEFENDANTS' MOTION TO VACATE OR MODIFY POPULATION REDUCTION ORDER** |

I, ROBERT A. BARTON, declare as follows:

1. I am the Inspector General for the State of California. The independent Office of the Inspector General (OIG) is responsible for overseeing and investigating several areas of the state prison system's operations, including internal affairs investigations, its disciplinary process, and its medical care system. I have served as Inspector General since August 2011. I am competent to testify to the matters set forth in this declaration, and if called upon to do so, I would and could so testify. I submit this declaration in support of Defendants' Motion to Modify or Terminate the Court's population reduction order.

2. Prior to becoming Inspector General, I served as the Senior Assistant Inspector General for the Central Region of California, beginning in 2005. Before my employment with the OIG, I was a prosecutor in the Kern County District Attorney's Office—serving as deputy district attorney from 1998-1999, and supervising deputy district attorney for gangs, prison crimes, juvenile crimes, and truancy prevention from 2000-2005.

3. I began my public service with the Fresno County Sheriff's Department in 1984, while completing my Bachelor of Science Degree in Criminology at California State University, Fresno, graduating summa cum laude. I also attended law school at University of California, Davis, King Hall, and graduated in 1988. I hold a lifetime California Community College instructor credential in the field of law, and have been an adjunct professor at Bakersfield College and California State University, Bakersfield.

4. In my capacity as Inspector General, I also serve as Chairman of the California Rehabilitation Oversight Board, which reports to the state legislature on the progress made by the California Department of Corrections and Rehabilitation (CDCR) to provide effective rehabilitation programs to California's inmates and parolees.

<u>Objectives, Scope, and Methodology of the Medical Inspection Program</u>

5. To evaluate and monitor the timeliness and effectiveness of medical care delivery to California inmates, the receiver requested, and the OIG agreed, to establish an objective, clinically appropriate, and metric-oriented medical inspection program to review the delivery of medical care at each state prison. The Inspector General's obligation to continue to perform these

inspections of every prison's medical care system has been codified in California Penal Code Section 6126(f).

6. In designing the medical inspection program, we reviewed CDCR's policies and procedures, relevant court orders, guidelines developed by the CDCR's Quality Medical Assurance Team, and guidance developed by the American Correctional Association. We also reviewed professional literature on correctional medical care, consulted with clinical experts, and met with stakeholders from the court, the receiver's office, the CDCR, and the Prison Law Office to discuss the nature and scope of the inspection program. Plaintiffs' counsel provided extensive input into, and ultimately approved, both the components and the specific questions that were included in the final audit instrument. Based on this input, our inspection program evaluates 20 components of medical care delivery consisting of up to 152 questions designed to gauge performance.

7. To make the inspection results meaningful to both medical experts and lay readers, we worked with clinical experts to create a weighting system that factors the relative importance of each component compared to other components. Further, the program considers the relative importance of each question within a component to the other questions in that component. This weighting ensures that more critical components—those that are of greatest significance to the receipt of effective medical care—are given more weight than those that do not compromise the overall quality and effectiveness of care. For example, we assign a high number of possible points to the chronic care component. Chronic care includes ongoing medical management for chronic diseases such as diabetes, heart disease, etc. This area receives higher points because lack of appropriate chronic care results in disproportionate medical crises.

8. Each inspection question is weighted and scored. The score for a prison is derived from the percentage of "yes" answers for each question from all items sampled. We then multiply the percentage of "yes" answers for a given question by the question's weight to arrive at a score. The receiver considers an overall audit score of 85% or higher as "high adherence" with the policies and procedures that formed the basis of the original stipulation for injunctive relief in this case; a score between 75% and 85% is considered "moderate adherence"; and a score

of less than 75% is considered "low adherence." A true and correct copy of the receiver's summary of the first 18 prisons inspected as part of Cycle Three is attached as Exhibit 1.

9. To arrive at the total score, we add the points received for each question and then for each program component. Finally, we calculate the institution's overall score by dividing the sum of the points received by the sum of the points possible. We do not include in the institution's overall score the weight for questions that are not applicable or, in some cases, where a lack of documentation would result in numerous "no" answers for one deviation from policy. For instance, an institution may not be able to provide documentation that its Emergency Medical Response Review Committee met for a particular month. When we evaluate whether meeting minutes document monthly meetings for a particular month, the institution would receive a "no" answer for that question. However, when we evaluate whether the meeting minutes document the warden's attendance at the meeting, the answer would be "unknown" so that the institution's score is not penalized twice for the same reason, not documenting the meeting. Further, we do not include a score for any question for which only one sample item is found to apply, unless we know that the sample item represents the entire population related to the question in the time period under review. In these cases, the one sample item is identified as not applicable in our report and thereby not included in the inspection scores.

