DONALD SPECTER – 083925
STEVEN FAMA – 099641
ALISON HARDY – 135966
SARA NORMAN – 189536
REBEKAH EVENSON – 207825
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
600 Harrison Street, Suite 120
San Francisco, California  94107-1389
Telephone:    (415) 864-8848

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
LISA ELLS – 243657
AARON J. FISCHER – 247391
LAURA BOYSEN-ARAGON – 248083
ROSEN BIEN GALVAN &
GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

WARREN E. GEORGE – 053588
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, California  94111-4067
Telephone:    (415) 393-2000

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURTS

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>       Plaintiffs,<br><br>    v.<br><br>EDMUND G BROWN, JR., et al.,<br><br>      Defendants. | Case No. Civ S 90-0520 LKK-JFM P<br><br>**THREE JUDGE COURT**<br><br>**PLAINTIFFS' STATEMENT IN RESPONSE TO OCTOBER 11, 2012, ORDER REGARDING POPULATION REDUCTION** |
| MARCIANO PLATA, et al.,<br><br>       Plaintiffs,<br><br>    v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>      Defendants. | Case No. C01-1351 TEH<br><br>**THREE JUDGE COURT** |

The Court's Orders of October 11, 2012, and December 6, 2012, require the parties to submit to the Court:

1.    Position statements regarding Defendants' request for a six-month extension of the final 137.5% benchmark.

2.    If no agreement is reached on an extension, the parties must submit Plans to achieve the required population reduction to 137.5% of design capacity by June 27, 2012;

3.    Plans to reduce the prison population to 137.5% of design capacity by December 27, 2012;

4.    Justifications for each party's population reduction proposals, and objections (if any) to the other party's proposals;

5.    If any state laws would have to be waived to implement the provisions proposed by either party, Defendants shall identify such state laws.

## I.    DEFENDANTS SHOULD NOT BE GRANTED A SIX-MONTH EXTENSION OF TIME

Defendants have a plan to reduce the prison population to 137.5% of capacity by June 27, 2013, as required by the January 12, 2010, Order to Reduce Prison Population (hereinafter, "Crowding Reduction Order").  Defendants' Plan is both safe and effective. *See infra*, Sec. II.[1]  Thus, Defendants should not be granted an extra six months to comply with the Crowding Reduction Order.

Moreover, Defendants seek an extension of time with unclean hands.  In May 2011, the United States Supreme Court affirmed this Court's order requiring the State to reduce crowding to 137.5% of capacity within two years, or by June 2013.

Defendants' chief response to the Supreme Court's order was the passage of AB 109, also known as "Realignment," which diverted a large number of prisoners to local

---

[1] As used herein, "Defendants' Plan" refers to the list of crowding reduction measures that Defendants provided to Plaintiffs on January 3, 2012, and which Defendants stated would form the basis for their submission to the Court.

PLAINTIFFS' STATEMENT IN RESPONSE TO OCTOBER 11, 2012, ORDER RE POPULATION REDUCTION

1   custody.  *See* Defs' Response to June 30, 2011, Order at 4-6 (July 20, 2011); Defs' Jan. 6,

2   2012, Status Report at 3.  Yet Defendants knew from the very beginning that the

3   Realignment legislation would not bring them into compliance with the Court's order.

4   Defs' Resp. to June 30, 2011, Order at 5 (estimating in July 2011 that Realignment

5   legislation "would reduce the prison population to 141% of design capacity").

6       Every "Population Projection" published by Defendants since the fall of 2011—and

7   numerous additional reports submitted by Defendants to this Court—confirm that

8   Defendants *never* expected that they could comply with the Crowding Reduction Order

9   unless they adopted additional crowding reduction measures.[2]

10      In the Spring of 2012, Defendants published a "blueprint" laying out their vision for

11  the future of California corrections; the blueprint contemplates a number of changes to the

12  prison system, but the document makes explicit that Defendants never intend to reduce

---

[2] Defendants' Fall 2011 Population Projections, published in September 2011, projected
that Defendants would not reduce crowding to 137.5% of capacity by June 2013.  Austin
Feb. 7, 2012, Decl., ¶ 5 & Exh. A.  Defendants Spring 2012 Population Projections
likewise projected that the State would default on the Crowding Reduction Order.  Austin
May 9, 2012, Decl., ¶¶3-6.  The same is true of Defendants' Fall 2012 Population
Projections.  All CDCR Population Projections are available on CDCR's website at
http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/Popula
tion_Reports.html (site last visited Jan. 3, 2013).

