1   DONALD SPECTER – 083925
    STEVEN FAMA – 099641
2   ALISON HARDY – 135966
    SARA NORMAN – 189536
3   REBEKAH EVENSON – 207825
    PRISON LAW OFFICE
4   1917 Fifth Street
    Berkeley, California  94710-1916
5   Telephone:   (510) 280-2621

6

7   CLAUDIA CENTER – 158255
    THE LEGAL AID SOCIETY –
    EMPLOYMENT LAW CENTER
8   600 Harrison Street, Suite 120
    San Francisco, California  94107-1389
9   Telephone:   (415) 864-8848

10  Attorneys for Plaintiffs

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
LISA ELLS – 243657
AARON J. FISCHER – 247391
LAURA BOYSEN-ARAGON – 248083
ROSEN BIEN GALVAN &
GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:   (415) 433-6830

WARREN E. GEORGE – 053588
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, California  94111-4067
Telephone:   (415) 393-2000

11              UNITED STATES DISTRICT COURTS

12            EASTERN DISTRICT OF CALIFORNIA

13        AND NORTHERN DISTRICT OF CALIFORNIA

14   UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

     PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

15  RALPH COLEMAN, et al.,                     Case No. Civ S 90-0520 LKK-JFM P

16              Plaintiffs,                     **THREE JUDGE COURT**

17         v.                                   **DECLARATION OF JAMES AUSTIN
                                                IN SUPPORT OF PLAINTIFFS'**
    EDMUND G BROWN, JR., et al.,                **STATEMENT IN RESPONSE TO
18                                              OCTOBER 11, 2012, ORDER**
              Defendants.                       **REGARDING POPULATION
19                                              REDUCTION**

20

21  _____

    MARCIANO PLATA, et al.,                     Case No. C01-1351 TEH
22
              Plaintiffs,                       **THREE JUDGE COURT**
23         v.

    EDMUND G. BROWN, JR., et al.,
24
              Defendants.
25

26

27

28

[711135-1]

I, James Austin, declare:

1.      I am a criminologist retained by Plaintiffs' counsel in this action.  I have previously submitted expert reports in this action, and have testified before the Court.  My resume and qualifications are on file with the Court.  I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.  I make this declaration in support of Plaintiffs' Statement in Response to October 11, 2012, Order Regarding Population Reduction.

**Introduction**

2.      Counsel for Plaintiffs have asked me to evaluate the CDCR's population reduction proposal.  The CDCR is proposing several actions that will serve to reduce the projected inmate population and expand bed capacity.  As will be noted, each of these measures is safe and effective.  In particular, to meet the June 2013 deadline the CDCR proposes to reduce the prison population primarily by what it calls "Court Ordered Early Releases."  As explained to me by CDCR, this will be achieved by identifying and releasing the lowest risk prisoners through CDCR's scientifically validated risk assessment instrument (California Static Risk Assessment or CSRA).  Since 43% of the current California's prison population is low risk, this method alone is sufficient to meet the target population.  The use of a validated risk assessment is by far the safest method of reducing the prison population because it selects only those who are low risk, while the other methods identified by the CDCR include inmates with higher risk levels.

3.      Below, I analyze the State's proposal as well as additional population reduction measures that the State could employ to comply with the Court's Order by June 27, 2013.

4.      All of the data presented in this report were provided to me by the CDCR.  These include detailed data files that consist of the current prison population, the last 12 months of prison admissions and the last 12 months of prison releases.  I also worked with the CDCR researchers to calculate recidivism rates for specific types of inmates and the likely impact of either diverting inmates or reducing their lengths of stay (LOS) in prison.

DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' STATEMENT IN RESPONSE TO
OCTOBER 11, 2012, ORDER REGARDING POPULATION REDUCTION

[711135-1]

## I.        Current and Projected Inmate Populations and Bed Capacities

5.       To comply with the court-ordered cap of 137.5% of design capacity, the State must reduce the population of the 33 in-state prisons to 109,805 prisoners.

6.       If current population trends remain constant, and no further steps are taken to reduce crowding, on June 27, 2013, there will be approximately 120,000 prisoners in the 33 prisons, approximately 9,000 more inmates than the order allows (See Table 2).

