PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
ALISON HARDY, Bar No. 135966
SARA NORMAN, Bar No. 189536
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA  94710
Telephone:  (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
ERNEST GALVAN, Bar No. 196065
LISA ELLS, Bar No. 243657
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>          Plaintiffs,<br>     vs.<br><br>EDMUND G. BROWN, et al.,<br><br>          Defendants | No.  Civ S 90-0520 LKK-JFM P<br>**THREE-JUDGE COURT**<br><br>**DECLARATION OF STEVEN FAMA IN SUPPORT OF PLAINTIFFS' STATEMENT IN RESPONSE TO OCTOBER 11, 2012, ORDER** |
| MARCIANO PLATA ,et al.,<br><br>          Plaintiffs,<br>     vs.<br><br>EDMUND G. BROWN, et al.,<br><br>          Defendants | No. C01-1351 TEH<br>**THREE-JUDGE COURT** |

I, Steven Fama, hereby declare:

1. I am a lawyer admitted to practice in this state and before this court. I am one of the lawyers for the plaintiff classes in the instant action.

2. Attached hereto as Exhibit A is a true and correct copy of the "Analysis of 2011 Inmate Death Reviews in the California Prison Healthcare System," as posted on the website of the California Correctional Healthcare System (*Plata* Receiver):

http://www.cphcs.ca.gov/docs/resources/OTRES_DeathReviewAnalysisYear2011_20120607.pdf  (site last visited January 7, 2013).

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct, and that this declaration was executed January 7, 2013, in Berkeley, California.



\_\_-           /s/
              Steven Fama

-2-
DECL. OF STEVEN FAMA ISO PLFS' STATEMENT IN RESPONSE TO OCT 11, 2012, ORDER, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

# Exhibit A

# Analysis of 2011 Inmate Death Reviews in the California Prison Healthcare System

May 12, 2012
Kent Imai, MD

*Table of Contents*

I. Introduction ........................................................................................................................... 1
II. Death Review Process ........................................................................................................... 1
III. Definitions ............................................................................................................................ 2
IV. Taxonomy for Lapses in Care ............................................................................................... 3
V. Limitations and Benefits in the Death Review Process ........................................................ 4
VI. Study Findings ...................................................................................................................... 6
   A. Causes of Inmate Death – 2011 ........................................................................................ 6
   B. Lapses in Care, 2011 ......................................................................................................... 8
   C. Non preventable deaths 2011 – ...................................................................................... 10
   D. Possibly Preventable deaths – 2011 ............................................................................... 11
   E. Likely (Definitely) Preventable Deaths – 2011 ................................................................ 15
   F. Lapses by contract specialists and outside hospitals (non CCHCS staff) 2011 ............... 16
   G. Primary Care – 2011 ....................................................................................................... 17
VII. Discussion ......................................................................................................................... 18
   A. Trends in California Prison Death rates 2006-2011 ....................................................... 18
   B. Trends in Preventable Deaths, 2006-2011 ..................................................................... 19
   C. Trends in causes of mortality ......................................................................................... 20
   D. Trends in Lapses in Care – 2011 ..................................................................................... 22
      1. Relationships between lapses in care and preventable deaths. ............................... 22
VIII. Opportunities .................................................................................................................. 27
IX. Conclusions ........................................................................................................................ 28

## *List of tables and figures*

Table 1. Causes of Death Among All California Inmates, 2011 .................................................. 6
Table 2 . Top causes of death among California inmates 2007-2011 ....................................... 7
Table 3. Summary of lapses of care (extreme departures), 2011 .............................................. 8
Table 4. Causes of non-preventable death among California inmates, 2011 ......................... 10
Table 5. Causes of possibly preventable death among California inmates, 2011. ................ 11
Table 6. Causes of likely preventable death among California inmates, 2011. ..................... 15
Table 7. Presence of Primary Care in California inmate death cases, 2009 – 2011. ............. 18
Table 8. Annual death Rates among California inmates, 2006- 2011 .................................... 18
Figure 1. Numbers of California Prison System Deaths by Preventability, 2006-2011 .......... 19
Table 9. Rates of preventable deaths among California inmates, 2006-2011 ....................... 19
Figure 2. Trend in Preventable Death Rates in the California Prison System, 2006-2011 ..... 20
Table 10. Numbers of Suicide- and Homicide- related deaths in the California Prison
    System, 2006-2011. ........................................................................................................ 20
Figure 3. Numbers of Suicide- and Homicide-related deaths in the California Prison System,
    2006-2011 ........................................................................................................................ 21
Table 11. Numbers of Drug Overdose-related deaths in the California Prison System, 2006-
    2011. ................................................................................................................................ 21
Figure 4. Cocci-related deaths in the California Prison System, 2006-2011 .......................... 22
Table 12. Cocci-related deaths in the California Prison System, 2006-2011. ........................ 22
Table 13. Number of lapses by preventability among California inmates, 2011 ................... 23
Figure 5. Average number of lapses per death by preventability among California inmates,
    2007-2011 ........................................................................................................................ 23
Table 14. Number of lapses, by preventability, in California Prison System deaths, 2007-
    2011. ................................................................................................................................ 23
Figure 6. Lapses, by year and death preventability, in the California Prison System, 2007-
    2011. ................................................................................................................................ 24
Table 15. Lapses, by type, in California Prison System deaths, 2007-2011. .......................... 25
Figure 7. Number of lapses, by type, in California Prison System deaths, 2007-2011. ......... 25
Figure 8. Signs and symptoms in Type 1 lapses in California Prison System deaths, 2011. .. 26
Table 16. Signs and symptoms in Type 1 lapses in California Prison System deaths, 2011. 26

