KAMALA D. HARRIS
Attorney General of the State of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS - SBN 166884
PATRICK McKINNEY – SBN 215228
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone:  (415) 703-3035
Facsimile:  (415) 703-5843
Email:  Patrick.McKinney@doj.ca.gov

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER – SBN 39374
PAUL B. MELLO – SBN 179755
WALTER R. SCHNEIDER – SBN 173113
SAMANTHA D. WOLFF- SBN 240280
PAUL B. GRUWELL – SBN 252474
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:   (415) 777-3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURTS

# FOR THE EASTERN DISTRICT OF CALIFORNIA

# AND THE NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

# PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                              Plaintiffs,<br><br>          v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>                              Defendants. | 2:90-cv-00520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| **MARCIANO PLATA, et al.,**<br><br>                              Plaintiffs,<br><br>          v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>                              Defendants. | C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**DECLARATION OF BRENDA GREALISH IN SUPPORT OF DEFENDANTS' RESPONSE TO OCTOBER 11, 2012 ORDER TO DEVELOP PLANS TO ACHIEVE REQUIRED PRISON POPULATION REDUCTION** |

I, Brenda Grealish, declare:

1. I am the Deputy Director of the Office of Research for the California Department of Corrections and Rehabilitation (CDCR). I am competent to testify to the matters set forth in this declaration and if called upon, I would and could so testify. I make this declaration in support of Defendants' Response to October 11, 2012 Order to Develop Plans to Achieve Required Prison Population Reduction.

2. I have a master's degree in psychology. I have worked in the field of social/behavioral research since 1998. I began working for CDCR in 2009. I work on projects on behalf, and at the direction, of CDCR Secretary Beard. In my current role as Deputy Director, I am responsible for the management and oversight of three branches of the Office of Research: the Research and Evaluation Branch, which manages and conducts internal and external research and evaluation projects; the Enterprise Data Management Branch, which collects and compiles data from CDCR databases and provides offender-level data to internal and external stakeholders; and the Offender Information Services Branch, which produces population projections, develops estimates of legislative and policy impacts, and provides summary statistical information for internal and external stakeholders. As part of my oversight of the Offender Information Services Branch, I am also responsible for managing a team of research analysts tasked with creating population reduction estimates for CDCR. I am also familiar with the numerous population reduction estimates that the State has completed and is currently undertaking to comply with the Court's order to limit the State's inmate population.

3. There are various approaches to reduce the inmate population. The Office of Research was tasked with estimating the impact of some of those approaches. Each is explained below (and set forth in a chart, attached as Exhibit A) along with the process of how we arrived at our estimate to reduce the Average Daily Population (ADP). ADP is the number of full beds utilized within a year (for example, 10 ADP equals 10 occupied beds for 1 year). ADP provides a tangible unit of measure commonly used for budgetary planning and estimating cost/savings. ADP is used instead of number of persons

because it incorporates the length of time a person stays in prison (for example, 2 persons spending 12 months in prison = 2 ADP; 6 persons spending 4 months in prison = 2 ADP). If budgetary cost were based on the 6 persons (rather than ADP) in the last example, the impact would be inflated 3 times what it should be. Using fall 2012 projections as our baseline, the Office of Research utilized the latest available trends up to December 2012 to account for a higher than anticipated prison population. Our results include discounts to prevent over counting due to overlap between one estimate and another. We did not include sex registrants in any of our estimates on population reduction as it is my understanding that it was determined the inclusion of sex registrants would create an unreasonable risk to public safety.

4. My team produced an estimate of the impact of the recently-passed Three Strikes Reform Act of 2012, commonly known as Proposition 36. It included admissions of third strikers dating to Fiscal Year 1993-94 and applied eligibility criteria based on the initiative. Additionally, it assumed a sentence length of 25 years and that all eligible third strikers would petition for resentencing. A discount was applied to the results from this estimate due to the uncertainty of resentencing behaviors of local jurisdictions. Accordingly, CDCR estimates that the prison population will be reduced by 300 ADP by June 2013 and 500 ADP by December 2013.

5. My team produced an estimate of the impact of applying two-for-one credits to offenders in minimum support facilities. This estimate was developed by calculating a time-to-serve reduction factor (1.72 months) obtained by changing credit earning from day-for-day for minimum custody inmates to two-for-one credits. The credit reduction factor was applied to future population projections and assumes a stable share of minimum custody inmates within the prison population and day-for-day inmates within the minimum support facilities. A discount was applied to the results of this estimate due to concerns that there may be overlap between this and other population reduction estimates my office produced. Accordingly, CDCR estimates that this potential population reduction measure could reduce the prison population by 257 ADP by

December 2013.

