KAMALA D. HARRIS
Attorney General of the State of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS - SBN 166884
PATRICK McKINNEY – SBN 215228
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-5843
Email: Patrick.McKinney@doj.ca.gov

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER – SBN 39374
PAUL B. MELLO – SBN 179755
WALTER R. SCHNEIDER – SBN 173113
SAMANTHA D. WOLFF- SBN 240280
PAUL B. GRUWELL – SBN 252474
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777--3200
Facsimile: (415) 541-9366
pmello@hansonbridgett.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## AND THE NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

## PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et. al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>EDMUND G. BROWN JR., et al.,<br><br>    Defendants. | CASE NO. 2:90-cv-00520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>EDMUND G. BROWN JR., et al.,<br><br>    Defendants. | CASE NO. C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**DECLARATION OF KATHLEEN ALLISON IN SUPPORT OF DEFENDANTS' RESPONSE TO OCTOBER 11, 2012 ORDER TO DEVELOP PLANS TO ACHIEVE REQUIRED PRISON POPULATION REDUCTION** |

/ / /

/ / /

4915878.1

I, Kathleen Allison, declare:

1. I am the Deputy Director of the Division of Adult Institutions (DAI), Facilities Support, for the California Department of Corrections and Rehabilitation (CDCR). I am competent to testify to the matters set forth in this declaration and if called upon to do so, I would and could so testify. I make this declaration in support of Defendants' Response to October 11, 2012 Order to Develop Plans to Achieve Required Prison Population Reduction.

2. I began working for CDCR in 1987 as a Medical Technical Assistant, later promoting to Senior Medical Technical Assistant in 1993, before moving to community resources manager in 1996, where I managed various inmate programs including religion, Arts in Corrections, Inmate/Family Services, and substance abuse programs such as Alcoholics Anonymous. I served one year as the Litigation Coordinator at Avenal State Prison. In 2002, I became a correctional health services administrator at the California Substance Abuse and Treatment Facility, with responsibility for health care budgets, contract management, personnel, and disciplinary matters. I also acted as health care manager at that institution, overseeing delivery of health care to inmates. In 2004, I became an Associate Warden overseeing the custody staff in the Health Care Access Unit and later overseeing operations on Level II General Population yards, a Sensitive Needs Yard, and Administrative Segregation units; managing various litigation compliance efforts; and overseeing areas including Case Records and Religious Services. In 2007, I became chief deputy warden, at which time my duties expanded to include, but were not limited to, oversight of all staff in the institution, with primary coordination of all clinical services and custodial functions of the institution. In 2009, I was appointed warden and became responsible for the safety and security of all the inmates, staff, and visitors to the institution. Among my duties was coordination with staff in the handling of the care, discipline, custody, and employment of inmates. In November 2011, I was named associate director for the Division of Adult Institutions. My duties

4915878.1

2

Decl. K. Allison Supp. Defs.' Resp. to Oct. 11, 2012 Order    4913489.1

included, but were not limited to, providing managerial direction to wardens who reported to me, implementing the Alternative Custody Program, and managerial direction of various community-based programs providing services to offenders and their children.

3.      Some of my current duties as Deputy Director for the Division of Adult Institutions include oversight of the following: policy and procedure standardization; inmate classification unit; budgeting; statewide inmate transportation unit; prison bed management; fiscal planning and development; staffing standardization; institutional audits; and inmate case records administration.  This unit oversees all the correctional case records staff in each of the institutions.  These staffs are responsible for ensuring that offender records are accurate and included in each inmate's Central File, for maintaining control over those records, and for copying those records when necessary. These staffs are also responsible for ensuring the accurate calculation of all credits due an offender and for calculation of the date each inmate has served sufficient time and received sufficient credits to deem that the inmate's sentence is served and the inmate may be released from prison.  My duty is to ensure that Case Records Services Unit policies are appropriate, that records staffs are trained to accurately calculate credits and carry out other records-related duties and that they are appropriately staffed to carry out those duties in a timely manner.

