# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,
     **Plaintiffs**

      **v.**                      **No. CIV S-90-0520 LKK JFM P**

EDMUND G. BROWN, JR., et al.,
     **Defendants**

## TWENTY-FIFTH ROUND MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES, AND PROTOCOLS

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & WEST LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
(401) 824-5100
Fax: (401) 824-5123
January 18, 2012

{P0327194 V 1}i

## ACRONYMS and ABBREVIATIONS

3CMS:               Correctional Clinical Case Management System

AIMS:               Abnormal Involuntary Movement Scale

Ambu bag:           Ambulatory Bag Used for CPR

ASH:                Atascadero State Hospital

ASP:                Avenal State Prison

C-file:             Case File

C&PR:               Classification and Parole Representative

Calipatria:         Calipatria State Prison

CAP:                Corrective Action Plan

CC I:               Correctional Counselor I

CC II:              Correctional Counselor II

CCAT:               Correctional Clinical Assessment Team

CCC:                California Correctional Center

CCI:                California Correctional Institution

CCWF:               Central California Women's Facility

CDCR:               California Department of Corrections and Rehabilitation

Centinela:          Centinela State Prison

CIM:                California Institution for Men

CIW:                California Institution for Women

| | |
|---|---|
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CMO: | Chief Medical Officer |
| CO: | Correctional Officer |
| CPR: | Cardiopulmonary Resuscitation |
| CRC: | California Rehabilitation Center |
| CSATF: | California Substance Abuse Treatment Facility |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CTC: | Correctional Treatment Center |
| CTF: | Correctional Training Facility |
| CVSP: | Chuckawalla Valley State Prison |
| DCHCS: | Division of Correctional Health Care Services |
| DSH: | Department of State Hospitals |
| DOT: | Direct Observation Therapy |
| DVI: | Deuel Vocational Institute |
| EECP: | Extended Enhanced Outpatient Program Care Program |
| EOP: | Enhanced Outpatient Program |

| | |
|---|---|
| ERRC: | Emergency Response Review Committee |
| eUHR: | Electronic Unit Health Record |
| FIT: | Focused Improvement Team |
| Folsom: | Folsom State Prison |
| FTE: | Full-time Equivalent |
| GACH: | General Acute Care Hospital |
| HDSP: | High Desert State Prison |
| HPS I: | Health Program Specialist I |
| HS: | *Hora Somni*/Hour of Sleep |
| ICC: | Institutional Classification Committee |
| ICF: | Intermediate Care Facility |
| IDTT: | Interdisciplinary Treatment Team |
| ISP: | Ironwood State Prison |
| KVSP: | Kern Valley State Prison |
| LOP: | Local Operating Procedure |
| MAPIP: | Medication Administration Process Improvement Project |
| MAR: | Medication Administration Record |
| MCSP: | Mule Creek State Prison |
| MHCB: | Mental Health Crisis Bed |
| MHOHU: | Mental Health Outpatient Housing Unit |

MHSDS:              Mental Health Services Delivery System

MHTH:               Mental Health Temporary Housing

MHTS.net:           Mental Health Tracking System

MPIMS:              Madrid Patient Information Management System

NKSP:               North Kern State Prison

OHU:                Outpatient Housing Unit

PBSP:               Pelican Bay State Prison

PC:                 Primary Clinician

PHU:                Protective Housing Unit

PSH:                Patton State Hospital

PSU:                Psychiatric Services Unit

QIP:                Quality Improvement Plan

RJD:                Richard J. Donovan Correctional Facility

RVR:                Rule Violation Report

SCC:                Sierra Conservation Center

SHU:                Segregated Housing Unit

SNF:                Skilled Nursing Facility

SNY:                Sensitive Needs Yard

SPRFIT:             Suicide Prevention and Response Focused Improvement Team

SQ:                 San Quentin State Prison

SRE:                    Suicide Risk Evaluation

SSI:                    Supplemental Security Income

SVPP:                   Salinas Valley Psychiatric Program

SVSP:                   Salinas Valley State Prison

TCMP:                   Transitional Case Management Program

TTA:                    Triage and Treatment Area

UNA:                    Unidentified Needs Assessment

VSPW:                   Valley State Prison for Women

VPP:                    Vacaville Psychiatric Program at CMF

WSP:                    Wasco State Prison

**Table of Contents**

**TABLE OF ACRONYMS AND ABBREVIATIONS**................................................1

**SPECIAL MASTERS TWENTY-FIFTH ROUND MONITORING REPORT**        10

**APPENDIX A – SUMMARY OF SUMMARIES**        52

**APPENDIX B – INSTITUTIONAL SUMMARIES**        84

**Service Area A**

    California State Prison, Sacramento (CSP/Sac) .......................................84

    Folsom State Prison (Folsom) ............................................................97

**Service Area B**

    Pelican Bay State Prison (PBSP) .......................................................104

    High Desert State Prison (HDSP) ......................................................114

    California Correctional Center (CCC) .................................................126

**Service Area C**

    Mule Creek State Prison (MCSP) ......................................................128

    Sierra Conservation Center (SCC) .....................................................141

**Service Area D**

    California Medical Facility (CMF) .....................................................145

    California State Prison, Solano (CSP/Solano) ......................................160

    San Quentin State Prison (SQ) .........................................................169

    Deuel Vocational Institution (DVI).....................................................194

**Service Area E**

    California State Prison, Corcoran (CSP/Corcoran) ...............................203

    California Substance Abuse Treatment Facility (CSATF) .......................221

    Pleasant Valley State Prison (PVSP) ..................................................232

    Avenal State Prison (ASP) ...............................................................243

**Service Area F**

Salina's Valley State Prison (SVSP)......................................................253

Correctional Training Facility (CTF)....................................................267

**Service Area G**

California Men's Colony (CMC)...........................................................275

Wasco State Prison (WSP)..................................................................289

Kern Valley State Prison (KVSP).........................................................301

North Kern State Prison (NKSP).........................................................310

**Service Area H**

California State Prison, Los Angeles County (CSP/LAC)......................324

California Correctional Institution (CCI)..............................................336

**Service Area I**

California Institution for Men (CIM) ...................................................347

California Rehabilitation Center (CRC)................................................358

**Service Area J**

Richard J Donovan Correctional Facility (RJD) ..................................365

Ironwood State Prison (ISP)................................................................376

Calipatria State Prison (Calipatria) .....................................................383

Centinela State Prison (Centinela) ......................................................386

Chuckawalla Valley State Prison (CVSP) ...........................................390

**Service Area K**

California Institute for Women (CIW)..................................................393

**Service Area L**

Central California Women's Facility (CCWF) ......................................400

Valley State Prison for Women (VSPW)...............................................414

# APPENDIX C – CASE REVIEWS

Exhibit A – Pelican Bay State Prison (PBSP) ....................................................................427

Exhibit B – High Desert State Prison (HDSP) ...................................................................432

Exhibit C – Mule Creek State Prison (MCSP) ...................................................................439

Exhibit D – California Medical Facility (CMF)..................................................................441

Exhibit E – California State Prison, Solano (CSP/Solano) .................................................448

Exhibit F – San Quentin State Prison (SQ) ........................................................................455

Exhibit G – San Quentin Specialized Condemned Care Program (SQ) ..............................466

Exhibit H – Deuel Vocational Institution (DVI) ................................................................479

Exhibit I – California State Prison, Corcoran (CSP/Corcoran).................................................486

Exhibit J – California Substance Abuse Treatment Facility (CSATF) ................................496

Exhibit K – Pleasant Valley State Prison (PVSP)...............................................................505

Exhibit L – Avenal State Prison (ASP) ..............................................................................514

Exhibit M – Salinas Valley State Prison (SVSP)................................................................520

Exhibit N – Correctional Training Facility (CTF) ..............................................................529

Exhibit O – Wasco State Prison (WSP) ..............................................................................535

Exhibit P – Kern Valley State Prison (KVSP) ....................................................................543

Exhibit Q – North Kern Valley State Prison (NKSP) .........................................................551

Exhibit R – California State Prison, Los Angeles County (CSP/LAC) .................................558

Exhibit S – California Correctional Institution (CCI).........................................................566

Exhibit T – California Institution for Men (CIM)...............................................................574

Exhibit U – California Rehabilitation Center (CRC)..........................................................582

Exhibit V – Richard J. Donocan Correctional Facility (RJD)................................................588

Exhibit W – Central California Women's Facility (CCWF)................................................594

Exhibit X – Valley State Prison for Women (VSPW) .........................................................602

## INTRODUCTION

This report covers the special master's twenty-fifth review of the defendants' compliance with the plans, policies, and protocols that were provisionally approved by this Court in mid-1997, subsequently revised and re-approved by this court on March 3, 2006 (Order, Docket No. 1773), and are currently known as the Revised *Coleman* Program Guide (Program Guide). The monitor's[1] institutional site visits for the Twenty-Fifth Monitoring Round began on May 1, 2012 and ended on August 31, 2012, and defendants' production of their documentation for all institutions on paper review ended on September 11, 2012. Institutional mental health staff and administrators of the California Department of Corrections and Rehabilitation (CDCR) continued their ongoing full cooperation with the special master's monitoring staff at institutional site visits.

The monitor conducted full on-site visits at 23 of the 33 CDCR adult institutions – Avenal State Prison (ASP), California Correctional Institution (CCI), California Institution for Men (CIM), California Medical Facility (CMF), California Rehabilitation Center (CRC), California State Prison/Corcoran (CSP/Corcoran), California State Prison/Los Angeles County (CSP/LAC), California State Prison/Solano (CSP/Solano), California Substance Abuse Treatment Program (CSATF), Central California Women's Facility (CCWF), Correctional Training Facility (CTF), Deuel Vocational Institution (DVI), High Desert State Prison (HDSP), Kern Valley State Prison (KVSP), Mule Creek State Prison (MCSP), North Kern State Prison (NKSP), Pelican Bay State Prison (PBSP), Pleasant Valley State Prison (PVSP), Richard J. Donovan Correctional Facility (RJD), Salinas Valley State Prison (SVSP), San Quentin State

---

[1]Although the collected data and findings discussed in this Report are the product of members of different monitoring teams, the various monitors are referred to collectively as "the monitor." Likewise, clinical judgments of the special master's experts are attributed collectively to "the special master's expert."

Prison (SQ), Wasco State Prison (WSP), and Valley State Prison for Women (VSPW).  Four institutions – California Institution for Women (CIW), California Men's Colony (CMC), California State Prison/Sacramento (CSP/Sac), and Folsom State Prison (Folsom) received a hybrid review, meaning that they were reviewed by a combination of a one-day site visit plus a paper review (i.e. a review based on their own documentation of their respective levels of compliance).  The remaining six institutions – California Correctional Center (CCC), Calipatria State Prison (Calipatria), Centinela State Prison (Centinela), Chuckawalla Valley State Prison (CVSP), Ironwood State Prison (ISP), and Sierra Conservation Center (SCC) each received a paper review.

The primary monitoring focus areas remained institutional mental health staffing levels, quality management, suicide prevention, medication management, and transfers to higher levels of care.  The monitor continued to examine the institutions' provision of mental health services in mental health crisis bed units (MHCBS), the enhanced outpatient program (EOP), administrative segregation units, reception centers, and the Correctional Clinical Case Management System (3CMS).  The monitor also examined the institutions' use of outpatient housing units (OHUs) for mental health purposes, treatment records and the internet-based mental health tracking system (MHTS.net), as well as inmates' access to mental health appointments, relationships between custody and mental health, and other functions in the institutions which have an impact on the delivery of mental health care to inmates.

Unlike the special master's preceding two compliance reports, this report has a different format which, it is hoped, will ease the reader's task.  It opens with an overview, with the usual summary of the monitor's findings by focus area now appearing as Appendix A.  The usual compilation of summaries of each individual institution's performance during the review

period now appears in Appendix B, and the clinical case reviews prepared by the special

master's experts, organized institution-by-institution, now appear as Appendix C.

## OVERVIEW

Overall, monitoring in the twenty-fifth round found that the progress shown in

some of the focus areas during recent monitoring periods was being sustained.  In the area of

medication management, the use of MAPIP gained further traction, improving and streamlining

many institutions' abilities to track and ensure that inmates were receiving their medications

timely.  It was noted that MAPIP still needs to be extended to all institutions. The number of

available MHCBs continued to increase, causing the persistent shortage of MHCBs to begin to

ease.  At least in part, the availability of MHCBs was assisted by ongoing improvement in the

area of access to higher levels of care, reducing the back-up of inmates waiting in MHCBs for

admission to inpatient care.  There was overall progress among the institutions with use of the

sustainable process for identifying and referring inmates in need of inpatient care.  Given the

relative newness of the process, it is still undergoing refinement and requires ongoing

monitoring.  It holds promise for providing a lasting means for bridging the gap between the

local mental health programs at the prisons, and the hospital level of care that, with the sole

exception of the 45-bed inpatient facility at CIW, is presently provided only at DSH programs.

Generally, the monitor's reports for the twenty-fifth round essentially

corroborated the findings from recent monitoring periods that CDCR prisons have generally

implemented the existing quality management processes.  As described below, institutional

committees were organized and conducting meetings attended by appropriate personnel, agenda

items were relevant, and the substance of the meetings was being recorded in minutes.  Peer

review was being implemented to good effect for more mental health disciplines at more institutions.  QITs were being used to address problem areas.

However, the above-described quality management processes were generally a quality *assurance* process, in contrast to a quality *improvement* process. There remained an important need to institute uniform system-wide processes for improving the quality of mental health care in CDCR prisons.  Even when the existing processes were consistent with a quality improvement process, they often lacked the capacity to implement needed changes because the required remedy involved system wide issues that could only be effectively addressed at the health care central office level. A health care central office-level quality improvement process would  include, but not be limited to, establishing system wide  measurements for providing mental health services within *Coleman* Program Guide (Program Guide) requirements, uniform monitoring of mental health services across the CDCR system and implementing quality improvement recommendations for mental health services into service management and service delivery system wide as appropriate,  especially when necessary for  achievement of desired mental health outcomes within the requirements of the Program Guide on an ongoing basis and into the future.   Such processes would include measurement and assessment tools consistent with Program Guide requirements, to be applied across the system to monitor mental health services in each institution. By integrating quality improvement of mental health into service management and service delivery, CDCR will be better positioned to improve services where necessary and reach desired outcomes.

Toward that end, there have been significant developments in the larger context of quality management which have far-reaching implications not only for quality management as it has been known and conducted in the institutions, but more importantly for what lies ahead.  In

late August 2012, as the twenty-fifth round of monitoring was coming to a close, the *Coleman*

special mastership entered a new chapter in the remedial phase of this litigation.  On August 30,

2012, the *Coleman* court adopted the special master's recommendation in his Twenty-Fourth

Round Monitoring Report and ordered defendants to review and assess their existing quality

management process, and to develop a central office-based quality *improvement* process.  Order,

August 30, 2012, Docket No. 4232.  (Exhibit A)  The special master's recommendation, and by

extension the court's order, were based on the special master's finding that "over the past several

monitoring periods . . .  CDCR institutions have generally succeeded with establishing and

maintaining the foundation of the quality management framework that was conceived early in

the remedial process. The initial goals of establishing the basic infrastructure of quality

management appear[Ed] to have been realized.  Across institutions, local governing bodies,

quality management committees, and mental health subcommittees [were] in place and [were]

generally meeting regularly and drawing good attendance.  QITs [were] being chartered and used

appropriately.  Peer review [was] generally taking place." *Special Master's Twenty-Fourth*

*Round Monitoring Report*, filed July 2, 2012, Docket No. 4205, p. 63.

      The court concurred with the special master's finding in his Twenty-Fourth

Round Monitoring Report that

> [a]n important goal of the remedial phase of this case is . . . for CDCR itself to assume
> the mantle of ultimate responsibility for diagnosing its own problems, i.e. conduct its own
> `qualitative analysis,' and create a quality improvement process that it can use to achieve
> and maintain compliance, *and move on to removal from federal court oversight.*

Order, filed August 30, 2012, Docket No. 4232, p. 4-5 (emphasis in original) (quoting *Special*

*Master's Twenty-Fourth Round Monitoring Report*, p. 65).

      The court ordered as follows:

> Defendants shall review and assess their existing quality assurance process, and   .
> . . develop an improved quality improvement process by which they can address
> issues with the quality of the care that is delivered, as described in the Special
> Master's Twenty-Fourth Round Monitoring Report.  The quality improvement
> process shall be developed from the standpoint of it being the beginning of a
> transition by CDCR into self-monitoring by its own DCHCS.  It shall include, but
> not be limited to, the development of a process for improved document
> production for institutional paper reviews, so that the provided information is
> clear, consistent, responsive to the Special Master's document request, and useful
> for the assessment of institutional levels of compliance.  The defendants' review
> and assessment of their existing quality assurance process, and the development
> of an improved quality improvement process, shall be carried out under the
> guidance of the Special Master and his staff, with participation and input of the
> *Coleman* plaintiffs, during the six-month period following the entry of this order.

Order, Docket No. 4232, p. 5-6 (emphasis in original)

This order has profound implications, as it sharpens the focus of the remedial effort on attainment of its long-term goal: for defendants to build the foundation for, and mark the beginning of, their assumption of responsibility for self-monitoring and eventual transition away from court-supervised external monitoring. The result will be, in effect, a maturation of the quality management process into one that goes beyond the quality management processes that have been conducted, monitored, and reported on in past compliance reports, as well as in this one.

As of this writing, work is underway on development of the new quality improvement process.  Since September 20, 2012, defendants and members of the special master's staff have had 16 meetings.  Progress has been made with identification of general subject matter categories and sub-categories of the mental health functions to be subjected to the process.  Work groups are in the process of identifying performance indicators and developing the metrics to measure compliance levels.  General categories identified thus far include special populations, quality of care, safety and cultural considerations, access to care, and utilization and management.

With the foregoing in mind, it should be noted that the information and data presented in the "quality management" section of the summary of summaries in Appendix A, and within the institutional summaries in Appendix B, were drawn from monitoring of the institutions' ongoing quality management activities that pre-dated the court's recent order on the quality improvement process. Consequently, the special master's findings and conclusions on the subject of quality management in Appendix A and Appendix B were based on institutional performance under the existing quality management framework of organization of committees, use of quality improvement teams, conduct of peer review, and the like. They do not reflect or pertain to the new quality improvement project described below, or any processes that may emanate from it.

Before this report moves into its discussion of the state of mental health care in CDCR prisons during recent twenty-fifth monitoring round, it is helpful to briefly review the context of Coleman monitoring at this stage of the remedial phase. In the Special Master's Twenty-Second Round Monitoring Report, filed on March 9, 2011, he identified the seven goals to be achieved in order to attain compliance and ultimately a conclusion to the remedial phase of this litigation. These goals are:

(1)  Re-evaluation and updating of CDCR suicide prevention policies and practices;

(2)  Ensuring that seriously mentally ill inmates are properly identified, referred, and transferred to receive the higher levels of mental health care that they need and that are only available from DSH;

(3)  Review of, and compliance with, all elements of their ASU Enhanced Outpatient Program Treatment Improvement Plan, including the conduct of a review every 30 days of all EOP inmates housed in ASU hubs for over 90 days;

(4)  Completion of the construction of mental health treatment space and beds for inmates at varying levels of care;

(5)  Full implementation of defendants' new mental health staffing plan;

(6)  Training of staff for greater collaboration between custody and mental

health; and

(7)     Refinement and implementation of MHTS.net to its fullest extent and benefit.

These goals were referenced by the *Coleman* court in its order of August 30, 2012 as the guideposts for the work that remains to be done.  Order, Docket No. 4232.  Defendants have made substantial progress on some of these fronts; on others more work remains to be done. The status of progress thus far toward these goals is summarized below.

A.     **Re-Evaluation and Updating of CDCR Suicide Prevention Policies and Practices**

Institutional performance in the areas of suicide prevention remains concerning. At this point, now two years into the implementation of the court-ordered suicide prevention measures that were developed in 2010, it does not appear that the rate of suicide deaths in CDCR prisons is declining, as discussed in greater detail below.  There have been 32 suicides in CDCR prisons thus far in 2012.  At this rate, as of the time of this writing, a CDCR inmate dies by suicide, on average, every 10.93 days.  The special master remains concerned that suicide rates in CDCR prisons continue to substantially exceed the national average among U.S. state prisons, despite the efforts that are being made.  Assuming that no additional suicides occur in 2012, for this year the rate of suicides per 100,000 inmates in custody in CDCR prisons now stands at 23.72, based on a reported CDCR inmate population of 134,901 at mid-2012[2].  This rate is even higher than the rate of suicides per 100,000 inmates in 2011, which was 21.01, based on 34 suicides in 2011[3], and based on a reported CDCR population of 161,818 at mid-2011.[4]  In

---

[2] Source: CDCR Website, archives, population as of midnight June 30, 2012.
[3] The special master's expert finds that there were 34 suicide deaths among CDCR inmates in 2011; CDCR reports 33 suicide deaths for 2011.
[4] Source: CDCR Website, archives, population as of midnight June 30, 2011.

contrast, the rate of suicides in state prisons in the United States was 16 per 100,000 in 2010, the most recent year for which this metric has been published.[5]

Prevention of inmate suicides has been an ongoing challenge for CDCR for a long time. From 2000 to 2012[6], the suicide rate per 100,000 in CDCR prisons has exceeded the suicide rate across state prisons in the United States for every year except 2000, 2002, and 2004:

### CDCR and U.S. State Prison Suicide Rates per 100,000
2000 – 2012

| Year | CDCR Prisons | U.S. State Prisons[7] |
|------|--------------|-----------------------|
| 2000 | 9.3 | 16 |
| 2001 | 19.3 | 14 |
| 2002 | 13.9 | 14 |
| 2003 | 23.1 | 16 |
| 2004 | 15.9 | 16 |
| 2005 | 26.2 | 17 |
| 2006 | 25.1 | 17 |
| 2007 | 19.7 | 16 |
| 2008 | 22.3 | 15 |
| 2009 | 15.7 | 15 |

---

[5]Source: Website, U.S. Bureau of Justice Statistics
[6] 2010 is the most recent year for which the U.S. Bureau of Justice Statistics publishes suicide rates across U.S. state prisons.
[7] Source: Website, U.S. Bureau of Justice Statistics

| 2010 | 21.1 | 16 |
|------|------|-----|
| 2011 | 21.01 | 16 (most recent published) |
| 2012 | 23.72 (as of 12/28/12) | 16 (most recent published) |

This troubling situation led to an order of the *Coleman* court that defendants conduct a review, under the guidance of the special master, of all suicide prevention practices and policies, including the suicide review and reporting process.  Order, filed April 14, 2010, Docket No. 3836.  Following completion of this project in August 2010, defendants submitted their report proposing a series of measures that focused on three general areas – change of conditions in administrative segregation, management of inmates at high risk of suicide, and clinical competency in the conduct of SREs - to reduce the incidence of inmate suicides among CDCR inmates.  The special master filed his report on the process and his recommendations with respect to defendants' proposed suicide-prevention strategies.  The Coleman court then ordered the following:

- That defendants' proposed *Coleman* Program Guide revisions and suicide prevention strategies presented in their report of August 25, 2010 be implemented forthwith;

- That defendants consult with the special master's experts with regard to the use of, and clinical practices within, CDCR OHUs, and any related proposed changes to the *Coleman* Program Guide concerning OHUs;

- That within 60 days, defendants shall submit their proposal for improvement of clinical competency levels of current CDCR clinicians with administration of the SRE;

- That defendants implement the SharePoint website system and the system-generated alert for high acute suicide risk inmates on MHTS.net as soon as possible, and within the following 60 days conduct a demonstration of these systems for the special master and/or designated members of his staff at a mutually convenient time; and

- ▪ That the special master's recommendation concerning submission of a plan by defendants to furnish suicide-resistant beds in their MHCBs shall be addressed by a subsequent order.

Order, filed November 17, 2012, Docket No. 3954.

As described below, defendants have completed or continue to make significant progress toward completion of the remaining tasks.  One of these tasks was the development and implementation of a training program to improve the level of clinical competency with administration of the SRE.  The program was designed around a proctor/mentor model by which more experienced clinical staff will orient, train, mentor, and monitor clinical staff who conduct SREs and mental health crisis interventions.  Initially, the SRE mentor program consisted of a pilot at five institutions in 2011, based on a list of indicators for elevated risk of suicide among their inmate populations.  The pilot was supported by various tools developed by the CDCR headquarters SPRFIT, including clinical vignettes for practice and skill assessment, quality-of-care review tools, and appropriate forms.  Staff considered to be in greatest need of mentoring were identified according to levels of job experience, probation status, and referral for skill enhancement through supervisory channels, as well as any staff who requested the training.  In 2012 thus far, the SRE mentor program has been rolled out at all institutions except Valley State Prison, where work is being done to roll it out.  Small webinar trainings for selected mentors occurred throughout 2012 and are continuing.  Currently, all prisons except Valley State Prison have a primary mentor, and some institutions have added additional mentors.  CDCR reports that it is currently setting up a series of teleconferences with the prisons to address ongoing issues or concerns with the program. The special master's expert will participate in these teleconferences.

Another activity ordered by the *Coleman* court in its November 17, 2010 order was for defendants to consult with the special master's experts with regard to the use of, and

clinical practices within, CDCR OHUs, and with regard to any related proposed changes to the *Coleman* Program Guide concerning OHUs. The need for work on use of and practices within OHUs arose again more recently, in the context of the defendants' Spring 2012 long-range mental health bed plan ("the Blueprint"). For the most part, the Coleman court approved the Blueprint, but it also ordered defendants to continue working with the special master on two aspects of mental health bed planning. Order, filed June 15, 2012, Docket No. 4199. One aspect concerned the incorporation of defendants' use of alternative placements and OHUs for crisis-level care into projections of mental health bed needs, discussed in greater detail below. Defendants were ordered to continue working with the special master, with plaintiffs to be included as appropriate, to address the incorporation of use of alternative placements and OHU units for inmates who require crisis care into projections of mental health bed needs. To the extent the process identified need for MHCBs that was above the Spring 2012 projections by CDCR's consultant on which the Blueprint was based, defendants were ordered to ensure that the bed plan provide for an adequate number of beds to meet that need. CDCR's consultant's most recent population and bed need projections, the "Mental Health Bed Need Study, Based on Fall 2012 Population Projections, November 2012," appear to indicate that the number of planned MHCBs will be sufficient. Work on the provision of these beds is continuing.

Significant progress has been made in the area of use of OHUs and alternative housing. During the past several months, defendants have had several meetings with the special master and his staff, both in-person and via teleconference, to discuss needed changes to the use of OHUs and alternative housing. Plaintiffs have participated in the more recent meetings. The goal of these meetings has been to reach consensus on what should be the directives to the field insofar as use of OHUs and use of alternative housing, if any.

The parties have reached agreement on the content of the draft memorandum to the field on the use of OHUs.  The new memorandum prohibits the housing of patients in need of an MHCB into an OHU, given the availability of MHCBs for this population.  The only occasion on which placement into an OHU is permitted is for the conduct of a crisis assessment, as may be clinically warranted.  If such placement occurs when there is no clinician available to conduct a face-to-face evaluation, the patient may be placed on suicide observation until seen by the clinician, and in any event, the initial evaluation shall occur and be documented within 24 hours, and a face-to-face evaluation shall occur at the earliest practicable time and no later than 48 hours after the verbal order for placement in the OHU.  A significant directive in the new OHU memorandum is that patients may not be kept in the OHU for treatment at a higher level of care, including the MHCB level of care.  Now, *any* time a patient in the OHU is clinically determined to require MHCB level of care, including suicide prevention or suicide watch, he or she shall be immediately referred to an MHCB.  Another important element is that the length of time in an OHU shall not exceed 48 hours, unless one of two conditions is present:  one is that the patient has been referred to an MHCB, whereupon he or she must be transferred to the MHCB within 24 hours of the clinical decision to refer, and shall not remain in the OHU for more than 72 hours altogether in any event.  The other condition is when an OHU patient is awaiting placement at the EOP level of care, and an IDTT determines that he or she may be at risk if returned to the housing units while awaiting such transfer.  In any event, if any mental health patient remains in the OHU longer than 72 hours, he or she shall receive enhanced treatment if transferring from the mainline general population or 3CMS level of care, or shall receive EOP treatment if transferring from the reception center, mainline or administrative segregation and if he or she was at the EOP level of care upon arrival at the OHU.  The parties have reached consensus on

the content of the draft memorandum to the field on use of alternative housing.  As of this writing, the memorandum has not yet been distributed to the field.

As noted above, when the *Coleman* court approved defendants' Blueprint, it also ordered defendants to continue working with the special master on two aspects of mental health bed planning, as noted above.  The second of those aspects involved clarification of the use of so-called "trued" projections among the Spring 2012 bed need projections on which the Blueprint is based.  As part of that process, defendants were order to ensure that sufficient EOP administrative segregation beds were planned.  Plaintiffs were to be included in this process as appropriate.  Order, June 15, 2012, Docket No. 4199.  On September 19, 2012, members of the special master's staff and plaintiffs' counsel met via teleconference with CDCR's consultant on mental health bed need projections.  The function and effect of "truing" in the bed need projections was defined and explained again at that time.  On November 13, 2102, defendants produced their consultant's November 2012 Mental Health Bed Need Study, which was based on Fall 2012 population projections.  These projections appear to indicate that the number of planned EOP administrative segregation bed is sufficient.

On the subject of suicide-resistant beds, defendants have completed their installation of these beds in CDCR MHCB units.  On July 21, 2011, the *Coleman* court ordered that defendants prepare a plan to furnish suicide-resistant beds in the MHCB units for any inmates at risk of suicide who would not otherwise be provided with a bed while in the unit.  In November, 2010, the special master recommended that defendants develop such a plan, among his other recommendations based on the defendants' report on their suicide-prevention strategies at the conclusion of the court-ordered review of all suicide prevention practices and policies.  On September 19, 2011, defendants filed their initial plan, which called for a total of 196 suicide-

resistant beds and 16 restraint beds throughout 16 CDCR institutions, with a protracted timetable for completion by September 13, 2013, based on the contingency of budgetary approval by the State legislature.  At the urging of the special master and plaintiffs, defendants were able to expedite the funding, timetable, and scope of the plan, to provide a total of 250 suicide-resistant beds and 18 restraint beds by the summer of 2012.  The special master approved the revised plan, which was then approved and ordered by the *Coleman* court.  On June 8, 2012, defendants revised their schedule for completion of the project to August 15, 2012. This was due to need for additional time to install corner-mounted beds at some institutions in order to avoid the suicide risk presented by placement of beds directly under ceiling fixtures.  On August 29, 2012, defendants formally announced that they had completed the installation of all 250 suicide-resistant beds.

With regard to the SharePoint electronic patient information sharing system, defendants timely implemented the system and demonstrated it to the special master and his staff.

Despite these efforts to reduce the incidence of suicides in CDCR prisons, it appears that the problem of inmate suicides has not been resolved.  Unfortunately, the most recent data on suicides appears to suggest that the suicide prevention measures taken thus far have not been fully implemented. The SRE mentoring program has only been partially implemented. Less than a quarter of the institutions met Program Guide requirements for monthly SPRFIT meetings.  Nine institutions did not provide any data on whether they had an operational ERRC during the review period, and 11 institutions did not provide data relative to CPR training during the review period.  Only three institutions were fully (i.e. 100 percent) complaint with the conduct of five-day clinical follow-up for inmates discharged from crisis

care.  Further, compliance levels for completion of the 31-item screen for newly-arriving inmates in administrative segregation have deteriorated, with only seven institutions compliant, as compared to 70 percent during the twenty-third round monitoring period.[8]  Staggering 30-minute welfare checks in administrative segregation has been an ongoing problem that, again, remained unresolved during the twenty-fifth monitoring – only nine institutions completed these checks correctly.

The problem of inmate suicides in CDCR prisons must be resolved before the remedial phase of the *Coleman* case can be ended.  Therefore, the special master expects to organize a suicide-prevention work group in the near future to review what has been done thus far, examine the results of these efforts, and possibly offer further recommendations for reaching a resolution to this problem.  The gravity of this problem calls for further intervention.  To do any less and to wait any longer risks further loss of lives.

B.   **Ensuring that Seriously Mentally Ill Inmates are Properly Identified, Referred, and Transferred to Receive the Higher Levels of Mental Health Care That They Need and That are Only Available from DSH**

The lack of access to DSH inpatient care for CDCR inmates was one of the problems which precipitated the *Coleman* litigation, and has persisted for years into the remedial phase of this case.  Inmate wait times for transfers to Atascadero State Hospital lasted for periods of several months.  *Coleman v. Wilson*, 912 F.Supp. at 1309 (citing "Final Report of Scarlett Carp and Associates, Inc.," California Department of Corrections, Mental Health Delivery System Study, February 16, 1993).  This persistent problem led to the special master's recommendation in September 2004 that the defendants, in consultation with the special master's

---

[8] The twenty-third round monitoring period was the most recent monitoring period which covered all 33 CDCR institutions.

experts, design and conduct a study of DSH bed needs. [9]  This study, known as the Unidentified

Needs Assessment (UNA) was ordered by the Court.  Order, October 5, 2004, Docket No. 1607.

In March 2005, defendants reported that their study had identified 400 inmates who needed but

otherwise would not have been referred to inpatient care.  They also stated that their plan to

address the problem of inpatient bed needs would involve management of the DSH wait list with

provision of level-of-care services to those inmates awaiting transfer to an inpatient bed; active

participation by DSH management and staff; utilization of standard admission and discharge

criteria; utilization oversight; conversion of beds at other programs for inpatient use; and

exploration of new treatment programs or designations that are necessary for providing

appropriate treatment for inmate-patients identified as a result of the UNA study.[10]  That plan

was far from the last of its type.  Defendants submitted revised bed plans in 2006, 2007, and

2008, but the problem of access to inpatient care was not resolved. The trial on overcrowding of

CDCR prisons before the three-judge panel in the *Coleman* and *Plata* plaintiffs' overcrowding

litigation took place in late 2008.  Among the evidence was the continued shortage of

intermediate care inpatient beds, with a lack of 166 such beds, a wait list that reached as high as

173, and wait times that lasted up to a year.

   In early 2009, the *Coleman* court granted plaintiffs' request for an evidentiary

hearing on the status of the defendants' bed plan, and ordered defendants to file a statement of

their bed plan within 15 days and scheduled an evidentiary hearing one week later.  Order,

February 17, 2009, Docket No. 3515.  The *Coleman* court denied a request by defendants for

---

[9] Special Master's Final Recommendation on Methodology for Defendants' Unmet Inpatient Bed Needs
Assessment, Docket No. 1602.

[10] UNA Report at 2-3.

additional time, directed them to work on the development of a bed plan, and ordered them to

submit a written progress report within ten days.  The scheduled hearing on March 24, 2009 was

re-designated to cover the remaining steps required to ensure timely compliance with outstanding

bed plan orders.  Order, March 5, 2009, Docket No. 3540.

          The result was a comprehensive order which set deadlines for compliance with all

existing *Coleman* bed plan orders and required defendants to develop and file concrete proposals

to meet all remaining short-term, intermediate, and long-range bed needs of the *Coleman*

plaintiff class.  Order, March 31, 2009, Docket No. 3556.   Within this order, CDCR and DSH

clinicians were directed to jointly conduct a modified assessment, later known as the Mental

Health Assessment and Referral Project (MHARP), to determine the extent of unmet inpatient

bed needs among the *Coleman* plaintiff class, and to refer on an expedited basis any inmates

identified in this assessment process for inpatient care.  The prototype utilized for MHARP was

the UNA study.  The immediate reason for MHARP was to identify those inmates who were

potentially in need of inpatient levels of care, and to facilitate their prompt referral to such care.

Its broader purpose was to clarify and re-define the landscape of mental health care and ongoing

need such that it would shape the future of mental health bed construction from an informed and

meaningful perspective.  By June 16, 2009, MHARP had identified 561 inmates at 12 selected

institutions for referral to inpatient care.  The court then approved the continuation and

expansion of MHARP to all other non-desert CDCR institutions.  Order, June 18, 2009, Docket

No. 3613.  The MHARP process then went forward throughout the rest of 2009.

          Following a status conference on March 31, 2010, the *Coleman* court directed

defendants to work under the guidance of the special master "to develop a plan to reduce or

eliminate the waitlists for inpatient care and, in the interim, to better serve the treatment needs of

the *Coleman* class members placed on such lists." Order, Docket No. 3831. The court ordered

the plan because the numbers of inmates on wait lists for inpatient care had grown to 574 men

awaiting intermediate level care, 64 men requiring acute level care, and a lesser number of

women awaiting inpatient care as well. Short of admission to a DSH program, these seriously

mentally ill inmates on wait lists often languished and further decompensated, with no alternative

source of appropriate treatment during the interim. Defendants submitted their plan to address

the wait list on November 24, 2010. Docket No. 3962

On April 27, 2011, the *Coleman* court ordered the special master to review the

defendants' plan and to submit his recommendations. Order, Docket No. 4004. In June 2011,

the special master submitted his report and recommendation to the court that the defendants' plan

be approved and that further action be taken immediately. Among other things, the special

master recommended that defendants be ordered to conduct a further assessment of unmet need

for inpatient care, to be modeled after MHARP, at the original 12 institutions for men and at two

of the women's institutions. He also recommended that the *Coleman* court hold an evidentiary

hearing for defendants to show cause why the 50 beds at Coalinga State Hospital (CSH)

designated for *Coleman* class members, as well as any other vacant beds in that facility, cannot

be filled with high custody CDCR inmates.

In response, defendants developed an alternate assessment process that varied

from the process that was developed in MHARP. The court ordered an evidentiary hearing on

the adequacy of the defendants' new process. Order, July 22, 2011, Docket No. 4045.

Defendants moved to vacate the evidentiary hearing and requested that instead they be granted a

90-day period in which to work with the special master on a supplemental plan to reduce the wait

list for inpatient care and to present their alternate assessment process to the special master for

evaluation.  Defendants recommended that if the special master did not agree with the defendants' alternate plan, then the evidentiary hearing may be reinstated.

In mid-August 2011, the *Coleman* court granted defendants' request and deferred the evidentiary hearing until December 14, 2011.  Order, August 15, 2011, Docket No. 4069.  It ordered defendants to work with the special master over the ensuing 90 days to develop a supplemental plan to reduce or eliminate the wait list and to better serve the treatment needs of inmates on the wait list, and to implement any step approved by the special master that would make hospital beds immediately available to inmates on the wait list.  Defendants were also ordered to work with the special master so that an assessment process that met his approval would have been conducted and completed by December 9, 2011.  During that 90-day period, defendants met regularly with the special master and his experts to work on developing a workable process to carry out that charge.  As part of the process, the special master's experts toured a number of CDCR facilities with a multi-disciplinary group of CDCR staff.

By mid-December 2011, defendants had taken several important steps and made considerable progress toward significant reduction of the inpatient wait list, and had completed the assessment process that was ordered on August 15, 2011.  As reported by the special master to the court, he and the parties agreed that the previously-ordered December 14, 2011 evidentiary hearing should be deferred for several months in view of these accomplishments and the positive momentum of the entire effort.  Because of this significant progress, the *Coleman* court continued the evidentiary hearing to July 13, 2012.  Order, December 12, 2011, Docket No. 4131.

On December 13, 2011, defendants submitted their plan for a sustainable self-monitoring process to ensure that inmates in need of inpatient care are timely identified, referred,

and transferred to such care.  Its broadest objectives were two-fold:  (1) to ensure that inmates are treated at the appropriate level of care, or, if deemed clinically necessary, referred and transferred to facilities of the Department of State Hospitals in a timely manner; and (2) to develop a sustainable, internally monitored, quality improvement process designed to meet the first objective while simultaneously providing feedback to refine existing policies and procedures, improve data management systems, enhance ongoing training of institutional staff, and take appropriate corrective action when warranted.   The plan is richly detailed with processes to ensure that these objectives are met.  They consist of three broad categories of review --monthly, quarterly, and annual procedures – in which both CDCR headquarters' staff and institutional staff will be involved on an ongoing basis.  The quality improvement aspect of the plan is based on an ongoing commitment to refining existing policies and procedures, improving data management staffing, and enhancing ongoing training.  *See* Defendants Report on Assessment Process and Plan Re: Sustainable Self-Monitoring, filed December 13, 2011, Docket No. 4132.

On December 15, 2011, the parties reached an agreement on a process for reporting, meeting, and conferring every 45 days, from January 2012 to July 13, 2012, on the status and progress of defendants' ongoing effort to reduce the inpatient wait list.  Within ten days after each such session, defendants were required to file a status report on their progress with implementation of their plan to reduce or eliminate the inpatient wait list, the referral review process, and, as needed, any other issues and developments related to inpatient access. Stipulation and Order, Docket No. 4134.

Beginning in January 2012, the special master worked closely with defendants to develop and complete quarterly reviews of the institutions' compliance with the sustainable

process, and to monitor, validate, and improve that process.  During this period, CDCR modified

its sustainable process to increase monitoring by CDCR headquarters and the regional directors,

and increased the number of staff from headquarters monitoring the process.  During the week of

June 26, 2012, the special master and his team, accompanied by CDCR and DSH representatives

and plaintiffs' counsel, visited CMC and RJD to review and substantiate that the agreed-upon

process was in place, operable, and sustainable, and that inmates needing DSH care were being

identified and transferred within the normal continuum of clinical care.

By the end of June 2012, it was apparent that defendants had substantially

implemented the objectives of the sustainable self-monitoring process, which are to timely

identify, refer, and transfer inmate-patients needing DSH inpatient care and to internally monitor

and improve the process.  The special master and the parties agreed to meet and confer through

the remainder of 2012 on the sustainable self-monitoring process at sixty-day intervals. He

notified the parties that his experts would monitor the sustainable process as part of regular

monitoring tours, carry out periodic headquarters review, and attend Regional tours.  The special

master's experts regularly also met with defendants and plaintiffs' counsel.

Shortly thereafter, on July 12, 2012, CDCR began accepting patients into its

completed conversion of L-Wing at CMF to house patients in temporary unlicensed intermediate

care beds.  This expansion of available bed space permitted CDCR to achieve placement of high-

custody inmates on the SVPP wait list into inpatient beds. Completion and activation of this

project was a milestone in the process of eliminating the intermediate care wait list.

Thus far, the defendants' plan appears to be unfolding with real results.  As part

of the sustainable process, institutions' clinical staff and headquarters' staffs (including the

Utilization Management Unit) are involved in the review of considerations for higher levels of

care monthly by using available tracking systems to record and monitor DMH referrals. In addition, institutions create non-referral logs and forward those to headquarters for review. Institutions also conduct monthly audits using the 7388-B audit tool and perform monthly agreement audits to compare MHTS.net with the documented contacts (completed appointments) in the Unit Health Record (eUHR) and the eUHR with MHTS.net.

Defendants reported periodically to the special master and plaintiffs' counsel on their progress, and have filed five status reports with the court during the period. Their updated process took effect in the fourth quarter of 2012. As of this writing, the parties' meet-and-confer process is completed. Review and refinement of the defendants' sustainable process are continuing. The sustainable process at designated institutions is being evaluated through scheduled reviews conducted on a quarterly basis and attended by the relevant CDCR regional administrator. Each designated institution receives an on-site visit by which is then followed by a written evaluation prepared by the relevant CDCR regional administrator. Latest developments on the sustainable process have been the CDCR's regional directors' submission of their respective reports on November 13, 2012 on the sustainable process for the third quarter, covering the process at CCWF, VSPW, SQ, and CIW. On November 19, 2012, the special master's expert conducted a review of CDCR central office's oversight and supervision of the sustainable process and confirmed that compliance with the plan approved by the special master was continuing. The special master's experts also attended the fourth-quarter review of two of the institutions designated for major reviews in that timeframe, SVSP and CSP/LAC.

From an overall perspective, identification, referral and transfers of inmates in need of inpatient care have improved greatly in the past two years. According to defendants'

December 3, 2012 DSH[11] licensure report, as of November 30, 2012, there were 36 inmates whose referrals to intermediate inpatient care had been accepted and who had been waiting less than 30 days.  In addition, there was one inmate who was accepted on October 23, 2012 for inpatient intermediate care, but whose admission was delayed due to a scheduled Keyhea hearing.  Also, three inmates were designated as "1370s," i.e. awaiting assessment to determine whether they are competent to stand trial, and had been waiting longer than 30 days for admission to intermediate care beds.  While every effort should be made to transfer the 40 inmates who are currently waiting for beds as soon as possible, this is still a vast improvement over the wait lists in early 2010, when there were 574 male inmates awaiting transfer to intermediate inpatient care, and 64 male inmates awaiting transfer to acute care.

Still, as described below, a number of institutions' levels of performance continued to lag on the basic elements within the process moving seriously mentally patients into inpatient care.  Tracking of referrals remained problematic at approximately one third of the men's institutions.  Appropriate use of Form 7388B continued to elude a third of institutions, albeit to varying degrees.  Although the core tasks of the referral and transfer process are generally being completed, they are not being done within timeframes.  Over two-thirds of institutions did not complete DSH referral packets timely. Once inmates were accepted at DSH programs, transfers to both acute level care and intermediate inpatient care continued to be slow at a number of institutions.  It is time for defendants to attend to these parameters.  They remain an important aspect of the entire process of moving seriously mentally ill patients to inpatient care.  The considerable progress that has been made with nearly eliminating the wait lists is

---

[11] The Department of State Hospitals (DSH) is the current name of the California state governmental entity which was formerly known as, and referred to in past special master reports as, the Department of Mental Health (DMH).

important and necessary, but to be sustained it requires a referral and transfer system that works well in all of its parts.  Defendants are encouraged to continue their focus on this area.

A recent development indicates that access to acute care inpatient beds should soon be further expedited.  The *Coleman* parties have agreed that the 20 DSH beds in Unit S-2 at the Vacaville Psychiatric Program at CMF that have been used temporarily as MHCBs may be restored to their original purpose for use as DSH acute care inpatient beds.  It is anticipated that the return of these beds to acute care will nearly alleviate wait lists for acute care.  Insofar as the intermediate care inpatient beds, defendants are, once again, encouraged to make sure that inmates identified and referred to such beds are moved into them as quickly as possible.  There should be no unoccupied intermediate care beds if there are patients in need of them.

C. **Review of, and Compliance With, All Elements of the Administrative Segregation Enhanced Outpatient Program Treatment Improvement Plan, Including Conduct of a Review Every 30 Days of All EOP Inmates Housed in Administrative Segregation Hubs for Over 90 Days**

There have been long-standing concerns with some elements of the provision of treatment for EOP inmates in administrative segregation, as well as the fact that some EOP inmates' stays in administrative segregation hubs remain excessively long.  As of September 7, 2012, 87 EOP inmates were housed in administrative segregation longer than 90 days.[12]

Nearly six years ago, defendants were ordered to improve the delivery of treatment to EOP inmates in CDCR's administrative segregation hubs.  On March 9, 2007, the *Coleman* court ordered defendants to work with the special master's experts to review and consider new, more effective approaches to the provision of EOP care in the administrative segregation units, including an examination of more effective ways for reducing EOP inmates'

--------

[12] Source: CDCR Secure FTP Website, posted November 1, 2012.

lengths of stay, in order to better serve the treatment needs of this population.  Defendants were ordered to prepare a report on their study and findings. Order, March 9, 2007, Docket No. 2158. Shortly thereafter, the court ordered, among other things, that defendants shall include in their report a plan for modification of existing requirements for institutional classification committee (ICC) reviews.  Defendants were ordered to consider conducting such reviews every 45 days for inmates awaiting disposition of referrals to the local district attorney and for all mental health caseload inmates who have been held in administrative segregation for over 90 days, and transferring inmates to more appropriate placements pending the processing of district attorney referrals.

On July 11, 2007, defendants submitted their Report and Plan for Improvement of EOPs in Administrative Segregation Units (the plan).  Docket No. 2311.  That plan generally called for 30-day reviews of all EOP inmates in administrative segregation hubs longer than 90 days, a stand-alone pilot of a 20-bed administrative segregation EOP at CSP/Sacramento, weekly monitoring to ensure provision of treatment and out-of-cell time, and adequate treatment and office space.  The goal of the plan was facilitation of the delivery of clinical care in the EOP hubs and enhanced capability with detection and resolution of impediments to meeting that goal. With that purpose, the measure of the success or failure of the plan is whether EOP inmates in the hubs are receiving care in accordance with applicable EOP Program Guide requirements and being reviewed regularly if their stays have exceeded 90 days.

Monitoring during the twenty-fifth round indicated that the objectives of the Plan have been met in a number of important areas within the EOP, but also that deficiencies persist

in some critical remaining areas at most or all of the 11 EOP hub institutions.[13]   Initial IDTT

meetings were conducted timely at CMC, CSP/LAC, RJD, SVSP, CIW, and MCSP, but not at

CSP/Sacramento, CSP/Corcoran, SQ, and VSPW.   Ten of the hubs conducted timely quarterly

follow-up IDTT meetings.   Ten of the hubs were also compliant with providing monthly

psychiatry contacts, with CMF the sole hub that was noncompliant in this area.   Weekly primary

clinician contacts were provided at all 11 hubs.   These compliance levels are encouraging and

noteworthy.   They signal that these core aspects of EOP care in administrative segregation have

taken root, and that inmates are being seen by a treatment team promptly and regularly, and are

having timely and regular clinical contacts.

In addition, as noted above, the Plan requires tracking and follow-up every 30

days for EOP inmates whose stays in administrative segregation exceed 90 days.   Institutions

which complied with at least some of the strategies to identify and track such inmates and

address delays in their release from segregation were CSP/Sacramento, CMC, CMF, and SVSP.

Any hubs which are not tracking and following up on inmates with overly long stays should

begin doing so as soon as possible.   Overly-long stays for mentally ill inmates in segregation can

frustrate the goals of clinical care, exacerbating mental illness and potentially increasing the risk

of suicidality.

A pervasive problem found during twenty-fifth round monitoring was that all 11

hubs failed to conduct all clinical contacts and/or therapeutic groups in confidential settings.

Many individual clinical contacts were occurring at cell-front, or in areas affording the patient no

auditory or visual privacy.   A related persisting problem was the lack of sufficient clinical space,

---

[13] CSP/Sacramento, CMC, CMF, CSP/Corcoran, CSP/LAC, MCSP, RJD, SQ, SVSP, CIW, and VSPW.

with reports of continued space shortages at CMC, MCSP, SVSP, and VSPW.  Patient candor is

necessary to a successful clinical interaction, but no patient can reasonably be expected to

communicate openly unless he or she is afforded a private treatment setting.  All hub institutions

must look critically at their own space resources and maximize their own capacities to provide a

private, confidential environment for patients to communicate openly with clinicians and fellow

therapeutic group members.

   Another concerning finding at the hubs was that ten of the 11 hubs failed to offer

at least ten hours per week of structured therapeutic activity per week.  Only CIW was able to

meet that benchmark.  Structured therapeutic activity is a critical part of EOP care in general.

This is particularly true in segregation units, where the group dynamic and interaction with

others can help ameliorate the anti-therapeutic effects of isolation on the mentally ill patient.  It

also should be noted that the problem of insufficient structured therapeutic activity was not

confined to the administrative segregation units.  Inmates in the PSU at CSP/Sacramento were

scheduled for 9.94 hours per week of structured therapeutic activity, but were offered only 7.91

hours.  Only 28.5 percent of PSU inmates were offered ten hours of group therapy per week.

Inmates refused on average 2.66 hours and received 5.25 hours.  The EOP hubs must take stock

of why they are nearly universally falling short on this parameter of EOP care.  Whatever may be

the reason – be it clinical or custodial staffing challenges, space shortages, some combination

thereof, or other reasons – the provision of at least ten hours of structured therapeutic activity

should be made a priority.

   There were also findings of continued noncompliance in the area of suicide

prevention in administrative segregation.  As reported above, the level of compliance with

completion of the 31-item screen post-placement in administrative segregation dipped to 21

percent, down from 33 percent in the twenty-fourth round and 70 percent in the twenty-third round.  This is a disturbing trend, particularly in light of the continued elevated rate of suicides in CDCR segregated units as compared to non-segregated units, and the rise in the suicide rate in CDCR prisons from 2011 to 2012.  Proper staggering of 30-minute welfare checks in administrative segregation remains an ongoing problem as well, with only nine institutions completing these checks correctly.  This is particularly concerning, given the increased incidence of suicides within segregated units as compared to non-segregated units, plus the fact that currently a suicide by a CDCR inmate occurs on average every 10.93 days.

The special master has begun a series of meetings with the *Coleman* parties to work on resolving persisting issues in CDCR's administrative segregation units.  The first such meeting took place on October 23, 2012, and another took place on December 14, 2012.  Among the issues to be addressed in upcoming meetings are the elevated proportion of inmates in administrative segregation who are mentally ill, reduction of risks of decompensation and/or suicide, alternatives to use of administrative segregation placements for non-disciplinary reasons, access to treatment/mitigation of harshness of conditions in the administrative segregation units, suicide prevention, and reduction of lengths of stay in administrative segregation.  The expectation is that these meetings will provide a forum for working through and resolving the range of issues which continue within the administrative segregation units of CDCR.  The progress of these meetings will be covered in upcoming special master's reports.

D.  **Completion of the Construction of Mental Health Treatment Space and Beds for Inmates at Various Levels of Care**

Progress continued with construction of mental health beds and treatment and office space since the filing of the Special Master's Twenty-Fourth Round Monitoring Report on July 2, 2012.  As noted above, defendants' Blueprint for long-range mental health bed planning,

submitted in the spring of 2012, was approved for the most part, with some additional work

ordered with the special master with regard to sufficiency of EOP administrative segregation

beds and MHCBs.  That work appears to have been completed, and that a sufficient number of

such beds will be provided pursuant to the Blueprint.  In the meantime, the CDCR in-custody

population continued to fall as the effects of the AB 900 population reduction process took hold.

One year ago, as of November 23, 2011, the in-custody population was 152,848.  As of

November 28, 2012, the in-custody population dropped to 133,023, for a decline by 15 percent.

Construction of the remaining mental health bed and treatment space projects is

generally proceeding well and remains projected for completion and activation by the end of

2013.  However two projects - the 50-bed MHCB unit at CMC and 50 EOP administrative

segregation beds and 375 EOP general population beds at the former Dewitt Nelson Juvenile

Justice Facility (Dewitt) – are significantly delayed.  Completion of the licensed 50-bed MHCB

unit at CMC is deferred due to problems with the performance of the contractor on the project.

The range of projected completion dates is now July 5, 2013 to October 3, 2013.  Patient

admissions are now expected to begin at some point in the July 5, 2013 to October 3, 2013

timeframe, with full occupancy no earlier than August 9, 2013 and no later than November 9,

2013. Dewitt, which is an adjunct to the California Health Care Facility (see below), will add 50

EOP administrative segregation beds and 375 EOP general population beds.  However, the

timeframe for completion of the construction has been extended to February 10, 2014, with

revised start dates of February 17, 2014 to begin patient admissions, and May 31, 2014 for full

occupancy.  See Order, filed June 15, 2012, Docket No. 4199.

The licensed 45-bed acute and ICF facility at CIW was activated on June 29,

2012.  On July 9, 2012, the facility was granted preliminary accreditation by the Joint

Commission for all services under the Comprehensive Accreditation Manual for Behavioral Health Care. The facility is comprised of two sides, one with 24 beds and the other with 21 beds. The 24-bed side admitted its first patient on July 3, 2012, and was fully activated on September 19, 2012. Activation of the 21-bed side began on October 16, 2012. Defendants reported that as of December 14, 2012, a total of 33 beds were occupied at the facility.

As noted above, the conversion of CMF's L-Wing to house patients in temporary unlicensed intermediate care beds has been completed. The purpose of this conversion was to accommodate high-custody inmates on the SVPP wait list. Patient admissions began on July 2, 2012. As of October 31, 2012, one floor of L-wing (L-3) was occupied at its present full capacity, with 37 patients.

At the beginning of September 2012, CDCR began the conversion of 132 Level II general population sensitive needs yard (SNY) beds at CSATF to 88 Level II Enhanced Outpatient Program (EOP) SNY beds. As of October 1, 2012, there were 31 inmates in the newly-activated CSATF EOP SNY.

The SVSP EOP A-quad project was for 108 EOP general population beds, but has been converted to a treatment and office space project to serve 300 EOP general population beds. It is running one month ahead of its scheduled completion date of October 2, 2013.

The 152-bed PSU treatment and offices space project at CSP/Sacramento is on schedule for completion by May 30, 2013.

The EOP general population treatment and office space project at CMF is presently three months ahead of its scheduled completion date of April 19, 2013.

Construction of the CSP/LAC treatment space project was completed timely. It now awaits approval by the Public Works Board for a change of scope of the project.

Completion of the office and treatment space project for the 45-bed administrative segregation EOP at CSP/Corcoran is on schedule but completion is being reassessed.  Activation is ordered to be completed by April 15, 2013.

The California Heath Care Facility (CHCF) project in Stockton remains on track, with recruitment and hiring of staff already begun.  The project is, by far, the largest of all of the new construction projects, with an additional 82 acute care beds, 432 high-custody intermediate care beds, and 98 MHCBs.  Activation and occupancy will be phased in as buildings within the project are completed.  Patient admissions are expected to begin on July 22, 2013 and to be completed by December 31, 2013.

The CCWF project for treatment and office space for the 70-bed EOP has been modified to a 54-bed project.  It is ordered to be completed by December 31, 2013, but it presently awaits a revised schedule due to a change in scope of the project.

The Stark project for conversion to 525 EOP beds, 50 EOP administrative segregation beds, and 30 MHCBs, and the Estrella project for conversion of 150 EOP and 40 EOP administrative segregation beds were eliminated.

The status and completion dates of the construction projects described above are summarized in the chart below.  A glance at this chart shows how pivotal the year 2013 will be for completion of the various mental health bed and treatment space projects:

| Project | Court-Approved Activation | Adjusted Date | Revised 2012 Bed Plan - Capacity |
|---------|---------------------------|---------------|----------------------------------|

|  | Complete Date |  |  |
|---|---|---|---|
| CMC 50 Bed MHCB | 10/4/12 | 7/5/2013 to 10/3/2013<br><br>First Admission | No change to project |
| SVSP EOP A Quad (108 GP EOP Beds) | 10/2/13 | One month ahead of schedule | 0 additional beds but still treatment space for 300 beds |
| SAC 152 PSU Treatment & Office Space | 5/30/13 | On schedule | reduced treatment space for 128 bed capacity |
| CMF 658 EOP GP Treatment & Office Space   (67 beds) | 4/19/13 | 1/25/13<br><br>Complete activation 3 months ahead of schedule | 0 additional beds but treatment space unchanged |
| LAC EOP Treatment Space | 9/12/12 | No New Date<br><br>Construction complete – waiting for PWB approval of scope change | Now capacity for 100 EOP ASU beds rather than 150 EOP GP beds |
| COR 45 Bed EOP ASU Treatment & Office Space | 4/15/13 | On schedule –<br><br>Re-assessing completion date due to time impacts not anticipated | No change to project |
| CHCF (137 MHCB) (43 Acute) (432 ICF-H) | 12/8/13 | 7/22/13 First Admission<br><br>12/31/13 Full occupancy | Now 98 MHCB, 432 ICF-H, 82 acute |
| Stark Conversion (525 EOP/50 EOP ASU not yet court approved)* (30 MHCB approved but not funded) | 12/10/13 |  | Project eliminated |

| Estrella (Paso) Conversion (150 EOP) (40 EOP ASU) | 9/16/12 | | Project eliminated |
|---|---|---|---|
| CCWF - 70 Bed EOP Female Treatment & Office Space | 12/31/13 | Waiting for revised schedule due to scope change | 0 additional beds but still treatment space for the 54 original beds |
| Dewitt Conversion (375 EOP) (50 EOP ASU) | 8/18/13 | 2/17/14 First Admission 5/31/14 Full occupancy | No change to project |

CDCR prisons have also been undergoing various mission changes. At CIW, beds which were previously used as reception center beds will be converted to 220 Level I, II, and III general population beds. Activation was expected on or about December 1, 2012. VSPW is in the process of a conversion to a men's facility. As a result of that change, CCWF has received an influx of women inmates to be placed into administrative segregation and EOP administrative segregation beds. To accommodate this development, administrative segregation bed capacity at CCWF will be expanded in Building 504 in Facility A, and EOP general population inmates in that unit will be moved to Building 503 in Facility A. At Folsom, activation of the new 403-bed Folsom Women's Facility (FWF) was projected for December 1, 2012. The FWF was proposed in CDCR's Spring 2012 plan, "The Future of California Corrections: A Blueprint to Save Billions of Dollars, End Federal Court Oversight, and Improve the Prison System" (the Blueprint). The FWF will be designated as a re-entry hub, providing academic and career technical education programs in a variety of vocational areas, and will have a treatment component that will address inmate issues with substance abuse and cognitive-

behavioral problems.  Also at Folsom, as of January 1, 2013, approximately 2,010 Level III

general population beds will be converted to 2,010 Level II beds for men.  In the meantime, the

CDCR in-custody population continued to fall as the effects of the AB 900 population reduction

process took hold.  One year ago, as of November 23, 2011, the in-custody population was

152,848.  As of November 28, 2012, the in-custody population dropped to 133,023, for a decline

by 15 percent.

       All of the foregoing makes it overwhelmingly clear that 2013 will be a pivotal

year in CDCR's years-long effort to provide a sufficient number of the right kind of beds and

treatment space for its population of mentally ill inmates.  It holds the promise of achievement of

this major goal - a landmark for CDCR and for the *Coleman* remedial effort.

## E.      Full Implementation of Defendants' New Mental Health Staffing Plan

       Over ten years ago, the *Coleman* court ordered that "[d]efendants shall maintain

the vacancy rate among psychiatrists and case managers at a maximum of ten percent, including

contracted services."  Order, June 12, 2002, Docket No. 1383.  Despite the passage of a decade,

the problem of high vacancy rates among mental health clinical staff does not appear to be

resolved yet.  The overall vacancy rate among mental health staff increased during the twenty-

fifth monitoring period to 21.2 percent.  Even with use of contractors, the overall functional

vacancy rate in mental health was lowered only marginally to 18.3 percent.  This was a reversal

of the trend of consistently declining vacancy rates across preceding monitoring periods.  It

signaled a significant departure from the overall mental health vacancy rate of 14 percent and the

overall functional vacancy rate of 7.7 percent that was reported for the twenty-third monitoring

period, which covered the period of October 2012 to April 2011 and was most recent review

period in which all 33 institutions were audited.  The addition of new but still unfilled positions

in defendants' staffing plan may have influenced these rates, but the extent to which that may be true is not clear.  Nevertheless, what is clear is that mental health staffing has been problematic for CDCR for years. If CDCR's inability to fill mental health positions continues, it may need to consider developing a plan for how to address this problem, new staffing plan notwithstanding.

Vacancies among staff psychiatry positions remained particularly problematic for CDCR.  Of the 261.08 allocated positions, 151.8 were filled by permanent staff, for an overall vacancy rate of 42 percent.  Contractors covered less than half of vacancies, for a functional vacancy rate of 26 percent.  CDCR must resolve the longstanding problem of inadequate staffing of psychiatry positions.  The solution to this problem is long overdue.  During the past five years, CDCR failed to meet the ten-percent benchmark for staff psychiatry positions staffing in four of the five monitoring rounds in which all 33 CDCR institutions were monitored.[14]  In the Twenty-Third Round, which covered the period of October 2011 through April 2012 and was most recent monitoring round in which all 33 institutions were audited, the functional vacancy rate in staff psychiatry was 11 percent.  In comparison, the present staff psychiatry functional vacancy rate of 26 percent indicates that the functional vacancy rate has more than doubled in only two years.  A decline that steep in the course of such a brief period of time warrants action.  Filling these vacancies must become a priority for CDCR.

Vacancy rates in staff psychology also increased since the twenty-third monitoring period.  The overall vacancy rate was 21 percent, with 601.52 of the 761.48 total allocated positions filled by full-time psychologists.  Use of contractors reduced the functional vacancy rate to 17 percent.  During the past five years, CDCR was able to satisfy the court-

---

[14] Rounds 18, 20, 21, 22, and 23.

ordered ten-percent benchmark for psychologist positions in three of the five monitoring rounds in which all 33 CDCR institutions were monitored.  In fact, as recently as the Twenty-Third Round, which was the most recent preceding full monitoring round, the functional vacancy rate for staff psychologists was only three percent, the lowest it had been during the past five years. As with psychiatry staffing, the rapid deterioration in staffing of psychology positions to a functional vacancy rate of 17 percent calls for concentrated effort to fill these important clinical positions.

As with staff psychology positions, CDCR met the ten-percent staffing benchmark for social worker positions for three of the past five monitoring rounds in which all 33 institutions were monitored.  However, for the Twenty-Fifth Round, the overall vacancy rate among social workers rose to 24 percent, for a significant increase over the 14-percent rate reported for the Twenty-Third Round.  Of the 257.42 allocated social worker positions, 195.45 were filled with full-time employees.  Contractors covered only an additional 10.42 positions, for a functional vacancy rate of 20 percent, doubling the ten-percent functional vacancy rate during the Twenty-Third Round.  Again, this sharp increase in the functional vacancy rate calls for redoubled effort with recruitment and hiring of social workers.  Primary clinician positions are the backbone of mental health care delivery.

The regression with staffing the key clinical positions of staff psychiatrists and primary clinicians (i.e. psychologists and social workers) to vacancy rates well above ten percent must be reversed.  This requires concentrated effort to fill and retain staff in these important clinical positions. The functional vacancy rates of 26 percent for staff psychiatry positions, 17 percent for staff psychology positions, and 20 percent for social workers are so high as to raise concern that delivery of day-to-day clinical care is being adversely affected.  As stated above, the

staffing plan was based on an assessment of clinical need and designed according to a ratio-based model by which the numbers and types of positions were driven by the numbers and needs of the inmate population.  The new positions, therefore, were created because they were deemed necessary to meet the needs of the inmate patient population.  Where positions are not filled, the implication is that clinical need is not being met.  The rather sudden uptick in mental health vacancy rates may well be attributable to the addition of new mental health position allocations within the defendants' staffing plan which have not yet been filled. But regardless of the reason(s) why this has occurred, these vacancies need to be filled.  Clinical staff are the conduit for delivery of care to patients.  Without necessary staff, the chain of care is broken and patients are not treated.  This sort of breakdown manifests itself in, among other things, inadequate attendance by required clinical staff at IDTT meetings, delays in clinical contacts, and untimely completion of referrals for inmates who require higher levels of care, all of which undermine the progress that has been made with the delivery of care.

An equally important component of the delivery-of-care continuum is the filling of mental health leadership positions.  The vacancy rate among the 18 allocated chief psychiatrist positions increased from 17 percent to 33 percent since the twenty-third monitoring period.  Contract coverage was not utilized for any of the vacant positions. The vacancy rate for senior psychiatry positions rose from 29 percent to 50 percent since the twenty-third monitoring period.  Among the total 28 chief psychologist positions, which were distributed among 27 institutions, 26 positions were filled, for a seven-percent vacancy rate.  The vacancy rate among senior psychologist positions rose markedly, from 11 percent to 39 percent, since the twenty-third monitoring period.  No contractors were used to cover any of these vacancies.

Vacancies among these supervisory positions need to be filled.  Chief and senior staff play a critical part in ensuring the delivery of good clinical care.  Supervisory staff are responsible for good management and utilization of line staff.  This is perhaps most directly manifested in the role of supervisory staff in the quality improvement activities – an area of great importance to completion of the remedial effort in this case, as discussed below.

For all of these reasons, the special master encourages defendants to proceed with filling their mental health staffing vacancies as quickly as possible.

F.      **Training of Staff for Greater Collaboration Between Custody and Mental Health**

Following a hearing on June 16, 2009, the *Coleman* court ordered defendants to develop a plan for training of mental health and custody staff to improve collaboration between the two groups.  Defendants then conducted training pilots at CSP/Sacramento and CSP/Solano, under the guidance of selected members of the special master's staff.  They developed a training plan which focused on interactions between custody and mental health staff and their treatment of mentally ill inmates.  The training plan envisioned the use of QIT techniques to evaluate the effectiveness of the collaboration training, and further refinement of the plan based on feedback gained therefrom.  Defendants reported that training was completed at all seven institutions - CSP/Corcoran, CSP/LAC, CSATF, RJD, SVSP, CSP/Sacramento, and SQ - designated for the initial round, that training outcomes had been evaluated, and that they wanted to expand the training to all CDCR institutions.  In their written objections to the special master's Twenty-Third Round Monitoring Report, dated August 26, 2011, defendants stated that they would provide the results of the outcome evaluation to the special master.

At a *Coleman* policy meeting on September 9, 2011, defendants reported that there had been no indication of sustained improvement in attitude 60 to 90 days after the training

sessions, and no significant changes in use-of-force incidents, individual cell-side visits, or treatment cancellations by custody.  They did report that the number of RVRs at three institutions had declined.  They also reported that staff had requested increased opportunity for joint training, that funding had been obtained funding to continue training for the next two years, and that the training for the trainers would begin in early November 2011 and would conclude in June 2013.  The project would expand to training of all CDCR custody, nursing, and mental health staff within the seven institutions.

Cooperation and understanding between custody and mental health staff is essential to the delivery of care.  Clinical staff and inmates rely on custody staff so that inmates arrive at mental health appointments timely and safely.  Any breakdown in the custody-mental health relations, and any actions on the part of custody which could have a chilling effect on a mentally ill inmate's willingness to be escorted to a clinical appointment, must be eliminated. The special master requests that defendants provide him with an update on the training program, including whether it was expanded system-wide, as defendants had reported they wanted to do.

G.  **Refinement and Implementation of MHTS.net to Its Fullest Extent and Benefit**

As discussed above, the development of a quality improvement process by CDCR is now underway.  An important aspect of the development of a viable process is the integration of MHTS.net into the process.  MHTS.net is a valuable tool which can help defendants succeed with their QI process, if refined and used properly.  It is expected that MHTS.net will be the tool within the QI process for measurement of performance levels, and the means by which feedback is garnered and worked back into the process.  Institutional monitoring in the Twenty-Fifth Round provided a window into how the institutions have been faring with MHTS.net. Indications were that CDCR still has work to do in this area.  Issues with MHTS.net were

reported or detected at no less than 19[15] of the 33 institutions during the monitoring round, as reported in the pertinent institutional summaries which appear in Exhibit A.  A number of these problems appear to be the result of lack of data input into the system, or faulty execution thereof. As a result, quantification of defendants' performance levels was sometimes vague and imprecise due to inconsistencies between MHTS.net reports and results of other audit methods, raising doubt about the reliability of MHTS.net reports.  In other instances, data in MHTS.net reports was simply unreliable on its face.  There were even some instances in which it appeared that MHTS.net results may have under-reported defendants' actual performance levels, again probably due to gaps and/or operator mistakes in data input.

Defendants would be well-advised to continue working on improving their usage and application of MHTS.net concurrently with their ongoing development of the QI process. The necessity of a reliable system for capturing the metrics of day-to-day performance levels within the various programs to a sound QI process is obvious.  There is no reason to delay the eventual completion of the QI process that may result if the necessary work on MHTS.net were deferred.

## CONCLUSION

In conclusion, while defendants have made significant progress toward achieving their seven general goals, more work remains to be done before all of these goals are met.  The development of a well-functioning, adaptable quality improvement process is a core aspect of the means toward that end.  Because the success of this project is so important at this stage of the remedial phase of *Coleman*, the special master suspended the Twenty-Sixth monitoring round so

---

[15] ASP, CCI, CIM, CMC, CSP/Corcoran, CSP/LAC, CSP/Solano, CSATF, CTF, CCWF, DVI, Folsom, HDSP, ISP, NKSP, PVSP, RJD SQ, and WSP

that both his and defendants' resources can be focused on this project. The strategy is to first develop the core of the quality improvement process which will then be piloted in the Twenty-Sixth round of monitoring. The process will then be modified or adjusted, to the extent necessary, as indicated by the results of the pilot, prior to its introduction system-wide.

Defendants are now engaged in the project and have made what appears to be a serious commitment to succeeding at it. The project is an intensive and complex undertaking, tapping the time and efforts of many CDCR staff. Although the project is consuming, the time and energy directed to it are well spent, for it is CDCR's path to compliance and eventual removal from *Coleman* court oversight. It is hoped that this project results in the implementation of an effective quality improvement process in which defendants self-monitor capably and meaningfully. If that occurs, there may no longer be a need for further comprehensive compliance reports of this type, and this one may in fact turn out to be the last of its kind. At this time, any attempt at a more abrupt conclusion to court oversight would be, in the opinion of the special master, not only premature but a needless distraction from the important work that is being done in the quality improvement project. The defendants' resources should not be deterred from the task at hand. Accordingly, the special master offers no recommendations for further orders of the court at this time.

Respectfully Submitted,

_____/s/_____
Matthew A. Lopes, Jr., Esq.
Special Master

January 18, 2013

# APPENDIX A

## SUMMARY OF THE MONITOR'S FINDINGS

### A.   Mental Health Staffing:

All Mental Health Positions

The overall vacancy rate in mental health staffing increased during the twenty-fifth monitoring period, reversing the general trend of decreasing vacancies over the past several monitoring periods.  As of September 30, 2012, the total number of all established mental health positions for chief, senior, and staff psychiatrists; chief, senior, and staff psychologists; social workers; psych techs; and recreational therapists was 2, 229.17.[16]  Of these established positions, 1,854.6 were filled by full-time employees.  The collective vacancy rate among all of these positions was 21.2 percent, as compared to the overall vacancy rate of 14 percent for the twenty-third monitoring period.[17]  The use of contractors reduced the functional vacancy rate among all mental health positions to 18.3 percent, which was substantially higher than the overall mental health functional vacancy rate of 7.7 percent reported for theexhibit a twenty-third monitoring period.

Chief Psychiatrists

The vacancy rate among the 18 allocated chief psychiatrist positions increased from 17 percent to 33 percent since the twenty-third monitoring period.  Contract coverage was not utilized for any of the vacant positions.  CIM, CIW, CSP/LAC, MCSP, PVSP, and SVSP

---

[16] Source of staffing data (excluding for psych techs) reported in this section: CDCR Secure FTP Website for Monthly Reports, posted November 1, 2012, covering the period of September, 2012.  Because staffing data for psych techs was not included in the monthly report, the data reported herein on psych tech staffing was obtained from the individual institutional reports for the twenty-fifth monitoring period.

[17] The twenty-third round was the most recent monitoring period which encompassed all 33 CDCR institutions.  The twenty-fourth round was an abbreviated round, covering only 12 institutions.

operated without chief psychiatrists.  For the fourth consecutive monitoring period, the chief psychiatrist position at CSP/LAC was vacant.

### Senior Psychiatrists

The vacancy rate for senior psychiatry positions rose from 29 percent to 50 percent since the twenty-third monitoring period.  Of the nineteen institutions with allocated positions, nine filled all of them, and CMC filled one of its three positions.  Another nine institutions - ASP, CCI, CSP/Corcoran, CSP/Sacramento, DVI, Folsom, RJD, SQ, and SCC - had 100-percent vacancy rates.  None of those vacancies were covered by contractors.

### Staff Psychiatrists

Vacancies among staff psychiatry positions remained problematic for CDCR.  Of the 261.08 allocated positions, 151.8 were filled by permanent staff, for an overall vacancy rate of 42 percent.  Contractors covered less than half of vacancies, for a functional vacancy rate of 26 percent.

The four institutions which had staff psychiatry vacancy rates of ten percent or less were Centinela and ISP, each with one allocated position, SCC with 2.5 allocated positions, and SQ with 12.25 allocated positions.  Contractors reduced the functional vacancy rate to ten percent or less for two additional institutions, DVI and KVSP.  Seventeen institutions – CCI, CIM, CMF, CRC, CSP/Sac, CSP/Solano, CCWF, CTF, DVI, Folsom, MCSP, NKSP, PVSP, RJD, SVSP, and VSPW - had vacancy rates ranging from 11 percent to 50 percent.  Seven institutions – CIW, CSP/Corcoran, CSP/LAC, CSATF, KVSP, PBSP, and WSP had vacancy rates ranging from 54 percent to 83 percent.  ASP, Calipatria, CVSP, and HDSP did not fill any of their line psychiatry allocations with full-time psychiatrists.

### Chief Psychologists

Among the total 28 chief psychologist positions, which were distributed among 27 institutions, 26 positions were filled, for a seven-percent vacancy rate.  CVSP did not fill its sole allocated position, and PBSP filled one of its two allocated positions.  No contractual coverage was used.

Senior Psychologists

The vacancy rate among senior psychologist positions rose markedly, from 11 percent to 39 percent, since the twenty-third monitoring period.  No contractors were used to cover any of these vacancies.

Seven institutions – CCC, CMC, CRC, CSP/Solano, Folsom, ISP, and KVSP - filled or nearly filled their senior psychologist posts.  Fifteen institutions – CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CTF, HDSP, MCSP, NKSP, PBSP, PVSP, RJD, SVSP, SQ, and WSP - had vacancy rates ranging from 20 percent to 50 percent.  Six institutions - CCI, CIM, CIW, CCWF, DVI, and VSPW - had vacancy rates ranging from 60 percent to 75 percent.  ASP, Centinela, CVSP and SCC, each with one allocated senior psychologist position, had vacancy rates of 100 percent.

Staff Psychologists

Vacancy rates in staff psychology also increased since the twenty-third monitoring period.  The overall vacancy rate was 21 percent, with 601.52 of the 761.48 total allocated positions filled by full-time psychologists.  Use of contractors reduced the functional vacancy rate to 17 percent.

ASP and SCC filled all of their staff psychology positions, and another eight institutions – CMF, CMC, CSP/Solano, Centinela, DVI, Folsom, RJD, and SQ - had vacancy rates under ten percent.  With use of contractors, five institutions – CVSP, CTF, ISP, KVSP, and

SVSP – reduced their functional vacancy rates to less than ten percent.  The 11 institutions with vacancy rates ranging from 13 percent to 30 percent were CIM, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, Calipatria, CCWF, HDSP, MCSP, PVSP, and WSP.  The six institutions with vacancy rates ranging from 31 percent to 65 percent were CCI, CIW, CRC, NKSP, PBSP, and VSPW.  The three staff psychologist positions at CCC were all vacant.

### Social Workers

For the Twenty-Fifth Round, the overall vacancy rate among social workers rose to 24 percent, for a significant increase over the 14-percent rate reported for the Twenty-Third Round.  Of the 257.42 allocated social worker positions, 195.45 were filled with full-time employees.  Contractors covered only an additional 10.42 positions, for a functional vacancy rate of 20 percent, doubling the ten-percent functional vacancy rate during the Twenty-Third Round.

Of the six institutions with vacancy rates less than ten percent- CIM, CRC, CSATF, Centinela, PBSP, and SCC - five had filled all of their allocations.  CSP/Solano reduced its functional vacancy rate to less than ten percent with contractual coverage.  Ten institutions – CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Solano, CCWF, NKSP, SVSP, and SQ - had vacancy rates ranging from 11 percent to 29 percent.  Nine institutions – ASP, CCI, Folsom, HDSP, MCSP, KVSP, PVSP, VSPW, and WSP - had vacancy rates ranging from 30 percent to 59 percent.  CTF and DVI had the highest vacancy rates, at 67 percent and 69 percent, respectively.

### Psych Techs

Vacancies among psych techs remained the lowest among all of the mental health staff, with a vacancy rate of 6.5 percent, and a functional vacancy rate of five percent.  Of the 626.39 allocated positions, 585.66 were filled.  An additional 10.25 positions were covered by

contractors.  A total of 11 institutions filled all of their psych tech positions with full-time employees.  Use of contractors reduced the functional vacancy rate to zero at three additional institutions.

Vacancy rates were ten percent or less at eight institutions - CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, PBSP, RJD and SQ.  Twelve institutions – CIW, CSP/Solano, Centinela, CCWF, CTF, Folsom, KVSP, MCSP, PVSP, SVSP, VSPW and WSP – had vacancy rates ranging from 11 percent to 20 percent.  NKSP and SCC had the highest vacancy rates, at 31 percent and 30 percent, respectively.

<u>Recreational Therapists</u>

The overall vacancy rate among recreational therapists was 26 percent. Contractors were used to cover only .46 positions out of 34.11 vacancies, which affected the functional vacancy rate negligibly.

Six institutions - CIM, CMC, CCWF, DVI, HDSP, and SCC - filled all of their recreational therapist positions with full-time employees.  Among the remaining 21 institutions that employ recreational therapists, three – CSP/Corcoran, CSP/Sacramento, and RJD - had vacancy rates under ten percent.  Vacancy rates at another ten institutions – CIW, CMF, CRC, CSP/LAC, CSP/Solano, CSATF, MCSP, NKSP, PBSP, and WSP - ranged from 13 percent to 50 percent.  SVSP, CCI, and KVSP had vacancy rates of 57 percent, 71 percent, and 75 percent, respectively.  Three institutions – ASP, CTF, and VSPW – did not fill any of their recreational therapist positions.

<u>Office Techs</u>

Of the 253.67 allocated office technician positions, 169.75 were filled, for a vacancy rate of 33 percent.  The use of 3.29 contractors marginally reduced the functional vacancy rate to 32 percent.

Calipatria, KVSP, SCC, and VSPW filled all of their office tech positions with full-time employees.  MCSP achieved full coverage with use of contractors.  Of the remaining 27 institutions that employ office techs, 21 institutions – ASP, CCI, CIM, CIW, CMC, CRC, CSP/Corcoran, CSP/LAC, CSP/Sacramento, CSP/Solano, CSATF, CCWF, CTF, DVI, HDSP, PBSP, PVSP, RJD, SVSP, SQ, and WSP- had vacancy rates ranging from 14 percent to 50 percent, and four institutions -  CMF, CVSP, Folsom, and NKSP- had vacancy rates ranging from 56 percent to 67 percent.  CCC and ISP, each with .5 office technician positions, had 100 percent vacancy rates.

**B.**     **Quality Management:**

Overall, it remained clear that most institutions continued their implementation of the core structure of the quality management processes, with appropriate committees meeting regularly and taking up pertinent matters, and QITs being used to address problem areas.  As stated above, CDCR has not yet put in place a system-wide approach to measuring and assessing mental health services and improving them consistent with Program Guide requirements on an ongoing basis.

On a generally positive note, CMC, DVI, and PBSP had quality management programs that made efforts to address mental health issues, and SVSP continued to demonstrate improvement, with elements of a good system in place for gathering data on key indicators.  CMF restructured its quality management program during the reporting period and instituted a chief quality officer position.  However, as before, some other institutions did not fare as well.

For example, at NKSP, the unreliability of MHTS.net data, due to a shortage of clerical staff, made it difficult to gauge performance in key areas of quality management. CCWF still needed to shift the focus of its quality management function toward emphasis on Program Guide requirements, and away from the corrective action plan model.

During the reporting period, local governing bodies were active and meeting regularly at 24 institutions - CCC, CCWF, Centinela, CIW, CMC, CMF, CRC, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, CVSP, HDSP, ISP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SQ, SVSP, VSPW, and WSP. Attendance was reported to have been generally good. CSP/Sac reported that it had resolved its past difficulties with attaining a quorum at local governing body meetings. CSP/Solano's and SCC's local governing bodies did not meet during the reporting period.

As with the local governing bodies, attendance at quality management committee meetings statewide was good, with quorums reported present at almost all meetings that were held. Quality management committees at 22 institutions - ASP, CCC, CCI, CCWF, Centinela, CIM, CIW, CRC, CSATF, CSP/Sac, CVSP, Folsom, HDSP, ISP, KVSP, MCSP, PVSP, RJD, SCC, SQ, VSPW, and WSP - were scheduled to meet monthly during the reporting period. A majority of these institutions held six meetings during the reporting period, while CVSP and SQ held five meetings, and Calipatria held four meetings. The quality management committee at PBSP held 24 meetings during the reporting period. At CSP/LAC, CTF, DVI, and SVSP, the number of quality management committee meetings ranged from ten to 12 during the reporting period. CMF's quality management committee was replaced with a quality management council. CMC, CSP/Corcoran, CSP/Solano, and NKSP held regularly scheduled quality management committee meetings.

Mental health subcommittees met twice per month at eight institutions - Centinela, CMC, CSP/Corcoran, CTF, DVI, KVSP, MCSP, and PBSP, and once or twice per month at Calipatria, CCWF, CSP/LAC, CSP/Solano, and SVSP. CMF's and CSP/Sac's mental health subcommittees met weekly. Monthly mental health subcommittee meetings were scheduled at 15 institutions - ASP, CCC, CCI, CIM, CIW, CRC, CVSP, Folsom, HDSP, ISP, PVSP, RJD, SCC, VSPW, and WSP. CSATF's mental health subcommittee met only once during the reporting period. At CRC and CVSP, the mental health subcommittee was combined with the SPRFIT. CCC had a consolidated medical, dental, and mental health subcommittee.

Attendance at mental health subcommittee meetings varied across institutions. A quorum was regularly reported at meetings held at 16 institutions - ASP, CCI, Centinela, CMC, CSP/Corcoran, CSP/LAC, CTF, Folsom, HDSP, MCSP, PBSP, PVSP, RJD, SQ, VSPW, and WSP. However, attendance was reported to have been problematic at six institutions - CMF, CVSP, DVI, KVSP, SCC, and SVSP.

Throughout the reporting period, many institutions chartered and used QITs. QITs were active at 25 institutions - ASP, CCI, CCWF, CIW, CMF, CMC, CSP/Corcoran, CSATF, CSP/LAC, CSP/Sac, CSP/Solano, CTF, DVI, Folsom, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SCC, SQ, VSPW, and WSP. QITs were resolved and recommendations were submitted at nine institutions - CCWF, CIW, CSP/Corcoran, CSP/Sac, CTF, MCSP, RJD, WSP, and VSPW. CSP/Sac and CTF in particular fully utilized the QIT process, having resolved seven and eight QITs, respectively, during the reporting period. Calipatria and Centinela used an action item process in lieu of QITs to address areas in need of improvement. There were no active QITs at CCC, CVSP, ISP, or SVSP. CRC did not utilize the QIT process at all, although there were areas in which it could have benefitted from doing so.

Peer review was in place at 26 institutions - CCI, CCWF, Centinela, CIM, CIW, CMC, CMF, CSP/LAC, CSP/Sac, CSP/Solano, CTF, CVSP, DVI, Folsom, HDSP, ISP, KVSP, MCSP, NKSP, PBSP, PVSP, SCC, SQ, SVSP, WSP, and VSPW.  Formats and effectiveness of the process varied across institutions.  Peer review at HDSP emphasized cross-training of primary clinicians, while at Folsom peer review of primary clinicians was specialized between mainline and administrative segregation.  At CSP/Solano, primary clinician peer review consisted of case consultation rather true peer review.  Peer review for both psychiatrists and primary clinicians at CMC had both qualitative and quantitative elements.  At CCI, peer review was recently restructured, while CIM revised and piloted its peer review audit tools.  DVI's peer review process continued to evolve.  Psychiatry peer review at CSP/Solano addressed Program Guide standards.

At SVSP, psychiatry peer review was convened when requested by the chief psychiatrist.  CSATF did not have an effective peer review process.  Primary clinician peer review was suspended at WSP due to staffing vacancies, and did not exist at NKSP and ASP.

C.    **Suicide Prevention**:

Suicide Prevention and Response Focused Improvement Teams

During the twenty-fifth monitoring period, only seven institutions - ASP, CSP/LAC, CCWF, HDSP, MCSP, NKSP, and RJD - demonstrated compliance with Program Guide requirements for monthly SPRFIT meetings with full attendance and pertinent agenda items.  Twenty-three institutions – ASP, CCI, CIM, CIW, CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, Calipatria, CCWF, CVSP, DVI, Folsom, HDSP, MCSP, NKSP, PBSP, PVSP, RJD, SVSP, SCC, VSPW, and WSP – convened monthly meetings.  Five institutions – CMC, CSP/Solano, CTF, Centinela, and KVSP – missed only one meeting during the six-month period,

while CSATF and CCC missed two or more meetings during the review period.  CRC and ISP combined their SPRFIT meetings with the monthly mental health subcommittee meetings at those institutions.

Eight institutions – CCC, CSP/LAC, CCWF, HDSP, MCSP, NKSP, PBSP, and RJD – demonstrated attendance by all required participants at SPRFIT meetings during the monitoring period.  All institutions maintained minutes of the SPRFIT meetings, but they continued to be scant at KVSP.  Relevant suicide prevention agenda items were reviewed at 29 institutions.  Content was problematic at CCC, CRC, and SCC, where the agenda was comprised of only the statewide suicide prevention video conference.  KVSP meeting minutes demonstrated minimal discussion and analysis of agenda topics.  SQ did not maintain minutes of monthly meetings until June, 2012.

Emergency Response

Twenty-four institutions – ASP, CCC, CIW, CMC, CRC, CSP/Sac, CSP/Solano, CSATF, CTF, Calipatria, Centinela, CCWF, CVSP, Folsom, HDSP, ISP, KVSP, PBSP, PVSP, RJD, SQ, SCC, VSPW and WSP – had functioning emergency response review committees (ERRCs) which maintained minutes that revealed appropriate review of emergency responses within the institution.  Nine institutions – CCI, CIM, CMF, CSP/Corcoran, CSP/LAC, DVI, MCSP, NKSP, and SVSP – did not provide any data regarding an operational ERRC during the review period.

Twenty-one institutions— ASP, CCI, CIW, CMC, CTF, CSP/Corcoran, CSP/Sac, CSP/Solano, CSATF, CCWF, CVSP, HDSP, ISP, KVSP, PVSP, RJD, SVSP, SQ, SCC, VSPW, and WSP – provided documentation of CPR training, including annual refresher training for custody staff.  PBSP reported CPR training of all medical staff.  Eleven institutions— CCC,

CIM, CMF, CRC, CSP/LAC, Calipatria, Centinela, DVI, Folsom, MCSP, and NKSP – did not provide data relative to CPR training during the review period.

Over 60 percent of the institutions continued to complete monthly emergency response drills in administrative segregation.  RJD conducted quarterly drills.  Six institutions - CCI, CRC, CTF, DVI, MCSP, and NKSP -did not demonstrate completion of monthly drills.  CMC's documentation was incomplete.

Eighteen institutions - ASP, CCC, CCI, CIM, CIW, CSP/Corcoran, CSP/LAC, CSP/Solano, CSATF, CTF, CCWF, DVI, KVSP, NKSP, PVSP, SVSP, VSPW, and WSP - were compliant with accessibility to cut-down tools and possession of on-person CPR micro-shields by custody officers.

Five-Day Clinical Follow-Up

Only Calipatria, CVSP, and Folsom were 100-percent compliant with provision of five-day clinical follow-up for all inmates discharged from crisis care.  While NKSP reported compliance, no validating documentation was provided by the institution, and CCC, a paper review institution, did not provide documentation of its performance in this area.

Eighteen institutions remained very close to compliance, but they did not achieve full 100-percent compliance.  These institutions were ASP, CIM, CMF, CMC, CSP/Sac, CSP/Solano, CTF, Centinela, HDSP, KVSP, MCSP, PBSP, PVSP, RJD, SVSP, SCC, VSPW, and WSP.  CIW, CRC, and CSP/LAC demonstrated compliance levels of approximately 85 percent.

At DVI, there were a significant number of cases in which no follow-up occurred on one or more days of the five-day period, and in some instances, no follow-up was completed at all.  At CSP/Corcoran, during three months of the review period there were some instances of

follow-ups that were not completed, and/or pertinent information in the documentation was missing.  CCI and CSATF were noncompliant as well.  At CCWF, the logs were incomplete and difficult to analyze.

Custody Follow-Up

VSPW was 100-percent compliant with completion of custody checks following inmates' discharges from crisis care.  Eight institutions— ASP, CIM, CSP/Sac, CSP/Solano, CTF, PBSP, RJD, and WSP – demonstrated compliance rates in the range of 90 percent. CSP/Corcoran reported compliance rates from 61 percent to 92 percent.  Six institutions -CCI, CIW, CSATF, CCWF, NKSP, and SCC - were noncompliant, as were CRC with only 33 percent compliance and Centinela with only 62 percent compliance.  At SVSP, custody follow-up logs were returned 83 to 100 percent of the time, but they were fully completed for only 17 percent to 67 percent of the cases.  Thirteen institutions— CCC, CMF, CMC, CSP/LAC, CSATF, CVSP, DVI, Folsom, HDSP, KVSP, MCSP, PVSP, and SQ--did not provide documentation on custody follow-up after discharge from crisis-level care.

Plan to Address Suicide Trends in Administrative Segregation

All institutions reported utilization of retrofitted or designated cells with placards for newly-placed inmates in administrative segregation.  However, almost every institution reported that the number of newly arriving inmates generally exceeded the number of available cells throughout the monitoring period.  MCSP reported three designated cells for new intakes in administrative segregation, but it had yet to remove the metal upper bunks in those cells. Further, while DVI placed newly-arrived inmates throughout the unit and used cell placards for identification, there was an insufficient visibility into the cells that were utilized.  CSP/Sac

reported that only 32 percent of newly-arrived inmates in administrative segregation were placed in designated intake cells.

Eighteen institutions - CCI, CIM, CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Solano, CSATF, CCWF, ISP, KVSP, PBSP, PVSP, RJD, SCC, VSPW, and WSP - were compliant with documented daily meetings between mental health and custody staff in administrative segregation. Meetings occurred approximately 80 percent of the time at Folsom and HDSP, from 70 to 75 percent of the time at CSP/Sac, NKSP, and SQ, and 65 percent of the time at CTF. Seven institutions - CCC, Calipatria, Centinela, CVSP, DVI, MCSP, and SVSP - did not provide documentation of these meetings.

Twenty-three institutions - ASP, CCC, CCI, CIM, CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CTF, Calipatria, Centinela, Folsom, HDSP, KVSP, NKSP, PBSP, RJD , SVSP, SQ, VSPW, and WSP - were compliant with conduct of documented daily psych tech rounds in administrative segregation. PVSP was lacking 40 days of documentation during the review period. Seven institutions - CSP/Solano, CSATF, CCWF, CVSP, DVI, ISP, and SCC - did not provide documentation demonstrating completion of daily psych tech rounds during the monitoring period.

Fifteen institutions - ASP, CCC, CIM, CIW, CMF, CMC, CSP/LAC, CSP/Sac, Calipatria, Centinela, CCWF, HDSP, KVSP, PBSP, and SQ - were compliant with completion of pre-placement screens in administrative segregation, which was a significant improvement over preceding monitoring periods. An additional five institutions— CCI, CSP/Solano, Folsom, RJD, and VSPW – hovered around 80-percent compliance levels, while MCSP and SVSP demonstrated compliance levels in the 70-percent area. CSP/Corcoran, NKSP, PVSP, SCC, and WSP were noncompliant. Four institutions - CSATF, CTF, CVSP, and DVI - did not provide

documentation demonstrating compliance with completion of pre-placement screens in administrative segregation during the review period.  ISP reported compliance, but did not provide verifying data.

Compliance levels deteriorated for completion of 31-question post-placement screens of newly-arriving inmates in confidential settings in administrative segregation.  Only seven institutions or 21 percent - CCI, CIM, CSP/Corcoran, CSP/LAC, CSP/Sac, DVI, and SQ - demonstrated compliance, as compared to 33 percent during the twenty-fourth monitoring period, and 70 percent during the twenty-third monitoring period.  Another nine institutions - ASP, CCC, CCI, CMF, Calipatria, CTF, PBSP, RJD, and VSPW- reported compliance, but they did not demonstrate that the screens were conducted in confidential settings.  PVSP was compliant with completion of the screens within 72 hours, but only 76 percent of screens were conducted in confidential settings.  Seven institutions - CSP/Solano, Folsom, HDSP, ISP, MCSP, SVSP, and SCC - were noncompliant with timely completion of the screens.  WSP reported compliance with completion of the screens over a seven-day period, rather than within the first 72 hours in administrative segregation.  CMF, CSATF, and KVSP did not provide documentation regarding compliance.  NKSP's audit did not capture the appropriate population to measure compliance in this area.

Staggering of 30-minute custody welfare checks in administrative segregation remained problematic throughout the monitoring period.  Only nine institutions - CCC, CIM, CIW, CSP/LAC, CSP/Solano, Calipatria, CVSP, VSPW, and WSP- demonstrated correctly completed 30-minute custody welfare checks.  Folsom reached a compliance level of 75 percent, and SCC reported compliance levels of 64 percent to 90 percent.  CTF, KVSP, and SQ did not provide audit documentation with regard to this area.  Centinela continued to utilize the Guardian

One Plus electronic system to document custody wellness checks.  The remaining institutions completed custody wellness checks, but they were not sufficiently staggered, with lapses exceeding 30 minutes often noted.

Access to ten hours or more of yard time in administrative segregation improved, but remained problematic during the monitoring period, with approximately half of institutions compliant in this area.  The 17 institutions offering ten or more hours were ASP, CIM, CIW, CMF, CMC, CSP/LAC, CSP/Solano, CSATF, CCWF, CTF, HDSP, KVSP, NKSP, PVSP, SQ, VSPW, and WSP.  MCSP offered nine hours, and inmates housed in the overflow administrative segregation unit at NKSP were offered six to nine hours per week.  CCI, PBSP, and RJD were not compliant with the provision of yard time.  Ten institutions— CCC, CSP/Corcoran, CSP/Sac, Calipatria, Centinela, CVSP, DVI, Folsom, ISP, and SCC--did not provide relevant data.

Availability of electronic entertainment devices in administrative segregation remained unchanged over the monitoring period, with 35 percent of the institutions permitting use of electronic devices.

**D.    Medication Management:**

Implementation of MAPIP

Twelve institutions - CIM, CMC, CTF, Centinela, CCWF, Folsom, NKSP, PVSP, SVSP, SQ, SCC, and WSP - reported that they had implemented the medication management audit tool that was developed in the Medication Administration Process Improvement Project (MAPIP).  MAPIP was partially implemented at CSP/Corcoran, CSATF, KVSP, and MCSP.

Medication Continuity for Newly-Arriving Inmates

Seventeen institutions reported compliance with provision of medications to newly-arriving inmates within 24 hours of arrival.  These institutions were CCI, CIM, CIW,

CMC, CSP/Corcoran, CSP/Sac, CSATF, Calipatria, CCWF, Folsom, NKSP, PBSP, RJD, SVSP, SQ, SCC, and VSPW.  WSP indicated compliance, but it did not account for inmates who had transferred from other CDCR institutions.  At Centinela, MAPIP audits indicated compliance.  CTF and PVSP reported that newly-arriving inmates received medications by the next calendar day, while CMF was approaching provision of medications within that timeframe.

ASP, CRC, CSP/LAC, and HDSP were noncompliant with medication continuity for newly-arriving inmates.  CRC's very low compliance rate of 25 percent applied to all medications and not merely psychotropic medications.  ISP received no new arrivals who were prescribed psychotropic medications.  CCC and CSP/Solano did not audit medication continuity.

<u>Medication Continuity Following Intra-Institutional Transfers</u>

Twenty institutions indicated compliance with medication continuity following intra-institutional transfers.  They were ASP, CCI, CIM, CIW, CMC, CRC, CSP/LAC, CSATF, Calipatria, CCWF, CTF, Folsom, ISP, MCSP, PBSP, PVSP, RJD, SVSP, SQ, and SCC.  CSP/Corcoran indicated compliance, but staff reported otherwise.  CSP/Solano and Centinela were nearly compliant.  CSP/Sac and WSP reported compliance, but did not include inmates discharged from the MHCB.  VSPW indicated compliance, but did not include moves into and out of administrative segregation or the OHU.  CIW and CCWF were compliant following moves into and out crisis care.  KVSP, MCSP, and PVSP were compliant for discharges from the MHCB, but KVSP was otherwise noncompliant.  HDSP was compliant following housing area transfers except after discharges from the MHCB.  CMF was noncompliant with medication continuity following intra-institutional transfers.  CCC did not provide audits of medication continuity.

<u>Medication Orders</u>

Medication orders were generally compliant at 21 institutions - ASP, CCI, CIM, CIW, CMC, CSP/Corcoran, CSP/LAC, CSP/Solano, Calipatria, Centinela, CVSP, DVI, HDSP, KVSP, MCSP, PBSP, RJD, SQ, SVSP, SCC, and VSPW.  CSP/Sac just missed compliance.

CRC reported compliance, but it was unclear whether it referred to all inmates or only MHSDS inmates.  PVSP indicated compliance, but did not distinguish between psychotropic and other medications.  CSP/Corcoran indicated compliance with new medication orders, but staff reported otherwise.  CSP/LAC was nearly compliant for new or changed medication orders.  CVSP was compliant with changes in dosage.  DVI reported that all new medication orders were received for administration within 24 hours of being written.  CSP/Solano filled medication orders by the next working day.

ASP, CMF, CSATF, ISP, and MCSP were noncompliant with medication orders.  Medication expirations were problematic at SVSP.  CCC reported no medication renewals, and CSATF and Folsom did not audit medication renewals.

.        Response to Inmate Medication Noncompliance

Nine institutions - ASP, CIM, CIW, CRC, CCWF, CVSP, Folsom, PBSP, and VSPW - indicated compliance with timeliness of mental health follow-up on cases of medication noncompliance.  CSP/LAC was nearly compliant.

Nineteen other institutions indicated noncompliance with appropriate identification, documentation, referral, and response to inmate medication noncompliance.  These were CCI, CMF, CMC, CSP/Corcoran, CSP/Sac, CSP/Solano, CSATF, Centinela, CTF, HDSP, ISP, KVSP, MCSP, NKSP, PVSP, RJD, SVSP, SQ, and SCC.

Pill Lines

Pill line lengths and wait times were appropriate at 18 institutions - CCI, CIM, CIW, CMC, CSATF, Calipatria, Centinela, CTF, HDSP, ISP, KVSP, MCSP, PBSP, RJD, SVSP, SQ, SCC, and VSPW.  Pill lines at Folsom were appropriate in mainline housing units and in administrative segregation.  CSP/Corcoran indicated compliance on one yard.  NKSP inmates indicated that the general population pill line was short.  Pill line wait times were appropriate at ASP, but exposure to the elements was problematic.

CSP/Solano reported appropriate pill line wait times, but staff and inmates indicated that pill lines were long.  PVSP inmates reported wait times of several minutes to one hour, and DVI indicated wait times of 30 to 105 minutes.  Seven institutions - CCC, CRC, CSP/LAC, CSP/Sac, CCWF, CVSP, and WSP - did not audit pill line wait times.

Informed Consent

At 12 institutions - CCI, CRC, Calipatria, CVSP, ISP, NKSP, PBSP, PVSP, RJD, SCC, VSPW, and WSP - current informed consent forms for psychotropic medications were present in charts.  ASP, CIW, CMC, CTF, and SQ were all nearly compliant.  Centinela and CCWF reported compliance for only portions of the review period.  CSATF indicated compliance for inmates housed in the MHCB or at the 3CMS level of care.

Nine institutions - CIM, CSP/Corcoran, CSP/LAC, CSP/Solano, DVI, Folsom, HDSP, KVSP, and MCSP - were noncompliant.  SVSP indicated that obtaining of informed consent forms was problematic.

Laboratory Testing

Ten institutions - CIM, CIW, CRC, Calipatria, Centinela, CVSP, ISP, PVSP, SQ, and SCC - were compliant with appropriate laboratory testing of inmate blood levels of psychotropic medications.  CMC, PBSP, VSPW, and WSP reported partial compliance.

CSP/Corcoran approached compliance for ordering laboratory tests when clinically indicated and for documentation of clinical interventions in cases of significant test results. MCSP indicated near compliance with ordering testing for inmates prescribed Clozapine, Depakote, and Lithium.

Ten institutions - ASP, CSP/LAC, CSP/Sac, CSP/Solano, CCWF, Folsom, HDSP, KVSP, RJD, and SVSP – were noncompliant with laboratory testing protocols. NKSP's indication of noncompliance was based on limited information and a small sample. CCI and CSATF did not audit laboratory testing.

Direct Observation Therapy (DOT) Medication Administration

Seventeen institutions - ASP, CCI, CIM, CIW, CSP/Corcoran, CSP/Sac, Calipatria, CVSP, CTF, KVSP, MCSP, PBSP, PVSP, RJD, SQ, SCC, and VSPW - were compliant with adherence to DOT medication administration procedures. CRC reported compliance, but did not provide supporting data. Folsom indicated that DOT procedures were performed correctly in 78 to 100 percent of cases. Centinela and NKSP reported noncompliance. CSP/LAC, CSATF, and WSP did not audit DOT medication administration.

Eight institutions - CIW, CSP/Solano, Calipatria, Centinela, ISP, MCSP, PVSP, and VSPW - administered all psychotropic medications by DOT. MCSP identified inmates with known histories of hoarding or cheeking and subjected them to additional scrutiny during medication administration. CSP/LAC prescribed medications by DOT for inmates on Keyhea orders, or who exhibited self-harm potential, or who had histories of noncompliance. At CSP/Sac, all inmates housed in the MHCB, CTC, OHU, alternative housing, EOP, PSU, or on Keyhea orders, and those with histories of medication noncompliance, received their medications by DOT. NKSP prescribed medications by DOT for inmates housed in the MHCB or the

MHTH[18], or with histories of suicidal behavior, hoarding, or cheeking.  ASP ordered

medications by DOT on a case-by-case basis.

Keyhea Process

The Keyhea process generally operated effectively at the institutions.  It was

implemented appropriately at 18 institutions - CCI, CIM, CIW, CMF, CMC, CSP/Sac,

CSP/Solano, CSATF, CCWF, DVI, HDSP, MCSP, NKSP, PBSP, PVSP, RJD, VSPW, and

WSP.

At CSP/Corcoran and CSP/LAC, there were instances of the Keyhea coordinator

not being notified that newly-arriving inmates were on Keyhea orders.  The timely provision of

Keyhea medications was also problematic at CSP/LAC.  At SVSP, four Keyhea orders lapsed

and four others were denied due to lack of psychiatric staff.  One Keyhea order lapsed or expired

at SQ.  No inmates were on active Keyhea orders at eight institutions - ASP, CCC, Calipatria,

Centinela, CVSP, Folsom, ISP, or SCC.

*Hora Somni*/ Hour of Sleep (HS) Medications

HS medication administration no earlier than 8:00 p.m. was compliant at 18

institutions - ASP, CCI, CIM, CIW, CSP/Corcoran, CSP/Solano, CSATF, Calipatria, CVSP,

CTF, DVI, HDSP, MCSP, PBSP, PVSP, RJD, SQ, and VSPW.  CCWF's indication of

compliance was based on a small sample size.  ISP indicated compliance, but did not provide

audit results.  CRC reported compliance, but a MAPIP report indicated that one yard began

administering HS medications at 7:45 p.m.

---

[18] MHTH refers to Mental Health Temporary Housing at NKSP, which is used to house and assess inmates referred
for admission to the MHCB, and is thus yet another alternative housing unit.  Details of care provided in the MHTH
appear in the institutional summary for NKSP, in Appendix A of this Report.

Centinela, KVSP, NKSP, and SCC were noncompliant.  CSP/LAC, CSP/Sac, Folsom, and WSP did not audit HS medication administration.  CCC did not indicate whether inmates were prescribed HS medications.

Parole Medications

Parole medications were appropriately provided at 22 institutions - ASP, CCI, CIM, CIW, CMF, CRC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, Calipatria, Centinela, CVSP, CTF, DVI, HDSP, MCSP, PBSP, RJD, SQ, SCC, and VSPW.  CCWF indicated compliance based on a small sample size.  CSP/Solano indicated compliance for paroling MHSDS and non-MHSDS inmates.  PVSP reported compliance for paroling inmates prescribed psychotropic and non-psychotropic medications.  Folsom was nearly compliant.  NKSP indicated that medications were provided to paroling inmates, but did not produce audit information.

CMC indicated noncompliance, based on review of a two-month period.  SVSP indicated that the provision of parole medications was problematic.  No inmates prescribed psychotropic medications paroled from ISP, and no MHSDS inmates paroled from CCC.

E. **Access to Higher Levels of Care**:

Men's Institutions

Compliance with DSH referral protocols improved overall.  All prisons except CSP/LAC had assigned at least one person to assume the responsibilities of DSH coordinator. CSP/LAC's position for DSH coordinator was vacant due to staff illness.  The dedication of time and scope of tasks performed by DSH coordinators varied widely from institution to institution.

Compliance with referral tracking requirements improved overall, but continued to be problematic in nearly a third of the men's prisons.  Logs were found to be well-maintained and/or notably improved at six institutions - CMC, CMF, CSATF, MCSP, NKSP, and RJD.

Data omissions and inaccuracies compromised the utility of referral and/or non-referral logs at seven institutions - CCI, CIM, CRC, CSP/Corcoran, HDSP, PVSP, and SVSP, and documented rationales for non-referral were vague at PBSP.

Treatment teams at eight institutions - CSP/Corcoran, CSP/Sac, CSATF, HDSP, MCSP, NKSP, PBSP, and SVSP - had consistent access to data regarding program participation, MHCB admissions, and RVRs.  This information was not routinely communicated to clinicians at PVSP.  Consideration of DSH referrals was not fully integrated into treatment planning at WSP.  Treatment teams at KVSP did not have routine access to information regarding multiple MHCB admissions.

Use of Form 7388B, which lists the indicators for consideration for referral to a higher level of care in a DSH program, was noted to be excellent or improved at ASP, CMC, CSP/Corcoran, CSP/Sac, CSP/Solano, CSATF, and PBSP.  However, 11 men's prisons continued to struggle with completion of Form 7388Bs to varying degrees.  Clinical rationales and/or alternative treatment interventions for non-referred inmates were often missing, incomplete, or inadequate at eight institutions - CCI, CIM, CSP/LAC, HDSP, NKSP, SVSP, SQ, and WSP.  Compliance rates for providing adequate clinical rationales and treatment interventions at RJD were 85 percent and 76 percent, respectively.  They hovered below 90 percent during four months of the six-month review period at MCSP.  High compliance rates reported by DVI were at odds with records reviewed by the monitor's expert, many of which documented inadequate rationales for non-referral.

Eight prisons - CIM, CSP/Solano, DVI, HDSP, KVSP, PBSP, PVSP, and SQ - completed DSH referral packets within prescribed timeframes.  Other prisons did not fare as well.  The compliance rates for completion of acute care referrals within two days were 35

percent at CSATF, 41 percent at RJD, 45 percent at CMF, 50 percent at CSP/Corcoran, 58

percent at NKSP, 60 percent at SVSP, 61 percent at CSP/LAC, 62 percent at CSP/Sac, 67

percent at WSP, and 70 percent at CMC.  The compliance rates for completion of intermediate

care referrals within five days, or within ten days if a Vitek hearing was required, were 55

percent at MCSP, 57 percent at RJD, 59 percent at SVSP, 67 percent at CSATF, 73 percent at

CSP/LAC, and 74 percent at CSP/Sac.  Monthly compliance rates at CMF ranged from 50 to 71

percent.

   The number of referrals to acute care varied considerably among prisons.  CMF

generated 56 referrals, followed by 45 at CSP/Sac, 40 at SQ, 31 at both CMC and NKSP, 23 at

CSP/LAC, 20 at CSATF, 17 at both KVSP and RJD, and 15 at WSP.  CSP/Corcoran,

CSP/Solano, and MCSP produced six to ten acute care referrals, and CIM, DVI, HDSP, PBSP,

PVSP, and SVSP referred five or fewer inmates.  Six prisons - ASP, CCI, CCC, CSATF,

Folsom, and SCC - did not refer any inmates to DSH acute care during the reporting period.

   Access to DSH acute care continued to be slow at a number of institutions.  None

of the inmates transferred to acute care from PVSP and SVSP left within ten days of referral.

Rates of compliance with the ten-day timeframe ranged from 20 to 29 percent at CSP/LAC and

CSATF, 30 to 39 percent at KVSP, MCSP, NKSP, and PBSP, and 50 to 59 percent at CIM and

HDSP.  The compliance rate at RJD was 44 percent.  Inmates referred to acute care from

CSP/Corcoran waited one to three weeks to receive a bed assignment.

   Six institutions - CSP/Solano, CSATF, PBSP, PVSP, SQ, and WSP - routinely

transferred inmates to DSH acute care within 72 hours of receiving a bed assignment.  Three of

four inmates transferred to acute care from SVSP left within 72 hours of receiving a bed

assignment.  Compliance with the 72-hour timeline hovered just below 70 percent at CMF and CSP/Corcoran.

CMC generated 82 referrals to DSH intermediate care, followed by 65 at CMF, 46 at RJD, 45 at CSP/LAC, 42 at CSP/Sac, and 29 at CIM.  Nine prisons - ASP, CSATF, DVI, MCSP, NKSP, PBSP, SVSP, SQ and WSP – generated ten to 19 intermediate care referrals, while five prisons -CCI, CSP/Corcoran, CSP/Solano, HDSP, and KVSP - referred nine or fewer inmates.  Five prisons - CRC, CTF, Folsom, PVSP, and SCC - did not refer any inmates to intermediate care during the reporting period.

The statewide capacity for non-high security intermediate care beds continued to meet demand, while access to high-security intermediate care beds significantly improved.  Improved access was perhaps most dramatically reflected in SVPP's waitlist, which fell from 81 in January 2012 to five in August 2012.  Far fewer referrals were canceled due to long waits for beds.  Over 80 percent of intermediate care referrals resulted in transfers.

Despite improved access, a number of prisons continued to struggle to transfer inmates to DSH intermediate care within 30 days of referral.  Rates of compliance with the 30-day timeframe were 24 percent at CSP/LAC, 32 percent at CIM, and 50 percent at SVSP, KVSP, and NKSP.  Compliance rates were 61 percent at PBSP, 64 percent at MCSP, 71 percent at RJD, and 83 percent at both CSATF and DVI.  Inmates at CSP/Corcoran waited three to four weeks to receive intermediate care bed assignments.

Licensed MHCBs are operated at 16 of the men's prisons. CMC and CIM operated large unlicensed units, and CSP/Sacramento had 20 unlicensed beds in addition to its

26-bed MHCB.  Beginning in March 2012, CMF referred inmates to its 50-bed Mental Health

Crisis Bed Facility (MHCBF)[19] located on its grounds.

Of the 18 prisons with local MHCB units, eight - CIM, CMF, CSP/Corcoran,

CSP/Solano, CSATF, HDSP, PBSP, and SQ - had sufficient beds to accommodate local demand.

MHCB capacity for the remaining ten prisons was insufficient, which necessitated the use of

alternative holding areas to monitor inmates for whom beds were unavailable.  CSP/Sac, the

prison with the largest unmet need for crisis care, monitored inmates in medical OHU beds, ZZ

cells, and contraband cells when MHCBs were unavailable.  There were 722 placements in these

areas, of which 269 or 37 percent were eventually transferred to local MHCBs.  CSP/LAC

reported 339 placements in alternative holding areas, followed by 328 at WSP, 246 at SVSP, 150

at MCSP, 126 at KVSP, 88 at RJD, 66 at PVSP, and 41 at CMC.  The average number of

placements per month in NKSP's MHTH Unit fell from 100 to 60 during the reporting period.

Average length-of-stay figures from CSP/Sac, KVSP, RJD, SVSP, and WSP

indicated that most inmates in alternative housing spent one to two days there, but occasionally

stayed four to five days.  Ninety-four percent of percent of alternative housing placements at

CSP/LAC and 83 percent of the MHOHU stays at MCSP did not exceed 72 hours.  At CMC, 58

percent of the stays in alternative housing lasted less than 24 hours, but reached five days in

some cases.  The average length of stay was just over 14 hours at SVSP, and no inmates spent

more than 43 hours in alternative holding areas.  Seventy-one percent of the placements at PVSP

lasted less than four hours, and none lasted longer than 26 hours.

---

[19] As distinguished from the 20-bed MHCB operated by DSH at CMF.

Information was sparse regarding the institutions' use of the Health Care Population Oversight Program to place inmates in outside MHCBs when local beds were unavailable.  CSP/LAC, apparently the largest recipient of HCPOP assistance, placed 110 inmates in outside MHCB units during the reporting period.  NKSP, the only other institution to provide HCPOP data, placed five inmates in outside crisis beds.  CMC contacted HCPOP immediately upon placing an inmate in alternative housing, but infrequently transferred inmates to outside MHCBs.

Seven men's prisons did not have licensed or unlicensed MHCBs and sent inmates in need of crisis care to other prisons.  Six of these prisons - ASP, CCI, CRC, CTF, DVI, and SCC - used OHU beds to monitor crisis cases pending transfer to an MHCB unit or return to housing.  There were 203 mental health OHU placements at DVI, 164 at CCI, 99 at ASP, 85 at CTF, 54 at CRC, and 41 at SCC.  Rates of compliance with the 72-hour timeframe for stays in the OHU were 63 percent at ASP, 71 percent at DVI, 80 percent at SCC, 82 percent at CTF, 85 percent at CRC, and 90 percent at CCI.  Approximately one third, or 206 out of 646, of all OHU placements were transferred to MHCB units.  Only 15 percent of 74 MHCB transfers from CCI occurred within 24 hours of referral, whereas all 19 inmates transferred from ASP left within 24 hours of referral.  MHCB transfer timelines were not reported for CRC, CTF, DVI, and SCC.

Folsom used eight alternative holding cells in administrative segregation to monitor crisis cases via continuous watch pending transfer to an MHCB or return to housing. The institution did not provide information regarding the number of placements in alternative holding cells or lengths of stay.  Sixteen inmates were transferred to outside MHCB units. Transfer times were not provided.

There were nine men's prisons - CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, MCSP, RJD, SVSP and SQ - with EOP administrative segregation hubs, none of which reported having slow or difficult access to these units.  Four other prisons also reported timely access to EOP hubs at other institutions.  CSATF transferred ten inmates to EOP hubs, all within 30 days of their placement in segregation.  Only one of 18 hub transfers from CSP/Solano took longer than 30 days.  The sole hub transfer from CRC occurred within 30 days.  DVI reported an average length of stay of ten days for EOP inmates in administrative segregation.

Access to EOP hubs was poor for the remaining 12 prisons.  Rates of compliance with the 30-day timeframe for transfer to an EOP hub were 20 percent at WSP, 27 percent at CCI, 29 percent at PVSP, 36 percent at HDSP, and 60 percent at CTF.  At NKSP, 85 percent of the 34 EOP inmates placed in segregation stayed longer than 60 days.  Twenty-one percent of the 73 EOP inmates placed in administrative segregation at CIM stayed longer than 90 days.  During the reporting period at KVSP, there were 50 EOP inmates who remained in administrative segregation 91 to 292 days, indicating that access to outside hubs was extremely limited.  PBSP housed two to ten EOP inmates in administrative segregation during the reporting period, some of whom waited as long as 64 days to transfer to a hub.  Four of 13 or 31 percent of EOP inmates in administrative segregation at ASP at the time of the monitor's visit had been there longer than 30 days.

Of the eight prisons that provided PSU transfer data, four - CMC, CSP/LAC, CSATF, and SQ - routinely transferred inmates within 60 days of their PSU endorsements.  About a quarter of the PSU transfers from MCSP, PVSP, and RJD did not occur within 60 days of endorsement, and the sole PSU transfer from HDSP took 74 days.  EOP inmates at CMF, CSATF, and CTF often languished in segregation waiting for PSU endorsements.  On average,

inmates in the PSU at CSP/Sacramento were scheduled for 9.94 hours per week of structured therapeutic activity, but were offered only 7.91 hours.  Only 28.5 percent of PSU inmates were offered ten hours of group therapy per week.  Inmates refused on average 2.66 hours and received 5.25 hours.

Access to mainline and SNY EOP programs continued to be slow in many cases. Ten prisons – ASP, CCI, CIM, CRC, CSP/Solano, CSATF, CTF, Folsom, MCSP, and PVSP – transferred 203 inmates to EOP programs.  Among these transfers, the rate of compliance with the 60-day timeframe was 64 percent.  Of the 31 EOP inmates at ASP, CIM, CTF, HDSP, and PVSP at the times of the monitor's visits at these institutions, 17 or 55 percent had been awaiting transfer longer than 60 days.  Delays of several months were not uncommon.

Reception centers continued to struggle to meet Program Guide timeframes for transferring MHSDS inmates.  Rates of compliance with the 60-day timeframe for transfers of EOP inmates from a reception center were zero percent at CSP/LAC, followed by 16 percent at CCI, 31 percent at SQ, 41 percent at CIM, 46 percent at NKSP, and 72 percent at WSP.  A quarter of the 112 EOP inmates in reception centers at HDSP, NKSP, and RJD at the times of the monitor's visits had been there longer than 60 days

Rates of compliance with the 90-day timeframe for 3CMS inmates to transfer from a reception center were one percent at CSP/LAC, followed by 44 percent at SQ, 56 percent at NKSP, 64 percent at CIM, and 86 percent at WSP.  Half of the 962 3CMS inmates in reception centers at HDSP, NKSP, and RJD at the times of the monitor's visits had been there longer than 90 days.

Mental health referral tracking improved notably among the men's prisons.  All men's prisons but two reported compliance rates of 90 percent or better for response to emergent

referrals within four hours.  SQ responded timely to 83 percent of emergent referrals and Folsom reported a compliance rate of 71 percent.

Over two-thirds of the men's institutions reported compliance rates of 90 percent or better for response to urgent referrals within 24 hours.  Compliance rates were 88 percent at SVSP, 87 percent at HDSP, 79 percent at CCI, and 72 percent at both KVSP and MCSP.  CIM, Folsom, and CSP/Corcoran struggled to respond timely to urgent referrals, reporting compliance rates of 67 percent, 56 percent, and 56 percent, respectively.

Eleven institutions -ASP, CIM, CMF, CMC, CRC, DVI, Folsom, PBSP, RJD, SQ and SCC - reported compliance rates of 90 percent or better for responding to routine referrals within five working days.  Another seven institutions - CCI, CSP/LAC, CSP/Solano, CTF, HDSP, KVSP, and SVSP - responded timely to 80 to 89 percent of routine referrals. Compliance rates for responding timely to routine referrals ranged from 70 to 77 percent at CSATF, Folsom, MCSP, and PVSP, followed by 56 percent at CSP/Corcoran, 40 percent at WSP, and 25 percent at NKSP.

Women's Institutions

CCWF, CIW, and VSPW were largely compliant with DSH referral protocols. DSH coordinators maintained required logs and tracked referrals.  During the reporting period, CCWF, CIW, and VSPW identified 458 inmates who met one or more of the objective indicators for considering referral to DSH.  Of these, 20 or four percent were referred to Patton State Hospital (PSH).  All referral packets were completed within five days.  Per institutional audits, compliance rates for documentation of rationales for non-referrals on Form 7388B were 94 percent at CCWF and 84 percent at CIW.  Compliance rates for identification of treatment

alternatives for non-referred inmates were 77 percent at CCWF and 69 percent at CIW.  Audit results were not reported for VSPW.

As in the past, DSH referrals did not distinguish between acute and intermediate levels of care.  CIW, CCWF, and VSPW collectively referred 20 inmates to PSH, 16 of whom were transferred.  Three DSH referrals were rejected and one was rescinded.  Compliance with transfer timeframes was not reported.

Female inmates had adequate access to crisis level care.  CIW had a licensed CTC with ten MHCBs and CCWF had 12 Mental Health Program Beds (MHPBs).[20]  Neither institution used alternative areas to monitor inmates for whom crisis beds were unavailable.  VSPW used OHU beds to monitor inmates in crisis.  Tracking reports from VSPW listed 284 to 287 OHU placements, six of which resulted in transfer to the MHPB at CCWF.  Twelve percent of OHU admissions lasted longer than 72 hours.

CIW and VSPW operated EOP administrative segregation hubs during the reporting period, and neither institution reported slow or difficult access to these programs.  At CCWF, 17 of the 27 EOP inmates in administrative segregation were transferred to the hubs at CIW and VSPW within the 30-day timeframe, for a compliance rate of 67 percent.

CCWF endorsed five inmates to the PSU at CIW.  All were sent to the EOP administrative segregation hub at VSPW to await transfer to CIW, but CCWF's transfer records were unclear as to whether or when these women eventually reached the PSU at CIW.  VSPW

---

[20]CDCR designated the MHPBs at CCWF as such, rather than as MHCBs, because they are located in a skilled nursing facility rather than in a CTC or a GACH.  Defendants reported on December 20, 2012 that because the program is an MHCB program and because the Program Guide, Chapter 5, Part A ("Mental Health Crisis Beds") permits MHCB programs to be located in a skilled nursing facility, henceforth the MHPBs at CCWF will be referred to as MHCBs.

transferred four inmates to the PSU at CIW.  Two of them were transferred within 60 days of endorsement, and the remaining two inmates waited 65 and 77 days, respectively.

VSPW, the only women's institution without an EOP program, transferred 15 EOP inmates, all within 60 days of their EOP designation.

CCWF, the only remaining reception center for women, processed 27 EOP inmates.  Stays in reception center for five of these women lasted longer than 60 days, for a compliance rate of 19 percent.  All EOP inmates were housed in the mainline EOP program at CCWF, and received full EOP programming, while completing reception center processing.  CCWF also processed 802 3CMS inmates, 629 of whom were transferred within 90 days, for a compliance rate of 78 percent.

All three women's institutions routinely responded to emergent referrals within four hours.  Compliance rates for response to urgent referrals within 24 hours were 77 percent at CIW, 86 percent at VSPW, and 91 percent at CCWF.  For response to routine referrals within five working days, compliance rates were greater than 90 percent at CCWF and CIW, and 88 percent at VSPW.

Non-MHSDS Prisons

CCC, Calipatria, Centinela, CVSP, and ISP did not have MHSDS programs. There were no EOP inmates in these prisons at the time of the review.  Of the 25 EOP inmates at these prisons during the review period, 24 or 96 percent transferred within 60 days.  All EOP inmates left Calipatria within 30 days.

The numbers of 3CMS inmates at the five institutions at the time of the review ranged from zero at CCC to 27 at ISP.  Over the course of the review period, Calipatria, CCC,

Centinela, and CVSP transferred 201 3CMS inmates, all of whom moved within 90 days.  ISP did not provide transfer information for 3CMS inmates.

All six 3CMS inmates mistakenly transferred to Centinela left within 30 days, as did three of four 3CMS inmates mistakenly sent to ISP.  Calipatria erroneously received 42 MHSDS inmates during the reporting period, but none of the 3CMS inmates among them were transferred within 30 days.  The three MHSDS inmates mistakenly transferred to CCC stayed an average of 17 days.  CVSP did not receive any MHSDS inmates during the reporting period.

For inmates pending transfer to an MHCB, CCC, Calipatria, CVSP, and ISP used OHUs and Centinela used a CTC.  No inmates were admitted to the OHU at CCC for mental health reasons.  At Calipatria, of the 17 inmates placed in the OHU for mental health reasons, 16 were transferred to an outside MHCB unit.  Twelve of 17 OHU stays did not exceed 72 hours, for a compliance rate of 71 percent.  There were 28 mental health admissions to Centinela's CTC.  Of these, 23 of resulted in transfers to outside MHCB units, but compliance with the 24-hour timeframe for MHCB transfers was not reported.  CVSP placed four inmates in its OHU for mental health reasons.  All were transferred to an MHCB unit, and none stayed in the OHU longer than 72 hours.  CVSP did not report on compliance with the 24-hour timeframe for MHCB transfers.  ISP provided conflicting information regarding the number of OHU placements and MHCB transfers.  Depending on the source of information, 17 to 30 inmates were placed in the OHU and then sent to an MHCB unit, but again, compliance with the 24-hour timeframe for MHCB transfers was not reported.

CCC, Calipatria, Centinela, and CVSP reported responding to all emergent, urgent, and routine mental health referrals within required timeframes.  ISP did not provide compliance data for mental health referrals.

# APPENDIX B

## INSTITUTIONAL SUMMARIES

### California State Prison/Sacramento (CSP/Sac)
Hybrid Paper Review

Census:

As of July 10, 2012, the total inmate population at CSP/Sac was 2,693, for a decrease by 95 inmates since the twenty-third monitoring round.  The MHSDS census remained essentially unchanged at 1,537 inmates, as did the EOP mainline census at 374 and the 3CMS population at 717.  Twenty-four inmates were in MHCBs.  The SHU program housed 93 inmates, including 20 inmates at the 3CMS level of care.  The PSU census declined marginally from 235 inmates to 224 inmates.  There were 56 EOP inmates and 121 3CMS inmates among the total administrative segregation population of 291.

Staffing:

The chief psychiatrist position was filled.  The number of senior psychiatrist positions was reduced from two to one, which was filled.  CSP/Sac reported that it had one chief psychologist position and an additional FTE chief psychologist position, both of which were filled.  The two senior psychologist specialist positions and two of the eight senior psychologist positions were filled.  The supervising social worker position was filled.

Of the 20.5 established staff psychiatrist positions, 12.75 positions were filled.  With 4.8 vacancies covered by registry staff, the functional vacancy rate in psychiatry was 14 percent.  The number of staff psychologist positions increased from 47.74 to 50 during the reporting period.  Registry staff covered 9.27 of the 15.25 vacant positions, for a functional vacancy rate of 12 percent in psychology.

Nineteen of the 25.33 established clinical social worker positions were filled. With use of registry staff, the functional vacancy rate was reduced to 16 percent in social work.

All seven senior psych tech positions and all but 1.39 of the 73.4 psych tech positions were filled.  The number of recreational therapist positions decreased from 16.04 to 13.54, with only a .74 vacancy which was covered by registry staff.

The health program specialist and the office services supervisor positions were filled.  However, positions for the health records tech, two office assistants, and eight of the 22 office techs were vacant.

Quality Management:

The institution's local governing body met at least quarterly and maintained minutes.  Previously-noted problems with attaining a quorum were resolved.

During the reporting period, the quality management committee met six times and maintained meaningful minutes.

The mental health subcommittee was chaired by the chief of mental health or designee.  It was scheduled to meet weekly and met 24 times during the reporting period. Matters that were taken up included review of data on compliance with Program Guide requirements, chartering of QITs, and reports from QITs, FITs, and the quality management committee.

QITs that were active during the reporting period dealt with MHTS.net, documentation related to group therapy, quality management for use of Clozapine, inmate access to psychiatry in the EOP, and disease management guidelines for psychiatry.  QITs that were resolved during the review period dealt with improvement of group therapy conducted in the evening, management of inmate misconduct in alternative housing, flow of documents from

nursing to mental health, five-day clinical follow-up, clinician back-up systems, management of staffing shortages in psychiatry, and DSH clinical review panel.  Final recommendations from these resolved QITs were submitted.

Peer review was implemented for psychiatrists, psychologists, and social workers. Psychiatry peer review was conducted quarterly and primary clinician peer review was conducted twice per year.  During the monitoring period, 23 clinicians were reviewed.

Suicide Prevention:

There were no suicides at CSP/Sac during the reporting period.

Six monthly SPRFIT meetings were held during the reporting period.  In addition, the SPRFIT met on five occasions to discuss and review incidents of self-harm.  Minutes provided an appropriate summary of the content of these meetings.

The ERRC met during December 2011, February 2012, and April 2012. Appropriate minutes were kept.  Monthly emergency response drills were completed in administrative segregation.  CPR training and refresher training continued.

The institution reported a 97-percent compliance rate for completion of five-day clinical follow-ups, and compliance with completion of custody wellness checks.

In administrative segregation, daily morning meetings between custody and clinical staff in administrative segregation were documented only 69 percent of the time. However, problems regarding documentation of the meeting had been identified by the institution, and at the time of reporting, conduct and documentation of the morning meetings had been re-instituted.

CSP/Sac reported a compliance rate of 97 percent for completion of administrative segregation pre-placement screens, but it did not provide data regarding whether

they occurred in confidential settings.  The institution was 100-percent compliant with completion of 31-item screens within 72 hours of placement in administrative segregation.

CSP/Sac had designated intake cells for new arrivals in administrative segregation.

Conduct of 30-minute welfare checks was reportedly compliant, but the provided data did not reflect appropriate staggering of the checks.   Documented daily psych tech rounds were compliant.

CSP/Sac did not report on whether ten hours of yard time per week was offered.

Medication Management:

CSP/Sac was scheduled to begin implementation of the MAPIP audit tool during September 2012.  During the review period, the institution experienced a number of problems related to medication management.

Institutional audits indicated that 97 percent of incoming inmates received their medications timely after arrival at the institution.  Following intra-institutional transfers, the compliance rate for continuity of medications was 99 percent, according to audit results. Continuity of medications following discharges from the MHCB was not audited.

Medication orders were written for a maximum of 90 days for 3CMS and EOP inmates, and for a maximum of 30 days for inmates in the MHCB.  Orders for Clozapine were limited to seven days.  Medications were renewed or discontinued before expiration in 88 percent of cases.  Bridge orders were utilized and were written for a maximum length of 14 days.

Audits of MARs for completeness, legibility, and timeliness of filing into charts indicated that 91 percent of the MARs written from December 1, 2011 to April 30, 2012 were compliant.

Response to cases of medication noncompliance was compliant in only 75 percent of cases, and in cases of noncompliance with Keyhea medications it was only 52 percent. Nursing staff received training to improve performance in this area.

Pill lines were not audited.

Laboratory testing of blood levels of inmates taking psychotropic medications was compliant in 71 percent of cases, but for those taking Clozapine, it was 96-percent compliant. Response to abnormal test results was compliant in only 50 percent of cases. Corrective action was implemented.

All inmates in the MHCB, CTC, OHU, alternative housing, EOP, PSU, or on Keyhea orders, as well as those with histories of cheeking, hoarding, or other medication noncompliance, received their medications by DOT. Monthly audits indicated compliance with DOT protocols. Three RVRs were written for hoarding or cheeking of medications.

At the end of May 2012, HS medications were prescribed for 200 MHSDS inmates. This area was not audited for compliance.

At the time of the monitor's visit, there were 387 inmates on active Keyhea orders at CSP/Sac. During the review period, 270 Keyhea orders were renewed, and 31 petitions were initiated. On May 31, 2012, there were 29 Keyhea petitions pending. Four Keyhea orders were denied and one petition was rescinded. Nine inmates left CSP/Sac before their Keyhea hearings. The central review process reportedly did not affect any petitions during the reporting period.

A monthly audit of inmates who paroled from CSP/Sac while on prescribed medications found that 97 percent left the institution with a 30-day supply of their medications.

Transfers:

CSP/Sac continued to have a full-time DSH coordinator who was responsible for monitoring documentation of non-referrals to DSH. The number of DSH referrals increased over the preceding year. Form 7388B was utilized during IDTT meetings, and data on numbers of MHCB admissions, RVRs, and participation in less than half of offered therapeutic activities was available. During the reporting period, 1,151 inmates met one or more indicators for consideration of referral to DSH. Of those, only eight percent were referred to DSH. A sample of 25 cases of non-referral revealed that all had a documented clinically-based rationale for the non-referral on the Form 7388B, and 83 percent had documented clinical interventions to improve the inmate's level of functioning.

Eighty-seven EOP inmates were referred to DSH programs, including 45 to acute care and 42 to intermediate care. CSP/Sac improved its timeliness of completion of referral packets for both acute care and intermediate care, but it was still noncompliant with timeframes. During the reporting period, 62 percent of acute care referrals were completed within two working days and posted on SharePoint, and 74 percent of intermediate care referrals were completed within five working days. There were no rejections from either acute care or intermediate care. Twenty-two percent of acute care and 12 percent of intermediate care referrals were rescinded.

Ninety-nine inmates returned to CSP/Sac from DSH during the reporting period. Discharge summaries were received with 100 percent of the returning inmates. Clinician-to-clinician contacts were completed within five working days of the inmate's return to CSP/Sac in 97 percent of cases. The institution was 95-percent compliant with completion of five-day clinical follow-up for returned inmates.

Management staff reported that data regarding MHCB admissions improved significantly during the reporting period, due to assistance from headquarters, staff attendance at weekly webinars, and completion of a QIT to address problems with MHTS.net.  CSP/Sac continued to operate two licensed MHCB units and one unlicensed MHCB.  There were a total of 46 MHCBs at CSP/Sac, including the 26 licensed MHCBs and 20 unlicensed MHCBs.  Of the licensed beds, 15 were in CTC I and 11 were in CTC II.  The 20 unlicensed MHCBs were in the B1 housing unit.  During the reporting period, up to five beds in CTC I were occupied by medical patients.  The institution used up to two beds in both CTC I and CTC II from time to time for medical patients.

There were 503 MHCB admissions during the reporting period, including 459 local MHCB admissions and 44 that were transferred to outside MHCB units.  The average length of stay was 15.2 days, with a range of zero to 112 days.  For inmates not on the DSH wait list, the average length of stay was 12.2 days.  There were 262 admissions or 55 percent of stays which exceeded ten days during the review period.

Other Areas:

Administrative Segregation EOP

The institution had a number of problems meeting Program Guide requirements for EOP inmates in administrative segregation.  Provided information on treatment of EOP inmates housed in administrative segregation indicated that only 80 percent of initial IDTT meetings were timely and 91 percent of follow-up IDTT meetings were timely.  Necessary participants were present.

The institution reported that inmates were seen timely by psychiatry during the monitoring period.  Thirty-one percent of psychiatry contacts occurred at cell front.  Primary

clinicians' caseloads ranged from five to ten inmates.  Although EOP inmates were reportedly seen timely by their primary clinicians, only 56 percent of these contacts occurred in a confidential setting.  Twenty-nine percent of primary clinician contacts occurred at cell-front. Twenty-three percent of all non-confidential settings for contacts with the psychiatrist and the primary clinician were attributed to inmate refusals.

EOP inmates were offered only an average of 8.66 hours of structured therapeutic activities per week in administrative segregation. Only 48 percent of EOP inmates were offered at least ten hours of structured therapeutic activities per week.  On average, EOP inmates in administrative segregation refused 4.29 hours, and received 4.37 hours.  An average of 2.47 hours of therapy was cancelled per week.  Inmates refusing at least 50 percent of group therapy were reportedly seen by the primary clinician daily during the work week.  Access to ten hours or more of yard time in administrative segregation improved, but remained problematic during the monitoring period, with approximately half of institutions compliant in this area.

During the reporting period, approximately 35 percent of inmates housed in administrative segregation had stays lasting longer than 90 days.  Each month, CSP/Sac conducted a 30-day custody review for all EOP inmates housed in administrative segregation longer than 90 days.  Minutes were not maintained, but a monthly report was generated for each meeting.

MHCB

Inmates admitted to the MHCBs reportedly received timely histories and physical examinations.  They were also evaluated by a recreational therapist within 72 hours of admission.  The institution reported compliance with timely initial and follow-up IDTT meetings that were attended by the necessary disciplines.  Inmates received daily contacts with the

psychiatrist or the psychologist.  Recreational therapy was provided to inmates housed in the MHCBs, including the unlicensed MHCBs.

Installation of suicide-resistant beds in 24 of the 26 licensed MHCBs, and all 20 of the unlicensed MHCBs was scheduled for July 9 to July 23, 2012.

The institution reported that it had implemented the headquarters' directive regarding the use of mechanical restraints in the MHCB.  Custody supervisory staff reported that general population inmates were routinely uncuffed when out of cell after a period of observation and stabilization in the licensed MHCB units.  A review by the monitor of the restraint and seclusion log plus the records of most of the inmates placed in restraints or seclusion indicated that in CTC I there was no use of restraints and one instance of seclusion that lasted 18.3 hours during the monitoring period.  In CTC II, there were three instances of use of restraints averaging 73 hours, and one instance of seclusion that lasted for 22.15 hours.  The monitor's expert determined that these placements and durations of restraint and seclusion were clinically appropriate.

In the unlicensed MHCB, the previously-reported treatment and physical plant issues persisted.  Admission remained restricted to inmates without medical conditions, mobility concerns, or vulnerability to heat and cold, as the unit lacked adequate temperature regulation.  All inmates remained cuffed when out of cell in the unlicensed unit due to physical plant issues including stairs and the close proximity of staff workspace to the interview modules.

Inmates requiring restraints or seclusion and those inmates being monitored in the OHU were accorded priority for admission to one of the licensed MHCB units.  Referrals to licensed MHCBs were coordinated by a triage team who evaluated inmates housed in alternative

housing daily, received referrals from primary clinicians regarding crisis care, and helped facilitate transfers to MHCBs.

OHU

CSP/Sac had 20 OHU beds at the time of the monitor's visit.  When an MHCB was unavailable, inmates in mental health crisis were placed into available medical OHU beds or into alternative housing.  Provided information indicated that there were 207 placements in the OHU, including 98 that resulted in admission to an MHCB.  The average length of stay in the OHU was 1.88 days, with a range of 0.5 to 4.5 days.  All of the inmates with stays greater than 72 hours were awaiting a bed in the MHCB.  Inmates who were placed into the OHU or alternative housing for mental health reasons were seen daily by a clinician who evaluated the need for continued suicide precautions, movement into the MHCB, or discharge from the OHU.

Alternative Housing

During the reporting period, 515 inmates were placed into alternative housing while awaiting a MHCB.  Of those, 171 were transferred to an MHCB.  The average length of stay was 1.9, with a range of zero to 3.24 days.  Those whose stays exceeded 72 hours were pending MHCB admission.

Inmates were housed, by order of preference, as follows: the OHU, two ZZ cells in A facility, two ZZ cells in B facility, two ZZ cells in C facility, two contraband cells in B facility, and two contraband cells in the C facility.  Contraband cells did not have a toilet and sink and were utilized when all of the other cells noted above were filled.  If all of these areas were occupied, regular cells on housing blocks were utilized as a last resort.  Mental health supervisory staff reported that regular cells on housing blocks were not utilized during the reporting period.

CSP/Sac had in place a crisis triage team who monitored and managed the alternative housing placements, including movements between the MHCBs, the unlicensed MHCB, the OHU, and all alternative housing locations. This approach provided a comprehensive process for managing the complex process of making placements into alternative housing and ultimate placements into MHCBs, when appropriate.

SHU

Institutional audits indicated compliance with provision of timely initial and follow-up IDTT meetings in the SHU. Attendance rates at IDTT meetings were, by discipline, 75 percent by psychiatry and 100 percent by primary clinicians and CC Is.

The one primary clinician covering the SHU had a caseload of 12 inmates, as of the end of the reporting period. Audits indicated compliance with quarterly psychiatric and monthly primary clinician contacts. The institution reported that space for groups was lacking and that no group therapy was provided for 3CMS inmates housed in the SHU. Weekly psych tech rounds were conducted 95 percent of the time;

PSU

The institution reported near compliance with provision of timely initial IDTT meetings. Follow-up IDTT meetings were reported to be timely. Meetings were attended by necessary disciplines except psychiatry.

Audits indicated compliance with weekly primary clinician contacts. Caseloads for PSU clinicians ranged from 12 to 20 inmates.

On average, inmates in the PSU were scheduled for 9.94 hours per week of structured therapeutic activity, but were offered only 7.91 hours. Only 28.5 percent of PSU inmates were offered ten hours of group therapy per week. Inmates refused on average 2.66

hours and received 5.25 hours.  An average of 2.03 hours of therapy per week was cancelled. Twenty-four inmates in the PSU were placed on modified programming that included less than ten hours of group per week.

EOP

Institutional audits indicated a compliance rate of 87 percent for provision of timely IDTT meetings for EOP inmates.  Meetings were attended by the psychiatrist and the primary clinician, but no information was provided regarding the presence of the CC I. Treatment plans were updated timely.

MHTS.net data indicated that 65 percent of initial psychiatric contacts were timely, and 82 percent of ongoing psychiatric contacts were timely.

Primary clinicians' caseloads ranged from 20 to 30 inmates.  Weekly primary clinician contacts were provided, but in a confidential setting only 71 percent of the time.

According to MHTS.net data, only 51 percent of EOP inmates were offered ten hours of structured therapeutic activity per week.  No EOP mainline inmates were placed on modified programming.

3CMS

Institutional audits indicated a compliance rate of only 74 percent for timeliness of initial IDTT meetings.  Follow-up IDTT meetings were provided timely, according to MHTS.net data.  Attendance rates were 69 percent for psychiatrists and 100 percent for primary clinicians.  No information was provided regarding participation by CC Is.

Initial contacts with the psychiatrist were timely in 85 percent of cases, and follow-up contacts with the psychiatrist were compliant.  Initial contacts with the primary

clinician were timely in only 54 percent of cases. Ongoing primary clinician contacts were compliant but occurred in confidential settings in only 46 percent of cases.

3CMS inmates housed in A facility were offered group therapy. However, for the 454 3CMS inmates housed in C facility, group therapy had been suspended as the result of a lockdown due to a facility-wide riot in December 2011.

### 3CMS Inmates in Administrative Segregation

3CMS inmates housed in administrative segregation received timely initial IDTT meetings. The institution reported that IDTT meetings were attended by all required disciplines except psychiatry.

Audits indicated that ongoing contacts with the psychiatrist and the primary clinician were timely. However, 32 percent of psychiatric contacts and 63 percent of primary clinician contacts were conducted at cell-front. Inmate refusal was the predominant explanation that was provided. Primary clinicians' caseloads ranged from 27 to 40 inmates.

### Referrals

During the monitoring period, CSP/Sac processed 1,134 referrals. Data indicated that 98 percent of emergent referrals were seen within the same day, 100 percent of urgent referrals were seen within 24 hours, and 75 percent of routine referrals were seen timely.

### RVRs

Of the total 1,490 RVRs issued during the reporting period, 430 were to mainline inmates, 60 were to inmates in the MHCB, 549 were to EOP inmates, and 462 were to 3CMS inmates. Approximately 800 mental health assessments were completed during the review period. All of the MHCB and EOP inmates, and any inmates involved in Division A, B, or C

offenses, and any inmates who received RVRs that could potentially result in a SHU term, received mental health assessments.

## Folsom State Prison (Folsom)
Hybrid Paper Review

Census:

   As of July 9, 2012, Folsom's total population was 2,911, down by 15 percent since the monitor's preceding visit during the twenty-third round.  The MHSDS population was also down since that time, by 16 percent.  There were five inmates in the EOP mainline and 581 inmates in 3CMS mainline population.

   The administrative segregation population of 154 included one EOP inmate pending transfer to a hub institution and 39 3CMS inmates.  The institution was scheduled to change from a Level II and III men's institution to a Level II men's institution

Staffing:

   The chief of mental health position, two senior psychologist positions, and the senior psych tech position were filled.

   Of the three staff psychiatrist positions, two were filled and one was covered by a contractor, resulting in full coverage in psychiatry.  Of the 6.5 staff psychologist positions, six were filled, for a vacancy rate of eight percent.

   Two of three social worker positions were filled, leaving a 33-percent vacancy rate.  Of the six psych tech positions, five were filled resulting in a 17-percent vacancy rate.  The recreational therapist position and the health program specialist I were vacant.

   Of the 4.5 clerical positions, two were filled, resulting in a vacancy rate of 56 percent.

Quality Management:

The quality management committee met monthly during the six-month reporting period, with a quorum attained for all meetings.  The mental health subcommittee also met monthly, with a quorum at five of the six meetings.  Detailed minutes indicated that it covered the MHCB, the EOP and 3CMS programs, mental health staffing, SPRFIT, medication management, peer review, QITs, audits, and staff training.  Results of the meetings were provided to line staff at their meetings.

There were two ongoing QITs, on MHTS.net data review and administrative segregation pre-placement screening.  The institution's management report stated that no QITs were initiated or resolved during the reporting period, although mental health subcommittee minutes referenced additional but unspecified ongoing QITs.

Folsom reported that psychiatry peer review met monthly, with the participation of the two full-time psychiatrists at the institution.  After each meeting, they were briefed and instructed on any deficits found in their work.  Peer review for primary clinicians was specialized between mainline and administrative segregation.  Administrative segregation primary clinicians had monthly peer reviews.  Folsom's management report stated that mainline primary clinicians had weekly peer reviews, but proof-of-practice documentation indicated that it occurred monthly.

Suicide Prevention:

There were two completed suicides during the reporting period.

The SPRFIT met monthly and maintained minutes during the reporting period, but it did not attain a quorum at any of the meetings.  The team took up review of MHCB admissions for suicidal ideation, review of inmates admitted to the MHCB within the preceding

30 days and had three or more MHCB admissions during the preceding six-month period, custody and clinical issues regarding high-risk inmates, and completed suicides.

The ERRC met regularly during the reporting period.  Sign-in sheets rather than minutes were provided for review.  Emergency response drills were conducted monthly, with documentation provided to the monitor.

Folsom reported 100-percent compliance with five-day clinical follow-up.  This was confirmed upon the monitor's review of the log and accompanying proof-of-practice documentation.  The chief of mental health indicated that training on five-day clinical follow-up was ongoing.  Minutes from a January 2012 training session were provided.

The institution provided raw data on custody observation and suicide watch for the monitor's review.  It did not appear that this area was being audited.

In administrative segregation, daily morning meetings between custody and mental health staff were ongoing and documented 80 percent of the time.

The institution was 87-percent compliant with timely pre-placement screening. MHTS.net reports indicated a compliance rate of 51 percent for administration of the 31-question screen within 72 hours of placement in administrative segregation.  However, institutional audits indicated that the compliance rate was actually 100 percent.  The significant discrepancy between these measures was reportedly the result of failure to forward the 72-hour placement chronos to mental health for entry into MHTS.net.

Eight designated intake cells were located on the first tier of the administrative segregation unit.  When these were filled, new intakes were housed within the 36 non-designated cells on the first tier.

The institution reported a compliance rate of 75 percent for 30-minute welfare checks, and a compliance rate of 100 percent for daily psych tech rounds during the reporting period.

Medication Management:

Folsom implemented MAPIP during July 2012.  Newly-arriving inmates, and inmates moved within the institution, received their medications timely.

Timeliness of renewals was not audited.  Psychotropic medication orders were no longer than 90 days, and bridge orders were no longer than 30 days.  Any orders written without benefit of the medical record were no longer than 72 hours.

MARs were not consistently audited during the review period.  There was an average of 22 notifications of medication non-compliance per week during the review period.  Audits indicated that mental health follow-up on instances of noncompliance was timely.

Audits of pill lines indicated that wait times were eight minutes or less in mainline housing units and in administrative segregation.

Audits found that timely informed consent forms for psychotropic medications were present in eUHRs in 74 percent of cases.  In-service training was provided to improve compliance in this area.

The institution provided audits results regarding laboratory studies for blood levels of mood stabilizing and atypical antipsychotic medications.  They indicated that appropriate clinically-indicated studies were obtained 82 percent of the time.  Among the cases in which abnormal results were found, the compliance rate for appropriate follow-up was 83 percent.

Approximately 47 percent of the MHSDS population at Folsom was prescribed psychotropic medications.  Thirty-five percent of them received their psychotropic medications by DOT.  Supervisory audits indicated that DOT procedures were performed correctly in 78 to 100 percent of cases.

There were no inmates on Keyhea orders during the monitoring period.

At the end of the reporting period, there were 158 MHSDS inmates on HS medications, but there were no audits of timeliness of administration of these medications.

Parole medication audits found that 87 percent of paroling inmates on medications signed receipts for a 30-day supply of their medications.

Transfers:

There were no inmates referred to DSH during the reporting period.

Folsom does not have a MHCB unit.  Of the 35 referrals to an MHCB during the reporting period, 16 transferred.  Data on transfer timelines and lengths of stay was not provided.

Folsom utilized alternative housing for inmates awaiting MHCB placements. Alternative housing consisted of the first eight cells on the first floor of the administrative segregation unit.  These cells had been modified with smaller vent grates.  Inmates waiting in these cells for MHCB placement were placed on constant watch, as the interiors of these cells were difficult to observe when they were not illuminated.

No inmates were referred to a PSU during the reporting period.

According to the management report and proof-of-practice documents, 18 inmates were referred to an EOP program during the reporting period.  All but two transferred within 60 days.  One inmate was referred to an EOP hub and was sent to an MHCB after waiting for 68 days.

Other Areas:

Administrative Segregation

Staffing of the administrative segregation unit consisted of two full-time primary clinicians, 0.5 staff psychiatrists, and six psych techs.  One of the psych tech positions was vacant.  Audits indicated compliance with monthly psychiatrist contacts, weekly primary contacts, and initial and ongoing IDTT meetings.  These audits also indicated that required participants attended IDTT meetings.

Individual contacts were offered in private offices, with inmates placed into therapeutic modules during sessions, affording both auditory and visual privacy.  However, because only 65 percent of individual contacts occurred in these confidential settings, a QIT was chartered to address why the proportion of cell-front contacts had increased from seven percent during December 2011 to 35 percent during the review period.  The QIT made recommendations and corrective action was implemented.

Due to physical plant and space limitations, group therapy was not available for 3CMS inmates housed on the unit.

3CMS

Institutional audits indicated compliance with timely initial and ongoing psychiatric contacts for 3CMS inmates.

Initial and follow-up IDTT meetings were timely, with over 90 percent of IDTT meetings attended by the necessary disciplines.

The mainline 3CMS program had six primary clinicians.  Their caseloads ranged from 60 to 140 inmates, or an average of 97.  Audits found a compliance rate of 87 percent for timely initial primary clinician contacts.  Ongoing primary clinician contacts were compliant.

Sixty-five percent of primary clinician contacts occurred in a confidential setting.  Non-confidentiality of contact settings was attributed to inmate refusals and clinician unavailability.

Fourteen therapeutic groups per week were offered to inmates.  These groups were facilitated by psychologists and social workers and covered a range of topics.

Pre-release needs assessments by the TCMP had been discontinued.  The institution reported that of the 101 3CMS inmates who paroled during the review period, only 23 percent received parole planning services.

Referrals

According to proof-of-practice documents, of the seven emergent referrals during the reporting period, five or 71 percent received a response within four hours.  Eighty-six urgent referrals were generated during the reporting period, of which 48 or 56 percent received a response within 24 hours.  The chief of mental health initiated monthly training on mental health referrals to address these low compliance rates.

Of the 819 routine referrals generated during the reporting period, 778 referrals or 95 percent received a response within five days.

Heat Plan

The heat plan was in effect for two months during the reporting period.  Indoor and outdoor temperatures were generally properly documented, but there were instances when outdoor temperatures were not logged every hour as required.  A weekly list of inmates on heat risk medications was provided to the housing units.  Monthly heat plan summary reports were submitted to headquarters, as required.  No heat-related incidents or illnesses occurred during the reporting period.

RVRs

According to proof-of-practice documents, 289 of the total 1,185 RVRs were issued to MHSDS inmates.  These included one RVR issued to an EOP inmate and 288 RVRs issued to 3CMS inmates.  Fifty-three of the 3CMS inmates received mental health evaluations.  In cases of self-injurious or suicidal behaviors, inmates were evaluated for manipulative behavior before any RVR was issued.

### Pelican Bay State Prison (PBSP)
August 27, 2012 – August 29, 2012

Census:

The institution reported that on August 24, 2012, it housed 3,140 inmates, for a two-percent decrease in population since the monitor's preceding visit during the twenty-third round.  The mental health caseload population declined by two percent, to 456 inmates.  There were 63 mainline EOP and 143 mainline 3CMS inmates.  The PSU housed 120 inmates.  The SHU population of 1,125 included six 3CMS inmates.  Among the 360 inmates in administrative segregation were two EOP inmates pending transfer to a hub and 114 3CMS inmates.  There were three inmates in the MHCB.

Staffing:

Of 102.65 allocated mental health positions, 79.15 were filled, for an overall vacancy rate of 23 percent in mental health.  Contractual coverage of an additional ten positions reduced the functional vacancy rate to 13 percent.

Positions for the chief psychiatrist, one of two chief psychologists, four senior psychologists, and all three senior psych techs were all filled.

Only two of 7.5 staff psychiatrist positions were filled.  Contractors covered an additional three FTE positions, reducing the functional vacancy rate in staff psychiatry to 33 percent.

Of 26 staff psychologist positions, 17.5 were filled.  Contractors covered four vacancies, reducing the staff psychologist functional vacancy rate to 17 percent.  Six of nine social worker positions were filled.  A contractor covered one vacant social worker position, which lowered the functional vacancy rate in social work to 22 percent.

Positions for 29 of the 31.5 psych techs were filled.  Coverage of two vacancies by contractors reduced the functional vacancy rate to near zero.

Of 3.65 recreational therapist positions, 2.65 were filled.  Positions for the health program specialist I and seven of the nine mental health clerical positions were filled.

Psychiatry telemedicine services were not utilized during the reporting period.

 Quality Management:

PBSP had a robust quality management program.  The local governing body was chaired by the institution's CEO.  It met twice and achieved a quorum regularly.

The quality management committee was also chaired by the CEO.  It met 24 times, with detailed minutes, and a quorum present at all meetings.  It regularly collected reports from up to 27 service delivery areas.

The mental health subcommittee was chaired by the chief of mental health.  It met 12 times and always achieved a quorum.  The mental health subcommittee routinely reviewed audits and compliance reports, new policies and procedures, mental health staff shortages, QITs, training activities, and peer review.  Documentation detailed extensive interaction with the quality management committee.

There were five QITs, three of which were chartered during the review period.  These addressed five-day clinical follow-up, establishment of procedures for the accurate entry

of scheduling information into both MHTS.net and MPIMS, and development of a local operating procedure as to eUHR reliability.

Peer review was active.  Psychiatry peer review met monthly.  It addressed eUHR entries, non-formulary antipsychotics, and audit processes for psychiatric medications. Psychology peer review met five times, addressing continuity of care, SRE training, and treatment plans.  Monthly social work peer review addressed cell-front contacts, modified treatment plans, inmate refusals, and completion of Form 7388B.

Suicide Prevention:

There were no completed suicides at PBSP during the review period.

The SPRFIT met monthly, maintained extensive meeting minutes, and always achieved a quorum.  SPRFIT agenda items included five-day clinical follow-up, self-injuries, 30-minute welfare checks, cheeking or hoarding of medications, and difficult clinical cases. Reviews of 30 instances of self-harm were presented to the SPRFIT for discussion.  Suicide prevention training at the institution included the proctor/mentor training program on SRE administration and conferencing of high-risk cases.

The ERRC met monthly.  It reviewed responses to medical emergencies and monitored emergency medical response drills.  The institution provided training on basic life support, including CPR, to all medical staff.

Compliance rates for five-day clinical follow up were 100 percent and 99 percent following returns from DSH and discharges from the MHCB, respectively.  For custody wellness checks after discharges from the MHCB, the compliance rate was 97 percent.

In administrative segregation, daily morning meetings between custody and mental health staff were documented 97 percent of the time.

PBSP reported a 93-percent compliance rate for completion of pre-placement screens.  Audits indicated a compliance rate of 99 percent for completion of the 31-item screen.

Thirty-minute welfare checks were performed for all inmates housed in administrative segregation during their entire stays, but typically they were not staggered. Audits indicated 100-percent compliance for daily psych tech rounds.

Cells in administrative segregation were equipped with electrical outlets.

Custody staff reported that inmates received ten hours of yard time per week, but this could not be confirmed by review of 114Ds.  Inmates reported receiving two episodes of yard time, or an average total of five to six hours per week.

Medication Management:

Staff had just recently received MAPIP training as of the time of the monitor's visit.   Non-MAPIP audits found compliance rates of 90 percent or higher for medication continuity following both new arrivals and intra-institutional transfers, and for medication renewal orders.  An audit of follow-up on cases of medication noncompliance found a compliance rate of 96 percent for documented appointments within four working days of referral.

PBSP typically did not use pill lines, and when it did, wait times were minimal.

An audit found that up-to-date informed consent forms were present in the eUHRs of inmates on psychotropic medications.

The institution was compliant with ordering of clinically-indicated laboratory testing of blood levels of inmates on psychotropic medications.  AIMS testing was completed in 83 percent of cases where indicated.

Protocols for DOT medication administration were followed.

At the time of the site visit, there were 73 inmates on Keyhea orders.  Over the course of the review period, nine Keyhea orders were initiated, 62 were renewed, 15 were allowed to expire, and six were denied.

According to audit results, HS medications were properly administered after 8:00 p.m.

Paroling inmates were properly supplied with a 30-day supply of their medications upon release.

Transfers:

Of the 202 inmates who had one or more indicators for consideration for referral to DSH, three were referred to acute care, with all three referral packages completed timely.  All three transferred to DSH within 72 hours of a bed assignment, but only one transfer was within ten days of referral.

Eighteen inmates were referred to intermediate care, with all but one of the referral packages completed timely.  All 18 transferred to DSH within 72 hours of a bed assignment, but only 11 transfers were within 30 days of referral.

Forty-two inmates returned from DSH during the review period.  The DSH coordinator was timely notified of the returns and received discharge summaries for all.

Review of the non-referral log indicated that rationales for non-referrals were generally appropriate, although some were vague.  Institutional audits of Form 7388Bs of non-referred inmates found that that 99 percent had a documented reason for non-referral, and that ten of 11, or 91 percent, indicated that referral to DSH referral was considered for inmates whose stays in the MHCB exceeded ten days.

PBSP had a ten-bed MHCB.  There were 172 MHCB referrals which involved 117 inmates.  Eight inmates had three or more MHCB admissions.  Of the 172 referrals, 146 resulted in admissions.  Stays averaged 7.2 days and ranged from zero to 38 days.  Eleven percent of MHCB stays exceeded ten days.  The average stay over ten days lasted 19 days.  The institution reported that all MHCB transfers took place within 24 hours of referral, but did not produce supporting documentation.

Thirteen inmates were placed in alternative housing, in either a CTC medical bed or the CTC mental health observation room.  Two of these inmates were on suicide watch or suicide precaution during their stays.  Stays ranged from 15 hours to approximately 6.5 days.

At any given time during the review period, two to ten EOP inmates were housed in administrative segregation pending transfer to a hub.  Stays lasted up to 64 days.

PBSP did not document PSU endorsements or transfer timelines, but reported that PSU transfers were routinely accomplished within several days of identification.

Other Areas:

MHSDS Inmates in Administrative Segregation

In administrative segregation, the institution piloted an enhanced care program for EOP and 3CMS inmates.  During the review period, 39 EOP and 90 3CMS inmates entered this program.  It included eight weekly therapeutic groups, each lasting two hours.

The compliance rates for completion of initial assessments, initial IDTT meetings, and follow-up IDTT meetings were 100 percent, 94 percent, and 93 percent, respectively.  IDTT meetings were nearly always attended by psychiatry, primary clinicians, and correctional counselors.

Ongoing contacts with the psychiatrist were compliant.  For weekly primary clinician contacts, the compliance rate was 100 percent, although only 51 percent of these were conducted in a confidential setting.  Daily psych tech rounds were documented 100 percent of the time.

MHCB

All inmates admitted to the MHCB during work hours were routinely administered a pre-admission screening.  Ninety-six percent of those admitted for suicidality received an SRE upon admission.

Audits indicated compliance rates of 99 percent and 100 percent for timeliness of initial and follow-up IDTT meetings, respectively.  Psychiatry and correctional counselors attended IDTT meetings 99 percent of the time, and primary clinicians attended 100 percent of the time.  Observed IDTT meetings had a full complement of staff.

Audits found a compliance rate of 99 percent for daily clinical contacts.  Staff indicated that all inmates were cuffed when escorted to these contacts, and that the handcuffs were removed following placement into a therapeutic module or holding cell, unless otherwise indicated for custodial reasons.

Inmates whose MHCB stays exceeded ten days were eligible for recreational activities and yard time.  Groups were not provided for inmates housed in the MHCB for mental health reasons, but were provided for mental health caseload inmates housed in the MHCB for an extended period due to medical reasons.  Staff reported that decisions as to whether inmates were allowed personal property and mattresses were individualized.

Data indicated significant reduction in the use of seclusion and restraints.  Twenty-three seclusion orders were issued; all related to three inmates.  There were three orders

for five-point restraints, all for one inmate, and three orders for four-point restraint, all for two inmates.  No applications of restraint exceeded 24 hours in duration.

Ninety-eight percent of inmates admitted for suicidality received an SRE upon discharge from the MHCB.

SHU

The SHU population ranged from 1,104 to 1,128, and included nine to 13 3CMS inmates over the course of the review period.  No 3CMS inmates paroled from the SHU.

All 3CMS inmates in the SHU received initial IDTT meetings within 14 days of arrival.  Follow-up IDTT meetings were compliant, with attendance by psychiatry, primary clinicians, and correctional counselors 100 percent of the time.  A record review of 20 IDTT meetings indicated that the inmates were invited to attend all of them.

3CMS inmates received weekly cell-front clinical contacts, and monthly out-of-cell clinical contacts.  Psychiatrists provided care on an as-needed basis.  There were no therapeutic groups in the SHU.

PSU

Eighty-three inmates were admitted to the PSU during the review period.  All were screened within required timeframes.  Ninety-three percent of admitted inmates had an initial mental health assessment prior to the initial IDTT meeting.  Compliance rates for attendance at IDTT meetings were 99 and 100 percent for initial and follow-up IDTT meetings, respectively.  There was 99-percent attendance by psychiatry at IDTT meetings, 100-percent attendance by the senior psychologist and primary clinician, and 97-percent attendance by correctional counselors.  The PSU captain attended all IDTT meetings.  Observed IDTT meetings were attended by a full complement of staff.  Clinical discussions and consideration of

DSH referral were appropriate.  Staff had access to necessary records and information concerning the inmates, who were appropriately engaged in the discussions.

Ninety-nine percent of psychiatric appointments occurred at least monthly.  All PSU inmates at least received weekly primary clinician contacts, of which 28 percent were conducted cell-front.

Inmates were offered a weekly average of 11.8 hours of structured out-of-cell therapeutic activity.  Forty-five groups were offered to PSU inmates.  An observed group was well-conducted and clinically meaningful.

EOP

Audits indicated that in 94 percent of cases, initial assessments were completed before the initial IDTT meeting.  IDTT attendance rates were 95 percent for psychiatry, 94 percent for correctional counselors, and 81 percent for inmates.  Observed IDTT meetings demonstrated appropriate case discussions and familiarity with individual patients.  A full complement of staff was in attendance.  Staff had access to the eUHRs, SOMS, and information on inmate participation in therapeutic activities, and utilized this information in discussions.  Staff reviewed indicators for consideration of referral to DSH and made an effort to ascertain that inmates understood their treatment plans and goals.

Psychiatry contacts were compliant.  There was 100-percent compliance for weekly primary clinician contacts.

EOP inmates were offered a combined weekly average of 11.8 hours of out-of-cell therapeutic activities, and individual clinical contacts.  Numerous therapeutic groups were offered.

Fourteen inmates were placed on modified treatment plans, which included monthly IDTT meetings.

3CMS

Among the 100 inmates entering the 3CMS program, six were removed from it within the first five days.  Audits indicated that of the remaining 94, 100 percent of newly arriving inmates received clinical intake assessments within ten working days of arrival and had initial IDTT meetings within 14 days of arrival.

Observed IDTT meetings had a full complement of staff, but the psychiatrist in attendance was not the treating physician.  Discussions were not sufficiently detailed with regard to the inmate's clinical condition or his treatment plan.  eUHRs were not sufficiently consulted. Staff had difficulty accessing relevant custody information.  The location of the meeting did not provide a confidential setting.

There was 98-percent compliance for timely psychiatry and primary clinician contacts.  Clinical groups were limited, with only 11 to 21 3CMS inmates enrolled in groups during the review period.  On a monthly basis, up to seven inmates were on group wait lists. Staff infrequently assessed inmate eligibility for group treatment.

Space for conduct of confidential contacts was sufficient.

Referrals

The total 1,021 referrals at PBSP during the review period included 339 of EOP inmates and 451 of 3CMS inmates.  There were 74 emergent, 192 urgent, and 755 routine referrals.  Compliance rates for timely response to these referrals were 100 percent for emergent referrals, 99 percent for urgent referrals, and 98 percent for routine referrals.

Medical Records/MHTS.net

Staff used both MHTS.net and MPIMS for scheduling purposes.  Records from MPIMS were being scanned into eUHRs.

Mental Health/Custody Relations

Mental health staff in both the PSU and administrative segregation indicated that relations between mental health and custody were good.

RVRs

Out of the total 1,163 RVRs issued during the review period, 259 were issued to EOP inmates, 98 were issued to 3CMS inmates, and the remaining 806 were issued to general population, SHU, or non-MHSDS inmates in administrative segregation.  Seven RVRs were related to cheeking or hoarding of medications.

The institution reported that mental health assessments were conducted for all of the EOP inmates, 75 of the 3CMS inmates, and two of the general population inmates.  It did not provide data as to whether all 3CMS inmates who received RVRs for Division A, B, or C offenses received mental health assessments.

**High Desert State Prison (HDSP)**
May 22, 2012 – May 24, 2012

Census:

HDSP reported that on May 21, 2012, it housed 3,762 inmates, for a 12-percent decrease in population since the preceding monitoring period.  The mental health caseload population declined by 17 percent, to 795 inmates.  There were ten EOP inmates and 662 3CMS inmates.  The MHCB unit housed nine inmates.

The administrative segregation population of 278 included three EOP inmates awaiting transfer to an EOP hub and 70 3CMS inmates.  The reception center population of 160,

which represented a 72-percent decline since the preceding monitoring period, included five EOP and 36 3CMS inmates.

Staffing:

Of 62 allocated mental health positions, 49 were filled, for an overall 21-percent institutional vacancy rate in mental health. Contractors provided an additional 4.5 FTE coverage, reducing the institutional mental health functional vacancy rate to 14 percent.

Positions for the senior psychiatrist, chief psychologist, and two senior psychologists were filled.

All five staff psychiatrist positions were vacant. Contractors provided an additional 3.5 FTE coverage, reducing the functional vacancy rate in staff psychiatry to 30 percent.

Twelve of 14 staff psychologist positions were filled. Contractors provided one additional FTE coverage, reducing the staff psychologist functional vacancy rate to seven percent. Four of seven social worker positions were filled, for a vacancy rate of 43 percent.

Positions for the senior psych tech, nine psych techs, and twelve registered nurses were filled. The sole recreational therapist and health program specialist I positions were filled. Five of eight mental health clerical positions were filled.

HDSP utilized a weekly average of 88 hours of psychiatry telemedicine, which was an increase from the average of 48 hours used weekly during the preceding review period.

Quality Management:

The local governing body was chaired by the institutional CEO. It met six times and always had a quorum. Mental health matters addressed by the local governing body

included personnel vacancies, *Coleman* audits, MHTS.net, psychiatry telemedicine, and the backlog with data entry.

The quality management committee was also chaired by the CEO, and also met six times and consistently achieved a quorum. Meeting minutes indicated that the committee addressed mental health personnel vacancies, QITs, and operating procedures for the heat plan and wellness checks.

The mental health subcommittee was chaired by the chief of mental health. It met six times, with a quorum at each meeting. The mental health subcommittee routinely addressed numerous mental health issues including personnel, telemedicine, MHCB admissions, *Coleman* audits, inmate appeals, audits of DSH referral and non-referral logs, QITs, medication management, and peer review.

There were nine QITs. The ones chartered since the preceding review period addressed delivery of mental health services at the institution, confidential treatment space, mental health clerical support staff responsibilities, data entry of administrative segregation pre-placement chronos and mental health referrals, and audits of psychotropic medications.

Peer review emphasized primary clinician cross-training. Eight training sections focused on various aspects of mental health services at the institution.

Suicide Prevention:

There were no completed suicides at HDSP during the reporting period.

The SPRFIT met monthly, maintained extensive meeting minutes, and consistently achieved a quorum. It routinely addressed suicide attempts, five-day clinical follow-up, MHCB admissions and discharges, DOT, EOP inmates in administrative segregation, and training issues. SPRFIT minutes were scanned and distributed to pertinent institutional staff.

The ERRC met ten times.  It reviewed responses to medical emergencies and monitored emergency medical response drills.  Custody officers reported that CPR refresher training was provided annually.  Custody staff routinely identified cut-down tools and personal protective equipment.  Officers in the units carried micro-shields.

HDSP reported a compliance rate of 98.5 percent for five-day clinical follow-up, although MHTS.net indicated a much lower compliance rate.

The institution reported that suicide risk evaluations were consistently administered during MHCB admission and release.  Random checks of records corroborated this. Inmates reported that newly-installed suicide-resistant beds were more comfortable than the mattresses used in most housing areas.

In administrative segregation, daily morning meetings between custody and clinical staff were documented 83 percent of the time.  The log documenting these meetings identified some of the issues which were addressed, including inmates' mental health status, five-day clinical follow-up, and new admissions.

HDSP reported a compliance rate of 91 percent for completion of pre-placement screens, as compared to the 44-percent compliance rate reported for the preceding review period. Audits indicated a 71-percent compliance rate for completion of 31-item screens.

Although new intake cells were retrofitted to be suicide-resistant, a custody officer had difficulty identifying them, and custody staff reported that inmates were placed in any available cell upon arrival and not in designated new intake cells.  Cells housing new arrivals were appropriately marked with door placards for three weeks.

Review of documentation of 30-minute welfare checks indicated that they were not routinely completed at staggered intervals.  Many began exactly on the hour or half-hour, or several minutes before or after the hour or half-hour.

Audits indicated a compliance rate of 99 percent for conduct of daily psych tech rounds.  Review of the isolation log indicated daily sign-ins by psych techs.  Observed rounds were adequately conducted and indicated good rapport between the psych tech and inmates.

Except for the suicide-resistant cells, administrative segregation cells were equipped with electrical outlets.  Review of 114Ds and interviews of inmates indicated that they had access to ten hours of weekly yard time.

Medication Management:

HDSP reported that of 209 newly-arriving inmates who were prescribed psychotropic medications, 82 percent received their medications by the end of the day following arrival.

Audits indicated that inmates transferring between housing areas generally received their prescribed medications without interruption 92 percent of the time, except following discharge from an MHCB, when medications were received without interruption only 82 percent of the time.  Interviewed 3CMS inmates reported good medication continuity.

HDSP reported no psychotropic medication lapses due to medication orders not being written, but it did not indicate the percentage of cases that required bridge orders.

The institution reported that 266 of 355, or 75 percent of, cases of psychotropic medication noncompliance resulted in documented follow-up with a psychiatrist within seven days of referral.  This was a decrease in compliance from the 99-percent rate of psychiatric follow-up during the preceding review period.  An average of 4.9 days elapsed between

notifications of medication noncompliance and follow-up.  Although audits indicated that 92 percent of medical records contained the previous month's MARs, only 62 percent contained complete and legible MARs.

Pill line wait times averaged two minutes on A, C, and D yards, and ten minutes on B yard.  Inmates reports were consistent with these wait times.

An audit found that up-to-date informed consent forms were present in only 26 percent of files for inmates who were prescribed psychotropic medications.  This was a marked decrease from the 67 percent reported during the preceding review period.

Laboratory tests were ordered for inmates on psychotropic medications in 25 of 28 cases in which the tests were clinically indicated.  However, psychiatrists reviewed the results and documented responses in only two of the nine cases that had "significant" laboratory results. An audit of AIMS testing found that an up-to-date AIMS test was present in only three of nine applicable cases.

Three of four Keyhea petitions were granted, and the fourth was dropped by the physician.

Data indicated that 290 inmates had orders for HS medications.  An audit of mental health caseload inmates indicated a compliance rate of 98 percent for administration of these medications after 8:00 p.m.  This result was consistent with inmate reports.

Thirty-three of 34, or 97 percent of, inmates who paroled with prescriptions for psychotropic medications were given a 30-day medication supply.  Of these inmates, 32 or 94 percent signed receipts for their parole medications.

Transfers:

At the time of the site visit, the duties of DSH coordinator were shared by a psychologist who was designated as the DSH coordinator and another psychologist who was assigned to the MHCB.  Both clinicians also maintained full-time clinical caseloads.

Four of the 20 inmates who had one or more indicators for consideration for inpatient care were referred to DSH.  Of these referrals, two were to acute care and two were to intermediate care.  All four referrals were timely.

Both acute care referrals resulted in transfers, with one of them timely.  One of the two intermediate care transfers was timely, and the other was rescinded.  Two of the three transfers to inpatient care occurred within 72 hours of a bed assignment.

The DSH referral log contained data omissions and inaccuracies, such as errors in the date of an intermediate care inmate transfer and in data as to whether a transfer was within 72 days of a bed assignment.  Review of the non-referral log indicated that most entries concerned referral to the MHCB and did not appear to document cases of EOP or 3CMS inmates who met one or more of the Form 7388B indicators but were not referred.  There were inconsistencies between MHTS.net reports and referral/non-referral log information.

Random checks of inmate files as to the DSH referral process indicated inadequate non-referral rationales and treatment plans, non-referred inmates who were not identified on the non-referral log, and contradictory Form 7388Bs.  Headquarters-based audits as to the adequacy of Form 7388B completion indicated that 50 percent were completed adequately.

Discussions with staff and the DSH coordinator indicated that reports identifying inmates who met one or more of the objective Form 7388B indicators for DSH referral consideration were typically not distributed during IDTT meetings.  Staff accessed such

information from the eUHR, self-generated MHTS.net reports, or the correctional counselor attending IDTT meetings.

No inmates returned from DSH during the reporting period.

HDSP had a 10-bed MHCB.  There was conflicting data as to MHCB referrals and admissions.  The institution reported that all 75 MHCB referrals were admitted.  Fifty-three admissions were from HDSP and the remaining 22 came from other institutions.  MHCB stays ranged from three to 33 days and averaged 5.8 days.  However, SPRFIT meeting minutes reported 84 MHCB admissions, of which 65 were from HDSP and the remaining 19 were from other institutions.  There was no use of alternative housing for crisis care placements.

HDSP was unable to report the number of EOP inmates who transferred to an EOP program and their transfer timelines.  During the site visit, ten SNY or mainline EOP inmates were awaiting transfer to an EOP program.  Seven were pending transfer for more than 60 days, with a range of 64 to 339 days.

Conflicting data indicated that nine or 14 EOP inmates were housed in administrative segregation during the review period.  Of these, nine stays exceeded 30 days, with a range of 44 to 166 days.  HDSP was unable to report the number of administrative segregation EOP inmates who transferred to EOP hubs and their transfer timelines.  Of the three EOP inmates in administrative segregation pending transfer to an EOP hub during the site visit, one was awaiting transfer for more than 30 days.  HDSP housed 255 3CMS inmates in administrative segregation during the reporting period.

HDSP was unable to report the number and lengths of stays of EOP and 3CMS inmates in reception center.  During the monitor's visit, five EOP inmates were awaiting transfer from the reception center.  Three had been pending transfer for more than 60 days, with a range

of 65 to 112 days.  There were also 37 3CMS inmates awaiting transfer.  Ten, or 27 percent, of their stays exceeded 90 days, with a range of 91 to 538 days.

One EOP inmate was referred to the PSU during the review period.  Seventy-four days elapsed between referral and transfer.

Other Areas:

Reception Center

The institution's reception center was reduced from three buildings to one.  The two former reception center buildings were converted to Level III mainline facilities.

Ninety-two percent of inmates were screened within 24 hours of arrival.  HDSP reported a 76-percent compliance rate for initial mental health screens for reception center inmates who had MHSDS histories.  The institution indicated 94-percent compliance for initial mental health evaluations.  Ninety-five percent of new arrivals requiring referral to a psychiatrist were seen within 24 hours.

For reception center EOP inmates who were prescribed psychotropic medications, the compliance rate for ongoing psychiatry contacts was 90 percent.  In its management report, the institution reported that all reception center EOP inmates were offered at least five weekly hours of out-of-cell therapeutic activity.  However, only two of 17 or 12 percent of reception center EOP inmates were offered and accepted more than five hours per week of out-of-cell structured therapeutic activity.  Five of the remaining 15 inmates were scheduled for five hours per week but they were offered less than that.  The remaining ten inmates were scheduled for less than five hours per week.  Staff reported that inmate refusals of group therapy hindered their ability to provide the five weekly hours.

All reception center 3CMS inmates who were prescribed psychotropic medications had ongoing contacts with the psychiatrist.  For primary clinician contacts, compliance rates were 76 and 94 percent for initial and follow-up contacts, respectively.  Eighty-three percent of primary clinician contacts were in confidential settings.

Therapeutic modules were arranged in a straight line and covered on their sides, hampering the effectiveness of group therapy.

<u>MHSDS Inmates in Administrative Segregation</u>

HDSP reported compliance rates of 50 and 87 percent for timeliness of initial IDTT meetings for EOP and 3CMS inmates, respectively.  Compliance rates for subsequent IDTT meetings were 91 percent for EOP inmates and 90 percent for 3CMS inmates.

Attendance rates at IDTT meetings for 3CMS inmates were 49 percent for psychiatry (though not necessarily by the treating psychiatrist), 100 percent for primary clinicians, and 33 percent for correctional counselors.  Inmates attended 90 percent of IDTT meetings.

The institution reported 100-percent compliance for initial psychiatry contacts for both EOP and 3CMS inmates.  Follow-up psychiatry contacts took place 66 percent of the time for EOP inmates and 97 percent of the time for 3CMS inmates.  Psychiatry saw all administrative segregation 3CMS inmates who were prescribed psychotropic medications at least quarterly.

There was a 67-percent compliance rate for initial primary clinician contacts for EOP inmates.  For follow-up primary clinician contacts, there were compliance rates of 88 percent for EOP inmates and 82 percent for 3CMS inmates, with 48 percent of the latter conducted in a confidential setting.

Psych techs conducted groups for administrative segregation inmates during the review period.

MHCB

Inmates arriving at the MHCB during regular working hours were routinely administered a pre-admission screening.  There were 88 and 89-percent compliance rates for initial and subsequent IDTT meetings, respectively.  IDTT meetings were routinely attended by required staff members.

During the site visit, mental health inmates housed in the MHCB were dressed in suicide-resistant smocks or boxers and t-shirts.  Orders as to clothing issue were modified to allow for more regular clothing as inmates' conditions improved.  Inmates had reading material.

There was one application of five-point restraint during the review period.

3CMS

The compliance rate for initial IDTT meetings was 71 percent.  Annual follow-up IDTT meetings were scheduled 94 percent of the time, but it was not clear whether they in fact occurred at the same rate.  Attendance rates were 81 and 100 percent for psychiatry and primary clinicians, respectively.  Correctional counselor attendance was not reported.  Inmates attended IDTT meetings 93 percent of the time.

Sixty-eight percent of inmates had an initial primary clinician contact within ten days of the clinical intake assessment.  Subsequent primary clinician contacts were 95-percent compliant, and quarterly psychiatry contacts for inmates on psychotropic medications were 98-percent compliant.

An observed group on A yard was well-conducted.  Interviewed 3CMS inmates on B yard reported reasonable access to treating clinicians and found the use of psychiatry telemedicine to be advantageous.

Referrals

HDSP reported a total of 1,766 referrals.  There were 31 emergent, 63 urgent, and 1,672 routine referrals.  Compliance rates for response to referrals were 100 percent for emergent referrals, and 87 percent for urgent and routine referrals.

MHTS.net

The institution reported monthly rates of 90 to 97 percent for concordance between MHTS.net and eUHRs during the review period.

RVRs

Out of a total of 1,326 RVRs, two were issued to inmates in the MHCB, six were to EOP inmates, 123 were to 3CMS inmates, 1,149 were to general population inmates, and 46 were to inmates in administrative segregation.  No RVRs were issued for hoarding or cheeking of medications.

HDSP reported that mental health assessments were conducted for all MHSDS inmates who received RVRs, and for nine non-MHSDS inmates, but did not provide audit results or other verifying information.  The institution also could not report whether all 3CMS inmates who had Division A, B, or C offenses had mental health assessments.  Staff reported that there was no mechanism in place to ensure that RVR mental health assessments took place as required.  HDSP was unable to report the number or percentage of cases in which hearing officers mitigated penalties based on mental health clinical input.

## California Correctional Center (CCC)
(Paper Review)

Census:

          At the time of reporting, CCC housed 4,420 inmates.  There were no inmates at CCC on the mental health caseload at that time.

Staffing:

          The senior psychologist position was filled.  Three staff psychologist positions were vacant.  Positions for four of 4.25 psych techs were filled, as was the sole health program specialist I position.  The half-time clerical position was vacant.

          Psychiatry telemedicine was available but was not utilized during the reporting period.

Quality Management:

          CCC's local governing body met monthly and maintained meeting minutes.  The quality management committee met monthly.

          A consolidated medical/dental/mental health subcommittee met monthly, but did not forward recommendations to the quality management committee.  There were no mental health QITs.

          The institution did not have a peer review process.

Suicide Prevention:

          The SPRFIT achieved a quorum at its four meetings during the reporting period. Meeting minutes indicated that statewide suicide prevention topics were discussed.

          The ERRC met monthly and addressed issues related to emergency response. CCC reported noncompliance with five-day clinical follow-up and custody follow-up.

          In administrative segregation, CCC was compliant with completion of pre-

placement screens, 31-item screens, and 30-minute welfare checks.  All newly-arriving inmates were placed into new intake cells.  Psych techs had mental health profiles for all new arrivals.

Medication Management:

CCC did not provide medication management audits.

The institution had a procedure for maintaining continuity of medications following new arrivals and intra-institutional transfers.  There were no medication renewals, medication lapses, nor cases of medication noncompliance during the reporting period.

CCC did not audit lengths of pill lines.

There were no inmates for whom laboratory testing orders were applicable.  No inmates were prescribed psychotropic medications to be administered DOT, and none were on Keyhea orders.

At the time of reporting, no inmates were on prescribed HS medications.  CCC did not indicate whether inmates received HS medications during the review period.

No MHSDS inmates paroled from the institution.

Transfers:

There were no DSH referrals during the review period.

Conflicting data indicated that there was either one MHCB transfer within one day of referral, or there were three MHCB transfers but without any report of compliance with transfer timelines.

During the review period, three MHSDS inmates were erroneously transferred to CCC.  These inmates' transfer times to appropriate institutions averaged 17 days.

No mental health caseload inmates were referred to the OHU.  There were no PSU transfers.  CCC did not use alternative housing.

One inmate identified as requiring EOP level of care and one identified as requiring 3CMS level of care transferred to other institutions after 13 days and 25 days, respectively.

Other Issues:

MHSDS Inmates in Administrative Segregation

There were no MHSDS inmates housed in administrative segregation during the review period.

Referrals

There were 417 mental health referrals.  The institution was 100-percent compliant with responses to emergent, urgent, and routine referrals.

RVRs

There were no RVRs issued to mental health caseload inmates during the review period.  Two general population inmates who were issued RVRs received mental health assessments.

**Mule Creek State Prison (MCSP)**
August 29, 2012 – August 31, 2012

Census:

MCSP's inmate population was 3,041, down by nearly 11 percent since the preceding monitoring period.  The MHSDS census was 1,682, or 55 percent of the total prison population, for a decline by eight percent.  There were 494 mainline EOP inmates and 1,071 mainline 3CMS inmates.  There were five inmates in MHCBs.  The total census of 141 inmates in segregation included 61 EOP inmates and 57 3CMS inmates, or 84 percent of the segregation population.

Staffing:

MCSP was in the process of hiring staff to fill newly-created positions, the effect of which was to elevate the vacancy rate in mental health at that time.  Sixty of 160 mental health positions were vacant, producing a vacancy rate of 38 percent.  Use of contractors reduced the functional vacancy to 29 percent.

Positions for the chief psychiatrist and all five senior psychologist specialists were vacant.  The chief psychologist position and four of the five senior psychologist positions were filled.

The vacancy rate among staff psychiatrists was 36 percent, with 4.5 of 12 positions vacant.  Use of contractors reduced the functional vacancy rate to 19 percent.

The vacancy rate among primary clinicians was also high, at 40 percent, with only 33 of 54.5 positions filled.  Use of seven nearly-FTE contractors reduced the functional vacancy rate to 27 percent.

Positions for two senior psych techs and 23 of 26 psych techs were filled.  Contractors covered all three psych tech vacancies.

Eight of 15 allocated recreational therapist positions remained unfilled, for a vacancy rate of 53 percent.

Two of three health program specialist positions were vacant.  Positions for an office services supervisor and unit supervisor were filled, but vacancies among clerical staff were high, with seven of 17.5 or 40 percent of positions vacant.

Quality Management:

MCSP's local governing body met five times during the six-month reporting period, with good attendance.  Agendas covered a wide range of issues including data on access to care, inmate appeals, laboratory testing, staffing, use of non-formulary and HS medications,

MHTS.net, mental health peer review, status of construction projects, *Coleman* monitoring visits, mental health QITs, and scanning of treatment records.

The quality management committee met monthly during the reporting period. Mental health supervisors attended only two of six meetings, due to staff turnover during the reporting period. An administrative assistant from mental health attended all meetings. Although sparse at times, status reports from mental health were presented to the quality management committee every month.

The mental health subcommittee was scheduled to meet twice per month and met eleven times during the six-month reporting period. It provided an adequate forum for tracking performance and addressing emerging and ongoing issues in mental health. Attendance was good and usually included a representative from custody. Minutes were maintained. Meetings typically covered compliance data from program and practice areas, as well as staffing updates.

Three QITs were active during the reporting period. A QIT tasked with developing mental health productivity standards was dissolved and presented its final recommendations to the quality management committee. One QIT was tasked with improving compliance with mental health referral timelines, and another was tasked with increasing eUHR/MHTS.net concordance. Both remained ongoing as of the end of the reporting period. No new QITs were chartered.

During the six-month reporting period, 40 clinicians underwent peer review for outpatient care, and another six clinicians were reviewed for inpatient care. The number of noted deficiencies was reported to be "stable or declining."

Suicide Prevention:

There were no completed suicides during the reporting period.

MCSP's SPRFIT met five times during the reporting period, with good attendance including one to two custody representatives.  Agendas were adequately comprised of suicide prevention topics.  The team kept minutes and articulated action items.

Cut-down tools were maintained in the control booths of the primary and overflow segregation units.

Internal tracking reports indicated a 90-percent compliance rate for five-day clinical follow-up for inmates discharged from the MHCB unit or the MHOHU or returned from DSH programs.  Compliance with custody wellness checks was not routinely tracked.  A single audit with a small sample of only ten cases found a compliance rate of 70 percent, including three cases in which associated documentation of wellness checks could not be located.

Administrative segregation audits found that a third of the 739 inmates placed into segregation during the review period did not receive a pre-placement screen.

Audits conducted earlier in the review period found that slightly more than half of the 151 non-MHSDS inmates placed into segregation received the 31-item screen within 72 hours.  However, later audits found a compliance rate of 95 percent for timely completion of 31-item screens.

Internal audits, inmate interviews, and the monitor's review of isolation logs confirmed continued compliance with daily psych tech rounds.  However, the institution's record review found inconsistent documentation of weekly summaries of psych tech rounds.

Each of the three designated intake cells in the primary segregation unit was retrofitted with two-paned doors, cement lower bunks, and suicide-resistant air vents.  However, the metal upper bunks had not been removed.

Custody logs indicated that 30-minute welfare rounds were routinely conducted in

the primary and overflow segregation units. Many of the rounds were conducted at staggered intervals. Most of the non-staggered rounds were conducted during the night shift. Log sheets were signed by supervisors on all three work shifts.

Inmates in the primary and overflow segregation units were permitted to have in-cell appliances.

Staff and inmates reported that yard time consisted of three, three-hour sessions per week, or one hour less than the weekly requirement of ten hours.

Medication Management:

MCSP continued to rely on an array of audits to monitor medication management during the reporting period. MAPIP was not yet fully implemented at the institution at the time of the monitor's visit.

On average, 98 percent of inmates moved within the institution, including those discharged from the MHCB unit, did not experience any interruption in medications.

Medications were renewed timely in 98 percent of cases. Thirty-day bridge orders were used to avoid gaps in renewals. The compliance rate for timely administration of new medications and adjusted ongoing prescriptions was 69 percent, an improvement over the 54 percent rate for the preceding monitoring period but not compliant.

Response to cases of medication noncompliance improved but remained noncompliant. Referrals to mental health occurred in 87 percent of cases of noncompliance, but only 44 percent of referrals elicited a timely response.

Pill line audits indicated that inmates typically waited less than four minutes to receive medications.

Audits found that 82 percent of reviewed records contained up-to-date informed

consent forms, as compared to 90 percent reported for the preceding monitoring period.

According to audit results, laboratory studies were appropriately ordered for inmates taking Lithium, Depakote, and Clozapine 86 percent of the time.  Psychiatrists documented their review of laboratory results and any resulting clinical interventions in 100 percent of audited cases.

All psychotropic medications were prescribed for DOT administration.  Audits indicated a compliance rate of 90 percent for adherence to DOT procedures.  Inmates with known histories of hoarding and/or cheeking were identified on a list and subjected to an elevated degree of scrutiny during medication administration.

As of the end of May 2012, there were 41 inmates at MCSP with current Keyhea orders.  The institution successfully initiated three Keyhea petitions and renewed 36 Keyhea orders during the reporting period.  Two petitions were denied by the administrative law judge and 13 orders were permitted to expire based on the inmate's clinical improvement.  No Keyhea cases were not pursued on the advice of counsel.

During the review period, the number of HS prescriptions declined by 24 percent, from 782 to 596.  Audits continued to indicate that HS medications were routinely administered no earlier than 8:00 p.m.

Audits showed that inmates signed for a supply of parole medications in 100 percent of reviewed cases.

Transfers:

The DSH coordinator, who also served as MCSP's suicide prevention coordinator, maintained the required DSH referral and non-referral logs.  Staff reported, and records reviewed by the monitor's expert generally confirmed, that IDTTs had access to accurate

and up-to-date information regarding multiple crisis care placements.  However, the DSH non-referral log did not document the reasons for non-referrals, but instead directed the reader to "see [Form] 7388B."  The Form 7388Bs reviewed by the monitor's expert generally documented adequate rationales for non-referral.  However, not all reviewed records contained the Form 7388Bs referenced in the non-referral log.  Monthly institutional audits found a range of compliance rates of 79 to 91 percent for reviewed Form 7388Bs as "adequate," but the compliance rate was less than 90 percent for four of the six months of the review period.

Access to DSH continued to be slow.  Nearly 45 percent of the 18 referred inmates were not transferred to DSH within required timeframes.  MCSP generated seven acute care referrals during the six-month reporting period, all of which were accepted by DSH.  Six of the seven referral packets were completed within two days, and three of the seven inmates were transferred within ten days of referral.  The average delay between referral and transfer was nearly 19 days.

There were 11 intermediate care referrals, none of which were rescinded by MCSP or rejected by DSH.  Six of the 11 referral packets were completed within ten days, and seven of the 11 inmates were transferred within 30 days of referral.  Transfer times ranged from eight days to 45 days from referral to transfer.

There were 57 MHCB admissions to the eight-bed crisis care unit.  Nearly a third of these stays lasted longer than ten days.  Approximately 40 percent of the prolonged stays involved inmates waiting for DSH beds.  The remaining 60 percent largely involved inmates with unabated mental health crisis conditions.

Demand for crisis care at MCSP exceeded MHCB capacity, thereby necessitating the continued use of six MHOHU beds in an overflow segregation unit.  There were 150

MHOHU placements, 26 or 17 percent of which lasted longer than 72 hours.  Most stays beyond three days were attributed to lack of space in housing units.  Ten percent of MHOHU placements resulted in admission to the MHCB unit.  Housing records indicated that utilization of the MHOHU declined significantly in July and August 2012, when the MHOHU census was higher than one on only five days and never exceeded three.

MCSP operated five alternative holding cells, all of which were located adjacent to the MHOHU in the overflow segregation unit.  Three inmates were placed in alternative holding cells when no MHCBs or MHOHU cells were available.  Their average length of stay in the alternative cells was three days.  One inmate was transferred to a MHOHU cell, and two inmates were returned to housing.

MCSP transferred 20 inmates to PSU programs.  Fifteen or 75 percent of them transferred within 60 days of endorsement.  However, SHU terms continued to be one of the more common reasons why EOP inmates languished in segregation.  Some of these were cases involving delays related to endorsement, and others were the result of staff decisions to forego PSU endorsements due to impending expiration of the SHU term.

Of the 235 EOP inmates placed into segregation during the reporting period, 35 or 15 percent had stays longer than 90 days.  At the time of the monitor's visit, there were 61 EOP inmates in segregation, 13 of whom had been there longer than 90 days.  Most of these overly-long stays, a few of which exceeded a year, were related to unexpired SHU terms, pending district attorney referrals, disciplinary complications, and delayed transfers to outside SNY beds.  On a monthly basis, a review of these inmates was conducted and sent to headquarters.

Of the 59 EOP inmates transferred to outside EOP programs, 52 or 88 percent went within 60 days of referral.

Other Areas:

MHCB

Eight suicide-resistant beds were installed by the time of the monitor's visit.

Audits found that SREs were completed for only a third of inmates admitted to the MHCB unit for suicidal behavior, and for fewer than half of inmates upon discharge. Staff attributed these low compliance levels to problems with paperwork and data entry, and reported that they did not accurately reflect actual practice.

All inmates admitted to the MHCB unit received an initial IDTT meeting within 72 hours of admission. Weekly follow-up meetings occurred 98 percent of the time.

Compliance rates for daily contacts with the psychiatrist and the psychologist were 100 percent and 94 percent, respectively.

Local efforts to reduce the use of handcuffs and treatment modules in the MHCB unit were unsuccessful. MCSP instituted a process for assessment of all inmates admitted to the MHCB for "danger to others." The results of these assessments were documented on an informational chrono to be consulted by staff as to whether restraints should be used. Mental health staff reported that even though less than 20 percent of admissions were found to be potentially dangerous to others, handcuffing and use of treatment modules were used throughout stays in the MHCB. Custody staff appeared to be unaware of the new process and acknowledged that the use of handcuffs and treatment modules continued to be the default practice in the MHCB unit.

MHOHU

The institution reported that all inmates who were placed in the MHOHU and alternative holding cells due to suicidality were given an SRE upon admission and discharge, and

received five-day clinical follow-up upon return to their housing units.  Clinicians reported that inmates placed into the MHOHU and alternative holding cells due to lack of local MHCBs were not routinely referred to HCPOP for potential admission to outside MHCBs.

### Administrative Segregation EOP

In the administrative segregation hub, timeframes for initial and quarterly IDTT reviews were satisfied, although comprehensive mental health assessments were not completed prior to the initial IDTT meeting, as required.  IDTT attendance rates were 89 percent for psychiatrists, 87 percent for primary clinicians, and 100 percent for correctional counselors. Access to eUHRs was limited during IDTT meetings.

A psychiatrist was assigned to segregation five days per week and covered all MHSDS inmates.  Monthly psychiatric contacts occurred routinely, but were compromised by lack of privacy for their settings.

Eight primary clinicians carried average caseloads of nine EOP inmates during the reporting period.  Compliance rates for weekly primary clinician contacts increased to 95 percent.  However, over 40 percent of weekly contacts occurred at cell-front.  Out-of-cell contacts took place in dayroom holding cells that afforded limited privacy.  In addition, clinicians had limited access to information from the electronic charts due to lack of laptop computers and eUHR terminals in segregation.

MHTS.net data indicated that EOP inmates in segregation were offered just under ten hours of therapeutic activity per week.  Group therapy space was relegated to two formations of nine modules on the dayroom floor, providing negligible auditory or visual privacy.

### 3CMS Inmates in Administrative Segregation

The institution placed 289 3CMS inmates into segregation during the reporting

period.  The average length of stay was 75 days.  At the time of the monitor's visit, there were 57 3CMS inmates in segregation.

Comprehensive mental health evaluations were routinely completed prior to the initial IDTT meeting.  Both initial and quarterly IDTT meetings were timely.  Attendance rates were 86 percent for psychiatrists, 83 percent for primary clinicians, and 100 percent for correctional counselors.

Two primary clinicians carried average caseloads of 24 3CMS inmates during the reporting period.  Internal audits generated a compliance rate of 97 percent for weekly primary clinician contacts.  However, 66 percent of these contacts occurred cell-front, and all other interviews took place in non-confidential dayroom modules.

EOP

In the mainline EOP at MCSP, compliance rates for initial and quarterly IDTT meetings were greater than 90 percent.  The attendance rate for psychiatrists was only 58 percent, but for primary clinicians it was 99 percent.  Attendance by correctional counselors was not tracked.  Internal audits confirmed that staff conducted monthly IDTT reviews for 16 inmates who had modified treatment plans.

Monthly psychiatric contacts were over 90 percent compliant.  Primary clinicians carried average caseloads of 29 inmates.  MHTS.net-based audits generated compliance rates of 97 percent for timely completion of initial contacts and 84 percent for timely completion of weekly individual or group contacts.

Mainline EOP inmates were offered an average of 6.9 hours of therapeutic activity per week.  This deficit in hours was due in part to the institution's strict adherence to schedules for locking and unlocking housing unit doors, which often resulted in missed or

abbreviated group sessions for EOP inmates.  The institution also continued to use inmate aides to provide assistance with recreational therapy groups and to sort and distribute appointment ducats.  The monitor's expert reiterated concern with involving inmates in the ducat process.

MCSP's Extended EOP Care Program (EECP) was discontinued prior to the monitor's visit.  The 14 inmates who had been in the program were reportedly continued within the mainline EOP program.

3CMS

In MCSP's mainline 3CMS program, initial and annual follow-up IDTT meetings were timely in 85 percent and 90 percent of cases, respectively.  Psychiatrists failed to attend a third of all IDTT meetings.

Only 70 percent of initial contacts occurred within ten days of arrival.  Primary clinician caseloads in the mainline 3CMS program ranged from 54 to 105 inmates.  Psychiatric and quarterly primary clinician contacts occurred routinely.

Twelve therapeutic groups were offered to mainline 3CMS inmates during the reporting period.  As of the end of April 2012, there were 274 3CMS inmates on wait lists for groups.

Mental Health Referrals

Compliance rates were 72 percent for response to both urgent and routine mental health referrals.  Emergent referrals drew a better response, with a compliance rate of 90.

RVRs

EOP inmates at MCSP received 267 RVRs, all of which resulted in a referral to mental health for an assessment for use in the adjudicative process.  In just over a quarter of these cases, a clinician concluded that mental illness influenced the subject behavior and/or

recommended that the hearing officer consider mental health factors when assessing a penalty. 3CMS inmates received 427 RVRs, a third of which resulted in referral to mental health. In 12 percent of these cases, a clinician concluded that mental illness influenced the subject behavior and/or recommended that the hearing officer consider mental health factors when assessing a penalty.

The monitor reviewed 11 RVRs involving six EOP inmates. Mental health input was cited as the reason for penalty mitigation in two cases. Other findings indicated that staff training was needed. In two cases, the mental health assessment was not completed within ten days of the incident, as required. In two cases involving the same inmate, the hearing officer used penal and evidence codes as a blanket rationale to exclude mental health input from the deliberative process. In three other cases, the hearing officer gave no explanation as to why the maximum allowable penalty was assessed, despite clinical input indicating that mental illness influenced the behavior. In three cases, the RVR did not record or only partially recorded relevant narrative provided by a clinician. Documentation was sometimes incomplete.

Heat Plan

Heat plan protocols were followed. Temperature logs were maintained and forwarded to the litigation coordinator, monthly summaries were submitted to headquarters, heat cards were circulated on a weekly basis, and lists of inmates taking heat-sensitive medications were delivered daily to housing units. However, thermometer sensors were sometimes located too close to industrial fans, which may have compromised the accuracy of readings.

Pre-Release Planning

The institution reported that of the 65 EOP inmates who were released from MCSP during the reporting period, 74 percent received parole planning. A post-community

release supervision coordinator worked with EOP inmates to ensure that health care information was forwarded to county probation offices.  TCMP social workers continued to help EOP inmates apply for state and federal benefits assistance.

### Sierra Conservation Center (SCC)
(Paper Review)

Census:

On August 14, 2012, SCC housed a total of 4,274 inmates, including inmates at the institution's camps.  This represented a decline by 19 percent since the time of the institution's preceding review for the twenty-third round.  The mental health caseload population had declined by 23 percent to 465 inmates.  Three EOP inmates were housed in the general population.  There were 420 mainline 3CMS inmates.  The administrative segregation population of 67 included 42 3CMS inmates.

Staffing:

The chief psychologist position was filled, but the senior psychiatrist and the senior psychologist positions were vacant.

All 2.5 staff psychiatry positions were filled.  Six of 7.3 staff psychology positions were filled, for a vacancy rate of 18 percent.  The sole social worker position was filled.

The senior psych tech position and six of the nine psych tech positions were filled.  The recreational therapist position was filled.  Three of six clerical positions were filled.

Psychiatry telemedicine was not utilized during the review period.

Quality Management:

The quality management committee met monthly, consistently achieved a quorum, and maintained meeting minutes.

The mental health subcommittee met monthly.  It maintained minutes and took up appropriate mental health-related topics, but attendance was problematic.

Two ongoing QITs addressed issues surrounding rescheduling of appointments and follow-up for cases of medication noncompliance.

SCC conducted peer review for psychiatrists and psychologists.

Suicide Prevention:

There were no suicides at SCC during the reporting period.

The SPRFIT met monthly, but attendance was problematic.  Meetings consisted primarily of the statewide suicide prevention videoconference.

The ERRC met monthly.  Emergency medical drills were conducted and CPR refresher training was provided.

SCC was 98-percent compliant with providing five-day clinical follow-up for inmates discharged from the OHU.  Custody follow-up was noncompliant.

In administrative segregation, daily morning meetings between mental health and custody staff were occurring.

The institution reported compliance with completion of pre-placement screens, although the management report indicated a compliance rate of only 56 percent for screens of non-MHSDS inmates.

Institutional data showed compliance with the 31-item screen, but conflicting data indicated that the compliance rate was only 56 percent.

Twelve intake cells were appropriately retrofitted.

Conflicting data indicated compliance rates of 64 percent to greater than 90 percent for completion of 30-minute welfare checks.

The institution did not report on inmate access to yard time.

Medication Management:

SCC utilized the MAPIP audit process.  Medications were administered without interruption for newly-arriving inmates and following intra-institutional transfers.  The institution was compliant with medication renewals.

Follow-up on cases of medication noncompliance was 76-percent compliant. Documentation of medication noncompliance in MARs was 86-percent compliant.

Audits indicated that wait times in pill lines lasted ten minutes or less.

Up-to-date informed consent forms were present in eUHRs.

Laboratory testing of inmate blood levels of specified psychotropic medications was ordered appropriately.

At the time of reporting, 226 inmates were prescribed medications that were administered DOT.  Audits verified adherence to DOT administration procedures.

No inmates were on Keyhea orders.

At the time of reporting, 60 inmates receiving psychotropic medications had orders for HS administration.  Audits indicated that delivery of these medications began an hour too early, at 7:00 p.m.

Audits indicated compliance with the parole medication process.

Transfers:

Although eight inmates had one or more indicators for consideration for DSH referral consideration, there were no referrals to DSH.  However, reviewed Form 7388Bs bore appropriate rationales for non-referral.  No inmates returned from DSH during the review period.

SCC did not have an MHCB unit.  It had a 13-bed OHU for which there were 41 referrals and admissions during the review period.  Eight of these resulted in stays longer than 72 hours, driving the average OHU stay to 3.15 days.  Fourteen inmates admitted to the OHU were referred to an MHCB at another institution.

Seventeen inmates transferred to EOP programs.  Transfers to EOP administrative segregation hubs took an average of 57 days, and transfers to other EOP programs took an average of 72 days.

There were no PSU transfers.

Other Issues:

MHSDS Inmates in Administrative Segregation

Initial and follow-up IDTT meetings in administrative segregation were timely. Psychiatric contacts were compliant.  Initial and follow-up contacts with primary clinicians were 88-percent and 93-percent compliant, respectively.  Daily psych tech rounds were occurring.

OHU

Inmates placed in the OHU received an SRE upon admission and discharge.  They also received daily contacts with a psychiatrist or psychologist.  SCC did not use alternative housing for inmates awaiting transfer to an MHCB unit.

3CMS

Initial and follow-up IDTT meetings for 3CMS inmates were compliant. Clinicians' attendance at IDTT meetings was generally compliant, although the institution did not report on attendance by correctional counselors.  Contacts with the psychiatrist were compliant.  Rates of compliance for initial and follow-up primary clinician contacts were 88 percent and 100 percent, respectively.

<u>Groups</u>

All EOP inmates and approximately 40 percent of 3CMS inmates participated in groups.  At the time of reporting, 177 inmates were on the group wait list.

<u>Referrals</u>

SCC reported a total of 774 referrals, including two emergent, 32 urgent, and 740 routine referrals.  The institution reported compliance with response to referrals.

<u>Heat Plan</u>

There were 11 stage II and four stage III heat plan activations.  Medical rounds were completed during stage III activations.  No inmates suffered heat-related incidents.

<u>RVRs</u>

Out of a total of 658 RVRs, four were issued to EOP inmates, 67 were issued to 3CMS inmates, 25 were issued to inmates in administrative segregation, and 562 were issued to general population inmates.  All EOP and 43 percent of the 3CMS inmates received mental health assessments.  No RVRs issued to 3CMS inmates resulted in SHU terms.

**<u>California Medical Facility (CMF)</u>**
June 12, 2012 – June 14, 2012

<u>Census</u>:

At the time of the site visit, CMF's total population was 2,386 and its total mental health population was 1,299.  There were 44 inmates in the MHCB, 347 inmates in the EOP mainline, and 442 inmates in the 3CMS mainline.  One hundred twelve inmates were in administrative segregation, including 36 EOP inmates and 25 3CMS inmates.  Eleven EOP inmates with SHU terms were pending transfer to a PSU.

<u>Staffing</u>:

The chief psychiatrist, senior psychiatrist, and chief psychologist positions were filled.  Of the 21.5 staff psychiatrist positions, 14.5 were filled, resulting in a 35-percent vacancy rate.  Full-time equivalent contractors plus a retired annuitant covered 3.5 positions, leaving a functional vacancy rate of 19 percent.

Ten of the 10.5 senior psychologist positions were filled, for a vacancy rate of four percent.  All 44.5 staff psychologist positions were filled.

All three supervising social worker positions were vacant.  Of the 21 staff social worker positions, 19.5 were filled, leaving a seven-percent vacancy rate.  A full-time equivalent contractor covered half of one of these vacancies, resulting in a five-percent functional vacancy rate among social workers.

The senior psych tech position was filled.  Three of the 50 psych tech positions were vacant, for a six-percent vacancy rate.  Coverage of two open positions by contractors reduced the functional vacancy rate to two percent.

Ten of 13.3 recreational therapist positions were filled, leaving a 25-percent vacancy rate.  Of the 17.5 MHSDS clerical positions, 10.5 were filled.  With coverage of another 1.75 positions, the vacancy rate for the clerical positions was reduced to 30 percent.

Quality Management:

CMF restructured its quality management program during the reporting period.  A position for chief quality officer was instituted in December 2011.  Implementation of the revised LOP had begun a few weeks prior to the monitor's visit.

CMF had a local governing body for each of the three separately licensed areas of the institution -- the GACH, hospice, and the mental health crisis bed facility (MHCBF), which is the 50-bed crisis care unit run by CMF, as opposed to the 20-bed MHCB unit run by DSH on

S2 at CMF.  These bodies each met three times during the reporting period, and maintained

minutes.  A quorum was present at all three GACH meetings and hospice meetings, and at two of

the MHCBF meetings.

        In March 2012, the quality management committee was replaced with a quality

management council.  It met 11 times, achieved a quorum at nine meetings, and maintained

minutes during the reporting period.  The council regularly heard reports from each service

delivery area and discussed issues of communications and coordination within quality

management.

        The mental health subcommittee was scheduled to meet weekly and held 19

meetings during the reporting period.  Although the management report stated that a quorum was

achieved at 53 percent of these meetings, the monitor's review of the minutes indicated that a

quorum was achieved at only three meetings.  The mental health subcommittee regularly

received reports concerning the institution's SPRFIT, higher levels of care at the institution,

medication management, QITs and workgroups, Keyhea, pre-release planning, performance of

the nursing program, protocols for institutional response to indecent exposure protocols, and

reports from the MHCBF medical staff committee.  It also addressed issues such as policies and

procedures on MHTS.net data entry.

        The documentation provided on QITs during the reporting period was incomplete

and sometimes difficult to interpret.  According to the institutional management report, QITs on

MHTS.net data entry, MTHS/eUHR concordance, psychotropic medication, and MHCBF

referrals were initiated during the reporting period.  No proof-of-practice documentation was

provided for QITs on MHCBF referrals and MHTS.net data entry.

There were two ongoing QITs during the reporting period.  One was chartered to design a new EOP treatment planning and service delivery model, in anticipation of the opening of the new EOP building in 2013.  The other was a joint QIT between the institution and the Vacaville Psychiatric Program at CMF that was chartered to improve continuity of care between inpatient and outpatient programs.

CMF had peer review in place for psychiatrists, psychologists, and social workers.  Psychiatrists were reviewed every two years and received feedback via in-person meetings.  A total of 13 psychiatry peer reviews were performed during the reporting period.  Critique was based on review of a sample of the psychiatrist's work and on peer feedback.

Psychologists were reviewed every two years.  During the reporting period, ten psychologists were reviewed, based on eight samplings of the work of the psychologist under review.  Findings were then discussed with the psychologist under review.

Social worker peer reviews were based on eUHR reviews, using an evaluation form specific to social work.  Eight social workers were reviewed during the reporting period.  Identified practice deficiencies included lack of clarity within diagnostic rationales in treatment plans and progress notes, failure to note appropriate disability codes and accommodations, and insufficient detail in narrative sections.

Suicide Prevention:

There were no completed suicides at CMF during the reporting period.  The institution was in the process of implementing the proctor-mentor program to improve clinicians' skills with conduct of suicide risk evaluations.  This was one of the initiatives that was developed as a result of the suicide prevention project of 2010.

The institution's SPRFIT met each month during the reporting period, for a total of six meetings.  None were attended by a quorum.  Topics taken up by the SPRFIT included reviews of incidents of self-injury or serious suicide attempts, inmates being followed as high-risk, and potential revision of the suicide prevention LOP.  The SPRFIT also discussed clinician errors related to failure to submit logs and documentation of five-day clinical follow-ups, problems with completion and submission of the 31-item screenings, and inmate suicide history profiles.

Interviewed staff reported that CPR refresher training was conducted annually.  Review of proof-of-practice documentation indicated that emergency response drills were occurring regularly.  A spot check by the monitor's expert revealed that cut-down tools were available and that correctional officers were carrying micro-shields.

Proof of practice documents indicated that five-day clinical follow-ups were completed as required 97 percent of the time in January 2012, and 100 percent of the time in November 2011, February 2012, and April 2012.  However, based on proof-of-practice documentation, there were at least two cases in which required SREs were not completed when they should have been.

In administrative segregation, daily morning meetings between custody and mental health were reported to be occurring.  The monitor's expert observed a morning meeting which demonstrated the usefulness of these meetings.

Proof-of-practice documentation indicated that 153 non-MHSDS inmates were placed in administrative segregation, and that 93 percent had received timely pre-placement screenings, all conducted in a confidential setting.

New-intake cells were identified by signs on the cell doors.  Reviews of 30-minute welfare checks indicated completion rates ranging from 97 percent in December 2011 and March 2012 to 100 percent in February 2012.  A review of a random sample of the logs indicated that the checks were being completed, but with occasional lapses on the first watch and insufficient staggering of the rounds.  Discussion with mental health leadership revealed methodological problems with the method of calculation of compliance percentages.  Review of proof-of-practice documents and discussions with staff also revealed problems with transmission and retention of the logs.

Proof-of-practice documents showed that psych tech rounds were conducted 100 percent of the time.  The monitor's expert observation of rounds in the administrative segregation unit found them to be conducted appropriately.  However, background noise caused by fans hindered communication between the psych tech and the inmates.

Custody staff indicated, and inmate interviews confirmed, that inmates were offered ten hours of yard per week.

A review of proof-of-practice documents showed that inmate suicide profiles were not consistently arriving with incoming inmates' paperwork.  However, institutional audits indicated that when indicated, inmates transferring out of CMF generally left with completed profiles.

Medication Management:

Although the reporting period spanned November 1, 2011 to April 30, 2012, CMF conducted quarterly medication management audits based on a calendar year.  Therefore, the institutional audits discussed herein covered the period of October 2011 to March 31, 2012, rather than the actual reporting period of November 1, 2011 to April 30, 2012.  In addition, it

was noted that the compliance thresholds for a number of the audits of medication practices were set at 80 percent rather than properly at 90 percent.  Another concern was the sample sizes of approximately 30 to 50 charts, which were reduced by exclusion of those charts which did not address the particular matters under audit.

CMF reported, and the monitor's expert's review confirmed, that 89 percent of new arrivals received their medications by the next day during the fourth quarter of 2011, and 83 percent of new arrivals received their medications by the next day during the first quarter of 2012.

The institution reported that following intra-institutional transfers, 77 percent of inmates did not experience any interruptions in their medications during the fourth quarter of 2011, and that 87 percent of inmates did not experience such interruptions during the first quarter of 2012.  These findings were corroborated by the monitor's record review.

CMF reported that inmates with new or changed medication orders received their medications by the next day 68 percent of the time during the fourth quarter of 2011, and on the same day 80 percent of the time during the first quarter of 2012.  These reports were confirmed by the monitor's expert's review of records.

For the fourth quarter of 2011, the institution reported 100-percent compliance with documentation of medication noncompliance in charts.  In 79 percent of cases, clinical follow-up occurred within seven days of the report of noncompliance.  The compliance rate for documentation rose to 83 percent for the first quarter of 2012.  However, these rates were not corroborated by the monitor's expert's findings from his review of a sample of records.

There was a compliance rate of only 19 percent for presence of MARs in eUHRs during the final quarter of 2011.  The rate rose dramatically to 86 percent for the first quarter of

2012.  However, there were problems with the MARs, which were prepared month by month. On several, there were notations that improperly extended into the next month.  This practice could lead to medication errors if nursing staff, upon reviewing a MAR, could not see that medication had in fact been ordered and given in the first few days of the month because it was documented only on the prior month's MAR that over-extended into the beginning of the current month.  Potentially, this practice could result in re-ordering and double-dosing of the medication within one month.

Institutional audits of completeness and legibility of MARs found that only 66 percent were complete and legible for the fourth quarter of 2011, and that only 41 percent were complete and legible for the first quarter of 2012.  The monitor's expert's review of MARs confirmed the presence of such problems, particularly with regard to nurses' initialing of medication administration on specific dates.  As a result, the MARs were difficult to interpret for determining whether or not medications had been given for periods as long as three days, as one initialing sometimes appeared to span three days.

During the period from November 20, 2011 through April 20, 2012, there were 11 petitions for initial Keyhea orders and 50 requests for renewals.  Of those 50, eight orders were not renewed.  All inmates on Keyhea orders received their medications in compliance with their orders.

The institution reported that parole medications were provided for 92 percent of inmates discharged during the fourth quarter of 2011, and for all inmates released during the first quarter of 2012.  EOP and 3CMS inmates received a 30-day supply of their medications upon their releases from the institution.

Transfers:

CMF maintained the required electronic referral and non-referral database plus a handwritten log which provided additional information on the DSH referral process.  The electronic log was often missing information which, in some cases, could not be supplied by reference to the handwritten log.

CMF generated 56 acute care referrals and 65 intermediate care referrals.  The institution's management report indicated that from January through April 2012, 31 to 45 percent of referrals to acute care were completed within timeframes, and that 50 to 71 percent of referrals to intermediate care were completed within timeframes.  Available data indicated that once bed assignment occurred, inmates were transferred within 72 hours in approximately 70 percent of cases.

During the same period, two percent of acute care referrals and no intermediate care referrals were rejected by DSH.  Eleven percent of acute care referrals and four percent of intermediate care referrals were rescinded prior to admission.  Information in the referral database indicated that 13 Vitek hearings were conducted, with findings in favor of the inmate in only one or possibly two of these cases.  During the reporting period, a total of 148 inmates returned from DSH treatment.

Though CMF has historically provided administrative oversight and staffing of the 50-bed MHCBF, during the reporting period CMF's patients made up only a minority of admissions there.  There were 296 referrals to crisis care in the MHCBF, but 264 of these referrals originated at institutions other than CMF. During the reporting period, the average length of stay in the MHCBF was 21 days, with a range of one to 87 days, meaning that all inmates admitted to the MHCBF were there longer than ten days.

Effective March 7, 2012, CMF began referring its patients to its MHCBF rather than to the DSH crisis bed program on S2.  By April 30, 2012, there were a total of 32 referrals to the MHCBF from within CMF.  In the three instances when all MHCBF beds were filled, CMF referred its crisis-level patients to the DSH crisis care facility on S2.

 During the reporting period, nine inmates were placed into crisis care within CMF's hospital unit because of co-occurring medical and mental health conditions.  Eight of these inmates were placed on suicide watch at the time of their admissions.  Institutional data indicated that 56 percent of these received an SRE at the time of placement and only 22 percent received five-day clinical follow-up after discharge.  Stays for eight of the nine inmates ranged from one to seven days, with three housed there for more than four days.  Three of these crisis-level inmates in the hospital unit were moved to S2 or the MHCBF, and five no longer required crisis-level care upon their discharge from alternative housing.  At the time of the site visit, one inmate needing crisis level care remained in a medical bed.

Other Areas:

Administrative Segregation EOP

During the reporting period, the number of inmates in administrative segregation increased from 69 to 81.  At the start of the reporting period, in November 2011, the average length of stay in administrative segregation was 77 days.  By April 2012, the average length of stay had increased to 81 days.

According to the institution, almost one quarter of EOP inmates were in administrative segregation over 60 days, and 16 percent had stays over 90 days during the reporting period.  Documentation provided by the institution indicated that these cases were reviewed monthly.  Wait time for PSU beds appeared to be a major factor in these delays.

Overall, data provided by the institution indicated that 36 percent of these inmates were endorsed awaiting transfer, 25 percent were pending disciplinary proceedings, and 31 percent were pending CSR action.

Documentation showed that 95 percent of EOP inmates in administrative segregation had at least weekly primary clinician contacts, and 86 percent had at least monthly contacts with their psychiatrist.  Whereas previously, inmates' group assignments had previously been governed by cell location, groups were now usually assigned based upon individual need and preference.  Group treatment spaces continued to lack sufficient confidentiality.

The institution had difficulty with offering a minimum of ten weekly hours of structured out-of-cell therapeutic activity to inmates in administrative segregation. Quantification of the extent of the problem was difficult because data was found to be inaccurate by mental health leadership.

MHCB

CMF staff reported that as a result of realignment of the prison population pursuant to AB 900, the MHCBF daily census generally declined from near capacity to an average of approximately 40 inmates.  Institutional data suggested that 100 percent of the inmates admitted to the MHCBF during regular working hours were administered a pre-admission screening.  IDTT meetings consistently occurred within 72 hours of admission for 99 percent of all admissions, and follow-up IDTT meetings occurred at least weekly for 96 percent of all admissions.  Except for the correctional counselor, who attended only 52 percent of the IDTT meetings, all other required staff attended.

Daily contacts with a psychologist or psychiatrist occurred 99 percent of the time. Ninety-nine percent of the inmates admitted for risk of suicidality received an SRE at the time of

admission.  The facility did not track the completion of SREs at the time of discharge, but it did

report that all discharged patients received five-day clinical follow-up.

Across the reporting period there were four applications of five-point restraints.

Durations ranged from two hours and 20 minutes to 16 hours and 15 minutes, averaging 6.70

hours, with three of the four applications lasting 4.25 hours or less.  There were eight

occurrences of seclusion during the reporting period, with durations ranging from one hour and

35 minutes to eight hours and 50 minutes, or an average 3.34 hours.  At the time of the site visit,

only one of the 44 inmates housed in the MHCBF was allowed out of cell without restraint.

Fifteen inmates were placed under restraint for "custody" reasons, while an additional 28 inmates

were listed as requiring restraint for "clinical" reasons.

MHCBF staff indicated that inmates were generally seen daily by a clinician after

clinical discharge from crisis placement and while awaiting transfer.  This was often completed

at cell-front as a result of limitations on clinician time or lack of custody support.  Inmates were

reportedly also provided with access to yard five days per week and with two hours per day of

individual exercise yard.  They were also seen routinely by nursing staff.  The monitor's expert

reviewed a sample of records of inmates awaiting transfer from the MHCBF and found that

recreational therapy and yard access were not documented consistently.

In three instances, CMF referred crisis-level patients to the 20-bed MHCB run by

DSH on S-2 because no beds were available in the MHCBF.

EOP

The EOP at CMF continued to have several of the same problems that have been

reported previously.  One was continued space limitations on the EOP units.  This often resulted

in therapeutic groups being very large, with some groups made up of 25 or more inmates.

Another problem was a lack of EOP documentation that is customarily provided for the monitor at the beginning of the site visit.

CMF was not meeting the Program Guide requirement of offering at least ten hours of structured therapeutic activities per week per inmate for EOP inmates.  Data on structured therapeutic activities was requested during the site visit, and ultimately indicated that approximately 69 inmates were participating in 50 percent or less of the offered structured therapeutic activities during the reporting period.  For those inmates who were participating in structured therapeutic activities, the monitor's expert reviewed a ten-percent sample and found that the average time for structured therapeutic activities scheduled per inmate was approximately 11.6 hours across the reporting period.  However, the average number of hours offered for the final quarter of 2011 was only 8.5.  The average number of refused hours was approximately 2.5, and the average number of hours cancelled by staff was approximately 3.1 per month for the fourth quarter of 2011.

The monitor's expert observed two IDTTs conduct meeting.  Staff attendance at the meetings was adequate although it was not by the regular team members.  Discussion of inmates' presenting problems and reasons for placement in the EOP was limited during inmates' initial IDTT meetings, but it was adequate in meetings for inmates already known to the teams.

3CMS

During the reporting period, the average total 3CMS population was 480, including 3CMS inmates in the OHU, the CTC, and hospice.  A total of 219 inmates entered the program during the reporting period.  Of these, 59 percent received an initial clinical contact within ten days.

Ninety-one percent of the incoming inmates received an initial IDTT meeting within 14 days, and 97 percent received annual follow-up IDTT meetings.  Institutional data indicated that psychiatrists and primary clinicians were present for 98 percent and 100 percent of scheduled IDTT meetings, respectively.  Data on attendance by correctional counselors was not available.

Five assigned clinicians served as primary clinicians.  Ninety-four percent of 3CMS inmates were seen by a primary clinician at least every 90 days, and 92 percent who were prescribed psychotropic medications were seen by a psychiatrist at least quarterly.

There were 18 functioning 3CMS therapeutic groups at the time of the monitor's visit.  However, at least two of these groups were being facilitated by inmates.  Staff reported that most groups had wait lists of up to 18 inmates.  Since the duration of the group cycle is ten to 12 weeks, and given the maximum group size of 12 to 15 inmates, most individuals on a given wait list had access to a group within ten to 12 weeks.

During the monitoring period, a total of 38 3CMS inmates paroled from the institution.  Institutional data indicated that all were seen for pre-release planning.

<u>3CMS Inmates in Administrative Segregation</u>

Proof-of-practice documents indicated a compliance rate of 87 percent for weekly primary clinician contacts, and a compliance rate of 99 percent for 90-day psychiatry contacts for 3CMS inmates in administrative segregation.  An institutional audit of charts in February 2012 indicated that all follow-up IDTT meetings for 3CMS inmates occurred timely and were attended by a full complement of staff.  Lack of other audits was attributed to staffing issues.

Data provided by the institution indicated that during the reporting period there were 174 cell-front contacts and 992 confidential contacts.  Interviewed inmates confirmed that

contacts occurred most often in confidential settings. Offered reasons for some contacts being conducted at cell-front included staff shortages and holidays.

Referrals

The data on mental health referrals provided in the proof-of-practice binders was incomplete, making it difficult to determine the number of referrals made during the reporting period. Additional data was requested. There was also a discrepancy between the total number of mental health referrals reflected in the management report versus what was reported on-site.

The provided data indicated that during the reporting period, there were approximately 1,068 mental health referrals, including 22 emergent, 115 urgent, and 931 routine referrals. All emergent and urgent referrals generated a timely response. Of the 931 routine referrals, 924 or 99 percent were completed within five days.

RVRs

There was inconsistency between the number of RVRs issued to mainline, 3CMS, EOP, and MHCB inmates in the management report, and the total number of RVRs provided in the same report. In addition, there were discrepancies between the data provided in the management report and the data provided in the proof-of-practice documents. Mental health staff indicated that data they provided to the monitor on site was more accurate. According to that data, there were 538 RVRs issued to mainline inmates, 303 to 3CMS inmates, 115 to EOP inmates, and 27 to MHCB inmates. All of the EOP and MHCB inmates, 75 of the 3CMS inmates, and 16 of the mainline inmates received mental health assessments. Of the 75 3CMS inmates who received a mental health assessment, 40 had received an RVR for a division A, B, or C offense.

<u>**California State Prison, Solano (CSP/Solano)**</u>
May 1, 2012 – May 3, 2012

<u>Census</u>:

At the time of the monitor's visit, CSP/Solano's census was 4,233, for a 15-percent decrease since the preceding monitoring period.  The mental health population fell by 14 percent, to 1,128.  There were two inmates in the MHCB and seven in the mainline EOP.  The 3CMS mainline population was 1,025, for a 19-percent decrease.  Among the administrative segregation population of 257, there were 93 3CMS inmates and one EOP inmate pending transfer to a hub institution.

<u>Staffing</u>:

All mental health clinical positions were either filled or covered by contract employees.  The chief psychiatrist and chief psychologist positions were both filled.  Of the five staff psychiatrist positions, three were filled, and full-time equivalent contractors covered the two open positions.

The two senior psychologist positions and all 14.5 staff psychologist positions were also filled.  Four of six social worker positions were filled, and contractors covered the two open positions.

The senior psych tech position was filled.  Of the 8.5 psych tech positions, 7.5 were filled, resulting in an 11.8-percent vacancy rate.  The two recreational therapist positions were filled.

The Health Program Specialist position and 9.5 of 10.5 clerical positions were filled.

<u>Quality Management</u>:

The local governing body was scheduled to meet quarterly, but did not meet at all during the reporting period.  The quality management committee met three times during the reporting period and took up substantive issues, according to meeting minutes.

The mental health subcommittee was scheduled to meet one to two times per month and held nine meetings during the reporting period.  Attendance was difficult to determine after implementation of a new format for the minutes beginning in January 2012.  The mental health subcommittee covered a variety of areas including performance indicators, audit reviews and results, QIT updates, reports from the DSH and SPRFIT coordinators, and issues and recommendations for the quality management committee.

Psychiatry peer review was only conducted annually and was concerned with a number of audits of Program Guide standards that would seem to be more appropriately addressed through program audits.  Peer review for psychologists and social workers was combined and consisted of case consultation rather than actual peer review.

The five open QITs during the reporting period dealt with group therapy, peer review, concordance between MHTS.net and eUHRs, 31-item screens used in administrative segregation, and parole medications.  However, the concordance QIT conducted audits but did not hold any meetings, and the peer review QIT functioned as a peer review committee during the reporting period.  Conflicting data made it difficult to determine whether the peer review and the parole medications QITs were open or closed.

Suicide Prevention:

There were no completed suicides during the reporting period.

The SPRFIT met monthly during the reporting period except in January 2012.  It took up a variety of pertinent agenda items, including an addendum to the local operating

procedure for Form 7230B for extended observation, RVRs for hoarding medications, referral of serious suicide attempts to DSH, review of the monthly statewide suicide prevention video conferences, ERRC updates, review of self-harm incidents, and training issues.  Attendance continued to be as problematic as it was during the preceding two reporting periods, without a quorum at any of the meetings.

The ERRC met regularly during the reporting period.  Minutes indicated that emergency response times were generally adequate.  A spot check found that all queried officers carried CPR micro-shields on their persons.  Cut-down kits were located in the control booth.

With regard to completion of five-day follow-up for inmates discharged from the MHCB, CSP/Solano reported compliance rates of 100 percent and 99.5 percent.  The monitor's expert encountered difficulty when attempting to confirm compliance through medical records review because documentation was difficult to find in the eUHR.  Custody wellness checks were documented 93 percent of the time.

Instead of reporting on compliance levels for conduct of SREs upon all admissions and discharges from an MHCB, the institution instead conducted 36 chart reviews.  It reported 100-percent compliance with SREs on admission and 97-percent compliance with SREs on discharge.  However, the monitor's expert's review of sample eUHRs revealed that admission SREs were often not found in the record.

Morning meetings between custody and mental health staff in administrative segregation occurred Monday through Friday.  CSP/Solano reported an 85-percent compliance rate for pre-placement screening in administrative segregation, for a 15-percent improvement over the preceding reporting period.

Audits results regarding the 31-item mental health screening varied widely.  An

MHTS.net-based audit of all administrative segregation admissions indicated 38-percent compliance, whereas an eUHR-based audit indicated 80-percent compliance.  It appeared that the MHTS.net audit examined all inmates placed into administrative segregation, regardless of their administrative segregation status, while the eUHR-based audit only included those inmates who were on administrative segregation status and actually placed into the unit.

All new intake cells were clearly marked during inmates' first 21 days in administrative segregation.  CSP/Solano reported 100-percent compliance with 30-minute welfare checks.

At the time of the site visit, inmates were still not permitted to have electrical appliances in administrative segregation.  Staff reported that inmates were offered ten hours of yard time per week.

Medication Management:

MAPIP had not yet been implemented at CSP/Solano at the time of the monitor's visit.

The institution did not audit continuity of medications for new arrivals.  Audits found that medications were not interrupted following intra-institutional transfers in 85 percent of cases.

According to audits, in 99 percent of cases renewals of psychotropic medications were timely and orders were filled by the next working day after receipt of orders.

Medication noncompliance remained problematic at CSP/Solano.  Mental health supervisory staff reported receiving up to 200 notifications of medication noncompliance.  Audits indicated that of a sample obtained, 44 percent had incidents of medication

noncompliance, and only 69 percent of those were documented to show timely psychiatric follow-up.

Audits of pill lines on all yards found that the average wait time for all lines was eight minutes, with morning pill line waits averaging 16 minutes, evening pill lines averaging five minutes, and HS pill lines averaging four minutes.

Only 52 percent of informed consent forms were completed timely, according to audits.

Audits indicated that 68 percent of laboratory studies for psychotropic medications were ordered as clinically indicated.  There was documentation of appropriate clinical intervention in 64 percent of instances of abnormal laboratory study results.

Solano continued to administer all psychotropic medications by DOT to all reported 743 inmates prescribed psychotropic medications during the reporting period.

There was one inmate with an active Keyhea order at the time of the site visit. Based upon a log provided to the monitor, three orders were initiated during the period but these inmates appeared to have been returned to their sending institutions.

There were 330 MHSDS inmates who were prescribed medications at HS. Institutional audits indicated compliance with timing of HS pill lines.

CSP/Solano reported that 354 inmates including both MHSDS and non-MHSDS paroled with active prescriptions during the reporting period.  An audit indicated that in 90 percent of cases, inmates received their medications at the time of parole.

Transfers:

CSP/Solano's continued use of a part-time DSH coordinator remained sufficient to cover needs.  During the reporting period, 32 inmates were identified as meeting one or more

indicators for consideration for a higher level of care.  Nine of the 32, or 28 percent, were

referred to DSH, with six to acute care and three to intermediate care.  According to the referral

log, all timelines for completion of the referral packet were met.  At the time of the site visit, no

inmates were pending transfer to DSH.  None of the referrals to DSH were rejected during the

reporting period.  No Vitek hearings were required.  All DSH transfers occurred within 72 hours

of receipt of a bed assignment.  No inmates returned from DSH to CSP/Solano during the

reporting period.

Audit results indicated satisfactory reasons for non-referral in 93 percent of cases,

although this was not always supported by chart review.  Alternative clinical interventions were

documented in 82 percent of cases, as supported by the monitor's expert's chart review.

During the reporting period, MHCB admissions decreased by 16 percent, from

108 to 91.  Thirty-three or 36 percent of MHCB admissions were from other institutions.  The

number of stays in the MHCB exceeding ten days dropped by nearly half since the preceding

monitoring period.  Clinical lengths of stay decreased to an average of 8.2 days, with a range of

one to 15 days.  The average physical length of stay average was nine days, with a range of one

to 18 days.  The most frequent reason for extended stays was the clinical need to stabilize

inmates who did not require a DSH referral.  However, a review of a random sample of records

indicated that some of those inmates with lengths of stay beyond ten days who were not referred

to DSH appeared to be appropriate for referral to DSH.  Those awaiting DSH transfer averaged a

clinical length of stay of 11.3 days, with a range of five to 22 days and a physical length of stay

of 12.1 days, with a range of six to 22 days.

According to information provided by the institution, 38 EOP inmates were

referred for transfer during the reporting period.  Of those, 20 were mainline EOP and 18 were

administrative segregation EOP.  Of the 20 mainline EOP inmates, 15, or 75 percent, were

transferred within 60 days.  Bed availability was reportedly still the most common reason for

delay in transferring EOP inmates.  Of the 18 administrative segregation EOP inmates, transfer

timelines were met in all but one case, for a compliance rate of 94 percent.

One inmate was referred and transferred to the PSU during the reporting period.

Other Areas:

MHSDS Inmates in Administrative Segregation

Institutional audits indicated 85-percent compliance with timely initial

assessments.  Initial IDTT meetings were timely 81 percent of the time, which was a significant

improvement over the 58-percent compliance rate of the preceding reporting period.  Follow-up

IDTT meetings were compliant.

Audits of initial and follow-up psychiatric contacts indicated a compliance rate of

95 percent or higher.  Weekly primary clinician contacts were compliant in 92 percent of cases.

The institution reported that 95 percent of these contacts were not confidential, and that 47

percent of contacts occurred at cell-front.  Inmates awaiting transfer to an EOP hub institution

were provided weekly contacts with the primary clinician, but did not receive group therapy.

The physical plant of the administrative segregation unit in Building 10 posed

challenges to the delivery of mental health services.  Clinicians utilized several therapeutic

modules in a partitioned area of the dayroom floor that was also utilized for staff offices and

individual interviews.  The area utilized for the IDTT meeting was shared with custody staff in a

partitioned area of the dayroom floor.  Building 9 did not have any of these interview areas, and

inmates requiring out-of-cell interviews had to be escorted to Building 10.

MHCB

While the MHCB at CSP/Solano continued to demonstrate improvement in some areas since the preceding monitoring period, other areas remained a challenge.  CSP/Solano continued to operate nine licensed MHCBs during the reporting period.  There was no OHU/MHOHU nor any alternate housing in use during the reporting period.  For MHCB overflow, CSP/Solano most frequently used the observation/restraint cell with one-to-one observation.

During the site visit, there were two patients in the MHCB.  CSP/Solano did not report an average daily census, but reported it had recently had three to five inmates in the MHCB at any given time, in contrast to its history of operating at full capacity most of the time.  The institution reported that as a result, it had been exploring a reduction to five MHCBs with HCPOP.

Inmates admitted to the MHCB appeared to have timely received their histories and physicals on a consistent basis.  Initial and follow-up IDTT meetings were reported to be compliant at 96 percent and 97 percent, respectively.  This was supported by chart review.  However, the correctional counselor attended about 80 percent of meetings, and treatment plans continued to need greater individualization and specificity.

Initial and ongoing clinical contacts were 100-percent compliant for psychiatry contacts, and 96-percent compliant for primary clinician contacts.  Clinical interventions were often inadequate or inappropriate in light of the diagnosis given to the inmate.  Documentation indicated that treatment interventions remained primarily isolation and medication management, as noted in the preceding monitoring period.

Lack of space caused limitations on therapeutic activities in the MHCB.  Inmates received books and were offered some recreational therapy activities such as games at their cells.

While inmates housed for medical reasons were afforded outside recreational therapy, inmates housed for mental health reasons were not allowed the same.

According to the log provided for review, it appeared that restraints were not used at CSP/Solano during the reporting period. Three inmates were placed into seclusion to prevent self-harm, for periods of nine hours and 12 minutes, 11 hours and 40 minutes, and 60 hours and 30 minutes, respectively. Program Guide requirements were generally satisfied.

3CMS

Compliance rates for initial IDTT meetings for 3CMS inmates improved to 81 percent, up from 58 percent during the preceding monitoring period. Annual follow-up IDTT meetings remained compliant at the rate of 95 percent. Audits regarding participation by clinicians at IDTT meetings indicated that psychiatrists and primary clinicians attended at the rate of 91 percent, and correctional counselors attended at the rate of 81 percent.

Initial psychiatric contacts were compliant in 91 percent of cases, as compared to 78 percent of cases at the time of preceding monitoring visit. Follow-up psychiatric contacts remained compliant at the rate 95 percent. The compliance rate for initial primary clinician contacts was 89 percent, up from 73 percent during the preceding monitoring period. Subsequent primary clinician contacts remained timely with a compliance rate in excess of 95 percent.

Staff and inmates reported that space was generally available for confidential interviews. Thirteen different groups were provided by mental health clinicians during the reporting period, involving 212 MHSDS inmates. The topics of these groups indicated awareness of the needs of the population at the facility. However, staff and inmates reported

long waits for some groups, indicating the need for additional group therapy. A wait list was not maintained during the reporting period.

Referrals

According to data provided, there were approximately 1,773 mental health referrals during the reporting period including nine emergent referrals, 74 urgent referrals, and 1,690 routine referrals. All emergent referrals were seen within four hours. Of the 74 urgent referrals, 69 or 93 percent were seen within 24 hours, for an improvement over the preceding monitoring period. Of the 1,690 routine referrals, 1,348 or 80 percent were completed within five days, which was an improvement by 30 percent over the preceding monitoring period.

RVRs

CSP/Solano reported that it had completed training and implemented the new RVR process. There were 1,113 RVRs issued during the reporting period, with 339 of those issued to MHSDS inmates. Of those, 335 were to 3CMS inmates, three were to EOP inmates, and one was to an inmate in the MHCB. All of the EOP and MHCB inmates and 86 of the 3CMS inmates received mental health assessments.

The institution's review of 60 available hearing outcomes identified 17 mental health assessments in which the clinician recommended that the penalty be mitigated. Among those 17 cases, the penalty was mitigated in five or 29 percent of the cases in which mitigation was recommended.

**California State Prison-San Quentin (SQ)**
August 6, 2012 – August 8, 2012

Census:

On August 3, 2012, the total population at San Quentin was 3,732 inmates, a significant decrease from 5,014 during the monitor's preceding visit during the twenty-third

round.  As of August 3, 2012, the total mental health population also decreased significantly from 1,239 inmates to 897 inmates, to 24 percent of the total prison population.  The mainline EOP population, including the condemned population, remained constant at 25.  There were no EOP or 3CMS inmates with SHU terms pending transfer.  San Quentin housed 638 mainline 3CMS inmates, an increase over the previously reported 559 inmates.

There were no inmates in the SHU or in the OHU, and there were 12 inmates in the MHCB unit.  The total administrative segregation population decreased from 413 inmates to 265, including 91 3CMS inmates and 11 EOP hub inmates.  The reception center population fell considerably from 2,163 to 676, including eight EOP and 112 3CMS inmates.  Of these, one EOP inmate and three 3CMS inmates were parole violators.

Staffing:

During the reporting period, out of San Quentin's 99.81 mental health clinical positions, 91.26 were filled, for a nine percent vacancy rate.  Contractors covered .54 FTE psychology positions and .51 FTE recreational therapy positions, thereby reducing the overall functional vacancy rate in mental health to six percent.

The chief of mental health and chief psychiatrist positions remained filled.  However, the senior psychiatrist position and 1.5 of the seven senior psychologist positions were eliminated.  Of the remaining 5.5 senior psychologist positions, five were filled, for a vacancy rate of nine percent.  There was no supervising social worker position.

Staff psychiatrist positions were also reduced from 15.05 to 12.25, of which 11.65 were filled, for a vacancy rate of five percent.  Staff psychologist positions were reduced from 41.85 to 35.5 positions, with 30.8 were filled, for a vacancy rate of 13 percent.  A contractor

provided .54 FTE coverage, for a functional vacancy rate of 12 percent in psychology.  After a reduction of .2 FTE social worker positions, ten of the 10.2 remaining positions were filled.

The senior psych tech position and 24.6 of the 25.6 staff psych tech positions were filled.  Positions for recreational therapists were reduced by .55, with 3.75 of the remaining 5.3 positions filled, for a vacancy rate of 29 percent.  Use of a .51 FTE recreational therapist contractor reduced the functional vacancy rate to 20 percent.  Ten of 12 clerical positions were filled, for a vacancy rate of 17 percent.

No psychiatry telemedicine was used during the review period.

Quality Management:

San Quentin had the components of quality assurance processes in place, with required committees meeting regularly and QITs, FITs, audits, and status reports being utilized.

The local governing body met with a quorum present during the review period.  It reviewed and approved policies and procedures related to MHCB admissions and care, recreational therapy in the CTC, laboratory testing of inmate blood levels of psychotropic medications, individual treatment plans, informed consent for psychotropic medications, suicide prevention, involuntary medications, use of restraints, inmate transfers, discharge planning, and security procedures.

The quality management committee met monthly from January through May 2012, with appropriate attendance.  The mental health subcommittee reported to the quality management committee at each of its meetings, and presented reports on QITs, FITs, audits, and status reports.  The QITs addressed specialized treatment for the condemned, MHTS.net-eUHR concordance, and quality assurance regarding use of Clozapine.

The mental health subcommittee met weekly during the review period, with required staff or designees in attendance.  It examined the topics of mental health assessments of inmates who received RVRs for suicidality, initial and follow-up SREs for admissions to the CTC, custody-mental health collaboration issues, audits of corrective action plans, and other audits and reports on mental health care delivery.

The institution conducted regular audits of its mental health programs, the results of which were reported to the mental health subcommittee and the quality management committee.  Audited areas included the MHTS.net-eUHR concordance, medications, therapeutic groups, primary clinicians, post-discharge care including both clinical and custodial aspects, referrals to DSH, CTC care and post-discharge procedures, structured therapeutic activities for condemned inmates, psych tech rounds, and screenings.

Peer review was active for psychiatry, psychology and social work.  It addressed medication management, documentation, assessment, diagnosis, treatment, consultation and referral, and pre-release planning.  During the review period, peer reviews were completed for three psychiatrists, 14 psychologists, and two social workers.  The monitor's expert noted an unusually high number of provisional diagnoses for inmates who had been at SQ for extended periods of time, including condemned inmates whose stays were already years long.  Although these diagnoses were supported by documentation, they continued to carry a "provisional" qualifier.  The peer review process was not utilized to address this situation.

Suicide Prevention:

There were two completed suicides at the institution during the review period.

The SQ institutional SPRFIT did not maintain minutes of its meeting until June 2012.  In conjunction with the SPRFIT, the institution offered the following suicide-prevention

training courses: *Profiling the Mainline*, *Self-Mutilation*, *Deliberate Indifference and Suicide*, *Administrative Segregation and Suicide*, and *Suicide, the Magic Word: Suicide Threats, Gestures, and Plans and Culture*.

The institution provided documentation of monthly medical emergency response drills, as well as a list of current CPR certifications for custody staff.  CPR training was included as part of annual block training.

In administrative segregation, daily morning meetings between custody and clinical staff were documented 73 percent of the time.  A meeting observed by the monitor's expert in the administrative segregation unit was attended by the psych tech, the sergeant, and the lieutenant.  Attendees discussed all new inmates, and any problems or issues concerning inmates in the unit.

SQ was compliant with completion of pre-placement screens for inmates entering administrative segregation.  It was 100-percent compliant with completion of the 31-item screen within 72 hours of placements into administrative segregation, based on MHTS.net data and staff report.  These screenings were conducted by psych techs in a confidential office setting.  Refusal rates ranged from zero to 22 percent.  Refusers were referred to the assessment team who provided out-of-cell follow-up interviews with the inmate.

Daily psych tech rounds were documented 100 percent of the time, based on staff and management reports, and the monitor's review of the administrative segregation log.  All inmates in administrative segregation received 30-minute welfare checks, regardless of their lengths of stay.  However, these checks were not audited.

There were electrical outlets on the fifth tier and in two cells on the first tier of the Carson unit.  SHU-endorsed inmates housed on the unit for over a year were given televisions or radios if the SHU program allowed appliances.

Administrative segregation inmates were offered ten hours of yard per week. EOP inmates were afforded access to both regular administrative segregation yard and the EOP administrative segregation yard.

Medication Management:

At the end of the review period, 615 inmates in the MHSDS were receiving psychotropic medications.  Implementation of MAPIP began in October 2011.  MAPIP audit results found compliance in the areas of medication continuity for new arrivals and following intra-institutional transfers, timely processing and renewal of orders and bridge orders, laboratory testing and results for blood levels of inmates taking psychotropic medications, DOT and HS medication administration, timeliness of referrals for cases of medication noncompliance, documentation on MARs,  length of pill lines, and parole medications.

MAPIP audits found compliance rates of 53 percent for timeliness of psychiatry consults in cases of medication noncompliance, 70 percent for conduct of AIMS testing, and 88 percent for presence of up to date informed consent forms in eUHRs.  Reports of line mental health staff corroborated these audit results.  Staff reported that appointments would be scheduled directly by nursing to improve timeliness of psychiatry contacts in cases of medication noncompliance.

By the time of the monitor's visit, the position previously referred to as "involuntary medication coordinator" had been changed to "medication court administrator" under Penal Code 2602.  This position carried expanded responsibilities including setting the

hearing date and direct coordination with the inmate's counsel and the Office of Administrative

Hearings.  During the review period, 31 inmates were under orders for involuntary medications.

There were 13 petitions for administration of involuntary medications.  One order lapsed or

expired, and 11 were renewed during the same period of time.

Transfers:

San Quentin had a full-time, experienced DSH coordinator throughout the

reporting period.

The institution reported that 92 inmates met one or more indicators for

consideration for referral to DSH.  Fifty-nine or 64 percent of those inmates were referred to

DSH, with 40 to acute care, and 19 to intermediate care.  All of the acute care referral packets

and 95 percent of the intermediate care referral packets were completed within timeframes.  Not

all were reviewed by DSH within three working days, and no explanation could be determined

from documentation.  DSH's rejection of one acute care referral was affirmed by the CCAT.  In

addition, seven acute care and four intermediate care referrals were rescinded due to

improvements in the inmates' conditions.

For inmates who were accepted and assigned a DSH bed, transfers took place

within 72 hours, as required.  At the time of the site visit, two inmates who had been referred to

intermediate care were awaiting transfer.  Both were recent referrals and had transfer dates.

It was unclear whether the 7388B checklist was routinely completed in IDTT

meetings as part of the treatment team process.  The dates of many checklists differed from the

date of the IDTT meeting.  In a number of medical records reviewed, 7388B checklists had not

been completed at all and were not available in the eUHR.  When the 7388B checklist was

present, there were numerous occasions when the IDTT failed to properly note that the inmate

met one or more of the objective indicators.  Compounding these problems, when an indicator

was checked as present, the rationale for non-referral was often inadequate and did not apply to

the checked indicator.  There were also several cases in which the inmate's impending release

date was referenced in the rationale for non-referral, implying that it was inappropriately the

reason for the non-referral.  There continued to be problems with alternative interventions as

well.  These were often left blank or were inadequate or inappropriate.  For example, in several

cases "MHCB placement" was listed as one of the alternative interventions, even though the

inmate was not being admitted to the MHCB.  The DSH coordinator continued to audit the

sustainability of the process, although the reliability of the findings on adequacy of the rationale

for non-referral was somewhat questionable.  The audit item regarding additional interventions

merely asked whether they were documented, not about the quality or adequacy of the

interventions.  The rationale was typically marked as supporting non-referral.

     Sixteen inmates returned to SQ from DSH during the reporting period.  Discharge

summaries were available for these inmates, but clinician-to-clinician contact took place within

five working days only 69 percent of the time.  An additional 19 percent of the returns had

clinician-to-clinician contacts after five working days had passed.  While the institution's

management report indicated that 100 percent of DSH-returning inmates received five-day

clinical follow-up, it also reported that five-day follow-up procedures were followed overall only

92 percent of the time.  This was corroborated by two of the records reviewed by the monitor,

which indicated that the returning inmate was ultimately seen for a total of five days, but not five

consecutive days.  Most returning inmates were seen timely by their primary clinicians and

psychiatrists, but a number of inmates were not seen by the IDTT timely and/or did not have

current treatment plans in their eUHRs.  The DSH discharge summaries did not always provide

clinically useful recommendations, and were not routinely incorporated into the treatment plans at SQ.

 Other Areas:

### Specialized Care Program for Condemned Inmates

During the monitor's twenty-fifth round site visit on August 6 to 8, 2012, SQ reported that it had a structured specialized care program that provided enhanced treatment services to condemned inmates who met clinical indicators for the intermediate inpatient level of care (condemned care program).  Defendants have reported that its specialized care program for condemned inmates was first implemented on November 8, 2010 and has been existence ever since, with a census of eight to ten inmates at any given time. Staff indicated that the program was largely based on an assertive community treatment (ACT) model.  The condemned care program was created because historically DSH has not accepted condemned inmates into its programs.  The institution described the program as a viable option and alternative to DSH intermediate level of care.

The monitor's expert requested all policies and local operating procedures and the program description and census, but the census was not provided.  The institutional management report indicated that all condemned EOP inmates were admitted to the program, but this could not be documented.  Initially, SQ indicated that six to eight inmates were in the condemned care program, but eventually identified ten such inmates, which led to concern about the actual structure and organization of the program.  Basic clinical requirements such as admission and discharge criteria were not articulated, although program clinicians could discuss the various treatment modalities and demonstrated that consideration had gone into determining the appropriate treatment for each inmate.  However, there were space limitations and challenges

with escorts which created problems with access to care.  The two confidential office areas (C and D) with modules served the entire caseload of inmates in the condemned unit, hindering availability of confidential contacts.  One of those spaces appeared to also serve as a law library, potentially limiting access even further.  Group therapy was provided in the health services building.

The medical records of each of the participants in the specialized care program were reviewed.  Most of these inmates clearly needed inpatient care and were not receiving it or its equivalent.  One such inmate was being treated at the 3CMS level of care but it should have been at the EOP level of care.  Contrary to the SQ management report, not all program participants were offered ten or more hours of structured treatment.  Two were assigned to eight groups while six were not assigned to any treatment groups.

IDTT meetings for the condemned care program were reportedly scheduled twice per month.  Treatment plans often did not focus on the primary symptoms for many inmates, and some interventions appeared to reinforce these symptoms.  Some inmates did not even have treatment plans or current treatment plans.  Except for one case, treatment plans failed to mention the admission to the condemned care program or any specific treatment related to it. There was no evidence of a structured behavior modification treatment program within the specialized care program, although many of the inmates in the program could have benefitted from it.  There was also no evidence that staff were completing functional analyses of any of the inmates' behaviors, which are a necessary component of an adequate treatment plan.

The condemned specialized care program was also mentioned in several 7388B checklists as a rationale for non-referral.  In those cases, the treatment plans did not describe the nature of the care being given, nor did information on clinical interventions appear in the

eUHRs.  There was little to no information regarding group therapy participation.  Despite the fact there were enough condemned care program inmates to maintain their own treatment groups, they were assigned to groups with non-program participants, which may have contributed to the confusion with identifying program participants.  Also, condemned care program inmates who were seriously decompensated, as indicated by the medical records, could not participate meaningfully with higher functioning inmates.

The primary treatment modality in the condemned care program appeared to be medication management and recreational therapy.  The recreational therapist's contacts were primarily one-to-one, with the recreational therapist going cell to cell, showing the inmates a photo of a scene, and asking them about it.  Much of the increased clinical contacts with the primary clinician were more like cell-front wellness checks than clinical contacts.  Inmate refusal to engage, even if due to mental illness, was generally tolerated and often was not a focus of treatment, which could exacerbate and reinforce symptoms.

During the review period, two condemned care inmates were housed in the OHU so that they could receive 24-hour nursing care in addition to their ongoing mental health treatment.  This placement appeared to be appropriate and allowed staff to monitor these inmates more closely and provide a greater level of enhanced care.  These inmates were able to continue attending therapy groups without problems.

On December 3-4, 2012, the special master and selected members of his staff, accompanied by CDCR and DSH representatives and plaintiffs' counsel, conducted a focused revisit at the institution to further examine the condemned care program.  Prior to the monitor's re-visit, defendants submitted a draft LOP to the special master and plaintiffs' counsel for their review. During the visit, SQ staff provided a presentation regarding the ACT model of the

program and the services provided within in, as well as case reviews of six inmates in the program.  Many of the patients in the program had been in the men's condemned unit many years, with long histories of serious mental illness that had not been treated adequately.

CDCR personnel, the special master and his staff, and plaintiffs' counsel also toured the Adjustment Center, which at that time housed 102 inmates including two inmates on administrative segregation status, and no EOP inmates.  Office space similar to a confessional booth was available for confidential individual contacts, although it was clearly not optimal. Group treatment space consisted of five therapeutic modules that had seats, but they were older modules and did not conform to agreed specifications.  Group therapy sessions reportedly lasted for 90 minutes.

The East Block, which also housed condemned inmates, was toured as well.  It had a central clinic area consisting of several medical examination rooms. Mental health staff reported that clinical case conferences with medical staff occurred in this area two to three times per month.  There were two offices for mental health clinicians that afforded confidential space for individual contacts on the first floor of the housing unit. An available small room was used for IDTT and ICC meetings and case conferences.  Group therapy and some individual contacts occurred in the hospital off the unit.  Inmates were also afforded yard time in covered individual yards.

The special master's expert accompanied a psych tech during rounds in the East Block.  The psych tech reported that rounds were conducted daily for EOP and Grade B 3CMS inmates housed on the unit.  New arrivals were identified and interviewed.  Inmates who required additional monitoring and contacts were housed on the first floor near the mental health offices. The psych tech was familiar with inmates on the unit, and the inmates appeared to have

good rapport with the psych tech. The special master's expert asked the psych tech to identify

any inmates who were not faring well on the unit and was provided with the same inmates'

names as during earlier site visits.

The special master's expert also attended IDTT meetings during the site visit. An

IDTT was conducted for one of the condemned inmates who was housed in the OHU.  The

meeting included the necessary participants, and the treatment planning appeared to be clinically

appropriate.  The inmate refused to attend the meeting.

IDTT meetings for inmates in the condemned care program were also observed

during this site visit. Three inmates were scheduled to be seen, but two refused to attend.  The

inmate who did attend said that mental health staff adequately addressed her gender identity

disorder and its resulting challenges. The new treatment plan developed at this IDTT essentially

mirrored the earlier one but it still did not address gender identity issues.  The two inmates who

did not attend were apparently very low-functioning severely mentally ill inmates whose

treatment plans continued to include items such as "recreational therapist will see inmate cell-

front and encourage inmate to attend group" and similar statements with respect to the primary

clinician and other staff.  When staff discussed a process to address these inmates' needs in their

treatment plans, it was akin to a process of successive approximation. Staff were then

encouraged to write with specificity in the treatment plans what was being done and what

reinforcers were being applied so that they all knew what the other staff were doing.  They

appeared to be unfamiliar with this approach, but understood that lack of clarity among the

treatment team and custody on the treatment goal and reinforcers could inadvertently reinforce

maladaptive behavior. Otherwise, the meeting was conducted appropriately. Treatment staff all

knew the inmate very well and offered thoughtful and meaningful contributions to the meeting.

They solicited input from custody staff and incorporated all staff information into their formulation of the inmate's treatment status. Use of a reward system for inmates who agreed to come out of their cells was also discussed.

The special master's expert's review found that treatment plans did not specify group treatment because inmates were apparently not assigned to groups. Instead, psych techs walked the tiers, asking MHSDS inmates if they wanted to attend groups. This was an effort to compensate for the limited group treatment space for condemned and administrative segregation populations at the institution.  Staff indicated that the most seriously ill inmates were accorded priority for the earliest treatment.  The special master's expert expressed concern that group placements were not being clinically determined, and that by using this process, the make-up of the group could differ from meeting to meeting, and inmates could not know who else would be their group. Several inmates reported being taunted by other inmates in the unit and indicated that they would not attend a group if those inmates were present at it.  A better approach would be to assign low functioning inmates in specialized treatment to stable closed groups of only other participants in the condemned care program.

A music recreational therapy group was observed by the special master's expert. It included two inmates from the specialized treatment program who were among the higher-functioning inmates in that program. The balance of the group was made up of 3CMS inmates. All individual treatment modules were filled, but one was placed along the same wall as the facilitator, making it impossible for that inmate to watch the videos utilized in the group.  The recreational therapist facilitating the group maintained control of it and interactive positively with the participants.  Inmates requested music videos which the facilitator then played.  The

inmate would then be asked to discuss the significance of the music and why he had selected it. The group appeared to be beneficial.

The special master's expert interviewed several inmates who were reported by the institution to be receiving specialized treatment. They indicated that they saw their IDTTs more frequently and had access to them on the unit. One inmate reported  that the IDTT allowed him to keep his prior care providers because he had bonded with them and did not want to make a change. The special master's expert observed that the IDTT was sensitive to this inmate's particular fears and needs, for which he appeared grateful.  The interviewed inmates expressed concern about lack of sufficient groups and activities, particularly during weekends.  They reported that they rarely received yard time on the weekends and spend most or all of that time locked up.  Otherwise, the special master's expert concluded that interviewed inmates were generally positive about the program.

Recreational therapy was observed during the visit.  The two recreational therapists were having difficulty engaging all of the inmates on the yard due to its layout. Consequently, contacts were mostly individual, with music playing for everyone. Interviewed inmates reported that the contacts with the recreational therapist were beneficial.

Overall, the special master's expert noted that the observed IDTT meetings and group were generally adequate but lacked important elements for specialized treatment such as behavioral therapy, daily treatment activities, and an appropriate treatment milieu. A separate housing unit would alleviate many of these concerns.  Particular training would be required, and the addition of a trained behavioral psychologist would be necessary to adequately address the needs of the program.  Generally, many of the inmates in the program demonstrated significant clinical improvement following the use of psychotropic medications via involuntary medication

orders, participation in psychosocial rehabilitation treatment, and placement in housing outside of the condemned unit in, for example, the CTC or the OHU or prolonged periods of time. However, most of these inmates actually participated in out-of-cell structured therapeutic activities from only one to six hours per week, due to their continued chronic psychotic symptoms.

The use of housing outside of the condemned unit and the implementation of the ACT model have helped mitigate the lack of a specialized housing unit, as previously described, but did not fully compensate for its absence, as evidenced by the high rate of treatment refusals, estimated to be about 75 percent. The need for a specialized housing unit for inmates in the program was clinically indicated. The draft LOP which defendants provided to the special master and plaintiffs' counsel prior to the focused re-visit made no specific reference to the condemned specialized treatment program or services. Both the special master's experts and plaintiffs' counsel expressed specific concern about this.

Following discussion with relevant CDCR staff, defendants agreed to work with the special master's expert to draft a written addendum to the draft LOP that would describe this program, including an outline of the criteria for admission to it and the services that it offers. Triggers for consideration of inmates for admission to the program were defined as those used in the sustainable process for identification and referral of inmates to higher levels of care. In addition, and unique to the condemned population, any condemned EOP inmate whose status was changed from Grade A to Grade B would also be considered for placement in the specialized treatment program. As a result of consultations between the special master's expert and SQ mental health leadership, it was determined that the enhancement of mental health staffing to meet the needs of the specialized care program would be approximately a 50-percent increase

over the staffing required for a PSU, based on the numbers in the staffing plan.  The addendum summarized the services currently being provided in SQ's specialized condemned care program, which stand in contrast to the services that should be provided to meet needs at the intermediate inpatient level of care. Additionally, the special master's expert offered recommendations for services that should be provided in the program, but were currently either not being provided or needed to be improved.

They core principals of the addendum covered:

a.   Housing exclusively inmates receiving such services together in an appropriate treatment facility at SQ;

b.   Assigning only specially trained correctional officers to the unit;

c.   Maintaining only specially trained correctional officers in assignments to the unit, and;

d.   Maintaining nursing staff regularly assigned to the unit.

The program, as developed with the special master's expert, would include a dedicated housing unit for inmates in the condemned care program.  This would facilitate the development of an appropriate therapeutic milieu for it. This specialized housing unit would facilitate implementation of a psychosocial rehabilitation model which emphasizes participation in at least ten hours of structured activities and an additional ten hours of out-of-cell recreational time.  An essential component of the program would be implementation of a behaviorally-based incentive program.  The treatment team would include mental health staff as well as housing officers and custody and nursing staff.  Other components of the program would be involvement of inmates' family members as appropriate, and participation by the inmates in non-mental health-based programming such as education and religious activities, also as appropriate.

During a meet-and-confer session on December 14, 2012 among the parties and the special master and his staff, defendants reported that the *Plata* receiver had designated six to ten flexible beds in Building 22 to be used on a priority basis as specialized housing for the condemned care program. Defendants further reported that mental health staff at SQ, with the assistance of CDCR headquarters staff, were continuing to develop the addendum to the LOP for the specialized program, and that they will share their draft with the special master and plaintiffs' counsel when it is completed. As of this writing, the draft addendum has not yet been received.

<u>Reception Center</u>

All reception center inmates with prior MHSDS histories were screened by mental health in a confidential setting within 72 hours of arrival to the institution.

SQ was compliant with completion of timely initial and follow-up monthly IDTT meetings for EOP inmates in reception center. This was an improvement since the twenty-third monitoring period. Compliance with weekly primary clinician contacts remained constant at 93 percent. Psychiatry contacts were well over 90 percent compliant for all reception center EOP inmates, whether or not on medications. Clinical contacts were conducted in confidential settings, with less than one percent occurring cell-front throughout the review period. SQ did not meet the requirement to offer five hours per week of structured therapeutic activities to the reception center EOP population. Data revealed that while five hours were scheduled for 86 percent of the inmates, they were only offered 77 percent of the time. Out-of-cell activities offered to reception center EOP inmates included yard on Monday, Tuesday, and Friday from 9:00 a.m. to 12:30 p.m., showers three times per week, breakfast and dinner each day, and depending on the inmate, visiting, canteen, library, and religious services. During the reporting period, 69 percent of reception center EOP inmates had lengths of stay longer than 60 days. The

average length of stay was 140 days, with a range of two days to 619 days. The delays were attributed to lack of available bus seats, disciplinary issues, safety concerns, and MHCB and DSH placements.

For 3CMS inmates in reception center, timely initial and follow-up contacts with the primary clinician were provided to 99 percent of inmates. Completion of psychiatry contacts every 90 days for inmates on psychotropic medications took place in 98 percent of cases. Contacts were completed in confidential settings. Fifty-six percent of reception center 3CMS inmates had lengths of stay longer than 90 days during the reporting period. The average length of stay was 166 days, with a range of one day to 1,106 days. Reasons for delays included those reported for reception center EOP inmates.

Administrative Segregation EOP

SQ is an EOP hub institution. Over 90 percent of administrative segregation EOP inmates at SQ were also reception center inmates. During the reporting period, 66 inmates entered the administrative segregation EOP program. All received a comprehensive assessment prior to transfer to the administrative segregation unit and while in the reception center intake process.

Initial IDTT meetings were completed within 14 days in 66 percent of cases. The institution changed its practice to complete an initial IDTT meeting within 14 days of admission, even if an IDTT meeting had been completed one day earlier in the MHCB. The institution did not report whether it was held prior to the initial ICC meeting. In 97 percent of cases, follow-up IDTT meetings took place at least every 90 days. MHTS.net data indicated that attendance by psychiatrists and correctional counselors at IDTT meetings was problematic, although this

appeared to be a data entry problem.  Staff reported that that required team members attended meetings.  Inmates routinely attended their IDTT meetings.

During the reporting period, 94 percent of EOP inmates received at least weekly individual primary clinician contacts in a confidential setting.  Reasons for contacts in non-confidential settings included inmate refusals, staff decisions, and in rare cases, lack of custody escorts.  Ninety-three percent of inmates prescribed psychotropic medications were seen by a psychiatrist at least every 30 days.  During the reporting period, about 90 percent of administrative segregation EOP inmates were offered over seven hours per week of structured out-of-cell therapeutic activities, and over 90 percent of those inmates received at least seven hours of such therapy per week.

MHCB

San Quentin continued to operate a 17-bed MHCB unit.  No inmates were placed in alternative housing while awaiting an MHCB.  During the reporting period, the MHCB received 210 referrals, including 54 from outside institutions, and admitted 194.  No beds were occupied by long-term medical patients during the review period.  Compliance with completion of consents to treatment improved to 94 percent, up from 64 percent during the twenty-third monitoring period.  Completion of histories and physicals within 24 hours improved to 97 percent compliance, well above the 79-percent rate reported during the twenty-third monitoring period.

Manual audits demonstrated a 94-percent compliance rate for completion of SREs upon admission to the MHCB.  Staff discovered that the MHTS.net compliance report on SREs under-reported compliance due to problems with data input.

MHTS.net data also did not accurately reflect the compliance rate for conduct of initial and follow-up IDTT meetings in the MHCB, but a manual audit demonstrated compliance for both, at 99 percent and 92 percent, respectively.  However, attendance rates for psychiatrists, primary clinicians, and correctional counselors were only 81 percent, 75 percent, and 59 percent, respectively.   The monitor's expert observed IDTT meetings for two inmates.  The meetings were conducted competently, with a full complement of attendees and the subject inmates present.  Need for higher level of care was considered.  Treatment plans were reviewed with the inmates.

The compliance rate for daily contacts by the psychiatrist or psychologist was 92 percent.  The MHCB had a group exercise yard and seven individual yards.  Inmates were not allowed to have any property other than approved healthcare appliances.

There were four instances of seclusion involving two inmates, with one inmate secluded on three occasions and the other secluded once.  Documentation demonstrated that physician orders were appropriate and that stays in seclusion did not exceed four hours.

The two instances of use of restraints involved one inmate.  Four-point restraints were used both times.  Documentation included doctor orders, time of application and removal, and vital signs.  Durations averaged less than three hours.

All inmates were restrained when moved within the MHCB or outside the unit. They were permitted to attend IDTTs and clinical contacts uncuffed, unless circumstances indicated otherwise.

The average length of stay remained at nine days, with a range of one to 50 days. Thirty percent, or 59 inmates, had lengths of stay longer than ten days.  Forty-nine percent of those delays were due to waits for DSH beds, and 35 percent were retentions for clinical reasons.

Nine percent of discharges were delayed due to involuntary medication proceedings, four percent were discharged and awaiting transfer to their sending institutions, and three percent were discharged and awaiting housing at SQ.  Placement chronos were completed for 89 percent of inmates discharged from the MHCB.  Audits showed 88 percent compliance for completion of SREs upon discharge from the MHCB, and 92 percent compliance with completion of five-day follow-up after discharge from the MHCB.

PSU

During the monitoring period, three EOP inmates transferred to a PSU.  One inmate was endorsed to a PSU but did not transfer pending parole.  The average time to transfer from the date of endorsement was 32 days, with a range of 21 days to 56 days.

3CMS

During the monitoring period, 290 inmates entered the 3CMS program.  Of these, 83 percent received an initial contact with their primary clinician within ten days, during which time the clinical intake assessment was completed.  Data indicated that initial IDTT meetings were timely in 73 percent of cases.  Nearly 100 percent of 3CMS inmates received primary clinician contacts at least once every 90 days, and 97 percent had a follow-up IDTT meeting at least annually.  Staff reported, and reviewed eUHRs corroborated, that required staff attended the IDTT meetings.  3CMS group therapies were not provided at SQ.

3CMS Inmates in Administrative Segregation

During the monitoring period, 212 3CMS inmates were housed in administrative segregation.  Of those, 84 percent were assessed by a clinician within seven days of placement. Seventy-three percent of initial IDTT meetings were completed within 14 calendar days.  The institution did not report whether the initial IDTT meeting occurred prior to the ICC meeting.

Follow-up IDTT meetings took place at least every 90 days in 99 percent of cases.  The monitor's expert observed four IDTT meetings which were well attended, but review of the treatment plans was cursory.  MHTS.net data indicated problems with psychiatrists' and correctional counselors' attendance at IDTT meetings, although this may have been due to data entry errors as staff reported that attendance complied with Program Guide requirements.  Inmates routinely attended their IDTT meetings.

One hundred percent of inmates prescribed psychotropic medications were seen by a psychiatrist at least every 90 days.  During the reporting period, 92 percent of inmates received at least weekly individual primary clinician contacts, with 82 percent of contacts conducted in a confidential setting and 18 percent conducted cell-front.  Reasons for cell-front contacts included staff decision, inmate refusals, lockdowns, or lack of escort.  The special master's expert observed psych tech mental health rounds and found them to be conducted competently.

Administrative segregation 3CMS inmates had access to group therapy, with 56 of the 88 3CMS inmates participating in group treatment.  Group topics included dialectical behavioral therapy, anger management, substance abuse treatment, and parenting skills.  Group sessions lasted two hours, and inmates were allowed to participate in more than one per week.  Good attendance rates were attributed to collaboration with access to care officers and quality of the groups.

Referrals

During the monitoring period, 2,252 referrals were generated.  Institutional audits demonstrated 83 percent compliance for response to emergent referrals within four hours, 95 percent compliance for response to urgent referrals, and 100 percent compliance for response to

routine referrals.  Tracking and documentation of improved significantly.  All requests were retrieved daily and triaged by a registered nurse.  Each morning the referral coordinator distributed referrals and checked to ensure that all referrals were responded to.

Emergency referrals were addressed immediately by calling the on-call clinician. The referral coordinator triaged the remaining referrals and assigned them to specific members of teams comprised of clinicians assigned to specific housing units.  Teams were designated for crisis, screening, and intervention to respond to all referrals for inmates in general population, mainline, and reception center non-administration segregation unit inmates.  An individual treatment team responded to referrals for EOP inmates and 3CMS inmates receiving weekly case management.  A specialized care team responded to referrals for condemned inmates.  A recidivism reduction team responded to all referrals from general population inmates in administrative segregation.  Medication referrals were given to psych techs for processing.

Medical Records/MHTS.net

An audit of MHTS.net and eUHRs concordance found rates ranging from 91 percent to 98 percent.

There were problems with the accuracy of MHTS.net data and reports.  For example, the MHTS.net report on timeliness of IDTT meetings combined data on both initial and follow-up IDTT meetings, making it erroneously appear that IDTT meetings in administrative segregation were over 90 percent compliant with timeliness.  Another example was that if an inmate's IDTT meeting was compliant during week one of any given month, it was reported as being compliant four times during that month, resulting in a skewed compliance rate.

Mental Health/Custody Relations

Access to care improved significantly since the monitor's preceding site visit during the twenty third round.  Mental health staff reported a good working relationship with custody housing staff and access to care officers.  Observation of conduct of mental health rounds and IDTT meetings corroborated that report.

RVRs

During the reporting period, 1,192 RVRs were issued to 816 inmates, including eight inmates in the MHCB, 49 EOP inmates, and 196 3CMS inmates.  Only one RVR was issued for hoarding or cheeking of medications during the review period.

All EOP inmates and three MHCB inmates received mental health assessments.  In addition, ten general population inmates and 78 3CMS inmates received mental health assessments.  SQ had implemented the RVR policy requiring a mental health assessment for any 3CMS inmate involved in a Division A, B, or C offense, or for any violation that may result in a SHU term.  All RVRs were tracked.  Consideration of mental health input by the hearing officers was noted.

Pre-Release Planning

The institution had a two-member pre-release planning team that provided services to inmates due to be released in 60 to 120 days.  The team provided information on community resources and housing, acted as liaison between headquarters and inmates released to post-release community supervision, and assisted the primary clinicians and IDTT in providing re-entry services.  It also gathered and updated release dates and contacted the parole outpatient clinic to secure appointments for those inmates being released to parole supervision.  During the monitoring period, mental health staff received one hour of training by the pre-release planning team on review of pre-release planning, updating, and case presentation.  Further, all primary

clinicians received one hour of training by county representatives on planning for post-release community supervision.

From December 2011 through May 2012, pre-release services were given to 87 MHSDS inmates, including 35 EOP inmates and 52 3CMS inmates.  Services were offered to all paroling EOP inmates and any 3CMS inmates who requested them or for whom they were recommended by the IDTT.  For the 18 inmates being released to community supervision during the review period, the community mental health center was contacted for an appointment.

### Deuel Vocational Institution (DVI)
August 7, 2012 – August 9, 2012

Census:

On August 6, 2012, DVI reported a total inmate population of 2,500, including 436 MHSDS inmates, for an overall decrease by 34 percent since the monitor's preceding site visit during the twenty-third round.  The overall MHSDS population decreased by 40 percent. There were 17 inmates in the OHU and 97 inmates in mainline 3CMS.  Of the 277 inmates in administrative segregation, seven were EOPs pending transfer to a hub institution, and 60 were at the 3CMS level of care.  The MHSDS population in the reception center decreased by 52 percent.  Out of a total reception center population of 1,190, ten were EOPs and 249 were at the 3CMS level of care.

Staffing:

Of the 77.95 established mental health positions at DVI, 52.65 were filled, for an overall vacancy rate of 33 percent in mental health.  The use of four contractors reduced the overall mental health functional vacancy rate to 27 percent.

The chief psychiatrist and chief psychologist positions were filled, but only one of the 3.5 senior psychologist positions was filled.

Of the five staff psychiatrist positions, only one was filled, but the remaining four vacancies were covered by contractors.  Among staff psychologist positions, 15.5 of the total 26.2 positions were filled.  With use of two contractors, the functional vacancy rate was reduced to 34 percent.  Two of the six social worker positions were filled, for a vacancy rate of 67 percent.

The senior psych tech position, the 19.5 psych tech positions, the .65 recreational therapist position, the health program specialist position, and the SSA position were all filled. Both office assistant positions and three of the six office technician positions were vacant.

Quality Management:

DVI maintained a robust quality management program throughout the reporting period.  The quality management committee met 11 times and was chaired by the CEO or his designee.  Minutes were maintained.  Agenda items included QIT formation and recommendations, as well as local operating procedure updates and reports from each program area and from custody.

The mental health subcommittee met 12 times during the reporting period. Custody attendance was poor due to communication problems which had reportedly been resolved by the time of the site visit.  Activities included monitoring of progress with meeting Program Guide requirements and prior CAP items, and reviewing reports on DSH referral process and QIT recommendations.  Topics of QITs that were chartered during the reporting period included OHU communication issues, 7388B procedures, MHTS.net reporting, and increasing group therapy.

The evolution of DVI's peer review process continued.  Peer review criteria were expanded to include the qualitative as well as the quantitative.  However, the methodology

needed modification, as cases subject to review were chosen by the treating clinicians, thereby introducing potential bias into the sampling of cases for review.  The institution implemented a statewide standardized psychiatry peer review audit tool, but because it was so new, and due to small sample sizes, it was too early to analyze statistics, identify patterns, or draw conclusions from the data.

Suicide Prevention:

The institution's SPRFIT met monthly and maintained minutes.  Rates of attendance by the required members ranged from 55 percent to 75 percent.  The team reviewed compliance with suicide prevention policies and procedures as well as training regarding suicide prevention, completed suicides, attempted suicides, and inmates designated as high utilizers of crisis services.

In administrative segregation, cut-down kits were present on the units and officers produced micro-shields upon request.

The institution was noncompliant with the completion of five-day clinical follow-up after discharges from the OHU.  In addition, problems with data entry accounted for a substantial number of the cases that were counted as noncompliant.  There were a considerable number of cases in which no follow-up occurred on one or more days of the five-day period, and in some cases there was no follow-up at all.  The institution did not maintain a database to provide information on custody follow-up after discharges from the OHU.

In administrative segregation, institutional data indicated that 99 percent of inmates were given the 31-question mental health screen, with a high proportion of these conducted out of cell.

New admissions to administrative segregation were placed throughout the unit and were identified with placards on the doors.  However, there was insufficient line of sight into these cells.  Staff attempted to house EOP inmates in L wing to provide access to group therapy, but this was not always possible.

The overall compliance rate for completion of 30-minute welfare checks in administrative segregation was 100 percent.  However, there continued to be concern with respect to the staggering of these checks, with some instances of checks being more than 30 minutes apart and some instances of no staggering at all.

Medication Management:

Staff had not been trained on MAPIP and continued to use local audit instruments.  DVI was compliant with the timely renewal of medication orders.  All new medication orders were received for administration within 24 hours of being written.

Pill lines were not audited at DVI but institutional reports indicated that wait times lasted from approximately 30 to 105 minutes.  Inmates did not wait outdoors for a pill call.

A sample of reviewed charts indicated that up-to-date informed consent forms were present in charts 75 percent of the time.

Of the 451 inmates prescribed psychotropic medications at the end of the reporting period, 90 were administered DOT and the remainder were nurse-administered.

During the reporting period, one Keyhea order was renewed, while 16 inmates with active Keyhea orders transferred and three paroled.  At the time of the site visit, five inmates had current Keyhea orders.

At the end of the reporting period, there were 90 inmates on HS medications.  All HS medications were administered after 8:00 p.m.

During the reporting period, 103 inmates paroled with active prescriptions for psychotropic medications.  All signed receipts for their medications.

Transfers:

Beginning in July 2012, DVI appointed a clinician to the position of DSH coordinator.  The DSH coordinator did not have a caseload, but did have other duties related to the quality management process.  Pursuant to CDCR's sustainable process for identifying and referring inmates to higher levels of care, the DSH coordinator conducted monthly audits of the 7388B forms for inmates who met indicators for consideration for referral to DSH, but who were not referred.  Audits indicated that the forms included rationales for non-referral as well as recommendations for interventions to address identified clinical problems.  However, the monitor's expert's review of a sample of cases on the non-referral log indicated that the entries did not include adequate rationales for non-referral, and that the statements on the log did not correlate with the information found on the 7388Bs.

That notwithstanding, the DSH referral process at DVI improved substantially since the twenty-third monitoring period.  During the reporting period, the institution initiated one referral to acute care and ten referrals to intermediate care.  The referral to acute care was completed within two days of identification, and acceptance was completed within one day of referral.  The inmate transferred to another institution during the referral process.

Nine of the ten intermediate care referrals initiated during the reporting period were completed within Program Guide timelines, and the tenth referral was late by one day.  The average time from identification to referral was 6.7 days, with a range of two to 13 days.  The average time from referral to acceptance was 9.85 days, with a range of two to 22 days.  The average time from acceptance to transfer was 11.16 days, with a range of two to an outlier of 36

days.  One intermediate care referral was rescinded and three inmates transferred to other institutions during the referral process.  Of the six inmates who transferred to a DSH facility, five were within Program Guide timelines.  The average time from referral to transfer was 19.33 days, with a range of seven to 40 days.  The average time from bed assignment to transfer was 2.5 days, with a range of same day to five days.  Four of the six transfers, or 67 percent, transferred within 72 hours of bed assignment.

During the reporting period, there were 203 referrals to the OHU, all of which resulted in admissions.  Of these referrals, 72 or 36 percent were subsequently admitted to an MHCB, where the average length of stay was 2.32 days, with a range of less than 24 hours to 13 days.  Twenty-nine inmates had OHU stays in excess of 72 hours.  Reasons for these extended stays included waits for an MHCB bed, waits for a bed due to level-of-care change, medical holds, and parole.  DVI reported that no inmates were placed in alternative housing during the reporting period.

Data from MHTS.net at the time of the site visit indicated that the average length of stay for EOP inmates in the administrative segregation unit was ten days during the reporting period.  At the time of the site visit, there were three EOP inmates in administrative segregation with lengths of stay ranging from nine to 45 days.

The average length of stay for 3CMS inmates in administrative segregation was 31 days during the reporting period.  At the time of the site visit, there were 59 3CMS inmates in administrative segregation, with 18 or 31 percent staying in administrative segregation in excess of 90 days.

Institutional data showed the average lengths of stay in the reception center for EOP and 3CMS inmates were 16 and 53 days, respectively.

Other Areas:

Reception Center

EOP inmates in reception center were offered four therapeutic groups and at least one individual contact per week.  Data from MHTS.net showed that inmates were offered an average of 4.91 treatment hours and attended an average of 4.14 hours weekly during the reporting period.  The presence of additional reception center EOP inmates in the Special Processing Unit limited programming time due to the inability of the two groups to program together.  Reception center EOP inmates were offered three hours of yard once per week.  The institution was compliant with providing weekly primary clinician contacts and monthly psychiatric appointments, most of which occurred in confidential settings.  IDTT meetings occurred monthly.

For 3CMS inmates in reception center, MHTS.net data indicated a 97-percent compliance rate for providing initial primary clinician contacts within 30 days of arrival, and a 99-percent compliance rate for providing quarterly routine primary clinician contacts.  DVI was also compliant with providing psychiatric contacts for inmates on psychotropic medications.  There was one weekly group, on anger management, offered to 3CMS inmates.

MHSDS Inmates in Administrative Segregation

Inmates in administrative segregation at DVI were housed in L and K wings.  The institution was noncompliant with the provision of initial and follow-up IDTT meetings for both EOP and 3CMS inmates in segregation.  Compliance rates for initial primary clinician contacts for EOP and 3CMS inmates were 76 and 84 percent, respectively.  For follow-up primary clinician contacts, compliance rates for EOP and 3CMS inmates were 86 and 85 percent, respectively.  Approximately 83 percent of primary clinician contacts occurred in a confidential

setting.  The inmate's primary clinician generally attended the initial IDTT meeting, but attendance by the correctional counselor and psychiatrist was inconsistent.

Proof- of-practice information indicated that DVI had not implemented a defined process for 30-day reviews of inmates who remained in administrative segregation over 90 days.

OHU

DVI's OHU consisted of 28 beds, 14 of which were designated for mental health inmates.  Four of these beds were located in an alcove and used for one-to-one observation for inmates on suicide precaution.  The OHU was staffed seven days per week, with coverage five days per week by a psychiatrist, one shift per day by a psychologist, and night and weekend coverage by an on-call psychiatrist.

MHTS.net data was insufficient to confirm the compliance rate for the administration of SREs upon admission to the OHU and upon discharge from the OHU to units other than an MHCB.

Review of eUHRs indicated that 100 percent of inmates in the OHU received daily contacts with a psychologist or a psychiatrist.  Clinical treatment decisions were made a by a team which included a psychologist and a psychiatrist, but not a correctional counselor. Inmates in the OHU did not have access to yard, out-of-cell therapy, or recreational therapy.

Clinicians reported that all inmates placed in the OHU remained in mechanical restraints while out of cell, irrespective of their custody status.  However, medical patients without administrative segregation designations were not handcuffed when out of cell.

3CMS

The number of 3CMS inmates at DVI grew with the expansion of the mainline population.  The institution was compliant with the provision of initial intake assessments, initial

and follow-up IDTT meetings, and initial and quarterly primary clinician contacts.  Only one group was offered in mainline 3CMS.  A QIT was chartered to address the limited amount of group offerings.

Referrals

The institution reported that 1,989 mental health referrals were initiated during the reporting period.  Data indicated that 93 percent of emergency referrals were seen on the same day, while 93 percent of both urgent and routine referrals satisfied timelines.

Heat Plan

Although DVI had implemented the system-wide heat plan and had its own LOP, there were numerous days in the months of June, July, and early August 2012, when protocols were not followed.  In June 2012, there were eight days when temperatures in the units reached 90 degrees or above.  Protocols were not followed in certain units for seven of those eight days. Staff indicated that reports of some of those lapses may have been the result of reporting omissions.

RVRs

The institution reported that during the reporting period it issued 1,014 RVRs, including 28 to inmates in the MHCB, 14 to EOP inmates, and 203 to 3CMS inmates.  However, this data could not be verified due to discrepancies in reporting.  The report provided by the institution listed the inmate's level of care at the time the report was generated and not at the time the RVR was issued.  One EOP inmate reportedly received four RVRs during the reporting period, but a review of the C-file indicated that he was not on the mental health caseload at the times these RVRs were issued.

**California State Prison – Corcoran (CSP/Corcoran)**
August 20, 2012 – August 23, 2012

Census:

        CSP/Corcoran reported that on August 21, 2012, it housed 4,744 inmates, for a four-percent decrease since the preceding monitoring period.  The institution's mental health caseload population was 1,528, representing an eight-percent increase in that population, and 32.2 percent of the total inmate population.  The MHCB unit housed 17 inmates.  There were 92 EOP hub inmates and 147 mainline EOP inmates.  The 3CMS population grew from 516 to 581 since the preceding monitoring period.  The administrative segregation population of 491 inmates included 168 3CMS inmates, a decrease by 185 inmates since the preceding monitoring period.  The SHU population of 1,395 included 4 EOP inmates pending PSU transfer and 424 3CMS inmates.

Staffing:

        There were 81.14 established mental health positions, of which 65.5 positions were filled, for an overall vacancy rate of 19 percent in mental health.  Use of 11.6 FTE contractors reduced the functional vacancy rate to five percent.  The positions of chief psychiatrist/chief of mental health, chief psychologist, four senior psychologists, one supervising social worker, and four senior psych techs were all filled.  The half-time senior psychiatrist position was vacant.

        Of the 12.5 staff psychiatrist positions, 2.75 were filled, resulting in a vacancy rate of 78 percent.  With contractual coverage of 7.6 staff psychiatrist positions, the functional vacancy rate was reduced to 17.2 percent.

        Of the 33.5 staff psychologist positions, 32.75 were filled, resulting in a vacancy rate of only two percent.  Contractors covered the vacancies.  Thirteen of the 17.4 social work

positions were filled, leaving a vacancy rate of 25 percent.  With contractors covering two FTE positions, the functional vacancy rate in social work was reduced to 14 percent.

There were 37.64 positions for psych techs, of which 34 were filled, resulting in a 3.64 percent vacancy rate.

Of the 10.5 recreational therapist positions established, ten were filled, resulting in a vacancy rate of 4.8 percent.  Thirteen of the 15 mental health clerical positions were filled, for a vacancy rate of 13 percent.

Quality Management:

During the reporting period, the local governing body met monthly, with a quorum present.  Minutes were maintained.  The group addressed EOP SNY conversion, mental health referrals, access to care, MHCBs, duty to warn, health records, health care appeals, use of priority health care ducats, release of health care information, medication management, urgent/emergent response, 3CMS care in the SHU, and the institution's heat plan.

The quality management committee met during the review period, with a quorum at each meeting and minutes maintained.  From January to March 2012, meetings were held twice a month, and thereafter once a month.  The committee took up reports on the mental health program along with other relevant health care topics.

The mental health subcommittee each met twice per month with a quorum present throughout the monitoring period, and maintained adequate minutes.  The mental health subcommittee addressed the 3CMS program, the EOP, MHCBs, DSH referrals, mental health audits, QITs, involuntary medications, and suicide prevention.

During the review period, two QITs were active, another on EOP hub treatment improvement continued from the preceding monitoring period, and two that that had resolved produced final recommendations to the quality management committee.

At the time of the site visit, peer review for psychiatry, psychology, and social work was active.

Suicide Prevention:

The SPRFIT met monthly and maintained minutes, but required participants and/or designees were often not in attendance.  The team took up high-risk cases, usage of MHCBs, use of five-point restraints, and suicide attempts, and conducted suicide prevention activities.  It maintained a log of suicide attempts that tracked inmates by location, method, injury, dispositions, recommendations, and follow up.

CPR training was conducted annually.  All officers in administrative segregation had either completed or were scheduled to complete the training, which occurred each month during the reporting period.  Emergency drills were conducted quarterly during the reporting period.  Cut-down tools and Ambu bags were stored in the control centers of administrative segregation housing units.  Random audits found that officers carried micro-shields on their persons.

Audits of five-day clinical follow-up found 100-percent completion in January and February 2012.  Audits for March, April, May, and June 2012, indicated that some five-day clinical follow-ups were not completed, or were missing information.  A report on custody follow-up after MHCB discharges indicated completion rates of 61 to 92 percent.

In administrative segregation, daily morning meetings between custody and clinical staff were documented 95 percent of the time.

Audits indicated that pre-placement screens were completed 44 to 75 percent of the time, generally in confidential settings.  Audits also indicated that 64 to 100 percent of non-MHSDS inmates placed in administrative segregation received a timely 31-item screen.

Cells of new arrivals in A-yard administrative segregation and the stand-alone unit bore placards.

All new administrative segregation intakes appeared in the log of 30-minute welfare checks maintained by custody.  Documentation of these checks showed that they were staggered in Unit 3A03, but not in 3A04.  Supervisor signatures were missing on several logs.  During the monitor's visit, it was observed at 10:30 a.m. on August 22, 2012 that documentation of checks in unit 3AO4 had not been entered since 5:30am that same day.

Audits of psychiatric technician rounds in administrative segregation found that documentation was completed 88 to 100 percent of time.

Medication Management:

In part, Corcoran utilized MAPIP audits for medication management.  During the site visit, significant medication management issues that had not been identified via the MAPIP process were identified.  Discussion with staff responsible for the MAPIP process indicated likelihood that the MAPIP methodology was not properly followed.

A review of MAPIP results yielded compliance rates of 90 percent or greater in the areas of medication continuity for new arrivals to the institution and following intra-institutional transfers, renewal of orders and bridge orders, DOT, HS medications, timely processing of medication orders, and parole medications.  However, it was observed that the results on timeliness of processing medication orders and medication continuity for intra-

institutional transfers were inconsistent with information provided by line staff, especially with regard to mental health inmates in the SHU and discharges from the MHCB.

Among the average of 30 cases of medication noncompliance per week, 63 percent resulted in documented follow-up with the psychiatrist within seven days of referral.

A MAPIP audit based on a random sample of eUHRs found up-to-date informed consent forms in files 81 percent of the time.

Medications were typically distributed via pill line in the mainline 3CMS facilities, with an average wait time of 28 minutes on 3B01 yard.

An audit of 20 randomly selected eUHRs of inmates receiving psychotropic medications found that among 19 applicable cases, 89 percent had laboratory tests ordered when clinically indicated, and 68 percent had an AIMS test within the preceding six months.  Of the 17 cases who had significant test results, psychiatrists reviewed results and documented clinical action in 89 percent of those cases.

During the reporting period, no RVRs were issued for hoarding or cheeking of medications.

At the time of the site visit, 86 inmates were receiving psychotropic medications via Keyhea orders.  Nineteen orders were renewed and none lapsed unintentionally.  Sixteen petitions for new orders were initiated during the review period, but eight were subsequently rescinded due to the patient's clinical improvement.  All but one of the remaining eight petitions were granted.  Review of logs indicated instances when the Keyhea coordinator was not being notified by either the sending institution or reception/receiving at CSP/Corcoran that an arriving inmate was under a Keyhea order.

Transfers:

CSP/Corcoran had a full-time DSH coordinator as of February 2012.  The DSH referral log remained out of date, with missing data, incorrectly filled out fields, erroneous calculations, and some poorly articulated rationales.  In addition, data was not timely entered into MHTS.net.  This was attributed to diversion of the coordinator's time to work on developing the sustainable process for identification and referral of inmates to higher levels of care.

Form 7388Bs were completed at each IDTT meeting, with the teams routinely reviewing indicators for consideration of referral to a higher level of care.  MHTS.net. reports prepared for IDTT meetings listed the number of MHCB admissions and RVRs received.  For EOP inmates, an additional report was prepared on the number of treatment hours received.  A log of MHCB stays was available during IDTT meetings in the MHCB.  Monthly non-referral logs and audits of non-referrals were complete.  The DSH coordinator's audits of the non-referrals consistently found compliance for entry of reasons for non-referral, including change or additional treatment interventions, on the Form 7388Bs.

During the reporting period, there were 16 DSH referrals, including nine to intermediate care and seven to acute care.  Of the seven referrals to acute care, one was cancelled when the inmate's referral was changed to intermediate care.  Out of the remaining six, three were completed timely and the others were completed within a week of the IDTT referral.  Bed assignments at DSH occurred within one to three weeks of the referral.  Two of the six acute care referrals were transported within 72-hours of bed assignment, but all went within a week of assignment.

Of the nine intermediate care referral packets, five were completed timely, and three were completed within one additional day.  Two of the DSH referrals had been initiated by other institutions.  At the time of the site visit, all had been accepted and transferred to DSH,

with no waitlist at that time.  The three *Vitek* hearings all affirmed the transfers.  The number of referrals to DSH appeared low, given the custody level of the institution, the size of its MHSDS caseload, the extent of treatment provided in many of the mental health programs, the number of MHCB referrals and admissions, and the number of inmates who met at least one indicator for consideration of transfer to a higher level of care.

The chief of mental health anticipated an increase in the number of referrals because waiting time for a DSH bed assignment was short, inmates generally returned clinically improved, and information about DSH treatment programs was routinely and timely provided. However, by mid-April 2012, DSH bed assignments were taking three to four weeks.

Twenty-seven inmates returned from DSH during the reporting period. Generally, the DSH coordinator and the MHCB director received e-mail notices of these discharges and notified program clinicians.  The DSH discharge summaries were posted on SharePoint and timely added to the eUHRs.  Clinician-to-clinician contacts were occurring regularly.

Other Areas:

Administrative Segregation EOP

The EOP hub had an authorized capacity of 99 inmates and staff allocations of one FTE psychiatrist and nine FTE primary clinicians.  During the reporting period, 603 inmates entered the administrative segregation EOP.  The institution reported that 100 percent of inmates received a comprehensive assessment prior to the initial IDTT meeting or within 14 calendar days of referral/identification.

Based on MHTS.net reports, 79 percent of initial IDTT meetings were completed within fourteen calendar days, and 88 percent of follow-up IDTT meetings took place at least

every ninety days.  IDTT meetings were attended by the primary clinician 100 percent of the time, and by the psychiatrist 83 percent of the time.  The audit also showed 83 percent of IDTT meetings were attended by correctional counselors, with 96 percent of IDTT meetings attended by inmates.  The only reported reason for any inmate non-participation was refusals

Inmates received at least weekly individual primary clinician contacts, 54 percent of which were in an out-of-cell confidential setting, and 46 percent of which were cell-front. Ninety-two percent of inmates prescribed psychotropic medications were seen by a psychiatrist at least monthly.  Fifty-seven percent of inmates attended at least ten hours of structured therapeutic activities per week.  However, access to recreation was problematic, due primarily to construction of the new treatment center.

On average, 34 percent of inmates refused more than half of offered treatment during any given week.  They were given primary clinician contacts five days per week, and a modified treatment plan, which produced little success with increasing participation in out-of-cell structured therapeutic activities.

A pilot on training and use of an alternative treatment module chair in group therapy was initiated during the review period.  The monitor's expert observed three therapeutic groups and interviewed inmates.  A clear majority of the inmates preferred therapeutic modules to the alternative chair, stating that it was uncomfortable and awkward.  Quality of the observed groups was very good.  Inmates reported satisfaction with EOP hub programming, access to the psychiatrist and primary clinician, and familiarity with the IDTT process and their individual treatment plans.  Medication management issues were not present.

The sources, reliability, and methodology behind program data were unclear in some instances.  Requested pre-site stand-alone documents were not provided.

MHCB

There was a 25 single-cell MHCB unit in the GACH at CSP/Corcoran.  One of the cells remained occupied since 2002 by one inmate who had medical and mental health complications, and another cell was reserved for use as an observation room during utilization of five-point restraint, leaving 23 MHCBs for use.  Suicide-resistant beds were installed during the review period.  All admissions were housed in the MHCB unit initially.  The overflow unit was used to house less acute inmates or those who had been clinically discharged and were awaiting bed assignment.  Overflow housing was available on the medical/surgical unit of the GACH, but the hospital cells/rooms had not been modified in any way to serve as overflow.  On each day of the site visit, there were eight to 12 inmates in the overflow.

Of the 583 referrals to the MHCB, there were 391 admissions including 327 from CSP/Corcoran and 64 from other institutions.  This was comparable to the preceding monitoring period, except that admissions from other institutions doubled.  Twenty-eight inmates had three or more admissions to the MHCB during the reporting period.  The average length of stay was 13.4 days, with a range of zero to 61 days.  Forty-eight inmates had stays over ten days, primarily due to clinical reasons and waits for a bed assignment.

Histories and physical examinations were completed within 24 hours of admission.  Inmates were assigned to one of two clinical teams composed of a psychiatrist, a psychologist, and a social worker.  According to MHTS.net reports, an initial IDTT meeting occurred within 72-hours of admission in 93 percent of cases, and weekly IDTT meetings occurred in 82 percent of cases.  An audit of 15 charts found higher compliance rates of 100 percent and 93 percent, respectively, for these requirements.  Attendance rates for psychiatry, primary clinicians, and the inmate were 93 percent, 100 percent, and 100 percent, respectively.

According to an MHTS.net report, a counselor was present for 64 percent of the meetings during the reporting period.  There was no correctional counselor at either of the IDTT meetings during the week of the site visit.  IDTTs had available to them an MHCB admission and RVR report for consideration of possible referrals to higher levels of care.  The monitor's expert observed IDTT meetings that were attended by the psychiatrist, psychologist, social worker, and nurse, but not the correctional counselor.  Inmates were escorted cuffed but were seen un-cuffed.  Discussion was clinically driven and actively engaged the inmate.

Inmates in the MHCB were seen daily 84 percent of the time.  Recreational therapy was provided in therapeutic modules located in private areas of the MHCB.

The monitor's expert observed a daily meeting of a clinical contact team made up of the psychologist, psychiatrist, nurse, and the inmate, who was cuffed and escorted into the treatment module.  Clinical staff appeared reluctant to have the inmate un-cuffed, although he had done nothing to harm himself, nor "manipulated" or refused to follow orders.  This team also did not discuss the potential referral of inmates to DSH care for cases whose stays exceeded ten days, but deferred it to an upcoming IDTT meeting.

Clothing for inmates in the MHCB and overflow remained restricted to a safety smock, regardless of clinical condition or length of stay, although other types of property may be returned to the inmate.  Clinical staff were reluctant to reconsider this practice.  Inmates transferred to the overflow medical wing were given a mattress to place on the floor.  Their clothing was not returned to them, even if they were clinically discharged.  Discussion of these practices with the MHCB director and chief of mental health was followed by issuance of a memorandum to MHCB staff that effective August 23, 2012, discharged patients on the medical wing should retain a bed and be issued hospital clothing.

The fifteen episodes of application of restraints during the reporting period involved 11 inmates, with one having four episodes and another having two.  Durations ranged from one hour to an outlier of 95.5 hours, with an average time of 18.43 hours.  The restraint log did not state the reason for restraint.  At the end of each month, the MHCB chief was notified of each restrained inmate's name, time placed in restraints, time released, and total time in restraints.

SHU

The SHU 3CMS program provided services to over 400 3CMS inmates.  It was staffed by 12.25 FTE primary clinicians and three part-time psychiatrists.  Already limited escort availability had become even more limited due to the increased demand from medical and dental services, which resulted in longer wait times for clinical contacts.

Initial IDTT meetings within 14 days were provided in 62 percent of cases.  Follow-up IDTT meetings reportedly took place at least quarterly, with few exceptions.  Attendance rates were 100 percent for primary clinicians and psych techs, 79 percent for both psychiatrists and correctional counselors, and 42 percent for inmates.

There were some problems with medication continuity.  Ninety-seven percent of inmates prescribed psychotropic medications were seen by a psychiatrist at least quarterly.  Ninety-three percent of inmates received contacts with their primary clinicians at least monthly, with half out of cell.  Cell-front contacts were due mainly inmate refusals.  Weekly psych tech rounds were completed and documented.  The monitor's expert observed that mental health rounds which were conducted appropriately.

EOP

The transition from a general population level IV yard to an SNY level IV yard resulted in 132 new admissions and a large number of discharges from the unit during the reporting period.  Programming was severely limited and some groups were cancelled during the transition period.  EOP inmates, including the five housed in 3CMs yards, were provided services by seven primary clinicians and one full-time psychiatrist.

At the time of the site visit, the transition had been completed.  Clinicians ran three groups each week, with group participation capped at 14 members per group except for the AA and NA groups**.**  In July 2012, mental health staff gained access to six additional rooms for individual and group treatment, but confidentiality of the space was curtailed by a custody-directed practice that EOP inmates must attend individual sessions with the door open and custody officers seated directly outside of the room.

Initial IDTT meetings were timely in 59 percent of cases, and follow-up IDTT meetings were timely in 84 percent of cases.  Treatment plans were updated 69 percent of the time.  Staff had received training on this issue.  The institution's management report indicated attendance rates of 100 percent for primary clinicians, 86 percent for psychiatrists, and 83 percent for inmates.  However, mental health leadership indicated that the rate reported for primary clinicians reflected attendance policy rather than actual attendance.  Staff discussion was good at IDTT meetings observed by the monitor's expert.

Provided data showed a compliance rate of 90 percent for primary clinician contacts, but did not indicate whether they were conducted in confidential settings.  Eighty one percent of psychiatry contacts were completed.  Reasons for lapses were the care provider's lack of time, modified programming, and provider unavailability.  The caseload for the psychiatrist on the EOP mainline yard was 147 at the time of the site visit.

Institutional data showed that only 42 percent of scheduled group contacts were completed. Lapses were due predominantly to modified programming and inmate refusals. An observed clinical group was well-conducted and clinically meaningful. According to institutional data, EOP inmates were offered only an average of 6.67 hours of structured therapeutic activities per week, including some activities that were not therapeutic activities.

At the time of the site visit, two EOP inmates received modified treatment plans while awaiting DSH transfer. Both received monthly IDTT meetings. Five EOP inmates were housed in 3CMS yards A and C while waiting for transfer to other institutions. Throughout the review period, 17 to 22 3CMS were on this status. They reported receiving more frequent clinical contacts and IDTT meetings, but they did not have access to group treatment and received 3CMS-level out-of-cell activities. Wait times from endorsement to transfer were one to nine months.

3CMS

The institution's 3CMS inmates were housed on A, B, and C Yards. Yard 3B was transitioned from a level IV GP yard to a level IV SNY yard, which led to complete turnover of the population on that yard and a large number of new intakes and initial IDTT meetings. There were two psychiatrists, who each had caseloads of 141 to 275, and five primary clinicians, who had caseloads of 130 to 150. A total of 489 inmates entered the program during the review period.

Initial IDTT meetings and primary clinician contacts were timely only 50 percent and 51 percent of the time, respectively. The institution attributed this largely to the mission change on the yard.

Contacts with the psychiatrist for inmates who were on psychotropic medications were timely 99 percent of the time, according to MHTS.net data.  Data from other sources, however, indicated a compliance rate of 74 percent.  Ongoing primary clinician contacts were timely in 92 percent of cases.

No therapeutic groups were available to 3CMS inmates at the time of the site visit.  Non-therapeutic groups, which were not led by mental health staff, operated on a limited basis during the reporting period.

Follow-up IDTT meetings occurred at least annually, and more frequently if indicated, 85 percent of the time.  Observed IDTT meetings on A Yard were well-conducted, and attended by a full complement who demonstrated good rapport with the inmates.  Central files were not available; eUHRs were available but were not consulted during the meetings.  However, IDTT meetings on B yard were problematic.  While a meeting observed by the monitor's expert took place in confidential office space, the primary clinician reported that they were frequently conducted on the housing units.  Attendance by the psychiatrist and the correctional counselor was deficient, and staff reported that it was not uncommon for the primary clinician to conduct the meeting in their absence.  At observed meetings, a non-treating psychiatrist and a correctional counselor arrived well after the meetings had begun.  Central files were not available.  The eUHR was available and was consulted by the primary clinician who appeared to be knowledgeable about the inmates' conditions.

Leadership and staff reported that custody officers were no longer assigned for escorts to mental health appointments, and were not present in the area of contacts unless there for other activities.  On B yard, the clinician reported that he generally conducted appointments in the housing units, at cell-front or in the day room, with access to the correctional counselor's

or custody offices.  On C yard, staff reported that most interviews were conducted in the mental health offices, although some staff expressed discomfort with the unpredictable presence of custody as well as frustration with the process of calling the housing area to have an inmate "sent" to see mental health.  One of the monitor's experts observed the process of mental health making repeated calls to the housing area in an attempt to interview an inmate.  The expert and mental health staff eventually went to the unit where the inmate was interviewed.

It appeared that under direction from custody leadership, 3CMS inmates on all yards were not allowed out of their cells for yard and/or dayroom time.  This was concerning, particularly for inmates on B Yard who were on heat medications and could not safely attend outdoor yard during high temperature days.

<u>3CMS Inmates in Administrative Segregation</u>

During the reporting period, 681 inmates entered the administrative segregation 3CMS program.  The program was housed in 3A04, with overflow into 3A03 and 3A05. Individual treatment was offered in treatment modules located on the dayroom floor.  Two of the program's six FTE case manager positions and the psychiatrist position were vacant.  Two psychiatrists covered the vacant position four days per week.  Two escort officers provided services for six clinicians with mental health appointments for about 160 inmates seen weekly. Staff described difficulties in seeing their caseload inmates for the clinically required time due to escort and physical plant issues.

Data sources and methodology were unclear at times.  The pre-site documentation requested for the stand-alone was not provided, while the reliability and validity of some of the data was questionable.

Based in part on an eUHR audit with a sample of 16, the institution reported that 77 percent of inmates received a comprehensive assessment within ten calendar days of identification and referral.

According to MHTS.net reports, 80 percent of initial IDTT meetings were completed within fourteen calendar days, and 96 percent of follow-up meetings took place at least every ninety days. Psychiatrists attended 94 percent of IDTT meetings, but correctional counselors did not attend. At an IDTT meeting observed by the monitor's expert, required staff was present. The location of the meeting in a dayroom with partitions and background noise from fans made it impossible to hear most of the discussion. No computer was present for access to the eUHR and C-file was not available.

During the reporting period, 88 percent of inmates received at least weekly individual primary clinician contacts, with 31 percent in a confidential setting and 69 percent at cell-front. Ninety-three percent of inmates on psychotropic medications were seen by a psychiatrist at least every 90 days.

The sole private office was used for medical lines. There were no available facilities for group treatment. Access to the recreational areas was very limited due to the construction of the new EOP treatment building. Recreational modules were shared by two different housing units. Consequently, inmates generally received less than five hours per week of outdoor recreational time.

Mental health rounds were observed by the monitor's expert in Building 3A04, the primary housing unit for administrative segregation 3CMS inmates. These rounds were performed competently by the psych tech.

Referrals

The institution reported 81 emergent, 39 urgent, and 3,050 routine referrals. Compliance rates for timely response to these referrals were 90 percent, 56 percent, and 68 percent, respectively.

Heat Plan

The institutional heat plan LOP was updated in May 2012.  Heat lists were available to staff online and in hard copy.  A review of logs and monthly reports to central office confirmed that they were current.

Outdoor temperature exceeded 90 degrees in May, June, and July, causing implementation of the heat plan.  There were no indoor temperatures of 90 degrees or higher recorded in May and June 2012, but indoor temperatures exceeded 90 degrees during three days in July.  Heat risk placards were placed on cell doors in several housing units at the institution.

RVRs

The institution reported that MHCB and EOP inmates who were issued RVRs received mental health assessments.  3CMS inmates received assessments for A, B or C SHU-able offenses and for D, E, or F offenses.  A total of 268 3CMS and 14 general population inmates received mental health assessments during the review period.

Use of Force

At the time of the site visit, CSP/Corcoran had timely completed 92 percent of final executive reviews of the 165 use-of-force incidents that occurred from January 1, 2012 to June 30, 2012.  Eight of the remaining 13 cases had completed initial reviews, each of which was ready for re-submission to the use-of-force executive review committee.  Reviews of the remaining five were pending conclusion of investigations by CDCR's Office of Internal Affairs before submission for the executive review process.

The institution maintained appropriate tracking of use-of-force incidents. Institutional data indicated that among the total 165 use-of-force incidents, 112 or 68 percent involved MHSDS inmates, down slightly from the 74 percent reported for the preceding monitoring period.  Required clinical interventions occurred for those incidents involving cell extractions.  Staff training on clinical interventions continued

There were 215 total non-use-of-force incidents during the monitoring period, including 142 or 66 percent involving MHSDS inmates.  This was a modest decline from the 233 such incidents in the preceding reporting period monitoring, and an increase in the proportion involving MHSDS inmates, up from 57.9 percent in preceding reporting period.

Pre-Release Planning

The primary clinician assigned to coordinate pre-release planning efforts reported that all paroling EOP cases were assigned to him for pre-release assistance.  He indicated that services to inmates released on probation, which accounted for about 90 percent of releases, were limited to sending information about the inmate to the relevant county's mental health headquarters.  Assistance to paroling inmates was somewhat broader.  Of the 17 EOP inmates who paroled during the reporting period, 11 received parole planning, five paroled or transferred before the parole date, and one was not scheduled.  The institution's TCMP staff member reported that she assisted caseload inmates with SSI, MediCal, and VA benefits applications, with priority given to EOP inmates.  The EOP pre-release group had been discontinued.

Access to Care

Information obtained from staff indicated that there were issues with access to care.  Due to insufficient numbers of access to care officers, clinicians reported that they could

not see their caseload inmates for sufficient lengths of time and still see all scheduled inmates.

Some clinicians resorted to seeing inmates at cell front.  Instances of clinicians choosing not to

see inmates at cell front appeared in the monthly access-to-care report as if the contact had been

canceled by the clinician.  Reasons for lack of group therapy offerings for 3CMS inmates in the

SHU and administrative and mainline yards included insufficiency of access-to-care officers, as

well as lack of programming space and safety concerns.

<u>**California Substance Abuse Treatment Facility (CSATF)**</u>
July 16, 2012 – July 19, 2012

<u>Census</u>:

CSATF reported that on July 12, 2012, it housed 5,526 inmates, for a 13-percent

decrease in population since the monitor's preceding site visit for the twenty-third round.  The

mental health caseload population dropped by one percent to 1,820 inmates.  There were 13

inmates in the MHCB, 267 in mainline EOP, and 1,381 in mainline 3CMS.  The administrative

segregation population of 382 included one EOP inmate awaiting transfer to an EOP hub and

158 3CMS inmates.

<u>Staffing</u>:

Of 116.55 allocated mental health positions, 101 were filled, for an overall 13-

percent institutional vacancy rate in mental health.  Contractors covered an additional five FTE

positions, reducing the functional vacancy rate to nine percent.

Positions for the chief psychiatrist, chief psychologist, two of three senior

psychologists, and supervising social worker were all filled.

Only two of eight staff psychiatrist positions were filled.  Contractors covered an

additional 4.25 FTE positions, reducing the functional vacancy rate to 22 percent.

Twenty-seven of 32 staff psychologist positions were filled.  Contractors covered .75 additional FTE positions, reducing the staff psychologist functional vacancy rate to 13 percent.  All 10.5 social worker positions were filled.

Positions for both senior psych techs, 34 psych techs, and three of 4.05 recreational therapists were filled.  The health program specialist I position was vacant.

Of eight mental health clerical positions, 6.5 were filled.

CSATF utilized a weekly average of 15.11 hours of psychiatry telemedicine.

Quality Management:

During the review period, quality management at CSATF focused on inmate clinical needs, development of a sustainable process for identification and referral of inmates to DSH programs, and upgrading the accuracy of MHTS.net data.

The local governing body met twice and attained a quorum at both meetings.

The quality management committee was chaired by the CEO.  It met six times, maintained meeting minutes, and consistently achieved a quorum.

The mental health subcommittee met once, but other scheduled subcommittee meetings were cancelled due to staff vacancies or redirection of staff resources to attend to clinical matters.

Two mental health QITs addressed five-day clinical follow-up and high-utilization inmates.

CSATF did not have an effective peer review process.

Suicide Prevention:

There were no completed suicides at CSATF during the review period.

The SPRFIT met twice.  Agenda items included the suicide prevention videoconference, review of statewide suicide statistics, five-day clinical follow-up, and inmates in danger of self-harm, among other things.

The ERRC met regularly.  According to documentation, 34 emergency medical response drills were reviewed.  Custody staff indicated that CPR refresher training was provided.  Officers in the units routinely carried micro-shields.  Cut-down tools and personal protective equipment were accessible in the control booth.

Conflicting data indicated that completion of five-day clinical follow-up after discharges from the MHCB was less than 100-percent compliant.

In administrative segregation, daily morning meetings between mental health and custody staff occurred regularly.

CSATF did not audit the compliance rate for completion of pre-placement screens prior to placement in administrative segregation.  Audits indicated compliance rates of 98 percent for completion of 31-item screens for inmates housed in E-1, which included MHSDS inmates, and 99 percent for completion of pre-placement screens for the stand-alone administrative segregation unit.  The institution did not report on confidentiality of settings for the 31-item screen.

Five administrative segregation cells were retrofitted to be suicide-resistant.  Because there were typically more new intakes than available intake cells, non-retrofitted cells were routinely used for new intakes.  Door placards appropriately identified cells housing new arrivals for the initial 21-days.

Thirty-minute welfare checks were generally not completed at staggered intervals.  Documentation indicated 100-percent compliance for daily psych tech rounds.

Except for the designated new intake cells, administrative segregation cells were equipped with electrical outlets.

Interviewed inmates indicated receiving ten hours of yard per week.

<u>Medication Management</u>:

The institution had implemented the MAPIP audit tool.  However, MAPIP audits did not include the psychiatry component.

The institution was compliant for medication continuity following new arrivals and intra-institutional transfers.

Audits indicated that medication orders were not processed timely.  There were no audits of medication renewal orders.

Audits indicated noncompliance with response to cases of medication noncompliance.  Wait times in pill lines were reasonable.

Based on review of records of inmates on psychotropic medications and housed in the MHCB or at the 3CMS level of care, up-to-date consent forms were present in eUHRs at least 98 percent of the time.

The institution did not audit laboratory testing of inmate blood levels of psychotropic medications or DOT medication administration.

Seventeen of 21 new petitions for Keyhea orders were granted, one was denied, and two were withdrawn by the treating psychiatrist.  The outcome of the other one was unknown.

MAPIP audits indicated that HS medications were properly administered after 8:00 p.m.

The institution adhered to protocols for supplying paroling inmates with a 30-day supply of their medications upon release.

Transfers:

Among other things, the DSH coordinator oversaw completion of the logs for referrals and non-referrals of inmates to DSH programs.  Review of the non-referral log indicated that it generally included adequate rationales for non-referrals.

Of the 20 inmates referred to acute care, seven referral packets were completed timely.  Two acute care referrals were rescinded.  Seventeen of these referrals resulted in transfers, with five of them within ten days of the referral.  All acute care transfers were within 72 hours of bed assignment.

There were 18 referrals to intermediate care, 12 of which had referral packets completed timely.  One of these referrals was rescinded.  Of the 12 intermediate care referrals which resulted in transfers, ten were within 30 days of the referral and were within 72 hours of a bed assignment.

The DSH coordinator reported that office techs generated weekly lists of EOP inmates who met objective indicators for consideration for referral to DSH programs.  These lists were based on MHTS.net data and were provided to clinicians attending IDTT meetings for EOP inmates.  The purpose was to stimulate consideration of referral to DSH care.  Clinicians assigned to 3CMS caseloads ran MHTS.net reports to identify inmates who met the indicators for consideration for referral.  However, observation of 3CMS IDTT meetings indicated that these reports were not used consistently.

Monthly audits of Form 7388B completion indicated that approximately 90 percent included appropriate rationales for non-referral and adequate alternate interventions. However, review of a sample of cases that were identified by MHTS.net as meeting indicators revealed that Form 7388Bs were not always present in eUHRs.  In addition, this review also revealed that those Form 7388Bs which were in the eUHRs also often contained rationales for non-referral and proposed interventions that were inadequate.

CSATF had a 20-bed MHCB.  The MHCB daily census averaged 16 inmates. Although there was timely access to the MHCB, data on admissions and stays was conflicting.  It seemed to indicate that there were 271 MHCB admissions, of which 65 or nearly a quarter resulted in stays that exceeded ten days.

During the reporting period, no inmates were placed in alternative housing while awaiting MHCB placement.

Incomplete logs indicated 23 EOP inmates transferred to outside EOP programs during the review period.  Of these, 14 or 61 percent waited more than 60 days before transferring.  None of the ten EOP inmate transfers to EOP hubs took place within 30 days.

During the review period, a total of 45 EOP and 295 3CMS inmates were housed in administrative segregation.  As of mid-July 2012, the administrative segregation population of 284 inmates included two EOP inmates, neither of whom had been there longer than 30 days, and 121 3CMS inmates, 46 of whom had been there longer than 90 days.

Logs documented that 12 inmates in the stand-alone administrative segregation unit were either designated 3CMS or admitted to the MHCB during the review period.  All of them were removed from the stand-alone unit within 24 hours, and were not returned there.

Access to the PSU was poor.  Most EOP inmates with SHU terms were not endorsed to the PSU, but served their SHU terms in administrative segregation.  PSU endorsements also took months to complete, although PSU transfers typically occurred within 60 days of endorsement.  Of the seven EOP inmates endorsed to the PSU, four transferred after spending an average of 113 days in administrative segregation.  Two other inmates paroled prior to PSU transfer, after spending 75 days and 127 days, respectively, in administrative segregation.  Another PSU-endorsed inmate transferred to DSH after 180 days in administrative segregation.

Other Areas:

MHSDS Inmates in Administrative Segregation

CSATF had two segregation units.  Building 1 on E facility housed MHSDS inmates and some non-MHSDS inmates.  The stand-alone unit housed only non-MHSDS inmates.  Building 8 on C yard functioned as an overflow segregation unit for 29 days during the review period.

Audits indicated compliance rates of 62 percent for initial IDTT meetings and 88 percent for follow-up IDTT meetings.  Psychiatry attended IDTT meetings less than ten percent of the time, but primary clinicians and the correctional counselor attended 100 percent of the time.  Observed IDTT meetings were attended by the psychologist, social worker, correctional counselor, and psych tech, but not the psychiatrist.  C-files were available, but computer access to them was not utilized.  IDTT team members reported that they reviewed information on the indicators for consideration of referral to DSH prior to the IDTT meeting.  However, neither that information nor completion of Form 7388Bs were consistently discussed during IDTT meetings.

Compliance rates for completion of initial and weekly clinical contacts were 67 and 87 percent, respectively.  Approximately 55 percent of clinical contacts occurred out-of-cell.

Observed psych tech rounds revealed that contact was made with all inmates, who were familiar with the psych tech.  The psych tech responded to inmate requests and made adequate appraisals of each inmate.

Group capacity was a six-module array, which included one module that was wheelchair-accessible.  Staff reported that groups occurred only sporadically during most of the review period.

MHCB

During May 2012, CSATF installed suicide-resistant beds in the MHCB unit. However, their placement in the middle of the cells was problematic, as it provided access to the overhead light fixture.

The compliance rate for completion of SREs upon MHCB admission and discharge was 93 percent.

All new inmates in the MHCB had an initial IDTT meeting within 72 hours of admission.  Weekly follow-up IDTT meetings occurred in 88 percent of cases.  Psychiatry attended IDTT meetings 83 percent of the time, and primary clinicians and the correctional counselor attended 100 percent of meetings.  At observed daily IDTT meetings, clinical interventions were appropriate and helpful.  Inmates attended the meetings.

During the review period, inmates in the MHCB were provided with a daily contact with a licensed psychiatrist or a psychologist.

Inmates in the MHCB had access to individual recreational therapy in therapeutic modules.  However, staff reported that due to custody staffing issues, MHCB inmates did not have access to yard but medical patients did have it.

Review of the restraint log indicated nine applications of restraints.  In many cases, the log did not document duration of restraint episodes.

Restrictions on inmates' personal property and bedding, as well as handcuffing and movement restrictions, were timely reviewed and relaxed as appropriate.

EOP

CSATF operated two EOP programs, namely, an 88-bed co-dependency program on Facility F-3, and a 176-bed Level II SNY EOP on Facility G-1.  Provided data covered both programs.

Eighty-eight percent of EOP inmates had an initial evaluation and IDTT meeting within 14 days of admission.  Audits further indicated IDTT meeting attendance rates of 56 percent attendance for psychiatry, 100 percent for primary clinicians and correctional counselors, and 83 percent for other staff such as psych techs, recreational therapists, and housing officers.  IDTT meeting rooms lacked internet access, resulting in inaccessibility to eUHRs.

Inmates reported that access to the psychiatrist was limited.  Initial primary clinician contacts were timely in 99 percent of cases.  Inmates reported that ongoing access to primary clinicians was good.

Inmates in both EOP programs reported receiving more than a weekly average of ten hours of structured therapeutic activity, which they described as helpful.  Group therapy was largely conducted by psych techs and covered an extensive array of topics.

3CMS

Audits of the 3CMS program were limited by staff turnover and vacancies.

Initial intake assessments, and initial and annual follow-up IDTT meetings, were 100 percent compliant. There was 100-percent compliance for completion of initial treatment plans and treatment plan updates.

Psychiatrists attended only about half of IDTT meetings, causing the overall IDTT attendance rate to be only 59 percent. However, correctional counselors attended consistently. C-files were available at IDTT meetings approximately 75 percent of the time. Observed IDTT meetings included the primary clinician, psych tech, and correctional counselor, but not psychiatry. Interaction between inmates and clinicians was generally appropriate, but typically there was little discussion of treatment issues and none of group treatment. Clinicians did not appear to have lists of inmates who met indicators for consideration for DSH referral, nor did they use a computer to access this information. In only two cases were there brief discussions about the team's opinion that the inmate did not meet indicators for consideration for a higher level of care. One inmate was recommended for a change from 3CMS to EOP level of care.

Interviewed inmates reported difficulty with access to psychiatry. There was 100-percent compliance with quarterly primary clinician contacts, although inmates described these as cursory. Inmates also indicated that housing moves and staff turnover often resulted in clinician reassignments.

Groups for 3CMS inmates were offered on all general population and SNY yards. Two groups observed during the site visit were well-organized and well-attended, and were held in clean, spacious, private rooms.

Inmates reported losing access to yard due to hot weather and custody coverage issues.

Referrals

CSATF had adequate procedures in place for collecting and assigning mental health referrals.  MHTS.net appeared to adequately capture the relevant information.

There were 81 emergent, 172 urgent, and 1,641 routine referrals.  MHTS.net data indicated compliance rates for response to referrals as 98 percent for emergent referrals, 95 percent for urgent referrals, and 77 percent for routine referrals.

Medical Records/MHTS.net

There were concerns surrounding the reliability of MHTS.net data.  CSATF lacked sufficient staff who were well-trained in the operation of MHTS.net.

Mental Health/Custody Relations

Line staff described good working relationships between mental health and custody staff.

RVRs

RVRs issued to inmates in the MHCB, EOP inmates, and 3CMS inmates charged with serious infractions and potentially SHU-able offenses, were routinely referred to mental health for an assessment.  During the review period, a total of 305 RVR cases were referred to mental health, including 15 MHCB inmates, 80 EOP inmates, 197 3CMS inmates, and 13 non-MHSDS inmates.

Attendance by a mental health clinician at ICC meetings and review of mental health assessments was required for a committee recommendation of imposition of a SHU term. However, at an observed ICC, neither the clinician nor custody staff consulted the mental health assessment attached to the RVR when considering whether to recommend a SHU term.

Pre-Release Planning

Clinicians reported periodic receipt of lists of inmates scheduled for release.  With the initiation of prison population realignment pursuant to AB-109, pre-release planning was a bifurcated process.  It depended on whether an inmate met criteria for release to the county by way of the Post Release Community Supervision (PRCS) process or was paroled.  CSATF's PRCS coordinator notified clinicians of pending releases of assigned caseload inmates and forwarded required documentation to the county.  The PRCS coordinator's log indicated that a total of 113 packets were provided to counties during the review period.

Access to Care

Staff generally reported no major problems with access to care.  They described access to care officers as helpful, although access was sometimes slow.

**Pleasant Valley State Prison (PVSP)**
July 9, 2012 – July 11, 2012

Census:

PVSP reported that on July 8, 2012, it housed 3,771 inmates, for an 18-percent decrease in population since the monitor's preceding visit to the institution during the twenty-third round.  The mental health caseload population dropped by 12 percent to 1,705 inmates.  There were eight mainline EOP and 1,537 mainline 3CMS inmates.  The MHCB unit housed five inmates.  Among the 304 inmates in administrative segregation were 155 3CMS inmates.

Staffing:

Of 52.95 allocated mental health positions, 47.45 were filled, for an overall ten-percent vacancy rate in mental health.  An additional 2.3 FTE coverage reduced the institutional functional vacancy rate marginally to six percent.

Positions for the chief psychiatrist, chief psychologist, and one of two senior psychologists were filled.  The sole senior psych tech position was filled.

Six of 6.5 staff psychiatrist positions were filled, for a vacancy rate of eight percent.  The 15.95 staff psychologist positions were all filled, plus contractors provided an additional 2.25 FTE coverage.  The 1.5 social worker positions were filled.

Six of the seven psych tech positions were filled.  The supervising registered nurse and five of 5.5 registered nurse positions were filled.  Positions for one health program specialist I, one office services supervisor II, and six of 8.5 mental health clerical positions were filled.

PVSP did not use telemedicine during the review period.

Quality Management:

The local governing body was chaired by the institution's CEO.  It met three times, maintained meeting minutes, and always achieved a quorum.

The quality management committee was chaired by the CEO.  It met six times, but achieved a quorum at only four meetings.  The quality management committee routinely accepted reports from mental health and other service areas.  It addressed the institution's higher than projected 3CMS population, personnel issues, and EOP transfer timelines, among other things.

The mental health subcommittee was chaired by the chief of mental health.  It met six times, with a quorum for five of those meetings.  The mental health subcommittee routinely addressed personnel issues, administrative segregation IDTT meetings, Form 7388B completion, MHSDS population increases, DSH referral data, EOP transfer delays, suicide-resistant bed installation in the MHCB, and routine referral timelines.  Mental health subcommittee meeting minutes were forwarded to the quality management committee.

One new QIT chartered during the review period addressed balancing of quality of care with optimization of staff time.

Peer review for psychiatrists, psychologists, and social workers consisted of review of eUHRs to assess adequacy of clinical notes and inmate evaluations, diagnoses, and treatment plans.  Beginning in January 2012, psychiatry peer review utilized MAPIP audits to select for review eUHRs of inmates taking psychiatric medications.

Suicide Prevention:

There were no completed suicides at PVSP during the review period.

The SPRFIT met monthly, maintained meeting minutes, and attained a quorum for five of six scheduled meetings.  SPRFIT agenda items and training activities typically included response to suicide attempts, five-day clinical follow-up, 30-minute welfare checks, suicide prevention video teleconferences, and DSH referrals.

The ERRC met monthly.  Emergency medical response drills were conducted. Custody officers indicated, and documentation confirmed, that first aid and CPR training was provided.  Officers carried micro-shields.  Cut-down tools and personal protective equipment were accessible in the control booth.

PVSP reported a compliance rate of 97 percent for five-day clinical follow-up after discharges from the MHCB.

In administrative segregation, daily morning meetings between mental health and custody staff were consistently documented.

An audit of 48 inmate eUHRs indicated a compliance rate of two percent for timely completion of pre-placement screens.  Mental health attributed this low percentage to

filing errors.  Audits indicated 100-percent compliance with completion of the 31-item screens, although only 76 percent were completed in a confidential setting.

Administrative Segregation II housed MHSDS inmates.  Custody officers reported that it was rare for mental health caseload inmates to be placed in the stand-alone unit, Administrative Segregation I.  Administrative Segregation II contained three new intake cells that were retrofitted to be suicide-resistant.  Door placards identified cells housing new intake inmates.  However, the number of new intake inmates often exceeded the number of available intake cells.

Documentation of 30-minute welfare checks indicated appropriate staggering of checks at some times but not others.

Audits indicated a 99.5-percent compliance rate for daily psych tech rounds, but documentation of sign-in and sign-out by psych techs was lacking for 40 days in both administrative segregation units.

Except for the three retrofitted new intake cells, all cells in Administrative Segregation II were equipped with electrical outlets.  Inmates received approximately ten hours of yard time per week.

Medication Management:

PVSP utilized the MAPIP audit process.  An audit indicated that 95 percent of newly arriving inmates received their prescribed medications by the day following arrival.

Continuity of medications was maintained for 95 percent of inmates following intra-institutional transfers, and for 94 percent of inmates following discharge from the MHCB.

At the end of the review period, 824 mental health caseload inmates were receiving psychotropic medications.  An audit indicated that renewals were timely in 92 percent of cases, but the audit did not distinguish between psychotropic and other medications.

According to MHTS.net, 64 percent of inmates who missed three consecutive doses of medication or 50 percent of prescribed medications within a one–week period were seen by psychiatry within seven days of referral.  The institution did not audit legibility of MAR documentation or the presence of MARs in eUHRs.

MAPIP audits indicated that total time in pill lines was under two hours in all instances.  Inmates reported wait times lasting from several minutes to an hour.

An audit of an unspecified number of records indicated that 98 percent contained up-to-date informed consent forms.

An audit of 20 cases indicated that PVSP was compliant with ordering clinically indicated laboratory testing for inmates who were prescribed atypical antipsychotic medications, Depakote, Lithium, or antidepressants.  AIMS testing was completed in 98 percent of applicable cases.

PVSP did not audit the processing of DOT orders, but staff reported that all psychotropic medications were ordered DOT.  Audits revealed that DOT administration procedures were followed 97 percent of the time.

During the review period, four inmates were on Keyhea orders, and two petitions for Keyhea orders were pending.

At the end of the review period, 576 inmates had orders for HS medications.  An audit indicated, and interviewed 3CMS inmates confirmed, that all HS medications were administered after 8:00 p.m.

Audits of both psychotropic and non-psychotropic medications found that 94 percent of paroling inmates received 30-days' supply upon release.

Transfers:

The DSH coordinator managed a full-time caseload as an MHCB clinician, in addition to overseeing the DSH referral process.

Five of 13 inmates who met one or more indicators for consideration for higher level of care were referred to acute care.  There were no rescissions or rejections.  All five were referred timely but transferred later than ten days after referral.  Four of the five transfers occurred within 72 hours of a bed assignment.

The non-referral log identified seven inmates, with one inmate listed twice.  The rationale for non-referral was missing for three log entries and was inadequate for a fourth.  Additional data indicated that three other inmates met indicators for consideration for DSH referral based on three or more MHCB placements, but they were not included on the non-referral log.  Staff reported that the DSH coordinator did not provide IDTTs with lists of inmates with three or more crisis care placements, three or more RVRs, or low rates of program participation.

The institution's CTC included 15 licensed beds within a 17-bed facility.  Six beds were typically used for mental health inmates.  There were 118 MHCB referrals, including 110 from PVSP and eight from other institutions.  There were 90 MHCB admissions.  Stays ranged from one to 29 days and averaged 6.4 days.  Excluding inmates on the DSH wait list, MHCB stays averaged 5.7 days, with 15 stays exceeding ten days.

Sixty-six inmates were placed in alternative housing.  In all but two cases, the alternative housing was located within the CTC.  All inmates placed in alternative housing were

on suicide watch except two who were listed as on suicide precaution.  Seventy-one percent of stays in alternative housing lasted less than four hours, with a range of 15 minutes to 26 hours and 35 minutes.  Ninety-four percent of inmates placed in alternative housing were ultimately placed in the MHCB.

During the review period, four inmates transferred to the PSU.  The average time from PSU endorsement to transfer was 109 days, with a range of 34 to 264 days.  Only one inmate transferred to the PSU within 60 days of endorsement.

There were 16 EOP referrals, 12 of which resulted in transfer to an EOP, and three of which transferred within 60 days.  The average wait time for transfer of the remaining nine inmates was 224 days.  At the time of the site visit, eight EOP inmates were pending transfer, including one who had been waiting longer than 60 days.

During the reporting period, PVSP housed 466 inmates in administrative segregation, including 13 EOP and 242 3CMS inmates.  Seven EOP inmates in administrative segregation were referred to an EOP hub, but only two of the transfers were timely.  The average wait time for the remaining five EOP inmates was 84 days, with one paroling after waiting 66 days.  At the time of the monitor's visit, no EOP inmates were housed in administrative segregation.

Other Areas:

MHSDS Inmates in Administrative Segregation

Ninety-six percent of mental health inmates housed in administrative segregation received weekly individual primary clinician contacts, of which approximately 40 percent were in confidential settings.  Eighty-three percent of cell-front contacts were attributed to inmate refusals.  Some of the cells used for individual clinical contacts lacked seating for the inmate.

Review of eUHRs of inmates housed in administrative segregation indicated that treatment plans typically were not individualized but consisted of generic recommendations. Subsequent eUHR entries did not reflect implementation of the interventions referenced in the treatment plans.

Staff reported that psych techs facilitated two to three weekly groups.  These often consisted of films that were available to all inmates in administrative segregation.  The settings, however, did not provide privacy for group discussion.

### MHCB

MHTS.net indicated that SREs were conducted for only eight percent of inmates admitted to the MHCB for suicidal threats or behavior, and for only 17 percent of inmates discharged from the MHCB.  Staff did not know whether these reported low percentages were accurate or were the result of MHTS.net error.

Initial IDTT meetings were timely and regularly attended by required staff members.  Observed IDTT meetings generally included adequate case discussion and inmate participation.  Daily psychiatrist or psychologist contacts were documented.

There were four applications of five-point restraints, which averaged 3.58 hours in duration.  Staff reported implementation of the new policy to assess inmates individually for whether they may be out of cell without mechanical restraints.  They also reported that fewer than half of non-administrative segregation inmates were out of restraints when out of cell. Custody information on inmates from other institutions was often lacking.

### 3CMS

MHTS.net data and staff interviews indicated that only 68 percent of newly-arriving 3CMS inmates received clinical intake assessments within ten days of arrival.

Sixty-three percent of 3CMS inmates had an initial IDTT meeting within 14 days of arrival, and 94 percent were scheduled for annual IDTT follow-up meetings.  The rate of attendance at IDTT meetings by psychiatrists was 55 percent, although it was not always by the treating psychiatrist.  Primary clinicians attended all IDTT meetings, but correctional counselors attended only about 71 percent of meetings.  The rate of inmate attendance was 95 percent.  If the inmate had seen the psychiatrist shortly before the IDTT meeting, a psychologist was allowed to substitute for the psychiatrist, and the inmate would be referred to psychiatry if clinically indicated.  Observed IDTT meetings were conducted adequately.  The psychiatrist and primary clinician attended but the correctional counselor did not.  The treatment team reviewed available eUHRs and primary clinicians exhibited familiarity with inmates.  Inmate concerns related to medication side effects were addressed.  Reviewed treatment plans were insufficiently individualized and included goals that were not reasonably achievable by the planned quarterly contact.  Subsequent progress notes did not typically relate to these goals.

MHTS.net indicated 93-percent compliance with quarterly psychiatry contacts for inmates receiving psychotropic medications, and 95-percent compliance with quarterly primary clinician contacts.

PVSP offered six groups, four fewer than were offered to 3CMS inmates at the time of the twenty-third round site visit.  Group offerings were based on housing location rather than clinical need.  Observed groups were well facilitated and took place in private settings.  Forty-six inmates were on the group wait list.

Interviewed 3CMS inmates reported difficulty with receiving intensive mental health treatment and lack of coordination between mental health and medical staff.

The confidentiality of settings for clinical contacts improved since the twenty-third monitoring round.  Each yard had two available rooms and a portion of a divided classroom.  Staff reported this to be sufficient for B and C yards.  However, in A and D yards inmates were sometimes seen in custody or correctional counselors' offices.

Referrals

PVSP reported a total of 3,308 referrals, including 23 emergent, 40 urgent, and 3,245 routine referrals.  Compliance rates for response to referrals were 100 percent for emergent, 95 percent for urgent, and 70 percent for routine referrals.

Medical Records/MHTS.net

PVSP indicated concern with the accuracy of MHTS.net data, citing inconsistencies with logs maintained by staff.  Staff reported that the availability and completeness of inmate medical records had continued to improve with the scanning of medical records into eUHRs beginning in July 2011.

During the review period, PVSP conducted monthly audits of eUHR-MHTS.net concurrence by randomly sampling up to 19 cases.  Concordance rates were 100 percent in the MHCB and with regard to EOP transfers, and 93 and 95 percent in the 3CMS and administrative segregation 3CMS programs, respectively.

Mental Health/Custody Relations

Mental health staff reported improved relations with custody and described the relationship as very good.

RVRs

Institutional data on RVRs was conflicting.  The institution reported issuance of a total of 1,260 RVRs, including three to inmates in the MHCB or the EOP, and 248 to 3CMS inmates.  Thirteen RVRs were related to cheeking or hoarding of medications.

The institution reported that mental health assessments were conducted for two inmates housed in the MHCB, four EOP inmates, 126 3CMS inmates, and 17 general population inmates.  Eighty of the inmates who received mental health assessments were housed in administrative segregation.  PVSP did not provide supporting data as to whether all 3CMS inmates who received RVRs for Division A, B, or C offenses had mental health assessments. The institution did not provide audits, outcome logs, or summary data as to penalty mitigation due to mental health considerations.

Lockdowns

There were lockdowns and modified programming on Facilities B, C, and D. Following a riot at the facility, some inmates on Facility C also had modified programming from mid-January through the end of the review period, which had a negative effect on the provision of mental health services.  Several other brief lockdowns and modified programs on Facilities B, C, and D resulted in cancellation of some mental health appointments.

Pre-Release Planning

Staff indicated that pre-release planning assistance was provided primarily by primary clinicians, and some TCMP personnel.  MHTS.net documented that 48 of 110 paroling 3CMS inmates received parole planning services.

**Avenal State Prison (ASP)**
May 7, 2012 – May 9, 2012

Census:

ASP reported that on May 7, 2012, it housed 5,014 inmates, for a 12-percent decrease in population since the preceding monitoring visit during the twenty-third monitoring round.  The mental health caseload population also dropped by 12 percent, to 1,169 inmates.  There were five mainline EOP and 1,109 mainline 3CMS inmates.  The OHU census of 26 included three EOP and eight 3CMS inmates.  Among the 135 inmates in administrative segregation were 44 3CMS inmates.

Staffing:

Total allocated mental health positions at ASP decreased by three to 46.15 positions.  Of these, 35.25 were filled, for a 24-percent institutional vacancy rate in mental health.  Contractors provided an additional 6.75 FTE coverage, reducing the institutional functional vacancy rate in mental health to nine percent.

The senior psychiatrist position was vacant.  The chief psychologist and one of two senior psychologist positions were filled.  A contractor covered the vacant senior psychologist position.

Only .25 of five staff psychiatrist positions were filled, but contractors covered all of the psychiatry vacancies.  All eleven staff psychologist positions were filled.  Two of 3.5 social worker positions were filled, and a contractor covered the equivalent of one full-time position, for a functional vacancy rate of 14 percent.

Positions for one senior psych tech and all ten psych techs were filled.  The 1.15 recreational therapist position was vacant.  Positions for one health program specialist I, and one office services supervisor II were filled.  Six of 7.5 mental health clerical positions were filled.

ASP utilized a weekly average of eight hours of psychiatry telemedicine.

Quality Management:

The quality management committee was chaired by the CEO.  It met six times and always had a quorum during the reporting period.  Mental health issues that were addressed included ERRC drills, participation by psychiatry at EOP IDTT meetings, transfers of EOP inmates, staffing vacancies, and processing of new arrivals.

The mental health subcommittee was chaired by the chief of mental health.  It met six times and consistently achieved a quorum.  Issues that were addressed included primary clinician contacts, IDTT meetings, DSH referrals, suicide prevention, and QITS, among other things.  Quality management committee and mental health subcommittee findings were distributed during mental health staff meetings.

Two mental health QITs were active during the review period.  One addressed inmate satisfaction with mental health treatment and the other addressed timely scheduling and quality of IDTT meetings.

There was no psychiatry or psychology peer review.

Suicide Prevention:

There were no completed suicides at ASP during the review period.

The SPRFIT met monthly, maintained meeting minutes, and always achieved a quorum during the reporting period.  SPRFIT agenda items and training activities covered suicide attempts, self-harm incidents, five-day follow-up, and audits.

The ERRC met six times.  It reviewed responses to serious incidents of self-harm and monitored emergency medical response drills.  Custody staff indicated that CPR refresher

training was provided annually.  Officers in the units carried micro-shields.  Cut-down tools and personal protective equipment were accessible in the control booth.

ASP reported a compliance rate of 96 percent for clinical five-day follow-up for inmates released from the OHU.  Fifty of 52 inmates received five-day follow-up without any missed days, and the remaining two missed the first day of five-day follow-up.  Audits of 47 custody follow-ups following discharge from suicide watch or suicide precaution indicated 98-percent compliance for hourly custody checks.

In administrative segregation, daily morning meetings between custody and clinical staff were documented in the sergeant's log 75 percent of the time.

Audits indicated a 93-percent compliance rate for completion of pre-placement screens, and a 99-percent compliance rate for completion of the 31-item screen.

Eight administrative segregation cells were retrofitted to be suicide-resistant and were located such that there was visibility into these cells.  Because there were often more new intakes than available intake cells, some non-retrofitted cells were used for new intakes.  Cells of newly-arrived inmates were appropriately marked for the initial 21-days.

Review of 30-minute welfare checks indicated appropriate staggering of checks during some periods, but not during others.

Daily psych tech rounds were conducted and documented appropriately.

Administrative segregation cells were not equipped with working electrical outlets.

Inmates routinely had access to ten hours of yard time per week.

Medication Management:

At the end of the review period, 728 or 58 percent of inmates on the mental health caseload were receiving psychotropic medications.  Audits found a 77-percent compliance rate for medication continuity for newly-arriving inmates.  Audits further indicated, and staff and inmates confirmed, 100-percent compliance for medication continuity following intra-institutional moves.

Medication renewals were timely in 99 percent of cases.  MHTS.net data on medication orders indicated that 55 percent were received by the inmate within one day of arrival.

An audit of referrals for medication noncompliance indicated in 96 percent of cases inmates were seen by a psychiatrist within seven days of referral.  An audit of MARs found legible documentation of these contacts in 99 percent of cases.

Audits indicated that pill line wait times did not exceed 23 minutes on any yard.  However, exposure to rain or cold during pill line wait times remained problematic and contributed to medication refusals.

Up-to-date informed consent forms were present in eUHRs at the rate of 87 percent.

An audit of 83 medical records indicated that laboratory testing orders followed CDCR protocols in 73 percent of cases where indicated, but in only 29 percent of cases where indicated for inmates prescribed antidepressant medications.  AIMS testing was completed in 59 percent of applicable cases.

The institution reported that psychotropic medications were ordered DOT on a case-by-case basis.  As of April 2, 2012, eight percent of inmates who were prescribed

psychotropic medications had DOT orders.  An institutional audit of 120 instances of DOT

medication administration found 100-percent adherence to DOT protocols.

During the monitoring period, no inmates were on Keyhea orders, and no Keyhea

orders expired or were not pursued on advice of counsel.

Thirty-seven percent of inmates receiving psychotropic medications had orders

for HS medications, which were administered at 8:00 p.m. or later.

Ninety-three percent of inmates who paroled with prescriptions for psychotropic

medications were given a 30-day medication supply.  Of these inmates, 99 percent signed

receipts for their supplies of medications.

Transfers:

The OHU psychologist served as the DSH coordinator, with a senior psychologist

serving as back-up.  The DSH coordinator's duties included maintenance of the DSH referral and

non-referral logs, review of DSH referral packages and uploads of completed packages to

SharePoint, review of treatment plans and Form 7388Bs for inmates who had positive indicators

but were not referred to inpatient care, and serving as the primary liaison between the institution

and DSH facilities.

Ten of the 92 inmates who had one or more indicators for consideration for

inpatient care were referred to intermediate care.  Eight of the ten referrals were timely, and the

remaining two were late by one day.  All ten resulted in transfers, six of which were timely.

There were no Vitek hearings, rescissions, or rejections by DSH.

The monitor reviewed Form 7388Bs that were completed early in the reporting

period and identified inmates as meeting one or more indicators, but did not result in referrals.

Some of these lacked rationales for non-referral.  Others were accompanied by complete

assessments, but nonetheless contained insufficient or missing rationales.  Form 7388Bs completed later in the reporting period were generally more thorough and contained more appropriate rationales.

One inmate returned from DSH during the reporting period, and four others who transferred to DSH were discharged to the CMC EOP during the review period.

ASP did not have an MHCB unit.  There were 99 OHU admissions.  OHU stays ranged from zero to five days and averaged 1.7 days.  Thirty-seven percent of OHU placements exceeded 72 hours.  Sixty-five percent of stays greater than 72 hours were due to bed unavailability on the yard.  One EOP inmate had five OHU admissions and another had three.  Twenty inmates admitted to the OHU were referred to an MHCB at another institution.  Nineteen of these inmates transferred, all within 24 hours of referral.

Thirty-three EOP inmates transferred to an EOP program.  Of these, 11 transfers took place within 60 days.  The average wait time for the remaining 22 inmates was 157 days.  At the time of the site visit, four inmates were pending transfer to an EOP program for more than 60 days, with a range of 82 to 210 days.

ASP housed 657 inmates in administrative segregation, including 13 EOP and 241 3CMS inmates, three of whom were sent to MHCBs at other institutions.  The EOP inmates' average stay was 21 days.  Four EOP inmates were housed in administrative segregation longer than 30 days, with stays ranging from 38 to 63 days.  The data provided by the institution on stays of 3CMS inmates was conflicting.

There were no PSU referrals or transfers during the review period.

Other Areas:

MHSDS Inmates in Administrative Segregation

ASP timely completed comprehensive assessments for five of nine or 56 percent of EOP inmates in administrative segregation.  Initial IDTT meetings were timely in 83 percent of cases.  The compliance rate for follow-up IDTT meetings improved from 83 to 94 percent over the course of the review period.  Although ASP reported an 83-percent compliance rate for psychiatrist attendance at IDTT meetings, staff reported frequent attendance by a psychiatrist other than the treating psychiatrist.  Correctional counselor IDTT attendance was problematic.

Audits conducted early in the review period indicated compliance rates for psychiatry and primary clinician contacts were 33 and 56 percent, respectively, while audits conducted later in the review period found improvement to 97-percent compliance.

Approximately half of EOP weekly primary clinician contacts were in confidential settings.  Sixty percent of cell-front contacts were attributed to inmates' refusals to leave their cells.

Audits found that 71 of 82, or 87 percent of, 3CMS inmates in administrative segregation were assessed by a clinician within ten days of placement.  Ninety-seven percent had an initial IDTT meeting within 14 days of placement or before the ICC meeting.  Follow-up IDTT meetings occurred timely in 963 of 964 or 99.9 percent of cases.

Compliance rates for psychiatry and primary clinician contacts were 95 percent and 98 percent, respectively.  Half of primary clinician contacts occurred cell-front.  Seventy-eight percent of non-confidential contacts were attributed to inmate refusal to leave their cells.

There were eight treatment modules in the group room.  Attendees were neither handcuffed nor shackled in the modules.

OHU

The OHU at ASP was located in building 390 and was marked "390" on the front; the name of the building was "TTA/OHU."  It was a distinct building separate from all other facilities, located in the center of the institution.  It contained various specialty units including telemedicine, optometry, X-ray, and physical therapy.  OHU overflow was located on Facility A in building 140, which was located in administrative segregation, not in an infirmary structure.

The OHU did not have dedicated mental health beds, but it designated medical beds for use by mental health inmates on a priority basis.  There were seven cells for general population or SNY inmates, and six for administrative segregation inmates.  Confidential interview space was adequate on the administrative segregation side, but not on the general population side.  Staff reported that MHSDS inmates were provided with full issue, including beds and personal items, unless individualized assessment indicated concerns of self-harm or assaultive behavior.  During the site visit, three EOP inmates were housed in the OHU and awaiting transfer to an EOP hub.  They were unable to function adequately outside of the OHU and were housed there on a long-term basis.

Audits found that 96 percent of inmates in the OHU for mental health reasons had daily contact with a psychologist or psychiatrist, but data was not specific to the frequency of psychiatric visits.  Of the 66 inmates placed in the OHU in connection with suicidality, the 58 placed during regular working hours were administered an SRE at the time of placement.  None of the remaining eight, who were placed by the on-call psychiatrist, were given an SRE at the time of placement.

An observed IDTT meeting was attended by a full complement of staff with access to the eUHR and C-file, and was well-conducted.  The inmate was placed uncuffed in a therapeutic module.

EOP

The institution did not have an EOP.  While EOP inmates were awaiting transfer they were seen weekly by a primary clinician and monthly by psychiatry.  Although EOP inmates received priority for group therapy, and none were on a group wait list at the time of the site visit, group hours were limited.  Inmates were offered a weekly average of 1.51 hours of structured therapeutic activity and received an average of 1.38 hours.  An observed IDTT meeting for an EOP inmate was well-conducted.

3CMS

Audits indicated that 95 percent of mainline 3CMS inmates had clinical intake assessments within ten days of arrival.  Ninety-two percent had an initial IDTT meeting within 14 days of arrival, and 99 percent had annual IDTT follow-up meetings.  Reviewed treatment plans were reasonably individualized.  Audits indicated 81-percent attendance by psychiatrists and 100-percent attendance by primary clinicians at IDTT meetings.  The rate of inmate attendance was 97 percent.  Observed IDTT meetings for 3CMS inmates were well-conducted.

Audits, chart reviews, and staff and inmate reports all indicated that ongoing psychiatry and primary clinician contacts occurred within Program Guide timeframes.  Staff and inmates reported that transfers between housing areas hindered continuity of treatment by the same psychiatrist.

ASP continued to provide active group therapy offerings.  As of April 3, 2012, approximately 20 active groups were dedicated to mainline 3CMS inmates.  Topics included medication management, anger management, psychotherapy, and self-esteem.  At the time of the site visit, 99 3CMS inmates were on the group wait list, with 53 waiting for over six months.

Referrals

ASP reported a total of 2,162 referrals, including 22 emergent, 100 urgent, and 2,040 routine referrals.  Compliance rates for response to referrals were 100 percent for emergent, 94 percent for urgent, and 98 percent for routine referrals.

MHTS.net

The institution reported monthly rates of 90 to 96 percent, and an overall rate of 93 percent, for concordance between eUHRs and MHTS.net during the review period.

RVRs

Out of a total of 997 RVRs, 19 were issued to EOP inmates and 354 were issued to 3CMS inmates.  None were related to hoarding or cheeking medications.  No EOP inmates received three or more RVRs during the second half of the reporting period.  Mental health assessments were conducted for 18 of the EOP inmates and for 48 of the 50 3CMS inmates who committed a Division A, B, or C offense.  The institution did not audit whether penalties were mitigated due to mental health considerations.

Lockdowns

ASP reported modified programming on Facility 6 that began in September 2008 and was ongoing at the end of the review period.  Three other disturbances during the monitoring period each resulted in modified programming for several days, resulting in cancellation of some mental health appointments.

Pre-Release Planning

The institution reported that 394 MHSDS inmates paroled, but MHTS.net indicated only 127 pre-release planning appointments.  The disparity was attributed to data input errors.  An audit of 101 charts of paroled MHSDS inmates indicated that 88 percent contained pre-release planning documentation.

**Salinas Valley State Prison (SVSP)**
July 23, 2012 – July 26, 2012

Census:

On July 23, 2012, SVSP had a total inmate population of 3,189, down from 3,975 during the preceding monitoring period.  The MHSDS population was 1,360 or 42 percent of the total population.  There were 176 mainline EOP inmates and 959 mainline 3CMS inmates.

The total number of inmates in segregation was 455 inmates, including 34 EOP and 231 3CMS inmates, down from 519 in the preceding monitoring period.

Staffing:

Of the 111.75 established mental health positions, 88.02 were filled, for an overall vacancy rate of 21 percent.  Use of contract coverage reduced the functional vacancy to 13 percent.

Positions for the chief psychiatrist, chief psychologist, two senior psych techs, and one health program specialist I were all filled.  Three of the four senior psychologist positions were filled, resulting in a vacancy of 25 percent.  The sole supervising social worker position was vacant.

There were 9.5 staff psychiatrist positions, of which 5.5 were filled.  Use of two FTE contract psychiatrists reduced the functional vacancy rate to 22 percent.  Of the 29.02 staff psychologist positions, 26.52 were filled.  With coverage by two FTE contract psychologists, the functional vacancy rate in psychology was reduced to two percent.

Six of the eight social work positions were filled, with one of the vacancies covered by a contractor, resulting in a 13 percent functional vacancy rate.  There were 22 psych tech positions, of which 19 were filled, and the remaining three vacancies were covered by contractors.

Three of the 6.5 recreational therapist positions were filled, resulting in a vacancy of 54 percent.  Of the 12 clerical positions, eight were filled, for a vacancy rate of 33 percent.

Quality Management:

The quality management program at SVSP generally improved since the preceding monitoring period.  The institution had a robust system for gathering data on key indicators and using it for managerial and quality improvement purposes.  There was still a need for greater organization and clarification of the data in a more stand-alone format to improve its usefulness.

The local governing body met three times during the monitoring period, focusing on policies governing the CTC at each meeting.  Minutes did not indicate whether a quorum was present.  Staff reported that bylaws of the local governing body were being revised at the time of the site visit.

The quality management committee met ten times, all with a quorum present and minutes maintained.  The committee was chaired by the CEO.  The warden or his designee, the associate warden for health care, the correctional health care services administrator II, the chief physician executive, the chief of mental health, the director of nursing, and the chief pharmacist all attended regularly.

The chief of mental health or his designee chaired the mental health subcommittee.  It met nine times, with a quorum present at 56 percent of the meetings.  It continued to use an action item approach for its quality assurance process, as reflected by minutes, with references to various audits and quality improvement projects.  The actual audits, including a summary of their methodologies, were available in binders provided during the site visit.  These audits covered problematic areas that had been identified during prior site visits, in

addition to other areas such as hours of structured therapeutic activities offered to EOP inmates and five-day clinical follow-up.  MHTS.net data demonstrated good reliability, as evidenced by concordance studies.

There were no active or resolved QITs during the monitoring period.  Staff reported that this was due to staff vacancies.

Consistent with past practice, the psychiatry peer review committee met only when requested by the chief psychiatrist to address a specific need or clinical issue.  The psychology peer review committee met twice, using reviews of eUHRs and providing written confidential feedback to each reviewed clinician.  The social work peer review committee met regularly, reviewing eUHRs and discussing ways to maintain clinical connections among the assessments recommendations, and interventions indicated in treatment plans.

Suicide Prevention:

There were three completed inmate suicides during the reporting period.

The institution had an active SPRFIT, which reported to the mental health quality management committee.  It met six times during the reporting period.  Minutes generally provided a useful summary of the meetings.  SPRFIT agendas included an audit of the pre-screen for placements in administrative segregation, an audit of the 31-item screen, reviews of suicide attempts during the preceding month, audits of five-day clinical follow-up and custody wellness checks during the preceding month, review of completed suicides, audits of DOT compliance, and training needs.  Other matters under review included completion and distribution of the administrative segregation pre-placement chronos, issues surrounding the process for 30-minute wellness checks of new intakes in administrative segregation, and completion and return of documentation of custody wellness checks.  The SPRFIT also tracked serious suicide attempts.

The institution documented that all staff assigned to administrative segregation had completed their annual CPR training, and that monthly emergency response drills were completed for all watches.  Cut-down tools and Ambu bags were stored in the control room of the units.

At the time of the site visit, the new SRE Proctor/Mentor Program had been introduced to the staff.  Implementation was scheduled to begin with CTC clinicians.

Five-day clinical follow-ups were completed for 100 percent of cases discharged from the MHCB for all months except January 2012, when compliance dipped to 83 percent. Custody follow-up logs were returned 83 to 100 percent of the time, but were fully completed only in 17 to 67 percent of cases.

In administrative segregation, presented data indicated that compliance rates for pre-placement screens were 83 percent for December 2011, 53 percent for January 2012, 82 for February 2012, 68 percent for March 2012, 85 percent for April 2012, and 68 percent for May 2012.  The average compliance rate for the review period was 73 percent.

Reported data on compliance with administration of the 31-item screen was inconsistent.  The institution reported that data in the binders was erroneous.  SPRFIT minutes stated that for January 2012, 81 non-MHSDS inmates were placed in administrative segregation, but that 107 non-MHSDS inmates were offered the 31-item screen within 72 hours of placement. Conversely, mental health data reported that 90 inmates received the 31-item screen in January 2012.  An audit dated April 10, 2012 reported that 39 non-MHSDS inmates were administered the 31-item screen in February 2012, while the SPRFIT minutes of March 6, 2012 reported that all 107 non-MHSDS inmates placed in administrative segregation received the 31-item screen in

February 2012.  However, mental health data reported that 67 inmates received the 31 item

screen in February 2012.

The institution had a limited number of designated intake cells in administrative

segregation.  Staff report that all were appropriately placarded for identification during the first

21 days of stays.  Review of 30-minute welfare checks logs demonstrated that not all required

checks were completed daily, and when completed, they were not consistently staggered.

Supervisors did not sign the logs during each watch as required.

Monthly reports on psych tech rounds indicated that they were compliant.

Medication Management:

The MAPIP audit tool was introduced at the institution prior to the site visit.  Staff

reported that staff were able to attend only two days of the week-long training program, and

received an additional day of training several months later.  At the time of the monitor's visit,

MAPIP audits were not yet yielding reliable results.  The institutional management report

included data on medication management that was gathered using MAPIP, but the results did not

include a summary of the methodology, assessment of the results, and/or corrective action plans

when appropriate.  That notwithstanding, these audits indicated that continuity of medications,

timely processing of medication orders, and pill lines were compliant.  The audits also identified

problems with implementation of procedures for response to cases of medication noncompliance,

expiration of medications, obtaining of informed consent forms, parole medications, and

ordering of clinically indicated test results.

As of June 30, 2012, the institution had 50 patients on Keyhea orders.  From

January 2012 to June 2012, 100 involuntary orders were scheduled to expire.  Eighty-five orders

were renewed, and two new ones were initiated.  Four lapsed due to untimeliness, four were

denied because of lack of psychiatrists, four petitions were denied for other reasons, four were not renewed based upon staff determination, and one was withdrawn.  The review process for Keyhea medications was changed as of January 1, 2012, requiring more detailed reports from psychiatrists.

Transfers:

The institution had an assigned DSH coordinator who was also responsible for oversight of elements of the quality assurance process.  At the time of the site visit, a back-up/assistant DSH coordinator was assigned.  Monthly, the DSH coordinator provided IDTTs with information on EOP inmates who met the indicators for consideration for DSH referral.  Staff reported that only a few 3CMS inmates met these indicators and were not included on weekly lists.

Initial reviews by central office of the institution's sustainable process for DSH referral found that only 29 percent of the Form 7388Bs for cases not recommended for referral contained adequate specification of the rationale for non-referral, and only 30 percent contained adequate specification of alternative treatment.  In response, the institution implemented several measures to improve performance in this area.  It instructed staff to revise and re-submit problematic Form 7388Bs.  Targeted staff were provided with training and feedback.  Senior psychologists began attending IDTT meetings.  The DSH coordinator began reviewing all Form 7388Bs completed by IDTTs and returning any problematic forms for correction.  Staff reported that after these interventions, the quality of the information entered on the Form 7388Bs improved, although no data-based documentation of this was available.

The DSH coordinator at SVSP maintained the required logs of referrals and non-referrals.  Review of the referral log indicated that information was missing.  This was confirmed by discussion with the DSH coordinator.

Five acute care referrals were initiated by IDTTs at SVSP during the review period.  Three of these referrals were completed within two days.  For the four cases for which data was available, none transferred within ten days of initiation of the referral, and three transferred within 72 hours of bed assignment.

There were 18 referrals to intermediate care initiated by IDTTs during the review period.  Approximately 59 percent of the referral packets were completed within required timeframes.  Three were discontinued when the inmates won their Vitek hearings.  For those cases for which data were available, 50 percent of referred inmates transferred within 30 days of initiation of the referral, and 80 percent of those transferred within 72 hours of bed assignment.

At the time of the site visit, no inmates were awaiting DSH transfer.  One inmate who had been housed in CTC pending transfer to acute care had been moved to the 50-bed CMF MHCB because of the cell retrofitting process.

Other Areas:

Administrative Segregation EOP

The population of administrative segregation EOP inmates ranged from 32 to 54 during each month of the reporting period.  Seventy-one percent of the EOP inmates were there for more than 90-days at the beginning of the reporting period, but that percentage decreased to 30 percent by the end of the period.  Weekly meetings among custody, classification, and mental health administration were helpful in monitoring cases to identify problems and work on their resolution.

MHTS.net reports indicated that, except in May 2012, 89 to 100 percent of new arrivals were seen within five calendar days for a brief evaluation and had an initial IDTT meeting before their ICC meeting.

Quarterly IDTT meetings were conducted timely 98 to 100 percent of the time. All required team members were present 67 to 100 percent of the time. Inmates were always offered the opportunity to attend and did so 48 to 79 percent of the time. The monitor's expert attended an IDTT meeting in administrative segregation. Cases included EOP and 3CMS inmates. All required team members were in attendance, including the psychiatrist, psych tech, recreational therapist, and correctional counselor. Cases were presented with the inmate in attendance. Indicators for consideration of referral to DSH on the Form 7388B were reviewed for the EOP inmates. Goals, objectives, and interventions were reviewed. The team provided positive feedback to the inmate and encouraged him to speak and ask questions.

Weekly primary clinician contacts occurred 83 to 99 percent of the time, with all but one month attaining at least 95 percent. Clinical contacts were held in individual office spaces, or in holding cells when the volume of contacts exceeded office space. Through the reporting period, 33 to 56 percent, or an average of 41 percent of contacts occurred in confidential settings. In February 2012, the mental health program was shut down for a week for staff development and program planning.

Eight to eleven hours of structured therapeutic programming was offered to each inmate weekly, with an average of five to seven hours attended. Six to fifteen percent of groups were cancelled during the reporting period, most commonly for inmate housing moves or transfers, custody reasons, and clinician cancellations. The arrangement of therapeutic modules

for group sessions in a straight line was not conducive to the group process.  Space constraints within the group rooms prevented alternative arrangements of the modules.

MHCB

The institution had ten operational MHCBs during the reporting period.  One bed was used to house a long-term medical patient during a portion of the reporting period.  At the time of the site visit, there were no inmates in the MHCB due to suicide-resistant beds being installed.

Inmates referred to the MHCB were placed in one of three holding cells in the CTC until seen by either the psychologist or psychiatrist.  These were small booths with a stool.  After 5:00 p.m., inmates were placed into one of four large alternative housing cells within the CTC.  These cells were located directly across from an officers' desk/station.  Large windows on the cell doors and on the hallway offered good visibility into the cells.  Each cell contained a stainless steel commode and sink.  Two of the cells contained a partial wall which provided privacy but obscured visibility to all areas of the cell.  Florescent lighting was good.  Inmates were placed on watch and given a smock, blanket, and mattress to place on the floor.  Custody logs of use of these cells were incomplete and often did not contain release times.  A log maintained by emergency room medical staff was complete, with both entry and release times.  Mental health staff used these logs to calculate durations of stays and sent information to central office on a weekly basis.  During the reporting period, 246 inmates were placed into alternative housing pending crisis bed screening/evaluation.  For the second half of May 2012, stays in alternative housing ranged from 1.5 hours to 42.95 hours, or an average of 14.2 hours.  If an inmate was awaiting an MHCB, he was given priority to remain in an alternative cell during the daytime, rather than moved to a small holding cell.

SVSP reported that there was no instance during which more than the four alternative housing cells were used during the reporting period.  Institutional procedures also identified additional wet cells to house inmates on watch temporarily, if necessary.  There were four such additional cells, one in each yard that ordinarily served as Bureau of Prison Terms holding areas.

Staffing in the MHCB consisted of 1.5 psychiatrists, one psychologist clinical director, and two psych techs, and shared one office tech with other mental health programs.  There was no recreational therapist.

There were 90 MHCB admissions during the reporting period, 37 percent of which were from institutions via HCPOP.  All HCPOP referrals were admitted to MHCB, but only 30 percent of the 202 SVSP referrals were admitted.  All SVSP referrals were screened and some were held briefly in the holding area until released back to their housing units.  The average clinical length of stay was 9.4 days, and the average physical length of stay of 12.3 days, and the range of stays was one to 29 days.  Forty-seven inmates stayed longer than ten days, for the following reasons:  DSH referral awaiting a bed (13 percent), clinically discharged but awaiting an institutional bed (30 percent), awaiting transportation back to sending institution (17 percent), starting a new psychotropic medication (four percent), and retention for clinical rationale (36 percent).

All non-admissions were monitored on their housing units with 24-hour observation and five-day clinical follow-up.  MHTS.net reports indicated that 75 to 91 percent of the 24-hour observation logs on the non-admissions were returned, but completion rates ranged from 12 to 38 percent.  The return rate for five-day clinical follow-ups on non-admissions was 85 to 100 percent, with an average completion rate of 94 percent.

All referrals to the MHCB were evaluated by a psychiatrist and intake assessments were completed within 24 hours of admission.  Audits of admission SREs found 100-percent compliance for each month of the reporting period for inmates admitted due to risk of self-harm.

Initial IDTT meetings were completed within 72 hours of admission in 87 percent of cases, and no case exceeded 96 hours.  Weekly follow-up IDTT meetings were conducted for all inmates 100 percent of the time.  All required staff attended.  Clinical staff provided information on a chrono about whether each admission was related to the inmate presenting risk of harm to others.  This information was used to determine whether restraints were used during escorts of inmates, except in cases from administrative segregation where other escort security measures controlled.

A psychiatrist or the psychologist saw each inmate daily in the MHCB treatment team/staff conference room that contained a therapeutic module for the inmate.  The psych techs interacted with all patients at cell front several times each day, providing reading and other activity materials.  At the time of the site visit, out-of-cell time was limited to participation in IDTT meetings and daily psychiatry or psychology contacts.

For the first time in two years, five-point restraints were used.  They were placed on one inmate due to danger to self.  The duration was 15.25 hours.

EOP

The mainline EOP program had 167 to 178 inmates each month of the reporting period.  It was located on housing units D3 and D4.  Fourteen EOP inmates were housed on non-EOP yards at some time during the reporting period.  Seven of them remained on the non-EOP yard beyond 60 days, including one who became 3CMS, one who went to DSH, one who was

transferred to KVSP, and one who paroled.  There were no EOP inmates housed on non-EOP yards at the time of the site visit.

MHTS.net was used to measure EOP treatment and found it generally consistent with Program Guide requirements.  Initial assessments were completed within five calendar days of arrival in 100 percent of cases.  Initial IDTT meetings occurred within 14 days of arrival in 84 to 100 percent of cases.  Quarterly follow-up IDTT meetings occurred 86 to 97 percent of the time.  All required staff attended IDTT meetings 77 to 100 percent of the time, and inmates attended 58 to 81 percent of the time.  The monitor's expert attended IDTT meetings during the site visit.  All required staff disciplines were represented.

Six to 12 hours of treatment were offered to each inmate each week during the reporting period, but nine to 26 percent of groups were cancelled, primarily due to clinician absence and custody reasons.  The sole benchmark that was not met consistently was the offering of at least ten hours of structured therapeutic activity per week.  During the site visit, the monitor's expert observed four structured EOP therapeutic activities involving three to seven inmates per group.  Three of these groups were activity-based groups and one was a psycho-educational group on the grieving process.  The inmates were all actively involved in these groups and appeared to adequately prepared for them.

SVSP continued to offer an enhanced EOP for lower functioning/chronically mentally ill inmates.  Twenty-eight inmates were in the program at the time of the site visit. They were given two weekly primary clinician contacts and daily assistance with activities such as cleaning, laundry, and personal hygiene.  Each inmate was offered eight to 12 hours of programming per week, of which four to six hours were received according to MHTS.net

reports.  The IDTT continued to consider DSH referral to intermediate care for these patients, although many of them had already been to DSH and returned.

3CMS

The mainline 3CMS population dropped from a high of 1,084 in January 2012 to 969 in April 2012.  Primary clinician caseload sizes ranged from 88 to 156 in January 2012, but by May 2012 they ranged from 92 to 142.

Quality management reports indicated that intake assessments were completed within ten working days of arrival in 64 to 81 percent of cases.  There was an upward trend during the latter half of the reporting period.  Initial IDTT meetings were held within 14 working days of arrival in 70 to 93 percent of cases.  Some delays were attributable to delays in removal of an administrative segregation designation in SOMS.  Follow-up IDTT meetings occurred at least annually in 93 to 99 percent of cases.  All required staff attended 95 to 100 percent of the time, and the inmate was present 79 to 89 percent of the time.  Inmate refusals were the only reason why any meeting was conducted without the inmate being present.

Ninety-three to 98 percent of all mainline 3CMS inmates were seen at least quarterly by their primary clinicians, and some were seen more frequently, usually based on inmate request.

The institution offered many group treatment opportunities to 3CMS inmates and also made it available to non-MHSDS inmates, with 3CMS inmates receiving priority access. Group topics included book club, cognitive thinking, conflict resolution, life sentence, stress management, substance abuse, anger management, and coping.  Some inmates were on a group wait list, but it was not clear whether the same inmates may have already been participating in other groups or whether the lists were updated regularly.  Some inmates had decided to be

removed from the lists when they receiving job assignments, but their names remained on the lists nevertheless.

The monitor's expert attended a 3CMS SNY group entitled "Anger Management." Nine inmates attended the group. Although some group members participated actively, the clinician could not succeed at drawing others into the process or refocusing or redirecting the discussion. It was observed that the clinician would likely benefit from some additional clinical supervision, co-facilitation, and/or peer review to improve group leadership skills.

<u>3CMS Inmates in Administrative Segregation</u>

MHTS.net reports indicated that 74 to 100 percent of 3CMS inmates received a brief assessment within five calendar days of placement in administrative segregation. Initial IDTT meetings were conducted before the initial ICC meeting 70 to 100 percent of the time. Timeliness was hindered by placements into administrative segregation overflow at times, making the use of the usual tracking mechanisms for assessment and scheduling less effective.

Weekly primary clinician contacts occurred 80 to 96 percent of the time, but they were conducted in confidential settings only 40 to 45 percent of the time due to the lack of private treatment space.

<u>Referrals</u>

From November 28, 2011 to June 30, 2012, there were 38 emergent referrals, of which 97 percent resulted in a response within four hours. There were 34 urgent referrals during this period, of which 88 percent triggered a response within 24 hours. During the same time period, inmates and staff generated 1,839 routine referrals, of which 85 percent prompted a response within five working days.

<u>RVRs</u>

SVSP reported that that1,982 RVRs were issued during the review period.  Of these, 938 were issued to MHSDS inmates and 1,044 were issued to non-MHSDS inmates.  Six were received by inmates in the MHCB, 180 were received by EOP inmates, and 752 were received by 3CMS inmates.  All of the MHCB and EOP inmates were reported to have received mental health assessments.  Of the 752 3CMS inmates issued RVRs, 392 or 52 percent received a mental health assessment.

The institution reported that 309 or 79 percent of the mental health assessments of 3CMS inmates were in connection with RVRs related to A, B, or C offenses, and that 83 or 21 percent of the assessments for 3CMS inmates were in connection with D, E, or F violations.

SVSP reported further that during the reporting period, there were no RVRs issued in connection with self-injurious or suicidal behaviors, and none related to hoarding or cheeking of medications.

**<u>Correctional Training Facility (CTF)</u>**
August 15, 2012 – August 17, 2012

<u>Census</u>:

At the time of the site visit, CTF's total population was 5,608, which was down by 14 percent since the time of the monitor's preceding visit for the twenty-third round.  The total mental health population was 1,083, a decline by three percent.  The EOP mainline population was five and the 3CMS mainline population was 1,026.  There were 11 3CMS inmates in the OHU.  The total administrative segregation population was 119, including 41 3CMS inmates.  No EOP inmates were pending transfer to a hub.

<u>Staffing</u>:

Positions for the senior psychiatrist, chief psychologist, 1.5 senior psychologists, and the senior psych tech were all filled.

Of the 3.5 staff psychiatrist positions 2.25 were filled, leaving a 36-percent vacancy rate.  Contractors covered 1.25 vacancies, resulting in a functional vacancy rate of zero. The 9.5 staff psychologist positions were all filled.  However, CTF's allocation of staff psychologists had been reduced by three positions since the twenty-third round, due to the population decline.

The 1.5 social worker positions were filled.  Eight of the ten psych tech positions were filled, resulting in a 20-percent vacancy rate.  The .65 recreational therapist position remained vacant.

Quality Management:

CTF reported that 12 quality management committee meetings were held during the reporting period.  The minutes for 11 meetings that were provided indicated good attendance, with a quorum present at all meetings.

The mental health subcommittee took up a variety of issues during the reporting period and made effective use of the QIT process.  It met twice monthly, with good attendance and a quorum present at all meetings.  Agenda items included office tech staffing, therapeutic groups, program priorities, change in policy for OHU placement, heat medication cards, the review team for movements to higher levels of care, discrepancies in SOMS regarding changes in level of care, and training on referrals to higher levels of care.  Minutes were submitted monthly for review by the quality management committee.

Of the ten ongoing QITs at the time of the monitor's visit, seven were chartered during the reporting period.  Eight QITs had been resolved during the reporting period.

Psychiatry peer review included a review of initial psychiatric evaluations and clinical progress notes.  Each of the seven CTF psychiatrists was reviewed by another CTF psychiatrist approximately three times during the reporting period.  The completed reviews were analyzed by the peer review coordinator and the results were then returned to the psychiatrists under review.

For primary clinicians, there were two quarterly peer review meetings and a review of 116 charts during the reporting period.  For the first quarterly review, 11 primary clinicians reviewed a sample of 62 3CMS charts, and for the second quarter, ten primary clinicians reviewed 54 3CMS charts.  The clinicians under review were then given the audit results, but with little discussion, analysis, or feedback.

Suicide Prevention:

There were no completed suicides during the reporting period.

According to the management report, the SPRFIT held six meetings, with a quorum present at four of the five meetings for which minutes were made available.  Agenda items included discussion of a suicide in December 2011, inmates on suicide watch/precaution, the monthly statewide suicide prevention videoconference, attempted suicides, custody wellness checks, and the quarterly statewide SPRFIT coordinators' teleconference, among other things. The self-harm review process continued during the reporting period, with six reviews completed and presented to the treatment teams and SPRFIT for discussion.

The ERRC met regularly and kept minutes which were provided for review.  CPR refresher training was given annually.  All queried officers were carrying micro-shields on their person.  Cut-down tools were readily accessible in the administrative segregation unit.

CTF reported 99.9-percent compliance with five-day clinical follow-up. According to the institution's management report, custody wellness checks were completed 98 percent of the time.

In administrative segregation, daily morning meetings between custody and clinical staff were documented 65 percent of the time.

The institution was unable to provide data regarding compliance with completion of pre-placement screens.  MHTS.net reports indicated a compliance rate of 92 percent for mental health screening within 72 hours of placement.

All new placements in administrative segregation were placed in 12 designated intake cells, all located on each side of the first tier and closest to the entry area/officer location.

According to the management report, 30-minute welfare checks were 100-percent compliant, but no documentation was provided for review during the site visit.  Daily psych tech rounds were documented appropriately 99 percent of the time.

Cells on the second and third tiers in the administrative segregation unit were equipped for electronics and inmates were allowed to have televisions.

The administrative segregation sergeant indicated that all inmates in administrative segregation had access to ten hours of yard per week.

<u>Medication Management</u>:

CTF had 572 inmates on psychotropic medications at the end of the reporting period.  It was among the first prisons to begin using the MAPIP tool, in August 2011.  The monitor was provided with a combination of MAPIP raw data spreadsheets and MHTS.net reports.

According to a MAPIP audit of 20 newly arriving inmates, 90 percent received their prescriptions by the next calendar day.

Ninety-eight percent of inmates transferred within CTF received their medications without interruption.

Medication orders were allowed to be written for up to 90 days.  Bridge orders were allowed to be written for up to 14 days, but a follow-up appointment with the prescriber had to occur within the 14-day period.

Mental health staff reported receiving an average of 12.61 notifications of medication noncompliance per week.  According to an MHTS.net report, 92 percent of these had documented follow-up with the psychiatrist within seven days of referral.  However, a MAPIP sample of 58 cases of medication noncompliance found that only 46 referrals were generated and only 29 appointments occurred within seven days, for a compliance rate of only 50 percent.

The institution started a monthly audit of wait times in medication lines.  It found that average monthly wait times ranged from 3.4 minutes to 10.75 minutes.

MAPIP audit results indicated that up-to-date informed consent forms were present in the eUHR in 85 percent of sampled cases.

It appeared that DOT administration was ordered appropriately.  There were 78 inmates on DOT.  All others on psychotropic medications received it nurse-administered.

Only one inmate was receiving medication involuntarily pursuant to a Keyhea order.

Audits founds that the 365 inmates on HS medications were consistently receiving them no earlier than 8:00 p.m.

Ninety-five percent of the 106 inmates who paroled during the reporting period signed receipts for a 30-day supply of their medications.

Transfers:

There were no DSH referrals, transfers, or returns during the reporting period. Any inmates identified as meeting the indicators for consideration of DSH referral were generally elevated in level of care from non-MHSDS to 3CMS, or from 3CMS to EOP, with a plan for follow-up by the IDTT and further consideration for a higher level of care, if necessary.

Because CTF does not have an MHCB, 14 inmates in need of that level of care were referred and sent to outside MHCBs. Some of these inmates were subsequently referred to DSH and did not return to CTF. The institution was not able to easily identify the number who returned, as it had not been tracking these inmates.

Four beds were identified as MHOHU beds in the institution's OHU. There were 85 admissions to the MHOHU during the reporting period. The average length of stay was 2.33 days with a range of one to seven days. Of the 15 patients who stayed longer than 72 hours, 20 percent were waiting MHCB transfer, six percent were waiting for a bed at a proper custody level and  location, and 73 percent were waiting for bed space within the institution even though they did not have a change in custody level or mental health level of care.

There were no PSU transfers during the reporting period.

There were five EOP inmates referred to an administrative segregation hub during the reporting period. Transfer timelines were met in three cases, and the other two inmates had lengths of stay of 54 and 57 days, respectively. At the time of the site visit, there were no inmates pending transfer to an EOP hub.

According to the data provided, there were 23 EOP inmates at CTF during the reporting period. Transfer timelines were met in all but four cases. Two inmates paroled prior to transfer, four were transferred to an MHCB, two were elevated to the 3CMS level of care, and 11 were timely transferred to an outside EOP. Of the four EOP inmates at CTF at the time of the site visit, three had been pending transfer longer than 60 days.

Other Areas:

### MHSDS Inmates in Administrative Segregation

The sole administrative segregation housing unit was located in the central facility. In the unit, there were three areas in which inmates could receive clinical contacts in a confidential setting. These were a primary clinician's office containing a module, a staff conference room, and an office on the third tier that contained a computer terminal, desk, and module. None of the modules had a seat for the inmate, and a plastic milk crate was placed into the module as a seat. Staff reported that inmate refusals of individual clinical contacts were generally due to the discomfort of the modules.

There were 41 3CMS inmates in administrative segregation at the time of the site visit. They received psychiatry and primary clinician contacts, IDTT meetings, and daily psych tech rounds.

Ninety-one percent of initial IDTT meetings were completed within 14 days of arrival or prior to the ICC meeting, whichever occurred first. Inmates on psychotropic medications were seen by the psychiatrist at least once every 90 days in all cases. During the reporting period, 95 percent of inmates received at least weekly primary clinician contacts, although they occurred in a confidential setting only 39 percent of the time. Cell-front contacts

were nearly always due to inmate refusals.  There were no therapeutic groups in administrative segregation.

MHOHU

Each inmate in the MHOHU had a daily contact with either a psychiatrist or psychologist.  SREs were completed on admission and discharge for those inmates who were referred for suicidality.  These inmates also received five-day clinical follow-up and 30-minute security checks following discharge.

The physical plant of the MHOHU remained unchanged and problematic, due to the age of the facility and the configuration of the cells and the unit.  The four MHOHU cells were located behind a large observation window.  These cells had bars as their cell fronts and were located immediately adjacent to one another.  This allowed inmates to pass things among themselves, and thus hindered suicide-resistance.  Each cell contained a raised concrete bed on which a mattress was placed.  Inmates' property and clothing were restricted according to level of suicide watch and assessment of risk of suicide.

3CMS

CTF had a large mainline and SNY 3CMS program.  Initial primary clinician contacts occurred within ten days in only 67 percent of cases, and initial IDTT meetings occurred within 14 days in only 61 percent of cases.  Ongoing care met Program Guide timeframes. Inmates received timely ongoing primary clinician contacts, psychiatric appointment, and IDTT meetings in 93 percent of cases, according to both MHTS.net reports as well as clinical records. IDTT meetings were attended by all required participants.  Meetings of two different IDTTs were observed.  Discussions, acceptance of input from the inmate, and planned clinical interventions at these meetings were all appropriate and clinically driven.

CTF reported that there were nine therapeutic groups in which 58 inmates participated.  There were 158 inmates on the group waitlist, of which 34 were at the 3CMS level of care and the others were not in the MHSDS.  The 3CMS inmates were given priority placement on the waitlist and the first option to participate in groups when openings became available.

Referrals

The institution had a reliable system for tracking and triaging mental health referrals.  During the review period, there were approximately 2,136 mental health referrals.  Of the 85 emergent referrals, 96 percent received a response within four hours.  Of the 104 urgent referrals, 91 percent received a response within 24 hours, and of the 1,947 routine referrals, 82 percent received a response within five days.  CTF reported that lack of clinical staff was the primary obstacle to achieving timely responses to all mental health referrals.

RVRs

According to provided data, a total of 726 RVRs were issued during the reporting period.  Two RVRs were issued to EOP inmates who both received a mental health assessment. Of the 155 RVRS issued to 3CMS inmates, mental health assessments were given in 55 of these cases.  Of the 569 RVRs issued to mainline inmates, three received assessments.  CTF did not issue RVRs for suicidal or self-injurious behaviors.

**California Men's Colony (CMC)**
Hybrid Paper Review

Census:

As of July 24, 2012, CMC's inmate population had decreased to 5,405, down by 400 since the time of the Twenty-Third monitoring round.  The MHSDS population remained constant at 1,681 inmates, as the EOP mainline population increased from 444 to 566 and the

mainline 3CMS population dropped from 1,089 to 966.  The MHCB remained full with 40 inmates, with an additional five inmates in alternative housing.

There were 342 inmates in administrative segregation.  This included 61 EOP inmates or 19 more EOP inmates than during the Twenty-Third monitoring period, and 40 3CMS inmates or 34 fewer than during the same period.  There were no EOP inmates awaiting PSU beds.

Staffing:

CMC reported 133.06 allocated mental health positions.  There were only 7.7 vacancies, for a vacancy rate of 5.8 percent that was virtually unchanged from the rate of 5.6 percent reported for the Twenty-Third monitoring period.  CMC did not utilize contractors to cover vacancies during the monitoring period.

The chief psychiatrist position remained filled, and one of the three senior psychiatrist positions remained vacant.  The chief psychologist position and all five senior psychologist positions were filled.

The number of staff psychiatrist positions decreased from 19.5 during the Twenty-Third monitoring period to 18.48 positions.  Two of these positions remained vacant throughout the monitoring period, for a vacancy rate of nearly 11 percent.  Staff psychologist positions increased in number from 35.48 to 41.98 positions, with 3.5 vacancies, for a vacancy rate of eight percent.

Supervising social worker positions were substantially reduced from seven during the Twenty-Third monitoring period to 1.2 positions, of which .2 were vacant, leaving a vacancy rate of nearly 17 percent.  CMC's previous 12.5 social worker positions were reduced by 0.5 but were all filled.

All of the ten recreational therapist positions were filled.  The two senior psych tech positions remained filled and only one of the 32.9 psych tech positions was vacant.  The one unit supervisor position was filled.

CMC lost one clerical position since the Twenty-Third monitoring period, resulting in 17.5 positions, of which four were vacant.

CMC did not use psychiatry telemedicine during the monitoring period.

Quality Management:

The quality management program at CMC included all of the necessary components, with a mature and well-functioning process that identified, examined, and addressed areas in need of corrective action.

The local governing body met twice, with a quorum present at each meeting during the reporting period.  It addressed pertinent matters including staff credentialing, peer review, CTC licensure, review of inmate deaths, and court compliance issues.

The quality management committee was chaired by the institutional CEO and met consistently.  The mental health subcommittee met twice monthly and achieved a quorum.  It was significantly involved in program performance and quality assurance functions at the institution.  Its recommendations were forwarded to the quality management committee.

There were two active QITs during the monitoring period.  These addressed validation of MHTS.net and timeliness of DSH referrals.

Peer review was in place for psychiatrists, psychologists, and social workers.  The reviews were both quantitative and qualitative.

Suicide Prevention:

There was one suicide at CMC during the reporting period.

The institutional SPRFIT was scheduled to meet monthly during the reporting period.  It provided documentation for five of its six meetings.  Minutes were maintained.  Items taken up by the team included review of suicide attempts and self-injurious behaviors, custody issues, reports from the ERRC, MHCB issues, and review of use of seclusion and restraints.

During the monitoring period, the ERRC met at least monthly, and at times it met twice monthly.  It continued to review emergency response at the facility, including all deaths, suicide attempts, and Code II/III ambulance transfers.  Recommendations were reviewed and approved by the CMO and the chief nurse executive (CNE).  CMC provided a list of all staff who had CPR certification and/or renewal training during the monitoring period.  The institution reportedly conducted monthly emergency response drills in administrative segregation.  However, some of the sign-in sheets regarding this training were undated, making verification difficult.

CMC reported 90-percent compliance for five-day clinical follow-up after discharges from the MHCB.  It did not provide information regarding compliance with custody follow-up.

In administrative segregation, daily morning meetings among mental health staff and the custody sergeant continued throughout the review period.  In addition, the senior psychologist supervisor and facility captain met weekly to review every EOP inmate in an effort to expedite transfers.

CMC remained compliant with completion of pre-placement screens.  While MHTS.net audits found a compliance rate of 65 percent for completion of the 31-question mental health screen within 72 hours, CMC's subsequent manual audit indicated a compliance rate of 93 percent.  Confidentiality of the settings of these screens was not reported.

Although CMC reported compliance with completion of 30-minute welfare checks, only supervisory summaries from an institutional audit were provided as proof of practice.  The audit did not address whether the checks were staggered, and no raw data was provided for verification purposes.

There were no cells in administrative segregation that were equipped with electrical outlets.

CMC remained compliant with offering ten hours of yard per week to inmates housed in administrative segregation.

<u>Medication Management</u>:

CMC implemented the new MAPIP audit process during April 2012.  As a result, some of their audits utilized MAPIP, while others utilized pre-existing audit processes.  Audits documented a number of medication management issues at the institution.

CMC demonstrated greater than 90 percent compliance for medication continuity for inmates arriving with an active prescription from other institutions.  The institution remained compliant with timely medication administration following housing moves throughout the institution.

Renewals remained 99 percent compliant throughout the monitoring period.  New and renewed orders were for no longer than 90 days, and bridge orders were for no longer than 14 days.

An institutional audit of medication noncompliance in May 2012 found a compliance rate of 75 percent for timeliness of staff referrals to psychiatry.  Another audit found that only 63 percent of eUHRs contained the previous month's MAR, and that completion of MARs for missed medication doses was done in only 58 percent of cases.  As a corrective action,

supervisory staff ordered stamps to encourage correct legible documentation on MARs.

Audits of morning and evening pill lines found that on average they lasted less than 30 minutes.  The number of inmates for whom prescriptions were written for HS administration decreased from 456 to 397 during the review period.

Completed consent forms for psychiatric medications continued to be present in eUHRs in 86 percent of cases.

A MAPIP audit of laboratory testing of inmate blood levels of psychotropic medications indicated a compliance rate of 33 percent for initialing, signing, and dating of test results, and for addressing and documenting abnormal test results in the eUHR.  The institution indicated that this low compliance rate may be due to unavailability of the eUHR when antipsychotic medications were initiated.  Audits of testing of blood levels for mood-stabilizing medications found compliance rates of 90 percent or better.  An audit of appropriate testing and documentation for monitoring of atypical antipsychotic medications indicated a compliance rate of 75 percent.

As of January 1, 2012, all new and renewed cases for involuntary medication administration were seen according to the new Penal Code Section 2602 (PC 2602).  The process was coordinated by a designated psychiatrist.  On May 31, 2012, CMC reported that it housed 47 inmates with Keyhea or Section 2602 orders.  Prior to January 1, 2012, petitions for one new order and 12 renewals were heard and granted under the prior law.  After January 1, 2012, petitions for two new orders and 24 renewals were filed under PC 2602.  Of the two petitions for new orders, one was granted and one was denied, and all but one of the renewals was granted.  Renewals were not pursued for seven cases based on clinical decisions at CMC.  Two inmates transferred out of CMC prior to their scheduled hearings, and two inmates transferred into CMC

prior to their scheduled hearings.

An audit of a two-month period demonstrated that 73 percent of the inmates who paroled from CMC received their prescribed parole medications.  While this was an improvement since the Twenty-Third monitoring period, no log was maintained in receiving and release, and the only documentation was maintained in the eUHR.  The institution had discontinued its prior procedure for documentation of parole medication and indicated that the lists provided by the parole unit were inaccurate.

Transfers:

CMC's tracking of DSH referrals improved during the reporting period.  There were 493 inmates who had one or more indicators for consideration for DSH referral.  Of these, 113 or 23 percent were referred, including 82 inmates referred to intermediate care and 31 inmates referred to acute care.  Of the 77 percent of inmates who were not referred, 25 eUHRs were audited.  Eighty-eight percent of these 25 audited eUHRs had a documented reason for non-referral on the form 7388B, and 98 percent of the non-referred inmates' eUHRs contained documented clinical interventions.

Seventy one percent of the acute care referrals were completed and posted on SharePoint within two working days.  There were no rejections from acute care.  The institution rescinded eight percent of the acute care referrals.

CMC completed 81 percent of the intermediate care referrals in five working days.  There were no rejections from intermediate care during the reporting period.  Only two percent of the intermediate care referrals were rescinded by the institution during the reporting period.

CMC received discharge summaries for most of the 142 inmates who returned from DSH during the review period.  It did not provide data for the rate of contacts between DSH clinicians and CMC clinicians upon these inmates' returns.  Ninety percent of inmates returning from DSH during the review period received five-day clinical follow-up.

During the monitoring period, CMC received 413 MHCB referrals from within the institution, and 59 referrals from outside institutions.  There were 472 admissions, with an average length of stay of 16.4 days.  Eighty-three or 18 percent had stays lasting longer than ten days, largely due to clinical determinations and waits for DSH beds.  Twenty three delays in discharges were due to administrative reasons.  No MHCBs were occupied by long-term medical patients during the review period.

When no MHCBs were available, alternative housing was used routinely. Utilized cells were located in the same building (Building Seven) on the intake unit, which was across the hall from the MHCB.  The intake unit housed primarily inmates arriving from DSH or other CDCR facilities.  Generally, ten such cells there were used, but additional ones were also used as needed.  Because the intake unit had once housed the MHCB, cells had been equipped to enhance visibility into the cell, and vents had smaller grates in order to minimize potential for self-harm.  Staff saw inmates in alternative housing for daily evaluation at cell-front.

About one month before the monitor's visit, CMC changed its procedure for the use of alternative housing.  Previously, when the MHCB census reached 40, inmates were placed into alternative housing, with a priority system for taking inmates nearing discharge and placement of newly-admitted inmates into the MHCB.  Under the new procedure, the new admission was placed in alternative housing, with immediate contact to HCPOP for an MHCB. One consequence of this change was the placement of inmates on administrative segregation

status in the alternative cells, which resulted in lockdown of the entire intake unit.  Supervisory

staff indicated that although HCPOP was contacted, inmates were usually placed into the MHCB

at CMC when another inmate was discharged, and that transfers to outside MHCBs were

infrequent.  During the monitoring period, 41 inmates were placed in alternative housing while

awaiting placement in an MHCB.  All were placed on suicide watch, and all were ultimately

transferred to an MHCB.  Twenty four or 58 percent of these 41 inmates had stays in alternative

housing that lasted less than twenty four hours, with a range of one to five days.

CMC again reported no transfers of EOP inmates out of the facility, as it

maintained these inmates in its own EOP.

During the review period, CMC endorsed 20 inmates for PSU placement.  Of

these seven were transferred, four were released to the EOP at CMC, one had a medical hold,

one returned to the 3CMS level of care, one paroled, two transferred to DSH, and four were

pending transfer as of May 31, 2012.  The average time from referral to the CSR and

endorsement was 24 days, and for endorsement to transfer it was an average of 60 days.

Other Areas:

Administrative Segregation EOP

Staffing for the administrative segregation EOP included one psychiatrist, one

senior psychologist supervisor, 6.5 primary clinicians, six psych techs, and two office techs.

Four recreational therapists, who shared their time in D-Quad EOP, provided group and in-cell

activities to administrative segregation inmates.

As of February 10, 2012, the central administrative segregation unit, which was

reported on for the Twenty-Third monitoring period, was closed.  Clinical space in

administrative segregation increased from five to nine confidential offices plus four renovated

cells on the tiers that were used as interview rooms.  The group space in the administrative segregation unit remained unchanged and inadequate for appropriate group interaction.

CMC's IDTT meeting attendance did not consistently meet Program Guide standards.  CMC was compliant with providing timely psychiatric contacts, initial and ongoing IDTT meetings, and initial and ongoing primary clinician contacts.  Approximately 50 percent of all clinical contacts occurred at cell-front.  Documentation of daily psych tech rounds was compliant.  However, attendance by correctional counselors at IDTT meetings remained insufficient.

CMC did not offer at least ten hours of structured therapeutic activity to over 25 percent of EOP inmates in administrative segregation.  The average number of hours of structured therapeutic activity offered to EOP inmates in administrative segregation was 13.25.  However, there were significant differences in the number of hours offered to individual inmates, as only 73 percent of inmates were offered at least ten hours per week.  This was a decline since the Twenty-Third monitoring period, when 82 percent of EOP inmates were offered at least ten hours per week.  During the review period, 45 percent of EOP inmates housed in administrative segregation refused 50 percent or more of offered therapeutic activities.  On average, EOP inmates in administrative segregation attended 7.87 hours per week.

CMC continued to send a monthly report to CDCR Headquarters on EOP inmates whose stays in administrative segregation exceeded 90 days.  Referrals were made to the CC II, as needed.

MHCB

During the review period, the Locked Observation Unit which functions as an MHCB unit at CMC was comprised of 40 beds plus two safety cells.  Because the unit is

functioning as an MHCB on an interim basis, suicide-resistant beds were not installed. Mattresses were placed on raised permanent platforms.  Clinical staff included one senior psychologist supervisor, 2.5 psychiatrists, four psychologists, two social workers, one psych tech, two office techs, and one recreational therapist.  Without a physician assigned to the MHCB, histories and physicals were not performed within 24 hours of arrival.

The institution was compliant with completion of timely initial contacts by the psychiatrist, and with ongoing contacts by both the psychiatrist and primary clinicians, but not with initial contacts by primary clinicians.  Both initial and follow-up IDTT meetings were compliant, but the teams continued to lack participation by correctional counselors.  CMC indicated that it was unable to report on the completion of SREs because of inaccurate data from MHTS.net.

The special master's expert and a monitor attended an IDTT meeting in the MHCB unit.  The necessary participants except the correctional counselor I were present. Clinical discussion included pertinent treatment issues and indicators for consideration of referral of the patient to a higher level of care.  Clinicians had access to the eUHR.

Recreational therapy, including groups, yard time, and cell-side activities, was available to inmates in the MHCB unit.  All inmates were allowed to participate unless they were on administrative segregation hold status.

Clinical restraints were not used in the MHCB during the monitoring period. There were no ADA-compliant cells and no ADA-accessible therapeutic modules in the MHCB unit.  Inmates requiring ADA accommodations were sent to the GACH at CMC.

All use of clinical restraints was in the GACH at CMC.  There were five instances involving three inmates placed into clinical restraints.  The longest duration of use of restraints

was approximately 14 hours.  It appeared that CMC was compliant insofar as use of mechanical restraints during IDTT meetings.  Inmates who had been stabilized and were not on administrative segregation status were uncuffed during the IDTT meeting that was observed by the special master's expert and monitor.

Documentation regarding seclusion was incomplete.  There were ten placements into seclusion during the review period.  Due to incomplete documentation, it was difficult to calculate the average duration of seclusion, but it appeared to range from less than one day to 15 days.

EOP

CMC had approximately 547 EOP beds on D-Quad.  Clinical staffing included one senior psychologist supervisor, five psychiatrists, 16 psychologists, and two clinical social workers.  According to institutional audits, CMC was compliant with initial and ongoing psychiatry and primary clinician contacts.

Initial IDTT meetings were timely in only 75 percent of cases, but follow-up IDTT meetings were compliant.  Attendance by required participants at IDTT meetings remained problematic.  The attendance rate for the assigned psychiatrist was 84 percent.  Attendance by correctional counselors was not reported by the institution.

CMC offered 13.3 hours of structured therapeutic activities per week during the review period.  On average, 7.57 hours were attended and 5.75 hours were refused.

3CMS

CMC's mainline 3CMS program staff included one senior psychologist supervisor, four psychiatrists, seven psychologists, and one social worker.  The institution was compliant with timeliness of initial and follow-up IDTT meetings, psychiatry contacts, and initial

and follow-up primary clinician contacts.  Attendance by correctional counselors at IDTT meetings was not reported.

Group therapy was provided to some 3CMS inmates.  Topics included a wide range of appropriate subject matter, including pre-release planning.  As of May 31, 2012, CMC reported a long wait list for group therapy.

3CMS Inmates in Administrative Segregation

CMC was compliant with timely initial and ongoing IDTT meetings, psychiatric contacts, initial and ongoing primary clinician contacts, and daily psych tech rounds for 3CMS inmates housed in administrative segregation, and daily psych tech rounds.  Problems with attendance by correctional counselors at IDTT meetings continued.

Approximately 50 percent of all clinical contacts occurred at cell-front.

Group therapy was provided to some 3CMS inmates housed in administrative segregation, but group space remained inadequate for appropriate group interaction.

Referrals

Over the review period, CMC generated 947 mental health referrals.  The institution was compliant for response to emergent, urgent, and routine referrals.

MHTS.net

CMC reported that audits of concordance between MHTS.net and eUHRs indicated rates ranging from 65 percent to 93 percent for all program areas.  They indicated some improvement but also the persistence of issues with coding, entry of documentation data, timely filing of information, and missing documentation.  These issues were addressed by a QIT as well as by supervisory interventions.

RVRs

During the review period, CMC issued a total of 1,775 RVRs, including 1,246 to general population inmates, 30 to inmates in the MHCB unit, 178 to EOP inmates, and 321 to 3CMS inmates.  One hundred percent of the EOP and MHCB inmates who received RVRs also received mental health assessments.

CMC implemented the new RVR policy with respect to 3CMS inmates.  Seventy four or 23 percent of the 3CMS inmates who received RVRs received mental health assessments based on A, B and C division offenses.  There were ten assessments completed for general population inmates.

CMC issued 12 RVRs for hoarding or cheeking of medications to three EOP inmates, four 3CMS inmates, and five general population inmates.  Mental health assessments were completed for the three EOP inmates, but not for the 3CMS or general population inmates.  RVR documentation reflected consideration of the mental health assessments in the penalty phase of the process.

Pre-Release Planning

Three clinicians provided most of the parole planning for inmates at CMC during the review period.  It was provided to EOP inmates, as well as some 3CMS inmates.  Due to MHTS.net coding errors, CMC was unable to provide specific documentation regarding the actual amount of parole planning provided during this period.  The coding errors were identified and addressed.

Licensed Marriage and Family Therapist Pilot Program

Due to staffing cuts, the licensed marriage and family therapist pilot program (LMFT) was discontinued during the monitoring period.

Access to Care

No problems with access to care were reported during the monitoring period.

Construction

The special master's expert and monitor toured the new 50-bed MHCB unit that was under construction at the time of the site visit.  Walls and ceilings, individual cells, and other areas such as the pharmacy, nursing station, isolation rooms, and the kitchen were in place.  Concrete masonry work was underway in both housing and administration sections.  Overall, the construction was assessed as 53 percent complete.

**Wasco State Prison (WSP)**
July 9, 2012 – July 11, 2012

Census:

At the time of the site visit, the total prison population at WSP was 5,064, which included 1,160 inmates in the MHSDS.  The reception center housed 4,324 inmates, including 65 EOP inmates and 1,006 3CMS inmates.  There were eight inmates in the MHCB.  The 3CMS mainline census was 55.  There were 116 inmates in administrative segregation, including three EOP inmate pending transfer and 27 3CMS inmates.

Staffing:

Since the preceding monitoring period, WSP lost one senior psychologist supervisor position, nine staff psychologist positions, all three psychometrist positions, and two MHSDS clerical positions, as a result of realignment of the prison population pursuant to AB 109.

The chief psychiatrist, senior psychiatrist, and chief psychologist positions remained filled.  One of two senior psychologist supervisor positions and the senior psychologist specialist position were filled.  The supervising social worker position was vacant.

1.5 of 7.05 staff psychiatrist positions were filled, leaving a 79-percent vacancy rate.  Full-time equivalent contractors filled 5.5 positions, which resulted in nearly full coverage.

There were significant vacancies among primary clinician positions at WSP.  Of the 30.5 staff psychologist positions, 23.25 were filled, leaving a 24-percent vacancy rate.  Seven of ten social worker positions were filled, for a 30-percent vacancy rate.  Use of a half-time contractor reduced the functional vacancy rate to 25 percent.

The senior psych tech position and six of the seven psych tech positions were filled.  One of 1.5 recreational therapist positions was filled, resulting in a 33-percent vacancy rate.  The health program specialist I position was filled.  One of the 8.5 clerical positions was vacant.

Quality Management:

The local governing body was scheduled to meet at least quarterly and more often if necessary.  All four meetings held during the reporting period achieved a quorum.

The quality management committee was scheduled to meet monthly and held seven meetings during the reporting period, all with a quorum present.

The mental health subcommittee met six times during the reporting period, with a quorum present at all meetings.  The chief of mental health served as chair.  Minutes were kept.  Agenda items included five-day clinical follow-up, Keyhea, DSH referrals, morning meetings in administrative segregation, pill lines, peer review, MHTS.net concordance, and QITs, among other things.

The sole QIT chartered during the reporting period dealt with timeliness of mental health contacts in the reception center.  There were also two ongoing QITs, one dealing with administration and noncompliance issues with discharge medications, and the other dealing with

exceeding CTC licensing capacity for emergency treatment of mental health inmates.  The two QITs that resolved during the reporting period concerned management of high-risk mental health inmates and suicide watch.

Psychiatry peer review met quarterly.  All psychiatrists were reviewed at least once during the reporting period.  Each psychiatrist was assigned five eUHRs to review.  Results were then scored and the combined data was distributed to all the psychiatrists for training purposes.

A primary clinician peer review committee had been formed and was scheduled to meet monthly, but was suspended due to staffing vacancies.  As of the time of the monitor's visit, no peer review for primary clinicians had occurred in 2012

Suicide Prevention:

There was one completed suicide during the reporting period.

The SPRFIT was scheduled to meet monthly and held six meetings during the reporting period.  Attendance was generally good, with a quorum present at five meetings. Minutes were kept.  Agenda items included CDCR headquarters' suicide review and report, development of a training presentation on hourly post-discharge checks to be included with the monthly suicide prevention training for custody, screening of inmates through the TTA following discharges from the MHCB or returns from DSH, discussion of the monthly update on suicide attempts, self-injurious behaviors, and implementation of the proctor/mentor training program for conduct of the SRE.

Emergency response drills were performed monthly.  The ERRC met regularly during the reporting period.  Minutes were kept and provided for the monitor's review during the site visit.  CPR refresher training was provided annually.  All queried officers were carrying

micro-shields.  The cut-down tool was located in the control booth in the administrative

segregation unit.

WSP reported a compliance rate of 97 percent for five-day clinical follow-up.

Custody wellness checks were reported as 97-percent compliant for inmates discharged from a

MHCB, and 93-percent compliant for inmates removed from suicide watch in alternative

housing.

In administrative segregation, morning meetings between clinical and custody

staff were properly documented and were reported to be productive.

Required pre-placement screening was problematic.  On average, pre-placement

screens were completed only 53 percent of the time during the reporting period.  However, there

was marked improvement, with the compliance rate reaching 100 percent at the end of the

reporting period in March and April 2012.

Audits found a compliance rate of 99 percent on average for timely completion of

the 31-item screen within seven days of arrival in administrative segregation.

There were 14 designated intake cells in administrative segregation, all located on

the first tier.  Placards indicating intake status were affixed to the doors.  Other cells on either the

upper or lower tier were used as intake cells if the number of new intakes exceeded 14.

WSP reported that 30-minute welfare checks were documented 100 percent of the

time.  Daily psych tech rounds were completed 100 percent of the time for each month of the

review period.

Cells were not wired for electricity and inmates were not allowed to have

electronic appliances.  Inmates were offered ten hours of yard time per week.

Medication Management:

A number of medication management audits were problematic during the review period.  Data from MHTS.net reports conflicted with data from other sources, making determination of the number of inmates on psychotropic medications very difficult.  WSP staff were trained on the use of MAPIP in April 2012 and implemented it during the following month.  Consequently, the institution reported results of audits that were non-MAPIP.

An audit of continuity of medications for newly-arriving inmates found a compliance rate of 100 percent.  However, a review of the monthly audit sheets indicated that the sample did not include inmates who had transferred in from other CDCR institutions.

Similarly, medication continuity for intra-institutional transfers was also reported as 100-percent compliant, but the audit sample did not include inmates who were discharged from MHCBs.

Pill lines were not audited.

Up-to-date informed consent forms were present in 98 percent of a sample of audited charts.

An audit of laboratory testing of blood levels of inmates on psychotropic medications found that 92 percent of clinically-indicated testing was ordered, and that test results and any clinical interventions were reviewed and documented.  Audits of AIMS testing found that in 88 percent of applicable cases it was done at six-month intervals for inmates on antipsychotic medications.

WSP reported that as of June 15, 2012, 756 inmates were receiving their medications by DOT, but no audits of the process had been conducted.

The seven *Keyhea* hearings during the reporting period resulted in six petitions being granted and one denied.  At the time of the site visit, there were five inmates at the institution on active *Keyhea* orders.

WSP reported that there were 463 MHSDS inmates on HS medications, but there was no available audit information as to whether these medications were administered no earlier than 8:00 p.m.

Transfers:

During the reporting period, there was initially one full-time DSH coordinator, but the position was reduced to part-time February 2012.

WSP experienced a number of problems related to implementing the DSH sustainable process at the institution.  Consideration of referral to DSH referral did not appear to be integrated into the overall treatment team approach at WSP. Many of the Form 7388Bs in records reviewed by the monitor's expert were incomplete and inaccurately filled out.  The objective indicators for consideration for referral to DSH were not accurately noted.   Of the 186 inmates identified as meeting one or more indicators for consideration for referral to DSH, 15 were referred to acute care.  One of these referrals was rescinded due to clinical improvement.  One was initially rejected but was later accepted and transferred to DSH following action by the CCAT.  Information in the proof-of-practice binders indicated that ten or 67 percent of the acute care referral packets were completed within timeframes.  Ten of these referrals resulted in transfers, with nine or 90 percent of them occurring within 72 hours of a bed assignment.

There were 12 inmates referred to intermediate care.  The DSH referral log indicated that 11 or 92 percent of the intermediate care referral packets were completed timely.  However, the institution reported a compliance rate of 87 percent, and the monitor calculated a

compliance rate of 75 percent.  A total of 13 inmates, including one from CMF who had already been referred before arriving at WSP, were awaiting transfer to intermediate care.  Two paroled before admission to DSH.  Of the remaining 11, nine or 82 percent transferred within 72 hours of a bed assignment.

Twenty-three inmates returned from DSH to WSP during the reporting period. Discharge summaries for all were available on SharePoint.  In 46 percent of cases, WSP clinicians attempted to contact the DSH clinician but received no response.  Clinician-to-clinician contacts took place within five working days of the inmate's return in only 18 percent of cases.

There were 384 referrals to the MHCB from within WSP and none from other facilities.  There were 148 admissions, for an admission rate of 39 percent.  The average length of stay was 7.5 days, with a reported range of one to 69 days.  There were reportedly 36 inmates whose stays were longer than ten days, but those were calculated without including any time that the inmate may have spent in alternative housing prior to MHCB placement.  When taking into account time spent in alternate housing, the number of stays exceeding ten days increased to 41.

WSP reported that 13 inmates transferred to a PSU during the reporting period, based on staff use of Form 135s.  Only four were documented in MHTS.net.  No data on lengths of stay was provided.

Among the 372 inmates in administrative segregation during the reporting period, there were 46 EOP inmates and 88 3CMS inmates.  Nine or 19 percent of the EOP inmates transferred to a hub within 30 days.  EOP inmates' stays in administrative segregation averaged 96 days, with a range of seven to 254 days.  Twenty-two or 48 percent of EOP inmates in administrative segregation had stays that exceeded 90 days.

For the 88 3CMS inmates in administrative segregation during the review period, the average stay lasted 107 days, with a range of four to 427 days.  Forty-seven percent of 3CMS inmates in administrative segregation had stays exceeding 90 days.

During the reporting period, 54 EOP inmates transferred from the reception center.  Fifteen or 28 percent of those inmates remained in reception center longer than 60 days.  The range of stays exceeding 60 days was 63 to 147 days.  The most common reason for delayed transfers appeared to be lack of bed availability.

Of the 401 3CMS inmates who transferred from the reception center during the reporting period, 57 or 14 percent waited longer than 90 days.  The range of stays exceeding 90 days was 91 days to 175 days.

Other Areas:

Reception Center

The average number of EOP inmates in reception center each month was 90, with a range of 68 to 123, including some housed in the administrative segregation unit.  They were offered an average of 4.95 hours of structured therapeutic activity per week, and received an average of 3.28 hours per week.  In addition, they were offered dayroom four times per week and yard twice weekly.

The average number of 3CMS inmates in reception center each month was 949, with a range of 895 to 1037.  Reception center 3CMS inmates received a mental health evaluation and primary clinician contacts, but no IDTT meetings and no groups, due to clinical staffing vacancies.

MHSDS Inmates in Administrative Segregation

For EOP inmates in administrative segregation, the initial IDTT meeting was timely in 96 percent of cases, and follow-up IDTT meetings were timely in 100 percent of cases. The compliance rate for timely initial appointments with the psychiatrist was 94 percent. For follow-up appointments with the psychiatrist, the compliance rate was 93 percent. Initial primary clinician contacts satisfied Program Guide timeframes in 75 to 79 percent of cases. The compliance rate for timely ongoing primary clinician contacts was 79 percent. This lack of timeliness was attributed primarily to inmate refusals, which were followed by cell-front contacts.

EOP reception center inmates who were housed in administrative segregation were offered 5.52 hours of structured therapeutic activity hours weekly during the reporting period. On average, 2.65 hours weekly were attended and 2.88 hours were refused. Groups were offered using seven therapeutic modules, one of which was wheelchair-accessible. Their arrangement in a horseshoe configuration on the middle of the dayroom did not resolve the problem of lack of visual and auditory privacy in the area.

For 3CMS inmates in administrative segregation, the initial IDTT meeting occurred in accordance with Program Guide timeframes in 94 percent of cases. Follow-up meetings of the IDTT were 100 percent compliant with timeframes. An audit of initial contacts with the psychiatrist found that initial and follow-up contacts were timely 100 percent and 99 percent of the time, respectively. 3CMS inmates in administrative segregation were seen daily on psych tech rounds, weekly by their primary clinician, and as needed by the psychiatrist. Audit results indicated that initial primary clinician contacts for 3CMS inmates were timely approximately 75 percent of the time, and follow-up contacts were timely 67 percent of the time.

MHCB

WSP continued to operate a six-bed MHCB unit during the reporting period.  In cases of unavailability of MHCBs, the institution used alternative housing on 328 occasions during the reporting period, according to the management report.  While WSP reported the average length of stay in alternative housing was 1.7 days, with a range of less than one day to five days, the alternative housing log indicated that there were at least four inmates whose stays lasted for six days.  WSP mental health staff reported that this was always due to the unavailability of MHCBs throughout the system.  The institution had identified multiple areas for use as alternative housing when the MHCB was full.  However, use of any given area was made dependent on the specific inmate and any concomitant custody issues.

In the MHCB, the reported compliance rates for completion of SREs upon admission and discharge were 40 percent and 81 percent, respectively.  However, as reported from MHTS.net data and in the institution's management report, these compliance rates were 87 percent and 86 percent, respectively. There was no apparent explanation for these discrepancies.

There were also discrepancies in reports of compliance rates for initial and ongoing IDTT meetings.  For example, while the management report indicated a 93-percent compliance rate for initial IDTT meetings held within 72 hours of admission and an 88-percent compliance rate for weekly follow-up IDTT meetings, MHTS.net indicated that initial and ongoing IDTT meetings were both 94-percent compliant.  Further, a medical record review suggested that WSP was close to compliance for completion of initial and follow-up IDTT meetings in the MHCB, but it could not confirm a compliance rate of 90 percent or greater.

The composition of IDTTs at WSP did not meet Program Guide requirements. The psychiatrist and psychologist were reportedly always present at IDTT meetings, but attendance by correctional counselors was not tracked.  Review of records by the monitor's

expert indicated that correctional counselors generally did not attend.  While WSP's proof-of-practice documentation indicated that most inmates were not handcuffed during clinical contacts and IDTT meetings in the MHCB, all inmates were cuffed during IDTT meetings observed by the monitor's expert.

Data from MHTS.net indicated that initial psychiatry contacts were compliant 90 percent of the time, and initial contacts with the psychologist were compliant 96 percent of the time.  According to the management report, the rate at which inmates were seen daily by the psychiatrist or psychologist was 92 percent.  However, there were some discrepancies with MHTS.net data, which indicated that ongoing psychiatry contacts were compliant 98 percent of the time, and ongoing contacts with the psychologist were compliant 95 percent of the time.  It should also be noted that some clinical contacts counted as compliant occurred during what should have been an IDTT meeting.

Errors in the restraint and seclusion logs made them difficult to interpret and made it impossible to calculate data on the use and duration of restraints. Seclusion was used on 16 different occasions, with one inmate placed into seclusion three times.  The average length of time in seclusion was 7.8 hours, with a range of 40 minutes to 23 hours.  Documentation of use of restraints and seclusion in the eUHR was problematic.

3CMS

There were approximately 60 mainline 3CMS inmates during each month of the reporting period and at the time of the site visit.  3CMS inmates received initial mental health evaluations, quarterly primary clinician contacts, and annual follow-up IDTT meetings. The primary clinician attempted to see inmates at more frequent intervals as clinically indicated, but this was hampered by reduced staffing levels and competing duties.  No therapeutic groups were

offered, also due to clinical vacancies as well as lack of appropriate space.  Consequently, medication management was often the primary mode of mental health treatment provided to mainline 3CMS inmates at WSP.

Referrals

WSP reported that 100 percent of the 564 emergent referrals and 17 urgent referrals generated during the reporting period received a timely response.  Of the 7,476 routine referrals, 40 percent received a response within five working days.  Staff attributed this low rate of response to primarily staffing shortages.

RVRs

Of the total 1,212 RVRs issued during the reporting period, 65 were issued to EOP inmates, 266 were issued to 3CMS inmates, and one was issued to an inmate in an MHCB. The MHCB inmate received a mental health evaluation as did all but five or 92 percent of the EOP inmates.  Approximately 67 or 25 percent of the 3CMS inmates received mental health evaluations.

WSP staff indicated that training on the new RVR process was completed, but did not provide data showing how many 3CMS inmates were issued RVRs for an A, B, C, or SHU-able offense.

Pre-Release Planning

During the reporting period, pre-release planning was provided to 64 inmates, including 57 EOP inmates and seven 3CMS inmates.  Forty-six inmates were placed into groups that focused on finding housing, employment, budgeting, etc., while another 18 were seen individually.  Twenty-nine inmates were seen by TCMP to complete SSI applications.

## Kern Valley State Prison (KVSP)
June 19, 2012 – June 21, 2012

Census:

At the time of the site visit, the total inmate census at KVSP was 4,184, down by 7.1 percent since the preceding monitoring period.  The total mental health population was nearly unchanged at 1,426.  There were 12 inmates in the MHCB, 86 EOP inmates, and 1,163 3CMS inmates.  The total administrative segregation population was 440, including three EOP inmates pending transfer and 164 3CMS inmates.

Staffing:

Positions for the chief psychiatrist, chief psychologist, one senior psychologist and one supervising social worker were filled.  However, the chief psychologist was in the process of retiring and was already gone from the institution.

Only two of the six staff psychiatrist positions were filled, but contractors covered the remaining four vacancies.  Of the 18.5 staff psychologist positions, 16.5 were filled.  The two remaining vacancies were covered by contractors, and the institution employed an additional full-time psychologist, for over-full coverage in psychology.

Six of the nine social worker positions were filled, leaving a vacancy rate of 33 percent.  Of the four recreational therapist positions, only one was filled, for a 75-percent vacancy rate.

The health program specialist I position was filled, as were all five office technician positions.  One additional office technician was working as a contractor.

Quality Management:

The local governing body met six times during the reporting period.  Minutes were kept and a quorum was consistently present.

The quality management committee met during each of the six months of the reporting period.  Attendance was good, with a quorum present at all meetings.

KVSP did not achieve a quorum for all of the mental health subcommittee meetings.  The mental health subcommittee held 12 meetings during the reporting period.  Attendance was somewhat problematic, with a quorum present for only eight meetings.  Minutes indicated that the subcommittee took up the topics of treatment space, effective communication, MAPIP audits, vacancies in psychiatry, formulary changes, access to care, training on the use of Form 7388B, forms for cases of medication noncompliance, mental health referrals, suicide prevention reports, and program performance reports.

The sole QIT chartered during the reporting period focused on improving the compliance rate of initial clinical contacts.

Psychiatry peer review convened five times during the reporting period.  At each meeting, six to eight reviewers each examined five eUHRs.  The institution did not provide information on any identified areas of concern.  Primary clinician peer review convened monthly, with eight or nine clinician reviewers present.

Suicide Prevention:

There were no completed suicides during the reporting period.

The SPRFIT met five times during the reporting period, but a quorum was not achieved at any of the meetings.  Minutes were maintained but they were sparse.  SPRFIT agenda items included five-day clinical follow-up, suicide prevention training, case presentations, and suicide attempts.  The monitor's expert observed a SPRFIT meeting.  Discussion and analysis of the issues before the team was minimal to non-existent.

Proctor/mentor training on conduct of the SREs was done at KVSP.  As a result, 15 clinicians had received the training.  A draft LOP on the SRE mentoring process was awaiting final approval.

The ERRC met regularly during the reporting period except in April 2012, when there were no Code III incidents to review.  Emergency response drills were performed monthly.  CPR refresher training was provided annually.  A spot check indicated that all queried officers had micro-shields on their person.  Cut-down tools were located in the control booth.

KVSP reported a compliance rate of 98 percent for conduct of five-day clinical follow-up.  It did not provide any data on compliance with custody follow-up.

In administrative segregation, daily morning meetings between administrative segregation custody and mental health staff occurred during the reporting period and were reported to be helpful.

KVSP reported a compliance rate of 90 percent for completion of pre-placement screens.  There was no tracking of timeliness of completion of the 31-item questionnaire for non-MHSDS inmates placed in administrative segregation.

New intake inmates were identified by magnetic placards on their cell doors.

The institution reported that 30-minute welfare checks were routinely conducted for the first three weeks of stays in administrative segregation.  However, there was no apparent process to track these checks, making it impossible to verify their conduct in a staggered manner.

KVSP reported, and proof-of-practice documentation confirmed, that psych tech rounds were compliant.

Most administrative segregation cells were equipped with working electrical outlets.  Custody staff reported that inmates were offered ten hours of yard time per week.

Medication Management:

There were a number of problems related to medication management generally and to the implementation of MAPIP at KVSP.  Data on medication management in the institutional management report and in the proof-of-practice binders was often contradictory.  Some but not all elements of MAPIP were implemented in November 2011.  A MAPIP interdisciplinary workgroup met monthly to address areas of non-compliance with targeted corrective action plans.

KVSP continued to have problems with medication continuity following intra-institutional transfers of inmates.  The management report indicated that only 25 percent of inmates received their prescribed medications without interruption.  However, proof-of-practice documents indicated an average compliance rate of 83 percent throughout the review period.  For inmates discharged from the MHCB, 91 percent continued to receive their medications timely.

Medication renewals were timely 92 percent of the time, but bridge orders were written when needed in only 53 percent of cases.

According to the management report, there was a weekly average of ten notifications of medication noncompliance.  Proof-of-practice documentation indicated a compliance rate of 90 percent for referral of inmates who had missed three consecutive does.  However, in cases of inmates who missed half of their doses in a seven-day period, the compliance rate for referral dipped to less than 50 percent.  Proof-of-practice documents indicated a combined compliance rate of 66 percent.

Pill line wait times were not problematic at KVSP.

Up-to-date informed consent forms were present in eUHRs in only 61 percent of applicable cases.

Seventeen randomly selected eUHRs of inmates receiving psychotropic medications were audited for compliance with protocols relating to laboratory testing of inmate blood levels of these medications.  For those cases in which testing was clinically indicated, 63 percent had tests ordered.  In the ten cases in which test results were clinically significant, psychiatrists reviewed the results and documented clinical action 60 percent of the time.  These findings were somewhat suspect, however, in that the sample size was small and the methodology of this audit was questionable.

At the end of the reporting period, KVSP had 1,044 inmates on psychotropic medications administered via DOT.  The management report stated a compliance rate of 100 percent, and the proof-of-practice documentation indicated a compliance rate of 91 percent.

According to the management report, HS medications were administered after 8:00 p.m. 100 percent of the time.  However, proof-of-practice documentation indicated an average compliance rate of 65 percent, with rates rising from 60 percent for December 2011 to 90 percent for April 2012.

The monitor's expert found the previous month's MAR in 53 percent of reviewed eUHRs.  Ninety percent of the MARs found in the charts were legible and complete.

Transfers:

KVSP did not consistently comply with sustainable process standards in the review period.  During the reporting period, there were 197 inmates who met one or more of the Form 7388B indicators for consideration for referral to a higher level of care.  Seventeen referrals to acute care were initiated.  One of them ultimately transferred to intermediate care.  Of the 16 remaining acute care referrals, 15 were completed within two days of identification and one was completed within six days of identification, for a 94-percent compliance rate.  Five of

the 16 transfers were completed within ten days of referral, for a compliance rate of 31 percent. The average time from referral to acceptance was 4.25 days, and the average time from acceptance to transfer was 8.4 days.  The average number of days to complete transfers was 12.8, with a range of five days to 35 days.

In addition to the one acute care referral that transferred to intermediate care, there was one additional referral to intermediate care.  Of these two cases, one referral was completed within five days and the other was completed within six days, for a 50-percent compliance rate.  One inmate transferred within six days of referral and the other transferred within 33 days of referral, again yielding a 50-percent compliance rate.  The times from referral to acceptance were 21 days for one inmate and four days for the other inmate, and the times from acceptance to transfer were 14 days and two days, respectively, with one still waiting for transfer at the time of the monitor's visit.

There were 258 admissions to the MHCB during the reporting period.  The average physical length of stay was 8.37 days, with an average clinical length of stay of 6.68 days, and a range of one to 44 days.  Of the 73 admissions that lasted more than ten days, the average stay was 16.76 days.  Reasons for stays exceeding ten days were availability of DSH beds, administrative delays, initiation of new psychotropic medications, and retention of the inmate in an MHCB for clinical reasons.

There were 126 alternate housing placements during the reporting period.  Eighty-seven of those placements, or 69 percent, resulted in admission to the MHCB unit.  The average length of stay in alternate housing was 1.2 days, with a range of less than one day to five days.

According to proof-of-practice documentation, a total of 50 EOP inmates remained in administrative segregation over 90 days, with a range of 91 to 292 days.  The data

provided with regard to other EOP transfers was incomplete and therefore inadequate for purposes of reporting lengths of stay and transfer times.

Other Areas:

Administrative Segregation

KVSP's administrative segregation mental health population was housed in buildings B1 and B2. According to information obtained from MHTS.net, the initial IDTT meeting for EOP inmates was timely in 88 percent of cases. Initial contacts with the primary clinician occurred within timeframes for only 63 percent of EOP inmates.

For 3CMS inmates, the initial IDTT meeting occurred within required timeframes 84 percent of the time, and initial contacts with the primary clinician occurred within timeframes 89 percent of the time. The monitor's expert's sampling of a number of eUHRs identified several cases in which inmates assigned to the 3CMS level of care appeared to require a higher level of care.

Weekly primary clinician contacts were completed for 94 to 95 percent of inmates in administrative segregation. For those who were prescribed psychotropic medication, initial and subsequent contacts were timely 93 to 100 percent of the time. Approximately 59 percent of all clinical contacts occurred out-of-cell, and 41 percent occurred at cell-front. Throughout the reporting period, no more than six inmates were participating in therapeutic groups at any given time.

MHCB

Twelve of the 22 beds in the institution's CTC were designated as MHCBs. During the reporting period, KVSP utilized the TTA, several areas within B, C, and D facilities, and the Board of Prison Terms hearing cells as alternative crisis bed housing. The institution

reported that all of the inmates placed into alternative housing were placed on suicide watch rather than on suicide precaution, and that all who were there due to suicidal or self-injurious behaviors were administered an SRE prior to placement.

Per MHTS.net, 94 percent of initial IDTT meetings and 100 percent of initial clinical contacts in the MHCB occurred within required timeframes. Weekly follow-up IDTT meetings occurred 97 percent of the time. Due in part to staff shortages, neither one-to-one recreational therapy nor yard time were being provided to mental health inmates placed within the MHCB.

Of considerable concern was the discovery by the monitor's expert of several cases of 3CMS inmates who had repeated MHCB admissions and appeared to require consideration for higher levels of care. These inmates were often discharged from the MHCB without such consideration by the IDTT.

Across the reporting period, there were 17 applications of five-point restraint. The average time per application was 5.89 hours, with a range of 1.17 to 29.2 hours. At the time of the site visit, all mental health patients were placed into mechanical restraints when out of cell. The institution had not yet implemented the March 2011 policy that requires a joint clinical-custody determination of whether MHCB inmates with no administrative segregation designation must be retrained when out of cell.

EOP

In 87 percent of cases, newly arriving EOP inmates were assessed and received an IDTT meeting within 14 days. Follow-up IDTT meetings occurred timely in 97 percent of cases. They were attended by the psychiatrist and primary clinician 100 percent of the time, but there was no data on attendance by the CC I.

No data was reported with respect to psychiatry appointments, but record review seemed to indicate compliance.  Weekly primary clinician contacts were provided in 85 percent of cases.  An average to 10.5 hours of structured therapeutic activity was offered per week.  There was no reported data on the number of hours that were received.

3CMS

Of the 712 3CMS inmates who arrived at, or were designated at, the 3CMS level of care during the reporting period, 80 percent received an initial evaluation and initial primary clinician contact within ten days.  Initial IDTT meetings took place within 14 days in 74 percent of cases.

The compliance rate for annual follow-up IDTT meetings was 97 percent, with the psychiatrist and the primary clinician present at all meetings and the inmate present at 71 percent of meetings.  There was no data on attendance by the CC I.

In 97 percent of cases, inmates on psychotropic medications had timely follow-up appointments with the psychiatrist.  Follow-up quarterly contacts with the primary clinician occurred timely in 94 percent of cases.  There was only one therapeutic group available to 3CMS inmates.  Space shortages remained problematic.

Referrals

The institution did not meet Program Guide requirements for response to urgent and routine referrals.  According to the data provided, there were 2,374 mental health referrals during the reporting period.  These included 15 emergent, 488 urgent, and 1,871 routine referrals.  All of the emergent referrals were seen on the same day.  Seventy-two percent of urgent referrals were seen within 24 hours, and 83 percent of routine referrals were seen within five business days.

RVRs

KVSP reported that the new RVR policy was implemented in May 2011.  A total of 1,621 RVRs were issued during the reporting period.  Nineteen RVRs were issued to inmates in the MHCB, and 42 were issued to EOP inmates.  All received mental health assessments.  Provided data did not break out the numbers of RVRs issued to 3CMS and mainline inmates, but merely indicated that 272 3CMS and seven mainline inmates received mental health assessments.

### North Kern State Prison (NKSP)
May 21, 2012 – May 23, 2012

Census:

Since the preceding monitoring visit, the prison population decreased by eight percent to 4,730.  Nearly all of the decline was in the institution's reception center population, which had dropped by seven percent.  There were 56 EOP inmates and 918 3CMS inmates in the reception center.

The total MHSDS population grew by nearly one percent to 1,172.  This was largely a result of NKSP's expanded mainline 3CMS program, which more than tripled from 42 inmates in September 2011 to 147 inmates in May 2012.  There were four mainline EOP inmates awaiting transfer.  Six inmates were in MHCBs at the time of the monitor's visit, but this relatively low number was attributed to the ongoing installation of suicide-resistant beds in the MHCB unit.

Staffing:

There were 84.5 mental health positions of which 72.25 or 86 percent were filled.  Use of contractors reduced the functional vacancy rate in mental health to ten percent.  As a result of population realignment pursuant to AB 900, NKSP gained a .75 FTE psychiatry

position, and lost a senior psychologist position, four staff psychologist positions, and all three psychometrist positions, for a net loss of 7.25 mental health positions.

All supervisory positions, including positions for the chief psychologist, a senior psychiatrist, and two senior psychologists, were filled.  Two of 8.25 psychiatrist positions were open, for a vacancy rate of 24 percent, but use of contractors reduced the functional vacancy rate to 12 percent.

Thirty of 33 psychologist positions and all six social worker positions were filled. One of two recreational therapist positions and the health programs specialist position were filled.  Five of 7.25 psych tech positions were filled, and contractors covered all vacancies.

The institution was challenged by vacancies and long-term absences among clerical staff, with nine of 12 positions neither filled nor covered.  Two office techs from the medical department were temporarily redirected to mental health, but the duration of this measure was unclear.

Quality Management:

The quality management structure at the institution was problematic during the review period.  NKSP's local governing body and quality management committee met regularly with adequate attendance.  The mental health subcommittee did not meet regularly.  It presented updated performance data at quality management committee meetings only sporadically.  This was attributed to the absence of the chief psychologist and health programs specialist during significant portions of the reporting period.

QITs were utilized appropriately.  Peer review was available for psychiatrists but not for primary clinicians.

Most of the key program guide service areas were regularly audited.  However,

due to the shortage of clerical staff, MHTS.net data was unreliable and/or indecipherable in many cases, making performance in key areas difficult to gauge accurately.

Suicide Prevention:

There were no completed suicides at NKSP during the reporting period.

The institution's SPRFIT met regularly, with appropriate attendance. It functioned as an effective forum for tracking compliance levels, identifying issues, and implementing corrective actions to reduce suicide risk at NKSP. Specific issues addressed by the team included lengths of stay in MHCBs, the wait list for intermediate inpatient care, incidents of self-harm, the quality of suicide risk evaluations, content of the monthly suicide prevention video conferences, the installation of suicide-resistant beds in the MHCB unit, local practices regarding the issuance of RVRs for suicidal gestures, consideration of whether to treat hunger strikes as suicidal behavior, and compliance with five-day clinical follow-up and custody wellness checks.

The mental health temporary housing unit (MHTH)[21] was used to house and assess inmates referred for admission to the MHCB. All decisions to place inmates in the MHTH unit or to instead monitor inmates in housing units were made by mental health clinicians. Inmates in the MHTH unit were seen within 24 hours and daily thereafter by a psychiatrist or licensed clinician. A recreational therapist also worked in the unit. IDTT reviews were held weekly. Clothing was initially restricted to a suicide smock, but could include a t-shirt, boxer shorts, socks, and shower slippers as an inmate's condition improved.

---

[21] The monitor found that some institutions, including NKSP, had adopted their own unique terminology and acronyms applicable to mental health, for example "MHTH." To avoid confusion and misunderstanding, the special master requests that the institutions utilize terminology and acronyms that are known and understood throughout the CDCR system.

The MHTH unit which had ten clustered alternative housing cells that were located on the lower tier of an overflow segregation unit.  Beds were removed and electrical outlets and light switches were deactivated in these cells.  During the reporting period, the MHTH continued to be used for mental health triage, step-down, and observation.  Inmates with three or more MHTH placements comprised 40 percent of all placements during the reporting period.  This led to the implementation of a new local policy whereby inmates with histories of suicidal ideation related to non-mental health issues were placed on suicide watch in their housing units, in lieu of being transferred to the MHTH unit.  All decisions to apply the new policy were made by a clinician with the approval of an IDTT.  Inmates removed from suicide watch in their housing units were provided with five-day clinical follow-up and three-day custody checks.  The new policy significantly reduced movement in and out of the MHTH unit during the reporting period.  The SPRFIT monitored this new local policy.  Minutes of SPRFIT meetings documented staff work on refining it, and indicated that this practice had significantly reduced the number of multiple admissions to the MHTH unit.

Changes in local policy governing utilization of the CDCR's revised suicide risk evaluation were reviewed by the mental health subcommittee and forwarded to the quality management committee for final approval in December 2011.  At the time of the monitor's visit, 28 percent of clinical staff at NKSP had completed the training on proper completion of the suicide risk evaluation.  Training efforts focused on addressing the problem of failure to record chronic suicide risk factors.

Cut-down tools were stored in the control booths of the primary and overflow segregation units.

The institution reported that 100 percent of inmates discharged from the MHCB

and MHTH units received five-day clinical follow-up, although indecipherable data provided by the institution could neither confirm nor refute this.

Per local policy, hourly wellness checks were conducted for at least three days following discharges from the MHCB and MHTH units.  A decline in compliance during the period of December 2011 through early February 2012, however, pulled down the average compliance rate of 83 percent for the reporting period.  Corrective action initiated by the SPRFIT led to a substantial improvement in March 2012.

NKSP's compliance with CDCR's plan to address suicide trends in administrative segregation was mixed.  The institution reported that daily morning meetings between custody and clinical staff in segregation were documented 73 percent of the time.

An internal audit of 147 eUHRs yielded a compliance rate of 43 percent for the completion of nursing pre-screens.  The institution's audit of 31-item screens was flawed in that it focused on MHSDS inmates placed in segregation, while the Program Guide requires this screen for non-MHSDS inmates.

Compliance rates for the completion and documentation of daily psych tech rounds averaged were just below 100 percent during the reporting period.  An internal review of 55 eUHRs yielded a compliance rate of 91 percent for the presence of summaries of weekly psych tech rounds.

The administrative segregation unit had retrofitted intake cells, but the overflow unit did not.  Both units used yellow cell-door placards to identify inmates who had been in segregation three weeks or less.

Logs of 30-minute welfare checks were complete and, in most cases, signed by custody supervisors on all watches.  The rounds were not staggered, however.

Inmates in segregation were not permitted to have in-cell entertainment appliances.

Inmates in the administrative segregation were reportedly offered nine to ten hours of outdoor yard per week.  Inmates in the overflow unit were reportedly offered six to nine hours per week.

Medication Management:

Local audit instruments were used to track medication management during the first five months of the review period.  The MAPIP process was implemented during the sixth and final month of the reporting period.

Internal audits of 75 charts yielded compliance rates of 89 to 98 percent for timely receipt of medications following arrival at the institution.  Inmates moved within the institution received medications by the following day in 88 percent of reviewed cases.

Psychotropic medications were ordered for no more than 90 days.  Bridge orders did not exceed 30 days.

Chart audits found eight cases of documented medication noncompliance.  Of these, seven or 88 percent were appropriately referred to mental health.  Three of the seven or 43 percent were followed-up within seven calendar days.

Reception center inmates received medications in pill lines in their housing units, and mainline inmates received medications in an outdoor pill line.  Duration of pill lines was not audited, but inmates described the general population pill line as short and well-managed.

Local audits found a compliance rate of 97 percent for the presence of signed current informed consent forms in eUHRs.

A MAPIP audit based on a small sample found inconsistent compliance with protocols for laboratory testing of blood levels for inmates taking psychotropic medications.  A MAPIP audit of 20 charts indicated compliance rates for all aspects of laboratory testing ranging from 64 to 69 percent.  However, the significance of the audit finding was limited because only one month's worth of information was available, and the audited sample did not include any mood stabilizing medications or Clozapine.

According to the institution's report, at the end of the reporting period there were 878 inmates receiving prescribed psychotropic medications.  Nearly two-thirds of these inmates received medications via DOT, and the remaining third received medications via nurse-administration.  DOT was ordered for inmates in the MHCB and the MHTH, as well as for inmates with histories of suicidal behavior, hoarding, and/or cheeking.  DOT instructions were printed on MARs and medication labels.  Institutional audits found that DOT protocols were followed 80 percent of the time.

The Keyhea process was utilized when it was deemed clinically appropriate. There were two inmates on Keyhea at the time of the site visit.

According to an institutional report, 448 inmates were prescribed HS medications. Internal audits indicated that these medications were administered at or after 8:00 p.m. only half of the time.  No explanation was provided.

The institution reported that parole medications were provided to released inmates, but no supporting audit information was provided.

Transfers:

Completion of acute care referral packages, timely transfers to acute care, and access to MHCBs were problematic during the review period.  A full-time DSH coordinator

managed the DSH referral process at NKSP.  Treatment teams were provided with information

about MHCB/MHTH admissions and disciplinary infractions for their consideration within the

referral process.  Referral and non-referral logs were maintained, and reasons for non-referral

were routinely recorded.  Ninety percent of Form 7388Bs audited by the institution documented

the reason for non-referral, but only 48 percent recorded the clinical interventions to be

undertaken.  This was consistent with findings by the monitor's expert in reviewed cases.  Logs

indicated that 233 inmates met one or more of the indicators for consideration for referral to

DSH.  Of those, 45 or 19 percent were referred.  These included 31 acute care referrals, 28 of

which resulted in transfer to APP.  One referral was redirected to intermediate inpatient care, one

inmate paroled prior to transfer to APP, and one inmate won his Vitek hearing.

> The acute care referrals were generally completed within ten days of the inmate's

admission to the MHCB unit.  However, only 58 percent of the acute care referral packages were

completed within two days of the treatment team's decision to refer, and only a third of acute

care transfers occurred within ten days of referral.

> There were 14 referrals to intermediate inpatient care.  Of these, nine resulted in

transfer, including one as a mentally disordered offender to ASH after parole.  Two referrals

were rescinded, two were redirected to acute care, and one inmate was sent to another prison

prior to being transferred to DSH.  Only half of the intermediate care transfers occurred within

30 days of referral.

> Eighteen inmates returned from DSH during the reporting period.  They were

initially placed in the MHTH unit and assessed by an IDTT prior to returning to the yard.  Upon

return to the yard, they were provided with five-day clinical follow-up, three-day custody

wellness checks, and a psychiatry contact within 15 business days.  All DSH discharge

summaries were timely posted to SharePoint.

There were 77 admissions to NKSP's ten-bed MHCB unit during the reporting period. Seventy-one, or over 90 percent, of these admissions came from the MHTH unit. The MHCB unit nearly always operated at full capacity. There were no admissions from other prisons, and no MHCBs were used for medical patients. With nearly 70 percent of MHCB stays exceeding ten days, access to the unit was hampered. Almost two-thirds of the overly-long stays involved inmates awaiting a DSH bed. Only one inmate had three or more admissions to the MHCB unit during the reporting period.

Inadequate access to the MHCB unit resulted in the continued use of the MHTH unit. The local changes described above with regard to observation of inmates with potential suicidal ideation significantly reduced the use of alternative housing. The average number of placements per month in the MHTH dropped to 65, down from over 100 during the preceding reporting period. In October 2011, there were 111 placements in the MHTH, as compared to 41 in March 2012, for a 63 percent difference. The institution also increased its use of HCPOP to move inmates from the MHTH to outside MHCB units, resulting in transfers of five inmates to outside MHCB units.

For the review period overall, NKSP rarely met the 30-day timeline for transferring segregated EOP inmates to hubs. Of the 34 EOP inmates placed in segregation during the entire reporting period, 85 percent had stays in excess of 60 days and 72 percent had stays in excess of 90 days. However, the number of EOP inmates in segregation and their stays there declined significantly over the course of the reporting period. At the time of the site visit in May 2012, there were four EOP inmates in segregation, none of whom had been there longer than 90 days.

Among the 152 EOP inmates transferred from the reception center during the reporting period, 82 waited longer than 60 days.  One languished in reception center for over a year.  However, during the weeks preceding the monitor's visit, NKSP's compliance with the 60-day transfer timeframe improved notably.  Only eight, or 15 percent, of the 54 EOP inmates in the reception center were waiting longer than 60 days at the time of the monitor's visit.

The institution reported that 44 percent of the 495 3CMS inmates who transferred from the reception center during the reporting period waited longer than 90 days.  At the time of the site visit, the reception center held 837 3CMS inmates, among whom 51 percent been waiting longer than 90 days.

Other Areas:

Reception Center

NKSP did not offer five hours of structured therapeutic activity per week to all EOP inmates in its reception center during the review period.  For EOP inmates in reception center, MHTS.net reports generated compliance rates well above 90 percent for the timely completion of initial and follow-up IDTT reviews, and initial and follow-up primary clinician contacts.  Timely initial and follow-up psychiatric contacts occurred 87 and 91 percent of the time, respectively.  However, NKSP reported a compliance rate of only 53 percent for offering five hours of therapeutic activity per week to EOP inmates in the reception center.  Noncompliance in this area was attributed to lack of adequate group space.

IDTT meetings for EOP inmates were observed by the monitor's expert.  However, the team did not have access to eUHRs or SOMS during the meeting. Required disciplines were present and participated in the discussion.  Inmates were encouraged to ask questions and provide information.

<u>MHSDS Inmates in Administrative Segregation</u>

NKSP operated a segregation program in unit D6 and an overflow segregation program in unit A4, as needed.  The overflow unit was deactivated from December 29, 2011 to February 16, 2012, but housed overflow inmates for the rest of the review period.  At the time of the site visit, there were 167 inmates in unit D6 and 18 in A4 overflow.

Four full-time primary clinicians and one full-time psychiatrist served both units. Per institutional report, 58 percent of EOP inmates and 82 percent of 3CMS inmates placed in segregation received a timely initial assessment.  Seventy three percent of EOP inmates and 85 percent of 3CMS inmates received timely initial IDTT meetings.  Compliance rates for weekly primary clinician contacts were 85 percent for EOP inmates and 83 percent for 3CMS inmates. After a period of not tracking out-of-cell contacts, the institution resumed tracking in February 2012 and found that 90 percent of weekly primary clinician contacts during February and March 2012 occurred out-of-cell.

Monthly IDTT reviews for EOP inmates and quarterly IDTT reviews for 3CMS inmates were timely 95 percent and 91 percent of the time, respectively.  Primary clinicians, correctional counselors, and psychiatrists routinely attended IDTT meetings.  Inmates prescribed psychotropic medications were seen by a psychiatrist at required intervals.

Access to confidential treatment space in administrative segregation was very problematic at NKSP.  Due to the absence of private offices, all one-to-one clinical contacts in units D6 and A4 occurred in non-confidential holding cells on the dayroom floor.  Group space in unit D6 was private but small and inadequate.  An institutional report indicated that during the first four months of the reporting period, staff conducted six to ten weekly groups on coping skills, current events, socialization, and anger management, among other things.  Thereafter,

turnover among clerical staff caused inaccuracies in tracking of groups.  Inmates in overflow were not offered group therapy.

MHCB

The institution's data recorded in MHTS.net indicated major problems in meeting Program Guide requirements in the MHCB.  Staffing in the MHCB consisted of a full-time psychiatrist, a full-time psychologist, a part-time psychologist/DSH coordinator, and a full-time recreational therapist who also served as the Keyhea coordinator.  MHTS.net reports reflected that initial IDTT meetings were timely in 88 percent of cases.  Initial and follow-up psychiatric contacts were timely 74 and 47 percent of the time, respectively.  Initial and follow-up primary clinician contacts were timely only 68 and 15 percent of the time, respectively.  Staff questioned the accuracy of these MHTS.net reports, citing gaps in data entry.

Staff reported that daily clinical rounds were conducted.  Mental health and custody staff met on weekday mornings to discuss the status of each MHCB patient.  A morning meeting observed by the monitor's expert was productive for ensuring that all treatment providers and custody officers exchanged current and accurate patient information.

Tracking records on the use of seclusion and five-point restraints were incomplete.  Available information suggested that NKSP used these measures for extended periods of time in some cases.  Six episodes of seclusion involved five inmates, with one episode lasting over three days.  Four inmates were placed in five-point restraints, with one restrained for 42 hours.

General population and reception center inmates in the MHCB were no longer restrained when escorted to and from appointments or during appointments, except when deemed necessary by the treatment team.  Segregation-status inmates continued to be handcuffed during

escorts, but the treatment team could recommend the removal of cuffs during appointments.  The therapeutic module in the treatment room was repositioned and retrofitted to permit visibility on all four sides.

Staff expressed concern regarding the placement of suicide-resistant beds that were installed in the CTC one week prior to the site visit. If standing on the beds, inmates could have access to ceiling-mounted light fixtures, sprinkler heads and vent covers, all of which could be used for self-harm or as weapons.  Installation of a restraint bed was postponed pending discussions with headquarters regarding its placement.

3CMS

Mental health staffing for the institution's mainline 3CMS program consisted of a full-time psychiatrist, a full-time psychologist, and a part-time social worker.  Staffing was augmented by psychology and social work students and interns, but they were due to finish at NKSP shortly after the site visit and were not expected to be replaced.

Timely initial assessments and psychiatry attendance at IDTT meetings were problematic at the institution during the review period.  The institution's review of 66 eUHRs for the completion of initial assessments within ten days and intake IDTT reviews within 14 days found compliance rates of 56 percent and 86 percent, respectively.  Conduct of annual IDTT reviews remained compliant.  The attendance rate for psychiatrists at IDTT meetings was 68 percent.  Primary clinicians and correctional counselors routinely attended IDTT meetings.  The institution reported that 90 percent of psychiatric appointments were timely.  Completion of quarterly primary clinician contacts remained compliant.

3CMS inmates were offered seven therapeutic groups, half of which were facilitated by interns and students.  Groups were scheduled in 90-minute time slots in the

classroom.  However, the impending loss of interns and student help was expected to reduce group offerings.

### Referrals

The institution did not meet Program Guide requirements regarding response to routine referrals.  Institutional data indicated that 92 percent of emergent referrals were resolved on the day they were received, and that 98 percent of urgent referrals resulted in a contact within 24 hours.  Only 25 percent of routine referrals generated clinical contact within five working days.  The institution had recently chartered a QIT to examine response to routine referrals.

### MHTS.net

An institutional audit compared information on clinical contacts in eUHRs to information in MHTS.net.  The audit data for October were lost, but the concordance rate for the balance of the reporting period ranged from 83 to 90 percent and averaged 86 percent.

### Heat Plan

NKSP was compliant with heat plan protocols.  Outdoor and indoor temperatures were monitored and recorded at required intervals.  Lists of inmates taking heat-sensitive medications were appropriately updated and distributed.  Monthly summary reports were generated and forwarded to headquarters.

### RVRs

In accordance with the new RVR protocol, 3CMS inmates charged with the most serious and potentially SHU-able infractions were referred for mental health assessments.  The institution developed a system for collecting relevant data points, including the date of the incident, the inmate's level of care, and the outcome of the disciplinary hearing.  Recording of dispositions was inconsistent during much of the reporting period, but improved notably toward

the end.  Clinicians participating in IDTT meetings observed by the monitor reported that the DSH coordinator used the tracking system to report cases of multiple RVRs.

Internal tracking reports indicated that of the 296 RVRs issued to 3CMS inmates, 97 or one-third were referred to mental health.  Thirteen RVRs were issued to inmates in MHCBs and 47 were issued to EOP inmates, all of whom were referred to mental health.

Mental health evaluations completed during the reporting period were consistently thorough and clear.  RVRs routinely cited the inmate's level of care and accurately referenced the content of the mental health evaluation.  Approximately 14 percent of the RVRs issued to inmates in the MHCB and EOP inmates were dismissed or reduced to an administrative infraction based on input provided by a mental health clinician.  It appeared that very few RVRs issued to 3CMS inmates were dismissed or reduced to administrative infractions.  Penalty mitigation usually consisted of assessing the lowest possible forfeiture of credit within an infraction division.

Issues surrounding the inappropriateness of RVRs for suicide attempts were discussed during mental health subcommittee and SPRFIT meetings.  Local policy was clarified and in-service training was provided to correctional staff.  Compliance appeared to have been restored by the end of the reporting period.

### California State Prison, Los Angeles County (CSP/LAC)
June 4, 2012 – June 7, 2012

Census:

On June 7, 2012, CSP/LAC's total inmate population was 3,937 inmates.  The total MHSDS population was 1,695.  Due to the closing of the institution's reception center in January 2012, only 13 EOP inmates and one 3CMS inmate remained in the reception center.

The mainline EOP population was 296.  The mainline 3CMS population was 1,142, which was an increase by 291 since the preceding monitoring period.

The total administrative segregation population of 392 included 63 EOP inmates and 168 3CMS inmates.  In the MHCB unit, there were eight inmates including two on administrative segregation status.

Staffing:

Of the 114.75 established mental health positions, 99.5 were filled, for an overall mental health vacancy rate of 13.3 percent.  Use of contractors reduced the vacancy rate to 7.6 percent.

The chief psychiatrist position remained vacant.  The chief psychologist position was filled as were all five senior psychologist positions.

Of the 11 staff psychiatrist positions, 5.5 were vacant, but contractors covered all of these open positions.  All 35 staff psychologist positions were filled.  Nine of the ten social worker positions were filled, and a contractor covered the sole vacancy.

The two senior psych tech positions were filled, and 24 of the 26.25 psych tech positions were filled.  No contractors were used to cover these vacancies.

Four of the six recreational therapist positions were filled.  The OSS II position remained vacant.  The HPS I position was filled.  Thirteen of the 15.5 office tech positions were filled.

Quality Management:

The local governing body met six times during the reporting period.  Attendance was good, with a quorum present at all meetings.  The local governing body approved minutes

from the Medical Executive Committee, the Licensed Inpatient Committee, and the Quality

Management Committee, and reviewed mental health and CTC policies and procedures.

The quality management committee met 12 times during the reporting period,

with a quorum present at all meetings.  Representatives from the subcommittees presented

compliance reports for their respective program areas.

The mental health subcommittee met 19 times during the reporting period, with a

quorum present at all meetings.  Various compliance reports were routinely presented to the

committee.  Areas of discussion included *Coleman* auditing, Keyhea issues, administrative

segregation, suicide prevention, MHTS.net, DSH auditing, and MHCBs.

There were no QITs chartered or resolved during the reporting period.  There

were five active QITs: peer review, improvement of EOP administrative segregation treatment

plans, alternative housing, mental health referrals, and MHTS.net/eUHR concordance.

Psychiatry peer review occurred monthly, and PC peer review occurred quarterly.

It consisted of review of completed chart notes and clinical documentation for the preceding

three months.

Suicide Prevention:

There were no completed suicides during the reporting period.

The institutional SPRFIT met monthly during the reporting period, with a quorum

present at all meetings.  Supervisors from every area of mental health provided monthly reports.

The information was then transmitted to the mental health subcommittee.

Emergency response drills were completed in all segregation units during the

reporting period.  Functioning cut-down tools were available in all segregation units.

The institution reported 100-percent compliance for completion of five-day clinical follow-up upon discharge from the MHCB unit.  However, the data indicated an overall compliance rate of 88 percent, and in 3CMS mainline a range of compliance rates of 40 percent to 100 percent.  The institution reported that custody follow-up after discharge from the MHCB was audited, but no summary or analysis of the data was produced to substantiate this report.

In administrative segregation, morning meetings between mental health and custody staff were held in units A4 and A5 and were attended by the psychologist, the psych tech, and the unit sergeant.  Discussions covered all germane issues including new arrivals and problematic inmates.

The institution maintained a 90-percent compliance rate throughout the reporting period for the completion of pre-placement screens and 31-question screens.  Screens were administered in therapeutic modules on the dayroom floor.  Inmates who refused to be placed in the modules were interviewed at cell-front.

All administrative segregation units had designated intake cells for new arrivals.  CSP/LAC continued to use door placards to identify intake-status inmates.

Documentation and logs indicated that 30-minute welfare checks were conducted at staggered intervals during the reporting period.

None of the cells in administrative segregation units had working electrical outlets, and no action was taken to place televisions on the tiers.  Inmates in administrative units were offered adequate yard time.

During the reporting period, there were 15 inmates in the stand-alone administrative segregation unit.  All were all moved within 24 hours of being placed on the mental health caseload.

<u>Medication Management</u>:

CSP/LAC had not yet implemented the new MAPIP process for auditing medication management.  During the monitoring period, CSP/LAC did not meet all Program Guide medication management requirements.

Audits indicated that 76 percent of newly-arriving inmates were provided with a three-day supply of medications, but only 52 percent of newly-arriving inmates received their medications by the day following their arrival.

The institution was compliant with regard to medication continuity following intra-institutional transfers.

Institutional audits indicated that 88 percent of new or changed medication orders were processed timely, and that over 90 percent of psychotropic medication orders were renewed timely.  Medication orders were routinely written for no longer than 90 days.  Bridge orders were written for a maximum of 14 days.

An audit found an average of 26 cases of medication noncompliance per week, but it did not report whether cases were referred properly.  A compliance rate of 86 percent was reported for timeliness of psychiatric follow-up to medication noncompliance.

The institution's audits indicated that timely informed consent forms were obtained in only 43 percent of cases.

Audits examined laboratory testing of inmates' blood levels for mood stabilizing medications but not for other medications, nor did they indicate rates of compliance with documentation of necessary clinical interventions.  A QIT was formed to address the issue.

DOT medication administration was ordered for inmates on Keyhea orders, as well as for those inmates who exhibited potential for self-harm, had abused medications, were

noncompliant with medications, had histories of overdosing, or had histories of recent suicidal ideation, threats, or attempts.  CSP/LAC reported that 496 inmates received their psychotropic medications by DOT, but no audit results were provided for the DOT process nor for pill lines.

There were 44 inmates with Keyhea orders housed at CSP/LAC.  During the reporting period, three petitions were initiated and 21 were renewed.  One petition was denied, one petition was not renewed based on clinical determination, and one was dismissed on the advice of counsel.  There were continuing issues with notification of the Keyhea coordinator of inmates arriving at the institution with Keyhea orders, and with timely provision of Keyhea medications.

There were 497 caseload inmates prescribed psychotropic medications at HS, but no audits of HS pill lines were conducted.  Audits indicated that CSP/LAC was compliant with the provision of medications to paroling inmates.

Transfers:

Timely transfers to all DSH acute and intermediate care was not consistently achieved during the reporting period.  On return from DSH, specific treatment recommendations were not routinely addressed in treatment plans.  The institution had a position for a DSH coordinator, but due to staff illness, there had been multiple changes regarding the individual assigned to cover the position.

A total of 68 inmates were identified for referral to inpatient care during the reporting period.  This included 23 to acute care and 45 to intermediate care.  One of these inmates transferred to another facility prior to completion of the referral packet.

Of the 23 acute care referrals, 14 or 61 percent were completed within two working days, or within seven days if a Vitek hearing was required.  The average number of days

from identification by an IDTT to completion of the referral was 3.95 days.  The average time from completion of the referral to acceptance by a DSH facility was 4.6 days, with a range from the same day to 43 days.  The average time from acceptance to actual transfer was 15.7 days.  Of the 22 inmates who transferred to acute care at a DSH facility, only six or 27.3 percent transferred within Program Guide timelines.

Of the 44 intermediate care referrals completed during the reporting period, 32 or 73 percent were completed within five days of identification, or within ten days if a Vitek hearing was required.  The average time from identification by the IDTT to completion of the referral was 9.22 days, with a range of the same day to 25 days.  The average time from completion of the referral to acceptance by a DSH facility was 18.9 days, with a range of the same day to 70 days.  The average time from acceptance to actual transfer was 28 days.  Of the 33 inmates who transferred to a DSH facility for intermediate care during the reporting period, only eight or 24 percent transferred within Program Guide timelines.

At the time of the site visit, seven inmates were awaiting DSH placement, with three waiting for acute care and four waiting for intermediate care.  Three inmates had already been accepted to a DSH facility and four were pending acceptance.  The average number of days on the wait list for these inmates was 22.7, with a range of six days to 32 days.

Twenty-five inmates returned from DSH to CSP/LAC during the reporting period, but they were not always seen timely upon their return.  Specific DSH recommendations were not referenced or discussed in treatment notes and plans.

The Form 7388B process for the inmate identification and referral process remained problematic.  Inmates who met objective indicators were not consistently identified. Subjective indicators were underutilized.  During the reporting period, reasons for non-referral

were not always stated or were frequently inadequate.  Alternative interventions were not listed in some cases, were inadequate in other cases, or were listed repeatedly despite their lack of therapeutic effect.  The institution was working on addressing these deficiencies.  Improvement was noted at the time of the monitor's visit.

During the reporting period, CSP/LAC operated a 12-bed MHCB unit and added another bed in January 2012, for a total of 13 MHCBs.  No long-term medical patients occupied MHCBs during the reporting period.

There were 357 referrals to the MHCB during the reporting period, including 355 from within the institution and two from other institutions.  Two hundred thirty seven, or 66 percent, resulted in admission.  Of those admitted, 127 or 54 percent were admitted to the MHCB unit at CSP/LAC, and 110 or 46 percent were admitted to MHCB units at other institutions.  Eighteen inmates had three or more MHCB admissions during the reporting period.  Lengths of stay ranged from two days to 124 days and averaged 16 days.  Fifty seven percent of admissions had stays longer than ten days.  Of these, 49 percent were detained for clinical reasons, 33 percent were attributable to DSH referrals, and 15 percent were clinically discharged but waiting for a bed.

CSP/LAC continued to utilize five cells in housing unit D1 and seven cells in administrative segregation unit A4 as alternative housing for inmates awaiting placement in an MHCB.  During the reporting period, 339 inmates were placed in alternative housing, for an average length of stay of two days, with a range of one to six days.  There were 20 inmates with stays longer than 72 hours.  Sixty-five percent of all of these admissions transferred to an MHCB.  All inmates placed into alternative housing due to suicidal or self-injurious behavior

were administered an SRE prior to placement.  All inmates pending MHCB admission who were subsequently discharged from alternative housing received five-day clinical follow-up.

CSP/LAC transferred 21 inmates to the PSU during the reporting period.  The average time from ICC referral to endorsement to the PSU was 18 days.  The average time from endorsement to transfer was 50 days.  At the time of reporting, there were ten inmates pending endorsement and/or transfer to the PSU.

At the time of the site visit, there were ten EOP inmates awaiting transfer to a SNY.  Waiting times ranged from 15 days to 233 days.

The average length of stay for EOP inmates in reception center inmates was 194 days, with all stays exceeding 60 days.  In January 2012, CSP/LAC ended its mission as a reception center.  No inmates were received after February 1, 2012.  During the reporting period, 30 inmates in reception center were transferred out.

The average length of stay for the 83 3CMS inmates in reception center was 184 days.  Only one inmate had a length of stay under 90 days.

Other Areas:

Reception Center

No audit data was provided on completion of the bus screen within 24 hours.  The institution was compliant with timely completion of the 31-question mental health screen, but it was noncompliant with completing psychiatric reviews within 24 hours.  Initial and follow-up IDTT meetings, psychiatry contacts, and primary clinician contacts were all timely.

During the reporting period, CSP/LAC offered an average of 9.16 hours of structured therapeutic activity.  An average of 5.74 hours was received.

Administrative Segregation EOP

For EOP inmates, institutional audits indicated compliance with timely initial and follow-up IDTT meetings, weekly PC contacts, and monthly psychiatric contacts. Facility audits indicated that all necessary participants were present at IDTT meetings. Forty-nine percent of clinical contacts with EOP hub inmates were in a confidential setting. They were offered ten hours of structured therapeutic activities 57 percent of the time.

Interviewed inmates reported lack of access to reading materials and electrical appliances.

MHCB

For the 13-bed MHCB unit, CSP/LAC did not provide data regarding the completion of histories and physicals, but records indicated compliance with Program Guide timelines.

Conflicting data in the institutional management report, MHTS.net, staff reports, and records review by the monitor's experts did not allow for an accurate assessment of compliance with the completion of SREs upon admissions and discharges from the MHCB unit.

The institution was compliant with initial PC contacts and IDTT meetings. For ongoing PC contacts and IDTT meetings, the institution's compliance rates were 88 percent and 87 percent, respectively. Psychiatrists, psychologists, and correctional counselors attended IDTT meetings. The mental health subcommittee was scheduled to address insufficiency of attendance by nursing staff.

Due to reassignment to other areas, the recreational therapist was available in the MHCB only two days per week and no longer participated in IDTT meetings. Inmates reported reduced access to recreational therapy and yard time.

CSP/LAC had implemented the mechanical restraint policy during the preceding monitoring period and continued to utilize it appropriately.  However, restraint and seclusion logs remained problematic at CSP/LAC, hampering accurate assessment of compliance in this area.  It could not be determined whether recorded incidents were for use of restraints or seclusion.  Omitted and erroneous data also made it difficult to determine the number of instances of restraints and seclusion and the length of time either were used.  Information in logs did not accurately reflect information contained in the eUHRs.

MHCB staff provided comprehensive and clinically meaningful discharge summaries which contained significant information for use in treatment planning following discharge.

EOP

Due to prison population realignment and mission changes at CSP/LAC, there was an increase in institution's more acutely mentally ill population.  This in turn increased demands on staff, with additional suicide watches, suicide attempts, and referrals to DSH programs.

Correctional counselors' attendance at IDTT meetings was problematic during the review period.  Compliance with psychiatric contacts with EOP inmates was not assessable due to the unavailability of data.

During the reporting period, initial evaluations and IDTT meetings occurred timely in 86 percent of cases.  Conduct of follow-up IDTT meetings and PC contacts was compliant.  Attendance by psychiatrists and PCs at IDTT meetings was compliant, but attendance by CC Is was not.  The quality of treatment plans remained variable, with clinically sound interventions but poorly-supported diagnoses.

The institution provided no data on compliance with psychiatric contacts for EOP inmates.  During the reporting period, the institution offered 11 hours of structured therapeutic activity but it did not report the average number of hours received.

3CMS

The mission change of some units from reception center to mainline housing led to misidentification of some newly-arriving 3CMS inmates as reception center inmates rather than mainline inmates.  As a result, institutional audits indicated a 71-percent compliance rate for timeliness of initial IDTT meetings, and a 79-percent compliance rate for timely initial PC contacts.  The problem was identified and remedied by the end of the reporting period.

The institution was compliant with attendance by psychiatrists and PCs at IDTT meetings, but not by CC Is.  Audits indicated that psychiatry contacts were timely.

Group therapy was limited to inmates on A yard.  There were groups on anger management, as well as a group for inmates serving life sentences and a support group for inmates infected with Hepatitis C.

3CMS Inmates in Administrative Segregation

3CMS inmates were housed in administrative segregation units in A4 and A5. Institutional audits indicated compliance with timely and follow-up IDTT meetings.  Facility audits indicated compliance with the presence of all necessary participants at IDTT meetings.

Access to confidential treatment settings was very problematic during the review period.  Weekly PC contacts and monthly psychiatric contacts were compliant.  Only 18 percent of contacts occurred in a confidential setting, with 43 percent of contacts occurring out-of-cell but in a non-confidential setting.  Individual clinical and psychiatry contacts occurred in

therapeutic modules on the dayroom floor.  Thirty-nine percent of contacts occurred at cell front.

Group therapy was not offered to inmates in A5.

Referrals

The institution reported receiving 3,764 mental health referrals during the

reporting period.  Provided data indicated that the rates of timely response to referrals were 98

percent for emergent referrals, 91 percent for urgent referral, and 87 percent for routine referrals.

RVRs

During the reporting period, CSP/LAC issued a total of 1,290 RVRs.  Of these

RVRs, 359 were issued to EOP inmates and 15 were issued to MHCB inmates.  Of the 680

RVRs issued to 3CMS inmates, 279 received mental health assessments due to division A, B, or

C offenses.

Pre-Release Planning

PCs were responsible for providing pre-release planning to inmates in their

caseloads through the use of groups and a pre-release worksheet.  The institution reported that

TCMP staff at the facility assisted with application for benefits in anticipation of inmate releases

from the prison.

Of the 135 3CMS inmates who paroled from the institution during the reporting

period, audits indicated that 13.5 percent received pre-release planning.  This low compliance

rate was attributed coding problems with use of MHTS.net.  Of the 56 EOP inmates who paroled

during the final month of the reporting period, 80 percent received pre-release planning services.

**California Correctional Institution (CCI)**
July 30, 2012 – August 1, 2012

Census:

CCI reported that on July 30, 2012, it housed 4,685 inmates, for a 17-percent decrease in population since the preceding monitoring period.  The mental health caseload population declined by 18 percent, to 1,070 inmates.  Three EOP inmates with SHU terms were pending PSU transfer.  There were 734 mainline 3CMS inmates.  One inmate was awaiting transfer to an MHCB unit.  Six inmates were in the OHU for mental health reasons.

The SHU population of 1,234 included 226 3CMS inmates.  The administrative segregation population of 249 included one EOP and 99 3CMS inmates.

Staffing:

Of 64.5 allocated mental health positions, 52.5 were filled, for an overall 19-percent institutional vacancy rate in mental health.  Contractors provided an additional 2.5 FTE coverage, reducing the overall functional vacancy rate in mental health to 15 percent.  Since the preceding monitoring period, CCI had lost 23.32 mental health positions, for a 27-percent decrease.

The senior psychiatrist position was vacant.  Positions for the chief psychologist, two senior psychologists, and the supervising social worker were filled.

Of 6.5 allocated staff psychiatrist positions, 2.5 were vacant.  Contractors provided an additional 1.5 FTE coverage, reducing the staff psychiatry functional vacancy rate to 15 percent.

Positions for all 15 staff psychologists were filled.  Three of six clinical social worker positions were filled, and contractors covered one FTE position, for a functional vacancy rate of 33 percent in social work.

Positions for two senior psych techs and 16 psych techs were filled.  One of 2.5 recreational therapist positions was filled.  Of 10.5 mental health clerical positions, 6.5 were filled.

Psychiatry telemedicine was not utilized during the review period.

Quality Management:

CCI had conducted MAPIP training and begun regular use of the MAPIP audit tool.  When MAPIP audits found compliance levels under 90 percent, CAPs were generated. CCI conducted numerous audits utilizing MHTS.net as a database, but there were problems with its reliability.

The quality management committee was chaired by the CEO.  It met six times, with a quorum present.  Reports were accepted regularly from the nursing, mental health, and pharmacy service delivery areas.  Minutes captured the content of meetings.

The mental health subcommittee was chaired by the chief of mental health.  It met six times and consistently achieved a quorum.  Custody attendance was inconsistent.

The nine QITs at the institution included four new ones which addressed custody follow-up, psych tech rounds, privacy issues on Facility 4-B, and 30-minute welfare checks in administrative segregation.

Peer review at CCI had recently been restructured.  Psychiatry peer review met once during the review period.  Peer review for primary clinicians met twice, with six psychologists reviewing six peers, and two social workers reviewing two peers.  Reviewers evaluated clinical diagnoses, treatment plans, and legibility of clinical documentation, among other things.

Suicide Prevention:

There was one suicide at CCI during the review period.

The SPRFIT met monthly and maintained meeting minutes.  Agenda items and training activities included the proctor/mentor program for training on conduct of the SRE, management of staff reductions, monitoring of CAPs from inmate suicide reviews, orientation of new staff, and the statewide suicide prevention videoconference.

Custody officers received CPR refresher training.  Officers in the units carried micro-shields on their person.  A spot check indicated the presence of cut-down tools and personal protective equipment.

CCI did not meet requirements for five-day clinical follow-up.  CCI reported that 62 percent of inmates received five-day clinical follow-up after discharges from the OHU and MHCB, and after returns from DSH.  The OHU supervisor attributed the low compliance rate to errors in data encoding.  Custody wellness checks following discharges from the MHCB were reported to be 79 percent compliant.

In administration segregation, daily morning meetings between mental health and custody staff were documented consistently.  CCI reported a compliance rate of 82 percent for completion of pre-placement screens.  Although CCI reported a 100-percent compliance rate for completion of the 31-item screen, the audits behind that rate were not methodologically sound.

New intake cells had been retrofitted but they did not meet the demand created by new placements in administrative segregation.  Door placards appropriately identified cells housing new intake inmates for their initial 21-days.

Thirty-minute welfare checks were not consistently completed at staggered intervals.  CCI indicated 100-percent compliance with daily psych tech rounds.

Administrative segregation cells were not equipped with electrical outlets.

Custody leadership and interviewed inmates reported that there was access to five to six hours of yard time per week.

Medication Management:

At the end of the review period, 594 inmates on the mental health caseload were receiving psychotropic medications.   Audits found compliance rates of 90 percent or higher for medication continuity for newly-arriving inmates and following intra-institutional transfers. MAPIP audits found compliance with timely processing of medication orders.  The institution reported compliance with medication renewals and bridge orders.  However, two psychiatrists were writing 30-day to 90-day bridge orders, a practice which is generally not clinically appropriate.  According to MAPIP audit results, up-to-date informed consent forms were present in eUHRs.

Audited eUHRs contained the previous month's MARs 96 percent of the time. One hundred percent of the MARs were complete and legible.  However, psychiatric follow-up of cases of medication noncompliance was reported to have been problematic.

Audits indicated that pill line wait times were not overly long.

There were no audits of laboratory testing of blood levels of inmates on psychotropic medications.  Audits found compliance with protocols for DOT medication administration.

CCI had one to two inmates on Keyhea orders at any given time during the review period.

Audits indicated compliance with the delivery of HS medications after 8:00 p.m., and with the parole medication process.

Transfers:

CCI continued to experience problems related to its implementation of the sustainable process.  In April 2012, CCI received a new part-time DSH coordinator whose duties involved maintaining the referral and non-referral logs.  Many time-consuming audits were conducted but they had limited utility.  There continued to be some problems with completion of Form 7388Bs, including failures to mark on the form all applicable indicators for consideration of the inmate for referral to inpatient care.  Overall, decisions not to refer were generally appropriate, but quality of rationales for non-referral on Form 7388Bs was inconsistent, ranging from clinically sound to weak.  Alternative clinical interventions were sometimes left blank, or were inadequate or unrelated to the reasons for non-referral.  There was also no reliable process by which clinical staff informed the DSH coordinator of cases in which the inmate met the Form 7388B indicators, but was not referred.  It was unclear how many inmates met one or more of the indicators but were not referred.

Five inmates were referred to intermediate care, and four transferred.  The fifth inmate transferred to an outside MHCB.  Four of the five intermediate care referrals were completed timely.  Two of the four transfers were completed within 30 days of the referral, and three of the four transfers were completed within 72 hours of a bed assignment.  Two inmates returned from DSH during the review period.

CCI did not have an MHCB unit.  There were 164 OHU referrals and 153 OHU admissions.  One inmate was placed in alternative housing for 1.9 days due to unavailability of an OHU bed.  Stays in the OHU ranged from less than one day to five days, and averaged 2.3 days.  Seventy-four inmates admitted to the OHU were referred to an MHCB at another institution.  Ten percent of OHU placements exceeded 72 hours, all due to MHCB placements

elsewhere.  All inmates referred to an outside MHCB transferred, but only fifteen percent transferred within 24 hours of referral.

Only one of 12 PSU-endorsed inmates transferred to the PSU.  He transferred within 15 days of PSU endorsement, although 180 days elapsed between EOP designation and PSU transfer.  The 11 other PSU-endorsed inmates transferred to an administrative segregation EOP hub, but only one was timely.

Data regarding transfers to EOP hubs and EOP programs was confusing.  Either 30 or 32 non-PSU endorsed EOP inmates transferred to an administrative segregation EOP hub. Ten of these transfers were timely.  During the review period, three EOP inmates were housed in administrative segregation for over 90 days, with the longest stay at 122 days.

Conflicting data indicated that either four or ten mainline EOP inmates transferred to EOP programs.  Only one transfer was timely.  CCI's reception center housed a steadily-declining population as the review period went on, and had closed by the time of the monitor's visit.  The reception center housed 29 EOP inmates during the review period.  EOP inmates remained in the reception center at least until March 2012.  Data on stays in the reception center indicated that among 25 of these EOP inmates, four or 16 percent transferred or paroled within 60 days.  Stays of the remaining 21 or 84 percent of these inmates exceeded 60 days, and ranged from 71 days to 327 days.  The reception center also housed at least nine 3CMS inmates during the review period.  Their lengths of stay were not indicated.

Other Areas:

Reception Center

MHTS.net data indicated compliance rates of 95 percent for initial and follow-up IDTT meetings for EOP inmates.  Compliance rates for initial and follow-up psychiatry contacts

were 69 and 88 percent, respectively.  Initial and follow-up primary clinician contacts were compliant in 100 percent and 99 percent of cases, respectively.

<u>MHSDS Inmates in Administrative Segregation</u>

The administrative segregation unit previously located on Level II D yard was deactivated in March 2012.  All inmates housed in administrative segregation were housed on 4-A yard, in units 6, 7, and 8.  During the review period, administrative segregation housed a total of 1,035 inmates, including 46 EOP inmates and 284 3CMS inmates.  CCI did not report the number of inmates placed in administrative segregation for non-disciplinary reasons.

Holding of initial IDTT meetings in administrative segregation was problematic during the review period.  Audit data indicated a compliance rate of 46 percent for conduct of initial IDTT meetings prior to the initial ICC meeting for both EOP and 3CMS inmates.  Compliance rates were 99 percent and 98 percent for follow-up IDTT meetings for EOP inmates and 3CMS inmates, respectively.  Attendance by required disciplines, including the assigned correctional counselor, was good.  Treatment plans for EOP and 3CMS inmates were updated timely in 99 and 93 percent of cases, respectively, but quality was variable.

Psychiatry contacts for EOP inmates did not meet Program Guide requirements.  For EOP inmates, MHTS.net indicated compliance rates of only 67 percent and 75 percent for initial and follow-up psychiatry contacts, respectively.  3CMS inmates received timely initial psychiatry contacts 100 percent of the time, and timely follow-up psychiatry contacts 99 percent of the time.

For primary clinician contacts, compliance rates for initial and follow-up contacts for EOP inmates were 80 percent and 93 percent, respectively.  For 3CMS inmates, initial and

follow-up primary clinician contacts were received timely in 86 percent and 90 percent of cases, respectively.

Therapeutic groups were not offered in administrative segregation during the review period.

OHU

The OHU had 16 beds, eight of which were dedicated to mental health use.  It was difficult to assess the compliance level for conduct of SREs, as data varied from source to source.  However, all sources indicated a significant degree of noncompliance in this area. MHTS.net data on the conduct of SREs indicated that of 71 OHU placements due to suicidality, 64 percent and zero received an SRE upon OHU admission and discharge, respectively.  Other data indicated that SREs were conducted for 35 percent of OHU admissions and 28 percent of OHU discharges.  An audit of eUHRs for OHU placements during May 2012 found a compliance rate of 27 percent for conduct of SREs upon both OHU admission and discharge. These low compliance rates were attributed to problems with data encoding.  Inmates referred from the OHU to an outside MHCB were administered another suicide risk evaluation, although the rationale for this was unclear.

Psychiatrists saw inmates on an as-needed basis, and primary clinicians saw inmates daily.  However, there was conflicting data which indicated that either 55 or 98 percent of inmates housed in the OHU had daily contact with a psychiatrist or a psychologist

All mental health inmates housed in the OHU were escorted in handcuffs. Clinical contacts occurred in treatment modules, irrespective of custody status.  Use of restraints for mental health purposes appeared to be rare, although staff typically did not use the restraint log.

Line staff reported that some correctional officers did not protect the confidentiality of inmates' therapeutic communications and made inappropriate statements to some inmates in the OHU.

SHU

The SHU had expanded onto 4-A, in addition to 4-B which was already a SHU yard.  During the review period, 311 3CMS inmates were placed in the SHU.  Sixty-two percent of IDTT meetings took place before the initial ICC meeting.  There was a 98-percent compliance rate for follow-up IDTT meetings.  Audits found IDTT meeting attendance rates of 92 percent for psychiatrists, 100 percent for primary clinicians, 100 percent for correctional counselors, and 87.5 percent for psych techs.  Inmates attended 51 percent of IDTT meetings.  Refusal was given as the only reason for inmate non-attendance.

The institution did not provide data as to initial psychiatry and primary clinician contacts.  The compliance rate for follow-up contacts with both the psychiatrist and the primary clinician was 96 percent.

There were no therapeutic groups in the SHU during the review period.  CCI reported that audits found that psych tech rounds were 100-percent compliant, but the audit methodology was not sound.

3CMS

CCI's mainline 3CMS program admitted 1,014 inmates during the review period. MHTS.net data indicated that 91 percent of inmates had clinical intake assessments within ten days of arrival and an initial IDTT meeting within 14 days of arrival.  MHTS.net data also indicated that annual follow-up IDTT meetings were scheduled in 100 percent of cases.

The institution did not meet Program Guide requirements for IDTT composition. Psychiatrists did not regularly attend IDTT meetings, but the rate of attendance by    primary clinicians was 100 percent.  Staff reported that inmates routinely attended IDTT meetings.

CCI reported a compliance rate of 98 percent for timely psychiatry contacts for inmates taking psychotropic medications.  MHTS.net data indicated that 99 percent of 3CMS inmates had at least quarterly primary clinician contacts.

Office space for individual clinical contacts was adequate but space for group therapy was not.

<u>Referrals</u>

CCI had an adequate process for the collection and assignment of referrals.  There were a total of 4,052 referrals, which was 42 percent fewer than during the preceding monitoring period.  There were 14 emergent, 113 urgent, and 3,925 routine referrals.  MHTS.net data indicated compliance with response to 100 percent of the emergent referrals, 79 percent of the urgent referrals, and 82 percent of the routine referrals.

<u>RVRs</u>

Out of a total of 660 RVRs, seven were issued to EOP inmates, 205 were issued to 3CMS inmates, and 448 were issued to general population inmates.  Assessments were conducted for five of the seven EOP inmates and 38 of the 3CMS inmates.

CCI was unable to report the number or percentage of inmates who received RVRs for Division A, B, or C offenses, or for offenses that could result in the assessment of a SHU term and were given an assessment.  It also did not provide any log or other data indicating mitigation of penalties based on mental health input.

<u>Pre-Release Planning</u>

CCI reported that parole planning was provided to three of the five EOP inmates who paroled and 90 percent of the 332 3CMS inmates who paroled.  Protocols for post-release community supervision were followed in about half of parole planning cases, and the parole outpatient clinic process was followed in the other half of cases.

Access to Care

Mental health staff reported that access to care had improved.

**California Institution for Men (CIM)**
May 15, 2012 – May 18, 2012

Census:

CIM reported that as of May 15, 2012, it housed 5,406 inmates, for an 11-percent decrease since the preceding monitoring period.  CIM's mental health caseload population was 1,469 inmates, which was a 17-percent decrease in this population.  There were 18 inmates in the MHCB, five in mainline EOP, and 1,163 in mainline 3CMS inmates, for a seven-percent increase in the 3CMS population.

The administrative segregation population of 199 included three EOP and 60 3CMS inmates.  The reception center population of 706, down by 72-percent since the preceding monitoring visit, included 20 EOP and 138 3CMS inmates.  There were five EOP inmates and 26 3CMS inmates in the MHCB.

Staffing:

The number of allocated mental health positions at CIM decreased from 119 to 105.8.  Of these, 98.5 positions were filled, for a seven-percent institutional vacancy rate in mental health.  CIM did not use contractors to provide additional coverage.

Positions for the chief psychiatrist, senior psychiatrist, chief psychologist, and supervising social worker were filled, as were two of 2.5 senior psychologist positions.

Twelve of 14.5 staff psychiatrist positions were filled, for a 17-percent vacancy rate.  Of 28.5 staff psychologist positions, 26.5 were filled, for a seven-percent vacancy rate. Eleven of 11.1 social worker positions were filled.

Positions for two senior psych techs, 14.5 psych techs, four recreational therapists, and one associate health program advisor were filled.  Positions for the health program specialist I and office services supervisor II were vacant.  Eleven of 11.2 mental health clerical positions were filled.

Psychiatry telemedicine services were not utilized.

Quality Management:

The quality management committee met six times and always had a quorum. Agenda items included follow-up reports, subcommittee reports, and QIT updates.

The mental health subcommittee met six times.  It was chaired by the chief of mental health and attained a quorum for two-thirds of its meetings.

Mental health QITs addressing custody/mental health relations and inmate refusals in administrative segregation, and reconciliation of mental health evaluations with eUHRs, were both concluded.  No other QITs were chartered.

CIM's peer review committee was comprised of the peer review/SPRFIT coordinator, a psychiatrist, a psychologist, and a social worker.  Four meetings were held during the reporting period.  The tools used by the various disciplines to conduct peer review were also revised and piloted during the reporting period.  All clinicians had their work reviewed twice per

year.  Feedback from peer review was provided to psychiatrists during a recent meeting and to psychologists and social workers electronically via email attachments.

Suicide Prevention:

There were no completed suicides at CIM during the review period.

The SPRFIT met monthly, maintained meeting minutes, and attained a quorum for five of six meetings.  SPRFIT agenda items included reviews of serious suicide attempts, five-day follow-up, high suicide risk alerts via MHTS.net, the SRE proctoring and mentoring project, and the suicide prevention video conference.

CIM conducted monthly emergency medical response drills and maintained appropriate documentation.  Cut-down tools and personal protective equipment were readily available in the control booth.  Officers in the units carried micro-shields on their persons.

The institution provided training on conduct of SREs for all mental health staff. CIM reported that SREs were completed within 24 hours of MHCB admissions unless the admission was over a weekend or on a holiday.  In those instances, the inmate was placed on suicide watch until the IDTT meeting was held.  For the SRE proctoring and mentoring project, which resulted from the suicide prevention project of 2010, the SPRFIT coordinator was trained to proctor approximately seven CIM clinicians, some of whom were then assigned to proctor other clinicians.  Feedback from clinicians on the project was positive.

Audits of 59 inmates revealed a 95-percent compliance rate for five-day follow-up after discharges from the MHCB.  The compliance rate for custody checks after discharge from the MHCB was 89.6 percent.

In administrative segregation, daily morning meetings between mental health staff and the unit lieutenant were taking place.  Discussion during an observed meeting revolved around inmates who were new intakes or required extra attention.

Review of 114Ds for Palm and Cypress Halls indicated 100-percent compliance for timely completion of pre-placement and 31-item screens.

CIM used 16 cells on the first tier of the administrative segregation units as new intake cells, but also housed new inmates in non-intake cells on the third tier.  Door placards identified the cells of new intake inmates.

CIM was compliant with completion of 30-minute welfare checks at staggered intervals.  Review of isolation logs indicated compliance with daily psych tech rounds.

Administrative segregation cells were not equipped with working electrical outlets.

A review of 114Ds indicated that inmates were offered ten hours of yard time per week.

Medication Management:

CIM had an effective medication management system and had implemented the MAPIP process.  Provided documentation was sufficiently comprehensive.

Audits found compliance rates of 90 percent or higher for medication continuity following new arrivals and intra-institutional transfers, as well as for medication renewal orders.  Audits also indicated compliance with policies on response to medication noncompliance.

Audits indicated that wait times in pill lines were not problematic.

Medication orders were processed timely.  Up-to-date consent forms were present in 80 percent of eUHRs.

MAPIP audits found compliance with laboratory testing and results for MHSDS inmates, DOT medication administration protocols, delivery of HS medications after 8:00 p.m., and the parole medication process.

Among the 52 Keyhea orders, 15 were contested and went to a hearing, with five resulting in denial of an order.  Three orders were discontinued on recommendation of the psychiatrist, and four orders were renewed.

Transfers:

CIM had a full-time DSH coordinator whose duties included maintenance of the DSH log and entry of referral data into MHTS.net.  The referral log contained errors and lacked some required data, but it had become somewhat redundant, given the use of MHTS.net for DSH referral tracking.

Of the 239 inmates who had one or more indicators for consideration for inpatient care on Form 7388B, three were referred to acute care and 29 were referred to intermediate care. Two of the acute care referral packages and 27 of the intermediate care referral packages were prepared timely.  One acute care referral was rescinded.  DSH rejected two of the intermediate care referrals. There were four Vitek hearings.

One of the two acute care transfers was timely, and six of the 19 intermediate care transfers were timely.

Fifteen inmates returned from DSH during the review period.  Discharge summaries were available for all, but were of variable quality.

CIM's adherence to the requirements of the sustainable process was problematic in several areas during the review period.  Audits of DSH referral practices were generally completed by a recreational therapist.  Based on the monitor's review of a random sample of

audited charts, a significant portion of the audit results were inconsistent with the monitor's findings from review of the charts. The record review indicated that clinicians were not consistently identifying inmates who met Form 7388B indicators, and Form 7388Bs frequently contained insufficient rationales for non-referrals to DSH. Alternative clinical interventions were either missing or inadequate. Based on the monitor's observation of IDTT meetings, it appeared that Form 7388Bs were typically included in packets for the meetings but were not consistently discussed.

CIM had a 36-bed MHCB unit. Admissions decreased from 986 for the preceding monitoring period to 599 during the review period. These included 83 admissions from other institutions. Lengths of stay ranged from zero to 125 days and averaged six days. Eighty-eight inmates, or 15 percent of admissions, had stays exceeding ten days. From January to March 2012, 19 percent of admitted inmates had had multiple MHCB admissions.

The transitional bed housing overflow unit was closed during the review period, and no other alternative housing was used for inmates requiring MHCB care. Reviewed logs indicated that use of holding areas prior to evaluation of inmates for MHCB admission had decreased with increased MHCB availability, and that stays were typically for less than four hours.

The six inmates who were endorsed to the PSU all paroled before transfer.

The institution reported that 73 EOP and 153 3CMS inmates were in administrative segregation, although data was conflicting. Fifteen EOP and 49 3CMS inmates were housed in administrative segregation for more than 90 days, but actual lengths of stay were not provided to the monitor.

From January 5 to April 19, 2012, CIM referred 22 EOP inmates in administrative segregation to EOP hubs. From October 1, 2011 to May 15, 2012, 17 EOP inmates in administrative segregation transferred to EOP hubs. The institution did not report lengths of stay prior to transfer or the number of inmates referred or transferred to EOP hubs across other time periods.

Ten of 12 mainline EOP inmates transferred to an EOP program.  EOP transfer times averaged 107 days, with only three occurring within 60 days.  During the site visit, five EOP inmates were pending transfer to an EOP SNY program.  Two had been awaiting transfer for more than 60 days.

CIM housed 126 EOP inmates in the reception center during the review period. Stays averaged 100 days, with 74 or 59 percent exceeding 60 days.  Lengths of stay among the 185 3CMS inmates housed in the reception center averaged 83 days.  Sixty-seven or 36 percent of these stays exceeded 90 days.

Other Areas:

Reception Center

Realignment of the CDCR institutional population pursuant to AB 900 led to population and mission changes at CIM.  The institution no longer received large numbers of parole violators, which led to a significant drop in new arrivals and the conversion of Reception Center East to a Level III SNY 3CMS yard, referred to as C yard.  The institution continued to operate a reception center in the former Reception Center Central, now known as B yard.

No data was provided on the timeliness of 31-item mental health screens or mental health evaluations.

CIM did not meet Program Gide requirements in many areas of its reception center program during the monitoring period. For EOP inmates, the institution was noncompliant with initial and follow-up IDTT meetings, initial psychiatry contacts, and follow-up primary clinician contacts. It was compliant with follow-up psychiatry contacts and initial primary clinician contacts. The institution was noncompliant with the requirement that inmates receive five hours of structured therapeutic activity per week. They were offered an average of 4.34 hours week and received an average of 3.58 hours per week.

Observed IDTT meetings for reception center EOP inmates indicated overall staff commitment to providing quality care. However, attendance by CC Is was lacking.

MHSDS Inmates in Administrative Segregation

CIM reported chronic understaffing in administrative segregation.

The quality of observed psych tech rounds had improved. Psych tech supervisory staff reported that staff psych techs had received training on conduct of rounds in administrative segregation, and that documentation was supervised more closely.

The mixed use of Cypress Hall for administrative segregation and non-administrative segregation inmates created delays with inmate escorts. The mix of SNY, non-SNY, and administrative segregation inmates also limited inmates' ability to move about freely.

For EOP inmates in administrative segregation, the institution reported that it was noncompliant with providing the initial IDTT meeting within 14 days of the inmate's arrival and prior to the initial ICC meeting, but was compliant with providing follow-up IDTT meetings. Provision of initial psychiatry and primary clinician contacts and ongoing psychiatry contacts was noncompliant, but provision of ongoing primary clinician contacts was compliant. A review

of documentation indicated that most clinical contacts for administrative segregation EOP inmates were brief "check-ins" and that 64 percent of them occurred cell-front.

CIM indicated that EOP inmates were offered a weekly average of 5.44 hours of structured therapeutic activity and received a weekly average of 5.13 hours.  Groups were often facilitated by psych techs and recreational therapists.

At an observed IDTT meeting, all required disciplines and supervisory staff were in attendance.  There was little engagement with the inmate and minimal discussion of clinical interventions.  DSH consideration was not integrated into the treatment team process. Diagnostic formulations and treatment interventions were problematic, and supervisory staff provided minimal guidance or feedback.  Staff also did not utilize the eUHRs.

For 3CMS inmates in administrative segregation, CIM was compliant with provision of initial and follow-up psychiatry contacts, and nearly compliant with ongoing primary clinician contacts.  Documentation of primary clinician contacts indicated that at least some of these contacts were therapeutic in nature rather than merely "check-ins."  Sixty-two percent of primary clinician contacts occurred cell-front.  Institutional data indicated that 48 percent of cell-front contacts were due to inmate refusal to leave the cell.  Attendance by CC Is at IDTT meetings was limited.

Form 7388B treatment plans varied in quality.  Most were generic and inadequate.

MHCB

During regular business hours, the D yard psychiatrist conducted intake evaluations.  After hours, they were conducted by the psychiatrist on call.

Each of three MHCB clinical teams consisted of a psychiatrist, a psychologist, and a social worker.  At daily morning meetings, each team exchanged clinical updates and

planned services.  All inmates were offered a daily out-of-cell confidential contact with a clinician or an IDTT meeting, and at least one therapeutic group.  Inmates were also offered ten hours of weekly group yard, unless they were on administrative segregation status or on suicide precaution or suicide watch.

An observed IDTT meeting was well-run and useful.  All disciplines except for nursing and a correctional officer were in attendance.

There were three applications of four-point restraints, lasting three hours and 50 minutes, three hours and 30 minutes, and two hours and 14 minutes, respectively.  Appropriate documentation was maintained.

3CMS

The A yard 3CMS program accommodated 3CMS inmates who were Level II SNYs.  The population of 960 on A yard remained at capacity during the review period, while the 3CMS population had decreased from 315 to 276 inmates.  Interviewed 3CMS inmates described access to psychiatry and clinical case managers as good and reported no problems with medication continuity, but indicated a lack of programming and limited yard time.  Few reported having jobs.

C yard housed primarily 3CMS inmates who were Level III SNYs.  By the end of the review period, it housed 793 inmates, including four EOP and 161 3CMS inmates. Interviews of 3CMS inmates on C yard confirmed reasonable access to the psychiatrist and clinical case managers and adequate continuity of medications, but limited access to group therapy, jobs, and out-of-cell time.

Referrals

CIM reported problems with timely response to urgent referrals.  There were a total of 1,964 referrals.  There were no emergent referrals.  The compliance rate for timeliness of response to the 18 urgent referrals was 67 percent.  The institution reported a 91-percent compliance rate for timeliness of response to its 1,946 routine referrals.

MHTS.net

Monthly audits of concordance between eUHRs and MHTS.net found a concordance rate of 94 percent for the period of October 2011 through January 2012.

Heat Plan

Implementation of the heat plan improved significantly. Heat lists were available in all toured housing units and were distributed weekly.  The local operating procedure had been amended so that inmates on heat risk medications were housed in specific units.  The monitor found improvement with heat plan monitoring in housing units on A and D yards, but there was need for training of officers to ensure proper locations of temperature readings and recordings.  Some officers were continuing to average observed temperatures instead of recording the hottest ones.

RVRs

Out of the total 1,208 RVRs, 442 were issued to mental health caseload inmates, including 17 to inmates in the MHCB, 63 to EOP inmates, and 362 to 3CMS inmates.  There were 20 RVRs related to hoarding or cheeking of medications.

All inmates in the MHCB and EOP inmates received mental health assessments. Review of these cases indicated that senior hearing officers' consideration of mental health assessments varied considerably and that mitigation of penalties was minimal.

CIM did not report the number of 3CMS inmates who received mental health assessments due to Division A, B or C offenses, or Division D, E, or F offenses which were marked by bizarre, unusual, or uncharacteristic behavior.  The monitor determined that 35 mental health assessments were completed for 3CMS inmates and found only one Division C offense for which a mental health assessment was not completed.

Pre-Release Planning

Realignment of the prison population resulted in a significant decrease in the number of short-term parole violators at CIM and their corresponding need for pre-release planning.

Of the 177 3CMS inmates who paroled, only 69 received parole planning.  Most pre-release planning was provided by primary clinicians.  A social worker was assigned as a further resource to clinicians and to serve as a liaison between CIM and the counties.  Staff indicated that clinicians typically were unaware of when TCMP saw caseload inmates, and inmates were not always aware that the individual with whom they were meeting was from TCMP.

**California Rehabilitation Center (CRC)**
August 28, 2012 – August 30, 2012

Census:

As of August 27, 2012, CRC's total population was 3,600, which was a decline by 12 percent since the time of the twenty-third monitoring round.  The total mental health population was 940, of which 938 were 3CMS inmates and two were EOP inmates pending transfer to an EOP hub.  Of the 71 civil addicts, 14 were 3CMS inmates.  There were no inmates in the OHU.

Staffing:

Positions for the chief psychologist, senior psychiatrist, and senior psychologist were all filled.

Of the 3.25 staff psychiatrist positions, two were filled, for a 38-percent vacancy rate.  All nine staff psychologist positions were filled.

The three social worker positions, the three psych tech positions, and the recreational therapist position were all filled.

The health program specialist I position was filled.  Four and a half of the 5.5 clerical positions were filled, resulting in an 18-percent vacancy rate.

Quality Management:

The local governing body continued to meet during the reporting period and was chaired by the health care CEO.  The quality management committee met on six occasions during the reporting period, with a quorum present at all meetings.  Minutes were provided for the monitor's review.

Mental health subcommittee meetings were combined with SPRFIT meetings. Four of the five scheduled meetings were held during the reporting period, and one was cancelled due to lack of a quorum.  Agenda items included concordance audits, scheduling of psych techs, MHCB transfers, DSH referrals and non-referrals, review of updated local operating procedures, psychiatry and non-formulary drug use, and updates on mental health staffing and the heat plan, among other things.  Mental health subcommittee findings were reported at staff meetings.  All mental health-related local operating procedures were made accessible to staff via the shared drive on their computers.

No QITs were chartered during the reporting period, although there were several areas that could have benefitted from utilization of the QIT process.

CRC provided information on the peer review process, but did not provide the requested data on the number of peer review meetings held, the number of clinicians reviewed, or any deficiencies or trends that were identified.

Suicide Prevention:

There were no suicides during the reporting period.

There were no psych techs in attendance at the combined SPRFIT-mental health subcommittee meetings during the reporting period.  CRC reported that the group participated in the statewide suicide prevention videoconferences.

The ERRC met monthly during the reporting period.  Minutes were provided for review.

The compliance rate for five-day clinical follow-up was only 86 percent.  The lapses were occurring on weekends.  Two psych techs were scheduled to conduct the follow-ups on weekends, but if one or both were absent, there was no back-up coverage.  The on-call psychiatrist did not come in, and no one else was on call.  The compliance rate for custody follow-up was only 33 percent.  After staff training to address this, the compliance rate reportedly rose to 100 percent, although no corroborating data was provided.

The institution reported that 26 percent of admissions to the OHU were due to suicidality, but review of the log indicated that no reason was given for the majority of OHU admissions.  Among those for whom there were stated reasons for admission, 33 percent were logged as suicidality.  For these cases, the institution was noncompliant with completion of an SRE upon admission, but it was 98-percent compliant for completion of an SRE upon their discharge.

CRC did not have an administrative segregation unit.

<u>Medication Management</u>:

During the review period, medication management and medication audits at CRC were problematic. The review period began in January 2012.  Some medication management audits that were previously conducted were not completed during the review period.  No reason was offered.  Accordingly, the audit data that was provided was somewhat limited.

Training on the use of MAPIP began in April 2012.

The total number of inmates in the MHSDS receiving psychotropic medications at the end of the reporting period was 746.

A MAPIP audit found that only 25 percent of newly-arriving inmates received their medications without interruption.  However, this audit examined all medications rather than only psychotropic medications.

An audit of 30 charts for continuity of psychotropic medications following intra-institutional transfers found a 100-percent compliance rate.

According to an audit of 20 charts, all medications had been renewed timely, but it was unclear whether this referred to all inmates on medications or only MHSDS inmates.

There was an average of 11 referrals for medication noncompliance per week, with a 91-percent compliance rate for receiving a documented follow-up appointment with a psychiatrist within seven days of the referral. During the reporting period, there was no audit performed to determine if the prior months' MARs were in the eUHRs and were legible.

Medications were typically distributed via pill line for all facilities.  MAPIP audits did not include pill line wait times.

Up-to-date informed consent forms were present in eUHRs in 98 percent of cases.

An audit of eUHRs indicated that in 97 percent of applicable cases, laboratory blood studies of inmates on psychotropic medications were ordered when clinically indicated. Psychiatrists reviewed results and documented clinical action in 100 percent of cases with significant laboratory results.  A MAPIP audit conducted in June 2012 indicated that out of 20 randomly sampled charts, 100 percent had laboratory testing ordered when clinically indicated. According to two audits of AIMS testing, compliance rates were 96 percent and 100 percent, respectively, although in the latter audit no corroborating AIMS documentation was found in the records.

There were 259 inmates on DOT medications.  The institution reported that DOT procedures were compliant 100 percent of the time, but the basis for that conclusion was not presented.

There were 102 inmates receiving HS medications.  The institution reported 100-percent compliance with administration of HS medications after 8:00 p.m., although a MAPIP report indicated that yard C began administering HS medications at 7:45 p.m.

During the reporting period, the C&PR notified the pharmacy of all paroling inmates at least 14 days in advance of their release dates.  MAPIP audits found that 95 percent of paroling inmates signed receipts for a supply of their prescription medications.

Transfers:

CRC had a part-time DSH coordinator who was also the chief of mental health/chief psychologist.  While CRC stated in its management report that five inmates were identified as meeting one or more indicators for consideration for referral to DSH, there was confusion surrounding definitions and no formal process for notifying the DSH coordinator when

an inmate who met the indicator(s) was seen by an IDTT.  No inmates were listed on the non-referral log.  There were no audits of the DSH referral process.

There were no referrals to DSH programs during the reporting period.  Some inmates who met the criteria for consideration for referral were elevated to the EOP level of care.  There were not enough IDTT meetings during the site visit for the monitor's expert to observe and draw conclusions on the DSH identification and referral process.

There were four main rooms and a total of ten beds in the OHU.  One room was designated for mental health inmates. It had one bed and could house two, if necessary.  None of the rooms had been retrofitted to be suicide-resistant.  Suicide hazards, including metal grating on the interior of the door, were still present.  However, staff reported that any inmates placed in these rooms were on continuous one-to-one observation.

During the reporting period there were 54 admissions to the OHU.  Of these, 13 or 24 percent were referred and transferred to an MHCB.  The average length of stay in the OHU was two days, with a range of one day to five days.  Of the eight inmates who had stays longer than 72 hours, four were waiting for a MHCB and four were waiting for housing.  Based on review of a sample of records, it did not appear that referral to an MHCB was being considered sufficiently early in the course of the OHU stay.  However, the institution reported that this had improved since the issuance of a memorandum on OHU use in May 2012.

No inmates were referred or transferred to a PSU during the reporting period.  One EOP inmate transferred timely to an EOP administrative segregation hub.

According to the proof of practice documents, nine inmates transferred to an EOP program, all within 60 days of designation at the EOP level of care.  Neither of the two EOP

inmates pending transfer at the time of the site visit had been awaiting transfer longer than 60 days.

Other Issues:

3CMS

CRC was meeting all Program Guide timelines for the 3CMS program except for the annual update of the treatment plan, for which the institution was 88-percent compliant. Caseloads were of appropriate size. Many inmates were seen more frequently than every 90 days, and some inmates were seen significantly more often.

Required members were present at IDTT meetings, although CRC did not report on attendance by CC Is. C-files were not available at the meetings. At the IDTT observed by the monitor's expert, disagreement among the team members on the inmate's diagnosis was not resolved. Discussion lacked sufficient depth. Overall, the treatment plans for 3CMS inmates that were reviewed by the monitor's expert were overly generic and merely restated Program Guide requirements. They were not updated despite the occurrence of clinically significant developments such as OHU admission or multiple RVRs. In some cases, information in records reviewed by the monitor's expert did not support the diagnoses stated in the treatment plans.

There were 28 active therapeutic groups at the time of the monitor's visit. Group topics included medication management, anger management, depression, mood management, trauma, and socialization. During the reporting period, 151 3CMS inmates were assigned to group therapy and attended at least one session. Another 30 inmates refused group treatment, transferred, or were released or paroled. According to proof-of-practice documents, eight inmates were on wait lists for groups. There were also recreational therapy groups.

Referrals

Provided data on referrals indicated that there were either 885 or 894 referrals, including one emergent referral, 14 urgent referrals, and 870 routine referrals.  The emergent and urgent referrals all received a timely response, and 91 of the routine referrals received a timely response.

Heat Plan

The heat plan was in effect during May and June 2012.  The institution reported that training on heat pathologies was completed as of July 2012 for all but a few staff.  Audits were completed at the beginning of the heat season to ensure that all inmates on heat sensitive medication possessed the proper cards.  A list of these inmates was distributed daily via e-mail.  There were no heat related incidents reported during the reporting period.

RVRs

During the reporting period, there were 1,119 RVRs, including three for hoarding or cheeking of medications.  No inmates awaiting an MHCB bed or EOP inmates were issued RVRs.  3CMS inmates received 160 of the issued RVRs.  According to the management report and proof-of-practice documents, 41 3CMS inmates and three mainline inmates received mental health assessments.

Pre-Release Planning

Of the 168 inmates who paroled from CRC, 34 percent received some form of pre-release planning.  Details of the services were not provided.

**Richard J. Donovan Correctional Facility (RJD)**
August 13, 2012 – August 16, 2012

Census:

On August 13, 2012, RJD's census was 3,282, including 1,907 MHSDS inmates. Although the institution's overall population decreased since the preceding monitoring period by

473 or 13 percent, the MHSDS caseload increased by 56 or three percent.  The number of caseload inmates in the reception center declined by 129 or 53 percent.  RJD deactivated its reception center in July 2012.

There were 13 inmates in the MHCB.  Of the 552 EOP inmates, there were 322 in mainline, 153 in SNYs, 55 in administrative segregation, and 22 in the reception center. There were 1,332 3CMS inmates, including 261 in mainline, 878 in SNYs, 105 in administrative segregation, and 88 in the reception center.

Staffing:

Among the 123.19 mental health positions, there were 17.69 vacancies, for a vacancy rate of 14 percent.  Use of contractors reduced the functional vacancy rate in mental health to zero.

The sole senior psychiatrist position, one of the six senior psychologist positions, and a 0.6 supervising social worker position were vacant.

Eight of 16 staff psychiatrist positions and 42.5 staff psychologist positions were filled.

Both senior psych tech positions and 21 of 22 psych tech positions were filled. Seven of the 7.65 recreational therapist positions were filled.

Among non-clinical positions assigned to mental health, 10.7 of the total 25.7 positions were vacant.  These vacancies included seven of the 14.7 office tech positions, and positions for the office services supervisor, the office assistant, the correctional health administrator, the associate health program advisor, and the supervising program tech.

Quality Management:

The local governing body met quarterly during the reporting period.

The quality management committee and mental health subcommittee met monthly during the reporting period, with quorums present. Minutes were comprehensive. Supervisory staff disseminated information to line staff.

The institution reported that during the reporting period, ten QITs were active and two resolved. QIT documentation was clear and final reports were relevant.

Suicide Prevention:

There were two suicides during the reporting period.

The SPRFIT met monthly during the reporting period, with a quorum achieved at all meetings. Minutes provided useful summaries of the meetings. The team addressed case reviews, DSH referrals, five-day clinical follow-up, self-harm reviews, errors of CNAs in the MHCB, and the list of inmates considered at high risk for suicide. In April 2012, the proctor/mentor training program to improve conduct of SREs was implemented. A process for review of cases of self-injurious behaviors and suicide attempts was developed and implemented.

The ERRC met monthly during the reporting period. Quorums were present and minutes were maintained. The institution conducted quarterly emergency response drills and provided CPR training.

The compliance rate for five-day clinical follow-up improved to 98 percent following discharges from the MHCB to the housing units, and 96 percent following returns from DSH programs. Compliance rates following returns from outside MHCBs and from alternative housing were lower, at 89 percent and 80 percent, respectively. Institutional data indicated an overall 90-percent compliance rate for custody follow-up.

In administrative segregation, daily morning meetings between mental health were documented as occurring 98 percent of the time.

Pre-placement screens were completed only 79 percent of the time.  Only 50 percent of pre-placement screens were conducted in confidential settings.  MHTS.net data indicated that 94 percent of inmates admitted into the administrative segregation unit had 31-item screens completed within 72 hours of arrival.

The institution continued to use placards on cell doors to indicate new arrivals in administrative segregation during the first three weeks of stays.  Staff reported a 90-percent compliance rate for 30-minute welfare checks.  However, a review of the logs revealed several instances of intervals as long as one to two hours between checks.

Cells in administrative segregation were not equipped with electrical outlets.

In Unit Seven of administrative segregation, inmates were offered four hours of yard every other day.  In Unit Six, inmates were not offered ten out-of-cell hours per week.

<u>Medication Management</u>:

Institutional audits demonstrated compliance with medication continuity for new arrivals, and following intra-institutional transfers and medication renewals.

In June 2012, an audit indicated that only 53.9 percent of cases of medication noncompliance resulted in follow-up appointments with the psychiatrist within seven days. Audits indicated that wait times in pill lines were not overly long. Medication orders were processed timely.  Up-to-date informed consent forms were present in eUHRs.

Institutional reports indicated that RJD was noncompliant with ordering laboratory tests of blood level of inmates on psychotropic medications when such tests were clinically indicated.  However, AIMS testing was not ordered when indicated.

Administration of DOT medications was compliant. HS medications were administered no earlier than 8:00 p.m.

During the reporting period, the institution initiated two Keyhea petitions. One was not pursued by the treating psychiatrist and the other was denied at the hearing. There were 19 renewal hearings across the reporting period. Eleven ongoing orders were not pursued by the treating psychiatrist. Two inmates on active orders paroled, and 13 transferred out. Fourteen inmates on Keyhea orders arrived at the institution.

The institution was compliant with the parole medication process.

Transfers:

RJD had a full-time DSH coordinator during the reporting period. There was continued improvement with collection and reporting of data in the DSH referral logs. Significant improvement was noted with documentation of rationales for non-referral and alternative interventions, with compliance rates of 85 percent and 76 percent, respectively. In addition, RJD was able to identify specific clinicians who required additional training, supervision, and accountability.

A total of 429 inmates were identified as meeting at least one indicator for consideration for referral to a DSH program. RJD referred 63 or 15 percent of these inmates.

Of the 17 inmates referred to acute care, 16 transferred to a DSH facility. Seven referral packets, or 41 percent, were completed within two days. For the 16 inmates who transferred to acute care, seven or 44 percent transferred within ten days. The average time from referral to transfer was 11 days, with a range of seven days to 20 days.

Forty-six inmates were referred to intermediate care during the reporting period. The institution completed 26 or 57 percent of the referral packets within five days. It took an average of 9.4 days from referral to acceptance, and an average of 12 days from acceptance to

transfer.  Seventy-one percent of intermediate care referrals were transferred within Program Guide timelines.

During the reporting period, 51 inmates returned from DSH.  Discharge summaries were available for all returning inmates.  Clinician-to-clinician contact within five days of return occurred 73 percent of the time.  The compliance rate for completion of five-day clinical follow-up was 94 percent.

The MHCB unit consisted of 14 mental health beds and two "swing" beds that were routinely used as crisis beds.  There were 289 admissions to the crisis bed unit during the reporting period.  Sixty-three or 22 percent of stays lasted longer than ten days.  The average length of stay was 9.11 days, with a range of one day to 40 days.  For inmates awaiting a DSH bed, the average length of stay was 16 days, and for inmates who did not receive a DSH referral, the average stay was 14.8 days.  The number of repeat MHCB admissions decreased markedly during the reporting period.  Eleven inmates were admitted to the MHCB unit three or more times over the six-month period, compared to 46 inmates during the preceding reporting period.

The number of admissions to alternative housing was 88, of which 55 or 65 percent subsequently resulted in admission to a crisis bed.  For inmates who went on to a crisis bed, the average length of stay in alternative housing was one day.  For those who did not proceed to a crisis bed, the average length of stay in alternative housing was 1.3 days.

RJD was not meeting transfer timelines for EOP inmates in administrative segregation during the monitoring period.  Due to problems with MHTS.net, the institution was unable to calculate lengths of stay across the reporting period for inmates in administrative segregation.  A "snapshot" for June 29, 2012 showed that 32 percent of EOP inmates in administrative segregation had been there longer than 90 days.  At the time of the site visit, there

were 18 EOP inmates with stays longer than 90 days.  In about 39 percent of stays over 90 days, inmates were endorsed but pending transfer.  Among those endorsed, 20 percent were listed as "pending CSR review" but upon closer examination it became clear that these delays were due to files not being prepared by correctional counselors.

The average length of stay for EOP inmates in the reception center was 53 days, with 33 percent of stays exceeding 60 days.  Over 70 percent of the delayed transfers were documented as "files ready to be worked up."

The average length of stay for 3CMS inmates in the reception center was 88 days, with 40 percent of stays lasting longer than 90 days.  Seventy percent of cases of delayed transfers were attributed to "files ready to be worked up."

Of the 22 inmates who transferred to the PSU during the reporting period, 72 percent transferred within Program Guide timelines.

Other Areas:

Reception Center

The reception center at RJD officially stopped accepting intakes during the first week of July 2012.  At the time of the site visit, there were 22 EOP and 88 3CMS inmates remaining in the reception center.

Bus screenings were timely and were conducted in confidential settings.

The institution was compliant with conduct of initial mental health screens of EOP inmates within 72 hours, and with evaluations of inmates with EOP histories within seven days of arrival.  In 97 percent of cases, inmates who arrived at RJD with prescriptions for psychotropic medications were evaluated by a psychiatrist within 24 hours.

Initial IDTT meetings were timely in 82 percent of cases, but follow-up IDTT meetings were provided timely in 98 percent of cases.  However, there was insufficient participation by all required disciplines.

Monthly EOP psychiatric contacts occurred 92 percent of the time.  For EOP inmates, the institution achieved compliance rates of 98 percent for initial primary clinician contacts, and 90 percent for weekly follow-up primary clinician contacts.  However, only 78 percent of these primary clinician contacts were conducted in confidential settings.

Institutional data indicated that EOP inmates in the reception center were offered an average of 6.4 hours of structured activities per week, and received an average of 5.5 hours per week.  They were offered only two hours of yard time per week and no time in the dayroom.

The institution was compliant with providing 3CMS inmates with initial and follow-up contacts with the psychiatrist and the primary clinician.  In 99 percent of 3CMS cases, inmates prescribed psychotropic medication were seen quarterly by psychiatry.

Several groups were offered to 3CMS inmates across the reporting period.

EOP inmates and 3CMS inmates who paroled from the reception center during the reporting period all received pre-release planning.

<u>Administrative Segregation EOP</u>

EOP inmates in the administrative segregation hub received timely initial and follow-up IDTT meetings.  Attendance by required disciplines was good.  Observed IDTT meetings in Units Six and Seven were conducted competently.

Ninety-seven percent of inmates prescribed psychotropic medication were seen by a psychiatrist every 30 days.

Weekly contacts with the primary clinician were provided.  Twenty percent of these contacts were conducted at cell-front.

Seventy-one percent of EOP inmates were offered ten or more hours of structured therapeutic activity per week.  However, 41 percent refused more than five hours per week.

MHCB

Audit results indicated that timely SREs were documented for 91 percent of inmates admitted to the MHCB due to suicidality.  Initial IDTT meetings were conducted within 72 hours of admission, and follow-up IDTT meetings were conducted weekly thereafter.  Meetings were attended by the psychiatrist and primary clinician, but attendance by correctional counselors was slightly deficient.  An IDTT meeting observed by the monitor's expert had multidisciplinary input that was useful.

Suicide-resistant beds were installed but were placed directly under air vents in the unit.

Timely SREs were documented for 85 percent of inmates at the time of discharge from the MHCB, and for 89 percent of inmates on the fifth day of five-day clinical follow-up.

EOP

The EOP SNY remained compliant with Program Guide requirements.  Initial evaluations, initial IDTT meetings, and follow-up IDTT meetings had compliance rates of 97 percent, 91 percent, and 99 percent, respectively.  Although no data on IDTT meeting attendance was produced, a record review indicated that all required disciplines were present.  An IDTT meeting observed by the monitor's expert was competently run and well attended.

Based on a review of records, psychiatry contacts were compliant.  Weekly primary clinician contacts occurred 94 percent of the time.  Inmates were offered an average of

14.9 hours of structured therapeutic activity per week and received an average of 10.5 hours per week.  A group therapy session attended by the monitor's expert was of good quality and well attended.

The non-SNY EOP was still noncompliant but was improving.  In 88 percent of cases, new inmates were evaluated and seen by IDTT within 14 days.  Follow-up IDTT meetings were conducted timely in 98 percent of cases, but treatment plans were updated only 82 percent of the time.  IDTT meetings were attended by the psychiatrist and the primary clinician but there was no data regarding attendance by correctional counselors.  However, staff reported that correctional counselors attended regularly as well.

Weekly primary clinician contacts for non-SNY EOP inmates occurred in 87 percent of cases.  During the reporting period, inmates were offered 9.87 hours of structured therapeutic activity per week and received an average of 6.59 hours per week.

3CMS Inmates in Administrative Segregation

RJD was compliant with the completion of pre-placement screens for inmates placed in administrative segregation for the first four months of the reporting period, but the compliance rate dropped to 81 percent for the last two months.  Within ten days of placement in administrative segregation, 98 percent of inmates were assessed by a clinician.

Initial and follow-up IDTT meetings were provided timely.  During the reporting period, 100 percent of IDTT meetings were attended by the psychiatrist and the primary clinician, and 94 percent were attended by a correctional counselor.

Weekly primary clinician contacts were received, but often in the non-private setting of a therapeutic module on the dayroom floor.  Eighteen percent of clinical contacts occurred at cell front.

Inmates prescribed psychotropic medications were seen quarterly by psychiatry 100 percent of the time.  Daily psych tech rounds were documented as required.

No groups were offered to 3CMS inmates in administrative segregation.

3CMS

In the mainline 3CMS program, the institution was compliant with providing initial evaluations and initial IDTT meetings.  Compliance rates for timely initial and quarterly psychiatric contacts were 96 percent and 100 percent, respectively.  The provision of follow-up IDTT meetings and primary clinician contacts was also compliant.  Clinical contacts occurred in confidential settings during the reporting period.

The numbers of groups offered were seven on A yard, four on B yard, and ten on C yard.  Group topics included coping skills, life sentences, anger management, anxiety management, substance abuse, parenting, EOP step-down, depression, communication, and pre-release planning.

 Mental Health Referrals

The institution was compliant with response to emergent, urgent, and routine referrals for the entire reporting period, with compliance rates of 100 percent, 98 percent, and 93 percent, respectively.

Heat Plan

Heat cards were issued to the appropriate inmates.  Lists of inmates on heat-sensitive mediations were transmitted to the units weekly, and the required reports were sent to headquarters monthly.

RVRs

During the review period, the number of RVRs issued to MHSDS inmates was 501, including four to inmates in the MHCB, 188 to EOP inmates, and 309 to 3CMS inmates. Mental health assessments were completed for all of the inmates in the MHCB, 97 percent of the EOP inmates, and approximately 50 percent of the 3CMS inmates. The institution had implemented the policy for completing mental health assessments for all inmates who received a Division A, B, or C offense as well as in cases in which a SHU term could be assessed.

Pre-Release Planning

Pre-release planning was available to all MHSDS inmates, with priority given to EOP inmates. Group therapy was the primary modality of pre-release planning, although individual therapy was used to a lesser extent. Issues addressed included development of a plan for parole and prevention of relapses.

**Ironwood State Prison (ISP)**
Paper Review

Census:

As of August 1, 2012, the total inmate population at ISP decreased from 4,000 inmates during the twenty-third monitoring round, to 3,415. The MHSDS caseload population remained constant at 23 3CMS inmates. There were no EOP inmates at ISP at the time of reporting. The total administrative segregation unit population of 117 inmates included four 3CMS inmates.

Staffing:

Staffing information provided by the institution was conflicting. Either a chief psychologist or senior psychologist position were filled. The senior psych tech position was filled.

The institution reported that it had filled 0.5 of its longstanding 1.5 vacancies in

psychiatry.  No contract coverage was utilized for psychiatry.

There was one vacancy among its 2.62 or its 3.5 psychologist positions.  No contract coverage was used.  The 4.4 or 5.5 psych tech positions were filled.  Two of the three or 3.5 office tech positions were vacant.

ISP continued to not utilize telemedicine.

Quality Management:

ISP's quality management structure was problematic during the reporting period. The local governing body met once.  The quality management committee met six times, but only one meeting was documented.

The institution reported that its mental health subcommittee was scheduled to meet monthly, but minutes for only two meetings were provided.  No recommendations were made to the quality management committee. There were no QITs during the reporting period.

Psychology peer review consisted of monthly records audits.

Suicide Prevention:

There were no suicides during the review period at ISP.  The institution was not compliant in all areas with suicide prevention in administrative segregation.

The institution combined its SPRFIT meetings with its mental health subcommittee meetings.  Documentation indicated that either two or three such meetings occurred during the review period.

The ERRC continued to meet monthly during the review period.  Monthly emergency response drills were conducted in administrative segregation.  The institution provided a list of staff members who received CPR training during the review period.

In administrative segregation, daily morning meetings between custody and

mental health staff were occurring.

The institution reported continued compliance with completion of pre-placement screens.  No supporting documentation was provided.

The compliance rate for completion of the 31-item questionnaire was only 30 percent.  Thirty-minute welfare checks were conducted, but a review of the logs indicated problems with staggering of these rounds.

No documentation was provided with regard to the provision of ten hours of yard per week.

Medication Management:

ISP reported that it had received no new arrivals who were on psychotropic medications during the reporting period.  One hundred percent of inmates transferring between housing units experienced no interruptions in medications.

The compliance rate for continuity of medications following new or changed medication orders increased from 63 percent to 81 percent.  There was no report on whether there had been medication lapses due to expirations.  Per policy, medication orders were to be no longer than 90 days, and bridge orders were to be no longer than 14 days.  Bridge orders were not utilized during the review period.

The sole reported case of medication noncompliance did not result in a referral for follow-up.  The average wait time in pill lines was approximately five minutes.  The institution was compliant with maintaining up-to-date informed consent forms.

Audits of laboratory testing of inmate blood levels of psychotropic medications indicated compliance with ordering of appropriate testing and response by psychiatry to abnormal test results.

All psychotropic medications were administered by DOT during the reporting period.  The institution reported that supervisory staff reviewed MARs every month, but no documentation was provided.

There were six MHSDS inmates who were prescribed HS medications.  The institution reported 100-percent compliance with administration no earlier than 8:00 p.m., but no audit results were provided.

No inmates were on Keyhea orders during the review period.

No inmates on psychotropic medications paroled during the review period.

<u>Transfers</u>:

Form 7388B was used in every case under consideration for referral to a higher level of care at a DSH program.  During the review period, no inmates met one or more of the indicators for such consideration, and consequently no inmates were considered for, or referred to, DSH programs.

All inmates requiring placement in an MHCB were placed in the institution's 14-bed OHU while awaiting transfer.  There was conflicting information on the use of the OHU.  According to some of the provided information, ISP reported 27 referrals and admissions to the OHU during the reporting period.  It further reported that a total of 30 inmates housed in the OHU were referred to an MHCB and admitted.  The average length of stay in the OHU was 1.07 days, with a range of same-day transfer to two days.  No inmates remained in the OHU longer than 72 hours.  However, other information stated that there was no data on lengths of stay in the OHU, as the information had not been entered into MHTS.net.  Further conflicting information stated that there were only 17, or 23, or 24 MHCB referrals.

The institution stated in the management report that alternative housing was not

used during the reporting period, but the proof-of-practice material indicated that eight inmates were placed in alternative housing.  It appeared from the logs that these inmates were placed into administrative segregation, as Form 114As were provided in the proof-of-practice materials.  No information was provided regarding the reasons for such placements.

There were no transfers to PSU during the monitoring period.  Any EOP inmates receiving a SHU term received an expedited classification process for transfer to an EOP administrative segregation hub.

Provided documentation indicated that ten EOP inmates were transferred to EOPs at other institutions.  The average time to transfer was 32 days from referral.  Thirteen additional inmates were identified as requiring the EOP level of care and were transferred within one to two days to an MHCB facility.  Other provided information indicated that a total of 26 EOP inmates required transfer to an outside institution.

During the reporting period, four 3CMS inmates were improperly transferred to ISP.  The average time for transfer to a 3CMS institution for three of these inmates was 30 days.  Information was not provided as to the fourth inmate.

Other Areas:

OHU

Fifty-eight percent of the inmates placed in the OHU were given histories and physicals within 24 hours.  The management report stated that inmates in the OHU were seen Monday through Friday by the psychiatrist or the psychologist, and on weekends they were seen by psych tech staff.  No proof-of-practice data was provided due to lack of data entry into MHTS.net.

The management report stated that all of the 14 inmates placed in the OHU due to

suicidality were administered an SRE on admission, but the proof-of-practice material stated that no data had been entered in the MHTs.net on the number of completed SREs.  Because all of these inmates transferred to an MHCB, no SREs were completed upon discharges from the OHU nor were any five-day clinical follow-ups conducted.

ISP did not utilize restraints or seclusion during the review period.

EOP

ISP reported that it housed a total of 26 EOP inmates during the review period.  It reported that although it did not have an EOP, it evaluated and followed EOP and 3CMS inmates.  The management report stated a 100-percent compliance rate for provision of timely initial IDTT meetings and primary clinician contacts, although there was no verifying data.  Psychiatry attendance at the IDTT meetings was very low, given the high degree of vacancy in the psychiatry positions.  No further information on EOP treatment was provided, as no pertinent data had been entered into MHTS.net.

3CMS

One hundred 3CMS inmates were housed at ISP during the review period.  It was reported that in the absence of a 3CMS program, 3CMS inmates received timely initial and follow-up IDTT meetings in 100 percent of cases, and were seen by a primary clinician and psychiatrist more frequently than every 90 days, according to the institution's report.  However, no verifying data was provided.

MHSDS Inmates in Administrative Segregation

ISP struggled with meeting Program Guide requirements for attendance at IDTT meetings. During the monitoring period, ISP housed 306 inmates in administrative segregation, including eight 3CMS inmates and three EOP inmates. The institution reported that IDTT

meetings occurred, but it did not indicate their timeliness or the percentage of inmates who actually received them.  It reported that primary clinicians attended 100 percent of IDTT meetings, but again no proof-of-practice data was provided.  Psychiatrists did not attend any IDTT meetings.

ISP reported 100 percent compliance with provision of quarterly psychiatric contacts and weekly confidential primary clinician contacts.  However, proof-of-practice documentation indicated that reports on contact intervals were not available due to the lack of data input throughout the reporting period.

Referrals

The only information provided by ISP on referrals was that during the reporting period, there were 627 referrals.  Lack of additional information on referrals was attributed to the absence of data entry into MHTS.net.

MHTS.net

Utilization of MHTS.net presented major problems for ISP during the review period.  ISP ascribed the numerous instances of lack of MHTS.net data entry to the shortage of office techs at the institution.

RVRs

ISP did not provide the total number of RVRs issued during the reporting period. There were 17 RVRs issued to 3CMS inmates and one RVR issued to an EOP inmate.  All of these inmates received mental health assessments, which were taken into consideration by hearing officers in their dispositions of these cases.

Heat Plan

There were no heat related issues at ISP during the review period.

**<u>Calipatria State Prison</u>**
(Paper Review)

<u>Census</u>:

On June 30, 2012, Calipatria housed 3,852 inmates, for a six-percent decrease in population since the twenty-third round monitoring period. There were 17 3CMS inmates in mainline. The administrative segregation population of 271 included four 3CMS inmates.

<u>Staffing</u>:

The staff psychiatrist position was vacant. Four of the six staff psychologist positions were filled, for a 33-percent vacancy rate.

The senior psych tech and 9.5 psych tech positions were filled. All 3.5 clerical positions were filled.

Psychiatry telemedicine was not used during the reporting period.

<u>Quality Management</u>:

The quality management committee met four times and maintained minutes of its meetings.

The mental health subcommittee met consistently, and met twice during some months of the review period. It addressed appropriate mental health issues but did not forward recommendations to the quality management committee.

There were no QITs. Instead, the institution utilized an action-item process to address areas of needed improvement.

<u>Suicide Prevention</u>:

There were no suicides at Calipatria during the reported period.

The SPRFIT met monthly, maintained minutes, and addressed relevant issues.

The ERRC met five times. No documentation was provided on emergency response drills during

the review period.

There was 100-percent compliance with five-day clinical follow-up after discharges from the OHU.  Data indicated several instances of lapses with custody follow-up.

In administrative segregation, the compliance rate for completion of pre-placement screens was 100 percent.  For completion of the 31-item questionnaire, the compliance rate was 96 percent.

Calipatria reported a compliance rate of 92 percent for 30-minute welfare checks. Documentation indicated that conduct of psych tech rounds was compliant.

Medication Management:

Medication continuity was maintained in 95 percent of cases for new arrivals at the institution, and in 97 percent of cases following intra-institutional transfers.  Orders for renewals of medications were 100-percent compliant.  There were no reported instances of medication noncompliance.  Pill line audits indicated wait times of five minutes or less on all yards.  Up-to-date informed consent forms were present in all applicable eUHRs.

The institution was compliant with ordering of laboratory studies of inmate blood levels of psychotropic medications.  Appropriate clinical interventions were provided as indicated by test results.  All psychotropic medications were administered by DOT.  Audits indicated compliance with protocols for DOT administration.  No inmates were on Keyhea orders.  At the end of the review period, five inmates had orders for HS medications, which were correctly administered no earlier than 8:00 p.m.  The institution was compliant with the process for providing paroling inmates with a supply of their medications.

Transfers:

Calipatria reported that no inmates met one or more indicators for consideration

for referral to DSH programs.

Inmates awaiting transfer to an MHCB were placed in the OHU.  There were 17 mental health admissions to the OHU, with an average stay of 2.5 days.  Five inmates remained in the OHU over 72 hours.  Sixteen of the 17 inmates admitted to the OHU transferred to MHCB units at other institutions.

Calipatria identified and transferred seven inmates to the EOP level of care.  All seven transfers were timely.

All 108 inmates identified for the 3CMS level of care during their stays at Calipatria were transferred timely to programs at other institutions.

Calipatria received 42 mental health caseload inmates.  Of these, all transfers of EOP inmates to programs at other institutions were timely, but all transfers of 3CMS inmates failed to comply with transfer timeframes.

Other Issues:

MHSDS Inmates in Administrative Segregation

In administrative segregation, initial and follow-up IDTT meetings were conducted timely.  Attendance by required disciplines was not reported.  Audits of psychiatric and primary clinician contacts were too inadequate to produce reportable results.

OHU

Mental health inmates in the OHU received daily contacts with the psychiatrist or the psychologist.

Referrals

The institution reported a total of 529 mental health referrals, and that it was compliant with response to emergent, urgent, and routine referrals.

Heat Plan

Temperatures of 90 degrees or above were not recorded inside any of the housing units.

RVRs

Out of 1,442 RVRs, two were issued to EOP inmates and six were issued to 3CMS inmates.  Both EOP inmates received mental health assessments.  There were no reports of 3CMS inmates receiving mental health assessments.

**Centinela State Prison**
(Paper Review)

Census:

On June 31, 2012, Centinela housed 3,740 inmates, for an eight-percent decrease in population since the twenty-third round monitoring period.  There were seven mainline 3CMS inmates.  The administrative segregation population of 294 included 17 3CMS inmates.

Staffing:

The chief psychologist, staff psychiatrist, the 4.87 staff psychologist positions, and the social work position were all filled.  The senior psych tech and five of six psych tech positions were filled.  One of 2.5 clerical positions was filled.

Quality Management:

Centinela's local governing body met quarterly, with a quorum present.

The quality management committee met monthly, with mental health represented at meetings.  Minutes were maintained.

The mental health subcommittee met 13 times and consistently achieved a quorum.  Pertinent issues were addressed and minutes were maintained.  Recommendations were forwarded to the local governing body and the quality management committee.

In lieu of QITs, Centinela utilized an action-item process to address areas of mental health in need of improvement.

The clinical social worker coordinated peer review which was multi-disciplinary, given the limited number of clinicians at the institution.

Suicide Prevention:

There was one completed suicide at Centinela during the reporting period.

The SPRFIT met five times, addressed appropriate issues, and maintained minutes.

The ERRC met monthly.  It reviewed inmate deaths, suicide attempts, and emergency medical response drills.

The institution reported 96-percent compliance with five-day clinical follow-up and 62-percent compliance with custody follow-up after discharges from the MHCB.

In administrative segregation, completion of pre-placement screens and 31-item questionnaires was compliant.  Based on use of the Guardian One Plus electronic system, 30-minute welfare checks were reported to have been compliant.

Medication Management:

Centinela implemented the MAPIP audit process during the review period.  For medication continuity for new arrivals at the institution, pre-MAPIP audits indicated a compliance rate of 82 percent, and MAPIP audits found a compliance rate of 100 percent.  The compliance rate for continuity of medications following intra-institutional transfers was 87 percent.  Orders for renewals of medications were reported to be 100-percent compliant.

Centinela continued to report difficulties with identification and referral of inmates who were noncompliant with their medications.  After implementation of corrective

action during the review period, there appeared to have been improvement toward the end of the review period.

Wait times in pill lines were not problematic. Pre-MAPIP audits indicated a 57-percent compliance rate for the presence of up-to-date informed consent forms in eUHRs. The institution attributed the low compliance rate to audit errors. MAPIP audits during the second half of the review period found a compliance rate of 95 percent. Laboratory testing of inmate blood levels of psychotropic medications was reported to be 100-percent compliant. All psychotropic medications were administered DOT. Audits indicated a compliance rate of 67 percent for adherence to DOT protocols.

No inmates were on Keyhea orders. At the end of the review period, 12 inmates had orders for HS medications. The institution reported a compliance rate of 84 percent for administration of these medications no earlier than 8:00 p.m. It also revised its LOP on HS medications. All inmates who were prescribed psychotropic medications at the time of paroling signed receipts for a supply of their medications.

<u>Transfers:</u>

Four inmates met one or more indicators for consideration for referral to a DSH program. None were referred. Reasons for non-referral and clinical interventions to improve levels of functioning were documented for three cases. No inmates returned from DSH programs during the review period.

Twenty-eight inmates awaiting transfer to an MHCB at another institution were housed in Centinela's CTC. Twenty-three or 82 percent transferred. Stays in the CTC averaged 1.3 days, with a range of one day to five days. The CTC was the only alternative housing used at Centinela.

During the review period, Centinela identified two inmates for the EOP level of care.  One transferred to an MHCB unit on the day following his EOP designation, and the other remained housed at Centinela due to court proceedings.

Centinela identified 37 inmates for the 3CMS level of care.  It housed seven additional 3CMS inmates due to court proceedings.  Six additional 3CMS inmates were inappropriately transferred to the institution during the review period.  All 3CMS inmates transferred timely to 3CMS programs at other institutions.

Other Areas:

MHSDS Inmates in Administrative Segregation

In administrative segregation, all required disciplines attended IDTT meetings. The institution reported compliance with provision of timely psychiatric and primary clinician contacts.  Eighty-two percent of primary clinician contacts occurred in a confidential setting. Daily psych tech rounds were 100-percent compliant.  Group therapy was not offered.

Referrals

There were 1,466 mental health referrals.  Audits indicated compliance with timeliness of response to referrals.

Heat Plan

There were no stage II or stage III heat plan activations.

RVRs

During the review period, Centinela issued 1,663 RVRs.  Thirteen were issued to 3CMS inmates.  Ten RVRs resulted in mental health assessments.

Pre-Release Planning

All four 3CMS inmates who paroled from Centinela received parole planning.

## **Chuckawalla Valley State Prison (CVSP)**
(Paper Review)

Census:

On August 1, 2012, CVSP housed 2,654 inmates, for a 16-percent decrease in population since the twenty-third round monitoring period. There were 11 mainline 3CMS inmates. There were no caseload inmates among the administrative segregation population of 56.

Staffing:

The senior psychiatrist and senior psychologist positions were filled. One of 1.5 staff psychiatrist positions was vacant, for a vacancy rate of 33 percent. Of 3.5 staff psychologist positions, one was vacant, resulting in a vacancy rate of 29 percent. The senior psych tech and 5.5 psych tech positions were filled. One of the three office tech positions was filled.

Psychiatry telemedicine was not utilized during the review period.

Quality Management:

In February, 2012, the institution's local governing body was re-designated for use only as needed.. It met once during the review period.

The quality management committee met five times. It was chaired by the CEO and always achieved a quorum. Meeting minutes were not provided. In May, 2012, the CVSP and ISP quality management committees merged.

The mental health subcommittee met six times, but achieved a quorum for only one meeting. Beginning in March, 2012, mental health subcommittee meetings merged with SPRFIT meetings.

There were no QITs at the institution.

Peer review of psychologists consisted of a monthly review of all charts of MHSDS inmates. Peer review for psychiatry was conducted in the same manner to the extent that psychiatry positions were filled.  Clinicians were provided with feedback.  Peer review result, minus the identities of the clinicians, were provided to the mental health subcommittee.

Suicide Prevention:

There were no suicides at CVSP during the reporting period.

The SPRFIT met monthly but achieved a quorum at only one meeting.  It addressed OHU placements, five-day clinical follow-up, MHCB transfers, screenings of placements in administrative segregation, and the suicide prevention videoconference.

The ERRC met monthly.  It attained a quorum for only one meeting.  The committee reviewed emergency responses and identified training issues.  Documentation indicated that monthly emergency response drills were conducted and that CPR training and certification of staff were taking place.

All inmates were administered SREs upon OHU admission but not upon discharge.

The sole inmate who required five-day clinical follow-up received it. Documentation as to custody checks was not provided.

In administrative segregation, pre-placement screens were reportedly being completed, but no verifying documentation was provided.

Thirty-one item questionnaires were being completed.

New arrivals in administrative segregation were placed in designated intake cells.

Thirty-minute welfare checks were staggered for all new intakes during their initial 21 days in administrative segregation.

Medication Management:

Inmates received their medications timely following orders for new medications or changes in dosage.  There were no lapses or expirations of medications.

All three inmates referred for medication noncompliance had documented follow-up by a psychiatrist within seven days of referral.  Wait times in pill lines were not audited.  No inmates were on Keyhea orders.  Up-to-date informed consent forms were present in eUHRs.  Appropriate laboratory testing of inmate blood levels of psychotropic medications was ordered.  The institution was compliant with protocols for DOT medication administration.  HS medications were administered no earlier than 8:00 p.m.  The institution was compliant with the process for supplying paroling inmates with a supply of their medications.

Transfers:

At all IDTT meetings inmates were considered for referral to DSH programs.  No referrals were made.  Four inmates awaiting transfer to an MHCB were housed in the OHU.  Stays in the OHU averaged 2.25 days, and none exceeded 72 hours.  There were no PSU transfers.  Alternative housing was not used during the review period.  Four of six inmates identified as requiring the EOP level of care transferred timely to EOPs in other institutions.  A fifth EOP inmate was released after 45 days.

The 55 inmates identified as requiring the 3CMS level of care all transferred to 3CMS programs.

No mental health caseload inmates were erroneously transferred to CVSP during the review period.

Other Areas:

MHSDS Inmates in Administrative Segregation

During the reporting period, three EOP inmates and 13 3CMS inmates were placed into administrative segregation.  Initial IDTT meetings were timely in 60 percent of cases, and follow-up IDTT meetings were timely in 94 percent of cases.  No information was provided on composition of the IDTTs by discipline.

Initial contacts with the primary clinician were compliant, but ongoing contacts were only 84-percent compliant.  The institution did not report on psychiatric contacts or psych tech rounds.

OHU

Inmates in the OHU received a daily contact with the psychiatrist or the psychologist.

Referrals

There were 359 mental health referrals.  The institution reported compliance with responses to emergent, urgent, and routine referrals.

Heat Plan

CVSP remained compliant with implementation of the heat plan.

RVRs

CVSP issued seven RVRs to six 3CMS inmates.  Six mental health assessments were conducted.

**California Institution for Women (CIW)**
Hybrid Paper Review

Census:

CIW reported that as of June 7, 2012, it housed 1,290 inmates, for a 35-percent decline since the twenty-third monitoring period.  The mental health caseload population declined by 29 percent to 512 inmates.  There were 47 mainline EOP and 372 mainline 3CMS

inmates.  There were three inmates in the MHCB and 19 in the PSU.  The SHU population of 72 included four EOP inmates pending PSU transfer and 55 3CMS inmates.  The administrative segregation population of 18 included three EOP and nine 3CMS inmates.  CIW's reception center had closed as of January 1, 2012.

Staffing:

CIW had an overall vacancy rate of eight percent in mental health. The institution did not use any contractual coverage.

The longstanding vacancy in the chief psychiatrist position continued.  Positions for the senior psychiatrist, chief psychologist, one senior psychologist supervisor, the supervising social worker, and two senior psych techs were all filled.

One of five staff psychiatrist positions was vacant, for a vacancy rate of 20 percent.  Eleven of 11.5 staff psychologist positions were filled.  Positions for the five social workers were all filled.

Fifteen of the 17 psych tech positions were filled.  Positions for three recreational therapists, one unit supervisor, and one health program specialist I, and nine clerical positions were all filled.

Psychiatry telemedicine was not utilized during the review period.

Quality Management:

The local governing body and the quality management committee met monthly, maintained meeting minutes, and attained quorums at their meetings.

The mental health subcommittee met monthly and maintained minutes.  It addressed improvement of treatment for inmates in the EOP and administrative segregation, QITs, and transfers to higher levels of care, among other things.

There were three active QITs.  Two QITs that addressed returns from the OHU and seclusion and restraint were resolved.  The QIT on the institution's administrative segregation EOP hub was ongoing.

Peer review was in place for psychiatrists, psychologists, and social workers.

Suicide Prevention:

There were no suicides at CIW during the review period.

The SPRFIT met monthly and maintained meeting minutes.  It reviewed numerous suicide-related topics and addressed potential problem areas.

The ERRC met monthly and maintained minutes.

Conflicting audit data indicated compliance rates of 84 and 88 percent for five-day clinical follow-up following discharges from the MHCB.  The reported compliance rate for five-day clinical follow-up after returns from DSH programs was 86 percent.  CIW reported compliance rates of 81 percent and 91 percent for custody checks following discharges from the MHCB.

Medication Management:

Medication continuity for newly-arriving inmates improved significantly, with a compliance rate of 96 percent.  The compliance rate for medication continuity following intra-institutional transfers improved from 52 percent to 96 percent.  An audit specific to medication continuity after moves into and out of the MHCB indicated a 94-percent compliance rate.

Orders for new medications and for renewals were processed timely 92 percent and 96 percent of the time, respectively.

CIW reported a weekly average of 4.8 notifications of medication noncompliance.  Response to cases of medication noncompliance was 95-percent compliant.  MAR

documentation was legible 99 percent of the time.

The institution operated nine pill lines. Audits indicated average wait times of 14.6 minutes and five minutes for second watch and third watch, respectively.

There was a compliance rate of 87 percent for the presence of up-to-date informed consent forms in eUHRs.

Audits indicated that in 99 percent of cases, laboratory testing of blood levels of inmates on psychotropic medications was ordered, and psychiatrists reviewed test results and documented interventions where clinically indicated.

At the time of reporting, approximately 500 mental health caseload inmates were prescribed psychotropic medications, all of which were administered DOT. Audits indicated that DOT protocols were followed.

Four new petitions for Keyhea orders were granted, and ten orders were renewed. No Keyhea petitions were not pursued on the advice of counsel. No Keyhea orders lapsed or expired.

At the end of the review period, 134 inmates had orders for HS medications. Audits indicated that HS medications were administered no earlier than 8:00 p.m.

Ninety-eight percent of 85 paroling inmates with active psychotropic medication orders received a 30-days' supply of medication upon their release.

Transfers:

Of 283 inmates who met one or more indicators for consideration for referral to a higher level of care, eight were referred to DSH programs. DSH rejected two referrals and CIW rescinded one. All referral packets were completed timely.

Monthly reviews of 25 non-referred inmates indicated that a documented reason

for non-referral was stated on the Form 7388B in 84 percent of cases, and a documented clinical intervention was stated on the Form 7388B in 69 percent of cases.

Nine inmates returned from DSH during the review period.  Discharge summaries were received for all at the times of their returns.  Clinician-to-clinician contacts occurred within five working days of the inmates' returns in 74 percent of cases.

All 167 MHCB admissions were from CIW.  Stays averaged 2.5 days and ranged from one day to 32 days.  Five inmate stays exceeded ten days.

There were no OHU admissions for mental health reasons.  No inmates were placed in alternative housing.

Twenty-two percent of EOP inmates housed in administrative segregation had stays exceeding 90 days.  There were two admissions to the PSU during the review period.

Other Issues:

MHSDS Inmates in Administrative Segregation

CIW was compliant with providing initial and follow-up IDTT meetings for EOP and 3CMS inmates.  Attendance by correctional counselors at IDTT meetings was problematic.

EOP and 3CMS inmates were provided with timely psychiatric and primary clinician contacts.  However, 67 percent of primary clinician contacts with EOP inmates and 65 percent of primary clinician contacts with 3CMS inmates were conducted in confidential settings.  The compliance rate for daily psych tech rounds was 97 percent.

On average, 98 percent of EOP inmates were offered ten hours of structured therapeutic activity per week.

MHCB

Inmates in the MHCB received timely initial and follow-up IDTT meetings.

Required disciplines attended.  There were daily contacts with the psychiatrist or the primary clinician.

There were eight applications of restraint and three episodes of seclusion.  Audits indicated compliance with applicable protocols.

SHU

CIW opened a SHU in February, 2012 and began accepting inmates from the SHU at VSPW.  For 3CMS inmates, provision of timely initial IDTT meetings was 80-percent compliant.  Follow-up IDTT meetings were timely and attended by required disciplines.

Inmates received timely contacts with the psychiatrist and primary clinician. Psych tech rounds were compliant.  No group therapy was offered.

PSU

Inmates in the PSU received timely initial and follow-up IDTT meetings. Required disciplines were present at more than 90 percent of meetings.

The compliance rate for contacts with the psychiatrist was 88 percent.  Initial and ongoing primary clinician contacts, and psych tech rounds were compliant.  Eighty-six percent of PSU inmates were offered at least ten hours of structured therapeutic activity per week.

EOP

CIW reported compliance with timely IDTT meetings.  The institution also indicated compliance with IDTT meeting composition, but did not report correctional counselor attendance.  There was a compliance rate of 82 percent for initial primary clinician contacts. Follow-up primary clinician contacts were compliant.  EOP inmates were offered an average of 9.9 hours of weekly structured therapeutic activity.

3CMS

Compliance rates for provision of initial and follow-up IDTT meetings for 3CMS inmates were 87 percent and 82 percent, respectively.  The institution reported that required disciplines attended IDTT meetings, but it did not report on attendance by correctional counselors.

The institution reported that inmates prescribed psychotropic medications were receiving required contacts with the psychiatrist.  Compliance rates for initial and ongoing contacts with the primary clinician were 89 percent and 97 percent, respectively.  Ninety-three percent of primary clinician contacts were in confidential settings.

At the time of reporting, group therapy for 3CMS inmates had been discontinued due to staffing reductions.

Referrals

There were 2,734 mental health referrals.  Emergent and routine referrals drew timely responses, but urgent referrals received a timely response in only 77 percent of cases.

Heat Plan

The institution was compliant with heat protocols during the review period.

RVRs

CIW issued a total of 583 RVRs, including 332 to 3CMS inmates, 26 to EOP inmates, and two to inmates in the MHCB.  All of the EOP inmates and those in the MHCB received mental health assessments, as did 16 percent of 3CMS inmates and two percent of the general population inmates.  No RVRs were issued for hoarding or cheeking of medications.

Pre-Release Planning

Pre-release planning was provided to only 66 percent of the 12 EOP inmates who were released, and to 60 percent of the 96 3CMS inmates who were released. These low

compliance rates were attributed to errors in encoding data.

**Central California Women's Facility (CCWF)**
May 16, 2012 – May 18, 2012

Census:

At the time of the site visit, CCWF's total population was 2,754, a 27-percent decrease since the time of the monitor's Twenty-Third round site visit.  The total mental health population was 931, for a 30-percent decline since the preceding visit.  In the reception center, there were 132 3CMS inmates and zero EOP inmates.  The EOP mainline population was 48.  The 3CMS mainline population was down by 27 percent, at 696.  Seven inmates were in MHPBs.[22]  The total administrative segregation population was 53, including 30 3CMS inmates and four EOP inmates pending transfer to a hub institution.  There were 14 3CMS inmates on condemned row.

Staffing:

The reduction in the prison population due to realignment under AB 900 resulted in significant staffing changes at CCWF.  Since the Twenty-Third round, the institution lost the equivalent of nearly two full-time senior psychologist positions, more than ten staff psychologist positions, a recreational therapist position, and the medical secretary position.

The chief psychologist position was vacant.  The senior psychiatrist position was filled.  Of the 8.26 staff psychiatrist positions, eight were filled, resulting in a six-percent vacancy rate.

---

[22] Now referred to as MHCBs.  *See* footnote 18.

One of the 1.69 senior psychologist positions was filled. Of the 17.79 staff psychologist positions, 17.5 were filled, leaving a vacancy rate of only two percent. Use of hourly employees provided full coverage for these positions.

The .91 supervising social worker position was vacant, but the 7.83 staff social worker positions were all filled. The senior psych tech position was filled, as were seven of eight psych tech positions, for a 13-percent vacancy rate among psych techs.

The 3.93 recreational therapist positions, the health program specialist position, and the 8.5 clerical positions were all filled.

Quality Management:

CCWF's quality management program was focused on outdated corrective action plan items rather than a model that encompassed Program Guide requirements. In addition, although the institution audited most problem areas, its use of MHTS.net needed more work, as compliance reports were inaccurate in some cases and indecipherable in others.

The local governing body convened quarterly. Meeting minutes and attachments were thorough. A representative from mental health attended only one of three meetings due to the loss of the full-time acting chief of mental health. Minutes of mental health subcommittee and SPRFIT meetings were made available for review at all local governing body meetings.

The quality management committee met monthly during the reporting period. Minutes indicated that all six meetings were attended by 11 of the 14 required participants, including a mental health representative. Covered issues included institutional response to an organized hunger strike and changes to the Keyhea law.

The mental health subcommittee met once or twice per month. Minutes were maintained and attendance was adequate. Activity was driven largely by a corrective action plan

that was developed years ago.  Most of the corrective action plan items that were routinely audited were either long-resolved or no longer applicable.

Two QITs were chartered during the reporting period.  One was tasked with revamping the local operating procedure governing the institution's response to inmate hunger strikes and mass hunger strikes.  The other QIT focused on developing a consistent referral process and clothing accommodation for inmates diagnosed with Gender Identity Disorder.  A QIT to improve concordance between eUHR documentation and MHTS.net data was dissolved during the reporting period.

CCWF had a psychiatric peer review committee comprised of two psychiatrists.  The committee utilized a comprehensive audit tool to review 232 eUHRs during the reporting period, and provided performance feedback to all psychiatrists at the institution.

CCWF had a primary clinician peer review committee comprised of three psychologists who conducted annual reviews of all primary clinicians.  For each clinician, the committee selected three MHSDS inmates and used CDCR's peer review audit tool to review the clinician's documentation in the inmates' eUHRs over a six-month period.  The results were then communicated to each clinician.  Any cases of frequent performance deficiencies were reported to the chief of mental health to determine whether corrective action was indicated.  CCWF also had another peer review committee comprised of two clinicians who used the same process to review the work of primary clinicians at VSPW and forward the results to VSPW's chief of mental health.

Suicide Prevention:

There were no completed suicides during the reporting period.

The SPRFIT was scheduled to meet monthly and met six times during the reporting period with a quorum present at each meeting.  Meeting minutes consisted of primarily program review forms for each topic on the agenda.  Agenda items included MHPB admissions, compliance with pre-screening in administrative segregation, reviews of self-harm incidents, and compliance with five-day clinical follow-up.

The ERRC met one to two times per month during the reporting period.  Meeting minutes indicated that response times were adequate.  A spot check revealed that all queried officers were carrying CPR micro-shields on their persons.  Cut-down kits were located in the control booth.  Emergency response drills were performed monthly and staff received CPR refresher training annually.

In its management report, CCWF reported 100-percent compliance with five-day clinical follow-up after discharges from the MHPB.  However, a review of the proof-of-practice documents indicated that the institution was not compliant with five-day clinical follow-up, as was confirmed in a discussion with the chief psychiatrist.  The logs provided for review were incomplete and difficult to interpret.  The institution's management report also stated that custody wellness checks were 100-percent compliant, but the log provided for review appeared to indicate that these checks were documented only 79 percent of the time.

CCWF reported that 100 percent of inmates who were admitted to the MHPB due to apparent suicidality were administered an SRE at the time of placement, and 96 percent received an SRE upon release from the MHPB.

In administrative segregation, morning meetings between mental health and custody staff occurred Monday through Friday.  During the reporting period, 99 percent of inmates placed in administrative segregation received a pre-placement screening prior to

placement.  Due to variances in the data provided for review, it was difficult to determine the percentage of mainline inmates who were given the 31-item screening.

Yellow cell door placards were used to identify new intake inmates for the first 21 days in administrative segregation.  Thirty-minute welfare checks were documented 100 percent of the time, but a review of the logs indicated that they were not always properly staggered.

The cells in the administrative segregation unit were wired for electricity and inmates were allowed to have televisions and radios.

Staff reported that inmates were offered ten hours of yard per week.  There was one group yard for administrative segregation inmates, with scheduling adjusted as needed to accommodate inmates on walk-alone status.

Medication Management:

CCWF was one of the original pilot institutions in the Medication Administration Performance Improvement Program (MAPIP) and was using the procedure.  Audit information was compiled on a monthly basis, except for psychiatry data which was compiled on a quarterly basis.

MAPIP audit findings indicated that 100 percent of newly arriving inmates and inmates who had been transferred within the institution were receiving their psychotropic medications timely.  A random check of 32 cases of inmates discharged from the MHPB also found that all received their psychotropic medications without interruption after their discharges.

A MAPIP audit examined the process for addressing medication noncompliance. It yielded a rate of 98-percent compliance for notation of cases of noncompliance and generation of referrals.  Psychiatric assessments of noncompliant inmates within seven days of the referral occurred 92 percent of the time.

Pill lines were used at CCWF and were randomly audited through MAPIP. No individual inmate wait times were tracked during the reporting period, but the overall duration of any pill call was two hours or less.

Documentation of informed consents was audited by psychiatrists as part of MAPIP. Depending on the specific class of medication, audit results for the first quarter of 2012 indicated compliance rates of 60 to 100 percent for the presence of completed consent forms in the eUHRs.

CCWF reported that approximately 100 randomly selected files were reviewed for compliance with laboratory testing protocols. Laboratory test results were present 80 to 100 percent of the time, and were signed and dated by a physician 60 to 100 percent of the time, depending on the specific class of medication and test results under review. AIMS tests were completed within timeframes in 78 percent of the cases.

Approximately 82 percent of MHSDS inmates were prescribed psychotropic medications. As of April 19, 2012, there were 525 inmates prescribed psychotropic medication to be administered by DOT. The institution had reduced its use of DOT for medication administration, down from 100 percent during the Twenty-Third round to about 88 percent, and was utilizing nurse-administration of medications when clinically appropriate.

At the time of the site visit, there were four inmates with active Keyhea orders.

There were 165 inmates receiving HS medications on April 9, 2012. An audit based on a small sample of nine cases in February 2012 found that all received HS medications after 8:00 p.m.

A February 2012 audit of 30-day supplies of medications to paroling inmates looked at 20 cases of released inmates.  The audit found that in all cases, the inmates received their medications, as indicated by their signatures on the manifest.

Transfers:

During the reporting period, 95 inmates met one or more indicators on Form 7388B for consideration for referral to inpatient care.  Ten, or 11 percent, were referred to intermediate care.  There were no referrals to acute care, as that level of care was not available to female inmates.  All ten referrals to intermediate were completed within five working days and uploaded to SharePoint.  None of the referrals were rejected by DSH and none were rescinded.  An audit found that for 94 percent of the non-referrals, the reason was documented, and for 77 percent of the non-referrals, there was documentation of interventions to improve the inmate's level of functioning.

During the reporting period, 17 inmates returned from DSH to CCWF and two remained at DSH.  Returning inmates were routinely sent through CIW where they remained for up to two weeks before returning to CCWF.  When they returned to CCWF, mental health clinical staff saw them within 24 hours of their arrivals.  The DSH coordinator provided the discharge summaries to the CCWF treatment team.  Most returned following a successful course of treatment.  Some were returned to CCWF because of behaviors that could not be managed safely in the DSH intermediate care environment.  Generally, these inmates were placed in the MHPB, usually for more than ten days, in an attempt to stabilize them.

CCWF reported that five inmates were endorsed for the PSU and transferred to the EOP hub at VSPW.  The provided information indicated the dates that the inmates were placed into administrative segregation and the dates they were transferred to the EOP hub at

VSPW, but it did not indicate the date of the PSU endorsements.  The number of days between the five placements in administrative segregation at CCWF and transfer to VSPW were 21, 28, 28, 56 and 70, or an average of 40.6, indicating that two of these five inmates remained in segregation longer than 30 days.  Transfer delays were attributed to bed unavailability related to mission changes at VSPW and CIW.

During the reporting period, 190 inmates were placed in administrative segregation.  Of these, 27, or 14 percent, were EOP inmates; 91, or 48 percent, were 3CMS inmates; and 72, or 38 percent, were non-MHSDS inmates.  Of the 27 EOP inmates, ten, or 37 percent, remained in administrative segregation longer than 30 days before being released or transferred to the hub at VSPW.  For the other EOP inmates in administrative segregation, stays there lasted from 31 to 60 days for three inmates, 61 to 90 days for six inmates, and 103 days for one inmate.  Of the 91 3CMS inmates, 11, or 12 percent, remained in administrative segregation longer than 90 days.

In the reception center, all EOP inmates were housed in the mainline EOP program and had access to full EOP programming.  According to MHTS.net data, there were 27 EOP inmates processed through the reception center during the reporting period.  It took longer than 60 days to complete the process for five of these inmates.  A total of 802 3CMS inmates were processed through the reception center during the reporting period.  Of these, 173, or 22 percent, had stays in the reception center that exceeded 90 days.

Other Areas:

Reception Center

As a result of population realignment, CCWF retained the sole reception center for female inmates within CDCR.  Its reception center population decreased from an average of

approximately 685 inmates during the period from March 2011 to September 2011 to an average of 430 inmates during January 2012, for a 37-percent decline.  As a consequence, in January 2012, 13 staff psychologists were transferred to other prisons and a number of clinical supervisors were either demoted or transferred.  One psychiatrist, five staff psychologists, and one social worker were redirected from the reception center to cover other programs at CCWF.

During January 2012, compliance with initial screening and assessment timelines declined significantly.  During that month, only 44 of 95 bus screens were completed within 72 hours of arrival, generating a compliance rate of 46 percent.  Similarly, 115 of 194 31-item mental health screens were completed within seven days of arrival, at a compliance rate of 59 percent.  Eight of 13 mental health evaluations, or 62 percent, were completed within 18 days of arrival.  However, the rates of compliance with these timelines improved to well above 90 percent during the remainder of the reporting period.

Despite the loss of clinical staff in the reception center, compliance in other key areas was sustained.  MHTS.net data indicated that the compliance rates for the timely completion of initial and follow-up psychiatric appointments remained well above 90 percent throughout the reporting period, as did the compliance rates for quarterly primary clinician contacts.

<u>MHSDS Inmates in Administrative Segregation</u>

CCWF's administrative segregation unit was located in one half of building 504, and was comprised of 29 cells for segregation inmates and 11 cells for condemned inmates.  Overflow inmates were temporarily housed in cells located in the other half of building 504, in which the institution's mainline EOP program was located.  Individual clinical contacts were most often conducted cell-front due to lack of treatment modules.  The psychiatrist and two

psychologists shared the sole confidential room/office in administrative segregation. There was no group treatment space.

During the months of October 2011, through January 2012, the administrative segregation census ranged from 39 to 50, including from zero to ten inmates in overflow cells in the adjacent EOP unit.

MHTS.net performance data indicated that compliance rates in some areas had fallen below the 90-percent threshold. Compliance rates for the timely completion of initial IDTT reviews for EOP and 3CMS inmates fell to 53 percent and 76 percent, respectively. Compliance with monthly IDTT reviews for EOP inmates and quarterly IDTT reviews for 3CMS inmates fell to 70 percent and 87 percent, respectively.

MHTS.net data indicated that initial and follow-up psychiatric contacts in administrative segregation were timely well above 90 percent of the time. The institution reported, and interviewed inmates confirmed, that nearly all psychiatric interviews occurred in a private setting. However, inmates consistently reported that the assigned psychiatrist was unresponsive, inattentive and, in some cases, disrespectful and unprofessional.

Eighty-five percent of newly arriving EOP inmates placed in administrative segregation for longer than a week had their initial contacts with their primary clinicians within seven days of arrival. Newly arriving 3CMS inmates had timely initial contacts with their primary clinicians 96 percent of the time. EOP inmates were seen weekly by their primary clinicians in 94 percent of cases, and 3CMS inmates were seen weekly by their primary clinicians in 87 percent of cases. Institutional tracking data indicated that an average of 79 percent of primary clinician contacts in administrative segregation occurred in a private setting. Inmates confirmed that most contacts with their primary clinician were confidential but also

reported frequent turnover among primary clinicians and indicated that contacts, while nearly always private, often felt hurried and superficial.

Groups were not offered to inmates in administrative segregation.

MHPB

At CCWF, there were 12 MHPBs, which were held to the same programmatic standards as MHCBs.  Four of the rooms containing MHPBs were double-cells, but these were rarely used to house two inmates, and thus the functional capacity of the MHPB was therefore most often eight beds.  There was no individual treatment space for administrative segregation inmates.  Essentially all clinical contacts for these inmates occurred at cell-front.  No long-term medical patients were housed in the MHPB.

Referrals to the MHPB were assessed by the IDTT.  If they were deemed appropriate for admission, the patient was admitted by the psychiatrist.  If the referral was not deemed appropriate, the inmate was returned to her housing unit with five-day clinical follow-up and hourly custody checks.

The institution reported that there were no delays in MHPB access, nor any administrative delays in discharges from the MHPB, during the reporting period.  Clinical and physical discharge occurred on the same day.  There were 72 admissions to the MHPB during the reporting period, including 60 from within the institution and 12 from other prisons.  The average length of stay was 12 days, with a range of one to 62 days.  Thirty-two inmates stayed longer than ten days, all for reasons that were clinical in nature, including DSH referral, continued treatment of clinically instability, and Clozapine initiation.

Inmates were seen in the MHPB at intervals that met or exceeded Program Guide requirements.  IDTT meetings were held twice weekly.  During the reporting period, the

compliance rate for timeliness of initial psychiatric assessments was 100 percent.  The

compliance rate for timeliness of initial primary clinician contacts was of 96 percent, and for

timeliness of initial IDTT meetings, it was 81 percent.  Compliance rates for meeting Program

Guide timelines for follow-up psychiatric and primary clinician contacts and IDTT meetings

ranged from 90 to 100 percent.  Neither seclusion nor five-point restraints were used during the

reporting period.

   Suicide-resistant beds had not yet arrived at the time of the site visit, but were due

for installation within the next couple of weeks.  Inmates were still being issued mattresses to be

used on the floor.  Suicide-resistant gowns with Velcro closures were the sole clothing offered to

inmates in the MHPB.  However, even though these gowns deteriorated after a number of

launderings, inmates were still required to wear them, even if they were no longer suicidal or

they had been admitted for reasons other than suicidality.  Inmates reported lack of toothpaste,

toothbrushes, and hand soap inside their cells.  This was concerning, given that some inmates'

entire course of treatment is in the MHPB if they have been returned to CCWF from DSH due to

inability to manage the patient's behaviors at DSH.

   EOP

   The mainline EOP program was staffed with a half-time supervising psychologist,

a half-time psychiatrist, four psychologists, one social worker, and two recreational therapists.

The EOP housing unit continued to lack adequate group and individual treatment space.  CCWF

continued to provide individual and group treatment that met or exceeded Program Guide

requirements.

   Reception center EOP inmates were housed in the mainline program and received

the same care as mainline EOP inmates.  Similarly, any inmate who was returned to the custody

of CDCR after paroling was automatically designated EOP and housed in the program.  Ninety-two percent of all inmates in EOP were offered ten or more hours of programming per week.  Forty-four percent attended at least ten hours weekly, and ten inmates participated in less than five hours per week during the reporting period.

Mainline EOP groups were conducted on the dayroom floor, which limited confidentiality and was noisy, or in a small room just off the dayroom.  Clinical staff were beginning to conduct individual contacts for mainline EOP inmates in office space across the yard in a trailer, and IDTT meetings in the chapel.  EOP operations were also disrupted by the continued use of the housing unit for administrative segregation overflow, particularly because of the custody requirements in place whenever administrative segregation inmates are out-of-cell, and the frequent use of the dayroom floor for groups due to lack of other space for groups and individual treatment.

3CMS

The mainline 3CMS population dropped by 29 percent over a ten-month period, from 980 inmates in July 2011 to 696 inmates in May 2012.  Most of the mainline 3CMS group activities and individual interviews, and all IDTT meetings, were held in private offices and rooms located in two mental health buildings.

MHTS.net performance data indicated that CCWF remained compliant with most of the key Program Guide requirements for 3CMS inmates.  Compliance rates remained above 90 percent for the timely completion of initial and quarterly psychiatric contacts, initial and annual IDTT reviews, and quarterly primary clinician contacts.  The compliance rates for the timely completion of intake assessments and initial primary clinician contacts ranged from a high of 94 percent in January 2012 to a low of 76 percent in February 2012, and averaged

approximately 88 percent.  Institutional data indicated that during December 2011 and January 2012, 88 to 91 percent of scheduled mainline 3CMS mental health appointments were completed.  Routine 3CMS programming was only rarely disrupted by lockdowns or other institutional events.

Institutional data indicated that there were 407 IDTT meetings for mainline 3CMS inmates during the period from October 1, 2011 to January 31, 2012.  Attendance rates were 99.5 percent for psychiatry, 100 percent for correctional counselors, and 86 percent for inmates.  eUHRs were available via laptop computers.  Correctional counselors often did not have access to individual case factors, limiting their contribution to these meetings.

CCWF continued to offer a wide variety of groups to mainline 3CMS inmates throughout the institution.  The number of 3CMS inmates on wait lists for groups declined by 54 percent, from an average of 142 during October and November 2011, to 97 in January 2012, to 65 in February.  This decrease in wait list numbers was largely the result of changes in local practice, and partially the result of a reduced 3CMS population.

<u>Referrals</u>

Response to mental health referrals was timely during the reporting period.  According to data provided by the institution, there were approximately 1,616 mental health referrals, including 53 emergent, 120 urgent, and 1,443 routine referrals.  Fifty one, or ninety-six percent of, emergent referrals were seen within four hours.  Of the 120 urgent referrals, 109, or 91 percent, were seen within 24 hours.  Of the 1,443 routine referrals, 1,400, or 97 percent, were seen within five days.

<u>RVRs</u>

CCWF reported that the training on the new RVR process was completed in May 2011.  According to the data provided, there were 462 RVRs issued to MHSDS inmates during the reporting period.  400 were issued to 3CMS inmates, 60 to EOP inmates, and two to inmates in the MHPB.  All of the inmates in the EOP and MHPB and 99 of the 3CMS inmates received mental health assessments.  Of the 99 3CMS inmates who received mental health assessments, it was unclear how many involved RVRs division A, B or C offenses.

The monitor's review of a sample of cases indicated that generally the results of mental health assessments were documented in the findings and when clinical input was taken into consideration in the assessment of a penalty.

**Valley State Prison for Women (VSPW)**
August 7, 2012 – August 9, 2012

Census:

At the time of the site visit, VSPW's total population was 1,980, including the mental health population of 871.  There were no EOP inmates in mainline.  The 3CMS mainline population was 817.  Four inmates were in the OHU for mental health reasons.  The total administrative segregation population was 65, including three EOP inmates and 36 3CMS inmates.

Staffing:

The senior psychiatrist position was vacant.  The chief psychologist position and two of the four senior psychologist positions were filled.  The supervising social worker position was vacant.  The senior psych tech position was filled.

Of the six staff psychiatrist positions, 5.75 were filled, resulting in a 4.2-percent vacancy rate.  Thirteen of the 25.7 staff psychologist positions were filled, resulting in a 50.6-

percent vacancy rate in psychology.  Coverage by interns of 1.2 positions modestly reduced the functional vacancy rate to 44.7 percent.

Among social work positions, 4.75 of 5.3 were filled, leaving a 29-percent vacancy rate.  Thirteen of 14.7 psych tech positions were filled, for a vacancy rate of 12 percent.

Of the 3.5 recreational therapist positions, three were filled, leaving a vacancy rate of 14.3 percent.  Five and a half of the 8.5 clerical positions were filled, which resulted in a 41.2 percent vacancy rate.

Quality Management:

The local governing body met twice during the reporting period.  A quorum was present at both meetings and minutes were kept.  The quality management committee met monthly during the reporting period, with a quorum present at all meetings.  Minutes were maintained.

The mental health subcommittee met six times during the reporting period, with a quorum present at all meetings.  Minutes indicated that the subcommittee covered reports and updates on the Keyhea process, response times to mental health referrals, EOP inmates, reception center population, a QIT on administrative segregation, the closing of the SHU, the OHU, monthly audits, updates to local operating procedures, mental health caseloads, MHTS.net compliance reports, incidents of indecent exposure, monthly health care access reports, and MAPIP training.

There were two new QITs chartered during the reporting period.  One was on gender identity disorder, chartered on March 28, 2012, and was ongoing at the time of the site visit.  The other QIT, on the care and treatment of inmates who swallow objects, was chartered on April 25, 2012.  It was already resolved at the time of the site visit, as the recommended

guidelines were developed at its first meeting.  An additional QIT on administrative segregation remained ongoing.

Peer review for psychiatry consisted of a committee of five psychiatrists who met monthly.  From December 2011 to May 2012, they reviewed 45 charts and found 44 to be of acceptable quality.

Peer review for primary clinicians consisted of a committee of two psychologists and two social workers who met four times during the reporting period and reviewed 12 psychologists and four social workers.  The committee found that overall, documentation was good but that there were deficiencies with treatment plans on Form 7388Bs.  Training was provided to deal with this problem.

Suicide Prevention:

There were no completed suicides during the reporting period.

The SPRFIT met monthly and held six meetings during the reporting period, with a quorum present at four of the meetings.  The team covered the use of safety cells and observation rooms, post-suicide watch procedures, pre-placement screening in administrative segregation, review of suicide attempts during the preceding month, review of 24-hour observation and audits of five-day clinical follow-up during the preceding month, and compliance with DOT medication protocols.  VSPW did not participate in the monthly statewide suicide prevention videoconference during the reporting period.

The ERRC met monthly.  CPR refresher training was provided annually.  All queried officers had micro-shields on them.  The cut-down tool was located in the control booth. Documentation of monthly emergency response drills was provided for review.

The management report indicated that 100 percent of inmates received five-day clinical follow-up after their discharges from the OHU, although proof-of-practice binders contained no documentation of this.  Information provided by staff on site showed that compliance rates for five-day clinical follow-up after discharges from the OHU were 100 percent for the months of December 2011, January 2012, and March 2012, but dipped to 83 percent for May 2012.  The management report indicated, and audit documentation corroborated, 100-percent compliance for custody wellness checks.

In administrative segregation, custody and mental health staff met each morning Monday through Friday.  Audit results indicated that 81 percent of inmates received pre-placement screening prior to placement in administrative segregation.  The institution reported 100-percent compliance with completion of 31-question screens during the reporting period. Cell door placards were used to identify new intake inmates for the first 21 days.  Documentation indicated that 30-minute welfare checks were appropriately staggered, with adequate time allotted for the checks to be conducted properly.

VSPW reported 100-percent compliance with daily psych tech rounds.  The monitor's expert observed rounds being conducted and found them to be appropriately carried out, with opportunity for out-of-cell contact with the psych tech and referral to the psychiatrist or the primary clinician, if indicated.

Administrative segregation cells were equipped with electrical outlets, and inmates were allowed to have appliances.

Inmates were offered ten hours of yard per week.

Medication Management:

MAPIP had not yet been implemented as of the end of the reporting period. Review of audit data indicated a number of problems regarding medication audits.

Institutional audits demonstrated continued compliance with continuity of medications for new arrivals and following intra-institutional moves.  However, these audits did not cover moves into and out of the administrative segregation unit or the OHU.

Audits also indicated that ongoing medications were renewed appropriately, and that inmates received their medications timely following the filling of new orders and or after renewals of existing orders.  However, a review of the audit methodology indicated that some cases of medication discontinuity may have been overlooked.

The institution reported that it received an average of 41 notifications of medication noncompliance per week.  Ninety percent of cases received timely follow-up with the psychiatrist.

Pill line audits found that the overall average wait time in pill lines was 11 minutes for all yards.  The average wait time was ten minutes for the morning lines on Yards A and D, and was also ten minutes for the evening lines on Yards A and B.  The average wait time was 13 minutes for the HS line on yard C.

.       Audits found a compliance rate of 90 percent or higher for the presence of up-to-date informed consent forms in eUHRs.

Audits conducted regarding laboratory studies of inmates' blood levels of psychotropic medications did not examine whether studies were conducted as clinically indicated.  They found that response to abnormal test findings, including follow-up interventions, were compliant.

VSPW continued its policy that all psychotropic medications be administered by DOT.  Institutional information indicated that DOT was employed 97 percent of the time during the review period.

During the review period two inmates were on Keyhea orders.  Neither order was initiated at VSPW, nor did any renewals of Keyhea orders occur during the reporting period.

Audits indicated that HS medications were administered no earlier than 8:00 p.m. There were 190 inmates who were prescribed psychotropic medications at HS.  This was a significant decrease from the 481 inmates on HS medications during the twenty-third round monitoring period.

Fifty-five inmates paroled with active prescriptions for psychotropic medications during the review period.  Audits indicated that inmates signed receipts for their 30-day supplies of medications at the times of their releases.

Transfers:

VSPW reported that 80 inmates met one or more of the indicators for consideration for referral to a higher level of care during the reporting period.  Of those 80 inmates, 78 or 97 percent were not referred, and two inmates were referred to intermediate care at DSH.  Both referrals were completed within five working days.  One referral was accepted and one was rejected.

Although the management report stated that there were no returns from DSH during the reporting period, during the site visit staff indicated that there had been two returns.

There were no reported problems with access to the MHPB at CCWF.  Six inmates were referred and admitted to the MHCB during the reporting period.  Lengths of stay in

the MHCB ranged from one day to 24 days.  The two stays that exceeded ten days lasted 13 days and 24 days, respectively.

According to the management report, there were 284 referrals to the OHU, but according to the proof-of-practice documents, there were 287 such referrals.  The management report indicated that all referrals were accepted, but staff indicated that on rare occasions, during "off-hours" the on-call psychiatrist might talk to the inmate on the phone and decide that admission was not required.   The management report also indicated that the average length of stay in the OHU was two days, with a range of one day to nine days, and that three inmates had OHU stays that lasted longer than 72 hours.  However, analysis of information contained in the proof-of-practice documents indicated that 34 inmates had OHU stays that exceeded 72 hours, with a maximum stay lasting 26 days.  The latter figures were later confirmed by staff during the course of the visit.

According to the proof-of-practice documents, four inmates were referred and transferred to the PSU during the reporting period.  Transfer timelines were met in two of these cases.  The overdue referrals did not transfer until the passage of 65 days and 77 days, respectively.  At the time of the site visit, three inmates were endorsed and awaiting transfer to the PSU.

There were 44 inmates in the administrative segregation EOP at VSPW during the reporting period.  Lengths of stay ranged from two days to 151 days.  Four inmates had stays exceeding 90 days, at 151 days, 149 days, 128 days, and 102 days, respectively.

According to the data provided by the institution, 15 mainline EOP inmates were referred and transferred during the reporting period, with timelines met in all cases.

VSPW did not provide any data on transfers from the reception center during the reporting period.

Other Areas:

### Administrative Segregation EOP

Since the twenty-third round monitoring period, the SHU at VSPW was moved to CIW, where all SHU inmates were transferred.  At the time of the site visit, the A4 housing unit housed exclusively inmates who were on administrative segregation status.  VSPW did not operate an administrative segregation overflow unit during the reporting period.

Physical plant limitations remained unchanged.  Space for individual clinical contacts was inadequate.  Clinicians utilized holding cells on the dayroom floor for clinical contacts, affording poor auditory and visual privacy.

Audits of IDTT meetings found a 60-percent compliance rate for provision of timely initial IDTT meetings for EOP inmates.  Follow-up IDTT meetings for EOP inmates were compliant, with necessary participants in attendance.

Only 77 percent of weekly clinical contacts were timely.  However, as the reporting period progressed, the compliance rate rose to 91 percent for the period of March 2012 to May 2012.  Only 37 percent of these contacts occurred out-of-cell, and 63 percent occurred at cell-front.

A review of the information provided by the institution indicated that EOP inmates were offered an average of 8.7 hours of structured therapeutic activities per week, and received 6.34 hours.

The previous practice of covering windows and doors of cells had been discontinued prior to the reporting period.

OHU

Overall, provision of data regarding the OHU was problematic in that information in the management report sometimes had no supporting documentation, or was contradicted by the proof-of-practice documents or information provided by staff during the course of the site visit.

According to provided data, during the reporting period approximately 26 percent of inmates who entered the OHU for mental health reasons were placed directly into observation cells. The management report indicated a compliance rate of 100 percent for conduct of SREs for inmates placed into the OHU, but proof-of-practice documents did not contain relevant data. During the site visit, staff analysis found that the compliance rate was only 84 percent. Similarly, the management report indicated a compliance rate of 100 percent for conduct of SREs upon discharges from the OHU.  A review of proof-of-practice documents found that staff had conducted a review of 60 sample cases and found that in 29 of 30 or 97 percent of relevant cases, an SRE was conducted on the same day as the discharge except for one case in which it was conducted on the following day.

The management report indicated that all inmates in the OHU for mental health reasons received daily contacts from a psychiatrist and/or a psychologist.  Proof-of-practice documents contained no supporting documentation, although staff did report that this occurred reliably Monday through Friday.

OHU staff referred six patients to the MHCB.  These inmates all transferred to the MHCB on the same day as their referral.

3CMS

According to the management report, 355 inmates entered the 3CMS program during the reporting period, and a total of approximately 875 inmates received 3CMS mainline services throughout the reporting period.

VSPW did not comply with all Program Guide requirements regarding 3CMS treatment.  The management report indicated that initial IDTT meetings were conducted timely in only 54 percent of cases.  Provision of annual follow-up IDTT meetings appeared to fare better, with a compliance rate of 98 percent.  Updated data provided to the monitor during the site visit showed that in a sample of 90 records, 89 of 90 or 99 percent of IDTT meetings were attended by the psychiatrist, 87 of 90 or 98 percent were attended by the primary clinician, 86 of 90 or 96 percent were attended by the correctional counselor, and 88 of 90 or 98 percent were attended by the inmate

The management report indicated that initial clinical contacts were timely in only 61 percent of cases, but that ongoing clinical contacts were compliant, with rates of 99 percent for psychiatric contacts and 97 percent for primary clinician contacts.  However, it was reported that the high compliance rates for ongoing clinical contacts and follow-up IDTT meetings were accomplished by decreasing the frequency of these events.  In addition, there were expressed concerns among leadership, staff, and inmates that inmates had multiple changes in psychiatrists and primary clinicians over the course of the monitoring period, making it more difficult to maintain continuity of care.

Groups were held in the OHU or in visiting areas visit areas.  Proof-of-practice documents showed that a total of 439 inmates were on wait lists for groups.  Interviewed inmates expressed concern about wait times.  A therapeutic group for 3CMS inmates was observed by the

monitor's expert and was found to be well-conducted, with the inmates clearly engaged in the group process.

### 3CMS Inmates in Administrative Segregation

For 3CMS inmates in administrative segregation, audits indicated a compliance rate of 77 percent for provision of timely initial IDTT meetings.  Follow-up IDTT meetings were conducted timely.

Audits indicated that weekly clinical contacts were provided in accordance with timeframes, but that 73 percent of these contacts occurred in holding cells and 27 percent occurred at cell-front.

### Referrals

Provided data indicated that there were 2,769 mental health referrals, including seven urgent referrals, 253 emergent referrals, and 2,509 routine referrals.  Of the 253 emergent referrals 245 or 97 percent were seen within four hours.  Six or 86 percent of the urgent referrals were seen within 24 hours.  Among the routine referrals, 2,208 or 88 percent of the 2,509 referrals were completed within five days.

### RVRs

The institution did not provide the total number of RVRs issued during the reporting period, but it reported that 12 RVRs were issued to EOP inmates and 705 were issued to 3CMS inmates.  Seventy two of the 705 3CMS inmates and three mainline inmates received mental health assessments.  No RVRs were issued for self-injurious or suicidal behaviors.

### Pre-Release Planning

Pre-release planning was provided by one psychologist to whom staff referred inmates in need of pre-release assistance.  This psychologist reported good cooperation with the TCMP staff assigned to VSPW.

**APPENDIX C**

**CASE REVIEWS**

EXHIBIT A
Pelican Bay State Prison (PBSP)
August 27, 2012 – August 29, 2012

**Inmate A**

This inmate's medical record was reviewed because he was being treated at the 3CMS level of care and his IDTT was observed by one of the monitor's experts.  He was variously diagnosed with Bipolar Disorder in full remission, Mood Disorder with psychotic features, and Personality Disorder NOS.  Extensive substance abuse, Borderline Personality Disorder, and the possibility of occasional, brief psychotic events connected with this personality disorder were also noted.  He was treated alternatively with Thorazine, Effexor, and Lithium, among other medications.

The inmate's self-reported history was significant for a strong family history of mental illness.  He was raised in foster care and had multiple psychiatric hospitalizations and suicide attempts during his teenage years.  His self-reported remote history was also significant for sexual abuse during childhood.

The inmate's recent mental health history was significant for a report of suicidal ideation on 12/27/11 while housed at CSP/Solano and a period of poor adherence to prescribed medications in November 2011.  He was referred to the CTC at CSP/Solano where he was hospitalized from approximately 12/27/11 thru 1/5/12.  He was discharged with a diagnosis of Personality Disorder NOS with antisocial features.  At that time, he reportedly exaggerated his mental health symptoms and "demand(ed) EOP."

By 3/9/12, an antidepressant medication was added and the PBSP nurse practitioner noted the diagnostic impression that the inmate exhibited micropsychotic experiences which might occur with personality disorders.  An antipsychotic medication with mood stabilizing properties was recommended.  Primary clinician contacts indicated that the inmate may have exaggerated his psychiatric symptoms in order to receive SSI benefits upon discharge.

A psychiatric note dated 4/12/12 indicated that the inmate's Thorazine had been discontinued and stated that "[n]ursing was gratified that this demanding, aggressive, and unpleasant IP had finally hit a limit."  The note went on to say that he presented with an angry, hostile attitude "as expected" and that he requested to be placed back on Lithium, indicating a "hint of better judgment."  The psychiatrist suspected that he had a mood disorder of the bipolar spectrum and Lithium was added to his medications.

Findings

This inmate was consistently followed during the review period.  There was a need for diagnostic clarification and a clearer approach to his treatment.  His presentation appeared to prompt negative reactions from some staff, which made a clinically driven and consistent approach by the treatment team especially important.

**Inmate B**

This inmate's medical record was reviewed because he was housed in the PSU with a recent CTC admission and was treated at the EOP level of care; one of the monitor's experts also observed him in group treatment and his IDTT was observed.

The inmate had multiple CTC admissions that began in 2006; the most recent two admissions occurred in December 2011 and August 2012.  He was treated at the EOP level of care.  He was housed in the PSU.  He initially arrived at PBSP on 2/22/06 and experienced multiple transfers to other facilities.  He most recently returned to PBSP on 11/16/11.

Mental health progress notes indicated that his symptoms appeared incongruent with his behavior and noted that his stated symptoms related to his desire to be placed at the EOP level of care.  Future suicide risk was also noted.

The inmate was prescribed multiple medications, but clinicians primarily appeared to view him as exhibiting symptoms of a personality disorder.  A diagnosis on Axis I was deferred and he was primarily treated with Haldol.  He reported past treatment with Thorazine, Ritalin, Geodon, Lithium, Haldol, Effexor, and Depakote.

Psychiatry and the primary clinician consistently followed the inmate during the review period.  The initial psychiatry note dated 11/17/11 reported that he had a cat scratch on his arm and noted that he was prescribed Trileptal, Haldol, and Buspar; he had, however, failed various medication trials.  He was provided with a diagnosis of Antisocial Personality Disorder and Effexor was added to the medication regimen.  At the next psychiatry contact on 12/16/11, the inmate was reportedly stable.  Haldol was continued to treat racing thoughts and psychosis, as was Effexor, but Thorazine was no longer believed to be clinically indicated.

A SRE completed on 11/17/11 assessed the inmate with low acute risk but moderate risk of self-harm.  He was evaluated as stable.  It was noted that he reported five suicide attempts; he was impulsive and had a family history of suicide.

On 12/19/11, a primary clinician's note reported that he was seen at cell front because he did not appear for his scheduled session; his mood and affect were described as euthymic.  During this time, there were a number of cell-front sessions.  He was generally described as manipulative, "lacking in sincerity," and stable.  The plan outlined was to enroll him in group therapy.

On 12/ 22/11, the inmate was brought to a holding cell as he reported "demons in his head;" he also stated that he had ingested a foreign object.  The primary clinician determined that his behavior was the result of drug-seeking.  The SRE noted a high risk of self-harm for the near future and moderate risk for the intermediate term, but described his behavior as purely manipulative.  He was transferred to the CTC.

A 12/22/11 psychiatry note documented the inmate's reported suicidal ideation and command hallucinations to commit suicide.  He was assessed as posing low risk for suicide but it was also noted that in light of his poor insight and poor impulse control, the situation would be approached more as a "hopeless depression."  He was provided with a diagnosis of Antisocial Personality Disorder.  He was transferred to the MHCB.  An IDTT on 12/28/11 indicated that he was stable for discharge to the EOP level of care.  Discharge medications included Effexor and Haldol.  The note indicated that the inmate had tried to convince staff that he had exhibited psychotic symptoms to gain MHCB admission.

Mental health staff regularly saw the inmate following MHCB discharge.  Progress notes addressed his difficulty in regulating his emotions, desire to obtain SSI and discharge, impulsivity, and impairment in judgment.  Other notes indicated his lack of participation in some treatment and his self-defeating behavior related to anxiety about his approaching prison release date.  According to one note, he was scheduled for prison discharge on 4/1/13.

The inmate was again admitted to the CTC in August 2012 due to command hallucinations to commit suicide.  He was provided with a diagnosis of Schizoaffective Disorder bipolar type and Antisocial Personality Disorder.  He was discharged from the CTC on the following day with the observation that he had rapidly constituted and agreed to continue treatment with Haldol.

A primary clinician note dated 8/27/12 documented that the inmate displayed a dysphoric mood with flat affect, but also noted that he was observed joking prior to the visit.  He was assessed with low current risk for suicide and a moderate intermediate risk.  The psychiatrist saw him and suggested that the diagnosis of Schizoaffective Disorder might be added.

Findings

The psychiatrist and primary clinician consistently followed the inmate during the review period.  Although there was a theme of the inmate exaggerating his symptoms for secondary gain, different clinicians assessed different degrees of serious mental illness and differing degrees of suicide risk.  These varying clinical views of the inmate should have been reconciled.

**Inmate C**

This inmate's care was reviewed at the request of plaintiffs' attorneys.  He reported dissatisfaction with the treatment program for exhibitionism.

A progress note dated 8/23/12 documented that the session's focus was on discussion of the inmate's programming level and group list with the next group cycle.  It also focused on development of a treatment program to address his constant feelings of anger and bitterness.  The inmate discussed his frustrations as to his perception that he was viewed as a "pervert."  On 8/22/12, the psychiatrist had indicated that the inmate had just been prescribed Celexa and had questions regarding treatment with Trazodone.

The inmate's last IDTT was dated 7/16/12.  This was an IDTT review of a mental health screening following indecent exposure.  A similar IDTT review occurred on 7/6/12.  The inmate was provided with a diagnosis of Schizoaffective Disorder and Personality Disorder NOS.  He was transferred to the MHCB where the indecent exposure protocol was implemented.

The 4/4/12 IDTT progress note provided a diagnosis of Schizoaffective Disorder and Antisocial Personality Disorder.  The inmate had received two RVRs since 1/1/12; neither RVR was for indecent exposure.  He attended indecent exposure groups 68 percent of the time during the prior month.

Documentation relevant to psychiatrist and primary clinician contacts was present in the eUHR and was consistent with Program Guide requirements.  Monthly indecent exposure group summary notes were reportedly completed, but the eUHR only contained the last two months' summaries.  The other monthly progress notes were located in the medical record.

Information was obtained from institutional mental health staff regarding the inmate's participation in the indecent exposure program.  He reportedly had initially reoffended during the beginning of the program; he subsequently stopped attending groups, but recently returned to treatment.  When in treatment, he was described as an active participant.  He also had prior treatment in the indecent exposure program.  Problems noted with the current indecent exposure program included a lack of updated treatment materials such as relevant handouts.

<u>Findings</u>

The inmate was well-known to the PBSP treatment staff.  It appeared that modifications were needed in the treatment plan to adequately address his inappropriate behaviors.

EXHIBIT B
High Desert State Prison (HDSP)
May 22, 2012 – May 24, 2012

**Inmate A**

This inmate's medical record was reviewed as he was housed in administrative segregation, where he was treated at the EOP level of care.  He transferred to HDSP in April 2012.  He was variously provided with diagnoses of Mood Disorder NOS, Psychotic Disorder NOS, Bipolar Disorder, Major Depressive Disorder, severe with psychotic features, Schizophrenia paranoid type, and a possible diagnosis of Schizoaffective Disorder.  He had received treatment with Remeron, Zyprexa, Trilafon, and Effexor.  A history of substance abuse was also noted.

The inmate's history was significant for mental health difficulties since 1995.  Beginning at age 29, he began to experience auditory and visual hallucinations which he described as akin to being "on LSD twenty-four hours a day."  During past incarcerations, he had been treated at the EOP level of care since 2007; he also received treatment in an MHCB.  His history was additionally significant for multiple head traumas, including a reported period of unconsciousness for five days, and multiple suicide attempts.

The SRE conducted on 4/27/12 noted that the inmate exhibited frequent derailment of thinking with disorganization and tangential speech.  His chronic risk of suicide was assessed as moderate with a low acute risk.  The plan was to maintain him at the EOP level of care and schedule him for group treatment.

A mental health evaluation dated 4/27/12 indicated that the inmate paroled from administrative segregation and also noted several RVRs for battery and mutual combat.  A psychiatric note dated 4/24/12 indicated that he had recently paroled from SQ; he had absconded for four months and was not compliant with psychotropic medication treatment recommendations.

A progress note dated 4/18/12 indicated that the inmate was informed that his assigned clinician would offer weekly out-of-cell sessions.  The inmate was interviewed during the site visit, when he reported that he believed that his primary clinician had "forgot about [him]."  At the time of review, regular weekly progress notes were not consistently filed in the corresponding section of the medical record.  However, mental health leadership subsequently located some of the missing notes and presented them to the monitor's expert.

Findings

This inmate was provided with multiple diagnoses over the course of his treatment which should have led to more comprehensive efforts to reconcile.  Although some subsequent notes were later located, at the time of review it was unclear whether the inmate was consistently receiving weekly primary clinician contacts.  Group treatment was not provided in administrative segregation at the time of the review, but the SRE dated 4/27/12 indicated that group therapy would be part of the treatment regimen.

**Inmate B**

This inmate's medical record was reviewed because of his recent placement in administrative segregation at the EOP level of care.  Previously, he had been treated in an MHCB.
An initial psychiatric contact in administrative segregation on 5/18/12 provided a diagnosis of Bipolar I Disorder, most recent severe.  He was prescribed Lamictal, Lithium, and Depakote.  It was noted that he had been housed in the MHCB due to a suicide attempt, felt "over-medicated," and was pending transfer to an EOP.

The medical record contained progress notes from early May 2012 indicating that the inmate had at least four MHCB admissions during the past two months.  Progress notes from late April 2012 revealed that he had been involved in altercations.  Notes from early and late April 2012 indicated sporadic issues with adherence to prescribed medications.

Findings

Although mental health staff regularly saw this inmate, his care was difficult for mental health staff to provide, especially as he awaited transfer from administrative segregation to an EOP program.

**Inmate C**

This inmate's medical record was reviewed due to his placement in administrative segregation and treatment at the EOP level of care.

A SRE dated 5/3/12 documented that the inmate had made a suicide attempt earlier that day; he reported that he stopped breathing after the incident.  The SRE also indicated that the inmate wanted to die and had made three previous suicide attempts.  No protective factors were identified.  He reported hopelessness and the clinician identified depressive symptoms with cognitive disruption.  He was referred to the MHCB; the SRE noted findings of moderate chronic and acute suicide risk factors.  At that time, he was receiving mental health services at the 3CMS level of care.

At the time of review, no mental health notes were located for the period of August 2011 thru December 2011.  However, there were some references to an MHCB admission due to a pattern of bizarre behavior.  A psychiatry note dated 1/12/12 indicated poor medication adherence.  At that time, the inmate was provided with a diagnosis of Substance Abuse Disorder; differential diagnoses of Bipolar Disorder and Schizoaffective Disorder bipolar type were also considered.  The medical record also contained an additional diagnosis of Mood Disorder NOS.

During January 2012, the primary clinician saw the inmate, but he refused out-of-cell contact.  A 2/9/12 progress note stated that the inmate was seen at cell front for his 3CMS primary clinician contact, when he reportedly had organized thinking.  On 2/12/12, he refused a psychiatry appointment.  On 2/14/12, he was again seen at cell front by his primary clinician without explanation.  A 2/21/12 primary clinician note stated that the inmate was seen at cell front due to

modified programming.  A 2/25/12 psychiatric note stated that he was seen at cell front after he refused a confidential visit.  The psychiatrist noted that the inmate might improve after treatment with psychotropic medications, and the inmate agreed to a trial of Zyprexa.  His primary clinician again saw him at cell front on 2/28/12 after the inmate refused an out-of-cell session.  Notes during March 2012 documented other confidential visit refusals.  The March 2012 IDTT indicated that the inmate reported that his food was "poisoned less."

A 3/26/12 psych tech note stated that the inmate was scheduled to see his primary clinician that same day.  A 4/8/12 psychiatrist note indicated that he was compliant with prescribed medications, which were beneficial for him.  However, with the exception of consistent and informative psych tech notes, at the time of review the next mental health contact occurred on 5/4/12 when, based on a self-referral, the primary clinician saw the inmate.  The inmate stated that he had experienced suicidal ideation for the past week or more, with hopelessness.  He was also concerned that the district attorney would pursue sexual assault charges against him, which related to the reason that he was housed in administrative segregation.  The note documented that the inmate considered self-strangulation, as well as a long process of psychiatric decompensation.

Findings

Mental health leadership reported that some progress notes were subsequently located.  However, at the time of review, the medical record contained a significant gap in mental health contact when the inmate appeared to be experiencing a period of decompensation and elevated suicide risk.

**Inmate D**

This inmate's medical record was reviewed because he was treated at the 3CMS level of care and was interviewed by the monitor's expert in a group setting.  He was alternately provided with diagnoses of Psychotic Disorder NOS, Anxiety Disorder NOS, and possible Schizophrenia paranoid type.  He was prescribed Risperdal, Zoloft, and Geodon.

Primary clinician contacts indicated that the inmate remained stable and was reportedly doing well.  Psychiatric contacts also confirmed that he was doing well, despite continued auditory hallucinations.  Progress notes documented that he had ongoing contacts with mental health staff during the review period.

Findings

This inmate was seen regularly during the review period and remained stable.  The interview with him confirmed that he had good accessibility to his treating clinicians.

**Inmate E**

This inmate's medical record was reviewed as he was receiving mental health services at the EOP level of care in the mainline EOP.  At the time of review, he had been awaiting transfer to an EOP for approximately nine months.

During the review period, the inmate received a number of SREs which identified various protective factors and assessed him with low suicide risk.  As recently as 4/25/11, an SRE noted that he appeared to exhibit negative symptoms of Schizophrenia and was scheduled for an evaluation regarding inclusion in the MHSDS.  He received an RVR on 7/13/11.  A progress note dated 8/1/11 documented his placement at the EOP level of care.

Psychiatrist and primary clinician progress notes between October 2011 and May 2012 documented regular contact with mental health staff and the presence of significant psychotic symptoms.  A primary clinician note dated 10/13/11 indicated that the inmate was having difficulty adjusting to a new cellmate; he was not prescribed psychotropic medications at that time.  A psychiatric note dated 10/18/11 indicated that he was apparently stable off of medications.  However, by 11/8/11, the primary clinician expressed concerns that psychotic symptoms might be present.

A primary clinician note dated 11/17/11 indicated that the inmate exhibited flat affect, poor activities of daily living, and auditory hallucinations, but the clinician concluded that he continued to maintain his level of functioning without medications.  A psychiatric note dated 11/18/11 indicated that the inmate said that he would not harm himself.  The inmate continued to believe that medications were not necessary.  He also stated that the counselor owed him $1,000.  The psychiatrist reported that the inmate was exhibiting evidence of auditory hallucinations, but also stated that the inmate was reluctant to provide details.  He was provided with a diagnosis of Schizoaffective Disorder.  The psychiatrist considered whether an interpreter would be useful in obtaining more details.

A 11/22/11 primary clinician note described the inmate as extremely paranoid and agitated; he had rambling incoherent speech about a truck in Los Angeles.  On 12/1/11, the primary clinician described him as more stable and also stated that he was functioning well without medications.  A subsequent progress note dated 12/8/11 provided a similar description.  On 12/15/11, the psychiatrist noted a reported history of head injuries and stated that the inmate expressed appropriate worries about his family.  The inmate continued to believe that medications were not required.  Less than three hours later on the same day, the primary clinician described the inmate as paranoid and distracted with renewed discussion about a truck in Los Angeles.  The primary clinician saw the inmate again on 12/20/11, when he was described as disorganized.  One week later, he again exhibited disorganization, albeit of less severity.

On 1/5/12, the inmate was observed sitting in his cell talking to himself.  On 1/12/11, the primary clinician described him as actively psychotic.  Conversely, on the following day, the psychiatrist assessed him as oriented with some disorganization and possible abnormality of thought

processes.  Primary clinician contacts on 1/19/12, 1/26/12, and 2/2/12 indicated that he was more stable.

A primary clinician note dated 2/9/12 indicated that the inmate was seen at cell front due to a lack of custody officers.  A 2/13/12 psychiatric note stated that he refused a confidential visit. On 2/16/12, the primary clinician indicated that the inmate, who appeared to be stable, was seen at cell front because custody staff was attending a training session.  On 2/23/12, the primary clinician reported that the inmate appeared paranoid and exhibited tangential thought processes. On 3/1/12, the inmate refused to leave his cell for an appointment with the primary clinician, who reported that the inmate's cellmate indicated that he was "ok," but constantly talked to himself.  The inmate declined psychiatric contact on 3/13/12.  The primary clinician saw him at cell front on 3/15/12 due to the lack of custody officers, who were searching another unit.  On 3/22/12, the primary clinician described the inmate as mildly paranoid and responsive to internal stimuli.  A 3/27/12 progress note stated that he was satisfied with his current medications, but it was unclear which medications were being referenced.

On 4/5/12, the primary clinician stated that the inmate had difficulty forming his thoughts and described his discussion of sacrificing chickens.  He again focused on a truck in Los Angeles. His continued refusal of medications was noted.  A 4/10/12 psychiatry note indicated that the inmate was difficult to understand and had tangential thinking.  The psychiatrist again noted the inmate's lack of insight regarding his psychiatric issues and his refusal to take medications.  The assessment that was outlined indicated that the inmate would continue to refuse medications until he decompensated sufficiently to permit involuntary medications.

On 4/12/12, the primary clinician reported that the inmate seemed calm after transfer to another housing unit, but on 4/19/12, he exhibited delusional thinking.  A mental health evaluation conducted on 4/22/12 due to an RVR noted that the inmate's cell appeared messy and that mental illness was a contributing factor to his offense.  A 4/22/12 primary clinician note stated that the inmate was seen at cell front because of the lack of custody officers; the inmate stated that he wanted to "go home to [his] blue house."  His affect was incongruous.  On 5/3/12, the primary clinician saw him when his mood was described as appropriate, although he had perseveration regarding winning the lottery.  His next IDTT was scheduled for 7/25/12.

A primary clinician note dated 5/10/12 stated that the inmate had inappropriate behavior with tangential speech and did not understand that he was moved to administrative segregation after hitting his cellmate.  A 5/11/12 psychiatry note quoted the inmate as saying that he was "older than the world going around."  The psychiatrist noted that he had grandiosity with paranoid delusional thinking and resistance to treatment.  The psychiatrist concluded that he was not treatable in the present setting and opined that transfer to an EOP would be beneficial.


Findings

This inmate presented differently to different clinicians and to the same clinicians over the course of time.  Overall, however, there was a general downward progression in his mental status during the extended time that he refused treatment and awaited transfer to an EOP.  Clinicians

made divergent assessments of him at very close intervals, but there was no evidence that there were attempts to reconcile their observations or assessments.  The decision to provide treatment at the EOP level of care was supportable at the time that it was made.  However, the inmate deteriorated while awaiting placement in an environment which could not address the need for comprehensive assessment and engagement in needed treatment.  It appeared that this inmate may have benefitted from transfer to DSH, but at a minimum he required treatment and assessment in an EOP setting.  There were also a number of instances of cell-front contacts due to the lack of custody escorts and an early notation about the possible need for a translator that was apparently not pursued.

EXHIBIT C
Mule Creek State Prison (MCSP)
August 29, 2012 – August 31, 2012

**Inmate A**

This EOP inmate was housed in the administrative segregation unit.  He was provided with diagnoses of Mood Disorder NOS (with a history of traumatic brain injury), PTSD, and Personality Disorder NOS with antisocial, borderline, narcissistic, and paranoid traits.  He was prescribed Strattera and Tegretol (for a seizure disorder).

The inmate was housed in administrative segregation at MCSP while completing court proceedings.  An ICC note dated 11/3/11 indicated that he was housed in administrative segregation due to staff threats and that he would be transferred to KVSP or RJD.  It appeared that he was transferred to KVSP, and subsequently to RJD.  He returned to MCSP's administrative segregation unit on 3/2/12 for court proceedings.  The primary clinician saw him for initial treatment planning on 3/7/12; this treatment plan indicated that he would be placed on a modified program.  Documentation indicated that he exhibited mood instability, impulsivity, anger issues, "manipulation and entitlement."

The inmate made superficial scratches to his arms on 4/26/12, when he was evaluated by the primary clinician; the progress note indicated that he was not suicidal, but cut himself due to anger at custody.  He was transferred to the MHOHU on 4/30/12 after he reportedly swallowed cleaning solution.  He was released from the MHOHU on the following day after no evidence of ingestion was found, and returned to administrative segregation.

Findings

There was a Form 7388-B completed regarding higher level of care referral consideration; the Form 7388-B correctly reflected the inmate's lack of treatment compliance.  The treatment plan appropriately noted problem areas, but lacked a detailed description of interventions to address them.  The psychiatrist consistently saw the inmate.  There was documentation of daily psych tech rounds and weekly primary clinician contacts.

**Inmate B**

This EOP inmate was housed in a mainline EOP unit.  He was provided with a diagnosis of Schizophrenia and was treated with Risperdal.  He was a participant in the EECP.  Progress notes indicated that he had previously neglected his hygiene and had poor group therapy attendance.  After his involvement in the EECP, documentation indicated significant improvement in his activities of daily living and group attendance.

Findings

There was documentation of monthly psychiatric contacts and weekly primary clinician contacts.  The inmate appeared to benefit from the treatment interventions provided to increase his activities of daily living and poor treatment compliance.  Treatment plans were individualized and the Form 7388-B was present, indicating higher level of care referral consideration.  There was also documentation of laboratory testing as to treatment with atypical antipsychotic medication, and abnormal laboratory results were addressed.

EXHIBIT D
California Medical Facility (CMF)
June 12, 2012 – June 14, 2012

**Inmate A**

This inmate's medical record was reviewed at the request of plaintiffs' counsel due to concerns regarding his stay in administrative segregation and his placement on a modified treatment plan.

The inmate had no reported history of mental health treatment prior to incarceration. Since incarceration, he reportedly developed depression related to a stroke. He was hospitalized at DSH in 2008 for depression and again in July 2010 secondary to a suicide attempt by hanging. The inmate reported an assault by his cellmate three years earlier and had refused to accept a cellmate as a result. He reported symptoms of anxiety, nightmares, flashbacks, and depression after being provided with a cancer diagnosis. On 11/19/11, there was medical record documentation that he told his primary clinician that he was willing to be placed in the SHU and forgo a television and visits rather than accept a cellmate.

The inmate was provided with a provisional diagnosis of Major Depressive Disorder, single episode, mild. Progress notes documented a history of at least three suicide attempts. During the review period, he was periodically treated with Zoloft, but intermittently refused to take the medication.

On 11/28/11, the inmate was described as depressed and sad. Due to his distractibility, it was thought that he would not benefit from group therapy, and he was continued on a modified treatment plan that included twice weekly primary clinician contacts. The primary clinician's progress note dated 11/30/11 noted a referral for a psychological assessment.

A 12/5/11 primary clinician note indicated that the inmate reported that he required a colonoscopy, and that the psychiatrist had been talking to him about the need for medication adherence. The inmate believed that it might be beneficial to resume group treatment and there was an agreement that he would begin regular programming in January 2012. He also reported that psychological testing had uncovered many difficult memories and experiences.

On 12/5/11, the psychiatrist considered a diagnosis of PTSD and the inmate agreed to restart Zoloft. A 12/13/11 primary clinician progress note indicated that the purpose of the psychological testing was to gain added information about a possible PTSD diagnosis and the inmate's refusal to double cell. For the remainder of December 2011, the primary clinician essentially saw the inmate weekly. Although prior documentation indicated that the inmate would resume regular programming in January 2012, a progress note dated 11/29/11 indicated that his group attendance was poor.

During early January 2012, the inmate again began to refuse medications. The primary clinician documented on 1/4/12 that the inmate had an adverse reaction to a pneumonia vaccine and complained that Zoloft caused side effects. The inmate was referred to the psychiatrist, who discontinued the medications on 1/6/12. A 1/11/12 primary clinician progress note documented multiple medical complaints and the inmate's report that he was having "psychotic thoughts" and was "wondering about the purpose of life."

Subsequent mental health contacts documented that the inmate exhibited distress and discouragement and reported ongoing medical problems that included suspected sickle-cell anemia.

A treatment plan dated 2/14/12 and the accompanying Form 7388-B indicated that the inmate was unable to adequately function at his current level of care.  Diagnoses of PTSD and Dysthymia were added and interventions to improve functioning were considered, including an increased focus on topics related to PTSD in an effort to improve his mood.  The inmate reportedly was more engaged in groups.  The IDTT meeting noted that during the inmate's last ICC, he was sentenced to a SHU term for refusing a cellmate, and was scheduled for transfer to the PSU at PBSP or CSP/Sac.  Because of a long wait list, the treatment team considered whether a recommendation for a single cell should be made.  The inmate remained at the EOP level of care.

Consistent mental health contacts continued during February, March, and April 2012.  DSH accepted the inmate for transfer on 4/3/12.  A 4/30/12 progress note indicated that he was rapidly deteriorating while awaiting DSH transfer.  The inmate had expected to transfer to DSH before being released from administrative segregation, and the transfer delay was upsetting to him.  DSH accepted him for admission in May 2012, but he did not actually transfer as he prevailed at his Vitek hearing.

Findings

The provision of health care to this inmate posed a significant challenge to CMF staff.  The inmate presented with chronic suicide risk and numerous medical issues, although he also required diagnostic clarification.  The inmate had periods of intermittent adherence to treatment recommendations.  Mental health clinicians followed him consistently during the review period and it appeared that the treatment provided was informed by the comprehensive evaluation which was conducted.  The staff ultimately attempted to transfer him to DSH, but those efforts were thwarted by his challenge to this transfer.  As discussed with staff, although efforts were made in this regard, additional multidisciplinary case conferences that included medical, custody, and mental health staff might have been indicated.  These recommendations were provided during the site visit.


**Inmate B**

This 62-year-old inmate had been incarcerated for 42 years.  He had resided at CMF for the preceding 25 years.  He was provided with diagnoses of Major Depressive Disorder, recurrent with psychotic features, Polysubstance Abuse, and Antisocial Personality Disorder.  He was prescribed Celexa, Vistaril, and Haldol Decanoate by intramuscular injection.

The inmate was interviewed in a confidential setting on an EOP unit where he reported being provided with a diagnosis of depression and receiving Haldol, Vistaril, and Cogentin as medication.  He reported consistently receiving his medication and meeting with the psychiatrist at least every 90 days.  He indicated that treatment planning occurred at least quarterly.  He

further reported that the group therapies offered in the EOP program on his unit were inconsistently conducted; he estimated that perhaps only three to four of every five scheduled groups actually occurred.

Review of the structured treatment hours provided for this inmate for October, November, and December 2011 indicated that he was scheduled for 8.9 weekly hours. However, only 6.5 weekly hours were actually offered as an average of 2.4 weekly hours were cancelled. For the time period of January, February, and March 2012, the average number of scheduled weekly hours decreased to 7.6; 5.5 weekly hours were offered and 2.1 weekly hours were cancelled.

Findings

This inmate was not offered EOP structured therapeutic activities in compliance with Program Guide requirements. Documentation indicated that medication management was conducted adequately.

**Inmate C**

This EOP inmate was interviewed in an EOP unit. He reported being incarcerated for five years, but only being housed at CMF for the most recent 16 months. Notably, the inmate ambulated with the assistance of a wheelchair and utilized hearing aids to assist with his hearing. He further stated that he had written various grievances about the inconsistency of group therapy and concerns as to his primary clinician.

A review of the inmate's structured treatment hours indicated that for the months of October, November, and December 2011, an average of 12.6 weekly hours were scheduled, 8.6 hours were offered, and 4.0 hours were cancelled. Review of treatment records for January, February, and March 2012 indicated that the inmate was scheduled for 9.7 weekly hours of structured treatment but was only offered 7.3 hours, as 2.4 hours were cancelled.

Medical record review indicated that the inmate was provided with diagnoses of Bipolar Disorder, Alcohol Dependence, and chronic pain. An EKG was ordered for him on 1/13/12. The results were noted on 1/23/12 as abnormal, but there was no documentation of the EKG in clinician progress notes or documentation of repeat EKG findings. The psychiatric progress note dated 1/25/12 also made no reference to the abnormal EKG.

Findings

This inmate was offered an average of less than ten hours of weekly structured therapeutic activities for the six months of the review period. The results of the EKG were not noted or evaluated.

**Inmate D**

This EOP inmate was provided with diagnoses of Substance Induced Psychotic Disorder with hallucinations and Personality Disorder NOS. He also had kidney failure and heart problems

according to a mental health treatment plan addendum dated 3/16/12.  The inmate reported being incarcerated since 2007 and being housed at CMF since at least 2011.  He reported attending most of his groups and commented positively as to the provision of group therapy by mental health staff.

The inmate was prescribed Invega and Remeron, but MARs for February and March 2012 documenting administration of Invega or Remeron were not located in the eUHR.  A December 2011 MAR indicated that he had been prescribed Thorazine, but multiple blank spaces indicated that he had not received the medication on specific days.

Findings

This inmate's care and treatment appeared to be inadequate for his mental health needs.  During the review period, he was scheduled for more than an average of ten weekly hours of group therapy, but was only offered 6.7 weekly hours.  Medication adherence could not be assessed.

**Inmate E**

This inmate's medical record was reviewed as he was receiving involuntary medications by way of a Keyhea order.  He was admitted to DSH acute care on 1/27/12 from CMF's administrative segregation unit.  He was transferred from DSH unit S2 to Q2 on 2/13/12.  The inmate had a history of multiple MHCB and DSH acute care admissions due to dangerousness to self and assault and battery of custody.  He was provided with a diagnosis of moderate mental retardation.

MAR documentation was problematic in that there were two MARs for January 2012.  Both indicated that the inmate was to receive Risperdal Consta by injection on 1/19/12.  One MAR indicated that he had received the medication, but the second MAR was blank for that date.  The inmate also received Depakote from 1/11/12 to 1/27/12, but there was no documentation that he received Depakote for the remainder of January 2012 as ordered by the physician.

Findings

Problems were noted regarding medication management.  There was the potential for medication errors based on duplicate MARs that both indicated that injectable medications be given on the same date.  Of concern was the possibility of medication noncompliance for this inmate who was ordered to receive involuntary medications by way of a Keyhea order.

**Inmate F**

This EOP inmate was housed in administrative segregation.  A mental health treatment plan addendum dated 2/17/12 provided diagnoses of Substance Induced Psychotic Disorder with hallucinations, Amphetamine Dependence, Antisocial Personality Disorder, and Hepatitis C.  The inmate was prescribed Thorazine on an as needed basis and Remeron daily, which was discontinued on 2/21/12.  The MAR noted that the inmate was taking Thorazine daily during

February 2012.  A psychiatric progress note dated 2/13/12 described the inmate as stable, but also noted that he "agrees to self reduce the use of prn Thorazine."

Findings

This inmate's medication management was of concern as he was daily taking a medication ordered on an as needed basis.  The psychiatrist's progress note indicated that the inmate would regulate his own Thorazine.  This appeared to illustrate inadequate medication management.

**Inmate G**

This inmate was provided with diagnoses of Major Depressive Disorder, Learning Disability, and Alcohol Dependence.  His prescribed psychotropic medications included Risperdal, Amantadine, Zoloft, and Effexor.  There were notable blank spaces on the MARs at the end of February 2012 and the beginning of March 2012 indicating that the inmate had not received his medications.  A new medication order was noted that indicated administration of Risperdal beginning March 2013.

Documentation indicated that the inmate was scheduled for an average 10.4 hours of weekly structured therapeutic activity from January through March 2012, but was only offered an average of 9.7 weekly hours due to cancellations.

Findings

It appeared that there were issues regarding medication management for this inmate.  Otherwise, the mental health care and treatment provided for him appeared to be adequate for his mental health needs.

**Inmate H**

This EOP inmate was housed in administrative segregation.  His name appeared on the list of inmates with three or more RVRs during a 90-day period.  He was also included on the list of inmates with less than 50 percent attendance at offered groups.  He was placed in administrative segregation due to an alleged assault on officers that occurred when they attempted to move another inmate into his cell.

A Form 7388-B completed on 3/22/12 at the beginning of the inmate's administrative segregation stay indicated that he had apparently attended groups prior to administrative segregation placement.  The Form 7388-B did not indicate that he met any indicators for higher level of care referral consideration, which appeared to be accurate at that time.  A progress note dated 6/4/12 described the inmate as stable with continuation of a modified treatment plan that consisted of twice weekly clinical contacts and monthly IDTT meetings.  Progress notes indicated that he was being considered for referral to the 3CMS program at the time of the site visit.

On 6/8/12, the inmate was referred for a mental health assessment after he covered his cell window with a towel which he refused to remove for count.  The primary clinician subsequently observed the inmate lying on the floor face down.  The inmate reported auditory hallucinations at that time and presented with dysphoric mood.  Documentation by the primary clinician noted that the inmate was difficult to assess due to the inability to visualize the inmate's facial expression.  The clinician further indicated an inability to evaluate the inmate's thinking and thought processes due to minimal communication, but stated that there was no evidence of bizarre thought content.  Of concern was the fact that, despite the clinician's apparent inability to adequately assess the inmate, he only made recommendations for custody to continue to monitor the inmate and to bring him for evaluation if symptoms worsened.

Findings

This inmate reportedly attended group therapy prior to his transfer to administrative segregation.  He assaulted custody officers when they attempted to provide him with a cellmate, resulting in administrative segregation placement.  The inmate was reportedly stable prior to the referral on 6/8/12, and his presentation at that time was significantly different from previous clinical presentations.  The clinician was unable to perform an adequate evaluation at that time, and documentation suggested that no significant intervention occurred other than to inform custody to rerefer the inmate if further deterioration was evident.  It was unclear whether the inmate received required additional care after that date.

The Form 7388-B completed at the beginning of administrative segregation placement was completed appropriately and provided adequate explanation of non-referral to a higher level of care.  The documentation of clinical follow-up after the 6/8/12 referral was insufficient.

EXHIBIT E
California State Prison, Solano (CSP/Solano)
May 1, 2012 – May 3, 2012

**Inmate A**

According to the DSH log, which listed an incorrect CDCR number, this inmate was housed in the MHCB on 11/1/11 when he was noted to have met indicators one through four for higher level of care referral consideration.  The medical record indicated that he had been admitted to the MHCB on 10/31/11.  Documentation further indicated that he had at least three MHCB placements during a six-month period.

Based on a mental health evaluation completed on 11/21/11, the inmate was a poor historian.  He reported having no siblings, but also stated having a brother with Schizophrenia with a history of incarceration.  He was prescribed Vistaril and Celexa.  He was provided with diagnoses of Adjustment Disorder with depressed mood and Antisocial Personality Disorder.

The admission evaluation indicated that the inmate was admitted to the MHCB three times during the preceding two months, but the admissions were due to his concern regarding a pending transfer.  The evaluation also noted that he reported experiencing auditory hallucinations with sleep and appetite disturbance, but demonstrated no visible symptoms, leading to speculation that he was attempting to avoid transfer.  Nursing staff reported that he made superficial cuts to his inner arms and wrists.  Although staff stressed the inmate's secondary gain and malingering, there was no plan to actually address the described behaviors.

<u>Findings</u>

The inmate was seen timely while housed in the MHCB, but that care did not properly address his primary issues.  Staff did not appropriately treat the underlying cause of his frequent MHCB placements.  The decision not to refer him to DSH appeared to be clinically appropriate at the time of review.

**Inmate B**

According to the DSH log, this inmate was hospitalized in the MHCB for his third admission on 12/18/11.  Reviewed documentation indicated that at least one clinician recommended referral to a higher level of care.  However, the inmate was retained in the MHCB with plans for a reassessment at the subsequent IDTT meeting.

The inmate was provided with diagnoses of Schizoaffective Disorder, bipolar type and Polysubstance Dependence.  He was discharged from the MHCB on 12/27/11.  During the hospitalization, he was prescribed Haldol Decanoate 100 mg intramuscular injection every four weeks, Haldol, and Depakote.  He indicated experiencing suicidal and homicidal ideation and psychotic symptoms due to stress that he experienced from staff and other inmates.  His psychotic symptoms began at age 19 and he had two prior psychiatric hospitalizations, but further information was not provided.  Inpatient record information indicated that the providers disagreed clinically about the inmate's presentation.  His clinical presentation also differed dramatically from relative stability to severe symptomatology.

The inmate reportedly stabilized during his MHCB stay; progress notes, Form 7388-Bs, and treatment plans reflected this improvement.  The MHCB treatment team initially had difficulty regarding cohesive diagnostic clarification and treatment planning for him, but these issues were eventually resolved.

Findings

This inmate was seen in accordance with Program Guide timeline requirements.  However, the treatment team did not appear to communicate well with one another and initially this may have negatively impacted the inmate's care.  MHCB supervisory staff should have closely monitored the treatment team to ensure that clinical differences were appropriately resolved without negatively impacting treatment.

**Inmate C**

This case was selected for review from the DSH non-referral log.  The inmate was transferred to the MHCB at CSP/Solano from CSP/LAC.  The non-referral log indicated that he met indicators three and five.  He also reportedly had sixteen prior DSH hospitalizations and a trial of treatment with Clozaril without significant improvement.  The IDTT decided not to refer him to DSH as he reportedly was programming well at the EOP level of care despite the repeated MHCB placements.

The inmate was admitted to the MHCB on 9/8/11.  He was provided with a diagnosis of Mood Disorder NOS.  Differential diagnoses of Schizophrenia, Antisocial Personality Disorder, and Borderline Personality Disorder were also under consideration.  He had an active Keyhea order due to dangerousness to self.  He was prescribed Effexor XR, Thorazine, Lithium, and Artane.  On 9/15/11, a clinician (illegible signature) indicated a belief that the inmate should receive a diagnosis of Personality Disorder with Borderline Features and that no mental health intervention was indicated.

The inmate reportedly had an extensive history of mental health treatment at the EOP level of care and cutting behaviors.  However, evaluations determined that he presented with a low risk of suicide as he had stated to clinicians "I'm a cutter, not a suicide risk."  He was further described as extremely violent toward others, with lability, impulsivity, and paranoia.  He reported being harassed and mocked by black inmates, with resulting aggressive behavior.

Document review contradicted the determination that he presented with low suicide risk and indicated the presence of a major mental illness.  According to the treatment plan dated 9/15/11, at the time of MHCB admission, the inmate smeared blood, urine, and feces, and engaged in self-mutilating (no further descriptors were provided) and assaultive behavior.  Treatment plan narrative suggested that he was consulted about his desire for DSH transfer and that his wishes were given greater importance than the clinical rationale for referral.  He was transferred from the MHCB at CSP/LAC to the MHCB at CSP/Solano with plans to return to CSP/LAC with a recommendation for EOP level of care.

Findings

This inmate appeared to be an appropriate candidate for DSH referral, but was not referred. It appeared that CSP/Solano staff did not appropriately diagnose him when he was housed in the MHCB. Staff also did not develop an appropriate treatment plan to address his serious mental health needs. The inmate clearly met multiple DSH referral consideration indicators. Although he stated that he preferred not to go to DSH, documentation indicated that he was clearly psychotic with significant mental health issues. Of note, he was later transferred to DSH from CSP/LAC for hospitalization and stabilization, although this transfer occurred after the review period.

**Inmate D**

This inmate was selected for review from the DSH non-referral log because he had three or more MHCB hospitalizations within six months, but was not referred because he was considered to be functioning at baseline at the EOP level of care. He was on a Keyhea order for involuntary medications. He was prescribed Depakote, Zyprexa (Zydis), Effexor XR, and Artane. He was admitted to the MHCB on 12/21/11. He was provided with a diagnosis of Schizoaffective Disorder, depressed type. The inmate had a long history of mental illness. He reported hallucinations and exhibited labile mood.

According to a discharge summary dated 12/29/11, the inmate had improved and was to be discharged to the EOP level of care despite his desire for DSH transfer. The discharge summary further indicated that he had multiple state hospital admissions for psychotic symptoms, mania, and multiple suicide attempts. The discharge summary did not provide documentation supporting the assertion of clinical improvement; the clinical team did not provide information to justify that he was functioning at his clinical baseline or why he would not benefit from DSH treatment. No special interventions were provided to modify the treatment plan to improve the inmate's level of functioning. He was returned to the sending facility at the EOP level of care, noting that he was functioning at his baseline.

It appeared that the mental health care that was provided during MHCB hospitalization focused primarily on medication management and social isolation. However, the content of some clinical contacts focused on the lengthy DSH waitlist to dissuade the inmate from his desire for DSH transfer.

<u>Findings</u>

This inmate met indicators for DSH referral consideration, and it appeared that he should have been referred. Documentation did not support the determination that he was functioning at his baseline and there was little documentation indicating the therapeutic value of clinical contacts. The mental health care provided to this inmate was inadequate in light of his symptomatology.

**Inmate E**

This inmate was selected for review from the DSH non-referral log, which identified him as meeting indicator five for higher level of care referral consideration. The most recent MHCB

admission occurred on 2/27/12 when he was provided with diagnoses of Adjustment Disorder and Schizophrenia.  The diagnosis was later modified to Schizophrenia paranoid type.

The inmate was admitted to the MHCB due to suicidal ideation after a visit with a TCMP representative.  He was reportedly upset due to the lack of support and resources available to him following release from prison.  He also reported anxiety regarding his safety in the general population prior to his release from prison.  Clinical staff recommended to the inmate that he request administrative segregation placement for safety reasons until his release.  It was unclear why mental health staff did not communicate the inmate's concerns directly to custody staff.  It was also unclear why DSH was not considered as a possible referral placement.  Review of the Form 7388-B indicated that it appeared that DSH transfer was considered, but no referral was made because "[inmate] is close to his release date."  The inmate exhibited significant anxiety as to his upcoming prison release as well as persistent, chronic psychotic symptoms. Documentation indicated that these chronic symptoms were exacerbated by acute anxiety.

Findings

This inmate was not appropriately considered for DSH referral and the justification for non-referral was inadequate.  Mental health staff did not properly address his initial anxiety and safety concerns.  He required intensive pre-release planning services due to the lack of any external resources and high anxiety; mental health staff only partially addressed this through the level of care change to the EOP.  The inmate's high risk of self-harm was not appropriately addressed and he remained at risk for self-harm.  The mental health care provided to him was inadequate.

## Inmate F

This inmate was admitted to the MHCB on 2/10/12 and was discharged on 2/15/12 with a diagnosis of Psychotic Disorder NOS.  He was prescribed Vistaril and Paxil.  An admission and discharge suicide risk evaluation and an initial intake evaluation were completed timely.

The inmate was admitted to the MHCB due to auditory and tactile hallucinations that included seeing a snake on his leg.  At the time of MHCB admission, he was provided with diagnoses of Polysubstance Dependence and Personality Disorder NOS, with a possible diagnosis of Adjustment Disorder with depressed mood.  The evaluation indicated that he was treated with multiple pain medications to address several medical conditions, including cellulitis, which caused him significant distress and anxiety.  Documentation indicated that mental health staff believed that his original symptoms were substance-induced, but there was no further explanation as to this assumption's rationale.  IDTT progress notes were present for 2/13/12 and 2/15/12 with accompanying 7388 treatment plans.  The treatment team initially indicated that the inmate may have been malingering, but provided him with a diagnosis of Adjustment Disorder. Initial treatment plans were minimal in content in addressing his specific treatment needs.  There was documentation of Form 7388-B completion.  An initial suicide risk evaluation was completed on 2/11/12 and an additional evaluation was completed upon discharge on 2/15/12.

Findings

Although the inmate was seen in accordance with Program Guide requirements for timely contacts while housed in the MHCB, mental health treatment was inadequate.  There was a lack of documentation that the treatment team appropriately evaluated his mental status and appropriately assessed the possibility of substance-induced hallucinations.  At the time of MHCB discharge, his diagnosis was changed from Adjustment Disorder to Psychotic Disorder NOS.  However, there was a lack of documentation of appropriate assessment and clinical justification.  The inmate should have received a comprehensive evaluation with reassessment by the IDTT and a medical consultation to assist in the development of comprehensive, individualized treatment planning; this would resolve any diagnostic issues and determine the appropriate level of care.

## Inmate G

This inmate from WSP was housed in the MHCB at CSP/Solano.  He was provided with a diagnosis of Psychotic Disorder NOS.  He was prescribed Depakote, Risperdal, and Remeron.  He had a history of suicide ideation and a prior 2010 suicide attempt by hanging.

The inmate reported having a medical disability, which facility staff questioned.  He had several somatic delusions and the disability claim appeared to be part of that delusional system; despite this, he was referred to medical for follow-up.  Initial medical testing yielded negative results.  He reported hearing voices commanding him to hurt himself and had recently placed his head in the toilet in an attempt to drown himself, resulting in MHCB hospitalization.  There was also documentation indicating that he had depression symptoms; he had recently received a new prison sentence that added six years to his existing sentence.

The inmate was evaluated for the need for mechanical restraints in the MHCB.  Although the IDTT was supposed to make this determination, clinicians "voted" on their need.  Their consensus was placed on a chrono to the correctional counselor.  The correctional counselor then provided an opinion and submitted the documentation to the health care sergeant, who would make the final determination.  IDTT staff would then be informed of the final decision as to the need for mechanical restraints.

<u>Findings</u>

The psychiatrist, primary clinician, and IDTT timely saw the inmate.  Medical record documentation adequately addressed clinical issues.  However, MHCB staff was not compliant with completion of an initial suicide risk evaluation.

## Inmate H

The inmate was admitted to the MHCB at CSP/Solano from WSP due to suicidal ideation.  He reportedly had difficulties with another inmate.  He denied that suicidal ideation precipitated his transfer to CSP/Solano.

The inmate was provided with a diagnosis of Adjustment Disorder.  He was initially prescribed Risperdal, an antipsychotic, at 4 mg/day, but this medication was eventually discontinued during

his MHCB stay.  He reported memory impairment, but was only in his 40s.  He also reported extensive alcohol use and possible head injury.  The primary clinician indicated that group therapy was not appropriate because the inmate was a "con man."  Staff described him as engaging and cooperative, although he spent much of his time in the MHCB sleeping.

The inmate had an extensive substance abuse history with intermittent suicidal ideation, but denied receiving mental health treatment prior to incarceration.  He expressed safety concerns and staff discussed SNY request possibilities with him.  The IDTT maintained him in the MHCB while referring him for a dementia assessment.

Findings

The psychiatrist and primary clinician timely saw the inmate.  The initial evaluation, daily contacts, and initial IDTT meeting were all completed timely.  There was no documentation of completion of an initial suicide risk evaluation.  Although the mental health care provided for him appeared to be appropriate, it did not appear that he required continued MHCB housing pending further medical evaluation.

EXHIBIT F
San Quentin State Prison (SQ)
August 6, 2012 – August 8, 2012

**Inmate A**

This EOP inmate was housed in administrative segregation.  A 12/8/11 mental health treatment plan was reviewed; it contained clinically useful information.  The inmate had a history of prior DSH treatment for a psychotic disorder and a coexisting developmental disability.  There was a history of numerous CTC admissions due to suicide threats.  He was on the wait list for transfer to DSH intermediate care.  Appropriate staff attended the IDTT.  A Form 7388-B was completed.

A 1/27/12 DSH discharge summary was reviewed.  During this hospitalization, the inmate was not treated with psychotropic medications due to his refusal to sign consent for treatment; he also did not meet criteria for a Keyhea order.  There was no documentation that he had major behavioral problems except for one episode of indecent exposure on 1/13/12.  During his IDTT on the tenth day after admission, he remained with disorganization and rambling speech.  Because he was paroling on 2/3/12, administration advised the treatment team to initiate his discharge process on 1/27/12.

The inmate was returned to the San Quentin CTC while awaiting a court appearance on 2/13/12.  He was to be transferred back to DSH following this hearing, which occurred in mid-February 2012.  He was again admitted to the CTC on or about 2/13/12 from DSH for the purpose of another court hearing.  He was subsequently transferred back to DSH at SVSP on 2/16/12.

A 4/5/12 DSH discharge summary was reviewed.  It indicated that the inmate consistently refused to participate in any aspect of treatment.  It was determined that he did not require 24-hour nursing care.  He was not prescribed psychotropic medications.  Discharge diagnoses included Polysubstance Dependence and Antisocial Personality Disorder; a provisional diagnosis of Substance Induced Mood Disorder was also provided.

The inmate was again treated in the CTC from 4/25/12 to 5/1/12.  The treatment plan indicated that he had been returned to SQ for a court hearing on 4/26/12.  The plan was for discharge back to intermediate care at SVSP.

A 6/19/12 CTC discharge summary indicated that he had been readmitted to the CTC on 5/21/12.  The plan was discharge him at the EOP level of care.  A 5/30/12 treatment plan indicated that he had returned to the SQ MHCB on 5/21/12 from DSH, where he was assessed to have received maximum benefit.

Findings

This inmate was receiving mental health treatment consistent with Program Guide requirements.

**Inmate B**

A 6/7/12 treatment plan indicated that the inmate arrived at SQ on 5/30/12; his last incarceration occurred in July 2011.  He was placed in administrative segregation as he had paroled from

administrative segregation in 2011.  He was determined to require mental health services at the EOP level of care.

The inmate was provided with diagnoses of Psychotic Disorder NOS, Polysubstance Dependence, and Personality Disorder NOS.  The Form 7388-B was completed.  Appropriate staff attended the IDTT.

There was documentation of mental health rounds in administrative segregation.  The psychiatrist saw him on 6/5/12, when a comprehensive initial assessment was completed.  Remeron was prescribed and Geodon was discontinued.  The plan outlined included follow-up with a psychiatrist in four weeks.  There was also documentation of weekly primary clinician contacts and group therapy participation.

<u>Findings</u>

This inmate was receiving mental health treatment consistent with Program Guide requirements.

**Inmate C**

This EOP inmate was housed in the administrative segregation unit.  A 12/7/11 treatment plan was reviewed; it indicated that he had recently returned from DSH and reported auditory hallucinations that commanded him to hurt himself.  He had returned from DSH approximately 12 weeks earlier.  He was provided with diagnoses of Psychotic Disorder NOS, PTSD, and Amphetamine Dependence.  Appropriate staff attended the IDTT, but it was unclear whether the inmate was in attendance.  It was determined that he would receive mental health services at the EOP level of care.  The Form 7388-B was completed.

Another treatment plan was completed on 1/4/12.  This amended treatment plan was apparently precipitated by the inmate's desire to no longer receive EOP treatment.  He had discontinued his medications one month earlier.  Although treatment planning was unclear, it appeared that the plan indicated that he would remain in the EOP with the goal of transferring to the 3CMS program.  The Form 7388-B was again completed and it was determined that he met no indicators for DSH referral consideration.

A 2/8/12 treatment plan was reviewed; it included the plan for the inmate to actively participate in three weekly groups.  Monthly treatment plans were subsequently documented.

Primary clinician progress notes were located in the eUHR beginning on 3/29/12.  Frequent clinical contacts with the primary clinician were documented for April and May 2012.  There was also documentation of mental health rounds.

The inmate received a 115 RVR on 4/27/12 for refusing to attend a scheduled appointment.  A 115X mental health evaluation was subsequently performed; it concluded that mitigation due to mental health reasons was not recommended.

On 5/14/12, the inmate refused to attend group therapy.  He was seen at cell front and agreed to attend the next scheduled group.  However, he again refused to attend the next scheduled group.  He attended a 5/21/12 scheduled group therapy.  Subsequently, he periodically refused other treatment.

Findings

This inmate was very difficult.  The IDTT frequently reviewed his care related to his treatment refusals as per Program Guide requirements.  The inmate's treatment was consistent with Program Guide requirements. The Form 7388-B was also consistently completed in conjunction with IDTT meetings.

**Inmate D**

This 3CMS inmate was housed in administrative segregation.  He was evaluated on 1/11/12 for suicide risk evaluation purposes.  He was provided with a diagnosis of Adjustment Disorder; a provisional diagnosis of Psychotic Disorder was also included.  He was next evaluated on 1/26/12 in an office setting.  He was assessed as stable and motivated for change.  Based on the documentation, his level of care was unclear.

Primary clinician progress notes dated 2/8/12 and 2/10/12 indicated little change.  On 2/15/12, it was noted that he was receiving mental health services at the 3CMS level of care.  He was expecting to parole in ten weeks.  He was provided with diagnoses of ADHD, Depressive Disorder NOS, and Exhibitionism.  The psychiatrist prescribed Strattera.

On 3/6/12, it appeared that he had experienced clinical improvement.  The plan outlined was to continue current medications with follow-up in eight weeks.  The psychiatrist added Celexa on 4/25/12.  A 4/30/12 note indicated that he was at baseline.  He was seen for pre-release purposes on 5/3/12.

The psychiatrist evaluated the inmate for follow-up on 5/17/12; the plan was to discontinue Celexa in eight weeks if he remained at SQ.

Findings

This inmate was receiving mental health services consistent with Program Guide requirements.

**Inmate E**

This 3CMS inmate was housed in administrative segregation.  A 1/10/12 treatment plan indicated that he was placed in the 3CMS program following a self-referral for self-reported anxiety and depression; he was provided with a diagnosis of Adjustment Disorder.  A Form 7388-B was completed.  The treatment plan was clinically adequate and was reviewed on 4/5/12, 6/28/12, and 7/26/12.  Appropriate staff members and the inmate were present at the IDTT.

The primary clinician consistently followed the inmate.  He was also involved in group therapy on a weekly basis.  Mental health rounds were documented.

Findings

This inmate was receiving mental health services consistent with Program Guide requirements.

**Inmate F**

This 3CMS inmate was housed in the Adjustment Center.  A 1/11/12 treatment plan indicated a diagnosis of Anxiety Disorder NOS.  Interventions were described as "anxiety management."  The Form 7388-B was not located in the medical record.  The psychiatrist was not present at the IDTT meeting.

An initial psychiatric evaluation took place on 1/30/12.  Prozac was prescribed for symptoms of PTSD and Vistaril was prescribed for insomnia and anxiety.  A psychiatric note on the following day indicated that the inmate had decided not to take Prozac, but was willing to continue Vistaril.  A 2/10/12 psychiatry note documented that the inmate had little benefit from treatment with Vistaril 50 mg/day; this medication was increased to 100 mg/day.

Documentation of mental health rounds was present in the UHR.  Cell-front visits occurred on 3/7/12 and 5/15/12.  The psychiatrist noted on 5/10/12 that the inmate remained compliant with Vistaril.  Vistaril was increased to 150 mg/day.

The inmate was transferred to the Adjustment Center on 5/18/12.  The recreation therapist saw him at cell front.  The primary clinician saw him at cell front on 5/19/12; the inmate declined a confidential office visit.  The psychiatrist saw him again on 5/22/12, when Vistaril was discontinued and Remeron was started.  The treatment plan dated 5/22/12 was reviewed.  There was no change in the interventions listed.  The Form 7388-B was completed.

A 115 X evaluation was completed on 5/31/12.  It indicated that mental illness did not contribute to the behavior that led to the RVR.

Findings

This inmate received timely contacts by the psychiatrist and primary clinician consistent with Program Guide requirements.  The treatment plan was sparse from the perspective of interventions and did not accurately reflect his current treatment, which included the use of psychotropic medications.  The psychiatrist was not part of the IDTT process.

**Inmate G**

This 3CMS inmate was housed in the Adjustment Center.  He reported submitting a self-referral and the clinician saw him; the clinician subsequently initiated an RVR based on the inmate's comments about wanting to harm a correctional officer.

The inmate's medical record was reviewed.  A 5/22/12 treatment plan listed his problems as "depression, angry/hostile and hypomania."  The treatment plan's intervention section was blank. He was provided with provisional diagnoses of Mood Disorder NOS and Narcissistic Personality Disorder.  The psychiatrist apparently did not attend the IDTT meeting.  The Form 7388-B was completed.

On 1/11/12, the primary clinician saw the inmate on the East Block.  The session focused on the recent death of the inmate's father.  The theme of the 2/2/12 session was similar.  On 2/24/12, he discussed his irritability related to the location of his current cell; it was next to an air blower.

A psychiatrist evaluated the inmate on 3/5/12, when he discussed his dissatisfaction with a variety of environmental concerns.  He declined treatment with psychotropic medications. On 3/15/12, he reported to his primary clinician concerns about a RVR 115 violation and his sleep disturbance.  On 3/20/12, he was again seen at cell front when he complained about environmental issues and reported harassment by correctional officers.

The primary clinician saw the inmate on 4/6/12, 4/14/12, and 4/21/12.  A 4/11/12 115X assessment related to a charge of battery on staff indicated no mental health mitigating factors. The psychiatrist saw him on 4/24/12, when he expressed concerns regarding the recent 115X evaluation.

A 4/30/12 progress note indicated that a clinician wrote an RVR and followed the duty to warn protocol after confronting the inmate with his healthcare services request that included the following statement:  "I fear I will not tolerate the latter again and will endanger my own life by doing all I can to injure him if he persists."  The inmate named the intended victim.

There was documentation of mental health rounds in the Adjustment Center.  On 5/8/12, the inmate talked with the primary clinician about the previous RVR written by the primary clinician.  On 5/14/12, he was evaluated related to the 4/28/12 RVR for threats to a peace officer. No mental illness-related mitigating circumstances were identified.

Another 115X assessment was completed on 5/31/12 related to an RVR issued on 5/12/12. Again, mitigating factors were not identified.

Findings

It was inappropriate for the mental health clinician to write an RVR.  This issue was discussed with administrative staff.

**Inmate H**

This 3CMS inmate was housed in general population.  The most recent treatment plan was dated 8/26/11.  A primary clinician note dated 12/20/11 described the inmate as high functioning with a history of significant Alcohol Dependence.  He was also provided with a diagnosis of Dysthymic Disorder in partial remission.

A psychiatric progress note dated 12/29/11 documented that Remeron was continued and a follow-up appointment was scheduled for 3/8/12. At the follow-up appointment, it appeared that the inmate was stable on prescribed medications. Follow-up was scheduled for six weeks. A psychiatric follow-up note indicated that he remained stable on 4/20/12. Primary clinician contacts also occurred on 1/18/12, 3/5/12, and 4/26/12.

Findings

This inmate did not have a current treatment plan. Otherwise, his mental health treatment was consistent with Program Guide requirements.

**Inmate I**

This 3CMS inmate was housed in general population. A 12/13/11 treatment plan described him as presenting with symptoms consistent with a diagnosis of Major Depressive Disorder, recurrent, in partial remission. Interventions included individual contacts for depression. A psychiatrist did not attend the IDTT. The Form 7388-B was completed. Clinical contacts with the primary clinician occurred on 12/3/11, 12/21/11, and 12/13/11. He was housed in administrative segregation at that time. There was also documentation of daily mental health rounds.

The primary clinician did not see the inmate again until 2/14/12, despite his continued housing in administrative segregation. Subsequent primary clinician progress notes were dated 3/15/12, 4/30/12, and 5/21/12. It appeared that the inmate had been transferred to general population by March 2012.

Findings

It was unclear from review of the records when the inmate was released from administrative segregation to general population housing. After transfer to general population, he received mental health treatment consistent with Program Guide requirements.

**Inmate J**

This 3CMS inmate was housed in general population. His treatment plan was dated 5/17/12. He had a history of taking psychotropic medication since 1995 for depression, anxiety, and auditory hallucinations. He was prescribed Haldol, Cogentin, and Remeron. He was provided with diagnoses of Mood Disorder NOS and Polysubstance Dependence. Appropriate staff members were present at the IDTT.

There was documentation of consistent primary clinician clinical contacts during the review period. The psychiatrist saw him on 3/21/12 and follow-up was scheduled for 5/2/12. His medications were continued. Little change was noted during the follow-up appointment.

Findings

This inmate was receiving mental health treatment consistent with Program Guide requirements.

**Inmate K**

This case was selected for review because the inmate was identified on the DSH non-referral log despite meeting several indicators for DSH referral consideration. He was a new arrival to SQ who was directly admitted to the MHCB due to psychosis with agitation. He was provided with a diagnosis of Psychotic Disorder NOS. He was admitted on 7/6/12 and was discharged on 7/12/12. He was reportedly transferred to SQ for safety reasons from the Marin County jail after head-butting his lawyer in court. He was initially housed in the Adjustment Center, but his agitated behavior resulted in custody involvement and ultimate referral to the TTA.

The inmate was well-known to county jail staff; he had a violent history believed to be secondary to extensive drug use. While housed in the MHCB, his speech was described as tangential and rambling. The initial rationale for DSH non-referral was that he had only recently arrived; alternative interventions were not well-articulated. He was discharged at the EOP level of care. He was readmitted to the MHCB, but the record of this treatment was not scanned into the eUHR. Consequently, the dates of hospitalization were unknown. The inmate had no current treatment plan and his level of care was unclear.

Findings

This inmate was appropriately not referred to DSH. However, he had two MHCB admissions and required close monitoring for possible DSH referral in the future if he did not stabilize. He also required a current treatment plan and the IDTT needed to clarify his level of care.

**Inmate L**

This inmate was selected for review because he was identified as a participant in the Specialized Care for the Condemned program and was also identified on the DSH non-referral log. He met indicator seven on the Form 7388-B, but was not referred to DSH reportedly because he participated in cell-front therapy, was adjusting well to medications, and was admitted to the Specialized Care program.

A petition for involuntary medication was initiated at the time of MHCB admission on 3/19/12 due to dangerousness to others. He was provided with a diagnosis of Schizoaffective Disorder bipolar type. He had a history of a prior DSH APP hospitalization on at least one occasion and forced medication orders. He also had a lengthy history of violence and aggression associated with paranoid delusional thinking. He was placed on a forced medication order; he was prescribed Zydis, Ativan, Depakote, and Benadryl, with orders for Thorazine as needed in the event of medication refusal.

An MHCB treatment plan dated 4/10/12 stated that the IDTT noted that the inmate had been functioning slightly better since initiation of his Keyhea order. However, it also stated that he was refusing psychotropic medications and did not meet criteria for a Keyhea order. These latter statements were clearly erroneous. The 7388 treatment plan dated 6/7/12 noted that he exhibited

delusional and paranoid thinking as the only problems that were the focus of treatment; the only intervention noted was medication management. The treatment plan also indicated that he did not meet criteria for a Keyhea order despite having an active forced medication order (PC 2602). Obviously, the treatment plan contained errors and was inadequate in light of the severity of symptoms that he expressed, placement in the Specialized Care for the Condemned program, and placement in the OHU for 24-hour nursing and as a transition back to the housing unit. It should be noted that the treatment plan did not note any reference to admission to the Specialized Care for the Condemned program.

The Form 7388-B dated 6/7/12 noted that the inmate met indicator seven regarding DSH referral consideration. The provided non-referral rationale was his participation in cell-front recreation therapy, his adjustment to medication, and the IDTT belief that moving him to a treatment facility would disrupt clinical progress made to date. While some clinical progress had occurred, documentation of such was minimal and staff did not document how providing a more treatment-intensive therapeutic environment would have been contraindicated. The treatment alternatives provided increased clinical contact and groups, but other documentation indicated that the inmate refused these services; therefore, it was unclear how increasing refused services would aid in stabilizing him.

Findings

This inmate should have been referred for inpatient care. He also required a new treatment plan that was appropriately completed and individualized.

**Inmate M**

This case was selected for review because the inmate was identified as a participant in the Specialized Care for the Condemned program and was also on the DSH non-referral logs for May and June 2012 as he met indicator seven. He was not referred because he was viewed as stable and progressing with participation in the Specialized Care program; it was believed that transfer would be detrimental to him.

The 7388 treatment plan dated 5/31/12 did not document the inmate's participation in treatment groups; it did, however, indicate that he was receiving care from the Specialized Care treatment team. The inmate refused group treatment and this issue was not addressed in the treatment plan. He reportedly consistently refused office visits with mental health staff.

The inmate was provided with diagnoses of Schizoaffective Disorder depressed type, Polysubstance Dependence, and Antisocial Personality Disorder. He was prescribed Haldol Decanoate 150 mg intramuscular injections monthly. He was described as paranoid, with selective mutism and probable auditory hallucinations. He reportedly exhibited bizarre speech content during May 2012 and only tolerated brief individual contacts with clinicians. According to that Form 7388-B, he was not referred to DSH as he had begun to participate in cell-front recreation therapy and the IDTT indicated that transferring him would disrupt the clinical progress made to date. The medical record, however, did not provide documentation in support of this substantial clinical progress to justify non-referral to the necessary level of care.

The Form 7388-B dated 6/25/12 noted that the inmate was functioning at baseline, but it was unclear how that was determined.  The non-referral rationale also noted that he had been moved to a new housing unit and reported feeling better.  Despite this, he continued to refuse out-of-cell contacts, but had increased participation at cell front with the recreation therapist.  The alternative interventions listed were primarily those that the inmate consistently refused; the IDTT indicated that they would attempt to engage him at cell front if he refused to leave his cell.  However, it did not appear that treatment modifications were made to improve his level of functioning.

The inmate's most recent treatment plan referenced a prior DSH admission.  Unfortunately, due to the nature of the eUHR, that record was unavailable.

The inmate had refused his medication in June 2012 and was placed in the Adjustment Center in July 2012 after spitting on a correctional officer.  At the time of the IDTT, the RVR was pending.  Apparently the entire building was searched by custody staff and the inmate was placed on the yard with other inmates.  Given his paranoia and reluctance to leave his cell, while on the yard he became agitated; he yelled at correctional officers, ultimately resulting in an altercation with them.  He reportedly spit on an officer and ultimately required restraint.  He later reported to clinical staff that he wanted to return to his cell because he was hot on the yard and was upset due to the close proximity to other inmates and the dogs that were brought onto the housing unit.  However, the staff noted that he seemed to be more engaged with mental health staff since his move to the Adjustment Center.

The inmate was often described as disorganized and was not always oriented to place.  He did not consistently understand the reason for his placement in the Adjustment Center.  He also indicated that he did not recall the incident that resulted in his RVR other than his complaint of feeling hot on the yard.  Clinical documentation suggested that there was minimal therapeutic care provided beyond brief cell-front recreation therapy contacts, wellness checks, and regular psychiatric medication evaluations.  He continued to exhibit severe negative symptoms which interfered with his ability to function in a correctional environment and resulted in disciplinary action.

Findings

This inmate would benefit from an inpatient level of care to improve his interpersonal functioning, increase his programming, and improve his ability to cope and maintain stability in a correctional setting.

**Inmate N**

This case was selected for review because the inmate had been identified as a participant in the Specialized Care for the Condemned program.  He was also identified on the DSH non-referral log as meeting indicator five, but was not referred because he was reportedly managing well on the unit.  On 5/7/12, the IDTT noted that he would be appropriate for referral to DSH intermediate care if that program accepted condemned inmates.

This transgendered inmate was provided with diagnoses of Major Depressive Disorder, severe with psychotic features, PTSD, and Borderline Personality Disorder.  The treatment plan indicated that he would be placed in a dialectic behavioral therapy (DBT) group for self-injurious behaviors.  He was prescribed Abilify, Remeron, Thorazine, and Effexor.  He reportedly had prior DSH admissions.  The Form 7388-B non-referral rationale did not directly address the positive indicator (multiple MHCB placements), while the alternative interventions essentially restated the non-referral rationale.  The IDTT did not see the inmate when he was discharged from the MHCB; he was not seen by the IDTT until 7/30/12.  Progress notes did not provide much information regarding his level of functioning.  However, he appeared to be appropriately treated at the EOP level of care.

Findings

This inmate did not appear to require DSH inpatient care despite multiple MHCB admissions.

**Inmate O**

This case was selected for review because the inmate was identified as a participant in the Specialized Care for the Condemned program.  Based on the eUHR, he was receiving mental health services at the 3CMS level of care and had a recent MHCB admission that occurred from 5/18/12 to 5/21/12.  The MHCB admission resulted from his increased paranoid delusional thinking that officers were plotting to kill him.  He was provided with diagnoses of Schizophrenia paranoid type, PTSD, and Antisocial Personality Disorder.

The current treatment plan was not located in the medical record.  The only treatment plan present occurred during his MHCB hospitalization.  It appeared that he stabilized with less paranoia during early to mid-June 2012, but by the end of June 2012 those delusional beliefs had increased.  As a result of the increase in delusional thinking, the inmate requested increased contact with his primary clinician.  He continued to demonstrate high levels of paranoia that appeared to worsen.

Findings

It was unclear why this inmate remained in the 3CMS program, but was enrolled in the Specialized Care for the Condemned program.  He most likely required mental health services at the EOP level of care and referral to an inpatient ICF program.  Treatment planning should have been amended to specifically address the inmate's worsening paranoid symptoms.

EXHIBIT G
San Quentin State Prison Specialized Condemned Care Program (SQ)
12/4/12 -- 12/5/12

**Inmate A**

*December 2010 review*

A July 1987 psychiatric chrono indicated that this 26-year-old first-time offender had been convicted of burglary and was later convicted of murder.

The inmate's first Keyhea order was issued in 1996 on the basis of grave disability. It was renewed from 1997 to 1999 and expired in December 2000. During June 2001, he stopped taking his medications, which eventually resulted in a new Keyhea order being granted in March 2002 based on grave disability. This order was renewed annually since that time. He was noted to be extremely dangerous when not adherent to prescribed medications.

An 10/24/03 psychology follow-up note documented the following:

"Cellfront. Inmate refused office visit. The visit was typical of many others. With a friendly smile, inmate says everything is fine and he has nothing to talk to me about. He has no complaints, mental health or otherwise. He sleeps or sits on his bunk all day, essentially doing nothing. He refuses all programming, but does keep himself and his cell reasonably clean.

Plan: weekly followed by case manager. Continue to offer groups and other EOP programming as available."

Other progress notes during 2003 indicated that the inmate reported working for the CIA. His working diagnosis was Schizophrenia, chronic, paranoid type. His presentation was consistent with progress notes written in 2002, when he was admitted to DSH.

The clinical summary from the last Form 7388 included the following information:

"47-year-old single white man sentenced to death after murdering three boys. Has an extensive history of delusions of grandiosity and mechanization of self. His sanity has been evaluated multiple times with varying results. His delusions have remained highly stable for years and are central in the functioning of his life. He is only capable superficial interaction before lapsing into delusional material. In recent months [his] head is bent forward because 'computers are making that happen.' "

A 5/27/10 progress note indicated that an application for a trial of Clozaril was being initiated.

A 6/10/10 progress note indicated that he was "barely able to say a single sentence without lapsing into pronounced, severely delusional material. He generally made so little sense that it was incoherent. He talked on and on about the computers controlling everything about him, including seemingly unrelated items."

A 8/20/10 recreational therapy note included the following information:

"Of the last 20 weekly visits, he has only come out for five.  The typical interaction with him is generally quick, and after many years he seems to know the routine questions and expected responses.  Inmate has been closely observed by the RT to place his fingers in a vertical or a "tweaked" position, making eye contact before declaring that he has an incoming telephone call or his computer is not right.  This appears to his way of saying he is no longer interested and or can't tolerate any further discussion… ."

On 11/9/10, the psychiatrist provided a diagnosis of Schizophrenia, chronic, paranoid type.  The inmate was prescribed Lamictal and Abilify.  Fixed delusions were noted.

A 11/19/10 weekly group summary note included the following information:

"The cell was not malodorous but in disarray with papers and blanket strewn over the floor and around the room… .  He reported poor sleep which is a symptom he reports frequently and usually believes is related to his delusional system, i.e. computer chips in his head, automaton-like experiences that persecute him in the night… .  He said he saw Dr. Street everyday but was still not sure to what extent he wanted to participate in the program by saying, 'I will still need some time to think about it.'"

The inmate continued to receive medication via a Keyhea order.  A 11/15/10 progress note indicated that he had chronically refused group therapy.

The inmate was interviewed during the afternoon of 12/8/10.  He was grossly psychotic as characterized by delusional thinking and disorientation.  His presentation was very consistent with information summarized above.

Findings

The inmate was in need of ICF level of mental health care.

*August 2012 review*

This case was selected for review because the inmate was reportedly part of the Specialized Care for the Condemned program at SQ; however, when his most recent treatment plan (7/31/12) was reviewed, there was no reference to the Specialized Care program for him.  He was described as experiencing bizarre delusions that resulted in behaviors that disrupted the unit, but reportedly attended music group twice weekly, as well as therapeutic yard.  He was on a forced medication order.

The most current treatment plan referred the reader to a treatment plan dated 12/14/12 for the problem list and interventions, but no such care plan was located in the eUHR.  He was described as having a blunted affect with dysphoric mood; he remained with delusional beliefs about the government and communication with his "computer."

The inmate was prescribed Risperdal M-tabs, Lamictal, and Artane.  He was provided with a diagnosis of Schizophrenia, disorganized type, provisional.  There was no associated Form 7388-B with the 7/31/12 treatment plan.  A subsequent Form 7388-B was completed that indicated that

he met several indicators for DSH referral consideration. Non-referral rationales were provided and included references to inclusion in the Specialized Care for the Condemned program. It appeared that he received more cell-front contact from staff in the Specialized Care program that encouraged him to participate in treatment and educated him as to the benefits of treatment. The inmate reportedly increased his attendance in treatment groups as a result, but the level of participation was not quantified and remained below 50 percent.

The 12/14/11 treatment plan did not have an associated Form 7388-B and did not include an actual treatment plan. None of the treatment plans (7388) directly referred to participation in the Specialized Care program, specific psychiatric symptoms to be addressed, or specific interventions.

Findings

This inmate appeared appropriate for referral to an inpatient facility and should have been referred. There were multiple missing Form 7388-B checklists for higher level of care referral consideration. In addition, several Form 7388-Bs had not been completed.

*December 2012 review*

A 11/28/12 progress note indicated that the inmate was receiving mental health services at the EOP level of care. He continued to demonstrate delusional beliefs. Conversely, a 11/26/12 note indicated that he was receiving services at the 3CMS level of care. A 11/26/12 psychiatric note provided a very useful clinical summary of the inmate, who was receiving Risperdal via a Keyhea order in addition to Artane and Lamictal. He was unwilling to comply with laboratory testing needed for treatment with Clozaril.

Somatic delusional thinking was noted on 11/20/12 that was apparently related to his belief that computer chips had damaged his spine.

The most recent treatment plan was dated 10/8/12. He was classified as a Grade A inmate. He reportedly often left his cell for confidential weekly individual clinical contacts and regularly met with a recreation therapist for music therapy. However, he had poor insight regarding his mental illness. He frequently used a wheelchair due to his unsteady gait that was reportedly, in part, related to kyphosis. He had frequent clinical contacts with his treatment team that were well-documented in the medical record.

Findings

The inmate was appropriate for a level of mental health care that was more intensive than EOP. His treatment team was essentially providing him with the best treatment available given the limited resources at SQ; this was especially true in the context of the current lack of a specialized SQ housing unit that would be close to an ICF level of care. The inmate would benefit from the equivalent of an ICF level of mental health care.

**Inmate B**

*December 2010 review*

This inmate chronically refused all psychiatric treatment.  Review of progress notes indicated that his general weekly interaction with mental health staff included him yelling for the clinician to leave his cell front as he did not believe that he was a psychiatric patient.

A 2/4/04 California Supreme Court decision relevant to the inmate's case was reviewed.  The facts included the following: during 1987, the inmate was noted to be very paranoid while housed in the Los Angeles County jail.  At that time, he was provided with a diagnosis of Schizophrenia paranoid type, Antisocial Personality Disorder, and Polysubstance Abuse.  Similar diagnoses were provided at ASH where he was hospitalized from June 1989 thru March 1990. When treated with Haldol, he became "less attentive" to the "very sick violent concepts that he had," with a modest remission of the more significant psychotic symptoms.  Upon discontinuation of Haldol for a trial period, he attacked another patient.  A neurological examination identified no organic problems, despite suspicion that he had a brain cyst.  In January 1990, he was found to be competent to stand trial; this occurred after treatment with psychotropic medications.  This order included reference to a psychiatric examination that found no evidence that he had a diagnosis of Schizophrenia.

An inpatient discharge summary from the Neumiller Infirmary was reviewed.  The inmate was admitted on 4/28/99 and discharged on 5/4/99.  He had presented with disorganization and hallucinations for eight to nine years.  While housed in the Adjustment Center, he submitted a note requesting help.  His inpatient course was described as being characterized by rapid improvement with structure; his psychosis became more organized with less delusional thinking. No overt psychotic behavior was noted.  He was not prescribed medications at this time.

An updated 8/13/10 clinical summary, which was based on a medical record and C-file assessment, was reviewed.  Excerpts included the following:

"[Inmate B] presents as paranoid, delusional, agitated, and meets criteria for Paranoid Schizophrenia.  He is untrusting and believes both mental health and custody staff intend on harming him.  He has no history of suicide attempts and numerous instances of harming others or attempting to harm others.  Current diagnoses: schizophrenia, paranoid type, antisocial personality disorder, hepatitis, Crohn's disease.

Inmate B received multiple life sentences for murdering homeless people in LA.  He believed that he was on a mission from God and called himself a 'bum buster.'  Some themes for him included that of cleanliness (he prefers to keep himself very clean, clean people, despises anything filthy).  Upon being housed in county jail after being sentenced, he decided to kill his cellmate by strangulation, which ultimately led to his current sentence of the death penalty.  His delusions have involved violent acts and he has been described by previous psychologists as someone who enjoys his delusions.

He was at Atascadero State Hospital from 1989-1990.  He had some positive response to Haldol.  He injured and attempted to kill a patient while at Atascadero State Hospital.  He

was considered a 'serious and continual homicidal threat.' His IQ was tested at 106 using the WAIS-III. He received a CAT scan in 1989 and a brain cyst was detected. In addition, his two hemispheres were found to not be symmetrical. All of which may indicate some organic brain dysfunction…

He has numerous 115s over the years… He has a long history of yelling obscenities and racial slurs at night according to tier officers, the frequency of which has declined somewhat… . Treatment plan is to encourage to cooperate with mental health via wellness checks. He would benefit from a higher level of care in a structured hospital environment to the chronic psychotic symptoms that are not currently remitting."

A 11/16/10 note by the recreation therapist indicated that the last group attended by the inmate was on 12/3/09. He continued to be ducated on a regular basis despite his chronic refusals. The recreation therapist noted that there were infrequent and rare occasions when he made eye contact and had a brief conversation with the inmate.

A 12/2/10 note indicated that the inmate chronically refused mental health services. He was described as highly suspicious and guarded around mental health clinicians and became more agitated with an increase in mental health contacts. The plan was to continue EOP level of care with consideration of downgrading him to the C3MS level of care. This note was consistent with a 11/22/10 weekly primary clinician contact progress note.

Records from ASH were not located in the inmate's three volumes of medical records.

The inmate refused to be interviewed on an out-of-cell basis. He was interviewed at cell front on the East Block. He was very guarded during his discussion with the monitor's expert, but attempted to be respectful. He answered both general and specific questions in a paranoid manner. He indicated that it would be a very long story to be told in the context of whether he had any mental health needs. When asked whether he would be willing to tell such a story to a mental health clinician, he again became very guarded and vague.

Findings

Based on review of the inmate's medical record, he had a long-standing serious mental illness and received inadequate treatment related, in part, to his medication refusal. He was very dangerous and probably would meet criteria for a Keyhea order. He was an appropriate candidate for a very structured and long term ICF program.

*August 2012 review*

The inmate was a participant in the Specialized Care for the Condemned program and was listed on the DSH non-referral log as meeting indicator seven. He was not referred to DSH because he had begun to participate in recreation therapy and was consistently seen by the psychiatrist, primary clinician, and recreation therapist. The Form 7388-B stated the opinion of the clinical team that moving him to DSH would disrupt clinical progress, but did not elaborate further.

He was provided with a diagnosis of Schizophrenia paranoid type and Antisocial Personality Disorder.  He remained on a forced medication order; he was prescribed Risperdal Consta 50 mg intramuscular every two weeks.  In a 6/5/12 treatment plan, the IDTT indicated that he did not yet meet Keyhea criteria; other documentation reported that he had been under a forced medication order since at least 2011.  Later in that same treatment plan, there was also reference to medications after the implementation of a Keyhea order.  This documentation indicated some confusion regarding staff's understanding of his medication consent status.

While the inmate was described as showing improvement and participating in recreation therapy, he continued to exhibit guardedness and paranoia, tolerating only brief interactions with clinicians; he also displayed passive-aggressive and overtly aggressive behaviors toward staff.  The treatment plan did not specify, beyond individual contact and medications, how these problematic behaviors would be addressed.  The inmate's lack of treatment engagement was not a focus of the treatment plan.  The Specialized Care for the Condemned program was not mentioned, recommended, or referenced in the treatment plan.

Findings

This inmate continued to demonstrate significant impairment in his functioning due to his psychiatric impairment and required a higher level of care.  He would benefit from inpatient treatment.

*December 2012 review*

This inmate's Keyhea order was discontinued on 6/4/12.  The most recent treatment plan was dated 11/13/12.  The inmate had a long history of paranoid delusions, disorganized thinking, and irritability.  He was eventually placed on Keyhea medications after threatening a correctional officer.  He subsequently demonstrated significant clinical improvement, but remained paranoid and only tolerated brief interactions at cell front.  He was provided with diagnoses of Schizophrenia paranoid type and Antisocial Personality Disorder.

Progress notes indicated that he often alternated between cell front and back of the cell interactions during his recreation therapy.  He was prescribed Risperdal Consta and Benadryl.

The inmate's psychiatric history and course of treatment was orally summarized by his treating psychiatrist to the monitor's expert during the site visit.  With the use of psychotropic medications on an involuntary basis and psychosocial treatment, the inmate was transferred from the Adjustment Center to the East Block where he remained for the past 18 months.  His classification changed from Grade B to Grade A during the same period of time.

Findings

This inmate was appropriate for a level of mental health care more intensive than the EOP level of care.  His treatment team was providing him with essentially the best treatment available to them given SQ's limited resources, especially in the context of the current lack of a specialized SQ housing unit that would be close to an ICF level of care.  However, the inmate would benefit

from the equivalent of an ICF level of mental health care based on his continued psychotic symptoms and isolated behaviors.

## Inmate C

### *August 2012 review*

This case was selected for review because the inmate was a participant in the Specialized Care for the Condemned program.  His most recent Form 7388-B dated 7/31/12 provided a rationale for DSH non-referral that was essentially equivalent to encouraging him to attend groups.  The inmate was considered to be functioning at his baseline, although clinical support for this determination was questionable.  The alternative interventions that were included were those for which the inmate had refused and modifications were not provided to improve his participation.

The inmate was described in the 7388 treatment plan as isolative and disorganized with a history of auditory hallucinations and self-injurious behavior.  While he remained isolative, staff noted improvement as manifested in a decrease in self-injurious behaviors and increased assertiveness. He was provided with diagnoses of Schizoaffective Disorder depressed type and Alcohol Dependence.  He was prescribed Prozac, Cogentin, Risperdal M-tabs, Thorazine, and Buspar.

The inmate had also been described as impulsive, with head-banging; however, documentation indicated significant improvement in his impulse control.  He also reportedly had decreased auditory hallucinations and was able to interact in a more coherent manner with mental health staff.  The treatment plan did not reference the Specialized Care for the Condemned program, nor did it mention group therapy; only medication management was mentioned.  The inmate appeared to be appropriately treated at the EOP level of care.

Findings

This inmate was appropriately not referred to DSH and appeared to be receiving mental health services at the appropriate level of care.

### *December 2012 review*

Between 2009 and 2011, the inmate had approximately 13 admissions to either the SQ CTC or the CMF APP.  Such admissions significantly decreased following initiation of medications via a Keyhea order in the spring of 2011.  Significant clinical improvement had also occurred since that time.

The most recent treatment plan was dated 11/27/12.  A decrease in auditory hallucinations and improvement relevant to negative psychotic symptoms were noted.  He was provided with diagnoses that included Schizoaffective Disorder depressed type and Alcohol Dependence by history.

A 10/12/12 treatment plan indicated that he continued to attend music group therapy and individual mental health appointments, but was also isolated in his cell, pacing, watching

television, or sleeping.

A 11/6/12 psychiatrist progress note indicated that the inmate was prescribed Thorazine, Risperdal, Prozac, Buspar, and Cogentin.  The plan described included continuing to encourage additional group/yard attendance to increase socialization.

Findings

Based on medical record documentation, it was clear that the inmate was frequently seen by his mental health treatment team, which facilitated clinical stabilization and improvement.  Despite this, he remained symptomatic and his rate of clinical improvement was likely hampered by the lack of a specialized treatment programming housing unit as previously summarized.

**Inmate D**

*August 2012 review*

This case was selected for review because the inmate was identified as a participant in the Specialized Care for the Condemned program and had been identified on the DSH non-referral log several times.  Most recently, he was identified as having met indicator seven in June 2012 and indicator three and seven on 5/30/12.  On 5/31/12, the Form 7388-B was completed; it indicated that he met those indicators.  The non-referral rationale provided was that the inmate was stable.  A comprehensive care plan was implemented that included increased individual recreation therapy and daily wellness checks.

The most recent treatment plan dated 7/31/12 referenced the Specialized Care team in that it mentioned that the inmate had been offered additional support by the recreation therapist.  At that time, he met indicator seven, but was not referred to DSH because he was considered to be functioning at baseline.  The alternative interventions appeared to imply that he would receive increased individual contacts and recreation therapy.  The treatment plan described him as unkempt with disorganized thinking and poor insight.  He made belts of toilet paper as his "job," and was disorganized with poor hygiene.  He was provided with a diagnosis of Schizophrenia disorganized type.  He was not prescribed psychotropic medications.

Progress notes consistently referenced continuation of the inmate in the EOP and there was no reference to higher level of care referral.  He was seen frequently, but primarily, was seen briefly at cell front.  It appeared that when contacts were brief, he was described as stable, but during longer clinical contacts he became derailed and was more likely to be described as disorganized.  Different staff described his cell differently, but most consistently it was described as unsanitary, with bugs observed in it due to poor cleanliness.

Findings

The Specialized Treatment program was only briefly mentioned in the documentation reviewed.  There was no evidence that the inmate was receiving any degree of inpatient level of care or even enhanced care.  Although he was a participant in the EOP, he did not appear to be

participating fully.  His participation appeared to be below 50 percent and the treatment team noted this in completing the Form 7388-B regarding DSH referral consideration.  The inmate continued to exhibit negative symptoms of psychosis and would benefit from inpatient treatment.

### December 2012 review

A 10/28/12 late entry IDTT note indicated that the inmate had refused more than 50 percent of offered treatment appointments.  The 11/27/12 treatment plan described him as exhibiting somewhat disorganized thinking and delusional beliefs.  During the month prior to the site visit, he reportedly attended art group and most of his weekly individual sessions with his primary clinician and recreation therapist.

He was provided with a diagnosis of Schizophrenia disorganized type.  He was not prescribed psychotropic medications due to his intermittent refusal and apparent lack of capacity to provide informed consent.

A 11/26/12 psychiatrist progress note described chronic psychotic symptoms that included delusional beliefs.

Medical record documentation indicated that frequent clinical contacts occurred, but very often he was seen at cell front due to refusal.

It was concerning that the inmate was not receiving psychotropic medications.  This appeared to be related, in part, to concerns that he was not able to provide informed consent for such treatment.

Findings

The monitor's expert discussed with staff issues relevant to informed consent concerns and recommended that they seek advice from legal counsel.  The inmate was in need of psychotropic medications and a more structured therapeutic environment than was available to him in his current setting.

## Inmate E

### August 2012 review

This case was selected for review because the inmate was observed during a PC2602 (forced medication) hearing and his name was included on the DSH non-referral log despite meeting referral indicators two, three, and four.  He reportedly was a participant in the Specialized Care for the Condemned program.  The non-referral rationale provided was that he was receiving increased services in the Specialized Care program and received daily clinical contacts; non-referral was due in part to his condemned status and the lack of a DSH ICF program for condemned inmates.

The inmate was admitted to the MHCB from 4/17/12 to 6/6/12. He was provided with an initial diagnosis of Schizophrenia disorganized type; this diagnosis was later changed to Schizophrenia, catatonic type provisional and Antisocial Personality Disorder. He had been admitted to the MHCB due to poor grooming and activities of daily living, to enhance his level of functioning, and to conduct a neurological assessment. No Form 7388-Bs were located in the medical record for each of the 7388 treatment plans during the MHCB admission. The treatment plan included more information; specifically, that the inmate had positively responded with improved hygiene and engagement with staff. This improvement, however, was limited as the inmate wrote his delusional content rather than directly engaging with clinical staff. The alternative interventions included "increased 1:1 contact from psychiatrist, psychologist, recreational therapist; group therapy offerings to be initiated upon discharge from CTC." These interventions were vague and did not properly address the social withdrawal and other negative symptoms that the inmate demonstrated.

The inmate had a long history of chronic psychotic symptoms dating back to the 1980's; a social security income evaluator noted that he was highly unlikely to ever be able to function independently. His commitment offense occurred in approximately 1985 (he murdered three people) and he had been incarcerated since that time.

During the review period, he was prescribed Risperdal Consta intramuscular injections every two weeks. The neurological assessment did not identify an abnormality of significance and the treating psychiatrist prescribed Ativan for Catatonia. He refused all oral psychotropic and medical medications. Since implementation of the Ativan, the psychiatrist reported improvement in his engagement with staff, although the improvement was minimal.

On 7/31/12, the inmate was noted to have met indicator three on the Form 7388-B, but was not referred to DSH because of improvement after the trial of Ativan, with reported occurrence of intermittent speech. The alternative interventions included individual contact once or twice weekly, group therapy and recreation yard, one hour of weekly individual recreation therapy, and psychiatric contact twice monthly. There was no information as to his participation in these offered treatments.

The inmate was on a forced medication order intermittently throughout his CDCR stay; he was consistently under such an order since 2006. The most recent order was upheld during the site visit. A review of progress notes indicated that he most frequently remained in bed and was non-responsive to most staff. He showered intermittently. On 7/23/12, he spontaneously interacted with the recreation therapist to request a pen; of note, he was administered intramuscular Thorazine and Ativan four hours prior. He spoke briefly to officers on the following day, but this improvement did not continue. The Ativan was increased and he again engaged in limited speech with the psychiatrist following administration of the medication. On 7/30/12, he was observed to be incontinent; this may have been due to over-sedation due to the Ativan dosage, which was reduced.

<u>Findings</u>

While this inmate showed improvement, his progress was very slow.  He appeared to be a good candidate for DSH referral and should have been afforded the opportunity to improve his level of functioning through treatment at DSH ICF.

### *December 2012 review*

This inmate was provided with a diagnosis of Schizophrenia catatonic type.  He was described as a poor participant in treatment, but exhibited improvement in catatonic symptoms with initiation of Ativan.  He remained with poor insight regarding his illness and a PC2602 order was renewed for an additional year.  He was prescribed Risperdal Consta 37.5 mg every two weeks, Ativan 2 mg intramuscular every morning, and Prozac 20 mg/day.

The inmate was housed in the OHU at the time of the site visit.  A Form 7388-B dated 11/13/12 noted that he met indicators one and two (unable to function at current level of care and required 24-hour nursing care); it also indicated that he would not be transferred to DSH due to his OHU placement.  It further noted that he was adherent to prescribed oral medications.  He was described as mute and wrote with delusional content regarding national security issues.  Therapy goals included improved communication and hygiene without prompting.  He was reportedly functioning at baseline and did not require DSH treatment, despite the symptoms described and the interventions outlined.  Necessary participants were present at the IDTT, but the inmate did not attend.

A neurology evaluation was conducted and indicated no evidence of the presence of a neurological condition.

Progress notes indicated that he showered three times weekly and had little, if any, verbal interactions with staff.  He was given a trial of treatment with Prozac, but it was tapered and discontinued as it was not thought to be helpful.

The inmate's involuntary medication petition was granted, renewing the involuntary medication order until 8/6/13 for grave disability.  Preliminary laboratory studies were obtained in anticipation of treatment with Clozaril on the week prior to the site visit.

The inmate was discussed during an IDTT meeting.  The team reported that he remained with social isolation and muteness.  He refused to attend groups and yard and reportedly refused any interactions with the primary clinician.  Treatment with Clozaril began on the week prior to the site visit, but information regarding these orders was not present at the time of review.  Necessary laboratory studies were documented.

Findings

This inmate required mental health services at a level higher than EOP.  He was housed in the OHU at the time of the site visit and a trial of treatment with Clozaril had been initiated.  This appeared to be an appropriate course of treatment for him at the time of review.  If he did not show improvement with this treatment, a level of mental health care greater than EOP would be

indicated.  He would benefit from specialized housing for greater monitoring and involvement in programming.

EXHIBIT H
Deuel Vocational Institution (DVI)
August 7, 2012 – August 9, 2012

**Inmate A**

This case was selected at random from a list of mainline 3CMS inmates to review the provision of mental health care.  At the time of reception, the inmate was screened and did not require mental health services.  However, within approximately one month, he requested to speak with a psychologist.  He was seen for several supportive therapy sessions, but did not wish to be included in the MHSDS.  A full mental health evaluation was not completed.

In April 2012, the inmate was transferred to administrative segregation as a result of an investigation of his possible involvement in a riot.  He was seen during mental health rounds and was specifically questioned as to MHSDS placement to assist him in dealing with the increased stress of administrative segregation placement.  A brief mental health screening report was completed on 4/24/12 and he was referred for a more comprehensive evaluation, which was completed on 4/27/12.  He was provided with a diagnosis of Adjustment Disorder for "vague and mild symptoms of anxiety and depression that appear related to his incarceration and recent placement in ASU."  He was enrolled in the MHSDS at the 3CMS level of care.  An initial IDTT occurred on 5/1/12 and a treatment plan was formulated.  The plan included weekly contacts with the primary clinician to assist the inmate with adjusting to administrative segregation, improving coping skills, and monitoring for safety.

The mental health evaluation was updated on 7/20/12.  There were some reports from segregation unit officers that the inmate appeared to be somewhat withdrawn and suspicious.  The IDTT subsequently saw him on 7/25/12 and the treatment team recommended that he remain on the MHSDS caseload for three to six additional months to ensure his stability.  The treatment plan included as interventions continued sessions with the primary clinician to identify and reinforce healthy coping skills and working on behavioral modifications for mood improvement.

During July 2012, the inmate returned to the general population and requested removal from the MHSDS.  An appointment was scheduled for him to see the psychiatrist on 8/1/12, but it appeared that referral for medication assessment was not indicated.  The inmate refused to attend the appointment, but the psychiatrist briefly saw him when the inmate again denied any problems.

Findings

As progress notes and mental health assessments indicated, the inmate appeared to be receiving mental health services at the appropriate level of care in the 3CMS program.  There was, however, a need for diagnostic clarification.  In addition, more frequent primary clinician contacts might be beneficial to reinforce healthy coping skills and behavioral modifications.

**Inmate B**

This case was selected at random from a list of mainline 3CMS inmates to review the provision of mental health care.  The inmate was received at NKSP on 12/29/11.  He was prescribed Zoloft upon arrival as he had been receiving this medication at the county jail.  He was referred for a mental health evaluation, which was completed in early January 2012.

The inmate reported a history of treatment for depression and auditory hallucinations.  He was hospitalized for three months at ASH prior to his trial for competency restoration.  Although he was provided with diagnoses that included Psychotic Disorder NOS, Major Depressive Disorder, recurrent, moderate and possible Schizophrenia, he was only prescribed Zoloft, an antidepressant medication.  A mental health chrono documented his MHSDS placement at the 3CMS level of care on 1/20/12.  A NKSP psychiatrist saw him in response to a medication noncompliance referral during mid-March 2012 and he agreed to continue Zoloft.

The inmate transferred to DVI on 3/22/12.  Medical staff referred him to mental health because of his level of care and he was prescribed psychotropic medication.  On 3/28/12, a brief mental health evaluation was completed.  An IDTT was conducted on 4/4/12 and he was maintained at the 3CMS level of care.  He requested discontinuation of his medication as he believed that it was no longer needed and the psychiatrist discontinued it, with follow-up scheduled.  The IDTT modified the inmate's diagnosis to Major Depressive Disorder, recurrent, moderate.  Psychiatry subsequently saw him on 4/9/12, 5/22/12, and 7/16/12 for routine contacts, although the inmate's medications had been discontinued.  Individual primary clinician contacts occurred on 4/26/12, 5/9/12, 5/30/12, and 6/29/12; at least two of these contacts occurred at cell-front due to institutional lockdowns.

Findings

It appeared that this inmate was receiving mental health services at the appropriate level of care in the 3CMS program.  It was unclear why the psychiatrist saw him so frequently when the inmate was not being treated with psychotropic medications and was being seen monthly by the primary clinician, who could refer him.  The frequency of psychiatric contacts appeared to be a poor use of a limited resource.

**Inmate C**

This inmate's medical record was selected for review at random from a list of reception center 3CMS inmates housed in the Special Processing Unit (SPU).  He arrived at DVI on 5/10/12.  He had prior incarcerations and had been out on parole for two years prior to his current incarceration.  There was no documentation of mental health treatment prior to incarceration.  Medical generated a mental health referral upon the inmate's arrival as he had been prescribed psychotropic medications at the county jail and reported a remote history of a suicide attempt as a teenager.  He was prescribed Buspar and Elavil, which had been prescribed at the county jail.

The inmate had received mental health services at the EOP level of care during one of his prior prison terms.  A mental health evaluation on 5/15/12 resulted in a diagnosis of Mood Disorder NOS.  The mental status examination was described as essentially normal, with the exception of the inmate's self-report of mild anxiety and depression.  His global assessment of functioning (GAF) score was assessed as 60 and he was placed in the MHSDS at the 3CMS level of care.

During late May 2012, the inmate requested to be returned to the EOP level of care.  Another psychiatrist, psychologist, and primary clinician evaluated him and a treatment team meeting was conducted.  The IDTT concurred that 3CMS was the appropriate level of care and he was

maintained at that level.  Another psychiatrist evaluated him in early June 2012 when Zyprexa and Remeron were prescribed.  Based on medical record documentation, the rationale for treatment with these medications was unclear.  However, documentation indicated that the inmate had done well with this medication combination in the past.  Buspar was continued.  There was another psychiatric appointment on 7/05/12, when Cogentin was added to his prescribed medications for probable Akathisia.  On 8/06/12, the psychiatrist saw him, and his medications were continued.

Findings

The inmate appeared to be receiving mental health services at the appropriate level of care in the 3CMS program.  Staff arranged for consultations and second opinions and conducted an IDTT meeting when the inmate expressed concern about his level of care.  Psychiatrists and primary clinicians saw him timely.  An area of concern was the lack of clinical justification warranting the ongoing prescription of four psychotropic medications.

**Inmate D**

This inmate's file was selected for review at random from a list of reception center 3CMS inmates who were housed in the SPU.  He arrived at DVI on 11/02/11 and the psychiatrist saw him at intake as he arrived with prescriptions for Abilify and Celexa.  These medications were continued.  Mental health screening was conducted on 11/04/11 and he was referred for further evaluation.

The inmate reported a history of childhood ADHD.  He also reported being provided with a diagnosis of Bipolar Disorder, depressive episodes, and anxiety as an adult.  He was treated with various psychotropic medications, including Adderall, Depakote, Klonopin, and Buspar.

He was seen for psychiatric appointments on 11/29/11, 1/10/12, 3/22/12, 4/10/12, 5/30/12, and 6/29/12.  He was seen by a different psychiatrist on almost every occasion and multiple medication changes occurred.  The primary clinician saw the inmate monthly and described him as stable.

Findings

The inmate appeared to be receiving mental health services at the appropriate level of care in the 3CMS program.  Psychiatrists and primary clinicians saw him timely.  Of concern was medication management which was complicated by treatment that occurred with five different psychiatrists over the course of seven months at DVI.  Although he was a reception center inmate, treatment planning would have been beneficial in clarifying diagnosis and ensuring a consistent approach to the inmate's care.

**Inmate E**

This EOP inmate was housed in the reception center.  He arrived at DVI on 5/16/12.  Intake staff noted that he had been prescribed psychotropic medications at the county jail; these medications

were continued.  The inmate was provided with a diagnosis of Schizophrenia.  He was transferred to the MHCB at CMF after exhibiting disorganized thinking and muteness with hair pulling.  Upon return to DVI, he was placed in the OHU and received five-day follow-up.  He was subsequently released to reception center housing at the EOP level of care.

The primary clinician saw him for confidential contacts on 7/9/12, 7/19/12, 7/25/12, and 8/2/12.  The psychiatrist evaluated him on 7/17/12 and 7/25/12.  EOP group notes documented group therapy participation three to four days each week.  He was seen at cell front during lockdowns and his refusal to attend groups.  An IDTT was conducted on 7/17/12.  It determined that he did not meet indicators for higher level of care referral consideration, citing his recent return from the MHCB and EOP level of care enrollment.

Findings

The inmate appeared to be receiving mental health services at the appropriate level of care in the EOP.  He was seen at intervals that met or exceeded Program Guide requirements for EOP level of care in the reception center.

**Inmate F**

This inmate's medical record was selected for review from a list of MHSDS caseload inmates housed in the reception center.  He was receiving mental health services at the EOP level of care.  During mental health screening that occurred on 7/12/12, he reported a history of psychiatric hospitalization, with paranoid and grandiose ideation.  Mental health staff requested previous mental health information because the inmate acknowledged prior CDCR commitments and mental health treatment while in prison.

The inmate had been at the EOP level of care during past CDCR incarcerations.  He was housed in the SHU for four years and had multiple PSU terms.  He was released on parole on 10/02/10, but returned to custody approximately one month later.  He reportedly was sentenced to a 62 years-to-life prison term due to his history of multiple offenses and prior convictions.  He was enrolled in the MHSDS at the EOP level of care.

Necessary participants were in attendance at an IDTT meeting conducted on 7/17/12.  The IDTT recommended placement at the EOP level of care.  The primary clinician saw him on 7/12/12, 7/17/12, 7/24/12, and 8/1/12.  Psychiatric appointments occurred on 7/12/12 and 7/20/12.  The medical record included documentation that the inmate participated in group therapy several days per week.

Findings

Documentation indicated that the inmate was timely identified as requiring mental health services at the time of intake.  Staff requested and timely received important historical information from his archived paper medical record and considered it during the mental health evaluation and treatment planning.  The inmate appeared to be receiving mental health services

at the appropriate level of care in the EOP.  He was seen at intervals that met or exceeded Program Guide requirements for this level of care.

**Inmate G**

This inmate's medical record was selected for review from a list of MHSDS caseload inmates housed in the reception center.  He was receiving mental health services at the 3CMS level of care.  Mental health screening was conducted on 6/1/12 following arrival at DVI.  Psychotropic medications from the county jail were ordered at the time of intake.  The mental health evaluation was completed on 6/8/12.  The inmate reported a history of psychiatric hospitalization and treatment with medication for depression and anxiety.  Upon examination, he was described as mildly depressed with vague reports of anxiety symptoms.  He denied prior suicide attempts and current thoughts of suicide.  He was enrolled in the MHSDS at the 3CMS level of care.  He was provided with diagnoses of Major Depressive Disorder, recurrent, Generalized Anxiety Disorder, provisional, and Amphetamine Dependence.

At a psychiatric appointment on 6/21/12, Celexa, an antidepressant, and Buspar, an anti-anxiety medication, were continued.  On 7/20/12, the psychiatrist added Trileptal, a mood stabilizer.  Within several days, the inmate developed a rash.  The psychiatrist saw him again on 7/27/12.  The rash was attributed to the Trileptal and it was discontinued.  Benadryl was prescribed for symptomatic relief of itching and the inmate was referred for medical follow-up.  The primary clinician also saw him on 6/26/12 and 7/24/12.

Findings

Documentation regarding the inmate's history and clinical condition supported placement in the MHSDS at the 3CMS level of care.  He was seen at intervals that met or exceeded Program Guide requirements.  Upon development of medication side effects, he was promptly assessed and the responsible medication was discontinued.  The inmate was also appropriately referred for medical follow-up.

**Inmate H**

This inmate was listed on the institutional DSH non-referral log, noting that he met indicator six, with three or more RVRs in three months, for DSH referral consideration.  Psych tech notes from the week of 7/9/12 indicated that he was stable and exhibited good cell maintenance and hygiene.  A clinical note dated 7/17/12 was illegible.  The Form 7388-B dated 7/24/12 noted that he was provided with a diagnosis of Psychotic Disorder NOS.  The treatment plan section of the 7388 dated 7/24/12 was blank.  The Form 7388-B included an adequate non-referral rationale and a clinically adequate alternate plan that included reference to cognitive behavioral therapy strategies.

Findings

The Form 7388-B appropriately included documentation that the inmate met an indicator for DSH referral consideration.  The rationale for non-referral and the treatment plan were clinically

appropriate.  The intervention section of the treatment plan dated 7/24/12 was incomplete. Progress notes subsequent to the Form 7388-B dated 7/24/12 did not mention implementation of cognitive behavior therapy that was mentioned in the treatment plan.

EXHIBIT I
California State Prison, Corcoran (CSP/Corcoran)
August 20, 2012 – August 23, 2012

**Inmate A**

This inmate's medical record was reviewed because he was receiving services in the mainline EOP. At the time of the site visit, he was confined to his cell and asked to speak with the monitor's expert. He was interviewed at cell front. He complained about his perceived lack of access to out-of-cell therapeutic activities.

The inmate was alternately provided with diagnoses of Major Depressive Disorder and Schizoaffective Disorder. He was prescribed Effexor and Celexa. He was also treated with Risperdal, which was discontinued secondary to poor adherence. Recent stressors included anxiety related to separation from his significant other. In May 2012, he was transferred to the MHCB due to suicidal ideation. His history was remarkable for reported multiple sexual molestations at age seven, report of an IQ of 84 as a teenager, and a reported history of ten suicide attempts. Inpatient MHCB information included mention of treatment with Geodon, Thorazine, Prozac, and Abilify, and a reported history of head trauma with loss of consciousness.

Upon arrival at CSP/Corcoran in April 2012 following transfer from RJD, the inmate appeared stable but expressed concern regarding rumors that the CSP/Corcoran EOP program was "poor." A primary clinician progress note dated 4/9/12 indicated that he was selectively mute and had yet to begin groups; he was asked "to be patient." He expressed his anticipation of group participation. Subsequent notes indicated that his muteness made assessment difficult.

Progress notes from late April 2012 indicated a mixture of the inmate refusing and attending groups, and of group cancelation. Progress notes from various primary clinicians during April and May 2012 indicated that he refused some individual sessions, attended some groups, and had difficulties coping. After return from the MHCB in May 2012, he reported improvement. A 5/25/12 progress note documented his belief that EOP inmates should be afforded more yard access; the note further expressed his fear of staff and perceived need for more privacy in treatment sessions.

Progress notes from June 2012 documented that the inmate had sporadic participation in treatment and consideration of moving him to the 3CMS level of care. On 6/5/12 and 6/12/12, he refused to attend group therapy. On 6/19/12, there was a reported lockdown and on 6/26/12, the group was cancelled. A June 2012 progress note stated that the primary clinician explained to the inmate that yard time could not be offered as the yard was locked down. A 6/21/12 progress note focused on his discouragement with the perceived lack of EOP programming and his depression after returning from the MHCB. Other notes during June 2012 illustrated the same pattern of the inmate refusing group and of group cancellations.

A 7/9/12 progress note indicated that the inmate declined out-of-cell contact. A 7/19/12 note showed that his lack of participation was discussed. However, the inmate reported that he felt threatened and therefore required EOP placement. He also refused an individual psychiatric appointment in July 2012. He continued to voice his dissatisfaction with the EOP during July 2012, focusing on clinical session privacy and what he perceived as the program's restrictive nature. He declined out-of-cell contacts on 7/30/12, 8/6/12, and 8/15/12.

Findings

Mental health consistently contacted this inmate during EOP placement, but he refused several individual sessions. He voiced concerns about the lack of confidentiality of his clinical contacts and his desire for more programming and yard time. Refusal, lockdowns, and cancelations resulted in sporadic group attendance. He also was not placed in group programming for a period of time after his arrival. The inmate required MHCB placement during the review period. Documentation did not show comprehensive consideration of referral to higher levels of care, but indicated consideration of a move to the 3CMS level of care.

**Inmate B**

This inmate's medical record was reviewed because he was treated at the EOP level of care. The medical record documented a history of DSH SVPP hospitalization for 15 months and discharge in May 2012. He was housed in administrative segregation at MCSP during the week of 6/17/12. A 7/5/12 primary clinician progress note from CSP/Corcoran indicated that he requested help with depression and anxiety.

Progress notes from DSH during May 2012 indicated that the inmate was discharged from SVPP to MCSP, where he continued to report intermediate suicidal ideation, despite his long DSH hospitalization (since 7/27/11). He did not exhibit evidence of depression and reportedly participated in group therapy. He developed new onset diabetes and was provided with diagnoses of Mood Disorder NOS and Polysubstance Dependence.

The inmate transferred to CSP/Corcoran on 6/26/12. He reported several suicide attempts by hoarding medications and overdose. At that time, he also reported auditory hallucinations that mostly occurred at night and in the early morning. He was described as motivated and hopeful, but also sad and depressed.

A 7/10/12 suicide risk evaluation noted multiple chronic risk factors including a history of sexual abuse, Major Depressive Disorder, poor impulse control, first prison term, being a sex offender, and numerous suicide attempts (occurring in 2000, January 2001, March 2011, and June 2011). There were also acute factors including safety concerns, recent suicide attempts, and housing area changes. However, many protective factors were also noted, including family support and future orientation. The inmate's chronic suicide risk was evaluated as moderate and his acute suicide risk was assessed as low.

An IDTT note dated 7/11/12 described the inmate's depression, mania, mood swings, and auditory hallucinations. A 7/17/12 note discussed suicidal issues but noted that he was doing well and indicated that plans were underway for group therapy placement. A 7/24/12 note indicated that although the inmate presented with smiling affect, he did not appear to be happy. The plan remained to place him in groups with weekly primary clinician contacts or contacts as needed.

The first psychiatry note from CSP/Corcoran was dated 7/27/12. It noted that the inmate was prescribed Lithium and Risperdal Consta. He was provided with a diagnosis of Major

Depressive Disorder, recurrent moderate with psychotic features.  A 8/7/12 progress note discussed his recent hospitalization for chest pain, and indicated that he was sedate, sad, and depressed, but not suicidal.  Conversely, a progress note dated 8/15/1212 described the inmate's increasing depression and concern regarding his lack of yard time.  It also described his attempt to remedy this situation by submitting a 602 grievance.

At the time of review, no subsequent mental health notes were located in the medical record.

Findings

The primary clinician initially regularly saw this EOP inmate following transfer to CSP/Corcoran.  Psychiatry at least saw him once.  At the time of review, there was no indication that the inmate had been placed in groups.  He expressed concern about what he perceived to be a lack of yard access in the EOP program.  He had a recent lengthy hospitalization at DSH, new onset diabetes, and extensive risk factors requiring close follow-up.

**Inmate C**

This inmate's case was reviewed at the request of plaintiffs' attorneys as he had been housed in the SHU since 3/7/07.  He was previously housed in the SHU at CCI and PBSP.  At PBSP, he was referred to the PSU, where he remained for two to three years.  He reported that he was doing poorly while housed in the CSP/Corcoran SHU as there were no groups and limited clinical care and out-of-cell time.  His MERD from the SHU was 2033.

The inmate's medical record was reviewed.  The most recent treatment plan dated 7/17/12 indicated that his symptoms had increased since he began refusing medications.  The treatment plan did not appear to address his medication refusal.  Documentation made it unclear who was in attendance at the IDTT meeting other than the primary clinician.  The treatment plan was little changed from the treatment plan dated 5/1/12.  A Form 7388-B was completed at the time of the IDTT.

Progress notes since January 2012 were reviewed.  On 1/26/12, the inmate requested to see the psychiatrist to adjust his medications, as he reported not receiving a benefit from Paxil.  He was then described as stable.  The treatment plan included continued monthly primary clinician contacts.  A psychiatrist referral was initiated.

The psychiatrist saw the inmate on 1/26/12.  His presentation was consistent with Bipolar Disorder depressed and Polysubstance Dependence.  Paxil was discontinued and Prozac was started.

Weekly SHU mental health rounds were documented.  An IDTT occurred on 1/31/12.  Group therapies were discussed with the inmate, but none were available in the mental health department at that time.  The inmate was retained at the 3CMS level of care.

The inmate assaulted a correctional officer on 2/9/12.  A 115X assessment was completed within several days of the assault.  On 2/22/12, the inmate requested EOP treatment.  The psychiatrist

saw him on 3/5/12.  Treatment with Lithium was initiated and appropriate laboratory studies were ordered.

On 3/26/12, the inmate again discussed his perceived need for EOP level of care with the primary clinician.  Documentation of mental health rounds indicated that he was stable.  The psychiatrist again evaluated him on 4/3/12 and his medications were subsequently adjusted.  Relevant background information was obtained from him at a 4/25/12 primary clinician appointment.

The psychiatrist again assessed the inmate's medications on 5/2/12.  At the inmate's request, his psychotropic medications were discontinued on 5/14/12 with plans for psychiatric follow-up in 90 days.

The primary clinician saw the inmate at cell front on 5/25/12 because he had refused an out-of-cell appointment.  The inmate's behavior was uncooperative and it was thought that this behavior was perhaps due to medication noncompliance.  He again presented with uncooperative behavior at a scheduled 6/25/12 primary clinician appointment.  A 7/12/12 primary clinician progress note indicated that he was seen in a confidential setting after he submitted a grievance requesting placement in group therapy, the PSU, and the EOP.  He had not attended a confidential appointment since 4/25/12.  The inmate complained about depression.  A 7/17/12 IDTT note indicated that his problems had worsened since discontinuation of his medications.

Findings

This inmate had discontinued his psychotropic medications and was not doing well from a mental health standpoint.  It was of concern that the medical record did not include any reference or summaries relevant to his past history of PSU housing for over two years.  He would likely benefit from involvement in group therapy.  PSU transfer should have been considered.  These concerns and recommendations were conveyed to the inmate's current primary clinician.

**Inmate D**

This inmate's case was reviewed at the request of plaintiffs' attorneys as he was housed in the SHU, with a 17-year SHU term.  He reported multiple MHCB admissions and expressed feelings of hopelessness in his correspondence.

The inmate's medical record was reviewed.  It included extensive documentation of his clinical contacts and prior MHCB admissions.  He was well-known to the administrative segregation EOP staff.  He had multiple MHCB admissions, although they had decreased since his admission to the administrative segregation EOP from the CSP/Corcoran SHU approximately three months earlier.  He had a history of over 25 psychiatric hospitalizations and MHCB admissions, as well as a history of significant suicide attempts and self-injurious behaviors.

The inmate was an active participant in EOP programming.  He received his psychotropic medications as a result of a Keyhea order due to assaultive behavior towards custody staff.  His medications included Invega, Abilify, Depakote, Geodon, and Vistaril.

Based on the most recent MHCB discharge summary dated 6/28/12, he was provided with diagnoses that included Schizoaffective Disorder bipolar type, Antisocial Personality Disorder, and Borderline Personality Disorder.

Review of a Form 7388-B dated 8/15/12 indicated that the reason for not referring him to DSH was because the "inmate has an extensive history of feigning mental illness and utilizing MHCB for secondary gain (see most recent mental health discharge summary 6/28/12). Inmate is aware that he could be referred to DSH after a certain number of MHCB admits and has stated that when you go to DSH you get to be around the nurses. Inmate's controlling offense requires "R" suffix. Based on recent session his goal is to go to DSH for the above reason. DSH referral is not clinically supported or appropriate at this time".

Findings

This inmate had a very complicated clinical history that had been clinically managed within the administrative segregation EOP. He reportedly was an active participant in the EOP and appeared to exhibit gradual clinical improvement.

**Inmate E**

This inmate's case was selected for review because the DSH coordinator indicated that he had returned from DSH to CSP/Corcoran without notice. He had a long history of treatment for self-injurious behaviors, poor impulse control, and severe mood swings. He was provided with diagnoses of Bipolar Disorder, mixed episodes, Borderline Personality Disorder, and Antisocial Personality Disorder. He received his psychotropic medications as a result of a Keyhea order.

The inmate had participated in the SNY-EOP program at CSP/Corcoran since August 2011. He was admitted to the MHCB on at least six occasions for depression with suicidal ideation prior to referral to the DSH APP in February 2012. The MHCB IDTT recommended DSH APP referral on 2/2/12 and the referral package was submitted on 2/8/12. The inmate consented to DSH transfer. DSH accepted him for admission and a bed was assigned on 2/23/12. He was transported to DSH on 3/1/12. According to the CSP/Corcoran DSH coordinator, he was assessed by DSH upon arrival when he informed them that he did not want to remain at DSH and would not participate in any treatment. He subsequently returned to CDCR custody and ultimately to CSP/Corcoran. Notably, no notice was provided to CSP/Corcoran as to this change of course and there was no DSH documentation in the medical record. The DSH coordinator's log also did not document his return to CSP/Corcoran.

The inmate was housed in the MHCB upon his return, where he was hospitalized from 3/15/12 to 3/29/12. He was subsequently discharged back to the EOP. He also had MHCB admissions from 6/3/12 to 6/5/12, 6/12/12 to 6/15/12, and 6/16/12 to 6/18/12. The Keyhea order was renewed and remained in effect until 6/13/12. He was subsequently admitted to DSH in July 2012 for restoration of his competency to stand trial. A DSH discharge packet was included in the medical record indicating hospitalization from 7/18/12 to 8/2/12. He remained at DSH SVPP at the time of the site visit and had not yet returned to CSP/Corcoran.

Findings

Coordination and continuity of care between DSH and CDCR was very poor for this inmate. He
was accepted for DSH admission and then apparently changed his mind upon arrival at DSH.
This should have triggered an immediate notification from DSH to CSP/Corcoran for appropriate
treatment planning and maintenance of inmate safety.

**Inmate F**

This inmate's case was selected for review from the DSH non-referral log. He was identified as
having met three indicators for higher level of care referral consideration, but was not referred.
The log listed the reason for non-referral as "refuses to participate in EOP due to personal
choice; currently stable in EOP mainline as long as he is left alone." The inmate had been
reassigned to CSP/Sac at the time of the site visit.

The IDTT meeting at CSP/Corcoran was conducted on 2/1/12. The Form 7388-B indicated that
he met several indicators for higher level of care referral consideration, including inability to
function in the EOP, having less than 50-percent participation in therapeutic activities, and
meeting screening eligibility for the Extended EOP Care Plan (EECP). Of note was the lack of
an EECP at CSP/Corcoran. Later in February 2012, he was transferred to the EOP program at
CSP/Sac, where he continued to have poor participation, sporadic medication compliance, and
minimization and denial of mental health symptoms. The CSP/Sac EOP IDTT generated a
referral to DSH for intermediate care on 8/2/12 due to his lack of participation and failure to
improve.

Findings

This case demonstrated that different thresholds for initiating referrals to higher levels of care
existed within the CDCR. The behavior that was tolerated or viewed as volitional at
CSP/Corcoran was considered to be a potential manifestation of mental illness and failure to
improve at CSP/Sac. The inmate's referral to DSH for intermediate care appeared to be
clinically appropriate.

**Inmate G**

This inmate's case was selected for review from the DSH non-referral log. He met an indicator
for DSH referral as he had been placed at the EOP level of care for 365 days or more. The non-
referral rationale was "persistent psychosis, managed well at EOP level of care." The IDTT was
conducted on 2/22/12.

The inmate transferred from KVSP to CSP/Corcoran during early February 2012. He had been
receiving mental health care at the EOP level of care for several years and was placed in the EOP
upon arrival at CSP/Corcoran. He reported being provided with a diagnosis of Schizophrenia at
the age of 19, but only agreed to take Prozac, an antidepressant medication. The psychiatrist
described him as exhibiting illogical thinking with the use of neologisms. He was also thought
to be a potential candidate for a Keyhea order based on his refusal to consider treatment with

antipsychotic medication.  The primary clinician noted that he displayed feminine mannerisms and identified himself as female.  He was placed in the EOP.

The inmate participated in EOP groups.  The psychiatrist saw him at approximately monthly intervals and the primary clinician saw him weekly.  Subsequent IDTT meetings on 5/16/12 and 8/15/12 did not indicate that he met any indicators for higher level of care referral consideration (length of stay at the EOP level of care was not considered a risk indicator on the revised Form 7388-B).  Although the inmate continued to refuse treatment with antipsychotic medication, he was compliant with Prozac and there was no further mention of the need to consider a Keyhea order.  He appeared to be functioning well and there was no additional documentation indicating disorganized or psychotic thinking.

<u>Findings</u>

This inmate attended group therapy and individual sessions with the psychiatrist and primary clinician.  He appeared to be managing well at the EOP level of care.  He did not appear to require a higher level of mental health care at the time of the site visit.

**Inmate H**

This inmate's case was selected for review from the DSH non-referral log.  An IDTT meeting on 2/1/12 identified him as meeting several indicators for higher level of care referral consideration, but he was not referred.  The log identified the non-referral rationale as a medical condition that precluded DSH placement, but mental health progress notes did not specify any Axis III (medical) diagnoses.  The medical portion of the health care record contained a history and physical examination dated 2/27/12 that documented insulin-dependent diabetes mellitus, hypertension, coronary artery disease, chronic renal insufficiency, worsening anemia, and impaired mobility as present medical conditions.  He also had been provided with a diagnosis of Schizophrenia paranoid type and a need for long-term placement in the GACH in a medical bed with skilled nursing care.  IDTT information did not explicitly document this information.  The only separate mental health progress notes in the medical record were an evaluation that occurred in September 2010 and routine mental health referral chronos for psychotropic medication reviews.

Additional information detailed the inmate's GACH hospitalization.  His physical course continued to deteriorate and he was transferred to an outside hospital for medical care for treatment of hypoglycemia, cardiac events, and infection on several occasions.  He returned to CSP/Corcoran and GACH placement in early June 2012.  He died of natural causes on 6/7/12 and his body was released to the coroner.  He had signed a "do not resuscitate" request.  His sister, his next of kin, was also consulted throughout the course of his physical decline and she concurred with his wishes.

<u>Findings</u>

The severity and acuity of the inmate's physical condition was not well described by mental health staff.  However, the seriousness of his medical condition precluded consideration of

transfer to an inpatient psychiatric facility. He was followed by mental health while in the GACH and the psychiatrist in consultation with the medical doctor prescribed him psychotropic medications. His level of care and mental health treatment were appropriate under the circumstances.

**Inmate I**

This inmate's case was selected for review from a list of inmates who had recently returned from DSH. He was admitted to DSH APP from the MHCB on 10/20/11. He had attempted suicide by hanging on at least two occasions. At the time of DSH admission, he was reportedly preoccupied with auditory hallucinations that told him to kill himself. The CDCR referral requested that DSH initiate Clozaril as the inmate's hallucinations had responded poorly to other antipsychotic medications. He was provided with a diagnosis of Schizophrenia paranoid type.

The inmate was compliant with Clozaril initiation and was also prescribed Geodon and Depakote. He was transferred from DSH acute to intermediate care on 2/3/12 for continued Clozaril dosage titration and mental health treatment. Although he cooperated with medication adjustments, he did not participate in other treatment modalities. He was discharged from DSH intermediate care on 3/30/12 and returned to CSP/Corcoran on 3/31/12. He was placed in the administrative segregation EOP.

The inmate received the 31-question mental health prescreening. On 4/5/12, his primary clinician conducted a mental health evaluation and suicide risk evaluation. He was seen daily during psych tech rounds. On 4/6/12, the psychiatrist saw him. At that time, it was noted that his white blood cell count was decreasing and he was experiencing significant hypersalivation, which were noted side effects of Clozaril. An IDTT conducted on 4/11/12 listed as a treatment goal to "decrease anxiety that contributes to delusions," and included as interventions "motivational interviewing, cognitive behavioral therapy (CBT) and Rogerian (therapy)." He continued to be seen consistently, but there was no documentation that CBT or Rogerian therapy were provided. There was also a lack of documentation that the IDTT reviewed or discussed the DSH discharge summary.

Despite consultation between the psychiatrist and medical providers, by 5/3/12 Clozaril was tapered and discontinued due to continued problems with hypersalivation and fluid loss. Prolixin Decanoate injections were initiated. A telephone conference between the primary clinician and a DSH clinician to discuss how DSH arrived at a diagnosis of Developmental Disability during the DSH hospitalization appeared to have occurred on 5/21/12. A recommendation for psychological testing to assist in diagnostic clarification appeared to have resulted from that teleconference.

At an IDTT meeting on 6/20/12, the inmate was noted to have attended fewer than 50 percent of the structured therapeutic interventions offered to him. He reported feeling uncomfortable in groups, but agreed to attend all individual appointments. He was attentive to his personal grooming and cell hygiene. A referral was not made to a higher level of care as he was thought to be functioning adequately at the EOP level of care.

Findings

Documentation indicated that the inmate was functioning adequately at the EOP level of care. Information from his DSH acute and intermediate care hospitalizations did not appear to have been utilized in formulating the EOP treatment plan at CSP/Corcoran. The motivational interviewing, CBT, and Rogerian therapy interventions listed appeared to be unrelated to the actual interactions that occurred between the primary clinician and inmate. It was unclear why these types of interventions were included in the treatment plan without subsequent reference to or utilization of these techniques. The inclusion of these modalities that were not utilized reduced the treatment plan to a somewhat meaningless document requirement rather than an actual blueprint for treatment.

**Inmate J**

This inmate's case was selected for review from a list of inmates who had recently returned from DSH. He was admitted to SVPP on 12/21/11 for treatment to restore his competency to stand trial. He was provided a course of treatment and his competency was restored. He was discharged on 5/14/12 and returned to CSP/Corcoran on 5/21/12 at the EOP level of care. He was provided with diagnoses of Schizoaffective Disorder bipolar type and Antisocial Personality Disorder. His discharge medications, Zyprexa, Seroquel, Effexor, and Remeron, were continued without interruption. A conference call between DSH and CDCR providers was conducted on 5/22/12. He had a mental health evaluation on the day of arrival at CSP/Corcoran and was placed at the EOP level of care. It was clear from mental health evaluation documentation that the clinician had access to and referenced the DSH discharge summary at the time of the inmate's evaluation. The inmate subsequently transferred to CMC and was not housed at CSP/Corcoran at the time of the site visit.

Findings

The medical record documented good continuity and coordination of care for this inmate returning from DSH to CSP/Corcoran. Medications were continued and the discharge summary was available and utilized upon his return. A conference call also occurred between the agencies to discuss the inmate's care.

EXHIBIT J
California Substance Abuse Treatment Facility (CSATF)
July 16, 2012 – July 19, 2012

**Inmate A**

This case was reviewed at the request of plaintiffs' attorneys.  Although the inmate was a participant in the MHSDS at CSATF, plaintiffs expressed concern regarding his current level of care.  The inmate reported transferring to CSATF in April 2012.  He further indicated that Trazodone, the non-formulary medication that had successfully treated his depression, was discontinued without psychiatric evaluation.  His mental health appeared to have significantly deteriorated since this change.  Plaintiffs requested review of his level of care and current treatment plan, including medications.

The inmate's medical record was reviewed.  A 3/6/12 primary clinician progress note indicated that he had remained asymptomatic during the year following his discontinuation of prescribed psychotropic medications.  On 4/24/12, he was transferred to CSATF, where a primary clinician initially saw him.  He requested to have his medications resumed.  Subsequent primary clinician contacts occurred on 5/3/12 and 5/29/12.

The psychiatrist evaluated the inmate on 6/4/12.  Medical record documentation indicated that his clinical presentation was consistent with a diagnosis of PTSD.  The treatment plan indicated that he was aware of the non-formulary status of Trazodone and there was discussion of possible medication side effects.  He was scheduled for follow-up with the psychiatrist in six to eight weeks.

A primary clinician progress note dated 6/27/12 indicated that the inmate had yet to receive medications.  Although two health care requests that the inmate initiated indicated that he was receiving Trazodone, this was not confirmed by review of medication reconciliation forms dating back to October 2011.

Findings

The primary clinician saw the inmate in a timely manner.  Medical record review did not appear to confirm the inmate's self-report regarding his Trazodone use.  It appeared that the psychiatrist submitted a non-formulary request for Trazodone, although the request was not located in the eUHR.  There was no documentation regarding the outcome of the non-formulary request.  Psychiatric follow-up was untimely.

**Inmate B**

This case was reviewed at the request of plaintiffs' attorneys.  The inmate was reportedly receiving mental health services at the EOP level of care, had recently attempted suicide, and complained of significant medication problems.  He appeared to be coping poorly at his current level of care.  Plaintiffs requested review of his level of care and current treatment plan, including medications.

The inmate's medical record, including a MHCB discharge summary dated 4/16/12, was reviewed.  He was admitted to the MHCB due to suicidal ideation; this presentation was very similar to prior hospitalizations that occurred from 3/2/12 to 3/7/12 and 3/27/12 to 4/2/12.  He

was provided with a diagnosis of Schizoaffective Disorder.  Documentation indicated that he had difficulty living in a general population yard.  He was subsequently discharged from the MHCB to the general population and to the 3CMS level of care.

A 5/1/12 mental health treatment plan review provided a diagnosis of Schizophrenia paranoid type.  The inmate was receiving mental health services at the 3CMS level of care.  Diagnoses provided in a treatment plan dated 5/10/12 included Adjustment Disorder that had resolved, Borderline Personality Disorder, and traits of Antisocial Personality Disorder.  Celexa was prescribed for impulsivity.  A 5/14/12 psychiatric progress note indicated that his presentation was consistent with a personality disorder.  The psychiatrist stated that he was programming well with good interpersonal relationships.  He was scheduled to parole in September 2012.  The previous MHCB admission was reportedly related to problems with a cellmate and/or other enemy concerns.

A 6/12/12 progress note indicated that the inmate was stable and ready for parole on 9/17/12.  His medications included Celexa and Vistaril.

Findings

The concern expressed by plaintiffs' attorneys was understandable in the context of the inmate's three MHCB admissions within a brief time period during 2012.  The medical record contained conflicting diagnoses, but it appeared that the most recent ones did not include a major mental disorder associated with psychotic symptoms.  It appeared that the inmate's presentation was consistent with a personality disorder.

The inmate continued to receive mental health services at the 3CMS level of care.  This appeared to be appropriate at the time of review based on available information.  The inmate was preparing for parole within two months of the site visit.

**Inmate C**

This 3CMS inmate's case was reviewed at the request of plaintiffs' attorneys.  He was housed in administrative segregation where he had been located since late May 2012 due to safety concerns.  Plaintiffs indicated that he had rapidly deteriorated in administrative segregation and requested evaluation of his treatment plan and level of care.

The inmate's medical record was reviewed.  A 6/18/12 treatment plan indicated that he was serving a life term without parole.  He had been placed on administrative segregation status due to safety concerns.  He reported experiencing auditory hallucinations several months prior to June 2012.  He indicated that his administrative segregation cellmate prevented him from contacting mental health for two weeks.  He was provided with diagnoses of Adjustment Disorder, mixed, with anxiety and depressed mood, and Polysubstance Dependence Disorder in institutional remission.  He was referred to the psychiatrist for medication assessment.

On 6/27/12, documentation indicated that the inmate continued to hear voices with sleep disturbance, although he reported that he felt better. At that time, the psychiatrist had not yet seen him.

A 6/29/12 psychiatric consultation was reviewed. The psychiatrist's handwriting was difficult to read, but it appeared that the inmate's presentation was consistent with symptoms of depression and anxiety. Zoloft was then prescribed with plans for follow-up with the psychiatrist on an as needed basis.

The medical record contained two other progress notes that summarized administrative segregation mental health rounds. No other mental health progress notes occurring after the psychiatric consultation were located in the medical record.

Findings

It was concerning that the inmate demonstrated clinical deterioration while housed in administrative segregation, where he was apparently housed due to safety concerns. The primary clinician did not see him weekly and the psychiatrist did not see him timely for follow-up.

**Inmate D**

This EOP inmate's case was reviewed at the request of plaintiffs' attorneys. He used a wheelchair full-time. He reported serious, ongoing suicidal ideation and was admitted to the MHCB on multiple occasions during recent years, in part due to severe pain that he indicated affected his mental health. Plaintiffs requested review of his level of care and current treatment plan, including medications.

The inmate's medical record was reviewed. Diagnoses listed on 6/7/12 included a primary diagnosis of Borderline Personality Disorder, Major Depressive Disorder, recurrent, severe with psychotic features, and Alcohol Dependence in sustained full remission. He was prescribed Prozac, Vistaril, and Remeron. He received mental health services at the EOP level of care.

A Form 7388-B dated 6/8/12 was reviewed. It provided a rationale for DSH non-referral.

The primary clinician documented clinical contacts occurring once to twice weekly during June 2012. Treatment themes included the use of spitting as a defense mechanism and feelings of emptiness, an unstable sense of self, and fears of abandonment.

The eUHR did not contain inpatient documentation of MHCB hospitalizations during the past year.

Findings

It appeared that this inmate was receiving mental health services at the appropriate level of care.

**Inmate E**

This 3CMS inmate's case was reviewed at the request of plaintiffs' attorneys.  He had been housed in administrative segregation since February 2012 due to safety concerns after his cellmate had stabbed him.  His mental health appeared to have deteriorated rapidly following administrative segregation placement.  He did not appear to be coping well in administrative segregation at his current level of care.  Plaintiffs requested evaluation of his treatment plan and level of care.

The inmate's medical record and a treatment plan dated 5/1/12 were reviewed.  It was indicated that he was serving a life sentence for a third strike due to his failure to register as a sex offender.  He was housed in administrative segregation for safety reasons as a victim of an attempted homicide.  He refused all out-of-cell contacts for the first three months of his administrative segregation placement.  He was receiving mental health services at the 3CMS level of care and denied significant mental health symptoms.

On 5/3/12, the inmate informed staff that he would hurt any inmate who was celled with him.  Cell-front interviews on 5/9/12 and 5/16/12 did not note any apparent distress.

Weekly primary clinician progress notes indicated that clinical contacts occurred at cell front.  The inmate consistently denied mental health problems.

Findings

The medical record did not confirm the previously referenced clinical deterioration.  The inmate appeared to be receiving mental health services at the appropriate level of care in the 3CMS program.

**Inmate F**

This EOP inmate's case was reviewed as he met indicators for higher level of care referral consideration, but was not referred.  He reportedly attended approximately 3.23 of 8.54 offered weekly hours of structured therapeutic activities.  Form 7388-Bs dated 12/22/11 and 2/2/12 did not indicate that he met indicators for higher level of care referral consideration.  On 3/2/12, the primary clinician indicated that he was clinically stable at the EOP level of care.  At the IDTT meeting on 3/23/12, he was provided with a diagnosis of Mood Disorder NOS.  Psych techs documented that he did not attend activities during March and April 2012.

On 4/24/12, the primary clinician documented a conversation with the inmate indicating plans for transfer to the 3CMS program and the inmate's reluctance regarding this change.  He was described as stable at that time.  On 5/7/12, the psychiatrist provided a diagnosis of Schizoaffective Disorder depressed type, and the inmate's participation in treatment was characterized as intermittent and unpredictable.

On 5/8/12, the primary clinician indicated that the inmate displayed normal cognitive functioning and reported that he was clinically stable on medications.  On 5/22/12, he was characterized as appropriate for change to the 3CMS program.  On 5/29/12, the primary clinician reported that the inmate functioned adequately.  Again on 6/12/12, he was characterized as stable and reported

that he was doing well. Plans were outlined to continue him at the EOP level of care with plans to transition him to the 3CMS level of care.

The Form 7388-B dated 6/21/12 included indicator seven, indicating consideration of referral to a higher level of care. It included an adequate non-referral rationale, but the intervention provided was inadequate in that it merely stated that the inmate was being transferred to a lower level of care. The IDTT note indicated that despite the inmate's complaints of depression and anxiety, there was no observable evidence that he was experiencing psychological or emotional distress. The team additionally noted that he appeared disinterested during therapy sessions. The team recommended moving him to the 3CMS program. At the time of the site visit, there was no treatment plan that detailed the IDTT's plan for treating him at the 3CMS level of care.

Findings

This inmate met indicators for consideration of referral to DSH based on treatment non-participation. The medical record contained several Form 7388-Bs; the most recent one acknowledged that he met an indicator for referral consideration and included a non-referral rationale. However, adequate alternative interventions were not included.

There was a lack of documentation that the primary clinician saw the inmate weekly. Although the decision to reduce the level of care to 3CMS may have been appropriate, the medical record did not document a plan outlining transition planning for the move to the 3CMS level of care. The medical record did not contain a current treatment plan.

**Inmate G**

This inmate was noted to have met indicators for DSH referral consideration due to low treatment participation; he attended only 3.23 of 8.54 offered weekly hours of structured therapeutic activities between 3/20/12 and 6/20/12. A treatment plan dated 9/1/11 outlined plans for individual primary clinician contacts every seven to fourteen days, with ten hours of weekly group therapy. The inmate's mental status was described as essentially unremarkable at that time.

Two Form 7388-Bs dated 12/8/11 and 3/1/12 indicated that the inmate did not meet indicators for DSH referral consideration. An IDTT meeting on 3/1/12 noted that he was receiving mental health services at the EOP level of care and was provided with a diagnosis of Schizoaffective Disorder. This note indicated that he was functioning at his baseline, but it was unclear how this determination was made. This note also indicated that the inmate would likely decompensate at a lower level of care due to the lack of structure and prompting.

Documentation indicated that primary clinician contacts occurred on 3/14/12, 3/29/12, 4/10/12, 4/24/12, 5/8/12, 5/22/12, 6/8/12, and 6/26/12. The primary clinician noted on 3/29/12 that the inmate's hygiene was improving. A note dated 5/21/12 documented a diagnosis of Bipolar Disorder, manic type with a provisional diagnosis of possible Schizophrenia, undifferentiated type. An updated IDTT note dated 5/24/12 provided an alternative diagnosis of Schizoaffective

Disorder; the note further documented that the inmate was attending only 49 percent of groups. However, an alternative plan was not proposed.

It appeared that the inmate was not considered for possible DSH referral, despite his low participation in offered treatment between 3/20/12 to 6/20/12.  Psych tech notes consistently documented his lack of group therapy participation.

Findings

The inmate attended less than half of offered structured therapeutic activities.  Despite this low level of participation, Form 7388-B documentation did not indicate this lack of programming and consideration of a higher level of care.  The inmate was described as functioning at his baseline without any explanation as to how this determination was made.  It appeared that diagnostic clarification was needed due to the various diagnoses provided for him.  It did not appear that the primary clinician saw him timely.

**Inmate H**

This EOP inmate's case was reviewed as he met indicators for referral consideration to a higher level of care, but was not referred.  He attended only 3.75 of 9.33 offered hours of structured therapeutic activities from 12/31/11 to 5/31/12.

Medical record review revealed that a treatment plan dated 12/22/11 was illegible.  A second treatment plan dated 1/25/12 indicated that the inmate was provided with a diagnosis of Depressive Disorder NOS and Cocaine Dependence by history.  Necessary participants were in attendance at the IDTT meeting and an accompanying Form 7388-B indicated that the inmate did not meet any objective indicators for higher level of care referral consideration.  An updated plan dated 2/23/12 indicated that he would receive weekly clinical contacts, medication management, and ten hours of weekly group therapy.  His mental status examination was described as unremarkable. The accompanying Form 7388-B did not indicate that he met any objective indicators for DSH referral consideration.  A Form 7388-B dated 5/17/12 indicated that he met indicators for higher level of care referral consideration.  The plan provided adequate rationale for non-referral and proposed appropriate clinical interventions.

The primary clinician consistently saw the inmate, but the contacts did not occur timely.  Psych tech notes for March and April 2012 indicated that the inmate attended few offered groups. Progress notes frequently described him as exhibiting irritability, with guardedness and concrete thinking.  On 3/27/12, the inmate reported that he was not attending groups due to auditory hallucinations.  On 4/12/12, he again reported auditory hallucinations.  An RVR evaluation dated 3/28/12 found that mental health factors did not contribute to the behavior that led to the RVR.

Findings

This inmate was described as guarded, with concrete thinking and irritability.  He reportedly had brief interactions with staff, but refused most clinical contacts.  It appeared that he met indicators for DSH referral consideration based on poor group therapy attendance.  In fact, the IDTT on

5/17/12 noted that he met DSH referral indicators.  The rationale for non-referral and the alternate intervention plan were clinically appropriate.

**Inmate I**

This inmate was housed in administrative segregation.  The IDTT saw him on 7/18/12.  He had recently transferred to administrative segregation, and had not yet been formally evaluated by clinicians, having only been seen at cell front.  The inmate had a history of depression, auditory hallucinations, and chronic pain stemming from a gunshot wound to his back.   He was provided with a diagnosis of Mood Disorder NOS.

The inmate refused most out-of-cell contacts in administrative segregation.  Although he reported significant issues with chronic pain, at the time of the site visit he had not been referred for a pain management consultation.  He reported only being prescribed Naproxen for pain.  When seen in the IDTT meeting, he presented with significant dysphoria.  He reported a history of psychiatric hospitalization prior to incarceration.  He denied any suicidal ideation, but previously had been hospitalized for it.

A 5/30/12 progress note indicated that the inmate was housed in the general population and appeared to be doing well. On 6/12/12, he was housed in administrative segregation.  He was seen for an RVR evaluation on 6/20/12, but was not seen for routine clinical contact until 6/27/12.  A clinician saw him on 7/5/12; this progress note, and the previous note dated 6/27/12, solely consisted of a mental status check sheet and did not provide additional information.  The most recent treatment plan located in the medical record was dated 3/13/12.

Findings

At the time that this inmate was observed in the administrative segregation treatment team meeting, he presented with dysphoric mood and complained of significant and apparently unmanaged pain.  The primary clinician did not see him timely.  The intake assessment and initial IDTT meeting also did not occur timely.  A current treatment plan was not located in the medical record.

The inmate likely required clinical contacts at intervals more frequently than every ninety days.  A change in level of care to the EOP would allow for more frequent clinical contacts and closer primary clinician monitoring.

The IDTT presentation observed by the monitor's expert during the site visit did not include review of indicators for higher level of care referral consideration or review of the Form 7388-B.  This meeting included minimal discussion of treatment planning.

**Inmate J**

This inmate was housed in administrative segregation during the site visit.  He was provided with a diagnosis of Adjustment Disorder NOS.  He was observed in the administrative segregation IDTT meeting that occurred on 7/18/12.  He presented with dysphoric mood and tearfulness.

The inmate was transferred to administrative segregation due to an alleged battery. He reported a history of poorly controlled knee pain and indicated experiencing difficulty obtaining appropriate medical treatment.

During the course of the IDTT meeting and at the monitor's expert's request, the CC I reported that the inmate had received three RVRs since 6/13/12. The primary clinician had not noted these RVRs and they had apparently not been included on the Form 7388-B.

The inmate was transferred to administrative segregation on 6/26/12. He was seen by an administrative segregation clinician on 7/3/12 when his mental status was described as unremarkable. A clinician again saw him on 7/9/12. The inmate was seen for an RVR assessment on 7/10/12.

<u>Findings</u>

The initial IDTT meeting for this inmate was untimely. It appeared that the primary clinician saw him timely. The inmate presented with dysphoria. He indicated that he would participate in interactions with a clinician. The inmate would likely benefit from at least weekly clinical contacts and might well benefit from the EOP level of care. He met indicators for higher level of care referral consideration, but no referral indicators were noted, and referral consideration did not occur.

EXHIBIT K
Pleasant Valley State Prison (PVSP)
July 9, 2012 –July 11, 2012

**Inmate A**

This inmate's medical record was reviewed because his name appeared on an audit related to responses to medication noncompliance.  The audit indicated that nursing referred him secondary to medication noncompliance on at least seven occasions beginning on 2/5/12; mental health saw him on 3/5/12.

The inmate was treated at the 3CMS level of care.  He was provided with diagnoses of PTSD and Panic Disorder with Agoraphobia.  He was prescribed various antidepressant medications including Effexor, Remeron, and Paxil.

Although he had been housed at SCC in the administrative segregation unit, by January 2012 he had transferred to PVSP.  A psychiatric note dated 1/24/12 indicated that he was serving a life sentence.  The note further indicated that the IDTT saw him, but a contemporaneous note indicated that the IDTT meeting was canceled due to a housing area change.  A third note indicated that the IDTT occurred on 1/24/12 and was attended by the psychiatrist, primary clinician, and CCI.

The inmate's reported history was significant for two inpatient psychiatric hospitalizations during the 1980's and a suicide attempt in 2009.  Progress notes also documented episodes of tremors and night terrors related to trauma.  The psychiatrist described him as anxious and depressed with hallucinations.  The psychiatrist outlined a plan to taper Effexor and to continue with Remeron.

A 2/7/12 laboratory review by the psychiatrist did not mention poor adherence to medication.  A 2/17/12 primary clinician note indicated that he was having difficulty receiving his Remeron related to his close A custody status.  It also stated that he reported that LVNs asked him to sign refusals despite his requests for the medication.  He was otherwise assessed as stable.

A 2/22/12 psychiatry note indicated that the inmate was seen due to laboratory follow-up (increased lipids) and was taking his medication as prescribed.  The note stated that he reported that he had not been receiving Remeron and would like to restart medications.  He was described as paranoid with increased arousal, anxiety attacks, and nightmares.  The psychiatrist encouraged him to discuss his grief and guilt with the primary clinician.

A 3/5/12 psychiatry progress note indicated that he was seen in response to a referral.  At that time, he continued to report that he was experiencing nightmares.  The note stated that he was taking medications as prescribed.

A different psychiatrist saw him on 3/14/12 for his IDTT when he continued to complain of nightmares.  The 3/14/12 treatment plan documented a history of suicide attempts and an MHCB admission in 2009.  It noted that his primary complaint related to intrusive memories of past events, nightmares, and poor mood.  His affect was described as blunted and his mood was depressed.  He was provided with a diagnosis of PTSD and was prescribed Paxil.  The treatment plan included no target dates or clinical updates.  The plan's goals included decreasing the frequency and intensity of intrusive memories and increasing his ability to articulate skills

related to sleep hygiene.  The plan included as strengths the inmate's patience and his lack of identified weaknesses.  The DSH screening was conducted.

The primary clinician saw him on 5/11/12.  The primary clinician noted that he had been provided with a diagnosis of pneumonia, had been feeling well for the past two months, and enjoyed education.  The inmate learned that his five children had moved to Oklahoma and he was discouraged that this issue had not been discussed with him.  Another psychosocial stressor included his concern about his mother's health, which resulted in sleep disturbance.  This was the most recent mental health progress note at the time of review.

Findings

The treatment plan was incomplete.  It contained reasonable goals which were not readily achievable with primary clinician contact that occurred every 90 days.  The issue of medication noncompliance was not adequately coordinated among mental health, psychiatric, and medical staff.

**Inmate B**

This 3CMS inmate had been housed at SVSP in administrative segregation, but by early December 2011 was transferred to PVSP.

A SRE dated 12/5/11 noted that he had a history of Major Depressive Disorder, was in chronic pain, and suffered from a chronic medical illness.  His acute risk factors included a current or recent depressive episode and feelings of helplessness.  He was also seen as angry or agitated with disturbance of mood.  He was noted to have had a history of suicidal gestures and plans and to have experienced suicidal ideation in August 2011.  A number of protective factors were also listed.  He was assessed with low chronic and acute risk of suicide.

A mental health evaluation dated 12/7/11 provided a diagnosis of Mood Disorder NOS.  It noted the inmate's report that he spoke five languages and had entered medical school.  The evaluation documented a history of several head injuries related to military activity, including head surgery.  He had been treated at the 3CMs level of care since 2009.  He also required EOP level of care treatment during three periods of time; the most recent occurred from May 2006 thru August 2009.  He was hospitalized at DSH from December 2005 thru May 2006.  He had several CTC admissions.

Reporting depression since childhood, the inmate was treated variously with Seroquel, Haldol, and Prozac.  He also had been provided with a diagnosis of Major Depressive Disorder recurrent, moderate.  He had a history of suicidal ideation intent, plan, and gestures.

A 12/20/11 treatment plan was conducted without the inmate in attendance due to a conflicting medical appointment.  It listed his problem as depression and recommended individual quarterly sessions with the primary clinician and groups when available; individual sessions with the psychiatrist were to be provided as needed and vocational placement "as available."  The goal

was to improve his mood and functioning through interventions and quarterly or as needed psychoeducation.

A 2/1/12 psychiatry note indicated that the inmate was seen for follow-up.  It stated that the last psychiatrist appointment occurred on 12/20/11, but this contact took place in the inmate's absence. It also noted that he was a new arrival after he arrived at PVSP on 12/11/11.  He exhibited hyperreligiosity, stating that he had killed an evil person.  He was provided with a diagnosis of Psychotic Disorder NOS and exhibited personality disorder-related cluster B traits; a history of head trauma in the EOP and a glass eye were also noted.  The plan outlined was for the inmate to be seen as needed.

The medical record documented his multiple medical care refusals.

On 4/9/12, a primary clinician's note documented the inmate's request for kosher meals.  The clinician described his mental status as normal and provided a diagnosis of Major Depressive Disorder.  He was noted to have benefited from the 3CMS program.  However, at the time of review, there was no other documentation of primary clinician contact since his arrival at PVSP in December 2011.

Findings

It appeared that treatment planning and scheduled initial contacts after arrival at PVSP were conducted in the inmate's absence due to a conflicting medical ducat.  Based upon available medical record notes at the time of review, these contacts were not rescheduled.


**Inmate C**

This inmate's medical record was reviewed as he was receiving mental health services at the 3CMS level of care.  He had a Keyhea order that was renewed on 3/6/12 as it was determined that he posed a threat to himself and to others.  He was provided with a diagnosis of Schizophrenia paranoid type.  He was primarily treated with Haldol Decanoate 100 mg intramuscular every four weeks.

A SRE dated 11/1/11 assessed him with low acute risk and moderate chronic suicide risk.  It noted his regular visits with family as a protective factor.  A SRE dated 1/13/12 noted that he cut his wrist two years earlier and evaluated his chronic and acute suicide risk as low.  It stated that he was stable on medications, which seemed to minimize his symptoms.

A primary clinician contact was conducted on 11/1/11 to complete a 90-day post-suicide follow-up.  The next progress note dated 12/4/11 indicated that he did not meet criteria for a Keyhea order, although there was documentation that he was not compliant with medications.  The narrative stated that he was receiving medications on a Keyhea order and was responding well to a monthly medication injection.

A primary clinician note dated 1/4/12 documented that he was doing well and that his mother had visited.  He was seen again on 1/13/12 for a 180-day post-suicide follow-up visit.
The psychiatric note dated 1/30/12 stated that he was seen for a Keyhea medication reevaluation.  It noted one prior suicide attempt and indicated that he remained stable.  He was described as ambivalent with minimization of his past psychotic symptoms, indicating that he remained at risk for treatment noncompliance and decompensation.  A psychiatric follow-up note dated 2/27/12 resulted in similar findings.

AIMS examinations were completed on 12/4/11 and again on 5/28/12.  The primary clinician saw him on 3/15/12 and again on 4/13/12 for a 270-day post-suicide follow-up.  A 4/13/12 SRE indicated that he cut his wrist several years prior; he was assessed with low chronic and acute risk for suicide.

A psychiatry note dated 5/28/12 reported that Keyhea orders were initiated after he decompensated; he barricaded himself in his cell, cut himself, and assaulted custody staff.  It noted that although he was programming, he declined to attend his Keyhea hearing.
A 6/7/12 primary clinician progress note indicated that he was interacting well with his cellmate and was receiving family visits.

Findings

The Keyhea process was appropriately addressed.  AIMS exams were consistently performed.  Clinical contacts occurred timely.  Evaluations of chronic suicide risk varied from low to moderate.

**Inmate D**

This inmate's record was reviewed because he was seen in a focus group during the site visit and was treated at the 3CMS level of care.  The primary clinician saw him on 11/3/11 at SQ, where excellent efforts at termination were made due to his pending transfer.  He was described as bright, thoughtful, and an asset to groups with good peer interactions.  He had ongoing individual contacts with mental health while housed in administrative segregation at SQ.

A 3/1/12 evaluation indicated that he had recently transferred from SQ to PVSP.  He reported feeling depressed since childhood.  He was provided with diagnoses of Major Depressive Disorder, recurrent, moderate and PTSD.  He reportedly experienced suicidal and homicidal ideation.  He was treated with Zoloft and Remeron.  Although not mentioned as a possible diagnosis, the evaluation included dialectical behavior therapy (DBT) as treatment for Borderline Personality Disorder.  The evaluation noted that he last saw a psychiatrist in early February 2012.  However, at the time of review, no psychiatric notes were located for this time period.

A SRE conducted at PVSP on 3/1/12 identified numerous chronic risk factors such as a history of abuse, psychotic disorder, and poor impulse control, chronic pain, being a sex offender, and violence, among others.  Numerous acute factors such as a recent or current depressive episode, increasing isolation, and recent or chronic anxiety or panic symptoms were also identified.  The history also noted considerable high risk behavior such as jumping from one roof to another.

Noted protective factors included future orientation and social support.  He was evaluated with low chronic risk and moderate acute risk for suicide.  There was no stated plan to address the identified moderate acute suicide risk.

A 3/15/12 psychiatry note indicated a long history of abuse as a child and a history of self-injurious behavior, chronic depression, suicidal ideation, and insomnia.  It noted that his last incident of self-injurious behavior was the preceding week when he cut himself so he could "feel it."

The annual IDTT was conducted on 3/15/12.  The target symptoms were depression and anxiety, but no target dates were noted.  He was described as depressed and anxious.  Goals provided included improvement in mood in 90 days and lowering negative ideation through the use of psychodynamic focus in sessions.  Other notes included the use of DBT and relaxation techniques, but subsequent notes did not include mention of these interventions.

A 5/2/12 primary clinician note from a different clinician provided a diagnosis of Borderline Personality Disorder; the note further stated that Remeron was beneficial, but the inmate continued to report symptoms of depression and anxiety. The plan was for referral to the psychiatrist.

Psychiatry saw the inmate on 5/8/12.  The psychiatrist provided diagnoses of Major Depressive Disorder and PTSD and the presence of a personality disorder related to cluster B traits.  The psychiatrist stated that the inmate reported that the increased Remeron dosage was not helping his depression; subsequently, a trial of Prozac was initiated.

No additional mental health notes were located in the medical record at the time of review.

Findings

While attempts were made to provide individualized treatment for the inmate, varying approaches were described that were unlikely to be applicable without more intensive primary clinician contacts.  Progress notes did not indicate that the planned techniques were employed to reach treatment goals.  An assessment of moderate acute suicidal risk warranted more clearly documented plans to monitor and lower that risk.  These issues were discussed with mental health supervisory staff during the site visit.

**Inmate E**

This inmate reported suicidal ideation that was likely based on perceived safety concerns.  Progress notes of a crisis admission that occurred on 11/17/11 indicated that he felt threatened by other inmates.  He was provided with a diagnosis of Adjustment Disorder NOS.  The Form 7388-B indicated that he met indicators for DSH referral consideration.

He was readmitted to crisis care on 12/1/11, again due to suicidal ideation.  The corresponding Form 7388- B indicated that he met no indicators for DSH referral consideration.  He was

discharged on 12/5/11.  However, he was readmitted on 12/6/11 after again encountering harassment by other inmates upon returning to the yard.

He was again admitted to crisis care from 12/15/11 thru 12/22/11.  Although this was the fourth admission within six months, the Form 7388-B dated 12/22/11 did not indicate that he met any indicators for DSH referral consideration.  This Form 7388-B, and some previous forms, were not completed entirely; blank boxes were present.  The treatment plan only listed suicidal ideation as a problem area and the MHCB as the treatment intervention.  However, a Form 7388-B dated 12/19/11 indicated that the inmate met one indicator for DSH referral consideration; a non-referral rationale was provided.  Progress notes during the review period indicated that he was seen at intervals consistent with Program Guide requirements.  However, the content of the notes did not indicate that facility staff acknowledged the behavioral patterns that had resulted in his frequent MHCB placements.

Findings

This inmate was in and out of the MHCB on at least four occasions from 11/12/11 thru late December 2011.  The Form 7388-B dated 12/19/11 indicated that he met indicators for DSH referral consideration.  However, Form 7388-Bs were often incomplete and the non-referral rationales lacked sound clinical justification.  There was no documentation as to treatment planning to address his chronic suicidal ideation and threats.

**Inmate F**

This inmate had at least three MHCB admissions during a six-month period as of 12/1/11.  However, his name did not appear on the December 2011 non-referral log.

Documentation indicated that he was admitted to the MHCB at PVSP on 9/8/11 due to suicidal ideation.  At the time, he had two prior MHCB admissions within the preceding three months and was apparently on an EOP wait list.  He reported that his cutting behaviors resulted from an attempt to relieve stress.  At that time, he was provided with a diagnosis of Anxiety Disorder.  The Form 7388-B included a treatment plan that only listed the MHCB as a treatment intervention; there was a lack of documentation as to coordination of treatment or assistance with the transition to the inmate's new program and housing location.  The Form 7388-B included recognition that he met one indicator of DSH referral consideration.  However, the rationale for non-referral was insufficient; it stated that he was not dangerous, suicidal, or gravely disabled.

The inmate was admitted to crisis care again on 9/30/11 after reporting thoughts of self-harm.  He had been told that he would transfer to an EOP program, but instead was endorsed for transfer to the CSP/Corcoran SHU (it was unclear why he was not recommended for transfer to a PSU).  The Form 7388-B did not indicate that he met indicators for DSH referral consideration.  However, the discharge summary acknowledged his three prior MHCB admissions.

He was readmitted to crisis care on 11/29/11.  Progress notes again indicated that his admission was precipitated by delay in transfer to the EOP.  The Form 7388-B again did not acknowledge that he met indicators for DSH referral consideration.

Findings

Although the inmate met indicators for DSH referral consideration, it did not appear that he was considered for such transfer. There appeared to have been a substantial delay in transferring him to the EOP.

**Inmate G**

Administrative segregation staff identified this inmate as one who had been on the EOP wait list for 18 months, was admitted to the MHCB, and was subsequently transferred from the EOP to the 3CMS level of care. He had concurrent medical illness, COPD, valley fever, and end-stage liver disease.

Information from an MHCB hospitalization dated 11/14/11 indicated that he had been placed in the MHCB on 11/9/11. A note dated 11/9/11 stated that he had a history of multiple MHCB admissions; this was his sixth admission. A progress note dated 11/12/11 provided a diagnosis of Adjustment Disorder, with depressed mood; he was not prescribed psychotropic medications.

The mental status examination section of the Form 7388-B dated 11/14/11 was blank. Although an earlier section of this Form 7388-B noted that he had six MHCB admissions, it stated that he met no indicators for DSH referral consideration.

Based on the medical record, it appeared that the inmate's level of care changed from EOP to 3CMS in February 2012. A progress note dated 2/24/12 stated that he was still awaiting EOP placement. A note dated 2/27/12 included reference to both the EOP and 3CMS levels of care and provided no rationale for the level of care change. However, a progress note dated 2/17/12 indicated that he was receiving services at the EOP level of care. Documentation did not indicate the exact date that the inmate was changed to the 3CMS level of care.

Findings

This 64-year old inmate suffered from end-stage liver disease and several other physical illnesses. He was generally described with dysphoric mood and had been hospitalized due to suicidal ideation. His primary clinician reported that he had been on the EOP wait list for several months (likely because of his medical condition), but was removed from it by the MHCB treatment team and placed at the 3CMS level of care. There was a lack of documentation as to the rationale for this level of care change. There also appeared to be a lack of interdisciplinary discussion and input regarding this change.

**Inmate H**

This inmate was placed in administrative segregation on 11/1/11. A treatment plan dated 11/8/11included a completed Form 7388-B that indicated that he met no indicators for DSH referral consideration.

The plan stated that he had a history of depression regarding safety concerns and that individual contacts with the primary clinician would occur quarterly.  It further stated that he would receive cognitive behavioral therapy (CBT) to address cognitive distortions.  It was unclear how this intervention would be provided during infrequently-occurring quarterly primary clinician contacts.

The revised treatment plan dated 2/7/12 included very little useful clinical information, such as a mental status evaluation.  The IDTT meeting was conducted in the inmate's absence.  No treatments were prescribed.  A treatment plan dated 5/15/12 outlined plans to increase coping skills to manage mood instability and depression, as well as CBT for anger management.  Progress notes written subsequent to the plan did not address treatment plan implementation; there was no documentation of CBT implementation or treatments to increase coping skills.  Periodic notes only consisted of brief mental status notes.

The Form 7388-B was completed at the time of the treatment plan updates.  Clinical contact appeared to have occurred on a weekly basis and contacts generally occurred at cell front.  Psychiatrist contacts occurred approximately every two to four weeks.

Findings

The treatment plan as written was vague.  No documentation indicated that the plan was implemented.  Clinical contacts appeared to have occurred timely.

EXHIBIT L
Avenal State Prison (ASP)
May 7, 2012 – May 9, 2012

**Inmate A**

This inmate's medical record was reviewed because he was housed in administrative segregation and was treated at the 3CMS level of care.  He was provided with diagnoses of Psychotic Disorder NOS, Depressive Disorder NOS, and Polysubstance Dependence.  He was prescribed Risperdal and Prozac.  He was housed in administrative segregation secondary to participation in a riot.

His mental status was significant for paranoid ideation and nighttime auditory hallucinations.  His history was significant for three suicide attempts, of which the most recent occurred in 2010.

A suicide risk evaluation dated 12/9/2011 noted a number of acute risk factors for suicide including symptoms of depression, anxiety, or panic, as well as chronic factors including a family history of suicide.  Protective factors included family and social support.  Although the rationale was sparse, the conclusions of moderate acute and chronic risks were supportable.  Form 7388-Bs dated 12/16/2011 and 3/2/2012 noted no positive findings for higher level of care transfer consideration.  The treatment plans accompanying these screenings targeted relevant symptoms, although the treatment plan dated 3/2/2012 described many of the goals as having been met.

At the time of review, the medical record contained progress notes indicating that the primary clinician saw the inmate on a weekly basis.  A recent focus of mental health contact was the inmate's concern about an RVR.  These individual contacts were supplemented by the inmate's generally regular group attendance, although he refused to attend group on some occasions.

Psychiatrist contacts took place on 2/17/2012, 11/15/2011, 11/9/2011, and 10/20/2011, with one refused appointment on 10/13/2011.  Two recent notations indicated that the inmate was seen at cell front.  One such contact reportedly occurred at the clinician's discretion to observe the state of the inmate's cell; the other occurred to observe the condition of the inmate's cell and due to "time limitations."

Findings

The psychiatrist and primary clinician consistently followed the inmate during the review period.  This frequency of contact was indicated by the inmate's assessed moderate chronic and acute risks for suicide and administrative segregation placement.  However, documentation of possible consideration for higher levels of care required greater attention to detail.  The indication that the inmate was seen at cell front due to time limitations indicated the need for mental health leadership's monitoring of this issue.

**Inmate B**

This EOP inmate's medical record was reviewed as a result of an interview in which he expressed concern with the provision of EOP services and mistreatment by custody staff and

other inmates.  He was provided with a diagnosis of Schizophrenia undifferentiated type.  He was prescribed Risperdal, which was sporadically discontinued due to worsening medication side effects.  He had received mental health services at both the EOP and 3CMS levels of care during the reporting period.  The inmate exhibited significant involuntary body movements attributed to tardive dyskinesia.  On 1/31/2012, the psychiatrist commented on the severe nature of his tardive dyskinesia.

A primary clinician note dated 2/2/2012 indicated that the inmate was not doing well.  At that time, he expressed paranoid ideation and experienced difficulty interacting with peers.  By 2/7/2012, he was placed at the EOP level of care; a progress note dated 2/8/2012 indicated his EOP level of care placement.  However, during February 2012, he periodically refused appointments with both psychiatrists and the primary clinician.  He was referred to CMF, with an alternate of CMC-E.

Subsequent progress notes indicated that the inmate could only tolerate brief clinician interactions.  The psychiatrist note dated 3/6/2012 stated that the inmate believed the psychiatrist had homosexual desires toward him.  Paranoia was exhibited again on 3/7/2012 when the inmate told the primary clinician that pill line nurses were trying to poison him.  A primary clinician note dated 3/1/2012 documented the inmate's difficulty functioning.  The note stated that he reported that his property had been stolen, but he feared informing custody staff due to possible retaliation.  A primary clinician note dated 3/16/2012 indicated that the inmate became very agitated when told that he had received an RVR.  That same note stated that he had recently received five RVRs, namely, one each in October 2011, November 2001, and December 2011, and two in January 2012.

A psychiatrist note dated 4/2/2012 stated that nursing staff had referred the inmate because he believed that others were "out to violate him" and he was noncompliant with medications.  He presented bizarrely at that time, but the note stated that custody staff reported that he did not demonstrate this same behavior in the housing area.  Although his medication was changed to Zyprexa at that time, subsequent notes indicated his ongoing refusal of psychotropic medications.  An OHU psychiatrist note dated 4/16/2012 indicated that the inmate provided his reasoning for not taking his medications.  It also noted the inmate's slurred speech, movements consistent with tardive dyskinesia, and chronic auditory hallucinations with paranoia.

The Form 7388-B dated 2/28/2012 noted that the inmate was unable to function within the structure of his current level of care due to a major mental disorder.  It documented that he should be treated at the EOP level of care.  This decision would have to be reevaluated were the inmate to decompensate.

Findings

This inmate presented with a complex picture of multiple RVRs, chronic psychotic symptoms such as auditory hallucinations and paranoia, and erratic adherence to prescribed medications in the context of apparent tardive dyskinesia.  Although the decision in February 2012 to attempt to treat him at the EOP level of care was supportable at the time, the

prolonged wait for transfer to an EOP program was problematic; it should have promoted either enhanced efforts to transfer him to an EOP setting or reevaluation for potential DSH transfer. The significant recent history of RVRs that one of the progress notes indicated was not reflected in the higher level of care transfer consideration.

**Inmate C**

This inmate's medical record was reviewed because DSH had accepted him but the inmate had not been transferred. He was provided with diagnoses of Mood Disorder NOS and Alcohol Dependence. He was prescribed Celexa and Depakote. The inmate's history was significant for numerous suicide attempts between the late 1990s and 2008. His recent history was also significant for five OHU admissions and two RVRs during 2011, which delayed his projected release date until 8/27/2013, as well as more recent RVRs. His OHU admissions were due to suicidal ideation, feelings that he would attack someone, and enemy concerns. Review of Form 7388-Bs indicated that the inmate met OHU admission and RVR indicators for DSH referral consideration, but noted that the EOP level of care and custody intervention to address enemy concerns were sufficient. The inmate was seen regularly during the review period and received comprehensive evaluations in the OHU.

Findings

This inmate received comprehensive evaluations during his multiple OHU admissions. The decision early in the review period for EOP level of care placement for him was supportable when made. However, over the course of the extended wait for his transfer, it became difficult for ASP to manage him; this should have prompted renewed consideration of potential DSH referral.

**Inmate D**

This inmate returned from DSH on 12/8/2011. He was scheduled for release on 2/6/2012. He was reportedly hospitalized at DSH Vacaville for approximately three months secondary to suicidal ideation and an inability to maintain his activities of daily living. He was provided with a diagnosis of Major Depression. He was prescribed Celexa, Remeron, and Buspar.

Upon return from DSH, the inmate reported that he remained in his cell most of the time while at DSH. He indicated that he nonetheless felt better than he did before the hospitalization. He also expressed not being worried about his parole because he could live with his parents. The inmate had intermittent suicidal ideation. The plan was to assist him with cognitive behavioral therapy, psychoeducation, and referrals to the parole clinic for aftercare. While incarcerated, he would receive services at the EOP level of care.

A treatment plan dated 12/16/2011 indicated that the inmate returned to administrative segregation from the OHU on 12/12/2011 and was maintaining well in a single cell. The treatment plan focused on the inmate's bereavement issues. These issues centered on the deaths of the inmate's aunts and sister, and most acutely on the killing of his pet dog.

A treatment plan dated 1/4/2012 indicated that the inmate had been placed in SNY housing. The plan noted that he would be considered for discharge from the EOP level of care if he was symptom-free without medication for six months.  The plan did not acknowledge his pending discharge from CDCR.  Subsequent progress notes indicated that he showed improvement due to his pending parole.  However, progress note documentation was not consistent with the treatment plan's content.

Findings

Overall, the psychiatrist and primary clinician saw the inmate in accordance with requirements during the review period.  The treatment plan provided individualized content, but progress notes were only partially related to issues that the treatment plan outlined.

**Inmate E**

This inmate's medical record was reviewed as he had transferred between the OHU and administrative segregation.  He was provided with a diagnosis of Major Depressive Disorder recurrent, with psychotic features.  He was prescribed Lithium, Paxil, and Geodon.  An ICC case note dated 11/3/2011 indicated that he was not enrolled in the MHSDS.  However, by February 2012, he was in administrative segregation at the 3CMS level of care.  Psychiatry and the primary clinician followed him consistently during February and March 2012, but documentation indicated that the inmate appeared to be decompensating.

An IDTT meeting on 3/16/2012 described the inmate as exhibiting unkempt hair, poor appetite, and hearing voices calling his name.  He also described "seeing things" which were increasing in size.  Also noted were the inmate's concerns that he might be developing dementia.  The Form 7388-B of the same date indicated that he was unable to adequately function due to a major mental illness, but noted that he was being placed at the 3CMS level of care to begin treatment.  The Form 7388-B also noted that DSH level of care was not indicated at that time.

On 4/10/2012, the inmate reported worsening auditory hallucinations and increasing frustration.  The IDTT meeting on 4/18/2012 considered the inmate's transfer to the EOP level of care.  At that time, he discussed his fears and thoughts of suicide, and stated that he would consider suicide if he could guarantee success.  A suicide risk evaluation dated 5/3/2012 indicated that he planned to shoot himself the day he was released from prison.  The inmate was referred to the OHU at that time.  A suicide risk evaluation dated 5/4/2012 documented many static and acute risk factors.  It also indicated the inmate's plan to kill himself and his desire to die, but the narrative indicated that he currently did not have any intention to commit suicide.  The inmate's chronic risk was assessed as high, and his acute risk was assessed as moderate.  The plan was to release him back to administrative segregation at the EOP level of care.

Findings

The inmate demonstrated a generally downward course during the reporting period.  Initially he was not receiving mental health treatment.  He subsequently required placement in the 3CMS program, and later at the EOP level of care.  The rationale for DSH non-referral lacked detail and provided as a rationale treatment at a level of care that the inmate was already receiving.  Suicide risk evaluations documented a high chronic risk of suicide and a moderate acute risk.  The questions of proper level of care and management of suicide risk required careful review and management by the treatment team.

**Inmate F**

This inmate's medical record was reviewed at the request of plaintiffs' attorneys as he reportedly had difficulty adjusting at ASP, where he arrived in February 2012.  A suicide risk evaluation conducted on 2/29/2012 found acute risk factors including passive suicidal ideation, but also indicated numerous protective factors including good contact with his family.  It noted that the inmate had recently transferred from KVSP where he was the captain's clerk.  His depression had increased due to this loss of employment.  However, his transfer to ASP had resulted in closer proximity to his family, making visits easier.  The suicide risk evaluation indicated low acute and chronic suicide risk.  A treatment plan dated 3/6/2012 recommended that the inmate remain at the 3CMS level of care, and provided him with a diagnosis of Depressive Disorder NOS.  The plan recommended weekly group treatment and quarterly primary clinician contacts.  No medications were ordered.  No history of treatment outside of CDCR or parole was noted.

A psychiatry note dated 3/7/2012 noted that the inmate appeared "demoralized" and that he missed the television he had at KVSP, but did not note overt depression.  No medications were prescribed.  A psychiatry note dated 3/24/2012 documented some improvement and decreased feelings of depression.  The psychiatrist indicated that there was no clear evidence of a psychiatric illness.  A psychiatry note dated 4/30/2012 stated that the inmate was optimistic about getting a job, and that his mood was good with group therapy attendance.  The symptoms of Adjustment Disorder had reportedly resolved at that time.

Findings

This inmate required ongoing contact with mental health staff to monitor his adjustment and level of suicidal ideation.  The medical record indicated that his adjustment to ASP had improved over time.  The inmate appeared to be receiving mental health services at the appropriate level of care.

EXHIBIT M
Salinas Valley State Prison (SVSP)
July 23, 2012 – July 26, 2012

**Inmate A**

The medical record of this administrative segregation EOP inmate was reviewed. There was documentation of a new arrival initial IDTT meeting on 1/5/12; the inmate was transferred from CSP/LAC to SVSP due to acquaintance with a CSP/LAC staff member. He was housed at SVSP while awaiting transfer to another facility. He was reportedly stable and not in acute distress.

A psychiatrist's progress note dated 1/23/12, which was difficult to read, indicated that he was prescribed Navane and Remeron. His primary clinician or group therapist wrote weekly progress notes. He was charged with a major rule infraction due to possession of a cell phone on 2/28/12.

The next mental health note was a treatment plan dated 3/22/12, which indicated that he attended groups with participation that occurred between 50 and 78 percent of the time. He was provided with a diagnosis of Psychotic Disorder NOS. He remained in the mainline EOP at that time. A Form 7388-B was completed during the IDTT meeting.

A treatment plan dated 4/18/12 indicated that he had been transferred to administrative segregation due to alleged "veiled threats" to staff. Documentation indicated that weekly clinical contacts occurred and he participated in administrative segregation EOP groups. There also was documentation of daily mental health rounds. The psychiatrist assessed him on 4/23/12.

An RVR mental health assessment was documented relevant to his rule infraction; this assessment was confusing due to the following findings:

> No mental health factors were to be considered during the disciplinary process;
> Mental disorder may have contributed behavior leading to the RVR; and
> No mental health factors to consider during assessment of penalties.

<u>Findings</u>

This inmate's treatment in the mainline EOP and administrative segregation EOP appeared to be consistent with Program Guide requirements. However, the findings in the RVR assessment were confusing, and likely, not very helpful to the hearing officer.

**Inmate B**

During March 2012, the inmate was housed in administrative segregation and was receiving mental health services at the 3CMS level of care. Documentation was present as to primary clinician contacts and daily psych tech rounds. The psychiatrist assessed the inmate on 3/20/12; he was prescribed Strattera for ADHD. An ICC occurred on 3/22/12. Due to space limitations, non-confidential individual clinical contacts took place on 3/22/12 and 3/27/12.

Progress notes relevant to group therapy participation were not located in the medical record until May 2012. In May 2012, the inmate's level of care was changed to EOP, when he was offered group therapy.

Findings

This inmate's treatment was consistent with Program Guide requirements.

**Inmate C**

This EOP inmate was housed in administrative segregation due to a pending SHU transfer following DSH discharge.  His 2/29/12 treatment plan was reviewed and was clinically appropriate.  He was provided with a diagnosis of Schizoaffective Disorder.  Group therapy progress notes were present for February 2012.

A psychiatrist evaluated the inmate on 3/1/12 and replaced Haldol with Zydis.  Mental health rounds and individual clinical contacts were documented during March 2012.  Progress notes documented group therapy participation, mental health rounds, and individual clinical contacts. A 115X assessment form completed on 3/6/12 included clear findings.

Findings

This inmate was receiving mental health treatment consistent with Program Guide requirements.

**Inmate D**

This case was selected for review from a MHCB roster of December 2011 admissions to review the mental health treatment provided.  The inmate was discharged from the MHCB to the EOP level of care.  He was serving time for a parole violation.  A mental health evaluation in the eUHR dated 11/04/11 indicated that he was a 22-year old man born in Brazil who was adopted by a family in the United States when he was 18 months of age.  Child protective services subsequently removed him from his adoptive parents due to abuse and neglect.  He was raised in foster care homes and had multiple placements.  He was single with no family contact or close relationships with others.  When not in prison, he was homeless with no history of gainful employment.  His criminal history included multiple theft offenses.

The inmate's initial mental health treatment occurred in January 2011 at WSP.  He was referred to mental health after complaining of blood in his urine, feces, and eyes.  When seen by mental health, he denied any symptoms.  He was not enrolled in the MHSDS.  His next mental health contact occurred on 3/3/11.  He was again referred due to his strange behavior; he was observed walking around wrapped in a blanket with a blank expression on his face.  He defecated on his bed and wiped himself with the blanket.

The inmate was admitted to the MHCB.  He was described as withdrawn, isolated, guarded, and refusing to eat or answer questions.  He again reported seeing blood coming from his own and others' eyes.  He refused to consider treatment with medication and was ultimately discharged to the EOP level of care in June 2011.

The inmate was released on parole, but it was revoked in short order; he returned to WSP on 8/31/11.  An evaluation at WSP on 9/15/11 placed him at the 3CMS level of care.  Correctional

officers again reported that his behavior was strange and resulted in problems with other inmates. He was placed on suicide watch in the WSP CTC on 10/29/11. He was subsequently discharged on 11/2/11 to the EOP level of care. He transferred to SVSP shortly thereafter.

The inmate was enrolled in the mainline EOP at SVSP, but refused to participate in any activities. He remained guarded throughout his stay. He would not answer questions or engage with clinicians. He continued to display unusual behaviors including standing in his cell naked for long periods of time, defecating on himself, and responding to internal stimuli. The primary clinician at SVSP concluded that an adequate, accurate assessment could not be completed and his diagnosis was deferred. A treatment plan indicated that he would remain at the EOP level of care until staff could perform an adequate assessment and initiate treatment. He refused to see the psychiatrist or consider medication. The Form 7388-B completed at the 11/22/11 IDTT meeting indicated that there were three or more MHCB admissions in a short period of time; however, the team decided to retain him at the EOP level of care rather than refer him to DSH. Ultimately, he was rereleased to the community on 1/4/12; he had received no mental health treatment in prison and was not provided with a referral for community treatment.

Findings

The mental health staff at WSP and SVSP failed to recognize and/or diagnose the inmate's psychosis in spite of repeated referrals from custody. The inmate received essentially no treatment in prison beyond mental health housing. There was no rationale to support the team decision not to refer the inmate to DSH level of care or minimally, seek a Keyhea order based on grave disability.

**Inmate E**

This 3CMS inmate was housed in administrative segregation. He was seen at the IDTT meeting in administrative segregation on 7/25/12 for an initial 3CMS treatment plan. He was previously incarcerated in the CDCR, but was not enrolled in the MHSDS at the time; however, prior to his arrival on the current sentence, he was prescribed antidepressant and antipsychotic medications at the county jail. He arrived at NKSP reception and underwent mental health screening on 2/21/12. He was referred for a mental health evaluation due to "indications of a possible mood disorder."

A mental health evaluation was conducted on 2/24/12 and a diagnosis of Mood Disorder NOS was provided. Celexa, an antidepressant, was initiated. No antipsychotic medication was ordered as the inmate denied experiencing hallucinations of any type and there was no evidence of delusional or disorganized thinking. He was enrolled at the 3CMS level of care. Psychiatry saw him every four to six weeks and he was seen for several individual primary clinician contacts while housed at NKSP. He requested discontinuation of Celexa after several months as he believed that it was ineffective. The last documented psychiatric appointment at NKSP occurred on 6/22/12 and the medication was discontinued. No treatment plan was developed at the time of NKSP intake.

The inmate transferred to SVSP on 7/3/12.  The primary clinician saw him on 7/6/12.  He was transferred to administrative segregation on 7/17/12 due to a disciplinary infraction.  His new primary clinician interviewed him and there was an IDTT meeting on 7/25/12.  Additional diagnostic clarification was not provided.  The inmate requested an evaluation by the psychiatrist to discuss his medications and an appointment was scheduled for the following week.  Due to the timing of the primary clinician's appointment and IDTT meeting, the information had yet to be scanned in the eUHR.  The treatment team discussed reviewing his paper UHR if still available from his earlier 2007 CDCR stay and asking his permission to obtain any outside treatment records, including those from the county jail, to assist in diagnostic clarification.

Findings

The inmate appeared to be receiving mental health services at the appropriate level of care.  His case was timely identified after transfer from reception and at the time of relocation to administrative segregation.  The IDTT was conducted timely.  Diagnostic clarification was required to update the "NOS" categorization to a more specific and precise diagnosis, if possible.

**Inmate F**

This 3CMS SNY inmate was reviewed after he was observed participating in an anger management group session.  During the group, he expressed anxiety about his impending parole release; he would return to Los Angeles, where he had not resided for 22 years.  He thought that he would have housing by virtue of family members, but expressed concern as to obtaining mental health services in the community.

The inmate's eUHR indicated that he was provided with a diagnosis of Adjustment Disorder with mixed disturbance of emotions and conduct.  He had a remote history of a previous suicide attempt in prison.  He was not prescribed psychotropic medications.  The primary clinician saw him for individual contacts at intervals of two to three months; the inmate had discussed his anxiety related to prison release for several months.

Findings

This inmate appeared to be receiving mental health services at the appropriate level of care.  However, service intensity and pre-release parole planning should have been increased as his parole approached to assist in decreasing anxiety and transitioning him to the community following a lengthy prison sentence.

**Inmate G**

This case was selected at random from a list of EOP inmates to review the mental health care provided.  The inmate was provided with diagnoses of Schizophrenia disorganized type, Polysubstance Dependence in institutional remission, and Antisocial Personality Disorder.  He was on a Keyhea order for psychotropic medication.

The last several IDTT plans, dated 1/12/12, 4/12/12, and 7/12/12, were reviewed.  The inmate was a participant in the EOP since 2009.  Most recently, he was assigned to ten weekly clinical groups and received two additional hours of credit for a job assignment.  He routinely attended 70 to 80 percent of groups until the most recent IDTT, when his participation was only 45 percent.  The Form 7388-Bs accompanied each IDTT meeting; the most recent one indicated that a DSH referral would not be submitted because he was clinically stable and would parole within three weeks.  Individual sessions with the primary clinician focused on parole issues, including securing transportation and discussing access to outside resources.

<u>Findings</u>

The inmate appeared to be receiving mental health services at the appropriate level of care.  Mental health interventions were provided that met or exceeded Program Guide minimum requirements.  Clinical documentation indicated that he was stable.  Recent individual contacts appropriately focused on issues related to his upcoming parole.

**Inmate H**

This case was selected at random from a list of inmates in the EOP to review that level of care.  The inmate's level of care was changed from 3CMS to EOP on 5/23/12.

In February 2012, the inmate was reassigned a new primary clinician.  A treatment plan with the new clinician was developed on 2/08/12; it indicated that he was receiving mental health services at the 3CMS level of care.  The plan also indicated that he had expressed interest in continuing to work on his depressive symptomatology.  He was provided with a diagnosis of Mood Disorder NOS.

The next IDTT plan occurred on 5/23/12.  It noted that the inmate had recently arrived in administrative segregation from A Yard for safety concerns.  He told his clinician on A Yard that he had purchased more than 700 mg of heroin on the yard and had taken it in a suicide attempt.  He had recently learned that his daughter was serving a life sentence in prison in Florida.  Following the heroin ingestion, he slept for two days.  He told his clinician about the incident when he awakened.  He was admitted to the MHCB, where he remained for approximately two weeks.  When he was discharged back to A Yard, he began to experience issues related to his drug debt on the yard; he originally had no intention of paying the drug debt because he expected to be dead.

The inmate's diagnosis was amended to Major Depressive Disorder, recurrent, severe without psychotic features and his level of care was increased to EOP.  He was subsequently released to the EOP yard; another IDTT meeting occurred on 6/14/12.  He was prescribed psychotropic medication (antidepressant), attended individual sessions with his primary clinician, and was enrolled in group therapy.  The Form 7388-B accompanied each treatment plan and indicated that he did not meet indicators for higher level of care referral consideration.  His depression had improved.

<u>Findings</u>

This inmate appeared to be receiving mental health services at the appropriate level of care. His level of care was changed from 3CMS to EOP after an MHCB admission following a suicide attempt by overdose. He showed improvement with an appropriate course of mental health treatment.

**Inmate I**

This inmate's case was reviewed as he had three or more MHCB placements within a six-month period ending within the review period.

On 2/12/12, he was housed in administrative segregation due to fights on the yard. He had a history of multiple crisis bed admissions due to suicidal ideation. He was provided with diagnoses of Mood Disorder NOS, ADHD, and PTSD. Documentation indicated that he was responsive to treatment, which consisted of group and individual therapies.

The Form 7388-B completed on 2/12/12 noted that he met several indicators for DSH referral consideration. DSH referral was recommended and he was subsequently transferred to DSH.

Findings

The inmate was appropriately identified as requiring DSH referral consideration and was subsequently transferred.

**Inmate J**

This inmate was encountered during the administrative segregation rounds. Staff reported that he had several DSH hospitalizations. When seen briefly at cell front, he was somewhat disheveled and minimally communicative.

A Form 7388-B dated 2/9/12 noted that he met one of the subjective indicators for DSH referral consideration. The non-referral rationale provided was that he would be reassessed on 2/9/12 (the same date as the IDTT meeting). A progress note of this same date indicated that he might require a higher level of care than what was offered in the EOP. The note further stated that this would require additional evaluation and that the possible referral would be considered at the next IDTT meeting on 2/16/12. The medical record did not include evidence that an IDTT meeting occurred on this date.

A progress note dated 2/21/12 did not mention DSH transfer. A note dated 2/23/12 documented a request for consultation based on his refusal of oral medication. A note dated 3/5/12 stated that he was very confused and was not aware of his scheduled mental health appointment. On 3/6/12, he was reportedly unable to function in the EOP; he presented with confusion and instability, after giving away some of his possessions under pressure from other inmates. In response to this difficulty, the clinician apparently changed his group assignment; however, there was no indication that he was considered for referral to a higher level of care.

The inmate was placed in administrative segregation due to safety concerns.  A primary clinician's note dated 3/13/12 described him as disheveled with unusual speech and jerky expressions.  The clinician wrote that he "will be given the opportunity" to seek DSH care while in administrative segregation.  A note written after his arrival in administrative segregation indicated that he was difficult to understand and his thinking was not goal-directed.  The clinician only recommended that the IDTT review the case on 3/21/12.  The mental status examination completed on 3/21/12, as part of the treatment plan, described his mental status as normal and included essentially no relevant clinical summary of recent notes.  He was provided with a diagnosis of Schizoaffective Disorder.  The Form 7388-B indicated that he did not meet indicators for DSH referral consideration.

A note dated 6/12/12 stated that he was improving after his medication administration was changed to crushing the medication and floating it in liquid.  When seen on 6/13/12, he had been endorsed to CSP/Sac and his condition had apparently improved as he had been placed on a Keyhea order.  A 6/19/12 note documented good group therapy participation.  Psych tech notes documented that he exhibited reasonable hygiene.  A note dated 6/26/12 stated that he continued to exhibit impaired thinking.  More recent psych tech notes stated that he maintained appropriate mood, hygiene, and cell maintenance.

Findings

This inmate had apparently been housed in administrative segregation for safety reasons for several months while awaiting transfer to CSP/Sac.  Progress notes from February 2012 indicated that he presented with confusion and poor hygiene; the clinician indicated that he should be considered for DSH referral.  The Form 7388-B dated 2/9/12 indicated the need for DSH referral consideration, but this decision was deferred until the next IDTT meeting; however, there was a lack of documentation that this IDTT meeting had occurred.

The inmate was not appropriately considered for DSH referral.  It appeared that he showed improvement after implementation of the Keyhea order and changes in medication administration.

**Inmate K**

The psych tech identified this administrative segregation inmate as he reportedly seldom spoke to staff, did not speak clearly, and appeared to sleep for prolonged periods of time with poor group participation.  Correctional officers on the unit also independently identified him due to his odd behavior.

He had a history of placement in the CSP/Sac PSU.  He was described as presenting with a severe potential risk for suicide and danger to others.  In February 2008, he was transferred to an outside hospital due to catatonic behavior.  He was apparently housed at CSP/Sac until May 2012.  He was housed at SVSP when he was transported to court.  A treatment plan dated 3/6/12 indicated that he had poor insight and judgment, limited fund of information, impaired intellectual functioning, and auditory hallucinations.

The inmate had no recent MHCB hospitalizations.  The treatment plan dated 2/8/12 noted that he presented with a normal mental status examination.  He was provided with a diagnosis of Schizophrenia paranoid type.  He was placed on a Keyhea order on 4/4/12 due to grave disability.  The Form 7388-B dated 4/4/12 noted that he did not meet any indicators for DSH referral consideration.

A treatment plan completed on 5/23/12 indicated that the inmate had arrived at SVSP from DVI on 5/17/12.  The plan noted that he had a history of DSH placement.  The inmate refused to attend the treatment team meeting.  He was again provided with a diagnosis of Schizophrenia paranoid type.  The Form 7388-B noted that he did not meet any indicators for DSH referral consideration.  A psych tech note dated 6/29/12 documented his group therapy and that he appeared to be stable.  A clinician's note dated 7/1/12 described his hygiene and cell maintenance as normal.  However, on 7/5/12, he was described as slightly disheveled with restricted range of affect.

Findings

This inmate presented with a significant history of staff assault and paranoid behavior.  Most recent notes appeared to indicate that he continued to attend some groups in a productive manner, with adequate interaction with clinicians; however, at times he presented with a somewhat disheveled appearance.  The most recent Form 7388-B did not identify any indicators for DSH referral consideration, which appeared to be clinically appropriate.

EXHIBIT N
Correctional Training Facility (CTF)
August 15, 2012 – August 17, 2012

**Inmate A**

This 3CMS inmate had been incarcerated since 2006 for manslaughter with gang enhancement. He had no history of mental health treatment prior to his CDCR incarceration. He requested SNY placement in 2007 as he wanted to discontinue his gang affiliation. He was not initially included in the MHSDS, but in December 2009 requested a mental health assessment for depression. He was provided with a diagnosis of Major Depressive Disorder and an antidepressant medication was prescribed. He was placed in the 3CMS program at that time. He transferred to CTF in September 2011.

An IDTT was conducted on 9/21/11 and the inmate was continued at the 3CMS level of care. IDTT documentation indicated that he did not meet indicators for higher level of care referral consideration. The primary clinician subsequently saw him on 10/13/11, 11/28/11, 2/7/12, 5/1/12, and 7/21/12. The psychiatrist saw him on 10/13/11, 1/4/12, 3/28/12, and 6/20/12. The psychiatrist also saw the inmate on 7/18/12 in response to a self-referral. The inmate asked the psychiatrist to change his antidepressant medication because he thought it would help him deal with his cellmate. The psychiatrist referred him back to the primary clinician as there was no clinical rationale for a medication change. The primary clinician saw the inmate three days later as a result of this referral.

Findings

It appeared that the inmate was receiving mental health services at the appropriate level of care in the 3CMS program. The psychiatrist and primary clinician saw him timely. The psychiatrist also saw him timely in response to a self-referral with an appropriate assessment and referral for counseling. Mental health staff was responsive to the inmate's requests for services.

**Inmate B**

This case was selected at random from a list of SNY 3CMS inmates. The inmate reported experiencing suicidal thoughts to a correctional officer on 3/25/12. The officer made an emergency referral to mental health and a sergeant escorted the inmate to mental health for an immediate suicide risk evaluation.

The suicide risk evaluation indicated both acute risk factors (suicidal thoughts, depressed mood, anxiety, recent bad news, and safety concerns) and several chronic risk factors (chronic pain, medical conditions, history of substance abuse, poor impulse control, and a long prison sentence.) The inmate was transferred to the Central Facility infirmary and was placed in the MHOHU. In the MHOHU, he was seen daily by a psychiatrist or psychologist and his condition improved. An IDTT was conducted on 3/27/12. The inmate was released back to the North Facility SNY on 3/28/12. A suicide risk evaluation conducted prior to his MHOHU release identified the same risk factors; it also noted that the inmate's agitation had subsided and he expressed plans for the future and a desire to work with his primary clinician on his acute problems. He was provided with a diagnosis of Adjustment Disorder. Vistaril was prescribed as needed for anxiety.

The inmate was seen daily for five days following MHOHU release and on the sixth day (4/3/12) the psychiatrist saw him. He had no primary clinician contact from 4/2/12 to 6/30/12. His subsequent psychiatrist appointment occurred on 6/26/12.

Findings

Correctional staff referred the inmate for a mental health assessment and mental health timely assessed him. He was admitted to the MHOHU and his condition reportedly improved. Upon discharge, he appropriately received five-day follow-up. Unfortunately, after the resolution of the acute episode, he was not seen for nearly two months. This interval was consistent with Program Guide minimum standards. However, it was too long from a clinical standpoint given the acuity of his March 2012 presentation and the lack of change in any of the acute or chronic risk factors noted in the suicide risk evaluation at the time of MHOHU release. The long interval between clinical contacts also did not provide an opportunity to address the acute problems that had been identified with his primary clinician.

**Inmate C**

This 3CMS inmate was serving a life sentence and was incarcerated for 25 years before requesting mental health services. In July 2010, he requested to see mental health following a parole hearing when he received an additional seven years. He reported that his "emotions changed after that," with sadness and anxiety. A mental health evaluation was conducted on 7/14/10 and he was included in the MHSDS at the 3CMS level of care. He was provided with a diagnosis of Adjustment Disorder, mixed with anxiety and depression. No referral to psychiatry was submitted, nor was a referral indicated.

The primary clinician continued to see the inmate at intervals of one to two months. He reported appreciating these sessions, which included discussion of his issues and concerns. The annual IDTT meeting, mental health evaluation update, and suicide risk evaluation were all completed in February 2012. Documentation indicated that he did not meet any indicators for higher level of care referral consideration. The inmate expressed his desire to continue participating in the 3CMS program and stated that he benefited from the primary clinician sessions. The primary clinician's progress notes indicated that psychodynamic psychotherapy was used as a treatment intervention, but documentation did not indicate that this therapy occurred.

Findings

This inmate clearly benefitted from occasional contact with his primary clinician. However, these contacts were supportive in nature and did not constitute psychodynamic psychotherapy. Documentation did not indicate that the inmate continued to meet 3CMS eligibility criteria. It may have been appropriate to begin transitioning him to other potential sources of support, such as the chaplain and/or volunteer activities, rather than indefinitely maintaining him on the MHSDS caseload.

**Inmate D**

Medical referred this inmate to mental health on 10/26/11 as part of the routine preliminary work-up to assess his mental health prior to initiating treatment with Interferon. Previously, he had not been an MHSDS participant. Mental health evaluated him on 11/14/11, when he reported multiple family losses over a relatively short period of time and episodic depression. He was provided with a diagnosis of Depressive Disorder NOS and was enrolled in the MHSDS at the 3CMS level of care. An IDTT was conducted on 11/22/11; the treatment plan outlined a combination of cognitive behavioral therapy and psychotropic medications. The IDTT plan was not signed and was not accompanied by a Form 7388-B, but a progress note indicated the IDTT meeting date and participants.

The psychiatrist evaluated the inmate and determined that he did not require treatment with psychotropic medications. The primary clinician saw him on 1/24/12, 4/19/12, 6/1/12, 6/29/12, and 7/19/12. Documentation from those contacts indicated that the inmate was stable.

Findings

Psychiatry and the primary clinician saw the inmate timely. Either diagnostic clarification or additional rationale was needed to justify continuing the diagnosis of Depressive Disorder NOS. Assessments and progress notes did not support the existence of depressive signs, with the exception of the inmate's self-report of episodic depressed mood. No signs or symptoms of depression, including appetite or sleep disturbances, thoughts of death/suicide, Anhedonia, or low energy levels were documented.

**Inmate E**

This case was selected for review from a roster of MHSDS inmates as the inmate was identified as being housed in administrative segregation and receiving mental health services at the EOP level of care. At the time of the site visit, he had transferred to the EOP program at SVSP.

This inmate had a long history of mental health treatment with psychiatric hospitalizations while incarcerated and prior to his arrival at CTF. He received SSI in the community due to psychiatric disability since the age of 18. He was provided with a diagnosis of Bipolar Disorder. He had a history of suicide attempts by overdose in jail and of cutting his wrists. He had received mental health services at both the EOP and 3CMS levels of care during a prior CDCR prison term.

The inmate was evaluated upon reception when he entered CDCR on new charges. He was provided with a diagnosis of Bipolar Disorder and was placed in the 3CMS program. He was prescribed Effexor and Lithium. He subsequently transferred to CTF on 10/13/11. He did well for a period of time until he was inconsistent with medication compliance. He was admitted to the MHOHU in May 2012 and was released with five-day follow-up following a one-day stay.

The medical record did not specify the reason for the inmate's administrative segregation placement; however, on 6/12/12 his level of care was changed from 3CMS to EOP. The primary clinician subsequently saw him on 6/14/12, 6/16/12, 6/25/12, 7/2/12, and 7/9/12. Documentation indicated that he was seen daily during psych tech rounds.

The inmate transferred to SVSP.  There was an initial contact with mental health on 7/16/12 and an IDTT meeting on 7/18/12.

Findings

The inmate's condition appeared to warrant an increase from the 3CMS program to a higher level of care.  This level of care change occurred and the inmate transferred to the EOP within four or five weeks.  The primary clinician saw him frequently when he was housed in administrative segregation and the inmate was seen daily during psych tech rounds.  The medical record did not contain information as to the reasons for administrative segregation placement; this information was important and clinically relevant and it would have been beneficial to have included it in the medical record.

**Inmate F**

This 3CMS inmate arrived at CTF from CMF in May 2012.  He was already enrolled in the MHSDS program at the 3CMS level of care.  He was provided with a diagnosis of Psychotic Disorder NOS, in remission.  He was not prescribed psychotropic medications.  He had been incarcerated for 15 years and was serving a life sentence due to a third strike for a non-violent incident.  In the past, he had required mental health treatment at the EOP level of care.

Since arriving at CTF, the psychiatrist saw the inmate on 5/24/12 and 6/22/12.  There were no reported mental health symptoms requiring treatment with psychotropic medications, which were not prescribed.  The primary clinician saw him on 5/16/12, 7/31/12, and 8/10/12.  Documentation indicated a stable clinical condition.

Findings

It appeared that the inmate was receiving mental health services at the appropriate level of care in the 3CMS program.  The psychiatrist and primary clinician saw him timely.

**Inmate G**

This case was reviewed at the request of plaintiffs' attorneys as the inmate reported being denied single cell placement by CTF mental health staff.

The inmate had a number of chronic medical conditions including sleep apnea, chronic pain, headaches, and asthma.  He had no history of mental health treatment prior to his CDCR incarceration.  He consistently reported anxiety related to fear that a cellmate would eventually discover the nature of his offense and harm him.  He refused to consider SNY placement.  In July 2008, a mental health evaluation referred him to psychiatry due to panic attacks and indicated that he "may require short term single cell housing."  Although not included in the eUHR, the psychiatrist apparently ordered Vistaril for anxiety and agreed to a single cell chrono.  This chrono was not renewed, but remained in effect until discovered in March 2011.  The inmate subsequently continued to advocate for a single cell due to anxiety associated with having a cellmate.

Different clinicians assessed the inmate on multiple occasions.  They determined that his mental health condition did not warrant a single cell.  The case was discussed with clinical supervisors and primary clinician peers.  The inmate's treatment plan was modified to include more frequent sessions, different providers, and medication management, but he was not cooperative with these interventions.  Several different mental health providers attempted to work with him in psychotherapy concerning his anxiety complaints, but he refused, citing only the need for a single cell.

The inmate was discharged from the MHSDS on 7/3/12 due to lack of a qualifying mental health condition, stability without medications, and lack of treatment engagement.  He appealed the decision.  The psychiatrist saw him on 8/6/12 when he stated that he wished to remain in the 3CMS program to talk about his mother's death in 2010 and a single cell placement.  An appointment with a psychologist was scheduled for 8/9/12 to begin working with him as to his feelings concerning his mother's death, but he left the session after ten minutes.

The medical record contained progress notes indicating psychiatric contacts on 9/12/11, 12/11/11, 12/30/11, 2/5/12, 4/26/12, and 8/6/12.  Primary clinician progress notes documented contacts on 9/14/11, 10/21/11, 12/30/11, 2/1/12, 2/7/12, 2/21/12, 3/20/12, 5/31/12, 6/20/12, and 8/9/12.

Findings

Documentation did not justify the inmate's single cell placement for mental health reasons.  He was assessed on multiple occasions by several providers, and was offered treatment for his anxiety symptoms.  The inmate's safety concerns may have had merit.  It appeared that mental health interventions were appropriate despite the inmate's lack of cooperation with treatment.

EXHIBIT O
Wasco State Prison (WSP)
July 9, 2012 – July 11, 2012

**Inmate A**

This case was reviewed at the request of plaintiffs' attorneys based in part on a concern that the inmate's endorsement for Level III 3CMS/SNY placement expired on 3/31/12 and had not been renewed. WSP reported that the endorsement had in fact expired on 3/31/12 and the C-file was sent to the CCI for re-endorsement. When the CSR reviewed the file, the mental health chrono was not current and the file was returned for an updated chrono. This was completed on 5/17/12 and the C-file was returned to records for the CSR to review by 5/18/12; however, the inmate was not re-endorsed until 7/6/12. At the time of the site visit, the inmate was endorsed to CSP/Corcoran Level III SNY.

Documentation indicated that primary clinician contacts occurred on 7/29/11, 8/23/11, 10/13/11, 11/4/11, 1/31/12, and 5/17/12. Psychiatry also saw the inmate for medication management at intervals of one to two months. He was compliant with prescribed Risperdal, Buspar, and Remeron. He routinely reported that the medications were beneficial and requested that they not be changed or adjusted. Documentation indicated that he was clinically stable and appropriate at the 3CMS level of care.

Findings

Documentation indicated that the inmate was clinically stable and managing well at his current level of care. The delay in his transfer was due in part to the statewide shortage of Level III 3CMS/SNY beds. Delays in the re-endorsement process due to human error and/or oversight accounted for additional delay.

**Inmate B**

This case was reviewed at the request of plaintiffs' attorneys based on concern that the inmate had been referred to the EOP level of care in April 2012, but remained at WSP in July 2012. This 35 year-old inmate had concomitant serious medical problems in addition to his mental health condition. His medical problems included a history of intractable seizures, chronic spine pain, possible early Parkinsonism, a remote history of thyroid cancer, dyslipidemia, hypertension, gastroesophageal reflux disorder, and facial seborrhea.

The inmate had a medical hold in May 2012 to complete a neurological consultation for Parkinson's disease and another medical hold until early July to evaluate a thyroid nodule. The nodule was biopsied on 6/29/12. Additional factors complicating placement included his single cell status for enemy concerns. This issue was referred for custody review to determine whether or not this status was still necessary before an endorsement could be completed.

Originally placed at the 3CMS level of care, the inmate was moved to the EOP following the death of his wife, who had been ill with cancer. He was housed in alternative temporary housing from 5/15/12 to 5/16/12 due to a report of suicidal ideation, poor sleep, and nightmares of victimization in the county jail. There was consistent documentation regarding the provision of EOP level of care in the reception center.

Findings

This case presented a number of highly complicated medical and psychosocial issues. Addressing the issues prior to transfer appeared to be the appropriate course of action under the circumstances.

**Inmate C**

This case was reviewed at the request of plaintiffs' attorneys based on the inmate's concern that he had been housed at WSP since November 2011 while awaiting transfer for several months. He had a history of MHCB placement at CIM in July 2011, but had no subsequent placements in the MHCB or alternative housing while at WSP. He was also sent out to court from 3/5/12 to 3/20/12. He was receiving mental health services at the 3CMS level of care.

The inmate was seen by the psychiatrist who prescribed Effexor (an antidepressant) at intervals of one to three months. He was seen by a primary clinician at intervals of two to eight weeks. Documentation indicated that he was clinically stable. His speech was fluent, coherent, and relevant, and his thinking was organized without evidence of delusional beliefs; he denied suicidal ideation. He reported feeling anxious and depressed regarding his continued stay at WSP; he requested change to the EOP level of care to obtain a single cell. However, his condition did not warrant a higher level of care.

The inmate was endorsed to the Level III at CSP/Corcoran on 7/9/12.

Findings

Documentation indicated that the inmate was receiving mental health services at the appropriate level of care. The reasons for the delay in his endorsement were unclear; however, he was endorsed to the Level III at CSP/Corcoran on 7/9/12 and transfer was expected thereafter.

**Inmate D**

This case was selected for review from a roster of reception center 3CMS inmates in order to review that level of care. The inmate arrived at WSP reception on 2/10/12; an initial health screening was completed that documented his report of a history of treatment for depression and ADHD. He reported receiving Elavil and Wellbutrin while in the county jail. A mental health screening was completed on 2/14/12 and a mental health evaluation was completed on 2/22/12.

The eUHR contained a back-filed note from a 2010 incarceration. The inmate was previously housed briefly at WSP due to methamphetamine possession. He was provided with a diagnosis of Mood Disorder NOS and medications were not prescribed at that time. The current incarceration followed a conviction for "attempted lewd conduct/harm or molest child." He reported depressed mood, anxiety, and anger, which he believed were in response to his legal case and incarceration.

Following evaluation, the inmate was provided with the following diagnoses: Adjustment Disorder, mixed with anxiety and depression; ADHD combined type and Amphetamine Abuse. He was placed on the 3CMS caseload and was not referred to psychiatry. When seen on 3/21/12 for a 30-day follow-up, he denied depression and anxiety. He reported sleeping six to eight hours per night, having a good appetite, and experiencing no problems socializing with others. He also enjoyed reading.

Findings

The inmate was appropriately identified, screened, and evaluated upon arrival. His condition did not appear to require psychotropic medication at the time of review. He appeared to be receiving mental health services at the appropriate level of care in the 3CMS program.

**Inmate E**

This inmate had been recently added to the mental health high risk list upon the recommendation of the outpatient supervisor. The case was reviewed to determine the care provided to inmates who were on the high risk list. High risk cases were reviewed weekly by a multidisciplinary team of mental health, health care, classification, and security administration to monitor risk and to intervene to expedite processes, transfers, referrals, or other actions to manage risk.

The inmate was received at the institution on 4/6/12 and was immediately referred to mental health because of his odd behavior. The psychiatrist saw him that same day and placed him on a one-to-one suicide watch in reception. He was described as exhibiting circumstantial and pressured speech, with grandiose statements thought possibly to be delusional in nature. A provisional diagnosis of Mood Disorder NOS was made. The alternative temporary housing/suicide watch team removed the one-to-one watch on the following day because he was determined not to be suicidal and without evidence of crisis symptoms.

During mental health screening on 4/10/12, the inmate was paranoid and argumentative, but denied all mental health problems. It was noted that he had been identified as requiring mental health treatment at the county jail. He refused to discuss or consider a referral for psychotropic medication. A mental health evaluation was eventually completed on 5/9/12. (The reason for the delay was not documented.) The inmate falsely stated that he was a Bakersfield police officer and was going to be a general in the National Guard. He reportedly wore his pants backwards, but his grooming and hygiene were otherwise described as good.

The inmate had been hospitalized at PSH prior to his trial for an evaluation of competency to stand trial. He "believes he is invincible; going to close all state hospitals because there is no such thing as mental illness." Grandiose and persecutory delusions were expressed including paranoid ideas of reference. He was volatile and stared intensely at the evaluator. He adamantly denied any mental health issues or problems and again refused to consider a psychiatric referral. A diagnosis of Delusional Disorder grandiose type was made. He was maintained at the 3CMS level of care. Of note, although significantly delusional, he was intelligent and articulate. He was provided with a single cell and considered for protective custody status based on his (delusional) statements about being a police officer.

Findings

Although referred immediately at the time of intake, the inmate was not followed timely by mental health staff and monitoring was insufficient.  Additional diagnostic clarification was required, including review of pre-sentence investigation material and contact with family and/or significant others.  The number and types of delusions that this inmate exhibited made a delusional disorder diagnosis highly unlikely.  He should have been considered dangerous given the nature of his paranoid and grandiose delusions and the fact that his behavior was influenced by his delusional beliefs.  Stated another way, he acted on the content of his delusional beliefs and might strike out at others in the paranoid misperception that he was acting in self-defense. He was a likely candidate for a Keyhea application.  He definitely required a higher degree of mental health monitoring than that afforded by the 3CMS level of care.  This case was discussed with the chief of mental health for immediate mental health follow-up of the issues identified.

**Inmate F**

This case was selected from a list of 3CMS inmates in the administrative segregation unit in order to review that level of care.  The inmate arrived at WSP on 5/31/12 and mental health screening was completed on 6/6/12.  He reported a history of treatment for depression, recent thoughts of suicide, and a family history of depression.  A mental health evaluation was completed on 6/6/12 and a preliminary diagnosis of Depressive Disorder NOS was formulated. He was referred to the psychiatrist for medications and was placed at the 3CMS level of care. Ultimately, he was prescribed Geodon and Trileptal.

There were weekly psych tech notes in the medical record dated 6/16/12, 6/24/12, and 6/29/12. Individual clinician contacts were documented on 6/12/12 and 6/18/12.  Psychiatry contacts occurred on 6/13/12 and 6/20/12.  At the last psychiatric appointment, psychotropic medications were discontinued at the inmate's request; he reported feeling better and no longer wished to continue the medications.

Findings

The care provided for this inmate suffered from poor mental health evaluation and assessment, nonspecific diagnostic formulation, and likely inappropriate or at least premature referral for psychotropic medications.  The inmate likely did not require medications at all, but may have benefited from additional support and contact during the first month of his reception.

**Inmate G**

This medical record was selected from a list of 3CMS inmates in administrative segregation to review that level of care.  The inmate had a mental health screening that was completed on 7/29/11.  He reported depressed mood and poor sleep, but no other signs or symptoms of serious mental illness were present on examination.  He denied any current suicidal ideation and had no history of suicide attempts.  A mental health evaluation was conducted on 8/1/11 and diagnoses of Mood Disorder NOS (provisional) and Amphetamine Dependence were provided.  He

previously paroled at the EOP level of care and was placed in the EOP upon his return to CDCR custody.  No psychotropic medications were prescribed.

The inmate's level of care was reduced to 3CMS on 2/16/12.  He was doing well without medication, denied depression, had a job assignment, and had not attended any EOP groups. Two months later, he was relocated to administrative segregation due to safety concerns.  He was seen daily during psych tech rounds and there were weekly individual sessions with his primary clinician.  There was no documentation of an IDTT meeting in the eUHR.

Findings

Progress note documentation supported placement at the 3CMS level of care.  However, there was no treatment plan in the medical record in spite of the inmate's placement in the EOP in reception for four months and current 3CMS level of care in administrative segregation.

**Inmate H**

This case was selected for review from a list of mainline 3CMS caseload inmates to review the care provided.  The inmate transferred from PVSP mainline 3CMS to WSP on 12/14/11.  He was seen for his initial primary clinician contact on the following day.  He was prescribed Celexa and provided with a diagnosis of Mood Disorder NOS.  Notably, the medical record also contained documentation that he had a history of multiple and serious suicide attempts outside of prison. There was also documentation of SREs that were completed at PVSP after 180-days and 360-days following an MHCB admission for suicidal ideation.  The inmate denied any thoughts or plans for suicide at the time of his intake at WSP.

The Celexa was continued and the inmate was referred to psychiatry for medication management.  Additional medications were initiated at WSP, including Abilify, Zoloft, and Risperdal.  The medical record contained a treatment plan dated 12/21/11, but there was no Form 7388-B attached regarding higher level of care referral consideration.

Nursing referred the inmate to mental health due to medication noncompliance on 2/20/12 and the psychiatrist saw him on the same day.  At the inmate's request, Abilify was discontinued. Another referral for medication noncompliance was submitted on 4/12/12.  The psychiatrist saw him on 4/23/12.  As a result of this appointment, the inmate's Celexa was discontinued at his request, but Risperdal and Zoloft were continued.  Medication management/psychiatry appointments occurred on 2/13/12, 2/20/12, 3/4/12, 3/26/12, 4/23/12, 6/25/12, and 7/2/12. Primary clinician contacts occurred on 1/12/12, 3/2/12, 4/24/12, and 6/12/12.  No group treatment was provided.  Documentation indicated that he was clinically stable.

Findings

The inmate appeared to be clinically appropriate for the 3CMS level of care.  The psychiatrist's rationale for prescription medication choices and polypharmacy (two antidepressants and two antipsychotic medications) was not documented.  He was actually seen more often by the psychiatrist than his primary clinician and no group treatment was provided.  The inmate's

diagnosis should have been updated and clarified: there was no justification to support the continued use of the "NOS" diagnosis for him.

## Inmate I

This case was selected for review from a list of mainline EOP inmates in order to review that level of care.  The inmate transferred from PVSP to the WSP mainline EOP on 12/14/11.  The primary clinician saw him for an initial contact on the following day.  The inmate had previously been prescribed psychotropic medications, but discontinued them eight months prior to transfer due to medication side effects.  A diagnosis of Psychotic Disorder NOS by history was recorded on the progress note.

The only IDTT plan in the medical record was dated 12/21/11 and did not include a Form 7388-B.  The inmate was referred to psychiatry; he was seen on 12/26/11, 1/23/12, 4/23/12, and 5/7/12.  Risperdal, Zoloft, and Vistaril were prescribed simultaneously during April 2012.  During May 2012, all doses were increased.  On 5/21/12, he was referred to psychiatry for noncompliance with medications.  He did not show for a psychiatry appointment on 6/8/12 and subsequent notes were not located in the medical record.  Primary clinician contacts occurred on 1/17/12, 3/2/12, and 4/24/12.  The inmate's EPRD was 10/17/12.

Findings

Diagnostic clarification was required.  There was poor follow-up regarding referrals for medication noncompliance.  The appointment with the prescriber was not scheduled timely and no additional actions were taken when the inmate did not show for the appointment.  Primary clinician contacts occurred too infrequently to provide meaningful intervention and treatment.  No group treatment was provided.

## Inmate J

This case was selected for review from a list of reception center EOP inmates in order to review that level of care.  The inmate was referred to mental health by medical staff on 6/21/12 for a routine assessment based on his history of past psychiatric care.  His medical history was significant for HIV positive status.  When seen by mental health on 6/26/12, he reported suicidal ideation and was subsequently admitted to the MHCB.  At the time of admission, he displayed pressured speech, appeared agitated, and reported racing thoughts in addition to suicidal ideation.  Psychotropic medications were initiated and he was discharged to the EOP level of care on 7/1/12.  He was seen daily for five-day follow-up and repeatedly denied active suicidal thoughts, but expressed passive suicidal ideation regarding death from his HIV infection.

The inmate was seen during an IDTT on 7/10/12 when he displayed some psychotic symptoms, reporting vague auditory hallucinations and delusional preoccupation with religious beliefs.  He was scheduled to be seen by the psychiatrist for medication management later that day; he was maintained at the EOP level of care in the reception center.  He was enrolled in daily group therapy.

Findings

The inmate was referred timely and assessed appropriately.  The acuity of his condition was addressed with an admission to the MHCB.  The discharge to the EOP level of care was clinically indicated based on the nature and severity of his symptoms.  It appeared that he was receiving mental health services at the appropriate level of care in the EOP.  The inmate should have been transferred to a regular EOP program consistent with Program Guide transfer timelines.

**Inmate K**

This case was selected for review because the inmate had received three or more RVRs within a 90-day period.  At least some of these RVRs were due to sexual misbehavior/exhibitionism.  An IDTT was conducted on 5/1/12, but a psychiatrist or CCI was not present.  At that time, it was determined that the inmate did not meet criteria for an exhibitionism program and he was maintained at the 3CMS level of care.  A Form 7388-B was not completed in conjunction with the IDTT meeting.  The treatment plan was generic and inadequate in addressing the psychiatric symptoms described.

Findings

The staff failed to complete a Form 7388-B as required; this should have noted that the inmate met an indicator for higher level of care referral consideration due to three or more RVRs.  The treatment plan was inadequate and did not meet Program Guide requirements.

EXHIBIT P
Kern Valley State Prison (KVSP)
June 19, 2012 – June 21, 2012

**Inmate A**

This inmate's case was reviewed at the request of plaintiffs' attorneys due to concerns regarding his level of care and treatment planning; there was concern that he had been prematurely downgraded to the 3CMS level of care.

The inmate was presented in a case presentation during the SPRFIT due to two "unusual incidents or gestures" that had occurred during the preceding month.  The MCSP IDTT saw him on 3/28/12, when he was maintained at the EOP level of care on a modified program.  Although there was no reference to reducing his level of care to 3CMS in the near future, there was an indication that his functional impairment had become more acute as he had become more distressed after learning that he had a son.  He also abruptly discontinued taking his psychiatric medications.  Medical record documentation suggested that he exhibited decreased mental health stability.

On 4/3/12, the inmate arrived at KVSP and was placed in the EOP SNY housing unit.  He was seen on 4/18/12 for his initial IDTT, when he was recommended for the 3CMS level of care.  He was provided with a diagnosis of Schizoaffective Disorder and an unspecified personality disorder.  Documentation was not present that provided a rationale for the change in level of care to 3CMS.  The mental health evaluation also presented ambiguity.  It listed a diagnosis of Schizoaffective Disorder in one section and Bipolar I Disorder in another area of the evaluation, without providing a rationale for either diagnosis.  The change in level of care was of concern as the inmate had only been a participant in the EOP for two weeks.

The inmate was prescribed Depakote, but refused treatment with other psychotropic medications.  The treating psychiatrist provided a diagnosis of Bipolar Disorder.  There was a lack of documentation of treatment planning at the 3CMS level of care.  Psychiatry frequently saw the inmate and several medication changes were documented.  There was no eUHR documentation indicating that the inmate's 3CMS primary clinician saw and evaluated him.

The clinician on call completed several SREs and numerous clinical contacts occurred as the result of five-day follow-up visits.  The inmate experienced suicidal ideation after learning that his significant other was involved in a car accident and was in serious condition.  He also made a suicide gesture while housed in the MHCB when he tore his suicide resistant blanket and made a noose.  Although it appeared that staff thought that the incident did not indicate true suicidal behavior, he was placed in restraints at that time.  He also reportedly tied a shoelace around his neck, but staff again indicated that he did not exhibit significant suicidal intent.

<u>Findings</u>

This inmate was not appropriately evaluated and was not allowed to remain in the KVSP EOP long enough for staff to adequately determine his needed level of care.  The EOP primary clinician and treatment team did not properly document the rationale for decreasing his level of care.  The 3CMS treatment team did not evaluate him and develop a treatment plan by the time of the site visit.

Staff appeared to minimize the inmate's suicide risk without documented clinical justification. While he was in the MHCB, his treatment did not adequately address his suicide risk or follow-up treatment. After MHCB discharge, there was a lack of necessary follow-up care. The inmate should have received a comprehensive evaluation that included review of his level of care. The IDTT also should have seen him with the development of an individualized treatment plan that appropriately addressed his suicide risk, current stressors, psychiatric symptoms, and level of care. The inmate was prematurely discharged from the EOP and was not receiving adequate mental health care at KVSP.

**Inmate B**

This inmate's case was selected for review as he reportedly had only been a participant in the EOP for three days at KVSP before being downgraded to the 3CMS level of care. He arrived at KVSP at the 3CMS level of care on 2/1/12 from RJD. He was seen by the administrative segregation IDTT on 5/2/12 for an initial treatment plan. As there was no other treatment plan located in the KVSP medical record, it was unclear what occurred between 2/1/12 and 5/2/12. The treatment plan contained minimal information.

Psychiatry saw the inmate on 2/17/12 for a medication evaluation, but the progress note provided little relevant clinical information other than indicating that he was stable. The psychiatrist again saw him on 3/1/12. Psychiatry consistently followed him, but there were lapses in timely primary clinician contacts. There was no mention in the eUHR of a level of care change to the EOP, although documentation indicated that the inmate presented with paranoia and delusional thinking.

Findings

Based on the medical record, this inmate did not appear to have been placed in the EOP. Information that was provided on-site that indicated that he was a participant in the EOP may have been the result of a computer error; all placement chronos indicated 3CMS level of care. Psychiatry timely saw the inmate, but the primary clinician and IDTT at the 3CMS level of care did not see him timely. The treatment plan was inadequate.

**Inmate C**

This case was selected for review to determine whether the inmate was receiving services at the appropriate level of care. His level of care was changed from EOP to 3CMS after reportedly spending 41 days in the KVSP EOP (this information was provided by KVSP staff during the site visit). Of note was the inmate's history of EOP participation for at least two years.

Medical record review revealed that he had been a participant in the EOP for greater than 41 days. He was provided with diagnoses of Mood Disorder NOS and Polysubstance Dependence.

The inmate was not always seen weekly while in the EOP. There was a lack of documentation of transitioning and treatment planning regarding the change in level of care from EOP to 3CMS. He had been assigned to a new primary clinician, and it appeared that the inmate was not

informed of the level of care change until six days prior to the IDTT meeting.  The level of care change occurred approximately one month after the inmate was confronted regarding a sexually inappropriate comment that he made to a female EOP therapist.  There was documentation that this issue was addressed by that clinician and his primary clinician as part of treatment.

The inmate was prescribed Abilify, Buspar, and Effexor.  He reportedly was compliant with medications.  He was followed consistently after placement in the 3CMS program and there were no subsequent MHCB admissions.  The inmate was ultimately placed in administrative segregation for allegedly making threats to staff.

Findings

It appeared that this inmate was receiving mental health treatment at the appropriate level of care in the 3CMS program.  However, due to his long history of EOP treatment, the transition to the new program was difficult.  There was a lack of documentation indicating that EOP clinical staff prepared him for this transition.  Clinicians at the 3CMS level of care saw him timely, but he was not seen weekly by his primary clinician while in the EOP.  The inmate was seen timely by psychiatry and the IDTT in the EOP.

**Inmate D**

This inmate's case was reviewed at the request of plaintiffs' attorneys.  His level of care was reduced from EOP to 3CMS on 2/22/12.  He had arrived at KVSP from the CSP/Sac PSU on 2/1/12, where he had been receiving mental health services at the EOP level of care.

The inmate was seen by the administrative segregation IDTT at KVSP on 2/15/12, but was incorrectly identified as a 3CMS inmate at that time.  A subsequent IDTT conducted on 2/22/12 correctly identified him as an EOP participant and indicated that he had been in the EOP since DSH discharge on 8/3/11.  The treatment plan stated that he would be retained in the EOP despite the placement chrono that originally indicated EOP level of care but was changed to place him in the 3CMS program.  Information in the treatment plan dated 4/24/12 provided conflicting information, alternately referring to the inmate as receiving services in the EOP and then indicating that he was in the 3CMS program but required return to the EOP.  A progress note dated 3/2/12 by another clinician indicated that the prior EOP primary clinician had been contacted and the inmate had reportedly exhibited predatory behavior on the EOP unit.

The inmate had multiple MHCB hospitalizations and it was noted that he met referral consideration indicators.  However, he was not referred to DSH due to his statements that he sought MHCB admission due to safety concerns regarding an SNY gang.  A treatment plan dated 5/15/12 stated that he would be seen more frequently for a period of time to address specific treatment goals.  Documentation indicated that the primary clinician attempted to provide him with treatment tailored to his diagnosis and to respond to his requests.  The inmate was scheduled for frequent sessions with the primary clinician, but he refused some sessions, requiring cell-front contacts.

Findings

Mental health staff failed to properly identify this inmate as an EOP participant; consequently, he was not treated at the appropriate level of care or appropriately downgraded to the 3CMS level of care when indicated. Although he met at least one DSH referral consideration indicator, the decision not to refer him to DSH appeared to be appropriate. The inmate's primary clinician at the time of the site visit was working to provide treatment appropriate to his diagnosis and the inmate was seen at intervals that were more frequent than the minimum standard. Despite initial problems with the provision of mental health care, at the time of the site visit it appeared that he was receiving appropriate mental health services.

**Inmate E**

This inmate's case was reviewed at the request of plaintiffs' attorneys. He was housed in the administrative segregation unit. He was seen at cell front during the regional mental health director's visit to KVSP in May 2012 (prior to the site visit). At that time, the inmate reported that his level of care had been changed from EOP to 3CMS and that he was on a hunger strike. He reported that he attempted suicide by setting his cell on fire. At the time of the site visit, he presented with coherent thinking, but mild and intermittent agitation.

Psych tech notes for the week of 5/28/12 documented that he presented with appropriate mood, good hygiene, memory, and judgment. A progress note dated 5/29/12 stated that he was seen in follow up when he presented with a normal mental status examination. He was provided with a diagnosis of Bipolar Disorder. An IDTT on 5/30/12 documented that he would be retained at the 3CMS level of care.

A progress note dated 6/1/12 stated that the inmate had normal thinking and an unremarkable clinical presentation. The note also indicated that he was transitioning from the EOP to the 3CMS program. On 6/4/12, he was seen for a crisis contact as he had refused to interact with the primary clinician at cell front. The plan outlined included use of cognitive behavioral therapy. However, this intervention appeared unlikely due to the inmate's refusal to engage in treatment. Additional notes dated 6/7/12 indicated that he refused all offered groups.

Several days later, progress notes indicated that the inmate had refused medications and interactions with the primary clinician. He also refused to accept a cellmate and presented with pacing and agitation. The plan outlined by the primary clinician called for cognitive therapy, which was unlikely given the inmate's agitation. Moreover, this treatment modality would more easily be provided in the EOP. By 6/14/12, the inmate had been placed on suicide watch.

<u>Findings</u>

This inmate appeared to have deteriorated significantly during a period of several weeks. Clinicians who saw him and the IDTT responsible for treatment planning did not document an adequate rationale for retaining him at the 3CMS level of care. The treatment plans located in the medical record did not appear to be realistic given the inmate's level of decompensation and his refusal to interact with the assigned clinician.

**Inmate F**

This 3CMS inmate's case was reviewed at the request of plaintiffs' attorneys due to concerns that he had been engaging in self-injurious behaviors (he reportedly had a history of such behavior). The inmate was housed in administrative segregation for safety reasons after he was attacked by another inmate in January 2012. He was confined to a wheelchair, wore diapers due to incontinence, and was visually impaired. He had received multiple RVRs for refusing cellmates.

The inmate was briefly interviewed by the expert during the regional mental health director's visit that occurred one month prior to the site visit. At that time, custody staff had identified him as an inmate for whom they had concern as to his mental health stability. When seen at cell front, a pile of bloody tissues was visible on the floor of his cell; the inmate reported that he had scratched his blind eye with a pen (due to itching) during the night. He reported that his eye was blinded due to a previous stabbing incident. He also reported that he suffered from a poorly controlled seizure disorder. He stated that he had recently been changed from the EOP to the 3CMS level of care. Staff reported that he had been placed in administrative segregation because of a recent fight and safety concerns.

A review of the Form 7388-Bs dated 5/9/12 and 5/24/12 indicated that the inmate met none of the indicators for DSH referral consideration.

A note dated 6/14/12 indicated that he refused out-of-cell activities and expressed safety concerns. He exhibited logical speech and was engaged in the interview with the clinician, without evidence of distress. A progress note dated 6/19/12 stated that he refused out-of-cell contact; he was described as dysphoric, but with clear and logical thinking.

Findings

This inmate's level of care was changed from EOP to 3CMS. His treatment plan should have been reviewed and the decision to retain him at the 3CMS level of care should have been reconsidered.

**Inmate G**

This 3CMS inmate was placed in administrative segregation on 8/11/10 with a MERD of 3/9/19 for refusing a cellmate. He had been housed in administrative segregation for 637 days at the time of review.

When seen at cell front, the inmate was marginally groomed and very soft spoken. He provided rather abbreviated responses at a very low volume. His cell was barren; he had no television and few possessions such as books or papers.

On 4/25/12, a clinician's note stated that he exhibited "manageable symptoms of depression." A psychologist's note written on the following day stated that he reported that he was fine. However, his cell condition was described as slightly malodorous and he was described as mildly paranoid. A psychologist note dated 5/10/12 again described him as mildly malodorous and

untidy.  He was characterized in this same manner during the following week, but notes from the latter part of May 2012 did not document poor hygiene.

The medical record did not include documentation indicating higher level of care referral consideration.

Findings

This inmate had a history of long administrative segregation placement.  He generally refused to program out of cell.  His primary clinician saw him weekly and at least through mid-May 2012, he presented with disheveled appearance and paranoia.  He appeared to function marginally and should have been considered for a higher level of care.  There was no documentary evidence that the treatment team considered EOP placement; such placement may have been indicated due to the inmate's long placement in administrative segregation and his relative instability.

**Inmate H**

This inmate was placed in the administrative segregation unit on 8/28/11; at the time of the site visit, he had been housed there for 255 days.  Progress notes indicated that he was serving an indeterminate SHU term and had been recommended for transfer to the CCI SHU.

The medical record contained little background information.  The inmate was briefly interviewed at cell front during the site visit.  His speech was very loud and his behavior was confrontational.  He denied that any clinicians visited his cell and also denied that he was seen during psych tech rounds.  During the interview, he approached the cell's window and placed his face close to the glass shouting "I don't get visits from anyone, I have no family, I have no money....."  His cell appeared marginally maintained.

The inmate's history included an MHCB admission that occurred from 4/2/12 thru 4/10/12 due to suicidal ideation.  He was discharged to the 3CMS level of care.  A treatment plan dated 4/3/12 noted that he presented with disheveled appearance and argumentative behavior, but was described as "lucid."  The Form 7388-B noted that he met the indicator regarding multiple MHCB placements for higher level of care referral consideration.  The provided rationale for non-referral was inadequate, as it noted that the inmate's MHCB admission had been precipitated by safety concerns.  A treatment plan dated 4/3/12 noted interventions of individual contacts and cognitive behavioral therapy to decrease suicidal ideation and hopelessness.  It further noted that problem solving would be implemented to reduce MHCB admissions.

A Form 7388-B dated 4/30/12 again noted that the inmate met the indicator regarding multiple MHCB placements for higher level of care referral consideration.  The provided non-referral rationale and the outlined interventions were inadequate, as they referenced the multiple MHCB admissions as a result of inappropriate attempts at seeking help.  The intervention stated that the inmate had been admitted to the MHCB and was placed on suicide precaution and provided with an evaluation and ongoing medication management.

The inmate was again admitted to the MHCB on 5/2/12 due to agitation and suicidal ideation.  A note dated 5/7/12 stated that he had several hospitalizations within the preceding few months. He was discharged to the 3CMS level of care on 5/11/12.

The inmate was again admitted to the MHCB from 5/25/12 thru 5/30/12 due to suicidal ideation and self-injurious behavior; he also reported auditory hallucinations.  He was also admitted to the MHCB on 6/8/12, when he was provided with a diagnosis of Schizoaffective Disorder.  He was subsequently again discharged to the 3CMS level of care.

Findings

This inmate was admitted to the MHCB on several occasions; each time he was discharged to the 3CMS level of care.  It did not appear that a Form 7388-B was completed each time he was discharged from the MHCB.  There was a lack of documentation that he was appropriately considered for EOP referral, which appeared to be an appropriate consideration.

The rationale for higher level of care non-referral and the plans presented in the Form 7388-Bs were inadequate.

Documentation of weekly primary clinician contacts was not located in the medical record. There also was no documentation that the plans outlined as options to higher level of care referral had been implemented.

Clinical staff frequently saw the inmate.  The IDTT failed to adequately consider the need for EOP level of care referral and did not develop adequate treatment plans for him.

EXHIBIT Q
North Kern State Prison (NKSP)
May 21, 2012 – May 23, 2012

**Inmate A**

This case was selected for review from the institutional DSH non-referral log as the inmate met three indicators for higher level of care referral consideration (unable to function, chronic symptoms, and three or more crisis bed admissions), but was not referred. The non-referral rationale was "symptom identification and increased individual contact as needed."

The IDTT occurred on 11/10/11; the inmate was receiving mental health services at the EOP level of care. The Form 7388-B, in contrast to the log, indicated that he had already been referred to intermediate care and was awaiting a bed at DSH. He was provided with a diagnosis of Major Depressive Disorder, severe with psychotic features. He was prescribed Risperdal and Zoloft. He was ultimately transferred to the ICF program at SVPP in mid-December 2011.

Findings

The non-referral log did not accurately reflect that the reason DSH referral was not made at the 11/10/11 IDTT meeting was because it had been made at the prior IDTT meeting. The IDTT assessment and documentation were appropriate; non-referral log documentation should have more accurately indicated that the inmate was awaiting transfer to intermediate care.

**Inmate B**

This case was selected for review from the DSH non-referral log; the inmate was identified as having met four indicators for higher level of care referral consideration. The non-referral rationale was that he had prevailed at his Vitek hearing, the DSH acute care referral had been rescinded, and the inmate would be returned to the administrative segregation EOP. The IDTT meeting was conducted on 12/16/11, when the inmate was housed in the MHCB. At the time of the site visit, he had transferred to CMC.

A referral packet was sent to DSH for acute care on 12/7/11. The inmate had been admitted to crisis care more than 25 times within six months due to suicidal ideation, suicidal gestures, safety concerns, and program failure. He also had three MHCB admissions. He made superficial cuts to his arm on 10/28/11 and reported two Tylenol overdoses, although blood levels did not substantiate his claims in either instance. He refused to consider treatment with psychotropic medications and a Keyhea request based on dangerousness to self was not upheld at the certification review hearing.

The inmate stated that he reported suicidal ideation to avoid being housed with a cellmate, but displayed poor judgment and an escalating pattern of self-harming behaviors. On 12/16/11, he won a Vitek hearing and the DSH acute care referral was rescinded. He was retained at the EOP level of care in administrative segregation and was transferred to the MHTH unit on several occasions due to continued statements about suicide plans. He refused to participate in groups and continued to refuse medications. In mid-January 2012, he transferred from NKSP to CMC. He was released from administrative segregation in mid-March 2012 and was placed in the mainline EOP. There were no subsequent instances of self-injury or suicidal threats after this transfer. The most recent IDTT located in the eUHR was dated 5/15/12 and indicated that he

was participating in mainline EOP programming at CMC. No documentation indicated that further consideration had been given for potential transfer to a higher level of care.

Findings

The DSH acute care referral was appropriate based on the inmate's behavior and condition in December 2011. Continued frequent follow-up and EOP placement after the Vitek hearing did not permit acute care transfer appeared to have been appropriate interventions. The inmate was maintained in the mainline EOP at the conclusion of his administrative segregation stay. At the time of the site visit, he appeared to be doing well; eUHR documentation indicated that he appeared to be receiving mental health services at the appropriate level of care.

**Inmate C**

This case was selected for review from the DSH non-referral log because the inmate met two indicators for higher level of care referral consideration (RVRs and crisis admissions), but was not referred. IDTT documentation dated 2/15/12 included the conclusion that the "inmate's multiple MHTH admits (are) related to fear of being assaulted on yard, not an underlying mental health condition." He was maintained at the 3CMS level of care although the behavior of seeking MHTH admission continued. As of mid-April 2012, approximately 16 very brief MHTH admissions had occurred.

A case consultation with the IDTT was conducted on 4/24/12 when the treatment team and the inmate discussed his limited coping skills and the use of crisis placement to relieve anxiety and discomfort. EOP placement was discussed, but the inmate did not want to transfer into the program. A plan for individual weekly therapy with the student intern was developed with the aim of assisting the inmate in developing more adaptive coping skills. The case consultation also involved custody staff. The treatment team planned to use the frequent readmit protocol if necessary; one-to-one supervision on the inmate's regular housing unit would be instituted rather than transferring him to a mental health bed.

Subsequent eUHR progress notes indicated that the inmate was doing well with additional individual contacts that occurred since the case conference. He did not voice suicidal concerns, engage in self-injury, require activation of the new protocol, or require transfer to a crisis bed after implementation of the new plan.

Findings

This case illustrated the benefit of involving the inmate in the treatment planning process and of modifying his plan to permit weekly individual therapy sessions (as opposed to case management contacts) at the 3CMS level of care to individualize his care. Although recently implemented, the plan appeared to be beneficial in promoting his recovery. The inmate appeared to be receiving mental health services at the appropriate level of care and referral to DSH did not appear to be clinically indicated.

**Inmate D**

This case was selected for review from the DSH non-referral log.  The inmate met three indicators for higher level of care referral consideration, but was not referred to DSH.  The reason cited for non-referral was "rejected from DSH, does not qualify."  The inmate had been in either CDCR or DSH custody since his initial term in 1994 as he had additional convictions for assault while in custody.

The inmate was admitted to the MHCB at NKSP directly from Receiving and Release on 7/14/11.  He was received from ASH where he had been hospitalized as a mentally disordered offender (MDO) to face new charges of battery on staff.  The Board of Parole revoked his parole and he was sentenced to an additional ten months in prison.  Upon transfer to NKSP, he presented with grossly disorganized thinking, incoherent speech, inappropriate laughter, internal preoccupation, and agitation.  He was prescribed Clozaril, Haldol, Depakote, and Ativan.  Documentation indicated that he was disorganized, disoriented, and highly sedated when admitted to the MHCB and that he remained with that presentation of symptoms.

Mental health staff attempted to refer the inmate to DSH acute care on 8/29/11 based on his extremely psychotic state, but DSH apparently denied the request.  Ultimately, Clozaril was discontinued due to a drop in his white blood cell count.  Sedating medications were also discontinued.  Despite his young age, he displayed significant signs of dementia and psychosis.  He required prompting and assistance to attend to his activities of daily living, including feeding himself and basic toileting.  He remained housed in the MHCB for the duration of his CDCR stay with daily staff contacts, nursing care, and correctional monitoring.  He paroled on 5/9/12, when he was returned to ASH as an MDO for a second time.  His diagnoses include Schizophrenia undifferentiated type and Dementia NOS.

Findings

This inmate had severe and significant illness upon release from ASH and it was concerning that he would be returned to CDCR in this state of disability.  Despite this, mental health staff attempted to manage the case to the best of their ability.  They immediately placed him in the MHCB from Receiving and Release and an acute care referral was initiated.  When this referral was denied, NKSP continued to manage him in the MHCB until his parole date; this resulted in an MHCB placement of nearly a year.  However, it was alarming that the Board of Parole would return this grossly psychotic, demented, and disorganized inmate to prison, resulting in the loss of an MHCB bed for an extended period of time and the inmate's placement in a setting that was clearly inappropriate to his treatment needs.

**Inmate E**

This case was selected for review as DSH accepted the inmate on 5/4/12, he was awaiting transfer, and his level of care prior to transfer was reviewed.

The inmate was received at NKSP in August 2011 and a mental health evaluation was conducted on 8/25/11.  He was provided with a provisional diagnosis of Panic Disorder with agoraphobia based on his complaints of decreased sleep, anxiety, and a history of panic attacks.  He was enrolled in the MHSDS at the 3CMS level of care.  The psychiatric evaluation on 9/15/11 led to

a provisional diagnosis of PTSD and a low dosage of Paxil was started.  When seen by psychiatry in November 2011, he reported that he had stopped taking Paxil because he was experiencing restless legs (a side effect).  Zoloft was ordered as a substitute and follow-up was planned in six weeks.

In December 2011, the inmate reported that he was tolerating the medication reasonably well and had had no panic attacks since his arrival in CDCR.  In January 2012, he reported depression after a disagreement with his mother.  That same month, he told the social worker that he was experiencing auditory hallucinations.  The psychiatrist saw him, but no medication change was made.  On 3/1/12, he was seen for routine 90-day follow-up when he denied hallucinations and reported improvement in his mood.  However, in April 2012 he was admitted to the MHCB due to dangerousness to himself and others.  He reported seeing shadows and experiencing auditory hallucinations that included hearing conversations, commentary, and derogatory statements and hearing commands to harm him and others.  Medication adjustments were attempted, but he continued to report refractory hallucinations and depression.  His diagnosis was amended to Major Depressive Disorder, severe with psychotic features.  A referral to DSH acute care was initiated on 4/30/12.

On 5/3/12, after returning from the MHCB and while awaiting DSH acute care bed availability, the inmate was moved to the MHTH.  He was seen daily and attended weekly IDTT meetings.  On 5/15/12, he was transferred to a crisis bed at CMF while safety beds were being installed at NKSP; he remained on the DSH acute care wait list.

Findings

Documentation in MHCB notes and DSH referral information described the course of the inmate's condition, but individual 3CMS progress notes did not convey the same severity of symptomatology.  It was unclear whether the inmate's presentation was in fact that variable, whether outpatient evaluations were not thorough enough, or whether MHCB evaluations were inaccurate or the inmate embellished his presentation there.  In any event, mental health staff responded appropriately to the inmate's reported symptoms and his complaints were taken seriously.  He was referred and accepted to DSH acute care; this hospitalization would be helpful in clarifying his diagnosis and planning a course for future management and treatment of his condition.

**Inmate F**

This inmate's case was selected to review the care provided to him in the reception center EOP.  He had a history of depressed mood and auditory hallucinations.  He was serving a life sentence.  Documentation indicated that he was a participant at the EOP level of care from 12/23/10 thru 4/14/11, when he was changed to the 3CMS program as his condition had improved and stabilized.  He was prescribed Buspar, Paxil, and Risperdal.  He was provided with a diagnosis of Major Depressive Disorder, recurrent, severe with psychotic symptoms.

The inmate reportedly functioned well at the 3CMS level of care for several months, but then began to experience some difficulty. He was placed in the MHTH on three occasions and was noted to have chronic suicidal ideation. He was placed back in the EOP on 4/26/12. Although he had only returned to the EOP for several weeks, he refused to attend any of the groups offered to him. During an IDTT meeting on 5/17/12, he stated that he had no interest in participating in EOP services as he did not want to be around other people. The plan was to encourage his attendance and participation at the EOP level of care. The IDTT did not believe a referral to DSH higher level of care was warranted.

Findings

The inmate's MHSDS assignment and level of care was adjusted in response to his clinical condition. At the time of review, the EOP level of care appeared to be appropriate for him.

**Inmate G**

This case was selected at random from a list of reception center EOP inmates to review the mental health care provided. The inmate was received at NKSP in September 2011. As a result of the mental health screening and evaluation process, he was placed at the EOP level of care on 9/27/11 when he reported a history of mental health treatment for mood swings and unpredictable behavior. He had received mental health treatment in the community, but also acknowledged a history of noncompliance with prescribed medications. He was provided with a provisional diagnosis of Schizoaffective Disorder. He was prescribed Risperdal, Trileptal, and Zoloft.

He attended approximately 70 percent of offered EOP groups. Group notes were fairly nonspecific and generally only commented on his group attendance with occasional comments as to group participation. IDTT meetings were conducted monthly. The primary clinician generally saw the inmate weekly, although there were some missed weeks.

Findings

The inmate was identified during the reception process and enrolled at the EOP level of care, which appeared to be the clinically appropriate placement for him.

**Inmate H**

This case was selected for review because it was noted that the inmate had been placed in five-point restraints for 41.6 continuous hours while housed in the MHCB. He arrived at NKSP on 5/17/11 from Los Angeles county jail. Parole information indicated that he was prescribed Risperdal in the community for treatment of Psychotic Disorder NOS, but was not prescribed medication at the jail. At the time of initial screening at NKSP, no mental health referral was generated and no medication was prescribed for him.

By August 2011, the inmate had had several physical altercations with other inmates. He was referred to mental health as a result of the altercations. During his mental health evaluation on

8/30/11, he was generally uncooperative and refused to answer questions.  Although his parole history and past treatment with medication was known, a provisional diagnosis of Impulse Control Disorder was provided and he was not referred to psychiatry.  He was enrolled in the MHSDS at the 3CMS level of care.

The inmate was admitted to the MHTH from 9/27/11 thru 9/30/11 due to psychotic symptoms.  He was prescribed Risperdal and was released.  Subsequently, he was recommended for the EOP level of care, but refused to continue medications after his MHTH release.

The inmate's psychiatric condition continued to deteriorate.  He was admitted to the MHCB on 10/19/11 following extraction from his administrative segregation cell where he had barricaded himself.  He was throwing urine and spitting through the door.  He was highly agitated and screaming incoherently.  He would not calm down, listen to, or speak with the mental health clinician.  He would not take any medication offered to him and would not cooperate with security's orders.  Following the cell extraction, he was brought to the CTC where he was immediately placed in five-point restraints.  He continued to refuse to take medication orally and was given an injection of Geodon with little effect.  He remained defiant, loud, argumentative, irritable, labile, and paranoid.  Keyhea paperwork was prepared the following day.  In the interim, emergency medication was used in an attempt to treat his symptoms.  His condition eventually improved (after several necessary doses of emergency medication) to the extent that he was released from restraint and housed in a regular MHCB cell.  The Keyhea order was ultimately granted.  He was prescribed Risperdal and Depakote.  He was discharged back to the EOP level of care on 11/1/11.  His diagnosis was changed to Schizophrenia paranoid type and Antisocial Personality Disorder.

The inmate was transferred to CMF on 2/19/12 and was released back to Los Angeles County on parole on 4/4/12.  He paroled at the EOP level of care.

Findings

This case illustrated some issues regarding the reception center process and the failure to timely evaluate and treat an inmate with a known history of psychosis who had been without medications.  It was highly likely that the inmate's assaultive behavior was a result of untreated and exacerbated paranoia; he received multiple infractions for inmate assaults, administrative segregation time, a cell extraction, and delayed access to the appropriate level of mental health care with eventual extended time in restraints.  These negative consequences could have been avoided if he had received appropriate classification and treatment at the time of reception.  The lack of timely and appropriate treatment also might have resulted in harm to the inmate, other inmates, or facility staff.

EXHIBIT R
California State Prison, Los Angeles County (CSP/LAC)
June 4, 2012 – June 7, 2012

**Inmate A**

This EOP inmate was housed in administrative segregation.  He was provided with a diagnosis of Depressive Disorder NOS.

On 10/20/11, the primary clinician documented that the inmate appeared to be delusional and expressed a belief that custody was putting feces in his food.  Another primary clinician's subsequent progress note stated that the inmate did not have a psychiatric diagnosis and was housed on C yard in general population on 11/30/11.  One week later, the same primary clinician saw the inmate and indicated that he was stable with no psychiatric diagnosis.

On 12/16/11, the inmate was seen due to a crisis call when he reported suicidal ideation and exhibited periods of muteness.  The psychologist noted that previously he had been in the 3CMS program and requested removal in June 2011 when he was reportedly stable.  The note also stated that medical and dental staff noticed that he presented with odd behavior and verbalizations and referred him to mental health staff.  However, the inmate continued to refuse mental health services.  The psychologist indicated that he was placed in alternative housing in building D-1.  The psychiatrist also evaluated him on 12/16/11 when a SRE was completed.  The psychiatrist noted that the inmate was not an MHSDS participant; at that time, he presented with paranoid delusional thinking, but refused psychotropic medications.

It appeared that the inmate was placed in alternative housing and returned to general population.  On 12/19/11, the primary clinician stated that he had expressed safety concerns, became mute during the interview, and fell off of the chair and lay on the floor.  He was reportedly admitted to the CTC, where he broke a window.

A placement chrono dated 1/9/12 indicated that the inmate returned to the 3CMS program.  On 1/13/12, he presented to a clinician with reported suicidal ideation and did not respond to questioning; he exhibited slumped posture, disheveled appearance, and muteness.  It appeared that he was again placed in alternative housing.  A note dated 1/14/12 indicated that he had been discontinued from suicide watch.  A subsequent note on the same date stated that he had been seen on 1/13/12 for five-day follow-up; however, as he had been placed on suicide watch for less than 24 hours, five-day follow-up was not required.  A psych tech noted indicated that he was placed in alternative housing on suicide watch in the administrative segregation unit on 1/14/12.  A progress note dated 1/17/12 reflected that he was seen for five-day follow-up.

A mental health chrono dated 2/4/12 indicated that he had been approved for transfer to the MHCB at CMF due to a lack of MHCB beds at CSP/LAC.  It appeared that he was transferred to DSH in February 2012.  Transfer information from the CMF MHCB revealed that he was malingering, but he was discharged to the EOP level of care.  He was not discharged with psychotropic medications.

An administrative segregation pre-placement chrono was completed on 2/17/12.  A mental health screening was completed on the following day.  An ICC note indicated that the inmate had been assaulted and was transferred to the EOP on D yard in late February 2012.

Subsequent EOP progress notes indicated that the inmate was stable.  A progress note dated 3/29/12 stated that he presented with somatic preoccupation and potential threats to staff, resulting in intervention to prevent escalation.

After the review period, the inmate began to have increased paranoia and social isolation, resulting in in-cell feeding.  It appeared that he received an RVR for refusing "the court mandated TB test;" this led to cell extraction and the use of pepper spray to administer the tuberculosis skin test.  The clinician indicated that he appeared to be psychotic.  His behavior continued to deteriorate and the primary clinician indicated that he should be considered for DSH as he could not function in the EOP.  He was transferred to administrative segregation in late May 2012, where he was housed during the site visit.

Upon interview with the monitor's expert, the inmate presented with disorganized thinking and behavior, with spitting and word salad.  Discussion with the primary clinician indicated that she believed he was malingering due to his history of this diagnosis at the CMF MHCB.

Findings

This inmate's care was inadequate.  He was inappropriately provided with a diagnosis of malingering, which colored subsequent clinician's impressions of his clinical presentation.  He should have been referred to DSH for further evaluation and treatment.  His care was discussed with mental health supervisory staff for further evaluation and intervention.

**Inmate B**

This inmate's case was reviewed in response to a request from plaintiffs' attorneys due to concerns regarding his mental status and treatment in administrative segregation.  The psychiatrist saw him on 3/8/12 in administrative segregation and reported that he was stable; however, he had experienced insomnia after receiving Depakote ER prescribed at night.  At the inmate's request, the psychiatrist modified the prescription for morning administration.

The most recent treatment plan dated 5/17/12 noted that the inmate was very angry that he had not been transferred to an institution that was closer to his family after administrative segregation placement.  A prior treatment plan dated 4/26/12 indicated that he was placed in administrative segregation due to self-reported safety concerns.

The primary clinician saw the inmate weekly while he was housed in administrative segregation, but he was frequently seen at cell front; some of these cell-front contacts occurred due to the inmate's refusal of out-of-cell contacts, while others were due to modified programming.  The inmate was seen more frequently than every 90 days while housed in general population at the 3CMS level of care.  The IDTT saw him timely and treatment plans were clinically adequate.

Findings

The inmate appeared to be receiving mental health services at the appropriate level of care and appeared to be clinically stable.

**Inmate C**

This inmate's case was reviewed in response to a request from plaintiffs' attorneys.  He had been admitted to VPP on 2/19/12 due to suicidal ideation.  He was initially admitted to the intermediate treatment program dormitories, but on 3/1/12 was moved to a single cell setting due to pending RVRs.  He was subsequently transferred to the acute care unit on 3/15/12 after swallowing a staple and reporting suicidal ideation.  DSH clinicians indicated a belief that he was exaggerating or feigning symptoms and used suicidal ideation and/or self-injurious behaviors for secondary gain.

The inmate was provided with diagnoses of Adjustment Disorder with mixed disturbance of emotions and conduct and Polysubstance Dependence.  On 3/15/12, he was observed in his cell naked; he had flooded his cell and smeared feces stating that he wanted to die.  He was treated with intramuscular medications at that time.  On 4/12/12, his programming was restricted due to inappropriate comments that he made to a female psychologist.  He became angry and refused afternoon medication.  He was described as increasingly agitated and was observed swallowing staples in his cell, stated that he was suicidal, and smeared feces on his cell window.  A cell extraction occurred to administer medications.

On the DSH acute care discharge summary dictated on 4/13/12, it was noted that the inmate "was unable to take advantage of the programming offered at the acute level of care and he failed the intermediate level of care…therefore he [was] not considered appropriate for referral to the intermediate level of care."  The discharge summary further stated "we have no illusions that he [the inmate] will tolerate EOP for a long period of time and he may need to return to DSH-VPP in the future…In the future however, please consider APP."  Discharge medications included Thorazine and Zoloft.

The inmate had six pending RVRs and it appeared that at each of these hearings, he reported suicidal ideation, resulting in MHCB admission.  At the time of the site visit, he was hospitalized in the MHCB at CMF.  He was expected to return to CSP/LAC after MHCB discharge.  As some of the RVRs could result in a SHU term, CSP/LAC was awaiting the outcome of RVR hearings to determine the appropriate facility (SHU) for endorsement.  The inmate was unable to remain at CSP/LAC due to family members working at that institution.

Findings

The inmate was housed in administrative segregation for disciplinary reasons.  His transfer had been delayed due to pending RVRs as a result of a staff assault.  He was reportedly upset because he wanted to remain at CSP/LAC, but this was not possible.  He was appropriately referred to DSH.  He was also appropriately treated in the MHCB for suicidal ideation.

**Inmate D**

This inmate's case was reviewed in response to a request from plaintiffs' attorneys.  He was a participant in the mainline EOP, but was also classified as DD3.  According to the most recent treatment plan dated 4/24/12, CDCR headquarters' staff had expressed concern regarding his

level of functioning in the EOP due to his DD3 status in March 2012.  As a result of that inquiry, a DSH referral was generated on 3/27/12.  However, DSH rejected the referral as the inmate had not been provided with a major mental illness diagnosis.  CSP/LAC staff noted that he continued to display symptoms consistent with his medical condition and exhibited no mental health symptoms.

The inmate was provided with a diagnosis of Amnestic Disorder; a diagnosis of Dementia NOS was also considered.  He was not prescribed psychotropic medications.  Clinicians attributed his functional impairment to his medical condition and not to a major mental illness.  He was placed in the EOP in an effort to provide him with sheltered housing.  A CCAT was conducted and recommendations were made to request a neurological consultation and medical reclassification.  The primary clinician had been told that there were no Level IV DD3 placement options for the inmate.  At the time of the site visit, the primary clinician was awaiting instructions regarding the process of medical reclassification.

<u>Findings</u>

Due to the inmate's significant memory and cognitive impairment, it was unclear how his personal safety was maintained in his current setting.  The treatment plan required individualization and modification to reflect his medical condition.  The inmate did not receive appropriate treatment.  A special IDTT was needed that included treating medical staff formulating an adequate care plan.

**Inmate E**

This case was selected for review as the inmate was identified on the DSH non-referral log as he met two indicators for DSH referral consideration, but was not referred.  The treatment plan dated 3/1/12 indicated that he was housed in administrative segregation after returning from an out-of-state facility where he had been placed in the 3CMS program.  Although he minimized his mental health issues in the IDTT, he presented with tangential speech and bizarre behavior.  Staff also reported that he frequently engaged in exhibitionism, with rumination about his innocence, and hyperverbal and tangential speech.

The inmate was provided with a diagnosis of Psychotic Disorder NOS.  He was prescribed Remeron for depression.  The Form 7388-B indicated that he met the DSH referral indicator as to multiple crisis placements.  His level of care was increased to EOP and he was referred to the IEX treatment program.  These interventions were appropriately provided as the rationale for not referring him to DSH.  A subsequent IDTT meeting on 3/7/12 described him as rambling, unkempt, and withdrawn.  His speech was tangential with loose associations and filled with bizarre statements such as "I want medicine for castration."  He apparently had a history of inappropriate sexual behavior, including four RVRs for public masturbation, which he denied except to state that he was scratching his penis.

The IDTT next saw the inmate on 4/25/12, when it was documented that he had refused all group and confidential individual treatment since his arrival in administrative segregation.  The clinician noted that he only had been minimally cooperative with daily cell-front contacts and it

was difficult to understand him as his speech consisted of mumbling. His diagnosis was changed to Depressive Disorder NOS, provisional, and Adjustment Disorder, chronic, with depressed mood. At that time, he was not prescribed psychotropic medications. In fact, when the psychiatrist saw him on 3/21/12, he discontinued the inmate's medications due to refusal. The psychiatrist provided him with a diagnosis of Adjustment Disorder with mixed disturbance of emotions and conduct.

Progress note review indicated that the inmate remained in his cell engaged in solitary activities such as reading or writing letters. Mental health and custody staff did not document the presence of any bizarre behaviors or vocalizations during their contacts. Psych tech documentation was minimal in content.

Findings

Due to poor medical record documentation, it was difficult to determine the appropriateness of DSH non-referral for the inmate. Multiple providers saw him while he was housed in administrative segregation. However, they provided different diagnostic impressions of him and these providers and the treatment team did not resolve or reconcile the differing diagnostic profiles. At the time of the site visit, the medical record continued to reflect diagnoses of Psychotic Disorder NOS, Schizophrenia undifferentiated type, Depressive Disorder NOS, and various Adjustment Disorders. His treatment was inadequate in large part due to poor diagnostic assessment, poor treatment planning, and poor treatment implementation.

Program Guide timelines were met for IDTT, psychiatry, and primary clinician contacts, with the exception of the initial IDTT and initial psychiatry medication evaluation. The inmate should have received a comprehensive diagnostic evaluation reviewed by the IDTT so that providers could reach consensus on the diagnosis, with development and implementation of an appropriate individualized treatment plan. Further DSH referral should have been thoughtfully considered.

**Inmate F**

This 3CMS inmate was selected for review as he was identified on the DSH indicator report as having three or more RVRs within a 90-day period. The IDTT treatment plan and Form 7388-B dated 3/28/12 were reviewed to determine whether staff correctly identified that he met DSH referral consideration indicators. He had a history of suicidal ideation and psychosis with a self-reported history of three psychiatric hospitalizations for acute psychosis.

The IDTT provided him with a diagnosis of Bipolar Disorder NOS. He was prescribed Depakote, Haldol, Lithium, and Cogentin. He would not leave his cell because he believed that custody would search it and remove his pictures if he left it. He had paranoid ideation regarding custody harassment.

The Form 7388-B correctly noted his multiple RVRs. The primary clinician saw him weekly while he was housed in administrative segregation. Psych tech rounds were also documented, but psych tech notes contained minimal information.

Findings

The inmate was appropriately identified as meeting an indicator for DSH referral consideration. It appeared that the decision not to refer him to DSH was appropriate. The IDTT, psychiatrist, primary clinician, and psych techs saw him timely, although treatment plans were not always individualized.

**Inmate G**

This case was selected for review as the inmate returned to CSP/LAC from DSH on 1/31/12. A clinician did not see him until 2/2/12 and a psychiatrist did not see him until 2/22/12. The IDTT saw him on 2/9/12, but incorrectly identified this meeting as a quarterly treatment team meeting rather than the inmate's initial meeting following DSH discharge. The treatment plan noted that he had recently returned from DSH. He had been admitted to DSH SVPP on 3/23/11 due to paranoia, safety concerns, and violence to cellmates.

The inmate was provided with diagnoses of Schizophrenia paranoid type, Alcohol Dependence in remission, and Avoidant Personality Disorder. SVPP discharge summary recommendations were minimal in content and provided little beneficial clinical guidance for CSP/LAC treating clinicians. The CSP/LAC treatment plan developed on 2/9/12 was not individualized and was inadequate in light of the inmate's serious symptoms and recent DSH placement; a subsequent treatment plan dated 4/5/12 was much improved and was specific to his treatment needs. However, treatment interventions for depressed mood and medication refusal remained unchanged from the February 2012 IDTT despite their ineffectiveness as demonstrated by the inmate's lack of improvement in those areas. He was prescribed Abilify, Cogentin, Depakote, Vistaril, Remeron, and Navane. The CSP/LAC psychiatrist did not follow the DSH psychiatrist's psychotropic medication recommendations.

Findings

There was a lack of documentation to indicate adequate continuity of care between DSH and CSP/LAC. The inmate was not seen timely for his initial medication evaluation and the initial treatment plan was clinically inadequate.

**Inmate H**

This case was selected for review because the restraint log indicated that the inmate was placed in five-point restraints from 12/6/11 thru 12/11/11. However, the MHCB discharge summary indicated that he was not placed in restraints until 12/10/11 and was released on 12/11/11. The MHCB discharge summary also indicated that he was placed in the seclusion room on 12/4/11. His MHCB stay exceeded the ten-day maximum. Although the IDTT noted that he met one indicator for DSH referral consideration (MHCB stay exceeding ten days), the Form 7388-B did not provide a valid rationale for DSH non-referral. Adequate alternative interventions were not included to address that indicator; the clinician merely restated the provided treatment in the MHCB. A subsequent IDTT referred the inmate to DSH and noted additional referral indicators. Medical record documentation was internally inconsistent as to the days that the inmate was in

restraints and seclusion.  No nursing notes were located in the medical record regarding this MHCB placement.

<u>Findings</u>

Documentation as to the inmate's use of restraints and seclusion was inadequate and noncompliant with Program Guide requirements.  Staff also did not appropriately complete the Form 7388-B.  The IDTT, psychiatry, and the primary clinician timely saw the inmate.  He was appropriately referred to DSH, although it appeared that earlier referral may have been indicated.

EXHIBIT S
California Correctional Institution
July 30, 2012 – August 1, 2012

## Inmate A

This 3CMS inmate's mental health care was reviewed at the request of plaintiffs' attorneys as the inmate reported recent mental health decompensation due to lockdowns, limited showers, and poor living conditions. The inmate's eUHR was reviewed. A Form 7388-B completed on 2/23/12 was negative for indicators of higher level of care consideration. The treatment plan of that same date indicated that the inmate was serving a life sentence related to the three strikes law. Inmate problems included depression, anxiety, and irritability. He was assessed as needing mental health services at the 3CMS level of care. He was provided with diagnoses that included Mood Disorder NOS and Polysubstance Dependence.

A 4/6/12 primary clinician note indicated that the inmate had been transferred from KVSP. He was seen at that time for a wellness check at the direction of headquarters' personnel. He presented with an anxious and angry mood. He complained of many different stressors, but denied suicidal and homicidal thinking at that time. The plan was to continue him at the 3CMS level of care and refer him to the psychiatrist.

The psychiatrist evaluated the inmate on 4/10/12, when Paxil was prescribed. The inmate reported to the psychiatrist on 5/8/12 that he had discontinued his Paxil the previous day. At that time, the psychiatrist discontinued Paxil and began Celexa. On 5/29/12, the inmate reported that he had stopped the Celexa three days earlier. At the inmate's request, the psychiatrist discontinued his psychotropic medications.

A primary clinician saw the inmate for follow-up on 5/31/12. The plan was to see him again in 90 days. On 6/7/12, the inmate was again seen by a primary clinician after apparently being sprayed with pepper spray by custody staff. The note indicated that the inmate would be seen on an as-needed basis.

A 7/18/12 OHU discharge summary indicated that the inmate had been admitted to the OHU two days prior after reporting suicidal thinking following an altercation with another inmate. The inmate was uncooperative with the mental health assessment during his two-day OHU stay. He was subsequently discharged back to the 3CMS level of care with a recommendation for five-day follow-up. He received only one day of five-day follow-up, on 7/20/12. A psychologist subsequently saw the inmate on 7/24/12. The plan was to see him in administrative segregation on a weekly basis for further diagnostic clarification. On 7/28/12, a primary clinician again saw the inmate; follow-up was recommended in sixty days, or sooner if needed.

The psychiatrist evaluated the inmate on 7/25/12, when he was described as mildly depressed. The psychiatrist indicated that the inmate's clinical presentation was consistent with a diagnosis of Mood Disorder NOS. Trileptal was prescribed for mood stabilization, and appropriate laboratory tests were ordered.

Findings

Mental health staff consistently followed the inmate. Until recently, however, the treatment plan essentially consisted of monitoring and medication management. The inmate did not

demonstrate evidence of a mental disorder associated with psychotic features.  The current treatment plan appeared to be clinically appropriate as it involved weekly contacts in administrative segregation until further diagnostic clarification could be obtained; this should facilitate subsequent treatment plan revisions.

**Inmate B**

This inmate's case was reviewed at the request of plaintiffs' attorneys.  The inmate had recently informed them of mental health decompensation due to his extended stay in administrative segregation without access to electrical appliances or group therapy.  The inmate reported that he was awaiting transfer to an SNY bed at KVSP.  Plaintiffs' counsel requested an update on the status of his transfer to an SNY yard.

The inmate's eUHR was reviewed.  A 2/27/12 treatment plan indicated that he was serving a life sentence and had recently completed a SHU term.  He was housed in administrative segregation while awaiting transfer to KVSP; the wait was anticipated to be an extended one.  The inmate was provided with a diagnosis of Major Depressive Disorder.  A completed Form 7388-B was consistent with his need for mental health services at the 3CMS level of care.

A 3/20/12 primary clinician note documented that the inmate remained in administrative segregation.  He was seen at cell front for mental health rounds.  Another primary clinician saw the inmate on 4/3/12 related to his complaint that his medications needed adjustment.  The inmate was referred for an urgent psychiatric appointment.

The psychiatrist evaluated the inmate on 4/5/12 related to his complaints of side effects from Effexor, which was then discontinued.  Another psychiatrist was scheduled to see him four days later for follow-up, but the inmate refused the appointment.

On 4/11/12, the primary clinician saw the inmate in a private setting for routine follow-up.  The inmate then appeared to be mildly depressed.  The primary clinician provided a diagnosis of Adjustment Disorder with mixed features.  Follow-up was recommended on an as-needed basis.  This primary clinician again met with the inmate on 4/16/12, when he exhibited significant frustration.  A psychiatrist evaluated the inmate on 4/19/12.

A different primary clinician met with the inmate on 4/23/12, due to recent news of family health problems.  The next day the psychiatrist prescribed the inmate Celexa.  That same day the inmate met with his regularly assigned primary clinician.  He again met with his primary clinician on 5/3/12, 5/7/12, and 5/14/12.  Diagnoses provided at that time included Major Depressive Disorder single episode, mild and Antisocial Personality Disorder.  The inmate was seen by a different primary clinician on 5/17/12, when he was referred to see the psychiatrist.

A 5/21/12 treatment plan indicated that the inmate recently received news that his father was terminally ill.  This news contributed to and exacerbated his depressive symptoms.  The inmate had been single-celled as a result of an ICC decision due to prior in-cell violence.  Celexa was prescribed.  The treatment plan indicated that the inmate would meet with his primary clinician on a weekly basis for cognitive behavioral therapy interventions.  His diagnoses remained

unchanged.

The inmate again refused to see the psychiatrist on 5/23/12.  He had stopped his Celexa two days earlier.  The primary clinician saw him on 5/29/12, when he was seen at cell front after refusing a confidential interview.  The plan was to continue to see him on a weekly basis.  The inmate again refused to see the psychiatrist on 6/11/12.  Weekly appointments with his primary clinician were documented.  The psychiatrist evaluated the inmate again on 6/21/12.  On 7/13/12, the chaplain informed him that his father had died.

Findings

Since at least April 2012, the primary clinician had seen the inmate on a weekly basis and provided appropriate clinical interventions.  However, documentation indicated that the primary clinician had not seen the inmate on a weekly basis during March 2012.

The CC I indicated placement of the inmate in the SHU around 7/5/11 for battery on an inmate with a weapon in his cell.  He was endorsed to the Level III SNY at CSP/Corcoran on 7/25/11; the inmate's custody level was changed to Level III due to changes in the CDCR classification scores.  He was placed in administrative segregation while awaiting transfer to CSP/Corcoran as transfers had not been occurring.  The inmate had no pending RVRs.  He was endorsed to KVSP on 1/24/12 and subsequently re-endorsed to KVSP on 5/9/12.  He was again endorsed on 7/25/12 to the Level III SNY at CSP/Corcoran.

**Inmate C**

This 3CMS inmate's last mental health treatment plan was dated 3/1/12.  He had recently been transferred to CCI and was housed in Facility C, which was an SNY.  His presentation was consistent with a diagnosis of Major Depressive Disorder recurrent, severe.  The appropriate staff attended the IDTT meeting.  The treatment plan was clinically appropriate.  A Form 7388-B was completed.

The psychiatrist evaluated the inmate on 3/19/12.  The psychiatrist discontinued Remeron at the inmate's request as he no longer felt depressed.  The plan was to continue to monitor him.  The primary clinician met with the inmate on 5/10/12, when he was described as stable.  The psychiatrist evaluated the inmate for follow-up on 6/5/12, when he was noted to be maintaining well.

Findings

This inmate was receiving treatment consistent with Program Guide requirements.

**Inmate D**

This 3CMS inmate's most recent mental health treatment plan was developed at an IDTT meeting that took place on 4/26/12.  The inmate's presentation was consistent with diagnoses of Adjustment Disorder with depressed mood, Polysubstance Dependence, and Personality

Disorder NOS.  Appropriate staff and the inmate were present at the IDTT meeting.  The treatment plan was clinically appropriate.  The inmate was housed in Facility D, which was an SNY.  Progress notes documented consistent psychiatrist and primary clinician clinical contacts.

<u>Findings</u>

This inmate was receiving mental health treatment consistent with Program Guide requirements.

**Inmate E**

This 3CMS inmate's last treatment plan was dated 4/4/12.  Appropriate staff and the inmate attended the IDTT meeting.  The treatment plan was clinically appropriate.  The inmate was provided with diagnoses of Major Depressive Disorder and Polysubstance Dependence.  There was documentation of Form 7388-B completion as to higher level of care referral consideration.  The inmate was housed in Facility E, which was an SNY.  Progress notes documented consistent psychiatrist and primary clinician clinical contacts.

<u>Findings</u>

This inmate was receiving mental health treatment consistent with Program Guide requirements.

**Inmate F**

This 3CMS inmate transferred to CCI on 2/5/11.  His most recent treatment plan, dated 7/25/12, was clinically appropriate.  He was provided with diagnoses of Schizoaffective Disorder bipolar type and Methamphetamine Dependence.  Appropriate staff and the inmate attended the IDTT meeting.  There was documentation of Form 7388-B completion as to higher level of care referral consideration.  Progress notes documented consistent psychiatrist and primary clinician clinical contacts.

<u>Findings</u>

This inmate was receiving mental health treatment consistent with Program Guide requirements.

**Inmate G**

This inmate's case was selected for review because he had three or more MHCB admissions during the last six months.  He originally arrived at CCI on 6/1/12 and had returned there from an MHCB on 7/5/12.  In the most recent treatment plan dated 7/12/12, the inmate was described as transgendered with an extensive history of exaggerating symptoms and using suicidal ideation for secondary gain.  That treatment plan indicated a diagnosis of Borderline Personality Disorder with histrionic traits as the primary diagnosis, and Adjustment Disorder with depressed and anxious moods.  The Form 7388-B noted one positive indicator; the provided reason for non-referral was that past hospitalizations were due to the inmate's use of suicide threats for secondary gain.  The IDTT meeting noted that the treatment plan had been developed to address

these behaviors.  It also indicated that the inmate's level of functioning was appropriate at the 3CMS level of care.  The treatment plan did not indicate the frequency of treatment.

The psychiatrist provided the inmate with a diagnosis of Mood Disorder.  He was prescribed Buspar, Prolixin, and Zoloft.  These medications were discontinued on 7/19/12 at the inmate's request and with a plan for reevaluation within two weeks.  A primary clinician note dated 7/19/12 indicated that the inmate wanted to transfer to the EOP to facilitate transfer to another facility.

Findings

The IDTT meeting correctly noted that the inmate met indicator five on the Form 7388-B and was seen timely upon return from his most recent MHCB placement.  The inmate may not have required a DSH referral, but appeared to require consideration for EOP level of care.  In light of the inmate's repeated MHCB admissions and the difficulty implementing his current treatment plan at the 3CMS level of care, EOP care should have been considered.  Documentation of primary clinician contacts indicated that the treatment provided at the 3CMS level of care was inadequate.  Alternative interventions were listed and may have been appropriate for an EOP level of care, but seemed difficult to implement in the 3CMS program.

**Inmate H**

This inmate's case was reviewed because he had a custody-reported parole date of 8/19/12, but had reportedly not received pre-release planning services.  The inmate arrived at CCI on 2/23/12.  He was not prescribed psychotropic medications and had been stable without them for months.

The inmate was seen at CCI for his initial IDTT meeting on 3/8/12.  The treatment plan completed at that time was generic and did not address pre-release planning.  The inmate was provided with a diagnosis of Major Depressive Disorder moderate, recurrent.  A Form 7388-B was completed on that date and required IDTT meeting members were present.  The inmate did not attend the IDTT meeting.  The primary clinician did not indicate the reason for inmate non-attendance in the space provided.

There was a lack of documentation of weekly primary clinician contacts during the inmate's administrative segregation placement.  It appeared that there may have been confusion whether he was on administrative segregation or SHU status, although the treatment plan indicated he would be seen weekly.

On 6/21/12, the inmate requested removal from the MHSDS.  He was seen for this request and advised to attend his primary clinician appointments so that his request could be properly evaluated; the inmate had been consistently refusing confidential primary clinician appointments.

On 7/25/12, a mental health summary and pre-release planning note were completed by a different clinician, apparently in anticipation of the inmate's upcoming release.  However, the note provided an assessment instead of a plan for release.  There was also a lack of primary

clinician pre-release planning documentation.  Progress notes did not explain or acknowledge a change in the inmate's primary clinician.

<u>Findings</u>

The primary clinician did not timely see the inmate in administrative segregation.  While the inmate was seen timely by the IDTT, treatment plans were inadequate.  The inmate also did not receive adequate pre-release planning.  While the inmate appeared to be stable, he had not received adequate mental health care.

**Inmate I**

This case was selected for review because the inmate had six MHCB admissions during a six-month period.  Previously, CIM mental health staff had attempted to obtain a Keyhea order for the inmate for danger to self and to others.  That order was denied on 6/14/12, reportedly because the inmate told the judge that he was malingering.  The inmate arrived at CCI on 7/2/12.  He remained opposed to treatment with psychotropic medications and was not prescribed them upon arrival to CCI.

Documentation from an OHU/MHCB placement in January 2012 indicated that the inmate had a prior DSH-APP admission noting that he had feigned mental health symptoms for secondary gain.  The documentation also indicated an MHCB admission after the inmate reported to his clinician hitting his head ten times.  His diagnoses during that hospitalization were Polysubstance Dependence by history and Personality Disorder NOS with antisocial traits.

The inmate had another MHCB admission from 5/24/12 to 6/18/12 due to suicidal ideation and vague auditory hallucinations.  His discharge diagnoses were Psychotic Disorder NOS, specified by history, now stable, Polysubstance Dependence, and Antisocial Personality Disorder.

The inmate was seen on 7/23/12 for his initial IDTT meeting as a SHU placement; he was housed in administrative segregation pending SHU bed availability.  He was identified as meeting indicator five for higher level of care referral consideration, was referred to intermediate care, and was placed at the EOP level of care.  Treatment modifications were specified to improve his functioning while awaiting DSH placement.

<u>Findings</u>

This inmate was appropriately referred to DSH intermediate care.  Clinically appropriate treatment modifications were also implemented to improve his level of functioning while awaiting DSH admission.

**Inmate J**

This case was selected for review because the inmate met one of the Form 7388-B indicators for DSH referral consideration on 5/8/12, but was not referred to DSH.  The Form 7388-B was handwritten and difficult to read.  Treatment goals were broad and vague, and interventions

merely restated Program Guide requirements.  The top portion of the Form 7388-B was incomplete.  The non-referral rationale was appropriate, but alternative interventions were not listed.  The inmate was provided with a diagnosis of Schizoaffective Disorder.  He was prescribed Risperdal and Cogentin.

Findings

This inmate was appropriately not referred to DSH.  The DSH Coordinator educated the primary clinician as to the need to include alternative interventions to improve inmate functioning when not referring to DSH.

**Inmate K**

This case was selected for review because it was included on the non-referral log as meeting indicators for DSH referral consideration due to multiple MHCB admissions.  However, the Form 7388-B dated 3/6/12 indicated that the multiple MHCB admissions indicator was not noted as positive.  The inmate's inpatient medical record indicated that he met the multiple MHCB admissions indicator.  The treatment plan was inadequate in light of the multiple crisis placements and diagnosis of Major Depressive Disorder.  A CC I was not in attendance at the IDTT meeting.  Indicator five for DSH referral consideration also was not properly identified on the Form 7388-B dated 12/1/11 and had initially been missed on 3/27/12, but was later corrected.  The non-referral rationale at that time was minimally adequate and would have benefitted from more detail and explanation.  The alternative treatment interventions that were listed also required further development.

Findings

The audit results were incorrect and treatment staff did not properly identify the inmate as meeting indicator five on the Form 7388-B.  All required members were not in attendance at the IDTT meeting.  The treatment plan was inadequate in light of documented symptoms.

EXHIBIT T
California Institution for Men (CIM)
May 15, 2012 – May 18, 2012

**Inmate A**

This inmate's healthcare screening was completed on 11/22/11.  It was negative from a mental health perspective.  This inmate was subsequently admitted to the MHSDS on 2/3/12 at the 3CMS level of care.

A psychiatrist completed a brief mental health evaluation on 2/9/12.  The evaluation determined that psychotropic medications were not clinically indicated.  A suicide risk evaluation and treatment plan were completed on 2/15/12.  The inmate was provided with diagnoses of Delusional Disorder and Antisocial Personality Disorder. The treatment plan did not address issues related to the inmate's Delusional Disorder.

There was documentation that a Form 7388-B was completed at an IDTT meeting on 2/20/12.  A psychiatrist again evaluated the inmate on 3/13/12.  The assessment indicated that the inmate did not have a major mental illness diagnosis.  The primary clinician subsequently evaluated the inmate on 5/9/12, when he was provided with a diagnosis of Delusional Disorder.

<u>Findings</u>

The psychiatrist and primary clinician timely saw the inmate, but there were diagnosis discrepancies that the IDTT meeting did not address.  The treatment plan also did not adequately address the inmate's treatment issues.

**Inmate B**

This 3CMS inmate was provided with a diagnosis of Attention Deficit Disorder.  A 7/22/11 note indicated that he had lost 25 pounds.  At the inmate's request, Strattera was discontinued.  He was to be seen again in 30 days or sooner, if needed.  Strattera was restarted on 10/26/11, when the psychiatrist saw the inmate.

On 11/3/11, the inmate was in an altercation with his cellmate that resulted in multiple cuts on both of his legs with a razor blade.  At that time, an administrative segregation screening was conducted at MCSP.

At CIM, an initial healthcare screening on 12/8/11 was positive from a mental health perspective.  A suicide risk evaluation was conducted on 12/20/11.  The mental health evaluation provided diagnoses of Attention Deficit Hyperactivity Disorder and Narcissistic Personality Disorder.  The treatment plan addressed issues relevant to the inmate's impulsivity.  A Form 7388-B was completed at the IDTT meeting.

The inmate participated in a current events group therapy program.  The psychiatrist wrote a clinically beneficial treatment summary on 3/1/12.

<u>Findings</u>

This inmate appeared to be receiving mental health services at the appropriate level of care. The psychiatrist and primary clinician consistently saw him. Treatment planning was clinically appropriate.

**Inmate C**

This 3CMS inmate was provided with a diagnosis of Bipolar I Disorder. He was prescribed Effexor and Strattera, but refused to take prescribed heat risk medications. A 3/19/12 suicide risk evaluation was completed, apparently as part of a routine intake assessment. A psychiatrist evaluated the inmate on 3/20/12. The inmate had discarded his HIV medications and was angry regarding the conditions of his confinement on Facility C; the inmate was essentially locked down and there was no electricity in his cell.

The 3/20/12 treatment plan did not address the inmate's refusal to take heat risk medications. A Form 7388-B was completed.

The psychiatrist saw the inmate on 3/30/12. He was provided information relevant to his current medications and possible precipitation of a manic episode. On 4/16/12, the inmate experienced racing thoughts and was easily distractible. As a result, Lamictal was started and the tapering of Effexor began. The psychiatrist planned to see the inmate again in two weeks.

The inmate submitted a mental health service request on 4/13/12. A psychiatrist saw him on 4/18/12. On 4/23/12, submitted health services requests indicated that the inmate wanted to start treatment with Lithium. On 4/30/12, the psychiatrist initiated treatment with Lithium, and Lamictal was stopped. Subsequent mental health contacts were not documented.

Findings

There was a lack of documentation of timely psychiatrist follow-up after significant medication changes. It also did not appear that appropriate laboratory testing was performed for treatment with Lithium; thyroid function tests were not performed.

**Inmate D**

This 3CMS inmate submitted a healthcare request form on 2/15/12 to see the psychiatrist regarding his medications. The psychologist saw him on 2/27/12. A psychiatrist referral was subsequently generated. The psychiatrist saw the inmate on 3/14/12, when Remeron was continued, Vistaril was discontinued, and Prozac was initiated. Psychiatric follow-up was scheduled for two weeks.

The psychiatrist again saw the inmate on 3/28/12, when he exhibited agitation and auditory hallucinations telling him to kill himself. The inmate was referred to the MHCB where Prozac was discontinued and treatment with Lithium was considered.

A 4/9/12 mental health discharge summary indicated that the inmate's diagnoses included Mood Disorder NOS, Polysubstance Dependence, HIV, and hepatitis C. The inmate's medications

were readjusted.  Risperdal was initiated, Trileptal and Prozac were discontinued, and the Lithium dosage was increased due to a subtherapeutic serum level.  Five-day follow-up was documented following the inmate's discharge from the MHCB.

A different psychiatrist saw the inmate on 4/17/12.  The primary clinician saw him the following day and provided a clinically useful past psychiatric history summary.  The inmate subsequently received appropriate five-day follow-up visits.  A suicide risk evaluation was also completed. The psychiatrist evaluated him on 5/15/12.  The inmate had been refusing medications, and his psychotropic medications were subsequently discontinued.  The psychiatrist documented plans for follow-up in two weeks.  A 5/15/12 treatment plan did not address the inmate's medication refusal.

<u>Findings</u>

The psychiatrist and primary clinicians timely saw the inmate.  There was documentation that necessary laboratory testing was conducted for treatment with Lithium.  The treatment plan did not address the inmate's medication noncompliance, which was an essential aspect of his treatment.

**Inmate E**

The psychiatrist saw this 3CMS inmate on 1/3/12, when he was prescribed Geodon, Depakote, and Effexor.  A follow-up psychiatrist appointment occurred on 2/2/12.  A 2/12/12 treatment plan adequately addressed the inmate's mental health issues.  The psychiatrist saw the inmate again on 2/16/12 and 3/8/12.

The inmate met with his primary clinician on 1/11/12.  He was provided with diagnoses of Schizoaffective Disorder, bipolar type and Polysubstance Dependence in remission.

On 2/6/12, the inmate told his primary clinician that he was experiencing continued dizziness, recent auditory hallucinations, paranoid thinking, and agitation.  This same primary clinician informed the inmate on 3/26/12 that he was being transferred to a new primary clinician.

<u>Findings</u>

This inmate was receiving timely and appropriate psychiatrist follow-up and clinical primary clinician contacts consistent with Program Guide requirements.

**Inmate F**

This 3CMS inmate was provided with diagnoses of Bipolar I Disorder and Borderline Personality Disorder.  His primary clinician saw him on 1/6/12.  A Form 7388-B and treatment plan were completed at a 1/12/12 IDTT meeting.  The psychiatrist saw the inmate during early February 2012 when Lithium, Strattera, and Vistaril were initially prescribed; Zoloft was subsequently added on 2/27/12.  Primary clinician contacts were documented on 1/20/12, 2/3/12, and 2/23/12.

The psychiatrist evaluated the inmate on 4/2/12, and the primary clinician saw him for psychotherapy on 4/4/12. The psychiatrist added Geodon to the medication regimen on 5/1/12. Appropriate laboratory testing for treatment with Lithium was performed.

Findings

This inmate was receiving mental health services at the appropriate level of care. The psychiatrist and primary clinician saw him timely. Appropriate laboratory testing was conducted.

**Inmate G**

This 3CMS inmate was provided with a diagnosis of Schizoaffective Disorder, depressed type. The psychiatrist saw him on 2/1/12, when he was prescribed Remeron, Cogentin, and Haldol. A mental health treatment plan and Form 7388-B were formulated on the following day. The psychiatrist saw the inmate again on 3/29/12, when he was reportedly doing well. The primary clinician saw him on 4/27/12.

Findings

The psychiatrist and primary clinician timely saw this inmate. The treatment plan was clinically appropriate and addressed relevant treatment issues.

**Inmate H**

This 3CMS inmate was provided with a diagnosis of Schizoaffective Disorder, bipolar type. He was prescribed Risperdal, Prozac, and Vistaril. There was documentation that he participated in weekly group therapy sessions. The psychiatrist evaluated him on 3/14/12, and the primary clinician saw him on 4/17/12. The psychiatrist saw him again on 5/10/12.

Findings

This inmate was receiving mental health services at the appropriate level of care. The psychiatrist and primary clinician saw him timely.

**Inmate I**

This inmate was housed in administrative segregation. A 4/19/12 mental health placement chrono indicated that he was receiving mental health services at the 3CMS level of care. However, on 4/11/12 he received services at the EOP level of care. It appeared that he may have been hospitalized in the MHCB at the time of the level of care change.

The inmate had multiple MHCB admissions. Progress notes described him as paranoid, fearful, anxious, and delusional, but MHCB admissions were characterized as resulting from housing concerns. He was not referred to DSH; the rationale provided for non-referral was that the inmate's MHCB admissions were solely due to housing issues.

The inmate was prescribed Risperdal, and was provided with a diagnosis of Psychotic Disorder NOS. The Risperdal dosage was decreased on 5/1/12, but there was no accompanying psychiatric progress note. There were also some inconsistencies in mental health documentation. For example, one progress note indicated both that the inmate had nightmares that awoke him and that he slept well.

Based on repeated crisis admissions, the inmate was described as psychotic with ongoing delusional beliefs about other inmates trying to harm him, including attempts to tunnel into his cell. There was also documentation that the inmate had possible hallucinations, such as hearing ongoing negative conversations. The most recent treatment plan dated 4/12/12 listed no interventions, but reasonable treatment goals were included. There were no Form 7388-Bs despite the fact that the inmate met at least one indicator based on his multiple crisis stays. A Form 7388-B completed during the inmate's last MHCB hospitalization justified non-referral by indicating that he did not exhibit features of a major mental illness, despite documentation that he exhibited symptoms of psychosis.

Findings

There appeared to be significant confusion regarding the mental health care provided for this inmate. Of concern were the level of care changes over a short period of time from 3CMS to EOP and back to 3CMS. There also appeared to be confusion regarding the reason for MHCB placement; documentation indicated that housing issues were the reason for admission. There was, however, documentation that indicated that the inmate suffered from a major mental illness with psychosis that frequently manifested itself as fear for his personal safety. The inmate's fear, anxiety, and paranoia resulted in multiple MHCB admissions.

This inmate should have been considered for DSH referral. His level of care also should have been reconsidered, as EOP may have been more clinically appropriate. The inmate also should have been seen by the IDTT to develop an appropriate individualized treatment plan that addressed his psychotic symptoms. This inmate did not receive adequate mental health care.

**Inmate J**

This 3CMS inmate was housed in administrative segregation. A treatment plan dated 11/8/11 indicated problem areas of treatment resistance and mood instability with appropriate treatment interventions listed. As a recent arrival to administrative segregation, the treatment plan had not been updated as of the site visit.

The inmate was provided with a diagnosis of Bipolar I Disorder. He was prescribed Vistaril, Remeron, Trileptal, and Risperdal. Progress notes indicated that he had been experiencing nightmares with labile mood and loud speech. He was not seen timely during the period when he was housed in general population. There was a lack of documentation of mental health contact from November 2011 until May 2012, when he was placed in administrative segregation and was seen by a psych tech.

Findings

This inmate was not seen timely in accordance with Program Guide requirements.  Although the treatment plan established appropriate treatment interventions for the problem areas identified, the interventions were never actually implemented.  The inmate did not receive adequate care during the period when he was housed in general population or after transfer to administrative segregation.

**Inmate K**

This inmate arrived at CIM on 1/20/12, when he was screened.  A psych tech referred him for a medication evaluation on 1/23/12 due to the inmate's complaints of not receiving psychotropic medication.  He received his mental health intake evaluation on 1/31/12 and was found to meet indicators for EOP level of care.  A psychiatrist also saw him on that date and prescribed Abilify and Vistaril.

The most recent treatment plan dated 5/17/12 was not individualized, but the plan included pre-release planning which was important as the inmate had a 5/19/12 release date.  The inmate received group treatment and documentation indicated his consistent participation.  The psychiatrist and primary clinician timely saw the inmate for ongoing contacts, although the initial medication evaluation was not timely.  The inmate's initial IDTT meeting was timely, but two of the subsequent IDTT meetings were not conducted every 30 days.

Findings

This inmate did not receive a timely initial medication evaluation, although the psychiatrist and primary clinician saw him timely.  The inmate also did not have consistent timely IDTT meetings and treatment plans were not individualized.  Despite the lack of an individualized treatment plan, treatment was focused on the inmate's symptomatology and important issues such as his impending release.

**Inmate L**

This inmate was received at CIM on 11/22/11.  As of the site visit, he had not been endorsed for transfer.  There was a lack of documentation of a mental health screening and an initial mental health evaluation.  A brief mental health evaluation was completed on 12/13/11.  At that time, a psychiatrist saw the inmate and provided him with a diagnosis of Major Depressive Disorder, recurrent, severe.  A psychiatrist did not see the inmate within 24 hours of arrival despite the inmate reporting that he was prescribed psychotropic medications upon arrival.

A placement chrono dated 11/29/11 indicated that the inmate had been placed in the MHCB and was discharged on 12/7/11 at the EOP level of care.  The initial reception center IDTT meeting was delayed and did not occur until 1/26/12.  Furthermore, a treatment plan was not located in the medical record, although the Form 7388-B was present.  Only one follow-up IDTT meeting was conducted timely, and the associated treatment plans were not individualized.  The psychiatrist consistently saw the inmate on a timely basis.  There were several periods when weekly primary clinician contacts were not documented in the medical record.  The inmate participated in group therapy.

<u>Findings</u>

Several omissions in mental health care were noted for this inmate, which resulted in inadequate mental health care.  Treatment planning was also poor, and contacts were at times delayed. These issues may have contributed to the failure to timely endorse and transfer the inmate.

EXHIBIT U
California Rehabilitation Center (CRC)
August 28, 2012 – August 30, 2012

**Inmate A**

This case was selected for review because the inmate had three or more crisis placements within a six-month period.  Review of available documentation indicated that he had at least eight different crisis placements.  He arrived at CRC on 2/9/12 and was placed in the OHU on 2/10/12.  He remained in the OHU for three days, but documentation did not indicate whether MHCB referral was ever initiated or considered.  He was placed on five-day follow-up, but was readmitted to the OHU on 2/15/12 due to increased auditory hallucinations that told him to hurt others.

The inmate was transferred to the MHCB at CIM on 2/18/12.  Upon admission there, he reported concern about dormitory setting housing, as he preferred celled housing.  He had been placed at the EOP level of care at CRC prior to transfer to CIM.  Of note, during a prior admission to the CIM MHCB, the inmate was placed at the 3CMS level of care due to a belief that he did not have a major mental illness.  His reported symptoms were considered to be atypical and inconsistent, which suggested that he was falsely reporting or exaggerating them.

The inmate was prescribed Risperdal 2 mg/day and Cogentin 1mg/day.  The CIM clinical team maintained him on these medications as they indicated that it was unclear whether he had a psychotic disorder that was in remission due to the medication.  He was provided with a diagnosis of Antisocial Personality Disorder.

There was no documentation that treatment planning was completed at CRC as part of the 3CMS program or when the inmate was recommended for EOP level of care.  OHU placements resulted from his report of auditory hallucinations, namely, of voices telling him to hurt others, even after CIM MHCB staff documented that they were highly questionable and most likely due to safety concerns and a desire for celled housing.  The inmate was not seen daily for each OHU admission when he was housed there as some admissions included days without documented clinical contacts.

The inmate was scheduled to parole on 8/15/12 to Kern County.  Although progress notes referenced his impending parole date, documentation indicated that pre-release services were not provided.  Prior to parole, he was prescribed Vistaril 75 mg and Risperdal 7 mg, both of which were ordered for p.m. administration.  Documentation did not indicate that he received either medication prior to parole.

<u>Findings</u>

There was a lack of documentation of completion of a current or timely initial treatment plan.  The IDTT also did not timely see the inmate and he was not appropriately considered for DSH referral.  The primary clinician frequently saw him.  He was also frequently seen by on-call clinicians as a result of crisis calls secondary to staff referrals for self-reported hallucinations and reports of command hallucinations to harm others.

The inmate had repeated OHU admissions that did not always result in timely MHCB referrals.  He was frequently placed in the OHU even when reported symptomatology did not appear to

justify the placement.  It seemed likely that the multiple crisis placements may have been due in part to the lack of a treatment plan and any comprehensive treatment program for him.  It also appeared that staff responded to repeat crises with resulting impairment in the provision of mental health care.  Although staff was aware that the inmate had an imminent parole date, they did not provide pre-release services.

**Inmate B**

This case was selected for review because the inmate met at least one indicator for consideration for DSH referral, namely, three or more crisis placements within a six-month period.  The inmate arrived at CRC from WSP on 3/2/12.  He was prescribed Risperdal and Celexa.  His most recent treatment plan dated 3/14/12 documented diagnoses of Major Depressive Disorder, single episode, severe with psychotic features, Alcohol Dependence in a controlled environment, Methamphetamine Dependence in a controlled environment, and possible PTSD.  The treatment plan was inadequate and not individualized for the inmate's specific treatment needs as it merely restated Program Guide requirements for the clinical interventions needed.  A Form 7388-B completed on 5/2/12 included subjective indicator one and two for higher level of care referral consideration, but did not include indicator six (three or more crisis placements).

The inmate was monolingual Spanish-speaking, but only some documentation noted the use of an interpreter and did not note the use of an approved or certified interpreter.  During one OHU admission, the inmate indicated that he had been told by other inmates in the dorm that he was "going to be hit."  He reported that he was going to kill himself before allowing someone else to kill him.  He further indicated that without these safety concerns he would not be suicidal, but was hesitant to talk to custody for fear that this would only result in a dormitory change where he would still remain in jeopardy.  This information was conveyed by way of an uncertified interpreter.  Progress notes were at times difficult to read, making it difficult to determine the inmate's mental status.

Findings

This inmate was not properly identified as meeting indicator six on the Form 7388-B dated 5/2/12.  It was unclear whether he should have been referred to DSH because of the difficulty reading the progress notes and the poor clinical evaluations that were completed in the inmate's non-native language.  This inmate should have been seen by a Spanish-speaking primary clinician or provided a certified interpreter in order to properly assess his suicide risk and determine whether there was a need for DSH referral.

**Inmate C**

This inmate arrived at CRC on 6/13/12, but immediately transferred to CIM after refusing to house at CRC.  He was placed in administrative segregation at CIM, but was ultimately released and returned to CRC on 6/26/12.  He was not seen by his primary clinician until 7/16/12, and was not seen by the IDTT until 7/19/12.  He was provided with diagnoses of Depressive Disorder NOS, Polysubstance Dependence, and Personality Disorder NOS.

The treatment plan simply stated that the inmate would be provided individual therapy to stabilize his mood and group therapy for anger management. The clinical summary provided no information about psychiatric symptoms, but instead included information about the inmate's legal history and complaints. There was a paucity of information regarding the clinical basis for the diagnoses provided. A Form 7388-B was appropriately completed, and all required attendees were present at the IDTT. The primary clinician saw the inmate approximately every two weeks, and there was documentation that he had begun involvement in a mood management therapeutic group. The inmate was not prescribed any psychotropic medication due to his refusal.

Findings

The primary clinician and the IDTT did not timely see the inmate for initial contacts. Treatment planning was not individualized. Medical record documentation did not support the provided diagnoses, making it difficult to determine whether the inmate had received appropriate mental health treatment. Psychiatry had not seen him at the time of the site visit. Although the inmate indicated that medications had not been beneficial for him in the past, should his psychiatric symptoms recur, a medication consult with psychiatry might be indicated. Since the IDTT, the primary clinician saw the inmate approximately every other week. Although this frequency was greater than the usual interval for 3CMS contacts, the medical record did not substantiate its rationale.

**Inmate D**

This case was selected for review because the inmate was identified as having met one of the DSH referral consideration indicators during the review period. He was not referred to DSH, but was ultimately placed in the EOP and transferred to an EOP facility. The referral date to an EOP facility was 1/5/12, but there was no treatment plan in the medical record from that date. A placement chrono from that date indicated EOP level of care. There was also a subsequent 128C chrono dated 1/10/12 that documented that an IDTT occurred on 1/5/12, noted the change in the inmate's level of care to EOP, and recommended him for the co-occurring dependency program at CSATF.

The inmate had been housed at CRC since September 2011. He had become increasingly disorganized, bothered other inmates in the dormitory, and demonstrated pressured and tangential speech with persistent delusions. He had previously been admitted to PSH due to incompetence to stand trial. He also had received social security benefits for 18 years due to mental illness. A Form 7388-B or 7388 treatment plan were not completed for him. An IDTT progress note indicated that an IDTT had occurred, but the form was pre-printed with staff names who had since retired from CRC. Other staff names had been added including a CC I, which suggested that an IDTT may have occurred. It was unclear how the determination was made that the inmate met a DSH referral indicator. The inmate refused medications. It was not possible to determine what diagnosis he was provided as there was no treatment plan and documentation did not otherwise indicate a diagnosis. He was not seen weekly prior to his transfer, although he was seen frequently.

Findings

There were significant concerns regarding the care that was provided for this inmate.  The poor state of documentation made it difficult to determine how he met DSH referral consideration indicators.  Many aspects of the care that was provided to him were inadequate, including timeliness of contacts, IDTT meetings, documentation of level of care changes, and treatment planning.

**Inmate E**

This case was selected for review because the inmate was identified as having met one or more DSH referral indicators.  The inmate was not referred to DSH, but was referred to the EOP level of care.  He was referred for transfer to an EOP facility on 2/23/12.

The inmate arrived at CRC from WSP on 2/9/12.  However, there was a Form 7388-B in the medical record dated 2/8/12 that indicated that he had been referred for EOP level of care.  It appeared that the inmate had been transferred from WSP to CRC without notification of appropriate staff, although a placement chrono was present in the medical record from that date. When the inmate first arrived at CRC, he was identified as a participant in the 3CMS program. A subsequent placement chrono was completed at CRC on 2/23/12.  There was no 7388 treatment plan or Form 7388-B located in the medical record.  A progress note indicated that an IDTT was conducted with several staff present.  The primary clinician did not see the inmate weekly prior to his departure.  Medical record documentation described him as psychotic with disruptive behavior that was problematic in a dormitory setting.  Despite these observations, the inmate remained housed in this location.

Findings

Based on available documentation, it was unclear how this inmate met DSH referral consideration indicators.  His level of care was unclear to treating staff and it appeared that the medical record was not reviewed following the inmate's transfer to CRC.  His level of care was also changed without a proper IDTT meeting and treatment planning.  There was also a lack of documentation of weekly primary clinician contacts prior to EOP transfer.

**Inmate F**

This case was selected for review because the inmate was identified as having met one or more DSH referral consideration indicators.  An EOP chrono located in the medical record indicated that he had been placed at the EOP level of care on 3/12/12 and was referred for EOP transfer on that date.  A Form 7388-B in the medical record indicated that he met indicator one and was referred from the 3CMS level of care to the EOP.  An associated treatment plan was not located. The Form 7388-B stated that the inmate did not require DSH care but could be appropriately treated at the EOP level of care at that time.  The IDTT progress note indicated that all required IDTT members were present.  Progress notes indicated that the inmate was psychotic, experiencing auditory hallucinations and delusional thinking.  He was not seen weekly prior to transfer and there were several periods when clinicians saw him at intervals greater than seven days.

Findings

Although a formal IDTT meeting was conducted to increase the inmate's level of care to EOP, there was a lack of documentation that appropriate treatment planning occurred. There was also a lack of documentation that the primary clinician saw the inmate weekly. Despite the inmate's significant symptomatology, transfer to the EOP appeared to be an appropriate step in the process of stabilization prior to DSH transfer consideration.

**Inmate G**

Although this 3CMS inmate had been housed at CRC for some period of time, the exact duration of his stay was unclear from the medical record. Medical record review revealed that a current and timely updated treatment plan was present. However, the treatment plan contained minimal and contradictory information. For example, the clinical summary indicated that the inmate had no substance abuse history, but then listed substance abuse in the problem area. The inmate was prescribed Abilify. There was a completed Form 7388-B and it appeared that all required attendees were present at the IDTT meeting. The inmate had begun a mood management therapy group at the time of the site visit. His primary clinician saw him approximately every two months. Based on a progress note by the psychiatrist dated 2/22/12, he was diagnosed with Bipolar Disorder NOS. It also appeared that in the most recent progress note, the psychiatrist may have provided diagnoses of Major Depressive Disorder and a substance abuse disorder, but the handwriting was nearly illegible. The psychiatrist saw the inmate every two months.

Findings

This inmate should have been returned to the IDTT to develop an appropriate treatment plan that was individualized and provided sufficient data to support the diagnosis. He was seen more frequently than the minimum standard and appeared to be receiving adequate mental health care.

EXHIBIT V
Richard J. Donovan Correctional Facility (RJD)
August 13, 2012 – August 16, 2012

**Inmate A**

This inmate was receiving mental health services at the 3CMS level of care in an SNY facility. The most recent treatment plan was dated 12/5/11.  Appropriate staff was in attendance at this IDTT meeting.  The mental status section of the IDTT note was incomplete.  The inmate was provided with diagnoses of Adjustment Disorder with anxiety and depression, Polysubstance Dependence, and Antisocial Personality Disorder.  The listed interventions were clinically appropriate.

Primary clinician contacts occurred on 12/1/11, 1/4/12, and 1/26/12.  Psychiatry contacts occurred on 12/14/11, 3/8/12, and 3/30/12.  Group therapy participation was documented for March and April 2012.

Findings

The psychiatrist, primary clinician, and IDTT timely saw the inmate.  Necessary participants were in attendance at the IDTT.

**Inmate B**

The most recent IDTT meeting for this 3CMS inmate was dated 11/29/11.  Appropriate staff was in attendance at the IDTT.  He was provided with diagnoses of Adjustment Disorder with depressed mood and Antisocial Personality Disorder.  The mental status section of the treatment plan was incomplete.  The clinical interventions listed with the problem list were appropriate.

The inmate was housed in the administrative segregation unit in December 2011.  Primary clinician contacts occurred on 12/7/11, 12/14/11, and 12/21/11.  The psychiatrist saw him on 12/28/11.

By March 2011, the inmate was housed in the SNY facility.  On that yard, primary clinician contacts occurred on 3/21/12.  Psychiatrist contacts occurred on 3/7/12, 5/16/12, and 6/28/12.

Findings

This inmate's mental health treatment was consistent with Program Guide timelines.  Treatment planning was clinically appropriate and the necessary participants were in attendance at the IDTT.

**Inmate C**

This inmate's most recent treatment plan was dated 1/25/12 and the listed interventions were clinically appropriate.  He was provided with a diagnosis of Mood Disorder NOS.  Appropriate staff attended the IDTT.  The Form 7388-B was completed.

Progress notes by the psychiatrist were dated 1/3/12 and 5/15/12.  Primary clinician progress notes were dated 2/28/12, 3/23/12, and 6/26/12.

Findings

This inmate's mental health treatment was consistent with Program Guide requirements.

**Inmate D**

This inmate was provided with diagnoses of Depressive Disorder NOS and Polysubstance Dependence.  There was documentation of three treatment plan reviews between 2/14/12 and 7/24/12.  There was also documentation that the Form 7388-Bs were completed in conjunction with IDTT meetings.  Treatment plan interventions were appropriate.  Required staff was in attendance.

The psychiatrist and primary clinicians consistently saw the inmate during the review period.  Psych tech rounds were documented during March, April, and June, 2012.

Findings

This inmate's mental health treatment was consistent with Program Guide requirements.

**Inmate E**

There was documentation of treatment plan reviews for this inmate on 5/23/12 and 5/19/12.  He was provided with diagnoses of Mood Disorder NOS, Methamphetamine Dependence, and ADHD by history.  Appropriate staff was present at the IDTT meetings.  Although clinical interventions were generic in nature, interventions listed in the 6/19/12 treatment plan provided more specificity.

Review of psychiatry and primary clinician contacts indicated that these assessment/treatments were timely and consistent with Program Guide requirements for May and June 2012, but not for March or April 2012.

Findings

This inmate's mental health treatment was not consistent with Program Guide requirements due to the lack of weekly primary clinician contacts in March and April 2012, when he was housed in administrative segregation.

**Inmate F**

Based on a 2/7/12 treatment plan, the inmate was provided with diagnoses of Mood Disorder NOS, Alcohol Dependence, and Cocaine Dependence, and possible diagnoses of Bipolar Disorder and Personality Disorder NOS.  Interventions were relevant to the listed problems.  Required staff attended the IDTT and the Form 7388-B was completed.  The 5/1/12 treatment plan included the same provisional diagnoses.

The eUHR contained scanned documents beginning on 5/20/12. These notes included documentation relevant to participation, mental health rounds, individual primary clinician contacts, and clinical contacts with the psychiatrist. The frequency of these clinical contacts was consistent with Program Guide requirements.

<u>Findings</u>

At least for June 2012, mental health treatment was consistent with Program Guide requirements. The provisional/possible diagnoses listed in the treatment plan should have been verified in the treatment plan rather than continuing as possible diagnoses.

**Inmate G**

This inmate was provided with diagnoses of Schizoaffective Disorder bipolar type, Polysubstance Dependence, and Antisocial Personality Disorder. A 3/14/12 treatment plan was completed at RJD and appropriate staff was present at the IDTT meeting. Clinical interventions were specific to the problems listed. Another treatment plan was completed in May 2012.

The eUHR contained scanned progress notes beginning on 5/10/12. The inmate complained about having to attend out-of-cell therapies wearing only his underwear. He stated that "(t)his is the last time I come out for anything. This organization expects me to go around in my underwear? They make me to sign an agreement about jacking off but they keep me in my underwear? And they won't even give me two! I had to fish for the second pair …!"

The inmate subsequently refused most out-of-cell clinical contacts for the reasons stated above. Mental health saw him at his request on 6/21/12 due to increased auditory hallucinations. He subsequently resumed his attendance in various therapies.

<u>Findings</u>

This inmate's participation in mental health treatment was impeded by his lack of access to clothing other than underwear. This issue was not adequately addressed. Based on information obtained from staff and other inmates, this issue was problematic for a small number of inmates due to their Muslim religion.

**Inmate H**

This case was selected for review because the inmate was identified on the DSH non-referral log as meeting indicators four and five (6/15/12). He was not referred because he had recently returned from DSH. The rationale provided for DSH non-referral was extensive, as were the alternative interventions.

The inmate transferred from RJD to CIM during the period of installation of suicide-resistant beds at RJD. On 6/18/12, he was again seen by the IDTT in the RJD MHCB; the IDTT appropriately noted on the Form 7388-B that he met indicators four and five. The rationale and alternative interventions for DSH non-referral were an exact duplicate of information from the

Form 7388-B dated 6/15/12.  There was no documentation as to the presence of a CCI at the 6/15/12 IDTT meeting, but a CCI was present at the 6/18/12 IDTT meeting.

Findings

This inmate was appropriately not referred to DSH.  Of note was the continuation of rationales for non-referral and alternative interventions; if the interventions were not successful, they should have been further modified.  The IDTT was noncompliant for the attendance of all required members.

**Inmate I**

This case was selected for review because the DSH non-referral log identified the inmate as meeting indicators five and six (6/8/12).  However, he was not referred as he had recently returned from DSH and was described as high functioning and manipulative.  The non-referral rationale was not well-articulated, but the underlying clinical basis appeared to be appropriate.  No alternative interventions were listed; instead, the rationale was repeated in the alternative interventions section of the Form 7388-B.  The treatment plan did not provide much detail regarding interventions, although 13 hours of clinical groups and 7.5 hours of recreation therapy groups were included.  The mental status examination was not completed fully; specifically, cognition and thought processes were not noted.

The inmate had apparently recently returned from DSH; he had been discharged on 5/25/12.  The primary clinician's progress notes suggested that the clinician formed the impression that the inmate would not change his behavior.  The plan was identical and stated that "I/P 'talks a good game' but rarely changes any of his behaviors."  He was seen approximately every two weeks in individual sessions with his primary clinician and weekly in group treatment.

Findings

The inmate was appropriately not referred to DSH, although the provided rationale was not well-articulated.  Clinical contact documentation lacked content as to needed therapeutic issues and the inmate's primary issue, manipulation, was not a focus of treatment.  Despite the clinician describing him as high functioning, he remained in the EOP.  The basis for the primary clinician's opinion that the inmate's behavior was intractable was also unclear, as supporting documentation was not provided.

**Inmate J**

This case was selected for review because the inmate was identified on the DSH non-referral log as meeting indicators five and seven, but was described as stable and medication compliant.  On 5/14/12, he was admitted to the MHCB due to worsening depressive, anxiety, and psychotic symptoms with suicidal ideation.  He presented with delusional thinking at the time of admission, believing that he owned the prison.

The inmate was transferred to the MHCB at KVSP on 5/28/12 due to the installation of suicide-resistant beds in the RJD MHCB.  He had a prior MHCB admission from 3/30/12 to 4/5/12 due to bizarre behavior.  He was provided with diagnoses of Schizoaffective Disorder NOS and Polysubstance Dependence.  The Form 7388-B dated 5/23/12 provided the rationale for DSH non-referral, but did not address the positively-noted indicator.  The rationale indicated that he was stable in the MHCB, but did not address his repeated MHCB placements.  The alternative interventions listed also did not address the underlying reason for the repeated MHCB placements.

The inmate was ultimately discharged from the KVSP MHCB on 6/4/12, after a total stay of 21 days.  He was unable to maintain stability in general population and was readmitted to the MHCB on 7/9/12.  He was identified for referral to DSH intermediate care on 7/11/12.  He remained delusional, with probable auditory hallucinations.  He was also described as disheveled with slowed speech, disorganized thinking, and poor hygiene.  He was discharged from the MHCB to SVPP on 7/26/12.

<u>Findings</u>

The inmate clearly met indicators for DSH intermediate care referral and was ultimately appropriately referred.  However, it was unclear why he was not admitted to DSH during the prior MHCB hospitalization.  The delay in referring him to the appropriate level of care was not clinically justified.

**Inmate K**

This EOP inmate was provided with a diagnosis of Schizophrenia paranoid type.  The most recent treatment plan was dated 6/25/12.  The Form 7388-B indicated that he met no indicators for DSH referral consideration.  It appeared from the medical record that he wanted to transfer to CMC and became upset when his counselor did not facilitate this transfer.

The inmate appeared to be psychiatrically stable.  He had numerous custody complaints, but none were related to mental health concerns.  The psychiatrist and primary clinician saw him timely, but medical record documentation indicated that the sessions primarily consisted of medication management and brief sessions with the primary clinician.  He was prescribed Vistaril, Risperdal, and Effexor ER.

<u>Findings</u>

The psychiatrist, primary clinician and IDTT timely saw the inmate.

EXHIBIT W
Central California Women's Facility (CCWF)
May 16, 2012 – May 18, 2012

**Inmate A**

This inmate's case was reviewed as it was determined that she met some indicators for DSH referral consideration, but was not referred.

The inmate transferred from VSPW.  Her mental health history was remarkable for a history of childhood physical abuse, juvenile criminal activity, and drug dependency.  She also had a history of treatment for mental health symptoms that included depression, impulsivity, and auditory hallucinations.  Past diagnoses included Schizoaffective Disorder depressed type, Major Depressive Disorder with psychotic features, Amphetamine Dependence, Alcohol Abuse, and Borderline Personality Disorder.  During the fall of 2011, VSPW referred her to PSH for intermediate care.  The inmate transferred and was admitted to PSH, but was subsequently discharged and returned to prison "due to gang activity" at PSH.

Documentation from an IDTT meeting at VSPW on 11/8/11 noted the inmate's return from PSH, EOP placement, planned weekly individual sessions, weekday groups, close monitoring, and use of the OHU, if necessary.  The inmate was admitted to the OHU on 11/10/11 after hitting a peer during a group therapy session.  The OHU IDTT meeting recommended transfer to CCWF for EOP level of care.

An IDTT meeting at CCWF on 11/23/11 documented that the inmate met referral indicators for higher level of care consideration.  These indicators included three or more OHU admissions, an OHU stay exceeding ten days, and four disciplinary infractions.  These indicators were identical to those that led to the VSPW referral to DSH intermediate level of care.  As the inmate had recently returned to CDCR from PSH, a referral was not made, but the inmate was enrolled in EOP programming at CCWF.

Documentation indicated that the psychiatrist worked with the inmate to address her medication concerns, and her condition improved over the course of several weeks.  She was prescribed Risperdal and Trilafon.  She received an additional RVR on 2/21/12 for disobeying an order, but received no subsequent RVRs and there was no documentation of problematic or aggressive behaviors.  The primary clinician saw the inmate weekly.  Documentation indicated that clinical contacts were confidential.  The inmate was reportedly compliant with prescribed medication and attended group therapy.

<u>Findings</u>

It did not appear that DSH provided an appropriate treatment setting for this inmate in need of a higher level of care.  She was transferred to DSH as a result of meeting multiple indicators for higher level of care referral, but was discharged early due to reported gang activity.  She returned to CDCR, despite her continued psychiatric symptomatology, and was placed at the EOP level of care.  Fortunately, her mental health condition improved and stabilized over the course of several months.  She remained at CCWF at the EOP level of care, which appeared to be appropriate.

**Inmate B**

This inmate's case was reviewed as it was determined that she met some indicators for DSH referral consideration, but was not referred.  Her mental health history was significant for self-injurious behaviors (burns, cutting wrists, banging head), uncontrollable rages, assaults, and psychosis.  She was hospitalized twice at PSH for competency to stand trial evaluations.  She was admitted directly to a mental health program bed (MHPB, which was comparable to an MHCB) upon initial intake due to hostile and bizarre behavior exhibited at the time of reception.  A mental health evaluation completed during this crisis stay documented a provisional diagnosis of Schizophrenia paranoid type and a history of methamphetamine abuse.  She refused medications.  A Keyhea order was sought and granted.  A DSH referral was initiated, and PSH accepted the inmate contingent upon a Vitek hearing for her transfer.

The inmate transferred to PSH for intermediate level of care.  At PSH, she assaulted staff and "her behavior exceeded the level of violence appropriate for an open treatment setting."  She was immediately returned to CCWF, where she was placed in the MHPB.  Although she was receiving psychotropic medications by a Keyhea order, her condition had not improved much when the IDTT meeting reviewed her in February 2012.  At that time, the IDTT meeting did not refer her to PSH again, as she had just returned from PSH less than one month earlier.

The inmate was released from the CCWF MHPB to administrative segregation on 5/14/12.  She was housed in the EOP unit as overflow from administrative segregation during the site visit.  The Keyhea order remained in effect at that time.

Findings

CCWF mental health staff attempted to manage this inmate's difficult mental health care with the tools available to them, which included the MHPB, involuntary medications, and referral to DSH intermediate care.  The inmate had been referred to PSH for intermediate care, but was discharged and returned to CDCR due to her assaultive behavior.  DSH acute care was not available for female inmates.

This case illustrated the interrelationship between mental health symptoms and security/safety concerns.  In this case, the inmate did not receive the appropriate level of mental health care and was ultimately placed in administrative segregation, which was a setting that did not afford her the opportunity to receive appropriate and necessary mental health care.  Housing this seriously mentally ill inmate with treatment-refractory symptoms in administrative segregation did not serve her best interests or the best interests of the institution.

**Inmate C**

This inmate's case was reviewed as it had been determined that she met some indicators for DSH referral consideration, but was not referred.  The inmate had a lengthy history of intensive mental health treatment, including recurrent depression with psychosis.  Prior to her prison arrival, she was psychiatrically hospitalized for years after being found not guilty by reason of insanity in the stabbing deaths of her three children in 1992.  She shot and killed her common law husband during this same incident and also attempted suicide at that time.  She was found guilty of murder in her husband's death, but initially was sent to PSH based on not being guilty by reason

of insanity in the death of her children.  She was subsequently transferred to prison to serve a sentence on the murder conviction.

The inmate was transferred to PSH for intermediate care on 8/30/11, where she remained until February 2012.  She then initially transferred to CIW, where she was housed from 2/24/12 thru at least 3/6/12.  She arrived back at CCWF on 3/12/12, where she was placed in the MHPB.  Antidepressant, antipsychotic, and mood stabilizing medications were prescribed, and she was compliant with prescribed psychotropic medications.  The inmate was discharged to the EOP level of care on 3/29/12.

In the EOP, the inmate was socially withdrawn and did not leave her cell.  She was subsequently readmitted to the MHPB during early April 2012, where she remained for 17 days.  She then returned to the EOP and her condition improved with better programming participation and increased social interaction.

A Form 7388-B completed during an IDTT meeting in the MHPB indicated that she was not referred to DSH again because she had just returned from DSH.  It was further indicated that some intensive transitional services were more clinically appropriate than another DSH transfer.

The inmate was provided with a diagnosis of Major Depressive Disorder, recurrent, mood congruent with psychotic features.  She remained with feelings of poor self-worth and with a high degree of guilt concerning the deaths of her family members.  She was assessed with a chronically elevated risk of suicide.

Findings

This case illustrated the need for female inmates to have access to DSH acute care when clinically indicated.  The inmate returned from PSH without significant improvement.  She also spent several weeks at CIW and may have decompensated there, while in transit to CCWF.  The practice of transferring mentally ill inmates through CIW after an episode of DSH intermediate care demonstrated a system-wide deficiency as to continuity of care.  The recuperating inmate was forced to transition through a new institution with unfamiliar and temporary providers before returning to her home institution and treatment team.

**Inmate D**

This inmate's case was reviewed as it had been determined that she met some indicators for DSH referral consideration, but was not referred.  She had a history of treatment for Schizoaffective Disorder bipolar type and Polysubstance Dependence.  She presented with treatment-refractory symptoms including auditory hallucinations, fixed delusional thinking, and mood instability.  Her delusional thinking included the belief that the Mexican Mafia was pursuing her.  She also believed that her children were dead, that she had been sexually assaulted while she slept, and that she was married to Jesus and the devil.

The inmate was transferred to PSH for intermediate care, but was discharged after assaulting another patient on 1/31/12.  She was admitted to the MHPB after returning to CCWF, after being

routed thru CIW, on 2/8/12.  She remained in the MHPB for over two months.  During this time, multiple medication adjustments occurred in an attempt to treat and stabilize her condition.  She was not re-referred to DSH because of her rejection from the intermediate level of care program.  During mid-April 2012, she was discharged to the EOP level of care.  The inmate was compliant with mood stabilizing and antipsychotic medications.

Findings

This case illustrated the impaired access to higher levels of care for female inmates who were acutely mentally ill and dangerous.  The PSH intermediate level of care program was unable to manage the inmate's presenting behaviors, while acute care was unavailable for women.  Subsequently, the inmate was held in the MHPB for more than two months, even though the MHPB was a treatment setting that was designed for no more than a ten-day stay.  As a result, the inmate was maintained in restrictive conditions with limited treatment interventions.

**Inmate E**

This inmate was housed in the MHPB during the site visit.  She arrived at CCWF on 1/9/12; this was her first prison term.  She was referred for further evaluation upon receiving screening as she appeared to be responding to internal stimuli despite denying any history of mental health problems or past treatment.  At that time, she presented with paranoid, hostile, and guarded behavior, and appeared disheveled and emaciated.

From reception, the inmate was placed in the EOP, but she refused medications and any program participation.  A provisional diagnosis of Psychotic Disorder NOS was provided.  She repeatedly asked to be discharged.  The inmate was subsequently placed in the 3CMS program and released to general population housing on 2/29/12.  On 3/9/12, custody staff generated an urgent mental health referral due to the inmate's hostile and unpredictable behavior, which included physical altercations with other inmates.  Medical staff also made a mental health referral as the inmate had refused a medical examination despite a bloody discharge from the nipple of one of her breasts.  On 4/3/12, she was returned to the EOP, despite her treatment refusal.  On the EOP unit, she was highly intrusive with other inmates and repeatedly asked them for cookies.  She refused programming, mental health encounters, and medications.  She also had additional physical altercations with inmates housed in the EOP.  She was transferred to the MHPB after smearing food and feces in the EOP.

The MHPB staff planned to seek a Keyhea order as soon as they thought that the inmate met the indicator for grave disability and/or dangerousness.  They did not consider referral to intermediate care at the time of the site visit.  The treatment team indicated that they believed that PSH would deny admission because of the inmate's assaultive behavior, medication refusal, and lack of an active Keyhea order.

Findings

This case illustrated the problems associated with the failure to provide DSH acute care for female inmates.  This patient was psychotic and assaultive and would not be admitted to

intermediate level of care at PSH.  As such, CCWF staff had to wait until the inmate's condition deteriorated further to the point where a petition for involuntary treatment would be granted. The inmate was not receiving mental health services at the appropriate level of care.  Of concern was the possibility that further treatment delays would result in delayed and less effective symptom response.

**Inmate F**

This inmate was housed in the EOP.  She expressed concerns regarding her need for mental health treatment and poor treatment by staff.  The inmate had reportedly refused to participate in mental health programming, but was agreeable to treatment with psychotropic medications. She transferred from VSPW to CCWF, where she arrived on 1/31/12 for EOP level of care.  She was provided with a diagnosis of Schizophrenia paranoid type.  She reportedly displayed evidence of disorganized behavior at the time of her transfer to CCWF.  She also reportedly used caustic chemicals to cleanse her face.  She presented with hostile, paranoid, and aggressive behavior with peers.

Medical record documentation indicated that the inmate was preoccupied with religious themes and expressed somatic delusions.  She regularly insisted that her rights were being violated and complained that the staff was attempting to intimidate her.  She received three RVRs within three months.  However, the inmate was not referred to DSH as it was believed that her behavior was not due to mental health factors.

Findings

The mental health assessment following the RVR implied that command hallucinations were necessary for the inmate's behavior to be considered a consequence of mental illness.  The inmate's irritability due to her hypervigilance and paranoia could explain her conflicts with other inmates.  Nevertheless, EOP level of care appeared to be appropriate for her, and she did not appear to require transfer to DSH intermediate care at the time of the site visit.  The inmate would nonetheless likely benefit from more assertive psychopharmacologic management as she presented with significant symptoms of paranoia that negatively influenced her behavior.

**Inmate G**

This inmate returned to CCWF from PSH because she had refused treatment and services at PSH.   She had transferred from the CCWF EOP to PSH on 10/27/10 for intermediate care for more intensive mental health treatment and diagnostic clarification.  She was hospitalized for approximately one month and was discharged on 11/23/10.  She was transferred to CIW prior to her return to CCWF.  Her return to CCWF was anticipated on 11/30/10 and again on 12/7/10, but the inmate refused to board the bus.  The inmate received a disciplinary infraction and eventually returned to CCWF on 12/10/10.

The medical record indicated that the inmate's husband reported that her mental health symptoms began in 2005.  At that time, she began to complain that unknown people were entering her house at night.  She also reported that she was not sleeping and believed that some

sort of tracking device had been implanted in her body.  She returned to Korea, her homeland, thinking that she would feel better, but her symptoms worsened.  She was hospitalized and treated with antipsychotic medication for a diagnosis believed to be a brief psychotic disorder.  She returned to the United States but did not comply with medication treatment or mental health care.  In the week prior to her offense, she became increasingly paranoid and decided to kill herself and her children because there would be no one to take care of them after her death.  She was found guilty of four counts of attempted murder regarding her children and was sentenced to prison.

After placement at the EOP level of care, the inmate consistently refused to meet with her primary clinician.  She attended some groups, but did not participate in the discussions or activities.  She consistently refused to consider treatment with psychotropic medications.  The inmate also refused to leave the housing unit for meals.  Instead, she ate canteen items alone in her cell due to her belief that she must remain on the unit to guard top secret government documents which she often carried under her shirt.  During 2011, clinicians sought a Keyhea order due to grave disability, but department attorneys advised discontinuing the request because the inmate ate food brought to her cell.  On 5/2/12, she was again referred to intermediate level of care.

Findings

This inmate required a higher level of care.  It appeared that she had untreated psychotic symptoms for at least two years which may have required a higher level of care for a significant period of time.

**Inmate H**

Documentation indicated that the inmate arrived at CCWF from VSPW on 11/4/11.  She had been identified from an audit of inmates considered for referral to a higher level of care.  IDTT meeting documentation dated 2/9/12 supported inmate non-referral and provided additional interventions.

The inmate had a remote history of a suicide attempt when not imprisoned and a history of CDCR treatment that included EOP, MHCB, and 3CMS levels of care, as well as OHU housing.  She exhibited paranoid/persecutory delusions that often led to verbally aggressive outbursts.  She had three OHU stays at VSPW prior to transfer to CCWF for EOP placement.  She was provided with diagnoses of Schizophrenia paranoid type and Cocaine Dependence in remission in a controlled environment.  She reportedly did well in the EOP at CCWF and was discharged to the 3CMS program on 1/25/12.

The IDTT meeting that occurred on 2/9/12 identified the inmate's three OHU admissions on 9/30/11, 10/7/11, and 10/12/11 as an indicator for higher level of care consideration.  The Form 7388-B and IDTT plan documented her improvement while in the EOP, the stability of her clinical condition, and her medication compliance.  The 3CMS treatment plan indicated that individual treatment would occur every three weeks or more often as needed.  This treatment plan also included group offerings and regular psychiatric contact.  The inmate was enrolled in

an EOP transition group, which she attended weekly.  The psychiatrist saw her every three to four weeks and worked with her as to medication adjustments in the interval between her EOP discharge and the site visit.  Individual sessions with the primary clinician were also documented.

Findings

This inmate exhibited mental health decompensation, but did well after transfer and treatment at the EOP level of care.  She was able to be discharged to the 3CMS level of care and received transitional services to assist her in a successful transition.  The IDTT meeting decision in February 2012 to not refer her to DSH appeared to be clinically appropriate.  The inmate appeared to be receiving mental health services at the appropriate level of care.

EXHIBIT X
Valley State Prison for Women (VSPW)
August 7, 2012 – August 9, 2012

**Inmate A**

This EOP inmate was housed in administrative segregation.  She was provided with a diagnosis of Schizophrenia.  She was prescribed Risperdal 6 mg/day, Cogentin 1 mg/day, Vistaril 50 mg/day and Depakote 750 mg/day, and intramuscular medication injections in the event of medication refusal.  She was on a Keyhea order due to danger to others and grave disability; the order would expire 12/7/12.

The inmate transferred from CCWF to the EOP hub at VSPW on 4/27/12.  At the time of arrival, she was receiving medications by way of a Keyhea order.  She was placed in administrative segregation after clearance following arrival.  She reportedly was assaultive to a nurse during medication administration.  Progress notes indicated that she chronically exhibited poor insight as to her mental illness.

Progress notes indicated that the inmate consistently presented with delusional thinking, limited insight regarding her mental illness, blunted affect, and circumstantial thinking.  She reportedly was compliant with prescribed medications and consistently attended group therapy.  A Form 7388-B completed on 5/22/12 indicated that she did not meet indicators for higher level of care referral consideration.

Findings

Although this inmate presented with chronic symptoms of psychosis, she appeared to be functioning adequately in administrative segregation with medication compliance and treatment participation.  She was awaiting transfer to the PSU, but transfer had been delayed due to the lack of PSU beds.

There was documentation of medication continuity upon arrival at VSPW, daily psych tech rounds, and group therapy participation in administrative segregation.  There was also documentation of timely informed consent and psychiatrist and primary clinician contacts.  The IDTT completed on 5/22/12 included the necessary participants.  Appropriate laboratory testing was conducted as to treatment with mood stabilizing and atypical antipsychotic medications.

**Inmate B**

This EOP inmate was housed in administrative segregation at the time of the site visit; she was a participant in the MHSDS at the 3CMS level of care during the review period.  She was provided with a diagnosis of Major Depressive Disorder recurrent.  She was treated with Prozac 20 mg/day and Vistaril 25 mg/day.  She was serving a life sentence.

Progress notes indicated that she presented with chronic depressive symptoms with persistent situational stressors.  They also indicated that the psychiatrist and primary clinician consistently followed her when she was housed in general population.  She was assigned to and attended group therapy.

A Form 7388-B completed on 5/29/12 indicated that she did not meet indicators for higher level of care referral consideration.

Findings

This inmate appeared to be functioning adequately in administrative segregation with medication compliance and treatment participation at the time of the site visit.

There appeared to be appropriate medication management for treatment of her depressive symptoms. There was documentation of timely informed consent. The primary clinician saw the inmate timely when she was housed in general population; the frequency of clinical contacts was appropriately increased during periods of increased depression. She was also appropriately provided with group therapy in the 3CMS program. It did not appear that she met indicators for higher level of care referral consideration during the review period; the Form 7388-B correctly documented that decision.

**Inmate C**

This EOP inmate was housed in administrative segregation at the time of the site visit. She was provided with diagnoses of Mood Disorder NOS, Borderline Personality Disorder, and possible Psychotic Disorder NOS. She was treated with Depakote 1000 mg/day, Vistaril 50 mg/day, Zoloft 100 mg/day, and Geodon 160 mg/day.

The inmate transferred from CCWF to VSPW in April 2012. She arrived at VSPW at the EOP level of care and was transferred to the EOP hub upon arrival. Progress notes indicated that she participated in treatment in administrative segregation. The psychiatrist and primary clinician consistently followed her and she was involved in group therapy.

The Form 7388-B completed on 5/22/12 indicated that she did not meet indicators for higher level of care referral consideration.

Findings

This inmate was awaiting transfer to the PSU, but transfer had been delayed due to the lack of PSU beds. Based on eUHR review during the site visit, she appeared to be functioning adequately in administrative segregation. Documentation indicated the presence of necessary participants at the IDTT meeting on 5/22/12. The Form 7388-B completed on 5/22/12 indicated that she did not meet indicators for higher level of care referral consideration. There was documentation of medication continuity upon arrival at VSPW and of timely informed consent.

Documentation indicated the conduct of daily psych tech rounds in administrative segregation. The psychiatrist consistently saw the inmate and the primary clinician saw her weekly. There was documentation of group therapy participation. Appropriate laboratory testing was conducted regarding treatment with mood stabilizing and atypical antipsychotic medications. However, the IDTT should have reviewed the inmate's diagnoses to provide definitive diagnoses rather than the provisional diagnoses currently in place.

**Inmate D**

This EOP inmate was housed in administrative segregation.  She was provided with diagnoses of Mood Disorder NOS, Depressive Disorder NOS, and Personality Disorder NOS.  She was treated with Geodon, Thorazine, Prozac, and Cogentin.

The inmate was not a participant in the MHSDS at the beginning of the review period.  She was placed in the 3CMS program at CCWF on 2/8/12.  It appeared that she transferred to administrative segregation at VSPW on 3/15/12.  On 3/27/12, the IDTT recommended a level of care change to the EOP.

Progress notes indicated that the inmate participated in group and individual therapies.  She exhibited poor impulse control and mood instability; however, she was generally cooperative with the exception of some periods of cell door kicking.  She was transferred to the OHU in April 2012 after swallowing cleaning solution.

A Form 7388-B completed on 5/8/12 indicated that she did not meet indicators for higher level of care referral consideration.

Findings

The inmate was awaiting transfer to the PSU, but transfer had been delayed due to the lack of PSU beds.  There was documentation of completion of an administrative segregation pre-placement chrono prior to placement in that unit.  There was also documentation of medication continuity upon arrival at VSPW, daily psych tech rounds, consistent psychiatrist contacts, weekly primary clinician contacts, and five-day follow-up following OHU discharge.  There was appropriate laboratory testing regarding treatment with atypical antipsychotic medications.

The IDTT should have reviewed the inmate's diagnoses in order to identify definitive diagnoses other than the provisional diagnoses provided.

**Inmate E**

This inmate's record was reviewed as she was housed in the OHU.  Prior to this placement in August 2012, she was receiving mental health services at the 3CMS level of care.  She was provided with diagnoses of Depressive Disorder NOS, Psychotic Disorder NOS, and PTSD.  Prescribed medications included Abilify, Trilafon, and Zoloft.  Her TABE score was 3.8.

The inmate's recent history was significant for a brief OHU admission that occurred from 1/25/11 thru 1/26/11 due to suicidal ideation secondary to chronic pain.  Her history was also significant for reported auditory hallucinations since age 15, a psychiatric hospitalization while living in the community, and at least two suicide attempts.  Immediate stressors included reported difficulties with her cellmate and a scheduled prison release in the fall 2012; she expected to be homeless.  Recent notes indicated that she had experienced increased auditory hallucinations and paranoia.

The psychiatrist saw her on 11/17/11, when it was noted that she did not want to continue Abilify.  A progress note dated 11/23/11 indicated that she was screened for a group focusing on older inmates, but was ineligible because she did not meet the age requirement.  A primary clinician note dated 1/9/12 stated that she was transferred from B to D yard and indicated that she reported good control of her auditory hallucinations.

A primary clinician note dated 2/1/12 reported the inmate's concern about housing and reinstatement of her social security income benefits upon prison release.  A 2/8/12 primary clinician note described her discussion of childhood trauma issues.  A 3/8/12 psychiatry note indicated that she had been seen by a different psychiatrist and noted her guardedness.  She spoke of the "people in [her] head" and related that she had received social security income benefits for Schizophrenia since 2003.  The psychiatrist saw her on 3/15/12 related to her poor adherence to prescribed medicines.  Her history of hospitalization, suicide attempts, and homelessness since age nine were reported.  A primary clinician note dated 3/20/12 indicated that she had stopped taking her morning medicines, noting that she wanted to talk to the psychiatrist.  She reported active nocturnal auditory hallucinations.

A psychiatry note dated 5/3/12 indicated that she was "doing well" on medications and made no mention of the compliance issue.  A 6/26/12 primary clinician note stated that she had moved to B yard.  At that time, she reported loud and frightening auditory hallucinations, sleep disturbance, and concern that the medication was less effective.  She again expressed concern about homelessness following release from prison.  The plan was to see her every four weeks and to refer her to psychiatry.  The psychiatrist on D yard saw her in July 2012, noting that she was referred for pre-release planning.  The psychiatrist also indicated that she had a TABE score of 3.8 and noted her reports of decreased hallucinations and paranoid ideation.  She was provided with diagnoses of Psychotic Disorder NOS and PTSD.  A primary clinician note dated 8/3/12 indicated nascent attention to pre-release planning and a plan to see her again in October 2012.  By 8/8/12, she had transferred to the OHU with reports of increased suicidal ideation and hallucinations, signs of poor cognitive functioning, and significant difficulties functioning with her cellmate.

Findings

Psychiatry and the primary clinician regularly saw the inmate during the review period.  Ongoing concerns about pre-release planning issues such as homelessness following release were beginning to be addressed.  However, management of the inmate's treatment could have been improved by more coordination between psychiatry and the primary clinician as to fluctuating reports of psychotic symptoms, periodic issues with adherence to prescribed medication, and reconciling various "NOS" diagnoses.

**Inmate F**

This 3CMS inmate's medical record was reviewed as to the provided mental health care.  The primary clinician saw her on 11/2/11 and reported that she was mildly depressed.  She was provided with a diagnosis of Major Depressive Disorder and PTSD.  The clinician indicated that she planned to see her again during the following week.  The inmate was serving a life sentence.

The inmate was seen again on 11/9/11, when she appeared less depressed; the plan was to see her again in two weeks.  At the time of this follow-up, she was reportedly stable.  A psychiatry note dated 11/29/11 indicated that she was stable on Zoloft; another note dated 11/29/11 indicated that she was compliant with prescribed medicines for 20 of 30 days.

There was documentation of weekly primary clinician contacts thru 1/31/12, noting that the inmate's depression was monitored.  The only exception was a 12/14/11 contact that stated that the session was canceled due to a lockdown; a note dated 1/25/12 also documented a cancelled session due to an institutional lockdown.  Psychiatry contacts consistently occurred during the review period.

A 1/31/12 primary clinician note indicated that the inmate did not wish to change to a different clinician.  Until this time, the primary clinician consistently saw her.  There was a subsequent lapse in contacts until 3/5/12, after which regular contacts with psychiatry and the primary clinician resumed.  During this period, the inmate remained relatively stable.

<u>Findings</u>

The psychiatrist and primary clinician consistently followed the inmate to address her depression during the review period.  There was a lapse in contacts that occurred between the end of January and early March 2012 when she was not seen at the same intervals or according to the plan; however, she was still seen with reasonable frequency.  Overall, the inmate remained stable and received treatment in accordance with Program Guide requirements.

**Inmate G**

This inmate's medical record was reviewed because between 6/7/11 and 3/12/12 she had approximately 13 OHU admissions while housed at VSPW.  It appeared that she was managed at the 3CMS level of care until her OHU admission in September 2011.  However, documentation also indicated that during OHU placement in January 2012 she was changed from general population to EOP status.  By March 2012, she had transferred to CIW.

A SRE was conducted on 10/17/11 while she was housed in the SHU at the EOP level of care.  Diagnoses of Mood Disorder and Borderline Personality Disorder with antisocial traits were provided at that time.  The SRE noted that she had multiple suicidal threats and previous suicide attempts, a history of violence and drug use, and poor impulse control.  A TABE score of 1.9 was noted.  The inmate also reported a history of swallowing razor blades for unclear reasons.  The plan outlined was to refer her to the primary clinician.

A SRE dated 11/10/11 completed at the inmate's IDTT noted that she remained in the EOP.  Acute risk factors included a recent depressive episode, current anxiety, agitation, and anger with mood disturbance.  The SRE noted that she had been placed in a single cell.  Her history was remarkable for frequent past suicide attempts in the community and on 9/16/11, she attempted to strangle herself.  She was reportedly motivated for treatment with future orientation.  She was assessed with low chronic and acute risk for suicide.

A mental health evaluation dated 12/21/11 indicated that she was admitted to the OHU due to suicidal and homicidal ideation, which reportedly had been present for two days.  There was a focus on her anger toward her primary clinician, who was transferring to a different institution as part of Realignment.  This was viewed as "inappropriate" anger for a "benign" event.  The evaluation also noted her feelings of abandonment related to this transfer.  She was discharged from the OHU with a plan for follow-up with the primary clinician within one to two days and with psychiatry within one week.  There was a recommendation for in-depth processing of termination issues.

On 1/3/12, the inmate was readmitted to the OHU due to self-injurious behavior.  She was subsequently released on 1/10/12 at the EOP level of care.  She was again assessed with low chronic and acute risk for suicide.  She received an RVR in January 2012.  On 1/10/12, the same day as her OHU discharge, she was readmitted to the OHU after becoming upset upon returning to the SHU and being placed in a different cell.  Use of force was required and she reported suicidal and homicidal ideation.  It was determined that she continued to demonstrate a significantly impaired ability to control her emotions and impulses.

On 2/13/12, she was readmitted to the OHU due to suicide precautions, thoughts of cutting herself, and reports that she was struggling with depression since last released from the OHU.  The progress note indicated that her recent depression was due to a three-week lockdown.  A SRE dated 2/14/12 indicated that she was stable as a result of medications.  A SRE dated 2/22/12 noted her receipt of a letter from her mother indicating that she was ill; it also noted the inmate's thoughts of wanting to cut herself.  At this point, she was assessed with moderate chronic but low acute risk for suicide.

A note dated 3/12/12 stated that the inmate initially did not want to attend her IDTT, but with some encouragement, agreed to attend.  She was described as mildly depressed.  The treatment plan documented plans to continue her at the EOP level of care.  It noted that she would benefit from learning coping skills to manage self-injurious behavior.  The plan also noted that she would benefit from learning to process loss.

By 3/15/12, the inmate was housed in administrative segregation at CIW at the EOP level of care.  A note on that date indicated that she had transferred from VSPW with a long history of mental health issues since age eight, physical and sexual abuse, and a diagnosis of ADHD since childhood.  The note further indicated that she had numerous psychiatric hospitalizations.

Findings

The psychiatrist and primary clinician consistently followed the inmate during the review period.  Identified issues such as her reaction to staff reassignments were difficult to manage in the context of her multiple OHU admissions and the need to transfer her to an EOP.  The inmate may have benefitted from transfer to a higher level of care for stabilization during this period; comprehensive consideration of this possibility should have occurred.

**Inmate H**

This inmate's medical record was reviewed as she was housed in the OHU for five days from 4/29/12 thru 5/4/12. She was otherwise managed at the 3CMS level of care, moving from general population to administrative segregation.

A primary clinician note dated 11/28/11 documented a diagnosis of Depressive Disorder NOS, Alcohol Dependence, and a seizure disorder. The plan outlined was for the inmate to be seen for follow-up in two months or sooner, if needed.

On 1/11/12, psychiatry saw her following her move to B yard. It was noted that she had been assessed with a TABE score of 4.1. She was awaiting assignment of a new counselor on B yard. She was prescribed no medicines after discontinuing Remeron due to side effects in the fall of 2011. It was noted that she changed yards after involvement in an altercation with her biological sister, who was also housed in her previous yard. She was described as programming well. Follow-up was planned for two months.

The next primary clinician progress note located in the medical record at the time of review was dated 2/23/12. It noted that she had moved from C to B yard. Follow-up was planned for two months. The inmate was seen on 2/28/12 for psychiatric follow-up. Her depression was reportedly under control with the assistance of psychotropic medications. Follow-up was planned for 90 days or sooner, if needed.

The primary clinician again saw her on 3/16/12 in administrative segregation, where she had been placed for unclear reasons. Follow-up with the primary clinician was planned within one week.

<u>Findings</u>

With one exception, the psychiatrist and primary clinician consistently followed the inmate while she was housed in general population. She appeared to be receiving mental health services at the appropriate level of care in the 3CMS program.