**Raymond F. Patterson, M.D., D.F.A.P.A[1]**
**1904 R Street, N.W.**
**Washington, D.C. 20009**
**Telephone: 301-292-3737**
**Facsimile: 301-292-6272**

**REPORT ON SUICIDES COMPLETED**
**IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**IN CALENDAR YEAR 2011**

## I.    Introduction

This is the thirteenth Report on Completed Suicides in the California Department of Corrections and Rehabilitation (CDCR or Department), covering the 34 such deaths which occurred in calendar year 2011.[2] It is submitted as part of the Special Master's continuing review of the defendant's compliance with court ordered remediation in the matter of *Coleman v. Brown*, No. CIV S-90-0520 LKK JSM P (E.D.Cal).

As discussed in detail below, a number of significant findings that are very concerning emerged from this reviewer's examination of all 34 suicides in 2011.  Among these are the following:

- **In 2011, a CDCR inmate died by suicide every 10.73 days on average.**

- **The rate of CDCR inmate suicides in 2011 was 21.01 per 100,000, which was essentially unchanged since 2010, when it was 21.1 per 100,000.  The rate for 2012 rose to 23.72 per 100,000, based on a reported CDCR inmate population of 134,901 at mid-2012.[3]  These rates stand in stark contrast to the rate of 16 suicides per 100,000 across U.S. State prisons in 2010.[4]  They also compare unfavorably with the average rates during the decade from 2001 to 2010 among the eight largest state prison systems during that decade, and with average rate of the U.S. Federal prison**

---

[1] *Curriculum Vitae* attached as Exh. A.

[2] The CDCR reported 33 suicide deaths, but based on this reviewer's examination, an additional death, identified as case number 34 below, was more likely than not to have been a suicide, for a total of 34 suicide deaths in 2011.

[3] Source:  CDCR Website, archives, population as of midnight June 30, 2012.

[4] The source of all citations in this report to other prison systems' suicide rates is the Website, U.S. Department of Justice, Bureau of Justice Statistics.  2010 is the most recent year for which the U.S. Bureau of Justice Statistics has published data on suicide rates in U.S. State prisons, and 2008 is the most recent year for which it has published data on suicide rates in U.S. Federal prisons.

system from 2001 to 2008 (the most recent year for which the U.S. Bureaus of Justice Statistics reports suicide rates in U.S. Federal prisons):

- o **Florida**, 2001-2010:  8 per 100,000[5]
- o **U.S. Federal Prisons**, 2001-2008 (most recent year reported):  9 per 100,000[6]
- o **Georgia**, 2001-2010:  12 per 100,000[7]
- o **Ohio**, 2001-2010:  12 per 100,000[8]
- o **Michigan**, 2001-2010:  14 per 100,000[9]
- o **Pennsylvania**, 2001-2010:  15 per 100,000[10]
- o **Texas**, 2001-2010: 16 per 100,000[11]
- o **Illinois**, 2001-2010:  17 per 100,000[12]
- o **New York**, 2001-2010:  20 per 100,000[13]

- **Thirty-minute welfare checks for inmates newly admitted to administrative segregation units were not conducted consistently.  Mandatory custodial checks were not completed consistently in administrative segregation units or in general population.**

- **In five of the suicide cases in 2011, identified as inmates G, R, X, AA, and EE, *rigor mortis* had already begun prior to the discovery of the inmate's body.[14]  In three of these five cases, the inmate was housed in administrative segregation at the time of the suicide.  The onset of *rigor mortis* indicates that in these five cases, at least two to**

_____

[5] Approximated average prison population of 89,768, based on population report closest to mid-point of period, i.e. 12/31/05.  Website, U.S. Bureau of Justice Statistics.

[6] Approximated average prison population of 187,618, based on population report closest to mid-point of period, i.e. 12/31/05.  Website, U.S. Bureau of Justice Statistics.

[7] Approximated average prison population of 48,749, based on population report closest to mid-point of period, i.e. 12/31/05.  Website, U.S. Bureau of Justice Statistics.

[8] Approximated average prison population 45,484, based on population report closest to mid-point of period, i.e. 12/31/05.  Website, U.S. Bureau of Justice Statistics.

[9] Approximated average prison population of 49,546, based on population report closest to mid-point of period, i.e. 12/31/05.  Website, U.S. Bureau of Justice Statistics.

[10] Approximated average prison population 42,380, based on population report closest to mid-point of period, i.e. 12/31/05.  Website, U.S. Bureau of Justice Statistics.

[11] Approximated average prison population of 169,003, based on population report closest to mid-point of period, i.e. 12/31/2005.  Website, U.S. Bureau of Justice Statistics.

[12] Approximated average prison population of 44,919, based on population report closest to mid-point of period, i.e. 12/31/05.  Website, U.S. Bureau of Justice Statistics.

[13] Approximated average prison population of 62,743 based on population report closest to mid-point of period, i.e. 12/31/05.  Website, U.S. Bureau of Justice Statistics.

[14] *Rigor mortis* is defined as "the stiffness of joints and muscular rigidity of a dead  body, caused by depletion of ATP in the tissues. It begins two to four hours after death and lasts up to about four days, after which the muscles and joints relax."  COLLINS ENGLISH DICTIONARY (2003 ed.)

four hours had passed since the time of death before the bodies were discovered, underscoring the importance of timely welfare checks and custodial checks.

- In 25 or 73.5 percent of the 34 CDCR suicide cases in 2011, there was at least some degree of inadequacy in assessment, treatment, or intervention, which is essentially unchanged since the rate of 74 percent among suicides which occurred in 2010. Inadequacies appeared among conduct of suicide risk evaluations, treatment and/or clinical interventions, non-completion of timely custody welfare checks, and potential lifesaving interventions such as administration of CPR or problems with the use of an automated external defibrillator.

- Trend analysis shows a disturbing rise in the rate of suicides across the seven-year period of 2005 through 2011, when the average suicide rate was 21.6 per 100,000. This is compared to the average rate shown by trend analysis for the six-year period of 1999 through 2004, when the average rate was 16.2 per 100,000.

- Alarmingly, in 50 percent of the suicide cases in 2011, inmate suicide risk evaluations were either not done, or found levels of "low" or "no appreciable" risk of suicide, without adequate consideration of risk factors, past history, and/or review of medical records. As a result, interventions that could have been appropriate were not implemented.

- Among 16 of the 34 suicides -- identified as inmates B, C, D, G, H, I, J, Q, T, V, W, X, Z, BB, CC, and FF – cardiopulmonary resuscitation, including availability or use of the Automated External Defibrillator (AED) and/or first aid, were not performed in a timely and/or appropriate manner. Among these 16 cases were 11 cases – identified as inmates B, C, H, I, J, Q, T, Z, BB, CC, and FF - involving failures to follow policies regarding availability and/or use of the AED.

- There were no suicide deaths by CDCR inmates in any Department of State Hospitals (DSH) facilities or CDCR Mental Health Crisis Beds (MHCBs). There was one suicide in an Outpatient Housing Unit (OHU) and two suicides in a Psychiatric Services Unit (PSU) in calendar year 2011.

- In 2011, there were four suicides at the California Men's Colony (CMC). This follows six suicides at the same institution in 2010, which was an unprecedented high for any single CDCR institution from 1999 through 2011. None of the four suicides at CMC in 2011 were determined to have been more likely foreseeable and/or preventable than not.

- **CDCR failed to comply with post-suicide review and reporting timeframes in seven or 20.6 percent of cases in 2011, which was an improvement over preceding years, but in five cases there was no signed review and approval by the Directors or their designees of the Statewide Mental Health Program or Adult Institutions in the documents provided, as required by the Program Guide.**

## II.     Format, Terminology and Definitions

Unlike past annual suicide reports by the special master's expert, this report is presented in narrative format. It is supported by tables, charts, and graphs which appear in Appendices A through E, and by reviews of each of the individual suicide cases in 2011, appearing in Appendix F.

The terms "foreseeable" and "preventable" are used in this report as they have been in previous reports. They describe the adequacy and implications of CDCR suicide prevention policies and procedures, staff training and supervision, clinical judgments, and utilization of clinical and custodial alternatives to reduce the likelihood of completed suicides.

The term "foreseeable" refers to those cases in which available information about an inmate indicates the presence of substantial or high risk for suicide, and requires reasonable clinical, custodial, and/or administrative intervention(s). Assessment of the degree of risk may be high, moderate, or low to none. This is an important component in determining foreseeability. In contrast to a high and immediately detectable risk, a "moderate risk" of suicide indicates a more ambiguous set of circumstances that requires significant clinical judgment based on adequate training, as well as a timely assessment, to determine the level of risk in the most appropriate manner and relevant interventions to prevent suicide. Interventions may include but are not limited to changes in clinical level of care, placement on suicide precautions or suicide watch, and changes in housing including utilization of safe cells and transfers to higher levels of care, as well as clinically appropriate treatment and management services which may include but not be limited to increased contacts/assessments by mental health professionals, medication management review and changes, other therapeutic interventions and measures, and/or changes in level of care, including short- term changes such as utilization of MHCBs and/or longer term level-of-care changes including transfer to DSH programs. Individuals evaluated as a "low risk," "no risk," or "negligible risk" may continue to require some degree of clinical and custodial monitoring and subsequent evaluation with appropriate treatment and management by clinical staff of the potential for self-injury and/or suicidal ideation or activity.

The term "preventable" refers to those cases in which the likelihood of completed suicide might have been reduced substantially had some additional information been gathered and/or some additional intervention(s) undertaken, usually as required by existing policy, reflected in the

Program Guide and/or local operating procedures.  Suicides that may have been preventable include not only cases in which additional information might have been gathered or additional interventions undertaken, but also cases involving issues with emergency response by custody and clinical staff.  The emergency response is reviewed not only by DCHCS mental health staff but also by DCHCS medical staff as part of the death review summary process, as well as by this reviewer.

The term "suicide," as defined in the sources identified below, was utilized in the CDCR Annual Suicide Report for 2005, which was the most recent CDCR annual suicide report received by this reviewer and the special master:

World Health Organization: Suicide is the result of an act deliberately initiated and performed by a person in the full knowledge or expectation of its fatal outcome.

National Violent Death Reporting System, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention: Suicide is a death resulting from the intentional use of force against oneself.  A preponderance of evidence should indicate that the use of force was intentional.

CDCR has classified as suicides any deaths under the circumstances described below.  This report utilizes the same definition as CDCR, which follows the definitions utilized by the World Health Organization and the National Center for Injury Prevention and Control, Centers for Disease Control and Prevention:

A person committed a suicide act and changed his mind, but still died as a result of the act;

A person intended only to injure rather than kill himself, for example by playing "Russian Roulette" voluntarily with a firearm;

Assisted suicide, including passive assistance to the decedent, for example, by supplying only information or the means needed to complete the act;

Intentional, self-inflicted death committed while under the influence of a voluntarily-taken, mind-altering drug;

Intentional, self-inflicted death committed while under the influence of a mental illness.

According to the CDCR Annual Suicide Report for 2005, deaths under the circumstances below should *not* be classified as suicides:

The physical consequences of chronic substance abuse, including alcohol or drugs (natural death);

Acute substance abuse, including alcohol or drugs, with less than a preponderance of the evidence showing intent to use the substance(s) against oneself (undetermined or unintentional injury or death).

Death as a result of autoerotic behavior, e.g., self-strangulation during sexual activity (death by unintentional injury).

**III.    Discussion and Findings**

      **A.    Brief Overview of Suicides by CDCR Inmates in 2011**

All of the 34 deaths in 2011 covered in this report occurred in CDCR prisons and more likely than not were the result of suicide.[15]  By far, the predominant means by which suicides were committed continued to be hanging.  Thirty or 88.23 percent of the suicides were accomplished by hanging, two or 5.88 percent by strangulation, one or 2.94 percent by exsanguination, and one or 2.94 percent by overdosing.

Five suicides occurred within CDCR reception centers and one was committed in an OHU.  None were committed by inmates in MHCBs or by women.  Fourteen or 41 percent of the suicides occurred in secured housing (administrative segregation, secured housing unit, or a psychiatric services unit).  This is somewhat higher than the 34 percent of suicides in 2010 which occurred in secured housing, and is slightly lower than the annual average of 45 percent of suicides occurring in segregated housing from 1999 through 2010.

      **B.    The Rate of Suicides Among CDCR Inmates Continues to Significantly Exceed the National Average and Is Growing**

While the CDCR has made progress toward completion of the suicide prevention projects which were ordered in November 2010, referenced in section III F below and discussed in other special master reports cited therein, suicide rate trend analyses continue to show that suicide rates in CDCR consistently exceed the average rates in U.S. state and federal prisons, and are growing.

Suicide rates in CDCR prisons from 2000 through 2011 have been as follows:

---

[15] For one inmate death within CDCR in 2011, the coroner did not specify the manner of death, and the cause was termed "undetermined."  Based on presently available information, this reviewer finds that this death was more likely than not a suicide. (*See* case identified as Inmate HH on Tables 1 and 2, Appendices A and B)

1999 - 25 suicides in a population of approximately 159,866[16]
      Completed suicide rate of 15.6/100,000

2000 – 15 suicides in a population of approximately 160,855
      Completed suicide rate of 9.3/100,000

2001 – 30 suicides in a population of approximately 155,365
      Completed suicide rate of 19.3/100,000

2002 – 22 suicides in a population of approximately 158,099
      Completed suicide rate of 13.9/100,000

2003 – 36 suicides in a population of approximately 155,722
      Completed suicide rate of 23.1/100,000

2004 – 26 suicides in a population of approximately 163,346
      Completed suicide rate of 15.9/100,000

2005 – 43 suicides in a population of approximately 164,179
      Completed suicide rate of 26.2/100,000

2006 – 43 suicides in a population of approximately 171,340
      Completed suicide rate of 25.1/100,000

2007 – 34 suicides in a population of approximately 172,535
      Completed suicide rate of 19.7/100,000

2008 – 37 suicides in a population of approximately 165,790
      Completed suicide rate of 22.3/100,000

2009 – 25 suicides in a population of approximately 159,084
      Completed suicide rate of 15.7/100,000

2010 – 35 suicides in a population of approximately 165,747
      Completed suicide rate of 21.1/100,000

2011 – 34 suicides in a population of approximately 161,818
      Completed suicide rate of 21.0/100,000

---

[16] Approximate population for each year is the mid-calendar year population reported by CDCR on its website.

> 2012 – 32 suicides in a population of approximately 134,901
>           Completed suicide rate of 23.72

The total number of suicides in CDCR prisons from 1999 through 2011 was 405, with the annual average number of suicides for the 13-year period at 31.2, or 2.6 suicides per month, for an average of one every 11.5 days over the 13-year period.  The overall trend analysis of the rate per 100,000 for all 13 years reviewed, from 1999 through 2011, is approximately 19.1 per 100,000.

However, trend analysis indicates that the suicide rate in CDCR prisons is worsening.  For four of the first six years that were reviewed by this examiner - 1999, 2000, 2002, and 2004 - the CDCR suicide rate per 100,000 was under 16.  However, for five of the seven most recent years - 2005, 2006, 2008, 2010, and 2011- the rate has exceeded 20 per 100,000.

A comparison of CDCR prison suicide rates with rates in U.S. Federal Prisons, across all U.S. State prisons, and within other large state prison systems also illustrates the persistent elevated rate in CDCR prisons:

CDCR Suicide Rate Trend Analysis (average suicide rate/year) for 1999-2004:
Average Suicide Rate 16.2/100,000

U.S. Federal and U.S. State Prison Suicide Rate Trend Analyses for 1999-2004:
Average Suicide Rate for U.S. Federal Prisons 1999-2004[17]:  9.33/100,000
Average Suicide Rate for U.S. State Prisons 1999-2004[18]:  15.2/100,000

CDCR Suicide Rate Trend Analysis (average suicide rate/year) for 2005-2010:
Average Suicide Rate 21.7/100,000,

U.S. Federal Prisons, U. S. State Prisons Generally, Average Suicide Rate for
U.S. Federal Prisons 2005-2008[19]:  9.25/100,000
Average Suicide Rate for U.S. State Prisons 2005-2010[20]:  15.6/100,000

CDCR average suicide rate 2001 – 2010:  20.2/100,000

---

[17] Source:  Website, U.S. Department of Justice, Bureau of Justice Statistics.
[18] *Ibid*.
[19] *Ibid*. (As of this writing, 2008 is the most recent year for which the U.S. Department of Justice, Bureau of Justice Statistics currently publishes the rate of suicides across U.S. Federal Prisons.)
[20] *Ibid*.  (As of this writing, 2010 is the most recent year for which the U.S. Department of Justice, Bureau of Justice Statistics currently publishes the rate of suicides across U.S. State prisons.)

U.S. Federal Prisons and Eight Largest U.S. State Prisons Suicide Rate Trend Analyses, for periods as calculated and reported by the U.S. Bureau of Justice Statistics:

Florida, 2001-2010:  8 per 100,000
U.S. Federal Prisons, (2001-2008):  9 per 100,000
Georgia, 2001-2010:  12 per 100,000
Ohio, 2001-2010:  12 per 100,000
Michigan, 2001-2010:  14 per 100,000
Pennsylvania, 2001-2010:  15 per 100,000
Texas, 2001-2010: 16 per 100,000
Illinois, 2001-2010:  17 per 100,000
New York, 2001-2010:  20 per 100,000

C.    **The Percentage of Suicide Cases Involving Inadequacy in Assessment, Treatment, or Intervention Declined Slightly but Remained Unacceptably High**

The high rate of inadequacy in assessment, treatment, or intervention is generally consistent with previous years, and remains unacceptably high.  Examination of the individual suicide cases revealed that for 25, or 73.5 percent, of the 34 inmates who completed suicides, there had been at least some degree of inadequate assessment, treatment, or intervention.  Review of the 2011 suicide cases substantiates ongoing chronic and systemic ongoing deficiencies in these areas. For example, inmates who were clinically appropriate for referral to higher levels of care were not referred.[21]  There were several cases of basic failures to conduct indicated mental health evaluations and/or assessments.[22]  Where mental health status examinations, evaluations or assessments were done, some were inadequate or untimely.[23] There were occurrences of failure to carry out basic clinical procedures: failure of mental health and medical providers to consult[24]; failure to conduct a UHR/eUHR review following discharge from DSH[25]; and the absence of needed clinical records from the UHR/eUHR.[26] Fundamental suicide-prevention measures such as appropriate completion of SREs did not occur in several cases, where post-suicide the SRE was found to have been inadequate.[27] In several cases, when an apparent suicidal attempt was discovered, emergency response was later documented to have been inadequate.[28]

---

[21]*See* Appendix F, Inmate B- CSP/LAC; Inmate CC-CSP/Sac; Inmate I-CSP/LAC; Inmate Y-PBSP; Inmate CC-CSP/Sac; Inmate N-DVI RC; Inmate O-ASP; and Inmate FF-SVSP.

[22]*See id.,* Inmate E-CIM; Inmate J-Folsom; Inmate W-DVI; and Inmate Y-PBSP.

[23]*See is,* Inmate N-DVI RC; Inmate O-ASP; and Inmate DD-CTF.

[24] *See id.*, Inmate E-CIM and Inmate S-CCI.

[25] *See id.*, Inmate R-CMF.

[26]*See id.,* Inmate DD-CTF.

[27] *See id.,* Inmate A-PVSP; Inmate I-CSP/LAC; Inmate Y-PBSP; and Inmate K-PVSP).

[28] *See id.,* Inmate D-HDSP; Inmate G-SQ RC; Inmate T-HDSP; Inmate V- CSP/Sac; Inmate W-DVI RC; Inmate X-PVSP (PSU); and Inmate CC-CSP/Sac.

There also continued to be general systemic failures among the suicide-prevention measures to be followed in CDCR's administrative segregation units. CDCR's segregated housing units have historically had an elevated incidence of suicides over the non-segregated housing units. Efforts to address this long-standing problem gave rise to the various suicide-prevention practices adopted in defendants' 2006 Plan to Address Suicide Trends in Administrative Segregation. As noted on page 8 *infra*, 41 percent of the suicides in 2011 occurred within segregated housing units, which is modestly better than the average of 45 percent from 1999 through 2010, but is worse than the 34 percent in segregated housing in 2010. The most recent round of *Coleman* monitoring found that defendants remained noncompliant with a number of suicide prevention requirements in administrative segregation which appear in the Program Guide or the defendants' 2006 Plan to Address Suicide Trends in Administrative Segregation. These are described in greater detail, institution-by-institution as well as collectively within the Twenty-Fifth Round Monitoring Report. Noted problems include improper documentation and improper completion of 30-minute welfare checks, with only nine institutions completing such checks properly. Compliance levels for completion of the 31-item screen for newly-arriving inmates in administrative segregation deteriorated, with only seven institutions compliant, as compared to 70 percent during the most recent preceding full monitoring round, the Twenty-Third Round, which covered all 33 CDCR institutions. There were also deficiencies in emergency response protocols. Less than a quarter of the institutions met Program Guide requirements for monthly Suicide Prevention and Response Focused Improvement Team (SPRFIT) meetings. Nine institutions did not provide any data on whether they had an operational emergency response review committee during the review period, and 11 institutions did not provide data relative to CPR training during the review period. Only three institutions were fully (i.e. 100 percent) compliant with the conduct of five-day clinical follow-up for inmates discharged from crisis care.

### D.    Levels of Foreseeability/Preventability of Suicides in 2011 Remained High

The above findings were based on the presence of information that was or should have been available to clinical staff. These suicides were, therefore, most probably foreseeable and/or preventable. In itself, the finding that 73.5 percent of cases were marked by inadequacy in assessment, referral and/or treatment continues to be troubling. This is evidenced by a comparison of the 2011 rate with the rates found for preceding years from 2003 through 2010, when the annual rates of such inadequacies exceeded 70 percent. However, even more concerning is the fact that the pattern of poor performance in this area continues, despite the fact that each year this reviewer's recommendations have focused on areas for needed improvement in staff training and supervision, adherence to the Program Guide and policies and procedures, and access to care, particularly at the higher levels of care.

### E.    Conduct of Suicide Risk Evaluations Continued to be Problematic

The case reviews in Appendix F demonstrate the specifics with regard to individual inmates and suicide risk evaluations (SREs).[29]  To summarize, this reviewer found that SREs were not completed appropriately in the majority of the cases, and staff did not properly prepare SREs according to CDCR policy by failing to:

obtain information that was available in records or via staff referrals, and instead over-relying on inmates' self-reports;

assess risk and/or protective factors;

conduct adequate mental status examinations;

develop and implement appropriate plans for follow-up evaluation and care;

prepare adequate management plans, including collaboration with custody; and/or

recommend transfers of inmates to more appropriate clinical settings, including MHCBs or DSH programs.

In addition to the deficiencies in SREs, there were also some measures of inadequate interventions and treatment, including instances of inadequate treatment as follows:

referrals that drew an inadequate response;

failures to review past medical records, which was complicated by the transition from the paper UHR to the electronic eUHR;

failure to reassess inmate noncompliance with treatment;

assignment of inmates to inappropriate levels of care;

failure to refer inmates to levels of care and associated lack of supervision;

failure to provide immediate and/or appropriate emergency response; and/or

insufficient communication among clinical, medical, and custodial staffs.

_____

[29] *See supra* n. 27, identifying specific cases of inadequacy of SREs.

As described above, CDCR continues to work on the SRE mentor program, which reportedly has been rolled out in all institutions except Valley State Prison in 2012, although its actual implementation remains partial at this time, two years after it was initially ordered. Given the serious concerns that remain unabated, as described elsewhere in this report, the importance of such training and supervisory follow-up cannot be understated.

      **F.**      **CDCR's Failures to Comply with Program Guide Timeframes for Its Own Suicide Review and Reporting Procedures Continued**

The conversion from paper UHRs to the electronic or eUHR and the posting of suicide reporting documents for each suicide on CDCR's secure website have been positive initiatives in the area of suicide reporting by CDCR. However, there are still delays in CDCR's completion and posting of the requisite documentation for this reviewer's examination, analysis, and preparation of his annual suicide reports. For example, insofar as content of the documentation, more frequently than not, CDCR suicide reports do not include full coroners' reports or are not updated when coroners' reports become available. Documentation related to five suicides in 2011 did not include the required review and signatures by the Director among the material posted on CDCR's secure website. In addition, CDCR's completion and posting of the requisite documentation, although improved, still remains chronically late.

As shown in the table of suicide tracking timelines below, defendants must conclude their post-suicide review and reporting tasks no later than 150 days following the date of death, with the facility warden's and chief medical officer's submission of the report of implementation of the quality improvement plan derived from CDCR's review and analysis of the suicide death. The last suicide death in 2011 occurred on December 31, 2011. Thus, by 150 days thereafter, on or before May 30, 2012, CDCR's posting of *all* required documentation with regard to *all* suicides in 2011 should have been completed. However, that did not occur until August 10, 2012, and even at that time, an autopsy report for one of the suicides in 2011 was not yet posted. [*See* Exhibit B, letter of D. Vorous]. Thus, availability of the necessary documentation from CDCR for this reviewer's analysis was delayed by over two months, setting back the completion of this review by at least the same amount of time.

The problem of late submissions by CDCR is far from new. In 2002, the special master reported that this reviewer's annual suicide report was delayed because of CDCR's delays in submission of basic documents on suicides, leading to a "tug-of-war" between CDCR and the special master's experts over the document production. *See Special Master's Ninth Round Monitoring Report*, filed April 25, 2002, p. 225, Docket No. 1373. A more recent instance in which CDCR delayed production of suicide-related information was its initial refusal to produce the report of its consultant on suicide prevention, Lindsay Hayes. During the court-ordered suicide prevention project in mid-2010, CDCR indicated that it was planning to retain Mr. Hayes to review the state

of its suicide prevention practices. The special master requested that defendants share that report with him, but defendants refused to produce it. It was not until approximately one year later, on May 24, 2012, that defendants finally produced the portion of Mr. Hayes' report concerning CDCR's use of outpatient housing units for suicide prevention, which was an integral part of the court-ordered project.

The timeframes for CDCR's review and reporting on suicides within its prisons appear in Chapter Ten of the Program Guide, "Suicide Prevention and Response," continue to be exceeded. These Program Guide provisions, like all others, were developed by the defendants themselves as part of their remedial plan, with the guidance and assistance of the special master. After the *Coleman* court's provisional approval, defendants continued to work with the special master to implement and further revise the Program Guide, in some instances as directed by the court, but in other instances provisions were modified and upgraded by the defendants on their own initiative. See *Coleman v. Schwarzenegger; Plata v. Schwarzenegger*, 2009 U.S. Dist. Lexis 67943, n.15 (August 4, 2009).

The applicable Program Guide timeframes for CDCR's suicide review are summarized as follows:

## Tracking Timelines for Department Review of Inmate Suicides[30]

| Event/Documents | Timeline |
|---|---|
| Date of Death | 0 hour |
| Chief Medical Officer Notice to Death Notification Coordinator | 8 hours from time of death |
| Initial Death Report by local SPRFIT Coordinator to Death Coordinator | 2 business days from date of death |
| Death Notification Coordinator Notice to DCHCS SPRFIT Coordinator | 1 business day from Number 3 |
| DCHCS SPRFIT Coordinator appoints Mental Health Suicide Reviewer | 2 business days from |

---

[30] *See* Program Guide, Chapter 10.

| | Number 4 |
|---|---|
| Mental Health Suicide Reviewer completes Preliminary Suicide Report | 30 days from date of death |
| DCHCS Suicide Case Review Subcommittee forwards completed Suicide Report to Mental Health Suicide Reviewer | 45 days from date of Death |
| Suicide Report signed and issued by Directors of DCHCS and the Division of Adult Institutions | 60 days from date of death |
| Facility Warden and Chief Medical Officer implement Quality Improvement Plan (QIP) | 120 days from date of Death |
| Facility Warden and Chief Medical Officer submit report Of implementation of Quality Improvement Plan | 150 days from date of Death |

From time to time, defendants have objected that this reviewer's and the special master's reports on suicides are not timely, implying that the special master is not concerned about suicides within CDCR prisons.  Very recently, within a report filed in the *Coleman* court by CDCR's experts on their prison mental health delivery system, is a statement that "[i]t was reported to us that there are often long delays before (the) findings and recommendations (of this reviewer and other special master's experts on suicide deaths)  are communicated to CDCR.  For example, we understand that the Special Master's office has not provided a report regarding suicides completed in 2011, even in draft form . . . .  If indeed (the recommendations) are not shared immediately, the very fact that the Special Master is comfortable delaying communication of these expert findings and recommendations for months belies the fact that they are crucial to institutional suicide prevention."[31]

In fact, that is not the case at all.  CDCR's objections in this vein amount to a mere "red herring," at best.  The special master provides defendants with an ongoing flow of updated information and analysis on the state of suicide prevention in CDCR prisons.  The Special Master's Expert's

---

[31] Report of J. Dvoskin, J. Moore, and C. Scott, "Clinical Evaluation of California's Prison Mental Health Services Delivery System," p. 34-35, Exh. 1 to Declaration of Debbie Vorous in Support of Motion to Terminate Litigation Under the Prison Litigation Reform Act [18 U.S.C. § 3626(b)] and to Vacate the Court's Judgment and Orders Under Fed.  R. Civ. P. 60(b)(5), filed January 7, 2013, Docket Nos. 4275-4, 4275-5.

Report on Suicides Completed in the CDCR in Calendar Year 2007 (2007 Suicide Report) was the most recent of this reviewer's annual suicide reports to include a general update on developments in suicide prevention in CDCR prisons.  By agreement of the *Coleman* parties, this reviewer's annual suicide reports for years 2008 through 2010 were prepared in a more streamlined fashion and dispensed with individual case reviews, in the interest of expediting release of those reports while a suicide prevention project ordered by the *Coleman* court on April 14, 2010 was in progress.  Order, filed April 14, 2010, Docket No. 3836.  That project involved a review by defendants of all suicide prevention policies and practices and identification and implementation of any and all specific modifications thereof as may be required to address the problem of inmate suicides.

Nevertheless, since the time of submission of the 2007 Suicide Report, the special master has reported on ongoing developments in the suicide prevention effort, including defendants' progress with afore-described suicide prevention project.  For the special master's continuing updates on suicides in CDCR prisons, *see Special Master's Report on Defendants' Review of Suicide Prevention Policies, Practices, and Procedures*, filed September 27, 2010, Docket No. 3918; *Special Master's Twenty-Second Round Monitoring Report*, filed March 9, 2011, Docket No. 3990; *Special Master's Report on the Adequacy of Defendants' Plan to Furnish Suicide-Resistant Beds in All Mental Health Crisis Bed Units*, filed November 17, 2011, Docket No. 4121; *Special Master's Twenty-Third Round Monitoring Report*, filed December 1, 2011, Docket No. 4124; *Special Master's Twenty-Fourth Round Monitoring Report*, filed July 2, 2012, Docket No. 4205;  *Special Master's Twenty-Fifth Round Monitoring Report*, filed January 18, 2013, Docket No.  4298.

Further, this reviewer has submitted an annual review of suicides for every consecutive year beginning in 1999, making this the thirteenth such annual report.  In addition, the special master reports on suicide prevention in all of his semi-annual compliance reports, covering suicide prevention as a focus area within each institutional summary as well as collectively within the summary of his findings in each compliance report.  The most recent of the special master's compliance reports, his *Twenty-Fifth Round Monitoring Report*, referenced in the preceding paragraph, was distributed to the *Coleman* parties on December 28, 2012 before it was filed in court on January 18, 2013.  It reports on the status of CDCR's compliance with suicide prevention efforts in all CDCR institutions, and includes a summary specifically devoted to digesting and analyzing the special master's findings on suicide prevention across institutions, plus a special section of the report, on pages 17 through 25, dedicated to discussion of the problem of suicides in CDCR prisons.

Defendants' assertion is also mystifying because it is defendants themselves who consistently fail to complete their own reviews and post the required documentation within timeframes, as discussed above.  *See, e.g.*, *2006 Suicide Report*, filed September 12, 2008, Docket No. 3030, p.

1; *2007 Suicide Report*, filed September 17, 2009, Docket No. 3677, p. 14.  The special master's and this reviewer's access to *any* information and documentation on suicides in CDCR prisons is limited to CDCR's postings on its secure website.  There is no other source which they can consult to even begin the suicide review process.  Moreover, the required postings are often voluminous, in some cases exceeding 500 pages in length, and including serial volumes of inmates' treatment records.  Careful review and analysis of these records and compilation of the findings and any recommendations to be gleaned from them consumes a great deal of time.  Consequently, it is impossible to produce an annual suicide review anywhere near contemporaneous with the completion of CDCR's postings on its website.

Every day which CDCR delays posting of its suicide review information causes at least a concomitant delay in the special master's and his expert's ability to prepare and distribute their suicide reporting duties.  If CDCR is serious about accelerating the suicide review process, it must conform to agreed-to reporting timeframes in the Program Guide.  It is up to CDCR to do its part and post the required documentation within applicable timeframes, and preferably earlier, if possible.  The special master and this reviewer are at their mercy to receive the information they need in order to fulfill their analytical and reporting obligations to the *Coleman* court.

## IV.     <u>Recommendations</u>

There are two major conditions which presently exist within CDCR that must be taken into consideration and addressed as part of the solution to the problem of suicides within CDCR institutions.  The first of these conditions is the persistent size of the mental health population in the prisons, despite the reduction in the overall prison population.  Realignment of the CDCR in-custody population to local jail facilities, pursuant to Assembly Bill 109, has led to a significant decrease in the CDCR in-custody population housed within the system's 33 in-state adult facilities.  The overall CDCR in-custody population dropped from 171,795 on May 23, 2007 to 133,176 on November 7, 2012, for a 24-percent decline during that period.  However, there has been virtually no correlated decline in the MHSDS population within the prisons over that period of time.  During approximately the same period, the MHSDS population in CDCR dropped from 32,958 on May 25, 2007 to 32,106 on November 2, 2012, for only a three-percent decline.  As a result of the decline in the general population, but absent a correlated decline in the raw number of suicides per year, the annual rate of suicides per 100/000 has increased since 2007.  While the numbers of suicides in 2007 and in 2011 are exactly the same at 34, the rate of suicides per 100,000 in 2007 was 19.7, but the rate per 100,000 in 2011 climbed to 21.

The second condition is the high rate of vacancies in mental health staffing in CDCR prisons.  The lack of sufficient mental health staff continues to exacerbate the above-described problem of inadequacy in assessment, treatment, and interventions.  The current mental health vacancy rate is 29 percent, based on 2268.26 funded mental health positions, and 653.86 vacancies among

16

them. This rate is calculated directly from data recited within a sworn declaration recently filed by CDCR.[32]  CDCR's filing states that "The Fiscal Year 2012/2013 system-wide mental health position authority, which is based on the 2009 (staffing) plan, totals 2268.26. The funding allocations for Fiscal Year 2012/2013 represent nearly 100% of the 2268.26 positions." Declaration, p. 2, ¶ 6. It further states that "[a]s of the end of November 2012, there were 1,614 people working state wide in the mental health delivery system . . . Although challenges remain to fill every single position for the 2009 staffing allocation plan, (*653.86 vacancies remain after adjustments for registry, new hires, and long-term sick leave*) . . . " *Id.* at 3, ¶ 8 (emphasis added). The vacancy rate among staff psychiatrists is even worse than the overall mental health vacancy rate, at 42 percent. Use of contract psychiatrists ameliorates the problem only to the extent of reducing the functional vacancy rate in staff psychiatry to 26 percent. Vacancies among staff psychologists and social workers are alarmingly high as well, at rates of 21 percent and 24 percent, respectively. Use of contractors in both of those disciplines marginally reduced the functional vacancy rates to 17 percent and 20 percent respectively. All of these vacancy rates far exceed the court-ordered maximum of ten percent for the aforesaid disciplines. Order, June 12, 2002, Docket No. 1383.

In view of the apparent resistance of CDCR's prison mental health population to reduction by population realignment and the current alarming mental health staffing shortages in CDCR prisons, as well as the state of suicide prevention initiatives within CDCR prisons described above, it is clear that CDCR's present resources to address the problem of inmate suicides are challenged. As a result, the special master and this reviewer are concerned about suicides in CDCR's prisons in 2013 and beyond, if conditions do not change. Accordingly, this reviewer recommends the following:

Establishment of a suicide prevention/management work group to timely review suicide prevention measures, suicide deaths, and deaths deemed to be of undetermined cause, with participation by CDCR clinical, custody, and administrative staff, DSH staff, and the special master's experts; continuation of monitoring of the CDCR suicide review process and its compliance with the Program Guide, Chapter 10, "Suicide Prevention"; and integration of the CDCR suicide review process with the *Plata* receiver's death review process.

Full implementation of the SRE Mentor Program to improve levels of clinical competency in the administration of the SRE, and ongoing assessment of clinician training, performance, and supervision regarding suicide risk evaluations and management;

---

[32]*See* Declaration of Diana Toche in Support of Motion to Terminate Under the Prison Litigation Reform Act [18 U.S.C. § 3626(b)] and to Vacate the Court's Judgment and Orders Under FED R. CIV. P. 60(b)(5), filed January 7, 2013, Docket No. 4275-3.

Continuation of monitoring and assessment of conduct of five-day clinical follow-up, custody staff adherence to policies and procedures regarding conduct of custody welfare checks and others, five-day clinical follow-up, and supervision of inmates, including those who are single-celled and have histories of increased risk of suicide;

Continuation of monitoring of referrals to higher levels of care, particularly referrals to MHCBs and to DSH programs, as per indicators established within the 7388B referral process;

Continuation of monitoring emergency response procedures, particularly in higher-custody housing such as administrative segregation, secured housing units, and psychiatric services units, establishment of state-wide criteria to improve emergency cell entry and extraction procedures; and

Inclusion of any documentation which is referenced within CDCR's own suicide reporting, such as policies, post orders, DOM sections, local operating procedures, and the like, within CDCR's reporting on its secure website.

It is time for all concerned to proceed toward working together on solving the problem of inmate suicides in CDCR's prisons.  Lives literally depend on it.


Respectfully Submitted,



_____/s/_____

Raymond F. Patterson, M.D., D.F.A.P.A.



January 25, 2013

**APPENDIX A**

2011 CDCR Suicides
Table 1 - Demographics

| Inmate | Facility | Date of Death | Sex | Method | Ethnicity | Age | HOUSING | LOC | R-SUFFIX | MEDICAL |
|---|---|---|---|---|---|---|---|---|---|---|
| A | PVSP | 1/1/2011 | M | OD | Cauc | 48 | SNY-D | N/A | N | Y |
| B | LAC | 1/25/2011 | M | Hanging | Cauc | 36 | SNY-S | EOP | N | N |
| C | CMC | 1/30/2011 | M | Hanging | Cauc | 37 | EOP-D | EOP | N | Y |
| D | HDSP | 2/5/2011 | M | Hanging | Cauc | 20 | ASU-D | CCCMS | Y | N |
| E | CIM | 2/5/2011 | M | Hanging | Cauc | 51 | ASU | CCCMS | N | Y |
| F | CMF | 2/15/2011 | M | Hanging | Asian | 41 | EOP-S | EOP | N | N |
| G | SQ | 2/28/2011 | M | Hanging | Hisp | 21 | ASU-S | N/A | N | N |
| H | SAC | 3/25/2011 | M | Hanging | Hisp | 37 | GP-S | EOP | N | N |
| I | LAC | 3/30/2011 | M | Hanging | Asian | 30 | GP-D | EOP | N | N |
| J | FSP | 3/31/2011 | M | Hanging | Cauc | 25 | ASU-S | CCCMS | Y | N |
| K | PVSP | 4/1/2011 | M | Hanging | African Amer | 33 | SNY-D | N/A | N | N |
| L | CMC | 4/18/2011 | M | Hanging | Asian | 40 | ASU-S | N/A | N | N |
| M | CMC | 5/15/2011 | M | Hanging | Cauc | 39 | GP-S | N/A | Y | Y |
| N | DVI | 5/25/2011 | M | Hanging | African Amer | 18 | ASU | CCCMS | N | N |
| O | ASP | 5/30/2011 | M | Hanging | Hisp | 56 | SNY-OHU-S | EOP | Y | N |
| P | CCI | 6/17/2011 | M | Hanging | Hisp | 23 | SHU-S | CCCMS | N | N |
| Q | LAC | 6/30/2011 | M | Hanging | African Amer | 30 | ASU-S | CCCMS | N | N |
| R | CMF | 8/4/2011 | M | Hanging | Hisp | 34 | EOP-S | EOP | N | N |
| S | CCI | 8/8/2011 | M | Hanging | African Amer | 46 | SHU-S | CCCMS | N | Y |
| T | HDSP | 8/19/2011 | M | Strangulation | Cauc | 50 | RC-EOP-S | EOP | N | N |
| U | PBSP | 9/16/2011 | M | Hanging | Cauc | 30 | PSU-S | EOP | Y | N |
| V | SAC | 9/20/2011 | M | Hanging | Hisp | 28 | PSU-S | EOP | N | N |
| W | DVI | 10/6/2011 | M | Hanging | Native Amer | 39 | RC-D | CCCMS | N | N |
| X | PVSP | 10/9/2011 | M | Hanging | AA/NA-Cauc | 25 | GP-D | N/A | N | N |
| Y | PBSP | 10/24/2011 | M | Hanging | Hisp | 40 | ASU-S | CCCMS | N | Y |
| Z | CAL | 11/9/2011 | M | Hanging | African Amer | 41 | ASU-S | N/A | N | N |
| AA | SQ | 11/17/2011 | M | Hanging | Cauc | 33 | COND.-S | N/A | N | N |
| BB | WSP | 11/23/2011 | M | Hanging | Hisp | 40 | RC-SNY-D | N/A | Y | N |
| CC | SAC | 11/26/2011 | M | Hanging | Iranian-Hisp | 31 | EOP-S | EOP | N | N |
| DD | CTF | 12/1/2011 | M | Hanging | Cauc | 55 | SNY-D | CCCMS | N | N |
| EE | SVSP | 12/6/2011 | M | Hanging | Hisp | 25 | ASU-S | N/A | N | N |
| FF | SVSP | 12/17/2011 | M | Strangulation | Asian | 47 | ASU-S | EOP | N | N |
| GG | CMC | 12/31/2011 | M | Exsanguination | Hisp | 65 | EOP-S | EOP | N | Y |
| HH | SOL | 5/2/2011 | M | Hanging | Cauc | 64 | GP-D | CCCMS | N | Y |

20

**<u>APPENDIX B</u>**

2011 CDCR Suicides
Table 2 - Mental Health Information

| Inmate | MHHX | SBHX | Keyhea | MHCB/DMH | 5-day f/u | CPR | Suicide Report | QIP Report | FOR/PREV |
|---|---|---|---|---|---|---|---|---|---|
| A | Y | N | N | N | N/A | Y | 2/22/2011 | 4/26/2011 | Y |
| B | Y | Y | Y | N | N/A | Y | 4/7/2011 | 10/4/2011 | Y |
| C | Y | Y | N | N | Y | | 3/3/2011 | N/A | N |
| D | Y | Y | N | N | N/A | Y (delayed) | 4/11/2011 | 5/18/2011 | Y |
| E | Y | Y | N | N | N/A | Y | 4/8/2011 | 6/28/2011 | Y |
| F | Y | Y | Y | N | N | Y | 4/26/2011 | 6/12/2011 | Y |
| G | N | Y | N | N | N/A | Y (delayed) | 5/2/2011 | 8/4/2011 | Y |
| H | Y | Y | Y | N | Y | Y (delayed) | 6/17/2011 | N/A | Y |
| I | Y | Y | N | N | N/A | Y | 5/18/2011 | 10/4/2011 | Y |
| J | Y | Y | N | N | N/A | Y (delayed) | 5/10/2011 | 7/1/2011 | Y |
| K | Y | N | N | N | N/A | Y | 6/1/2011 | 8/18/2011 | Y |
| L | N | Y | N | N | N/A | | 6/28/2011 | N/A | N |
| M | Y | Y | N | N | N/A | Y | 6/28/2011 | 8/9/2011 | N |
| N | Y | N | N | N | N/A | Y (delayed) | 8/4/2011 | 9/15/2011 | Y |
| O | Y | Y | N | N | N/A | Y | 8/10/2011 | 10/24/2011 | Y |
| P | Y | Y | N | N | N/A | Y | 8/22/2011 | 10/24/2011 | Y |
| Q | Y | Y | N | N | N/A | Y | 10/13/2011 | 1/17/2012 | Y |
| R | Y | N | N | N | N/A | Y | 10/24/2011 | 12/14/2011 | Y |
| S | Y | Y | N | N | N/A | Y | 10/31/2011 | 12/14/2011 | Y |
| T | Y | Y | N | N | N/A | Y (delayed) | 10/5/2011 | 11/7/2011 | Y |
| U | Y | Y | Y | N | N/A | Y (delayed) | 11/3/2011 | N/A | N |
| V | Y | Y | N | N | N/A | Y (delayed) | 11/17/2011 | 11/8/2011 | Y |
| W | Y | Y | N | N | N/A | Y (delayed) | 11/28/2011 | 1/14/12 or 2/1/12 | Y |
| X | Y | Y | N | N | N/A | Y (delayed) | 11/28/2011 | 1/17/2012 | N |
| Y | Y | Y | N | N | N/A | Y | 12/19/2011 | 1/30/2012 | Y |
| Z | N | Y | N | N | N/A | Y | 12/22/2011 | N/A | N |
| AA | Y | N | N | N | N/A | Y | 12/26/2011 | 2/22/2012 | Y |
| BB | Y | N | N | N | N/A | Y | 1/9/2012 | 2/21/2012 | N |
| CC | Y | N | Y | N | N/A | Y | 1/10/2012 | 3/12/2012 | Y |
| DD | Y | N | N | N | N/A | Y | 1/9/2012 | 3/12/2012 | Y |
| EE | N | N | N | N | N/A | Y | 1/23/2012 | N/A | N |
| FF | Y | N | Y | N | N/A | Y | 1/30/2012 | N/A | Y |
| GG | Y | Y | N | N | N/A | Y | 2/21/2012 | N/A | N |
| HH | Y | Y | N | N | N/A | Y | 6/8/2012 | N/A | N |

22

**APPENDIX C**

**Frequency of 34 Total Suicides, by CDCR Facility, in 2011**

| | |
|---|---|
| California Men's Colony (CMC) | 4 |
| California State Prison – Los Angeles County (CSP/LAC) | 3 |
| Pleasant Valley State Prison (PVSP) | 3 |
| California State Prison – Sacramento (CSP/Sacramento) | 3 |
| Pelican Bay State Prison (PBSP) | 2 |
| California Medical Facility (CMF) | 2 |
| Salinas Valley State Prison (SVSP) | 2 |
| San Quentin State Prison (SQ) | 2 |
| Deuel Vocational Institution (DVI) | 2 |
| High Desert State Prison (HDSP) | 2 |
| California Correctional Institution (CCI) | 2 |
| Calipatria State Prison (Calipatria) | 1 |
| Avenal State Prison (ASP) | 1 |
| Correctional Training Facility (CTF) | 1 |
| California Institution for Men (CIM) | 1 |
| Folsom State Prison (Folsom) | 1 |
| Wasco State Prison (WSP) | 1 |
| California State Prison – Solano (CSP/Solano) | 1 |

**<u>APPENDIX D</u>**

**Prevalence of Selected Characteristics Among All Suicides
by CDCR Inmates in 2011**

Single Cell Housing:

     24 of 34                                  (70.6 percent)

Inmates Incarcerated for Sex Offenses ("R" Suffix)

     6 of 34                                   (17.6 percent)

Method

Hanging:        30 of 34        (88.2 percent)
Overdose        1 of 34        (2.9 percent)
Strangulation: 2 of 34 (5.9 percent)
Laceration: 1 of 34        (2.9 percent)

History of Suicidal Behavior

     20 of 34                                  (61.8 percent)

History of Past Mental Health Treatment

     30 of 34                                  (88.2 percent)

Housed in Infirmary, Mental Health Crisis Bed (MHCB), Outpatient Housing Unit (OHU),
Psychiatric Services Unit (PSU) or Department of Mental Health (DMH)

OHU:        1 of 34        (2.9 percent)
PSU:        3 of 34        (8.8 percent)

Housed in Administrative Segregation Unit (ASU), Security Housing Unit (SHU), or
Condemned

ASU:        9 of 34        (26.5 percent)
SHU:        2 of 34        (5.9 percent)
Condemned:  1 of 34        (2.9 percent)

26

Housed in Reception Center (RC) or Special Needs Yard (SNY)

RC:        5 of 34        (14.7 percent)
SNY:       7 of 34        (20.1 percent)

Inmates on Keyhea Order for Involuntary Medication

    5 of 34                        (14.7 percent)

Concomitant Severe, Life Threatening, Medical Illness

    8 of 34                        (23.5 percent)

On Mental Health Services Delivery System (MHSDS) Caseload at Time of Death

    24 of 34                       (70.6 percent)

Enhanced Outpatient Program (EOP):  13 of 34
        (38.2 percent of all suicides; 54.2 percent of suicides by inmates on MHSDS
        caseload)

Correctional Clinical Case Management System (3CMS):  11 of 34
        (32.5 percent of all suicides, 45.8 percent of suicides by inmates on MHSDS
        caseload)

Psychiatric Services Unit (PSU):  2 (both EOP) of 34
        (5.9 percent of all suicides)

Outpatient Housing Unit (OHU):  1 (EOP) of 34
        (2.9 percent)

Correctional Treatment Center (CTC):  0 of 34
            (0 percent)

Age Range

    Under 18:       0           (0 percent)
    18-30:          11 of 34    (32.4 percent)
    31-40:          10 of 34    (29.4 percent)

41-50:              7 of 34          (20.6 percent)
50+:                6 of 34          (17.6 percent)

Race

    Caucasian:          12 of 34         (35.3 percent)
    Hispanic:           10 of 34         (29.4 percent)
    African-American:   5 of 34          (14.7 percent)
    Native American:    1 of 34          (2.9 percent)
    Asian:              4 of 34          (11.8 percent)
    Biracial:           2 of 34          (5.9 percent)

Gender

    Male:               34 of 34         (100 percent)
    Female:             0 of 34          (0 percent)

Significant Indications of Inadequate Treatment

    25 of 34                             (73.5 percent)

**APPENDIX E**



Figure 1The figures above include 1 death in 2003 at RJD, 4 deaths in 2005 (2 at CSP/Sac, 1 at CIM, and 1 at SQ), 1 death in 2008 at CSATF found to be non-suicides, and 1 death at CSP/Solano in 2011 found by Special Master's expert to be a suicide and found by CD



The figures above include 1 death in 2003 at RJD, 4 deaths in 2005 (2 at CSP/Sac, 1 at CIM, and 1 at SQ), 1 death in 2008 at CSATF found to be non-suicides, and 1 death at CSP/Solano in 2011 found by Special Master's expert to be a suicide and found by CDCR to be of undetermined cause.



















## CALIFORNIA STATE PRISON/ CORCORAN
## 1999-2011



## CALIFORNIA STATE PRISON/ LOS ANGELES
## COUNTY
## 1999-2011







Includes 1 death in 2011 found by the Special Master's expert to be a suicide and found by CDCR to be of undetermined cause.



Includes 1 death in 2008 found by the Special Master's expert to be a suicide and found by CDCR to be a non-suicide.





















*Facility opened July 2005















Includes 1 death in 2005 found by the Special Master's expert to be a suicide and found by CDCR to be non-suicide.













**<u>APPENDIX F</u>**

# REPORT ON SUICIDES COMPLETED
# IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND
# REHABILITATION IN CALENDAR YEAR 2011

## Case Reviews

### 1. Inmate A

Brief History: This inmate was a 48-year-old Caucasian male who committed suicide by overdose on 1/1/11 at Pleasant Valley State Prison (PVSP). He was not a participant in the Mental Health Services Delivery System (MHSDS) at the time of his death. He was double celled on a Sensitive Needs Yard (SNY). The inmate entered the California Department of Corrections and Rehabilitation (CDCR) on 4/24/02 for his first prison term. He was sentenced to a term of 15-years-to- life for murder, evading a peace officer-death/injury, driving while under the influence of alcohol and drugs with bodily injury, and eluding/fleeing from a pursuing officer. He had been housed at PVSP since 6/22/06 with a Minimum Eligible Parole Date (MEPD) of 2/8/16.

The inmate was discovered on 1/1/11 at approximately 4:58 p.m. by an officer conducting the 5:00 p.m. standing count. During the count, the officer discovered the inmate to be unresponsive to verbal commands and he appeared not to be moving. The officer activated his personal alarm device and summoned medical assistance via his institutional radio. Once responding staff arrived, the officer opened the cell door and placed the inmate's cellmate in handcuffs and removed him from the cell. A licensed vocational nurse (LVN), officers, and a sergeant entered the cell and placed the inmate on a Stokes litter. He was removed from the cell and two LVNs began CPR. Central Control was notified and dispatched an Emergency Response Vehicle (ERV) to the front of the building. The ERV arrived with an RN who applied the Automated External Defibrillator (AED) and the inmate was transported to the Triage and Treatment Area (TTA). At approximately 5:29 p.m., paramedics arrived at the TTA. At approximately 5:33 p.m., a physician pronounced the inmate dead via telephone from the Community Regional Medical Center-Fresno.

The Fresno County Coroner issued a coroner's report stating that an autopsy was performed on 1/3/11. The cause of death was reported as acute Tramadol toxicity and the manner of death was suicide. The toxicology report indicated that a blood specimen was positive for Tramadol at a concentration of 52,618 ng/mL. The coroner noted that a toxic concentration was determined in five persons whose deaths were attributed solely to Tramadol overdose at an average of 6100 ng/mL. Blood and urine screenings for illicit drugs indicated morphine levels of 1591 ng/mL in blood and 5085 ng/mL in gastric contents (toxic level greater than 200 ng/mL).

The suicide report recounted the inmate's criminal justice history and stated that he did not have a juvenile criminal record. The report indicated that prior to his commitment offense he had been arrested three times. The first arrest was in March 1992 for driving under the influence of alcohol, but there was no conviction. The second arrest was in November 2000 for driving at an excessive speed; there was a conviction and the inmate was fined and placed on 36 months' probation. The third arrest occurred on 3/26/01 for driving under the influence of alcohol, but no disposition was noted.

`

On 6/23/01, police officers pursued the inmate in a high speed car chase that ended with the inmate crashing into another vehicle and killing the driver. He was noted to have been intoxicated at the time. On 3/6/02, he was convicted of the offenses as indicated above. The inmate entered the CDCR via the North Kern State Prison Reception Center (NKSP RC), transferred to the California Substance Abuse Treatment Facility (CSATF) on 8/26/02, and ultimately transferred to PVSP on 6/22/06.

On intake at NKSP RC, the inmate reported having no history of mental illness or treatment for mental illness, but he indicated taking psychotropic medications including Seroquel, Trazodone, and Paxil. He was not referred for mental health treatment at that time. However, he was placed in the MHSDS at the Correctional Clinical Case Management System (3CMS) level of care on 5/20/02 after a psychologist identified depression. A psychiatrist subsequently saw him that same month and prescribed Trazodone and Benadryl to treat the depression.

The inmate was confined to a wheelchair secondary to injuries suffered at the time of his arrest. The injuries included a fractured right hip and partial left-sided paralysis. He was also diagnosed with chronic pain and in 2008, was diagnosed with spondylosis of the cervical spine and degenerative disc disease. He was prescribed a number of medications and most recently was prescribed Neurontin for treatment of back pain. However, in October 2009, he signed a refusal of treatment that stated that the prescribed medication was the wrong medication and that he intended to pursue litigation in federal court.

The UHR indicated that in July 2002 the inmate began to complain about violation of his rights under the Americans with Disabilities Act (ADA) based on his belief that medical staff was not properly treating his pain and physical disabilities. The record noted that he had increasing anger and agitation due to his belief that he was not being treated properly. In August 2006, mental health staff diagnosed Adjustment Disorder with Depressive Mood; a psychiatrist had previously diagnosed Major Depressive Disorder, Severe with Suicidal Risk, when he was housed in administrative segregation (ASU) during November 2002, in conjunction with a hunger strike. He was admitted to the Mental Health Crisis Bed (MHCB) on suicide precaution; he reported to mental health staff that he could not tolerate being in ASU and did not want to live "locked in a cage like an animal". He was diagnosed with Adjustment Disorder, Mixed and was discharged at the 3CMS level of care. He continued to be housed in ASU and the treatment team changed his diagnosis to Anxiety Disorder NOS, continuing him at the 3CMS level of care. The treatment plan indicated that he would receive weekly individual sessions with his primary clinician and noted his medical problems, which included partial paralysis on the left side.

A social worker conducted a suicide risk evaluation (SRE) on 1/17/03; the noted purpose was to formulate treatment planning. The SRE noted the inmate's risk factors to be his ethnicity, recent lengthy prison sentence, first prison term, and current ASU, SHU, or PSU term. Family support was the only protective factor. Clinical interview/inmate report was the only source of information. The assessment of imminent risk was low with no referral needed.

A social worker completed a SRE on 1/24/05. The noted reason for the evaluation was to determine the need to refer the inmate to the MHCB. The source of information was noted

as the correctional officer or staff interview, inmate, and UHR.  Noted risk factors were the inmate's ethnicity, history of violence and suicidal ideation/threats on 11/02/02, first prison term, longer life sentence, history of poor impulse control, poor coping skills, and being early in his prison term.  Recent suicidal ideation was also noted as a dynamic risk factor.  There were no protective risk factors.  The social worker noted that the inmate denied suicidal ideation and stated that he was not eating because he was not hungry, but agreed to attempt to eat.  The plan was to refer him to the primary clinician and that there was "no referral needed".  No estimate of risk was offered.  A note written by the same social worker indicated that the inmate was not eating and that was the reason for the referral; the inmate denied that he was on a hunger strike, but simply stated that he had no appetite.  In that note, the social worker also reported that the inmate had been referred to the psychiatrist.

The inpatient discharge summary indicated that the inmate was admitted to the MHCB from 4/12/06 through 4/17/06 after staff discovered marks on his neck; he was admitted with a diagnosis of Adjustment Disorder with Depressed Mood.  He denied suicidal thoughts or intent and reported that the marks came from a fight with another inmate on the previous day, resulting in his return to ASU.  The psychologist completed a SRE and noted that the only source of information was the inmate interview.  Noted risk factors were the inmate's ethnicity, history of adjustment disorder, first prison term, and long or life sentence.  Protective factors included family support.  The assessment did not note any dynamic risk factors.  On 4/13/06, the evaluation of suicide risk was evaluated as low.

Another SRE was completed on 4/17/06; both the inmate interview and UHR were noted as sources of information.  Additional risk factors of history of violence, suicidal ideation, and Level IV custody score were noted.  Once again, the assessment did not note dynamic risk factors despite the inmate's clear affective instability or lability and poor compliance with treatment or medication.  Protective factors included family support, support of friends, and helping others.  The evaluation of risk was determined as low with "custody issue resolved", and the inmate was discharged to ASU.  The inmate's admission diagnosis to the MHCB was Psychotic Disorder NOS, but his discharge diagnosis returned to Adjustment Disorder with Mixed Mood and Behavior and Narcissistic Personality Disorder.  His Global Assessment of Functioning (GAF) score was 29, indicating severe symptoms at the time of discharge.  The GAF score of 29 would indicate serious impairment in communication or judgment, behavior considerably influenced by delusions or hallucinations, or inability to function in almost all areas.

During his stay in the ASU and MHCB, the inmate continued to complain of severe pain from his injuries and demanded accommodations.  However, staff reported that he did not appear to have signs of pain or distress, was uncooperative during examinations, and had inconsistent findings of physical pain and disability.  There were multiple refusals of medical care, CTC transfers for medical evaluations including MRIs, and examinations throughout the inmate's course in the CDCR.  In his refusals, he frequently stated "I am not refusing my medication.  I cannot walk to the MTA office for morning, noon or evening medication by reason of severe leg, hip and back pain".  He filed 602 grievances and appeals.  He also frequently stated that he was in state and/or federal court with lawsuits regarding his claims of inadequate medical care against individuals and the governor.

53

The inmate had multiple MRIs and was seen by several physicians including orthopedics and the HCM/CMO. The orthopedic physician recommended physical therapy in 2004, which the inmate appeared not to have received and/or refused. The inmate had hardware in his hip, i.e., a screw, which ultimately might have required removal, and he should have been seen by a neurologist as he reported that he thought that he had a mild stroke. The HCM/CMO opined that the inmate had a "possible pain syndrome secondary to motor vehicle accident in 2001 with multiple fractures and possible closed head injury". He was treated with multiple medications for pain management, including Morphine, Vicodin, Tramadol, Indomethacin, and Neurontin over the years.

On 1/25/07, the IDTT removed the inmate from the 3CMS level of care, noting that he had been placed in the MHSDS based on medical necessity on 4/17/06 and that the medical necessity "no longer exist". A previous notation dated 10/4/05 indicated that he was removed from the MHSDS as he had been placed there on 9/3/02 due to medical necessity, but that medical necessity "is no longer applicable."

A psychologist completed a SRE on 5/5/08 "to determine the need for referral to the crises (MHCB) program." Again the risk factors were noted as ethnicity, first prison term, long or life sentence, and Level IV custody score, and for the first time, "affective instability or lability" and "recent trauma or threat to self-esteem". The only protective factor noted was "helping others". It was also noted that the inmate denied any suicidal ideation, intent, or plan. The assessment of risk was "no apparent significant risk", and no referral was needed.

A staff referral resulted in a psychologist completing a progress note on 1/7/09. The note indicated that the psychologist received a call from custody staff stating that the inmate was very angry; he stated that when he paroled he would "blow my f…ing head off". It was then noted that he denied suicidal and homicidal ideation and was refusing medical and dental services. It was also noted that he appeared "very frustrated and angry about custody's treatment of him today". He further indicated that he did not trust the medical doctors and CDCR because he believed that they might cause him to be paralyzed; he was thus refusing medical appointments because he was in so much pain. The psychologist assessed that the inmate denied suicidal ideation, intent, and plans and denied homicidal ideation, but did not provide any diagnostic impressions. The plan was to "continue present treatment plan" and the inmate was to submit a request if he wanted to "see psych if need arises".

The inmate was noted to have refused visits with his primary clinician on 9/16/09, 10/15/09, and 10/29/09.

During the course of incarceration, the inmate refused medical treatment and mental health care on a number of occasions. He was noted to be angry and verbally abusive. He claimed to have a degree in psychology and, as such, knew how he should be treated. He denied suicidality, but refused to eat on at least two occasions; he indicated that he had a right to refuse to eat and to refuse medical treatment and noted that he had lawsuits filed and pending. Although he was removed from the MHSDS on 1/25/07, his last contact with mental health occurred on 1/7/09; there was a referral from custody after the inmate stated that he would "blow my f…ing head off" after he was released from the CDCR, as referenced earlier in this report. No notations in the record indicated that he subsequently

54

refused mental health services; although no notations indicated that follow-ups were scheduled based on his refusals. The CDCR reviewer also noted that the inmate's involvement with MHSDS revolved around his anger and depression, i.e., being in prison, the medical department, the prison system, and correctional staff. The reviewer further found that there was no suicide attempt history although there was a "questionable incident" in January 2005 when staff found rope marks on his neck.

The inmate incurred several Rules Violation Reports (RVR) from July 2002 through October 2008; there were approximately 17 RVRs between 2002 and 2004, and one each in 2005, 2006, and 2008. The RVRs specifically included those for behavior creating the potential for violence, multiple for obstructing a peace officer, delaying a peace officer, disrespect towards staff, disobeying orders, disruptive behavior and out-of-bounds, mutual combat, and falsification of records. The inmate received developmental disability testing on 4/26/02 and was found not to have a developmental disability.

The inmate was placed in ASU on 9/11/02 pending an investigation into his allegations of staff misconduct. He applied for and was endorsed to the SNY in January 2003. The reviewer also noted his family support, including that of his sister and mother and their funding of his trust account. However, no one from his family visited him following his transfer to PVSP. More recent letters from family indicated their need to reduce the amount of money they sent to his trust account and not wanting to send packages and money to other "cellmates."

The reviewer also noted information provided by the inmate's cellmate of approximately four and one-half years; he indicated that he was the inmate's only friend, and that neither inmates nor staff liked the inmate and the inmate did not like them. He stated that the inmate only came out of his cell for showers and spent his time watching television and eating in his cell. The cellmate reported that the inmate's physical condition had deteriorated during the past two years, that he had aged considerably, and that although he was tired of living this life, he never mentioned suicide. The cellmate also noted that the inmate had physical rigidity in that he was in constant pain from injuries suffered in his car accident. The cellmate further noted that the inmate also claimed that he had testicular cancer, but the medical department was not providing proper treatment. He was noted to have five boxes of legal and institutional documents among his property; documentation included appeals and legal actions against CDCR for Eighth Amendment claims for cruel and unusual punishment and for violations of the ADA. The cellmate further reported to the reviewer that the inmate began buying pills to relieve his pain approximately three months before his suicide.

The inmate left a nine-page suicide letter that was addressed to a sergeant. The suicide letter indicated that he had sent a copy of it to his attorney and had provided a telephone number for notification of his mother. In the letter, he expressed respect for the sergeant. He further indicated his belief that the required actions of the sergeant were preservation of relevant and related evidence for investigation/prosecution of inmates directly involved in drug dealing "relative to my self-execution death by the taking of 465 CDCR-issued Tramadol controlled medication pain pills." The inmate proceeded to list the names of inmates who had sold medication to him during the previous two months. He then wrote about his wrongful conviction. He distinguished himself from the rest of the prison population; this included his not socializing or interacting with inmates, never going to

yard, and only leaving his cell to take showers during the four and one-half years since his arrival at PVSP. He described himself as a lawyer, indicating that his "self-execution death" was due to medical, custody, and administrative conditions with CDCR at PVSP. In the letter, he stated that he began planning to kill himself two months earlier in late October 2010 and that the suicide method would be by overdose of medication or heroin. He also wrote of purchasing 500 Tramadol tablets from two inmates who were prescribed it and that they were able to save their medication because of "the lax work of an RN who dispensed the medication." He further stated that the inmates provided him with 465 Tramadol tablets and described how he secured the medication.

The inmate also described what he referred to as "factual information" regarding "medications." He then gave advice on how CDCR and custody staff should conduct searches. He concluded his letter by describing himself as a man "only in death" because he had been "regularly treated like an animal" by CDCR as a "truly innocent man who was wrongfully and unlawfully convicted." He again thanked the sergeant for treating him with dignity and respect, listed the names of ten prisoners and their CDCR numbers, and included a P.S. that stated "I died this cold night a broken man." He also left a one-page document titled "Final Will and Testament" that he and three other prisoners signed where he described how his trust account money should be divided, specifically excluding his sister. He also made reference to his belief that he was dying of the terminal medical condition of testicular cancer, which he believed CDCR medical staff were aware of.

The CDCR suicide report included one problem and quality improvement plan as follows:

Problem 1: The inmate was able to purchase a large amount of pain medication which he used to commit suicide. While the drug trafficking of prescribed and illegal drugs is a challenge in prison settings, this case points to the need to review medication prescribing and dispensing practices and the importance of custody monitoring criminal behavior. While staff may feel helpless because of this difficult population to monitor, efforts should be made to identify ways to minimize criminal infiltration of the medication administration process.

Quality Improvement Plan: During review of this case by the Suicide Prevention and Response Focused Improvement Team (SPR-FIT) and representatives from PVSP on 2/14/11, the Chief Executive Officer at PVSP noted that following the death of inmate __ a number of concerns pertaining to the issue of medication prescribing and dispensing practices were immediately addressed. As a result, a Quality Improvement Team (QIT) was convened at PVSP with a consultant from DCHCS, in order to identify and correct concerns related to the use of opiates, medication dispensing procedures, and staff compliance with policies and procedures.

A physician and nurse consultant completed a Death Review Summary on 3/21/11. The death type was noted as suicide and the primary cause of death was a drug overdose. Co-existing conditions were chronic back pain. Contributing cause analysis indicated "medication prescribing issue". The summary provided information regarding the inmate's course of incarceration and treatment including his diagnosis of Adjustment Disorder, refusal to be seen by neurosurgery as one of many refusals in his medical record, the physician seeing the inmate without the medical record, and medication being prescribed without an associated progress note. Standard of care issues for medical providers were identified as (1) a medication should not be initiated without a "good faith"

examination and the initiation of some medications did not have an accompanied progress note suggesting a departure from the standard of care and (2) the ACLS did not appear to have been conducted with physician oversight, suggesting a violation of CPHCS policy. As for the standard of care for nursing, the two reported concerns were that (1) the LVNs responding to the medical emergency did not have an AED with them, but rather the AED was brought by an RN from the TTA and (2) the patient refused Gabapentin on numerous occasions, but a 128-C form was not completed. There was also systemic concern that the patient was able to purchase large quantities of diverted medications, underscoring one of the problems with pain medication management within the CDCR. Recommendations included providing the Healthcare Manager (HCM), CME, and CNE with a copy of the review and nursing counsel referrals for the two items identified for educational purposes.

On 4/26/11, the Director (A) Statewide Mental Health Program, Division of Correctional Health Services and Director, Division of Adult Institutions issued their report on the implementation of the Quality Improvement Plan for this inmate's suicide, in response to the suicide report dated 2/22/11. In this report, the Directors reported that (1) the PVSP QIT has continued to meet monthly since the inmate's suicide, reviewed each step of the medication administration process and staff training issues, recommended to the Nursing Education Office utilization of this case study in future trainings and made a recommendation to the Pharmacy and Therapeutic Committee to consider adopting a "crush order" for Tramadol. The Directors also required designation of a mental health clinician as a "required" rather than an "optional" member of the QIT; (2) the Pharmacy and Therapeutics Committee met to discuss and approve "crush and float" as a standing order for routine medication administration practice for Tramadol and the LVN identified for failing to carry out her duties in contributing to this issue was terminated; (3) the PVSP "Medical Case Review/Appeal Evaluation Committee" reviewed the prescriptions and medical status of the patient-inmates identified in the inmate's suicide letter as having supplied the medication and all but two of the "suppliers" had their pain medications terminated. Overall, there was a 49-percent decrease in opioid prescription and a 33-percent decrease in adjunctive medications due to an aggressive campaign of collaboration and targeted interventions to support appropriate provider prescribing patterns; (4) the PVSP SPR-FIT continued to meet monthly, reviewed the suicide report, discussed the initiatives described above, and placed particular emphasis on the importance of utilizing the SRE form when suicide risk was a component of clinical contact. It was also a recommendation to continue discussion of the SRE at a meeting of mental health staff; (5) a mental health staff meeting addressed SRE utilization and additional resources to assess suicide risk, that SRE completion was part of peer review, and that supervisors noted that SRE forms were reviewed as part of ongoing audits and evaluation activities; and (6) the PVSP Emergency Medical Response Review Committee discussed this case and steps taken by custody and medical staff when responding to this emergency.

Further details were discussed in the "Nursing Suicide Report Clarification" as Attachment A. Attachment A indicated that the first responder was custody, but that custody did not initiate CPR. Rather, CPR was not initiated until the LVNs arrived. The TTA RN applied the AED five minutes from the initial alarm, but no shock was advised; the LVN who first arrived did not apply the AED because the American Heart Association recommends that five cycles of CPR can be completed by EMS personnel before using the AED. Narcan was administered along with Epinephrine and Atropine. A minute-by-minute synopsis of what occurred in the TTA was attached.

**Findings**:  This inmate's suicide does not appear to have been foreseeable as he did not indicate that he had suicidal intent or plans to any staff, despite having indicated his planned suicide to other inmates.  However, his suicide may have been preventable had there been collaboration between medical and mental health staff to address his continuing chronic pain complaints, angry and volatile behaviors toward staff, isolation from other inmates, and, except for showers and some medical appointments, failure to come out of his cell for approximately four and one-half years while at PVSP.  The inmate's suicide may also have been preventable had there been appropriate and thorough SREs which would have noted his three MHCB admissions due to staff concerns of possible suicidality, including the last referral that he received while not an MHSDS participant due to custody staff reporting his statements that he would kill himself when paroled.

In addition, the inmate's ability to obtain 465 Tramadol tablets as a controlled substance administered under Direct Observation Therapy (DOT) indicated a serious failure in monitoring the dispensing of pain medications and highlighted problems with prescribing practices for inmates who did not require such medications.  The inmate was also identified as having a number of issues related to his complaints of pain and inability to come to appointments or to meals.

Despite his three MHCB admissions, he was discharged from the MHCB on one occasion with a GAF score of 29, which was indicative of serious mental health impairment.  However, he was never referred to a higher level of care such as EOP or DSH for a more comprehensive and focused assessment of his mental health and medical issues in order to collaborate and coordinate treatment given his resistance to medical and mental health staff regarding assessments, treatment, and medication adherence.

## 2.  Inmate B

Brief History:  This inmate was a 36-year-old Caucasian male who committed suicide by hanging on 1/25/11 at California State Prison, Los Angeles County (CSP/LAC).  He was a participant in the MHSDS at the EOP level of care at the time of death and was single celled pending double cell placement on an SNY.  The inmate entered the CDCR in 1995 and paroled twice before returning to the CDCR on 10/8/08 via the NKSP RC, when his probation was revoked and he was sentenced to 13 years.  His MEPD was in 2017.

Page one of the crime/incident report (CDCR 837-A) was not provided, and page two was a handwritten continuation from page one.  Therefore, the circumstances of the inmate's discovery and emergency response are provided based on documentation in the CDCR suicide report.

According to the CDCR suicide report, the inmate was discovered on 1/25/11 at approximately 12:35 a.m. by a corrections officer who activated his emergency alarm and requested medical assistance via the institutional radio.  The inmate was discovered hanging and unresponsive in his solely occupied cell.  He had reportedly jammed a towel in his cell door, which delayed opening the door by approximately one minute.  After entering the cell and discovering that they could not cut through the thick noose around the inmate's neck, the officers maneuvered the noose attachment off of the ceiling light fixture.  The report further stated that 30 seconds after officers entered the cell; they carried the inmate out of the cell, placed him on the grass in front of the building, removed the

noose from his neck and initiated emergency medical response measures. At approximately 12:40 a.m., medical personnel arrived and continued to provide emergency medical response measures, which were sustained through transport to the TTA. Los Angeles County Fire Department paramedics arrived at 12:55 a.m. and continued provision of CPR until the inmate was pronounced dead at 1:10 a.m. The report stated that a razor blade was later found in the inmate's cell; it was apparently used to inflict superficial cuts on his wrists. The timeline for CPR administration was noted to have occurred at 12:37 a.m., which was two minutes after the inmate was discovered. The timeline also indicated that the AED was applied at 12:47 a.m. in the TTA, and no shock was advised. Epinephrine and Atropine were administered three times; the AED advised no shock three times, and oxygen was administered. At 1:10 a.m., the paramedic pronounced the inmate dead. An autopsy report provided by the Department of Coroner, County of Los Angeles indicated that the cause of death was hanging, and the manner of death was suicide. The autopsy was performed on 1/27/11.

The suicide report recounted the inmate's criminal justice history, which included a juvenile history of arrests for petty theft and possession of controlled substance paraphernalia in 1989 and petty theft in 1991. He received counseling supervision and placement in a community placement camp; his juvenile probation ended in November 1992. That same month he was arrested and convicted of first degree burglary at age 18 and sentenced to 36 months' probation and one year in jail. Also in that month he was charged with residential burglaries, receipt of stolen property, and possession of a bad check, all of which were dismissed. In May 1993, he was convicted of second degree burglary, and during June 1993 he was convicted of bringing illegal substances into the county jail. He subsequently incurred charges of infliction of corporal injury upon a spouse or cohabitant, terrorist threats upon a police officer, and making weapons with intent to harm a police officer, for which he received probation camp, county jail, and state prison. Many of the inmate's offenses were related to his substance abuse and gang affiliation.

The inmate first entered the CDCR in March 1995, when his probation on previous charges was revoked and he was sentenced to serve four years for the burglary, substance abuse, and weapons-related charges. He entered the NKSP RC and was paroled from CSP/LAC in December 1998. His second CDCR incarceration began in October 2000 when he was received at NKSP RC with a six and one-half year sentence for drug possession, carrying a weapon, and making terrorist threats. He paroled in April 2007. His substance abuse-related charges included possession of methamphetamine, possession of methamphetamine for sale, and possession of a controlled substance for sale. He had become a member of the Nazi Low Riders gang and was validated in November 1998, after returning to prison in October 1998.

Records indicated that the inmate began his use of methamphetamine as a teenager. As an adult, he used heroin, morphine, alcohol, marijuana, and cocaine. His mental health history appeared to have begun when he was approximately eight years old when he was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and was prescribed Ritalin. He continued to be prescribed Ritalin through age 12. The record also referenced one or two suicide attempts as an adolescent, hospitalization at age 13 or 14 for depression, and three hospitalizations between the ages of 15 and 17. The inmate reportedly joined the Nazi Low Riders in 1989, but became a gang dropout in prison, resulting in his SNY

placement. Records also indicated that he reported two suicide attempts in 1994 when he was approximately 20 years old; the attempts were by hanging and an overdose of pills.

The inmate was initially incarcerated in the CDCR from March 1995 until December 1998, but he was not placed in the MHSDS or identified as having mental health needs despite his history. He received screening for developmental disability that concluded that he did not have a developmental disability; and therefore, he was not in need of services. During the second incarceration that began in October 2000, he requested mental health services because of insomnia; although he had a history of bipolar disorder, he was not believed to meet the criteria for MHSDS inclusion. He was prescribed Benadryl for sleep. In October 2003, he was placed at the 3CMS level of care due to medical necessity, and he was prescribed Lithium to augment symptoms of Bipolar Disorder. He was also diagnosed with Antisocial Personality Disorder; and after one dose of Lithium, he refused medication, reporting side effects. Subsequently his Lithium dosage was reduced, and Zyprexa was added. By this time he had dropped out of the Nazi Low Riders gang, and he requested removal from the MHSDS, admitting that he had used heroin and alcohol while incarcerated. His refusal of psychotropic medication and denial of suicidal ideation or intent continued, and he reported mood swings.

A psychologist completed a SRE on 1/26/04 when the inmate was housed in the ASU at the 3CMS level of care. No reason for purpose of the SRE was documented, and the sources of information were not identified. The risk factors were identified as ethnicity, history of violence, and history of mental illness, but suicidal ideation/threats in the past were denied. No other risk factors and no protective factors were identified. The evaluation of risk was noted as negative suicide attempt history and patient denied suicidal ideation. The recommendation/plan was referral to the primary clinician/case manager.

A psychologist conducted a SRE on 2/17/04, noting that the reason for the evaluation was that the inmate had just returned from court. The source of information was noted as clinical interview/inmate report. The risk factors included Axis I Mood Disorder, history of poor impulse control and poor coping skills, Level IV custody score, and single cell placement. Protective factors were family support and caring for children. In the assessment, imminent risk was evaluated as low, and there were no recommendations or referrals.

The inmate received RVRs in 2006 for possession and sale of drugs while incarcerated. Records indicated that he did not receive mental health evaluations in connection with these RVRs. He paroled in April 2007.

While on parole, records indicated that the inmate continued to abuse methamphetamine and heroin and stole from his parents. In August 2007, he was involuntarily committed by the Los Angeles County Department of Mental Health. The Los Angeles County Department of Mental Health's medical record was included in the CDCR medical record; this information indicated that on 8/7/07 the inmate was seen and application for 72-hour detention for evaluation and treatment was completed. He was noted to be a danger to self and to others, as being "suicidal earlier today", claimed that people were following him, that he feared people, was disturbed, and had extreme hyperactivity. He was held for 72 hours from 8/7/07 until 8/10/07 with a diagnosis of Psychotic Disorder NOS and methamphetamine-induced psychosis. Subsequently, he was sent to a drug rehabilitation

facility following discharge from the Department of Mental Health, but he did not report there.  He was arrested in August 2007, detained in jail for violation of parole, and returned to CDCR in October 2008.

The inmate underwent mental health screening and evaluation at NKSP RC upon his return in October 2008.  Despite his history of treatment and diagnosis of Bipolar Disorder, he was provided with a diagnosis of Polysubstance Abuse and was not placed in the MHSDS. He was placed in an SNY based on his history of being a validated Nazi Low Riders dropout.  A psychologist completed a SRE on 10/8/08; the reason noted for the evaluation was unspecified, and the only source of information was the inmate interview.  Noted risk factors were history of substance abuse (methamphetamine), protective custody (gang drop-out), history of mental illness (bipolar), and early in prison term.  Protective factors were family support, spousal support, and regular exercise.  The evaluation indicated that the inmate was not at risk for suicide at the present time.  The estimate of risk was no apparent significant risk; the plan was that no referral was needed.

A psychologist completed a SRE on 10/16/08 when the inmate was in general population in the reception center.  No reason was provided for the completion of the risk assessment, and the inmate interview was the only source of information.  The only risk factors noted were ethnicity and history of substance abuse.  No protective factors were noted on the SRE.  There was no narrative provided, and the conclusion was that no apparent significant risk was present; no referral was needed.

The inmate was next seen in February 2009.  At that time, he denied a history of suicide attempts, was given no mental health diagnosis, and was not placed in the MHSDS.

The inmate was admitted to the MHCB on 6/7/09 as a danger to himself due to suicidal ideation; a SRE indicated high suicide risk as he reported suicidal ideation without a plan. His diagnosis was Adjustment Disorder, and he was provided with a GAF score of 35.  A psychologist completed a SRE on 6/9/09; the inmate was noted to be at the 3CMS level of care, and the reasons provided for the completion of the evaluation was to formulate treatment planning and for temporary housing in the A-4 housing unit.  Information sources were correctional officer or staff interview, inmate interview, and the UHR.  Risk factors included a history of violence, history of substance abuse, previous suicide attempts with no dates specified, and history of mental illness.  Additional risk factors included protective custody with the notation SNY-dropout, Level IV custody score, hernia and chronic, serious or terminal illness.  Other risk factors included being anxious, agitated, or fearful, insomnia, poor appetite, hopelessness or helplessness, fear for his safety, feelings of guilt or worthlessness, psychosis (with "delusion" circled), recent trauma or threat to self-esteem, recently assaultive or violent behavior, and recently victim of assault -- "three months."  Noted protective factors were outside contacts, family support, religious support, spousal support, CDCR friendships, and regular exercise.  It was noted that the inmate was not taking medication.  The narrative indicated that he was paranoid and delusional, believing that the CDCR was able to read his mind.  The suicide risk was estimated as high risk.  The recommendation and plan were not checked on the SRE.

On 6/9/09, the IDTT saw the inmate and diagnosed Schizophrenia Paranoid type and Antisocial Personality Disorder with a GAF score of 47; however, a psychiatrist who saw him on the same day provided a GAF score of 30.  The inmate remained in the MHCB at

the 3CMS level of care; although the psychiatrist noted that the inmate was paranoid and
delusional, believing that he was receiving messages from the television and that staff
could read his mind.  The very next day he was reevaluated; his diagnosis was changed to
Adjustment Disorder, and he was discharged from the MHCB at the 3CMS level of care
prior to his transfer to CSP/LAC on the following day.  He was not prescribed any
medication while in the MHCB prior to his transfer to CSP/LAC.

After his transfer to CSP/LAC on 6/11/09, the inmate received a mental health evaluation
that made reference to his 3CMS level of care, past mental health treatment, and history of
suicide attempts.  It also noted that he had been in the MHCB because of suicidal ideation
prior to transfer and was not receiving any medication.  A SRE indicated that he was not at
risk for suicide; further, it was noted that he did not have a psychiatric diagnosis, and he
was assessed with a GAF score of 70.  Four days later, he was diagnosed with Adjustment
Disorder with Depressed Mood, with a GAF score of 45 while in the CSP/LAC reception
center.  On 6/15/09, the psychiatrist saw the inmate in the TTA; it was noted that the
inmate was now on a hunger strike due to delusional beliefs of being persecuted.  At that
time, he denied auditory and visual hallucinations or ever being suicidal; however, he
exhibited paranoid delusions and appeared to be responding to internal stimuli.  The
psychiatrist determined that the inmate should be transferred to a higher level of care in the
EOP, and Abilify was offered to treat his psychosis; however, he was not prescribed
psychotropic medication.  A SRE dated 7/15/09 noted that the clinician determined that the
inmate was not at risk for suicide; although he remained on a hunger strike.

In 2009, the inmate subsequently received diagnoses of Delusional Disorder and Bipolar
Disorder Manic.  In August 2009, Abilify was prescribed, but the inmate refused the
medication and it was discontinued.  During the latter part of 2009, his diagnosis was again
changed to Psychotic Disorder NOS; he repeatedly requested removal from the EOP and
refused antipsychotic medications.  It was also noted that he was not participating in
groups because of his legal issues.  Different mental health clinicians saw him and gave
differing opinions as to his mental health symptoms; these opinions varied from the
presence of no behavioral problems and a psychotic disorder in remission to the inmate
actively responding to internal stimuli with delusional thinking.

The inmate remained in the EOP, but the CDCR suicide report made reference to the
MHTS indicating that he had been scheduled for approximately 772 mental health
appointments but only attended 175 of them, refusing all others.  Moreover, 28
appointments were noted as having been cancelled as the provider was unavailable; and 40
were cancelled due to custody-related issues.  The CDCR suicide reviewer noted that based
on review of the entire UHR prior to the final two months of his life, the inmate was
isolative and withdrawn; however, his level of group attendance and EOP participation had
increased significantly in the last two months of his life.  The reviewer attributed this
increase to the assignment of a new primary clinician in early December 2010.  However,
it was also noted that the day prior to the inmate's suicide his appointment with his
primary clinician was cancelled due to a mandatory mental health staff meeting.

Records indicated that in May 2010 there was consideration of referral to a higher level of
care at DSH due to the inmate's problems functioning in the EOP.  However, the IDTT
and primary clinician expressed concerns that a move to DSH might be counter-therapeutic
because the inmate "had created somewhat of a life for himself" and "is psychotic but

contains himself". The record also indicated that the inmate did not want to go to DSH, had no insight into his mental health issues, did not want to take medications, and was not in a state of decompensation that would make him eligible for a Keyhea order. A review of the physician's orders and MARs indicated that the inmate was prescribed Vistaril, Lithium, Zyprexa, and Olanzapine, and he was adherent between July 2003 and October 2006; although there were some medication refusals during 2004. The inmate, however, refused his prescriptions for Lithium and Abilify from January 2007 until his death. The treatment team concluded that he was generally coping well, as he was busy with legal work, he cleaned himself daily, and he spent time in the library; however, but he was also psychotic, "yells at walls at night", and he had paranoid delusional thinking. The conclusion was that "he has created a stable existence for himself". The reviewer noted that during the screening for possible DSH referral in August 2010, the inmate met two indicators for DSH referral including inability to function at the EOP level of care and less than 50-percent overall participation with programming or with the treatment plan. DSH referral was not recommended, however, "due to concerns about the destabilizing effect of a significant change in his environment".

A psychologist completed a SRE on 9/15/10 to formulate treatment planning. It was noted that the inmate had been receiving mental health services at the EOP level of care with an EPRD of 12/3/17. Sources of information included correctional officer or staff interview, inmate interview, and the UHR. Suicide risk factors included ethnicity, history of substance abuse, suicide ideation/threats in 1991 and 2006, and history of mental illness including psychosis and mood symptoms since at least 2006. Additional risk factors included third prison term, history of poor impulse control or poor coping skills, anxiety, agitation, or fearfulness, disturbance of mood, poor compliance for treatment or medication, and single cell placement. Family support was the only protective factor, and insight into the problem was noted to be very poor. The summary of the evaluation was that the inmate did not present a danger to self, and there was no evidence of suicidal thought, plan or intent. The conclusion was that there was no apparent significant risk, and no referral was indicated.

In December 2010, the inmate's diagnosis was changed to Schizophrenia Undifferentiated Type, and he again continued to refuse medication. His last mental health contact occurred on 1/19/11 when he told his primary clinician "I'm feeling really good". He reported that the groups helped him to feel less depressed, and he was doing homework to cope with a lockdown. He also reported that despite continued psychotic symptoms, he was sleeping and eating well, denying dangerousness to himself or to others; he was evaluated as being stable. He attended a group the following day when he was noted to be cooperative, but he was unable to remain focused on the group discussion. He committed suicide five days later, on 1/25/11. He did not leave a suicide note; however, he left letters to his family that were not traditional suicide notes as they ended abruptly regarding his future plans following parole in 2017; the letters were initiated during 2010 with notes entered at different dates.

The CDCR suicide reviewer noted that the information in the inmate's mental health history revealed documentation that was difficult to follow due to missing dates and notes and incorrectly recorded dates. However, the CDCR suicide reviewer also noted consistent statements as to the inmate's refusal to accept medication, denial of and poor insight into his mental health problems, refusal to attend groups until the month prior to his death,

refusal to participate in EOP treatment, and his fixed delusional beliefs about a conspiracy to keep him in prison and that people could read his mind.  There was conflicting information regarding his suicide attempt history in the UHR and unconfirmed community hospital reports.

The inmate did not appear to have had a significant medical history other than Hepatitis C and a history of back pain.  He had engaged in a hunger strike in July 2009 related to his beliefs of staff misconduct regarding a missing UHR.

The CDCR suicide reviewer noted that four concerns were generated; three resulted in formal problems requiring quality improvement plans, and the fourth concerned decisions regarding referral to a higher level of care.  The reviewer noted that although he had not been referred to DSH, records indicated that a higher level of care was often considered; documentation highlighted mental health staff's ongoing dilemma of maintaining the inmate in close proximity to his support and family or sending him to DSH where he would not have the benefit of having family close enough to visit regularly.  The reviewer also noted that the inmate did not want to go to DSH, did not qualify to be placed on Keyhea status, and "together with the fact that he was not considered to be gravely disabled or a danger to himself, cast doubt on the benefit of a referral to DMH for this inmate".  The reviewer concluded that the "treatment team monitored him closely to provide the best treatment possible".  The reviewer concluded with "it's not clear the treatment at DMH would have benefited the inmate given his need to isolate and consistent refusal to attend group treatment".  It was also noted that the factors involved in the decision to refer an inmate to a higher level of care would be explored via the monthly suicide videoconference for the benefit of clinicians statewide.

The CDCR suicide report identified three problems and quality improvement plans as follows:

Problem 1:  Prior to the initiation of CPR, inmate __ was carried out of the building and placed on the grass area outside of the building rather than outside his cell.
    Quality Improvement Plan:  The Warden or designee and a Chief Executive Officer at CSP/LAC shall: (1) Conduct an inquiry into the reasons why the inmate was taken outside the building before CPR was initiated.  (2) If necessary, revise Local Operating Procedures (LOPs) to include guidelines regarding an acceptable distance an inmate may be transported prior to the initiation of CPR.

    Problem 2:  During discussion of this case by the Suicide Case Review Focused Improvement Team, it was noted by CSP/LAC nursing staff, that the AED is locked in a room on a unit during first watch.  During the meeting the incident reports was not reviewed again to confirm the first use of the AED which was in the TTA.  Documentation did not indicate that the AED was brought to the scene of the initial emergency response measures.
    Quality Improvement Plan:  The Warden or designee and Director of Nursing or designee and CSP/LAC shall ensure that the AED is immediately accessible to first responders on each watch.  Local Operating Procedures (LOPs) shall be updated to correspond with the change in accessibility of the AED.  Staff shall be trained on updated procedures.

Problem 3:  Information pertaining to the inmate's mental health history was often difficult to follow because apart from some anticipated occurrences of illegible handwriting, there were also missing dates and notes, as well as incorrectly recorded dates. For example, upon arrival at CSP/LAC on 6/11/09, the initial health screen CDCR-7277 did not have an arrival date or arrival time documented.

Quality Improvement Plan:  The Chief of Mental Health or designee at CSP/LAC shall provide an in-service training to all mental health staff regarding clear and accurate documentation in the UHR.

A Death Review Summary was provided on 4/18/11.  The primary cause of death was noted as suicide by hanging; co-existing conditions were Hepatitis C, Schizophrenia, and right inguinal hernia.  The physician provided an executive summary of the inmate's medical care and the emergency response; it was determined that the medical care six months prior to his death did not depart from the standard of care, and there were no systemic concerns.  Nursing issues were deferred to nursing counsel.  A Nursing Death Review Summary was provided on 2/28/11 and concluded that no nursing issues were identified.

On 10/4/11, the Deputy Director (A), Statewide Mental Health Program, California Correctional Healthcare Services and the Director (A), Division of Adult Institutions provided their report on implementation of the Quality Improvement Plan for this inmate's suicide in response to the CDCR suicide report dated 4/7/11.  In this report, the Directors provided the following responses: With regard to quality improvement plan number one, all three of the officers that took the inmate outside of the building before CPR was initiated responded that they did not have a clear reason why the inmate was carried out of the housing unit.  They indicated that they believed that they were assisting each other and followed the group to the grass area, outside of the housing unit.  LOP number 535 developed in April 2000 and revised in October 2010 was also provided with the title Emergency Medical Response/Emergency Response Review Committee.  The LOP indicates that in the event that medical staff had not arrived and onsite custody personnel did not possess sufficient medical certification to initiate appropriate basic life support, the inmate shall be transported immediately to the nearest medical treatment area/clinic. However, the LOP appeared to be silent as to whether first responding custody officers should initiate CPR at cell side rather than transporting the inmate outside of the building. Additional policies on the emergency response system and process were also provided.

With regard to Quality Improvement Plan number two, the nurse instructor clarified that the AED was carried with the emergency response team; and therefore was always accessible during an emergency; the procedure was documented in the current LOP. Furthermore, a memo issued by the supervisory registered nurse II and dated 9/22/11, informed staff that "Mary 3 (the housing unit) is equipped with an AED at all times, and in the event of an emergency please inform TTA/Mary 3 staff of the need for the AED as soon as possible".

With regard to the Quality Improvement Plan concerning UHR documentation at CSP/LAC, a QIT was generated to train staff on clear and accurate UHR documentation; training for mental health staff was conducted on 4/13/11 regarding the importance of thorough and accurate UHR documentation.  A copy of the training agenda and sign-in sheets was provided.

**Findings**: This inmate's suicide does not appear to have been foreseeable in that he was not reporting suicidal ideation in the days to weeks prior to his actual suicide. However, his suicide may very well have been preventable had he been referred to a higher level of care. The inmate had a history of suicide attempts and, more recently, had unstable mood, agitation, and increasingly psychotic thinking and behavior. His delusional and paranoid beliefs were clearly documented, but it appeared from the record that some staff who were completing updated assessments or SREs did not review the prior UHR documented history, but rather relied on the inmate's denial of suicidal ideation. Despite that denial, he had a positive history and was becoming increasingly more psychotic and decompensating. He refused medications and was not actively participating in treatment. Staff reported that they considered DSH referral and documented that the inmate had no insight into his mental health issues; and he continued to present with psychosis including yelling at the walls at night and appearing to be responding to internal stimuli (suggestive of hallucinations). He also had fears that others were trying to kill his parents and that he would rather die than to have that occur. The rationale for not referring him to DSH appeared to be based on a belief that he had "created a stable existence" for himself and "contains himself" despite his deteriorating condition. The inmate met criteria for DSH referral consideration for several months prior to his suicide; his suicide may have been prevented had he been appropriately referred for treatment to a higher level of care.


**3**. **Inmate C**
Brief History:  This inmate was a 37-year-old Caucasian male who committed suicide by hanging on 1/30/11 at California Men's Colony (CMC). He was a participant in the EOP and was double celled at the time of his death. He was discovered by his cellmate who was returning from church and called "man down," and other inmates also assisted. The inmate entered the CDCR via the San Quentin State Prison Reception Center (SQ RC) on 10/1/92 after he was convicted of murdering his mother and received a 26-years-to-life sentence. His MEPD was 1/9/10; however, his parole board hearing on 1/15/09 resulted in a seven-year denial, which was modified to a three-year denial on 4/17/09.


The inmate was discovered on 1/30/11 at approximately 11:09 a.m. by an officer responding to a "man down" call in Building 7. The officer initiated a Code One response via his handheld radio and ran to the cell. When the officer looked through the cell door, he observed the inmate suspended by the neck from a strip of blue material fashioned into a noose with the other end attached to the air vent above the toilet in the cell. The officer saw the inmate's cellmate in the cell attempting to help the inmate by lifting him at the waist to relieve the pressure on his neck from the noose. The officer initiated a Code One response via his personal alarm device and yelled for another officer to retrieve the cut-down tool. The other officer obtained the cut-down tool, and as he was responding, the first officer entered the open cell door and tried to untie the noose as the cellmate continued to lift the inmate. The second officer arrived at the cell, handed the officer the cut-down tool, and the noose was cut from around the inmate's neck. The officer and cellmate laid the inmate on the cell floor, and the cellmate exited the cell. The second officer removed the inmate from the cell and onto the tier floor when two additional officers initiated CPR. Medical staff arrived and continued lifesaving measures. Emergency personnel responded and transported the inmate in the ETV to the CMC East Clinic.

The timeline provided in the incident report indicated that at 11:09 a.m., the Code One medical response was initiated by the first officer utilizing his personal alarm device and CPR was initiated.  At 11:11 a.m. custody staff requested the response of the ETV to Building 7, and by 11:17 a.m. the fire captain arrived on the scene.  At 11:30 a.m. the ETV departed the building; it arrived at the CMC East Clinic at 11:32 a.m.  CPR continued in the emergency room at 11:33 a.m. until 11:45 a.m., when the physician pronounced the inmate dead.  An autopsy report was provided by the San Luis Obispo County Coroner's Office, indicating that a limited autopsy was performed on 2/2/11.  The cause of death was reported as asphyxiation (minutes), ligature strangulation (minutes).  No toxicology report was issued.

The suicide report recounted the inmate's criminal justice history and stated that he had been arrested as a juvenile at age 16 for misdemeanor burglary, and he was made a ward of the juvenile court.  At age 17 he was arrested for receiving stolen property and was placed on probation, which included participation in a work program and community service.  However, he was also abusing drugs including marijuana, cocaine, methamphetamine, and lysergic acid diethylamide (LSD), resulting in his placement in juvenile hall.  He was released from juvenile hall three weeks prior to committing the instant offense at age 18.  The instant offense occurred in May 1992 when the inmate murdered his mother after an argument regarding growing marijuana plants in her home and refusing to clean the house or to look for work; she ordered him out of the house.  He subsequently beat his mother with a wooden bat and stabbed her multiple times, placing her body in a state park.

The inmate had a history of treatment for mental illness beginning as a child when he was treated with Ritalin by his self-report.  He began abusing drugs, initially using marijuana at age 12 and progressing to other drugs as listed earlier in this report.  He continued to abuse drugs while incarcerated and reportedly contracted HIV after his incarceration.  He next received mental health treatment, including Zoloft, for depression while in jail.  The record also referred to a suicide attempt by cutting his wrist while in jail.  His depression in jail was attributed to his extreme guilt and remorse for killing his mother; he had suicidal ideation prior to his CDCR incarceration.
The inmate entered the SQ RC on 10/1/92.  The psychiatrist saw him on 10/5/92 after initial screening revealed treatment for depression at the county jail.  He was prescribed Elavil and transferred to Calipatria State Prison (Calipatria), but he was redirected to California State Prison, Sacramento (CSP/Sac) because he was prescribed a heat medication.  While at CSP/Sac, he cut his wrist on 1/3/95, and he was treated in the infirmary.  He was placed in the MHSDS at the 3CMS level of care on 9/8/95, even though he had been receiving antidepressant medications since 1992.  Records also indicated that he was using heroin with his cellmate during the early 1990s and was raped at CSP/Sac in 1994.  After placement in the MHSDS, there was documentation of treatment planning and regular mental health contacts; he was provided with a diagnosis of Major Depressive Disorder, Moderate to Severe.  He transferred from CSP/Sac to CMC in March 1998 and in December 1998, he was sent to Atascadero State Hospital (ASH) for seven months after he had reported suicidal ideation.  Upon his return to CMC in July 1999, he was placed in the EOP; however, he was returned to the 3CMS level of care approximately three months later.

After his return from ASH in July 1999, he was placed at either the EOP or 3CMS levels of care until his second admission to ASH that occurred from May 2006 through December 2007. He subsequently returned to CMC at the EOP level of care. Since September 1995 the inmate had been provided with diagnoses of Major Depressive Disorder with or without psychotic features, PTSD, Polysubstance Dependence and Antisocial Personality Disorder. A psychologist performed a SRE on 12/13/07 to determine the need for the inmate's referral to the MHCB. He was listed at the EOP level of care, but no sources of information were noted. Multiple identified risk factors included "cut self in the past". No protective factors were listed. The summary indicated that the inmate had some chronic risk factors, but minimal acute risk for suicide. The plan was to recommend placement in the TLU; the form also noted that the inmate posed both low and moderate risk.

After his return from ASH in December 2007, the inmate was again placed at the EOP or 3CMS levels of care until January 2010, when he was transferred to the MHCB. The MHCB placement was related to his learning of his grandmother's death in January 2010 with recurrent suicidal ideation. A social worker completed a SRE on 1/27/10; the reason for the evaluation was to assist with MHCB discharge planning. Sources of information were the inmate interview and UHR. Risk factors included ethnicity, history of violence, substance abuse, suicidal ideation/threats, previous suicide attempts in 1995 and 2006, and history of Major Depressive Disorder. Additional risk factors were life sentence and history of impulse control or poor coping skills by history. No dynamic risk factors were noted. Supportive factors included support of friends, and another was listed as "CCCMS". In summary, the social worker noted that the inmate/patient denied current suicidal ideation and/or plan and agreed to tell staff if he became suicidal. The estimate was low risk, and the plan was to discharge the inmate to a lower level of care.

After learning of his grandmother's death, the inmate had suicidal ideation. Two SREs were performed by psychologists in the MHCB on 1/25/10 and 1/27/10. On 1/25/10, the psychologist evaluated the inmate and determined that his level of suicide risk was high chronic and moderate acute risk. However, two days later on 1/27/10, the psychologist evaluated his estimate of risk as low, and the inmate was discharged back to the 3CMS level of care. He was noted to have continued suicidal ideation. He also had a fight with his cellmate in February 2010 resulting in a level of care change to EOP on 2/10/10 and a recommendation for transfer to ASH. A psychologist completed a SRE on 2/12/10; the identified reason was to formulate treatment planning, but sources of information were not noted. Identified multiple risk factors included ethnicity, history of violence and substance abuse, history of chronic suicidal ideation, previous suicide attempts in 1995 and 2006, and history of mental illness. Other risk factors were his life sentence, poor coping skills, HIV+ status, suicide intent two weeks prior, recent loss of grandmother, disturbance of mood, perceived lack of a support system, hopelessness or helplessness, and feelings of guilt and worthlessness. Protective factors were family support and job assignment. The estimate of suicide risk was determined as moderate. The inmate was noted to be noncompliant with psychotropic medications, treatment groups, and medical medications. He also stated that he wished to die of AIDS and thus would not take HIV medications.

A psychologist completed a SRE on 3/1/10 at CMC East. The reason for the SRE was to determine the need for the inmate's referral to the crisis program. Sources of information were listed as correctional officer or staff interview, inmate interview, and the UHR.

Multiple noted risk factors included ethnicity, history of violence, substance abuse, suicidal ideation, previous suicide attempts in 1995, 2002, 2005, and 2006, family history of suicide, and history of mental illness of Major Depressive Disorder and Polysubstance Dependence.  Also noted were history of self-mutilation, first prison term, longer life sentence, disciplinary actions, and chronic series of terminal illness.  The only dynamic risk factor was the perceived lack of a support system.  Protective factors were family support and exercises regularly.  The estimate suicide risk was determined as chronic moderate risk and acute low risk.  The narrative noted significant static risk factors; the inmate was stable on psychotropic meds, but he would passively allow an opportunistic illness to kill him. The plan was to refer him to the primary clinician.  He was ultimately transferred to ASH on 3/4/10; while at ASH the inmate attempted to hang himself on 4/22/10.  He continued in treatment at ASH, but he once again attempted to hang himself on 8/27/10.

The ASH discharge summary dated 11/14/10 provided a diagnosis of Major Depressive Disorder Recurrent Moderate, Polysubstance Dependence and Antisocial Personality Disorder with Borderline Features. In addition, the summary noted the presence of a chronic viral illness and life sentence as well as the recent death of his grandmother and no family support; he was provided with a GAF score of 40.  It was noted that the inmate was not suicidal at that time, and he was taking care of his activities of daily living skills and participating in treatment.  The recommendations provided were that the inmate should maintain compliance with psychotropic medications indefinitely (which at the time of discharge included Melatonin, Lamictal, Celexa, and others for his medical problems) and should participate in other forms of therapy such as group therapy and/or individual therapy.  It was also noted that "statistically speaking" he should be considered at high risk for attempted or completed suicide based on both static and dynamic risk factors; however, he was not on an increased level of observation and he denied suicidal ideation.

The inmate was discharged from ASH, and a psychiatrist performed a SRE on 11/22/10.  This evaluation form included a Part I and Part II.  He was noted to have been seen at the R&R intake upon his return from ASH.  Sources of information were the inmate and the UHR.  Identified multiple chronic risk factors included family history of suicide, history of emotional abuse, Major Depressive Disorder, chronic pain problems, chronic medical illness, substance abuse, history of violence, poor impulse control, longer life sentence, ethnicity, age, gender, and history of suicide attempts.  The only identified acute risk factor was recent change in housing.  Protective factors included family support, interpersonal social support, future orientation, job assignment, active and motivated in treatment, and sense of optimism.  Part II of the SRE (Form CDCR-7447) (Rev. 03/10) provided narrative details describing the inmate's mental status.  The estimate of suicide risk was moderate chronic risk and low acute risk.  The plan was to house the inmate in D-quad housing unit with follow-up by the EOP psychiatrist within one week to discuss the inmate's wish to discontinue Celexa and to resume Effexor.

A psychiatrist's progress note was also written on 11/22/10 after the inmate's return from ASH.  In the note, the psychiatrist described the inmate's return from ASH after eight months, the inmate's belief that he had improved, and that he only wanted to discuss changing his antidepressant to Effexor.  The psychiatrist reviewed suicide risk factors, and the inmate provided reasons why he was not at risk at that time; the psychiatrist also

referred to the SRE dated 11/22/10. The inmate was noted to be stable at that time, and the plan was to house him in D-quad with follow-up with the EOP psychiatrist.

Another note written by a different psychiatrist dated 11/30/10 reviewed the inmate's history and return from ASH; at that time, the inmate reported that his level of depression was ranked as a two out of ten, in which ten was the worst imaginable depression. He stated that his highest level of depression on that week was ranked as five. He denied current suicidal ideation or homicidal ideation. The psychiatrist noted his history of suicide attempts including his attempts at DSH, ASH hospitalizations, medications that he had taken in the past, and his substance abuse history. He conducted a mental status examination and assessed the inmate as having Major Depressive Disorder Recurrent; the inmate was reportedly stable on medication, and the plan was to continue Lamictal and Celexa. The IDTT saw the inmate on 11/30/10, when his treatment plan and mental health placement were reviewed; he was continued at the EOP level of care. The primary clinician saw the inmate on a weekly basis after his return from ASH; the last appointment was occurred on 1/24/11.

The inmate continued to receive antidepressant and mood stabilizing medications; since 2009 his medications consisted of Lamictal and Prozac, which were changed to Lamictal and Effexor, until the time of his death. He had a brief period when Celexa was substituted for Effexor, but it was changed back to Effexor in December 2010. He was also prescribed Lithium, Lamictal, Prozac, Risperdal Consta, Remeron, Wellbutrin, and Seroquel during incarceration.

After the inmate returned to CMC at the EOP level of care, he began weekly meetings with his primary clinician and was placed in two groups. He was on a wait list for other groups including a recovery group and a depression management group. Individual therapy which he had received prior to his transfer to ASH was terminated.

The inmate was also receiving medications for HIV treatment, which had been diagnosed in 2001. Records indicated that beginning in 2005 he had been intermittently refusing treatments reportedly because the medications were not effective and "he wanted to hasten his death in prison". A public health follow-up progress note dated 2/17/10 noted that he had asymptomatic HIV, and his symptoms were not of the severity to reach the AIDS range. It was also noted that the inmate was not interested in resuming medications and would not elaborate further. On 1/26/11, he signed a refusal regarding HIV medications stating "I don't feel I need it". At the time of his death, he was prescribed Simvastatin, but he had signed a refusal on 1/26/11.

The suicide report and UHR made reference to the inmate's placement in ASU in April 2002 for "slashing an inmate", in July 2002 for refusing a cell move, and in March 2009 for suspected sexual battery on an inmate which was subsequently dismissed. The suicide report also referenced RVRs for self-mutilation when he cut his wrist in 1995, inmate-manufactured alcohol in November 2000 and November 2009, theft in December 2000 and December 2009, refusal to house in 2002, mutual combat in 2005, and unauthorized use of the copy machine in January 2009. There was no reference in the RVR reports cited in the suicide report to the "slashing" incident during 2002 or suspected sexual battery in March 2009.

A psychiatrist note dated 12/28/10 indicated that the inmate reported lower energy levels while on Celexa, and he wanted to resume treatment with Effexor. He exhibited poor eye contact and a flat affect, but he denied suicidal ideation, homicidal ideation, auditory hallucinations, and paranoia. The psychiatrist indicated that he had also exhibited apathy, but with good impulse control and clear speech. He was provided with a diagnosis of Major Depressive Disorder, Recurrent; the plan outlined was to discontinue Celexa, continue Lamictal, and to start Effexor the following morning with return to the clinic in four weeks.

Records indicated that the inmate had his last mental health contacts on 1/24/11 with his primary clinician and on 1/25/11 with his psychiatrist. The last primary clinician progress note was dated 1/24/11 and indicated that the inmate presented with "sad, but not cheerful affect today". The note further stated that there was discussion of several goals, including his desire to find more social outlets through a job change or relationships, need for a job change, ways to pursue more independent self-care and to meet his emotional needs more responsibly, and a possible cell change. The psychologist also indicated that the inmate exhibited no evidence of suicidal intent; he was described as stable and working five days per week in PIA, but he wanted a job that kept him busier. It also noted his interest in expanding his coping skills. The inmate also requested more group therapy. The psychiatrist reportedly noted that the inmate appeared to be doing better than when he first returned from ASH, and he reported no suicidal ideation for the prior three days. The inmate also reportedly was eating and sleeping well, as well as going to work and yard. He was a scorekeeper for basketball on Saturday and anticipated participating in a game on Sunday; however, when the inmate's cellmate returned from church on Sunday morning, the inmate had killed himself by hanging.

The suicide report reviewer noted that no problems were identified and no quality improvement plans were generated by the inmate's suicide. The reviewer noted a concern; however, that was also shared by CMC mental health staff that upon his return from ASH, the inmate did not immediately rejoin the clinical groups that he had been involved in before his transfer. He was referred to Narcotics Anonymous and a Lifers Group, but he refused both. He was also scheduled for a Dialectical Behavior Therapy group, and he had been placed on that group's wait list. The reviewer compared this lower level of activity to the increased activities that the inmate had experienced while at DSH and noted that a transition group at CMC could have provided him "with a less jarring experience following DMH placement". CMC staff also reported to the reviewer that they were reviewing their own group process including how decisions were made for group placement and acceptance of inmate/patients into particular groups by group leaders. The reviewer concluded the suicide report by stating that review of the group process would be an improvement in services but did not rise to the level of a formal recommendation; CMC's QIT would focus on improvement of the group treatment process.

The inmate received individual therapy on a weekly basis from a psychologist in 2009 and 2010, but there were times when he did not come to therapy. Therapy notes indicated that there were attempts to discuss termination of individual therapy before his transfer to DSH; the inmate was thus aware that he would not be returning to individual therapy after his return from DSH. This was again discussed in the final individual therapy session on 3/3/10 prior to his transfer to ASH.

71

A Death Review Summary was completed by a physician on 5/3/11 and submitted on 5/12/11. It noted the inmate's diagnoses and cause of death as suicide. It also noted that a contributing cause analysis indicated a failure in provider to provider communication in that documentation was missing to show that medical providers were communicating with mental health providers regarding to the possibility of worsening depression, which may have required DSH transfer in December 2010.

**Findings**: This inmate's death does not appear to have been foreseeable or preventable. The inmate had a history of Major Depressive Disorder and chronic suicidal ideation which waxed and waned from the time of his instant offense until his death in CDCR more than 17 years later; it was related not only to his guilt, remorse, and grief regarding the murder of his mother but also to a family history of depression and suicide. He had been treated by mental health staff over the years with a variety of medications and interventions at the EOP level of care, SREs when indicated, and transfers to ASH at the intermediate care level when indicated. He had returned from ASH two months before his suicide and was seen by his primary clinician on a weekly basis, by a psychiatrist on a monthly basis, and the IDTT had provided treatment planning which included a return to group therapies when they were available. The inmate did not have the benefit of individual therapy upon his return, although termination of individual therapy had been discussed prior to his transfer to ASH. The ASH discharge summary had follow-up recommendations that CMC EOP clinicians appeared to follow. The inmate also had HIV disease, and medical staff followed him for his HIV status; the inmate had a history of adherence to HIV medications that waxed and waned with his statements that he wanted to die a natural death.

The internal CDCR review generated concerns as to whether the CMC group process was adequate; the CMC quality management process was reportedly reviewing their processes for group therapy participation. The Death Review Summary noted concerns regarding provider to provider communication and the possibility of the inmate's worsening depression due to his changing HIV status and the need for medical staff to communicate his medical condition to mental health staff. However, mental health staff was aware of his HIV condition, saw him regularly, and conducted mental status examinations and assessments of suicidality which appeared to have been appropriate based this review. Although potential improvements in the process were to be reviewed, the inmate's care and treatment were adequate.

## 4. Inmate D

Brief History: This inmate was a 20-year-old Caucasian male who committed suicide by hanging on 2/5/11 at High Desert State Prison (HDSP). He was a participant in the MHSDS at the 3CMS level of care. He was double celled in the ASU at the time of his death. He entered the CDCR via Deuel Vocational Institution Reception Center (DVI RC) on 3/4/10. He had been convicted on four counts of child abuse/endangerment with an enhancement due to great bodily injury of a child under five years of age. He was sentenced to 16 years in prison; his earliest minimal release date (EMRD) was not provided.

The inmate was discovered on 2/5/11 at approximately 1:45 p.m. hanging from the light fixture in his cell by what appeared to be a white piece of material. Two floor officers responded when the inmate's cellmate began yelling "man down" and called a Code One medical emergency. The lieutenant entered the section and gave permission to remove the

inmate and to place him in the shower. As responding staff entered, the lieutenant ordered them to put on Personal Protective Equipment (PPE). The sergeant arrived at the cell and announced on the radio that there was "a hanger" and for the RN Rover to respond as soon as possible. Four officers arrived at the cell with their PPEs on, and the sergeant ordered the door to be opened. Three of the officers held the inmate up while the fourth officer cut down the noose. The inmate was placed on a gurney and an unidentified RN cut off the noose from his neck. One officer immediately began chest compressions, and a LVN began administering the ambu bag. The inmate was placed in the ambulance, and the ambulance left for the CTC; CPR continued en route to the CTC. While en route to the CTC TTA, a pulse was detected. The inmate was then transported via helicopter to an outside hospital.

The crime/incident report part B-2 (CDCR-837-B1) did not describe timelines after the inmate's discovery. The CDCR suicide report provided additional detail. The additional detail included the following information: the cell door was opened, and the cellmate was removed as the three officers held up the inmate's body while the fabric between the light fixture and his neck was cut with scissors; the scissors had been supplied along with the emergency kit cut-down tool by the control officer as requested by the responding officer. Additional detail included the inmate's placement on the Stokes litter, and the registered nurse cut the noose from his neck; the AED was utilized, and it indicated asystole. An officer then began chest compressions, a LVN utilized the ambu bag, and the inmate was transported to the TTA as noted in the crime/incident report.

Additional information in the CDCR suicide report included that a carotid pulse was detected approximately 20 minutes after the start of CPR. After the inmate had arrived at the TTA emergency room, staff there assumed care and ended CPR when cardiac rhythm was established. Ventilation was maintained via the ambu bag with 100-percent oxygen as TTA staff members unsuccessfully attempted intubation twice. The CDCR suicide report described the inmate as pink and pale after the establishment of sinus tachycardia, but he remained hypotensive with blood pressure readings of 70/40 despite two intravenous administers of normal saline. Dopamine was administered, and his blood pressure improved to 80/62. The CDCR report continued that TTA staff noted a delay of 10-15 minutes in obtaining a correctional officer to accompany the inmate in the helicopter. At 3:09 p.m., the inmate was transported via helicopter to Renown Medical Center in Reno, Nevada. While en route, LifeFlight personnel successfully intubated the inmate, and he was placed on life support equipment at Renown Medical Center. Progress notes from the Intensive Care Unit (ICU) documented a progressive neurologic deterioration. The inmate was declared brain dead on 2/8/11, and life support was withdrawn. He died at 12:27 p.m.

The timeline provided in the CDCR suicide report was approximate, as follows:

13:40-cellmate alerted staff of hanging inmate; staff responded, alarm activated.
13:45-custody staff cut inmate down, checked for vital signs, placed on litter, began CPR.
13:48-AED arrived and applied, indicated asystole, CPR continued.
13:50-sergeant arrived, radioed for RN to respond as soon as possible.
13:51-physican and ambulance notified.
13:52-ambulance left D-7, CPR continued en route to CTC TTA.
13:53-ambulance arrived at CTC, RNs took over CPR and advanced cardiac life support measures were initiated.

14:00-cardiac pulse detected.
14:08-Sinus tachycardia detected; no respirations; RN called helicopter; ACLS measures continued.
14:40-ambulance left TTA for helipad.
15:09-LifeFlight departed for Renown Medical Center, Reno.
12:27 on 2/8/11-inmate died after removal of life support equipment following physician declaration that inmate was brain dead.

A provided autopsy report was dated 2/10/11, but the report did not state where the autopsy was performed. The names of the two medical examiners were stated with signatures on 3/16/11. Determination of the autopsy protocol stated that the final pathologic diagnoses were (1) hanging by ligature, and (2) surgical absence of heart, major vessels, lung, kidneys, portions of gastric intestinal tract; status post-organ donor procurements. The medical examiners stated their opinion that the 20-year-old Caucasian male died due to asphyxia due to hanging by ligature, and the manner of death was deemed to be suicide. A toxicology report was provided and reported that the only positive findings were for acetone in a blood sample.

The CDCR suicide report recounted the inmate's criminal justice history which consisted of only juvenile offenses prior to the commitment offenses. The inmate was found guilty of burglary at age 16 and placed on probation for stealing two bottles of whiskey from a liquor store. He violated probation at age 17 by leaving home without permission twice and using marijuana and ecstasy. In 2008, at age 18, he committed the commitment offense. He was living with his girlfriend and her seven-month-old child, and the girlfriend attempted suicide on or about 10/20/08. The child was taken into protective custody. While changing the baby's diaper, the social worker noticed extensive bruising on the child's genitals, buttocks, and both sides of her jaw. Forensic examination revealed further bruising on the inner thighs, multiple fractures of the ribs, wrists and both legs, and evidence of sexual abuse to both the vagina and anus. Both parents denied noticing the bruising and denied any knowledge of the injuries. The girlfriend further explained that her daughter fell down a lot. However, the girlfriend subsequently acknowledged that she noticed the inmate being too rough with the baby and had noticed the bruising, temporarily leaving him but subsequently returning to him.

The inmate and his girlfriend were arrested in January 2009 and both were convicted and sentenced to CDCR terms. In preparing a probation report to the court, the inmate denied responsibility for the child's injuries, for seeing the bruises, and for sexually abusing the child. The inmate was tried on four counts of abusing or endangering the health of a child with an enhancement for infliction of great bodily injury on a child under five years of age during the commission of a felony. A jury convicted him on 1/26/10, and he was sentenced to six years on the felony counts and ten years for the enhancement, for a total of 16 years.

The psychosocial history indicated that the inmate had a history of mental health treatment as early as age 14 when he was in the Midtown Community School. In 2006, the juvenile drug court ordered him to undergo treatment for substance abuse, but he was dismissed from the program because he continued to actively use drugs. Records indicated that he attempted to commit suicide by hanging himself at age 16, and he was treated for depression with Effexor at ages 16 and 17. The record did not indicate that he had

treatment in the county jail prior to his transfer to CDCR on 3/4/10.  The mental health screening was negative for medical or mental health problems and treatment.  A brief mental health screening that was dated 3/5/10 did not result in referral for further mental health assessment.  That same day, the inmate received a developmental disability screening which indicated that he was not in need of services and was not developmentally disabled.  He was placed in the ASU for safety concerns after being the victim of battery by another inmate on 3/11/10.  On 3/18/10, he was released from the ASU and was placed on an SNY at DVI-RC.  On 3/28/10 the inmate submitted a healthcare services request form that stated that he was feeling depressed and having trouble eating.  He was referred to a clinician, but was not placed in the MHSDS, despite his stating that he had been prescribed Zoloft in the past.  He refused referral to the 3CMS program; despite his complaints of sleep and appetite disturbances.

The inmate was placed in the Outpatient Housing Unit (OHU) on suicide watch on 6/6/10, after stating that "I feel like killing myself."  He reported that his grandmother had died; he had a lengthy prison sentence, and he had safety concerns as he had heard that an inmate had recently been killed at the facility.  His diagnosis was Adjustment Disorder with Depressed Mood.  He was prescribed Prozac, and he was placed at the 3CMS level of care.  He was released from the OHU on 6/8/10 when he reported improved mood, appetite, and sleep.  After his placement in the SNY, he was assaulted on 6/27/10 in a dining hall and was ultimately placed in the ASU.

On 6/29/10, the inmate was transferred to HDSP as he was unable to be transferred to another Level III facility with an SNY because his security point score was too high.  Records indicated that he had no contact with mental health prior to 7/18/10, despite his history of suicidal ideation, which required a SRE to be completed upon his arrival at HDSP.  An IDTT was conducted on 6/21/10, and the inmate was continued at the 3CMS level of care for medical necessity with SNY housing.  His diagnosis continued as Adjustment Disorder with Depressed Mood, and his medication continued as Prozac until 7/26/10, when Prozac was discontinued and he was prescribed Effexor.  On 8/21/10 he was again a victim, this time of extortion, battery, assault, and threats by members of a SNY gang called "Brothers By Choice"; he was then placed in the ASU for safety concerns.  The ICC met five days later on 8/26/10 and reduced his points so that he was eligible for the Level III SNY; he was referred to the SNY at Mule Creek State Prison (MCSP).  The inmate remained housed in the ASU pending transfer; he was cleared to have a cellmate, and he was seen by mental health staff timely in compliance with the Program Guide for 3CMS inmates.

By September 2010, the inmate saw clinicians at cell front because he refused out-of-cell contacts; he also had variable medication compliance.  On 11/24/10, he told his psychologist that he had no motivation and found it "hard to focus".  He was also refusing medications, due to reported side effects of nausea and diarrhea.  His dosage was reduced from Effexor 225 mg per day to 150 mg per day, and he became adherent with medications.  He continued to have cell-front contacts with his psychologist and the psych tech from September 2010 until the time of his suicide attempt on 2/5/11.  The ICC met on 12/16/10, retained him in the ASU, and then transferred him to MCSP.  His last mental health contact was with the psych tech at cell-front when he reportedly stated "we're good" during psych tech rounds.

75

The inmate had no RVRs during his incarceration. He had been placed in ASU as noted in this report based on safety concerns after he was assaulted by other inmates on 6/27/10 at DVI and on 8/21/10 at HDSP, where he remained pending transfer to the MCSP SNY; although he was not transferred prior to his death. He was incarcerated at DVI from 3/4/10 through 6/29/10 and at HDSP from 6/29/10 through 2/5/11.

After the inmate attempted suicide; he was transferred to an outside hospital, and a suicide note was found in his property. The note was addressed to his mother. It stated that he was sorry that it had come to this and that he loved her, but could not take this anymore. He wrote about all of his problems and people judging him for what "I didn't do". He also wrote that he had so many problems with people since his false conviction to the extent that he could not take it anymore due to all of the hostility and false judgment. He repeated that he loved his mother and wanted to make sure that she let two others know that too. He apologized for making the decision to end his life and added that the "police keep harassing me come and telling me to do it!". He repeated once again that he loved his mother and missed her, and hoped that his cellmate could get this letter to her.

The suicide reviewer reported that the inmate had indicated to clinicians that he had held a knife to his throat at age 12 or 13 and attempted to hang himself with a sheet in the county jail in December 2009 or January 2010. The inmate's cellmate reported that the inmate attempted to hang himself from the cell door in late fall of 2010, but the cellmate told him to stop.

The CDCR suicide reviewer also reported talking with the inmate's cellmate; the inmate had talked with the cellmate about the transfer to MCSP, but six months had passed without a move since the initial transfer discussion during the ICC. The reviewer also reported that the cellmate indicated that correctional officers had harassed the inmate.

The CDCR suicide reviewer noted the following concerns as a result of the review: (1) with the inmate's history of suicidal ideation, a SRE should have been performed upon arrival at HDSP, but one was not performed; (2) there was a five-minute delay in entering the inmate's cell while correctional officers dressed in their PPEs; (3) there was a delay of approximately 15 minutes in the inmate's departure for the outside hospital due to a custody staffing issue; and (4) the inmate's cellmate's indication that custody staff harassed and treated the inmate with contempt due to his commitment offense. The reviewer reported an additional concern regarding the required 30-minute welfare checks to be conducted by custody on inmates housed in ASU pursuant to the Program Guide; a search of records indicated that the welfare check forms were not found. The reviewer noted that prior to discussion of the case in committee on 4/4/11; HDSP staff located the missing documents and indicated that they would be sent electronically to DCHCS following the case review. The reviewer also reported that based on information from the Investigative Services Unit (ISU), it could take approximately "10-15 minutes tops" to put on protective equipment before entering a cell; the five-minute delay in entering the inmate's cell was thus particularly rapid. There was also speculation by HDSP that the delay in the helicopter's departure for the outside medical center was due to the need for the correctional officer to meet specific weight requirements for the flight. In response to allegations made by the cellmate to the reviewer as to the inmate's harassment, ASU personnel indicated that the cellmate was well-known to them as a troublemaker, opportunist, and unreliable reporter. However, an Office of Internal Affairs (OIA)

investigation was being considered based on a personnel matter related to this case. The matter was also the subject of a QIP in the Recommendation section of this report.

The CDCR suicide report identified three problems and recommendations as follows:

Problem 1: The Suicide Risk Evaluation (SRE) was not completed as part of the initial assessment following the inmate's transfer from DVI-RC to HDSP. According to the MHSDS Program Guide (Page 12-10-9), an SRE should be completed upon arrival at an institution anytime the inmate's history indicated a history of suicide risk factors.
Quality Improvement Plan: The Chief of Mental Health or designee at High Desert State Prison shall provide a training update to all mental health staff pertaining to this policy.

Problem 2: During emergency response procedures TTA staff noted a delay of 10-15 minutes before finding a correctional officer who could accompany the inmate in the helicopter to the outside medical center. During discussion of this case by a committee on 4/4/11 the Warden described the complex procedures necessary to get an inmate to an outside hospital.
Quality Improvement Plan: The Warden or designee at High Desert State Prison shall describe in a memorandum all of the elements necessary to transport an inmate via helicopter to an outside hospital.

Problem 3: The inmate left a suicide note indicating that COs were "harassing" him, that they told him to "do it." During an interview conducted for the purposes of this review the inmate's cellmate indicated that custody was giving __ a "hard time." However, during an investigation by the Investigative Services Unit (ISU) the cellmate reported to an ISU correctional officer that he "never heard anyone tell __ to kill himself" (excerpt from 837-C1 incident report). During review of this case by committee on 4/4/11, the Warden at HDSP indicated that the case was being reviewed for possible OIA investigation.
Quality Improvement Plan: The Warden or designee at High Desert State Prison shall provide the investigation number and referral date if this matter will be adopted by the Office of Internal Affairs (OIA) as a formal investigation. If the fact finding by the OIA does not result in a formal investigation, the outcome of the fact finding shall be reported by the Warden to the Division of Correctional Health Care Services (DCHCS).

A physician provided a Death Review Summary on 3/4/11. In that summary, the cause of death, co-existing conditions, and the inmate's treatment history were provided. The physician also indicated recommendations for custody inquiry into the possible delay in opening the cell door and the delay in a correctional officer accompanying the LifeFlight helicopter.

On 5/18/11, the Director of (A), Statewide Mental Health Program, Division of Correctional Health Care Services, and Director, Division of Adult Institutions, provided their report on implementation of the Quality Improvement Plan for the inmate's suicide in response to the suicide report dated 4/11/11. In their report and in response to Quality Improvement Plan number one, the HDSP suicide prevention committee minutes dated 3/8/11 were provided. They included as training having the chief of mental health have the senior psychologist in charge of the ASU and all clinicians who dealt with the inmate

conduct their own suicide autopsy and present their findings at a clinical staff meeting. It was also noted "on the custody side there were no half-hour checks that can be verified on the 114". There was also an in-service training sign-in sheet for a class entitled "SRA Training and Suicide Review Presentation" dated 3/29/11 with 20 signatures.

With regard to Quality Improvement Plan number two, a memorandum from the Correctional Captain of Health Care Access at HDSP to the suicide response coordinator dated 4/7/11 reported that the captain had contacted the majority of staff on duty during the incident. No one recalled any prolonged wait, other than normal, to get ready to accompany the inmate in the helicopter. The memorandum further stated that the captain had been informed that it took about 10-15 minutes to get staff to the CTC from the yards and provide them with the equipment necessary to provide coverage. The captain outlined the process. At the beginning of each shift, a staff member from each of the four yards was identified to go on emergency transports; the focus was to identify one or more staff members who met the 150-pound requirement that was placed upon them by the helicopter services. The captain reported that there were few staff members who actually weighed 150 pounds or less. When custody was notified of the need, the staff members were contacted and they immediately reported to the CTC, although it could take up to 15 minutes to get to the CTC. The captain noted that this time period usually coincided with the time needed to get an ambulance and/or helicopter to the facility; therefore there was no issue regarding any type of delay. The captain stated, not related to this incident, that he had instructed CTC custody supervisors to take over the responsibility of making a list of staff to be contacted and utilized in such emergency situations and a list of staff to be called to provide coverage at the beginning of each shift; this made the process more efficient and less time demanding as the watch office was overtasked with their routine daily duties.

There was an additional memorandum from the warden to the DCHCS suicide response coordinator dated 5/9/11 that addressed Quality Improvement Plans number two and three. In this memorandum, the warden stated the procedure for transport via air ambulance to an outside hospital; it included the TTA RN calling 911 to request an ambulance, giving information about the size of the inmate and where the inmate was to be transported to, and the institution requesting dispatch of a ground ambulance to the institution to transport the inmate from the CTC to a helicopter pad. The warden continued that due to the prison's rural location and the large coverage area for the ambulance company, it was not uncommon to have a waiting period of between 30 to 45 minutes. The warden continued that to ensure minimal wait time, HDSP had incorporated a procedure which regulated inmate transportation and included the watch sergeant generating a list of officers who were "flight compatible", which consisted of officers weighing less than 175 pounds. The warden stated that even with this list, there were still unavoidable logistical delays associated with preparing the officer for the flight; these included relieving the officer from their assigned position, transportation to the TTA, providing proper equipment and protective gear, and being taken to the ambulance for transport. The warden cautioned that even after taking proper preparatory steps, there was still no guarantee that the officer would be accepted by the air ambulance, including the weight restrictions. The warden also reported that the transport process included the air ambulance being able to carry enough fuel to transport more than 85 miles and consideration of wind conditions. He noted that there were times when the officer boarding the air ambulance was turned away

because of the above-mentioned factors, requiring the process of finding a "flight compatible" officer to begin anew.

With regard to Quality Improvement Plan number three, the warden reported that the OIA was investigating this matter; the investigation number was N-HDSP-256-11-A. He noted that the OIA had opened the case on 3/30/11.

**Findings**: This inmate's suicide does not appear to have been foreseeable as the inmate was not reporting suicidal ideation or intent, nor were there any staff observations of increased risk of suicide in the immediate time prior to his completed suicide. However, his suicide may very well have been preventable had there been a more timely emergency response. The initial response and delay in the provision of CPR by first responders of five to eight minutes as per the reported timelines and the delay in the inmate's transport by air ambulance were excessively long. Understanding the LOPs and departmental policies regarding ASU inmates, this inmate was clearly hanging and efforts to cut him down and to begin CPR were delayed. Furthermore, it was particularly concerning that despite the delay, the inmate responded to CPR. Vital signs, including a pulse and blood pressure were reestablished; however, the inmate subsequently succumbed after the delay in transport to the hospital.

HDSP reported their efforts to review the process and to reduce response time. However, it does not appear that given the emergency nature of responses to attempted suicides that HDSP and very likely other facilities have augmented their ASU policies to provide a more rapid response to these types of emergencies. For facilities in rural areas in need of air ambulance services, there did not appear to be immediate custody notification to implement the availability of an officer to accompany the inmate to be transported to the TTA or dispatched from another location simultaneously to arrive at the TTA, and from there to accompany the air ambulance to an outside hospital. The Department should most certainly review these circumstances and provide guidelines for all facilities with similar issues to reduce the timeframes to acceptable limits for the preservation of life. The OIG investigation and information was not provided prior to the completion of this review.

**5. Inmate E**

Brief History: This inmate was a 51-year-old Caucasian male who committed suicide by hanging on 2/5/11 at the CIM reception center SNY. He was a participant in the MHSDS at the 3CMS level of care at the time of his death. He was the sole occupant of his cell. He committed suicide six days after returning to the CDCR on a parole violation for his second prison term. The inmate had turned himself in for a drug-related parole violation, and he arrived at CIM on 1/31/11. He was eligible for return to parole in April 2012.

The inmate was discovered on 2/5/11 at approximately 4:30 p.m. by two correctional officers who were conducting security checks in the reception center housing unit. Both officers observed the inmate, the sole occupant of his cell, hanging inside of the cell with a white sheet wrapped around his neck with the other end attached to the top bar of the step ladder in front of the bunk. One officer immediately activated her personal alarm device, and the other officer announced over the institutional radio for Code One response to the housing unit. The cut-down tool was retrieved from the PPE box; both officers entered the cell, cut the sheet, and brought the inmate down and pulled him out of the cell and onto the tier. The inmate was not responsive. One officer notified RCC Control to call 911, and

staff immediately started lifesaving measures including CPR.  A sergeant, three other
officers, and a LVN rotated performing the chest compressions and rescue breathing
utilizing the ambu bag.  A registered nurse arrived on the scene with the AED.  The RN
took over the assessment of the inmate's condition, attached the AED, and lifesaving
efforts continued.  At 4:32 p.m., a request for a gurney was made and at 4:35 p.m., the
inmate was placed on the gurney en route to medical.  At 4:37 p.m., the ambulance arrived
at CIM's front gate; it arrived in front of RC Central at 4:39 p.m.  The inmate was placed
in the ambulance at 4:42 p.m. and the ambulance left the grounds at 4:44 p.m. en route to
Chino Valley Medical Center.  At 4:56 p.m., an emergency room physician at Chino
Valley Medical Center pronounced the inmate deceased.

An autopsy report was provided by the San Bernardino County Sheriff's Department,
Coroner's Division, dated 2/7/11.  The cause of death was listed as hanging, and the
manner of death was suicide.  A toxicology report indicated that blood specimens revealed
the presence of methadone (trace amount), mirtazapine (trace amount), naproxen 15 mg/L,
and 7-aminoclonazebam 0.24 mg/L.  The only illegal drug found in test specimens was the
presence of cannabinoids as a presumptive positive, but no confirmation test was
performed.  There was no evidence of alcohol (ethanol) in blood specimens.

The CDCR suicide report recounted the inmate's criminal justice history.  However, it
should be noted that this was the inmate's second CDCR number; for his first CDCR
number, neither the C-file nor the UHR for that discharge number were available at the
time of the review and were not provided to the reviewer.  Records indicated that the
inmate was first arrested at the age of 19 and referenced arrests for burglary, driving under
the influence, theft, receiving stolen property, vehicle theft, forgery/fraud, and battery.  It
was noted that there was no known juvenile history.  Review of Offender Commitment
Data Entry information did not include the inmate's first commitment under his first
CDCR number, but the records referenced his receiving visits during his first CDCR
incarceration between 1993 and 1999.  The Offender Commitment information indicated
that the inmate was received by CDCR via the WSP RC on 11/6/09 and paroled on 5/15/10
for his second term.  He subsequently returned on 1/31/11 for his third term and remained
in the CDCR until his death.

MHTS data reflected that the inmate was first received in the CDCR in 1984.  His second
term began on 11/6/09, with parole on 5/15/10.  His sensitive needs status was established
after he had been assaulted by his cellmate in November 2009.  Upon his return on
1/31/11, because of his prior SNY status, he was assigned a single cell in the section of
reception center housing that served as sensitive needs housing.  Review of medical
records from 2010 indicated that the inmate was prescribed Elavil, Buspar, Neurontin,
Remeron, and Zyprexa; in addition to Havrix (hepatitis virus vaccine), Pneumovax
(pneumococcal vaccine), and Lisinopril for hypertension.  Upon arrival at CIM on 1/31/11,
medical renewed his last Lisinopril dosage.  The psychiatrist renewed Geodon, Vistaril,
and Remeron on 2/1/11.

The CDCR suicide report and the UHR recounted the inmate's mental health history.
Records indicated that he first became a participant in the MHSDS between 1996 and 1997
during his first term in the CDCR while at RJD.  Although he was receiving mental health
services at the 3CMS level of care, MHTS indicated that he had not participated in mental
health treatment between 2000 to 2002, when he paroled.  He returned to the CDCR in

2003, was again placed in the MHSDS, and records indicated that he was admitted to the MHCB from 1/11/07 through 1/16/07 due to amphetamine withdrawal. He was again admitted to the MHCB from 3/13/08 through 3/20/08 related to heroin withdrawal. The records further indicated that he first began abusing illegal drugs at age 13 with marijuana. By age 17, these drugs had progressed to cocaine, heroin, and amphetamines; a notation indicated that heroin was his drug of choice. The records also indicated that the inmate stated that he had been hospitalized in the community while on parole in 2009 for reasons that were unclear. No specific diagnosis was reported in the CDCR suicide report regarding the inmate's mental health care prior to his last CDCR admission on 1/31/11; however, there were repeated references to his treatment for depression and to the depression being related to his wife's death and the loss of contact with his family. He was noted to have been placed on psychotropic medications, though they were not specified. He was also noted to have been homeless during his last paroles. After his death, in attempting to notify next-of-kin, CDCR staff learned that his father had died sometime in 2010, which the inmate did not appear to have known.

The inmate returned to CDCR at CIM on 1/31/11. He reported his history of mental health treatment and use of psychotropic medications on screening and identified a past diagnosis of Bipolar Disorder. He also reported that he had been treated in the EOP, but no records indicated that he had been in the EOP during his incarceration. However, records from his first incarceration were not available. It was unclear whether or not he was in the EOP at that time.

The inmate received a mental health screening on 2/1/11, but several items were not completed. It was noted that he was disheveled, irritated, and frustrated about medication issues and his return to prison.

A SRE was completed on 2/1/11 at 9:10 a.m.; the reason for assessment was "screening", but only Part I Data Collection was provided in the records. It was assumed that the psychologist completed this SRE, as referenced in the CDCR Suicide Report. Identified risk factors included a history of Major Depressive Disorder, Psychotic Disorder, chronic pain, chronic mental illness, substance abuse, and poor impulse control, as well as perceptional loss of social support, ethnicity, age, gender, and history of suicide attempts; however, there were no details as to the number of attempts, method, age, etc., in terms of chronic risk factors. Identified acute risk factors included current/recent depressive episode, psychotic symptoms, anxiety or panic symptoms, hopelessness/helplessness, increasing isolation, agitated or angry, current/recent violent behavior, recent serious medical diagnosis, recent trauma, early in prison term, safety concerns, and single cell placement. The one noted protective factor was insight into problems, with a handwritten "absconding" next to it without further explanation. The inmate did not report a plan to kill himself or a desire to die. However, the second page of the SRE was not found in the records provided, but the CDCR suicide report referenced the psychologist performing this SRE and providing additional information.

The suicide report indicated that the SRE completed on that date noted multiple risk factors including substance abuse history, two past suicide attempts, poor impulse control, and dynamic factors of depression, anxiety, and hopelessness. No positive factors were indicated. The source of information for the SRE was the inmate interview; no UHR was available and the CDCR suicide report indicated that there was no detailed evaluation with

basic and important psychosocial background information collected.  A previous SRE dated 12/9/09 noted a number of risk factors for the inmate including a history of multiple suicide attempts; the last attempt occurred during September 2009.  There was a diagnosis of Major Depression provided, and the estimate of suicide risk was determined as moderate.

A brief mental health evaluation was conducted by an individual who appeared to be a psychiatrist on 2/1/11.  However, the signature was illegible and much of the writing was difficult to read.  The psychiatrist documented the source of information as the inmate interview, noting a history of depression and that the inmate was on medications until three days prior.  The psychiatrist indicated that psychology had referred the inmate and that he appeared to be depressed (and a word that was illegible).  The psychiatrist noted a mental health history of past inpatient psychiatric treatment and one or two suicide attempts, with the last in 1983 by cutting his wrists.  The psychiatrist also noted that the inmate denied both suicidal ideation and drug abuse.  The psychiatrist did not note any current problems.  In the evaluation mental status and formulation, he noted that the inmate was cooperative, logical, sad, frustrated about being arrested again, depressed but working intermittently and living on the street homeless.  The inmate denied suicidal ideation and auditory hallucination (as well as additional illegible writing).  The psychiatrist described the inmate's affect as appropriate but depressed; there was no evidence of an overt cognitive defect and he was oriented to all spheres.  He was provided with an Axis I diagnosis of Mood Disorder, and the recommendation was for treatment with psychotropic medication.  The psychiatrist wrote that the target symptoms suggested hospitalization for (illegible) depression, but patient stated that he was "okay, can handle it, willing to resume med, no acute PPS or (illegible)".  The psychiatrist did not note the level of care.  Remeron, Geodon and Vistaril were ordered with a return to the clinic in one week; the psychiatrist also noted that the inmate was not in need of MHCB placement.  Again, the psychiatrist's signature and much of the note were illegible and although he suggested hospitalization for "something" (it was illegible) depression, he did not refer the patient to the MHCB and did not consult with the psychologist who referred to the inmate on an urgent referral.  This was the last contact between the inmate and mental health staff.  The inmate committed suicide on 2/5/11.  No suicide note was found in his property.  The reviewer reported that the 31-item questionnaire lacked three items and two of them pertained to suicide risk; while the SRE was solely based on the inmate's self-report, but lacked extent and detail.  The psychologist and psychiatrist also did not consult each other.

As previously noted, records were not available from the inmate's first incarceration.  Review of the UHR from 2008 indicated diagnoses of Polysubstance Dependence, Opioid Abuse, Personality Disorder NOS, Opioid Withdrawal, Bipolar I Disorder, Depression Severe with Psychotic Features, Psychosis NOS, Mood Disorder NOS, and Major Depression.  The inmate's most current diagnoses provided on 1/28/11 were Major Depressive Disorder, Single Episode, Moderate and Psychotic Disorder NOS.  In terms of medical history and diagnoses, the inmate was diagnosed with Hepatitis C and reported disability secondary to chronic back pain.

The CDCR suicide reviewer made reference to the need for CIM to provide a more comprehensive intervention for problems in the SREs in the form of a program that provided intensive monitoring and one-on-one training for clinicians in the near future.  Furthermore, CIM was selected as one of six test sites for initiation of the High Risk

Inmate Identification Monitoring and Treatment Program, as well as the Proctoring and Mentoring Program to provide intensive training for the administration of the SRE. CIM was also in the process of hiring a senior psychologist and developing a LOP for implementation of the two programs. Other issues of concern identified by the reviewer in the CDCR suicide report included the housing of reception center inmates with sensitive needs in a section of Birch Hall, a recommendation for adding safety checks by psych techs to this area, and limited UHR and C-file availability both to clinicians and the reviewer as to the inmate's discharged CDCR number.

The reviewer noted in summary that the review identified no significant departures from policies as to mental health Program Guide timeline requirements. It was also noted that issues related to the quality of two clinical encounters in their documentation and systemic issues were addressed in the Problems and Quality Improvement Plans in the Recommendation section of the report. The CDCR suicide report identified six problems and quality improvement plans as follows:

Problem 1: Since UHRs are not immediately available to provide background data for intake evaluations and SREs during the first 10-14 days following an inmate's arrival at CIM, there is an increased need for thorough evaluations prior to arrival of records. Inmate evaluations of inmate __ raised the following concerns:
Documentation lacked in detail and thoroughness and did not reach the standard of care consistent with clinical best practice standards.
The Suicide Risk Evaluation (SRE) was conducted without the UHR, and no more in-depth evaluation was completed in order to support SRE conclusions.
The rationale supporting the clinician's judgment of the inmate's risk level is poorly documented on the SRE.
Quality Improvement Plan: The Chief of Mental Health or designee at CIM shall: (1) Provide all of mental health staff with a training pertaining to the need for in-depth evaluation of suicide risks for new arrivals, especially in the absence of the UHR. The training shall stress the importance of providing a comprehensive evaluation that addresses the inmate's psychosocial, substance abuse, mental health and criminal history as well as the inmate's current mental status. In addition, documentation should address the rationale for the clinician's judgment of suicide risk. (2) Following development of the LOP for the Proctoring and Mentoring Program a local Suicide Prevention and Response Coordinator (SPR-FIT) shall be appointed as interim proctor for the psychologist indicated in this QIP. The clinician shall receive direct monitoring in accordance with the LOP.

Problem 2: Due to a delay at CIM in receiving records for newly arriving inmates, the institution put in place a system that requires clinician to do in-depth evaluation within the first few days of an inmate's arrival. Since initial evaluations do not have the benefit of being based on a review of records, a reconciling of the initial evaluation with an inmate's records is needed. While this additional step was important in order to ensure the quality of the original evaluation, it also represents workload concerns and will require procedural changes.
Quality Improvement Plan: The Chief of Mental Health at CIM shall convene a Quality Improvement Team (QIT), to include the Director of Medical Records at CIM and the Regional Mental Health Director of the Division of Correctional Health Care Services (DCHCS), in order to develop a process for 3CMS inmates whereby their records will be

reconciled with the initial evaluation.  A Local Operating Procedure shall be developed that will specify the process developed by the QIT.

Problem 3:  The psychiatrist who evaluated inmate __ wrote on the SRE form completed for the inmate by the psychologist, rather than completing his own SRE.  Instead of providing the inmate with two clinician impressions of risk level, this gives the impression that only one clinician's judgment of risk was the basis of decisions made regarding the inmate's care.

Quality Improvement Plan:  The Chief Psychiatrist or designee at CIM shall provide individual training to the psychiatrist who evaluated inmate __ on 2/1/11, regarding both the following factors:

Importance of independent documentation of suicide risk.
Importance of documenting clinical rationale for judgment of suicide risk.
Consultation with other clinicians regarding treatment concerns.

Problem 4:  The psychologist who evaluated the inmate upon arrival at CIM was concerned enough about the inmate's present mental state following the screening that he recommended immediate evaluation with a psychiatrist.  He planned to schedule the inmate for a detailed mental health evaluation (CDCR Form 7386) but at the time of the inmate's death, this evaluation had not been scheduled.

Quality Improvement Plan:  The Chief of Mental Health or designee at CIM shall conduct an inquiry into the reasons the evaluation was not scheduled.  Corrective action shall be taken as deemed necessary.

Problem 5:  The psychologist and the psychiatrist who evaluated the inmate on 2/1/11, expressed concern about the inmate's current mental status.  Records indicated that while both clinicians were concerned about the inmate, they independently determined that he was not at imminent risk of suicide.  Records did not show that the clinicians consulted with each other about their decisions not to increase the inmate's level of care.

Quality Improvement Plan:  The Chief of Mental Health or designee at CIM shall: Provide a reminder to mental health staff regarding the importance and value of peer consultation for inmates who present with mental health concerns.  Provide a training update to all mental health staff regarding the assessment of suicide risk.

Problem 6:  While there was repeated documentation between 2009 and 2011 of this inmate's history of at least one previous suicide attempt, MHTS data did not reflect this in the Behavioral Alerts Section.

Quality Improvement Plan:  The Chief of Mental Health or designee at CIM shall conduct an inquiry into the data missing from the local MHTS, determine the reasons for the lack of data, and initiate corrective actions as deemed necessary.

A Death Review Summary was completed by a physician on 2/23/11.  In the summary, the physician noted the inmate's cause of death and his co-existing conditions of hepatitis C, hypertension, depression, and psychosis.  The summary provided a synopsis of the inmate's care and treatment and noted that he had not been seen by a medical provider after his return from parole.  No nursing or emergency medical response issues were identified.

On 6/28/11, the Director (A) Statewide Mental Health Program, Division of Correctional Health Care Services and Director, Division of Adult Institutions provided their report on the implementation of the Quality Improvement Plan for suicide of this inmate, in response to the CDCR Suicide Report dated 4/8/11. In their report, the Directors included the memorandum from CIM addressing the recommendations.

With regard to the first Quality Improvement Plan recommendation: Provide SRE assessment and documentation training; the memorandum recounted the Program Guide requirement for assessment of suicide risk, referenced headquarters' implementing a "SRE Proctoring and Mentoring Program" and the process, purpose, and aim of the program, a mental health department subcommittee meeting on 2/23/11 reviewing this suicide, a mental health supervisor's meeting on 3/1/11 making reference to a clinician-to-clinician contact QIT, and the Suicide Prevention and Response coordinator's recommendations regarding the most recent suicide. Also included was an in-service training sign-in-sheet with a class title "M. H. Department Meeting" on 2/23/11 with 63 signatures, and an in-service training sign-in sheet with a class title "SPR-FIT Quick Action Plan Training" dated 3/30/11 with approximately 57 signatures. There was also submission of committee meeting minutes of the mental health department meeting on 3/30/11 with discussion of the SRE being a qualitative evaluation that should be documented correctly and an in-service training sign-in sheet with the class title "Departmental Meeting" on 3/30/11 with approximately 73 signatures. As to the first recommendation, there was a "Part Two" which addressed providing SRE mentoring and proctoring to identified psychologists; this was noted to have occurred on 5/11/11, 5/12/11, and 5/19/11, with a report on 5/31/11 with supporting documentation of the review of the SREs. The draft policy on the Suicide Risk Evaluation Proctoring and Mentoring Program was also provided.

With regard to the second Quality Improvement Plan recommendation of convening a QIT to develop a 3CMS UHR reconciliation process, the QIT chartered by the mental health subcommittee on 4/20/11 was provided; it included four members.

With regard to the third recommendation of providing individual training, consultation, and documentation for SRE assessments to a certain identified psychiatrist, a memorandum dated 4/14/11 from the chief psychiatrist to the chief of mental health with the subject "Supporting Document for Inmate Suicide Corrective Action Plan" reported a one-hour meeting with the psychiatrist; it discussed in detail the problem with his evaluation of the inmate and the focus of training on independent documentation, SREs, clinical rationale for assessment and judgment of suicide risk, and consultation follow-ups with all clinicians regarding treatment concerns.

With regard to the fourth Quality Improvement Plan recommendation of conducting an inquiry regarding mental health intake scheduling, a memorandum dated 4/14/11 from the senior psychologist supervisor to the chief of mental health indicated that the inmate had been screened and a chrono had been generated for further evaluation. Contrary to the operating procedure for the chrono to be given to the local clerical office, the chrono was given to the psychiatrist and was attached to paperwork that was given to a nurse who then sent it to medical records to be filed; as such, clerical never received the chrono and the inmate was not scheduled for his evaluation. The memorandum indicated that staff had been retrained to always submit screening chronos to clerical staff before the end of the day.

With regard to the fifth Quality Improvement Plan recommendation of providing staff training regarding peer consultation and documentation, a document entitled "Clinician to Clinician Consultation Documentation Training" was provided.  It noted that consultation between mental health clinicians was good clinical practice and was <u>strongly</u> encouraged, that consultation issues discussed in conclusions shall be thoroughly and accurately documented on a mental health progress note, and that the responsibility of completing the necessary paperwork and scheduling all follow-up appointments was for the last clinician who saw the inmate.  There was an additional section of the MHTS.net tracking forms and system that reminded mental health clinicians to be competent and accurate in IDTT participation and documentation and to make clinically appropriate use of the MHTS.net system.  The minutes and sign-in sheets of the mental health department subcommittee meeting of 2/23/11 were also provided with this response, as were the mental health supervisor's meeting minutes and sign-in sheets for 3/1/11 and the 3/30/11 department meeting minutes.

With regard to the sixth Quality Improvement Plan recommendation to conduct an inquiry regarding missing data and local MHTS.net, a memorandum dated 5/6/11 from a mental health OSS II to the chief of mental health indicated that no documentation had been inputted into MHTS.net from WSP, the sending institution.

**Findings**:  This inmate's suicide does not appear to have been foreseeable as the inmate did not report suicidal ideation or intent to the medical or mental health staff who evaluated him.  However, it was to be noted that according to the CDCR suicide report and the opinion of this reviewer that mental health staff did not perform adequate evaluations of the inmate for inquiry regarding his current suicidality and history.  The records provided to this reviewer were incomplete and did not include Part II of the SRE performed on 2/1/11, which would include the signatory page and information that may have been added by the psychiatrist according to the CDCR suicide report.  In addition, the mental health screening was also not provided in the records reviewed.

This inmate's suicide may very well have been preventable had there been adequate and appropriate evaluations by the psychologist and psychiatrist and collaboration between the two.  Despite the psychologist making an urgent referral for the inmate to be seen on the same day by the psychiatrist, and the psychiatrist considering MHCB placement, the suicide report and the Special Master's reviewer's record review indicated that they never consulted with one another about their findings or concerns regarding the inmate.  The unavailability of inmate information in the UHR and C-file did not excuse the requirement and necessity for thorough and quality evaluations.  In this case, such evaluations were not performed; had this inmate received comprehensive and quality evaluations, he very well may have provided more information about his history and risk factors.  The SRE identified a number of risk factors of both chronic and acute factors and essentially no protective factors, along with an inadequate clinical staff evaluation; in the opinion of this reviewer, this contributed to the inmate's suicide being highly likely to have been preventable had adequate assessment and management been provided.  The Quality Improvement Plan responses, in the opinion of this reviewer, were inadequate and insufficient to address and identity problems and needs for corrective actions.

**6.  Inmate F**

Brief History:  This inmate was a 41-year-old Asian male who committed suicide by hanging on 2/15/11 at the California Medical Facility (CMF).  He was a participant in the MHSDS at the EOP level of care and was on double cell status, although he was single celled at the time of his death.  The inmate entered the CDCR on 5/10/00 via the DVI RC, after being convicted of second degree murder for the drowning death of his stepson, with a sentence of 15-years-to-life.  His MEPD was 4/3/14.

The inmate was discovered on 2/15/11 at approximately 7:40 p.m. by the clinical support officer who was releasing inmates for the evening medication pass.  After the officer passed the inmate's cell to release him to receive his medication; he observed that the light in the cell was off, and he could not see inside the cell.  The inmate had been discharged from DSH that same day (2/15/11), and he was re-housed in the "N" Tower of the EOP and placed on a five-day observation protocol.  The officer used his flashlight to see the inmate and observed him unresponsive and hanging from his cell window, with a sheet wrapped around his neck.  The officer notified the housing officer of the incident for notification to Control and to send medical assistance as well as a Code One response to N-1.  The housing officer used his radio to notify Control of the incident and activated his personal alarm; he then obtained a cut-down tool from a lock box located within the unit.  He proceeded to the cell to cut the ligature that was wrapped around the inmate's neck.  Two additional officers were the first responders to arrive at the scene and assisted the housing officer.  After the housing officer cut the sheet and removed the inmate from the window, he attempted to sit the inmate upright on the lower bed of the cell so he could cut the sheet which was still wrapped around the inmate's neck.  The two other officers assisted the housing officer in lowering the inmate from the window to the bed in his cell.  A sergeant arrived and assisted the two officers to lift the inmate from the bed to the N-1 corridor as two registered nurses arrived, assessed the inmate, and began to administer CPR.  Another sergeant arrived and obtained an ambu bag, but the RNs determined that they did not need the ambu bag; the sergeant gave the ambu bag to another officer who had responded to the incident.  Two officers escorted the inmate to the medical clinic on a gurney with the two RNs.

At the B-1 clinic, resuscitation efforts continued and at the direction of a physician, the CMF watch commander called for a Code Three ambulance to report to CMF to transport the inmate to an outside medical facility.  At 8:12 p.m., the same doctor pronounced the inmate deceased and all resuscitation efforts were stopped.

The timeline was provided in the CDCR suicide report.  It indicated that the housing officer discovered the inmate at 7:40 p.m., medical staff arrived at 7:42 p.m. when the inmate was placed on a backboard and the two responding RNs initiated CPR and utilized the AED; no shock was advised.  The inmate was transported to the B-1 clinic where he arrived at 7:45 p.m. and clinical staff provided advanced life support measures.  At 8:02 p.m., emergency medical service responders from the community arrived, and CPR continued.  At 8:12 p.m., the inmate was pronounced deceased.

The CDCR suicide report also made note of there being two broken window panes and of the inmate tying his noose around the bar between the broken panes.  The housing officer reported that the windows had not been broken when the inmate was moved into his cell at 12:00 noon that day.  Furthermore, drops of blood were seen in photos of the scene on the cell's floor.  The officer also stated that the inmate had blood on the front of his shirt, but

the origin of the blood was not clear. The photo of the inmate taken at the clinic appeared to show a trickle of blood coming from his nose, but the physician stated that the inmate was bleeding from the mouth.

The CDCR suicide report stated that it was not clear when and how the window was broken or what the source of the blood was and whether or not the two were related. An autopsy report was provided by the Office of the Coroner, County of Solano, indicating that the autopsy was performed on 2/18/11. The cause of death was listed as hanging and the manner of death was suicide. A blood toxicology revealed presence of fluoxetine at 3.0 mg/L (potentially toxic 1.3-6.8 mg/L), norfluoxetine 0.98 mg/L (potentially toxic 0.9-5.0 mg/L), donepezil less than 0.05 mg/L, (potentially toxic-unknown), and mirtazapine 0.05 mg/L (potentially toxic greater than 0.3 mg/L). According to the toxicology report, the inmate's fluoxetine and norfluoxetine levels were in the toxic ranges and his donepezil and mirtazapine were in the therapeutic ranges.

The CDCR suicide report recounted the inmate's criminal justice history and noted that he had no previous juvenile or adult criminal history. He also had no history of substance abuse including alcohol, illegal drugs, or tobacco. The CDCR report made reference to the inmate stating that he had been arrested and released for stalking a former girlfriend, but there was no record to substantiate his self-report. The report made reference to a probation officer's report (POR) in which it was stated that his wife told him to go out to look for employment. On 3/26/99, he left with his oldest stepson to look for employment and on the way back became despondent about his relationship with his wife and decided to commit suicide. He reportedly drove the car into the Sacramento River after rolling down the window on the passenger side and subsequently swam to safety, but the stepson drowned. He was later taken into custody, convicted of second degree murder, and sentenced to 15-years-to-life as noted above.

Based on record review it appeared that the inmate did not have a reported history of mental health treatment prior to his incarceration, but he received Paxil in the Sacramento jail. He entered the CDCR at DVI RC on 5/10/00 and received a mental health screening the following day, resulting in his referral for further evaluation. He was cleared for general population on 5/22/00 and transferred to HDSP on 7/25/00. On 8/3/00 he was admitted to the MHCB for suicidal ideation; and because he reported being targeted by Asian gang members due to his crime, he was placed in ASU. He had two subsequent MHCB admissions prior to his transfer to CSP/Sac on 9/25/00, and he was placed at the EOP level of care the following month. He remained at the EOP level of care, received a number of different medications, and was ultimately transferred to MCSP on 5/6/02. Records indicated that the inmate had nine MHCB admissions within the first 14 months of his incarceration; all were for suicidal ideation and depression. He also had nine ASU stays for safety concerns during this same period with very brief periods in general population with a return to either the ASU or MHCB.

The inmate had his first of 15 admissions to DSH on 9/26/01 when he was admitted to the Vacaville Psychiatric Program (VPP) after he had attempted to overdose on medications that he had reportedly hoarded for two months. He was discharged to MCSP, but had two subsequent return admissions to VPP, the second of which occurred on 7/16/02 after he attempted to commit suicide by hanging. Records also noted a hunger strike in October 2002 and ultimately his transfer to ASH from 11/13/02 to 6/25/03 when he returned to

CMF.  Upon his return to CMF, the inmate was placed in VPP, where he remained for approximately five months until he was discharged to the EOP on 10/20/03.

A psychiatric evaluation dated 7/11/07 noted that the date of the report was actually 11/12/03 when the inmate was admitted to DSH due to a self-inflicted laceration to his right lateral throat and continuing suicidal ideation.  It was noted that he stated that he "still feels suicidal" and suffered from chronic "voices" telling him to kill himself; he felt compelled to act upon the auditory hallucinations. He was placed on a Keyhea order from November 2003 through October 2005, when it expired; however, he continued the medications voluntarily until December 2005 when he began reducing his dosages.  By March 2006, he was reportedly suspicious and paranoid as well as "tired of living", and he inflicted a superficial cut to the side of his neck, resulting in the reinstitution of the Keyhea order.

The inmate underwent psychological and personality testing, which was reflected in a report dated 5/19/08 while he was hospitalized at DSH.  The report recounted his history, including his report of auditory hallucinations telling him to kill himself; these symptoms began in 2001 and continued intermittently since that time.  In April 2001, the inmate overdosed on two months' supply of medications.  His first admissions to DSH occurred during September and December 2001 due to suicidal ideation.  In July 2002, he was found hanging with a bed sheet around his neck, and he was transferred to DSH for a third time. He was then endorsed to CMF, and in October 2002 he was admitted to the S-2 unit of DSH due to a hunger strike; shortly after that, in November 2002, he was admitted to ASH. The inmate returned to CMF in June 2003, and between 2004 and 2008 he was admitted from the EOP to DSH acute care units approximately 11 times for suicidal ideation; there were a total of 16 DSH admissions through 2008.  He had additional suicidal behaviors of superficial cuts to his throat using a razor blade in October 2005, May 2006, and January 2007.

In July 2007, he was discharged from the DSH S-2 unit to the N-1 EOP unit, but he transferred to ASU in December 2007 because of a sudden and unprovoked attack on another inmate on N-1 that he believed was making fun of him.  He returned to the DSH unit S-2 from ASU, and he was noted in 2006 to have successfully completed six months of a "breaking barriers" group.  His diagnoses at the time of testing were Dysthymic Disorder, Major Depressive Disorder, Recurrent, peptic ulcer and positive TB tests and treatment.  No diagnosis was provided on Axis II and his life sentence and lack of social network were noted on Axis IV.  He was provided with a GAF score of 41.  The psychologist administering the test indicated that the inmate's test performance was affected by negative impression management, poor effort, and hasty responding such that the data should be interpreted with caution.  He was noted to have borderline to low average IQ, which supported the diagnoses of Dysthymic Disorder and Major Depressive Disorder, but did not support the diagnosis of a thought disorder or psychotic process within the schizophrenia spectrum of disorders.

The psychologist provided the following recommendations:  (1) an EOP or intermediate treatment program level of care would be most appropriate.  In addition, it would be best for the inmate to be comfortable in a stable setting for a longer period of time as opposed to his frequent transfers between EOP and DSH; (2) a psychiatrist should stay closely involved with his care and continuity of psychotropic care across various treatment units

must remain a priority; (3) the inmate should be taught alternative coping skills including finding enjoyable and relaxing activities, learning to use PRNs, talking to someone he trusted, and directly expressing his fears to staff regarding other inmates rather than making suicidal threats; (4) staff should help to educate him on connecting physical sensations to emotions because of his underdeveloped emotional and social understanding; (5) group or individual treatment using a structured and directive cognitive behavioral modality could be helpful; and (6) helping the inmate gain access to staff members who were Hmong and spoke his native language could also help improve his sense of community and social support.

A SRE was completed on 11/30/09 by a psychologist who listed risk factors including previous suicide attempt in 2007, past suicidal ideation/threats, first prison term, longer life sentence, history of poor impulse control, affective instability or lability, lack of perceived support system, hopelessness or helplessness, and feeling of guilt or worthlessness; two protective factors that were noted were insight into crime and group activities.  The estimate of suicide risk was low, and no referral was needed.

The psychologist completed a SRE on 12/16/09.  The psychologist's note listed multiple chronic risk factors including a history of Major Depressive Disorder, Psychotic Disorder, violence, poor impulse control, and suicide attempts.  In addition, age, gender, perceptual loss of social support, first prison term, and longer life sentence were also listed.  The only acute risk factor listed within the past 12 months was hopelessness/helplessness; the only protective factor listed was insight into problems.  The inmate did not report a plan to kill himself or a desire to die.  Chronic and acute suicide risk were both determined as low.  The inmate was noted to have been transferred between EOP and VPP nine additional times until 1/25/10, when he was again transferred to ASH.  He was transferred to ASH on 1/25/10 due to extreme depression and statements that he did not want to live because he did not want to be in prison.  He attempted to choke himself in a suicide attempt during that admission; he was placed on a Positive Behavioral Support Plan, and his Keyhea order remained in effect.  He had also been placed on suicide precaution during March and April 2010, but after implementation of the Behavioral Plan the inmate was noted to be participating in groups and denying suicidal ideation.  Records indicated that in March 2010, while at ASH, he attempted to choke himself with a piece of fabric.  This was one of many suicide attempts (including at least three attempts to cut his throat with a razor blade) in February 2004, October 2005, May and November 2006, and January 2007.

The inmate returned to CMF from ASH on 9/15/10 and was again admitted to the VPP MHCB on the following day for suicidal ideation with a plan to hang himself.  He remained on that unit for five weeks and, according to the suicide report, returned to the EOP with ultimate transfer to the N-1 unit for chronic EOP inmates who had difficulty programming.  Records indicated that he reported that he heard his mother's voice telling him to kill himself and not remain alive in prison.  Upon his return, he was provided with a cellmate, and the staff completed five-day follow-up.  However, the CDCR suicide report indicated that notes following his five-day follow-up were not located in the UHR; they may have been placed in loose filing at the time of the CDCR suicide report's preparation.

A SRE dated 11/12/10 was provided by a clinician whose signature and credentials were illegible.  The clinician identified multiple chronic risk factors including family history of suicide, history of Major Depressive Disorder, Psychotic Disorder, poor impulse control,

perception of loss of social support, longer life sentence, age, gender, and history of suicide attempts; there were eight previous attempts with the last attempt occurring in 2007. Identified acute risk factors were suicidal ideation, current/recent depressive episode, current/recent psychotic symptoms, current/recent anxiety or panic symptoms, hopelessness/helplessness, agitated or angry, disturbance of mood/lability, recent change in housing, and safety concerns. Two identified protective factors were regular exercise and children at home. The inmate did not report a plan to kill himself, but he reported a desire to die. In the narrative, the clinician indicated that the "inmate/patient denies thoughts, plans or intent on harming himself at present". He reported liking the unit he was housed on and reported feeling "happy today". The estimate of chronic risk was moderate, and the estimate of acute risk was low. The treatment plan was that the inmate was willing and able to discuss his symptoms with clinical or custody staff should they become concerning to him; he had demonstrated this capacity numerous times in the past.

On 12/2/10 the inmate was again admitted to the VPP acute psychiatric unit after a razor blade was found in his cell, and he admitted to thoughts of hanging himself. He again felt hopeless and stated that he had no reason to live, and his Zyprexa was restarted. He subsequently began attending group activities and when discharge was discussed, he refused his medication, began banging his head, and ultimately was placed on suicide precaution. Records indicated that he told the VPP treatment team that he did not want to return to the EOP nor to the DSH intermediate care program on P-3 as he would only be able to stay for a few months; he preferred to go to ASU where he felt more comfortable. The CDCR suicide report noted that the DSH treatment team "apparently" told him that if he went to EOP but refused to house, he could end up in ASU, to which the inmate was noted as "smiling and appreciative". He was subsequently discharged to EOP on 2/15/11, with a diagnosis of Depressive and Anxiety Disorder NOS and a GAF score of 50. His discharge medications included Haldol Decanoate with the next dose due on 2/18/11, Remeron, Prozac, and Benadryl liquid. The DSH discharge summary dated 2/8/11 from the inmate's last DSH admission recounted his treatment history and indicated that he had been transferred from S-2 to P-1 on 12/13/10. His medications on admission were Haldol Decanoate 100mg every two weeks, Prozac 60 mg, Zyprexa 10 mg at night, and Lithium 900 mg at night. During his hospital course, Lithium and Zyprexa were held on admission and Haldol Decanoate was changed from biweekly to monthly administration.

DSH provided an Integrated Suicide Risk Assessment (ISRA) on 12/13/10 during his admission of 12/2/10. The psychiatrist indicated multiple risk factors and noted the protective factor as "held in highly structured environment (DMH)". The psychiatrist's estimate of risk was that chronic risk was low to moderate and acute risk was low. The social worker indicated protective factors related to the decrease in suicide risk and social history factors related to increased suicide risk. The rehabilitation therapist reported on the inmate's personal restraints, leisure skills, deficits, etc. and the patient's description of his increased or decreased risk of suicide in the past. The RN and MTA staff provided input on perceived risks, current responses to interventions, etc. The treatment team consensus on the current risk level was moderate and recommended that given the patient's history and statements, he would likely benefit from further treatment on an acute unit.

Even though the inmate was on a Keyhea order, it was noted that he complained about not being prescribed Zyprexa and stated that he heard voices without this medication. The medication was thus restarted on 12/15/10, and on 12/28/10 the inmate was placed on

suicide precautions which were discontinued the following day.  Remeron was added to supplement the Haldol, and it was reported that the inmate did well over the following week.  He was provided with his personal belongings, and he attended at least one group activity.  However, when discharge was discussed the inmate began refusing his medications, wringing if not tearing his scrub top, and banging his head as observed by custody on 1/30/11.  He was again placed on suicide precautions, and he reported that he did not want to be discharged to the EOP; P-3 was not seen as a good option because he could only stay for a few months.  He was noted to have persistent requests to be sent to "the hole" where he felt more comfortable.  It was decided that the patient was likely at baseline and had received maximum benefit from inpatient treatment "but has the right to be in ad seg from custody standpoint if happens to refuse re-housing once gets to EOP".  Thereafter, he remained compliant with medications.  A renewal application for his Keyhea order was submitted on 1/21/11, as it was scheduled to expire on 3/6/11.

It was noted that the patient was not referred to the intermediate program given his minimal participation during past days and his stated preference not to be in DSH and to avoid group treatment if at all possible.  His diagnoses at discharge were Depressive and Anxiety Disorder NOS, rule out Adjustment Disorder with Depression/Anxiety, rule out Major Depressive Disorder with Psychotic Features, rule out Acculturation Problems, as well as rule out Cluster C Traits (personality disorder).  The reviewer was also referred to the Psychological Testing Report from 2008.  The level of care recommended was EOP.  A social worker provided a social work discharge summary, which indicated diagnoses of Major Depressive Disorder, Recurrent, in Partial Remission with Atypical Features and Personality Disorder NOS, rule out Avoidant Personality Disorder.  He was provided with a GAF score of 49 on 2/10/11.

This inmate's diagnoses ranged over the years from Major Depressive Disorder, Recurrent, Severe with Psychotic Features, Psychotic Disorder NOS, and Personality Disorder NOS and Depressive and Anxiety Disorder NOS during his last DSH admission from 12/2/10 to 2/15/11.

The inmate had a history of multiple DSH admissions, particularly to acute care programs, with few admissions to the intermediate level of care at ASH or CMF, with transfers to the EOP units with recurrence of suicidal ideation and plans.  These plans included attempts at cutting his throat with a razor, choking himself on fabric, and hanging himself.  The CDCR suicide report listed the inmate's SREs between March 2009 and 11/12/10, noting that he was in the care of CDCR clinicians from 2/25/09 through 1/25/10 and again from 10/28/10 through 2/2/11.  The listing did not include his return from DSH on 2/15/11, the day of his death.  The report listed ten SREs performed from 3/10/09 through 11/12/10.

In the suicide report, the CDCR reviewer provided the process that CMF and DSH undertook at the Bed Utilization Management (BUM) meeting when DSH staff brought their list of discharges, which were discussed, and a CMF psychiatrist went to DSH after the BUM meeting to interview each patient and to review the discharge plan.  The inmate was recommended for discharge back to the "Enhanced EOP Chronic Program (EECP)" on 2/15/11.  In his case, the CDCR reviewer indicated that he had not been cleared by the CMF psychiatrist for discharge; this ordinarily resulted in a Clinical Assessment Team (CAT) meeting to resolve this issue within 72 hours.  Instead, the inmate was transferred to the N-1 unit at 12:00 noon.  The housing sergeant who received an e-mail from the

supervising clinician for N-1 was also the higher level of care team coordinator. However, the housing sergeant did not receive a fax from the RN housing coordinator, who also ensured that medications were ordered and that the five-day follow-up and hourly custody check packets were sent to the receiving unit. According to the CDCR suicide report, when the inmate arrived on N-1, a clinician noticed that he was there, retrieved the hourly and five-day packet, and custody initiated continued hourly checks in a timely manner. The LPT notified the senior psychiatrist, who wrote a medication order. Despite the mistake in discharge procedures, the inmate received all appropriate continuing care following his arrival at N-1.

The CDCR reviewer, however, also noted that the CMF senior psychiatrist went to the DSH P-1 unit before 11:00 a.m. on 2/15/11 and wrote a note at 2:00 p.m. (after the inmate had been moved) in which the psychiatrist indicated that he would not have cleared the inmate for transfer due to the fact that he had been ordered full issue (property), but he had not received sheets. The reviewer further stated that the CMF psychiatrist wanted the inmate to demonstrate safety with sheets before clearing the transfer. However, since the inmate had already been moved, the psychiatrist did not want to have him moved back to P-1 as "that would have created further disruption to the IP" (inmate/patient). The CDCR suicide report further stated that the senior psychiatrist notified the RN housing coordinator that the inmate was not cleared, but had already been moved and the RN faxed the placement chrono to the housing sergeant at 2:05 p.m. The CDCR suicide report noted a timeline of the inmate coming out of his cell for dinner at 1700 hours, medication pass had started, an hourly check on the inmate found him standing in his cell at 1900 hours, and he was discovered hanging in a darkened cell at 1940 hours.

The reviewer further noted that this inmate was "extremely challenging" for clinical staff and rarely stayed in one setting long enough for therapeutic interventions to be effective, while the number of movements during his ten years of incarceration was "staggering". The reviewer further noted that "given his tumultuous history, numerous suicide attempts, and profound coping skills, it is remarkable that he survived prison as long as he did". The reviewer further stated "this reviewer considers the DMH's decision to return him to the EECP appropriate." The reviewer continued "essentially due to a custody error, __ was moved prematurely. If the LOP had been followed correctly, he would likely have been retained on P-1 (DMH) for another day, and would have been given sheets."

The CDCR reviewer noted having talked with custody staff, who told the reviewer that the housing sergeant was new to the position and believed that the problem was a training issue. The reviewer also spoke with the housing sergeant, who stated that he received a fax at 1405 hours clearing the inmate; therefore, the issue was mute. The supervising lieutenant declined to talk to the reviewer, claiming to have no information. A captain and associate warden also claimed to have no knowledge of the premature housing move. The reviewer continued that the captain asserted that the housing sergeant had been in that position previously and already knew the process. The reviewer continued further that difficulties in the collaborative process coordinating discharges and follow-up between CDCR institutions and DSH was highlighted by the review and that DSH staff was responsive to all requests by the reviewer with timely, efficient, and professional assistance. The reviewer also noted that the CMF chief of mental health and the executive director of VPP were reinstituting a quality improvement team beginning in April 2011 to discuss and develop recommendations for improved collaboration between CMF and DSH.

The CDCR suicide report provided one problem and Quality Improvement Plan as follows:

Problem 1:  During the course of this review, a lack of awareness by the housing sergeant and his superiors of significant details pertaining to the process for clearing and moving inmates from DMH to CMF were highlighted.

Quality Improvement Plan:  The Warden at CMF shall conduct an inquiry into this situation, review the relevant LOPs and take corrective action as deemed necessary. Corrective action should include, but are not limited to, on-the-job training (OJT) provided to the captain, lieutenant and housing sergeant with ongoing supervision in order to assure compliance with policy.

A Death Review Summary was prepared by a physician dated 4/7/11.  The physician noted the inmate's cause and manner of death and the inmate's history.  The physician identified a systemic concern as the inmate committed suicide on the same day that he was released from DSH; mental health would focus on this issue to ascertain whether the patient was appropriately discharged from DSH.  There were no other recommendations.

On 6/16/11, the Deputy Director (A) Statewide Mental Health Program, Division of Correctional Health Care Services and Director of Adult Institutions provided their report on implementation of the Quality Improvement Plan for this inmate in response to the CDCR suicide report dated 4/26/11.  In response to the one identified problem, the Directors provided memoranda from CMF indicating the actions taken at various levels to address the concern related to the lack of awareness and clarity of existing policy for clearing and housing inmates discharged from DSH to CMF.  CMF staff reviewed the LOPs pertaining to DSH discharges.  The LOPs were revised, routed for final review and signature to relevant executive staff members, and disseminated.  The chief deputy warden provided training to custody through the custody chain of command, all executive staff were provided training, and MHSDS staff were provided training on the revised LOP and were provided copies for their personal use.  The revised LOP 7.0 was titled "Clinical and Custody Follow-Up (5/8 day) Post-Discharge from the Department of Mental Health – Vacaville Psychiatric Program in the Mental Health Crises Bed Facility" and the in-service training sign-in sheets for all trainings were provided.

**Findings:**  This inmate's suicide may have been foreseeable in that while at DSH for his last DSH admission his estimate of risk was evaluated as moderate, but he was also assessed as having reached maximum benefit in the DSH acute care program.  Based on the records reviewed, the inmate was not referred to an intermediate care program because he did not want to attend, but he also did not want to be referred to an EOP.  DSH staff documented that once he was told that if he did not participate in the EOP he might get his wish to be moved to ASU, he was noted to have brightened considerably and was enthusiastic about returning to the CMF EOP.  Although the CDCR suicide reviewer recorded his history of self-injurious and suicidal behaviors and his chronic moderate suicide risk, overall acute risk was reported as low.

The inmate's suicide appeared more likely than not to have been preventable given his considerable history and notations in the UHR and CDCR suicide report that he would benefit from being housed in a program for an extended time period rather than repeatedly moved between DSH and EOP; his treatment was a challenge and his movement between

programs was "staggering". There is clear evidence in the record of recommendations that he would have benefitted from a longer length of stay in a consistent program than had been previously provided; the Psychological Report of 2008 and other reports within the record indicated that the movement back and forth between programs was not assisting him overall to develop stability. His medication compliance resulted in repeated renewal of Keyhea orders after it was determined that his initial Keyhea orders had been allowed to expire and the inmate decompensated. There was clearly a need not only for collaboration between clinicians and custody with regard to his DSH discharge and placement on the N-1 unit, but also for collaboration between DSH and CMF clinicians as to the inmate's overall management at the appropriate level of care; this was true whether or not the inmate agreed or disagreed to placement at that level of care.

It was striking that upon the CMF psychiatrist learning that the inmate had been moved without clearance, he indicated that he would not have cleared him. However, because the inmate already had been moved, he allowed for him to remain in a less restrictive and less clinically appropriate environment, because it might be disruptive to the inmate to return to DSH. This decision should have been based on the inmate's clinical needs and safety issues.

The inmate's risk factors were clearly identified; although, the documentation by clinicians who provided SREs varied with regard to which risk factors they considered. It was striking that at least in the most recent DSH ISRA, the one protective factor identified was the DSH environment. The inmate appeared to have been appropriate for intermediate care on a continuing basis despite his resistance to treatment, severe and persistent depression, and grief related to his commitment offense of killing his stepson in an attempted suicide.

## 7. Inmate G

Brief History: This inmate was a 21-year-old Hispanic male who committed suicide by hanging on 2/28/11 at the SQ RC. He was single celled in ASU, and he was not a participant in the MHSDS at the time of his death. He entered the CDCR at the SQ RC on 12/30/09 for his first prison term after pleading guilty to second degree burglary and possession of controlled substances. He was sentenced to a 16-month prison term. While incarcerated in CDCR, he was charged with other crimes. He was released to parole on 12/31/10 with immediate remand to custody due to the pending charges. He was found guilty of the manufacture of a deadly weapon by a prisoner on 2/7/11; he received an additional 16-month prison term. He returned to SQ RC on 2/15/11 to begin his 16-month sentence, and he committed suicide on 2/28/11. His EPRD had not been reestablished to reflect his parole revocation and new sentence at the time of his death.

The inmate was discovered on 2/28/11 at approximately 8:05 p.m. by two correctional officers who were conducting 30-minute welfare checks in ASU. Upon arriving at the inmate's cell, where he was the sole occupant, an officer noticed the inmate hanging from his cell door with a thin noose around his neck made from torn bed sheets. The inmate's body was facing the back of the cell. The officer blew his whistle, sounded his personal alarm device, and leaned over the tier and flashed his flashlight to inform his supervisor that he had a situation on his tier. A second correctional officer responded to his location. The sergeant called for MED One and TTA medical to respond to the unit. When staff arrived, the sergeant instructed them to report to the fifth tier with a shield and cut-down tool to aid in the emergency cell evacuation; and upon his arrival made several attempts to

95

communicate with the inmate, but the inmate was non-responsive. The sergeant instructed the officer to open the door and as the door swung open the inmate was hanging from a noose that was tied to the top of the door; he was non-responsive. Another correctional officer utilized the cut-down tool and cut the noose from the inmate's neck. The inmate was laid on the Stokes litter, and a correctional officer began CPR. An LVN and RN arrived on the scene from the TTA, and the RN began utilizing the Ambubag and attached the AED to the inmate. The LVN and an officer alternated the chest compression cycles. MED One arrived and also assisted with CPR, and the inmate was moved to the fifth tier landing. The EMTs arrived on the scene, utilized another AED and aided in CPR. An EMT determined after 25 minutes of constant CPR to contact Marin General Hospital for consultation to confirm his findings of a non-recoverable cardiac arrest. Based on that determination, the inmate was pronounced dead at 8:38 p.m.

The CDCR suicide report provided a timeline and indicated that the inmate was discovered at 2010 hours, and the alarms were sounded. The sergeant arrived at 2011 hours and instructed staff to bring the cut-down tool and shield; the reviewer cited CDCR guidelines for ASU Emergency Cell Entrance Procedures that required use of shields in the presence of at least three officers. An officer was ordered to bring the shield and arrived with the shield to the cell front at 2014 hours. The reviewer noted that it was unclear which action occurred at this time; the officer's report indicated a question mark as to the time that the cell door was opened and the inmate was cut down. The timeline indicated that medical staff from the TTA and the San Quentin Fire Department Ambulance (MED One) were alerted to the medical emergency at 2017 hours. The timeline also indicated that CPR was started at "2019" after an LVN checked the inmate's pulse and told custody that he was not breathing and needed CPR. The RN was noted to have arrived at 2021 and instituted use of the ambu bag with oxygen and attached the AED, which instructed to provide no shock. CPR and use of the AED continued and at 2032 an EMT noted ligature marks around the inmate's neck, rigor in his jaw, and that the inmate was cold to touch. It was further noted that the EMT attempted to establish an airway, but rigor prevented the opening of the inmate's mouth. The reviewer noted that at 2038 hours, the EMT consulted with a medical doctor at Marin County General Hospital who concurred with discontinuation of CPR based on the EMT's report that CPR had been in progress for 25 minutes at the time of death. However, the reviewer noted "at the most, CPR was in progress for approximately 19 minutes". An autopsy protocol report was provided by the Coroner Division of the Marin County Sheriff's Office. The report noted that the autopsy was performed on 3/4/11, and the cause of death was noted as hanging due to a consequence of suicide. The coroner's investigation also noted that chest compressions were begun by a correctional officer at approximately 2017 hours. A toxicology report was provided and indicated that there were no positive findings in blood specimens.

The CDCR suicide report recounted the inmate's criminal justice history. It indicated that he was first arrested in 2004 at age 15. As a juvenile, he had convictions and/or sustained petitions for possession and possession for sale of controlled substances, including hashish and marijuana. He also had arrests for second degree burglary, petty theft, manufacturing a controlled substance, possession of a weapon, and vehicle theft. As stated earlier in this report, he was arrested for second degree burglary and sentenced to a 16-month prison term on 12/23/09. He entered the CDCR for his first adult prison term via the SQ RC on 12/30/09 and was subsequently convicted of the manufacture of a deadly weapon by a prisoner and sentenced to an additional 16-month term; this term began on 2/15/11,

approximately 13 days prior to his death. The inmate was noted to have a gang affiliation with the Norteño (Northern Hispanics) street gang. His street moniker was "Lil Maniak".

The inmate appeared to have had no history of treatment for mental health reasons prior to his CDCR incarceration. During his first intake evaluations in December 2009, he was seen by a psychologist for mental health screening, determined to have no mental health needs, and was cleared for general population. He was screened a second time in April 2010 when he had been placed in ASU; again, there was no evidence of mental illness or mental health needs. His ASU placement was due to possession of an inmate manufactured weapon on his person; he received a 10-month SHU term, and he was referred to the District Attorney. However, he was not transferred to a SHU, but he was retained at SQ RC; on 11/17/10, the remainder of his SHU term was suspended and he was released back to the mainline reception center.

Mental health staff saw the inmate on 8/24/10 as part of a debriefing effort by mental health after there had been a completed suicide in the ASU. Records indicated that he denied any suicidal or self-harm ideation, and he did not request any mental health assistance. He was subsequently paroled to the county jail and returned to the SQ RC on 2/15/11. Upon return to SQ RC, he was again screened by a psychologist; it was noted that there was no need for mental health services, and he was placed in general population. He was placed in ASU on 2/23/11 due to an RVR on 2/22/11 for battery on an inmate without serious injuries. The psych tech screened the inmate, and he was again determined not to be in need of mental health services and was cleared for ASU placement. This was his last contact with mental health staff.

The inmate appeared to have no significant medical problems; although, he complained of back pain, and he was prescribed naproxen to take as needed for the back pain. He also complained of chest pain on 2/21/11, and he was seen by an RN on 2/22/11. When he was seen by the RN; however, he did not have complaints of chest pain, but he noted that he had chest pressure two days prior and thought that the problem could be due to exercise. He also reported to the nurse that he was experiencing stress. The CDCR suicide reviewer indicated in the suicide report of speaking with the RN, who stated that she had asked the inmate whether he wanted to be referred to mental health. He reportedly responded "no, I'm not crazy". The inmate had developmental disability testing and was determined to have normal cognitive functioning (NCF); he was not in need of any services based on a developmental disability.

The CDCR reviewer expressed an opinion in the suicide report regarding the inmate having had a conflict in his dual roles as a bank teller and an active gang member prior to incarceration; this conflict may have been exacerbated by his return to prison after his first parole based on his conviction on charges that occurred during his first incarceration. The reviewer also included in the suicide report information from a letter the inmate had written to his father, after his father had visited him on 2/24/11. The letter included the inmate stating that it was "scary", that the place is "sick twisted", and that he was "unsure how or what really really bad to the point I have 'all' racist speaking some bogus shit". He included that he thought it was "not even inmates to do it its K-9s! (i.e. cops)". The inmate asked his father to contact his lawyer to see if he could overturn his sentencing, but to "not call San Quentin and say anything". He added that he felt trapped, that "this is crazy", and that he had "done nothing to be put in this predicament". He concluded "if I don't make

home I'm innocent of this all!  I hope to make it home".  He added to the note "Pop these K-9s set it up all lies!  3:30am Donner SQSP 2/26/11", and on the back of the page included "I've never heard so many people happy to kill Pops.  These police are setting it up".  He ended with "All the wrong I've done caught up to me but this I did not do. I love you Family and sorry".

The reviewer also included a letter written to his uncle on 2/26/11 which included a statement "it's crazy, I'm confused but stuck in a corner almost inevitable…no matter where I go I'll be hit".  At the bottom of that note he included "RIP 2/28/11, A letter before RIP love to you Tio.  Before your RIP.  P.N.  This here my permanent address!".  The reviewer also included a letter he wrote to fellow gang members on the street dated 2/27/11 which included references to "K-9 really smutted me for some strange reason and I can't run no were regardless".  At the top of this note he included "(RIP)".

There was also a note found inside of a lunch bag that read "if you don't get me out of here this prison I will be killed I don't know by who but for sure I'm wanted and not safe at all in this facility not safe!  I'm not crazy or triple CMS I'm serious tonight I will be killed."

The inmate joined the Norteño street gang at age 15.  He admitted to use of alcohol, marijuana, and methamphetamine, and to snorting heroin.  The reviewer also opined that there were cues that pointed to the possibility of the presence of a Brief Reactive Psychosis after he was placed in ASU, but added "that these cues were missed and did not lead to a mental health referral does not rise to the level of requiring a corrective action plan".

The reviewer also included in the report that there were four major issues that emerged as to the emergency response measures following the inmate's discovery, including (1) the approximate time between initial discovery at 2010 hours and the initiation of chest compressions at 2019 seemed excessive to the reviewer, either suggesting delay in implementing procedures, and/or delay in opening the cell door, and/or delay in beginning CPR after the inmate was cut down; (2) the medical response that was initiated at 2019 hours by a correctional officer at the direction of the facility LVN consisted only of chest compressions by the correctional officer for approximately two minutes; the ambu bag was not used at that time.  Subsequent inquiries revealed that the ambu bags were kept in the medical clinic and not on the housing units; (3) during discussion with the Suicide Case Review Focused Improvement Team and personnel from SQ RC, discrepancies in emergency response timelines were highlighted, indicating wide variability and requiring in-depth inquiries by both custody and nursing officials; and (4) although ambient temperatures affected the onset of rigor mortis, the length of time between death and the onset of rigor in humans was generally considered to be two hours, with facial muscles affected first.  Based on the 30-minute welfare check documentation, the earliest that the inmate could possibly have died was after 1936 hours, i.e., which was less than an hour between the death and the EMT observation at 2032 hours of rigor mortis onset in the jaw significant enough to interfere with placement of an airway apparatus.  The reviewer continued "this timeline calls into question for this reviewer whether the Welfare Checks for 1900 hour were in fact completed".

The CDCR Suicide Report included three problems and quality improvement plans in their recommendations as follows:

Problem 1:  Inmate __ was found unresponsive, and appeared to be hanging at approximately 2010 hours.  The following problems emerged as a result of this review:  Documentation of the emergency response indicated that the TTA received notification of the emergency at 2017 hours, seven minutes after the inmate was discovered.  The reason for the delay in notifying the TTA was not documented in the incident reports.

Emergency responders did not bring the ambu bag during the initial response.  The cut down tool was brought immediately to the cell, but without the ambu bag.  The ambu bag and cut down tool should be together in the "trauma boxes" according to policy.

Delay of between four and seven minutes occurred before officers were instructed to open the cell door.  The review indicated that protective shields were used prior to cell entry.  The reason for the delay in cell entry due to donning the protective equipment was not adequately explained.  This time delay appears to be excessive and requires further explanation.

Quality Improvement Plan:  TWO SEPARATE INQUIRIES WERE REQUIRED IN RESPONSE TO THE IDENTIFIED CONCERNS.

1.  The Warden or designee at San Quesntin State Prison Reception Center shall conduct an inquiry into the problems in the emergency response to this inmate's death.  The inquiry shall address each of the problems listed in this recommendation (seven-minute delay in notifying TTA of emergency, lack of Ambu bag in "trauma box", delay of four minutes in entering cell).  Radio logs indicating announcement of the emergency alarm shall be referenced in this inquiry.

Corrective Actions:  As a result of the inquiry corrective actions shall be taken as deemed necessary, including inventorying and updating "trauma boxes," and reviewing and updating LOPs.  In addition, all staff who responded to this emergency shall be provided with training updates pertaining to emergency response procedures.

2.  The Chief Executive Officer or designee at San Quentin State Prison Reception Center shall conduct an inquiry into the delay indicated in the incident reports between the discovery of the inmate and documentation by TTA personnel of the "man down" call from the inmate's housing unit.  The inquiry shall include a review of TTA call logs and other relevant documentation.  Corrective action shall be taken as deemed necessary.

In addition this matter shall also be referred for review to the local Emergency Medical Response Review Committee (EMRRC).

Problem 2:  Difficulties with emergency response procedures such as the time discrepancies indicated in Incident Reports and the TTA logs revealed problems with emergency response procedures at San Quentin State Prison Reception Center that require collaboration between custody and medical departments.

Quality Improvement Plan:  The Warden or designee and the Chief Executive Officer or designee at SQ RC shall convene a meeting to discuss difficulties that emerged from this review and make recommendations for changes designed to address those difficulties.  Relevant LOPs shall be updated as needed.

Problem 3:  At 2032 hours the EMT noted that the inmate's jaw had onset rigor mortis sufficient to interfere with introduction of an airway device.  If the 30-minute Welfare Check log book sign-offs were accurately recorded, the suicide occurred less than one hour prior to the EMT's observation.  Since onset of rigor is generally considered to

begin in humans at approximately two hours after death, the question arises as to whether Welfare Checks were actually completed as indicated in the log book.

Quality Improvement Plan: The Warden or designee at San Quentin State Prison Reception Center shall:

(1) Conduct an inquiry into the 30-minute welfare checks documented on the day of the inmate's death, particularly whether the welfare checks for the 1900 hour were in fact completed and by the officer whose initials were included in the log book.

(2) Provide corrective actions as deemed appropriate for any departures from policy, procedures, or employee ethical standards.

(3) If deemed necessary this case shall be considered for a referral to the Office of Internal Affairs (OIA).

A Death Review Summary was completed by a physician on 4/4/11. The summary recounted the inmate's primary cause of death, diagnostic category of death, and treatment history. The conclusion was that he received adequate medical care while under CDCR care.

On 8/4/11, the Deputy Director (A) Statewide Mental Health Program and Director, Division of Adult Institutions provided their report on implementation of the Quality Improvement Plan for this inmate in response to the CDCR suicide report dated 5/2/11. In their report, the Directors provided a summary of the CAP items generated from the inmate's suicide as follows:

With regard to Quality Improvement Plan number one, the following documents were provided: (1) memorandum from the associate warden of the specialized housing division detailing review of the inmate's suicide and subsequent corrective actions taken by custody; (2) a crime/incident report part C-1 supplement clarification report from the sergeant; (3) an e-mail from the AW of the specialized housing division that cut-down tools had been received and were en route to the housing units; (4) an e-mail from the office technician of the specialized housing division documenting inventory of "trauma boxes" and steps taken to update equipment; (5) Local Operations Manual chapter 5 (Custody and Security Operations, Subchapter 55000, Section 55050.18A, Addendum A; (6) a copy of the radio log for 2/28/11; (7) memorandum from the CEO of Health Care; (8) response to questions brought up during the suicide review teleconference on 4/12/11; (9) 2010 American Heart Association Guidelines for First Aid, CPR and Emergency Cardiovascular Care; and (10) SQ Health Care Services ERRC minutes for 3/28/11.

With regard to Quality Improvement Plan number two, which identified difficulties with emergency response procedures such as the time discrepancies indicated in the incident reports and the TTA logs, collaboration was required between custody and medical departments; the memorandum from the correctional officer as listed above was identified to provide documentation.

With regard to Quality Improvement Plan number three regarding onset of rigor mortis as noted by the EMT, the memorandum and e-mail from the AW identified above indicated that a request for an investigation had not yet been processed. The memorandum from the AW requesting administrative review of the officer in relation to the inmate's suicide included a recommendation that the investigation was pending at the time of the preparation of the response.

100

Supporting documentation regarding the three identified Quality Improvement Plan recommendations included the memorandum from the AW of the specialized housing division to the mental health department senior psychologist.  It noted the request for administrative review from other correctional officers as to the validity of the 1900 hour welfare check.  In addition, as to the placement of ambu bags and cut-down tool kits together in trauma boxes on tiers, this resulted in an e-mail stating that as of 6/15/11, the ambu bags and cut-down tools had been received at the warehouse and would be delivered to two of the units on that day.  The memorandum referenced other memorandums and documents as to the timeline for the incident, local operational procedure SQP-55050.18 regarding Extraction Policy For Emergency Medical Alarm Response, the incident commanders supplemental report regarding the issue of the four-to-seven minute delay in opening the cell door and the delay in notifying the TTA.

The crime/incident report part C-1 supplement was provided and stated that the sergeant made a radio transmission to Control that the inmate was hanging; this was appropriate notification via radio and the normal practice was that Control repeated the information and received acknowledgement from the TTA that the information was heard and received.  The supplement included a statement that it appeared that there was no delay in any notification to Control or the TTA and that TTA staff must have received the notification as they responded to the scene of the alarm.  With regard to the four-to-seven minute delay before the door was opened, the supplement reported that; although the timeframes were an approximation, it appeared that staff responded, prepared for entry, and conducted the entry in a timely manner with all factors considered, as stated in the supplement.

An additional e-mail indicated that the trauma boxes and cut-down kits were separate entities that were kept in separate locations; the cut-down tool kits were stored and secured in "equipment rooms" in each unit, and the ambu bags were kept in trauma boxes located on the tiers themselves.  Additional items were ordered to merge the cut-down tool kits and ambu bags in the trauma boxes as per the memorandum.

Also provided was the "videotape record of cell extraction" document which indicated that it was a guideline to be followed in the event that staff was required to supervise an inmate's extraction from his cell; it included a six-page document that detailed the process.  A memorandum by the SQ CEO to the suicide response coordinator dated 6/8/11 indicated that review of the case confirmed that SQ nursing staff responded timely and took appropriate action; reports and documents included in the review were attached.  Some questions were deferred to the warden for a response.  It was also noted that SQ healthcare staff would not be submitting a CAP as it had been determined that healthcare staff followed all policies and procedures and took appropriate actions.

**Findings:**  This inmate's suicide death does not appear to have been foreseeable as the inmate was not reporting suicidal ideation or intent in the hours to days prior to his completed suicide.  However, his suicide may very well have been preventable.  Despite the responses by the Directors to the problems identified and the quality improvement plans as stated in the CDCR suicide report, there appears to have been a delay in opening the cell door and a delay in notifying the TTA of the emergency.  Furthermore, the presence of rigor as identified by the EMT at the time of the incident was very concerning; the investigation had not been completed at the time of this review.  The presence of rigor

would appear to indicate that the inmate had not received adequate 30-minute welfare checks; the welfare check would have discovered that the inmate was unresponsive in a much shorter time than reflected by the actual discovery of the inmate hanging in his cell. It thus appears that this inmate's death may have been preventable. The results of the investigation and efforts to reduce the time for emergency response to an inmate in emergency crisis should be further reviewed and revised.

**8. Inmate H**

Brief History: This inmate was a 37-year-old Hispanic male who committed suicide by hanging on 3/25/11 at CSP/Sac. He was a participant in the MHSDS at the EOP level of care. He was single celled in general population at the time of his death. He entered the CDCR at WSP RC on 4/20/07 after pleading no contest to driving under the influence of alcohol with an enhancement for causing great bodily injury. He was sentenced to four years and four months in prison, and his EPRD was 3/31/11.

The inmate was discovered on 3/25/11 at approximately 3:58 p.m. by a floor officer who was conducting the institutional standing count. The floor officer discovered the inmate in his cell hanging by one end of a white cloth tied around his neck and the other end of the white cloth tied to the vent inside his cell. The officer immediately activated his personal alarm device and yelled to the observation officer that the inmate was "hanging". The observation officer immediately announced via institutional radio a medical emergency, and the EOP sergeant responded to the incident site and observed the inmate hanging as described. The sergeant assigned another officer as recorder for the incident and organized a team to enter the cell to conduct an emergency medical extraction. Once sufficient staff arrived to the cell, the door was opened and an officer entered the cell and applied wrist restraints to the inmate. The officer then lifted the inmate by his left bicep and right underarm to relieve the pressure on his neck and another officer utilized the cut-down tool and cut the white cloth above the knot that was wrapped around the inmate's neck. Two officers assisted the inmate to the floor on his back, and an officer initiated CPR and requested medical assistance to respond to the scene.

At approximately 4:00 p.m., an LVN arrived and observed the inmate lying on the ground, noting that his pupils were fixed and dilated, his lower extremities were mottled, and his nail beds were blue. The LVN checked for a carotid pulse, which was absent, and the skin was cold to touch. The LVN advised custody to get the inmate to the TTA. He was placed on a Stokes litter, carried out of the cell, and placed on a rolling gurney. The LVN and two officers escorted him to the TTA. At 4:03 p.m., the inmate arrived at the TTA; a registered nurse continued CPR at 4:04 p.m., while the LVN utilized the ambu bag to provide assisted breathing. At 4:10 p.m., the AED was attached to the inmate's chest. All attempts by medical staff to resuscitate the inmate were noted as unsuccessful. At 4:21 p.m., a physician pronounced the inmate deceased. The CDCR suicide report indicated that there were four AED applications; the first two and fourth advised no shock; the third AED attempted at 4:15 p.m. advised shock with no response obtained and asystole, and CPR continued.

An autopsy report provided by the Department of Coroner, County of Sacramento indicated that the autopsy was performed on 3/28/11. The cause of death was listed as asphyxia due to hanging, and the final classification was suicide.

102

The CDCR suicide report recounted the inmate's criminal justice history. It noted that although he had been arrested on three prior occasions for DUI with probation and a jail term, this was his first prison term. There was no known juvenile criminal justice history. The circumstances of the commitment offense were that the inmate was driving on 12/16/06 with a passenger in his vehicle, and the vehicle crashed as he was driving. Both he and the passenger suffered injuries, but the passenger suffered fractures of both lower extremities. The inmate's blood alcohol level was found to be above the legal limit. He was arrested while in the hospital and charged with driving under the influence of alcohol with an enhancement for causing great bodily injury, driving without a license or insurance, and providing false identification to a peace officer. He subsequently pleaded no contest to the DUI with enhancement, and the other charges were dismissed. He was sentenced as noted above.

Record review indicated that the inmate had no known mental health history prior to his CDCR incarceration, including during his time at the Santa Barbara County Jail prior to transfer. He entered the CDCR via the WSP RC on 4/20/07 when a bus screening was conducted; it did not identify any history of mental health treatment or problems. He received a brief mental health screen, developmental disability screen, and a history and physical on 4/24/07. They all indicated that he had no mental health needs, and he was cleared for general population. He remained at WSP RC until 7/23/07, when he was transferred to the California Correctional Center (CCC) as a minimum security inmate.

The inmate received notice from the Immigration and Naturalization Service (INS) on 1/18/08 indicating that there was an investigation to determine whether or not he would be deported. Four days later, he participated in a riot in the dormitory. He was placed in ASU, was assessed a SHU term, and was transferred to California State Prison, Corcoran (CSP/Corcoran) on 5/21/08. He was found guilty of battery on another inmate during the riot and assessed a 14-month SHU term; 26 points were added to his classification score resulting in classification as a Level IV inmate. He received a second RVR on 7/31/08 when he engaged in a fist fight with his cellmate, and he was found guilty of mutual combat with the use of force. Records indicated that he told staff that this fight with his cellmate was related to his belief that the cellmate was using witchcraft to poison his food, causing him abdominal pain. He appeared to have delusional beliefs of harm from others and what may have been realistic beliefs of retaliation by the Border Brothers (gang) due to his attack on his cellmate. He remained in the CSP/Corcoran SHU until 2/10/09, when he was transferred to the ASU at HDSP. The second RVR that occurred on 7/31/08 when the inmate was housed in the SHU noted that he was a MHSDS participant at the 3CMS level of care. However, the records and the CDCR suicide report indicated that no notes were located regarding when and how the inmate was placed in the MHSDS. Following his transfer to HDSP, a note dated 3/3/09 indicated that he "did not meet the criteria for 3CMS on 3/13/08".

There was a note in the record dated 12/2/08, while the inmate was still in the SHU, indicating that he was observed with "bizarre behavior". He was described as talking to the wall and to himself as well as speaking strangely about drinking water. It appeared, however, that he was not placed in the MHSDS or referred for further evaluation.

When the inmate was released from the SHU on 1/23/09, he remained at CSP/Corcoran in the ASU. The ASU mental health screening indicated that he was mumbling to himself

and making faces at unseen others; however, the inmate denied hallucinations. He was referred for an "emergent mental health screening". This screening was conducted six days later on 1/29/09 and concluded that the inmate was not suffering from a mental illness. On 2/10/09, he was transferred to HDSP in general population. He was described as staring at walls, refusing to eat, urinating on himself, and complaining of abdominal pain. On 4/16/09, he was referred for evaluation to 3CMS for medical necessity after he lost 36 pounds over two months; except for one daily meal, he had been refusing meals, in addition to the above noted symptoms. The inmate was admitted to a MHCB for a "grave disability" evaluation on 4/22/09, where he remained until 5/4/09. He was discharged to the EOP level of care, and a Keyhea petition was filed on 5/6/09, as he refused to take his antipsychotic medication. The inmate's diagnosis was Major Depressive Disorder with Psychotic Features, and a Keyhea order began on 6/3/09.

The day prior to the initiation of the Keyhea order, he was transferred to CSP/Sac, where he was placed at the EOP level of care. Records indicated that with active treatment his symptoms initially improved; however, he subsequently became withdrawn, isolated, and exhibited poor care after a referral for a level of care change to 3CMS had been considered with the inmate's approval. He subsequently began taking his oral antipsychotic medication, and he was told that he would remain in the EOP. However, he began to withdraw from EOP therapeutic activities, not coming out of his cell for individual contacts and reducing his participation in groups and yard; in September and October 2009, he was also expressing safety concerns. It appeared from the records that the treatment team began to consider reducing his level of care to 3CMS because he was not participating in EOP structured therapeutic activities. These considerations for a reduced level of care occurred in November 2009. However in January 2010, he was referred to DSH because he had become selectively mute; his condition had continued to deteriorate to the extent of not getting up from his bed to be seen at cell-front. While awaiting results of the DSH referral in February 2010, the inmate began to report auditory hallucinations as "voices" to his primary clinician.

The inmate attempted suicide on 3/1/10 by hanging himself while his cellmate was at an appointment, and he was discovered by his cellmate when the cellmate returned. He was transported to the Queen of the Valley Hospital in Napa. Brain imaging studies revealed no permanent damage. It was noted that during transport he exhibited evidence of seizures. He subsequently transferred back to CSP/Sac on 3/3/10, and on 4/1/10 to the VPP program at CMF. The records did not include a SRE in March 2010 when he had attempted to hang himself and was transported to an outside community hospital, either before or after his return from the hospital. SREs were completed during April 2009, June 2009, and January 2010. The CDCR suicide report made reference to SREs that were completed on 4/9/09, 4/10/09, and 4/22/09 that determined that there was no apparent significant suicide risk on the first two evaluations; no level of risk was provided on the third evaluation. SREs dated 6/15/09 and 1/13/10 indicated low suicide risk.

Another referral was instituted to DSH, and the inmate was transferred to the VPP at CMF for an acute care admission on 4/1/10; he was placed on suicide precaution. The court also renewed his Keyhea order. Staff noted that he reported that he did not recall his suicide attempt, but only remembered having awakened in the hospital and being told that he had attempted to hang himself.

The inmate remained at the acute level of care at VPP from 4/1/10 until 6/17/10, when he was transferred to intermediate care at the Salinas Valley Psychiatric Program (SVPP). He reported auditory hallucinations with command voices telling him to harm himself or others, ordering him to stand or sit, and informing him that he was going to be deported. He further reported attempting to resist these voices. He began participating in groups and had a cellmate. His appetite returned, and he began to gain weight. He also continued to be in fear for his safety because of beliefs that he might be harmed by the Border Brothers gang. His diagnosis had been Major Depressive Disorder, Recurrent, Severe with Psychotic Features while he was in the EOP and VPP programs; his diagnosis was changed to Schizoaffective Disorder, Depressed Type when he was hospitalized in the SVPP.

The inmate remained at SVPP until 3/23/11, when he was returned to CSP/Sac. The SRE performed at SVPP on 3/9/11 was quite remarkable in that it listed no prior suicide attempts or the use of a translator during the interview. The CDCR suicide reviewer also noted that the SRE appeared to have been completed without a thorough record review; risk levels were assessed as "low" despite the inmate's prior near lethal attempt and history of risk factors.

The inmate returned to CSP/Sac on 3/23/11 and was placed on five-day follow-up at the EOP level of care. The treatment team noted that he was scheduled to parole on 3/31/11 to the custody of INS for deportation to Mexico. A psychiatric progress note dated 3/23/11 indicated that the psychiatrist was assisted with the translation by a staff member. The inmate was noted to be a new arrival on a Keyhea order; he was prescribed Risperdal Consta, Risperdal (oral), and Effexor. The psychiatrist also noted that the inmate would be paroling the following week on 3/31/11; he denied "suicide or homicide", and he was aware of his parole date. The psychiatrist wrote "he likes to go back to Mexico if cannot stay in the U.S". The inmate denied suicidal or homicidal ideation, intent, or plan. At that time, his speech was coherent in Spanish, thought processes were goal directed, and he denied hallucinations. His focus and memory were intact, his insight to illness and judgment improved, and his impulse control was fair. The psychiatrist diagnosed Schizoaffective Disorder, assessed him as a new arrival from DSH, and noted that the inmate denied "suicidal and homicidal thoughts and denied psychotic symptoms at this time". The plan was to continue with medication management and to speak with another clinician regarding the parole condition "as he is going to be released to INS and he is still on Keyhea Order". The psychiatrist indicated that he would provide "30-days of medication" for him and "would adjust his meds". The psychiatrist also noted that the patient "needs careful psychiatric attention upon discharge".

The inmate had seen the psychiatrist and said that he was "okay" about going back to Mexico because his mother was there, but the clinician did not realize at the time that the inmate's mother was dead. On that same date, the inmate met with an INS agent who informed him that he would be deported; the INS agent also met with the inmate's psychiatrist regarding the inmate's need for medication and his "psychiatric fragility". He was seen on 3/23/11 by his primary clinician, who saw him with an interpreter. The inmate was seen in an intake booth out of his cell as the correctional officer brought him to the clinician. The inmate was seen with an interpreter, and his sleep and appetite were both "okay" according to the correctional officer, his mood appeared calm, and his affect was consistent with his mood. As to the inmate's thoughts, the clinician indicated that they were "unable to fully assess but responded to interpreter in a normal way and there was no

evidence of psychosis". His insight and judgment were assessed as poor, and his grooming as good. The clinician noted that he was on five-day suicide follow-up and a Keyhea order. The assessment was that the inmate had just returned from DSH and was on an INS hold. The INS official spoke with the interpreter. The diagnosis was Major Depressive Disorder, Severe with Psychotic Features and Antisocial Personality Disorder with a GAF score of 38. The plan was to "continue to monitor the inmate and to use CBT, stress management techniques per inmate's treatment team".

During the course of his treatment from approximately April 2009 through December 2010, the inmate had been treated with antipsychotic medications including Geodon, Haldol Decanoate and Risperidone Microspores. The Haldol Decanoate and Risperidone Microspores were both injectable medications; the inmate had refused oral medications. From April 2010 through December 2010 he also received Effexor, an antidepressant, in addition to antipsychotic medications. It appeared from the MARs that the inmate received Effexor from 12/13/10 through 3/25/11, and no antipsychotic medication after his return to CSP/Sac.

The inmate's medical history was essentially unremarkable with the exception of abdominal complaints. He complained of rectal bleeding, gas, constipation, abdominal pain, difficulty eating, and urgency in urination. He had suffered a ruptured bladder in the vehicular accident which resulted in the commitment offense. While in the CDCR, he was diagnosed with irritable bowel syndrome and gastroesophageal reflux disease, and his bladder trauma was noted.

The DSH discharge summary dated 3/24/11 provided discharge diagnoses of Schizophrenia, Paranoid Type, Polysubstance Dependence, Antisocial Personality Disorder, and a GAF score of 40, which was an improvement from the GAF score of 25 on admission. The discharge summary included the identifying data of the inmate being a 40-year-old Hispanic male admitted from CSP/Sac, where he had been transferred from Patton State Hospital, with a parole date of 7/1/14. On closer inspection, however, it was clear that this discharge summary was for a different inmate with a different CDCR number, but was included in this inmate's UHR. The record also included a SRE and other documents for this other inmate wrongfully filed in this inmate's UHR, and a VPP individualized treatment plan and a Keyhea order.

The CDCR suicide reviewer noted in the suicide report that the inmate "received appropriate treatment for his symptoms at all CDCR facilities". The reviewer further noted that the inmate had the opportunity to disclose suicidal ideation or plans on many occasions, but did not and generally denied or minimized suffering from mental illness symptoms. The reviewer also noted that the SRE performed at SVPP just prior to the inmate's discharge was problematic in that it was apparently not completed with the aid of an interpreter, nor was there more than a cursory record review; consequently the suicide risk was assessed as low. The reviewer reported that senior clinicians at SVPP had discussed the SRE with the clinician who performed the evaluation and would be monitoring and mentoring her performance. The reviewer further noted that additional training for staff psychologists about the importance of incorporating all available information into the SRE and using a translator when indicated was planned. The reviewer continued that this concern was the object of discussion during case review, which was also attended by representatives from DSH and included "rapid intervention" by DSH

staff, which was similar to Quality Improvement Plans. The reviewer indicated that a SRE was completed at CSP/Sac within 24 hours of his return, five-day follow-up was scheduled, and procedures were followed. As such, the procedures exceeded the requirements specified in the Memorandum of Understanding (MOU) between CDCR and DSH, which required a single clinical contact with the inmate within five working days of return to the institution. The inmate committed suicide while on the third day of a five-day observation status after his return from SVPP. No recommendations were generated as a result of the review, and no Quality Improvement Plans were formulated. The suicide report made no reference to the DSH discharge summary and ISRA in the inmate's UHR for a different inmate with a different CDCR number.

A physician provided a Death Review Summary dated 6/21/11. The inmate's cause of death, diagnoses, and medical care were reviewed. The physician concluded that there were no significant medical concerns, but noted that the Code notes (i.e. details) were quite limited, and the application of the AED seemed delayed.

**Findings**: This inmate's suicide death does not appear to have been foreseeable because, according to the limited records provided, he reportedly had not stated any suicidal intent, ideation, or plan after his return from SVPP on 3/22/11, nine days before his EPRD. However, it is to be noted that a SRE referenced in the suicide report was not located in the records provided; although five-day follow-up documentation and notes by the primary clinician and the psychiatrist were included in the documentation. The inmate's suicide may very well have been preventable had he had an accurate SRE while still housed at SVPP and had he not been transferred to a lower level of care at CSP/Sac. Although he had been seen after his arrival at CSP/Sac by a clinician who determined that he was not acutely suicidal, his chronic risk factors and his imminent deportation did not appear to have been factored in as additional risk factors affecting his acute level of risk, and his GAF score was 38. In addition, his statement to the psychiatrist that he would be going home to Mexico and that his mother was there may very well have been an indication of his intent to go home to Mexico after his death given that his mother was already dead. The psychiatrist was apparently unaware of that fact until after the inmate's death. However, a GAF score of 40 on discharge from SVPP, an inadequate SRE performed at SVPP with no recognition of his past serious suicide attempt in 2010, and his imminent release to be deported all contributed to his suicide being very possibly preventable had he been retained at SVPP and/or placed at the MHCB level of care upon his return. It should also be noted that the SRE referenced in the CDCR suicide report that was reportedly done at CSP/Sac after his return was not located in the records provided for this review.

An additional concern generated during this review was the presence of another inmate's medical records, including the SVPP discharge summary and an ISRA pertaining to that inmate present in the UHR provided for this inmate. It was unclear whether or not that errant information was included as the information received from SVPP to clinical staff at CSP/Sac and/or the information reviewed by the CDCR suicide reviewer. However, the presence of another inmate's medical records in this inmate's UHR was not identified as a problem or need for corrective action during the CDCR suicide review process.

**9**. **Inmate I**
Brief History: This inmate was a 30-year-old Asian male who committed suicide by hanging on 3/30/11 at CSP/LAC. He was a participant in the MHSDS at the EOP level of

care and was double celled at the time of his death.  He entered the CDCR on 5/15/09 at the California Correctional Institution Reception Center (CCI RC)  He had been found guilty of two counts of murder in the first degree and sentenced to two consecutive life terms, resulting in life without the possibility of parole.

The inmate was discovered on 3/30/11 at approximately 1:54 a.m. by a correctional officer who was alerted by a "man down" call by the inmate's cellmate.  The officer responded and discovered the inmate hanging from the air vent with a ligature tied around his neck; the inmate was unresponsive.  The officer activated the unit alarm and retrieved the bar box key and the cut-down tool.  The officer returned to the cell and escorted the inmate's cellmate to the shower.  The officer returned to the cell, cut the ligature, and with assistance from another officer, carried the inmate out of the cell and onto the tier.  Responding staff initiated CPR, and the inmate was placed on a Stokes litter and taken to the front of the building.  A registered nurse was summoned and responded.  Staff continued CPR while transporting the inmate to the CTC.  The Los Angeles County Fire Department was notified and responded, but upon arrival determined that the inmate was beyond lifesaving measures and he was pronounced dead.  A physician confirmed the death at 2:17 a.m.

The incident report provided a timeline as follows:  At 1:54 a.m., the officer was alerted to a "man down" call from the cellmate, the unit alarm was activated, and medical staff were requested.  At 1:57 a.m., medical staff arrived and at 1:59 a.m., 911 emergency was requested.  At 2:15 a.m., the fire department arrived and at 2:17 a.m., the fire department EMS pronounced the inmate dead.  A physician confirmed the death at 2:17 a.m.  An autopsy report was provided by the Department of Coroner, County of Los Angeles; it indicated that the autopsy was performed on 4/1/11.  The cause of death was listed as hanging, and the manner of death was suicide.  A provided toxicology report indicated that no alcohol (ethanol) or illegal drugs were found in blood specimens.  A suicide note was found inside an envelope in the inmate's property.  The CDCR suicide report also indicated that the AED was utilized by the RN in the TTA and advised no shock.  The ambulance with paramedic support arrived at 2:12 a.m., and the paramedic assumed care and communicated to the physician, who pronounced the inmate dead at 2:17 a.m.

The CDCR suicide report recounted the inmate's criminal justice history.  It noted that he was arrested twice as a juvenile in February 1998 for maliciously defacing property with paint and for receiving stolen property.  The dispositions of these arrests were unknown at the time of this report.  As an adult, he was arrested twice for driving under the influence of alcohol in June 2003 and May 2004; the dispositions of these arrests were unknown at the time of this report.  As for the commitment offense, the inmate was arrested in December 2004 for two murders that occurred in October 2003.  Records indicated that he was involved in business dealings of an illegal nature with friends who ultimately became his victims based on threats against the inmate's brother and possibly other family members.  The inmate reportedly strangled both men, took their bodies to a remote location in the desert, and attempted to burn them.  However, their bodies were subsequently discovered and the inmate was tried and found guilty of two counts of murder in the first degree, as noted above.

The inmate had no known mental health history prior to his CDCR incarceration on 5/15/09.  While at CCI RC, he was screened for mental illness and was cleared for general

population.  He was transferred to Centinela State Prison (Centinela) on 9/18/09.  He initiated a health care request form, and the psychiatrist saw him on 5/1/10; he had been sleeping poorly and "feeling down".  The inmate wanted to be seen in a confidential setting.  However, the yard was on lockdown and his appointment was rescheduled for a week later when he would be seen in a confidential setting rather than at cell-front.  On 5/1/10, he denied suicidal ideation.  On 5/8/10, after he had initiated another health care request form, the yard nurse referred him to the TTA; he was admitted to the CTC on suicide precaution due to severe depression and vague suicidal ideation.  A psychologist completed a SRE on 5/8/10; the reason for this assessment was a "complaint of depression".  Sources of information included the MTA, inmate/patient interview, and UHR.  Identified chronic risk factors were history of Major Depressive Disorder "likely," history of Psychotic Disorder "secondary to street drugs including LSD," history of substance abuse, violence, poor impulse control, and perception of loss of social support.  Additional noted chronic risk factors were first prison term, longer life sentence, male gender, and "White ethnicity-other Japanese/Caucasian".  The acute risk factors included current/recent depressive episode, anxiety or panic symptoms "with paranoid flavor", hopelessness/helplessness, increasing interpersonal isolation, "apathy and loss interaction", disturbance of mood/lability, and early in prison term, "appeal still in progress".  Noted protective factors were family support, religious/spiritual/cultural beliefs, job assignment, and active and motivated in psych treatment.  It was noted that the inmate did not plan to kill himself or desire to die.  Additional details included the "MSE is highly abnormal with flat affect" and "serious risk of major depression and/or suicidal thinking".  The estimate of suicide risk was chronic risk moderate and acute risk moderate and high, with a justification of risk level due to facing life without parole, losing psychosocial support, and showing maximum signs of major depressive episode.  The treatment plan was for an IDTT within 24 hours, psychiatric consultation within 24 hours, CTC admission on suicide precaution (completed at 1805 hours), and physical exam with assessment of right shoulder injury, with follow-up as needed.

On 5/9/10, the IDTT placed the inmate in the MHSDS at the 3CMS level of care with a diagnosis of rule out Major Depressive Disorder, Severe and a GAF score of 30 to 35.  He was referred to a MHCB and transferred to CMF on 5/15/10.  He received a SRE while in the CTC that indicated moderate chronic risk and moderate to high acute suicide risk.  He reported at that time that he had a previous suicide attempt by overdose in 2002 following his discharge from the Navy.

The inmate's diagnosis in the MHCB was Major Depressive Disorder, Recurrent, Severe with Psychotic Features, Polysubstance Dependence and rule out thyroid problem; he was assessed with a GAF score of 25 on admission and 45 at the time of discharge.  He was discharged on 5/24/10.  A SRE was completed on 5/24/10 that noted chronic and acute risk factors, but the inmate denied suicidal ideation, intent, and plan; and the clinician estimated the inmate's acute risk as low.  He was noted to have refused all medications during his admission to the MHCB.  He was discharged from the MHCB on 5/24/10 to the EOP level of care with a five-day follow-up at CMF.

On 6/7/10, the inmate was transferred to CSP/LAC.  At CSP/LAC, he was placed in the ASU on 10/14/10 pending an investigation for a cell phone charger that was found in his cell, but he was returned to mainline housing the following day with no further action taken.  At CSP/LAC, the inmate's EOP level of care was continued, and he was provided

with a diagnosis of Psychotic Disorder NOS.  However, the inmate generally did not attend groups as he decided that he was uncomfortable in groups.  During his admission to the MHCB, there was a period when he was prescribed Remeron and Geodon; however, with the exception of Geodon prescribed on an as needed basis for agitation, all medications were discontinued on 5/24/10.

After his arrival at CSP/LAC, he was prescribed Remeron on 6/11/10 for sleep.  On 7/3/10, Geodon was added, and by 7/29/10, Remeron was discontinued as the inmate refused to take it.  He remained on Geodon, and Prozac was added on 9/24/10; however, the Prozac was discontinued on 11/13/10 and Effexor was started.  By 12/8/10, the inmate requested that all medications be discontinued, and they were discontinued.  He resumed taking Effexor from 1/12/11 until 2/6/11.  He was prescribed Effexor, which began again on 3/7/11, at the time of his death.

A psychiatrist's brief mental health evaluation on 1/19/11 did not describe the inmate's past mental health history; risk assessment results were "minimal".  The present mental status portion of the evaluation was incomplete.  The inmate was provided with a diagnosis of Mood Disorder NOS, and the recommendation was to start Effexor at 75 mg with a follow-up in 30 days.  A different psychiatrist saw the inmate on 11/2/10 for a brief mental health evaluation for medication review purposes.  Sources of information were not identified, but the psychiatrist noted a past mental health history of one suicide attempt.  The result of the risk assessment was "minimal with meds and follow-up", but there was no present mental status examination documented.  Boxes on the form were checked; and some of the areas of mental status were provided in the evaluation and formulation, including negative suicidal and homicidal ideas and fair insight and judgment.  There also was a notation of "(illegible) past depression and anxiety".  The diagnosis provided was Mood Disorder NOS, rule out Major Depressive Disorder, and Cannabis Dependence with a plan to "D/C Prozac, medical education, and begin Effexor" and "continue Geodon, continue (illegible) and supportive/expressive sessions-(illegible) with follow-up in 30 days".

Based on a staff referral, a psychiatrist provided a brief mental health evaluation on 2/6/11.  Sources of information were the inmate interview and UHR.  The psychiatrist identified as a presenting problem the inmate having last been seen on 1/12/11 when Effexor was prescribed; he stopped taking it after a few days and wanted to stay off of all medications stating "I'm okay without meds".  The mental health past history portion of the evaluation was blank, and risk assessment results were noted as "minimal".  The evaluation and formulation included "no (illegible) of psychosis, mood (illegible), depressed but stable, affect restricted.  I/J are fair".  The inmate was provided with a diagnosis of Mood Disorder NOS, and the recommendation was to "D/C Effexor per patient's request.  Wants to stay off meds.  With follow-up in 30 days".  There was no indication from the records that the inmate was seen for follow-up within 30 days.

The record indicated that the inmate's attendance in structured therapeutic activities in the EOP at CSP/LAC was poor.  It was noted that during the first quarter of 2011, MHTS.net documentation indicated that he had been scheduled for 213 groups; of these, staff cancelled 33 and the inmate only attended 12 of the remaining 180 group sessions.  For the first quarter of 2011, the CDCR suicide report indicated that he was generally cooperative in attending individual appointments with his primary clinician and psychiatrist.  However, the report noted that his primary clinician saw him on 11 occasions, eight of which

occurred in the dayroom and three occurred at cell-front, with four refusals.  The inmate was also seen for four scheduled psychiatric appointments; the last occurred on 3/6/11.  The inmate's psychiatrist had prescribed and discontinued Effexor, an antidepressant, and Geodon, largely as a consequence of the inmate's request for medications and subsequent request for medication discontinuation because he wanted to attempt deal with his symptoms without medications.  The last time that the psychiatrist prescribed Effexor was on 3/7/11, when the inmate reported an increase in depressive symptoms.  However, according to the MARs, he began to refuse the medication at least half of the time that it was offered between 2/6/11 and 3/29/11, the day prior to his hanging in the early morning hours of 3/30/11.  Despite the inmate's variable compliance, there was no follow-up appointment scheduled with the psychiatrist after 3/7/11 and prior to the inmate's death.  His depressive symptoms were described as depressed mood, increased sleep, decreased appetite, and feeling fatigued.  His initial diagnosis was Major Depressive Disorder, Recurrent, Severe with Psychotic Features.  The diagnoses were changed to Mood Disorder NOS, Psychotic Disorder NOS, rule out Schizoaffective Disorder, and ultimately Mood Disorder NOS on 2/17/11, the last time that his IDTT met for treatment planning.

A psychologist completed a SRE on 2/15/11.  The reason for this assessment was an update for the IDTT; the inmate's level of care was EOP.  The sources of information were the inmate/patient interview and the UHR.  Chronic risk factors identified included a history of Major Depressive Disorder, Psychotic Disorder, chronic pain problem, chronic medical illness, history of substance abuse, history of violence, first prison term, longer life sentence, and male gender.  A history of a suicide attempt by overdose at age 21 was also noted as was suicidal ideation 2010 with an admission to the MHCB at Centinela and "Vacaville SI".  Acute risk factors included suicidal ideation with "thoughts in passing" written, current/recent depressive episodes, current/recent psychotic symptoms, current/recent anxiety or panic symptoms, and disturbance of mood.  Protective factors included family support, religious/spiritual/cultural beliefs, interpersonal social support, future orientation/plans for future, exercises regularly, positive coping skills and conflict resolution skills, insight into problems, active and motivated in psych treatment.  The inmate did not report a plan to kill himself or report a desire to die.  The SRE referenced a progress note regarding a complete mental status examination, and the estimate of suicide risk was chronic risk moderate and acute risk low; acute risk was assessed as low due to inmate's "firm denial SI" and improvement in depressive symptoms.  Also noted were the inmate's excellent family support and future focus with a plan to study theology.  Chronic risk was assessed as moderate due to previous attempts, history of impulsivity, history of substance abuse, and violence.  The plan was to continue to monitor and assess suicide risk and to encourage the inmate to focus on future orientation plans, to work to increase stress tolerance to reduce suicidal ideation and to monitor physical conditions for stability.

The inmate's medical history included a history of hypoglycemia.  His thyroid levels were to be checked in March 2011, but he refused an appointment with a physician; a rescheduled appointment had not been completed prior to his death.

The CDCR suicide reviewer indicated in the suicide report that during the course of the review it was discovered that the inmate had access to a cell phone and a computer that allowed him an internet connection to utilize both e-mail and Facebook.  The reviewer discovered that the inmate had gained internet access on 12/15/10 and had written numerous Facebook messages to friends during December 2010 and two messages in

March 2011.  The reviewer noted that all of the messages were invitations to establish contact and that the inmate had 24 Facebook friends.

The reviewer further discovered that the inmate had met with his brother's attorney.  His brother had also been arrested for the murders, and on 3/25/11 the inmate's parents told the reviewer that this inmate gave a full confession regarding his sole role in the murder of the victims and subsequent actions such as the disposal of the bodies, which involved his brother.  The reviewer also spoke with the inmate's uncle who reported that the inmate was very despondent during their last meeting on 3/26/11 and was hopeless about being able to do anything that would give his life meaning.  According to the reviewer, the inmate had been in contact by cell phone, written communications, and e-mail with his family members, all of whom were aware of his increasing depression and despondency.  However, none thought that he would commit suicide, and none contacted any CSP/LAC staff regarding their concerns.

The inmate left a suicide note in an envelope addressed to his brother.  The letter stated in part that he had been going over the letter countless times in his head, that he had "been planning to do it for a while," and that he had hoped to see a few more people before he "left this world".   The inmate stated his reasons for suicide as having too much guilt and too many demons in his head, and that he could not defend his sins.  He went on to thank all of his family and friends for being there and stated that he loved all of them.  He asked for forgiveness for everyone's life that he had made harder and forgave those who had sinned against him.  The inmate requested that he be cremated and that his ashes be taken to "some skiable glacier".  He asked that others pray or forgive him and hoped that God would forgive him for his sins.  He concluded by stating that he loved them all, "God Bless.  I got your back from the over side", and he signed with Japanese language characters.

The reviewer noted finding no concerns or problems in the handling of this case by medical or mental health staff but identified several concerns as to mental health treatment at CSP/LAC, as follows:  (1) the MHCB discharge diagnosis of Major Depressive Disorder, Severe with Psychotic Features was not mentioned or carried forward by CSP/LAC mental health staff and the first four IDTT treatment plans did not mention the inmate's MHCB admission, suggesting to the reviewer that mental health staff at CSP/LAC may not have reviewed the MHCB records; (2) an inaccurate and superficial MHCB history was included in the mental health treatment plan of 11/18/10 and no substantive comments were made as to the clinical course at the MHCB or discharge diagnosis.  The reviewer noted that tentative diagnoses were made without specifying clinical rationale for these diagnoses or steps to clarify the diagnoses; (3) the inmate was transferred to the EOP level of care at CSP/LAC from the MHCB with a documented history of suicidal ideation chronic moderate risk and variable acute risk including one previous suicide attempt prior to prison, and no SREs were completed by CSP/LAC mental health staff until 2/15/11.  The IDTT of 2/17/11 appeared to provide the most complete documentation of the inmate's presenting problems and proposed interventions, but the first page of the treatment plan contained information that was clearly related to another inmate.  The information had been included in error but apparently was not noticed by all IDTT clinical staff during the IDTT review.  The reviewer noted that the first page of the treatment plan was computer generated, but the rest of the document was handwritten; it appeared that the problem list and proposed interventions, goals, progress, etc. were "generic verbiage provided without clinical thought or discussion"; (4) the IDTT of

2/17/11 with a tentative diagnosis made by the same IDTT in November 2010 was dropped and replaced by a diagnosis of Mood Disorder NOS with no clinical discussion or rationale to explain or justify the new diagnosis or how the diagnostic change would involve informed treatment; (5) most, if not all, of the inmate's primary clinician contact at CSP/LAC occurred in the dayroom, which was not a private and confidential space although such a space was available.  However, the inmate would not avail himself of that space because he did not go to the mental health office.  The reviewer opined that the self-imposed lack of privacy would have been both a hindrance and a protection for this very guarded inmate and that this in turn created an impediment to the clinician's ability to evaluate and understand the level of the inmate's depression, lack of hope, and increasing despondency, and (6) the medication noncompliance notifications provided by psych techs when the inmate was noncompliant for three days in a row did not result in timely psychiatric follow-up of these notices dated 3/20/11 and 3/27/11.  The reviewer further opined that "the lack of certainty about diagnosis may have undermined the treatment of this individual", acknowledging "that the breadth of treatment provided to the inmate may not have been fully captured in the documentation", but "the MHCB discharge diagnosis continued to fairly accurately describe the inmate's mental illness intensity and symptom presentation during the balance of his life".  The Mood Disorder NOS diagnosis could not account for the ongoing endorsement of auditory hallucinations or other distrustful and paranoid feelings that the inmate repeatedly reported.  Had the Major Depressive Disorder, Severe with Psychotic Features diagnosis continued, all mental health staff and particularly psychiatric staff may have undertaken more focused and aggressive assessment, treatment, and monitoring of the inmate.  The reviewer continued that it was unclear, given the lack of the inmate's treatment compliance, whether carrying forward the more definitive and strong diagnosis would have changed the clinical course and final outcome; it was "still incumbent upon the mental health staff to take the time and care necessary to establish the most accurate diagnosis possible in order to make and implement the most appropriate treatment decisions".

The CDCR suicide report provided five problems and quality improvement plans as follows:

  Problem 1:  Documentation at CSP/LAC suggested mental health staff did not review and/or did not consider history and diagnostic input from the CTC and MHCB admissions that occurred in the month prior to the inmate's arrival at CSP/LAC.
  Quality Improvement Plan:  The Chief of Mental Health or designee at CSP/LAC shall: (1) Interview the primary clinician and the EOP supervisor in charge of providing treatment for inmate __.  The purpose of the interview is to determine if a review is conducted of the inmate's mental health treatment and diagnosis from inpatient admissions, and the rationale for not making any changes in diagnosis or treatment.  (2) Conduct a retrospective audit for the period of two weeks of inmate-patients returning from MHCB/DSH placements to determine if the inpatient mental health information was reviewed by primary clinicians and taken into account when developing treatment plans after an inmate's return to CSP/LAC.  Rationale for current treatment plans must be documented and indicate that a review of MHCB/DSH placement occurred.  (3)Take additional corrective actions as deemed appropriate including additional training for all mental health staff regarding review of an inmate's mental health history as well as ongoing monitoring by supervisors to ensure continued review by clinicians of the mental health histories of the inmates in their care.

Problem 2:  The Program Guides require, at a minimum, an SRE shall be completed 'any time the medical or mental health screening of a new arrival to an institution indicates a current or significant history, over the past year, of suicide risk factors, ideation, threats, or attempts.'  Following a MHCB admission for suicidal ideation and depression, inmate __ arrived at CSP/LAC on 6/7/10.  The first and only SRE completed by mental health staff at CSP/LAC was provided on 2/15/11.

Quality Improvement Plan:  In response to the suicide of inmate __, the Chief of Mental Health at CSP/LAC developed a new policy requiring that all new arrivals who will be receiving a CDCR-7386 (Mental Health Evaluation) during the in-take process, as well as those inmates already enrolled in the MHSDS upon arrival, will automatically receive a SRE as part of the intake process.  This QIP requests from the Chief of Mental Health or designee at CSP/LAC documentation of the implementation of the new policy and of subsequent training provided to mental health staff.

Following implementation of the policy an audit shall be conducted for a period of two weeks on a random sample of 20 percent of the UHRs for new arrivals to ensure that the new procedures were being followed.  If 95-percent compliance is not reached during the initial two week period, continue conducting the audit until 95-percent compliance continue to be conducted until 95-percent compliance with the new policy has been reached.


Problem 3:  CSP/LAC mental health staff made frequent diagnostic changes without documenting clinical reasoning and justification for those changes.  Further, the various diagnoses failed to address the symptoms picture consistently presented by the inmate.  This problem highlighted the need for additional training opportunities for the exploration of differential diagnoses.  In discussion with the Chief of Mental Health at CSP/LAC it was determined that a venue for exploring diagnostic issues already exists at CSP/LAC in the form of monthly clinical case presentations attended by all mental health staff.  This setting is ideal for exploration of diagnostic issues raised by this review.

Quality Improvement Plan:  The Chief of Mental health or designee at CSP/LAC shall use the monthly case presentation to present and review cases of diagnostic complexity.  While this QIP requests the use of the monthly case presentation for this purpose only once, continued exploration of diagnostic problems is encouraged.

The goal of requesting a review of diagnostic issues in this setting is to encourage clinicians to have an interactive, rather than didactic, experience exploring complex diagnostic matters.  Vignettes shall be used to explore cases where diagnosis is unclear, complex or difficult to determine.

In order to determine if the review was effective, a pre- and post-test method shall be used in the following manner: vignettes will be distributed to assembled staff, who will provide an initial diagnostic impression.  An interactive discussion of the possible diagnoses will follow.  Clinicians will then be asked to consider and document their final diagnostic impression, including rationale for arriving at that conclusion.


Problem 4:  Most, if not all, primary clinician contacts with inmate __ at CSP/LAC were conducted either in the Day Room or at the cell front and did not occur in a confidential setting.  In discussion with representatives from CSP/LAC, it was determined that the inmate most often refused to use the available space (mental health building), leaving the Day Room as the only alternative.

114

Management at CSP/LAC has recognized that the current procedure for responding to inmate refusal of confidential settings is not effective and needs revision. The institution is in the process of revising local procedures to include additional methods of responding to the concerns of inmates who are refusing treatment. Among the options are additional staff consultation regarding treatment as well as a focus on inmate responsibility to provide input into their own treatment plan.

Quality Improvement Plan: The Chief of Mental Health or designee at CSP/LAC shall continue the revision of current Local Operating Procedures (LOPs) to ensure a more effective solution to the incidents of inmate refusal of treatment. It is expected that the revised LOP will address treatment plan alternatives for inmates refusing mental health appointments, as well as improved guidelines for clinicians faced with inmate refusal of treatment in the available confidential setting.

Problem 5: Psychiatric follow-up routinely had not occurred with respect to the LPT notifications of inmate __ medication non-compliance and specifically did not occur for such notices dated 3/20/11 and 3/27/11.

Quality Improvement Plan: The Chief Executive Officer and other members of the Management team at CSP/LAC have recognized that the current local process of referring inmates for mental health evaluation, including those inmates who are non-compliant with medication, have not been effective and is in need of revision. The institution is in the process of completing revisions to the local procedure. This QIP therefore requests of the Chief Executive Officer or designee at CSP/LAC completion and implementation of local operating procedures for the referral of inmates for mental health evaluations, including those inmates who demonstrate medication non-compliance.

A physician provided a Death Review Summary dated 5/16/11. The summary reviewed the inmate's cause of death and his mental health and medical conditions. The conclusion was that the records reviewed indicated that during the last six months of the inmate's life, the provided medical care was appropriate. A systemic concern was noted regarding a telephone order for the inmate to be placed on doctor's line after a nurse saw him on 10/21/10; follow-up did not appear to have taken place, but this lack of follow-up did not contribute to the inmate's death.

On 10/4/11, the Deputy Director (A), Statewide Mental Health Program and Director (A) Division of Adult Institution provided their Report on the Implementation of the Quality Improvement Plan for the inmate in response to the CDCR suicide report dated 5/18/11. In their report, the Directors included the following:

With regard to Quality Improvement Plan number one, a memorandum from the chief of mental health (A) to the senior psychologist specialist stated that interview of the clinicians responsible for the inmate's care and investigation determined that the inmate's inpatient information was considered when formulating his treatment plan. Symptoms that the inmate experienced while in the MHCB were discussed in the clinical summary section of the treatment plan and the rationale for changing the diagnosis was based on reported symptoms at CSP/LAC and collateral information from the treatment psychiatrist. Part Two of the QIP for Problem number one included an audit conducted on 6/16/11, 6/20/11, and 6/21/11 for review of the 7388/notes of MHCB or DSH admissions for 13 inmates; it indicated that 11 of 13 inmates had their 7388/notes reviewed from MHCB or DSH by clinicians.

115

With regard to Quality Improvement Plan number two, a memorandum from the senior psychologist (A) to the chief of mental health (A) at CSP/LAC provided minutes from the mental health subcommittee meeting on 5/17/11 documenting a directive that all new arrival inmates were to be identified in reception/screening for a CDCR-7386 (MH-7, Mental Health Evaluation) and that inmates who were already enrolled in the MHSDS upon arrival would be required to have a completed CDCR 7447 (SRE). The memorandum stated that an audit performed on 6/16/11, 6/20/11, and 6/23/11 documented 100-percent compliance. Training was provided to reception/screening clinicians on 5/18/11. Minutes from a mental health subcommittee meeting documented that CSP/LAC OT staff would automatically ducat MHCB discharges and DSH returns every 90 days for 12 months for SREs. An IST attendance sheet was provided and dated 5/16/11.

With regard to Quality Improvement Plan number three, a memorandum from the senior psychologist to the chief of mental health at CSP/LAC indicated that training was held on 8/17/11 for all CSP/LAC mental health staff on complex diagnostic issues; the senior psychologist from headquarters provided a vignette, of which clinical staff received a copy, recorded an initial diagnosis, had interactive training, and provided post-training diagnoses. The analysis of pre- and post-test measures indicated that approximately 54 percent of participants changed their diagnosis as a result of the case discussion/training. In-service training sheets and vignette copies were provided as proof of practice.

With regard to Quality Improvement Plan number four, a memorandum in lieu of a LOP was provided; it indicated that strategies were being developed to encourage and increase clinical contacts in clinical settings. The same memorandum from the suicide response coordinator, clinical practices division, CCHCS, to the QIP coordinator, nurse consultant program review, DCHCS, included for Quality Improvement Plan number five noting that a referral triage protocol was developed and submitted to mental health supervisors and was an appropriate substitute for a LOP. The protocol was submitted to supervisors who would be informing senior psychologists in charge of the daily triage referral process.

In addition with regard to Quality Improvement Plan number four, a memorandum from the chief of mental health (A) to the senior psychologist specialist indicated that there had been a longstanding problem of getting general population EOP inmates to go to their individual confidential appointments as they had to go to another building (MH Building) to receive such contacts and frequently did not wish to go. If the inmate refused to go, the inmate was seen in the building and due to a lack of confidential space, was seen in the dayroom area or at cell-front. The memorandum further stated that clinicians worked with the inmates to try to determine the nature of the resistance and that the issues were continually addressed in individual sessions and IDTT meetings. The memorandum stated that training with mental health supervisors would be conducted on 9/26/11 and that supervisors would check the percentage of confidential versus non-confidential contacts and work with primary clinicians to develop new strategies to encourage compliance with confidential contacts. An IST dated 9/27/11 was provided with the class title of 'training for improving confidential contacts'.

Also with regard to Quality Improvement Plan number five, a memorandum from the senior psychologist (A) to the CSP/LAC chief of mental health (A) noted that the minutes from the mental health subcommittee meeting on 5/17/11 documented directives that the

referral process had been modified and that effective 5/18/11, the referral triage process had been modified. The memorandum concluded that every day a different senior psychologist would go to the SAP drill at 10:30 a.m. and would triage the referrals for the day. A memorandum dated 7/5/11 to mental health supervisors with the subject "Referral Triage Protocol" outlined the revision of referral triage protocol; an additional memorandum on that same date entitled "Referral Triage Protocol" provided a schedule for mental health supervisors in concert with the earlier memorandum.

**Findings**: This inmate's suicide death does not appear to have been foreseeable as the inmate was not reporting suicidal ideation or intent in the days prior to his completed suicide. However, the inmate's suicide may have been preventable had there been appropriate consideration of his past history of suicide ideation/attempt and had SREs been performed by CSP/LAC staff. Furthermore, in view of his failure to participate in EOP structured therapeutic activities, medication refusals, and his increasing refusals of out-of-cell contacts with clinicians, a referral to a higher level of care such as DSH intermediate care would have been appropriate. There was no information provided in the inmate's records that he was indeed referred for a higher level of care; he clearly met indicators for such a referral given his participation failure and deteriorating condition at the EOP level of care.

## 10. Inmate J

Brief History: This inmate was a 25-year-old Caucasian male who committed suicide by hanging on 3/31/11 at Folsom State Prison (Folsom). He was a participant in the MHSDS at the 3CMS level of care. According to the suicide report, he was housed in ASU and had just been moved into a cell by himself. The inmate entered the CDCR via the NKSP RC on 12/14/09. He had been convicted of arson of an inhabited structure with an enhancement for having a prior conviction and was sentenced to eight years (three for the arson and five for the enhancement). His EPRD was 9/18/16.

The inmate was discovered on 3/31/11 at approximately 8:19 a.m. by an officer who was conducting welfare checks on the unit. The officer found the inmate, the sole occupant of his cell, hanging. A medical emergency was announced via institutional radio, and the sergeant had ASU staff conduct an emergency medical extraction of the inmate. The sergeant used the cut-down tool to cut the ligature that was around the inmate's neck. The inmate was then transferred via Stokes litter and gurney to the Folsom TTA, where he arrived via 8:23 a.m. The incident report indicated that while en route to the TTA, an officer provided lifesaving measures by performing CPR. A Code Three ambulance was requested at 8:24 a.m., and EMT staff from the ambulance reported to the TTA at 8:37 a.m. At approximately 8:56 a.m., a Folsom fire department paramedic officially pronounced the inmate deceased.

The CDCR suicide report provided a timeline which indicated the events as described above; it included the statement that two officers entered the cell with a cut-down tool and that the first officer initiated CPR at 8:19 a.m. and continued it as the inmate was transferred to the TTA, where he arrived at 8:23 a.m. The CDCR suicide report did not indicate that there was any additional first responder who assisted with CPR or provided ventilation support. After arriving at the TTA at 8:23 a.m., the AED was applied, an oral airway was inserted, and the ambu bag was utilized. The timeline indicated that at 8:25 a.m., CPR was stopped due to the AED analyzing cardiac rhythm; however, the inmate

was in asystole, no shock was advised and CPR resumed.  At 8:30 a.m., CPR was again stopped due to AED analyzing cardiac rhythm and again the patient returned to asystole; no shock was advised and CPR resumed.  Epinephrine was injected, and the medical officer of the day was notified.  At 8:35 a.m., CPR was stopped for a third time due to AED analyzing rhythm and again the patient was in asystole; no shock was advised and CPR resumed. Atropine was given and at 8:40 a.m., paramedics arrived and CPR continued.  At 8:41a.m., CPR was stopped as paramedics switched to their AED and pads and CPR was then resumed.  Epinephrine was again administered and at 8:48 a.m. the patient was intubated and provided ventilation via the ambu bag with oxygen.  Atropine and Epinephrine was subsequently administered, and at 8:56 a.m., a paramedic from the Folsom fire department ordered CPR stopped and declared the inmate dead.  An autopsy report provided by the Coroner's Office, County of Sacramento indicated that the autopsy was performed on 4/1/11.  The autopsy findings indicated that the cause of death was asphyxia due to hanging.  No manner of death was listed.  A toxicology report was provided and based on a blood sample, no illegal drugs were confirmed.  The blood alcohol report also revealed that no ethanol was detected.

The CDCR suicide report recounted the inmate's criminal justice history.  It indicated that he was first arrested at age 16 for reckless driving and subsequently for other driving-related offenses, including careless driving, speeding, reckless driving, and driving without insurance.  He was arrested at age 18 for several counts of vehicle theft, theft of $500 to $1,500, and burglary of a dwelling; he was convicted of felony burglary and sentenced to four years in the Colorado State Penitentiary on 4/29/05.

The inmate's commitment offense occurred on 9/3/09 when, reportedly as a suicide attempt, he set a mattress on fire in a hotel.  He was on parole from the State of Colorado at the time.  According to the CDCR suicide report, he stated that he had been under the influence of drugs, including marijuana, methamphetamine, and alcohol, at the time of the crime.  He was tried and sentenced to three years for the arson with a five-year enhancement for having a prior conviction for a total of eight years, as noted above.

The inmate's mental health history appeared to have begun after his incarceration in the Colorado Department of Corrections.  He reported that he had been stabbed 12 times in the Colorado prison due to his mania.  He also reported that he had a history of manic episodes including his flight to California while he was on parole, impulsive financial and sexual behavior; he also reported depression, paranoid ideation, and auditory hallucinations.  He reported having been hospitalized while being held at the Los Angeles County Jail in their psychiatric unit in 2003 due to depression.  Otherwise, his mental status was noted to be within normal limits, and he denied suicidal ideation at that time.  Family history was significant in that both of his parents were diagnosed with severe mental disorders, and he reported that a cousin had committed suicide.

After entry into the CDCR at NKSP, he was placed at the 3CMS level of care with diagnoses of Bipolar I Disorder and Alcohol Dependence.  Records indicated that the inmate requested removal from the 3CMS in April 2010 to facilitate an interstate transfer to be closer to his family, but he remained in the 3CMS program after a discussion with his primary clinician.  The inmate requested that his medications be discontinued at that time.

The inmate was transferred to Folsom on 7/15/10 and continued at the 3CMS level of care. His diagnosis at Folsom was Depressive Disorder NOS. It should be noted, however, as reported in the CDCR suicide report and based on UHR review, that no documentation was found of the intake evaluation or SRE after his transfer to Folsom. The first note by a mental health clinician was dated 9/28/10 and occurred as the result of a 90-day follow-up contact for his 3CMS level of care. The inmate did not have a SRE completed by any clinical staff after his transfer to Folsom on 7/15/10; this despite his reported history of three suicide attempts prior to entering the CDCR, including the arson which was the basis of the commitment offense, a medication overdose, and driving off a cliff. While in the CDCR, he had two SREs performed at NKSP on 1/20/10 and 3/2/10 while at the 3CMS level of care; they both provided estimates of suicide risk as low. While in the CDCR, his diagnoses ranged from Mood Disorder NOS, Bipolar I Disorder, Polysubstance Dependence, and Alcohol Dependence to his last diagnosis in January 2011 of Depressive Disorder NOS with diagnosis deferred on Axis II.

After his arrival at Folsom, he was placed on Zoloft and Trileptal. In October 2010, a psychiatrist discontinued the Zoloft and began Prozac. By 12/29/10, the inmate signed a refusal for medication telling the psychiatrist that he felt better without medication. However, he resumed taking medications in February 2011, which included Prozac, Abilify, and Remeron, which he continued until his death.

The inmate remained in the 3CMS program and was in general population until 1/18/11, when he was placed in the ASU for safety concerns; he reported fears that he had been targeted by Skinhead gang members. The inmate's suspicion that he might be a target of the Skinhead gang appeared to be related to his having been assigned an "R" suffix when he entered the CDCR because he had a 16-year-old girlfriend when he was 18 years old. The CDCR suicide report did not describe the connection or whether he had been charged with some offense related to having a sexual relationship with a minor; the report noted that he had no history of sex crimes. He remained in ASU pending transfer to an SNY institution, which had been approved. Records indicated that he had been double celled until the night prior to his suicide. The report further stated that the custody welfare checks and psych tech rounds were documented in the appropriate places. The CDCR suicide reviewer opined that "had the inmate been able to escape the administrative segregation environment where gang members reportedly taunted and berated him until he killed himself, he may have survived".

The inmate was seen for weekly contacts by his primary clinician with the exception of two appointments, one of which was 2/21/11 (a holiday) and a second on 3/28/11, which would have been the last contact before his suicide on 3/31/11. The CDCR suicide reviewer reported in the CDCR suicide report that these contacts were missed because of scheduling by the office technician and because primary clinicians at Folsom did not track their own caseloads. According to the CDCR suicide report, there appeared to be some discrepancies that noted that MHTS.net indicated that a contact was completed on 2/14/11, yet there was no note in the UHR, but there was a note in the UHR on 2/28/11, but no notation that it was completed in MHTS.net.

While in the CDCR, the inmate was treated for asthma, allergies, and hypothyroidism. He also had two skin lesions removed from his scalp in January 2011; documentation did not indicate the causes of the skin lesions.

119

The CDCR suicide report made reference to the inmate telling a psych tech at 6:00 p.m. on 3/30/11 during a medication pass that he was "very stressed out" and "needed to talk to the psych". The psych tech reported that when asked whether he felt like hurting himself, the inmate responded "yes", and the psych tech noted that the inmate appeared very anxious. Custody staff placed the inmate in a holding cell based on the psych tech's request, and he was given a healthcare request form (7362) to write out his request while the psych tech finished the medication pass. The psych tech returned and took the Form 7362, noting that he had written exactly what he had told her, namely, that he was very stressed out, wanted to talk to a doctor, and felt like hurting himself. The psych tech gave the Form 7362 to the other psych tech who was covering psychiatric issues and told her that they needed to start a suicide watch on the inmate. The CDCR suicide report continued that the second psych tech should have called the TTA to contact the psychiatric physician-on-call. Instead, she went back to talk to the inmate herself and told custody that the inmate just wanted a housing change. She returned to the medication room and shredded the form 7362, as witnessed and documented by the first psych tech.

The reviewer noted that the third watch officer on the third tier where the inmate was housed stated that she was asked to place him in a holding cell because he needed to see the psych doctor, and that she talked to him and he told her that he was "freaking out" because an enemy had been moved onto the third tier and he needed to move. The officer told the reviewer that after being told by the second psych tech that he just needed to move, the officer escorted him to the first tier. The inmate was placed in a cell by himself and did not see a psychiatrist for an evaluation. He was found hanging in that same cell the next morning.

The reviewer noted "the administration at FSP immediately recognized that this was a preventable death". The reviewer added that had the proper protocol been followed once the inmate was placed in a holding cell, he would have had an SRE completed by a psychiatrist or psychologist on-call and may have gone to a MHCB. However, the second psych tech did not call the TTA and allegedly shredded the healthcare request Form 7362. The reviewer noted that the psych tech was removed from patient care and was under formal investigation at the time of preparation of the CDCR suicide report.

The reviewer also noted that the primary clinician did not see the inmate that week for their usual Monday appointment; since that appointment was missed, it should have been rescheduled for later that week, but this did not happen. The reviewer noted that it was apparent from talking to the primary clinician and supervising psychologist that primary clinicians depended entirely upon office technicians to schedule their contacts and did not track their own caseloads as was done at other institutions, as required by the Program Guide. The reviewer also noted the undocumented intake when the inmate arrived at Folsom, and the absence of a required SRE. The reviewer further noted that the 3CMS program provided to this inmate at Folsom appeared to be minimal and that documentation was cursory. There was no indication that any primary clinician had a full grasp of the extent of the inmate's mental illness and suicide risk. The reviewer indicated that Folsom had had the same issue revealed in another suicide and the problem appeared to be broader than just a missing intake note and required focused corrective action.

The CDCR suicide report provided three Problems and Quality Improvement Plans as follows:

Problem 1:  On the evening of 3/30/11 the LPT was supposed to follow through with having the inmate evaluated, did not contact the TTA or PPOC when the inmate reported thoughts of self-harm.

Quality Improvement Plan:  The LPT has been removed from patient care and is under formal investigation.  ISU staff prepared the 989 for referral of this incident to the Office of Internal Affairs (OIA).  It was submitted to OIA, Central Intake, on 4/14/11.

Problem 2:  The primary clinician missed two weekly contacts, including one due the week of the suicide.  The current process at FSP has OTs schedule appointments, and clinicians apparently do not take responsibility for managing their own caseload appointments.

Quality Improvement Plan:  The Chief of Mental Health or designee at Folsom State Prison shall:  (1) Revise Local Operating Procedure (LOPs) to place primary responsibility upon the clinicians for ensuring that all clinical contact occurs per Program Guidelines.  This pertains to all 3CMS contacts, not just for those inmates in ASU.  Although the OTs will continue to schedule appointments, clinicians will be responsible for oversight and management of their caseloads.  (2) Train clinicians on new procedure.  (3) Conduct an audit of primary clinician contacts in ASU for two weeks following the training to ensure a compliance rate of at least 95 percent.

Problem 3:  Intake contact when inmate __ arrived at FSP was not documented in the UHR.  No SRE was completed despite the history of suicide attempts and ideation.  Follow-up at FSP did not reflect that anyone had reviewed records from NKSP.

Quality Improvement Plan:  The Chief of Mental Health or designee at Folsom State Prison shall: Conduct a focused qualitative audit of UHRs for all new 3CMS arrivals every month to ensure complete clinical intake documentation including review of previous records, and completed SRE as indicated.

A physician completed a Death Review Summary dated 5/13/11.  The summary reviewed the inmate's cause of death and diagnoses and treatment history.  The physician reported with regard to the standard of care of medical providers; two physicians wrote progress notes that were illegible and one of the physicians had their name stamped but unsigned.  He noted that these were departures from the standard of care and deviations from departmental guidelines as outlined in the "In Focus" Manual.  The physician also noted no problem list was found in the review of records, which was also a departure from guidelines by two primary care physicians.  With regard to the standard of care in nursing, the physician noted that the AED was not applied until the inmate arrived in the TTA, six minutes after he was found lifeless; ideally, it should have been applied as soon as possible at the scene.  The physician noted that this issue was addressed in a separate Nursing Death Review.  Recommendations by the physician were to be provided to the healthcare executives; they should consider dictation of all notes from providers with illegible handwriting, peer review referrals for three providers, and nursing counsel referrals for nursing staff involved in the emergency response.

On 7/1/11, the Director (A) Statewide Mental Health Program and Director of Adult Institutions provided their Report on Implementation of the Quality Improvement Plan for

this inmate in response to the CDCR suicide report dated 5/10/11. In their report, the Directors included a report from Folsom as to the Quality Improvement Plan for problems number one, two, and three.

With regard to problem number one, the report indicated that the psych tech had been removed from patient care, was under formal investigation, and an OIA referral was submitted on 4/14/11.

With regard to problem number two, the report indicated that there had been a revised LOP, training agenda, sign-in sheets, and an audit. On 5/23/11, an addendum to Operational Procedure Number 101, 3CMS noted changes in the LOP. These changes included that the primary clinician shall on a daily basis access the MHTS.net "new arrival appointment tracking" report to be aware of inmates who were new on their caseload and shall at least weekly obtain a caseload report to verify proper follow-up of inmate/patients on their caseload. The addendum was signed by the Folsom CEO and warden on 5/23/11 and 6/1/11, respectively. A QIT progress update form dated 5/23/11 for a QIT named "Ad Hoc Clinician Management of Caseloads" was also submitted; it noted attendance by psychology and office technician staff as well as a psychiatrist, social worker, and health program specialist. The report noted that the team reviewed the Suicide Quality Improvement Plan and Addendum to OP Number 101 and that training was provided to clinicians on usage of MHTS.net to obtain their weekly caseload list and daily list of new arrivals. Examples of new arrival reports and an IST class titled "Clinician Management of Caseloads" and dated 5/23/11 was provided. An audit conducted on 6/7/11 of primary clinician contacts in ASU for a two-week period noted that the compliance rate was 100 percent and provided attached documents in support of the audit and clinician caseloads; housing changes for MHSDS inmate encounters by clinicians were also provided.

With regard to problem three, a memorandum from Folsom to the senior psychologist specialist, DCHCS, dated 6/15/11 indicated the request of a qualitative audit of UHRs for all new 3CMS arrivals every month. In addition, a memorandum dated 5/19/11 instructed all clinicians to stop using preformatted notes by a deadline of 6/6/11. The audit of all new Folsom arrivals during the month of May 2011 revealed 84-percent compliance for the required questions being asked on the monitoring forms. Memoranda were issued by the chief of mental health to specific clinicians regarding the results of the audit with requirements to follow-up on identified problems by 6/30/11. There were no additional documents submitted as to the follow-up required by 6/30/11, nor was there any repeat audit indicating a compliance of greater than the 84-percent compliance from the audit conducted on 6/15/11.

**Findings**: This inmate's suicide appears to have been both foreseeable and preventable. The inmate clearly reported information that indicated that he had increased risk of suicide, and this information was provided to the psych tech covering psychiatric services. The psych tech failed to follow the Program Guide or appropriate standards of practice and did not notify the TTA and have a psychiatrist see the inmate. Furthermore, the psych tech shredded the healthcare services request form that the inmate had been required to complete. This occurred in the hours before the inmate's completed suicide, after a cell change. The CDCR suicide report indicated that corrective actions were taken with regard to the psych tech. However, there were more systemic problems identified at Folsom as to clinicians' failure to adequately evaluate this inmate upon his transfer from NKSP or

provide a mental health evaluation or a SRE of this inmate with known risk factors. The scheduling deficiencies identified by the CDCR suicide reviewer with regard to Folsom clinicians, the cursory and at times illegible documentation of clinical contacts, and the failure to follow the Program Guide were clearly identified in the report. In addition, the QIP that was identified in the CDCR suicide report appeared not to have been realized or implemented at Folsom. The referral of the psych tech to OIA did not include any further information as to the outcome of that referral. The requirement for audits to be done for new arrivals resulted in one audit in which the compliance threshold was not met. Moreover, no follow-up audit or information was provided as to further implementation of the QIP either by Folsom or Central Office staff following the failure to meet the compliance threshold in the audit conducted in June 2011. These findings reflected tragic failures at the facility level, Folsom staff level, and Central Office review level.

**11**. **Inmate K**

Brief History: This inmate was a 33-year-old African-American male who committed suicide by hanging on 4/1/11 at PVSP. He was not a participant in the MHSDS at the time of his death. He entered the CDCR on 8/13/10 via the NKSP RC as a parole violator with a new term. He was convicted of attempted kidnapping and illegal possession of a weapon and was sentenced to 15 years, four months in prison. His EPRD was 3/30/22. The inmate was double celled at the time of his death.

The inmate was discovered on 4/1/11 at approximately 10:05 p.m. when his cellmate returned from church services, went to the cell, and when the door was opened, turned toward an officer and yelled "man down". The officer ordered the cellmate to come down the stairs, responded to the cell, and observed the inmate with a noose made from a sheet tied tightly around his neck from the end of the bunk. The inmate was in a seated position between the toilet and lower bunk with no movement. The officer instructed another officer to activate her personal alarm device, (PAD) and simultaneously she utilized her prison radio and notified Central Control of the occurrence. Responding staff arrived and an officer retrieved the cut-down tool and, along with other officers, entered the cell and lifted the inmate so that the officer with the cut-down tool could cut the noose, freeing the inmate. The sergeant arrived and utilized his prison radio to request the ERV to respond to the building. An LVN arrived and started to initiate lifesaving measures by placing the AED on the inmate until the ERV arrived from the CTC. The inmate was placed on a Stokes litter and transported to the CTC.

The CDCR suicide report provided additional information that was not included in the incident report. This information included the fact that the LVN was actually in the building at the time of the "man down" call, responded and assisted the inmate who was unresponsive with no pulse or respiration, fixed pupils, and asystole, and CPR was started between 10:05 p.m. and 10:07 p.m. The timeline indicated that the AED was placed on the inmate by the LVN as the ERV was arriving. The ERV left the building and arrived at the CTC TTA at 10:10 p.m., and staff continued CPR. Atropine and Epinephrine were administered, and the AED indicated no shock when tried again. At 10:33 p.m., a paramedic declared the inmate dead. An autopsy report was provided by the Fresno County Coroner; it indicated that the autopsy was performed on 4/2/11. The report stated that the cause of death was hanging, and the manner of death was suicide. A toxicology report indicated that the blood drug screen was negative for illegal drugs and alcohol (ethanol).

The CDCR suicide report recounted the inmate's criminal justice history. It indicated that he had a juvenile criminal history with arrests for purse snatching in 1992, grand theft/firearm in 1993 in which he was declared a ward of the state, minor in violation of court/removal from physical custody of parent or guardian with his continuation as a ward of the state later that year, and possession of marijuana in 1994 with continuation as a ward of the state. His wardship was terminated in January 1996.

The inmate's adult criminal history began later that year in March 1996, when he was arrested for possession of alcohol and received 20 months' probation. In 1997, he was arrested for possession of a loaded firearm and obstructing a police officer and received a 30-day county jail sentence and 36 months' probation, and for driving with a suspended or revoked license and violation of a promise to appear, resulting in an additional 36 months' probation. In 1999, he was convicted of battery and sentenced to 60 days in the county jail and 36 months' probation; later that year; he was convicted of unlawfully carrying a weapon (knife) and received a sentence of 120 days in the county jail and 36 months' probation. In 2000, the inmate violated probation due to his possession of a controlled substance; his probation was revoked on 11/28/00 and reinstated on 11/30/00. He had additional charges between 2001 and 2005 for possession of a weapon (gun), violation of probation with a three-year sentence in state prison in 2002, and assault with a deadly weapon (gun) with two prior felony convictions for a sentence of three years in state prison later in September 2002. The inmate entered the CDCR for his first term on 9/20/02.

The inmate paroled in February 2004, but returned to state prison on 12/6/05 as a parole violator with a new two-year sentence based on a conviction of assault with a deadly weapon. He paroled again in 2007, but returned to CDCR on 8/13/10 for the commitment offense.

The inmate's commitment offense involved going to a school. When a teacher saw him outside of the school and asked him what he was doing, he grabbed the teacher, straddling her body, and threatened to hurt her. The inmate was seen by another staff member who yelled at him and he ran away. He was subsequently arrested by police and found to have a handgun in his pocket.

The inmate's mental health history appeared to have begun in 2008 when he was seen by a Parole Outpatient Clinic (POC) psychiatrist. Records indicated that he denied any history of mental illness or mental health treatment during his first two CDCR admissions in 2002 and 2005. After his parole in 2007, he reported to the Region 3 Moreno Valley POP. A psychiatrist prescribed Zyprexa for him, but records indicated no stated reason for the medication prescription. A parole agent referred him for a mental health evaluation; the parole agent noted the inmate's difficulty processing information after having received a gunshot wound to his head in 2005, when he was placed on life support for six days. The CDCR report indicated that the bullet was not removed. A psychologist evaluated the inmate, but did not provide additional information regarding the gunshot wound. The psychologist reported that the inmate's substance abuse history included marijuana, LSD, and methamphetamine since age 17 and noted that he reported that he had been taken to a county hospital because he was hearing voices; he further reported that he began having hallucinations after he was shot in the head in 2005. The inmate also reported participation in a drug rehabilitation program. The psychologist noted a normal mental status

examination, but diagnosed Amphetamine Dependence in alleged remission and Psychotic Disorder NOS.  The psychologist also noted that the inmate's hallucinations might be secondary to his methamphetamine dependence.

The inmate returned to the CDCR on 8/13/10.  The psychologist completing the mental health screening determined that he did not have any signs of mental illness, and he was cleared for general population.  However, the inmate reported hearing "bad things" and feeling depressed and suicidal on 12/2/10; he was placed in a "psychiatric holding cell" on 24-hour supervision due to danger to self.  He was transferred to Mental Health Temporary Housing (MHTH) in place of a MHCB and diagnosed with Psychotic Disorder NOS; a GAF score of 20 was also assessed.  The following day, the IDTT evaluated him and noted that he was depressed, had a plan to hang himself, and had homicidal ideation towards his cellmate.  He was diagnosed with Major Depressive Disorder with Psychotic Features Severe, with a GAF score of 20.  The CDCR suicide report noted that the IDTT did not document review on the standardized treatment form and that a psychologist completed a screening checklist for DSH referral and found that the inmate did not meet any of the ten referral indicators.  The psychologist also indicated that the inmate's condition had quickly stabilized and that he could return to prior housing; however, the psychologist stated that the inmate was not on SNY status even though he was on this status.  A psychiatrist also saw the inmate and indicated that he had depression with paranoid ideation and prescribed Zyprexa and Paxil.  A review of the doctor's order sheets indicated that the psychiatrist ordered Zyprexa and Paxil on 12/3/10.  On 12/5/10, the doctor's orders indicated daily suicide follow-up for five days and for a psychiatrist to see the inmate in seven days. However, there was no documentation regarding the non-formulary medication Zyprexa.

The following day, the IDTT saw the inmate and diagnosed Major Depressive Disorder with Psychotic Features, with a GAF score of 25.  The IDTT also noted that the inmate denied suicidal ideation, but he stated that he had problems after his gunshot wound to the head (without further explanation of the problem).  The inmate further stated that if he was given a cellmate, the cellmate might not be safe but he would tell the staff if he was having thoughts of hurting himself.  The inmate was retained in the MHTH unit, and he was placed at the 3CMS level of care.  The following day, on 12/5/10, the IDTT saw the inmate again; the GAF score was reassessed at 50, noting that the inmate denied suicidal ideation. The IDTT also reported that the inmate was in the SNY and preferred to house with Hispanic inmates rather than his African-American cellmate.  The team did not complete an SRE for the inmate during his stay in the MHTH unit, either upon admission or discharge.  However, he was ordered to have five-day follow-up and psychiatric follow-up in seven days.

During five-day follow-up, the clinicians who saw the inmate noted that he presented with normal mental status, but he had not received his medication for at least three days; documentation did not indicate any follow-up or further clarification.  By the fifth day, a clinician wrote that the MAR indicated that the inmate was refusing Paxil, but the inmate stated that his medication had not arrived.  This clinician completed an undated page one of a SRAC (noted as the old form) and page two of the SRE (noted as the new form) as part of five-day follow-up.  No boxes were checked on page one, which contained information on risk factors and protective factors.  According to the suicide report, on page two, the clinician wrote "I/M admits to MHTH (Mental Health Temporary Housing) admission as a means of bed move".  The plan was for mental health staff to review the

inmate's mental status on the following day and for the clinician to review the issue of his refusal of Paxil with the senior registered nurse. The partial SRAC that was completed on or about 12/12/10 (undated) noted the estimate of suicide risk as low chronic and low acute. It appeared that staff did not implement either of these plans, and the inmate did not have further mental health contact.

While the inmate remained in the NKSP reception center, MARs for December 2010 and January 2011 indicated that he had refused Paxil on three days; there were no notations on two days in December, and medication compliance from 12/14/10 through 1/2/11, but refusal on 1/3/11. The MAR also indicated that the inmate refused Zyprexa once between 12/4/10 and 1/3/11; it also indicated that he took both medications on 1/4/11, refused both on 1/5/11, and refused Paxil on 1/6/11. The inmate had been transferred from NKSP to PVSP on 1/3/11; therefore, MAR notations at NKSP regarding medication administration could not have occurred at NKSP after 1/3/11. When the inmate was transferred from NKSP to PVSP, healthcare transfer information indicated that there were "no current medical/MH problems". The mental health level of care was indicated as "none". Regarding medications, the name of medication included the notation "see attached". The Special Master's reviewer was unable to locate an attachment in the provided records that listed the inmate's medications.

The inmate arrived at PVSP on 1/3/11 and denied a mental health history, but reported that he was taking medications. The RN did not list the medications on the bus screening, but the pharmacy filled the medication orders written at NKSP for Paxil and Zyprexa. The order for Zyprexa was to expire on 1/18/11, and the order for Paxil was to expire on 3/3/11. Between 1/5/11 and 3/15/11, there were approximately 30 times when the inmate did not report for his Paxil, and there were two dates in February 2011 when there were blanks on the MAR. The inmate did not report for his Zyprexa on 1/5/11, but he was noted to have taken Zyprexa from 1/6/11 through 1/18/11, when the order expired. Medication management chronos indicated that the inmate did not show for three consecutive days and/or refused medications on 1/7/11, 1/23/11, 1/24/11, 1/26/11, 1/29/11, 2/1/11, 2/5/11, 2/8/11, 2/12/11, and 2/15/11. It did not appear from the record that the psychiatrist or any other mental health staff saw the inmate after his arrival at PVSP. The record also did not indicate that nursing or medical staff referred him to Mental Health Services either upon intake or when his medications were refused and subsequently expired.

The physician saw the inmate on 3/28/11 at PVSP for a history and physical examination. He was described as having a normal physical examination and reported his history of the gunshot wound to his left eye socket and being in good health. He denied any medical or mental health problems. The record did not indicate that he was being actively treated for any medical problems.

The inmate had reported being a member of the "Moreno 13" southern Hispanic street gang and had been placed in SNY status during an earlier CDCR incarceration. In October 2010, he was endorsed for housing to the PVSP SNY. At PVSP, he was placed in the SNY on double cell status and was noted to be at the 3CMS level of care on 1/19/11.

After the inmate's suicide, a letter was found in his property dated 4/1/11 and addressed to "mom". The inmate wrote in his letter that he missed his mother and family. He further wrote that he wished that he could be a stronger man, but that too much had been taken

from him, his life "has no meaning to me anymore", and "I hate who I am now all my power is gone so its time for me to give up. My life has come to an end, my enemy put me here so that I couldn't get them back for what has been done to me. They fear the real me". He ended the letter by stating that he loved his mother and to tell his kids that he would always love them, "from dad", and signed his name.

The CDCR suicide reviewer indicated that "the inmate's mental health history was unclear, primary because of poor assessments, evaluations, and documentation, or the lack of this documentation in the available files".

After the inmate was placed in MHTH from 12/2/10 through 12/5/10, he was diagnosed with diagnoses of Psychotic Disorder and Major Depressive Disorder. However, the IDTT discharged him to general population and did not place him in the MHSDS, despite the inmate having been placed on antipsychotic and antidepressant medication.

The CDCR suicide report provided three problems and quality improvement plans as follows:

Problem 1: While housed at NKSP RC mental health staff admitted the inmate/patient to Mental Health Temporary Housing (MHTH) cell due to depression and suicidal thoughts. The inmate/patient was there from December 2-5, 2010. The assessment and documentation during this stay were inadequate and did not provide a clear picture of the precipitant of the crises, the nature of the crises resolution and the efficacy of the treatment provided. In addition, mental health staff did not complete an initial SRE at admission or discharge.

The psychiatrist continued inmate __ on anti-depressant and antipsychotic medication after discharge, but the IDTT did not include him in the MHSDS. The IDTT did not provide an explanation for their decision to discharge inmate __ or for not including him in a MHSDS despite the fact that he was continued on medication. This resulted in the inmate/patient not being probably identified as a mentally ill inmate/patient when he arrived at PVSP.

In addition there was no documentation for approval of the non-formulary Zyprexa medication and notation errors by nursing staff on the MARs suggesting that dispensing medication to the inmate/patient at NKSP RC when he was actually housed at PVSP.

Quality Improvement Plan: The Chief of Mental Health or designee at NKSP RC shall: Charter a Quality Improvement Team (QIT) in order to review these problems including inadequate documentation, the rationale for not including the inmate in the MHSDS, deficiencies in follow-up evaluation of the inmate after admission to the MHTH cell, and inadequate documentation of approval of Zyprexa. In addition the QIT shall review Local Operating Procedures (LOPs) to make sure that they are sufficient and provide clear guidance. The QIT shall recommend corrective actions and establish a monitoring system. The QIT recommendation should reference in the monitoring system aspects of the Proctoring and Mentoring Program noted below. (Note: NKSP is a test site for Proctoring and Mentoring Program that will guide clinicians in the assessment of suicide using the SRE and the assessment and treatment of high risk inmates.)

Problem 2: Nursing staff at PVSP completed the initial screening when the inmate/patient arrived to the prison. The inmate/patient reported he was taking medication but the nurse failed to ask about or document the type of medications he was taking. This

resulted in the inmate/patient not being identified as a mentally ill inmate/patient and not being referred to mental health. During review of this case by committee, the Director of Nursing indicated the current Local Operating Procedures (LOPs) are being modified to identify those inmates who are taking psychotropic medication. In the new procedures, an inmate in this situation will trigger an immediate referral to mental health. In addition a method of identifying psychotropic medications is being developed.

 Quality Improvement Plan: The Director of Nursing or designee at PVSP shall: (1) Conduct an inquiry into this problem and take corrective actions as deemed appropriate. (2) Continue revision of LOPs and provide additional training to all nursing staff. (3) Establish a monitoring system in order to track compliance with revised LOP.

 Problem 3: Nursing staff at PVSP repeatedly documented the inmate/patient's behavior of not presenting himself to receive his morning medication. During review of this case by committee, the Director of Nursing at PVSP indicated that nursing staff had completed a significant number of chronos indicating that the inmate was refusing his medication. These chronos were placed in the UHR should have been received by mental health staff. Receipt of the chronos should have triggered a referral to psychiatry. However, mental health staff did not receive any of the chronos.

 During the case review meeting, the Chief Executive Officer at PVSP indicated that this breakdown in communication is being extensively researched with the focus on system issues. A tracking tool to ensure future problems with communication is being developed.

 Quality Improvement Plan: The Chief Executive Officer or designee and Director of Nursing or designee at PVSP shall: (1) Conduct an inquiry into this problem and take appropriate corrective supervisorial actions including additional training to nursing staff. (2) Provide a detailed summary of the corrective actions already initiated in response to this problem, including mechanisms developed to prevent future breakdowns in communication regarding medication non-compliant issues.

A physician completed a Death Review Summary on 4/25/11. The physician reviewed the inmate's cause of death and treatment history. The physician concluded that no departures were found as to the inmate's medical treatment, and that no nursing issues or systemic concerns were identified.

On 8/18/11, the Deputy Director (A), Statewide Mental Health Program and Director (A) Division of Adult Institutions provided their report on implementation of the Quality Improvement Plan for the inmate in response to the CDCR suicide report dated 6/1/11. As to QIP number one, NKSP documentation noted that the inmate's arrival and departure and MHTH admission from 12/2/10 through 12/5/10 were in error regarding the completion of the Form 7388-B, which erroneously indicated that the inmate had three MHTH admissions, was not SNY, and noted that he required a higher LOC (namely 3CMS). The memorandum also noted that the inmate was not receiving medications for four of the five days of five-day follow-up; he was also noted to have refused medications on the fifth day; although the inmate reported that the medications had not arrived. NKSP's response determined that there was inadequate documentation/assessment, that the inmate was not added to the MHSDS, that non-formulary documentation was absent, and that nursing staff dispensed medication when the inmate was at PVSP. The corrective actions included the formation of a QIT to address these items and five-day follow-up documentation, and the Proctoring/Mentoring Program for high risk inmates. The response also noted that the five-day follow-up form indicated that the inmate's level of care was 3CMS, although it

was not, and a SRE dated 12/3/10 indicated six chronic risk factors, four acute risk factors, and nine protective factors; it estimated risk as "low" acute and "low" chronic.  The response also indicated that the inmate was not added to the MHSDS, and at the time the old MHTS system was being replaced by the current MHTS.net system; however, the inmate had not been added to either and there was no mental health placement chrono or tracking.

The response noted that there was an absence of non-formulary documentation for Zyprexa and that the treating psychiatrist was a contract psychiatrist, and that psychiatrists (typically contract) had been amiss regarding completion of the non-formulary process.  Actions to be taken were on the job training during weekly MHCB/MHTH staff meetings, completion of the mental health placement chrono and tracking form upon inmates' MHTH release, and maintenance for 12 months of the MH-7388 with scanning of the tracking forms.  This new plan of action would include all psychiatrists, including contract psychiatrists, receiving on the job training regarding non-formulary procedures with a sign-in sheet submitted as proof of practice and the senior psychiatrist conducting a monthly compliance audit.  Additionally, specific nursing staff would receive on the job training regarding medication documentation, and the sign-in sheet would be submitted as proof of practice.

A QIT titled "Mental Health Transfers to Mainline Facility" was chartered on 6/6/11.  The QIT found that information was not submitted to MHTS that was noted in the inmate's UHR.  However, upon arrival at PVSP, the R&R nurse noted that the inmate was on psychiatric medications and documents that were noted as being absent were located in the inmate's records provided by PVSP.  IST training sheets for psychiatrist, mental health staff and nurses regarding MAR documentation were provided.

Regarding QIP numbers two and three, a memorandum from the chief of mental health and CEO to the senior psychologist specialist DCHCS, stated that nursing supervisors had met with assigned nursing and Receiving & Release (R&R) staff and had conducted an inquiry regarding the process utilized when performing initial screenings of newly arrived inmates.  The nurses received corrective training regarding psychotropic medication orders and the questions on the screening form, as well as making referrals to mental health or the TTA.  Furthermore, a revision of LOP number 109 (Healthcare Transfer Process) included an automatic, immediate referral to mental health of any patients arriving with psychotropic medication, but not enrolled in the 3CMS.

With regard to the problem of repeated documentation of medication noncompliance by nursing staff not received by mental health staff, the CEO led a meeting of healthcare department heads to discuss medication noncompliance for healthcare services generally, and more specifically, for mental health.  It appeared that this was a problem throughout CDCR and an inquiry for guidance at the statewide level was made to the Regional Medical Director.  Furthermore, the CEO was also working with CPHCS medical legal counsel on the process of breaking the "vicious cycle of repeated therapy noncompliance, referrals, prescriptions, etc".

The chief of mental health, CNE, and director of nursing met to discuss referral of inmate/patients to mental health to address medication noncompliance.  LOP number 19 "Non-compliance Psychiatric Medication Procedure" was reviewed and deemed to

operationalize an appropriate referral and follow-up process. Training was provided to nursing staff on the operational procedure, home study version of the class for continuing education classes was to be offered by the nurse educator, and mental health supervisors provided training to clinical staff regarding appropriate follow-up. The QIT would review existing monthly medication noncompliance audits, which would be reviewed monthly by nursing and mental health supervisors with appropriate follow-up until 95-percent compliance was reached. A copy of LOP 109 was included in the response, as well as other standardized and existing forms, as well as training forms. ISTs were also provided for a class entitled "Medication Refusal and Six Rights of Medication Administration".

There did not appear to be any audits included in the documents provided.

**Findings**: This inmate's suicide may have been foreseeable as he received only one SRE while in MHTH at NKSP on 12/10/10, and he had no SREs performed once he arrived at PVSP. He also was not seen by any mental health clinicians following his arrival at PVSP, but it was unclear whether or not he was experiencing any suicidal ideation or intent. His suicide was very highly likely preventable, however, had he been appropriately placed in the MHSDS, referred for a higher level of care while at NKSP, and had appropriate information been acted upon at R&R at PVSP when he informed the RN that he was taking medication. Furthermore, pharmacy continued the medication orders that he was receiving at NKSP, which included both an antipsychotic and antidepressant medication. The CDCR suicide report appeared to indicate that the inmate was placed at the 3CMS level of care, but the Special Master's reviewer was unable to locate any chrono or evidence that he in fact was placed at that level of care. It was also clear from the record that PVSP staff did not perceive the inmate to be a participant in the MHSDS, despite his treatment with prescribed psychotropic medications.

The inmate had a history of suicidal ideation and did not receive a SRE or any other evaluations at PVSP. He also remained in MHTH housing at NKSP for five days prior to transfer without a referral to an MHCB or more appropriate higher level of care, including 3CMS or EOP at the time of his discharge. There were numerous medication management issues regarding the inmate's repeated failures to appear for medications or medication refusals documented on MARs and in chronos by nursing staff without any medical staff response to evaluate the inmate and to assess his medication adherence. After transfer to PVSP, his medications were allowed to expire without renewal; essentially, the inmate was not taking medications and/or they had expired without psychiatric evaluation in the weeks before his death. While the QIPs identified in the CDCR suicide report appeared to be appropriate, responses by NKSP and PVSP appeared to be inadequate as to staff's actual supervisory role and audits to demonstrate improvement in actual compliance with the Program Guide.

**12. Inmate L**
Brief History: This inmate was a 40-year-old Asian male who committed suicide by hanging on 4/18/11 at CMC. He was not a participant in the MHSDS. He was single celled in the ASU at the time of his death. He entered the CDCR via the NKSP RC on 3/12/98. He had been found guilty of aggravated assault and sentenced to 25-years-to-life for his third strike. The inmate's EPRD was 11/15/22.

130

The inmate was discovered at approximately 9:09 p.m. on 4/18/11 by an officer who was conducting a count and picking up mail in the ASU Annex. The officer looked into the cell door window of the inmate's cell, which was occupied solely by him, and observed the inmate hanging from a makeshift noose that had been fashioned from a torn sheet and a torn t-shirt. The other end of the noose was attached to the cell air vent. The officer activated his PAD and initiated a Code One response to the cell. A sergeant responded to the cell along with other officers, and the sergeant ordered an immediate emergency entry into the cell. The sergeant opened the cell door, and an officer entered with the emergency shield, followed by two other officers. An officer cut the noose away from the air vent, and another officer lowered the inmate to the cell floor. The remaining portion of the noose then fell off from around the inmate's neck, and two officers removed the inmate from the cell onto the tier.

CPR was immediately initiated by the two officers, and a psych tech arrived at the scene with the emergency medical bag and attached the AED to the inmate. The AED indicated no shock required and advised staff to continue CPR. CMC emergency medical staff arrived at the scene along with the CMC fire staff in the ETV. The CMC captain ordered direct flow oxygen to be administered to the inmate and chest compressions continued as he was loaded into the ETV and transported to the East Facility medical clinic. CMC fire staff continued chest compressions during transport until those duties were taken over by CMC emergency room staff. At approximately 9:30 p.m., the CMC physician determined that attempts to resuscitate the inmate had failed and pronounced the inmate dead.

The incident report indicated a timeline that stated that from 2100 to 2105 hours, an officer conducting a 30-minute welfare check of all inmates used his flashlight to look into this inmate's cell as the cell light was off. The officer noted that the inmate was lying in his bed and appeared to be trying to sleep. At 2109 hours, after turning the cell override lights on to facilitate picking up inmate mail, the same officer looked into his cell and observed the inmate in the act of hanging himself. The officer activated his PAD, and the events took place as described above. At 2114 hours the ETV arrived at the scene, and direct flow oxygen was administered. At 2123 hours, the ETV departed the East Facility medical clinic and upon arrival emergency room staff took over CPR. At 2130 hours, the physician pronounced the inmate dead and his body temperature was determined to be 97.1 degrees. An autopsy report was provided by the Sheriff-Coroner Office of San Luis Obispo County; it stated that the autopsy was performed on 4/20/11. The cause of death was noted as asphyxiation (minutes) by ligature strangulation (minutes). A toxicology report indicated that no common acidic, neutral, or basic drugs were detected, and no blood ethanol alcohol was detected in femoral blood sample.

The CDCR suicide report recounted the inmate's criminal justice history. It noted that his first arrest occurred at age 15; there were four additional arrests as a juvenile, all of which were for burglary and auto thefts. He was sentenced to juvenile hall, camp, and probation. The inmate's adult criminal history included five prior arrests for auto thefts, burglary, possession of articles with identification removed, possession of burglary tools, and possession of stolen property. There were sentences of probation, county jail, and state prison. The inmate also had arrests in Nevada and Colorado, which were not specified.

The inmate was committed to the California Youth Authority (CYA) in the 1980s and was transferred to the CDCR in 1989 for his first CDCR term. He remained there until 1996.

He was noted to have a gang affiliation with the "V Boys" street gang, but no known prison gang affiliation. His commitment offense was noted to have occurred in 1997 when he and several associates drove to Texas to commit a series of burglaries and upon return accused one of the associates (who became the victim) of belonging to a rival street gang. The victim was kept in a locked apartment for three days and brutally beaten, stabbed, and threatened with death. This inmate and his associates were arrested, tried, found guilty, and sentenced as noted above.

The CDCR suicide report indicated that this was the commitment offense resulting in the inmate's third strike. It also indicated that the inmate's first term in the CDCR began in August 1989, when he was transferred from the CYA. A second term began 3/12/98, which was this commitment and current term at the time of his death. The inmate was noted not to have been included in the MHSDS or to have received any mental health treatment during his first incarceration and for the majority of his incarceration from March 1998 until approximately five months prior to his death. The report noted that he had been assessed a 12-month SHU term based on a battery on another Vietnamese inmate that occurred on 9/18/10.

The inmate was housed in the ASU and on 11/18/10, made a comment to a psych tech about "stress" resulting in his referral to a mental health clinician; he was seen on 11/19/10. A psychologist wrote a note in response to an ASU inmate request. The inmate was seen for 45 minutes after he had told a psych tech the previous evening his stress about ASU. He was noted to be clean, neatly groomed with a broad affect, and he was quick to laugh when appropriate. He reported sleeping adequately, eating three meals a day, and having no auditory hallucinations. He also reported no history of suicide attempts and no family history of mental illness; he denied current suicidal and homicidal ideation. He further reported no history of previous treatment; a brief review of the UHR indicated no history of mental health treatment. The inmate was serving a life sentence on a third strike. He had been incarcerated for 13 years with 12 years remaining, and he was housed in the ASU for battery on an inmate with serious injury. He had received a 14-month SHU term and was stressed about the impact to his program future and safety. He reportedly asked to speak to mental health because he wanted to "get some things off my chest" and had mild stress, but no more than would be appropriate given his circumstances. The assessment was that the inmate seemed to be "experiencing non-clinical levels of stress and dysphoria." He clearly denied suicidal or homicidal ideation, and he did not want to enter the MHSDS. The plan was for follow-up in two weeks and to review the C-file with continuation of the evaluation process.

The same psychologist saw the inmate again on 12/15/10, 26 days later, as an ASU inmate request follow-up. The inmate was noted to have said "every time I hear people talking about '1030' I have a panic attack". He was seen in a confidential office for one hour, denied suicidal and homicidal ideation, and had dysphoric mood with restricted affect, but the content "seemed to be moving from reasonable concern to mild paranoia". The inmate stated that his dad was dying and he was worried, and "some cultural issues were discussed" regarding ASU. He stated that he cried on occasion in his cell, had lost interest in the exercise program, ate two meals per day, and had books in his cell. He noted the complaint of panic attacks, which lasted about two minutes but were "scary" and he could not breathe. The assessment was to begin the evaluation process for MHSDS and to conduct an SRE. The psychologist stated that the inmate denied suicidal or homicidal

ideation at this time, that "MHCB does not appear appropriate at this time," and that the inmate had concerns about placement in the 3CMS program and would like to have further discussion about options. The psychologist noted that she would complete the evaluation and present the case to the IDTT concerning 3CMS placement; in addition, she would consider change in SRE from low risk for suicide to moderate risk due to current stressors. Of note, the SRE indicated low risk. According to the CDCR suicide report, the clinician completed the evaluation and presented the case to the IDTT for consideration of the 3CMS level of care and considered moving his suicide risk from low to medium. The inmate was not evaluated by any clinician, including this clinician and others, as presenting with other than low risk of suicide.

The inmate was seen on 12/23/10 in response to an ASU inmate request, and the note dated 12/31/10 was noted as "late entry". The psychologist indicated that the inmate stated "I should have known this would happen", reportedly in response to having been assessed a SHU term. The inmate explained his concerns regarding his paperwork and transfer issues and was described as having a restricted affect with dysphoric and worried mood. The clinician noted that he seemed less dysphoric than the previous week, and he was very ambivalent about receiving mental health treatment. They discussed the pros and cons of 3CMS placement, and he talked about the shame he feared for his part in this current situation and blamed himself for the choices leading up to it. The clinician noted that she completed a SRE and that "although he denied SI he didn't seem forthright, avoiding answering and switching subjects. He ultimately said that at times he thinks about killing himself but he didn't have means". The clinician noted that they discussed these thoughts further, and he denied any plans to harm himself and minimized intent. The clinician assessed that his "chronic and acute risks appear low based on history and a few current factors, but it is not clear how forthcoming he is on the subject". She noted "it remains unclear if his stressors are at a clinical level or reasonable reaction to current circumstances". The plan was to contact the MHCB pre-screening team and to see the inmate for follow-up in one week.

A different psychologist from the MHCB pre-screening team saw the inmate on 12/23/10; the inmate reportedly stated "I'm okay doc". The inmate was seen in a holding cell in ASU due to safety concerns. The clinician noted his life sentence, his father's ill health, and his concern about these issues. The psychologist also noted that the inmate conversed easily, and demonstrated intact cognitive functioning and normal thought processes with no psychosis evident. He denied suicidal and homicidal ideation or auditory and visual hallucinations. The clinician noted that the inmate was able "to assure this writer of his safety". The inmate was described with euthymic mood and appropriate affect; no Axis I diagnosis was provided, and no medications were prescribed. The inmate was released to custody.

The SRE was completed on 12/23/10, but only part one was provided. The reason for assessment was "possible SI". The sources of information were the inmate/patient interview and the UHR. This assessment noted multiple risk factors including chronic pain problem (neck/shoulder), history of substance abuse (pot, crack), violence, poor impulse control, first prison term, longer life sentence, older than 35 years of age, and male. Additional risk factors were current/recent depressive episode, hopelessness/helplessness, current/recent violent behavior, recent bad news loss or anniversary date ("dad in ill health"), single cell placement, and recent disciplinary ("115"). Protective factors included

133

family support, religious/spiritual/cultural beliefs, interpersonal social support, future orientation plans for future, exercises regularly, insight into problems, sense of optimism and self-efficacy. The inmate did not report a plan to kill himself, and he did not report a desire to die. The narrative indicated that the inmate was alert and oriented to all spheres, and that his thought process was logical and goal-directed with intact cognition. His communication was normal with timely responses to questions, and he easily established good eye contact. His mood was stable with no instability noted, and he was cooperative and congenial. He denied "SI, HI, AH, and VH". It was noted that he never made a suicide attempt nor had anyone in his family. He also denied depression or history of suicidal ideation, had no mental health history, and "his father was in ill health which gives him concern and some anxiety but has no intention of doing anything compulsive". The estimates of suicide risk were low for both chronic and acute risks. The plan was for the inmate to return to his cell at ASU, and crisis bed was not warranted at that time.

A note dated 1/6/11 by the psychologist who had seen the inmate during December 2010 noted that the inmate wanted to remain in general population, and that he would send a request if he wished to be seen. He was seen for 30 minutes in a confidential setting when he discussed his mood, which was primarily anxious with worrying about his potential transfer and paperwork. He denied any plan to harm himself or others and "reported times where hearing about his enemy would trigger a panic attack but he described it as brief in duration and although distressing is surprising, manageable". The inmate discussed future plans, seemed goal-directed with logical plans for several different possibilities, and was working on an appeal. The assessment was that the inmate did not meet criteria for a diagnosis of Panic Disorder. The plan was for the inmate to remain in general population and to access mental health in the future if the panic symptoms became more intrusive in daily functioning.

The clinician saw the inmate briefly at cell-front two days prior. At that time, the inmate did not want to leave his cell for an interview, but according to the CDCR suicide report, her contact with custody indicated that he was eating well, socializing in the tier, and using his yard time. The clinician decided not to place the inmate in the MHSDS at that time. A note by the same clinician, dated 1/4/11, noted that it was a late entry for ASU weekly follow-up and indicated that the inmate stated "I'm okay. I don't want to come out". He was seen at cell-front "to continue evaluation for CCCMS", and the inmate reported that he was sleeping eight hours, eating three meals, and denied suicidal ideation or homicidal ideation. The note further stated that correctional officers reported that he was socializing with peers and attended yard and showers. The assessment was that it was "unclear if he requires MHSDS", and the follow-up would occur in one week.

Mental health last saw the inmate the week before his death when he had submitted a health services request form requesting to be seen by that same clinician. The clinician was not available, and another clinician approached the inmate, but he did not want to talk with the second clinician about his concerns. The second clinician asked that a staff member from the MHCB pre-screening team interview the inmate. A MHCB pre-screening note dated 4/12/11 indicated that he was seen, but he would not say what was on his mind other than the request noting "I am so messed up in the head. I just want to share how I feel with you". He referenced wanting to speak with a particular clinician who was not available. This clinician noted that he was alert and oriented, and his mood was mildly agitated with congruent affect. His speech was coherent, thoughts were

134

logically organized and goal-directed, and "no psych symptoms endorsed or evident". He denied suicidal ideation and homicidal ideation. He further stated that his request for interview and the contents of the discussion were between him and the clinician that was unavailable; he "did not want to speak with the undersigned" and "no diagnosis was evident but possible situational stressors". The clinician determined that the inmate "does not want" MHCB admission, and the plan was to maintain present programming housing in the ASU for this general population inmate.

An SRE was completed by a psychologist on 4/12/11. The reason for the assessment was "MHCB-pre-screening". Sources of information were correctional officer or staff interview, inmate/patient interview, and the UHR. The SRE noted a number of risk factors including history of substance abuse, history of violence, long or life sentence, older than 35 years of age, male, agitated or angry "mild" and recent change in housing. There was a question mark for current/recent violent behavior. Protective factors included family support, religious/spiritual/cultural beliefs, interpersonal social support, future orientation/plans for future, positive coping skills and conflict resolution skills (as both "yes" and "no"), insight into problems, sense of optimism, and self-efficacy. There was a "no" and question mark for active and motivated in psychiatric treatment. The inmate did not report a plan to kill himself or report a desire to die. Comments included "see IDN dd 4/12/11" and "inmate has no documented history of SI/SA. No family history as well. Denies current SR/S plan". The estimates of chronic and acute suicide risk were low. The plan was to "maintain current programming, return to cell in the ASU and no crises bed needed presently".

The inmate was not included in the MHSDS and was not seen by any other mental health staff after that contact. He committed suicide six days later on 4/18/11.

The inmate did not have significant medical problems or history with the exception of sinusitis and had septoplasty in 2003. Of note, he committed suicide the night before he was to be transferred to CSP/Corcoran to the SHU.

The CDCR suicide reviewer noted that the inmate's hesitancy to participate in mental health services was not uncommon in correctional settings and had a variety of reasons. The reviewer continued that the inmate appeared to have had a brief and valuable relationship with one clinician, but chose not to discuss his issues with two other clinicians who saw him when the first clinician was not available. The reviewer noted "this implies that efforts to educate inmates about the process of mental health treatment – even for brief periods of crises – are warranted." The reviewer also noted the mental health staff attempts to work with the inmate as he struggled with the decision to enter the MHSDS and that he gave an "absolute negative" in January 2011 and also appeared to have improved. The reviewer noted the challenge to clinicians to balance obvious need for treatment as in this inmate's case through his distress and admission of brief panic episodes, with the demands of inmates denying the boundaries of inmate culture which might equate participation in mental health programs or mental health problems with weakness and vulnerability. The reviewer also noted that cultural issues may have played a role in the demise of the inmate based on the shame for his original crime and subsequent behavior resulting in a SHU term. There were no recommendations, including problems or quality improvement plans, identified or offered in the CDCR suicide report.

A physician completed a Death Review Summary on 6/15/11. The physician reviewed the inmate's cause of death and his treatment course and emergency response. The physician noted that the Form 7229-B indicated that a "MHCA (SIC) Pre-Screening" was performed on 4/12/11 but there are no notes found regarding this encounter". No recommendations were offered based on the Death Review Summary.

**Findings**: This inmate's suicide death does not appear to have been foreseeable or preventable. While it was clear that the inmate was struggling with the issues related to his having received a SHU term and transfer to another facility, he consistently denied suicidal ideation and intent and had no history of previous suicidal ideation or suicide attempt. He also struggled with the concept of being mentally ill and being included in the mental health treatment program, namely the MHSDS. There were considerations by clinicians to include him in the MHSDS, to increase his level of risk from low to moderate based on SREs, and to possibly place him in a MHCB. Clinical staff appeared to have carefully thought about these issues and attempted to engage the inmate in MHSDS participation. Unfortunately, the clinician he had established a relationship with was not available in the days before his suicide and he did not want to share information with the two clinicians who interviewed him. However, he did not indicate any suicidal ideation or intent to those clinicians. Based on their interviews of him and review of the records, they did not believe that his suicide risk had increased from low risk, nor did they determine that the inmate required transfer to a higher level of care.

## 13. Inmate M

Brief History: This inmate was a 39-year-old Caucasian male who committed suicide by hanging on 5/15/11 at the CMC East Facility. He was single celled in general population in an intake cell. He was not a participant in the MHSDS at the time of his death. He entered the CDCR at the NKSP RC on 6/26/01 after having been found guilty on three counts of lewd acts with a child by force and fear, and one count of possessing child pornography. He was sentenced to 42-years-to-life. His EPRD was 5/2/35.

The inmate was discovered on 5/15/11 at approximately 6:46 a.m. by custody staff, who approached his cell during the issuance of breakfast food trays. The inmate was the sole occupant of his cell, and the officers observed him with an inmate-manufactured noose wrapped around his neck and affixed to a jacket hook within his assigned cell. An officer delivering food trays opened the cell food port. When the inmate did not respond to knocks on the cell door, the officer observed the inmate standing toward the rear of the cell in what appeared to be an attempt to conceal himself behind his personal property. When the officer looked in the food port, he observed the inmate standing in the back of his cell facing the toilet. The officer called the inmate's name, but he did not respond. The officer saw that the inmate's face was pale white and completely motionless. The officer advised a second officer that he believed the inmate had hung himself, and the second officer initiated a Code One medical response. A sergeant responded as well as an additional officer, the cell door was opened, and they entered the cell. An officer utilized the cut-down tool and cut the noose from the jacket hook. The officer and sergeant placed the inmate on the ground and removed him from his cell onto the tier.

Two LVNs and a psych tech responded and began chest compressions. The psych tech removed the noose from around the inmate's neck and utilized the ambu bag. Staff continued life preserving measures, and the LVN applied the AED. The ETV responded

along with the assistance of officers and medical staff. The inmate was placed in the ETV and transported to the East medical clinic. An officer went along with ETV inmate firefighters, continued chest compressions during transport, and upon arrival at the clinic, medical care was relinquished to an RN and a physician who continued additional life sustaining measures. At approximately 7:13 a.m., the physician declared the inmate deceased.

A timeline was provided in the incident report. It was noted that at 6:46 a.m., the inmate was discovered, at 6:47 a.m. additional staff arrived, the cell was entered, and the noose was cut, and at 6:48 a.m. medical staff began life preserving measures. At 6:49 a.m., a RN and LVN responded to the building and assessed the inmate, and at 6:51 a.m. the ETV responded and the inmate was transported to the East medical clinic, where he arrived at 7:03 a.m. Lifesaving measures continued and at 7:13 a.m., the physician pronounced the inmate dead.

The incident report noted that the inmate had stacked cardboard boxes and clothing in a manner that hindered staff's view of the cell. The suicide report also indicated that the AED was applied and advised no shock, and responders described the inmate's body as "cold and stiff, with a deep indentation around neck, tongue sticking out and no response to stimuli". The suicide report also noted that the coroner responded to the institution on 5/15/11, and the core body temperature was taken at 9:00 a.m. on order of the coroner. Based on physical observation of the inmate's body and the core body temperature, the coroner's best estimate of the inmate's actual time of death was six to eight hours prior, between 1:00 a.m. and 3:00 a.m. in the morning. The coroner's report was provided by the Sheriff-Coroner's Office, San Luis Obispo County and indicated that the cause of death was ligature strangulation (minutes), and the manner of death was suicide. The coroner's investigation indicated that the decedent had returned from a court hearing on 5/12/11 and was on a housing unit with 24-hour lockdown. The autopsy was performed on 5/18/11, and toxicology samples were taken. The toxicology blood sample indicated that oxcarbazepine (trade name Trileptal) was detected, as well as hydroxycarbamazipine. The toxic blood ranges for oxcarbazepine are not known, and the hydroxycarbamazipine level was below toxic levels. No other common, acidic, neutral, or basic drugs were detected, and no blood ethanol alcohol was detected.

The suicide report recounted the inmate's criminal justice history. There was no known juvenile criminal justice history, as noted in the report. The inmate was arrested twice between 1989 and 1999 with charges of trespass with intent to interfere, driving with a suspended license, grand theft property, tampering with a vehicle, and kidnapping, all resulting in dispositions of probation. The inmate's commitment offense occurred on 6/1/00 when he abducted a 10-year-old girl, forced her into his car, and drove to his apartment. He threatened to kill her, forced her to undress, tied her hands in front of her, and sexually assaulted and sodomized her. He then made her shower and dropped her off in an unfamiliar part of town. The inmate was subsequently arrested. When arrested there was also a cache of child pornography found in his apartment. He was found guilty of three counts of lewd acts with a child by force and fear and one count of possessing child pornography on 4/16/01. He was sentenced on 6/7/01 to 42-years- to-life, as noted above.

The inmate's mental health history began prior to his incarceration. Records indicated that he attempted suicide in 1995 and was hospitalized for approximately seven days. His

mother provided information after his death that the suicide attempt was by cutting his wrist after a breakup with his girlfriend. He called his brother who drove him to a hospital for treatment, and he was released a few hours later. His mother also reported that he had been hospitalized in 1998 for depression and suicidal tendencies. There was also a family history of psychiatric hospitalization for his father and a history of depression and suicide on his mother's side of the family; although the particular individual was not specified. The inmate was reportedly diagnosed with Bipolar Disorder prior to his commitment and received treatment in the community. UHR review and the suicide report indicated that these treatments were not located in the UHR, and it was unclear whether those records were ever requested by CDCR mental health staff. He was also treated at the Los Angeles County Jail with psychotropic medications prior to his CDCR commitment.

The inmate entered the CDCR via the NKSP RC on 6/26/01, was evaluated by mental health staff, and was placed in the MHSDS at the 3CMS level of care. He was diagnosed with Bipolar Disorder, and on 1/25/02 he transferred to CSP/LAC. His diagnosis was changed to Depressive Disorder NOS by the IDTT, which notably did not include a psychiatrist in attendance at the IDTT meeting. He remained at the 3CMS level of care until 11/4/03 when he was discharged from the MHSDS, due to stability and the lack of medication or other mental health treatment for over one year. The suicide report indicated that a psychiatrist undertook this discharge. Moreover, no final IDTT documentation regarding the discharge was located in the record, resulting in some confusion as to the inmate's subsequent status. This confusion resulted in mental health staff continuing to see the inmate through January 2004. A clinician noted that the inmate had concerns for his personal safety, and the clinician documented plans for follow-up; however, there was no further contact with the inmate until after his transfer to CMC in March 2006. The inmate was placed in general population and not included in the MHSDS after his arrival at CMC. He did not receive mental health treatment at CMC up to the time of his death.

The inmate was seen by medical staff on 5/15/11 after he was discovered with cuts on both sides of his neck and on both wrists; he was not a participant in the MHSDS at that time. The suicide report indicated that the inmate's cellmate observed bandages on the inmate's neck on 5/9/11, and the inmate stated that he had cut himself shaving. The cellmate did not observe the cuts on the inmate's wrists, and the inmate did not seek treatment for these wounds. CDCR medical and mental health staff was apparently unaware of these cuts prior to the inmate's completed suicide. The cuts were discovered during an incident response by responding custody staff, who apparently did not refer the inmate to medical or mental health.

The inmate's last diagnosis was provided during February 2002; he was provided with a diagnosis of Depressive Disorder NOS, and he was subsequently discharged from the MHSDS, as noted above. Only one SRE was documented during his incarceration, in July 2001. It described risk factors as his history of mental illness, emotional instability, life sentence, mood disturbance, hopeless/helpless feeling, insomnia, anxiety, fearful for safety, and new court proceeding/pending disciplinary action, but did not indicate any estimated level of risk; and no referrals were made. The inmate was also treated with medications including Paxil, Buspar, Benadryl, and Depakote in 2001 and 2002, but all of the medications were discontinued in July 2002.

138

The record indicated that the inmate had multiple significant medical problems, including asthma, genital herpes, allergic rhinitis, and hypercholesterolemia; additionally, he had neurological and orthopedic conditions that required surgeries, physical therapy, knee braces, and special shoes, as well as pain management medication. Surgical interventions included surgical fusion in 2007, right knee arthroscopy in 2007, right shoulder arthroscopy in 2009, and a final right knee arthroscopy in 2010. The pain management consisted of several courses of physical therapy and various pain medications, including primarily Neurontin, Tylenol and Motrin. The inmate's primary care physician repeatedly completed limited duty chronos and requests for other interventions, as noted above. He also was referred for further surgery, which the medical authorization review committee and orthopedic surgeon denied on 4/18/11. He received physical therapy, which ended on 5/4/11 with no improvement noted.

The inmate was prescribed Neurontin in January 2008, which he continued until February 2009 at a high dosage of 3600 mg per day. However, because of a system wide change in the pharmacy in 2011, Neurontin was removed from the CDCR formulary, and Neurontin was discontinued until 4/22/11; initially, Elavil was provided as a replacement. The inmate had negative side effects to Elavil, and it was replaced with Trileptal at low dosage (600 mg per day) and Tylenol (650 mg three times daily as needed) for pain. The Trileptal was also not well-tolerated by the inmate, and it was discontinued in April 2011. The inmate was seen on 5/6/11 in response to a health services request made by the inmate for assistance in better pain management; his only medications, which were naproxen and Tylenol (as needed dosage), were renewed.

The inmate stated that he was unable to walk 50 feet without stopping based on his knee pain. A disability placement program verification form designating him mobility-impaired and requiring housing in a level terrain was completed by his physician. However, it appeared from records that this was not discussed with the inmate, but the form and a duty limitation chrono were mailed to him. His disability placement program verification form had not been reviewed by committee prior to his death on 5/15/11. He had been moved on 5/12/11 to an intake cell until placement in DPP housing based on the medical chrono of 5/6/11. As there was no level terrain housing available at CMC, he was pending transfer to a level terrain facility. The inmate had submitted an appeal on 5/10/11 to reverse the physical impairment chrono, which was referred for medical review to be completed by 6/6/11 (after his death). The suicide report referenced the changes in the inmate's medical condition in that he had a request for further knee surgery denied and changes in his pain medications, which appeared to be ineffective. It also referenced the plan for his placement in the DPP program, which required transfer to another facility, and his efforts to appeal that decision.

After the inmate's death, it was discovered that on 5/14/11 he wrote several letters. They totaled 12 pages to his mother and other family members. They stated his love for them, apologies for difficulties he had caused, citing some of the events in his life, and his decision to commit suicide. He was discovered hanging on 5/15/11 at 6:46 a.m. The inmate's concerns regarding his possible transfer to another institution also were reflective of his ongoing safety concerns regarding his commitment offense and the possibility of renewed safety concerns in a different facility.

The suicide reviewer indicated a primary area of concern as to the manner in which the DPP designation was issued by the inmate's primary care physician, namely, by mail rather than directly discussing it with him. An additional concern expressed by the reviewer was the possible impact on the psychological stability of inmates by the system wide discontinuation of medication prescribed for physical symptoms, in this case, Neurontin. Of note was the fact that Neurontin had been prescribed in the past off label for the treatment of mood disorders and the inmate had a history of such disorders; the unidentified impact of the Neurontin prescription may have been to assist the inmate in mood stabilization, which was not recognized by treatment staff. The reviewer suggested that the SPR-FIT of DCHCS address how to review, prepare for, and coordinate with field staff any future system wide somatic medicine discontinuations which could predictably result in negative mental health impact toward minimizing those impacts. The reviewer concluded by stating that it was impressive how the incident response was handled; the condition of the inmate's body at the time of discovery would have been a difficult case to respond to and "every staff member did exactly what the response protocol required in a rapid and professional manner".

The suicide report provided one problem and quality improvement plan as follows:

Problem 1: An informal expectation at CMC-E for physicians who are in the process of establishing DPP need is to verify an inmate's report of physical disability and clarify the actual needs of the inmate. Physicians have been encouraged to follow this informal policy in order to prevent miscommunication. This informal standard of practice was not adhered to by the PCP and resulted in the placement of the inmate into a level terrain DPP designation which in turn became a factor in the inmate's developing crises. Staff at CMC-E have discussed this practice and are interested in developing a formal policy.

Quality Improvement Plan: The Chief Medical Executive or designee at CMC-E shall: (1) Charter a time limited Quality Improvement Team (QIT) for the purpose of developing a Local Operating Procedure (LOP) pertaining to the practice of verification of verbal claims by inmates with disability/pain. The LOP shall provide clear guidelines for verification of DPP designation, documentation of rationale, and communication with the inmate about the outcome. (2) Provide training to all physicians regarding the new procedure. (3) Conduct an inquiry into the actions of the PCP who made the decision to designate inmate __ as DPP mobility impaired without following the accepted practice at CMC-E. Factors to explore in the inquiry may include: Why the physician chose to designate the inmate as DPP mobility impaired; the manner in which the inmate was informed about the designation; and what kind of rapport the physician was able to establish with the inmate. Corrective actions as deemed appropriate shall be taken as a result of the inquiry.

A physician completed a Death Review Summary on 7/27/11. It reviewed the inmate's cause of death, medical and mental health history, and emergency response. The physician indicated that there was a problem with the standard of care regarding a physician exam which indicated that the inmate's asthma and lipids were good and stable on 2/25/11 without documenting inquiry into other symptoms related to nocturnal waking, TTA visits, chest pain, or dyspnea, or performing an evaluation of the abdomen. There was also a systemic concern as to the four-day lapse between the date that the health care services request form was sent by the inmate and received by medical; this suggested that the

patient misdated the form, a delay occurred in the appropriate placement of the form, or the health care services request form was not properly processed. The issue of the inmate not having been seen by mental health staff during his four years at CMC-E was referred to mental health for review.

On 8/9/11, the Deputy Director (A) Statewide Mental Health Program, and Director (A) Division of Adult Institutions issued their report on implementation of the Quality Improvement Plan for this inmate in response to the suicide report dated 6/28/11. Included in the response was a memorandum from the suicide response coordinator, clinical practices, CCHCS to the QIP coordinator, nursing consultant program review, CCHCS, indicating that the suicide response coordinator had approved a CMC decision that their executive staff meet informally to develop the LOP via an informal arrangement in place of a formal QIT to be an appropriate manner of swiftly addressing and completing QIP requirements. This was in contrast to the directors' approved QIP plan requiring a QIP. A memorandum from CMC medical management indicated that the suicide report was reviewed and that a policy and procedure were developed to replace the existing memoranda regarding physician completion of the CDC 1845; the new policy and procedure also included information and direction to CMC physicians about necessary documentation of alleged disabilities and direction to physicians about informing inmates of likely consequences, such as transfer based on a disability determination. The policy was included and an IST sheet indicating that the policy had been distributed as required reading for all CMC physicians and training, namely, the reading of the document by all CMC physicians, would be completed by 8/5/11. The matter was also discussed in two physician meetings prior to the issuance of the policy.
Furthermore, the physician who was the inmate's primary care physician and his prior primary care physician were interviewed to discuss the care and treatment provided to the inmate. In response to the review and interviews of the CMC medical department, counseling was provided to the patient's PCP, a new policy and procedure equivalent to the LOP was developed, and training was scheduled and provided to all CMC PCPs on the new policy and procedure. The policy was entitled "Policy and Procedure for Inmates/Parolee Disability Verification (completion of the 1845)". IST, sign-in sheets for a class entitled "Mandatory Training regarding Documentation of Disability and Completion of CDC 1845," dated 7/19/11, consisting of two sheets, included 21 signatories.

**Findings**: This inmate's completed suicide does not appear to have been foreseeable or preventable. He had a history of treatment for mental illness with diagnoses in the past of Bipolar Disorder and Depressive Disorder. He also had been prescribed treatment, including medication in the community, for a brief period of time, and during his CDCR incarceration through 2002. He had been a participant in the MHSDS early in his incarceration, but was removed from the MHSDS. After his transfer to CMC, he was not identified and did not report any need for mental health services.

The inmate remained at CMC until his death. Over the years, he did not request mental health services, but requested medical interventions for chronic pain and orthopedic issues. Part of his treatment for his pain included Neurontin, which had been reported to have had some impact on mood stabilization; therefore, he may not have experienced significant mood dysphoria prior to discontinuation of the Neurontin. However, once the Neurontin was discontinued as a blanket (i.e, system wide) discontinuation, medical staff did not

request it as a non-formulary medication, which could have been performed. Instead, other medications were provided as substitutes, which the record noted that the inmate reported were ineffective. The plan was to transfer the inmate to another institution based on a permanent disability, but the physician did not inform him of this change to be moved to another facility. Unfortunately, this represented a serious situation for him and was a serious disruption to his life. He did not request mental health services to assist him with his distress. The inmate had appealed, and the appeal had not been reviewed prior to his death. There were an unfortunate number of circumstances that came together in this inmate's life, but they did not appear to be departures from the Program Guide or indications that the inmate was at increased risk. Therefore, this suicide does not appear to have been foreseeable or preventable.

### 14. Inmate N

Brief History: This inmate was an 18-year-old African-American male who committed suicide by hanging on 5/24/11 at the DVI RC. He was a participant in the MHSDS at the 3CMS level of care. He was single celled in the ASU in the reception center at the time of his death. The inmate was charged as an adult and accepted a plea bargain on charges of second degree robbery and a sentence of four years. His EMRD was 5/12/13.

The inmate was discovered on 5/24/11 at approximately 12:01 a.m. by a correctional officer conducting the count in ASU. He was discovered hanging by his neck with what appeared to be a noose made from a state-issued sheet. The inmate was lying on his stomach with his feet going toward the back of the cell. The noose was tied around one of the top bars at the front of the cell, and the inmate was not moving and was unresponsive. The officer announced "we have a hanger", and the second officer activated his personal alarm and utilized his radio to summon medical staff to the cell. He informed the watch commander that the inmate was hanging and three correctional officers arrived with the sergeant instructing the officers to apply their personal protective gear. The sergeant instructed the first officer to open the cell door and instructed officers to enter the cell and place the shield on the inmate's back as another officer placed the inmate's hands behind his back and placed him in handcuffs. Once the inmate was handcuffed, an officer cut the noose below the knot tied to the bars. Two officers then moved the inmate away from the front of the cell and placed him on his stomach in the middle of the cell next to the bed. Officers then placed the inmate on a sheet and lifted him up and carried him out of the cell to the end of the tier and placed him on a Stokes litter.

A RN arrived, checked for a pulse and began CPR as two additional RNs applied oxygen. Staff continued CPR, and the officers carried the inmate on a Stokes litter out of the unit to the mainline Infirmary TTA and placed him on a gurney. At approximately 12:10 a.m., American Response Paramedic EMTs arrived at the institution, and a correctional officer escorted them to the Infirmary. The EMTs assisted medical staff with CPR on the inmate and at approximately 12:20 a.m., the EMTs instructed an officer to assist with chest compressions. The officer assisted for approximately three minutes and the paramedics then took over CPR. At approximately 12:45 a.m., the inmate was escorted via gurney by paramedics and a correctional officer to the East exit where he was placed in the ambulance. At approximately 12:54 a.m., the ambulance left the institutional grounds as EMT staff continued to perform chest compressions and monitor the inmate's vital signs. CPR continued until they arrived at San Joaquin General Hospital and emergency room

EMTs took over with CPR. At approximately 1:11 a.m., the inmate was pronounced dead by a physician at the hospital.

The suicide report provided additional information. This included a nurse having inserted an oral airway at 12:04 a.m. and placement of a cervical collar; although, the time that it was applied was not listed in emergency response documentation. The AED was applied and indicated "no shock advised" at some time between 12:05 a.m. and 12:15 a.m., but the time was unclear. The AED was applied three more times between 12:25 a.m. and 12:37 a.m. At 12:37 a.m., the noose was actually removed from the inmate's neck by an EMS paramedic, but it was noted that the noose was loosened from around his neck at 12:01 a.m. It was not clear why the noose was not removed at that time. An autopsy report was provided by the San Joaquin County Office of the Coroner, indicated that the autopsy was performed on 5/25/11, and recorded that the inmate died as a result of asphyxiation due to hanging. However, no manner of death was recorded. A toxicology examination of blood indicated the presence of Atropine and citalopram at non-toxic levels. No other common acidic, neutral, or basic drugs were detected, and no blood ethanol alcohol was detected.

The suicide report recounted the inmate's criminal justice history. The POR indicated that he had juvenile arrests for vehicle theft, probation violation, larceny, and assault. According to that report, the commitment offense occurred when the inmate was 16 years of age when he and an accomplice assaulted and robbed a 67-year-old man. The victim's vehicle was located during a search of the area and when attempts were made to apprehend the suspects, they both fled and a pursuing K-9 officer was hit by a car and killed. According to the suicide report, the inmate was tried as an adult because of his past juvenile history, which included rape, arson, assault with a deadly weapon, theft, petty theft, shoplifting, and robbery; however, the suicide reviewer noted that the POR did not confirm this information. The commitment offense was noted to have involved the death of the K-9 police officer, carjacking, battery of an elderly man, elder abuse, assault with a deadly weapon, and robbery. The suicide report indicated that the defense accepted a plea bargain of four years for second degree robbery to avert a potential life term conviction with the sentence and parole date, as noted above.

The inmate's mental health history appeared to have begun as a child when he was treated for ADHD with Ritalin, Adderall, and Wellbutrin. He was also noted to have had a history of depression since age seven, i.e., from 1999 to 2000, and to have made a suicide attempt via hanging in 2009. There were also references to possible self-injurious behaviors (SIB) with multiple incidents of cutting as well as suicide attempts by cutting, hanging and overdose; in addition, there were also reports in which the inmate denied ever attempting to harm himself in any way. Records indicated that he was evaluated during the pre-trial phase of his trial at Metropolitan State Hospital (MSH), and he claimed to have Multiple Personality Disorder. He was treated with Prozac, and he was discharged with diagnoses of Dysthymic Disorder, Conduct Disorder, Childhood Onset, and Polysubstance Dependence. His drug abuse included the use of marijuana, ecstasy, and alcohol beginning approximately at age 15.

The inmate entered the CDCR via DVI RC on 3/11/11. He denied a history of mental health symptoms or treatment on a mental health screening on 3/14/11, and he was not referred for further mental health evaluation. He received an RVR on 4/14/11 because of a

fight and riot on the yard, and he was placed in ASU.

The inmate received a pre-placement chrono and was screened for mental health symptoms, but denied any mental health symptoms and was cleared for ASU. On 4/18/11 he submitted a health care services request form to mental health, stating that he was very depressed; primarily due to an incident in which he was assaulted by an officer and his front teeth was knocked out. Additionally his father was shot in the head on 10/25/10. He stated that his father could die at any time, and he had no updates about his dad's condition since he had entered the CDCR. The inmate concluded by stating that he was dealing with a lot, and the depression was worsening; he was diagnosed with depression, and he needed help as soon as possible. The nurse who triaged the request on 4/19/11 noted that this was an emergency request; mental health staff saw the inmate on 4/20/11.

A clinician observed the inmate "sobbing uncontrollably" in the ASU, and he was referred to the OHU on 4/20/11. He was placed on suicide precaution as it appeared that he was overwhelmed and tearful. He was placed at the 3CMS level of care with a diagnosis of Major Depressive Disorder, Severe, without Psychotic Features. A SRE was completed prior to his transfer to the OHU; in that assessment, he endorsed past suicide attempts including overdose, cutting, and hanging, reporting that there were "too many to count". He was prescribed Prozac. He initially stated that he had denied past suicidal attempts because he did not want to have more classification points, but by 4/21/11 he denied that he had made suicidal statements and stated that he just wanted to talk to the psych tech. The IDTT met on 4/24/11 and documented that his mental status was within normal limits. On that same date, he was transferred to the MHCB at CMF. Prior to his transfer, two SREs were completed at DVI. The SRE on 4/20/11 estimated both his chronic and acute risks as moderate, and the SRE on 4/24/11 estimated his chronic risk as moderate and his acute risk as high. He was subsequently transferred.

After his transfer to CMF, in the MHCB his diagnosis continued as Major Depressive Disorder, Recurrent, Severe, without Psychotic Features. He remained in the MHCB from 4/24/11 through 5/9/11. While in the MHCB, he received a SRE using the current form (the outdated form had been used at DVI for both suicide risk assessments). His chronic risk was assessed as moderate, and acute risk was assessed as low. He was initially placed on Prozac on 4/25/11, but on that same day it was discontinued. He was then placed on Celexa at CMF, which was continued after his return to DVI until the time of his death.

During his MHCB admission, he was described as depressed, overwhelmed by his current reality, having trouble with dreams seeing himself as being shot in place of his father and dreams of a friend being shot and killed, which had actually occurred when he was on the street. It was noted that he denied auditory and visual hallucinations, as well as suicidal and homicidal ideation. He was further described as a "non-psychotic 18-year-old overwhelmed by a series of major losses and stressors". It was also noted that he was reluctant to engage in treatment and was guarded, withdrawn, and depressed. He also was concerned about his appearance as he had lost two of his front teeth in the fight and riot that occurred at DVI. The record noted that the inmate had difficulty concentrating and had anxiety about his current circumstances and dreams about his family.

A psychiatrist noted on 5/1/11 that the inmate had difficulty, was not doing well, and had minimal interaction with staff; this included the inmate refusing to leave his cell to meet

with the psychiatrist. The psychiatrist saw him in his cell, noting that he had prolonged reaction times in his responses and a low voice. Other notes indicated that he was stressed and depressed and spent much of his time either lying on the mattress or actually sleeping. Although he reportedly denied suicidal ideation and psychotic symptoms, he continued to present with negativity and isolation with psychomotor slowing and poor concentration. A psychologist completed a SRE on 5/6/11, indicating that the reason for assessment was discharge planning from the MHCBF-CMF. Sources of information were identified as the inmate interview and correctional officer or staff interview; the UHR were not reviewed. Identified risk factors included family history of suicide, history of emotional, physical or sexual abuse, Major Depressive Disorder, substance abuse, violence, and poor impulse control. Also noted were first prison term, male gender, and history of suicide attempts, with the last in 2009 by hanging. Additional risk factors included current/recent depressive episode, disturbance of mood/lability, recent trauma, recent bad news, early in prison term, recent housing change, and recent negative staff interactions. Protective factors included interpersonal social support, future orientation/plans for future, spousal support, insight into problems, and active and motivated in psychiatric treatment. The inmate did not indicate a plan to kill himself or a desire to die. The estimate of suicide risk was chronic risk moderate and acute risk low with a justification stating that he denied suicidal ideation or intent, "does continue to present with some depression secondary to being placed in prison and recent injury to teeth however it would be helpful to support him through EOP LOC". The discharge plan was to the EOP level of care, with five-day suicide assessment follow-up needed.

The inmate was discharged from the MHCB on 5/9/11 with the same diagnoses and a GAF score of 46. The diagnosis was Major Depressive Disorder, Recurrent, Severe without Psychotic Features. He was also noted to have symptoms of hopelessness, fear, and depression, but again he denied suicidal ideation. Curiously, the psychiatrist noted on 5/5/11 that despite these symptoms, "no serious Axis I symptoms had been observed". The discharge treatment plan included a recommendation for EOP level of care, which the inmate might only temporarily need. The suicide reviewer indicated that during an interview of the psychiatrist, who had discharged the inmate, it was indicated that a referral to DMH had been considered, but the team felt that a return to his home institution would be more beneficial.

The inmate returned to DVI RC and was placed in the OHU before transfer back to the ASU. He was seen by a psychiatrist, who completed a SRE on an outdated form, and assessed the inmate's chronic and acute risk factors. The SRE completed by the psychiatrist contained largely illegible writing, but indicated several risk factors. These risk factors included family history of suicide, history of emotional or sexual abuse as a child, history of Major Depressive Disorder, substance abuse, violence, poor impulse control, male gender, and history of suicide attempts in 2009 by hanging. Additional risk factors were current/recent depressive episode, recent trauma (with illegible writing next to it), early in prison term, and recent change in housing. Protective factors included religious/spiritual/cultural beliefs, interpersonal social support, future orientation/plans for the future, positive coping skills and conflict resolution skills, spousal support, insight into problems, active and motivated in psychiatric treatment, and sense of optimism; self-efficacy. He did not report a plan to kill himself or a desire to die. The estimates of suicide risk were chronic risk low and acute risk low. Drug use history included "mj, ecstasy, (illegible)", and justification of risk level indicated "returns from crises bed no SI

(illegible)". The safety plan included five-day follow-up and the printed name included MD staff psychiatrist, but the signature and the printed name were illegible. A progress note dated that same date with the heading Psychiatry and apparently the same signature indicated that the inmate stated "'alright' no S/I, recently returned to regular unit (illegible)". The note indicated that the inmate was "calm alert, fair mood, (illegible) logical, (illegible), good (illegible)". The "A2" indicated "ASPD" and the P2 indicated "(illegible)", with an illegible signature. The psychiatrist also included a principal diagnosis of Antisocial Personality Disorder, Provisional.

The treatment team decided to retain the inmate at the 3CMS level of care despite the CMF MHCB team's recommendation of the EOP level of care. The suicide reviewer included in the suicide report that the treatment team made this decision based on no observable Axis I symptoms and the inmate's presentation, denial of suicidal ideation or plan, and compliance with his medication regimen, which was Celexa, an antidepressant. The reviewer added that the team noted that the inmate had been at the 3CMS level of care for only four days prior to his transfer to CMF and they wanted to see if he could benefit from continuing at this lower level of care. The inmate was returned to the ASU that same day. ASU policy required that he be seen weekly whether he was at the 3CMS or EOP level of care. However, at the EOP level of care, he would have been required to be offered ten hours of structured therapeutic activities in addition to the clinical appointments.

Records indicated that the inmate received daily psych tech contacts, custody welfare checks every 30 minutes, and had five-day follow-up with a mental health clinician and weekly clinician contacts. During the five-day follow-up, he was initially described as appearing to be more stable on medications, and he continued to deny suicidal intent. However, on days three and four of five-day follow-up, he "refused to wake up other than to deny SI/HI and report medication compliance". On day five, he was still lying in bed and was difficult to hear because of low speech volume, but he reportedly denied symptoms and his appetite and sleep were within normal limits. The note indicated that he "denied intent to harm self" and appeared to be stable. The OHU post-discharge five-day clinical follow-up dated 5/13/11 stated that he did not get out of bed, "stated that he was okay, getting his meds, not feeling suicidal".

The daily clinical contact sheet dated 5/14/11 for hourly checks indicated that the inmate was observed lying down from 2203 hours on 5/13/11 through 1308 hours on 5/14/11 every hour. The daily clinical contact sheet from 2215 hours on 5/12/11 through 2114 hours on 5/13/11 indicated that he was lying down with six exceptions, when he was sitting on his bunk or standing in the cell for hourly checks. Daily clinical contact sheets from 5/10/11 at 2200 hours through 5/11/11 at 2109 hours had the inmate consistently lying down or sleeping, with five exceptions, which included his eating (once), his standing at the front of the cell or sitting down, or his using the restroom (once). The daily clinical contact sheet for 5/9/11 at 2210 hours through 5/10/11 at 2108 hours indicated that he was sleeping or lying on his bunk, with 13 exceptions. Most of these exceptions observed him sitting on the bunk, with two observations of his kneeling in front of the bunk and one of his playing cards.

Five-day follow-up was completed on 5/14/11. Follow-up appointments, which were to occur weekly, were scheduled for 5/25/11 and 5/27/11 for the inmate to see his primary

clinician and psychiatrist, respectively. The inmate was also scheduled for an IDTT meeting on 5/17/11. However, he refused to attend the IDTT meeting, saw his primary clinician at cell-front, and stated that he would talk with her the following week. The team reviewed the UHR and decided to retain him at the 3CMS level of care; as noted above, one of the reasons provided to the suicide reviewer was the inmate having no observable Axis I symptoms in his presentation, despite his refusal to attend the IDTT meeting or out-of-cell clinical interviews. The suicide reviewer included the team's clinical summary that stated "the committee decided that currently the I/P is most appropriate for the CCCMS level of care. His current clinical concerns include recent MHCB/OHU and depressive SX and he will require continued attention by his PC. In the past month the I/P has decompensated. His medication was renewed by the psychiatrist and the I/P will continue med as currently prescribed. The I/P's treatment plan will be adjusted to the CCCMS level of care. The I/P did not respond to the IDTTs decision to change his LOC to CCCMS…the DMH referral consideration checklist was reviewed and the I/P is a new arrival/assessment is ongoing". Soon after the IDTT meeting, on 5/19/11, the inmate began to refuse his medication. An urgent referral was sent on 5/20/11, but a follow-up appointment with the psychiatrist was not scheduled until 5/25/11, the day after his suicide death.

The inmate had no significant current medical history with the exception of his request for dental services after he had lost two teeth in the riot that occurred at DVI as noted above. Dental saw him, and a dental authorization review request was submitted on 5/3/11 which was marked urgent. The inmate was apparently not seen urgently, and a second referral to Dental Services following his return to DVI was made on 5/9/11. However, records indicated that he was not seen prior to his death on 5/24/11. Notably, he had been found guilty of participating in a riot based on the RVR he received on 4/15/11. He was assessed a 61-day forfeiture of credit and referred to the ICC for assessment of a SHU term.

The suicide reviewer provided in the suicide report a poem in which the inmate appeared to express his distress and fear of being in an adult prison and the pain and hurt that he was feeling. In contrast, there was also a partial reproduction of a letter in which he appeared to express hope that his girlfriend would still be there for him and that he could not wait until all of this was over. The reviewer also noted the impact that the inmate's loss of his teeth appeared to have had, and his ASU placement, where some other inmates were verbally aggressive; such verbal aggression may have increased his fear. He had also lost 61 days and was being considered for a SHU term. The suicide reviewer noted several concerns that arose during the course of the review, but stated that every concern did not rise to the level of a formal recommendation.

The concerns included (1) the emergency response in which it was difficult to determine the flow and efficacy of interventions during the attempted resuscitation due to incomplete documentation; (2) MHCB discharge plans, in which the inmate was discharged despite his continuing diagnosis of Major Depressive Disorder, with minimal improvement, and his beginning to refuse both Prozac and Celexa; (3) CMF obtained MSH records that "echoed their observation and no serious Axis I symptoms were being demonstrated by the inmate." The reviewer commended CMF for obtaining the records from MSH, but noted that other than a "C-file flimsy," no records pertaining to the inmate's history of incarceration had been forwarded to CMF, which complicated their clinical decision making efforts. The reviewer noted that the inmate's psychological condition upon discharge was complex; the

discharging psychiatrist acknowledged the conflict in his statements that explained that the inmate was not presenting acute Axis I symptoms at the time of discharge in a case discussion on 7/21/11. Furthermore, balancing the inmate's depressive symptoms and the observations by the CMF primary clinician that there could be a positive effect in the inmate returning to DVI, where he would get his teeth fixed and have visits from his girlfriend and family, in contrast to the hopelessness that he expressed, added to the complexity. The reviewer noted that while the inmate was minimally improved and continued to present with symptoms of depression, the team judged that he could best be treated at the EOP level of care at DVI.

Furthermore, additional concerns were that (4) the Program Guide indicated that MHCB length of stay should be 10 days or less, but this inmate remained in the MHCB for 16 days. The reviewer noted "however, inmates can and often do stay longer than 10 days if clinically appropriate." The reviewer also noted that the inmate was discharged "without much measurable improvement" and during discussion with CMF and CCHCS staff, it was considered that he had improved enough to be treated at the EOP level of care; (5) assessment of suicide risk and diagnostic considerations in which the reviewer noted that a psychiatrist evaluated the inmate at DVI on 5/9/11, when he returned and was placed in the OHU. The reviewer noted that the psychiatrist's ratings were in contrast to previous risk ratings completed on 4/20/11 and 5/6/11. However, in an interview the psychiatrist reported that he had reviewed the inmate's record and based his judgment of risk on the record and his clinical impression of the inmate's symptoms. The psychiatrist further stated that he had provided a provisional and principal diagnosis of Antisocial Personality Disorder based on his review of the records which mentioned Malingering and Conduct Disorder symptoms from MHS and CMF; (6) post-discharge follow-up care, in which the reviewer noted that five-day clinical follow-up was completed; despite the inmate responding "no" as to whether he felt like hurting himself, notes were extremely brief and did not fully assess the inmate's mental status. The reviewer concluded that staff did not appear to attempt to synthesize the evaluation given the inmate's history of depression and his current clinical presentation; it included three consecutive days when he refused to get out of bed to speak with a clinician. The progress note on the fifth day failed to provide any additional information other than the inmate's denial of suicidal ideation and that he "seemed stable". The reviewer reported that no mental status information was provided to support those statements. Furthermore, the primary clinician did not see the inmate within one week. Rather, he was seen on 5/17/11 at cell-front after refusing to attend the IDTT meeting, and a discussion with his primary clinician indicated that the inmate seemed "hopeful"; however, there was no progress note in the records indicating this meeting with the clinician. The reviewer added that there was discussion with DVI staff regarding issues related to clinical practice; the Proctoring and Mentoring Program was mentioned as a way to augment clinical expertise.

The DVI SPR-FIT coordinator revealed that the institution had taken steps to ensure the safety of high risk inmates, including extending hours and additional staff to provide inmates following discharge from crisis bed units the evaluations and consideration for need of a higher level of care; and (7) regarding discharge recommendations, the reviewer noted concerns about policy issues pertaining to the recommendation made upon MHCB discharge and specifically, CMF recommending that this inmate be placed in the EOP. The DVI team determined that the 3CMS level of care was appropriate and provided their rationale. The reviewer noted that this raised a general concern regarding how

recommendations generated by discharging crisis bed clinicians were handled and accepted.  The issue warranted consideration by the CCHCS SPR-FIT.

The suicide report provided four recommendations of problems and quality improvement plans, as follows:

Problem 1:  Documentation of the medical response measures, specifically the use of the AED, was incomplete and did not indicate when the AED was employed.

Quality Improvement Plan:  The Director of Nursing or designee at DVI shall provide the missing documentation to California Correctional Health Care Services, Headquarters, if the documentation is available.  In addition, a training pertaining to documentation of the use of the AED shall be provided to nursing staff.

Problem 2:  The form used by the psychiatrist at DVI to complete the Suicide Risk Assessment on May 9, 2011, was an outdated version of the current Suicide Risk Evaluation (SRE).

Quality Improvement Plan:  The Chief Psychiatrist or designee at DVI shall ensure that the updated Suicide Risk Evaluation form __ by all clinicians in the institution and that clinicians have access to that form.

Problem 3:  Documentation of the follow-up provided to the inmate upon his return to DVI did not show that the inmate's mental status and psychological status were adequately evaluated or documented by the clinicians providing daily clinical follow-up.  A mental status examination that includes only the words 'seem stable' did not describe any behavioral indicators that would support that statement and fall short of good clinical practice in the provision of mental status exams, which are listed as an integral component of five-day follow-up procedures in the MHSDS 2009 Program Guide, Page 12-5-29.

Quality Improvement Plan:  The Chief of Mental Health or designee at DVI shall: (1) Conduct an audit for 30 days or up to 30 charts to determine if inmate 'stability' is clearly supported by description of mental status factors which are related to the current problem affecting the inmate.  If the audit does not determine that 90 percent of the charts are in compliance with the standards described above and in the Program Guide, the following actions shall be taken: (2) Charter a Quality Improvement Team (QIT) to discuss interventions to solve this problem including the possibility of revising the form used for five-day follow-up procedures to provide clinicians with additional guidance in completing a clinically relevant follow-up to a crisis bed discharge.

Problem 4:  According to policy, the inmate should have received weekly visits with his primary clinician.  His first appointment was scheduled for May 27, 2011, 13 days after completion of his five-day follow-up, which was conducted by a clinician who was not his primary clinician.  Prior to IDTT, the inmate had not received an interview with his primary clinician after his return from CMF.  It was not clear from documentation that he met with his primary clinician when he refused to attend IDTT.  In discussion with the treatment team at DVI it appeared that documentation of their interaction had been incorporated into IDTT notes rather than documented in a separate SOAPE note.

Quality Improvement Plan:  The Chief of Mental Health or designee at DVI shall provide additional training to mental health staff regarding the standard of practice pertaining to clinical documentation.

A physician completed a Death Review Summary on 9/6/11. The physician described the inmate's primary cause of death, medical and mental health treatment, and the emergency response. The physician reported that there were no departures from the standard of care for medical providers. However, it was noted that a provider ordered an extensive array of laboratory tests on 3/16/11, but no indication for these tests was found in the medical records. The physician also concluded that the emergency response was timely and adequate. The Death Review Summary did not generate any recommendations other than peer review referral for the provider for education as to the excessive laboratory tests ordered on 3/16/11.

On 9/15/11, the Deputy Director (A) Statewide Mental Health Program, and Director (A) Division of Adult Institutions provided their report on implementation of the Quality Improvement Plan for this inmate's suicide. In the report, the Directors stated the problems and improvement plans for this inmate's suicide (problems one, two, three, and four). The following responses were supplied:

As to problem one, the institution stated that nursing staff had received AED training and that documentation regarding AED use during the emergency response to this inmate's suicide was not completed and thus could not be produced.

As to problem two, the final report indicated that the DVI chief of mental health provided a memo to all staff as well as training regarding use of the new version of the CDCR 7447 (3/11). Staff was instructed to destroy all previous versions of the CDCR 7447. The new version was widely distributed. DVI was also selected as a test site for implementation of the proctoring/mentoring process to ensure high quality SREs. DVI also had been developing a LOP for implementation of that program; it was being routed for signatures and was included in the final report. (LOP 303 Suicide Risk Evaluation Proctoring and Mentoring Program). IST sign-in sheets were provided for the training.

As to problem three, there was an audit of five-day post-discharge documentation for 30 randomly sampled charts. The audit asked three questions, namely, (1) did clinical documentation speak to mental status; (2) did the rationale support mental status; and (3) was suicide risk mentioned? The results indicated affirmative responses of 77 percent for question one, 85 percent for question two, and 99 percent for question three. Given that the compliance percentage with Program Guide requirements fell below 90 percent, a QIT was formed and modifications were made to the form to specifically assist clinicians with additional guidance in completing a clinically relevant follow-up to crisis bed discharges. Training was also provided, and IST training sheets were signed. The response indicated that a future audit would be conducted to measure compliance. If compliance numbers reached 90 percent or above, the QIT would be closed with final recommendations submitted. Results would be forwarded to the SPR-FIT at DCHCS when completed. There was no additional submission provided in the documents reviewed.

As to problem four, the final report indicated that training was provided to ASU clinicians as to appropriate documentation to meet Program Guide requirements. ASU clinicians were responsible for scheduling their own follow-up appointments. It included that clerical staff would be responsible for scheduling appointments with the primary clinician and psychiatrist within one week of return from the OHU/MHCB. A memorandum from

the chief of mental health to the SPR-FIT coordinator and DCHCS was provided, as was an IST sign-in sheet and an agenda for the training.

The audit was conducted between 7/20/11 and 7/26/11 for what appeared to be 30 inmates and included 139 days of five-day follow-up for these inmates. A second audit appeared to have been conducted on the same questions between 8/3/11 and 9/6/11 and included 30 inmates and 101 days of five-day follow-up; it indicated 100-percent compliance for question one, 99-percent compliance for question two, and 100-percent compliance for question three. The response indicated that the QIT had met its goals by developing a proof of practice audit procedure and tool, by revising the CDCR 7230-MH and OHU post-discharge five-day clinical follow-up documentation, by providing training to staff, and by establishing an auditing timeline to ensure continued monitoring and compliance. The QIT was closed as of 9/12/11.

**Findings**: This inmate's suicide death may well have been foreseeable. Although the inmate denied active suicidal ideation or plan in the days prior to his death, his isolation, medication refusal, and despondency were clear and not adequately addressed by clinical staff. The mental status examinations and subsequent evaluations that were conducted at DVI after his return from the CMF MHCB were inadequate and untimely. The five-day follow-up was grossly inadequate, and the inmate refused to get out of bed and to respond to questions other than to deny suicidal ideation and to state such things as "I'm alright". Furthermore, timeliness of primary clinician contacts after his return to DVI also was not met. The inmate's refusal to attend the IDTT also appeared not to have been viewed as an indication of his lack of participation in treatment and probable decompensation. He subsequently refused medications, and an urgent referral appeared not to have been responded to prior to his death even though there were several days from the time of the referral to the time of his death. DVI staff also essentially overrode the recommendation from the CMF MHCB team for EOP level of care for the inmate. Instead, it was decided to retain the inmate at the 3CMS level of care with far less interventions; this despite recognizing that the ASU environment included verbally aggressive inmates and other conditions that more likely than not would cause even more distress for an 18-year-old during his first adult incarceration in which the reason for his MHCB referral was because he was becoming "overwhelmed" and depressed.

In addition, the decision by the CMF MHCB to return the inmate to DVI after a 16-day stay in the MHCB rather than to refer him to a higher level of care appeared to be at least questionable. The MHCB psychiatrist progress note included the statement that the inmate was "complex" and some indication that he was stabilizing and improving. It also contained other indications that he was refusing appointments with MHCB staff out of cell, and he began refusing Celexa prior to his transfer back to DVI. The rationale that he could see his family and girlfriend and get his teeth fixed at DVI seemed to have overridden the consideration that he was unstable, had not demonstrated significant improvement, and was in need of further stabilization and/or a referral to a higher level of care, such as DSH. For these reasons, this inmate's suicide may very well have been preventable had he first been referred to a higher level of care from the MHCB to DSH. His level of decompensation and increased suicide risk should have been recognized; however, incomplete, absent and insufficient evaluations precluded this assessment. At a minimum, the inmate should have been placed at the EOP level of care; more likely, he should have been referred back to the MHCB or to DSH.

151

### 15.  Inmate O

Brief History:  This inmate was a 56-year-old Hispanic male who committed suicide by hanging on 5/30/11 at Avenal State Prison (ASP).  He was a participant in the MHSDS at the EOP level of care, and he was single celled in the SNY OHU at the time of his death.  He had entered the CDCR on 1/25/06 via the DVI RC after being convicted on three counts of lewd and lascivious acts with a child under the age of 14.  He was sentenced to a term of seven years in the CDCR, and his earliest possible release date was 8/9/11.

The inmate was housed in the SNY OHU, and he had been receiving mental health services at the EOP level of care.  He had received a RVR on 5/9/11 due to fighting, and after he identified enemy and self-harm safety concerns; he was transferred to the MHCB at CMF.  He remained there for 11 days, and he was transferred back to ASP at the 3CMS level of care.  However, after his return to the ASP OHU, his level of care was increased to EOP.  He was single celled in the OHU at the time of his death.

The inmate was noted to have been observed sitting on his OHU bed in no apparent distress at 12:30 p.m. on 5/30/11.  He was discovered at 12:43 p.m. by an officer performing security checks; the inmate was in his cell sitting on the floor, leaning against the wall alongside the toilet, and lying in a pool of urine.  He did not respond to the officer's efforts of knocking on his door and calling his name.  The officer immediately summoned the registered nurse to the cell.  The door was opened, they both entered the cell, and they discovered the inmate with a t-shirt wrapped around his neck hanging from the disability assistance/safety bar located along the toilet.  The officer activated her PAD, and she and a certified nursing assistant (CNA) ran to the nursing station to retrieve the cut-down tool.  TTA and OHU staff including two RNs and a MD responded in the OHU.  The RN attempted to lift the inmate to remove pressure from the noose until additional help arrived.  The two additional RNs, the MD, and custody staff responded and lifted the inmate's body up to ease the pressure from the noose, to cut the inmate down, and to begin CPR.  An ambulance was called, and a Code Three medical emergent response was requested.  The ambulance dispatch was notified that CPR was in progress.  A timeline recorded these interventions occurring between 12:44 p.m. and 12:46 p.m.  Between 12:45 p.m. and 12:46 p.m., a RN used scissors to cut the t-shirt from around the inmate's neck and the disability assistance bar.

The CNA retrieved the AED from the TTA, and the RN prepared the AED and ambu bag airway for oxygen to be administered.  At 12:46 p.m., the AED was placed on the inmate, rhythm was interpreted, and no shock was advised.  CPR continued with the inmate being monitored for a pulse and AED response.  No pulse was detected, AED rhythm was analyzed and advised no shock, and the MD documented no oculocephalic reflex and that the inmate's pupils were fixed and dilated.  The inmate was placed on a cardiac monitor, that also advised no shock, and CPR continued.  Epinephrine was given, but Atropine was not.  The MD attempted intubation, which was unsuccessful, and the ambu bag continued to be utilized to support respiration.  IVs were started, Epinephrine was again administered, and the cardiac monitor advised no shock.  At 12:58 p.m., the ambulance arrived at the OHU, IV fluids were provided, and CPR and airway ventilation was continued.  At 1304 hours, the MD pronounced the inmate deceased and the body was transported to the TTA.

152

The autopsy report, dated 7/13/11, was provided by the Office of Sheriff, County of Kings. The report indicated that the autopsy consisted of an external examination of the body and determined the cause of death as ligature hanging (minutes). Toxicology screening indicated that no blood alcohol was detected, and the drug screen was negative. The autopsy was performed on 5/31/11. In the blood toxicology, Fluoxetine and Phenytoin were detected at non-toxic levels. No other medications were reported as detected. The suicide report indicated that the coroner's best estimate of the actual time of death was six to eight hours prior to the inmate's discovery, as reported by the coroner.

The suicide report recounted the inmate's criminal justice history. It indicated that there were no records of known juvenile criminal history. He was first arrested at age 20 for vehicle theft; that charge was dismissed. His adult criminal history included arrests and convictions for vehicle theft, inflicting corporal injury on a spouse, battery, possession of marijuana for sale, importation of controlled substances, possession of a dangerous weapon, lewd and lascivious acts, smuggling, illegal entry, importation of marijuana, and possession of methamphetamine. He served a 62-day sentence in jail and three days probation for the sale of marijuana in 1996. In 1999, he was arrested for marijuana and methamphetamine possession, but was granted supervised release, after serving a short-term in a federal correctional institution; the suicide report indicated that no records were found in the C-file, despite the request for records from the federal incarceration in 2006.

The inmate was arrested for the commitment offense on 9/1/05, and he was charged with lewd and lascivious acts with a child under the age of 14, which involved sexual molestation of his seven-year-old granddaughter. He was convicted in January 2006 and sentenced to a term of seven years in the CDCR. His EMPD was 8/9/11. However, it was noted that due to the nature of his crime, he was ineligible for non-revocable parole and was required to register as a sex offender. He was received via the DVI RC on 1/25/06.

According to the suicide report, the inmate's mental health history was notable for a history that had contradictory self-reports. He reportedly had a psychiatric hospitalization in Mexico and one prior suicide attempt in 1990, which were not confirmed. He also was shot in the head in 1990 and had a history of a seizure disorder. He was reported to have denied any past psychiatric history for himself and his family. Notably, the CDCR suicide reviewer indicated that the inmate had said to other inmates that he was socially isolated in the MHCB in the last month of his life. It was also noted that he had expressed a desire to join his dead father, and he had reported auditory hallucinations of his father's voice, which existed prior to his CDCR incarceration.

The inmate entered the CDCR via DVI on 1/25/06, and he was referred for further evaluation after a mental health screening. He had been prescribed Dilantin for his seizure disorder, but he reported no history of taking psychotropic medication. In approximately one week, on 2/1/06, he attempted suicide by hanging; he was transferred to the OHU, and he was admitted to a safety cell on suicide watch. Records indicated that he stated to a psychiatrist that he wanted to die so that he could join his deceased father. The inmate was Spanish-speaking, and the interview was assisted by a translator. He was diagnosed with Major Depressive Disorder, but no GAF score was reported. He was prescribed Lexapro and Ativan at small dosages; subsequently he was prescribed Zyprexa and Seroquel, both of which were antipsychotic medications.

Three days later on 2/4/06, the inmate was transferred from the MHCB to CSATF; he reported auditory hallucinations of his father telling him to kill himself. He also continued his intention to hang himself; he was provided with diagnoses of Psychotic Disorder NOS and Adjustment Disorder NOS, with a GAF score of 29. Despite his reports of endorsing the desire to die, being severely depressed and psychotic with social withdrawal; his evaluation determined that he posed low risk for suicide. Records indicated that he reported on 2/8/06 that he wanted to remain in the MHCB because of safety concerns, and other inmates threatening him because of his "R" suffix. However, he was placed on psychiatric observation on 2/12/06 and returned to DVI RC on 2/16/06; even though he continued to report "demons" that continued to bother him and safety concerns. He was placed in the OHU from 2/17/06 to 2/21/06, and he was administered Zyprexa and Lexapro. He reportedly denied any prior mental health history of suicide attempts. He returned to the OHU from 3/13/06 to 3/14/06, and he was placed on suicide precautions. However, he was discharged with no change in his medications, and he denied suicidal ideation. His medications were discontinued on 7/23/07 after he was described as stable and had refused all psychotropic medications.

The inmate was returned to the OHU in 2008 because he had stopped taking psychotropic medications, requested to be removed from the MHSDS, was observed to be crying, depressed, and unable to cope on the yard, and was having safety problems. He reported auditory and visual hallucinations as well as PTSD symptoms, but no SRE was located in the records that the Special Master's reviewer examined or based on the suicide report. The suicide reviewer opined that this omission occurred over three years prior to the inmate's suicide and did not merit a formal recommendation at this time. The inmate's diagnoses when admitted to the OHU were Acute Stress Reaction and Major Depression, and his GAF score was 25. The inmate refused medications and was removed from all medications except Dilantin for his seizure disorder. The suicide report noted that he continued to function well without medication, and he was removed from the MHSDS in October 2008.

The inmate reportedly functioned without incident at ASP until 5/9/11, when he had a seizure. Because he had a seizure and a head contusion which resulted in his presentation of confusion, he was transported to Coalinga Regional Medical Center for further evaluation. It appeared from record review that he was returned to the OHU on 5/10/11, and he was referred to mental health because he was observed crying in his cell. A psychologist evaluated him on 5/11/11; the psychologist described the inmate with tearfulness, depression and guardedness. He also endorsed suicidal ideation, intention, and plan, but he denied auditory and visual hallucinations. He also stated that he had "lost everything", he did not want to parole, and he did not have "anything left". He reported a decrease in his appetite and sleep and that he feared parole in Sacramento because he would be killed there. He also reported an increase in depression, shame, and feelings of hopelessness and helplessness, as well as a past suicide attempt in 2006. The inmate reported suicidal ideation "all the time" and that he had serious intent and was "just waiting for the right moment". Records also noted that he had stated that he had a plan, but he would not discuss it. He was admitted to the OHU, and he was placed on suicidal precaution. He was seen by a psychiatrist and psychologist, and he was provided with diagnoses of Depressive Disorder NOS and rule out Major Depressive Disorder; he was assessed with a GAF score of 20. He was placed in a safety stripped cell on suicide precaution. A SRE was completed; it indicated that his estimate of chronic suicide risk

154

was moderate to high, and his acute risk was rated as high due to his reported suicidal thoughts and intent and his plan that he would not discuss.

On 5/12/11, the IDTT reviewed the inmate's treatment plan and documented a need for referral to the MHCB/higher level of care due to the inmate's suicidal thoughts, intention, and plan, an increase in depressive symptoms, and parole planning concerns. His diagnoses were changed to Major Depressive Disorder, Recurrent, Severe without Psychotic Features and Alcohol Dependence, and a GAF score of 20 was assessed. He was referred to the MHCB, but his suicide precautions were changed from every 15 minutes to every 30 minutes.

On 5/13/11, the inmate was transferred to the MHCB at CMF. On 5/14/11, a psychiatrist evaluated him with the use of an interpreter and documented his prior history of depression, suicide attempt by hanging and treatment with psychotropic medication. He was noted to have threatened to kill himself by hanging and had "reached a breaking point". He reported both suicidal ideation and auditory hallucinations for the past six months, and his diagnoses remained unchanged. He was described as exhibiting an altered mental status with depressing, distraught affect, rocking behavior, with grimacing and tearfulness; but he denied suicidal ideation on that day. However, he admitted that he had suicidal ideation on the previous day. He was noted to be socially isolated and depressed; a completed SRE rated his acute and chronic risks as moderate.

The inmate was seen on 5/15/11, the following day. A clinician noted that he appeared to be functioning within normal limits, and he denied suicidal ideation or a plan. The plan was to discharge him on 5/23/11 to the 3CMS level of care, and his GAF score was raised to 52. The next day (5/16/11) an IDTT occurred where a psychiatrist noted that the inmate reported feeling safe and sleeping well in the MHCB setting. The psychiatrist also noted mild anxiety and impaired concentration and memory, but the inmate denied suicidal and homicidal ideation and was judged to be at "no imminent risk of self-harm". He was noted to be functioning within normal limits on 5/17/11 and 5/18/11; and on 5/19/11, it was again noted that he was "at no imminent risk for self-harm and harm to others", but that the "communication was brief but adequate" as the inmate was described as being "in bed under covers". The inmate denied psychiatric, suicidal, or homicidal symptoms or ideation and was determined to be stable. The plan was to discharge him on the following week.

The primary clinician saw the inmate at cell-front on 5/20/11; the primary clinician stated that he had complained of a headache and had a history of headaches, but did not want headache medication. The inmate denied other symptoms and walked away from the clinician, appearing uncomfortable. It was noted that he was psychiatrically stable and cooperative, but the writer was unable to adequately assess the inmate due to his lack of communication. The plan was for likely discharge by the IDTT, which would occur three days later. An additional note dated 5/21/11 indicated that the inmate had effective communication; he spoke with staff clearly and slowly in basic English and responded to simple requests. It was also noted that he stated that he understood English, he did not need or want an interpreter, and he had been confused; however, the medication had been effective and he was "alright now". An interpreter was contacted, but the inmate explained his reluctance to use an interpreter; he did not think that he was depressed, but rather that he was confused. A physician was contacted because the inmate had stated that he was confused and felt a drunken sensation similar to the experience when one had too much to

drink.  The physician reviewed the inmate's CT scan and opined that he was demonstrating signs of dehydration; he was encouraged to drink more fluids and to become more active.

The psychiatrist noted that the inmate was cooperative, denying suicidal ideation and auditory hallucinations; he was not psychotic.  A psychologist completed a SRE on 5/23/11 for reasons noted as discharge planning.  The SRE was incomplete; at the time of 'completion', the inmate's age, ethnicity, and level of care were not documented.  However, his level of suicide risk was determined to be low acute and low chronic risk with a justification provided that he had one suicide attempt in 2005 and the inmate "consistently denies suicidal ideation and is future oriented".  The suicide reviewer noted in the suicide report "in accordance with the MHSDS 2009 Program Guide, the inmate was discharged within 10 days since he was evaluated as stable.  He was screened for a higher level of care using a checklist for DMH referrals, which indicated negative responses to all questions".

A psychologist completed a treatment plan on 5/23/11 in the MHCB and noted that the inmate denied suicidal ideation or intent; he was feeling better, but he was a little depressed with "mild depression and mild paranoia".  It was noted that at discharge the MHCB clinicians documented resolution of the inmate's depression, increasing stability, and the lack of suicidal ideation or intent.  He was prescribed Abilify, Prozac, and Dilantin; he was noted to be tolerating the medications well with minimal side effects of transient dizziness in the morning.  The plan was for him to continue receiving the prescribed medications; although, his Dilantin blood level was noted as sub-therapeutic.  The recommendation was for placement at the 3CMS level of care.  His discharge diagnoses were the same as his prior diagnosis, and his GAF score was raised to 52.

The inmate was returned to the ASP OHU on 5/25/11 at 10:45 p.m. with orders for hourly psychiatric observation and continuation of his prescribed medications, which included Ability, Prozac, Dilantin, and Tylenol.  However, due to a lack of appropriate bed space, a physician approved temporary housing for the inmate in the ASU section of the OHU; no pre-placement mental health evaluation was needed for placement in the ASU as per an ASU pre-placement chrono.

On 5/26/11, the OHU psychologist completed a mental health assessment and SRE, noting that the inmate had depressed mood; however, his mental status examination appeared to be within normal limits.  It was noted that he denied past and current auditory and visual hallucinations.  He was determined to have moderate chronic suicide risk based on shame and embarrassment, and low-moderate acute risk related to safety concerns; he hoped to parole to Mexico.  He did not endorse any plan to kill himself or a desire to die.  The treatment plan was to release him to custody with placement on five-day follow-up.  The plan included that the inmate, after OHU release, be escorted to the program office to discuss safety concerns with the sergeant before being released to the yard; once on the yard, direct contact would be made between the inmate and the primary care clinician.  The psychologist also wrote an order to stop psychiatric observation, to substitute routine nursing checks, and to provide full issue including an ASU bed, mattress, blanket, boxers and t-shirt.  A progress note indicated that the inmate would require EOP level of care to provide him with weekly primary clinician appointments and to address problems identified during his OHU placement prior to his referral and placement in the MHCB, including safety concerns and parole planning options.

156

The IDTT saw the inmate that same day and documented his mental status as within normal limits, although he appeared slightly depressed. The IDTT agreed that he would need a higher level of care, and he was placed in the EOP, maintaining his former diagnoses. After the IDTT meeting, a psych tech went to the inmate's cell because he was shouting and complaining about wanting to return to the yard. The psych tech observed the inmate collapsing to the floor, apparently having a seizure. Medical staff was summoned, the cell door was opened, and medical staff entered. The inmate was placed on a gurney and transported to the TTA, and his OHU discharge was placed on hold.

On 5/27/11, a psychiatrist evaluated the inmate and discontinued Abilify, but Prozac was continued. His diagnosis was changed to Depressive Disorder NOS, and a GAF score of 55 was provided. The inmate reportedly denied any thoughts of harming himself and reported that he was "doing good" and wanted to parole. The psychiatrist documented that the inmate's mental status was within normal limits and diagnosed him with Major Depressive Disorder, Recurrent, Severe without Psychotic Features and Alcohol Dependence. His GAF score was lowered to 49. The inmate was medically cleared for discharge back to the yard, and the plan was to discharge him to the ASU. The suicide report referenced nursing staff informing the OHU psychologist that he had expressed concerns about placement and was "very labile", and he refused to have his blood drawn to check his Dilantin level. The psychologist saw the inmate in a holding cell, and he stated that he was tired of having his blood drawn. His speech was slurred, and he was "extremely distraught," tearful, and quiet. The psychologist described him as very agitated; he attempted to talk but he was unable to make sounds, often times grunting and becoming tearful. According to records and the suicide report, he reported that he wanted to die and repeated several times "I am so tired." It was noted in the records that he told the psychologist that he wanted to "hang myself", and it would be easier on the yard than in the OHU. The psychologist performed a mental status examination that determined that the inmate was oriented and denied auditory and visual hallucinations, but his thought processes were difficult to understand due to tearfulness, and his speech was "muted times". Although the inmate's grooming and hygiene appeared to be within normal limits, his behavior was clearly distressed. He endorsed suicidal ideation and a hanging plan; although his diagnosis remained unchanged, his GAF was reduced to 25. He was placed on suicide precautions with every 15 minute checks, and he was issued a safety smock, blanket, and safety mattress. The psychologist completed a SRE at 11:45 a.m., and he was determined to pose high chronic risk and high acute risk for suicide. The inmate was readmitted to the OHU, and a new 72-hour timeframe was instituted (the inmate had not actually left the OHU pending medical clearance).

Nursing staff notes dated 5/28/11 and 5/29/11 indicated that the inmate was cooperative, denied suicidal ideation and auditory hallucinations, and was not in acute distress. A psychiatrist saw him on 5/29/11 at 3:08 p.m., and assessed that he was not in acute distress. He was reportedly did not exhibit psychotic symptoms, and he was not imminently homicidal, suicidal, or gravely impaired. The psychiatrist wrote an order to stop suicide precaution, and to begin monitoring the inmate on psychiatric observation every hour as he was not imminently suicidal or self-destructive.

On 5/30/11 at 10:40 a.m., two psychologists saw the inmate. They documented that he had voiced being ready to return to the unit, but exhibited difficulty staying focused on the

interview; he appeared tearful, complained of not feeling well, and he was physically trembling.  He was determined to be appropriate for the EOP level of care.  His mental status examination revealed a dysphoric mood, blunted affect, orientation to date and release date, and impaired thought processes, but "no evidence of psychosis".  He repeatedly denied suicidal and homicidal ideation.  His diagnosis remained the same, and his GAF score was raised to 50 with a plan to follow up with the clinician the following day.  He remained on suicide precautions with every 30-minute staggered checks and limited issue.  Approximately two hours later at 12:43 p.m., the inmate was found in a semi-sitting position hanging from the disability bar in his cell.  The suicide report indicated that the OHU psychiatric patient observation record documented that although he had been placed on 60-minute checks the previous day; he was actually observed every 15 to 30 minutes until the time that he was discovered.

The inmate's medical history indicated that he had a history of a seizure disorder; it appeared that his seizure control varied.  Although he was noted not to have had any seizure activity witnessed, it appeared that he reported that his last seizure occurred on 1/5/11.  The inmate may have experienced a seizure on 5/9/11 when he was found and "man down" was called; at that time, his Dilantin level was sub-therapeutic.

The suicide reviewer opined in the suicide report "if he had not hanged himself in the OHU where he had strong clinical support, it is highly probable he would have attempted to hang himself on the yard".

The suicide reviewer indicated that there were several factors that contributed to the complexity of the inmate's psychological presentation including: (1) the inmate's mental health difficulties were complicated by a seizure disorder which precipitated hospitalizations on three occasions in 2005, May 2011, and after he had returned from the MHCB pending medical clearance; (2) the inmate's history of polysubstance abuse prior to incarceration was well-documented and the rapid turnaround of his symptoms during his prison term – from decompensation to stability was with a resurgence of serious symptoms of mental illness and seizure-like symptoms – suggested the possibility of substance abuse as a factor in his behavior.  It should be noted that the inmate's rapid turnaround symptoms occurred in the MHCB and OHU, and it would be presumed that access to illicit substances would be more difficult to achieve; (3) "the end of inmate __ life was marked by numerous sudden shifts in his psychological presentation and it was possible that he may have been able to hide his serious mental health symptoms for brief periods of time with sudden loss of control during times of stress.  The reviewer noted that he demonstrated steady improvement that was viewed as genuine by CMF clinicians, but his shift and stability once he returned to ASP with increases in agitation and suicidal ideation was notable.  The reviewer noted that a joint evaluation by two licensed psychologists two hours before his death indicated that he was judged as functioning well enough in his current EOP level of care and orders for hourly psychiatric observation were deemed appropriate.

The reviewer further indicated that concerns were generated as a result of the review including: the SRE at CMF completed in preparation for his discharge from the MHCB at CMF endorsed many chronic and acute risk factors; both sets of factors were rated as low.  The reviewer opined "the rationale provided for the assignment of that risk level was inadequate.  It did not include an satisfactory explanation of the thought process that led to

that clinical impression of risk level.  In addition, the treatment plan portion of the form provided no information about the inmate's current goals and therefore failed to provide sufficient information to clinicians at ASP regarding continuity of care for this inmate".  The reviewer noted the inmate's continuing instability after returning to ASP.  The reviewer opined that two days after he returned to ASP from the CMF MHCB, he was evaluated by a psychiatrist who discontinued Abilify but continued Prozac, noting that the inmate's increase in distressing symptoms might have been related to Abilify.  The psychiatrist indicated that the inmate was tolerating the selective serotonin reuptake inhibitor (SSRI) for depression, but the Abilify was poorly tolerated and the inmate had side effects starting with the SSRI (drowsiness and ataxia) that might have been amplified by the addition of Abilify.  The psychiatrist noted that Abilify might increase the risk of seizures, and it was discontinued immediately.  The psychiatrist noted that he would consider an increase in Prozac in the future.

The reviewer noted that following a change in medication, the inmate presented with increasing instability.  Nursing staff described him as "very labile" and "extremely distraught", agitated, tearful, and suicidal.  However, the psychiatrist evaluated him two days later and noted that he was not in acute distress, appeared to be grossly non-psychotic, was not imminently homicidal, suicidal, or gravely impaired, and had no significant medication side effects.  Following this, the psychiatrist wrote an order to stop suicide precautions and to start hourly psychiatric observation.

The reviewer noted that the inmate continued to demonstrate instability and during the joint evaluation by two psychologists on 5/30/11, he had difficulty remaining focused, appeared to be close to tears, was trembling, wanted to return to the yard, and was concerned about his Dilantin level.  Although the psychologists did not return the inmate to general population, they also did not increase his level of observation, return him to the OHU or refer him back to the MHCB or to the Acute Psychiatric Program at DSH, given his instability and decompensating condition.

The reviewer reported that all policies and procedures were met, and competence was demonstrated in the rationales provided by the clinicians in a discussion during the review of this case by committee on 8/1/11.  Furthermore, there was discussion with ASP staff regarding the design component of the OHU, as the inmate was able to hang himself from a disability bar inside of the OHU single cell; this information was included in the suicide report.  This issue was discussed as an agenda item in the SPR-FIT meeting at CCHCS headquarters.  It was discussed that grab bars with closed bar design that did not allow for a ligature site were approved for acute and intermediate levels of care but not at other levels of care such as OHUs.  The possibility of a design that eliminated ligature attachment possibilities for ensuring the safety of inmates with disabilities was noted as a continuing CDCR focus.

One recommendation and quality improvement plan was generated from the suicide report as follows:

      Problem 1:  The CMF MHCB Discharge SRE was inadequate.  It did not include a sufficient rationale for the assessment of low risk for this inmate.  In addition, the treatment plan portion of the SRE did not contain any recommendations for the inmate's continued treatment after discharge.  Although a treatment plan was referenced, the

scarcity of information provided in this document warrants a renewed focus on suicide risk evaluation efforts at CMF.

Quality Improvement Plan:  The Chief of Mental Health or designee at CMF shall develop the Proctor/Mentor (P&M) Program in the administration of the SRE.  __ of the Proctoring and Mentoring Program developed by Headquarter staff at CCHCS, along with the monitoring tool, has been provided to the Chief of Mental Health at CMF.  The purpose of this program is to ensure that clinicians have the knowledge and skills to adequate assess inmates at risk for suicide.  Headquarters will provide additional assistance as needed.

A physician completed a Death Review Summary on 7/28/11.  The physician described the inmate's cause of death, medical and mental health course of treatment, and emergency response.  The physician opined that medical providers met the standard of care, more documentation was needed to support the discontinuation of suicide precautions which was first ordered on 5/29/11 and continued on 5/30/11 (with referral to mental health for further review), and that the note written by the psychiatric clinician on 5/11/11 was well-written and provided a clear description of the patient's concerns.  The physician also opined that no nursing issues were identified and a systemic concern included consideration of review of the ACLS response to PMP.

The Deputy Director (A) Statewide Mental Health Program and Director (A) Division of Adult Institutions issued their report on implementation of the quality improvement plan for this inmate on 10/24/11, in response to the suicide report dated 8/10/11.  In their response, the Directors provided a memorandum regarding details of the development of the Proctoring/Mentoring Program referencing selected proctors/mentors and a timeline for including all staff for rotation in the program.  They also noted that a LOP had been developed to outline the PMP and methods for monitoring quality of care.  An outline was provided indicating that review of PMP materials, a draft LOP, and identification of mentors had been accomplished by 8/23/11.  There were also plans to compile a list of potential mentors, and to provide subsequent documentation to CCHCS.  They would also meet and train mentors; mentors and mentees would be matched, mentoring would commence, and there would be monthly chart reviews between 9/12/11 and 11/1/11.  A LOP was also provided as a draft without signatures.  Additional policies and procedures titled "Chapter Two:  Mental Health Services Delivery System Coleman Corrective Action Plan – Suicide Prevention" and "Section 6:  Suicide Risk Evaluation Proctoring and Mentoring Program" were provided and signed by the CEO, chief of mental health and chief psychologist.

**Findings:**  This inmate's suicide death appears to have been both foreseeable and preventable.  The inmate was not transferred from the OHU to a higher level of care, and he should have been transferred to either an MHCB or APP.  The inmate, during his treatment in the MHCB and OHU, had a variable course in which he was clearly demonstrating a fluctuating mental status, at times endorsing and at other times denying suicidal ideation, intent, and a plan to hang himself.  Given the inmate's history and his clear need for adequate assessment and management of his suicidal thoughts and intent, the staff did not appropriately address his mental health needs.

The inmate presented with moderate to high suicide risk and should have been referred from the MHCB to an acute psychiatric program under suicide observation given the level of suicide risk.

## 16. Inmate P

Brief History:  This inmate was a 23-year-old Hispanic male who committed suicide by hanging on 6/17/11 at the CCI.  He was single celled in the SHU at the time of his death.  He was a participant in the MHSDS at the 3CMS level of care.  The inmate reentered the CDCR via the WSP RC on 8/18/10 after he was convicted by a plea agreement on 7/6/10 of murder and second degree robbery with enhancement.  The inmate was sentenced to life without the possibility of parole.

The inmate was discovered on 6/17/11 at approximately 12:34 a.m. by a correctional officer.  He was hanging from the vent in his cell with a sheet tied around his neck.  The correctional officer called a medical emergency via institutional radio and a second officer activated their personal alarm device.  At approximately 12:35 a.m., a sergeant and all Code One and Code Two responders arrived at the housing unit along with a registered nurse.  The staff entered the cell and one officer utilized the shield as the second officer cut the noose and the inmate was placed in restraints.  An RN placed a C-collar on the inmate and checked for breathing and a pulse and, when detecting neither, began CPR.  The inmate was placed on a backboard, removed from the cell, and placed on a gurney at approximately 12:36 a.m.  He was transported to the IVB clinic, arriving at approximately 12:42 a.m.  At 12:48 a.m., an ambulance arrived on the grounds and by 12:51a.m., arrived at the IVB Clinic to assist with medical treatment.  At 1:20 a.m., an EMT and paramedic determined that the inmate was not responding to lifesaving procedures and contacted a physician via institutional phone.  The physician, according to a doctor's order, pronounced the inmate dead. The RN was noted to have utilized the AED prior to the inmate's transport to the IVB Clinic, where medical treatment continued.

The suicide report provided additional information.  It stated that the initial responding officer was conducting a 1:00 a.m. count and discovered the inmate at 12:34 a.m.  It further stated that the inmate was the sole occupant of the cell and was hanging from a noose which was tied to the air vent.  The officer immediately called a Code One stating "we got a hanger" on the radio and the response was "enroute."  A registered nurse gathered the AED emergency bag, backboard, and gurney, and proceeded to the housing unit at 12:35 a.m.  The first correctional officer continued to observe the inmate while another correctional officer ran downstairs to get the shield and cut-down knife.  A sergeant responded with other correctional staff to the alarm, bringing additional required safety equipment including batons, cuffs, helmets, face shields, and rubber gloves.  It was noted that regulations required a ratio of three staff to one inmate for entry into a SHU cell.  At 12:37 a.m., after appropriately equipped staff arrived on the scene, the sergeant gave the order to open the door; the RN arrived with a backboard and other equipment as the cell door was opened.  At 12:38 a.m., a sergeant and three correctional officers entered the cell with a shield and cut the sheet holding the inmate, who was slumped forward onto the lower bunk.  The inmate was placed on the floor, a correctional officer handcuffed him, and the RN then entered the cell, removed the noose, assessed the inmate for pulse and breath, finding him unresponsive, used the cervical collar for spine stabilization, and placed him on a backboard with the assistance of correctional staff.  The RN then began CPR approximately four minutes after the inmate had been discovered.  He was then

placed on a gurney and the RN attached the AED at approximately 12:42 a.m., which advised no shock.  CPR was maintained by the RN en route to the medical clinic.  An ambulance was requested and the inmate arrived at the medical clinic at 12:45 a.m.  Oxygen was started by a bag mask valve and CPR continued.  The inmate was nonresponsive and his body temperature was noted as 96.6 degrees.  An IV line was started at 12:50 a.m. and normal saline was administered.  The AED was utilized again, no shock was advised, and CPR was resumed.  The ambulance medical response team arrived and assumed care at 12:55 a.m., a second IV catheter was placed in the emergency room, and a medical doctor at Tehachapi Community Hospital was contacted for orders regarding continued care.  Epinephrine was given as well as Atropine, ACLS actions to monitor continued to display asystole, and the ER physician ordered discontinuation of CPR and pronounced the inmate dead at 1:20 a.m.

An autopsy report was received by the Kern County Sheriff/Coroner, Coroner Section, on 6/17/11.  The report indicated that the autopsy was performed on 6/17/11 and noted the cause of death to be ligature hanging and the manner of death was suicide.  A toxicology coroner's screening was conducted and indicated that the drug panel was negative and the alcohol panel was negative.

The suicide report recounted the inmate's criminal justice history.  It indicated that he had juvenile arrests and sustained a petition/conviction for driving under the influence of alcohol.  He was also noted to have a substance abuse history, which was positive for methamphetamine, marijuana, and alcohol abuse.  He was arrested for possession of drug paraphernalia and driving without a license in 2006 as an adult, and for driving under the influence in 2007 and obstructing a police officer.  These arrests resulted in probation, restitution fines, and a three-month drug program with minimal jail time.  He was also convicted by plea agreement of discharging a firearm with gross negligence, which involved his being under the influence of methamphetamine, carrying a concealed firearm, possession of a dangerous weapon, shooting at vehicles, resisting police officers, and killing/maiming or abusing animals.  He was sentenced to 16 months in state prison and entered the CDCR via the WSP RC on 10/2/08.  He was paroled on 3/31/09, but his parole was revoked and an arrest warrant was issued for driving under the influence on 5/9/09.  He was returned to WSP RC on 5/14/09.  He was paroled on 10/22/09.

The inmate's commitment offense involved his having been convicted by plea agreement on 7/6/10 of murder and second degree robbery with enhancement of his friend.  He was sentenced to life without the possibility of parole and entered the CDCR on 8/8/10.

The inmate's mental health history appeared to have begun before his incarceration in the CDCR.  He was treated in the county jail for depression with psychotropic medication.  He also reported that he had a previous suicide attempt when he entered the CDCR at WSP RC during his first commitment in October 2008.  He was placed in the MHSDS at the 3CMS level of care due to medical necessity.  A SRE completed at that time documented that he had static and long-term risk factors and protective factors, resulting in an estimate of his suicide risk as low.  A psychologist completed a SRA on 10/28/08; it noted that the reason for the SRA was to formulate treatment planning and "other – 7386."  This SRA indicated that the sources of information were only the inmate interview.  Risk factors included history of violence, history of substance abuse, suicidal ideation one and one-half years ago, previous suicide attempt one and one-half years ago when inmate hung himself

stating "not sure why he did it. I'm over it," as well as a history of mental illness. Additional risk factors were first prison term, history of poor impulse control or poor coping skills, early in prison term, and anxious, agitated or fearful. Protective factors were family support, religious support, support of friends, helping others, and exercises regularly. The evaluation of risk was low risk and the inmate was referred to the primary clinician/case manager and psychiatrist for medication review.

A psychologist progress note dated 6/17/11 was noted as a "late entry." The note indicated that there was a non-encounter case consultation in which the primary clinician presented his case to the mental health team. It was noted that the meeting was held on 6/16/11 and the team discussed diagnosis, increased symptoms (alogia and avolition) as was the concern of four correctional officers, trash in his cell, challenges to evaluation, treatment and diagnostic clarification, and planning to address these issues. Current referrals to both psychiatry and medical were discussed. It was noted that the inmate might also be losing weight. Correctional officers also reported trays coming back empty. It was noted that the inmate had recently begun collecting trash in his cell. Furthermore, the primary clinician spoke to the MD about the inmate's refusal to come out of his cell, but of his willingness to come to the cell window for an interview. It was noted that he denied AH/VH, and denied any stressors or feeling sad or thoughts of death or suicide. There was discussion of changing the inmate's LOC and discussion of grave disability. It was noted that the outcome of the meeting was "the inmate does not meet criteria for grave disability at this time. The inmate has been referred to medical and is scheduled 6/20, inmate is referred to psychiatry."

The inmate was prescribed Paxil, which was changed to Celexa in November 2008 because he reported that the Paxil was sedating. However, the medication was discontinued after a trial of Celexa. He reported that he did not want to take medication and did not want to be included in the MHSDS. The suicide report indicated that mental health staff monitored him through February 2009, but that he was not seen again prior to his parole in March 2009. The suicide report indicated that the POP discharged the inmate from the MHSDS, but no such documentation was provided in the UHR.

The inmate returned to the CDCR in May 2009 due to a parole violation. After a mental health evaluation, he was not returned to the MHSDS. He remained in general population and paroled in October 2009.

The inmate reportedly had a history of methamphetamine and other drug abuse, and alcohol abuse. He also was reportedly a member of the Sureño (Southern Hispanic) gang. His substance abuse began as an adolescent at approximately age 13 and continued until his incarcerations.

Following his return on 8/18/10, an initial health screening resulted in his referral for a mental health screening and mental health evaluation. However, mental health staff did not see him again until 9/14/10, after he had been placed in the ASU. On 9/22/10, the IDTT saw him and a diagnosis of Alcohol Dependence by History was established, with a GAF score of 70. He was placed at the 3CMS level of care. The mental health evaluation referenced his suicide attempt in 2006 as an attempted hanging in which he was found by his parents and cut down. He had been placed in the ASU because of two RVRs that occurred on 8/23/10 and 8/26/10 for fighting with his cellmate. The suicide report

referenced his being returned to the ASU based on a RVR that occurred on 10/21/10 for battery on an inmate with a weapon. An IDTT on 10/6/10 determined that he should be housed in a single cell without specifying any clinical rationale, but noted that he had been identified as a Southern Hispanic and his fights with other inmates had been with other Southern Hispanics. He was noted to have protested his inclusion in the MHSDS due to his gang association. The IDTT changed his diagnosis on 10/6/10 to Mood Disorder NOS, Psychotic Disorder NOS, and Polysubstance Dependence, with a GAF score of 55, and retained him at the 3CMS level of care. On 11/3/10, the Mood Disorder NOS diagnosis was continued, but the Psychotic Disorder NOS and Polysubstance Dependence were dropped. He was retained at the 3CMS level of care as medical necessity and his GAF score was estimated at 50. He was also noted to have paranoid personality features, although a diagnosis of Personality Disorder was deferred at that time. It was noted that the inmate denied suicidal ideation or intent.

The inmate was transferred to CCI to begin a SHU term on 2/1/11. He had been assessed a 14-month SHU term after committing battery on an inmate with a weapon on 10/21/10. His MERD was 9/6/11. He was initially double celled, but was placed in a single cell on 2/8/11 as nonconfidential enemies were involved in the 9/14/10 battery. The suicide report noted that the inmate had been the victim of batteries on 9/14/10 and 9/30/10 as the basis for his single cell housing. Six non-confidential enemies were noted in his records; he was noted as an associate of the Sureño gang with the moniker "Scarface."

The inmate's last SRAC was completed on 6/4/09. It indicated no apparent significant risks and noted three static risk factors, no long-term or dynamic risk factors, and some protective factors.

The suicide report made reference to the inmate having been dropped from the MHSDS because a psychiatrist inappropriately completed a MHSDS removal chrono dated 2/7/11; this was not told to the inmate when he had an IDTT on 2/10/11. The inmate therefore was not noted as an active patient in the MHSDS and was not seen again until 5/5/11. He refused to leave his cell at that time; the primary clinician noted that he denied any problems, but presented with an "odd gaze" and "blunted affect." The inmate refused to attend an IDTT review on that same day. However, the primary clinician noted that he was well-groomed, his cell was tidy, he was without apparent distress, and custody staff indicated that he was functioning in a "non-problematic" manner. The IDTT retained him at the 3CMS level of care. The primary clinician again saw him on 5/25/11 at cell front as the refused to leave the cell. He also denied any mental health problems or symptoms, as well as suicidal ideation and stressors. The clinician noted restricted affect and paucity of speech, but could not complete a mental status examination due to the inmate's lack of cooperation. The clinician wrote a note on 5/25/11 stating that it was a routine visit; the UHR was reviewed and the treatment plan with a diagnosis of Mood Disorder NOS Provisional with a history of depression and anxiety was noted. The inmate had a restricted affect, history of insomnia, and had refused psychiatric treatment. He was noted to deny suicidal ideation and previous suicide attempts, and the UHR indicated an Axis II Schizoid Personality. Weekly amphetamine abuse since age 18 was noted. It was also noted that the inmate wanted to be removed from the 3CMS level of care and that he had last rated depression as four and anxiety as three, but the rating was unclear from the note dated 2/9/11. The inmate refused primary clinician contact and denied mental health complaints. He also denied stressors and reported that he was getting along well with the

correctional officers.  He also refused to sign a refusal form.  He was noted to have a
restricted affect and paucity of speech and was difficult to assess "due to poor
coordination."  The plan was to consult the correctional officers regarding the inmate's
behavior, programming, and actions.  It was added "inmate seems in no distress.  Will
follow-up in three weeks" and educate the inmate.

A correctional officer referred the inmate to mental health staff on 5/30/11 due to concerns
about his behavior.  There was an attempt to see him on 5/31/11, but he refused to leave
his cell and spoke to the primary clinician at cell front.  According to the suicide report, the
primary clinician had learned from correctional staff that he was hoarding trash, exhibiting
unusual and fearful behavior, refused to speak with correctional officers, had stopped
showering and attending yard, was sleeping at "weird times," and was confused regarding
the date and prison environment.  When the primary clinician interviewed him at cell front, she
noted that he had a blunted affect and paucity of speech, and that his eyes were bloodshot
and red.  The inmate denied having any problems, agreed to throw his trash away, and
stated that he was taking birdbaths in his cell.  He was also noted as guarded and difficult
to assess; an IDTT meeting was scheduled specifically to consider the possible need for a
change in his level of care.

A psychologist completed a mental health evaluation on 6/4/09, indicating a diagnosis of
Alcohol Dependence, with a GAF score of 70.  The clinician noted that the mental health
screener had referred the inmate for further evaluation of 3CMS history and suicide
attempt.  The inmate was noted to have presented with no apparent mental health
symptoms and reported a history of alcohol dependence.  The SRAC indicated no
significant suicide risk at this time and the inmate was cleared for GP placement.  The
mental health evaluation noted that the suicide attempt had occurred in 2006; the inmate
was found hanging and had lost consciousness for several seconds before his parents
discovered him.  Mental status was noted as appropriate and essentially within normal
limits with the exception of some hesitance in response and speech and limited insight and
judgment.  The SRA that a psychologist completed on 6/4/09 indicated that it was to
formulate treatment planning; inmate interview was the only source of information.  Noted
risk factors were history of substance abuse, previous suicide attempt in 2006 by hanging
self, and history of mental illness of depression.  There was also a handwritten "parole
violation," but all other suicide risk factors were lined through and noted as "denies" or
"denies present."  Protective factors were family support, religious support, exercises
regularly, and "read."  The assessment was no apparent significant risk and no referral
needed.  The UHR, C-file and correctional officer or staff interview were not noted as
sources of information.

An updated IDTT note dated 6/9/11 indicated the scheduling of an IDTT to discuss a
possible level of care change and treatment plan as the inmate continued to refuse to
meet/speak with the primary clinician.  A history of a suicide attempt in 2006 by hanging
himself and being found by his parents and a history of methamphetamine and alcohol
abuse were noted, as per the UHR.  He was diagnosed with schizoid personality feature
and "301.7," and a history of Adjustment Disorder with Anxiety, and had been treated with
Paxil in 2008.  He thought that he was homeless at that time and recently became a greater
concern for correctional staff as he had been hoarding a large pile of trash in his cell,
stopped showering, grabbed the food tray rapidly, slept at odd times, never attended yard,
and constantly refused to speak with the primary clinician.  The treatment plan was

discussed and the diagnosis was Mood Disorder NOS, per the UHR. The team discussed communicating with officers, monitoring the inmate for grave disability status, and increasing primary clinician contacts. It was noted that he would be referred to medical for weight. It appeared from the record that the inmate did not attend the IDTT.

Records indicated that the primary clinician attempted a follow-up interview with the inmate on 6/16/11. The inmate again refused to come out of his cell. A primary clinician note dated 6/16/11 indicated it was a routine visit and that the inmate refused to come out of the cell. The primary clinician noted that she contacted both second and third watch, who indicated increased alogia and increased avolition. It was noted that the inmate articulated one word responses after a long silent pause. "Denies stressors, complaints AH/VH/SI. Reports sleep, appetite, mood okay." The objective findings were that the inmate had an increased flat affect, increased alogia, increased avolition, was a pile of trash was building in the corner of his cell, and the primary clinician noted that she expressed health/safety concerns related to trash, such as bugs, etc. It was noted that the inmate agreed to throw his trash away. The assessment was that he presented as schizophrenic – "sleeping at odd times, alogia, avolition, extremely flat affect, abnormal psychomotor activity, apathetic, and approaching catatonic-like yet not catatonic." The primary clinician continued that it was "difficult to assess for other symptoms, i.e., delusions or hallucinations as the inmate denies any symptoms – inmate is O times four". The plan was to refer him to psychiatry and medical and educate him as to the plan to closely monitor him. She noted that he had an increased flattening of his affect, increased lack of speech and initiative, and abnormal activity approaching a "catatonic-like state." Correctional staff indicated that he was less communicative and not showering and that a pile of trash remained in his cell. The clinician noted that he exhibited signs of schizophrenia, but she could not assess him for delusions or hallucinations as he was uncooperative. He was referred to psychiatry and medical for assessments and, according to the suicide report, later that same afternoon, there was a formal case consultation with the IDTT that considered the possibility of a change in his level of care, and the possibility that he met criteria for a Keyhea order as gravely disabled. Quite remarkably, the IDTT determined that the inmate had not yet met the grave disability criteria. He was scheduled for another appointment with the clinician on 6/17/11, and with his psychiatrist and medical staff on 6/20/11. The inmate committed suicide on 6/17/11.

The CDCR suicide reviewer reported that the inmate's primary clinician attempted to establish therapeutic contact and complete assessments for his treatment needs and interventions. However, she was thwarted by the inmate's lack of cooperation, which may have stemmed from multiple causes. The reviewer noted that the inmate's inability to cooperate may have stemmed from a cultural prohibition against receiving mental health treatment within the Southern Hispanic gang. It also may have resulted from the inmate's probable pathology including guardedness inherent in his Personality Disorder, denial, and "of course, the increasing symptoms of his primary Axis I disorder." The reviewer noted that the fact that an adequate assessment of the inmate "could not be made was not surprising to, or problematic for, this reviewer." The reviewer noted, however, that it was concerning that the response and decision making of the IDTT with respect to the primary clinician's concerns as to the inmate's increasing symptoms and possible need for a level of care change, especially in the context of no established therapeutic relationship and extreme diagnostic uncertainty, was "concerning." The reviewer added that documentation described in the rationale supporting the IDTT's decision was sparse and did not clarify the

factors upon which decisions were made. The reviewer added that it appeared that ample clinical justification was present for a level of care change at IDTT reviews on 6/9/11 and 6/16/11; this included the inmate's deteriorating condition and that his functioning was "most definitely no longer stable," such that a level of care change to EOP might have been warranted. The reviewer noted that documentation of the IDTT members for not increasing the inmate's level of care, which might have been in keeping with Program Guide requirements, was lacking in the record. The reviewer also noted formal SREs and additional documentation missing from the record; none were completed during the inmate's second term of incarceration and another SRE should have been completed at some time during the obvious decline in his functioning beginning at the end of May 2011. The reviewer noted completion of a SRE posthumously using only data available in the UHR at the IDTT on 6/9/11; this indicated that 14 of 38 defined risk factors "were absolutely present." An additional ten risk factors, most of which had to do with current or recent mental health symptoms, could not be ruled out with any degree of certainty due to the inmate's lack of cooperation on assessment; therefore, they "had to be considered possibly present." Furthermore, the reviewer opined that no protective factors were identified that were absolutely present; only two were possibly present.

The reviewer noted two issues of concern. These issues were ultimately under the control of custody. They were the inmate's single cell status without adequate documentation and the lack of IEM time offered to him; this would have been out-of-cell time for the inmate to have had regular breaks from SHU confinement.

The suicide report provided five problems and Quality Improvement Plans as follows:

Problem 1: Documentation by the SHU-IDTT presenting the clinical rationale for retaining inmate __ at the 3CMS level of care rather than formally increasing his mental health treatment to EOP was not found in the records.

Quality Improvement Plan: The Chief of Mental Health or designee at CCI shall: (1) Submit a memorandum providing a detailed rationale regarding the IDTT's decision to retain inmate __ at the 3CMS level of care, including barriers to changing his level of care to EOP. (2) Provide training to all ASU/SHU clinical staff regarding decision making for changing level of care in the ASU/SHU. Training should provide a review of program guidelines as well as clinical discussion regarding the need to consider medication/treatment compliance, mental health stability, suicide risk factors, and any other changes or life issues that would negatively impact an inmate's mental health treatment if the level of care change is not made. Include training regarding documentation of clinical discussions in IDTT should, with the focus on thorough documentation of the rationale for IDTT decisions.

Problem 2: On several occasions during this term of incarceration at both WSP and CCI (see the body of the report for details), SREs were not completed in accordance with Program Guide requirements and this was inadequate clinical practice, given the inmate's documented history of a suicide attempt in 2006.

Quality Improvement Plan: The Chief of Mental Health or designee at CCI shall develop the Proctor/Mentor Program in the administration of the SRE. An outline of the Proctoring and Mentoring Program developed by Headquarters staff at CCHCS, along with a monitoring tool, has been provided to the Chief of Mental Health at CCI. The purpose of this program is to ensure that clinicians have the knowledge and skills to adequately assess inmates at risk for suicide. Headquarters will provide additional assistance as needed.

WSP is one of the institutions originally chosen to pilot the Proctor/Mentor Program. The Chief of Mental Health or designee at WSP shall provide the LOP developed for the Proctor/Mentor Program and describe initial efforts in program development.

Problem 3: Both WSP and CCI, documentation by the either the ICC or the IDTT describing the rationale for assigning this inmate singled cell status was not found in the records. Although discussions may well have occurred regarding the risks versus benefits of single cell housing in view of his inmate/patient's history, it was not possible for this reviewer to determine if discussions took place or what factors were explored in making the decision. Since single cell housing is a risk factor for suicide, and an increase at the already higher risk of suicide presence in the ASU or SHU setting, it was critical to document, both at the time of initial single cell placement and at subsequent reviews, the ICC/IDTT's exploration of the absolute need for single cell housing and the mitigating factors for the resulting increased risk for suicide.

Quality Improvement Plan: The Warden or designee at WSP and the Warden or designee at CCI shall: (1) Provide staff training regarding the issues considered in the assignment of single cell status to the inmate including (a) information regarding the inmate's history, both correctional and mental health; (b) information received from his current primary clinician and IDTT members; and (c) identification of complicating factors in a given case and how those factors (e.g. conflicts between custody and mental health needs) will be addressed in future situations. (2) Provide ICC staff with training regarding the documentation of discussions in ICC that pertain to the mental health needs of inmates.

The Chief of Mental Health or designee at CCI and the Chief of Mental Health or designee at WSP shall remind all mental health staff that primary clinicians should provide information to ICCs regarding single cell status risk factors for inmates receiving mental health treatment.

Problem 4: The CDC-114A Daily Logs from February 28, 2011, through June 16, 2011, indicated only two opportunities for IEM time were given to the inmate. Regulations required a minimum of 10 hours of IEM time per week. Being able to have regular breaks from the confinement of a SHU cell is an important stress reducer, and not having this outlet may have contributed to his deterioration.

Quality Improvement Plan: The Warden or designee at CCI shall: (1) Submit a memorandum providing detailed reasons for the lack of IEM opportunities provided to this inmate. Include an updated account of how much IEM time was provided to inmate __. Take corrective actions as deemed appropriate or describe recent developments at the institution that have improved inmate access to IEM time. (2) review 114A documentation requirements with ASU staff.

Problem 5: A recently hired psychiatrist inappropriately completed a Removal Chrono after his first meeting with the inmate because the inmate refused medications and treatment. The IDTT was not informed of the Removal Chrono but it was entered into the MHTS. This resulted in inmate __ being dropped from PC's current patient roster, which in turn resulted in the inmate not being seen by mental health staff for almost three months.

Quality Improvement Plan: The Chief Psychiatrist or designee at CCI shall ensure that all newly hired clinical staff at CCI undergo training that includes the focus on procedures, such as chronos, that communicate changes in treatment provided to inmates in the MHSDS.

A physician completed a Death Review Summary dated 7/19/11. The physician reviewed the inmate's cause of death, co-existing conditions, medical and mental health care, and the emergency response. The physician indicated that there were no issues regarding the standard of care of medical providers. The standard of care for nursing would be per nursing review. The physician also noted that there were no systemic concerns.

On 10/24/11 the Deputy Director (A) Statewide Mental Health Program, and Director (A) Division of Adult Institutions, submitted their report on implementation of the quality improvement plan for this inmate, in response to the suicide report dated 8/22/11. In their report, the Directors submitted information from CCI as to quality improvement plans one through five. With regards to QIP number one, a senior psychologist wrote a memo stating that there were no barriers to changing the inmate's level of care, but that his resistance to intervention and treatment was a primary factor in not elevating his level of care, especially given that his treatment was enhanced consistent with EOP level of care criteria. The memorandum continued that the inmate was being seen at least weekly and that the IDTT could be convened at any time to address the level of care issue. While an EOP referral at IDTT would have gotten the inmate to the PSU setting faster than if it was done at a later date, the wait for these beds was lengthy, "and in this case would not have made any difference in the outcome." The memorandum included that staff considered his history of resistance and non-participation in the mental health program and how EOP placement would change that. The senior psychologist continued that the goal was to gain his cooperation so they might understand what was going on with him and provide adequate treatment intervention. Furthermore, given his reported gang involvement and non-participation history in mental health assessment/treatment, they were concerned that an EOP referral would decrease any chance they might have of obtaining his cooperation. The senior psychologist added that the treatment team was convened on the afternoon of 6/16/11 to discuss treatment and intervention options. The inmate was scheduled for a psychiatric visit on 6/17/11 and a referral was made to medical to rule out any substance and all medical causes of his observed behavior.

Training was also held for clinical staff as to IDTT decision making, appropriate documentation of the decision, and special decisions. Staff attended training sessions on 8/17/11, 8/23/11, or 8/24/11; the training outline and ISG sign-in sheets were included in the response. The IST sign-in sheets indicated that 24 staff members attended training on these dates.

With regard to QIP number two, the chief psychologist wrote a memorandum and the LOP for the Proctor and Mentoring Program was completed; it was currently going through the committee process to become an institutional LOP. The LOP was reviewed and approved by members of SPR-FIT at headquarters. The memorandum indicated selection of a psychologist as lead proctor/mentor for CCI—the institution's current SPR-FIT coordinator, completing the draft LOP, and beginning the proctoring and mentoring process with an intent to train 30 staff members who completed SREs; there was a timeframe of 12 to 18 months for all such staff to rotate through the mentoring process.

With regard to QIP number three, a memorandum from the chief psychologist to the CCHCS senior psychologist specialist indicated that training for staff participants in ICC reviews for single cell housing was completed on 10/21/11 and 10/24/11; it consisted of

the review of several LOPs including "Suicide Prevention," "Double Cell Prohibition/Temporary Placement in Single Cell Status in the Reception Center and Mainline General Population," and "In-Cell Assault Review/Staff Responsibilities of Inmate Double Celling." An IST sign-in sheet indicated that four staff members attended the training. The memorandum was also provided to all clinicians reminding them that as mental health representatives at ICC meetings, they were to present mental health information including suicide risk, assaultive risk, victimization risk, level of care, need for staff assistance, and any other pertinent information that would increase the risk factors of inmate suicide. There was an additional listing of staff and the dates that the memorandum had been read. This QIP was noted as completed on 9/22/11. Furthermore, a memorandum from the CCI chief deputy warden to the warden indicated the information that would be included in the CDCR 128-G classification chrono pertaining to MHSDS inmates at any level of care concerning ICC meeting discussions. A class entitled "Institutional Classification Committee Suicide Precaution" with IST sign-in sheets included 23 staff who attended the class. An additional memorandum provided by the senior psychologist to staff instructed staff to begin using the 128-MH8 form immediately; it was the form to be completed at the IDTT meeting and included the signatures of the primary clinician and the chief of mental health or designee.

With regard to QIP number four, the Directors provided a statement with regard to the inmate's segregation record. It indicated that a CDC 114-A daily chronological record in the SHU and ASU was to be completed, including all out-of-cell time. An IST sign-in sheet was provided for a class entitled "OP 111 R/114 Completion;" it included approximately 168 signatories.

With regard to QIP number five, a memorandum from the CCI psychiatry supervisor to the chief of mental health indicated that training for the psychiatrist with respect to the use of various types of chromos was conducted. Training was completed on 8/9/11. A second educational training began on 8/3/11 and included group training for all psychiatric staff and specifically for psychiatrists who only worked on weekends. The training took placed on 8/3/11 and 8/8/11. An IST sheet with seven signatories was included.

**Findings:** This inmate's suicide death was probably not foreseeable as the inmate did not report suicidal ideation or intent, but the assessments conducted by the primary clinician and IDTT reviews were grossly inadequate. The inmate was uncooperative. He repeatedly refused to come out of his cell for an examination by clinical staff or for an IDTT meeting. However, he was allowed to continue such refusals without efforts to remove him from the cell for a more comprehensive examination or refer him to the MHCB or a higher level of care for adequate assessment, despite his clearly decompensating mental status. Given his clear deterioration in mental health functioning, his suicide was very likely preventable had he been appropriately assessed and placed at a higher level of care. He remained at the 3CMS level of care despite his deteriorating condition and was not referred to a higher level of care for more comprehensive and adequate examination. His medications had been discontinued in 2008. It was clear from the record that he had great difficulty accepting that he had a mental illness; this may very well have been related to cultural and gang association issues. This included the inmate being placed in a SHU; despite the requirement that inmates with serious mental illness be placed in a PSU, there appeared to have been minimal consideration that he should have had an evaluation to determine his ability to remain mentally healthy in a SHU. The inmate also was errantly removed from

the MHSDS on 2/10/11 and was not seen again until 5/5/11. His condition had clearly deteriorated and continued to do so. Despite the primary clinician alerting the IDTT and scheduling the inmate to be seen by psychiatric and general medical staff, this did not occur prior to his death. He was not referred or transferred to an OHU or MHCB for a more comprehensive evaluation. Given that he refused to come out of his cell for clinical appointments, yard, and showers, such a referral would have been appropriate.

**17. Inmate Q**

Brief History: This inmate was a 30-year-old African-American male who committed suicide by hanging on 6/30/11 at CSP/LAC. He was a participant in the MHSDS at the time of his death at the 3CMS level of care. He was single celled in the ASU at the time of his death. The inmate reentered the CDCR via the CSP/LAC reception center on 9/1/09. He had been found guilty of two counts of first degree murder with enhancements for gang activity and having an assault weapon. He was sentenced to life without the possibility of parole.

The inmate was discovered on 6/30/11 at 2:08 p.m. by a correctional officer who was conducting security checks. When the officer arrived at the inmate's cell, which was solely occupied by him, he observed the inmate hanging from the top bunk utilizing a sheet. The officer activated his personal alarm device and upon the arrival of additional responding staff, the cell door was opened and staff entered the cell using a protective shield against the inmate's person. Other staff utilized the cut-down tool in disassembling the noose from the fixture and the inmate's legs. The inmate was then removed from the cell.

The incident report provided a timeline. It indicated that at 1408 hours, the inmate was discovered hanging and was removed from the cell, and CPR was initiated by custody staff. At 1409 hours, the institutional medical response was requested as well as ISU personnel. At 1412 hours, the institutional ambulance arrived and CPR continued. At 1415 hours, ISU personnel arrived and the inmate was transported via gurney to the rear of the building staging area while CPR continued pending arrival of the Los Angeles County Fire Department and the American Medical Response Team (AMRT). At 1424 and 1425 hours, the Los Angeles County Fire Department and AMRT arrived on the scene. At 1427 hours, Los Angeles County fire personnel relieved custody staff and continued CPR measures. This timeline indicated that fire personnel administered IV medications to the inmate's right arm at 1430, 1433, 1434, 1435, 1437, and 1438 hours. At 1440 hours, a physician at Antelope Valley Hospital pronounced the inmate deceased. At 1442 hours, the inmate was transported to the TTA pending arrival of the coroner.

The suicide report provided additional information that included the inmate hanging from his neck and feet from two nooses which suspended him in a hammock-like position from the upper bunk at 1408 hours. At the same time, the correctional officer activated his PAD, signaled to a sergeant that the cut-down tool was needed, and the sergeant gave orders to various staff to respond with appropriate equipment. Sufficient staff responded with necessary safety and rescue equipment, staff entered the cell with a safety shield and cut nooses, and the inmate was placed on a lower bunk; the inmate was unresponsive. The inmate was then carried from the cell across the dayroom, was placed on the floor in front of the nursing station, and the already loosened noose was removed from his neck. The suicide report did not reference the start of CPR until 1410 hours; at that time, the sergeant

assessed the inmate for a pulse and respiration and yelled for the AED, and initiated chest compressions while a LVN applied the ambu bag.  According to the suicide report, at 1410 hours the LVN arrived and applied the AED, while staff continued CPR.  CPR and the use of the AED continued and the ambulance arrived at the back of the building at 1415 hours.  At 1420 hours, an RN ordered the inmate lifted onto a gurney and wheeled out to the back of the building as staff continued CPR and waited for 911 emergency response personnel to arrive.  Between 1424 and 1425 hours, the Los Angeles County Emergency Response and AMRT arrived.  Paramedics assumed care and initiated ACLS protocol until 1427 hours.  An IV line was established and medications were administered including two doses each of Atropine and Epinephrine and one dose of sodium bicarbonate between 1428 and 1438 hours.  There was telephone contact between paramedics and the physician at Antelope Valley Hospital at 1440 hours, when the inmate was pronounced dead and CPR was discontinued.  At 1442 hours, the inmate was placed in the institutional ambulance and transported to the TTA.

The Department of Coroner, Los Angeles County provided an autopsy.  It indicated that the autopsy was conducted on 7/4/11; the cause of death was hanging and the manner of death was suicide.  A toxicology report was provided and indicated that blood specimens detected the presence of Venlafaxine at 0.89 ug/ML in femoral blood and 0.94 ug/ML in heart blood.  No other drugs or alcohol (ethanol) were detected in the blood specimen.

The suicide report recounted the inmate's criminal justice history.  It reported that he had been first arrested as a juvenile at age 12 and charged with the rape of his three-year-old sister.  There was a sustained petition and he was ordered with "suitable placement," resulting in his placement in several foster homes.  As a juvenile, he also reportedly committed robbery and engaged in disorderly conduct, resulting in his placement in the CYA; while there, he was charged with battery on a police officer in 1997.  The inmate reportedly also had a history of gang affiliation with the Crips, including a moniker as "L Mack."  It was reported that he admitted to marijuana and alcohol use as an adolescent, but did not admit addiction problems or substance abuse program treatment.  The inmate's adult history included arrests and convictions for robbery, grand theft auto, taking a vehicle without consent, assault by a prisoner, and attempted burglary, resulting in probation, jail, and prison sentences.  He first entered the CDCR on 5/24/00.  However, the specific charge was not referenced.  It was noted that he was paroled on several occasions, but returned to prison on revocations until his final parole two months prior to the instant offenses.

The inmate's instant offense occurred on 5/24/04.  According to the suicide report, it was gang related.  The offense involved the inmate and two co-defendants shooting two men who were standing on a street corner with AK-47 assault rifles because they believed that these men were members of a rival gang.  The inmate was subsequently arrested on 6/10/04 on a different warrant and returned to prison on a parole violation.  He received a four-year term following a plea agreement for possession, transportation, and sale of PCP, and was paroled on 7/14/06.  He was subsequently arrested and arraigned on 6/7/07 for the two murders that occurred on 5/24/04.  He was found guilty of two counts of first degree murder with enhancements and sentenced to life without the possibility of parole, as noted above.

172

The inmate's mental health history prior to his incarceration was unclear. Records indicated that he reported being physically abused by his parents as a child and that his mother had committed suicide. The suicide report reviewer indicated that after his death, his mother was located in a care home for mentally ill individuals and his father was located as an inmate within CDCR. There were also references to the inmate having been hospitalized for approximately one year after a car accident, which included head trauma and loss of consciousness, after his parole in July 2006. The inmate was noted to have had a seizure disorder. He was placed in the MHSDS at the 3CMS level of care as medical necessity in February 2006. He had diagnoses of Depressive Disorder NOS and Polysubstance Abuse. He remained at the 3CMS level of care until his parole in July 2006. He had been prescribed Prozac during this first prison term and was followed in the Parole Outpatient Clinic after his release, but was eventually removed from the MHSDS.

The inmate returned to the CDCR via CSP/LAC on 9/1/09 and was returned to the MHSDS at the 3CMS level of care. Symptoms on intake that he reported included auditory hallucinations, paranoid ideation, and a history of past treatment in the MHSDS. He reported command hallucinations telling him to hurt others and/or himself and was initially diagnosed with Psychotic Disorder NOS. Despite this diagnosis, he was prescribed Remeron and Zoloft, but no antipsychotic medication. Despite his having had SRACs and/or SREs in 2004 and 2006 resulting in estimates of low risk, he did not receive a SRAC in 2009. In November 2009, his diagnosis was changed to Adjustment Disorder with Depressed Mood and he remained at the 3CMS level of care. He was subsequently placed in the ASU with a RVR for battery on an inmate with a weapon. He was found guilty of battery on an inmate with no serious injury and remained in the ASU. He received a SHU term and the records indicated that he was in the ASU or SHU from that time until his death.

Despite his being placed in restrictive housing, the inmate received nine RVRs in 2010 including charges of battery on a police officer (three), willfully obstructing a police officer (four), disobeying a direct order, and possession of a weapon. He initially had a release date from the SHU of 6/9/11, but it was extended to 10/28/11 based on additional charges. He was noted in the suicide report to have had safety concerns as to information that he had provided regarding his co-defendants and the commitment offense; he would have been placed on an SNY had he been released from the SHU prior to his death. The CDCR suicide reviewer made reference in the suicide report to an inmate who had ordered "discipline" for the inmate when they both were in the county jail; the other inmate had arrived in the SHU on the day that this inmate committed suicide. The reviewer also referenced a number of letters and appeals found in the inmate's personal possessions including legal documents regarding working on his appeal and incidents where the inmate alleged staff misconduct against ASU and CTC correctional officers, as well as his contacts with OIA.

A psychiatrist provided a SRAC on 1/23/10 indicating that the reason for the assessment was to determine the need for MHCB referral and to formulate treatment planning. Identified risk factors were sex offender, history of violence, history of mental illness, and illegible handwritten information about previous suicide attempts. Longer life sentence, current ASU, SHU, or PSU term, and Level IV custody were also noted. The only dynamic risk factors were single cell placement and trauma with threat to self-esteem. No protective factors were indicated. Evaluation of risk was noted as risk for suicide "hard to

assess, patient is uncooperative, will reevaluate to finalize assessment." There was no estimate of risk.

A psychiatrist completed a SRAC on 1/24/10. It was noted that the reason for the assessment was to determine the need for MHCB referral. Sources of information were correctional officer or staff interview, inmate interview, and the UHR. Noted risk factors were sex offender, history of violence, previous suicide attempts with illegible comments, and history of mental illness with illegible comments. Other factors were longer life sentence, current ASU, SHU or PSU terms, and Level IV custody score.

A psychiatrist also completed a SRAC on 1/25/10. It indicated that the reason for evaluation was to determine the need for MHCB referral. No sources of information were checked. Noted risk factors were sex offender, history of violence, history of mental illness, illegible comments regarding a previous suicide attempt, longer life sentence, current ASU, SHU or PSU term, and Level IV custody score. The only dynamic risk factor noted was single cell placement. Protective factors included family support, support of friends, realistic life plan, and exercises regularly. The evaluation of risk was no apparent significant risk and the comments were "risk for suicide as minimal." The plan was to refer the inmate to the primary clinician.

A psychologist completed a SRAC on 3/16/10. The reported reason for the assessment was to formulate treatment planning. Sources of information were the inmate interview and the UHR. Noted risk factors were history of violence and mental illness as depression, a history of poor impulse control or poor coping skills, and current ASU, SHU, or PSU term. No dynamic risk factors were checked. Protective factors were family support, children at home, and exercises regularly. There were no comments. The evaluation of risk was low risk and the plan was that no referral was needed. In May 2010, the inmate's cell status was changed from single cell to double cell as he reported that he wanted to have a cell mate.

A psychiatrist conducted a SRAC on 6/5/10, who reported that the reason for the assessment was to determine the need for MHCB referral. No sources of information were checked. Endorsed risk factors were history of violence, substance abuse, and "handwritten illegible 2010 OD illegible illegible." It was also noted that the inmate had risk factors of long or life sentence, history of poor impulse control, current ASU, SHU, or PSU term, and Level IV custody score. There was a notation of "battery inmate" and "recent suicidal ideation ? acute chronic," hopelessness or helplessness, feelings of guilt or worthlessness, and recent rejection or loss. Protective factors were family support, children at home, religious support, spousal support, support of friends, helping others, insight into problems, exercises regularly, and job assignment. The evaluation of risk indicated that the inmate denied "AHI, SI, intent or plan." It was noted that he was "SATF, CY, illegible, _____, Corcoran." No evaluation of risk was checked. The recommendation was for referral to the primary clinician and psychiatrist for medication review.

A psychologist provided a SRAC on 7/9/10 and noted that the reason for the evaluation was "yearly SRA." Risk factors included history of suicide attempt, violence, substance abuse, suicide ideation/threats in the past in February 2010, previous suicide attempts in February 2010, family history of suicide, and history of mental illness of Psychotic

Disorder NOS. In addition, slowly changing risk factors were long or life sentence with the word life underscored, early in prison term, no new court proceedings/disciplinary actions, current ASU, SHU, or PSU term, and Level IV custody score. Dynamic risk factors included single cell placement. Protective factors included family support, children at home, insight into problem, and exercises regularly. The evaluation of risk was "low risk – SA was actually death of daughter." The plan was for no referral of the inmate.

A psychologist also conducted a SRAC on 9/3/10. The noted reason for the assessment was to determine the need for MHCB referral. The inmate interview was the only source of information identified. Noted risk factors were history of suicide attempt, history of violence, history of substance abuse, suicide ideation/threats in the past with dates noted as February 2010 (after the inmate's daughter's death), family suicide history, history of mental illness, long or life sentence, current ASU, SHU or PSU term, and Level IV custody score. Dynamic risk factors were noted as suicide intent, recent suicidal ideation, acute chronic, and disturbance of mood with depression underlined. Protective factors were children at home and exercises regularly. The risk evaluation was noted as "moderate risk currently – short-term risk." It was further noted that the inmate "also responds to command hallucinations to commit suicide." The estimate of risk was moderate risk and the plan was for TTA evaluation for possible admission or placement on suicide watch.

During this time period, the inmate's diagnosis was changed from Adjustment Disorder with Depressed Mood to Depressive Disorder NOS; ultimately, it was changed to Mood Disorder NOS, and rule out Adjustment Disorder. In addition, Antisocial Personality Disorder and glaucoma and seizure disorder were also noted in the records.

Records indicated that the inmate was informed that his daughter had died in a car accident in January 2010. He was placed on suicide watch after self-inflicted injuries. According to the suicide report, suicide watch was maintained with the inmate in ASU in a "management" or "control" cell. He was not transferred to the MHCB, but was monitored in this alternative housing on three occasions. The inmate was noted to have made superficial cuts and to have had a noose tied around his neck and feet.

The inmate's diagnosis remained Depressive Disorder NOS or Mood Disorder NOS, Antisocial Personality Disorder, and history of Polysubstance Abuse until 9/15/10, when his diagnosis was changed to Bipolar Disorder NOS, rule out Major Depressive Disorder, Moderate to Severe. There were multiple changes in his diagnosis from that time until his death when his diagnosis was changed again to Depressive Disorder NOS, Mood Disorder NOS, Psychosis NOS, Schizoaffective Disorder, Mood Disorder NOS, and at the time of his death, Schizoaffective Disorder (in Remission), with the last change occurring on 6/7/11.

The inmate also had a number of SRACs from 7/9/10 through 5/20/11. They all indicated low chronic risk and low acute risk and/or no acute risk, with the exception of a SRAC dated 9/3/10 which indicated moderate risk currently as a short-term risk. His last SRAC was on 5/20/11; it again indicated low chronic risk and low acute risk and that he was stable despite his long stay in ASU. During this time period, his medications were essentially antidepressants, including Remeron, Zoloft, and/or Effexor, which was supplemented by Abilify beginning in April 2010. His last medication prescription was

Zoloft, as Abilify and Remeron had been discontinued with his MHCB discharge on 9/13/10.

The inmate was admitted to the MHCB on 9/3/10 after reporting suicidal ideation to his primary clinician and subsequently cutting both wrists and hands with a razorblade. Sutures were required. He reported to a psychiatrist that he was depressed and experiencing command hallucinations telling him "it's time to end it." He remained in the MHCB until 9/13/10, when he returned to the ASU. While he was in the MHCB, the IDTT determined that he would benefit from group therapy for anger management and substance abuse, but he declined the interview for the IDTT and continued to state suicidal ideation. However, the inmate was observed as being compliant with his medications, eating and sleeping well, and not showing signs of depression. It was noted that his mental status was within normal limits. A psychiatrist wrote that the inmate was "quite talkative and somewhat argumentative," with irritable and angry mood. The psychiatrist further noted that the inmate's affect was congruent with his mood, and that he had normal speech, linear thought processes, and was goal-oriented on improving his housing and staying in the MHCB. The psychiatrist opined that the inmate did not appear to have suicidal intent or plan nor did he appear to be responding to internal stimuli, and that his insight and judgment were appropriate. The inmate had a brief period of prescription of Haldol, Benadryl, and Ativan in September 2010 as prn medications for acute agitation.

The inmate was noted to have scratched himself superficially with a plastic spoon when informed that he would be returning to the ASU. He was in fact returned to ASU after cell extraction and five-day follow-up was ordered. The suicide report referenced him having received five-day follow-up. The psychiatrist documented the inmate receiving his medications and reporting no suicidal thoughts or plans, with an assessment of minimal risk of self-harm. It was also noted that the psychiatrist advised him to use the coping skills that he had learned in the MHCB.

Records indicated and the suicide reviewer noted in the suicide report that five-day follow-up did not mention that the inmate had inflicted superficial cuts on his wrists while in the shower on the second day of five-day follow-up. The suicide reviewer noted an interview with the psychiatrist who was not involved in the five-day follow-up process; the inmate stated to him that he cut his wrists because "nobody really cares." The psychiatrist documented the filing of the report by the inmate as "I got a cellie I be wanting to hurt him was trying to hook it up…none of the Drs took me seriously just tryin' to get help" on suicide watch in A-5 but he felt he was not being taken seriously "so made them cell extract me took me to TTA where I showered with a spoon – tried to cut leg & wrists. People don't seem to believe me – I feel lonely – people dislike me – I get agitated, start kicking door…I wanna go back to TTA…I hear voices but the Abilify help…Use to work out but not anymore…I feel lonely." The report further stated that the psychiatrist continued the inmate's medication, but also added additional medication to manage his agitation. The psychiatrist diagnosed Bipolar Disorder NOS, and rule out Major Depressive Disorder, Moderate to Severe. He also performed a SRE in which he noted that the inmate was not deemed to be a current suicide risk and estimated low risk, but included that the questionable history of his mother's suicide might increase the long term risk.

176

The inmate remained at the 3CMS level of care. Primary clinician notes from September and October 2010 noted that he continued to report depression symptoms. The psychologist saw him on 10/12/10 in response to concerns expressed by plaintiffs' counsel; the psychologist determined that he did not have any current level of distress, mood, or affective problems or suicidal ideation. The psychiatrist saw him on 10/25/10 as the inmate reported that he had suicidal ideation. However, the psychiatrist determined that he reported suicidal ideation to return to the MHCB and to avoid a move to another building. The suicide report noted that after the inmate was reassured that he was not going to move, he denied suicidal ideation.

A social worker provided a SRAC on 10/25/10. It indicated that the reason for the assessment was to formulate treatment planning. Identified sources of information were the inmate and the UHR. Risk factors included history of a suicide attempt in the CDCR and history of mental illness noted as depression. Also noted were long or prior sentence, history of poor impulse control, current ASU, SHU, or PSU term, and Level IV custody score. No protective factors were indicated. Evaluation of risks was summarized as the inmate reporting to two doctors that he was not suicidal. No apparent significant risks were checked. The plan was to refer him to the psychiatrist for medication review.

The psychiatrist saw the inmate for medication review on 11/1/10 without the UHR; no changes in his medication were made. He continued to be prescribed Benadryl prn. Records indicated that he received injectable Benadryl prn for agitation. A psychiatrist again saw him the following day; the inmate told the psychiatrist that he wanted to go to the MHCB because he was suicidal, but he would not remain suicidal if he were given back his paperwork. According to the suicide report, the inmate originally told the psychiatrist that he was not suicidal and efforts were made to speak with the ASU sergeant regarding the inmate's paperwork. The primary clinician saw the inmate on 11/9/10. It was noted that he was depressed with sad affect; a psychiatrist was consulted and Benadryl was again administered for agitation and the psychiatrist provided a telephone order to add Abilify on a prn basis.

The inmate was placed on suicide watch in the management control cell in ASU on that same day. The following day a psychiatrist completed a SRE. It noted recent reports of suicidal ideation and staff interventions. However, the inmate would not come out of his cell or talk with the psychiatrist, who reportedly told the inmate that "if you don't answer questions the answer means no unless you tell me otherwise." When the inmate continued to refuse to cooperate with the evaluation, the psychiatrist determined his suicide risk to be minimal, discontinued suicide watch, and ordered five-day follow-up.

The suicide report made reference to the inmate giving a note to the psych tech on 2/5/11. The note stated that people had told him that if they did not kill him they had forfeited their way to go home; this came to him through the voice box in his vent. The psych tech documented that she gave the note back to the inmate after talking with him about auditory hallucinations and his desire to see a psychiatrist. The inmate then gave the note to a correctional officer, who contacted the psych tech and stated that he thought that this was a threat of harm. After the psych tech talked to the inmate further, she made an urgent mental health referral. The suicide report indicated that in this note the inmate made a reference to "the program." Another reference was found in the inmate's possessions that also mentioned there being a "voice box" that told him what to do in his cell. Based on the urgent referral, records indicated that the inmate's primary clinician met with him on

2/8/11. However, there was no mention of these symptoms in the primary clinician's note in the UHR. Subsequent meetings on 2/11/11, 2/15/11, 2/16/11, and 2/18/11 also did not reference the note given to the psych tech and subsequently to the correctional officer. The inmate continued to request to move to another cell, to see a psychiatrist, and to go to another institution.

The psychiatrist also saw the inmate on 2/16/11 and documented his reports of auditory hallucinations, delusional beliefs, and depression. The psychiatrist changed the inmate's diagnosis to Schizoaffective Disorder and changed his medication from Effexor ER to Effexor Immediate Release. The inmate's status in the ASU and his remaining in the management cell continued. The CDCR reviewer noted that he was in the management cell for suicide watch from 1/23/10 through 2/26/11. The reviewer also noted that even though the inmate was housed in the management cell, he was not on management status and did not have the usual activity restrictions. The inmate also filed 602 appeals indicating that he did not have access to activities or accommodations usually provided to ASU inmates; he specifically reported not having access to his legal files and paperwork. He made repeated requests to be moved to another cell.

On 2/26/11, the inmate reported to the psych tech that he was again suicidal; this was also reported to the program sergeant and RN. The RN interviewed the inmate. According to the suicide report, the inmate reported to the RN that he only wanted a break from the ASU; a referral to mental health for a formal SRAC was not requested or conducted. The inmate had requested a cell change and according to the suicide report, the housing log documented that a move occurred on 2/26/11; this despite the ASU sergeant telling the inmate that it was not possible due to a lack of available cells for him to move from the control cell to a regular ASU cell.

The inmate had two SREs completed before his death in preparation for IDTT meetings, on 3/1/11 and 5/20/11. Review of SREs completed by his primary clinician, who was a social worker, indicated that the forms were incomplete; there were significant risk factors that were not noted on the forms, but were reflected in the UHR. These risk factors included the inmate's depressive episodes, psychotic symptoms, anxiety symptoms, agitation, anger, mood disturbance, physical pain including chronic back and leg pain, being early in his prison term, and the inmate's safety concerns. The forms also did not include any details about his suicide attempt in September 2010 and additional self-harming behaviors during that year; the inmate was determined to be "stable." There was no evidence of mental status examinations being conducted in conjunction with the forms' completion. The social worker's determination was that the estimate of risk levels was low for chronic and acute risk. There was no indication in the IDTT notes that the inmate was considered for higher level of care referral despite his ongoing difficulties in the ASU and his repeated reports of suicidal ideation, self-harming behaviors, and changes in his diagnoses and medication regimens.

The inmate had a significant medical history for chronic pain secondary to a gunshot wound to his knee and back injuries from an automobile accident. He was also receiving treatment for glaucoma and chronic headaches. He reported a seizure history. However, a physician who evaluated him in 2010 felt that he did not have evidence of an active seizure disorder. Nonetheless, the inmate was subsequently seen that same month when he presented to medical staff as having fallen and hit his head on the toilet; he had a

superficial abrasion to his scalp and felt anxious. He was prescribed Dilantin. He subsequently reported ongoing seizures and was sent to a community hospital in May 2010 after reportedly having a seizure and being injured by correctional officers during the course of the seizure. He subsequently returned and his Dilantin was increased. The inmate reported additional seizures and was treated with Dilantin and Keppra. After some adjustments in his Dilantin regimen, he remained on Keppra and Dilantin and was reportedly seizure free after July 2010.

The CDCR suicide reviewer indicated in the suicide report that the inmate's reports of auditory (command) hallucinations and descriptions of his being paranoid and depressed were clearly documented in the UHR. The reviewer noted that several clinician notes indicated that he did not demonstrate visible psychosis symptoms such as responses to internal stimuli, but that at times he expressed concerns about a delusion he labeled "the program;" this consisted of auditory hallucinations that he reportedly received through the air vent in his cell, ordering him around and commanding behavior. The reviewer noted that the diagnoses from 2006 in his record included Depressive Disorder NOS, Mood Disorder NOS, Schizoaffective Disorder, Bipolar Disorder, and occasionally Psychotic Disorder NOS; the diagnosis that appeared most often was Mood Disorder NOS. The constellation of diagnoses suggested that he struggled with both mood-related symptoms and symptoms related to psychosis.

The reviewer noted that the inmate's prescribed psychotropic medications targeted both of these symptom presentations. However, it was clear from the record that a great majority of the time he was prescribed antidepressant medication and was rarely prescribed antipsychotic or mood stabilizing medications. The reviewer noted the inmate's drop in participation and opportunities for physical activity, including going to the exercise yard and showering, and his increase in isolation during May and June 2011. The reviewer noted that the ASU 114-A daily log sheet for the week of 6/27/11 was unavailable at the time of preparation of the suicide report; therefore, it was unknown whether the inmate's pattern changed during the last four days of his life. The reviewer noted that the inmate's cell was not observed to be disorganized or malodorous, despite shifts in his routine. He was observed to be lucid and appeared to continue his exercise and grooming activities in his cell and also continued to work on his appeals during that time. The reviewer made reference to several letters found in the inmate's property that indicated an increasing sense of urgency in his request for responses to his appeals, as well as incorporating what suggested to the reviewer to be the subjects of his delusional beliefs and/or auditory hallucinations (i.e., "the program"). The reviewer also noted that the inmate expressed feelings of hopelessness and anger in his writings as to the judicial system's denials and rejections of his appeals by the judicial system and the CDCR.

The CDCR suicide reviewer noted in the suicide report several IDTT treatment plans that failed in any way to document the inmate's MHCB admission in September 2010 or the several instances of suicidal ideation and self-harming behaviors in 2010. The reviewer suspected the UHR was not available and/or not reviewed. This was confirmed by the ASU primary clinician, who stated not receiving the UHR for clinical contacts, although the UHR was available for IDTTs. Several psychiatric appointments that different psychiatrists completed also frequently documented they were conducted without the benefit of the UHR, as were some of the SREs that resulted in the inmate's removal from suicide watch status. The reviewer opined that "often when an inmate has a strong Axis II

component to his behavior, as inmate __ did, it was easy for staff to minimize the presence of mental illness or the severity of his risk for self-harm." The reviewer stated that clinicians who completed assessments without the benefit of UHR review lacked the most important tool that they had for assessing and treating caseload inmates, which included the ability to view and track a merging pattern of mental illness and/or an increase in suicide risk indicators. The reviewer identified several concerns based on the review, including the emergency response, the ICC's assignment of the inmate to double cell and single cell status, and the lack of documentation indicating that IDTT reviews as to safety issues and either mode of housing were not undertaken.

The reviewer also noted the inmate making serious allegations of staff misconduct against correctional officers and the primary clinician indicating that he would need to earn his way out of a management cell by good behavior. The reviewer noted that the inmate was in a management cell from 1/23/10 through 2/26/11. The reviewer also indicated that the use of management cells had changed considerably at this point and did not resemble these cells' previous use. The reviewer summarized the inmate's completed suicide in the context of a number of factors, including (1) a long SHU term, served in an ASU primarily in single cell/management cell placement; (2) the presence of significant Axis II symptoms; (3) the presence of Axis I disorders including escalating depression, especially in 2010, and symptoms of a psychotic process; (4) fear of retaliation by gang members, which in all probability spiked sharply the day of his suicide when a gang member/shot caller arrived in his housing unit; (5) the ongoing and increasing feeling of vulnerability from the presence of correctional officers against whom he had made allegations of staff misconduct; (6) increasing isolation and fears of correctional officers searching his cell and taking his paperwork; (7) numerous rejections or denials regarding appeals and; (8) "a seemingly total isolation and lack of support from the outside world." However, the reviewer noted that in contrast to these factors, the inmate demonstrated improvement in his mental health symptoms in the last months of his life. It was possible, however, that the inmate's external improvement masked the solidification of his suicidal intent.

The suicide report provided seven problems and quality improvement plans as follows:

Problem 1: (1) Access to the UHR: Documents reviewed for this report indicated that the UHR may have been routinely unavailable for case management contacts, frequently unavailable for psychiatric contacts and Suicide Risk Assessments, and possibly unavailable for one IDTT review. However, it was unclear whether difficulties existed in access to the UHR, and clinicians practice of reviewing the UHR, or simply in documentation of both access and review of the UHR.
Quality Improvement Plan: The Chief Executive Officer or designess at LAC and Chief of Mental Health or designee at LAC shall: (1) Instruct clinical supervisors to monitor the review of the UHR by their supervisees and provide an audit for the period of one month to demonstrate UHR review by clinicians. (2) Provide additional training to clinical staff pertaining to the review of the UHR, including gaining access to the eUHR.

Problem 2: Documentation/Clinical Concerns: (a) Treatment plan documentation produced by the inmate's PC was sparse, cursory and failed to address significant clinical issues addressed in other documents in the inmate's UHR. (b) documentation was lacking in the inmate's records regarding clinical discussion. However, regarding the appropriate level of care during 2010, in light of his frequent self-harm behaviors and periods of

instability from the existing records, it was not possible to determine if the inmate's IDTT discussed an increase in mental health treatment to the EOP level of care during 2010. (c) it was impossible to determine from the inmate's records if the IDTT routinely addressed, but failed to document, clinical matters such as differential diagnoses, advisability of single versus double cell housing, suicide risk level, etc., which would impact treatment and inmate's safety. (d) IDTT documentation did not reference discussions between correctional counselors and mental health IDTT members regarding safety factors inherent in double or single cell placement of this inmate.

Quality Improvement Plan: The Chief of Mental Health or designee at LAC shall conduct an inquiry into these concerns in order to address the following concerns: (1) Quality of IDTT clinical discussion and documentation. (2) The PC supervisor shall provide guidance and monitoring to improve the quality of this individual clinician's documentation, specifically with regard to treatment plans. (3) Provide training to all mental health providers regarding documentation.

Problem 3: Although basic life support was rapidly provided, Inmate __ was not transported directly to the TTA following arrival of the CTC ambulance, (Mary 3). This delayed initiation of ACLS protocol by approximately 10 minutes.

Quality Improvement Plan: The Chief Executive Officer or designee at LAC shall conduct an inquiry into the decision by first responders and, if necessary, take corrective actions as deemed appropriate.

Problem 4: On February 26, 2011 the inmate reported suicidal ideation but was not referred to mental health for a follow-up Suicide Risk Assessment. On that date, he reported to the LPT that he was suicidal. The LPT told the program sergeant and RN. The RN then interviewed the inmate, reported that he only wanted a break from the ASU. The referral for a mental health evaluation was not made. That night he was moved from his management cell into a regular cell, which increased suicide risk.

Quality Improvement Plan: The Director of Nursing or designee at LAC shall interview the RN regarding the lack of a referral to mental health. The following quality improvements shall be provided to the RN: (a) updated training regarding the occasion that shall generate a referral to mental health, (b) weekly auditing by the RN supervisor for the period of two months to ensure that referrals for follow-up mental health evaluations are provided where appropriate. This audit shall continue until 95% compliance with requirements is achieved. In addition an audit of 20% of all nursing records for ASU inmates shall be conducted for the period of one month to determine if referrals to MH are completed by nursing staff per Program Guide requirements.

Problem 5: SRE concerns: On November 10, 2010, the inmate was evaluated by a psychiatrist who completed a SRE. The SRE noted the recent history of suicidal ideation and verbalization as well as staff interventions. However, the inmate refused to come out of the cell for the evaluation and refused to communicate with the psychiatrist. The psychiatrist determined suicide risk to be minimal, discontinued the suicide watch and ordered mental health follow-up within five days. The last two SREs (March 2011 and May 2011) were completed in preparation for IDTT meetings. On both forms, some chronic and acute risk indicators that were present in the inmate's life were marked as 'not present.' Despite the fact that the inmate made a suicide attempt in September 2010 and was admitted to the MHCB as a result, the forms did not provide any details of that

181

attempt.  The second page of SREs provided incomplete or negligible information regarding mental status, justification of risk level, and treatment plan details.

Quality Improvement Plan:  The Chief Executive Officer or designee and the Chief of Mental Health or designee at LAC shall develop the Proctor/Mentor Program in the administration of the SRE.  An outline of the Proctoring and Mentoring Program developed by Headquarters' staff at CCHCS, along with a monitoring tool, will be provided to the Chief of Mental Health at LAC, along with any additional assistance either from Headquarters during the development of this program.  The purpose of this program is to ensure that clinicians have the knowledge and skills to adequately assess inmates at risk for suicide.


Problem 6:  On the second of the post MHCB five-day follow-up, Inmate __ again cut himself.  The five-day follow-up was completed by psychiatrists who did not comment on this new self-harm behavior.  Documentation that does not describe behavioral indicators and instability fall short of good clinical practice in the provision of mental status exams, which are listed as an integral component of five-day follow-up procedures in the MHSDS 2009 Program Guide, Page 12-5-29.  In addition, it falls short of documentation required by psychiatrists and outlined in detail by the memorandum dated August 28, 2008, entitled 'Guidelines for Clinical Documentation by Psychiatrists' (A copy will be forward to CSP-LAC).

Quality Improvement Plan: The Chief of Mental Health or designee at LAC shall provide training and supervision to the psychiatrist who completed documentation of the five-day follow-up for this inmate.  In addition, all clinicians will be provided additional training in the revised five-day protocol recently developed at CSP-LAC.


Problem 7:  Inmate __ was making serious allegations of staff misconduct against COs who continued to have control over him in his ASU placement.  During the last months of his life, he attempted to seek justice regarding his allegations that the COs used excessive force and injured him while he was having a seizure.  The reviewer was not able to discover the outcome of the interviews conducted with the inmate regarding his allegations.  Additionally, inmate peers reported to this review that some COs (the same ones against whom he had made allegations) often teased and made fun of inmate __.

Quality Improvement Plan:  The Warden or designee at LAC shall conduct an inquiry into the allegations of staff misconduct by Inmate __ and reports by other inmates that COs teased and made fun of the inmate.  Corrective action shall be taken as deemed necessary including a referral, if necessary, to the OIA.


A physician provided a Death Review Summary on 8/26/11.  The physician reviewed the inmate's medical and mental health history and his cause of death.  The physician indicated that the inmate died due to suicide by hanging on 6/30/11 and that he suffered a seizure disorder, glaucoma, and chronic knee and back pain.  The physician also noted that mental health treated the inmate for Schizoaffective Disorder.  The physician indicated that there were no departures from the standard of care for medical providers and deferred the standard of care for nursing to nursing colleagues.  No systemic concerns were identified.


On 1/17/12, the Deputy Director (A) Statewide Mental Health Program, and Director (A) Division of Adult Institutions provided their Report on Implementation of the Quality Improvement Plan for this inmate's suicide, in response to the suicide report dated 10/13/11.  With regard to QIP number one, facility staff indicated that it was "completely

impossible to accomplish this task at the present time." The memorandum from the psychologist to the senior psychologist at CCHCS indicated that as of 11/15/11, UHRs were no longer delivered to yards, and there was no mechanism in place for clinicians to monitor the clinician's log on the eUHR. The memorandum noted that training was provided on the eUHR on 11/23/11. IST sheets were provided as to the training.

As to QIP number two, a memorandum was submitted stating that a thorough review of expectations as to completion of individualized treatment plans was discussed with the primary clinician. Also included was the supervisor's weekly review of treatment plans prior to the IDTT for a 90-day period or longer, if deemed necessary, and quarterly audits of 20 percent of clinical caseloads reviewing all clinical documentation for the past 90 days. As of 12/6/11, the clinician was transferred to the 3CMS general population yard under the supervision of another psychologist, who would continue to monitor his clinical documentation. IST sheets were also included for the training.

As to QIP number three, a memorandum from the SRN II to the review committee indicated that according to the interview with the RN and UHR documentation, the RN was the first responder on the scene. Upon arrival, CPR was in progress, at which time the RN immediately notified the TTA to have paramedics respond to the ASU. The memorandum further stated that in addition to CPR being in progress, the RN observed that the AED did not at any time determine that the inmate had a "shockable rhythm." The decision to wait for paramedics arrival at the scene while continuing "good and consistent" CPR was appropriate adherence to the emergency medical response program policy and procedure, Section C., 1C, Patient Transportation and Definitive Care.

With regard to QIP number four, a memorandum from the SRN II indicated that UHR review determined that the inmate reported to the psych tech that he was feeling suicidal on 2/26/11. The memorandum further stated that 2/26/11 "fell on a Saturday" and that the institution did not staff ASU with a RN on weekends. However, a RN was assigned to the TTA 24 hours a day, seven days a week. It would be the responsibility of the RN in the TTA to go to the housing unit to evaluate the patient or have the patient brought to the TTA. The memorandum further stated that since the psych tech did not document the RN's name, and no documentation was found in the UHR on or around 2/26/11 pertaining to the inmate feeling suicidal "it has been determined that both RNs who were scheduled in the TTA on that date will be retrained on suicide prevention." The plan for the training was on 12/23/11. IST sheets were included regarding patient transport and definitive care training.

With regard to QIP number five, the LOP for the "Suicide Risk Evaluation Proctoring and Mentoring Program" was provided with an effective date of February 2012.

With regard to QIP number six, a memorandum was provided with the subject "Training and Supervision of Psychiatrists." It noted that as of 12/12/11, as part of the quality improvement plan, psychiatrists were trained with regard to the five-day step-down protocol and guidelines for clinical documentation. It was noted that "specifically, psychiatrists were informed that documentation of recent self-destructive behavior must be documented in the progress note and five-day step-down paperwork." IST sheets were provided.

183

With regard to QIP number seven, the correctional captain, health care operations, provided a memorandum to the associate warden, health care operations, as to the inmate. It stated that based on review of available documents of the inmate's allegations of staff misconduct noted in the report, the inmate's complaints were noted as "screened out" as the complaints were not submitted on an approved CDCR form. Furthermore, the memorandum noted the complaint of June 9 included a denial note citing California Code of Regulations 3084.6 (b)(6) as the appeal offered general allegations, but failed to state facts or specify an act or decision consistent with the allegation. The memorandum further stated that the CSP/LAC internal affairs unit indicated no record of an investigation based on allegations of staff misconduct as submitted by this inmate. The memorandum ended with a phone number should there be any questions or requirements for additional information.

A memorandum dated 1/17/12 to the CCHCS chief of clinical practices mental health programs from the suicide response coordinator noted that it became necessary to revise some of the QIP requirements. The memorandum further stated that on 11/8/11 the changes were discussed and approved for completion by the institution. The changes involved QIP numbers one and two and further stated that the changes to these QIPs were necessary due to the current use of the eUHR. The memorandum noted that use of the eUHR made it impossible at this point to audit its review by the clinicians; while the audits could not be conducted, the requirements of both QIPs were deemed to have been met by the suicide case review subcommittee.

On 1/17/12, a memorandum from the Deputy Director (A) Statewide Mental Health Program and Director (A) DAI indicated that the responses were reviewed and approved by the suicide case review focus improvement team and that no further actions were necessary.

**Findings:** This inmate's completed suicide death appears highly likely to have been foreseeable in that he was reporting chronic suicidal ideation or intent prior to his death with inadequate SRAs or management. The inmate had chronic risk factors for suicide which had also resulted in acute exacerbations. His struggles with his confinement and his particular conditions of being in a management cell within the ASU while serving a SHU term complicated this process. The suicide reviewer appropriately pointed out that there were numerous flaws in the overall evaluation, assessment, treatment, and management of the inmate; these flaws included clinicians frequently providing assessments without the benefit of the UHR or incorporation of the "long-term" clinical picture of the inmate during his incarceration. The presence of an Axis II diagnosis of Antisocial Personality Disorder and the inmate's refusals and difficult interactions with staff complicated this picture. However, it did not excuse the realities that he also had an Axis I diagnosis with both depressive and psychotic symptoms. Of note was that he did not receive SREs as required by the Program Guide at appropriate times, while notes that were performed were frequently incomplete without specific and important references to his past history and his current level of functioning. In view of the overall management of this inmate's mental health care and treatment, it was the Special Master's reviewer's opinion that this death was more likely than not preventable had the inmate been appropriately assessed and had appropriate treatment including a higher level of care and most certainly medication management to include an antipsychotic and/or mood stabilizing medication on a continuing basis been undertaken. Furthermore, participation in activities at the EOP or

higher level of care would have afforded the inmate an opportunity to interact more frequently and more consistently with staff; it would also have afforded staff a better opportunity to assess his ongoing functioning and clearly deteriorating conditions in view of his overall symptoms and presentation. In addition, the emergency response appeared inadequate as the incident reports did not mention use of the AED in the ASU, and the inmate was not transported to the TTA until after his death.

## 18. **Inmate R**

Brief History: This inmate was a 34-year-old Hispanic male who committed suicide by hanging on 8/4/11 at the CMF. The inmate was a participant in the MHSDS at the EOP level of care and was single celled at the time of his death. He entered the CDCR at the NKSP RC on 10/14/08 after having entered a plea of nolo contendere to one count of voluntary manslaughter with an enhancement for using a knife. The inmate was sentenced to 12 years in prison and his EPRD was 8/26/16.

The inmate was discovered on 8/4/11 at approximately 5:56 a.m. by two correctional officers who were conducting the morning meal release in the L-3 Unit (EOP) and observed the inmate, the sole occupant of the cell, lying on his side on the cell floor. One correctional officer knocked on the cell door repeatedly but the inmate did not respond. When the correctional officer opened the cell door, he observed what appeared to be a sheet tied around the inmate's neck and hands and a small amount of blood near his head on the floor. The second correctional officer called via radio for medical code response to L-3 and Code One responders arrived, at which time additional correctional officers pulled the inmate out of the cell by his legs and into the corridor. One of the correctional officers retrieved the cut-down tool, returned to the cell, and cut the noose from the inmate's neck to clear the inmate's airway. Additional correctional officers immediately began CPR and rescue breathing was conducted with the ambu bag while one officer initiated chest compressions. At approximately 5:58 a.m., the B-1 medical staff arrived and immediately applied the AED which indicated no shock and the inmate was transported to the B-1 emergency room. CPR continued en route and the inmate arrived at the B-1 emergency room at approximately 6:01 a.m. At approximately 6:18 a.m., a physician ordered discontinuation of CPR and pronounced the inmate dead.

The suicide report indicated that there were questions remaining regarding the time that the inmate was initially discovered and the actions that were followed. The report noted that a staff report was not obtained from one of the discovering correctional officers at the time of the CDCR suicide report. The suicide report made reference to one of the correctional officers being interviewed as well as the information recorded which stated that the two officers were working together to release inmates for breakfast at approximately 5:50 a.m. The correctional officer indicated that he had approached this inmate's cell and noticed the inmate was not waiting at the door which was not usual for him. After the correctional officer had released all of the inmates who had been standing at the doors, he waited at the end of the tier for a short period of time, began moving back down the tier and releasing inmates who had not been ready on the first pass, and again noticed that this inmate was not standing at his cell door. The correctional officer then looked in the cell window and observed the inmate lying on his right side with his feet toward the door in a fetal-like position curled around the toilet. The correctional officer noted that he could see the inmate's body from "mid-torso up," knocked and called to the inmate, and receiving no response, opened the cell door where upon he observed a sheet tied around the neck and

hands of the inmate and "a small amount" of blood near his head. The correctional officer advised the second correctional officer to activate emergency response as a medical emergency.

A timeline provided in the suicide report indicated that CPR began at approximately 5:56 a.m. and medical staff arrived at approximately 5:58 a.m. A physician arrived at 6:10 a.m. and attempted to insert an oral airway but was unable to open the inmate's mouth "due to stiffness and rigidity." Epinephrine was given and the AED advised no shock. A rectal temperature was noted as 95.3 degrees F at 6:18 a.m. and at 6:19 a.m. the physician pronounced the inmate dead. It was noted that the inmate had multiple cuts including cuts in his left elbow crease, below his right eyebrow and on his nose, as well as dried blood in his hair and the back of his head. An autopsy report was provided by the Sheriff/Coroner of Solano County and indicated the autopsy was performed on 8/4/11. The cause of death was noted as hanging, and the deceased had a cutting wound to the left arm and right eyebrow. Toxicology tests for alcohol and drugs were negative.

The inmate's criminal justice history was recounted in the suicide report. According to the suicide report, the inmate's commitment offense was his first arrest in the United States. The circumstances of that crime occurred on 2/21/05 when the inmate stabbed another farm worker with a knife. He was charged with murder and pleaded not guilty by reason of insanity. He was found incompetent for trial and sent to ASH on 4/25/06. The inmate was diagnosed with Schizophrenia, Chronic Paranoid Type and Alcohol Abuse at ASH and was subsequently admitted to Napa State Hospital (NSH) on 7/17/08 prior to his conviction and transfer to the CDCR. He entered the CDCR at NKSP RC on 10/14/08, receiving mental health screening, and was placed in the MHSDS at the 3CMS level of care. He was referred for evaluation to be admitted to the EOP level of care in January 2009. However, because the inmate stated he did not need mental health services and denied psychiatric symptoms including suicidal ideation or previous suicide attempts, he remained at the 3CMS level of care according to the suicide report. He was once again referred for an EOP evaluation based on custody referrals and as he was observed to be responding to internal stimuli, was placed at the EOP level of care.

The inmate was returned to the 3CMS level of care in March 2009 after he was transferred to CMF and according to medical records was not symptomatic or taking psychotropic medication. He received a RVR for fighting in the dining hall and was transferred to administrative segregation. While in administrative segregation, he was diagnosed as being in remission for Psychotic Disorder NOS, refusing medications, and remained in ASU until 9/23/09. In October 2009, he received a second RVR for indecent exposure and was noted to have pulled down his pants and underwear exposing his genitals to a correctional officer. Because of the bizarre and sexual nature of the incident, the inmate received a mental health evaluation in which the clinician determined that his mental disorder did not contribute to the behavior that led to the RVR. The inmate returned to ASU for a term of 60 days in 2009 and was assessed a mitigated SHU term of three months with a MERD of 12/16/09. He also had an indecent exposure suffix added to his classification record.

The inmate appeared to continue to have difficulties with adjustment to corrections. This included his having been reported by custody in January 2010 to have been running with a cape, looming over others while they were sleeping, and perched on his bunk like a bird

according to the suicide report. The inmate's diagnosis continued as Psychotic Disorder NOS and he was subsequently changed to the EOP level of care in January 2010. However, his level of care was reduced to 3CMS in April 2010 with a primary diagnosis of Alcohol Abuse and a secondary diagnosis of Antisocial Personality Disorder, as the EOP staff found him to have no symptoms of mental illness or a need for a DSH referral despite his bizarre behavior. EOP staff suggested he be removed from the MHSDS in six months if his bizarre behavior did not continue. The inmate was returned to the EOP level of care on 5/15/10 after a custody referral reported that his behavior had worsened. Five days later, the EOP IDTT described his mental status as unremarkable, his odd behavior for a secondary gain, and he was to be reevaluated in 30 days for a return to general population. There was no documentation of a reevaluation in 30 days.

In October 2010, the inmate was placed in ASU after he attempted to strike a correctional officer through a glass window. He remained in ASU until 12/8/10. On 12/22/10, clinicians evaluated him as not appearing in crisis or needing a DSH referral, after he had been screaming in Spanish and noted to have loose and tangential speech, paranoia, and refusing medication.

The inmate was admitted to a DSH crisis bed on 2/23/11 because of bizarre, threatening, and psychotic behavior based on a Vitek hearing. He had threatened correctional officers to come into his cell and was discovered to have several razors. He had no insight into his mental illness and refused medications. While in the Vacaville psychiatric program (VPP), he admitted command auditory hallucinations and depression, and agreed to take antipsychotic medication. His diagnosis was Psychotic Disorder NOS. By 3/15/11 he was refusing medication, had decompensated, and was transferred from the crisis bed to the APP on 3/25/11.

The inmate continued in treatment at the APP and was noted to have an episode of head-banging because he believed he was having chest pain. His medications were changed from Risperdal Consta to Invega Sustenna as well as Zyprexa because of his continuing to have psychotic decompensation.

The inmate continued head-banging on 4/16/11 and 4/18/11, and on 4/18/11 agreed to have his blood drawn for laboratory work because he believed he did not have enough blood in his body. His blood volume was determined to be adequate. The inmate refused to attend most treatment groups, but appeared to have stabilized somewhat in May 2011. He reported during that month that he felt he was "totally good" according to the suicide report and was thinking about stopping his medications. However, he continued to believe that he did not have enough blood in his body and sometimes felt dizzy. The psychiatric staff determined that he should be maintained at no less than the EOP level of care and that a Keyhea order should be considered because of his medication noncompliance. The inmate continued to state that he wanted to stop medications, believed that his blood volume was low, and refused programming. He was discharged from the DMH APP to CMF EOP level of care on 7/20/11 and the discharge summary noted that he had demonstrated gradual improvement. The summary continued that he did not present with organized delusions "which probably still exist" but he had sufficient ego strength "to cover his delusional thought." It was noted the inmate continued to believe that he was being bled to death both at the EOP level of care, at DSH S2, and again on Q1 (APP) but the complaint "which is judged to be delusional, has now abated." The summary

187

concluded that it appeared that he was no longer acutely ill and that he had not been compliant with medications but was not on a Keyhea. The summary also stated "this may be a problem. He was thought to be Keyheable, and has been compliant with the medications during his stay at this unit." The records indicated variable compliance and refusals in the week prior to discharge.

After his transfer the inmate was seen by a psychiatrist at CMF and stated he did not want to take any medications. The psychiatrist was unable to get much history and noted that the inmate was "all over the place and tangential in his responses." The inmate was noted to have been focused on not taking medications and denying both suicidal and homicidal ideations as well as auditory and visual hallucinations. The inmate would not sign a consent for oral medications and his injection of Invega that was due on 7/24/11 was not administered on that date. The injection was noted to have been given on 7/26/11, which according to the MARs was accurate.

The inmate was seen by a psychiatrist and his primary clinician at CMF on 7/21/11. His primary clinician began documentation of five-day follow-up and during five-day follow-up found no evidence of psychotic thought processes, mood symptoms, hallucinations or disorientation, and the inmate denied suicidal and homicidal ideation. The inmate was noted on the second day of five-day follow-up to appear lethargic, reporting poor sleep and his affect was flat and depressed. The inmate continued to deny suicidal or homicidal ideation, on days three and four no unusual behaviors were noted by clinicians, and on day five the inmate was seen by his primary clinician who opined that he said he was "fine." The clinician noted that the inmate appeared to be "at his baseline," and attended groups on 7/21/11, 7/22/11, and 7/25/11. However, he refused groups on 7/26/11, and had variable compliance between 7/27/11 and 8/1/11.

The inmate committed suicide on 8/4/11. He had an IDTT on 8/3/11, which was not included in the record until after the inmate's suicide. The IDTT noted that the date prior to his suicide he continued to deny psychiatric symptoms but was tangential, unable or unwilling to answer "some direct clarifying questions," and had latencies in his responses. Some members of the IDTT who knew the inmate prior to his admission to DSH stated that he appeared to be much improved and "although his thinking continued to be disorganized, his hallucinations seemed to be in remission."

According to the suicide report, the last SRAC completed for this inmate was on 7/21/11 at the EOP level of care when his chronic and acute risks were both estimated as low. This reviewer was able to locate that SRAC in the record, but given the inmate's established levels of risk in DSH and lack of improvement, the assignment of low risk appeared inconsistent with his risk factors. It appeared that the DSH acute care staff provided ISRAs on 2/23/11, 3/22/11, and 7/18/11. When the inmate was at the MHCB level of care on 2/23/11, his risk was assessed as moderate. The level of risk on 3/22/11 was also moderate. There did not appear to be estimates of risk for 7/18/11 ISRAs.

The inmate's final diagnoses from DSH were Schizophrenia, Paranoid Type, in Partial Remission, and Alcohol Dependence in a Controlled Environment. His diagnoses on 8/4/11 at the EOP level of care at CMF were Schizophrenia, Paranoid Type and Alcohol Abuse in Institutional Remission. In addition, diagnosis of Psychotic Disorder NOS and a GAF score of 46 were offered.

The inmate appears to have had no significant problems in his physical health as well as no chronic medical conditions.

The suicide report made reference to the inmate having been discharged from DSH APP on 7/20/11 "with only minimal improvement in symptoms and reluctant compliance with medication." The reviewer noted the inmate's hospital course was one of "gradual improvement" and "he did not present with organized delusions which probably still exist." It was also noted that his condition was improved; he was no longer acute and was not expressing overt delusions, although he was somewhat guarded and reclusive secondary to his basic diagnosis. It was noted after his return to CMF the inmate was re-housed in the ASU overflow section of L-3 and the windows in his cell were reinforced which hampered visibility. The suicide reviewer also noted that when the inmate was discovered the cell walls had "666" written in large prints with numbers in several areas, which may have fueled the paranoid and delusional symptoms with which the inmate struggled. He also had cuts, some quite deep, on his arms, legs, abdomen and face which appeared to have been inflicted by a razorblade which was found at the scene.

The reviewer noted that the CMF psychiatrist did not renew the inmate's prescribed Zyprexa/Zydis because he said he would not take it, and that during the five-day post MHCB follow-up period, he was noted as having been depressed, lethargic, and demonstrating flat affect. The reviewer noted that the notes from clinicians who saw the inmate during five-day follow-up and were not his primary clinician were minimal and unremarkable.

The EOP IDTT staff noted on a mental health treatment plan, dated 8/4/11, that the inmate reported he was "fine" and he seemed to have improved by members who knew him prior to his being transferred to DSH (where he was transferred because he threatened officers with a razor in his cell and was "out of control"). However, they noted that his thinking continued to be disorganized and his hallucinations seemed to be in remission. They also noted he continued to deny all psychiatric symptoms or was unable or unwilling to answer some direct questions.

The reviewer noted that the inmate's symptoms appeared to wax and wane as well as his candor with clinicians. The reviewer opined that the "night of August 4, 2011" the inmate appeared to have become "overwhelmed by psychotic symptoms and banged both his head and hands as well as cutting himself with a razor on various parts of his body," and ultimately "placed a noose around his neck and hung himself from the vent over the cell door." The reviewer noted that the noose broke and the inmate fell to the floor where he was found at breakfast time.

The reviewer noted that the inmate had been provided a certified interpreter nearly 100 percent of the time for his clinical contacts and that this was a real achievement given the demands for interpreter services. Further, the reviewer noted that there was an ongoing review under the direction of the warden at CMF of correctional officer actions relative to the discovery and initial response to the inmate's suicide on 8/4/11. The reviewer continued that this review was because of the condition of the inmate's body with the presence of rigor mortis and decreased body temperature, as well as apparently missing CDC 837-C reports.

The reviewer noted that there were several concerns that did not rise to the level of formal quality improvement plans but were offered for discussion and consideration including (1) treatment options as the inmate was discharged from DSH's APP although he was still delusional and had achieved only fragile stability; (2) Keyhea concerns given the inmate's demonstrated pattern of decompensation as a result of medication noncompliance; (3) clinical follow-up after crises bed discharge in which the inmate was perceived as "much improved" although he continued to demonstrate acute symptoms; (4) language barriers as the inmate was noted to have acted confused or ignored officers raising concerns about his ability to understand common commands; (5) the review of records indicating that the inmate had revealed symptom patterns of severe mental illness dating back to 2005 and the inmate having been transferred between EOP and 3CMS level of cares without apparent recognition of his overall history and functioning; (6) access to records for medication review in that a psychiatrist discontinued all of the inmate's medications with the exception of Invega Sustenna on 7/21/11 and the inmate was seen by a psychiatrist without access to the eUHR on 8/3/11 and correctly noted that the discontinued medications would be continued; (7) mental health input into the RVR process in which there were a number of occasions when relevant and accurate clinical input into the RVR process appeared to be lacking; (8) medication ordering, administration, and documentation in which there appeared to be erroneous documentation showing the inmate was compliant with medications most of the time when in fact he was not; and (9) the effect of suicide on other inmates in that an inmate porter was asked to clean the inmate's cell after the inmate's death which contained blood on the floor and therefore was a biohazard resulting in the porter being so disturbed by the suicide and clean-up that he had to be admitted to a MHCB in DSH.

The suicide report provided four problems and quality improvement plans as follows:

Problem 1:  There is an ongoing review under the direction of the warden at CMF, of CO actions relative to the discovery of an initial response to inmate __'s suicide.  Specifically, the condition of the inmate's body with respect to the presence of rigor mortis and significantly decreased body temperature indicates possible irregularities with the correctional count mandated at 0500 hours either in how it was conducted or if it was done at all.

Quality Improvement Plan:  The Warden or designee at CMF shall provide a referral number and date when this investigation was referred to the Office of Internal Affairs (OIA).

Problem 2:  Errors related to the administration, documentation, or recordkeeping related to medication management occurred in three instances: (a) October 2010 to December 2010:  In the ASU, between October 2010 and December 2010, daily clinical rounds made by the nurses included erroneous documentation showing the inmate as compliant with his medications most of the time; only a few nurses correctly noted that medication compliance was not applicable to his inmate because he was not prescribed medications. (b) July 24, 2011 – July 26, 2011:  An injection of Invega Sustenna, ordered for July 24, 2011, was not administered on that date.  The error was caught, the injection was reordered and the injection administered on July 26, 2011.  Unofficial recordkeeping indicated time lags exist for inmates who move between DMH and CMF.  (c) The MAR for August 5, 2011, documented the administration of Zyprexa Zydis to inmate __ (the day following his

death).  The medication was actually ordered on August 3, 2011 the day before his death.
It was on the med cart on August 5, 2011, and initialed that it had been given after inmate
__ was dead.  These errors raise questions regarding the accuracy and veracity of
recordkeeping pertaining to medication management.

Quality Improvement Plan:  The director of nursing or designee at CMF shall conduct an
inquiry and, if deemed necessary, request an investigation by OIA into these delays;
corrective actions and progressive discipline shall be taken as deemed appropriate,
including additional staff training as needed.

Problem 3/4:  After the inmate's death, the L-3 inmate porter was asked to clean the cell.
There was blood on the floor, a biohazard.  The porter was also inmate __'s friend and was
so disturbed by the suicide and the clean-up that he had to be admitted to a MHCB in
DMH.  Although there is no guarantee that staff was aware of their friendship, precautions
to prevent trauma should be taken in those inmates who are asked to provide clean-up
services following an inmate death.

Quality Improvement Plan:  The warden or designee at CMF shall:  (1) provide a copy of
either local operating procedures regarding clean-up of biohazards by inmates or
guidelines for such clean-up with proof that inmates have been trained in those procedures.
(2) Ensure that inmates asked to clean-up after the death of a peer are prepared
psychologically for any trauma that may develop as a result of the clean-up efforts.  This
may require a referral to mental health either before or after the cell is cleaned by an
inmate.

A Death Review Summary was provided by a physician dated 8/18/11.  The physician
reviewed the inmate's primary cause of death, co-existing conditions, and medical and
mental health care.  The physician opined that the patient had no medical needs, contact
with medical was quite limited, and concerns about the code included it was not clear if
Narcan was given, not clear if nasopharyngeal airway was used, not sure if blood sugar
was checked, not sure of when EMS called, and if MOD noticed rigor mortis upon his/her
arrival, why was code continued.  The standard of care for nursing indicated "see nursing
report," no systemic concerns were noted, and the recommendation was mental health
would do a separate review.

On 12/14/11, the Deputy Director (A) Statewide Mental Health Program and Director (A)
DAI submitted their report on implementation of the Quality Improvement Plan for this
inmate's suicide.  The cover letter noted that the responses were reviewed and approved by
the CCHCS Suicide Case Review Focused Improvement Team on 12/14/11.  However,
there were no responses included with the report on the secure website.  This reviewer
obtained a copy of the QIP for the inmate while on site at CMF.

With regard to problem one, the QIP indicated that the request to OIA was made and
submitted on 10/11/11, and the warden (A) at CMF had a referral number for references as
needed.  With regard to problem two, the QIP was for the director of nursing or designee at
CMF to conduct an inquiry and if necessary request an investigation by OIA into the
delays in medication administration.  In addition, corrective action and corrective
discipline shall be taken if deemed appropriate, including additional staff training as
necessary.  The QIP report indicated that the actions taken for item (a) were that nursing
staff was provided with training pertaining to their documentation of medication
compliance.  The training specifically addressed having patient specific knowledge in

order to conduct their job assignment appropriately. In-service training sheets were included. With regard to item (b) the order for Invega Sustenna and the injection not being administered on 7/24/11 as ordered, it was noted that CMF had conducted an injection clinic for psychotrophics twice a week on Tuesdays and Thursdays and that the "tremendous flexibility" of the Invega Sustenna in regard to "steady state levels of the blood" made it acceptable practice for psychiatrists at CMF to indicate frequency of dosing only and not specific administration dates. The inmate was scheduled for the closest injection date (Tuesday or Thursday) based on that frequency, and once the order was processed the inmate received his next injection on Tuesday 7/26/11 – per protocol. With regard to item (c) the nursing employee responsible for initialing that Zyprexa was administered on 8/5/11, after the inmate's death, was called into review for this as well as other identified documentation discrepancies and was provided formal counseling and review of standards of practice on 11/7/11. In addition a referral to the employee assistance program was provided. The report as to specific disciplinary action was yet to be determined based on the fact that more errors had occurred than were cited in the report.

With regard to problem three and the inmate porter being required to clean the inmate's cell after his death, and the inclusion that there was blood on the floor, a biohazard, as well as the porter having been the inmate's friend and being so disturbed by the suicide and clean up that he was admitted to the DSH MHCB, the report noted that actions taken included revision of (a) The Operations Plan, number 138 titled "Precautions for Exposure to Blood and Body Fluids" outlining the plan for proper procedures and equipment necessary for clean-up of blood and other body fluids and a copy was attached to the report. The report went on to state in response to item (b), in the event of any death or traumatic incident mental health staff is available for support and both staff and inmates are both aware of the means by which they can access such support. In addition, mental health staff are assigned to a work area following any traumatic incident and also make known their availability and means by which they can be helpful. That concludes the QIP responses to the suicide report and the death of this inmate.

**Findings:** This inmate's suicide does not appear to have been foreseeable as he was not reporting suicidal ideation or intent in the days to weeks prior to his death. However, the inmate's suicide appears to very likely have been preventable as he was discharged from APP to an EOP level of care in a psychiatrically fragile state without there having been resolution or substantial improvement in his clinical condition. Although there are notations that he appeared to have "improved," the level of improvement does not appear to have justified his return to an EOP level of care. This inmate should have been continued at the APP level of care or transferred to an intermediate care facility level of care for further treatment and a Keyhea order pursued given his long-term difficulties regarding insight into his mental illness and the need for psychotropic medications. The recordkeeping and failure to review the UHR and/or eUHR by CMF staff contributed to the inappropriate and inadequate management of the inmate after his return to CMF. Further, the inmate was discovered in rigor mortis which raised appropriate questions from the warden regarding monitoring by custody staff. It is unclear why the reviewer determined the premature discharge of this inmate by APP did not warrant a formal QIP.

## 19. **Inmate S**

Brief History: This inmate was a 46-year-old African-American male who committed suicide by hanging on 8/7/11 at CCI. The inmate was single celled in the SHU at the time

of his death and was a participant in the MHSDS at the 3CMS level of care. The inmate re-entered the CDCR on 2/5/92 via the CCI RC after having been convicted of attempted murder in the first degree, kidnapping, and armed robbery. He was sentenced to life with the possibility of parole and his MEPD was 7/4/10.

The inmate was discovered on 8/7/11 at approximately 11:15 a.m. by a RN and correctional officer who observed the inmate in his cell leaning forward with one end of a sheet wrapped around his neck and the other end attached to the vent next to and above the sink. The inmate's feet were underneath the lower bunk. Attempts to get the inmate to communicate were unsuccessful as he was unresponsive. Staff announced a medical emergency and prepared for a medical extraction by donning minimal extraction gear including shield, gloves, helmets, and gas masks. Staff entered the cell, used the cut down scissors to remove tension on the sheet, placed the inmate in restraints, and immediately began CPR. Medical staff arrived and lifesaving measures were transferred to medical staff. The inmate was transferred to the 4B medical clinic on a gurney and a Code Three ambulance was called. Paramedics arrived and the inmate was transferred to the Kern Medical Center by air transport; he left the facility at 12:47 p.m. The incident reports indicate that the ambulance was called at 11:35 a.m. and arrived at the facility at 12:00 p.m. Paramedics notified Kern County Air Medivac Services at 12:07 p.m., the airlift arrived on the grounds at 12:37 p.m., and departed with the inmate at 12:47 p.m., arriving at Kern Medical Center at 1:10 p.m. At 1:45 p.m., the inmate was pronounced deceased by a physician at Kern Medical Center.

The suicide report supplemented the incident reports and provided a timeline. It indicated that the inmate was discovered at 11:15 a.m., correctional officers entered the cell at 11:17 a.m. and began CPR, and medical clinic staff arrived at 11:27 a.m. and attached the AED. The AED indicated no shock at 11:30 a.m. and CPR continued. Intravenous lines were placed in the inmate's left arm and right leg at 11:35 a.m. and the emergency records noted the inmate had an "Agonal" heart rhythm with the AED advising shock which was administered at 11:39 a.m. Atropine and Epinephrine were administered between 11:41 a.m. and 11:44 a.m., his cardiac rhythm was noted to be in ventricular tachycardia, and at 11:45 a.m. a faint pulse was detected and Epinephrine was again administered. A pulse was detected and between 11:45 a.m. and 11:59 a.m., Epinephrine, Atropine, high volume oxygen, and Sodium Bicarbonate were administered and the inmate was noted to have a pulse and ventricular tachycardia. At 12:01 p.m., the AED was turned off, oxygen saturation was noted at 77 percent at 12:03 p.m., and the ambulance arrived at 12:04 p.m. The inmate was intubated by paramedics at 12:11 p.m. and medivaced by helicopter at 12:47 p.m. The helicopter arrived at the hospital at 1:13 p.m. The suicide report indicated that between 9:05 p.m. and 9:43 p.m., the inmate suffered three cardiac arrests, was resuscitated twice and when the third effort failed was declared dead by a hospital physician at 9:45 p.m.

An autopsy report was provided by the Kern County Sheriff, Coroner Section and indicated the autopsy was performed on 8/9/11 and determined the cause of death as ligature hanging and the manner of death as suicide. Toxicology studies revealed Acetone 1.4 mg/dl, Lorazepam 8.0 ng/ml, and Midazolam 14 ng/ml. No other positive findings of toxicological significance were determined.

The suicide report recounted the inmate's criminal justice history. It indicated that his juvenile justice history began at age ten when he was detained for shoplifting. He had subsequent arrests/convictions for petty theft, assault with a deadly weapon, and battery in 1981 at the age of 16 and was sentenced to a camp program. He was arrested at age 19 and convicted on charges of kidnapping, assault with a firearm on a person, and grand theft auto and sentenced to six years in the CDCR. He first entered the CDCR in March 1985 and paroled on 4/17/88. He returned to the CDCR on 8/10/88 on a parole violation and was released on 1/10/91. His last CDCR commitment was on 2/5/92 for the commitment offenses of attempted murder in the first degree, robbery, and kidnapping. He was returned to CCI on 2/5/92 and from 2/5/92 until 2/4/11 he was transferred to Folsom State Prison (Folsom), CSP/Corcoran, NKSP, CSP/Corcoran SHU, RJD, KVSP, and ultimately to the CCI SHU on 2/4/11.

The inmate's commitment offense occurred on 1/13/91 when he robbed a pizza delivery man, placed the victim in the trunk of his car, backed into a tree three times, and then stabbed the victim repeatedly. However, the victim was able to escape and the inmate was convicted of attempted murder in the first degree, kidnapping, and armed robbery, and sentenced to life in prison plus 13 years.

The inmate's mental health history appeared to have begun when he was a juvenile, when at age ten he was referred to mental health professionals after his arrest for shoplifting. The suicide report made reference to the difficulty in obtaining some of the UHR records as the initiation of the eUHR process began and some records were scanned and others were only partially scanned into the eUHR. Only parts of the eUHR were provided for this review. The records indicated the inmate's mental health services prior to 2006 included his being a participant in the MHSDS at the 3CMS level of care after his entry into the CDCR in 1992. He reportedly was diagnosed with Depressive Disorders and/or Adjustment Disorders. He also was diagnosed with PTSD secondary to a sexual assault that occurred at CSP/Corcoran in the 1990s according to the records reviewed. In addition, he had a number of personality disorder diagnoses including Antisocial Personality Disorder, Narcissistic Personality Disorder, and Borderline Personality Disorder.

Prior to incarceration, the inmate was noted to have had a history of substance and alcohol abuse including marijuana, cocaine, and alcohol. There was no record available of his having received any treatment for substance abuse. The inmate appeared to have been treated with a variety of medications including Lithium while he remained at the 3CMS level of care until 8/17/09, when he was discharged from the MHSDS.

The inmate requested return to the MHSDS in March 2010 after he had been placed in ASU with charges of battery on his cellmate. Although he was seen by clinicians at RJD, he was returned to the MHSDS at the 3CMS level of care as medical necessity on 9/13/10 after his transfer to KVSP on 6/10/10. Between 6/10/10 and 9/1/10, he was not seen by mental health staff. However, he placed an inmate health care services request on 9/1/10 after he was charged with battery on a correctional officer (and was assessed a SHU term). He was seen by mental health staff who completed a SRAC and reported moderate acute and moderate chronic levels of suicide risk based on his history of suicide attempt and current suicidal ideation and increased distress. However, he was not removed from ASU and was not placed in the MHSDS until 9/13/10 at the 3CMS level of care as medical necessity. At that time, he received a SRAC that estimated his level of risk as acute, low,

and chronic, moderate.  His diagnoses on 9/13/09 were Mood Disorder NOS and Major Depressive Disorder, Recurrent, Moderate.  He was noted to have made a suicide attempt in 2004 when he attempted to drown himself in a cell toilet, but the records of that specific incident were not provided.  Recommendations by the clinician who evaluated the inmate and returned him to the MHSDS at the 3CMS level of care as medical necessity included a need for complete evaluation, formal treatment plan, daily psych tech rounds, group therapy "as available," weekly primary clinician contact, and psychiatric consultation regarding psychotropic medications.  He was prescribed psychotropic medications in October 2010 to address his depression and irritable mood.

The inmate was transferred to CCI on 2/4/11 to complete his SHU term.  The suicide report made reference to there being an incident with a correctional officer on that date, but there appeared to have been no RVR in the records reviewed.

The inmate was admitted to the OHU from 2/4/11 through 2/6/11 with a diagnosis of Mood Disorder NOS.  He was discharged back to custody on a five-day follow-up with medications of Zoloft and Risperdal.  The SRE on 2/6/11 noted multiple chronic risk factors including history of emotional, physical, or sexual abuse, Major Depressive Disorder, Psychotic Disorder, "voices," medical illness, substance abuse, violence, poor impulse control, long or life sentence, older than 35 years of age, and male.  Acute risk factors included current/recent psychotic symptoms with the inmate claiming voices and stating "I can handle it," recent violent behavior and staff assault, recent change in housing in the SHU, recent negative staff interactions, and recent disciplinary RVR.  Protective factors included family support, religious/spiritual/cultural beliefs, interpersonal social support, future orientation/plans for future, children at home, active and motivated in psych treatment, sense of optimism self-efficacy, and (curiously) job or school placement even though the inmate was in the SHU.  The chronic and acute estimates of risk were low and low.

A SRE completed on the day before, 2/5/11, noted identical chronic risk factors but also with acute risk factors included suicidal ideation, current/recent anxiety or panic symptoms, hopelessness/helplessness, increasing interpersonal isolation, agitated or angry, disturbance of mood/lability, and safety concerns, in addition to those factors noted the following day.  The protective factors were also identical with an explanation written along with job or school assignment indicating "SHU term, no job – when returns home."  In this SRE there were comments on the mental status examination which is a requirement on part two, that was not completed the following day on 2/6/11.  Despite the inmate continuing to report suicidal ideation without intent or plan, both the acute and chronic risks were estimated as low, but he was continued with OHU placement until stable.

He was seen by the IDTT on 2/17/11 and his diagnoses were Major Depressive Disorder, Recurrent, Moderate and Antisocial Personality Disorder.  His antidepressant medication at that time was Fluoxetine.

After his transfer to CCI, the inmate complained of chronic heartburn and in May 2011 reported that he had been throwing up, could not hold food down, and believed he was suffering from acid reflux.  The inmate had been diagnosed with gastric esophageal reflux disease (GERD) prior to his transfer and high blood pressure and hypercholesterolemia.  His GERD appeared to have worsened and the inmate was noted to have lost 40 pounds

between February 2011 and August 2011. His antidepressant medication was discontinued in May 2011 because of his difficulties with GERD. He had chronic and intractable hiccups as well as other GERD symptoms and was sent to an outside hospital for diagnostic testing to rule out Barrett's Esophagus.

The inmate was treated with Zoloft and Risperdal from October 2010 through May 2011 when these medications were discontinued. He was restarted on Prozac and Propranolol from 7/29/11 through 8/7/11 because of continuing depressive symptoms as well as his ongoing intense symptoms of GERD. He continued to report problems with GERD symptoms including being unable to hold food down, vomiting, intractable hiccups, and weight loss of approximately 20 pounds to his primary clinician on 6/5/11 and to the psychiatrist on 6/16/11. The inmate was noted by a psychiatrist to state that he was tired of arguing with doctors and was "giving up" and the psychiatrist noted the inmate needed medical follow-up. The offender commitment data entry sheet indicated the inmate was hospitalized at San Joaquin Hospital on 7/7/11 and returned on 7/9/11 (he had been evaluated at San Joaquin Hospital from 2/18/11 to 2/20/11 previously).

On 7/18/11 the inmate told officers he was thinking of killing himself and a crises evaluation was completed. He was seen by a clinician who documented his being dysphoric, frustrated, and angry and he received a SRAC where his suicide risk was rated acute: low and chronic: low. He was not placed in the OHU and when seen the following day by a clinician due to pain related to his GERD, was described as doing "much better." Despite these notations of his doing much better, the IDTT found on 7/18/11 that his depressive symptoms had increased and that he had an ongoing medical problem that was causing him to become "very depressed," having poor sleep, and suicidal ideation.

A SRE was performed on 7/29/11 as an emergency assessment and included chronic risk factors of history of emotional, physical, or sexual abuse, chronic pain problem, chronic medical illness, history of substance abuse, violence, poor impulse control, long or life sentence, older than 35 years of age, male gender, and a history of suicide attempts from 2004 which were not noted on the SREs that were conducted in February 2011. The acute risk factors included suicidal ideation, agitated or angry, disturbance of mood/lability, single cell placement, and negative staff interactions. Protective factors included family support, religious/spiritual/cultural beliefs, interpersonal social support, future orientation/plans for the future, children at home, and sense of optimism/self-efficacy. The inmate was reporting a plan to kill himself but was not reporting "a desire to die" despite his reporting a plan to kill himself. The estimates of acute and chronic risks were both low. The inmate was noted to have stated "I'm gonna try you got my word on that" in reference to advice to care for himself and cope with the SHU. The narrative indicated that he denied suicidal ideation and intent despite the form noting that he reported a plan to kill himself. Both the acute and chronic risks were estimated as low and the plan was to return to custody. No mental status examination was included on the form.

Despite his being very depressed and his lack of progress in individual psychotherapy, as well as recurring suicidal ideation and a plan, there were no changes in his treatment. Because of his 40 pound weight loss in five and one-half months, a psychiatrist determined on 7/29/11 to prescribe Prozac and Propranolol with the Propranolol to assist in treating his chronic hiccups. The suicide report noted that the psychiatrist discussed the inmate's condition with the primary care physician. However, there did not appear to be

documentation of that discussion or collaboration to determine the best course for this inmate by both mental health and medical staff in a treatment planning format. The inmate's last clinical contact was on 7/29/11 when his primary clinician saw him and completed the SRE as noted above. At that time the plan was for follow-up by the primary clinician, but no such contact occurred before the inmate committed suicide nine days later on 8/7/11.

The suicide reviewer made note of several concerns generated based on review of this inmate's death. Among those concerns were that the inmate had SREs performed and in those evaluations his chronic risk for suicide was rated as "low" despite the presence of many chronic risk factors including his age, long sentence, gender, history of suicide attempt, history of childhood abuse, history of violence, impulsivity, chronic medical problems including pain, and a history of depressive disorder. The reviewer opined that given the inmate's history, there was no doubt that his chronic risk for suicide should have consistently been rated as moderate and that one of the consequences of underestimating chronic risk may be that the impact of acute risk can appear less significant to the clinician such that overall risk is underestimated. The reviewer also noted the inmate possessed few protective factors and when combined with his moderate chronic risk set the stage for collapse of his ability to cope and his will to live. The reviewer, however, noted that CCI had initiated the proctor mentor program and based on that no formal recommendation was warranted.

A second major concern offered by the suicide reviewer was the inmate's medical condition and gaps or breakdowns in the continuity of care of his chronic GERD, which may have impacted his depressive syndrome. The reviewer noted the inmate's deteriorating medical condition and the impact on his depressive symptoms as well as psychotropic medication prescription. The reviewer noted there was no doubt that his medical condition contributed to his depressive state and may have played a role in his eventual suicide.

There were two suicide reports, one with one problem, the other with two problems, both dated 10/13/11 and endorsed by the directors on 10/31/11. The suicide report identified two problems and quality improvement plans as follows:

Problem 1: A 12 minute delay in applying the AED during emergency medical response procedures was documented on incident reports.
Quality Improvement Plan: The director of nursing or designee at CCI shall conduct an inquiry into this delay and take corrective actions, including the following: (a) Assure that AEDs are readily available to staff for emergency situations, (b) Develop a backup plan for medical staff during weekend hours, (c) Conduct additional emergency response drills to ensure efficiency and to review any changes in the location of emergency equipment, (d) Update LOP as needed to include any/and changes to the procedures.

Problem 2: Breakdown in continuity of care of inmate's __ GERD and a lack of collaboration between mental health providers and medical providers.
Quality Improvement Plan: Under the direction of the chief executive officer at CCI, the mental health program and the medical care program shall convene a QIT to develop a plan to increase communication and collaboration between medical providers and mental health providers.

197

A Death Review Summary was completed by a physician on 9/15/11. The reviewer identified the primary cause of death as suicide by hanging, and co-existing conditions as GERD with erosive esophagitis and gastritis, hypertension, hyperlipidemia, dyslipidemia, chronic headache, chronic low back pain, and Depressive Disorder NOS. The physician reviewed the inmate's contributing cause analysis and indicated that there were failures (1) of provider to provider communication, (2) to follow clinical guidelines, and (3) to communicate effectively with the patient. The summary included recommendations for a management review which would share the summary with the mental health department and peer review subcommittee for all medical providers that were listed for review and/or educational items. The physician noted that on 7/7/11 the inmate was found to be dehydrated due to not tolerating any oral intake, was sent to an outside hospital, and diagnosed with severe grade four actively bleeding esophageal and gastric erosions. He returned to CCI and his symptoms worsened. He was noted as appearing depressed on 7/20/11 and was referred to mental health on 7/28/11. He was seen in the chronic care clinic on 8/1/11 when he denied gastrointestinal symptoms and on 8/6/11 by nursing with complaints of hiccups and GERD burning pain. The abdominal exams were noted to be unremarkable. On 8/7/11 the inmate was discovered hanging.

The physician concluded that the inmate's death was unexpected and possibly preventable. The physician then gave a very detailed review of the inmate's medical care as reflected in the UHR and identified that providers number two and number three at KVSP, and number five, number six, number seven, and number eight at CCI all had departures from the standard of care. The physician also identified two standard of care nursing concerns, namely, (1) KVSP issues from 12/28/10, and (2) CCI issues from the 3/11/11 encounter, as well as referral for additional findings to the nursing reviewers. The physician also identified systemic concerns as being raised about a substandard primary care model at CCI where the inmate was cared for by five different primary care providers. The physician also noted a concern that it was not clear from the records if the IDTT was in place at CCI or what the reasons were for the lack of medical and mental health departments' close communication and joint management of high risk patients such as this one. The recommendations were for the CEO, CME, and CNE at CCI to have copies of the review, a case conference at CCI for all providers, and counseling to providers number one, two, three, five, seven, and eight related to the standard of care issues identified. In addition, peer review subcommittee referrals for providers with one or more extreme departures from the standard of care were recommended for provider number six and nursing counsel referrals were noted to be as per nursing review.

There was no report on a QIP for this inmate's suicide approved by the directors/designees of the statewide mental health program or DAI included in the documents provided. A memorandum dated 12/14/11 to the chief of mental health and CEO of health care services at CCI from the SPRFIT coordinator/staff psychologist at CCI indicated that the executive summary of the suicide report was reviewed and QIPs were discussed and implemented. There was also some discrepant information related to QIP number one in which CCI staff members were under the impression that the problem was going to be removed after documentation demonstrated there was not a 12-minute delay. There was an attached memo and packet from the EMRRC regarding QIP number one. With regard to QIP number two, the memorandum indicated it was completed and there were attached

documents from the quality improvement team that planned to further discuss and attempt to resolve problem number two.

A memorandum from the suicide response coordinator, clinical practices division, DCHCS to the chief of clinical practices, CCHCS dated 1/1/12 referenced documents pertaining to QIP number one that indicated there was no delay in use of the AED during emergency response procedures for this inmate. The EMRRC reviewed all documentation and determined the emergency measures were timely and adequate. Further, an interview by senior mental health staff providers to the CEO of CCI also concluded that procedures were followed and completed in a timely manner without significant delays. Discussion was had within the EMRRC regarding leadership during the emergency response measures and a need for improvement in recordkeeping. As a result of this information, QIP number one was removed from the suicide report. Minutes from the EMRRC meeting dated 8/15/11 were also provided.

With regard to QIP number two, QIT meeting minutes dated 12/8/11 were provided which included the QIT members as the chief physician, chief medical executive, senior psychologist and chair (staff psychologist/SPRFIT coordinator). These minutes indicated that there was review and discussion of a clear need for more collaboration and communication between medical and mental health staff. They also noted a need to utilize existing forums like the "morning huddle" or invite primary care physicians to IDTT meetings to be part of the treatment team; it was noted that mental health was able but rarely made referrals to medical to address issues or ask for evaluation of a specific symptom or condition. Additional documentation of the charter of this QIT dated 12/8/11, and final recommendations dated 12/14/11, were also provided.

**Findings:**  This inmate's suicide death appears to have possibly been foreseeable and highly likely preventable. There were identified increased risks for the inmate and additional measures to both treat and manage the increased risk were not documented by mental health staff. There were consistent determinations that his acute and chronic risks were low despite his deteriorating medical condition including pain, serious weight loss, and inability to eat and maintain hydration, which appeared to be underestimated and did not generate utilization of existing methods to include and collaborate with medical staff. Similarly, medical staff who saw the inmate in the chronic care clinic, and nursing staff, did not utilize existing mechanisms to meet with mental health staff given their observations of the inmate's deteriorating physical condition and depression. The inmate's death is very likely to have been preventable had these measures been taken. It is unclear why the suicide reviewer did not determine that the inadequate assessments of the inmate's suicide risk factors and incorporation of his deteriorating condition and the static risk factors over the long term, particularly given the reduction in treatment interventions including psychotropic medications, were not offered as a formal recommendation.

## 20.  Inmate T

Brief History:  This inmate was a 50-year-old Caucasian male who committed suicide by strangulation on 8/19/11 at HDSP RC. He was a participant in the MHSDS at the EOP level of care and was the sole occupant of his cell in the RC at the time of his death. The inmate re-entered the CDCR on 6/21/11 via the HDSP RC for his fifth prison term after being arrested for trespassing and being under the influence, as a parole violation. His next parole date would have been 12/18/11.

199

The inmate was discovered on 8/19/11 at approximately 3:08 p.m. The control booth officer called a medical emergency via the institutional radio at approximately 3:08 p.m. for this inmate, who was unresponsive in his cell. The inmate was the sole occupant of the cell and was lying on the top bunk. A sergeant looked into the cell and saw what appeared to be fresh blood on the sheet that was located on the mattress on the lower bunk. The sergeant immediately assembled an emergency medical cell entry team consisting of several officers and a LVN. Staff donned PPE and at approximately 3:18 p.m. the team made entry into the cell, a shield was placed over the inmate, the inmate was placed in handcuffs and leg restraints, and a correctional officer noticed a noose made of sock material tied around the inmate's neck, and immediately cut the noose. A gurney with a backboard was pushed into the cell, the inmate was placed on the backboard on the gurney, and the LVN attempted to provide oxygen to the inmate but was unsuccessful. The inmate was carried out of the cell into the dayroom area and the LVN noticed another noose made of sheet material on the inmate's neck; however, that noose had already been cut. The LVN removed the noose and the sergeant removed the handcuffs while a correctional officer placed waist restraints on the inmate. The LVN subsequently placed an ambu bag on the inmate and started administering artificial breaths, while a second LVN started CPR. A physician ordered the inmate to the CTC TTA. The incident reports did not provide a timeline for the emergency response.

The suicide report provided a timeline. It indicated that the inmate was discovered at 3:08 p.m. when he did not come out of the cell when the cell was opened by the control officer. Two floor officers approached the cell and observed the inmate lying face down on the metal upper bunk with the mattress on the floor. The suicide report indicated the mattress appeared to have blood on it and the control officer called the Code One emergency. The suicide report indicated the timeline was at 3:18 p.m. when the emergency medical cell entry team entered the cell. It also indicated that the LVN started chest compressions while a second LVN administered breaths with the ambu bag at 3:20 p.m. The timeline continued that the van arrived and transported the inmate to the CTC, where he arrived at 3:23 p.m., and a physician pronounced the inmate dead at 3:44 p.m. There was no mention in the suicide report or the incident reports of the AED being brought onsite during the emergency response.

An autopsy report was provided by the Washoe County ME/Coroner's Office and indicated the autopsy was performed on 8/20/11. The cause of death was stated as "probable asphyxia due to ligature injury to his neck," and the manner of death was stated as "determination resides with the Lassen County Sheriff/Coroner." A toxicology report was provided and indicated under positive findings "none detected." There was no report by the Lassen County Sheriff/__ included in the documents provided.

The suicide report recounted the inmate's criminal justice history. According to the report, he had no known juvenile criminal history. The suicide report referenced the inmate having had multiple misdemeanor offenses related to alcohol and drug abuse beginning when he was age 19. It also referenced one prior prison term with the CDCR for convictions of two counts of driving under the influence with priors resulting in a 16-month sentence that began on 11/6/96, with parole on 8/19/97. The inmate was convicted of obstructing/resisting an executive officer and received a prison term of three years four months. He entered the CDCR at the HDSP RC on 7/8/08. Records indicated that he

paroled on 11/26/09 and was returned to custody on 3/11/10 for making criminal thefts and evading a police officer. He paroled again on 10/5/10, but was returned on 10/19/10 with an arrest for alcohol use. He paroled for a third time on 12/14/10 and returned on 12/21/10 for being drunk in public and using alcohol. His fourth parole was 3/6/11 and he returned on 3/10/11 for disturbing the peace, alcohol use, and being under the influence of a controlled substance.

The inmate was returned to the CDCR on 6/21/11 after having been arrested on 6/11/11 and 6/18/11 for charges of trespassing and being under the influence, respectively. His next parole date would have been 12/18/11, but he committed suicide on 8/19/11.

According to the records, the inmate had a history of alcohol and drug abuse beginning in his adolescence. He was receiving supplemental security disability income (SSDI) which was most likely based on mental illness as the inmate was noted to have no physical disabilities; this indicated he was being treated for mental illness prior to his incarceration. No UHR was provided regarding his incarceration in 1996-1997, but the suicide report referenced that he was housed at CCC, which does not house MHSDS inmates; the conclusion was therefore that he was not in the MHSDS. During his second CDCR admission, which began on 7/8/08, he had been diagnosed with Bipolar I Disorder, Severe, Manic. He was also diagnosed with Unspecified Mental Disorder. While at the HDSP RC, he was admitted to the MHCB from 10/16/08 through 10/23/08 and was admitted again from 11/19/08 through 12/1/08. It appeared from the records that despite these two MHCB admissions, the inmate was not placed in the MHSDS at the 3CMS level of care until after he had been transferred to SQ RC on 1/13/09. He was subsequently placed at the EOP level of care on 4/15/09. He was then transferred to CMC on 5/13/09, where he remained until 11/26/09, when he was paroled. Prior to his parole, he was again admitted to the MHCB from 7/14/09 through 7/20/09. The inmate was treated in the Parole Outpatient Clinic with the antipsychotic medication Haldol and Cogentin for side effects. Records indicated that he suffered from tardive dyskinesia, suggesting that he had had past treatment with antipsychotic medications.

The inmate returned to HDSP RC on 3/11/10 at the EOP level of care and had an MHCB admission from 4/13/10 through 4/27/10. He was returning to the MHCB on 5/1/10 because of decompensation when he assaulted a correctional officer during a cell extraction after he had refused to leave the cell to receive medication by injection. The inmate was placed in a MHCB cell and ten days later required extraction again. Because of extremely threatening behavior and psychosis, a Keyhea order was initiated on 5/6/10; however, by the time the Keyhea hearing was held, the inmate had stabilized and was accepting medications. The Keyhea order was issued but expired on 12/12/10. The inmate remained in the MHCB for six weeks according to reviewed records. He was also assessed a SHU term for the assault on the correctional officer on 5/1/10 despite recommendations from mental health staff that his mental illness was significant in his receiving the RVR. Records indicated the inmate had poor insight into his need for treatment, but was cooperative when he was stable on medications.

After MHCB discharge, the inmate was housed in ASU until he was paroled. As referenced earlier, his parole never lasted more than two weeks and upon return he was placed back at the EOP level of care. He was housed in ASU because his SHU term

continued.  Even when endorsed for an ASU hub, he was never transferred from the HDSP ASU after his returns.

The inmate's last return to the CDCR was on 6/21/11.  Records indicated he was floridly psychotic, reporting that he was a captain in the military and that he was threatening to kill staff before he left for orbit as he was from a different planet.  He was noted to be uncooperative and was placed directly in the MHCB because of grave disability, where he remained until 6/28/11.  After this discharge, he was placed in the EOP level of care with five-day follow-up, but once again was in administrative segregation.  He remained in ASU until his return to the MHCB on 7/12/11, when he had clearly decompensated and was psychotic, and where he remained until 7/28/11.  The inmate was noted to have extremely poor insight and judgment.

The inmate was transferred from ASU to the RC on 8/11/11 because his SHU term had been completed.  It was unclear as to why he was not transferred to the EOP program, particularly given his noted decompensation and poor adjustment on his returns to the CDCR.  According to the suicide report, between the time of his transfer to the RC on 8/11/11 and his death on 8/19/11, he attended one EOP group and had two out-of-cell primary clinician contacts in addition to daily wellness checks at cell front.

The suicide reviewer noted that the inmate received intensive mental health care with clinical contacts in some form almost daily throughout his stays at HDSP.  The reviewer was impressed by the efforts of the mental health staff to treat the inmate as he was a severely mentally ill man in a high security prison setting.

There was no documented suicide history.  The SRACs completed for him between 4/13/10 and 7/28/11 (there were seven, all related to his MHCB admissions and discharges) all estimated his level of risk as low.

The suicide reviewer also made reference to the inmate having appeared to have adjusted to incarceration when he was at CMC in the EOP program.  However, after his returns from parole to the HDSP RC in usually a decompensated state or decompensating during these returns, the inmate received multiple RVRs.  The reviewer noted five RVRs during a 30-day period from 4/10/10 through 5/10/10.  This resulted in his placement in the MHCB on two occasions and two of the RVRs occurred in the MHCB prior to his being stabilized.  Mental health staff found in all five RVRs that his mental illness significantly contributed to the behavior and recommended it be considered as a mitigating factor.  The senior hearing officer (SHO) did consider mental illness as mitigating in his first two RVRs; however, the SHO did not consider mental illness as being a mitigating factor in his subsequent two RVRs on 5/1/10 and 5/10/10, despite mental health recommendations to the contrary.

The inmate's three RVRs from 5/1/10 through 5/10/10 and a fourth on 7/12/11 all involved obstruction of a peace officer and one battery on a peace officer when he kicked a correctional officer while being escorted to the MHCB after refusing medications, and all occurred while he was refusing medications.  However, in three of these four, the hearing officer did not consider mental health staff recommendations that mental health factors were present and significantly affected his behavior and on the fourth (7/12/11), the RVR was pending adjudication.

202

The inmate was assessed a SHU term for 18 months and began serving the SHU term after six weeks in the MHCB.  There was no indication in the records that with the inmate's multiple MHCB admissions and extended MHCB length of stay for six weeks that he was referred to a higher level of care by HDSP staff.  He had been endorsed for transfer to the CSP/Sac EOP in July 2010 and April 2011, but these endorsements expired because he was within 30 days of parole.  Despite his SHU term being completed on 7/25/11 after his final return from parole on 7/21/11 while he was in the MHCB, he was returned upon discharge from the MHCB to ASU where he remained until 8/11/11.  He was then transferred back to the mainline RC rather than to an EOP program.

The suicide reviewer indicated there were a number of concerns generated during the course of the review, but stated that the majority did not represent departures from policy requirements and therefore did not rise to the level of formal recommendations.  The reviewer stated their concerns for discussion and consideration by institutional and headquarters staff as follows:  (1) the time it took for the emergency medical response team to enter the cell after the inmate was discovered unresponsive, which was ten minutes, and therefore too long to save a life if the inmate had stopped breathing.  The reviewer stated that this was accepted protocol and accepted within statewide standards; (2) the complexity of providing care for an EOP inmate in a non-EOP institution and although the inmate was never incarcerated for a long enough period of time to allow for transfer to an EOP setting, the reviewer opined that he was provided with excellent clinical care at HDSP.  The reviewer noted that the fact that the inmate was on a SHU term and housed in ASU exacerbated his condition which again was impacted by extension of the SHU term; (3) the disciplinary process and the penalties given to the inmate despite his chronic and severe mental illness, and recommendations by mental health clinicians that his mental illness be considered as a mitigating factor in the assessment of his penalty.  The reviewer noted that in two RVRs the hearing officer did consider the inmate's mental illness and in the remaining three RVRs, the hearing officer did not.  He/she justified not considering mental health staff's recommendations because the hearing officer observed the inmate was able to recall the events leading to the disciplinary actions.  The reviewer noted that all five of the incidents occurred when the inmate was clearly mentally unstable, was refusing medications, and required cell extractions to receive care.  The reviewer noted that the hearing officer who would not consider mental health factors as mitigating wrote "I respectfully disagree with this assessment.  Inmate __'s statements during this hearing demonstrate he had a very clear recollection of the situation….This does not, in my professional opinion, qualify as 'poor commerce with reality.'  I find that there was willful intent behind inmate __'s actions."  The reviewer noted that the mental health clinician documented regarding that specific RVR that the inmate's "judgment and behavioral control may have been markedly diminished due to his mental disorder" and that the hearing officer disagreed on the basis that the inmate had a clear recollection of the situation and could articulate his own actions.  The reviewer continued that it was concerning that a custody officer considered his or her "professional opinion" about the influence of mental illness to be superior to that of a trained and licensed mental health professional, particularly when the RVR occurred when the inmate was under escort to the MHCB for behavior that was already out of control; (4) concerns involving the inmate's need for parole planning and the need for more extensive pre-parole planning for inmates such as these; (5) issues raised by custody staff in the RC housing unit which the reviewer found worthy of discussion and was the subject of a recommendation in the QIP section of

the report.  That issue was housing EOP inmates with non-EOP inmates and will be addressed in the QIP section of the report; and (6) the delay in moving the inmate to the mainline RC after the SHU term ended and instead placing him in ASU for another two weeks.  The reviewer opined that the inmate was moved frequently, which added to his instability, and stability in housing may have reduced his anxiety.

In conclusion, the reviewer opined that the death of this inmate provided a reflection of several systemic factors in the treatment of severely mentally ill inmates.  This inmate may have continued through the revolving door of incarceration, parole, incarceration, and parole until his term was discharged.  The reviewer recommended clear plans and concrete guidance toward services that were available in the community for him.

The suicide report identified two problems and QIPs as follows:

Problem 1:  The ten minutes taken to enter the cell, while not in violation of any policies, raised concerns.  Similar concerns have been raised with previous suicides at HDSP. Quality Improvement Plan:  HDSP conducts on-going training and monthly drills for emergency cell entry.  The Warden has expressed interest in learning more about what other institutions do to decrease entry time while maintaining staff safety.  DAI will look further into this issue.

Problem 2:  The policy that dictates that inmates in the EOP level of care be housed with other EOP inmates and not with inmates in the general population.  This requirement resulted in Inmate __ being singled celled, which increased his vulnerability at a difficult time. Quality Improvement Plan:  The SPRFIT at Headquarters CCHCS shall add this item to the meeting agenda in order to discuss and generate possible recommendations for policy changes.

A Death Review Summary dated 9/26/11 was provided by a physician.  The physician reported the primary cause of death as suicide by hanging and noted the co-existing disorders of Schizoaffective Disorder, Bipolarity, and enrolled in EOP.  The inmate had no notable past medical history.  The reviewer noted with regard to standard of care of medical providers delays in opening the cell and initiating CPR, calling EPS, and initial and repeated application of the AED (18 minutes after the alarm sounded and not after every two cycles of CPR).  Recommendations were for health care management to review with all participants the flaws in this code.

On 11/7/11 the Deputy Director (A) Statewide Mental Health Program, and Director (A) DAI issued their report on implementation of the Quality Improvement Plan for this inmate's suicide, in response to the suicide report dated 10/5/11.  In their report, the directors included a memorandum dated 10/19/11 from the HDSP warden to the senior psychologist, suicide response coordinator at DCHCS.  In that memorandum, the warden stated that all protocols were followed in accordance with HDSP's operational procedure for emergency medical extractions (OP118).  The warden noted that while HDSP respects and values the sanctity of human life, their number one priority always lies with the safety of the public and their staff.  The warden also noted that this has been a contention in the past and HDSP has been training their staff during the annual bloc training on the donning of personal protective equipment (PPE) and the emergency medical extraction process, and

that each month staff conducts training drills to ensure consistency throughout the prison. Further, each control booth is stocked with the appropriate number of PPE kits to accommodate an extraction at any given time, which ensures there are no delays in the extraction process. The warden concluded by stating that HDSP is taking a proactive approach to ensure they are providing healthcare in the fastest and safest manner possible when inmates are discovered non-responsive within their cells. The warden continued that staff would be trained to ensure efficiency in this area of concern and strive to improve response times where possible. Further, he noted HDSP is open to any alternative procedures brought forth from other institutions which offer an acceptable level of protection to the staff and improvement in extraction times.

With regard to QIP number two, the minutes of the DCHCS SPRFIT meeting of 10/10/11 were provided. An accompanying memorandum from the suicide response coordinator, DCHCS to the chief, clinical practices, mental health program, CCHCS, reported that during the 10/10/11 meeting, the possibility of making a change in the current policy was discussed. The memorandum went on to state that the team decided that the policy continues to be the best approach, given the greater chance that inmates in EOP can be easily victimized by non-EOP cellmates and that if the policy allows for a case-by-case determination of housing EOP and non-EOP inmates together it may introduce an increase in victimization. The memorandum concludes with the team determining that at this point the recommendation is to maintain current policy.

**Findings:** This inmate's death by suicide does not appear to have been foreseeable as the inmate had not in the past reported suicidal or self-harm intent. It is concerning that the inmate was not transferred to an EOP hub during his incarceration, and that upon release from ASU he was transferred to the RC mainline rather than to the RC EOP program. This inmate's suicide, however, appears very likely to have been preventable for a number of reasons.

The practice at HDSP to assemble an emergency medical entry team that takes ten minutes to enter the cell in a medical emergency is simply unacceptable. To suggest that any individual facility is so different from its sister facilities that it can, as a matter of course, have such delays during a medical emergency should be a primary focus for DAI and should have been corrected immediately in cases like this. The suicide reviewer appropriately references that this is not the first case in which such a delay has occurred.

This inmate's death may have been preventable if emergency procedures had been effected timely. In addition to the ten minute delay to enter the cell, records indicate that there was an additional two minute delay before CPR was started and another eight minute delay from the time of entry into the cell before the AED was applied; this was only after the inmate was transported to the CTC. This is a violation of policy in that the AED was not transported to the inmate's cell for utilization at that time. Further, this inmate had multiple MHCB admissions, with three occurring within a short time period. One of these MHCB admissions had a length of stay of six weeks. Thus, the inmate met multiple indicators for consideration of referral to a higher level of care such as DSH. However, there was no documentation in the records that the inmate was ever referred for a higher level of care despite staff's clear understanding of his repeated decompensations and very rapid returns from parole in a decompensated state. The Special Master's reviewer certainly agrees with the suicide reviewer that this inmate's death raises serious questions

205

about systemic failings and particular practices that appear to have continued despite there being suicides at HDSP.

## 21. Inmate U

Brief History:  This inmate was a 30-year-old Caucasian male who committed suicide by hanging on 9/16/11 at the Pelican Bay State Prison (PBSP) PSU.  He was a participant in the MHSDS at the EOP level of care at the time of his death.  He was housed in the PSU and was the sole occupant of his cell.  He entered the CDCR on 9/7/01 via the DVI RC, having been convicted of indecent exposure with priors and sentenced to 16 months in the CDCR.  His EPRD was 4/18/02, but it was eventually recalculated to 3/12/23.  The inmate was at level IV placement and MaxR custody status at the time of his death.

The inmate was discovered on 9/16/11 at approximately 11:58 a.m. by two correctional officers who came to his cell to escort him to a medical appointment.  One correctional officer announced to the inmate he had psych line.  The cell light was out and he saw the inmate lying face down on the floor with his arms tucked against his chest and his forearms and hands underneath him.  The inmate's head was approximately ten inches off the floor with a sheet wrapped around his neck that was tied to the cell desk and fastened to the cell door.  The correctional officer called the inmate's name and received no response and yelled to the control booth officer for medical staff to respond.  The sergeant directed the control booth officer to open the cell door, which opened approximately ten inches and then jammed.  The sergeant reached into the cell and used the scissors to cut the sheet off of the cell door.  Once the cell door was completely opened, the sergeant cut the inmate down, and medical staff began to perform CPR.  Medical staff also used the AED on the inmate, who was then placed on a backboard and onto a gurney.  The inmate was transported to the facility gate and placed in an ambulance.  He was subsequently transported to Sutter Coast Hospital and pronounced dead by a physician.

A timeline was provided in the incident reports.  It indicated that the correctional officer saw the inmate on the floor unconscious with a sheet wrapped around his neck at 11:58 a.m., at which time a radio transmission was announced.  At 12:00 p.m., the inmate's door was opened with medical staff present, and security squad personnel arrived.  At 12:01 p.m. medical staff started CPR and placed the AED on the inmate.  At 12:02 p.m. the inmate was removed from the cell and placed on a backboard and gurney and at 12:03 p.m., the ambulance was contacted for a Code Three response.  The inmate was transported out of the unit to the gate at 12:04 p.m. and at 12:06 p.m., the ambulance transported him from the gate to outside of the facility as medical staff continued to perform CPR and utilized the AED.  At 12:13 p.m., the Code Three ambulance was on the grounds, at 12:20 p.m. the inmate was placed in the ambulance, and at 12:28 p.m. the ambulance departed the grounds en route to Sutter Coast Hospital.  At 12:40 p.m., the inmate was pronounced dead by a physician at Sutter Coast Hospital.

An autopsy report was provided by the County of Del Norte, Office of the Sheriff indicating the cause of death was hanging and the classification of death was suicide.  A toxicology report was provided and indicated there was no alcohol or coroner's panel (amphetamines, benzodiazepines, cannabinoids, cocaine, opiates, or phencyclidine) detected.  Risperidone at 0.0014 ng/l, Lithium at 0.44 meq/1, Trihexyphenidyl at 27 ng/mL, and Paliperidone at 9.7 ng/ml were detected in blood specimens.

The suicide report recounted the inmate's criminal justice history, which began as a juvenile. According to the records, this inmate's first arrest occurred at age seven or eight for breaking a window and fighting at school. He was returned to his parents' home. When he was nine he was arrested three times including twice for burglary and once for throwing rocks at cars. He was sentenced to six months informal probation and restitution. At age 12, he was charged with battery with serious bodily injury and two counts of burglary. At age 15, he was charged with two counts of indecent exposure and battery and committed to Camarillo State Hospital until age 17. When he was 18, he was again charged with indecent exposure and battery and sent to the CYA. The suicide report indicated that he obtained more than 65 disciplinary actions while at the CYA, including 40 for indecent exposure or assault. He was convicted for indecent exposure at age 20 while at the CYA. Four months later, he was convicted of indecent exposure with priors and was sentenced to 16 months in CDCR. This was his original commitment offense to CDCR, which he entered on 9/7/01 via the DVI RC as noted above.

After he arrived at DVI RC on 9/7/01 from the CYA, the inmate was housed in ASU due to his fear of retaliation from other inmates who he had known from the CYA. He had accepted a plea bargain and was convicted of assault with force likely to cause great bodily injury and possession of a weapon while in prison after he had assaulted another inmate with an unknown weapon. He was sentenced to four years with an EPRD of 12/12/05. During his course of incarceration, he received multiple RVRs with possible SHU terms. He was transferred to CSP/Corcoran on 7/12/02 and had received six SHU terms for RVRs including battery on an inmate (two counts), battery on staff, assault on an inmate with a weapon, aggravated battery on a peace officer, control of a weapon, and indecent exposure/masturbation.

On 9/24/03, he was found guilty of two counts of indecent exposure with priors and was sentenced to seven years and four months to run concurrently with his original sentence. He also received a four year sentence from Monterey County subsequent to incidents of indecent exposure at SVPP.

The suicide report noted that a case review conducted at PBSP indicated that between 2002 and July 2011 the inmate received 84 RVRs for indecent exposure, 26 for resisting a peace officer, one for making a threat of force or violence, nine for battery on a peace officer, three for disorderly conduct, four for disrespect/potential for violence, seven for destruction of state property, five for refusal to obey orders, and two for willfully delaying a peace officer. The suicide report noted that there were three RVRs pending at the time of his death within the CDCR and the counts reflected above did not include violations that occurred during his ten DSH admissions. The suicide report also stated that a significant number of RVRs resulted in mental health evaluations, but clinicians concluded that mental health issues did not contribute to the commission of the offenses.

The suicide report also noted that the inmate filed multiple appeals during his incarceration, complaining about staff, his special treatment plan, institutional policies and procedures, suicide issues, and the need for orthopedic shoes and a soft mattress. The appeals were not successful. The suicide report noted that the inmate's classification score at the time of his death was 999 points, which is the highest entry field for points; custody estimated his points to be above 1500. The inmate was at a level IV placement and MaxR custody status, and although he had been approved for double celling, he had not been

assigned a cellmate at the time of his death. As noted above, his final EPRD at the time of his death was 3/12/23. During the course of his incarceration, he had been incarcerated at DVI, CSP/Corcoran, CMF, VPP, PVSP, SVPP, SVSP, and finally, at PBSB in the PSU unit since 6/1/10. He received a developmental disability evaluation on 9/7/01 and was determined NCF, i.e., not requiring services.

As noted above, the inmate's mental health history began as a child when he was diagnosed with ADHD and continued throughout his life. Treatment for mental illness, sexual paraphilias and personality disorders also continued throughout his life. On 9/27/01, the inmate requested mental health services and was placed at the 3CMS level of care. The records indicated that he was placed at the 3CMS level of care for approximately 18 months and the EOP level of care for eight years and five months. His initial level of care was 3CMS from September 2001 through December 2002 and an additional four months later in his incarceration.

The suicide report was very comprehensive, detailed the inmate's mental health treatment, and was consistent with the UHR. When the inmate was placed in MHSDS at DVI, he was diagnosed as having an Adjustment Disorder and Exhibitionism. During his incarceration, he was diagnosed with Bipolar II Disorder and ADHD. He had other diagnoses of affective disorders including Mood Disorder NOS, Schizoaffective Disorder, Intermittent Explosive Disorder, and Malingering. He also had Axis II diagnoses of Borderline Personality Disorder and Antisocial Personality Disorder.

On 7/12/02, the inmate was transferred to CSP/Corcoran and remained there until he was transferred to CMF in the VPP on 10/31/03. He reported that he was suffering from depression and suicidal ideation and auditory hallucinations. While at CSP/Corcoran, he was admitted to the MHCB in July 2002, September 2002, November 2002, December 2002, February 2003, April 2003, June 2003, and October 2003. He was prescribed antidepressant and antipsychotic medications beginning in July 2002. He attempted an overdose after tying a sheet to the ceiling vent of his cell after boarding up his window. He had a brief course of involuntary medication as a danger to self from September 2002. In December 2002, his level of care was changed from 3CMS to EOP. He was admitted to the VPP at CMF in October 2003 after he had attempted to hang himself at CSP/Corcoran. He returned to CSP/Corcoran, but was again returned to VPP on 3/1/04 for the first of five subsequent VPP admissions between March 2004 and June 2005. He was transferred to PBSP in July 2005 and remained on a Keyhea order because of danger to self and others.

After his transfer to PBSP on 7/5/05, the inmate remained at the EOP level of care until his death in 2011, with the exception of a few months from 4/13/11 through 8/25/11 when he was at the 3CMS level of care for a new pilot program that was being offered at PBSP. During his time at PBSP, his primary diagnosis was Paraphilia NOS and Personality Disorder NOS. The 3CMS pilot program was in the ASU unit and included inmates seeing their clinicians weekly for individual therapy, one two-hour weekly group therapy session, and psychiatric support services. While in this pilot program, the inmate had seven MHCB admissions from 5/1/11 through 5/11/11, 5/28/11 through 6/6/11, 6/16/11 through 6/23/11, 7/13/11 through 7/25/11, 7/31/11 through 8/10/11, and 8/25/11 through 8/30/11. Record review indicated the inmate was considered for transfer to DSH for a higher level of care. However, he had been placed in DSH programs in the past without significant

improvement and although considered for transfer, the treatment team decided to retain him in the 3CMS pilot program in administrative segregation.

The records indicated that he received appropriate care in the MHCBs as well as five-day follow-up after discharge. He was returned to the EOP level of care on 8/30/11 after his last discharge from the MHCB and five-day follow-up was completed. He was housed in the PSU at PBSP because of his multiple SHU terms. He also remained on a Keyhea order through 2011 until the time of his death. The Keyhea order was based on the inmate being determined to be a danger to self. He also reported command hallucinations telling him to expose himself to others. His indecent exposures was noted to have occurred on average of two times per week to any female staff member that he may have encountered, and his exposures included women in the CDCR and DSH. In the last few years of his life while at PBSP in the PSU, MHCB or at DSH, the inmate was prescribed Geodon, Prolixin Decanoate (injectable), and Depakote through June 2011. In July 2011 his medications consisted of Prolixin Decanoate, Prolixin by mouth and Depakote. In August 2011, they were changed again to Risperdal, Depakote, and Invega. The Depakote was changed to Lithium in September 2011, in addition to the Risperdal and Invega. The inmate remained in the 3CMS pilot program in ASU until 8/30/11. He was subsequently returned to the EOP level of care and placed in the PSU.

The records demonstrated that a behavioral plan was developed to provide a mechanism for the inmate to earn privileges if he would refrain from inappropriate sexual behaviors for specified periods of time. Unfortunately, the plan had not been implemented at the time of the inmate's death. There were numerous notations in the record that staff believed the inmate used statements of suicidal ideation to achieve changes in his location within PBSP as well as to go to DSH. However, he had engaged in suicidal and self-injurious behaviors. These included an overdose of Depakote in August 2004 requiring his being sent to an outside hospital, scratching his wrists with dried putty, a razorblade and a piece of glass from a broken television, and cuts on his arms from a piece of a broken cup. He engaged in head banging, hyperventilation to the point of blacking out, and placing nooses around his neck at various times while reporting intent to kill himself. The SREs performed on him varied in their estimates of level of risk from low risk when it appeared the inmate may have been utilizing threats of self-harm to change his conditions of confinement, to high risk for eventually completing suicide, perhaps by accident or intentionally because of his efforts to change his conditions of confinement and his mood disorder symptoms.

The UHR from approximately September 2010 through September 2011 documented the inmate's individual meetings with his psychologist, psychiatrist, and IDTT meetings. It also noted his statements to custody that he was suicidal and retractions of his being suicidal after he was admitted to MHCBs. The UHR noted his being angry, irritated, and defiant when restrictions were placed on him because of his repeated indecent exposures to female staff. There were notations in the record regarding his complaints of dental problems and refusals of extractions because he wanted the teeth to be filled, complaints of back and foot pain, headaches, and chest pain, with appropriate evaluations by medical. There were also statements that he did not intend to kill himself because he was a Christian and Christians do not "do those sorts of things."

The suicide report provided summaries of the inmate's level of care changes, SREs, and psychotropic medications from March 2011 through his death in September 2011. The eUHR reviewed was consistent with the charts reflected in the suicide report in terms of diagnoses, level of care, medications prescribed, and SREs. The inmate had 16 SREs from 4/19/11 through 8/30/11. All of the SREs estimated his suicide risk as low except on 5/1/11 when the estimate was moderate and he was admitted to the MHCB, 7/13/11 when the estimate was high and he was admitted to the MHCB, 7/21/11 when the estimate was both high and low and he was admitted to the MHCB, and 8/25/11 when the estimate was high and he was admitted to the MHCB. Notably, on 8/30/11 the SRE estimate of risk was low when the inmate was discharged from the MHCB to the EOP level of care and then to the PSU. He was scheduled to meet with his psychiatrist on 9/16/11, but was discovered hanging before that appointment could be completed.

The CDCR suicide reviewer opined that the inmate did not intend to die but was intending to be found as he had been so many times in the past. The reviewer based this opinion on conversations with clinical staff who knew the inmate and stated that there were no distinguishable precipitating events, mood changes, or changes in his normal behavioral pattern before his death. The reviewer also commented on the inmate's diagnoses being changed over time to Personality Disorder NOS with Antisocial, Borderline, and Narcissistic Features and Paraphilia NOS as clinical staff determined that he did not suffer from an impulse control problem that would indicate a diagnosis of Exhibitionism. The reviewer also stated the opinion that mental health clinicians provided the inmate with every possible clinical intervention available in CDCR. It was suggested that perhaps the inmate was in need of a type of treatment unavailable in CDCR such as Dialectical Behavior Therapy (DBT) for the treatment of personality disorders requiring multiple, intensive, and prolonged interactions between patient and therapist that "in an institutional setting is likely cost prohibitive" or possibly long term treatment in DSH. The reviewer also opined that on the morning of 9/16/11, the date of his death, the inmate decided to suspend himself from a noose in order to achieve his goal of transfer to DSH; whether he hyperventilated or just miscalculated the time that custody would arrive at his cell was unknown, but by the time he was found he was unable to be revived. The reviewer noted that there was a single recommendation that did not rise to the level of a formal quality improvement plan. It was based on the PSU primary clinician not completing a SRE when the inmate was discharged from the MHCB and returned to the PSU on 8/30/11, which is a PBSP local operating policy rather than an MHSDS statewide policy. This recommendation was not included in the quality improvement plan section of the report. Finally, the reviewer commended the PBSP staff for the thorough manner in which the inmate's treatment was handled other than the single omission that was noted above. There were no recommendations generated to require a quality improvement plan as a result of the CDCR review.

A preliminary death review report dated 10/5/11 was provided by the PBSP health care services death review committee. The report summarized the inmate's presentation and treatment history including his suicidal/self-harming behaviors and the last Keyhea order that was granted on 6/7/11 based on his danger to self. He had used cup fragments to superficially cut both arms and engaged in head banging and punching his hands on the cell wall. The review also noted the inmate's near lethal suicide attempts that occurred while under Keyhea court order as far back as 2005 and opined that these behaviors were

secondary to his severe personality disorder.  The last SRAC on 8/30/11 determined that the inmate was a low risk although he was considered a chronic suicide risk.

The PBSP death review committee also reviewed the emergency response and determined that it was appropriate.  In addition, pharmacy services, mental health services, case management, and psychiatric management were all appropriate with the exception of a SRAC not being completed on 9/6/11 by the primary clinician; this was to be addressed in supervision.  Further mental health services, dental services, custody operations, nursing services, primary care provider services, health record services, and emergency response were determined to have been appropriate with no recommendations in any of those areas.

A Death Review Summary dated 11/21/11 was completed by a physician for the CPHCS.  The physician provided a review of the primary cause of death as asphyxiation by hanging and the category of death as suicide, as well as the inmate's mental health and medical histories, medication and transfer histories, and the emergency response.  The physician determined that the standard of care for medical providers was met, there were no systemic concerns, and the only recommendation was for mental health to conduct a suicide review of the case.

**Findings:**  Based on this reviewer's analysis of the records which are consistent with the thoroughness of the review reflected in the CDCR suicide report, it does not appear that this inmate's suicide death was either foreseeable or preventable.  The inmate clearly had chronic risk factors for suicide and each acute manifestation of self-harming behavior and/or suicidal ideation was responded to appropriately by clinical staff.  In addition, management plans included transfers to higher levels of care including MHCBs and/or DSH when indicated.  The omission of a required SRAC warranted a formal recommendation.

## 22.  Inmate V

Brief History:  This inmate was a 28-year-old Hispanic male who committed suicide by hanging on 09/20/11 at CSP/Sac.  He was a participant in the MHSDS at the EOP level of care and was single celled in the PSU at the time of his death.  He entered the CDCR via the RJD RC on 02/23/03.  He had been convicted of attempted murder of a police officer and sentenced to an indeterminate term of life in the CDCR.  His MERD was 11/02/07.

The inmate was discovered on 09/20/11 at 11:00 p.m. by a floor officer conducting a 2300 hour count.  The inmate was the sole occupant of his cell.  The correctional officer observed him in a standing position at the center of the cell facing the back of the cell with one end of a noose around his neck and the other end attached to the ceiling light fixture.  The inmate was positioned with both feet on the ground, with minimal bending of his torso, and his head was moderately angled downward.  The correctional officer announced an attempted suicide over his institutional radio and activated his personal alarm.  A second correctional officer arrived after opening the yard door for responding staff and passed a cut-down kit to the first correctional officer.  A sergeant arrived and assumed the duties of on-site commander and ordered an emergency extraction.  After the extraction team had donned protective equipment and was in position, the sergeant directed the correctional officer to open the cell door.  The cell door was jammed closed, which required the sergeant to pull on it to break it free.  When the door was opened, the team entered the cell.  The inmate remained unresponsive throughout this observation.  Two

correctional officers grabbed onto the inmate and a third correctional officer used the cut-down tool to cut the noose above the inmate's head. The correctional officers lowered the inmate to the ground and a correctional officer applied leg restraints. The correctional officers then carried the inmate out of the cell, placed him on a rolling gurney, and transported him to the A Facility triage treatment area (TTA), for medical evaluation and treatment. CPR was initiated in the TTA by medical and custody staff and continued until a doctor directed that it be discontinued. At 11:35 p.m., a physician from Folsom Mercy Hospital pronounced the inmate deceased.

An autopsy report was provided by the Department of Coroner, County of Sacramento indicating that an autopsy was performed on 9/21/11 and determining the cause of death as hanging, but did not provide a manner of death. The toxicology report indicated blood specimens revealed the presence of Lithium, caffeine, Fluoxetine, and Norfluoxetine, none at toxic levels.

The suicide report recounted the inmate's criminal justice history. It indicated that he was first arrested at age 14 as a juvenile. He was arrested for burglary, battery on school personnel, being drunk in public, and vandalism as a juvenile. His commitment offense of attempted murder of a peace officer occurred when he was age 17. Although he was initially charged as a juvenile, he was eventually tried as an adult and convicted and sentenced as referenced above. He entered the CDCR on 02/25/03 via the RJD RC.

The inmate's mental health history began when he was age 14 when he was diagnosed as having Inhalant Dependency and received treatment by a child and adolescent psychiatric services program, which also diagnosed Polysubstance Dependence and Psychosis NOS. He was subsequently diagnosed with Schizophrenia, Paranoid Type, Substance-induced Organic Mental Disorder, Hallucinogen-induced Psychosis, and Borderline Intellectual Functioning. His treatment included psychotropic medications and mental health counseling. He also was hospitalized at UC San Diego. During that hospitalization, he reportedly "jumped off a 12-foot balcony," but it was unclear whether or not this was an attempted self-harm or was for other reasons.

After his arrival in the CDCR on 2/23/03, he received mental health screening and an evaluation. The evaluation was completed on 3/04/03. The inmate was diagnosed with Schizophrenia, Paranoid Type and Polysubstance Dependence and was placed in the MHSDS at the EOP level of care. He remained at the EOP level of care throughout his incarceration. He was transferred to CSP/LAC on 6/26/03. He had been placed in ASU at RJD prior to his transfer to CSP/LAC and was in the general population EOP from 6/26/03 through 8/21/03 at CSP/LAC. However, was placed in ASU on 8/21/03 and then transferred to the CMC ASU EOP hub from 8/29/03 to 1/05/04. He was transferred to the SVPP at SVSP from 1/05/04 through 12/17/04 and then returned to the mainline EOP at CMC from 12/17/04 through 12/28/06. He was admitted for his first DSH APP admission, his second DSH admission overall, at CMF from 12/28/06 through 4/18/07. He returned to CMC in the mainline EOP from 4/18/07 through 1/18/08, was subsequently placed in the EOP ASU from 1/18/08 through 6/11/08, and transferred to the PSU at CSP/Sac from 6/11/08 through 9/29/08.

The inmate was again admitted to the SVPP at SVSP from 9/29/08 through 4/27/10 and transferred to the VPP at CMF from 4/27/10 through 8/18/10. He returned to the mainline

EOP at CSP/Sac from 8/18/10 through 11/26/10. However, he was again placed in the EOP ASU at CSP/Sac from 11/26/10 through 5/27/11. He was subsequently transferred to the CSP/Sac PSU from 5/27/11 until the time of his death on 9/20/11. His placements in ASU and the PSU were related to approximately 13 RVRs that he received from 12/06/04 through 8/31/11. These included possession of marijuana, possession of dangerous property (two), assault on a non-prisoner, mutual combat, resisting a peace officer, possession of drug paraphernalia, and four batteries on a peace officer, the last of which occurred on 8/31/11 at CSP/Sac.

Early in his incarceration during 2003 and 2004, he was noted to have decompensated after a stay in the CMC ASU. This resulted in his long admission to the SVPP DSH program in January 2004. He had a charge of battery on a peace officer on 12/06/04, but was transferred to the CMC mainline program on 12/17/04. He received an additional four-year sentence related to the battery that occurred in the SVPP program in December 2004. He also had engaged in self-injurious behavior or suicidal behavior and in 2006 attempted to choke himself. He was admitted to the DSH APP at Vacaville in December 2006, where he remained until April 2007. Application for a Keyhea order for involuntary medication was granted on 3/08/08 and he was subsequently transferred to CSP/Sac in the SHU on 6/16/08 because of a battery on a correctional officer that occurred in January 2008. This Keyhea order was renewed until 2/20/08. Records indicated that the inmate had some periods of adequate adjustment while at CMC, but also had continuing symptoms of severe and persistent mental illness displayed as manic episodes, continued substance abuse, and incidents of self-choking and serious injurious behaviors (SIBs). He also had batteries and assaults against other inmates and staff and was described as having chronic auditory hallucinations, delusional thinking, and thought disorder.

The inmate was transferred to the CSP/Sac PSU on 6/16/08 to serve his SHU term because of the battery on an officer in January 2008. He also was charged by the district attorney for the battery on the peace officer. Competency evaluations revealed that he was incompetent to stand trial. Therefore, he was ordered to DSH for restoration of competency and was put on a wait list in 2008. While in the PSU, he had a SRE that rated his chronic risk of suicide as moderate and his acute risk of suicide as low.

It should be noted that the inmate's Keyhea order expired in August 2008 without renewal. In December 2008, he was treated in an outside hospital for three days after he was discovered with a piece of string tightly placed around his scrotum, cutting off the blood supply to his testicles. He reported to staff that he believed he was becoming a robot and his testicles were responsible. He also was discovered to have been smoking scrapings of banana peels and admitted to engaging in self-choking several times during that time period. He subsequently was hospitalized regarding the incident involving his testicles and one of them was ultimately removed. While in the mainline EOP program after his release from the SHU in February 2009, records indicated his group attendance in the program was only 36 percent and he only went out to yard approximately 18 percent of the time.

The inmate was ultimately admitted to the SVPP program for restoration of competency on 9/29/09. He was noted to have continuing symptoms of psychosis including delusions, hallucinations, and hypomania. The suicide report also referenced his having been reported to have been abusing multiple drugs including buying methadone, manufacturing pruno, crushing and snorting his antidepressant, and smoking banana peels. He was also

discovered to be hoarding his prescribed medications.  The inmate remained at the DSH program at SVPP from 9/29/09 through 4/27/10, but was transferred to the VPP at CMF because he had decompensated and appeared to be in a manic episode.  It appeared from the records that based on a report from DSH on 4/15/10 indicating that it was unlikely that he would become competent to stand trial, the court dismissed the battery case on 5/17/10.  The inmate remained in the SVPP program from 9/29/08 through 4/27/10 with transfer to the VPP program from 4/27/10 through 8/18/10.  He was then returned to the mainline EOP program at CSP/Sac from 8/18/10 through 11/26/10, but subsequently was admitted on 11/26/10 to the EOP ASU at CSP/Sac.  He was transferred to the PSU at CSP/Sac on 5/27/11 until the time of his death on 9/20/11.  His transfer to the EOP ASU at CSP/Sac on 11/26/10 was based on another charge of battery on a peace officer.  While in the EOP ASU, he received three additional RVRs for possession of dangerous property, assault on a non-prisoner, and assault on a peace officer, prior to his transfer to the PSU on 5/27/11.

The inmate was admitted to the MHCB from 9/27/10 through 10/19/10 while he had a pending referral to DSH intermediate care, but was number 50 on the wait list despite his meeting several indicators for DSH referral.  During the three weeks of his MHCB stay, he denied suicidal ideation or intent.  The MHCB treatment team recommended that his DSH referral be expedited.  In addition, Depakote as a second mood stabilizer was added to his treatment regimen.  He was discharged to the EOP program on 10/25/10.  By 11/17/10, the EOP team recommended that his pending referral to intermediate care be rescinded because he had been programming at greater than 50 percent, his medications appeared to improve his mental status, and he had had no self-harming behaviors.  However, nine days later on 11/26/10, he slapped a correctional officer and was re-housed in ASU and received an 18-month SHU term for assault.  On 11/29/10, an SRE was provided by a social worker who indicated the reason for the SRE was "initial."  The only source of information identified was the inmate/patient interview.  The social worker identified a number of chronic risk factors including substance abuse, violence, poor impulse control, and perception of loss of social support.  A long or life sentence and gender were also identified, but first prison term and history of suicide attempts were checked as no.  Acute risk factors included hopelessness, helplessness, increasing interpersonal isolation, agitated or angry, current/recent violent behavior, recent change in housing, recent negative staff interactions, and recent disciplinary.  Protective factors were religious/spiritual/cultural beliefs, and exercises regularly.  The inmate did not report a plan to kill himself and did not report a desire to die.  The estimate of risk was low chronic and low acute risk with a notation that he denied previous suicide ideation and/or attempts.  The justification of level of risk was that the inmate appeared stable with no signs of acute distress and denied history of suicidal ideation and/or suicide attempt.

While in the EOP ASU, the inmate was again admitted to the MHCB on 4/29/11 because his mental status had deteriorated.  He was also receiving Effexor since March 2011, which was the medication he had two years previously been discovered crushing and snorting.  His behavior in March 2011 was described as manic.  By the end of March, the psychiatrist discontinued the Effexor.  The inmate was also given an RVR for possession of a piece of metal during that month.  His condition continued to deteriorate with his becoming more psychotic and manic, and he was admitted to the MHCB on 4/29/2011.  On 4/28/11, while awaiting an MHCB bed while housed in alternative housing, he threw a liquid substance at two staff members and received two additional RVRs.

An SRE was completed on 5/10/11 by a psychologist with the reason for SRE as "MHCB discharged." The psychologist noted sources of information as correctional officer or staff interview, inmate/patient interview, and the UHR, and identified multiple chronic risk factors and multiple acute risk factors. The clinician indicated a question mark after yes for history of suicide attempts with a narrative that the inmate actually denied a history of wanting to kill self, but had a history of self-asphyxiation and attempted castration by tying string around his testicles. Chronic risk factors included history of emotional abuse, major depressive disorder, psychotic disorder, medical illness, substance abuse, violence, poor impulse control, first prison term, long or life sentence, male gender, and the question mark of history of suicide attempts. The acute risk factors included current/recent psychotic symptoms, anxiety or panic symptoms, increasing interpersonal isolation, agitated or angry, disturbance of mood/lability, early in person term, recent change in housing, recent negative staff interactions, evidence of medication hoarding/cheeking, and recent disciplinary. Among the protective factors were family support, religious/spiritual/cultural beliefs, interpersonal social support, exercises regularly, and sense of optimism. The inmate did not report a plan to kill himself or a desire to die. The estimate of risk was chronic risk-moderate, and acute risk-low. The justification included the inmate denying current/recent suicidal ideation but history of self-asphyxiation, poor impulse control, mood lability and multiple risk factors. The plan was to discharge the inmate from the MHCB to the EOP ASU with a 5/8 day follow-up and to monitor for possible Keyhea criteria if he became noncompliant. His medications were adjusted in the MHCB and on 5/27/11 he was transferred to the PSU. While in the PSU, he was placed on a Behavioral Incentive Program (BIP) and, according to records, he appeared to improve. However, at the end of August 2011, he head-butted and pushed a correctional officer during escort. Subsequently, the inmate received an RVR, a mental health assessment, and was seen by a psychiatrist and by his primary clinician. The last mental health contact was by the primary clinician on 9/09/11. However, according to the suicide report, the inmate did not see a clinician as per guidelines the following week because his primary clinician was away from the institution and there was an emergency absence by the backup clinician. The inmate committed suicide on 9/20/11.

The inmate had a number of SRACs or SREs during his incarceration. The suicide report reviewer made reference to 13 SRACs between 7/08/11 and 09/20/11. The reviewer noted the last SRAC had occurred on 5/19/11, and a postmortem SRAC was performed by the reviewer himself. In 2008, two of the SRACs indicated high potential risk, and referrals to the OHU or MHCB were instituted. Another SRAC in August 2008 indicated no apparent significant risk and was noted to have been completed after a telephone call from the inmate's mother. One additional SRAC in February 2009 indicated "moderate to risk for accidental suicide." The SRACs prior to 11/29/10 indicated low risk, chronic low risk, acute low risk, and moderate chronic risk. After 4/28/11, SRACs consistently indicated chronic risk moderate and acute risk moderate. The postmortem SRAC conducted by the reviewer also indicated chronic risk moderate, acute risk moderate. The reviewer also indicated in the suicide report that the inmate's suicide attempt history included one self-reported but undocumented suicide attempt by hanging in the county jail, and that the inmate's self-choking episodes were by the inmate's report "ways to get high."

The inmate's medications at the time of his death included Lithium Carbonate, Fluoxetine, and Abilify. His medical problems included his attempted self-castration in December 2011 when he was reportedly in a psychotic state, and treatment for hypothyroidism.

The suicide report included 13 entries on post-it notes that were considered suicide notes. These post-it notes included the inmate's statements of: "Mommy, bye mommy, I love you, had to go. I think I have to say somoar (sic) in the other world I left a shrine message to the Plata, cry tears of happy," with references to individuals, "my angels I love you and will cherish and help you forever my babies, I love 800 (illegible), this was a pure suicide only like sometimes things happen, don't you ever worry (sic), babies I love you, please don't get mad or (illegible), give all my belongings to mom with Armando, and "REMEMBER ME"…" There were other entries that referenced individual persons and some notations in Spanish, but these were the general themes of the post-it notes found in the inmate's property.

The suicide reviewer noted that there were issues of concern encountered in the review including aspects of the emergency response, the continuity of Keyhea orders for involuntary medication, and SRAs, but "only the emergency response issues reach the level of seriousness required (for) a formal recommendation and Quality Improvement Plan." With regard to the Keyhea order expiration, the reviewer noted that the records at CSP/Sac indicated that the treatment team was aware of the order. However, there was no documentation regarding a discussion about whether to petition to renew or let the order expire, although the psychiatrist noted that the inmate was generally compliant with his medications and a renewal of the Keyhea order was not considered. The reviewer noted that since that time, numerous systems had been put into place for transferring inmates to have their Keyhea orders maintained and decisions about those orders were well-documented. With regard to the SRAs, the reviewer noted that the inmate's suicide risk fluctuated over time; he never presented with acute suicidal crises, and was maintained on suicide watch precaution status for short periods of time while in inpatient settings. The reviewer also noted that because he was chronically disorganized and had delusional thinking, clinicians were often not able to accurately evaluate the level of depression, hopelessness or despair he may have been experiencing. The reviewer went on to state that while few clinicians viewed his chronic risk as significant, "there is an argument to be made that his chronic risk for suicide was high because of his chronic self-harming behavior and its potential lethality. The classic practicing behavior for this inmate may have been his self-choking which could desensitize him to actual hanging." The reviewer noted that the inmate's behavior in the months prior to his death had improved to the extent that he no longer met indicators for DSH referral. The reviewer also made reference to ongoing efforts to improve suicide prevention strategies at CSP/Sac with training of new employees, presentation of clinical interviews for high-risk inmates and statewide video conferences, and regular completion by clinical staff of self-harm reviews for high-risk inmates.

The suicide report provided one recommendation and Quality Improvement Plan as follows:

Problem 1: This inmate was discovered at 2255 hours on 9/20/2011, but instead of starting CPR in the housing unit, as required by policy, the inmate was moved to the TTA where CPR was started ten minutes after discovery.
Quality Improvement Plan: The warden or designee and chief executive officer or designee at CSP/Sac shall submit the date and referral number for the investigation by the Medical Oversight Program (MOP).

216

A Death Review Summary was provided by a physician and nurse consultant peer reviewer on 11/03/11. The inmate's cause of death, co-existing conditions, and review of his medical history was provided. The physician determined that there were no departures identified for the standard of care of medical providers. However, there was the failure of nursing staff members to initiate CPR and apply an AED immediately upon cutting down the patient as departures from the standard of care and from CCHCS policy, and failure of the nurses to call the MOD for further instructions.

On 11/08/11 a memorandum was provided by the suicide response coordinator, clinical practices division, CCHCS, to the chief of clinical practices, mental health program CCHCS, entitled "Quality Improvement Plan for Suicide" of this inmate. In this memorandum, the suicide response coordinator reported that a call had been received from the associate warden of health care at CSP/Sac that provided the MOP referral number as N-SAC-758-11-8. The memorandum went on to state that the referral was made by the OIA and on 11/03/11 an email providing the date of referral was received from the nurse consultant for program review at CCHCS. Further, the MOP referral was requested on 10/28/11. There were no other documents regarding the QIP or approval by the directors of the mental health program or adult institutions.

**Findings:** This inmate's suicide does not appear to have been foreseeable in that he was not expressing suicidal ideation, intent, or plans in the several weeks prior to his death. He did have a history of chronic suicide risk which was estimated as low to moderate, but certainly could have been estimated as moderate to high given his long history and practicing behaviors. This inmate's death, however, does appear to have been possibly preventable based on the failures in the emergency response. Understanding the need for safety of officers, it took an inordinately unacceptable long period of time to remove the inmate from his cell despite there being adequate manpower assembled at the cell. Once removed, CPR was not begun by first responders, which included not only custody staff but an RN. CPR was not begun until the inmate had been transported to the TTA, which is in violation of the Program Guide and the standards of care.

### 23. Inmate W

Brief History: This inmate was a 39-year-old Native American male who committed suicide by hanging on 10/06/11 at the DVI RC. He was double celled at the time of his death and was a participant in the MHSDS at the 3CMS level of care. He re-entered the CDCR on 5/12/11 via the DVI RC after he accepted a plea bargain on a charge of murder in the second degree and an indeterminate sentence of 15-years-to-life. His MERD was 9/20/25.

The inmate was discovered by a correctional officer conducting yard recall when he heard another inmate yell from his cell "man down" and stated "he's hanging." The correctional officer responded to the cell and saw the inmate hanging with a sheet around his neck, unconscious in his cell, and the correctional officer activated his personal alarm device. The correctional officer went into the cell and attempted to speak to the inmate, but he was unresponsive. The correctional officer then observed that the inmate was hanging from a pipe about three to four inches from the floor and his body was limp. The inmate appeared to be gray in color. The correctional officer utilized a cut-down tool and cut the noose near the base of the pipe and secured the noose in his jumpsuit pocket. Another correctional

officer helped lay the inmate on the floor as he was cut down. Medical staff arrived on the scene as the inmate was placed on the floor and attempted lifesaving measures. The inmate was carried out of the cell and placed on a Stokes litter. He was carried from the third tier to the first tier and placed on a medical gurney where medical staff continued lifesaving measures. The inmate was transported to the main infirmary TTA for further treatment. At 1:46 p.m., a physician pronounced the inmate deceased with the official cause of death asphyxia due to hanging (suicide).

A chronology of events was provided. It indicated that the first inmate returned from the yard and called "man down" at 1:10 p.m. A correctional officer responded and saw the inmate hanging in his cell and activated his personal alarm device at 1:15 p.m. The inmate was cut down at 1:18 p.m. and medical staff arrived at 1:20 p.m. and began lifesaving measures. At 1:30 p.m., the inmate arrived via medical gurney to the TTA and lifesaving measures were continued. At 1:46 p.m., a physician pronounced the inmate deceased. At 1:47 p.m., American Medical Response arrived at the TTA.

An autopsy report was provided by the San Joaquin County Office of the Coroner and indicated that the autopsy was performed on 10/07/11. The cause of death was asphyxiation due to hanging. The manner of death was not provided, but the injury description was stated as "self-hanging."

The suicide report recounted the inmate's criminal justice history. It indicated that the inmate had no juvenile criminal history. His first arrest was as an adult in 1994 when he was 22 years of age for possession of a dangerous weapon, but the charges were dismissed. Records indicated that between 1994 and 2002, he served two jail terms for possession of controlled substances for sale and vehicle theft. This was apparently his third term in the CDCR; his first term was from 6/19/02 through February 2003 following conviction of possession of methamphetamine with intent to sell. He was committed again on 3/13/03 and paroled on 2/09/05, but the charge was not noted in the record. His third commitment to CDCR began on 5/12/11, which was his recommitment at the time of his suicide. The commitment offense occurred on 4/23/10 when the inmate killed his girlfriend. Records indicated that he gave varying accounts of what occurred. He reported that he accidentally fell asleep following a sexual encounter in which his girlfriend was tied up, but at other times stated that during a fight he tied her up because she was kicking him and gagged her because she would not stop screaming. The inmate buried her body in a shallow grave near the house after her death. On 9/20/10, after police found and identified the body, the inmate was arrested. He was charged with second-degree murder with implied malice and accepted a plea bargain, receiving an indeterminate sentence of 15-years-to-life as noted above.

The inmate had an extensive mental health history which began at age nine when he made two suicide attempts and was hospitalized for 90 days. When he was nine years of age, his parents divorced and it was reported that he began an extensive substance abuse history, which was consistent with substance abuse problems throughout his family. The records indicated that he was hospitalized multiple times from age nine to age 37, primarily because of depressive symptoms and evidence of substance abuse. The suicide report indicated that it was not clear from the documentation and history what type of treatment the inmate received before, during, or after various hospitalizations. It also indicated that

218

there was no evidence of his having received mental health treatment during his first incarceration which was at age 30 as noted above.

After his arrest on the commitment offense, the inmate was treated in the county jail by mental health staff. He entered the CDCR via the DVI RC on 5/12/11. Information communicated from the jail noted that the inmate had medical problems including methicillin-resistant staphylococcus aureus (MRSA) and depression with suicidal ideation. He had been prescribed Trazodone and was monitored by mental health staff in a safety cell twice per day from 4/15/2011 until his transfer to DVI on 5/12/11. The bus screening on 5/12/11 indicated the inmate was suffering from depression and endorsed taking Trazodone at the county jail. He denied suicidal or homicidal ideation and was referred to mental health to be seen with 24 hours. However, there was no notation that he had transferred from a safety cell or of a need to see him immediately. He was seen on 5/13/11 by DVI's mental health "strike team" and the psychiatrist discontinued the Trazodone and prescribed Remeron instead to be administered at bedtime for 60 days. Although the inmate reported having suffered from depression to the psychiatrist and in the 31-item screening questionnaire, he denied suicidal thoughts or intent. However, there was documentation of past suicide attempts in 2009, with four or five attempts. A SRE was not completed at this time and there was no notation that the inmate had been transferred from a safety cell.

On 5/24/11, the inmate was seen by a mental health clinician for a mental health evaluation. He was placed in the MHSDS at the 3CMS level of care with diagnoses of Major Depression, Recurrent, Moderate, Amphetamine Dependence, and Opioid Dependence. This evaluation was conducted without the UHR or C-file being available. The clinician referenced the history of suicide attempts in 2009 and suicidal ideation in the county jail and listed suicide risk and protective factors with a plan to follow-up with the inmate in one week. The inmate was next seen on 6/03/11. He reported that he was feeling "pretty good," his mood was described as euthymic with broad affect, and he was assessed as functioning adequately with depressive symptoms responding positively to treatment.

The psychiatrist conducted a follow-up appointment on 6/09/11, described the inmate as stable, and continued his current Remeron. The primary clinician saw the inmate again on 6/30/11 and reported that he was responding positively to treatment and his endorsement for transfer to CSP/Solano. He was seen by medical for shortness of breath and chest pain, who opined that he was suffering anxiety and referred him to mental health. On 07/13/11, a psychologist saw him and reported he was doing much better and thought the incident was because of extreme heat during the day. The inmate reported his prior suicide attempts in 2009, but denied current suicidal ideation. The plan was for the inmate to see his primary clinician the following week, which he did. During that meeting, he reported that he had a job in the kitchen, was looking forward to transferring, and appeared to be stable.

His primary clinician saw him on 8/01/11 when the inmate reported he wanted to be removed from the MHSDS and was refusing medications. He reported that he was not having any distress or depression and was evaluated as stable, with a plan to follow-up in one month to discuss removal from the MHSDS.

The inmate was seen for a follow-up appointment by the psychiatrist on 8/12/11 because he was refusing his medication. He requested that he be taken off his medications and removed from the MHSDS. He was noted to appear stable and the Remeron was discontinued.

On 10/03/11, the inmate met with his primary clinician for a follow-up appointment. It was noted that he continued to present as stable and future-oriented, but he was to continue in the MHSDS until he had been off medication for four months or transferred to a mainline institution. His psychiatrist saw him for a follow-up appointment two days later on 10/05/11. He was described as stable, continued to program, and functioned well off medications, with a follow-up appointment for 90 days or as needed. This was the last mental health contact as his suicide occurred one day later. MAR review indicated that the inmate's Remeron expired on 6/10/11 and was not renewed until 6/17/11. According to the suicide report, this was attributable to power failures experienced at DVI during that time period.

The record indicated that the inmate had multiple suicide attempts beginning at age nine, with the last in May of 2009. Records also indicated that the jail took an unusual step in advising that he had been on two per day checks after he was observed as despondent and depressed and was placed in a safety cell for approximately one month from 4/15/11 until 5/12/11. The inmate's diagnoses after his incarceration in CDCR were Major Depressive Disorder, Recurrent, Moderate and he remained at the 3CMS level of care.

The reviewer noted in the suicide report that in a conversation with the inmate's cellmate, the cellmate indicated that the inmate and the cellmate had talked about ways to commit suicide in the past, the inmate's lack of family support, and his sadness and guilt regarding the death of his girlfriend. The inmate apparently reported to custody staff that she had multiple health problems, he found her dead, and his mistake was to panic and try to hide her body. The cellmate indicated that the inmate talked with him about his plans for an appeal. The suicide reviewer also identified a number of factors of concern that emerged during the review including the inmate having spent 26 days in a safety cell in the county jail for danger to self and being seen twice daily by mental health professionals. The reviewer noted a transfer summary with this information was completed, but there was no verbal communication between professionals when the inmate was transferred to CDCR.

A second item of concern was the discontinuity of treatment caused by the oversight of the R&R nurse who did not inform mental health clinicians that the inmate had been in a safety cell for 26 days prior to transport. The reviewer stated they had a discussion with the RN and chief nursing executive that revealed the RN focused primarily on medication continuity and did not recognize the true acuity level of the inmate upon intake. It was also noted there were no specific instructions for continuity of care and notification of mental health in the medical local operating procedures at DVI. This issue was addressed in the recommendation section of the report. An additional concern with regard to disruption and continuity of care was when the primary clinician did not conduct a mandatory document review including C-file and UHR, and the lack of a formal SRA for the inmate when he entered the CDCR. The reviewer noted that the initial mental health screener and the primary clinician were aware of suicidal ideation and prior attempts within the last month and the SRA should have been completed as per the Program Guide. It was noted that to improve assessment risk, DVI requested additional training for clinical

staff by the coordinator of SPRFIT at the headquarters of CCHCS, which was scheduled to begin in December 2011.

The reviewer also noted the documentation of the emergency response was "somewhat divergent and confusing" as it contained conflicting accounts of how quickly CPR was initiated after the inmate was removed from a hanging position. The form 837 incident reports indicated that CPR started immediately after cut down or that it was initiated when the inmate was actually placed on the motorized gurney. The reviewer interviewed first responders including medical staff who said they began CPR immediately after the inmate was cut down. The reviewer determined that since medical staff were available when the inmate was cut down, it was appropriate and a common sense decision that they initiate CPR. A second concern was that a cervical collar was not applied before the inmate was placed on the Stokes litter. Despite the discrepancies, the reviewer noted improvements and good clinical practice including custody having the cut-down tool available and ready when needed, CPR starting immediately, the AED and ambu bag being utilized at the first opportunity, the medical response arriving expeditiously, and mental health timelines being met and exceeded. Documentation was above average and staff ensured that the cellmate was evaluated by mental health staff after the suicide. The reviewer noted processes that met or exceeded program guidelines for nursing, mental health, custody, medical, and DVI staff regarding the treatment of the inmate, the emergency response, and appreciation to the DVI staff for their approach to the review process and diligence in developing methods of improving inmate care.

The suicide report identified five problems and QIPs as follows.

Problem 1: Disruption in continuity of care upon the inmate's arrival at DVI occurred when mental health staff was not notified for immediate assessment based on the information that he came from a safety cell in county jail where he spent 26 days and was seen twice a day by mental health staff at the jail.
Quality Improvement Plan: The nurse executive officer (NEO) or designee at DVI shall convene a QIT to address proper procedures for continuity of care and referrals to mental health to include: a) Update LOPs to include clear instructions for notifying mental health of any relevant history or acuity. b) Training in suicide prevention provided to R&R nursing personnel. c) County outreach by NEO to request person-to-person contact when significant mental health acuity exists. d) Review requirement to request documents from referring institution when significant acuity is identified. e) Include participation in QIT by R&R nursing staff involved in incident.

Problem 2 - A C-File: The C-file and UHR were not available for review during Mental Health Evaluation and important documents in the C-file were not found in the UHR.
Quality Improvement Plan: The chief of mental health or designee at DVI shall conduct a retrospective of 30 CDCR 7386 mental health evaluations for inmates arriving at the institution with new commitments to determine if the UHR and C-file were available and were reviewed at the time of the evaluation.
If the results of the audit are 90 percent or above, individual training will be provided to the PC.
If the results of the audit fall below 90 percent compliance, the chief of mental health or designee shall convene a QIT to address issues of availability and review of the UHR and C-file. The QIT shall address the following concerns: a) For reception center processing

221

of inmates with prior CDCR history, schedule file review one month after the initial mental health evaluation.  b)  Use of CDCR 7230 to document review of UHR and C-file.  c) Update Local Operating Procedures to reflect changes in process.  d)  Require a transfer of relevant documents from C-file to eUHR.  e)  Include participation in QIT by clinical staff involved in incident.

Problem 3:  The clinician providing the initial mental health evaluation and the PC failed to complete an SRE (CDCR 7447) as required by the MHSDS Program Guide (see page 12-10-9).
Quality Improvement Plan:  The chief of mental health or designee at DVI shall conduct an audit of 30 charts of new arrivals to determine compliance with completion of the SRE (CDCR 7447) when the significant history over the past year of suicide risk factors, ideation, threats or attempts is present.
If the results of the audit are 90 percent or above, individual training will be provided to the PC and the clinician who provide the initial Mental Health Evaluation.
If the results of the audit fall below 90 percent compliance, the chief of mental health or designee will form a QIT to address issues of compliance with program guide requirements to include:  a) Update LOP to be congruent with Program Guide requirements.  b)  Require PCs to complete the SRE (CDCR 7447) when an initial mental health evaluation is completed.  c)  Begin proctoring and mentoring process with the clinician who provided the initial mental health evaluation, primary clinician and psychiatrist.  d)  Require participation in QIT by clinical staff involved in incident.

Problem 4:  A cervical collar was not applied to the inmate in accordance with policy.
Quality Improvement Plan:  The chief nurse executive or designee at DVI shall conduct an audit of the last five hangings to determine if a cervical collar was used as dictated by policy.  If the results of the audit are 90 percent or above, individual training will be provided to nursing staff involved in the incident.
If the results of the audit fall below 90 percent compliance, the chief nurse executive or designee shall (provide) a training update to all nursing staff on emergency medical response procedures, with a special focus on the use of cervical collars.

Problem 5:  837 Incident Reports indicated the staff did not respond to the call by inmate __'s cellmate for approximately five minutes after they heard the cellmate yell "man down."
Quality Improvement Plan:  The warden or designee at DVI shall conduct an inquiry into the lapse in response time and initiate corrective actions as deemed appropriate.

A Death Review Summary was provided by a physician dated 12/02/11.  The inmate's history and emergency response were reviewed.  The physician also included comments as to agreement with the reviewer that the evaluation and treatment provided on 7/06/11 for the complaint of chest pain was inadequate; the emergency response was appropriate with the exception of a failure to attempt to obtain an intraosseus access of fluid and medication delivery in the absence of an intravenous access and any nursing concerns per the nursing report.  A nursing report was not included in the documents provided.

There were several QIP documents submitted regarding the inmate's suicide.  None of these documents were submitted under the signatures of the directors or designees of the statewide mental health program at DCHCS or DAI.  There were six documents submitted

in regard to this inmate's suicide as follows:  On 1/05/12 a memorandum was submitted to the senior psychologist supervisor from the CNE indicating the CNE had spoken with the vice president of operations and personnel for the California Forensic Medical Group (CFMG) who provided treatment for this inmate when he was incarcerated in the county jail.  The CNE noted that the transfer of information may have been missed because a notation was in an "obscure place on the transfer sheet."  They discussed possible training for CFMG staff to place notations of such significance in the area reserved for diagnoses, possibly copying and sending pertinent progress notes when the inmate was transferred, and this discussion was to be taken to the CFMG quality management group for consideration.  There was also an in-service training sign-in sheet for two staff with a class title "Orientation for 7371 with County Forms."

There was also an audit submitted for 30 random new commitments of the mental health evaluation CDCR 7386.  However, only 28 files were actually audited for C-files and indicated that 100 percent were available, but zero C-files had been reviewed; 25 charts for eUHR data were available, there was 89.3 percent compliance, and the number of eUHR data reviewed was 22 for 78.6 percent compliance.  As these thresholds were less than 90 percent, a QIT was chartered and the name of the QIT was "(inmate's name) Suicide-Quality Improvement Plan;" it was comprised of three members.  The QIT was to focus on problems two and three, which included the C-file and UHR not being available during the mental health evaluation, the commission providing the initial mental health evaluation, and the primary clinician failing to complete an SRE as required by the MHSDS Program Guide.

The QIT met on four occasions and submitted addenda to Operational Procedure No. 159, "Delivery of Mental Health Services to Inmate-patients in Administrative Segregation," and No. 160, "Correctional Clinical Case Management Systems Services-General Population."  The senior psychologist supervisor issued a memorandum to all primary clinicians that required 1) review of the UHR/eUHR at the time of the initial mental health evaluation, 2) completion of an SRE if the inmate/patient is being included in MHSDS at the time of the initial mental health evaluation, and 3) review of the C-file in a month after the initial mental health evaluation and transfer copies of relevant mental health-related documents from the C-file to eUHR.  In-service training sign-in sheets were also submitted and included for a class entitled "Corrective Action Plan and Training on Problem 2 and 3, Suicide Report" of this inmate.  A second audit was also submitted utilizing 30 randomly selected records for compliance of evaluation for suicide risk factors which was at 100 percent, the number of SRAs performed by screeners was at 90 percent, and the number of SRAs performed at the time of the first evaluation was 66.7 percent.

A second QIP document addressing problem 3 was submitted which was a copy of Operational Procedure No. 303, "Suicide Risk Evaluating Proctoring and Mentoring Program at DVI," which was unsigned at the time of the submission.

A third document was submitted dated 2/1/12.  It was a memorandum from the CNE to the senior psychologist indicating that there was an attempt to review six records for cervical collar placement on hanging victims, of which only four were available.  Of the four records that were reviewed, none had documentation showing that a cervical collar was placed when the patient was found and treatment begun.  These deaths occurred between 2007 and the inmate's death on 5/24/11.  A fourth document was submitted with regard to

223

QIP No. 4, which included in-service training sign-in sheets for a class entitled "Application of Cervical Collar" for registered nurses dated 1/31/12.

A fifth document was submitted as a memorandum dated 12/22/11 from the DVI warden to the senior psychologist entitled "clinical practices CCHCS." It indicated that the discrepancy in the timeline indicating the cellmate had yelled "man down" at 1310 hours and the responding officer responded at 1315 hours was corrected to indicate that the time the inmate returned to his cell and yelled "man down, he's hanging" was actually at 1315 hours, the same time that the officer responded to the cell.

A sixth document dated 1/14/12 was a memorandum from the warden and chief executive officers at DVI to the senior psychologist specialist with a subject "Final Report for Problems and Resolution Plans For, (this inmate's suicide) (Problems: 1, 2, 3 and 4)." In that memorandum, it stated that this represented the final report for Problem and Resolution Plans received on 11/30/11 and provided a summary of responses for problems one, two, three, and four and the QITs progress on meeting the problem items. The DVI QITs related to the issue of these problem items was included as a reference, as well as required memos and proof of practice documents. For problem one, the final report stated that the CNE conducted county outreach with the CFMG, issues were discussed, and training for involved DVI staff was conducted. For problem two, the final report indicated that the audit was conducted of the mental health evaluation CDCR 7386 for 28 randomly selected charts with the data as reported earlier in this report, which caused the institution to change policies with addenda to Operational Procedures No. 159 and No. 160. With regard to problem three, the final report stated that an audit was conducted on assessment of suicide risk factors for 30 randomly selected reports with the percentages as noted above, and compliance percentage was below 90 percent. Therefore, a QIT was formed, operational procedures were revised, and quarterly audits will be completed and reviewed through DVI's quality assurance process for the proctoring and mentoring process. For problem four, the final report stated "(M)edical proof of practice sheets were unavailable at this time; however will be provided." These were the documents submitted as the QIP response from DVI without the signatures of the directors as noted above with the submission date as 1/14/12.

**Findings:** This inmate's suicide death may have been both foreseeable and preventable even though the inmate was not reporting active suicidal ideation or intent prior to his death. However, it should be noted that there were inadequate assessments and a failure to refer the inmate for an emergency or urgent evaluation and possible placement in an MHCB given the information on the transfer sheet from the jail as to the inmate having been released from a safety cell in the jail immediately prior to coming to DVI. This failure by staff to recognize and report this information and to follow the Program Guide therefore makes this suicide very likely preventable had the information been appropriately relayed by medical staff and reviewed by mental health staff, and the inmate properly assessed as per the Program Guide. Further, the discrepancies in the emergency response timeline and differences in local operating policies were very concerning.

## 24. Inmate X

Brief History: This inmate was a 25-year-old Biracial (African American/Native American and Caucasian) male who committed suicide by hanging on 10/9/11 at the PVSP (PVSP) PSU. He was not a participant in the MHSDS and was double celled in general

population at the time of his death. The inmate entered the CDCR at the RJD RC on 6/12/07. He had pled guilty to second degree murder, with an indeterminate term of 15-years-to-life. His MEPD was 2/11/21.

The inmate was discovered on 10/9/11 at approximately 5:26 a.m. when the inmate's cellmate began yelling "man down." The control booth officer summoned additional staff via institutional radio. A correctional officer arrived at the cell and observed the cellmate standing at the cell door and the inmate sitting on the toilet leaning forward with a noose tied around his neck and vomit on the floor. The noose was already cut from the ventilation system. When sufficient staff arrived, the cell door was opened and the cellmate was placed in handcuffs and escorted out of the cell to the dayroom. Lifesaving measures were started by a LVN and RN. The inmate was transported via ERV to the CTC. The cellmate was escorted to the program office and placed in a holding cell. Coalinga Ambulance was requested and upon arrival, a paramedic pronounced the inmate dead at 5:53 a.m.

A timeline was provided in the suicide report. It indicated that at 5:26 a.m. the control booth officer heard the cellmate yell "man down." When the control booth officer shouted to the cellmate asking what happened, the inmate replied "my cellmate just hung himself." Between 5:26 a.m. and 5:33 a.m., correctional officers arrived, the cell was opened after a sergeant instructed the control booth officer to open the cell, and the cellmate was placed in handcuffs and escorted out of the cell. Another correctional officer retrieved the Stokes litter and brought it to the cell front. The suicide report indicated that reports varied as to when medical staff arrived during this activity. At 5:30 a.m., the TTA was notified of the emergency and medical staff responded in the ERV. At 5:33 a.m., TTA staff arrived at the facility building and a LVN and RN found the inmate sitting on the toilet unresponsive with cold modeled skin, pupils dilated and fixed, rigor mortis present in his limbs, and skin indentation at the neck. They pulled the inmate off the toilet and placed him on the floor outside of the cell door, and the LVN initiated CPR. At 5:35 a.m., the supervisory RN applied the AED with no shock advised. Medical staff placed the inmate on a Stokes litter with the assistance of two correctional officers and carried him down the stairs to the gurney. Medical staff rolled the gurney and placed the inmate in the ERV for transfer to the TTA. At 5:36 a.m., the EMS were notified while the inmate was en route to the TTA, and at 5:40 a.m. the ERV arrived at the TTA. CPR continued and the AED indicated no shock. There were attempts at placing an IV line three times without success. At 5:46 a.m., the on-call MD was notified and Narcan was administered per telephone order. At 5:52 a.m., the EMS arrived at the TTA and the inmate was unresponsive and without vital signs. At 5:53 a.m., the inmate was pronounced dead by an EMS paramedic from a local hospital.

An autopsy report provided by the Fresno County Coroner indicated the autopsy was performed on 10/9/11, the cause of death was hanging, and the manner of death was suicide. A toxicology report was issued and indicated that no blood alcohol was detected in vitreous humor fluids tested for blood chemistry. There did not appear to be analysis for illicit substances tested in blood, urine, or vitreous humor specimens.

The suicide report recounted the inmate's criminal justice history. It indicated he had no juvenile criminal history and no adult criminal history prior to the commitment offense. The commitment offense occurred on 2/7/06 and involved the inmate having gotten drunk

with a friend, awakening and finding this friend having sex with him, and placing this friend in a choke hold and killing him. The inmate subsequently attempted to hide the crime, but the victim's body was discovered on 2/9/06 and the inmate was arrested on 2/11/06. The inmate pled guilty to second degree murder on 6/1/07 and was sentenced to an indeterminate term of 15-years-to-life.

The inmate's mental health history appeared to have begun around the time of his crime. Information from the San Diego Central Jail received by CDCR noted the inmate had been treated for "bipolar," including prescriptions for Celexa and Lithium. He also was noted to have made a suicide attempt on 2/11/07 by taking an overdose and reported an attempted suicide by overdose on 2/11/06 when police were investigating the crime. There are references in the records to three suicide attempts prior to his CDCR incarceration. After entry into the CDCR, he was placed in the MHSDS at the 3CMS level of care while at the RJD RC. He was transferred to HDSP on 7/11/07, where he remained until 11/15/07.

The inmate was transferred to CCI on 11/15/07 for safety issues based on his refusal to accept the racial rules imposed by his peers, according to the suicide report. A psychiatrist at CCI noted the inmate had a history of mental health treatment during early childhood including inpatient treatment between the ages of seven and nine, as well as the inmate's current diagnosis of Bipolar Disorder, Mixed. He was prescribed Lithium, which was increased after he arrived at CCI. The inmate began refusing Lithium in February 2008 and during psychiatric follow-up reported he was feeling good and the Lithium was discontinued. He was subsequently transferred to PVSP in July 2008, his diagnoses were Mood Disorder NOS and Adjustment Disorder, and the psychiatrist noted that the inmate was not taking medication and the psychiatrist did not prescribe any. In June 2009, the inmate was removed from the MHSDS during an IDTT review based on his own request and his having not taken medications since August 2008. At that time the records indicated he was diagnosed with Mood Disorder NOS, Resolved and a GAF score of 75. No formal SRACs were completed for this inmate at any time during his incarceration despite his history of previous suicide attempts, two of which had occurred since his commitment offense.

The inmate did not have any identified chronic or acute medical problems with the exception of an inflamed tendon in his foot in 2008.

During the preparation of the CDCR suicide report, the suicide reviewer interviewed the inmate's cellmate. The cellmate reported that in January 2011 he had observed the inmate with cuts on both wrists that he believed were self-inflicted and that occurred shortly after the inmate had been fired from his job in the kitchen. The inmate treated these injuries himself and there were scars that were detected at the autopsy. This event appeared not to have been reported to staff prior to the inmate's death.

The inmate, after removal from the MHSDS, attended a therapy group on managing emotions which lasted until October 2009. The inmate was not referred to or evaluated by mental health staff after that time.

The suicide reviewer noted two concerns regarding the emergency response to this inmate's discovery. The first concern was whether or not correctional staff could have initiated CPR prior to the arrival of medical staff. It appeared that correctional staff was

present and able to begin basic life support by 5:30 a.m., but CPR was not initiated until 5:33 a.m. The reviewer called the senior registered nurse, who confirmed that the cell door had been opened prior to medical staff arriving and the inmate was sitting on the toilet rather than CPR being in progress. The second concern was that although the inmate's cellmate called "man down" at 5:26 a.m., the TTA did not receive a call until 5:30 a.m. The reviewer also noted two clinical care issues that emerged from the review. The first was that a formal SRAC was not completed for this inmate in any institution although it was clearly indicated at the time of his intake into the MHSDS at RJD RC. The reviewer noted that RJD had recently developed a proctor/mentor program to provide intensive mentoring for clinicians in the assessment of suicide risks. The reviewer also noted that a SRAC was not indicated after the inmate arrived at PVSP, so one was not performed, and that was in compliance with current policy.

The second concern was the inmate's discontinuation of medication in August 2008 and the re-emergence of depressive symptoms in February 2009 with his consideration of restarting medication at that time. Documentation also indicated the presence of depression as late as May 2009. However, the inmate was discharged from the MHSDS in June 2009. The criteria for removal from the MHSDS were not met because the inmate was discharged from the 3CMS when he had not been in continuous remission and functioning adequately in the mainline without treatment for six months. The reviewer noted that the inmate continued to receive treatment, i.e., the managing emotions group after his removal from the MHSDS.

The suicide report identified three problems and QIPs as follows:

Problem 1: Correctional staff may have failed to initiate CPR response in a timely manner. It appeared from reports that correctional staff was present and able to provide basic life support response by 0530 hours. However, basic life support was not initiated until medical staff arrived and initiated CPR at 0533 hours. Policy requires that first responders "immediately initiate CPR if appropriate."
Quality Improvement Plan: The Warden or designee at PVSP shall provide copies of drills for the last six months and initiate the date of the last drill for emergency medical response. In addition, an updated training shall be provided to all custody staff with a specific focus on the policy requirement that first responders are responsible for initiating CPR.

Problem 2: Although inmate's __ cellmate called "man down" at 0526 hours, TTA records indicated that a call to the TTA was not received until 0530 hours. Incident reports document the time of discovery as 0526 hours.
Quality Improvement Plan: The Warden or designee at PVSP shall conduct an inquiry into the time lag between discovery and notification of TTA staff and take corrective actions as deemed appropriate."

Problem 3: Inmate __ was discharged from the 3CMS level of care without discharge criteria having been met. Policy requires a minimum of six months of symptom remission and adequate functioning prior to removal from MHSDS.
Quality Improvement Plan: This failure to follow MHSDS policy occurred over two years ago. To ensure the policy is now being followed, the Chief of Mental Health or designee at PVSP shall conduct a retrospective audit of all MHSDS removals occurring in the last 30 days to determine if policy requirements are currently being followed. If the results of

the audit determine compliance lower than 95 percent, training shall be provided to clinical staff pertaining to Program Guide requirements for removal of inmates from 3CMS.

A Death Review Summary dated 12/5/11 was completed by a physician.  The physician reviewed the inmate's primary cause of death, co-existing conditions, and category of death as suicide.  The physician noted the inmate's medical record was quite sparse and the problem list showed only Bipolar Disorder with no medications at the time of his death.  The physician noted that the mental health staff's removal of the patient from mental health services was a departure from mental health policy and that custody staff's failure to start CPR was a departure from CDCR policy.  There were no standard of care deficiencies identified for medical providers.  With regard to the standard of care of nursing, there was no "First Medical Responder-Data Collection Tool" used to document emergency response.  No systemic concerns were identified.

On 1/17/12, the Deputy Director (A) Statewide Mental Health Program, and Director (A) Division of Adult Institutions submitted their Report on Implementation of the Quality Improvement Plan for this inmate's suicide in response to the suicide report completed on 11/28/11.  The minutes of the PVSP EMRRC meeting of 12/13/11 were submitted and documented training and an in-service training sheet and proof of practice regarding the lack of documentation for this inmate.  The minutes also indicated that three quarterly emergency response drills were held:  two on 11/22/11, and one on 11/23/11.  There was a review of seven inmates who had Code Threes and one inmate who died.  There was reporting on response times, staff compliance and training issues were identified in which all had response times checked as adequate, staff compliance as adequate and three were checked as having training issues identified.  This was the sum total and content of the QIP responses to the suicide report for this inmate.

**Findings:**  This inmate's death does not appear to have been foreseeable.  However, there were clearly departures from the standard of care with regard to the inmate being removed from the MHSDS in 2009, an unnecessary delay of approximately three minutes from the time that first responders of custody officers could have begun CPR, and the time that medical staff did begin CPR.  The inmate's body was noted to be in rigor mortis at the time that CPR was started.  Observing that the initiation of CPR occurred after rigor mortis had begun, it is unlikely that the inmate would have been resuscitated.  This inmate's suicide may have been preventable had timely custody checks been conducted.  The departures from the CDCR Program Guide and policies are noted and should have been addressed and corrected.  The report on implementation of the QIP for this inmate, bearing the signatures of the acting deputy director and director, appears to be inadequate and does not adequately address the problems identified in the suicide report.

## 25.  Inmate Y

Brief History:  This inmate was a 40-year-old Hispanic male who committed suicide by hanging on 10/24/11 at the PBSP ASU.  He was a participant in the MHSDS at the 3CMS level of care.  The inmate was single celled at the time of his death.  He had re-entered the CDCR via NKSP on 5/12/00.  He had been found guilty of two counts of second degree robbery and one count of assault with a firearm, all with enhancements, and was sentenced to 85- years-to-life.  The inmate had no MERD.

The inmate was discovered on 10/24/11 at approximately 12:45 a.m. in his cell in a seated position with a ligature around his neck. The incident report did not specify who discovered the inmate. The incident report continued that an alarm was sounded. An RN checked for vital signs and determined that CPR should be initiated. Chest compressions and respirations with an ambu bag were initiated and the AED was attached. The AED indicated that no shock was warranted. Del Norte Ambulance was notified and responded Code Three to the outside of the housing unit. At approximately 1:10 a.m., Del Norte Ambulance personnel placed the inmate in the ambulance and transported him from the facility. Ambulance crew personnel consulted with a Sutter Coast Hospital emergency room physician via telephone, who advised the personnel that the inmate was declared dead at approximately 1:16 a.m.

The suicide report provided supplemental information to the incident reports. It indicated a timeline beginning with the inmate's discovery at 12:45 a.m. by a floor officer making 30-minute welfare checks. The floor officer discovered the inmate in his cell, which was brightly lit, sitting on the floor at the end of the lower bunk with his back against the wall and eyes closed. The inmate had one end of the bed sheet around his neck and the other around the top bunk. The correctional officer tapped on the cell door and yelled the inmate's name. Receiving no response, he told the control officer to activate the alarm. A second correctional officer responded and retrieved the scissors and ambu bag from the control officer. A third correctional officer and sergeant arrived and when sufficient staff was present, the sergeant gave the order to unlock the cell. A correctional officer entered the cell and checked the inmate's wrist for a pulse but did not find one. Two other correctional officers cut and tore the sheet and the inmate was lowered to the floor. A correctional officer removed the knotted sheet portion from the inmate's neck and checked for a pulse; finding none, CPR was begun by first responding officers. The timeline continued that correctional officers maintained these actions until a RN arrived with the AED at 12:53 a.m. The AED was placed, no shock was advised, and chest compressions resumed. An RN initiated O2 via bag valve mask and a Code Three ambulance was requested by the RN. A neck brace was placed around the inmate's neck and staff placed him on the Stokes litter, carried him to the lower tier, and placed him on a weld gurney. At 12:58 a.m., with CPR in progress, the inmate was moved to the rotunda area to await arrival of the ambulance. At 1:02 a.m., the ambulance arrived at the facility. At 1:05 a.m., he was escorted out of the unit and transferred to an ambulance gurney. He was placed in the ambulance and CPR continued. According to the suicide report, at 1:06 a.m. the ambulance left the facility en route to Sutter Community Hospital. At 1:16 a.m., a paramedic provided status information to the hospital and an emergency room physician declared the inmate deceased.

An autopsy report was provided by the Del Norte County Sherriff's Office. It indicated that an autopsy was performed on 10/27/11 and determined that the cause of death was asphyxiation due to hanging, seconds to minutes, and the manner of death as suicide by hanging. Toxicology was reported as negative.

The suicide report recounted the inmate's criminal justice history. It indicated that he had an extensive arrest history that began when he was eight years old. The inmate was noted to be a member of a street gang, high school dropout, and abused drugs and alcohol. He was placed in the CYA on 2/11/88 at age 16 and paroled in 1990. He was arrested on three subsequent occasions for second degree robbery during 1990 and sentenced in April 1991

for his first CDCR term of nine years. He paroled in July 1998 and was re-arrested in February 1999. He was noted to have remained in custody from that point on. His criminal justice history included arrests and convictions for burglary, multiple assaults with a firearm, robbery, possession and sale of a dangerous weapon, grand theft of a vehicle, and a threatening crime with intent to terrorize. Between 1/22/99 and 2/12/99, the inmate was arrested and charged with a series of four armed robberies. He was found guilty of two counts of second degree robbery and one count of assault with a firearm, all with enhancements. On 5/4/00, he received a sentence of 85-years-to-life.

Records indicated that the inmate had no history of mental illness or treatment in the community. In the CDCR, he received routine screening and was cleared for general population during his first and second terms. He was transferred to PBSP in February 2010 for an indefinite SHU placement as a validated gang member of the Mexican Mafia. A correctional officer made a mental health referral on 1/12/11 stating that the inmate was "excessively paranoid" regarding his mail. A second referral was made to mental health by a different correctional officer the following day. It was marked "urgent" and also indicated that the inmate had paranoia regarding his mail. He was evaluated by a mental health clinician on 1/14/11. The record indicated that he presented with a normal mental status. It stated that he had no mental health issues and no further action was taken at that time.

A series of referrals from correctional officers to mental health began on 5/31/11 and continued on 6/5/11 and 6/7/11. They indicated that the inmate had increased anxiety and appeared to have paranoid delusions and hallucinations. The suicide report indicated that the inmate was seen for several mental health evaluations, but was cleared and remained in SHU housing on 6/10/11. He was again evaluated by mental health staff on 6/12/11 following a custody referral and was admitted to the CTC MHCB unit on suicide precaution due to possible suicidal ideation. The following day, on 6/13/11, the MHCB diagnosis was Antisocial Personality Disorder with a GAF score of 29, which was marked through and 65 was written. The day before, the inmate had a SRAC and his estimate of imminent risk was moderate. Notably, the inmate had SRACs on 6/5/11, 6/10/11, and 6/11/11, when he was not included in the MHSDS. These SRACs estimated low risk, negligible risk, or no risk. During his stay in the MHCB, progress notes indicated that the inmate repeatedly stated he would hang himself if he returned to the SHU and complained of delusional and paranoid symptoms, and anxiety symptoms.

On 6/16/11, the inmate had a SHU IDTT in absentia. Documentation focused on his significant safety concerns, which he was unwilling to discuss. The IDTT recommended that he should be excluded from the SHU. This information was provided to MHCB staff. On that same day, the inmate ripped his mattress cover, made a noose, and then pointed it out to staff. He was placed on suicide watch and prescribed psychotropic medications consisting of Zoloft, Risperdol, and Vistaril PRN. The inmate accepted the Zoloft only once, Risperdol four times, and requested Vistaril four times. These medications were all discontinued on 6/22/11 because of the inmate's poor compliance. On 6/22/11, he had another SRAC in preparation for the MHCB discharge, when his estimated imminent risk was decreased to low. He was discharged from the MHCB to the 3CMS level of care for five-day follow-up. During this admission, his diagnosis remained Antisocial Personality Disorder with a GAF score of 60 at discharge. MHCB clinical staff notes indicated that he was an "unreliable historian" who gave contradictory reports, was irritable and

unmotivated for treatment, and demonstrated unpredictability, impulsivity, and mood instability. He was transferred to ASU as he had been excluded from the SHU. Five-day follow-up was conducted and he was determined to be guarded, ambivalent, and actively delusional; this included paranoia, confusion, and possible disorganization by the licensed clinical social worker who saw him on 6/28/11, which was day five of five-day follow-up, and opined "I think he is mentally ill." The inmate remained in ASU at the 3CMS level of care.

A routine referral to psychiatry was made on 7/6/11 by a psychologist who observed that the inmate had thrown the contents of his food tray all over the tier and reported "electromagnetic pulses" interfering with his thoughts. The following day, the psych tech submitted an urgent referral as the inmate was withdrawn and refused to talk. The IDTT met and determined that he was grossly psychotic and delusional and "in denial of mental health problems." The plan was to monitor and assess him for 30 days and refer him to psychiatry for medication assessment and monitoring. However, on 7/8/11, the following day, he was re-admitted to the MHCB for monitoring of his psychotic decompensation. He was placed on suicide precaution and was evaluated by a psychiatrist as very paranoid, hypervigilant, and disorganized, and appeared more actively psychotic when stress increased. He was prescribed Risperdal, which he took 14 of 20 times, and requested PRNs on three occasions from 7/8/11 to 7/18/11 while in the MHCB. SRACs were performed on 7/8/11, upon MHCB admission, which determined that he was at low risk, and on 7/18/11, upon MHCB discharge, when low level of risk was also reported. The diagnosis during this MHCB admission was Psychotic Disorder NOS, with an initial GAF score of 28 and a discharge GAF score of 55.

The inmate was returned to ASU at the 3CMS level of care on 7/18/11 for five-day follow-up and immediately began refusing medication. A medication noncompliance referral was generated. The inmate was seen by a psychiatric nurse practitioner on 7/22/11, who he told that he was back to normal and did not need medication. As a result, the medication was discontinued. Two days later on 7/24/11, he requested to his primary clinician that he be removed from the 3CMS and moved back to the SHU. This request was denied as he had a SHU exclusion. Records also indicated that he refused to engage in treatment for the following month. His diagnosis was changed to Brief Psychotic Disorder on 8/3/11 and the Antisocial Personality Disorder diagnosis remained. He was also diagnosed with Hepatitis C and his GAF score was estimated at 60. His medication of Risperdal had been discontinued on 7/22/11 and he had not received any further medications until 10/23/11. He had an IDTT on 8/31/11 when his diagnosis was changed to Brief Psychotic Disorder, in remission as his psychotic disorder was believed to have been resolved. He continued to have IDTT updates on a monthly basis and was placed on a modified treatment plan with no groups and a plan that he would be eligible for removal from the MHSDS in January 2012.

The IDTT met on 9/28/11. It noted that the inmate was stable with a plan to continue him at the 3CMS level of care in ASU as he could not return to the PBSP SHU. Records indicated that on 10/17/11 the inmate met with his primary clinician. He informed her that he had a "green light" on him, custody staff was making his condition worse, and the psychiatrist in the SHU had told him to expose himself to female staff. The clinician documented that the inmate appeared to be paranoid but was "still holding his own" and his ADLs' were intact with a plan to monitor him for decompensation. The primary

clinician met with the inmate three days later on 10/20/11 at his request and noted that the inmate appeared to be confused and could not recall what they had talked about three days earlier. The clinician noted the meeting was "odd" and that the inmate appeared to have a memory impairment and remained paranoid, but was still "holding his own" with intact ADLs and he seemed healthy. This was the inmate's last scheduled contact with mental health staff.

The suicide report and the records indicated that the inmate had crisis intervention consults on 10/23/11, 24 hours prior to his suicide. The suicide report indicated that the inmate told a correctional officer that he felt anxious, but denied wanting to hurt himself, and was told to put in a medical slip at 1:00 a.m. on 10/23/11. Twenty minutes later, the inmate flashed his cell light and told the control booth officer he "needed to see a psych." When asked if he was alright, the inmate gave the officer a "thumbs up." Ten minutes later at 1:30 a.m., the inmate reported to the control booth officer that he was having chest pains. An RN was called, who saw the inmate at 3:27 a.m., although there was no progress note in the UHR. Between 7:40 a.m. and 10:30 a.m., the inmate asked the psych tech to take his blood pressure because he felt dizzy. His blood pressure was within normal limits and the psych tech consulted with the RN who had seen the inmate during first watch and cleared him. The inmate requested to talk with the RN. The psych tech took his blood pressure again, which was within normal limits, and he was to be placed in a holding cell to see the RN. While in the rotunda on his way to the holding cell, the inmate laid down or fell down and the psych tech responded with the emergency bag. The RN evaluated the inmate, who made repeated statements about having demons that controlled him. The inmate also asked if he was going to see the psychiatrist that day. The inmate was told he was scheduled to see a clinician the following day. The RN assessed that there was "risk for injury r/t (with respect to) delusional thinking." The RN spoke to the CTC psychologist and requested a mental health referral and the psych tech completed the mental health referral marked "urgent" and faxed it to the scheduler, placing the original in an envelope according to local procedures. The inmate was cleared by the RN and returned to his cell at 10:30 a.m.

During the early afternoon at 12:05 p.m., the psych tech checked the inmate's blood pressure at his request and the inmate said that he would take a PRN medication if it would help. The psych tech called the psychiatrist, who was told of the inmate's delusional ideation and hallucinations with demons, and the psychiatrist gave a verbal order for Vistaril 100 mg stat, which was given to the inmate by 12:30 p.m. Later that day at 5:15 p.m., the inmate asked to see the psych tech, again complaining of bodily sensations of pain and pressure, feeling bad for what he had done, and saying he did not believe in Satan. His vital signs were within normal limits. However, he was described as more anxious, unstable, less memory, and talking in short and unclear words, but denied suicidal ideation and hallucinations. The RN was notified by the psych tech that the inmate had a psychiatric appointment scheduled for the next day, and to see his primary clinician the next day, the inmate should submit a sick call request. The psych tech submitted a mental health referral that was marked "routine" and encouraged the inmate to practice relaxation techniques and return to his cell, which he did at 5:55 p.m.

The suicide report indicated that the floor officer knew that the inmate asked for PRN medications at 10:10 p.m. and the RN was called and told the officer that the inmate had received all that he would get and would see the doctor in the morning. By 11:00 p.m., the

log noted the inmate was complaining of chest pains and both the RN and sergeant were called. However, there was no documentation of what response occurred. The inmate was again reported as having chest pains at 11:40 p.m. and 11:50 p.m. The log book indicated that the RN was on the unit to see the inmate and the inmate "seems very confused." The inmate was returned to his cell at 12:15 a.m. Welfare checks were completed between 12:05 a.m. and 12:15 a.m., and again at 12:45 a.m., when the inmate was discovered hanging in his cell.

Records indicated that the inmate had two medical conditions including Hepatitis C Virus and cardiovascular disease. His cardiovascular disease included a diagnosis of First Degree Atrioventricular (AV) Block with palpitations, the major symptoms of which include racing heart rate and palpitations that could be exacerbated by stress and/or anxiety associated with depression or mental illness.

The suicide reviewer wrote that the information obtained during the course of this review indicated the Facility A psychologist was contacted at approximately 9:30 p.m. on 10/23/11 as the inmate had symptoms of delusions and hallucinations. According to the local operating procedure, the psychologist should have evaluated the inmate to determine whether a referral to the CTC/MHCB was appropriate. The reviewer went on to note that the Facility A psychologist instructed the RN to contact the CTC psychologist directly. When the RN called the CTC psychologist and reported their concerns, since local operating procedure dictated that the Facility A psychologist would have already evaluated the inmate, the CTC psychologist did not evaluate the inmate. The reviewer also made note of the psych tech contacting the psychiatrist, who authorized a one-time stat PRN medication order for Vistaril, which the inmate accepted. The reviewer added that the remainder of 10/23/11 "staff continued to be responsive to the inmate" and "repeatedly questioned him about the presence of suicidal ideation, which he consistently denied."

The reviewer also contacted the RN who assessed the inmate at 11:50 p.m. and went back to the rotunda at 5:47 a.m. the following day. The RN indicated that she talked to the inmate, hoped that he would divulge or voice any suicidal ideation that he might be having, made best efforts to engage him, and he denied any problems and asked to go back to his cell. The inmate denied suicidal ideation and gave assurances that he was safe, so the RN cleared him to return back to his cell at approximately 12:05 a.m. The inmate was escorted to his cell at 12:15 a.m. and was discovered hanging thirty minutes later at 12:45 a.m. on 10/24/11. The reviewer found that the inmate, for the most part, received responsive and well-coordinated care, staff generally followed departmental guidelines with one exception, and their performance was in accord with high professional standards. The one staff member who did not follow local operating procedure was the psychologist who did not see the inmate on 10/23/11 for emergent mental health issues. The reviewer noted that the lapse was under administrative review at PBSP.

The reviewer noted in the suicide report having had telephone contacts with the on-call psychologist, on-call psychiatrist, and members of the nursing staff regarding the inmate on 10/23/11. The review summarized those interviews as follows:

The RN consulted with the CTC psychologist at approximately 9:30 p.m., was concerned regarding the inmate's safety as he went back to the cell due to inadvertent physical

injuries he might suffer while responding to command auditory hallucinations that he was experiencing, recalled the inmate's conversation was "scrambled", as he believed demons had made him fall and the inmate specifically denied suicidal thoughts on several occasions. The CTC psychologist reported to the reviewer that the local operating procedure is for the on-call staff to keep informal notes of contacts when a formal evaluation did not occur and those notes were eventually shredded. The psychologist told the reviewer however that she knew the inmate, had assessed him several months prior in the CTC and he had been considered a low risk for suicide while his primary difficulties included his paranoid thought processes. The psychologist went on to state that the inmate had not been actively suicidal during previous periods of mental illness, and while his current presentation was odd, it was not dissimilar to his presentation when she evaluated him in July. The psychologist decided that a formal crisis assessment was not indicated at that time given her historical knowledge of the inmate and his current presentation as described by the RN.

The psych tech (LPT) who contacted the on-duty psychiatrist told the psychiatrist that the inmate was exhibiting delusional ideation and was hallucinating with demons, requested a stat order for Vistaril and the inmate accepted. The psychiatrist reported she was in the room when the CTC psychologist was consulted, had heard the inmate deny suicidal ideation and was scheduled to be seen by the clinician the next day, and the LPT requested a one time stat order, so she ordered it followed by a standard indication to call back if needed. The psychiatrist also told the reviewer that it is her practice to prescribe the minimum doses of medication needed on a PRN basis when she is not the treating psychiatrist.

The reviewer summarized that the inmate's mental health began to deteriorate in mid-October, and his deterioration increased sharply in the 24 hours prior to his suicide. On the day of his death, numerous staff responded quickly and professionally to his concerns. The reviewer offered that interventions which if taken might have changed the outcome were an evaluation by the Facility A psychologist as mandated by local operating procedures, direct evaluation by the CTC psychologist, direct evaluation by the on-call psychiatrist, ordering multiple doses of PRN medication, and an emergency CTC admission at 11:50 p.m. on 10/23/11. The reviewer found that except for the first intervention, each of the other interventions appeared to have been thoughtfully considered and rejected by the staff member making the decision. The reviewer continued, the Department does not expect or require staff members to be omniscient, but rather to exercise good professional judgment and decision-making. It appeared to this reviewer that standard was met in this case by most staff members involved. The reviewer identified other issues that required further explanation, training or discussion including the Facility A psychologist's failure to evaluate the inmate on 10/23/11, the physical layout of PBSP making rapid transport to the CTC impractical or impossible, the possibility of the inmate's Hepatitis C and cardiovascular disease presented as signal to mental illness, and the difficulties in assessing for mental illness or suicide risk in Southern Hispanic inmates who have a strong prohibition against gang members in good standing participating in any mental health treatment. The reviewer went on to commend the staff at PBSP in several areas where they met or exceeded program guidelines.

234

The suicide report identified three problems and QIPs as follows:

Problem 1:  The Facility A Psychologist failed to follow established local operating procedures regarding evaluation of identified inmates in need of assessment for possible CTC/MHCB referral.  This appears to have been a significant omission in the care provided to this inmate in the days preceding his death.
Quality Improvement Plan:  The Chief of Mental Health or designee at PBSP is currently conducting an inquiry into this failure to act and will provide follow-up pertaining to quality improvements that may include training, mentoring and/or disciplinary action.

Problem 2:  Several critical care minutes would have been saved if the initial call for an ambulance occurred at the time of incident announcement rather than after medical first responders were on scene.
Quality Improvement Plan:  The Warden or designee and the Associate Warden of Health Care or designee shall either: (1) charter a time-limited Quality Improvement Team (QIT) to consider making changes (if needed), in local operating procedures (LOPs) governing who calls for an ambulance and when that call is made. (2) Conduct an inquiry into this incident to ensure that LOPs pertaining to calling for an ambulance were followed.   Please describe your usual procedures and explain if needed, why documentation of the first call for an ambulance was not available.

Problem 3:  An active Southern Hispanic gang identity makes acute risk assessment less accurate if reliance is placed on the inmate's denial of suicidal ideation or mental illness symptoms.
Quality Improvement Plan:  The Suicide Prevention and Response-Focused Improvement Team (SPR FIT) at CDCR headquarters shall consider including Southern Hispanic active gang status as a risk factor on the SRE when considering acute suicide risk.

A Death Review Summary dated 12/29/11 was completed by a physician.  The physician indicated the primary cause of death as asphyxiation due to hanging and noted co-existing conditions as Hepatitis C, Brief Psychotic Disorder, in remission, with Antisocial Personality Disorder, and the category of death as suicide.  The reviewer noted there were no recommendations regarding the standard of care of medical providers, referred to the nursing report regarding the standard of care of nursing providers, and also noted no systemic concerns.  There were no recommendations other than the CEO, CMO, and DON be provided with copies of the death review and mental health review secondary to nature of death as a suicide.

A memorandum dated 1/27/12 from the SPRFIT Coordinator at PBSP to the senior psychologist specialist, CCHCS, indicated that the intent of the memo was to address the actions taken by PBSP in regard to the first identified QIP.  The memorandum stated that a memorandum dated 1/3/12 directed to the CEO at PBSP requested direct adverse action against the Facility A psychologist who failed to follow established local operating procedures.  The request was reviewed by the CEO and forwarded to headquarters for disposition.  The review was noted as pending.  In addition, mental health senior management staff at PBSP reviewed the established clinical guidelines and the local operating procedures.  It was determined there was a need to incorporate a document that had been disseminated to mental health staff as informal clinical guidelines into formal

policies and procedures for the mental health crisis bed program (MHCBP). This resulted in a revised LOP that was currently in draft form awaiting approval by the quality management committee. The memorandum stated the draft copy will be forwarded as a part of the response to the QIP. Quality training on the revised LOP was given to mental health staff by the chief of mental health and senior psychology staff. IST training sheets will be forwarded as a part of the PBSP's response to the first QIP.

With regard to QIP number two, a memorandum dated 12/20/11 from PBSP to the senior psychologist specialist, CCHCS, was provided. It noted that there was discussion regarding the recommendation which was to charter a QIT to make a change to the LOP governing who calls an ambulance. The memorandum went on to state that the LOP was that any first responder had the authority to call for an ambulance and that the timeline in this case, even midnight on a weekend, indicated the response time was only four minutes. The memorandum noted that PBSP staff believed that waiting for the RN to make the determination usually did not alter the final departure time. The memorandum concluded that the alarm was sounded at 0045 hours, basic life support was provided, and the patient was pronounced dead at 0116 hours, 31 minutes later, and that the staff "do not believe this time could have been improved upon." This memorandum was signed by the CEO.

With regard to QIP number three, SPRFIT meeting minutes dated 1/30/12 were provided. An agenda item labeled "Southern Hispanic gang issues" indicated there was discussion and that plans were being developed for other staff members to join the discussion and the SPRFIT team would consider the need for statewide training on this issue with the notation "action: none."

That concluded the QIP responses to the suicide report. There was no letter or memorandum provided and signed by the directors of the statewide mental health program or DAI or their designees accompanying theses QIP responses.

**Findings**: This inmate's suicide death appears to have been both foreseeable and preventable. The inmate quite clearly had a history of suicidal ideation and at least one suicide attempt. He was noted to have been decompensating, particularly during the month of October 2011 and especially in the 24 hours prior to his death. The inmate requested help for his mental illness and suffering from medical and custody staff, including indicating to custody and the psych tech that he wanted to see the psychiatrist. He agreed to take a PRN medication of Vistaril and complained of chest pain to the RN and requested assistance from medical. Quite clearly the inmate was decompensating and is described in the record as having psychotic symptoms that were escalating. Curiously, the suicide reviewer made references to these very documents, and appeared to be of the view that if the inmate denied suicidal ideation, he did not have any appreciable suicide risk or need for a SRAC. Review of the UHR indicates the inmate was clearly distressed, anxious, and fearful. Therefore, these factors alone should have raised the levels of concern with regard to the possibility of self-harming and impulsive behaviors which would have indicated the need for mental health staff to perform a SRAC.

The Facility A psychologist not seeing the inmate for crisis referral as a departure from local operating procedures is a major and significant factor in the failure of mental health staff to adequately assess and manage this inmate's deteriorating and psychotic condition. Further, the ordering of Vistaril on a one time stat dosage by the psychiatrist and the

apparent responses from the RN, according to the suicide report, that the inmate "had gotten all that he was going to get" despite his ongoing distress were again woefully inadequate management measures. The inmate's death appears to have been preventable had he had the appropriate assessments, SRAC completed, and transfer to the CTC/MHCB as he was clearly decompensating and psychotic.

## 26. Inmate Z

Brief History: This inmate was a 41-year-old African American male who committed suicide by hanging on 11/9/11 in the ASU at Calipatria. He was not a participant in the MHSDS and was housed alone on double cell status at the time of his death. The inmate entered the CDCR via the WSP RC on 3/8/95. He had been found guilty of attempted murder in the first degree, with enhancements for use of a firearm, for causing great bodily injury, and for driving away in a stolen vehicle. He was sentenced to consecutive sentences of ten years and 25-years- to-life with the possibility of parole. His MEPD was 3/9/08.

The inmate was discovered on 11/9/11 at approximately 2:14 p.m. by a correctional officer who approached the inmate's ASU cell to advise him of a scheduled doctor's appointment. The inmate was the sole occupant in the cell and when the correctional officer looked inside the cell, he observed the inmate suspended from a bed sheet fashioned into a noose around his neck. The bed sheet was tied to the uppermost air vent located above the toilet/sink. The correctional officer immediately notified a supervisor and the sergeant notified medical staff and retrieved the cut-down tool from the control booth officer. At approximately 2:15 p.m., the sergeant notified all ASU staff of the situation via institutional radio and proceeded to the cell. Upon arrival the sergeant ordered the cell door opened in order to provide the emergency response. At approximately 2:16 p.m., he and another correctional officer entered the cell and began to take the inmate down. The sergeant grabbed the inmate by the legs and lifted him, and the correctional officer cut the bed sheet from the inmate's neck utilizing a pair of medical scissors. The two placed the inmate on the floor of the cell. At approximately 2:17 p.m., medical staff began initiating life saving measures. A correctional officer notified central control of the situation via institutional radio and requested a Code Three ambulance. At approximately 2:19 p.m., the inmate was secured to a backboard and placed on a gurney. He was then transferred to the Calipatria TTA via the ERV. While at the TTA, medical staff declared the inmate dead at approximately 2:42 p.m.

The suicide report provided additional information including a timeline. It indicated that a primary care physician who had been seeing inmates on the unit arrived at 2:17 p.m., found no pulse, and began giving chest compressions while the sergeant provided rescue breathing utilizing the ambu bag. The physician also applied the AED and no shock was advised. The inmate was then lifted onto a backboard and taken to the TTA via the ERV. The suicide report also indicated that the inmate was placed on a heart monitor and an intravenous line was established at 2:28 p.m., as medical and nursing staff continued providing advanced cardiac life support. At 2:41 p.m., the outside ambulance arrived and at 2:42 p.m. death was pronounced by a staff physician with agreement of ambulance staff and other physicians present. An autopsy report was provided by the Imperial County Coroner's office and indicated the autopsy was performed on 11/15/11. The cause of death was determined as hanging and the manner of death as suicide. Toxicology analysis was provided and indicated a coroner's panel tested for amphetamines, benzodiazepines,

cannabanoids, cocaine and/or metabolized opiates, and alcohol resulted in "none detected" in a blood specimen.

The suicide report recounted the inmate's criminal justice history, which began as a juvenile at age ten when he was arrested for vehicle theft. The inmate was arrested four times between ages ten and 17 with three charges of vehicle theft and one for selling cocaine. He had nine prior arrests as an adult, for offenses including possession of a narcotic/controlled substance, carrying a loaded firearm in a public place, obstructing/resisting a public officer, carrying a concealed weapon in a vehicle, taking a vehicle without the owner's consent, battery, possession/purchase of cocaine for sale, burglary, receiving stolen property, and traffic violations. The commitment offense resulted in the inmate's first CDCR term, which began on 3/8/95. The circumstances of the commitment offense involved the inmate having been stopped by a California highway patrolman for speeding in a stolen car. During the course of the stop, the inmate fired a weapon at the patrolman and caused great bodily injury, resulting in the above charges and conviction.

During the course of his incarceration, the inmate was confined at WSP, Calipatria, SVSP, CSP/Corcoran, Centinela, CSATF, CSP/Sac, and ultimately to Calipatria on 4/25/07, where he remained until the time of his death. The inmate had his first parole hearing in February 2007 when the board recommended that he obtain a high school equivalency certificate, learn a trade, participate in self-help groups, remain discipline-free, and work to reduce his custody level. The inmate obtained his GED in April 2008, held a number of vocational assignments as a janitor and in the kitchen, and had only one RVR at Calipatria for refusing to submit to a urinanalysis on 2/28/10. In his second parole hearing on 2/20/09, he was encouraged to remain disciplinary free, attend Alcoholics Anonymous meetings, engage in self-help groups, and do more to prepare to return to the community. His next parole hearing was to be in 2013.

Uncharacteristically, the inmate received three RVRs on 9/27/11. The inmate was observed by the control booth officer standing at his cell door exposing his penis and masturbating, and the control booth officer told the floor officer, who approached the cell. The inmate moved away from the cell door; however, when the officer also moved away from the cell front, the inmate returned to the door and continued to masturbate. He was issued a RVR for indecent exposure. On that same day, less than three hours later, the inmate reached through the handcuff port and grabbed a correctional officer's wrist when the correctional officer was attempting to serve the inmate with his ASU placement notice, resulting in a second RVR. A cell extraction team was assembled and negotiated with the inmate to exit his cell. However, when the inmate finally volunteered to exit his cell and a correctional officer started to place handcuffs on him, the inmate suddenly turned and reached through the cuff port attempting to grab the correctional officer's arm. The inmate struck the correctional officer on the hand, resulting in a third RVR for battery on a peace officer. The ICC met, the inmate was found guilty of all three charges, and he was assessed a twelve month SHU term.

The inmate filed a 602 appeal on 10/17/11, which had not been heard at the time of his death. He began a hunger strike on 10/27/11 to protest the charges against him. On 10/30/11, he was sent to the OHU for a medical evaluation because of his hunger strike. On 11/7/11, the inmate had hearings on his three RVRs and was found guilty on one of the

assaults. The outcome of the other two charges was not reported in the suicide report. It was noted in the suicide report that the inmate projected an attitude of hopelessness during the hearing on the second two charges and appeared to be tired and giving up. He had a medical appointment scheduled on 11/9/11 for follow up based on his hunger strike. As a correctional officer approached the cell to move the inmate for the appointment, he found the inmate hanging as noted above.

The inmate left a note on his desk that was reported in the suicide report as follows: "They lied, they conspired, they use trickery to keep you in prison. Hypocrisy…They toy with your life and your families (sic) sympathies. The moral corruption is absolute, it is better to rest in peace, rather than exist in eternal misery and suffering!!! Catch you in the next life…11/9/11."

The inmate's mental health history indicated that he had minimal involvement with mental health services both before and during incarceration. The report did not describe his mental health contacts prior to incarceration but noted that he self-referred to mental health in the CDCR in January 2000, complaining of stress. He was next seen by mental health in August 2004 and was admitted to the MHCB from 8/28/04 through 8/30/04 with an unknown diagnosis. He was released to general population without being placed in the MHSDS. The inmate again self-referred to mental health on 4/3/07 while at SVSP, after he was denied parole at his initial parole hearing and again was not identified as having mental health needs or placed in the MHSDS. After his transfer to Calipatria, he submitted a health care services request form for a psychological evaluation in October 2007 and a mental health evaluation on 10/24/07 indicated that he did not meet the criteria for inclusion in the MHSDS. However, the psychologist held counseling sessions with the inmate in 2007 and 2008.

A comprehensive psychological evaluation was ordered by the Board of Parole Hearings (BPH). It was completed on 9/22/08 to assist them in parole planning. The psychologist found no evidence of major mental illness, but according to the suicide report, noted the inmate's conflicts with authority and a tendency to blame others instead of accepting responsibility for his disciplinary history. The psychologist also noted the inmate had made limited efforts toward realizing what was required for parole, had little evidence of cognitive or emotional maturation, and the assessment found him to be a high risk for violence. The psychologist diagnosed Polysubstance Dependence and Antisocial Personality Disorder with a GAF score of 80.

The inmate had a comprehensive mental health evaluation after the RVRs he received on 9/27/11. He was seen by a psychologist in the SHU on 9/29/11 for an indecent exposure evaluation. The inmate also requested follow-up with mental health and was seen by the psychologist again on 10/11/11 and a SRE and mental health evaluation were completed. The inmate denied suicidal ideation and based on the SRE had an estimate of risk of low chronic risk and low acute risk. His diagnosis was Adjustment Disorder and Antisocial Personality Disorder with a GAF score of 65. Despite the Adjustment Disorder diagnosis, the clinician determined he did not meet criteria for inclusion in the MHSDS.

The inmate was seen by a psychiatrist for his final mental health contact on 11/1/11 after he ended his hunger strike and continued to deny any mental health issues. The psychiatrist indicated there would be follow-up in eight weeks. The inmate committed

suicide before that follow-up could be completed. Other than the inmate's hunger strike, the record indicates he had no significant medical conditions or treatment. It was noted, however, that he completed an advanced directive for health care while he was in the OHU on 10/30/11.

The suicide reviewer noted the inmate's frustration and anger at having received three RVRs on 9/27/11 and his statements to custody that he believed that custody had targeted him and he was fearful of custody. The inmate was noted to have made statements to the effect as to why he would engage in masturbation when his next BPH hearing was approaching in 2013. The reviewer also noted the inmate's appeal of the guilty findings and statements that he was being subjected by the correctional officer with sexual taunts and gestures and that his appeal had not been heard at the time of his death. Further, the inmate's hunger strike began on 10/27/11 after placement in the OHU where he reported that officers were against him and he was looking forward to his hearing so he could argue against the charges. The hearing of 11/7/11 in which he was found guilty was also recounted in the suicide report with information that the inmate was noted as drained, defeated, and hopeless. He had an appointment with his primary care physician on 11/9/11 based on his hunger strike, but was found hanging in his cell prior to that appointment, when he "gave up the fight" according to the reviewer. The reviewer opined "his decision to take his life was clear and absolute." The reviewer further opined that there was nothing the staff could have done to prevent the suicide and the inmate was not mentally unstable and knew how to access mental health services. The emergency response was noted as excellent.

The reviewer commended the actions of the Calipatria staff in which they met or exceeded program guidelines. This included health care, in which the reviewer was impressed by the response of the primary care physician. It also included mental health staff, who provided the inmate with a thorough evaluation following the incidents of indecent exposure and batteries on staff, including assessment for mental health concerns and suicide risk. There were no recommendations for quality improvement generated by the suicide report.

A Death Review Summary dated 12/8/11 was completed by a physician who noted the primary cause of death as suicide by hanging and medical conditions of low back pain and dyslipidemia. The physician noted the category of death as suicide. The physician determined that there were no departures from the standard of care, and no systemic concerns. The standard of care of nursing was deferred to nursing review. There were no recommendations other than providing the CEO, CMO, and DON with a copy of the review.

**Findings:** Based on this reviewer's analysis of the documents provided, including the suicide report, this inmate's suicide death does not appear to have been foreseeable or preventable. Although there were clear indications that the inmate did not react well to receiving the three RVRs in September 2011 or his eventually having been found guilty on 11/7/11, he did not report nor was he observed to be at risk for intent for self-harm. He was clearly frustrated and angry and during the hearing was described as hopeless, but this did not generate a SRAC despite it being "bad news". The inmate had two previous SRACs in October 2007 and October 2011. Each assessment estimated the inmate to be at low risk, including the SRAC on 10/11/11 after receiving the RVRs, but prior to his hunger strike and hearing in which he was found guilty. Retrospectively, it appears the inmate

lost all hope for a favorable outcome of his upcoming BPH hearing scheduled in 2013. The staff appeared to follow all relevant Program Guide requirements prior to his suicide.

## 27. Inmate AA

Brief History: This inmate was a 33-year-old Caucasian male who committed suicide by hanging on 11/17/11 at SQ. The inmate was condemned, housed in East Block, and single celled at the time of his death. He was not a participant in the MHSDS. He entered the CDCR via the SQ RC on 11/9/99 after he was found guilty of one count of murder with a special circumstance and sentenced to death.

The inmate was discovered on 11/17/11 at approximately 6:20 a.m. by a correctional officer who was conducting a security check and distributing the breakfast meal in the East Block. The correctional officer observed cell coverings on the front of the cell and ordered the inmate to take them down, but received no response. The correctional officer continued to pass out the morning meal and when he walked back to the inmate's cell, observed that the cell coverings had not been removed from the front of the cell. He again ordered the inmate to remove the cell coverings, received no response, and utilized his flashlight to see inside the cell. He then proceeded to physically remove the cell coverings himself and once able to see inside the cell, he observed that the inmate appeared to have a clenched fist leaning against the cell door. The correctional officer continued to establish verbal communication, but received no response. He continued to remove the cell coverings and was able to clear enough of them out of the way to observe what was later identified as a leather belt affixed to the top of the cell door and the other end of the belt cinched around the inmate's neck. The correctional officer activated his personal alarm device and notified staff by yelling and alerting custody and medical staff of the location of the incident. Other correctional officers responded, the cell door was opened, and the inmate's body was lifted by two correctional officers in order to loosen the tension of the belt that was around the inmate's neck. The belt was removed from the top of the cell door and after it was removed the correctional officers laid the inmate's body on the Stokes litter that was positioned directly in front of the cell. The inmate was unresponsive throughout the process and a correctional officer began to perform chest compressions as medical staff arrived on the scene. The correctional officer was relieved by two RNs who provided CPR. A C-collar was applied and oxygen was provided via a bag valve mask. The San Quentin Fire Department (SQFD) arrived in East Block and assisted in transporting the inmate off the fifth tier; he was subsequently transferred onto a gurney as CPR continued. The inmate was transported to the central health services building and at 6:34 a.m., the inmate arrived at the TTA along with the SQFD and custody staff. At 6:36 a.m., a Code Three ambulance arrived at the TTA as CPR continued and medical staff administered Epinephrine and Atropine. At 6:47 a.m., CPR was stopped and the inmate was pronounced dead by a paramedic.

The suicide report provided a timeline. It included the inmate being discovered at 6:20 a.m. and a medical emergency call being received by TTA staff. CPR was begun by first responders and by 6:23 a.m. health care staff arrived, assessed the inmate's vital signs, and noted that there was no pulse or respiration, his pupils were fixed and dilated, and his skin was cold to touch with "contracted extremities." The AED and cervical collar were placed and oxygen was administered by bag. At 6:24 a.m., the suicide report noted that the AED was activated and advised no shock. At 6:25 a.m. on the tier three landing, the AED was applied and advised shock; one shock was delivered however no palpable pulse was

detected. CPR continued and the AED was utilized three additional times before the inmate was transported by the emergency vehicle at 6:34 a.m.

While the emergency vehicle was en route to the TTA at 6:28 a.m., the AED was applied again and advised no shock. The emergency vehicle arrived at the TTA at 6:34 a.m. Clinical notes indicated that "rigor mortis set in upper extremities and lower extremities, mottling noted on hands and feet bilateral, bluish discoloration of upper and lower extremities." CPR continued and the paramedics arrived at the TTA at 6:36 a.m. and noted a rectal temperature of 92.8 degrees. An IV line was inserted in the right anti-cubital fossa by a RN and Epinephrine and Atropine was administered. The AED again advised no shock. A "finger stick" was attempted but the notation was "unable to open finger." At 6:47 a.m., death was pronounced by the paramedics and the finger stick was noted as successful.

The coroner's report was provided by the Sheriff's Office, Office of the Coroner of Marin County and indicated that there were signs of rigor on the body. The coroner's verdict was that the inmate's death was "due to or is a consequence of suicide." The report was dated 11/18/11. It does not appear that there was an autopsy or toxicology analysis performed.

The suicide report recounted the inmate's criminal justice history. It indicated that the inmate had a juvenile history beginning in 1994 (age 15) when he was arrested for vandalism of mailboxes, flowerpots, and a tombstone in Wisconsin. His prior adult criminal history revealed that he was arrested in January 1998 for disorderly conduct (possession of marijuana), also in Wisconsin. His commitment offense occurred on 11/14/98. Records indicated that he had spent several days in the California desert ingesting multiple doses of LSD and returned to the coast while experiencing the psychotic delusion that he was God's messenger and needed to commit a murder – a sacrifice. The inmate subsequently followed a nine-year-old boy into a bathroom, slit his throat, and stabbed him multiple times. Two days later, he attacked a woman on a street in Los Angeles but was subdued by a passerby, held by police, and returned to San Diego County. He was tried and found guilty of one count of murder with a special circumstance and sentenced to death. He remained at SQ throughout his incarceration from 11/9/99 through 11/17/11.

The suicide report indicated that the inmate had no mental health history prior to incarceration, but that he had made suicidal statements while in jail prior to commitment to the CDCR. Review of the records indicated that the standardized bus screening completed on 11/9/99 stated the inmate responded that he had received mental health treatment in the community, and had attempted suicide in November 1998 and had suicidal ideation in January 1999. A letter from the Los Angeles County Jail dated 2/2/00 indicated the inmate had been on "psych line" while he was at the jail. He was evaluated by mental health clinicians but there was no record of his having received mental health treatment in the jail. After he entered the CDCR, he was evaluated on 11/12/99 and determined not to fit the criteria for inclusion in the MHSDS. He was cleared for placement with no mental health restrictions. However, his statements regarding mental health treatment and suicidal ideation in the county jail were noted as well as his history of attending counseling while he was in high school following the death of his best friend in a motor vehicle accident. He was also noted to have a substance abuse history and particularly of marijuana and LSD during his teenage years.

242

During his incarceration the inmate was never placed in the MHSDS and from 1999 to 2006 did not have contact with mental health staff.  Between 2006 and June 2009, records indicate that the inmate was seen five times by mental health staff for welfare checks in the aftermath of suicides of other condemned inmates, but was never placed in the MHSDS or received follow-up mental health treatment.  In July 2011, he was referred to mental health by a correctional counselor based on information from a "confidential informant," and what appeared to be a change in the inmate's mental state.  He was seen by a psychiatrist and psychologist on 7/13/11, who found no evidence of altered mental status or need for further evaluation, noting his mental status was essentially stable and he denied any wish to die or suicidal urges.  He was determined to not be in need of further mental health services.  This was the last contact he had with any mental health clinicians.  The inmate was noted to not have any chronic health problems.  The only medication prescribed for him at the time of his death was Ibuprofen.

The suicide reviewer noted that based on interviews of others for preparation of the suicide report, it was suggested that the inmate was an isolated young man with chronic delusional religious beliefs and preoccupations who stayed aloof from others.  There were no known precipitants identified for the inmate's suicide.  The inmate did not leave a suicide note.  The suicide reviewer also noted in the report that during the last months of the inmate's life, he apparently gave away all of his belongings except for major items that might draw attention, like his television and CD player.  In addition, 11/14/11 was the 13th anniversary of his crime.  The suicide reviewer commended the SQ staff for meeting or exceeding program guidelines in the emergency medical response.

The suicide report identified one problem and QIP as follows:

Problem 1:  Evidence collected during the emergency response (92.8 degree body temperature, signs of rigor mortis) suggested that the inmate had been dead for at least several hours.  East Block custodial procedures include mandatory positive counts during First Watch.
Quality Improvement Plan:  The warden or designee at San Quentin State Prison shall make a referral to the Office of Internal Affairs (OIA) for a formal investigation regarding the completion of First Watch counts.

A Death Review Summary dated 12/14/11 was completed by a physician who indicated the primary cause of death as ligature strangulation/asphyxiation and the category of death as suicide.  The only co-existing condition was allergic rhinitis and the conclusion was the inmate died of suicide and the death was not preventable.  The physician identified no deviations from the standard of care for medical providers or nursing, or systemic concerns.  Recommendations were for a suicide review report by mental health that was pending and that copies of the review were provided to health care executives.

On 2/22/12, the Deputy Director (A) Statewide Mental Health Program and Director (A) Division of Adult Institutions issued their Report on Implementation of the Quality Improvement Plan for this inmate's suicide.  The report included a memorandum from the senior psychologist, crises screening and intervention team at SQ to the chief of mental health at SQ.  It indicated that on 1/6/12 a request for administrative review was submitted to the labor relations officer of the employee relations office regarding the potential negligence on the part of identified first and second watch staff relative to the inmate's

suicide. The request was approved and the potential negligence was being investigated by a SQ ISU lieutenant. In addition, tier officer post orders would have an addendum specifying that hourly security checks will include wellness checks to ensure the safety of inmates housed in East Block.

An additional memorandum was provided which specified the count times that security checks are required to be conducted by staff during first watch and stated that the inmate's body, given the body temperature and presence of rigor mortis, suggested that the inmate had been dead for several hours at the time of discovery, bringing into question the veracity of the 0430 hours count. The memorandum continued that the collected data would suggest that the inmate had been dead for at least several hours and would indicate that staff on both first and second watch was remiss in their duties to "ensure that all inmates are alive and not seriously ill or injured." The recommendation was that two correctional officer staff be referred for administrative review. The recommendation was endorsed by the associate warden, specialized housing division.

**Findings:** This inmate's suicide death does not appear to have been foreseeable as he was not reporting any ideation or intent for self-harm or suicide. He was retrospectively discovered to have been giving away some of his property, but not in such an overt way as to be noticeable by staff. The inmate's death, however, may have been preventable had the required security checks been performed. The inmate's body was discovered with rigor mortis and livor mortis and cold body temperature, indicating that it was likely he had been dead for several hours. The suicide report asserts staff failed in their responsibilities for the required security checks. The facility has re-emphasized the need for security and welfare/wellness checks as required by local operating procedures and policies.

## 28. Inmate BB

Brief History: This inmate was a 40-year-old Hispanic male who committed suicide by hanging on 11/19/11 at the WSP RC. He was not a participant in the MHSDS, was housed on a SNY, and was double celled at the time of his death. The inmate entered the CDCR via the WSP RC on 6/15/11 after pleading guilty to anal and genital penetration with a foreign object and second degree robbery. He was sentenced to nine years in prison. The inmate's EPRD was 11/24/18.

The inmate was discovered on 11/19/11 at approximately 10:29 a.m. by a correctional officer who was conducting a security check of the building. He saw the inmate inside of his cell hanging by the door with a sheet tied around his neck and attached to the handicap railing located by the toilet, with his feet stretched out in front of him. A Code One emergency was immediately announced via institutional radio and the building's audible alarm was activated. The correctional officer retrieved the cut-down tool from the control booth officer as responding staff entered the building and the cell door was opened. The correctional officer immediately cut the rope and initiated CPR. Responding staff placed the inmate on a medical gurney and escorted him to the TTA. While at the TTA medical staff was able to establish a pulse. Subsequently the inmate was transported to Delano Medical Regional Center via Code Three ambulance.

The suicide report provided a timeline which included the floor officer having observed the inmate in his cell pacing and reading a book at 9:55 a.m. Between 10:29 a.m. and 10:32 a.m., the floor officer discovered the inmate hanging, announced the emergency, other staff

responded, the inmate was cut down and CPR was initiated, and staff placed the inmate on a gurney. The report continued that between 10:32 a.m. and 10:35 a.m., nursing staff arrived with the emergency response bag, assessed the inmate as having no pulse, and staff continued CPR while en route to the TTA. At 10:35 a.m., staff at the TTA requested an outside ambulance. At 10:40 a.m., staff in the TTA assessed the inmate as unresponsive with no pulse and respiration and eyes dilated but no pallor or cyanosis. The inmate's skin was warm to touch; staff established an airway and placed a cardiac monitor which demonstrated asystole. Staff started an IV line as well as a nasal airway and placed a cervical collar for support. The inmate was given Epinephrine IV and advance cardiac life support resuscitation. The inmate received another amp of Epinephrine at 10:47 a.m. and at 10:49 a.m. a carotid pulse was detected, CPR was stopped, and blood volume monitoring and respiratory status monitoring were continued. At 10:50 a.m., staff assessed the inmate as having vital signs of a blood pressure of 132/69, pulse 124, and oxygen saturation of 84 percent and "continued chest compressions."

At 10:53 a.m., emergency personnel arrived at the TTA and staff placed the inmate on a backboard for C-spine precautions and the inmate was placed in an ambulance. The ambulance departed for Delano Regional Medical Center at 11:00 a.m. The inmate was subsequently transferred to the San Joaquin Community Hospital for intensive lifesaving treatment at 3:35 p.m. He continued receiving treatment until 11/21/11, when he was pronounced dead by a neurologist at 5:25 p.m. as he had no brain activity. He was pronounced dead by a second neurologist at 7:18 p.m. The inmate remained on life support pending harvest of his organs from 11/21/11 to 11/23/11, and was again pronounced dead on 11/23/11 at 11:40 a.m. An autopsy report was provided by the Kern County Sheriff/Coroner, Coroner Section. It indicated the cause of death as hanging and the manner of death as suicide. No toxicology studies were provided.
The suicide report recounted the inmate's criminal justice history. It indicated that he had been arrested as a juvenile at age 15, but no details of that arrest were provided. He had one prior adult conviction in May 2002 for domestic violence for which he received 36 months' probation and 20 days in the county jail.

The inmate's commitment offense was his first entry into the CDCR. The commitment offense involved the inmate sexually assaulting a woman on 3/20/11 that he had befriended; they had been sharing vodka. The woman reportedly refused his sexual advances and he subsequently became forceful and sexually assaulted her. The inmate also stole the woman's purse and was arrested by police when they found him in possession of the purse. He was subsequently connected to the sexual assault based on his possession of the purse. The inmate entered the CDCR on 6/15/11 and had been at WSP for approximately six months when he committed suicide. He requested and was placed in protective housing based on his commitment offense. He was placed on what has been reported at WSP as a "SNY," but is not considered a genuine SNY per departmental guidelines. The inmate also had two detainers placed by Immigration and Customs Enforcement (ICE). He also was required to register as a sexual offender.

The inmate's mental health history appeared to have begun at the Ventura County Jail when on 6/10/11 he was seen by a nurse after reporting feeling depressed. That was the day of his sentence to nine years in prison. He reportedly requested medication to calm him, but denied any thoughts of wanting to hurt himself or others. He was returned to general housing and referred for a mental health appointment, but was transferred to prison

before he was seen. A nurse at the jail prepared a "Confidential Transfer of Medical Information" form dated 6/14/11 and noted the inmate had a pending appointment with mental health for his anxiety. He arrived at WSP on 6/15/11 and completed a bus screening in Spanish. He reported that he had been treated for mental illness three months earlier, had anxiety problems, and was referred for a routine mental health evaluation. It appeared from the record that mental health staff did not see him within 72 hours as required.

On 6/29/11, the inmate was evaluated by a bilingual psychologist in the housing unit in a confidential setting. The inmate completed a 31-item RC screening, was noted not to endorse current or past suicidal ideation, and was not placed in the MHSDS. He also received a Clark Adaptive Support Evaluation and was designated as NDD, indicating that he did not have a need for adaptive support. Records indicated that the inmate did not speak English, and it appeared that he had his evaluations conducted by a Spanish-speaking clinician. The inmate had no further contact with mental health staff and was never placed in the MHSDS during his incarceration. Records indicated the inmate had no known suicide or self-harm attempt history. He also had no known or significant medical problems. However, he had a substance abuse history, which included methamphetamine, marijuana, cocaine and alcohol. The inmate described himself during reception screening as an alcoholic.

The inmate left two suicide notes written in Spanish and translated in the suicide report. One letter was to his sister in which he begged her not to cry for him. He stated he made the decision on his own that it was necessary to take his own life so as not to continue living "this way all of my life." He asked her forgiveness from their parents for causing this shame for all of them. He continued that he wanted to be forgiven for his sins, that they knew what to do with his ashes, and that he wrote this with his own hand. The second letter he wrote to Ventura County and stated that what he did does not have a name and asked their forgiveness with a "sincere heart." He went on to state that it was necessary for him to pay with his life because he did not deserve to live. He ended the note with a goodbye and to please give his ashes to his sister, again writing that he wrote the letter with his own hand, signing it with his last name, first initial, and CDCR number.

The suicide reviewer made reference to having interviewed the inmate's new cellmate, who did not speak Spanish and the inmate did not speak English. The cellmate informed the reviewer that they communicated through hand gestures. The cellmate stated that the inmate gestured holding up nine fingers to indicate that he had nine years. The inmate also made a "hanging gesture" on 11/18/11 that the cellmate interpreted as meaning that he had tried to hang himself in the past. The following day, 11/19/11, the cellmate reported that he had asked another Spanish-speaking inmate to ask this inmate if he was okay and to ask this inmate if he was going out to yard; the inmate said no. The suicide reviewer continued that according to the cellmate, the cellmate informed the floor officer that the inmate was acting strangely, "had torn up some sheets and tying them together to make a rope." The inmate was discovered hanging by the floor officer and according to the suicide reviewer, another correctional officer said that the inmate porter had alerted the floor officer about the hanging, at 10:29 a.m. The reviewer continued that there was no information that the inmate's cellmate had informed the officer as he was going to the yard that the inmate was making a rope out of sheets. The reviewer added that the control booth officer reported that an inmate porter had discovered the inmate hanging and had alerted the floor officer.

The suicide report identified three problems and QIPs as follows:

<u>Problem 1</u>:  On June 15, 2011, upon the inmate's arrival at Wasco State Prison a nurse completed a healthcare screening.  The nurse noted that the inmate had received mental health treatment in the recent past and reported anxiety.  The R&R nurse made a mental health referral.  Mental health staff did not interview the inmate until June 29, 2011.
<u>Quality Improvement Plan</u>:  The Chief of Mental Health or designee at Wasco State Prison Reception Center (WSP-RC) shall conduct a retrospective audit of ten percent of new arrivals to the Reception Center, spanning the period of one week, to determine if mental health clinical interviews (as distinct from screenings) are conducted in a timely fashion as a result of mental health referrals from R&R.  (1) If the audit shows 90-percent compliance with mental health referrals for new arrivals, an inquiry shall be conducted to determine the reason for the lack of timely follow-up in this instance.  Corrective actions for the specific individuals involved shall be taken as deemed appropriate.  (2) If the audit shows less than 90-percent compliance with mental health referrals for new arrivals and timely follow-up, a Quality Improvement Team (QIT) shall be chartered to review this problem and make recommendations for improvement.

<u>Problem 2</u>:  There are discrepancies in the reports regarding the events immediately preceding the inmate's attempted suicide.  For example, what did the cellmate tell the floor officer about inmate __ tearing his sheet and what did the officer do with this information?  Also who actually discovered the inmate hanging?
<u>Quality Improvement Plan</u>: The Warden or designee at WSP-RC shall conduct an inquiry to review these discrepancies and, if necessary, make a referral to the Office of Internal Affairs (OIA).  Corrective action shall be taken as deemed necessary.

<u>Problem 3</u>:  Several difficulties occurred during the emergency response for inmate __ .  (a.) The Ambu Bag taken from the control booth apparently did not function.  In addition, memoranda from custody staff indicated that responding medical personnel seemed confused about their role in the medical emergency and did not take charge of the lifesaving efforts.  They also appeared to be unfamiliar with the content or use of the medical equipment in the emergency bag.  (b.) The emergency medical kit brought from the TTA did not include an Ambu Bag.
<u>Quality Improvement Plan</u>:  The Warden or designee at WSP-RC and the Chief of Nursing or designee at WSP-RC shall conduct an inquiry to review these problems, clarify the difficulties, and develop corrective actions as deemed appropriate.

A Death Review Summary dated 2/2/12 was completed by a physician and nurse consultant.  The reviewers identified the primary cause of death as anoxic encephalopathy with secondary cause ligature hanging and co-existing condition of anxiety.  The category of death was listed as suicide and the death was considered not preventable.  The reviewers provided a review of the inmate's treatment history, executive summary, and use of an interpreter for this inmate.  In their analysis, the reviewers indicated that a nurse failed to use an interpreter on 8/22/11.  The reviewer also indicated that two nurses failed to take control of the management of the patient upon arrival on 11/19/11, including their directing the handling of the patient including applying the C-collar, use of the backboard, and attempting an inappropriate patient lift during the course of the emergency response.  Otherwise, the reviewers indicated there was no departure identified in the medical care or

the emergency response. Standard of care for medical providers identified no departure for the medical care or emergency response. Nursing concerns identified related to the patient's death were "none." However, concerns not related to the patient death were the failure to use an interpreter and failure of the RN to take over management of the patient during the emergency response. There were no non-nursing concerns or systemic concerns identified. Recommendations were to provide copies of the review to healthcare managers, and nursing counsel referrals for two nurses as reflected in their report. A nursing review of the inmate's care and treatment from 6/15/11 through 11/19/11 was also provided.

On 3/15/12 the Deputy Director (A) Statewide Mental Health Program, and Director (A) Division of Adult Institutions issued their report on implementation of Quality Improvement Plans for this inmate in response to the suicide report dated 1/9/12. A memorandum was provided from WSP administrative staff to the suicide response coordinator, senior psychologist specialist, CCHCS, indicating the QIP responses to the suicide report as follows: As to problem one: A memorandum from the chief of mental health referencing the retrospective audit data memo of 2/9/12 for one week of referrals from R&R for new arrivals to the RC was completed. The audit indicated that 89 percent (39 of 45 referrals) were seen for a timely clinician contact within five working days. A ten percent random sample (five of 45) of those referrals indicated that a comprehensive mental health evaluation was completed 100 percent of the time within 18 days. Based on the audit, a QIT was chartered. The QIT was chartered on 2/15/12, and the task was to identify the process for receipt of referrals, MHTS data entry, and assignment to mental health clinicians; develop monitoring tools to ensure timely mental health contact of each referral; and staff training for clear documentation of each referral and progress note.

With regard to problems two and three, (a) a memorandum was sent from the chief deputy warden (A), WSP RC to the senior psychologist specialist, CCHCS. The memorandum addressed problem two of the QIP response that a psychologist interviewed the cellmate who told him that he had informed the correctional officers that the inmate was cutting his sheets into strips. According to the inmate, while he was out on the yard, the correctional officers continued to monitor the cell and that is why the correctional officers intervened as they did. This information was not available to the sergeant who interviewed the cellmate. Therefore, the sergeant did not ask the cellmate specific questions about cutting sheets. However, the cellmate told the sergeant that as he left the building for yard activities he had told the correctional officer that the inmate was "acting strange." The chief deputy warden interviewed the correctional officer. According to the correctional officer, as he was exiting the building, the cellmate told the correctional officer that the inmate was acting strange, but did not make any mention of the inmate tearing up sheets. The correctional officer went on to say that after yard release was completed he conducted the first of three security tours of the building. During his first pass of the inmate's cell, the inmate was sweeping his floor and the correctional officer did not see anything out of the ordinary. During the second pass, the correctional officer was processing laundry issues and observed the inmate reading a book, believed by the correctional officer to be a Bible. The correctional officer continued that he asked the inmate if he was alright and the inmate stated that he was. The correctional officer also said he told the inmate to bang on the door if he needed anything. The correctional officer was completing his third round of security checks and went to the inmate's cell for a third time based on the cellmate's concerns and found the inmate with a ligature around his neck. The correctional officer stated that he

was not alerted to the hanging by another inmate. The determination was that "referral for an investigation regarding the action/inactions of custody staff is unnecessary."

With regard to problem three, (a) the ambu bag taken from the control booth "apparently did not function." The QIP response was that the ambu bags in the housing units have been replaced with new ambu bags and it is the responsibility of the hazardous materials specialist to check these items during quarterly inspection of existing safety equipment. Also, with regard to problem three, a memorandum was sent from the SRN III to the senior psychologist specialist, CCHCS specifying the WSP RC drills for the 2011 calendar year by quarter. In addition, copies of the emergency response training class sign-in sheets conducted in November 2011 and December 2011 were attached. There were 15 drills conducted across first, second, and third watch during calendar year 2011.

A memorandum from the CNE dated 1/30/12 was provided to the chief psychologist who authored the suicide report. The intent was to report the results of the inquiry and corrective action taken and required supporting documentation for problem three. Regarding Problem 3(a) and 3(b), the investigator inquiry had been submitted and referred to the hiring authority for administrative review for appropriate action. Nursing medical staff had received on-the-job training (OJT) concerning proper emergency response. In addition, a description of the responsibilities of the registered nurse/LVM/psychiatric technician responder was also provided. Lastly, EMRRC minutes for 11/30/11 were attached, including discussion of this inmate's suicide and other inmates who were reviewed because of the need for emergency response. In addition, ASU medical emergency response drill proof of practice was submitted for November and December 2011 with different scenarios. In-service training class rosters were provided for RNs, LVNs, and psych techs from 2/1/12 through 3/1/12.

**Findings:** This inmate's suicide death does not appear to have been foreseeable or preventable. The inmate was not reporting ideation or intent for suicide or self-harm, although he clearly was anxious about his status within the prison. The inmate's cellmate reported that he had told the floor officer that the inmate was "acting strange" and that the inmate was tearing up sheets. The floor officer when interviewed stated that the cellmate told him that the inmate was acting strange. He therefore checked on the inmate on three rounding passes while other inmates were out to yard. On the first two, he spoke with the inmate about whether or not he was alright and told him to bang on the door if he needed any help. It was on the third pass that he discovered the inmate hanging. The investigative review at WSP concluded that there was no need for further investigation and that the officer acted appropriately. With regard to the emergency response, there was criticism that the RNs did not take over the management of the inmate during the emergency response. However, custody staff acted as first responders in providing CPR and staff was able to re-establish a pulse and vital signs for the inmate prior to his transfer to an outside hospital. It appears from review of the documents that the Program Guide and policies were followed and this inmate's suicide death was not foreseeable or preventable.

**29**. **Inmate CC**
Brief History: This inmate was a 31-year-old Iranian-Hispanic male who committed suicide by hanging on 11/26/11 at CSP/Sac. He was a participant in the MHSDS at the EOP level of care and was single celled at the time of his death. The inmate entered the CDCR via the NKSP RC on 2/2/07. He had pled no contest to assault with a deadly

weapon and to inflicting great bodily injury and was sentenced to five years in the CDCR. His EPRD was 12/12/14.

The inmate was discovered on 11/26/11 at approximately 5:14 a.m. by a floor officer who was conducting the 0500 hours count. The correctional officer arrived at the cell, solely occupied by this inmate. He observed the inmate in a corner of the cell facing away from him with what appeared to be a long white cloth strip of what appeared to be an altered issued bed sheet with a knotted loop (noose) at one end. The noose end was around the inmate's neck and the other end was attached to the left upper corner of the upper bunk closest to the toilet. The inmate was in a slouching position with his knees slightly off the ground. The correctional officer made several quick attempts to get a verbal response without success and then announced an attempted suicide over his institutional radio and activated his personal alarm. The inmate remained unresponsive. Other correctional officers arrived at the scene and the block control officer passed the cut-down kit to a correctional officer. The sergeant assumed duties as on-site commander and ordered the emergency extraction. The extraction team donned protective equipment (gloves) and the cell door was opened. The team entered the cell, the inmate remained unresponsive, and a correctional officer placed his shield against the inmate's back. The sergeant quickly checked for weapons and then used the cutting shears located in the cut-down kit to cut the noose above the inmate's head. The inmate was lowered to the ground and rolled onto a Stokes litter. Correctional officers carried the inmate out of the cell, down the stairway, and placed him on a rolling gurney. He was then transported to the "A" Facility TTA for medical evaluation and treatment. CPR was initiated in the block at 5:15 a.m. by an RN and continued by combined medical and custody staff until the doctor directed that it be discontinued at 5:48 a.m. The Code Three medical emergency transport was called for. The ambulance arrived at the institution at about 5:45 a.m. and at 5:48 a.m. the inmate was pronounced deceased.

The suicide report provided a timeline for the emergency response. It indicated that at 5:14 a.m. the inmate was discovered, CPR began at 5:15 a.m. after the cell door was opened following the officers donning gloves, the inmate was carried to the nearby TTA on a rolling gurney at 5:16 a.m., and arrived at the TTA at 5:18 a.m. with advanced life support measures in progress. There was no mention in the incident report or the suicide report of the AED being utilized during the emergency response. An autopsy report was provided by the Sacramento County Coroner and indicated the autopsy was performed on 11/28/11. The autopsy indicated the cause of death was hanging and the manner of death suicide. A toxicology report was provided and stated the only drug confirmed in femoral blood was caffeine.

The suicide report recounted the inmate's criminal justice history. According to records, the inmate had no juvenile criminal history and no prior adult criminal history before the commitment offense. The instant offense involved the inmate beating his brother at a family gathering in October 2006 to the extent that his brother had difficulty breathing. He was charged with assault with a deadly weapon, inflicting great bodily injury, and pled no contest resulting in a sentence of five years in the CDCR, which began on 2/2/07. The inmate remained at NKSP until October 2007, when he was transferred to PBSP after having received three RVRs with charges of two separate batteries on an inmate and one mutual combat. He received additional RVRs after his transfer to PBSP for mutual combat, refusing to obey orders, willfully resisting, and two RVRs for destruction of state

property. The willfully resisting RVR occurred in June 2008 when he was in the process of being transferred to the PSU at PBSP, but he curled up in a ball and refused to move. He was described as being in a catatonic-like state and was admitted to the infirmary for six days.

The inmate was subsequently transferred to SVSP in March 2009. In June 2009, he assaulted a correctional officer and was charged with battery on a non-prisoner resulting in a district attorney referral and a SHU term. He received an additional four-year sentence because of the battery on a non-prisoner and his EPRD changed from October 2011 to 12/17/14. He was transferred to CSP/Sac on 3/30/10 for placement in the PSU to serve his SHU term, as he had been placed at the EOP level of care in June 2008. His SHU term was suspended, however, on 5/5/10 when he beat his cellmate. He was then moved to the EOP ASU with a pending SHU term, but was transferred to the DSH program at SVSP on 5/25/10. He returned to CSP/Sac on 3/1/11 and after a short stay in the EOP ASU, was placed in mainline EOP where he remained until his death.

Records indicated that the inmate's mental health history began while he was in the Army. He enlisted at age 22 but was discharged after spending five months in a psychiatric hospital. He had prior treatment in a community mental health clinic starting at age 18. His diagnosis was Bipolar Disorder with Psychotic Features and he had been prescribed mood stabilizing medications. He also was reported to have stopped his medications and engaged in substance abuse including methamphetamine, marijuana, and alcohol. After his entry into the CDCR, the inmate was placed in the 3CMS program in 2007 while at NKSP. He remained at the 3CMS level of care until June 2008 while at PBSP, when he was placed at the EOP level of care. His EOP placement occurred after he had become catatonic-like in June 2008, at which time he received the RVR for willfully resisting as noted above. He was also placed on a Keyhea order at that time because of grave disability. The Keyhea was subsequently renewed on the basis of danger to self, with the last renewal occurring in June 2011.

The inmate transferred to SVSP in March 2009. He was placed on the wait list for SVPP in May 2009, because he was becoming decompensated and not participating in EOP programmatic activities. His diagnoses at that time were Schizoaffective Disorder and Antisocial Personality Disorder. While on the wait list for SVSP, he committed battery on a correctional officer in June 2009. This resulted in an additional four-year sentence and a SHU term. The inmate also assaulted his cellmate in May 2010 while in general population, resulting in a move back to EOP ASU at CSP/Sac. He was transferred to the DSH ICF program on 5/26/10 where he remained until 3/1/11. At that time, he was returned to CSP/Sac and placed in the EOP ASU because of the pending RVR for battery on his cellmate that had occurred before he left CSP/Sac in 2010. After his return to CSP/Sac, his SHU term was suspended and he was placed in the mainline EOP.

The inmate had a SRAC on 3/2/11 that estimated his level of risk as acute moderate and chronic high. The SRAC and progress notes indicated that the inmate was noted for history of suicidal and self-injurious behaviors including using rope to cut off his circulation in his hands, choking himself for stress relief, and cutting his fingers. He was also noted to have a history of impulsivity, aggression towards staff and other inmates, and labile mood. Despite his estimate of risk as acute moderate and chronic high, he remained in the EOP program, but continued to decompensate. He would not come out of his cell to

see his clinician for appointments and refused to speak with a psychiatrist. Records indicated that he was not participating in EOP programming and engaged in some bizarre behaviors, including wearing togas and turbans made out of sheets.

The inmate was noted to have delusional thinking involving his being a warrior or Samurai. Records indicated that he would smear blood on his face and cell wall, but the source of the blood was unknown. His clinician discovered in October 2011 that the inmate was cutting his fingers to smear blood on his face and body as part of his warrior rituals. Curiously, in the suicide report it was noted that the clinician worked with custody to obtain coffee grounds for the inmate to mix with water to make dark "paint" instead of using his own blood. However, there was no indication in the records that he was considered appropriate for transfer to a MHCB or APP. In addition to his clinician working with custody to obtain coffee grounds to substitute for his own blood in his rituals, nursing staff encouraged him to use ointment and band-aids on his fingers, comparing different brands of ointment on each hand. The suicide reviewer noted that the "creativity and teamwork of staff with this inmate/patient was noteworthy." The inmate had his last IDTT meeting on 11/16/11 and "proudly showed his healed fingers to staff," which staff took as a positive sign in the weeks preceding his death. The inmate should have been scheduled to see a psychiatrist for his monthly November appointment prior to 11/19/11, as his last psychiatric appointment was on 10/18/11. He also had other bizarre behaviors including putting blood in his eye to "see outside of himself," according to records. During this time period, his medication remained Risperdal at 2 mgs two times per day, which was never increased despite the inmate's clearly decompensating status and his being on an active Keyhea order.

The suicide report made reference to the inmate appearing to gradually decompensate during the summer of 2011. However, this was clearly a longer process where the inmate was decompensating since his return from DSH ICF. There were also questions as to whether or not the inmate was getting his medication even though the dosage remained a low to moderate dose of Risperdal without any increase by the psychiatric staff. A progress note dated 5/31/11 by the primary clinician indicated the inmate was seen at cell front for a brief welfare check because he would not come out of the cell. He reported that he took bird baths and washed his clothes in the cell and he did not need to come out of the cell except to go to the canteen. The inmate stated to the clinician that the clinician was annoying him and asked if the clinician could go away. The inmate was described as a Caucasian male of average height and weight, alert and oriented times four. His cell was tidy/organized, but emitted a foul odor. The inmate had a fixed eye contact. His speech was of normal rate and low in tone and his hygiene grooming was fair. It was noted his clothing emitted a foul odor and he refused to send them out to be washed. His mood was indifferent with blunt affect and his thoughts were linear and goal-directed. The clinician noted negative symptoms as the patient adamantly denied any mental health symptoms, continued to isolate in his cell, and maybe experienced auditory hallucinations, paranoid ideations with no evidence of visual hallucinations or suicidal or homicidal ideation. His GAF score was noted as 40. The plan was to continue to maintain weekly contact and there was a notation that custody indicated that his cell smelled really bad and that the inmate would not take a shower nor give up his sheets or blankets for new ones.

A progress note by the inmate's primary clinician dated 6/29/11 described him as being seen at cell front for a wellness check because he would not attend the one-to-one session

in the EOP treatment center.  The inmate stated he was alright but that he would not ever go to the treatment center, but the writer could come to his cell.  The inmate stated he only left the cell early to go to the canteen once a month and he had already finished a book the writer provided him the previous week.  He denied hallucinations and suicidal and homicidal ideation.  He maintained his hygiene in his cell by taking bird baths, but did not leave the cell to shower.  The inmate spoke in a very soft high pitched voice.  As a result, eye contact was difficult as the writer often needed to stand near the crack of the door to hear him.  The inmate's speech was relevant, appropriate, and without evidence of unusual ideation, and he presented as indifferent and conversed in response to questions.  His affect was blunted and did not reflect changes in emotion.  The assessment was of Schizoaffective Disorder Bipolar Type and Polysubstance Dependence and his GAF score was noted as 40.  The writer noted they would assess and monitor him for possible change in diagnosis.  The inmate also had been asking for clean laundry, but appeared not to understand how laundry exchange worked despite the writer explaining it to him several times.  The clinician concluded that despite isolation in his cell, the inmate appeared to be stable and in no apparent distress, was always clean, and maintained hygiene in his cell.

A progress note dated 7/12/11 by the primary clinician indicated that the inmate was again seen at cell front for a wellness check due to his not attending his individual clinical meetings in the EOP treatment center.  The writer observed that the inmate had blood on his head and stated he had hit his head when working out in the morning, reporting that he exercised every morning.  The inmate said he would think about meeting with the writer outside of the cell and denied hallucinations and suicidal and homicidal ideation, and none were noted by the writer.  The inmate was described as maintaining his hygiene in his cell because he did not leave the cell to shower.  Despite his taking bird baths, there was a noticeable odor coming from his cell.  The inmate was able to maintain eye contact, was articulate, and was quiet.  The clinician noted that at times the inmate's thought content was bizarre, but at others it was logical and linear.  There were approximately six apples in various degrees of freshness lined up on his sink.  The inmate's affect was blunted.  The diagnosis remained as it had at the previous contact and his GAF score was 40.  However, the writer was considering changing the Axis I diagnosis to Schizophrenia Undifferentiated Type.  Finally, on 8/31/11, the inmate was referred back to DSH and his GAF score was rated at 33.  His diagnosis was changed from Schizoaffective Disorder to Schizophrenia Disorganized Type.  There was no indication in the record that he was referred to the MHCB based on his clearly decompensated condition.

The suicide report indicated that the staff at CSP/Sac was notified on 11/3/11 that a DSH bed was available for the inmate and that there was need for an update on the inmate's medical condition to complete the transfer packet.  Despite there being an urgent request to nursing supervisors to complete the form with a due date of 11/8/11, the form was not returned prior to the inmate's death on 11/26/11.  The suicide reviewer noted "potentially, he could have left prior to November 26, 2011, the date of his suicide."  The suicide report also indicated that the inmate last saw his primary clinician on 11/22/11.  However, the progress note was not written until 11/29/11 because of the four-day Thanksgiving holiday, which was certainly after the inmate's death on 11/26/11.  The progress note by the clinician, dated 11/22/11 and noted as a late entry written on 11/29/11, indicated the inmate was seen at cell side for a wellness check and reported nightmares that he described as "very scary," and they contained "ninjas and sorcerers."  The inmate went on to state that he would wake up from the nightmares and he would "have a cloak on my chest."  He

stated that he was writing a letter to his mother and that he would go over the letter with the writer the next week. The inmate appeared not to be aware that it was Thanksgiving, but Thanksgiving was the week of the meeting and he denied hallucinations and suicidal and homicidal ideation. He was noted as wearing no shirt and prison-issued pants, which was different from his baseline of wearing a sheet wrapped around his waist. He was also sleepy and showed the writer the tips of his fingers, which appeared to be almost fully healed from his self-injurious behavior. The note went on to state that the inmate was future-oriented and that psychosis and delusions continued to be evident in his thought content. The diagnosis was Schizophrenia Disorganized Type and Polysubstance Dependence in a Controlled Environment. There was no Axis II diagnosis and his asthma and history of low back and knee pain was noted. His Axis V GAF score was estimated at 31. The plan was to continue monitoring his bizarre thoughts and self-reported nightmares and to monitor "to ensure he is not engaging in self-harming behaviors." The inmate was encouraged to write a letter to his mother.

Several incomplete letters to his mother were found in his cell. The suicide report included excerpts from the letters which included the following: "Elizabeth, Today is November 24, 2014, my outdate is December 14, 2014. I thought maybe we could start a bonsai garden. or travel to France! Flights are inexpensive. And there are many available Hotels and estates. As for me I want to buy a castled estate for me and the girls. For them to play in with a big backyard and a nice front yard. And perhaps with a gate. So how s (sic) London? I bet the coffee out there is to die for. And how s (sic) the tea? Sweet and hot! – I heard Queen Diane is throwing a March, comes the 1st – through the 5th of the month. And so did you receive any coffee from up top? Can I have some $$$ on my books? I just found out I have colon cancer. I'm dieing (sic) in prison. I need to write a will. I do not want a funeral. Can you cremate me…."

Another portion of a letter that was reproduced in the suicide report stated, "I never thought of myself as a ninja warrior. But I could imagine the destiny of one…So in Quest, how lethal is your samari? (sic) Then (I'm going to send you some coffee this morning. You'll know what to do) $$. So how is London?" There are portions of two other letters, and one of these reads "My Dearest (illegible) How are you? – Just a token of my appreciation. Dear Elizabeth, Forethoughts If I may entrust you with my life."

The UHR indicated the inmate was not ever diagnosed with cancer and that he consistently refused medical appointments. He did complain of back pain and a history of asthma. He had been prescribed Tylenol, Milk of Magnesia, and an asthma inhaler and medications for allergies. Records also indicated that he received his last dosage of Risperdal on 11/24/11, two days before his death, as the order was scheduled to expire on that date and had only been re-ordered on 11/23/11.

The suicide reviewer provided information in the discussion section of this case which included "regardless of a motive, what Inmate __ needed was a safe environment and more effective treatment for his mental illness. CSP/Sac staff did all they could to keep the inmate safe within the prison setting, given that he presented no acute risk." Further, the reviewer stated "the fact that no alternative medication therapies or even an increase in his fairly modest dose of medication had been tried with this inmate was perplexing to this reviewer." The reviewer added that even while at DSH his medication remained unchanged. The reviewer continued that the inmate's "psychosis was evident to anyone

who spent more than a couple of minutes talking to him" and he was "sharing massive amounts of delusional content" with his primary clinician, in addition to her observing bizarre behaviors.  The reviewer also noted that the inmate appeared to be beginning to show some improvement in program participation when he was at DSH, but that improvement did not carry over when he returned to EOP.  The reviewer commented that "what would have been ideal for someone as ill as Inmate __ is an indefinite commitment to an intermediate care facility," but noted that such was not available to inmates unless they were paroled as a Mentally Disordered Offender.  The reviewer opined that CDCR should consider reviewing the feasibility of legislation to allow indefinite CDCR inmate commitment to DSH.  The reviewer included in recommendations, commendation for CSP/Sac for actions which met or exceeded program guidelines for mental health to the primary clinician, custody in showing flexibility, nursing in working creatively, and coordination between custody and mental health in mitigating the inmate's SHU term and placing him in the EOP program.

The suicide report identified two problems and QIPs as follows:

Problem 1:  Health Care staff (nursing and physicians) failed to respond promptly to the urgent request to complete the Health Care Transfer Information form needed for transfer to DMH when a bed was available.  As a result, the transfer was delayed and Inmate __ died without access to a higher level of care.
Quality Improvement Plan:  The Chief Executive Medical Officer or designee at CSP/Sac shall direct the Quality Management Committee at CSP/Sac to charter and implement a Quality Improvement Team (QIT) to examine this process in order to determine the root cause of the problem and make any changes deemed necessary by the QIT.

Problem 2:  Inadequate medication management for severe psychosis was noted by this review.  Although the inmate would not talk to the psychiatrist, the psychologist described the extent of the psychosis very well.  The psychiatrist could have worked with the team to understand the extent of the illness and try him on a more aggressive medication regimen or sought a consultation.  Additionally, the 30-day contact appointment for November was overdue and the medication renewal was late (see Problem 3).
Quality Improvement Plan:  The Chief Psychiatrist or designee at CSP/Sac shall conduct an inquiry into the psychiatrist's treatment of inmates with severe mental illness.  If the inquiry results in a concern about the psychiatrist's treatment of mentally ill inmates, a referral shall be made to the Mental Health Peer Review Subcommittee (MHPRSC) at CCHCS Headquarters for a Pattern of Practice Review to determine whether this psychiatrist's inadequate treatment of this inmate's illness was a unique case or whether this is a pattern seen with this treatment of other inmate/patients.

There was no Problem 3 in the suicide report as referenced above.

A death review summary dated 12/13/11 was completed by a physician.  The death review summary noted the primary cause of death as asphyxiation secondary to ligature hanging and the co-existing condition of Schizoaffective Disorder.  The category of death was suicide.  The reviewer summarized the inmate's treatment and chronological order of significant events.  It was determined with regard to the standard of care of medical providers that provider seven's failure to order medications per ACLS protocol was a departure from the standard of care; with regard to the standard of care for nursing, nurse

A's failure to take the AED with her to the emergency response, failure to activate EMS in a timely fashion, moving the patient to the TTA rather than providing high quality CPR at the scene, and failure to refuse an order to intubate a patient in an attempt to resuscitate him were all departures from the standard of care and CCHCS policy. No systemic concerns were identified. Recommendations were for the health care administrative staff to be provided copies of the review, and nursing counsel referrals were N/A due to an open investigation with MOP.

On 2/29/12 the Deputy Director (A) Statewide Mental Health Program and Director (A) Division of Adult Institutions issued their Report on Implementation of the Quality Improvement Plan for this inmate's suicide. Included in the response was a memorandum dated 2/21/12 from the suicide response coordinator, CCHCS, to the chief clinical practices, mental health program, CCHCS, regarding the inmate's QIP. This noted that according to a memorandum from headquarters dated 11/10/10, the primary care providers (PCP) were responsible for completing the referral paperwork to DSH, and the suicide report erroneously assigned responsibility to nursing staff. The memorandum went on to state that during the course of completion of the QIPs by CSP/Sac staff, clarification regarding responsible parties was provided in a memorandum and an updated operating procedure. A copy of the 11/10/10 memorandum was included in the response.

With regard to problem one and the QIP, a QIT was chartered and met on 12/16/11, 1/13/12, and 2/8/12 and the inmate's suicide was discussed by the QMC on 1/5/12 and 2/2/12. The memorandum stated that the chief physician executive at CSP/Sac agreed there were systems and communication issues that could have been improved and were addressed in their final recommendation. However, it also stated that it should be noted that even if the information had been provided on time, it would not have guaranteed the inmate would have been transferred to DSH right away. The memorandum continued that the purpose of the QIT was to streamline the process for obtaining required medical information for DSH transfer and the final recommendation from the QIT was that the DSH coordinator would print the problem list and other required information from the eUHR and provide it to DSH. Further, if the required information was not in the eUHR, the medical records department would be contacted to locate the information in the paper UHR, scan it into the eUHR, and send a copy to the DSH coordinator. In addition, the inmate's PCP would be responsible for completing the CDCR form 7371, the problem list, and other required information. The DSH coordinator was added to the distribution list to receive the weekly medical provider schedule to allow her to determine who the PCP was, and when information was needed the DSH coordinator would email the PCP and make a phone call to notify them of the request. After the PCP completed the required documents, they would be sent to medical records for scanning into the eUHR. Finally, the final recommendation was that if two days passed and the PCP had not completed the required documents, the DSH coordinator would notify the chief physician and surgeon (CPS) and copy the chief of mental health by email. The CPS would ensure that the information was completed within one business day and that a copy was sent to the DSH coordinator, which was then sent to medical records for scanning. The response indicated that a QIT meeting was scheduled for 4/11/12 to follow-up on implementation and compliance with the final recommendations.

With regard to problem two in the QIP, the chief psychiatrist (A) CSP/Sac sent a memorandum to the chief of mental health noting that the treating psychiatrist was a

contractor and had not elected to renew his contract at CSP/Sac as of 2/7/12. The memorandum went on to state that the psychiatrist had difficulty working with the inmate because he would rarely attend appointments, the inmate was maintained on an "average dosage of an antipsychotic medication," the laboratory studies and Involuntary Movement Scales were monitored appropriately, and the psychiatrist's notes were sparse and not completed every 30 days as required by the Program Guide. The memorandum continued that at the time of the inmate's suicide the treating psychiatrist was being counseled and monitored closely for the completion of progress notes. The memorandum stated the psychiatrist was maintaining a caseload of over 90 severely mentally ill inmate/patients, including approximately 40 with an involuntary medication order. The memorandum continued that the psychiatrist was overwhelmed with his workload, requested to move to a different program, that 1.25 psychiatrists were assigned to replace him for his EOP caseload, and monitoring was in place to determine if this was adequate coverage. The chief psychiatrist opined that after reviewing cases and input from staff and supervisors it appeared the psychiatrist was "confident/competent, provides quality care and monitoring, works well with others, but was unable to manage the large caseload, frequency of visits and documentation." The psychiatrist was noted since a change in assignment to have been following timelines for follow-up and completing appropriate documentation, and "a referral to Inmate Mental Health Peer Review Subcommittee for a Pattern of Practice Review is not indicated at this time." The chief psychiatrist concluded with a statement that the CDCR credentialing department had been informed that any future supervisor of this psychiatrist should monitor documentation.

**Findings:** This inmate's suicide appears to have been preventable and quite possibly foreseeable. The inmate had a history of suicidal ideation and self-harming behaviors including his cutting his fingers and using his own blood to include in his delusional rituals. Staff was well aware of this and counseled the inmate with the assistance of custody to use coffee grounds instead of his own blood. The records reviewed and the suicide report reviewer's comments with regard to CSP/Sac doing all they could to assist this inmate did not appear to be consistent with how the inmate was treated and managed.

While there was a referral to DSH ICF level of care, after months of decompensation the inmate was evaluated as decompensating, isolating himself from clinical contacts, refusing to see the psychiatrist, and had questionable medication compliance; however, there was no documentation of a referral to the MHCB or to an APP. Curiously, despite the inmate being actively psychotic and on a Keyhea order, the apparent justification for not having a joint meeting of the inmate with his PCP and the psychiatrist as well as the IDTT in the many months before his death after his return from DSH in March 2010 was that the inmate was not an acute risk. He was clearly decompensating and not participating at the EOP level of care and his delusions and bizarre behaviors were active. It is unclear based on this reviewer's analysis of this inmate's care and treatment as to why he was not referred to the MHCB and as necessary to APP for acute management of his active symptoms. The suicide reviewer in this reviewer's opinion correctly identified that the referral to DSH was not acted upon promptly, but even the referral to ICF was delayed for several months despite the inmate's clearly deteriorating condition. In addition, the review indicated that the emergency response was inadequate, particularly with the use of the AED and calling for the ambulance. Given these clear failures of adequately responding to the inmate's mental health needs, the late referral to ICF, the placement on the wait list for transfer for over one year, inadequate medication management and the other factors listed

in this report, in this reviewer's opinion, the inmate's suicide was highly likely preventable.

**30**. **Inmate DD**
Brief History: This inmate was a 55-year-old Caucasian male who committed suicide by hanging on 12/1/11 at the Correctional Training Facility (CTF). The inmate was housed on a SNY and was double celled at the time of his death. He was a participant in the MHSDS at the 3CMS level of care. The inmate re-entered the CDCR via the WSP RC on 9/16/05 having been convicted on two counts of aggravated arson. He was sentenced to 24 years to life and his MEPD was 7/22/23.

The inmate was discovered on 12/1/11 at approximately 4:04 p.m. by his cellmate who was returning from yard and notified a correctional officer "there is something wrong with my cellie, I think he's injured." The correctional officer referred the inmate to other tier officers and the inmate ran to a second correctional officer and at approximately 4:05 p.m. told the correctional officer "I think my cellie hung himself." The correctional officer questioned the inmate, what cell he lived in, informed his partner, and the two correctional officers reported to the inmate's cell. Upon arrival at the cell, the correctional officer looked through the cell window and observed the inmate alone inside the cell facing the cell wall between the bunk and toilet. The correctional officer observed a torn bed sheet fashioned into a noose tied to an unknown location above the inmate leaning down towards the inmate's head. The correctional officer was not able to see in what manner the noose was secured to the inmate because of the inmate's large amount of facial hair. The officer activated his personal alarm and announced a "Code One" emergency via institutional radio, and requested medical assistance. Other correctional officers responded and one of the correctional officers got the cut-down tool at the sally port and a RN requested the assistance of the CTF fire department and told North Control to contact 911 to request an outside ambulance to the scene.

Upon arrival at the cell by several correctional officers, the cell was unlocked and the inmate was observed hanging from a noose that was tied to the cell vent and wrapped around the inmate's neck. A correctional officer observed that the inmate's eyes were open and yelled to the inmate, but received no response. The second correctional officer shook the inmate and as he did the fashioned noose broke and the inmate began to fall towards that correctional officer. The correctional officer wrapped his arms around the inmate's torso guiding him to the floor of the cell and removed the noose from the inmate's neck. A correctional officer checked him for a pulse and did not find any. At approximately 4:06 p.m., the RN arrived as the first medical responder on the scene and the inmate was moved to the floor and CPR was initiated. A correctional officer tried to provide CPR via a pocket CPR mask. However, he could not obtain a seal due to the large amount of facial hair on the inmate and the RN instructed the correctional officer to discontinue attempts to provide rescue breathing as she continued chest compressions. At approximately 4:14 p.m. the CTF fire department arrived, one fire captain relieved the RN and took over chest compressions, and another fire captain attached the AED to the inmate. The second captain also began airway management of the inmate, utilized trauma shears to remove some facial hair from the inmate's face, and cut off the inmate's shirt. The captain inserted an oropharyngeal airway (OPA) into the inmate's mouth and utilized a bag valve mask to provide rescue breathing. At approximately 4:18 p.m., American Medical Rescue (AMR) paramedics arrived on the scene and took over chest compressions. The AMR

paramedics confirmed asystole and at 4:31 p.m. CPR was stopped and a CTF physician declared the inmate deceased.

A timeline was provided in the incident report consistent with the narrative report. It contained additional information that after the arrival of the CTF fire captains at 4:14 p.m., the AED was brought to the scene by CTF staff, was applied, and advised no shock. An autopsy report was provided by the Office of the Coroner, Monterey County Sheriff Coroner's Office and indicated that the autopsy was performed on 12/2/11. The cause of death was determined as asphyxiation due to hanging and the manner of death as suicide. A toxicology analysis was provided and indicated there were no common acidic, neutral, or basis drugs detected in a femoral blood sample and no blood ethyl alcohol detected. Detected in blood samples were Risperidone .01 mgs per liter, Fluoxetine 0.16 mgs per liter, Norfluoxetine 0.26 mgs per liter, Cetirizine 0.53 mgs per liter, Hydroxyzine 0.5 mgs per liter, and Propanolol 0.05 mgs per liter. The blood Cetirizine level was above the effective level of 0.02 – 0.4 mgs per liter but potentially toxic ranges are not known. The blood levels for Fluoxetine, Propanolol, Norfluoxetine and Risperidone were all within effective levels. The blood Hydroxyzine was above the potentially toxic level of greater than 0.1 mgs per liter.

The suicide report recounted the inmate's criminal justice history. The inmate self-reported that he had been arrested at age 13 but there were no details known about that arrest or any other juvenile arrests that may have occurred. The inmate's first adult arrest was at age 24 for rape and assault with a deadly weapon, but the charges were dismissed. In 1988 he was arrested and convicted for obstructing and resisting a public officer and placed on three years' probation. According to the report, he had numerous arrests over the next year for driving on a suspended license and received probation. He was again arrested in 1996 for burglary and receiving stolen property and received more probation. In 1997, he was arrested for attempted burglary and sentenced to 90 days in jail at a six-month residential drug treatment program, in addition to five years of probation. He absconded the following month and re-offended by burglarizing. Following conviction for that burglary, he was continued on probation. The inmate was arrested and charged with four counts of arson of property and battery on a custodial officer in January 2000. He was convicted and sentenced to state prison for a term of two years and eight months. He paroled and was on parole when he was arrested on his commitment offenses, which occurred on 8/12/03. He was arrested for arson and convicted on 4/5/05 on two counts of aggravated arson. He was sentenced to two terms of ten years to life which were doubled because of a second strike sentencing requirement and they were to be served consecutively with a four-year enhancement. This amounted to a term of 44 years to life; upon appeal the length of the sentence was amended by reducing the second count charge and deleting the second strike sentence such that reduction resulted in a sentence of 24-years-to-life.

After the inmate entered the CDCR, he requested protection for safety reasons as he might have been a possible target for assault by other inmates. He was referred for SNY housing but retained in ASU until after his court appeal in 2007. He was transferred to the SVSP SNY on 10/31/07 and as his points dropped from level IV to level III he was transferred to CTF on 11/8/11. At the time of his transfer, the facility building that he was transferred to was on lockdown status due to an inmate-on-inmate stabbing and a modified program until

the evening of 11/29/11. This inmate and others were confined to their cells except for release for priority ducats and showers every three days.

The inmate entered the CDCR on 9/16/05 via the WSP RC. At the bus screening, he denied any past mental health problems or past treatment. He acknowledged that he had abused alcohol and street drugs until 1995, when he stopped using drugs. However, he filled out a health care services request form on 11/8/05 to mental health and was seen by a clinician on that same day. Based on symptoms of depression and visual and auditory hallucinations as well as paranoia, he was placed in the MHSDS at the 3CMS level of care. The inmate also reported having suicidal ideation on three occasions when he was in the county jail, but denied any past suicide attempts. The UHRs were not provided regarding the inmate's first CDCR incarceration so it was unclear as to whether or not he received mental health treatment during that incarceration. There was also no information that he received any mental health treatment in the community prior to his incarcerations.

The inmate's diagnoses were Major Depressive Disorder with Psychotic Features and Alcohol Dependence in Remission in a Controlled Environment. His GAF score was estimated at 55.

The inmate was transferred to PBSP on 12/20/05. He was prescribed Seroquel and in January 2006, Risperdal, Paxil, and Benadryl were added. He remained at the 3CMS level of care throughout his incarceration. The following month, in February 2006, he reported that the medication was helping but he continued to have depressive symptoms including hopelessness, helplessness, and poor sleep, as well as psychotic symptoms of auditory hallucinations, and people talking about him. These symptoms appear to have improved after the addition of the other medications to his initial Seroquel, as noted above. His diagnosis was changed to DSM-IV "296.32," which corresponded to Major Depressive Disorder Recurrent, Moderate; although there was a notation in the record that had abbreviations as "RECURR DEPR PSYCHOS-MOD." While at PBSP, his diagnosis was changed on 5/23/07 to Schizoaffective Disorder, rule out Major Depressive Disorder with Psychotic Features. On 7/31/07, the diagnosis was again changed to Psychotic Disorder NOS. During this time period, his medications were also changed with his Seroquel being increased from 300 mgs to 500 mgs between December 2005 and May 2006. In April 2006, his Risperdal was discontinued so by June 2006, he was prescribed Seroquel, Paxil, and Benadryl. Those medication regimens continued through late 2007 to early 2008, but it was unclear from the records as to when his Seroquel was discontinued. The inmate remained on Prozac and Benadryl in April 2008 and in June 2008, Lithium Carbonate was added. He continued to receive Lithium, Prozac, and Benadryl, and Propanolol was added in July 2008.

The inmate was transferred to SVSP in November 2007 and his diagnoses were changed at that time to Dysthymic Disorder, Stuttering, Polysubstance Dependence, with possible Persistent Perceptual Disturbance, Antisocial Personality Disorder, and Schizotypal Personality Disorder. Records indicated that during the month of July 2008, psychiatrists also indicated a diagnosis of Mood Disorder NOS and Bipolar I Disorder, Most Recent Hypomanic. It was during this time that the Lithium was started in response to the inmate's symptoms of Bipolar Disorder. On 10/1/08, the diagnosis was again changed to Major Depressive Disorder, Recurrent and Polysubstance Dependence, with possible Persistent Perceptual Disturbance. From that point until his death, the inmate had

diagnoses of Psychosis Disorder NOS, Mood Disorder NOS, and/or Bipolar Disorder NOS. The medication regimen remained Lithium, Prozac, Benadryl, and Propanolol, with the addition of Risperdal in December 2009 until the time of his death. On 11/20/11, Hydroxyzine 150 mgs hs was added. This was of considerable importance given that the toxicology report at the time of autopsy indicated that he had blood levels of Hydroxyzine above the toxic range. Although his initial presentation of symptoms reflected depression and psychotic symptoms including hallucinations, over the years he also began to display other symptoms of Mood Disorder and Bipolar Disorder, including delusions, grandiosity, paranoia, and ideas of reference suggestive of Bipolar Disorder. Laboratory testing demonstrated consistently that his Lithium and Risperdal levels were within the therapeutic ranges. He, however, was noted to have very limited interaction with his primary clinician in terms of "talk" therapy. The inmate also was isolated from other inmates in that he was noted spending most of his time on the yard or watching television. The inmate's Lithium was lowered because of a reaction and fine resting tremor, but remained within therapeutic ranges.

The inmate was transferred to CTF on 11/17/11 as his points had dropped to level III. The suicide reviewer indicated that his primary clinician at CTF was a psychologist who reported to the suicide reviewer that she only had access to the eUHR and the only recent documentation was a mental health treatment plan dated 10/5/11. A progress note by the case manager, dated 11/17/11, indicated the inmate would be scheduled to see the psychiatrist on 11/20/11, referred for a DDP evaluation, and scheduled for the IDTT as soon as possible. The diagnosis was Mood Disorder and Psychotic Disorder and the assessment was that he was stable and did not exhibit signs or symptoms of acute decompensation at that time. Unfortunately, the psychologist did not have the past medical records in order to compare the inmate's current presentation to his previous functioning prior to transfer to SVSP. The case manager indicated that communication was established by speaking slowly using simpler English and reading materials to the inmate. Noted also was that the inmate was able to ask and answer questions appropriately during evaluation, except for the consent forms. The other document that the psychologist was able to review that was provided was a mental health evaluation dated 4/24/07 when the diagnosis was Major Depressive Disorder Recurrent, Moderate and Alcohol Dependence. The medications at that time were very different and included Seroquel and made reference to a SRAC completed on 4/24/07.

Based on the referral for a DDP evaluation, the inmate was to be seen on 11/28/11 by a psychologist to complete a Clark Adaptive Support Evaluation (CASE). However, the inmate was sitting in the medical rather than the mental health area waiting for his appointment and by the time he was discovered, the psychologist could not complete the testing that day. Notably, the inmate in past testing had been found both NCF and NDD. He was noted to be functionally illiterate as he had difficulties both reading and writing. According to the suicide report, she interviewed the inmate. Based on the interview, she was concerned that he was depressed and compromised and although looking physically healthy, was in fact debilitated. The psychologist scheduled to see the inmate the following week. According to the suicide report, she also informed the facility sergeant of her concerns about his presentation and to contact her if he worsened.

A mental health treatment plan dated 11/17/11 was provided by the case manager. It indicated that the inmate was taking his medications as prescribed. It also noted that he

appeared mildly depressed, but that he rated himself on a scale of one to ten, with ten being the most severe, as a "ten;" he also indicated that he had depressed mood most of the time. His concentration, attention, and memory were rated as decreased, and his intellectual functioning as "borderline?"

A SRA dated 11/17/11 by the same case manager indicated the source of information was the inmate/patient interview only.  It identified a number of chronic risk factors including a history of Major Depressive Disorder, substance abuse and violence, perception and loss of social support, longer life sentence, white ethnicity, and older than 35 years of age and male.  The acute risk factors were current/recent depressive episode, increasing interpersonal isolation, and agitated or angry.  The only protective factors were positive coping skills and conflict resolution skills, active and motivated in psych treatment, and sense of optimism; self-efficacy.  The inmate did not report a plan to kill himself or a desire to die and special communication needs were indicated.  The additional details section did not include a full mental status examination, but the mental status examination was completed on the mental health evaluation form.  The acute risk was estimated as low and the chronic risk as moderate.  The plan was to schedule an IDTT and consider EOP or DD placement.

The CTF new arrival IDTT review for the inmate was conducted on 11/30/11.  The IDTT decided that he should remain at the 3CMS level of care, with plans for his primary clinician to see him weekly to more fully assess his treatment needs.  This IDTT review was the last contact mental health staff had with the inmate prior to his death on 12/1/11.  The inmate's medication regimen had not changed significantly since 2010.  However, when he was transferred to CTF, the psychiatrist discontinued his Benadryl and substituted Hydroxyzine on 11/20/11.  Review of the MARs from CTF indicated several blanks on the MARs between 11/23/11 and 11/28/11 and refusals on 11/24/11 and 11/28/11 of his antidepressant medication Prozac.  He also refused his morning dosages of Lithium and Propanolol on 11/24/11, 11/27/11, and 11/28/11.  The MAR indicated that he received all of his bedtime medications.  However, based on the toxicology analysis at the time of the autopsy, his Hydroxyzine, which was prescribed hs, was above toxic ranges; this indicated that he may have hoarded that medication and taken multiple dosages at once, mostly likely on the night of 11/30/11 or the morning of 12/1/11.  The MARs also indicated that the inmate received all of his a.m. medications on 11/29/11, 11/30/11, and 12/1/11.

The inmate's medical history was positive for Hepatitis-C, refractory reflux disease, and mild arthritic degeneration of the mid-lumbar spine.  These were chronic medical conditions for which he received periodic treatment.

The suicide reviewer made reference in the suicide report to the inmate having written a letter to one of his brothers in September 2011.  The letter indicated that he was frustrated that his brother had not responded to previous letters, he had essentially lost contact with his family members, and he was very lonely.  In the letter, the inmate asked for addresses of other family members and contact with them.  This letter was discovered in the inmate's property as it had been returned and was marked "addressee moved/no forwarding address."  The reviewer also made reference to the inmate having moved to CTF shortly before his death, which was on lockdown; there was thus little contact with anyone other than his cellmate, and that neither he nor his cellmate had a television.  Furthermore, the cellmate was paroling in February 2012 and the inmate was a lifer.

The inmate did not receive any of his morning medications between 11/24/11 and 11/27/11 either because they were refused or were simply not administered. This included his Prozac and half of his dosages of Lithium and Propanolol (both given twice per day). The suicide report stated that no alerts were required to be sent to mental health staff because the inmate did not refuse his medications for three consecutive days, although a pattern of refusing medications in the morning appeared to have been present. The suicide reviewer reported that the psychologist who was to test the inmate on 11/28/11, a Monday following a four-day weekend, expressed a great deal of frustration in not being able to locate the inmate in a timely manner. The reviewer opined that the psychologist's inability to see him in a timely manner that day "may have contributed to the outcome of this case." The reviewer commended the staff at CTF for their exceptionally rapid and professional response to the discovery of the inmate hanging and their emergency response.

The suicide report identified four problems and QIPs as follows:

Problem 1: Lack of access to the complete UHR, either in paper or electronic form, by CTF mental health staff following the inmate's transfer from SVSP made it impossible for CTF mental health staff to accurately assess Inmate __. During the review of this case by committee on January 4, 2012, a concern was raised about the management of documents entered into the eUHR, especially when an inmate is transferred from one institution to another. This matter will be introduced for discussion and possible policy development at the next meeting of the Suicide Prevention and Response Focused Improvement Team (SPRFIT) at Headquarters.
Quality Improvement Plan: The Chief of Mental Health or designee and the Supervisor of Medical Records or designee at CTF shall charter a Quality Improvement Team (QIT) to research this problem and recommend solutions. If needed, Local Operating Procedures (LOPs) shall be developed or updated to reflect the QITs recommendations.
The SPR FIT at Headquarters at CCHCS shall discuss eUHR management and difficulties pertaining to the eUHR when inmates are transferred between institutions.

Problem 2: Documentation revealed considerable confusion regarding the administration of the inmate's medications from November 23 to November 28, 2011. Although missing MARs suggested there was an interruption in the administration of his medications, other documents such as a handwritten note, indicated the inmate received his medications even in the absence of a MAR. This matter was further complicated by the documented refusal of medications by the inmate, despite the lack of a MAR. Further inquiry is needed to determine exactly what occurred regarding administration of the inmate's medications and whether or not he received them.
Quality Improvement Plan: The Director of Nursing or designee at CTF shall conduct an inquiry in conjunction with the Pharmacy Supervisor, into the disruption of Inmate __'s medication. Based on the outcome of the inquiry, quality improvement measures shall be developed.
If the disruption is determined to be a systemic problem, LOPs shall be updated to reflect improvements in the process and nursing staff shall be trained on the new procedures.
If determined to be the result of individual error, those involved shall be provided with training and ongoing supervision to ensure compliance with current Local Procedures.

<u>Problem 3</u>:  While an inmate's refusal of medication for three consecutive days is governed by policy due to potentially serious consequences, current policy does not require that a physician be notified when an inmate misses his medications for three days in a row regardless of the reason.

In response to the medication difficulties outlined in QIP Number Two, this problem will be introduced for discussion and possible policy development at the next meeting of the Suicide Prevention and Response Focused Improvement Team (SPRFIT) at Headquarters. <u>Quality Improvement Plan</u>:  The SPRFIT at Headquarters at CCHCS shall discuss the possibility of amending Departmental Guidelines to include policy governing the lack of medication administration for reasons other than refusal of medications by the inmate.

<u>Problem 4</u>:  Inmate __ was ducated by a psychologist for a DDP assessment at 1300 hours on November 28, 2011.  He was not released from his cell for the ducat until 1330 hours and was then sent to, or accidentally ended up in, the wrong area.  He was not found or seen for this evaluation until 1500 hours, by which time it was too late for the psychologist to complete this assessment, thus an opportunity to detect the inmate's level of distress was missed.

<u>Quality Improvement Plan</u>:  The Warden or designee at CTF shall charter a QIT to examine and make recommendations for improvements in various aspects of the care provided to this inmate including but not limited to the missed DDP assessment due to an apparent ducating error.

A Death Review Summary dated 1/3/12 was provided by a physician.  The physician described the primary cause of death as asphyxia (minutes) due to hanging (minutes) and co-existing disorders of Hepatitis-C virus, Psychotic Disorder NOS, and Mood Disorder NOS.  The diagnostic category of death was suicide and the physician provided a summary review of the inmate's medical care and emergency response.  With regard to the standard of care of medical providers, the reviewer noted that from the available medical records (August 2011-December 2011) the patient was not seen by a medical provider in the months leading to his death, although he was seen by mental health providers.  The standard of care of nursing was noted as "per nursing."  A systemic concern was that the patient was seen by nursing on 8/26/11 for vomiting and stomach issues at which time he was referred to a primary care provider to be seen within 14 days (routine referral), which appeared not to have taken place.  This oversight (or filing error) likely did not contribute to the patient's death.  Recommendations included providing health care management with a copy of the review and a QMC report with systemic concerns as noted above.

There was no report on the implementation of the QIP for this inmate signed by the directors or designees of the statewide mental health program or DAI included in the documentation provided.  With regard to identified problem one, a memorandum from the chief psychologist and chief of mental health at CTF to the senior psychologist specialist, CCHCS dated 1/30/12, reported that a QIT was chartered on 1/12/12 and met on 1/12/12 and 1/25/12.  The goal of the QIT was to make sure that there was access to the UHR by mental health clinicians so that they could complete a thorough assessment.  It was decided to conduct an audit of at least 50 appointments of clinicians at the North Facility over a two-day period to determine what percentage of UHRs was obtained.  A total of 53 appointments were audited, involving six different clinicians.  The findings were that 48 UHRs were obtained by the six clinicians for the 53 appointments held, representing a 90.5-percent access to the UHR.

The second identified problem was whether or not the psychologist who saw the inmate for the initial evaluation knew how to access all documents in the eUHR. On interview, the psychologist was found to have difficulty recalling how much information was available in the UHR, but claimed that some of the documentation that was now in the eUHR from SVSP was not there on 11/8/11, when she saw the inmate. The memorandum indicated that the QIT found the latter problem more difficult to understand since when they investigated the information in the eUHR further it was found that many documents were scanned into the eUHR the date after the inmate was seen at SVSP. With regard to corrective actions taken to resolve the problem, the QIT members concluded there was no systems problem with mental health clinicians accessing the UHR and the case involving this inmate was an anomaly; therefore, development or updates to existing LOPs was not considered necessary. In terms of the clinician knowing how to access the information, it was included that some clinicians may need additional training in accessing documents in the eUHR. Training would thus be arranged to train clinical staff in accessing documents in the eUHR at the first staff meeting in February 2012. The aspects of eUHR management pertaining to when inmates are transferred from one institution to another would be discussed at headquarters SPRFIT.

With regard to problem two, a memorandum was provided from the CTF director of nursing to the senior psychologist specialist, CCHCS, regarding interruption in antidepressant medication from 11/23/11 to 11/27/11. This appeared to be caused by the failure of pharmacy staff to produce an updated MAR or the MAR sheet being misplaced by psych tech staff. Findings from the director of nursing's inquiry indicated that the inmate arrived at CTF on 11/8/11 from SVSP and did not come with a medication administration sheet upon arrival, or with three days of medication. His medication profile was sent to the pharmacy and medication was dispensed on 11/9/11, but nursing did not start the Fluoxetine until 11/10/11. Records indicated he received his medication through 11/22/11, but did not receive his 11/23/11 and 11/24/11 dose of Prozac. Documentation indicated he refused the 11/24/11 dose, but it was not clear whether he was a no-show or refusal on 11/23/11. The memorandum went on to state that he received his Prozac for the next two days on 11/25/11 and 11/26/11, but did not receive it again until 11/29/11, 11/30/11, and 12/1/11. The 11/27/11 and 11/28/11 doses were missed and no documentation from nursing was found to support the reason. The Lithium, Hydroxyzine, and Risperdal he was to take every morning were given daily except for missing three doses of Lithium on 11/24/11, 11/27/11, and 11/28/11.

The DON concluded that nurses were not following proper protocol and documenting refusals on a refusal form or whether the patient was a no-show or refusal in the MAR. The DON also noted the missing documentation was made by two LVNs and no one documented the reasons for the missed dosages. It was also noted the patient missed 50 percent of his doses that week, which should have prompted the nurse to submit a mental health referral for an evaluation by mental health staff. The DON indicated the corrective action taken to resolve the problem was for nursing staff to be trained by the SRN II and the SPP regarding the importance of documentation for a missed dose of medication and how to start the process of the referral on 2/9/12 during the monthly staff meeting. The two individual nursing staff would be required to attend the four-hour medication management refresher course with a nurse instructor. The agenda and sign-in sheets from

the monthly staff meeting would be forwarded to the chief psychologist to accompany the memorandum.

With regard to problem three, a memorandum from the DON to the senior psychologist specialist, CCHCS regarding medication refusal by an inmate for three days in a row requiring physician notification under Departmental Guidelines, stated the DONs response that per the findings, as discussed on identified Problem 2, a monthly audit was done by nursing and noted that for the month of January there was 63-percent compliance from nursing. The audit results ranged from nursing not making the referral or referrals being made, but there was no evidence that a MH5 mental health referral was done as found in the inmate's eUHR. Corrective action to resolve the problem by the DON determined the issue of nursing utilizing the referral process needed to be addressed. Staff were trained on 11/10/11 regarding the MH5 mental health referral form and documentation on the MARs. Staff training was scheduled to be given again on 2/9/11. The minutes, agenda, and names of staff who attended the November 2011 monthly staff meeting were included and the agenda and sign-in sheet of the meeting for 2/9/11 were to accompany the memo. The referenced minutes, agenda, and ISTs were provided in the documentation.

With regard to identified problem four, a memorandum from the associate warden (A) health care access unit to the senior psychologist specialist, CCHCS indicated that the evaluation of the circumstances concluded that the inmate was a close custody inmate subject to the close custody count at 1200 hours. The close custody count on 11/28/11 cleared at 1250 hours and it was reasonable to assume there would be sufficient time for the inmate to have been released from his cell to report for the 1300 hours appointment time. The associate warden went on to say that the inmate was not listed on the master ducat list for 11/28/11, meaning he was an add-on appointment. The tracking sheet used by the health care access unit North Facility clinic processing officer reflects that the inmate's appointment was at 1300 hours; he was checked in at 1500 hours and checked out at 1530 hours. The memorandum continued that the specific reasons for the late arrival could not be ascertained through the assessment but offered several possibilities that may have contributed to his tardiness. It concluded, however, that it simply appeared that custody did not follow established protocol. Problems for processing inmate/patients were reported and for a variety of reasons, including the need for office space, it appeared that the inmate checked in albeit late at the main clinic processing area, but the psychologist was in the educational area. The corrective action taken to resolve the problem was additional and ongoing custody supervision, intervention, and review of custody tracking sheets to ensure that inmate/patients are being accounted for with higher review if determined necessary. Further, the use of side gates for mental health services had been discontinued, eliminating the potential confusion of two entry points. Inmates were now processed through a single ingress/egress point by custody and then escorted to their appointment.

There were two memoranda sent from the senior psychologist specialist, suicide response coordinator, CCHCS, to the chief clinical practices, CCHCS. The first memorandum addressed QIP one. It reported the facility response that included that it was discovered that there was not yet a policy governing the entering of documents into the eUHR. Further, an inquiry regarding policy development was made at headquarters level and a response from the CEA director indicated that a policy had been written, but had not received formal approval. Formal approval was expected to be accomplished in the next

several months.  The second memorandum addressed problem three.  It recounted the
inquiry conducted by the DON at CTF.  The prior QIP requested a discussion by SPRFIT
at headquarters pertaining to policy regarding missed medications and the assumption was
that the policy did not cover the situation at CTF.  However, examination of the policy by
SPRFIT revealed that a patient who has missed three consecutive days of medications or
50 percent of any medication in one week either by refusal or no-show or shows a pattern
of unexplained missed medications should be referred to the prescriber for medication
follow-up counseling.  The conclusion was that this policy already covered the concerns
listed in QIP three and that training had been implemented.  This QIP was considered to be
completed.

**Findings:**  This inmate's suicide does not appear to have been foreseeable as he was not
reporting or communicating ideation or intent to harm himself or to commit suicide.
However, the suicide may very well have been preventable had there been the availability
of important mental health information contained in the UHR and/or eUHR.  This
information was not available and therefore the psychologist doing the initial assessment
was not aware of the inmate's history and complex treatment.  In addition, the inmate not
being seen and evaluated in a comprehensive manner by the second psychologist who was
going to provide the Clark Adaptive Testing, was also an opportunity for the inmate to
have been clinically evaluated and his condition assessed; this very well may have led to
his being placed in a MHCB and to a review of his medication adherence.  For these
reasons, this inmate's suicide may very well have been preventable.

### 31.  Inmate EE

Brief History:  This inmate was a 25-year-old Hispanic male who committed suicide by
hanging on 12/6/11 at SVSP.  The inmate was single celled in the stand alone ASU.  He
was not a participant in the MHSDS at the time of his death.  The inmate re-entered the
CDCR via the CCI RC, having been found guilty of murder in the first degree and having
received a sentence of 50-years-to-life.  His MEPD was 5/2/57.

The inmate was discovered on 12/6/11 at approximately 4:45 p.m.  Custody staff was
conducting the evening meal when they approached the inmate's cell, solely occupied by
him.  They looked in the cell and discovered the inmate with a noose around his neck and
hanging from the vent.  A medical emergency was announced and a cut-down tool was
retrieved from the control booth.  Staff was able to cut the inmate down from the vent and
medical staff immediately initiated lifesaving measures.  The CTF fire department
responded to the area and transported the inmate to the CTC.  At 5:07 p.m., the inmate was
pronounced deceased.

A timeline was included in the incident report and specified that the inmate was discovered
at 1645 hours.  At 1649 hours, 911 was called and at 1650 hours, medical staff began
lifesaving measures.  The timeline continued that at 1654 hours, the CTC RN arrived on
the scene, and at 1656 hours CTF Fire arrived to the scene.  The inmate was transported by
CTF Fire to the CTC and AMR arrived to the CTC.  At 1707 hours, AMR paramedics
announced that the inmate was deceased.

The suicide report provided additional information indicating that at 1647 hours, a psych
tech who was on the unit for medication pass responded and began chest compressions
while an officer assisted with the ambu bag.  The report included that when the RN arrived

at 1653 hours from the CTC, she had the AED and no shock was advised.  The suicide report also included the statement " anecdotal reports indicated that the body of Inmate __ was in full rigor when discovered."  An autopsy report was provided by the Monterey County Sheriff/Coroner, Office of the Coroner and indicated that the autopsy was conducted on 12/7/11.  The cause of death was asphyxia due to hanging, and the manner of death suicide.  A toxicology report indicated no common, acidic, neutral, or basis drugs detected including specific drug assay for THC, and no blood ethyl alcohol was detected.

The suicide report recounted the inmate's criminal justice history.  It indicated that he had first been arrested at age 15 for throwing a substance at a vehicle with intent to cause bodily injury.  He was subsequently arrested at age 16 for assault with a deadly weapon and robbery and the disposition was probation and "camp."  An adult criminal history included arrests and convictions for burglaries, robberies, vehicle burglaries, and battery on a spouse/cohabitant.  The inmate was placed on probation and jail terms and entered the CDCR for his first term on 5/19/05 with convictions of two vehicle burglaries for a total term of two years.  He paroled in May 2006 and in August 2006 committed the crime for which he was incarcerated when he died.  The details of that crime involved his shooting a fellow gang member's girlfriend's mother.  The inmate was a member of the El Monte Flores gang.  He was subsequently arrested on a parole violation, and told undercover police posing as fellow prisoners of the crime.  He was subsequently convicted as noted above.  His gang was a part of the Surenos (Southern Hispanics).  He was validated as an active gang member, and during a cell search was discovered to have inmate manufactured weapons in his cell in July 2010.  He received a SHU term which he served in the CCI SHU until he was transferred to SVSP on 2/15/11.  The inmate received additional RVRs in March 2011 and August 2011, the first for resisting officers trying to search his cell and flushing a cell phone down the toilet, and the second for assaulting a CO trying to conduct a search.  He was placed in ASU and assessed a SHU term which would have continued until 1/6/12.  He also had a DA referral for prosecution.  The SHU term was suspended on 10/20/11 and he returned to the general population on 10/31/11.  The inmate returned to ASU on 11/14/11 because of safety concerns after he had met with investigators from the Los Angeles County Sheriff's Department where he reportedly revealed the identities of other perpetrators in his commitment offense, as well as information about other gang-related crimes.  The inmate requested protective custody after this interview and was placed in ASU for safety concerns in a single cell and walk alone yard.

Based on a review of the records, it appeared that the inmate had no mental health history prior to incarceration.  He also denied any substance abuse or alcohol abuse history.  The inmate received appropriate screenings and was cleared for population.  After the inmate returned to ASU on 11/14/11, he received a mental health screening on 11/15/11 by a psych tech and the results of this screening were negative.  However, the inmate told the psych tech that he had submitted a health care services request form requesting to see mental health due to his hearing voices and because of problems sleeping.  He was seen by a psychologist on 11/17/11 at cell front because he refused to come out of the cell.  He denied symptoms of mental illness and suicidal ideation when he saw the psychologist and then was observed.

On 11/30/11, the inmate submitted a second health care services request form with complaints of hearing voices and of needing pills to sleep.  A different psychologist saw him on 12/2/11.  The inmate again refused the appointment to come to a confidential space

and was seen alone in the rotunda area of the building where he was shaving. Again he denied any mental health symptoms and suicidal ideation and continued shaving. The inmate was moved to the stand alone ASU on 12/2/11 and mental health rounds were conducted each day in the morning between 10:30 and 11:00 a.m., according to the suicide report. He was seen on 30-minute observations from 11/14/11 every 30 minutes for the first 21 days he was in administrative segregation. The inmate committed suicide on day 22 of his ASU stay, which was the first day that he was not to be seen on 30-minute welfare checks, which may indicate that this suicide was well-planned and not impulsive.

A note which appeared to be a suicide note was found in the inmate's property. It was recounted in the suicide report as follows: "Dear Mom, I'm sorry I just can't be a failure at everything I know. You guys are going to be sad but don't cry. Please I just couldn't keep lying to you especially (name of daughter). I love you guys very much. I'm sorry it had to be like this. Take care Mom its (sic) not your fault. Its (sic) mine. I can't live in here anymore its too much for me. Please don't bury me just get my ashes. I hope you understand. I'm sorry, your son, (inmate's name)."

The suicide reviewer indicated that the inmate's suicide appeared to be planned. The reviewer noted that quite likely the inmate decided that he could not survive the many years in ASU that it would take him to debrief and possibly feared consequences to his family should his betrayal of the gang become known. The reviewer also noted the last custody check would have been after shift change at approximately 3:00 p.m. and the inmate was discovered at 4:45 p.m. The reviewer commended the nursing staff at SVSP, specifying that the psych tech as first responder made a great effort to provide CPR as mandated even though the inmate was clearly beyond help, and that the emergency response was excellent. There were no recommendations generated by this review and thus no QIPs.

A Death Review Summary dated 12/12/11 was completed by a physician and nurse consultant. The reviewers indicated the primary cause of death as asphyxiation due to ligature hanging and the category of death as suicide. No co-existing conditions were noted and an executive summary was provided. The reviewers also noted that the inmate was discovered with signs of rigor mortis and livor mortis, CPR was continued by the RN, and the patient was transported to the TTA. The reviewers found no documentation indicating why the inmate was transported to the TTA and as Advanced Cardiac Life Support was not initiated, the standard of care would be to provide high quality CPR on the scene. The reviewers noted any interruption in CPR by emergency personnel to put the patient on a backboard and transport him to the TTA would be a departure from ACLS standards. The nurse consultant was noted to have reservations regarding that statement, and the reviewer noted the statement was "not reflected as a departure from the nursing standard of care, but intended to highlight the common practice of personnel to 'scoop and run to the TTA'." No systemic concerns were generated with the exception of no record of an MD appointment for the patient's sunburn. There was no recommendation to nursing counsel regarding CPR on 12/6/11 for educational purposes. There were no other recommendations.

**Findings:** This inmate's suicide does not appear to have been foreseeable or preventable. However, according to the suicide report, the inmate was discovered in full rigor and therefore there should have been a recommendation with regard to the completeness and

quality of the custody check that should have occurred at 3:00 p.m. Given that the inmate was in full rigor, he must have been dead for several hours and the time between the scheduled last custody check and his discovery was only one hour and forty-five minutes. It is unlikely given the planning of his suicide that the custody check would have prevented his death however it was a departure from required policy.

**32. Inmate Number FF**

Brief History: This inmate was a 47-year-old Asian male who committed suicide by strangulation on 12/17/11 at SVSP. He was a participant in the MHSDS at the EOP level of care. He was on double celled status but was the sole occupant of his cell in ASU at the time of his death. The inmate entered the CDCR for his first prison term via the DVI RC on 3/14/05. He had been convicted of attempted murder, assault with a deadly weapon, and battery on a spouse or cohabitant. His EPRD was 1/14/13.

According to the incident report, the inmate was discovered on 12/17/11 at 10:05 p.m. in his cell, non-responsive by his door with a rope around his neck "(rope was not attached to anything just around his neck)." The incident report indicated that staff immediately activated the alarm and conducted an emergency entry and initiated lifesaving measures (CPR). However, the inmate was pronounced deceased at 10:47 p.m. by AMR staff. The incident report provided a timeline that indicated that at 2006 hours, an audible alarm sounded for an unresponsive inmate, an ERV was requested, and CPR started by custody staff; at 2010 hours, staff requested AMR 911 notification by central control; at 2020 hours, an ERV was on the grounds and assumed CPR responsibilities; and at 2035 hours, the AMR arrived and assumed CPR responsibilities; and finally at 2047 hours, Inmate __ was pronounced dead by AMR staff.

The suicide report provided additional information, including a timeline. It stated that a CO was conducting a security check at 1800 (sic) hours and discovered the inmate lying on the floor of his cell with a rope around his neck that was not attached to a ligature site. The officer activated his personal alarm at 2005 hours and custody staff responded, initiated CPR, and placed the inmate on a gurney. At 2008 hours, the ERV was requested via radio and arrived with RNs at 2013 hours. At 2015 hours, an IV was inserted and Narcan was given as CPR continued. At 2017 hours, the AED was applied and at 2018 and 2020 hours advised no shock. An oral airway was inserted at 2020 hours. At 2025, the AED advised shock and shock was administered and then CPR continued. At 2026 hours, a blood gas was done with a result of 126, and blood on the inmate's mouth and nose were noted and manual suctioning was performed. The AED advised no shock at 2028, 2030, 2032, 2035, and 2037 hours, and CPR continued. Narcan, Epinephrine and Atropine were administered between 2028 and 2045 hours, and at 2047 hours the paramedic team leader ordered CPR, suction and AED stopped. There was no notation in the suicide report of the inmate being pronounced dead.

An autopsy report was provided by the Monterey County Sheriff-Coroner, Office of the Coroner. It indicated that an autopsy was performed on 12/20/11 and stated the cause of death as mechanical asphyxia, and the manner of death as suicide. The toxicology report indicated that a femoral blood sample revealed no common acidic, neutral, or basic drugs detected and no blood ethyl alcohol was detected. However, Atropine was detected at 0.20 mg/L, which is within the effective level.

The suicide report recounted the inmate's criminal justice history. It stated that there was no known or reported juvenile history as the inmate had grown up in Vietnam. His only prior arrest as an adult was for an assault and battery in 2000 that occurred in Massachusetts. The inmate's commitment offense involved the inmate stabbing his wife at her home in August 2004. It was noted that the couple had been married for 19 years, had four children, and lived in Boston, Massachusetts until 2003, when they separated and his wife moved to California. The inmate went to visit his wife uninvited, was noted to appear to have been drinking, and told her that he wanted to get back together. When his wife refused, he began stabbing her with a kitchen knife. The inmate was subsequently arrested and convicted. The suicide report noted that the inmate disagreed with the jury's verdict. He stated that he could not make it in prison and would kill himself if he had to serve time.

After entering the CDCR via the DVI RC, he was transferred in October 2005 to HDSP, in December 2006 to CSP/Corcoran, in December 2007 to CMC, in December 2008 to CMF, back to CMC in February 2009, and finally on 6/30/09 to SVSP. Not long after his entry into the CDCR, the inmate began receiving RVRs. He received his first RVR in July 2005 for resisting staff. He continued to receive RVRs in 2006, 2008, 2009, and 2011 for charges which included battery on a peace officer (with a 12-month SHU term), refusing a direct order to accept a cellmate (three times), failure to comply with C-Status order, delaying a peace officer (two times), assault on an inmate (with a two month 15-day SHU term), fighting (two times), and finally battery on a peace officer with a weapon on 7/2/11, resulting in a one year, six-month SHU term imposed on 11/27/11. It should be noted that mental health staff concluded in his last RVR and in two other RVRs that mental illness was a factor in the charge. However, on two other charges mental health staff concluded that mental illness was not a factor in his behavior. The inmate had developmental disability testing in 2005 that classified him as NCF.

Reviewed records did not indicate that the inmate received treatment for mental illness prior to incarceration. However, the suicide reviewer noted that the circumstances surrounding the inmate's crime suggested that he had some instability in mood and distorted thinking and had informed the probation officer that he would kill himself if he had to serve time in prison. The transfer information from the county jail in March 2005 indicated the inmate had a history of anxiety and was receiving Vistaril, indicating that he had treatment while in the jail. On the initial bus screening, the inmate had denied symptoms of mental illness and past treatment and was cleared for population. He received a mental health evaluation by a social worker in March 2005, reported symptoms of depression, and was placed at the 3CMS level of care with a GAF score of 65. By November 2005, the inmate had requested removal from the MHSDS and mental health staff discharged him from the 3CMS level of care.

The inmate remained non-MHSDS and on 11/23/08 was admitted to the MHCB because of hostile and unpredictable behavior. He refused medications and was transferred to DSH APP. His diagnosis was Schizoaffective Disorder, Alcohol Dependence, and Paranoid Disorder with a GAF score of 46. He remained at DSH until his transfer to CMC on 2/13/09. Following arrival at CMC, he acknowledged in the bus screening that he did have a mental health problem and his diagnosis was changed to Psychosis NOS and Depression NOS, rule out Delusional Disorder. He had a SRAC on 2/23/09 which indicated a number of static, slowly changing, and dynamic risk factors, and no protective factors. In addition, the inmate refused the interview, resulting in an estimate of risk as moderate. He remained

in the EOP program and in April 2009 a Keyhea order application was initiated after he
had received a RVR for assault on an inmate in which he claimed another inmate was
attempting to take pictures of his buttocks. He received a mental health evaluation by a
social worker who concluded his mental illness was a factor in his behavior and should be
considered as mitigating, but he received a two month, 15-day SHU term. The Keyhea
application was successful for administration of involuntary medication based on mental
illness and danger to others.

The inmate was transferred to SVSP on 6/30/09. During the bus screening, he reported
that he had been treated for mental illness and was having mental health problems. He was
noted to be at the EOP level of care and a Keyhea order was in effect and was renewed in
December 2009 and again in May 2010.

While in the MHCB, the inmate's diagnosis had been changed to Schizophrenia
Disorganized Type and Antisocial Personality Disorder. His diagnosis would remain
Schizophrenia throughout the rest of his incarceration until his death, but the type changed
from disorganized to residual to finally undifferentiated. The Antisocial Personality
Disorder diagnosis remained. His GAF score was estimated in the 40s from 2009 through
the time of his death.

By July 2010, the IDTT determined the inmate was doing well, changed his diagnosis to
Schizophrenia, Residual Type and noted he was receiving a low dose of antipsychotic
medication. The medication was Risperdal and the plan had been for a slow taper from
Risperdal since March 2010 with the anticipation that he would be taken off antipsychotic
medications given that he was an active participant in the EOP structured therapeutic
activities. A psychiatrist reported in a note dated 9/30/10 that the intention was to end the
Keyhea order as his mental status was within normal limits with no evidence of psychosis.
The Keyhea order expired on 11/18/10.

A psychologist completed the screening for DSH referral on 7/26/10, 11/5/10, and 1/24/11,
concluding that the inmate did not meet indicators for DSH referral. He was cleared for
placement in ASU on 3/7/11 by a psychologist even though it was noted that the inmate
refused to cooperate with the evaluation only stating that he was "good" and did not want
to hurt himself or anyone else, after he reported safety concerns. On 3/9/11, an IDTT was
held in absentia as the inmate refused to attend. The IDTT changed his diagnosis to
Schizophrenia Undifferentiated Type, estimated his GAF score at 42, and retained him in
the EOP level of care. On 7/7/11, he was admitted to the MHCB with a diagnosis of
Paranoid Schizophrenia with Acute Exacerbation and danger to others based on his
becoming aggressive toward an officer on 7/2/11. He had received a RVR for battery on a
peace officer with a weapon. He received a mental health evaluation regarding this charge.
The psychologist concluded that he was mentally ill at the time, his condition contributed
to the charge, and that it should be considered as mitigating. On 10/27/11, the inmate
received a one year, six month SHU term.

The inmate was admitted to the MHCB on 7/7/11 where he remained until 7/14/11. He
received involuntary medication consisting of Risperdal liquid by mouth and Haldol by
injection for each refusal of Risperdal. He returned to ASU on 7/14/11 as he was
determined by the MHCB team not to meet indicators for referral to a higher level of care
at DSH. After his return to administrative segregation, the EOP team reviewed his care,

noticed his improvement after restarting medication, and changed his diagnosis to Schizophrenia, Undifferentiated Type. He was designated as EOP in the enhanced case management program (ECMP), which was designed for inmates refusing 50 percent or more of their treatment. He was also screened for referral to DSH and although he met four of 13 indicators for referral, the team decided not to refer him to DSH for inpatient psychiatric treatment, but rather to monitor his response to medication. The Keyhea petition that a psychiatrist prepared while the inmate was in the MHCB noted that the reason for involuntary medication was the inmate's mental illness and danger to others. The petition was heard on 8/18/11. The administrative law judge denied the request for continued forced medication. The inmate immediately stopped taking his medications and by 8/26/11 his primary clinician noted that his mood and demeanor were declining rapidly, he refused to be seen out of cell with the interpreter, and was noted to be watching television and pacing in his cell. The psychologist noted that he appeared angry and custody staff described their interactions with him as also being negative. The psychologist opined that without forced medication the inmate would not take medications, decompensate, and "eventually face another 115."

The progress note by the primary clinician dated 8/31/11 shortly after the Keyhea hearing resulted in a denial of the Keyhea order, described the inmate as dismissive, and yelling at the primary clinician "I am fine why are you here!" The inmate was observed to be watching television and "continues to appear to decline after his discontinued compliance with medication intervention following a Keyhea hearing." Custody also described him as being organized and clean, but less approachable and more verbally aggressive and hostile since he stopped taking medications. This decline improved when he agreed to take Risperdal four mgs per day from 9/1/11–9/8/11, although he refused this medication on several dates. However, he was adherent from 9/9/11–9/30/11 for Risperdal two mgs, which was a decrease to half of the dosage he had been taking while on a Keyhea order. The Keyhea order stated four mgs per day. Quite remarkably, during the same time period, the psych tech daily round notes indicated that the inmate's behavior was cooperative, his mood was appropriate, his cognitive was within normal limits, and his hygiene and cell were within normal limits without exception.

Over the course of the next several months, the inmate was seen by his primary clinician and the psychiatrist in August and September 2011. He became sporadic in taking medication in October and November 2011, refusing approximately one-third of the days in October and November 2011. MARs indicated the pattern of noncompliance with eight refusals in October 2011 and 12 refusals in November 2011. The primary clinician wrote in weekly notes that the inmate was compliant with medication and that his mood had improved in that he was relatively pleasant but would become easily irritated regarding his mental health. He continued to refuse to come out of his cell for individual and some group appointments, as well as IDTTs. He continued in the ECMP program because he was still not participating in 50 percent of his groups and had variable medication compliance. Despite his meeting four of the 13 indicators for DSH referral, the team continued to monitor his medication response and did not refer him to DSH.

On 11/14/11, the inmate was scheduled to see a psychiatrist, but again refused to come out of cell. The psychiatrist renewed his medication for another 90 days with a follow-up for 30 days. On 12/7/11, the IDTT reviewed the inmate's treatment for the last time and noted that he continued to refuse all mental health services including medications, but did not

meet indicators for a DSH referral. The inmate remained in the ECMP program. As with previous IDTT meetings, this meeting was held in absentia as the inmate refused to attend. The inmate was noted to have delusions, labile mood, and treatment noncompliance. The IDTT note referenced a SRAC completed on 12/5/11 indicating an estimate of low risk. However, there was no documentation of this SRAC or the screening for a referral sheet to DSH in the records provided. The suicide report referenced the IDTT notes which indicated that the inmate had been observed by his primary clinician as pleasant, cooperative, and treatment compliant when medicated. It was noted he attended groups after the Keyhea order was initiated and "beaten on 9/18/2011." His behavior was noted as vacillating given his inconsistent medication compliance and it was difficult to assess his true baseline. He was noted to maintain his ADLs, was not a danger to self, and was deemed not a danger to others at his recent Keyhea hearing. Therefore, DSH referral was not pursued.

A review of the MAR for December 2011 indicated that the inmate did not receive medication on nine of the 17 days in December prior to his death. He was noted to have refused medication on at least seven of those days. Attempts by his primary clinician to see him in December 2011 were met with the inmate refusing to see the clinician on 12/5/11, 12/6/11, 12/7/11, 12/8/11, and 12/9/11. The clinician noted the inmate was "decompensating due to lack of treatment compliance with his medications." A medication noncompliance referral was initiated by a nurse on 12/9/11 as the inmate had been refusing 50 percent of his prescribed medications. However, this referral had not had a response prior to his death on 12/17/11. The clinician wrote that from 12/5/11 through 12/9/11 and from 12/12/11 through 12/16/11, the inmate would not acknowledge the clinician at his cell door and refused all EOP activities. Psych tech notes indicated that the inmate was cooperative and appropriate and that his mental status was within normal limits.

Based on record review, the inmate's clinical condition was clearly deteriorating after the Keyhea order was not renewed and he stopped medications in November 2010. However, there was improvement in his clinical condition in the MHCB for a brief time when he was receiving involuntary medications, followed by decompensation after the denial of the petition for involuntary medication in August 2011. Despite this spiraling decompensation from August 2011 through December 2011, and his having met at least four of 13 indicators for DSH referral, the IDTT determined to continue to monitor his progress rather than refer him to DSH. The inmate responded in September 2011 by agreeing to take half of the previous dosage of his antipsychotic medication, but in October and November 2011 demonstrated variable adherence. By December 2011, he was essentially refusing all of his antipsychotic medication.

In terms of the screening for higher level of care indicators completed during the IDTT meetings, the most consistent indicator met was: 1) the inmate/patient demonstrating psychiatric symptoms that have not responded sufficiently to at least six months of treatment to a degree that facilitates adequate levels of functioning; 2) less than 50 percent overall cooperation/participation with programming during the last three months; 3) has been at the EOP level of care for 365 days or more; and 4) has incurred three or more RVRs during the last three months. These were the four of the 13 indicators that were consistently met.

The inmate's medical history was essentially unremarkable with the exception of his having been diagnosed with herniated disks at L3-L4 and L4-L5 in 2006. He had several disability placement accommodation chronos from 2006 which allowed him use of a cane and wheelchair, restrictions on lifting, bending, prolong standing and sitting, lower bunk, no climbing stairs, and a special mattress. He had received lumbar surgery at an outside hospital and continued to receive medications, including Neurontin, to treat his pain. The Neurontin was prescribed from January 2010 but denied in May 2010, even though his physician had prescribed the Neurontin in May 2010. The inmate was diagnosed with spondylosis but determined not to meet the criteria for a lower bunk or level terrain chrono, and in June 2010 a nurse practitioner dictated a chrono rescinding the previous lower bunk and level terrain chrono stating there was no mobility impairment. His Neurontin was re-ordered in December 2010. In July 2010, a physician at SVSP removed him from all special accommodations and wrote "physical limitation is minimal. No restrictions to placement or housing." It was unclear how or why this change was made. Review of the eUHR indicated that the inmate submitted numerous health care service requests for back pain, stuffed and runny nose, a need for eyeglasses, and jaw pain after a fight, but there were no health care service request forms for mental health reasons.

The suicide reviewer noted several case factors worthy of note that did not rise to the level of formal recommendations. These included the inmate's extensive history of lower back pain, documentation indicating an interpreter was used for some contacts but not for others, ASU housing for 278 days, denial of the inmate's Keyhea order by the administrative law judge, and 13 RVRs in the course of his incarceration with his mental illness judged as a mitigating factor in some actions and as non-contributory in others.

The reviewer determined that there were no recommendations or QIPs generated by this review. The reviewer also determined that SVSP staff was to be commended for their proactive approach to the care of inmates in RVR proceedings, particularly in the establishment of a specialized group of clinicians for inmates experiencing the disciplinary process. The reviewer continued that additional commendations were in order for the ongoing custody/mental health efforts to monitor inmates housed in ASU for prolonged periods of time. There were no QIPs developed related to the death of this inmate.

A death review summary dated 2/1/12 was provided by a physician who recounted the inmate's primary cause of death as mechanical asphyxiation/strangulation. The co-existing conditions were Hepatitis C, chronic low back pain, s/p spinal surgery 2006, Paranoid Schizophrenia, Antisocial Personality Disorder and noted the category of death as suicide. This reviewer provided a summary of the inmate's movement and treatment and determined that with regard to the standard of care of medical providers, provider SNP I provided inadequate subjective history on several visits in 2010. Moreover, SNP I did not address Hepatitis C on two visits and a lack of medical documentation for an order written to continue Flunisolide Nasal Spray and Omeprazole. With regard to provider Dr. One, no subjective history was provided in the admission history and physical completed on 7/7/11. Regarding the standard of care of nursing, the physician referred to "see nursing review" and a systemic concern was noted that the inmate was discharged from the CTC on 7/14/11 at the EOP level of care and given 3CMS housing without documentation to reflect that a medical provider saw him after discharged from the CTC.

275

**Findings:**  This inmate's suicide death does not appear to have been foreseeable as he was not reporting suicidal or self-harming ideation or intent to staff although the suicide reviewer indicated that the inmate told another inmate through the cell vent that he would kill himself if he had to go to a SHU term in PBSP.  The inmate had made a similar statement prior to incarceration that he would kill himself if he were incarcerated.

However, the inmate's suicide may very well have been preventable had the inmate been transferred to a higher level of care.  The inmate deteriorated after the denial of the Keyhea petition in August 2011 with some improvement when he agreed to take half of the previously prescribed medication dosage of his antipsychotic medication in September 2011, but progressively deteriorated from October 2011 through December 2011.  He became increasingly more isolated and agitated and was utilizing poor judgment and poor insight as the weeks went on without the benefit of psychotropic medications.  His history was quite clear that without psychotropic medications he became more psychotic and aggressive to others, including staff and other inmates.

The treatment team's decision to continue him at the EOP enhanced level of care despite this deterioration and with the inmate's variable medication adherence and ultimately non-adherence should have at least resulted in a referral to a MHCB because of his psychotic decompensation, and more likely DSH APP for review and pursuit of renewal of his Keyhea order.  Therefore, the inmate's death was very likely preventable had he been referred to and accepted at a higher level of care beginning with a MHCB.  This became an increasingly clear necessity particularly by December 2011 when he was no longer maintaining even minimal contact at cell front with his primary clinician.  It is unclear why there was no problem identified in the QIP recommendations during the CDCR review for this failure to refer him to a higher level of care given his clear decompensation.  In addition, there was no problem identified based on the inconsistencies in the UHR, with the psych tech describing the inmate as cooperative, appropriate, and mental status within normal limits when he was clearly decompensating.  It also appears that his physical health complaints were not adequately addressed.

### 33.  Inmate GG

Brief History:  This inmate was a 65-year-old Hispanic male who committed suicide by exsanguination on 12/31/11 at CMC.  The inmate was a participant in the MHSDS at the EOP level of care.  He was classified as double celled but was single celled due to longevity privilege.  The inmate re-entered the CDCR via the CIM RC on 2/15/85.  He had been convicted of second degree murder with enhancements for personal use of a firearm and prior serious felonies.  He was sentenced to 15-years-to-life for the murder and seven years to run consecutively for the enhancement.  His MEPD was 8/25/98.

The incident report stated that the narrative was a synopsis of written and verbal reports submitted by involved staff.  The incident report stated that the inmate was discovered on 12/31/11 at approximately 11:20 a.m. by a floor officer conducting the 1130 hour close custody count.  The correctional officer looked through the cell door window of the inmate's cell, solely assigned to him, and observed him lying on his back on his bunk.  The correctional officer attempted to gain the inmate's attention, but he was not responsive.  The correctional officer observed what appeared to be a pool of fresh blood on the floor, activated his personal alarm device, and called for the assistance of staff.  The staff responded and a correctional officer opened the bar box and pulled the lever to open the

locking bar to the key position. Two other correctional officers opened the door and entered the cell. They pulled the mattress from the cell with the inmate on it into the hallway, where lifesaving measures were initiated. A correctional officer noted a fresh laceration on the inmate's left biceps. There were more descriptive accounts by each reporting employee in their individual supplemental crime/incident reports. A timeline was provided that indicated that at 1120 hours, the correctional officer activated his personal alarm device. At 1121 hours, he initiated CPR as a sergeant requested the response of the ETV via institutional radio. At 1125 hours, the ETV/fire captain arrived on the scene and at 1135 hours, the ETV departed the building en route to the clinic. At 1139 hours, the ETV arrived at the CMC East Clinic. At 1154 hours, a physician pronounced the inmate dead.

The suicide report provided additional information that indicated that at 1120 hours, the correctional officer observed the inmate in his cell and yelled down the tier "we have a cutter." Additional custody and medical staff responded, along with other yard and building staff, from the MHCB unit located on the lower floor just below where the inmate was housed. At 1121 hours, officers and nursing staff initiated CPR utilizing an ambu bag, portable oxygen tank, and AED. Nursing staff reinforced the pressure dressing on the inmate's arm. At 1125 hours, the fire captain and ETV arrived, a nurse inserted an oropharyngeal airway, the inmate was secured to a backboard, and CPR continued. At 1135 hours, CPR was briefly interrupted as the inmate was carried down the stairs to the ETV and the ETV departed the scene with CPR continuing. The ETV arrived at the CMC East Clinic at 1139 hours and advanced cardiac life support measures were provided. At 1154 hours, the inmate was pronounced deceased by the medical officer. At 1155 hours, the inmate's body temperature was recorded as 98.8 degrees.

An autopsy report was provided by the Sheriff-Coroner's Office, San Luis Obispo. It indicated that an autopsy was performed on 1/4/12 and determined the cause of death as exsanguination (minutes), sharp force trauma, left arm (minutes), and the manner of death was suicide. The autopsy report identified an elongate cut at the anterior aspect of the mid-arm, and anatomical sections showed that the cut extended to and lacerated a proportion of the brachial artery. A toxicology report indicated Citalopram, 0.24 mg/L and Ranitidine, 1.4 mg/L were detected. Both the Citalopram and Ranitidine blood levels were above the effective levels, but the potentially toxic levels for both were not known. No other common acidic, neutral, or basis drugs were detected, and no ethyl alcohol or acetone was detected in blood or vitreous humor.

The suicide report recounted the inmate's criminal justice history. It began as a juvenile when he was noted to have had at least three arrests for grand theft auto, glue sniffing, and burglary with dispositions including probation, placement in a foster home, and 90 days in juvenile hall. The suicide report made reference to the inmate having a history of physical and sexual abuse by both of his parents, uncles, and grandparents. His adult criminal justice history began in 1966 when he was convicted of interstate transportation of a stolen vehicle and sentenced to two years in federal prison, but placed on probation. In 1967, he was arrested in California for transporting marijuana and for receiving stolen property, and in Texas for drunk and disorderly conduct. In 1968, he was arrested for violation of his federal probation and received an additional six-year sentence. However, the suicide report stated that he apparently did not serve that sentence. In 1969, the inmate was arrested for murder after stabbing a man to death in a fight, was evaluated at ASH for competency for trial, and was ultimately convicted of voluntary manslaughter, receiving an

indeterminate sentence of six months to 15 years in the CDCR. In 1973, while serving that term he was also convicted of being a prisoner in possession of a weapon (knife) and sentenced to an additional three-years-to-life to run concurrently with the voluntary manslaughter term. He was ultimately paroled from the CDCR in 1975 and that term was discharged in 1978.

The inmate had subsequent arrests in 1976 for assault to commit rape, which was dismissed, and twice in 1977 for unlawful entry. In 1979, he was convicted of child molestation and sentenced to three years formal probation and ordered to receive psychiatric treatment in the community. That probation was terminated in August 1982. The inmate was arrested in 1981 and 1982 for possession of controlled substances and for intoxication; records indicated that he had a history of substance abuse beginning at age 14 and that included cocaine, marijuana, and alcohol. The inmate's commitment offense involved his wife. In May 1984, they were arguing and he was reportedly under the influence of cocaine. He pulled out his shotgun and shot her in the stomach. The inmate called paramedics and his wife died later that night at the hospital. He was convicted of second degree murder and received a sentence as listed above.

After the inmate entered the CDCR via CIM, he was transferred to CMF in March 1985 because he had a notation on a transfer form from the jail that he was a dangerous suicide risk. He was placed in CMF as a Category "J" inmate. He remained at CMF until he was transferred to CMC in April 1997, after he had been admitted to ASH (see below). The inmate's institutional adjustment at CMF and CMC was that he was employed, received only one RVR in 1985 for substance intoxication, and had the lowest classification score possible until approximately August 2006. At that time, he received an RVR for circumventing the medication line and attempting to pocket his medications and walk away. He was transferred from CIM to CMF on 3/27/85 and was between CMF, CMC, and ASH from March 1985 until 7/22/08, when he continued to be housed between CMC and ASH until he was permanently housed in CMC from 8/18/11 until his death. His work performance appeared to have been affected by his serious medical issues which included chronic renal failure, Hepatitis C, diabetes, hypertension, arthralgias, prosthetic enlargement, edema, and anemia. He also had a total knee replacement in 2009, suffered congestive heart failure and bradycardia in March 2010, and was hospitalized for pneumonia in March 2011.

The inmate's mental health history predated his current incarceration in that he was treated during his first CDCR term with a diagnosis according to the DSM II of "Explosive Personality with Dysocial Features." He was treated with Meprobamate and Valium. He also had court ordered treatment from 1979 to 1982 as part of his probation for child molestation and was evaluated at ASH prior to his commitment offense. Since his incarceration on the commitment offense, he was noted to have become suicidal and admitted to the prison hospital at CIM in February 1985. He was then sent to CMF in March 1985 as a Category "J" inmate, designated for inmates with mental illness. His diagnosis was depression and Antisocial Personality Disorder. In April 1986, he was transferred to ASH because of his depression. During that admission, he tied a sheet around his neck in full view of the nurses' station. He was noted to have displayed suicidal behavior because the nurse reportedly did not have time to talk with him. The suicide report referenced the ASH discharge summary as stating "the patient was quite normal, his associations were excellent and he was manipulative and demanding with no

278

evidence of any thinking disorder." He was retained at CMC after his discharge from ASH as was the practice at that time; all inmates returning from ASH were processed at CMC prior to returning to their referring institution.

Records indicated that he was functioning at CMF from September 1986 at what would be equivalent to an EOP level of care until 1996, when he was admitted to ASH for a second admission because of worsening depression, irritability and auditory hallucinations. The suicide report indicated that he was again manipulative and demanding and may have been attempting to influence the parole board at his first parole board hearing. He was returned to CDCR at CMC in April 1997 where he remained and was placed at the EOP level of care. The following month his diagnosis was changed to Psychosis NOS, Secondary to Drugs and "pruno" in Remission, PTSD Secondary to Child Abuse, and Polysubstance Dependence, with a primary diagnosis of Antisocial Personality Disorder and a GAF score of 45. The inmate participated in EOP structured therapeutic activities, maintained a job, and also reported that he had had three unreported suicide attempts; there was an attempted overdose in 1984, he tried to hang himself in 1987, and he reported trying to cut his throat in 1997.

The inmate was transferred to the 3CMS level of care in November 2006 with a diagnosis of Major Depressive Disorder. He returned to the EOP level of care in May 2007. At that time, his diagnosis was changed to Schizoaffective Disorder, which remained his diagnosis until 8/12/11, when it was changed to Mood Disorder with Depressive Features due to multiple medical conditions. On 11/15/11, it was changed again to Major Depressive Disorder, Recurrent, Severe, with Psychotic Features. The inmate's level of care remained EOP unless he was transferred to a higher level of care which included a MHCB from 11/3/07 through 11/9/07 and 11/26/07 through 1/9/08. He was transferred to DSH on 1/9/08 where he remained until 7/22/08, and was then returned to the EOP level of care at CMC. He was again transferred to DSH on 8/6/09, where he remained until 3/11/10 with a return to CMC. He again was placed in the MHCB from 6/3/10 to 6/6/10 and in DSH from 8/19/10 until 1/14/11. The inmate was again admitted to the MHCB from 1/15/11 through 1/18/11 and again transferred to DSH from 8/12/11 through 8/18/11. He was returned to the EOP on 8/18/11 and remained at the EOP level of care at CMC until his death on 12/31/11. He also had SRACs and evaluations at various times during his commitment. From 4/20/10 through 1/25/11, he had eight SRACs or SREs all of which estimated his acute level of risk as low or moderate and his chronic level of risk as consistently moderate.

The inmate's third admission to ASH was from 8/6/09 through 3/11/10. Records indicated that he was admitted because of delusions, auditory hallucinations, and increased depression. He also referenced having multiple medical problems that were affecting his mental health. He was diagnosed as suffering from congestive heart failure and bradycardia during this ASH admission. He was returned to CMC on 3/11/10, received continuing hospital treatment for his medical conditions, and was placed on a medical hold awaiting readmission to ASH. His mood instability increased, related to his medical conditions, and he was admitted to the MHCB from 1/3/10 through 7/6/10 for depression and suicidal ideation. He subsequently was returned to ASH on 8/19/10 for his fourth admission. He remained at ASH until 1/14/11, when he returned to CMC and the next day was admitted to the MHCB for observation because he was confused and depressed, but

not reporting suicidal ideation. He was discharged on 1/18/11 and a SRE on 1/25/11 estimated his level of risk as acute low and chronic moderate.

The inmate continued to participate in the EOP program and medical appointments for his medical conditions. However, he was referred for admission to ASH on 4/1/11 for worsening depression and thoughts of death and dying. The referral was rescinded because of his medical hold, but resubmitted in July 2011. After medical clearance, he was transferred to ASH for his fifth and final admission on 8/12/11. He remained at ASH for only four days as the ASH team concluded that his depression was secondary to his medical problems which could be better addressed at CMC. The suicide report made reference to ASH staff not discussing their decision to return the inmate to CMC with CMC clinicians and that CMC staff did not agree with the ASH decision to return the inmate. CMC staff believed that the inmate was medically stable enough to stay at ASH for a longer period of time for his depression to improve. Records also indicated that the inmate was upset about the quick return and reported thoughts of wanting to hurt himself and of committing suicide. A SRE conducted on 8/18/11 estimated his acute risk as moderate and his chronic risk as high. The suicide report also referenced the inmate stating something about gagging himself as an attempted suicide. However, the records indicated that he choked on food in the dining hall and fell over and had to be taken to medical as an accidental event on 8/18/11. He received another SRE on 8/30/11. It documented that the 8/18/11 choking was accidental and that the inmate did not have current intent or plan for harming himself. It also noted that his estimate of risk was chronic, moderate and acute, low based on his thoughts about dying from his medical issues.

The suicide report reflected and eUHR notes indicated that the inmate spoke more of his medical conditions and dying, but did not report current suicidal or self-harming ideation or intent. His last diagnosis was Major Depressive Disorder, Recurrent, Severe with Psychotic Features and Polysubstance Dependence with no Axis II diagnosis as noted above. The suicide report indicated that there was no documentation of any actual self-harming incidents occurring in the CDCR record despite the inmate's self-reports of an overdose attempt in 1984, hanging in 1987, and unsubstantiated reports of cutting in 1991 and/or 1997. Despite there being no documented suicide attempts according to the suicide report, the inmate received SREs or SRACs as referenced above. They estimated his acute risk as low or moderate and his chronic risk as consistently moderate and high on 8/18/11 upon his last return from DSH. His last SRAC was on 8/30/11 with estimates of risk of acute low and chronic moderate. During the course of his incarceration, he had been prescribed multiple antidepressants and most recently had been prescribed Remeron and Celexa. In November 2011, Abilify was added extensively to augment his antidepressant medication.

The inmate's medical conditions had progressed. In particular, his chronic renal failure and diabetes had progressed to the extent that on 10/14/11, he received an outpatient procedure to create a fistula in his upper left arm to enlarge the vein to make it easier for him to undergo dialysis. He had not started dialysis prior to his death. However, he apparently used the same fistula to cut himself resulting in exsanguination and death. He also had received a letter from the district attorney opposing his parole on 11/15/11 and he requested that his upcoming parole board hearing be postponed. He also indicated he had no place to go if he was released. According to the suicide report, he had mused with staff

280

about why any effort should be made to keep him alive. The suicide reviewer noted that they met with the CMC nephrologist who told the reviewer that he had met with the inmate on 11/17/11 to discuss dialysis. This would require transfer to another institution and the process would take several months. The nephrologist said that he told the inmate that he could be sent to WSP, CSATF, or CMF, and the inmate expressed a preference for CMF. The nephrologist stated that he responded to the inmate that CMF had the smallest dialysis program and it would be more difficult to get a bed at CMF. The inmate also discussed his not wanting to go to CSATF with his primary clinician and psychiatrist.

The suicide report made reference to the inmate having been sent to an outside hospital on 12/29/11 after he had met with a psychology intern and became disoriented, incoherent, and unable to stand. East Clinic ER staff evaluated him and found him to be confused, dizzy, lethargic, and weak. He was sent to an outside hospital where medical tests and a CT scan found nothing remarkable. He was returned to CMC later that afternoon and said that he was feeling better and did not want to go to the CMF hospital. The inmate last saw his primary clinician on 12/30/11 as a walk-in, stating that he could not remember what had happened the previous morning except being seen at the outside hospital. He also told his primary clinician that he would be okay to transfer anywhere for his dialysis. On the day of his death, 12/31/11, the inmate took his morning medications, went to work in the dining room at 6:15 a.m., and returned to his housing unit at 9:05 a.m. He was reportedly in the TV room at around 11:00 a.m. according to another inmate and was found unresponsive during the count at 11:20 a.m.

The suicide reviewer noted that there were concerns by CMC medical staff regarding the inmate's quick return from ASH in August 2011. The reviewer also noted concerns that the nephrologist could not understand the reasoning of ASH clinicians regarding the inmate being sent out for consults which could have occurred as easily from ASH as from CMC. The reviewer went on to state that concerns about the lack of communication between ASH staff and CMC clinicians were discussed during a case review. Although no formal recommendation was generated, dialogue between representatives from DSH and CDCR would continue. The reviewer added that the SPRFIT at headquarters would take up the issue of communication between CMC and ASH representatives and encourage continued dialogue between the appropriate representatives of CDCR and DSH. There were no formal recommendations identified in the suicide report and therefore no QIPs.

A Death Review Summary dated 12/13/12 and 12/14/12 was provided by a physician. The reviewer recounted the primary cause of death as exsanguination (minutes), and the secondary cause as sharp force trauma left arm (minutes). The physician noted co-existing conditions of coronary artery disease, hypertension, hyperlipidemia, diabetes mellitus, benign prosthetic hypertrophy, anemia, chronic kidney disease, and depression. The physician also noted the category of death as suicide and provided a summary of the inmate's movement and an executive summary of his treatment. The summary included that the cause of death was suicide and was not medically preventable. The reviewer indicated there were no departures from the standard of care for medical providers and referred to nursing for the standard of care for nursing. The reviewer also indicated a systemic concern that "the need for the shunt (AVF) placement in anticipation of dialysis was known prior to the patient's transfer to ASH/DMH in August 2011, the patient was still accepted by ASH/DMH, only to be discharged days later due to specialty care (Vascular Surgery) not being available/accessible by ASH/DMH (but available via

CDCR)." The reviewer went on to say that the concerns stemmed from the possible lack of communication/planning between CDCR and ASH/DSH. The only recommendation was to provide the health care managers with copies of the report.

**Findings:** This inmate's suicide death does not appear to have been foreseeable or preventable. CDCR staff at CMC appeared to have made extensive efforts to treat the inmate's mental and medical conditions and concerns. It is very unfortunate that the transfer to ASH in August 2011 resulted in a very brief stay and return based on the assertion that ASH could not obtain and arrange for consultative services but that CDCR could. The suicide reviewer very correctly identified this as a significant problem. The reviewer also identified as a significant problem the need for collaborative efforts between CDCR and DSH to avoid such problems in the future and to better understand why such a problem occurred with this inmate given the information communicated by CDCR to DSH prior to the transfer. It does not seem plausible that ASH clinicians have not been faced with inmates who may have been committed to that facility who then may develop medical complications, such as renal failure and the need for dialysis, which may require coordination and collaboration with consultant services outside of ASH. Despite this problematic circumstance, the inmate returned to CMC and returned to appropriate management by mental health and medical staff, returned to his work assignment, and participated in programmatic activities to the extent he could with the assistance of clinical and custody staff.

## 34. Inmate HH

Brief History: This inmate's death is included in the Special Master's 2011 Suicide Report even though the CDCR has classified it as a non-suicide death. The death notification on 5/5/11 regarding this inmate indicated that he died on 5/2/11 in his double occupancy cell in general population. The cause of death was unknown, but a number of factors point in the direction of a suicide. The death was being investigated by ISU. The case completion notification memorandum dated 6/9/11 for this inmate indicated that the "suicide report for Inmate __ was distributed on June 8, 2011. No recommendations were developed as a result of the review of Inmate __ 's death. No further action is needed. Thank you for your participation in this process." A memorandum dated 6/8/11 with the subject "Death Report for Inmate __ , at California State Prison, Solano" and signed by the Director (A) Statewide Mental Health Program, and Director Division of Adult Institutions indicated that the death report was attached, the inmate was discovered in his cell hanging at approximately 1700 hours on May 2, 2011, CPR was initiated but unsuccessful, and the inmate was pronounced dead at approximately 1754 hours.

The memorandum went on to state that the suicide case review focused improvement team met on 6/2/11, and that no recommendations were developed as a result of the review of the inmate's death. The second page of that memorandum is titled "Suicide Report: Inmate __ , California State Prison, Solano Page Two". The report goes on to detail the "Executive Summary of Death Report" and "Death Report." The CDCR suicide reviewer indicated in the report that the coroner's full report had not been received, that upon receipt it would be filed electronically in the inmate's data folder at DCHCS, and that the coroner's report would make a final determination of the manner of death. The CDCR suicide reviewer opined "this reviewer cannot conclude that this was a suicide. If so, it was a very sudden, impulsive act that may have resulted from this fairly intelligent and insightful inmate contemplating his future, following a fairly routine and upbeat phone call

with his mother, facing his 65th birthday." Based on this reviewer's analysis of the documentation provided, this inmate's death was more likely than not a suicide. If there is additional documentation to suggest or demonstrate that it was not, that documentation should be provided for further review.

This inmate was a 64-year-old Caucasian male who committed suicide by hanging on 5/2/11 at CSP/Solano. He was a participant in the MHSDS at the 3CMS level of care. He was double celled in general population. The inmate re-entered the CDCR via the DVI RC on 7/25/07. He had been convicted by plea bargain of terroristic threats and driving under the influence with priors. He was sentenced to six years and his EPRD was 6/24/12.

The inmate was discovered on 5/2/11 at approximately 5:09 p.m. by a correctional officer performing his duties in conducting the 5:00 p.m. count. The correctional officer observed the inmate in his cell with a rope made from a torn sheet tied around his neck and the other end tied to the upper bunk fixture. The inmate's head was down and he was facing the back of the cell between the table and the lower bunk with his knees on the floor. Both of the inmate's hands were dropping to the floor. The inmate's cellmate was standing next to the toilet area. The correctional officer notified the control booth officer to contact central control and announce a medical code. The control booth officer announced a Code One in the building and the correctional officer then activated his personal alarm device. A responding correctional officer arrived and ordered the cellmate to get down on his stomach. The control booth officer opened the cell door and a correctional officer ordered the cellmate to crawl backwards out of the cell. The correctional officer placed mechanical restraints on the cellmate and escorted the cellmate to the dayroom area and had him sit at the table. The correctional officer then relinquished custody of the cellmate to another correctional officer. An additional correctional officer arrived and retrieved from the control booth officer the scissors from the cut-down kit located in the control booth and handed the scissors to his sergeant. The sergeant and two correctional officers entered the cell; one correctional officer wrapped his arms around the inmate from the back and lifted him to relieve the pressure on the inmate's neck. Another correctional officer who had retrieved the scissors from the sergeant cut the rope from the inmate's neck and laid the inmate on the floor and checked for breathing. The sergeant lifted the inmate by placing his arms under the inmate's arms and pulled him out of the cell. Two RNs arrived and began CPR. One RN put on the AED and the second RN began chest compressions. A Code Three ambulance was called and arrived at 5:33 p.m. At approximately 5:54 p.m., a physician pronounced the inmate dead.

The inmate was subsequently taken to the primary care clinic and retrieved by the Solano County Coroner. The cellmate was taken to the North Bay Medical Center for the Sexual Assault Response Team (SART) to conduct a sexual assault examination. The incident report concluded that pending the autopsy and S&I investigation, the cellmate would be charged with "CCR3005(d)(1) force or violence, homicide. This incident will be referred to the Solano District Attorney's Office for criminal prosecution." The incident report further stated that due to the injuries sustained by both inmates, the cellmate was placed in ASU as the suspect in the inmate's homicide. The cellmate was the suspect pending autopsy and Investigation Unit investigation.

The suicide report provided additional information regarding the incident. The report stated that "either suicide or homicide appears to be possible based on available evidence,

and a final determination of the cause of death was pending a coroner's report." A timeline was provided that indicated that the correctional officer conducting the 1700 hours standing count saw the inmate hanging at 1709 hours. Officers entered the cell at 1712 hours and CPR was initiated by responding medical personnel at the scene at 1713 hours. Medical personnel applied the AED and used chest compressions and a call was made to the TTA for supplies. The inmate was observed to be "extremely cyanotic" from the neck up with a line of demarcation at the neck. At 1715 hours, supplies arrived for an IV line, but attempts were unsuccessful. CMF fire personnel arrived on the scene and assisted with CPR at 1727 hours. Paramedics arrived on the scene and began life support protocol, including successful intubation at 1733 hours, and the inmate was pronounced dead by a community doctor via phone per paramedics at 1754 hours. The suicide report continued that the cellmate initially stated that the inmate was hanging in the cell when he returned from yard at 3:45 p.m. The report stated that when asked why he did not notify staff, the cellmate told one correctional officer that he "didn't want to touch him" and told another correctional officer "I'm not here for telling." The cellmate refused to talk further. Both inmates were noted to have scratches and bruises suggesting that an altercation had occurred. Further, drops of blood were found in the cell and on clothing, and the position of the body was considered suspicious, "as force may have been required to put pressure on the noose." The suicide report also referenced "an undated possible suicide note in Inmate __ 's handwriting was also found lying on top of other material in the cell according to verbal report of an investigation lieutenant."

The suicide report stated that at the time of the report the coroner's full report had not yet been received. Upon receipt, it would be filed electronically in the inmate's data folder at DCHCS. The coroner's report would make a final determination of the manner of death. An autopsy report was provided by the Solano County Sheriff-Coroner's Office. It indicated that the autopsy was conducted on 5/4/11. The pathologic diagnoses included asphyxia and stated the deceased was discovered in the cell hanging from a ligature he had constructed from a bed sheet, was not fully suspended, and was on his knees. It further stated that there was no ligature mark in the neck, that neck dissection was negative for any hemorrhage in the neck, and that there were no conjuntival hemorrhages in the eyes, periorbital, or perioral soft tissues. A second finding was atherosclerotic cardiovascular disease. A third finding was "superficial injuries," including a half-inch laceration lateral to the left eyebrow, four small abrasions below the left eye, two abrasions on the nose, eight small abrasions on the left cheek, a one and one-quarter inch abraic contusion extending from the left corner of the mouth to the left jaw, two small abrasions on the chin, small abrasions on both knees, two linear abrasions on the left leg, and no subgaleal, subdural, or subarachnoid hemorrhage. The opinion stated that "this 64-year-old White male, died of asphyxia. The deceased was found hanging from the ceiling of his jail cell from a bed sheet which was wrapped around his neck. He was not fully suspended. Findings at autopsy were consistent with the scene. However, ongoing investigation of the incident indicates that the scene may have been staged and his death may not represent a suicidal hanging." The report went on to state that the toxicological tests for drugs and alcohol were negative. The coroner's report did not state a manner of death. There was no supplemental report or other documentation from the coroner included in the documents reviewed. A memorandum from the suicide response coordinator DCHCS dated 6/9/11 with a subject Case Completion Notification stated that the "suicide report for this inmate was distributed on June 8, 2011. No recommendations were developed and no further action was needed."

The inmate's criminal justice history was recounted in the death report.  The report stated that he was first arrested at age 14 for vehicle theft.  This appeared to be his only known juvenile offense.  His adult criminal history began with an arrest in 1964 for absence without leave from the United States Navy.  He was arrested later that year for vehicle theft and sentenced to three years' probation.  He had four subsequent arrests for vehicle code violations, falsely reporting a crime, and resisting arrest.  His probation was revoked and he was committed to the CDCR on 11/17/67.  He paroled three times but continued his criminal behavior, which included forgery, robbery, possession of drugs, and parole violations leading to revocation of parole and his serving out his term with discharge of his first number on 6/30/73.  He had multiple arrests for burglary, robbery, reckless driving, drug possession, stolen property, domestic violence, failure to appear, and criminal conspiracy.  He was committed to the CDCR for a second term on a conviction for armed robbery on 1/21/75.  He escaped from CIM on 8/8/76, was apprehended at home with his wife the following day, and was sentenced to a concurrent prison term with parole in May 1977 and discharge of his second term in July 1978.

The death report referenced the inmate having convictions and prison terms in Idaho in 1980 and in Oklahoma in 1986.  The record also indicated an arrest for vehicle theft in California in 1985 and multiple jail terms and two out-of-state terms.  He was arrested in 2007 for his commitment offense and a possible felony hold in Oregon was noted.  The commitment offense involved the inmate rear ending a vehicle in the mountains on 5/9/07.  The inmate was intoxicated, had a verbal altercation with the victim and police, refused a sobriety test, resisted arrest, threatened harm, and verbally abused the officers, according to the death report.  He reportedly also tried to kick out the windows of the police car during transport and ultimately was charged with the controlling offense of terrorist threats and non-controlling offense of driving under the influence with priors.  The report noted he was convicted by plea bargain and sentenced to six years in the CDCR entering on 7/25/07, as noted above.

The inmate's mental health history began prior to his incarceration as he had been seeing a psychiatrist in the community and had voluntarily committed himself to DeWitt State Hospital in September 1967 for treatment.  The report noted that he had been drinking heavily for 18 months and had threatened suicide several times prior to his admission and made "insignificant suicide gestures."  He also admitted using "pills, methedrine, marijuana and LSD on one occasion."

The inmate had a mental health screening at DVI in July 2007 and was referred for a mental health evaluation, reporting he had received mental health treatment in the past.  He was placed in the MHSDS at the 3CMS level of care as medical necessity on 8/8/07.  His diagnosis at that time was Substance-Induced Mood Disorder, Polysubstance Dependence, and rule-out PTSD.

He was transferred to SQ and his diagnosis was then PTSD, Polysubstance Dependence, and rule-out Antisocial Personality Disorder.  He was prescribed Prozac for depression.  He was removed from the 3CMS on 3/17/08 at his own request and a SRA indicated no significant risk, according to the death report.  The inmate was subsequently transferred from SQ to FSP on 2/3/09 where he was assigned to a "camp," from FSP to CCC on 11/18/09, and then to the North Fork Correctional Facility in Oklahoma as part of the

COCF Program on 5/28/10.  Prior to his transfer to Oklahoma, he had received a RVR because of staff receiving a phone call from a woman on 5/18/09.  This woman stated that she had received a letter from the inmate threatening to harm her when he was released. The death report indicated a copy of the letter was in his C-file and the incident was referred to the district attorney, who declined to prosecute.  The inmate apparently received a third RVR for tobacco possession on 7/1/09.  After his transfer to Oklahoma, he received a RVR on 8/27/10 for threatening to kill his cellmate, resulting in administrative segregation, a mental health referral, and transfer back from COCF.  The inmate's movement history indicated that he was actually transferred to a COCF facility in Arizona on 9/7/10 and returned to the CDCR in state at CIM on 9/10/10.

The suicide reviewer stated that there were phone calls that occurred on 4/14/11, 4/21/11, 4/28/11, and 5/2/11.  The reviewer noted that the last phone call occurred less than four hours before the inmate was discovered hanging.  The reviewer stated that all calls started with a greeting of hi mom it's me, inquiries about her health, and in the first call the inmate excitedly told his mother about being interviewed for the welding shop and thinking that he would be hired.  The inmate also discussed plans to apply for social security and a VA Hospital residential program after prison.  The reviewer noted that his mother was worried about money she had sent him in March 2011 that was not on his books and he assured her it would take some time.  The reviewer stated the second call was similar and the inmate asked if his mother could send him "a few bucks" for his birthday.  The third call the reviewer noted as a departure from the inmate's usual dialogue.  It consisted of strange concerns in which he told his mother "people are messing with me," that these people were outside of the fence, they had messed with him in Arizona, he could see them through his window in the shadows, they were wearing Ghillie suits (camouflaged garments), creeping around and getting up in trees, and had been flashing pictures into his cell.  The inmate reportedly stated this was related to a time 15 years earlier when he was doing speed and the inmate said "my past caught up with me."  The inmate reportedly stated that his primary concern was that "these people were spreading word on the yard," that he was an informant, and he might have to go to the hole for a while.  He concluded with stating "I know it sounds bizarre" before wishing her a happy mother's day in advance.  The reviewer noted that the inmate's mother was having difficulty following the phone call and offered to call the inmate's nephew who apparently was an officer at CSP/Solano.  The reviewer added they also talked about the missing money.

The reviewer made reference to the final phone call that took place on 5/2/11 and lasted nearly eight minutes.  During this call, the inmate told his mother "come to find out the info being passed around was not about me" in regards to the previous conversation about his being an informant.  It was noted that the inmate sounded relaxed during this call and was unconcerned and expressed being finished with that issue.  The reviewer noted that his mother focused on the missing money, offered to send him more, and wished him a happy birthday, and the inmate asked her what time of day he was born.  The reviewer also reported that the inmate told his mother how many minutes he had been alive and that was how long he had loved her.  The reviewer noted as always in his conversations the inmate told his mother how much he loved her and she did the same and they made small talk.  He also told her that he was angry with his nephew for becoming a "cop" and talked about how he hated all the "cops."  The reviewer went on to state that his mother tried to explain to him that his nephew had a family to support and the inmate told his mother that if his nephew asked about him "to tell him he was dead."  The call ended with "I love you."  The

reviewer offered that despite the "tell him I'm dead" comment, which was an expression of disgust toward his correctional officer nephew, the fourth call was like all others. It was future-oriented and the inmate was actively making plans both for his remaining time in prison and for life after prison.

The reviewer stated that the inmate's property was not made available for review, with the exception of a journal that he apparently kept. The reviewer noted that the journal did not contain any dates and had written and copied bits of poems and popular songs, existential writings, and meditations of life and death. The journal also included sketches including one of a headstone. The reviewer also referenced a note that was left by the inmate for his mother and found in the cell following his death. Staff was not sure whether to consider it a suicide note. The reviewer recorded the note in the death report and stated the note read as follows: "Mom I am so very sorry that I am a selfish and inconsiderate piece of garbage-Tito was correct. Thank you for loving me thru (sic) all these years. I been here much too long and I am so tired of my stoopidity (sic). I love you. Dear! PS nothing is what I want."

The suicide reviewer noted that from all appearances the inmate was not a suicide risk and had no known or reported suicide attempts other than the "insignificant" gestures referenced in the 1973 parole officer's report, which were never verified. The reviewer noted the inmate was excited about a job in the welding shop, was 14 months from parole, actively engaged and planning for his release, and had good support from his mother, who he phoned weekly. The inmate's treatment for depression at the 3CMS level of care and his taking Zoloft were referenced. The reviewer added there was no information about what symptoms, if any, he was experiencing at the time of his death and the medication appeared to be working. The reviewer also offered that there had been a recent altercation between the inmate and his cellmate, who had housed together for only five and one-half weeks. Custody also offered that although the inmate was discovered hanging, gravity could not have been enough to cause strangulation and force would need to be applied from above. The reviewer continued that the incident was processed as a possible homicide and that because it was a hanging, a CDCR Form 7229-B report of inmate suicide to the suicide response coordinator at DCHCS was filed. The reviewer noted the coordinator made the decision to have the case reviewed in order to provide the institution with additional information from a mental health perspective and to assist in his termination regarding the cause of death.

The reviewer noted the physical evidence for the death as possibly being a suicide and the note and the handwriting was the same as in the journal. The reviewer added that custody was not sure whether or not it was a suicide note, had apparently not classified it as such in evidence, and it was not mentioned in the incident report. The reviewer noted that the inmate received mental health services in accordance with the Program Guide and the only possible deviation was that no SRE was found with his paperwork for his mental health intake at CSP/LAC. The reviewer opined that no current suicide risk factors existed when the inmate arrived at CSP/LAC other than his taking medication for depression, although no SRE was actually conducted at the time of his arrival. The reviewer continued that although there was no reason to consider this inmate a suicide risk, the CSP/LAC chief of mental health recently developed a new policy. This policy required SRE completion for all new arrivals who received a mental health evaluation during the intake process and for inmates already enrolled in the MHSDS, to provide a more thorough screening process for

new arrivals.  The reviewer noted the policy went into effect on 5/16/11, two weeks after the inmate's death.

The reviewer also commented on the inmate's phone call to his mother of 4/28/11 and the "bizarre content" was "out of context with his otherwise lucid conversations."  The reviewer said that the inmate himself acknowledged it sounded bizarre and opined that it may have been related to illicit drug use.  The reviewer's final statement was "this reviewer cannot conclude that this was a suicide."  The reviewer went on to state that if so, it was a very sudden impulsive act and may have resulted from this fairly intelligent and insightful inmate contemplating his future following a fairly routine and upbeat phone call with his mother, facing his 65th birthday.  No recommendations were generated as a result of the review and no QIPs were recommended.  The inmate was diagnosed with GERD, Hepatitis-C, hyperlipidemia, low back pain, and depression.  It was noted that he refused treatment for Hepatitis-C.  His medication at the time of death was Zoloft 50 mg qam (every morning).  Given his previous diagnosis of PTSD, it does not appear that his bizarre conversation with his mother may have been considered as any form of flashback phenomena related to previous traumas.

A SRAC was completed on 3/17/08 by a psychologist.  Sources of information were the inmate interview and UHR.  The reason for the SRAC was discharge planning.  Static risk factors noted were ethnicity (white), history of violence and substance abuse, past suicidal ideation/threats, and history of mental illness.  There were no long-term or short-term risk factors identified.  The risk was "no apparent" significant risk.  Protective factors included family support, caring for children, religious support, spousal support, support of friends, helping others, insight into crime, realistic life plan, exercise, and job performance.  The additional comments included "the inmate no longer has suicidal thoughts, has never attempted suicide in the past and has numerous risk factors but is not at risk."

A SRAC was completed on 9/18/07 and the reason was to formulate treatment planning.  The sources of information were the inmate and UHR.  Risk factors identified were ethnicity (white), history of violence and substance abuse, suicidal ideation/threats in the past with a notation "always, never with a plan or intent but thought (illegible), family history of suicide, and history of mental illness, PTSD" with "comments of PTSD, severe."  Other risk factors were "lengthy sentence," and "dynamic risk factors were agitated and insomnia."  Protective factors were family support, spousal support, support of friends, realistic life plan, exercises regularly, and job assignment.  The summary was that the inmate was a 61-year-old white male, no history of suicidal behavior, reports increased support from wife, life goals, future-oriented, denies active suicidality and the estimate of risk was no apparent significant risk.  A SRAC dated 9/7/07 indicated static risk factors of ethnicity (white), history of violence and substance abuse, and history of mental illness (PTSD) but that suicidal ideation/threats in the past were denied and previous suicide attempts were denied.  Other risk factors were longer life sentence and protective factors were support of friends and exercises regularly.  The evaluation of risk was no apparent significant risk and no referral needed.  A brief mental health evaluation completed on 9/7/07 indicated a diagnosis of PTSD, Polysubstance Dependence, and Antisocial Personality Disorder.  It also noted that the inmate reported PTSD symptoms including flashbacks, nightmares, and avoidance, denied current suicidal ideation, but reported homicidal ideation toward others in his dorm, specifically, the Asian in his dorm.

While at the COCF, the inmate's diagnoses were PTSD and Depressive Disorder NOS and he was prescribed Zoloft 100 mg/day. A progress note by a psychologist dated 3/16/11 as a 90-day follow-up indicated that the inmate was seen on the yard for a non-confidential case management contact. The inmate stated he was feeling lethargic, wanted to get off 3CMS, and to stop Zoloft in January. He reported that he was doing well, going to parole soon, and the only suicide risk he had "was Viet Nam." The inmate's mental status was essentially intact, he denied suicidal and homicidal ideation, and his judgment and insight was fair. He was diagnosed with Depressive Disorder NOS and was stable with a GAF score of 65. The plan was a 90-day follow-up and six months would have to expire before he could be removed from the 3CMS.

An IDTT note of 4/21/11 indicated the inmate's mental status was essentially within normal limits and the plan was to retain him in the 3CMS. A progress note of 4/4/11 by a psychologist indicated that his mental status was essentially stable with a positive outlook. He reported that he was doing okay but took lots of medications for PTSD. He also stated that he had a six-year term for drunk driving and was returned from out-of-state transfer from Oklahoma. The plan was to bring the inmate to IDTT and continue one-to-one. However, he declined participation in the combat veterans group. The documents provided did not include any progress notes after 4/4/11 or IDTT notes after 4/21/11.

**Findings:** The differential diagnosis for the manner of death for this inmate would appear to be suicide, assisted suicide, homicide, and accidental. The Special Master's reviewer appreciates the CDCR suicide reviewer's opinion that this was not a suicide and their citing the inmate as being future-oriented, having conversations with his mother, looking forward to a job, having money in his account, and making statements of looking forward to release. However, this reviewer was also very much impressed by the inmate having a bizarre and difficult to understand conversation with his mother in the weeks before his death, having left what appeared to be a suicide note, his being discovered hanging in his cell, and the cause of death as asphyxiation. The inmate did not have a known history of suicide attempt. However, he had a history of suicidal ideation, past mental health treatment for what the records have referred to as PTSD, depression and/or alcohol dependence, voluntarily committing himself to a psychiatric hospital prior to incarceration, and notations of impulsivity that may have been related to possible PTSD, substance or alcohol abuse in prison, or known factors including his impending 65th birthday.

Based on all of the available information, it is the opinion of the Special Master's reviewer that this death was more likely than not a suicide. However, based on this same information, it is the opinion of the Special Master's reviewer that this suicide death was not foreseeable or preventable. There was no documentation that indicated that the inmate was reporting or experiencing suicidal ideation or suicidal intent. The superficial scratches on the inmate's face and superficial bruising and the references to scratching and/or bruising on the cellmate's face and the absence of there being any internal injury to the inmate such as a subdural hematoma or other brain trauma, do not indicate that this was a homicide. Despite the view of custody that the inmate would have to have force applied downward for him to have died by asphyxiation, that assumption simply is not true. The inmate could have died from asphyxiation as a suicide even though he was found in an unusual posture. The possibility of an accidental death is not supported as related to some form of interaction between the inmate and his cellmate and possibly of a sexual nature.

This does not appear to have been substantiated by examination of the cellmate or the inmate.

Lastly, it is the Special Master's reviewer's analysis that the assumption by CSP/Solano clinicians that this was a suicide was correct.  The pathologist's report of the autopsy as this death possibly being staged left an open question that was never addressed by the pathologist in any of the documents that were presented to bring closure, other than the death was from asphyxiation.  If there is additional information based on the investigative services report or other investigations or analysis that would suggest that this death was more likely a homicide or accident, that information should be provided or disclosed for further review.

**<u>EXHIBIT A</u>**

October 2012

**Raymond F. Patterson, M.D., D.F.A.P.A.**
**1904 R Street, N.W.**
**Washington, D.C.  20009**
**Telephone:  (301) 292-3737**
**Fax:  (301) 292-6272**

EDUCATION
1973 - 77        Doctor of Medicine
Howard University College of Medicine
Washington, D.C.

1970 - 73        Undergraduate
Northwestern University
Evanston, Illinois

MEDICAL LICENSURES
State of Maryland
District of Columbia
Commonwealth of Virginia

BOARD CERTIFICATIONS
        2004, 2012      Recertification as Diplomate of the American Board of Psychiatry and
                Neurology in Forensic Psychiatry

1994   Diplomate of the American Board of Psychiatry and Neurology, Added
Qualifications in Forensic Psychiatry

        1988                Diplomate of the American Board of Forensic Psychiatry

1983   Diplomate of the American Board of Psychiatry and Neurology in General
Psychiatry

FACULTY APPOINTMENTS
1996 - Present        Associate Professor of Psychiatry
                Howard University College of Medicine
Washington, D.C.

2008 - Present Associate Professor of Psychiatry
1988 – 2000           Georgetown University Department of Psychiatry
Washington, D.C.

1992 – 2001    Associate Professor of Psychiatry
                          Institute of Psychiatry and Human Behavior
University of Maryland, School of Medicine
Baltimore, MD


1982 - 1996    Clinical Instructor
                          Howard University College of Medicine
Washington, D.C.


1982 - 1992    Clinical Faculty
& 1998 - 2001        Overholser Division of Training
                          St. Elizabeths Hospital
                          Washington, D.C.


APPOINTMENTS/POSITIONS
          1981 - Present        Private Practice in General and Forensic Psychiatry
                          1904 R Street, N.W.
                          Washington, D.C.  20009


Mar 1998 – Oct 2001  Director of Forensic Services
                          Commission on Mental Health Services
Washington, D.C.


May 1997 – Mar 1998 Chief Psychiatrist
                          Department of Public Safety & Correctional Services
Baltimore, MD


Sept 1995 – Mar 1998 Senior Psychiatric Consultant
                          Patuxent Institution
Department of Public Safety & Correctional Services
Jessup, MD


Nov 1996 – April 1997        Chief Psychiatrist
          Central Detention Facility
Department of Corrections for the District of Columbia
Washington, D.C.


Aug 1994 – Sept 1995        Director
                          Division of Demonstration Programs
Center for Mental Health Services
Substance Abuse, Mental Health Services Administration
United States Department of Health and Human Services
Rockville, MD


Oct 1992 – July 1994  Superintendent and State Forensics Director
          Clifton T. Perkins Hospital Center
Mental Hygiene Administration, State of Maryland

Jessup, MD

Jan 1992 – Sept 1992  Commissioner
                          Commission on Mental Health Services
Washington, D.C.

Mar 1987 – Sept 1992 Forensic Services Administrator
              Commission on Mental Health Services
              Washington, D.C.

              July 1985 – Feb 1987  Associate Superintendent
              General Clinical Programs
St. Elizabeths Hospital
Washington, D.C.

Sept 1983 – Feb 1987 Medical Director
              Division of Forensic Programs
St. Elizabeths Hospital
Washington, D.C.

July 1981 – Sept 1983 Staff Psychiatrist
              Division of Forensic Programs
St. Elizabeths Hospital
Washington, D.C.

Dec 1981 – July 1982  Staff Psychiatrist
              Alexandria Community Mental Health Center
Alexandria, VA

May 1980 – Nov 1982        Admitting Psychiatrist
              Psychiatric Institute of Washington
Washington, D.C.

Feb 1979 – Mar 1980  Medical Officer
              Godding-Noyes Asylum Program Division
St. Elizabeths Hospital
Washington, D.C.   .


CONSULTATIONS

              Aug 2010 - Present    Consultant
                                    Ohio Legal Rights Service
                                    Columbus, OH

              2009 – Present        Consultant
                                    U.S. Department of Justice
                                    Washington, D.C.
                                    Re:  Grant County Jail, Kentucky

2009 – Present          Consultant
                        U.S. Department of Justice
                        Washington, D.C.
                        Re:  Erie County Holding Center, New York

2001 - Present          Consultant
                        Philadelphia Prison System
                Philadelphia, PA

1996 - Present          Special Expert to Federal Special Master
                        California Department of Corrections
Sacramento, CA

1994 - Present  Consultant - Examiner in General Psychiatry
                        American Board of Psychiatry and Neurology
Chicago, IL

March 2010              Consultant
                        Pennsylvania Institutional Law Project
                        Philadelphia, PA

October 2009            Presentation and Workshop
                        Judges, Attorneys and Clinicians for the Baltimore County
Drug Court

                          and Mental Health Court
                        Baltimore, MD

July 2009               Consultant
                        Monroe County Jail
                        Rochester, NY

July 2009               Consultant
Sexually Violent Predator Program, Treatment and Detention  Facility
                        Illinois Department of Mental Health
                        Rushville, Illinois

2008 – 2009             Consultant
                        U.S. Department of Justice
                        Washington, D.C.
                        Re:  Delaware Correctional Center

December 2008           Consultant
                        U.S. Department of Justice
                        Washington, D.C.
                        Re: Lake County Jail, Indiana

2007 - Present          Consultant
                        Unity Health Care, Inc.
                        District of Columbia Central Detention Facility
                Washington, D. C.
                        295

2004 - 2009          <u>Consultant</u>
                     U.S. Department of Justice
                     Washington, DC
             Re: Augusta State Medical Prison


1999 - 2007          <u>Monitor</u>
                     New Jersey Department of Corrections
             Trenton, NJ

July 2005            <u>Consultant</u>
                     Illinois Department of Mental Health
                     Joliet, Illinois
                     Re: Sexually Violent Predator Program


        2003 - 2006          <u>Consultant</u>
                     U.S. Department of Justice
                     Washington, DC
                     Re: Wyoming State Prison


        2003 – 2005          <u>Consultant</u>
                     California Youth Authority
                     California Department of Corrections (Little Hoover
Commission)
                     Sacramento, CA


        Dec 2002             <u>Consultant/Participant</u>
                     Reentry Roundtable
                     Urban Institute
                     Los Angeles, CA


April 2002           <u>Consultant</u>
                     Prison Law Office
                     San Quentin, CA
                     Re: California Youth Authority


        2001 - 2005          <u>Consultant</u>
                     Department of Public Safety and Corrections
                     State of Louisiana
                     Baton Rouge, LA


        2000 - 2001          <u>Consultant</u>
                     Department of Justice
             South Carolina Department of Corrections
                     Columbia, SC


        1999 - 2005          <u>Consultant</u>
                     New York State Office of the Attorney General
                     Albany, NY

Sept 1999          <u>Consultant</u>
                   Cultural Issues in Correctional Mental Health
Massachusetts Department of Mental Health
                    & Department of Corrections
                   Gardner, MA


April 1999    <u>Consultant</u>
Taylor-Hardin Forensic Facility
              Tuscaloosa, AL


1996 - 2001         <u>Consultant</u>
                   Central State Hospital
                        Virginia Department of Mental Health
          Petersburg, VA


1996 – 1997    <u>Consultant</u>
               Department of Mental Health
San Juan, Puerto Rico


May – June 1995         <u>Consultant</u>
                   Maryland Adjustment & Classification Center (Supermax)
Department of Public Safety & Correctional Services
Baltimore, MD


May 1995          <u>Psychiatrist Member</u>
Special Task Committee to review mental health needs for Cuban
              and Haitian Migrants
Guantanamo Bay, Cuba


1993 – 1994    <u>Psychiatrist Member</u>
                   Center for Mental Health Services Ad Hoc Working Group
  for Mental Health and Criminal Justice Systems
United States Department of Health and Human Services
Rockville, MD


1991 - 1993         <u>Clinical Consultant</u>
                        Law Center Clinical Program
Georgetown University
Washington, D.C.


1989 - 1991    <u>Consultant</u>
        The National Conference of Christians and Jews, Inc.
Washington, D.C.


Oct 1989          <u>Consultant-Examiner</u>
American Board of Forensic Psychiatry, Inc.
American Academy of Psychiatry and the Law
Baltimore, MD


297

1989 - 1990          Psychiatric Consultant
                     U.S. Capitol Police
Washington, D.C.

1988 -1991     Forensic Psychiatric Consultant
                     Georgia Regional Hospital
Atlanta, GA

May 1987          Consultant on Professional Supervision and Clinical Privileges
Indiana Department of Mental Health
Indianapolis, IN

1985 – 1996          Consultant Surveyor
                     Joint Commission on the Accreditation of Healthcare
 Organizations
Oak Brook Terrace, IL

1983 -1987     Psychiatric Consultant
                     United States Marshal's Service
Washington, D.C.

1982 - 1984     Psychiatric Consultant
                     Metropolitan Police Department
Washington, D.C.


SPEAKING ENGAGEMENTS & PRESENTATIONS

     Sept 2012          Presenter
"The Criminal Mind:  Presidential Assassins, Terrorists, and Serial
  Killers"
Medicine for Lawyers: A One Day Seminar on Up and Coming Medical-Legal Topics
Klores Perry Mitchelle, P.C.
Washington, D.C.

     June 2012          Presenter
                     "Alternatives to Solitary Confinement:  Prisoners with
Disabilities"
                     2012 TASC P&A/CAP Annual Conference
                     Baltimore, MD

     July 2011          Lecturer
                     "Correctional Psychiatry"
                     Forensic Fellowship Program
                     St. Elizabeths Hospital
                     Washington, D.C.

     April 2011          Guest Lecturer
                     "The Expert Witness"
298

John Marr Day
St. Elizabeths Hospital
Washington, D.C.

October 2010     <u>Presenter</u>
"Behavioral Management of Drug Addicted Patients"
Society of Correctional Physicians 2010 Annual Conference
Las Vegas, NV


June 2010     <u>Presenter</u>
"Risk Assessment and Conditional Release Decision
Making"
Mental Health and Justice 2010 Conference
Mental Health Court Association 3rd Annual Conference
Illinois Department of Human Services
Glen Elyn, IL

Nov 2008     <u>Presenter</u>
"The Shotgun Stalker – Terrorism in Adams Morgan"
CME Activity:  Forensic Psychiatry: Crimes of the Washington
   Metropolitan Area
Washington Hospital Center
Washington, D.C.

July 2008     <u>Presenter</u>
"Presidential Assassins, Terrorist Suspects & Other High
Profile Cases"
20th Annual Statewide Conference on Mental Health and
Justice
Mental Health Forensic Services Bureau
Illinois Department of Human Services
Chicago, IL

April 2008     <u>Speaker</u>
"Forensic Assessment of Competency in Civil and Criminal
Matters"
Grand Rounds
Howard University Department of Psychiatry
Washington, D.C.

March 2008     <u>Guest Lecturer</u>
"Understanding Testimony by Mental Health Experts"
Baltimore City Mental Health Court
Baltimore, MD

Jan 2008     <u>Guest Lecturer</u>
"Understanding Testimony by Mental Health Experts"
Washington, D.C., Superior Court Judges
299

Washington, D.C.

Dec 2007                    Speaker/Panelist
                            "Moussaoui Presentation"
                            Forensic Evaluations:  A Focus on Cultural Considerations
                            John Marr Symposium
                            Georgetown University Hospital
                            Washington, D.C.

Sept 2007                   Guest Lecturer
"Interview techniques and how to elicit information from mentally ill or
  retarded defendants"
                            Baltimore City Mental Health Court
                            Baltimore, MD

July 2007                   Speaker
                            "Assessment and Management of the Violent Patient"
                            Grand Rounds, Howard University Department of Psychiatry
                            Washington, D.C.

Oct 2006                    Panelist
                            "Terrorism and the Death Penalty:  Expert Testimony and
Legal Strategy
                              in the Moussaoui Trial
                            American Academy of Psychiatry and the Law Annual
Meeting
                            Chicago, IL

April 2006                  Presenter
                            "Working Effectively with the Adult Forensic Consumer"
                            Clinical and Cultural Competency Training for DMH
Stakeholders
                            Department of Mental Health
                            Washington, D.C.

August 2005                 Presenter
"Forensic Psychiatry:  Competence to Stand Trial and Legal Insanity"
                            Department of Psychiatry Grand Rounds
Howard University Hospital
Washington, D.C.

May 2005                    Speaker
                            "History of Forensic Psychiatry and Landmark Forensic
Cases"
                            Sesquicentennial Celebration Program
                            St. Elizabeths Hospital
                            Washington, D.C.

June 2003                   Speaker
                            "Impulsive Aggression in Children and Adolescents"

300

National Capital Symposium on Mental Health
Howard University Hospital
Washington, DC

May 2002              <u>Presenter</u>
                     "Mental Health Defenses"
                     Continuing Legal Education Program
                     District of Columbia Bar
                     Washington, D.C.

Mar 2002              <u>Presenter</u>
                     "Assessment and Management of Axis I and Axis II
Disorders
   in Forensic Disorders in Forensic Patients"
                     State-wide Grand Rounds
                     New York State Office of Mental Health
                     Albany, NY

Mar 2002              <u>Keynote Speaker</u>
                     "Correctional Psychiatry"
                     Louis Van Wezel Schwartz Symposium on Mental
                      Health Issues in Correctional Psychiatry
                     Washington, DC

Mar 2002        <u>Panelist</u>
                     "Impact of September 11th"
                     Washington Bar Association Judicial Council Seminar
                     Washington, DC

Mar 2002              <u>Speaker/Panelist</u>
                     "New Challenges and Opportunities in Mental Health"
                     NASW Conference on New Dimensions in Social Work
Practice
                     Washington, DC

Nov 2001        <u>Keynote Speaker</u>
                     "Maintaining the Integrity of the Unit"
                     Kirby Forensic Center w/ NYU School of Medicine
                     14th Annual Forensic Workshop
                     New York, NY

May 2001              <u>Guest Speaker and Workshop</u>
                     "Civil vs. Forensic Cultures" (Part II)
                     Kirby Forensic Psychiatric Center
                     Wards Island, NY

May 2001              <u>Speaker/Participant</u>
                     "Saving Our Youth: Juvenile Justice & Mental Health"
                     13th Annual Conference
                     Mental Health Association of the District of Columbia

Washington, DC

June 2001          <u>Speaker</u>
                   "Partnerships Behind the Walls and Beyond:  Mental Health
                     Disabilities Among Offender Populations"
                   Lt. Joseph P. Kennedy Institute
                   Washington, D.C.


Mar 2001          <u>Keynote Speaker</u>
                   "Cultural Competence in Forensic Settings"
                   8th Annual Forensic Conference
                   Little Rock, AR


Nov 2000           "Forensic Psychiatry in Practice"
                   University of Baltimore
                   Baltimore, MD


Oct 2000           "Correctional Psychiatry (Advanced Course)"
                   Annual Meeting
                   American Academy of Psychiatry and the Law
                   Van Couver, B.C. Canada


June 2000          <u>Faculty & Speaker</u>
                   "Outpatient Commitment in the District of Columbia"
                   Medical Services Division of Circuit Court of Baltimore
                   Baltimore, MD


June 2000          <u>Panelist</u>
                   "Government and Private Roles in the Provision of Forensic
                     Mental Health Services"
                   Innovations in Forensic Mental Health Conference
                   Ehrenkranz  School of Social Work, Research Department
                   New York University School of Medicine
                   New York, New York


June 2000          <u>Faculty and Speaker</u>
                   "Outpatient Commitment in the District of Columbia"
                   Medical Services Division of the Circuit Court of Baltimore
                   Baltimore, MD


April 2000         <u>Keynote Speaker</u>
                   "Cultural Competence in Forensic Settings"
                   17th Annual Forensic Workshop
                   Missouri Department of Mental Health
                   Lake Ozark, MO


March 2000         <u>Keynote Speaker and Workshop</u>
                   "Cultural Competence in Forensic Settings" (Part I)
                   Kirby Forensic Psychiatric Center
                   Wards Island, NY

Dec 1999                    <u>Panelist</u>
"Mental Health and Criminal Justice: An In-Depth, Interactive
Exchange to Examine Appropriate Roles for State Mental
Health Agencies"
                    National Association of State Mental Health Program
Directors
                     Winter 1999 Commissioner's Meeting
                    Washington, D.C.


Nov 1999                <u>Panelist</u>
                    Mental Health and the Law
                    35th Criminal & 3rd Appellate Practice Seminars
                    Criminal Practice Institute & Appellate Practice Institute
                    Washington, D.C.


Nov 1999            <u>Presenter</u>
"Understanding Forensic Expert Witness Testimony"
                    University of Maryland
                    Baltimore, MD


August 1999         <u>Presenter</u>
                    "The Intersection of Mental Health, Civil, & Criminal
                     Issues"
                    1st Annual Commission on Mental Health Services
Conference
                    Washington, D.C.


June 1999      <u>Presenter</u>
        "Expert Witness Testimony"
Georgetown University Law School
Washington, D.C.


May 1999       "Relapse in Forensic Settings"
Annual Meeting
American Psychiatric Association
Washington, D.C.


May 1999       <u>Speaker</u>
        "Juvenile Justice – Should 14 Year Olds Be Tried As Adults?"
Family Advocacy and Support Association, Inc.
Washington, D.C.


Mar 1999       <u>Presenter</u>
        "Forensic Psychiatry in Practice"
University of Baltimore
Baltimore, MD


Oct 1998       <u>Keynote Address</u>
        "Cultural Competency in Forensic Settings"

NASMHPD 1998 State Mental Health Forensic Directors Conference
St. Petersburg, FL

Oct 1998                Speaker and Panelist
"Opening the Door:  Mental Health & Criminal Justice Systems"
Woodley House, Potomac Residence Club, Inc.
Washington, D.C.

May 1998        Presenter
        "Direct and Cross-examination"
D.C. Office of the Corporation Counsel
Washington, D.C.

Oct 1998        "Correctional Psychiatry (Basic Course)"
Annual Meeting
American Academy of Psychiatry and the Law
New Orleans, LA

Nov 1997        Discussant
Thirteenth Annual Rosalyn Carter Symposium on Mental
    Health Policy
The Carter Center Mental Health Task Force
Atlanta, GA

June 1997        "Hospitalization:  Who Needs It?"
Consortium on Special Delivery Settings
Council on Psychiatric Services
American Psychiatric Association
                SanDiego,CA

Oct 1996        Presenter
"Regulatory Agencies and Mental Health Care Delivery                Systems"
Tulane University Medical Center
New Orleans, LA

Mar 1996        Presenter
"Presidential Assassins"
Tenth Annual Conference
Florida State Hospital
Orlando, FL

Nov 1995        Discussion Group Leader
"Public Psychiatry"
American Psychiatric Association
Washington, D.C.

Sept 1995        Presenter
"A Comparison of Treatment Models for Women in Forensic
  Hospitals"
1995 State Mental Health Forensic Directors Conference

National Association of State Mental Health Program Directors
Madison, WI

July 1995                Presenter
"Successes from the Streets:  Strategies Beyond Shelters
    and Jails"
15th Annual National Alliance for the Mentally Ill Convention
Washington, D.C.

July 1995                Presenter
"Implications of Treatment Breakthroughs for Persons with
  Mental Illness"
'Knowledge Development and Application in Mental Health
  and Criminal Justice Systems for Persons with Mental
  Illness Living in the Community' Conference
Albuquerque, NM

June 1995                Presenter
"Fostering Hope and Celebrating Strengths, Embracing
  Families and Communities"
Family Advocacy and Support Association, Inc.
Washington, D.C.

May 1995                Presenter
"Perspectives on Mental Illness in the Criminal Justice
  System"
Alliance for the Mentally Ill of Michigan
Southfield, MI

April 1995          Keynote Address:  "Approaches to Violent Behavior"
Second Annual Forensic Conference
Little Rock, AR

April 1995                Presenter
"Clinical Diagnosis and Treatment of Mental Illness:  An
  Overview for the Non-Clinician"
Superior Court of the District of Columbia
Washington,D.C

Nov 1994                Presenter
"Community Forensics:  Evolving Trends"
Grand Rounds Presentation
Department of Psychiatry
George Washington University Hospital
Washington, D.C.

Oct 1994                Presenter
"An Overview of Mental Illness and Managing Violent
  Persons in the Hearing Room"
National Association of Administrative Law Judges

Baltimore, MD

Sept 1994          <u>Keynote Address</u>:  "Community Forensics"
National Association of Social Workers Working with
  Forensic Patients and Their Families
Bethesda, MD

May 1994          <u>Panelist</u>
"The Mentally Ill in Prisons"
National Coalition for the Mentally Ill in Prisons
United States Capitol
Washington, D.C.

May 1994          <u>Presenter</u>
"Community Forensics and Aftercare:  Placement and
  Treatment Issues"
Johns Hopkins Department of Psychiatry
Baltimore, MD

May 1994          <u>Presenter</u>
"Transition Services for Mentally Ill Offenders"
The National Coalition for the Mentally Ill in the Criminal
                    Justice System
Breakfast and Briefing for Members of Congress
Washington, D.C.

May 1994          <u>Presenter</u>
"Managing a Violent Crisis:  Media Relations,
  Countertransference, and Other Internal and External
  Systems Issues", Managing the Risk of Violence
Georgia Regional Hospital
Atlanta, GA

May 1994          <u>Presenter</u>
"Remediation for the Juvenile Offender"
Patuxent Institution Staff Retreat
Marriotsville, MD

April 1994          <u>Keynote Address</u>:
"Providing a Continuum of Care for Forensic Patients"
Galt Scholar Lecturer
Virginia Department of Mental Health, Mental Retardation
  and Substance Abuse
Richmond, VA

April 1994          <u>Guest Speaker</u>
"Forensic Inpatient Services:  Trends for the 90s"
Fourth Annual Conference for Forensic Mental Health
  Treatment Providers
Vernon, TX

April 1994            Presenter
"Emergency Psychiatry"
Grand Rounds, Department of Emergency Medicine
University of Maryland Hospital
Baltimore, MD
Mar 1994            Presenter
"Effective Clinical Documentation"
Catonsville Community College
Catonsville, MD


Jan 1994                  Presenter
"Community Forensics"
Grand Rounds, Department of Psychiatry
University of Maryland
Baltimore, MD


Jan 1994                  Speaker
"Overview of the Forensic System in Maryland"
Educational Program Series
Baltimore Mental Health Systems, Inc.
Baltimore, MD


Dec 1993            Presenter
"The Insanity Defense and Serial Sex Offenders"
Thurgood Marshall Inn of Court
Superior Court of the District of Columbia and the U.S.
  Court of Appeals
Washington, D.C.


July 1993            Keynote Address:  "The Forensic Care Providers' Role in
  Educating the Public"
Third Annual Conference for Forensic Mental Health
  Treatment Providers
Vernon, TX


June 1993            Keynote Address:  "Forensic Mental Health Care in the
  United States"
The Alliance for the Mentally Ill of Maryland
The 11th Annual Convention, Hood College
Frederick, MD


May 1993            Presenter
"Developing an Integrated System for Correctional
  Institutions"
1993 Annual Meeting
American Psychiatric Association
San Francisco, CA

May 1993              <u>Presenter</u>
"Community Violence:  How Have We Arrived Here?  Can
  We Go Anywhere Else?"
Georgia Regional Hospital
Atlanta, GA


April  1993          <u>Presenter</u>
"Mock Trial:  Serial Rapists"
Board of Professional Responsibility
District of Columbia Court of Appeals, Annual Disciplinary Conference
Washington, D.C.


April 1993           <u>Presenter</u>
"History of Forensic Psychiatry and the Insanity Defense"
Psychiatry Grand Rounds
University of Maryland
Baltimore, MD


Feb 1993             <u>Presenter</u>
"The Insanity Defense in the Federal System and the District
  of Columbia"
Forensic Psychiatry Fellowship Program Seminar
University of Maryland
Baltimore, MD


Jan 1993                      <u>Keynote Address</u>:  "Violence is a Community Problem:
How
  Did We Get Here?"
Workshop on Violence and the Community
Sponsored by the University of Maryland
Linthicum, MD


Nov 1992             <u>Speaker</u>
"The Psychological Dimensions of Preventing Violence"
Violence in Our Community Action Agenda
1992 Family Life Conference
Henry C. Gregory III, Family Life Center
Washington, D.C.


Sept 1992            <u>Speaker</u>
"Cross Cultural Differences in Evaluation and Treatment"
Treatment or Punishment:  Mental Illness and the Criminal
Justice System
National Alliance for the Mentally Ill
Washington, D.C.


May 1992             "Evaluation and Treatment of Blacks in Jails and Prisons"
Annual Meeting
American Psychiatric Association
Washington, D.C.

May 1992                <u>Speaker</u>
"Children and Violence"
D.C. Mental Health Association Annual Luncheon and
  Workshop
Washington, D.C.


Feb 1992                <u>Presenter</u>
"Hostage Negotiations"
Annual Hostage Negotiation Seminar
Baltimore County Policy Department
Baltimore, MD


Oct 1991                "Criminalization of the Mentally Ill"
Annual Meeting
American Academy of Psychiatry and the Law
Orlando, FL


Sept 1991               "Victimization of Staff and Critical Incidents"
Twelfth Annual Conference
NASMHPD State Mental Health Forensic Directors
Birmingham, AL


Sept 1990               "Maintaining the Integrity of the Unit"
Eleventh Annual Conference
NASMHPD State Mental Health Forensic Directors
Sante Fe, NM


June 1990               <u>Speaker</u>
"Signs and Symptoms of Depression"
Women in Business
Prince George's Chamber of Commerce
Landover, MD


May 1990                <u>Speaker</u>
"Not Guilty by Reason of Insanity:  Implications for the
  Judicial System, the Community and Clinicians"
Region 4 Community Mental Health Center Conference
Washington, D.C.


May 1990                <u>Speaker</u>
"Violent Death and the Family:  Multiple Victims"
St. Francis Center Conference
Washington,D.C.


Dec 1989                <u>Speaker and Panelist</u>
"Mental Health is Everybody's Business"
Fifth Annual Mental Health Planning Conference

309

D.C. State Mental Health Planning Council
Washington, D.C.


Oct 1989                    Presenter
"Mental Health Issues in the Courtroom"
D.C. Superior Court Judges and Commissioners
Washington, D.C.


April 1989                  Speaker
"People Reaching People: Pathways to Black Mental Health"
D.C. Chapter of the Association of Black Psychologists
Howard University
Washington, D.C.


Nov 1987                    Speaker
"Client and Community Rights and Responsibilities"
Fourth Annual State of the District of Columbia Mental
  Health Conference
Washington, D.C.


June 1987                   Speaker
"Advocacy - A Shared Responsibility"
Information, Protection and Advocacy Center for
  Handicapped Individuals, Inc.
Washington, D.C.


Jan 1987                          Speaker
"Depression:  Approaches to Community Management"
PSI Associates, Inc.
Washington, D.C.


Oct 1986                    Presenter
"Re-enactment of Ezra Pound Trial"
Annual Meeting
American Academy of Psychiatry and the Law
Philadelphia, PA


Aug 1986                    Presenter
"Forensic Psychiatry and General Psychiatric Practice"
Howard University Hospital
Washington, D.C.


June 1986                   Speaker
"Schizophrenia:  Treatment Approaches"
PSI Associates, Inc.
Washington, D.C.


Nov 1985                    Presenter
"Sexual Psychopathology and Anti-Androgen Therapies"
St. Elizabeths Hospital

310

Washington, D.C.

Oct 1985            <u>Presenter</u>
"Re-enactment of Ezra Pound Trial"
Medical Society Scientific Day Program
St. Elizabeths Hospital
Washington, D.C.

Mar 1985            <u>Presenter</u>
"Tarasoff and Its Offsprings:  Implications for Clinical
  Practice"
Eighth Annual John Marr Day Symposium
St. Elizabeths Hospital
Washington, D.C.

Sept 1984            <u>Presenter</u>
"Civil Commitment and Post NGI Proceedings"
Criminal Practice Institute
Washington, D.C.

Jan 1984                 <u>Presenter</u>
"Critical Issues in Forensic Psychiatry:  Where Do We Go
  From Here?"
Seventh Annual John Marr Day Symposium
St. Elizabeths Hospital
Washington, D.C.

June 1983          <u>Speaker</u>
"Psychological Effects of Cancer"
Introductory Course in Cancer Education for D.C. Health and
  Science Teachers
Washington, D.C.

Dec 1980            "Use of Psychotropic Medications in Pregnancy:  A Review"
St. Elizabeths Hospital Medical Society
Washington, D.C.

Aug 1979               "The Psychosocial Aspects of Liaison Psychiatry to Cancer
  Patients"
The National Medical Association Annual Meeting
Detroit, MI

<u>PUBLICATIONS</u>

Patterson, RF.  "Commentary:  The Problem of Agreement on Diagnoses in Criminal
Cases"

311

Journal of the American Academy of Psychiatry and the Law
November 2010

Patterson, RF and Hughes, KC., "Review of Completed Suicides in the California Department
    of Corrections and Rehabilitation, 1999 to 2004"
    Psychiatric Services (A Journal of the American Psychiatric Association)
    June 2008

Patterson, RF and Greifinger, RB. ,"Treatment of Mental Illness in Correctional Settings"
Chapter in <u>Public Health Behind Bars:  From Prisons to Communities</u>
Edited by Robert B. Greifinger, Springer Science + Business Media, LLC, 2007

Patterson, RF, and Greifinger, RB. "Insiders as Outsiders: Race, Gender and
Cultural Considerations Affecting Health Outcome after Release to the
Community"
Journal of Correctional Health Care, Vol. 10, #3, Fall 2003

    4.  <u>Co-Author</u>
        Task Force Report: Guidelines for Treatment of Schizophrenia in a
Correctional Setting
         National Commission on Correctional Health Care
         Washington, DC

5.  Patterson, RF, "Review Mechanisms and Regulatory Agencies"
         Chapter in <u>Mental Health Care Administration: A Guide for Practitioners</u>.
Edited by P. Rodenhauser, M.D. University of Michigan Press.  2000

Dvoskin, JA, and Patterson, RF:  "Administration of Treatment Programs for
    Offenders with Mental Disorder"
    Chapter in <u>Treatment of Offenders With Mental Disorders</u>
    Edited by R.M. Wettstein. Guilford Press, New York, 1998.

Patterson, RF, and Wise, BF: The Development of Internal Forensic Review
    Boards in the Management of Hospitalized Insanity Acquittees.
    Journal of the American Academy of Psychiatry and the Law 26 (4), 1998.

Patterson R: Managed Care in Corrections.
Journal of the American Academy of Psychiatry and the Law 26 (1), 1998.

<u>MEDIA ACTIVITIES</u>

        Dec 2007              "Treatment of Insanity Acquitees in the U.S. Virgin Islands"
                              National Public Radio

Jan 1998                      "Competence and Criminal Responsibility"
FOX Evening News
Washington, D.C.

Jan 1998                         "Unibomber"
FOX Morning News
Washington, D.C.


Dec 1996             "Holiday Blues and Depression"
Crosstalk - WDCU Live Public Radio Talk Show
Washington, D.C.


Dec 1995             "Violence in the Community" and "The Holiday Blues"
Crosstalk - WDCU Live Public Radio Talk Show
Washington, D.C.


Oct 1993             "Understanding Your Mental Health"
Focus on Health
WOL Radio 1450 AM
Washington, D.C.


Oct 1993             "The Criminally Insane"
FOX TV

                    Washington, DC


June 1993            "Psychodynamics of Violence" and "Total Well Being"
WPFW-FM Talk Radio Show
Washington, D.C.


Mar 1992             "State of the District: Need and Delivery of Mental Health
  Care Services Through DHS"
DC Today, Channel 16
Washington, D.C.


Jan 1992                    "A Perspective on Justice"
Discussion with Prince Georges County State's Attorney
Channel 18
Prince Georges County, MD


Sept 1991            "Panic Disorders"
Urban Health Report
WHMM-TV, Channel 32
Washington, D.C.


July 1991            "Serial Killers"
FOX News Channel 5
Washington, D.C.


Mar 1991             "Domestic Violence"
Urban Health Report
WHMM-TV, Channel 32
Washington, D.C.

Mar 1991            "Anxiety Disorders"
Urban Health Report
WHMM-TV, Channel 32
Washington, D.C.

Aug 1990            "Impact of the Marion Barry Trial on the Community"
Evening Exchange
WHMM-TV, Channel 32
Washington, D.C.

Aug 1990            "After the Trail"
WNTR-AM Radio
Washington, D.C.

May 1990            "Your Mental Health"
Crosstalk - WDCU Live Public Affairs Talk Show
Washington, D.C.

May 1989            "How Stress Factors Affect the Community"
The Morning Show with Cathy Hughes
WOL Radio Talk Show
Washington, D.C.

Feb 1987            "A Washington Life"
Washington Post Magazine
Washington, D.C.

Jan 1987                     "The San Isidro Murder Slayings:  Psychological Aspects"
Newscenter 4
Washington, D.C.

OTHER ACTIVITIES

        2006 - Present        Peer Reviewer
                    Psychiatric Services
                    Journal of the American Psychiatric Association
                    Arlington, VA

1998 - Present        Peer Reviewer
                    Journal of the American Academy of Psychiatry and the Law
                         Blumfield, CT

1998 - 2004        Chairman
                    Institutional and Correctional Psychiatry Committee
American Academy of Psychiatry and the Law
Blumfield, CT

        2000 - 2001        President
                    Washington Psychiatric Society

Washington, D.C.

August 1999            <u>Co-Chairman</u>
                       National Summit on Violence Throughout the Life Span
                       Colorado Violence Prevention Center
                       Denver, CO

1999 - 2000    <u>President-Elect</u>
        Washington Psychiatric Society
Washington, D.C.

1998 - 1999            <u>President</u>
                       Guttmacher Forensic Educational Fund, Inc.
Baltimore, MD

Dec 1997               <u>Trainer</u>
& Jan 1998             Suicide Prevention Training for Correctional Officers
Central Booking Intake Facility and Baltimore City Detention Center
Baltimore, MD

1997 - 1998            <u>Vice President</u>
                       Guttmacher Forensic Educational Fund, Inc.
Baltimore, MD

1996 - 1997            <u>Chairperson</u>
                       Consortium on Special Delivery Settings
Council on Psychiatric Services
American Psychiatric Association
Washington, D.C.

1994 - 1999            <u>Vice Chairperson</u>
                       Council on Psychiatry and Law
American Psychiatric Association
Washington, D.C.

1994 -1997    <u>Member</u>
                       Executive Council
American Academy of Psychiatry and Law
Blumfield, CT

1994 - 1997    <u>Member</u>
                       Ad Hoc Committee to Develop a Slate of Candidates for
 Election to the American Board of Psychiatry and Neurology
Deerfield, IL

1993 - 1997    <u>Member</u>
                       Institutional and Correctional Psychiatry Committee
American Academy of Psychiatry and the Law
Bloomfield, CT

1993 - 1994     <u>Vice-Chair to Executive Committee</u>
                        Forensic Division
National Association of State Mental Health Program Directors
Alexandria, VA


1992 - 2001     <u>Member</u>
                        Committee on Added Qualifications in Forensic Psychiatry
American Board of Psychiatry and Neurology
Deerfield, IL


1990 - 1994     <u>Member and Washington, D.C. Representative</u>
& 1998 - 2001           Forensic Division
                        National Association of State Mental Health Program
                                Directors
Alexandria, VA


1992 - 1994     <u>Treasurer</u>
                        Washington Psychiatric Society
Washington, D.C.


1992 - 1994     <u>Member</u>
                        Institutional Review Board
Department of Health and Mental Hygiene
State of Maryland


1990 - 1991     <u>President</u>
                        D.C. Chapter
Washington Psychiatric Society
Washington, D.C.


1990 - 1991     <u>Member</u>
                        ABT Oversight Committee
Patuxent Institute
Jessup, MD


1990 - 1991     <u>Chairman</u>
                        Council on Psychiatry
D.C. Medical Society
Washington, D.C.


1989 - 1994     <u>Councilmember</u>
                        Council on Psychiatry
D.C. Medical Society
Washington, D.C.


1989 - 1990     <u>Secretary</u>
                        Council on Psychiatry
D.C. Medical Society
Washington, D.C.

1987 - 1993   <u>Member</u>
              Advisory Merit Selection Panel
(Appointed by Chief Judge Fred B. Ugast of the Superior
  Court of the District of Columbia)
Washington, D.C.


1986 - 1988        <u>Co-Editor</u>
                   American College of Mental Health Administration Newsletter
Washington, D.C.
1985 - 1986        <u>Editor</u>
                   St. Elizabeths Hospital Medical Society Newsletter
Washington, D.C.


<u>AWARDS</u>

      February 2001           "Key to Louisiana State Penitentiary at Angola"
                              Louisiana Department of Corrections
                   Baton Rouge, LA,


May 1998          Award for Support to Commission on Mental Health Services
                  Department of Nursing, Commission on Mental Health Services
                  Washington, D.C.,


February 1998     "Key to Patuxent Institution"
Department of Public Safety and Correctional Services
Jessup, Maryland


March 1996        Distinguished Visiting Professor
Florida State Hospital
Orlando, Florida


1994   Certificate of Appreciation for Dedication to Clifton T. Perkins Hospital
                         and the Mental Health Forensic System of Maryland
Department of Health and Mental Hygiene
Baltimore, Maryland


1994              Certificate of Appreciation
Medical Records Department, Clifton T. Perkins Hospital
Jessup, Maryland


November 1992            Award for Public Service
United States Department of Justice
Washington, D.C.,


October 1992      Certificate of Appreciation
Risk Management/Quality Assessment Program
Mental Hygiene Administration

Baltimore, Maryland

October 1992          Outstanding Public Service Recognition Resolution
Council of the District of Columbia
Washington, D.C.

October 1992          Distinguished Service Award
Department of Human Services, District of Columbia
Washington, D.C.

October 1992          Meritorious Public Service Award
Office of the Mayor
Washington, D.C.

October 1992          Our Hero Award
Patient's Rights Council
St. Elizabeths Hospital
Washington, D.C.,

October 1992          Outstanding Assistance and Support to Law Enforcement
United States Secret Service
Washington, D.C.

September 1992             Superior Support for United States Public Health Service
Washington, D.C.

May 1992          Certificate of Appreciation for Dedicated Service to the Psychiatry
                        Section of the Medical Society of the District of Columbia
Washington, D.C.

February 1992     Certificate of Appreciation for Hostage Negotiations Conference
Baltimore County Police Department
Baltimore, Maryland

1989               Blacks in Government Award for Outstanding Service in Forensic
                        Psychiatry and Community Service
Washington, D.C.

March 1987          The ADAMHA Administrators Award for Achievements of the
Quality
                        Assurance Workgroup
St. Elizabeths Hospital
Washington, D.C.

June 1986          Alumnus of the Year
St. Elizabeths Overholser Division of Training
Washington, D.C.

MEMBERSHIP IN PROFESSIONAL ASSOCIATIONS

American Academy of Psychiatry and the Law
American College of Mental Health Administration (Fellow)
American Medical Association
American Psychiatric Association (Distinguished Fellow)
Black Psychiatrists of America
Howard University Medical Alumni Association
Medical Society of the District of Columbia
National Alliance for the Mentally Ill
National Medical Association
Society of Correctional Physicians
Washington Psychiatric Society

**<u>EXHIBIT B</u>**

**From:** Debbie Vorous <Debbie.Vorous@doj.ca.gov>
**Date:** August 10, 2012 6:39:38 PM EDT
**To:** "Lopes, Matthew A.  Jr." <MLopes@pldw.com>
**Cc:** "Benjamin.Rice@cdcr.ca.gov" <Benjamin.Rice@cdcr.ca.gov>,
"Katherine.Tebrock@cdcr.ca.gov" <Katherine.Tebrock@cdcr.ca.gov>, Martin Hoshino
<Martin.Hoshino@cdcr.ca.gov>, Debbie Vorous <Debbie.Vorous@doj.ca.gov>,
"linda.holden@pldw.com" <linda.holden@pldw.com>
**Subject: Suicide Report for 2011**

August 10, 2012

Dear Special Master Lopes:

It is our understanding that the only thing remaining for Dr. Patterson to complete his report on the 2011
suicides is the receipt of the autopsy report for inmate Galindo, D00753, who died on December 31,
2011.  According to CDCR mental health, staff have repeatedly followed up with the Coroner's office and
the report is not complete.  Nor can staff predict when it will be complete.

For that reason, Defendants request that you proceed forward with having Dr. Patterson complete his
report on the 2011 suicides, absent this additional autopsy report.  Should Dr. Patterson determine that
the Galindo autopsy report warrants a change to his report on the 2011 suicides, it would be appropriate
to prepare an addendum to the report.  In the meantime, CDCR will continue to try and obtain the report
from the Coroner's office and, to the extent that it gets participation from the county, will provide the
report to Dr. Patterson to that he can include it in his review.

Because CDCR does not always have the ability to obtain the autopsy reports in a timely manner,
Defendants would request that for future reports, Dr. Patterson prepare his report once he has all the
other information he needs to complete it, and not wait for CDCR to receive all the autopsy reports from
the counties.

If Dr. Patterson is waiting for additional information in order to prepare his report on the 2011 suicides,
please let me know so that it can be obtained and he can move forward with his report.

Thank you,
Debbie J. Vorous
Deputy Attorney General
State of California
Department of Justice
1300 I Street
Sacramento CA 94244-2550
(916) 324-5345

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain
confidential and/or legally privileged information. It is solely for the use of the intended
recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may
violate applicable laws including the Electronic Communications Privacy Act. If you are
not the intended recipient, please contact the sender and destroy all copies of the
communication.

October 2012

**Raymond F. Patterson, M.D., D.F.A.P.A.**
**1904 R Street, N.W.**
**Washington, D.C.  20009**
**Telephone:  (301) 292-3737**
**Fax:  (301) 292-6272**

EDUCATION
1973 - 77          Doctor of Medicine
Howard University College of Medicine
Washington, D.C.

1970 - 73          Undergraduate
Northwestern University
Evanston, Illinois

MEDICAL LICENSURES
State of Maryland
District of Columbia
Commonwealth of Virginia

BOARD CERTIFICATIONS
          2004, 2012          Recertification as Diplomate of the American Board of Psychiatry and
                              Neurology in Forensic Psychiatry

1994     Diplomate of the American Board of Psychiatry and Neurology, Added Qualifications in Forensic
Psychiatry

          1988                Diplomate of the American Board of Forensic Psychiatry

1983     Diplomate  of  the  American  Board  of  Psychiatry  and  Neurology  in  General  Psychiatry

FACULTY APPOINTMENTS
1996 - Present          Associate Professor of Psychiatry
                        Howard University College of Medicine
Washington, D.C.

2008 - Present     Associate Professor of Psychiatry
1988 – 2000             Georgetown University Department of Psychiatry
Washington, D.C.

1992 – 2001     Associate Professor of Psychiatry
                Institute of Psychiatry and Human Behavior
University of Maryland, School of Medicine
Baltimore, MD

1982 - 1996     Clinical Instructor
                Howard University College of Medicine

Washington, D.C.


1982 - 1992        Clinical Faculty
& 1998 - 2001           Overholser Division of Training
                        St. Elizabeths Hospital
                        Washington, D.C.


APPOINTMENTS/POSITIONS
          1981 - Present           Private Practice in General and Forensic Psychiatry
                                   1904 R Street, N.W.
                                   Washington, D.C.  20009


Mar 1998 – Oct 2001       Director of Forensic Services
                          Commission on Mental Health Services
Washington, D.C.


May 1997 – Mar 1998       Chief Psychiatrist
                          Department of Public Safety & Correctional Services
Baltimore, MD


Sept 1995 – Mar 1998      Senior Psychiatric Consultant
                          Patuxent Institution
Department of Public Safety & Correctional Services
Jessup, MD


Nov 1996 – April 1997     Chief Psychiatrist
          Central Detention Facility
Department of Corrections for the District of Columbia
Washington, D.C.


Aug 1994 – Sept 1995      Director
                          Division of Demonstration Programs
Center for Mental Health Services
Substance Abuse, Mental Health Services Administration
United States Department of Health and Human Services
Rockville, MD


Oct 1992 – July 1994      Superintendent and State Forensics Director
          Clifton T. Perkins Hospital Center
Mental Hygiene Administration, State of Maryland
Jessup, MD


Jan 1992 – Sept 1992      Commissioner
                          Commission on Mental Health Services
Washington, D.C.


Mar 1987 – Sept 1992      Forensic Services Administrator
          Commission on Mental Health Services
          Washington, D.C.


          July 1985 – Feb 1987      Associate Superintendent
          General Clinical Programs
St. Elizabeths Hospital
Washington, D.C.


Sept 1983 – Feb 1987      Medical Director
          Division of Forensic Programs

St. Elizabeths Hospital
Washington, D.C.


July 1981 – Sept 1983      Staff Psychiatrist
            Division of Forensic Programs
St. Elizabeths Hospital
Washington, D.C.


Dec 1981 – July 1982      Staff Psychiatrist
            Alexandria Community Mental Health Center
Alexandria, VA


May 1980 – Nov 1982      Admitting Psychiatrist
            Psychiatric Institute of Washington
Washington, D.C.


Feb 1979 – Mar 1980      Medical Officer
            Godding-Noyes Asylum Program Division
St. Elizabeths Hospital
Washington, D.C.   .


CONSULTATIONS

            Aug 2010 - Present        Consultant
                        Ohio Legal Rights Service
                        Columbus, OH


            2009 – Present            Consultant
                        U.S. Department of Justice
                        Washington, D.C.
                        Re:  Grant County Jail, Kentucky


            2009 – Present            Consultant
                        U.S. Department of Justice
                        Washington, D.C.
                        Re:  Erie County Holding Center, New York

2001 - Present            Consultant
                        Philadelphia Prison System
            Philadelphia, PA

1996 - Present            Special Expert to Federal Special Master
                        California Department of Corrections
Sacramento, CA

1994 - Present      Consultant - Examiner in General Psychiatry
                        American Board of Psychiatry and Neurology
Chicago, IL

March 2010            Consultant
                        Pennsylvania Institutional Law Project
                        Philadelphia, PA

            October 2009            Presentation and Workshop
                        Judges, Attorneys and Clinicians for the Baltimore County Drug Court
                          and Mental Health Court
                        Baltimore, MD


            July 2009                Consultant

324

Monroe County Jail
Rochester, NY

July 2009                    Consultant
            Sexually Violent Predator Program, Treatment and Detention  Facility
                    Illinois Department of Mental Health
                    Rushville, Illinois

                    2008 – 2009            Consultant
                            U.S. Department of Justice
                                Washington, D.C.
                        Re:  Delaware Correctional Center

December 2008        Consultant
                    U.S. Department of Justice
                    Washington, D.C.
                    Re: Lake County Jail, Indiana

2007 - Present        Consultant
                        Unity Health Care, Inc.
                        District of Columbia Central Detention Facility
            Washington, D. C.

2004 - 2009          Consultant
                        U.S. Department of Justice
                        Washington, DC
            Re:  Augusta State Medical Prison

1999 - 2007          Monitor
                        New Jersey Department of Corrections
            Trenton, NJ

July 2005            Consultant
                        Illinois Department of Mental Health
                        Joliet, Illinois
                        Re:  Sexually Violent Predator Program

        2003 - 2006          Consultant
                        U.S. Department of Justice
                        Washington, DC
                        Re:  Wyoming State Prison

        2003 – 2005          Consultant
                    California Youth Authority
                    California Department of Corrections (Little Hoover Commission)
                    Sacramento, CA

        Dec 2002             Consultant/Participant
                    Reentry Roundtable
                    Urban Institute
                    Los Angeles, CA

April 2002           Consultant
                    Prison Law Office
                    San Quentin, CA
                    Re:  California Youth Authority

        2001 - 2005          Consultant
                    Department of Public Safety and Corrections
                    State of Louisiana

325

Baton Rouge, LA

2000 - 2001                 Consultant
                            Department of Justice
                 South Carolina Department of Corrections
                            Columbia, SC

1999 - 2005                 Consultant
                            New York State Office of the Attorney General
                            Albany, NY

Sept 1999                   Consultant
                            Cultural Issues in Correctional Mental Health
Massachusetts Department of Mental Health
                                 & Department of Corrections
                            Gardner, MA

April 1999          Consultant
Taylor-Hardin Forensic Facility
                 Tuscaloosa, AL

1996 - 2001                 Consultant
                            Central State Hospital
                                 Virginia Department of Mental Health
                 Petersburg, VA

1996 – 1997                 Consultant
                            Department of Mental Health
San Juan, Puerto Rico

May – June 1995             Consultant
                            Maryland Adjustment & Classification Center (Supermax)
Department of Public Safety & Correctional Services
Baltimore, MD

May 1995            Psychiatrist Member
Special Task Committee to review mental health needs for Cuban
and Haitian Migrants
Guantanamo Bay, Cuba

1993 – 1994         Psychiatrist Member
                            Center for Mental Health Services Ad Hoc Working Group
  for Mental Health and Criminal Justice Systems
United States Department of Health and Human Services
Rockville, MD

1991 - 1993                 Clinical Consultant
                                 Law Center Clinical Program
Georgetown University
Washington, D.C.

1989 - 1991         Consultant
              The National Conference of Christians and Jews, Inc.
Washington, D.C.

Oct 1989                    Consultant-Examiner
American Board of Forensic Psychiatry, Inc.
American Academy of Psychiatry and the Law
Baltimore, MD

326

1989 - 1990          <u>Psychiatric Consultant</u>
                     U.S. Capitol Police
Washington, D.C.

1988 -1991      <u>Forensic Psychiatric Consultant</u>
                     Georgia Regional Hospital
Atlanta, GA

May 1987          <u>Consultant</u> on Professional Supervision and Clinical Privileges
Indiana Department of Mental Health
Indianapolis, IN

1985 – 1996          <u>Consultant Surveyor</u>
                     Joint Commission on the Accreditation of Healthcare
 Organizations
Oak Brook Terrace, IL

1983 -1987      <u>Psychiatric Consultant</u>
                     United States Marshal's Service
Washington, D.C.

1982 - 1984      <u>Psychiatric Consultant</u>
                     Metropolitan Police Department
Washington, D.C.


<u>SPEAKING ENGAGEMENTS & PRESENTATIONS</u>

         Sept 2012              <u>Presenter</u>
"The Criminal Mind:  Presidential Assassins, Terrorists, and Serial
  Killers"
Medicine for Lawyers: A One Day Seminar on Up and Coming Medical-Legal Topics
Klores Perry Mitchelle, P.C.
Washington, D.C.

         June 2012              <u>Presenter</u>
                               "Alternatives to Solitary Confinement:  Prisoners with Disabilities"
                               2012 TASC P&A/CAP Annual Conference
                               Baltimore, MD

         July 2011              <u>Lecturer</u>
                               "Correctional Psychiatry"
                               Forensic Fellowship Program
                               St. Elizabeths Hospital
                               Washington, D.C.

         April 2011             <u>Guest Lecturer</u>
                               "The Expert Witness"
                               John Marr Day
                               St. Elizabeths Hospital
                               Washington, D.C.

         October 2010           <u>Presenter</u>
                               "Behavioral Management of Drug Addicted Patients"
                               Society of Correctional Physicians 2010 Annual Conference
                               Las Vegas, NV

June 2010                        Presenter
                                 "Risk Assessment and Conditional Release Decision Making"
                                 Mental Health and Justice 2010 Conference
                                 Mental Health Court Association 3rd Annual Conference
                                 Illinois Department of Human Services
                                 Glen Elyn, IL


         Nov 2008                Presenter
                                 "The Shotgun Stalker – Terrorism in Adams Morgan"
CME Activity:  Forensic Psychiatry: Crimes of the Washington
   Metropolitan Area
Washington Hospital Center
Washington, D.C.


         July 2008               Presenter
                                 "Presidential Assassins, Terrorist Suspects & Other High Profile Cases"
                                 20th Annual Statewide Conference on Mental Health and Justice
                                 Mental Health Forensic Services Bureau
Illinois Department of Human Services
                                 Chicago, IL


         April 2008              Speaker
                                 "Forensic Assessment of Competency in Civil and Criminal Matters"
                                 Grand Rounds
                                 Howard University Department of Psychiatry
                                 Washington, D.C.


         March 2008              Guest Lecturer
"Understanding Testimony by Mental Health Experts"
Baltimore City Mental Health Court
                                 Baltimore, MD


         Jan 2008                Guest Lecturer
                                 "Understanding Testimony by Mental Health Experts"
                                 Washington, D.C., Superior Court Judges
                                 Washington, D.C.


         Dec 2007                Speaker/Panelist
                                 "Moussaoui Presentation"
                                 Forensic Evaluations:  A Focus on Cultural Considerations
                                 John Marr Symposium
                                 Georgetown University Hospital
                                 Washington, D.C.


         Sept 2007               Guest Lecturer
"Interview techniques and how to elicit information from mentally ill or
   retarded defendants"
                                 Baltimore City Mental Health Court
                                 Baltimore, MD


         July 2007               Speaker
                                 "Assessment and Management of the Violent Patient"
                                 Grand Rounds, Howard University Department of Psychiatry
                                 Washington, D.C.


         Oct 2006                Panelist
                                 "Terrorism and the Death Penalty:  Expert Testimony and Legal Strategy
                                     in the Moussaoui Trial
                                 American Academy of Psychiatry and the Law Annual Meeting

Chicago, IL

April 2006                    <u>Presenter</u>
                              "Working Effectively with the Adult Forensic Consumer"
                              Clinical and Cultural Competency Training for DMH Stakeholders
                              Department of Mental Health
                              Washington, D.C.

August 2005                   <u>Presenter</u>
"Forensic Psychiatry:  Competence to Stand Trial and Legal Insanity"
                              Department of Psychiatry Grand Rounds
Howard University Hospital
Washington, D.C.

May 2005                      <u>Speaker</u>
                              "History of Forensic Psychiatry and Landmark Forensic Cases"
                              Sesquicentennial Celebration Program
                              St. Elizabeths Hospital
                              Washington, D.C.

June 2003                     <u>Speaker</u>
                              "Impulsive Aggression in Children and Adolescents"
                              National Capital Symposium on Mental Health
                              Howard University Hospital
                              Washington, DC

May 2002                      <u>Presenter</u>
                              "Mental Health Defenses"
                              Continuing Legal Education Program
                              District of Columbia Bar
                              Washington, D.C.

Mar 2002                      <u>Presenter</u>
                              "Assessment and Management of Axis I and Axis II Disorders
in Forensic Disorders in Forensic Patients"
                              State-wide Grand Rounds
                              New York State Office of Mental Health
                              Albany, NY

Mar 2002                      <u>Keynote Speaker</u>
                              "Correctional Psychiatry"
                              Louis Van Wezel Schwartz Symposium on Mental
                               Health Issues in Correctional Psychiatry
                              Washington, DC

Mar 2002        <u>Panelist</u>
                              "Impact of September 11th"
                              Washington Bar Association Judicial Council Seminar
                              Washington, DC

Mar 2002                      <u>Speaker/Panelist</u>
                              "New Challenges and Opportunities in Mental Health"
                              NASW Conference on New Dimensions in Social Work Practice
                              Washington, DC

Nov 2001        <u>Keynote Speaker</u>
                              "Maintaining the Integrity of the Unit"
                              Kirby Forensic Center w/ NYU School of Medicine
                              14th Annual Forensic Workshop
                              New York, NY

May 2001      <u>Guest Speaker and Workshop</u>
"Civil vs. Forensic Cultures" (Part II)
Kirby Forensic Psychiatric Center
Wards Island, NY

May 2001      <u>Speaker/Participant</u>
"Saving Our Youth: Juvenile Justice & Mental Health"
13th Annual Conference
Mental Health Association of the District of Columbia
Washington, DC

June 2001      <u>Speaker</u>
"Partnerships Behind the Walls and Beyond:  Mental Health
  Disabilities Among Offender Populations"
Lt. Joseph P. Kennedy Institute
Washington, D.C.

Mar 2001      <u>Keynote Speaker</u>
"Cultural Competence in Forensic Settings"
8th Annual Forensic Conference
Little Rock, AR

Nov 2000      "Forensic Psychiatry in Practice"
University of Baltimore
Baltimore, MD

Oct 2000      "Correctional Psychiatry (Advanced Course)"
Annual Meeting
American Academy of Psychiatry and the Law
Van Couver, B.C. Canada

June 2000      <u>Faculty & Speaker</u>
"Outpatient Commitment in the District of Columbia"
Medical Services Division of Circuit Court of Baltimore
Baltimore, MD

June 2000      <u>Panelist</u>
"Government and Private Roles in the Provision of Forensic
  Mental Health Services"
Innovations in Forensic Mental Health Conference
Ehrenkranz  School of Social Work, Research Department
New York University School of Medicine
New York, New York

June 2000      <u>Faculty and Speaker</u>
"Outpatient Commitment in the District of Columbia"
Medical Services Division of the Circuit Court of Baltimore
Baltimore, MD

April 2000      <u>Keynote Speaker</u>
"Cultural Competence in Forensic Settings"
17th Annual Forensic Workshop
Missouri Department of Mental Health
Lake Ozark, MO

March 2000      <u>Keynote Speaker and Workshop</u>
"Cultural Competence in Forensic Settings" (Part I)
Kirby Forensic Psychiatric Center
Wards Island, NY

330

Dec 1999 <u>Panelist</u>
"Mental Health and Criminal Justice: An In-Depth, Interactive
Exchange to Examine Appropriate Roles for State Mental
Health Agencies"

National Association of State Mental Health Program Directors
Winter 1999 Commissioner's Meeting
Washington, D.C.

Nov 1999 <u>Panelist</u>

Mental Health and the Law
35th Criminal & 3rd Appellate Practice Seminars
Criminal Practice Institute & Appellate Practice Institute
Washington, D.C.

Nov 1999 <u>Presenter</u>
"Understanding Forensic Expert Witness Testimony"

University of Maryland
Baltimore, MD

August 1999 <u>Presenter</u>
"The Intersection of Mental Health, Civil, & Criminal
Issues"
1st Annual Commission on Mental Health Services Conference
Washington, D.C.

June 1999 <u>Presenter</u>
"Expert Witness Testimony"
Georgetown University Law School
Washington, D.C.

May 1999 "Relapse in Forensic Settings"
Annual Meeting
American Psychiatric Association
Washington, D.C.

May 1999 <u>Speaker</u>
"Juvenile Justice – Should 14 Year Olds Be Tried As Adults?"
Family Advocacy and Support Association, Inc.
Washington, D.C.

Mar 1999 <u>Presenter</u>
"Forensic Psychiatry in Practice"
University of Baltimore
Baltimore, MD

Oct 1998 <u>Keynote Address</u>
"Cultural Competency in Forensic Settings"
NASMHPD 1998 State Mental Health Forensic Directors Conference
St. Petersburg, FL

Oct 1998 <u>Speaker and Panelist</u>
"Opening the Door: Mental Health & Criminal Justice Systems"
Woodley House, Potomac Residence Club, Inc.
Washington, D.C.

May 1998 <u>Presenter</u>
"Direct and Cross-examination"
D.C. Office of the Corporation Counsel
Washington, D.C.

Oct 1998          "Correctional Psychiatry (Basic Course)"
Annual Meeting
American Academy of Psychiatry and the Law
New Orleans, LA


Nov 1997              <u>Discussant</u>
Thirteenth Annual Rosalyn Carter Symposium on Mental
    Health Policy
The Carter Center Mental Health Task Force
Atlanta, GA


June 1997          "Hospitalization:  Who Needs It?"
Consortium on Special Delivery Settings
Council on Psychiatric Services
American Psychiatric Association
                    SanDiego,CA


Oct 1996          <u>Presenter</u>
"Regulatory Agencies and Mental Health Care Delivery                    Systems"
Tulane University Medical Center
New Orleans, LA


Mar 1996          <u>Presenter</u>
"Presidential Assassins"
Tenth Annual Conference
Florida State Hospital
Orlando, FL


Nov 1995              <u>Discussion Group Leader</u>
"Public Psychiatry"
American Psychiatric Association
Washington, D.C.


Sept 1995              <u>Presenter</u>
"A Comparison of Treatment Models for Women in Forensic
  Hospitals"
1995 State Mental Health Forensic Directors Conference
National Association of State Mental Health Program Directors
Madison, WI


July 1995              <u>Presenter</u>
"Successes from the Streets:  Strategies Beyond Shelters
    and Jails"
15th Annual National Alliance for the Mentally Ill Convention
Washington, D.C.


July 1995              <u>Presenter</u>
"Implications of Treatment Breakthroughs for Persons with
  Mental Illness"
'Knowledge Development and Application in Mental Health
  and Criminal Justice Systems for Persons with Mental
  Illness Living in the Community' Conference
Albuquerque, NM


June 1995              <u>Presenter</u>
"Fostering Hope and Celebrating Strengths, Embracing
  Families and Communities"
Family Advocacy and Support Association, Inc.
Washington, D.C.

May 1995                    Presenter
"Perspectives on Mental Illness in the Criminal Justice
 System"
Alliance for the Mentally Ill of Michigan
Southfield, MI


April 1995              Keynote Address:  "Approaches to Violent Behavior"
Second Annual Forensic Conference
Little Rock, AR


April 1995                  Presenter
"Clinical Diagnosis and Treatment of Mental Illness:  An
 Overview for the Non-Clinician"
Superior Court of the District of Columbia
Washington,D.C


Nov 1994                    Presenter
"Community Forensics:  Evolving Trends"
Grand Rounds Presentation
Department of Psychiatry
George Washington University Hospital
Washington, D.C.


Oct 1994                    Presenter
"An Overview of Mental Illness and Managing Violent
 Persons in the Hearing Room"
National Association of Administrative Law Judges
Baltimore, MD


Sept 1994              Keynote Address:  "Community Forensics"
National Association of Social Workers Working with
 Forensic Patients and Their Families
Bethesda, MD


May 1994                    Panelist
"The Mentally Ill in Prisons"
National Coalition for the Mentally Ill in Prisons
United States Capitol
Washington, D.C.


May 1994                    Presenter
"Community Forensics and Aftercare:  Placement and
 Treatment Issues"
Johns Hopkins Department of Psychiatry
Baltimore, MD


May 1994                    Presenter
"Transition Services for Mentally Ill Offenders"
The National Coalition for the Mentally Ill in the Criminal
                                    Justice System
Breakfast and Briefing for Members of Congress
Washington, D.C.


May 1994                    Presenter
"Managing a Violent Crisis:  Media Relations,
 Countertransference, and Other Internal and External
 Systems Issues", Managing the Risk of Violence
Georgia Regional Hospital
Atlanta, GA

May 1994                Presenter
"Remediation for the Juvenile Offender"
Patuxent Institution Staff Retreat
Marriotsville, MD


April 1994                Keynote Address:
"Providing a Continuum of Care for Forensic Patients"
Galt Scholar Lecturer
Virginia Department of Mental Health, Mental Retardation
  and Substance Abuse
Richmond, VA


April 1994                Guest Speaker
"Forensic Inpatient Services:  Trends for the 90s"
Fourth Annual Conference for Forensic Mental Health
  Treatment Providers
Vernon, TX


April 1994                Presenter
"Emergency Psychiatry"
Grand Rounds, Department of Emergency Medicine
University of Maryland Hospital
Baltimore, MD

Mar 1994                Presenter
"Effective Clinical Documentation"
Catonsville Community College
Catonsville, MD


Jan 1994                Presenter
"Community Forensics"
Grand Rounds, Department of Psychiatry
University of Maryland
Baltimore, MD


Jan 1994                Speaker
"Overview of the Forensic System in Maryland"
Educational Program Series
Baltimore Mental Health Systems, Inc.
Baltimore, MD


Dec 1993                Presenter
"The Insanity Defense and Serial Sex Offenders"
Thurgood Marshall Inn of Court
Superior Court of the District of Columbia and the U.S.
  Court of Appeals
Washington, D.C.


July 1993                Keynote Address:  "The Forensic Care Providers' Role in
  Educating the Public"
Third Annual Conference for Forensic Mental Health
  Treatment Providers
Vernon, TX


June 1993                Keynote Address:  "Forensic Mental Health Care in the
  United States"
The Alliance for the Mentally Ill of Maryland
The 11th Annual Convention, Hood College
Frederick, MD

334

May 1993          <u>Presenter</u>
"Developing an Integrated System for Correctional
  Institutions"
1993 Annual Meeting
American Psychiatric Association
San Francisco, CA


May 1993          <u>Presenter</u>
"Community Violence:  How Have We Arrived Here?  Can
  We Go Anywhere Else?"
Georgia Regional Hospital
Atlanta, GA


April  1993          <u>Presenter</u>
"Mock Trial:  Serial Rapists"
Board of Professional Responsibility
District of Columbia Court of Appeals, Annual Disciplinary Conference
Washington, D.C.


April 1993          <u>Presenter</u>
"History of Forensic Psychiatry and the Insanity Defense"
Psychiatry Grand Rounds
University of Maryland
Baltimore, MD


Feb 1993          <u>Presenter</u>
"The Insanity Defense in the Federal System and the District
  of Columbia"
Forensic Psychiatry Fellowship Program Seminar
University of Maryland
Baltimore, MD


Jan 1993          <u>Keynote Address</u>:  "Violence is a Community Problem:  How
  Did We Get Here?"
Workshop on Violence and the Community
Sponsored by the University of Maryland
Linthicum, MD


Nov 1992          <u>Speaker</u>
"The Psychological Dimensions of Preventing Violence"
Violence in Our Community Action Agenda
1992 Family Life Conference
Henry C. Gregory III, Family Life Center
Washington, D.C.


Sept 1992          <u>Speaker</u>
"Cross Cultural Differences in Evaluation and Treatment"
Treatment or Punishment:  Mental Illness and the Criminal
Justice System
National Alliance for the Mentally Ill
Washington, D.C.


May 1992                    "Evaluation and Treatment of Blacks in Jails and Prisons"
Annual Meeting
American Psychiatric Association
Washington, D.C.

May 1992                    <u>Speaker</u>
"Children and Violence"
D.C. Mental Health Association Annual Luncheon and
  Workshop
Washington, D.C.


Feb 1992                    <u>Presenter</u>
"Hostage Negotiations"
Annual Hostage Negotiation Seminar
Baltimore County Policy Department
Baltimore, MD


Oct 1991                    "Criminalization of the Mentally Ill"
Annual Meeting
American Academy of Psychiatry and the Law
Orlando, FL


Sept 1991                   "Victimization of Staff and Critical Incidents"
Twelfth Annual Conference
NASMHPD State Mental Health Forensic Directors
Birmingham, AL


Sept 1990                   "Maintaining the Integrity of the Unit"
Eleventh Annual Conference
NASMHPD State Mental Health Forensic Directors
Sante Fe, NM


June 1990                   <u>Speaker</u>
"Signs and Symptoms of Depression"
Women in Business
Prince George's Chamber of Commerce
Landover, MD


May 1990                    <u>Speaker</u>
"Not Guilty by Reason of Insanity:  Implications for the
  Judicial System, the Community and Clinicians"
Region 4 Community Mental Health Center Conference
Washington, D.C.


May 1990                    <u>Speaker</u>
"Violent Death and the Family:  Multiple Victims"
St. Francis Center Conference
Washington,D.C.


Dec 1989                    <u>Speaker and Panelist</u>
"Mental Health is Everybody's Business"
Fifth Annual Mental Health Planning Conference
D.C. State Mental Health Planning Council
Washington, D.C.


Oct 1989                    <u>Presenter</u>
"Mental Health Issues in the Courtroom"
D.C. Superior Court Judges and Commissioners
Washington, D.C.


April 1989                  <u>Speaker</u>
"People Reaching People: Pathways to Black Mental Health"
D.C. Chapter of the Association of Black Psychologists
Howard University
Washington, D.C.

Nov 1987            <u>Speaker</u>
"Client and Community Rights and Responsibilities"
Fourth Annual State of the District of Columbia Mental
  Health Conference
Washington, D.C.

June 1987           <u>Speaker</u>
"Advocacy - A Shared Responsibility"
Information, Protection and Advocacy Center for
  Handicapped Individuals, Inc.
Washington, D.C.

Jan 1987            <u>Speaker</u>
"Depression:  Approaches to Community Management"
PSI Associates, Inc.
Washington, D.C.

Oct 1986            <u>Presenter</u>
"Re-enactment of Ezra Pound Trial"
Annual Meeting
American Academy of Psychiatry and the Law
Philadelphia, PA

Aug 1986            <u>Presenter</u>
"Forensic Psychiatry and General Psychiatric Practice"
Howard University Hospital
Washington, D.C.

June 1986           <u>Speaker</u>
"Schizophrenia:  Treatment Approaches"
PSI Associates, Inc.
Washington, D.C.

Nov 1985            <u>Presenter</u>
"Sexual Psychopathology and Anti-Androgen Therapies"
St. Elizabeths Hospital
Washington, D.C.

Oct 1985            <u>Presenter</u>
"Re-enactment of Ezra Pound Trial"
Medical Society Scientific Day Program
St. Elizabeths Hospital
Washington, D.C.

Mar 1985            <u>Presenter</u>
"Tarasoff and Its Offsprings:  Implications for Clinical
  Practice"
Eighth Annual John Marr Day Symposium
St. Elizabeths Hospital
Washington, D.C.

Sept 1984           <u>Presenter</u>
"Civil Commitment and Post NGI Proceedings"
Criminal Practice Institute
Washington, D.C.

Jan 1984                    Presenter
"Critical Issues in Forensic Psychiatry:  Where Do We Go
  From Here?"
Seventh Annual John Marr Day Symposium
St. Elizabeths Hospital
Washington, D.C.


June 1983                   Speaker
"Psychological Effects of Cancer"
Introductory Course in Cancer Education for D.C. Health and
  Science Teachers
Washington, D.C.


Dec 1980                    "Use of Psychotropic Medications in Pregnancy:  A Review"
St. Elizabeths Hospital Medical Society
Washington, D.C.


Aug 1979                    "The Psychosocial Aspects of Liaison Psychiatry to Cancer
  Patients"
The National Medical Association Annual Meeting
Detroit, MI


PUBLICATIONS

Patterson, RF.  "Commentary:  The Problem of Agreement on Diagnoses in Criminal Cases"
Journal of the American Academy of Psychiatry and the Law
November 2010

Patterson, RF and Hughes, KC., "Review of Completed Suicides in the California Department
    of Corrections and Rehabilitation, 1999 to 2004"
        Psychiatric Services (A Journal of the American Psychiatric Association)
        June 2008

Patterson, RF and Greifinger, RB. ,"Treatment of Mental Illness in Correctional Settings"
Chapter in Public Health Behind Bars:  From Prisons to Communities
Edited by Robert B. Greifinger, Springer Science + Business Media, LLC, 2007

Patterson, RF, and Greifinger, RB. "Insiders as Outsiders: Race, Gender and
                Cultural Considerations Affecting Health Outcome after Release to the
                                Community"
                Journal of Correctional Health Care, Vol. 10, #3, Fall 2003

        4.   Co-Author
            Task Force Report: Guidelines for Treatment of Schizophrenia in a Correctional Setting
             National Commission on Correctional Health Care
             Washington, DC

5.   Patterson, RF, "Review Mechanisms and Regulatory Agencies"
            Chapter in Mental Health Care Administration: A Guide for Practitioners.
Edited by P. Rodenhauser, M.D. University of Michigan Press.  2000

Dvoskin, JA, and Patterson, RF:  "Administration of Treatment Programs for
    Offenders with Mental Disorder"
    Chapter in Treatment of Offenders With Mental Disorders
    Edited by R.M. Wettstein. Guilford Press, New York, 1998.

Patterson, RF, and Wise, BF: The Development of Internal Forensic Review
    Boards in the Management of Hospitalized Insanity Acquittees.
    Journal of the American Academy of Psychiatry and the Law 26 (4), 1998.

Patterson R: Managed Care in Corrections.
Journal of the American Academy of Psychiatry and the Law 26 (1), 1998.

<u>MEDIA ACTIVITIES</u>

Dec 2007                    "Treatment of Insanity Acquitees in the U.S. Virgin Islands"
                            National Public Radio

Jan 1998                "Competence and Criminal Responsibility"
FOX Evening News
Washington, D.C.

Jan 1998                "Unibomber"
FOX Morning News
Washington, D.C.

Dec 1996                "Holiday Blues and Depression"
Crosstalk - WDCU Live Public Radio Talk Show
Washington, D.C.

Dec 1995                "Violence in the Community" and "The Holiday Blues"
Crosstalk - WDCU Live Public Radio Talk Show
Washington, D.C.

Oct 1993                "Understanding Your Mental Health"
Focus on Health
WOL Radio 1450 AM
Washington, D.C.

Oct 1993                "The Criminally Insane"
FOX TV

                        Washington, DC

June 1993               "Psychodynamics of Violence" and "Total Well Being"
WPFW-FM Talk Radio Show
Washington, D.C.

Mar 1992                "State of the District: Need and Delivery of Mental Health
  Care Services Through DHS"
DC Today, Channel 16
Washington, D.C.

Jan 1992                "A Perspective on Justice"
Discussion with Prince Georges County State's Attorney
Channel 18
Prince Georges County, MD

Sept 1991               "Panic Disorders"
Urban Health Report
WHMM-TV, Channel 32
Washington, D.C.

July 1991               "Serial Killers"
FOX News Channel 5
Washington, D.C.

| | |
|---|---|
| Mar 1991<br>Urban Health Report<br>WHMM-TV, Channel 32<br>Washington, D.C. | "Domestic Violence" |
| Mar 1991<br>Urban Health Report<br>WHMM-TV, Channel 32<br>Washington, D.C. | "Anxiety Disorders" |
| Aug 1990<br>Evening Exchange<br>WHMM-TV, Channel 32<br>Washington, D.C. | "Impact of the Marion Barry Trial on the Community" |
| Aug 1990<br>WNTR-AM Radio<br>Washington, D.C. | "After the Trail" |
| May 1990<br>Crosstalk - WDCU Live Public Affairs Talk Show<br>Washington, D.C. | "Your Mental Health" |
| May 1989<br>The Morning Show with Cathy Hughes<br>WOL Radio Talk Show<br>Washington, D.C. | "How Stress Factors Affect the Community" |
| Feb 1987<br>Washington Post Magazine<br>Washington, D.C. | "A Washington Life" |
| Jan 1987<br>Newscenter 4<br>Washington, D.C. | "The San Isidro Murder Slayings:  Psychological Aspects" |

OTHER ACTIVITIES

| | |
|---|---|
| 2006 - Present | <u>Peer Reviewer</u><br>Psychiatric Services<br>Journal of the American Psychiatric Association<br>Arlington, VA |
| 1998 - Present | <u>Peer Reviewer</u><br>Journal of the American Academy of Psychiatry and the Law<br>Blumfield, CT |
| 1998 - 2004 | <u>Chairman</u><br>Institutional and Correctional Psychiatry Committee<br>American Academy of Psychiatry and the Law<br>Blumfield, CT |
| 2000 - 2001 | <u>President</u><br>Washington Psychiatric Society<br>Washington, D.C. |
| August 1999 | <u>Co-Chairman</u><br>National Summit on Violence Throughout the Life Span<br>Colorado Violence Prevention Center<br>Denver, CO |

1999 - 2000          President-Elect
                     Washington Psychiatric Society
Washington, D.C.


1998 - 1999          President
                     Guttmacher Forensic Educational Fund, Inc.
Baltimore, MD


Dec 1997             Trainer
& Jan 1998           Suicide Prevention Training for Correctional Officers
Central Booking Intake Facility and Baltimore City Detention Center
Baltimore, MD


1997 - 1998          Vice President
                     Guttmacher Forensic Educational Fund, Inc.
Baltimore, MD


1996 - 1997          Chairperson
                     Consortium on Special Delivery Settings
Council on Psychiatric Services
American Psychiatric Association
Washington, D.C.


1994 - 1999          Vice Chairperson
                     Council on Psychiatry and Law
American Psychiatric Association
Washington, D.C.


1994 -1997           Member
                     Executive Council
American Academy of Psychiatry and Law
Blumfield, CT


1994 - 1997          Member
                     Ad Hoc Committee to Develop a Slate of Candidates for
 Election to the American Board of Psychiatry and Neurology
Deerfield, IL


1993 - 1997          Member
                     Institutional and Correctional Psychiatry Committee
American Academy of Psychiatry and the Law
Bloomfield, CT


1993 - 1994          Vice-Chair to Executive Committee
                     Forensic Division
National Association of State Mental Health Program Directors
Alexandria, VA


1992 - 2001          Member
                     Committee on Added Qualifications in Forensic Psychiatry
American Board of Psychiatry and Neurology
Deerfield, IL


1990 - 1994          Member and Washington, D.C. Representative
& 1998 - 2001        Forensic Division
                     National Association of State Mental Health Program
                          Directors
Alexandria, VA


341

1992 - 1994     <u>Treasurer</u>
                          Washington Psychiatric Society
Washington, D.C.


1992 - 1994     <u>Member</u>
                          Institutional Review Board
Department of Health and Mental Hygiene
State of Maryland


1990 - 1991     <u>President</u>
                          D.C. Chapter
Washington Psychiatric Society
Washington, D.C.


1990 - 1991     <u>Member</u>
                          ABT Oversight Committee
Patuxent Institute
Jessup, MD


1990 - 1991     <u>Chairman</u>
                          Council on Psychiatry
D.C. Medical Society
Washington, D.C.


1989 - 1994     <u>Councilmember</u>
                          Council on Psychiatry
D.C. Medical Society
Washington, D.C.


1989 - 1990     <u>Secretary</u>
                          Council on Psychiatry
D.C. Medical Society
Washington, D.C.


1987 - 1993     <u>Member</u>
                          Advisory Merit Selection Panel
(Appointed by Chief Judge Fred B. Ugast of the Superior
 Court of the District of Columbia)
Washington, D.C.


1986 - 1988          <u>Co-Editor</u>
                          American College of Mental Health Administration Newsletter
Washington, D.C.
1985 - 1986          <u>Editor</u>
                          St. Elizabeths Hospital Medical Society Newsletter
Washington, D.C.


<u>AWARDS</u>

       February 2001              "Key to Louisiana State Penitentiary at Angola"
                               Louisiana Department of Corrections
                          Baton Rouge, LA,


May 1998                 Award for Support to Commission on Mental Health Services
              Department of Nursing, Commission on Mental Health Services
              Washington, D.C.,

February 1998            "Key to Patuxent Institution"
Department of Public Safety and Correctional Services
Jessup, Maryland


March 1996              Distinguished Visiting Professor
Florida State Hospital
Orlando, Florida


1994    Certificate of Appreciation for Dedication to Clifton T. Perkins Hospital
                    and the Mental Health Forensic System of Maryland
Department of Health and Mental Hygiene
Baltimore, Maryland


1994                    Certificate of Appreciation
Medical Records Department, Clifton T. Perkins Hospital
Jessup, Maryland


November 1992           Award for Public Service
United States Department of Justice
Washington, D.C.,


October 1992            Certificate of Appreciation
Risk Management/Quality Assessment Program
Mental Hygiene Administration
Baltimore, Maryland


October 1992            Outstanding Public Service Recognition Resolution
Council of the District of Columbia
Washington, D.C.


October 1992            Distinguished Service Award
Department of Human Services, District of Columbia
Washington, D.C.


October 1992            Meritorious Public Service Award
Office of the Mayor
Washington, D.C.


October 1992            Our Hero Award
Patient's Rights Council
St. Elizabeths Hospital
Washington, D.C.,


October 1992            Outstanding Assistance and Support to Law Enforcement
United States Secret Service
Washington, D.C.


September 1992          Superior Support for United States Public Health Service
Washington, D.C.


May 1992                Certificate of Appreciation for Dedicated Service to the Psychiatry
                    Section of the Medical Society of the District of Columbia
Washington, D.C.


February 1992           Certificate of Appreciation for Hostage Negotiations Conference
Baltimore County Police Department
Baltimore, Maryland

343

1989                          Blacks in Government Award for Outstanding Service in Forensic
                              Psychiatry and Community Service
Washington, D.C.


March 1987                    The ADAMHA Administrators Award for Achievements of the Quality
                                Assurance Workgroup
St. Elizabeths Hospital
Washington, D.C.


June 1986                     Alumnus of the Year
St. Elizabeths Overholser Division of Training
Washington, D.C.


MEMBERSHIP IN PROFESSIONAL ASSOCIATIONS

American Academy of Psychiatry and the Law
American College of Mental Health Administration (Fellow)
American Medical Association
American Psychiatric Association (Distinguished Fellow)
Black Psychiatrists of America
Howard University Medical Alumni Association
Medical Society of the District of Columbia
National Alliance for the Mentally Ill
National Medical Association
Society of Correctional Physicians
Washington Psychiatric Society

# ACRONYMS and ABBREVIATIONS

3CMS:               Correctional Clinical Case Manager System

ACH:                Acute Care Hospital

ADD:                Attention Deficit Disorder

ADHD:               Attention Deficit Hyperactivity Disorder

ADLs:               Activities of Daily Living

AED:                Automatic Electronic Defibrillator

AHA:                Assistant Hospital Administrator

Ambu bag:           Ambulatory Bag Used for CPR

APP:                Acute Psychiatric Program at Vacaville

ASH:                Atascadero State Hospital

ASMHS:              Administrative Segregation Mental Health Services

ASP:                Avenal State Prison

ASU:                Administrative Segregation Unit

BLS:                Basic Life Support

BMU:                Behavioral Modification Unit

BPT:                Board of Prison Terms

C-file:             Central File

C & PP:             Clinical Policy and Programs

C&PR:               Classification and Parole Representative

CAL:                Calipatria State Prison

CAP:                Corrective Action Plan

| | |
|---|---|
| CAT II: | Category II |
| CC I: | Correctional Counselor I |
| CC II: | Correctional Counselor II |
| CCAT: | Coordinated Clinical Assessment Team |
| CCC: | California Correctional Center |
| CCF: | Community Correctional Facility |
| CCI: | California Correctional Institution |
| CCPOA: | California Correctional Peace Officers Association |
| CCWF: | Central California Women's Facility |
| CDC: | California Department of Corrections |
| CDCR: | California Department of Corrections and Rehabilitation |
| CEN: | Centinela State Prison |
| CIM: | California Institution for Men |
| CIW: | California Institution for Women |
| CM: | Case Manager |
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CMO: | Chief Medical Officer |
| CO: | Correctional Officer |
| CPER: | Clinical Performance Enhancement and Review Subcommittee |
| CPR: | Cardiopulmonary Resuscitation |
| CRC: | California Rehabilitation Center |
| CSATF (II): | California Substance Abuse Treatment Facility (II) |

| | |
|---|---|
| CSH: | Coalinga State Hospital |
| CSP: | California State Prison |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CTC: | Correctional Treatment Center |
| CTF: | California Training Facility/Soledad |
| CTQ: | Confined To Quarters |
| CVSP: | Chuckawalla Valley State Prison |
| CYA: | California Youth Authority |
| DA: | District Attorney |
| DAI: | Division of Adult Institutions |
| DCHCS: | Division of Correctional Health Care Services |
| DDP: | Developmental Disabilities Program |
| DDPS: | Distributed Data Processing System |
| DHS: | Department of Human Services |
| DMH: | Department of Mental Health |
| DNC: | Death Notification Coordinator |
| DNR: | Do Not Resuscitate |
| DOF: | Director of Finance |
| DON: | Director of Nursing |
| DOT: | Directly Observed Therapy |

| | |
|---|---|
| DRC: | Death Review Committee |
| DRMC: | Delano Regional Medical Center |
| DSM: | Diagnostic and Statistical Manual |
| DTP: | Day Treatment Program |
| DVI: | Deuel Vocational Institute |
| EOP: | Enhanced Outpatient Program |
| EPPD: | Earliest Possible Parole Date |
| EPRD: | Earliest Possible Release Date |
| ERDR: | Emergency Response and Death Review Committee |
| ERRC: | Emergency Response Review Committee |
| ERV: | Emergency Response Vehicle |
| ETV: | Emergency Transport Vehicle |
| FIT: | Focus Improvement Team |
| Folsom: | Folsom State Prison |
| FPTTP: | Foreign Prisoner Transfer Treaty Program |
| GACH: | General Acute Care Hospital |
| GAF: | Global Assessment of Functioning |
| GP: | General Population |
| HCCUP: | Health Care Cost and Utilization Program |
| HCM: | Health Care Manager |
| HCPU: | Health Care Placement Unit |
| HCQMC: | Health Care Quality Management Committee |
| HDSP: | High Desert State Prison |

| | |
|---|---|
| HQ: | Headquarters |
| HRT: | Health Records Technician |
| HS: | *Hora Somni*/Hour of Sleep |
| ICC: | Institutional Classification Committee |
| ICF: | Intermediate Care Facility |
| ICP: | Intermediate Care Program |
| ICU: | Intensive Care Unit |
| IDTT: | Interdisciplinary Treatment Team |
| IEX: | Indecent Exposure |
| IMHIS: | Inmate Mental Health Information System |
| IMSP: | Inmate Medical System Policy |
| INS: | Immigration and Naturalization Service |
| IP: | Inmate Profile |
| I/P: | Inmate/Patient |
| ISP: | Ironwood State Prison |
| IST: | In-Service Training *or* Incompetent to Stand Trial |
| ISU: | Investigative Services Unit |
| KOP: | Keep on Person |
| KVSP: | Kern Valley State Prison |
| LCSW: | Licensed Clinical Social Worker |
| LLE: | Language Learning Enterprises |
| LOC: | Level of Care |
| LOP: | Local Operating Procedure |

| | |
|---|---|
| LOU: | Locked Observation Unit |
| LPN: | Licensed Practical Nurse |
| LPT: | Licensed Psychiatric Technician |
| LSW: | Limited Suicide Watch |
| LVN: | Licensed Vocational Nurse |
| MAR: | Medication Administration Record |
| MCSP: | Mule Creek State Prison |
| MDD: | Major Depressive Disorder |
| MHCB: | Mental Health Crisis Bed |
| MHOHU: | Mental Health Outpatient Housing Unit |
| MHP: | Mental Health Program |
| MHQMS: | Mental Health Quality Management System |
| MHS: | Mental Health Subcommittee |
| MHSDS: | Mental Health Services Delivery System |
| MHSPC: | Mental Health Suicide Prevention Coordinator |
| MHSR: | Mental Health Suicide Reviewer |
| MHTS: | Mental Health Tracking System |
| MOD: | Medical Officer of the Day |
| MOU: | Memorandum of Understanding |
| MPIMS: | Madrid Patient Information Management System |
| MSF: | Minimal Support Facility |
| MTA: | Medical Technical Assistant |
| NCF: | Normal Cognitive Functioning |

NKSP:              North Kern State Prison

NOS:               Not Otherwise Specified

NPPEC:             Nursing Professional Practice Executive Committee

NVDRS:             National Violent Death Reporting System

OHU:               Outpatient Housing Unit

OIA:               Office of Investigative Affairs

OJT:               On the Job Training

OP:                Operating Procedure

OT:                Office Tech

PBSP:              Pelican Bay State Prison

PC:                Primary Clinician

PES:               Psychiatric Evaluation Service

PHU:               Protective Housing Unit

PIA:               Prison Industry Authority

po:                *per os* (by mouth)

POC:               Parole Outpatient Clinic *or* Psychiatrist on Call

POD:               Psychiatrist on Duty *or* Psychiatrist of the Day

PPE:               Personal Protective Equipment

PPEC:              Professional Practice Executive Committee

PPRC:              Psychological Peer Review Committee

PSH:               Patton State Hospital

PSU:               Psychiatrist Services Unit

PSW:               Psychiatric Social Worker

| | |
|---|---|
| PT: | Psychiatric Technician |
| PTSD: | Post-Traumatic Stress Disorder |
| PVSP: | Pleasant Valley State Prison |
| QIP: | Quality Improvement Plan |
| QIT: | Quality Improvement Team |
| QMAT: | Quality Management Assessment Team |
| QMT: | Quality Management Team |
| QNC: | Quality Nurse Consultant |
| QVH: | Queen of the Valley Hospital |
| R&R: | Reception and Receiving |
| RC: | Reception Center |
| RJD: | Richard J. Donovan Correctional Facility |
| RN: | Registered Nurse |
| RT: | Recreational Therapist |
| RVR: | Rule Violation Report |
| SAC: | California State Prison/Sacramento |
| SCC: | Sierra Conservation Center |
| SHU: | Segregated Housing Unit |
| SI: | Suicidal Ideation |
| SMTA: | Senior Medical Technical Assistant |
| SMY: | Small Management Yard |
| SNF: | Skilled Nursing Facility |
| SNY: | Sensitive Needs Yard |

| | |
|---|---|
| SOA&P: | Subjective Objective Assessment and Plan |
| SPRFIT: | Suicide Prevention and Response Focused Improvement Team |
| SPU: | Special Processing Unit |
| SQ: | California State Prison/San Quentin |
| SRA: | Suicide Risk Assessment |
| SRAC: | Suicide Risk Assessment Checklist |
| SRC: | Suicide Review Committee |
| SRN: | Senior Registered Nurse |
| SVP: | Sexually Violent Predator |
| SVPP: | Salinas Valley Psychiatric Program |
| SVSP: | Salinas Valley State Prison |
| TCMP: | Transitional Case Management Program |
| TLU: | Transitional Living Unit |
| TPU: | Transitional Program Unit *or* Temporary Protective Unit |
| TTA: | Triage and Treatment Area |
| UCC: | Unit Classification Committee |
| UCSF: | University of California at San Francisco |
| UHR: | Unit Health Records |
| UNA: | Unidentified Needs Assessment |
| VSPW: | Valley State Prison for Women |
| VPP: | Vacaville Psychiatric Program |
| WHO: | World health Organization |
| WSP: | Wasco State Prison |