FUTTERMAN DUPREE DODD CROLEY MAIER LLP
MARTIN H. DODD (104363)
180 Sansome Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 399-3840
Facsimile: (415) 399-3838
mdodd@fddcm.com

*Attorneys for Receiver*
J. Clark Kelso

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## AND FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCIANO PLATA, et al., | Case No. C01-1351 TEH |
|     *Plaintiffs*, | |
|   v. | |
| EDMUND G. BROWN, JR., et al., | |
|     *Defendants*. | |
| RALPH COLEMAN, et al., | Case No. CIV S-90-0520 LKK JFM P |
|     *Plaintiffs*, | |
|   v. | |
| EDMUND G. BROWN, JR., et al., | |
|     *Defendants*. | |
| JOHN ARMSTRONG, et al., | Case No. C94-2307 CW |
|     *Plaintiffs*, | |
|   v. | |
| EDMUND G. BROWN, JR., et al., | |
|     *Defendants*. | |

## NOTICE OF FILING OF RECEIVER'S TWENTY-SECOND TRI-ANNUAL REPORT

1    PLEASE TAKE NOTICE that the Receiver in *Plata v. Schwarzenegger*, Case No. C01-

2 1351 TEH, has filed herewith his Twenty-Second Tri-Annual Report.

3 Dated:  January 25, 2013                    FUTTERMAN DUPREE DODD CROLEY
                                             MAIER LLP
4

5                                             By:_____/s/ Martin H. Dodd_____
                                                       Martin H. Dodd
6                                                      Attorneys for Receiver J. Clark Kelso

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



# Achieving a Constitutional Level of Medical Care in California's Prisons

**Twenty-second Tri-Annual Report of the Federal Receiver's Turnaround Plan of Action**
**For September 1 – December 31, 2012**

**January 25, 2013**

# California Correctional Health Care Receivership

**Vision:**

As soon as practicable, provide constitutionally adequate medical care to patient-inmates of the California Department of Corrections and Rehabilitation (CDCR) within a delivery system the State can successfully manage and sustain.

**Mission:**

Reduce avoidable morbidity and mortality and protect public health by providing patient-inmates timely access to safe, effective and efficient medical care, and integrate the delivery of medical care with mental health, dental and disability programs.

# Table of Contents

Page

1.   Executive Summary.................................................................................................  1

2.   The Receiver's Reporting Requirements.............................................................  4

3.   Status and Progress Toward the Turnaround Plan Initiatives...........................  5

     GOAL 1    Ensure Timely Access to Health Care Services.........................  5

     *Objective 1.1*    Screening and Assessment Processes...........................................  5

     *Objective 1.2*    Access Staffing and Processes.....................................................  5

     *Objective 1.3*    Scheduling and Patient-Inmate Tracking System............................  6

     *Objective 1.4*    Standardized Utilization Management System...............................  7

     GOAL 2    Establish a Prison Medical Program Addressing the Full Continuum

               of Health Care Services........................................................  8

     *Objective 2.1*    Primary Care.............................................................................  8

     *Objective 2.2*    Chronic Care.............................................................................  8

     *Objective 2.3*    Emergency Response.....................................................................  8

     *Objective 2.4*    Specialty Care and Hospitalization................................................  8

     GOAL 3    Recruit, Train and Retain a Professional Quality Medical Care

               Workforce.............................................................................  10

     *Objective 3.1*    Physicians and Nurses.................................................................  10

     *Objective 3.2*    Clinical Leadership and Management Structure...............................  10

     *Objective 3.3*    Professional Training Program.....................................................  10

     GOAL 4    Implement a Quality Assurance and Continuous Improvement

               Program.................................................................................  11

     *Objective 4.1*    Clinical Quality Measurement and Evaluation Program.................  11

     *Objective 4.2*    Quality Improvement Programs.....................................................  15

     *Objective 4.3*    Medical Peer Review and Discipline Process...................................  19

     *Objective 4.4*    Medical Oversight Unit................................................................  19

     *Objective 4.5*    Health Care Appeals Process.......................................................  19

i

*Objective 4.6*     Out-of-State, Community Correctional Facilities and Re-entry
Oversight................................................................................. 19

**GOAL 5     Establish Medical Support / Allied Health Infrastructure...................... 20**

*Objective 5.1*     Pharmacy................................................................................. 20

*Objective 5.2*     Medical Records....................................................................... 20

*Objective 5.3*     Imaging/Radiology and Laboratory Services.................................. 20

*Objective 5.4*     Clinical Information Systems......................................................... 22

*Objective 5.5*     Telemedicine............................................................................ 22

**GOAL 6     Provide for Necessary Clinical, Administrative and Housing
Facilities.................................................................................... 23**

*Objective 6.1*     Upgrade Administrative and Clinical Facilities................................. 23

*Objective 6.2*     Expand Administrative, Clinical, and House Facilities....................... 25

*Objective 6.3*     Finish Construction at San Quentin State Prison.............................. 26

**4.     Additional Successes Achieved by the Receiver...........................................  27**

A.     Office of the Inspector General – Update on the Medical Inspections of
California's 33 Adult Prisons.......................................................... 27

**5.     Particular Problems Faced by the Receiver, Including Any Specific Obstacles
Presented By Institutions Or Individuals...................................................  29**

**6.     An Accounting of Expenditures for the Reporting Period.............................  32**

**7.     Other Matters Deemed Appropriate for Judicial Review..............................  34**

A.     Coordination with Other Lawsuits................................................. 34

B.     Master Contract Waiver Reporting............................................... 34

C.     Consultant Staff Engaged by the Receiver..................................... 34

**8.     Conclusion...................................................................................  35**

# Section 1: Executive Summary

In our first Tri-Annual report for 2013, the accomplishments for the period of September 1 through December 31, 2012 are highlighted. Progress continues toward fully implementing the Vision and Mission outlined in the Receiver's Turnaround Plan of Action (RTPA). Highlights for this reporting period include the following:

- RTPA - Substantial completion of more than 77 percent of the action items. Work on remaining items continues, including completion of a system-wide scheduling function, full definition of medical processes for primary care, implementation of a quality improvement program, and implementation of a medical records system that can properly support a safe and efficient pharmacy function.
- Office of the Inspector General (OIG) Inspections – Continuation of round three inspections with scores improved.
- California Correctional Health Care Services (CCHCS) introduced on-demand registries – CCHCS staff have used the on-demand registries to create more than 35,700 customized reports to manage specific patient populations.
- CCHCS provided a number of tools and services to help institutions appropriately place and manage high risk patients. Among them are:
  - Facilitation of patient transfers by a multi-disciplinary workgroup
  - New patient registries
  - Performance monitoring

In the key areas of timely access to primary care physicians and timely access to medications, the OIG scores showed a modest improvement between round two and three of the inspections, although our scores in these areas still lag behind other improvements, demonstrating that we have more work to do to solve the challenges of providing timely access to care and ensuring that medications are timely delivered to all who need them. The OIG overall scores show steady improvement from round two to round three with 12 out of the 20 final reports thus far having a score of 85 percent or better.

The State has now agreed to complete all construction-related improvements. The California Health Care Facility (CHCF) in Stockton is on schedule to open later this year, and construction at DeWitt Nelson (DWN) has been approved. In addition, CDCR's published plan, *The Future of California Corrections (Blueprint)*, proposed the upgrades of the existing facilities: Healthcare Facility Improvement Program (HCFIP), along with a streamlined legislative approval process allowing oversight to be retained by the Public Works Board (PWB). These changes required legislative support and were approved with the passing of Senate Bill 1022 on June 27, 2012 allowing these projects to follow an approval process similar to other State capital outlay projects. CDCR will submit projects to the Department of Finance (DOF) for approval, with informational letters sent simultaneously to the Joint Legislative Budget Committee (JLBC), and will be scheduled for the soonest PWB meeting available to receive project approval.

