1   DONALD SPECTER – 083925        MICHAEL W. BIEN – 096891
    STEVEN FAMA – 099641           JANE E. KAHN – 112239
2   PRISON LAW OFFICE              ERNEST GALVAN – 196065
    1917 Fifth Street              LISA ELLS – 243657
3   Berkeley, California  94710-1916   AARON J. FISCHER – 247391
    Telephone:    (510) 280-2621   MARGOT MENDELSON – 268583
4                                  KRISTA STONE-MANISTA – 269083
                                   ROSEN BIEN
5                                  GALVAN & GRUNFELD LLP
                                   315 Montgomery Street, Tenth Floor
6                                  San Francisco, California  94104-1823
                                   Telephone:    (415) 433-6830
7
8   JON MICHAELSON – 083815        CLAUDIA CENTER – 158255
    JEFFREY L. BORNSTEIN – 099358  THE LEGAL AID SOCIETY –
9   LINDA L. USOZ – 133749         EMPLOYMENT LAW CENTER
    MEGAN CESARE-EASTMAN – 253845  180 Montgomery Street, Suite 600
    K&L GATES LLP                  San Francisco, California  94104-4244
10  4 Embarcadero Center, Suite 1200   Telephone:    (415) 864-8848
    San Francisco, California  94111-5994
11  Telephone:    (415) 882-8200

12  Attorneys for Plaintiffs

13                UNITED STATES DISTRICT COURT

14              EASTERN DISTRICT OF CALIFORNIA

15

16  RALPH COLEMAN, et al.,          Case No. Civ S 90-0520 LKK-JFM

17            Plaintiffs,            **PLAINTIFFS' RESPONSE TO
                                     DEFENDANTS' OBJECTIONS AND**
18      v.                          **MOTION TO STRIKE OR MODIFY
                                     PORTIONS OF THE TWENTY-FIFTH**
19  EDMUND G. BROWN, Jr., et al.,   **ROUND MONITORING REPORT OF
                                     THE SPECIAL MASTER**
20            Defendants.           **(Fed. R. Civ. P. 53)**

21                                  Judge:   Hon. Lawrence K. Karlton

22

23

24

25

26

27

28

[726807-1]

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS .................................................................................................iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

I.  THE SPECIAL MASTER REPORTS UPON DEFENDANTS'
    COMPLIANCE WITH THIS COURT'S ORDERS AND REMEDIAL
    PLANS AS PART OF THIS COURT'S ASSESSMENT OF
    DEFENDANTS' CONSTITUTIONAL COMPLIANCE............................................. 2

II.  DEFENDANTS' LIMITED SUBSTANTIVE OBJECTIONS ARE
     UNFOUNDED AND FACTUALLY ERRONEOUS.................................................. 7

        A.  The 25th Report Supports a Finding that Defendants Have Not
            Implemented and Staffed a Suicide Prevention Program Fully. .................. 9

                1.  High Suicide Rates and the High Percentage of
                    Foreseeable/Preventable Suicides Support the Special Master's
                    Findings ......................................................................................... 10

                2.  Suicide Rates Remain Disproportionately High in
                    Administrative Segregation Units ....................................................... 12

                3.  Defendants' Failure to Implement Fully Their Suicide-
                    Prevention Response Focus Improvement Team Meetings Is
                    Supported By the Special Master's Findings ...................................... 13

        B.  Other Overall Objections and Requests to Strike or Modify The
            Report ................................................................................................. 14

III.  INSTITUTIONAL OBJECTIONS................................................................................ 24

IV.  DEFENDANTS' PROCEDURAL COMPLAINTS ARE WITHOUT MERIT ...... 26

CONCLUSION................................................................................................................... 27

[726807-1]

# TABLE OF AUTHORITIES

**Page**

## Cases

*Althen v. Sec'y of Health & Human Servs.*,
 418 F.3d 1274 (5th Cir. 2005) ................................................................... 7

*Brown v. Plata*,
 131 S. Ct. 1910 (2011) .................................................................... 3, 6

*Burlington N. R.R. v. Dep't of Revenue*,
 934 F.2d 1064 (9th Cir. 1991) ................................................................... 7

*Coleman v. Brown*,
 428 Fed. App'x. 743 (9th Cir. 2011) ............................................... 3, 4, 16

*Coleman v. Wilson*,
 912 F. Supp. 1282 (E.D. Cal. 1995) .......................................... 3, 4, 9, 23

*La Buy v. Howes Leather Co.*,
 352 U.S. 249 (1957) ................................................................................. 7

*Lewis v. Casey*,
 518 U.S. 343 (1996) ................................................................................. 4

*Rufo v. Inmates of Suffolk Cnty. Jail*,
 502 U.S. 367 (1992) ................................................................................. 3

*Wakefield v. Thompson*,
 177 F.3d 1160 (9th Cir. 1999) ................................................................. 25

## Statutes

18 U.S.C. § 3626(a) ......................................................................................... 3

## Rules

Fed. R. Civ. P. 702 ........................................................................................... 9

[726807-1]

ii

PLS.' RESPONSE TO DEFS.' OBJECTIONS AND MOTION TO STRIKE OR MODIFY PORTIONS OF THE
25TH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| ASU | Administrative Segregation Unit |
| CCCMS | Correctional Clinical Case Management System |
| CCI | California Correctional Institution |
| CDCR | California Department of Corrections and Rehabilitation |
| CMF | California Medical Facility |
| CPR | cardiopulmonary resuscitation |
| CRC | California Rehabilitation Center |
| CSATF | California Substance Abuse Treatment Facility |
| CSP | California State Prison |
| CSP-SAC | California State Prison – Sacramento |
| CTF | Correctional Training Facility |
| DCHCS | Division of Correctional Health Care Services |
| DSH | Department of State Hospitals |
| DVI | Deuel Vocational Institution |
| EOP | Enhanced Outpatient Program |
| ERRC | Emergency Response Review Committees |
| eUHR | Electronic Unit Health Record |
| FTP | file transfer protocol |
| GAF | Global Assessment of Functioning |
| IDTT | Interdisciplinary Treatment Team |
| LOP | local operating procedure |
| MCSP | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| MHPB | Mental Health Program Bed |
| MHSDS | Mental Health Services Delivery System |
| MHTS.net | Mental Health Tracking System.net |
| OBIS | Offender Based Information System |
| PLRA | Prison Litigation Reform Act |
| PMP | Proctor-Mentor Program |
| PSU | Psychiatrict Housing Unit |
| QIP | Quality Improvement Report |
| QIT | Quality Improvement Team |
| RJD | Richard J. Donovan Correctional Facility |
| SHU | Security Housing Unit |

PLS.' RESPONSE TO DEFS.' OBJECTIONS AND MOTION TO STRIKE OR MODIFY PORTIONS OF THE
25TH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

| SPR-FIT | Suicide Prevention Response Focus Improvement Team |
| SRE | suicide risk evaluation |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP | Salinas Valley State Prison |
| VPP | Vacaville Psychiatric Program |

[726807-1]

**INTRODUCTION**

The *Coleman* Special Master's Twenty-Fifth Round Monitoring Report (Docket No. 4298, hereinafter "25th Report" or "Report") properly is focused on remedial measures that are necessary to prevent avoidable and unnecessary suffering, serious injury and death. Contrary to Defendants' assertions, these remedial measures did not spring from the Special Master's fiat. Nor do these remedial measures represent an attempt to impose national standards on the Defendants or to gold-plate their mental health system. On the contrary, the remedial measures monitored by the Special Master are orders of this Court that remain vital and necessary to alleviate the serious risks of injury and death that still threaten California prisoners with serious mental illness.

In their January 29, 2013 Amended Objections and Motion to Strike or Modify the Special Master's Report (Docket No. 4314, hereinafter "Objections"), Defendants do not dispute the facts regarding what the Special Master's experts observed in five months of inspecting 23 prisons. They instead try to belittle the remedial measures on which the Special Master properly focused. The Special Master has provided undisputed evidence of Defendants' ongoing failures to comply with their own remedial plan and with numerous orders of this Court, all designed to remedy ongoing constitutional violations. This Court, the three-judge *Plata/Coleman* Court, and the Supreme Court have all relied upon the Special Master's detailed and specific reports as critical evidence in finding ongoing constitutional harms to members of the Plaintiff class.

