DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
LISA ELLS – 243657
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California 94104-4244
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. Civ S 90-0520 LKK-JFM |
| Plaintiffs, | **DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO STRIKE OR MODIFY PORTIONS OF THE TWENTY-FIFTH ROUND MONITORING REPORT OF THE SPECIAL MASTER** (Fed. R. Civ. P. 53) |
| v. | |
| EDMUND G. BROWN, Jr., et al., | |
| Defendants. | Judge: Lawrence K. Karlton |

727660-1

I, Jane E. Kahn, declare:

1.    I am an attorney admitted to practice law in California, a member of the bar of this Court, and Of Counsel to the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs Ralph Coleman, *et al.*  I have personal knowledge of the matters set forth herein, and if called as a witness I could competently so testify.  I make this declaration in support of Plaintiffs' Response to Defendants' Motion to Strike or Modify Portions of the Twenty-Fifth Round Monitoring Report of the Special Master.

2.    In 2010, in response to a Court order, Defendants worked with the *Coleman* Special Master to review all their suicide prevention policies, practices, and processes, as well as their implementation of those policies, practices, and processes.  Order, Apr. 14, 2010, Docket No. 3846.  Attached hereto as **Exhibit A** is a true and correct copy of Defendants' Amended August 25, 2010 Updated Report on Activities Taken Following the Court's April 14, 2010 Order.  The Special Master reviewed Defendants' August 2010 Plan, which included their proposed Program Guide revisions and suicide prevention strategies, and recommended that Defendants implement them immediately.  Special Master's Report on Defs.' Review of Suicide Prevention Policies, Practices and Procedures at 38, Sept. 27, 2010, Docket No. 3918.  Defendants objected to only the Special Master's recommendation that they submit a plan to furnish suicide-resistant beds in their MHCBs and were subsequently ordered by the Court to submit within sixty days from the date of the order their proposal for improving the clinical competency of current CDCR clinicians with the administration of the suicide risk evaluation.  Order, Nov. 18, 2010, Docket No. 3954.  Attached hereto as **Exhibit B** is a true and correct copy of Defendants' January 18, 2011 Update, submitted to the Special Master as required by the November 18, 2010 Order.

3.    On June 8, 2006, the Court ordered Defendants to develop a plan to address the escalating percentage of suicides in the administrative segregation units in California's prisons, and directed Defendants to collaborate with Plaintiffs' expert, Lindsay M. Hayes.  Order at 3, June 8, 2006, Docket No. 1830.  Mr. Hayes is an expert in the area of suicide

1   prevention in jails and prisons who has served as a technical assistance consultant to the

2   Special Litigation Section of the U.S. Department of Justice Civil Rights Division in

3   numerous investigations of suicides and general conditions of confinement within jails,

4   prisons, and juvenile facilities throughout the country. *See* Declaration of Lindsay M.

5   Hayes In Support of Pls.' Objections to Defs.' Plan to Address Suicide Trends in

6   Administrative Segregation at 1-2, Oct. 31, 2006, Docket No. 2011. He has also written

7   extensively in the area of suicide prevention and correctional facilities, noting that "the

8   number of jail suicides far exceeds the number of prison suicides." Lindsay M. Hayes,

9   Project Director, National Center on Institutions and Alternatives, *Prison Suicide: An*

10  *Overview and Guide to Prevention*, (June 1995), Ch. 1 at 1, attached hereto as **Exhibit C**.

11          4.      Defendants have created a secure file transfer protocol ("FTP") site where

12  the California Department of Corrections and Rehabilitation ("CDCR") periodically

13  uploads documents related to prisoner suicides and some prisoner non-suicide deaths,

14  including homicides of prisoners on the mental health caseload. Counsel for CDCR have

15  provided Plaintiffs' counsel with log-in information to access portions of CDCR's FTP

16  site, including the folders containing suicide and non-suicide death-related documents.

17  The documents uploaded to the FTP site for suicides differ from case-to-case, but

18  generally include the following: Suicide Notifications; Suicide Report Cover Memos;

19  Suicide Reports; Quality Improvement Reports ("QIP") and related documents;

20  Autopsy/Coroner Reports; Offender Based Information System ("OBIS") Reports; Death

21  Review Summary Reports; various incident reports; and eUHR documents. I have

22  instructed a paralegal in our office to regularly check this FTP site and to download suicide

23  and other non-suicide documents as they become available and to create a folder for every

24  prisoner death, organized by year of death. I have also instructed this paralegal to log the

25  date of death, prison, location by housing and type of housing, level of care, and any other

26  relevant information provided through the notification, prisoner correspondence, and

27  uploaded documents.

28

2

5.      One of my responsibilities as counsel in this litigation is to work with various outside mental health, custody, and suicide prevention experts, and to review and analyze CDCR suicides in an effort to identify systemic issues and problems and to ultimately reduce the high rate of suicides in CDCR, as much as possible.  I have reviewed many of the CDCR Suicide Reports and QIPs prepared for the 2011 and 2012 suicides committed in California's prisons.  Despite policies, procedures, and existing court orders, the CDCR Suicide Reports identified continued non-compliance with requirements in areas of emergency response, suicide risk evaluations, 30-minute welfare checks, screenings, and compliance with treatment standards, and document the impact of staffing shortages, extended stays in segregation and lack of mandated yard.

**Recent Suicides Illustrating Continued Non-Compliance**

6.      In each of the sub-paragraphs below, I have summarized the facts from CDCR's Suicide Reports and/or QIPs. I have assigned a number for each 2012 suicide that I reviewed so as to keep the name of the prisoner confidential.  All 2011 suicides are discussed in the Special Master's expert's report, filed with this Court on January 25, 2013, and will be referred to by the letter of the alphabet assigned by the Special Master's expert.  *See* Raymond F. Patterson Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2011, Docket No. 4308 (hereinafter "Patterson 2011 Suicides Rep.").

a.      On July 24, 2012, at approximately 1 a.m., Prisoner 1 was found hanging in a Psychiatric Services Unit ("PSU") cell, used as an administrative segregation unit ("ASU") overflow cell, at CSP-Sacramento ("CSP SAC").  The suicide reviewer noted three significant concerns:  (1) the psychiatric technician who saw him regularly during the days before his suicide failed to mention his significant injuries from an excessive use of force incident or any signs of his instability; (2) the psychologist who observed his instability provided no rationale for not referring him to a higher level of care; and (3) officers who discovered him in his cell unresponsive, waited fourteen minutes before opening his cell.  No QIP has been provided, although it was due December 21,

3

2012 (150 days from the date of his death). *See* Patterson 2011 Suicides Rep. at 13-14 (setting forth post-suicide documentation timelines). According to CDCR's Suicide Report, on July 21, 2012, the prisoner, who was receiving mental health care at the CCCMS level, was involved in a fight with his cellmate, and refused a command to stop. In response, officers pepper-sprayed both cellmates several times, and then fired six 40 mm Foam Baton rounds and 60-Caliber Sting Ball Direct Impact rounds at Prisoner 1, at which time he fell and an extraction team entered the cell and subdued him. The prisoner was injured in this use of force, and he required sutures for his left ear, had a broken arm, bruising on many parts of his body, and was sent out to an area hospital to rule out a head injury. The Suicide Report notes that an investigation of the use of force was underway by the Office of Internal Affairs. On July 23, 2012, custody observed that he was acting "weird," and the Deputy Associate Warden sent a psychologist to see him. The Mental Health Progress note indicates that the prisoner was "pacing in his cell, appeared agitated and refused to speak with the psychologist." The clinician did not document that she looked at his records nor did she document her rationale for not referring him to a higher level of care, such as a Mental Health Crisis Bed ("MHCB"). He was found a few hours later in his cell hanging. As noted above, no report on the QIP has been provided yet.

b. On August 12, 2012, Prisoner 2 was found hanging in his general population cell in Facility B at Salinas Valley State Prison ("SVSP"). At the time of his suicide, he was no longer on the mental health caseload, although he had reported suicidal thoughts to jail staff, a fact that he also reported at the High Desert State Prison Reception Center. He was placed on suicide precaution on December 7, 2011 in the Triage and Treatment Center in a holding cell and held overnight, but then returned to his housing the next day. The author of the CDCR Suicide Review noted that the yards on Facility B and Facility A at SVSP, "have been closed for over 900 days due to a riot." In the Suicide Review, dated September 24, 2012, the reviewer identified inadequate Suicide Risk Evaluations ("SREs") as a problem, noting that "[d]espite a number of chronic risk factors, Inmate … received SREs that assessed his chronic risk as low, based largely on his denial

1   of suicidal ideation." The Suicide Report identified inadequate SREs and directed the

2   Chief of Mental Health to develop a draft local operating procedure ("LOP") for the

3   Proctor-Mentor Program and to construct a schedule for training of clinical staff.  No

4   Report on Implementation of the QIP has been provided, although it is past due.  The

5   Proctor-Mentor Program was one of the initiatives proposed in Defendants' August 25,

6   2010 Suicide Plan. *See* Ex. A at 23.

7           c.      On May 30, 2012, Prisoner 3 was found hanging in his administrative

8   segregation cell at Folsom State Prison ("Folsom").  Prisoner 3 was receiving mental

9   health services at the CCCMS level of care at the time of his suicide.  The Suicide Report

10  identified two problems:  (1) the prisoner's bridging order for pain medication was allowed

11  to expire without interviewing the patient; and (2) 30-minute welfare checks were

12  generally complete on the hour and half-hour rather than staggered and a tier officer signed

13  for all of them, rather than the officers who actually completed them.  This prisoner was

14  scheduled to be temporarily transferred to Folsom from CSP SAC on May 16, 2012

15  because of overflow conditions in the ASU at CSP SAC.  On May 15, 2012, he was told

16  that he would be transferred to Folsom on overflow status, and he threatened suicide, and

17  was placed into a holding cell for crisis assessment.  "At the time of this assessment, [his]

18  Global Assessment of Functioning (GAF) score was estimated to be 30.  He was placed in

19  an Alternative Housing cell under Suicide Precaution awaiting MHCB admission."  He

20  remained overnight in the holding cell, and was released the next day, back to his ASU cell

21  at SAC, but "rather than be re-housed in the CSP SAC ASU, … [he] was immediately

22  transferred to the [Folsom] ASU."  The QIP provided by the institution indicated that ASU

23  staff were re-trained in 30-minute welfare check requirements and Folsom provided the

24  December 31, 2006 Memo from Director Scott Kernan, setting forth the 30-minute welfare

25  check process.

26          d.      On May 16, 2012, Prisoner 4 committed suicide by laceration of his

27  neck and exsanguination in his general population cell at Pleasant Valley State Prison

28  ("PVSP").  This prisoner was not on the mental health caseload, although he had reported

727660-1

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' MOTION TO STRIKE OR MODIFY PORTIONS OF
THE TWENTY-FIFTH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

1   during his reception center screening that he had a history of suicide attempts, psychiatric

2   hospitalization, and psychotropic medications.  The suicide reviewer noted the failure to

3   refer this prisoner for a further mental health evaluation despite his positive responses on

4   the Reception Center 31-item mental health screening questionnaire.  The QIP directed the

5   Suicide Prevention and Response Focused Improvement Team ("SPR-FIT") of the

6   Division of Correctional Health Care Services ("DCHCS") to discuss ways to improve the

7   accuracy and utility of the screening questionnaire used in the Reception Centers and to

8   make recommendations for changes to the scoring rules.  The SPR-FIT Committee met on

9   June 18, 2012, and provided an update on their review of both the reception center

10  screening questionnaire, as required by the suicide review, and the ASU screening tool,

11  which they linked to another recent suicide.  Attached hereto as **Exhibit D**, is a true and

12  correct copy of the QIP Plan submitted on July 27, 2012, including the SPR-FIT Minutes,

13  (the name of the prisoner who committed suicide is redacted).  Under the action item for

14  the reception center screening questionnaire, it is noted that Dr. Canning, Senior

15  Psychologist, Specialist, DCHCS, "will finish updating the scoring rules and will send out

16  for review."  Ex. D at 2, item b.  To date, Plaintiffs' counsel have not been provided with

17  either updated scoring rules for the reception center screening questionnaire or the new

18  ASU screening tool developed in response to a different recent suicide.  Ex. D at 2, item a.

19              e.      On October 25, 2012, Prisoner 5 committed suicide by hanging in the

20  stand-alone ASU at Salinas Valley State Prison.  At the time of his suicide, Prisoner 5 was

21  not on the mental health caseload.  Plaintiffs have not yet received the CDCR Suicide

22  Report, which was due within 60 days of his death, or no later than December 24, 2012.

23  However, as noted on the Initial Death Report, this prisoner was on five-day "crisis"

24  follow-up at the time of his suicide, after returning from Natividad Medical Center on

25  October 21, 2012, after an overdose attempt.  Page 12-7-11 of the 2009 Revised *Coleman*

26  Program Guide prohibits the housing of prisoners in the mental health delivery system in a

27  stand-alone ASU.  Attached hereto as **Exhibit E** is a true and correct copy of Page 12-7-11

28  of the Revised Program Guide.  The five-day clinical follow-up procedure is used for

727660-1

6

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' MOTION TO STRIKE OR MODIFY PORTIONS OF
THE TWENTY-FIFTH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

1    prisoners who have been discharged from a crisis unit where they were observed after a

2    suicide attempt or on suicide observation.  This patient appears to have been returned, after

3    an overdose attempt, to the harsh conditions of the stand-alone ASU, from which prisoners

4    requiring mental health services are excluded by both court order and the Revised Program

5    Guide.

6         f.    On May 15, 2012, Prisoner 6 committed suicide on a sensitive needs

7    yard at PVSP.  He was not on the mental health caseload at the time of his suicide.  The

8    suicide reviewer identified several problems in this suicide that relate to staffing shortages

9    and additional training needs.  This prisoner was interviewed several times by clinical staff

10   who identified a need for follow-up, which never occurred, despite the prisoner endorsing

11   mental health symptoms.  The reviewer noted that:  "[i]n an effort to address the needs of

12   inmates in a time of increasing staff reductions, executive mental health staff at PVSP

13   chartered a Staff Reduction Quality Improvement Team ("QIT") on January 10, 2012."

14   Attached hereto as **Exhibit F** is a true and correct copy of the QIT, entitled "Mental Health

15   Service Reduction," dated August 28, 2012 (the CDCR number of the prisoner who

16   committed suicide at PVSP is redacted).  The QIT defines the issue or problem thus:  "[a]s

17   a result of staffing shortages, budget constraints and incorrect inmate-patient population

18   projections delivery of MH services which meet *Coleman* guidelines is adversely

19   impacted."  Ex. F at 1.  The QIT analyzes the issue problem and attaches relevant data,

20   noting that they "[d]iscussed staffing issues and workloads and their relationship to recent

21   suicide."  *Id*.  Attached to the QIT was a chart prepared showing PVSP's prison census,

22   their Mental Health Services Delivery System ("MHSDS") census, and staffing vacancies.

23   Ex. F. at 5.  Following the chart is this statement:  "PVSP's MHSDS staffed capacity is

24   1,499.  Current MHSDS is 1,712, which is 114% of capacity.  FY 12/13 MH Staffing

25   Ratio Model (8/1/12) indicates that PVSP should have 63.5 positions to support a

26   treatment population of 1,499.  However, only 31.5 (50%) are currently filled."  Ex. F. at

27   6.  Finally, PVSP also attached to their QIT an email chain documenting their difficulty

28   managing the population of MHSDS prisoners that they continued to receive because of

1    their staffing shortages: "31 new arrivals represents 100+ staff time—case manager

2    contact, psychiatry contact, interdisciplinary treatment team, support staff tracking—and

3    all the paperwork that goes with it. In addition, nursing, pharmacy, medical records, and

4    custody resources are impacted getting these new patients on boards. The number also

5    represents a 1.8% turnover in our patient population in just one week …. I will be passing

6    this on through the MH chain." Ex. F. at 7. Despite these local efforts to advocate for a

7    reduction in their MHSDS population given their staffing shortages, in December 2012

8    (according to the most recent data provided to Plaintiffs by Defendants) PVSP had a total

9    MHSDS population of 1717, with a staffed capacity of 1,499, and a staffing vacancy rate

10   adjusted for registry staff of 47.60% (or 30.22 of 63.5 positions vacant). Attached hereto

11   as **Exhibit G** is a true and correct copy of Defendants' *Coleman* Data, Mental Health

12   Population by Institution Report, dated December 7, 2012. Attached hereto as **Exhibit H**

13   is a true and correct copy of Defendants' *Coleman* Data, Mental Health Institutions

14   Vacancies, PVSP, December 2012.

15        g.    On July 25, 2012, Prisoner 7 committed suicide by hanging in his

16   general population housing unit at Deuel Vocational Institution (DVI). At the time of his

17   suicide, he was not on the mental health caseload. The suicide reviewer notes that his

18   suicide occurred during the first week of a new staffing pattern that reduced the number of

19   officers in each wing at DVI from three to two assigned officers during second and third

20   watch. On the day of the suicide, the log book "indicated no security checks were made by

21   any second or third-watch officers." The condition of Prisoner G at the time of discovery

22   "suggested that he probably died between three and six hours prior to discovery." The QIP

23   directed the Warden to conduct an inquiry to determine why security checks did not occur

24   and to determine whether the current LOP adequately outlines how to manage custody

25   checks with reduced numbers of custody personnel. No Report on Implementation of the

26   QIP has been provided yet, although it was due on December 25, 2012, 150 days from the

27   date of death.

28

8

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' MOTION TO STRIKE OR MODIFY PORTIONS OF
THE TWENTY-FIFTH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

1         h.       On November 26, 2011, Inmate CC committed suicide at CSP SAC in

2 his Enhanced Outpatient Program ("EOP") general population housing unit. *Id.* at 249.

3 The CDCR Suicide Report indicated that staff at CSP SAC had been notified on November

4 3, 2011 that a Department of State Hospitals ("DSH") bed was available for this severely

5 psychotic EOP prisoner. He had been referred, accepted, and now had an inpatient bed

6 waiting for him, but he was not transferred because an updated health form was never

7 completed. *Id.* at 253. The CDCR Suicide Report identified two problems: (1) Failure to

8 promptly complete the urgent request for health care information needed for transfer to

9 DSH; and (2) Inadequate medication management for the severe psychosis. In discussing

10 these problems, the CDCR suicide reviewer noted that while "[t]ypically, the mental health

11 [DSH] coordinator follows up delinquent forms; however, due to a subsequent series of

12 key staff absences, the follow-up was not successful." As part of the QIP response to these

13 staffing-related problems, SAC's Chief of Mental health reviewed the treating psychiatrist,

14 who was a contractor, and noted that the doctor was "maintaining a caseload of over 90

15 severely mentally ill inmate-patients …. The psychiatrist was overwhelmed … 1.25

16 psychiatrists were assigned to replace his EOP caseload and we are monitoring if this is

17 adequate coverage." The Special Master's expert found that emergency response was also

18 inadequate and determined that this suicide was preventable and possibly foreseeable. *Id.*

19 at 257.

20         i.       Prisoner 8 committed suicide at Richard J. Donovan Correctional

21 Facility ("RJD") in an EOP ASU overflow cell on June 23, 2012. He was classified as

22 EOP at the time of his death. The suicide reviewer noted that he was pending parole and

23 as early as February 2011 had expressed concerns over what would happen after he

24 paroled. "This issue became an almost constant theme in his individual contacts over the

25 spring and early summer of 2012." Problems identified in the Suicide Report included

26 clinical issues, including cursory and formulaic progress notes, and insufficient or missing

27 SREs. In addition, there were problems noted with the 30-minute welfare checks,

28

9

1    including the inadequate record-keeping and timeframes for the checks that would not

2    permit an adequate welfare check.

3                    j.        Prisoner 9 committed suicide at Mule Creek State Prison ("MCSP") in

4    an ASU cell on June 7, 2012.  He was classified as 3CMS at the time of his death and had

5    a history of prior suicide attempts while in custody.  The suicide reviewer was "dismayed

6    by the Suicide Risk Evaluations done for [this prisoner] at MCSP."   The SREs appeared to

7    have been done in haste, were inadequate, and "were frequently based on the inmate's self-

8    report, which was unreliable in the extreme."  The Suicide Report identified the

9    inadequate Suicide Risk Evaluations as a problem, and recommended that the Chief of

10   Mental Health facilitate the development of the Proctor-Mentor Program ("PMP") at

11   MCSP  and provide a "draft LOP," which was later submitted as part of the QIP as a draft,

12   with a date stamp of October 2012.

13           7.        On December 14, 2012, I attended a meeting in Sacramento with

14   Defendants, including representatives from DSH, DCHCS, CDCR's Division of Adult

15   Institutions, the Special Master and his experts, and other *Coleman* counsel.  The

16   meeting's agenda included the DSH Waitlist/Referral Process and ASU issues.  During the

17   meeting, plaintiffs raised our concerns regarding the high staffing vacancies at Salinas

18   Valley Psychiatric Program ("SVPP") and Vacaville Psychiatric Program ("VPP"),

19   especially in light of a recent December 2012 suicide at SVPP in C-5, one of the temporary

20   Intermediate Care Facility units.  DSH administrators assured us that staffing was adequate

21   for these programs, and that in fact, on the day of the SVPP suicide, there was full staffing.

22   During the meeting on ASU issues, Kathleen Allison, Deputy Director of the Division of

23   Adult Institutions, Facilities Support, reported on the ASU population, including the total

24   number at 7,000 prisoners.  She reported that Defendants do not track the impact of mental

25   health assessments (115x) on the rule violation process; she was unable to report on

26   whether the 115x process results in any mitigation for prisoners with mental illness.

27   Defendants indicated that they had a "plan for a plan" to implement a Quality

28   Improvement process for the mental health input into the RVR process.  Defendants

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' MOTION TO STRIKE OR MODIFY PORTIONS OF
THE TWENTY-FIFTH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

727660-1

1  reported that they have not yet implemented the High Risk Patient Protocol, which was a

2  critical element of their August 2010 suicide plan, for monitoring inmates at a high risk of

3  suicide.  Defendants also acknowledged that they were unaware whether the licensed

4  psychiatric technicians were even informed that a prisoner placed into the ASU was on the

5  high-risk patient list.

6       8.    Attached hereto is **Exhibit I**, Plaintiffs' Chart of CDCR ASU suicide rates

7  for 2007 through 2012.  I directed my paralegal to create this chart using the ASU

8  population figure of 7,000 provided to us by Defendants on December 14, 2012.  He

9  computed the suicide rate for ASU using this population and the number of ASU suicides

10 for each year, which is provided to us by Defendants on their FTP site, as well as through

11 the Special Master's annual suicide reports.  He computed the rate per 100,000 with a

12 formula using X (the number of ASU suicides) divided by 7,000 (ASU population)

13 multiplied by 100,000 (X/7,000 x 100,000 = rate).  This is the same formula used by the

14 Bureau of Justice Statistics to calculate rates per 100,000.  Declaration of Tim Belavich at

15 26, Jan. 28, 2012, Docket 4313 (hereinafter "Belavich Decl.").  I also directed my paralegal

16 to chart the CDCR system-wide suicide rates for 2007 through 2012, using data provided

17 by CDCR.  The "N" on this chart represents the total number of CDCR suicides in the

18 calendar year.  The percentage of ASU suicides was figured by dividing the number of

19 ASU suicides by the total number of suicides in a year (*e.g.* in 2007, there were 11 ASU

20 suicides)  As noted on this Chart, the rates of suicide in ASUs remain six times higher than

21 the overall prison rate within CDCR.

22 **Security Housing Unit ("SHU") Suicides Illustrating Continued Non-Compliance**

23       9.    In each of the sub-paragraphs below, I have summarized the facts from

24 CDCR's Suicide Reports and/or QIPs.

25          a.    Inmate P committed suicide in the California Correctional Institution

26 ("CCI") SHU on June 17, 2011.  Patterson 2011 Suicides Rep. at 161.  He was classified at

27 the CCCMS level of care at the time of his death.  The prisoner was inappropriately

28 dropped from the mental health caseload on February 10, 2011, and was not seen again

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' MOTION TO STRIKE OR MODIFY PORTIONS OF
THE TWENTY-FIFTH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

1  until May 5, 2011.  At that time, he presented with an "odd gaze" and "blunted affect."  *Id.*

2  at 164.  Problems that were identified in the CDCR Suicide Report included:  (1) lack of

3  documentation by the IDTT for retaining him at CCCMS level of care due to his

4  functioning; (2) inadequate Suicide Risk Evaluations not completed for him at various

5  times at both Wasco State Prison and CCI; (3) failure to offer yard except twice from

6  February 28, 2011 through June 16, 2011; and (4) inappropriate removal from the mental

7  health caseload by treating psychiatrist during first meeting.  The Special Master's expert

8  found that the assessments conducted by the primary clinician and the IDTT reviews were

9  "grossly inadequate."  *Id.* at 170.  "Given his clear deterioration . . . his suicide was very

10  likely preventable."  *Id.*

11           b.       Inmate S committed suicide in the CCI SHU on August 7, 2011.  He

12  was classified as CCCMS at the time of his death.  Patterson 2011 Suicides Rep. at 197.

