Kamala D. Harris
Attorney General of California
Jonathan L. Wolff
Senior Assistant Attorney General
Jay C. Russell
Supervising Deputy Attorney General
Debbie J. Vorous, SBN 166884
William H. Downer, SBN 257644
Deputy Attorney General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 324-5345
  Fax:  (916) 324-5205
  E-mail:  Debbie.Vorous@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 LKK JFM PC |
| Plaintiffs, | **DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY PORTIONS OF SPECIAL MASTER'S REPORT ON SUICIDES OCCURING IN CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION FACILITIES IN 2011** |
| v. | |
| **EDMUND G. BROWN JR., et al.,** | |
| Defendants. | |

1

## TABLE OF CONTENTS

2                                                                                       **Page**

3   INTRODUCTION ................................................................................................................ 1

4   PROCEDURAL DISCUSSION ......................................................................................... 2

5   OBJECTIONS....................................................................................................................... 3

6   I.   OVERALL OBJECTIONS TO REPORT'S STATEMENTS CONCERNING

7        SUICIDE PREVENTION ................................................................................................. 3

8        A.   The Court Must Strike the Report's Language Concerning 34 Suicides

9             in Calendar Year 2011. .......................................................................................... 6

10       B.   The Court Must Strike the Report's Language Challenging Suicide Rates
              in CDCR Prisons and Portraying Suicide Rates as Substantially Greater Than

11            the Average Among U.S. State Prisons. ............................................................. 6

12       C.   The Court Must Strike the Language that in 25 or 73.5 Percent of the 34
              CDCR Suicide Cases in 2011, There was at Least Some Degree of Inadequacy

13            in Assessment, Treatment, or Intervention, Speculating That the State Failed

14            to Foresee and Prevent at Least 24 of the 25 Inmate Suicides.................................... 9

15            1.   The Court Should Strike the Language That 24 Suicides Were
                   Foreseeable or Preventable. .................................................................. 10

16            2.   Objections and Requests to Strike or Modify the Report's Assertions

17                 of 50% Inadequacy in Clinical Assessment, Evaluation, and Treatment. ............ 12

18            3.   Objections and Requests to Strike or Modify Portions of the Report's

19                 Assertions of Non-Completion of Timely Custody Welfare Checks. .................. 21

20            4.   Objections and Requests to Strike or Modify Portions of the Report's
                   Assertions That in 16 Cases Emergency Response Procedures Were Not

21                 Performed in a Timely and or Appropriate Matter. .............................. 23

22       D.   The Court Should Strike the Language that CDCR Failed to Comply With
              Post-Suicide Review and Reporting Timeframes and Assertion That CDCR

23            was Responsible for the Special Master's Failure to File the 2011 Suicide

24            Report Until January 2013. .................................................................................. 25

25   II.  DEFENDANTS OBJECT TO ANY RECOMMENDATION THAT THE COURT ORDER
         FURTHER COSTLY AND INTRUSIVE OVERSIGHT OF THE PRISON MENTAL-HEALTH

26       CARE SYSTEM. ................................................................................................................ 28

27   CONCLUSION ................................................................................................................... 29

28

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Balla v. Idaho State Bd. of Corr.*
    595 F. Supp. 1558 (D. Idaho 1984) ............................................................... 3, 8, 10

*Miller v. Harbaugh*
    698 F.3d 956 (7th Cir. 2012) .......................................................................... 3, 7

STATUTES

Federal Rule of Civil Procedure 53(f) .................................................................. 2

Federal Rule of Evidence 703 ............................................................................... 6

CONSTITUTIONAL PROVISIONS

U.S. Constitutional Amendment VIII ................................................................... 3, 7

Defs.' Obj. & Mot.  Strike or Modify Portions of Report on Suicides Occurring in CDCR in 2011   (2:90-cv-00520 LKK JFM PC)

1

## INTRODUCTION

2      The special master's report on suicides occurring in California prisons in 2011—like his

3  twenty-fifth monitoring round report—provides further evidence that he has lost sight of his

4  primary obligation, which is to assess whether the State's prison mental health care system

5  satisfies constitutional standards.  The Constitution requires that the State establish a basic

6  program to identify, treat, and supervise inmates with suicidal tendencies; it does not mandate

7  that the prisons eliminate all suicide risks.  California's prison system exceeds that standard

8  because the State has fully implemented and staffed a thorough, standardized suicide-prevention

9  and investigation program.  (Defs.' Motion to Terminate, ECF No. 4275.)

10      Rather than assessing whether the State has an adequate prison suicide prevention

11  program in place, the report mistakenly focuses on tangential and misleading issues.  For

12  example, the report suggests that the number of suicides that occurred in 2011 is of constitutional

13  significance.  It is not.  While all suicides are tragic, the Constitution does not proscribe a

14  particular number of suicides that can occur in a given year without offending the Constitution.

15  Although it is true that California's prison suicide rate is a few points higher than the national

16  average, that fact does not establish that the system violates constitutional standards.  In fact, 25

17  other states also have prison suicide rates higher than the national average, some more than

18  double the national average.  California's is nowhere close to that.

19      The special master's report also uses vague language to suggest that most of the suicides

20  were foreseeable or preventable.  His report concentrates on individual cases of alleged

21  inadequacies in assessment, treatment, or intervention instead of discussing whether the system is

22  deliberate indifferently to the serious mental health needs of inmates.  In several cases, he opines

23  that more could have been done or that mistakes were made, but his report actually finds that just

24  4 of the suicides that occurred in 2011 were actually "foreseeable" or "highly likely foreseeable;"

25  and just 6 were actually "preventable" or "highly likely preventable."  Regardless of whether

26  more could have been done to prevent a suicide (hindsight of course is 20/20), the constitutional

27  inquiry is whether the prison system is deliberately indifferent to the issue of suicide prevention.

28  / / /

1

Although the special master's 2011 suicide report argues that the State sometimes failed to follow every element of its own internal policies and procedures, it in no way establishes that the State's *system* is deliberately indifferent to the serious mental health needs of class members. Indeed, the report itself acknowledges the presence of such policies and procedures, describes that the training has and continues to be conducted, and exhaustively details the State's own internal investigation of each and every suicide. Even in the few preventable cases, there is no evidence of system-wide deliberate indifference; just the opposite, there is evidence of a systemic focus on preventing suicide. The State, therefore, objects to this report because it is misleading, lacks foundation, and is irrelevant to the critical issue at hand. It must not be used to support the continued intrusive and costly oversight of California's prison mental-health system.

**PROCEDURAL DISCUSSION**

On January 17, 2013, the Court ordered the special master to file his 2011 suicide report within fourteen days. (ECF No. 4297 ¶ 3.) The special master filed his report on January 25, 2013. (ECF No. 4307 & 4308.) Previously, the State has had thirty days to provide the special master with informal comments and objections. (1995 Order of Reference, Docket No. 640.) On January 17, 2013, the Court eliminated this interim step and ordered the parties to file any objections to the 2011 suicide report fifteen days after the report was filed. (ECF No. 4297 ¶ 4.)

Defendants object and move to strike or modify the special master's report under Federal Rule of Civil Procedure 53(f) because it is speculative, inaccurate, misleading, lacks foundation, and fails to assess the State's suicide prevention program against the minimally adequate level of care required by the Constitution. Because the Court has eliminated the opportunity for the special master to consider the parties' comments and objections before this report was filed, and reduces the twenty-one day time period to file objections or a motion to strike or modify the 354-page report under Federal Rule of Civil Procedure 53(f) to fifteen days, Defendants reserve their right to raise additional objections to the report that they may have inadvertently overlooked in the compressed time frame.

/ / /

/ / /

2

**OBJECTIONS**

I.     OVERALL OBJECTIONS TO REPORT'S STATEMENTS CONCERNING SUICIDE PREVENTION.

The Eighth Amendment does not mandate that prisons eliminate all suicide risks. *See, e.g., Miller v. Harbaugh*, 698 F.3d 956, 962–65 (7th Cir. 2012). To ensure an appropriate response, prisons must establish a "basic program for the identification, treatment, and supervision of inmates with suicidal tendencies" as a "necessary component of any mental health treatment program." *Balla v. Idaho State Bd. of Corr.*, 595 F. Supp. 1558, 1577 (D. Idaho 1984). The State has done just that—it has fully implemented and staffed a thorough, standardized program for the identification, treatment, and supervision of inmates at risk for suicide. (ECF No. 4271–5 at 22:23–23:10.) The State devotes "extraordinary resources to clinical and operational investigations of completed suicides, as well as prospective efforts to prevent such acts in the future." (ECF No. 4275–5 at 2.) Indeed, nationally renowned experts have found "[e]specially impressive" the State's systemwide attention to suicide prevention, and that "CDCR does as diligent a job of investigating suicides as any system of prisons or jails in the county." (ECF No. 4275–5 at 2; *see also* 4314–1 at 2–3.)

