# EXHIBIT 1

# *Coleman v. Brown*

Case No. 90-cv-00520 LKK JFM P (Eastern District of California)

## Response to Dr. Raymond F. Patterson's "Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2011"

By

**Joel A. Dvoskin, Ph.D., A.B.P.P.**

## Summary

It would be grossly unjust to conclude from either Dr. Raymond Patterson's January 25, 2013 report, or my following response to it, that the California Department of Corrections and Rehabilitation is currently deliberately indifferent to the prevention of inmate suicide. It is not. CDCR's suicide investigations are as thorough and rigorous as any system of prisons or jails in the United States that I have observed. Its suicide assessments and investigations result in findings that are reasonable and frequently self-critical, and the Department has attempted to follow-up on each serious recommendation. Similarly, its efforts to prevent suicides are as extensive as any correctional system with which I am familiar.

## Introduction

In the following response to Dr. Patterson's January 25, 2013 report, I make a number of important recommendations, all of which I regard as likely to improve the Department's ability to prevent suicides going forward. The systemic recommendations in Dr. Patterson's report at pages 16-18 are reasonable and should assist the California Department of Corrections and Rehabilitation in its essential goal of preventing suicides in the future. Indeed, in reviewing the individual cases, I agree with many of Dr. Patterson's findings, which often represent best practices for improvement moving forward. Even where we disagreed, in most cases these were simply two alternative and equally reasonable ways to look at the case.

Unfortunately, Dr. Patterson used the terms "foreseeable" and "preventable" in the same manner in which they had been used in previous reports. As I have suggested to the parties in an earlier report, it would be much more useful to articulate more specific ways of categorizing errors and suggested improvements. Specifically, I continue to believe that findings and recommendations should be categorized as institutional or systemic, based on the seriousness of the error, and whether the error was: 1) unrelated to the death; 2) speculatively or possibly related to the death; 3) definitely related or contributory to the death; or 4) directly causal to the death (alleged or confirmed). An additional category should include errors that were post-mortem, such as documentation or notification errors. This will clarify vague terms such as "preventable," making it much more clear whether and how alleged failures may have contributed to a suicide. Further, it will allow for the Department to make positive changes even when there was no negligence or malfeasance, without fear of being "punished" for systemic improvements going forward.

Nevertheless, because Dr. Patterson continues to use these terms, I have tried to articulate my agreement or disagreement with his categorization of foreseeability and preventability in each case, using the same terms. However, I believe that lumping all of these various categories together, for example, by saying that 73.5 percent of suicides included "at least some degree of inadequate assessment,

treatment, or intervention," creates an unfairly negative impression of CDCR's mental health and suicide prevention system. For example, in some cases, this inflated figure includes errors that preceded the inmate's death by years, or alleged errors that clearly had little or nothing to do with the eventual suicide. Thus, preventability of the suicide in these cases is a matter of speculation. Most importantly, clinical decisions should be judged by what was known at the time of the decision.

Dr. Patterson rightly speculates that in some cases a referral to a higher level of care might have led to a different outcome. That, of course, does not imply that referring the person to a higher level of care would have been the only reasonable course of action at the time the decision was made, when the outcome (i.e., suicide) was not known and, as Dr. Patterson states, could not have been "foreseen." It is my understanding that there was a system-wide study to identify inmates in need of referral to a higher level of care in August-December of 2011, as part of what has been called the "sustainable process." It is also my understanding that this study was jointly conducted by the Special Master and his experts in collaboration with CDCR in 14 facilities. Finally, it is my understanding that this study revealed only 44 inmates in the entire system who were questionable, of whom 18 were determined to actually need a higher level of care. In a system the size of CDCR, this is a remarkable level of success in identifying inmates with serious mental health needs and referring them to the appropriate level of care.

I also note that Dr. Patterson's statistics lump together alleged errors on the part of CDCR with those of employees under the control of the Federal Court Receiver. Obviously, any error that contributes to a suicide must be addressed, but it seems unfair to blame CDCR for things over which it has no control.

Finally, retrospective review of mental health treatment almost always reveals the possibility of some improvement. If a person was seen weekly and commits suicide, it would be accurate to say that seeing them more often might have led to a different outcome. However, that is not a fair way to determine whether and to what degree the clinician met the standard of care.

All of that being said and as noted above, I believe Dr. Patterson's recommendations are useful and should be considered, and concur in many of his individual case assessments.  Even in cases where we did not agree, I often viewed both points of view as reasonable.

## Timing of Findings and Recommendations

In a previous report, I noted that generally, CDCR has not received timely, case-specific comments and questions from the Special Master's office. I wrote: "If indeed (the recommendations) are not shared immediately, the very fact that the Special Master is comfortable delaying communication of these expert findings and recommendations for months belies the fact that they are crucial to institutional

suicide prevention." Dr. Patterson took issue with this observation, on several grounds. Most importantly, Dr. Patterson asserts that these delays are largely due to the Defendants' own delays in completing reviews and posting them on the secure web site.

My comment was not meant to imply that Dr. Patterson and his colleagues, the Special Master, plaintiffs' counsel, or CDCR lack a passionate dedication to the prevention of suicide. Each of these actors has demonstrated a diligent and sincere effort to leave no stone unturned in the prevention of correctional suicides. Nor did I intend to assign blame to anyone for the delays.

However, I remain convinced, especially in light of Dr. Patterson's long experience and that of other members of the Special Master's expert team in reviewing suicides, that their feedback and questions regarding every suicide should be made available to the Department immediately, as soon as the Special Master or his experts become aware of them. For example, some of the observations, recommendations, and questions will require additional investigation, and the passage of time makes investigations more difficult or impossible. Also, to the extent that the recommendations are important, timely implementation might decrease the chances that someone else might die in a similar manner during the months that currently elapse between the suicide death and communication of the recommendations or questions.

I have no way to know who is responsible for the long delays in receiving feedback from the Special Master's experts. Nevertheless, whatever their cause, I continue to believe that the delays are troubling and counter-productive. If these delays are the predictable result of an agreed-upon process, and if the Court determines that monitoring of suicide prevention is to continue, then perhaps the agreement could benefit from a revision that allows for more timely feedback, interaction, questions, and recommendations regarding completed suicides as soon as possible after a death.

## Findings Regarding Rates of Suicide

One important finding of reviewing these cases is that the CDCR suicide review team has been consistently competent and self-critical in their reviews of these suicides. Indeed, the vast majority of Dr. Patterson's criticisms, as well as my own, were taken directly from the findings of CDCR's own suicide reviewers. In my opinion, this is powerful evidence that CDCR is not deliberately indifferent to the prevention of suicide among its inmates.

Dr. Patterson provides data to suggest that the suicide rate within CDCR appears to consistently exceed the reported national averages, and I agree with him. Obviously, year-by-year results have little meaning, but consistently higher rates are concerning.

What are less clear are the reasons for the higher rates in California. Indeed, a look at the reported rates of individual states is puzzling to say the least. Some states with far less extensive mental health services than CDCR have much lower reported rates. In order to determine the causes of these higher rates, one must not presume that they are the result of inadequate or poor mental health services, and consider other alternative explanations as well. In my opinion, one way to approach the question is to identify the ways in which California's prison system is different than that of other states.

