1    DONALD SPECTER – 083925
     WARREN E. GEORGE – 053588
2    STEVEN FAMA – 099641
     ALISON HARDY – 135966
3    SARA NORMAN – 189536
     REBEKAH EVENSON – 207825
4    PRISON LAW OFFICE
     1917 Fifth Street
5    Berkeley, California  94710-1916
     Telephone:    (510) 280-2621
6

7    CLAUDIA CENTER – 158255
     THE LEGAL AID SOCIETY –
8    EMPLOYMENT LAW CENTER
     600 Harrison Street, Suite 120
9    San Francisco, California  94107-1389
     Telephone:    (415) 864-8848
10
     Attorneys for Plaintiffs

11

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
LISA ELLS – 243657
AARON J. FISCHER – 247391
KRISTA STONE-MANISTA – 269083
MARGOT MENDELSON – 268583
ROSEN BIEN GALVAN &
GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

GEOFFREY T. HOLTZ -- 191370
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, California  94111-4067
Telephone:    (415) 393-2000

12                  UNITED STATES DISTRICT COURTS

13              EASTERN DISTRICT OF CALIFORNIA

14          AND NORTHERN DISTRICT OF CALIFORNIA

15    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

16

17    RALPH COLEMAN, et al.,

18              Plaintiffs,

19          v.

20    EDMUND G. BROWN, JR., et al.,

              Defendants.

21    MARCIANO PLATA, et al.,

22              Plaintiffs,

23          v.

24    EDMUND G. BROWN, JR., et al.,

              Defendants.

25

26

27

28

Case No. Civ S 90-0520 LKK-JFM P

**THREE JUDGE COURT**

**PLANTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY POPULATION REDUCTION ORDER AND COUNTER MOTION FOR FURTHER RELIEF**

Case No. C01-1351 TEH

**THREE JUDGE COURT**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................................iii

INTRODUCTION ................................................................................................. 1

PROCEDURAL BACKGROUND ......................................................................... 3

FACTUAL BACKGROUND................................................................................. 3

     A.    California State Prisons Are in a State of Emergency ................................... 3

     B.    Coleman Special Master's Report and Defendants' Management
           Reports Set Forth Continuing Systemic Deficiencies ..................................... 4

     C.    Prisoners Are Dying From Inadequate Medical and Mental Health
           Care............................................................................................................... 7

     D.    Receiver's Twenty-Second Report Finds Crowding Continues to
           Interfere with the Delivery of Constitutional Health Care ............................ 8

     E.    Office of the Inspector General Audit Results Mask Serious Care
           Deficiencies ................................................................................................. 9

     F.    Defendants Lack Health Care Infrastructure............................................... 10

ARGUMENT........................................................................................................ 15

     I.     Defendants' Motion Must Be Denied Because This Court Does
            Not Have Authority to Decide It. ...................................................... 15

     II.    Defendants Have Failed to Carry their Initial Burden of
            Showing a Significant Change in the Facts that Would Support
            Vacating or Modifying this Court's Population Reduction
            Order............................................................................................... 15

            A.    Legal Standard.................................................................... 16

            B.    Defendants' Motion Fails to Establish a Significant
                 Change in the Facts Regarding the Delivery of Medical
                 Care under *Plata v. Brown*. .................................................. 17

                 1.    Defendants' Declarations Are Entitled to Little
                     Weight ....................................................................... 17

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY

2.   Defendants' Construction Program Has Not Increased Capacity Sufficiently to   Permit the Delivery of Medical Care at Constitutional Levels. ......................................................................... 19

C.   Defendants' Motion Fails to Demonstrate a Significant Change in the Facts Regarding the Delivery of Mental Health Care under *Coleman v. Brown*..................................... 20

D.   If this Court Finds this Motion Should Not Be Denied Based on the Current Record, Discovery Must Be Reopened to Allow Plaintiffs an Opportunity to Develop a Full Record. ......................................................................... 21

III.   The Court Should Direct the Defendants to Proposed Institution-Specific Caps. ................................................... 22

IV.   The State Has Identified Safe Methods To Comply With the Crowding Reduction Order. ................................................ 24

V.   Plaintiffs Have Good Cause for Missing the Deadline for Responding to Defendants' Motion to Modify. ................................ 27

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Brown v. Plata*,
  131 S. Ct. 1910 (2011) ................................................................................................. passim

*McReynolds v. Sodexho Marriott Services, Inc.*,
  349 F.Supp.2d 30 (D.D.C. 2004) ........................................................................................ 18

*Pixion, Inc. v. Citrix Systems, Inc.*,
  __ F. Supp. 2d __, No. C 09-0349631, 2102........................................................................ 18

*Rufo v. Inmates of Suffolk Cty. Jail*,
  502 U.S. 367 (1992) ............................................................................................................ 16

*Sharp v. Weston*,
  233 F.3d 1166 (9th Cir. 2000) ............................................................................................. 16

*U.S. v. Asarco Inc.*,
  430 F.3d 972 (9th Cir. 2005) ............................................................................................... 16

FEDERAL STATUTES

18 U.S.C. § 3626(a)(3)(B) ........................................................................................................ 1

18 U.S.C. § 3626(b)(4) ............................................................................................................ 16

STATE STATUTES

Cal. Gov. Code, § 8571 ............................................................................................................. 4

Cal. Gov. Code § 8629 .............................................................................................................. 2

RULE

Federal Rule of Civil Procedure 60(b)(5) ................................................................................ 16

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY

1

## INTRODUCTION

2      The Court should deny Defendants' January 7, 2013, Motion to Vacate or Modify

3 Population Reduction Order, and instead order defendants to propose a plan for institution-specific

4 population caps so that plaintiffs can receive constitutionally adequate health care.

5      Defendants' Motion should be denied because it is premised on the argument that the

6 constitutional violations in both *Plata v. Brown* and *Coleman v. Brown* have been cured, but only

7 the single-judge courts can make that determination.  This Court has jurisdiction to determine

8 whether the constitutional violations found by the single-judge courts were caused by

9 overcrowding and, if so, what is the appropriate remedy (18 U.S.C. § 3626(a)(3)(B)); it does not

10 have authority to  adjudicate underlying liability. As the Supreme Court has explained, the three-

11 judge court's "*role was solely to consider the propriety and necessity of a population limit,*" not to

12 consider the merits.  *Brown v. Plata*, 131 S. Ct. 1910, 1936 (2011) (emphasis added).[1]

13      If the Court determines that it has the authority to decide this motion, however, the Court

14 should deny it because defendants have failed to meet their burden of showing there have been

15 significant changes in both *Plata* and *Coleman* that warrant modifying the Population Reduction

16 Order. Notwithstanding defendants' representations to the contrary, there remain ongoing

17 constitutional deficiencies in the prison health care delivery system.  Perhaps the most telling

18 evidence showing that Defendants' motion to terminate the crowding cap is premature is the

19 Governor's own proclamation, issued on January 8, 2013, in which the Governor himself states

20 that the Prison Overcrowding State of Emergency, originally announced in October, 2006,  must

21 remain in effect until July 31, 2013.  Jan. 8, 2013 Governor's Proclamation, available at

22 http://gov.ca.gov/news.php?id=17886 (last viewed on February 12, 2013).   If the emergency were

23 over, the Governor would have been required to terminate the state of emergency.  Cal. Gov. Code

24 _____

25 [1]   Defendants have filed a motion to terminate the *Coleman* case based on the same argument

26 raised here ( *i.e.,* that they now provide constitutional mental health care), and both motions rely
on much of the same supporting evidence.

27

28

1

1   § 8629 ("The Governor shall proclaim the termination of a state of emergency at the earliest

2   possible date that conditions warrant".)  That the Governor estimates that the emergency will

3   continue until at least July 31, 2013 demonstrates the continuing nature of the crowding crisis.

