1  KAMALA D. HARRIS
   Attorney General of California
2  JONATHAN L. WOLFF
   Senior Assistant Attorney General
3  JAY C. RUSSELL, State Bar No. 122626
   Supervising Deputy Attorney General
4  DEBBIE VOROUS, State Bar No. 166884
   PATRICK R. MCKINNEY, State Bar No. 215228
5  Deputy Attorneys General
    455 Golden Gate Avenue, Suite 11000
6   San Francisco, CA 94102-7004
    Telephone: (415) 703-3035
7   Fax: (415) 703-5843
    E-mail: Patrick.McKinney@doj.ca.gov
8  Attorneys for Defendants

   Hanson Bridgett LLP
   JERROLD C. SCHAEFER, State Bar No. 39374
   PAUL B. MELLO, State Bar No. 179755
   WALTER R. SCHNEIDER, State Bar No. 173113
   SAMANTHA D. WOLFF, State Bar No. 240280
   MEGAN OLIVER-THOMPSON, SBN 256654
   PAUL GRUWELL, State Bar No. 252474
    425 Market Street, 26th Floor
   San Francisco, California 94105
    Telephone: (415) 777-3200
   Fax: (415) 541-9366
   E-mail: pmello@hansonbridgett.com

9
                    IN THE UNITED STATES DISTRICT COURTS
10
                 FOR THE EASTERN DISTRICT OF CALIFORNIA
11
                AND THE NORTHERN DISTRICT OF CALIFORNIA
12
         UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
13
            PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
14

15  **RALPH COLEMAN, et al.,**                    2:90-cv-00520 LKK JFM P

16                                Plaintiffs,     **THREE-JUDGE COURT**

17      v.

18  **EDMUND G. BROWN JR., et al.,**

19                                Defendants.

20

21  **MARCIANO PLATA, et al.,**                   C01-1351 TEH

22                                Plaintiffs,     **THREE-JUDGE COURT**

23      v.

24                                                **REPLY BRIEF IN SUPPORT OF**
                                                  **MOTION TO VACATE OR MODIFY**
25  **EDMUND G. BROWN JR., et al.,**              **POPULATION REDUCTION ORDER**

26                                Defendants.     **OBJECTIONS AND MOTION TO**
                                                  **STRIKE PORTIONS OF PLAINTIFFS'**
27                                                **OPPOSITION AND PLAINTIFFS'**
                                                  **FEBRUARY 14, 2013 SUR-REPLY**
28

1

**TABLE OF CONTENTS**

2
Page

3    I.    Introduction. ........................................................................................................ 1

4    II.   The State Carried Its Burden to Show that Changed Factual Circumstances
           Require the Court to Vacate or Modify the Population-Reduction Order. ......... 2

5          A.   There Is No State of Emergency: The State's Evidence that Overcrowding
                Is No Longer an Issue Is Undisputed. ..................................................... 3

6
7          B.   The State's Evidence of a Substantial Increase in Capacity to Effectively
                Provide Health Care Is Undisputed. ......................................................... 5

8          C.   Plaintiffs Failed to Rebut the Testimony that the State Can Provide
                Adequate Medical and Mental Health Care at the Current Population Level......... 6

9          1.   Plaintiffs Failed to Rebut Dr. Beard's Testimony that Overcrowding
                No Longer Impacts the State's Ability to Provide Adequate Health
10              Care. ................................................................................................ 7

11         2.   Plaintiffs Failed to Rebut the Inspector General's Testimony. ..................... 7

12         3.   Plaintiffs' Mischaracterization of the OIG's Methodology Must Be
                Rejected. ........................................................................................ 8

13         4.   The Receiver's Recent Comments About Overcrowding in the 22nd
                Tri-Annual Report Should Be Stricken. ............................................. 9

14         5.   Plaintiffs' Reliance on Issues Reported by Some of the Institutions to
                the Special Master Is Misplaced. ..................................................... 9

15   III.  Plaintiffs Presented No Evidence to Address the Issue This Court Must Decide:
           The Continued "Propriety and Necessity of a Population Limit.".................... 10

16         A.   Deficiencies Allegedly Described in the *Coleman* Special Master's Report
                and Defendants' Management Reports Are Not Before This Court. .................... 12

17
18         B.   Plaintiffs Mislead the Court About California's Inmate Mortality and
                Suicide Rates. ................................................................................... 15

19         1.   The State's Inmates Are Not Dying from Inadequate Medical Care. .......... 15

           2.   The State's Suicide-Prevention Measures Are Appropriate. .................... 16

20   IV.   There Is No Reason to Delay Granting the Motion. ......................................... 18

21   V.    Plaintiffs' Proposal for Institution-Specific Population Caps Ignores Binding
           Supreme Court Precedent and Attempts to Circumvent the Prison Litigation
22         Reform Act. ..................................................................................................... 19

23   VI.   The State Did Not Identify Any Measures that would Reduce the Population to
           137.5% of Design Bed Capacity Without Jeopardizing Public Safety. ............. 20

24   VII.  Conclusion. ..................................................................................................... 22

25

26

27

28

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Balla v. Idaho State Bd. of Corr.*
  595 F. Supp. 1558 (D. Idaho 1984)......................................................................... 17

*Brown v. Plata*
  131 S. Ct. 1910 (2011) .........................................................................................*passim*

*Estelle v. Gamble*
  429 U.S. 97 (1976) ...................................................................................................... 14

*Horne v. Flores*
  557 U.S. 433 (2009) .................................................................................................. 2, 11

*Kyle v. Campbell Soup Co.*
  28 F.3d 928 (9th Cir. 1994)......................................................................................... 1

*Miller v. Harbaugh*
  698 F.3d 956 (7th Cir. 2012)..................................................................................... 17

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*
  507 U.S. 380 (1993) ...................................................................................................... 1

*Rufo v. Inmates of the Suffolk Cty. Jail*
  502 U.S. 367 (1992) .................................................................................................. 2, 11

CONSTITUTIONAL PROVISIONS

United States Constitution
  Eighth Amendment ...................................................................................................... 17

California Constitution
  art. VII ............................................................................................................................ 21

STATUTES

United States Code, Title 18
  § 3626(a)(1)(A)............................................................................................................. 18
  § 3626(a)(3)................................................................................................................... 20
  § 3626(a)(3)(E).............................................................................................................. 11

California Penal Code
  § 458 *et seq.* ................................................................................................................ 21
  § 473 ............................................................................................................................... 21
  § 484 *et seq.* ................................................................................................................ 21
  § 1170(a) ........................................................................................................................ 21

ii

# TABLE OF AUTHORITIES
**(continued)**

Page

§ 1170(h)(3) ........................................................................................... 21
§ 1170.05 ............................................................................................... 21
§ 1216 .................................................................................................... 21
§ 2901 .................................................................................................... 21
§ 667(c)(5) ............................................................................................. 21
§ 2933.05(a) ........................................................................................... 21
§ 2933.05(e) ........................................................................................... 21
§ 2933.1 ................................................................................................. 21
§ 6126(e) .................................................................................................. 7
§ 6228 .................................................................................................... 21
§ 6263 .................................................................................................... 21

Health & Safety Code
§§ 11350(a) & 11377(a) ......................................................................... 21

Vehicle Code
§ 10851 .................................................................................................. 21

California Code of Regulations, Title 15
§ 3080 .................................................................................................... 21
§ 3081 .................................................................................................... 21
§ 3375.2 ................................................................................................. 21

**COURT RULES**

E.D. L.R. 230(c) ...................................................................................... 1

Fed. R. Civ. P 60(b)(5) .................................................................... 1, 2, 11

1

## I.    INTRODUCTION.

2    The State has dramatically reduced the prison population, significantly increased population

3    and treatment capacity through construction, and fundamentally transformed the medical and

4    mental health care system.  These exceptional changes render further inmate population

5    reductions unnecessary to ensure constitutionally adequate health care.  The population-reduction

6    order has served its purpose, and the Court should now vacate it.

7    Not surprisingly, Plaintiffs argue that more inmates should be released.  But they fail to

8    identify any evidence that overcrowding is the primary cause of an ongoing constitutional

9    violation.  Plaintiffs' untimely opposition is devoid of any admissible or persuasive evidentiary

10    support.  Plaintiffs offer only declarations from their counsel, with attached documents that have

11    no relevance to whether this Court should vacate the population-reduction order.[1]

12    In an attempt to avoid whether the population-reduction order remains necessary, Plaintiffs

13    argue that the Court should delay deciding the motion to vacate until the underlying courts have

14    found that the underlying constitutional violations are cured.  This extraordinary position runs

15    contrary to Rule 60(b)(5), the Prison Litigation Reform Act, and controlling Supreme Court

16    precedent.  The Supreme Court in *Plata* directed this Court to consider modifying the population-

17    reduction order when the State shows that "significant progress [has been] made toward

18    remedying the underlying constitutional violation."  Here, the progress is remarkable, and

19    overcrowding no longer causes constitutionally inadequate care.

20

21    [1] Plaintiffs did not oppose the State's motion as required by this Court's April 25, 2008
Order, which states: "for all motions filed in these proceedings . . . [o]pposition papers, if any,
22    shall be filed and served no later than fourteen calendar days after the filing of the motion."  (ECF
Nos. 1180/2779.)  The Court gave Plaintiffs a second opportunity and additional time to oppose,
23    but directed them to "show good cause for their failure to file a response . . . ."  (ECF Nos.
2527/4317.)  Plaintiffs filed two attorney declarations with their opposition, but neither attorney
24    testified why Plaintiffs failed to file a timely opposition.  Instead, Plaintiffs assert that that they
"neglected to note . . . [the] Court['s] April 25, 2008 Order."  "[I]nadvertence, ignorance of the
25    rules, or mistakes construing the rules do not usually constitute 'excusable' neglect.'"  *Kyle v.
Campbell Soup Co.*, 28 F.3d 928, 931 (9th Cir. 1994) (quoting *Pioneer Inv. Servs. Co. v.
26    Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 392 (1993).)  While the Court can and should grant
the State's motion on the merits, it should also not permit Plaintiffs to essentially ignore the
27    Court's OSC.  (*See, e.g.,* E.D. L.R. 230(c) ["No party will be entitled to be heard in opposition to
a motion at oral arguments if opposition to the motion has not been timely filed by that party."].)

28

1

1   Plaintiffs have conducted extensive discovery, including seven site visits as of the date they

2   filed their opposition.  Accordingly, their lack of evidence speaks for itself.  The Court should

3   reject Plaintiffs' attempt to delay the inevitable conclusion of this matter, as well as their

4   improperly presented request for institution specific population caps.

5   Finally, Defendants object to and move to strike the following: (1) Exhibits B through I and

6   the accompanying paragraphs of the Declaration of Steven Fama, which are inadmissible hearsay

7   and irrelevant to any issue before this Court; (2) Plaintiffs' scurrilous attacks on the Inspector

8   General, Robert Barton, and CDCR Secretary Jeffrey Beard, which are unsupported by any

9   evidence; and (3) Plaintiffs' improper sur-reply filed on February 14, 2013 (ECF Nos.

10  2535/4338).

11  **II.    THE STATE CARRIED ITS BURDEN TO SHOW THAT CHANGED FACTUAL CIRCUMSTANCES
12          REQUIRE THE COURT TO VACATE OR MODIFY THE POPULATION-REDUCTION ORDER.**

13  The parties agree that Federal Rule of Civil Procedure 60(b)(5) is the proper vehicle for

14  terminating federal court oversight in institutional reform cases when there are no longer

15  violations of federal law that the order was intended to address.  *Brown v. Plata*, 131 S. Ct. 1910

16  (2011); *Horne v. Flores*, 557 U.S. 433 (2009).  Although Plaintiffs ignore the applicable guidance

17  in *Plata* and fail to cite *Horne* at all, they acknowledge that an injunction must be vacated when

18  significant changes render continued enforcement detrimental to the public interest.  (Pls.' Opp'n

19  16; *see also Horne*, 557 U.S. at 453; *Rufo v. Inmates of the Suffolk Cty. Jail*, 502 U.S. 367, 384

20  (1992).)

21  The Court's power to modify the population-reduction order is "long-established, broad,

22  and flexible."  *Plata*, 131 S. Ct. at 1946.  With that power comes "the continuing duty and

23  responsibility to assess the efficacy and consequences of its order."  *Id.* at 1947.  An injunction

24  must be vacated whenever "changes in the nature of the underlying problem . . . and new policy

25  insights . . . render[] continued enforcement  . . . 'detrimental to the public interest.'"  *Horne*, 557

26  U.S. at 447-48 & 453.  "[F]ederal court decrees exceed appropriate limits if they are aimed at a

27  eliminating a condition that does not violate federal law . . . ."  *Id.* at 450 (citation omitted).  Here,

28

2

1   the Supreme Court instructed this Court to consider modification of the population-reduction

2   order if significant progress renders further population reduction unnecessary or less urgent:

3       If *significant progress* is made toward remedying the underlying
    constitutional violation, *that progress may demonstrate that further*

4       *population reductions are not necessary* or are less urgent than
    previously believed.

5

6   *Plata*, 131 S. Ct. at 1947 (emphasis added).

7      The motion to vacate and accompanying evidence that the State has eliminated

8   overcrowding demonstrate that continued enforcement of the population-reduction order is unfair,

9   unnecessary, and illegal.  And Plaintiffs did not submit any admissible evidence to the contrary.

10  Because all the uncontroverted evidence shows that the State can comply with its constitutional

11  obligations absent further population reductions, the motion to vacate must be granted.

12    **A.  There Is No State of Emergency: The State's Evidence that Overcrowding
     Is No Longer an Issue Is Undisputed.**

13

14     The State's prisons house nearly 43,000 fewer inmates than in November 2006 when

15  Plaintiffs moved to convene this Court.  (Motion 7-8; Second Decl. Jeffrey Beard Supp. Defs.'

16  Motion ¶ 3.)  As of February 6, 2013, 119,107 inmates were housed in the State's 33 adult

17  institutions.  (ECF Nos. 2538/4342.)  The current population is 25,081 fewer inmates than in

18  October 2011 when public safety realignment went into effect, and 31,929 fewer inmates than

19  when the Court issued its population-reduction order in January 2010.  (Beard 2nd Decl. ¶ 3.)

20  This dramatic population reduction permitted the State to long ago eliminate the use of beds in

21  areas not designed for housing, such as in gymnasiums and dayrooms.  (Motion 10-13; Beard

22  Decl. ¶ 12 & Exs. 1-7.)

23     The factual evidence that the State has eliminated overcrowded conditions is undisputed.

24  In the opposition, Plaintiffs failed to acknowledge any population reduction.  Rather than address

25  actual prison conditions, Plaintiffs instead argue that California prisons remain "in a state of

26  emergency," citing the Governor's January 8, 2013 Proclamation terminating the Overcrowding

27  Emergency Proclamation issued by former Governor Schwarzenegger in 2006.  (Pls.' Opp'n 3.)

28  Relying solely on the date on which Governor Brown's proclamation becomes effective,

3

1    Plaintiffs argue that a state of emergency continues "to be in place" and that the proclamation

2    "establishes that the prison system is still in crisis." (*Id.* at 4.)  But these arguments ignore the

3    Governor's finding that the "circumstances that gave rise the emergency no longer exist." (Jan. 8,

4    2013 Proclamation by the Governor of the State of California, available at

5    http://gov.ca.gov/news.php?id=17886 (last viewed Feb. 19, 2013).)

6            In the Proclamation, the Governor declared that "prison crowding no longer poses safety

7    risks to prison staff or inmates, nor does it inhibit the delivery of timely and effective health care"

8    to Plaintiffs. (*Id.*)  Nationally recognized experts in correctional mental health, and findings by

9    California's independent Inspector General, confirm this to be true. (*See* Decl. D. Vorous Supp.

10   Defs.' Mot. to Terminate Ex. 1 & 2, ECF Nos. 4275-5 & 4279; Decl. R. Barton Supp. Defs.' Mot.

11   to Vacate or Modify Population Reduction Order, ECF Nos. 2507/4282.)  The Governor further

12   explained that the Legislature's approval and implementation of his administration's

13   comprehensive plan to further improve the correctional system (the Blueprint) means that CDCR

14   will no longer need to involuntarily transfer inmates to out-of-state facilities after July 2013. (*See*

15   Jan. 8, 2013 Proclamation.)  Although the Governor's Proclamation makes clear that the

16   emergency is over, the Governor allowed the 2006 Proclamation to remain temporarily in place to

17   allow the last few inmates to be transferred to out-of-state facilities, with none being housed out

18   of state after July 2016. (*Id.*; *see also* Defs.' Resp. to Jan. 22, 2013 Order, *Coleman* ECF No.

19   4320.)  Accordingly, rather than declaring a "continuing emergency" as Plaintiffs assert without

20   factual support, the Proclamation confirms that there is no current emergency but that the 2006

21   Proclamation remains in place for a few months to accomplish the return of out-of-state inmates

22   to California facilities in a gradual, measured, and responsible way.  For Plaintiffs to argue that

23   this "establishes that the prison system is still in crisis" ignores the Proclamation's plain language

24   that there is no emergency and that overcrowding no longer interferes with the State's ability to

25   provide constitutional health care for inmates.

26

27

28

**B.    The State's Evidence of a Substantial Increase in Capacity to Effectively Provide Health Care Is Undisputed.**

The State submitted extensive evidence showing its substantial investment in construction and renovation projects to increase the State's capacity to meet the inmate-patients' health-care needs. (Motion at 8-10.) The motion includes undisputed evidence about *19 completed projects* at San Quentin, Avenal, the California Medical Facility, Salinas Valley, Mule Creek, the Substance Abuse Treatment Facility at Corcoran, the California Institution for Women, Los Angeles County, and Sacramento. (*Id.*; *see also* Decl. Chris Meyer, ¶¶ 3-4, 7-9, 11-13 & 15; Exs. 1-2, 5-9, 11-13 & 15.)

Plaintiffs did not dispute this evidence with any factual information. Instead, they misrepresent the significant increases in treatment space and beds, and other improvements to the health-care system. (*See, e.g.,* Opp'n at 10:24-25 [falsely claiming that "defendants have substantially completed upgrades at only two prisons – San Quentin and Avenal"].) The argument that the State "rel[ies] heavily" on the construction of the California Health Care Facility and DeWitt Nelson Correctional Annex in Stockton is similarly false. (Pls.' Opp'n 10-11.) While these projects will further improve the State's ability to provide quality health care, the State's evidence focuses on current conditions, which demonstrate no further need for a population-reduction order.

Moreover, Plaintiffs dedicate five pages of their opposition to argue that there must be inadequacies because the State has plans to make further facility improvements. (Opp'n at 10-14.)[2] Plaintiffs make no attempt to connect the State's facility-improvement plans with a need to continue enforcement of the population-reduction order. Plaintiffs cite examples from just 7 of the 33 facilities to claim that: medication distribution facilities and treatment space are "too

---

[2] Exhibits B through I to the Fama Declaration are apparently documents produced by the Receiver in response to Mr. Fama's inquiries "regarding the status and scope of specific projects to improve medical care . . . ." (Fama Decl., ¶ 3.) Rather than evidence of deficiencies, these documents show that the State is continuing to improve its system, and the Court should not countenance Plaintiffs' use of the State's efforts at continued self-improvement against them. It is inappropriate for Plaintiffs to use documents intended to gain funding or otherwise improve the system as evidence of inadequacy. Accordingly, the State moves to strike this evidence.

5

1   small," and that treatment is not provided in a confidential setting.  (*Id.* at 13.)  Plaintiffs' hand-

2   picked examples from the State's facility improvement plans are irrelevant to the issue before the

3   Court: the current population does not prohibit the State from operating a system that provides

4   constitutionally adequate medical and mental health care to its prison inmates.[3]

5        The Court should not consider Plaintiffs' irrelevant evidence.  Even if the evidence is

6   deemed admissible, Plaintiffs make no attempt to connect the State's planned facility

7   improvements to the violation of an inmate's federal right to adequate health care, let alone the

8   entire *Plata* or *Coleman* classes.  For example, based on anecdotes from four institutions,

9   Plaintiffs argue that treatment is not being provided in a confidential setting.  No policies or

10  procedures—and certainly nothing in the Constitution—mandates that all clinical contacts occur

11  in confidential settings.  (*See* Dvoskin Comments to Obj. to Special Master's 25th Round Report,

12  *Coleman* ECF 4314-1 at 4 ("I disagree with the premise that all clinical contacts . . . must occur in

13  confidential settings."); *Plata,* 131 S. Ct. at 1964 (Alito, J. dissenting) ("this court has never

14  suggested that the failure to provide consultation rooms in prisons amounts to cruel and unusual

15  punishment").)  In addition to being irrelevant to the issue before the Court, Plaintiffs introduced

16  no evidence showing that CDCR's practices and treatment in this regard violate the Constitution

17  or show that it is deliberately indifferent to inmates' medical needs.

18       **C.    Plaintiffs Failed to Rebut the Testimony that the State Can Provide Adequate
             Medical and Mental Health Care at the Current Population Level.**

19

20       The motion to vacate included testimony that the State can and is providing adequate

21  medical and mental health care to its inmates at the current population level.  (Motion 13-14;

22  Barton Decl. ¶ 15; Beard Decl. ¶¶ 8-14.)  Plaintiffs submitted no evidence to rebut this testimony,

23  but instead attack the Inspector General, Robert Barton, and CDCR's current Secretary, Jeffrey

24  Beard, who testified on Plaintiffs' behalf at trial.  Plaintiffs' attacks are nothing more than

25  argument, and do not merit serious consideration by this Court.  To the extent the Court is going

26

27  _____

    [3] As discussed in detail in Section III, while some of Plaintiffs' arguments may be relevant
    to whether medical care is constitutional and the underlying *Plata* case should be dismissed,
    Plaintiffs argue repeatedly—and correctly—that this issue is not before the Court.

28

                                          6

1    to consider Plaintiffs' argument, the State objects to and moves to strike Plaintiffs' defective

2    objections to the Barton and Beard declarations in pages 17 & 18 of the opposition because

3    Plaintiffs present no competent evidence to rebut the factual statements in those declarations.

### 1.    Plaintiffs Failed to Rebut Dr. Beard's Testimony that Overcrowding No Longer Impacts the State's Ability to Provide Adequate Health Care.

6    Plaintiffs' unsupported attacks on Dr. Beard's testimony have no merit. Their argument

7    that the State cited no "factual basis" for Dr. Beard's opinions is frivolous. As set forth in his

8    declaration (ECF Nos. 2508/4281), Dr. Beard has more than thirty years of correctional

9    experience, is the former Director of the Pennsylvania Department of Corrections, and is a

10   psychologist who testified on Plaintiffs' behalf at trial. (Beard Decl. ¶¶ 4-7.) This Court cited his

11   testimony 39 times in its August 4, 2009 opinion, and Dr. Beard's current knowledge of the

12   State's prison-medical-care system is far superior to when he testified five years ago. (*Id.* ¶¶ 8-9.)

13   As he testified, Dr. Beard visited the majority of CDCR's institutions in the last year and

14   observed the State's medical and mental health programs. (*Id.*) It is his unrebutted opinion that

15   the State currently has adequate capacity to appropriately place inmates according to their needs.

16   (*Id.* at ¶¶ 8-14.) It cannot be disputed that this Court previously found that Dr. Beard was

17   imminently qualified to opine whether overcrowding was the primary barrier to the delivery of

18   constitutionally adequate health care. It is therefore axiomatic that he can now opine whether the

19   current population level is the primary barrier (or any barrier) to the delivery of constitutionally

20   adequate care. Thus, Plaintiffs' argument must be rejected—there is no one better situated than

21   Dr. Beard to testify that the State can provide adequate health care at current population levels.

### 2.    Plaintiffs Failed to Rebut the Inspector General's Testimony.

23   The Inspector General is the official mandated by state law to "conduct an objective,

24   *clinically appropriate, and metric-oriented medical inspection program* to periodically review

25   delivery of medical care at each state prison." (Cal. Penal Code § 6126(e) [emphasis added]; *see*

26   *also* Barton Decl. ¶ 5.) The Inspector General's medical inspection program was designed in

27   consultation with clinical experts, the Receiver, CDCR, and Plaintiffs' counsel, and is

28   implemented by both the Inspector General's staff and clinicians. (Barton Decl. ¶¶ 5-14.) Mr.

7

1   Barton's opinion that "[o]vercrowding is no longer a factor affecting the CDCR's ability to

2   provide effective medical care in its prisons" is properly before this Court and is dispositive of the

3   issue. (*Id.* at ¶ 15.) Plaintiffs failed to rebut this evidence. Their plea that the Court "disregard

4   [Mr. Barton's] testimony" because "he is a lawyer with no medical training, who has never

5   worked in a prison" (Pls.' Opp'n 17:23-27) is contrary to the evidence and Defendants request

6   that the Court strike it.[4]

### 3. Plaintiffs' Mischaracterization of the OIG's Methodology Must be Rejected.

9        Now that the average institution score for the third round of inspections is 86.3%—

10  indicating "high adherence" to medical policies—Plaintiffs incorrectly claim that the overall

11  average OIG scores "mask serious deficiencies." (Pls.' Opp'n 9:1-3; *see* Beard 2nd Decl. ¶ 6;

12  Barton Decl. ¶¶ 8 & 14.) Plaintiffs fail to acknowledge their intimate involvement in creating the

13  very audit tool that they now criticize. Indeed, "Plaintiffs' counsel provided extensive input into,

14  *and ultimately approved*, both the components and the specific questions that were included in the

15  final audit instrument." (Barton Decl. ¶ 6 [emphasis added].) Plaintiffs' claim that the audit tool

16  is somehow inaccurate now that the third round scores find high adherence to medical policies is

17  therefore specious at best.

18       More significantly, the audit tool accurately reflects the current status of each institution's

19  medical care system. As the Receiver's 22nd Report indicates, the OIG inspection program was

20  developed to "evaluate and monitor the progress of medical care delivery to patient-inmates at

21  each prison"; the OIG's "objective, clinically appropriate, and metric-oriented medical inspection

22  program" fulfills this goal. (22nd Report, ECF No. 2525, at 33.) To that end, the OIG instituted a

23  "weighting system that factors the relative importance of each component compared to other

24  components." (*Id.*) The weighting system protects against exactly that which Plaintiffs allege to

---

25       [4] In the next paragraph, Plaintiffs ironically assert that the Court should instead rely on the
Receiver's statements about the Inspector General's medical inspection methodology. Mr. Kelso
26  is also "a lawyer with no medical training, who has never worked in a prison . . . ." (Pls.' Opp'n
17:23-27.) The State (unlike Plaintiffs) rejects that this alone disqualifies Mr. Kelso from
27  testifying, but substantively addresses his newly formed opinions about overcrowding in Section
C.4 below.

28

8

Reply Brief Supp. Defs.' Mot. to Vacate or Modify Population Reduction Order
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

1   be a flaw by "ensur[ing] that more critical components—those that are of greatest significance to

2   the receipt of effective medical care—are given more weight than those that do not compromise

3   the overall quality and effectiveness of care." (*Id.*)  Plaintiffs approved this weighting system.

4   Their claim—without reference to any evidence—that it is now somehow inaccurate simply

5   because well-functioning prisons are receiving accurate scores must be rejected.  (*Id.*)

6   ### 4.    The Receiver's Recent Comments About Overcrowding in the 22nd Tri-
7   Annual Report Should Be Stricken.

8       Plaintiffs assert that statements in the Receiver's recent 22nd Report "establish[ ] that

9   crowding is an ongoing problem that impedes the delivery of health care in the prisons."  (Pls.'

10  Opp'n 8:16-17.)  On February 13, 2013, Defendants objected to the very statements that Plaintiffs

11  seek to rely on, which appeared suddenly after the State filed the motion to vacate, and despite

12  several earlier reports from the Receiver making no mention of crowding as a factor inhibiting the

13  State's ability to provide adequate medical and mental health care.  (Defs.' Obj. to the Receiver's

14  22nd Report ("Defs.' Obj. to Report"), *Plata* ECF No. 2532; *see also* Mot. 14-15.)  As

15  Defendants stated in their objections, the Receiver's statements should be stricken from the report

16  because they are unsubstantiated and misleading.  (Defs.' Obj. to Report 1:21-26.)  Further,

17  significant evidence contradicts the Receiver's statements and shows that the greatly reduced

18  prison population no longer interferes with the delivery of effective medical care.  (*Id.* at 2:19-

19  20.)  This Court subsequently ordered Plaintiffs' counsel and the Receiver to respond to

20  Defendants' objections by February 28, 2013.  (Feb. 14, 2013 Order, ECF No. 2536.)

21  Accordingly, no weight may be accorded the Receiver's statements regarding overcrowding and

22  evidence of constitutional care while Defendants' objections remain pending.

23  ### 5.    Plaintiffs' Reliance on Issues Reported by Some of the Institutions to the
24  Special Master Is Misplaced.

25      The State's efforts to further improve mental health care contradict any finding of

26  deliberate indifference.  For instance, the State candidly reports to the special master any

27  "obstacles" to providing mental health care so that they can be addressed.  (*Coleman* ECF No.

28  4331 at 5:16–11.)  Plaintiffs strain to argue that these mere obstacles constitute evidence that

9

1    more prisoners should be released.  (Pls.' Opp'n 5:16-7:7.)  But they fail to demonstrate that these

2    challenges actually prevent constitutional care, much less that they relate to any crowding that is

3    the primary cause of unconstitutional care.

4         It is true that one prison—Central California Women's Facility, which recently received an

5    influx of inmates when the State converted Valley State Prison for Women into a male facility—

6    has identified overflow conditions in its administrative segregation unit as an obstacle for the

7    Enhanced Outpatient Program population.  (*Coleman* ECF No. 4331–1 at 6.)  But Plaintiffs and

8    their experts visited this prison on February 8, 2013, and Plaintiffs submitted no evidence that it is

9    currently overcrowded—much less that any overcrowding actually causes unconstitutional care.

10   (Beard 2nd Decl. ¶ 8.)  The State's mental-health experts also concluded that "each prison they

11   visited," including the Central California Women's Facility, "met the standard of care in regards

12   to inmates' access to EOP level of care."  (*Coleman* ECF No. 4275–5 at 8 & 18.)

13        Thus, the fact that institutions candidly report obstacles to the special master, along with

14   their efforts (which are often successful) to remedy the obstacles, is not evidence of system-wide

15   deliberate indifference, much less evidence that population density somehow is impacting mental

16   health care.  Rather, it is evidence of a state correctional system constantly seeking to improve its

17   operations, the very opposite of deliberate indifference.

18   **III.    PLAINTIFFS PRESENTED NO EVIDENCE TO ADDRESS THE ISSUE THIS COURT MUST
          DECIDE: THE CONTINUED "PROPRIETY AND NECESSITY OF A POPULATION LIMIT."**

19

20        Plaintiffs argue that Defendants, by their motion to vacate the prisoner-release order, are

21   somehow seeking reconsideration of orders in the *Plata* and *Coleman* cases adjudging the

22   medical and mental health care delivery systems.  (Pls.' Opp'n 15.)  Plaintiffs thus claim that

23   Defendants' motion should be denied because it was filed in the wrong court.  (*Id.*)  Under

24   Plaintiffs' rationale, however, the State would never be permitted to modify the population-

25   reduction order, contrary to the Federal Rules of Civil Procedure and binding Supreme Court

26   precedent.

27        The Supreme Court explicitly stated that "[t]he State will be free to move the three-judge

28   court for modification on [the basis that implementation of certain remedies will end the

10

1    constitutional violations even without a significant decrease in the prison population], and these

2    motions *would be entitled to serious consideration*." *Plata*, 131 S. Ct. at 1941 (emphasis

3    added).  Further, the Supreme Court's admonition that this Court must be receptive to modifying

4    its order is consistent with its jurisprudence, which holds that federal courts overseeing

5    institutional-reform decrees must undertake an analysis whether changed circumstances warrant

6    relief.  *Horne*, 557 U.S. at 448, 450; *Rufo*, 502 U.S. at 381.

7         Moreover, Defendants do not dispute that "[t]he underlying question, whether mental health

8    and medical care have improved so that the care is no longer constitutionally deficient, belongs

9    before the single-judge courts."  (Pls.' Opp'n 15:15-16.)  That is precisely why Defendants filed

10   the *Coleman* termination motion in the *Coleman v. Brown* case and not here, before this three-

11   judge court.  (*See* Defs.' Mot. to Terminate Under the Prison Litigation Reform Act and to Vacate

12   the Court's Judgment and Orders Under Federal Rule of Civil Procedure 60(b)(5), *Coleman* ECF

13   No. 4275, filed Jan. 7, 2013.)  Plaintiffs confuse the standard applicable to Defendants' motion to

14   vacate, and conflate it with that of a motion to terminate – which is not at issue here.  Here, the

15   relevant inquiry is whether overcrowding is no longer the primary barrier to the provision of

16   constitutional care.  18 U.S.C. § 3626(a)(3)(E).  The constitutionality of the mental health and

17   medical care provided in prison will be decided by the *Coleman* and *Plata* courts respectively and

18   individually.  Defendants' motion did not seek a determination of constitutionality; rather,

19   Defendants sought to vacate or modify the population reduction order "[b]ecause prison crowding

20   has been alleviated [and] the prison population density no longer inhibits the State's ability to

21   provide adequate care."  (Defs.' Mot. to Vacate 1:27-2:1.)  That Defendants could file this very

22   motion was contemplated and approved by the Supreme Court.  *Plata*, 131 S. Ct. at

23   1941.  Accordingly, Plaintiffs' assertion that "Defendants have brought this motion in the wrong

24   court" is simply wrong.  (Pls.' Opp'n 15:3.)

25        Plaintiffs' erroneous view of the issue in the motion to vacate drives the remainder of the

26   arguments in their opposition.  Although these arguments are irrelevant to the issue presented in

27   the motion to vacate, the State addresses each of them in turn.

28

1

**A.    Deficiencies Allegedly Described in the *Coleman* Special Master's Report and Defendants' Management Reports Are Not Before This Court.**

2

3      The State has presented compelling evidence that the constitutional deficiencies found by

4   the *Coleman* Court in 1995 have been remedied, and has moved to terminate that case.  (Defs.'

5   Mot. to Terminate, *Coleman* ECF No. 4275.)  The parties agree that any alleged ongoing

6   constitutional deficiencies are not before this Court.  Nonetheless, Plaintiffs cite the special

7   master's twenty-fifth round report for examples of alleged "systemic deficiencies that [they

8   claim] continue to plague defendants' mental health care delivery system."  (Pls.' Opp'n 4:16–

9   9:15.)  But the special master's report in no way establishes that the State's system is deliberately

10  indifferent to the serious mental health needs of class members.  Indeed, the special master's

11  monitoring report confirms that he no longer (if ever) assesses whether the State's prison mental

12  health care system satisfies constitutional standards.  (*See, e.g.,* Special Master's 24th Monitoring

13  Rep., *Coleman* ECF 4205, at 18-19.)

14     The Constitution requires only that the State's prison system not be deliberately indifferent

15  to the serious mental health needs of inmates.  California's prison system far exceeds that

16  standard.  (*See* Defs.' Mot. To Terminate.)  Yet the special master's report fails to convey this

17  crucial information because he has not attempted to assess the system against this standard, and

18  neither do Plaintiffs.  (*See, e.g.,* Special Master's 24th Monitoring Rep., *Coleman* ECF 4205 at

19  18-19.)  Likewise, Plaintiffs' reference to excerpts from ten prisons' management reports, which

20  were prepared for the special master in advance of his twenty-fifth round site visits and on which

21  his  report rely, fails for the same reason—they do not assess whether the State's prison mental

22  health care system satisfies constitutional standards.  (*See* Pls.' Opp'n 5:16–7:7.)

23      Plaintiffs' first example of an alleged deficiency is that "Defendants do not have a system

24  to provide seriously ill class members timely access to appropriate mental health placement and

25  treatment, as there remain lengthy delays in transferring class members to appropriate placements

26  and continued use of dangerous and inappropriate 'bad beds' during those transfer delays."  (Pls.'

27  Opp'n 4:19–23.)  Plaintiffs use the term, "bad beds," without any framework whatsoever to

28  sustain their unfounded assertions.  (*Id*.)  At page 33 of his twenty-fifth round report, the special

12

1  master reports that tracking of referrals remains "problematic," but provides no evidence of

2  impact or harm to the *Coleman* class.  (*Coleman* ECF No. 4298 ["25th Report"] at 33.)  Indeed,

3  the special master reports that "considerable progress . . . has been made with nearly eliminating

4  the wait lists."  (*Id.*)  Plaintiffs reference two places in the special master's report where he

5  focuses on CDCR's failure to comply with Program Guide timeframes prescribed for transfers to

6  other custodial settings such as special-needs yards and administrative segregation units designed

7  for housing inmates receiving outpatient program care.  (Pls.' Opp'n 5:14–15 (citing 25th Report

8  44–45, 79).)  But the special master offers no evidence to support a conclusion that the failure to

9  comply with timelines impacted the quality of or access to necessary mental health care system

10  wide.  (*See* 25th Report at 44-45, 79.)  And finding that three select institutions failed to meet

11  Program Guide referral timelines 100% of the time does not establish systemic deliberate

12  indifference.  (*Id*, (citing 25th Report 125, 169, 346).)

13      Second, Plaintiffs lack a basis for their assertion that "Defendants do not have anywhere

14  near the number of clinical staff necessary to provide an adequate level of mental health treatment

15  across the system."  (Pls.' Opp'n 4:24–27 (citing 25th Report at 44–45).)  The special master

16  reports high vacancy rates among mental health clinical staff, but again offers no evidence that

17  these vacancies adversely impact the quality of or access to mental health care.  (*See* 25th

18  Report.)  In addition, there is—and can be—no showing that the Constitution requires a particular

19  staffing rate.  Rather, if treatment is appropriate and effective—as it is in California prisons (*see*

20  Termination Motion & Supporting Evidence)—that is sufficient to meet constitutional

21  requirements, no matter the number of clinicians providing it.

22      Third, Plaintiffs also lack support for their assertion that "Defendants continue to lack

23  sufficient office and treatment space to deliver minimally adequate mental health treatment."

24  (Pls.' Opp'n 5:4–5 (citing 25th Report 36–37).)  To be sure, the special master reports "continued

25  space shortages" at California Men's Colony, Mule Creek State Prison, Salinas Valley State

26  Prison, and Valley State Prison for Women.  (25th Report at 36–37.)  But what is missing from

27  this report and Plaintiffs' argument is any evidence that the "shortage," assuming it exists, affects

28  the State's system-wide ability to deliver minimally adequate mental health treatment.  Indeed,

13

1  California's mental health care system "meets and often exceeds the standard of care for prisons

2  in the United States." (*Coleman* ECF Nos. 4275–1 at 5, 8 & 18; 4326–6 at 5–6.)

3       Plaintiffs' fourth example of an alleged deficiency is that "Defendants uniformly deny

4  access to inpatient care to certain populations of seriously mentally ill prisoners who require

5  psychiatric hospitalization." (Pls.' Opp'n 5:2–3, citing 25th Report at 33 & 134.) Plaintiffs'

6  argument is contrary to the evidence. The State has in place a self-monitoring process to confirm

7  that class members needing inpatient care are timely identified, referred, and transferred. (Defs.'

8  July 10, 2012 Report on Access to Inpatient Care, *Coleman* ECF No. 4208, at 9–10.) And by

9  July 2012, the State had successfully guaranteed timely access to inpatient mental health care for

10  all class members needing hospitalization. (*See* July 10, 2012 Order, *Coleman* ECF No. 4214.)[5]

11       Finally, Plaintiffs argue that Defendants house too many mentally ill inmates in

12  segregation, fail to provide minimally adequate treatment to those inmates, and lack appropriate

13  disciplinary procedures.[6] (Pls.' Opp'n 5:9–12.) Plaintiffs' argument that there are "too many"

14  inmates in segregation does not establish systemic deliberate indifference. For instance, the

15  special master recommends that prisons continue to track and follow up on inmates with "overly

16  long stays," but does not conclude that Defendants "still house far too many mentally ill prisoners

17  in segregation." (*Id.* (citing 25th Report 36).) Plaintiffs make two arguments regarding

18  treatment: (1) clinical contacts do not always occur in a confidential setting, and (2) inmates in

19  segregation do not receive ten hours per week of structured therapeutic activity. (Pls.' Opp'n 5-7

20  & 20-21.) As discussed above, there is no constitutional guarantee that all clinical contacts will

21  occur in private. *See Plata,* 131 S. Ct. at 1964 (Alito, J. dissenting). Similarly, although ten

22      [5] Plaintiffs also cite to two pages in the special master's report regarding the condemned-

23  inmate population at San Quentin State Prison (*see* Pls.' Opp'n 5:15 (citing 25th Report 177–78)),

24  but misleadingly fail to discuss the agreed-upon development of a program, including dedicated

  housing, for the condemned care program. (25th Report 184–86.) Therefore, San Quentin's

  mental health treatment program meets the serious mental health care needs of its inmates, and

25  the State is not acting with deliberate indifferent to their serious mental health needs. *Estelle v.*

  *Gamble,* 429 U.S. 97, 104 (1976).

26      [6] The only support Plaintiffs offer for this last claim is a single example in the special

27  master's report concerning a hearing officer's failure to correctly follow procedures for

  processing rules-violation reports. (Pls.' Opp'n 5:14–15 (citing 25th Report 140)). One officer's

28    failure to follow policy does not establish system-wide deliberate indifference.

14

Reply Brief Supp. Defs.' Mot. to Vacate or Modify Population Reduction Order
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

1  hours per week of structured therapeutic activity may be clinically optimal, providing such

2  treatment is not a constitutional mandate.  (*See* Dvoskin Comments Regarding 25th Report,

3  *Coleman* ECF No. 4314–1, at 4.)  And contrary to Plaintiffs' assertion, the State has developed

4  and implemented statewide procedures when placing and retaining inmates with mental health

5  needs in an administrative segregation or security housing unit.  (*See* Defs.' Mot. to Terminate,

6  ECF No. 4275–1 at 23:19–25.)

7      **B.    Plaintiffs Mislead the Court About California's Inmate Mortality and Suicide
          Rates.**

8

9      **1. The State's Inmates Are Not Dying from Inadequate Medical Care.**

10        Plaintiffs continue to assert that "prisoners are dying from inadequate medical and mental

11  health care." (Pls.' Opp'n, 7:9.)  This would be alarming were it true.  To support this statement,

12  Plaintiffs refer to the Receiver's 2011 Death Review, which states that "in 2011, there were 43

13  total preventable deaths (*2 likely and 41 possibly preventable*)."  ("Analysis of 2011 Inmate Death

14  Reviews in the California Prison Healthcare System," May 12, 2012, at 19 [emphasis added]

15  [attached as Ex. 8 to Beard Decl. & Ex. A to Fama Decl.].)  Plaintiffs omit the emphasized

16  portion of the sentence.  Plaintiffs' careful selection and omission of critical language from the

17  death report is misleading, particularly because the next sentence in the report states that "[t]his

18  represents a *reduction* in the rate of all preventable deaths [per] 100,000 inmates, which *continues*

19  *a trend* that began in 2009."  (*Id.* at 19-20 (emphasis added).)  Significantly, the rate of likely

20  preventable deaths per 100,000 inmates in California has decreased from 39.6 in 2006 to a six-

21  year low of 26.6 in 2011.  (*Id.* at 19.)

22        In evaluating and understanding the findings of the death review, it is imperative to

23  understand the distinction between "possibly preventable" and "likely preventable"

24  deaths.  "Possibly preventable" deaths are those that "might" have been prevented or delayed by

25  better medical management or improvement in the system of care, while "likely preventable"

26  deaths are those that "likely or definitely" would have been prevented or significantly delayed by

27  better medical management or improvement in care.  (*Id.* at 2-3.)  Thus, "possibly preventable"

28  deaths, in the "judgment of the reviewer," may or may not have been preventable.  (*Id.* at

15

1    2.)  Further, the report indicates that 1 of the 2 likely preventable deaths was caused by lapses in

2    care provided by non-CDCR specialists or hospital systems.  (*Id.* at 16.)  Similarly, 10 of the 41

3    possibly preventable deaths were caused by lapses by outside providers.  (*Id.*)  These lapses

4    cannot be attributed to CDCR clinicians or systems.

5         Plaintiffs ignore the report's emphasis that described "improvements in several

6    areas."  (*Id.* at 1.)  Significantly, the report notes "[f]or the third consecutive year, asthma caused

7    no preventable deaths.  This continues a significant trend, since in 2006, the first year of the

8    Receivership, asthma caused six preventable deaths."  (*Id.* at 14-15 (emphasis in original).)  The

9    report further states that all inmates are now assigned to primary care teams, which are "held to a

10   high standard of practice – responsible for timely access, efficient and appropriate care, and for

11   using evidence based guidelines in the management of chronic diseases."  (*Id.* at 17-18.)  And

12   finally, as indicated above, the rate of likely preventable deaths has experienced a six-year

13   downward trend, from 39.6 per 100,000 inmates in 2006 to 26.6 in 2011.  (*Id.* at 19.)

14        Additionally, contrary to Plaintiffs' assertion that prisoners are dying from purportedly

15   inadequate care, California's inmate mortality rate is below that of 18 other states.  (Noonan,

16   Margaret, "Mortality in Local Jails and State Prisons, 2000-2010 – Statistical Tables," December

17   2012, U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics ("BJS

18   Mortality Report"), Table 20, available at http://bjs.ojp.usdoj.gov/content/pub/pdf

19   /mljsp0010st.pdf.)   Contrary to Plaintiffs' arguments, California is not violating the Constitution.

20                    **2. The State's Suicide-Prevention Measures Are Appropriate.**

21        Plaintiffs argue that "Defendants have failed to implement the basic elements of suicide

22   prevention and medical emergency response protocols, resulting in an unacceptably high number

23   of foreseeable and preventable deaths by suicide."  (Pls.' Opp'n at 5:6–8.)  Plaintiffs further state

24   that the rate of suicides in CDCR prisons "significantly exceed[s]" the national average.  (Pls.'

25   Opp'n, 7:26.)  But the special master's focus on the number of suicides and CDCR's alleged

26   failures to fully implement their suicide prevention measures, do not establish deliberate

27   indifference.   (25th Report at 17, 24 & 25.)  Nor does his twenty-fifth-round report draw the

28   conclusion that the alleged failures have resulted in an unacceptably high number of foreseeable

16

1   and preventable deaths by suicide.  (*Id.*)  And suicide totals, by themselves, say nothing about

2   whether the prison system is deliberately indifferent to preventing suicides.  Indeed, the Eighth

3   Amendment does not mandate that prisons eliminate all suicide risks.  *See, e.g., Miller v.*

4   *Harbaugh,* 698 F.3d 956, 962–65 (7th Cir. 2012).  To ensure appropriate response, prisons must

5   establish a "basic program for the identification, treatment, and supervision of inmates with

6   suicidal tendencies" as a "necessary component of any mental health treatment program."  *Balla*

7   *v. Idaho State Bd. of Corr.,* 595 F. Supp. 1558, 1577 (D. Idaho 1984).

8        The State has done just that—it has fully implemented and staffed a thorough,

9   standardized program to identify, treat, and supervise inmates at risk for suicide.  (*See* Defs.' Obj.

10   & Mot. Strike or Modify Portions of Report on Suicides Occurring in CDCR in 2011, *Coleman*

11   ECF No. 4326 & Termination Motion at 22:23–23:10.)  The State devotes "extraordinary

12   resources to clinical and operational investigations of completed suicides as well as prospective

13   efforts to prevent such acts in the future."  (*Coleman* Expert Report, ECF No. 4275–5, at 4.)

14   Thus, "there is no reason to even allege deliberate indifference to this important problem."

15   (Dvoskin Comments Regarding 25th Report, *Coleman* ECF No. 4314–1, at 3.)

16        In Defendants' objections and motion to strike or modify portions of the special master's

17   twenty-fifth monitoring report and supporting evidence, Defendants show why comparing suicide

18   rates to the national average among other U.S. state prisons is speculative, misleading, lacks

19   foundation, and is irrelevant to the governing legal standard.  (Defs.' Obj. to 25th Report, ECF

20   No. 4314, at 4-9.)  In addition, there is no evidence to support a presumption that California's

21   allegedly higher rate is "the result of inadequate or poor mental health services."  (Dvoskin Resp.

22   to Suicide Report, *Coleman* ECF No. 4326–6, at 5.)  Moreover, the special master's report

23   confirms that the State has created an extensive program, and indeed has fully implemented the

24   suicide prevention plan developed by the special master and the State in 2010.  (25th Report 17–

25   24; *see also* Obj. to 25th Report 10:7-11:21.)

26        Further, and tellingly, California's average prison suicide rate of 20 from 2001 through

27   2010 is lower than or equal to that of 20 other states.  (*Id.* at 7:6-8, quoting BJS Mortality

28   Report.)  Twenty-five other states have prison suicide rates higher than the national average.  (*Id.*

17

1    at 10-11.)  And California's suicide rate is also less than half that of the national suicide rate in

2    jails.  (*Id.* at 7:16-17.)

3    When viewed in the full context of all of the evidence, Plaintiffs' misleading statements

4    regarding California's suicide and general mortality rates must be accorded no consideration.

5    IV.    THERE IS NO REASON TO DELAY GRANTING THE MOTION.

6    Under the PLRA, court-ordered relief "shall extend no further than necessary to correct

7    the violation of a Federal right of a particular plaintiff or plaintiffs."  18 U.S.C. § 3626(a)(1)(A).

8    Indeed, the Supreme Court held in this case that "[a] court that invokes equity's power to remedy

9    a constitutional violation by an injunction mandating systemic changes to an institution has the

10    continuing duty and responsibility to assess the efficacy and consequences of its order."  *Plata*,

11    131 S. Ct. at 1945.  Accordingly, "the three-judge court must remain open to a showing or

12    demonstration by either party that the injunction should be altered to ensure that the rights and

13    interests of the parties are given all due and necessary protection."  *Id.* (emphasis added).  The

14    State has provided compelling evidence that California's current prison population does not

15    prevent it from providing constitutionally adequate health and mental health care, and any further

16    ordered prison population reductions would be improper, unnecessary, and unsafe.  (*See* Defs.'

17    Mot. to Vacate.)

18    Plaintiffs had sufficient time to oppose the motion, including a three-week extension after

19    they initially failed to respond.  And Plaintiffs conducted extensive discovery, including seven

20    site visits in *Coleman* as of February 12, 2013.  (Beard 2nd Decl. ¶ 8.)  Despite this opportunity,

21    Plaintiffs offer no evidence to support continued enforcement of the population-reduction order.

22    Granting Plaintiffs additional time to conduct additional discovery would be futile since Plaintiffs

23    have not and cannot prove a condition—overcrowding that is the primary cause of systemic

24    violations of inmates' rights to receive adequate health care—that does not exist.

25    Plaintiffs' allegations that Defendants "secretly" prepared for and filed their motions here

26    and in *Coleman* barely merit a response, and certainly do not support their request for more time.

27    The State is unaware of any authority requiring a party to disclose its litigation strategy to the

28    other party in advance of presenting it to the Court.  Nevertheless, Plaintiffs' arguments regarding

18

1  the timing of the termination motion in *Coleman* are not before this Court.  Regarding the motion

2  to vacate, the State's intention to move to modify the population-reduction order has long been

3  out in the open.  (*See, e.g.,* ECF Nos. 2442/4191 [Defs.' May 23, 2012 Opp'n]; 2447/4203 [Defs.'

4  June 22, 2012 Resp. to June 7, 2012 Order]; 2463/4226 [Defs.' Aug. 17, 2012 Resp. to Aug. 3,

5  2012 Order].)  On November 15, 2012, the State informed the Court that the in-state prison

6  population would not be reduced to 147% of design bed capacity by the December 27, 2012

7  benchmark, and moved to extend the final benchmark for six months to December 27, 2013.

8  (ECF Nos. 2494/4259.)  On December 6, 2012, the Court denied that motion as "premature."

9  (ECF Nos. 2499/4269.)  On January 7, 2013, the date the State was required to report on

10  compliance with the December 2012 benchmark, the State necessarily and appropriately

11  presented its evidence demonstrating that continued enforcement of the population-reduction

12  order is unnecessary.

13       For the reasons discussed in this reply and the State's February 12, 2013 response to the

14  Court's January 29, 2013 order (ECF Nos. 2529/4332 at 4-5), the Court must promptly decide the

15  motion to vacate.  Defendants object to and move to strike Plaintiffs' untimely sur-reply, filed on

16  February 14, 2013 and styled as an "Opposition to Defendants' Motion to Lift the Stay."  (ECF

17  Nos. 2535/4338.)  Plaintiffs were aware of the Court's decision to stay consideration of the

18  motion to vacate when they filed their opposition, and should have addressed the issue in their

19  opposition rather than in an untimely sur-reply filed without leave of court.  To the extent the

20  Court considers it, all of the reasons why the Court must promptly decide the motion to vacate are

21  addressed here and in the January 29 objections.

22  **V.    PLAINTIFFS' PROPOSAL FOR INSTITUTION-SPECIFIC POPULATION CAPS IGNORES
          BINDING SUPREME COURT PRECEDENT AND ATTEMPTS TO CIRCUMVENT THE PRISON
23        LITIGATION REFORM ACT.**

24       Plaintiffs move for an order requiring each California prison facility to abide by a 137.5%

25  design bed capacity limit.  (Pls.' Opp'n at 22-24.)  The United States Supreme Court in this case

26  has already unambiguously rejected institution-specific caps.  *Plata*, 131 S. Ct. at 1941.  The

27  Supreme Court stated unequivocally that prison officials need to be afforded discretion in meeting

28

19

1  the requirements of the population-reduction order.  Stated simply, "[t]here is no requirement that

2  every facility comply with the 137.5% limit." *Id.*

3  Even if the Supreme Court had not addressed the issue head on, Plaintiffs' request fails

4  because it ignores the PLRA's prisoner-release requirements, which restrict courts' powers to

5  issue orders to alleviate overcrowding.[7]  18 U.S.C. § 3626(a)(3).  In ordering a statewide

6  reduction in the prison population, the Three-Judge Court followed the PLRA's specific strictures,

7  which require a finding by clear and convincing evidence that "crowding [was] the primary cause

8  of the violation of a Federal right" and "no other relief will remedy the violation" of that right.  *Id.*

9  at § 3626(a)(3)(E)(i)-(ii).  Only after finding that a previously entered order for less-intrusive

10  relief has failed can a court enter a subsequent inmate release order to remedy the identical

11  deprivation.  *Id.* at § 3626(a)(3)(A).  Plaintiffs' request for institution-specific population caps is

12  an improper attempt to circumvent both the Supreme Court's holding in this case and the PLRA's

13  strict and exacting requirements, and must be denied.

14  **VI.    THE STATE DID NOT IDENTIFY ANY MEASURES THAT WOULD REDUCE THE
          POPULATION TO 137.5% OF DESIGN BED CAPACITY WITHOUT JEOPARDIZING PUBLIC
15        SAFETY.**

16  On January 7, 2013, the State submitted further population-reduction measures to comply

17  with the Court's directive, but made clear that none of those measures should be implemented,

18  nor could the State implement them absent the Court's waiver and rewriting of numerous State

19  laws, including provisions of California's Constitution.  (Defs.' Resp. to Oct. 11, 2012 Order,

20  ECF Nos. 2511/4284.)  The State advised the Court that further population reductions are

21  "unnecessary because the underlying constitutional deficiencies in prison medical and mental

22  health care have been remedied." (*Id.* at 1:9-10; *see also* Motion to Vacate Population Reduction

23  Order & *Coleman* Termination Motion, ECF Nos. 2506-08 & 2510/4275-82.)  In addition to

24  being unnecessary, "further reductions are unwise, would jeopardize public safety, [] would run

25  afoul of numerous laws . . . [and] are not consistent with sound penological or democratic

26  _____
    [7] In addition, Plaintiffs offer no evidence that a facility-population-reduction order is
27  constitutionally required, or that 137.5% would be an appropriate cap for any facility.  Instead,
    they demand that Defendants be subjected to burdensome discovery for Plaintiffs to investigate
    this concept.

28

20

Reply Brief Supp. Defs.' Mot. to Vacate or Modify Population Reduction Order
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

principles." (Defs.' Resp. to Oct. 11, 2012 Order at 2.) Based on the evidence, the State advised the Court that, "rather than force further population reductions, the Court should vacate the population cap and end this three-judge court proceeding." (*Id.* at 23.)

Plaintiffs misstate Defendants' response to the Court's October 11, 2012 order. Concerning expansion of credits for violent, serious, and second-strike inmates, Defendants informed the Court that it would need to rewrite California Penal Code sections 667(c)(5), 2933.05(a), and 2933.1, and waive section 2933.05(e) to effect these changes. (*Id.* at 10-11.) Defendants further informed the Court that, were it to order changes in sentencing laws to so that additional felonies were punishable by county jail incarceration, it would need to rewrite California Penal Code sections 458 *et seq.*, 473, 484 *et seq.*, 1170(a), 1170(h)(3), 1216, & 2901; Health & Safety Code sections 11350(a) & 11377(a); and Vehicle Code section 10851. (*Id.* at 11-13.) Similarly, expanding alternatives to state prison—including expanding fire-camp eligibility and alternative-custody programs—would require this Court to rewrite California Penal Code sections 6228, 6263, and 1170.05; sections 20160 *et seq.* of the Public Contracting Code; and title 15, sections 3080, 3081 3375.2 of the California Code of Regulations. (*Id.* at 13-14.) To slow the return of inmates housed in other states to California, the Court would need to disrupt democratic principles and waive Article VII of the California Constitution as well as numerous state laws. (*Id.* at 14-15.)

Moreover, all admissible evidence before this Court shows that early releases cannot be done without jeopardizing public safety. (Defs.' Resp. to Oct. 11, 2012 Order, ECF Nos. 2511/4284; Defs.' Resp. to Jan. 29, 2013 Order, ECF Nos. 2529/4332, at 6; Beard 2nd Decl., ¶ 7; Sept. 17, 2012 Decl. Martin Hoshino, ECF Nos. 2479/4244, ¶ 6.) Under realignment, inmates who committed non-serious, non-violent, or non-sexual offenses have been diverted to local custody or supervision. (Beard 2nd Decl. ¶ 7.) These inmates would have been the most likely candidates for early release or the measures contemplated by Plaintiffs, rather than the serious, violent, and sexual offenders that remain in the State's institutions. (*Id.*) Plaintiffs' argument that this undisputed testimony is contrary to the testimony Secretary Beard gave in 2008 (*see* Opp'n 24:4-25:10) ignores the reality that there are 43,000 fewer inmates in California's prisons than

21

1  were there at the time he gave his prior testimony.  (Beard Second Decl. ¶ 7.)  Plaintiffs submitted

2  no evidence showing otherwise.

3  **VII.  CONCLUSION.**

4          The evidence of changed factual circumstances demonstrating that the State can provide

5  adequate care at current population levels is undisputed.  Since continued enforcement of the

6  population-reduction order would address a condition—overcrowding—that no longer exists, this

7  Court must grant the State's motion, and immediately end prospective enforcement of the

8  following orders: (1) August 4, 2009 Opinion and Order (ECF Nos. 2197/3641); (2) January 12,

9  2010 Order to Reduce Prison Population (ECF Nos. 2287/3767); (3) June 30, 2011 Order

10  Requiring Interim Reports (ECF Nos. 2375/4032); and (4) October 11, 2012 Order to Develop

11  Plans (ECF Nos. 2485/4251).

12  Dated:  February 19, 2013                    HANSON BRIDGETT LLP

13

14                                              By:  */s/ Paul B. Mello*
                                                     PAUL B. MELLO
15                                                   *Attorneys for Defendants*

16  Dated:  February 19, 2013                    KAMALA D. HARRIS
                                                  Attorney General of California
17

18                                              By:  */s/ Patrick R. McKinney*
                                                     PATRICK R. MCKINNEY
19                                                   Deputy Attorney General
                                                     *Attorneys for Defendants*
20

21  SF2007200670
    20672919.docx

22

23

24

25

26

27

28

Reply Brief Supp. Defs.' Mot. to Vacate or Modify Population Reduction Order
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH