1  KAMALA D. HARRIS
   Attorney General of California
2  JONATHAN L. WOLFF
   Senior Assistant Attorney General
3  JAY C. RUSSELL
   Supervising Deputy Attorney General
4  DEBBIE J. VOROUS, State Bar No. 166884
   PATRICK R. MCKINNEY, State Bar No. 215228
5  WILLIAM H. DOWNER, State Bar No. 257644
   Deputy Attorney General
6    1300 I Street, Suite 125
     P.O. Box 944255
7    Sacramento, CA 94244-2550
     Telephone:  (916) 324-5345
8    Fax:  (916) 324-5205
     E-mail:  Debbie.Vorous@doj.ca.gov
9  *Attorneys for Defendants*

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12                    SACRAMENTO DIVISION

13

14 | | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 LKK JFM PC |
| Plaintiffs, | **AMENDED DEFENDANTS'** |
| | **OBJECTIONS AND MOTION TO** |
| **v.** | **STRIKE OR MODIFY PORTIONS OF** |
| | **THE TWENTY-FIFTH ROUND** |
| | **MONITORING REPORT OF THE** |
| **EDMUND G. BROWN JR., et al.,** | **SPECIAL MASTER (Fed. R. Civ. P. 53)** |
| Defendants. | Judge:      The Honorable Lawrence K. Karlton |
| | Action Filed:  1990 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................... 1

PROCEDURAL DISCUSSION ................................................................................. 2

OBJECTIONS............................................................................................................. 3

    I.    OVERALL OBJECTIONS. ............................................................. 3

        A.    Objections to Report's Statements Concerning Suicide Prevention. .......... 3

            1.    The Court Must Strike the Report's Language Challenging Suicides Rates in CDCR Prisons, Portraying Suicide Rates as Substantially Greater Than the Average Among U.S. State Prisons, and Criticizing the State's Implementation of the 2010 Suicide Prevention Plan. ................................................... 4

            2.    The Court Should Strike Language in the Report that Asserts Increased Suicides in Segregated Housing...................... 12

            3.    The Court Should Strike the Language Relating to Program Guide Requirements for Monthly SPRFIT Meetings. .................. 13

        B.    Other Overall Objections and Requests to Strike or Modify the Report. ................................................................................................ 14

    II.    INSTITUTIONAL OBJECTIONS. ................................................... 24

        A.    Correctional Rehabilitation Center ............................................. 25

        B.    California Correctional Institution ............................................... 26

        C.    Central California Women's Facility .......................................... 27

        D.    California Men's Colony .............................................................. 27

        E.    San Quentin State Prison............................................................. 27

        F.    Calipatria State Prison................................................................. 28

        G.    Centinela State Prison ................................................................. 28

        H.    Kern Valley State Prison ............................................................. 29

        I.    Mule Creek State Prison ............................................................. 29

        J.    North Kern State Prison ............................................................... 30

        K.    Substance Abuse and Treatment Facility and State Prison at Corcoran, California....................................................................... 30

CONCLUSION .......................................................................................................... 31

i

1

# TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

*Balla v. Idaho State Bd. of Corr.*
   595 F. Supp. 1558 (D. Idaho 1984)....................................................... 3, 4, 8

5

6

*Coleman v. Wilson*
   912 F. Supp. 1282 (E.D. Cal. Sep. 13, 1995)........................................ 26

7

8

*Estelle v. Gamble*
   429 U.S. 97 (1976)................................................................................ 27

9

*Miller v. Harbaugh*
   698 F.3d 956 (7th Cir. 2012)................................................................ 3, 4

10

11

*Plata v. Brown*
   131 S. Ct. 1910 (2011)......................................................................... 17, 18

12

13

STATUTES

14

California Code of Regulations, Title 15, § 3343(h) (2012)....................... 22

15

CONSTITUTIONAL PROVISIONS

16

U.S. Cont. amend. VIII ............................................................................. 3, 4

17

COURT RULES

18

Federal Rule of Civil Procedure § 53(f)...................................................... 3

19

OTHER AUTHORITIES

20

*Suicide and Homicide in State Prisons and Local Jails,* U.S. Department of Justice,
   Bureau of Justice Statistics, August 2005 ............................................. 9

21

22

23

24

25

26

27

28

# INTRODUCTION

The special master's twenty-fifth monitoring report confirms that he has lost sight of his primary obligation, which is to assess whether the State's prison mental health care system satisfies constitutional standards. The Constitution simply requires that the State's prison system is not deliberately indifferent to the serious mental health needs of inmates. California's prison system far exceeds that standard. Yet the special master's report fails to convey this crucial information because he has not even attempted to assess the system against this standard.

The special master instead focuses on whether the State achieves a near-perfect level compliance with an exhaustive and detailed set of internal policies covering every aspect of the mental health care system. When the State fails to achieve perfection, he labels the State as "noncompliant" and deems the issue "problematic." These vague terms misleadingly suggest serious problems where none exist. The special master does not examine whether a policy area with less-than-perfect compliance is actually having any harmful effect on inmate mental health care. Thus, his report is of limited use because the shortcomings he perceives are disconnected to any real world impact. Given the quality mental health care system that now exists, his misleading and overstated "findings"—untethered to the minimum levels of care required by the Constitution—are no longer tolerable.

Over the past seventeen years, the special mastership has issued twenty-four reports, yet not one has assessed the mental-health care system against the minimally adequate level of care required by the Constitution. The special master's most recent 609 page-report is no different. (ECF No. 4298.) This report, like all previous ones, details the special master's monitoring of "all aspects" of the State's compliance with its own mental health policies and procedures and perceived deficiencies in relation to a court-ordered program guide, no matter how trivial they may be. (*Id.*) Indeed, monitoring continues even after the institutions are found to have complied with the State's internal procedures. (*Id.*) But this monitoring and assessment of an ever-expanding list of compliance criteria and minutia has no relationship to the standard of care for prisons in the United States, much less to the real world impact that the care is having on the

1  treatment of inmates with serious mental disorders.  (*See* Dvoskin Comments Regarding 25th

2  Round Monitoring Report of the Special Master in *Coleman v. Brown* (Dvoskin Comments).)

3      This class action was filed over two decades ago to remedy deficiencies in the State's

4  prison mental-health care system.  In 1995, the Court found that the State was deliberately failing

5  to deliver adequate care to mentally ill inmates, and appointed a special master to guide the State

6  toward meeting its constitutional obligations.  This case has thus been in a remedial, monitoring

7  phase for the last seventeen years.  During that time, California dedicated substantial resources to

8  remedy the constitutional deficiencies, and transformed its prison mental-health care system into

9  one of the best in the nation.  The State has now presented compelling evidence that those

10 deficiencies have been remedied, and has moved to terminate this case.  (Defendants' Motion to

11 Terminate, ECF No. 4275.)

12      Although the special master's Twenty-Fifth Round Monitoring Report is replete with

13 overblown allegations that the State sometimes fails to follow the letter of each of its own internal

14 policies and procedures, it in no way establishes that the State's system is deliberately indifferent

15 to the serious mental health needs of class members.  The State, therefore, objects to this report

16 because it is misleading, lacks foundation, and irrelevant to the critical issue at hand.  The State's

17 termination motion and supporting evidence establish that the constitutional violations found by

18 this Court more than seventeen years ago have been resolved.  It is time for the continued

19 intrusive and costly oversight of California's prison mental-health system to end.

20

21                         **PROCEDURAL DISCUSSION**

22      On December 28, 2012, the special master circulated to the parties a draft of his Twenty-

23 Fifth Round Monitoring Report.  (*See* Order, ECF No. 4297.)  Previously, the State has had thirty

24 days to provide the special master with informal comments and objections.  (1995 Order of

25 Reference, Docket No. 61.)  On January 17, 2013, the Court eliminated this interim step and

26 ordered the special master to "forthwith" file his report, further ordering the parties to file

27

28

2

1    objections to the report on or before thirty days from December 28, 2012.  (ECF No. 4297 ¶¶ 1–2.)

2    The special master filed his report on January 18, 2013.  (ECF 4298.)

3    　　　Defendants now object and move to strike or modify the special master's report under

4    Federal Rule of Civil Procedure 53(f) because it is speculative, inaccurate, misleading, lacks

5    foundation, and fails to assess the State's mental-health delivery system against the minimally

6    adequate level of care required by the Constitution.  Because the Court has eliminated the

7    opportunity for the special master to consider the parties' comments and objections before it is

8    filed, and reduces the twenty-one day time period to file objections or a motion to strike or

9    modify the 609-page report under Federal Rule of Civil Procedure 53(f) to six business days,

10   Defendants reserve their right to raise additional objections to the report they may have

11   inadvertently missed in the compressed time frame.

12

13   　　　　　　　　　　　　　　　　　**OBJECTIONS**

14

15   **I.    OVERALL OBJECTIONS.**

16   　　　**A.    Objections to Report's Statements Concerning Suicide Prevention.**

17   　　　The Eighth Amendment does not mandate that prisons eliminate all suicide risks.  *See, e.g.,*

18   *Miller v. Harbaugh,* 698 F.3d 956, 962–65 (7th Cir. 2012).  To ensure appropriate response,

19   prisons must establish a "basic program for the identification, treatment, and supervision of

20   inmates with suicidal tendencies" as a "necessary component of any mental health treatment

21   program." *Balla v. Idaho State Bd. of Corr.*, 595 F. Supp. 1558, 1577 (D. Idaho 1984).  The

22   State has just done that—it has fully implemented and staffed a thorough, standardized program

23   for the identification, treatment, and supervision of inmates at risk for suicide.  (ECF No. 4275–1

24   at 22:23–23:10.)  The State devotes "extraordinary resources to clinical and operational

25   investigations of completed suicides as well as prospective efforts to prevent such acts in the

26   future." (ECF No. 4275–5 at 4.)  Thus, "there is no reason to even allege deliberate indifference

27   to this important problem."  (Dvoskin Comments at 3.)

28

　　　　　　　　　　　　　　　　　　　3

1    Rather than recognize the robust suicide prevention program that CDCR has established,

2    the special master mistakenly focuses on the number of suicides.  As is explained below, for

3    purposes of assessing whether constitutional compliance, the appropriate focus is not on the

4    number of suicides, but on the adequacy of the suicide-prevention program.

5

6    **1.    The Court Must Strike the Report's Language Challenging Suicides Rates in CDCR Prisons, Portraying Suicide Rates as Substantially Greater Than the Average Among U.S. State Prisons, and Criticizing the State's Implementation of the 2010 Suicide Prevention Plan.**

7

8    On Page 17 of the Introduction, the special master reports that "it does not appear that the

9    rate of suicide death in CDCR prisons is declining, … suicide rates [the number of suicides per

10    100,000 inmates] in CDCR prisons continue to substantially exceed the national average among

11    U.S. state prisons, despite the efforts that are being made," and "performance in the areas of

12    suicide prevention remains concerning."  To support these conclusions, the special master

13    compares the suicide rates in CDCR prisons with the suicide rates across all United States prisons

14    for the years 2000 to 2012.  (Report, ECF No. 4298 at pp. 17-19.)[1]  Criticizing current rates, he

15    compares the 2012 suicide rate for California prisons—23.72 suicides per 100,000 inmates—with

16    the national average suicide rate of 16 suicides per 100,000 inmates for state prisons in the United

17    States and the District of Columbia in 2010.  (*Id.*)  He also states that the suicide prevention

18    measures developed in 2010 have not been completed.  (*Id.* at 24.)

19    Defendants object to the special master's conclusions based on CDCR's suicide rate

20    because it is speculative, misleading, lacks foundation, and irrelevant to the governing legal

21    standard.  The Eighth Amendment does not mandate that prisons eliminate all suicide risks.  *See,*

22    *e.g., Miller,* 698 F.3d at 962–65 (rejecting argument that "state officials violate the Constitution

23    when they fail to prevent the suicides of inmates who are not actively or 'imminently' suicidal").

24    The special master's report draws no established relationship between the suicide rate or the

25    State's suicide prevention policies and procedures and the constitutional requirement that prisons

26    _____

27    [1] The special master's source for the average national suicide rate is a U.S. Department of Justice, Bureau of Justice Statistics publication entitled "Mortality in Local Jails and State Prisons, 2000-2010 – Statistical Tables."  (*See* Belavich Decl., Ex. 1.)

28

have in place a "basic program for the identification, treatment, and supervision of inmates with suicidal tendencies." *Balla,* 595 F. Supp. at 1577.  Indeed, nationally renowned experts have found "[e]specially impressive" the State's systemwide attention to suicide prevention, and that "CDCR does as diligent a job of investigating suicides as any system of prisons or jails in the country."  (ECF No. 4275–5 at 2; *see also* Dvoskin Comments at 2–3.)

The special master's assertions:  (1) ignore that the suicide frequency at California prisons has declined in the past five years; (2) provide no evidence or analysis showing that the inmate population composition of the national average of prisons provides a fair statistical comparison to California's prison population; (3) do not account for the dramatic inmate population reduction in California prisons under realignment in 2012, or the population reduction's statistical impact on the suicide rate and risk demographic in California prisons; and (4) fail to recognize that Defendants have complied with all the elements of their 2010 Suicide Plan.

Suicide frequency (i.e., the total number of suicides per year) in California Prisons has declined since 2007, and has dropped by nearly 10% within the past two years.  (Decl. T. Belavich Supp. Obj. & Mot. to Strike Portions of Special Master Rep. (Belavich Decl.) ¶ 5.) These downward trends are a significant departure from the suicide frequency trend between the years 2000 and 2006 during which the suicide frequency rate nearly tripled.  (*Id.* ¶¶ 4 & 6, Ex. 2.)



5

1    In addition, between 2003 and 2012, the suicide rate trend in California prisons has

2  remained relatively flat.  (Belavich Decl. ¶ 9, Ex. 3.)  The graph below reflects this trend.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



6

Between the years 2000 and 2006, the suicide rate in California prisons increased from 9.3 to 25.1 suicides per 100,000 inmates. (Belavich Decl. ¶ 7.) By contrast, the overall trend since 2007 has actually flattened. (*Id.* ¶¶ 8-9, Exs. 3 & 4.)



Figure 2. Total CDCR Suicide Rate: 2000-2006 & 2007-2012, with trends

In his report, the special master ignores these suicide trends, choosing instead to rely on a comparison of California's prison suicide rate with the national average prison suicide rate and a comparison between the rate of suicides per 100,000 inmates in CDCR prisons in 2011 and 2012. His reliance on these comparisons is flawed for several reasons.

First, the special master provides no evidence showing that the national average reflects, or is even comparable to, the demographic composition of California prisons. In so doing, he ignores the complexities of prison population demographics across states and delivers a simplistic and misleading comparison that should carry little or no weight. Prison population demographics including race, culture, age, commitment offense, morbidity rate, and other factors such as the

7

1  prevalence of prison gangs, are all relevant to suicide risk. (Belavich Decl. ¶ 12; Dvoskin

2  Comments at 2.) If one is going to endeavor to compare suicide rates, the differences in each

3  system's demographics must be evaluated. The variability in population demographics and

4  circumstances unique to California that are relevant to suicide risk can yield unreliable

5  comparisons. (*Id.*) The U.S. Department of Justice expressly disclaims that the mortality rates

6  presented in the national average suicide rate for state prisons, referenced by the special master,

7  are "adjusted for age, sex, race, geographic location, or any other characteristic" (Belavich Decl.,

8  Ex.1, table 14 [Mortality rate per 100,000 state prisoners, by cause of death]) and it expressly

9  discourages such a comparison between states. (*Id.* ¶ 13, Ex. 5.)

10     Regardless, according to the U.S. Department of Justice Report, California's prison

11  suicide rate is in the middle of other state prison systems. (Belavich Decl. ¶ 3, Ex. 1.) Based on

12  prison mortality statics from 2001 through 2010, California's average prison suicide rate of 20 for

13  this time period is lower than or equal to 20 other states. If ranking higher than the national

14  average was the constitutional litmus test (which of course it is not), then California is in the

15  company of the majority of states. Twenty five additional states have prison suicide rates higher

16  than the national average of 16. (*Id.,* Ex. 1, table 25.) California's suicide rate over the last

17  decade is also less than half that of the national suicide rate in jails (41 per 100,000). (*Id.*) The

18  special master's emphasis on suicide rates suggests that in his view 25 other states and the vast

19  majority of jails across the country are in violation of the Constitution. Of course that is not the

20  case, and his mistaken and misleading comparison of suicide rates reveals the critical flaws in his

21  findings.

22     Moreover, there is no causal connection between the suicide rates in California prisons as

23  compared to the reported national average for state prisons for the last several years and

24  constitutionally adequate mental health care. *See Balla*, 595 F. Supp. at 1577 (prisons must

25  establish a "basic program for the identification, treatment, and supervision of inmates with

26  suicidal tendencies" as a "necessary component of any mental health treatment program").

27

28

8

Defs.' Objs. to & Mot. to Strike and Modify 25th Round Monitoring Rpt.
(No. 2:90-cv-00520 LKK JFM P)

Although there were fewer suicides in 2012, CDCR's suicide rate rose slightly to 23.7 because the population dropped under realignment—17.2% since October 2011 when the State implemented public safety realignment.  (Jan. 7, 2013 Mot. to Vacate Pop. Reduction Order, ECF No. 4280 at 8.)  The special master, however, fails to consider or address realignment's impact on California's prison suicide rate in 2012 or its impact on prison population demographics. Statistical trends that show California's suicide frequency (i.e., the total number of suicides per year) has steadily declined in the past five years.  (Decl. Belavich ¶¶ 4-6; Ex. 2.)  But the 17.2 % population reduction since October 2011 disguises this trend when calculating the suicide rate—a measurement that is sensitive to population size.  (Decl. Belavich. ¶ 10.)[2]  Violent offenders—the majority of offenders who remain in prison under realignment—commit suicide at nearly three times the rate of nonviolent offenders.  (*Suicide and Homicide in State Prisons and Local Jails,* U.S. Department of Justice, Bureau of Justice Statistics, August 2005, p. 7.)  So while the overall prison population has decreased, the offenders most prone to committing suicide have remained in prison.

The special master ignores all of these variables in his report at the expense of accuracy and fairness.  Dr. Joel Dvoskin, a nationally recognized prison mental health expert, has concluded that CDCR's suicide prevention program is appropriate and meets the standard of care. He found that CDCR's efforts "demonstrate a passionate interest in preventing suicide."  (ECF No. 4275–5 at 2, 32; Dvoskin Comments at 2–3.)  Indeed, he concludes that because "CDCR has aggressively worked to prevent suicide and has embraced and acted upon reasonable recommendations received both from within CDCR and from external sources (e.g., the special master's experts and Plaintiffs' counsel), [it] has not been deliberately indifferent to this problem and continues its efforts to find new solutions toward preventing correctional suicide."  (ECF No. 4275–5 at 32.)

---

[2] In fact, had California's inmate population remained constant since June 30, 2011, the number of completed suicides in 2012 would have:  (1) yielded a rate of 19.7 suicides per 100,000 inmates for 2012; (2) resulted in the suicide rate trend from 2007 to 2012 remaining relatively flat; and (c) declined by 1.4 suicides since 2010.  (Decl. Belavich ¶ 12.)

1    The special master's report attributes suicides to the State's failure to fully implement the

2    court-ordered suicide prevention measures that were developed in 2010 and ordered by the Court.

3    (*See* ECF No. 4298 at 17-25.)  On page 24, the special master asserts:  "Unfortunately, the most

4    recent data on suicides appears to suggest that the suicide prevention measures taken thus far have

5    not been fully implemented."  (ECF No. 4298 at 24.)  But for the reasons already stated, reliance

6    on data on suicide trends is misleading and unfair.  In addition, the special master's report

7    confirms that the State has created an extensive program, and indeed has implemented the suicide

8    prevention plan developed by the special master and the State in 2010.  (*Id*. at 17–24.)

9    One item that the special master highlights as incomplete is the development and

10   implementation of a training program to improve the clinical competency in administering

11   Suicide Risk Assessments.  (ECF No. 4298 at 20.)  At page 24, the special master asserts that the

12   "[Suicide Risk Evaluation] SRE mentoring program has only been partially implemented."  This

13   is inaccurate.  The Suicide Risk Evaluation program was designed to mentor new and unlicensed

14   staff, with an initial intent to "grandfather in" veteran staff.  (Belavich Decl. ¶ 14.)  From August

15   2011 to the present, ongoing training has been provided to selected mentors in all institutions—to

16   date, over 90 staff members have been trained as mentors and every institution has an identified

17   primary mentor.  (*Id.*)  Although there are differences in the percentages of staff mentored at each

18   institution, all institutions are focusing on the completion of mentoring for staff working with

19   inmates placed in Enhanced Outpatient Programs and Mental Health Crisis Beds.  (*Id.*)  By now

20   focusing on all staff members who administer Suicide Risk Evaluations and putting all staff

21   through a peer review cycle (which generally takes two 2 years), the State has embarked upon a

22   significant expansion of the original plan, underscoring its commitment to embrace, and maintain,

23   its ongoing focus on quality clinician work.  (*Id.*)

24   Another task that the special master criticizes relates to the work associated with using,

25   and the clinical practices within, CDCR Outpatient Housing Units and alternative housing.  (ECF

26   No. 4298 at 19, 21-22.)  But that work is complete and memoranda on its use have been

27   distributed to the field.  (*Id.* at 21–22; ECF No. 4275–3 at 23.)  A third task—implementing the

28

10

1  SharePoint website system and the system-wide generated alert for high acute suicide inmates on

2  MHTS.net—was implemented and demonstrated to the special master and his staff.  (ECF No.

3  4298 at 19 & 24.)  In addition, Defendants have completed their installation of suicide-resistant

4  beds in the Mental Health Crisis Bed units, another ordered task.  (*Id.* at 20, 23-24.)  Although not

5  noted by the special master, Defendants have worked to further improve conditions in

6  administrative segregation and manage inmates at high risk of suicide by, among other things,

7  improving tracking systems and data analysis and continually monitoring the institutional high-

8  risk management process.  (Belavich Decl. ¶¶ 15 & 16.)  Last, Defendants have completed their

9  work with the special master on bed planning, ensuring an adequate number of mental health

10  crisis beds and capacity for Enhanced Outpatient Program inmates requiring segregated housing.

11  (ECF No. 4298 at 23.)

12      Defendants have implemented their suicide prevention plans, aggressively worked to

13  prevent suicide, and embraced and acted upon reasonably recommendations received from the

14  special master's experts.  Despite the State's dedicated effort to prevent suicides, the numbers are

15  still higher than desired.  The State now "devotes extraordinary resources to clinical and

16  operational investigations of completed suicides, as well as prospective efforts to prevent such

17  acts in the future" and "does as diligent a job of investigating suicides as any system of prisons or

18  jails in the country."  (ECF No. 4275–5 at 2 & 32.)  As even nationally recognized expert Dr.

19  Dvoskin concedes, eliminating all suicides is an "elusive (and sadly, probably unrealistic) goal"

20  and there is no "evidence that I or the Special Master are in possession of any simple solution to

21  this perplexing problem.  (*Id.* at 34; Dvoskin Comments at 3.)  Nevertheless, the State's

22  commitment to identifying inmates at risk for suicide and preventing its occurrence shows a

23  diligent focus on this pressing issue.  To contend that the State is somehow deliberately

24  indifferent to these inmates willfully ignores these efforts.

25      For all these reasons, the Court must sustain Defendants' objections and strike the special

26  master's conclusions reached by comparing California prisons' suicide rates with the national

27  average suicide rates for state prisons, comparing California prisons' suicides rates for 2011 and

28

1   2012, and his belief that the suicide prevention measures thus far taken have not been fully

2   implemented.  "There is no reason to even allege deliberate indifference to this important

3   problem."  (Dvoskin Comments at 3.)

4         **2.    The Court Should Strike Language in the Report that Asserts
                Increased Suicides in Segregated Housing.**
5

6         On Page 37 of the introduction, the special master states that there "were also findings of

7   continued noncompliance in the area of suicide prevention in administrative segregation," and

8   concludes that "[t]his is a disturbing trend, particularly in light of the continued elevated rate of

9   suicides in CDCR segregated units as compared to the non-segregated units" and "the increased

10  incidence of suicides within the segregated units as compared to non-segregated units."  (ECF

11  No. 4298 at 37–38.)

12        Defendants object to these statements because they are both inaccurate and lack

13  foundation.  Contrary to the special master's assertions, since 2003, suicides occurring in

14  administrative segregation units as a percentage of the overall suicide rate have significantly

15  declined.  (Belavich Decl. ¶¶ 17-18, Exs. 6-7.)

16        Suicides have also decreased in security housing units and psychiatric services units.

17  (Belavich Decl. ¶ 19.)  Since 2007, only ten suicides have occurred in security housing units—six

18  occurred in 2007 and 2008 and four occurred from 2009 through 2012.  (*Id.*)  Additionally only

19  three suicides occurred in psychiatric services units since 2007, and none in 2012.  (*Id.*)

20        As shown above, the special master's assertion that suicides are elevated in segregated

21  housing is misleading, inaccurate, and lacks foundation.  It is also improper and misleading to

22  imply that any alleged noncompliance with the Administrative Segregation Enhanced Outpatient

23  Program plan in any way increased the number of suicides in segregation units when they have

24  actually declined.  The State does not dispute that the Administrative Segregation Units remain a

25  high-risk environment.  But this is "not unique to California."  (ECF No. 4275–5 at 36.)  For that

26  reason, the State continues to address suicides in administrative segregation units, including

27

28
                                        12

1  recent efforts to reduce the unit sizes, prioritize transfers, and provide electrical appliances.  (ECF

2  No. 4275-5 at 36.)

3       For all of these reasons, the Court must sustain Defendants' objections, strike this

4  language from the Report, and strike the special master's implied conclusion that noncompliance

5  with the administrative segregation plan resulted in an increased suicide rate.

6       **3.    The Court Should Strike the Language Relating to Program Guide**
                 **Requirements for Monthly SPRFIT Meetings.**
7

8       On page 24, the special master states that monthly Suicide Prevention Response Focus

9  Improvement Team (SPRFIT) meetings—a suicide prevention measure—have not been fully

10 implemented.  (ECF No. 4298 at 24.)  To support this statement, the special master contends that

11 "[l]ess than a quarter of the institutions met Program Guide requirements for monthly SPRFIT

12 meetings."  (*Id.*)  On page 60, the special master contends that "only seven institutions . . .

13 demonstrated compliance with Program Guide requirements for monthly SPRFIT meetings with

14 full attendance and pertinent agenda items."  (*Id.* at 60.)

15      The special master's statements distort the truth because the majority of prisons are

16 holding meaningful, productive suicide-prevention meetings.  (ECF No. 4298 at 60–61; *see* ECF

17 No. 4275–2 at 31 ("Each institution has a suicide prevention committee that considers and

18 addresses appropriate topics relevant to suicide prevention").)  For instance, the special master

19 himself admits that a majority of the prisons are holding meetings:  twenty-three institutions

20 convened monthly meetings, five institutions held five meetings, two institutions held four

21 meetings, and two institutions combined their meetings with the monthly mental health

22 subcommittee meetings.  (ECF No. 4298 at 6361.)  In addition, all institutions maintained

23 minutes of the meeting and "relevant suicide prevention agenda items" were reviewed at 29

24 institutions.  (*Id.*)  The special master thus failed to credit the majority of the institutions with

25 compliance because their attendance and agenda items did not strictly adhere to the specifications

26 of their internal policies.  (*Id.* at 61 (only "[e]ight institutions . . . demonstrated attendance by all

27 required participants at SPRFIT meetings during the monitoring period.")

28

13

For these reasons, Defendants object to this statement because it lacks foundation and is inaccurate.  Moreover, these perceived deficiencies in complying with Program Guide requirements are not related to any standards of care in a correctional system.  And any shortcomings in fulfilling Program Guide requirements do not alter the fact that the State has fully implemented its suicide prevention plan.  In addition, the special master's language implies that complying with Program Guide requirements is conditioned on including particular agenda items in meeting minutes.  (ECF No. 4298 at 60.)  In fact, the Program Guide does not define what agenda items are appropriate for suicide prevention meetings.  Moreover, Defendants object to any implication that alleged staff absences at these meetings, or the failure to include "pertinent" topics in meeting agendas, somehow causes the quality of care provided to *Coleman* class members to decline.  Rather, these issues "likely bear little correlation to the incidence of any suicides." (Dvoskin Comments at 3.)

In sum, there is no justifiable reason for the special master's continued intrusive and costly oversight of California's suicide prevention program.  The State has fully implemented and staffed a thorough, standardized program to identify, treat, and supervise inmates at risk for suicide, including a "suicide risk evaluation instruction [that] is much more detailed than the majority of prison and community mental health systems in the United States."  (ECF No. 4275–1 at 22.)  The State also has polices and practices to ensure that employees receive effective training on suicide prevention and response.  (*Id.* at 23.)  A suicide prevention committee at each institution is tasked with implementing and amending policies when deemed necessary, and each institution has adequate procedures in place to thoroughly investigate and timely report on completed suicides and serious suicide attempts.  (*Id.*)  The remedial phase of *Coleman* can end now, and any additional special master guide work groups or meetings are unjustified.

**B.    Other Overall Objections and Requests To Strike or Modify the Report.**

In addition to the suicide specific objections, the State submits the following objections and requests to strike or modify the special master's report.  In each of these items, the special

14

master fails to focus on the core issue in this case—the systemic constitutionality of the mental health care system.

1.    The State specifically objects to special master's use of the term "compliance," some variation of which appears 804 times in the 25th report, as irrelevant and misleading.  The special master's use of this term has nothing to do with constitutional compliance.[3]  Rather, the special master generally uses this term to denote ninety percent (90%) compliance with Program Guide requirements.  For suicide prevention issues, the special master declares an institution "noncompliant" if it fails to achieve less than 100% compliance with Program Guide requirements.  (*See, e.g.,* ECF No. 4298 at 62 ["Eighteen institutions remained very close to compliance, but they did not achieve full 100-percent compliance" for five-day follow-ups].)  The special master's use of the term "compliance" to require a minimal score of 90% against Program Guide requirements is one of the primary reasons the reports are not useful in determining whether the mental health system is constitutionally adequate.

In addition to inappropriately using the Program Guide rather than the Constitution as the benchmark, the special master's use of the term "compliance" is misleading.  The report simply uses the term to denote some failure to meet a Program Guide requirement, but typically does not explain what specifically led to the finding of noncompliance.

2.    On page 12, the special master reports that there "was overall progress among the institutions with use of the sustainable process for identifying and referring inmates in need of inpatient care" but that "[g]iven the relative newness of the process, it is still undergoing refinement and requires ongoing monitoring."

Defendants object that the "need for ongoing monitoring" is not at all clear.  The special master's own monitoring of this process has revealed a remarkably low number of inmates who appeared to be in need of a higher level of care.  (ECF No. 4298 at 74-78 & 82. )  Because there

---

[3] The word "Constitution" does not appear in the current report.  Similarly, the term "standard of care" is conspicuously absent.  The term "deliberate indifference" appears once, when the report refers to a CDCR suicide prevention training entitled "*Deliberate Indifference and Suicide*."  (ECF No. 4298 at 173.)

1    is utterly no evidence to support the special master's conjecture, the Court should strike this

2    portion of the report.

3        3. On page 24, the special master reports that "[n]ine institutions did not provide any data

4    on whether they had an operational ERRC during the review period, and 11 institutions did not

5    provide data relative to CPR training during the review period."

6        Defendants object to any implication or conclusion that an alleged failure to provide data

7    on whether institutions had an operational emergency response and review committee or CPR

8    training during the monitoring period has impacted the quality of or access to necessary mental

9    health care systemwide.  Any such conclusion is speculative and lacks foundation.  For all

10   institutions for which the special master obtained data, he concluded that they each "had

11   functioning emergency response review committees (ERRCs) which maintained minutes that

12   revealed appropriate review of emergency responses within the institution."  (ECF No. 4298 at

13   61.)  The special master introduced no evidence to support this conclusion and the Court should

14   strike this portion of the report.

15       4. On page 33, the special master reports that "[t]racking of referrals remained

16   problematic at approximately one third of the men's institutions."

17       Defendants object to this statement as micro managerial, and because the term

18   "problematic" is vague.  Defendants further object to any implication that an alleged failure to

19   demonstrate that "problematic tracking of referrals to inpatient care" impacted the quality of care

20   provided to *Coleman* class members.  The special master has provided no evidence of impact or

21   harm to the *Coleman* class and the Court should strike this portion of the report.

22       5. On page 33, the special master reports that "appropriate use of Form 7388B continued

23   to elude a third of institutions, albeit to varying degrees."

24       Defendants object to this statement because the terms "appropriate" and "varying degrees"

25   are vague.  Defendants further object to any implication that "varying appropriateness of the use

26   of Form 7388B" somehow impacted the quality of care provided to *Coleman* class members.  The

27   special master has provided no evidence of impact or harm to the *Coleman* class caused by the

28

16

1  alleged "inappropriate use" of a medical form, and the Court should strike this portion of the

2  report.

3      6.  On page 34, the special master asserts that the "*Coleman* parties have agreed that the

4  20 DSH beds in Unit S-2 at the Vacaville Psychiatric Program at CMF that have been used

5  temporarily as MHCBs may be restored to their original purpose for use as DSH acute care beds."

6      This statement should be changed to acknowledge that the Court has approved the parties'

7  agreement to restore the 20 Department of State Hospitals beds in Unit S-2 for use as acute care

8  beds.  (*See* ECF No. 4265.)

9      7.  On page 34, the special master states that "EOP inmates' stays in administrative

10  segregation hubs remains excessively long.  As of September 7, 2012, 87 EOP inmates were

11  housed in administrative segregation longer than 90 days."

12      Defendants object and move to strike the statement that placement in administrative

13  segregation hubs exceeding 90 days are "excessive" because it lacks foundation.  The

14  Constitution does not require policies or procedures prohibiting stays in administrative

15  segregation hubs exceeding 90 days, and the special master offers no evidence that any such

16  placement has harmed an inmate receiving EOP care.  To the contrary, the State's experts have

17  found that the "CDCR Mental Health Services Delivery System appropriately meets the mental

18  health needs of inmates assigned to an EOP-ASU Hub."  (ECF No. 4275–2 at 22; *see also*

19  Dvoskin Comments at 3 (noting that it is unclear why the special master would characterize these

20  placements as "excessive").)

21      8.  On page 36, the special master asserts that a "pervasive problem found during twenty-

22  fifth round monitoring was that all 11 hubs failed to conduct all clinical contacts and/or

23  therapeutic groups in confidential settings."

24      Defendants object to and move to strike this statement because it lacks foundation.  No

25  policies or procedures—and certainly nothing in the Constitution—mandates that all clinical

26  contacts and therapeutic groups occur in confidential settings.  Defendants further object to any

27  implication that confidentiality is clinically necessary for every clinical contacts or group

28

17

meeting.[4]  (*See* Dvoskin Comments at 4 ("I disagree with the premise that all clinical contacts and/or therapeutic groups must occur in confidential settings."); *Plata v. Brown,* 131 S. Ct. 1910, 1964 (2011) (Alito, J. dissenting) ("this court has never suggested that the failure to provide consultation rooms in prisons amounts to cruel and unusual punishment").)  The special master has introduced no evidence showing that CDCR's practices and treatment in this regard violate the Constitution or show that it is deliberately indifferent to inmates' mental health needs.

9.  On page 37, the special master reports that "ten of the 11 hubs failed to offer at least ten hours per week of structured therapeutic activity per week…  Structured therapeutic activity is a critical part of EOP care in general.  This is particularly true in segregation units, where the group dynamic and interaction with others can help ameliorate the anti-therapeutic effects of isolation on the mentally ill patient."

Defendants object to any implication or conclusion that ten hours per week of structured therapeutic activity or group therapy is clinically necessary for all EOP inmates living in administrative segregation hubs.  The special master has introduced no evidence supporting such a conclusion.  The need for structured therapeutic activity, including group therapy, is determined clinically on a case-by-case basis.  Moreover, although ten hours per week of structured therapeutic activity may be clinically optimal, providing such treatment is not a constitutional mandate.  (*See* Dvoskin Comments at 4.)  And the actual amount of treatment is a matter that can be determined via a review of treatment records, and does not require the continued involvement of the special master to count the number of treatment hours reflected in patient records.  (*Id.*)

10.  On page 37, the special master asserts:  "It also should be noted that the problem of insufficient structured therapeutic activity was not confined to the administrative segregation units.  Inmates in the PSU at CSH/Sacramento were scheduled for 9.94 hours per week of structured therapeutic activity, but were offered only 7.91 hours.  Only 28.5 percent of PSU inmates were offered ten hours of group therapy per week.  Inmates refused on average 2.66

---

[4] Defendants question how confidentiality is ever maintained in a group setting.

hours and received 5.25 hours." On page 79, the special master reports that "[o]nly 28.5 percent of PSU inmates were offered ten hours of group therapy per week."

Defendants object to any implication or conclusion that ten hours per week of structured therapeutic activity or group therapy is clinically necessary for all inmates living in a psychiatric services unit. Defendants further object to the implication that 5.25 hours of group therapy is "problematic." The special master has introduced no evidence supporting such conclusions. Appropriateness for structured therapeutic activity, including group therapy, is determined clinically on a case-by-case basis. Indeed, Defendants' experts have found that the "CDCR's Mental Health Services Delivery System appropriately meets the mental health needs of EOP inmates assigned to a PSU." (ECF No. 4275–2 at 24.)

11. On page 38, the special master asserts that "[p]roper staggering of 30-minute welfare checks in administrative segregation remains an ongoing problem as well, with only nine institutions completing these checks correctly. This is particularly concerning, given the increased incidence of suicides within segregated units as compared to non-segregated units, plus the fact that currently a suicide by a CDCR inmate occurs on average every 10.93 days." (*See also* page 25 ("Staggering 30-minute welfare checks in administrative segregation has been an ongoing problem that, again, remained unresolved during the twenty-fifth monitoring. . . .").)

Defendants object to and move to strike the conclusion that failure to stagger welfare checks is causally linked to any completed suicides or harm to a *Coleman* class member during the monitoring period. The special master introduced no evidence to support this conclusion. Defendants further object to any implication that the alleged failure to stagger custody welfare checks has impacted the quality of mental health care provided to *Coleman* class members. Again, there is no evidence to support this assertion.

12. On pages 44-48, the special master reports high vacancy rates among mental health clinical staff and concludes that because of mental health clinical staff vacancies, "delivery of day-to-day clinical care is being adversely affected." The special master further concludes that the "new positions, therefore, were created because they were deemed necessary to meet the

1   needs of the inmate patient population.  Where positions are not filled, the implication is that

2   clinical need is not being met.  The rather sudden uptick in mental health vacancy rates may well

3   be attributable to the addition of new mental health position allocations within the defendants'

4   staffing plan which have not yet been filled.  But regardless of the reason(s) why this has

5   occurred, these vacancies need to be filled."  (ECF 4298 at 47.)  Also, the special master reports

6   and concludes throughout the entire 609 page report that clinical and non-clinical vacancies are

7   impacting the quality of and access to mental health care  (*See* Monitoring Report, ECF 4298, pp.

8   52-57, 60, 84-85, 97, 104-5, 115-15, 129, 141, 146, 160, 170-71, 194-95, 203-4, 221-22, 229,

9   232-33, 243-44, 253-55, 268, 276, 290-291, 296, 300-2, 310, 311, 325, 337, 347-48, 359, 366,

10  376-77, 381, 383, 390, 394, 400-1, 414-15.)

11          Defendants object to the special master's conclusions that clinical staffing vacancies

12  exceeding 10% have adversely impacted the delivery of day-to-day care because they are

13  speculative and lacks foundation.  The special master offers no evidence showing that the mental

14  health clinical staffing rates have adversely impacted the quality of or access to mental health

15  care.  Defendants also object to the special master's conclusion that mental health clinical staff

16  positions were established because CDCR mental health deemed they were clinically necessary to

17  meet the needs of the inmate population.  Defendants were ordered to develop a staffing plan

18  under the guidance of the special master, which they did and filed on September 30, 2009.  (ECF

19  No. 2693.)  In the plan, Defendants clarify that "it represents a comprehensive, optimal staffing

20  model with regard to CDCR's mental health program needs, [but that] the Plan will be

21  reexamined, and possibly revised, once it is implemented."  (*Id.* at 3.)  In addition, there is—and

22  can be—no showing that a particular staffing rate is mandated by the Constitution.  Rather, if

23  treatment is appropriate and effective—as it is in California prisons—that is sufficient to meet

24  constitutional requirements, no matter the number of clinicians providing it.  (*Id.* at 3 n.1.)

25  Indeed, the special master's presentation of the staffing issue is misleading—California's mental

26  health care system "meets and often exceeds the standard of care for prisons in the United States."

27  (ECF No. 4275–1 at 5; Dvoskin Comments at 5–6.)

28

                                        20

13.  On pages 49 and 50, the special master reports on Defendants' refinement and implementation of MHTS.net.

Defendants object to any reporting on MHTS.net because the refinement and implementation of an electronic computer system is not a basic component of constitutional care. The Court must therefore strike this portion of the report and eliminate it as a matter of court oversight.  (Dvoskin Comments at 7.)

14.  On page 57, the special master reports that "CDCR has not yet put in place a system-wide approach to measuring and assessing mental health services and improving them consistent with Program Guide requirements on an ongoing basis."

Defendants object and move to strike because this statement is inaccurate.  Defendants' prison mental health services delivery system had a system-wide quality management and improvement system in place before the Court ordered them to reassess and improve their program with the special master's guidance.  (ECF No. 4275–1 at 19:7–17.)  Defendants further object to the implication that any further implementation of the court-ordered quality improvement process as described at pages 12 to 16 is necessary under the Constitution, or that the special master's ultimate approval of CDCR's improvements to its existing quality management system is necessary to ensure the quality of and access to mental health care that meets the needs of inmates systemwide because any such conclusion lacks foundation and is speculative.  The special master provides no evidence showing that the court-ordered process was necessary to correct a deficiency in California prisons' provision of mental health care to inmates.  Indeed, the experts "have never seen a system that is more comprehensive and extensive regarding quality improvement within a correctional environment."  (*Id.* at 19:15–17.)  Moreover, the "micro-managerial nature of the current monitoring system directly interferes with CDCR's ability to … implement an innovative system improvement" and remove itself from federal court oversight.  (Dvoskin Comments at 2.)

15.  On page 59, the special master reports that attendance at mental health subcommittee meetings was "problematic at six institutions - CMF, CVSP, DVI, KVSP, SCC, and SVSP."

21

Defendants object to use of the vague term "problematic." Defendants further object to the implication or conclusion that attendance at quality management meetings impacted the quality of or access to mental health care systemwide. Any such conclusion lacks foundation and is speculative. Yet again, the special master offers no evidence showing that staff attendance at quality management meetings has any affect on the quality of or access to mental health care systemwide.

16. On page 65, the special master reports that "[a]nother nine institutions - ASP, CCC, CCI, CMF, Calipatria, CTF, PBSP, RJD, and VSPW- reported compliance [with completion of 31 question post-placement screens], but they did not demonstrate that the screens were conducted in confidential settings."

Defendants object because this statement lacks foundation. To the special master, if an event was not "demonstrated" to him, he concludes that it did not occur. However, the special master offers no evidence showing that inmate screenings were not completed in confidential settings, which in any event is not a constitutional mandate. And Defendants object to any implication that failure to prove to the special master that the 31 question post-placement screens were completed in a confidential setting in any way affected the quality of care provided to *Coleman* class members.

17. On page 66 of the report the special master asserts that "[a]ccess to ten hours or more of yard time in administrative segregation improved, but remained problematic during the monitoring period, with approximately half of the institutions compliant in this area."

Defendants object and move to strike this language because it misstates the regulation by implying that inmates housed in administrative segregation must have access to 10 hours of yard time per week under any circumstances. In fact, CDCR regulations require that administrative segregation units offer either ten hours of yard time or one hour of out-of-cell time five days per week, unless security and safety considerations preclude such activity. Cal. Code Regs. tit. 15, § 3343(h) (2012). Moreover, Defendants object to any implication that failure to ensure access to ten hours or more of yard time in administrative segregation impacted the quality of care provided

22

1    to *Coleman* class members.  The special master offers no evidence of impact or harm to the

2    *Coleman* class.

3         18.  On page 78 of the report the special master asserts that "EOP inmates at CMF,

4    CSATF, and CTF often languished in segregation waiting for PSU endorsements."

5         Defendants object and move to strike because the statement lacks foundation.  The report

6    offers no evidence that indicates inmates' wait times for endorsement to Psychiatric Services

7    Units from these institutions was excessive or that the institutions did not provide adequate care

8    while the inmate waited endorsement.  Rather, experts retained to evaluate the State's system

9    found that treatment at all levels of care and in all placements, including treatment provided to

10   inmates awaiting special placements, including Psychiatric Services Units, was appropriate and

11   met constitutional requirements.  (ECF No. 4275–1 at 17–18.)

12        19.  The special master concludes throughout the entire 609 page report that California

13   prisons failed to comply with Program Guide timelines and timeframes prescribed for particular

14   mental health care-related services, including but not limited to five-day clinical follow ups and

15   referrals and transfers to higher levels of care (pp. 24, 33, 47, 74, 75 & 80), referrals and transfers

16   to other custodial settings such as special needs yards and administrative segregation units

17   designed for housing inmates receiving enhanced outpatient program care (pp. 36 & 78), length

18   of stays in crisis care (p. 75), and completion of screenings, clinical contacts, and treatment team

19   meetings (pp. 36–38 & 65).  (*See also* Monitoring Report, ECF 4298, pp. 24-25, 81, 83, 87, 89,

20   90-91, 49-96, 99-102, 108-11, 113, 120-21, 123, 127, 130-31, 134, 139-39, 144, 149, 153, 159-

21   59, 165-68, 175-76, 186-87, 190, 198-99, 202, 206, 208-9, 214-15, 219, 225-26, 229, 233-34,

22   237-39, 247, 249, 251, 257, 259-60, 266, 272-75, 277, 279, 284-87, 292, 294, 297, 300, 303, 307-

23   8, 316, 318-22, 329-30, 332-36, 341-44, 346, 350-51, 353, 357, 363-365, 370-75, 381-82, 385,

24   389, 392-393, 396-99, 405, 408-9, 411-413, 420-21, 423-24, 449-50, 452-54, 459, 482-83, 497,

25   499, 502-3, 509, 513, 524, 530-33, 539, 541-42, 545-46, 557, 560, 563-65, 571, 575-80, 583,

26   585-90, 593, 603-04.)

27

28

23

Defs.' Objs. to & Mot. to Strike and Modify 25th Round Monitoring Rpt.
(No. 2:90-cv-00520 LKK JFM P)

1    Defendants object to any implication or conclusion that failure to comply with the

2    Program Guide timelines impacted quality of or access to necessary mental health care

3    systemwide because any such conclusion lacks foundation and is speculative.  The special master

4    introduced no evidence supporting this conclusion and the Court should strike these references in

5    the report.  Again, the special master's dogmatic recitation of Program Guide timelines highlights

6    the flaw in his rationale.  As this Court ordered in 1995, the special master was retained to assist

7    the State in complying with constitutional requirements, not its own internal policies and

8    procedures.  (Dec. 12, 1995 Order of Reference, Docket No. 640.)  Asserting that the State has

9    allegedly failed to comply with its own timelines obscures an evaluation based on the

10   Constitution.  And as the experts have concluded, the State is meeting those constitutional

11   requirements, regardless of any compliance with internal guidelines—or any other provisions that

12   exceed constitutional minima.

13       20.  The special master reports and concludes throughout the Monitoring Report that

14   California prisons failed to comply with all medication management timelines.  (*See generally*

15   Monitoring Report, ECF 4298.)

16       Defendants object to any implication or conclusion that failure to comply with the

17   medication management timelines impacted quality of or access to necessary mental health care

18   systemwide.  Any such conclusion lacks foundation and is speculative.  The special master

19   provides no evidence of any systemwide impact and the Court should strike these references in

20   the report.

21   **II.    INSTITUTIONAL OBJECTIONS.**

22       In his report, the special master includes allegations concerning individual institutions.

23   Similar to the general allegations concerning the State's mental health delivery system as a whole,

24   the special master again fails to focus on the core issue in this case—the systemic

25   constitutionality of the mental health care system.  Accordingly, Defendants object to these

26   statements concerning individual institutions and move to strike them as follows.

27

28

24

Defs.' Objs. to & Mot. to Strike and Modify 25th Round Monitoring Rpt.
(No. 2:90-cv-00520 LKK JFM P)

### A.    Correctional Rehabilitation Center

1.  On page 59, the special master reports that "CRC did not utilize the QIT process at all, although there were areas in which it could have benefitted from doing so."

Defendants object to any implication or conclusion that CRC's purported failure to use the QIT process during the monitoring period impacted the quality of or access to necessary mental health care systemwide, or that use of a QIT process is constitutionally required.  (*See* ECF No. 4275–1 at 7–17.)  The special master provides no evidence supporting such a conclusion and the Court should strike it from the report.

2.  On page 61, the special master reports that "[c]ontent was problematic at CCC, CRC, and SCC, where the agenda was comprised of only statewide suicide prevention video conference."

Defendants object because this statement is inaccurate.  CRC provided minutes of the meetings showing that items other than the statewide video conference were included in the SPRFIT agenda in Tab I, 1 of the prison's response to the special master's twenty-fifth round document request. Accordingly, the special master's statements are inaccurate, and the reference to CRC should be removed.

3.  On page 66, the special master reports "[t]welve institutions . . . reported that they had implemented the medication management audit tool . . ."

This statement must be revised to include CRC because it implemented MAPIP during the monitoring period as reported to the special master in the prison's mental health manage report, pages 8-10 and in Tab C, 17 & 18 of the prison's response to the special master's twenty-fifth round document request .

4.  On page 79, the special master reports that "[a]ccess to mainline and SNY EOP programs continued to be slow in many cases.  Ten prisons…transferred 203 inmates to EOP programs.  Among these transfers, the rate of compliance with the 60 day timeframe was 64 percent."

1    CRC's documentation of these transfers shows that it transferred its inmates within the 60

2    day timeframe.  (*See* Tab O of the prison's response to the special master's twenty-fifth round

3    document request.)  The reference to CRC must be removed.

4          5.  On page 359, the special master reports that "four of the five scheduled [quality

5    management subcommittee] meetings were held during the reporting period."

6          Defendants object to this statement because it is inaccurate.  The CRC mental health

7    quality management subcommittee held five of the six scheduled meetings during the monitoring

8    period.  (*See* CRC Mental Health Management Report, p. 7 and Tab B3 of the prison's response

9    to the special master's twenty-fifth round document request.)  This statement must be modified to

10   report that CRC's subcommittee met five times.

11         6.  On page 364, the special master reports that "[r]equired members were present at IDTT

12   meetings, although CRC did not report on attendance by CCIs."

13         Defendants object to and move to strike this statement because it is inaccurate.  CRC

14   reported that CCIs attended IDTT meetings 93% of the time during the reporting period.  (*See*

15   Tab B of prison's response to the special master's twenty-fifth round document request.)

16   **B.    California Correctional Institution**

17         1.  On page 339, the special master reports that "CCI reported that 62 percent of inmates

18   received five-day clinical follow-up after discharges from the OHU and MHCB, and after returns

19   from DSH."

20         Defendants object to and move to strike this statement because it is inaccurate.  CCI

21   reported that it provided five-day clinical follow-up after discharge from DSH 100% of the time,

22   from OHU 100% of the time according to internal logs and 62 % of the time according to

23   MHTS.net, and from MHCB 100% of the time. (*See* CCI Mental Health Management Report pp.

24   8 & 10.)

25         2.  On page 347, the special master reports that "[p]rotocols for post-release community

26   supervision were followed in about half of parole planning cases, and the parole outpatient clinic

27   was followed in the other half of cases."

28

26

Defendants object to and move to strike this statement because monitoring post-release community supervision of inmates is beyond the scope of the *Coleman* class. Inmates released into the community are no longer *Coleman* class members. *See Coleman v. Wilson*, 912 F. Supp. 1282, 1293 (E.D. Cal. Sep. 13, 1995).

**C.    Central California Women's Facility**

1. On page 410, the special master reports that MHPB inmates are not seen in IDTT prior to admission.

Defendants object to and move to strike this statement because it inaccurately implies that the program requires that an inmate be seen in an IDTT prior to admission. (Program Guide at p. 12-5-12.) No CDCR policies or procedures require that inmates be seen by an Interdisciplinary Treatment Team prior to admission to a crisis bed.

**D.    California Men's Colony**

1. On pages 63 and 67, the special master reports that CMC failed to provide documentation regarding custody follow-up after discharge from crisis care.

Defendants object to and move to strike this statement because it is inaccurate. CMC provided this information to the *Coleman* monitors in its proof of practice binders. (*See* Tab C, sections 2-4 of the prison's response to the special master's twenty-fifth round document request.)

**E.    San Quentin State Prison**

1. On page 178, the special master reports that the "[m]ost of these inmates clearly needed inpatient care and were not receiving it or its equivalent." The special master asserts similar opinions on pages 463-475.

Defendants object to and move to strike these statements because they are inaccurate. All inmates in the condemned unit are receiving the proper level of care, and hospitalization within a Department of State Hospital facility is not clinically indicated for any of the condemned inmates receiving specialized care. The most recent report updating San Quentin's specialized care for the condemned program, which was submitted to the special master and plaintiffs' counsel on July 20, 2012, contradicts the special master's conclusions that hospitalization is necessary for

27

inmates A, B, and D in pages 469-74 of the special master's report. Therefore, San Quentin's mental heath treatment program meets the serious mental health care needs of its inmates, and the State is not acting with deliberate indifference to their serious mental health needs. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).

**F.    Calipatria State Prison**

1. On page 59, the special master failed to include Calipatria among the institutions that regularly reported a quorum at mental health subcommittee meetings.

Calipatria reported in its mental health management report at page five that its mental health subcommittee met regularly and attained a quorum at all meetings. Therefore, this should be included in the statement.

2. On page 60, the special master failed to include Calipatria among the institutions that reported a peer review process in place.

Again, Calipatria provided documentation of its peer review process during the monitoring round and should be included in the statement. Calipatria reported this information in its mental health management report at pages 5 and 6 and provided documentation of it in Tab B 6 of the prison's response to the special master's twenty-fifth round document request.

**G.    Centinela State Prison**

1. On page 62, the special master reports that Centinela was not one of the institutions that achieved 100% compliance with clinical five day follow-up with inmates discharged from crisis care.

Defendants object to and move to strike this statement because it is inaccurate. Centinela reported that it provided clinical five-day follow-up for all inmates discharged from crisis care. Centinela provided this information at pages ten and eleven of its mental health management report and at Tabs G 6 and H 6 of the prison's response to the special master's twenty-fifth round document request.

2. On page 80, the special master failed to include Centinela among the institutions that reported a timely response to 90% or better for routine referrals.

28

Defendants move to modify this statement to include Centinela among the institutions that reported a timely response to 90% or better for routine referrals because Centinela reported timely responses 99% of the time.  Centinela provided this information at page fourteen of its mental health management report and at Tab S 2 of the prison's response to the special master's twenty-fifth round document request.

**H.    Kern Valley State Prison**

1.  On page 309, the special master reports that Kern Valley State Prison offered only one therapeutic group to CCCMS inmates.

Defendants object to and move strike this statement because it is inaccurate.  Kern Valley offered at least three groups to CCCMS inmates during the monitoring period.  Kern Valley State Prison provided this information at Tab M of the prison's response to the special master's twenty-fifth round document request.  The implication that only offering one group to CCCMS inmates is insufficient also lacks foundation because there is no evidence that the CCCMS population at Kern Valley clinically needed more than one therapeutic group.

**I.    Mule Creek State Prison**

1.  On page 62, the special master reports that Mule Creek "did not demonstrate completion of monthly [emergency] drills" in administrative segregation.

Defendants object to and move to strike this statement because it is inaccurate.  Mule Creek provided the monitors with documents showing the emergency drills were completed.  Mule Creek State Prison provided this information in Tab H 12 sub a of the prison's response to the special master's twenty-fifth round document request.

2.  On page 62, the special master failed to include Mule Creek among the institutions that demonstrated accessibility to cut-down tools and possession of on-person CPR micro-shields by custody officers.

Defendants object to and move to modify this omission.  The special master's own report acknowledges on page 131 that Mule Creek maintained cut-down tools in primary and overflow segregation unit control booths.

29

3.  On page 64, the special master omits Mule Creek from the list of institutions that he considered compliant with documented daily psych tech rounds in administrative segregation.

Defendants object to and move to modify this omission.  Mule Creek provided the monitors with documents showing daily psych tech rounds in administrative segregation.  Mule Creek State Prison provided this information in Tab H 6 sub b of the prison's response to the special master's twenty-fifth round document request.

**J.      North Kern State Prison**

1.  On page 61, the special master reports that North Kern "failed to provide data regarding an operational ERRC [Emergency Response Review Committee] during the review period."

Defendants object to and move to strike this statement because it is inaccurate.    North Kern conducted regular committee meetings, and provided the monitors with documents proving they were held.  North Kern provided this information in Tab R of the prison's response to the special master's twenty-fifth round document request

2.  On page 311, the special master reports that the "mental health subcommittee did not meet regularly" at North Kern.

Defendants object to and move to strike this statement because it is vague.  The North Kern mental health subcommittee met five times during a seven month period from November 2011 to April 2012.  North Kern provided this information in Tab B of the prison's response to the special master's twenty-fifth round document request.

**K.      Substance Abuse and Treatment Facility and State Prison at Corcoran, California**

1.  On page 60, the special master asserts that "CSATF did not have an effective peer review process."

Defendants object to and move to strike this statement because the use of the word "effective" is vague and speculative.  The special master provides no evidence supporting his conclusion that the peer review process was not effective or explaining precisely how the peer

1   review process at CSATF was somehow ineffective.  Defendants further object to any implication

2   or conclusion that the lack of an "effective peer review process" impacted the quality of or access

3   to necessary mental health care system wide.  The special master introduced no evidence in

4   support of such a conclusion.

5                                                    **CONCLUSION**

6          The special master has lost sight of his mission—assisting the State to establish a system

7   that provides constitutionally adequate mental health care to prison inmates.  (*See* Dec. 12, 1995

8   Order of Reference, Docket No. 640 at 2.)  Instead, the special master now concentrates his and

9   his monitors' efforts on reviewing the State's compliance with the minutiae of its own internal

10  policies and procedures.  But none of this is related to the Constitution or any actual harm to

11  inmates' mental health care needs.  Rather, the special master's efforts have resulted in a Gordian

12  knot of intricate criticism with which no organization could possibly comply, assuring continued

13  monitoring—and shocking expenses to state taxpayers—for years to come.

14         These efforts are neither the special master's mission, nor what is required by the

15  Constitution.  When examined under the objective light of constitutional minima, California's

16  prison mental health delivery system is one of the best in the United States.  (ECF No. 4275–1 at

17  5:10–19.)  Because the State has established such a system, and has complied with the

18  Constitution, its objections to the special master's report must be sustained, and this 23-year old

19  litigation must finally end.

20  Dated:  February 19, 2013                    KAMALA D. HARRIS
                                                 Attorney General of California
21

22                                               By:  */s/ Debbie J. Vorous*

23                                                    DEBBIE J. VOROUS
                                                      Deputy Attorney General
24                                                    *Attorneys for Defendants*

25

26  CF1997CS0003

27

28

                                                        31