# EXHIBIT 1

# *Coleman v. Brown*

Case No. 90-cv-00520 LKK JFM P (Eastern District of California)

## Comments Regarding 25th Round Monitoring Report of the Special Master

By

**Joel A. Dvoskin, Ph.D., A.B.P.P.**

## **COMMENTS**

I was asked by the Attorney General's Office as an expert in the field of correctional mental health care to offer my initial impression of the 25th Round Monitoring Report of the Special Master.  Note: Because of the very short time frame provided to respond to this report, my notes are based only on the report itself. I have not yet had a chance to read the Appendices.

### **General Comments**

The Special Master makes a variety of negative criticisms, each of which implies that CDCR is failing to meet some sort of legally required standard of care.  What is often missing from his analysis is the absence of any citation or authority that identifies the standard that CDCR is allegedly failing to meet. The most obvious example of this is the vague criticism of CDCR's quality improvement system.  As we noted in our report, I am aware of no correctional mental health system in the United States that matches the amount of effort or the quality of CDCR's quality improvement system, which includes a well-attended QI Committee at every single prison.

As I have made clear on many occasions, I have great respect for the experience and expertise of many of the Special Master's experts. However, many (indeed most) of the good suggestions contained in the Special Master's report are not based on any legal standards of which I'm aware, and can only be described as best practices to which no correctional health system other than California's has ever been held. To be sure, many of these recommendations are good ones, and I have no objection to striving for excellence and implementing best practices, but I have never seen a prison mental health system held to such standards as a matter of constitutional law.

As one example of the need for additional transparency, it would be very useful to be able to ask the Special Master and his individual experts whether the best practices they are recommending are in fact in place in a significant plurality of other correctional mental health systems. Again, I admire and share the obvious desire of the plaintiffs, the Special Master, and his expert team to make the CDCR mental health system the very best system in the United States. I have seen a great deal of evidence to suggest that this desire is shared by the new Secretary of CDCR, and by Drs. Toche and Belavich. However, as admirable as this goal may be, I am unaware that it is a constitutional mandate.

In the overview, the Special Master states that the increase in the number of available MHCB's has caused "the persistent shortage of MHCBs to **begin** to ease. (Emphasis added.)" Please correct me if I am wrong, but it is my understanding that there is currently <u>no</u> waiting list for transfer to a Mental Health Crisis Bed, and that this has been the case for some time. Thus, a more accurate statement would have been that the "previously persistent shortage of MHCB's has been <u>eliminated</u>."

1

Similarly, in the Overview, the Special Master writes, "Given the relative newness of the process (for identifying and referring inmates in need of inpatient care), it is still undergoing refinement and requires ongoing monitoring." It is my understanding that the Special Master's own assessment revealed a remarkably low number of inmates who appeared to be in need of a higher level of care. Thus, the reason for the "need for ongoing monitoring" is not at all clear.

Quoting his previous (24th round) monitoring report, the special master wrote, "(A)n important goal of the remedial phase of this case is... for CDCR itself to assume the mantle of ultimate responsibility for diagnosing its own problems, i.e. conduct its own 'qualitative analysis,' and create a quality improvement process that it can use to achieve and maintain compliance, *and move on to removal from federal court oversight*. (Emphasis in original.)" As a person who previously ran a correctional mental health system, it is my opinion that the highly detailed nature of the current monitoring system directly interferes with CDCR's ability to do just that. For example, if the Director of Mental Health for CDCR wishes to make a system improvement by changing the Program Guide, is well known that he must first ask the permission of the Special Master. Further, any system improvement that does get added to the Program Guide then becomes a matter of monitoring by the Special Master. Thus, it is literally true that CDCR is likely to be deemed less compliant every time it improves the system, because it is virtually impossible to implement an innovative system improvement without making a significant number of mistakes in its early stages.

I agree with the Special Master's general observation that the suicide rate in California's prisons appears to be consistently higher than the national average. (Since the data for 2011 have not yet been published, it is not yet possible to know if that is true for 2011 and 2012. Nevertheless, it appears likely that California's rate will also exceed the national average for those years once the data is available.) Sadly, no one knows why the suicide rate in California's prisons is higher than the national average, and it is likely that there is more than one reason. Among the hypotheses that should be considered are the obvious differences between California's prison system and that of other states. For example, the prevalence of prison gangs is a pernicious and ever-present reality that poses challenges to inmates and staff alike. Second, the system is very large compared to most other states. Third, it has been alleged that California uses various types of segregation more often than other prison systems, although I am not aware of whether or not this allegation has been studied empirically. Fourth, and frankly less likely, the diligent and highly detailed monitoring of CDCR, by the Special Master, the Receiver, and the Department itself may result in more diligent identification and reporting of suicide deaths.

Regarding the use of alternative housing, I found myself in generally enthusiastic agreement with the draft memorandum that was reportedly developed as a consensus document between the Special Masters experts, the Plaintiffs, and the Department. Note, however, that the use of OHUs and their equivalents is typically

the most prevalent manner in which suicide watches are conducted in prisons across the country. That being said, I applaud this consensus document as a best practice, and one with which I am in strong agreement.

On pages 24 and 25 of his report, the Special Master notes that several of the required actions have not been fully implemented. Some of these likely bear little correlation to the incidence of any suicides, such as the frequency of SPRFIT meetings, but most of them are best practices that the Department itself wants to implement with a very high level of consistency. Thus, my own opinion is that debating the constitutional obligation to improve performance in these areas is not productive, and the Department should continue its efforts to meet its own standards simply because it is the right thing to do.

In my opinion, there is no evidence whatsoever that CDCR lacks commitment or effort in its efforts to prevent prison suicides, nor is there evidence that I or the Special Master are in possession of any simple solution to this perplexing problem. Thus, there is no reason to even allege deliberate indifference to this important problem. Nevertheless, there is widespread agreement between the parties that there is always room for improvement, that more must be done, and that the Department's efforts are aimed in the right direction and must continue.

(Note: Additional comments regarding suicide prevention will await my review of Dr. Patterson's report for 2011 and a review of each of the suicide that occurred in 2011. This will occur next week.)

**Administrative Segregation and Related Issues**

On page 34 of his report, the Special Master wrote, "…(S)ome EOP inmates' stays in administrative segregation hubs remain excessively long.  As of September 7, 2012, 87 EOP inmates were warehoused in administrative segregation longer than 90 days. (Footnote 12.)" I did not understand this paragraph. Specifically, were the 87 inmates to whom the Special Master referred in ASU or in an ASU-EOP hub? If they were in ASU, I would agree with the implication that these stays were presumptively excessively long. However, if these 87 inmates were housed in an ASU-EOP hub, then they would have been receiving an EOP level of care, and it would be less clear why these stays were deemed to be excessive.

That being said, as I have clearly and repeatedly noted, placement of any inmate into ASU, and especially those at an EOP level of care, should be based upon a clearly documented need to do so in order to protect the institution, its staff, and its inmates. It is unclear if the Special Master is alleging that any or all of the 87 inmates to whom he refers were placed in ASU or held there for inappropriate reasons.

I agree with the Special Master's finding "that (the) core aspects of EOP care in administrative segregation have taken root, and that inmates are being seen by a

treatment team promptly and regularly, and are having timely and regular clinical context." This finding is consistent with my own observations in touring these units throughout the state. I also agree that overly long stays for mentally ill inmates in segregation should be avoided.

On page 36 of his report, the Special Master noted, "A pervasive problem found during 25th round monitoring was that all 11 hubs failed to conduct all clinical contacts and/or therapeutic groups in confidential settings." I disagree with the premise that all clinical contacts and/or therapeutic groups must occur in confidential settings. For example, many groups are psychoeducational in nature and do not require extreme confidentiality or privacy. Supportive contacts can often occur at cell front, contacts that many inmates appreciate and find very helpful. In my tours of the 13 prisons, I repeatedly asked inmates about their relationship with and attitude toward their primary clinician and their psychiatrist, and was quite impressed with the consistency with which inmates responded in a positive manner. I also asked inmates, clinical staff, and custody staff about the ability of inmates or clinicians to successfully request that a clinical contact occur in a private setting. The responses were overwhelmingly positive. It is important to note that inmates don't always want to be removed from their cell, especially in segregation, where cell removal may require that the inmate be cuffed and shackled. In my opinion, it is not obligatory that every clinical contact occur in a private setting. It is, however, essential that both inmates and clinical staff have the opportunity to request and receive privacy when they feel it is it is appropriate or necessary.

With respect to the requirement of ten hours of therapeutic programming for inmates in ASU-EOP or PSU levels of care, I generally agree with the Special Master. While the constitutionality of this requirement is a legal issue, it is consistent with my understanding of the standard of care, and there is a need for improvement in this area. That being said, CDCR is working hard to reach this goal, and the data provided by CDCR is sufficient to monitor the Department's performance in this regard; thus, the need for on-site monitoring (as opposed to simply reviewing the reported data) is unclear to me.

As suggested below, I believe that it is very likely that the temporary staffing shortages were caused by reallocation of staff in accordance with the staffing plan that has been approved by the Special Master. Further, I believe it to be likely that the failure to meet the 10 hours of offered therapy was caused or exacerbated by these situational staffing shortages.

The Special Master's summary of the status of CDCR building projects is indeed impressive. While it is a positive and admirable program of construction, it is unclear to me why the current status of the CDCR physical plants creates issues of constitutional significance. For example, it is my understanding that the waiting lists for MHCB admission has been eliminated. Thus, while it is a very good thing to build more and better space, the need for external monitoring of these projects is not clear.

**Staffing Issues**

For a variety of reasons, the special Master's report on vacancy rates may create an inaccurate impression. As the Special Master is undoubtedly aware, the Department has moved many positions from one location to another, in accordance with the staffing plan that was previously approved by the Special Master. Each time a position is moved, is my understanding that California's civil service law provides certain rights to the person who occupies that position. The person can either accept a voluntary transfer to another location, or except the layoff. Each of these decisions carries some delay; and since many employees decline the voluntary transfer, these reallocations of resources always result in temporary creation of additional vacancies. It is therefore no surprise that the current report notes a "sudden uptick" of additional vacancies. Further, once a position has been vacated, there are delays built into the hiring process to fill it, many of which are not under the direct control of CDCR. Ironically, it is my understanding that hiring processes are controlled by a HR Department that is directly controlled by the Federal Court through its receiver.

For reasons that are unclear to me, the Special Master makes a point of reporting vacancy rates that omit the presence of contractors. This gives a misleading view of the vacancy rate. To his credit, the Special Master then gives the correct number (i.e., including the use of contractors), a difference he dismisses as "marginal." In regard to psychiatrists, the Special Master first alleges a vacancy rate of 42 percent, by reporting only permanent employees. The actual rate is reported later, which is 26 percent. The implication is that contract employees are somehow less valuable or less competent than permanent employees, or that the employment of contract employees is in some way unusual or problematic. Nothing could be further from the truth. Mental health and correctional systems all over the United States use contract employees when necessary to respond to temporary or chronic staffing shortages. There is to my knowledge no constitutional distinction whatsoever between permanent and contract employees. Indeed many correctional mental health and healthcare systems rely entirely on private-sector contractors.

As the Special Master notes, some of the vacancies are the direct result of positions that have been <u>added</u>, though not yet filled. Thus, the creation of additional positions, which ought to be cause for praise, it presented as evidence of non-compliance. However, vacancy rates have never been the subject of constitutional adequacy, especially when they reflect the fact that additional positions have been added to the budget. The real test of whether there are enough psychiatrists is not the vacancy rate, but the quality of psychiatric services being provided. I leave this assessment to Dr. Scott, but in our report, he noted that the overall quality of psychiatric services was more than adequate despite some staffing shortages. My own interviews with inmates resulted in very consistent reports that inmates were seeing their psychiatrist regularly, most knew the name of their psychiatrist, most knew the name and/or type of medication they were taking, and most reported a generally positive opinion of the psychiatrist. (For example, I frequently asked if the

5

inmate felt that the psychiatrist was trying to help the inmate, or if the inmate felt comfortable asking for a change in medication.)

Further, recruitment issues, especially regarding psychiatrists, are a problem in the majority of prisons and jails in the US, and hardly evidence of deliberate indifference. Nevertheless, I believe that Dr. Scott and I are in agreement that there remain recruitment or retention challenges in several prisons in regard to psychiatric services. For example, in one prison (SATF) the shortage of psychiatrists led to a decision that psychiatrists would no longer attend IDTT meetings. However, this problem has been vigorously addressed by Dr. Belavich.

We have also been informed by Dr. Toche and Dr. Belavich that the Department is in the process of implementing an ambitious program of tele-psychiatry to alleviate some of the shortages.

Regarding psychologists and social workers, the Special Master again first reports inaccurately high vacancy rates by omitting contractors, before reporting the actual rates, which also seem high. The causes and the consequences of the reported shortages of psychologists and social workers are similarly unclear, but quite likely the result of the same challenges listed above. I also am not clear regarding the extent to which these shortages may have contributed to the failure to offer 10 hours of programming to each inmate in ASU-EOP or PSU.

All of this being said, I certainly agree with the Special Master that filling as many psychiatrist, psychologist, and social worker positions as possible is important. CDCR enthusiastically agrees, and is doing everything within their power to expedite the process of keep its positions filled.

Only after criticizing the Department for its high vacancy rates, the Special Master writes, "The rather sudden uptick in mental health vacancy rates may well be attributable to the addition of new mental health position allocations within the defendant's staffing plan which have not yet been filled." (He neglects to consider the possibility that reallocation of clinician positions has caused temporary vacancies, as explained above. Thus, the manner in which these shortfalls were reported suggests a very unfair implication. In fact, instead of reporting an increase in vacancy rates, it would have been far more informative and fair to report the increase or decrease in the total number of clinicians and the number of clinical positions.

I agree with the Special Master that supervisory positions are important and should be filled. However, these too have been affected by the re-allocation of positions as described above. More generally, vacancies are a fact of life in the provision of public mental health services in any setting, including prisons. The Special Master offers no allegation or recommendation that would suggest a lack of effort on the part of CDCR, nor should he.

Our expert team did, however, make several observations regarding leadership issues that may have contributed to at least some of the leadership vacancies, each of which was promptly and appropriately acted upon by CDCR.

I agree with the special master that collaboration and cooperation between mental health and custody staff is essential. However, in our visits to 13 prisons, we saw little evidence of a problem in this regard. In fact, custody staff were often advocates for treatment, and there appeared to be a very positive relationship between the majority of custody staff and the majority of clinical staff.

I found the reference to MHTS.net rather puzzling, since I am unaware of any analogous data system in any prison mental health system in the United States. While I agree with Special Master that it is a valuable tool, is much less clear to me why it is a matter of court oversight. In any event, the tool appears to be working well at the present time, and we are aware of no evidence that the data it produces is currently inaccurate. In the Special Master's report, he raises "doubts about the reliability of MHTS.net reports." However, in several cases, we asked prisons to do separate audits to determine the accuracy of the reported data and found in each case that the data were accurate.

Dated: January 28, 2013          /s/ Joel A. Dvoskin Ph.D. A.B.P.P

                                 (original signature retained by attorney)
                                 Joel A. Dvoskin, Ph.D. A.B.P.P.

7