1  DONALD SPECTER – 083925
STEVEN FAMA – 099641
2  PRISON LAW OFFICE
1917 Fifth Street
3  Berkeley, California  94710-1916
Telephone:    (510) 280-2621
4

5

6

7
8  JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
9  LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
K&L GATES LLP
10  4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
11  Telephone:    (415) 882-8200

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
LISA ELLS – 243657
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

12  Attorneys for Plaintiffs

13

14              UNITED STATES DISTRICT COURT

15            EASTERN DISTRICT OF CALIFORNIA

16

17  RALPH COLEMAN, et al.,

18              Plaintiffs,

19        v.

20  EDMUND G. BROWN, Jr., et al.,

21              Defendants.

Case No. Civ S 90-0520 LKK-JFM

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT**

Judge:   Hon. Lawrence K. Karlton

22

23

24

25

26

27

28

[727956-6]

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS ............................................................................ IV

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 4

I.   DEFENDANTS' OVERALL OBJECTIONS ARE UNFOUNDED, WITHOUT MERIT, AND SUPPORT A FINDING OF ONGOING CONSTITUTIONAL VIOLATIONS ................................................................. 4

    A.   The 2011 Suicide Report's Findings Are Highly Probative of Ongoing Constitutional Violations. ...................................................... 4

    B.   Defendants' Conduct Demonstrates Deliberate Indifference to Known Risks of Preventable Suicides. ..................................................... 7

        1.   CDCR Has Failed to Implement Life-Saving Emergency Response Requirements as Part of Suicide Prevention .................... 7

        2.   Defendants Have Failed to Implement Their 30-Minute Welfare Checks As Required ................................................... 9

        3.   Defendants' Failure to Train and Supervise Staff Adequately in the Proper Use of Suicide Risk Assessment/Evaluation Tools Has Caused Unnecessary Pain and Suffering .................................. 11

        4.   Defendants' Failure to Act Upon Reasonable Recommendations of Lindsay Hayes, Their Suicide Consultant, Is Further Evidence of Deliberate Indifference ............. 13

    C.   The Special Master's Conclusion That the 34th 2011 Death Was a Suicide Is Supported by the Evidence. ........................................... 17

    D.   Defendants' Objections to 2011 Suicide Report Conclusion That 73.5 Percent of the Suicides Were Foreseeable And/Or Preventable Lack Merit. .................................................................................. 18

        1.   Defendants' Request to Strike the Report's Assertion That 24 Suicides were Foreseeable or Preventable Is Meritless ................... 19

        2.   Defendants' Request to Strike the Report's Assertion That In 50% of the Suicides, Suicide Risk Evaluations Were Inadequate Is Unsupported and Should Be Denied .......................... 25

        3.   Defendants' Request to Strike the Report's Conclusion That They Failed To Conduct Timely Custody And Welfare Checks In Five Suicides Is Unfounded And Should Be Denied. .................... 27

        4.   Defendants' Request To Strike The Report's Finding That Emergency Response Procedures Were Not Performed Timely And/Or In An Appropriate Manner In 16 Suicides Is

i

1          Unfounded And Should Be Denied.................................................... 28

2          5.    Defendants' Request to Strike the Report's Language that
                  CDCR Failed To Comply With Post-Suicide Review and
3                 Reporting Timelines Is Unsupported By The Evidence. ................... 29

4    II.    THE REPORT'S RECOMMENDATIONS ARE WELL SUPPORTED BY
            EVIDENCE OF PERSISTENT AND SYSTEMIC CONSTITUTIONAL
5           FAILURES IN DEFENDANTS' SUICIDE PREVENTION PROGRAM ............. 31

6    CONCLUSION.................................................................................................. 33

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[727956-6]

# TABLE OF AUTHORITIES

**Page**

## Cases

*Balla v. Idaho State Bd. Of Corr.*,
    595 F. Supp. 1558 (D. Idaho 1984) ........................................................ 11

*Brown v. Plata*,
    131 S. Ct. 1910 (2011).................................................................... 4, 5

*Coleman v. Wilson*,
    912 F. Supp. 1282 (E.D. Cal. 1995) .................................................... 12

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ........................................................................... 5

*Helling v McKinney*,
    509 U.S. 25 (1993) ...................................................................... 2, 4, 6

## Other Authorities

Joel A. Dvoskin, Erin M. Spiers, Jeffrey L. Metzner & Steven E. Pitt, *The Structure of Correctional Mental Health Services*, *in* PRINCIPLES AND PRACTICE OF FORENSIC PSYCHIATRY 489, 494 (Richard Rosner ed., 2d ed. 2003) .................. 5, 11

[727956-6]

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| AED | Automated External Defibrillator |
| ASP | Avenal State Prison |
| ASU | Administrative Segregation Unit |
| CCCMS | Correctional Clinical Case Management System |
| CCI | California Correctional Institution |
| CDCR | California Department of Corrections and Rehabilitation |
| CPR | Cardiopulmonary Resuscitation |
| CSP-SAC | California State Prison – Sacramento |
| CTF | Correctional Training Facility |
| DOM | Department Operations Manual |
| DSH | Department of State Hospitals |
| DVI | Deuel Vocational Institution |
| EOP | Enhanced Outpatient Program |
| FTP | File Transfer Protocol |
| HDSP | High Desert State Prison |
| IDTT | Interdisciplinary Treatment Team |
| LAC | California State Prison – Los Angeles County |
| MH | Mental Health |
| MHCB | Mental Health Crisis Bed |
| MH-OHUs | Mental Health-Outpatient Housing Units |
| MHSDS | Mental Health Services Delivery System |
| NKSP | North Kern State Prison |
| OHU | Outpatient Housing Units |
| PLRA | Prison Litigation Reform Act |
| PMP | Proctor-Mentor Program |
| PSU | Psychiatric Housing Unit |
| PVSP | Pleasant Valley State Prison |
| RJD | Richard J. Donovan Correctional Facility |
| SATF | Substance Abuse Treatment Facility and State Prison |
| SHU | Security Housing Unit |
| SPR-FIT | Suicide Prevention Response Focus Improvement Team |
| SRA | Suicide Risk Assessment |
| SRE | Suicide Risk Evaluation |
| SVSP | Salinas Valley State Prison |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY
PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

**INTRODUCTION**

The Special Master's Report on Completed Suicides in the California Department of Corrections and Rehabilitation ("CDCR") for Calendar Year 2011, filed on January 15, 2013, Docket No. 4307 (hereinafter "2011 Suicide Report"), properly focused on a review of the 34 suicide deaths that occurred in 2011 within California's prisons, as well as on a broader analysis of the system-wide deficiencies identified by Dr. Patterson, the Special Master's expert. Dr. Patterson, who is a nationally recognized expert on suicide prevention in correctional settings, has written thirteen previous annual reports on CDCR suicides on behalf of the Special Master, starting with calendar year 2000. 2011 Suicide Report at 1. In the 2011 Suicide Report, Dr. Patterson identifies two over-arching concerns: the small reduction in the mental health population within CDCR, despite the overall population reduction; and the high rate of vacancies in mental health staffing within CDCR prisons, which exacerbates the problems of inadequacies in assessment, treatment and intervention with respect to prisoners who are suicidal. 2011 Report at 16. These problems make clear that overcrowding continues to stand in the way of the *Coleman* remedial process.

In addition, Dr. Patterson makes a series of recommendations, which renew prior recommendations from his earlier reports. He also identifies the following new recommendation, to which Defendants object:

> (1) Establishment of a suicide prevention/management work group to timely review suicide prevention measures, suicide deaths, and deaths deemed to be of undetermined cause, with participation by CDCR clinical, custody, and administrative staff, DSH staff, and the special master's experts, including monitoring of the CDCR suicide review process and its compliance with the Program Guide, Chapter 10, "Suicide Prevention," and integration of the CDCR suicide review process with the *Plata* receiver's death review process.

*Id*. at 17-18.

In response to the 2011 Suicide Report, Defendants filed Objections and Motion to Strike or Modify Portions of the Special Master's 2011 Suicide Report on February 11,

PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

[727956-6]

1  2013, Docket No. 4326 (hereinafter "Objections").  In their Objections, Defendants move

2  to strike references to their number of suicides, their suicide rates, the percentages of

3  foreseeable and/or preventable suicides, and the specific deficiencies noted by Dr.

4  Patterson in his review of the 34 suicides.  Defendants even object to the "suggestion" that

5  "the number of suicides that occurred in 2011 is of constitutional significance."

6  Objections at 1:12.

7       It is of constitutional significance that the Defendant state officials are continuing to

8  ignore the simple suicide prevention steps identified by their own consultants, to delay

9  implementation of the incremental steps that they have adopted, and to deliberately short-

10  staff the entire mental health system so that suicide prevention policies that look good on

11  paper go unimplemented or only partially implemented.  Defendants even "buried" and

12  ignored the report and recommendations of their own nationally prominent suicide

13  consultant, hired in 2010.  In combination with these indisputable facts, the continued high

14  rate of suicide in California prisons is of enormous constitutional significance.  The 2011

15  Suicide Report properly reports on these facts, including (1) the high CDCR suicide rate

16  when compared to the national prison suicide rate and suicide rates of other large prison

17  systems; (2) the trend line showing CDCR suicide rates going up; and (3) the precise ways

18  in which delayed, partial, and short-staffed implementation of suicide prevention plans

19  have made CDCR prisons an extremely dangerous place for persons with severe mental

20  illness whose symptoms include suicidality.

21       What is not of constitutional significance is whether Defendants "have a passionate

22  interest in preventing suicide," to use the words chosen by Defendants' termination expert.

23  *See* Clinical Evaluation of California's Prison Mental Health Delivery System by Dvoskin,

24  Moore and Scott, filed 1/7/13, Docket No. 4275-5 (hereinafter "Report of Termination

25  Experts") at 2.  The Eighth Amendment test has a subjective component, but it is not

26  satisfied merely by claiming to have a good attitude.  On the contrary, it requires that

27  Defendants engage in conduct consistent with a subjective lack of deliberate indifference.

28  *Helling v McKinney*, 509 U.S. 25, 26 (1993).  Some state officials may have a "good

2

[727956-6]

1  attitude," but they engage in conduct that shows deliberate indifference. The evidence

2  reviewed in the 2011 Suicide Report shows that, in every area of suicide prevention,

3  CDCR is starving the system of resources.  CDCR, like all state agencies, has been forced

4  to manage their complex mission with significant staffing vacancies and little ability to

5  hire and fill critical positions, due to Defendant Governor Brown's February 15, 2011

6  Statewide Hiring Freeze, as well his decision to order the massive layoffs associated with

7  realignment.  *See* Declaration of Jane Kahn In Support of Plaintiffs' Opposition to

8  Defendants' Objections and Motion to Strike or Modify Portions of the Special Master's

9  2011 Suicide Report (hereinafter "Kahn Decl.") ¶ 2, Ex. A (Executive Order, B-3-11).

10          Rather than using the partial population reduction as an opportunity to address the

11  underlying constitutional violations, Defendants once again put their constitutional

12  obligations on the back burner to maximize the financial benefits to the State.  These

13  extraordinary number of vacant clinical and custody positions prevent the implementation

14  of basic suicide prevention measures adopted by CDCR, pursuant to this Court's orders, as

15  reflected in numerous admissions by CDCR senior officials in their own reports and

16  analyses.  CDCR's internal Suicide Reports and institutional management reports admit

17  that staffing vacancies, linked to the Governor's Hiring Freeze and realignment, have

18  interfered with the ability to provide the basic elements of the mental health program,

19  including critical suicide prevention measures.  *See* Declaration of Jane E. Kahn in Support

20  of Plaintiffs' Response to Defendants' Motion to Strike or Modify Portions of the Twenty-

21  fifth Round Monitoring Report of the Special Master, filed 2/11/13, Docket No. 4325

22  (hereinafter "Kahn Decl. ISO Pls 25th Report Resp.") ¶¶ 6(f), (g).; Kahn Decl. ¶ 3, Ex. C

23  (CDCR Institutional Management Reports, produced by Defendant Edmund G. Brown Jr.

24  in Response to Plaintiff's First Request for Production of Documents).

25          In addition to the previously discussed objections, Defendants object for the first

26  time in twelve years to Dr. Patterson's use of the terms "preventable" and "foreseeable."

27  Objections at 10:3-4.  Dr. Patterson's employment of these terms is not a defect in his

28  reporting.  On the contrary, the use of generally accepted terms for evaluating institutional

[727956-6]

1   responses to known risks shows that his reporting hews closely to the constitutional

2   standard in this case.  *See Brown v. Plata*, 131 S. Ct. 1910, 1925 n.3 (2011) (Constitution

3   prohibits systemic deficiencies that subject mentally ill prisoners to "substantial risk of

4   serious harm"); *Helling*, 502 U.S. at 33-34 (Eighth Amendment prohibits knowing

5   exposure of inmates to unreasonable risk).

6         Far too many California prisoners are losing their lives due to systemic and repeated

7   failures in the custodial and mental health system.  The vast majority of these lives could

8   and should have been saved if clinicians, custody officers, and state officials had been

9   appropriately trained, supervised, and managed, and if the resources necessary to

10  implement suicide prevention measures had not been denied or delayed by the Governor

11  and the Legislature, resulting in worsening staffing vacancies, as well as inadequate

12  treatment and housing for class members.

13        As demonstrated below, the Court should adopt the Findings and Recommendations

14  of the 2011 Suicide Report and Order Defendants to implement these Recommendations

15  forthwith.  The Court should deny Defendants' Objections and Motion to Strike or Modify,

16  which are unfounded, unwarranted, and unsupported by the evidence provided.

17                                    **ARGUMENT**

18  **I.    DEFENDANTS' OVERALL OBJECTIONS ARE UNFOUNDED, WITHOUT
19         MERIT, AND SUPPORT A FINDING OF ONGOING CONSTITUTIONAL
           VIOLATIONS**

20        **A.    The 2011 Suicide Report's Findings Are Highly Probative of Ongoing
21               Constitutional Violations.**

22  Contrary to Defendants' repeated assertions,[1] the Special Master's 2011 Suicide

23  _____

24  [1] Many of Defendants' objections to the 2011 Suicide Report — "that [the Special Master]
25  has lost sight of his primary obligation," that the "report mistakenly focuses on tangential
    and misleading issues," and that "CDCR's prison suicide rate is a few points higher than
26  the national average" — are groundless and rehashed from their objections to the 25th
    Round Report.  Plaintiffs incorporate by reference their response to the 25th Round Report
27  objections.  *See* Plaintiffs' Response to Defendants' Objections and Motion to Strike or
28  (footnote continued)

1  Report directly addresses the question of whether CDCR's mental health care system

2  satisfies constitutional standards.  The Eighth Amendment constitutional standard asks

3  whether Defendants are acting with deliberate indifference to known risks of substantial

4  harm.  *Brown*, 131 S. Ct. at 1925 n.3.

5      Dr. Patterson's methodology in the 2011 Suicide Report, as in all of his prior

6  suicide reports, is to use the evidence from the year's suicides to measure the degree to

7  which CDCR's mental health system presents unreasonable risks of harm to CDCR

8  prisoners and class members whose symptoms include tendencies toward self-harm.  In

9  health care, as in other fields, a generally accepted way to measure an institution's

10  response to risk is to ask whether signal events in the institution were "foreseeable" and

11  "preventable."  This principal is generally accepted by experts in correctional health care

12  as well, including, at least until recently, Defendants' termination expert, Dr. Dvoskin:

13  "Each facility has an overriding obligation to protect inmates or detainees from foreseeable

14  and preventable harm."  Joel A. Dvoskin, Erin M. Spiers, Jeffrey L. Metzner & Steven E.

15  Pitt, *The Structure of Correctional Mental Health Services*, *in* PRINCIPLES AND PRACTICE

16  OF FORENSIC PSYCHIATRY 489, 494 (Richard Rosner ed., 2d ed. 2003) (hereinafter

17  "Dvoskin, et al., *Structure of Correctional Mental Health Services*").  Dr. Patterson used

18  this same methodology in his article analyzing five years of  CDCR suicides published in

19  the peer-reviewed American Psychiatric Association journal, Psychiatric Services.  *See*

20  Kahn Decl. ¶ 4, Ex. D (attaching article).

21      Dr. Patterson's definitions for "foreseeable" and "preventable" hew closely to the

22  constitutional standard that requires institutions to protect inmates from known risks of

23  substantial harm, and that measures acceptable risks by a standard of reasonableness.  *See*

24  *Farmer v. Brennan*, 511 U.S. 825, 844 (1994) (knowledge element); *Helling*, 509 U.S. at

25  ───────────────

26  Modify Portions of the Twenty-Fifth Round Monitoring Report of the Special Master, filed
    2/11/13, Docket No. 4324 (hereinafter "Plaintiffs' Response") at 10:6-7; 10:11-21;12:10-
27  16; 14:6-23; *see generally* Kahn Decl. ISO Pls 25th Report Resp.

28

1  36 (unreasonable risk).  Dr. Patterson uses the term "foreseeable" to "refer to those cases

2  in which *available information* about an inmate indicates the presence of substantial or

3  high risk for suicide, and requires reasonable clinical, custodial, and/or administrative

4  intervention(s)."  2011 Suicide Report at 4 (emphasis added).  Dr. Patterson uses the term

5  "preventable" to describe "cases in which the likelihood of completed suicide might have

6  been reduced substantially had some additional information been gathered and/or some

7  additional intervention(s) undertaken, usually as required by existing policy."  *Id.*

8       When Dr. Patterson measures foreseeability, he always does so with reference to

9  information that was known to the clinical and custodial officials at the institution, based

10  on material in the institution's files, or information reported by custody and clinical

11  officials to the suicide reviewer.  Where such prior knowledge is lacking, Dr. Patterson

12  finds that the suicides are not foreseeable.[2]  This is faithful to the constitutional standard

13  set forth in *Farmer*.  The preventability measurement corresponds to the reasonableness of

14  the risk discussed in *Helling*.  If the suicide could have been prevented by proper

15  implementation of reasonable measures within CDCR's reach, as shown especially by the

16  suicide prevention policies CDCR itself has developed, then the suicide was preventable,

17  and its occurrence tends to show that CDCR is tolerating unreasonable risk.

18       In his current role as one of Defendants' termination experts, Dr. Dvoskin now says

19  Dr. Patterson use of generally accepted risk evaluation terms is too "judgmental."  Dvoskin

20  Response to Dr. Raymond F. Patterson's 2011 Suicide Report (hereinafter "Dvoskin

21  _____

22  [2] *See*, *e.g.,* 2011 Suicide Report at 170 (discussing Inmate P whose suicide Dr. Patterson

23  determined was likely not foreseeable as the "inmate did not report suicidal ideation or
   intent" even though he noted that "the assessments conducted by the primary clinician and

24  IDTT reviews were grossly inadequate"); *id.* at 240 (discussing Inmate Z whose death

25  Dr. Patterson determined did not appear foreseeable, as the inmate did not report nor was
   he observed to be at risk of self-harm, although there were clear indications that the inmate

26  did not react well having been found guilty of three RVRs two days before his suicide, and
   was clearly frustrated, angry and was described as "hopeless" during the hearing, but this

27  did not generate a suicide risk assessment despite it being "bad news").

28

1   Response"), Docket No. 4326-6, at 2, 27.  Dr. Dvoskin, however, does not actually reject

2   measurements of foreseeability and preventability, but merely suggests adding additional

3   gradations to the scale for measuring them.  *Id.* at 2.  Neither Dr. Dvoskin nor his CDCR

4   employers can dispute that Dr. Patterson's analysis of foreseeability and risk is extremely

5   faithful to the governing Eighth Amendment rule that institutions must protect prisoners

6   from known risks of serious harm.

7       **B.     Defendants' Conduct Demonstrates Deliberate Indifference to Known
            Risks of Preventable Suicides.**

8

9       The 2011 Suicide Report identifies three significant suicide prevention

10  requirements with serious, long-standing deficiencies.  Each of these requirements have

11  been long monitored and are mandated by existing CDCR policies and procedures, as well

12  as this Court's orders.  These significant ongoing deficiencies support a finding that

13  Defendants remain deliberately indifferent to the pain and suffering caused by their non-

14  compliance with Court-ordered suicide prevention requirements:

15      (1)  Emergency response was not performed in a timely and/or appropriate manner

16  in 47%, or 16 of 34, suicides.  2011 Suicide Report at 3.

17      (2)  30-minute staggered welfare checks ("living, breathing checks") were not

18  consistently provided for prisoners newly admitted to ASUs.  *Id.* at 2.

19      (3)  In 50% of the suicides, suicide risk evaluations either were not done, or were

20  done without adequate consideration of risk factors, past history, and/or review of medical

21  records.  As a result, interventions that could have been appropriate were not implemented.

22  *Id.* at 3.

23      **1.     CDCR Has Failed to Implement Life-Saving Emergency
            Response Requirements as Part of Suicide Prevention**

24

25      Timely emergency response, including the provision of CPR by first responders,

26  can make the difference between life and death, especially in the case of a suicide attempt.

27  In the Special Master's first Suicide Report reviewing 1998 and 1999 suicides, dated

28  July 14, 2000, he found that in over 30% of suicides, CPR was not initiated and

PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY
PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

[727956-6]

1  recommended "a sustained effort to reinforce provisions of the new DOM on emergency

2  responses to suicides."  Kahn Decl. ¶ 5, Ex. E (2000 Suicide Report excerpts).  In

3  subsequent reports on suicides, the Special Master's expert, Dr. Patterson, annually

4  documented persistent failures by CDCR staff to provide CPR to prisoners who were

5  found after a suicide attempt.  *See, e.g.*, Kahn Decl. ¶ 6, Ex. F (excerpts from 2001 Suicide

6  Report (showing 30% of suicides with no CPR); 2002 Suicide Report (showing 27% no

7  CPR); 2003 Suicide Report (showing 15% no CPR)).

8        Noting a persistent "not my job" attitude among custody staff refusing to initiate

9  CPR, the Special Master in 2003 recommended an order requiring custody staff to provide

10  immediate life support until medical staff arrive.  Kahn Decl. ¶ 6, Ex. F(p. 11 of 2003

11  Suicide Report, plus Table).  This Court adopted the Special Master's recommendation and

12  ordered Defendants to implement a policy, which was incorporated into the *Coleman*

13  Program Guide.  *See* June 10, 2005 Order, Docket No. 1668; *see also* Kahn Decl. ¶ 7,

14  Ex. G (Program Guide section implementing policy).  Despite this Court's order,

15  Defendants remain non-compliant with this essential element of their suicide prevention

16  policy ten years later.[3]

17        Defendants are fully aware of these deficiencies and nonetheless have failed to

18  address this serious constitutional violation adequately, which has resulted in unnecessary

19  and avoidable death over the past decade.  Defendants' "defense" is to attach a declaration

20  from Kathleen Allison, Deputy Director of the Division of Adult Institutions, Docket

21  No. 4326-1 (hereinafter "Allison Decl."), attaching the Receiver's most recent emergency

---

23  [3]  2005 Suicide Report, Docket No. 2566, at 4 (no CPR in 16%, and late CPR in 19%, of
24  suicides); 2006 Suicide Report, Docket No. 3030, at 10 (no CPR or untimely CPR in 39.5% of suicides); 2007 Suicide Report, Docket No. 3677, at 17 (no CPR or untimely
25  CPR in 21% of suicides); 2008/2009 Suicide Report, Docket No. 4009, at 9 (CPR or first aid not performed in timely and/or appropriate manner in 21.6% of suicides in 2009 and
26  16% of suicides in 2009); 2010 Suicide Report, Docket No. 4110, at 9 (in 42.8% of suicides, CPR, including use of AED and/or first aid, not performed in timely and/or
27  appropriate manner).

response policy, dated December 2011.  This policy regarding custody obligations as first responders merely incorporates the language in this Court's June 10, 2005 Order (Docket No. 1668).  Plaintiffs do not dispute that Defendants have a good written policy—the Special Master and Court already saw to that.  The problem is that Defendants are not implementing the policy due to overcrowding factors:  clinical and custody understaffing, lack of management skills, lack of financial resources, and lack of will.  This is demonstrated by high percentages of suicides with no or inadequate emergency response, year after year.

### 2.    Defendants Have Failed to Implement Their 30-Minute Welfare Checks As Required

In 2006, in response to the escalating number of suicides in administrative segregation units, this Court ordered Defendants to work with the Special Master and his experts, as well as Plaintiffs and their expert, Lindsay Hayes, to develop a plan of action.  *See* June 7, 2006 Order, Docket No. 1830.  During the meeting that followed, all of the experts urged Defendants to implement regular welfare checks in administrative segregation—meaning that all inmates in such units must "be personally observed by a correctional officer at least every thirty minutes at an irregular schedule."  Special Master's Report and Recommendations on Defendants' Plan to Prevent Suicides in Administrative Segregation, filed 12/18/06, Docket No. 2084, at 7.  Despite undisputed evidence that 30-minute welfare checks for all prisoners housed in administrative segregation would save lives, and are a generally accepted correctional practice adopted by the American Correctional Association and followed by prison systems throughout the country, Defendants rejected the experts' recommendation, "citing the strain on thin custody resources it would entail."  *Id.*

Ultimately, Defendants agreed to provide 30-minute welfare checks *only* to prisoners in an administrative segregation unit for the first three weeks of their stay.  *Id.*  To date, Defendants have failed to implement fully even this compromised standard for 30-minute welfare checks.  *See*, *e.g.*, Declaration of Walter L. Kautzky in Support of

PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY
PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

1  Plaintiffs' Objections to Defendants' Plan to Address Suicide Trends in ASUs, filed

2  10/31/06, Docket No. 2012; Declaration of Lindsay M. Hayes in Support of Plaintiffs'

3  Objections to Defendants' Plan to Address Suicide Trends in ASUs, filed 10/31/06 Docket

4  No. 2011 (describing the critical nature of 30-minute welfare checks in ASUs, which

5  increase the likelihood of an opportunity for an emergency response to a suicide in

6  progress); *see also* Kahn Decl. ¶ 8, Ex. H (Excerpts from Deposition Testimony of Lindsay

7  M. Hayes, 2/18/13).

8          In his memorandum of December 12, 2006 implementing the limited 30-minute

9  welfare checks, then-CDCR Director Scott Kernan acknowledged that although "[m]any

10  institutions have expressed concerns about this process in regard to workload issues and

11  staffing … *there are no additional staffing resources associated with this change*."  Kahn

12  Decl. ¶ 9, Ex. I (Kernan Memo, emphasis added).  In plain English, Defendants told

13  CDCR's wardens to implement this new requirement and at the same time told them that

14  they would not receive any additional staff resources to do so.  Avoidable and unnecessary

15  deaths have resulted.

16          Defendants' deliberate indifference to this fundamental requirement continued in

17  2012, resulting in the avoidable and unnecessary loss of lives.  Although Defendants claim

18  to have implemented the 30-minute welfare checks, several prisoners died in 2012 suicides

19  where the failure to perform these checks was identified by Defendants themselves as a

20  problem.  *See* Kahn Decl. ISO Pls 25th Report Resp. ¶ 6(c) (May 30, 2012 Suicide where

21  30-minute welfare checks not staggered, and tier officer signed log rather than officers

22  who completed them); ¶ 6(i) (June 23, 2012 suicide where problems with 30-minute

23  welfare checks noted, including inadequate record-keeping and timeframes for the checks

24  that would not permit an adequate welfare check to have been completed).

25          The problems identified in the Special Master's monitoring reports, as well as in the

26  Special Master's annual suicide reports, clearly document systemic failures in this critical

27  suicide prevention measure that has been Court-ordered for many years.  Defendants'

28  overcrowding-related decision to "implement" 30-minute welfare checks without any

PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY
PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

1    allocation of resources for additional custodial staff is shocking.  Ms. Allison's testimony

2    primarily restates Defendants' existing policies and procedures concerning 30-minute

3    welfare checks, CPR and emergency response, and security checks.  Ms. Allison does not

4    address what efforts, if any, CDCR has undertaken to remedy the 30-minute welfare check

5    custody failures that have been identified in the 2011 Suicide Report or that have been

6    identified by Defendants themselves in 2012 CDCR Suicide Reports.  Defendants' on-

7    going failure to implement this life-saving suicide prevention measure is a constitutional

8    violation.

9               **3.    Defendants' Failure to Train and Supervise Staff Adequately in**
                **the Proper Use of Suicide Risk Assessment/Evaluation Tools Has**
10              **Caused Unnecessary Pain and Suffering**

11          Defendants object to the 2011 Suicide Report finding that in 50 percent of the

12   suicides, "suicide risk evaluations were either not done or found levels of 'low' or 'no

13   appreciable' risk of suicide, without adequate consideration of risk factors, past history,

14   and/or review of medical records."  Defendants assert this finding lacks foundation, is

15   speculative, fails to connect the inadequacy to the suicide, blames the State for suicides out

16   of its control, and disregards the State's "attention" to suicide prevention.  Objections at

17   12:3-13 (citing 2011 Suicide Report at 3).  The suicide risk evaluation ("SRE"), or suicide

18   risk assessment ("SRA"), is a checklist utilized by clinicians to assess the level of risk of

19   suicide when a prisoner expresses current suicidal ideation, makes suicidal threats or

20   attempts, when the prisoner is admitted or discharged from and OHU, MHCB, or DSH,

21   and anytime when a newly arriving prisoner indicates a current or significant history of

22   suicide risk factors.  Kahn Decl. ¶ 10, Ex. J (MHSDS Program Guide, section 12-10-7

23   to -9).

24          Suicide prevention and a system of suicide risk assessment and intervention is a

25   mandatory element of a constitutional prison mental health system.  *Balla v. Idaho State*

26   *Bd. Of Corr.*, 595 F. Supp. 1558, 1576 (D. Idaho 1984); Dvoskin, et al., *Structure of*

27   *Correctional Mental Health Services* at 495.  At the time of the *Coleman* trial, this Court

28   found that Defendants had adequate policies and procedures regarding suicide prevention,

[727956-6]

PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY
PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

1    but had yet to properly implement the system. *Coleman v. Wilson*, 912 F. Supp. 1282,

2    1315 (E.D. Cal. 1995). This remains the case today, eighteen years later. As evident from

3    the 2011 Suicide Report, CDCR Suicide Reports for 2012 suicides, and the findings in the

4    Special Master's Twenty-Fifth Round Monitoring Report, Docket No. 4298 (hereinafter

5    "25th Report"), Defendants have failed to implement this key element of their suicide

6    prevention policy despite years of monitoring and feedback.[4]

7          Defendants ignore almost *two decades* of failure in this area, and now measure

8    progress from the development of their very latest of suicide prevention plans, the August

9    2010 Plan, which includes their Proctor Mentor Program ("PMP") proposal. Kahn Decl.

10   ISO Pls 25th Report Resp. Ex. A. Defendants cite to the declaration of Tim Belavich, the

11   acting Director of CDCR's mental health program, filed in support of their Objections to

12   the 25th Report. Declaration of Tim Belavich, filed 1/28/13, Docket No. 4313 (hereinafter

13   "Belavich Decl."). Dr. Belavich asserts that the mental health program has developed and

14   implemented a mentoring program to improve clinical competency in the administration of

15   suicide risk evaluations. *Id.* at 3:20-22. This implementation is incomplete. *See* Kahn

16   Decl. ISO Pls 25th Report Resp. ¶ 14 (discussing June 28, 2012 meeting in CDCR

17   Headquarters where discussion regarding fact that person in charge of implementing PMP

18   program had left and had not been replaced; also discussing two 2012 suicides at

19   _____

20   [4] *See, e.g.*, 2005 Suicide Report, Docket No. 2566, at 12 ("Untimely administration and

21   inadequate completion of SRACs remained problematic."); 2006 Suicide Report, Docket
     No. 3030, at 10-11 ("Inadequate and untimely completion of the SRACs remained ongoing

22   problems that were identified in a number of suicide reviews … there appeared to be
     inadequate supervision at the facility level to ensure that these policies were being

23   followed"); 2008 and 2009 Suicide Report, Docket No. 4009, at 9, 14 ("A number of

24   inmate suicide risk assessment finding levels of 'low' risk were done without adequate
     consideration of risk factors, past history, and/or review of the medical records."); 2010

25   Suicide Report, Docket No. 4110, at 9 ("In 18 or 51 percent of the suicide cases in 2010,

26   inmate suicide risk assessments were either not done, or found levels of 'low' or 'no
     appreciable' risk of suicide, without adequate consideration of risk factors, past history,

27   and/or review of medical records.").

28

[727956-6]

PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY
PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

1 institutions where PMP programs were in infancy). Defendants acknowledge that "there

2 are differences in the percentages of staff mentored at each institution," and project that all

3 staff will be trained eventually through a peer review cycle that "generally takes two

4 years." Objections at 4. Defendants, of course, do not clarify whether the "two years" is

5 from the date of their plan — August 2010 — or their filing — February 11, 2013.

6        Meanwhile, as Defendants have chosen to roll out their newest of initiatives at their

7 business-as-usual pace, there continue to be foreseeable and/or preventable deaths where

8 either no suicide risk evaluation was done when needed, or an inadequate suicide risk

9 evaluation was completed. *See* Kahn Decl. ISO Pls 25th Report Resp. ¶ 6(a) (discussing

10 2012 suicide of Prisoner 1); ¶ 6(b) (discussing 2012 suicide of Prisoner 2); ¶ 6(i)

11 (discussing 2012 suicide of Prisoner 8); ¶ 6(j) (discussing 2012 suicide of Prisoner 9).

12 Defendants have known of this serious deficiency in their suicide prevention program,

13 have been ordered to correct it, and have failed to allocate the appropriate resources to do

14 so at the cost of great harm and suffering to the *Coleman* class. Defendants have failed to

15 remedy this constitutional violation by their profound deliberate indifference.

16        **4.    Defendants' Failure to Act Upon Reasonable Recommendations
             of Lindsay Hayes, Their Suicide Consultant, Is Further Evidence
17           of Deliberate Indifference**

18        Defendants' termination experts opine that CDCR is not deliberately indifferent to

19 suicide prevention because CDCR "has acted upon reasonable recommendations received

20 from within CDCR and from external sources." Objections at 3:21-22. This is patently

21 untrue. Not only have Defendants failed to adequately implement their own suicide

22 prevention plans, they have also failed to act upon basic life-saving measures

23 recommended by their own suicide consultant, Lindsay M. Hayes, of the National Center

24 for Institutions and Alternatives. In 2010, Defendants hired Mr. Hayes to provide "Suicide

25 Expert Consultant Services for CDCR's Suicide Prevention Program." As articulated by

26 CDCR, "[Mr. Hayes]'s experience (more than 25 years) with correctional suicide

27 prevention programs will allow the CDCR to make immediate, short-term, and long-term

28 changes in its suicide prevention program to begin to decrease the overall rate of suicide

PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY
PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

[727956-6]

1   over the long-term.  This consultation will allow the CDCR to implement a more effective
2   suicide prevention policy and demonstrate to the *Coleman* court its resolve to deal with an
3   issue that impedes its ability to resolve the litigation."  Kahn Decl. ¶ 11, Ex. K at 1.  As
4   CDCR's Suicide Prevention consultant, Mr. Hayes came to California, toured three
5   prisons, met with CDCR officials and reviewed policies, procedures, and practices,
6   reviewed Suicide Reports for 25 of the 35 suicides that occurred in 2010, and, as required
7   by the contract, provided CDCR with his preliminary recommendations on January 30,
8   2011 followed by a final report with his recommendations on August 16, 2011.  *Id*.  The
9   contract provided for one- and two-year follow ups, and then a consultation in year three,
10  to be followed by an additional final report including recommendations for long-term
11  changes.  *Id*. at 3.  After Mr. Hayes submitted his August 16, 2011 report to Defendants,
12  however, CDCR "buried" the report and has not requested any additional services from
13  him despite the significant further steps contemplated by the contract.  *See* Feb. 14, 2013
14  Order, Docket No. 4341, at 5:3-7; *see also* Kahn Decl. ¶ 12, Ex. L.

15      Indeed, Defendants withheld Mr. Hayes's recommendations from the Special
16  Master or Plaintiffs' counsel for almost a year despite their repeated requests, and even
17  then only provided a redacted report containing limited information and conditioned on
18  extreme restrictions on its use, including that the redacted report not be used in litigation.
19  *See* 2011 Suicide Report at 12-13 (documenting refusal to provide Hayes report).
20  Mr. Hayes testified that based on his contract and his work with CDCR officials in 2010,
21  he had always understood that his recommendations and reports would be provided to the
22  Special Master and Plaintiffs' counsel as part of the *Coleman* remedial process.  Kahn
23  Decl. ¶ 13, Ex. M (excerpt from Hayes Depo transcript).

24      Defendants "buried" the life-saving recommendations and strategies set forth in
25  Mr. Hayes's August 16, 2011 Report ("Hayes Report"), which came to light only when
26  Mr. Hayes produced the report in response to a subpoena.  *See* Feb. 14, 2013 Order; *see*
27  *also* Kahn Decl. ¶ 14, Ex. N (Hayes Report).  The Hayes Report has ten sections including
28  the following:

PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY
PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

1    (1) Mr. Hayes's review of 25 CDCR suicides in 2010 showing a "continuing and

2    chronic problem in the identification and management of inmates at risk of suicide."  Kahn

3    Decl. ¶ 14, Ex. N at 1-2.  He found that 28% of the cases involved problems with

4    emergency response; 28% of the cases involved prisoners who committed suicide within

5    hours or days of being released from suicide observation status or who had suicide risk

6    factors that did not result in their placement on suicide observation; 16% of the cases had

7    rigor mortis or other evidence that wellness checks had not been performed by custody;

8    44% of the cases were in administrative segregation and that, in some of those cases,

9    suicide prevention procedures such as welfare checks and use of intake cells had not been

10   followed; and 68% of the cases involved multiple problem areas requiring corrective

11   action.  *Id.* at 1-2.

12   (2) Mr. Hayes's recommended changes in the threshold for placement on suicide

13   observation, which he found were "overly restrictive" and "set too high and unnecessarily

14   and dangerously excludes a potentially suicidal inmate and/or inmate at moderate risk for

15   self-injurious behavior."  Mr. Hayes based this on his review of the 2010 CDCR suicides,

16   where he found in 28% of the cases, prisoners committed suicide within hours or days

17   following discharge from suicide observation or had suicide risk factors but were not put

18   on suicide observation.  *Id*. at 3-4;

19   (3) Mr. Hayes's recommended substantive changes to CDCR's written suicide

20   prevention policies, including (a) expanding the mental health tracking system to include

21   all inmates who have attempted suicide, engaged in self-injurious behavior, or otherwise

22   been placed on suicide observation regardless of whether or not they are currently in the

23   MHSDS due to a formal diagnosis; (b) addressing the risks created by widespread

24   imposition of harsh suicide observation conditions — such as inmates being stripped naked

25   and deprived of showers and other privileges — because those conditions discourage

26   inmates from honestly reporting suicidal ideation; (c) ensuring that inmates who are

27   released from "alternative" crisis placements, such as Outpatient Housing Units, receive

28   the same 5-day clinical follow-up used for inmates released from licensed crisis

1   placements; (d) instituting 30-minute safety checks on inmates released from suicide

2   observation for a duration to be determined by the inmates' clinician; and

3   (e) implementing hourly welfare checks for all prisoners to bring CDCR in line with

4   standard correctional practice throughout the country. *Id*. at 4-6;

5        (4) Mr. Hayes's recommended change that *all* inmates on suicide observation,

6   regardless of their location, be provided with a suicide-resistant bed: "[I]t is difficult to

7   understand how forcing an inmate to sleep on a mattress without a bed is conducive to

8   alleviating the symptoms of suicidal behavior and/or mental illness." *Id*. at 11.  This

9   recommendation address the fact that this Court ordered, over Defendants' objection, that

10  suicide-resistant beds be installed in all licensed MHCBs, but Defendants have refused to

11  install suicide-resistant beds in their numerous unlicensed OHUs and MH-OHUs, where

12  suicidal prisoners are also routinely housed.

13       (5) Mr. Hayes's recommendation that CDCR "prohibit the use of ZZ cells

14  (temporary holding cells) for suicide observation." *Id*. at 11-12.

15       (6) Mr. Hayes's recommendation that CDCR expand the information tracked on the

16  MHTS to include non-MHSDS prisoners who attempt suicide or are placed on suicide

17  observation. *Id*. at 12-13.

18       (7) Mr. Hayes's recommended improvements and expansion in suicide prevention

19  training for clinical and custody staff. *Id*. at 13.

20       (8) Mr. Hayes's recommended changes to the local institutional committees

21  established to review and remedy problems identified in past suicides ("SPR-FITS"[5]).  He

22  found SPR-FITS need to do far more and are currently of "questionable effectiveness"

23  based on easily observed deficiencies he discovered during his tours. *Id*. at 14.

24       (9) Mr. Hayes's recommendation that CDCR abandon its plan to use administrative

25  segregation for suicide observation. *Id*. at 15.

26  _____

27  [5] Suicide Prevention and Response Focused Improvement Team.

28

[727956-6]

16

PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY
PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

1      (10) Mr. Hayes toured three OHU facilities at CSP-SAC, DVI, and Mule Creek. He

2  expressed significant concerns about the current conditions in each of those institutions

3  OHUs due to poor lighting, visibility, and sanitation, as well as hazardous conditions for

4  self-harm. He recommended that CDCR significantly upgrade the overall conditions of

5  these units, as well as augment clinical and custody staffing, in order to provide a

6  minimally adequate level of care. *Id*. at 9-10.

7      Rather than taking steps to address these major problems and to implement

8  Mr. Hayes's clear recommendations for change, Defendants ignored them. Dr. Canning,

9  CDCR's Statewide Suicide Prevention Coordinator, told Mr. Hayes in an email dated June

10  18, 2012 that "obviously when your report landed it was not roundly applauded and in fact

11  was buried." Kahn Decl. ¶ 12, Ex. L. Defendants' decision to "bury" the

12  recommendations made by their own suicide prevention consultant, Lindsay Hayes — who

13  was specifically hired to improve their suicide prevention program — is further evidence

14  of their deliberate indifference.

15     **C.**    **The Special Master's Conclusion That the 34th 2011 Death Was a Suicide Is Supported by the Evidence.**

16

17      Defendants next object to Dr. Patterson's inclusion of Inmate HH as a suicide

18  because they claim Dr. Patterson's opinion is based upon speculation and lacks foundation.

19  Objections at 6:16-17. Dr. Patterson reviewed Defendants' Death Report and other

20  documents and concluded that, based on the available information that he reviewed, this

21  "death was more likely than not a suicide."

22      Dr. Patterson clearly sets forth the basis of his decision for concluding that Inmate

23  HH's death was likely a suicide, including that: (1) the prisoner had threatened suicide

24  several times before and had made prior suicidal gestures; (2) he had a history of prior

25  mental health treatment; (2) there were two phone calls by the prisoner to his mother in the

26  last weeks of his life that were concerning – the first where his conversation was odd and

27  paranoid, and the second where he told his mother to tell his nephew that "he was dead;"

28  (3) the prisoner's sketchbook, including a drawing of a headstone; (4) the prisoner left a

[727956-6]

PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY
PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

1   note for his mother which appeared to be a suicide note: "Mom I am so sorry that I am a

2   selfish and inconsiderate piece of garbage … I been here much too long and I am so tired

3   of my stoopidity (sic)  I love you.  Dear ! PS nothing is what I want:" (5) the prisoner was

4   diagnosed with Depression and prescribed Zoloft; and (6) an earlier suicide risk

5   assessment done in 2007 noted family history of suicide.

6          Dr. Patterson's conclusion is well supported by these facts.  Furthermore, Dr.

7   Patterson requested that "[i]f there is additional information to suggest or demonstrate that

8   it was not, that documentation should be provided for further review."  2011 Suicide

9   Report at 283.  Defendants have failed to provide any such information in their

10  declarations, and Defendants' termination expert offers no opinion.  Dvoskin Response at

11  27.  Defendants' objection is unsupported and without merit.

12          **D.     Defendants' Objections to 2011 Suicide Report Conclusion That 73.5
                    Percent of the Suicides Were Foreseeable And/Or Preventable Lack**
13                  **Merit.**

14          Defendants object and move to strike the 2011 Suicide Report conclusion that 73.5

15  percent of the 34 suicides in 2011 involved some degree of inadequacy in assessment,

16  treatment, or intervention, which resulted in a suicide that might have been either

17  "preventable" and/or "foreseeable."  Objections at 9:12-14.  Defendants attack Dr.

18  Patterson's  "classification system" as speculative, misleading, lacking in foundation, and

19  irrelevant to the governing standard.  *Id*. at 10:3-4.  Plaintiffs have already addressed the

20  charge of irrelevancy to the governing standard, above at Section I.A.  Nothing could be

21  more relevant to that standard than whether suicides are foreseeable and preventable in

22  light of what CDCR officials knew about the inmate's condition before his death.  The rest

23  of Defendants' attack is merely quibbling about word choice, based on Defendants'

24  contention that Dr. Patterson should not qualify his findings by noting the degree of

25  probability that a particular event was foreseeable or preventable.  This quibbling appears

26  only in legal argument.  Defendants' termination expert, Dr. Dvoskin, does not adopt or

27  endorse it.

28

[727956-6]

18
PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY
PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

1    **1.    Defendants' Request to Strike the Report's Assertion That 24 Suicides were Foreseeable or Preventable Is Meritless**

2

3    In each of Dr. Patterson's reviews of the 2011 suicides, he reaches a conclusion as

4    to whether the suicide was preventable and/or foreseeable.  Dr. Patterson bases his

5    conclusions on his review of the prisoner's records, the CDCR Suicide Report, and other

6    CDCR documents, and his conclusions are supported by his expert review of the evidence.

7    Defendants' termination expert reviewed each of the 2011 suicides and noted with regard

8    to Dr. Patterson's individual case reviews:

9        Indeed, in reviewing the individual cases, I agree with many of Dr.
10       Patterson's findings, which often represent best practices for improvement
         moving forward. Even where we disagreed, in most cases there were simply
11       two alternative and equally reasonable ways to look at the case.

12   Dvoskin Response at 2.

13   Defendants' termination expert reviewed Dr. Patterson's determinations of

14   foreseeability and/or preventability and *did not disagree* with Dr. Patterson's findings in

15   23 of the suicides (A, C, J, K, L, M, Q, S, T, U, V, Y, Z, AA, BB, DD, EE., FF, GG, E, F,

16   G, I).  *See* Dvoskin Response at 6, 7-8, 9, 10-11, 12, 13-14, 15, 17, 19, 20, 21, 22-23, 24,

17   25, and 26.  In another four suicides, Defendants' expert agreed with at least one of Dr.

18   Patterson's findings of foreseeability and/or preventability.

19   Dr. Dvoskin's disagreement in those four cases is equivocal and not well-supported:

20   (1)   Inmate O:  Dr. Patterson found this OHU suicide both "foreseeable"

21        and "preventable."  Dr. Dvoskin writes:  "While I do not strongly

22        disagree with Dr. Patterson, I note that two psychologists evaluated

23        him two hours before his death, thus calling into question the degree

24        to which the suicide was foreseeable.  On the other hand, I tend to

25        agree with Dr. Patterson's belief that this man's 'fluctuating mental

26        status, at times endorsing and at other times denying suicidal ideation,

27        intent, and a plan to hang himself' would have justified a transfer to a

28        mental health crisis bed."  Dvoskin Response at 17.

[727956-6]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(2)    Inmate P:  Dr. Patterson concluded that this suicide was "preventable" because the prisoner was refusing all contacts, and CDCR made no efforts to remove him from the cell for a more comprehensive evaluation or referral to a higher level of care for evaluation.  Dr. Dvoskin writes that "Dr. Patterson implies that the inmate should have been forcibly extracted from his cell in order to compel an evaluation or a transfer … I agree that this inmate appeared to need a higher level of mental health care."  Dvoskin Response at 18.

(3)    Inmate R:  Dr. Patterson concluded that this suicide was "preventable" because the inmate had been discharged from acute inpatient care in a fragile state without resolution or substantial improvement in his clinical condition, and had received inappropriate and inadequate medication management.  2011 Suicide Report at 192.  Dr. Dvoskin writes:  "I agree with Dr. Patterson that the inmate could have continued at the APP or ICF level of care, but I do not agree with his assessment that this was the only reasonable course of action."  Dvoskin Response at 19.  Dr. Dvoskin also wrote that improvement had been noted, "though the inmate denied having a mental illness."  *Id.*;

(4)    Inmate CC:  Defendants' expert agreed that while "this suicide appears to be preventable … I am less convinced that the suicide was 'quite possibly foreseeable."  Dvoskin Response at 24.

None of these statements provide a sufficient basis to upend Dr. Patterson's well substantiated conclusions.

Finally, there are five suicide cases where Defendants' expert disagrees with Dr. Patterson's findings.  Dvoskin Response at 7, 12, 15-16, 21 & 22.  The Court should accept Dr. Patterson's findings in these cases as well founded and deny Defendants'

20

[727956-6]

1    objections because Dr. Patterson's findings are based on his extensive knowledge of

2    Defendants' policies and procedures regarding crisis bed admissions and discharges,

3    referrals to inpatient programs, reception center screenings, transfers to EOP hubs, and the

4    many other elements of the *Coleman* Program Guide, which Dr. Dvoskin has not fully

5    mastered as evidenced below.  In addition, Dr. Patterson's review of the suicides was

6    informed by his knowledge of the inpatient referral remedial process, known as the

7    "sustainable referral process," which was in development in 2011 (*see* 25th Report at 28-

8    29), and this knowledge informed his review of suicides where clinically-indicated

9    referrals to DSH were not made.  Finally, Dr. Dvoskin has objected to findings of

10   foreseeability or preventability in cases involving medical staff performing *Coleman*-

11   mandated tasks, which this Court should reject.

12        (1)    <u>Inmate B</u>:  Inmate B was very psychotic and treatment resistant, but

13                   was not referred to DSH because of family ties.  Dvoskin Response at

14                   7.  Defendants' expert agreed with Dr. Patterson's opinion that "the

15                   suicide 'may have been' preventable" as "concretely true," but

16                   "disagree[ed] with its implication that the CDCR MH staff was wrong

17                   to decide not to refer him [Inmate B] to DSH."  *Id.*  Dr. Patterson

18                   described in his review that the "rationale for not referring him to

19                   DSH appeared to be based on a belief that he had 'created a stable

20                   existence' for himself and 'contains himself' despite his deteriorating

21                   condition."  2011 Suicide Report at 66.  In fact, Dr. Patterson found

22                   that this prisoner "met criteria for DSH referral consideration several

23                   months prior to his suicide."  *Id.*  Dr. Patterson's overall conclusion

24                   that "inmates who were clinically appropriate for referrals to higher

25                   levels of care [such as Inmate B] but were not referred," has been

26                   documented as a significant problem at Lancaster State Prison, where

27                   this suicide occurred.  *See* 2011 Suicide Report at 9; 25th Report at

28                   330-31.

[727956-6]

(2)     Inmate H:  Dr. Patterson found this suicide possibly "preventable" had the prisoner been provided an appropriate suicide risk evaluation prior to discharge from DSH, and had he not been transferred to a lower level of care right before his parole date.  2011 Suicide Report at 107. In addition, Dr. Patterson noted a failure by clinicians to consider his chronic suicide risk factors, as well as additional risk factors including his imminent deportation, low Global Assessment Functioning score of 38, and comments that he made about going home to Mexico to see his mother, who was dead.  *Id.*  Defendants' expert disagreed only with Dr. Patterson's inference that hearing the prisoner's comments about seeing his dead mother should prompt "a reasonably prudent mental health practitioner to assume that the inmate also intended to die."  Dvoskin Response at 12.  Dr. Dvoskin did not address the other suicide risk factors that led Dr. Patterson to conclude that this suicide may have been preventable.  *Id.*

(3)     Inmate N:  Defendants' expert disagrees with Dr. Patterson's finding that this suicide was both "foreseeable" and "preventable." Dr. Dvoskin notes that he "does not understand Dr. Patterson's finding that the 'five day follow up was grossly inadequate,'" based upon his understanding of the requirement.  Dvoskin at 16.  However, CDCR's suicide reviewer also identified the same significant problem with the five-day follow-up clinical assessments provided to this prisoner after discharge from a crisis bed.  2011 Suicide Report at 149.  Dr. Dvoskin also agreed with Dr. Patterson that the decision by the reception center clinicians to ignore CMF's MHCB recommendation that the prisoner be treated at EOP level of care was "questionable," but incorrectly concluded that it would not have made

[727956-6]

22

PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY
PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

a difference given that DVI has no EOP hub.  Dvoskin Response at

16.  Dr. Dvoskin appears unaware of the significance of the Program

Guide's 30-day transfer requirement, as well as MHCB discharge

procedures that mandate that a patient be sent to a prison where

mental health services are available at the level of care the patient

requires, in this case, EOP.  Kahn Decl. ¶ 15, Exs. O, P (MHSDS

Program Guide at 12-1-16 & 12-5-27 to -28, requiring that a patient

transferred to an MHCB shall be returned to the sending institution

unless the sending institution does not provide the level of care that

the patient currently requires).  This prisoner was discharged from

CMF's MHCB with a recommendation for EOP level of care, but was

nonetheless returned to a prison without an EOP and, compounding

the problem, was housed in the high-risk ASU.  When he returned, his

level of care was reduced to 3CMS, but if his care been elevated, as

noted by Dr. Dvoskin, he would at least have been identified as EOP

in the high-risk unit and been referred for expedited transfer to an

EOP hub as required by the Program Guide.  Kahn Decl. ¶ 15, Ex. O

(MHSDS Program Guide at 12-1-16, mandating expedited transfer of

EOPs placed into regular, non-hub ASUs).

(4)    Inmate W:  Dr. Dvoskin disagreed with Dr. Patterson's finding that

this suicide may have been "foreseeable" and "preventable" due to

delayed emergency response and a failure to correctly document that

the prisoner had been in a safety cell for 26 days in a county jail

before transfer to DVI.  Dvoskin Response at 21.  He notes that "even

if Dr. Patterson's assessment was correct, the error appears to have

been that of an RN," who he concludes was under the Receiver's —

not CDCR's — control.  *Id.*  Reception center screening is a critical

[727956-6]

part of the mental health program and nursing staff are part of that
screening team, with duties set forth in the Program Guide.  Kahn
Decl. ¶ 15, Ex. Q (MHSDS Program Guide at 12-2-3).  The Reception
Center RN is tasked with administering a standard set of questions
regarding a prisoner's medication needs, and his or her need for
immediate referral for crisis care or urgent psychiatric referrals.  The
RN also gathers health transfer information from committing counties
related to a prisoner's need for mental health care or assessment and
puts them in the prisoner's Unit Health Record.  *Id.*  This RN, as part
of the reception center screening team, failed to place the critical
information that this prisoner just had an extended stay in a county jail
safety cell into his Unit Health Record.  The suicide is no less
preventable because the member of the reception center screening
team who failed to perform this crucial, required task was a nurse.

(5)   Inmate X:  Defendants' expert also disagreed with Dr. Patterson's
conclusion that this suicide, where CPR was delayed and the body
was found in a state of rigor mortis, may have been preventable had
custody checks been conducted because "the only required checks of
general population inmates that would establish an inmate's well-
being are so-called standing counts, which occur only several times
per day."  Dvoskin Response at 22.  Lindsay Hayes, Defendants'
suicide consultant, advised Defendants that "[c]onsistent with
standard correctional practice throughout the country, an inmate
should never be left unobserved for longer than 60 minutes."  Kahn
Decl. Ex. N at 15:19-20.  This is one of Mr. Hayes's many important
life-saving recommendations that Defendants "buried."

Dr. Patterson's findings regarding the 2011 suicides are well supported by the

[727956-6]

1  evidence he reviewed, his extensive knowledge of CDCR generally and Defendants'

2  suicide prevention policies, procedures, and practices specifically, as well as his long

3  expertise in correctional suicide prevention.  Defendants' objections are unfounded and

4  without merit.

5           2.    **Defendants' Request to Strike the Report's Assertion That In
                  50% of the Suicides, Suicide Risk Evaluations Were Inadequate Is
6                 Unsupported and Should Be Denied**

7           Defendants object to the 2011 Suicide Report finding that "in 50 percent [or 17] of

8  the suicide cases in 2011, inmate suicide risk evaluations were either not done, or found

9  levels of 'low' or 'no appreciable' risk of suicide, without adequate consideration of risk

10  factors, past history, and/or review of medical records."  Objections at 12:3-6.

11  Dr. Patterson's report on this particular deficiency is limited to whether clinicians

12  completed an adequate suicide risk evaluation when clinically required and/or indicated.

13  Defendants themselves have described this as an essential suicide prevention tool, noting

14  that "[t]he knowledge and ability to complete an adequate suicide risk evaluation is a

15  fundamental clinical competency for all CDCR clinicians."  Kahn Decl. ISO Pls 25th

16  Report Resp., Ex. A at 22.  In their Objections to the 17 individual cases, Defendants make

17  objections that are broader than to findings about the inadequacies of suicide risk

18  evaluations, however.  They object to any findings of inadequacy in assessment, evaluation

19  and treatment, any findings regarding the one OHU suicide[6], to all determinations of

20  foreseeability and/or preventability, and attempt to dodge responsibility for any cases

21  involving medical/pain issues or staff hired by the Receiver by blaming the Receiver.

_____

23  [6] This prisoner hung himself in an OHU cell at Avenal State Prison while on suicide
24  observation.  As noted by Defendants' expert, the patient was able to use his grab bars to
    attach a ligature and hang himself, and should not have been placed in a cell that had not
25  been retrofitted.  In addition, he was not even observed in accord with the correct standard
    for suicide precaution, but was rather observed only once every 30 minutes.  Dvoskin
26  Response at 17.  Nonetheless, Defendants object to any finding of wrongdoing on the basis
27  that they have created a new policy regarding suicide observation in OHUs, dated
    December 2012 — long after this suicide occurred.  Objections at 16.

28

[727956-6]

25

PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY
PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

1  Objections at 16:18-21.  These are irrelevant and improper, as Dr. Patterson's findings in

2  these 17 cases relate to the "inadequacy of the suicide risk assessments," and Defendants

3  objections to that finding are unsupported by their evidence.

4        Defendants' effort to shift responsibility from CDCR to the Receiver because one

5  suicide involved an error by a psychiatric technician and another suicide involved a

6  prisoner who had an increased suicide risk due to medical issues is disturbing, and these

7  objections are unfounded.  Objections at 21:4-5 (Inmates J and S).  The mental health

8  duties of psychiatric technicians are carefully detailed in both the *Coleman* Program Guide

9  and the *Coleman* Staffing Plan, and include:  monitoring prisoners in administrative

10  segregation, secured housing units, and psychiatric housing units; crisis intervention;

11  implementation of behavioral management techniques; social and vocational training;

12  medication distribution; and the facilitation of individual and group mental health

13  treatment.  *See* Defendants' *Coleman* Staffing Plan, filed 9/30/09, Docket No. 3696, at 11.

14        Although the hiring and supervision of psychiatric technicians has moved under the

15  authority of the Receiver, psychiatric technicians continue to work as part of mental health

16  teams in the various prison units and are trained in suicide prevention like all prison

17  employees.  Second, the impact of pain and serious medical conditions has been long

18  recognized as a suicide risk factor, and was addressed specifically in the Special Master's

19  Report on Suicides Completed in the California Department of Corrections and

20  Rehabilitation in Calendar Year 2007, Docket No. 3677 ("2007 Suicide Report").  In the

21  2007 Suicide Report, Dr. Patterson made the following recommendation:

22       [to i]dentif[y] inmates' known and/or suspected medical problems and
     medications within these inmates' mental health treatment plans. Ten of the

23       34, or 29 percent of, inmates who committed suicide in 2007 had significant
     to substantial medial illnesses.  Given this frequency of co-occurrence of

24       medical problems and suicides, as well as the fact that medical problems are
     a known risk factor for suicide, mental health staff who are preparing

25       inmates' treatment plans should specifically identify inmates' medical

26       illnesses and medications within the treatment plans rather than merely
     allude to them by reference to other records.

27

28  2007 Suicide Report at 18-19.

1    Defendants now attempt to inappropriately hide behind the Receivership, in a

2 situation where mental health staff should be communicating with medical providers about

3 the impact of serious illness and pain on the risk of suicide, and appropriately considering

4 that impact when assessing suicide risk.  Defendants' objections are baseless and without

5 foundation.  The fact that another federal court has found Defendants so inadequate that a

6 Receivership was required is not a defense to continued failures in *Coleman*.

7          **3.    Defendants' Request to Strike the Report's Conclusion That They
                   Failed To Conduct Timely Custody And Welfare Checks In Five
8                   Suicides Is Unfounded And Should Be Denied.**

9    Defendants do not dispute the 2011 Suicide Report's finding that five of the

10 prisoners who committed suicide were in "rigor mortis" at the time of discovery.  This is a

11 profoundly important finding in a suicide prevention system that depends on regular

12 checks by custody staff to make sure that high-risk inmates are still alive and breathing.

13 The 2011 Report clearly states that "[i]n three of these five cases [in rigor], the inmate was

14 housed in administrative segregation at the time of the suicide.  The onset of rigor mortis

15 indicates that in these five cases, at least two to four hours had passed since the time of

16 death before the bodies were discovered."  2011 Suicide Report at 2-3.  For the three

17 prisoners housed in segregated housing units, either welfare or security checks are

18 required, and if properly completed, would have discovered a prisoner hanging before

19 rigor mortis set in.

20    Indeed, Defendants' own termination expert, Dr. Dvoskin, reviewed these suicides

21 and agreed with Dr. Patterson's conclusions about the emergency response failures and

22 state of rigor mortis:

23          <u>Prisoner G</u>.  Dr. Dvoskin noted the delay of between three to six minutes

24          before the officers entered, and that CPR was reportedly started nine minutes

25          after he was discovered.  He concluded "this was excessive," and that

26          "forensic evidence suggested that "welfare checks were not completed as

27          required, which would have been a serious error that might have contributed

28          to the inmate's death."  Dvoskin Response at 11-12.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY
PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

1

2        <u>Prisoner X</u>.  Dr. Dvoskin noted that this prisoner was housed in a general

3     population unit, that first responder custody officers began CPR three

4     minutes later than they could have started it, and that the body was in rigor in

5     a unit where only standing counts are required.  *Id*. at 22.

6

7        <u>Prisoner AA</u>.  Dr. Dvoskin notes that this prisoner was housed in the

8     condemned unit at San Quentin.  There is no dispute that the prisoner was

9     found with rigor mortis and a body temperature that indicated "that it was

10    likely that he was dead for several hours.  … [I]f required security checks

11    were not being performed, it would be a serious error, even if it did not

12    contribute to the inmate's death."  *Id*. at 24.

13

14       <u>Prisoner EE</u>.  Dr. Dvoskin notes this prisoner was housed in a standalone

15    ASU and, at the time he was discovered, was in "full rigor."  *Id*. at 26.

16    Dr. Dvoskin wrote that "if Dr. Patterson's observation that the inmate was

17    'in full rigor' were correct, then it would raise a question as to whether or not

18    appropriate security checks were conducted."  *Id*. at 26.

19

20 Given that Defendants' own expert is largely in agreement with Dr. Patterson in these

21 cases, Defendants' motion to strike must be denied.

22             **4.**        **Defendants' Request To Strike The Report's Finding That**
                         **Emergency Response Procedures Were Not Performed Timely**

23                         **And/Or In An Appropriate Manner In 16 Suicides Is Unfounded**
                         **And Should Be Denied.**

24

25        Defendants object and move to strike Dr. Patterson's reference to 11 of the 16 cases

26 on the grounds that in those cases, the lack of emergency care purportedly did not

27 contribute to the prisoner's death.  The issue here is not whether bad emergency responses

28 could be found to have proximately caused these deaths.  The issue is whether Defendants'

[727956-6]

1    emergency response implementation is so poor that it imposes an unreasonable risk on the

2    living members of the *Coleman* class.  The 2011 Suicide Report finding provides

3    Defendants further notice of the unreasonable risk to which Defendants expose vulnerable

4    prisoners who may attempt suicide and require emergency rescue.  The documented lapses

5    in the 2011 Suicide Report are important, regardless of whether the particular life under

6    review could not have been saved, because they illustrate the persistent systemic failures in

7    emergency response.  Until Defendants acknowledge and address their systemic and long-

8    standing failures in emergency response, lives that can be saved will be lost.

9         Once again, Defendants' termination expert, Dr. Dvoskin, supports the 2011

10   Suicide Report findings that the emergency response procedures were not performed

11   timely or in an appropriate manner.  *See, e.g.*, Dvoskin Response at 7 (Prisoner B, "serious

12   error in emergency response"); *id.* at 9 (Prisoner D "delay in this case, if accurately

13   reported, appears to have been excessive"); *id.* at 11 (Prisoner G, "CPR was reportedly

14   started 9 minutes after the inmate was discovered hanging – I agree with reviewer that this

15   was excessive"); *id.* at 20 (Prisoner T, "I also agree with Dr. Patterson that a 10-minute

16   delay to enter a cell in a medical emergency is 'unacceptable'"); *id.* at 21 (Prisoner W, "I

17   agree with [Dr. Patterson's] concern over the emergency response timeline"); *id.* at 22

18   (Prisoner X, "assuming the reported [CPR] times to be reasonably accurate, I agree with

19   Dr. Patterson").  Defendants' request to strike on this point is unfounded and without

20   merit.

21        **5.    Defendants' Request to Strike the Report's Language that CDCR**
            **Failed To Comply With Post-Suicide Review and Reporting**
22          **Timelines Is Unsupported By The Evidence.**

23        In support of Defendants' request to strike the 2011 Suicide Report language

24   regarding CDCR's continued failure to comply with post-suicide review and reporting

25   timeframes, Defendants rely on the Declaration of Judy Burleson, filed 2/11/13, Docket

26   4236 (hereinafter "Burleson Decl.").  Ms. Burleson's testimony, however, does not

27   demonstrate compliance with the required timeframes and is in fact consistent with

28   Dr. Patterson's findings.  Ms. Burleson, Associate Director of the Statewide Mental Health

1  Program for CDCR, testifies that for 2011 suicides, "every suicide report but one was

2  uploaded and available for review before March 1, 2012.  Eight of these suicide reports

3  were uploaded and available within the first six months of 2011.  Seventeen of these

4  suicide reports were uploaded and available within the six months of 2011."  Burleson

5  Decl. ¶ 7 (citations omitted).  Ms. Burleson only lists three reports on the "implementation

6  of quality improvement plans" that were issued more than 150 days after the death of the

7  prisoner, which is beyond the required timeframe.  Burleson Decl. ¶ 9.  Ms. Burleson is

8  silent, however, about the timeliness of the suicide reports, which must be completed

9  within 60 days of the suicide death.  2011 Suicide Report at 14.

10       Ms. Burleson attached to her declaration a tracking document Defendants use to

11  record when a particular suicide document is completed and posted to the secure website.

12  Burleson Decl. ¶ 4, Ex. 1.  Among the items tracked on this chart is the completion date

13  for each suicide report prepared by CDCR, and the date when each completed suicide

14  report is uploaded to the FTP site.  Burleson Decl. ¶ 3.  While the Burleson Declaration is

15  silent about the timeliness of the suicide reports, the tracking document shows that at least

16  12 of the 34 Suicide Reports were late and completed after the 60-day timeframe.  *See*

17  Burleson Decl. Ex. 1 (Inmates D, E, B, P, O, N, T, S, L, H, EE, and Z).  In addition, some

18  of these late suicide reports were uploaded to the FTP site months after completion.  *See,*

19  *e.g.*, *id.* (Inmate E Suicide Report completed late on 4/11/11, uploaded 6/20/11;  Inmate P

20  Suicide Report completed late on 8/23/11, uploaded 12/12/11).  Even some of the suicide

21  reports completed within the required 60 days were not promptly uploaded to the FTP site,

22  making them unavailable to the Special Master and his experts until well after the 60-day

23  timeframe.  *See, e.g.*, *id.* (Inmate Q, Suicide Report completed on 9/16/11, uploaded on

24  12/20/11; Inmate V Suicide Report completed on 11/17/11, uploaded on 12/20/11).

25       Defendants' own evidence supports a finding that their request to strike is without

26  merit.

27

28

[727956-6]

30

PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY
PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

II.    **THE REPORT'S RECOMMENDATIONS ARE WELL SUPPORTED BY EVIDENCE OF PERSISTENT AND SYSTEMIC CONSTITUTIONAL FAILURES IN DEFENDANTS' SUICIDE PREVENTION PROGRAM**

Defendants attack the methodology, findings, and recommendations in Dr. Patterson's 2011 Suicide Report, with citations to the their termination expert, but their own expert agrees that "[t]he systemic recommendations in Dr. Patterson's report at pages 16-18 are reasonable and should assist the California Department of Corrections and Rehabilitation in its essential goal of preventing suicides in the future." Dvoskin Response at 2. Yet, Defendants object broadly to the same recommendations by asserting that they have "presented compelling evidence that any deficiencies in implementing suicide policies and procedures have been remedied and they moved to terminate this case." Objections at 28:15-17. These objections to the 2011 Suicide Report are without foundation and meritless, and are simply a rehash of legal conjecture from their motion to terminate. *See* Defendants' Motion to Terminate, filed 1/7/13, Docket No. 4275-1, at 21:20-23:10.

Dr. Patterson's recommendations direct Defendants to continue implementation of existing Court-ordered obligations, including the SRE Mentor Program; monitoring and assessment of five-day clinical follow-up; custody adherence to policies and procedures regarding custody welfare checks; monitoring of referrals to higher levels of care — particularly to MHCBs and DSH — within the 7388B referral process; and continued monitoring of emergency response procedures, especially in higher custody housing such as ASUs, SHUs and PSUs. 2011 Suicide Report at 17-18. Dr. Patterson includes a recommendation that Defendants provide to the Special Master any documentation referenced in their own suicide reporting, such as policies, post orders, Departmental Operational Manuals, and local operating procedures, on its secure website. This recommendation is necessary to permit a full and complete review of the suicide reporting process by the Special Master.

Finally, Dr. Patterson recommends:

[The e]stablishment of a suicide prevention/management work group to

[727956-6]

timely review suicide prevention measures, suicide deaths, and deaths deemed to be of undetermined cause, with participation by CDCR clinical, custody, and administrative staff, DSH staff, and the special master's experts; continuation of monitoring of the CDCR suicide review process and its compliance with the Program Guide, Chapter 10, "Suicide Prevention;" and integration of the CDCR suicide review process with the Plata receiver's death review process.

*Id.* at 17.

Dr. Patterson's recommendation to convene a suicide prevention/management work group is a necessary and narrowly drawn remedy to address Defendants' persistent constitutional violations to implement their Court-ordered suicide prevention policies and procedures. The 2011 Suicide Report properly found that (1) CDCR's suicide rate was high when compared to the national prison suicide rate and suicide rates of other large prison systems; (2) the trend line showed CDCR suicide rates going up; (3) 73.5% of the suicide deaths were either foreseeable and/or preventable; and (4) delayed, partial, and short-staffed implementation of suicide prevention plans have made CDCR prisons an extremely dangerous place for persons with severe mental illness whose symptoms include suicidality. The work group should also consider the recommendations of Lindsay Hayes, articulated in his recently "unburied" August 16, 2011 Report. Defendants have already wasted 18 months and many lives due to their decision to "bury" this report, rather than implement Mr. Hayes's recommendations.[7]

---

[7] Defendants complain of the "compressed time frame" the Court granted for the filing of their objections, stating that this "Court has eliminated the opportunity for the special master to consider the parties' comments and objections before [his report] is filed" and that their time to file these objections was unfairly shortened. Objections at 2:21-23. Defendants fail to acknowledge that this Court's Order governing the filing of the Special Master's recent reports, and the parties' comments thereupon, was mandated by Defendants' decision to file, without warning or notification to the Court or Plaintiffs, a motion to terminate this litigation entirely. Because Defendants chose a litigation tactic that, in turn, set in motion the dictates of the PLRA, under which this Court must make findings regarding the termination request within ninety days, the Court issued necessary (footnote continued)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

[727956-6]

1      Based on the relevant facts and controlling constitutional law, the Court should

2  deny Defendants' Objections and Motion to Strike or Modify, and instead should adopt the

3  2011 Suicide Report's Findings and Recommendations, on the grounds that the

4  prospective relief provided therein is "narrowly draw, extends no further than necessary to

5  correct the violation of the Federal right, and is the least intrusive means necessary to

6  correct the violation of the Federal right."

7                                **CONCLUSION**

8      For the foregoing reasons, Plaintiffs request that the Court adopt the Findings and

9  Recommendations of the 2011 Suicide Report, and deny Defendants' Motion to Strike or

10 Modify.

11

12 DATED:  February 21, 2013              Respectfully submitted,
                                         ROSEN BIEN GALVAN & GRUNFELD LLP
13

14                                       By:  */s/ Jane E. Kahn*
                                              Jane E. Kahn
15

16                                       Attorneys for Plaintiffs

17

18

19

20

21

22

23

24

25

26  _____

27  and proper orders to ensure that it has before it all the evidence required to assess current
    conditions in the system.

28

_____
PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY
PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT