DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
LISA ELLS – 243657
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

          Plaintiffs,

     v.

EDMUND G. BROWN, Jr., et al.,

          Defendants.

Case No. Civ S 90-0520 LKK-JFM

**DECLARATION OF JANE KAHN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT**

Judge:   Hon. Lawrence K. Karlton

[727962-2]

1    I, Jane E. Kahn, declare:

2    1.    I am an attorney admitted to practice law in California, a member of the bar

3  of this Court, and Of Counsel to the law firm of Rosen Bien Galvan & Grunfeld LLP,

4  counsel of record for Plaintiffs Ralph Coleman, *et al*.  I have personal knowledge of the

5  matters set forth herein, and if called as a witness I could competently so testify.  I make

6  this declaration in support of Plaintiffs' Opposition To Defendants' Objections And

7  Motion To Strike Or Modify Portions Of Special Master's 2011 Suicide Report.

8    2.    On February 15, 2011, Defendant Governor Jerry Brown issued a hiring

9  freeze across state government, Executive Order, B-3-11.  Attached hereto as **Exhibit A** is

10  a true and correct copy of Governor Brown's February 15, 2011 press release and the text

11  of Executive Order B-3-11, posted on his website at http://gov.ca.gov/news.php?id=17335.

12  According to the press release, "[t] action is part of Brown's efforts to save money this

13  fiscal year and to cute $363 million in operational costs next fiscal year.  'The hiring freeze

14  will be in effect until agencies and departments can prove that they can achieve these

15  savings,' Brown said."

16    3.    On February 1, 2013, in response to Plaintiff Ralph Coleman's First Request

17  for Production of Documents, Defendants produced 33 Management Reports prepared for

18  each CDCR institution for the 25th round of monitoring by the *Coleman* Special Master.

19  Attached hereto as **Exhibit B** is a true and correct copy of the February 1, 2013 cover

20  email from the Office of the Attorney General, attaching the first seven of 33 reports that

21  Defendants produced to our office.  I have reviewed the 33 Management Reports provided

22  by Defendants, and I have attached hereto as **Exhibit C** a true and correct copy of excerpts

23  from the Management Reports for twelve CDCR institutions, including:  Avenal State

24  Prison ("ASP"), California Correctional Institution ("CCI"), Centinela State Prison

25  ("CEN"), California Institution for Men ("CIM"), California Training Facility Soledad

26  ("CTF"), High Desert State Prison ("HDSP"), California State Prison – Los Angeles

27  County ("LAC"), North Kern State Prison ("NKSP"), Pleasant Valley State Prison

28

1
DECLARATION OF JANE KAHN IN SUPPORT OF PLS.' OPPOSITION TO DEFS.' OBJECTIONS AND
MOTION TO STRIKE OR MODIFY PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

1  ("PVSP"), Richard J. Donovan State Prison ("RJD"), Substance Abuse Treatment Facility

2  and State Prison ("SATF"), and Salinas Valley State Prison ("SVSP").

3      4.      Attached hereto as **Exhibit D** is a true and correct copy of Dr. Patterson's

4  article, "Review of Completed Suicides in the California Department of Corrections and

5  Rehabilitation, 1999 to 2004," co-authored with Dr. Kerry Hughes, and published in the

6  peer-reviewed American Psychiatric Association journal, *Psychiatric Services*, available at

7  http://ps.psychiatryonline.org.

8      5.      Attached hereto as **Exhibit E** is a true and correct copy of excerpts from

9  Dr. Patterson's first Suicide Report, dated July 17, 2000, which reviewed the 1998 and

10  1999 CDCR suicides.  In this report, Dr. Patterson found that CPR was not initiated in over

11  30% of the reviewed suicides, and made Recommendation 5 to address this failure.  Table

12  2 identifies whether CPR was provided in each of the suicides.  In 11 of the 32 suicides

13  (34%), Dr. Patterson determined that CPR was not provided.  In two additional cases,

14  Dr. Patterson was unable to determine whether CPR was provided.

15      6.      Attached hereto as **Exhibit F** is a true and correct copy of excerpts from

16  Dr. Patterson's 2001, 2002, 2003 and 2004 Suicide Reports, including Tables including

17  data showing whether CPR was provided in each of the suicides.  In 2001, the data shows

18  that CPR was not provided to 30% of the prisoners discovered after a suicide attempt.

19  2001 Suicide Report, Table 2.  In 2002, the data shows that CPR was not provided to 27%

20  of the prisoners who were discovered after a suicide attempt.  2002 Suicide Report, Table

21  2 at p. 5.  In 2003, the data shows that CPR was not provided to 15% of the prisoners

22  discovered after a suicide attempt.  2003 Suicide Report, Second Unnumbered Table.  In

23  2004, the data shows that CPR was not provided to 38.5% of the prisoners who were

24  discovered after a suicide attempt.  2004 Suicide Report, Table 2.

25      7.      Attached hereto as **Exhibit G** is a true and correct copy of an excerpt from

26  the *Coleman* Mental Health Services Delivery System ("MHSDS") Program Guide at 12-

27  10-21, which is part of a section entitled "Response to Self-Injurious Behaviors and

28  Suicide Attempts, Custody Protocol."

[727962-2]

2

DECLARATION OF JANE KAHN IN SUPPORT OF PLS.' OPPOSITION TO DEFS.' OBJECTIONS AND
MOTION TO STRIKE OR MODIFY PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

8.    Attached hereto as **Exhibit H** is a true and correct copy of excerpts from the transcript of the February 18, 2013 deposition of Lindsay M. Hayes, including pages 41:3-45:8, describing a suicide prevention meeting in 2006 to address the high rate of suicides in ASUs and the discussion regarding 30-minute welfare checks.

9.    Attached hereto as **Exhibit I** is a true and correct copy of then-CDCR Director Scott Kernan's December 12, 2006 Memorandum regarding the Revised 30-Minute Welfare Check Process.  This memorandum was attached to a Quality Improvement Plan provided by California State Prison-Sacramento in response to a May 15, 2012 suicide, discussed in the Kahn Declaration in Support of Plaintiffs' Response to Defendants' Motion to Strike or Modify Portions of the Twenty-fifth Round Monitoring Report ("Kahn Decl. to Pls 25th Report Resp."), Docket 4325, at 5:22-25.

10.    Attached hereto as **Exhibit J** is a true and correct copy of an excerpt from the MHSDS Program Guide at 12-10-7 to -9, which is part of a section entitled "Suicide Risk Assessment."  This section of the Program Guide sets forth the importance of suicide risk assessments, the various times when they must be performed, and the clinicians who are required to be trained to perform a suicide risk assessment.  (Defendants' August 2010 Suicide Plan modified the Program Guide language and changed "Suicide Risk Assessment" to "Suicide Risk Evaluations."  *See* Kahn Decl. to Pls 25th Report Resp. Ex. A at 14.)

11.    Attached hereto as **Exhibit K** is a true and correct copy of the three-year consulting contract for Suicide Expert Consultation Services for CDCR's Suicide Prevention Program made between Lindsay M. Hayes and CDCR in 2010.  Mr. Hayes provided this document to Plaintiffs and Defendants on February 5, 2013 in response to a February 4, 2013 subpoena.

12.    Attached hereto as **Exhibit L** is a true and correct copy of an excerpt from Exhibit 4 to the February 18, 2013 deposition transcript of Lindsay Hayes, which includes a June 18, 2012 email from Dr. Robert Canning to Lindsay Hayes.  At page 3 of 4 of this

3

DECLARATION OF JANE KAHN IN SUPPORT OF PLS.' OPPOSITION TO DEFS.' OBJECTIONS AND
MOTION TO STRIKE OR MODIFY PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

1    exhibit, Dr. Canning states, "Obviously when your reported landed it was not roundly

2    applauded and in fact was buried."

3          13.    Attached hereto as **Exhibit M** is a true and correct copy of an excerpt from

4    the transcript of the February 18, 2013 deposition of Lindsay M. Hayes, at page 136:10-22.

5          14.    Attached hereto as **Exhibit N** is a true and correct copy of the August 16,

6    2011 Suicide Consultation Report prepared by Lindsay M. Hayes for CDCR as part of his

7    contract.  Mr. Hayes provided this document to Plaintiffs and Defendants on February 5,

8    2013 in response to a February 4, 2013 subpoena.

9          15.    Attached hereto as **Exhibit O** is a true and correct copy of an excerpt from

10    the MHSDS Program Guide at 12-1-16, which is part of the section entitled "Level of Care

11    Change / Transfer Timelines."  This section incorporates Court-ordered transfer timelines,

12    including the requirement that any prisoner at the EOP level of care placed into

13    administrative segregation must be transferred to an EOP ASU Hub within 30 days of

14    either ASU placement or referral to EOP level of care.  Attached hereto as **Exhibit P** is a

15    true and correct copy of an excerpt from the MHSDS Program Guide at 12-5-27 to -28,

16    which is part of the section entitled "Discharge."  This section states that prisoners

17    transferred to the MHCB shall be returned to their sending institution, "unless the sending

18    institution does not provide the level of care that the inmate-patient currently requires or

19    the inmate-patient has any other case factor(s) that preclude return to the sending

20    institution.  In those cases, the MHCB will transfer the inmate-patient to an institution that

21    provides the appropriate level of care and security."  Attached hereto as **Exhibit Q** is a true

22    and correct copy of an excerpt from the MHSDS Program Guide at 12-2-3, which is part of

23    the section entitled "Initial Health Screening of Inmates at Receiving and Release."  This

24    / / /

25    / / /

26    / / /

27    / / /

28    / / /

DECLARATION OF JANE KAHN IN SUPPORT OF PLS.' OPPOSITION TO DEFS.' OBJECTIONS AND
MOTION TO STRIKE OR MODIFY PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

1  section sets forth the policies and procedures for initial health screening of prisoners when

2  they arrive at a reception center.

3      I declare under penalty of perjury under the laws of the United States and the State

4  of California that the foregoing is true and correct, and that this declaration is executed at

5  San Francisco, California this 21st day of February, 2013.

6

7                              /s/ Jane E. Kahn
                              Jane E. Kahn
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JANE KAHN IN SUPPORT OF PLS.' OPPOSITION TO DEFS.' OBJECTIONS AND
MOTION TO STRIKE OR MODIFY PORTIONS OF SPECIAL MASTER'S 2011 SUICIDE REPORT

# EXHIBIT A



### Office of Governor
# Edmund G. Brown Jr.

Search 

HOME    ABOUT    MULTIMEDIA    CONTACT    NEWSROOM    APPOINTMENTS    ISSUES

---

**GOVERNOR BROWN ORDERS STATEWIDE HIRING FREEZE**

**Latest News**

2-15-2011

SACRAMENTO – Continuing his work to save scarce taxpayer dollars, Governor Jerry Brown today issued a hiring freeze across state government.

"We have a $25 billion deficit, and we must do everything possible to save money and make government leaner and more efficient," Brown said.

The hiring freeze is comprehensive, applying to vacant, seasonal and full and part-time positions. It prohibits hiring outside contractors to compensate for the hiring freeze, converting part-time positions into full-time positions and transferring employees between agencies and departments.

This action is part of Brown's efforts to save money this fiscal year and to cut $363 million in operational costs next fiscal year.

"The hiring freeze will be in effect until agencies and departments prove that they can achieve these savings," Brown said.

The order allows for limited exemptions, subject to the approval of the Governor's Office. It permits agencies to fill positions that are critical to public safety, revenue collection and other core functions, in cases where these essential duties cannot be carried out at current staffing levels. Examples include positions that provide hands-on patient support in 24-hour care facilities and those that respond to emergencies, disasters or other life-threatening situations. The order will not prevent Brown from making senior-level appointments as he forms his new administration.

Earlier this year, Brown issued Executive Orders to cut state cell phones and the passenger vehicle fleet by 50 percent.

The text of the Executive Order is below:

**EXECUTIVE ORDER B-3-11**

WHEREAS, California's significant imbalance between revenues and expenditures has resulted in an estimated budget deficit of $25.4 billion; and

WHEREAS, strong measures must be implemented to reduce costs and to regain and safeguard the trust of the people of California; and

WHEREAS, Executive Order B-1-11, issued on January 11, 2011, ordered state agencies and departments to review operational costs and to identify ways of reducing waste, redundancies and associated costs to create a more efficient and effective government, while protecting core services; and

WHEREAS, the Governor's 2011-12 budget proposes a reduction of $363 million ($200 million from the General Fund) in state operation efficiencies and other savings; and

WHEREAS, restrictions on hiring are necessary to help achieve these savings; and

WHEREAS, these restrictions should be implemented in a manner that promotes true cost reductions, encourages better fiscal management by agencies and departments, protects the health, safety, and welfare of the State, and allows the State adequately and properly to serve the People of California,

NOW, THEREFORE, I, EDMUND G. BROWN JR., Governor of the State of California, by virtue of the power and authority vested in me by the Constitution and statutes of the State of California, do hereby issue this order to become effective immediately:

1. State agencies and departments are prohibited from filling vacant positions, regardless of the positions' funding source, except as provided for herein. This prohibition applies to:
• Appointments of any persons not currently employed by the State, including permissive reinstatements, limited-term appointments, temporary-authorization appointments, training-and-development assignments, and retired-annuitant appointments.
• Increases in time base.
• Appointments of seasonal employees.
• Appointments of permanent intermittent employees.
• Interdepartmental transfers of current permanent or probationary employees.


**Governor Brown Announces Appointments** 02-11-2013


**Governor Brown to Speak at Housing Summit on Tuesday** 02-08-2013


**Governor Brown Issues Statement on Death of Riverside Police Department Officer** 02-07-2013


**Governor Brown to Speak at Colusa Farm Show Breakfast Tomorrow** 02-05-2013


**Governor Brown Announces Appointments** 02-05-2013


**Governor Brown to Speak at Founders Forum 2013 Innovation Forum in Los Angeles** 02-03-2013


**Governor Brown Issues Proclamation Declaring Eleanor and Francis Ford Coppola Day** 02-02-2013


**Governor Brown to Join UPS for Rollout of All-Electric Delivery Vehicle Fleet on Tuesday** 02-01-2013


**Governor Brown Announces Appointments** 02-01-2013


**Governor Brown Issues Proclamation Declaring Black History Month** 02-01-2013

• Emergency appointments as specified in law.
• Mandatory reinstatements.
• Appointments of employees currently holding a temporary authorization appointment into a
permanent appointment.
• Intradepartmental transfers of current permanent or probationary employees.

3. Agency secretaries and department directors who do not report to an agency secretary may request
exemption for appointments that are essential to carry out the following responsibilities if the
responsibilities cannot be fulfilled by existing staffing levels:
• Direct, hands-on services to clients in 24-hour care institutions.
• Emergency response and public safety defined as services and functions directly related to the
preservation and protection of human life and safety; emergency and disaster response activities that
are necessary to prevent, contain, or mitigate the effects of a disastrous event and minimize the loss of
life or property.
• Revenue generation.
• Core functions of departments' statutory missions.
• Essential functions that could otherwise only be fulfilled by paying existing employees more in
overtime than the costs of the requested exemption.
Requests for exemptions shall be submitted to the Governor's Office for approval in accordance with
forms and instructions that will be issued by the Department of Finance.

4. State agencies and departments are prohibited from initiating or increasing personal-services
contracts to compensate for the effects of these hiring restrictions.

5. The Department of Finance will work with agencies and departments to develop targets for
budgetary reductions in lieu of the hiring restrictions. Departments that achieve their target budget
reductions, as determined by the Director of the Department of Finance, will be exempted from the
provisions of this executive order.

6. IT IS REQUESTED that other entities of State government not under my direct executive authority
implement similar limitations on their appointments to reduce State expenditures.

This Executive Order is not intended to create, and does not create, any rights or benefits, whether
substantive or procedural, or enforceable at law or in equity, against the State of California or its
agencies, departments, entities, officers, employees, or any other person.

I FURTHER DIRECT that as soon as hereafter possible, this Order shall be filed with the Office of the
Secretary of State and that it be given widespread publicity and notice.

IN WITNESS WHEREOF I have hereunto set my hand and caused the Great Seal of the State of
California to be affixed this 14th day of February 2011

_____
EDMUND G. BROWN JR.
Governor of California


ATTEST:


_____
DEBRA BOWEN
Secretary of State

### ###

3. Agency secretaries and department directors who wish to request an agency-secretary employee exemption for appointments that are essential to carry out the following responsibilities if the responsibilities cannot be fulfilled by existing staffing levels:
• Direct, hands-on services to clients in 24-hour care institutions.
• Emergency response and public safety defined as services and functions directly related to the preservation and protection of human life and safety; emergency and disaster response activities that are necessary to prevent, contain, or mitigate the effects of a disastrous event and minimize the loss of life or property.
• Revenue generation.
• Core functions of departments' statutory missions.
• Essential functions that could otherwise only be fulfilled by paying existing employees more in overtime than the costs of the requested exemption.
Requests for exemptions shall be submitted to the Governor's Office for approval in accordance with forms and instructions that will be issued by the Department of Finance.

4. State agencies and departments are prohibited from initiating or increasing personal-services contracts to compensate for the effects of these hiring restrictions.

5. The Department of Finance will work with agencies and departments to develop targets for budgetary reductions in lieu of the hiring restrictions. Departments that achieve their target budget reductions, as determined by the Director of the Department of Finance, will be exempted from the provisions of this executive order.

6. IT IS REQUESTED that other entities of State government not under my direct executive authority implement similar limitations on their appointments to reduce State expenditures.

This Executive Order is not intended to create, and does not create, any rights or benefits, whether substantive or procedural, or enforceable at law or in equity, against the State of California or its agencies, departments, entities, officers, employees, or any other person.

I FURTHER DIRECT that as soon as hereafter possible, this Order shall be filed with the Office of the Secretary of State and that it be given widespread publicity and notice.

IN WITNESS WHEREOF I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 14th day of February 2011

_____
EDMUND G. BROWN JR.
Governor of California

ATTEST:

_____
DEBRA BOWEN
Secretary of State

###

EXHIBIT B

## Jane E. Kahn

| | |
|---|---|
| **From:** | Michelle Latimer <Michelle.Latimer@doj.ca.gov> |
| **Sent:** | Friday, February 01, 2013 1:41 PM |
| **To:** | Aaron Fischer |
| **Cc:** | Kevin Jones; Debbie Vorous |
| **Subject:** | Coleman: Defs' Production in Response to Pltfs' Req. for Production of Docs., set 1, No. 1 |
| **Attachments:** | Def_Resp_Pls_1st_RPD.pdf; ASP Coleman Round XXV Manangement Report-4-26-12-Edit (2).pdf; CAL Round 25 MHMREPORT  8 29 12 final.pdf; CCC Coleman Round 25 with changes 1 _2_.pdf; CCI Round 25 - Final er.pdf; CCWF MHMR 20120516 coleman 25 er 5 8 12 (2).pdf; CEN 2012-0412  MHMREPORT final  - Round 25 CEN 8 28 12.pdf; CIM Rnd XXV MHMR final for submission.pdf |

Mr. Fischer -

Defendants' Production in response to Plaintiffs' Request for Production of Documents, set 1, No. 1, is attached.  There will be a total of 33 production documents.  I will be sending them in multiple e-mails due to file size.  Please let me know if you have a problem with receiving the attachments.

Thank you.
Michelle Latimer
*Legal Secretary for Debbie Vorous*
*Office of the Attorney General*
*Correctional Law Section*
*Ph: (916) 322-2342*

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

EXHIBIT C

# AVENAL STATE PRISON
# MENTAL HEALTH SERVICES
# DELIVERY SYSTEM
# MANAGEMENT REPORT

# ROUND XXV
# October 1, 2011 through March 31, 2012

## JAMES D. HARTLEY
## WARDEN

## ROBERT CHAPNICK, M.D.
## CHIEF EXECUTIVE OFFICER, HEALTH CARE SERVICES(A)

DRPD 1 00001

**2. Space Shortages.**

ASP's Mental Health Program has no space shortage with the exception of the GP portion of the OHU.

**3. Facilities Improvement Coordination with the Receiver's Office.**

All previously completed facility construction was coordinated by the Receiver's Office.

**c. New or Anticipated Mission Changes.**

No major mission changes have occurred at ASP since Coleman Monitoring Round XXIV.

**d. Major Population Moves.**

Between October 1, 2011 and March 31, 2012, the inmate population at ASP has decreased from 5,763 to 5,282 (8.35%). The MHSDS population decreased from 1,389 to 1,265 (8.93%).

**e. New or Overflow Administrative Segregation or any other Specialized Housing Units.**

No new or Overflow Administrative Segregation or any other Specialized Housing Units were created.

**f. Obstacles to Providing Mental Health Services and Adherence to Program Guide Requirements.**

The major obstacle to providing mental health services and adhering to Program Guide requirements is clinical and supervisory staffing due to the hiring freeze.

As a result of the hiring freeze ASP was unable to hire allotted Senior Psychiatrist and Senior Psychologist positions. In the absence of a Senior Psychiatrist, psychiatry leadership was provided with the help of the Chief Medical Executive and headquarters. The Senior Psychologist position was covered by a contract Psychologist and vacant clinical positions were covered by registry staff.

*Coleman* Site Visit, Round XXV

**MENTAL HEALTH MANAGEMENT REPORT**

Monitoring Period: December 1, 2011 thru May 31, 2012

Date of site visit: July 30th thru August 1st, 2012

**CALIFORNIA CORRECTIONAL INSTITUTION**

**Institutional Program Summary**

**Overview of all the mental health programs:** CCI recently realigned to be an all SHU on yard A with a small Administrative Segregation component (HU6-8) and no General Population inmates. Yard B is completely SHU. Currently we house minimum and medium SNY inmates on levels C, D, and E. Yard C, no longer a reception center, houses security Level II inmates and is designated a SNY. Our RC program was discontinued 12/1/11. As of 4//5/12 we were designated a transgender cluster facility with selected mental staff, psychiatrist and psychologists, being sent to HQ for subject matter expert (SME) training in transgender issues.

**New Construction/Remodeling:** There is no construction or remodeling activity.

**New or Anticipated Mission Changes:** The small Reception Center ran on Yard III for many years has been closed and has been replaced with a SNY level III.

**Major Population Moves:** The realignment involved a major population move to transfer current inmates from our former reception yard to make room for the incoming medium (level II) security SNY population.

**New or Overflow Administrative Segregation or any other Specialized Housing Units:** Facility C (medium security 270 design yard) has been realigned to become an SNY facility. All other facilities remain as before. Level II Administrative Segregation is no longer active and inmates are no longer housed there.

**Obstacles to Providing Mental Health Services and Adherence to Program Guide Requirements:**

1. Labs continue to be challenging in two ways:
   Obtaining timely draws. The main fail point has been identified as getting the lab order to phlebotomists for scheduling. A new LOP was recently developed and implemented to resolve this problem. Ongoing MAPIP lab audits will prove whether or not the new LOP brings us up to threshold. Once the lab draw is scheduled the completion rate is well above 99%.
   Doing labs on required psychiatric medications. At this time labs are ordered on Lithium, Depakote, and Tegratol.
2. Timely psychiatric response to clinical referrals continue to be exigent, however; more recent innovations appear to have finally solved the problem and while we are encouraged we must remain guardedly optimistic until a larger pool of data can be analyzed.

Page 1 of 11

3. <u>CCI MH AB109 realignment staffing losses</u> amount to over 60% of clinical line staff and 70% of supervisory staff. CCI's CEO and Chief of MH services have launched discussions as to how to arrange clinical priorities in the face of diminishing staff. We expect that the next six months will give the MH program the full reading of realignment impact.

4. <u>Shortage of medical escort staff</u> have slowed the pace of clinical contacts and IDTT's on celled yards. Steps have been taken to remedy this. We have centralized our service delivery efforts on the ASU and SHU yards which has reduced some of the bottlenecks caused by escort shortage and this has helped immensely.

5. <u>Privacy</u> has been a problem on Level 3 (Facility C) due to no confidential treatment space but this has most recently has been solved by the CEO with some minor construction and the authorization of laptops.

## **Mental Health Roster**

### **Institutional Mental Health Staffing and Telemedicine**

December 1, 2011 thru May 31, 2012

(<u>Note</u>: Throughout the reporting period, AB109 resulted in incremental MH staff losses as described in #6 above. The below figures represent staffing at the conclusion of the reporting period.)

| Position | Positions Established | Positions Filled | Vacancies | Vacancy Rate | Full-Time Equivalent | Functional Vacancies | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|
| Chief Psychiatrist | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Senior Psychiatrist | 1 | 0 | 1 | 100% | 0 | 0 | 100% |
| Chief Psychologist | 1 | 1 | 0 | 0 | | | |
| Senior **** Psychologist | 2 | 2 | 0 | 0 | | | |
| Staff Psychiatrist | 6.5 | 4 | 2.5 | 38% | 1.5 | 1.0 | 15% |
| Staff Psychologist | 15 | 15 | 0 | 0 | | 0 | 0 |
| Supervising Social Worker | 1 | 1 | 0 | 0 | | | |
| Social Worker | 6 | 3 | 3 | 50% | 1.0 | 2 | 33% |
| Registered Nurse | 1.0 | 1.0 | 0 | | | | |
| Senior Psych Tech | 2.0 | 2.0 | 0 | 0 | | | |
| Psych Tech | 16 | 16 | 0 | 0 | 0 | 0 | 0 |
| Recreation** Therapist | 2.5 | 1.0 | 1.5 | 40% | 0 | 1.5 | 40% |

DRPD 1 00047

*Coleman* **Paper Review Document Request
Round XXV**

# MENTAL HEALTH MANAGEMENT REPORT

January 1, 2012 to June 30, 2012

# CENTINELA STATE PRISON

**Domingo Uribe, Jr.
Warden**

**Charles D. Crow
Chief Executive Officer**

DRPD 1 00081

INSTITUTIONAL PROGRAM SUMMARY

a. **Overview of all the mental health programs at institution.**

Centinela State Prison (CEN) is a limited mission institution that provides mental health services to inmates included in the Mental Health Services Delivery System (MHSDS), pending their transfer or return to an MHSDS institution. Screening is also provided to inmates not included into the MHSDS. Mental health (MH) services include consultation, assessment, brief psychotherapy, crisis intervention, medication management, psychoeducation and other brief supportive and preventative services.

Mental health clinicians are available Monday through Friday, during business hours (8:00am - 4:00pm). When available, mental health clinicians also provide services on weekends. As needed, physicians-on-call (POCs) provide response to mental health emergencies after business hours, weekends and holidays (with mental health consultation as needed).

The populations served include inmates housed in the general population (GP) (security levels III and IV), the administrative segregation units (ASUs), the minimum security yard, and the Correctional Treatment Center (CTC).

A primary clinician is assigned to cover MH needs on each of the four secure perimeter yards (yards A, B, C, and D) and to each of the ASUs (units A5 and C6). As needed, clinicians will travel to the minimum security yard (E) to provide MH services on that yard. CEN has one full-time staff psychiatrist that is shared with Calipatria State Prison (CAL). The staff psychiatrist is scheduled to work at CEN on Mondays, Wednesdays and Fridays, 8:00 am to 4:00 pm. The psychiatrist, while at CEN, provides clinical services, as needed, for inmates across the entire CEN population (i.e., all yards, ASUs, and the CTC).

b. **New Construction/Remodeling.**

There was no new construction during the monitoring period.

c. **New or Anticipated Mission Changes.**

During the monitoring period, CEN was notified that C yard will be converted to security level III housing, by April 2013. Currently, C yard houses security level IV inmates.

d. **Major Population Moves.**

During the monitoring period, there was no major population move. The inmate population at CEN was reduced from 3,833 (on January 1, 2012) to 3,740 (on June 30, 2012).

e. **New or Overflow Administrative Segregation or any other Specialized Housing Units.**

DRPD 1 00082

For the current monitoring period, there was no activation of any new or overflow ASUs, nor of any Secure Housing Unit.

**f.   Obstacles to Providing Mental Health Services and Adherence to Program Guide Requirements.**

During the monitoring period, staffing problems created some challenges in meeting program guide requirements and quality management duties. For example, during the monitoring period, the Chief of Mental health at CEN was tasked with overseeing the MH departments at both CEN and CAL. This allowed only a part-time presence at each institution, and limited the ability to participate in various quality management meetings and functions. Also, the staff psychiatrist was asked to cover psychiatric services at both institutions (CEN and CAL). This resulted in only part-time coverage for each institution, which limited psychiatrist availability for prompt response to urgent and emergent referrals.

Also, during the monitoring period, CEN had limited and inconsistent clerical staffing. There were 1.5 office technician (OT) positions vacant that could not be filled due to the hiring freezes. To help complete the work, the medical department loaned staff (Assistant Clerks) to the MH department, to cover the vacancies until MH could fill the positions. The turnover with clerical staff led to increased errors in scheduling and other data management functions.

During some of the monitoring period, the Supervising Registered Nurse II (SRNII) assigned to MH, was on medical leave. The post was inconsistently covered and quality management processes were not kept up. Also, the Senior Licensed Psychiatric Technician (LPT) was on medical leave for most of the monitoring period, and this contributed to a lack of follow-through with some of the quality management functions performed by the LPT staff.

DRPD 1 00083

# CALIFORNIA INSTITUTION FOR MEN

## CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION

## MENTAL HEALTH SERVICES DELIVERY SYSTEM
## MANAGEMENT REPORT
## ROUND 25

October 1, 2011 to March 31, 2012

### GARY SANDOR
WARDEN

### ROBERT HERRICK
CEO

### VICTOR JORDAN, PH.D.
### CHIEF OF MENTAL HEALTH

SUBMITTED APRIL 25, 2012

DRPD 1 00095

**Administrative Segregation**

The CIM ASU's mental health program provided services to approximately 602 I/Ps. An average of 19.2 I/Ps were at the EOP level of care and 84.3 were CCCMS. I/Ps were housed in Reception Center Central Cypress Hall, and Palm Hall. Birch Hall overflow was not used during the monitoring period. During this monitoring period, ASU was significantly impacted by staffing issues created by the AB109 mission change. Three psychologists and one social worker were displaced by the SROA process. This resulted in disrupted continuity and chronic understaffing of the program. Group treatment remained suspended throughout the monitoring period. As staffing patterns stabilize, it is anticipated that ASU will improve significantly and return to full programming.

**Reception Center Processing**

The Reception Center Processing program is staffed by three full time psychologists, who also share DDP and CCCMS case manager duties. As a result of AB109 mission changes, most arrivals to CIM are new commitments from Riverside County, as opposed to the parole violators received in the past. The vast majority of inmates are screened within 24 hours of arrival. 211 inmates were evaluated during the review period. A review of current programming indicates no significant changes over the previous monitoring period. The screening program continues to review the county jail transfer forms whenever available, as in the past monitoring period.

**Reception Center Correctional Clinical Case Management System (RC-CCCMS)**

There are approximately 150 inmates in the RC CCCMS program. All RC CCCMS I/Ps are seen at the 30-day mark after having been seen for their initial evaluation, and 90 days thereafter. In addition all CCCMS inmates who arrive at RCC from ASU, MHCB or any other facility or prison, are seen 30 days after arrival.

NEW CONSTRUCTION/REMODELING.

There was no new construction or remodeling during the reporting period.

NEW OR ANTICIPATED MISSION CHANGES.

One CIM mission change involved the repurposing of the Reception Center East Facility from a Reception Center into a Mainline Level Three General Population Sensitive Needs Yard Facility now referred to as Facility C. This facility now houses CCCMS Patient-Inmates and, occasionally, EOP Patient-Inmates pending transfer.

MAJOR POPULATION MOVES.

There were several significant population moves during the reporting period due to the implementation of Assembly Bill (AB) 109. In October 2011, the intake of parole violators ceased. Intake remained closed until December 2011. Continuing since that time, CIM is, with few exceptions, primarily receiving new commitments from Riverside County. Between September 28, 2011 and April 11, 2012 there was an overall reduction of the CIM prison population of 898 inmates. Since the beginning of the October 2011 reporting period, there was an overall reduction of approximately 347 MHSDS Patient-Inmates. This reduction included

DRPD 1 00102

200 CCCMS, 128 EOP, and 19 MHCB Patient-Inmates.  Also included among these reductions, were 4 ASU CCCMS and 17 ASU EOP Patient-Inmates.

### NEW OR OVERFLOW ADMINISTRATIVE SEGREGATION OR ANY OTHER SPECIALIZED HOUSING UNITS.

There were no new ASU overflow or SPU units.

### OBSTACLES TO PROVIDING MENTAL HEALTH SERVICES AND ADHERENCE TO PROGRAM GUIDE REQUIREMENTS.

There was a hiring freeze for Mental Health positions and, as a result of Assembly Bill 109, a reduction of 2.5 senior psychologist supervisor positions and 14 staff psychologist positions during the reporting period.  Simultaneously, there was a reduction in the intake of Reception Center Inmates.  The office services supervisor (OSSII) and health program specialist (HPSI) positions could not be filled due to the hiring freeze.  This resulted in a significant reorganization of staff assignments throughout the institution and increased supervisory responsibilities.

DRPD 1 00103

*Coleman* Site Visit, Round XXV
**MENTAL HEALTH MANAGEMENT REPORT**
For the Period January 1, 2012 to June 30, 2012
(CTF Soledad Prison)

INSTITUTIONAL PROGRAM SUMMARY

**a. Overview of all the mental health programs at the institution**

At CTF Soledad Prison we provide the following mental health programs: Correctional Clinical Case Management System (CCCMS); Administration Segregation Unit (ASU); ASU-CCCMS and Outpatient Housing Unit (OHU).

**b. New Construction/Remodeling**

Due to the changes related to AB109 realignment, the significant population increases that have been seen at North Facility, Sensitive Needs Yard (SNY) leveled off and we saw a decline in the population of MHSDS inmates at North Facility from over 500 to 425. This has taken some pressure off the office space needs, although only to a minor extent. The attempt to purchase modular offices for the "old library" (that has been assigned to Mental Health), has been officially put on hold, since there are no funds available for this purpose at this time. Therefore, we continue to have clinical staff spread throughout North Facility, using office space on the patio, in the education building, and in the new library.

**New or Anticipated Mission Changes**

While there have been no major mission changes during the monitoring period, we have needed to be flexible with the allocation of our staff resources as our population continues to change from facility to facility and as we continue to lose staffing resources through the layoff process. North Facility, SNY, had been our largest MHSDS population and, hence, where we dedicated more of our staffing resources prior to the end of 2011. Since that time, the MHSDS population has decreased from just over 500 to approximately 425. At the same time, our MHSDS population at South Facility increased from a low of approximately 85 to approximately 143. Central Facility initially showed signs of a MHSDS population decrease, but this has reversed somewhat and now stands at approximately 513. We have responded to these changes by having staff redirected from one facility to another, sometimes on very short notice, to cover for the changing mental health workload at the various facilities.

**c. Major Population Moves**

At the time of writing this overview, the population changes continue, due to the ongoing AB109 realignment. As we have found, this is an unpredictable process, especially as it relates to the number of MHSDS inmates/patients being released from prison. Thus far, the total prison population has decreased by about 20% from its high of over 7,000 to just over 5,600. In contrast, the MHSDS population has only decreased by less than 3% from its high of approximately 1110 to approximately 1,080. In fact, for several months, from late 2011

DRPD 1 00233

until early 2012 and again after June, 2012, the MHSDS population had only decreased by approximately 1%.

**d. New or Overflow Administrative Segregation or any other Specialized Housing Units**

We currently have no inmates in ASU overflow.

**e. Obstacles to the Provision of Mental Health Services and Adherence to Program Guide Requirements**

CTF has experienced a significant reduction in our clinical staff as well as support staff. The loss of staffing resources meant a reduction in primary clinicians (PCs) many of them clinical psychologists, by nearly 25% and of office technicians by a full 33%. There has not been a proportionate reduction in MHSDS patient population.. As a result CTF mental health staff experienced an increase in workload. Accordingly CTF faces, challenges in deciding how best to allocate and utilize the remaining staff to best meet MHSDS patient population needs without diminishing staff morale. CTF staff members have risen to the challenge in most areas and did more with less. We also took a multifaceted approach to this problem. We redirected some staff, reassigned others, "played" to each staff member's strengths, were supportive, and established a set of well defined priorities. In addition, when even these adjustments were insufficient to meet patient needs in high risk areas, the Chief of Mental Health and C.E.O. retained a contract psychologist to cover for the high acuity areas of ASU and the Outpatient Housing Unit (OHU). Through this process, we have been able to maintain mental health services, for the most part, in the high acuity/high risk areas despite staffing challenges.

MENTAL HEALTH ROSTER

## Institutional Mental Health Staffing and Telemedicine

(January through June, 2012)
(CTF Soledad Prison)

| Position | Positions Established | Positions Filled | Vacancies | Vacancy Rate | Full-Time Equivalent | Functional Vacancies | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|
| Chief Psychiatrist | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Senior Psychiatrist | 1.0 | 1.0 | 0 | 0 | 0 | 0 | 0 |
| Chief Psychologist | 1.0 | 1.0 | 0 | 0 | 0 | 0 | 0 |
| Senior Psychologist | 1.5 | 1.5 | 0 | 0 | 0 | 0 | 0 |
| Staff Psychiatrist | 3.5 | 2.25 | 1.25 | 35% | 1.25 | 0 | 0 |
| Staff Psychologist | | | | | | | |

DRPD 1 00234

# HIGH DESERT STATE PRISON

# MENTAL HEALTH SERVICES DELIVERY SYSTEM MANAGEMENT REPORT

## ROUND XXV
### MAY 22-24, 2012

### J. D. CUMMINGS, PH.D.
#### CHIEF MENTAL HEALTH

### R. BARNES
#### WARDEN (A)

### CHARLES YOUNG
#### CHIEF EXECUTIVE OFFICER

DRPD 1 00291

**New Mission Changes**
By December 2011 the RC was reduced to one building, A5. Buildings A3 and A4 became level three mainline buildings.

**New or Overflow Administrative Segregation or or any other Specialized Housing Units**
None

**Obstacles to the Provision of Mental Health Services and Adhereence to Program Guide Requirements**
Hiring Freeze: The statewide hiring freeze precluded the employment of 3 OT positions delaying data input.

Psychiatry Shortage: Due to an inability to hire state psychiatrists all state staff psychiatry positions at High Desert State Prison were vacant. The utilization of registry hires allowed us to maintain medication continuity, but has not provided enough coverage for all other psychiatry responsibilities on all yards. Currently, tele-psychiatry is providing psychiatric services on all yards.

Lockdowns and modified programs: To help mitigate the impact of lock-downs and modified programs inmates are being seen in their buildings in the day room area and at cell front when escorts are not available.


## Institutional Mental Health Staffing and Telemedicine


Monitoring Period 10/01/11 to 03/31/12
HIGH DESERT STATE PRISON

| Position | Positions Established | Positions Filled | Vacancies | Vacancy Rate | Full-Time Equivalent | Functional Vacancies | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|
| Chief Psychiatrist | NA | | | | | | |
| Senior Psychiatrist | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| Chief Psychologist | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| Senior Psychologist | 2 | 2 | 0 | 0 | 0 | 0 | 0 |
| Staff Psychiatrist | 5 | 0 | 5 | 100% | 3.5 | 1.5 | 30% |
| Staff | 14 | 12 | 2 | 6.5% | 1 | 1 | 7% |

2

DRPD 1 00296

# California State Prison – Los Angeles County

## California Department
## Of
## Corrections and Rehabilitation

# MENTAL HEALTH SERVICES DELIVERY SYSTEM
# MANAGEMENT REPORT
# ROUND 25
# June 4-7, 2012

## Auditing Period
## October 1, 2011 to March 31, 2012

**L.S. McEwen**
**Warden (A)**

**T. Belavich, Ph.D., MSHCA**
**Chief Executive Officer**

**Richard Kendall, Psy.D.**
**Chief of Mental Health (A)**

DRPD 1 00338

As a part of the CDCR realignment plan, CSP-LAC has ended its reception center mission. As a result the MH department will lose both its RC-screening and RC-EOP programs.

**Obstacles to the Provision of Mental Health Services and Adherence to Program Guide Requirements**

**AB 109:**
AB 109 impact began in the latter portion of 2011. Due to this CSP-LAC lost several staff members who were replaced with staff from the Department of Juvenile Justice (DJJ). Almost all of the staff that were impacted worked in the ASU-EOP program. For this reason, our ability to adhere to Program Guide requirements in ASU-EOP suffered during the months of December and January.

MENTAL HEALTH ROSTER

## Institutional Mental Health Staffing and Telemedicine

| Position | Positions Established | Positions Filled | Vacancies | Vacancy Rate | Full-Time Equivalent Contractor | Functional Vacancies | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|
| Chief Psychiatrist | 1 | 0 | 1 | 100% | 0 | 1 | 100% |
| Senior Psychiatrist | 0 | 0 | 0 | 0% | 0 | 0 | 0% |
| Chief Psychologist | 1 | 1 | 0 | 0% | 0 | 0 | 0% |
| Senior Psychologist | 5 | 5 | 0 | 0% | 0 | 0 | 0% |
| Staff Psychiatrist | 11 | 5.5 | 5.5 | 50% | 5.5 | 0 | 0% |
| Staff Psychologist | 35 | 35 | 0 | 0% | 0 | 0 | 0% |
| Supervising Social Worker | 0 | 0 | 0 | 0% | 0 | 0 | 0% |
| Social Worker | 10 | 9 | 1 | 10% | 1 | 0 | 0% |
| HPS-I | 1 | 1 | 0 | 100% | 0 | 0 | 0% |
| Senior Psych Tech | 2 | 2 | 0 | 0% | 0 | 0 | 0% |
| Psych Tech | 26.25 | 24 | 2.25 | 8.6% | 0 | 2.25 | 8.6% |
| Recreation Therapist | 6 | 4 | 2 | 33% | 0 | 2 | 33% |
| Other (OSSII) | 1 | 0 | 1 | 100% | 0 | 1 | 100% |

DRPD 1 00344

# NORTH KERN STATE PRISON
# MENTAL HEALTH SERVICES DELIVERY SYSTEM
# MANAGEMENT REPORT

## ROUND XXV
## OCTOBER 1, 2011 TO MARCH 31, 2012

### P.L VASQUEZ
### WARDEN (A)

### TED KUBICKI
### CHIEF EXECUTIVE OFFICER
### HEALTH CARE SERVICES

### ELAINE FORCE, PH.D.
### CHIEF OF MENTAL HEALTH

DRPD 1 00376

## Mental Health Crisis Bed (MHCB)

NKSP maintains ten suicide resistant cells in the MHCB. The MHCB program has had a consistently high utilization rate and an increasing census resulting in the use of additional beds in the Mental Health Temporary Housing (MHTH) unit located in A4.

The MHCB is staffed with one psychologist, one psychiatrist, one lead nurse (RN), one recreational therapist (RT) (.5 time in MHCB & .5 time in MHTH), and one correctional counselor. One psychologist serves as the Department of Mental Health (DMH) Coordinator. IDTT meetings are conducted twice weekly for each inmate. Rounds occur on a daily basis, including weekends and holidays. Weekends and holidays are always covered by psychiatry and by psychology as available. All discharges receive a 5-day follow-up order and in addition Custody performs 3-day minimum monitoring simultaneously.

## New Construction/Remodeling

The MHCB holding cell was rotated so that it faces into the room and is covered with lateral perforated walls and Plexiglas to allow visual access. This has allowed inmates to be placed into the holding cell during clinical encounters without custody present for confidentiality.

## New or Anticipated Mission Changes

As a result of Prison Realignment, there has been a significant increase in the ML population. In August 2011 the ML CCCMS population was 36. It is currently 150. A-Yard Reception Center buildings were converted back to mainline housing.

## Major Population Moves

RC inmates were moved from A yard to other yards in anticipation of the increase of mainline inmates.

## New or Overflow Administrative Segregation or any other Specialized Housing Units

NKSP has not constructed or created any new ASU overflow or other Specialized Housing units during this reporting period.

DRPD 1 00383

mid-April for medical reasons.   A senior psychologist was Acting Chief of Mental Health during this three month period.

Staffing Shortages:

Due to statewide realignment, six psychologists transferred to other institutions.   NKSP received three psychologists through the same process.

NKSP had been allocated three psychometrist positions, but has had only two filled during this monitoring period, forcing the department use one psychologist to complete the testing ordinarily performed by a psychometrist. On February 28, 2012 all three psychometrist positions were eliminated resulting in the redirection of social workers to cover these positions.

One RT transferred to another institution and NKSP was not allowed to fill the vacant position.

There are six office assistant (OA) positions in Mental Health.  Three are filled, but one OA has been out on leave since August 2011.  In addition, of the six office technician positions, two have been vacant.  With help from the Chief Executive Officer (CEO), other clerical personnel have worked overtime to assist in data entry.

DRPD 1 00385

*Coleman* Site Visit, Round XXV
## MENTAL HEALTH MANAGEMENT REPORT
Monitoring Period November 1, 2011 through April 30, 2012
Pleasant Valley State Prison

### INSTITUTIONAL PROGRAM SUMMARY

**a. Overview of all the mental health programs at institution.**

There were no significant changes to the Mental Health (MH) mission at Pleasant Valley State Prison (PVSP) during monitoring period. PVSP provides the following mental health programs: Mainline Correctional Clinical Case Management System (ML CCCMS), Administrative Segregation Unit CCCMS (ASU CCCMS), and Mental Health Crisis Bed (MHCB). Of these programs, the primary MH treatment focus at PVSP is to provide outpatient mental health care at the CCCMS level of care. During the monitoring period our MHSDS programs provide mental health services to an average census of 1,694 inmate-patients (I/P).

The ML CCCMS program offers MH evaluations, Primary Clinician (PC) contacts, psychiatric medication management, and Interdisciplinary Treatment Team (IDTT) treatment planning. Group psychotherapy services are offered as clinically indicated given the availability of staff and treatment space. During the reporting period the average monthly census for ML CCCMS was 1,542.

The ASU CCCMS program includes orientation to ASU, daily Licensed Psychiatric Technician (LPT) rounds, weekly PC contacts, and IDTT meetings. Small group therapy services are offered by LPTs and PCs by utilizing therapeutic modules. The ASU CCCMS population averaged 142 I/P per month.

The MHCB program averaged 15 admissions per month. The average length of stay (LOS) for the six bed unit was 6.4 days. If a crisis bed was not available, the I/P was maintained in alternative temporary housing (ATH) under suicide watch (SW). Typically, a certified nursing assistant (CNA) provided clinical supervision pending MHCB admission or transfer to another institution's MHCB. Approximately 12.5 I/Ps were placed in ATH each month. MH, medical and custody staff actively managed these I/Ps to minimize the number of hours I/Ps remained on ATH-SW status.

**b. New Construction/Remodeling.**

PVSP's Mental Health program office and treatment space were unchanged during the monitoring period. PVSP has a space utilization committee that meets periodically to review proposals and address concerns.

**c. New or Anticipated Mission Changes.**

DRPD 1 00417

During this monitoring period, there have been no significant mission changes at PVSP. PVSP continues to house Level I thru Level IV inmates in General Population (GP), Sensitive Needs Yards (SNY), and ASU settings. PVSP also continues to offer the same mental health programs: CCCMS ML, CCCMS ASU, and MHCB. There are no mission changes pending.

**d. Major Population Moves.**

Due to implementation of AB 109 there have been population reductions at PVSP both in terms of institutional census and MHSDS treatment population during the monitoring period. PVSP institution population dropped 883 inmates to 3,740 on April 30, 2012. This 23.6% reduction in institutional census has allowed for closure of all gym housing units. Our MHSDS population decreased by 149, or 9.1%, to a total of 1,646 I/Ps. While still the largest outpatient CCCMS program in CDCR, the decrease in MHSDS occurred in the CCCMS Mainline program. The average census of 142 in the CCCMS ASU program during the period represents an increase of 19.3% of I/Ps receiving services in that program relative to the average census in the last monitoring period. During the monitoring period, 22 I/Ps transferred to EOP programs, 2 I/Ps had LOC returned to CCCMS from EOP, and 1 I/P paroled prior to transfer to an EOP program. At the end of the monitoring period 3 I/P had pending EOP transfers.

**e. New or Overflow Administrative Segregation or any other Specialized Housing Units.**

No inmates were placed in new or overflow ASU or other Specialized Housing Units at PVSP during the monitoring period. Custody has closely managed the ASU population to minimize the need for an overflow housing unit.

**f. Obstacles to Providing Mental Health Services and Adherence to Program Guide Requirements.**

Although EOP transfer timelines are closely monitored, the absence of appropriate beds (i.e., Level IV, SNY, ASU hubs) at receiving facilities continued to delay inmate transfers.

With respect to treatment and office space the frequency and types of MH services offered to I/Ps per Program Guide and Court mandates have continued to strain PVSP's physical plant. Although MH's first designated treatment space became operational in May, 2011, due to the concentration of I/Ps on two of our four yards fully half of clinical contacts continue to occur in custody offices located in individual housing units. Access to these offices must be planned and coordinated with custody staff. The concern has been discussed by the Space Committee.

Staffing has been a significant challenge during the monitoring period due to AB 109-related staffing reductions and corresponding budget reductions that resulted in restructuring caseloads and work assignments. We incurred staffing reductions based on AB 109 realignment. However, treatment population reductions were not proportional and the result has been significant challenges in treating the large CCCMS population. In addition, as

DRPD 1 00418

many as three psychologists and one psychiatrist absent at one time due to long-term medical leave, representing approximately 25% of our clinical staff, compounded coverage problems. During the monitoring period MH staff attempted to enhance efficiencies while maintaining clinically indicated care. Clinical psychologist staffing vacancies have been addressed through the use of dual appointments and retired annuitant clinicians.

An additional concern has been identified with reliance upon MHTS.net database reports. While improvements have been made in the quality and accuracy of the reports, audit information generated by MHTS.net in some instances was not consistent with internal logs maintained by program staff.  PVSP continues to participate in a statewide Unit Health Record – Mental Health Tracking System Agreement Audit in order to provide feedback to headquarters, and, as needed, provide additional staff training.  Audit results showed marked improvement over the prior review period.  This report presents both data from MHTS.net and, when applicable, internal audit and tracking data.

Availability of inmate medical records improved dramatically with the scanning of medical and mental health forms into the eUHR when the project was launched in July 2011. However, conflicting ducat requests for Health Care appointments are processed daily. Otherwise, close cooperation and coordination between custody and Health Care Services (HCS) staff has minimized impacts of modified programs on services delivery.  During the monitoring period there were no identified conflicts with service delivery between the various Court monitored programs.

DRPD 1 00419

*Coleman* Site Visit, Round XXV
## MENTAL HEALTH MANAGEMENT REPORT
(January 1, 2012- June 30, 2012)
(Richard J. Donovan Correctional Facility)

### INSTITUTIONAL PROGRAM SUMMARY

**Overview of all the Mental Health Programs at Institution.**
Population: At the time of the Mental Health Management Report (MHMR) writing, the Richard J. Donovan Correctional Facility (RJDCF) total population is 3,282. The total MHSDS population is 1,904 including a total EOP population of 548: ML EOP 325, SNY EOP 143, ASU EOP 57, RC EOP 23. Total CCCMS population is 1,334 including, ML CCCMS 270, ML SNY CCCMS 860, ASU CCCMS 113, RC CCCMS 91, and CTC medical patients including CCCMS and EOP I/Ps total 7, and CTC MHCB 15 I/Ps.

**New Construction/Remodeling.**
- Trailer acquired on Facility D for Mental Health individual, group and office space.
- Trailer acquired on Facility B for ASU medical treatment and office space.
- Wall installed to create telemedicine office in CTC.
- Removal of fence, Mental Health Building, Facility D. Completed on June 13, 2012.
- Facility D visiting room non-contact booths removal for ML conversion planned.

**New or Anticipated Mission Changes.**
- Designated as an intermediate medical care site.
- RC to ML conversion of Facility D. Deactivation of reception mission in process.
- ML Sensitive Needs Facility III CCCMS mission activation in process.

**Major Population Moves.**
- RC intakes continued in reporting period with all County intakes into the RC ceasing at the writing of the management report, July 2012.
- Conversion of Facility D, HUs 16-19 from a RC to a Level III SNY Program in process.
- Convert Facility D, HU 20 from a Level III GP to a Level III SNY Program in process.

**New or Overflow Administrative Segregation or any other Specialized Housing Units.**
- No ASU Overflow was utilized during this reporting period.

**Obstacles to Providing Mental Health Services and Adherence to Program Guide Requirements**

The ongoing hiring freeze has continued to affect the ability to hire clinical staff and senior clinical staff integral to the delivery of mental health services. The use of out of class assignments and contractors as full time equivalents behind established position vacancies and functional vacancies (such as staff out for Family Medical Leave Act, worker's compensation or in out-of-class assignments) has been essential to clinical service delivery.

DRPD 1 00433

## *Coleman* Site Visit, Round XXV
## MENTAL HEALTH MANAGEMENT REPORT

### July 16, 2012

### Monitoring Period: December 1, 2011 to May 31, 2012

### Substance Abuse Treatment Facility and State Prison—Corcoran

### INSTITUTIONAL PROGRAM SUMMARY

**a. Overview of all the mental health programs at institution.**

There have been no major changes in the services CSATF Mental Health provides to *Coleman* class inmates since the last auditing period. CSATF Mental Health provides services at the Correctional Clinical Case Management (CCCMS) level of care, two Enhanced Outpatient Programs (EOP);an 88-bed Co-occurring Disorders EOP (CoD) and a 176-bed Level II Sensitive Needs Yard (SNY) EOP, and a 20-bed Mental Health Crisis Bed unit (MHCB). The Mental Health staff provides scheduled services to inmates on each of CSATF's seven mainline yards and Administrative Segregation Unit (ASU), and performs screenings and evaluations in the stand-alone ASU and elsewhere throughout the institution as needed. When activated, overflow ASU patients were screened and monitored in R&R and other overflow units. Scheduled individual and group therapy, as well as psychiatric services are provided on all mainline yards, ASU, and the two EOP programs; group therapy was not provided in the MHCB during this period. Recreational therapy is provided in the EOP programs and the MHCB, and substance abuse counselors co-facilitate groups and provide substance abuse counseling services in the CoD EOP under contract through Walden House. In addition Mental Health staff provided a variety of crisis and welfare evaluations, and mental status evaluations for candidates for certain medical procedures (e.g., HCV, dialysis, kidney transplants).

The MHCB was operated at its 20-bed capacity and both the CoD EOP and Level II SNY EOP were operated at their full planned census of 88 and 176 beds respectively during the audit period. CSATF Mental Health has access to one telemedicine station serving patients on yards F and G, and telepsychiatry services were scheduled four days per week (Monday through Thursday), alternating between those yards on a regular schedule of psychiatry contacts and IDTT treatment planning sessions.

**b. New Construction/Remodeling.**

As part of the statewide initiative, CSATF's MHCB unit was retrofitted with suicide resistant beds in May 2012, and these beds are now being utilized in all regular patient rooms for mental health admissions. The capacity of the healthcare computer network also was

DRPD 1 00482

expanded during the audit period, with significant increases in the number of ports available across the institution, as well as the installation of a Wi-Fi network which is expected to be available in the third quarter of 2012. The availability of these additional ports and Wi-Fi services is expected to resolve the remaining limitations in computer access are restricted to multi-use locations (e.g., chapels).

**c.  New or Anticipated Mission Changes.**

CSATF Mental Health anticipates activating an 88-bed Level II general population (GP) EOP program on Facility F3, with the first patients scheduled to be admitted in September 2012. This program will be housed in the A and D sections of Facility F3, adjacent to the CoD Program.

During the audit period CSATF also was designated as one of seven CDCR institutions that will serve as primary housing locations for Gender Identity Disorder/Transgender inmates. Initial training for the staff who will provide evaluation services to those inmates was completed in April 2012.

**d.  Major Population Moves.**

No major population moves were initiated or completed during the audit period.

**e.  New or Overflow Administrative Segregation or any other Specialized Housing Units.**

As a result of a major inmate disturbance on the yard which resulted in an unusually large number of lockups, overflow ASU was activated in Facility C building 8 from January 11, 2012 until February 9, 2012.

**f.  Obstacles to Providing Mental Health Services and Adherence to Program Guide Requirements.**

**Staffing Shortages:**  Due to realignment, CSTAF has experienced significant staffing shortages and turnover. One of the biggest problems has been an ongoing shortage of office technicians. This has made it difficult to enter and retrieve mental health program data.

**Office Space CCCMS Yards**: The 13 psychologists were added to the staff during the audit period increased demand for already scarce office space, and a ceiling failure in the program office on D-yard following heavy rains further restricted the alternative space available to mental health clinicians on that yard. However with the introduction of a mobile trailer housing medial support staff, Mental Health was able to negotiate the use of two offices in the Correctional Treatment Center (CTC) outpatient area (CTC 102 and 103) to supplement the space available to CCCMS clinicians. This additional space has reduced the difficulties faced by clinicians in finding a confidential office in which to treat their patients, but at a cost

DRPD 1 00483

of increased inconvenience to the patients as a result of the time and security processes required to transfer them to the CTC.

Custody continues to assist mental health staff in securing treatment space, but lack of consistent office space remains disruptive to both the patients and clinicians involved. The acquisition of several laptop computers has improved access to the eUHR, DECS, and SOMS in these unassigned treatment spaces, but consistent access will not be assured until the Wi-Fi network is activated.

MENTAL HEALTH ROSTER

## Institutional Mental Health Staffing and Telemedicine

### Monitoring Period: December 1, 2011 to May 31, 2012

## Substance Abuse Treatment Facility and State Prison—Corcoran

| Position | Positions Established | Positions Filled | Vacancies | Vacancy Rate | Full-Time Equivalent | Functional Vacancies | Functional Vacancy Rate (PY Basis) |
|---|---|---|---|---|---|---|---|
| Chief Psychiatrist | 1 | 1 | 0 | 0 | 0.00 | 0 | 0.00% |
| Senior Psychiatrist | 0 | 0 | 0 | 0 | 0.00 | 0 | 0.00% |
| Chief Psychologist | 1 | 1 | 0 | 0 | 0.00 | 0 | 0.00% |
| Senior Psychologist | 3 | 2 | 1 | 33.3% | 0.00 | 1 | 33.33% |
| Staff Psychiatrist | 8 | 2.00 | 6.00 | 75.00% | 4.25 | 1.75 | 21.88% |
| Staff Psychologist | 32 | 27 | 5 | 15.62% | 0.75 | 4.25 | 13.28% |
| Supervising Social Worker | 1 | 1 | 0 | 0 | 0.00 | 0 | 0.00% |
| Social Worker | 10.5 | 10.5 | 0 | 0.00% | 0.00 | 0 | 0.00% |
| Registered Nurse | 11.0 | 11.0 | 0 | 0.00% | 0.00 | 0 | 0.00% |
| Senior Psych Tech | 2 | 2 | 0 | 0.00% | 0.00 | 0 | 0.0% |
| Psych | 34.00 | 34.00 | 0.00 | 0.00% | 0.00 | 0 | 0.00% |

DRPD 1 00484

## *Coleman* Site Visit, Round XXV
## MENTAL HEALTH MANAGEMENT REPORT
(December 1, 2011 – May 31, 2012)
(Salinas Valley State Prison)

### INSTITUTIONAL PROGRAM SUMMARY

#### a. Overview of all mental health programs at institution

Salinas Valley State Prison (SVSP) is a Level IV prison and provides the following mental health programs: ML CCCMS/SNY, ML EOP, ASU CCCMS, ASU EOP (Hub), and MHCB. In addition, the Department of Mental Health's Salinas Valley Psychiatric Program is located within the perimeter of SVSP.

While the overall SVSP population has decreased, the percentage of inmates with mental illness has increased. We are currently developing reliable metrics to determine what, if any, change in mental health treatment requirements emerge as a result of titrating into a higher concentration.

#### ML CCCMS:

The ML CCCMS program is located on all four yards. A Yard houses Level 4 SNY inmates. B, C and D yards house Level 4 non-SNY inmates. The A yard population experienced the greatest decrease starting at 605 I/Ps and dropping to 537. The end of May showed 260 patients on B yard, 160 patients on C yard and D yard with 27 patients.

#### ML EOP:

ML EOP inmates are housed in two buildings, D3 and D4. The ML EOP population has held steady beginning the reporting period at 178 inmates and ending at 175. At the time of this report, 6 ML EOP SNY inmates are housed on A yard and await transfer to other institutions.

#### ASU CCCMS:

ASU CCCMS inmates are housed in D1, D2 and D8 with the main concentration of patients in D8. The ASU CCCMS population has dropped from 205 to 172 inmates.

#### ASU EOP (Hub):

ASU EOP inmates are housed in D1 and D2. The ASU EOP population began the reporting period at 54 and has oscillated with a low of 32 and ended the reporting period at 36.

#### MHCB:

DRPD 1 00548

ASU Overflow inmates were located in buildings B1 and C8.  April saw two ASU Overflow inmates in C8.

**f. Obstacles to Providing Mental Health Services and Adherence to Program Guide Requirements**

Modified programs remain an obstacle to providing mental health services on B and C yards. Both yards were locked down for the majority of the reporting period.

Lack of treatment space impacts the ASU and ML EOP programs.  A plan has been presented for using the D Yard gym for mental health recreational activities with a potential start date of late summer 2012.  The lack of treatment space problem should be alleviated if not eliminated with the completion of the new A Yard ML EOP building.

Staffing issues, both clinical and non-clinical, greatly affected the delivery of mental health services.  A hiring freeze prohibited filling vacancies for psychologists and office technicians (OTs).  Staff Services Analyst (SSA) and Office Services Supervisor I (OSSI) support staff positions were eliminated.  Limited-term appointments for one OT and one psychologist end this July.  LCSW and psychiatry positions remain difficult to fill despite attempts to hire.  Budgetary constraints prohibited the hiring of contractors to fill all positions.  Extended illness affecting 4 OTs in addition to an unfilled vacancy contributed to OT shortages during the reporting period.

DRPD 1 00550

EXHIBIT D

# Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004

Raymond F. Patterson, M.D.
Kerry Hughes, M.D.

*Objective:* **The purpose of this extended review is to assist health care managers, clinicians, prison administrators, and custody staff in identifying and responding effectively to prisoners who present a substantial risk of suicide in the foreseeable future.** *Methods:* **The California Department of Corrections and Rehabilitation (CDCR) is the largest state-operated prison system in the country, with a census range of 155,365 to 163,346 prisoners between 1999 and 2004. The authors conducted a review of all 154 suicides that occurred in CDCR during this period and examined several factors related to the suicide, including demographic characteristics of the inmate, health care information, suicide method, custody information, and emergency response.** *Results:* **The analysis of trends in this six-year review reveals that prisoners who completed suicide were similar to those who took their lives in the community in age distribution and mental health factors. The analysis also found that this group of prisoners who committed suicide had other characteristics or commonalities related specifically to their incarceration. In this review 60% of the suicides were judged to have been foreseeable, preventable, or both.** *Conclusions:* **Although suicide is not predictable, the terms "foreseeable" and "preventable" are used to indicate cases in which the risk of suicide was elevated or events occurred that should have triggered clinical or custodial reactions that would have reduced the likelihood of completed suicide. This review provides clues to recognize inmates at elevated risk and identifies some of the health care practices and conditions of confinement to consider for provision of an adequate suicide prevention program.** *(Psychiatric Services 59:676–682, 2008)*

This review examines prisoner suicides that occurred in the California Department of Corrections and Rehabilitation (CDCR) from 1999 to 2004. The review was conducted pursuant to *Coleman v. Schwarzenegger,* a federal district court case decided in late 1995 in which the plaintiffs, a certified class of state prison inmates, successfully challenged the adequacy of mental health services available to them. The litigation culminated in the appointment of a special master and a deputy master to oversee the development and implementation of a constitutionally sound mental health services program in CDCR. These persons were appointed by the court to remedy constitutionally inadequate mental health care and to promote other constitutional requirements in the program.

CDCR's mental health services delivery system is intended to provide reasonable access to screening, assessment, and treatment for prisoners with serious mental illness. The mental health services delivery system comprises several levels of care, including the correctional clinical case management system (that is, an outpatient program for prisoners within the prison setting), the enhanced outpatient program (which consists of specialized housing units with enhanced mental health treatments), mental health crisis bed units with 24-hour nursing care (that is, an infirmary setting) for suicidal prisoners or prisoners in crisis, and acute and intermediate inpatient care in programs operated by the California Department of Mental Health located within two CDCR facilities and within hospitals run by the California Department of Mental Health that are outside CDCR.

This review is not intended to provide a comprehensive analysis of the mental health services and programs provided by CDCR. Rather, it focuses solely on the suicides that occurred in CDCR during the covered six-year span; on the recorded events before, during, and after each suicide that help facilitate an analysis of the potential suicide risk; and on the clinical and custodial factors relevant to each completed suicide.

## Methods

The data on demographic characteristics, health care, and custody presented in this study are based largely

*Dr. Patterson is affiliated with the Department of Psychiatry, Howard University College of Medicine, Washington, D.C., and with the Department of Psychiatry, Georgetown University, Washington, D.C. Dr. Hughes is with the Department of Psychiatry, Morehouse School of Medicine, Atlanta, Georgia. Send correspondence to Dr. Patterson at 1904 R St., N.W., Washington, D.C. 20009 (e-mail: rpattersonmd@earthlink.net).*

on comprehensive reviews conducted at both institutional and central-office levels by CDCR mental health, custody, and administrative personnel. The compilation of the data collected originally occurred as part of CDCR's internal process for the review of individual suicides. At the direction of the special master in the *Coleman* case in 1999, two court-appointed psychiatric experts (the authors of subsequent annual installments and this six-year study) collaborated in the generation of the first annual suicide review.

The development of a more effective individual suicide review process became one of the early goals of the authors' annual suicide reviews, and the process was influenced by the National Commission on Correctional Health Care's standards and recommendations (1). Each annual review generated refinements in the compilation and analysis of collected data, which in turn contributed to substantive and procedural improvements in suicide prevention policies and practices. All of this took place in a state correctional system that has a design-rated capacity of 79,477 beds and an annual population average of 159,893 for the six-year review period, exceeding the rated capacity by approximately 200% (2).

In addition to the suicide review documents prepared by CDCR personnel, the authors also compiled data from prisoners' health and classification records, autopsy reports, and inmate suicide notes (when available). These data were further supplemented by the observations and reports of the mental health experts in the *Coleman* case and monitors at facilities where suicides occurred, as well as by insights and information provided by counsel for plaintiffs in the *Coleman* case.

The sifting of the available demographic data together with the circumstances surrounding each death that were discernible from the attendant records permitted the identification of some shared characteristics that suggested a heightened potential risk of suicide for some categories of prisoners. Similarly, a close reading of the historical clinical and custody documentation surrounding each completed suicide helped identify some common clinical failures and conditions of confinement that seemed to contribute to the translation of the potential for suicide into reality.

## Results

The third leading cause of death in U.S. prisons is suicide, exceeded by natural deaths and deaths from AIDS (3). At least six well-known demographic characteristics of persons who commit suicide are shared by the U.S. general population and the incarcerated subpopulation, including age, gender, ethnicity, drug and alcohol abuse, history of psychiatric treatment, and prior suicide attempts (4,5). For the community, more than 90% of people who die by suicide have a combination of those risk factors, such as male gender and increasing age (4,5). For the incarcerated population these risk factors are similar with the exception of the highest rates of suicide being in the 31 to 40 age range because of fewer numbers of inmates aged 41 and older. The rates for inmates older than 50 are 9%, similar to the 14% rate in the community (4). In prisons, such as the CDCR, younger inmates comprise the majority of inmates, with declines in numbers over time. The percentage of suicide reflects these declining numbers by age but is consistent with prevalence in the community (4,5). From 2000 to 2002 state prisoner suicide rates ranged from 13 to 14 suicides per 100,000 prisoners for every age group over 18 (6). Men are four times more likely than women to commit suicide (7). Non-Hispanic Caucasian males are the highest-risk group (7). The rate of suicide is highest among non-Hispanic Caucasian men, regardless of whether they are inside or outside of correctional facilities (5,7). Family conflict, bereavement, and loss of support are well-known risk factors. First incarceration, which usually takes place in a jail, is a widely known risk factor, as described by Metzner and Hayes (5,8) and others (6,9–11).

In contrast to society at large, where easy access to a handgun is identified as a risk factor and handguns are the most common method of suicide, hanging was the most frequently employed method of suicide in custody found in this and other studies. This was not surprising in view of the crucial role played by a readily accessible method. In the sample presented here, hanging was employed in 85% of cases. This finding was consistent with the literature on incarcerated populations (5,6,8) and with the Missouri samples of completed suicides in prisons (N=37) described by Daniel and Fleming (11), who found that hanging was the most frequent method of suicide, employed in 81% of cases.

Although the suicide rate in jails dropped more than 50% between 1983 and 2002 in the United States, from 129 per 100,000 down to 47 per 100,000, as described by Mumola (6), jails continue to have a much higher rate of suicide than prisons. Suicide rates in state prisons also dropped, from 34 per 100,000 in 1980 to 16 per 100,000 in 1990, with further decline to 14 per 100,000 by 2004 (5–7,9).

Recently there have been indications that suicide rates among Hispanics and suicide attempts among young African-American men are rising nationwide (6). Regarding the incarcerated population, non-Hispanic Caucasian inmates commit suicide at the highest rate (96 per 100,000), compared with rates of 30 per 100,000 among Hispanics in custody and rates of 16 per 100,000 among African Americans in custody (6). In the sample presented here, the number of Hispanic men who committed suicide approached that of non-Hispanic Caucasians, while the number of African Americans who committed suicide remained low.

The body of literature on suicide risk factors suggests hypotheses—some already codified in standards promulgated by the American Correctional Association and the National Commission on Correctional Health Care (1,12)—that should elicit keen interest among those charged with the care of incarcerated individuals.

The accompanying tables provide graphic representation of the demographic data collected during each of the six years covered in the study.

The number of annual suicides oc-

**Table 1**

California Department of Corrections and Rehabilitation population, suicide rate, and housing and location of suicide

| Variable | Population (at end of year) | Total suicides (N=154) | Suicide rate per 100,000 | Single-cell housing | | Administrative segregation or secure housing unit | | Mental health crisis bed unit | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | N | % | N | % | N | % |
| Year | | | | | | | | | |
| 1999 | 160,970 | 25 | 15.5 | 20 | 80 | 9 | 36 | 2 | 8 |
| 2000 | 160,855 | 15 | 9.3 | 12 | 80 | 8 | 53 | 0 | — |
| 2001 | 155,365 | 30 | 19.3 | 25 | 83 | 12 | 40 | 6 | 20 |
| 2002 | 158,099 | 22 | 13.9 | 15 | 68 | 6 | 27 | 1 | 5 |
| 2003 | 160,722 | 36 | 23.1 | 22 | 61 | 20 | 56 | 3 | 8 |
| 2004 | 163,346 | 26 | 15.9 | 22 | 85 | 19 | 73 | 3 | 12 |
| Average | 159,893 | 26 | 16.2 | 19 | 73 | 12 | 46 | 3 | 12 |

curring during the covered period ranged from a low of 15 in 2000 to a high of 36 in 2003. On the basis of the institutional population of CDCR at the end of each of these respective years, the suicide rate ranged from 9.3 per 100,000 to 23.1 per 100,000. The variability in the annual rate of suicides is tracked for each of the covered years in Table 1.

The wide range of variability illustrates the pitfalls of comparing annual rates of an event with a low base rate event in a small, fluctuating population. Even with large samples, a minimum of five years of data are needed for meaningful analysis because of year-to-year variability and other factors affecting mental health resources (10,11,13).

Table 1 also provides a breakdown of the annual end-of-year overall CDCR population and the annual number of suicides per year in each type of housing unit where prisoners resided at the time of their deaths. Three different types of housing units were examined: single cell, administrative segregation or secure housing, or mental health crisis bed. Single-cell units are defined as one inmate per cell and can be for the general population or for inmates with specialized needs. Administrative segregation and secure housing units can have one or two persons in a cell. Administrative segregation consists of housing units where inmates are generally locked in their cells 23 hours per day, for days to months at a time, and secure housing units are a "super maximum" security setting where inmates are typically locked in their

cells for 23 hours per day for one to many hours. Mental health crisis bed units or outpatient housing units have one person in a cell and have nursing and clinical staff on the units 24 hours per day. The breakdown of suicides occurring in single-cell housing in administrative segregation or secure housing units and in the general population (that is, nonspecialized housing units) is also included in Table 1. The data indicate that 73% of all suicides were completed in single cells, while 46% of completed suicides occurred in single cells in administrative segregation or secure housing units and 12% occurred in mental health crisis beds.

These findings regarding the importance of environmental stressors unique to prison conditions, such as isolation, punitive sanctions, severely restricted living conditions, and acquisition of new charges or imposition of an unexpected sentence were consistent with previous reports (11,14,15). We found that the conditions of deprivation in locked units and higher-security housing were a common stressor shared by many of the prisoners who committed suicide. Liebling (16) found that recent punishment, segregation, long or unexpected sentences, and high levels of reported distress, including symptoms of depression and anxiety, were reported by a sample of men who attempted suicide. In Liebling's (16) sample of 50 cases, 24% had recently experienced punishment or were in segregation and 22% had recently received a long or an unexpected sentence.

Among the 154 prisoners who committed suicide during the six-year period, 149 (97%) were male, and four (3%) were female. Sixty-two (40%) were Caucasian, 55 (36%) were Hispanic, 25 (16%) were African American, four (3%) were Asian, and eight (5%) were of another race or ethnicity. Seventy-three (47%) of the prisoners who completed suicide were aged 31–40 years, 42 (27%) were 18–30 years, 24 (16%) were 41–50 years, 14 (9%) were older than 50 years, and one (1%) was younger than 18 years.

The methods utilized by prisoners who completed suicide included hanging (N=131, or 85%), lacerations or exsanguinations (N=9, or 6%), overdose (N=5, or 3%), and other (N=9, or 6%).

Among prisoners who completed suicide during the six-year period, 73% had a history of mental health treatment, and 62% had a history of suicidal behavior or statements. The breakdown of these numbers for each year is provided in Table 2.

Among the 154 suicides completed during the covered period, 87 (56%) involved prisoners on the mental health caseload. Table 3 provides the breakdown. One caveat: prisoners housed in a mental health crisis bed unit or a Department of Mental Health inpatient program may have been at any level of care before their placement in those beds, including "none." The level of mental health care for the 87 prisoners included in the CDCR mental health caseload at the time of their suicides was as follows: five (3%) were at the Department of Mental Health inpatient

(hospital) level of care; two (1%) were at a crisis level of CDCR care (in a mental health crisis bed unit, outpatient housing unit, or transitional care unit); 27 (18%) were in the enhanced outpatient program; and 53 (34%) were in the correctional clinical case management system program.

These findings are consistent with Daniel and Fleming's ten-year review (11) of prison suicides in Missouri. These findings point to the need for thorough suicide risk assessment of prisoners who appear to be relatively high functioning or who are found not to be in need of ongoing mental health treatment. In the group of suicides presented here, 59 (38%) were not in need of mental health treatment (as determined by the CDCR clinical treatment staff), a percentage that was higher than Daniel and Fleming's finding that nearly 30% of the prisoners who committed suicide over a ten-year period in Missouri presented with no mental health problems (11). For eight (5%) inmates, mental health treatment status was unknown because of missing data. In our California sample, like the Missouri sample, the prevalence of prior treatment was higher than current need for treatment. Both findings reflect a well-known indicator of elevated suicide risk in society at large—that is, history of psychiatric treatment. A total of 112 of 154 (73%) of the persons who committed suicide in our sample had a history of psychiatric

treatment; however, 101 of the 112 (90%) had axis I diagnoses. Seventy-three percent of the total Missouri sample had been diagnosed as having an axis I disorder at some point in the past, and 66% of our total sample had a diagnosis of an axis I disorder at some point in the past (11).

Also reviewed were emergency responses to inmates who were unresponsive when they were discovered and who subsequently were determined to have committed suicide. The reviews focused on the timely initiation and continuation of cardiopulmonary resuscitation (CPR) by first responders. Policy requires that CPR be initiated and continued with very few exceptions, exceptions such as the presence of rigor mortis, lividity, or obvious trauma, such as severe head injury or decapitation. For the

six-year review period, CPR was performed in a timely and appropriate manner on 107 inmates who committed suicide (69%), CPR was not performed in a timely and appropriate manner on 42 inmates (27%), and it could not be determined on the basis of the available documentation whether CPR was performed in a timely or appropriate manner on five inmates (3%). These results are presented by year in Table 4.

Sixty percent of all the suicides covered in this six-year period were either foreseeable or preventable, and some were both. The term "foreseeable" refers to cases in which already known and reasonably available information about an inmate indicates the presence of a substantial or high risk of suicide that requires responsive clinical, custody, or administrative in-

**Table 2**

Mental health history of persons who committed suicide in the California Department of Corrections and Rehabilitation

| Variable | Total suicides (N=154) | Mental health caseload at time of death | | Previous mental health treatment | | Previous suicidal activity | |
|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % |
| Year | | | | | | | |
| 1999 | 25 | 16 | 64 | 18 | 72 | 17 | 68 |
| 2000 | 15 | 8 | 53 | 11 | 73 | 11 | 73 |
| 2001 | 30 | 16 | 53 | 22 | 73 | 19 | 63 |
| 2002 | 22 | 10 | 45 | 14 | 64 | 12 | 55 |
| 2003 | 36 | 23 | 64 | 27 | 75 | 18 | 50 |
| 2004 | 26 | 13 | 50 | 20 | 77 | 15 | 58 |
| Average | 26 | 14 | 54 | 19 | 73 | 15 | 58 |

**Table 3**

Level of care received by persons who committed suicide in the California Department of Corrections and Rehabilitation

| Variable | Total suicides | Correctional clinical case management system | | Enhanced outpatient program | | Mental health crisis bed, outpatient housing unit, transitional care unit | | Department of Mental Health | | None | | Unknown[a] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % | N | % | N | % | N | % |
| Year | | | | | | | | | | | | | |
| 1999 | 25 | 10 | 40 | 6 | 24 | 0 | — | 0 | — | 8 | 32 | 1 | 4 |
| 2000 | 15 | 4 | 27 | 3 | 20 | 0 | — | 1 | 7 | 0 | — | 7 | 47 |
| 2001 | 30 | 7 | 23 | 6 | 20 | 0 | — | 3 | 10 | 14 | 47 | 0 | — |
| 2002 | 22 | 9 | 41 | 0 | — | 0 | — | 1 | 5 | 12 | 55 | 0 | — |
| 2003 | 36 | 16 | 44 | 6 | 17 | 2 | 6 | 0 | — | 12 | 33 | 0 | — |
| 2004 | 26 | 7 | 27 | 6 | 23 | 0 | — | 0 | — | 13 | 50 | 0 | — |
| Total | 154 | 53 | 34 | 27 | 18 | 2 | 1 | 5 | 3 | 59 | 38 | 8 | 5 |

[a] Unknown because of missing data.

**Table 4**

Cardiopulmonary resuscitation (CPR) performed on persons who committed suicide in the California Department of Corrections and Rehabilitation

| Variable | Total suicides | CPR performed | | CPR not performed | | Unknown | |
|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % |
| Year | | | | | | | |
| 1999 | 25 | 15 | 60 | 8 | 32 | 2 | 8 |
| 2000 | 15 | 11 | 73 | 4 | 27 | 0 | — |
| 2001 | 30 | 20 | 67 | 9 | 30 | 1 | 3 |
| 2002 | 22 | 16 | 73 | 6 | 27 | 0 | — |
| 2003 | 36 | 29 | 81 | 5 | 14 | 2 | 6 |
| 2004 | 26 | 16 | 62 | 10 | 38 | 0 | — |
| Total | 154 | 107 | 69 | 42 | 27 | 5 | 3 |

terventions to prevent self-harm. The term foreseeable is not to imply "predictable," because suicide is not predictable, but rather to refer to the presence of an elevated risk to substantial or high risk, which requires appropriate clinical or custodial intervention or monitoring.

The term "preventable" applies to situations where if some additional information had been gathered or some additional interventions had been undertaken, usually as required in existing policies and procedures, the likelihood of a completed suicide might have been substantially reduced. The concept includes, but is not limited to, situations where inmates report self-injurious behaviors or threats but do not receive appropriate evaluation or treatment, are not transferred to a more clinically appropriate or safe environment, or fail to receive appropriate lifesaving procedures, such as timely CPR.

Table 5 shows the breakdown of foreseeable and preventable suicides by year. Major contributing factors in foreseeable or preventable deaths included inadequate clinical assessments, inappropriate interventions, incomplete referrals, missed appointments and appointments that were not rescheduled, unsupported diagnoses, failure to review records, assignments to inappropriate levels of mental health care, failure to provide protective housing, and the provision of inadequate or untimely resuscitation efforts. In numerous cases, multiple such factors contributed to the outcome.

## Discussion

During the period covered by this review, both the scope and quality of CDCR's review process improved significantly. In 1999 psychological autopsies were rarely included in reviews, and many of the psychological autopsies were conducted by personnel who were clinically involved directly or indirectly with the specific inmate who committed suicide. By 2004 clinicians not involved in specific inmates' care and treatment had performed psychological autopsies for all inmates who had committed suicide. In 1999 the special master's reports recommended improvements in the review process that included clarification of the duties of local reviewers, mandated time frames for completion of reviews, and the development of corrective action plans. Subsequent procedural recommendations focused on specific timelines for the preparation of responsive corrective action plans by institutions.

The review process did not focus solely on procedural elements. From the beginning of the study period the annual review helped prompt substantive changes and improvements in suicide prevention policy and practices, including, for example, requirements for increased clinical monitoring of prisoners in high-security units, both for those who were and for those who were not on the mental health caseload; the development of clinical and custody follow-up monitoring regimens for suicidal prisoners discharged from mental health crisis beds and their alternatives; the effective provision of group therapy for prisoners on the mental health caseload in administrative segregation units; the development of routinely administered suicide risk assessments; efforts to keep suicidal prisoners out of cells with heating, ventilating, and air conditioning vents with large-mesh screens to facilitate hanging; a ban on the substitution of video monitoring for the personal observation of prisoners on suicide watch; and the development and implementation of improved CPR policies and practices.

The suicides by four female inmates and the sharp rise in the number of suicides in locked units, particularly administrative segregation, led to greater attention to both areas. Failure to use a suicide risk assessment instrument as required by departmental policy was a factor in the female suicides, and corrective measures were taken. The rising rate of

**Table 5**

Foreseeable or preventable suicides in the California Department of Corrections and Rehabilitation

| Variable | Total suicides | Foreseeable or preventable | | Not foreseeable or preventable | | Unable to determine | |
|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % |
| Year | | | | | | | |
| 1999 | 25 | 8 | 32 | 6 | 24 | 11 | 44 |
| 2000 | 15 | 11 | 73 | 3 | 20 | 1 | 7 |
| 2001 | 30 | 14 | 47 | 13 | 43 | 3 | 10 |
| 2002 | 22 | 10 | 45 | 12 | 55 | 0 | — |
| 2003 | 36 | 29 | 81 | 7 | 19 | 0 | — |
| 2004 | 26 | 21 | 81 | 5 | 19 | 0 | — |
| Total | 154 | 93 | 60 | 46 | 30 | 15 | 10 |

suicide in administrative segregation initiated a two-year effort to analyze the causes and prescribe remedies. The latter have included, among other initiatives, custody monitoring of new arrivals at 30-minute intervals, preplacement mental health screenings, better tracking of history of suicidal behavior, easing of property restrictions for protective custody prisoners, and improved physical safety in cells for newly arrived prisoners. Several of these remedies were based upon data indicating that suicides occurred most often within three weeks of a prisoner's placement in an administrative segregation unit. In the California cases, 39 of 74 (53%) of the suicides that occurred in administrative segregation or secure housing units occurred within three weeks of placement. Individuals housed in administrative segregation and secure housing units are more isolated than those in the general prison population, and these housing changes may represent a very different and stressful environment for inmates as they are placed in these environments because they incurred charges or for safety and protective custody reasons (typically these environments involve 23 hours per day in cell confinement with some exceptions for out-of-cell time for yard activities and showers).

## Conclusions

Over the six years of the study, the suicide review process has identified characteristics that ought to draw the attention of staff to certain categories of prisoners, including the following:

٠ Prisoners with a history of serious mental illness

٠ Prisoners with a history of suicide attempts

٠ Prisoners housed in a single cell, particularly in administrative segregation or a secure housing unit

٠ Prisoners expressing safety concerns with associated anxiety and agitation

٠ Prisoners with serious medical concerns

٠ Prisoners with both severe personality disorders and coexisting mental illness

٠ Prisoners whose legal status has undergone significant change—for example, individuals returning from court after denial of appeals and those receiving third-strike determinations or other additions to their sentences

٠ Caucasian prisoners, although the number of suicides among Hispanic prisoners increased rapidly during the six-year period.

The above categories may help identify prisoners who might warrant focused attention. CDCR's experience with completed suicides over the study period highlights both clinical practices and physical conditions that ought to be addressed, including the following:

٠ The failure of clinical staff to refer potentially suicidal prisoners to programs with more intensive monitoring and care

٠ The provision of prompt and adequate access to higher levels of monitoring and care to prisoners identified as potentially suicidal

٠ The elimination of physical safety deficiencies in cells and other housing for prisoners most at risk of suicide—for example, large mesh vents or other protuberances regularly used for hanging

٠ The lack of adequate confidential interviewing space in most high-custody housing units, which inhibits the ability and willingness of potentially suicidal prisoners to communicate effectively with clinicians about their risk of suicide

٠ Clinicians' failure to review fully and carefully available documentation, such as health and classification records, for indices of prior suicidal activity or ideation

٠ The timely completion of all of the documentation associated with the institutional or departmental elements of the suicide review process, including the documentation of implemented remedies and adverse personnel actions

This review suggests the following recommendations and considerations for correctional administrative, clinical, and custody staff members to assist in their efforts to establish and manage an effective suicide prevention program:

٠ The development and timely implementation of effective policies and procedures

٠ Training and supervision of all staff regarding adherence to policies and procedures

٠ Development and implementation of a systematic quality management process with review of all completed suicides

٠ Use of screening criteria, clinical rounds, and timely access to care for inmates in isolated conditions of confinement, especially administrative segregation

٠ Access and timely transfers to higher levels of care when indicated

٠ Provision of a timely and complete emergency response system, including CPR, first aid, and transfer to medical units or facilities

٠ Consideration of the impact of overcrowding and staffing deficiencies.

Prisons and prison life create enormous stress, even for individuals who are mentally healthy. The strain for offenders with mental illness, who are often both fragile and intensely vulnerable, sometimes exceeds their ability to cope. One surpassingly critical purpose of mental health services in prisons is to help identify such individuals for intervention and provide the monitoring, treatment, and physical safety needed for their survival. This review attempts to provide some clues about recognizing prisoners most at risk of suicide and to identify some of the failed practices and inadequate conditions that often combine to prevent the provision of adequate protection and treatment. This review identifies several risk factors, as well as necessary administrative, clinical, and custody staff involvements and responsibilities for an effective suicide prevention program.

## Acknowledgments and disclosures

The authors thank J. Michael Keating, Jr., J.D., special master appointed through *Coleman v. Schwarzenegger*, Matthew A. Lopes, Jr., J.D., deputy special master appointed through *Coleman v. Schwarzenegger*, and the other team experts and monitors also appointed through the case. The authors also thank the California Department of Corrections and Rehabilitation and plaintiffs counsel for their diligence and assistance.

The authors report no competing interests.

## References

1. Standards for Health Services in Prisons, 5th ed. Chicago, National Commission on Correctional Health Care, 2003

2. California Department of Corrections and Rehabilitation (CDCR), 2007. Available at www.CDCR.ca.gov

3. Metzner JL: Class action litigation in correctional psychiatry. Journal of the American Academy of Psychiatry and the Law 30:19–29, 2002

4. Moscicki EK: Epidemiology of completed and attempted suicide: toward a framework for prevention. Clinical Neuroscience Research 1:310–323, 2001

5. Metzner JL, Hayes LM: Suicide prevention in jails and prisons, in Textbook of Suicide Assessment and Management. Edited by Simon RI, Hales RE. Arlington, Va, American Psychiatric Publishing, 2006

6. Mumola CJ: Suicide and Homicide in State Prisons and Local Jails: Bureau of Justice Statistics Special Report. Washington, DC, US Department of Justice, Aug 2005

7. Web-Based Injury Statistics Query and Reporting System (WISQARS). Atlanta, Ga, Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, 2006. Available at www.cdc.gov/ncipc/wisqars

8. Hayes LM: National study of jail suicides: seven years later. Psychiatric Quarterly 60: 7–29, 1989

9. Hayes LM: Prison suicide: an overview and guide to prevention. Prison Journal 75: 431–456, 1995

10. Hayes LM: National and state standards for prison suicide prevention: a report card. Journal of Correctional Health Care 3:5–38, 1996

11. Daniel AE, Fleming BA: Suicides in a state correctional system, 1992–2002: a review. Journal of Correctional Health Care 12:24–35, 2006

12. Standards for Adult Correctional Facilities, 4th ed. Lanham, Md, American Correctional Association, 2003

13. White TW, Schimmel DJ, Frickey R: A comprehensive analysis of suicide in federal prisons: a fifteen-year review. Journal of Correctional Health Care 9:321–343, 2002

14. Liebling A: Vulnerability and prison suicide. British Journal of Criminology 36: 173–187, 1995

15. Way BB, Sawyer DA, Barboza S, et al: Inmate suicide and time spent in special disciplinary housing in New York State prison. Psychiatric Services 58:558–560, 2007

16. Liebling A: Prison suicide and prisoner coping. Crime and Justice 26:283–359, 1999

## Submissions for Datapoints Column Invited

Submissions to the journal's Datapoints column are invited. Datapoints encourages the rapid dissemination of relevant and timely findings related to clinical and policy issues in psychiatry. National data are preferred. Areas of interest include diagnosis and practice patterns, treatment modalities, treatment sites, patient characteristics, and payment sources. The analyses should be straightforward, so that the figure or figures tell the story. The text should follow the standard research format to include a brief introduction, description of the methods and data set, description of the results, and comments on the implications or meanings of the findings.

Datapoints columns, which have a one-page format, are typically 350 to 400 words of text with one or two figures. The maximum total word count—including the title, author names, affiliations, references, and acknowledgments—is 500. Because of space constraints, submissions with multiple authors are discouraged; submissions with more than four authors should include justification for additional authors.

Inquiries or submissions should be directed to column editors Amy M. Kilbourne, Ph.D., M.P.H. (amy.kilbourne@va.gov), or Tami L. Mark, Ph.D. (tami.mark@thomson.com).

EXHIBIT E

# LITTLE, BULMAN & WHITNEY, P.C.
### *Attorneys*

72 Pine Street
Providence, Rhode Island 02903
(401) 272-8080
Facsimile (401) 521-3555
Email info@lbwlaw.com

Christopher H. Little*
John E. Bulman*
Christopher C. Whitney*
Fredrika Quinn Little**
Norma P. D'Apolito
Scott K. Pomeroy
Stephen T. Carney**
Jack J. Vultaggio, Jr.□

J. Michael Keating, Jr.
Henry R. Kates
*Of Counsel*

*Also admitted in Massachusetts
**Also admitted in Connecticut
□Admitted in Massachusetts only

```
RECEIVED
JUL 1 8 2000
ROSEN BIEN & ASARO
```

July 17, 2000

**VIA FEDERAL EXPRESS**

Donald Specter, Esquire
Prison Law Office
2173 East Francisco Blvd, Suite M
San Rafael, CA 94901

Michael Bien, Esq.
Rosen, Bien & Asaro
155 Montgomery St., 8th Floor
San Francisco, CA 94104

Jennifer Weck, Esq.
Deputy Attorney General
1300 I Street, 10th Floor
P.O. Box 944255
Sacramento, CA 94244

John Sugiyama, Esq.
Deputy Director, Legal Affairs
California Dept. of Corrections
1515 S Street
P.O. Box 942883
Sacramento, CA 94283-0001

Diane de Kervor, Esq.
Deputy Attorney General
110 West A Street, Suite 1100
P.O. Box 85266
San Diego, CA 92186-5266

Re:     **Coleman et al. v. Davis et al.,**
        **No. CIV S-90-0520 LKK JFM P**

Counselors:

Enclosed is a copy of the <u>Coleman</u> Suicide Report prepared by Drs. Raymond Patterson and Kerry Hughes, two of the psychiatric experts for the master in the <u>Coleman</u> case.

This long-discussed report does not respond to any specific court order, but I presently intend to append it as an exhibit to my next regular report on progress in the <u>Coleman</u> case. Consequently, if you have any strong objections to any element(s) of the report, I would appreciate hearing from you within 30 days so that we may make any appropriate amendments prior to its filing as a final report.

Raymond F. Patterson, M.D.
1904 R Street, N.W.
Washington, D.C. 20009
301-292-3737
301-292-6272 (fax)

Kerry C. Hughes, M.D.
21 Saratoga Place, N.E.
Atlanta, GA 30324-3137
404-364-1667
404-364-9708 (fax)

# COLEMAN SUICIDE REPORT
### July 14, 2000

## I. Overview and Introduction

Suicide is the third leading cause of death in U.S. prisons and jails. The National Center on Institutions and Alternatives reports that the rate of suicides in correctional facilities around the country, based on data gathered from 1984 to 1993, was 20.6 deaths per 100,000 inmates. This rate is more than 1.5 times greater than that in the general population, reported in 1991 to be 12 per 100,000 by the U.S. Bureau of the Census. Jeff Metzner, a Coleman psychiatric expert and national authority on mental health in corrections, questions whether the frequently cited suicide rate for prisons and jails is actually so much greater than the general population's. He notes that most studies of correctional suicide rates are based on the average daily census in institutions rather than the much higher number of inmates admitted to correctional facilities, particularly jails, within any given period and suggests that the prison suicide rate would be considerably lower if calculated as a percentage of admissions rather than the average daily population.

Suicides in correctional facilities usually occur early in the period of incarceration, typically within the first two months. Hanging is the method of choice. The vast majority of suicides in custody occur when an inmate is housed alone or at night while a cellmate is asleep.

This report examines completed suicides in the California Department of Corrections (CDC) from October 1998 through December 1999 and provides some basis for comparison with reported national rates, at least for the period covered. The report includes descriptive tables that record a variety of demographic and clinical variables, traces efforts at clinical intervention and estimates whether each suicide might have been foreseeable and/or preventable. The tables are designed to encourage discussion of the variables and risk factors common to completed suicides. Lastly, the report offers some recommendations on current procedures for reviewing completed suicides and CDC's policies on suicide prevention. Appendix A provides brief summaries of the clinical management of individual inmates in CDC who completed suicide in the covered period.

A supplemental report on the four suicides completed in CDC in the first quarter of 2000 will be submitted when complete packages on each become available.

Table 2 – Mental Health Issues

| Inmate # | Past MHTx | Past SB | MHCB 5-day | 5-Day FU | CPR | Fore/Prev |
|---|---|---|---|---|---|---|
| ▮ | Y | Y | Y | Y | Y | N |
| ▮ | N | N | N | N/A | Y | N |
| ▮ | Y | Y | Y | N/A | Y | U*. |
| ▮ | N | N | N | N/A | Y | U* |
| ▮ | Y | Y | Y | N | N | Y |
| ▮ | N* | N | N | N/A | Y | U* |
| ▮ | N | N | N | N/A | Y | N* |
| ▮ | Y | Y | N* | N | N | Y |
| ▮ | Y | Y | N* | N/A | Y | Y |
| ▮ | Y | Y | N* | N/A | Y | Y |
| ▮ | N | N | N | N/A | N | N |
| ▮ | Y | Y | N | N/A | Y | U* |
| ▮ | N | U | N | N/A | Y | N |
| ▮ | Y | Y | N | N/A | ? | U* |
| ▮ | Y | Y | ? | N | Y | Y |
| ▮ | Y | Y | ? | ? | Y | U* |
| ▮ | Y | Y | Y | N | Y | Y |
| ▮ | Y | N | N | N/A | N | U* |
| ▮ | Y | Y | N | N/A | Y | Y |
| ▮ | N | N | N | N/A | N | N |
| ▮ | Y | N | N | N/A | N | U* |
| ▮ | Y | Y | N | N | N | Y |
| ▮ | N | Y | N | N/A | N | U* |
| ▮ | N | N | N | N/A | N | U* |
| ▮ | Y | Y | N* | N | N | U* |
| ▮ | Y | Y | N | N/A | Y | U* |
| ▮ | Y | Y | N* | N | N | Y |
| ▮ | Y | Y | N* | N/A | U | U* |
| ▮ | Y | N | N | N/A | N | N |
| ▮ | Y | Y | N* | N/A | Y | Y |
| ▮ | Y | N | N | N/A | Y | N |
| ▮ | Y | Y | N* | N/A | Y | U* |

■  Legend:  Past SB = Past suicidal behavior (ideation, gesture, attempt)
MHCB 5-day = Housed in MHCB Unit within 5 days of death
5-day FU = Adherence to 5-day follow up after discharge from MHCB
Fore/Prev = Foreseeable: data/information associated with high risk
   Preventable: failure to assess, interview or provide appropriate
      care
N = Not foreseeable or preventable          U = Unable to determine
Y = Foreseeable or Preventable
* Information inadequate to determine

### III.    Discussion

While it is probably unfair to consider the frequency of suicides in a particular facility in isolation from its overall population and security level and the levels of mental health care provided there, frequency figures for suicide in the various CDC facilities remain an important piece of information.

| | | | | | | | | | |
|------|---|------|---|------|---|------|---|------|---|
| CAL  | 1 | CMC  | 1 | CMF  | 2 | COR  | 5 | CTF  | 1 |
| FOL  | 1 | HDSP | 3 | LAC  | 1 | NKSP | 1 | PBSP | 3 |
| RJD  | 1 | SAC  | 3 | SATF | 2 | SCC  | 1 | SQ   | 2 |
| SVSP | 2 | WSP  | 2 | | | | | | |

Analysis of the 32 reviewed cases of suicide in CDC from October 1998 through December 1999 suggests some notably persistent variables, including the following, which are presented together with the percentage of the total represented by each noted item:

- Single-cell housing:  22 (67%)

- Inmates incarcerated for sex offenses (R-jacket or R-suffix):  6–13 (18.7 – 40.6%)

- Method: hanging:  26 (81.2%)

- Past history of suicidal behavior:  20-21 (62.5 to 65.6%)

- Recent discharge from an infirmary or MHCB unit (within 5 days of death):  4-6 (12.5 -18.7%)

- Inadequate assessment (canceled appointments, referrals not completed, past records not reviewed, unsupported diagnosis, inappropriate level of care assignment): 20 (62.5%)

- Lack of response to recent threat or gesture:  8 (25%)

- Recent imposition of Ad Seg or SHU term (within 10 days): 12 (37.5%)

- On mental health caseload:  23 (71.99%)

- Age range: 18-30yrs.: 10 (31.2%); 31-40yrs.: 13 (40.6%);  41-50yrs.:  6 (18.8%); 51+yrs.: 3 (0.94%)

- Race:  6 African Americans (18.75%); 1 Asian (3.0%); 14 Caucasians (43.75%); 11 Hispanics (34.4%)

- Gender:  Male (100%)

4

Review of individual suicides indicated that, in some facilities, deficiencies in care occurred due to the failure of staff, both clinical and custody, to comply with CDC mental health program guide requirements and CDC and institutional suicide policies. Review of data submitted on individual suicides indicated a delivery of care that was inconsistent with established program guides and/or suicide policies in FOL, PBSP, SAC, SATF, SQ, SVSP, CMF, COR, CTF, NKSP, HDSP and LAC. In several reviewed cases, submitted information was insufficient to determine whether such deficiencies had occurred. The five suicides that occurred at Corcoran during the period reviewed reflect the difficulties that facility had in providing adequate mental health treatment to seriously mentally disordered inmates generally, and to inmates at risk for suicide in particular.

The annual rate of suicide in the CDC over the past four years was as follows:

> 1998:  22 suicides in a population of 158,159: a rate of 13.9/100,000
> 1999:  24 suicides in a population of 160,970: a rate of 14.9/100,000
> 2000:  04 suicides in a population of 160,885: a rate of 2.48/100,000 (for the first quarter only)

The annual CDC suicide rates for 1998 and 1999 were lower than the reported national correctional suicide rate of 20.6 deaths per 100,000 inmates and only slightly higher than the suicide rate in the general population of 12.5 deaths per 100,000.

## IV    Observations and Recommendations

1. The psychological autopsies reviewed were variable in quality and reflected some problems attributable to in-house conflicts of interest. The department has sought to respond to this problem by involving extra-institutional clinicians in the conduct of suicide reviews. It is too early to tell whether this will improve the quality and objectivity of the suicide review process, but it is a reasonable response to the problem.

2. Executive summaries of suicides prepared by the department consistently contained sound observations and recommendations and were effective tools for the review and enforcement of institutional and departmental policy and procedures on suicide. The summaries, however, need to be completed on a much more timely basis.

3. Based on this analysis of suicides in the CDC during the indicated period, the following comments and recommendations relative to the defendants' newly drafted DOM on Suicide Prevention and Response seem appropriate:

    a. Defendants should incorporate all relevant existing policies and memoranda on suicide prevention into one departmental statement of policy. The draft DOM on Suicide Prevention and Response incorporates many, but not all, existing key suicide policies and

5

memoranda. Key policies excluded are, e.g., the HCSD Memorandum, dated October 6, 1999, on Discharge Follow-Up From Mental Health Crisis Beds and Administrative Bulletin 99/04, dated July 2, 1999, on Psychological Autopsies.

b. The defendants should write into the DOM a requirement that the suicide report in each case be prepared by a clinician from outside the institution in which the suicide occurred. The department, as noted, has already undertaken such a practice; the DOM should reflect that practice. In addition, as noted by plaintiffs' counsel, responsibility for the production of a suicide report(s) is divided in the draft DOM among the institutional Suicide Prevention Coordinator, a clinician appointed by the Mental Health Services Coordinator (MHSC) and the MHSC him/herself. There needs to be greater clarity in this division of duties.

c. The final draft should also incorporate a specific time frame for the completion and submission of a suicide report(s).

d. The DOM should include, as part of each suicide review, provisions for the development of a Corrective Action Plan with specific timelines for its completion and clearly assigned responsibility for implementing the prescribed corrective actions. While ultimately, the MHSC and the Deputy Director for HCSD will be responsible for ensuring the implementation of each corrective action plan, the institutional Suicide Prevention Coordinator and other local administrators will probably be required to oversee implementation of the corrective action plan at the institutional level.

4. Based on this analysis of suicides in the CDC, it is clear that the defendants' continuing effort to limit suicides is dependent on their ability to enforce compliance with existing program guides for the delivery of mental health care services. In those cases where serious lapses occurred in the provision of services mandated by departmental program guides, resulting in potentially preventable suicides, a variety of causes contributed, including inadequate clinical resources, a lack of efficient supervision, inconsistent quality review and management and serious gaps in the training of both clinical and custody staffs. No amount of clarity in the articulation of suicide prevention policies and procedures can compensate for these deficiencies. In particular, success in curtailing suicides in the department is dependent on effective training of clinicians and correctional officers in recognizing and responding responsibly to indices of suicide.

5. The case reviews suggest that the defendants may need to mount a sustained training effort to reinforce provisions of the new DOM on emergency responses to suicides. The reviews described several instances in which the initiation of CPR was delayed once custody and emergency staff appeared on the scene of a suicide.

# EXHIBIT F

Raymond F. Patterson, M.D.
1904 R Street, N.W.
Washington, D.C. 20009
301-292-3737
301-292-6272 (fax)

Kerry C. Hughes, M.D.
21 Saratoga Place, N.E.
Atlanta, GA 30324-3137
404-364-1667
404-364-9708 (fax)

## REPORT ON SUICIDES COMPLETED
## IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS
## IN CALENDAR YEAR 2001

### 1. Overview and Introduction

This is the third report on completed suicides in the California Department of Corrections (CDC) by the special master's psychiatric experts as part of the review of the defendants' overall compliance with court-mandated remedies and requirements in Coleman v. Davis. The first of these reports provided some initial background information on suicides generally and in correctional settings. Updated data indicates that the most recently calculated annual incidence of suicide in the general U.S. population is 10.7 suicides for every 100,000 persons (Minino et al. 2002). The National Center on Institutions and Alternatives, as well as other sources, also recently reported that the rate of suicides in prisons around the country, based on data gathered over a ten-year period from 1984 to 1993, was 20.6 deaths per 100,000 inmates.

This report examines suicides completed in CDC from January through December 2001 and provides data, analyses and recommendations in a format similar to its predecessors. Also included are two tables that summarize collected demographic data and mental health information on CDC inmates who completed suicide while incarcerated in 2001. The tables are intended to stimulate further review and discussion among CDC clinicians and parties and counsel in the Coleman case. They also provide longitudinal data for the eventual generation of a five-year study based on completed suicides in CDC for calendar years 1998 through 2002.

Throughout 2001, CDC was immersed in the development of a revised and expanded suicide review process, finalized in January 2002, that assigns investigatory and reporting responsibilities for facility and central office clinical staff, as well as related time frames for the completion of specific responsibilities. Establishment of the new process came too late to be fully applicable to the suicide reviews compiled for this report, but the process of development helped to accelerate somewhat the submission of a broader range of suicide-related documents for this report. For example, the key addition to the suicide review process, the corrective action plan developed in the Executive Suicide Report and the institutional report on implementation of the identified corrective

## Table 2 – Mental Health Issues

| CDC # | PAST MENTAL HEALTH TX | PAST SUICIDAL BEHAVIOR | KEYHEA | MHCB | 5 DAY F/U | CPR | SUICIDE REPORT | 60-DAY CAP | 90-DAY FACILITY RESPONSE | FORE/ PREV |
|---|---|---|---|---|---|---|---|---|---|---|
| ■ | YES | YES | YES | YES | NO | YES | YES | YES | YES | NO |
| ■ | NO | NO | NO | NO | N/A | YES | YES | YES | YES | YES |
| ■ | YES | NO | NO | NO | N/A | NO | YES | NO | NO | NO |
| ■ | YES | NO | NO | NO | N/A | YES | YES | YES | YES | NO |
| ■ | NO | NO | NO | NO | N/A | YES | YES | YES | YES | NO |
| ■ | YES | YES | NO | YES | N/A | NO | YES | YES | YES | YES |
| ■ | NO | NO | NO | NO | N/A | YES | YES | YES | NO | NO |
| ■ | YES | YES | NO | NO | N/A | YES | YES | YES | YES | U |
| ■ | YES | YES | NO | YES | NO | YES | YES | YES | YES | NO |
| ■ | YES | YES | YES | YES | NO | YES | YES | YES | YES | YES |
| ■ | NO | NO | NO | NO | N/A | YES | YES | YES | YES | NO |
| ■ | YES | YES | NO | NO | N/A | YES | YES | YES | NO | YES |
| | | | | | | | | | | |
| ■ | YES | YES | NO | NO | N/A | NO | YES | YES | YES | YES |
| ■ | YES | YES | YES | YES | N/A | YES | YES | YES | YES | NO |
| ■ | YES | YES | NO | NO | N/A | NO | YES | YES | YES | NO |
| ■ | NO | NO | NO | NO | N/A | NO | YES | YES | NO CAP REC | NO |
| ■ | NO | NO | NO | NO | N/A | YES | YES | YES | NO | U |
| ■ | YES | YES | NO | NO | N/A | YES | YES | YES | YES | YES |
| ■ | YES | YES | NO | NO | N/A | NO | YES | YES | NO | YES |
| ■ | YES | YES | NO | NO | N/A | YES | YES | YES | YES | NO |
| ■ | YES | YES | NO | NO | N/A | NO | YES | YES | NO | YES |
| ■ | NO | NO | NO | NO | N/A | NO | YES | YES | NO | NO |
| ■ | YES | NO | NO | NO | N/A | NO | YES | YES | YES | YES |
| ■ | YES | YES | NO | NO | N/A | NO | YES | YES | YES | NO |
| ■ | NO | NO | NO | NO | NO | YES | YES | YES | NO | NO |
| ■ | YES | YES** | NO | NO | N/A | NO? | YES | YES | NO | YES |
| ■ | YES | YES | NO | NO | N/A | YES | YES | YES | YES | YES |
| ■ | YES | YES | NO | NO | N/A | YES | YES | YES | YES | U |
| ■ | YES | YES | NO | NO | N/A | YES | YES | YES | YES | YES |
| ■ | YES | YES | NO | NO | ?NO | YES | YES | YES | YES | YES |

*Female Inmate

** As reported by the coroner in this inmate's autopsy report

Raymond F. Patterson, M.D.
1904 R Street, N.W.
Washington, D.C. 20009
Telephone: 301-292-3737
Facsimile: 301-292-6272

# REPORT ON SUICIDES COMPLETED
# IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS
# IN CALENDAR YEAR 2002

## I. Overview and Introduction

This is the fourth report on completed suicides in the California Department of
Corrections (CDC) by the Special Master, submitted as part of the review of the
defendant's overall compliance with court mandated remedies and requirements in
Coleman v. Davis. The third report on completed suicides provided updated data on
recent calculations of annual incidence of suicide in the general U.S. population as 10.7
suicides for every 100,000 persons (Minino, et. al., 2002). The third suicide report also
noted that the National Center on Institutions and Alternatives and other sources have
analyzed data gathered over a ten-year period from 1984-1993 and concluded that the
average annual incidence of deaths from suicide in correctional institutions was 20.6 per
100,000 inmates. More recent data suggests that this rate has fallen during the past
decade to approximately 17 deaths per 100,000 inmates.

The data analysis and recommendations provided in this report follow the same format as
its predecessors. This format includes two tables: Table 1 summarizes collected
demographic data, and Table 2 provides a review of mental health information on CDC
inmates who completed suicides while incarcerated in 2002. In the past these tables and
the following discussion has stimulated further review and comment among the parties
and counsel in the Coleman case, as well as CDC clinicians. It is anticipated that a five-
year longitudinal summary study will be provided for the period from 1999-2003 on
completed suicides in the CDC next year.

Unlike its predecessors, this report will reflect the policies and procedures that were
finalized in January 2002, establishing assigned time frames for the completion of
specific reviews at the clinical and executive level and mandating the development and
implementation of Corrective Action Plans (CAPs) as an integral component of the
department's suicide prevention strategy. The third report recorded considerable, though
far from complete, improvement in the timeliness of the defendants' provision of data on
suicides. While timeliness continued to improve in 2002, and most of the documents
relevant to the 22 completed suicides in calendar year 2002 were provided within
specified timelines, documentary materials for some continued to be provided untimely.
Indeed, the department provided reviews completed for a number of suicides occurring in

calendar year 2003 before completed reviews and necessary information was submitted on some suicides completed in 2002.

Coleman experts and monitors have, as in past years, reviewed information on completed suicides during their site visits to CDC institutions conducted during 2002. The information provided by the Coleman experts and monitors was often an additional source of invaluable information. Plaintiffs' reviews and observations on some specific suicides were also incorporated into the reviews provided in this report.

Previous reports have all referenced the terms "foreseeable" and "preventable." These concepts have been discussed in considerable detail, reviewed and critiqued by the parties and confirmed by the court as appropriate for purposes of analyzing the adequacy of the defendants' suicide prevention efforts.

"Foreseeable" refers to those cases where information already available about an inmate indicates the presence of a substantial or high risk of suicide, which requires reasonable clinical, custody and/or administrative intervention(s). Assessment of the degree of risk, whether high, moderate, or low to none, is an important component in consideration of foreseeability. In contrast to a high and immediately visible risk, a "moderate" risk of suicide involves an ambiguous set of circumstances that requires significant clinical judgment based on adequate training and timely assessment to determine the level of risk and the most appropriate and relevant interventions to prevent suicide. As previously defined, those individuals who are evaluated as "low risk" or "no risk" may still require some degree of monitoring and subsequent evaluation, with appropriate notification of clinical and custody staff of the potential for self injury and/or suicidal ideation or activity.

Over the past few years CDC has established policy requiring the provision of both clinical and custody monitoring and follow-up of suicidal inmates discharged from Mental Health Crisis Bed (MHCB) units or returned from the Department of Mental Health (DMH). In addition, the department now requires that suicide risk assessments be conducted of inmates admitted to, or considered for admission to, MHCB units or Outpatient Housing Units (OHUs) with suicidal ideation or activity. These are important and useful addition to the department's overall suicide prevention efforts. At the institutional level, some ambiguity exists about the need for five-day clinical and one-day custody follow-up monitoring of inmates who have been admitted to an MHCB unit or OHU, and whose risk of suicide during the course of admission has been assessed as low to none. Specific completed suicides in calendar year 2002, where issues involving suicide risk assessments and follow-up clinical or custody monitoring have been identified, are reflected in Table 2 and the appendix.

"Preventable" applies to those situations in which, if some additional information had been gathered and/or some additional intervention(s) undertaken, usually as required in existing policy, the likelihood of a completed suicide might have been reduced substantially. The concepts of "foreseeable" and "preventable" implicate clearly the adequacy of policies and procedures, training and the implementation and supervision of policies and procedures, as well as clinical judgment.

2

The number of completed suicides in CDC during calendar year 2002 declined to 22, down from the 30 that recorded in calendar year 2001. Of the 30 suicides in 2001, three occurred in DMH and were remarkable for the inadequacy of the subsequent suicide review process, particularly in the development of plans for corrective action, in all three cases. In 2002, only one of the 22 completed suicides occurred in a DMH facility. This death and the other 21 deaths are described individually in Appendix B.

The first completed suicide in calendar year 2002 occurred on January 4; the last occurred on December 30. Documents provided on each suicide included, as in previous years, the deceased inmate's UHR, the official incident report, the autopsy report, the Suicide Report, the CDC Executive Suicide Report and the Facility's Implementation Report with its response to the recommended CAP. Since 2001, Executive Suicide Reports have, where appropriate, included a CAP, followed by a report from the facility documenting implementation of the CAP within 90 days of the receipt of the Executive Suicide Report. These timelines were not consistently met for completed suicides in 2002, as shown below in Table 2 and the summary, which reflect delays in both the completion of some Executive Suicide Reports at the CDC level and institutional responses to CAPs.

Earlier difficulties in assessing the adequacy of responsive CAPs and their implementation were attributable largely to the recent vintage of the CAP process for completed suicides. Given the clear imposition of requirements for CAPs and their implementation by early 2002, all of the suicides completed in 2002 should have met applicable guidelines and timelines for their preparation and submission. As will be seen in the following analysis, many did not. As suggested in the report on 2001 suicides, training in, and an understanding of the intent of, the suicide prevention CAP process continues to be needed. The department's process for both generating and reviewing institutional CAPs also needs to be upgraded. Too many institutional CAPs simply repeat corrective actions, such as training staff on established policy or developing better quality management procedures, that cite remedies already recommended for implementation in CAPs following suicides completed in the facility in 2000 and 2001. The department, again, needs to organize and provide training to institutional staff on the development and implementation of meaningful responses to departmental CAPs following completed suicides. To date, no standards have been developed to measure the effectiveness of the implementation of CAPs. The process for developing and implementing corrective local strategies remains embryonic. With appropriate review of completed suicides and careful examination of failed applications of existing policies and procedures, institutions should be better able to identify and redress factors that contribute to foreseeable or preventable suicides. Joint departmental and institutional analyses should result in improved institutional adherence to policies and procedures and enhanced clinical judgments that help reduce risk factors for other inmates who may experience suicidal ideation or engage in suicidal behaviors.

The timeliness of the provision of most materials documenting completed suicides in 2002 improved. The time frame for the completion of Executive Suicide Reports

3

averaged 62.5 days from the date of death to dispatch of the report to the institution with a range of 31 to 95 days. The facility response time averaged 126.9 days, with a range of 22 to 254 days for those facilities providing a response. While this represents a considerable improvement over 2001, some delays in the timelines enacted in early 2002 continue to occur. The timelines for completion of documents on completed suicides, established in the Suicide Reporting and Review Policy in 2002, are provided again in Appendix A of this report. The defendants need to adhere to these timelines more consistently.

Appendix B provides the narrative case summaries of the 22 CDC inmates who committed suicide in 2002.

**TABLE 1: Demographics**

| CDC # | FACILITY | DATE OF DEATH | AGE | RACE | METHOD | HOUSING (SINGLE/DOUBLE CELLED) | LEVEL OF CARE | R-SUFFIX | Medical |
|---|---|---|---|---|---|---|---|---|---|
| ▮ | WASCO | 1/04/02 | 32 | ASIAN | HANGING | AD SEG (S) | 3CMS | NO | NO |
| | SVSP | 1/06/02 | 28 | WHITE | HANGING | GP (S) | 3CMS | NO | NO |
| | WASCO | 2/11/02 | 25 | HISPANIC | HANGING | AD SEG (S) | NONE | NO | NO |
| | RJD | 3/06/02 | 37 | BLACK | HANGING | AD SEG (S) | 3CMS | NO | NO |
| | SAC | 3/09/02 | 36 | WHITE | HANGING | AD SEG (S) | 3CMS | NO | NO |
| | LAC | 3/22/02 | 36 | WHITE | HANGING | GP (S) – CLOSE CUSTODY | NONE | NO | NO |
| ▮ | CAL | 3/24/02 | 42 | HISPANIC | HANGING | AD SEG (S) | NONE | NO | NO |
| | NK | 3/27/02 | 39 | WHITE | LACERATION | GP (S) | 3CMS | NO | NO |
| | CTF | 4/10/02 | 41 | WHITE | LACERATION | GP (D) | NONE | NO | YES |
| | CIM | 5/13/02 | 41 | WHITE | HANGING | GP (D) | NONE | NO | NO |
| | OVI | 5/21/02 | 30 | WHITE | HANGING | GP (D) | NONE | YES | NO |
| | CMC | 6/02/02 | 41 | WHITE | HANGING | GP (S) | 3CMS | NO | YES |
| | RJD | 6/28/02 | 27 | ASIAN | HANGING | GP (D) | 3CMS | NO | NO |
| | CMF/DMH | 7/16 /02 | 48 | BLACK | HANGING | DMH (S) | DMH | YES | NO |
| | DVM COMM CF | 7/25/02 | 37 | HISPANIC | HANGING | GP (S) | NONE | YES | NO |
| ▮ | DVI | 7/27/02 | 39 | BLACK | TRAUMA | GP (D) | NONE | NO | YES |
| | CIM | 8/08/02 | 45 | HISPANIC | HANGING | GP (S) | 3CMS | NO | NO |
| | SAC | 8/18/02 | 44 | WHITE | LACERATION | GP (D) | NONE | YES | YES |
| | CMF | 9/15/02 | 33 | HISPANIC | HANGING | GP (S) | NONE | NO | YES |
| | CCI | 9/22/02 | 30 | WHITE | HANGING | AD SEG (S) | NONE | NO | NO |
| | SAC | 12/08/02 | 34 | BLACK | OVERDOSE | GP (S) | 3CMS | NO | NO |
| ▮ | PVSP | 12/30/02 | 35 | WHITE | LACERATION | GP (D) | NONE | NO | NO |

**TABLE 2: Mental Health Issues**

| CDC # | PAST MENTAL HEALTH | PAST SUICIDAL BEHAVIOR | KEYHEA | MHCB | 5DAY F/U | CPR | SUICIDE REPORT | 60-DAY CAP | 90-DAY FACILITY RESPONSE | FORE/ PREV |
|---|---|---|---|---|---|---|---|---|---|---|
| ▮ | YES | YES | NO | NO | N/A | NO | YES | YES | YES | YES |
| | YES | YES | NO | NO *MD REFUSED | N/A | NO | YES | YES | YES | YES |
| ▮ | YES | YES | NO | NO | N/A | YES (LATE) | YES | N/R | N/A | YES |
| ▮ | YES | YES | NO | NO | N/A | YES | YES | YES | YES | NO |
| | YES | YES | NO | NO | N/A | NO | YES | N/R | N/A | NO |
| ▮ | NO | NO | NO | NO | N/A | YES | YES | N/R | N/A | NO |
| | NO | NO | NO | NO | N/A | YES | YES | N/R | N/A | NO |
| | YES | NO | NO | NO | N/A | YES | YES | YES | YES | NO |
| | NO | NO | NO | NO | N/A | NO | YES | YES | YES | NO |
| | YES | YES | NO | NO | N/A | YES | YES | YES | YES | YES |
| | NO | NO | NO | NO | N/A | NO | YES | YES | YES | YES |
| | YES | YES | NO | NO | N/A | YES | YES | YES | YES | NO |
| | YES | YES | NO | NO | N/A | NO | YES | YES | YES | NO |
| | YES | YES | NO | DMH | N/A | YES | YES | YES | NONE | YES |
| | NO | NO | NO | NO | N/A | YES | YES | YES | YES | YES |
| | NO | NO | NO | NO | N/A | YES | YES | YES | NONE | YES |
| | YES | YES | NO | NO | N/A | YES (LATE) | YES | N/R | N/A | NO |
| ▮ | YES | YES | NO | NO | N/A | YES | YES | N/R | N/A | NO |
| | YES | NO | NO | NO | N/A | YES | YES | YES | NONE | YES |
| | NO | NO | NO | NO | N/A | YES | YES | N/R | N/A | NO |
| | YES | YES | NO | NO | N/A | YES | YES | YES | YES | NO |
| | NO | NO | NO | NO | N/A | YES | YES | N/R | N/A | NO |

N/R = NO RECOMMENDATIONS
N/A = NOT APPLICABLE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.

     Plaintiffs,

        vs.                 No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

     Defendants.

## SPECIAL MASTER'S REPORT ON SUICIDES COMPLETED IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS IN CALENDAR YEAR 2003

        Attached is the fifth annual report covering suicides completed in calendar year 2003 prepared by Dr. Raymond F. Patterson, M.D., one of the special master's psychiatric experts in the above-captioned case. The number of suicides in CDC in 2003 rose to 36 from the 22 recorded in 2002. The report provides in Appendix B extended case reviews of all of the suicide deaths that occurred in 2003. The main report contains an analysis and summary of the case reviews, together with tables aggregating data on various aspects of the annual toll, as well as some general observations on the defendants' overall suicide prevention efforts and some recommendations that flow from the analysis.

                                   Respectfully submitted

                                   /s/ J. Michael Keating, Jr.

                                   J. Michael Keating, Jr.
                                   Special Master

April 28, 2004

focus of the review process is prevention, the same focus that is the crux of the peer review and quality improvement processes. There are other systems for affixing blame and sanctions for incompetence, malfeasance and negligence. This process seeks to prevent future suicides through better clinical understanding and practices.

o   On the other hand, when the review process reveals incompetence, malfeasance or negligence, the defendants must pursue it in the proper investigatory and disciplinary channels. An outstanding court order requires the defendants to provide the Coleman monitor with a summary description of the methods and outcome of such investigations. No description of an investigatory outcome or method was provided for a single suicide that occurred in 2003, despite the mention within a few Suicide Reports of one sort of investigation or another.

o   As indicated, the department sometimes sounds defensive in the suicide review process, but some institutions are even more prickly about the identification of local mental health and custody failings in the Suicide Reports. They often do not respond at all, or if they do respond, their replies are not shared with the monitor. The corrective actions described in institutional responses typically cite training efforts and the production of memorandums that often seem perfunctory and tangential to the quality of clinical practices and judgments questioned in the Suicide Report. Never do facilities report the use of the analysis and findings of a Suicide Report to generate focused thought and discussion among local clinicians about how to improve the quality of their own clinical practices and judgments.

o   Lastly, the final phase of the review process is evolving only slowly. The department is learning to include more pointed recommendations for improvement, while institutions are beginning to respond more often with some basic description of remedial actions contemplated and undertaken. But there are few indications that the department is using the process to analyze and change system-wide practices, although the unfurling effort to address the issue of mesh ventilation screens in administrative segregation cells may represent just such a development. And nowhere is there an indication yet that the department means to hold institutions accountable for their inadequate responses to the recommendations in the Suicide Reports or intrude to ensure the actual implementation of reforms described or promised in the institutional replies. Both of these elements are critical if the process is ever to contribute substantially to the prevention of suicides in CDC.

The following recommendations flow from this annual report on suicides that occurred in CDC in 2003:

1.   The defendants should be required to submit to the monitor within 30 days of the court's order a plan for dealing with the hazard of

10

large-mesh ventilation screens in administrative segregation cells in which mental health caseload inmates are housed.

2. The defendants should be required to develop and implement a policy that establishes clearly and unequivocally a requirement for custody staff to provide immediate life support, if trained to do so, until medical staff arrive to initiate or continue life support measures, irrespective of whether the obligation to do so is part of the particular custody staff member's duty statement.

3. Whenever the Suicide Report or suicide review process refers any member of the mental health, medical or custody staff, initially judged to have been responsible for some act of incompetence, malfeasance or negligence, to another investigatory and/or disciplinary channel, the defendants should be required, once again, to provide the monitor with a summary description of the methods and outcomes of such investigations.

4. Health Care Services Division of CDC should be required within 90 days to develop as part of the suicide review process a procedure to ensure the implementation of remedies described or promised in institutional responses to the recommendations for corrective action in individual Suicide Reports.

In their objections to the draft version of this report, the plaintiffs urged the adoption of three additional measures and the acceleration of one of the proposed recommendations. Two of the additional measures sought improved tracking of inmates with a past, but presently inactive, history of involvement in CDC's mental health caseload and of inmates with a history of attempting suicide or making suicidal gestures.

In support of the suggestion for a mental health identifier code for inmates formerly included in CDC's Mental Health Services Delivery System (MHSDS) caseload, the plaintiffs cite two suicides that occurred in 2003. (See case reviews nos. 19 and 33 in Appendix B). In neither of these two cases was it remotely likely that the existence of a code identifying the inmates as former members of the caseload would have prevented their subsequently completed suicides. Inmate 19 was administered a mental health evaluation on his admission to administrative segregation and denied any mental health problems, needs or suicidal ideation. He committed suicide two days later. Inmate 33 was seen by a psych tech on the day after he was returned as a parole violator to CDC and denied any need for mental health services or suicidal ideation. He committed suicide the next day, his second day back in CDC. Even if these two inmates had an identifier code alerting the clinicians interviewing them that they were once on the MHSDS caseload, nothing in either interview would have triggered an emergency or urgent referral, which meant that neither would have received further clinical intervention prior to the time of their imminently subsequent suicides.

11

The plaintiffs cited four additional cases of suicide over the preceding three years from 2000 to 2002 to support their argument for an identifier code. None of the cited cases makes a compelling argument for the necessity of the identifier code sought by the plaintiffs. In one case, the deceased inmate had been briefly on a suicide watch 20 years earlier, but was never formally included in the MHSDS. The second case involved an inmate who was discharged from the mental health caseload some three years before his suicide. When he was admitted in early 2002 to administrative segregation a month prior to his suicide, he did not receive a mental health evaluation; present CDC policy and the revised program guides require the administration of a mental health evaluation of all inmates entering administrative segregation who are not presently on the MHSDS caseload. The special master's psychiatric expert thought this inmate's suicide to be unforeseeable, but found it potentially preventable only because of a delay in the administration of CPR. The third cited case involved an inmate who received considerable, but essentially ineffectual, clinical attention prior to his suicide. He did not need the identifier code to catch the attention of the defendants' mental health services, which, unfortunately, did not assess his mental health needs accurately. The fourth case cited by the plaintiffs involved an inmate in CDC for 25 years, who in the early '90s was in the MHSDS caseload for an Axis II personality disorder. He received a mental health screening in administrative segregation five months before his suicide and a subsequent bus screening a month before his suicide. It was unclear from the record whether on not the screeners were aware of his past mental health history, but both reported no mental health problems and cleared him for general population. The special master's psychiatric expert found the suicide to be neither foreseeable nor preventable.

The plaintiffs have long argued for the necessity of an identifier code for inmates discharged from the MHSDS caseload, usually within the context of discussions on revisions to the program guides. The special master's psychiatric experts have consistently rejected that argument. The evidence provided in this annual suicide report does not suffice to override the experts' opinions in this matter.

The plaintiffs also sought the initiation of a process for tracking the suicidal history of inmates in CDC's mental health caseload. There is much stronger evidence in both this suicide report and its predecessors to support such a recommendation. Indeed, the plaintiffs appropriately cite the defendants' own report on suicides in 2003 to buttress the need for a suicide-related tracking system. The defendants' compilation found that 22 CDC inmates who committed suicide in 2003 had a history of prior attempted suicides in either the community or CDC. In addition, from time to time, the department's own Suicide Reports have recommended the use of the department's Mental Health Tracking System to track caseload inmates at risk for suicide. See, for example, p. 53 in Appendix B. There is no evidence that this recommendation has been adopted to date. Now, as the incidence of suicide continues at so high a level in CDC, is the appropriate time to do so.

The third additional recommendation sought by plaintiffs rightly focused on the sometimes ineffectual intervention of mental health clinicians in the deliberations of Institutional Classification Committee hearings involving long-serving inmates in administrative segregation and security housing units (SHUs) with extremely serious

mental health problems, who are also experiencing decompensation. Thoughtful and emphatic intervention is particularly needed when inmates return to an administrative segregation unit or SHU from a DMH inpatient program or a MHCB unit. But even in the normal course of providing mental health monitoring and treatment to seriously mentally ill inmates confined for long periods of time in administrative segregation or a SHU, clinicians need to be more attentive than they have been historically to detect signals of decompensation and push aggressively for appropriate alternative placements or increased mental health care. The plaintiffs listed seven completed suicides in the period from 2000 to 2003 that seemed to illustrate this problem and concluded with a rather vague recommendation that defendants develop a policy and procedure for a written mental health assessment of such inmates.

The problem here, however, involves practice more than policy. As the plaintiffs point out, current policy requires clinical participation in ICC hearings in segregated units to determine whether inmates can be retained in segregation without serious adverse mental health consequences. Until the defendants opened in 2004 the DMH program for inpatient Level IV inmates with a history of violence or volatility at Salinas Valley State Prison, there genuinely was nowhere to send seriously mentally ill, violent inmates in need of intermediate inpatient care. It has taken, moreover, the recently completed Unmet Needs Assessment to make clinicians in CDC more broadly aware of the availability of this resource. Finally, the recent attention focused on the inadequate delivery of mental health treatment to inmates in the CSP/Corcoran SHU has led to demands for increased clinical resources to provide meaningful mental health care in that facility, which houses 80 percent of all male MHSDS caseload inmates in a SHU in CDC. All of these practical developments postdate all of the suicides listed by the plaintiffs in their call for a new policy and were designed, in part, to give clinicians in ICC hearings in segregated units an expanded array of alternative treatment placements and resources with which to meet their role in ICC hearings as defined in the policy. There does not appear to be a need to redo the policy at this point.

Finally, the plaintiffs sought to accelerate the timing of the recommendation for the defendants' implementation of a policy for a clear requirement that custody staff, when confronted with the need to respond to an emergency involving suicide, provide immediate life support, if trained to do so, until medical staff arrive to initiate or continue life support measures, irrespective of whether the obligation to do so is part of the particular custody staff member's duty statement. By failing to object to this recommendation, the defendants have known at least since March they will need to address this issue. Because of the length of the process for review of and comments on the draft version of this report and revisions to the draft version in response to those comments, the recommended timeframe for the implementation of this recommendation is reduced to 60 days from the entry of a court order.

In addition to the change in the timing of implementation of the 2nd recommendation, a fifth recommendation, as indicated in the preceding text, is proposed, as follows:

5.  The defendants should be required to develop a plan within 60 days of the court's order for the initiation of a process for tracking the suicidal history of inmates in CDC's mental health caseload in the Mental Health Tracking System and/or any successor management information system utilized by the department.

| NUMBER | CDC# | FACILITY | DATE OF DEATH | AGE | RACE | METHOD | HOUSING (Single/ Double Celled) | LEVEL OF CARE | R-SUFFIX | MEDICAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | CTF | 3-Jan-03 | 52 | Caucasian | exsanguinations | Double | GP | no | yes |
| 2 | | CAL | 9-Jan-03 | 36 | African-American | Hanging | Single Ad Seg | GP | no | no |
| 3 | | SAC | 11-Jan-03 | 43 | Hispanic | exsanguinations | Double | CCCMS | no | no |
| 4 | | SOL | 19-Jan-03 | 39 | Am. Indian | Hanging | Double Ad Seg | CP | no | no |
| 5 | | CIM | 21-Jan-03 | 25 | Afghanistanian | Trauma | Dorm | RC-GP | no | no |
| 6 | | CIM | 28-Jan-03 | 32 | Hispanic | Hanging | Single | EOP | no | no |
| 7 | | ISP | 12-Feb-03 | 37 | Hispanic | Hanging and exsanguination | Double | GP | yes | no |
| 8 | | MCSP | 12-Mar-03 | 40 | Caucasian | Hanging | Double | CCCMS | no | yes |
| 9 | | CMC | 15-Mar-03 | 52 | Caucasian | Hanging | Single Ad Seg | EOP | yes | yes |
| 10 | | CMF | 18-Mar-03 | 42 | Hispanic | Hanging | Double | EOP | no | yes |
| 11 | | SVSP | 22-Mar-03 | 42 | Caucasian | Hanging | Double | CCCMS | no | no |
| 12 | | SATF | 23-Mar-03 | 52 | Caucasian | Hanging | Double | CCCMS | Yes | yes |
| 13 | | SCC | 26-Mar-03 | 39 | Caucasian | Hanging | Single | GP in OHU | No | no |
| 14 | | CMC | 3-Apr-03 | 48 | Caucasian | Hanging | Single Ad Seg | EOP | No | yes |
| 15 | | HDSP | 20-Apr-03 | 27 | African-American | Hanging | Single | MHCB | No | yes |
| 16 | | RJD | 4-May-03 | 40 | African-American | Overdose | Double | CCCMS | No | yes |
| 17 | | PBSP | 10-May-03 | 33 | Caucasian | Hanging | Single SHU | EOP | No | yes |
| 18 | | SATF | 21-May-04 | 26 | Hispanic | Hanging | Single Ad Seg | GP | Yes | no |
| 19 | | COR | 22-May-03 | 41 | Hispanic | Hanging | Single Ad Seg | GP | No | no |
| 20 | | SATF | 27-May-03 | 22 | Hispanic | Hanging | Single Ad Seg | CCCMS | No | no |
| 21 | | COR | 2-Jun-03 | 37 | Hispanic | Hanging | Single Ad Seg | EOP | No | no |
| 22 | | DVI | 14-Jun-03 | 31 | Caucasian | Hanging | Double | CCCMS | Yes | no |
| 23 | | COR | 19-Jun-03 | 38 | Hispanic | Hanging | Double SHU | CCCMS | No | yes |
| 24 | | FOL | 28-Jun-03 | 56 | Hispanic | Trauma | Double | GP | Yes | no |
| 25 | | CCI-YOR | 1-Jul-03 | 17 | African-American | Hanging | Single Ad Seg | CCCMS | No | no |
| 26 | | MCSP | 9-Jul-03 | 48 | Caucasian | Hanging | Single Ad Seg | GP | Yes | no |
| 27 | | RJD | 10-Aug-03 | 48 | Caucasian | Hanging | Single Ad Seg | CCCMS | No | no |
| 28 | | CTF | 5-Sep-03 | 25 | Pacific Islander | Hanging | Single Ad Seg | GP | No | no |
| 29 | | LAC | 11-Sep-03 | 32 | Hispanic | Hanging | Double | CCCMS | Yes | no |
| 30 | | COR | 2-Oct-03 | 31 | Caucasian | Hanging | SHU | CCCMS | No | no |
| 31 | | RJD | 6-Oct-03 | 36 | Hispanic | Hanging | Single Ad Seg | CCCMS | Yes | yes |
| 32 | | SATF | 24-Oct-03 | 58 | Caucasian | Hanging | Single Ad Seg | CCCMS | No | yes |
| 33 | | DVI | 27-Oct-03 | 36 | Caucasian | Hanging | Single Ad Seg | GP | No | no |
| 34 | | SVSP | 7-Nov-03 | 38 | Native American | Hanging | Single | CCCMS | No | yes |
| 35 | | SAC | 9-Nov-03 | 30 | Native American | Hanging | Single Ad Seg | CCCMS | No | no |
| 36 | | CMC | 12/17/03S | 43 | African-American | Hanging | Single Ad Seg | CCCMS | No | yes |

| | CDC# | PAST MENTAL HEALTH | PAST SUICIDAL BEHAVIOR | KEYHEA | MHCB | 5 DAY F/U | CPR | SUICIDE REPORT | 60-DAY CAP | 90-DAY FACILITY RESPONSE | FORESEEABILITY/ PREVENTABILITY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | no | Yes | no | no | n/a | no | 8-Apr-03 | n/r | n/r | Preventable |
| 2 | | no | No | no | no | n/a | yes | 8-Apr-03 | n/r | n/r | Preventable |
| 3 | | yes | Yes | no | no | n/a | yes | 13-Mar-03 | n/r | n/r | Preventable |
| 4 | | no | No | no | no | n/a | no | 8-Apr-03 | n/r | n/r | Preventable |
| 5 | | yes | Unknown | no | no | n/a | n/a | 8-Apr-03 | No | No | Preventable |
| 6 | | yes | No | no | no | n/a | yes | 8-Apr-03 | No | No | Preventable |
| 7 | | no | No | no | no | n/a | n/a | 27-May-03 | No | No | Foreseeable/Preventable |
| 8 | | yes | Yes | no | no | n/a | yes | 12-May-03 | n/r | n/r | Neither |
| 9 | | yes | Yes | no | yes | n/a | yes | 7-Aug-03 | Yes | Yes | Preventable |
| 10 | | yes | Yes | yes | no | n/a | yes | 7-Aug-03 | n/r | n/r | Neither |
| 11 | | yes | No | no | no | n/a | yes | 7-Aug-03 | Yes | Yes | Preventable |
| 12 | | no | No | no | no | n/a | yes | 7-Aug-03 | No | No | Neither |
| 13 | | no | Yes | no | ohu | n/a | yes | 29-Aug-03 | Yes | Yes | Preventable |
| 14 | | yes | No | no | no | n/a | yes | 15-Aug-03 | Yes | Yes | Preventable |
| 15 | | yes | Yes | no | yes | n/a | yes | 7-Aug-03 | Yes | Yes | Foreseeable/Preventable |
| 16 | | yes | Yes | no | no | n/a | yes | unknown | Yes | unknown | Foreseeable |
| 17 | | no | No | no | no | n/a | yes | 10-Jul-03 | n/a | n/a | Neither |
| 18 | | no | No | no | no | n/a | yes | 10-Sep-03 | n/r | n/r | Preventable |
| 19 | | yes | No | no | no | n/a | yes | 2-Mar-04 | No | No | Preventable |
| 20 | | yes | Yes | no | no | n/a | no | 10-Sep-03 | Yes | Yes | Foreseeable/Preventable |
| 21 | | yes | No | no | no | n/a | yes | 10-Sep-03 | No | No | Foreseeable/Preventable |
| 22 | | yes | Yes | no | no | n/a | yes | 29-Oct-03 | No | No | Neither |
| 23 | | yes | No | no | no | n/a | yes | 12-Sep-03 | | | Preventable |
| 24 | | no | No | no | no | n/a | no | 19-Feb-03 | No | No | Preventable |
| 25 | | yes | Yes | no | no | n/a | yes | 22-Mar-03 | No | No | Preventable |
| 26 | | yes | No | no | no | n/a | yes | 15-Oct-03 | No | No | Neither |
| 27 | | yes | Yes | no | no | n/a | yes | 10-Sep-03 | No | No | Foreseeable/Preventable |
| 28 | | yes | Yes | no | no | n/a | yes | 10-Mar-04 | Yes | No | Preventable |
| 29 | | yes | No | no | no | n/a | yes | 8-Apr-04 | Yes | No | Foreseeable/Preventable |
| 30 | | yes | Yes | no | no | n/a | yes | 16-Dec-03 | Yes | Yes | Preventable |
| 31 | | yes | No | no | no | n/a | yes | 10-Mar-04 | No | No | Preventable |
| 32 | | yes | Yes | no | no | n/a | yes | 6-Apr-04 | Yes | Yes | Foreseeable/Preventable |
| 33 | | yes | No | no | no | | yes | 6-Apr-04 | No | No | Neither |
| 34 | | yes | Yes | no | no | n/r | no | 6-Apr-04 | No | No | Foreseeable/Preventable |
| 35 | | yes | Yes | no | no | n/r | yes | 8-Apr-04 | No | No | Preventable |
| 36 | | yes | Yes | no | no | n/r | yes | 6-Apr-04 | No | No | Foreseeable/Preventable |

Raymond F. Patterson, M.D.
1904 R Street, N.W.
Washington, DC 20009
Telephone: 301-292-3737
Facsimile: 301-292-6272

**REPORT ON SUICIDES COMPLETED
IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS
IN CALENDAR YEAR 2004**

## I. Overview and Introduction

This is the sixth annual report on completed suicides in the California Department of Corrections (CDC)[1] submitted as part of the Special Master's continuing review of the defendants' overall compliance with court mandated remedies and requirements in Coleman v. Schwarzenegger. To set the suicide rate in CDC in some national perspective, past reports have provided statistics on the incidence of suicide in the general U.S. population and correctional institutions. The most recent data from the U.S. Department of Justice's Bureau of Justice Statistics indicates that state prison suicide rates dropped from 54 per 100,000 inmates in 1980 to 14 per 100,000 in 2002. This represents a slight increase from the incidence rate of 12 per 100,000 cited in the preceding report on suicides in CDC in 2003.

The data analysis and recommendations provided in this report follow the same format used in these reports of the special master on suicides in CDC since 1999. The report includes two tables: Table 1 summarizes collected demographic data, while Table 2 provides a summary of mental health information on CDC inmates who completed suicides while incarcerated in 2004. The tables represent an extreme distillation of the 26 case reviews, which constitute the heart of this report, and provide in graphic form the data on which the summary analysis is based.

The vast bulk of the data captured in this report has been generated pursuant to the defendants' still evolving suicide review process. The process requires the preparation of a Suicide Report that includes an executive summary and a more detailed narrative, typically with sections covering the suicide incident itself, the medical autopsy, background information, mental health history, medical history, the deceased inmate's institutional functioning and personality dynamics, precipitating events, pre-suicidal functioning and motive for suicide Sources of information for the various sections may include custody incident reports, death reports, central classification records, uniform

---

[1] In 2005, the California Department of Corrections was reorganized and incorporated into the larger California Department of Corrections and Rehabilitation. Throughout this report, the department will be referred to as the California Department of Corrections, the applicable appellation in 2004.

2000 – 15 suicides in a population of approximately 160,855 resulted in a suicide rate of 9.3/100,000

2001 – 30 suicides in a population of approximately 155,365 resulted in a suicide rate of 19.3/100,000

2002 – 22 suicides in a population of approximately 158,099 resulted in a suicide rate of 13.9/100,000

2003 – 36 suicides in a population of approximately 155,722 resulted in a suicide rate of 23.1/100,000

2004 – 26 suicides in a population of approximately 163,346 resulted in a suicide rate of 15.9/100,000

## III. Summary of Observations and Recommendations

From 1999 to 2004 the suicide rate for inmates in CDC ranged from a low of 9.3/100,000 in 2000 to a high of 23.1/100,000 in 2003, compared to the national average for correctional institutions of 12 to 14/100,000 during most of that same time period. The difference between the national and CDC rates provides a standard against which to measure the department's record in dealing with suicides. From an incredibly low rate of suicides in 2000 to significantly higher rates in 1999, 2001 and 2003, with intermediate rates in 1998 and 2002, the department has had over this six-year period an average annual rate of suicides per 100,000 inmates of 16.47[2].

This report indicates that 76.9% (20 of 26) of suicides completed in 2004 were foreseeable, preventable or both based on the definitions used in this review and the information that was, or should have been, available to clinical staff. The findings also confirm that the department's process for developing both local and system-wide corrective responses to deficiencies identified in individual completed suicides continued to improve, but still reflected some significant substantive inconsistencies.

An analysis of the case reviews provided in Appendix B allows some generalizations, many of which are consistent with conclusions reached in earlier annual reports on suicides in CDC.

o   The three suicides among women in 2004 were a shock. The number surpassed the total number of suicides for women in CDC in the previous 16 years combined. All three of these suicides were foreseeable or preventable; two of them were both foreseeable and preventable.

---

[2] These figures on the annual suicide rate differ somewhat from the rates reported in the department's five-year report on suicides. The department's calculations were based on the average daily CDC population during the given year, while these reports have used the department's population count on the last day of the covered year.

o  In ten of the 26 case reviews of suicides in 2004 (38.5 percent), delays in the
   immediate initiation of CPR were cited as potentially contributing to successful
   completion of the suicide.  The report on suicides in 2003 led to a mid-2005 court
   order directing the defendants to develop and implement a policy requiring
   custody staff trained to do so to provide immediate life support measures,
   including CPR, in responding to medical emergencies, including suicides.  The
   completeness of the defendants' response has been the subject of court pleadings
   and negotiation throughout the past six months and will be a focus of monitoring
   during the 17th compliance review that begins in March 2006.

o  The failure of clinicians to make use of available information to ensure that
   inmates are fully and appropriately screened, assessed and treated remained a
   dominant problem.  In too many cases, completed suicides occurred when
   information in a UHR or central file, had it been reviewed by mental health
   clinicians during interviews with inmates, might have alerted mental health staff
   to inmates' potential for suicide. The lack of appropriate screening in confidential
   settings for new intakes into administrative segregation, including the
   administration of Suicide Risk Assessments, was also an important recurring
   problem.  Both of these problems represent essentially inadequate clinical
   practices on the part of the department's clinicians, although the second problem
   often seemed to involve inadequate custody escort resources and private interview
   space in administrative segregation units.

o  Inadequate treatment interventions included the failure to place inmates in need of
   more intensive treatment in appropriate mental health programs or units.  This
   failure, which contributed to a number of 2004 suicides, was confirmed by the
   Unmet Needs Assessment.  That assessment, conducted in early 2005, led to a
   requirement that the defendants substantially expand the availability of DMH
   inpatient programs.

o  Two completed suicides in 2004 involved inmates whose Keyhea orders expired
   within weeks of their completed suicides.  In both cases, the inmates were non-
   compliant with medications, resulting in each case in predictable decompensation.
   The expiration of the inmates' Keyhea orders was attributable to the failure to
   anticipate and pursue renewal of the orders, rather than to improvement in the
   inmates' mental health symptoms or condition.  Other medication-related issues
   contributing to suicides in 2004 included the hording of medications (two suicides
   resulted from overdoses) and the slow response, or failure to respond at all, to
   non-compliance with medications.

o  Large-mesh screens covering air ventilation ducts particularly in administrative
   segregation cells to which a noose can be attached to accomplish suicide by
   hanging emerged as an issue in 2003 and resulted in a June 9, 2005 court order
   requiring the defendants to develop a plan for dealing with the large-mesh
   ventilation screens in administrative segregation cells in which mental health

caseload inmates are housed. In 2004, 18 of the 26 completed suicides occurred in administrative segregation units, all but one of which were accomplished by hanging. Five of the 17 hangings involved the large-mesh screens. In the remaining 12, the noose was attached to a variety of anchors, including bunks (in seven instances), light fixtures (two), windows (two) and a shelf (one). While physical plant structure is an important element of prevention efforts to reduce the incidence of suicide in administrative segregation units, the careful, thorough screening of inmates entering administrative segregation, daily rounding by psych techs as required by departmental directives and the prompt identification of inmates whose conditions may be deteriorating, followed by appropriate assessments in a confidential setting and referrals to appropriate levels of mental health treatment, are even more important.

o   While the suicide review process continued to improve, identification of facility versus departmental issues and the documentation of efforts to achieve the objectives, goals, and outcomes for corrective actions specified in some suicide reports varied widely. In some instances, implementation problems were local and involved individual clinician/correctional officer/treatment team issues, as well as human resource and other resource allocation concerns. In some other instances, the suicide review too readily accepted institutional failures as inevitable.

Based on a review of the suicides completed in CDC in 2004, there appears to be less need of new recommendations than a greater need to focus on the full implementation of the recommendations included in the predecessors to this report, namely:

1.  Implement fully all of the elements of the suicide review process already in place, including both institutional and departmental follow-up to corrective action plans and submission to the special master of documentation on the outcome of investigations of staff misconduct, negligence and errors.

2.  Conclude the pilot project at Pelican Bay State Prison and finalize and submit to the special master forthwith a system-wide plan for dealing with the large-mesh ventilation screen issue.

3.  Fix the now broken mechanisms for tracking and maintaining Keyhea orders for the involuntary medication of inmates in need of psychotropic medications.

4.  Continue to work on improving access to DMH inpatient placements, particularly for Level III and Level IV inmates, and focus greater training, supervisory and peer review efforts on the placement of decompensating inmates in appropriate levels of mental health care.

5.  Determine whether clinicians' failure to review and utilize existing UHRs and central files, including probation reports, was attributable to difficulties in access to pertinent records or faulty clinical practices. The department needs to address

11

the accessibility issue, a problem shared by all of the components of health care services. In the meantime, increased training, supervisory and peer review efforts need to be focused on clinicians' review and use of available records and documentation.

6. Undertake increased efforts to understand more clearly and respond adequately to the potential for suicide among the department's female inmates. Fortunately, no female offenders in CDC committed suicide in 2005.

7. Implement fully the finally approved policy on the application of CPR by custody staff.

In 2004, 69.2 percent of all CDC suicides (18 of 26) occurred in administrative segregation, up from an already high 48.5 percent in 2003 (17 of 35). In both years, a majority of the suicides completed in administrative segregation involved inmates who were not on the mental health caseload at the time of their deaths (11 in 2003; ten in 2004). The defendants need to analyze this rising trend more closely and focus more energy and resources on reversing it. Policies and practices appeared to be in place to deal with the problem, including mental health screenings and, where indicated, suicide risk assessments of inmates newly placed inmates in administrative segregation, regular psych tech rounding of caseload and non-caseload inmates, more frequent clinical contacts with caseload inmates, regular interdisciplinary team meetings and classification hearings, but the number of suicides in administrative segregation went unabated. These policies and practices were fully implemented in 2001 and 2002. In the latter year, just 27.2 percent of suicides in CDC occurred in administrative segregation (six of 22).

The individual case reviews of suicides in 2004 in Appendix B suggest that some initial screenings, SRAs and many psych tech rounds were performed perfunctorily and most often at cell-front or in holding cells, where the lack of privacy often precluded meaningful inmate participation, especially for those inmates placed in administrative segregation for protective reasons. Based on the information in the suicide reports, it is uncertain whether these inadequacies reflected poor clinical practices, a lack of adequate mental health staff, insufficient correctional officers to escort inmates to interview space, inadequate confidential space for clinical contacts or some combination of all of these factors.

From all of this comes the single specific recommendation of this report:

- The defendants need to develop by May 15, 2006 a plan for dealing with the escalating percentage of suicides occurring in administrative segregation units. The plan must be based on an analysis of the causes for the increasing rate and, depending on the outcome of the analysis, provide adequate resources of mental health and/or custody staff, create sufficient confidential interview space and/or enhance the quality of mental health services provided in administrative segregation units.

12

**TABLE TWO**

| NUMBER | CDC# | PAST MENTAL HEALTH | PAST SUICIDAL BEHAVIOR | KEYHEA | MHCB | 5 DAY F/U | CPR | SUICIDE REPORT | 90-DAY FACILITY RESPONSE | FORESEEABILITY/ PREVENTABILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | yes | yes | no | no | n/a | yes | 20-Apr-04 | 30-Aug-04 | Preventable |
| 2 | | yes | yes | no | no | n/a | yes | 22-Sep-04 | 31-Jan-05 | Foreseeable/Preventable |
| 3 | | no | no | no | no | n/a | yes | 7-Sep-04 | 28-Jan-05 | Preventable |
| 4 | | yes | yes | no[a] | yes | no | yes | 19-May-04 | 14-Mar-05 | Foreseeable/Preventable |
| 5 | | yes | no | no | no | n/a | no | 9-Jul-04 | 12-Nov-04 | Preventable |
| 6 | | yes | yes | no | no | n/a | yes | 9-Jul-04 | 1-Nov-04 | Preventable |
| 7 | | yes | yes | yes | no | n/a | yes | 9-Jul-04 | n/a | Preventable |
| 8 | | no | no | no | no | n/a | no | 9-Jul-04 | 21-Oct-04 | Preventable |
| 9 | | yes | yes | no | yes | no[b] | yes | 21-Sep-04 | 3-May-04 | Foreseeable/Preventable |
| 10 | | no | no | no | no | n/a | no | 16-Aug-04 | 18-Nov-04 | Preventable |
| 11 | | no | no | no | no | n/a | yes | 6-Aug-04 | 29-Sep-04 | Neither |
| 12 | | yes | no | no | no | n/a | yes | 29-Sep-04 | 11-Mar-05 | Neither |
| 13 | | yes | yes | no | no | n/a | yes | 22-Sep-04 | 13-Dec-04 | Preventable |
| 14 | | yes | no | no | no | n/a | yes | 18-Oct-04 | 13-Jan-05 | Neither |
| 15 | | yes | yes | no | no | n/a | no | 28-Sep-04 | 18-Apr-05 | Foreseeable/Preventable |
| 16 | | yes | yes | no | no | n/a | no | 28-Sep-04 | 31-Dec-04 | Preventable |
| 17 | | yes | yes | no | no | n/a | no | 28-Sep-04 | 22-Mar-05 | Preventable |
| 18 | | yes | yes | no[c] | no | no[d] | yes | 12-Nov-04 | 18-Apr-05 | Foreseeable/Preventable |
| 19 | | no | no | no | no | n/a | yes | 2-Nov-04 | n/a | Neither |
| 20 | | yes | no | no | no | n/a | yes | 30-Nov-04 | 30-Mar-05 | Neither |
| 21 | | yes | yes | yes | no | n/a | no | 25-Jan-05 | 27-Apr-05 | Foreseeable/Preventable |
| 22 | | no | no | no | no | n/a | yes | 18-Feb-04 | n/a | Neither |
| 23 | | yes | yes | no | no | yes | yes | 28-Dec-04 | 5-May-05 | Foreseeable/Preventable |
| 24 | | yes | no | no | no | n/a | no | 28-Apr-04 | 22-Jun-05 | Preventable |
| 25 | | yes | yes | no | no | n/a | no | 16-Feb-05 | 12-Aug-05 | Foreseeable/Preventable |
| 26 | | yes | yes | no | no | n/a | no | 16-Feb-05 | none | Preventable |

a - expired shortly before death
b - suicide on 5th day
c - expired 7/4/04
d - not as per policy

EXHIBIT G

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

| Suicide Prevention and Response | Mental Health Services Delivery System |

after a second evaluation, mental health clinical staff feel additional hourly checks are required, the inmate shall be readmitted to the MHCB for further stabilization. Custody staff shall maintain a log on CDCR 114A, *Detention/Segregation Record,* of rounds on inmate-patients.

- The local SPR FIT shall regularly audit compliance with the 5-day clinical follow-up and custody wellness check procedure. Audit findings shall be forwarded monthly to the Local MHP Subcommittee.

c.  **Response to Self-Injurious Behaviors and Suicide Attempts**

Self-injurious behaviors cause, or are likely to cause, physical self-injury. A suicide attempt is an intentional act that is deliberately designed to end one's own life. Both are medical emergencies that require immediate and appropriate responses.

Custody Protocol

**In medical emergencies, the primary objective is to preserve life.** All peace officers who respond to a medical emergency are mandated, pursuant to court order, to provide immediate life support, if trained to do so, until medical staff arrives to continue life support measures. All peace officers must carry a personal CPR mouth shield at all times.

The officer must assess and ensure it is reasonably safe to perform life support by effecting the following actions:

- Sound an alarm (a personal alarm or, if one is not issued, an alarm based on local procedures must be used) to summon necessary personnel and/or additional custody personnel.
- Determine and respond appropriately to any exposed bloodborne pathogens.
- Determine and neutralize any significant security threats to self or others including any circumstances causing harm to the involved inmate.
- Initiate life saving measures consistent with training.

The responding peace officer will be required to articulate the decision made regarding immediate life support and actions taken or not taken, including cases where life support is not initiated consistent with training and/or situations which pose a significant threat to the officer or others.

# EXHIBIT H

# TLS | THORSNES
## litigation services

Transcript of the Testimony of:

# **Lindsay M. Hayes**

Coleman v. Brown

February 18, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312 | F: 877.561.5538
www.thorsnes.com

Lindsay M. Hayes                                      February 18, 2013

1    until December of 2010.

2        Q.    What are 30-minute welfare checks?

3        A.    30-minute welfare checks are simply cell

4    checks made by correctional staff in particular areas

5    of an institution, normally required in what is

6    called special housing.  They could be mental health

7    units.  They could be medical units.  They could be

8    administrative and disciplinary Seg units.

9        It's a standard practice in correctional

10   systems around the country, I will say outside of

11   California.  It's been a requirement of the ACA, the

12   American Correctional Association standards for as

13   long as I've read the ACA standards to conduct

14   30-minute checks in special housing units.

15       Q.    And are these -- who conducts these checks

16   under ACA standards?

17       A.    Normally, it's the officers.

18       Q.    Correctional officers?

19       A.    Correct.

20       Q.    And what are they looking for?

21       A.    They're looking for an inmate that's alive,

22   an inmate that's in their cell.  Those are the two

23   main -- main reasons why welfare checks are called.

24   That's why the term is called "welfare."  I think

25   that it's not used as a suicide observation, because

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Lindsay M. Hayes                                    February 18, 2013

1    30-minute observations are well in excess of the -- a

2    reasonable time period for someone that is assessed

3    as being suicidal.

4         However, the philosophy is that the more

5    opportunity, the more visibility, the more

6    interactive you are with an inmate, the less problems

7    there normally are.  And, therefore, it's not

8    reasonable for all inmates in a correctional system

9    to receive 30-minute checks.  But it's felt

10   throughout the industry that it's reasonable for

11   those inmates housed in what are referred to --

12   vaguely or generically referred to as special housing

13   units to receive 30-minute checks.

14        Q.   And by those, would you include

15   administrative segregation units?

16        A.   Yes.

17        Q.   Okay.  And what about secured housing units

18   like the SHU in California?

19        A.   Yeah.  I mean, as I said, usually you see

20   them in the following areas:  An intake unit, an

21   orientation or classification unit.  So, in other

22   words, when an inmate comes into a system and you

23   don't know very much about them, and you want to

24   observe them for a period of time to see how they

25   adjust.  That's where you will find them.

Lindsay M. Hayes                                    February 18, 2013

```
 1        Other places will be in a mental health unit
 2   or a medical unit.  And then, finally, in any type of
 3   administrative or disciplinary housing unit.  So,
 4   yes, it would include the SHU or the Ad-Seg unit
 5   within CDCR.
 6        Q.   Do you recall that CDCR, in the conference
 7   you attended in 2006, seemed unfamiliar with welfare
 8   checks as a correctional tool?
 9        MR. RUSSELL:  Objection.  Vague,
10   ambiguous, lacks foundation, calls for speculation.
11        A.   I will -- I remember our discussion very
12   clearly, because I was very frustrated that we were
13   spending as much time during this conference as we
14   were with this issue.  And there were many people
15   there.
16        There were -- the CDCR had brought in three
17   expert consultants of their own.  One was a retired
18   psychologist from the Federal Bureau of Prisons.  One
19   was a mental health director in Colorado.  One was a
20   mental health director in the state of the Georgia,
21   along with Drs. Metzner and Patterson.
22        And I seem -- I felt that I was alone with
23   the attorney who was present for the plaintiffs, Jane
24   Kahn and I were alone on an island trying to get past
25   this 30-minute welfare check issue, because it should
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Lindsay M. Hayes                                          February 18, 2013

```
 1    not have been as controversial as it was.
 2         As I stated, the ACA, which is a very
 3    conservative correctional organization, and they
 4    don't come out with any controversial standards that
 5    I am aware of, and they had been -- 30-minute checks
 6    had been part of the their standards since the '80s,
 7    and I was getting a tremendous amount of pushback
 8    from CDCR representatives that, we're not going to do
 9    that, it's either not feasible or it's not practical,
10    or what impact would it have on suicide prevention.
11         And we were -- we were tossing around many
12    ideas on how to strategize a reduction of suicides
13    within Ad-Seg, and this was just one of many that we
14    were talking about.  And we had to spend an
15    inordinate amount of time.
16         And at the end of it, I don't recall -- I
17    recall there being no agreement whatsoever, and I was
18    a little disappointed in the CDCR experts.  One was
19    from the Bureau of Prisons, as I said, and I know for
20    a fact that the federal Bureau of Prisons has been
21    doing 30-minute welfare checks for 20 years or more.
22    And I was a little disappointed that that clinician
23    did not speak up and say that, hey, it is a standard.
24    It is a standard practice within the Bureau of
25    Prisons.
```

Lindsay M. Hayes                                    February 18, 2013

1          So, you know, whether they were uninformed or

2    not, I am not sure.  I just remember there was a

3    tremendous amount of resistance by the CDCR

4    personnel.

5          I think that there were some -- although most

6    of the CDCR representatives were clinicians, I think

7    there were also correctional officials that were at

8    this meeting, as well.

9          Q.   Okay.  Another issue that you discussed in

10   this 2006 declaration was treating non-disciplinary

11   inmates different from disciplinary inmates in

12   Ad-Seg.  Can you explain what that refers to,

13   Mr. Hayes?  I'm referring to Page 7 and 8 of your

14   declaration, beginning at Paragraph 16.

15         A.   I believe that there was a discussion that,

16   for a variety of reasons that I don't recall, that

17   there were non-disciplinary inmates being housed

18   within the Ad-Seg units.  And the concern was that

19   they were being managed as if they were disciplinary

20   inmates.

21         In other words, there was very little

22   movement.  In other words, lack of out-of-cell time.

23   Their property was limited.  So they were being

24   treated as if they were disciplinary inmates, but

25   they did not have disciplinary orders.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

# EXHIBIT I

State of California

Department of Corrections and Rehabilitation

# Memorandum

WSP-RC Received & Distributed on 12/13/06
By Thomas P. Gaines, Executive Assistant

1 COPY REC'D  *ZST*
1 COPY TO CDW-*too ASU Staff*
1 COPY TO AW - BS *Rev aggin.*
1 COPY TO AW - CS *Watch Cdr.*
1 COPY TO AW - H & P
1 COPY TO AW - RC
1 COPY TO *all Captains*
1 COPY TO *ISU*
1 COPY TO FILE

Date    :    December 12, 2006

To    :    Associate Directors – Division of Adult Institutions
           Wardens          *Warden*

Subject :    **REVISED 30 MINUTE WELFARE CHECK PROCESS**

On October 31, 2006, institutions were directed to conduct Welfare Checks of inmates during the first three weeks of placement in Administrative Segregation Unit (ASU). This directive was given in an effort to preserve life and improve emergency response to suicide attempts by inmates during the difficult time of change to a more restrictive housing environment.

Many institutions have expressed concerns about this process in regard to workload issues and staffing. However, it is imperative that institution administrators understand that there are no additional staffing resources associated with this change.

In response to suggestions from the institutions, a revised, two-page "ASU 30 Minute Welfare Check Tracking Sheet" has been developed. Effective immediately, the attached, revised form shall be used to document the completion of 30 Minute Welfare Checks of all inmates during the first three weeks of placement in ASU. The revised form shall be used to document the 30 Minute Welfare Checks at start and stop times by unit, section, and tier, rather than the previous form required for each cell. This change should sharply reduce the time used to document the checks, while still achieving the desired reduction in suicides in ASU's.

A *Frequently Asked Questions* (FAQ) page has been attached to provide additional clarification to the Welfare Check process. Please ensure that this memorandum and its' attachments are distributed to staff in all ASU's immediately.

If you have any questions, please contact Joseph Moss, Correctional Captain, General Population III/IV, at (916) 323-3578.


*Original Signed by Scott Kernan, Director (A)*

SCOTT KERNAN
Director (A)
Division of Adult Institutions

Attachments

cc:  D. L. Runnels, Chief Deputy Secretary, Adult Operations
     Richard Rimmer, Assistant Secretary, Office of Correctional Safety

## ASU 30 MINUTE WELFARE CHECK TRACKING SHEET

DATE:_____   PRISON:_____   UNIT/SECTION:_____

CELL NUMBERS IN SECTION:_____

| START TIME | END TIME | PRINTED STAFF NAME | STAFF SIGNATURE |
|---|---|---|---|
| 00: | 00: | | |
| 00: | 00: | | |
| 00: | 00: | | |
| 01: | 01: | | |
| 01: | 01: | | |
| 01: | 01: | | |
| 02: | 02: | | |
| 02: | 02: | | |
| 02: | 02: | | |
| 03: | 03: | | |
| 03: | 03: | | |
| 03: | 03: | | |
| 04: | 04: | | |
| 04: | 04: | | |
| 04: | 04: | | |
| 05: | 05: | | |
| 05: | 05: | | |
| 05: | 05: | | |
| 06: | 06: | | |
| 06: | 06: | | |
| 06: | 06: | | |
| 07: | 07: | | |
| 07: | 07: | | |
| 07: | 07: | | |
| 08: | 08: | | |
| 08: | 08: | | |
| 08: | 08: | | |
| 09: | 09: | | |
| 09: | 09: | | |
| 09: | 09: | | |
| 10: | 10: | | |
| 10: | 10: | | |
| 10: | 10: | | |
| 11: | 11: | | |
| 11; | 11: | | |
| 11: | 11: | | |

Revised December 8, 2006

# ASU 30 MINUTE WELFARE CHECK TRACKING SHEET

DATE:_____    PRISON:_____    UNIT/SECTION:_____

CELL NUMBERS IN SECTION:_____

| START TIME | END TIME | PRINTED STAFF NAME | STAFF SIGNATURE |
|---|---|---|---|
| 12: | 12: | | |
| 12: | 12: | | |
| 12: | 12: | | |
| 13: | 13: | | |
| 13: | 13: | | |
| 13: | 13: | | |
| 14: | 14: | | |
| 14: | 14: | | |
| 14: | 14: | | |
| 15: | 15: | | |
| 15: | 15: | | |
| 15: | 15: | | |
| 16: | 16: | | |
| 16: | 16: | | |
| 16: | 16: | | |
| 17: | 17: | | |
| 17: | 17: | | |
| 17: | 17: | | |
| 18: | 18: | | |
| 18: | 18: | | |
| 18: | 18: | | |
| 19: | 19: | | |
| 19: | 19: | | |
| 19: | 19: | | |
| 20: | 20: | | |
| 20: | 20: | | |
| 20: | 20: | | |
| 21: | 21: | | |
| 21: | 21: | | |
| 21: | 21: | | |
| 22: | 22: | | |
| 22: | 22: | | |
| 22: | 22: | | |
| 23: | 23: | | |
| 23: | 23: | | |
| 23: | 23: | | |

Revised December 8, 2006

# Frequently Asked Questions
## 30-Minute Welfare Checks in Administrative Segregation Units

Q1)   Are staff expected to complete the 30-Minute Welfare Checks at exact 30 minute intervals?

A1)   *No, the Welfare Checks should be conducted at irregular intervals to avoid a discernible pattern. However, the checks should be no more than 30 minutes apart.*

Q2)   If we are no longer completing the "ASU 30 Minute Welfare Check Tracking Sheet" for each cell, how will we know which inmates have been checked?

A2)   *The revised form has space at the top where all cells in the section included in the 30 minute check process are to be listed. This information can be cross-referenced with cell assignment data that is already available via the Distributed Data Processing System.*

Q3)   If the Welfare Checks are only required every 30 minutes, why does the revised form have three sections available per hour?

A3)   *The checks are required to be completed no more than 30 minutes apart, but can be completed at intervals less than 30 minutes. Therefore, it is possible to have more than two Welfare Checks per hour (i.e. – first check at 00:05, second check at 00:30, and third check at 00:55).*

Q4)   Can the standardized form be altered to begin the first checks at the beginning of First Watch (22:00 or 22:30)?

A4)   *No, the revised form shall be used as it has been provided. No changes to the distributed form are authorized at this time. However, if staff have suggestions that they feel will improve the form, they can provide their recommendations to Correctional Captain Joseph Moss at (916) 323-3578.*

Q5)   What is a Welfare Check?

A5)   *A Welfare Check is defined as the "personal observation" of inmates by a Correctional Officer, at least every 30 minutes, at irregular intervals. During the "personal observation", officers should ensure that inmates are alive and are not involved in self-injurious or life-threatening behavior. The Welfare Check does not rise to the level of observation required during the count process (i.e. – living, breathing flesh) in that staff are not required to observe flesh during this process.*

Q6)   Should staff wake up inmates on First Watch to ensure that inmates are alive?

A6)   *If staff can see that the inmates are breathing and not actively involved in self-injurious or life-threatening behavior, there is no need to awaken them. However, if there is any question to the safety of an inmate, assigned staff should take steps to ensure that the inmate is alive. The intent of this process is to ensure inmate safety during the difficult transition to a more restrictive environment, not to further agitate inmates during hours of rest.*

EXHIBIT J

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

| Suicide Prevention and Response | Mental Health Services Delivery System |
|---|---|

Response training shall be part of the new employee orientation provided by mental health staff in collaboration with the IST unit at each local institution. New correctional officers shall receive this training at the Basic Correctional Officer Academy.

The suicide prevention and response training shall include the following elements:

- Suicide risk assessment

- Suicide methods awareness

- Interventions for suicidal ideation, threats, gestures, and attempts

- Suicide reporting and reviews

- Mental health evaluations for rules violation reports

Clinical and custody staff shall receive specialized training with respect to their particular roles in responding to self-injurious behaviors, suicide attempts, and suicides.

## D. CLINICAL CARE SERVICES

This subsection addresses the various clinical care services for inmates regarding suicide prevention and response. Included are the assessment of risk for suicide, the utilization of a form for documenting the risk factors, and clinical interventions such as procedures for Suicide Precaution and Suicide Watch, and responses to suicide attempts and to suicide.

Education regarding the methods utilized by inmates when attempting suicide shall be taught as part of the suicide prevention and response training.

Employee strategies for maintaining a safe environment, and for ensuring that other policies and procedures relative to suicide prevention and response, such as regarding medication distribution and inmate-patient compliance, are detailed in the relevant chapters and sections of the complete Inmate Medical Services Program Policies & Procedures.

**Any CDCR employee who becomes aware of an inmate's current suicidal ideation, threats, gestures, self-injurious behaviors or suicide attempts shall immediately notify a member of the health care staff. The inmate shall be placed under direct observation, per local custody operating procedure, until a clinician trained to perform a suicide risk assessment (psychiatrist, psychologist, clinical social worker, primary care physician, nurse practitioner, or RN) conducts a face-to-face evaluation.**

### 1. Suicide Risk Assessment

All inmates are observed for suicide risk. Suicide risk assessment is critical to successful suicide prevention. Inmate-patients enrolled in the MHSDS shall be regularly monitored

---

**Suicide Prevention and Response         Mental Health Services Delivery System**

for risk of suicide as clinically appropriate. When an inmate expresses current suicidal ideation, or makes threats or attempts, a suicide risk assessment shall be made by collecting, analyzing, and documenting data. Documentation is achieved by utilizing the CDCR standardized Suicide Risk Assessment Checklist (SRAC) and by clinician notation in the Unit Health Record (UHR). When an inmate expresses chronic suicidal ideation without intent or plan, the clinician may document that no change in suicide risk has occurred since completion of the prior SRAC, instead of completing a new SRAC.

**These clinicians shall be trained to perform a suicide risk assessment and complete the SRAC:**

- psychiatrists
- psychologists
- clinical social workers
- primary care physicians
- nurse practitioners
- RNs

This shall occur during the specialized training provided for clinical staff who are receiving either the new employee orientation or completing the required annual training module, or when determined necessary by supervisory and/or management staff.

When a primary clinician is scheduled to be available on-site, he or she shall be responsible for completing a SRAC. When a mental health clinician is not available, any other staff member who has been trained by CDCR in suicide risk assessment may complete the SRAC.

A RN completing the SRAC shall collect data related to suicide risk and protective factors and refer the patient and data collected to a mental health clinician for further evaluation to determine level of risk.

**At a minimum, a written suicide risk assessment using a SRAC shall be completed:**

- Every time an inmate has an initial face-to-face evaluation for suicidal ideation, gestures, threats, or attempts, by a clinician trained to complete the SRAC.
- By the referring clinician prior to placement of an inmate-patient into an OHU for continued suicide risk assessment or into a MHCB for suicidal ideation, threats, or attempt.
- After hours, on weekends and holidays, on call clinicians shall conduct a face-to-face assessment of suicide risk prior to releasing an inmate to any housing without suicide watch or precaution.

| Suicide Prevention and Response | Mental Health Services Delivery System |
|---|---|

- After hours, on weekends and holidays, when the referring clinician has not completed an SRAC, by the clinician providing coverage, by the next day, for those inmate-patients placed into an OHU or MHCB.

- By the associated Interdisciplinary Treatment Team (IDTT) and/or clinician for all inmate-patients placed into an OHU, for mental health reasons, or MHCB, for any reason, upon decision to release or discharge.

- Subsequent to release from an OHU placement that was for the purpose of continued suicide risk assessment, or a MHCB placement for the reason of suicidal ideation, threats, or attempts, at a minimum of every 90 days for a twelve month period, by a mental health clinician.

- Within 72 hours of return from a Department of Mental Health (DMH) facility, or within 24 hours if clinically indicated based on new arrival screening.

- Any time the medical and mental health screening of a new arrival to an institution indicates a current or significant history, over the past year, of suicide risk factors, ideation, threats, or attempts.

- Pursuant to Department Operating Manual (DOM), Article 41, Prison Rape Elimination Act Policy, for victims of sexual assault, within four hours after the required sexual assault forensic examination.

**The clinician shall use the SRAC when documenting a suicide risk assessment, in addition to making a notation in the UHR. At a minimum, the following categories shall be used to assess potential risk:**

a. Static Risk Factors (unchanging, historical):

- Ethnicity

- History of lewd and lascivious acts with a child and/or killed a child

- History of violence

- History of substance abuse

- Suicide ideation and/or threats in past (when and method)

- Previous suicide attempts (when and method)

- Family history of suicide

- History of mental illness with Axis I diagnosis

- High profile case

# EXHIBIT K

National Center on Institutions and Alternatives        Agreement Number: 5600001125
California Department of Corrections and Rehabilitation (CDCR)        Exhibit A
Scope of Work

## Suicide Expert Consultant Services for CDCR's Suicide Prevention Program

### I.    INTRODUCTION

The National Center on Institutions and Alternatives (NCIA) shall provide a comprehensive and system-wide review of the California Department of Corrections and Rehabilitation (CDCR)'s Suicide Prevention Program. This consultation will directly respond to the *Coleman* court's stated concerns about the CDCR's suicide review process and other aspects of suicide prevention in the department. This consultation will directly contribute to resolution of the *Coleman* litigation.

### II.    BACKGROUND

Suicide crosses all professional and organizational boundaries of the CDCR. A successful suicide prevention program in the CDCR environment targets all inmates, all staff, and all levels of custody. In the last ten years the CDCR has experienced an increase in the rate of suicide. For most years in the last decade the suicide rate in the CDCR has exceeded the national rate of suicide among state prisoners. Recently the CDCR has stumbled in the timeliness of its suicide reviews and the adequacy of the responses to these reviews by institutions and the CDCR as a whole. The recognition of and response to suicide risk in the correctional environment is one of the most important and difficult tasks for mental health staff, yet it is apparent from the CDCR's own reviews of suicide and those of the *Coleman* court's suicide expert that assessments are often subpar and inadequate, leading to poor follow-up and trajectories that may contribute to an eventual suicide. In addition, the CDCR has struggled with how to assure that local policies, procedures, and practices reflect departmental standards and are consistent across institutions. Finally, the ability of the CDCR to adequately track, monitor, and prevent suicide attempts has eroded until at the current time the CDCR has no active database of suicide attempts and no plan to systematically collect data on attempts as a way to better understand who may and who may not attempt, and ultimately complete a suicidal act. These factors have contributed to the CDCR's inability to make progress toward an exit from the *Coleman* litigation. The Contractor's experience (more than 25 years) with correctional suicide prevention programs will allow the CDCR to make immediate, short-term, and long-term changes in its suicide prevention program to begin to decrease the overall rate of suicide over the long-term. This consultation will allow the CDCR to implement a more effective suicide prevention policy and demonstrate to the *Coleman* court its resolve to deal with a issue that impedes its ability to resolve the litigation.

### III.    CONTRACTOR RESPONSIBLITIES

As a special court monitor, a National Institute of Corrections grantee, and consultant to state correctional systems, the Contractor has developed a framework to allow state correctional systems to more effectively meet the problem of the suicide of inmates and resolve litigation. The Contractor will apply eight critical components of a suicide

National Center on Institutions and Alternatives        Agreement Number: 5600001125
California Department of Corrections and Rehabilitation (CDCR)        Exhibit A
Scope of Work

prevention policy[1] (staff training, identification/screening, communication, housing, levels of supervision, intervention, reporting, and follow-up/mortality review) to his consultation with the CDCR. The Contractor will be retained for a period of three years. The consultation will include an initial consultation resulting in comprehensive recommendations, and three annual follow-up consultations.

IV.    **TASKS**

Due to the complexity of evaluating suicide prevention programs in correctional settings, and because the full extent of changes secondary to recommendations may not be apparent for several years, the full consultation will extend over a three year period: an initial consultation and three annual follow-up consultations (year one follow-up on-site and the remainder via document review and teleconference).

The initial consultation (FY 2010-2011) will require Contractor to first review documents provided by the CDCR concerning current policies, its review process, court documents pertaining to suicide prevention, and examples of suicide evaluations, recommendations derived from the reviews, and the responses of institutions to the recommendations.

Following the review of documents, the Contractor will visit the CDCR headquarters for on-site consultation with senior clinical and custodial staff to discuss current suicide prevention policies, training protocols (with staff from the Office of Training & Professional Development), custodial/mental health liaison processes, facilities construction and planning, and current suicide review policies and practices.

The Contractor will then visit several institutions to review suicide policies and procedures in action. He will visit high security institutions, institutions with significant mental health missions, and institutions that experienced increased numbers of suicides in recent years. The purpose of these visits will be to meet with staff, review local practices and their contexts, and discuss possible recommendations.

Finally the initial visit will close with a second visit to the CDCR's headquarters to discuss preliminary recommendations and identified problem areas.

A report with recommendations will be delivered to the CDCR approximately one month after the end of the on-site visit.

The one-year follow-up will include a document review of changes made pursuant to the report's recommendations, annual suicide and suicide attempt data, and new and revised policies/procedures. It will be followed by a three-day site visit: one day at CDCR headquarters and two days in institutions. A follow-up report will be delivered approximately after the site visit.

---

[1] This protocol was developed in accordance with both Standard 4-4373 of the American Correctional Association's *Standards for Adult Correctional Institutions* (2003) and Standard P-G-05 of the National Commission on Correctional Health Care's *Standards for Health Services in Prisons* (2003).

National Center on Institutions and Alternatives        Agreement Number:  5600001125
California Department of Corrections and Rehabilitation (CDCR)        Exhibit A
Scope of Work

The year-two follow-up will consist of document review and a distance consultation with senior clinical and custodial staff followed by a report approximately one month after the consultation.

The final (year three) consultation will again consist of a document review and distance consultation with the CDCR staff.  A final report and recommendations for long-term changes will be delivered one month following the final consultation.

V.    **DELIVERABLES**

1)  **FY 2010-2011:  Initial Consultation (7 days)**

   a)  Preliminary Document Review (2 days)

      Due Date:  09/15/2010 or within 15 days of award of contract

   b)  Headquarters Visit (1 Day)

      Due Date:  10/30/2010 or within 45 days of initial review

   c)  Site Visits (3 Days)

      i)    California State Prison, Sacramento & Folsom State Prison
      ii)   California Medical Facility (CDCR & DMH)
      iii)  Mule Creek State Prison

      Due Date:  01/01/2011 or within 90 days of HQ on-site consultation

   d)  Headquarters Visit (1 Day)

      Due Date:  01/15/2011 or within 15 days of Institution site visits.

   e)  Report and recommendations (30 days after site visit)

      Due Date:  02/01/2011 or within 30 days of Institution site visits.

2)  **FY 2011-2012:  Year One follow-up consultation (5 days)**

   a)  Document Review (1 Days)

      Due Date:  07/15/2011 or within 15 days of new fiscal year

   b)  Headquarter Visits (1 Day)

      Due Date:  08/30/2011 or within 45 days of document review

National Center on Institutions and Alternatives        Agreement Number: 5600001125
California Department of Corrections and Rehabilitation (CDCR)        Exhibit A
Scope of Work

    **c)** Site Visits (3 days)

        Due Date:  11/30/2011 or within 90 days of HQ consultation visit

    **d)** Year One Follow-up Report

        Due Date:  03/01/2012 or within 30 days of last Institution on site visit.

**3) <u>FY 2012-2013: Year Two follow-up consultation (2 days)</u>**

    **a)** Document Review (1 Days)

        Due Date:  07/15/2012 or within 15 days of new fiscal year.

    **b)** Headquarter Distance-Consultation (1 Day)

        Due Date:  08/30/2012 or within 30 days of document review

**4) <u>FY 2013-2014: Year Two follow-up consultation (2 days)</u>**

    **a)** Document Review (1 Days)

        Due Date:  07/10/2013 or within 10 days of new fiscal year.

    **b)** Headquarter Distance Consultation (1 Day)

        Due Date:  07/20/2013 or within 10 days of document review

        Final Report for Project Due 08/30/2013 or within 30 days of Consultation.

**VI.**    **<u>CDCR RESPONSIBILITIES</u>**

1. The CDCR shall identify a Program Manager for this contract.
2. The CDCR shall provide the Contractor with the data necessary to complete the scope of this project.
3. The CDCR shall make staff available as needed to provide support and other assistance.
4. The CDCR shall be responsible for reviewing deliverables detailed under the Contractor's Responsibilities.
5. The CDCR shall identify the positions and/or classifications to participate in this project; and upon identification shall notify the Contractor.
6. The CDCR shall responsible for all travel arrangements during the site visits.

National Center on Institutions and Alternatives      Agreement Number: 5600001125
California Department of Corrections and Rehabilitation (CDCR)      Exhibit A
Scope of Work

VII.  **DEPARTMENT OF CORRECTIONS AND REHABILITATION CONTACT INFORMATION**

Should questions or problems arise during the term of this contract, the Contractor should contact the following offices:

**Billing/Payment Issues:**
    Headquarters Accounting Services
    Phone Number: (916) 255-2042
    Fax Number (916) 255-5418

**CDCR Program Manager**
    Robert D. Canning, Ph.D.
    Senior Psychologist Specialist, and
    Suicide Prevention Coordinator
    Statewide Mental Health Program
    Division of Correctional Health Care Services (DCHCS)
    Phone: (916) 322-4344
    Email: robert.canning@cdcr.ca.gov

**General Contract Issues:**
    Services Contract Management Branch
    Phone Number: (916) 255-5612
    Fax Number: (916) 255-6187

EXHIBIT L

## RE: Suicide Prevention Consultation

**Lindsay Hayes** (lhayesta@msn.com)
Tue 1/08/13 11:26 AM
tim.belavich@cdcr.ca.gov
diana.toche@cdcr.ca.gov

Dr. Belavich:

You will recall that I contacted the agency back in August 2012 regarding clarification of my role as a CDCR suicide prevention consultant. It was the most recent of several attempts at seeking such clarification. As stated back in August, my CDCR consultation has been limited to only my December 2010 visit resulting in my August 2011 report. This limited role is very disappointing and clearly different than what the agency and I agreed to in my 2010 contract which covered a 3-year period.

In your return e-mail to me dated August 21, you asked for my patience for "a few days" to make inquiries about potential future suicide prevention consultation. It has obviously been more than a few days and my patience has come to an end. Please accept this e-mail as notification of resignation/withdrawal as an CDCR consultant. However, although we never had a chance to meet, I wish you and Dr. Toche the best in your new positions, as well as future efforts in suicide prevention.

Sincerely,

Lindsay M. Hayes, Project Director
National Center on Institutions & Alternatives
40 Lantern Lane
Mansfield, MA 02048
(508) 337-8806

From: lhayesta@msn.com
To: tim.belavich@cdcr.ca.gov
CC: diana.toche@cdcr.ca.gov
Subject: RE: Suicide Prevention Consultation
Date: Tue, 4 Sep 2012 13:41:49 -0400

Tim:

I greatly appreciate your getting back to me regarding any future suicide prevention consultation role with CDCR. I know you both have a great deal on your plates and look forward to hearing from you in the very near future.

Lindsay M. Hayes, Project Director
National Center on Institutions & Alternatives
40 Lantern Lane
Mansfield, MA 02048
(508) 337-8806



Δ π EXHIBIT 4
Deponent HAYES
Date 18/13 Rptr
WWW.DEPOBOOK.COM

Ironically, CDCR agreed to give the special master and plaintiff counsel a sanitized version of my report that only contained the section on the OHUs. CDCR also agreed to allow Jeff Metzner to speak with me about it. Jeff and I spoke last week. He was in overall agreement with my findings and recommendations, although we slightly disagreed in the comparison I made between California and New York State (where we both consulted together). From our conversation, it appears that the special master might be willing to revisit the issue of utilizing OHUs for certain suicidal inmates that did not require MHCB level of care. Jeff said the OHU argument had never been presented that way before.

It would appear that this issue could be discussed during another suicide prevention summit, but I, of course, have not been invited to any such meetings as a CDCR consultant. Having written my three-year contract, you know as well as I that my consultation could have extended beyond the lone on-site visit and report, but it has stopped dead in the water. Thus, the main source of my frustration with the agency. Thanks for allowing me to vent.

Lindsay M. Hayes, Project Director
National Center on Institutions and Alternatives
40 Lantern Lane Mansfield, MA 02048
(508)337-8806
www.ncianet.org/services/suicide-prevention-in-custody/

From: Robert.Canning@cdcr.ca.gov
To: lhayesta@msn.com
Date: Mon, 18 Jun 2012 12:53:36 -0700
Subject: F/U question to your consulation to CDCR

So, since I've got your attention, let me ask you how, the next time we hire you (or someone else for a similar task) we could improve. Obviously when your report landed it was not roundly applauded and in fact was buried. Part of the problem could have been our ability to frame the consultation in a way that would have made the end-product more helpful. For instance, was the scope of work we outlined concrete enough for you to produce a useable product, or was it too vague? Of course there is always the situation that by the time you delivered the situation on the ground had deteriorated and circumstances had changed. Any thoughts you might have about this?

Thanks.

Robert D. Canning, Ph.D.                    Desk:    (916) 691-0276

EXHIBIT M



Transcript of the Testimony of:

# **Lindsay M. Hayes**

Coleman v. Brown

February 18, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312  |  F: 877.561.5538
www.thorsnes.com

Lindsay M. Hayes                                    February 18, 2013

1    that this was the only information that CDCR was at

2    that point willing to give to the special master and

3    plaintiff counsel.

4          So instead of actually redacting the full

5    report and blacking it out in sections, it was

6    requested of me that I just provide them with my

7    section of the full report dealing specifically with

8    the outpatient units.  And that's really all I was

9    told.

10         Q.   Okay.  Had you -- when you submitted the

11   August 16, 2011 report to CDCR, was it your

12   understanding that it was going to be communicated to

13   the special master and plaintiffs' counsel?

14         A.   The original report?

15         Q.   Yes.

16         A.   Yes.  I mean, yes.  My assumption was that

17   that was the reason why I was hired, was to assist

18   the agency, submit a report, and then that report

19   would be utilized as confirmation to the other

20   parties -- or to plaintiff and special master that

21   CDCR is strongly committed to the topic, and this is

22   our consultant's report.

23         Q.   Okay.  After you submitted -- I guess it

24   was January 30th, you submitted the redacted version

25   of the report -- you know, I think I might have used

EXHIBIT N

TO:           Thomas L. Gilevich, Assistant Chief Counsel
Office of Legal Affairs
California Department of Corrections and Rehabilitation

FROM:     Lindsay M. Hayes, Project Director
National Center on Institutions and Alternatives

DATE:      August 16, 2011

RE:     **CDCR Suicide Prevention Consultation**

Please accept this memorandum as my opinion regarding several suicide prevention issues within the California Department of Corrections and Rehabilitation (CDCR). This memorandum also includes a slight revision of my preliminary opinions previously offered on January 30, 2011. These opinions and recommendations are made with the explicit intent for CDCR to strategize ways to systemically reduce both the number and rate of inmate suicides, as well as remove the suicide prevention requirements from *Coleman v. Brown*.

As of August 15, 2011, the CDCR has sustained 19 suicides for the year (with an estimated 28-29 such deaths projected thru the end of the year). In 2010, CDCR had 35 suicides, resulting in a suicide rate of 21.1 deaths per 100,000 inmates. In 2009, CDCR had 25 suicides, resulting in a suicide rate of 14.9 deaths per 100,000 inmates. In 2008, CDCR had 37 suicides, resulting in a suicide rate of 22.3 deaths per 100,000 inmates.

1)      **Review of 2010 Inmate Suicides**

I reviewed the Suicide Reports for 25 of the 35 inmate suicides during 2010. As a preface, it should be noted that these Suicide Reports, compiled by designated mental health suicide reviewers (MHSR), represent the strength of CDCR's Mental Health Services Delivery System. Per Program Guide requirements, the reviews are conducted by clinical psychologists with specific training and experience in this area. Each report contains an executive summary, review of circumstances leading to the suicide, medical autopsy/toxicology findings, background information, mental health history, medical history, institutional functioning, personality dynamics, precipitating events and pre-suicidal functioning, discussion/conclusions, and recommendations. The recommendations section includes identification of the problem area(s), quality improvement plan for each problem area, and required supporting documents for each problem area. Each preliminary Suicide Report is then reviewed and subsequently approved by the Division of Correctional Health Care Services (DCHCS)' Suicide Case Review Subcommittee.

The 25 reviewed Suicide Reports were extremely thorough and among the most comprehensive evaluations of inmate suicides that I have seen in correctional agencies throughout the country. The DCHCS and each MHSR should be strongly commended for their work.

However, the DCHCS's strength also reveals its greatest weakness in suicide prevention, i.e., documentation of a continuing and chronic problem in the identification and management of

inmates at risk for suicide. Following review of these 25 cases, I informally made the following calculations:

- 28% (7 of 25) of the cases involved problems with the emergency response to the incident, most of which were caused by either untimely responses in opening the cell door and initiating CPR and/or emergency equipment failure. However, it should also be noted, that a previous chronic problem of correctional officers failing to initiate CPR prior to the arrival of medical staff has perhaps been resolved, as few of the cases involved such an issue.

- 28% (7 of 25) of the cases involved inmates who committed suicide within hours or days following their discharge from suicide observation status,[1] or cases in which inmates either threatened suicide, expressed suicidal ideation, and/or had other suicide risk factors that did not result in their placement on suicide observation status. These cases were very troubling and will be discussed in more detail throughout this report.

- 16% (4 of 25) of the cases involved inmates who were found with either rigor mortis and/or the review determined that cell checks were not performed as required.

- 44% (11 of 25) of the cases involved inmates who were confined in Administrative Segregation Unit cells (ASU). This finding is not surprising and consistent with previous CDCR data indicating that there is a disproportionate number of inmate suicides occurring within ASU cells. However, as a result of this phenomenon, the CDCR instituted several corrective actions, including designating suicide-resistant intake cells in the ASU units, as well as requiring correctional officers to conduct cell checks at 30-minute intervals during the first 21 days of ASU confinement. However, my review of the suicide reports found that several inmates who committed suicide shortly after ASU placement were not placed in designated ASU intake cells and, as indicated above, several ASU inmates were not observed at 30-minute intervals as required.

- 68% (17 of 25) of the cases involved multiple problem areas, with recommendations for corrective action offered to mental health, medical, and correctional officials. In the remaining 32% (8 of 25) of the cases, either only minor deficiencies or no problem areas were found during the reviews.

---

[1]For purposes here, I am using the term "suicide observation" generally to include the CDCR terms "suicide precautions" and "suicide watch."

## 2)   Threshold for Placement on Suicide Observation is Set Too High

According to *Chapter 10: Suicide Prevention and Response*, inmates identified at risk for suicide are placed on either of the following suicide observation levels:

- ***Suicide Precaution***, *"when the inmate is in an MHCB because of high risk of attempting self- injurious behavior, but is not in immediate danger"*; and

- ***Suicide Watch***, *"when an inmate is in an MHCB because of suicide risk and is in immediate danger of self-injurious behavior."*

As written, a literal interpretation of these definitions requires the placement of an inmate on suicide observation status ***only*** if they are at high risk of attempting suicide and are in immediate danger.

The Suicide Risk Evaluation form (CDCR 744) is an excellent tool for the assessment of suicide risk and includes a listing of both chronic and acute risk factors, as well as protective factors. The evaluation form also includes a mental status exam, estimate of suicide risk, and treatment plan (if appropriate). Within the Estimate of Suicide Risk section, both Chronic Risk and Acute Risk are listed with corresponding boxes for risk level (Low, Moderate, and High). It could be argued that this matrix of risk level, while appropriate, is either not consistent with the definitions of risk behavior necessitating either Suicide Precaution or Suicide Watch, or potentially confusing to the clinician.

In fact, in comparing both the definitions of Suicide Precaution and Suicide Watch with the estimate of risk levels contained within the Suicide Risk Evaluation (SRE) form, a clinician could easily conclude that only an inmate scoring in the high category of acute risk would be placed on suicide observation status. The question then becomes, is this what DCHCS officials intended when developing the definitions of risk behavior necessitating either Suicide Precaution or Suicide Watch?

I would argue that the current definitions of risk behavior necessitating either Suicide Precaution or Suicide Watch are overly restrictive and exclude suicidal behavior that warrants placement under suicide observation status. For example, a clinician completing an SRE could conclude based upon acute risk factors, lack of protective factors, and troubling mental status exam that the inmate fell into the moderate acute risk for suicide category, yet because the inmate is not at high risk of attempting suicide nor in immediate danger according to the Program Guide, they will not be placed on suicide observation status. In fact, this is exactly what is happening within CDCR facilities. I reviewed various medical charts during tours of Mule Creek State Prison, Deuel Vocational Institution, and the California State Prison – Sacramento and found examples at each site in which inmates at moderate acute risk for suicide were discharged from suicide observation status in the MHCB. And, as stated above, 28% (7 of 25) of the reviewed Suicide Reports for 2010 involved inmates who committed suicide within hours or days following their discharge from suicide observation status.

In conclusion, it is my belief that the current threshold for placement of inmates on suicide observation status is set too high and unnecessarily and dangerously excludes a potentially suicidal inmate and/or inmate at moderate risk for self-injurious/suicidal behavior. As such, the definitions necessitating placement on both Suicide Precaution and Suicide Watch in *Chapter 10: Suicide Prevention and Response* should be revised to include this concerning behavior.

**3)       Recommended Changes to *Chapter 10: Suicide Prevention and Response***

I reviewed *Chapter 10: Suicide Prevention and Response* (2009 Revision) and offer the following changes:

- On page 11, under Peer Consultation: would recommend adding both "correctional staff " and "medical staff" as peers that need to be consulted.

- On page 11, bottom, and top of page 12: Why is this disclaimer necessary? Earlier in this section, it is stated peer consultation can be one of the most important clinical safeguards. In this paragraph, the statement reads that peer consultation is not always necessary. If peer consultation is one of the most clinical safeguards then it should always be necessary. I would recommend that this paragraph be deleted from the program guide.

- On page 12, under Suicide History Tracking: As offered on page 10 of this report, I strongly believe that the Mental Health Tracking System be expanded to include *all* inmates who have attempted suicide, engaged in self-injurious behavior, or otherwise been placed on suicide observation regardless of whether or not they are "high risk mental health inmate–patients' or current members of the MHSDS. This section should be revised accordingly.

- On page 12, third paragraph from the bottom reads "When an inmate–patient verbalizes suicidal ideation without other signs and symptoms of increased risk of suicide, the mental health clinician is responsible for evaluating any contributing environmental stressors and communicating with custody staff and supervisors regarding any potentially solvable custody issues." This paragraph is seemingly referring to inmates who are using the threat of suicide to gain cell relocation, i.e., are viewed as manipulative and/or malingering. My concern is that inmates who present as manipulative and/or malingering can still be suicidal and require placement on suicide observation status. I would recommend that this paragraph be reviewed again and clarified if necessary.

- On page 14, under Inmate and Cell Search, third paragraph from bottom of page: delete reference to "bed frames" being "removed" from the cell, as well as "on the floor." Insert narrative that all inmates on suicide observation status shall be provided with a suicide-resistant beds.

- On page 14, under <u>Inmate and Cell Search</u>: There is no narrative describing what other items or privileges (shower, out-of-cell time, telephone calls, visitation, etc.), if any, is permitted. In my tours of the visited facilities, I found very restrictive conditions for inmates that were on suicide observation status. All inmates were stripped of all clothing and possessions, and given only a safety smock. Except for being offered a shower every other day, they were confined to their cells at all other times, without consideration for out-of-cell time, telephone calls, visitation, etc. I was informed that these were correctional (not mental health) decisions.

  It would be my opinion that such a practice is overly restrictive and seemingly punitive. Confining a suicidal inmate to their cell for 24 hours a day only enhances isolation and is anti-therapeutic. Under these conditions, it is also difficult, if not impossible, to accurately gauge the source of an inmate's suicidal ideation. Take, for example, the daily scenario of a clinician interviewing an inmate on suicide observation status. The inmate has been in the cell for a few days, clothed only in a smock. He rarely has been out of the cell that has an incredibly foul odor because the inmate has not showered (even if it had been offered). The clinician then asks the inmate: "Are you suicidal?" Given the circumstances he finds himself in, the likelihood of an inmate answering affirmatively to that question, the result of which will be his continued placement under these conditions, is highly questionable.

  The management of inmates under suicide observation status can be a complex issue and would require further discussion within CDCR. However, I would argue that the decision to remove clothing and issue a safety smock to an inmate on suicide observation status should be determined on a case-by-case basis *by a mental health clinician*. In addition, unless contraindicated by a clinician following a suicide risk assessment, each inmate on suicide observation status should continue to receive regular privileges (e.g., showers, telephone, visiting, out-of-cell time, etc.) commensurate with their security level.

- On pages 15 and 16, revise definitions of both Suicide Precaution and Suicide Watch as discussed above.

- On page 16 and 17, within the boxes that indicates Guidelines for Clinician-Ordered Suicide Precaution and Suicide Watch: delete reference to "remove all furniture" and insert provision of suicide-resistant beds.

- On page 19, under <u>Discharge or Return</u>: I would argue that inmates sent to the OHU for suicide observation status should receive the same 5-day clinical follow-up as inmates placed in the MHCB for similar reasons. Therefore, delete the last sentence of the second paragraph that begins with "The inmate-patient may, depending on clinical determination, be placed on 5-day clinical follow-up...." and insert the following: "The inmate-patient shall be placed on the 5-day clinical

follow-up treatment plan and custody wellness check procedures as detailed below."

- On page 19, under both <u>Discharge or Return</u> and <u>MHCB Discharge</u>: I would recommend deleting the word "imminent" from the paragraphs. As previously detailed above, the lack of imminent or immediate danger of self harm should not be the only criteria for removal from suicide observation status.

- On page 20, at the bottom of the page, the sentence reads that "Custody shall conduct an hourly check of the inmate–patient's discharge from MHCB for the first 24 hours after discharge....If the custody checks are continued, the mental health clinician shall determine whether the checks are to be every hour, every two hours, or every four hours for the next 24–48 hours." I have several concerns regarding this paragraph. Its intent seems to suggest a transitioning from suicide observation status to general population, yet cell checks at 60-minute intervals does not seem like much of a transition. Utilizing the same rationale as the requirement to observe inmates at 30-minute intervals upon their placement into the ASU, the policy should be revised to require that inmates discharged from suicide observation status should be observed at 30-minute intervals upon return to their designated housing unit for a duration determined by the mental health clinician. (It is also concerning that there is program guide narrative regarding observation intervals of between two and four hours. Consistent with standard correctional practice throughout the country, an inmate should never be left unobserved for longer than 60 minutes.)

- On pages 21 and 22, under both the <u>Custody Protocol</u> and <u>Hanging</u> sections: There is reference to the term "if trained to do so" when referring to providing immediate life support by officers. It was my understanding that correctional officers within the CDCR were required to be trained in both first aid and CPR/AED and, if so, this term should be deleted from the program guide.


**4)    Use of Outpatient Housing Units (OHUs) for Suicide Precautions**

According to *Chapter 5: Mental Health Crisis Bed* of the Mental Health Services Delivery System Program Guide, "*Not all crises require admission to the MHCB. Crisis episodes for some inmate–patients may be handled on an outpatient basis.*" The overall treatment criteria for a mental health crisis bed includes meeting one of the following two criteria: 1) Treatment and monitoring are provided to any inmate who has *current* symptoms and/or requires treatment for the current DSM diagnosed (may be provisional) Axis 1 serious mental disorders... or 2) Medical necessity: Mental health treatment shall be provided as needed, after review by the Interdisciplinary Treatment Team (IDTT)....

In addition to the overall treatment criteria cited above, an inmate must meet the following specific criteria to receive treatment at the MHCB level of care:

- Marked impairment and dysfunction in most areas (daily living activities, communication and self interaction) requiring 24-hour nursing care; and/or

- Dangerousness to Others as a consequence of a serious mental disorder/Dangerousness to Self.

- These conditions usually result in a Global Assessment of Functioning (GAF) score of less than 30.

In addition, although *Chapter 5* does not explicitly detail conditions upon which MHCB and/or alternative housing can be utilized for inmate-patients requiring suicide observation, *Chapter 10: Suicide Prevention and Response* allows for the use of out-patient housing units (OHUs) to house suicidal inmates. According to *Chapter 10*, "The preferred location to place an inmate on Suicide Precautions or Watch status is in the MHCB, or in the OHU pending transfer to the MHCB…. Inmate/patients that are placed in the OHU for *continued assessment of suicide risk* or, in an MHCB for *active suicidal ideation, threats, or attempt,* shall have a note regarding progress toward the treatment plan goals and objectives recorded daily by a treating clinician in the Interdisciplinary Progress Notes section of the UHR.

There appears to be several issues for discussion regarding placement of inmate-patients on suicide observation within CDCR facilities. First, the *Mental Health Services Delivery System Program Guide* does <u>not</u> either explicitly endorse or exclude the use OHUs for inmates on suicide observation. In addition, the clarifying language to set certain criteria appears misleading. For example, *Chapter 10* attempts to distinguish use of OHU versus MHCB by suggesting that OHUs are utilized as a location to place an inmate for *continued assessment of suicide risk,* whereas the MHCB is reserved for *active suicidal ideation, threats or attempt.* This distinction is not helpful because the assessment of suicide risk occurs in both units, and inmates that are actively suicidal, expressing ideation or demonstrating self-injurious behaviors could be found in either unit.

In my opinion, the real differences between the two housing locations should be: 1) whether the inmate-patient meets the MHCB admission criteria, which at a minimum includes serious mental illness, and 2) the level of care necessary to treat the inmate-patient's suicidal behavior. As detailed below, not all inmates that appear to be suicidal, as demonstrated by suicidal ideation, gesture, and/or attempt are seriously mentally ill and require an in-patient level of care.

The second issue concerns the standard of care for treating and managing inmates on suicide observation in correctional systems throughout the country. MHCBs within the CDCR are noteworthy for providing a *licensed* 24-hour continuous nursing level of care. It has been my experience in consulting with numerous state departments of corrections throughout the country that not all inmates who are in need of treatment and management under suicide observation require a licensed 24-hour continuous nursing level of care. In fact, few if any, agencies provide in-patient treatment to all inmate-patients placed on suicide observation within the prison system.

For example, the New York State Department of Correctional Services (DOCS) provides 12 out-patient mental health satellite units within selective maximum security DOCs facilities. Each

satellite unit contains a Residential Crisis Treatment Program (RCTP) comprised of both crisis observation cells and dormitory beds. The vast majority of inmates placed on suicide observation are housed in these crisis cells and dormitory beds. The RCTP is <u>not</u> licensed and does <u>not</u> provide a 24-hour continuous nursing level of care. Inmate-patients in DOCS that require extended mental health care are committed to the Central New York Psychiatric Center (CNYPC), a 226-bed maximum security forensic hospital.

It should be noted that the recent settlement agreement in *Disability Advocates, Inc. v. New York State Office of Mental Health et al* [02-Civ. 4002 (GEL] outlines the specific use of RCTP beds for inmate-patients requiring suicide observation:

> a. <u>Length of Stay</u>. The use of observation cells should be no longer in duration than necessary to deal with the mental health crisis which caused the inmate-patient to be placed in observation. Defendants' goal shall be to keep inmates in observation cells for no more than four (4) days and there shall be a presumption in favor of releasing inmates from observation cells within four (4) days. However, any decision on when to release an inmate from an observation cell after more or less than any particular number of days is a clinical judgment. All cases in which an inmate is held over seven days in observation shall be referred to the CNYPC Clinical Director or designee for consultation.

> b. <u>Suicide Watch</u>. Constant 24-hour observation will be provided for inmates on suicide watch.

> c. <u>Amenities</u>. No inmate should be left in an observation cell without clothing, smock or paper gown, and a paper gown should only be used where there is a specific safety and security need. The specific amenities provided to an inmate in an observation cell must be determined on the basis of clinical need and safety and security considerations relating to the particular crisis involved in each case.

> d. <u>Clinical Contact and Treatment</u>. All inmates in observation cells will be seen by clinical staff every day, five days a week, and by nursing staff on two shifts every day, seven days a week. In addition, every inmate in an observation cell will be offered a minimum daily out-of-cell individual session with a therapist and/or psychiatrist, five (5) days a week, Monday through Friday, when this can be done without unacceptable risk to safety and security. Determinations of such unacceptable risk shall be documented in the mental health treatment record.

The entire agreement can be found at:
www.disabilityadvocates.info/complaints/DAIvOMHSettlement.pdf

Having been a consultant to both the New York State Department of Correctional Services (DOCS) and California Department of Corrections and Rehabilitation, I can state with confidence that use of the New York State DOCS' non-licensed RCTP for treating and managing most inmates on suicide observation is comparable to CDCR's use of the OHU program.

Returning to the CDCR, it would appear from the description of the MHCB admission criteria in *Chapter 5*, that not all potentially suicidal inmates, including those that threatened suicide, express suicidal ideation, and/or engage in non-lethal self-injurious behaviors warrant treatment within a mental health crisis bed. There are numerous reasons why inmates engage in self-injurious behaviors, including: 1) To cope with their environment -- it temporarily relieves intense feelings, tension, pressure, anxiety, and anger; 2) As an act of self-punishment in response to feelings of guilt, sexual or violent impulses, low self-esteem; 3) As a way to control and manage pain (unlike the pain experienced through physical or sexual abuse); and 4) To manipulate their environment, e.g., to gain a desired housing unit or cell relocation due to conflicts with other staff or inmates, etc. It is important to realize that not all of these behaviors reflect a serious mental illness.

Not all inmates who become suicidal are seriously and persistently mentally ill and require an in-patient level of care. As former special master J. Michael Keating said in his Report on Defendants' Plan to Expedite Access to a Mental Health Crisis Bed (MHCB) Level of Care in November 2001, "inmates with no mental health involvement may manifest temporarily symptoms of a mental disorder in the correctional environment, especially during the reception process. A rigid requirement to transfer immediately every agitated inmate who enters and OHU makes no sense. As long as the OHU transfers an inmate as soon as it becomes clear that he or she needs, for example a MHCB level of stabilizing care, the 72-hour observation period is acceptable." I would agree.

It should also be noted that while on site and touring several facilities, I learned that due to the shortage of MHCB beds within the system, inmate-patients were being transported offsite to other prison facilities that had MHCB beds. In some cases, transporting an inmate-patient on suicide observation from an OHU level of care on-site to a MHCB level of care off-site, perhaps several hours away, is contraindicated, interrupts the continuity of care, and is not in the best interests of the inmate-patient.

With that said, while I would support the decision to utilize out-patient housing units for the management of certain inmates on suicide observation, the current structure and environment of the OHUs would need to be revised. As you are aware, I toured the Mule Creek State Prison, Deuel Vocational Institution, and the California State Prison – Sacramento. Each of these facilities has an OHU, and both Mule Creek State Prison and California State Prison – Sacramento have MHCBs. The Deuel Vocational Institution is the only reception center in the CDCR system that does not have any mental health crisis beds.

I was quite concerned about the current conditions observed in the OHUs at each facility. The Mule Creek State Prison has an unlicensed mental health outpatient housing unit (MHOHU). Cells utilized to house inmates on suicide observation generally had poor lighting, visibility, and sanitation conditions (i.e., dirty floors and walls, non-sanitized mattresses, etc.).

At the Deuel Vocational Institution, inmates on suicide observation were housed in either OHU or the OHU Overflow unit located alongside the administrative segregation unit on L–Unit. The conditions within the OHU were quite bad, with poor lighting, visibility, and sanitation problems. I had difficulty observing inmates through the cell windows. Many cells contained tile

floors, with pieces of tile previously removed that could easily be utilized for self-injurious behavior. Clinical staff space was quite limited, with a converted cell being utilized as a staff office, storage area, and interview room. Conditions in the OHU Overflow were worse and quite deplorable. All of the inmates in this unit were on constant 1:1 observation with one certified nursing assistant (CNA) assigned to each inmate at significant expense to the CDCR due to the hazardous conditions of each cell. The OHU Overflow is situated in the same area as the ASU. Upon my entrance into the unit, there was a foul odor apparently left from the recent use of pepper spray. Due to this foul odor, many of CNAs were wearing face masks as they were observing each inmate. Similar to the OHU, each cell in the OHU Overflow had poor lighting, visibility, and sanitation. Each inmate was on lockdown status and clothed in a safety smock. It is difficult to understand how this environment is conducive to alleviating the symptoms of suicidal behavior and/or mental illness. In addition, by routinely subjecting an inmate-patient to these conditions, CDCR runs the risk of some suicidal inmate-patients denying any suicidal ideation during clinical interviews in order to avoid continuation of such harsh conditions.

At the <u>California State Prison – Sacramento</u>, I toured both a mental health crisis bed unit (which although unlicensed had receive a waiver to be a MHCB) and a OHU. Within the OHU, the same conditions existed with poor visibility, lighting, and sanitation. Cells in the unit also had hazardous ventilation grates that were conducive to a suicide attempt by hanging. While on the unit, I observed two mental health staff conducting cell-side assessments of inmates that were on suicide observation. I observed these assessments to be very brief, and neither clinician was utilizing the required Suicide Risk Evaluation (Form No. CDCR-7447). When inquiring as to why assessments were not being conducted in a private interview room, one clinician told me that the designated room was not available (although a subsequent inquiry determined that it was, in fact, available).

In addition, as previously stated, basic amenities and privileges for inmate-patients in each facility,  such as protective clothing, out-of-cell time, showers, visits, telephone calls, other possessions, etc. are controlled, not by mental health staff but, by custody personnel. This is not appropriate for an OHU and in contrast to how MHCBs are managed. Such decisions should be made by clinical staff based upon the inmate-patient's individual treatment plan.

*In conclusion, it would be my opinion that although OHUs could effectively be utilized for the short-term treatment and management of certain inmate–patients on suicide observations not requiring an acute inpatient level of care, the CDCR would need to significantly upgrade the overall conditions of these units to provide an adequate level of care.* For example, OHU cells should be suicide-resistant, contain adequate lighting, visibility into the cell interior, and sanitation (i.e., clean floors and walls, sanitized mattresses, etc.). Daily suicide risk assessments should be conducted with reasonable privacy and confidentiality in an interview room, with cell-side assessments avoided when possible. Nursing staff should also make twice daily rounds of the unit.  Unless the inmate-patient has lost basic amenities/privileges as a result of a disciplinary sanction, all decisions regarding protective clothing out-of-cell time, showers, visits, telephone calls, other possessions, etc. should be made by mental health staff based upon the inmate-patient's individual treatment plan.

*Finally, in an attempt to convince the Special Master, his experts, and the plaintiffs that OHUs could effectively be utilized for the short-term treatment and management of certain inmate–patients on suicide observation status not requiring an acute inpatient level of care, I would strongly recommend that the CDCR argue that it is proposing to lower the threshold for behavior that warrants placement on suicide observation status and, as such, will be in need of additional suicide-resistant cells to house these inmates. It is both impractical and unreasonable to expect that all these inmates will necessitate a MHCB-level of care and, therefore, would be more appropriately housed in an OHU.*

**5)    Use of Suicide-Resistant Beds in the Correctional Treatment Centers' MHCBs**

During my tour of prison facilities that contained correctional treatment centers with mental health crisis beds, I observed that *none* the inmate–patient rooms contained any beds. Upon inquiry, I was informed that hospital beds were automatically removed from the room when it was used as an MHCB for inmate–patients on suicide observation. The rationale for removing hospital beds was that they were hazardous for inmates who had a propensity for engaging in self-injurious behavior. While hospital beds may indeed be hazardous for suicidal individuals, the practice of withholding a bed from an inmate-patient is not an acceptable alternative and does not reflect the standard of care in correctional facilities throughout the country. The standard of care reflects that inmate–patients placed on suicide observation should be housed in a cell or room that is suicide-resistant and includes a bed that is suicide-resistant. Current CDCR policy allows for inmate-patients to be housed in a MHCB for up to 10 days, and forcing them to sleep on a mattress on the floor is, at a minimum, degrading and seemingly punitive, however unintentional it might be. As previously stated, it is difficult to understand how forcing an inmate to sleep on a mattress without a bed is conducive to alleviating the symptoms of suicidal behavior and/or mental illness.

Suicide-resistant beds are readily available to correctional facilities throughout the country, either through purchase from a private vendor or manufactured by the agency itself. While the plaintiffs have pointed to the use of ModuForm beds in several CDC facilities that house inmate-patients on suicide observation, I also observed suicide-resistant beds during my tour of non-MHCB areas that simply included bunk construction that was securely bolted to the floor and flush with the walls, with a metal skirt covering the entire bunk thus ensuring no anchoring points from which a ligature could be tied.

In conclusion, there is simply no security or therapeutic rationale for prohibiting inmates from having suicide-resistant bedding. Therefore, I would strongly encourage the CDCR to ensure that any inmate-patient placed on suicide observation is housed in a room or cell within a OHU or MHCB that contains a suicide-resistant bunk.

**6)    Use of "ZZ" Cells for Housing Inmate-Patients on Suicide Observation**

While touring the CDCR facilities, and in particular the California State Prison–Sacramento, I observed the use of "ZZ" cells for the housing of inmate–patients on suicide observation. Three

(3) inmates were observed in these cells at California State Prison–Sacramento during my tour. These cells are normally located outside common areas and/or corridors of housing units and were originally intended for the temporary housing of inmates in transit. They appear to more resemble temporary holding cells. I was informed that these ZZ cells were being utilized to house inmate-patients on suicide observation who were awaiting placement into the MHCB. These cells appeared very small and I was also told that an inmate–patient can remain in these holding cells under lockdown status for several days while awaiting an appropriate housing assignment. During this time, inmates are on constant 1:1 observation with a CNA assigned at significant expense to the CDCR due to the hazardous conditions of each cell. There is no discussion about utilizing ZZ cells for inmate-patients on suicide observation status in the *Mental Health Services Delivery System Program Guide*. Once the CDCR significantly upgrades the overall conditions of OHUs to provide an adequate level of care, I would strongly encourage the agency to prohibit the use of these ZZ cells for suicide observation.


**7)     Expanded Use of the Mental Health Tracking System**

CDCR currently has a Mental Health Tracking System i.e., a standardized automated system of record management and case tracking. During my on-site visit to CDCR headquarters, as well as various prison facilities, I was informed that the Mental Health Tracking System does not routinely collect data on *all* inmates who have attempted suicide, engaged in self-injurious behavior, or otherwise been placed on suicide observation.

It is extremely important for a clinician assessing suicide risk to not only gather self-reported information from the inmate–patient, but also any relevant information gathered from external sources, e.g., the Mental Health Tracking System. Although it is my understanding that the CDCR has expressed a willingness to collect historical data on previous suicidal behavior for inmate–patients who are *currently* in the Mental Health Services Delivery System (MHSDS), there has been a reluctance to collect such data for *all* inmates (i.e., non-MHSDS).

It is been my experience that a significant percentage of inmates who commit suicide in correctional facilities throughout the country are *not* on a mental health caseload at the time of their deaths. In fact, within the CDCR, it appeared that more than 42% of the inmate suicides during 2010 were non-MHSDS inmates. It has also been my experience that a number of prison suicide victims not only had a mental health history, but a history of suicidal and/or self-injurious behavior. In fact, CDCR's own data indicates that 48% of inmates who committed suicide during 2007 had a history of suicidal behavior.[2] This is a very significant finding.

I have recently been informed that the CDCR is committed to creating a new generated alert system for those inmates with a "High Acute Suicide Risk." This term was not defined and it was unclear how many current CDCR inmates would be classified under this status, nor whether it would include both MHSDS and non-MHSDS inmates. Nevertheless, it is strongly recommended that the CDCR begin utilizing the Mental Health Tracking System to collect data on *all* inmates (including non-MHSDS) who has been placed on suicide observation, to include

---

[2]Canning, R.D. (2009), *Annual Report of Suicides and Suicide Prevention in the CDCR for Year 2009*, Sacramento, CA: California Department of Correction and Rehabilitation.

inmates attempting suicide and/or engaging in self-injurious behavior. The collection of such data will serve as an invaluable tool for a mental health clinician's suicide risk assessment.

Quite frankly, it is difficult to see any downside to expansion of the Mental Health Tracking System to include all inmates (including non-MHSDS) who has been placed on suicide observation. The inclusion of data of all inmates who were on suicide observation status will not necessarily increase the number of inmates placed on suicide observation. The data will simply provide clinicians with more tools in their toolbox to assess current suicide risk, as well as decreasing potential liability to the CDCR.[3]

## 8)    Suicide Prevention Training Curricula

Several suicide prevention training curricula were reviewed, including the lesson plan entitled *Mental Health Services Delivery System* for the Basic Correctional Officer Academy. This lesson plan includes a 2.5-hour instruction on Crisis Intervention and Suicide Prevention. Although the lesson plan has very good content in these two subject areas, it was last revised in 2008 and is in need of revision.  I would recommend adding the following sections:  1) self-injurious v. suicidal behavior and effectively dealing with manipulative inmates; 2) identifying inmates at risk for suicide despite their denial of risk; 3) updated research on CDCR suicides, and 4) identified problem areas and corrective actions from previous Suicide Review reports.

A 1-hour lesson plan for Health Care New Employee Orientation entitled *Suicide Prevention* was also reviewed. The content is adequate, but the 1-hour duration is not and wrongly suggests that health care employees need less suicide prevention training then correctional personnel.  This workshop should be expanded to 2.5 hours and contain the same information as offered in the Basic Correctional Officer Academy lesson plan referenced above.

Finally, a 1-hour In-Service Training lesson plan entitled *Suicide Prevention* was reviewed. This lesson plan is designed for annual instruction to all CDCR employees.  The content is very good, but the workshop should be expanded to 2 hours and include discussion of identified problem areas and corrective actions from previous Suicide Review reports.

It is my firm belief that the problem areas and corrective actions identified in individual Suicide Review reports are pertinent not only to the individual facilities that sustained the death, but to all CDCR facilities.  Therefore, while ensuring confidentiality of inmate and facility names, all staff should have knowledge of these potential problem areas and recommended corrective actions.  The most appropriate forums for presenting this knowledge are pre-service and annual training workshops.

---

[3]An effective argument could be made that, if an inmate committed suicide and their previous placement on suicide observation status was unknown to a clinician during an assessment, the State could be held liable in a wrongful death case for having knowledge of the information but not allowing clinicians easier access to the data.

**9)     Local Suicide Prevention and Response Focused Improvement Team (SPR-FIT)**

*Chapter 10: Suicide Prevention and Response* sets out various specific responsibilities for the local Suicide Prevention and Response Focused Improvement Team (SPR-FIT). The following review of the Suicide Reports from the 2010 inmate suicides, it would appear that many of the deficiencies cited in each case, as well as the responsible parties for corrective actions, fall within the responsibility of the local SPR-FIT. One of the inherent responsibilities of the SPR-FIT system should be to systemically strive for a decrease in both the rate and number of inmate suicides, but that has not occurred. The question is - Why? It would be my opinion that CDCR needs to determine if the local SPR-FITs are functioning effectively, including whether they are operating as reactionary committees following a bad outcome or trying to proactively prevent a bad outcome. For example, each local SPR-FIT is required to meet at least monthly, with various responsibilities that include, but are not limited to, ensuring compliance with all CDCR policies and procedures, suicide prevention procedures, 5-day clinical follow-up treatment plans, etc. However, when I toured each of the three facilities, I observed numerous poor practices in the area of suicide prevention that should have previously been identified by each of the local SPR-FITs.

For example, at Deuel Vocational Institution, clinicians were utilizing an assessment form entitled "Suicide Risk Assessment," a slightly different version of the CDCR-mandated Suicide Risk Evaluation form that did *not* contain the treatment planning section. At Mule Creek State Prison, clinicians were utilizing a "psychiatric observation" status that required observation at 15-minute intervals for inmates that were being transitioned from Suicide Precaution/Suicide Watch, were at risk to others, and/or assessed as gravely disabled. Although this observation status level might be an excellent idea, it appears to be a local practice and not authorized within *Chapter 10: Suicide Prevention and Response.* Of interest, clinicians at the facility could not even point me to any locally written policy or description of the practice. At the *California State Prison – Sacramento,* I observed two different certified nursing assistants (CNAs) in *both* correctional treatment centers falsifying observation logs of inmates on suicide observation status (i.e., making notations on the forms for time intervals that had not yet occurred). In another unit, CNAs were utilizing an observation form that had staggered time intervals already pre-printed on the form that had been developed by the facility's nursing department. Finally, following review of medical charts at all three facilities, I had concerns regarding the adequacy of documentation on the SREs to justify discharge from suicide observation status. In several of the reviewed charts, SREs required for discharge from suicide observation status and 5-day follow-up progress notes were missing or never written.

In conclusion, most, if not all, of these deficiencies were easily observable and should not have been identified for the *first* time by an outside consultant. The fact that I easily identified these issues speaks to the questionable effectiveness of the local SPR-FITS at these facilities, and perhaps systemwide.

**10)    Use of Administrative Segregation Units for Suicide Observation**

Although CDCR officials have entertained the possibility of utilizing administrative segregation unit (ASU) cells as an option for the housing and management of inmates on suicide observation status, given the current inadequate and inconsistent practices of effectively managing such inmates in the OHUs, it would appear premature to discuss an ASU option until the State has demonstrated good practices in other areas. In fact, if the State can eventually demonstrate to the Special Master, his monitoring team, and the plaintiffs that the OHUs are a viable alternative to MHCB placement for selective inmates, the option for utilizing ASU cells might not be necessary.


**Concluding Thoughts**

Where does the CDCR go from here?  It is my opinion that the State's ability to remove itself from the suicide prevention requirements of the *Coleman* case are predicated upon its ability to maintain a robust quality improvement program. The Suicide Review process of DCHCS's Suicide Case Review Subcommittee and mental health suicide reviewers is among its strengths, yet its inability to historically reduce the number of corrective actions in these cases and the corresponding questionable effectiveness of the local SPR-FITs is among the greatest weaknesses.

# EXHIBIT O

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



Division of Correctional Health Care Services

Department of Corrections & Rehabilitation

| **Program Guide Overview** | | **Mental Health Services Delivery System** |
| --- | --- | --- |

| **From:** | **To:** | |
| --- | --- | --- |
| **Setting/Level of care** | **Setting/Level of Care** | **Timeline for Transfer** |
| RC/CCCMS | Mainline/ CCCMS | Within 90 days of referral; 60 days of referral if clinically indicated |
| RC/EOP | Mainline/EOP | Within 60 days of referral; 30 days of referral if clinically indicated |
| Any setting/level of care | MHCB | Within 24 hours of referral |
| Any institution/ level of care | Any Acute DMH placement | Within ten days of referral, if accepted to DMH. (Referral must be completed within two working days of identification. Transport must be completed within 72 hours of bed assignment) |
| Any institution/level of care | Any Intermediate Care DMH placement | Within 30 days of referral, if accepted to DMH. (Referral must be completed within five working days of identification by IDTT if inmate-patient consent is obtained, and within ten working days of identification if due process hearing is required. Transport must be completed within 72 hours of bed assignment). |
| Mainline (General Population)/ CCCMS | Mainline (General Population) /EOP | Within 60 days of referral; 30 days of referral if clinically indicated |
| Desert institutions (CAL, CEN, ISP, CVSP, CCC)/CCCMS | CCCMS | Within 30 days if inappropriately transferred; otherwise 90 days of referral or 60 days of referral if clinically indicated |
| Desert institutions (CAL, CEN, ISP, CVSP, CCC)/EOP | EOP | Within 21 days if inappropriately transferred; otherwise 60 days of referral or 30 days of referral if clinically indicated |
| EOP ASU | EOP ASU Hub | Within 30 days of ASU placement or referral to EOP level of care. |
| EOP ASU/ EOP ASU Hub | PSU | Within 60 days of endorsement to PSU |
| Outpatient Housing Unit | EOP | Within 30 days of endorsement to EOP |

EXHIBIT P

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

**Mental Health Crisis Bed**                    **Mental Health Services Delivery System**

   b.  The IDTT shall assess the inmate-patient's need for further medical, psychiatric, psychological, social work, and rehabilitative services; nursing services; education services; and transportation when developing the discharge plan. The plan ensures that needed services are available at the appropriate level of care.

   c.  The plan shall include participation by the inmate-patient to facilitate inmate-patient responsibility for his or her care and treatment.

   d.  The plan reflects appropriate coordination with and utilization of MHCB custody staff.

   e.  The plan includes documentation of contact with the Chief of Mental Health at the institution where the inmate-patient is being transferred.

   f.  Once the discharge plan is completed, referrals for appropriate aftercare placement shall be documented by an MHCB clinical staff member in the inmate-patient's treatment plan.

   g.  The assigned CCM or PC at the institution where the inmate-patient is being transferred is responsible for implementing the discharge plan.

   h.  Treatment shall continue for all inmate-patients clinically discharged until transferred.

**Discharge Criteria**

Criteria for discharge from the MHCB to an EOP or CCCMS program include:

- stabilization of the crisis behavior; and

- the ability to function in a less clinically structured environment.

Discharge criteria do not necessarily include complete resolution of symptoms but a resolution sufficient to allow continuation of treatment at a less intensive level of care.

Discharge to DMH inpatient care requires the clinical need for inpatient services of a duration greater than ten days.

**Procedure**

   a.  Upon completion of MHCB inpatient treatment, cases transferred to the MHCB as "Psychiatric and Return" shall be returned to the sending institution, unless the sending institution does not provide the level of care that the inmate-patient currently requires or the inmate-patient has any other case factor(s) that preclude return to the sending

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

institution. In those cases, the MHCB will transfer the inmate-patient to an institution that provides the appropriate level of care and security.

b. The MHCB discharge summary shall be completed by the attending psychiatrist or psychologist prior to release from the MHCB. This should include specific recommendations regarding follow-up visits with the CCM or PC and custody staff. The discharge summary, either handwritten or dictated, includes, but is not limited to, the MHCB course of treatment, current medications, response to treatment, condition at time of discharge, and detailed information regarding follow-up care needs. The inmate-patient's participation, which supports inmate-patient responsibility, shall also be included.

c. An inmate-patient shall be discharged only on the written order of the MHCB psychiatrist or psychologist.

d. Each institution with an MHCB shall appoint a Discharge Coordinator who is responsible for notifying the Chief of Mental Health or designee at the institution where the inmate-patient is being transferred of the pending discharge. The notification shall occur prior to discharge and shall include the inmate-patient's discharge summary, custody level, treatment needs, and any significant medical conditions. The Discharge Coordinator shall document the notification in the inmate-patient's discharge plan.

e. The Chief of Mental Health or designee at the institution where the inmate-patient is being transferred shall notify the assigned CCM or PC. If the inmate-patient does not have an assigned CCM or PC, one shall be assigned. If the inmate-patient was admitted to the MHCB for Suicide Precaution or Watch, the Chief of Mental Health shall also notify the mental health clerical staff responsible for the tracking system, clinical staff responsible for weekend or holiday coverage, and the Facility Captain of the housing unit to which the inmate-patient is being transferred so that the required clinical and custody evaluation can be scheduled.

f. No inmate-patient shall be discharged from the MHCB without an IDTT review, or in the event a new IDTT cannot be convened, a consultation with an IDTT member, such as a nurse.

g. At the time of discharge, the original inpatient record is retained at the MHCB institution. The inmate-patient's UHR shall be transferred to the receiving institution at the time of discharge. Certain documents from the Inpatient Record are copied and filed in the Inpatient section of the UHR. This includes copies of the Admission Record, History and Physical, Operative Reports, Physician Orders, Discharge Summary, Consultations, Progress Notes, and Diagnostic Reports.

EXHIBIT Q

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



# Division of Correctional Health Care Services

# Department of Corrections & Rehabilitation

| Reception Center | Mental Health Services Delivery System |
|---|---|
| Mental Health Assessment | |

6.   All mental health screening and evaluation interviews shall be conducted in a private setting.

7.   All psychological evaluations shall conclude with a provisional diagnosis, level of functioning, and recommended level of care placement, if required.

8.   Mental health services shall be provided to inmates while awaiting transfer.

9.   In order to facilitate long range planning, each RC shall accumulate and regularly report data on all inmates screened, evaluated, and determined to be in need of particular levels of treatment.

## C.   PROCEDURES TO IMPLEMENT POLICIES

1.   Initial Health Screening of Inmates at Receiving and Release

All inmates arriving at a RC shall be interviewed utilizing a standard set of questions (CDCR 7277, *Initial Health Screening*) regarding their medication needs or need for immediate referral for crisis care under the supervision of a Registered Nurse (RN). Medical staff or equivalent staff trained in the procedures for the standardized health screening and mental health referrals, shall review available documentation from committing jurisdictions regarding mental health treatment. This includes a review of medications provided at County facilities or observed behavior that may indicate a need for mental health treatment.

This interview shall be conducted in an environment which is sufficiently private and confidential to encourage full disclosure and open, candid responses. Inmates who are unable to speak English shall be provided with necessary interpreters. Where a need for emergency or urgent psychiatric review is identified, a direct referral to a psychiatrist shall take place, utilizing a standard CDCR 128-MH5, *Mental Health Referral Chrono*. The original 128-MH5, *Mental Health Referral Chrono,* shall be sent to the psychiatrist and a copy to the mental health office for data entry and filing. These Chronos should be hand delivered or this information relayed by telephone, if necessary. Emergency referrals shall be made and responded to immediately. Urgent referrals, including medication assessment or review, shall be responded to within 24 hours. Observation of possible mental health symptoms not requiring emergency attention may also be documented on a staff referral chrono and forwarded to the mental health office within the next working day. Clinical evaluation and health transfer information from committing counties relating to a need for medical or mental health care or assessment are to be placed in the inmate's Unit Health Record (UHR).