10. To evaluate an institution's delivery of medical care, we obtain various electronic data files maintained by the institution for inmate medical scheduling and tracking, pharmacy, and census data. We use this data to identify random samples of inmates receiving or requiring specific medical services. We then review the medical file for each inmate in our sample.

11. Our inspection program assumes that if a prison's medical staff does not document an event in an inmate's unit health record, the event in question did not happen. If an inmate's record does not show that the inmate received his medications on a specified date, for example, we assume that the inmate did not receive the medication. While it is possible that the inmate received his medications and the staff neglected to document it, our program does not assume that appropriate care was provided. Rather, our program assumes for purposes of measurement that appropriate care was not provided even though it may very well have been. Thus, for example,

while an inmate may have received a medication a single day late, our program does not provide partial credit and it interprets such a scenario as a complete failure to provide care even though it was probably not the case.

12. In addition to reviewing inmate medical records, our inspectors review staffing level reports, medical appeals summaries, nursing policies and procedures, summaries of medical drills and emergencies, minutes from Quality Management Committee and Emergency Medical Response Review Committee meetings, contents of inmate transfer envelopes, and assorted manual logs or tracking worksheets related to medical care delivery. We also interview medical and custody staff members about the delivery of medical care to inmates, and we observe day-to-day medical delivery at each institution.

## Implementation of the Medical Inspection Program

13. My office agreed to inspect each state prison on a cycle basis. In June 2010, we completed the fieldwork for our first cycle of medical inspections of the State's 33 prisons. In December 2011, we completed the field work for our second cycle of medical inspection reviews. We are completing the field work for our third cycle of medical inspections and, as of December 21, 2012, we have issued 20 Cycle Three medical inspection reports.

14. Attached as Exhibit 2 is a true and correct copy of a summary of the overall scores of the OIG's inspections of medical health care services at the State's prisons. Taking into consideration the Cycle Two scores for the 13 prisons not yet completed in Cycle Three, the average score for all prisons is 83.9%. Our Cycle Three scores are showing further improvements. The average Cycle Three score is 86.1% demonstrating "high adherence" with effective medical care policies.

## Impact of Population Density on CDCR's Ability to Provide Quality Health Care

15. Overcrowding is no longer a factor affecting the CDCR's ability to provide effective medical care in its prisons. As the Cycle Three scores show, some high scoring prisons also have high population densities. For example, Avenal State Prison—with a population density of 183.2% of design capacity —received a Cycle Two score of 86.9%; RJ Donovan—with a population density of 165.2%—received a Cycle Three score of 87.0%; the California

Decl. Robert A. Barton Supp. Defendants' Motion to Modify or Terminate Population Reduction Order
Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

Correctional Institution—with a population density of 172.0%—received a Cycle Three score of 85.3%; and the Substance Abuse Treatment Facility—with a population density of 162.3%—received a Cycle Three score of 85.0%. The following table (organized in descending order of scores) shows the population density for each prison at the time of inspection:

| Institution | Cycle 1 Score | Report Date | Cycle 2 Score | Report Date | Cycle 3 Score | Report Date | Change | Pop. Density |
|---|---|---|---|---|---|---|---|---|
| SCC | 76.1% | June 2009 | 87.5% | June 2011 | 93.0% | July 2012 | +16.9% | 119.7% |
| VSPW | 80.0% | May 2010 | 82.2% | Sept. 2011 | 92.6% | Nov. 2012 | +12.6% | 100.8% |
| CCWF | 77.9% | May 2009 | 77.5% | May 2011 | 90.7% | Nov. 2012 | +12.8% | 133.1% |
| SQ | 68.2% | Dec. 2009 | 81.5% | Sept. 2011 | 90.4% | Aug. 2012 | +22.2% | 120.8% |
| CCC | 73.4% | Jan. 2010 | 89.5% | Dec. 2011 | 89.2% | Nov. 2012 | +15.8% | 113.5% |
| FSP | 83.2% | Mar. 2010 | 89.1% | Nov. 2011 | | | +5.9% | 143.7% |
| HDSP | 62.4% | Dec. 2009 | 77.8% | Oct. 2011 | 88.6% | Nov. 2012 | +26.2% | 157.5% |
| PBSP | 81.0% | Nov. 2010 | 82.8% | Jan. 2012 | 88.6% | Dec. 2012 | +7.6% | 128.0% |
| CIW | 69.6% | Nov. 2009 | 77.5% | Mar. 2011 | 87.6% | Nov. 2012 | +18.0% | 109.7% |
| RJD | 68.0% | Feb. 2009 | 73.0% | Apr. 2011 | 87.3% | July 2012 | +19.3% | 165.2% |
| COR | 68.9% | July 2010 | 76.2% | Dec. 2011 | 87.2% | Dec. 2012 | +18.3% | 151.5% |
| ASP | 70.4% | Nov. 2009 | 86.9% | Feb. 2012 | | | +16.5% | 183.2% |
| CMC | 71.3% | May 2009 | 80.0% | June 2011 | 85.4% | July 2012 | +14.1% | 143.9% |
| CCI | 64.3% | Sept. 2009 | 79.8% | Sept. 2011 | 85.3% | Nov. 2012 | +21.0% | 172.0% |
| SATF | 68.1% | May 2010 | 75.7% | Sept. 2011 | 85.0% | Dec. 2012 | +16.9% | 162.3% |
| CIM | 81.4% | Oct. 2010 | 84.8% | Apr. 2012 | | | +3.4% | 172.3% |
| PVSP | 64.5% | Aug. 2009 | 73.3% | May 2011 | 84.7% | Aug. 2012 | +20.2% | 161.1% |
| CRC | 74.3% | Oct. 2009 | 75.9% | Apr. 2011 | 84.6% | Aug. 2012 | +10.3% | 153.2% |
| LAC | 71.7% | Jul. 2009 | 78.4% | Sept. 2011 | 84.4% | Nov. 2012 | +12.7% | 171.7% |
| WSP | 75.9% | Nov. 2010 | 84.3% | Mar. 2012 | | | +8.4 | 173.2% |
| CAL | 76.6% | July 2010 | 83.0% | Mar. 2012 | | | +6.4% | 173.3% |
| CVSP | 69.4% | July 2010 | 82.2% | Mar. 2012 | | | +12.8 | 157.2% |
| NKSP | 72.2% | Mar. 2010 | 79.3% | Aug. 2011 | 80.8% | Nov. 2012 | +8.6% | 174.3% |
| MCSP | 74.5% | Sept. 2010 | 79.8% | Feb. 2012 | | | +5.3% | 181.7% |
| SAC | 65.2% | Nov. 2008 | 76.3% | Feb. 2011 | 79.2% | June 2012 | +14.0% | 153.3% |
| CMF | 72.4% | Jan. 2009 | 79.0% | Mar. 2011 | 79.1% | June 2012 | +6.7% | 104.7% |
| ISP | 68.3% | June 2010 | 78.6% | Jan. 2012 | | | +10.3% | 174.2% |
| SVSP | 74.1% | Oct. 2010 | 78.0% | Jan. 2012 | | | +3.9% | 160.4% |
| KVSP | 64.0% | Mar. 2010 | 76.1% | Sept. 2011 | 77.6% | Nov. 2012 | +13.6% | 170.5% |
| SOL | 67.1% | Apr. 2010 | 76.7% | Jan. 2012 | | | +9.6% | 172.8% |
| DVI | 72.6% | Mar. 2009 | 75.4% | Oct. 2011 | | | +2.8% | 144.6% |
| CEN | 74.4% | Feb. 2009 | 74.7% | May 2011 | | | +0.3% | 181.6% |
| CTF | 72.0% | Aug. 2010 | 74.5% | Dec. 2011 | | | +2.5% | 189.6% |
| **Average:** | 71.9% | | 79.6% | | 86.1% | | +14.0% | |

Findings and Conclusions

16. I understand that the Constitution requires that the state's prison medical care system not exhibit a deliberate indifference to the serious medical needs of inmates. California's prison medical care system far exceeds this requirement. Having now nearly completed three full rounds of medical care inspections at every prison in the state, it is abundantly clear that the system provides timely and effective medical care. While there are certainly some isolated areas at some prisons that could be improved upon (as some of the lower scores reflect), none of those areas have a significant detrimental impact on the quality or effectiveness of the medical care provided to state inmates overall. Stated another way, our reports have illustrated ongoing improvement and no pervasive or systemic problems that undermine the effectiveness of the medical care system as a whole. In fact, in prison after prison, we have found that the inmates' medical needs are treated with timely and appropriate medical care. The medical facilities are clinically appropriate and offer sufficient capacity for the inmate population, even at the more densely populated prisons. The necessary systems that have been established (such as the medical records and medication delivery systems) are effective for the continued delivery of appropriate care. And the medical professionals who work in the system are competent and focused on delivering quality medical care.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in Sacramento, California on January 7, 2013.

_____
Robert A. Barton
California Inspector General

CF1997CS0003
20650679.docx