Defendants reaffirmed that they would not achieve a reduction to 137.5% of capacity by
June 2013 in various filings before this Court.  *See, e.g.*, Defs' Resp. to June 7, 2012,
Order at 1 (June 22, 2012) (projecting that "the prison population will be just 2,955
inmates over the final benchmark …  which equates to approximately 141%" of capacity);
Defs' Supplemental Report at 1 (Aug. 16, 2011) (Realignment will reduce the prison
population, but "perhaps not in a way that is exactly in line with each benchmark"); Defs'
Response to Sept. 7, 2012, Order at 1 (Sept. 17, 2012) ("California will fall short of the
Court's 137.5% population benchmark by June 27, 2013").

Defendants were correct to project that Realignment would not achieve the required
population reduction.  While realignment reduced the population of the 33 State prisons by
approximately 21,000 prisoners—from 141,000 to 120,000—the effects of realignment
have now plateaued, and the State's prison population is not expected to fall any further as
a result of realignment.  *See* Austin Jan. 7, 2012, Decl., ¶¶ 7-7,  Figures 1&2.

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' STATEMENT IN RESPONSE TO OCTOBER 11, 2012, ORDER RE POPULATION REDUCTION

1   crowding to 137.5% of capacity.  *See* "*The Future of California Corrections*," Appx. G,

2   available at http://www.cdcr.ca.gov/2012plan/index.html (site last visited Jan. 4, 2012).

3       Defendants have made no secret of the fact that they intended to take no additional

4   steps to comply with the Crowding Reduction Order.  In more than a dozen reports to the

5   Court, Defendants stated that there is "no need" for them to implement any additional

6   population reduction reforms.[3]

7       They actively resisted Plaintiffs' efforts to require them to take timely corrective

8   action.  In February 2012, Defendants argued that it would be "premature" for them to

9   undertake any further crowding-reduction measures.  Defs' Feb. 27, 2012, Opp. Br. at 4.

10  Even after the State's Spring 2012 Population Projections confirmed that Defendants were

11  on track to violate the Crowding Reduction Order, Defendants still maintained that it

12  would be "premature" and "counterproductive" for Defendants to take steps to bring

13  themselves into compliance.  Defs' May 23, 2012, Opp'n at 3, 7-8.  They maintained that

14  position well into the fall of 2012, announcing that they would take the additional

15  necessary steps only if the Court "*insists*" that they do so.  Defs' Resp. to Sept. 7, 2012,

16  Order at 6 (Sept. 17, 2012) (emphasis added).

17      Now, Defendants argue just the opposite:  that it is too late.  They claim they need

18  more time to comply with the Crowding Reduction Order, based on a plan by which they

19

20  [3] *See, e.g.*, Defs' Aug. 16, 2011, Supp. Report at 1 ("at this point … there appears to be no
    need to implement additional measures …"); Defs' Sept. 15, 2011, Status Report at 2
21  ("There appears to be no need at this time to implement additional measures …"); Defs'
    Oct. 14, 2011, Status Report at 2 ("there does not appear to be a need at this time to
22  undertake additional crowding-reduction measures …"); Defs' Nov. 15, 2011, Status
    Report at 2 (same); Defs' Dec. 15, 2011, Status Report at 2 (same); Defs' Jan. 6, 2012,
23  Status Report at 4 (same); Defs' Feb. 15, 2012, Status Report at 2 (same); Defs' March 15,
    2012, Status Report at 2 (same); Defs' April 13, 2012, Status Report at 2 (same); Defs'
24  May 15, 2012, Status Report at 2 (same); Defs' June 15, 2012, Status Report at 2 (same);
    Defs' July 11, 2012, Status Report at 4 (same); Defs' Aug. 15, 2012, Status Report at 2
25  (same). Beginning with the September, 2012, Status Report, Defendants began omitting
    this language, but they still have taken no steps to implement additional crowding
26  reduction measures.

27

28

PLAINTIFFS' STATEMENT IN RESPONSE TO OCTOBER 11, 2012, ORDER RE POPULATION REDUCTION

1  won't even *start* most of their crowding reduction measures until July 1, 2013, seven

2  months from now.

3       Because Defendants have intentionally dragged their feet and refused to take the

4  actions they knew were necessary to timely and fully comply with this Court's Crowding

5  Reduction Order, they cannot now be heard to complain that there is too little time

6  remaining for them to come into compliance by June 2013.

7       Moreover, further delays in complying with the Crowding Reduction Order will

8  cause harm and suffering to the *Plata* and *Coleman* plaintiffs.  California's prisons remain

9  vastly overcrowded—for example, the Central California Women's Facility is crowded at

10  more than 180% over capacity—and the medical and mental health care systems in

11  California prisons remain well below constitutional standards.  *See* CDCR Weekly

12  Population Report (Dec. 26, 2012), available at http://www.cdcr.ca.gov/Reports_Research/

13  Offender_Information_Services_Branch/WeeklyWed/TPOP1A/TPOP1Ad121226.pdf (site

14  last visited Jan. 4, 2012); *see infra* at pp. 4-7.

15       Prisoners are continuing to die from inadequate medical care.  In the most recent

16  report on prisoner deaths, an independent reviewer found that "there were 43 total

17  preventable deaths" in California prisons in 2011.  Declaration of Steven Fama in Support

18  of Plaintiffs' Statement in Response to October 11, 2012, Order Regarding Population

19  Reduction ("Fama Decl."), Exh. A at 19 (Death Reviews).  For example, one prisoner died

20  when recurrent symptoms of shortness of breath and low oxygenation "were poorly

21  managed," another when medical staff "missed several opportunities" to evaluate him for

22  cardiovascular disease, and a third died of leukemia after "[m]ultiple opportunities to

23  evaluate abnormal high white blood cell counts were missed, causing a 10 month delay in

24  diagnosis." *Id.* at 14 (cases 19, 20, and 22). Another prisoner, a "young man with a known

25  seizure disorder died after missing five days of anticonvulsant medication," in an

26  outpatient housing unit "later found to have a non-functioning call system;" another

27  prisoner, a 45-year-old man with cardiovascular disease died after receiving "double his

28  usual dose of medication" which "contributed to a prolonged period of hypotension (low

1   blood pressure) culminating in unresponsiveness." *Id.* at 12 (cases 5 and 9).  In another

2   case, a man "died of metastatic malignant melanoma after a nine month delay in a

3   requested skin biopsy for a suspicious neck lesion." *Id.* at 13 (case 11).  Other similar cases

4   are described in the report. *Id.* at 11-14.

5         The Inspector General has issued reports showing improved health care scores for

6   many prisons, but those improved average scores mask serious deficiencies in important

7   areas; for example, the California Men's Colony, which received an overall score from the

8   Inspector General of  85.4%, scored just 44% with respect to timely appointments for

9   chronic care patients, 54.5% for timely appointments for patients ordered at sick call to be

10  seen again by a doctor, and 25% for timely appointments for newly arrived patients

11  referred by a nurse to a doctor.  *See* Office of Inspector General, California Men's Colony

12  Medical Inspection Results Cycle 3, July 2012, at 1 (overall score), 8 (reference number

13  03.076), 9 (reference number 01.247), and 11 (reference number 02.018), available at

14  http://www.oig.ca.gov/media/reports/MIU/California%20Mens%20Colony%20

15  Medical%20Inspection%20Results%20Cycle%203.pdf (site last visited January 7, 2013).

16  Other prisons saw similar discrepancies between high overall scores and low scores for

17  critical indicators of quality of care.[4]  In any event, it is premature to base any conclusions

18  _____

19  [4] For example, High Desert State Prison received an overall score of 88.6% but scored

20  only 64% with respect to timely appointments for chronic care patients, 56% regarding the
    providing of medications to those patients, and 33.3% for the providing of medications to

21  newly arrived prisoners.  *See* Office of Inspector General, High Desert State Prison

22  Medical Inspection Results Cycle 3, November 2012, at 1 (overall score), 8 (reference
    numbers 03.076 and 03.175) and 11 (reference number 02.128), available at

23  http://www.oig.ca.gov/media/reports/MIU/California%20Mens%20Colony%20Medical%

24  20Inspection%20Results%20Cycle%203.pdf (site last visited January 7, 2013).  The
    California Substance Abuse Treatment Facility and State Prison at Corcoran received an

25  overall score of 85%, but scored only 64% with respect to timely appointments for chronic
    care patients, 52% regarding the providing of medications to those patients, 52% with

26  respect to timely doctor appointments for sick call patients referred to a doctor by a nurse,

27  28% with regard to timely appointments for newly arrived patients referred to a doctor by a
    nurse, and 60% with regard to timely appointments with doctors for prisoners who are

28  (footnote continued)

_____

PLAINTIFFS' STATEMENT IN RESPONSE TO OCTOBER 11, 2012, ORDER RE POPULATION REDUCTION

1    on the Inspector General scores, since the Court's experts have yet to tour a single prison

2    to verify the level of care being provided, and the death reports illustrate serious

3    deficiencies in medical care throughout the system.

4        Serious violations remain with the mental health system as well.  By several critical

5    measures, timely access to appropriate mental health care for *Coleman* class members has

6    declined in recent years.  Declaration of Michael W. Bien in Support of Plaintiffs'

7    Statement in Response to October 11, 2012, Order Regarding Population Reduction ("Bien

8    Decl.") ¶¶ 2-7.  Despite the drop in the overall prison population, there are persistent

9    severe shortages of mental health clinicians, mental health treatment space and mental

10   health programs for patients requiring higher levels of care.  *Id.*

11       Shortages of critical mental health staff, including psychiatrists, worsened in 2012

12   with vacancies of psychiatrists increasing to 42%, and overall clinical vacancy rates

13   increasing to 35%.  Bien Decl. ¶ 2.  The State used registries and contractors to reduce the

14   "functional" vacancy rate for critical mental health staff to 29%, but that is still more than

15   double the 2011 "functional" vacancy rate of 12%.  *Id.*  As a result of these staffing

16   shortages, and other inadequacies, the suicide rate in California prisons—already high by

17   national standards—has been getting worse since 2009 and appears to have increased to an

18   even higher rate in 2012.[5]  The Special Master's most recent report found that more than

19   74% of the CDCR suicides were foreseeable and/or preventable.  Docket No. 4110 at page

20   _____

21   discharged from a hospital.  *See* Office of Inspector General, California Substance Abuse
     Treatment Facility and State Prison at Corcoran Medical Inspection Results Cycle 3,

22   December  2012, at 1 (overall score), 8 (reference numbers 03.076 and 03.175), 9
     (reference number 01.027), 11 (reference number 02.018), and 13 (reference number

23   21.249), available at http://www.oig.ca.gov/media/reports/MIU/California%20

24   Substance%20Abuse%20Treatment%20Facility%20and%20State%20Prison%20at%20
     Corcoran%20Medical%20Inspection%20Results%20Cycle%203.pdf (site last visited

25   January 7, 2013).

26   [5] CDCR's rate of suicide per 100,000 was 15.7 in 2009, 21.1 in 2010, 21 in 2011 and 23.7
     in 2012; the rate for U.S. state prisons was 16 in 2010.  *Coleman* Docket No. 4110 at 5;

27   Bien Decl. ¶¶ 4-6.

28

1  11 (26 out of 35 suicides).

2      *Coleman* class members in need of emergency treatment in Mental Health Crisis

3  Beds and inpatient psychiatric hospitalization continue to be denied timely access to these

4  critical life-saving higher levels of care.  Bien Decl. ¶ 7.  While some additional mental

5  health beds have opened, many construction projects have been cancelled and others have

6  been delayed.  *Id.*  A significant percentage of existing MHCB and inpatient psychiatric

7  programs are unlicensed, "temporary, emergency" conversions of regular prison units that

8  do not meet health, safety or programmatic standards.  *Id.*  As a result, *Coleman* class

9  members in need of MHCB and inpatient psychiatric hospitalization continue to be housed

10  in dangerous "alternative locations" such as Outpatient Housing Units, infirmaries,

11  administrative segregation units, holding cells and cages.  *Id.*

12      Timely compliance with the population reduction order, and strict compliance with

13  and enforcement of existing remedial orders in both *Plata* and *Coleman*, are necessary to

14  achieve compliance with Constitutional standards.

15      This Court set a two-year deadline for complying with the Crowding Reduction

16  Order because of the urgency of the constitutional violations, and based upon the State's

17  own submission showing that it could safely and effectively achieve 137.5% of capacity in

18  two years.  Order to Reduce Prison Crowding at 2, 4 (Jan. 12, 2010).  The Order was

19  affirmed in full by the Supreme Court.  While the State's preferred methods for achieving

20  the ordered reduction have changed over time, and Defendants now plead for more time to

21  implement their newest Plan, Defendants are still violating Plaintiffs' constitutional rights

22  because of the overcrowded prisons, and Defendants still have a safe way to comply with

23  the Court's order in time.  Accordingly, there has not been "a significant change either in

24  factual conditions or in law" warranting the extension Defendants seek.  *Rufo v. inmates of*

25  *Suffolk Cty Jail,* 502 U.S. 367, 384 (1992).  Any motion to extend the timeframes for

26

27

28

PLAINTIFFS' STATEMENT IN RESPONSE TO OCTOBER 11, 2012, ORDER RE POPULATION REDUCTION

1   compliance with the Crowding Reduction Order should be denied.[6]

2   **II.     DEFENDANTS CAN TIMELY AND SAFELY COMPLY WITH THE
3            CROWDING REDUCTION ORDER BY IMMEDIATELY
         IMPLEMENTING THEIR CROWDING REDUCTION PLAN**

4           Defendants' Plan contains several crowding reduction methods that this Court

5   analyzed and found to be safe in its August 4, 2009 Order.  Those methods include

6   increasing prison capacity, increasing good time credits and program credits to shorten the

7   length of stay in prison for those prisoners who follow prison rules and complete prison

8   programs, and diverting away from prison low-level offenders such as those convicted of

9   drug possession or with short sentences.  Each of those methods are safe and effective.

10  Austin Jan. 7, 2013, Decl., ¶¶ 13, 18, 31-33.

11          One additional population reduction measure proposed by the State has not

12  previously been analyzed by this Court:  shortening the length of stay in prison of the

13  lowest risk offenders (identified in Defendants' Plan as "Court-Ordered Early Releases").

14  Defendants have explained that this method involves identifying the lowest risk prisoners

15  in the California state prisons using the State's validated risk assessment instrument.

16  Defendants intend to select the lowest risk of the low risk prisoners; for example, they will

17  start with very elderly prisoners, including elderly women and those with severe

18  disabilities.  Excluding prisoners who have notorious crimes, or those whose case factors

19  make them uniquely unsuited for release, Defendants will only release those prisoners

20  whom they believe are the least likely to commit any new offenses.  This strategy

21  represents the safest means to reduce prison crowding.  Austin Jan. 7, 2013 Decl., ¶¶ 2, 12-

22  13.

23          Accordingly, each of the elements of Defendants' Crowding Reduction Plan can be

24  _____

25  [6] Plaintiffs make this submission without having reviewed Defendants' submission,
26  including their rationale for seeking an extension of time to implement their newly
    proposed Crowding Reduction Plan.  Should Defendants submit any such argument to the
27  Court, Plaintiffs reserve the right to respond.

28

1  implemented without causing an adverse impact on public safety or on the operation of the

2  state or local criminal justice systems. Austin Jan. 7, 2013, Decl., ¶ 32.

3         There is some uncertainty about what will be the size of the gap on June 27, 2013

4  and December 27, 2013 between the actual prison population and 137.5% of prison

5  capacity if no additional measures are taken.  This is due to questions about the accuracy

6  of CDCR's population projections, uncertainty about when and by how much prison

7  capacity will increase, and uncertainty about when and how many prisoners will be

8  returned from out-of-state prisons.  Accordingly, the parties agree in principle that any

9  population reduction plan must be crafted to 1) achieve with a high degree of certainty a

10  population reduction sufficient to eliminate the minimum estimated gap, and 2) include

11  alternate measures that the State can quickly implement to achieve a reduction at the high

12  end of the possible gap.  Defendants' Plan will be sufficient to meet their expected gap,

13  and, with the ability to release additional low-risk offenders, Defendants will be able to

14  meet a higher gap should these initial projections prove inaccurate.

15  **III.    THE COURT SHOULD WAIVE THE STATE LAWS IDENTIFIED BY**
          **DEFENDANTS**

16

17         This Court should waive the State laws identified by the Defendants as impediments

18  to their compliance with the Crowding Reduction Order.  As previously established,

19  compliance with this Court's Crowding Reduction Order is necessary and narrowly

20  tailored to prevent further constitutional violations, no other relief will correct the

21  constitutional violations, and the Crowding Reduction Order is the least intrusive means to

22  correct the constitutional violations. *Brown v. Plata,* 131 S. Ct. 1910 (2011).  Defendants

23  have stated that unless this Court waives certain state laws, Defendants cannot implement

24  the measures necessary to comply with the Crowding Reduction Order.  Accordingly, the

25  requirements of the Prison Litigation Reform Act for waivers of state law have been

26  met:  Federal law requires this Court to order the waiver of State laws identified by

27  Defendants; the waiver of the State laws identified by Defendants is necessary to correct

28  the violation of federal constitutional rights, and no other relief will correct the violation of

1   those rights.  18 U.S.C. § 3626(a)(1)(B).

2        Any assertion by Defendants that waivers of State law are not sufficient because the

3   Defendants believe they need new statutory authority, such as new sentencing laws, is not

4   well-taken.  No waiver of state law is required for Defendants to implement their proposed

5   sentencing changes, which Defendants aver they could implement by refusing to admit

6   persons convicted of certain crimes to state prison.  Without suspending any part of the

7   Penal Code, the Secretary of Corrections has authority to respond to an emergency by

8   placing inmates in "jails and other facilities" instead of state prisons.  Cal. Penal Code

9   Section 2900(b)(1).  Additionally, the Emergency Services Act, which permits the

10  Governor to "suspend any regulatory statute, or statute prescribing the procedure for the

11  conduct of state business," expressly authorizes the "person in charge of" a prison to

12  "remove the inmates from the institution" during an emergency.  Cal. Gov't Code §§ 8571,

13  8658.  The prior Governor used Emergency Services Act powers to transfer prisoners to

14  out-of-state prisons in order to address the prison overcrowding crisis, and the suspension

15  was upheld by the California courts.  *California Correctional Peace Officers Association*

16  *v. Schwarzenegger*, 163 Cal. App. 4th 802 (2008), *review denied*, 2008 Cal. LEXIS 10212.

17  The prison overcrowding state of emergency remains in effect.  Accordingly, Defendants

18  have the authority they need to implement their plan to refuse admission to persons

19  convicted of certain crimes.  For all other elements of Defendants' Plan, the Court should

20  waive the state laws identified by Defendants.

21                                    **CONCLUSION**

22        Defendants must begin to implement their crowding reduction plan immediately.

23  For more than a year they have known that they would violate the Crowding Reduction

24  Order unless they took additional measures to reduce crowding, but instead of taking "all

25  steps necessary to comply" with the Order (Order, Aug. 3, 2012 at 4) they obfuscated and

26  stalled, playing for more time.  Defendants continue to act in bad faith here, by suggesting

27  that they will not even begin to implement a number of the crowding reduction measures

28  until July 1, 2013.  Nonetheless, Defendants' plan contains safe, effective means for

                                          10

reducing prison crowding.  If Defendants promptly and full implement their plan, they will comply with the Order to reduce crowding to 137.5% of capacity by June 27, 2013, without causing any increase in crime or having an adverse impact on the operation of state or local criminal justices systems.

No further injunction is necessary to require Defendants to implement their plan. This Court has already issued an injunction requiring the State to achieve a reduction in prison crowding.  Accordingly, Plaintiffs' respectfully request that this Court issue an order denying Defendants' request for an extension of time or a modification of the effective Crowding Reduction Order, and granting Defendants waivers of the State laws that Defendants identified as impediments to their implementation of measures to comply with the Crowding Reduction Order.

DATED: January 7, 2013                    Respectfully submitted,

PRISON LAW OFFICE

By:  */s/ Rebekah Evenson*
        Rebekah Evenson

Attorneys for Plaintiffs

PLAINTIFFS' STATEMENT IN RESPONSE TO OCTOBER 11, 2012, ORDER RE POPULATION REDUCTION