7.       This shortfall will occur notwithstanding the recent passage of AB 109 (more commonly referred to as Realignment).  Between October 1, 2011, when AB 109 took effect, and December 31, 2012, the total inmate population declined by over 23,000.  For the 33 in-state institutions that are within the domain of the court order, the population declined by over 21,000 (see Table 1).

8.       CDCR's Fall 2012 Population Projections and the CDCR crowding reduction plan suggest that between January 1, 2013 and June 27, 2013, the current prison population would decline by another 1,335 prisoners.  But the most recent trends show that the population has been relatively stable since the summer of 2012 (Figures 1 and 2). Prison admissions have been stable or slightly increasing over this period.  The impact of Realignment appears to have hit a plateau.

9.       Table 2 are my estimates of how much the prison population must be reduced by June 27, 2013 and December 27, 2013.  These numbers are slightly different from CDCR's projections.  However, both I and the CDCR agree that the population needs to be reduced by about 9,000 by June 27, 2013.

**Table 1. Changes in Inmate Populations**
**October 2011 and December 2012**

|  | Oct-11 | Dec-12 | Difference |
|---|---|---|---|
| Total Inmate Populations | 156,595 | 133,120 | -23,475 |
|  |  |  |  |
| In-State Institution Populations | 141,088 | 119,589 | -21,499 |
| Out of State Institution Population | 9,469 | 8,883 | -586 |
|  |  |  |  |
| Court Order Capacity |  |  |  |
| December - 2012 | 117,391 | 117,391 | NA |
| June- 2013 | 109,805 | 109,805 | NA |

DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' STATEMENT IN RESPONSE TO
OCTOBER 11, 2012, ORDER REGARDING POPULATION REDUCTION

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25
26



27
28

3
DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' STATEMENT IN RESPONSE TO
OCTOBER 11, 2012, ORDER REGARDING POPULATION REDUCTION

1

**Table 2.  Projected Populations and Capacities 2013**

| | Dec 2012 | June 2013 | Dec 2013 |
|---|---|---|---|
| **Total Population** | 132,941 | 132,941 | 132,941 |
| | Jan-13 | Jun-13 | Dec-13 |
| Current Capacity | | | |
| Institutions at 137.5% of Design | 109,665 | 109,665 | 112,032 |
| Out of State | 8,910 | 8,988 | 4,596 |
| New CHCF | 0 | 0 | 1,722 |
| Camps | 3,760 | 3,000 | 2,500 |
| In-State Contract Beds | 944 | 985 | 2,210 |
| | | | |
| **New Capacity** | | | |
| Alternative Custody | 0 | 300 | 1,000 |
| New Jails/Contract | 0 | 1,225 | 1,225 |
| Increased Out of State | 0 | 0 | 3,892 |
| Total System Capacity | 123,279 | 124,163 | 129,177 |
| | | | |
| **Gap** | -9,662 | -8,778 | -3,764 |

In developing a safe and effective plan to lower the current prison population, the risk level of the inmates to recidivate is an important tool to use. As shown in Table 3, 42% of the CDCR prison population is low risk.[1]

**Table 3.  Risk Levels of Current CDCR Inmate Population Eligible for Release by Sentence Type**

| | Assessed Risk Level to Recidivate | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sentence Type | Not Assessed | High Violent | High Drug | High Property | Medium | Low | Total Inmates | % of Total Inmates |
| Life With Parole | 725 | 1,168 | 60 | 163 | 3,744 | 19,999 | 25,859 | 20% |
| Third Strike | 612 | 452 | 133 | 382 | 2,252 | 5,095 | 8,926 | 7% |
| 2nd Strike | 697 | 7,996 | 1,844 | 3,363 | 10,048 | 9,008 | 32,956 | 26% |
| DSL-Non Violent | 1,215 | 6,391 | 2,068 | 3,181 | 6,371 | 4,706 | 23,932 | 19% |
| DSL-Violent | 1,597 | 5,659 | 581 | 1,383 | 12,030 | 15,305 | 36,555 | 28% |
| Not Assessed | 279 | 208 | 47 | 72 | 181 | 146 | 933 | 1% |
| Total Inmates | 5,125 | 21,874 | 4,733 | 8,544 | 34,626 | 54,259 | 129,161 | 100% |
| % of Total Inmates | 4% | 17% | 4% | 7% | 27% | 42% | 100% | |

---

[1] Table 3 does not include prisoners who are sentenced to Death or serving a sentence of life without the possibility of parole.

1  Source: CDCR Current Inmate Population data file December 2012.

2  **II.    Review of CDCR Plan to Reduce Inmate Populations**

3        10.    Below, I have excerpted the CDCR's proposals for reducing prison crowding

4  and the projected impact of CDCR's plan.

5

| | Current[1] | Benchmarks | |
|---|---|---|---|
| | | June 2013 | December 2013 |
| **CDCR Population Projections** | 132,941 | 131,606 | 130,628 |
| **The Blueprint** | | | |
| Camps | 3,760 | 2,500 | 2,500 |
| In-State Contract Beds | 944 | 985 | 2,210 |
| Out-of-State Contract Beds | 8,910 | 8,988 | 4,596 |
| New Construction[2] | | | 1,722 |
| Prop 36 Third Strikers--Projected Releases Upon Court Resentencing | n/a | 300 | 500 |
| Prison Population | 119,327 | 118,833 | 120,822 |
| Court-Ordered Targets at 137.5% | 109,665 | 109,665 | 112,032 |
| Gap at 137.5% | -9,662 | -9,168 | -8,790 |
| **Areas for Potential Court Order** | | | |
| Allow Minimum Custody inmates to receive 2 for 1 credit earning* | n/a | 0 | 257 |
| Expand Milestone Completion Credits to Violent & 2nd Strike Offenders* | n/a | 0 | 554 |
| Increase Credits--Second Strikers from 20% to 34% (excludes sex offenders)* | n/a | 0 | 387 |
| Increase Credits--Violent Offenders from 15% to 34% (excludes sex offenders)* | n/a | 0 | 380 |
| Sentencing Changes for Specified Offenses* | n/a | 0 | 228 |
| Convicted Felons in County Jail with 9 months or Less Left to Serve Stay in Jail* | n/a | 0 | 439 |
| Expand Alternative Custody Program and Work Furlough/Restitution Centers | n/a | 300 | 1,000 |
| Expanded In-State Contract Beds/Leased Jail Beds | n/a | 1,225 | 1,225 |
| Slowed Return of Out-of-State Contract Beds | n/a | 0 | 3,892 |
| Camps | n/a | 500 | 0 |
| Court-Ordered Early Releases | n/a | 7,143 | 429 |
| Prison Population | 119,327 | 109,665 | 112,032 |
| Court-Ordered Targets at 137.5% | 109,665 | 109,665 | 112,032 |
| **Gap at 137.5%** | -9,662 | 0 | 0 |

1 Information set forth in the "Current" column is actual data as of December 26, 2012.
2 Recognition of the increased capacity of 1,722 for activation of the California Health Care Facility has been shifted from June 2013 to December 2013. Activation is anticipated in July 2013.
* Assumes implementation is effective on July 1, 2013.

11        11.    CDCR officials explained their proposal to me during a December 2012

meeting.  For both the June and December 2013 deadlines, the proposal consists of

DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' STATEMENT IN RESPONSE TO
OCTOBER 11, 2012, ORDER REGARDING POPULATION REDUCTION

[711135-1]

1  increasing prison bed capacity and reducing the projected prison population.   The prison

2  bed capacity is largely increased by delaying the CDCR plan to return out of state inmates

3  (3,892 inmates), the opening of the California Health Care Facility (1,722 beds) and

4  expanding in-state and local jail contract beds (2,225 beds).

5         12.    The balance of the gap is addressed by reducing the inmate population.  To

6  meet the June 2013 deadline, the CDCR appropriately relies on a validated risk assessment

7  instrument to reduce the population by approximately 7,000 prisoners.  In general terms,

8  the CDCR explained that it will identify the lowest-risk prisoners using a validated risk

9  assessment instrument, and release those with the least risk first, working through the low-

10 risk inmate population until the court-ordered target is met.

11        13.    From a public safety standpoint, the use of risk assessments to reduce prison

12 populations is by far superior to all the other proposed methods because it relies on an

13 objective measure of risk, and does not include, as do the other methods, higher risk

14 inmates.  (That is not to say that the other methods, which largely increase credits, are not

15 safe; they are safe, practical and widely used in other states, as well as California.)  In my

16 opinion, the CDCR's reliance on risk as the primary means of meeting the Court's

17 deadline is well justified.

18        14.    The CDCR also uses other measures to reduce the prison population:

19   *Reducing Prison Admissions*

20        1.    Redefines certain drug possession crimes as misdemeanors and thus
             cannot be sentenced to state prison;

21

22        2.    Increases the types of non-violent, non serious crimes that would fall
             under the recently passed re-alignment act (AB109) and thus would
             be sentenced to serve time in the local jails;

23

24        3.    Requires inmates who have 9 months or less to serve after being
             sentenced by the courts to remain in the local jails;

25   *Reducing Length of Stay*

26        4.    Allows minimum custody inmates to receive 2 for 1 credits similar to
             inmates assigned to conservation and work camps.

27

28        5.    Increases the amount of good time credits that 2nd strikers are entitled
             to earn.

[711135-1]

DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' STATEMENT IN RESPONSE TO
OCTOBER 11, 2012, ORDER REGARDING POPULATION REDUCTION

6.  Increases the amount of good time credits that prisoners convicted of violent offenses are entitled to earn.

7.  Allows 2nd Strikers and those convicted of a violent offense to receive Milestone program credits.

15.  There are three concerns I have with the CDCR Plan. First, the document provided by CDCR only shows the impact of the reforms as if they were applied to the current inmate population *on a specific date.* In essence CDCR's figures show a one-shot application to inmates in custody as of July 1, 2013. As such, CDCR's document significantly undercounts the impact that CDCR's methods would have if they were applied on a sustained basis going forward, and/or if they were made retroactive to the current inmate population.

16.  Second, the CDCR's Plan will begin implementation of the population reduction measures *after* the June 27, 2013 deadline. There is no reason that it should take the State so long to implement these measures, assuming the Court waives the relevant laws in the coming weeks and the CDCR makes its reforms retroactive to low risk inmates.

17.  Third, CDCR's Plan does not include a 20% discount factor to ensure the projected reductions will occur and the plan will succeed. Based on my extensive experience working with other jurisdictions to reduce prison populations, I have come to understand that calculated population reductions rarely occur as designed due to unexpected and/or unintended developments. This happened in California, when AB 109 did not have the full impact on the state prison population that was initially projected. Consequently, any population reduction plan should have a discount factor that will provide a sufficient cushion in the estimates and help ensure compliance with the Court's Order. For purposes of my estimates, based on my experience in other states, the discount factor must be at least 20%. In Table 4, I show the impact of CDCR's Plan applying the 20% discount factor.

18.  Despite these concerns, I am confident that even if CDCR implemented it's plan exactly as written, it could achieve the full crowding reduction ordered by the Court

[711135-1]

7

DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' STATEMENT IN RESPONSE TO OCTOBER 11, 2012, ORDER REGARDING POPULATION REDUCTION

1  in a safe manner by June 27, 2013, because, as explained above, CDCR's "catchall" plan

2  for reducing the prison population targets the lowest-risk prisoners in the system, and

3  would not cause an increase in crime rates.

4  **III.**    **Additional Population Reduction Measures**

5        19.    There are other reforms that the State could employ to safely reduce the

6  current inmate population by June 27, 2013.

7        20.    The additional reforms are set forth below.  Each reform would be made

8  retroactive to the current inmate population between now and June 27, 2013.  These

9  measures are designed to 1) easily meet the court order by June 27, 2013, 2) have no

10  significant impact on the counties in terms of supervision costs, 3) have no impact on the

11  crime rate, and 4) reduce current recidivism rates.[2]

12        **a)**    **Diversion of Drug Possession Cases.  Retroactive and Sustained**

13        21.    This reform is the same as the one proposed by the CDCR except that it is

14  made retroactive to the current inmate population and would be sustained.  This reform if

15  fully implemented would reduce the current prison population by nearly 2,000.

16        **b)**    **2nd Strikers serve 34% of Sentence versus 20%.  Retroactive and**

17                **Sustained**

18        22.    This reform is identical to the CDCR recommendation but is made

19  retroactive to the current inmate population and would be sustained. This would require

20  CDCR to recalculate release dates for some portion of the approximately 33,000 2nd

21  strikers.   This would reduce prison population by approximately 3,000 by June 27, 2013

22  and have no impact on the counties.

23

24

25

26

_____

27  [2] Recidivism rates would be reduced by providing incentives in the form of good-time
credits for inmates to participate in and complete rehabilitative programs.

28

[711135-1]

8

DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' STATEMENT IN RESPONSE TO
OCTOBER 11, 2012, ORDER REGARDING POPULATION REDUCTION

**c)  Violent Offense- Non Strikers – serve 34% of Sentence versus 15%. Retroactive and Sustained**

23.    This reform is similar to the CDCR recommendation but would reset good time rate from 15% to 34%.  If this reform is made retroactive to the current inmate population and sustained going forward, it would reduce the prison population by 6,000 by June 27, 2013 and have no significant adverse impact on the counties.

**d)  Enhanced Program Credits –All inmates. Retroactive and Sustained.**

24.    This reform is similar the one proposed by the CDCR but is made retroactive to the current population and sustained going forward.  It assumes that 35% of all DSL, 2nd Strike and 3rd Strikers can complete a meaningful program that would serve to reduce their risk of recidivism, and their length of stay would be reduced by an average of six months.  The long-term impact would be a reduction in the CDCR population of approximately 4,000 inmates. This reform would require the CDCR to redefine and recalculate Milestone program credits for the existing inmate population.

**e)  ICE Transfers**

25.    This reform would transfer all prisoners with ICE holds (i.e., those who will be transferred to ICE custody on their release date) to ICE when the prisoner is within 6 months of their release date.  This proposal is based on the New York state policy that commutes sentences and transfers prisoners with ICE holds to ICE for deportation.  This would reduce the population by approximately 1,000 prisoners.

**f)  Diversion of Probation Technical Violators-Retroactive**

26.    This reform would prohibit the admission of probationers who have been admitted to prison for a technical violation of probation while on probation status. This reform would be based on the principle that only persons convicted of new felony crimes should serve time in state prison.  This would reduce the population by approximately 2,500 prisoners.

9

**g)    Facilitated Implementation of Prop 36 3rd Strike Law**

27.    This reform would expedite the release of all inmates who are part of the affected Prop 36 class rather than waiting upon individual judges to resentence these inmates.   This would reduce the population by approximately 2,200 prisoners.

**h)    Release Low Risk Lifers Past Their Minimum Parole Eligibility Date**

28.    There are some 9,000 Lifers with the possibility of parole who are low risk and are past their minimum eligible parole date (MEPD).  This class of inmates by far poses the lowest risk to public safety based on recidivism studies completed by the CDCR. Based on the CDCR data there are approximately 9,315 prisoners who are past their MEPD. Virtually all of them (96%) are low risk.

29.    Table 4 shows the effects on prison population and prison costs that would accrue from the population reduction measures discussed herein (with the exception of the "Court–Ordered Releases").  All of these policies have been implemented previously in California and/or in other states without jeopardizing public safety.  There are a sufficient number of low and medium risk inmates in these groups to ensure that public safety will not be compromised.  If the reforms in Table 4 were implemented, the state could return all of its nearly 9,000 out of state inmates as proposed by the CDCR in its Blueprint Report, and still achieve the court-ordered population reduction on time.

**Table 4.  Summary of Fully Implemented CDCR and Additional Population Reduction Measures – Impact on Prison Population and CDCR Operating Costs**

| Reforms | Current Target Population | Pure Impact | Adjusted @20% Discount | Annualized Prison Savings | Annualized Parole Costs |
|---|---|---|---|---|---|
| Initial CDCR Reforms | | | | | |
| 1. Minimum Custody Inmates - 2 for 1 Credits | 15,000 | 257 | 206 | $5,149,869 | $659,565 |
| 2. Expand Milestone Credits -2nd Strikers/Violent | 69,511 | 554 | 443 | $11,101,274 | $1,421,786 |
| 3. 2nd Striker Good Time Credits | 32,846 | 387 | 310 | $7,754,861 | $993,197 |
| 4. Violent Offense Good Time Credits | 36,447 | 380 | 304 | $7,614,592 | $975,232 |
| 5. Drug Possession to Misd Crime | 2,436 | 228 | 182 | $4,470,259 | 0 |
| 6. Restrict inmates with <9 months | 3,200 | 439 | 351 | $8,607,210 | 0 |
| Sub-Totals | | 2,245 | 1,796 | $44,698,064 | $4,049,779 |
| | | | | | |
| Modified CDCR Reforms - Retroactive & Sustained | | | | | |
| 1. Minimum Custody Inmates - 2 for 1 Credits | 15,000 | 5,000 | 4,000 | $100,192,000 | $12,832,000 |
| 2. Expand Milestone Program Credits-All Inmates | 88,886 | 4,200 | 3,360 | $84,161,280 | $10,778,880 |
| 3. 2nd Striker Good Time Credits | 32,846 | 7,542 | 6,034 | $151,129,613 | $19,355,789 |
| 4. Violent Offense Good Time Credits | 36,447 | 11,705 | 9,364 | $234,549,472 | $30,039,712 |
| 5. Felony Drug Possession to Misd Crime | 2,436 | 2,436 | 1,949 | $47,761,190 | 0 |
| 6. House inmates with <9 months in local jails | 3,200 | 3,200 | 2,560 | $62,740,480 | 0 |
| Sub-Totals | | 34,083 | 27,266 | $680,534,035 | $73,006,381 |
| | | | | | |
| Other Options Not Proposed By CDCR - Retroactive & Sustained | | | | | |
| 1.  Low Risk Lifers Past MPED | 25,860 | 4,912 | 3,930 | $98,428,621 | $12,606,157 |
| 2.  Divert Technical Probation Violators | 3,128 | 3,128 | 2,502 | $62,680,115 | $0 |
| 3.  ICE Transfers with 6 months to serve | 15,236 | 1,298 | 1,038 | $26,009,843 | $0 |
| 4.  Expedite  3rd Strike Law | 8,876 | 2,800 | 2,240 | $56,107,520 | $7,185,920 |
| Sub-Totals | | 12,138 | 9,710 | $243,226,099 | $19,792,077 |
| | | | | | |
| Grand Totals- Modified CDCR and Other Options Only | | 46,221 | 32,936 | $835,070,176 | $92,798,458 |

Table 4 Notes:

1.	Impact for "modified CDCR Reforms" and "Other options" assume each reform is implemented starting March 1, 2013.  Impact shown reflects population reductions by June 27, 2013.

2.	Prison savings calculated based on CDCR estimate of $25,048 of marginal cost savings per inmate.  Parole supervision costs based on $3,208 per additional parolee. Grand totals exclude Initial CDCR recommendations 1-7 and "Other Options" 2 and 3 which duplicate some portion of prisoners in other recommendations.

## IV.    Impact on Public Safety

30.    Since the mid-1990s California's and the nation's crime rate has dropped dramatically.  As shown in Figure 3, California's rate is now below what it was in 1960 when the incarceration rate for the state was about 140 per 100,000 as compared to the current rate of over 400 per 100,000.  Figure 3 shows that compared to the US crime rate, which has also declined dramatically, California's rate is now below the national rate. The reforms outlined above will not increase the current low crime rate.

31.    There is ample evidence that California (and other states) can reduce their prison populations *and lower their crime rates at the same time*.  As shown in table 5, California's prison population peaked in 2007 at 173,312; since then, the prison population has been lowered by nearly 40,000 inmates, and California's crime rate *declined* by 11% (17% reduction for violent crime).  As I previously testified at the trial in 2008, lowering the state prison population would have no impact on crime or arrest rates which has proven to be the case. So it is clear that prison populations and crime rates can be lowered simultaneously.

32.    Based on my previous reports to this Court, each of the new measures chosen by the CDCR to reduce crowding, as well as the additional measures that I discuss above, are safe.  That is, they could be implemented without having an impact on public safety or the operation of the state or local criminal justice systems. In fact they would provide large cost savings that could be used to offset any local criminal justice costs and increase the level of effective programs at the state and local levels.

33.    To ensure this conclusion is true I re-calculated the impact of seven of the major reforms using the same methods I explained during trial in this matter, plus applying the CDCR risk assessment system to ensure that no high risk inmates are released sooner (Table 6).  These calculations confirm that there will be no adverse impact to public safety if the CDCR Plan or an expanded version of the CDCR Plan as described previously is implemented.  Further, implementing these seven reforms using the risk assessment system would reduce the prison population by at least 18,577 by June 27, 2013 – sufficient to meet

[711135-1]

12

1    the Court's order and return all of the out of state inmates as originally proposed by the

2    CDCR by 2014 (or sooner).

3    **Figure 3**



**Figure 4**



**Table 5. Changes in CDCR Inmate Populations**
**December 2007, October 2011 and December 2012**

|  | July 2007 | Oct 2011 | Dec 2012 | Difference |
|---|---|---|---|---|
| Total Inmate Populations | 172,528 | 156,595 | 133,120 | -39,408 |
| In-State Institution Populations | 172,298 | 141,088 | 119,589 | -52,709 |
| Out of State Institution Population | 230 | 9,469 | 8,883 | +8,653 |
| California Crime Rate Per 100,000 Population |  |  |  |  |
| Total Crime Rate per 100,000 | 3,730 | 3,295 | NA | -12% |
| Violent Crime Rate per 100,000 | 469 | 386 | NA | -17% |
| Property Crime rate per 100,000 | 3,431 | 2,909 | NA | -11% |

14
DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' STATEMENT IN RESPONSE TO
OCTOBER 11, 2012, ORDER REGARDING POPULATION REDUCTION

**Table 6.  Estimated Bed Savings and Impact on State Arrests for Selected Population Reduction Options**

| Target Group | Annual Releases | Low Medium Risk Releases | Current LOS (mos) | New LOS (mos) | Bed Impact | 20% Discount | Highest Possible Impact on Total Arrests |
|---|---|---|---|---|---|---|---|
| 2 for 1 Credits for Min Custody | 6,810 | 3,549 | 25 mos | 13 mos | 3,549 | 2,839 | 0.4% |
| 2nd Strikers 34% Credit | 7,050 | 3,309 | 53 mos | 41 mos | 3,309 | 2,647 | 0.2% |
| Violent Offense 34% Credit | 6,025 | 3,820 | 83 mos | 61 mos | 7,003 | 5,603 | 0.3% |
| Milestone Credits - All Inmates | 9,518 | 4,759 | 38 mos | 35 mos | 1,190 | 952 | 0.4% |
| Low Risk Lifers | 4,912 | 4,912 | NA | NA | 4,912 | 3,930 | 0.0% |
| Probation Tech | 2,954 | 1,550 | 11 mos | 0 mos | 1,421 | 1,137 | 0.2% |
| 3rd Strike | 2,240 | 1,837 | NA | NA | 1,837 | 1,470 | 0.0% |

Notes:  Current admissions and length of stay estimates derived from CDCR admission data file. Impact on number of arrests each year based on CDCR FY2007/08 recidivism data file.  Low and medium risk inmates assumed to have a 25% lower pooled rate of recidivism than high risk inmates.  About 60% of the re-arrests are misdemeanor crimes.

      I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration is executed at San Diego, California this 7th day of January, 2013.

/s/ _____
James Austin
(Approval to e-file on file with Plaintiffs' counsel)

[711135-1]

15

DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' STATEMENT IN RESPONSE TO OCTOBER 11, 2012, ORDER REGARDING POPULATION REDUCTION