# I. Introduction

The California Prison Healthcare System has been under federal receivership since April of 2006. The Receiver has overseen incremental improvements in health care, resulting ultimately in a wholesale system redesign, replacing a system driven by episodic complaints with a system within which healthcare teams bear responsibility for patient outcomes, and use proactive and guideline driven care for chronic medical conditions. An extensive quality Improvement program identifies and targets specific areas for clinical improvement.

Since the beginning of the receivership, a rigorous process of peer review has used the death review to identify serious individual and systemic lapses in care and to record and track the numbers of preventable deaths. The death review tool has been used to identify and sanction unsafe practitioners, and to find opportunities for system improvement.

This sixth annual analysis of all inmate death reviews in the California state prison system once again focuses on the following areas – trends in mortality, identification and trending of serious lapses in care, and identification and trending of preventable deaths.

This report shows improvements in several areas, discusses how these might have been achieved, and makes recommendations.

# II. Death Review Process

As described in prior reports, each inmate death is reviewed by a board certified physician who has been trained to do death reviews using a uniform procedure. Findings are recorded on a standardized death review template form

For each death review, the reviewer reads the decedent's healthcare record focusing on all clinical encounters that took place during the last six months of life. All patient requests for healthcare are noted, as well as the thoroughness of initial evaluation at time of intake into the system (if it occurred within the last six months), responsiveness of the system to the patient requests for healthcare, the quality of the evaluations, the timelines of access to indicated specialty care, the results of all laboratory and diagnostic imaging studies, the quality and thoroughness of the care of any identified chronic medical condition such as diabetes, asthma, emphysema, cancer, chronic pain, liver or kidney failure, chronic infection with the human immunodeficiency virus (HIV) or chronic hepatitis. All visits to specialists, emergency departments and inpatient hospitals are reviewed. The quality of terminal care for fatal conditions is noted. The timing and quality of responses to emergency situations is also reviewed.

Reviewers also determine whether there was an identifiable primary care physician involved in the patients care, cite the cause of death (using post mortem autopsy results

1

when available), identify all lapses in care (even if those lapses did not contribute to a patient's death), judge whether the death was preventable or not preventable, and recommend referrals for any adverse findings. Reviewers spend an average of 6-8 hours preparing each review. . In 2011, there were 17 reviewers, who averaged 22.8 reports (range 1- 43).

Completed death reviews are presented to the Death Review Committee (DRC), where the reviewer's conclusions are discussed. The eight member DRC is composed of a physician chair, three physician executives, three nurse executives and one custody representative. After discussion, the DRC votes to accept or modify the report (the chair and custody representative do not vote).

Systemic lapses such as delays in access or breakdowns in emergency response are referred to the Chief Medical Executive of the appropriate prison and to the receiver's Quality Management group. Lapses in care by individual nurses, physicians or mid level providers are referred to the appropriate peer review committee. Lapses which occur at contracted hospitals or specialist offices are referred to the contracting entity or to the appropriate peer review body.

This extensive and rigorous death review process meets or exceeds similar peer review activities conducted in the non prison world.

## III. Definitions

These definitions are used by the Death Review Committee and in this analysis.

Lapse in Care (individual) – In the judgment of the reviewer, a clinician has committed a departure from the standard of care that a reasonable and competent clinician would not have committed under the same or similar circumstances.

Lapse in care (systemic) – In the judgment of the reviewer, there was a lapse in the system of care delivery which departed significantly from the usual standard seen in the medical community.

Non preventable death – In the judgment of the reviewer, the patient's death could not have been prevented or significantly delayed by more optimal care.

Possibly preventable death – In the judgment of the reviewer, better medical management or improvement in the system of care delivery might have prevented or significantly delayed the patient's death.

2

Likely (or definitely) preventable death – In the judgment of the reviewer, better medical management or improvement in the system of care delivery would likely or definitely have prevented or significantly delayed the patient's death.

## IV. Taxonomy for Lapses in Care

Previous annual reports have described how the taxonomy for grouping lapses in care was developed. The classification system describing fourteen different types of care lapse was proposed to the DRC in 2007, so that reviewers might be able to use a common language when discussing potential errors in clinical management or systemic processes of care. In 2008 the taxonomy was incorporated into the death review template. After having been in use for a year, the taxonomy was presented at the April 2009 meeting of the National Commission on Correctional Health Care and at the September 2009 meeting of the American Correctional Health Services Association.

As described at these meetings, the taxonomy has been a useful quality improvement tool for identifying potentially unsafe clinicians, gaps in the healthcare system, opportunities for system and process redesign, and educational strategies for California Correctional Health Care Services (CCHCS) clinical staff. The fourteen categories of lapse are:

Type 1 – Failure to recognize, evaluate and manage important symptoms and signs – so called clinical "red flags".

Type 2 – Failure to follow clinical guidelines or departmental policies developed by the medical department of the CCHCS. These include evidence based guidelines for the management of asthma, diabetes mellitus, hepatitis C infection, HIV/AIDS, chronic pain, and care at the end of life. Other guidelines include national standards for the treatment of hypertension, acute coronary syndromes, congestive heart failure, cardiac arrhythmia, and anticoagulation.

Type 3 – Delay in access to the appropriate level of care, of sufficient duration as to result in harm to the patient.

Type 4 – Failure to identify and appropriately react to abnormal test results.

Type 5 – Failure of appropriate communication between providers, especially at points where transfers of care occur.

Type 6 – Fragmentation of care resulting from failure of an individual clinician or the primary care team to assume responsibility for the patient's care.

Type 7 – Iatrogenic injury resulting from a surgical or procedural complication.

3

Type 8 – Medication prescribing error, including failure to prescribe an indicated medication, failure to do appropriate monitoring, or failure to recognize and avoid known drug interactions.

Type 9 – Medication delivery error, including significant delay in a patient receiving medication or a medication delivered to the wrong patient.

Type 10 – Practicing outside the scope of one's professional capability (may apply to LVNs, RNs, midlevel practitioners, or physicians).

Type 11 – Failure to adequately supervise a midlevel practitioner, including failure to be readily available for consultation or an administrative failure to provide for appropriate supervision.

Type 13 – Failure to communicate effectively with the patient.

Type 13 – Patient non adherence with suggestions for optimal care.

Type 14 - Delay or failure in emergency response, including delay in activation or failure to follow the emergency response protocol.

## V. Limitations and Benefits in the Death Review Process

1. Inter-reviewer variability

One study from the medical literature addresses the problem of reviewer variability. 393 hospital deaths in a Veteran's Administration hospital were reviewed by a group of board certified specialists in internal medicine. Initially reviewers judged that 23% of the deaths were possibly preventable and 6% definitely preventable. When each death was then reviewed by another physician member of the same group, concordance in finding of preventability was 0.34 (the reviewers agreed only 34% of the time). *Hayward, et.al. "Estimating hospital deaths due to medical errors: preventability is in the eye of the reviewer". Journal of the American Medical Association.* Vol 286, pp 415-423, 2001. The DRC tries to mitigate inter reviewer variability by seeking consensus on the assignment of preventability and the severity of lapses in care.

In this year's analysis, as in past years, the author of this review also requires that the reviewer identify a clear relationship between a lapse or lapses in care and a preventable death. If such a lapse is not identifiable, the case is counted as a non preventable death, despite the consensus of the DRC.

2. Off site peer review

Traditional peer review takes place at the site where care originated and is conducted by staff who work there. The CCHCS death reviews are conducted off site by a designated cadre of physicians who are not involved in direct care of the decedent whose case is being reviewed.

3. Separate process for review of suicide deaths

All suicides are reviewed by a separate multidisciplinary committee in the California Department of Corrections and Rehabilitation, Mental Health Program by the Suicide Prevention and Response Focused improvement Team. This separate review is not integrated into the DRC, so that review findings and recommendations may not be facilitated.

4. Potential benefits

Benefits of the CCHCS death review process include a limited number of trained and experienced reviewers, the diligence expended in each review, and discussion of each death at the DRC. Off site review also has the potential benefit of removing subjective bias generated by a reviewer's personal knowledge of the on site providers involved in the care of the patient.