6. My team produced an estimate that revised the "milestone" credits that could be earned by all non sex registrants. The first part of the estimate included day-for-day credit earners only and used one year of milestone completion credit data. The ADP reduction was calculated for this group by removing the six-week cap that currently exists. The second part was developed by allowing violent and second-strike inmates to earn milestone credit for programs completed, and then doubling the credit earned in order to maximize reduction in the near term, as well as the long term. Those doubled weeks of credit were applied to future population projections based on estimates of the proportion of the future population expected to be violent and second strikers. The estimate was calculated based on the amount of time each group has to serve as no impact is realized until they leave. The savings for violent and second strikers were calculated separately, then combined with the estimate for the day-for-day group, creating the final estimate. A discount was applied to the result to account for overlap between this and other population reduction estimates my office produced. Accordingly, CDCR estimates that this measure, if implemented, could reduce the prison population by 554 ADP by December 2013.

7. My team produced an estimate for increasing credit earning capacity to 34% for violent inmates without a second strike. It assumed that the increased credit earning capacity would be applied starting January 1, 2013 to the remainder of this population's sentences. It excluded parole violators returned to custody, offenders pending parole revocation, sex registrants and lifers. A discount was applied to the result to account for overlap between this and other population reduction estimates my office produced. Accordingly, CDCR estimates that this measure, if implemented, could reduce the prison population by 380 ADP by December 2013.

8. My team produced an estimate for increasing credit earning capacity to 34% for non violent inmates with two strikes. It assumed that the increased credit earning capacity would be applied starting January 1, 2013, to the remainder of this

population's sentences. It excluded parole violators returned to custody, offenders pending parole revocation, sex registrants and lifers. A discount was applied to the result to account for overlap between this and other population reduction estimates my office produced. Accordingly, CDCR estimates that this measure, if implemented, could reduce the prison population by 387 ADP by December 2013.

9. My team produced an estimate to determine the amount by which the future prison population would not increase if convicted felons with nine months or less left to serve on their sentences were retained in county jails. It included new admissions and parole violators with new terms sentenced under the determinate sentencing law. It excluded parole violators returned to custody, all lifers, condemned and inmates with three strikes. It assumed that starting January 1, 2013, this population would serve time in county jail. A discount was applied to the result to account for overlap between this and other population reduction estimates my office produced. Accordingly, CDCR estimates that this measure, if implemented, could prevent the future prison population from increasing. The net result would reduce the population by 439 ADP by December 2013.

10. My team produced an estimate to determine the amount by which the future prison population would not increase if specified court-ordered felonies, including drug possession, petty theft, second degree burglary, vehicle theft, vandalism, and forgery, are punishable by incarceration in county jail instead of prison. The estimate included offenders not eligible for realignment because they are sex registrants, strikers, or have a serious or violent offense. It excludes anyone eligible for realignment and those offenders with dual commitment offenses where one offense is not one of the specified offenses. It assumed that offenders currently receiving day-for-day credit earning would continue to receive the same credit earning at the local level and that the proposed sentence at the local level is for one year. The result was adjusted based on an unanticipated increase in population admissions. Accordingly, CDCR estimates that this measure, if implemented, could prevent the future prison population from increasing.

The net result would reduce the population by 228 ADP by December 2013.

11. The above measures will not achieve the Court-ordered population cap of 137.5% by the required timeframe. There will be an additional shortfall amount of approximately 7,143 ADP by June 2013 and 429 ADP by December 2013.

12. It is my understanding that CDCR would likely employ its risk assessment tool if it were required to further reduce the prison population. However, a risk assessment tool only determines an inmate's likelihood of reoffending and does not and cannot determine the severity of what the potential new offense could be. Although a low-risk offender is less likely than a high-risk offender to commit a new crime, there is still a chance that a low-risk offender will commit a crime, and it is also possible that the crime(s) committed may be severe in nature. In other words, it is impossible to determine with 100% certainty whether a low-risk offender will reoffend and, furthermore, current risk-assessment tools are limited in their ability to predict the severity of any such new offense.

13. I am familiar with a November 2009 study by the University of California, Irvine, Center for Evidence-Based Corrections, entitled "Development of the California Static Risk Assessment Instrument," which indicated that 69% of moderate risk offenders and 82% of high-risk offenders are likely to be arrested for a felony within 3 years of their release. This study also found that 48% of low-risk offenders are likely to be rearrested for a felony within 3 years of release. I have read the study and I have confidence in its findings that even low risk offenders are likely to reoffend within 3 years of their release. A courtesy copy of this study is attached as Exhibit B.

14. My staff in the Office of Research has spent more than 100 hours over the last three months working with James Austin, Ph.D., who calculated his estimates for the plaintiffs using our data. Specifically, my staff compiled and sent to him data files for use in developing his own estimates, and educated him on how to use the data elements in those files. My staff also spent time explaining our estimating process and providing estimates to him, some of which were completed at his request according to his

specifications. Information that we provided to him included, but was not limited to, twelve months of prison admissions, current prison population snapshots, twelve months of prison releases, current parole population snapshots, monthly updates of admissions and releases, recidivism data, probation revocation data, Immigration and Customs Enforcement hold data, number of lifers past their minimum eligible parole dates, milestone completion credit estimate based on an increase from six weeks to three months, CDCR's estimate of increasing credit earning for second strikers from 20% to 50%, CDCR's estimate of increasing credit earning for violent offenders from 15% to 50%, CDCR's Proposition 36 estimate, and other estimates used to formulate compliance with the October 11, 2012 court order. Additionally, the data files provided to Dr. Austin were updated several times for him upon his request, with additional data elements added as needed. We understand his methodology and results.

15. In analyzing our data and developing our estimates, my team used a highly methodical and extensively detailed approach, based on "tried and true" processes from experience and data trends. Additionally, CDCR calculated its estimates using a comprehensive and data-driven approach to ensure that we reached the highest possible level of precision. Dr. Austin's estimates, while based on our data, differ from ours in several respects. First, it is our understanding that Dr. Austin applies rounding throughout his estimates, which we believe risks embedding inaccuracies in his final results. By rounding at each new calculation, inaccuracies could be compounded, which may skew the final results. Cognizant of this risk, we took steps to minimize rounding, which we believe resulted in more precise reduction numbers. Second, as previously noted, our office calculated our estimates using ADP, whereas we understand that Dr. Austin based his estimates on actual inmates. As explained above, ADP is more likely to represent the true impact of a reduction measure because it incorporates the length of time a person stays in prison and avoids overinflating the population numbers. Third, due to varying factors in inmate populations, our office often broke down calculations into smaller groupings based on these variances to reach more accurate estimates for

1-28

each type of population, whereas Dr. Austin tended to perform less detailed and more global calculations.  For example, when reviewing sentencing factors, it is our understanding that Dr. Austin took the global sentence average of all second-strike admissions during one year despite wide variance in sentence length, whereas my team examined the entire CDCR second-strike population, separated the population into smaller subgroups based on sentence length, and then averaged each group to obtain a more comprehensive sentence average of the whole second-strike population.  Fourth, Dr. Austin's estimates may not adequately account for overlap between the different population-reduction categories and, consequently, the resulting estimates could have overestimated potential reductions by double-counting inmates who may be represented in multiple categories.  For example, offenders who are retained in county jails, based on having less than nine months on their sentences or having specified felonies, would not benefit from other population reduction measures, such as the credit-earning increases, because these inmates would never enter CDCR facilities.  There cannot be a reduction in population if the offenders never come to prison. CDCR methodically discounted its estimates to account for overlap and present a more precise overall reduction estimate.  Lastly, Dr. Austin's calculations include applying credits to sex registrants, which, as noted above, we did not do.  Therefore, his calculations incorporate a larger estimated reduction in numbers than those produced by my team.

16.     My Offender Information Services Branch produces a monthly report, entitled the "Number of Inmates in the Institution Population Who Have a USICE Hold, Have a Potential USICE Hold or Do Not Have an Actual or Potential USICE Hold By Country of Birth and Hold Status."  This report reflects the number of foreign nationals in CDCR custody, broken down by, among other categories, their countries of birth.  The December 5, 2012 report indicates that approximately 71.2% of the foreign nationals with ICE holds in CDCR Custody originate from Mexico.  (A copy of the report is attached as exhibit C.)

///

I declare under penalty of perjury that the foregoing is true and correct. Executed in Sacramento, California on January 7, 2013.

                                                _/s/ Brenda Grealish_
                                                Brenda Grealish