**Population estimates**

4.      I am familiar with the potential population reduction measure which would permit offenders with violent and serious offenses to be placed fire camps, and am also familiar with the estimated population reduction made by CDCR. My team estimated that if the eligibility criteria for inmates participating in fire camps were expanded to include serious and violent felons, coupled with increased security at the camps, then the fire camp population could increase by 500 Average Daily Population (ADP)  by June 2013 (thus reducing the institution population by 500 ADP).  The State's Blueprint estimates that the fire camp population will be 2500 ADP by June 2013, thus this measure would

4915878.1

1  increase that population to 3000 ADP.  This increase is temporary, however, due to
2  limited qualified offenders.  Over time, inmates who may otherwise be eligible to
3  participate in fire camps may be released due to other potential population reduction
4  measures, including enhanced credit earning and milestone completion.  As a result, we
5  anticipate that if all the measures identified are enacted, the camp expansion of 500
6  inmates will no longer exist by December 2013.

7      5.    I am familiar with the population reduction measure that would create an
8  Alternative Custody Program for male inmates, expand eligibility criteria for restitution
9  centers, and make use of community-based treatment programs such as work furlough to
10 house inmates.  My team estimated that if the court ordered the use of alternative
11 custody arrangements, including work furlough and restitution centers, and the creation
12 of an Alternative Custody Program for male inmates, then these measures may result in
13 a reduction of 300 ADP by June 2013 for a total of 1,000 ADP by December 2013.
14 These figures are dependent upon finding willing contractors to provide the restitution
15 center and community-based treatment programs.  My team estimates that CDCR could
16 restore approximately 100 restitution center beds, increase Alternative Custody Program
17 participation by 500 ADP, and obtain community-based treatment beds for 400 ADP by
18 December 2013.  However, due to time needed to locate willing contractors and enter
19 into contracts, I estimate that CDCR will only be able to move 300 ADP into those
20 programs by June 2013.

21     6.    I am familiar with the population reduction measure to maintain the inmate
22 population currently in the California Out-of-State Correctional Facility program.  My team
23 determined that if out-of-state placement were ordered to be maintained, we could slow
24 the return of inmates to California and still meet our final target for closure of these out-of-
25 state beds in June 2016.  I estimate that the slowed return of inmates from out-of-state
26 facilities would result in a decrease in CDCR's in-state inmate population of 3,892 ADP,
27 in addition to the original out-of-state contract beds estimate of 4,596, for a total reduction
28 4915878.1

4

of 8,488 by December 2013. There will be no decrease to CDCR's in-state inmate population in June 2013 as a result of this measure because the Blueprint does not anticipate the return of out-of-state inmates until after that time.

7. I am familiar with the population reduction measure that would expand the use of in-state contract beds and/or leased jail beds, including private contractors. My team estimated that if the court ordered the State to expand the use of in-state contract beds and/or leased jail beds, including private contractors and jails, then the population would reduce by 1,225 ADP in June 2013 (that number would remain constant through December 2013). This estimate is based on reinstating contracts with two modified community correctional facilities that were previously terminated. Together, those two facilities have 1,225 beds.

8. I am familiar with the population reduction measure that would change more felonies to be served in county jail. I believe that this would be a strain for many counties as they are still working to implement their additional responsibilities under realignment. Further, many county jails are overcrowded and governed by court-ordered population caps themselves.

9. I am aware that even if CDCR were ordered to implement each and every identified potential population reduction measure, the resulting prison population reductions would still fall short of the Court's 137.5% mandate by 7,143 ADP in June 2013 and by 429 ADP in December 2013. Accordingly, to bridge these population gaps, if this Court insists that the population cap must still be enforced, the Court will need to order that many serious or violent felons be released from prison before the completion of their prison terms. In the face of such an order, CDCR would use its best efforts to release inmates based on risk using a risk assessment tool and other screening factors to minimize the impact upon California's citizens. Even using a risk analysis, any such order would seriously risk public safety.

**Delay in release if credit calculations are ordered**

4915878.1

5

10.     I am familiar with the population reduction measure that would increase both "good time" and "milestone" credits.  Implementation of credit increases, even those that are prospective, requires significant time and planning to ensure accurate calculations.  Upon receipt of such an order or change in the statutory eligibility criteria, the appropriate policy and protocols must be drafted, a training curriculum must be developed, and staff must be trained on the new protocols for each group of offenders.  This is anticipated to take at least six months.  After that, staff must pull thousands of offender files and review for eligibility for the increased credits.  If an offender is determined to be eligible, a correctional case records analyst must recalculate by hand the credits due to each offender.  A credit calculation requires approximately two to three hours to complete, followed by supervisor review.  As a result the extensive work involved with changes to credit earning, I do not anticipate any reduction in the prison population by June 2013.

**Proposition 36**

11.     On November 6, 2012, the voters of California passed Proposition 36, a measure that enacted Penal Code section 1170.126 which authorizes resentencing for some offenders who received life sentences under the "Three Strikes" sentencing scheme.  The statute took effect November 7, 2012.  Proposition 36 provides that eligible inmates may request to have their sentences recalculated under this law.

12.     CDCR took steps shortly after the passage of Proposition 36 to inform inmates of their rights and provide them with information necessary to allow them to initiate the process of filing a petition for resentencing.  To that end, CDCR posted the text of Proposition 36 in all inmate law libraries in English and Spanish and also gave copies of the text to inmate advisory council representatives.  CDCR also made available in the inmate law libraries a list of the contact information for the county superior courts and the county public defender offices.

13.     CDCR also provided the California Public Defenders Association and the

4915878.1

6

Decl. K. Allison Supp. Defs.' Resp. to Oct. 11, 2012 Order                                        4913489.1

California District Attorneys Association with a list of more than 2,800 inmates who appear to meet eligibility requirements to request resentencing under Proposition 36. The list was broken down by county of commitment. CDCR's intent in providing the list was to allow prosecutors and defense attorneys to avoid the time-consuming process of culling through decades of files to identify inmates who may be eligible, and thereby expediting the resentencing of inmates.

14. CDCR officials, including myself, also met via teleconference with representatives from the Administrative Office of the Courts to discuss the workload that Proposition 36 poses for the courts, both from the resentencing petitions and any orders that would be necessary should prosecutors or defense attorneys seek records that cannot be released without a court order, including the confidential section of the Central File and health records. Shortly thereafter, CDCR provided the Administrative Office of the Courts with a list that showed the number of potentially eligible inmates according to county of commitment. CDCR's intent was to assist the superior courts with planning for the upcoming workload associated with Proposition 36.

15. Since November 13, 2012, CDCR staff have worked with the Administrative Office of the Courts to develop a sample standing order that addresses the confidential section and health care records orders to avoid the workload for the courts as well as for CDCR, the prosecutors, and the defense attorneys. The Administrative Office of the Courts has advised my team that the matter is currently being reviewed by an advisory committee of presiding superior court judges.

16. Since November 13, 2012, CDCR staff have discussed records production issues on a nearly daily basis with district attorneys, public defenders, and superior court staff, all with the goal of streamlining production of records in an effort to expedite the resentencing process.

17. CDCR has worked closely with several counties, including Kern, Riverside, San Bernardino, and Los Angeles, as they have large numbers of potentially eligible

4915878.1

Decl. K. Allison Supp. Defs.' Resp. to Oct. 11, 2012 Order        4913489.1

inmates. On January 8, 2012, CDCR officials, including myself, are scheduled to meet with the Los Angeles County Superior Court, District Attorney, and Public Defender to discuss methods to streamline production of records for the more than 1,000 inmates from Los Angeles County.

**Plaintiffs' Proposed Population Reduction Measures**

18. I have reviewed and am familiar with Plaintiffs' population reduction proposals. I am aware that Plaintiffs propose that all second-strike and violent offenders be awarded day-for-day credits retroactive to the beginning of their incarceration. Imposition of retroactive 50% percent time credits for this population will result in the immediate release of thousands second-strike and violent offenders into the community. This is because potentially thousands of these classes of felons who are currently incarcerated have already served 50% of their sentence. Thus, if Plaintiffs' proposal was adopted, these inmates would all be eligible for immediate release. Plaintiffs' 50% retroactive credit proposal is dangerous because it indiscriminately expedites the release of violent and repeat offenders without regard to their risk assessments or their readiness for release and safe reintegration back into society.

I declare that the foregoing is true and correct. Executed this 7th day of January, 2013, at Sacramento, California.

       /s/ Kathleen Allison
       Kathleen Allison

4915878.1

Decl. K. Allison Supp. Defs.' Resp. to Oct. 11, 2012 Order      4913489.1