At the end of the formal reporting period for this report, it became apparent that the State's realignment program would fall short of the reductions necessary to meet the population density level ordered by the three-judge court. In essence, the reductions from realignment plateaued short of the target set by the court. So long as the State was meeting its court-ordered targets, there was no need in our reports last year to comment specifically on the effects of overcrowding other than to note that population and overcrowding were indeed decreasing as ordered by the three-judge panel.

However, in its brief recently filed with the Three-Judge Court, the State attempts to cite our recognition of the State's prior compliance with the Court's overcrowding order and silence regarding particular problems caused by overcrowding as an endorsement of the State's position that further compliance with the overcrowding order is unnecessary. That distorts the content of our reports. We clarify the current status below in Section 5 ("Particular Problems Faced by the Receiver"). In short, there is no persuasive evidence that a constitutional level of medical care has been achieved system-wide at an overall population density that is significantly higher than what the Three-Judge Court has ordered.

Format of the Report
To assist the reader, this Report provides three forms of supporting data:
*Metrics*: Metrics that measure specific RTPA initiatives are set forth in this report with the narrative discussion of each Goal and the associated Objectives and Actions that are not completed.

*Appendices*: In addition to providing metrics, this report also references documents in the Appendices of this report.

*Website References*: Whenever possible website references are provided.

RTPA Matrix
In an effort to provide timely and accurate progress reports on the RTPA to the Courts and other vested stakeholders, this format provides an activity status report by enterprise, for statewide applications/programs, and by institution, as appropriate for and in coordination with that operation.

The Enterprise Project Deployment worksheet and the Institution Project Deployment worksheet provide an illustration of the progress made toward each action item outlined in the RTPA and reported in the Tri-Annual Report. The Enterprise Project Deployment worksheet captures projects specifically assigned to the Receiver for broad administrative handling, analysis or testing. The Institution Project Deployment captures the status of all other activity by institution. Reporting will reflect activity that is completed, on schedule, delayed or not progressing, with corresponding dates. The Tri-Annual Report will continue to provide a narrative status report.

Due to the size of the document, the Matrix is included as Appendix 1.

<u>Information Technology Project Matrix</u>
In addition to the RTPA Matrix, a separate chart has been created to specifically illustrate the major technology projects and the deployment of those projects. This document is included as [Appendix 2](#).

# Section 2: The Receiver's Reporting Requirements

This is the twenty-second report filed by the Receivership, and the sixteenth submitted by Receiver Clark Kelso.

The Order Appointing Receiver (Appointing Order) filed February 14, 2006 calls for the Receiver to file status reports with the *Plata* court concerning the following issues:

1. All tasks and metrics contained in the Plan and subsequent reports, with degree of completion and date of anticipated completion of each task and metric.
2. Particular problems being faced by the Receiver, including any specific obstacles presented by institutions or individuals.
3. Particular success achieved by the Receiver.
4. An accounting of expenditures for the reporting period.
5. Other matters deemed appropriate for judicial review.

(Reference pages 2-3 of the Appointing Order at
http://www.cphcs.ca.gov/docs/court/PlataOrderAppointingReceiver0206.pdf)

In support of the coordination efforts by the three federal courts responsible for the major health care class actions pending against the CDCR, the Receiver files the Tri-Annual Report in three different federal court class action cases: *Armstrong, Coleman, and Plata*.  An overview of the Receiver's enhanced reporting responsibilities related to these cases and to other *Plata* orders filed after the Appointing Order can be found in the Receiver's Eleventh Tri-Annual Report on pages 15 and 16. (http://www.cphcs.ca.gov/receiver_tri.aspx)

Court coordination activities include: facilities and construction; telemedicine and information technology; pharmacy; recruitment and hiring; credentialing and privileging; and space coordination.

# Section 3: Status of the Receiver's Turnaround Plan Initiatives

## Goal 1: Ensure Timely Access to Health Care Services

**Objective 1.1.** Redesign and Standardize Screening and Assessment Processes at Reception/Receiving and Release

*Action 1.1.1. By January 2009, develop standardized reception screening processes and begin pilot implementation*
This action is completed.

*Action 1.1.2. By January 2010, implement new processes at each of the major reception center prisons*
This action is completed.

*Action 1.1.3. By January 2010, begin using the new medical classification system at each reception center prison.*
This action is completed.

*Action 1.1.4. By January 2011, complete statewide implementation of the medical classification system throughout CDCR institutions.*
This action is completed.

**Objective 1.2.** Establish Staffing and Processes for Ensuring Health Care Access at Each Institution

*Action 1.2.1. By January 2009, the Receiver will have concluded preliminary assessments of custody operations and their influence on health care access at each of CDCR's institutions and will recommend additional staffing, along with recommended changes to already established custody posts, to ensure all patient-inmates have improved access to health care at each institution.*
This action is completed.

*Action 1.2.2. By July 2011, the Receiver will have fully implemented Health Care Access Units and developed health care access processes at all CDCR institutions.*
This action is completed.

Refer to Appendix 3 for the Executive Summary and Health Care Access Quality Reports for August through November 2012.

**Objective 1.3.** Establish Health Care Scheduling and Patient-Inmate Tracking System

> *Action 1.3.1. Work with CDCR to accelerate the development of the Strategic Offender Management System with a scheduling and inmate tracking system as one of its first deliverables.*

This action is ongoing. Implementation of the scheduling and inmate tracking system has been substantially delayed from our original plan because of difficulties in integrating the different business requirements of the mental health, dental and medical programs. The delay has meant, among other things, that scheduling remains an overly complicated and error-prone process where each institution has been forced to adopt a variety of manual work-arounds in an effort to ensure patients are scheduled for appointments appropriately. It appears we may finally be approaching implementation of a new system, but until that new system is fully implemented and tested in the field, we will remain unsure whether a reliable scheduling system truly exists. This is a significant gap in the development of systems to ensure timely access to care.

Progress during this reporting period is as follows:

- The centralized database, the health care operational data store (HCODS), which is the storehouse for demographic information and shared calendar appointments, has proven out as viable.

- The medical scheduling system (MedSATS) has been presented for user requirements review after several iterations of the prototype.

- The mental health scheduling system (MHTS) coding is complete and beginning extensive testing.

- Similarly, the dental scheduling system (DSTS) coding is complete and moving into user approval.

- Medical and dental programs approved Sierra Conservation Center (SCC) as the pilot site for proving out functionality.

- MedSATS and DSTS will be in pilot in December 2012/January 2013 timeframe. MHTS will deploy to all 33 institutions in January 2013.

Recent Accomplishments:
1. Coding has been completed for all scheduling systems other than bug fixes and user modifications.
2. Testing is in process for all systems.
3. Implementation planning is underway.

We expect the Health Care Scheduling and Tracking Systems (HCSTS) to be fully deployed in all institutions by the end of the 1st Quarter 2013.

**Objective 1.4.** **Establish a Standardized Utilization Management System**

    ***Action 1.4.1. By May 2010, open long-term care unit.***
This action is completed.

    ***Action 1.4.2. By October 2010, establish a centralized UM System.***
This action is completed.

## Goal 2: Establish a Prison Medical Program Addressing the Full Continuum of Health Care Services

**Objective 2.1.** Redesign and Standardize Access and Medical Processes for Primary Care

*Action 2.1.1. By July 2009, complete the redesign of sick call processes, forms, and staffing models.*
This action is ongoing. Progress during this reporting period is as follows:

The Episodic Care Policy and Procedure remains on hold pending a definitive decision as to whether a specific policy to address episodic care is needed or should be incorporated into an existing policy. The Policy Development Section is in the process of reviewing and revising all Inmate Medical Services Policies and Procedures (IMSP&P) in collaboration with the Clinical Operations Team (COT).

*Action 2.1.2. By July 2010, implement the new system in all institutions.*
This action is ongoing. Please see action item 2.1.1.

**Objective 2.2.** Improve Chronic Care System to Support Proactive, Planned Care

*Action 2.2.1. By April 2009, complete a comprehensive, one-year Chronic Care Initiative to assess and remediate systemic weaknesses in how chronic care is delivered.*
This action is completed.

**Objective 2.3.** Improve Emergency Response to Reduce Avoidable Morbidity and Mortality

*Action 2.3.1. Immediately finalize, adopt and communicate an Emergency Medical Response System policy to all institutions.*
This action is completed.

*Action 2.3.2. By July 2009, develop and implement certification standards for all clinical staff and training programs for all clinical and custody staff.*
This action is completed.

*Action 2.3.3. By January 2009, inventory, assess and standardize equipment to support emergency medical response.*
This action is completed.

**Objective 2.4.** Improve the Provision of Specialty Care and Hospitalization to Reduce Avoidable Morbidity and Mortality

*Action 2.4.1. By June 2009, establish standard utilization management and care management processes and policies applicable to referrals to specialty care and hospitals.*
This action is completed.

***Action 2.4.2. By October 2010, establish on a statewide basis approved contracts with specialty care providers and hospitals.***

This action is completed.

***Action 2.4.3. By November 2009, ensure specialty care and hospital providers' invoices are processed in a timely manner.***

This action is completed.

## Goal 3: Recruit, Train and Retain a Professional Quality Medical Care Workforce

**Objective 3.1** **Recruit Physicians and Nurses to Fill Ninety Percent of Established Positions**

For details related to vacancies and retention, refer to the Human Resources Recruitment and Retention Reports for August through November 2012. These reports are included as [Appendix 4](#).

> ***Action 3.1.1. By January 2010, fill ninety percent of nursing positions.***
This action is completed.

> ***Action 3.1.2. By January 2010, fill ninety percent of physician positions.***
This action is completed.

**Objective 3.2** **Establish Clinical Leadership and Management Structure**

> ***Action 3.2.1. By January 2010, establish and staff new executive leadership positions.***
> ***Action 3.2.2. By March 2010, establish and staff regional leadership structure.***
These actions are completed.

**Objective 3.3.** **Establish Professional Training Programs for Clinicians**

> ***Action 3.3.1. By January 2010, establish statewide organizational orientation for all new health care hires.***
This action is completed.

> ***Action 3.3.2. By January 2009, win accreditation for CDCR as a Continuing Medical Education provider recognized by the Institute of Medical Quality and the Accreditation Council for Continuing Medical Education.***
The action is completed.

## Goal 4: Implement Quality Improvement Programs

<u>**Objective 4.1.**</u> **Establish Clinical Quality Measurement and Evaluation Program**

> *Action 4.1.1. By July 2011, establish sustainable quality measurement, evaluation and patient safety programs.*

This action is ongoing. Progress during this reporting period is as follows:

<u>Patient Safety Program</u>

In May 2012, CCHCS adopted policies and procedures to establish a statewide Patient Safety Program, which includes:

- Routine program surveillance to identify problematic health care processes, including a statewide system for reporting patient-inmate safety issues, "near misses", and adverse/sentinel events;
- An annual Patient Safety Plan, which determines priority areas for statewide interventions and performance objectives;
- Statewide and institution-level interventions designed to protect patient-inmates and improve health outcomes;
- Regular communication in the form of patient-inmate safety alerts, program reports, and other mechanisms to ensure that all institutions are aware of patient-inmate safety issues;
- Technical assistance, staff development programs, and decision support tools, such as forms, checklists, and flowcharts, to support root cause analysis and process redesign;
- A patient-inmate safety culture that encourages staff to proactively identify and mitigate risk to patient-inmates and emphasizes continuous learning and improvement;
- A triaging process to ensure that patient-inmate safety issues that present immediate danger to patient-inmates and/or staff are resolved quickly and effectively and provide direction to institutions about appropriate follow up;
- A headquarters Patient Safety Committee to manage to the statewide Patient Safety Program and an Adverse/Sentinel Event Committee to provide oversight to the adverse/sentinel event review process; and
- A referral process for adverse or sentinel events that involve blameworthy acts, such as staff misconduct, deliberate indifference, and criminal activities.

Appendix 5 provides the full text of the Patient Safety Program Policy and associated procedures.

Since its inaugural meeting in August 2012, the Patient Safety Committee has convened five times; the Adverse/Sentinel Event Committee has met seven times. During this reporting period, both committees have primarily focused on activities required to implement the new Patient Safety Policy statewide.

The Patient Safety and Adverse/Sentinel Event Committees introduced the new policy in a series of Webinar trainings in late November and early December 2012, with staff participation from all health care disciplines and reporting levels. Appendix 6 provides the PowerPoint used in this training session. Additional make-up training sessions will be provided in January 2013. The next phase of implementation, slated for January and February of 2013, involves a statewide reporting system for health incidents, including near misses and adverse/sentinel events, and training for all health care staff on reporting requirements specified in the new policy. Another major patient safety training module on root cause analysis is being developed in conjunction with the Patient Safety and Adverse/Sentinel Event Committees.

Revisions to the Health Care Services Dashboard

During this reporting period, CCHCS continued to release the monthly Health Care Services Dashboard, which consolidates strategic performance information across all clinical program areas into a single report, allowing health care staff to identify improvement opportunities and assess progress toward local and statewide performance objectives.

The Dashboard is designed to include performance measures from the CCHCS Performance Improvement Plan (PIP), as well as other measures that may not be tied to a specific performance objective, but are useful in evaluating how well the health care system is functioning. With the updated PIP, anticipated for release in early 2013, CCHCS will revise the Dashboard to reflect new priority areas in the PIP. In 2013, Dashboard measures will be organized under the seven major components of the CCHCS Primary Care Model:

- Consistent care teams
- Population and care management
- Scheduling and access to care
- Medication management
- Health information management
- Resource management
- Continuous evaluation and improvement

In addition, CCHCS will continue to work on providing performance measure data at care team and provider levels, to support recognition of best practices and identification of particular clinics or patient panels that require additional support to reach performance goals.

Patient-Inmate Registries

In October 2012, CCHCS expanded the Chronic Care Master Registry, a report that lists patients with common chronic conditions and provides important clinical data for the care teams that manage them. Additional elements of the Chronic Care Master Registry introduced in October 2012 include information for patients with:

- End-stage liver disease
- Physical disabilities
- Developmental disabilities

Please see Figure 1.

*Figure 1: Chronic Care Master Registry with Some Data Points Added in October 2012 Highlighted*



The expanded registry also shows the number of prescriptions currently ordered for the patient, and flags medications due to expire soon. In addition, the Chronic Care Master Registry now links to a Mental Health Registry, with information on diagnostic codes, Penal Code 2602 status (patients who may be subject to involuntary medication administration by court order), psychotropic prescriptions, and the status of required diagnostic studies for specific medications, among other data elements. All underlined column headers link to sub-registries with more detailed clinical information. Please see Figure 2. CCHCS issued statewide training on the expanded registry in October, specifically targeting in particular mental health providers.

CCHCS has made it a priority to promote the use of patient registries, which make critical clinical information, such as a patient's health risk status, easily accessible to care teams working to manage an assigned patient panel. The flags imbedded in the patient registries prompt care teams to follow CCHCS guidelines, which both improves patient outcomes and helps to reduce costs. Widespread and consistent registry use is required for full

implementation of the Population and Care Management elements of the CCHCS Primary Care Model, and necessary for compliance with certain IMSP&Ps.

*Figure 2: Screen Shot of Mental Health Registry Released in October 2012*



Registry usage has steadily increased statewide since the May 2012 release of on-demand patient registries, which allow users to select from drop-down menus to customize registry reports for a particular patient population, care team, or other data element. Please see Figure 3. By December 2012, 86,440 on-demand registry reports had been run by CCHCS staff.



*Figure 3.* Number of On-Demand Registry Reports Run per Month by CCHCS Users, May through December 2012

During this reporting period, CCHCS produced two "best practices" documents that recommend ways to use patient registries for improvement initiatives and general population management. Appendix 7 provides these two best practices documents, which are posted on the Quality Management (QM) SharePoint site. CCHCS updated the Registry User's Guide to reflect the expanded Chronic Care Registry released in October 2012, and QM Section staff provided on-site demonstrations of the new registries to leadership teams at 12 institutions. In the next reporting period, CCHCS will continue to provide registry demonstrations at scheduled site visits and at the request of any institution staff, and will host a regular Webinar session twice per month to answer questions about the registries and provide other support to staff using it.

> *Action 4.1.2. By July 2009, work with the Office of the Inspector General to establish an audit program focused on compliance with Plata requirements.*
This action is completed.

**Objective 4.2.** **Establish a Quality Improvement Program**

> *Action 4.2.1.(merged Action 4.2.1 and 4.2.3): By January 2010, train and deploy existing staff--who work directly with institutional leadership--to serve as quality advisors and develop model quality improvement programs at selected institutions; identify clinical champions at the institutional level to implement continuous quality improvement locally; and develop a team to implement a statewide/systems-focused quality monitoring/measurement and improvement system under the guidance of an interdisciplinary Quality Management Committee.*
This action item is ongoing. Progress during this period is as follows:

QM Policy and Procedures

In December 2012, CCHCS issued updated QM Program Policies and Procedures. This new policy and associated procedures replace Volume 3, Chapters 1 through 4, of the IMSP&Ps dated January 2002.

For years, CCHCS has operated with outdated QM Program policies and procedures, established more than a decade ago with the original *Plata* settlement. The 2002 policies and procedures referenced programs, functional units, and positions that no longer exist and did not include many important developments in our organization that have occurred in recent years, including various committee and subcommittees that manage and improve performance in key service and functional areas, an annual planning process for statewide and local improvement activities, and the development of the Health Care Services Dashboard and patient registries.

Over the past 24 months, leadership at headquarters and in the field, as well as other stakeholders, including the Prison Law Office (PLO), worked together to update the QM Program Policy and Procedures. The intent of the policy revisions is as follows:

- Align the official policy with what is current operational best practices;
- Provide sufficient detail and direction to CCHCS staff to support full implementation of the policy and procedures;
- Eliminate references to obsolete functional titles or units;
- Outline the responsibilities and relationship of committees referenced in other statewide policies that conduct improvement activities;
- Codify essential program functions to ensure sustainability into the future;
- Incorporate related input from the institutions, federal court and other stakeholders.

Policy revisions include, but are not limited to the following:

- Contextual Information. The new policy emphasizes that an effective QM program relies on every person being involved and that we all must "own" the QM Program in order for us to continuously improve our system of care, and describes the performance management system's role of supporting the successful and sustainable implementation of the Primary Care Model as a major over-arching improvement strategy.
- Program Planning. A requirement of this policy is the establishment of organization-wide (updated at least biennially) and institution improvement plans (updated at least every 12 months). The policy outlines the criteria for selecting improvement priorities and describes the responsibilities of headquarters and institution leadership in communicating improvement priorities to CCHCS staff, helping staff to understand their role in improvement activities, and aligning operations to support improvement activities.
- Performance Evaluation. The new policy mandates monthly production of a Health Care Services Dashboard. CCHCS institutional staff are required to review Dashboard data monthly, use additional methods to evaluate performance as appropriate, and implement processes to ensure accuracy in data reporting. In addition, institution care teams are required to review patient registries at least monthly (and more often as

appropriate) and take action to follow-up on patients as necessary to improve patient outcomes.

- Governance Structure. The original 2002 policy and other subsequent statewide policies have established a network of multi-disciplinary committees at headquarters and in the field that manage quality improvement activities, including the Governing Body, QM Committee, and Program Subcommittees. The policy details how these committees interface with each other and other important units or structures in the organization, including regional teams, the Professional Practice Executive Committee, and local organized medical staff.

- Quality Improvement Techniques. The policy emphasizes the use of improvement models and approaches common in the health care industry, including the Care Model (also called the Chronic Care Model), FOCUS-PDSA, Lean / 6 Sigma, the Model for Improvement, Failure Mode and Effects Analysis, Root Cause Analysis, and others. The QM Program is tasked with training staff to use these techniques and developing toolkits to support appropriate application of an improvement model or concept.

- Technical Assistance. Headquarters and regional staff have a significant role in assisting institutions as they redesign health care processes and establish a well-functioning local performance management system. The policy outlines the various types of technical assistance that may be provided to institutions by regional teams and other CCHCS staff, including professional practice reviews and identifying and disseminating best practices.

The full text of the QM Policy and Procedures is included in Appendix 8.

Training on certain aspects of the new policy, such as institution improvement plans and use of patient registries, has already commenced and will continue into spring 2013. CCHCS will continue to add training modules to support implementation of the new policy for the next 6 to 12 months, including use of specific improvement models and tools to analyze quality problems and redesign health care processes.

Statewide PIP
Three years ago, CCHCS established its first statewide PIP, which outlines the organization's major improvement priorities, lists statewide performance objectives, and describes strategies that will be used to achieve the stated objectives. The PIP is updated periodically as performance objectives are met and new priorities emerge. The PIP is posted on the Intranet.

In August, CCHCS staff initiated a review process to update the PIP for 2013 through 2015. Review and revisions continued during this reporting period, with input requested from all headquarters health care executives and Chief Executive Officers at each institution. Part of the review process involves aligning the PIP with the Strategic Plan for health care services, which will be incorporated into the larger CDCR Strategic Plan.

Institution Performance Improvement Work Plans (PIWP) and the CCHCS Primary Care Model
In 2012, CCHCS modified the corrective action process that follows each OIG medical inspection to promote a system-wide approach to improvements and full implementation of the primary

care model. As institutions complete the third round OIG medical inspection, the institution develops a PIWP, which places priority on core processes in the primary care model, such as medication management and timely access to health information, to improve overall health care system performance and address deficiencies noted by the OIG. Institutions are encouraged to describe all improvement priorities that will be the focus for the next six months in their PIWP, including mental health, dental, and allied health projects. By producing this plan, institutions also satisfy major element of the new QM Policy.

To assist institutions in developing their PIWP, QM Section staff created a tool kit that guides institutions through the process. Appendix 9 provides a copy of the PIWP Tool Kit. Institutions receive an orientation to the tool kit by Webinar, and have the option of having QM Section staff facilitate leadership team discussions that determine PIWP content.

Once the institution has submitted a draft PIWP, the plan is disseminated to the Joint Clinical Executive Team (JCET) at headquarters for comment, and comments are forwarded on to the institution. Institutions are required to update the PIWP monthly, and the most current version of the Work Plan is posted on the QM Portal for view by all health care staff.

During this reporting period, 12 institutions completed a draft PIWP. Ten institutions have received a draft OIG report and await orientation and a site visit, and 11 institutions have not received their draft OIG report and are not yet required to submit a plan. Please see Figure 4.

*Figure 4: Status of PIWP Completion at CDCR Adult Institutions*

| PIWP Complete (N=12) | Draft OIG Report Received, Site Visit Pending (N=10) | 3rd Round Draft Report Not Yet Received (N=11) |
|---|---|---|
| • RJD | • NKSP | • CAL |
| • CMF | • CCWF | • FSP |
| • SQ | • VSP | • ASP |
| • CMC | • CCC | • CTF |
| • CRC | • HDSP | • SVSP |
| • SCC | • SATF | • MCSP |
| • PVSP | • COR | • CIM |
| • SAC (pending review) | • DVI | • CVSP |
| • CCI (pending review | • PBSP | • ISP |
| • LAC (pending review) | • CEN | • SOL |
| • CIW (pending review) | | • WSP |
| • KVSP (pending review) | | |

***Action 4.2.2. By September 2009, establish a Policy Unit responsible for overseeing review, revision, posting and distribution of current policies and procedures.***
This action is completed.

***Action 4.2.3. By January 2010, implement process improvement programs at all institutions involving trained clinical champions and supported by regional and statewide quality advisors.***

This action is combined with Action 4.2.1.

**Objective 4.3.** **Establish Medical Peer Review and Discipline Process to Ensure Quality of Care**

***Action 4.3.1. By July 2008, working with the State Personnel Board and other departments that provide direct medical services, establish an effective Peer Review and Discipline Process to improve the quality of care.***

This action is completed.

**Objective 4.4.** **Establish Medical Oversight Unit to Control and Monitor Medical Employee Investigations**

***Action 4.4.1. By January 2009, fully staff and complete the implementation of a Medical Oversight Unit to control and monitor medical employee investigations.***

This action is completed.

**Objective 4.5.** **Establish a Health Care Appeals Process, Correspondence Control and Habeas Corpus Petitions Initiative**

***Action 4.5.1. By July 2008, centralize management overall health care patient-inmate appeals, correspondence and habeas corpus petitions.***

This action is completed.

Refer to Appendix 10 for health care appeals, and habeas corpus petition activity for September through December 2012.

***Action 4.5.2. By August 2008, a task force of stakeholders will have concluded a system-wide analysis of the statewide appeals process and will recommend improvements to the Receiver.***

This action is completed.

**Objective 4.6.** **Establish Out-of-State, Community Correctional Facilities (CCF) and Re-entry Facility Oversight Program**

***Action 4.6.1. By July 2008, establish administrative unit responsible for oversight of medical care given to patient-inmates housed in out-of-state, community correctional or re-entry facilities.***

This action is completed.

## Goal 5: Establish Medical Support / Allied Health Infrastructure

**Objective 5.1.** **Establish a Comprehensive, Safe and Efficient Pharmacy Program**

> ***Action 5.1.1. Continue developing the drug formulary for the most commonly prescribed medications.***
This action is completed.

Refer to Appendix 11 for Top Drugs, Top Therapeutic Category Purchases, and Central Fill Pharmacy Service Level for September through December 2012.

> ***Action 5.1.2. By March 2010, improve pharmacy policies and practices at each institution and complete the roll-out of the GuardianRx® system.***
This action is completed.

> ***Action 5.1.3. By May 2010, establish a central-fill pharmacy.***
This action is completed.

**Objective 5.2.** **Establish Standardized Health Records Practice**

> ***Action 5.2.1. By November 2009, create a roadmap for achieving an effective management system that ensures standardized health records practice in all institutions.***
This action has been completed.

**Objective 5.3.** **Establish Effective Imaging/Radiology and Laboratory Services**

> ***Action 5.3.1. By August 2008, decide upon strategy to improve medical records, radiology and laboratory services after receiving recommendations from consultants.***
This action is ongoing. Progress during the reporting period is as follows:

Imaging/Radiology Services
Medical Imaging Services has developed statewide medical imaging policies and procedures for the institutions of which have been approved and disseminated. The policies and practices provide guidance for all Medical Imaging departments to have consistent operational procedures and uniformity in radiology protocol and practice.

Medical Imaging forms and workflow have been modified or changed to improve consistent documentation throughout the institutions. Medical Imaging forms previously denoting mobile services name or requirement have been revised or adapted to medical imaging practices. The forms have been placed into practice to further provide a consistent usage and practice within the system.

The Radiology Information Systems and Picture Archiving Communication System (RIS/PACS) is scheduled to be implemented in the first quarter of 2013 and the process is projected to be

completed within six to seven months. The conversion will save funds for film, chemical process, and transportation of films to offsite radiology interpretations, lost film jackets, reduction or elimination of duplicate x-ray exams, single medical imaging records and the opportunity to include offsite medical imaging exam into the patient-inmate health records. RIS/PACS will be supported by a single radiology group, thus eliminating the multiple radiology offices currently providing x-ray interoperation. Therefore, there will be only one exam protocol standard, which will reduce report turnaround time from days to hours, improve image quality, and offer consistent radiology protocols from institution to institution.

A centralized medical imaging record area has been established within the Health Records Center to provide a single location for patient-inmate film jackets storage. The process was established so prior exam images could be scanned and placed in the RIS/PACS. This provides prior exams for comparison with current exams for the radiologist and institution clinical providers. Also, it consolidates duplicate film jacket exams as a result of patient-inmate transfers. It creates a single point of request for exam images for legal, personal or offsite medical providers.

As of December 2012, five institutions were in the construction process of new concrete pads to support mobile imaging services. Twenty-four institutions have completed construction of their concrete pads that meet the mobile infrastructure. The mobile pad service improvement project will improve the workflow of the specialty modalities, Magnetic Resonance Imaging (MRI) and Computed Tomography (CT). This will allow the service to be connected to the RIS/PACS. It will provide telephone connections for the technologist to directly contact internal radiology and the radiologists (should questions arise regarding the patient-inmate exams in September 2012).

<u>Laboratory Services</u>

In August 2012, Laboratory Services initiated a study to evaluate the current level of diagnostic laboratory services and the need for a Statewide Enterprise Laboratory Information System (LIS) that could enhance patient care and reduce duplicate testing at the institutions. Business requirements are being gathered for the LIS that will enable real-time receipt of all lab testing results, logistic tracking of specimens and testing turnaround time, management reporting, and reduce redundancies in testing due to patient-inmate transfers.

In September 2012, a statewide initiative began to standardize Point of Care Testing (POCT) analyzers/ devices and practices to improve quality performance and financial management with optimum statewide pricing for the equipment and supplies. In addition, the standardization processes has began for referral testing procedures. Statewide distribution of general procedures has occurred for testing inquiries and courier pick-ups, rapid Tuberculosis preliminary smear report, STAT testing log, cocci testing, and critical test values reporting.

<u>**Objective 5.4.**</u> **Establish Clinical Information Systems**

*Action 5.4.1. By September 2009, establish a clinical data repository available to all institutions as the foundation for all other health information technology systems.*
This action is completed.

<u>**Objective 5.5.**</u> **Expand and Improve Telemedicine Capabilities**

*Action 5.5.1. By September 2008, secure strong leadership for the telemedicine program to expand the use of telemedicine and upgrade CDCR's telemedicine technology infrastructure.*
This action is completed.

## Goal 6: Provide for Necessary Clinical, Administrative and Housing Facilities

Much of Goal 6 is currently on a path for successful completion. The two major projects planned for the purpose of adding new medical and mental health beds to the CDCR system are under construction and advancing according to CDCR's aggressive construction schedule. The first of these, the California Health Care Facility (CHCF), is under construction with activation staff being hired and is on schedule to accept the first patient-inmates in July 2013. The second project, which is a remodel of the DWN juvenile facility (located adjacent to CHCF), is under construction and is scheduled to receive patient-inmates beginning in February 2014. In addition, CDCR has completed several mental health projects at existing prisons, which provide additional mental health beds and/or office and treatment space. Several other projects are also under design or construction.

As it relates to the Health Care Facility Improvement Program (HCFIP), which includes upgrades to add/renovate exam rooms and related healthcare space as well as improvements to medication distribution at existing prisons, upgrade projects at several locations have now received initial approval from the Public Works Board (PWB) and have also received funding from the Pooled Money Investment Board (PMIB). The statewide medication distribution projects have also received initial PWB approval and are being funded from State General Funds. The remaining HCFIP projects are being sequenced by CDCR for submittal to the PWB upon completion and review of site-specific plans. However, beginning in November, several projects were delayed in the submissions to the PWB. The latest indication is that three of the delayed projects are now going to be processed in time for the February PWB meeting. If this progress continues, the delays to date should not impact the successful completion of these needed upgrades.

Thus far, CDCR and the State continue to demonstrate the commitment, focus, and ability to complete the construction of CHCF and DWN projects pursuant to the previously signed revocable letter-of-delegation. The new medical and mental health beds added pursuant to Goal 6 will be substantially completed by 2014. With the streamlined PWB and legislative oversight processes approved through SB 1022, and with the recent progress that was made on seven of the HCFIP projects, it is possible for the HCFIP and medication distribution upgrades at existing prisons to be substantially completed by 2017, with the priority focus of the upgrades at the "intermediate level-of-care" facilities substantially completed by 2016. However, these projects require two approvals by the PWB (one for project authorization and one for approval of preliminary plans) and interim funding by the PMIB. Thus, if these projects continue to experience delays as they have in the last two months, this program is at risk for completion.

**Objective 6.1.** Upgrade administrative and clinical facilities at each of CDCR's thirty-three prison locations to provide patient-inmates with appropriate access to care.

CDCR's published plan, *The Future of California Corrections (Blueprint)*, proposed the upgrades of the existing facilities (with the exception of California Rehabilitation Center, which is scheduled for closure) along with a streamlined legislative review process allowing oversight

and approval to be retained by the PWB. These changes required legislative support and were approved with the passing of Senate Bill 1022 on June 27, 2012, allowing these projects to follow an approval process similar to other State capital outlay projects. CDCR indicates they will continue to submit projects to the DOF to be scheduled for the soonest PWB meeting available for project approval, with informational letters sent simultaneously to the JLBC.

CDCR received approval for the California Medical Facility (CMF) and California State Prison, Solano (SOL) projects at the September 2012 PWB and interim financing was authorized at the October 2012 PMIB. PWB approval for the statewide medication distribution projects was also received at the September PWB (PMIB financing is not required since these projects are being funded by State General Funds). Approval was received for the HCFIP projects at California Institution for Men (CIM), California Institution for Women (CIW), and Richard J. Donovan Correctional Facility (RJD) at the October PWB and interim financing was approved at the November PMIB. Approval was received for the HCFIP projects at California State Prison, Sacramento (SAC) and Mule Creek State Prison (MCSP) at the December PWB and interim financing is being requested at the January PMIB. Although CDCR is proceeding with sequential submittals for the remaining projects through 2013-2014 as site-specific plans are developed, several projects have been delayed in scheduling for PWB approval. We have been advised that these projects are now being scheduled for the next available PWB.

The scope of medical improvements provided through the HCFIP is aligned with the *Blueprint*. This document presented a "standardized staffing" model to replace the previous staffing model, which provided marginal ratio-driven staffing adjustments as patient-inmate populations increased or decreased. The new staffing model provides a staffing compliment to allow a prison to safely operate housing units, programs, and services with a wide range of patient-inmate population densities from 100 percent design-bed capacity to 160 percent design-bed capacity. HCFIP improvements are planned and will be designed to ensure adequate medical care can be provided within this same range of patient-inmate population densities. This flexibility is especially important because the population density ordered by the three-judge court was a system-wide number, and it has become clear during realignment that there will be wide variation in the population densities at individual prisons.

> ***Action 6.1.1. By January 2010, completed assessment and planning for upgraded administrative and clinical facilities at each of CDCR's thirty-three institutions.***

This action item is ongoing. Progress during this reporting period is as follows:

Initial PWB approvals have been secured for the projects at CMF, SOL, CIM, CIW, RJD, SAC, and MCSP along with the statewide medication distribution projects. Submission of subsequent projects will be scheduled in sequence based on completion and review of site-specific plans through 2013-2014 with the priorities focused on the "intermediate level-of-care" facilities. Site reviews are now being initiated for the "basic level-of-care" facilities. Plans are not being developed for CRC due to the planned closure. However, the placement of HCFIP projects on the PWB agendas appears to be at risk.

***Action 6.1.2. By January 2012, complete construction of upgraded administrative and clinical facilities at each of CDCR's thirty-three institutions.***
This action item is ongoing. Progress during this reporting period is as follows:

The design, bid, and construction phases for projects at each of the 32 institutions will begin once PWB project approvals and PMIB loan approvals have been obtained. Following PWB and PMIB approval for the projects at CMF, SOL, CIM, CIW, and RJD (and PWB approval for statewide medication distribution), these projects are now proceeding with the acquisition of Architectural and Engineering contracts and the development of preliminary plans. The typical project duration for design and construction is three to four years from PMIB loan approval.

**Objective 6.2.** **Expand administrative, clinical and housing facilities to serve up to 10,000 patient-inmates with medical and/or mental health needs.**

The initial plan to expand facilities to serve up to 10,000 patient-inmates with medical and/or mental health needs was based upon studies and population projections developed in 2007 by Abt Associates. Approximately half of the beds were to serve patient-inmates with mental health needs and half were to provide medical beds for patient-inmates needing long-term nursing care and those with clinically-complex and high risk medical conditions (high acuity, low acuity, and Specialized General Population [SGP] intermediate level-of-care ).

Since 2007, the patient-inmate population has declined, first due to changes in the parole program and secondly (and more significantly) through changes in sentencing law referred to as AB 109 realignment. It is the Receiver's continued commitment to ensure that healthcare capacity needs are met while remaining accountable for the judicious use of taxpayer funds. Thus, the projected need and resulting recommendations for a construction program have undergone continuous scrutiny by the Receiver as well as by CDCR and DOF as the impacts from realignment occur.

Taking into account the projected patient-inmate population reductions ordered by the three-judge court and resulting from AB 109 realignment, the medical capacity needs for the high and low acuity patient-inmates will be fully met by CHCF, which will add 1,010 high and low acuity beds. CHCF is scheduled to begin accepting patient-inmates in July 2013. A portion of the medical bed needs for the specialized general population (SGP) intermediate level-of-care patient-inmates will be met through the 528 beds added by the remodeled DWN facility, which is scheduled to receive patient- inmates beginning in February 2014. The remaining SGP needs will be accommodated in those existing hub prisons designated to house SGP intermediate level-of-care patient-inmates. These intermediate level-of-care prisons are scheduled to receive a larger number of additional and/or remodeled exam rooms and associated spaces through the HCFIP program. With the state now proceeding with the approval, funding and design development for these upgrades and with the pending completion of CHCF and DWN projects, adequate medical capacity will exist upon the completion of all construction to serve the patient-inmate population.

Relative to mental health needs, 1,037 new beds are being built at CHCF and DWN to provide crisis, acute, and intermediate levels of mental health care. In addition, numerous projects at existing prisons have already been initiated by CDCR to add bed capacity and treatment and office space. This revised mental health construction plan has been submitted to and approved by the Coleman Court.

### Action 6.2.1. Complete pre-planning activities on all sites as quickly as possible.
This action item is ongoing. Progress during this reporting period is as follows:

CHCF is on schedule to receive the first patient-inmate in July 2013. Construction is underway and state lease-revenue bonds have been sold for this project. In addition to the construction progress being made, activation staff continue to be hired to support the 2013 activation date. The DWN project is also proceeding in construction and is scheduled to receive the first patient-inmates in February 2014. The state is currently planning to sell bonds for this facility within the next month.

### Action 6.2.2. By February 2009, begin construction at first site.
This action item is ongoing. Progress during this reporting period is as follows:

CHCF is on schedule for construction and for the first patient-inmates to be received in July 2013. All building structures are now standing and interior finish work and exterior paving continues on schedule.

### Action 6.2.3. By July 2013, complete execution of phased construction program.
This action item is ongoing. Progress during this reporting period is as follows:

Receipt of the first patient-inmates at CHCF is scheduled for July 2013 and construction is expected to be complete by January 2014. Receipt of the first patient-inmates at DWN is expected to occur in February 2014 and construction is expected to be completed by June 2014.

**Objective 6.3.** Complete Construction at San Quentin State Prison

### Action 6.3.1. By December 2008, complete all construction except for the Central Health Services Facility.
This action is completed.

### Action 6.3.2. By April 2010, complete construction of the Central Health Services Facility.
This action is completed.

# Section 4: Additional Successes Achieved by the Receiver

A.    **Office of the Inspector General – Update on the Medical Inspections of California's 33 Adult Prisons**

To evaluate and monitor the progress of medical care delivery to patient-inmates at each prison, the Receiver requested that the OIG conduct an objective, clinically appropriate, and metric-oriented medical inspection program. To fulfill this request, the Inspector General assigns a score to each prison based on multiple metrics to derive an overall rating of zero to 100 percent. Although only the federal court may determine whether a constitutional standard for medical care has been met, the Receiver's scoring criteria for adherence to medical policies and procedures establish the minimum score for moderate adherence to the policies and procedures to be 75 percent. Scores below 75 percent denote low adherence, while those above 85 percent reflect high adherence.

Using this tool, the Inspector General rated California's 33 adult institutions for the first round of inspections (September 2008 – June 2010) at 72.9 percent, on average. High Desert State Prison scored lowest, at 62.4 percent, and Folsom State Prison received the highest score, at 83.2 percent. The Inspector General found that nearly all prisons were not effective in ensuring that patient-inmates receive their medications. In addition, prisons were generally not effective at ensuring that patient-inmates are seen or provided services for routine, urgent, and emergency medical needs according to timelines set by CCHCS policy. However, the Inspector General did find that prisons generally performed well in areas involving duties performed by nurses, and continuity of care.

Second round inspections began September 2010 and the OIG completed 33 inspections as of April 30, 2012 and issued 33 final inspection reports. Summary results of these final reports show that four of the 33 institutions achieved a score higher than 85 percent placing them in the category of high adherence and 25 of the 33 institutions achieved a score of 75 percent or higher placing them in the moderate adherence area. California Correctional Center achieved the highest score of 89.5 percent. Of the four institutions scoring less than 75 percent, RJD scored the lowest at 73 percent but improved by 5 percent over their previous score of 68 percent. With 33 finalized inspections reports, the overall statewide average for the second round inspections is 78.9 percent which reflects an improvement of seven percent over the first round statewide average of 71.9 percent.

The OIG began the third round of inspections in February 2012, and as of December 28, 2012, the OIG has inspected 27 institutions and released 20 final medical inspection reports. The average overall score for the 20 institutions with final third round inspection scores is 86.1 percent, a 7.2 percent increase over the 78.9 percent overall average score for the second round. To date, no institution has scored in the low adherence category of less than 75 percent compliance. All 20 institutions have obtained a score above 75 percent, with 7 institutions achieving a score in the moderate adherence category between 77.6 percent and 84.9 percent. Thirteen institutions received a compliance score in the high adherence category of 85 percent

compliance and above. In addition, seven institutions scored more than 10 percent improvement from second to third round, and 15 scored more than five percent improvement. Appendix 12 illustrates the difference in scores from round two and three for each institution.

# Section 5: Particular Problems Faced by the Receiver, Including Any Specific Obstacles Presented by Institutions or Individuals

At the end of the formal reporting period for this report, it became apparent that the State's realignment program would fall short of the reductions necessary to meet the population density level ordered by the three-judge court. In essence, the reductions from realignment plateaued short of the target set by the court.

So long as the State was meeting its court-ordered targets, there was no need in our reports last year to comment specifically on the effects of overcrowding other than to note that population and overcrowding were indeed decreasing as ordered by the three-judge panel. However, in its brief recently filed with the three-judge court, the State attempts to cite our recognition of the State's prior compliance with Court orders and our silence regarding particular problems caused by overcrowding as an endorsement of the State's position that further compliance with the overcrowding order is unnecessary. That distorts the content of our reports and misrepresents the Receiver's position.

Overcrowding and its consequences are and have been a chronic, widespread and continuing problem for almost twenty years. The overcrowding reduction order entered by the court recognizes that the connection between overcrowding in the prisons and the provision of constitutionally adequate medical and mental health care is complex, with overcrowding creating a cascade of consequences that substantially interferes with the delivery of care.

The court's system-wide target of 137.5% also recognizes that care at some institutions may require a lower population density while care at other institutions may be constitutional even at higher population densities (and, in fact, this is how CDCR is implementing the order – population densities range from 91% to 184% of design capacity). This is because the key elements of timely access to care and proper distribution of medications are very much influenced by each institution's total population level compared with its design capacity, the precise mix of inmates at different security levels, the precise mix of inmates belonging to various gang groups, the level of violence at a prison, the prevalence of lockdowns at an institution, and other operational factors that play out at both the institution and system-wide levels, all of which are influenced by overcrowding. So, for example, it is easier to provide care even at higher population densities at a low-security level prison (such as Avenal State Prison) that does not have a gang population prone to violence, includes a significant number of inmates with reduced mobility or who are wheel-chair-bound, and has a very low level of modified program or lockdown. But our experience at that type of prison does not mean that a constitutional level of care can be delivered system-wide at a higher system-wide population density given the differences among the prisons. Based on the evidence before it from a system-wide perspective, the three-judge court set an overall population density that gives the

CDCR the flexibility it needs to manage its population while maintaining a constitutional level of care on a system-wide basis.

The State now asserts that both mental health and medical care have reached and exceeded constitutionally minimum levels with the consequence that any further reduction in population density is unnecessary. With respect to medical care, the Receiver does not believe there is, at present, sufficient evidence to support the State's conclusion. Instead, the available evidence supports only the more limited conclusion that significant progress and improvements have been made, without establishing that the constitutional threshold has been crossed.

In support of its assessment, the State places substantial weight upon the improving OIG scores for medical care. The Receiver agrees that the OIG scores support the conclusion that significant progress is being made in establishing systems and practices that are in compliance with CDCR medical Policies & Procedures. However, as the State knows (and as the *Plata* court has already recognized), the OIG scores cannot be used by themselves to establish the constitutional line. First, the scale for the OIG scores has never been validated for purposes of making constitutional measurements, and although the parties agreed to use the OIG audit as an indicator of improved performance over time, the parties never agreed to any particular scale. For management purposes and for convenience, the Receivership established cut-lines for "high adherence," "medium adherence," and "low adherence." But these lines were never intended to have any constitutional significance at all. Second, the scores on individual items in the OIG audit frequently depend upon sample sizes so small (e.g., less than 5 items may be examined for a particular question) that the confidence intervals for the items are unusually large (e.g., a score of 70% on an item may have a confidence interval stretching from 50% to 90%). In short, the OIG audits are a statistically soft measure of performance.

Recognizing that these deficiencies prevent the OIG scores from presently being used by themselves as conclusive evidence of constitutionality, the *Plata* court, after a lengthy meet-and-confer and briefing by the parties, has already ordered that the court's experts begin visiting high scoring institutions to prepare a report for the court, on an institution-by-institution basis, documenting whether medical care is being delivered at a constitutional level. In particular, the court's order provides that ". . . an institution shall be deemed to be in substantial compliance, and therefore constitutionally adequate, if it receives an overall OIG score of at least 75% and an evaluation from at least two of the three court experts that the institution is providing adequate care. Among other factors, the experts must consider whether any pattern or practice exists at the institution, or system-wide, that presents a serious risk of harm to inmates that is not being adequately addressed." The three court experts have, as of this date, visited two institutions (San Quentin and CMC) and have not yet submitted their initial reports to the court. Ultimately, it will be the experts' reports that create the primary factual record from which the *Plata* court can make a finding that medical care is being provided consistent with constitutional minimums.

Based on all of the above, the Receiver concludes that, at present, there is no persuasive evidence that a constitutional level of medical care has been achieved system-wide at an

overall population density that is significantly higher than what the three-judge court has ordered.

# Section 6: An Accounting of Expenditures for the Reporting Period

**A.    Expenses**

The total net operating and capital expenses of the Office of the Receiver for the four month period from September through December 2012 were $622,587 and $0 respectively. A balance sheet and statement of activity and brief discussion and analysis is attached as Appendix 13.

**B.    Revenues**

For the months of September through December 2012, the Receiver requested transfers of $775,000 from the State to the California Prison Health Care Receivership Corporation (CPR) to replenish the operating fund of the office of the Receiver. Total year to date funding for the FY 2012/2013 to CPR from the State of California is $1,100,000.

All funds were received in a timely manner.

**C.    Correctional Health Care Expenditures**

Over the last five years, the Receiver has sought to improve care to constitutional levels while simultaneously reducing overall expenditures directed to health care. The improving OIG scores establish that significant improvements in care have in fact occurred. We have been less vocal about our successes in controlling and reducing expenditures, but as the Receivership begins to transition various healthcare functions back to the State, it is now an appropriate time to review our budgetary performance.

When you compare CDCR's expenditures for prison healthcare to other states using the same budget items as used by other states in calculating their prison healthcare expenditures, we are spending about the same amount per inmate as other large prison systems. In particular, we project that the costs of direct medical care for 2012-13 will be $4,480 per inmate, the costs of direct mental health care will be $2,373 per inmate, and the costs of direct dental services will be $1,125 per inmate. Thus, the total direct costs for healthcare will be $7,978 per inmate. These figures are comparable to similar expenditure data reported by other states.

In addition to direct costs, we project that costs for outside hospital care for 2012-13 will be $2,914 per inmate, and the costs of pharmaceutical and medical supplies will be $1,536 per inmate. Indirect costs for administration, clinical support, information technology, activation and other equipment and expenses are projected to be $3,734 per inmate.

Clinical risk is one of the most important factors in the high overall costs of hospital care, and those costs are concentrated in older inmates. Our data shows that average costs for patients at the highest clinical risk and with the most complex cases are nearly 10 times the costs of the lowest risk patients ($4,942 per month for highest risk versus $532 per month for low risk). Only 2.6% of our patients fall into the highest clinical risk category, yet these patients cost CDCR

approximately $190,000,000 per year. Sixty percent of these patients are over 50 years of age, and eight-five percent are over 40 years of age. Clearly, we are spending a large sum of money to provide medical care to a relatively small number of aging, ill inmates. Unless the State constructively addresses this issue, its increasingly geriatric population of inmates will continue to sap General Fund moneys for necessary health care.

The story of overall expenditures on prison medical care is even more hopeful than the above numbers may suggest. The numbers right now are still high, but they have been decreasing for the last four years. Indeed, expenditures hit a high of $1.9 billion in FY 2008-09 and decreased since then so that we project expenditures in FY 2012-13 to be $1.5 billion, a 21% decrease. The primary factors in this decrease include substantial reductions in pharmaceutical costs because of our successful formulary program (an 18% reduction from a high of $191 million in FY 2010-11 to $157 million in FY 2012-13), substantial reductions in outside hospital care through utilization management (a 58% reduction from a high of $846 million in FY 2008-09 to $355 million for FY 2012-13, which is actually *below* the amount spent by CDCR in FY 2005-06 *before* the Receivership was established). Finally, personnel costs will decrease beginning in FY 2013-14 as we downsize staff in the field and in headquarters in response to realignment and other organizational factors.

# Section 7: Other Matters Deemed Appropriate for Judicial Review

### A.    Coordination with Other Lawsuits

During the reporting period, regular meetings between the three courts, *Plata, Coleman,* and *Armstrong* (Coordination Group) class actions have continued. Coordination Group meetings were held on September 19th  and November 7th. Progress has continued during this reporting period and is captured in meeting minutes.

### B.    Master Contract Waiver Reporting

On June 4, 2007, the Court approved the Receiver's Application for a more streamlined, substitute contracting process in lieu of State laws that normally govern State contracts. The substitute contracting process applies to specified project areas identified in the June 4, 2007 Order and, in addition, to those project areas identified in supplemental orders issued since that date. The approved project areas, the substitute bidding procedures and the Receiver's corresponding reporting obligations are summarized in the Receiver's Seventh Quarterly Report and are fully articulated in the Court's Orders, and therefore, the Receiver will not reiterate those details here.

During the last reporting period, the Receiver has used the substitute contracting process for various solicitations relating to services to assist the Office of the Receiver in the development and delivery of constitutional care within CDCR and its prisons. However, those solicitations have not yet resulted in fully executed and approved contracts. Therefore, those contracts will be reported in subsequent Reports to the Court.

### C.    Consultant Staff Engaged by the Receiver

In accordance with Section III, Paragraph B, of the Court's Order Appointing Receiver, dated February 14, 2006; the Receiver has engaged the following consultants:

- The Receiver entered into a consulting services agreement with Carter Goble Associates, Inc., for David Runnels to provide services as Chief Deputy Receiver.

- The Receiver entered into a legal services agreement with Best Best & Krieger LLC, for Jared Goldman to provide services as Chief Counsel.

## Section 8: Conclusion

Notwithstanding the State's recent court filings, which inevitably create a more confused and chaotic work environment for staff in the field and in headquarters, we will do our best to continue our work to conclude the remaining unfinished elements of the Turnaround Plan of Action, to cooperate and support CDCR in finishing the capital construction in Stockton and the institution upgrades, to implement the Court's September 5, 2012 Order Re: Receivership Transition Plan and Expert Evaluations, and to continue the transition from a Receiver-led medical program to a CDCR-led medical program.