Defendants' primary complaints about the 25th Report—that the Special Master has not "attempted to assess the system against [a constitutional] standard," and that his findings "are disconnected [from] any real world impact"—are unfounded. Objections at 1:7, 1:14-15. The Special Master's Report documents how Defendants' failure to comply with the Revised *Coleman* Program Guide and with this Court's orders continue to result in serious harms to the Plaintiff class, including in a horrific number of class member suicides. Because of Defendants' continued failures to remedy their systematic deficiencies in, among others, the critical areas of suicide prevention, monitoring of

[726807-1]

1

PLS.' RESPONSE TO DEFS.' OBJECTIONS AND MOTION TO STRIKE OR MODIFY PORTIONS
25TH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

individuals in high-risk contexts such as administrative segregation, and access to higher

levels of care, mentally ill prisoners across California continue to suffer entirely

preventable harms and loss of life in violation of the Eighth Amendment.  The close

connection between the remedy monitored by the Special Master and the ongoing

constitutional violations is reviewed below in Part I of this Response.

Some of Defendants' Objections are couched in terms of disputes with the Special

Master's choice of language, or with the reasonable inferences that the Special Master

draws from the undisputed facts observed in monitoring.  These are addressed in Part II of

this Response.  Parts III and IV, respectively, address Defendants' Institutional and

Procedural objections.

Defendants' Objections are also peppered with *ad hominem* attacks on the

motivations and probity of the Special Master.  These entirely improper attacks are not

addressed here, but are the subject of a separate motion to strike, filed concurrently with

this Response.

## ARGUMENT

**I.     THE SPECIAL MASTER REPORTS UPON DEFENDANTS'
       COMPLIANCE WITH THIS COURT'S ORDERS AND REMEDIAL PLANS
       AS PART OF THIS COURT'S ASSESSMENT OF DEFENDANTS'
       CONSTITUTIONAL COMPLIANCE**

Defendants contend that the Special Master reports on too many policies and

procedures and in too much detail.  Objections at 1:8-28.  Defendants' Objections give the

wholly false impression that they voluntarily developed a comprehensive set of mental

health policies and procedures, and that the Special Master is punishing Defendants for

doing so by monitoring these policies and procedures too closely and then recommending

continued Court scrutiny when Defendants do not reasonable adhere to them.  If that

warped version of the history of this case were true, then perhaps the scrutiny of the

Special Master's Report would be unfair.  But it is not true.

The policies and procedures at issue in the 25th Report—indeed the entire CDCR

mental health system—were developed in response to not just one finding of a

1    constitutional violation, but dozens of such findings in Court orders stretching from 1995

2    through 2012.  This Court allowed Defendants to develop these policies and procedures

3    themselves as an alternative to even closer forms of judicial supervision that this Court

4    would have been well justified to undertake at many stages of this case, when State

5    correctional authorities repeatedly failed to remedy life-threatening conditions.

6           Each of the policies and procedures monitored in the 25th Report stems from and is

7    necessary to achieve the minimum components of a constitutional prison mental health

8    system.  These minimum components are not items Defendants undertook to develop on

9    their own, or agreed to in a consent decree.  Rather, these minimum components—and

10   Defendants' failure to provide them—were established through substantial evidence in a

11   contested trial and ordered as part of a contested injunctive remedy in 1995, and

12   established again as part of the overcrowding trial in 2008.  *Brown v. Plata*, 131 S. Ct.

13   1910, 1933-36 (2011); *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995).  Under

14   both the law as it existed at that time of this first trial in 1995, and as later codified by the

15   Prison Litigation Reform Act, 18 U.S.C. § 3626(a), injunctive relief imposed over the

16   objections of prison administrators must be "tailored to curing a constitutional violation

17   that has been adjudicated."  *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 389

18   (1992).  The remedies developed and ordered in this case are narrowly tailored and hew

19   closely to the constitutional violations.  *See Coleman v. Brown,* 428 Fed. App'x. 743, 744-

20   45 (9th Cir. 2011).

21          The minimum elements of a constitutional prison mental health system are:

22                  (1) a systematic program for screening and evaluating inmates
                    to identify those in need of mental health care; (2) a treatment
23                  program that involves more than segregation and close
                    supervision of mentally ill inmates; (3) employment of a
24                  sufficient number of trained mental health professionals;
                    (4) maintenance of accurate, complete and confidential mental
25                  health treatment records; (5) administration of psychotropic
                    medication only with appropriate supervision and periodic
26                  evaluation; and (6) a basic program to identify, treat, and
                    supervise inmates at risk for suicide.

27

28   *Coleman*, 912 F. Supp. at 1298 n.10.  After the Court found these components to be both

1    necessary to and absent from the California prison system, Defendants demanded that the

2    Court set forth a precise set of plans and guidelines for their establishment.  *Id.* at 1301.

3    The Court properly declined to specify "the exact mechanisms" for achieving compliance,

4    but rather exercised due deference to Defendants' penological expertise, "leaving the

5    matter to the creation of protocols, standards, procedures and forms to be developed by

6    defendants in consultation with court appointed medical experts."  *Id.* at 1302.

7         The policies and procedures now being monitored by the Special Master are

8    precisely those Defendants themselves developed through the deferential remedial process

9    set forth by this Court in 1995 and mandated one year later by the United States Supreme

10   Court in *Lewis v. Casey*, 518 U.S. 343, 362-63 (1996).  In areas where Defendants' initial

11   policies and procedures proved inadequate to reduce the serious risk of harm to class

12   members, the Court has, over the years, provided more specific direction, but always gave

13   Defendants additional opportunities to develop their own remedies.  *See, e.g.*, *Coleman*,

14   428 Fed. App'x. at 745.

15        The clearest example of this process is in the area of suicide prevention.  Initially, in

16   the 1995 findings and resulting Injunction, the Court found that Defendants already had

17   adequate policies and procedures regarding suicide prevention and lacked only

18   implementation, and therefore ordered no separate remedy.  *Coleman*, 912 F. Supp. at

19   1315.  Experience soon proved, however, that Defendants' implementation of their suicide

20   prevention policies was inadequate, and that preventable and foreseeable deaths were

21   occurring as a result.  By 2006, it was clear from the Special Master's reporting that

22   suicides in segregation units were escalating, and this Court consequently directed

23   Defendants to develop a plan to address the problem.  Order, June 7, 2006, Docket No.

24   1830.  Defendants thereafter developed a plan pursuant to the Court's order, which the

25   Court provisionally approved subject to further reporting and recommendations by the

26   Special Master.  Order, Feb. 12, 2007, Docket No. 2139.  The Court approved Defendants'

27   plan over Plaintiffs' specific objections that it was inadequate.  *Id.* at 2.

28        The suicide prevention plan that Defendants developed and submitted, and that the

4

1   Court approved, included the specific life-saving measures that Defendants now belittle in

2   their objections to the 25th Report:  retrofitting some segregation cells as "intake cells"

3   (Defs. Plan to Address Suicide Trends in Administrative Segregation Units, Ex. A. at 6-7,

4   Oct. 2, 2006, Docket No. 1990) (hereinafter "Defs 2006 Suicide Trends Plan")); providing

5   out-of-cell time for segregation inmates as required by the State's own regulations (*id.* at

6   11); providing the necessary space for confidential mental health interviews out of earshot

7   of other inmates (*id.* at 9); monitoring lengths of stay in segregation units (*id.* at 13); pre-

8   placement screening of segregation inmates for suicide risk (*id.* at 13); auditing weekly

9   rounds by psychiatric technicians (*id.* at 14); and rapid implementation of cardio-

10  pulmonary respiration and other emergency medical response after suicide attempts (*id.*),

11  among other elements.  After further consultation with the Special Master, Defendants also

12  added 30-minute welfare checks during the first three weeks of segregation—over

13  Plaintiffs' objection that such checks were necessary for the entire period of segregation.

14  *See* Special Master's Report and Recommendations on Defs' Plan to Prevent Suicides in

15  Administrative Segregation at 6-7, Dec. 18, 2006, Docket No. 2084.

16          In 2009, the Special Master asked the Court to make more specific orders regarding

17  suicide prevention in light of the continuing increase in the overall suicide rate, and the

18  rate of suicides involving inadequate assessment, treatment, and intervention.  *See* Order at

19  6-7, Apr. 14, 2010, Docket No. 3836.  The Court declined to issue more specific orders,

20  and instead directed Defendants to revise their suicide prevention plans to address the

21  problems.  *Id.* at 7-8.  In August 2010, Defendants reported to the Special Master on the

22  results of their work, including specific remedial measures to address, among other things,

23  inadequate suicide risk evaluations, inadequate 30-minute welfare checks, and revisions to

24  some of the processes Defendants use after a suicide to identify and fix systemic and

25  prison-specific problems.  *See* Decl. of Jane Kahn In Support of Pls. Resp. to Defs' Mot. to

26  Strike Or Modify Portions of the Twenty-Fifth Round Monitoring Report of the Special

27  Master (hereinafter "Kahn Decl."), Ex. A.

28          All of these suicide prevention measures were developed by Defendants themselves

[726807-1]

1    in response to ongoing losses of life that the Special Master identified as foreseeable and

2    preventable.  Whether or not Defendants actually are implementing these measures and

3    whether these measures are sufficient is highly material to the question of whether

4    Defendants are or are not acting with deliberate indifference to ongoing risks of serious

5    harm.  It is therefore wholly appropriate and necessary for the Special Master to monitor

6    these critical, life-saving elements of the remedial plan which defendants belittle as

7    "micromanaging" or "details."

8         Suicide prevention policies are just one example of how the special remedial

9    measures discussed in the 25th Report directly flow from the minimum components of a

10   constitutional mental health system.  Substantially the same history can be traced for the

11   other details in the areas of screening and evaluation, treatment programs (including timely

12   movement of inmates to higher levels of care when necessary), staffing, records, and

13   medication.  This process of working with Defendants to develop the precise remedial

14   mechanisms in each area is exactly what the Supreme Court described with approval when

15   it found that the *Coleman* court "had issued over 70 orders directed at achieving a remedy

16   through construction, hiring, and procedural reforms."  *Plata*, 131 S. Ct. at 1931.

17        Defendants assert that "the special master was retained to assist the State in

18   complying with constitutional requirements, not its own policies and procedures."

19   Objections at 23:21-23.  In so doing, Defendants ignore the nexus between the subjects of

20   the Special Master's monitoring and the ongoing constitutional violations that this Court

21   has, implicitly or explicitly, found in dozens of orders over the decades-long course of this

22   litigation.

23        The Order of Reference to the Special Master states that his duties "are and shall be

24   limited to the following":  First, to work with defendants and the Special Master's experts

25   "to develop a remedial plan"; second, to submit "a proposed timeline for development of

26   said remedial plan"; third, to "make interim reports to the court on the progress of the

27   remedial plan"; fourth, to "monitor defendants' implementation of and compliance with

28   any remedial plan that this court may order"; and fifth, to "prepare and file with the court

[726807-1]

6

PLS.' RESPONSE TO DEFS.' OBJECTIONS AND MOTION TO STRIKE OR MODIFY PORTIONS OF THE
25TH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

1   periodic reports assessing defendants' compliance with such remedial plan as the court

2   may order." Order of Reference at 3-4, Dec. 11, 1995, Docket No. 640 (hereinafter "Order

3   Ref."). Defendants now complain that the Special Master reports on their failures to

4   implement specific remedial measures without saying whether each measure itself

5   constitutes a minimum requirement under the Eighth Amendment, and whether each

6   particular implementation failure constitutes cruel and unusual punishment. *See, e.g.*,

7   Objections at 1:16-17, 3:5-6, 4:22-25, 14:24-25, 14 n.3, 17:5-7, 17:23-25, 20:13-16, 20:22-

8   23, 21:4-6, 22:2-4, 23:23-25, 24:20, 30:23-24. That objection makes no sense in the

9   context of this case. All of Defendants' policies and procedures are the product of judicial

10  deference to Defendants—to allow them to remedy ongoing constitutional violations in a

11  way that respects California's sovereign interests in running its own corrections system. In

12  lieu of such deference, the Court could have simply appointed experts to establish a new

13  mental health system with all deliberate speed, at any cost, without regard to Defendants'

14  budgetary or penological interests. Having deferred to Defendants to develop a remedy

15  and implement it at a pace consistent with their penological interests, the Court properly

16  has directed the Special Master to monitor progress in the implementation of that remedy.

17  If the Special Master were instead reporting only the bottom-line conclusion, and ignoring

18  Defendants' remedial plans, then every report would say the exact same thing:

19  Constitutional violations are ongoing. That is not the purpose of the Special Master in this

20  case. Nor, in any event, would it be proper legally for the Special Master to take on the

21  Court's role of making ultimate legal conclusions. *See La Buy v. Howes Leather Co.*, 352

22  U.S. 249, 256 (1957); *Burlington N. R.R. v. Dep't of Revenue*, 934 F.2d 1064, 1071 (9th

23  Cir. 1991); *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1280 (5th Cir. 2005)

24  (noting that "[q]uestions of law … are matters for the courts," not for special masters).

25  **II.    DEFENDANTS' LIMITED SUBSTANTIVE OBJECTIONS ARE**
26          **UNFOUNDED AND FACTUALLY ERRONEOUS**

27      Where Defendants raise objections to the Special Master's choice of verbiage or his

28  reasonable inferences from the undisputed facts, their objections are both unsupported and

1    unfounded.

2        Defendants' objections are far beyond the scope of what is permissible in the form

3    of a response to a monitoring report filed by the Special Master.  The Order of Reference

4    clearly sets forth the appropriate procedure for such objections: "The objecting party shall

5    note each particular finding or recommendation to which objection is made, shall provide

6    proposed alternative findings or recommendations, and may request a hearing before the

7    court."  Order Ref. at 8.  Instead of taking this charge seriously and submitting substantive

8    objections with proposed alternative findings, of which they offer none, Defendants have

9    submitted a wide-ranging litany of complaints about the word choice, tone and language

10   employed by the Special Master, even taking issue with the Special Master's "implied

11   conclusions[s]," Objections at 12:27 (implied by whom?).  *See, e.g.*, *id.* at 14:23-25

12   (objecting to the Special Master's "use of the term 'compliance'"); 16:8-9 (objecting to a

13   statement "as micro managerial, and because the term 'problematic' is vague").

14   Defendants also complain that the Special Master does not use terms they would have him

15   use, including "standard of care" and "deliberate indifference."  *Id.* at 14 n.3.  They

16   provide no justification for taking an opportunity provided by the Court for the purpose of

17   making substantive written objections and using it to submit picayune quarrels with the

18   Special Master's phraseology.

19       As evidentiary support for their line of objections, Defendants present a declaration

20   of Tim Belavich, the director of the CDCR's mental health program.  Declaration of Tim

21   Belavich, Jan. 28, 2012, Docket No. 4313 (hereinafter "Belavich Decl.").  Dr. Belavich

22   does not dispute any of the facts documented by the Special Master's experts.  Instead, his

23   declaration tries to repackage the CDCR suicide statistics in ways more favorable to

24   Defendants.  *Id.* at 2:10-3:5.  There is no evidence that this repackaging was ever presented

25   to the Special Master at any point during the monitoring period, or even after.  In any

26   event, the Special Master did not err in presenting CDCR's suicide rates in the ordinary

27   and straightforward manner in which health statistics are reported—incidents per

28   100,000—rather than in the novel repackaging now suggested by Dr. Belavich.

[726807-1]

Dr. Belavich also discusses the status of Defendants' August 10, 2010 suicide plan initiatives. He asserts that the mental health program has developed and implemented a mentoring program to improve clinical competency in the administration of suicide risk evaluations. *Id.* at 3:20-22. This implementation is, however, incomplete, and it is proper for the Special Master to monitor progress in this area. *See* Kahn Decl. ¶¶ 10-15.

Defendants also attach a document styled as "Comments" by Defendants' termination motion expert, Joel Dvoskin. Exhibit 1, Jan. 28, 2012, Docket No. 4312-1. Dr. Dvoskin admits that he had not even taken the time to read the entirety of the Special Master's Report before drafting his "Comments." *Id.* at 1. The Court should disregard Dr. Dvoskin's essay, and the portion of Defendants' objections predicated upon his opinions, because the "Comments" clearly fail the test of Federal Rule of Civil Procedure 702. The Comments: (1) lack any basis upon which this Court could evaluate Dr. Dvoskin's standing as an expert in the field of correctional mental health care by way of "knowledge, skill, experience, training, or education"; (2) are completely devoid of any citations whatsoever to any evidence either within this case or within the field of correctional mental health care that could possibly constitute "sufficient facts or data"; (3) lack any explanation of Dr. Dvoskin's methodology, or the principles he applies in order to reach his conclusions; and (4) contain absolutely no information that would allow this Court to evaluate whether he has "reliably applied [his] principles and methods to the facts of this case." Fed. R. Civ. P. 702.

Defendants' Objections are thus largely irrelevant to the important questions before this Court, and unfounded in substance. As detailed below, Defendants have presented no basis upon which this Court should strike or modify any portion of the 25th Report.

## A. The 25th Report Supports a Finding that Defendants Have Not Implemented and Staffed a Suicide Prevention Program Fully.

Defendants have, for years, struggled to develop and implement "a basic program to identify, treat, and supervise inmates at risk for suicide," as required by the Eighth Amendment. *Coleman*, 912 F. Supp. at 1298 n.10. Because of Defendants' continuing

[726807-1]

9

PLS.' RESPONSE TO DEFS.' OBJECTIONS AND MOTION TO STRIKE OR MODIFY PORTIONS OF THE 25TH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

1  failures to implement such a plan, class members continue to suffer and die in foreseeable

2  and preventable suicides, in violation of their constitutional rights.  Defendants object to

3  the Special Master's statement that "[i]nstitutional performance in the areas of suicide

4  prevention remains concerning," but fail to provide any contrary evidence.  Objections at

5  4:9-10 (citing 25th Report at 17).  Dr. Belavich's recital of the 2010 suicide plan

6  components does not address the critical fact that implementation remains incomplete.  *See*

7  Kahn Decl. ¶¶ 10-15.

8              **1.      High Suicide Rates and the High Percentage of
               Foreseeable/Preventable Suicides Support the Special Master's**
9              **Findings**

10

11          Suicide rates within California prisons—which remain higher than national prison

12  suicide rates and are in fact increasing—and the percentage of foreseeable and preventable

13  suicides—73.5 percent—are measures of the efficacy of Defendants' suicide prevention

14  measures upon which the Special Master is permitted to rely.  Suicide rates are trending

15  upward within California prisons.  Kahn Decl. ¶ 10, Ex. J.  Defendants cannot contradict

16  or obscure this simple fact.

17          In his declaration, Dr. Belavich tries to finesse the problem by comparing year-

18  over-year absolute numbers of suicides, which he calls "suicide frequency."  Belavich

19  Decl. at 2:14-18.  Dr. Belavich ignores, however, the one fact CDCR trumpets in all of its

20  other recent filings—CDCR's institutional population has decreased sharply.  Incredibly,

21  Dr. Belavich claims that calculating the suicide rate based on the actual, reduced

22  population is a "distortion," and rates should instead be calculated based on what the

23  population would have been had it remained constant.  *Id.* at 2:27-3:5.  That absurd

24  approach contradicts all accepted methods for calculating the rate of health events in a

25  population.  Kahn. Decl. ¶ 10.

26          Defendants in their Objection (but in no supporting declaration) assert that

27  California's rising prison suicide rate should be excused because jail suicide rates are even

28  higher.  Objections at 8:16-17.  Perhaps the reason this appears in no declaration is because

1  comparing jails and prisons this way contradicts Dr. Belavich's testimony that differing

2  demographics should be taken into account when comparing suicide rates.  Belavich Decl.

3  at 3:10-14.  Jail demographics are recognized widely as differing from prison

4  demographics—including the average rates of suicide, which far exceed prison suicides

5  nationwide.  Kahn Dec. ¶ 3, Ex. C.

6      Suicides can occur even in well-run prisons, and the occurrence of a suicide does

7  not itself prove a constitutional violation.  The failure to protect mentally ill prisoners from

8  known risks of serious harm and death, however, is a constitutional violation.  *Coleman*,

9  912 F. Supp. at 1319.  The Special Master properly reports on the percentage of suicides

10  that were foreseeable or preventable for that very reason.

11      These evaluations are undertaken not by lawyers, but by highly qualified medical

12  professionals.  The Special Master's expert, Dr. Raymond Patterson—a nationally

13  recognized expert on suicide prevention in correctional settings—reviews CDCR suicides

14  annually.  In his most recent report, Dr. Patterson found that *73.5 percent* of the 2011

15  suicides were preventable and/or foreseeable due to inadequacies in treatment, assessment

16  or intervention.  *See* Special Master's Report on His Expert's Report on Suicides

17  Completed in the California Department of Corrections and Rehabilitation in Calendar

18  Year 2011 at 1, Jan. 25, 2013, Docket No. 4307 (hereinafter "Special Master's 2011

19  Suicides Report"); Raymond F. Patterson Report on Suicides Completed in the California

20  Department of Corrections and Rehabilitation in Calendar Year 2011 at 3, Jan. 25, 2013,

21  Docket No. 4308 (hereinafter "Patterson 2011 Suicides Rep.").

22      Dr. Patterson concluded these preventable and/or foreseeable 2011 suicides were

23  linked to findings of inadequate assessments, including but not limited to suicide risk

24  assessments, treatment or intervention, untimely emergency response procedures, and

25  failures to provide 30-minute welfare checks in administrative segregation and mandated

26  consistent custodial checks.  Patterson 2011 Suicides Rep. at 2-3.

27      Similarly, in his review of the 2010 suicides, Dr. Patterson found that *74 percent* of

28  the CDCR suicides were foreseeable and/or preventable.  Raymond F. Patterson Report on

[726807-1]

1  Suicides Completed in the California Department of Corrections and Rehabilitation in

2  Calendar Year 2010 at 9, Nov. 9, 2011, Docket No. 4110.  Among many of those

3  foreseeable/preventable suicides, suicide risk assessments were either not done or

4  inadequately done, so that "interventions that would have been appropriate were not

5  implemented." *Id.*

6      There is nothing improper or erroneous about the Special Master's monitoring and

7  evaluation of suicides and suicide prevention efforts.

8          **2.    Suicide Rates Remain Disproportionately High in Administrative**
                   **Segregation Units**
9

10     The Special Master has reported properly and correctly that Defendants have failed

11  to implement simple but life-saving measures in administrative segregation units

12  ("ASUs"), including 30-minute welfare checks, mental health screening, and basic

13  elements of mental health care such as confidential mental health interviews.  25th Report

14  at 36-38.  Defendants do not contradict these observations factually, but instead belittle

15  them and attempt to obfuscate the astronomical suicide rates in segregation units.

16  Objections at 12:11-12; Belavich Decl. at 4:15-24.

17     The suicide rate among CDCR's administrative segregation population in 2012 was

18  157 per 100,000, the same as it was in 2007, and significantly increased from 2011.  Kahn

19  Decl. ¶ 8, Ex. I.  Although the ASU population is no more than 5.8 percent of the overall

20  prison population, 26.5 percent of the 2011 and 34 percent of the 2012 suicides occurred in

21  ASUs.  *See id.*

22     Defendants mistakenly assert that suicides in security housing units ("SHUs") and

23  psychiatric housing units ("PSUs") have been reduced.  Objections at 12:13-16.

24  Defendants, however, misstate the number of PSU suicides and mischaracterize the trend

25  of the SHU suicides.  Defendants state that four SHU suicides occurred from 2009 to 2011,

26  while in actuality four suicides occurred from 2011 through 2012.  Kahn Decl. ¶ 13.  (No

27  SHU suicides occurred in 2009 and 2010.)  Three of the four SHU suicides in 2011 and

28  2012 were prisoners on the mental health caseload.  CDCR suicide reviewers identified

1   significant problems that contributed to the suicides, including: improper removal from the

2   mental health caseload; breakdowns in continuity of care; denial of yard access for five

3   months; inadequate and/or missing suicide risk evaluations; emergency response failures;

4   and rounding failures indicated by rigor mortis at time of death.  Kahn Decl. ¶ 9(a)-(d).

5   Defendants also inaccurately report that there were three PSU suicides since 2007.

6   Belavich Decl. at 4:27-28.  In fact, there have been five suicides in the PSU since 2007,

7   including one prisoner who was housed there on ASU overflow status. Patterson 2011

8   Suicides Report at 26; Raymond F. Patterson Report on Suicides Completed in the

9   California Department of Corrections and Rehabilitation in Calendar Years 2008 and 2009,

10  May 16, 2011, Docket No. 4009, at 12, 15.

11          **3.      Defendants' Failure to Implement Fully Their Suicide-Prevention**
               **Response Focus Improvement Team Meetings Is Supported By**
12             **the Special Master's Findings**

13

14          Defendants object to the Special Master's finding that suicide-prevention measures

15  have not been implemented fully, which is based upon his observations regarding

16  requirements for the Suicide Prevention Response Focus Improvement Team Meetings

17  ("SPR-FIT").  Objections at 13:3-22 (citing 25th Report at 24).  Defendants complain that

18  the Special Master "distort[s] the truth."  *Id.* at 13:10.  But Defendants offer no evidence to

19  the contrary—instead, they argue that a *majority* of prisons are holding suicide-prevention

20  meetings.  *Id.* at 13:10-11.  There is no inconsistency, and certainly no distortion of the

21  truth, for the Special Master to report that implementation by only a majority of

22  institutions is not full implementation.

23          Moreover, Defendants cite to the evidence relied upon by the Special Master, but

24  disagree with his overall conclusions and impressions about the implementation of this

25  element of suicide prevention.  *Id.* at 13:19-21 ("The special master thus failed to credit the

26  majority of the institutions with compliance because their attendance and agenda did not

27  strictly adhere to the specifications of their internal policies.").  The SPR-FIT meetings are

28  a critical part of Defendants' own plan, developed in response to findings of constitutional

1   violations in this case.  The purpose of these bodies is to ensure that after a suicide occurs,

2   any systemic errors that contributed to the death are identified and remedied promptly.

3   The Special Master is not nitpicking when he reports that not all clinical disciplines are

4   participating in this process.  Failure to recognize and correct errors that have already

5   contributed to a death can lead to more deaths.

6          Defendants also include a general objection to the "special master's continued

7   intrusive and costly oversight of California's suicide prevention program" and

8   affirmatively argue that Defendants have fully implemented and staffed a thorough,

9   standardized program to identify, treat and supervise inmates at risk for suicide, including

10  a "'suicide risk evaluation [that] is much more detailed than the majority of prison and

11  community mental health systems in the United States.'"  *Id.* at 14:10-12 (quoting and

12  citing Mem. P & A in Support of Defs Mot. to Terminate at 22, Jan. 7, 2013, Docket No.

13  4275-1).  Although Defendants do have a suicide-prevention policy and plan, they mistake

14  the existence of a plan as a substitute for implementation thereof.  Suicide reports prepared

15  by Defendants' own clinicians and by the Special Master's expert, Dr. Patterson, continue

16  to document failures to complete suicide risk evaluations appropriately in situations where

17  such an evaluation might well have prevented a suicide.  *See, e.g.*, Patterson 2011 Suicides

18  Rep. at 57 (discussing Inmate A and finding SRE found inadequate); 114 (discussing

19  Inmate I and finding no SRE done on new arrival with prior MHCB admission for suicide

20  observation); 130 (discussing Inmate K and inadequate SREs, none done when arrived at

21  new prison after crisis stay); 236-37 (discussing Inmate Y and no suicide assessment done

22  of decompensating prisoner with attempt history).  Defendants' objections to the 25th

23  Report on this point are baseless.

24  **B.     Other Overall Objections and Requests to Strike or Modify The Report**

25         Plaintiffs next respond to the twenty objections listed below, which fall into a series

26  of categories, including: (1) the Special Master used words that Defendants do not like;

27  (2) the Special Master is monitoring Defendants under the Program Guide and remedial

28

[726807-1]

14

PLS.' RESPONSE TO DEFS.' OBJECTIONS AND MOTION TO STRIKE OR MODIFY PORTIONS OF THE
25TH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

1  plan standards that Defendants developed and agreed to, but which they now would prefer

2  he ignore; (3) the Special Master does not connect his findings to constitutional harm; and

3  (4) the Special Master lacks evidence, foundation, or speculates.  As explained above, *see*

4  *supra* part I, there is no basis for Defendants' complaints about the method or scope of the

5  Special Master's monitoring, and each of the policies and programs that he monitors are

6  critical parts of Defendants' overall compliance with the requirements of the Eighth

7  Amendment.

8      Plaintiffs address each of Defendants' overall objections in turn.  For the Court's

9  ease of reference, Plaintiffs refer to each by the same numbers provided by Defendants

10 under heading "B" of their Objections.

11     **B.1.**    Defendants' quibbles over the Special Master's word choice are not proper

12 bases on which to object to his findings.  Objections at 14:23-15:3 (objecting to the use of

13 the term "compliance" as requiring 90 percent or 100 percent satisfaction of Program

14 Guide requirements). The Special Master's role is to monitor whether Defendants have

15 complied fully with their own policies and with this Court's orders, not to monitor whether

16 they have done so to Defendants' satisfaction.  As to the substance of their objection to the

17 Special Master's standard of monitoring for the suicide prevention measure of  5-day

18 clinical follow-up checks for patients discharged from suicide observation, Defendants'

19 position is unsupported by any evidence.  Failures to comply with this aspect of careful

20 clinical monitoring of a patient discharged from a crisis unit after suicide watch can be

21 deadly.  *See, e.g*., Patterson 2011 Suicides Rep. at 151 (describing how on May 24, 2011,

22 Inmate N, 18 year old discharged from MHCB back to DVI and was provided with five-

23 day follow-up that was "grossly inadequate," and later committed suicide).  The 5-day

24 clinical follow-up requirements are described in detail in two chapters of the Program

25 Guide: Suicide Prevention and Response (Chapter 10) and Mental Health Crisis Bed

26 (Chapter 5), with special emphasis on the procedures for discharge and communication

27 with the primary clinician.  Kahn Decl. ¶ 17, Ex. L & L-1.

28     **B.2.**    Defendants also make the unsupported objection that the Special Master has

[726807-1]

1   no evidence to support his statement that the sustainable inpatient referral process needs

2   further monitoring.  Objections at 15:17-21.  The inpatient referral process is Defendants'

3   chosen method of ensuring that prisoners receive inpatient hospitalization when they need

4   it.  Defendants' record in this area has been atrocious, causing needless suffering and death

5   among prisoners waiting for inpatient care.  *See Coleman*, 428 Fed. App'x. at 744-45.

6   Only recently, in August 2011, have Defendants developed a plan that the Court could

7   approve as leading to a sustainable remedy for the inpatient referral process.  *See* Order,

8   Aug. 15, 2011, Docket No. 4069 (vacating evidentiary hearing on inpatient referral

9   process, and approving plan).  The Special Master properly found that implementation of

10   this new process requires further monitoring.

11       **B.3.**    Defendants next make an inappropriate, nonsensical objection to the Special

12   Master's conclusion regarding emergency response review committees (ERRCs).

13   Objections at 15:25-16:5.  The Special Master concluded that the nine institutions did not

14   provide any data on ERRCs.  25th Report at 24.  This was a fact.  Contrary to Defendants'

15   argument that no inference can be drawn here about the quality of their mental health care

16   system, the Special Master is reporting that Defendants have failed to implement fully a

17   critical part of an effective and self-sustaining suicide-prevention plan by noting that nine

18   of CDCR's 33 institutions are failing to carry out this critical element of such a plan.  For

19   the other 24 institutions that provided him with the minutes from their meetings, based

20   upon the review of those minutes and the fact that they kept minutes, he was able to

21   conclude that their committees were functioning.

22       **B.4.**    Defendants also make an inappropriate and unfounded objection to the

23   Special Master's statement regarding the failure to track mental health referrals.

24   Objections at 16:8-9.  Defendants object to the Special Master's statement as "micro

25   managerial" and assert there is no link between failure to track mental health referrals and

26   quality of care.  *Id.* This is obviously false, as without an appropriate tracking system,

27   patients can be missed, even those who have been accepted and assigned an inpatient bed,

28   and preventable deaths can occur.  *See*, *e.g.*, Patterson 2011 Suicides Rep. at 253

16

PLS.' RESPONSE TO DEFS.' OBJECTIONS AND MOTION TO STRIKE OR MODIFY PORTIONS OF THE
25TH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

[726807-1]

1   (describing November 26, 2011 suicide of Inmate CC, an EOP prisoner at CSP-

2   Sacramento, who was severely psychotic and had been referred, accepted, and assigned an

3   inpatient bed by the Department of State Hospitals ("DSH"), but not transferred for weeks

4   due to tracking system failures).

5   The Court has issued numerous orders, all of which were narrowly tailored to

6   remedy ongoing constitutional violations, directing Defendants to implement an effective

7   tracking system to ensure that prisoners referred to higher levels of care are transferred in a

8   timely manner, implementation of which the Special Master is now monitoring.  *See*

9   Seventeenth Monitoring Report of the Special Master on the Defendants' Compliance with

10  Provisionally Approved Plans, Policies, and Protocols, Part A, at 132, Feb. 14, 2007,

11  Docket No. 2140.  In March 2005, the Court directed Defendants to develop summaries of

12  inpatient referrals, acceptances, and transfers based upon a finding that tracking failures

13  affected care, but Defendants failed to comply with that order.  Order, Mar. 8, 2005,

14  Docket No. 1654.  Two years later, the Special Master again recommended, and the Court

15  again ordered, Defendants to implement the March 7, 2005 order "forthwith" and added

16  additional tracking requirements.  Order, Mar. 12, 2007, Docket No. 2158.  The Special

17  Master's monitoring of Defendants' compliance with these critical Court orders is not

18  "micro managing."

19  **B.5.**   Defendants again make inappropriate objections to the use of particular

20  words and phrases by the Special Master in his report.  Objections at 16:15-16.

21  Furthermore, they object to any implication that the inappropriate use of Form 7388-B,

22  which was developed for reviewing patients for possible referral to a higher level of care,

23  would impact on the patient's quality of care. *Id.* at 16:16-17.  This objection is nonsense.

24  The 7388-B form was part of a remedial effort addressing Defendants' long-standing

25  failure to identify and refer patients to inpatient settings appropriately.  Without the

26  appropriate implementation of the 7388-B form, Defendants can hardly claim they have

27  implemented a system that appropriately and constitutionally screens and evaluates class

28  members' mental health care needs and makes timely referrals to higher levels of care.

1    **B.6.**    Defendants' objection on this point has no real basis, but is again an attempt

2    to control the Special Master's choice of words.  *Id.* at 16:24-26.  The parties agreed and

3    stipulated to the Court that the beds would be restored to DSH.  Stipulation & Order, Nov.

4    27, 2012, Docket No. 4265.  Defendants' objection to the Special Master's phrasing is

5    irrelevant.

6    **B.7.**    Defendants here make an inappropriate objection to the Special Master's

7    characterization of the EOP ASU lengths of stay, which have been a focus of monitoring,

8    Court orders, and their own suicide prevention process.  Objections 17:4-8.  They now

9    argue that the Court-ordered limitations on such stays are not constitutionally required.  *Id.*

10    But Defendants' own suicide prevention experts recognized the need to address ASU

11    length of stay as part of a remedy for constitutional violations.  *See* Defs 2006 Suicide

12    Trends Plan at 9-10.  Defendants are thus aware that uncontrolled lengths of stay for

13    mentally ill prisoners in segregation present known risks of serious injury and death.

14    Defendants contend that the Special Master offers no evidence that any extended

15    placement in an ASU has harmed an EOP prisoner.  Objections at 17:7-8.  But CDCR

16    provides the Special Master with their own suicide reports and quality improvement plans

17    that clearly demonstrate uncontrolled segregation stays are a factor in recent suicides.  *See*

18    Patterson 2011 Suicides Rep. at 270-76 (describing Dec. 17, 2011 suicide of Inmate FF, an

19    EOP housed in SVSP's EOP HUB for 278 days).  Inmate FF was allowed to deteriorate in

20    segregation and "became increasing more isolated and agitated and was utilizing poor

21    judgment and poor insight as the weeks went on without benefit of psychotropic

22    medications."  *Id.* at 276.  Dr. Patterson concluded that this death was "very likely

23    preventable had he been referred to and accepted at a higher level of care beginning with a

24    MHCB."  *Id.*

25    **B.8.**    Defendants do not object to the Special Master's observation on this point.

26    Objections at 17:16-20.  Rather they argue that his conclusion—that the provision of

27    clinical contacts in a non-confidential setting, *e.g.*, dayroom floor or cell-front, are

28    improper—imposes a standard not required by the Constitution.  *Id.*  To the contrary,

[726807-1]

18

PLS.' RESPONSE TO DEFS.' OBJECTIONS AND MOTION TO STRIKE OR MODIFY PORTIONS OF THE
25TH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

1  confidential communications between a patient and clinician are a basic part of a

2  functional mental health care system.  The Special Master is describing persistent, long-

3  standing practices that deny class members these crucial confidential clinical contacts.

4  *See, e.g.*, 25th Report at 137 (Mule Creek clinicians saw EOP HUB patients cell-front 40%

5  of the time or if out-of-cell, "contacts took place in dayroom holding cells that afforded

6  limited privacy.").  Even Dr. Ira Packer, Defendants' expert witness in the three-judge

7  court overcrowding trial, testified that confidentiality is important in a prison setting, as

8  did Dr. Chaiken, Chief Psychologist, CSP-SAC, in her deposition before trial.  Kahn Decl.

9  ¶¶ 18-19, Exs. M & N (testifying to the importance of confidential clinical contacts in a

10  prison setting).  Even if confidential treatment spaces were not directly required as a

11  minimal component of care, they are a critical component of Defendants' own suicide

12  prevention remedy.  *See supra* Part I.

13       **B.9.**   Defendants' objection on this point is inappropriate and unsupported.

14  Objections at 18:6-8.  Defendants designed the Enhanced Outpatient Program (EOP) to

15  serve the most seriously ill members of the Plaintiff class who do not need immediate

16  hospitalization, but who cannot function in the general population.  The minimal standard

17  of care designed by Defendants for these patients is "at least" 10 hours of structured

18  therapeutic activity per week.  *See* Kahn Decl. ¶ 17, Ex. L-1 at 12-4-8.  While Defendants'

19  Program Guide recognizes permits clinicians to make an individualized determination that

20  that some patients may require fewer (or more) hours of care, *id.*, the remedy for

21  constitutional violations requires building capacity to deliver at least 10 hours of care per

22  week per EOP inmate.  The fact that individual clinicians might decide that some inmates

23  need greater or fewer hours of care does not take away from the need to create this

24  capacity through proper staffing and facility planning.  Failure to create sufficient capacity

25  prevents clinicians from exercising their discretion in cases where the full 10 hours or

26  more are needed.  It is therefore proper for the Special Master to report on the fact that

27  Defendants have consistently failed to reach the capacity to deliver 10 hours per week of

28  treatment.

[726807-1]

19

PLS.' RESPONSE TO DEFS.' OBJECTIONS AND MOTION TO STRIKE OR MODIFY PORTIONS OF THE
25TH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

1    **B.10.**  *See* response to B.9.

2    **B.11.**  Defendants' objection to the Special Master's observation that the failure to

3    provide staggered 30-minute welfare checks in administrative segregation is "particularly

4    concerning, given the increased incidence of suicides within segregated units" is without

5    any foundation.  Objections at 19:8-10 (citing 25th Report at 38).  The consultants

6    Defendants retained to develop a remedy for constitutional violations in this case

7    consistently have recommended that segregation staff conduct staggered 30-minute

8    welfare checks as a basic suicide prevention measure.  *See* Defs 2006 Suicide Trends Plan

9    at 9-10; Kahn. Decl. ¶ 2, Ex. A.  Defendants resisted the measure at first, and instituted the

10   step only after their initial plans failed to stem the wave of segregation deaths.  *See* Special

11   Master's Report and Recommendations on Defendants' Plan to Prevent Suicides in

12   Administrative Segregation at 6-7, Dec. 18, 2006, Docket No. 2084.  Over Plaintiffs'

13   objections, Defendants limited the 30-minute checks to the first 21 days of segregation.  *Id.*

14   Defendants, however, have failed to implement even this limited 21-day policy, and that

15   deficiency has led to tangible harm.  There have been at least two suicides in 2012 in

16   which CDCR's own suicide reviewer identified a breakdown in the 30-minute welfare

17   check process.  Kahn Decl. ¶¶ 6(c), 6(i).

18   **B.12.**  Defendants here object to the Special Master's report on the high vacancy

19   rate among clinical staff because he concludes that these vacancies will adversely affect

20   delivery of day-to-day care.  Objections at 20:3-7.  In fact, in a review of a May 15, 2012

21   Pleasant Valley State Prison suicide, the CDCR reviewer identified as a problem the fact

22   that a clinician twice evaluated the prisoner in question because he was reporting mental

23   health symptoms, but failed to follow up.  Kahn Dec. ¶ 6(f).  Defendants' own review

24   identified staffing shortages as a factor, and the institution chartered a Quality

25   Improvement Team to consider and recommend strategies to address staffing shortages

26   and to optimize available staff time, while providing quality care to the fullest extent

27   possible.  *Id.*  At that time, Pleasant Valley State Prison was reporting staffing vacancies of

28   45.8%, with an MHSDS population of 1,712, well above their designated capacity of

1  1,499.  *Id.*  In this case, staffing shortages were clearly identified by the suicide reviewer

2  and by local institutional staff as a barrier to providing quality, necessary care, which

3  resulted in this class member's suicide.  *Id.*

4    Furthermore, Defendants take issue with the Special Master's reference to the

5  Court-ordered maximum clinical vacancy rate of 10 percent.  Objections at 20:3-5; *see*

6  Order at 4:1-2, June 13, 2002, Docket No. 1383 (ordering Defendants to maintain the

7  vacancy rate among psychiatrists and case managers at a maximum of 10 percent,

8  including contracted services).  In support of their contention, Defendants cite their

9  September 30, 2009 Staffing Plan, rather than the Budget Change Proposal they actually

10 submitted to the Legislature for funding of their plan.  Notably, that Budget Change

11 Proposal justifies the staffing request under the September 30, 2009 Plan on the basis that

12 it "identifies appropriate staffing levels to meet constitutional standards, avoid costly

13 litigation, and further action by the courts."  Kahn Decl. ¶ 18, Ex. M.

14   **B.13.**  Defendants' objection here is baseless and unsupported.  Objections at

15 20:22-25.  Defendants elected to implement MHTS.net as their tracking system, which

16 they designed to include essential information for clinical staff, including suicide history

17 and alerts.  Defendants' own suicide prevention plans include a system of tracking suicide

18 history (*see* Defs 2006 Suicide Trends Plan, Attachment E (October 2, 2006 Memo,

19 "Transfer of Mental Health Tracking System Suicide History")) and they have presented

20 this newest version of their tracking system to the Court and to the Special Master as a

21 partial solution for their ongoing failure to implement a constitutional adequate

22 comprehensive suicide-prevention system.

23   **B.14.**  Defendants also object to the Special Master's statement that "CDCR has not

24 yet put in place a system-wide approach to measuring and assessing mental health services

25 and improving them consistent with Program Guide requirements on an on-going basis."

26 Objections at 20:26-21:1 (citing 25th Report at 57).  This objection relates to the 24th

27 Monitoring Report recommendation, which became an order of the Court.  Order, Aug. 30,

28 2012, Docket No. 4232.  Defendants objected at the time to the recommendation for a

21

court order in part because they claimed to be willing to work collaboratively with the Special Master to improve the quality assurance process without a court order. Defendants' Objections to the Special Master's Twenty-Fourth Round Monitoring Report at 2, July 12, 2012, Docket No. 4212.  The Court order remains in effect.  Defendants no longer appear willing to work collaboratively.

**B.15.**  Defendants object to the Special Master's use of the word "problematic." Objections at 21:19.  Once again, Defendants offer complaints about the Special Master's word choice in lieu of substantive objections to his actual factual findings.  And once again, Defendants ignore the fact that the Special Master is monitoring whether they have successfully and completely implemented the plan that they developed, and that this Court adopted, in order to remedy serious constitutional violations.

**B.16.**  Defendants object to the Special Master's statement that nine institutions "did not demonstrate that the screens [31 question post-placement] were conducted in confidential settings."  Objections at 21:25-28 (citing 25th Report at 65).  Their objection is absurd—if  Defendants do not provide the Special Master documentation showing the screens occurred in an appropriate manner, how can he possibly infer anything except that they did not occur?  Defendants would have the Special Master assume compliance exists unless he can prove otherwise (in this case, unless he himself can provide evidence that the screens occurred in a non-confidential setting).  Placing that burden of proof on the Special Master would require a dramatic *increase* in monitoring time and costs even though Defendants are already complaining he monitors too much.  Defendants also object to any implication that a failure to conduct the screening in confidential areas might affect quality of care.  *Id.* at 22:4-7.  But their own witnesses have testified that a lack of capacity for confidential mental health interviews *does* impact quality of care.  Kahn Decl. ¶¶ 18-19, Exs. M & N.

**B.17.**  The Special Master reviews yard time as part of Defendants' own suicide prevention plans that include proposals to maximize out-of-cell time for prisoners housed in segregated housing due to the risk of suicide.  Nevertheless, Defendants object to the

1    Special Master's observation that the provision of 10 hours or more of yard time in

2    administrative segregation remained problematic at approximately half of the institutions

3    for two reasons: (1) that CDCR regulations do not require the provision of 10 hours of yard

4    time; and (2) that the Special Master offers no evidence of harm as a result of this denial.

5    Objections at 22:8-18.

6         Lack of yard access has been a factor in several recent reported suicides, as overuse

7    of CDCR's segregation and endless lockdowns restrict prisoners to their cells for weeks

8    and months at time.  *See* Kahn Decl. ¶ 6(b) (Aug. 12, 2012 suicide); ¶ 9(a) (June 17, 2011

9    suicide); ¶ 9(c) (Mar. 18, 2012 suicide).  It is no accident that yard time was part of

10    Defendants' own 2006 suicide reduction plan.  Defs 2006 Suicide Trends Plan at 11.

11    Indeed, deprivation of out-of-cell time was recognized as a factor in dangerous mental

12    health decompensation from the beginning of this remedy.  *See* Findings and

13    Recommendations at 51-52, June 6, 1994, Docket No. 547; *Coleman,* 912 F. Supp. at

14    1320-21.

15         **B.18.**  Defendants next object to the Special Master's statement that EOP prisoners

16    at California Medical Facility ("CMF"), Correctional Training Facility ("CTF"), and

17    California Substance Abuse Treatment Facility ("CSATF") often languished in

18    segregation, waiting for PSU endorsements, for lack of foundation.  Objections at 22:20-

19    22 (citing 25th Report at 73).  This objection is baseless.  The Special Master supports his

20    conclusion with his extensive knowledge of the EOP HUB programs, where additional

21    staff are allocated for treatment of EOPs placed into administrative segregation.  CTF and

22    CSATF are not EOP HUB facilities and are required to transfer their EOPs within 30

23    days.[1]  Stays in the CMF HUB were long due to the delays in PSU transfers, and the CMF

---

[1] At CSATF, "[o]f the seven EOP inmates endorsed to the PSU, four transferred after
spending an average of 113 days in administrative segregation.  Two other inmates paroled
prior to PSU transfer, spending 75 days and 127 days … [a]nother PSU-endorsed inmate
transferred to DSH after 180 days in administrative segregation."  25th Report at 227.

23

1  consequently had difficulty offering the minimum of ten weekly hours of structured out-of-

2  cell therapeutic activity.  24th Report at 155.  The Special Master's opinion was well-

3  founded.

4        **B.19.**  Defendants make an absurd objection to the Special Master monitoring the

5  Court-ordered policies and procedures they themselves developed, which include

6  timeframes for particular evaluations, follow-ups, referrals, clinical contacts, etc.  Order

7  Regarding Revised Program Guide, Mar. 3, 2006, Docket No. 1753 (substantially adopting

8  Defendants' Revised Program Guide).  Without such firmly defined guidelines,

9  Defendants' policies and procedures would be meaningless.  Furthermore, Defendants

10 object to any implication that the failure to comply with the timelines and timeframes set

11 forth in the policies and procedures impacts on the quality of or access to necessary mental

12 health care.  Objections at 23:16-18.  Defendants offer no reason why failure to comply

13 with these Court-ordered timelines and timeframes—which were developed with clinical

14 input—would not affect quality and access to necessary mental health care.

15        **B.20.**  Defendants object to the Special Master's reports regarding medication

16 management timelines, as well as any implication or conclusion that the failure to comply

17 with these critical timelines might impact quality of care.  *Id.* at 24:1-6.  Defendants make

18 this objection boldly, but do not cite to even their own psychiatric experts for support.

19 This objection is baseless and without merit.

20 **III.    INSTITUTIONAL OBJECTIONS**

21        Defendants also object to the Special Master's findings about their level of

22 compliance at specific CDCR institutions because the Special Master does not cast his

23 findings specifically within constitutional terms.  But all of the Special Master's findings

24 go to the core point of constitutional compliance that Defendants so disingenuously ignore.

25 This Court has ordered the implementation of Defendants' own policies and procedures, as

26 embodied in the Program Guide, in order to remedy their ongoing constitutional violations.

27 If Defendants have not implemented the Program Guide, they have not completed the

28 remedy ordered by this Court to cure their constitutional deficiencies.  There is simply

1  nothing improper or inappropriate about the Special Master's reporting to the Court on this

2  matter.

3        To the extent that they attempt to contradict the factual basis for the Special

4  Master's findings, Defendants have not attached a single piece of evidence in support of

5  their institution-specific objections.  Specifically, in Objection II.A.2 at 24:23-27,

6  Defendants assert that CRC has provided minutes of a SPR-FIT meeting that contradict the

7  Special Master's report, but do not attach any such minutes, instead asking this Court to

8  rely on their bare assertion that they exist.  In Objections II.A.3-6, B.1, D.1, E.1, F.1-2,

9  G.1-2, H.1, I.1, I.3, and J.1-2 (*see* Objections at 24-30), Defendants again refer to, but do

10 not provide for Court review, documents supposedly provided to the Special Master in

11 preparation for his monitoring tours.  Assertions that all of these documents exist and

12 support Defendant's objections do not constitute an evidentiary foundation upon which

13 this Court may credit their views.

14       The three remaining objections are all erroneous and invalid.  In Objection II.B.2,

15 Defendants object to the Special Master's assessment of their compliance with pre-release

16 planning on the grounds that "[i]nmates released into the community are no longer

17 *Coleman* class members."  Objections at 26:14-15.  But the Special Master never refers to

18 post-release prisoners—rather, he is assessing the implementation of the planning process

19 that is required to occur prior to class members' release.  Moreover, release of seriously

20 mentally persons into the community with no planning for continuity of care would be an

21 independent Eighth Amendment violation, even if it were not a necessary part of the

22 remedy in this case.  *See Wakefield v. Thompson,* 177 F.3d 1160, 1164 (9th Cir. 1999).

23       In Objection C.1, Defendants take issue with what they perceive to be the

24 implications of the Special Master's statement that Mental Health Program Bed[2] (MHPB)

25 _____

26 [2]The term Mental Health Program Bed (MHPB) is applied to Mental Health Crisis Bed
   (MHCB) units that are located within a skilled nursing facility, rather than in  a

27 Correctional Treatment Center or a General Acute Care Hospital.

28

[726807-1]

25
PLS.' RESPONSE TO DEFS.' OBJECTIONS AND MOTION TO STRIKE OR MODIFY PORTIONS OF THE
25TH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

1  inmates are not seen in an Interdisciplinary Treatment Team (IDTT) meeting prior to

2  admission, but they do not and cannot contradict the statement's factual accuracy.

3  Objections at 26:18-23.

4          Finally, in Objection I.2, Defendants challenge the Special Master's failure "to

5  include Mule Creek among the institutions that demonstrated accessibility to cut-down

6  tools and possession of on-person CPR micro-shields by custody officers." *Id.* at 29:8-13.

7  The only basis for their objection, however, is that some control booths have cut-down

8  tools.  They do not even attempt to explain Mule Creek's apparent failure to provide on-

9  person CPR micro-shields, and thus fail to justify its inclusion on the Special Master's list

10  of compliant institutions.

11  **IV.    DEFENDANTS' PROCEDURAL COMPLAINTS ARE WITHOUT MERIT**

12          Defendants complain of the "compressed time frame" the Court granted for the

13  filing of their objections, stating that this "Court has eliminated the opportunity for the

14  special master to consider the parties' comments and objections before [his report] is filed"

15  and that their time to file these objections was unfairly shortened.  Objections at 3:6.

16  Defendants never acknowledge that this Court's Order governing the filing of the Special

17  Master's most recent reports, and the parties' comments thereupon, was mandated by

18  Defendants' decision to file, without warning or notification to the Court or the Plaintiffs, a

19  motion to terminate this litigation entirely.  Because Defendants chose a litigation tactic

20  that, in turn, set in motion the dictates of the PLRA, under which this Court must make

21  findings regarding the termination request within ninety days, the Court issued necessary

22  and proper orders to ensure that it has before it all the evidence required to assess current

23  conditions in the system.  In any event, Defendants were provided with a full thirty days

24  after receipt of the Special Master's draft report in which to file their objections—the draft

25  report was provided to the parties on December 28, 2012; Defendants' unamended

26  objections were filed on January 28, 2013.  This Court's order did not diminish

27  Defendants' time in which to prepare objections, but only streamlined the process under

28  which the Court will consider their objections.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the foregoing reasons, Plaintiffs request that the Court approve the 25th Report of the Special Master, and deny Defendants' Motion to Strike or Modify.

DATED: February 11, 2013            Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Jane E. Kahn*
        Jane E. Kahn

Attorneys for Plaintiffs

27

PLS.' RESPONSE TO DEFS.' OBJECTIONS AND MOTION TO STRIKE OR MODIFY PORTIONS OF THE
25TH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)