13  Two CDCR suicide reports were issued, each with a different number of problems.  *Id.*

14  One problem was delayed emergency response and the second was a breakdown in

15  continuity of care, including the lack of collaboration between medical and mental health

16  providers.  *Id.*  The first problem, regarding emergency response, was eventually removed

17  from the second suicide report.  The Special Master's expert's report concluded that the

18  suicide may have been foreseeable and was "highly likely preventable," due to the failure

19  of staff to appropriately assess this prisoner's suicide risk factors.  *Id.* at 199.

20           c.       Prisoner 10 committed suicide on March 18, 2012 in the CCI SHU.

21  He was not on the mental health caseload at the time of his death.  The Suicide Report

22  identified a problem with the emergency response, as chest compressions were not

23  initiated until he was brought from his housing unit to the Facility B clinic.  The reviewer

24  also noted a lack of consistent yard time, with this prisoner only offered yard 14 times

25  between July 2011 and March 18, 2012.  The report also discussed staffing shortages that

26  might create difficulties in responding to suicides due to "the lack of adequate Facility B

27  medical staffing to handle emergency response for that facility ….  During the discussion

28  of this case on April 24, 2012, the CEO at CCI noted that in the current economic climate,

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' MOTION TO STRIKE OR MODIFY PORTIONS OF
THE TWENTY-FIFTH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

1   the institution is facing further reduction in staff positions and funding for the medical

2   clinics, which will exacerbate the difficulty raised by this review."

3          d.      Prisoner 11 committed suicide on August 28, 2012 in the Corcoran

4   SHU.  According to the suicide notification provided by Defendants, no CPR was provided

5   due to the presence of "extensive rigor mortis."  He was classified at the 3CMS level of

6   care at the time of his death.  The CDCR Suicide Report, which was due October 28, 2012,

7   or 60 days from the date of death, has not yet been provided.  *See* Patterson 2011 Suicides

8   Rep. at 13-14 (setting forth post-suicide documentation timelines).

9          **The Declaration of Tim Belavich in Support of Defendants' Objections and
       Motion to Strike or Modify Is Unsupported**

10

11          10.     Tim Belavich, Acting Statewide Mental Health Deputy Director, sets forth

12   various statistics regarding the frequency (the total number of prisoner suicides per year) in

13   California prisons for various timeframes, noting increases and decreases over time.

14   Belavich Decl. at 2:14-18.  He attaches a graph, that "compares the suicide frequency in

15   California Prisons" for two timeframes.  *Id.* at 2:18-19.  These total number of prisoner

16   suicides for the designated years fail to account for the prison population for each year, and

17   as such are a meaningless measure of suicide prevention measures.  Although the Bureau

18   of Justice provides raw numbers of suicides for each state for the years 2001-2010, the

19   actual numbers bear no resemblance to the rate of suicide, which it also computes based

20   upon each prison system's total population.  *See* Belavich Decl., Ex. 1, Tables 24 & 25.

21   Dr. Belavich makes a similarly flawed argument that the high rate of suicide for 2012 of

22   23.7 would not be high "[h]ad the inmate population remained constant since June 30,

23   2011."  *Id.* at 3:2-3.  Calling the 23.7 percent  rate a "distortion" due to the population

24   reduction, he then figures his "new" suicide rate using the total number of 2012 suicides

25   and the higher June 30, 2011 population, happily concluding that with these facts, the 2012

26   suicide rate "declined" and was only 19.7 suicides per 100,000.  *Id.* at 2:27-3:5.

27   Unfortunately, this is not the methodology used by the Bureau of Justice Statistics or any

28   knowledgeable suicide expert, and reflects a poor attempt by Defendants to hide their true

727660-1

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' MOTION TO STRIKE OR MODIFY PORTIONS OF
THE TWENTY-FIFTH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

1    2012 suicide rate which increased from 2011.  *Id.* at Ex. 1 p. 25.  Exhibit 4 to the Belavich

2    Declaration is a graph that is described as showing the decrease in the overall suicide rate

3    beginning in 2007 in California prisons.  Plaintiffs have created their own chart, using the

4    suicide rates provided in the Special Master's Annual Suicide Reports.  Attached hereto as

5    **Exhibit J** is a true and correct copy of Plaintiffs' Chart 1, reflecting the CDCR Suicide

6    Rate for 2007 to 2012.  I directed my paralegal to create this chart using the suicide rates

7    provided in the *Coleman* Special Master's Annual Suicide Reports for 2007-2011, and the

8    suicide rate for 2012 reported in the Special Master's 25th Report.  Both Defendants'

9    Exhibit 4 and Plaintiffs' Exhibit J illustrate the same trend over the past five years of

10   increasing suicide rates during the same timeframe that Defendants were ordered to

11   develop and implement two different suicide prevention plans.

12          11.     Exhibit 5 of the Belavich Declaration is an email thread between Defendants

13   and a statistician working for the Bureau of Justice Statistics, which runs from December

14   11, 2012 through January 9, 2013, days after Defendants filed their Motion to Terminate

15   this action (Docket 4275).  This was a self-serving attempt to create evidence for their

16   motion, but Defendants use it to attack any effort to compare CDCR's rates of suicide to

17   other prisons, while they do the very same thing in the Belavich Declaration a page earlier.

18   *Compare* Belavich Decl. at 3:15-19; 2:10-13.

19          12.     Dr. Belavich incorrectly states that the "trend of suicides occurring in

20   administrative segregation units as a percentage of the overall suicide rate has declined."

21   *Id.* at 4:15-18.  In Exhibit 6 to his declaration, the trend line clearly shows that the

22   percentage of suicides occurring in ASU is going up, with a larger percentage in 2012. *Id.*

23   at Ex. 6.  Moreover, the risk of suicide in ASUs remains six times higher than the rate of

24   suicide within CDCR overall.  **Exhibit I**, a graph prepared at my direction as detailed in

25   paragraph 8, *supra*, shows the astronomical suicide rate in ASUs for 2007 through 2012, as

26   compared to the overall suicide rate for CDCR during those years.

27          13.     Dr. Belavich misstates the total number of PSU suicides since 2007, and

28   inaccurately describes the occurrence of SHU suicides.  Belavich Decl. at 4:25-28.

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' MOTION TO STRIKE OR MODIFY PORTIONS OF
THE TWENTY-FIFTH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

1   Dr. Belavich states that four SHU suicides "occurred from 2009 through 2012." *Id.* at

2   4:26-28.   According to my review of information provided by Defendants on their secure

3   FTP site, all four of those suicides occurred in 2011 through 2012;  Dr. Belavich' s

4   statement thus misleads as to the current magnitude of the problem.  And while

5   Dr. Belavich claims that no suicides occurred in PSUs in 2012, *see id.* at 4:28, in fact,

6   Prisoner 1 discussed in Paragraph 6.a, *supra*, was housed in a PSU cell at the time of his

7   death.

8          14.    Dr. Belavich also discusses the status of Defendants' August 10, 2010

9   suicide plan initiatives.  He states that the mental health program has developed and

10  implemented a mentoring program to improve clinical competency in the administration of

11  suicide risk evaluations.  Belavich Decl. at 3:20-22.  There is evidence that the

12  "implementation" is incomplete.  In a SPR-FIT Meeting held in CDCR Headquarters on

13  June 18, 2012, the proctor-mentor program was discussed.  *See* Ex. D.  at 3, item e.  In the

14  background section, it was noted that a specific clinician had been working on

15  implementing the program, but that she "has moved on to new tasks and therefore

16  someone is going to have to take over the Proctor-mentor program."  *Id.*  The action item

17  for the proctor-mentor program was:  "None."  *Id.*  There have also been recent 2012

18  suicides where the failure to provide an appropriate suicide risk evaluation was identified

19  as a problem and the QIP indicates that the Proctor-Mentor Program at the prison had

20  either not been implemented or not fully implemented.  *See*, *e.g*., June 7, 2012  MCSP

21  suicide, discussed at paragraph 6.j *supra,* with QIP regarding inadequate SRE, with

22  recommendation that Chief of Mental Health facilitate the development of the Proctor-

23  Mentor Program and develop a "draft LOP," which was later submitted as part of the QIP

24  with a date stamp of October 201;  *see*, *also,* August 12, 2012  SVSP suicide, discussed at

25  paragraph 6.b *supra*, with QIP regarding inadequate SRE, directing prison to develop a

26  Proctor-Mentor Program at SVSP, suicide reviewer "[a]lso noted during this review, as in

27  others at other facilities, … the poor inter-rater reliability of the SRE."

28

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' MOTION TO STRIKE OR MODIFY PORTIONS OF
THE TWENTY-FIFTH ROUND MONITORING REPORT OF THE SPECIAL MASTER (Fed. R. Civ. P. 53)

15.    During the December 14, 2012 meeting with Defendants, described in paragraph 8 *supra*, the Division of Adult Institutions presented on ASU issues, including on the percentages of mentally ill prisoners housed in the ASUs and reasons why they were housed there.  No strategies were offered for reducing the high percentage of mentally ill prisoners housed in ASUs for safety concerns.  Defendants also reported at that meeting that they have not yet implemented the High Risk Patient Protocol, a key component of their August 2010 suicide plan for monitoring prisoners at high risk of suicide.

16.    Attached hereto as **Exhibit K** is a true and correct copy of Mental Health Staffing Ratio Budget Change Proposal, FY 2010-2011.

17.    Attached hereto as **Exhibit L** is a true and correct copy of Revised Program Guide page 12-10-4, titled "SPR FIT Membership."  Attached hereto as **Exhibit L-1** is a true and correct copy of Revised Program Guide pages 12-4-1 through 12-4-9, titled "Enhanced Outpatient Program."

18.    Attached hereto as **Exhibit M** is a true and correct copy of a transcript excerpt from Dr. Packer's testimony in the trial before the three-judge *Coleman*/*Plata* Court.

19.    Attached hereto as **Exhibit N** is a true and correct copy of an excerpt of the Deposition of Shama Chaiken at 41:1-8; 43:19-44:19, Aug. 29, 2008 (Designations), Docket 3444-4.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 11th day of February, 2013.


*/s/ Jane E. Kahn*
Jane E. Kahn

# Exhibit A

# FOR SUBMITTAL TO THE *COLEMAN* SPECIAL MASTER

## DEFENDANTS' *AMENDED* AUGUST 25, 2010 UPDATED REPORT ON ACTIVITIES TAKEN FOLLOWING THE COURT'S APRIL 14, 2010 ORDER

1

| ACRONYM LIST | |
|---|---|
| **Term** | **Definition** |
| **AMBU** | Ambu Bag |
| **APP** | Acute Psychiatric Program |
| **ASH** | Atascadero State Hospital |
| **ASU** | Administrative Segregation Unit |
| **B-SHAR** | Basic Self Harm Review |
| **CCAT** | Clinical Case Assessment Team |
| **CCCMS** | Correctional Clinical Case Management System |
| **CCM** | Clinical Case Manager |
| **CDCR** | California Department of Corrections and Rehabilitation |
| **CMO** | Chief Medical Officer |
| **C-SHAR** | Comprehensive Self Harm Review |
| **CIW** | California Institution for Women |
| **CMC** | California Men's Colony |
| **CPHCS** | California Prison Health Care Services |
| **CPR** | Cardiopulmonary Resuscitation |
| **CSW** | Clinical Social Worker |
| **CTC** | Correctional Treatment Center |
| **DAI** | Division of Adult Institutions |
| **DCHCS** | Division of Correctional Health Care Services |
| **DDPS** | Distributed Data Processing System |
| **DMH** | Department of Mental Health |
| **DNC** | Death Notification Coordinator |
| **DOM** | Department Operations Manual |
| **DSM** | Diagnostic and Statistical Manual |

| ACRONYM LIST | |
|---|---|
| **Term** | **Definition** |
| EOP | Enhanced Outpatient Program |
| ERDR | Emergency Response and Death Review Committee |
| GACH | General Acute Care Hospital |
| GP | General Population |
| HCM | Health Care Manager |
| HCPOP | Health Care Placement Oversight Program |
| H&P | History and Physical |
| HQ | Headquarters |
| ICF | Intermediate Care Facility |
| ICC | Institutional Classification Committee |
| IDTT | Interdisciplinary Treatment Team |
| IST | In-Service Training |
| LOP | Local Operating Procedure |
| LOC | Level of Care |
| LOS | Length of Stay |
| LVN | Licensed Vocational Nurse |
| MAR | Medication Administration Record |
| MH | Mental Health |
| MHCB | Mental Health Crisis Bed |
| MHP | Mental Health Program |
| MHSDS | Mental Health Services Delivery System |
| MHSR | Mental Health Suicide Reviewer |
| MHTS | Mental Health Tracking System |
| MOD | Medical Officer of the Day |
| OHU | Outpatient Housing Unit |

| ACRONYM LIST | |
|---|---|
| **Term** | **Definition** |
| OIA | Office of Internal Affairs |
| OLA | Office of Legal Affairs |
| PBSP | Pelican Bay State Prison |
| PC | Primary Clinician |
| POC | Physician or Psychiatrist on Call |
| PPEC | Professional Practice Executive Committee |
| PSH | Patton State Hospital |
| PSU | Psychiatric Services Unit |
| PT | Psychiatric Technician |
| QIP | Quality Improvement Plan |
| QM | Quality Management |
| QMC | Quality Management Committee |
| RC | Reception Center |
| RN | Registered Nurse |
| RVR | Rules Violation Report |
| SCR | Suicide Case Review |
| SHU | Security Housing Unit |
| SNF | Skilled Nursing Facility |
| SRAC | Suicide Risk Assessment Checklist |
| SRE | Suicide Risk Evaluation |
| SPR FIT | Suicide Prevention and Response Focused Improvement Team |
| TB | Tuberculosis |
| TTA | Triage and Treatment Area |
| UHR | Unit Health Record |

# I.

## INTRODUCTION

On April 14, 2010, the Court ordered that Defendants, over the next one hundred and twenty days and under the guidance of the *Coleman* Special Master, review all suicide prevention policies, practices, and processes and the implementation of those policies, practices, and processes. The Court further ordered that Defendants, as part of this review, identify any need to modify its suicide policies, practices, and processes and the implementation thereof as may be required to address inmate suicides. Additionally, the Court ordered that the California Department of Mental Health (DMH) meet and confer with the Special Master concerning production of information essential to the Special Master's suicide review process and develop, if necessary, appropriate policies and procedures for such production.

This Report, along with the attached Exhibits 1 to 6, responds to the Court's April 14, 2010 order. The Report is divided into four parts: First, the Report discusses the process that the California Department of Corrections and Rehabilitation (CDCR) followed to review all suicide policies, practices, and processes, and the implementation of those policies, practices, and processes. Additionally, this section of the Report describes the process put in place by CDCR to share information essential to the Special Master's suicide review process. Furthermore, CDCR and DMH have collaborated to develop a SharePoint Site that, when available, can be used to facilitate collaboration, implement business processes, and supply information concerning an inmate-patient's mental health care.

Second, this Report describes the process that CDCR undertook to review and assess the need to modify the Defendants' October 2, 2006 Plan to Address Suicides in Administrative Segregation Units and/or how CDCR is implementing the Plan. Additionally, this Section addresses concerns that CDCR identified with the Plan and discusses how it is or is planning to address those concerns. Third, the Report identifies specific modifications to CDCR's suicide prevention policies and practices in the Mental Health Services Delivery System Program Guide (2009 Revision) (Program Guide) and the implementation thereof as may be required to address inmate suicides.

Last, the Report summarizes three new strategies that CDCR has identified to address inmate suicides: (1) Change of Conditions in Administrative Segregation Units; (2) High Risk Inmate-Patient Management; and (3) Clinical Competency in Performing Suicide Risk Evaluations. Though CDCR has diligently considered these three new strategies, they remain in their infancy. Additionally, because the strategies are dependent upon, among other things, staff availability and financing, they will be reexamined, and possibly revised, once they are implemented.

# II.

## REVIEW OF SUICIDE POLICIES, PRACTICES, AND PROCESSES, AND THE IMPLEMENTATION OF THOSE POLICIES, PRACTICES, AND PROCESSES

Defendants' review of the suicide policies, practices, and processes, and the implementation of those policies, practices, and processes involved four components, as follows:

5

A.    **Review of Mental Health Services Delivery System Program Guide (2009 Revision).**

In January 2010, CDCR Department of Correctional Health Care Services (DCHCS) staff members in the Suicide Prevention and Response Program evaluated how CDCR was implementing the suicide review and reporting process as set forth in the Program Guide, Chapter 10. Suicide Prevention and Response. In May 2010, and in response to the Court's April 14, 2010 order, CDCR's Suicide Prevention and Response Focused Improvement Team (SPR FIT) committee convened to review those policies, practices, and processes that remained in the Program Guide and that relate to inmate suicides.

Thereafter, representatives from CDCR and DMH mental health and the CDCR Division of Adult Institutions (DAI) worked with the Special Master and his experts (hereafter referred to as *Coleman* monitors) as well as representatives from the *Plata* Receiver's Office to review all of the sections in the Program Guide that address suicide prevention policies and practices and suicide review and reporting processes. This review included identification of concerns, a description of the nature of those concerns; that is, whether or not a change in policy or implementation was identified and suggested, the anticipated outcome of the suggested change, and the anticipated time frame for implementing the recommendation. Exhibit 1 compiles all the sections in the Program Guide that are part of this review. Exhibit 2 summarizes this review. Additionally, this Report addresses the proposed changes below.

B.    **Review of CDCR Suicide Prevention and Response Program Actions Taken Between 2007 and 2010.**

The SPR FIT committee reviewed all suicide prevention and response program actions taken between 2007 and 2010. This review was undertaken to ascertain which, if any, of the issues raised by Dr. Ray Patterson in his "Report on Suicides Completed in the California Department of Corrections and Rehabilitation in the Calendar Year 2007," have since been resolved. Attached as Exhibit 3 is a list of those actions, including Policy Memoranda, SPR FIT actions, Training, Suicide Review Revisions, and DMH and CDCR Collaboration. For example, in March 2010, CDCR revised Form 7447. This form was previously identified as the Suicide Risk Assessment Checklist (SRAC). It is now known as Form 7447, Suicide Risk Evaluation (SRE). (Ex. 4.) The committee also reviewed agendas for the Suicide Prevention Videoconferences that occurred between 2007 and 2010 and that detailed monthly educational topics for viewing during statewide SPR FIT meetings. Exhibit 5 is a list of the agendas for those videoconferences. The agendas illustrate CDCR's attention to issues and its efforts to collaborate with the field to remedy deficiencies.

C.    **CDCR Work-Group.**

On May 18, 2010, SPR FIT organized a Work-Group consisting of three institution-based Chiefs of Mental Health and DCHCS staff members in the Suicide Prevention and Response Program (Chiefs Work-Group). On May 19, 2010, the Chiefs Work-Group requested that the Chiefs of Mental Health of all 33 CDCR institutions review CDCR's policies, practices, and processes related to Suicide Prevention and Response. Between May 20 and June 9, 2010, the input

received by the Chiefs Work-Group was collated and organized by topic area. Best practices were reviewed state-wide in order to determine which strategies were most effective in addressing suicide. CDCR, consequent to the activities and collaborative policy/procedure/implementation review processes outlined above, identified several general topic areas and corresponding suggestions for potential intervention to address inmate suicides. After consulting with the *Coleman* monitors on these general topic areas, the Chiefs Work-Group recommended that CDCR implement the following three new strategies to address inmate suicides:

- Change of Conditions in Administrative Segregation Units;

- High Risk Inmate-Patient Management; and

- Clinical Competency in the Administration of the Suicide Risk Evaluation.

This Report addresses these strategies in detail below.

Defendants discussed other areas of import with the *Coleman* monitors during the May – July 2010 meetings. The DCHCS SPR FIT, as well as the Chief's Work-Group, will discuss these topic areas, and address them for possible action:

o Continue training for clinicians regarding transference and counter-transference issues:
   1. Dealing with difficult patients;
   2. Maintaining professional boundaries and improving distinctions between mental health functions in a correctional setting and correctional functions in a mental health setting; and
   3. Improving the ability of clinicians to set priorities appropriately and offer inmate-patients care that recognizes the complexities of working in a prison setting.

o Promote a "culture of the whole" that includes custody, mental health, medical and other stakeholders in a prison setting:
   1. Improve the working relationship between custody and mental health – embrace custody colleagues as partners in treatment.

o Evaluate how local mental health programs can address the mental well-being of non-MHSDS inmates using a public health/education paradigm to promote wellness (groups, non-traditional approaches, etc.).

o Improve communication between the California Prison Health Care Services (CPHCS) and DCHCS regarding chronic and serious medical issues, including end-of-life issues.

o Review policy of using suicide-prevention smocks for inmates in a Mental Health Crisis Bed (MHCB) unit.

o Explore general treatment issues such as the "continuity of care teams" utilized by San Quentin State Prison, and use of behavioral incentives in segregated housing as is done in the state of New York.

o   Improve treatment plans for inmates being released from a MHCB.

o   Ensure appropriate follow-up on referrals from all sources: medical, custody, etc.

**D.      DMH/CDCR Plan to Share Documents.**

CDCR and DMH are developing a SharePoint Site, which they expect to be fully operational within the next few months. Microsoft SharePoint is a software platform for collaboration and web publishing that combines a number of capabilities under a single service. SharePoint can be used to facilitate collaboration, implement business processes, and supply information concerning an inmate's mental health care. It is expected that when SharePoint is fully operational, DMH and CDCR HQs, DMH programs, and CDCR institutions will have access to, among other things, DMH referrals, DMH discharges, waitlists, and CDCR high risk lists.

**III.**

**DEFENDANTS' OCTOBER 2, 2006 PLAN TO ADDRESS SUICIDES IN ADMINISTRATIVE SEGREGATION UNITS**

On June 8, 2006, the Court directed Defendants to develop a plan for dealing with the escalating percentage of suicides occurring in Administrative Segregation Units (ASU)—the *Coleman* Special Master's Report on Suicides Completed in CDCR in the Calendar Year 2004 reported that an escalating percentage of suicides were occurring in ASUs; that is, 69% of the suicides in Calendar Year 2004 occurred in an ASU. Defendants submitted their Plan to Address Suicides in ASU (2006 ASU Plan) on October 2, 2006.

In response to the Court's April 14, 2010 order, CDCR reviewed the 2006 ASU Plan to assess the need to modify the Plan and/or modify how it is implementing the Plan. Additionally in order to assess the Plan's impact on the rate of suicides in ASUs, CDCR reviewed the Quality Improvement Plans (QIPs) for all 36 suicides from 2008, all 25 suicides from 2009, and 15 suicides that occurred in the first 6 months of 2010. This review revealed a reduction in the percentage of suicides occurring in ASU: 39% in 2008, 40% in 2009, and 40% in 2010, for an average percentage rate of 40%. Nonetheless, CDCR identified the current rate of suicides in ASUs as an ongoing concern for two primary reasons.

First, while a review of the 2006 ASU Plan revealed that CDCR had successfully implemented numerous parts of the Plan, it also revealed that other proposals have only been partially implemented and are the subject of ongoing auditing or refinement.

The parts that have been successfully implemented are the following:

•   Double-celling of inmates in ASU when possible: This programmatic part has been a longstanding feature of ASU's statewide. DAI reviews all new ASU inmates to determine if they are suitable for double-cell placement.

- Construction of New Small Management Yards: CDCR completed this project on June 20, 2009. This project was envisioned prior to the onset of the 2006 plan.

- "Bad News" Screening: CDCR successfully implemented this proposal by adding questions to the CDCR Form 7277 Initial Health Screening. CDCR administers this questionnaire to all inmates passing through the Receiving & Release process.

- Retrofitting of ASU Intake Cells: CDCR completed this project as of January 31, 2009.

- Additional emergency response training including CPR: CDCR completed this training program in the Fall of 2007 and continues to hold drills on a monthly basis.

- Daily coordination meetings in ASU: These meetings occur each morning throughout the CDCR system in order to identify inmates in need of services and new arrivals in ASU.

- Screening prior to placement in ASU: CDCR coordinated implementation of this procedure with the CPHCS Nursing administration. Training was provided to all nursing in the field by videoconference in July 2007.

By comparison, those parts that have been partially implemented and remain subject to ongoing auditing and refinement are as follows:

- Explore the feasibility of providing entertainment devices in ASU: The Department conducted the feasibility study and found that only nine institutions could not provide power for entertainment devices.

- Upon placement into ASU, inmates are housed in retrofitted intake cells for 72 hours: Population pressures have adversely impacted full implementation of this provision. After completion of initial construction, reviews of procedure and practice have revealed that additional modifications may be necessary to fully implement this provision.

- Custody welfare checks required every 30 minutes during the first 21 days in ASU: This provision has been successfully implemented throughout CDCR institutions and CDCR is continuing to refine its audit process.

- Priority for out-of-cell time for new arrivals in ASU: CDCR directed the institutions to implement this procedure, but fully implementing it has been difficult due to population pressures creating difficulty auditing the out-of-cell time for new arrivals.

- Reducing length of stay in ASU: Local audit teams have succeeded in reducing the length of stay for many inmates. At all CDCR institutions, upon an inmate's placement in the ASU, the inmate is tracked in the institution's local ASU tracking

system. The institution then continuously tracks the inmate to determine whether or not the inmate should be considered for release from the ASU or referred to an alternative program/institution. For inmates at the Enhanced Outpatient Program level of care, additional levels of review occur when the inmate has been in the ASU for 90 days. DAI initiated ASU Strike Teams in June 2010 for the dual purpose of evaluating institution ASU bed utilization and providing the institutions with assistance in identifying cases requiring additional consideration for release from an ASU. The Strike Teams performed on-site reviews of ASU Bed Utilization using an ASU Bed Utilization Audit Tool. Additionally, the Teams provided direction and assistance to the institutions related to expedited handling of ASU cases that were appropriate for early release from ASU. The Strike Teams are currently completing their final reports on the reviews, and will develop modifications, if any, to departmental practice or policy based on those reports. (See modification to Program Guide, page 12-7-9, discussion below.)

- Auditing of ASU screening refusals: CDCR has directed its institutions to comply with this requirement and many have instituted local auditing procedures and processes to deal with those inmates who refuse the screening requests.

- Minimum stay of 60 days at EOP level of care for inmates transferred to ASU Hubs: CDCR directed its institutions to comply with this provision but thorough audits of compliance have not been completed.

- Transfer of Mental Health Tracking System (MHTS) Inmate Profiles when inmates are transferred between institutions: CDCR implemented this procedure by memorandum but compliance has not been consistent throughout the state. The roll-out of the new MHTS.net tracking system to all institutions by the end of 2010 will obviate the need for this paper-based solution to suicide history tracking because all institutions will have networked access to tracking information in real-time.

- Confidential interview locations for post-placement screenings: New construction and/or re-allocation of space for mental health services in ASU has been ongoing. Some local solutions have included construction of booths. Exact results of this initiative are not available at this time.

With respect to these procedures, many are subject to ongoing local auditing and may not have system wide data available at this time. The introduction of the fully networked MHTS.net system will allow real-time auditing of mental health processes.

The second reason that CDCR identified the current rate of suicides in ASU units as an ongoing concern derives from its review of the QIPs for the suicides that occurred between 2008 and the first six months of 2010. Specifically, CDCR's review revealed a need to address a failure to properly complete or document the 30-minute custody checks. Additionally, its review revealed various deficiencies in emergency response procedures. In an effort to address these findings, CDCR's Office of Legal Affairs (OLA), DAI, and Mental Health staff formed a multi-disciplinary work group focused on improving communication and collaborative efforts between custody and mental health. The first two meetings for this work group occurred on July 22, 2010

10

and August 4, 2010, at which time the group discussed, among other things, improving the systems for monitoring an institution's compliance with Program Guide requirements and communication between custody and mental health staff.

With respect to improving CDCR monitoring, CDCR intends to establish a regular Quality Management (QM) process in order to centralize policy making between divisions. This process would reduce the need for other processes by creating one centralized strategy for CDCR to manage interdivisional issues impacting the mental health population at CDCR's institutions. DAI and DCHCS propose to create a new reporting process from institutions to HQs whereby cross-division policy issues can be brought to a small group of policy makers who can respond with uniform and consistent decisions, providing clear policy direction to the field. DAI and DCHCS propose to require that the institutions report to HQs those issues that impact the operation of both divisions. Currently, DAI and DCHCS divisions are developing this process and expect to provide an update to the *Coleman* monitors by mid-November 2010.

Finally, the DCHCS Mental Health Program and the CPHCS continue to collaborate to ensure appropriate Emergency Response.


## IV.

## IDENTIFICATION OF THE MODIFICATIONS TO THE SUICIDE POLICIES, PRACTICES, AND PROCESSES IN THE PROGRAM GUIDE AND THE IMPLEMENTATION THEREOF AS MAY BE REQUIRED TO ADDRESS INMATE SUICIDES

Defendants, in consultation with the *Coleman* monitors as well as representatives from the *Plata* Receiver's office, reviewed the policies, practices, and processes in the Program Guide, Chapters 1–10, that relate to inmate suicides. Exhibit 1 represents a compilation of all the policies, practices, and processes in the Program Guide that relate to inmate suicides. (Ex. 1 pp. 1–99.) For each policy, practice, and process that makes up Exhibit 1, Defendants, in consultation with representatives from the *Plata* Receiver's office, have indicated whether there is a proposed modification to policy or to implementation and noted any recommended modification. To the extent that there is a modification to policy, that modification is reflected by track changes in the body of the text. (*See also* Ex. 2, Summary of Proposed Changes to MHSDS Program Guide.)

## A.    Program Guide, Chapters 1–9:

Set forth below are those sections in Chapters 1–9 that Defendants have identified as relating to inmate suicides. This Report identifies, by Chapter, each section and indicates whether there is a proposed modification to policy or an identified need to change how CDCR, DMH, and/or the Receiver's Office implements that policy.

11

1.    **Chapter 1. Program Guide Overview:**

Two sections in Chapter 1 relate to inmate suicides. The first is Section C. Referrals to Mental Health, page 12-1-4 (Ex. 1 pp. 1–2). The text in this section was modified to remove the term "qualified" from "qualified mental health clinician" and to add the terms "psychiatric nurse practitioner" to the definition of a "mental health clinician." (Ex. 1 p. 1.) The second section is Section K. Mental Health Tracking System, page 12-1-14 (Ex. 1 p. 3). There are no modifications to this Section, but in December 2009, CDCR rolled out the MHTS.net tracking system as a method to transmit relevant data between institutions and provide clinicians with an increased ability to provide continuity of care.

2.    **Chapter 2. Reception Center Mental Health Assessment:**

One section in Chapter 2 relates to inmate suicides: Section A. Introduction, page 12-2-1 (Ex. 1 p. 4). There are no modifications to this section or to its implementation.

3.    **Chapter 3. Correctional Clinical Case Management System:**

Three sections in Chapter 3 relate to inmate suicides. The first is Section D. Treatment and Assessment Services, Clinical Intake Assessment, pages 12-3-7 to 12-3-8 (Ex. 1 pp. 5–6). There are no modifications to this section or to its implementation. The second is Section D. Treatment and Assessment Services, Transfer and Clinical Discharge, page 12-3-13, paragraphs 7 and 9 (Ex. 1 pp. 7–8). There are no modifications to this section, but CDCR and DMH have identified a need to modify how to implement paragraph 9 relating to transfer and clinical discharge from a MHCB. (Ex. 1 p. 8.) CDCR and DMH have formed a collaborative work group to improve prioritization of referrals from MHCBs to DMH level of care. (*Id; see also* Ex. 3, discussion on DMH and CDCR collaboration.) There are no modifications to the third section—Section E. Inmate-Patient Monitoring and Clinical Case Review, Monitoring Contacts, page 12-3-15 (Ex. 1 p. 9)—or to the implementation of that section.

4.    **Chapter 4. Enhanced Outpatient Program:**

There are no sections in Chapter 4 that address inmate suicides.

5.    **Chapter 5. Mental Health Crisis Bed:**

There are nine sections in Chapter 5 that relate to inmate suicides, as follows:

- Section E. Admission, Pre-admission Screening, page 12-5-7 (Ex. 1 pp. 10–12):

   The text has been modified to reflect the new Suicide Risk Evaluation (SRE) form and specify that only "qualified" mental health clinicians (psychiatrist, psychologist, Clinical Social Worker, or psychiatric nurse practitioner) shall administer the SRE. Standardized suicide risk evaluation training will be provided to mental health staff at each institution. Clinicians shall be qualified to perform suicide risk evaluations only after completing the training and proctoring. (Ex. 1 pp. 10–11.)

12

- Section E. Admission, Admission and Transfer Log, pages 12-5-8 to 12-5-9 (Ex. 1. pp. 13–14):

This text was modified to reflect the new SRE form. Also, the text was modified to state that the MHCB pre-admission SRE is not required if the inmate is admitted to the MHCB because a SRE was done at the time of the referral to the MHCB. The SRE form will have been completed by the referring clinician and then utilized by the MHCB admitting clinician to determine level of suicide risk for treatment planning purposes. There are no modifications to implementing this Section. (Ex. 1 pp. 13–14.)

- Section E. Admission, Procedure, pages 12-5-9 to 12-5-10 (Ex. 1 pp. 15–16): This text was modified to reflect the new SRE form and to state that the MHCB pre-admission SRE is not required if the inmate is admitted to the MHCB; there are no modifications to implementing this section.

- Section F. Assessment and Treatment Services, Intake Assessment, page 12-5-11 (Ex. 1 p. 16): There are no modifications to this Section or to its implementation.

- Section F. Assessment and Treatment Services, Interdisciplinary Treatment Team and Individualized Treatment Planning, pages 12-5-11 to 12-5-13 (Ex. 1 pp. 17–18): There are no modifications to this Section or to its implementation.

- Section I. Discharge, Procedure, paragraph e, page 12-5-28 (Ex. 1 p. 19): There are no modifications to this Section or to its implementation.

- Section I. Discharge, Procedure, paragraph i, page 12-5-29 (Ex. 1 pp. 20–21): There are no modifications to this Section or to its implementation.

- Section J. Mental Health Patients in Outpatient Housing Units, pages 12-5-30 to 12-5-31 (Ex. 1 pp. 22–24): This text was modified to reflect use of the new SRE form. Additionally, Defendants indicate that they will notify the *Coleman* monitors within forty-five days of any additional proposed changes.

- Section J. Mental Health Patients in Outpatient Housing Units, Mental Health Conditions Appropriate for Placement into an OHU, page 12-5-32 (Ex. 1 p. 25): There are no modifications to this Section or to its implementation.

6.    **Chapter 6. Department of Mental Health Inpatient Program:**

There are five sections in Chapter 6 that relate to inmate suicides: 1) Section A. Introduction, page 12-6-1 (Ex 1 p. 25); 2) Section B. Overall Treatment Criteria, Inpatient Placement General Requirements, page 12-6-2 (Ex. 1 p. 26); 3) Section C. DMH Acute Psychiatric Program (APP), Admission Criteria, pages 12-6-2 to 12-6-3 (Ex. 1 p. 27); 4) Section C. DMH Acute Psychiatric Program (APP), Referral Procedure, page 12-6-4 (Ex. 1 p. 28); and 5) DMH Intermediate Care Facilities: ASH, CSH, PSH, SVPP, and VPP, Referral Procedure, pages 12-6-9 to 12-6-10 (Ex. 1 pp. 29–30). The only modification to Chapter 6 is to Section C. DMH Acute Psychiatric Program (APP), Referral Procedure; that is, to modify the text to reflect the use of the new SRE form. There are no modifications to implementing these Sections.

13

7.    **Chapter 7.  Administrative Segregation:**

Four sections in Chapter 7 relate to inmate suicides.  The first is Section D. Treatment Population, pages 12-7-2 to 12-7-3 (Ex. 1 pp. 31–32).  The text of this Section was revised to more accurately reflect the process of transferring an inmate's Medication Administration Record (MAR).  There are no modifications to implementing this Section.

The second is Section E. Clinical Rounds and Screening, Clinical rounds, pages 12-7-5 to 12-7-6 (Ex. 1 pp. 33–35).  The text in this section was revised to reflect a change from referring to a "Licensed Psychiatric Technician" to a "Psychiatric Technician."  The text in the third Section— F. Clinical Evaluation, pages 12-7-6 to 12-7-7—was revised to reflect the use of the new SRE form.  (Ex. 1 pp. 36–37).  There are no modifications to implementing either of these Sections.

The last section is Section H. Enhanced Outpatient Program Care, page 12-7-9 (Ex. 1 pp. 38–39).  There are no modifications to this Section, but CDCR has identified a need to modify how it implements the requirements in paragraph 5 that relate to an inmate housed in an ASU for more than 90 days.  (*See* discussion at Section III above.)

8.    **Chapter 8.  Security Housing Unit:**

One section in Chapter 8 relates to inmate suicides:  Section F. Sources for Referral For Mental Health Services, pages 12-8-5 to 12-8-7 (Ex. 1 pp. 40–42).  The only modification to this Section is to reflect a change from referring to a "Licensed Psychiatric Technician" to a "Psychiatric Technician."  (Ex. 1 pp. 40–41.)

9.    **Chapter 9.  Psychiatric Services Unit:**

Like with Chapter 8, only one section in Chapter 9 relates to inmate suicides:  Section F. Clinical Services, Intake Assessment, pages 12-9-3 to 12-9-4 (Ex. 1 p. 43).  There are no modifications to this Section or to how it is implemented.

B.    **Program Guide, Chapter 10:**

Set forth below are all the Sections from Chapter 10.  Here, with the exception of Section A. Introduction, this Report identifies, by Section, each subject (by page number) within that Section and indicates whether there is a proposed modification to the policy or an identified need to change how CDCR, DMH, and/or the *Plata* Receiver's Office implements that policy.

1.    **Section A.  Introduction (Pages 12-10-1 to 12-2-2).**

The text "Suicide Risk Assessment" was revised to state, "Suicide Risk Evaluation."  This will require that the institutions update their Local Operating Procedures (LOPs).  (Ex. 1. pp. 44–45.)

2.    **Section B.  Suicide Prevention and Response Project.**

    a.    Pages 12-10-2 to 12-10-4 (sets forth the purpose, policy, and procedure for the Suicide Prevention and Response Project) (Ex. 1 pp. 46–49):

14

The text has been modified as follows: the terms, "The Coordinator shall be a licensed physician, psychologist, social work, nurse practitioner, or registered nurse (RN)," were revised to state "The Coordinator shall be a licensed physician, psychologist, social worker, or member of nursing staff" and the terms, "suicide gestures," were removed. (Ex. 1 p. 46.) CDCR identified a need to modify how to implement this section and improve communication between HQs and the institutions regarding the policies and suicide prevention strategies—the DCHCS SPR FIT initiated quarterly meetings of institutional SPR FIT Coordinators, which commenced in February 2010.

        b.      Pages 12-10-5 to 12-10-6 (identifies the SPR FIT Membership, frequency of meetings, attendance requirements, and Management Reports) (Ex. 1 pp. 50–53):

The text has been modified as follows: added "or designee" to the Chief Psychiatrist and Chief Psychologist members of the DCHCS; added Custody Representatives (**Associate Warden for Heath Care or Designee and ASU Captain or designee**) to the Local SPR FIT membership; deleted "Keyhea Coordinator" for optional membership in the Local SPR FIT; and added "or designee" to "Classification and Parole Representative." Additionally, the text was revised from, "A quorum consists of the above listed mandatory members," to state, "A quorum consists of the majority of the mandatory members." (Ex. 1 pp. 50–51). These changes will require that the institutions update their LOPs.

      **3**      **Section C. Training for Staff.**

        a.      Pages 12-10-6 to 12-10-7 (identifies training components for health care and custodial employees) (Ex. 1 pp. 53–55).

The text has been modified to omit the definition of "Suicide gestures" and to change the terms "Suicide risk assessment" to "Suicide risk evaluation" (Ex. 1 pp. 53–54). Again, these changes will require that the institutions update their LOPs.

      **4.**      **Section D. Clinical Care Services.**

        a.      Page 12-10-7 (states that for any inmate who by which a CDCR employee becomes aware of that inmate's current suicidal ideation, threats, self-injurious behaviors or suicide attempt, shall be placed under direct observation until a clinician trained to perform a suicide risk assessment conducts a face-to-face evaluation) (Ex. 1 pp. 56–57).

The text has been modified to omit the term "gestures" and to replace the terms "suicide risk assessment" with "suicide risk evaluation." Additionally, the text was revised to state that only a qualified clinician (psychiatrist, psychologist, clinical social worker, or psychiatric nurse practitioner) can perform a SRE. Additionally, the terms "direct observation" have been changed to "continuous direct visual observation." CDCR and the *Plata* Receiver's office identified a need to modify how to implement this Section relating to health care staff's role in CDCR's suicide prevention program. CDCR intends to revise its training program to clarify the suicide prevention training appropriate for mental health and health care staff. (Ex. 1 p. 57.)

        b.      Pages 12-10-7 to 12-10-11 (discusses the assessment for suicide risk and training on performing a suicide risk assessment and completing the form) (Ex. 1 pp. 58–63):

The text of this Section has been modified to reflect the re-design of the new SRE form and to conform to CDCR's program to improve clinical competency in the administration of the SRE (see discussion below). Consistent with CDCR's new program, the text reflects that clinicians shall be qualified to perform a suicide risk evaluation only after completing the training and proctoring. (Ex. 1 pp. 58–63.) Additionally, the text has been modified to clarify the role of health care staff in CDCR's suicide prevention program. To implement these changes, CDCR mental health and health care staff are collaborating to develop training commensurate with the roles of health care staff in evaluating suicide risk. (Ex. 1 p. 63.)

   c.  Pages 12-10-11 to 12-10-12 (peer consultation) (Ex. 1 pp. 64–65):

There are no modifications to this section, but CDCR did identify a need to modify how to implement it. Specifically, CDCR has determined that an increase in the practice of consulting experienced peers when evaluating an inmate for suicide risk may be an important factor in addressing inmate suicides. As such, CDCR is implementing a new program – High Risk Inmate-Patient Management (addressed below) to address this issue. (Ex. 1 p. 65.)

   d.  Pages 12-10-12 to 12-10-14 (interventions for suicidal ideation, threats, and attempts) (Ex. 1 pp. 66–69):

This text has been modified to clarify that only a "qualified clinician" can perform SREs, and to include psychiatric nurse practitioners in the definition of a "qualified clinician." Additionally, it has been modified to reflect the need for ICD coding and utilization of DSM coding. (Ex. 1 pp. 66–67.) This will require that the institutions update their LOPs.

   e.  Pages 12-10-15 to 12-10-16 (Suicide Precaution and Suicide Watch) (Ex. 1 pp. 70–72):

The section was modified to revise the terms "one book" under materials allowed to "one item of reading material." (Ex. 1 p. 71.) This will require that the institutions update their LOPs.

   f.  Pages 12-10-16 to 12-10-19 (Suicide Watch) (Ex. 1 pp. 73–76):

The text concerning the job classifications for Suicide Watch Posts was revised to more accurately reflect appropriate health care staff. The guidelines for "Behavior Checks" now states: **"Continuous observation and 15 minute nursing checks."** The changes also include deleting three bullets pertaining to emergency response procedures, which are outlined in separate documents. (Ex. 1 pp. 73–74.) This will require that the institutions update their LOPs.

   g.  Pages 12-10-19 to 12-10-21 (Discharge or return re: MHCB/OHU) (Ex. 1 pp. 77–79):

There are no modifications to this Section or to its implementation.

   h.  Pages 12-10-21 to 12-10-22 (Response to Self-Injurious Behaviors and Suicide Attempts) (Ex. 1 pp. 80–81):

There are no modifications to this Section or to its implementation.

      i.       Pages 12-10-22 to 12-10-23 (Emergency responses) (Ex. 1 pp. 82–83):

There are no modifications to this Section or to its implementation.

    **5.**       **Section E. Suicide Reporting.**

      a.       Pages 12-10-23 to 12-10-24 (Ex. 1 pp. 84–85):

There are no modifications to these Sections or to how they are implemented.

    **6.**       **Section F. Suicide Death Review.**

There are no modifications to the text in Section F, pages 12-10-24 to 12-10-28 (Ex. 1 pp. 85–97). CDCR has, however, identified a need to modify how CDCR implements various parts of this Section, as follows:

      a.       Page 12-10-25 (completing the preliminary Suicide Report within 30 calendar days of the inmate's suicide) (Ex. 1 p. 87):

CDCR identified a need to modify how to implement this Section in two ways: 1) improve the time to complete the reports; and 2) revise the reports. As a consequence of the Suicide Prevention and Response Program staff's January 2010 evaluation of the suicide review and reporting process, SPR FIT staff revised its process of tracking the suicide reporting process. Additionally, staff created an individualized tracking tool that CDCR sends to reviewers and institutions putting them on notice of the reporting due dates. Attached as Exhibit 6 is a copy of this tracking tool, which was disseminated in January 2010. Additionally, CDCR has put in place quarterly writing improvement workshops, which commenced on May 5, 2010.

      b.       Page 12-10-26 (cases referred to the DCHCS Professional Practice Executive Committee (PPEC) for review of individual practice of clinicians when appropriate) (Ex. 1 p. 90):

CDCR identified a need to modify how to implement this Section after determining that cases were somehow inappropriately referred directly to PPEC. CDCR finalized a process to have the Mental Health Peer Review Subcommittee screen the cases prior to formal PPEC referral.

      c.       Page 12-10-26 (Suicide Report shall be signed by Director of the CDCR DCHCS and the Director of DAI) (Ex. 1 p. 91):

CDCR identified a need to modify how to implement this Section after determining that it was not meeting the 60-day time line on a consistent basis. CDCR Mental Health and DAI met on March 9, 2010, resulting in a renewed commitment to expedite the report.

      d.       Page 12-10-26 (When investigation is required, the Office of Internal Affairs (OIA) shall forward its outcome to the DCHCS SPR FIT coordinator) (Ex. 1 p. 92):

CDCR identified a need to modify how to implement this Section after receiving irregular reports from the OIA. In order to address this, CDCR will include OIA in the e-mail sent to the

institution giving the institution a specific deadline in which to submit its Quality Improvement Plans (QIPs).

      e.     Pages 12-10-26 to 12-10-27 (setting 60-day and 90-day deadlines for submitting QIPs) (Ex. 1 pp. 93–94):

CDCR identified a need to modify how to implement this Section because the QIPs have frequently not been submitted in a timely manner, nor have they been adequately tracked by DCHCS SPR FIT. CDCR has added a statement to the cover letter sent electronically to the institution that indicates the specific due dates in order to meet the 60-day and 90-day deadlines. Additionally, it urges completion of the QIPs "as soon as possible" within the mandated deadlines.

      f.     Page 12-10-28 (requires follow-up report on implementing QIP) (Ex. 1 pp. 96–97): CDCR identified a need to follow-up QIPs in a consistent manner. On March 10, 2010, CDCR designated a staff member to track and monitor QIPs in order to ensure that institutions submit evidence of completing their QIPs.

Additionally, prior to the receipt of the April 14, 2010 Court order, CDCR had instituted several significant improvements in the suicide review process, resulting in an overall increase in meeting the Program Guide time-line requirements. The following steps were initiated in January 2010 in order to fully and in a timely manner complete suicide reports and ensure completion of Quality Improvement Plans (QIP) generated by those reports:

**Improve Report Quality:**

- Recruited, interviewed, and hired a retired annuitant for flexible availability enabling timely completion of suicide reports;
- Revised report style and content (e.g., reduce irrelevant detail, enhance summary and pertinent information) (ongoing);
- Created and provided ongoing report writing training sessions for reviewers (quarterly meetings established May 5, 2010); and
- Developed a draft audit tool in order to facilitate data gathering specific to Program Guide requirements.

**Improve Quality Improvement Plan Development:**

- Revised Suicide Case Review process to include greater collaboration with staff at the institutions, clarify questions raised in the course of suicide reviews, and to ensure the development of relevant QIPs;
- Expanded final editing of the suicide report following the case review process to include feedback from all members of the Suicide Case Review Focused Improvement Team;
- Legal consulted during development of QIPs; and
- Standardized QIP language.

**Improve Submission of Quality Improvement Plan:**

- Statement added to cover letter and electronically mailed with final report indicating deadlines for QIP submission, along with a request that QIPs be completed immediately or as soon as possible prior to the deadlines;
- Regional Chiefs included in emails and invited to all suicide case reviews; and
- Assigned duties to a QIP Coordinator for daily tracking of QIP submissions, preparing for review by committee, and consulting with institutional staff regarding submissions.

**Tracking System Update:**

- Revised tracking system in order to highlight problems with timely submission of reports; and
- Track receipt of autopsy results.

    7.    **Section G.  Mental Health Evaluation Component for a Rules Violation Report (Pages 12-10-28 to 12-10-29).**

There are no modifications to this Section, but CDCR has identified a potential need to modify how it is implemented. (Ex. 1 pp. 98–99.) Specifically, CDCR is investigating the need for additional training for both custody and mental health staff on the RVR Process. This is being addressed in the ongoing meetings between CDCR Mental Health and DAI that commenced on July 22, 2010.

**V.**

**STRATEGIES TO ADDRESS THE PROBLEM OF INMATE SUICIDES**

**A.    Change of Conditions in Administrative Segregation Units.**

The DAI/Mental Health work group is discussing an option to change conditions in ASU units to better meet the mental health needs of these inmates. Using the pilot project implemented at Pelican Bay State Prison as a model, the work group is reviewing the feasibility of implementing a similar policy on a state-wide level.

Specifically, the work group expects to complete the following tasks over the next thirty days: (1) discuss the various components of the Pilot Project in order to ensure a mutual understanding of the specific ideas being proposed; (2) discuss any additional ideas to be considered; (3) create lists of any potential foreseeable barriers, obstacles, or other difficulties in implementing a state-wide roll out of the project, as well as any specific concerns; and (4) present lists to allow the work group to collaborate on methods of overcoming each potential obstacle and still build a policy that can meet the needs and address the concerns of each discipline.

**B.        High Risk Inmate-Patient Management.**

Identified Concern:

Dr. Patterson concludes in his "Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2007," that suicide reviews continue to reflect the need for improved assessments of inmates who display symptoms of serious mental illness or past suicidal behavior, ideation, or statements.

Reason for Identification:

The identification and management of inmates presenting as high risk is critical in order to address inmate suicides. Inmates who present as high risk include those who display signs of psychiatric decompensation, unstable medical conditions, grave disability, self-injurious behavior, danger to others, frequent DMH or MHCB admissions, or who have housing/custody concerns. Those who engage in suicidal behaviors such as suicidal ideation, or who attempt suicide, fall into the general category of inmates who are at risk. Research reveals that prior suicide attempts correlate with risk of eventual successful suicide. CDCR's review of the QIPs from the suicides that occurred between 2008 and the first 6 months of 2010, support this strategy.

Proposed Solutions:

The proposal is to develop a manner of identifying, tracking, and treating inmates identified as being at high risk of suicide. Active management of the high risk subpopulation of inmates is necessary to promote suicide reduction. This active management, as part of the MHSDS, will track these inmates to ensure continuity of care between health providers (Mental Health, Medical, and others) and oversee service delivery to ensure the development of individualized treatment protocols and consistency of treatment.

Method:

    Process to Identify High Risk Inmates:

The development of such programs will begin with the HQ-based Utilization Management Team. The Utilization Management Team, currently focused on reducing the wait list of CDCR inmates needing inpatient care, is in the process of obtaining lists of multiple admits, or frequent users of mental health services. These lists will be based on data provided by DMH and by CDCR. CDCR expects to receive the lists of high-user inmates by the end of August 2010.

Once the combined list is obtained, it will be broken down into two categories:

1. Chronically mentally ill inmates at the EOP level of care and who have multiple admissions to either MHCB units or DMH. The inmates in this category tend to be prone to episodic decompensation, but at baseline, tend to be low functioning.

20

2. Inmates who suffer from chronic suicidal ideation (SI) or self-injurious behavior (SIB) and who have revolving admissions to DMH or to a MHCB unit.

The information obtained from DMH and from the CDCR MHCB units will be analyzed to identify those institutions with high users of DMH and MHCB services. The HQ Utilization Management Team will determine the timeline for the analysis of the data once the data has been obtained.

Upon review of the data, and in conjunction with input from the Chiefs of Mental Health, there will be a determination of those institutions that have the highest number of repeat users. Then, risk identification/tracking/treatment programs will be created and piloted at those institutions.

Program Creation:

In accordance with institutional resources, a high risk coordinator is designated, or a crisis management/high-risk team composed of clinicians across disciplines, is established. Whether the institution utilizes a team or an individual coordinator, for purposes of simplification, the term "high risk program" will be used.

The Referral Process:

In addition to those inmates identified on the high user list provided by the HQ-Utilization Management Team, any clinician (Case Manager, Psychiatrist, etc.) can make a referral to the high risk program. The referral form would require a brief description of the reason for referral to the high risk program.

The referral is made to the high risk program and entered into a log or tracking system. The high risk program staff (or coordinator) will perform a file review focused on identifying risk factors as well as protective factors that may contribute to the inmate's high risk status. Suicide history, methods of suicide attempts, frequency of suicide attempts, and other relevant mental health and medical conditions are among the areas focused upon in the chart review.

Then, if appropriate, the inmate will be assigned to the high risk program. If not appropriate for the high risk program, the reviewer will assess the need for a possible higher level of care.

Management of High Risk Inmates:

The high risk team (or high risk coordinator) will develop a High Risk Management Protocol (HRMP) for each inmate identified as high risk.

The HRMP will contain a detailed description of the inmate's history, including: developmental history, criminal history, including a description of the commitment offense and past offenses, substance abuse/dependence history, history of violence, mental health history, history of suicide attempts, family history of suicide attempts or completed suicide, review of diagnoses, provision of treatment recommendations and treatment management including exit criteria (i.e., criteria for

patient's removal from high risk status). Frequency of clinical contact, and IDTT meetings, can be decided during the case conference.

Whenever a high risk inmate for any reason is re-assigned a new case manager, or moves into a different part of the institution for custody reasons (Ad/Seg, etc.), the high risk team, or coordinator, will communicate with appropriate clinicians about the arrival/departure of a high risk inmate. Supervisory staff is also notified and provided with a copy of the high risk management protocol (HRMP) to ensure continuity of care and promote suicide reduction.

As a component of managing high risk inmates, the high risk management team (or high risk coordinator) will promote the conduction of Self-Harm Reviews on identified cases involving suicide attempts. The institutions may determine a process for conducting Basic Self Harm Reviews as well as Comprehensive Self-Harm Reviews. The Self-Harm Reviews provide an avenue for clinicians to address clinical uncertainty in a peer-review format. It is anticipated that the reviews will provide ongoing education regarding the treatment of high-risk inmates and identify systemic factors that may be contributing to suicide risk.

## C.    Clinical Competency in Administering the Suicide Risk Evaluation.

Identified Concern:

In the "Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2007," Dr. Patterson concludes that in 82% of the suicide cases in 2007, "there was at least some degree of inadequacy in assessment, treatment, or intervention, for the highest rate of inadequacy in these areas in the past several years."

Reason for Identification:

The knowledge and ability to complete an adequate suicide risk evaluation is a fundamental clinical competency for all CDCR clinicians. CDCR's review of the QIPs from the suicides that occurred between 2008 and the first 6 months of 2010, support this strategy.

Proposed Solution:

CDCR must ensure that clinicians possess the knowledge and skills to adequately evaluate inmates who may be at an elevated suicide risk. Clinicians must complete evaluations (including the use of the SRE form) in the unique and challenging correctional setting. This Mental Health Program is proposed to include the following:

o   A requirement that all newly hired mental health clinicians (psychiatrists, psychologists, social workers, and psychiatric nurse practitioners) complete MHSDS Program Guide training and participate in the most recent suicide risk assessment training for clinicians (either face-to-face training or distance learning).

o   The monthly suicide prevention videoconference provided to all clinicians, either live or via intranet.

o  Weekly clinical supervision for unlicensed clinical staff.

o  Proctoring of all newly hired mental health clinicians on the proper use of CDCR's SRE form. This will include direct supervision by an experienced clinician of one or more actual SRE evaluations. Clinicians will not be qualified to perform independent SREs until this requirement is met. The clinician will be assessed as qualified based upon the demonstrated ability to show:

   o  Data gathering (from C-file, UHR, collateral sources)
   o  Identification of risk and protective factors
   o  Formulation of risk level
   o  Clear rationale and justification for risk level - focus on individual factors rather than a generic approach
   o  Documentation is thorough
   o  Treatment plan clearly identifies relevant concerns
   o  The evaluation of risk is clearly communicated to appropriate staff

o  Encouraging local SPR FITs to disseminate information about intra-institutional suicide prevention developments to clinical staff in their institutions. Clinical material presented in SPR FIT meetings can be used to provide ongoing clinical discussion and quality improvement outside the actual SPR FIT meetings.

o  Senior clinicians from MHCB units can facilitate ongoing clinical discussions with clinicians across treatment programs to facilitate dialogue and clinical discussion of difficult case material.

o  Encourage institutional programs to include suicide risk evaluation as a key indicator of clinical competence in their peer review programs.

Training and Proctoring of Current CDCR Clinicians

CDCR HQ's Suicide Prevention and Review staff, in conjunction with the Chiefs Work Group, are developing the process for training and proctoring of current clinicians. Additionally, staff and the Chiefs Work Group are considering how to develop an alternative process to grandfather in clinicians without requiring that those clinicians undergo the training and proctoring process. Moreover, staff and the Chiefs Work Group recognize the further need to ultimately develop audit and monitoring tools necessary to validate the success of this strategy.

# EXHIBIT LIST

| NUMBER | TITLE |
| --- | --- |
| 1 | Select Excerpts From Mental Health Services Delivery System Program Guide (2009 Revision) Concerning Suicide Prevention Policies and Practices and Suicide Review and Reporting Processes |
| 2 | Summary of Proposed Changes to 2009 MHSDS Program Guide |
| 3 | Suicide Prevention and Response Focused Improvement Team Actions Taken Between 2007 and 2010 |
| 4 | Suicide Risk Evaluation Form 7447 |
| 5 | Agendas for Suicide Prevention Videoconferences |
| 6. | Tracking Tool – Suicide Review Process |

# Exhibit B

**FOR SUBMISSION TO THE *COLEMAN* SPECIAL MASTER**

**DEFENDANTS' JANUARY 18, 2011 UPDATE TO REPORT ON ACTIVITIES
TAKEN FOLLOWING THE COURT'S APRIL 14, 2010 ORDER CONCERNING
CLINICAL COMPETENCY IN PERFORMING SUICIDE RISK EVALUATIONS**

## INTRODUCTION

On August 25, 2010, Defendants submitted an updated report on the activities taken following the Court's April 14, 2010 order. Among other things, Defendants summarized a new strategy that the California Department of Corrections and Rehabilitation (CDCR) identified to address inmates suicides—enhancing clinical competency in administering suicide risk evaluations. On November 18, 2010, the Court ordered that, within sixty days from the date of the court order, Defendants submit to the *Coleman* Special Master "their proposal for improvement of clinical competency levels of current CDCR clinicians with administration of the suicide risk evaluation." This update responds to the Court's November 18, 2010 order.

## CLINICAL COMPETENCY IN ADMINISTERING SUICIDE RISK EVALUATIONS

As one strategy to address self-injury and suicide, the Division of Correctional Health Care Services (DCHCS) is focusing on improving the clinical competency of staff in administering Suicide Risk Evaluations and providing crisis intervention. To improve clinical competency in suicide risk evaluation, DCHCS is developing and implementing proctoring and mentoring for new and veteran mental health clinicians. Experienced clinicians will orient, train, mentor, and monitor clinical staff who perform suicide risk assessments and provide crisis intervention. This strategy seeks to retain high quality clinical staff by providing effective orientation and training on suicide risk evaluation and giving recognition to the highly-skilled staff members who serve as proctors and mentors.

This Report provides an update on the five parts of the process CDCR has put in place to develop and implement proctoring and mentoring in administering Suicide Risk Evaluations: (1) identification of five test institutions; (2) identification of proctors/mentors; (3) development of proctoring training program and tools; (4) identification of staff requiring proctoring and mentoring; and (5) program evaluation.

## 1.    Identification of Test Institutions:

Between October and December 2010, CDCR Headquarters Suicide Prevention and Response Program identified numerous indices that correspond with increased risk, both for suicide and psychiatric decompensation. Specifically, data was obtained from the High-Risk Inmate Workgroup, the Quality Management staff of the Receiver's office, the Census Data Discharge Information System, the DCHCS Fiscal Department, and the Department of Mental Health.

Among the indices included in the research are:

- o Percentage of mental health population of the total population
- o Suicide watch incidents
- o Repeat incidents of suicide watch
- o Mental Health Crisis Bed admissions
- o Intermediate Care Admissions, including repeat admissions
- o Percentage of inmates presenting in crisis on third watch
- o Staffing allocations and current resources (of each institution)

The Headquarters Suicide Prevention and Response Program analyzed data on all 33 institutions to determine which institutions should be prioritized in terms of need for enhanced focus. Institutions were ranked in terms of frequency of the indices measured and, from that ranking, the Suicide Prevention and Response Program determined that the following five institutions were the most appropriate test sites:

- o Wasco State Prison
- o North Kern State Prison
- o Kern Valley State Prison
- o California Institution for Men
- o Richard J. Donovan Correctional Facility

**2.     Identification of Proctors/Mentors:**

To facilitate the implementation of the program, additional staffing has already been provided to the selected institutions. Among the added positions is a Senior Psychologist Specialist.

A job description for the Senior Psychologist Specialist is being developed. Specific to the proctoring and mentoring needs, the job description proposes:

> Coordination and provision of proctoring and mentoring in the conduction of the Suicide Risk Evaluation in order to ensure that clinicians are competent in the ability to establish rapport and conduct thorough interviews focused on: gathering relevant data, identifying risk and protective factors, developing clear rationales and justification for risk levels, and providing thorough documentation that includes reference to specific concerns and relevant treatment interventions. Additionally, proctoring and mentoring includes the assurance of competent skills in providing interventions related to suicide threats, suspected malingering, and/or situations where secondary gain is identified.

The description of the Senior Psychologist Specialist specifically delineates the skill level required for proctoring and mentoring. Note that a Senior Psychologist Specialist can be hired as a contractor in the event that a selected institution experiences delays in finding a qualified employee for the position. Any contractor filling the position in the interim must meet the position qualification requirements.

3

**3.    Development of Proctoring Training Program and Tools:**

The Headquarters Suicide Prevention and Response Program is developing proctoring and mentoring resources for use by the institutions.  The materials will include various training tools for guidance such as, clinical vignettes for practice and skill assessment, quality of care review tools, forms, and other supportive resources.  Those resources are being developed and will be made available as soon as possible.  Meanwhile, assuming either registry or employees may qualify to serve as proctors/mentors, the program will move forward with individualized assistance from the Headquarters Suicide Prevention and Response Program, as needed.

**4.    Identification of Staff Requiring Proctoring and Mentoring:**

Staff in the following categories will be referred for proctoring and mentoring:

- o  New employees
- o  Any employee on probation
- o  Any staff member referred for skills enhancement through a supervisorial avenue including a direct supervisor, a quality improvement plan, or PPEC
- o  Any staff who requests proctoring/mentoring

**5.    Program Evaluation:**

A pre and post measurement is being developed to assess the impact of proctoring and mentoring in enhancing clinical skill level in administering the suicide risk evaluation. The Headquarters Suicide Prevention and Response Program expects to issue quarterly reports assessing how this intervention has impacted clinical competency in the use of the suicide risk evaluation.

After the proctoring program has been in place for one quarter, it will be re-evaluated and modified as necessary for roll-out to other identified institutions, including revisions to the proctoring tools and training resources.

# Exhibit C

**U.S. Department of Justice**
National Institute of Corrections

# Prison Suicide: An Overview and Guide to Prevention

# National Institute of Corrections

**Morris L. Thigpen, Director**

**Susan M. Hunter, Chief**
**Prisons Division**

**John E. Moore, Project Manager**

# Prison Suicide: An Overview and Guide to Prevention

By
Lindsay M. Hayes
Project Director
National Center on Institutions and Alternatives
Mansfield, Massachusetts
June 1995

This document was prepared under grant number 93P01GHU1 from the National Institute of Corrections, U.S. Department of Justice. Points of view or opinions stated in this document are those of the author(s) and do not necessarily represent the official position or policies of the U.S. Department of Justice.

Copyright © 1995 by the National Center on Institutions and Alternatives

The National Institute of Corrections reserves the right to reproduce, publish, translate, or otherwise use, and to authorize others to publish and use all or any part of the copyrighted material contained in this publication.

# TABLE OF CONTENTS

FOREWORD ........................................................................................................................v

PREFACE AND ACKNOWLEDGMENTS ..............................................................vi

1. INTRODUCTION AND LITERATURE REVIEW ...........................................1
2. NATIONAL AND STATE STANDARDS FOR PRISON
   SUICIDE PREVENTION .................................................................................8
   Reviewing the National Standards ....................................................................9
   Reviewing State Standards ..............................................................................15
   Conclusion ......................................................................................................26
3. PRISON SUICIDE RATES: A 10-YEAR REVIEW .......................................27
   NCIA Survey Findings.....................................................................................27
   Conclusion ......................................................................................................31
4. EFFECTIVE SUICIDE PREVENTION PROGRAMS IN STATE PRISONS.....33
   Elayn Hunt Correctional Center......................................................................33
   State Correctional Institution at Retreat...........................................................40
5. SUICIDE PREVENTION IN FEDERAL PRISONS: A SUCCESSFUL
   FIVE-STEP PROGRAM .................................................................................46
   Program Description ........................................................................................47
   Demographic Data...........................................................................................51
   Survey of Chief Psychologists — Overview......................................................56
   Summary..........................................................................................................56
6. THE COURTS' ROLE IN SHAPING PRISON SUICIDE POLICY.............58
   Jail and Prison Suicide Lawsuits.......................................................................58
   Two Roads to the Courthouse ..........................................................................59
   Courts as Agents of Reform.............................................................................59
   Suicide Claims and Section 1983 Actions.........................................................60
   So Much for Theory — What About the Facts? ................................................63
   Summary...........................................................................................................67
7. SUMMARY AND CONCLUSIONS..............................................................68

REFERENCES .................................................................................................70

APPENDICES

A. Sample Suicide Precaution Protocols ...........................................................78
B. Total Prison Suicides and Rates by State: 1984-1992 ...................................80
C. Suicide Prevention Protocols of the Elayn Hunt Correctional Center...........83
D. Selected Procedures of the Pennsylvania Department of Corrections ...........95

**TABLES**

Table 2-1.    Suicide Prevention Protocols Within Departments of Corrections ........................18
Table 3-1.    Total Prison Suicides and Rates by State, 1993 ..........................................................29
Table 3-2.    Total Prison Suicides and Rates by State, 1984 through 1993................................29
Table 3-3.    Total Prison Suicides and Rates in the Seven Smallest State Prison
                    Systems, 1984 through 1993................................................................................30
Table 3-4.    Total Prison Suicides and Rates, 1984 through 1993 .................................................30
Table 3-5.    States with Declining Prison Suicide Rates of 50% or More .....................................31
Table 4-1.    Total Annual Admissions versus Total Annual Suicides, 1983
                    through 1994 ........................................................................................................34
Table 4-2.    Annual Prison Suicide Rates in Louisiana, 1984 through 1994................................40
Table 4-3.    Annual Prison Suicide Rates in Pennsylvania, 1984 through 1993.........................42
Table 4-4.    Suicide Potential Checklist at SCI-Retreat ................................................................43

# FOREWORD

While suicide is recognized as a critical problem within the jail environment, the issue of prison suicide has not received comparable attention. Until recently, it has been assumed that suicide, although a problem for jail inmates as they face the initial crisis of incarceration, is not a significant problem for inmates who advance to prison to serve out their sentences. This assumption, however, has not been supported in the literature. Although the rate of suicide in prisons is far lower than in jails, it remains disproportionately higher than in the general population. To date, little research has been done or prevention resources offered in this critical area.

This monograph was produced by the National Center on Institutions and Alternatives in an effort to fill a critical void in the knowledge base about prison suicide. In addition to a thorough review of the literature and of national and state standards for prevention, the document offers the most recent national data on the incidence and rate of prison suicide, effective prison suicide prevention programs, and discussion of liability issues. The National Institute of Corrections hopes that this document will encourage continued research, training, and development of comprehensive prevention policies that are imperative to the continued reduction of prison suicides throughout the country.

Morris L. Thigpen, Director
National Institute of Corrections

June 1995

v

## PREFACE AND ACKNOWLEDGMENTS

In April 1993, I embarked on the task of developing a comprehensive monograph on prison suicide. Having devoted more than 15 years to the study and prevention of jail suicide, I was not only well aware of the problem of suicide in custody, but also had developed the strong bias that we should be directing much more energy toward the issue. My feeling then and now is that while the number of suicides in jails far exceeds the number in prison, that fact certainly should not lessen our responsibility to identify and prevent as many of these prison deaths as we can. It is always difficult, however, to preach prevention without first identifying the parameters of the problem. The intent of this document is not only to detail what is now known about prison suicide, but also to describe how far we have come in our prevention efforts and the work that still lies ahead. Only by continuing to examine the problem of prison suicide and transmitting what is learned to those entrusted with the custody and care of inmates will we be in the best possible position to reduce the likelihood of prison suicide. It is my hope that this monograph provides the appropriate vehicle for disseminating such information.

Many individuals are involved in a project of this scope. First, I would like to thank Susan M. Hunter, chief, NIC Prisons Division, and John E. Moore, program monitor, for their positive response to my initial concept proposal and support in the project, as well as Nancy Sabanosh for her diligence in pushing the document through the publication process. Second, the assistance from each department of correction throughout the country, resulting in a 100 percent survey response, is greatly appreciated and thanks are also due to those jurisdictions that granted permission for various suicide prevention protocols to be reprinted in the appendices. Third, I would like to especially thank staff at both the Elayn Hunt Correctional Center (EHCC) in St. Gabriel, Louisiana, and State Correctional Institution (SCI) at Retreat in Hunlock Creek, Pennsylvania, for allowing me to conduct onsite case studies of the suicide prevention programs that are presented in Chapter 4. At EHCC, Warden C.M. Lensing and Mental Health Coordinator Nancy Gautreau provided invaluable assistance and insight during my visit. At SCI Retreat, Superintendent Dennis R. Erhard, Inmate Program Manager John G. Mack, Psychologist James P. McGraw, Jr., and Chief of Psychological Services for the Pennsylvania DOC Dr. Lance Couturier were equally as helpful to developing the case studies.

Finally, this monograph could not have been written without the assistance and support of several other individuals. Thanks go to Thomas W. White, Ph.D., and Dennis J. Schimmel, Ph.D., for writing the article on suicide prevention efforts within the Federal Bureau of Prisons that appears as Chapter 5; and William C. Collins, Esq., for writing the article on prison suicide liability that appears as Chapter 6. In addition, Ronald L. Bonner, Ph.D., James T. Sprowls, Ph.D., and Chris Cormier Hayes reviewed earlier drafts and provided invaluable assistance, while Alice Boring brought it all together.

Lindsay M. Hayes
June 1995

# Chapter 1

# INTRODUCTION AND LITERATURE REVIEW

Writing about "difficult prisoners" in his autobiography *Fifty Years of Prison Service,* Zebulon R. Brockway appeared perturbed by the prospect of managing suicidal inmates and by the resulting publicity in the event of their deaths. As superintendent of Elmira Reformatory (often described as the original model from which progressive penology evolved) from 1876 to 1900, Warden Brockway described his experience with three prison suicides:

> One, a prisoner on parole in New York City who violated his obligations, was taken for kindly investigation to the secretary of the Prison Association, at the rooms then situated in the third story of the Bible House. While awaiting the secretary's convenience the young man suddenly dashed through an open window to his death on the pavement below. The newspapers made a sensational account of it and inquired why, if the reformatory was as it should be, a paroled man should voluntarily go to his death rather than be returned to treatment there. Another, a resident prisoner under a definite sentence, hanged himself in his cell. The coroner's jury absolved the reformatory management from any blame, but the hungry newspapers magnified the incident. Hughes, a prisoner from Albany, of feeble intellect, hanged himself by his suspenders in his cell. The remains were forwarded to his parents, working people in Albany. The condition of the remains on arrival, by reason of the manner of the death and the futile extraordinary efforts by our physician, Dr. Wey, for his resuscitation, led to the mistaken opinion that he suffered ill treatment at the reformatory — an opinion which, though contrary to the coroner's verdict, was entertained by his parents and was mentioned sensationally in the newspapers of Albany (Brockway, 1969, pp. 191-92).

Of course, Warden Brockway had his own theory about suicidal behavior among his prisoners: "I traced the abnormal activity to (a) instinctive imitation, (b) craving curiosity, (c) mischievous desire to excite alarm, (d) intent to create sympathy and obtain favors, (e) a certain subjective abnormality induced by secret pernicious practices." His solution: "Suicide attempts were completely stopped by notice in the institution newspaper that thereafter they would be followed in each case with physical chastisement" (Brockway, 1969, p. 192).

Fortunately, our current understanding of both the causes and prevention of suicide within the correctional environment has survived Warden Brockway's questionable wisdom. But while suicide is recognized as a critical problem within jails, the issue of **prison** suicide has not received comparable attention — primarily because the number of jail suicides far exceeds the number of prison suicides. Suicide continues to be the leading cause of death in jails, where over 400 inmates take their lives each year; the suicide rate in detention facilities is approximately nine times greater than that of the general population (Hayes and Rowan, 1988). On the other hand, suicide ranks third as a cause of death in prisons (Bureau of Justice Statistics, 1993a), and, as will be shown in Chapter

1

3, the number and rate of suicides in prison are considerably lower than in jails. While two comprehensive national studies of jail suicide have been completed (Hayes and Kajdan, 1981; Hayes and Rowan, 1988), a comparable national examination of prison suicides has not occurred to date.

Historically, little is known about the risk of suicide in prison, a research topic that has been characterized as a victim of relative neglect in criminology and corrections (Austin and Unkovic, 1977). Before 1973, most research on prison suicides was concentrated on attempted suicide (e.g., Reiger, 1971), self-mutilation (e.g., Johnson, 1973), or deaths in the European correctional system.[*] More recent research offers limited insight through its exclusive focus on prison suicide rates (e.g., Batten, 1992; Lester, 1990); victim profiles (e.g., Austin and Unkovic, 1977); absence of discussion regarding precipitating factors; and failure to differentiate prison and jail suicides (e.g., Salive, Smith, and Brewer, 1989). Other observers are simply unimpressed with prison suicide rates and are not convinced that the issue bears significant attention (e.g., Payson, 1975). These same observers assume that, while the risk of suicide looms large in jail among inmates facing the initial stages of confinement, such risk dissipates over time in prison as individuals become more comfortable or tolerant of their predicament and develop coping skills to effectively handle life behind bars. This assumption, of course, has not been empirically studied, is far too simplistic, and ignores both the process and individual stressors of prison life.

The precipitating factors of suicidal behavior in jail are well established (Rowan and Hayes, 1995). It has been theorized that there are two primary causes for jail suicide — first, jail environments are conducive to suicidal behavior and, second, the inmate is facing a crisis situation. From the inmate's perspective, certain features of the jail environment enhance suicidal behavior: fear of the unknown, distrust of the authoritarian environment, lack of apparent control over the future, isolation from family and significant others, shame of incarceration, and the dehumanizing aspects of incarceration. In addition, certain factors often found in inmates facing a crisis situation could predispose them to suicide: recent excessive drinking and/or use of drugs, recent loss of stabilizing resources, severe guilt or shame over the alleged offense, and current mental illness and/or prior history of suicidal behavior. These factors become exacerbated during the first 24 hours of incarceration, when the majority of jail suicides occur. Inmates attempting suicide are often under the influence of alcohol and/or drugs and placed in isolation. In addition, many jail suicide victims are young and generally have been arrested for non-violent, alcohol-related offenses. Although prison suicide victims share some of these characteristics, the precipitating factors in suicidal behavior among prison inmates are somewhat different and fester over time.

---

[*] Research on prison suicides in foreign countries was purposely excluded from this literature review, primarily because correctional systems in other countries are operated quite differently from those in the United States. For example, the word "prison" has different meanings throughout Europe, and many foreign prison systems hold both pretrial (remand) and sentenced inmates. The most comprehensive and enlightening research on prison suicide from Europe to date is Liebling, *Suicides in Prison*, London, England: Routledge Publishing, 1992.

An Englishman named J.M. Wooley was one of the first researchers to address these issues over 80 years ago. Studying the topic of prison suicide when transportation was a common method of excluding criminals from society, Wooley (1913) reviewed specifically the suicides of Indian prisoners from 1902 through 1911 who were placed in solitary confinement before being transported to settlement camps. The research indicated that 43 percent of the suicides occurred during the first 18 months of incarceration, 90 percent were by hanging, and inmates sentenced for murder committed suicide five times more frequently than non-murderers. Wooley cautioned, however, that the data became less significant unless certain institutional factors were addressed: prison discipline, hard labor, solitary confinement, overcrowding, homosexual attacks, and staff brutality.

More recently, Anno (1985) examined 38 suicides in the Texas Department of Corrections (TDC) between 1980 and 1985 and determined that the suicide rate was 18.6 per 100,000 inmates. The research also revealed that the vast majority of victims (97%) were housed in single cells, 45 percent had a history of prior suicide attempts, 68 percent had a history of mental illness, and 58 percent had been convicted of a personal crime. The victims' case files also contained various behavioral and verbal cues:

> In almost all of the TDC cases, there was some evidence available in the records or, more often, in the subsequent reports of the individuals' deaths that could have alerted an aware staff member to the fact that the inmate was suicidal. In some cases, the inmate told someone he had been thinking of suicide. In others, it was noted that the individual had just received some bad news (e.g., death of a family member). In still other instances, there were notations in the record of bizarre behavior or withdrawn, depressed behavior or expressions of extreme shame and remorse regarding their crime (Anno, 1985, p. 90).

A study of 19 suicides in Kentucky prisons between 1973 and 1986 found that, although most victims' characteristics paralleled those of the general inmate population, 79 percent of the suicides occurred in special housing units and 53 percent of victims had a history of serious mental illness and one or more prior suicide attempts (Jones, 1986). Most interesting was the finding that several **environmental** and **operational** factors might have contributed to the suicides: 1) inadequate or unavailable psychological services at initial intake and during incarceration, 2) poor communication among staff, 3) perception of self-injurious behavior as a means of manipulation, 4) basic elements of the institutional environment that constrain personal efficacy and control, 5) limited staff training and direction in suicide prevention, 6) limited staff direction in responding to suicide incidents, and 7) investigations directed primarily toward establishing an appropriate response by staff without the accompanying thorough investigation of the causes of the suicide.

Based on 37 prison suicides between 1979 and 1987, Salive et al. (1989) projected a suicide rate in the Maryland prison system of almost three times that of the general population. Although precipitating factors were not offered, the study found higher suicide rates among white inmates and those aged 25 to 34, convicted of personal crimes, and housed in a maximum security facility. In addition, while the length of actual time served by inmates who committed suicide varied widely, only 22 percent of the victims had sentences under eight years, and almost 25 percent of all victims were serving life sentences.

Two states with large prison populations — California and New York — recently collected data on inmate suicides within their prison systems. In a review of 15 suicides that occurred in its

3

prison facilities during 1990, the California Department of Corrections (1991) found that 60 percent of victims had been diagnosed with a serious mental disorder and that 53 percent had a history of substance abuse. All but one of the victims were housed in a single cell, and 40 percent were confined in administrative segregation units. A subsequent analysis by the California Department of Corrections (1994) determined that the rate of suicide in its prison facilities decreased from 17 per 100,000 inmates in 1990 to 14 per 100,000 in 1992, but dramatically and inexplicably rose to 25 per 100,000 in 1993.

The New York State Department of Correctional Services (1994) analyzed 52 suicides in its prison facilities between 1986 and mid-1994 and compared the data to the general inmate population. White inmates represented 18 percent of the prison population but 42 percent of the suicides, whereas black inmates represented 50 percent of the prison population but only 20 percent of the suicides. Further, although inmates convicted of a violent felony represented 56 percent of the prison population, they accounted for 80 percent of the suicides. Regarding length of incarceration, 64 percent of all victims committed suicide within 2 years of entering the prison system, and 66 percent of the victims had mandatory minimum sentences of at least 4 years, with 23 percent serving life sentences.

Finally, in a study provided in Chapter 5, White and Schimmel discuss one of the most thorough reviews to date of suicides in federal prisons. In their analysis of 86 suicides that occurred within the Federal Bureau of Prisons (FBOP) system between 1983 and 1992, the researchers found that 49 percent of the victims had a documented history of diagnosed mental illness or treatment and that approximately 46 percent of those who committed suicide had attempted it or made gestures in the past. In addition, approximately 68 percent of the inmates who committed suicide were on "special housing status" (e.g., segregation, administrative detention, or in a psychiatric seclusion unit) and, with only one exception, all victims were in single cells at the time of their deaths.

Of special interest was the fact that although pretrial inmates and Mariel Cuban detainees represented only 6 percent and 4 percent of the total FBOP population, respectively, these two groups combined accounted for 42 percent of all suicides. In addition, although inmates serving sentences of over 20 years represented only 12 percent of the inmate population, they accounted for 28 percent of all suicides. Generally, long-term prisoners committed suicide after serving approximately 5 years of their sentences. Finally, with access to FBOP-authorized psychological autopsies on each suicide, White and Schimmel speculated about several precipitating factors: "new legal problems" for the inmate in 28 percent of the suicides, "marital or relationship difficulties" in 23 percent, and "inmate-related conflicts" in 23 percent.

Despite the consistent findings in all of this recent research, its general use is somewhat limited. Research to date in the area of custodial suicide has generally been retrospective and descriptive. The descriptors have been gathered after the fact, and their etiological and/or developmental role in the process of suicide is therefore unclear. Most important, this research has perhaps unknowingly conceptualized suicide as a static, isolated event that is simply associated with other static factors (e.g., demographics). Such an approach, however, cannot explain or account for the **process** by which certain prison inmates decide to end their lives at a given time within a particular condition (Bonner, 1992a).

This process can be better explained in the general literature on suicidology. Efforts to correlate suicide to socio-demographic variables and psychiatric categories (e.g., depression) will have a negligible impact unless the individual's "psychache" (intolerable psychological pain) is addressed (Shneidman, 1993). "Suicide is not a bizarre and incomprehensible act of self-destruction. Rather, suicidal people use a particular logic, a style of thinking that brings them to the conclusion that death is the only solution to their problems. This style can be readily seen, and there

4

are steps we can take to stop suicide, if we know where to look" (Shneidman, 1987, p. 56). In applying this doctrine to prison suicide, Bonner (1992a) offers the "stress-vulnerability model," the theory that suicide must be viewed in the context of a process by which an inmate is (or becomes) ill-equipped to handle the common stresses of confinement. As the inmate reaches an emotional breaking point, the result can be varying degrees of suicidal intention, including ideation, contemplation, attempt, or completion. Initially, these stressors mirror those of jail suicide victims, such as fear of the unknown and isolation from family, but over time:

> ...incarceration may bring about added stressors, such as loss of outside relationships, conflicts within the institution, victimization, further legal frustration, physical and emotional breakdown, and a wide variety of other problems in living. Coupled with such negative life stress, individuals with psychosocial vulnerabilities (including psychiatric illness, drug/alcohol intoxication, marital/social isolation, suicidal coping history, and deficiencies in problem-solving ability) may be unable to cope effectively and in time may become hopeless (Bonner, 1992a, p. 407).

In addition to hopelessness, the general literature on suicidology identifies other risk factors for suicidal behavior: current degree of suicidal ideation and previous attempts, dysfunctional assumptions, dichotomous (all-or-nothing) thinking, inability to solve problems and a view of suicide as the desirable solution to one's problems, psychiatric disorders, substance abuse, and availability of something to use to commit suicide (Weishaar and Beck, 1992). Such factors, in combination or interaction with the common stresses of confinement, could break down the ability to cope and create the emotional avenue for suicidal behavior. With few exceptions, however (most notably Bonner and Rich, 1992; Ivanoff and Jang, 1991; Ivanoff, Smyth, Grochowski, Jang, and Klein, 1992), these factors have not been empirically tested in a correctional setting. Yet, although research has not sufficiently addressed the psychosocial process of prison suicide, court decisions and developing national standards have, to a degree, filled the void by advocating the view that suicide is a process that typically displays observable signs of maladaptive coping and suicidal intention. If identified in time, the process can be reversed or prevented in most cases (Bonner, 1992b).

A discussion of prison suicide would be incomplete without a few words about suicide and the manipulative inmate. Few issues challenge prison officials and staff more than the management of manipulative inmates. It is not unusual for inmates to call attention to themselves by threatening suicide or feigning an attempt to avoid a court appearance, bolster an insanity defense, be relocated to a different cell, be transferred to the prison infirmary or a local hospital, receive preferential staff treatment, or seek compassion from a previously unsympathetic spouse or other family member. Although the prevailing theory is that any inmate who would go to the extreme of threatening suicide or engaging in self-injurious behavior is suffering from at least an emotional imbalance that requires special attention, too often prison officials (with the support of mental health staff) conclude that the inmate is not dangerous and simply attempting to manipulate his or her environment. They often suggest such behavior be ignored and not reinforced through intervention. In fact, it is not unusual for mental health professionals to resort to labeling, with inmates engaging in "deliberate self-harm" termed "manipulative" or "attention seeking," and "truly suicidal" inmates seen as "serious" and "crying for help." Clinicians routinely differentiate between behavior they

regard as genuine suicide attempts and other self-injurious behavior they label, variously, as self-mutilation, suicidal gestures, parasuicide, manipulation, or malingering (Haycock, 1989a).

A study of self-injury among prison inmates, for example, found that acts of self-mutilation often signify increased tension in the inmates' lives caused by situations they sense are beyond their direct control (Thorburn, 1984). Use of violence for control is common in prison, and self-directed violence as in self-mutilation can provide a distorted sense of control. A study of parasuicide (intentional self-harm) among prison inmates found that psychiatric history and parasuicide records of the inmates' group of significant others (i.e., other prisoners) were the best predictors of intentional self-harm (Ivanoff, 1992). In any event, at a minimum, **all** acts of self-injury can be said to reflect personal breakdowns resulting from crises of self-doubt, poor coping and problem-solving skills, hopelessness, and fear of abandonment (Toch, 1975). It has been argued that there are no false suicidal acts:

> Correctional, medical, and mental health staff should abandon the effort to classify suicidal behavior according to expressed or presumed intent, particularly since the tendency of persons to minimize the seriousness of their suicidal intent after the fact is well-known across community, hospital, and other settings. There are no reliable bases upon which we can differentiate "manipulative" suicide attempts posing no threat to the inmate's life from those true "non-manipulative" attempts which may end in a death. The term "manipulative" is simply useless in understanding, and destructive in attempting to manage, the suicidal behavior of inmates (or of anybody else) (Haycock, 1992, pp. 9-10).

Other clinicians disagree and argue that self-injurious behavior displayed by "truly suicidal" or "manipulative" inmates should result in different interventions. For suicidal inmates, intervention that promotes close supervision, social support, and access to or development of psychosocial resources is crucial. For manipulative inmates, intervention that combines close supervision with behavior management is crucial in preventing or modifying such behavior. Historically, the problem has been that manipulative behavior was ignored or resulted in punitive sanctions, including isolation. Often, manipulative inmates escalate their behavior and die, either by accident or miscalculation of the staff's responsiveness. Therefore, these clinicians stress, the problem is not in how we "label" the behavior, but how we react to it — and the reaction should not include isolation.

Finally, the literature is replete with recommendations on how to reduce incidents of suicidal behavior among prison inmates, a problem that many believe is the most preventable cause of death in prisons (Anno, 1991; Salive et al., 1989). A primary recommendation, based chiefly on overwhelmingly consistent research, is that isolation should be avoided whenever possible. Whether its use is disciplinary or observational, isolation can pose a special threat to inmates who have limited abilities to cope with frustration. Further, while some inmates are initially placed in administrative segregation for reasons unrelated to risk of suicide, they can injure themselves as a result of the isolation. As one inmate offered: "The Hole and Segregation cells are depressing enough to drive many men to take their lives in order to escape. For some it would appear to be the only way out. After years of living in the cramped confines of a segregation cell with no hope of getting out, it is easy to see why a man would prefer death" (Cardozo-Freeman, 1984, p. 430). Death row inmates are preoccupied with thoughts of suicide (Johnson, 1981) and exhibit an unusually high rate of suicide (Lester, 1990). A psychiatrist who investigated the use of isolation in several prison systems throughout the country attributed prolonged social isolation and lack of stimulation in segregation to a "solitary confinement syndrome," where inmates become "floridly psychotic and subject to uncontrollable impulses, including random violence, self-mutilation, and suicidal behavior" (Murphy, 1994, p. 4).

And while few prison officials today would support Warden Brockway's suggestion of "physical chastisement" as a tool for suicide prevention, the use of segregation for self-injurious inmates can be said to be the modern equivalent, and it should be met with the same disapproval. As observed by one federal court:

> ...The Court finds the treatment of seriously mentally ill inmates to be appalling. Rather than providing treatment for serious mental illnesses, ADOC punishes these inmates by locking them down in small, bare segregation cells for their actions that are the result of their mental illnesses. These inmates are left in segregation without mental health care. Many times the inmates, such as H.B. are in a highly psychotic state, terrified because of hallucinations, such as monsters, gorillas or the devil in her cell....This use of lockdown as an alternative to mental health care for inmates with serious mental illnesses clearly rises to the level of deliberate indifference to the serious mental health needs of the inmates and violates their constitutional rights to be free from cruel and unusual punishment (*Casey* v. *Lewis*, 1993, p. 1477).

Other recommendations found in the literature include suicide prevention training for both correctional and mental health staff (Anno, 1985; Sperbeck and Parlour, 1986); preventive intervention for long-term inmates (Salive et al., 1989); better communication between correctional, medical, and mental health staff (Jones, 1986); and comprehensive suicide prevention policies that include screening procedures, architectural considerations, monitoring/observation patterns, and interaction techniques (Anno, 1991). The success of efforts to prevent suicide in prisons will depend on our ability and willingness to identify the vulnerable inmate, provide the necessary supervision, and offer alternative ways of coping and reducing emotional distress (Bonner, 1992b).

7

# **Exhibit D**

(Prisoner Name and CDCR Number Redacted)

 CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES


# MEMORANDUM

| | |
|---|---|
| **Date:** | July 27, 2012 |
| **To:** | TIMOTHY G. BELAVICH, Ph.D.<br>Deputy Director (A), Statewide Mental Health Program<br>Division of Correctional Health Care Services |
| **From:** | CATHERINE PRUDHOMME, PH.D.<br>Suicide Response Coordinator<br>Clinical Practices Division<br>Division of Correctional Health Care Services |
| **Subject:** | QUALITY    IMPROVEMENT    PLAN    FOR    THE    SUICIDE    OF<br>INMATE ████ ████, |

As a result of the suicide review for ████, ████, a recommendation was made to initiate changes in the screening tool for reception center inmates. The Suicide Case Review Committee met on June 28, 2012. The recommendation that was developed as a result of the review of Inmate ████'s death was approved by the committee. That QIP had been anticipated by the reviewer and was completed during the Suicide Prevention and Response Focused Improvement Team (SPR FIT) meeting on June 18, 2012.

If you have any questions, you may contact Catherine Prudhomme, Ph.D., Senior Psychologist, Specialist, Division of Correctional Health Care Services (DCHCS), at (916) 691-0310, or via facsimile at (916) 691-0534.

Cc:    Terri Gonzalez, Associate Director (A), General Population (Males), DAI
Kenneth Martin, Chief, Health Care Support Unit, DCHCS
Tia Araminta, Psy. D., Chief Psychologist, Regional Chief of Mental Health,
Central Region, DCHCS
Timothy Belavich, Ph.D., Deputy Director (A), Statewide Mental Health Program,
DCHCS
Kathleen O'Meara, Ph.D., Chief, Clinical Practices, DCHCS
Rachel Bramble, Psy.D., Clinical Psychologist, Retired Annuitant, DCHCS
Jennifer Benavidez, Correctional Counselor II, Specialist, DAI
Cheryl Schutt, Assistant Statewide Chief Nurse Executive, Oversight
Charles Joslin, Assistant Statewide Chief Nurse Executive, Operations
Karen Rea, Statewide Chief Nurse Executive

| **MIN** Meeting Minutes | **Suicide Prevention and Response-Focused Improvement Team (SPR FIT)** |
|---|---|
| | Institution Name: **CCHCS** |
| Minutes noted by: Victoria Winiecki | Meeting Date:  June 18, 2012 — Meeting Time: 1000 |

| Name | Position Title | Present | Absent |
|---|---|:---:|:---:|
| Robert Canning, Ph.D. | Senior Psychologist, Specialist CCHCS | ☒ | ☐ |
| Kathleen O'Meara, Ph.D. | Chief Psychologist, Clinical Practices CCHCS | ☐ | ☒ |
| Joe Stein | CC II, Division of Adult Institutions | ☐ | ☒ |
| Jennifer Benavidez | CC II, Division of Adult Institutions | ☐ | ☒ |
| Art Gonzales | CC II, Division of Adult Institutions | ☒ | ☐ |
| Terri Layton | Nurse Consultant, Program Review, CCHCS | ☐ | ☒ |
| Vicky Lundeby | Captain – Design Standards | ☒ | ☐ |
| Joe Cocke | Captain – Design Standards | ☐ | ☒ |
| Bryan Wilbur | Division of Adult Institutions | ☐ | ☒ |
| Catherine Prudhomme, Ph.D. | Senior Psychologist, Specialist, CCHCS | ☒ | ☐ |
| Virginia Steele-Pirie | Nurse Consultant, CCHCS | ☒ | ☐ |
| Heather McCray | Staff Counsel, Office of Legal Affairs | ☐ | ☒ |
| Charles Joslin | Chief Nurse Executive | ☒ | ☐ |
| Victoria Winiecki | Associate Health Program Adviser, CCHCS | ☒ | ☐ |

**Agenda:**

1. Announcements, Introductions, Additions to the Agenda
2. New Items
3. Follow-Up on Ongoing Items
   a. Update on Proposal for new ASU screening tool (to replace 31-item questionnaire)
   b. Changes to referral criteria for RC screening (from ▉▉▉ suicide review)
   c. Suicide prevention posters
   d. Update on county coroner contacts
   e. Proctor-mentor program update
   f. Issues from *Coleman* policy meeting
4. Ongoing items (updates as needed until item closed)
   a. Suicide-Resistant Bed Project
   b. Training issues
5. Periodic (recurring) items
   a. Suicide Prevention Videoconference Agenda
6. Ongoing, Tabled, and Postponed Items
7. Wrap-Up and Other Business

**Summary of Meeting:**

| **Announcements, Introductions, Additions to the Agenda** |
|---|

None.

| New Items |
|---|

None.

| Follow-up on Ongoing Items |
|---|

**a.    Update on proposal for new ASU screening tool (to replace 31-item questionnaire)**

**Background:** Continuation of the discussion on the 31-item screening questionnaire. This topic, although independently requiring attention, is a component of a Quality Improvement Plan for a recent suicide. It is the opinion of some that the questionnaire is of questionable validity for the task.

**Discussion:** Dr. Canning sent out the most recent version of the questionnaire to Mr. Joslin. This version has 12 items instead of 31. Mr. Joslin said that the scoring criteria makes sense and looks fairly easy to follow. Dr. Canning said that he has several institutions in mind for the pilot of the new questionnaire.

**Action:** Dr. Canning and Mr. Joslin are going to send out the new questionnaire to a few people in the field and at Headquarters for feedback.

**b.    Changes to referral criteria for RC screening (from Trujano suicide review)**

**Background:** Dr. Canning did a suicide review at Pleasant Valley State Prison recently. The inmate was not in MHSDS and had only been in CDCR for six months. He had been screened negative using the 31-item RC questionnaire, even though he had marked yes under the questions for past suicide attempts and past involuntary hospitalizations.

**Discussion:** Dr. Canning said that he wants to update the scoring rules in order to get a better screening of inmates when they come into CDCR. Dr. Prudhomme asked if there will be any problems if we recommend changes to an existing questionnaire. Dr. Canning said that as long as we keep the questionnaire the same, we do not expect to encounter problems with changes in the scoring algorithm.

**Action:** Dr. Canning will finish updating the scoring rules and will send out for review.

**c.    Suicide prevention posters**

**Background:** Staff has been working on several suicide prevention posters that need to be printed and distributed to the institutions.

**Discussion:** Dr. Prudhomme wants to make sure that the cost, for the various posters that have been developed, be included in the budget. The three posters are: 1. One that is hung in all the areas where attorneys interview the inmates and the visiting areas. 2. Additional copies of the

posters that have already been developed with the hands reaching out.  3.  Warning signs for clinician areas.

**Action:**  Ms. Steele-Pirie is going to speak with Dr. Eargle about including the costs for the posters in the budget.

**d.   Update on county coroner contacts**

**Background:**  During a recent suicide case review the topic of distributing suicide notes to the inmate's family came up.  The reviewer of this particular suicide felt that it was very important for the families to have access to these notes in order to achieve closure.

**Discussion:**  Dr. Prudhomme has been getting more responses from the coroner offices.  She said that the Marin County Coroner has a great relationship with San Quentin.  She said that in the past they didn't have such a good relationship.  She also said that the piece that might be missing is the communication between the coroner and the institution.

**Action:**  Dr. Prudhomme is going to try within the next two months to develop a memo to send to the Wardens of the institutions.

**e.   Proctor-mentor program update**

**Background:**  Dr. O'Meara has been working on implementing a suicide risk evaluation proctor mentor program.

**Discussion:**  Dr. O'Meara has moved on to new tasks and therefore someone is going to have to take over the Proctor-mentor program.  Dr. Prudhomme said that there have been some issues with the title of the training.  She said that the institutions have had a negative view of the training because when they see the word proctor they think that they are being watched and scrutinized.

**Action:**  None.

**f.   Issues from *Coleman* policy meeting**

**Background:**

**Discussion:**  This item was not discussed.

**Action:**  None.

| Ongoing Items (updates as needed until item closed) |
| --- |

**a.   Suicide-Resistant Bed project**

**Background:**   There are new facilities being built for mental health beds. These beds are supposed to be suicide resistant.

**Discussion:** Captain Lundeby is at PBSP right now. Dr. Canning said that 20 beds at CMF DMH have been put back into service as crisis beds for CMF. This reduces the number of swing beds in the crisis beds. He said that there has always been flexibility with the use of the beds. New beds can only be used for mental health, not CTC. Captain Lundeby thinks that the project will be completed by the end of the first period of the next fiscal year.

**Action:** None.

**b.  Training issues**

**Background:**

**Discussion:** This item was not discussed.

**Action:** None.

| Periodic (recurring) items |
|---|

**a.  Suicide Prevention Videoconference Agenda**

**Background:** Monthly Suicide Prevention Videoconference statewide.

**Discussion:** There was a conference last week.

**Action:** Ongoing.

| Ongoing, Tabled, and Postponed Items |
|---|

| Wrap Up and Other Business |
|---|

| Date of next meeting: | July 2, 2012 |
|---|---|
| F.I.T.          Leader Approval of Minutes: | Signature<br>**Robert Canning, Ph.D.**<br>**Senior Psychologist, Specialist**                    6/29/2012<br>Date |

- 4 -

# Exhibit E

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

- Interact with these inmate-patients daily on scheduled work days (instead of weekly)

- Include in the treatment plan efforts to reduce resistance to participation in group therapy

- Discuss these inmate-patients during the ASU morning meeting with custody

- Consider referral of inmate-patients to higher levels of care and document the results of this consideration.

## I. INPATIENT PLACEMENT

Inmates who are found to meet the clinical criteria for referral to the MHCB for inpatient care shall immediately be transferred for such treatment, upon authorization by the Chief of Mental Health of the sending institution. (Refer to Section 5, Mental Health Crisis Bed, for transfer procedure)

If an ASU inmate-patient in an MHCB is determined to meet the clinical criteria for referral to the Department of Mental Health (DMH) program, the Chief of Mental Health or designee, of the sending institution shall initiate the referral process following established procedures to facilitate the admission to a DMH program.

## J. STAND-ALONE ADMINISTRATIVE SEGREGATION UNITS

1. No participant in the MHSDS shall be housed in a stand-alone ASU. Any inmate-patient included in the MHSDS, who is inadvertently placed in a stand-alone ASU, shall be transferred out within 24 hours.

2. LPTs shall make rounds seven days a week.

3. A mental health clinician shall conduct an assessment of any inmate in a stand-alone ASU identified and referred by the LPT or any staff immediately or within 24 hour depending on urgency of the referral. Any inmate who meets criteria for MHSDS sha be transferred to another ASU as soon as possible but no longer than 24 hours followin identification.

## K. PLACEMENT REVIEW AND CLINICAL INPUT IN CLASSIFICATIC COMMITTEE

1. The initial IDTT is held prior to the initial ICC and as often as needed thereafter, a minimum, once every 90 days. The PC and the Correctional Counselor assigned to case shall present relevant clinical and custody case factors with recommendati

# Exhibit F

(Prisoner CDCR Number Redacted)

Page 1

| PUF<br>Progress Update Form | PLEASANT VALLEY<br>STATE PRISON | | |
|---|---|---|---|
| Date: August 28, 2012 | Name of QIT: **Mental Health Service Reduction** | | |
| Name of members | Title | Present | Absent |
| 1. **Chair:** Gary Hoffman, Ph.D | Chief of Mental Health | ☒ | ☐ |
| 2. M. Mullan, Ph.D. | Senior Psychologist, Supervising | ☐ | ☒ |
| 3. M. Murphy, Ph.D. | Senior Psychologist, Supervising | ☐ | ☒ |
| 4. B. Satterthwaite, Psy.D. | Senior Psychologist, Supervising | ☐ | ☒ |
| 7. E. Malarchick, Ph.D. | Senior Psychologist, Supervising (A) | ☐ | ☒ |
| 8. D. Flores | HPS I, Mental Health | ☒ | ☐ |
| 9. J. Tran | OT | ☒ | ☐ |

☒ **Define the issue or process problem:** *(check box (s) and give explanation in comment section)*

　　☐ Study an issue or process problem and collect data to make sure the issue or process problem is understood.

　　☒ Review existing policies, procedures, processes, and strategies.

　　☐ Write an issue or process problem statement below and present to the program subcommittee for confirmation.

Comments:

As a result of staffing shortages, budget constraints and incorrect inmate-patient population projections delivery of MH services which meet Coleman guidelines is adversely impacted. The QIT is chartered to consider and recommend strategies for service reduction which will optimize available staff time while providing quality care to the fullest extent possible. Look for areas where changes can be made and still stay within the Program Guide.

☒ **Analyze the issue or process problem:** *(check box (s) and give explanation in comment section)*

　　☒ Collect more data to clarify the issue or process problem. Identify root causes and obstacles.

　　☐ Review any pending action items and add new items.

　　☒ Attach all data, and any other relevant documentation to this PUF.

Comments:

Continue to research items considered for service reduction. Committee looked at suggestions from last meeting. Discussed staffing issues and workloads and their relationship to recent suicide. Looked at trends in increasing inmate population and discussed possible solutions to handle workload with current staffing levels. Discussed changes in psychiatry scheduling to help alleviate the current backlog with appointments that need to be scheduled with psychiatry. Discussed implementation of scheduling procedures created at last QIT to help with low number of routine referrals being completed within timeframe guidelines.

☒ **Select a solution or recommendation:** *(check box (s) and give explanation in comment section)*

　　☐ Evaluate each potential solution or recommendation against the weighted criteria. (Brainstorm)

　　☐ Choose criteria to evaluate potential solutions or recommendations.

PVSP
PUF Form
Page 2 of 2

☒ Include criteria of ease of implementation, impact on causes and/or obstacles, cost, schedules, workload, likelihood of success, training, and risk exposure.

☐ Select best solution/recommendation and present to the program subcommittee for approval.

Comments:

Discussed issues involving inmate ▓▓▓▓ suicide and how staffing levels may have been a contributor to follow-ups not occurring as described in inmate's treatment plan. Also, training on documentation was provided to staff. They are to make lists of inmates that need IDTT but are unable to schedule. Clinicians are to inform supervisor of any problems. Supervisors are to check in with their staff monthly to review IDTT needed list. Issues stemming from high rates of new arrival inmates increasing MHSDS population were conveyed to headquarters and they will look into slowing the intake here at Pleasant Valley State Prison. The Chief of Mental Health met with the Chief Psychiatrist (A) and outlined new procedures to help improve the use of psychiatry appointments (ATTACHED). Since the schedulers have started scheduling routine referrals for the clinicians, there has been a small increase in the number of referrals being completed on time.

| New Action Items | Persons Responsible | Due Date |
|---|---|---|
| 1. Update on new staffing model for Mental Health and hiring of those positions | CMH | TBA |
| 2. Updated productivity numbers for case managers and psychiatrists | CMH | TBA |
| 3. Data for routine referral timeframe being met | HPS I | TBA |
| 4. Data provided by PCs for inmates needing IDTT scheduling | Sr. Psychologist | TBA |

Date of next meeting:  TBA

QIT Chair: _~OHHn RD_                                    8/20/12

GARY L. HOFFMAN, Chief of Mental Health          Date

Approved by Mental Health Subcommittee:

GARY L. HOFFMAN, Chief of Mental Health          Date

Approved by QMC:

Signature and Title          Date

Revised 1/2007

STATE OF CALIFORNIA
IN-SERVICE TRAINING SIGN-IN SHEET
CDC 844 (REV. 08/98)

IST DATA BASE _____
BUDGET FOLDER _____
TIMEKEEPER _____

| CLASS TITLE | CLASS CODE | CLASS TIME | CLASS DATE |
|---|---|---|---|
| QIT-MENTAL HEALTH SERVICE REDUCTION | B-9771 | 1400 TO 1500 | AUGUST 28, 2012 |

| CLASS DESIGNATED FOR | INSTRUCTOR'S NAME | LENGTH OF CLASS (In hours) | CLASS LOCATION |
|---|---|---|---|
| ALL MENTAL HEALTH STAFF | DR. GARY HOFFMAN | 1 HOUR | VARIES |

| | LAST 4 DIGITS SSN. | PRINT FULL NAME (LAST, FIRST) | PPAS ID | WORK CLASS | TODAY'S WORK HOURS | IN | OUT | MEAL BREAK Y OR N | OVER TIME HOURS | FULLTIME OR PIE | SIGNATURE | Class Score Instructor Use Only |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | 7882 | TRAN, JOSEPH | | OT | 0700-1500 | 1400 | 1500 | N | N | FT | | |
| 2. | 0040 | FLORES, Deborah | | HPS | 0600-1600 | 1400 | 1600 | EN | N | FT | | |
| 3. | 9397 | HOFFMAN, GARY | | CMH | 06-16 | 14 | 16 | N | N | FT | | |
| 4. | | | | | | | | | | | | |
| 5. | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | |
| 7. | | | | | | | | | | | | |
| 8. | | | | | | | | | | | | |
| 9. | | | | | | | | | | | | |
| 10. | | | | | | | | | | | | |
| 11. | | | | | | | | | | | | |
| 12. | | | | | | | | | | | | |
| 13. | | | | | | | | | | | | |
| 14. | | | | | | | | | | | | |
| 15. | | | | | | | | | | | | |
| 16. | | | | | | | | | | | | |
| 17. | | | | | | | | | | | | |
| 18. | | | | | | | | | | | | |
| 19. | | | | | | | | | | | | |
| 20. | | | | | | | | | | | | |
| 21. | | | | | | | | | | | | |
| 22. | | | | | | | | | | | | |
| 23. | | | | | | | | | | | | |
| 24. | | | | | | | | | | | | |
| 25. | | | | | | | | | | | | |

ALL COLUMNS MUST BE COMPLETED ACCURATELY

IN ORDER TO RECEIVE APPROPRIATE CREDIT

INSTRUCTOR'S SIGNATURE

LAST 4 DIGITS OF SSN
9397

Service Reduction QIT                                              08/28/12

### Proposed Changes to Psychiatry Scheduling

1. Weekend lines:  Ducat medication non-compliant IMs.

2. If there is a pending IDTT, rather than schedule a psychiatrist contact, bundle all psychiatry related concerns into IDTTs – medication renewals, referrals, noncompliance.

3. Psychiatry will write bridge orders that provide four weeks of medication.  Bundle all psychiatry related concerns into the upcoming appointment.

4. Substitute a new psychiatry appointment if an IDTT has been held in last week (*month?*) that had a psychiatrist in attendance.  We don't want to see IM in IDTT and then have psychiatry see them again in the next few days.  Psychiatrists, when preparing their contacts for the day will call and ask for a new IM to be seen if they note that an IM was recently seen by psychiatry.

5. CM will turn in IDTT requests at least 1 week early.  *"Penalty" for failure to do this?*

6. All clinicians are responsible for educating the IM that IDTTs provide an opportunity to have medication concerns addressed at that time.

7. Group all psychiatry referrals received during the week for review over the weekend by psychiatry.  The weekend psychiatrist will review of the eUHR and other documentation and write orders, if appropriate, to close the referral.  Psychiatrist will return all referrals with each noted whether the referral was completed or if the IM should be scheduled for F/U by psychiatry.

### PVSP Census / MHSDS Census/ MHSDS Concentration

### & Staffing Summary

| Date | Census | % | Note |
|---|---|---|---|
| 1/19/11 | 4,720*/1,952 | 41.4% | |
| 2/16/11 | 4,720*/ 1,939 | 41.1% | |
| 8/11/11 | 4,620 / 1,839 | 39.8% | |
| 8/29/11 | 4,603 / 1,831 | 39.8% | |
| 9/07/11 | 4,588 / 1,838 | 40.1% | |
| 9/21/11 | 4,624 / 1,840 | 39.8% | |
| 11/07/11 | 4,427 / 1,795 | 40.5% | AB 109 Effective 10/1/11 |
| 11/21/11 | 4,223 / 1,768 | 41.9% | PVSP** 4,476 (DG -120) |
| 12/05/11 | 4,032 / 1,729 | 42.9% | |
| 12/19/11 | 3,851 / 1,681 | 43.7% | PVSP** 3,961 (AG -120; Fac B -75; Fac C -320) |
| 1/04/12 | 3,744 / 1,654 | 44.2% | PVSP** 3,817 (D Dayroom -144) |
| 1/18/12 | 3,765 / 1,655 | 43.6% | |
| 2/01/12 | 3,782 / 1,674 | 44.3% | |
| 2/15/12 | 3,780 / 1,684 | 44.6% | |
| 2/29/12 | 3,807 / 1,702 | 44.7% | |
| 3/14/12 | 3,767 / 1,678 | 44.5% | PVSP** 3,757 (Fac D -60) |
| 4/02/12 | 3,733 / 1,664 | 44.6% | |
| 4/16/12 | 3,740 / 1,646 | 44.0% | |
| 5/07/12 | 3,729 / 1,653 | 44.3% | |
| 5/21/12 | 3,719 / 1,653 | 44.5% | |
| 6/1/12 | 3,714 / 1,657 | 44.6% | |
| 6/12/12 | 3,706 / 1,661 | 44.8% | |
| 6/26/12 | 3,739 / 1,678 | 44.9% | |
| 7/12/12 | 3,780 / 1,712 | 45.3% | |
| 7/31/12 | 3,803 / 1,722 | 45.3% | |
| 8/14/12 | 3,760 / 1,710 | 45.5% | PVSP** 3,632 (Fac B -125) |
| 8/23/12 | 3,742 / 1,712 | 45.8% | |
| September 2012 | | | PVSP** 3,557 (Fac A -75) |

*Estimated overall census on those dates.

** PVSP Census based on projections from "CDCR AB 109 Institution Activation Schedule" released 8/5/11 which lists institution capacity changes and inter-institution bed moves.

PVSP MHSDS staffed capacity is 1,499. Current MHSDS population is 1,712, which is 114% of capacity. FY 12/13 MH Staffing Ratio Model (8/1/12) indicates PVSP should have 63.5 positions to support a treatment population of 1,499. However, only 31.5 (50%) are currently filled. If long-term absences are considered 30.5 (48%) are currently staffed. The details are:

|  | Model | Filled | % Filled |  |
|---|---|---|---|---|
| Psychologists: | 16 | 14 (18*) | 88% | (113%*) |
| Social Workers | 14 | 1.5 (2.5) | 11% | (18%) |
| Psychiatrists: | 8 | 5    (5.25) | 63% | (66%*) |
| Sr Psychologist, Supr | 2 | 1 | 50% |  |
| Sr Psychologist, Spec | 2 | 0 | 0% |  |
| Sup Psych Soc Wkr | 1 | 0 | 0% |  |
| Chief Psychiatrist | 1 | 1 (out LT) | 100% | (0%) |
| Chief Psychologist | 2** | 1 | 50% |  |
| CHSA II | 1** | 0 | 0% |  |
| Office Tech (T) | 11 | 6 | 55% |  |
| Office Svcs Supr II | 1 | 1 | 100% |  |
| Health Prog Spec I | 3 | 1 | 33% |  |
| Rec Therapists | 1.5 | 0 | 0% |  |

* Includes dual appointments, retired annuitant and registry

** 1.0 Chief Psychologist and 1.0 Correctional Health Services Administrator shall not be filled – positions held for salary savings.

Hoffman, Gary@CDCR

| | |
|---|---|
| **From:** | Force, Elaine@CDCR |
| **Sent:** | Tuesday, August 28, 2012 12:39 PM |
| **To:** | Hoffman, Gary@CDCR; Bylund, Steven@CDCR |
| **Subject:** | Re: SEND AND INTAKE FOR THE WEEK OF 8/27/2012 |

Gary,

I will forward to HCPOP and see what we can do to slow down your intake.

**From:** Hoffman, Gary@CDCR
**Sent:** Tuesday, August 28, 2012 09:44 AM
**To:** Bylund, Steven@CDCR; Force, Elaine@CDCR
**Subject:** FW: SEND AND INTAKE FOR THE WEEK OF 8/27/2012

31 new arrivals represents 100+ hours of staff time – case manager contact, psychiatry contact, interdisciplinary treatment team, support staff tracking - and all the paperwork that goes with it. In addition nursing, pharmacy, medical records and custody resources are impacted getting these new patients on board. The number also represents a 1.8% turnover in our patient population in just one week. For the past 3 months we have been treated like a MH program at a Reception Center but I don't have the staff to devote to the full-time jobs this is requiring. Our MHDS population is now as high as it was in early December. It will be easier at some point down the road if we are successful in filling vacancies but at this time it is untenable. I will be passing this on through the MH chain.

Gary L. Hoffman, Ph.D.
Chief of Mental Health, Pleasant Valley State Prison
Division of Correctional Health Care Services

Office: 559-935-4900x5413
Fax: 559-935-7026

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use disclosure, or distribution is prohibited and may violate applicable laws, including the Electronic Communications Privacy Act. If you are not an intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Buckley, Jonathan@CDCR
**Sent:** Monday, August 27, 2012 11:53 AM
**To:** Joslin, Charles@CDCR; Igbinosa, Felix@CDCR; Hoffman, Gary@CDCR
**Subject:** FW: SEND AND INTAKE FOR THE WEEK OF 8/27/2012

Bad week. We will be receiving 31 CCCMS inmates this week and only sending out 9.

*Jonathan Buckley*
*Associate Warden*
*Housing C/D/E and Ad Seg*
*Pleasant Valley State Prison*
*(559) 935-5716*
*JONATHAN.BUCKLEY@CDCR.CA.GOV*

# Exhibit G

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    EDMUND G. BROWN, JR., GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
STATEWIDE MENTAL HEALTH PROGRAM
P.O. Box 942883
Sacramento, CA94283-0001



February 1, 2013

Matthew A. Lopes, Jr. Esquire                    via: Debbie J. Vorous, Esquire
Office of the Special Master                          Deputy Attorney General
Pannone Lopes & Devereaux LLC                        Department of Justice
317 Iron Horse Point Way, Suite 301                  1300 "I" Street, Suite 125
Providence, RI  02908                                P. O. Box 944255
                                                     Sacramento, CA  94244-2550

RE: **COLEMAN MONTHLY REPORT OF INFORMATION REQUESTED AND RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES**

Dear Mr. Lopes:

Enclosed is the Coleman Monthly Report reflective of December, 2012, data (or as otherwise noted).  The following is the list of enclosures:

1. Mental Health Services Delivery System (MHSDS) Staffing Allocation and Vacancy History.
2. MHSDS Hiring Activity Report.
3. Health Care Placement Oversight Program (HCPOP) Information Report, Summary and Administrative Segregation Greater than 60 Days.
4. Mental Health Contract Services including Summary and Telemedicine Monthly Report for all disciplines.
5. California Department of Corrections and Rehabilitation (CDCR) Reception Center (RC) Monthly Report.
6. Monthly Summary of Mental Health Crisis Bed use by Institution Titles Inpatient Psychiatric Aging Report.
7. Referrals for Transfer to the Department of Mental Health (including admissions).
8. Atascadero State Hospital (ASH) Discharges.
9. Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program.
10. The Department of Mental Health (DMH) Monthly Report of CDCR Patients in DMH Hospitals -- Summary and Penal Code 2684.
11. Suicide Report.
12. Statistics on Contracted Registered Nurse (RN).  **(No Longer Available)**
13. RC Processing for MHSDS Inmate Patients.
14. Medical Technical Assistant (MTA) Vacancy Report.  **(No Longer Available)**
15. Allocated Case Manager Positions and Vacancies for the EOP Administrative Segregated Hub institutions.
16. EOP Inmates Waiting Transfer to a Psychiatric Services Unit (PSU).

# Mental Health Population By Institution
Download Date: December 7, 2012

 CONFIDENTIAL

## SUMMARY OF OUTPATIENT POPULATION
### (ASU, GP, RC and SHU Detail on pages 2-4)

| Institution | CCMS [1] | | | EOP [2] | | | PSU [2] | | | Inst Total Outpatient Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| ASP | 1099 | 1319 | 120% | | 5 | | | | | 1324 |
| CAL | | 28 | | | | | | | | 28 |
| CCC | | 7 | | | | | | | | 7 |
| CCI | 1349 | 1090 | 81% | | 4 | | | | | 1094 |
| CCWF | 899 | 1188 | 132% | 64 | 43 | 67% | | | | 1231 |
| CEN | | 28 | | | | | | | | 28 |
| CIM | 1299 | 1380 | 106% | | 53 | | | | | 1433 |
| CIW | 499 | 592 | 119% | 85 | 66 | 78% | 20 | 17 | 85% | 675 |
| CMC | 1099 | 990 | 90% | 634 | 593 | 94% | | | | 1583 |
| CMF | 599 | 482 | 80% | 391 | 413 | 106% | | | | 895 |
| COR | 949 | 1213 | 128% | 249 | 250 | 100% | | | | 1463 |
| CRC-M | 848 | 966 | 114% | | 1 | | | | | 967 |
| CTF | 845 | 1085 | 128% | | 7 | | | | | 1092 |
| CVSP | | 5 | | | | | | | | 5 |
| DVI | 649 | 423 | 65% | | 12 | | | | | 435 |
| FOL | 599 | 485 | 81% | | 3 | | | | | 488 |
| HDSP | 699 | 789 | 113% | | 5 | | | | | 794 |
| ISP | 11 | | | | | | | | | 11 |
| KVSP | 1000 | 1242 | 124% | 96 | 91 | 95% | | | | 1333 |
| LAC | 1149 | 1298 | 113% | 374 | 387 | 103% | | | | 1685 |
| MCSP | 1149 | 1063 | 93% | 546 | 544 | 100% | | | | 1607 |
| NKSP | 799 | 854 | 107% | | 69 | | | | | 923 |
| PBSP | 349 | 243 | 70% | 66 | 67 | 102% | 128 | 117 | 91% | 427 |
| PVSP | 1499 | 1715 | 114% | | 2 | | | | | 1717 |
| RJD | 1199 | 1417 | 118% | 543 | 541 | 100% | | | | 1958 |
| SAC | 849 | 737 | 87% | 458 | 382 | 83% | 256 | 235 | 92% | 1354 |
| SATF | 1199 | 1563 | 130% | 352 | 367 | 104% | | | | 1930 |
| SCC | 499 | 531 | 106% | | 2 | | | | | 533 |
| SOL | 1199 | 1091 | 91% | | 10 | | | | | 1101 |
| SQ | 899 | 1015 | 113% | 36 | 42 | 117% | | | | 1057 |
| SVSP | 999 | 1275 | 128% | 264 | 222 | 84% | | | | 1497 |
| VSP | 849 | 565 | 67% | | 1 | | | | | 566 |
| WSP | 1049 | 884 | 84% | | 65 | | | | | 949 |
| TOTAL | 26118 | 27574 | 106% | 4158 | 4247 | 102% | 404 | 369 | 91% | 32190 |

# Exhibit H

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    EDMUND G. BROWN, JR., GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
**STATEWIDE MENTAL HEALTH PROGRAM**
P.O. Box 942883
Sacramento, CA94283-0001



February 1, 2013

Matthew A. Lopes, Jr. Esquire                      via: Debbie J. Vorous, Esquire
Office of the Special Master                             Deputy Attorney General
Pannone Lopes & Devereaux LLC                      Department of Justice
317 Iron Horse Point Way, Suite 301                1300 "I" Street, Suite 125
Providence, RI  02908                                   P. O. Box 944255
                                                        Sacramento, CA  94244-2550


**RE: COLEMAN MONTHLY REPORT OF INFORMATION REQUESTED AND RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES**

Dear Mr. Lopes:

Enclosed is the Coleman Monthly Report reflective of December, 2012, data (or as otherwise noted).  The following is the list of enclosures:

1.  Mental Health Services Delivery System (MHSDS) Staffing Allocation and Vacancy History.
2.  MHSDS Hiring Activity Report.
3.  Health Care Placement Oversight Program (HCPOP) Information Report, Summary and Administrative Segregation Greater than 60 Days.
4.  Mental Health Contract Services including Summary and Telemedicine Monthly Report for all disciplines.
5.  California Department of Corrections and Rehabilitation (CDCR) Reception Center (RC) Monthly Report.
6.  Monthly Summary of Mental Health Crisis Bed use by Institution Titles Inpatient Psychiatric Aging Report.
7.  Referrals for Transfer to the Department of Mental Health (including admissions).
8.  Atascadero State Hospital (ASH) Discharges.
9.  Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program.
10. The Department of Mental Health (DMH) Monthly Report of CDCR Patients in DMH Hospitals -- Summary and Penal Code 2684.
11. Suicide Report.
12. Statistics on Contracted Registered Nurse (RN).  **(No Longer Available)**
13. RC Processing for MHSDS Inmate Patients.
14. Medical Technical Assistant (MTA) Vacancy Report.  **(No Longer Available)**
15. Allocated Case Manager Positions and Vacancies for the EOP Administrative Segregated Hub institutions.
16. EOP Inmates Waiting Transfer to a Psychiatric Services Unit (PSU).

Correctional Health Care Services
Mental Health Institution Vacancies

**SUMMARY BY INSTITUTION BY CLASSIFICATION**
**As Of December - 2012**

| PVSP | | FY 12/13 | SCO DATA | | | ADJUSTMENTS | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Abbrev Class Title | Class Code | Authorized Per 7A | Established | Filled | Vacant | 918 | 920 | Registry (PY) | Hires | Adjusted Vacancy | Percent Vacant |
| CHIEF PSYCHIATRIST, CORRECTIONAL AND REHABILITITATIVE SERVICES (SAFETY) | 9774 | 1.00 | 1.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 100.00% |
| CHIEF PSYCHOLOGIST/CF | 9859 | 2.00 | 2.00 | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 50.00% |
| CLINICAL SOCIAL WORKER (HEALTH/CF)-SAFETY | 9872 | 14.00 | 14.50 | 3.00 | 11.50 | 0.00 | 0.00 | 0.78 | 1.00 | 9.22 | 65.86% |
| CORRECTIONAL HEALTH SERVICES ADMINSTRATOR II, CORRECTIONAL FACILITY | 4912 | 1.00 | 1.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 100.00% |
| HEALTH PROGRAM SP I | 8338 | 3.00 | 3.00 | 2.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 33.33% |
| OFFICE SERVICES SUP II (G) | 1150 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| OFFICE TECH (T) | 1139 | 11.00 | 11.50 | 4.00 | 7.50 | 0.00 | 0.00 | 0.00 | 0.00 | 7.00 | 63.64% |
| PSYCH-CLINIC CF | 9283 | 15.99 | 16.00 | 11.00 | 5.00 | 0.00 | 0.00 | 1.82 | 0.00 | 3.17 | 19.82% |
| REC THERAPIST CF | 9286 | 1.50 | 2.00 | 0.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.50 | 100.00% |
| SR PSYCH CF/SP | 9287 | 2.00 | 2.00 | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 50.00% |
| SR PSYCH CF/SUP | 9288 | 2.00 | 2.00 | 1.50 | 0.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.50 | 25.00% |
| STAFF PSYCHIATRIST, CORRECTIONAL AND REHABILITATIVE SERVICES (SAFETY) | 9758 | 8.00 | 9.00 | 5.00 | 4.00 | 0.00 | 0.00 | 0.17 | 0.00 | 2.83 | 35.38% |
| SUP PSYCH S WK I CF | 9291 | 1.00 | 1.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 100.00% |
| | Totals | 63.49 | 66.00 | 29.50 | 36.50 | 0.00 | 0.00 | 2.77 | 1.00 | 30.22 | 47.60% |

Source: FY 12/13 7A; SCO Reports; MIRS reports; Hire Tracking System

Report Generated By:

Resource Management

# Exhibit I



**Exhibit J**



# Exhibit K

STATE OF CALIFORNIA
**BUDGET CHANGE PROPOSAL - COVER SHEET**
**FOR FISCAL YEAR**    2010-11
F-46 (WORD Version)(REV 04/08)
*lease report dollars in thousands.*

| | | | Department of Finance<br>915 L Street<br>Sacramento, CA 95814<br>IMS Mail Code: A-15 |
|---|---|---|---|

| BCP #<br>7 | PRIORITY NO. | ORG. CODE<br>5225 | DEPARTMENT<br>Corrections and Rehabilitation |
|---|---|---|---|
| PROGRAM<br>50 | ELEMENT<br>30 | COMPONENT<br>090 | |

TITLE OF PROPOSED CHANGE
Mental Health Ratio Staffing

SUMMARY OF PROPOSED CHANGES
On June 16, 2009, the *Coleman* Court ordered that the California Department of Corrections and Rehabilitation (CDCR) resolve all outstanding allocation issues as well as include a description of the funding source(s) for the staffing needs identified in the implementation plan. CDCR's Division of Correctional Health Care Services (DCHCS), Mental Health Program (MHP) is requesting 362.1 positions and $77.2 million to be allocated over the next five fiscal years to fully implement a ratio-driven staffing model to replace the Workload Study approved in the FY 2008-09 Budget Change Proposal process. The Budget Change Proposal Process will also remove 245.1 unfunded positions. The purpose of costing the unfunded positions is to correct unfunded classifications while using the workload study and subsequently zeroing out the position authority. The proposed, ratio-driven model was developed under the guidance of the *Coleman* Court Special Master, and will be used to determine staffing allocations for the various levels of care within the institution. The new staffing ratios will be used twice each year, based on the May Revise mental health population and the Fall Population Process to determine the resources necessary to provide services. The Budget Proposal Process reflects the following changes: 1) Removing unfunded positions. There are 245.1 of the 404.7 positions that were unfunded and were not Receiver classifications. The adjustment is correcting the 2008-09 Finance Letter which was attributed to the Workload Study, which was decided to be an incorrect methodology to use. This BCP uses a more ideal methodology for the Mental Health program while removing the unfunded positions which included incorrect classifications produced by the Workload Study; 2) In the 2008-09 May Revise, the population inadvertently showed 121 OHU beds and not 26; this has been corrected in the BCP and 3) A fifth year is provided as a ~mple of full year funding for partially funded positions.

| ~EQUIRES<br>LEGISLATION<br><br>☐ YES<br>☒ NO | CODE SECTION(S) TO BE<br>AMENDED/ADDED | BUDGET IMPACT—PROVIDE LIST AND<br>MARK IF APPLICABLE<br>☐ ONE-TIME COST      ☐ FUTURE<br>                                                SAVINGS<br>☒ FULL-YEAR COSTS  ☐ REVENUE<br>☐ FACILITIES/CAPITAL COSTS |
|---|---|---|

| PREPARED BY<br>Daryl Brown<br>Staff Services Manager II | DATE<br>12.22.09 | REVIEWED BY<br>Dave Lewis, Deputy Director<br>Office of Fiscal Services | DATE<br>12/23/09 |
|---|---|---|---|
| DEPARTMENT DIRECTOR<br>Sharon Aungst<br>Chief Deputy Secretary | DATE<br>12.22.09 | AGENCY SECRETARY<br>Matthew Cate<br>Agency Secretary | DATE<br>12/24/09 |

DOES THIS BCP CONTAIN INFORMATION TECHNOLOGY (IT) COMPONENTS?    YES ☐    OR    NO ☐
IF YES, DEPARTMENT CHIEF INFORMATION OFFICER SIGNATURE          DATE

FOR IT REQUESTS, SPECIFY THE DATE A SPECIAL PROJECT REPORT (SPR) OR FEASIBILITY STUDY
REPORT (FSR) WAS APPROVED BY THE OFFICE OF THE CHIEF INFORMATION OFFICER (OCIO), OR
PREVIOUSLY BY THE DEPARTMENT OF FINANCE.
DATE      PROJECT #          FSR ☐    OR    SPR ☐

IF PROPOSAL AFFECTS ANOTHER DEPARTMENT, DOES OTHER DEPARTMENT CONCUR WITH
PROPOSAL?
☐ YES    ☐ NO          ATTACH COMMENTS OF AFFECTED DEPARTMENT, SIGNED AND
                              DATED BY THE DEPARTMENT DIRECTOR OR DESIGNEE.

**DEPARTMENT OF FINANCE ANALYST USE (ADDITIONAL REVIEW)**

| CAPITAL OUTLAY ☐    ITCU ☐    FSCU ☐    OSAE ☐    CALSTARS ☐    OCIO ☐ |
|---|

DATE SUBMITTED TO THE LEGISLATURE:              JAN 0 7 2010          PPBA: Original Signed by:
                                                                          Jay Sturges

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
BUDGET CHANGE PROPOSAL
FISCAL YEAR 2010-11

**Division of Correctional Health Care Services – Mental Health Program**

**Mental Health Ratio Staffing**

## A. NATURE OF REQUEST

On June 16, 2009, the *Coleman* Court ordered that the California Department of Corrections and Rehabilitation (CDCR) resolve all outstanding allocation issues as well as include a description of the funding source(s) for the staffing needs identified in the implementation plan. CDCR's Division of Correctional Health Care Services (DCHCS), Mental Health Program (MHP) is requesting 362.1 positions and $77.2 million to be allocated over the next five fiscal years to fully implement a ratio-driven staffing model to replace the Workload Study approved in the FY 2008-09 Budget Change Proposal process. The Budget Change Proposal Process will also remove 245.1 positions from the FY 2008-09 Mental Health Workload Study BCP (less the Receiver positions) to offset the total position request of 607.2. The purpose of costing the unfunded positions is to correct unfunded classifications while using the workload study, and subsequently zeroing out the position authority. The proposed, ratio-driven model was developed under the guidance of the *Coleman* Court Special Master, and will be used to determine staffing allocations for the various levels of care within the institution. The new staffing ratios will be used twice each year, based on the May Revise mental health population and the Fall Population Process to determine the resources necessary to provide services to the mental health inmate population.

The Budget Change Proposal reflects the following changes:  1) Removing unfunded positions. There are 245.1 of the 404.7 positions that were unfunded and were not Receiver classifications. The adjustment is correcting the 2008-09 Finance Letter which was attributed to the Workload Study, which was decided to be an incorrect methodology to use. This BCP uses a more ideal methodology for the Mental Health program while removing the unfunded positions which included incorrect classifications produced by the Workload Study; 2) In the 2008-09 May Revise, the population inadvertently showed 121 OHU beds and not 26; this has been corrected in the BCP and 3) A fifth year is provided as a sample of full year funding for partially funded positions.

## B. BACKGROUND/HISTORY

The DCHCS developed various strategies and systems over the years to determine the adequate number and classification of staff required to provide effective and efficient quality mental health services to inmates to meet the *Coleman* Court requirements.  Preliminary ratios released with the 1997 Mental Health Services Delivery System (MHSDS) Program Guide determined mental health staffing from 1997-2006.  In 2006, additional mental health staff was allocated to perform duties associated with the release of the revised version of the MHSDS 2006 Program Guide. Concurrently, the *Coleman* Court ordered CDCR to hire

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
BUDGET CHANGE PROPOSAL
FISCAL YEAR 2010-11

an expert to perform an analysis of the workload driven by the MHP. Funding was allocated and the expert analysis included visits to 30 institutions, a review of all tasks required by the MHSDS 2006 Program Guide, and the development of a mathematical model to guide future staffing. This analysis yielded the Staffing Analysis Model (SAM), a final product that has proven to be unreliable in its findings.

The SAM was comprised of three Master Control Files, 33 site files, 271 program modules, 2,435+ tasks, and 33,450 workload subtasks by position. The model was contained in a set of linked Excel spreadsheets and errors are impossible to find. It is difficult to verify and replicate the results produced by the model. Furthermore, execution and maintenance of the system requires four, full-time staff. The complicated mathematical model relies on flawed mechanics and erroneous assumptions. The application is vulnerable to data corruption, and the data is inaccurate.

Moreover, the "master assumptions" were not verified by CDCR Mental Health Chiefs or other clinical supervisors and managers in the field, nor were they partners in the SAM development. As a result, many of the core model assumptions were clinically, or otherwise, flawed while other critical assumptions were not included.

The *Coleman* Special Master highlighted concerns regarding the SAM in a letter to the DCHCS dated July 12, 2008. The concerns most troubling are cited as:

- Some of the data used to drive the staffing numbers is unreliable and not based on objective measures. Consequently, time estimates for the necessary tasks are inaccurate.
- Some critical tasks not specified in the 2009 Program Guide are not included in their calculations.
- The SAM is a point-in-time study that does not take into account additional workload requirements for mental health practitioners resulting from projected clinical revisions to the Program Guide subsequent to January 2007.
- All additional workload requirements for mental health practitioners resulting from approved plans subsequent to *Coleman* Court Orders are likewise not included.
- Some key assumptions based upon factors such as percentages of time allocations to clinical positions, with regard to the 2009 Program Guide, as well as on-site interviews are considerably flawed. An example of a flawed assumption relates to the inaccurate reporting of the percentage of inmate-patients on medication.
- The discipline specific implementation of mental health treatment at some institutions was not distinguished or recognized by SAM.
- Questions about some of the assumptions remain unanswered.

Despite these concerns, the SAM was implemented as the new staffing model in the 2008-09 Budget Act and 407.7 unfunded positions were allocated to the DCHCS MHP. Three positions were removed in the legislative change. These 404.7 positions have yet to be funded or filled because DCHCS staff has been working for over a year to resolve the computing issues overshadowing the mathematical complexities of SAM. As a result,

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
BUDGET CHANGE PROPOSAL
FISCAL YEAR 2010-11

DCHCS staff was unable to appropriately respond to questions raised by the DOF and the *Coleman* Special Master on multiple occasions.

## C. STATE LEVEL CONSIDERATIONS

Under *Coleman*, CDCR is mandated to provide plans for the provision of acute and intermediate, in-patient beds for all seriously, mentally ill inmates within 24 hours of a clinical determination. In June 2009, the *Coleman* Court issued subsequent court orders (see Attachment A) primarily mandating that the CDCR MHP, "complete a staffing plan by the end of August 2009...and the plan shall be developed under the guidance of the Special Master."

Pursuant to this order, the Department has vigorously worked to develop a staffing plan, under the guidance of the Special Master, which identifies appropriate staffing levels to meet constitutional standards, avoid costly litigation, and further action by the courts.

## D. FACILITY/CAPITAL OUTLAY CONSIDERATIONS

None.

## E. JUSTIFICATION

On May 26, 2009, *Coleman* Defendants submitted a Bed Plan (Plan) for their short-term and intermediate-term projects. In the Plan, Defendants informed the Court that some of these proposals would require the hiring of additional mental health, nursing, custody and support staff to implement the projects. Counsel for the *Coleman* class members alleged that the Defendants did not identify specific funding sources they would use for funding proper staffing levels for these projects. On June 16, 2009, the Court ordered that Defendants continue to take all steps necessary to resolve all outstanding allocation issues, complete a staffing plan by the end of August 2009, and develop the plan under the guidance of the Special Master. On September 4, 2009, the Court extended the time to complete the plan to September 30, 2009, ordering that it include a description of the funding source(s) for the staffing needs identified in the plan. On September 30, 2009, CDCR met the Court's deadline by filing its staffing plan. This BCP is a formal request for resources to support that staffing plan.

In responding to the *Coleman* Court Order, the DCHCS Chief Deputy Secretary met and consulted with numerous DCHCS headquarters staff from mental health administration, DOF, CDCR BMB, and highly experienced mental health management and staff from the field to discuss viable methods to meet the court orders. A ratio-driven staffing model was selected as the most accurate model.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
BUDGET CHANGE PROPOSAL
FISCAL YEAR 2010-11

**Ratio Development**

The Chief Deputy Secretary met with DOF, CDCR field offices, CDCR BMB, administrative and mental health clinical staff familiar with the SAM to review the current SAM as well as concerns related to the SAM.  Several DCHCS clinical staff, in consultation with database experts conducted an extensive review of the SAM.

The *Coleman* Special Master set up a series of meetings with DCHCS leadership, and the key stakeholders including the DOF, nursing leadership from the California Prison Health Care Services (CPHCS) and the Division of Adult Institutions (DAI) to participate and frame the process of developing staffing ratios.  Meetings were scheduled for July 1, and 6, 2009, and August 4, 13, 19, 25, and 26, 2009.  The Chief Deputy Secretary assigned a project manager and developed a CDCR internal leadership group to oversee the development of staffing ratios.  This group consisted of all Chiefs of Mental Health in the field, clinical leadership in headquarters, DCHCS administrative and budget staff, and nursing leadership from the CPHCS.

The project manager obtained staffing ratio-data from five out-of-state sources (New York, Michigan, Alabama, New Jersey, and Ohio) considered by the Special Master to be most comparable with California.  These data were used as benchmarks in the determination of the CDCR staffing ratios.

The Program Support Unit (PSU) of the DAI are meeting with the DOF to discuss the custody staffing for the MHP.  The PSU staff are also meeting with Custody Support Services of the CPHCS to obtain feedback on the staffing methods.

The leadership group developed the project plan for the staffing ratios and formed teams for each clinical program and various administrative functions.  The teams were directed to review national data, other state correctional systems' mental health staffing and recommendations of the Special Master.  Based upon these data resources together with the teams' extensive knowledge and expertise in the provision of quality mental health services to California's inmate population, the teams developed and submitted staffing ratios that were subsequently reviewed by the project leadership team.  Attachment B contains an explanation for the development of the ratio methodology.  Attachment E provides the workload analysis by classification and by level of care.

**Success Criteria**

From the inception, this project was conducted with an eye toward achieving consensus among the key stakeholders.  The ultimate goal of the project was to identify a solution that, through sufficiency and necessity would concurrently satisfy judicial, financial and policy objectives.

Broad consensus determined that the model should be transparent, simple in its display and operation, be ratio-driven, have the ability to project future need, be easily adaptable to

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
BUDGET CHANGE PROPOSAL
FISCAL YEAR 2010-11

changes in program requirements or industry standards, make provision for the professional and ethical standards of care, and was adequate to meet patient treatment needs and the minimum requirements of the project.  See Attachment C for a detailed listing of the success criteria.

**Completed Product**

The final staffing ratios proposed to the DOF, CDCR BMB, and the Special Master were based on a consensus of the State Chiefs of Mental Health, and Health Care administrative staff in consultation with key stakeholders including representatives from the CPHCS. Attachment D reflects the proposed ratio by staff classification program area.

## F.  OUTCOMES AND ACCOUNTABILITY

All stakeholders and interested parties were invited to participate in the formal *Coleman* Staffing Model Meeting held on July 1, 2009.  In attendance were representatives of the *Coleman* Special Master and DOF, along with representatives from various divisions and units within CDCR.  Represented divisions and units included: DCHCS MHP, Nursing, DAI, Financial Services Division, and the Office of Legal Affairs.  Additional meetings have taken place over the period of July-September 2009.

The *Coleman* Court continues to monitor compliance with their requirements, and it is the Department's goal to demonstrate the ability to plan for and to provide meaningful mental health care, and to affect an exit from this case.

The CDCR submits baseline mental health staffing adjustments, based on the ratio-driven methodology and changes in inmate population, two times a year to ensure that CDCR has sufficient resources to provide inmates with the appropriate level of mental health services. These ratios will be used during the population process to adjust mental health staffing levels, based on population changes, to maintain approved levels of care for the various types of mental health programs.

CDCR in collaboration with the *Coleman* Court Special Master and interested stakeholders will ensure proper allocation of resources to meet the requirements of *Coleman* and related services provided by the MHP.  Implementation of this request will take place over the next five years (see Attachment F "Implementation Schedule").   DCHCS will submit an implementation report to DOF annually, to report on the status of implementation and how accurately the staffing ratios reflect staffing needs to provide and support necessary mental health services in compliance with the MHSDS Program Guide and acceptable standards of care.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
BUDGET CHANGE PROPOSAL
FISCAL YEAR 2010-11

## G. ANALYSIS OF ALL FEASIBLE ALTERNATIVES

**Alternative 1** – Implement the ratio-driven staffing model to determine appropriate staffing levels within the CDCR MHP.

Pros:
• This alternative would provide the quantity and quality of resources needed to achieve compliance with policies and procedures contained in the 2009 MHSDS Revised Program Guide, a critical step toward final exit of the *Coleman* case and reduction of legal costs associated with this case.
• This alternative is consistent with the mission of CDCR "to take responsibility and accountability for the rehabilitation of offenders" and to "provide training, counseling, and support" services.
• This alternative is consistent with models for program staffing in similarly situated programs in other states.

Con:
• This alternative will require further augmentation to the department's budget.

**Alternative 2** – Maintain the status quo and continue use of the Mental Health Workload Study

Pro:
• This alternative would not require additional augmentation to the department's budget.

Cons:
• This alternative does not allocate the staff resources necessary to implement the MHSDS 2009 Program Guide since the MHWS was a point in time study completed in January 2007.
• This alternative perpetuates the inaccurate allocation of resources based on flawed assumptions; resource requests would not be objectively based, and would be inconsistent with need.
• This alternative could prolong the exit from the *Coleman* lawsuit.
• This alternative could expose CDCR to further litigation.

## H. RECOMMENDATION

Approve Alternative 1. This alternative will provide sufficient and necessary resources to provide treatment services in compliance with CDCR policies and the MHSDS Program Guide.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
BUDGET CHANGE PROPOSAL
FISCAL YEAR 2010-11

**<u>Attachments</u>**
A – 6/18/09 *Coleman* Court order
B – Explanation of Ratios
C – Success Criteria
D – Ratio-driven Staffing Analysis
E – Time Estimate Primary Functions
F – Implementation Schedule

# Exhibit L

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

**Suicide Prevention and Response          Mental Health Services Delivery System**

6). Provide oversight, assistance, coordination, and supervision of MHSR activities and reports.

7). Track and analyze demographic and clinical information received from the DCHCS ERDR Subcommittee for improving suicide prevention and response processes.

b. **Each Local SPR FIT shall:**

1). Ensure implementation and compliance with all CDCR policies and procedures, relating to suicide prevention and response, at their institution.

2). Be responsible for updating local operating procedures (LOP) to ensure consistency with DCHCS policies regarding suicide prevention and response. The institution's Suicide Prevention and Response LOP shall be updated at least annually and sent to the DCHCS through the standard Quality Management process for review and approval.

3). Implement training, in collaboration with the local In-Service Training (IST) unit, regarding the issue of suicide prevention and response.

4). Review Suicide Watch and precaution procedures, including use of video cameras (used as a supplement to direct visual observation), to ensure they are being carried out consistent with operating procedures.

5). Work with the Local ERDR Subcommittee to review all suicides and those suicide attempts, in which Cardiopulmonary Resuscitation (CPR) and/or other medical procedures were performed, as well as custody cell entry and cut-down procedures.

6). Monitor and track all suicide gestures, suicide attempts, self-mutilations, and deaths. Monitoring and tracking of suicide attempts should include a review of the appropriateness of treatment plans and five-day follow-ups.

7). Review and track all 5-day clinical follow-up treatment plans and custody wellness check procedures. The Mental Health Tracking System (MHTS) shall be used to track all clinical five-day follow-ups.

8). Ensure all required documentation for suicide death reporting is forwarded to DCHCS in adherence with time-sensitive due dates.

9). Provide assistance for the activities of the visiting MHSR.

10). Provide oversight for the implementation of DCHCS-issued quality improvement plans (QIP) with input and assistance from the Local MHP and Local ERDR Subcommittees.

---

# Exhibit L - 1

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



Division of Correctional Health Care Services

Department of Corrections & Rehabilitation

# TABLE OF CONTENTS

CHAPTER 1 ................................................................ Program Guide Overview

CHAPTER 2 ......................................Reception Center Mental Health Assessment

CHAPTER 3 ................................ Correctional Clinical Case Management System

CHAPTER 4 ........................................................... Enhanced Outpatient Program

CHAPTER 5 ...................................................................Mental Health Crisis Bed

CHAPTER 6 ................................ Department of Mental Health Inpatient Program

CHAPTER 7 ................................................................... Administrative Segregation

CHAPTER 8 ........................................................................ Security Housing Unit

CHAPTER 9 ................................................................Psychiatric Services Unit

CHAPTER 10 ...................................................... Suicide Prevention and Response

APPENDIX A...............................................................................Glossary of Terms

ATTACHMENT A .......................................................Confidentiality Guidelines

ATTACHMENT B ....................................................... Inmate Disciplinary Process

ATTACHMENT 1 ........................... Department of Mental Health Contraband List

ATTACHMENT 2 .............. Department of Mental Health Transfer/Discharge List

ATTACHMENT 3 ...............Dept. of Mental Health Day Treatment Referral Form

ATTACHMENT 4 ................................. Other Department of Mental Health Forms

ATTACHMENT 5 ........................................................................MHSDS Forms

# CHAPTER 4
# Enhanced Outpatient Program

## A. INTRODUCTION

The Enhanced Outpatient Program (EOP) provides the most intensive level of outpatient mental health care within the Mental Health Services Delivery System (MHSDS). The program is characterized by a separate housing unit and structured activities for mentally ill inmate-patients who, because of their illness, experience adjustment difficulties in a General Population (GP) setting, yet are not so impaired as to require 24-hour inpatient care. Inmate-patients who, because of a mental disorder, do not function well in EOP may be referred for higher levels of care including: Mental Health Crisis Bed (MHCB); or Department of Mental Health (DMH) Day Treatment Program, Intermediate Care Program, or Acute Psychiatric Program.

Critical components include:

1. A comprehensive array of mental health services delivered within the framework of an Interdisciplinary Treatment Team (IDTT), which is composed of representatives from a cross-section of clinical disciplines as well as prison custodial and counseling staff. Treatment is focused on resolution of institutional adjustment problems which impede functioning within the GP. Services include management of activities of daily living, group and individual psychotherapy, medication management, recreational therapy, and clinical pre-release planning.

2. A designated housing unit with restricted access and alternative educational, work, and recreational opportunities specifically provided for inmate-patients whose mental illness precludes their placement and participation in the GP programs.

3. Active interface with custodial staff, including Correctional Counselors (CC), which enhances the assessment and treatment process and optimizes the inmate-patient functioning within the prison environment.

## B. PROGRAM OBJECTIVES

The goal of the EOP is to provide focused evaluation and treatment of mental health conditions which are limiting an inmate's ability to adjust to a GP placement. The overall objective is to provide clinical intervention to return the individual to the least restrictive clinical and custodial environment.
More specific objectives include:

**Enhanced Outpatient Program**        **Mental Health Services Delivery System**

1. Provide short to intermediate term (a range of 3 to 12 months for most cases) focused care for inmate-patients who do not require 24-hour inpatient care. Short term treatment goals are primarily directed at developing constructive coping mechanisms, achieving treatment compliance, and further stabilization of psychiatric symptoms that are necessary for transition to the Correctional Clinical Case Management System (CCCMS) level of care.

2. Provide longer-term placement for inmate-patients with chronic mental illness whose symptoms have stabilized but whose level of functioning is insufficient to allow GP placement. Supportive care, assistance with activities of daily living, recreational therapy, anger management, reality therapy, and programs related to symptom management and clinical pre-release planning are offered.

3. Provide short-term secure custodial placements with clinical resources which address behavioral problems for mentally ill EOP inmate-patients who are transitioning from Security Housing Units or Psychiatric Services Units (PSU). Treatment for these inmate-patients focuses on achieving behavioral control and the development of socially acceptable behavior within the institution.

## C. **POPULATION SERVED**

Overall Treatment Criteria

Overall treatment criteria have been developed for the MHSDS. An inmate must meet the criteria in 1, 2, or 3 below in order to receive MHSDS treatment at any level of care:

1. Treatment and monitoring are provided to any inmate-patient who has ***current*** symptoms and/or requires treatment for the current Diagnostic and Statistical Manual diagnosed (may be provisional) Axis I serious mental disorders listed below:

   **Schizophrenia (all subtypes)**
   **Delusional Disorder**
   **Schizophreniform Disorder**
   **Schizoaffective Disorder**
   **Brief Psychotic Disorder**
   **Substance-Induced Psychotic Disorder (exclude intoxication and withdrawal)**
   **Psychotic Disorder Due To A General Medical Condition**
   **Psychotic Disorder Not Otherwise Specified**
   **Major Depressive Disorders**
   **Bipolar Disorders I and II**

**Enhanced Outpatient Program          Mental Health Services Delivery System**

2.  Medical Necessity: Mental health treatment shall be provided as needed. Treatment is continued as needed, after review by an IDTT, for all cases in which:

    **Mental health intervention is necessary to protect life and/or treat significant disability/dysfunction in an individual diagnosed with or suspected of having a mental disorder. Treatment is continued for these cases only upon reassessment and determination by the IDTT committee that the significant or life threatening disability/dysfunction continues or regularly recurs.**

3.  Exhibitionism: Treatment is required when an inmate has had at least one episode of indecent exposure in the six-month period prior to the IDTT that considers the need for exhibitionism treatment, and the inmate-patient is either:

    - Diagnosed with Exhibitionism, or

    - Meets the alternate criteria (*Alternate Criteria*: An inmate who meets all criteria for the diagnosis of Exhibitionism, except that the victim was not an "unsuspecting stranger" but was a staff member or inmate who did not consent to or encourage the behavior.)

    (A diagnosis of Exhibitionism is not required for inmates who meet the alternate criteria.)

Specific Treatment Criteria for EOP

In addition to the overall treatment criteria above, an inmate must meet the following specific treatment criteria to receive treatment at the EOP level of care:

- Acute Onset or Significant Decompensation of a serious mental disorder characterized by symptoms such as increased delusional thinking, hallucinatory experiences, marked changes in affect, and vegetative signs with definitive impairment of reality testing and/or judgment; and/or

- Inability to Function in General Population Based Upon:

    a.  A demonstrated inability to program in work or educational assignments, or other correctional activities such as religious services, self-help programming, canteen, recreational activities, visiting, etc. as a consequence of a serious mental disorder; or

    b.  The presence of dysfunctional or disruptive social interaction including withdrawal, bizarre or disruptive behavior, extreme argumentativeness, inability

to respond to staff directions, provocative behavior toward others, inappropriate sexual behavior, etc., as a consequence of a serious mental disorder; or

   c.   An impairment in the activities of daily living including eating, grooming and personal hygiene, maintenance of housing area, and ambulation, as a consequence of a serious mental disorder.

- These conditions usually result in Global Assessment Functioning (GAF) Scores of less than 50.

<u>Enhanced Outpatient Care (Designated Housing Unit)</u>

Participants in the MHSDS EOP are placed in designated housing units that provide increased clinical and custodial support and limit contact with members of the institution's GP inmates.

## D. <u>ADMISSION TO PROGRAM</u>

<u>Referral Process</u>

1. Mental Health clinicians may initiate an EOP referral. This referral decision is documented on a CDCR 128-MH3, *Mental Health Placement Chrono*, and clinically supported in an original or updated CDCR 7386, *Mental Health Evaluation*. Both forms are placed in the Unit Health Record (UHR) and the CDCR 128-MH-3, *Mental Health Placement Chrono*, is placed in the Central File.

2. If the referral is generated for an inmate-patient at a GP institution without an EOP, the clinician at the referring institution may consult with the Chief of Mental Health at the closest EOP site regarding the need for EOP level of care, prior to initiating the referral process. In situations where there is a disagreement between the conferring clinicians, the inmate-patient will be referred to an EOP treatment setting for further onsite evaluation.

3. EOP placements do not require prior clinical approval from the receiving institution.

4. Referral documentation is prepared by the referring clinician. The documentation includes the chronological CDCR 7230, *Interdisciplinary Progress Note*, containing circumstances, symptoms, and behaviors justifying the need for EOP level of care. This document is placed in the UHR. The documentation also includes a CDCR 128-MH3, *Mental Health Placement Chrono*, containing a brief description of behavioral alerts. The original of this document is forwarded to classification staff for processing and

Classification Staff Representative (CSR) endorsement for institutional placement. A copy of the CDCR 128-MH3, *Mental Health Placement Chrono,* is placed in the UHR.

5. EOP placements from within the same institution are accomplished with the approval of the IDTT, placed in an available EOP bed, and documented on a CDCR 128-MH3, *Mental Health Placement Chrono.* For inmates not currently participating in the MHSDS program, the classification committee will refer the case to the CSR for EOP endorsement. For those currently participating in the MHSDS program, the classification committee will refer the case to the Classification and Parole Representative (C&PR) for EOP endorsement. Subsequent placements of the same individual into the EOP require only C&PR approval. A weekly count of filled and vacant EOP beds is provided to Division of Correctional Health Care Services (DCHCS) and Division of Adult Institutions to facilitate the use of available beds by population management staff.

6. The classification and transportation systems are designed to ensure placement within 60 days of level of care designation, or 30 days of level of care designation, if clinically indicated. Transfers within the same institution of inmate-patients previously identified and treated as EOP or from the institution's MHCB should occur on the same day, or within 24 hours of referral.

7. EOP inmate-patients who are inappropriately transferred via CSR endorsement action to a non-EOP institution shall be transferred to an EOP institution within 21 days of arrival.

8. Inmate-patients who are determined to require EOP level of care while in a non-EOP institution, shall be transferred to an appropriate EOP treatment setting within 60 days of the EOP designation, or 30 days of the designation, if clinically indicated.

9. Inmates who receive a CDCR 115, *Rules Violation Report* for Indecent Exposure or Intentionally Sustained Masturbation Without Exposure shall be referred for all of the following:

   • CDCR 115-MH *Rules Violation Report: Mental Health Assessment;*

   • A mental health assessment shall be completed within 24 hours to rule-out decompensation and/or intoxication. The referral shall be made by telephone to the local Chief of Mental Health who shall arrange this assessment; and,

   • For inmate-patients included in the MHSDS, to the inmate-patient's Primary Clinician (PC)

   NOTE: When an IDTT determines that an inmate requires treatment of exhibitionism, that inmate's level of care shall be changed to CCCMS, Medical Necessity (or higher if appropriate), bypassing the standard referral process.

Interdisciplinary Treatment Team

The responsibilities for overall treatment planning within the EOP rest with the IDTT. These responsibilities include:

- Program admission decisions for individual case

- Formulation and approval of initial and updated individual treatment plans

- Periodic case reviews and re-justifications of treatment

- Discharge decisions

- Overall utilization review of available beds

- Overall program quality improvement

The IDTT is composed of, at a minimum:

- Assigned Primary Clinician (PC)

- Assigned Psychiatrist

- Correctional Counselor

- Inmate-patient

Other staff who have direct knowledge of the inmate-patient are encouraged to attend or provide information:

- Licensed Psychiatric Technicians (LPT)

- Custody Officers

Recreation Therapists (RT), Registered Nurses (RN), Licensed Vocational Nurses, LPT, and the housing custody officer will also normally participate. Each member of the team will provide input into the overall treatment plan. Input from additional staff, including vocational and educational personnel, is strongly encouraged. A representative from the IDTT (the assigned PC or designee) should be present in all classification hearings regarding inmate-patients in treatment to provide mental health input into the classification decision-making process. The inmate-patient shall be included in the IDTT, unless the inmate-patient refuses to participate. If the inmate-patient refuses to

Case 2:90-cv-00520-KJM-SCR  Document 4325    Filed 02/25/13

participate in the IDTT, the inmate-patient shall indicate the refusal and the reason for the refusal. The PC shall document this information on the treatment plan, CDCR 7388, *Mental Health Treatment Plan*, and in the progress notes, CDCR 7230-MH, *Mental Health Progress Note*. Inmate-patients shall not be disciplined for not participating in IDTT. The PC is responsible for presenting the inmate-patient's concerns to the IDTT.

The Chief of Mental Health shall designate the IDTT leader.

### Initial Evaluation Process

The initial clinical assessment involves an interview with the inmate-patient and a review of available clinical records, the Central File, the evaluation of the referring clinician, and records from prior institutional placements. A review of these evaluations and an observation period are utilized to establish a functional baseline and working clinical diagnosis. This process shall be completed within 14 calendar days from arrival at the EOP.

If the inmate-patient states that he or she had significant prior treatment or the file review indicates history of such treatment, the clinician shall obtain a signed *Release of Information* and forward it to the Institutional Health Record Services to obtain previous records. The referring clinician, custodial staff, work supervisors, teachers, chaplains, and family members are excellent sources of patient collateral information and should be utilized whenever possible (with appropriate release of information when required).

At the conclusion of the evaluation process and within 14 calendar days from arrival at the EOP, the IDTT will review all relevant clinical, institutional, and criminal history data, interview the inmate-patient and make one of the following determinations:

1. Admit to the program and develop a treatment plan on the CDCR 7388, *Mental Health Treatment Plan.*

2. Decline admission (indicate clinical options).

3. Extend evaluation process for an additional 14 calendar days.

All decisions regarding change of treatment level made by the IDTT shall be documented with a CDCR 128-MH3, *Mental Health Placement Chrono*. This chrono shall be forwarded to classification for review and central file update. One copy of the chrono is placed in the UHR and another copy forwarded for entry into the MHTS. An individualized treatment plan, CDCR 7388, *Mental Health Treatment Plan*, shall include the recommendations of the IDTT and specifics such as type of therapeutic activities (schedule, duration, outcome expectations) and anticipated length of stay. The

prescription of treatment activities should consider the commitment offenses and current institutional maladjustment.

Inmate-patients who are released from Administrative Segregation Unit (ASU) or the PSU to a GP EOP for continuing mental health treatment may require mental health services related to adjustment to the GP environment. The ASU or PSU PC shall document recommendations regarding the inmate-patient's specific treatment needs, including any concerns about facilitating the inmate-patient's successful transition to GP. The receiving EOP IDTT will consider documentation by the ASU or PSU clinician in developing the inmate-patient's treatment plan. The treatment plan for inmate-patients transferred from ASU or PSU to GP-EOP shall include services provided to aid in the transition to the GP environment. Inmate-patients referred from the ASU or PSU to a GP-EOP Unit shall be retained at EOP level of care for a minimum of 90 days.

**Release after Initial Evaluation**

If, at the conclusion of the initial evaluation process, the IDTT determines that EOP placement is inappropriate, documentation to this effect is placed in the UHR using CDCR 7388, *Mental Health Treatment Plan*. A CDCR 128-MH3, *Mental Health Placement Chrono*, noting the decision and recommending more appropriate placement shall be prepared for classification processing and transfer (if appropriate). If inpatient care is indicated, the assigned PC is responsible for initiating and completing the placement process.

## E. EOP INMATE-PATIENT TREATMENT SERVICES

Each EOP inmate-patient will have an individualized treatment plan that provides for treatment consistent with the inmate-patient's clinical needs. The treatment plan shall be documented on a CDCR 7388, *Mental Health Treatment Plan*. Each inmate-patient shall be offered at least ten hours per week of scheduled structured therapeutic activities as approved by the IDTT. It is recognized that not all inmate-patients can participate in and/or benefit from ten hours per week of treatment services. For some inmate-patients, ten hours per week may be clinically contraindicated. For those inmate-patients scheduled for less than ten hours per week of treatment services, the PC shall present the case and recommended treatment program to the IDTT for approval. The CDCR 7388, *Mental Health Treatment Plan,* must include a detailed description of the diagnosis, problems, level of functioning, medication compliance, and rationale for scheduling less than ten hours. For inmate-patients who are scheduled for less than ten hours of treatment activities per week, the IDTT shall meet at least monthly and be responsible to review and increase the treatment activities or refer to a higher level of care as clinically indicated.

# Exhibit M

PACKER − CROSS / BIEN                1102

1   INTERACTION IS LIMITED, COULD THAT INCREASE THAT PERSON'S RISK

2   OF SUICIDE?  MY ANSWER IS:  YES.

3   **BY MR. BIEN:**

4   Q.  AND IF THEY ARE IN AN ADSEG UNIT THAT AS A RESULT OF

5   OVERCROWDING THERE'S LIMITED ACCESS TO MENTAL HEALTHCARE, THE

6   CLINICIANS CAN'T SEE THE PATIENTS IN A CONFIDENTIAL SETTING,

7   WOULD YOU AGREE THAT ALSO MIGHT INCREASE THE RISK OF SUICIDE?

8   A.  YES, IN THAT HYPOTHETICAL, AGAIN, THAT COULD LEAD TO AN

9   INCREASED RISK OF SUICIDE.

10  Q.  AND YOU'RE AWARE, THEN, THAT AS PART OF THE PROGRAM GUIDE,

11  THE MENTAL HEALTH DELIVERY SYSTEM, PRISONERS AT THE ENHANCED

12  OUTPATIENT LEVEL OF MENTAL HEALTHCARE, PEOPLE WHO ARE AT THE

13  HIGHER LEVEL OF CARE ARE SUPPOSED TO BE REMOVED FROM REGULAR

14  ADSEG UNITS TO SPECIALIZED ADSEG UNITS WHERE THEY CAN RECEIVE

15  10 HOURS A WEEK OF EOP CARE.

16          YOU'RE AWARE OF THAT REQUIREMENT?

17  A.  YES, I AM AWARE OF THAT.

18  Q.  AND IN THE COURSE OF YOUR TOURS, DID YOU LEARN THAT THE

19  SYSTEM AS IT CURRENTLY EXISTS IS UNABLE TO MEET THAT TRANSFER

20  REQUIREMENT, AND SO YOU FOUND MANY EOP'S HOUSED IN NORMAL ADSEG

21  UNITS THAT HAD NOT BEEN ABLE TO BE TRANSFERRED TO THESE

22  SPECIALIZED UNITS?

23  A.  OVER THE COURSE OF MY TOURS, I DID COME ACROSS SOME EOP

24  INMATES WHO WERE AWAITING TRANSFER TO AN EOP ADSEG AND WERE AT

25  THIS TIME BEING HOUSED IN REGULAR ADSEG AWAITING A BED SPACE,

# Exhibit N

# EXHIBIT 6

# Deposition of Shama Chaiken, August 29, 2008
# (Designations)

# Part A

Golden Gate Reporting

Page 1

IN THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE


RALPH COLEMAN, et al.,

     Plaintiffs,

vs.               No. Civ S 90-0520 LKK-JFM P

ARNOLD SCHWARZENEGGER,
et al.;

     Defendants.
_____/
MARCIANO PLATA, et al.,

     Plaintiffs,

vs.               No. C01-1351 TEH

ARNOLD SCHWARZENEGGER,
et al.,

     Defendants.
_____/


DEPOSITION OF SHAMA CHAIKEN

DATE:          August 29, 2008

TIME:          9:28 a.m.


LOCATION:      ROSEN, BIEN & GALVAN, LLP
               315 Montgomery Street, Tenth Floor
               San Francisco, California


REPORTED BY:   Brenda L. Marshall
               Certified Shorthand Reporter
               License Number 6939

Golden Gate Reporting

Page 6

```
 1                   SHAMA CHAIKEN,
 2   called as a witness by the Plaintiffs, who, having been
 3   duly sworn by me, was examined and testified as
 4   hereinafter set forth.
 5                       --oOo--
 6
 7        EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
 8   BY MR. BIEN:
 9        Q.   Could you please state your name for the record.
10        A.   Shama Chaiken.
11        Q.   Okay.  And what's your position?
12        A.   Chief psychologist for policy and program
13   development.
14        Q.   Okay.  Have you been deposed before,
15   Dr. Chaiken?
16        A.   No.
17        Q.   And that's for the Department of Corrections?
18        A.   Correct.
19        Q.   Okay.  You understand that you're here in the
20   deposition today in the Coleman and Plata overcrowding
21   case?
22        A.   Yes.
23        Q.   Okay.  Let me just go over a little bit in terms
24   of the rules of a deposition and what's going on here.
25             Have you had a chance to talk to an attorney
```

Golden Gate Reporting

Page 41

1      Q.   Okay.  What about just as a psychologist in

2   terms of a treatment relationship?  Move away from prison

3   for a second.  If you were a treating psychologist and you

4   were meeting with a patient, do you think it -- would it

5   be important to you, as a professional, to be able to talk

6   to the patient in a confidential setting?

7      A.   In a confidential setting?

8      Q.   Yes.

9           MR. ANTONEN:  Again, that's -- I object as to

10   vague, but from your personal perspective, go ahead.

11           THE WITNESS:  It depends on the situation.

12   Sometimes you engage in family therapy with other people

13   in the room, or group therapy, which is not confidential,

14   which can be beneficial.

15           But, in certain circumstances, you establish a

16   situation where you can talk to an individual alone, in a

17   confidential setting, with limits, and it's important for

18   them to understand the limits of what you can and will

19   keep confidential.

20   BY MR. BIEN:

21      Q.   Okay.  Is it -- what are you trying -- is there

22   some information that you might elicit in a psychological

23   interview with a patient that they might be more willing

24   to share if they were in a confidential setting?

25           MR. ANTONEN:  Objection.  Calls for speculation

Page 42

1    and appears to be an incomplete hypothetical.  Please

2    don't speculate, but based on your experience.

3    BY MR. BIEN:

4        Q.    Were you trained to interview patients, as a

5    psychologist, in public settings?

6            MR. ANTONEN:  Objection as to "public."  If you

7    can provide some parameters.

8    BY MR. BIEN:

9        Q.    You can answer, if you understand.

10           MR. ANTONEN:  To the extent you understand the

11   question.

12           THE WITNESS:  I was trained to provide certain

13   types of services in confidential settings and other types

14   of services in nonconfidential settings.

15   BY MR. BIEN:

16       Q.    Okay.  What services were you trying to provide

17   in confidential settings?

18       A.    Individual psychotherapy.

19       Q.    Okay.  Do you understand why it was good

20   practice, in psychology, to provide individual therapy in

21   confidential settings?

22       A.    Yes.

23       Q.    Okay.  And why was that?  Why is that?  Do you

24   believe that to be the case?

25       A.    Yes.  Because it facilitates a therapeutic

Golden Gate Reporting

Page 43

1  relationship where the rules of our society apply that

2  people can disclose information without worrying that it

3  could be later used against them in a harmful way.

4      Q.  Okay.  May it also result in -- would a

5  confidential setting -- were you ever trained that a

6  confidential setting might make it more likely the person

7  would share things that they would be embarrassed to share

8  in a public setting?

9      A.  I was trained that there are different

10  conditions that facilitate disclosure.  Sometimes, in

11  group therapy, having others disclose would help people

12  overcome shame or embarrassment, and sometimes, being

13  alone in a room could facilitate that.  Sure.

14      Q.  Okay.  Are you aware that -- any other reasons

15  why you'd want to be in a confidential setting for

16  individual therapy that you can think of?

17      A.  I think it helps people be able to concentrate

18  and have a thread of conversation without interruption.

19      Q.  In a prison setting, a correctional setting, are

20  you aware of any reasons why individual clinical contact

21  should be held in a confidential setting?

22      A.  Yes.

23      Q.  And what are those?

24      A.  For the same reasons as in the community.

25      Q.  Which are what?

Golden Gate Reporting

Page 44

1        A.    You can have a conversation that's

2    uninterrupted, that the rules of confidentiality and

3    disclosure of information apply when the information is

4    disclosed within a patient-psychotherapist communication

5    that's not intended to be overheard by other people, that

6    individuals may disclose information in a confidential

7    setting that they would worry about could be harmful to

8    them if other people had that information.

9        Q.    Okay.  Are you aware that there is a -- can be a

10   stigma associated with seeking mental health services for

11   people in society?

12       A.    My -- your question is am I aware that --

13       Q.    Some people are embarrassed about seeking mental

14   health care.

15       A.    Am I aware that some people are embarrassed by

16   seeking mental health care?  Yes, I have heard people say

17   they are embarrassed about seeking mental health care.

18       Q.    Are you also aware that is true in prison?

19       A.    Yes.

20       Q.    Okay.  Have you ever heard that certain -- have

21   you ever heard clinicians say that certain members of

22   certain ethnic groups are more or less likely to seek

23   mental health care than others, in prison?

24       A.    Have I heard clinicians say that?  I'm going to

25   take that broadly.  We've had conversations.  Clinicians