Dr. Joel Dvoskin, a nationally recognized prison mental health expert, has concluded that CDCR's suicide prevention program is appropriate and meets the standard of care. He found that CDCR's efforts "demonstrate a passionate interest in preventing suicide." (ECF No. 4275–5 at 2, 32; *see also* ECF No. 4314–1 at 2–3.) Indeed, because "CDCR has aggressively worked to prevent suicide and has embraced and acted upon reasonable recommendations received both from within CDCR and from external sources (e.g., the special master's experts and Plaintiffs), [it] has not been deliberately indifferent to this problem and continues its efforts to find new solutions toward preventing correctional suicide." (ECF No. 4275–5 at 32.) Moreover, the fact that "the CDCR suicide review team has been consistently competent and self-critical in their reviews of the [2011] suicides, . . . is powerful evidence that CDCR is not deliberately indifferent to the prevention of suicides among its inmates." (Decl. D. Vorous Supp. Obj. & Mot. to Strike Potions of 2011 Suicide Rep. (Vorous Decl.) ¶ 2 & Ex. 1 (Joel A. Dvoskin, Resp. to Dr.

3

1    Raymond F. Patterson's "Report on Suicides Completed in the California Department of

2    Corrections and Rehabilitation in Calendar Year 2011" at 4 (Feb. 8, 2013) (Dvoskin Resp. to

3    2011 Suicide Rep.).)

4            Specifically, the State has developed and implemented a training program to improve

5    clinical competency in administering Suicide Risk Evaluations, which addresses a clinical issue

6    the report found to be problematic in several cases.  (ECF No. 4313 at 14.)  The Suicide Risk

7    Evaluation program was designed to mentor new and unlicensed staff, with an initial intent to

8    "grandfather in" veteran staff.  (*Id.*)  From August 2011 to the present, ongoing training has been

9    provided to selected mentors in all institutions—to date, over 90 staff members have been trained

10   as mentors and every institution has an identified primary mentor.  (*Id.*)  Although there are

11   differences in the percentage of staff mentored at each institution, all institutions are focusing on

12   completing mentoring of staff working with inmates placed in Enhanced Outpatient Programs and

13   Mental Health Crisis Beds.  (*Id.*)  By focusing on staff who administer Suicide Risk Evaluations

14   and putting all staff through a peer review cycle (which generally takes 2 years), the State has

15   embarked upon a significant expansion of the original plan, underscoring its commitment to

16   maintain an ongoing focus on quality clinician work.  (*Id.*)

17           In addition, the State implemented a self-monitoring process to confirm that class

18   members needing inpatient care are being timely identified, referred, and transferred—another

19   area in which the report found clinical care problematic.  (ECF No. 4208 at 9–10.)  But by July

20   2012, the State had successfully guaranteed timely access to inpatient mental health care for all

21   class members needing hospitalization.  (*See* Order, ECF No. 4214 (noting the "remarkable

22   accomplishments" in addressing the problems in access to inpatient mental health care); 24th

23   Monitoring Rep., ECF No. 4205 at 9 (the reduction of wait lists for admission to inpatient care

24   represented a "dramatic improvement that is unprecedented in the history of the *Coleman*

25   remedial effort"); Clinical Exp. Rpt. at 18 & 20, ECF No. 4275–1 at 17:28–18:2 ("[d]espite

26   explicitly looking for underserved inmates, we found few, if any, inmates who needed a higher

27   / / /

28   / / /

4

1    level of care and were not identified").)[1]  From an extensive review of inmate-patients for

2    potential referral to a higher level of care by the special master and his experts in collaboration

3    with CDCR in 14 prisons between August and December 2011, only 18 cases in the entire system

4    were referred for Department of State Hospital inpatient care. (ECF No. 4132 at 12 & 17.)  "In a

5    system the size of CDCR, this is a remarkable level of success in identifying inmates with serious

6    mental health needs and referring them to the appropriate level of care."  (Dvoskin Resp. to 2011

7    Suicide Rep. at 3.)

8        The State also has, and continues to improve, its emergency medical response system

9    procedures.  Recently, the Receiver in *Plata v. Brown* issued a revised procedure that, among

10    other things, outlines the responsibilities of first responders, administration of cardiopulmonary

11    resuscitation, use of an Automated External Defibrillator, and emergency transportation.  (Decl.

12    of K. Allison in Supp. Obj. & Mot. To Strike Portions of 2011 Suicide Rep. (Allison Decl.) ¶ 6,

13    Ex. 1, Inmate Medical Service Policies and Procedures, Vol. 4, Ch. 12.)  Thus, given the

14    extensive resources and changes made to the mental health delivery system, "there is no reason to

15    even allege deliberate indifference to this important problem," (ECF No. 4314–1 at 3) and "it

16    would be grossly unjust to conclude from [the 2011 Suicide Report that CDCR] is currently

17    deliberately indifferent to the prevention of inmate suicide" (Dvoskin Resp. to 2011 Suicide Rep.

18    at 2).

19        Rather than recognize the robust suicide prevention program that CDCR has established,

20    the report mistakenly focuses on the number of suicides, which by themselves say nothing about

21    whether the prison system is deliberately indifferent to preventing suicides.  Again, the

22    Constitution does not require prison systems to eliminate all suicides; neither does it impose an

23    arbitrary annual number of suicides that are acceptable.  Rather, the Constitution is satisfied when

24    a suicide prevention program has been established to identify, treat, and supervise inmates with

25    suicidal tendencies.  The special master's report misleadingly suggests that as many as 24

26    suicides were "foreseeable" or "preventable."  In the majority of those cases the report merely

27    ――――――――――
        [1] Given the special master's timing of the Report on Suicides, none of these relatively
28    recent steps were extensively addressed in it.

1  speculates that the suicides "*may*" or "*possibly may*" have been "foreseeable" or "preventable."

2  But the report only makes determinations that the suicides were actually "foreseeable" in four of

3  these cases and actually "preventable" in six of them. The report's exclusive focus on individual

4  cases, instead of the system's overall efficacy, guarantees that the report in no way addresses the

5  core issue of whether the prison system is currently deliberately indifferent to the serious mental

6  health needs of inmates. As explained below, to assess constitutional compliance, the appropriate

7  focus must be on the adequacy of the suicide-prevention program as a whole.

8     **A.  The Court Must Strike the Report's Language Concerning 34 Suicides in
            Calendar Year 2011.**

9

10        The special master reports 34 suicides in calendar year 2011. (ECF No. 4308 at 1.) Even

11  though CDCR reported one of the deaths as a homicide, the special master's expert insists

12  (despite referral of the case to the Solano County District Attorney's Office for criminal

13  investigation) that it "was more likely than not to have been a suicide." (*Id.* at 1 n.2, 6 n.15, 282–

14  90.) He also concludes that the "rate of CDCR inmate suicides in 2011 was 21.01 per 100,000,

15  which was essentially unchanged since 2010, when it was 21.1 per 100,000." (*Id.* at 1.)

16  Defendants object to the conclusion that the 34th death was a "suicide" because it is speculative

17  and lacks foundation. Fed. R. Evid. 703 (expert testimony must be based on sufficient facts or

18  data). The suicide reviewer could not conclude that this was a suicide, and additional information

19  reflects that the death may not represent a suicidal hanging. (ECF No. 4308 at 282–83.) Thus, the

20  Court must sustain Defendants' objection and strike the language that the rate was 21.01 per

21  100,000 and stayed essentially unchanged from 2010, because it did not—it decreased.

22     **B.  The Court Must Strike the Report's Language Challenging Suicide Rates in
            CDCR Prison and Portraying Suicide Rates as Substantially Greater Than
            the Average Among U.S. State Prisons.**

23

24        On page 1 of the Introduction, the report states that CDCR's suicides rates for 2010 to

25  2012 "stand in stark contrast to the rate of 16 suicides per 100,000 across U.S. State prisons in

26  2010" and that they "also compare unfavorably with the average rates during the decade from

27  2001 to 2010 among the eight largest state prison systems during that decade, and with the

28  average rate of the U.S. Federal prison system from 2001 to 2008." (ECF No. 4308 at 1–2.) The

6

1    report also states that the suicide rate is "growing," and "worsening." (*Id.* at 6; s*ee also* at. 3 &

2    8.) Despite exaggerating the significance of the suicide rate, there is no evidence to support a

3    presumption these allegedly higher rates "are the result of inadequate or poor mental health

4    services." (Dvoskin Resp. to 2011 Suicide Rep. at 5.)

5          According to the U.S. Department of Justice Report, California's prison suicide rate is in

6    the middle of other state prison systems. (ECF No. 4314 at 11:10–11.) Based on prison mortality

7    statics from 2001 through 2010, California's average prison suicide rate of 20 for this time period

8    is lower than or equal to 20 other states. (*Id.* at 11:12–13.) If ranking higher than the national

9    average was the constitutional litmus test (which of course it is not), then California is in the

10   company of the majority of states. Twenty five other states have prison suicide rates higher than

11   the national average of 16. (*Id.* at 11:15–16.) It is also unfair and misleading to subjectively cast

12   the 4-point difference between California's prison suicide rate and the national average as a large

13   or disturbing discrepancy. For example, Utah's highest-in-the nation prison suicide rate is 48,

14   which is 32 points above the national average. (ECF No. 4313 ¶ 3, Ex. 1.) If any "stark

15   contrasts" exist, the 4-point difference between California's rate and the national average is not

16   one of them. California's suicide rate over the last decade is also less than half that of the

17   national suicide rate in jails (41 per 100,000). (*Id.*) The special master's emphasis on suicide

18   rates suggests that in his view 25 other states and the vast majority of jails across the country are

19   in violation of the Constitution. Of course that is not the case, and his mistaken and misleading

20   comparison of suicide rates reveals the critical flaws in his findings.

21         In Defendants' objections and motion to strike or modify portions of the special master's

22   twenty-fifth round monitoring report and supporting evidence, Defendants establish why

23   comparing CDCR's suicide rates to the national average among other U.S. state prisons is

24   speculative, misleading, lacks foundation, and is irrelevant to the governing legal standard. (*See*

25   ECF No. 4314 at 4–9.) The Eighth Amendment does not mandate that prisons eliminate all

26   suicide risks. *See, e.g., Miller,* 698 F.3d at 962–65 (rejecting argument that "state officials violate

27   the Constitution when they fail to prevent the suicides of inmates who are not actively or

28   'imminently' suicidal"). The special master's report draws no established relationship between

7

1    the suicide rate or the State's suicide prevention policies and procedures and the constitutional

2    requirement that prisons have in place a "basic program for the identification, treatment, and

3    supervision of inmates with suicidal tendencies." *Balla,* 595 F. Supp. at 1577.  Indeed, nationally

4    renowned experts have found "[e]specially impressive" the State's systemwide attention to

5    suicide prevention, and that "CDCR does as diligent a job of investigating suicides as any system

6    of prisons or jails in the country."  (ECF No. 4275–5 at 2; *see also* ECF No. 4314–1 at 2–3 &

7    Dvoskin Resp. to 2011 Suicide Rep. at 5 ("I have been consistently impressed with the emphatic

8    diligence of CDCR, at headquarters and at each prison, to prevent suicides.  While the rate of

9    suicides remains higher than the national average, CDCR's efforts to prevent suicides are as

10   impressive as those of any state I have observed.").)

11        The analysis in the 2011 suicide report ignores that suicide frequency (i.e., the total

12   number of suicides per year) at California prisons has declined in the past six years and the

13   suicide rate (the number of suicides per 100,000 inmates) has actually flattened.[2]  (ECF No. 4314

14   at 6–8.)  Attempting to compare California with other correctional systems ignores the

15   complexities of prison population demographics across states and delivers a simplistic and

16   misleading comparison that should carry little or no weight.  As discussed in Defendants'

17   response to the special master's 25th round monitoring report, prison population demographics,

18   including race, culture, age, commitment offense, morbidity rate, and other factors such as the

19   prevalence of prison gangs, are all relevant to suicide risk and must be evaluated in any such

20   comparison.  (ECF No. 4314 at 7:26–8:9.)  Additional factors—such as the prevalence of

21   undocumented aliens and the size of other prison systems—must also be considered.  (Dvoskin's

22   Resp. to 2011 Suicide Rep. at 5.)

23        Moreover, the comparison fails to consider or address realignment's impact on

24   California's 2012 prison suicide rate or its impact on prison population demographics.  (ECF No.

25   4314 at 8.)  Violent offenders—the majority of offenders who remain in prison under

26   realignment—commit suicide at nearly three times the rate of nonviolent offenders.  (*Suicide and*

27        ─────────────
     [2] This remains true even taking into account the discrepancy between the suicides that Dr.
28   Patterson reports in 2005 (43 versus CDCR's 36) and in 2008 (37 versus CDCR's 36).

8

Defs.' Obj. & Mot.  Strike or Modify Portions of Report on Suicides Occurring in CDCR in 2011   (2:90-cv-00520 LKK JFM PC)

1   *Homicide in State Prisons and Local Jails,* U.S. Department of Justice, Bureau of Justice

2   Statistics, August 2005, p. 7.)  So while the overall prison population has decreased, the offenders

3   most prone to committing suicide have remained in prison.

4       As with the 25th round report, this report ignores all of these variables at the expense of

5   accuracy and fairness.  Dr. Joel Dvoskin, a nationally recognized prison mental health expert, has

6   determined that CDCR's suicide prevention program is appropriate and meets the standard of

7   care.  Indeed, he concluded that "CDCR . . . has not been deliberately indifferent to this problem

8   and continues its efforts to find new solutions toward preventing correctional suicides" (ECF No.

9   4275–5 at 32), and "it would be grossly unjust to conclude from [the 2011 suicide report that

10  CDCR] is currently deliberately indifferent to the prevention of inmate suicide" (Dvoskin Resp.

11  to 2011 Suicide Rep. at 2).

12      **C.    The Court Must Strike the Language That in 25 or 73.5 Percent of the 34
            CDCR Suicide Cases in 2011, There was at Least Some Degree of Inadequacy
13          in Assessment, Treatment, or Intervention, Speculating That the State Failed
            to Foresee and Prevent at Least 24 of the 25 Inmate Suicides.**
14

15      At page 3, the reports states that in "25 or 73.5 percent of the 34 CDCR suicide cases in

16  2011, there was at least some degree of inadequacy in assessment, treatment, or intervention,

17  which is essentially unchanged since the rate of 74 percent among suicides which occurred in

18  2010" and that "[i]nadequacies appeared among conduct of suicide risk evaluations, treatment

19  and/or clinical interventions, non-completion of timely custody welfare checks, and potential

20  lifesaving interventions such as administration of CPR or problems with the use of an automated

21  external defibrillator."  (ECF No. 4308 at 3.)  On page 28, the report states that 25 of the 34 cases

22  showed "Significant Indications of Inadequate Treatment."  (*Id.* at 28.)[3]

23      The report places the allegedly inadequate cases (some of which overlap) into three

24  categories: (1) 17 cases allegedly involved some level of inadequacy in clinical evaluation,

25  treatment, or intervention; (2) 5 cases in which timely welfare and custodial checks were

26  / / /

27      [3] Earlier, on page 22, the report includes at table alleging that 24 cases—rather than 25—
    were "foreseeable" and/or "preventable," listing them as "FOR/PREV."
28

9

allegedly not conducted; and (3) 16 cases in which emergency responses were not performed in a timely or appropriate manner. (*Id.* at 2–3.)

Defendants object that the report's resort to this classification system is speculative, misleading, lacks foundation, and is irrelevant to the governing legal standard. The assertions in the 2011 suicide report: (1) fail to recognize the fallacy in calling 24 cases as "foreseeable" or "preventable" to infer causation; (2) include suicides where the foundation for the conclusion is lacking or is speculative or subject to two reasonable clinical decisions; (3) refer to or assert some degree of inadequacy without evidence that the alleged inadequacy caused the suicide; and (4) fail to recognize the State's systemwide attention to suicide prevention and investigation of suicides. Moreover, the report draws no established relationship between the 25 cases and the constitutional requirement that prisons have in place a "basic program for the identification, treatment, and supervision of inmates with suicidal tendencies." *Balla,* 595 F. Supp. at 1577.

### 1. The Court Should Strike the Language that 24 Suicides Were Foreseeable or Preventable.

The report links the assertion that in 25 or 73.5% of the cases there was at "least some degree of inadequacy in assessment, treatment, or intervention," with the conclusion that 24 suicides were "foreseeable" and "preventable," as reflected in Table 2 – Mental Health Information. (ECF No. 4308 at 3 & 22.) By lumping all these various conclusions together—rather than categorizing the findings and recommendations as institutional or systemic, based on the seriousness of the error—the report creates an unfairly negative impression of the State's mental health and suicide prevention system. (Dvoskin Resp. to 2011 Suicide Rep. at 3.) Moreover, lumping all these conclusions together makes it difficult to determine whether and how the alleged failures may have contributed to the suicide. (*Id.*) For example, "in some cases, [the 73.5%] inflated figure includes errors that preceded the inmate's death by years, or alleged errors that clearly had little or nothing to do with the eventual suicide." (*Id.*) "Clinical decisions should be judged by what was known at the time of the decision." (*Id.*)

In addition, a review of each case study reveals why using these vague terms is inherently misleading. In only 4 of the 24 cases did the special master's expert find the suicide to be

1   actually "foreseeable" or "highly likely to have been foreseeable." (*See* ECF No. 4308 at 58, 66,

2   79, 101–02, 107, 117, 192, 205, 217, 228, 244, 267 & 276 (14 cases "*not* appear to have been

3   foreseeable" [identified as Inmates A, B, D, E, G, H, I, R, T, V, X, AA, DD, FF] ; at 170 (1 case

4   "*probably not* foreseeable" [identified as Inmate P]); at 94, 130, 151 & 224 (4 cases "*may* have

5   been foreseeable" [identified as Inmates F, K, N, W]); at 257 (1 case "appears to have been *quite*

6   *possibly* foreseeable" [identified as Inmate CC]); at 199 (1 case "appears to have *possibly* been

7   foreseeable" [identified as Inmate S]); at 184 (1 case "appears highly likely to have been

8   foreseeable" [identified as Inmate Q]); and at 122, 160 & 236 (3 cases "appear to have been

9   foreseeable" [identified as Inmates J, O, Y])) (emphasis added).

10       Similarly, in only six cases did the special master's expert conclude that the suicide was

11   actually "preventable" or "highly likely preventable." (*See* ECF No. at 217 (1 case "appears to

12   have been *possibly* preventable" [identified as Inmate V]) at 58, 101–02, 107, 224, 228, 244 (6

13   cases "*may* have been preventable [identified as Inmates A, G, I, W, X , AA ]); at 94, 184 (2

14   cases "*more likely than not* to have been preventable" [identified as Inmates F, Q]); at 66, 79, 86,

15   107, 151, 267 (6 cases "*may very well* have been preventable" [identified as Inmates B, D, E, H,

16   N, DD]); at 170, 192 & 205 (3 cases "*very likely* have been preventable" [identified as Inmate P,

17   R, T]); at 276 (1 case "may very well have been preventable" and "was very likely preventable"

18   [identified as Inmate FF]); at 199 (1 case "highly likely preventable" [identified as Inmate S]); at

19   257 (1 case "appears to have been preventable" and "was highly likely preventable" [identified as

20   Inmate CC]); at 130 (1 case "very highly likely preventable" [identified as Inmate K]); at 122,

21   160 & 236 (3 cases "appear to have been preventable" [identified as Inmates J, O, Y])) (emphasis

22   added.)

23       Finally, the statistics lump together alleged errors by CDCR personnel with those under

24   the control of the *Plata* receiver.  It "seems unfair to blame CDCR for things over which it has no

25   control."  (Dvoskin Resp. to 2011 Suicide Rep. at 3.)  Lumping together the assessment of

26   inadequate treatment with use of the vague terms, "foreseeable" and "preventable," and blaming

27   the State for things over which it had no control, is unfair and prejudicial, and these parts of the

28   report must be stricken.

**2. Objections and Requests to Strike or Modify the Report's Assertions of 50% Inadequacy in Clinical Assessment, Evaluation, and Treatment.**

On page 3, the special master reports: "Alarmingly, in 50 percent [or 17] of the suicide cases in 2011, inmate suicide risk evaluations were either not done, or found levels of 'low' or 'no appreciable' risk of suicide, without adequate consideration of risk factors, past history, and/or review of medical records."  (ECF No. 4308 at 3.)

Defendants  object that the analysis lacks foundation, is speculative (not judged by what was known at the time of  the decision), fails to connect the alleged inadequacy to the suicide, blames the State for suicides outside of its control, and disregards the State's systemwide attention to suicide prevention and investigation of suicides.  While it can always be said that if a person was seen more often it might have led to a different result, "it is not a fair way to determine whether and to what degree the clinician met the standard of care."  (Dvoskin Resp. to 2011 Suicide Rep. at 3.)

Thus, in addition to the overall suicide objections, the State submits objections and requests to strike or modify the report on 2011 suicides with respect to the these 17 cases.  And as the following review shows, there is no evidence of systemic deliberate indifference.

**Inmate A**

Defendants object and move to strike the statement that this suicide may have been preventable if there had been more collaboration between medical and mental health and a suicide risk evaluation and referral to higher level of care completed.  (ECF No. 4308 at 58.)  The likelihood that such collaboration would have prevented the suicide is unknown and speculative. (Dvoskin Resp. to Rep. on 2011 Suicides at 6.)  In addition, the alleged inadequacies occurred two years prior to his death and had "no likely casual or contributory connection to the death." (*Id.*)  Therefore, this suicide should not be considered preventable or an error in clinical care and creates an unfair impression of CDCR's mental health and suicide prevention system.  Moreover, there can be no deliberate indifference because, since this death, CDCR has implemented its program to mentor clinicians on the competency of administering a suicide risk evaluation and its

/ / /

1  program to ensure the timely identification, referral, and treatment of inmates needing a higher

2  level of care.

3  **Inmate B**

4      Defendants object and move to strike the retrospective statement that this inmate's suicide

5  "may very well have been preventable had he been referred to a higher level of care."  (ECF No.

6  66.)  The inmate was considered for transfer to the Department of State Hospitals, but it was felt

7  that his family's social support was more important to him than the potential value of a different

8  milieu.  (Dvoskin Resp. to 2011 Suicide Rep. at 7.)  Because this was a reasonable clinical

9  decision at the time, this suicide should not be considered preventable or an error in clinical

10  judgment.   (*Id.* ("[h]is opinion that the suicide 'may have been' preventable is concretely true—

11  one never knows the result of an action not taken—but I disagree with its implication that the

12  CDCR MH staff was wrong to decide not to refer him to DSH.  A referral was seriously

13  considered, and the decision to refrain from such a referral was reasonable at the time it was

14  made").).)

15  **Inmate E**

16      Defendants object and move to strike the statement that this suicide "may very well have

17  been preventable."  (ECF No. 4308 at 86.)  The report notes the lack of an adequate and

18  appropriate evaluation by clinical professionals, and criticizes inadequate documentation on

19  information that may have been in a suicide risk evaluation. (*Id.*) But the report also notes that a

20  psychiatrist saw the inmate on the date of his death.  (*Id.*) Therefore, although these might be

21  valid criticisms, they do not appear to have contributed to this inmate's death.  (Dvoskin Resp. to

22  2011 Suicide Rep. at 9.)  Thus, this suicide should not be considered preventable. Moreover, there

23  can be no deliberate indifference with respect to this case given that the State has ongoing

24  training to improve clinical documentation and suicide risk evaluations.  (ECF Nos. 4132 at 31 &

25  4313 at ¶ 14.)

26  **Inmate F**

27      Defendants object and move to strike from the report the statements that this suicide "may

28  have been foreseeable" and also that this suicide appeared "more likely than not to have been

13

1    preventable" if there had been better patient management between CDCR and the Department of

2    State Hospitals relating to the movement of an inmate from inpatient care a day early. (ECF No.

3    4308 at 94–95.) However, the only problem noted was the Sergeant apparently misunderstanding

4    the transfer process, "but it is not clear if or how this had anything to do with the inmate's death."

5    (Dvoskin Resp. to 2011 Suicides Rep. at 11.) Nonetheless, CDCR and the Department of State

6    Hospitals have undertaken several quality management measures to improve patient management

7    between CDCR and DSH, including implementing the SharePoint website system and inmate-

8    patient management plan. (ECF Nos. 4103, 4150 & 4298 at 19 & 24.) The report suggests that

9    this inmate was prematurely discharged from inpatient care. (ECF No. 4308 at 94–94.)

10   However, absent a factual basis for this assertion—which does not appear to exist—the Court

11   should strike this statement from the report.

12        **Inmate H**

13        Defendants object to the conclusion that this death "may very well have been preventable"

14   had the inmate been kept at a Department of State Hospital inpatient program and not transferred

15   back to a lower level of care at California State Prison, Sacramento. (ECF No. 4308 at 107.)

16   This inmate was admitted to acute care on April 1, 2010, transferred to intermediate care on June

17   17, 2010, and discharged back to CDCR at the Enhanced Outpatient Program level of care on

18   March 22, 2011, after spending nearly a year in inpatient care. (ECF No. 4308 at 102-107.) He

19   committed suicide three days later. The assertion that "his statement to his psychiatrist that he

20   would be going home to Mexico and that his mother was there may very well have been an

21   indication of his intent to go home to Mexico after his death given that his mother was already

22   dead," is retroactive speculation. (Dvoskin Resp. to 2011 Suicide Rep. at 12.) Thus, absent a

23   factual basis for this assertion—which does not appear to exist—the Court should strike it from

24   the report.

25        **Inmate I**

26        Defendants object to the statement that this suicide "may have been preventable." (ECF

27   No. 4308 at 117.) The report concludes that there was not appropriate consideration of the

28   inmate's suicidal ideation, and that he should have been referred to the Department of State

14

1    Hospital.  (*Id.*)  However, this "inmate may have been undertreated," or "a competent refuser of

2    service."  (Dvoskin Resp. to 2011 Suicide Rep. at 13.)  Because it is unclear whether this was a

3    reasonable clinical decision at the time, this suicide should not be considered preventable or an

4    error in clinical care. Regardless, there can be no deliberate indifference associated with this

5    suicide because CDCR has implemented both its program to mentor clinicians on the competency

6    of administering a suicide risk evaluation and its program to ensure the timely identification,

7    referral, and treatment of inmates needing a higher level of care.

8        **Inmate J**

9        Defendants do not disagree that this suicide was predictable and preventable. (Dvoskin

10   Resp. to 2011 Suicide Rep. at 14.)  Defendants, however, object to the allegation that State action

11   contributed to this suicide.  The inmate reported information that indicated he had an increased

12   risk of suicide and this information was provided to the psychiatric technician covering

13   psychiatric services.  (ECF No. 4308 at 122.)  The psychiatric technician—under the control of

14   the Receiver—did not follow up on this information and corrective action was taken.  (*Id.*)  The

15   report also noted problems with the intake process at Folsom—the inmate was not seen for intake

16   interview within ten days per Program Guide requirements.  (ECF No. 4308 at 119.)  "However,

17   since he was at Folsom for 9 months, this error had no reasonable connection to his death."

18   (Dvoskin Resp. to 2011 Suicide Rep. at 14.)  Similarly, any assertion that a failure to be seen for

19   his weekly contact in the week before death contributed to his suicide is speculative.  The inmate

20   clearly felt comfortable asking "to see a psych," but the technician did not complete the referral.

21   (*Id.*)

22       **Inmate K**

23       In this case, the report states that suicide risk evaluations should have been completed at

24   both the transferring (KVSP) and receiving prisons (PVSP) and consideration made for transfer

25   this inmate to a higher level of care.  (ECF N. 4308 at 130.)  In addition, his medications were

26   allowed to expire.  (*Id.*)   Although it would appear that this inmate should have been followed by

27   mental health, the State is not deliberately indifferent to these concerns, and CDCR has

28   implemented programs to mentor clinicians on the competency of administering a suicide risk

15

1    evaluation and to ensure the timely identification, referral, and treatment of inmates needing a

2    higher level of care.  The report should thus be modified to accordingly.

3    **Inmate N**

4    Defendants object and move to strike to the statements that this death "may well have

5    been foreseeable" and that it "may very well have been preventable." (ECF No. 4308 at 151.)

6    (Dvoskin Resp. to 2011 Suicide Rep. at 16 ("I also do not agree with Dr. Patterson's suggestion

7    that this suicide was preventable by means of a transfer to DSH.").)  Although the decision to

8    retain the inmate at the Correctional Clinical Case Management System level of care could be

9    evaluated, "it does not appear that this decision would have changed the inmate's living

10   circumstances, as DVI does not have an EOP and the inmate would have remained in the same

11   ASU environment until completion of his reception process and transfer to a EOP hub." (*Id.*)  For

12   these reasons, this suicide should not be considered foreseeable or preventable or an error in

13   clinical care, and the Court should strike it from the report.

14   **Inmate O**

15   The report states that the inmate should have been transferred from the Outpatient

16   Housing Unit to either a Mental Health Crisis Bed or acute level of care.  (ECF No. 4308 at 160.)

17   Defendants agree that the inmate's mental health symptoms may have justified transfer to a

18   Mental Health Crisis Bed.  (Dvoskin Resp. to 2011 Suicide Rep. at 17.)  In December 2012,

19   CDCR issued a memorandum addressing stays in Outpatient Housing Units, and requiring

20   inmates who exhibit suicidal ideation to be transferred to a Mental Health Crisis Bed.  (ECF No.

21   4277 at ¶ 14, Ex. 2.)  Thus, the State is not deliberately indifferent to these concerns and the

22   report must be modified.

23   **Inmate P**

24   Defendants object to the conclusion that this inmate's suicide was "very likely

25   preventable" had his clinicians appropriately assessed him and placed him at a higher level of

26   care.  (ECF No. 4308 at 170.)  Despite a challenging clinical presentation, staff continued to

27   provide this inmate with mental health care—immediately prior to his death, his treatment team

28   considered a Keyhea petition, but determined he did not meet the grave disability requirement.

16

1  (ECF 4308 at 160.)  Staff nonetheless scheduled an appointment with his clinicians, although they

2  did not occur before he died.  (*Id.* at 163; Dvoskin Resp. to 2011 Suicide Rpt. at 18.)  Therefore,

3  the conclusion that this suicide was preventable lacks foundation and is speculative and, given the

4  staff's efforts to treat this inmate, should not be considered an error in clinical care and in no way

5  does it exhibit deliberate indifference to this inmate's mental health needs.  (*See* Dvoskin Resp. to

6  2011 Suicide Rep. at 18 (noting clinician's decision as reasonable).) The Court should therefore

7  strike from the report the language that this suicide was preventable and that it constitutes an error

8  in clinical judgment.

9          **Inmate Q**

10         The report for this inmate notes flaws in lack of access to the Unit Health Record and the

11  benefit of inmate's long-term picture, the failure to timely and adequately complete suicide risk

12  evaluations as required by the Program Guide, and contends that the inmate should have been

13  referred to a higher level of care.  (ECF No. 4308 at 184.)  Although Defendants do not disagree

14  that the evidence would have supported a transfer to Enhanced Outpatient Program status,

15  inferring that transfer to a higher level of care would have prevented his death is speculative.

16  (*See* Dvoskin Resp. to 2011 Suicide Rep. at 18 ("I also agree with Dr. Patterson that it is not

17  unfair to regard this suicide as likely preventable if the inmate had been transferred to a higher

18  level of care, but this is of course a matter of speculation.").)  As noted, the State has instituted

19  programs to address problems with suicide risk evaluations and to ensure that inmates are timely

20  and appropriately identified, referred, and transfer to higher levels of care.  Thus, it is in no way

21  exhibiting deliberate indifference to inmate's serious mental health needs.  Defendants therefore

22  object and move to strike from the report the statements that this suicide was foreseeable and

23  preventable.

24         **Inmate R**

25         Defendants object and move to strike the statement that this suicide appears "to very

26  likely have been preventable." (ECF No. 4308 at 192.)  The report asserts that this inmate "was

27  discharged from APP to an EOP level of care in a psychiatrically fragile state without there

28  having been resolution or substantial improvement in his clinical condition."  (*Id.*)  But this

17

1    conclusion lacks foundation and is speculative.  "Improvement had been noted, even though the

2    inmate denied having a mental illness." (Dvoskin Resp. to 2011 Suicide Rep. at 19.)  Even

3    though the inmate could have continued at APP care, this was not the only reasonable course of

4    action. (*Id.*)  This suicide should thus not be considered an error in clinical care and the assertion

5    struck from the report.

6        **Inmate S**

7        This inmate suffered from a deteriorating medical condition including pain, serious weight

8    loss, and inability to eat and maintain hydration. (ECF No. 4308 at 199.)  The report states that

9    this suicide "appears to have been possibly foreseeable and highly likely preventable" had mental

10   health clinicians deemed the inmate's medical condition a "risk factor" and had measures been

11   taken by medical clinicians to collaborate with mental health clinicians. (*Id.*)  Thus, it appears

12   that "pain was the likely cause of his suicide," and that "more successful medical care may have

13   likely prevented this man's suicide." (Dvoskin Resp. to 2011 Suicide Rep. at 19)  For this reason,

14   it is unfair and prejudicial to contribute this suicide to the State and the report should be modified

15   accordingly.

16       **Inmate W**

17       Defendants object and move to strike the statements that this suicide may have been both

18   foreseeable and preventable.  The report states that this suicide was "very likely preventable"

19   because staff failed to recognize that the inmate was housed in a county jail safety cell more than

20   five months before his death. (ECF No. 4308 at 224.)  But he was seen by a psychiatrist on

21   October 5, 2011—the day before he committed suicide—and a primary clinician on October 3,

22   2011. (*Id.* at 220)  Both clinicians found the patient to be stable and future orientated. (*Id.*)  Thus,

23   the "fact that an inmate may have been placed in some sort of suicide prevention status five

24   months earlier cannot be presumed to imply that he would have been deemed an acute risk when

25   evaluated the day before his death." (Dvoskin Resp. to 2011 Suicide Rep. at 21.)  There is no

26   evidence that he was not properly assessed during these visits and the report offers no reasons that

27   these clinicians should have found him to present a serious or imminent risk of suicide at that

28   time. (*Id.*)  For these reasons, this suicide should not be considered foreseeable or preventable or

18

1  as an error in clinical care because it creates an unfair impression of CDCR's mental health and

2  suicide prevention system and the Court should strike this conclusion from the report.

3    **Inmate Y**

4    According to the report, this inmate's death appears to have been preventable had he had

5  appropriate assessments, a suicide risk evaluation completed, and transferred to a Mental Health

6  Crisis Bed.  (ECF No. 4308 at 236–37.)  But there is no evidence of systemic deliberate

7  indifference to this or any inmate's serious mental health needs.  System-wide, the State has

8  implemented a comprehensive system with standardized forms for screening and evaluating

9  inmates with mental health issues upon admission, readmission, or transfer, including

10  standardized mental health screening forms and protocols.  (ECF No. 4275–1 at 16.)  In addition,

11  the State has implemented an ongoing training program to teach staff to recognize the signs and

12  systems of mental illness among inmates, including training to improve the clinical competency

13  in administering suicide risk evaluations.  (ECF Nos. 4275–1 at 16 & 4314 at 10:7–21.)  Finally,

14  the State has a proven process now in place to ensure that inmates are identified and referred to

15  higher levels of care as needed.

16    **Inmate CC**

17    Here, the report finds that this inmate's death was "highly likely preventable" had he been

18  transferred to the Department of State Hospitals' Salinas Valley Psychiatric Program at Salinas

19  Valley State Prison in a timely manner. (ECF No. 4308 at 257–58.)  The inmate returned from the

20  Psychiatric Program in March 2011, and was re-referred in August 2011.  (*Id.* at 251 & 253.)  He

21  committed suicide two months later.  Since then, the State had successfully guaranteed timely

22  access to inpatient mental health care for all class members needing hospitalization.  (ECF No.

23  4275–1 at 17:20–18:2.)

24    **Inmate DD**

25    In this case, the report states that this suicide "may very well have been preventable had

26  there been the availability of important mental health information continued in the Unit Health

27  Record or electronic Unit Health Record.  (ECF No. 4308 at 267.)  Defendants object and move

28  to strike this language from the report because it is speculative.  The inmate was seen by a

19

1   psychologist and a psychiatrist less then 2 weeks before his death, one of whom completed a

2   suicide risk evaluation, and both of whom believed that the inmate did not pose a high risk of

3   suicide. (Dvoskin Resp. to 2011 Suicide Rep. at 25.)   In addition, the *Plata* Receiver has

4   implemented a statewide electronic unit health record project and staff have been trained to use

5   and maintain these electronic records, which are now in use at all prisons. (ECF No. 4277 ¶ 22.)

6   While the State's expert offers suggestions concerning developmental disability evaluations and

7   responses to instances of missed medication distributions, he also concludes that the "results of

8   such an assessment are a matter of speculation." (Dvoskin Resp. to 2011 Suicide Rep. at 25.)

9   Therefore, the conclusion that this suicide was preventable should be struck from the report

10  because it is speculative.

11          **Inmate FF**

12          The report supposes that this suicide was "very likely preventable had he been referred to

13  and accepted at a higher level of care beginning with a MHCB." (ECF No. 4308 at 276.) But this

14  inmate had a history of refusing treatment and deteriorating, and a judge denied a Keyhea

15  petition. (Dvoskin Resp. to 2011 Suicide Rep. at 26.) Although Defendants' expert believes that

16  some clinical intervention was warranted, he did not agree that referral to a higher level of care

17  was the only reasonable course of action. (*Id.*) Because the State has in place a successful

18  program designed to ensure that inmates are identified, referred, and transferred to a higher level

19  of care when appropriate, there is no evidence of deliberate indifference.

20          In sum, the Court should grant Defendants' motion to strike or modify the above cases, as

21  follows:

22      •   Conclusions in 8 cases (inmates identified as A, B, F, H, N, P, R, & W) must be

23          stricken on the grounds that these suicides were not foreseeable or preventable and the

24          assertions regarding inadequacy in clinical care lack foundation, are speculative, and

25          create an unfair impression of CDCR's mental health and suicide prevention system;

26      •   Conclusions in 3 cases (inmates identified as E, Q & DD) must be stricken on the

27          grounds that the suicides were neither foreseeable nor preventable because any alleged

28          inadequacy in clinical care did not contribute to the suicides;

- The conclusions concerning inmate I must be stricken on the ground that the evidence is unclear as to whether the clinical care was reasonable and there is no evidence of deliberate indifference;

- Conclusions in 2 cases (inmates identified as J & S) must be stricken on the grounds that the error in care was not under the control of the State; and

- Conclusions in 5 cases (inmates identified as K, O, Y, CC, & FF) must be stricken on the ground that there is no evidence of deliberate indifference on the part of the State.

For all these reasons, the Court must sustain Defendants' objections and strike the conclusions in the report claiming that "in 50 percent of the suicide cases in 2011," there was some level of inadequacy in clinical assessment, treatment, and intervention.  In addition, the Court must sustain Defendants' objections and strike the findings that "73.5 percent of cases were marked by inadequacy in assessment, referral and/or treatment" (ECF No. 4308 at 10), and that the "conduct of suicide risk evaluations continued to be problematic" (*id.* at 11).  "There is no reason to even allege deliberate indifference to this important problem."  (ECF 4314–1 at 3.)

### 3.  Objections and Requests to Strike or Modify Portions of the Report's Assertions of Non-Completion of Timely Custody Welfare Checks.

The report identifies five cases in 2011 (identified as inmates G, R, X, AA, and EE) in which timely custody and welfare checks were allegedly not conducted.  (ECF No. 4308 at 2–3.) According to the report, two inmates (identified as G and EE) were housed in administrative segregation and one inmate (identified as AA) was housed in the condemned unit at San Quentin State Prison at the time of their death.  (*Id.*)

CDCR's policy is that custody staff assigned to high-risk areas perform hourly security checks during First Watch to ensure inmates are accounted for and secured within their assigned housing units."[4]  (Allison Decl. ¶ 9.)  There is no hourly security check in General Population.  (*Id.*) In addition, CDCR conducts 30 minute "Welfare Checks" of inmates during the first three

/ / /

---

[4] First watch is from 10:00 p.m. to 6:00 a.m. (Allison Decl. ¶ 9.)

21

weeks of administrative segregation unit placement.  (*Id.* ¶ 10.)  Each institution provides training on the requirement to conduct 30 minute Welfare Checks.  (*Id.*)

Defendants object and move to strike the report's findings regarding inmate EE. The suicide report does not find inmate EE's death to have been foreseeable or preventable. Defendants object and move to strike the report's findings regarding inmate X because neither hourly custody security checks nor welfare checks are required for inmates placed in General Population.  (Allison Decl. ¶¶ 9–10.)

The report states that inmate G, who was housed in administrative segregation, was found with *rigor mortis.* (ECF No. 4308 at 96.)  Because of this finding, the institution developed and completed a quality improvement plan to provide corrective action as deemed appropriate for any departure from policy, procedures, or employee ethical standards related to 30-minute wellness checks.  (ECF No. 4308 at 100–101.)  Thus, because CDCR quickly and effectively responded to the findings in this case, there is no evidence of deliberate indifference.

The report concerning inmate R noted concerns regarding possible irregularities with the correctional count at 5:00 a.m.  (ECF No. 4308 at 190.)  Because of this finding, the institution developed and completed a quality improvement plan and took appropriate action.  (*Id.* at 190–91.)  Again, because CDCR quickly and effectively responding to the findings in this case, there is no evidence of deliberate indifference.

Inmate AA, who was housed in the condemned unit at San Quentin State Prison, was also found with *rigor mortis*.  (ECF No. 4308 at 242.)  Because of the nature of custody checks— which are designed to ensure that inmates are accounted for—"the likelihood that hourly checks would have prevented death by hanging is speculative at best."  (Dvoskin Resp. to 2011 Suicide Rep. at 24.)  Nonetheless, CDCR again took corrective action in response to this suicide and revised their policy to include wellness checks to ensure the safety of inmates housed in East Block.  (ECF No. 4308 at 244; Allison Decl. ¶10.)  Thus, the State's change in policy in response to this single incident proves the lack of any deliberate indifference.

In sum, the Court should grant Defendants' motion to strike or modify the language regarding the above five cases, as follows:

1     • The conclusion concerning inmate EE must be stricken on the ground that the suicide

2        was not found to be foreseeable or preventable;

3     • The conclusions in 1 case (inmates identified as X) must be stricken on the ground that

4        there was no error in complying with court-approved policies;

5     • The conclusions concerning inmates G & R must be stricken on the ground that,

6        although errors may have been made, the State responded to them and there is no

7        evidence of deliberate indifference; and

8     • The conclusion concerning inmate AA must be stricken on the grounds that any

9        assertion that errors may have contributed to this inmate's death are speculative and

10       there is no evidence of deliberate indifference.

11

12          **4.    Objections and Requests to Strike or Modify Portions of the Report's
                     Assertions that in 16 Cases Emergency Response  Procedures Were Not
13                   Performed in a Timely and or Appropriate Manner.**

14       On page 3, the report states:  "Among 16 of the 34 suicides—identified as inmates B, C,

15    D, G, H, I, J, Q, T, V, W, X, Z, BB, CC, and FF—cardiopulmonary resuscitation, including

16    availability or use of the Automated External Defibrillator (AED) and/or use of first aid, were not

17    performed in a timely and/or appropriate manner."  (ECF No. 4308 at 3.)  Defendants object and

18    move to strike the reference to 11 of these cases on the grounds that any alleged failure use an

19    AED in no way contributed to the inmates' deaths, and it is therefore unfair and prejudicial to the

20    State to infer otherwise.

21       In three cases (identified as Inmates C, Z, and BB), the report found the suicides were

22    neither "foreseeable" nor "preventable." (ECF No. 4308 at 72, 240 & 249.)   Accordingly,

23    including these inmates in alleged instances of untimely emergency responses is unfair and

24    misleading.  Moreover, in 8 additional cases (inmates B, H, I, J, Q, W, X, and FF), the report fails

25    to relate—or inaccurately relates—the allegation of an untimely emergency response to any

26    finding of preventability.

27       For the following reasons, the Court should also sustain Defendants' objections to the

28    remaining five cases and strike or modify portions of the 2011 Suicide Report:

23

**Inmate D**

Defendants object to the statement that the "[i]nmates suicide may have been preventable had there been more timely emergency response.  The initial response and delay in the provision of CPR by first responders of five to eight minutes as per the reported timelines and the delay in the inmate's transport by air ambulance were excessively long."  (ECF No. 4308 at 79.)  In response to concerns related to air evacuation timeliness, the prison developed improved procedures to ensure timely medical transportation and care for the inmate population.  (ECF No. 4308 at 77–79.)  In addition, the institution developed a local operating procedure that requires the use of Emergency Personal Protective Equipment for cell entry in an emergency situation. (Allison Decl. ¶ 11.)  The actions taken by CDCR and the prison after the suicide, including corrective action, training, and modified policies and procedure, establish that there is no institutional or systemwide deliberate indifference.

**Inmate G**

Defendants object to the inference that this death may have been preventable had there not been a delay before staff started emergency response procedures.  (ECF No. 4308 at 101.)  In fact, the timing of the emergency response "probably had nothing to do with the death, as [the inmate] was likely already dead."  (Dvoskin Resp. to 2011 Suicide Rep. at 11.)   Moreover, because the State continues to develop and improve appropriate quality improvement plans, including the review and updating of emergency response policies, there is no evidence of deliberate indifference.  (ECF No. 4308 at 99-101.)

**Inmate T**

The report concludes that "[t]he practice at HDSP to assemble an emergency medical entry team that takes ten minutes to enter the cell in a medical emergency is simply unacceptable," and "the inmate's death may have been preventable if emergency procedures had been effected timely."  (ECF No. 4308 at 205.)  In response to this suicide, HDSP implemented a quality improvement plan to conduct on-going training and monthly drills for emergency cell entry, and the Warden represented that staff would be trained to ensure efficiency in the area of concern and strive to improve response times where possible.  (*Id.* at 204–05.)  In addition, the

24

1    institution developed a local operating procedure that requires the use of Emergency Personal

2    Protective Equipment for cell entry in an emergency situation.  (Allison Decl. ¶ 11.) The

3    corrective actions taken by CDCR and the prison after this single event, including additional

4    training, and modified policies and procedures, establish that there is no institutional or

5    systemwide deliberate indifference concerning the issue of emergency response times.

6          Apart from the responses to these individual cases, policies and procedure related to

7    timely emergency responses are continuously evaluated and updated.  (Allison Decl. ¶ 6, Ex. 1.)

8    The policies provide direction on medically necessary medical response, treatment, and

9    transportation twenty-four hours per day to patient-inmates, employees, and contract staff,

10   including the administration of CPR and application of an Automated External Defibrillator.  (*Id.*)

11   Moreover, staff continues to receive training in the use of CPR and AED's as it is a bi-annual

12   certification and requirement for training in numerous classifications.  (*Id.*¶ 7.)  Finally, quarterly

13   emergency drills occur at each institution, and results are provided to headquarters.  (*Id.*)

14         In sum, the Court should grant Defendants' motion to strike or modify the above cases, as

15   follows:

16   •     The conclusions in 12 cases (identified as inmates B, C, G, H, I, J, Q, W, X, Z, BB &

17         FF) must be stricken on the grounds that the alleged errors did not contribute to inmate

18         deaths, and the conclusions therefore lack foundation and are speculative.

19   •     The conclusions in 2 cases (identified as inmates D & T) must be stricken on the

20         grounds that although there may have been emergency response delays, actions

21         subsequently taken by CDCR show that there is no institutional or systemwide

22         deliberate indifference to emergency response timing.

23   **D.    The Court Should Strike the Language that CDCR Failed to Comply With Post-Suicide Review and Reporting Timeframes and the Assertion That CDCR was Responsible for the Special Master's Failure to File the 2011 Suicide Report Until January 2013.**

24

25

26         The 2011 suicide report asserts that CDCR failed to comply with post-suicide review and

27   reporting timeframes in seven cases.  (ECF No. 4308 at 4.)  Defendants object because there are

28   no facts to support this assertion.  The Report lists several program guide timeframes for

                                                25

1   conducting post-suicide review measures and reporting, but it does not identify a single instance

2   in which these guidelines were not followed.  It also bears noting that CDCR produced reporting

3   about the implementation of quality improvement plans within program guide timelines in all but

4   three occasions in which a quality improvement plan was recommended.  (Burleson Decl. ¶ 9.)

5           Defendants also object to any implication or conclusion that a failure to meet all post-

6   suicide review and reporting timeframes under the Program Guide adversely impacted the State's

7   provision of adequate suicide prevention services to inmates who needed them, or that any such

8   alleged failure harmed an inmate.  There is no causal connection between meeting these deadlines

9   and the quality of the State's efforts to prevent or reduce suicides in prison.

10          The Suicide Report further contends that "more frequently than not, CDCR suicide reports

11  do not include full coroners' reports or are not updated when the coroners' reports become

12  available."  (ECF No. 4308 at 12.)  Defendants object to this inaccurate statement.  First,

13  coroners' reports are typically uploaded to the secure site separately from the suicide report.

14  CDCR has no control over how quickly County Coroner offices produce their autopsy reports.

15  (Burleson Decl. ¶ 5.)  As the Report acknowledges, some coroners' reports are not released until

16  eight months after the inmate's death.  (ECF No. 4308 at 12.)  Thus, to ensure timeliness, CDCR

17  must often prepare a suicide report before the coroner's report is released, and then post the

18  coroner's report when it arrives.  (Burleson Decl. ¶ 5.)  Second, even if some reports were

19  produced before the coroner's report was released, none of the suicide reports required updating

20  because they did not contain information that contradicted suicide report findings or necessitated

21  revision.  (*Id.*)

22          The Suicide Report also asserts that "documentation related to five suicides in 2011 did not

23  include the required review and signatures by the Director among the material posted on CDCR's

24  secure website."  (ECF No. 4308 at 12.)  Defendants object because this statement is also

25  inaccurate.  CDCR posted all 2011 suicide reviews and the Directors' signed review memoranda

26  on the secure website.  (Burleson Decl. ¶ 6.)  Occasionally, CDCR posted the Directors' signed

27  review memorandum separately from the suicide report.  (*Id.*)  In 2011, ten suicide reports were

28  posted separately from the Directors' signed memoranda.  (*Id.*)  More importantly, Defendants

26

Defs.' Obj. & Mot.  Strike or Modify Portions of Report on Suicides Occurring in CDCR in 2011   (2:90-cv-00520 LKK JFM PC)

object to any suggestion that providing these materials separately impacted the special master's

expert from timely reviewing the suicide reports.  Signatures are not necessary to review CDCR's

suicide reports.  They merely confirm that the Directors of Mental Health and the Division of

Adult Institutions have reviewed and approved the report.  (Burleson Decl. ¶ 6.)  If the report is

uploaded to the site, it can be reviewed whether signed or not.  (*Id.*) Providing unsigned copies

cannot be reasonably linked to any delay the special master's expert claimed to experience in

obtaining necessary information.

Last, the special master's expert complains that CDCR's failure to timely upload suicide

review materials is the root cause of his inability to submit a comprehensive report on 33 suicides

in 2011 until January 2013.  (ECF No. 4308 at 12-16.)  Defendants object because this assertion

is inaccurate and lacks foundation.  To ensure that the special master's suicide expert has

immediate access to documents near or at the time they become available, CDCR has given the

expert electronic access to the secure site in which all documents relevant to post-suicide review

and reporting are maintained.  (Burleson Decl. ¶¶ 2–4.)  For 2011 suicides, every suicide report

but one was uploaded and available for review before March 1, 2012—nearly a year before the

special master's suicide report was filed.  (*Id.* ¶ 7, Ex. 1.)  Eight of these suicide reports were

uploaded and available in the first six months of 2011.  (*Id.*)  Seventeen suicide reports were

uploaded in the second six months of 2011.  (*Id.*)  All death review summaries were uploaded and

available for review by April 19, 2012.  (*Id.* ¶ 8.)  Only two documents—both coroners' reports—

were posted after May 30, 2012. (*Id.* ¶ 10.)  But, as discussed earlier, CDCR had no control over

when the coroners' reports are released.  (*Id.*)

The special master's expert had access to all but two coroners' reports by May 2012.

(Burleson Decl. ¶¶ 7–10.)  Thus, even if the special master's expert chose to forestall his review

until CDCR posted all suicide review and reporting materials to the secure site, he would have

had at least seven months to complete and file a report before the end of 2012.  The special

master's expert had access to necessary documents on a rolling basis since early 2011.  (*Id.* ¶¶ 7–

9, Ex. 1.)  Accordingly, any attempt to assign CDCR blame for the untimely review of CDCR's

work, when nearly all necessary materials were available between February 2011 and April 2012,

27

1  is disingenuous at best.  For all of these reasons, the Court should sustain Defendants' objections

2  and strike the reports' statements from pages 4, and 12-16 of the 2011 Suicide Report.

3  **II.    DEFENDANTS OBJECT TO ANY RECOMMENDATION THAT THE COURT ORDER FURTHER COSTLY AND INTRUSIVE OVERSIGHT OF THE PRISON MENTAL-HEALTH CARE SYSTEM.**

4

5      The special master's expert's report offers no remedial recommendations, instead

6  concluding that a "suicide prevention/management work group" be established, and that the

7  Suicide Risk Evaluation mentor program be "fully implemented."  (ECF No. 4308 at 17.)  The

8  report bases these recommendations on purportedly elevated suicide rates (*id.* at 16), despite the

9  fault in the analysis described above.[5]

10      The State undeniably "devotes extraordinary resources to clinical and operational

11  investigations of completed suicides as well as prospective efforts to prevent such acts in the

12  future."  (ECF No. 4275–5 at 4.)  Defendants object to any recommendation that Defendants be

13  ordered to participate in any further intrusive and costly oversight of California's prison mental-

14  health system or continued monitoring by the special master for compliance with Program Guide

15  guidelines.  (*See* ECF No. 4308 at 17.)   The State has now presented compelling evidence that

16  any deficiencies in implementing suicide prevention policies and procedures have been remedied,

17  and they moved to terminate this case.  (ECF No. 4275–1 at 21–23.)  As noted by Dr. Dvoskin,

18  "[i]t would be grossly unjust to conclude from either Dr. Richard Patterson's January 25, 2013

19  report, or [Dr. Dvoskin's] response to it, that the California Department of Corrections and

20  Rehabilitation is currently deliberately indifference to the prevention of inmate suicides.  It is

21  not."  (Dvoskin Resp. to 2011 Suicide Rep. at 2.)  Therefore, the Court must reject any suggestion

22  that a "suicide prevention/management work group," or full implementation of the State's Suicide

23  Evaluation Risk mentoring program, should include participation by the special master, the

24  special master's expert, or Plaintiffs' counsel.

25  / / /

26          [5] To the extent that the report asserts staff vacancies to support the recommendations, Defendants object to their use on the grounds stated in their objections and motion to strike portions of the special master's twenty-fifth round monitoring report and incorporate those objections here.  (ECF No. 4314 at 19–20.)

27

28

28

1

**CONCLUSION**

2      The report on 2011 suicides does not assess whether the State's prison mental health care

3  system satisfies constitutional standards.  Instead, it creates confusion by lumping together an

4  analysis of "foreseeability/preventability" with assertions that 73.5 percent of suicides included

5  "at least some degree of inadequate assessment, treatment, or intervention."  (ECF No. 4308 at 3

6  & 4; *see also* Dvoskin Resp. to 2011 Suicide Rep. at 2.)  But none of this is related to the

7  Constitution or the core question of whether the State is doing everything required under the

8  Constitution. When examined under constitutional criteria, California's "suicide investigations

9  are as thorough and rigorous as any system of prisons or jails in the United States."  (Dvoskin

10  Resp. to 2011 Suicide Rep. at 2.)  In addition, the State's "suicide assessments and investigations

11  result in findings that are reasonable and frequently self-critical, and the Department has

12  attempted to follow-up on each and every serious recommendation.  Similarly, its efforts to

13  prevent suicides are more extensive than any correctional system with which [Defendants' expert

14  is] familiar."  (*Id.*)   Because the State has established such a system, and has complied with the

15  Constitution, its objections to the report on 2011 suicides must be sustained, and this 23-year old

16  litigation must finally end.

17  Dated:  February 11, 2013                    Respectfully submitted,

18                                              KAMALA D. HARRIS
                                                Attorney General of California
19
                                                */s/ Debbie J. Vorous*
20
21                                              DEBBIE J. VOROUS
                                                Deputy Attorney General
                                                *Attorneys for Defendants*
22  CF1997CS0003
    31619815.doc
23

24

25

26

27

28