For example, no other state has the degree or severity of prison gang activity as that of CDCR, and the degree to which gang activity might influence suicidality is unknown. Another possibility is the prevalence of undocumented aliens in CDCR, which I believe is higher than most other states. One can also consider the ethnic makeup of one system versus another, the relative size of the systems, etc. Of course, the reason for the higher rate does nothing to diminish the necessity of taking every reasonable step to reduce it, but it does call into question the presumption that a higher than average rate necessarily implies a lack of competence or diligence in the fight to prevent prison suicide, or somehow shows deliberate indifference to suicide risk. To the contrary, I have been consistently impressed with the emphatic diligence of CDCR, at headquarters and at each prison, to prevent suicides. While the rate of suicides remains higher than the national average, CDCR's efforts to prevent suicides are as impressive as those of any state I have observed.

## Suicides at the California Men's Colony (CMC)

There were 6 suicides at the California Men's Colony (CMC) in 2010, followed by 4 suicides in 2011. After reviewing the facility's quality improvement plans, I spoke with Dr. Amy Eargle and the Chief of Mental Health and the Suicide Prevention Focus Improvement Team (suicide prevention) coordinator from CMC. After a comprehensive review, there appeared to have been relatively few commonalities among the suicides at CMC, making it more difficult to know what remedial actions could be implemented. Indeed, Dr. Patterson offers no recommendations specific to CMC. Nevertheless, the facility has taken many steps to enhance its suicide prevention efforts, which have been communicated to the Special Master and his experts.

One commonality noted was that many of the inmates who committed suicide had received recent bad news. When the facility mental health staff becomes aware that an inmate has received bad news, they make it the focus of treatment; however, it is not always the case that staff becomes aware of bad news. To address this possibility, the facility is making more frequent clinical contact with inmates who appear to be more psychologically vulnerable in the event that they receive bad news.

The most likely commonality among the CMC suicides is the fact that many inmates prefer to live there. Thus, designating an inmate for transfer to another institution

might be considered as a trigger for additional attention to the possibility of suicide. I have recommended that CDCR look into this question, and indeed it appears to be a viable hypothesis.

CMC's leadership took a number of serious and sensible steps toward enhancing its suicide prevention efforts, all of which are known to the Special Master and his expert team. I will not repeat them here.

## Individual Cases 2011 Suicides

A.  Died 1/1/11 at Pleasant Valley S.P. (Overdose)

This inmate was a 48-year-old Caucasian man. He was not a participant in the Mental Health Services Delivery System (MHSDS) at the time of his death. He was double-celled in a sensitive needs yard.

Dr. Patterson found that this suicide was not foreseeable by staff, and I agree. (He may have communicated suicidal intent to other inmates.) Also, the inmate's 9-page letter suggests a great deal of planning, and a sincere and prolonged wish to die.

The most obvious error leading to this suicide was that this inmate was allowed to obtain 465 Tramadol tablets, which is likely the responsibility of nursing staff under the direct control of the Federal Receiver. Dr. Patterson also suggested that this suicide might have been preventable had there been better collaboration between psychiatrists and primary care physicians who were treating his chronic pain. Although the likelihood that such collaboration would have prevented the suicide is unknown and highly speculative, I agree that the collaboration should have taken place.

Dr. Patterson also criticized the failure to refer this inmate for a higher level of care, despite being given a GAF of 29 upon leaving a crisis bed many years earlier. I agree. Finally, Dr. Patterson criticized the failure to document suicide risk evaluations at various points in the inmate's care. I note that this inmate's last clinical visit was in 2009, and the clinician did not do a suicide risk assessment, despite the inmate's conditional suicidal statement (i.e., that he would commit suicide if paroled.) Note, however, that this was prior to CDCR's policy and procedure changes regarding SRE proctoring, and mentoring, and that this was 2 years prior to the inmate's death. Considering the fact that this inmate had consistently denied any suicidality, even during his three crisis unit visits in (2004-5), I would describe this as a serious error (in 2009) but one that had no likely causal or contributory connection to the death.

The QIP in this case only included a recommendation for the CEO regarding the inmate's ability to collect and buy so much pain medication. However, the inmate's 9-page letter suggests planning, which suggests that the means of suicide was less important than the planned intention.

B.  Died 1/25/11 at C.S.P. Los Angeles County (Hanging)

This inmate was a 36-year-old Caucasian male, who was served at the EOP level of care. He appeared to have been both very psychotic and resistant to treatment. At the time of his death, he was single-celled pending double-cell placement at an SNY. He was considered for DSH transfer, however, his family reportedly provided social support, and it was felt that this was more important to him than the potential value of a different milieu. In my opinion, this appears to have been a reasonable clinical decision at the time it was made. Dr. Patterson's retrospective opinion, that the inmate should have been transferred, is also not unreasonable, but neither was the opinion of the clinicians at the time. The inmate remained voluntarily isolative, and frequently refused to leave his cell. Thus he was often seen at cell-side.

I agree with Dr. Patterson's opinion that the suicide was not foreseeable. His opinion that the suicide "may have been" preventable is concretely true – one never knows the result of an action not taken - but I disagree with its implication that the CDCR MH staff was wrong to decide not to refer him to DSH. A referral was seriously considered, and the decision to refrain from such a referral was reasonable at the time it was made.

There were also issues related to the speed with which the AED was used, and the decision to take the inmate outside before commencing CPR. This appears to have been a serious error in emergency response. Finally, there were problems noted with the legibility of portions of the inmate health and MH record; while these likely had nothing to do with this inmate's suicide, they are nevertheless important lessons going forward. Obviously, implementation of a truly comprehensive electronic medical records system would virtually eliminate the legibility problems; until then clinical staff members must be consistently reminded to write legibly.

C.  Died 1/30/11 at California Men's Colony (Hanging)

This 37-year-old Caucasian inmate killed himself 3 months after he returned from DSH placement. He was double-celled in EOP at the time of his death. His parole denial was several years before his death and likely not related. The first anniversary of his grandmother's death was 7 days prior to the suicide. The inmate made two suicide attempts at DSH, in April and August of 2010. It is unclear if there was an analysis of the appropriateness of his discharge from DSH.

I agree with Dr. Patterson's overall conclusion that this suicide was likely neither foreseeable nor preventable, however, I have a few additional recommendations that arose from my review of the case.

The inmate apparently participated in group therapy in DSH, but was only offered N.A. and Lifer Group upon his return to EOP at CMC, both of which he refused. Instead of negotiating with the inmate to ensure that a reasonable array of group experiences were offered to him, he was apparently treated as a group refuser. (For

example, he was on a waiting list for DBT.) While it is entirely speculative as to whether or to what extent this contributed to his decision to kill himself, or the degree to which group therapy might have prevented his suicide, it should have been a recommendation for possible improved services. Note that CMC already had a QI team working on group therapy; and this case was appropriately brought to that team's attention.

I have no way of knowing the degree to which this inmate's discharge from DSH was appropriate, however, the question is a good one. When a recent DSH discharge commits suicide, CDCR should notify DSH so that it can complete its own investigation of the appropriateness of DSH treatment and discharge. Of course, it is possible that such investigations take place when DSH becomes aware of such cases; however, there should be a formal notification and a meeting to discuss any discrepancies between the respective Departments' findings.

### D.  Died 2/8/11 at High Desert State Prison (Hanging)

This 20-year-old Caucasian male was convicted of child abuse/endangerment. He was assigned to the CCCMS level of care due to depression, and treated with medication. There was a reported history of suicidal ideation, but there was no SRE completed. There was a 5-minute delay in entering the inmate's cell while the CO's donned their personal protective equipment. There was also a reported 15-minute delay for the medivac helicopter to leave due to weight restrictions.

This inmate's cellmate reportedly "intimated" that custody staff harassed the inmate due to commitment offense, but the results of an IAD investigation of this allegation are unknown. (See below.) The evaluator believed that an SRE would not have revealed suicidality, because the inmate had denied suicidality to his clinician during cell-front interviews. The cellmate reported that the inmate had tried to hang himself in the fall of 2010, but it is unclear whether that was known to custody or mental health or medical staff. After being assaulted, the inmate was transferred to High Desert S.P. – note this was less than 1 month after the inmate had been moved to an OHU due to suicidal ideation. Failure to complete an SRE violates the program guide, and an SRE should have been completed because of the recent suicidality and assault. However, this was 8 months prior to his death, and should be described as a serious error that was not likely to have contributed to the inmate's death. Procedures for contacting and preparing for air ambulance transports must also be reviewed to determine if timeframes can be reduced.

Dr. Patterson found this suicide to be unforeseeable, but notes that it may have been preventable had there been a more timely emergency response. He notes a delay of between 5 and 8 minutes before the initiation of CPR, as well as a delay in moving the inmate by helicopter to a medical facility. Since the inmate nevertheless responded to CPR before expiring, it is not unlikely that the delays contributed to his death.

I understand that corrections staff must be wary of feigned suicide attempts, which can be a ruse for harming staff members. In segregation housing, the requirement for backup before opening the cell door is not unreasonable. That being said, the delay in this case, if accurately reported, appears to have been excessive. I strongly agree with Dr. Patterson's recommendation that High Desert S.P. and all CDCR facilities review and standardize their policies regarding emergency response in segregated environments such as ASU.

The inmate also reportedly left a suicide note suggesting that the staff had harassed him and told him to "do it." There was an IAD investigation, but the results are confidential and were apparently not communicated to the suicide review team. While certain aspects of an IAD investigation must remain confidential, the basic findings should be communicated to the suicide review team as soon as they are known.

### E. Died 2/5/11 at California Inst. For Men (Hanging) [1]

This inmate was a parole violator in reception center status. In my opinion, CDCR headquarters' suicide review was unduly harsh. For example, the reviewer criticized the screening psychologist for not filling in 2 of the 31 screening questions, both dealing with suicide; but the psychologist did an SRE, which was exactly the right thing to do, and an SRE is the only result or consequence of a positive screen. (It is important to note that the only purpose of the screening is to decide whether or not to refer the person, and whether the referral should be routine or emergent.)

A more realistic criticism was that the psychologist "planned to schedule" a psychological evaluation 5 days before the inmate's death, but had not done so by the time of the inmate's death. On the other hand, a psychiatrist saw the inmate on the same day as the screening. However, the psychologist and the psychiatrist did not consult with each other on the case. The psychiatrist's clinical thinking was reported as reasonable but was not reflected in the documentation. (Note that CIM was selected as a test site to initiate a High Risk Inmate Identification and Treatment Program.) A previous suicide attempt was not reflected in the behavioral alerts

---

[1] This review was hampered by the fact that the archived record was unavailable for the inmate's treatment. Surprisingly, it was also not made available to the suicide reviewer. These investigations must be treated as an extremely high priority by all parts of the correctional system, including custody, mental health, and the medical care system under the control of the Receiver's office. Fortunately, in this case, the problem was eventually solved, thanks to the efforts of one employee in the Medical Records office. That being said, suicide prevention is far too important to have to depend upon the goodwill of one particular employee. I would also be remiss if I did not note that this problem (i.e., lost records) is the predictable result of an enormous system that still does not have an electronic medical record.

section. The inmate was housed in Birch Hall, which is described as an unofficial SNY unit for reception inmates.

The inmate died 4 days after seeing the psychiatrist. The psychiatrist's rationale was not reflected in the note, which is a serious error but unlikely to have contributed to the death. There is no criticism offered of the psychiatrist's rationale. The HQ review also noted that the psychologist's evaluation reportedly "lacked in extent and detail," and the documentation was noted to be inadequate. (This may have been exacerbated by the fact that the psychologist and psychiatrist did not consult with each other on the case.)

The fact that the psychiatrist wrote on the psychologist's SRE form is neither serious nor contributory, if the note was useful and clearly the work of the psychiatrist. The review team also criticized the psychologist for failing to schedule a psychological evaluation, a criticism with which I agree; however, this was mitigated by the fact that the inmate was seen the same day by a psychiatrist. Regarding the lack of documentation of consultation between the psychiatrist and the psychologist, the reviewer should have determined whether or not they communicated with each other (for example by phone), even if it wasn't documented.

The reviewer also noted that the previous suicide attempt was not in the behavioral alerts section, an observation with which I agree.

F.  Died 2/15/11 at Cal. Medical Facility (Hanging)

CDCR's reviewer noted that his difficult inmate "rarely stayed in one place long enough for therapeutic interventions to be effective."  That review shows, however, that he received substantial attention from both CDCR and DSH. The inmate was transferred from the DSH acute inpatient service on the day of his death after being deemed stabilized after a 2-month stay.

Note that during this suicide review, a lieutenant reportedly refused to speak to the suicide reviewer. I assume that this issue relates in part to the union contract. However, it is absolutely imperative that the Department find a way to compel every employee to honestly and timely respond to any question from a suicide reviewer or investigator. This could include union representation, or CDCR and the union might negotiate some form of "privilege" (i.e., an agreement not to use a compulsory statement in a disciplinary action); however, this information is absolutely essential to saving lives, and cooperation cannot be considered voluntary.

This inmate was discharged on the morning of his death from the acute DSH program at CMF. It appears that DSH moved him before returning his sheets to him, suggesting the possibility that the discharge was premature. (He was supposed to get his sheets the next day.) I could not determine if DSH's discharge was appropriate; however, I have been advised that DSH's policy is to conduct such a review whenever a death occurs within one month of discharge. Thus, while it is

likely that such a review took place, it appears that neither Dr. Patterson, the suicide reviewer, or I were able to read it.

The reviewer made an excellent suggestion to use this for a teaching case for interagency treatment planning. The Coordinated Clinical Assessment Team (CCAT) is reportedly a good process that has recently begun to improve in frequency and quality. The only problem noted with this case had to do with the Sergeant apparently misunderstanding the transfer process, but it is not clear if or how this had anything to do with the inmate's death.

Dr. Patterson suggested that this suicide might be predictable and preventable, but if so this would predominantly reflect behavior by DSH, and because I did not have access to the DSH incident review, I cannot comment upon Dr. Patterson's conclusions.

G.  Died 2/28/11 at San Quentin (Hanging)

This inmate was not in the MH service delivery system, and reportedly had no MH history in the community. His unusual history was that he worked as a bank teller by day and a gangster/criminal at night.  He returned to prison as a parole violator with a new term on 2/15/11. He never screened positive during suicide screenings. Preparations were made prior to entering the inmate's cell in ASU – the delay was somewhere between 3 and 6 minutes. CPR was reportedly started 9 minutes after the inmate was discovered hanging – I agree with reviewer that this was excessive. In prison, he was noted to be an active Northern Structure gang member. It was noted during the review that apparently, all Northern Structure gang inmates are instructed to assault any SNY inmate they see.

Apparently, this inmate mistakenly assaulted an African-American inmate on 2/22/11 that he wrongly believed to be housed in a special needs yard. As a result, he apparently (wrongly) believed that he would be killed by his own gang as "restitution" for an unjustified and unapproved assault of a non-Hispanic inmate. The inmate's suicide letter indicated that he was anxious and fearful and believed that he had been ordered to be killed by his own gang leaders; there was, however, no evidence to support this fear. It was hypothesized that the inmate was experiencing a possible acute psychotic disorder that was situational. He was seen by nursing on 2/22/11 for chest pains but declined MH referral, despite a diagnosis that his chest pains were due to stress, but this was before the assault that led to his ASU transfer. A nurse saw him in a holding cell before he assaulted the African-American inmate, and noted that he appeared happy and smiling.

The 9-minute delay before staff began applying CPR was deemed excessive, but probably had nothing to do with his death, as he was likely already dead.  More importantly, forensic evidence suggests that prior welfare checks were not completed as required, which would have been a serious error that might have

contributed to the inmate's death. This allegation was reportedly investigated by IAD, but neither the suicide review team nor I are aware of the results.

H.  Died 3/25/11 at CSP-Sacramento (Hanging)

This was a 37-year-old Mexican man. He was assigned to the EOP level of care, and was under a Keyhea order for several years prior to his death, starting in June 2009. At the time of his death, he was single celled in general population.

This inmate had been sent to ASU and then SHU for rioting despite no gang affiliation. There was a serious suicide attempt (near lethal) reported in March 2010. He was sent to the DSH program at Salinas Valley for a year, and returned just 8 days before his impending parole, which was scheduled to occur on 3/31/11, 3 days before his death.

Dr. Patterson's review of the case includes an observation that "the SRE performed at SVPP on 3/9/11 was quite remarkable in that it listed no prior suicide attempts or the use of a translator during the interview." It is not clear from Dr. Patterson's summary whether the SRE to which he refers was completed by DSH or CDCR clinicians.  After returning to CSP-Sacramento (apparently in order to complete his parole paperwork) this inmate was appropriately placed on a five-day follow-up.

This suicide review raises the overall issue of investigating suicides of multi-agency clients.  A related issue relates to discharge planning for CDCR inmates treated in DSH. Is my understanding, by law, that inmates must be returned to CDCR prior to their parole.  It is not clear to me whether changing this statutory requirement is realistic, but it should be considered.

Dr. Patterson describes this suicide as "possibly preventable," based on retrospective speculation. For example, the inmate, who was indeed being deported to Mexico, stated that he was excited to see his mother, who was dead. I do not agree with Dr. Patterson's inference that this would have led a reasonably prudent mental health practitioner to assume that the inmate also intended to die. Because I was unable to review the DSH suicide investigation, assuming that one was completed, I am unable to comment on the degree to which his discharge met or fell below the standard of care.

I.  Died 3/30/11 at Los Angeles County (Hanging)

This inmate was a 30-year-old Japanese male who was discovered hanging by his cellmate.  Staff "immediately" cut him down.  He was in prison for 2 murders despite a reportedly good social history; the murders reportedly involved his response to threats against family members. He went AWOL from the Navy; he reportedly had difficulty in closed quarters on ship. His crime reportedly came about when people threatened his family, so he strangled the alleged threateners and tried to burn their bodies.

The emergency response to this inmate's suicide was apparently good; he was cut down quickly, and CPR was started within 4 minutes. At the one-year anniversary of his incarceration, he became depressed and was appropriately sent to a MH Crisis Bed. He was non-compliant with medications for depression after taking medications for a while. Due to his non-compliance, the medications were discontinued. As a likely result, he became depressed again, was referred to MH, and agreed to re-start anti-depressant medications two weeks before his death. Nevertheless, his compliance was reportedly still sporadic. He was not compliant with group treatment but saw his clinician regularly.

This inmate appeared to have gotten much more depressed in the two weeks prior to his death, but told no one except the family, and they never told the prison. His diagnosis was changed from a MHCB diagnosis of major depressive disorder (severe) with psychotic features to Mood Disorder NOS. However, there was no documented explanation for the change in diagnosis. This change in diagnosis should have been properly explained and documented.

This inmate received no SRE from June 2010 to Feb. 2011 despite a documented history of suicidality and one crisis bed admission with a diagnosis of severe Major Depressive Disorder with psychotic features. A February 17, 2011 IDTT referred to another inmate's suicide attempt.  This undetected error calls into question the quality of the IDTT's interaction with the inmate during this particular session. This inmate was seen by a clinician in the day room because the inmate did not want to go into the MH office.

Also noted was a failure of psychiatrists to follow-up on notices of non-compliance with psychotropic medication.

This inmate may have been undertreated, as he attended 12 of 180 group therapy sessions offered. Alternatively, he may have been a competent refuser of service. Possibly he was undertreated because they were treating a mood disorder NOS instead of severe MDD with psychotic features. He was seen by an IDTT about one month before his death.

J.  Died 3-31-2011 at Folsom S.P. (Hanging)

This 25-year-old white inmate was a CCCMS inmate. He reportedly had a history of bipolar disorder, and had received mental health services in jail. He had an R suffix (sex offender) reportedly because he previously had a 16-year-old girlfriend when he was 18. He was reportedly targeted by others as a sex offender and placed in ASU for his own safety. He was double celled and scheduled for transfer to a special needs yard.

The evening before his suicide, he told the medication LPT that he was having thoughts of suicide and needed to see the "psych." Instead, he was pulled out of his

13

double cell, moved into a holding cell, then the psychiatric LPT told the custody people to re-house him. The LPT allegedly shredded the inmate's request for health care.

Dr. Patterson calls this suicide predictable and preventable, and I agree. The inmate asked for help and did not receive it. However, Dr. Patterson fails to note that the most important error noted was made by a psychiatric LPT, who is supervised by the Federal Court Receiver's staff. The CDCR reviewer noted problems with the intake process at Folsom, as this CCCMS inmate was not seen for intake interview within 10 days. However, because he was at Folsom for 9 months, this error had no reasonable connection to his death.

While in ASU for 2½ months, the inmate was seen for weekly clinical contacts, with two exceptions. One of these did not occur the week before his death. However, it is important to note that the inmate felt comfortable asking "to see a psych," although the LPT did not complete the referral.

K. Died 4/1/11 at Pleasant Valley S.P. (Hanging)

This was a 33-year-old African-American inmate, who had been paroled and violated numerous times. He received a new 15-year term in 2010. He was transferred to an MHCB in December 2010. For unknown reasons, he was prescribed psychotropic medications but was not entered into the MH system. He was transferred to Pleasant Valley as GP, but as noted he was on psychotropic medications, which expired in January (Zyprexa) and March (Paxil), respectively. It is unclear why he was never made CCCMS, but it may have been a communication problem between mental health and nursing (upon discharge from the crisis unit) at Pleasant Valley.

CDCR should investigate this potential miscommunication, examining both MHCB psychiatric staff and nursing staff records, to determine why the referral was not made, and hopefully to institute a system to ensure that all inmates on psychotropic medications are entered into the MHSDS. I suggest that every MH Director, in conjunction with nursing and pharmacy staff, audit their CCCMS list against the list of people on psychotropic meds.

Further, CDCR should meet with the Receiver to ensure that there is an adequate process so that prescriptions do not ever expire (as opposed to discontinuation that is ordered by a physician). It also appears that the process for notifying medical and psychiatric providers when medications are refused was not followed in this case. I agree with Dr. Patterson's assessment that this suicide "may have been foreseeable."

Since the inmate was not followed by mental health, there is no way to know whether he would have shared his psychological distress and suicidality with clinicians, but a therapeutic relationship with a mental health clinician would have

increased the likelihood that he would have done so. For these reasons, I agree with Dr. Patterson that this suicide should be likely regarded as preventable.

L. Died 4/18/11 at California Men's Colony (Hanging)

This 40-year-old Vietnamese inmate was in ASU serving a SHU term (awaiting a SHU bed). He was interviewed by mental health but deemed to not meet criteria for MHSDS. The week before his transfer to Corcoran he asked to see a psychologist who was not available, and refused to see a different psychologist. Nevertheless, he was given an emergency (private) evaluation and SRE and deemed to be at low risk (4/12/11). He was a third strike inmate. I agree with Dr. Patterson that this suicide does not appear to have been foreseeable or preventable.

M. Died 5/15/11 California Men's Colony (Hanging)

This was a 39-year-old white male who was not in the mental health program at the time of his death. He was serving a long sentence for child molestation. He had numerous physical issues, specifically with pain. Neurontin was discontinued and alternatives were ineffective per the inmate's report. I agree with Dr. Patterson's observation that the non-psychiatric physicians could have requested Neurontin on a non-formulary basis for this inmate had they chosen to do so; however, since I am not a physician, I offer no opinion as to whether or not the standard of care required them to do so. Under any circumstances, the management of severe, chronic pain is difficult and challenging, and especially so in a prison.

I agree with Dr. Patterson that this suicide does not appear to have been foreseeable or preventable from the standpoint of CDCR mental health staff. However, this suicide again raises the issue that inmates who are scheduled to leave CMC involuntarily may be especially likely to experience psychological distress. In some cases, this distress can rise to the level of suicidality, and I support the decision of the CMC leadership to pay special attention to such cases.

N. Died 5/24/11 at Deuel Vocational Institution reception center (Hanging)

This 18-year-old African American inmate was a new admission to the DVI reception center. He was assigned to the CCCMS level of MH care. He had a history of DJJ placement and was evaluated for competency and deemed competent at Metropolitan State Hospital. He had been transferred to ASU after a riot. During an SRE, the inmate reported numerous prior suicide attempts.

Because he was "emotionally overwhelmed," he was sent to MHCB for sixteen days and referred to EOP. Upon discharge from MHCB, he was temporarily sent to OHU and reevaluated, and then changed to CCCMS status. On 4/20/11, he was transferred to a MHCB by the IDTT, and remained there until 5/9/11. Numerous SRE's were completed in the weeks prior to his death. His discharge treatment plan recommended a temporary assignment to EOP. However, the IDTT at DVI decided to

leave the inmate at CCCMS level of care, which resulted in the same (weekly) frequency of clinical contacts. Had he been placed in EOP, the only change would have been the offering of 10 hours of group per week, which the inmate would not necessarily have attended.

I do not understand Dr. Patterson's finding that "the five day follow up was grossly inadequate, and the inmate refused to get out of bed and to respond to questions other than to deny suicidal ideation and to state such things as 'I'm alright'". As I understand the requirement for five-day follow up reviews, they are not intended to be psychotherapeutic visits or suicide risk assessments. Rather, it is my understanding that they are the equivalent of a repeated suicide risk screening, to allow the inmate an opportunity to tell someone if his suicidal intentions have returned. I also do not understand why Dr. Patterson regards refusal to attend the IDTT as evidence of "probable decompensation". Inmates refuse to attend IDTT meetings for a wide variety of reasons. While it is difficult to retrospectively judge the decision to change the inmate to CCCMS, I tend to agree with Dr. Patterson that the decision seems questionable given the crisis bed unit's recommendation to temporarily make him EOP. However, it does not appear that this decision would have changed the inmate's living circumstances, as DVI does not have an EOP and the inmate would have remained in the same ASU environment until competition of his reception process and transfer to a EOP hub. I also disagree with Dr. Patterson's implication that the inmate should have been referred to DSH from the MHCB. As a result, I do not agree with Dr. Patterson's conclusion that this suicide "may well have been foreseeable." I also do not agree with Dr. Patterson's suggestion that this suicide was preventable by means of a transfer to DSH.

O.  Died 5/30/11 at Avenal S.P. (Hanging)

This 56-year-old Hispanic inmate hung himself in the SNY-OHU at Avenal. He was about to be paroled after serving a seven-year term for lewd and lascivious acts with a child under the age of 14. He attempted suicide by hanging in 2006, and was CCCMS until 2008. He was reportedly programming well at a Level II SNY until he received a disciplinary ticket for fighting on 5/11/11.  After the fight, he was taken to the hospital for seizures and then returned to the OHU. Because a nurse saw him crying in his cell he was sent to the crisis unit at CMF from 5/13/11 to 5/23/11. From there he was returned to the Avenal OHU, released and then readmitted to the OHU, due to lability, seizures, and possible suicidality. He was seen on 5/27/11 by a psychiatrist and reported that he was "doing good" and wanted to parole. He was medically cleared for return to the yard and was slated to return to ASU. Before this transfer, however, his status changed and he became tearful and apparently suicidal. He was placed on suicide precautions with 15-minute checks and was issued a safety smock, blanket, and safety mattress.

After that, the inmate's suicidality appeared to wax and wane over several days.  On the day of his death, two psychologists noted him to be in distress but denying

suicidality. Nevertheless, he remained on suicide precautions with 30-minute checks. Two hours later he hung himself from the disability bar in his cell.

Dr. Patterson's opinion is that this death was both foreseeable and preventable. While I do not strongly disagree with Dr. Patterson I note that two psychologists evaluated him two hours before his death, thus calling into question the degree to which the suicide was foreseeable. On the other hand, I tend to agree with Dr. Patterson's belief that this man's "fluctuating mental status, at times endorsing and at other times denying suicidal ideation, intent, and a plan to hang himself" would have justified a transfer to a mental health crisis bed until such time as the inmate's stability would have been more consistent.

The information provided raises an issue that was not noted by Dr. Patterson: the inmate appears to have used the grab bar in his OHU cell to commit suicide.  If an inmate is subject to suicide precautions, he should be placed in a cell with grab bars that have been retrofitted with anti-suicide devices, for example, a flat piece of metal welded to the bottom of the disability bar.

P.  Died 6/17/11 at California Correctional Institution (Hanging)

This 23-year-old Hispanic male was single celled in SHU and assigned to CCCMS at the time of his death. He had been sentenced to LWOP. He had reportedly been treated for depression at the county jail prior to his transfer to CDCR. The inmate consistently refused to cooperate with mental health treatment, likely due to his gang affiliation. I agree with Dr. Patterson that there was enough observable evidence to support a higher level of care.

On 5/5/11, the inmate was observed by his primary clinician to have an "odd gaze" and "blunted affect," but later that same day to have been "without apparent distress." This raises the possibility that the inmate may have gained access to some sort of intoxicating substance, but there is no way to know, as this was a month before his death. At the end of May, officers reported that he appeared confused and was hoarding trash in his cell. His primary clinician responded, and noted blunted affect and bloodshot eyes that may also have been the result of intoxication. Again, there is no way to be sure.

Appropriately, the primary clinician scheduled an IDTT meeting to consider a different level of care for this inmate, who appeared to be exhibiting signs of schizophrenia according to the primary clinician. The suicide reviewer and Dr. Patterson noted that the inmate's refusals to cooperate with mental health treatment might have been due to gang prohibitions against receiving such care.

Due to what appears to be a clerical error, this inmate was not seen for almost three months, an error that should have been detected earlier.

17

Because of the inmate's lack of cooperation, it was difficult to complete an SRE. However, I find no evidence to support the presumption that an SRE would have revealed a high risk of suicide. Dr. Patterson appropriately concludes that the "suicide death was not foreseeable." However, Dr. Patterson implies that the inmate should have been forcibly extracted from his cell in order to compel an evaluation or a transfer, for example, to a mental health crisis bed. In my opinion, this is an extremely difficult dilemma for prison mental health programs and the standard of care is extremely unclear. On one hand I agree that this inmate appeared to need a higher level of mental health care. On the other hand, unnecessary cell extractions should be avoided at all costs and can have an extremely counter-therapeutic effect. In retrospect, it is easy to say that the cell extraction should have taken place, but I believe this decision would have been far less clear prior to the suicide. Thus, I think it is fair to say that while I do not disagree with Dr. Patterson that a cell extraction would have been one reasonable option, I do not believe the alternative decision was any less reasonable at that time.

Note that just prior to his death, the IDTT considered requesting a Keyhea order and determined that the inmate had not yet met the grave disability criterion. However, they rescheduled his appointment with a clinician (6/17/11), his psychiatrist (6/20/11), and medical staff (6/20/11).

Q. Died 6/30/11 C.S.P. Los Angeles County (Hanging)

This 30-year-old gang affiliated, multi-term, African American inmate was serving an LWOP sentence and had been sent to ASU to serve a SHU term. He had a history of suicidal gestures and self-harm and had multiple admissions to crisis beds. His diagnosis was Schizo-Affective Disorder. Because he had provided information against other inmates, he has reasonable concerns for his own safety, and was appropriately scheduled for transfer to a special needs yard upon expiration of his SHU term.

The suicide reviewer noted problems with accessing the eUHR for regular clinical contacts, reiterating the need for a readily accessible electronic medical record within CDCR.

Generally, I agree with Dr. Patterson's criticisms with the management of this patient. Specifically, there appears to have been sufficient evidence to support a transfer to EOP status. However, calling the suicide foreseeable because of chronic suicidal ideation is less clear to me. To be fair to Dr. Patterson, this is partly due to the problems with the SREs that were noted by the suicide reviewer and by Dr. Patterson. I also agree with Dr. Patterson that it is not unfair to regard this suicide as likely preventable if the inmate had been transferred to a higher level of care, but this is of course a matter of speculation.

R.  Died 8/4/11 at California Medical Facility (Hanging)

This 37-year-old Mexican National originally pled NGRI for manslaughter before pleading no contest. He was twice found incompetent and treated at Napa and Atascadero State Hospitals. He was both CCCMS and EOP at various times, and had been treated in crisis beds and DSH acute care. Upon transfer back from DSH to CMF, he denied mental illness and refused medications. However, he attended some EOP groups. He had no history of suicidal attempts or gestures.

I agree with Dr. Patterson that this suicide does not appear to be foreseeable. I disagree with Dr. Patterson's assessment that the inmate "was discharged from APP to an EOP level of care in a psychiatrically fragile state without there having been resolution or substantial improvement in his clinical condition." Improvement had been noted, even though the inmate denied having a mental illness. I agree with Dr. Patterson that the inmate could have been continued at the APP or ICF level of care, but I do not agree with his assessment that this was the only reasonable course.  I am also not certain that the evidence would have supported a Keyhea order prior to his suicide.

S.  Died 8/8/11 at California Correctional Institution (Hanging)

This 46-year-old African American had been in prison for almost two decades, in his third prison term serving life plus 13 years. He had a long history of extreme violence both in and out of prison. He had multiple admissions to ASU and SHU. He was CCCMS until 8/2009, and requested to be returned to CCCMS in March 2010. His diagnoses included depression, anxiety, and multiple personality disorder. His main problems in the month preceding his death were severe medical problems that were deemed to be inadequately treated, and the likely reason for his suicide was pain and medical distress.

Dr. Patterson calls this suicide possibly foreseeable and highly likely preventable. I agree with Dr. Patterson that more successful medical care may have likely prevented this man's suicide. I defer to the Receiver's staff and to Dr. Patterson on issues related to medical care, as I am not a physician. In other words, whether the inmate's pain was the result of bad medical care or bad luck, it appears clear that the pain was the likely cause of his suicide. I am less willing to conclude that the suicide was foreseeable simply because the inmate had a number of risk factors. It is difficult to assess the quality of the communications between clinicians and the inmate; thus I cannot offer a firm conclusion regarding the foreseeability of this suicide. Finally, I agree with Dr. Patterson that more and better communication between mental health and medical providers would have been important, especially in light of the severe weight loss and reports of severe GERD and chronic pain.

T. Died 8/19/11 at High Desert S.P. (Strangulation)

This 50-year-old fifth term inmate had a long history of serious mental illness and very quick failures on parole due to medication non-compliance, drugs, and alcohol which would lead him back to prison for repeated short stays. He had two admissions to crisis units but no history of suicidal behavior. Upon his last return to prison he was immediately assigned to SHU. When his SHU term ended he was returned to reception GP as an EOP inmate. Officers wanted to double cell him, because they thought he would do better with a cellmate, but due to his EOP status he was single celled.

I agree with Dr. Patterson that this suicide was not foreseeable. I also agree with Dr. Patterson that a 10-minute delay to enter a cell in a medical emergency is "unacceptable". The other issue raised by this case is one to which I have spoken before, regarding mitigation of RVRs and/or SHU terms when the violation itself is symptomatic of the person's mental disorder. (In this case, the hearing officer rejected recommendations by mental health staff to mitigate.) I do not, however, suggest that this issue was the cause of this suicide.

U. Died 9/16/11 at Pelican Bay S.P. (Hanging)

This 30-year-old white male was housed in the PSU at Pelican Bay. He had a long history of mental illness and violence, both in and out of prisons. At age 15, he was charged with indecent exposure and battery and was committed to the Camarillo State Hospital for 2 years. At age 18, he was sentenced to the California Youth Authority, where he accumulated more than 65 disciplinary actions. While in CDCR, he accumulated more than 84 RVR's for indecent exposure in less than 10 years. Many of his RVR's resulted in mental health evaluations, but clinicians consistently concluded that mental health issues did not contribute to the commission of the offenses.

This inmate was admitted to crisis beds on numerous occasions, and was considered for transfer to DSH. However, because DSH placement had been unsuccessful in the past, it was decided to retain him at the CCCMS level of care at Pelican Bay.

This inmate was on a Keyhea order for many years despite which his behavior was consistently problematic. He admittedly used suicidal gestures to manipulate housing but was also likely episodically suicidal.

Dr. Patterson reported that this suicide did not appear foreseeable or preventable. I agree with his assessment.

V. Died 9/20/11 at CSP-Sacramento (Hanging)

This 28-year-old Hispanic man was serving a life sentence. He had a long history of SMI and drug abuse, with many admissions to DSH and crisis beds. He left a suicide note on "post-it" notes. Dr. Patterson found that the suicide was not foreseeable but that the death may have been preventable, noting that staff entered the cell promptly but did not begin CPR for 10 minutes after the inmate was discovered hanging. Assuming the reported time lines to be accurate, I agree with his assessment.

W. Died 10/6/11 (DVI Reception Center) (Hanging)

This 39-year-old Native American male was double-celled at the CCCMS level of care, having recently returned to prison. This inmate had been housed in a safety cell at the county jail from April 15 to May 12, 2011, which was reported on the transfer sheet. However, it is not clear if the nurse completing the referral communicated this information to mental health at the time of the referral. The inmate had a long history of mental health problems and past suicide attempts.

In August 2011 the inmate asked to be removed from mental health treatment and to be taken off psychotropic medication (Remeron). Nevertheless, a psychologist saw him on October 3, 2011, and a psychiatrist saw him on October 5, 2011, the day before his death. At that time he denied all symptoms, and was deemed to be stable and future orientated.

I disagree with Dr. Patterson that this suicide death "may have been foreseeable and preventable." Dr. Patterson notes staff's failure to recognize that this inmate had been housed in a safety cell, but this occurred more than five months before his death. Further, both a psychiatrist and a psychologist saw the inmate within the week before his death. At that time, the inmate was deemed to be stable and future oriented, and Dr. Patterson has offered no reason to presume that these clinicians would have deemed the inmate to present a serious or eminent risk of suicide at that time, even if the additional information were available. The fact that an inmate may have been placed in some sort of suicide prevention status five months earlier cannot be presumed to imply that he would have been deemed an acute risk when evaluated the day before his death. Finally, even if Dr. Patterson's assessment was correct, the error appears to have been that of an RN. Nursing services are under the direct control of the Federal Court Receiver, not CDCR.

Although Dr. Patterson did not articulate his exact concerns regarding the emergency response, I agree with his concern over the emergency response timeline. Specifically, I refer to the reported delay of approximately five minutes before staff responded to a "man down" call by inmates. (Please note that I do not know whether this issue was investigated. Also, as noted before, this presumes that the reported times were accurate.)

X.  Died 10/9/2012 at Pleasant Valley S.P. (Hanging)

This was a 25-year-old multi-racial (African American/Native American/Caucasian) male who was not a participant in mental health treatment and was double-celled in GP at the time of his death. The inmate was functioning well, until he lost his job on January 11, 2011 after which he tended to "isolate himself." He reportedly rarely left his cell but had a good relationship with his cellmate. The cellmate had noticed possible self-inflicted wounds on the inmate prior to his death, but did not report these observations to staff.

Dr. Patterson appropriately found that the death was not foreseeable. However, Dr. Patterson expressed concern about "an unnecessary delay of approximately 3 minutes from the time that first responders of custody officers (sic) could have begun CPR, and the time that medical staff did begin CPR." I note that in the absence of videotape, time reports from custody staff are often quite approximate, so it is difficult to know the degree to which this report is accurate; however, assuming the reported times to be reasonably accurate, I agree with Dr. Patterson. Dr. Patterson also noted that the body was noted to be in rigor mortis at the time CPR was started. If this is accurate, I agree with Dr. Patterson that it would suggest that a 3-minute delay had no effect on the inmate's death.

I do not understand Dr. Patterson's statement that, "This inmate's suicide may have been preventable had custody checks been conducted." Since the inmate was in GP at the time, I simply do not understand to what Dr. Patterson was referring.  The only required checks of general population inmates that would establish an inmate's well-being are so-called standing counts, which occur only several times per day.

Y.  Died 10/24/11 at Pelican Bay S.P. (Hanging)

This inmate was a 40-year-old Hispanic male treated at the CCCMS level who was singled-celled at the time of his death. He was a validated gang member of the Mexican mafia, who was serving an indeterminate SHU sentence. On May 31, 2011, he was reported to be paranoid, delusional, and hallucinating. He was sent to the MHCB for evaluation on June 12, 2011, and should have been transferred to CCCMS or higher status at that time. In July 2011, custody staff reported that he was psychotic, including delusions and hallucinations. He was again sent to a MHCB and was changed to CCCMS, which again may have been an inadequately intensive level of care. Because of his CCCMS designation, he was assigned to Corcoran. In my opinion it would have been more appropriate to transfer the inmate to the PSU at Pelican Bay at that time. On July 22, 2011, the inmate requested out of the MHP; in my opinion this request was most likely due to gang pressures to refuse MH treatment.

On Sept. 21, 2011, the inmate was deemed to be stable. However, his condition worsened after that. On the day before his death, the inmate gave numerous indications that he wanted and needed help. He told the control booth officer that he

needed to see a "psych." He complained of chest pains. He complained of dizziness. He requested to talk to a nurse. While on his way to the holding cell, the inmate "laid down or fell down." The inmate made repeated statements about having demons control him, and asked to see the psychiatrist that day. He was told he was scheduled to see a psychologist the next day. The RN spoke to a CTC psychologist and requested a MH referral, which was completed by the Psych LPT as urgent and faxed to the scheduler. On the afternoon before his death, the inmate was deemed to be delusional and hallucinating; the psychiatrist gave a verbal order for one dose of Vistaril, which was provided to the inmate. The inmate made many more complaints that day, and was variously described as anxious, unstable, "less memory," and talking in short unclear words, though denying suicidal ideation. The LPT submitted a MH referral that was marked "as routine." I agree strongly with Dr. Patterson's opinion that this suicide was both foreseeable and preventable, and with Dr. Patterson's discussion of the events, with one exception.

This one exception is that I disagree with Dr. Patterson's statement that: "Curiously the suicide reviewer... appeared to be of the view that if the inmate denied suicidal ideation, he did not have any appreciable suicide risk or need for a SRAC."   Dr. Patterson's inference regarding the opinion of the suicide reviewer seems incorrect, particularly given that the reviewer wrote the following: "Problem 3: An active Southern Hispanic gang identity makes acute assessment less accurate if reliance is placed on the inmate's denial of suicidal ideation or mental illness symptoms." With this exception, I agree with Dr. Patterson's assessment of this case.

Z.  Died 11/9/11 at Calipatria S.P. (Hanging)

This inmate was a 41-year-old African American male who was not a participant in the MHSDS and was housed alone (though on double-celled status) at the time of his death. He was serving consecutive sentences of 10 years and 25 years to life for the attempted murder of a police officer. While he was not on the caseload of MHSDS, he did receive some services. Upon his transfer to Calipatria and possibly because of hopes of eventually parole, he did better until 9/27/11, when he was charged by a correctional officer with indecent exposure. He was enraged by this charge, and assaulted officers that were escorting him to ASU. I agree with Dr. Patterson's assessment that this suicide does not appear to be foreseeable or preventable.

AA.  Died 11/17/11 at San Quentin S.P. (Hanging)

This inmate was a 33-year-old Caucasian male who was condemned and single-celled in East Block. He was not a participant in the MHSDS. This inmate was described as a loner who never received any MH services, although after his death, the possibility was raised (in conversations with other inmates) that he had experienced chronic, delusional religious preoccupations. There is, however, no evidence that staff knew this.. He did not appeal his case or his death sentence, had stated that he was "not afraid to die," and gave away belongings prior to his death. Dr. Patterson concluded that this death was not foreseeable.

Dr. Patterson, however, noted the presence of reported rigor mortis and livor mortis, and cold body temperature that indicated "that it was likely that he was dead for several hours." Dr. Patterson suggests the possibility that this death "may have been preventable had the required security checks been performed." However, the likelihood that hourly checks would have prevented death by hanging is speculative at best. Nevertheless, if required security checks were not being performed, it would be a serious error, even if it did not contribute to the inmate's death. I understand that this allegation was forwarded to Internal Affairs, but the results of the investigation were not provided to the suicide prevention team. As noted before, feedback regarding the results of such investigations should be provided to the suicide review team, while taking care to protect information that truly needs to remain confidential.

BB.  Died 11/23/11 at Wasco S.P. Reception Center (Hanging)

This 40-year-old Hispanic male was not a participant in the MHSDS and was double-celled at the time of his death. He was serving a 9-year sentence for anal and genital penetration with a foreign object and robbery. He had requested SNY placement due to his offense, and was housed on a "soft" yard. The inmate reportedly left suicide notes or letters expressing shame and guilt over his instant offenses. Dr. Patterson concluded that this suicide death does not appear to be foreseeable or preventable, and I agree.

CC.  Died 11/26/11 at CSP-Sacramento (Hanging)

This inmate was a 31-year-old Iranian-Hispanic male who was single-celled in EOP at the time of his death. He was serving a sentence of 5 years. This inmate had a history of very serious mental illness since age 18, but had no other criminal history prior to the assault that resulted in his sentence. He was on a Keyhea order throughout most of his time in CDCR. He spent 10 months in the DSH program at Salinas Valley S.P. before being returned to CSP-Sacramento. He was reportedly actively delusional, isolative, violent toward other inmates, and was eventually referred back to DSH. A bed was available for him on 11/3/11, however, due to staff absences, paperwork that would have facilitated his transfer back to the DSH program at SVSP was delayed. As a result, he was never transferred to SVPP prior to his death.

I agree with Dr. Patterson that this suicide appears to be preventable, had the inmate been transferred to SVPP in a timely manner. I am less convinced that the suicide was "quite possibly foreseeable." Dr. Patterson sites as evidence of foreseeability that the inmate had cut his fingers and used his own blood in his delusional rituals; however, I do not agree that I would have prospectively deemed this behavior to be suicidal. I also did not find support for the statement that the inmate had a history of suicidal ideation.

I simply do not understand the following sentence in Dr. Patterson's report: "Curiously, despite the inmate being actively psychotic and on a Keyhea order, the apparent justification for not having a joint meeting of the inmate with his PCP and the psychiatrist as well as the IDTT in the many months before his death after his return from DSH in March 2010 was that the inmate was not an acute risk." It is possible that the reference to his "PCP" is a typographical error, and was intended to refer to the inmate's primary mental health clinician. It is also possible that this was intended to refer to the Primary Care Physician in regard to medical clearance for transfer to DSH. Dr. Patterson also appears to have misapprehended the date of this inmate's return from DSH, which was March 2011, rather than March 2010 as reported by Dr. Patterson. In general, however, I believe it likely that Dr. Patterson was advocating improved communication between clinician and psychiatrist, a position with which I would agree.  It does not appear that Dr. Patterson is correct in his observation that the inmate was placed on a transfer list for over one year, as he was returned from the DSH program at SVPP in March 2011, and re-referred in August 2011.

DD.  Died 12/1/11 at Correctional Training Facility (Hanging)

This 55-year-old white male was housed on a special needs yard and double-celled at the time of his death. He was CCCMS. I agree with Dr. Patterson's assessment that this suicide does not appear to be foreseeable. I do not agree with Dr. Patterson's speculation that the suicide "may very well have been preventable had there been the availability of important MH information contained in the UHR and/or eUHR." I note that a psychologist and a psychiatrist saw this inmate less than 2 weeks before his death, one of whom completed an SRE, and both of whom believed that the inmate did not pose a high risk of suicide.

I do note that a third psychologist evaluated Mr. Horner on 11/28/11 for a so-called Clark evaluation (to assess for developmental or intellectual disabilities as required under the *Clark v. Brown* litigation), and although she was unable to complete the evaluation, she expressed significant concern with the inmate's presentation. Unfortunately, this psychologist did not report her concerns to mental health, which should have resulted in additional assessment. The patient also missed 50% of his medication for the week preceding his death, which should have resulted in a referral to mental health and an additional contact. While the results of such an assessment are a matter of speculation, the facts do support the notion that this suicide might have been prevented.

EE.  Died 12/6/11 at Salinas Valley S.P. (Hanging)

This inmate was a 25-year-old Hispanic male who was single celled in a stand alone ASU, and was not a participant in the MHSDS. He was serving a sentence of 50 years to life.  The inmate had reportedly become an informant against fellow gang members, and therefore sought protective custody and was planning to be "debriefed." There is evidence that the suicide was planned; e.g., he killed himself on

his 22nd day in ASU, after the predicable end of 30-minute-welfare checks. He left a suicide note. I agree with Dr. Patterson that this suicide does not appear to have been foreseeable or preventable. If Dr. Patterson's observation that the inmate was "in full rigor" were correct, then it would raise a question as to whether or not appropriate security checks were conducted. However, I also agree that this would not have had a causal relationship to his death.

FF.  Died 12/17/11 at Salinas Valley S.P. (Strangulation)

This 47-year-old Vietnamese male was an EOP inmate who was in double-celled status but single celled in ASU at the time of his death. He was in prison for stabbing his wife. He told probation officers that he would kill himself if he were sent to prison, but this was 7 years before his death. He had a history of refusing treatment and deteriorating; however, a judge denied a Keyhea petition. He had multiple RVRs and had served two SHU terms. Shortly before his death, he was refusing treatment and appeared to be deteriorating.

I agree with Dr. Patterson that this inmate's suicide does not appear to have been foreseeable to staff, although the inmate reportedly said to another inmate that he would kill himself if returned to SHU. Dr. Patterson opines that this suicide "may very well have been preventable had the inmate been transferred to a higher level of care." While such a decision would have been reasonable, I do not believe it was the only reasonable course of action. For example, the staff might have again tried a Keyhea petition even though the previous one had been denied. In general, however, I agree with Dr. Patterson some additional clinical intervention was warranted.

GG.  Died 12/31/11 at California Men's Colony (Exsanguination)

This 65-year-old Hispanic male was classified as double-celled in EOP but was single celled due to "longevity privilege." The inmate had been imprisoned since 1985 on a second term for murdering his wife while under the influence of cocaine. He programmed well for many years but was treated in EOP for depression. He was transferred to DSH 6 times. More recently, he had serious medical problems, including renal failure, and was being transferred to Corcoran to receive dialysis. I agree with Dr. Patterson that this suicide does not appear to have been foreseeable or preventable. However, it appears that three of the four CMC suicides in 2011 involved inmates who were scheduled to leave this facility, which is generally viewed by inmates as a desirable placement. CMC MH staff has expressed awareness of this phenomenon and it is my understanding that they are attempting to give special attention to high-risk inmates who are scheduled for involuntary transfer.

HH.  Died 5/2/11 (SOL) (Found in a hanging position)

This case involves an inmate whose death is declared a homicide by the coroner.  Dr. Patterson has suggested the possibility that this was a suicide. I would describe it as an equivocal death for purposes of this review. However, because Dr. Patterson

opined that the death, which he regards as a suicide, was neither foreseeable nor preventable, I will not comment further without an opportunity to review the case more thoroughly.

### General Recommendations and Conclusion

Before summarizing my findings, I wish to thank CDCR's headquarters suicide prevention experts for their open and candid information, and the Office of the Attorney General for asking me to provide the Department with unflinching and candid findings and recommendations.

It is no secret that I have enormous respect for Dr. Patterson, and not surprisingly, I agree with many of his observations. However, I do believe strongly that the court would be better served by revising the judgmental nomenclature used in his reports, replacing vague terms such as "preventable" or "may have been preventable" with more specific terms that make it clear whether findings of poor practice were clearly or speculatively causal of the suicide, or whether they necessarily represented failures to meet the standard of care. I also believe that his findings are of value only to the extent that they are timely communicated to the Department and the Receiver.

It is also clear to me that suicide investigation is one area where there must be an integrated and comprehensive response that involves all three parts of the correctional system: mental health, medical (currently the Receiver), and custody.

Perhaps the most important recommendation involves improvement of the Suicide Risk Evaluations by mental health clinicians. While I strongly believe that this is an essential goal, it is also fair to observe that this problem exists in virtually every clinical setting in which I have worked, within and outside of corrections. Simply put, the professions of psychiatry and clinical psychology should strive to improve their assessments of suicide, particularly in patients and clients with severe depression or histories of suicidal behavior. That being said, I enthusiastically agree with the parties that this is a worthy and essential goal that should be vigorously pursued.

In short, CDCR is anything but indifferent to the problem of correctional suicide. Nevertheless, I remain convinced that my suggestions, as well as those of the Special Master and his experts and the plaintiffs, many of which can best be described as best practices, should be seriously considered by CDCR as it continues its efforts to achieve the elusive (and sadly, probably unrealistic) goal of eliminating all suicides.

Dated:  February 11, 2013

*/s/ Joel A. Dvoskin*
Joel A. Dvoskin, Ph.D. A.B.P.P.