4   Moreover, the *Plata* Receiver has documented serious ongoing violations, including an

5   unacceptably high number of preventable deaths, and recently declared that "there is no persuasive

6   evidence" that defendants have achieved a constitutional level of medical care systemwide.  The

7   *Coleman* Special Master's most recent report likewise details serious deficiencies, including

8   inadequacies in suicide prevention procedures that place vulnerable mentally ill prisoners at risk,

9   which preclude a finding that the State is delivering constitutionally-adequate mental health care.

10      If this Court finds that defendants have made a *prima facie* showing of a significant factual

11  change in both *Coleman* and *Plata*, then this Court's current stay on consideration of defendants'

12  motion should be extended to permit plaintiffs to pursue discovery.  Defendants have based their

13  motion on evidence collected over a fourteen month period, during which they have, among other

14  things, engaged experts, performed site visits and interviewed plaintiff class members, all without

15  notice to plaintiffs' counsel.  Plaintiffs must be afforded an equivalent opportunity to develop a

16  full record on this critical issue.

17      Finally, plaintiffs seek further relief.  Certain prisons remain dramatically overcrowded

18  despite the overall reduction in the prison system's population, and these conditions continue to

19  impede the delivery of constitutionally adequate health care.  Accordingly, in addition to opposing

20  defendants' motion to modify the Population Reduction Order, plaintiffs submit this counter

21  motion for further relief, requesting an order that defendants develop a plan for institution-specific

22  population caps that includes a discussion of each prison's clinical and custody staffing levels,

23  staffing vacancies, infrastructure, prisoner custody level and available programs.  Further,

24  plaintiffs request that the order require defendants to meet and confer with the Special Master,

25  Receiver, *Plata* Court Experts and plaintiffs after the plan is developed, and that the parties be

26  required to subsequently report back to this Court regarding the results.

27

28

2

**PROCEDURAL BACKGROUND**

On January 7, 2013, defendants filed two related motions. The first was filed in *Coleman v. Brown*, to terminate all relief, to vacate all orders in that action and dismiss the case, based on defendants' claim that they now provide a constitutional level of mental health care to the plaintiff class. After additional briefing, the *Coleman* court ruled that it will consider "whether the California prison mental health care delivery system is now in constitutional compliance." Jan. 29, 2013 Order, *Coleman* Dkt. No. 4316, at 3. Discovery will close on March 1, 2013; plaintiffs' opposition is due March 15, 2013, and oral argument is set for March 27, 2013. *Id.* at 4.

The second motion was filed before this Three Judge Court, seeking to vacate or modify the June 30, 2011 population reduction order, based on defendants' assertion that they have achieved constitutional compliance in both *Coleman v. Brown* and *Plata v. Brown* without having attained the ordered population reduction. As yet, defendants have not moved to terminate relief in *Plata v. Brown*, and this Court has directed defendants to identify, by February 12, 2012, whether they will pursue termination in that action.

**FACTUAL BACKGROUND**

Although the question of whether defendants are providing a constitutional level of medical and mental health care to state prisoners is not properly before this Court, the answer is plain. They are not. Ample facts demonstrate that California prisons, which currently average 150% of capacity, and reach as high as 185% of capacity at one prison, continue to deliver health care that is constitutionally deficient.

**A. California State Prisons Are in a State of Emergency**

The prisons are in a state of emergency. On October 4, 2006, Governor Schwarzenegger declared a state of emergency in the California state prisons, based on the severe overcrowding that, among other things, caused substantial risk to the prisoners' health and safety. Oct. 4, 2006 Governor's Proclamation, available at http://gov.ca.gov/news.php?id=4278 (last viewed on February 12, 2013). In support of the proclamation, the Governor detailed the harmful impact that overcrowding was having on each of the 29 prisons that were severely overcrowded,

describing both the degree of the crowding and the number of assaults and disturbances.  *Id.*  With emergency powers, the Governor gained authority to suspend statutes, rules and regulations that would "prevent, hinder or delay the mitigation of the effects of the emergency."  Cal. Gov. Code, § 8571.  Using those powers, Governor Schwarzenegger authorized the CDCR to contract with out-of-state private prisons to house some of the state's prisoners, and to transfer them on an involuntary basis.

The state of emergency continues to be in place today.  On January 8, 2013, Governor Brown declared that the state of emergency will last at least until July 31, 2013.  Jan. 8, 2013 Governor's Proclamation, available at http://gov.ca.gov/news.php?id=17886 (last viewed on February 12, 2013).   Although some of the conditions giving rise to the state of emergency – such as the beds in gyms and dayrooms – have been alleviated, others continue, as defendants continue to struggle to provide care in a crowded system at 150% of capacity.  The Governor's most recent proclamation establishes that the prison system is still in crisis.

**B.    Coleman Special Master's Report and Defendants' Management Reports Set Forth Continuing Systemic Deficiencies**

The Special Master's most recent 25th Round Monitoring Report sets forth systemic deficiencies that continue to plague defendants' mental health care delivery system.  Those deficiencies include:

- Defendants do not have a system to provide seriously ill class members timely access to appropriate mental health placement and treatment, as there remain lengthy delays in transferring class members to appropriate placements and continued use of dangerous and inappropriate "bad beds" during those transfer delays;

- Defendants do not have anywhere near the number of clinical staff necessary to provide an adequate level of mental health treatment across the system.  Despite a ten year old order requiring a maximum vacancy rate of ten percent for psychiatrists (including contracted services), defendants' functional vacancy rate for psychiatrists

1    is 26%, and 42% of staff psychiatrist positions are unfilled;

2    • Defendants uniformly deny access to inpatient care to certain populations of

3    seriously mentally ill prisoners who require psychiatric hospitalization;

4    • Defendants continue to lack sufficient office and treatment space to deliver

5    minimally adequate mental health treatment;

6    • Defendants have failed to implement the basic elements of suicide

7    prevention and medical emergency response protocols, resulting in an

8    unacceptably high number of foreseeable and preventable deaths by suicide; and

9    • Defendants still house far too many mentally ill prisoners in segregation, fail

10    to provide minimally adequate treatment to mentally ill prisoners in

11    segregation, and have not implemented appropriate procedures to address prisoners

12    facing disciplinary action for behaviors that are manifestations of serious mental

13    illness.

14    *See* Special Master's Twenty-Fifth Report, *Coleman* Dkt. No. 4298, at 17, 24-25, 33, 36-27 44-45,

15    79, 125, 134, 140, 169, 177-178, 180, 217, 346, 412.

16        Defendants' own Mental Health Services Delivery System Management Reports likewise

17    identify serious barriers to the delivery of mental health care, including barriers that exist because

18    the number of prisoners outstrips the prisons' resources:

19    • At CCWF, which is crowded at 185.6% of capacity,[2] housing for Enhanced

20    Outpatient Program (EOP) patients is also used by overflow administrative

21    segregation patients, which disrupts EOP treatment groups and undermines

22    confidentiality.  Declaration of Alison Hardy in Support of Plaintiffs' Opposition to

23    Vacate or Modify, Exh. A, at DRPD 1 00064 (CCWF Report, May 16, 2012).

24    _____

25    [2]  All population densities in this subsection are set forth in defendants' Weekly Report of

26    Population as of Midnight, January 30, 2013,  available at:

    http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/WeeklyWed/T

27    POP1A/TPOP1Ad130130.pdf (last reviewed on February 12, 2013).

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY

- At CIW, 143.4% of capacity, the Administrative Segregation Unit lacks adequate treatment space, "due to the physical plant." Hardy Dec., Exh. B at DRPD 1 00122-00123 (CIW Report).

- At CEN and CAL, 140.6 and 148.4% capacity respectively, staff shortages resulted in only part-time psychiatric coverage for each institution and limited psychiatrist availability for urgent and emergent referrals. Hardy Dec., Exh. C at DRPD 1 00083 (CEN Report) and Exh. D. at DRPD 1 00024 (CAL Report).

- At KVSP, 155.4% of capacity, there is insufficient space to provide groups and for conducting confidential treatment for General Population prisoners. Hardy Dec., Exh E, at DRPD 1 00326-00327 (KVSP Report).

- At CTF, 170.8% of capacity, the mental health clinician staff was reduced by nearly 25%, without a proportionate reduction in the mental health patient population. Hardy Dec., Exh F at DRPD 1 00234 (CTF Report).

- At HDSP, 150.2% of capacity, all state psychiatry positions were vacant, and due to a lack of sufficient custody officers during lockdowns and modified programs, patients are treated in non-confidential settings, including day rooms and at cell front. Hardy Dec., Exh G. at DRPD 1 00296 (HDSP Report).

- At ISP, 157.9% of capacity, there has been an increase in the number of OHU admissions for suicide watch and precautions, without a staff increase, and the absence of Office Technicians has adversely affected record-keeping, referral processing and accurate tracking. Hardy Dec., Exh H at DRPD 1 00312 (ISP Report).

- At SVSP, 146.7% of capacity, lockdowns were an obstacle to providing mental health services on two yards, and staffing issues "greatly affected" the delivery of mental health services. Hardy Dec. Exh. I at DRPD 1 00550 (SVSP Report).

- At WSP, 167.7% of capacity, mental health patients did not receive group therapy because of clinical vacancies and a lack of confidential treatment space. The

6

frequency and types of mental health services "continued to strain" WSP-RC's physical plant. Implementation of third watch onsite clinical coverage did not occur due to the hiring freeze. Hardy Dec., Exh J at DRPD 1 00578-00580 (WSP Report).

- At PVSP, 157.1% of capacity, EOP transfers were delayed during to an absence of appropriate beds at the receiving facilities. PVSP incurred staffing reductions that were not proportional to treatment population reductions. Hardy Dec., Exh K at DRPD 1 00418-00419 (PVSP Report).

**C.    Prisoners Are Dying From Inadequate Medical and Mental Health Care**

Prisoners are continuing to die from inadequate medical and mental health care. In the most recent report on prisoner deaths, an independent reviewer found that "there were 43 total preventable deaths" in California prisons in 2011. Declaration of Steven Fama in Support of Plaintiffs' Opposition to Vacate or Modify, ("Fama Dec."), Exh. A at 19 (Death Reviews). For example, one prisoner died when recurrent symptoms of shortness of breath and low oxygenation "were poorly managed," another when medical staff "missed several opportunities" to evaluate him for cardiovascular disease, and a third died of leukemia after "[m]ultiple opportunities to evaluate abnormal high white blood cell counts were missed, causing a 10 month delay in diagnosis." *Id.* at 14 (cases 19, 20, and 22). Another prisoner, a "young man with a known seizure disorder died after missing five days of anticonvulsant medication," in an outpatient housing unit "later found to have a non-functioning call system;" another prisoner, a 45-year-old man with cardiovascular disease died after receiving "double his usual dose of medication" which "contributed to a prolonged period of hypotension (low blood pressure) culminating in unresponsiveness." *Id.* at 12 (cases 5 and 9). In another case, a man "died of metastatic malignant melanoma after a nine month delay in a requested skin biopsy for a suspicious neck lesion." *Id.* at 13 (case 11). Other similar cases are described in the report. *Id.* at 11-14.

The rate of suicides in CDCR continues to significantly exceed the national average and is growing. Report on Suicides in the California Department of Corrections and Rehabilitation in

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY

Calendar year 2011, January 25, 2013, *Coleman* Dkt. No. 4308, at 6-9.  Moreover, 25 or 73.5% of

the 34 completed suicides in 2011 – the most current annual data available – had at least some

degree of inadequate mental health assessment, treatment, or intervention.  *Id.* at 9.  According to

the Coleman Special Master's expert, this "high rate of inadequacy . . . is generally consistent with

previous years, and remains unacceptably high."  *Id.*   Moreover, the inadequacies are based on

information that was or should have been available to clinical staff, meaning that the suicides

"were . . . most probably foreseeable and/or preventable."  *Id.* at 10.

　　　　The high rate of vacancies in mental health staff in CDCR prisons continues to exacerbate

the problem of inadequate assessment, treatment, and interventions.  *Id.* at 16.  The mental health

staffing vacancies are "alarmingly high" and well in excess of the Court-ordered maximum of ten

percent for certain clinical classifications.  *Id.* at 17 (describing, inter alia, a 42% vacancy rate

among psychiatrist, reduced to only a functional vacancy rate of 26% through the use of registry,

and functional vacancy rates of 17% and 20% among staff psychologists and social workers).

> **D.    Receiver's Twenty-Second Report Finds Crowding Continues to Interfere with the Delivery of Constitutional Health Care**

　　　　The Receiver's most recently filed report establishes that crowding is an ongoing problem

that impedes the delivery of health care in the prisons.  The Receiver explains

> Overcrowding and its consequences are and have been a chronic, widespread and
> continuing problem for almost twenty years.  The overcrowding reduction order
> entered by the court recognizes that the connection between overcrowding in the
> prisons and the provision of constitutionally adequate medical and mental health
> care is complex, with overcrowding creating a cascade of consequences that
> substantially interferes with the delivery of care.

Receiver's Twenty-Second Tri-Annual Report, Jan. 25, 2013 ("Receiver's 22nd Report"), *Plata*

Dkt. No. 2525, at 29.  Refuting defendants' claim that they now provide a constitutional level of

health care, the Receiver states, "there is no persuasive evidence that a constitutional level of

medical care has been achieved system-wide at an overall population density that is significantly

higher than what the Three-Judge Court has ordered."  *Id.* at 2.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY

1

### E.    Office of the Inspector General Audit Results Mask Serious Care Deficiencies

2

The Inspector General has issued reports showing improved health care scores for many

3

prisons, but those overall average scores mask serious deficiencies in important areas; for

4

example, the California Men's Colony, which received an overall score from the Inspector

5

General of 85.4%, scored just 44% with respect to timely appointments for chronic care patients,

6

54.5% for timely appointments for patients ordered at sick call to be seen again by a doctor, and

7

25% for timely appointments for newly arrived patients referred by a nurse to a doctor.  *See* Office

8

of Inspector General, California Men's Colony Medical Inspection Results Cycle 3, July 2012, at

9

1 (overall score), 8 (reference number 03.076), 9 (reference number 01.247), and 11 (reference

10

number 02.018), available at

11

http://www.oig.ca.gov/media/reports/MIU/California%20Mens%20Colony%20

12

Medical%20Inspection%20Results%20Cycle%203.pdf (site last visited February 12, 2013).

13

Other prisons saw similar discrepancies between average overall scores and low scores for critical

14

indicators of quality of care.[3]

---

15

[3] For example, High Desert State Prison received an overall score of 88.6% but scored only 64%

16

with respect to timely appointments for chronic care patients, 56% regarding the providing of medications to those patients, and 33.3% for the providing of medications to newly arrived

17

prisoners.  *See* Office of Inspector General, High Desert State Prison Medical Inspection Results Cycle 3, November 2012, at 1 (overall score), 8 (reference numbers 03.076 and 03.175) and 11

18

(reference number 02.128), available at

19

http://www.oig.ca.gov/media/reports/MIU/High%20Desert%20State%20Prison%20Medical%20Inspection%20Report%20Cycle%203.pdf.  The California Substance Abuse Treatment Facility and

20

State Prison at Corcoran received an overall score of 85%, but scored only 64% with respect to timely appointments for chronic care patients, 52% regarding the providing of medications to

21

those patients, 52% with respect to timely doctor appointments for sick call patients referred to a

22

doctor by a nurse, 29% with regard to timely appointments for newly arrived patients referred to a doctor by a nurse, and 60% with regard to timely appointments with doctors for prisoners who are

23

discharged from a hospital.  *See* Office of Inspector General, California Substance Abuse

24

Treatment Facility and State Prison at Corcoran Medical Inspection Results Cycle 3, December 2012, at 1 (overall score), 8 (reference numbers 03.076 and 03.175), 9 (reference number 01.027),

25

11 (reference number 02.018), and 13 (reference number 21.249), available at

http://www.oig.ca.gov/media/reports/MIU/California%20

26

Substance%20Abuse%20Treatment%20Facility%20and%20State%20Prison%20at%20

Corcoran%20Medical%20Inspection%20Results%20Cycle%203.pdf (site last visited February 12,

27

2013).

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY

### F.    Defendants Lack Health Care Infrastructure

As this Court explained in its order, "One of the clearest effects of crowding is that the current prison system lacks the physical space to deliver minimally adequate care to inmates." Aug. 4, 2009 Order, *Plata* Dkt. No. 2179, at 60.  Without sufficient physical space, the evidence shows defendants cannot, among other things, conduct confidential medical and mental health screening, schedule timely appointments or transfer sick prisoners who required higher levels of medical and mental health care, and treat sick patients.

As this Court noted, California's newer prisons were built with the intention to house two people per cell, but the medical and mental health facilities were built to accommodate a prisoner population based on single-celling.  *Id.* at 40-41; *See also, Brown v. Plata*, 131 S. Ct. at 1925. Defendants now have plans to address some (but not all) of these deficiencies by constructing new facilities, and renovating old ones.  But Defendants' submissions, and the Governor's proclamation, are remarkable in that they both proclaim "success" based on construction that is *planned* but still years from completion.

Defendants rely heavily on their plan to build and open a new facility in Stockton (known as California Health Care Facility-Stockton), and to remodel and operate a former juvenile facility (known as DeWitt).  Def's Motion, at 9.  But neither of these projects is complete.  The Stockton facility is scheduled to open to the first prisoner in July, but is not scheduled to be fully built and operational until January 2014.  Receiver's 22nd Report, *Plata* Dkt. No. 2525, at 26.  The DeWitt facility is not scheduled to receive its first inmate-patient until February 2014, and will not be completed until at least June 2014.  *Id.*

Defendants also rely on their efforts to upgrade healthcare facilities at existing prisons. But while major upgrade renovations are needed at *each* of the existing prisons (the latter project known as the Healthcare Facility Improvement Program (HCFIP), defendants have substantially completed upgrades at only two prisons - San Quentin and Avenal.  Even those two institutions still require additional work for adequate medication distribution.   Fama Dec., Exh. I at 1-4 (Budget Change Proposal, California Department of Corrections and Rehabilitation, Statewide

1 Medication Distribution Improvements, July 17, 2012) (San Quentin and Avenal listed among

2 prisons for which upgrades are necessary to correct medication distribution deficiencies).  That

3 work, as well as all the necessary medical construction upgrades at all of the approximately 30

4 other prisons, remains in the planning stages.  Receiver's 22nd Report at 25.

5        The future of defendants' building program is subject to bureaucratic contingencies.

6 Initial state funding agency approval has been received for only seven of the remaining 32 prison

7 upgrade projects,[4] and for a statewide project to upgrade medication distribution facilities at 22

8 prisons, and those projects will require additional approvals in the future.  *Id*. at 23-24.  The

9 healthcare construction projects for the other 25 individual prisons have not yet been submitted by

10 CDCR to the necessary state entities for initial review and approval.  *Id*.  If CDCR and the state

11 entities timely submit, review, and continue to approve these projects, "it is possible" that some

12 existing prisons will have necessary healthcare upgrades completed by 2017, with some "priority"

13 projects substantially completed by 2016.  However, completion of the necessary upgrades may

14 take even longer than three and four years.  *Id.* ("if these projects continue to experience delays as

15 they have in the last two months, this program is at risk for completion").

16        Until the construction upgrade projects are completed, the existing prisons' physical

17 infrastructure is not adequate for the existing population levels.  As CDCR itself recently stated

18 regarding the necessary healthcare construction upgrade work, the prison infrastructure is "aging"

19 and there is "inadequate treatment space" that "hinder[s] the department's ability to deliver care."

20 "The Future of California Corrections: A Blueprint to Save Billions of Dollars, End Federal Court

21 Oversight, and Improve the Prison System," April 23, 2012, available at:

22 http://www.cdcr.ca.gov/2012plan/docs/plan/complete.pdf (last visited February 12, 2013)

23 ("Blueprint") at 35.  Notably, moreover, defendants' own plans make clear that the necessary

24 construction upgrades would if completed, permit adequate treatment only if crowding is reduced

---

26 [4] The 33rd prison, California Rehabilitation Center at Norco, is scheduled for closure and thus will
27 not be renovated.  Receiver's 22nd Report at 23.

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY

is 145% of design capacity, not the current 150%. *Id.* at 8 ("The additional measures proposed in this plan will allow the state to seek and obtain from the court a modification to raise the final benchmark to 145 percent of design capacity.")

Just last year, defendants provided more detail about the current deficiencies in health care infrastructure:

> Currently there is insufficient (and in some instances, no) facility space and infrastructure in CDCR institutions to appropriately perform medication distribution activities.  Lack of adequate medication distribution rooms and windows does not allow for timely, effective and secure medication. [ . . . ] . . . existing space is inadequately sized to accommodate proper distribution protocols and procedures.

Fama Dec., Exh I at 3 (Budget Change Proposal).  In CDCR's 22-prison medication distribution project, defendants describe more than 135 different existing spaces that require upgrades, with most have multiple deficiencies identified.  *Id.* at Attachment A (14 page log detailing deficiencies in each area in each prison).

The individual prison HCFIP upgrade projects so far initially submitted and approved, again by defendants themselves, similarly identify medication distribution problems at the prisons. For example, with regard to one prison defendants state:

> At each Facility, medications are distributed from non-secure rooms originally used to store and distribute athletic equipment, one at each side of the gymnasium to serve their respective facilities. Each of the converted medication rooms has a single medication distribution window facing out toward the yard.  Due to the volume of inmate-patients requiring medications, the single window is insufficient and nurses must also distribute medication and injections across a medication cart on the open floor inside the gymnasium. [ . . . ] The existing rooms do not have sinks or drinking fountains and are not large enough to accommodate the counter space and number of windows needed to effectively serve the populations receiving medications at these facilities within a timely manner.

Fama Dec., Exh. B at 13-14 (CDCR HCFIP project, California State Prison, Solano, September 2012).  At that same prison, "[t]he existing pharmacy is too small to accommodate the operations required to manage the receipt of daily prescriptions, central fill workflows, and on-site prescription preparation and dispensing of medications." *Id.* at 11.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY

1    These types of deficiencies impede delivery of care throughout the prison system.  *See,*

2   *e.g.,* Fama Dec., Exh. C at 9 and 11 (CDCR HCFIP project for Mule Creek State Prison,

3   November 2012) (each prison yard clinic has a single window for medication distribution where

4   four or five are required); Fama Dec., Exh. D at 8-9, 11-13 (CDCR HCFIP project for Richard J.

5   Donovan Correctional Facility, October 2012) (existing pharmacy space is "less than a quarter of

6   the area of a standard pharmacy required for this program; existing medication distribution space

7   too small to facilitate timely distribution of medications); Fama Dec., Exh. E at 14-15 and 19-20

8   (CDCR HCFIP project for California Medical Facility, September 2012 ) (lack of secure storage

9   for medications creates unsafe conditions); Fama Dec., Exh. F at 7 and 13 (CDCR HCFIP project

10  for California Institution for Men, October 2012) (existing medication distribution facilities too

11  small, not secure and lack water); Fama Dec., Exh. G at 7-11 (HCFIP project for California

12  Institution for Women, October 2012) (existing medication distribution facilities too small, lack

13  water), and Fama Dec., Exh. H at 14-16 (CDCR HCFIP project for California State Prison,

14  Sacramento, November 2012) (existing medication distribution facilities too small, lack secure

15  storage for medications).

16    Defendants identify a multitude of other healthcare treatment related physical plant

17  deficiencies that they acknowledge must be corrected.  *See*, *e.g.*, Fama Dec., Exh. D at 7 (CDCR

18  HCFIP project for Richard J. Donovan Correctional Facility, October 2012) (insufficient treatment

19  space in RJD administrative segregation to permit confidential treatment, and required number of

20  treatment hours); Fama Dec., Exh. C at 13 (CDCR HCFIP project for Mule Creek State Prison,

21  November 2012) (insufficient treatment space in MCSP administrative segregation to permit

22  timely and confidential individual and group treatment sessions); Fama Dec., Exh. B at 8 (CDCR

23  HCFIP for California State Prison, Solano, September 2012) (existing exam spaces at SOL too

24  small, compromise confidentiality and pose infection control concerns).

25    Substantially similar physical plant deficiencies exist at other prisons: the space currently

26  available is too small and/or otherwise inadequate to provide medical care for the prisoner-patient

27  population.  See Fama Dec., Exh. D at 12 (CDCR HCFIP project for Richard J. Donovan

28

13

Correctional Facility, October 2012) ("[t]he existing primary care clinics at the four facilities are not large enough to accommodate the number of exam rooms and support space needed to serve RJD's inmate-patient population…"); Fama Dec., Exh. F at 8 (CDCR HCFIP project for California Institution for Men, October 2012) ("[t]the existing clinic location [in Facility A] cannot accommodate the four exam rooms and one multi-use exam room required to meet the inmate population clinical utilization"), at 12 ("[t]the existing [Facility B Primary Care Clinic] exam areas are inappropriate for a clinical environment because they lack privacy and patient-provider confidentiality . . ."), at 15 ("[t]the existing clinic [in Facility C] is not large enough to accommodate the number of exam rooms needed to serve [the] inmate-patient population . . ."), and 18 ("[t]he existing [Facility D] primary care clinic in the old modular building is temporary and is not large enough to accommodate the number of exam rooms needed to serve [the] inmate-population . . ." and "[t]he exam spaces are too small . . . and they do not have sinks or cleanable surfaces leading to infection control concerns"); Fama Dec., Exh. G at 8 (CDCR HCFIP project for California Institution for Women, October 2012) ("[t]he existing [Reception Center clinic] exam areas are inappropriate for a clinical environment . . .") and 11 ("[t]he existing [General Population Primary Care] clinic building is not large enough to accommodate the health care space needed to serve [the] inmate-patient population . . ."); and Fama Dec., Exh. H at 12 (CDCR HCFIP project for California State Prison, Sacramento, November 2012) (" [t]he existing primary care clinics at Facilities B and C and the specialty care clinic are not large enough to accommodate the number of exam rooms needed to serve [the] inmate-patient population . . .").

The evidence is thus overwhelming that defendants continue to house far more prisoners than their health care infrastructure can handle, and that the prison system's physical plant deficiencies will be resolved, if at all, years in the future.

**ARGUMENT**

I.   **Defendants' Motion Must Be Denied Because This Court Does Not Have Authority to Decide It.**

Defendants have brought this motion in the wrong court.  Defendants' motion is premised on the argument that the constitutional violations have been cured.    Def's Motion at 1 (arguing that "California's vastly improved prison health care system now provides inmates with superior care that far exceeds the minimum requirements of the Constitution" ). That is a matter that can only be decided by the single-judge courts.

Defendants are currently subject to remedial orders in both *Coleman v. Brown* and *Plata v. Brown,* because they have failed to provide a constitutionally adequate level of health care to the plaintiff classes.  Neither order has been terminated, and the Three-Judge Court has no authority to reconsider the propriety of those underlying orders.  As the Supreme Court explained, "[o]nce the three-judge court was convened, that court was not required to reconsider the merits. *Its role was solely to consider the propriety and necessity of a population limit.*"  *Plata v. Brown*, 131 S. Ct. at 1936 (emphasis added).

The underlying question, whether mental health and medical care have improved so that the care is no longer constitutionally deficient, belongs before the single-judge courts that have been adjudicating those issues for the last 23 and 12 years, respectively.  *See id.* at 1930-31 (noting that Defendants had the option of moving to terminate the *Coleman* and *Plata* remedies on grounds of constitutional compliance); Aug. 4, 2009 Three-Judge Court Order at 54 (*Plata* Dkt. No. 2197);  Three-Judge Court Pretrial Conference Transcript (Nov. 10, 2008) at 28:16-21.  Defendants must seek termination of the *Plata*  and *Coleman* remedial order *in the single-judge courts* before they can bring this motion before this Court.

II.  **Defendants Have Failed to Carry their Initial Burden of Showing a Significant Change in the Facts that Would Support Vacating or Modifying this Court's Population Reduction Order.**

If this Court determines that defendants' motion is properly before the Court, the motion must be denied because defendants have failed to meet their initial burden to justify any modification to the Population Reduction Order.  Ample evidence in both *Plata* and *Coleman*

15

1  demonstrates ongoing systemic constitutional violations.  In the alternative, however, if this Court

2  finds that defendants have made a *prima facie* case to meet their initial burden, further

3  consideration of this motion must be stayed to permit plaintiffs an opportunity to develop a full

4  record on this issue.

### A.    Legal Standard

6      Under the Prison Litigation Reform Act, a party is permitted to seek "modification or

7  termination" of prospective relief "to the extent that modification or termination would otherwise

8  be legally permissible."  18 U.S.C. § 3626(b)(4).  Federal Rule of Civil Procedure 60(b)(5)

9  permits a party to obtain relief from a judgment or order if "the judgment has been satisfied,

10  released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or

11  applying it prospectively is no longer equitable…."  A party seeking relief pursuant to Rule

12  60(b)(5) bears the burden to show that modification is warranted.  *See Rufo v. Inmates of Suffolk*

13  *Cty. Jail*, 502 U.S. 367, 383 (1992).

14      A party making a motion to modify must make, at a minimum, the following showings:

15  first, the party has the "initial burden" of "showing a significant change either in factual conditions

16  or in law."  *Rufo*, 502 U.S. at 384.  The changes to the factual or legal landscape must be so

17  significant as to demonstrate that the fully adjudicated facts forming the basis of the existing

18  injunction no longer apply, or would make compliance with that order substantially more onerous,

19  unworkable, or detrimental to the public interest.  *See U.S. v. Asarco Inc.*, 430 F.3d 972, 979 (9th

20  Cir. 2005); *see also Sharp v. Weston*, 233 F.3d 1166, 1170-72 (9th Cir. 2000) (affirming denial of

21  defendants' motion to dissolve injunction, applying *Rufo* standard, based on continuing

22  constitutional deficiencies and defendants' history of noncompliance).  Second, the moving party

23  must show that "the proposed modification is suitably tailored to the changed circumstance."

24  *Rufo*, 502 U.S. at 391.  Modification of an existing injunction "must not create or perpetuate a

25  constitutional violation."  *Id.*

26

27

28

1

2

**B.    Defendants' Motion Fails to Establish a Significant Change in the Facts Regarding the Delivery of Medical Care under Plata v. Brown.**

3        Defendants have failed to present substantial evidence to support their claim that the facts

4   have changed significantly such that they are now providing a constitutional level of medical care

5   to California state prisoners.  Defendants base their "changed facts" claim primarily upon the

6   declarations of the California Inspector General, Robert Barton, and Jeffrey Beard, the new

7   Secretary of the CDCR, and on their plan to construct additional medical facilities.  As explained

8   below, neither the declarations nor the inchoate construction program constitute substantial

9   evidence in support of defendants' motion.   Moreover, their position is belied by the Governor-

10  imposed State of Emergency, the Receiver's most recent report, numerous reports on the prison

11  construction/renovation projects and by ample other evidence.  The Receiver has recently declared

12  that overcrowding is a "chronic, widespread and continuing problem" that "substantially

13  interferes" with medical care delivery.  Receiver's 22nd Report, *Plata* Dkt. 2525 at 29.  As the

14  Receiver states, "there is no persuasive evidence that a constitutional level of medical care has

15  been achieved system-wide at an overall population density that is significantly higher than what

16  the Three-Judge Court has ordered."  *Id.* at 2.

17            **1.    Defendants' Declarations Are Entitled to Little Weight**

18        First, the Barton declaration.  Mr. Barton executed a declaration to "support" defendants'

19  motion to vacate or modify the crowding reduction order.  Declaration of Robert A. Barton in

20  Support of Defendants' Motion to Vacate or Modify Population Reduction Order, January 7,

21  2013, *Plata* Dkt. No. 2507.  Mr. Barton emphatically opines that California prison medical care

22  "far exceeds" constitutional requirements and that it is "abundantly clear" that timely and effective

23  care is provided.  *Id.* at 7.  But Mr. Barton is a lawyer with no medical training, who has never

24  worked in a prison; he is in no way qualified to provide expert testimony on the impact of

25  crowding on prison medical care or prison operations, and thus this Court should disregard his

26  testimony on that point.

27        Mr. Barton bases his opinion on the results of the audits that were performed under his

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY

1  direction at each of the state prisons.  But as Receiver Clark Kelso indicates in his Twenty-Second

2  Tri-Annual Report, the OIG scores are not sufficient to establish a constitutional level of care.

3  Receiver's 22nd Report at 30.  The Receiver explains that "the scale for the OIG scores has never

4  been validated for purposes of making constitutional measurements….[and] the scores on

5  individual items in the OIG audit frequently depend upon sample sizes so small . . . that the

6  confidence intervals for the items are unusually large (e.g., a score of 70% on an item may have a

7  confidence interval stretching from 50% to 90%)."  *Id.*  The Receiver describes the OIG audit

8  results as "a statistically soft measure of performance."  *Id.*

9        Dr. Beard's declaration is likewise unpersuasive.  Without citing any factual basis or

10 independent research, the new Secretary of the CDCR declares that "the CDCR now delivers

11 superior medical and mental health care that would compare favorably with any correctional

12 system in the United States."  Beard Dec., *Plata* Dkt. No. 2508, at 2.  This unsupported assertion

13 must be disregarded.  *See Pixion, Inc. v. Citrix Systems, Inc.*, __ F. Supp. 2d __, No. C 09-

14 0349631, 2102 WL 3313533 (Aug.13, 2012), at *7 (expert's unsupported conclusion is

15 insufficient to raise genuine issue of material fact).  Moreover, the assertion is one that Dr. Beard,

16 who is a psychologist with no medical training, is not qualified to make.  *McReynolds v. Sodexho*

17 *Marriott Services, Inc*., 349 F.Supp.2d 30, 34 (D.D.C. 2004) ("expert testimony should not be

18 considered in a case unless the expert has genuine expertise…").

19       The self-serving declaration should also be disregarded because it contradicts the sworn

20 testimony Dr. Beard gave when he was an unpaid expert.  In 2008, Mr. Beard testified without pay

21 that crowding at a level of 150-160% makes it difficult to manage prisons safely.  Trial Tr. at

22 209:9-25, 230:8-10.  He also testified that at higher levels of care, there must be a vacancy rate

23 (*i.e.*, occupancy at less than 100%) to have a "properly functioning" system.  Trial Tr. at 207:12-

24 208:16.  Eleven days after his appointment as the Secretary of the CDCR, he submitted a

25 declaration advancing the opposite opinion, in support of defendants' motion.  His about-face is

26 entitled to little weight.

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY

1

### 2.    Defendants' Construction Program Has Not Increased Capacity Sufficiently to Permit the Delivery of Medical Care at Constitutional Levels.

2

3    This Court found that "[o]ne of the clearest effects" of crowding is that defendants lack the

4    physical space necessary to deliver minimally adequate health care to the plaintiff class.  Aug. 4,

5    2009 Order, Dkt. No. 2197, at 60.   In their 2012 "Blueprint" to end court oversight, defendants

6    acknowledge that the prisons' aging infrastructure and inadequate treatment space hinder the

7    department's ability to deliver care.  Blueprint at 35.  Defendants have yet to build themselves out

     of their overcrowded conditions.

8    Defendants' physical plant deficiencies were caused in part by the fact that, while

9    California's newer prisons were built to house prisoners at more than 100% of capacity, "no

10   similar accommodation was made for the provision of medical and mental health care in

11   California's prisons."  Aug. 4, 2009 Order at 41.  Defendants now claim that this finding is "no

12   longer accurate" because the state has initiated a construction and renovation program to meet the

13   present and future health care needs of the state prisoners.  Def's Motion at 8.  In fact, this Court's

14   2009 description of the space shortage remains very accurate, as any benefits of defendants'

15   construction plan have yet to be realized at the overwhelming majority of the prisons.

16   Defendants' plan to address the clinical space deficiencies for medical care delivery

17   throughout the state is encompassed in their Health Care Facilities Improvement Plan.  Under the

18   best case scenario, the construction and renovation that would be necessary for the prisons to

19   provide medical care at *145%* capacity will be completed in 2017.  Receiver's 22nd Report, Dkt

20   No. 2525, at 23; Blueprint at 8 ("[T]he additional measures proposed in this plan will allow the

21   state to seek and obtain from the court a modification to raise the final benchmark to 145 percent

22   of design capacity").  Thus, in four years, defendants might have sufficient health care facilities

23   for a prison population five percent lower than the current level, and significantly higher than the

24   level ordered by this Court.

25   Defendants' building plan is in its infancy.  To date, defendants have completed facility

26   upgrades at two of the 33 prisons – San Quentin and Avenal – but even those two prisons still

27   require additional renovation to permit adequate medication distribution.  Receiver's 15th Report,

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY

1  Dkt. No. 2337-2 at 52.  Defendants' new facility in Stockton, currently under construction, is not

2  slated to be fully operational until the end of this year, and the extensively renovated DeWitt

3  facility will not receive patients until next year.  Receiver's 22nd Report at 1, 23.  Renovations of

4  medical facilities at the remaining 30 prisons (CRC, slated for closure, will not be renovated) have

5  yet to begin, and defendants have obtained initial approvals for only seven of the prison clinic

6  projects.  Receiver's 22nd Report at 23-24.  As the Receiver recently explained, it is possible that

7  the Health Care Facility Improvement Program projects and medication distribution upgrades will

8  be substantially completed by 2017.  Receiver's 22nd Report at 23.  This, however, assumes that

9  the projects will receive the necessary approvals and interim funding, and the Receiver warned, "if

10  these projects continue to experience delays as they have in the last two months, this program is at

11  risk for completion."  *Id.*

12         By defendants' own statements, the existing healthcare infrastructure remains

13  fundamentally deficient and the prisons cannot provide adequate care at current levels of

14  crowding, and in the State's own view will not do so until 2017 when all construction is

15  completed.   And, even then, defendants' plan provides for infrastructure built for crowding at

16  145% of capacity, not the current level of 150%. Defendants' construction project does not

17  constitute a significant factual change that would justify modification or termination of the

18  population reduction order.

19

20  **C.    Defendants' Motion Fails to Demonstrate a Significant Change in the Facts
         Regarding the Delivery of Mental Health Care under *Coleman v. Brown*.**

21         Defendants' mental health care delivery care system continues to be constitutionally

22  deficient.  The Special Master's most recent report details serious problems including delays in

23  care, inadequate staffing, a very high suicide rate, and delays in transferring very sick patients to

24  higher care levels.  Defendants' own management reports establish that prisons continue to have

25  insufficient treatment space for their population levels, have high clinical vacancy rates and are

26  impeded from providing timely care by ongoing lockdowns and other crowding-driven issues.

27         As noted above, defendants have initiated termination proceedings before the single-judge

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY

court in *Coleman*, and plaintiffs are engaged in extensive and expedited discovery. While the Special Master's Reports and defendants' management reports support plaintiffs' position that there have not been significant factual changes that would support modifying the population reduction order, plaintiffs require additional time to conduct discovery in order to fully respond to defendants' motion, as explained below.

**D.    If this Court Finds this Motion Should Not Be Denied Based on the Current Record, Discovery Must Be Reopened to Allow Plaintiffs an Opportunity to Develop a Full Record.**

If this Court determines that defendants have made a *prima facie* showing of significant changed circumstances with regards to medical and mental health care delivery, this Court should reopen discovery so that plaintiffs may develop a full record for its consideration.

Defendants have been preparing for this motion to modify, in secret, for many months beginning in October, 2011, when they convened experts for a working session at CDCR headquarters. At the same time they were conducting expert tours to assess current conditions in California's prisons, Defendants repeatedly represented in multiple pleadings that neither they nor Plaintiffs could or should start conducting such discovery or investigations until December 2012 at the very earliest. *E.g.*, Defs' Resp. to Aug. 3, 2012 Second Order Requiring Further Briefing, *Plata* Dkt. No. 2463, at 2 ("Expert investigation and discovery proceedings [regarding current conditions in California prisons] should not commence until the end of March 2013"); Defs' Resp. to June 7, 2012 Order Requiring Further Briefing, *Plata* Dkt. No. 2447, at 2 ("A motion, investigation or discovery based on current conditions" would be "premature" before December 2012 at the earliest, and any discovery conducted before then would be "irrelevant").

When Defendants filed their August 2012 Response begging the three-judge court to delay opening discovery until March 2013 at the earliest, they had already retained experts, completed a "working session at CDCR offices" with their experts in October 2011, held an "initial site inspection" of CSP-Sacramento to lay the groundwork for future inspections later that year, and conducted ten of the thirteen expert site inspections upon which their present

21

termination and modification/vacatur motions rely. *See* Vorous Dec. in Support of Defs' Mot. to Terminate, Ex. 2 (Report of Defs' Expert Steve Martin), *Coleman* Dkt. No. 4279, at 6-8. All of these inspections were conducted without notice to the single judge courts, to this Court, or to Plaintiffs' counsel, in violation of existing Court orders governing such inspections. *See* Oct. 30, 2007 Three-Judge Court Order, *Plata* Dkt. No. 906, at 4 (ordering that plaintiffs' counsel be notified of and permitted to attend defense experts' prison inspections, as the presence of all counsel would enable the creation of a "common factual baseline" and "minimize[] potential conflicts arising from" communications with class members). Defendants then filed the present motions almost six months prior to the June 28, 2013 date by which they represented to the three-judge court that a motion to modify would be filed. Defs' Resp. to Aug. 3, 2012 Order, *Plata* Dkt. No. 2463, at 10.

If this Court finds that this motion should not be denied based upon the current record, then discovery must be opened in both cases to afford plaintiffs the opportunity to develop a full record on these issues.  The single-judge *Coleman* court has already reopened discovery, in response to defendants' termination motion, and plaintiffs have launched discovery on an extremely expedited basis. Plaintiffs opposition to defendants' motion is due on March 15, 2013, and plaintiffs intend at that time to supplement this opposition to defendants' motion to modify the Population Reduction Order to incorporate the evidence produced in that proceeding.

Plaintiffs will also require discovery in *Plata*.  Plaintiffs estimate that it will take six months to identify experts and have them conduct site visits at the state prisons, write reports and conduct expert depositions.  Following the expert deposition cut-off date, plaintiffs should have two months to draft the opposition to defendants' motion.  A hearing in the case would likely take four to six days.

## III.    The Court Should Direct the Defendants to Proposed Institution-Specific Caps.

Defendants have reduced crowding at certain prisons, but have kept some prisons extremely overcrowded.  For example, CCWF remains crowded at 185% of capacity.  Several others top 170% of capacity.  And as explained above, care remains well below constitutional

standard.  Secretary Beard previously testified that he could not safely run a prison that is 150-160% of capacity.  Accordingly, Plaintiffs request that the Court order defendants to propose a plan for institution-specific population caps, based on the ability of each institution to provide constitutionally adequate care.

Currently, this Court's order imposes a "single systemwide cap" of 137.5% of design capacity.  Aug. 4, 2009 Order  at 121, 130.  In taking this approach, the Court acknowledged that "institution-specific caps would be tailored to each institution's needs and limitations"; however, out of concern to maximize the State's flexibility in complying with the order, it declined to impose individualized caps, unless "it is demonstrated that a single systemwide cap provides inadequate relief…."  *Id.* at 121.  The Court also explained that this approach was predicated on its "trust that any population reduction plan developed by the state in response to [the Court's] opinion and order will properly account for the particular limitations and needs of individual institutions and programs."  *Id.* at 131, n. 64.

With no institution-specific caps, defendants have significantly overcrowded some prisons.  For example, Central California Women's Facility remains at 187.2% of design capacity; North Kern State Prison is at 171.8%; Correctional Training Facility is at 170.9%, and Avenal State Prison is at 168.6% of design capacity.  Defendants' January 2013 Status Report In Response to June 30, 2011 Order, Exhibit A, *Plata* Dkt. No. 2518-1, January 15, 2013.

Secretary Beard himself testified that crowding at 150-160% is unmanageable, and ample evidence shows that crowding continues to create "a cascade of consequences that substantially interferes with the delivery of care."  Receiver's 22nd Report at 29.  As documented and discussed above, mental health care continues to be inadequate because of significant staffing shortages, and there is insufficient infrastructure to provide mental health and medical care.  Further, with a few exceptions the most overcrowded prisons received the lowest overall scores in the Office of the Inspector General's medical inspections.  Declaration of Robert A. Barton in Support of Defendants' Motion to Vacate or Modify Population Reduction Order, January 7, 2013, *Plata* Dkt. No. 2507, at 6.  Conversely, eight of the nine institutions that reduced crowding to below 137.5%

of design capacity were among the top nine highest overall scores in the Office of the Inspector General's medical inspections. *Id.*

Therefore, to prevent further harm to prisoners from constitutionally inadequate health care, it may be necessary to modify this Court's order such that Defendants must reduce the populations at specific institutions to a level at which constitutional care can be provided. Thus, plaintiffs request that this Court order defendants to develop a plan for prison-specific caps, within 120 days of the Court's order, that includes a discussion of each prison's clinical and custody staffing levels, staffing vacancies, physical plant limitations, prisoner custody level and available programs. Plaintiffs also request that the order require defendants to meet and confer with the Special Master, Receiver, *Plata* Court Experts and plaintiffs, and that the parties be required to subsequently report back to this Court within 150 days of the Court's order regarding the results.

## IV. The State Has Identified Safe Methods To Comply With the Crowding Reduction Order.

On January 7, 2013, Defendants submitted to the court a list of methods that they could implement to comply with the crowding reduction order. Grealish Dec. in Support of Defs' Resp. to Oct. 11, 2012 Order, Exh. A. (Jan. 7, 2013), *Plata* Dkt. No. 2512-1 ("Grealish Dec."). Defendants' plan involves increasing good time credits, diverting prisoners, and expanding capacity, all methods that have been tried in other jurisdictions and proven to cause no increase in crime. *Brown v. Plata*, 131 S. Ct. at 1942-43 (crediting testimony that such methods can be implemented without any "deleterious effect on crime" and affirming this Court's findings that "any negative impact on public safety would be 'substantially offset, and perhaps entirely eliminated, by the public safety benefits' of a reduction in overcrowding") (quotations omitted); *see also* Austin Jan. 7, 2013, Dec., ¶¶30-33, Figs. 3-4, Tables 5-6, *Plata* Dkt. No. 2509-1.

Defendants assert that any further crowding reduction will come at a "cost" to "public safety," but they have no evidentiary support for this contention; they base their assertion on a single conclusory statement made by the newly-appointed Secretary Beard that further population reductions would involve the "early release of inmates convicted of violent or serious felonies."

1  Defs' Motion at 20 (citing Beard Dec., ¶ 25).  The Secretary's statement ignores the State's

2  options for reducing crowding that were the subject of extensive testimony and analysis at trial –

3  including from Secretary Beard himself, who testified that there are safe ways to reduce crowding-

4  - and both this Court and the United States Supreme Court agreed with Dr. Beard and found that

5  there are effective means of complying with the Court's order that will not cause any adverse

6  impacts on public safety or the operation of a criminal justice system.  See, e.g., *Brown v. Plata*,

7  131  S. Ct. at 1942 (crediting this Court's findings that "prison populations can be reduced in a

8  manner that does not increase crime to a significant degree" and that "[s]ome evidence indicated

9  that reducing overcrowding in California's prisons could even improve public safety"); Austin

10  Jan. 7, 2013, Dec., ¶¶30-33, Figs. 3-4, Tables 5-6.

11      The first major component of the State's plan is to expand good time credits available to

12  prisoners who are following prison rules, and completing rehabilitative programs.  Def's Resp. to

13  Oct. 11, 2012, Order at 9-11 (Jan. 7, 2013).  As the Supreme Court found, "[e]xpansion of good-

14  time credits would allow the State to give early release to only those prisoners who pose the least

15  risk of reoffending."  *Brown v. Plata*, 131 S. Ct. at 1943.  The court credited this Court's findings

16  that such methods would not increase crime.  *Id.; see also* Austin Jan. 7, 2013, Dec., ¶¶30-33,

17  Figs. 3-4, Tables 5-6.  Secretary Beard testified at trial in this matter that wholesale early release,

18  giving all prisoners four months off their sentence, "does not have an adverse effect on recidivism,

19  and it does not have an adverse effect on the crime rate."  Beard Trial Tr. 1569 and 1602 (same).

20  He further testified that giving prisoners extra credits for completing programming would "make it

21  less likely they are going to come back to prison, so you are going to lower recidivism rates."  *Id*.

22  1570.  Finally, Secretary Beard testified that any adverse impact from early releases could be fully

23  mitigated "by providing services to those people who are coming out in the form of education,

24  vocational training, job, housing, substance abuse . . ."  *Id.* at 1572-1573.

25      The second major component of Defendants' plan is to change sentencing laws so that

26  some low level prisoners (such as those with short sentences, or those convicted of simple drug

27  possession or petty theft) will serve time in county jail rather than prison.  Def's Resp. to Oct. 11,

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY

2012, Order at 11-13.  Defendants do not contend that this would increase crime; nor do they contend that it would have an adverse impact on public safety.  They assert only that "counties are still working to implement their additional responsibilities under realignment."  *Id.* at 12.  That vague statement does not establish an adverse impact on public safety or the operation of a criminal justice system.

The third major component of Defendants' plan is to expand alternatives to state prison, including expanding the ability of prisoners to participate in work furlough or other alternative custody programs, and continuing to use out-of-state prison beds.  *Id.* at 13-16.  Defendants make no contention regarding the adverse impact of alternatives to incarceration, and indeed Secretary Beard testified at trial that when Pennsylvania implemented a program to divert people from prison to drug treatment facilities "inmates who went through the [program] had lower recidivism rates than people who were sent to county jail or state prisons."  Beard Trial Tr. 1554-1555.  He further explained that such programs make "a whole bunch of sense" because "the research is really clear out there that community-based programming is actually more effective than prison-based programming."  *Id*. at 1555.  The Supreme Court agreed, finding that "[d]iverting low-risk offenders to community programs such as drug treatment, day reporting centers, and electronic monitoring would . . . lower the prison population without releasing violent convicts."  *Brown v. Plata*, 131 S. Ct. at 1943.

Defendants also make no argument that keeping prisoners out-of-state would have negative impacts on public safety or the operation of local criminal justice systems.  (They argue only that they should not have to slow the return of out-of-state prisoners for fiscal reasons, but ignore the fact that their plea to keep the prison population at 150% of capacity will cost the state more than $250,000,000 per year.)[5]

_____

[5] CDCR calculates that it saves $25,048 "marginal cost savings per inmate" per year.  Austin Dec., Table 4, n. 2.  If the State remains 10,000 prisoners above the population cap, those extra prisoners will cost the State $250,480,000 each year.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY

Defendants' plan also includes "outright" early releases of the lowest-risk prisoners. However, that plan was mainly aimed at achieving 137.5% of capacity by the June 2013 benchmark.  See Grealish Dec., Exh. A.  Since the Court has extended the deadline for compliance with that benchmark until December 2013, the State's plan contemplates only a very small number of such releases.  *Id.*  In any event, as Defendants have previously explained, this method involves prison officials identifying the lowest risk of their low-risk prisoners, excluding prisoners who have notorious crimes, or those whose case factors make them uniquely unsuited for release.  This strategy represents the safest means to reduce prison crowding.  Austin Jan. 7, 2013, Dec., ¶¶2, 12-13.  As noted above, Secretary Beard testified at trial that early releases have no impact on recidivism rates or crime rates (Beard Trial Tr. 1569, 1602), and the Supreme Court decision specifically suggests such an approach.  *Brown v. Plata*, 131 S. Ct. at 1947 (this Court may "consider whether it is appropriate to order the State to begin without delay to develop a system to identify prisoners who are unlikely to reoffend or who might otherwise be candidates for early release").

In short, Defendants have available to them effective means of complying with the Court's order that are not only safe, but will save the State hundreds of millions of dollars each year. Perhaps Secretary Beard put it best when he said, at trial, that "there are many safe ways" to reduce the prison population; the problem is not the lack of options, the problem is the lack of "political will."  Beard Trial Tr. 1578.

## V.    Plaintiffs Have Good Cause for Missing the Deadline for Responding to Defendants' Motion to Modify.

The Court Ordered Plaintiffs to show cause for failing to file a response to Defendants' motion by the January 22, 2013 deadline.

Defendants filed their motion to modify/vacate on January 7, 2013.  Plaintiffs incorrectly relied on this Court's October 10, 2007 Order (*Plata* Dkt. No. 880) regarding briefing schedules, which states at footnote 6:

Local Rule 78-230 sets forth procedures for noticing motions, other than discovery

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY

1

2

3

motions, on a civil motion calendar and for briefing said motions. That rule will not be followed in this action. Any such motions filed in this action shall be filed without a noticed hearing date. The court will thereafter issue an order setting, as appropriate, a hearing date and briefing schedule for any specific motions so filed.

4     Plaintiffs neglected to note that the order had been superseded by this Court April 25, 2008 Order.

5     Plaintiffs regret the inconvenience to this Court and to defendants.

6

7     DATED:  February 12, 2013               Respectfully submitted,

8

9                                            By:  */s/*_____
                                                    Alison Hardy
10

11                                           Attorneys for *Plata* Plaintiffs and on
                                             Behalf of *Coleman* Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY