**Raymond F. Patterson, M.D., D.F.A.P.A.**
1904 R Street, N.W.
Washington, D.C.  20009
301-292-3737

**REPORT ON SUICIDES COMPLETED IN THE**
**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**JANUARY 1, 2012 – JUNE 30, 2012**

## I.  <u>Introduction</u>

This is the fourteenth Report on Completed Suicides in the California Department of Corrections and Rehabilitation (CDCR or Department) by the special master's expert.  It is submitted as part of the special master's continuing review of the defendant's compliance with court-ordered remediation in the matter of *Coleman v. Brown*, No.  CIV S-90-0520 LKK JSM P (E.D.Cal).

In the interest of reporting on suicides as quickly as possible, this report differs to some extent from previous suicide reports.  Unlike each of the previous annual suicide reports which covered all suicides within a given calendar year, this report covers the clinical experts' review of the 15 suicides which occurred within the first six months of calendar year 2012.  *See* Order, January 30, 2012, Docket No. 4319.  Accordingly, this report is generally limited in scope to those 15 suicides, except for the calculation of the total number of suicides (32) which occurred in 2012 and the rate per 100,000 derived therefrom.  Otherwise, all data and statistical compilations in this report are based on, and apply to, the initial 15 suicides in calendar year 2012.

Another respect in which this report differs from prior reports is that the 15 case reviews appearing in Exhibit H were written by this reviewer and the special master's five other mental health experts[1], all of whom are top nationally recognized experts in the field of correctional mental health.  They are Kerry C. Hughes, M.D.; Jeffrey L. Metzner, M.D.; Kathryn A. Burns, M.D., M.P.H.; Mary Perrien, Ph.D.; and Henry A. Dlugacz, J.D., M.S.W.[2]  All six experts were appointed by the *Coleman* court, with the approval and consent of both parties.  This reviewer and the five other experts presently serve as consultants and/or monitors for a total of 24 different correctional systems or facilities other than the CDCR across the United States.

---

[1] One of the reasons why all six experts participated in the preparation of the case reviews was to expedite the examination and analysis of the voluminous records on each of the initial 15 suicide cases posted on CDCR's secure website.  Preparation of each case review is very time consuming.  Although each review is a distillation of the relevant information on the individual case, plus the reviewer's findings, the compiled 15 case reviews fill 95 single-spaced pages.  (*See* Appendix H)

[2] A summary of each expert's experience and qualifications and their *curricula vitae* are attached as Exhibits A through F.

As discussed in detail below, a number of significant findings that are very concerning emerged from this reviewer's examination of 15 of the 32 suicides in 2012. Among these are the following:

- **In 2012, a CDCR inmate died by suicide every 11.4 days on average.[3]**

- **The rate of CDCR inmate suicides in 2012 was 23.72 per 100,000, based on a reported CDCR inmate population of 134,901 at mid-2012.[4] This was an increase over the rate of 21.01 in 2011, and represents a further pulling ahead of the rate of 16 suicides per 100,000 across U.S. state prisons.[5] It also continues to compare unfavorably with the average rates during the decade from 2001 to 2010 among the ten largest state prison systems during that decade, and with the average rate of the U.S. Federal prison system from 2001 to 2008 (the most recent year for which the U.S. Bureau of Justice Statistics reports suicide rates in U.S. Federal prisons):**

  - **<u>Florida</u>, 2001-2010:  8 per 100,000[6]**
  - **<u>U.S. Federal Prisons</u>, 2001-2008 (most recent year reported):  9 per 100,000[7]**
  - **<u>Georgia</u>, 2001-2010:  12 per 100,000[8]**
  - **<u>Ohio</u>, 2001-2010:  12 per 100,000[9]**
  - **<u>Michigan</u>, 2001-2010:  14 per 100,000[10]**
  - **<u>Pennsylvania</u>, 2001-2010:  15 per 100,000[11]**

---

[3] The Special Master's Twenty-Fifth Round Monitoring Report, at page 17, states the following with regard to the frequency of suicides among CDCR inmates in 2012: "At this rate, as of the time of this writing, a CDCR inmate dies by suicide, on average, every 10.93 days." The reason for the discrepancy between "10.93 days" in the Twenty-Fifth Round Monitoring Report, and "11.4 days" stated above is that the earlier figure was calculated and written before the end of 2012, and as of that time, a CDCR inmate had died by suicide every 10.93. Because there were no additional suicide deaths in 2012 following that writing, the final calculation for 2012 is one suicide every 11.4 days on average.

[4] Source:  CDCR Website, archives, population as of midnight June 30, 2012.

[5] The source of all citations in this report to other prison systems' suicide rates is the Website, U.S. Department of Justice, Bureau of Justice Statistics.  The rate of 16 suicides per 100,000 was reported for 2010, which is the most recent year for which the Bureau has published data on suicide rates in U.S. State prisons.  2008 is the most recent year for which the Bureau has published data on suicide rates in U.S. Federal prisons.

[6] Approximated average prison population of 89,768, based on population report closest to mid-point of period, i.e. 12/31/05. Website, U.S. Bureau of Justice Statistics.

[7] Approximated average prison population of 187,618, based on population report closest to mid-point of period, i.e. 12/31/05. Website, U.S. Bureau of Justice Statistics.

[8] Approximated average prison population of 48,749, based on population report closest to mid-point of period, i.e. 12/31/05. Website, U.S. Bureau of Justice Statistics.

[9] Approximated average prison population of 45,484, based on population report closest to mid-point of period, i.e. 12/31/05. Website, U.S. Bureau of Justice Statistics.

[10] Approximated average prison population of 49,546, based on population report closest to mid-point of period, i.e. 12/31/05. Website, U.S. Bureau of Justice Statistics.

- o **Texas**, 2001-2010: 16 per 100,000[12]
- o **Illinois**, 2001-2010:  17 per 100,000[13]
- o **New York**, 2001-2010:  20 per 100,000[14]
- o **North Carolina**, 2001-2010: 7 per 100,000[15]
- o **Louisiana**, 2001-2010: 7 per 100,000[16]

- **Trend analysis indicates a continuation of the ongoing rise in the rate of suicides since 2005.  From 2005 through 2012, the average suicide rate in CDCR was 21.86 per 100,000.  This is compared to the average rate shown by trend analysis for the six-year period of 1999 through 2004, when the average rate was 16.2 per 100,000.**

- **Among the 32 total suicide deaths by CDCR inmates in 2012, one occurred in a Department of State Hospitals (DSH) facility, Salinas Valley Psychiatric Program (SVPP).**

- **Among the 15 reviewed cases, rigor mortis[17] had already begun by the time of the discovery of the inmate's body in three cases, one of which was in administrative segregation.  The onset of *rigor mortis* indicates that in these three cases, at least two to four hours had passed between the time of death and discovery of the bodies, underscoring in the most dramatic and tragic of ways the importance of timely welfare checks and custodial checks.**

- **In 13 or 86.6 percent of the 15 reviewed suicide cases in 2012, there was at least some degree of inadequacy in assessment, treatment, or intervention.  This rate is higher than the rate of 73.5 percent for 2011.  Inadequacies appeared among conduct of suicide risk evaluations, treatment and/or clinical interventions; non-completion of timely custodial welfare checks, and potential lifesaving**

---

[11] Approximated average prison population of 42,380, based on population report closest to mid-point of period, i.e. 12/31/05.  Website, U.S. Bureau of Justice Statistics.

[12] Approximated average prison population of 169,003, based on population report closest to mid-point of period, i.e. 12/31/05.  Website, U.S. Bureau of Justice Statistics.

[13] Approximated average prison population of 44,919, based on population report closest to mid-point of period, i.e. 12/31/05.  Website, U.S. Bureau of Justice Statistics.

[14] Approximated average prison population of 62,743 based on population report closest to mid-point of period, i.e. 12/31/05.  Website, U.S. Bureau of Justice Statistics.

[15] Approximated average prison population of 36,365, based on population report closest to mid-point of period, i.e. 12/31/05.  Website, U.S. Bureau of Justice Statistics.

[16] Approximated average prison population of 36,083 based on population report closest to mid-point of period, i.e. 12/31/05.  Website, U.S. Bureau of Justice Statistics.

[17] *Rigor mortis* is defined as "the stiffness of joints and muscular rigidity of a dead  body, caused by depletion of ATP in the tissues.  It begins two to four hours after death and lasts up to about four days, after which the muscles and joints relax."  COLLINS ENGLISH DICTIONARY (2003 ed.)

interventions such as administration of CPR or problems with the use of an automated external defibrillator (AED).

- In 11 or 73 percent of the 15 reviewed cases, the inmate's suicide was either foreseeable or preventable, as those terms are defined in this report.

- Failure to conduct SREs or inadequacies in their conduct appeared in six[18] or 40 percent of the 15 reviewed cases.

- Inadequacies in conduct of mental health assessments or clinical evaluations appeared in seven[19] or 47 percent of the 15 reviewed cases.

- Referrals to higher levels of care were not considered or made in two[20] or 13 percent of the 15 reviewed cases in which such referrals may have prevented their suicides.

- Post-mortem suicide reviews revealed that in two[21] or 13 percent of the 15 reviewed cases, mental health staff failed to consult with each other or with custody with regard to identification and provision of appropriate treatment of inmates.

- In two[22] or 13 percent of the 15 reviewed cases, custody welfare checks were not completed appropriately.

- Among four[23] or 27 percent of the 15 reviewed suicides, cardiopulmonary resuscitation, including availability or use of the Automated External Defibrillator (AED) and/or first aid were not performed in a timely and/or appropriate manner.

- Fourteen or 93 percent of the 15 suicides were committed by hanging, which remained by far the predominant means by which suicides were committed.

- Seven (six in administrative segregation and one in a security housing unit), or 47 percent, of the 15 suicides occurred in secured housing units.

---

[18] Inmate C-SVSP, Inmate F-DVI, Inmate J-SQ, Inmate M-RJD, Inmate N-ASP, and Inmate O-RJD.
[19] Inmate C-SVSP, Inmate E-WSP, Inmate F-DVI, Inmate G-PVSP, Inmate J-SQ, Inmate M-RJD, and Inmate O-RJD.
[20] Inmate E-WSP and Inmate M-RJD.
[21] Inmate C-SVSP and Inmate K-Folsom.
[22] Inmate K-FSP and Inmate N-ASP.
[23] Inmate C-SVSP, Inmate F-DVI and Inmate H-PVSP, and Inmate N-ASP.

**II.**   <u>**Format**</u>

This report, like the 2011 Suicide Report, is presented in a narrative format, supported by a number of tables and graphs.  It includes a lexicon of terms and their definitions utilized in this report (Appendix A), a table of tracking timelines for CDCR departmental review of inmate suicides (Appendix B), a table of the demographics of the 15 suicide cases (Appendix C), a table of the mental health information on the 15 suicide cases (Appendix D), a table indicating the frequency of the 15 suicide cases (Appendix E), a summary of the prevalence of selected characteristics among the 15 suicide cases (Appendix F), bar graphs indicating the numbers of suicides among CDCR inmates, year by year, collectively and by institution (Appendix G), clinical case reviews for each of the 15 suicides (Appendix H), and *curricula vitae* and biographical summaries for this reviewer and the other five *Coleman* experts who shared the preparation of the 15 case reviews (Exhibits A through F).

**III.**   <u>**Discussion and Findings**</u>

    **A.**   <u>**CDCR's Already-Elevated Suicide Rate Continues to Rise**</u>

Suicide rates and rate trend analyses show that suicide rates in CDCR continue to exceed the average rates in U.S. state and federal prisons, and are growing.

Suicide rates in CDCR prisons from 1999 through 2012 have been as follows:

> 1999 - 25 suicides in a population of approximately 159,866[24]
>     Completed suicide rate of 15.6/100,000

> 2000 – 15 suicides in a population of approximately 160,855
>     Completed suicide rate of 9.3/100,000

> 2001 – 30 suicides in a population of approximately 155,365
>     Completed suicide rate of 19.3/100,000

> 2002 – 22 suicides in a population of approximately 158,099
>     Completed suicide rate of 13.9/100,000

> 2003 – 36 suicides in a population of approximately 155,722
>     Completed suicide rate of 23.1/100,000

> 2004 – 26 suicides in a population of approximately 163,346

---

[24] Approximate population for each year is the mid-calendar year population reported by CDCR on its website.

Completed suicide rate of 15.9/100,000

2005 – 43 suicides in a population of approximately 164,179
Completed suicide rate of 26.2/100,000

2006 – 43 suicides in a population of approximately 171,340
Completed suicide rate of 25.1/100,000

2007 – 34 suicides in a population of approximately 172,535
Completed suicide rate of 19.7/100,000

2008 – 37 suicides in a population of approximately 165,790
Completed suicide rate of 22.3/100,000

2009 – 25 suicides in a population of approximately 159,084
Completed suicide rate of 15.7/100,000

2010 – 35 suicides in a population of approximately 165,747
Completed suicide rate of 21.1/100,000

2011 – 34 suicides in a population of approximately 161,818
Completed suicide rate of 21.0/100,000

2012 – 32 suicides in a population of approximately 134,901
Completed suicide rate of 23.72

The total number of suicides in CDCR prisons from 1999 through 2012 was 437.  The annual average number of suicides for the 14-year period was 31.21, or 2.6 suicides per month.  That equates to an average of one suicide every 11.7 days over the 14-year period.  For all 14 years reviewed, from 1999 through 2012, the average rate is 19.42 per 100,000.

However, trend analysis indicates that the suicide rate in CDCR prisons is worsening.  For four of the first six years that were reviewed by this examiner - 1999, 2000, 2002, and 2004 - the CDCR suicide rate per 100,000 was under 16.  However, for six of the eight most recent years - 2005, 2006, 2008, 2010, 2011, and 2012 - the rate has exceeded 20 per 100,000.

A comparison of CDCR prison suicide rates with rates in U.S. Federal Prisons, across all U.S. State prisons, and within other large state prison systems also illustrates the persistent elevated rate in CDCR prisons:

CDCR Suicide Rate Trend Analysis (average suicide rate/year) for 1999-2004:
- Average Suicide Rate 16.2/100,000

*Compare* U.S. Federal and U.S. State Prison Suicide Rate Trend Analyses for 1999-2004:
- Average Suicide Rate for U.S. Federal Prisons 1999-2004[25]:  9.33/100,000
- Average Suicide Rate for U.S. State Prisons 1999-2004[26]:  15.2/100,000

CDCR Suicide Rate Trend Analysis (average suicide rate/year) for 2005-2010:
- Average Suicide Rate 21.7/100,000

*Compare* U.S. Federal Prisons 2005-2008, U. S. State Prisons 2005-2010:

- Average Suicide Rate for U.S. Federal Prisons 2005-2008[27]:  9.25/100,000
- Average Suicide Rate for U.S. State Prisons 2005-2010[28]:  15.6/100,000

CDCR Prisons average suicide rate 2001 – 2010:
- 20.2/100,000

*Compare* U.S. Federal Prisons and the Ten Largest U.S. State Prisons Suicide Rate Trend Analyses, for periods as calculated and reported by the U.S. Bureau of Justice Statistics:

- Florida, 2001-2010:  8 per 100,000
- U.S. Federal Prisons, (2001-2008):  9 per 100,000
- Georgia, 2001-2010:  12 per 100,000
- Ohio, 2001-2010:  12 per 100,000
- Michigan, 2001-2010: 14 per 100,000
- Pennsylvania, 2001-2010:  15 per 100,000
- Texas, 2001-2010: 16 per 100,000
- Illinois, 2001-2010:  17 per 100,000
- New York, 2001-2010:  20 per 100,000
- North Carolina, 2001-2010:  7 per 100,000
- Louisiana, 2001-2010: 7 per 100,000

---

[25] Source:  Website, U.S. Department of Justice, Bureau of Justice Statistics.
[26] *Ibid.*
[27] *Ibid.* (As of this writing, 2008 is the most recent year for which the U.S. Department of Justice, Bureau of Justice Statistics currently publishes the rate of suicides across U.S. Federal Prisons.)
[28] *Ibid.*  (As of this writing, 2010 is the most recent year for which the U.S. Department of Justice, Bureau of Justice Statistics currently publishes the rate of suicides across U.S. State prisons.)

**B.     CDCR Has Chronically Failed to Implement Past Suicide Prevention Measures Recommended by this Reviewer**

Defendants have included reports by their expert Joel Dvoskin, Ph.D. in two of their recent filings in the Coleman court.[29]  In both reports, Dr. Dvoskin criticizes this reviewer's annual suicide reports in *Coleman* as untimely and therefore not helpful to prompt identification and implementation of corrective actions to prevent additional suicides.

As described in past annual suicide reports, delays in this reviewer's reporting originate with the delays in CDCR's posting of the required information for each suicide on its secure website.  That is the sole means by which this reviewer can obtain that information.  But more importantly, Dr. Dvoskin's criticism misses the bigger picture.  This reviewer has repeated many of the same recommendations over and over again in his annual reports *because, year after year, CDCR fails to implement these recommendations*.  As a result, many of the same recommendations in the annual suicide reports have been repeated several times.  For example, the 2011 Suicide Report presented a number of recommendations.  As indicated below, these recommendations or reasonably related ones had been made previously, and in some cases they had been made as early as the 1999 Suicide Report and have been asserted repeatedly since that time.

**2011 Suicide Report Recommendation No. 3:**
Recommendation that CDCR comply with various specified existing Program Guide and court-ordered requirements and standards:  "Continuation of monitoring and assessment of conduct of five-day clinical follow-up, custody staff adherence to policies and procedures regarding conduct of custody welfare checks and others, and supervision of inmates, including those who are single-celled and have histories of increased risk of suicide."

**Previous Recommendations:**

1999 Suicide Report, Recommendation No. 4:
"Based on this analysis of suicides in the CDC it is clear that the defendants' continuing effort to limit suicides is dependent on their ability to enforce compliance with existing program guides for the delivery of mental health care services. . ."

2001 Suicide Report, Recommendation No. 6:

---

[29] Report of J. Dvoskin, J. Moore, and C. Scott, "Clinical Evaluation of California's Prison Mental Health Services Delivery System," Exh.1 to Declaration of D. Vorous in Support of Motion to Terminate Litigation Under the Prison Litigation Reform Act [18 U.S.C. §3626(b)] and to Vacate the Court's Judgment and Orders under Fed.R. Civ. P. 60(b)(5), filed January 7, 2013, Docket Nos. 4275-4, 4275-5; Report of Joel Dvoskin, Ph.D., Exhibit 1 to declaration of D. Vorous in Support of Defendants' Objections and Motion to Strike or Modify Portions of Special Master's Report on Suicides Occurring in California Department of Corrections Facilities in 2011.

"Focus on the training of mental health staff on the implementation of existing program guide requirements and related departmental policies on mental health."

2006 Suicide Report, Recommendation No. 1:
"Full implementation of the suicide prevention and review processes that were already in place at both the institutional and department levels, as well as incorporation of revised policy and procedural guidelines and court orders into those processes. . ."

**2011 Suicide Report Recommendation 4:**
"Continuation of monitoring of referrals to higher levels of care, particularly referrals to MHCBs and to DSH programs, as per indicators established within the 7388B referral process."

**Previous Recommendations:**

2004 Suicide Report, Recommendation No. 4:
"Continue to work on improving timely access to DMH inpatient placements, particularly for Level III and Level IV inmates, and focus greater training, supervisory and peer review efforts on the placement of decompensating inmates in appropriate levels of mental health care."

2005 Suicide Report, Recommendation No. 3:
"Several inmate suicides in 2005 reinforce the need for clinicians to monitor suicidal inmates more closely and, where appropriate, aggressively refer decompensating suicidal inmates, especially those at Level III and Level IV, to DMH programs. The cases also point out the need for providing appropriate crisis-level care until such transfers to DMH programs can be achieved."

2006 Suicide Report, Recommendation No. 4:
"Prioritization by the Department of access to inpatient care at DMH, particularly with respect to Level III and Level IV inmates. This would involve requiring clinical staff to properly assess suicide risk factors for inmates whose mental health functioning may have changed, particularly when placed in administrative segregation or other single-cell housing. This underscores the need for appropriate screening, assessment, and referrals to higher levels of care, especially DMH, when indicated. The need to provide appropriate crisis-level services in appropriate treatment settings such as MHCBs, or appropriate limited treatment within OHUs, until transfers can be achieved is also a vital component of this process."

2007 Suicide Report, Recommendation No. 3:

    "Access to inpatient care for CDCR inmates at DMH facilities must be given priority, particularly for Level III and Level IV inmates.  This involves requiring clinical staff to properly assess suicide risk factors for inmates experiencing changes in mental health functioning, particularly on placement in administrative segregation or other single-cell housing.  It underscores the need for appropriate screening, assessment, and referrals to higher levels of care, especially at the DMH level, when indicated.  A vital component of this process is appropriate crisis-level service in treatment settings such as MHCBs, or limited treatment within OHUs, until transfers to DMH facilities can be achieved. . ."

**2011 Suicide Report Recommendation 5:**

"Continuation of monitoring emergency response procedures, particularly in higher-custody housing such as administrative segregation, secured housing units, and psychiatric services units, establishment of state-wide criteria to improve emergency cell entry and extraction procedures."

    **Previous Recommendations:**

    1999 Suicide Report, Recommendation No. 5:

    "The case reviews suggest that the defendant may need to mount a sustained training effort to reinforce provisions of the new DOM (Department Operating Manual) on emergency response to suicides.  The reviews described several instances in which the initiation of CPR was delayed once custody and emergency staff appeared on the scene of a suicide."

    2003 Suicide Report, Recommendation No. 2:

    The defendant should be required to develop and implement a policy that establishes clearly and unequivocally a requirement for custody staff to provide immediate life support, if trained to do so, until medical staff arrives to initiate or continue life support measures, irrespective of whether the obligation to do so is part of the particular custody staff member's duty statement."

    2004 Suicide Report, Recommendation No. 7:

    "Implement fully the finally approved policy on the application of CPR by custody staff."

As exemplified by the above, the timing of this reviewer's feedback and recommendations have had little or no effect on the timing of CDCR's development and implementation of suicide prevention corrective actions.  It is disingenuous for CDCR, through its expert, to blame the timing of this reviewer's suicide reports for CDCR's own years-long delays in responding to those recommendations, making a commitment, and taking action to reduce suicides.  One example of this was CDCR's dilatoriness in production of suicide-related information,

specifically its initial refusal to produce the report of its consultant on suicide prevention, Lindsay Hayes.  During the court-ordered suicide prevention project in mid-2010, CDCR indicated that it was planning to retain Mr. Hayes to review the state of its suicide prevention practices.  The special master requested that defendants share that report with him, but defendants refused to produce it.  It was not until approximately one year later, on May 24, 2012, that defendants finally produced a redacted version of Mr. Hayes' report concerning CDCR's use of outpatient housing units for suicide prevention.  Such use of outpatient housing units had been an integral aspect of the 2010 court-ordered project.

### C.    Contrary to Defendants' Arguments, the Problem of Suicides Among CDCR Inmates Is Not Resolved

#### 1.    Declaration of Tim Belavich in Support of Defendants' Objections and Motion to Strike or Modify Portions of Special Master's Twenty-Fifth Round Monitoring Report

CDCR argues in its Objections to the Special Master's Twenty-Fifth Round Monitoring Report that prevention of inmate suicides within its prisons is not inadequate.  Objections, filed January 28, 2013, Docket No. 4312.  In support of their objections, defendants submitted a sworn declaration of Tim Belavich, Ph.D., acting Statewide Mental Health Deputy Director for CDCR, which addresses numerous points in the Twenty-Fifth Round Monitoring Report concerning suicides among CDCR inmates.

The special master reported in his Twenty-Fifth Round Monitoring Report that the rate of suicides in CDCR prisons in 2012 was 23.72 per 100,000, based on a reported CDCR inmate population of 134,901 at mid-2012.[30]  That is the highest rate of suicides in CDCR since 2006, when the rate per 100,000 was 25.1 per 100,000.  (See table below)  Dr. Belavich, however, states in paragraphs 4-6 of his declaration that from 2000 to 2006, the frequency of suicides in CDCR prisons increased by over 190 percent, and then from 2007 to 2012, it declined by nearly ten percent.  In 2009, there were 25 suicides, but in 2010, the number of suicides increased to 35, followed by 34 suicides in 2011, and 32 suicides in 2012.

Dr. Belavich's statement, however, ignores the trend of an increasing *rate* of suicides within the past three years.  It relies on the *frequency, i.e. the raw number,* of suicides per year.  Frequency is not a meaningful metric by which to gauge whether suicides are increasing, leveling off, or decreasing in CDCR prisons during the past five years.  This is because from 2007 to 2012 the size of the CDCR in-prison population has declined.  As the population declines, each suicide represents a higher proportion of the in-prison population, i.e. an increasing rate of suicides.  Thus, Dr. Belavich's comparison of the number of suicides which had occurred at an earlier

---

[30]Annual CDCR population figures cited herein are CDCR population as of midnight June 30 of each year referenced.  Source: CDCR Website, archives.

time, when the size of the total population had not yet declined, does not and cannot indicate or suggest improvement, deterioration, or maintenance of the status quo.  It presents a scenario which simply never occurred, and therefore has no relevance to the matter at hand.

In 2007, CDCR's average population was 172,231, based on the number of inmates in CDCR institutions as of June 30, 2007.  Reduction of the in-state CDCR prison population began in late 2007, with transfers of CDCR inmates to out-of-state facilities to help ease the severe overcrowding in CDCR prisons at that time.  Since 2011, the rate of the CDCR population has declined further as a result of population realignment pursuant to AB 109.  From 2007 to 2012, the CDCR in-prison population fell by 37,330 or nearly 22 percent.  In 2012, the average CDCR population in 2012 was 134,901, based on the population at the mid-point of 2012.  Consequently, even if the rate of suicides per 100,000 had remained the same during that five-year period, the frequency or raw number of suicides should have fallen commensurate with the decline in the total population.

Unfortunately, that has not occurred, as the suicide rate has increased since 2009.  The suicide rate in CDCR prisons rose in 2010 and 2011, and in 2012 it reached its highest level since 2006:

### CDCR and U.S. State Prison Suicide Rates per 100,000
#### 2000 – 2012

| Year | CDCR Prisons | U.S. State Prisons[31] |
|------|--------------|------------------------|
| 2000 | 9.3          | 16                     |
| 2001 | 19.3         | 14                     |
| 2002 | 13.9         | 14                     |
| 2003 | 23.1         | 16                     |
| 2004 | 15.9         | 16                     |
| 2005 | 26.2         | 17                     |
| 2006 | 25.1         | 17                     |
| 2007 | 19.7         | 16                     |
| 2008 | 22.3         | 15                     |

---

[31] Source: Website, U.S. Bureau of Justice Statistics

| 2009 | 15.7 | 15 |
| 2010 | 21.1 | 16 |
| 2011 | 21.01 | 16 (most recent published) |
| 2012 | 23.72 | 16 (most recent published) |

Moreover, even assuming that the raw number of suicides was a meaningful metric for evaluating the Department's record in inmate suicide prevention, CDCR's record in that respect is no less abysmal.  The State of California has consistently led the nation in the number of suicide deaths in its prisons by a large margin, as indicated below, with 78 more suicide deaths than Texas, which has the next largest state prison system population, and many more suicide deaths than any of the other 48 state systems and combined U.S. Federal prisons:

**Number of Suicide Deaths in U.S. State Prisons and Combined Federal Prisons**
**Highest to Lowest**
**2001 – 2010[32]**

| Prison System | Number of Suicide Deaths |
|---|---|
| **California** | **326** |
| Texas | 248 |
| U.S. Federal Prisons | 148 |
| New York | 127 |
| Illinois | 76 |
| Michigan | 70 |
| Florida | 68 |
| Pennsylvania | 66 |
| Arizona | 61 |
| Ohio | 59 |
| Georgia | 57 |
| Maryland | 50 |
| Wisconsin | 50 |
| Connecticut | 46 |
| Indiana | 40 |
| Missouri | 39 |
| Colorado | 36 |
| Oklahoma | 36 |
| New Jersey | 34 |

---

[32] 2010 is the most recent year for which the U.S. Bureau of Justice Statistics has published data on the numbers of suicides in U.S. state and combined federal prisons.

| | |
|---|---|
| Massachusetts | 33 |
| Virginia | 32 |
| Tennessee | 31 |
| North Carolina | 27 |
| South Carolina | 26 |
| Arkansas | 25 |
| Oregon | 23 |
| Utah | 23 |
| Mississippi | 21 |
| Washington | 20 |
| Idaho | 18 |
| Iowa | 18 |
| Delaware | 17 |
| Nevada | 17 |
| Alaska | 16 |
| Hawaii | 16 |
| Minnesota | 16 |
| New Mexico | 16 |
| Louisiana | 15 |
| Rhode Island | 15 |
| Kansas | 13 |
| Alabama | 12 |
| Kentucky | 11 |
| Montana | 9 |
| South Dakota | 9 |
| New Hampshire | 8 |
| Vermont | 5 |
| Wyoming | 4 |
| Nebraska | 3 |
| West Virginia | 3 |
| Maine | 2 |
| North Dakota | 1 |

Dr. Belavich also states in paragraphs 7-11 of his declaration that the rate of suicides in CDCR prisons has "flattened" since 2007. He references general periods of 2000 to 2006 and 2007 to 2012. Comparison of trends as "pre-2006" as opposed to "post-2006" does not present a reliable indicator -- 2005 and 2006 were both peak years for raw numbers of suicides in CDCR, artificially causing the appearance of a post-2006 downward trend in suicides and suicide rates.

In fact, trend analysis shows that the *average* rate of suicides from 1999 through 2004 was 16.18 suicides per 100,000, while the average rate from 2007 through 2012 was 20.58 per 100,000. Thus, the mean suicide rate has actually *worsened* since 2006. In any event, even assuming that the suicide rate trended toward "flattening" since 2007, no comfort should be taken in that. It would simply mean that the already excessively high rate of suicides has not improved.

14

In paragraph 10 of Dr. Belavich's declaration, he states that if the inmate population had not declined from 2011 to 2012, then the rate of suicides would have fallen rather than risen across that two-year time span.  That assertion has no relevance because the decline in population from 161,818 to 134,901 during that two-year period is a historical fact.  Comparison of the number of suicides in 2012 against the larger inmate population of an earlier time yields no useful data.

Paragraph 12 of Dr. Belavich's declaration refers to demographic differences among the prison population which indicate that suicide rates among some groups tend to be higher than among others.  The inference of that statement is that the higher-than-average suicide rate in CDCR prisons may be attributable to the demographics of CDCR's inmate population.  This is a puzzling, if not troubling, assertion because it seems to suggest that CDCR is resigned to higher rates of suicide among some groups.  If CDCR prisons do in fact house groups of persons who tend to have higher rates of suicide, CDCR is therefore on notice of this elevated suicide risk factor and has a duty to address that risk in its suicide prevention efforts.  Awareness of a higher propensity to suicide among certain groups requires greater vigilance on the part of CDCR, not a reason for acquiescence.

As noted above, the most recently reported average suicide rate across U.S. state prison systems is 16 per 100,000, compared to California's rate, which is 20 per 100,000, according to the U.S. Department of Justice, Bureau of Justice Statistics.  Dr. Belavich states in paragraph 13 of his declaration that suicide rates published by the U.S. Department of Justice are not adjusted to make direct comparisons between states.  Nevertheless, in a comparison of CDCR to U.S. Federal prisons and the next ten largest state prison systems, CDCR shares with New York the highest average rate of suicides (20 per 100,000) among all of other nine largest systems during the decade 2001-2010.  (See *infra*, p. 2-3)

In paragraphs 14 and 15 of his declaration, Dr. Belavich refers to CDCR's mentor program to improve clinical competency in the conduct of SREs, its process to identify and refer high-suicide risk inmates to higher levels of care, and the establishment of a work group to address the increased risk of suicide in administrative segregation units.  The special master's monitors and experts have reported that implementation of the SRE mentor program has been sparse and incomplete.  As reported in the 2011 Suicide Report, in "50 percent of the suicide cases in 2011, inmate suicide risk evaluations were either not done, or found levels of 'low' or 'no appreciable' risk of suicide without adequate consideration of risk factors, past history, and/or review of medical records."  In 40 percent of the 15 suicides in 2012 that are reviewed in this report, there were failures to conduct SREs or inadequacies in their conduct.

The foregoing findings substantiate that, notwithstanding the SRE mentoring program described by Dr. Belavich, there were continuing systemic failures to conduct adequate SREs in CDCR

institutions during 2011 and 2012.  With regard to CDCR's process to identify at-risk inmates, the 2011 Suicide Report also presented detailed evidence from analyses of suicide cases which showed systemic failures to refer to higher levels of care those inmates who were clinically-appropriate for such referral but who subsequently committed suicide.  In two of the 15 reviewed cases reviewed in this report, referrals to higher levels of care were not considered but may have prevented these suicides.  Insofar as the CDCR work group to address the problem of elevated risk of suicide in administrative segregation units, the special master is aware that the work group was organized, but is not aware of any initiatives it has taken to address suicide prevention in administrative segregation.

In paragraphs 17 through 19 of his declaration, Dr. Belavich states that the high percentage of suicides in segregated housing units has declined, implying that the problem of suicides in administrative segregation has been solved.  However, he relies on a measurement that is not useful to compare the number and percentage of suicides which occurred in segregated housing units [(administrative segregation, secured housing units (SHUs), and psychiatric services units (PSUs)] to the number and percentage of total suicides.  That is not the appropriate gauge because the size of the population in segregated housing is dramatically smaller than the size of the population in non-segregated housing.  The meaningful measurement would be the number of suicides per inmate and the rate of suicides (i.e. the number of suicides per 100,000 inmates) *within* segregated housing units, as compared to the incidence and rate of suicides in non-segregated housing:

- In 2011[33], CDCR's average daily combined population <u>in its segregated housing units (administrative segregation units, SHUs, and PSUs)</u> was 3,771.  In 2011, there were 15 suicides in these units, for an incidence of one suicide per every 251.4 inmates in segregated housing units, and for a rate of 397.77 suicides per 100,000 inmates in segregated housing units.

- In 2011[34], CDCR's average daily population <u>in non-segregated housing</u> was 158,047.  In 2011, there were 19 suicides in non-segregated housing units, for an incidence of one suicide per every 8,318.26 inmates in non-segregated housing units, and for a rate of 12.02 suicides per 100,000 inmates in non-segregated housing units.

***The difference between segregated housing and non-segregated housing with regard to their respective rates of suicides per 100,000 is staggering.  <u>Stated another way, the likelihood of a CDCR inmate committing suicide in segregated housing units in CDCR prisons is 33.09 times greater than it is in non-segregated housing units, based on total suicides in 2011.</u>***

---

[33] Based on closest available reported date to midpoint of 2011, July 12, 2011.  *See* CDCR secure website.
[34] Based on CDCR total population of 161,818 on June 30, 2011, minus population of 3,771 in segregated housing on July 12, 2011.  *See* CDCR website, CDCR secure website.

Other indicia corroborate the continuation of the problem of elevated rates of suicide in administrative segregation.  Post-suicide analysis demonstrated that in three of the five suicide deaths in administrative segregation in 2011, *rigor mortis* had already begun prior to the discovery of the inmate's body, indicating that at least two to four hours had already passed before the body was discovered.  The presence of *rigor mortis* in three-fifths of the suicide deaths in administrative segregation supports a reasonable conclusion of failure to conduct or appropriately conduct required custody checks, which may have prevented these deaths.

Moreover, in four of the suicide deaths in administrative segregation and one of the suicide deaths in a PSU in 2011, out of the total of 12 suicide deaths in administrative segregation or a PSU, in 42 percent of these cases, CPR and/or Automated External Defibrillation (AED), and/or first aid were not performed in a timely and/or appropriate manner.  In short, despite Dr. Belavich's assertions, the evidence and the data confirm that problems in the segregated housing units with conduct of required suicide prevention measures persist, and that preventable suicide deaths appear to continue at an alarmingly high rate in CDCR segregated housing units.

> ### 2.   Report of Joel Dvoskin, Ph.D. in Support of Defendants' Objections and Motion to Strike or Modify Portions of the 2011 Suicide Report

On January 25, 2013, the 2011 Suicide Report by this reviewer was filed with the court [Docket No. 4297].  On February 11, 2013, defendants filed objections to the 2011 Suicide Report [Docket No. 4326], with a supporting report by their expert Joel Dvoskin Ph.D.  Although Dr. Dvoskin's assertions were intended for the 2011 Suicide Report, this reviewer will respond to them below because they also relate to many of the points raised in this report.

In his report, Dr. Dvoskin states that "[it] would be grossly unjust to conclude from either Dr. Raymond Patterson's January 25, 2013 report, or my following response to it, that the California Department of Corrections and Rehabilitation is currently deliberately indifferent to the prevention of inmate suicide."  [Dvoskin Report, p. 2].  Whether Dr. Dvoskin, a mental health expert, is qualified to opine as to whether CDCR is "deliberately indifferent" to inmate suicide prevention may be a question for the court to decide.  In any event, it would seem to be outside the scope of his qualifications, as he does not hold himself out to be also a legal expert.

Nevertheless, despite Dr. Dvoskin's assertion that CDCR is not guilty of "deliberate indifference," he offers a number of what he terms "important recommendations, all of which [he] regard[s] as likely to improve the Department's ability to prevent suicides going forward," (Dvoskin report, p. 2, 27), indicating that Dr. Dvoskin agrees that CDCR needs to improve its

suicide prevention effort.  In fact, Dr. Dvoskin's report is largely supportive of this reviewer's findings and recommendations in his 2011 Suicide Report:

> The systemic recommendations in Dr. Patterson's report at pages 16-18 are reasonable and should assist the California Department of Corrections and Rehabilitation in its essential goal of preventing suicides in the future.  Indeed, in reviewing the individual cases, I agree with many of Dr. Patterson's findings, which often represent best practices for improvement moving forward.  Even where we disagreed, in most cases there were simply two alternative and equally reasonable ways to look at the case.

(Dvoskin Report, p. 2)

Dr. Dvoskin notes that this reviewer uses the terms "foreseeable" and "preventable" in his 2011 Suicide Report in the same manner in which they had been used in previous reports.  He recommends the use of a broader spectrum of classifications which, he contends, "will allow for the Department to make positive changes even when there was no negligence or malfeasance, without fear of being `punished' for systemic improvements going forward."  (Dvoskin Report, p. 2)  The terms "foreseeable" and "preventable" were defined and used appropriately in the 2011 Suicide Report, as well as in all preceding annual suicide reports, and should continue to be utilized so that consistency across annual suicide reports is maintained.[35]  To clarify the meaning and use of these terms in this report, and to avoid any potential miscommunication or misunderstanding of their meaning, they are defined in Appendix A, and are utilized in this report as they have been in all of this reviewer's preceding annual suicide reports.

Regardless of any difference of opinion between Dr. Dvoskin and this reviewer on the terminology and classifications of suicides as "foreseeable" or preventable," Dr. Dvoskin states that he agrees with this reviewer's views and recommendations on suicide prevention and that CDCR should utilize them to its own benefit:

> All of that being said and as noted above, I believe Dr. Patterson's recommendations are useful and should be considered, and concur in many of his

---

[35] Approximately ten years ago, the *Coleman* court rejected defendants' objection to, among other things, the special master's experts' use of the classifications "foreseeable" and preventable" in reviewing completed suicides by CDCR inmates.  In defendants' response to the special master's Eleventh Round Monitoring Report, defendants objected to the special master's experts' standards by which completed suicides were reviewed.  Those standards included the classifications of "foreseeable" and "preventable" in the experts' suicide case reviews in the 2001 Suicide Report, which was included within the Eleventh Round Monitoring Report.  The plaintiffs objected to the special master's experts' final recommendation as "too vague."  The *Coleman* court overruled both parties' objections:  "The court is satisfied that the special master and his experts are appropriately monitoring defendants' suicide prevention policies and procedures and that their recommendation should be adopted in full.  The parties' objections are therefore overruled."  Order, filed July 25, 2003, Docket No. 1536.

individual case assessments.  Even in cases where we did not agree, I often viewed both points of view as reasonable.

(Dvoskin Report, p. 3)  Dr. Dvoskin also acknowledges that the "vast majority" of this reviewer's criticisms, as well as Dr. Dvoskin's own criticisms, were taken directly from the findings of CDCR's own suicide reviewers.  (Dvoskin Report, p. 4)  While Dr. Dvoskin finds many of this reviewer's suicide prevention recommendations "useful" and that they "should be considered," defendants apparently reject their own suicide prevention expert's opinion and state that the special master's oversight of suicide prevention should be stopped:  "In sum, there is no justifiable reason for the special master's continued intrusive and costly oversight of California's suicide prevention program."  Amended Defendants' Objections and Motion to Strike or Modify Portions of the Twenty-Fifth Round Monitoring Report of the Special Master, filed February 19, 2013, p. 14, Docket No. 4347.  This is yet another example of CDCR receiving recommendations from their own suicide prevention expert and dismissing it.

Dr. Dvoskin notes the importance of promptness of reviews of suicides for, among other reasons, timely feedback and resolution of ongoing conditions which can elevate risk of suicides.  Undoubtedly, the earlier suicide reviews can be completed, the better for all concerned.  However, while this reviewer acknowledges that CDCR has improved the timeliness of its completion and posting of required documentation on suicides, further expedition of the suicide review process would be helpful.  This is one of the reasons for this reviewer's first recommendation in his 2011 Suicide Report:

>Establishment of a suicide prevention/management work group to timely review suicide prevention measures, suicide deaths, and deaths deemed to be of undetermined cause, with participation by CDCR clinical, custody, and administrative staff, DSH staff, and the special master's experts; continuation of monitoring of the CDCR suicide review process and its compliance with the Program Guide, Chapter 10, "Suicide Prevention"; and integration of the CDCR suicide review process with the *Plata* receiver's death review process.

(2011 Suicide Report, p. 16)  Review and analysis of each suicide death by a joint work group in as close to "real time" as possible is the goal.  Given the consensus that timeliness of expert review feedback to CDCR is important, defendants should welcome this reviewer's recommendation for establishment of a collaborative work group to conduct timely constructive reviews of each suicide.

Most significantly, Dr. Dvoskin acknowledges that CDCR's consistently higher than average suicide rate is concerning.  (Dvoskin Report, p. 4)  He cites one of the same hypothetical reasons for CDCR's higher suicide rates – the particular demographic makeup of CDCR's inmate

19

population and the extent of gang activity in its prisons – which were cited by Dr. Belavich. [36] However, Dr. Dvoskin acknowledges that whatever the reason for the elevated rate, "the reason for the higher rate does nothing to diminish the necessity of taking every reasonable step to reduce it. . ." (Dvoskin Report, p. 5)  That is a point which cannot be disputed.

3. **Defendants' Memorandum in Support of Their Objections to the 2011 Suicide Report**

As with Dr. Dvoskin's report discussed above, a response to defendants' objections to this reviewer's 2011 Suicide Report is in order, given the proximity in time and the alignment of issues discussed in the two reports.

As noted above, Dr. Dvoksin's report submitted in support of defendants' objections to the 2011 Suicide Report agrees with this reviewer's findings, conclusions, and recommendations in that report to a significant extent.  The legal memorandum submitted by defendants in support of their objections to the 2011 Suicide Report (filed February 11, 2013, Docket No. 4326), on the other hand, is highly critical of this reviewer's 2011 Suicide Report in nearly every regard.  It purportedly relies on Dr. Dvoskin's report, but deviates from it greatly.

Overall, defendants rely on the fact that they have a suicide-prevention program to refute claims of deliberate indifference to the problem of CDCR inmate suicides.  While they have such a program, it is not effective.  The rate of suicides among CDCR inmates remains at unacceptably high levels, having risen to 23.72 per 100,000 for 2012, for the highest rate since 2006.  This begs the question whether a suicide prevention program that is ineffectual will suffice, or whether the duty is not merely to develop and implement a suicide prevention program, but to have an *effective* one.

Like the Belavich declaration discussed above, defendants' memorandum states that the suicide rate in CDCR prisons has been "flattening" and that the frequency (i.e. the number) of suicides is declining.  (Objections, p. 8)  As noted above, the rate is not "flattening," but even if it were, "flattening" of an elevated rate indicates no improvement of an already-problematic situation.  It merely indicates that the problem is ongoing and is not being resolved.  Defendants also contend that the demographics of the CDCR inmate population must be taken into account in evaluating the adequacy of CDCR's suicide prevention program.  (Objections, p. 8)  Also as noted above, the fact that suicides may be more common among certain groups who are housed within the

---

[36] See Belavich Declaration in Support of Defendants' Objections and Motion to Strike or Modify Portions of the Special Master's Twenty-Fifth Round Monitoring Report, filed January 28, 2013, Docket No. 4313, ¶ 6,: "Prison population demographics, including race, culture, age, commitment offense, morbidity, and other factors including the prevalence of prison gangs, are relevant to determining suicide risk.  These factors must be considered when comparing one prison population with another because the variability in population demographics and circumstances unique to California that are relevant in assessing suicide risk can yield unreliable comparisons."

California state prison population is *not* a reason to acquiesce to a higher suicide rate.  It means that attention must be given to overcoming the higher incidence of suicide among members of those groups.

Defendants' memorandum also states that the 2011 Suicide Report does not take into account the realignment of the prison population, which has resulted in an increased proportion of violent offenders in a smaller overall population.  (Objections, p. 8-9)  Again, as for certain other groups within the prison population, it has been long known to CDCR that violent offenders tend to commit suicide at higher rates than non-violent offenders.  Defendants have thus been on notice that as a result of prison population realignment, the rate of suicides within CDCR institutions would be likely to rise because realignment has caused a diversion of many non-violent offenders from CDCR prisons to local jail facilities, thus causing a rise in the proportion of violent offenders to the total inmate population, and a probable concomitant rise in the rate of suicides as well.

Defendants objected to the classification of 25 or 73.5 percent of the suicides in 2011 as involving "at least some degree of inadequacy in assessment, treatment, or intervention, which is essentially unchanged since the rate of 74 percent among suicides which occurred in 2010."  (Objections, p. 9-10)  They assert a blanket legalistic basis for their objection – that the 2011 Suicide Report's "classification is speculative, misleading, lacks foundation, and is irrelevant to the governing legal standard."  (Objections, p. 10)  As a clinical expert's report, the 2011 Suicide Report does not, nor should it, conclude whether a legal standard has been met.  That determination is exclusively for the Court.

Defendants also move to strike the language in the 2011 Suicide Report that in 25 or 73.5 percent of cases there was "at least some degree of inadequacy in assessment, treatment, or intervention," on the ground that this classification creates an "unfairly negative impression of the State's mental health and suicide prevention system."  (Objections, p. 10)  It creates a negative impression because it should: *nearly three quarters of the suicide cases in 2011 were characterized by problematic clinical assessment, treatment, or intervention*.  While that state of affairs may be distasteful and unpleasant for defendants to acknowledge, it is the stark truth and must be stated.  In addition, the general categorization of cases marked by "at least some degree of inadequacy in assessment, treatment, or intervention" in the 2011 Suicide Report is broken down into sub-categories of types and frequencies of inadequacies (*see* 2011 Suicide Report, p. 9-10), so that the reader has a more specific understanding of what these inadequacies actually were.

Defendants also object to the finding in the 2011 Suicide Report that "in 50 percent of the suicide cases in 2011, inmate suicide risk evaluations were either not done, or found levels of `low' or `no appreciable' risk of suicide, without adequate consideration of risk factors, past

history, and/or review of medical records." (Objections, p. 12) Again, defendants assert a legalistic objection that "the analysis lacks foundation, is speculative (not judged by what was known at the time of the decision), fails to connect the alleged inadequacy to the suicide, blames the State for suicides outside of its control, and disregards the State's system wide attention to suicide prevention and investigation of suicides." Defendants suggest that their SREs are judged in hindsight by whether or not a suicide occurred, notwithstanding the administering clinician's conclusion as to the patient's level of risk for suicide.

Defendant's statement does not convey what the 2011 Suicide Report actually said about the SREs that were conducted. It does not evaluate the SREs by merely pointing out a 50-percent "failure rate" in detecting suicidality among those inmates who eventually did commit suicide in 2011. Rather, the 50-percent rate measures instances in which no SRE was done at all, or was done without adequate consideration of risk factors, past history, and/or review of medical records. (*See* 2011 Suicide Report, p. 9, 11-12). In short, the 2011 Suicide Report comments on whether the SREs that were done were actually done properly or whether SREs were done at all. That is very different from an assertion that administered SREs had a 50-percent "failure rate" based solely on hindsight, i.e. whether the inmate eventually did commit suicide, as defendants contend.

## IV.   Recommendations

The serious and persistent need for corrective actions to improve CDCR's suicide assessment and prevention program continues. As discussed above, the same recommendations have been made repeatedly, beginning as early as the 1999 Suicide Report and up to and including the recently-submitted 2011 Suicide Report. It is absolutely unacceptable that such recommendations have not been implemented and realized by CDCR. No matter how many times these recommendations are reiterated, they continue to go unheeded, year after year, while the suicides among CDCR inmates continue unabated, and is worsening, as manifested by suicide rates that inch ever higher over the past several years.

At this juncture, this reviewer must, once again, repeat a past recommendation. It is the first recommendation which was presented in the 2011 Suicide Report, with the added feature of participation by plaintiffs' counsel in the process described below:

> Establishment of a suicide prevention/management work group to timely review suicide prevention measures, suicide deaths, and deaths deemed to be of undetermined cause, with participation by CDCR clinical, custody, and administrative staff, DSH staff, *Coleman* plaintiffs' counsel, and the special master's experts; continuation of monitoring of the CDCR suicide review process and its compliance with the Program Guide, Chapter 10, "Suicide Prevention";

and integration of the CDCR suicide review process with the *Plata* receiver's death review process.[37]

This report on suicides among CDCR inmates will be the last of its kind from this reviewer.  In the course of the 14 successive annual suicide reports which this reviewer has submitted, all that can be recommended by this reviewer to help CDCR divert itself from its course of a seemingly intractable elevated rate of inmate suicides has already been said, in some cases repeatedly.  It has become apparent that continued repetition of these recommendations would be a further waste of time and effort.


Respectfully Submitted,



_____/s/_____
Raymond F. Patterson, M.D., D.F.A.P.A.



March 13, 2013

---

[37] The work group may benefit from the complete report on suicide prevention prepared for CDCR by its consultant Lindsay Hayes.

**<u>APPENDIX A</u>**

## **Terminology and Definitions**:

### _Suicide_:

The term "suicide," as defined in the sources identified below, was utilized in the CDCR Annual Suicide Report for 2005, which was the most recent CDCR annual suicide report received by this reviewer and the special master:

- <u>World Health Organization</u>: Suicide is the result of an act deliberately initiated and performed by a person in the full knowledge or expectation of its fatal outcome.

- <u>National Violent Death Reporting System, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention</u>: Suicide is a death resulting from the intentional use of force against oneself.  A preponderance of evidence should indicate that the use of force was intentional.

CDCR has classified as suicides any deaths under the circumstances described below.  This report utilizes the same definition as CDCR, which follows the definitions utilized by the World Health Organization and the National Center for Injury Prevention and Control, Centers for Disease Control and Prevention:

- A person committed a suicide act and changed his mind, but still died as a result of the act;

- A person intended only to injure rather than kill himself, for example by playing "Russian Roulette" voluntarily with a firearm;

- Assisted suicide, including passive assistance to the decedent, for example, by supplying only information or the means needed to complete the act;

- Intentional, self-inflicted death committed while under the influence of a voluntarily-taken, mind-altering drug;

- Intentional, self-inflicted death committed while under the influence of a mental illness.

According to the CDCR Annual Suicide Report for 2005, deaths under the circumstances below should _not_ be classified as suicides:

- The physical consequences of chronic substance abuse, including alcohol or drugs (natural death);

- Acute substance abuse, including alcohol or drugs, with less than a preponderance of the evidence showing intent to use the substance(s) against oneself (undetermined or unintentional injury or death).

- Death as a result of autoerotic behavior, e.g., self-strangulation during sexual activity (death by unintentional injury).

*<u>Foreseeable and Preventable Suicides</u>*:

The terms "foreseeable" and "preventable" are used in this report as they have been in previous reports. They describe the adequacy and implications of CDCR suicide prevention policies and procedures, staff training and supervision, clinical judgments, and utilization of clinical and custodial alternatives to reduce the likelihood of completed suicides.

The term "foreseeable" refers to those cases in which available information about an inmate indicates the presence of substantial or high risk for suicide, and requires reasonable clinical, custodial, and/or administrative intervention(s). Assessment of the degree of risk may be high, moderate, or low to none. This is an important component in determining foreseeability. In contrast to a high and immediately detectable risk, a "moderate risk" of suicide indicates a more ambiguous set of circumstances that requires significant clinical judgment based on adequate training, as well as a timely assessment, to determine the level of risk in the most appropriate manner and relevant interventions to prevent suicide. Interventions may include but are not limited to changes in clinical level of care, placement on suicide precautions or suicide watch, and changes in housing including utilization of safe cells and transfers to higher levels of care, as well as clinically appropriate treatment and management services which may include but not be limited to increased contacts/assessments by mental health professionals, medication management review and changes, other therapeutic interventions and measures, and/or changes in level of care, including short-term changes such as utilization of MHCBs and/or longer term level-of-care changes including transfer to DSH programs. Individuals evaluated as a "low risk," "no risk," or "negligible risk" may continue to require some degree of clinical and custodial monitoring and subsequent evaluation with appropriate treatment and management by clinical staff of the potential for self-injury and/or suicidal ideation or activity.

The term "preventable" refers to those cases in which the likelihood of completed suicide might have been reduced substantially had some additional information been gathered and/or some additional intervention(s) undertaken, usually as required by existing policy, reflected in the Program Guide and/or local operating procedures. Suicides that may have been preventable include not only cases in which additional information might have been gathered or additional interventions undertaken, but also cases involving issues with emergency response by custody and clinical staff. The emergency response is reviewed not only by DCHCS mental health staff but also by DCHCS medical staff as part of the death review summary process, as well as by this reviewer.

### *Suicide Risk Evaluation (SRE)  Program Guide, Chapter 10, "Suicide Prevention and Response," §12-10-7 – 12-10-8.*

All inmates are observed for suicide risk. Suicide risk assessment is critical to successful suicide prevention. Inmates-patients enrolled in the MHSDS shall be regularly monitored for risk of suicide as clinically appropriate. When an inmate expresses current suicidal ideation, or makes threats or attempts, a suicide risk evaluation (SRE) shall be made by collecting, analyzing, and documenting data. Documentation is achieved by utilizing the CDCR standardized SRE and by clinician notation in the Unit Health Record (UHR). When an inmate expresses chronic suicidal ideation without intent or plan, the clinician may document that no change in suicide risk has occurred since completion of the prior SRE, instead of completing a new SRE.

The following clinicians shall be trained to perform a suicide risk assessment and complete the SRE:

- Psychiatrists
- Psychologists
- Clinical social workers
- Primary care physicians
- Nurse practitioners
- RNs

This shall occur during the specialized training provided for clinical staff who are receiving either the new employee orientation or competing the required annual training module, or when determined necessary by supervisory and/or management staff.

When a primary clinician is scheduled to be available on-site, he or she shall be responsible for completing an SRE. When a mental health clinician is not available, any other staff member who has been trained by CDCR in suicide risk evaluation may complete the SRE.

An RN completing the SRE shall collect data related to suicide risk and protective factors and refer the patient and data collected to a mental health clinician for further evaluation to determine the level of risk.

**At a minimum, a written SRE shall be completed:**

- Every time an inmate has an initial face-to-face evaluation for suicidal ideation, gestures, threats, or attempts, by a clinician trained to complete the SRE.
- By the referring clinician prior to placement of an inmate-patient into an outpatient housing unit (OHU) for continued suicide risk assessment or into a mental health crisis bed (MHCB) for suicidal ideation, threats, or attempt.
- After hours, on weekends and holidays, on-call clinicians shall conduct a face-to-face evaluation for suicide risk prior to releasing an inmate to any housing without suicide watch or precaution.
- After hours, on weekends and holidays, when the referring clinician has not completed an SRE, by the clinician providing coverage, by the next day, for those inmate-patients placed into an OHU or MHCB.
- By the associated interdisciplinary treatment team (IDTT) and/or clinician for all inmate-patients placed into an OHU for mental health reasons, or MHCB for any reason, upon decision to release or discharge.
- Subsequent to release from an OHU placement that was for the purpose of continued suicide risk evaluation, or an MHCB placement for the reasons of suicidal ideation, threats, or attempts, at a minimum of every 90 days for a 12-month period, by a mental health clinician.
- Within 72 hours of return from a Department of State Hospitals (DSH) facility, or within 24 hours if clinically based on new arrival screening.
- Any time the medical and mental health screening of a new arrival at an institution indicates a current or significant history, over the past year, of suicide risk factors, ideation, threats, or attempts.
- Pursuant to the Department Operating Manual (DOM), Article 41, Prison Rape Elimination Act Policy, for victims of sexual assault, within four hours after the required sexual assault forensic examination.

**The clinician shall use the SRE form when documenting a suicide risk evaluation, in addition to making a notation in the UHR.  At a minimum, the following categories shall be used to assess potential risk.**

**Suicide Prevention Measures in Administrative Segregation.** *Program Guide, Chapter 7,* *"Administrative Segregation," §§ 12-7-1 – 12-7-15*

**Pre-Placement Screening.** *Program Guide, § 12-7-2 - 12-7-3.* All inmates are screened by medical personnel for possible suicide risk, safety concerns, and mental health problems before placement in administrative segregation (*see* Inmate Medical Services Policy and Procedure, *Volume 4, Chapter 16: CDCR 7219*). If an inmate screens positive on the CDCR 128-MH7, ASU Pre-Placement Chrono, they are referred to a mental health evaluation on an Emergent, Urgent, or Routine basis, depending on their answers to the screening questions. After completion, the CDCR Form 128-MH7, *ASU Pre-Placement* *Chrono*, shall be placed in the mental health chrono section of the Unit Health Record (UHR). For Urgent and Routine referrals, the medical staff conducting the screening shall complete a CDCR 128-MH5, Mental Health Referral Chrono, and follow the referral process below.

**Post-Placement 31-Question Screen.** *Program Guide, § 12-7-6.* All inmates who are not in the MHSDS and who are retained in administrative segregation shall receive, within 72 hours of placement in administrative segregation, a mental health screening interview utilizing the same 31-question mental health screening questionnaire also used in the Reception Centers. The interview shall be conducted by a mental health clinician or trained nursing staff in private and confidential settings that afford confidentiality of sight and sound from other inmates and confidentiality of sound from staff. Screening interview appointments shall be announced by custody staff as "health appointments" to avoid stigmatization and possible retribution by other inmates. Every effort should be made to encourage inmates to attend these appointments.

The results of the screening are evaluated either by hand-scoring or an approved automated scoring system to determine the need for further evaluation. The scoring sheet shall be filed in the UHR. All inmates scoring positive on the questionnaire shall be referred to a mental health clinician to be seen within the clinically appropriate time frame. Emergent cases shall be seen immediately, urgent cases shall be seen within 24 hours, and all others shall be seen within 5 working days.

All referrals and results of evaluations are documented in the individual inmates' UHRs on approved forms and entered into the institutional MHTS. Decisions to provide treatment via placement into an outpatient program or an MHCB shall be entered into the distributed data processing system (DDPS).

**30-Minute Welfare Checks for Initial 21 Days of Placement into Administrative Segregation.** *Defendants' Plan to Address Suicide Trends in Administrative Segregation Units.* Custody welfare checks shall be conducted at staggered intervals not to exceed every 30 minutes. They shall be recorded on the 30-Minute Welfare Check Tracking Sheet.

**Daily Psych Tech Rounds in Administrative Segregation.** *Program Guide, § 12-7-5.* A mental health staff member, usually a Licensed Psych Tech (LPT), shall conduct rounds seven days per week in all administrative segregation units to attend to the mental health needs of all inmates. The psych tech shall make initial contact with each inmate placed into administrative segregation with 24 hours of placement.

In order to establish contact and provide information, mental health staff shall attend to developing rapport with new inmates on the first day of mental health rounds.

Those inmates not previously identified as having mental health treatment needs who exhibit possible signs and symptoms of serious mental disorders shall be referred for clinical evaluation. Interaction shall be sufficient to ascertain the inmate's mental condition particularly during the first ten days. The psych tech shall maintain an individual record of clinical rounds on both MHSDS and non-patients by initialing next to the inmate's name on the CDCR 114, *Isolation Log Book*, each time the inmate is seen. Any unusual findings that may require closer observation by custody shall be documented on the CDCR 114A, *Daily Log*, on the same day as the occurrence. For identified MHSDS inmate-patients, the psych tech shall document a summary of daily clinical rounds on a CDCR 7230, *Interdisciplinary Progress Notes*, in the UHR on a weekly basis. Notes will be clearly labeled as "weekly summaries of psych tech clinical rounds." If clinically indicated, the psych tech may provide additional documentation.

**Response to Self-Injurious Behaviors and Suicide Attempts.** *Program Guide, §12-10-21 – 12-10-23.* Self-injurious behaviors cause, or are likely to cause, physical self-injury. A suicide attempt is an intentional act that is deliberately designed to end one's own life. Both are medical emergencies that require immediate and appropriate responses.

Custody Protocol

**In medical emergencies, the primary objective is to preserve life.** All peace officers who respond to a medical emergency are mandated, pursuant to court order, to provide immediate life support, if trained to do so, until medical staff arrives to continue life support measures. All peace officers must carry a personal CPR mouth shield at all times.

The officer must assess and ensure it is reasonably safe to perform life support by effecting the following actions:

- Sound an alarm (a personal alarm or, if one is not issued, an alarm based on local procedures must be used) to summon necessary personnel and/or additional custody personnel.
- Determine and respond appropriately to any exposed blood-borne pathogens.
- Determine and neutralize any significant security threats to self or others including any circumstances causing harm to the involved inmate.
- Initiate life saving measure consistent with training.

The responding peace officer will be required to articulate the decision made regarding immediate life support and actions taken or not taken, including cases where life support is not initiated consistent with training and/or situations which pose a significant threat to the office or others.

**Upon arrival, responding medical personnel shall relieve the correctional peace office and assume primary responsibility for the provision of medical attention and lifesaving efforts.  Custody and medical personnel together are responsible for the continuance of life saving efforts for as long as necessary.**

**Preservation of life shall take priority over preservation of a crime scene.**

Emergency Response

The following first aid procedures shall be implemented when an inmate attempts suicide by hanging, laceration, or other methods:

Hanging: Medical and custodial staff shall be informed of the nature of the emergency by the most expedient method available.  The cut-down kit shall be transported to the location immediately by custody staff.  Clearing the obstruction to the airway as quickly as possible is critical to saving the life of the inmate who has attempted suicide by hanging.  When it appears safe, a minimum of two staff shall enter the area where the inmate is located, and relieve pressure on the airway by using a stable object for support of the inmate's body or by physically lifting the inmate's weight off the noose.  The inmate shall be cut down by cutting above the knot and then loosening the noose. Custody staff shall preserve any item for evidentiary value.

Once the inmate is cut down, custody staff shall provide immediate life support, if trained to do so, until medical staff arrives to continue life support measures.

Medical staff, upon arrival, shall assume responsibility for medical care, as outlined in the institution's local operating procedures for emergencies, including any decisions regarding initiating or continuing CPR.

If possible, the inmate shall also be transported to a triage and treatment area.

Laceration:  General guidelines;

- Use impervious latex gloves and/or appropriate, personal protective equipment.
- Utilize whatever clean material is available to apply pressure to the wound site.
- Elevate extremities if they are bleeding.
- Transport to a triage and treatment area or an emergency room.

Other methods (overdosing, trauma, swallowing dangerous objects):

- Provide assistance to medical staff and obtain as much information as possible.
- Staff shall perform the Heimlich maneuver if choking is evident.

Cut-down Kit Availability

Each warden shall ensure that cut-down kits:

- Are maintained within each housing unit.
- Are inventoried and inspected on a daily basis with problems immediately reported to a supervisor.
- Consist of a lockable metal box containing:
  a.     One inventory list affixed to the inside of the box door.
  b.     One emergency cut-down tool.
  c.     One single-patient-use resuscitator (e.g. Ambu Single-Patient-Use Resuscitator).
  d.     One CPR mask (e.g., Lardell CPR Mask, for use by CPR-certified staff only)
  e.     Minimum of ten latex gloves.
  f.     Disposable oral airway.

**<u>APPENDIX B</u>**

**Tracking Timelines for Department
Review of Inmate Suicides**[38]

The applicable Program Guide timeframes for CDCR's suicide review are summarized as follows:

| **Event/Documents** | **Timeline** |
|---|---|
| 1.  Date of Death | 0 hour |
| 2.  Chief Medical Officer Notice to Death Notification Coordinator | 8 hours from time of death |
| 3.  Initial Death Report by local SPRFIT Coordinator to Death Coordinator | 2 business days from date of death |
| 4.  Death Notification Coordinator Notice to DCHCS SPRFIT Coordinator | 1 business day from Number 3 |
| 5.  DCHCS SPRFIT Coordinator appoints Mental Health Suicide Reviewer | 2 business days from Number 4 |
| 6.  Mental Health Suicide Reviewer completes Preliminary Suicide Report | 30 days from date of death |
| 7.  DCHCS Suicide Case Review Subcommittee forwards completed Suicide Report to Mental Health Suicide Reviewer | 45 days from date of Death |
| 8.  Suicide Report signed and issued by Directors of DCHCS and the Division of Adult Institutions | 60 days from date of death |
| 9.  Facility Warden and Chief Medical Officer implement Quality | |

---

[38] *See* Program Guide, Chapter 10.

Improvement Plan (QIP)                                                120 days from date of
                                                                     Death

10. Facility Warden and Chief Medical Officer submit report
of implementation of Quality Improvement Plan                        150 days from date of
                                                                     Death

**APPENDIX C**

2012 CDCR Suicides

January 1, 2012 – June 30, 2012

Table 1 - Demographics

| Inmate | Facility | Date of Death | Sex | Method | Ethnicity | Age | HOUSING | LOC | R-SUFFIX | MEDICAL |
|--------|----------|---------------|-----|--------|-----------|-----|---------|-----|----------|---------|
| A | CEN | 1/1/2012 | M | Hang | Hisp | 36 | GP-D | NA | N | N |
| B | CCI | 3/18/2012 | M | Hang | Cauc | 31 | SHU-S | NA | N | N |
| C | SVSP | 3/20/2012 | M | Hang | Cauc | 34 | ASU-D | CCCMS | N | N |
| D | SQ | 4/25/2012 | M | Hang | Haitian | 39 | GP-D | NA | N | N |
| E | WSP | 5/12/2012 | M | Hang | Cauc | 27 | ASU-S | CCCMS | N | N |
| F | DVI | 5/12/2012 | M | Hang | Cauc | 34 | RCSPU-S | CCCMS | Y | N |
| G | PVSP | 5/15/2012 | M | Hang | Hisp | 38 | SNY-D | NA | N | N |
| H | PVSP | 5/16/2012 | M | Exsang | Hisp | 40 | GP-D | NA | Y | N |
| I | FSP | 5/21/2012 | M | Hang | Cauc | 49 | GP-D(S) | NA | N | Y |
| J | SQ | 5/27/2012 | M | Hang | Cauc | 68 | Cond-S | CCCMS | Y | Y |
| K | FSP | 5/30/2012 | M | Hang | Cauc | 35 | ASU-S | CCCMS | N | Y |
| L | MCSP | 6/7/2012 | M | Hang | AA | 38 | ASU-S | CCCMS | N | Y |
| M | RJD | 6/11/2012 | M | Hang | Hisp | 26 | SNY-S | EOP | N | Y |
| N | ASP | 6/28/2012 | M | Self-Strang | NA | 36 | ASU-S | CCCMS | N | N |
| O | RJD | 6/29/2012 | M | Hang | Cauc | 43 | ASU-S | EOP | N | N |

**APPENDIX D**

2012 CDCR Suicides

January 1, 2012 – June 30, 2012

Table 2 – Mental Health Information

| Inmate | MHHX | SBHX | Keyhea | MHCB/DMH | 5-Day f/u | CPR | Suicide Report | QIP Report | FOR/PREV | Autopsy Rpt |
|--------|------|------|--------|----------|-----------|-----|----------------|------------|----------|-------------|
| A | N | N | N | N | N/A | Y | 2/21/2012 | 3/15/2012 | N | 4/27/2012 |
| B | N | N | N | N | N/A | Y | 5/11/2012 | 7/12/2012 | Y | 4/12/2012 |
| C | Y | Y | N | N | N/A | 8 min | 5/17/2012 | 8/1/2012 | Y | 5/2/2012 |
| D | N | Y | N | N | N/A | Y | 6/12/2012 | N/A | N | 4/25/2012 |
| E | Y | Y | N | N | N/A | Y | 8/16/2012 | 10/1/2012 | Y | 7/24/2012 |
| F | Y | Y | N | N | Y | 7 min | 6/22/2012 | 9/7/2012 | Y | 5/25/2012 |
| G | N | N | N | N | N/A | Y | 6/26/2012 | 9/7/2012 | Y | N/A |
| H | Y | Y | N | N | N/A | N | 6/26/2012 | 8/1/2012 | Y | N/A |
| I | N | N | N | N | N/A | Y | 7/5/2012 | N/A | N | N/A |
| J | Y | N | N | N | N/A | Y | 7/16/2012 | N/A | Y | 7/25/2012 |
| K | Y | Y | N | N | N/A | Y | 7/20/2012 | 9/21/2012 | Y | N/A |
| L | Y | Y | N | N | N/A | Y | 7/20/2012 | 9/7/2012 | N | 7/24/2012 |
| M | Y | N | N | N | N/A | Y | 7/31/2012 | 10/1/2012 | Y | 7/28/2012 |
| N | Y | Y | N | N | N/A | 10min | 8/10/2012 | 11/7/2012 | Y | 7/11/2012 |
| O | Y | Y | N | N | N/A | Y | 8/10/2012 | 11/7/2012 | Y | 9/24/2012 |

**<u>APPENDIX E</u>**

**Frequency of First 15 Suicides, by CDCR Facility, in 2012**

| | |
|---|---|
| **Pleasant Valley State Prison (PVSP)** | **2** |
| **San Quentin State Prison (SQ)** | **2** |
| **Folsom State Prison (Folsom)** | **2** |
| **Richard J. Donovan Correctional Facility (RJD)** | **2** |
| **Avenal State Prison (ASP)** | **1** |
| **Salinas Valley State Prison (SVSP)** | **1** |
| **Deuel Vocational Institution (DVI)** | **1** |
| **California Correctional Institution (CCI)** | **1** |
| **Wasco State Prison (WSP)** | **1** |
| **Centinela State Prison (Centinela)** | **1** |
| **Mule Creek State Prison (MCSP)** | **1** |

**APPENDIX F**

## Prevalence of Selected Characteristics Among All Initial 15 Suicides
## By CDCR Inmates in 2012

Single Cell Housing:

     9 of 15                         (60 percent)

Inmates Incarcerated for Sex Offenses ("R" Suffix)

     3 of 15                         (20 percent)

Method

- o  Hanging:         13 of 15    (86.6 percent)
- o  Self-strangulation  1 of 15     (6.6 percent)
- o  Exsanguination:   1 of 15     (6.6 percent)

History of Suicidal Behavior

     9 of 15                         (60 percent)

History of Past Mental Health Treatment

     11 of 15                      (73.3 percent)

Housed in Infirmary, Mental Health Crisis Bed (MHCB), Outpatient Housing Unit (OHU), Psychiatric Services Unit (PSU) or Department of Mental Health (DMH)

     None                          (0 percent)

Housed in Administrative Segregation Unit (ASU), Security Housing Unit (SHU), or Condemned

- o  ASU:         6 of 15     (40 percent)
- o  SHU:         1 of 15     (6.6 percent)
- o  Condemned:  1 of 15     (6.6 percent)

Housed in Reception Center (RC) or Special Needs Yard (SNY)

- o  RC:          1 of 15     (6.6 percent)
- o  SNY:        2 of 15     (13.3 percent)

Inmates on Keyhea Order for Involuntary Medication

    0 of 15                                   (0 percent)

<u>Concomitant Severe, Life Threatening, Medical Illness</u>

    5 of 15                                   (33.3 percent)

<u>On Mental Health Services Delivery System (MHSDS) Caseload at Time of Death</u>

    9 of 15                                   (60 percent)

  o  EOP:  2 of 15                          (13.3 percent)

  o  3CMS:  7 of 15                    (46.6 percent of all suicides; 77.7 percent of suicides by inmates on MHSDS caseload)

<u>Age Range</u>

| | | |
|---|---|---|
| Under 18: | 0 | (0 percent) |
| 18-30: | 2 of 15 | (13.3 percent) |
| 31-40: | 10 of 15 | (66.6 percent) |
| 41-50: | 2 of 15 | (13.3 percent) |
| 50+: | 1 of 15 | (6.6 percent) |

<u>Race</u>

| | | |
|---|---|---|
| Caucasian: | 8 of 15 | (53.3 percent) |
| Hispanic: | 4 of 15 | (26.6 percent) |
| African-American: | 1 of 15 | (6.6 percent) |
| Haitian: | 1 of 15 | (6.6 percent) |
| Nat. American: | 1 of 15 | (6.6 percent) |

<u>Gender</u>

| | | |
|---|---|---|
| Male: | 15 of 15 | (100 percent) |
| Female: | 0 of 15 | (0 percent) |

**<u>APPENDIX G</u>**



## SUICIDES IN CDCR INSTITUTIONS BY FACILITY
## 1999-2012
## (Highest to lowest)

The figures above include 1 death in 2003 at RJD, 4 deaths in 2005 (2 at CSP/Sac, 1 at CIM, and 1 at SQ), 1 death in 2008 at CSATF found to be non-suicides, and 1 death at CSP/Solano in 2011 found by Special Master's expert to be a suicide and found by CDCR to be of undetermined cause.



The figures above include 1 death in 2003 at RJD, 4 deaths in 2005 (2 at CSP/Sac, 1 at CIM, and 1 at SQ), 1 death in 2008 at CSATF found to be non-suicides, and 1 death at CSP/Solano in 2011 found by Special Master's expert to be a suicide and found by CDCR to be of undetermined cause.



























Includes 1 death in 2011 found by the Special Master's expert to be a suicide and found by CDCR to be of undetermined cause.



Includes 1 death in 2008 found by the Special Master's expert to be a suicide and found by CDCR to be a non-suicide.





















*Facility opened July 2005.















Includes 1 death in 2005 found by the Special Master's expert to be a suicide and found by CDCR to be non-suicide.













**<u>APPENDIX H</u>**

**APPENDIX H**
**REPORT ON SUICIDES COMPLETED IN THE**
**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**JANUARY 1, 2012 – JUNE 30, 2012**

**Case Reviews**

**1. Inmate A**

Brief History:  This inmate was a 36-year-old Hispanic man who committed suicide by hanging at Centinela on 1/1/12.  He was admitted to the CDCR via NKSP on 8/9/96 and began serving his first term of 19-years-to-life for the murder of a rival gang member's father.  By the time of his death at Centinela, he had served 14.5 years of his sentence and changed institution seven times.  He was not a participant in the MHSDS and was double celled in the general population.  His EPRD was 1/14/14.

The inmate was discovered during yard recall to Building A1 at approximately 1126 hours on 1/1/12, when the inmate's cellmate notified officers that the inmate appeared to be hanging inside the cell.  Officers approached the cell and confirmed that the inmate was hanging from a noose draped over the top of the shelf unit.  The control officer opened the cell door and the inmate was cut down and removed from the cell to the floor outside the tier.  A Code One medical emergency was called over the radio and officers immediately started chest compressions and rescue breathing.  CPR was continuously applied as the inmate was transported to the CTC, arriving at 1135 hours.  Despite resuscitation efforts, he was declared dead at 1151 hours.

An autopsy report was provided by the Coroner's Office, County of Imperial, dated 4/27/12, and posted on the secure website on 11/28/12.  The cause of death was hanging and toxicology results were negative.

There was no history of juvenile crime in the inmate's record.  As an adult, he was arrested in 1994 and 1995 for selling illegal drugs, which resulted in dispositions of jail time and probation.  He failed to comply with the conditions of his probation on either conviction.  On 7/22/95, he fatally shot the father of a rival gang member after the man attempted to intervene in the dispute between the gangs and hit the inmate's hand with a stick.  The inmate was found guilty by a jury of one count of second-degree murder with an enhancement for using a firearm on 6/11/96.  He was sentenced to a term of 19-years-to-life and lost his appeal in 11/24/97.

The inmate began his incarceration at the NKSP RC on 8/19/96.  He was transferred to CSP/Sac on 10/26/96, where he remained until his transfer to CSP/Corcoran on 1/18/01.  At CSP/Sac, the inmate had five RVRs with the most serious RVR occurring during 2000 for fighting and possession of an inmate-manufactured weapon.  He was sent to the administrative segregation unit on 7/28/00 and eventually assigned a ten-month SHU term related to these charges.

The inmate was transferred from CSP/Corcoran to PBSP on 4/17/01 where he completed his SHU term.  After doing well in general population at PBSP, he threatened to assault a

correctional officer, which resulted in another RVR.  He was given a five-month commuted SHU term for that offense.
The inmate was transferred back to CSP/Sac where he remained from 12/4/03 until 2/3/04, when he was returned to PBSP.  He programmed without incident and he transferred to CSP/Corcoran on 3/25/09 related to a gradual decrease in his classification points.  The inmate was transferred to Centinela on 4/29/09.  Following completion of an ABA III class, he was assigned to yard crew and cleared for food handling in 2010.  He was scheduled to join the kitchen crew on 1/3/12.  The custody staff described him as programming well and not being a disciplinary problem.

During the year prior to his death, the inmate had four different cellmates.  One of the cellmates paroled during August 2011, one was housed in administrative segregation, one cellmate's disposition was unknown, and his most recent cellmate had just moved into that cell three days prior to the suicide.  His most recent cellmate described the inmate as being very quiet and not talking very much.

The suicide report indicated that ten days after the inmate's death, custody officers opened the cell to remove his property and discovered a thin noose, approximately 18 inches long and carefully crafted, among his possessions.  It appeared that the inmate had been planning his death for an unknown period of time before he finally decided to act.  It was unclear why he chose not to use the noose that was found for his suicide; although it appeared to the author of the suicide report that the diameter of the braided noose and the sheet he finally used varied enough that it might have been difficult to connect the two pieces securely together.

The inmate's intake health screening and mental health screening completed at NKSP RC on 8/21/96 were negative from a mental health perspective.  Following his transfers to other institutions, he was also routinely screened for mental health issues and in each case the findings were negative.  A psychologist during 2001 indicated that the inmate might be depressed during his incarceration in the SHU at CSP/Corcoran.  She noted "denies problems but presents as depressed."  The following week she saw the inmate again and he appeared euthymic and without symptoms.  His last mental health screening occurred at CSP/Corcoran on 3/29/09 and was also negative.  There were no further contacts with mental health staff.

There was no prior history of suicide attempts.

Medical history indicated that he was treated for tuberculosis and completed the isoniazid protocol on 2/28/97.  He sought treatment for a growth near his eye in 2007, had a foreign body removed from both ears during January 2010, had liver function and lipid blood levels drawn during April 2010, and was prescribed a foot soak on September 2010.

Very little background history was known about the inmate, who was born in El Salvador on 12/2/75.  His father was a baker and his mother was a housewife.  He denied having siblings and reported that he had no relatives in the United States.  He was single but had a son who was born in 1994 or 1995.

The inmate reportedly immigrated to Mexico in 1990 at age 15 and arrived in Los Angeles, California illegally in 1991. He supported himself by working at odd jobs and house painting before joining a gang that was known for extreme violence. There was a history of marijuana use.

The suicide report identified one problem and Quality Improvement Plan as follows:

> Problem: Documentation of the emergency response, as noted above, contained multiple inconsistencies in the recording of the times various actions were taken.
> Quality Improvement Plan: The CME and DON at CEN have already provided their respective staffs with reminders regarding timeline accuracy during emergency procedures.

The suicide report concluded that the inmate's suicide was not foreseeable. As indicated in the CCCHS death summary, the emergency response documentation had numerous instances of imprecise, inconsistent, and omitted documentation. Following the death of the inmate, medical and nursing executives at Centinela provided reminders to medical and nursing staff of the importance of providing accurate timelines during emergency response procedures. The QIP recommendation was "submit memoranda providing details of the reminders provided to staff."

The CCHCS Death Review Summary recommendations were as follows:

> Provide the Health Care Manager (CEO); CMO; DON with a copy of this review and of the provider key. The review should be shared with the nursing and providers. In addition each provider should be informed of his/her identifier and the review findings. Provider #1's documentation of his/ her involvement in the emergency response lacks important detail related to his/ her event notification time, the arrival time to the TTA, and some elements of the pertinent exam (skin exam looking for lesions/ signs of trauma; eye exam – corneal reflex, subconjunctival petechiae). Documentation does not reflect Provider #1's clinical decision making related to non-initiation of the ACLS measures (such as unknown down time)…

> Systemic Concerns: Substandard emergency response documentation across different disciplines (custody, medical providers, nursing). Also, it appears that a cervical collar (for C-spine immobilization) was not applied by first responder, or in TTA.

> Recommend that CME/ CP&S discuss the emergency response policy and related documentation with all providers including Provider #1. Recommend that CEO addresses the system's issue.

**Findings**: The inmate denied mental health problems throughout his incarceration and had not been on the mental health caseload. This inmate's suicide was not foreseeable and not preventable if the timeframes documented by custody staff were accurate. It is very concerning that medical and nursing staff did not properly document the emergency response process.

**2. Inmate B**

Brief History:  This inmate was a 31-year-old Caucasian male who committed suicide by hanging on 3/18/12 at CCI.  He was not a participant in the MHSDS during the course of his incarceration.  He was housed in a single cell in the SHU at the time of his death.  The inmate entered the CDCR on 11/02/04 for this, his first and only prison term.  He was serving a 59-year and four-month sentence for two counts of attempted murder with a firearm.

The inmate was discovered on 3/18/12 at approximately 9:25 p.m. by an officer conducting count on the housing unit.  The officer observed the inmate hanging from a noose fashioned from his bed sheet and tied to the air vent located in the upper right wall of the cell.  The inmate was unresponsive.  A second officer on the housing unit responded and announced a medical emergency, "inmate hanging," via the radio.  After donning emergency extraction gear, the officers entered the cell and used cut-down scissors.  The inmate's body was lowered, pulled out of the cell, and placed on a Stokes litter to be carried down from the upper tier.  Rescue breathing was started.

Medical staff had responded and was at the entrance to the building with a gurney by approximately 9:30 p.m.  The inmate was placed on the gurney and taken to the medical clinic.  Additional medical staff took over lifesaving procedures.  Provided incident reports indicated that rescue breathing began in the housing unit, but chest compressions were not started until the inmate arrived in the medical clinic at approximately 9:34 p.m.  Institutional medical staff provided CPR and paramedics from an outside ambulance arrived at 9:47 p.m.  The paramedics pronounced the inmate dead at 9:49 p.m.

An autopsy report from the Kern County Coroner, dated 3/20/12 and uploaded to the secure website on 2/5/13, stated the cause of death was asphyxia by hanging and the manner of death was suicide.  Toxicology indicated no positive findings.

At the time of intake at HDSP in November 2004, the inmate reported no history of medical or mental health problems.  He was assigned to Close A custody status due to the length of his sentence.  He programmed in general population for the first months of his incarceration, but was subsequently involved in a number of serious RVRs from 2005 through 2008.  These RVRs were reportedly gang-related.  Although three incidents were referred for outside prosecution, the district attorney declined to prosecute any of them.  However, the infractions resulted in significant administrative segregation time and ultimately, a lengthy SHU term.  In fact, at the time of his death, the inmate had been continuously housed in the SHU since 5/15/08.  His pending release date was 7/15/12.

The inmate was seen for general medical, optometric, and dental care during his incarceration.  Medical diagnoses included gastroesophageal reflux disease, hypertension, and chronic knee pain.  He was given medication for GERD and hypertension in 2008, but refused treatment for either condition beginning in 2009.  He requested and was prescribed ibuprofen and later, acetaminophen for his knee pain.  At his last physician appointment on 5/16/11, the doctor noted that his hypertension was "good, stable."  No medications were prescribed for this (past) condition though the over-the-counter (OTC) pain management medications continued.

4

The inmate never requested mental health services and was never referred by custody staff to mental health.  However, medical staff referred him to mental health on three occasions; all of these referrals were a result of the inmate's refusal to see the medical doctor for renewal of his OTC medication prescriptions and medication "non-adherence."  (Again, his only prescription was for OTC pain medication.)  Nevertheless, mental health staff assessed the inmate in response to the referrals.  In all three instances, he refused to come out of his cell for a private assessment, but was cooperative with a cell-front interview.  The inmate was assessed and determined to have no mental health issues or problems on 07/18/11, 11/02/11, and 03/13/12.  He was pleasant and cooperative and his cell and personal hygiene were good.  Custody staff reported him to be somewhat atypical for a SHU inmate; he was polite, friendly, and liked to work and keep busy.  He was often given informal job assignments during second watch.  A letter to his mother was found following his suicide and appeared to indicate that his suicide was planned, rather than impulsive, and that he struggled with depressive thoughts that he did not reveal to anyone.  His behavior in the week preceding his death revealed no warning signs or unusual activities to correctional staff.

The CDCR suicide report dated 4/24/12 included three problems and Quality Improvement Plans as follows:

> Problem 1:  Initiation of chest compressions appeared to be delayed until the inmate was removed from the housing unit and transported to the medical clinic.  Although rescue breathing was started, a full CPR response was not initiated for approximately nine minutes.
> Quality Improvement Plan 1:  The institution acknowledged that responding staff did not immediately perform chest compressions as required by CPR protocols and did remedial training with them.  Additionally, the Emergency Medical Response Drill report for the first quarter of 2012 was provided.  Furthermore, the CCI Emergency Medical Response Review Committee identified numerous other technical difficulties with the medical response to address in staff training (e.g., proper placement of C-collar; unfamiliarity with IV bag spiking and priming; monitor placement; difficulties in scribing; etc.).

> Problem 2:  Lack of adequate medical staffing in Facility B to handle an emergency response.  Staff from Facilities A and C were called to assist and responded, leaving their own facilities without coverage if another emergency arose.  Further, since staff responding from Facilities A and C had to leave their security checkpoint, go to their cars, drive to Facility B and re-enter security, there was a concern that medical response time was delayed.
> Quality Improvement Plan 2:  The CCI CEO disputed the accuracy of the inadequacy of staffing concern identified in the suicide report.  There was an RN on third watch at Facility B, which is the same staffing level for TTAs statewide, and the RN was on the scene to assist within five minutes of the inmate having been discovered.  The five-minute response was "within standards."  The call for additional assistance was and remains common practice during emergencies.

Problem 3: Lack of consistent exercise yard time for SHU inmates in the months prior to the inmate's suicide. Specifically, from July 2011 through March 18, 2012, the inmate was offered outdoor recreation time on only 14 occasions.

Quality Improvement Plan 3: CCI acknowledged that the inmate was not afforded yard time in compliance with Departmental standards but reported it was a result of having insufficient Individual Exercise Modules (IEMs) for the size of the SHU population and exacerbated by an additional 79 days in which the yard was closed due to "Modified Programs, Weather Conditions, and/or Training." Construction of additional IEMs was underway at the institution to begin to address the problem.

On 7/12/12, the Deputy Director (A), Statewide Mental Health Program and Director (A), Division of Adult Institutions thanked the institution for completing the recommended Quality Improvement Plans and advised that no further actions were necessary.

**Findings:** This particular inmate's suicide does not appear to have been foreseeable. However, as defined in this report, it is this reviewer's opinion that this suicide was preventable had CPR been initiated as per policy requirements. In addition, there were problems with the emergency medical response. Furthermore, there were issues related to custody in terms of failure to provide outdoor recreation consistent with CDCR policy guidelines. Inmates in SHU need out-of-cell activities and access to recreation to help them cope with the conditions of confinement; this is the very reason that the CDCR guidelines exist. In general, time is of the essence in initiating basic life support – both respirations and chest compressions. In this case, there was a delay in initiating chest compressions (in addition to some other problems with technical aspects of the resuscitative efforts).

### 3. Inmate C

Brief History: This inmate was a 34-year-old Caucasian male who committed suicide by hanging on 3/20/12 at SVSP. He was a participant in the MHSDS at the 3CMS level of care at the time of his death. The inmate was double celled in the ASU. He returned to the CDCR via the RJD RC as a parole violator with a new term on 4/18/05. He had pled guilty to residential burglary and received a nine-year prison term. His EPRD was 4/29/15.

The incident reports (837AB) did not provide a narrative description of the incident by the first responding officers. The incident reports indicated that the inmate was found on 3/20/12 at approximately 10:13 p.m. in his cell, nonresponsive, by his door with a rope around his neck attached to the vent. Staff immediately activated the alarm and conducted an emergency entry. Staff initiated lifesaving measures (CPR), but pronounced the inmate deceased at 10:44 p.m.

The incident report provided a timeline indicating that at 2213 the alarm was activated by a correctional officer. A sergeant arrived on the scene at 2215 and requested "911" via institutional radio along with response from CTC-ER staff, and the cell was manually opened with staff entering and cutting down the inmate at 2216. Also at 2216, the inmate was carried out to the tier and CPR was initiated by two correctional officers. The timeline further indicated that at 2218 the sergeant cut the noose off of the inmate's throat and the inmate was handcuffed. At 2222, CTC-ER staff arrived on the scene and at 2225 a RN placed the AED on the inmate as CPR continued. At 2226, IV fluids were applied to the inmate's right arm, and at 2228 a first

shock by AED was delivered.  At 2229, a Narcan shot was given by a RN with negative results.
At 2230, as CPR continued, Central Control notified staff that the AMR ambulance was on the
grounds; oxygen was administered and medical staff applied a neck collar.  At 2235, the AMR
arrived at the scene with EMTs.  At 2237, a first Epinephrine shot was administered by an EMT
and at 2244 the same EMT administered a second Epinephrine shot.  At 2244, a physician was
contacted via cell phone and pronounced the inmate deceased.

The suicide report provided additional information.  It indicated that the inmate was discovered
hanging in his cell at approximately 2213 hours by a floor officer conducting security checks.
He was hanging from the air vent on the right side of the cell.  The officer activated his alarm
and the rest of the timeline is as noted above.  The suicide report indicated that the AED was
initially placed at 2225 and no shock was advised.  However at 2228, the AED advised shock,
which was applied but not successfully.  The suicide report did not indicate that the inmate was
transported to the CTC, but rather that CTC nursing staff and outside EMTs arrived at the scene.
The inmate was pronounced dead by a physician from the emergency room at Natividad Medical
Center at 2244 hours.

The Monterey County Sheriff-Coroner, Office of the Coroner, issued the coroner's report.  It
indicated that an autopsy was performed on 3/21/12.  The cause of death was noted as asphyxia
(minutes) due to hanging (minutes) and the manner of death was noted as suicide.  The coroner's
investigation also noted that the coroner's investigator discovered a suicide note in the inmate's
cell.  A toxicology study conducted on his femoral blood sample indicated that no common
acidic, neutral, or basic drugs were detected, and no blood ethyl alcohol was detected.

The suicide report recounted the inmate's criminal justice history, in part based on the probation
officer's report.  It indicated that the inmate was declared a ward of the state at age 15 following
his arrest for assault and battery.  He was placed in a number of treatment facilities before being
committed to the CYA in February 1995, from which he paroled in April 1997.  He entered the
CDCR for his first adult prison term in May 1998, after he pled guilty to second degree burglary
and was assessed a 16-month sentence.  He paroled on 1/1/99.  He returned to the CDCR on
3/18/99 as a parole violator and with a new conviction for auto theft, for which he received a 16-
month sentence.  He subsequently paroled on 2/18/00, but returned on 3/23/00 as a parole
violator with a new term after having pled guilty to unlawful taking of a vehicle for which he
received a 16-month prison term.  He paroled on 12/20/00, returned to CDCR in February 2001
as a parole violator, and subsequently paroled in June 2001.  He subsequently returned later that
month with a new term as a parole violator, having pled guilty to making a criminal threat, and
received a sentence of four years.  He paroled in November 2004, but returned on 4/18/05 as a
parole violator with a new term; he pled guilty to residential burglary and was assessed a nine-
year prison term.  He had an additional three-year sentence added after his return to the CDCR
after having pled guilty on 1/5/09 to possession of illegal substances in a prison facility.  After
his return to CDCR in 2005, he was transferred to MCSP in July 2006.  He subsequently
transferred to SVSP on 5/12/10, where he remained until his death.

The suicide report made reference to the inmate having initially entered the CDCR in 1998 and
having paroled five times during the next seven years, with his ultimate return to the CDCR on
4/18/05.  He was noted to have an extensive substance abuse history, which included

methamphetamine and alcohol. He reportedly began using alcohol at approximately age seven, marijuana at age 11, and methamphetamine at approximately age 16 or 17. He was also noted to have used LSD and heroin. During his incarcerations, he was housed in a variety of different facilities. He was also noted to have a significant number of RVRs beginning in 1998 and continuing through 2/22/12. The RVRs included battery on an inmate (with a SHU term), theft by force, mutual combat, destruction of state property, possession of inmate manufactured alcohol, disobeying orders, possession of controlled substance drug paraphernalia, and most recently on 2/22/10, participation in a riot and battery on an inmate with a pending possible SHU term.

The inmate's mental health history appeared to have begun prior to incarceration. He reported that he had been treated for depression and substance abuse during the initial health screening in May 1998. However, subsequent screenings indicated that he responded "no" to all questions regarding mental illness following his return to prison as a parole violator and due to new charges. The suicide report reviewer noted there were mental health screenings of the inmate with results that appeared to indicate that he suffered from a Mood Disorder or other mental illness. However, subsequent documentation regarding follow-up of the screenings was not located in the UHRs from 1998 through 2002.

By November 2002, the inmate had been placed at the 3CMS level of care and was provided with diagnoses of Psychotic Disorder NOS and Polysubstance Dependence. He reportedly had a history of auditory and visual hallucinations, but no history of suicidal behavior. He had admissions to the CTC for suicidal ideation in June 2003 with a diagnosis of Adjustment Disorder with Depressed Mood, and in December 2003 after attempting suicide by overdosing on medication. In July 2003, he was reported to have made a suicide attempt by ingesting medications and placing a sheet around his neck, resulting in transfer to an outside emergency room and return to the CTC on suicide watch. He was diagnosed with Adjustment Disorder with Mixed Disturbance of Emotions and Conduct and Antisocial Personality Disorder. The inmate also reported that he had attempted suicide at age 14 by cutting himself and at age 15 by hanging himself, and was hospitalized on both occasions. However, prior hospital records were not requested by staff in 2003. In 2004, the inmate remained at the 3CMS level of care and his history of suicidal thoughts and suicide attempts were noted. He was diagnosed with Bipolar Disorder, Mixed, Polysubstance Dependence, and Antisocial Personality Disorder by the MCSP treatment team.

Following his return to the CDCR in April 2005, an RJD psychologist evaluated the inmate and noted that he reported a history of hyperactivity and treatment with Ritalin beginning at age 11, a suicide attempt by hanging at age 13, and four psychiatric hospitalizations. The psychologist diagnosed the inmate with Attention Deficit Disorder by History, Polysubstance Dependence and rule out Bipolar Disorder, and Antisocial Personality Disorder. Later that month, he was diagnosed with Bipolar Disorder Mixed with Psychotic Symptoms, Polysubstance Abuse, and Antisocial Personality Disorder, and was placed at the EOP level of care. The inmate's diagnoses remained the same, and he remained at the EOP level of care, until September 2006, when they were changed to Mood Disorder NOS, Polysubstance Dependence, and Antisocial Personality Disorder, and his level of care was changed to 3CMS.

The inmate was admitted to the OHU in March and August 2007 after he had cut himself.  On one occasion, he reported that his grandmother had passed away, and on the other occasion, he reported depression, anxiety, and fear of cutting himself as part of a housing issue; he also wanted to be placed at the EOP level of care.  A social worker performed a SRE in September 2007, which noted his history of suicidal ideation and suicide attempts, violence, substance abuse, poor impulse control, disturbance of mood, and hopelessness.  Protective factors included family support.  However, there was no indication of the level of suicide risk and he was discharged from the OHU after an eight-day stay.

On 9/17/09, the inmate's diagnosis was changed to Bipolar Disorder NOS and he remained at the 3CMS level of care.  He was placed in ASU in April 2010 after he received an RVR charging him with participation in a riot as noted above.  He was noted to have a normal mental status and his diagnoses remained Mood Disorder NOS and Antisocial Personality Disorder.  He remained at the 3CMS level of care.

The inmate arrived at SVSP on 5/12/10.  An RN completed the initial health screening and noted his reported history of mental illness and attempted suicide, and his thoughts of hurting himself in the past year with referral to mental health.  A psychologist evaluated him and noted his history and reason for transfer from MCSP due to his participation in the riot.  The psychologist noted that he reported prior suicide attempts, including attempts to hang himself, polysubstance abuse, experiences with hallucinations, and cutting himself "122 times" when he was angry.  The inmate also reported that he received a rush from cutting himself.  The IDTT at SVSP reviewed his mental health care and provided diagnoses of Bipolar Disorder NOS by history, rule out Mood Disorder NOS, Polysubstance Dependence, and Antisocial Personality Disorder.  He remained at the 3CMS level of care.  A SRE dated 6/1/10 noted risk factors of his history of violence, substance abuse, suicidal ideation, mental illness, poor impulse control, Level IV custody points, and ethnicity.  No dynamic risk factors were identified.  Protective factors included family and spousal support, regular exercise, job assignment, and insight into his problems such that the estimate of suicide risk was "low."

A subsequent IDTT on 5/24/11 at SVSP indicated that the inmate remained in ASU.  His history was essentially the same with the exception of a report that he attempted suicide by cutting himself in 2007.  His diagnoses and level of care remained unchanged from June 2010.

The inmate was prescribed Invega (antipsychotic medication) 3 mg/day on 1/24/12.  Artane 5 mg/day was added on 2/29/12 for side effects.

The inmate returned to ASU on 2/22/12 after receiving a RVR charging him with assault on another inmate, an offense that could potentially result in a SHU term.  He was screened by a licensed psych tech who reported to the suicide reviewer that the inmate was angry and would not participate in the screening.  His primary clinician subsequently saw him on 2/28/12 and indicated that he reported depression and feeling "up and down."  A SRE was completed and noted risk factors that included histories of suicide attempts at ages 15 and 30, Major Depressive Disorder, violence, poor impulse control, substance abuse, ethnicity, and gender.  Acute risk factors were change in housing, safety concerns, disciplinary problems, and a current depressive episode.  Protective factors included family support, future orientation, other coping skills,

exercising regularly, spousal support, children at home, religious/spiritual support, sense of optimism, and active and motivated in treatment. The estimate of suicide was low chronic risk and low acute risk. The diagnosis offered was Bipolar Disorder NOS.

After his transfer to ASU, the IDTT met and developed a treatment plan on 2/29/12. The IDTT continued the diagnosis of Bipolar Disorder NOS, noted his history of suicide attempts, and continued his level of care at 3CMS. The primary clinician saw the inmate last on 3/12/12 and 3/13/12. On 3/12/12, he was seen at cell front and stated that he wanted to be in the EOP to help with his sadness, anger, and anxiety. He also stated that he was maintaining activities including exercising, watching television, reading, writing letters, and socializing. He was offered extra contact by the primary clinician, who again saw him at cell front on 3/13/12; the inmate declined an out-of-cell session and stated that he was doing okay.

The suicide reviewer noted in the suicide report interviews with staff and inmates. The reviewer further indicated that on 3/14/12 the inmate told a correctional officer that he was feeling suicidal. The inmate's cellmate also informed the officer that the inmate was having problems and that he did not want this inmate in his cell. The inmate was removed from the cell and placed in a holding cell by custody staff and a registered nurse was contacted to complete a medical assessment. The nurse completed the assessment but informed the reviewer that he did not know why he was evaluating the inmate. The nurse also noted that the inmate refused to stand up for completion of a thorough evaluation of his body. While in the holding cell in the CTC, mental health staff saw the inmate, who reportedly stated "I've got some bad news but I'm all good now." The inmate's primary clinician assessed him in the CTC and completed a SRE. The primary clinician reviewed the UHR, received information from custody staff, and evaluated the inmate noting he had chronic risk factors including the history as reported in past SREs. However, the inmate also reported that he had a suicide attempt "today (3/14/12-hanging)." Noted acute risk factors were suicidal ideation, recent serious suicide attempt, current or recent depressive episode, disturbance of mood, recent bad news, and safety concerns. Protective factors were family support, interpersonal social support, insight into problems, spousal support, religious beliefs, and active and motivated in psych treatment with a sense of optimism. The inmate reported to the primary clinician that he had a desire and a plan to kill himself that included making a noose and hanging himself. The making of the noose and attempting to hang himself was confirmed by his cellmate to a correctional officer. The primary clinician reported to the reviewer that the inmate stated "I was gone. I don't know why he (cellie) saved me. He didn't have the right to save me. I'm just done. I was gone. He stole that from me." The primary clinician also wrote that the inmate had increased stress on the unit, exacerbated by news of his grandmother's death, and said he hung himself with no expectations to live and was angry at his cellmate for "stealing" his death from him. The clinician estimated his level of suicide risk as low chronic risk and high acute risk and he was referred to the MHCB.

A psychiatrist and psychologist in the MHCB evaluated the inmate, who reported that "I felt better before I got here." The suicide report noted that the inmate stated he was no longer suicidal and described this suicide attempt as impulsive and "stupid." The psychologist completed the SRE and indicated chronic risk factors as noted in previous SREs. However, with regard to the history of suicide attempts, the psychologist did not check that box but instead wrote "3X, age 15 (hanging) and age 30, cutting, all unverified. Reports prior attempts were

instrumental." The psychologist also did not identify any acute risk factors. Noted protective factors included family support, religious beliefs, orientation/plans for future, children at home, spousal support, religious beliefs, active and motivated in psych treatment, sense of optimism, and insight into problems. The psychologist also wrote that the inmate had no evidence of significant mood or psychotic symptoms and rated his chronic risk as low to moderate and his acute risk as low with the recommendation that he return to his housing unit with five-day follow-up with his primary clinician.

The suicide reviewer noted in the suicide report that neither the psychiatrist nor psychologist consulted with the primary clinician or custody staff, did not review the referral, were not aware of the inmate having reportedly attempted to hang himself, and relied on the inmate's self-report that he did something "stupid," would never do it again, and wanted to go back to his cell. The psychiatrist and psychologist also reported to the suicide reviewer that when the inmate was asked by them what he had done, he responded "I tried to hang myself but my cellie intervened." The psychiatrist and psychologist reported to the suicide reviewer that they decided not to admit the inmate to the MHCB because his prior suicide attempts were described as "instrumental" (to achieve a goal and not to kill himself), he had a parole date in a few years, was finding pleasure in his activities, and was future-oriented. The inmate was returned to the ASU on single cell status.

The inmate received five-day follow-up; he was seen by his primary clinician on the first and fifth days and by different clinicians on the second, third, and fourth days. Five-day follow-up notes indicated that he "did not voice" or "denied" suicidal ideation, had improved mood, and wanted to make a phone call. The notes reflected that he was informed by a licensed psych tech on the fourth day of "details after speaking with building sergeant" without further explanation and the inmate was not happy and was agitated. On the fifth day, he reported to his primary clinician that he was stressed because his wife had missed her last visit, but he denied suicidal and homicidal thoughts while reporting sadness, crying, and anxiety. Five-day follow-up ended on 3/19/12. The last contact with a clinician, by the licensed psych tech, was dated 3/20/12. It documented that the inmate was cooperative with appropriate mood, normal cognition, normal hygiene, and cell cleanliness, which was consistent with licensed psych tech notes from 3/6/12 through 3/20/12; this despite the inmate's fluctuations as reported by other clinicians in other notations during this same time period.

During the course of his incarceration, the inmate had reported injuries to his back from a motor vehicle accident in November 2004 and to his right knee from skateboarding in 2002. He was noted on examination and MRI to have spinal stenosis and lumbosacral disk disease involving L4, L5, and S1 for which he received steroid injections and physical therapy in 2008 and 2009. He was also diagnosed with a seizure disorder for which he received Neurontin 1200 mg three times/day and Dilantin 100 or 300 mg twice daily. The record did not indicate that he had any active seizure activity in the last several years of his life.

The coroner's investigative report and the suicide report indicated that the inmate left a suicide note taped to the wall of his cell which stated "this is my suicide not (sic)! Please call my wife…(wife's name and phone number). I want all my stuff to be sent to her address. PO Box…Its (sic) for my son! I love them both but I was hurting and could (sic) deal with pain.

Thank (inmate's name and CDCR number)." There were also two letters found in the inmate's property, one of which was addressed to his wife and had information on the outside of the envelope including "why does love hurt so bad. I never had my heart broken till I met you – better you the one I loved – then someone ell's (sic)," and "Happy Birthday momma." There was also a three-page letter with information to his wife regarding being the only man who loved her, her leaving him three times and being unfaithful, his giving her so many chances, and his questioning whether she loved the other man more than she loved him. The letter also included statements that it did not matter anymore, to call the prison for his property which was for his stepson, and that he was "not going through with it anymore." The suicide report indicated that the second envelope was addressed to his stepson and contained a letter telling his stepson that he was "a broke man," wanted to know if he loved him, and expressing his love for the stepson. He also included information to his stepson about a great aunt and his grandmother and money that he expected would be left to his stepson.

The suicide reviewer also indicated in the suicide report that not only had he interviewed the inmate's cellmate but he had also interviewed other inmates housed near the inmate. One of these other inmates told the suicide reviewer that the inmate had talked to him and said it was "nice meeting him, I'm leaving." The inmate was discovered two hours later, having hanged himself. Another inmate told the reviewer that he had known the inmate for two years and knew that he was stressed for a few days regarding not having had contact with his wife and requesting a telephone call to her which he could not make because he was housed in ASU. A third inmate told the reviewer that he talked to the inmate through the air vent on the night of the suicide and reported that the inmate "was tripping, talking about killing himself." The inmate was discovered by a correctional officer on 3/20/12 at 10:13 p.m. hanging from the air vent in his cell, as noted in this report.

The suicide reviewer noted in the suicide report that this case "demonstrates the importance of obtaining firsthand information about an individual referred for a mental health evaluation for admission to the CTC. For example, information from the officer who identified the inmate-patient as being suicidal would have been helpful. In addition, had the CTC clinicians been aware of the primary clinicians' findings and specifically the inmate-patient statements, they would have had valuable information to complete their assessment. The inmate-patient informed the primary clinician he wanted to die and was upset that his cellmate intervened in his plan to kill himself. The inmate-patient presented differently to the CTC."

The suicide report provided one recommendation and quality improvement plan as follows:

> <u>Problem</u>: Inmate-patient __'s mental health history contained serious suicide attempts and incidents of self-harm, dating back to mid-adolescence. On March 14, 2012, the inmate-patient informed an officer that he was suicidal. The cell mate also informed the officer that the inmate-patient was having mental problems and he did not want him in his cell. The officer started the referral process to mental health staff. Despite an in-depth interview by his primary clinician, by the time he reached the MHCB, the inmate had completely altered his presentation. Although the MHCB clinicians noted the presence of numerous risk factors, the inmate-patient was not admitted, based on several factors that were out of sync with his recent actions, including his insistence that his

actions had been foolish.  Five-day follow-up procedures noted increasing agitation, sadness and tearfulness.  However these indicators were not followed by increased mental health interventions.

Quality Improvement Plan:  The Chief of Mental Health or designee and the Chief Psychiatrist or designee at SVSP shall ensure that the inmate-patient's primary clinician and the CTC clinicians (both the psychologist and psychiatrist) who interviewed __ for the MHCB referral will be entered into the Proctor/Mentor Program (PMP) as mentees.  Documentation regarding their progress will be submitted to Headquarters.  However, the names of the clinicians do not need to be submitted and should be altered in order to protect their anonymity.

A physician provided a Death Review Summary dated 4/6/12.  The physician noted the primary cause of death as asphyxiation and the diagnostic category of death as suicide, with the co-existing conditions of seizure disorder and schizophrenia.  The physician's supervisory review included a recommendation for education of a provider for the visit of 8/3/11 regarding not submitting a non-formulary request for Neurontin, "otherwise closed case."  An Executive Summary included a statement that the inmate had suicidal ideation a few days prior to his death, his care was handled appropriately by nursing and mental health staff, and he was discharged to his cell.  The summary also stated that the inmate's death was unexpected and not preventable.  The physician opined that the standard of care of medical providers and the emergency medical response was met.

On 8/1/12 the Deputy Director (A) Statewide Mental Health Program and Director (A) Division of Adult Institutions submitted their Quality Improvement Plan in response to the suicide report dated 3/20/12.  In their report, the Directors referenced the QIP responses that were reviewed and approved by the "Suicide Case Review Focused Improvement Team (SPR FIT)," DCHCS on 5/2/12.  Included in the response was an undated page referenced as SVSP Proctor/Mentoring Program which contained two identification codes, dates initialed as 12 July and 5 July with a self-evaluation score of 90 percent and a pre-test score of 74 percent for one identification code, and a self-evaluation score of 90 percent and no pre-test score for the other identification code.  There was no further explanation regarding this document.  A second two-page document referencing proctoring procedures for the SVSP Proctoring/Mentor Program described the four steps of the program and indicated that names would not be given when recording data to headquarters.  A third provided document was entitled CCHCS Proctoring and Mentoring Program and referenced SVSP; this was a 22-page document that described the program, making reference to the Special Master's Report on Suicides Completed in the CDCR in Calendar Year 2007, and the process for completion of the program.

**Findings:**  As defined in this report, this inmate's death appears to have been both foreseeable and preventable.  The inmate clearly was in substantial distress, and the SRE by his primary clinician on 3/14/12 documented that he had attempted to hang himself and was at high acute suicide risk.  The primary clinician's evaluation occurred after the inmate informed a correctional officer that he was suicidal and the cellmate also reported that the inmate was having mental health problems.  Custody's referral of the inmate to the primary clinician was appropriate, as was the primary clinician's referral of the inmate to the MHCB.  However, the psychologist and psychiatrist who evaluated the inmate in the CTC provided a SRE that rated the

13

inmate with low to moderate chronic risk and low acute risk.  It is clear from the records that they did not review the eUHR, contact the referring clinician or custody with regard to the reasons that the inmate had been referred to them, and relied essentially on the inmate's self-report.  Furthermore, the completed SRE was inaccurate as to the inmate's very recent past suicide attempt and suicidal history.  After the inmate was returned to ASU, five-day follow-up indicated that he had increasing agitation, sadness, and instability.  The failure to admit him to the MHCB for safety reasons, comprehensive evaluation, and treatment, and the failure to return him for an assessment in the MHCB during five-day follow-up, are failures on the part of SVSP treatment staff.

Curiously, the identified problem in the suicide report has a QIP response which includes a cover memorandum from the Directors or designees of the Statewide Mental Health Program and DAI, descriptions of the Proctoring and Mentoring Program, and references to two individuals identified by numbers which are presumed to be two of the three clinicians that were to be referred to the Proctoring and Mentoring Program as per the suicide report.  These responses were also inadequate to address the failures of the clinicians involved in the inmate's suicide assessment and risk management prior to his death.

## 4.  Inmate D

Brief History:  This inmate was a 39-year-old Haitian man serving his first term of 16-years-to-life for the murder of an ex-girlfriend.  The inmate was initially incarcerated at the SQ RC on 4/16/04.  He had transferred from CMC to SQ on 8/26/10.  He was double celled in the North Block housing unit at SQ prior to his suicide on 4/25/12.  This inmate was not a participant in the MHSDS at the time of his death or at any other time during his CDCR incarceration.

On Wednesday, 4/25/12, at approximately 1401 hours, the inmate's cellmate approached the North Block officers' podium and informed staff that he had just found the inmate dead and hanging from the cell bunk.  A correctional officer sounded his personal alarm device and responded with other correctional officers to the inmate's cell.  Another officer notified Central Control, via an institutional radio, of the situation and requested a medical response.  Two officers entered the cell and, via the use of a cut-down tool, cut the inmate loose from his assigned bunk at approximately 1403 hours.  The officers physically lifted and removed the inmate from the cell and placed him onto the tier.  A correctional officer utilized safety scissors to immediately remove the noose from the inmate's neck.  Medical staff and a fire captain immediately began CPR.  At approximately 1405 hours, under the direction of medical staff, the inmate was placed on a Stokes litter and escorted to the TTA, where he arrived three minutes later.  He was pronounced dead by the physician at approximately 1411 hours.  No autopsy report was posted on the secure website.

Rigor mortis was present when the inmate was found at 1401 hours.  Custody staff reportedly made rounds during count at 0500 & 2000 hours, and three times at night.

The suicide report included the following information:

> [The inmate] gave no indication to anyone that he was contemplating suicide until
> the morning of his death, when he told another inmate that he wouldn't be

14

working out with him anymore.  On the day of the suicide the inmate went to breakfast between 0530 and 0600 hours.  He returned to his cell after breakfast and his cellmate went to work.  He draped a sheet to hide the inside of the cell, hid socks and his watch amid his cellmate's possessions, tied a boot lace to the top bunk, and completed the act of suicide at sometime between 0925 hours, when his watch stopped [because he took the battery out of his watch], and 1400 hours when his cellmate found him.

The inmate was transferred from the SQ RC to Folsom on 6/29/04, where he was housed in general population housing.  He completed his Adult Basic Education classes during the next six months and entered a GED program, which he completed on 7/10/06.  The inmate was transferred to SCC on 7/19/06, where his classification points continued to drop from 26 to 19.

Transfer to CMC occurred on 8/2/07, where his stay was uneventful until receiving a RVR on 5/23/10.  The inmate was found guilty despite claiming that he was the victim of an unprovoked attack.  He was placed in the administrative segregation unit from 7/1/10 until 8/26/10, when he was transferred back to SQ, where he remained until his death.

While at SQ, the inmate enrolled in Patton University, where he was attempting to complete an Associate's degree.  His roommate reported that the inmate read and studied nearly all the time.  The inmate taught himself to be fluent in Spanish, English and Italian, in addition to his native languages, French and Creole.  His roommate also described the inmate as having been quiet and generous with his belongings and food items.

Visitation logs indicated that the inmate was visited nearly every week by friends or family.  He had four visitors on 4/22/12 and was seen by his public defender on 4/10/12.  Another frequent visitor was his legal guardian.  His public defender was shocked to hear about the inmate's suicide.  His legal guardian expressed a belief that "an evil spirit came over him in the night."  She received a letter from him the week before he died asking for a book of stamps and communicating that he was looking forward to seeing her.

A suicide note was not found.

The inmate had no history of mental health treatment in the community prior to his incarceration and denied mental health issues at various CDCR prisons during his incarceration.  However, immediately after he realized that he had killed his ex-girlfriend, the inmate took 200 Excedrin P.M. tablets with a bottle of rum and reportedly wrote a 17-page suicide note.  Intervention occurred when the motel staff entered his room after he failed to check out and discovered the victim and the inmate.  Following his arrest and during his detention in the county jail, he was placed on suicide watch for several months.

Although he provided all negative responses to initial health screening and mental health screening at SQ RC on 4/16/04, the inmate was referred to an RN for review due to his suicide attempt in 2002 according to the suicide report (This reviewer was unable to find such documentation in the records).  Upon review, the inmate was cleared for general population without a mental health referral.  Following his transfers to other institutions the inmate was also

15

routinely screened for mental health issues and in each case the findings were negative. Throughout his incarceration, he did not have contact with mental health staff and was never prescribed any psychotropic medications.

Past medical history was positive for the following:

1. Coronary artery disease; status post myocardial infraction and stent placement April 2011 (nuclear stress test in November 2011 showed small scar but no ischemia; left ventricular ejection fraction (LVEF 55%). Dyslipidemia – well controlled on statin
2. Latent tuberculosis on isoniazid (INH) treatment (completed two days before he died)
3. Allergic rhinitis
4. Status post left medial femoral condyle chondroblastoma

The inmate was receiving appropriate medications for the above conditions at the time of his death.

A history of alcohol abuse was present. The inmate had a tumor (chondroblastoma) removed from his left knee in 1999 with residual knee pain when standing for extended periods of time. He had activity restrictions based on his chronic knee problem.

The inmate was born in Haiti during 1972. He was the second son of five children born out of wedlock to a woman who was a street vendor. His father, who is now deceased, was a married man who resided with his other family but was known to the inmate. Between the ages of five and 15, it was reported that the inmate was sold and sent to live with a family where he was kept as a domestic servant expected to do a variety of household chores. By age 15, he had become rebellious and the family returned him to his mother. He taught himself to read at a young age because he did not go to school as a child.

The inmate came to the United States at the age of 23 to seek economic and educational opportunities. He was always employed, primarily as a care worker in a variety of convalescent or specialty care facilities. His alcohol use escalated to the point of experiencing blackouts on many occasions.

There was not a history of juvenile or adult arrests except for the offense that led to his incarceration. While under the influence of alcohol, he fatally strangled and stabbed an ex-girlfriend after she told him she had aborted his child and married another man in Haiti.

The suicide report assessed the inmate's suicide as not being foreseeable. Review of his health care records and information obtained from others was not helpful in understanding or identifying the precipitants leading to the inmate's suicide. No formal recommendations were developed as a result of the suicide report review.

The CPHCS death review summary noted that the care provided to the inmate was appropriate. His death was assessed to be unexpected and not preventable. The following issues were identified:

16

1. Emergency Response documentation needs improvement (medical responders' notes do not mention the presence of rigor mortis, but the custody incident report (Form 837) does; there is no Provider #2 note related to death declaration in eUHR or in loose filing.
2. Loss to follow up issue appears to be system related as there are no documented refusals of provider visits in eUHR/ loose filing; the movement history for 2012 is negative; patient was last seen in chronic care clinic on 01/25/12 when follow up in 60 days was ordered.

**Findings**:  The inmate received appropriate mental health screening throughout his CDCR incarceration, which were all negative from the perspective of the inmate needing or wanting mental health treatment.  He was never placed on the mental health caseload during his incarceration in the CDCR.  The events leading to his suicide are unknown.  The inmate's suicide was not foreseeable.

The inmate's suicide was also not preventable.  The emergency response was rapid but CPR was unsuccessful due to the timing of his death—rigor mortis had already occurred.

### 5.  Inmate E

Brief History:  This inmate was a 27-year-old Caucasian male who committed suicide by hanging on 5/12/12 at WSP.  The inmate was a participant in the MHSDS at the 3CMS level of care at the time of his death.  He was single celled in the ASU.  The inmate returned to the CDCR via the WSP RC as a parole violator with a new term; he had pled guilty to unlawful taking of a vehicle and grand theft auto for which he received a four-year sentence.  His EPRD was 3/25/14.

The inmate was discovered unresponsive in his assigned cell by ASU staff on 5/12/12 at approximately 4:24 p.m.  He was discovered in a standing position with what appeared to be a piece of state-issued sheet tied around his neck at one end; the other end extended up between the ceiling and the cell light fixture.  A Code One was announced via institutional radio and the building's audible alarm was activated.  Staff responded under direction of a sergeant, who initiated an emergency medical cell extraction.  The staff handcuffed the inmate, pulled the sheet down and removed it from his neck, and lowered him to the cell floor.  CPR was initiated and the inmate was transported to the TTA via medical gurney where CPR was continued while awaiting a Code Three ambulance.  Upon arrival, a Kern Ambulance paramedic contacted a physician at the Delano Regional Medical Center, who pronounced the inmate deceased at 4:50 p.m.

A timeline was included in the incident report.  It indicated that at 16:24 the Code One alarm was announced and lifesaving measures were continued at 16:25.  The inmate was transported and arrived at the TTA at 16:30 and a Code Three ambulance arrived at 16:41.  The inmate was pronounced deceased by a physician from Delano Regional Medical Center at 16:50.

The suicide report provided an additional timeline.  It stated that the inmate was discovered at 16:24 hanging in a cell from the light fixture, a Code One was announced, and additional officers arrived, initiated a cell extraction, and carried the inmate outside the cell and began CPR.  Medical personnel arrived at the scene at 16:25, found no vital signs, applied the AED which

17

advised "no shock," and CPR continued. The inmate was transported to the TTA, arrived at 16:30, IV lines were established, and he was administered saline solution. Medical staff contacted Kern Ambulance at 16:34; they arrived at 16:41. Medical staff administered Epinephrine and Sodium Bicarbonate and continued CPR. At 16:46 paramedics arrived at the TTA and found the inmate pale, cold, unresponsive, and in full arrest. A physician was contacted via telephone and pronounced the inmate dead at 16:50.

An autopsy report was provided on the secure website; it had a modification on 1/31/13. The autopsy report was provided by the Kern County Sheriff/Coroner, Coroner Section, and indicated that the cause of death was asphyxia secondary to hanging. The manner of death was noted as suicide. The toxicology report issued on 5/17/12 indicated "(n)one detected" for positive findings from a basic blood (forensic) sample for illicit drugs and ethanol. The autopsy date of examination was 5/14/12.

The suicide report recounted the inmate's criminal justice history. It indicated that he had no known juvenile criminal history. As an adult, his criminal history began when he pled guilty to first degree burglary, unlawful taking of a vehicle, and grand theft on 1/12/09. He entered the CDCR for his first prison term at the WSP RC on 2/11/09 with a sentence of three years. He paroled on 8/16/10, but was rearrested on 8/27/10 for a parole violation and returned to the CDCR via the CIM RC. He paroled again on 9/1/10 and was rearrested on 3/3/11. He pled guilty to unlawful taking of a vehicle and grand theft auto on 12/7/11 for his commitment offense as noted above.

On an initial healthcare screening on 2/15/12, the inmate answered "no" to all questions pertinent to mental health history, mental health symptoms, or mental health treatment. On the initial mental health screening of 2/17/12, he responded "yes" to his father suffering from depression and "yes" to having received mental health services from an alcohol and drug counselor in March 2011. All other responses were negative and his mental health needs were noted as routine. He received an RVR for battery on an officer on 4/5/12 and was placed in ASU. On 4/11/12, he had a fight with his cellmate and was placed on single-celled status. He received a mental health evaluation and was placed in the MHSDS at the 3CMS level of care.

Despite the inmate's denial of a mental health history, the suicide report indicated that the reviewer was told by the inmate's grandmother's daughter that he began hearing voices approximately seven years prior to his death. He was also noted to have a family history of mental illness, as his mother committed suicide; additionally, he had a history of substance abuse, including methamphetamine and heroin. The grandmother's daughter reported that the inmate said that the voices would tell him to do things such as kill and rob people and dress as a woman. He reportedly did not receive any mental health treatment in the community other than for drug addiction. He also did not receive any mental health treatment in the county jail prior to his incarceration.

After his incarceration, the inmate cut his wrists on 4/5/12 and while being escorted for treatment became combative, injured an officer, and was charged with battery on an officer, as noted above. He was referred for an emergency mental health evaluation and placed in the MHSDS at the 3CMS level of care on that same date. A SRE was completed which identified several risk

18

factors, including the inmate's report of past suicide attempts; they included attempted hanging in 2008, having cut his wrists four times including the day of the evaluation, and histories of Major Depressive Disorder, Psychotic Disorder, substance abuse, and violence. He was noted to have a number of acute risk factors including psychotic symptoms, depressive episode, anxiety, agitation, disturbance in mood, and recent negative staff interactions. He also was noted to have protective factors of family support, exercise on a regular basis, and religious beliefs. He reported hearing voices telling him he had to "give oral copulation to fight back" and was described as having pressured speech, and being "very agitated" and hypomanic. His acute and chronic levels of risk were estimated as moderate, and he was referred for psychiatric evaluation for a medication prescription. He was also recommended for MHSDS placement, but was not referred to an MHCB.

A psychiatrist evaluated the inmate on the same day and noted that he was hearing voices telling him to do sexual acts on his cellmate and that he had cut his wrists superficially, but the inmate told the psychiatrist "I am not suicidal. I needed to get away from my cellmate." The inmate reported anxious and paranoid mood but denied past hospitalizations. The psychiatrist determined that he had symptoms of mental illness including self-reported auditory hallucinations and paranoia, but was not suicidal. The psychiatrist diagnosed Psychotic Disorder NOS and Anxiety Disorder, and estimated his GAF score at 40. He was prescribed Risperdal 2 mg and Vistaril 2 mg to be given at the time of the evaluation, as well as to be continued as Risperdal 2 mg and Vistaril 2 mg at bedtime.

The inmate was seen on the following day, 4/6/12, by a psychologist who diagnosed Schizoaffective Disorder, depressive type, and estimated his GAF score at 50. The psychologist noted that the inmate was experiencing auditory hallucinations and voices telling him to kill himself by hanging, to urinate on prisoners and officers, and to do sexual things to get more time. The inmate reported having two suicide attempts in 2009 by hanging and stated that he cut himself the day before to "get help." He further reported a fear of hurting his cellmate or of his cellmate hurting him, and that he had engaged in banging his head on the wall in jail because he was frustrated. The psychologist noted his delusions, obsessions, auditory hallucinations, depression, and fear of reprisal; and an SRE was administered. The SRE noted the inmate's history of psychotic disorder, suicide attempts in 2009 and the day before by cutting his wrists, substance abuse, and being male and Caucasian. He was noted to have acute risk factors, including suicidal ideation, hopelessness, psychotic symptoms, depressive episodes, agitation, anxiety, violent behavior, disturbance of mood, safety concerns, recent negative staff interactions, and recent change in housing. Protective factors were family support, being active in psychological treatment, and future orientation. The psychologist rated his acute and chronic levels of risk as moderate. The psychologist noted that the inmate would be included in the MHSDS, and the inmate was maintained in the ASU.

Three days later, on 4/9/12, the inmate was seen by another psychologist who was unaware that he had been seen by a psychologist on 4/6/12. At that evaluation, the inmate denied suicidal and homicidal ideation, but reported anxiety, hallucinations/delusions related to his RVR/ASU placement, and a history of methamphetamine use. He reported sleep problems, urinating on himself, and that "people control my body." He also stated that he was a "happy dude" and was trying to get social security income (SSI) because of paranoid schizophrenia. The psychologist

19

diagnosed Depressive Disorder NOS, methamphetamine dependence, and rated his GAF score as 60. The SRE completed by this psychologist indicated chronic risk factors of family history of suicide in his mother, five suicide attempts with four by cutting and one by hanging, histories of psychotic disorder, substance abuse, and Major Depressive Disorder, and loss of social support, being Caucasian, and male. His acute risk factors included current psychotic symptoms, hopelessness, current depressive episode, agitation, recent violent behavior, disturbance of mood, single-cell placement, disciplinary problems, recent negative staff interactions, and recent change in housing. Family support, religious beliefs, physical exercise on a regular basis, positive coping skills, active in psychological treatment, and sense of optimism were noted as protective factors. This psychologist estimated his acute and chronic levels of risk as low. The psychologist further noted that the inmate appeared to be exaggerating symptoms from the recent RVR, and the symptoms were not consistent with "paranoid schizophrenia." The psychologist consulted with the clinician on duty and the inmate's primary clinician in an effort to determine whether the self-reported symptoms seemed to be inconsistent. The psychologist also wrote that the licensed psych tech reported that the inmate was using alleged symptoms to go to the hospital and custody reported that he was trying to get out of ASU.

The inmate had a fight with his cellmate as noted above and was seen by a psychiatrist on 4/11/12. He reported hearing voices since 2006 and having two suicide attempts, including cutting his wrists in the county jail and attempting to hang himself in 2009. He reported that his mother had committed suicide and that he had a history of substance and alcohol abuse, including marijuana, methamphetamine, heroin, and cocaine. The inmate was noted to have interrupted sleep, depressed and anxious mood, and to be worrying about his pending RVR. He was also described as paranoid, believing cops were after him and people were following him; he also had auditory hallucinations of voices telling him to urinate on himself and everywhere. He denied suicidal ideation. The psychiatrist diagnosed Depressive Disorder NOS, estimated his GAF score as 45, increased his Risperdal to 3 mg at night, and added Remeron 15 mg and Vistaril 100 mg at night.

The inmate was seen by the IDTT on that same date when he reported having difficulty sleeping, as well as hearing voices telling him to harm himself and to "pee on people." He reported that officers and prisoners were conspiring against him to keep him from leaving. He presented as "fearful, cautious, agitated with sad moody anger." The inmate reported two suicide attempts by hanging in 2009. The IDTT determined a diagnosis of Schizoaffective Disorder, depressed type and a GAF score of 50, and the inmate was officially placed at the 3CMS level of care.

The inmate remained in ASU at the 3CMS level of care and was seen by his primary clinician on 4/13/12, 4/20/12, 4/25/12, and 5/9/12. He was seen at cell front. Notes indicated that he discussed his pending RVR for battery on an officer and requested help in formulating a defense, including an insanity defense from his primary clinician. He was last seen on 5/9/12 at cell front and denied sleep problems, reporting that he was fine. However, on 5/10/12 he was referred to a psychiatrist after reporting that his medication was not helping him; he committed suicide two days later on 5/12/12, prior to being evaluated by the psychiatrist.

The suicide reviewer indicated that the primary clinician had told him that the inmate said that he had received five additional years for battery on the officer. However, progress notes did not

20

indicate that the inmate reported this information during his contacts with the primary clinician. The reviewer also noted that the primary clinician reported that the inmate had intrusive thoughts about urinating on his cellmate and felt compelled to do it, as well as touching his cellmate's penis. Furthermore, custody staff was aware of this and wanted the inmate on single-cell status, as well as wanting mental health to evaluate him.

The suicide reviewer noted that the ASU licensed psych tech notes for the four weeks beginning 4/15/12 through 5/6/12 all stated:

> Mr. __ appears to be doing well, he can be observed on most days resting on bunk, and is appropriate and easy to engage during psych tech rounds. He denies any current issues or concerns in regards to his medications and appears to adherent. His cell and appearance appears to be neat and clean, and ADL's are completed with no prompting. No negative reports from custody with regards to inmate's behavior.

This statement in the suicide report indicated that all four notes appeared to be the same direct quote. The reviewer further noted that information provided by licensed psych techs included statements that the inmate frequently stood by his cell door and looked out the window, that his cell was sparse but clean, that he reported that he was doing well, and that he would ask staff for the time. The inmate was described as "an ideal inmate." However, there may have been conflict between the inmate and his cellmate as to possible sexual advances by the inmate as the cellmate made the point of telling staff he was heterosexual when they discussed the fight that occurred between the two. The reviewer noted that one officer informed him that two days prior to the suicide, the inmate had asked if he was getting a cellmate.

The inmate was noted not to have any significant medical problems or medical history other than his substance abuse.

The suicide report identified four problems and Quality Improvement Plans as noted below. The suicide report memorandum from the Directors or designees of the Statewide Mental Health Program and DAI was dated 8/16/12, while the suicide report itself was dated 6/21/12.

> Problem 1: Apparent lack of follow-up questions during clinical interviews: A review of available written documentation did not show evidence that clinicians probed for details about inmate's self-harm history and current symptoms. Documentation did not clearly support the clinical formulation and rationale for the specific clinical interventions provided and, specifically, if all the known history was taken in to consideration for developing alternative interactions, including a referral to the Mental Health Crisis Bed level of care.
> Quality Improvement Plan: The Chief of Mental Health or designee at WSP shall: a) present a full case review for all mental health clinicians at WSP to serve as a didactic training to clarify clinical indicators related to dynamic process of suicide. The review shall include clinical interview techniques with a particular focus on asking probing questions, followed by case conceptualization and treatment plan development that takes into account the constraints experienced by clinicians in institutional settings. b) facilitate the development of the PM (Proctor-Mentor)

Program at WSP by outlining plans for expediting training of the mental health clinicians.

Problem 2:  On 4/12/12, the ICC reviewed his case and placed him on single-celled status due to his recent fight with his cellmate.  The ICC also referred him for a mental health evaluation to get an opinion about the housing issue.  There was no documentation in the eUHR regarding this evaluation.

Quality Improvement Plan:  The Chief of Mental Health or designee at WSP shall review the process for receiving, completing, and tracking mental health referrals from custody staff.  Quality improvements shall be taken as deemed necessary.

Problem 3:  The eUHR did not contain the "Administrative Segregation (ASU) Unit Pre-Placement Chrono" (CDCR 128-MH7).  This is a policy and procedure issue (rather than clinical) since a psychologist and psychiatrist did see the inmate-patient prior to his placement in the ASU.

Quality Improvement Plan:  The Director of Nursing (DON) or designee at WSP shall conduct an inquiry into the missing documentation.  If it is not located, Quality Improvements shall be made as deemed necessary by the DON to ensure nursing staff complete these screenings.

Problem 4:  A review of the ASU light fixture and its ability to be used as an attachment site raised concerns regarding the physical environment for inmates in ASU.  The Warden at WSP and Captain Vicky Lundeby of DNS design standards discussed as a short term solution, the fact that security caulking is needed in ASU cells in order to reduce attachment sites.  A long term solution is the replacement of all ASU light fixtures and would require funds to which the institution currently does not have access.

Quality Improvement Plan:  The Warden or designee at WSP shall ensure that security caulking of at least the corners of the light fixtures in all ASU cells shall be completed.  In order to begin the process of replacing all ASU light fixtures, and Architecture and Engineering Service Requests to that effect shall be completed and submitted.

A Death Review Summary dated 6/8/12 was provided by a physician.  The summary reported the primary cause of death as asphyxiation by hanging and the category of death as suicide.  The Death Review Summary provided the inmate's movement history and an executive summary, which noted no significant past history, little contact with medical staff, and a history of psychiatric problems including Schizoaffective Disorder and depression.  The emergency medical response review provided a timeline that was determined to be timely and appropriate, including ACLS protocols being followed.  No departures from the standard of care were found for medical providers.  The standard of care for nursing was referred to nursing.  No systemic concerns were identified.

On 10/1/12, the Deputy Director (A) Statewide Mental Health Program, and Director, Division of Adult Institutions provided their "Report of Implementation of Quality Improvement Plans for

the Suicide" of this inmate.  The plan consisted of several QIP responses which are listed below by problem number.

Problem 1a:  A case presentation and staff training was scheduled on 10/4/12 and a training outline and staff OJT sheet was to be submitted on 10/5/12.  The training was to include a review and discussion of 1. Specific case factors related to the inmate's death; 2. The dynamic process of suicide; 3. Clinical interview techniques to assess for suicide response; and 4. Development of treatment plans for suicide prevention.  A one-hour training was held on 5/23/12 that included four participants, including a senior psychiatrist, two CSW's and an illegible job classification which appears to be possibly a psychiatrist or a psychologist.  There is also a notation dated 5/23/12 noting the comments provided from the suicide report and a handwritten statement 'reviewed above areas – discussed ways to ensure ICC documentation and improve documentation of clinical rationale -.'  As part of the response to Problem 1a a clinical case review and training outline as well as a post-test was submitted addressing the above noted criteria. A memoranda from the Chief Psychologist, CMH, with subject 'Mandatory OJT: Clinical Case Review and Training' was issued on 10/4/12 requiring clinical staff to attend mandatory training, and if not to review the training information, complete the tests, and sign the IST sheet.  IST sign in sheets were provided for approximately 73 clinical staff.

Problem 1b:  A QIP response was provided for the WSP-RC Proctor/Mentor Program indicating a status date as of 9/21/12 stating an outline highlighting the completed timeframe for the development of the program, when the mentoring will commence, and an estimated completion date as well as responsibility for the program implementation to the Chief of Mental Health and the PMP/SPRFIT coordinator.  The review of PMP materials was completed on 8/2/11, a draft LOP completed on 9/21/11, and the initiation of proctoring implementation on 11/9 for training of five proctors and four mentees.

Problem 2:  A QIP response from the Chief Psychologist, CMH, to the Senior Psychologist Specialist at headquarters which stated the primary clinician served on the ICC when the referral was made and a clinical interview of the inmate was completed the day after the ICC meeting, however the documentation did not reflect whether the housing issue related to single-celled status was assessed.  The memorandum went on to state that a review of the ICC documentation and follow-up mental health referral process was completed and determined that mental health staff participating in the ICC process had not been consistently documenting the committee discussion regarding housing concerns nor submitting a standardized referral document when requested by the ICC. Improvement plans were discussed and were being implemented with the mental health staff involved in the ICC meetings, including a prepopulated ICC clinical progress note designed to ensure specific documentation of the committee discussion regarding housing considerations for single-celled status and if a mental health referral has been issued by the committee, it should be 1. Prepopulated; 2. Mental health staff who participate on the ICC have been instructed to complete a CDCR 128-MH5 referral form, and instructed to clearly document on the clinical note the specific referral reason for the contact, including the date of referral.

An additional half-hour class with the subject ICC/UCC progress note was provided and listed five attendees, including a social worker and three psychologists.

Problem 3:  The QIP response to item 3A indicated the senior psychiatric technician reviewed the eUHR and was unable to locate the MH-7 preplacement crono for this inmate.  A general staff meeting was conducted and the completion of the MH-7 preplacement crono for ASU was discussed, and a memo placed in the medical clinics to complete the crono when a CDCR 7219 is completed.  There was also a meeting by the chief psychologist with the D facility captain regarding the importance of custody notifying nursing staff, ensuring that the MH-7 preplacement crono is completed and the captain instructed other captains to OJT their staff and the senior psychiatric technician would follow-up daily to identify inmates who are new admits to ASU.  Nursing staff were also to be given an additional OJT that would be followed with progressive discipline when staff is found to be noncompliant.  Regarding problem 3B, a QIP response indicated a 15 minute class with the subject '128-MH-7 Preplacement Crono ADSeg' was provided with approximately 93 signatories for the OTJ training.  With regard to problem 3C, a QIP response was provided as were the nursing department general staff meeting minutes for 7/10/12 for one hour.  Within those minutes were items including 1) CDCR 7219 and CDCR 128-MH-7, regarding report of injury or unusual occurrence, and ASU preplacement crono respectively, and 2) ASU preplacement questions including three questions to ask inmates being placed in ASU, which would require submission of an emergency mental health evaluation if answered 'yes.'  Questions were, 'Have things reached the point that you have had thoughts of hurting yourself?,' 'Have you ever tried to kill yourself because you were placed in AdSeg?,' and 'Have you been told that others may be harmed if you don't kill yourself?'  Multiple participants OTJ training sign-in sheets were also provided for several trainings on that same date of 7/10/12.  The first training had the subject of 'General Nurse Staffing Meeting' and included 62 signatories.  The second training had the subject of 'Approved OP (s) June 2012' taught by the same instructor for one hour with discussion of operational procedures and had 67 signatories, that appeared to be the same signatories for the first training.  The third training had the subject 'LOP 102 Medication Management,' taught by the same instructor for one hour and had 20 signatories who also appeared to have been at the first two listed trainings above.

**Findings:**  This inmate's suicide appears to have been foreseeable as he was reporting voices telling him to kill himself and behaved bizarrely in the days to weeks prior to his suicide.  As defined in this report, the inmate's suicide was preventable had he received adequate evaluations and referral to an MHCB based on his clinical assessments dated 4/5/12, 4/6/12, and 4/9/12.  In those assessments, the inmate reported increased risk of harm to himself and a history of suicide attempts, and reported cutting himself on 4/5/12.  Although his suicide risk was estimated as "moderate risk" on 4/5/12 and 4/6/12, he was returned to the ASU on both occasions without significant changes in his treatment.  On 4/9/12 he was evaluated as "low risk," was subsequently placed on the MHSDS caseload, and antipsychotic and antidepressant medications were prescribed and increased.  The inmate's mental status was deteriorating and continued to deteriorate, and he was placed on single celled status pending a mental health evaluation and recommendation.  The licensed psych tech notes from 4/15/12 through 5/6/12 appeared to be

24

identical and contradicted the primary clinical notes. There was no documentation in the record that the mental health evaluation and recommendation occurred, and the inmate was placed in a single cell. The inmate's primary clinician referred him to a psychiatrist on 5/10/12 after the inmate informed him that the medication was not helping him, but it appears from the record that a psychiatrist did not see him prior to his death on 5/12/12.

**6. Inmate F**

Brief History: This inmate was a 34-year-old Caucasian male who committed suicide by hanging on 5/12/12 at DVI. He was a participant in the MHSDS at the 3CMS level of care. The inmate had been double cell approved, but he had no cellmate at the time of his death. This was the first term for this inmate who entered the CDCR on 4/25/12 at the DVI RC to serve a sentence of 49-years-to-life for two counts of lewd and lascivious acts with a child under 14, oral copulation with a child under age ten and two counts for possession of child pornography and harmful matter/seduction of child. He was serving a life sentence with an EPRD of 12/10/51.

The incident reports (837AB) and associated documents provided a narrative description of the incident by the responding staff. On 5/12/12 at approximately 0830, the inmate who was housed alone in E-Wing cell 204L was found by staff in his cell unresponsive and hanging from a noose made from a bed sheet. The reports noted that while the E-Wing inmates were returning to their cells from the East Hall Dining Room, a group of unidentified inmates saw the inmate through the cell window, hanging. The group alerted one of the officers, and an officer responded to the cell door, observing the inmate positioned above the toilet and hanging by his neck. The officer called for medical staff on his institutional radio and then activated his personal alarm. Another officer and the sergeant arrived at the cell, and the sergeant instructed the officer to retrieve the cut-down tool from the officers' station. As the officer returned with the cut-down tool, they entered the cell. The officers lifted the inmate, and the noose was cut from behind the inmate's head. After placing the inmate on the floor, the officers began CPR. Medical staff arrived on the scene, relieving the officers and taking over CPR. The nurse applied the AED and continued CPR. The inmate was placed on the Stokes litter. The inmate was pronounced dead at 0913 by a physician from the San Joaquin General Hospital.

An incident report by an RN described the inmate at the time of medical staff arrival; the inmate was unresponsive and not breathing, with dusky facial skin color, a extruded tongue and his lips and tongue were blue. There was no palpable pulse and a deep impression was present on his neck. The officers were performing CPR and the nurse applied the AED; no shock was advised. The nurse then took over CPR and another nurse attempted ventilation. There was no response to CPR after five cycles of CPR. The inmate was transferred to the TTA and CPR was continued. They arrived at the TTA at approximately 0855 where an IV was started. At 0902 emergency medical responders arrived and notified the physician at San Joaquin General Hospital. ACLS protocol was followed in collaboration with the physician at the hospital. There was no response to CPR and ACLS medications, and CPR was terminated by the physician at 0913.

The suicide report provided additional information and a timeline of events. At 0800 inmates on E-Wing were released for morning meals. At 0835 inmates began returning from morning meals. A group of returning inmates saw the inmate hanging in cell 204. An officer was called

and found the inmate hanging by the neck suspended above the toilet by a sheet attached to the vent grill. He requested medical assistance and activated his personal alarm. The sergeant and another officer arrived and brought the cut-down tool. They entered the cell and began CPR. At 0842 two nurses arrived, applied an AED, and continued CPR for five cycles. The inmate was taken to the TTA. At 0855 the inmate arrived at the TTA. An IV was placed and Epinephrine was administered with no results. The suicide report noted that the "inmate's protruding tongue was gripped between his teeth and his jaw was rigid, so it was not possible to establish an airway. Ambu bag was utilized to the extent possible." At 0902 emergency medical responders arrived and followed ACLS protocol. The inmate was pronounced dead at 0913 on advice from a physician at San Joaquin General Hospital.

The San Joaquin County Sheriff-Coroner, Office of the Coroner issued the coroner's report. The coroner's report was not available at the time of the suicide report. A review of the report indicated that the full autopsy was performed on 5/14/12. The cause of death was noted as asphyxiation (minutes) due to hanging (minutes), and the manner of death was noted as suicide. A toxicology study conducted on his femoral blood sample indicated that sertraline was detected; no other common acidic, neutral, or basic drugs were detected. The level of sertraline was 0.08 mg/L. No ethyl alcohol was detected.

The suicide report recounted the inmate's criminal justice history; the report noted that the inmate had a minimal criminal history. There was no known juvenile criminal history. He was arrested for driving under the influence and was convicted of reckless driving; he was assessed three years of probation and a fine during 1999. Regarding the instant offense, the inmate was sentenced to three consecutive terms of 15-years-to-life for the above mentioned charges; the inmate sexually molested two boys, ages eight and nine, in his home. Additionally, a large volume of child pornography was found on the inmate's computer. At court, the inmate admitted to a life-long attraction to young boys; he also reportedly tearfully pleaded with the court for a death sentence, stating that the sentence imposed would amount to "torture."

The inmate arrived at the DVI RC on 4/25/12. After he was assessed at intake, it was determined that he was at risk for suicide, and he was transferred to the OHU at DVI on suicide precautions. On 4/27/12 he was transferred to the MHCB at SQ where he was hospitalized for three days and returned to DVI. The inmate was housed in administrative segregation for protective custody due to the nature of his charges where five-day follow-up was performed. The suicide report noted that the inmate did not attend yard when offered. The inmate was released from administrative segregation by the ICC on 5/10/12; he was subsequently transferred to RC housing on East Wing. He was housed in a Special Programs Unit (SPU) which was a unit for inmates who would likely require SNY placement. He had reportedly been approved for a cellmate; however, at the time of his death, two days after his placement on the SPU, he was found hanging in his cell. The inmate had not completed RC processing. He had no RVRs, gang affiliation, or appeals.

The suicide report and UHR provided information regarding this inmate's mental health history. The inmate was evaluated by a psychologist when the inmate was 13 years of age after his parents found a boy's underwear in his bed. There was no other documentation of mental health treatment for this inmate. Upon his arrival at DVI on 4/25/12, his initial screening indicated that

he was depressed and considered suicide by cutting his carotid artery.  He was referred to mental health for further evaluation.  He was evaluated by a psychologist when an SRE was completed; the SRE indicated moderate to high chronic and acute risk for suicide.  The inmate indicated that he saw death as his only option and presented with depressive symptoms and fear of his incarceration in prison.  He was provided with a diagnosis of Depressive Disorder NOS and was placed into the MHSDS at the 3CMS level of care.  The inmate was then transferred to the OHU while awaiting placement in an MHCB.

While housed in the OHU, trazodone was initially prescribed as the inmate had received this medication at the county jail; this medication was discontinued and Zoloft (sertraline) was started at 50 mg at bedtime.  The inmate was subsequently transferred to the MHCB at SQ on 4/27/12.  The inmate continued to discuss his outrage at his sentencing and expressed his views regarding pedophilia; the MHCB treatment team retained the inmate in the MHCB until 4/30/12 when he was discharged and returned to DVI.  Prior to his discharge, the inmate made statements that he would commit suicide if he had a Japanese sword in front of him, "It's obviously better to die than to face 50 years of torture."  In the MHCB admission note, the psychiatrist stated that the inmate "appears fairly naïve with poor judgment in his cavalier verbalizations of 'suicide by Japanese sword' or displaying absolute bravery if other inmates are going to attack him of having a 'relationship with a kid' akin to characters in a fantasy video game."  There was documentation on the SRE that was completed on 4/28/12 that indicated that the inmate was at moderate chronic and acute risk for suicide.  The treatment team indicated that they would clarify whether the inmate "indeed has suicidal intent, or is proclaiming his ideology."  An SRE completed on 4/30/12 indicated moderate chronic and low acute risk for suicide, and the inmate was discharged from the MHCB to return to DVI with five-day follow-up at the 3 CMS level of care.

It appeared that the treatment team may have minimized the inmate's statements regarding suicide.  The treatment plan of the same date described the inmate's mood/affect as "sad, tearful" with "poor judgment, fair insight;" suicidality/violence was noted as "not present", despite the SRE that indicated moderate chronic risk for suicide.  The mental status examination comments noted that the inmate had "sadness with suicidal ideation; no intent at this time despite the cavalier pronouncement that he should fall on a Japanese sword if he had one.  Wants very much to be able to get in contact with his family."  The discharge summary also commented on the inmate's focus on completing the RC process so that he could have visits with his family and to write to them.  According to the suicide report, the reviewer noted that "it did not appear that he had much contact with his family," making the inmate's statements regarding his plans for contact with his family questionable.

The inmate was returned to DVI on 5/1/12, and he was placed into administrative segregation where five-day follow-up was completed.  An SRE was completed on that date that indicated moderate chronic and low acute suicide risk.  The suicide report noted that the final sign-off for the last day of the follow-up should have been completed by a primary clinician as per Program Guide requirements; however, this did not occur, and the last follow-up was provided by a psychiatric technician.  A progress note was present in the UHR that was dated 5/8/12 which appeared to be by a psychiatrist, although the writing was mostly illegible.  The note indicated that a diagnosis of Mood Disorder NOS was provided and that it was "too early to (increase)

27

Zoloft." The suicide report indicated that the inmate was seen by the primary clinician on 5/8/12; however, this documentation was not located in the information provided. It appeared that the last SRE was completed on 5/1/12.

On 5/10/12 the ICC released the inmate to reception center housing, and he was placed into the SPU where he was found hanging two days later.

The inmate's medical history was essentially unremarkable. He had a history of glaucoma for which he had received treatment; in addition he also reported neck pain.

The Combined Death Review Summary (final) dated 6/21/12 to 6/27/12 noted that the primary cause of death was asphyxiation by hanging and the death type was a suicide. There were no coexisting conditions. The report stated that the death was not preventable. Regarding the standard of care for the emergency medical response, the physician stated that the "(e)mergency response nursing notes indicated the mask portion of the ambu bag did not fit properly and one of the RNs called out for another ambu bag. It required a trip to the TTA to obtain another ambu bag. This represents a failure to maintain and have available emergency equipment." The nurse stated, "(w)hile not in the UHR, there was a copy of an e-mail and an 837 that indicated the mask portion of the ambu bag did not fit properly and one of the RNs called out for another ambu bag. It required a trip to the TTA to obtain another ambu bag. This represents a failure to maintain and have available emergency equipment." The summary noted that there were no departures from the standard of care for medical providers. Regarding the standard of care for nursing, it was noted that on 4/27/12, "the receiving institution RN failed to review and sign 7371." Regarding systemic concerns, both the nurse and physician commented regarding time discrepancies: discrepancy was found in the documentation of incident times. Custody staff documented that medical was called immediately upon discovering [the inmate] hanging in his cell at 0830 on 5/12/12. RN 1 documented that a call was received at 0840 to respond to a medical emergency. With regard to recommendations, the Death Review Committee stated the following:

> The Committee agreed that the cause of death was Asphyxiation by Hanging. The Committee agreed no departures from the standard of care by providers were identified. The Committee determined a referral to NPPC for 7371 not reviewed and signed and the mask portion of the Ambu bag did not fit properly. System issues identified will be forwarded to CEO and QM.

The preventability/improvement matrix noted that the death was not preventable, but that there were "many opportunities for improvement (3+)." Several action item referrals/notifications were noted as follows:

> CEO (Institution) for Systemic Issue

> - Failure to maintain and have available emergency equipment, i.e., the mask portion of the Ambu bag did not fit properly and another one had to be obtained from the TTA, refer to Combined Death Review Summary, Emergency Medical Response, page 7.

28

- There was a time discrepancy documentation of 10 minutes of the incident times between custody staff and nursing, refer to Combined Death Review Summary, Systemic Concerns, "Physician", page 8.

Mental Health
- Mental Health evaluation of this suicide case.

Nursing Professional Practice Committee (NPPCC) referral

- RN from SQ, failure to review and sign form 7371 on 4-27-12, refer to Combined Death Review Summary, Standard of Care of Nursing, page 8.
- Failure to maintain and have available emergency equipment, i.e., the mask portion of the ambu bag did not fit properly and another one had to be obtained from the TTA, refer to Combined Death Review Summary, Emergency Medical Response, "Nursing", page 7.

Quality Management (QM) for Systemic Issue

- Failure to maintain and have available emergency equipment, i.e., the mask portion of the Ambu bag did not fit properly and another one had to be obtained from the TTA, refer to Combined Death Review Summary, Emergency Medical Response, page 7.
- There was a time discrepancy documentation of 10 minutes of the incident times between custody staff and nursing, refer to Combined Death Review Summary, Systemic Concerns, "Physician", page 8.

The suicide report provided two recommendations and quality improvement plans as follows:

Problem 1:  This review revealed at least a 10-minute discrepancy between the time the inmate was discovered hanging per the 837 Incident Reports (0830 hours), and the time the alarm was given as documented by responding medical staff and by the unit logbook (0842 hours).
Quality Improvement Plan:  The Warden or designee at DVI shall conduct an inquiry into this discrepancy and provide a written explanation in the form of a memorandum.
Problem 2:  The last day of the five-day post MHCB discharge follow-up was not completed by a primary clinician.  A contingency plan to ensure this requirement is met was completed by DVI staff and discussed at the SPR FIT meeting on May 23, 2012.
Quality Improvement Plan:  The Chief of Mental Health or designee at DVI has provided dates of training regarding the revised tracking log to the Suicide Response Coordinator at DCHCS Headquarters.  Local operating procedures (LOPs) have been updated and are pending final approval at DVI.  The revised LOP shall be forwarded to DCHCS Headquarters.

DVI presented DCHCS with their responses to the two QIPs; the first QIP response was dated 6/26/12 and was in the form of a memorandum from the acting warden in which the incident was described and it indicated that the differences in time recorded were due to clocks calibrated at

29

different times.  The memo mentioned the need for atomic clocks, but noted that their purchase was dependent upon the department's funding approval process.  Regarding the second QIP, DVI provided training logs regarding five-day follow-up and welfare checks training.

On 9/7/12 the Deputy Director (A) Statewide Mental Health Program and Director (A) Division of Adult Institutions submitted their report on implementation of the Quality Improvement Plan in response to the suicide report.  The report indicated that the responses were reviewed and approved by the Suicide Case Review Focused Improvement Team, CCHCS on 6/18/12.  The Directors indicated that no further actions were necessary.

**Findings:**  This inmate who was a participant in the MHSDS at the 3CMS level of care had been included in the MHSDS as a result of his poor adjustment to prison and his persistent suicidal ideation.  He was placed into the OHU at DVI at the time of intake due to suicidal ideation with subsequent admission to the MHCB at SQ.  While housed in the MHCB, the inmate continued to voice suicidal ideation, in fact, this inmate broadcasted his intent to kill himself or to die since the time of his sentencing, when he asked the judge for the death penalty.  Although he did not always acknowledge current suicidal intent, he presented with chronic and persistent suicidal ideation.

This reviewer does not believe that this suicide was foreseeable; however, it was preventable based upon the definition of preventability utilized in this report.  Although there were few SREs completed, those that were performed indicated at least moderate chronic risk.  It appeared that the treatment team in the MHCB at SQ may have minimized the inmate's threats of self-injury, and he was discharged when assessed with moderate chronic risk.  Additionally, as the suicide reviewer noted, he was not appropriately assessed for suicide risk at the completion of the five-day follow-up after return to DVI.  The inmate was released from administrative segregation to the SPU where he committed suicide in his single cell.

The two issues noted in the suicide report appear to be important in addressing deficiencies. The CCHCS Combined Death Review Summary also identified critical issues that occurred and made recommendations to address these issues.

Additional recommendations would include reevaluation of the criteria for MHCB admission and discharge that allowed for discharge of this inmate with recent active suicidal threats and moderate chronic risk of suicide.  This is particularly pertinent for this inmate due to the nature of his charges and his persistent suicidal threats and ideation.  Another area of concern that was not mentioned in the suicide review was the presence of jaw tightness, tongue protrusion and clenched teeth at the time of discovery, all signs of early rigor mortis.  This condition precluded the placement of an airway and the appropriate use of the ambu bag.  Although the suicide report was silent regarding this issue, it calls into question whether custody rounding is a requirement for specialized housing units, such as the SPU.  If not required, custody rounding on this RC housing unit with restricted inmate mobility and the housing of high risk inmates who may eventually require SNY placement, should be considered.

**7. Inmate G**

Brief History:  This inmate was a 38-year-old Hispanic male who committed suicide by hanging on 5/15/12 at PVSP.  At the time of his death, he was not a participant in the MHSDS, but was awaiting completion of a referral to the IDTT.  Although the suicide notification sent to the Special Master from the CDCR on 5/21/12 indicated that he was single celled at the time of death, other documentation stated that he was double celled on an SNY.  The inmate entered the CDCR on 5/20/99 to begin serving a total term of 34-years-to-life for second degree murder, leaving the scene of an accident, and fleeing a peace officer.  The suicide report noted a history of incarceration in the CYA, as well as "jail time" for driving without a license.  The inmate had been housed at PVSP since 9/6/11 with a MEPD of 9/5/32.  His custody status was Close B/Level IV with 69 points.

As recounted in the crime incident report, the inmate was apparently discovered by another inmate on 5/15/12, who informed an officer at approximately 4:06 p.m. that there was a possible suicide attempt in cell 141.  An officer was monitoring inmates' returning to the building from afternoon yard when informed.  That officer notified other staff members who were outside the building conducting searches of inmates.  Five officers in total responded to the cell, one of whom looked inside the cell and reported seeing the inmate.  This officer further reported that the inmate appeared to be unconscious, in a kneeling position on the floor, facing the wall with a white shoelace tied around his neck, and tied to the corner of the top bunk closest to the wall.  One of the other officers activated his personal alarm device upon the direction of the officer who observed the inmate in the cell.  That officer also directed another officer to open the cell door and provide a cut-down tool and safety scissors to the staff responding to the incident.  The inmates in the area were directed to sit on the floor, while another officer notified Central Control of the incident.

The inmate was lifted off of his knees and the shoelace was detached from the upper bunk.  The inmate was pulled from the cell by his arms by two officers.  The officers attempted to cut the shoelace from the inmate's neck, unsuccessfully at first because it was too tight.  With assistance, the officer was able to cut the shoelace, and the inmate, who was reported to be unresponsive and unconscious, was placed on his back.  An officer attempted to find a pulse but could not.  The ambu bag was "relinquished."  CPR was initiated and continued by various officers.  A sergeant responded to the scene, observed the officers performing CPR, and called Central Control to summon an ERV.  Medical staff arrived at the time that an officer was transferring the inmate to the Stokes litter.  A licensed vocational nurse applied the AED with negative results.  The ERV arrived at approximately 4:10 p.m.  Chest compressions continued as the inmate was transported out of the building on a gurney.  He was placed in the ERV while one officer continued chest compressions and another utilized the ambu bag.  The inmate was transported to the CTC, arriving at approximately 4:15 p.m.  Once in the TTA, medical staff took over CPR and the ambu bag.

According to the inmate death report 7229A, the inmate's trachea was not accessible because of rigidity of his jaw, and an intravenous line was not accessible because of collapsed veins.  Per the Combined Death Review Summary, no medications were administered to the inmate.  This was found to be justified by the already evident rigor mortis in the inmate's jaw muscles.  The EMTs arrived at approximately 4:34 p.m., pronouncing the inmate dead at 4:37 p.m.

31

The first medical responder's note indicated that he arrived at building A-5 at 4:06 p.m., responding to a call concerning an attempted suicide, and that CPR by custody staff was already in progress.  The responder noted that the inmate was not breathing, and his skin appeared ashen and dry.  The inmate's skin temperature was described as "warm," but that was crossed out, initialed, and replaced with a check mark indicating "cool" skin.  The inmate was noted to be unresponsive, without motor response or pulse.  Other vital signs could not be taken because the officer was providing CPR.  AED pads were applied at 4:07 p.m. and no shock was advised.  CPR was resumed with "bag and mask."  The rescue vehicle and a nurse arrived at 4:11 p.m. and CPR continued.  The inmate was transferred to the rescue vehicle at 4:15 p.m. while CPR continued.

As per the Combined Death Review, the inmate arrived in the TTA at 4:18 p.m. where he was evaluated as unresponsive, with no pulse or breathing, dilated nonreactive pupils, mottled skin, rigid jaw muscles, a strangulation mark around his neck, and incontinent of urine and feces.  It was noted that the monitor showed no electrical activity and that three attempts at intubation were unsuccessful due to the inmate's jaw rigidity.  Staff was unable to establish intravenous access, and no medications were given.

As per the triage and treatment services flow sheet, the TTA physician was present and presided over the code.  Paramedics arrived at 4:30 p.m. and were unsuccessful at intubation.  An EMT pronounced the inmate dead at 4:37 p.m. (The time of death was noted to be 4:36 p.m. per the eUHR.).  At 4:45 p.m., the physician completed the medical death sheet CDC 7229A, another physician was to complete the mental health portion of the form CDC 7229B, and the packet was given to a third physician for review.  The inmate's body was removed by the Fresno County Coroner's Office staff at 10:38 p.m.  No autopsy report was posted on the secure website.

The Death Review Summary completed on 9/18/12 by the physician and on 7/27/12 by a nurse indicated that the autopsy results had not yet been released, and the death review committee's assessment status was "waiting for meeting."

The suicide report, which included a review of the C-file and the probation officer's report, recounted the inmate's criminal justice history.  His first arrest occurred when he was 13 years old; he was charged with vandalism and received probation.  He again received probation at age 15 when he was convicted of car theft.  He was remanded to the CYA at age 16 following a conviction for burglary.  He absconded from the CYA and was not incarcerated again until age 20, when he was arrested for receiving stolen property.  At that time, he was again remanded to the CYA.  He served time in jail in 1997 after being arrested for driving without a license.  On 8/29/98, he was stopped by the police for possibly driving while under the influence of alcohol.  After fleeing from the police, he hit another vehicle, injuring two people who eventually died.  He fled the scene, but was apprehended after several days.  In connection with this incident, he was convicted of two counts of second degree murder, one count of leaving the scene of an accident, and one count of fleeing a peace officer.  He was sentenced to a total of 34-years-to-life on these various convictions.  The convictions were upheld on appeal on 5/25/01.

The inmate entered the CDCR via the NKSP RC on 5/20/99.  He transferred to Calipatria on 9/17/99, to SVSP on 12/01/99, and to CSP/Sac on 2/19/03, returning to SVSP on 6/18/03.  He remained at SVSP until 3/12/09, when he transferred to CSATF, and ultimately, to PVSP on 9/6/11, where he remained until his death on 5/15/12.  During the course of his incarceration, he received RVRs on 3/18/00, 4/8/00, 7/7/02, 5/8/04, 11/3/08, 10/8/10, and 4/13/11.

The suicide report indicated that the inmate received an initial mental health screening at the NKSP RC on 5/24/99, when he did not endorse mental health problems or a history of mental health treatment.  The suicide report also noted that subsequent screens when the inmate transferred facilities or when he was moved to segregation were "consistently negative."  This reviewer was not provided a eUHR dating back to that time, so this could not be verified.  A "screen" dated 9/6/11 conducted upon the inmate's arrival at PVSP from CSATF indicated that he did not endorse having mental health problems, recently receiving bad news, being treated for mental illness, having hallucinations, or having current or past thoughts of self-harm.  The RN noted that he did not appear to be disoriented.  This form also noted that his primary language other than English was Spanish and indicated that he did not have a TABE score.  The health care transfer information form (7371) checked "no" for suicide history and showed no markings to indicate the inmate's mental health level of care.

This reviewer reviewed the eUHR provided.  It showed that an interdisciplinary progress note dated 6/22/11(CSATF) indicated that the inmate was seen briefly in the ASU ICC by a social worker in connection with an RVR for being "over familiar with staff."  His appearance, behavior, hygiene, and cognition were all noted to be "WNL" or "Within Normal Limits."  He expressed no mental health concerns and no referrals were thought to be required.  His TABE score was reported to be 9.9.

A health care services request form (7362) submitted by the inmate and received on 12/17/11 showed a complaint of migraines for "days" at a time.  A medical progress note completed by a physician assistant on 12/29/11 indicated that the inmate stated that he was having headaches which sometimes "last[ed] for 5 days straight with nausea and vomiting and there is a sense of that he wants to stay in the dark."

A 1/12/12 psychology note indicated that the inmate self-referred and subsequently was seen in a mental health office.  It noted that he reported being "alright" and that he had never spoken with anyone from mental health before.  The inmate stated that within the past "couple of years" he had been experiencing "difficulty breathing, migraines, + [and] stress."  He reported his belief that he was experiencing "anxiety" but that he did not know what anxiety was.  He stated feeling "worried" all the time and that this was difficult to control.  Exercise, which had helped previously, no longer brought relief.  He reported feeling "tired a lot" and also indicated having tension, racing thoughts, decreased sleep, and difficulty relaxing.  He reported remaining in contact with his family.  He was assessed as having an unremarkable mental status but decreased sleep was noted.  Suicidal or homicidal ideation was not noted, nor were hallucinations or delusions.  His GAF score was assessed as 65, and his level of care was noted to be "GP" (general population).  His daily functioning was considered "fair" and he was thought to exhibit symptom control.  The inmate's diagnosis was changed from no diagnosis to Generalized Anxiety Disorder (GAD).  The plan was to follow up in 30 days, and a referral was noted to have

been made for an IDTT.  The plan also included the notation to "[c]ontinue current treatment plan until next IDTT," although an initial IDTT had not occurred and the only plan was for referral to the IDTT.  The inmate was informed of the plan and told to request mental health services "if needed."

On 1/30/12, the inmate submitted a health care services request form 7362 for medical services because he had yet to receive medications which were prescribed to him on 12/28/11.  He indicated that his migraines continued and that this was his second request inquiring about his medications.  On 2/13/12, he also submitted a health care services request form 7362 requesting that his prescription for Imitrex be renewed and increased.  He reported still being in pain.  The inmate submitted another health care services request form 7362 on 4/21/12 to medical requesting evaluation due to suffering from chronic migraines, which had not been alleviated by the medication prescribed.  On the same date, he submitted a 7362 indicating a request for mental health services.  It stated that the inmate spoke with the "pysch tec" on 1/12/12 who "assured [him]" that he would be called back within ten days to discuss possible treatment.  It ended with the request to "please respond."  This form contained a notation indicating that the inmate was seen on 4/30/12.

Subsequently, an interdisciplinary progress note was completed by the same psychologist who saw the inmate on 1/30/12.  It was originally dated 3/30/12, but that date was stricken and initialed with the date of 4/30/12 inserted and initialed.  The reason for the interview was originally noted to be for follow up, but that was stricken and initialed with the correction that it was related to a self-referral.  The inmate was noted to have been seen in a mental health office. He reported being "the same."  He indicated that he felt good for a couple of days "then it comes back and my mind just goes."  He reported worrying about a lot of things and it was noted that he stated that it was difficult to control the worry.  He continued to report symptoms of anxiety and stress, stating that the symptoms appeared approximately one and one-half years ago, coinciding with his mother almost passing away.  He denied depression or anhedonia.  His mental status was mostly unremarkable with the exception of anxious mood.  His sleep was "fluctuating."  His level of care was reported to be general population and his current diagnosis was V71.09 (no diagnosis).  This was reported to signify no change in diagnosis; this despite the earlier diagnosis of GAD made by the same clinician in January 2012.  The inmate was seen as stable, with his daily functioning within normal limits, and assessed as exhibiting symptom control.  The plan was to follow-up within 30 days with the IDTT.  However, at first there was an indication of no referral being made, which was stricken, initialed, and replaced with an indication of referral to the IDTT.  The inmate's TABE score was noted to be 12.9.

The suicide report indicated that the inmate was seen by a social worker on 5/15/12, the day of his death.  It stated that the social worker recalled the interview to have taken place between 9:15 and 9:30 a.m., although the interdisciplinary progress note documented the time as 10:30 a.m. That note was not present in the eUHR provided for review and was not mentioned in the initial inmate death report, which indicated that the inmate's last contact with mental health before his death was with a social worker on 3/30/12.  The Combined Death Review stated that the inmate had two mental health contacts before his death on 1/12/12 and 4/30/12.

The suicide report indicated that at 6:10 a.m. on 5/15/12, a corrections officer heard a loud banging noise coming from cell 141. The officer saw the inmate and his cellmate fighting with each other. Eventually, pepper spray was introduced to the cell through the food port. The report continued that the inmate was taken to the satellite medical clinic for decontamination, a medical evaluation, and an interview, and that the officer summoned a social worker to interview him. Although this note of the encounter was not available for review, the suicide report transcribed the progress note as follows:

> C/o (officer's name) referred I/m [inmate] due to mutual combat. I/m stated he had gotten into a fight with another I/m and did not wish to talk about it. Later I/m reported it was a misunderstanding between him and other I/m. I/m was covered with pepper spray and rubbing eyes with both hands. Asked I/m if he had any suicide or homicide hx [history] and he replied no. I/m cut short the interview and reported he did not want to talk anymore. During interview, I/m was unwilling to discuss any MH [mental health] issues and was uncooperative. His main concern was to return to 5 block. Informed custody of I/m wish to return to 5 block and they would hold I/m until mutual combat issues was resolved.

The suicide report went on to state that in the 5/15/12 note the inmate was described as oriented and alert, his behavior as uncooperative and vague, and his speech as soft and slow. He was reported to have looked down and also to have denied suicidal or homicidal ideations and psychotic thinking. His GAF score was assessed as 60. He was reported to have been a participant in the 3CMS program, although as noted in the suicide report, the inmate "had not yet been included in the MHSDS." The plan was reported to be "I/M to contact custody/MH staff if needed." Review of the eUHR by this reviewer indicated that the inmate's assessment by the IDTT was pending, and he had not yet had the IDTT assessment which had been planned in January and again in April 2012.

The narrative discussion of these concerns noted, among other things, that of the three encounters mental health staff had with the inmate only one (which was on the same day as the inmate's suicide) included treatment plan options to help him manage his anxiety. However, this could not be accomplished because the note contemplated follow-up with the inmate's primary clinician even though the inmate was not enrolled in the MHSDS. The suicide report narrative also noted that the progress notes concerning mental health encounters suggested that evaluating clinicians did not review recent clinical documents for specifics such as diagnoses and MHSDS involvement.

The report also noted that PVSP had chartered a Service Reduction Quality Improvement Team (QIT) in "an effort to address the needs of inmates in a time of increasing staff reductions." Problems addressed by the QIT included "staffing shortages, budget constraints and inmate-patient population projections, and services that are required to comply with Coleman guidelines and are adversely impacted by staffing shortages."

Also subsequent to the inmate's suicide, the chief of mental health and the clinician's immediate supervisor conducted a review of eUHRs of the clinician who evaluated the inmate in January

35

and April of 2012.  This review found that between 95 and 98 percent were compliant with IDTT referrals and primary clinician follow-up appointments, respectively.

The suicide report also indicated that the inmate's cellmate, who was interviewed after the inmate's suicide in connection with the suicide report, indicated that during the week of 5/6/12, the inmate stopped going to meals and yard.  At this time, the inmate also reported to his cellmate that he saw mice running around the cell, although none were present, in addition to "faces" and "people."  The suicide report also noted "rumors" of the inmate's drug usage and a $27.00 "drug debt."

A third concern discussed by the suicide report involved procedures pertaining to the physical care of inmates following pepper spraying, although it did not result in a recommendation.  The social worker who saw the inmate approximately three hours prior to his death wrote a note stating that he was "covered in pepper spray and rubbing his eyes."  The inmate's cellmate also reported to the suicide reviewer that the inmate was not offered a shower after the incident. However, the reviewer concluded that a review on 6/25/12 by the Suicide Case Review Focused Improvement Team and staff from PVSP adequately documented that the inmate and his cellmate were provided water and decontamination procedures in accordance with policy; the inmate was given an opportunity to decontaminate using cool running water and a cooling fan was placed in front of the holding cell.

A Death Review Summary was completed by a physician on 9/18/12 and by a nurse on 7/27/12. It was indicated that the primary cause of death was asphyxiation and the secondary causes were intentional self-harm by hanging, strangulation, and suffocation.  The inmate's coexisting conditions were asthma, allergic rhinitis, headache, and gastroesophageal reflux disease.  His suicide was not thought to have been preventable and no contributing causes were identified. The medical care provided was found not always to have met the standard of care, but this was not found to have caused or contributed to his death.  The reviewers found that the emergency response was adequate, and given that rigor mortis was already present in the jaw muscles, the decision not to administer medication such as Epinephrine was justified.

The Death Review Summary found some departures from the standard of care.  A nurse conducting an intake screening on 9/6/11 did not address the inmate's asthma.  On 10/4/11, a provider ordered Chlorpheniramine without explanation.  According to the review, on 12/16/11 a provider did not adequately evaluate the inmate's headache.  It noted that "[a] severe new headache in a 38-year-old man warrants a thorough evaluation which should include detailed history and exam, and may require investigations to rule out serious causes, such [as] a fungal or bacterial infection, cerebrovascular aneurysm and space occupying lesions."  On 4/20/12, a provider ordered Loratadine and Ranitidine without explanation.  On 4/24/12, an inadequate evaluation of the inmate's uncontrolled headaches occurred.  The problem list did not include medical conditions such as migraines.

The reviewer noted no systemic concerns, but suggested further mental health review concerning the notations of IDTT referrals which appeared not to have produced any follow up.

The CDCR suicide report included two recommendations and quality improvement plans as follows:

> Problem 1:  The report identified lack of clinical follow up as a problem noting:  On January 12, 2012, the inmate was evaluated by a clinician who intended to schedule him for follow-up by the IDTT within 30 days. A referral for that follow-up did not occur. On April 21, 2012 after a second evaluation, the clinician evaluated the inmate's level of distress as non-acute and non-emergent. Although the progress note indicated plans for IDTT follow-up, no referral was made.  On May 15, 2012, after being pepper sprayed following a fight with his cell mate, the inmate was evaluated by a clinician who described the inmate as 'uncooperative, vague' with speech that was soft and slow. The clinician indicated a plan to have the inmate receive a follow-up appointment with his primary clinician, although the inmate was not an MHSDS participant.
>
> Quality Improvement Plan 1:  The Chief of Mental Health or designee at PVSP shall:
> a) Include additional items in an ongoing QIT that will address follow-up concerns highlighted by this review.  Additional items include methods to ensure clinical follow-up; alternatives to IDTT requirements; and development of a secondary tracking system to ensure compliance with clinical follow-up procedures.
> b) Provide a summary of findings pertaining to the review of records for the clinician who provided clinical evaluations for the inmate in January and April 2012.
> c) Explore access to records for clinicians required to provide emergency evaluations to inmates.  (This can be added to the items discussed in the QIT if appropriate.)
>
> Problem 2:  The report found inadequate review of recent clinical documents to be a problem noting:  Progress notes documenting the incidents listed above suggested a lack of familiarity with this inmate's history. Diagnoses were not consistent from one evaluation to the next and available documentation did not indicate the development of a treatment plan, other than referral to IDTT.
>
> Quality Improvement Plan 2:  The Chief of Mental Health or designee at PVSP shall provide mental health staff with a training update pertaining to adequate documentation of clinical contacts with inmates.

The chief of mental health at PVSP issued a Quality Improvement Plan on 8/30/12 in response to the inmate's suicide.  The memorandum attached QIT meeting minutes noting discussion of a secondary IDTT tracking system which was said to improve IDTT efficiency and communication with headquarters regarding slowing the intake of new 3CMS inmates to PVSP due to a lack of staffing.  A clinical review of the clinician who evaluated the inmate in January and April 2012 was conducted.  Access to records for clinicians providing emergency services were included in training provided to staff on documentation of clinical contacts.  Staff also received training regarding appropriate documentation of clinical contacts at a mental health department staff meeting.

QIT minutes dated 8/28/12 appended to this same memorandum showed that "[a]s a result of staffing shortages, budget constraints and incorrect inmate-patient population projections delivery of MH services which meet Coleman guidelines is adversely impacted."  The minutes also noted discussion of "how staffing levels may have been a contributor to follow-ups not

37

occurring as described in the inmate's (the instant inmate whose death is being reviewed) treatment plan."

Also included in the QIT material was a memorandum dated 7/20/12 by the PVSP chief of mental health. Among other things, it discussed a concern about the emergency response to the inmate's suicide. Questions included why custody did not initiate basic life support when the door was opened and why they waited until medical staff arrived? However, this was not what was reported in the incident report or the first responder's medical note, which indicated that custody had commenced CPR at the time that medical staff arrived. According to the memorandum, the chief of mental health interviewed both medical and custody staff. "[The o]fficers reported that due to staff coverage needs at 0530 (providing dining hall coverage and escorting inmates to R & R) there was only one officer in the yard." That officer, reportedly, had to wait for responding staff from another facility.

On 9/7/12, the Deputy Director (A) Statewide Mental Health Program and the Director (A) Division of Adult Institutions issued their report on the implementation of Quality Improvement Plans for this inmate's suicide. The report indicated that the response was reviewed and approved by the Suicide Case Review Focused Improvement Team, DHCS on 6/25/12 and that no further actions were necessary.

The inmate's suicide occurred on 5/15/12 at approximately 4:06 p.m. Notification as reported on the initial death report was distributed to various personnel including the death review coordinator on 5/15/12, placing this occurrence within the required eight hours from death. The initial death report was completed on 5/15/12, prior to the required two business days from the date of death as required by the Program Guide. The comprehensive morality/morbidity review was unsigned and blank except for the inmate's identifying information. The documentation did not make clear when the notice to the SPRFIT coordinator of the appointment of the mental health suicide reviewer took place and did not contain a preliminary suicide report. The suicide report was completed on 6/25/12. According to the minutes of the QIT attached to the submitted QIP report, the facility warden and chief medical officer implemented the Quality Improvement Plan on 8/28/12, which was prior to the 120 days from the date of death required by the Program Guide. The facility warden and chief medical officer submitted their report on implementation of the QIP on 8/30/12, which was 111 days from the date of death, which was before the 150 days required by the Program Guide.

**Findings**: This inmate's completed suicide does not appear to have been foreseeable as he did not indicate that he had suicidal intent or plans to any staff and reported no history of suicidal behavior. As defined in this report, however, it is this reviewer's opinion that this suicide was preventable. There was no mental health follow-up in the IDTT as planned on two occasions (January and April 2012). This would have been accompanied by an interdisciplinary assessment and, if he was enrolled in the MHSDS, by regular suicide risk monitoring as clinically appropriate, as required by the Program Guide 12-10-7 and 8. The inmate's two requests for mental health assistance came in the context of his increasing anxiety and retrospective reports by the inmate's cellmate of hallucinations, and isolating behavior in the week prior to his death. There were also "rumors" of his recent drug use. He requested various appointments with medical concerning his unresolved migraine headaches and issues related to

38

his pain medication including what the Combined Death Review described as inadequate evaluation of the inmate's headaches on 4/24/12. The headaches were described by the inmate as lasting for days at a time. Had the required interdisciplinary assessments occurred, they might have led to mental health staff becoming aware of this downward course and the potential for suicide, and may have led to coordination with medical staff about the inmate's medical concerns.

Generally, the Program Guide timelines, with respect to the response to the suicide, were met. The suicide report appropriately identified two primary problems with mental health staff's handling of this case. However, some questions and concerns remain unclear even after review of the documentation provided. The suicide report indicated a contact with mental health staff on the day of the inmate's suicide, but that progress note was not contained in the eUHR provided for review. There are also references in the facility's investigation which raised the possibility that custody may not have initiated CPR until medical staff arrived on the scene. However, other documentation states that custody was performing CPR when medical staff arrived and initiated it promptly. There also are references in the facility's investigation indicating the possibility that inadequate mental health staffing may have contributed to the lack of follow-up to two plans made by mental health clinicians to refer the inmate to IDTT within 30 days of the encounter.

## 8. Inmate H

Brief History: This inmate was a 40-year-old Hispanic male who committed suicide by laceration of the neck and exsanguination on 5/16/12 at PVSP. The inmate was not a participant in the MHSDS and was double celled in general population at the time of his death. The inmate entered the CDCR via the SQ RC on 12/1/11 having been convicted of two counts of lewd and lascivious behavior with a child under 14 years of age and sentenced to 22 years in prison. His EPRD was 10/20/29.

The inmate was discovered on 5/16/12 at approximately 4:54 p.m. by a correctional officer conducting the 1700 standing count. The officer approached the inmate's cell and peered through the cell window; the officer observed the inmate's cellmate standing in the center of the cell next to the lower bunk facing the door, and the inmate was lying on the top bunk on his left side facing the north wall, partially covered with a blanket with his head and feet exposed. The inmate was positioned with his head facing towards the back wall, and he did not respond to the officer's first announcement of standing count time. The officer again announced standing count time while banging on the cell door with her fist, and the inmate failed to respond to her announcement. The officer ordered the cellmate to wake the inmate, and the inmate again failed to respond. The officer ordered the cellmate to go to the back of the cell and to remove the blanket so this inmate would wake up; the cell mate did as ordered, but immediately stated "he's bleeding, he's bleeding!" The officer notified another correctional officer that she had a "man down" situation and activated her personal alarm device.

The control booth officer notified Central Control of a medical emergency via his prison radio, and the second officer responded to the cell; both officers simultaneously ordered the cellmate to take a seated position on the lower bunk and not to move. The cellmate complied with these orders. Other officers responded; the food port was opened, and the cellmate was ordered to stand with his back to the door and to submit to handcuffs, to which he complied. The cellmate

39

was placed in handcuffs; the cell door was opened, and the cellmate was escorted from the cell. A clothed body search was conducted which produced negative results for contraband. The cellmate was escorted to a shower where he was secured inside. A floor officer maintained direct and constant visual observation of the cellmate. Officers attempted to obtain a response through the open doorway from this inmate, and they noted that the cell appeared to be undisturbed and no foul play or trauma was apparent. The sergeant instructed the staff to remove this inmate from the cell in order to allow medical staff the opportunity to evaluate him. A Monadnock Expandable Baton (MEB) was utilized in the extended position with the Power Safety Tip run down on the inmate's foot which produced negative results. As an officer was taking hold of the mattress to bring the inmate down from the upper bunk, he noticed a large amount of blood pooled under the inmate's body; the officer informed the sergeant and stepped down from a stool to allow medical staff the opportunity to enter the cell.

A LVN and another officer entered the cell. After the officer was unable to find a pulse, the LVN directed the staff to summon the ERV. As the LVN was attempting to find a pulse, it was discovered that the inmate's body from the back of the neck to his ears and upper neck to the mid back were cold, rigid and yellow in color. The LVN observed a large pool of blood approximately one inch deep under the inmate from his chin to his abdomen. As both of the inmate's hands were under his body, an RN ordered that the pulse oximeter could be attached to the inmate's toe to determine if there was a pulse. A SRN II who attempted to enter the cell was told by the sergeant that it was a crime scene and the fewer people in the cell the better; however, the SRN II entered the cell anyway and both she and the LVN read the results of the pulse oximeter and agreed that there was no pulse. The SRN II also felt the inmate's left foot and stated "that's cold. Rigor is setting in." The sergeant ordered all staff out of the cell and determined that the cell was a crime scene; the food port was padlocked, and the cell secured. An additional nurse arrived to the front of the building via the ERV and entered the dayroom where she was met by the SRN II who reported to the arriving RN "it's a crime scene. He's gone". The RN exited the building and returned to the CTC by way of the ERV. CPR was not attempted.

The suicide report provided additional information including a timeline; however, the timelines appeared to be unclear as the timeline indicated that the inmate was discovered at approximately 1654 as well as 1656 and did not respond to attempts to communicate with him. The alarm was sounded and at 1656 medical staff activated the ERV to respond. The timeline indicated that at 1658 all of the other activities listed above occurred, through the time that the senior RN II informed the arriving ERV staff that "it's a crime scene. He's gone." The timeline concluded with a statement that a physician was escorted to the cell and pronounced the inmate deceased at 1800 hours. No coroner's report was included in the documents provided at the time of this review; however, the suicide report indicated that an autopsy was conducted by the Fresno County Coroner's Office (date unspecified), and the pathologist who conducted the autopsy was interviewed by the suicide reviewer and confirmed the inmate's death was caused by exsanguination from an approximately five to six centimeter laceration on the left side of the inmate's neck, that pierced the external jugular vein. The suicide report stated that death occurred within minutes of the act and also noted a jagged scar on the inmate's right wrist consistent with a self-inflicted laceration. The suicide report indicated that upon receipt of the

coroner's report, the report would be filed in the inmate's data folder at DCHCS.  No autopsy report was posted.

The suicide report recounted the inmate's criminal justice history and stated that he had no documented juvenile arrests.  He had been convicted of a misdemeanor of driving under the influence in 1996, but he had no other known adult criminal justice record prior to the commitment offense.  After his commitment, an Immigration and Customs Enforcement (ICE) hold was placed on this inmate.  The suicide report indicated that his commitment offense occurred during late 2010 and involved the inmate attempting to perform sex acts on a female victim who was the daughter of a woman he had been dating.  The victim revealed to her mother that the inmate had attempted the acts, and he was ultimately arrested at the residence; he was placed into custody, and was convicted on two counts of lewd and lascivious behavior with a child under 14 as noted above.  After his arrival at the SQ RC on 12/1/11, the inmate remained at that facility until 4/3/12, when he was transferred to PVSP.  The inmate had no RVRs during his incarceration and had requested a SNY due to the nature of his commitment offense.  The inmate reported to staff that he had been housed in protective custody while in the jail and that he also had a history of alcohol abuse, describing himself as a recovering alcoholic.

The inmate's mental health history is notable for a reported suicide attempt in 2001 in which he cut his right wrist.  The pathologist who conducted the autopsy reported a jagged scar on his right wrist consistent with the self-inflicted injury.  According to the suicide report, his ex-wife also stated that he had a depressive episode in 2001 including attempted suicide and involuntary psychiatric hospitalization.  There was no information regarding mental health treatment while at the county jail prior to his transfer to CDCR; however it was noted that at the time of transfer, the inmate was not taking psychotropic medications.  When the inmate was admitted at the SQ RC on 12/1/11, he received a 31-item mental health screening questionnaire and answered "yes" to questions about previous psychiatric hospitalizations, psychotropic medications, and a history of suicide attempt.  The suicide report noted that the clinician who administered the screening questionnaire followed procedure in accepting the algorithm and did not make a referral to mental health; however the reviewer noted the scoring algorithm does not include questions about previous suicide attempts.  The mental health screening chrono dated 12/1/11 noted that the inmate was cleared for general population (no restrictions).  The inmate was not referred to mental health and had no contact with mental health staff for mental health services during his incarceration either at SQ from 12/1/11 through 4/3/12 or after his transfer to PVSP on 4/3/12 through his death on 5/15/12.  It is notable that upon his arrival at PVSP, he also had an Initial Health Screening (CDCR 7277-A) when he endorsed treatment for depression in 2001.  He again was not referred to mental health staff for an evaluation.

The suicide report recounted the inmate's suicide note that was translated from Spanish and read:

 "To whom it may concern:

Please don't blame anybody for my death.  Please tell my family not to worry about me and that I never hurt anybody or tried to hurt anybody.

I can't continue with this, it's too hard for me.  I hope God will forgive me for what I did "for committing suicide."  I did not harm my children.  I swear I never did it and I never wanted to hurt anybody.

I feel like I have to face society, I never thought of ending it in jail.  I ask my family to please forgive me.  Thank you for your support.  I love you all very, very, very much.  Sincerely yours

(Inmate's First Name)."
The suicide reviewer indicated there were events preceding the inmate's death including his receipt of a letter from his brother dated 5/10/12 indicating that his twin sons had made accusations that the inmate had sexually abused them and that there might be more charges.  The inmate committed suicide by hanging on 5/16/12, and the cellmate reported that the inmate asked how long would it take for an individual to bleed to death after cutting his neck.  On the date of his death the inmate reportedly told his cellmate he had not slept well the night before.  He used a blade removed from a state-issued razor to make the laceration on his neck, and he bled to death during a late morning or early afternoon.  The suicide reviewer also noted that given the inmate had a cellmate and was discovered to be lying in a pool of blood on the upper bunk, the custody staff present assumed the death was possibly due to homicide and sealed the cell as a crime scene, calling the Fresno County Sheriff to investigate.  The sheriff's investigators arrived that evening, collected the body and personal effects and within two days found several letters, one of which was explicitly a suicide note.

The suicide reviewer noted only one issue for discussion and recommendation which involved the screening for mental health needs using the standardized mental health screening questionnaire.  The reviewer noted that the decisions to refer new arrivals for further mental health evaluation are based on the scoring rules: if the inmate taking psychotropic medications, received mental health services in the CDCR during prior incarcerations, or if the clinician believes there is a need despite a negative finding from the questionnaire.  The reviewer noted "the scoring rules for the questionnaire do not include several significant questions:  history of psychiatric (and involuntary) hospitalization, history of taking psychotropic medication, and most surprisingly, a history of having made a suicide attempt."  The reviewer noted they reviewed the screening questionnaire for this inmate and if only the usual scoring rules were followed there was no need for further evaluation, but the inmate answered positively to questions about past psychiatric (and involuntary) hospitalization, taking psychotropic medications including antidepressant medication in the past, and having a history of attempted suicide.  The reviewer noted that it would have been helpful to have referred the inmate for further mental health evaluation; although a full mental health evaluation may have found no current need for mental health services, but his significant mental health history would have been documented and known to staff in other institutions.  The reviewer concluded that it was time to systematically evaluate the need for changes to the questionnaire itself and the scoring rules as it is based on the DSM-III.

The suicide report generated one recommendation and Quality Improvement Plan as follows:

> Problem:  Inmate __ was not referred for a further mental health evaluation despite positive responses on the Reception Center 31-item Mental Health Screening

questionnaire indicating a previous suicide attempt, psychiatric hospitalization, and being prescribed psychotropic medications.

Quality Improvement Plan:  The Suicide Prevention and Response Focused Improvement Team (SPR FIT) of the Division of Correctional Health Care Services (DCHCS) will discuss ways to improve the accuracy and utility of the standardized mental health screening questionnaire used in Reception Centers.  SPR FIT will make recommendations for changes to the scoring rules for the questionnaire and transmit those recommendations via memorandum to DCHCS Mental Health Program and Policy staff.

A Death Review Summary (preliminary) was provided by a physician dated 6/22/12 and revised on 7/6/12.  The primary cause of death as exsanguination due to self-inflicted laceration to the left jugular vein and the category of death as suicide were noted and a contributing cause analysis indicated a failure to follow clinical guidelines.  In the Executive Summary the physician noted that the patient was determined to be deceased due to the finding of rigor mortis, and a resuscitation attempt was therefore determined to be not indicated and death was later pronounced.  The reporter noted standard of care issues due to incomplete documentation provided by the first medical responders and delay in notification of the on-call physician.  With regard to the standard of care for the emergency response, the physician opined that the inmate was determined to be deceased at or around 1654 due to the finding of rigor mortis, the physician was notified at 1715 and death pronounced at 1800 or 2000.  The physician went on to note there was no documentation found in the eUHR by the nurse responders what their clinical observations were and why they determined that a Code Three response was inappropriate, and the physician-on-call was not notified about the events for more than one hour after the incident.  Also incomplete documentation was noted with regard to the standard of care for nursing.  The standard of care for medical providers found no departures.  There were systemic concerns regarding the emergency response and documentation of the emergency response not being in accordance with policies and procedures, as well as a time discrepancy.

On 8/1/12 the Deputy Director (A) Statewide Mental Health Program, and Director (A) Division of Adult Institutions issued their Report on Implementation of Quality Improvement Plan for the suicide of this inmate.  In their report the Directors referenced the responses to the suicide report being reviewed and approved by the SPR FIT on 6/28/12, in response to the suicide report dated 5/16/12.  An additional memorandum from the Directors dated 7/27/12 indicated that the recommendation that was developed as a result of the review of the inmate's death was approved by the committee on 6/28/12 and the QIP had been anticipated by the reviewer and was completed by the SPR FIT meeting on 6/18/12.  The minutes of the 6/18/12 meeting were provided.  The minutes included a discussion of this QIP and included that the suicide reviewer had sent out a more recent version of the questionnaire to the chief nurse executive (CNE).  The more recent version of the questionnaire sent to the CNE had 12 items instead of 31 and the CNE said that the scoring criteria made sense and was fairly easy to follow.  The senior psychologist specialist reported the action would be for he and the CNE to send out the new questionnaire to people in the field and at headquarters for feedback, with the intent to pilot the new questionnaire in several institutions.  The senior psychologist specialist also noted that he wanted to update the scoring rules in order to get a better screening of inmates when they come into the CDCR and that the scoring rules would be updated and sent out for review.  This item was listed under changes to referral criteria for RC screening following this inmate's suicide review.

**Findings**:  This inmate's suicide death does not appear to have been foreseeable in that he was not reporting suicidal ideation or intent in the days to weeks prior to his suicide to any health care staff.  The retrospective review by the CDCR reviewer indicated that the inmate may have been asking questions of his cellmate about how long it would take to die from self-inflicted laceration and had received a letter from his brother indicating that he may be the subject of further charges; however, neither was known to treatment staff prior to his death.  As defined in this report, this inmate's suicide was preventable as he should have been referred to mental health staff after the initial health screening and 31-item questionnaire mental health screening during his intake at the SQ RC.

The reviewer noted that the clinician followed the "algorithm" and "rules" for scoring the screening; however the responses by the inmate  regarding a prior suicide attempt, involuntary psychiatric hospitalization, and being prescribed psychotropic medications including antidepressants should have been enough for the clinician to utilize the other criteria for referral based on the inmate's history alone.  Further, the inmate was in his first incarceration and was incarcerated for a sex offense which would have raised further indicators for referral to mental health given his past history.  The reviewer did not address these issues directly in terms of the clinician's decision-making; however, the reviewer referred the matter to the SPR FIT at headquarters for consideration of revision of the 31-item questionnaire.  From a systems' perspective, this makes very good sense; however in terms of this individual inmate's intake screening and assessment and need for further mental health evaluation, the decision-making of the clinician was clearly inadequate.  As the inmate was not referred for mental health services, the receiving staff at PVSP did not appear to have information of his past suicide history and psychiatric hospitalization.  The inmate did report having been treated for depression in 2001 to PVSP staff, but again referral was not made to mental health staff for further evaluation.  In addition the emergency response in this case appears to be problematic in that the presence of rigor mortis was declared by nursing staff, and no first aid or CPR was attempted.  This is not in compliance with the Program Guide.

The on-call physician was not notified for at least one hour and because of an unclear timeline possibly much longer than that.  Custody staff determined that this could be a potential crime scene; therefore they stopped all access to the inmate by medical staff at the scene.  This included possible other medical interventions and/or transport to the CTC by the ERV which was turned away by a RN as she appeared to have determined that the inmate was deceased rather than having that determination made by a physician.

## 9.  Inmate I

Brief History:  This inmate was a 49-year-old Caucasian man, who committed suicide by hanging/strangulation on 5/21/12 at Folsom.  He was on double celled status in general population, but was the sole occupant of the cell, and was not in the MHSDS at the time of his death.  He had completed 23 years of a sentence of 32-years-to-life for two counts of second-degree murder, prior to his suicide.  The inmate was sentenced for these murders in 1989 and entered the CDCR in 1999 via DVI after serving ten years in a Nevada prison concurrent with his California sentence.  His MEPD was 1/15/12.

At 0715 hours on 5/21/12 an anonymous inmate informed a correctional officer to walk the tier. When the officer arrived at the inmate's cell he found a sheet covering the view to the cell with blood on it. The officer activated his personal alarm and gave orders to remove the cell covering. Another correctional officer responded and released the bar lock for the first officer to enter the cell. The inmate was found unconscious and unresponsive hanging from a bed sheet around his neck. Medical staff immediately responded and assisted the officer in cutting the ligature from the inmate's neck and lowered him to the ground. Medical staff immediately began CPR compressions. The inmate was transported to the Folsom main clinic via a Stokes litter where the main clinic medical staff performed lifesaving efforts. A call was made for an ambulance to respond to the Folsom main clinic. At 0740 hours, the inmate was pronounced dead by a physician at the Folsom main clinic. No autopsy report was provided.

The inmate had no known juvenile criminal history. He was first arrested in 1987, at age 24 for assault with a deadly weapon. He was sentenced to 45 days in jail and 36 months summary probation. The inmate had a history of substance abuse since his early adolescent years that included marijuana, alcohol, LSD and cocaine. Cocaine was described as his drug of choice.

The instant offense occurred during the early morning on 1/18/88. The inmate had been using cocaine for several days. He eventually became involved in an argument with his victim, who was supplying the cocaine. When the victim was awakened by the inmate asking for more cocaine and was again denied, the inmate picked up a hammer and started to beat the victim on the head. The victim's 18-year-old girlfriend woke up, tried to stop the inmate, and was also beaten on the head. Both victims died of multiple traumas to the head.

Following the death of his victims, the inmate smoked more cocaine, took about two kg of cocaine from the victim's stash, and about $100,000 in cash. He eventually was arrested in Las Vegas, Nevada and initially charged with drug trafficking. The inmate was later sentenced in Nevada to 15 years. He was returned to Los Angeles, California where he was convicted of two counts of second-degree murder and sentenced to two 15-years-to-life terms plus two years for additional enhancements for a total of 32-years-to-life. Initially he was returned to Nevada to serve his term there; however, he was again returned to California to complete his term there that began on 6/22/89 and ran concurrently with his Nevada term.

During the inmate's Nevada incarceration he had two major rule violations (1994 and 1995) for inmate manufactured alcohol. In 1997 he slashed another inmate because the inmate owed him $25 for a marijuana purchase. Following those offenses, he demanded a single cell and made threats to harm anyone that might be housed with him.

He was initially admitted to the DVI RC on 11/15/99 before being transferred to PVSP one month later. While at PVSP he incurred six RVRs. On 6/22/09, the inmate was placed in administrative segregation at PVSP for causing racial unrest, relating to his alleged influence in promoting a race riot between white inmates and the Fresno Bulldogs during August 2008. He was subsequently transferred to the CCC on 7/28/09. The inmate was later transferred to Folsom on 12/15/09 after being the victim of a battery by other inmates.

In his Life Prison Evaluation for June 2011 calendar, the inmate told his counselor that he did not

45

believe he would ever be granted parole and did not mind, as he was content with his current situation.  He was described by staff as an inmate who programmed and was respectful.  He was associated with the Skinheads gang, and he was considered to be influential but low-profile within the group.  Although he had double cell status, the inmate had been single celled since February 2012.

The inmate had a history of nine visits from family members and his attorney since 2000.  Two family visits occurred at Folsom during October 2011 and February 2012.
Although the inmate frequently submitted health care request forms, he had no history of involvement with mental health services in the community or in prison.  His father had a serious alcohol abuse problem and one of his sisters committed suicide during March 2010.  A mental health screening form was not found in the record from his reception processing at DVI.  However, subsequent mental health screening chronos dated 7/12/09, 9/1/09, and 11/13/09 were completed at CCC and indicated no mental health needs.  There was no history of prior suicide attempts.

The inmate's medical history was positive for Hepatitis C, benign prostatic hypertrophy, and a history of valley fever.  As previously referenced, he had a history of chronic shoulder pain resulting from a torn rotator cuff during 1985, which was followed by several surgeries and cortisone injections.

The inmate had chronic shoulder pain, which he aggravated while at work on 5/18/12.  He left work and was seen by his primary care physician at the clinic, who prescribed acetaminophen and wrote him a chrono for a one-week layoff in order to rest his shoulder.  There were no other significant events noted prior to his suicide or any noticeable change in his functioning.  The staff was reportedly surprised by his suicide.  An LVN reported after the suicide that other inmates had mentioned that the inmate was giving away some of his canteen items the day before he died.  However, this information was not confirmed.

An emergency dental examination occurred on 5/15/12.  The decayed portions of a tooth were removed, and it appears that an extraction was recommended.

Custody staff last saw the inmate during the 0400 hours count on the day of his suicide.  A suicide note was left in his cell which read as follows:

> To whom it may concern.  Dr. __ told me to kill myself if I wanted pain relief.
> On top of the locker is a hose with a needle on the end of it.  I poked myself, several times once in the back of the left hand, few times in both arms, I just can[not] seem to get it to work.  So I will cut my arms and throat [-] if that doesn't work[,] I will hang myself.

> Please be careful. I have Hep C. Needles on the hose on the locker. [Inmate's name]

The suicide report included the following information:

Per custody, the day after the suicide, an inmate told an officer that the PCP had told Inmate __ "the only way the pain will go away is if you die."  This inmate also said there would be a note in Inmate __'s cell documenting this.  A second inmate approached the officer and told him that the same PCP had told him that if he wants his shoulder pain to go away he would need to die and was not provided any pain medications.  However, when an investigations lieutenant interviewed this inmate about what the PCP told him, the inmate said the doctor had informed him that he would have to live with this pain for the rest of his life.  The PCP was not available on the day that the suicide review was conducted.  When the PCP returned on his vacation, the chief executive officer (CEO) met with him regarding the content of the suicide note, and relayed the outcome of this meeting to the reviewer via email.  Per the CEO, the PCP stated that he informed Inmate __ that he would most likely have some shoulder discomfort/pain for the rest of his life, but never implied or stated that the only way to stop the pain was to kill himself.

Staff processing the cell after the incident discovered two razor blades and multiple bloodstained pieces of towels and sheets were found, and the upper bunk with saturated with blood.  A funnel devised from a rain coat sleeve ran from the upper bunk down to a white plastic bucket that was placed on the lower bunk.  The bucket contained approximately 1 gallon of blood… ."

The inmate's risk factors for suicide included his life sentence, a violent offense history, violent behaviors in prison, substance abuse history, Caucasian race, and likely not being granted parole in the near future.  Protective factors included family support, respect from other inmates and staff, and his fairly good health.

The suicide report had no formal recommendations, however recommended that the medical/health care death review committee of CCHCS review whether the pain management provided to the inmate was adequate and if necessary, generate their own quality improvement plan.

The CPHCS Death Review Summary was reviewed.  Significant medical history during the six months prior to the inmate's death focused on his complaints of shoulder pain.  On 2/7/12, he initiated a 7362 requesting a steroid injection for his left shoulder pain, which he received from Provider 1 on 2/16/12.  The inmate reported no improvement on 3/26/12, when he rated his pain as being a 3.5 to 4 on a 0 to 10 scale.  On 4/4/12, he submitted another 7362 stating that salsalate, which was prescribed during his prior appointment, was not effective.  He was seen by Provider 2 on 4/13/12, who diagnosed impingement syndrome and offered Nortriptyline, which the inmate refused.  He agreed to continue the salsalate.  On 5/15/12 the inmate initiated a 7362 complaining of left shoulder pain, asking for a refill of pain medication and a MRI of the shoulder.  He initiated a 7362 three days later due to a work-related injury that exacerbated his shoulder pain.  He was seen by Provider 2, who documented the injury and the patient's request for Tylenol #3.  Salsalate was discontinued, and APAP 325 mg, two tablets by mouth three times per day as needed for pain was prescribed.

47

The Emergency Medical Response Review found insufficient documentation by LVN 1 on the first medical responder data collection tool (specifically, the mechanism of injury noted). More significantly, a five-minute delay in cutting the ligature from the inmate's neck was noted. The ligature had been cut after CPR was initiated due to ventilation being obstructed by the ligature. However, this report indicated "no departures identified" in the context of the standard of care for emergency medical response. The presence or absence of rigor mortis was not mentioned. This report appeared to be incomplete because it did not contain the standard death review committee assessment form.

The CPHCS Death Review Summary did not directly address the pain management issue. The review did indicate that the "medical care appears to have met standards" and that no departures from the standard of medical care were identified.

**Findings**:  Based on the suicide note, it appears clear that the inmate's suicide was precipitated by his dissatisfaction with treatment of his chronic pain. Review of the physicians' and nursing progress notes did not provide any documentation regarding the apparent desperation that the inmate was experiencing in the context of this issue. His suicide was not foreseeable.

This reviewer is unable to explain the significant disconnect between the inmate's suicide note and a review of relevant medical progress notes in the context of the inmate's apparent feelings of desperation regarding management of his chronic pain as reflected in his suicide note. The delayed response (five minutes) in essentially opening (i.e., cutting the ligature from his neck) the inmate's airway during the CPR process is of concern. The five-minute delay in cutting the ligature from the inmate's neck was not addressed in the review. The inmate's death was preventable related to this delay.

## 10.  Inmate J

Brief History:  This inmate was a 68-year-old Caucasian male treated at the 3CMS level of care under sentence of death while serving a life sentence concurrently. He committed suicide by hanging in his cell; he was single celled at SQ in East Block (first tier, bay side, cell #68). The inmate first entered California corrections in 1999 while serving a 60-years-to-life sentence. It was during that time (2004) that he was found guilty of a 1979 rape and murder of a 13-year-old boy and was also sentenced to death.

The inmate was discovered at approximately 1605 and "appeared" to be sitting on his toilet. In actuality, he was hanging with a power cord tied around his neck and secured to the shelf directly above him. Officers had begun distributing the evening meal when they found him. One officer blew his whistle to summon additional staff who arrived on the scene at an unspecified time. They formed an emergency extraction team and the sergeant ordered them to enter the cell. At the same time, the sergeant requested a medical response and a medical I response (inmates from the fire crew). The extraction team secured the inmate by cuffing his wrists, though it was unknown whether they were cuffed in front of or behind the inmate's back. Subsequently, the extension cord was cut. The CDCR 837AB did not indicate that anyone had held the inmate and removed pressure from the ligature while he was being secured. He was placed on a Stokes litter and removed from his cell. Once he was removed from the cell, the building sergeant called for an ambulance and staff began CPR. While none of these separate occurrences were individually

identified with specific times, staff reported that no more than two minutes passed from the time that custody staff found the inmate until the time that medical staff appeared on the scene.

When medical staff arrived on the scene at 1607, they relieved some custody staff of CPR duties. When medical response I inmates arrived, the remainder of custody staff were relieved. A Code Three ambulance from St. Joseph's Hospital arrived at SQ East Block at approximately 1615, after being dispatched at 1611. The paramedic and his assistant conducted a medical assessment of the inmate and attempted to take his vital signs. SQ staff informed the paramedic that the inmate had been receiving uninterrupted CPR for 30 minutes with no response, when in actuality CPR had only been provided for eight minutes. The paramedic placed the inmate on the ambulance monitor and continued CPR. With the inmate remaining in asystole, the paramedic pronounced the inmate dead at 1620 and left the facility at approximately 1624. SQ staff continued with their documentation of the cell and the inmate's condition (e.g., taking photos of the ligature marks on the inmate's neck, getting a rectal temperature) before turning his body over to the coroner and funeral home. The autopsy report had reportedly been requested but not received before the suicide report was completed.

An autopsy report was provided by the Office of the Coroner, San Rafael County, dated 5/31/12 and uploaded to the secure website on 1/31/13. The report stated the cause of death as hanging due to or a consequence of suicide. A toxicology report noted the presence of caffeine, codeine, and sertraline.

The suicide report provided few relevant details regarding the inmate's early life. The inmate's father had died in a motorcycle accident when the inmate was 14 years of age and the inmate had dropped out of school in the eighth grade; it was unknown whether these two events were related. The inmate joined the military at age 17 and his mother died when he was 21. One year after joining the military, he was court-martialed for sexually assaulting four children. This began his criminal career. He was sentenced to eight years in prison and served four. His criminal history was somewhat confusing as it was characterized by frequent moves, evading convictions, and absconding from parole or probation. He also had sentences that were overturned for technicalities and even one for incompetent counsel. He was believed to have been involved in at least two murders of children, including the one for which he was serving a death sentence. The older case occurred in Arizona following his release from Fort Leavenworth. While under investigation, he fled to Wisconsin. He continued sexually assaulting minors in Wisconsin and was eventually convicted, serving prison time there as well. When paroled, he absconded and fled to California. Approximately ten years later, he was found and arrested by Arizona authorities, though it was not clear where he was at the time or how they found him. He was tried, convicted, and sentenced to life in prison. The sentence was overturned due to incompetent counsel and he was allowed to plead to kidnapping and time served, and was placed on supervised release. Over the next dozen years, he continued to sexually assault male juveniles with an accomplice, a psychiatrist who was also his roommate, lover, and employer; the psychiatrist worked as a consultant at a juvenile residential treatment facility. Many of the victims were from this treatment facility and were given intoxicants so that they were unable to resist the assault. For these crimes, the inmate was serving a 60-years-to-life term beginning in September 1999.

The second murder occurred in 1979, but was not linked to the inmate until 1996. The body was not found until 1990 when the inmate "found" it and reported it to authorities. The victim could not be positively identified until 1996 and the case was reopened. Because of the inmate's background and "discovery" of the body, he became a person of interest in the death of this 13-year-old boy and was ultimately convicted of his death and sentenced to death. While other inmates on death row waited to see if the election would result in their death sentences being "thrown out," the inmate told staff that it did not really matter to him because he still had the 60-years-to-life sentence to serve.

The inmate did not initially actually spend much time in CDCR custody, having gone out to court twice. The last transfer out to court occurred on 1/4/00, when he returned to Riverside County for the 1979 murder trial that resulted in his death sentence; he returned to SQ in 2004. During his first brief CDCR incarceration, he was placed in administrative segregation for safety concerns. No similar references were mentioned during the second stay, though his known offenses remained the same. He received no RVRs throughout his stay, and he received only one counseling chrono for sleeping through standing count. Upon arrival at SQ, he was classified as Grade B level and went to yard alone. He was later moved to Grade A level on SNY yards, indicating that concerns regarding his safety must have remained. He was on a medically restricted yard (MRY) at the time of his suicide due to increasing health issues; this is a yard where inmates who are medically restricted for any reason yard together.

The inmate's yard status was temporarily suspended in December 2011 and he was placed on walk-alone status following self-reported safety concerns. The inmate's case was also profiled for a television series called "Cold Case Files" and was viewed by inmates at SQ. The show went into great detail regarding the inmate's offenses, murders, and suspected crimes. According to the suicide reviewer, this show only aired on 11/7/11. However, multiple inmate acquaintances who were interviewed indicated that it had been aired multiple times from November 2011 through May 2012 on different channels. The inmate reported that he was being harassed by other inmates on the yard and in the housing unit, with an inmate neighbor responsible for some of the worst abuse, which other inmates confirmed. The inmate told his housing lieutenant that inmates on his yard were talking about the show and that he no longer felt safe and was afraid that someone would harm him. The lieutenant requested that the facility captain authorize placing the inmate on confined-to-quarters status while an investigation of his safety concerns was completed. The findings of the investigative lieutenant were that while the inmate had valid concerns, inmates on the medically restricted yard did not pose a valid threat to him and the inmate should be returned to that yard. He was subsequently returned to the MRY.

The inmate was admitted to the MHSDS on 7/20/04 when he was placed at the 3CMS level of care with a diagnosis of Major Depression, recurrent, moderate. Three days later, the diagnosis was changed to Depressive Disorder NOS, Pedophilia, attracted to males, non-exclusive, Polysubstance Dependence, and Personality Disorder NOS. In July 2005, the primary diagnosis was changed to Dysthymia in partial remission, but in 2006 the diagnosis was returned to Depressive Disorder NOS. The diagnoses effectively remained the same for the remainder of the inmate's incarceration. On 10/7/04, the inmate requested that his Zoloft be discontinued and psychiatry complied. While no progress notes were available from that time, more recent progress notes indicated that the inmate functioned appropriately during that time but remained

on the mental health caseload.  He then began to feel increasingly depressed and isolated and requested medication to assist him to deal with his increasing psychiatric symptoms.  Once he was restarted on medication, on 6/26/09, he reported improvement and stabilization.

The inmate's current treatment plan was dated 8/2/11.  It noted a diagnosis of Depressive Disorder NOS by history, Pedophilia by history, and Personality Disorder NOS; he was prescribed Zoloft 100 mg every afternoon.  The treatment plan also noted that the inmate had serious medical issues and indicated isolative behavior that was to be a target for intervention. He was noted to have acute and chronic low risk for suicide, though minimal justification for that assigned risk was provided.  The inmate had many chronic risk factors, but only one acute risk factor was endorsed (single cell status).  The SRE indicated that he had social support, while the treatment plan's narrative indicated that he had no social support.  It was unclear whether the inmate ever actually had social support and whether this was an error on an earlier SRE that continued to be repeated or whether the social support that he had was removed or was withdrawn from him.  The inmate was also noted to be active in psychiatric treatment, although progress notes did not seem to support his active participation in such treatment.  The inmate was given medications which he appeared to take and he typically complied with appointments, but it was unclear whether he remained in his cell.  The inmate's behavior appeared to be passive; he appeared to be compliant without argument or resistance to direction, but he hardly appeared to be an active participant in treatment.  If staff believed that he was stable and did not need such services, then an updated treatment plan identifying a discharge plan for removal from MHSDS should have been completed and implemented.

During the last year of the inmate's life, he was seen by the psychiatrist approximately every 90 days and by his primary clinician on average every six to eight weeks.  Documentation in the progress notes indicated that clinical contacts were brief.  Psychiatric contacts only focused on medication efficacy and primary clinician contacts generally did not address therapeutic issues, but instead served as "checks" on the inmate.  Primary clinician progress notes also did not indicate whether the contact occurred cell front or in a confidential setting.  There were also two primary clinician contacts in late 2011 when the inmate communicated to his primary clinician about his safety on the yard.  The primary clinician indicated that the information needed to be discussed with custody to ensure that the inmate was safe.  After this was done, the inmate was placed on confined-to-quarters and walk-alone yard status until the investigation was completed. At the next contact, the inmate reported to the clinician that he had disliked confined-to-quarters status and found the walk-alone yards to be very depressing, both because he could not socialize with anyone and particularly because he could not see the sun.  On 4/11/12, the inmate requested to see a different primary clinician and reported that he was having a great deal of trouble with a neighbor on the tier who had been verbally harassing him.  The progress note indicated that he was frustrated and wanted support from the clinician and assistance in resolving the issue.  The inmate also reported that he was very lonely and wanted to connect with others.  The clinician reported that they discussed problem solving options for the harassment, and the inmate was offered group therapy to assist with his feelings of loneliness.

There was no documentation of the completion of a SRE during this time period.  Given the inmate's history of depressive disorder diagnoses (i.e., Major Depression, Depressive Disorder NOS, and Dysthymia), he should have been carefully evaluated for the presence of depression

symptoms.  A clinician indicated on a progress note dated 4/11/12 that the inmate's mood was dysthymic.  A current depressive episode and disturbance of mood/lability would have increased the risk of suicide, as they were acute risk factors.  Another present acute risk factor was current anxiety about the ongoing harassment by other inmates, particularly by a neighbor that was so troubling that the inmate requested to speak to a different clinician, rather than to his primary clinician.  The inmate also reported harassment by custody officers, or recent negative staff interactions, which was another acute risk factor.  There was no information about the inmate's substance use or abuse.  He also had signed a pain medication contract due to the addictive narcotics that he received for his ongoing medical issues.  He was quite explicit about his increasing interpersonal isolation, loneliness, and desire to connect with others.  Only group therapy was offered to him as a solution, which he turned down.  Since the harassment included multiple inmates with the neighbor simply being the worst, group treatment may not have been appropriate for the inmate at that time and he may have feared that more harassment could occur via group.

With both inmates and correctional officers harassing him about his crime and his social isolation growing, all without any clear hope of resolution in the near future, the inmate may have been experiencing feelings of hopelessness and helplessness.  These are acute risk factors and hopelessness is a strong predictor of subsequent suicide.  The inmate was also agitated, feeling frustrated about the ongoing harassment which had lasted for approximately seven months.  He previously had fears for his safety, but custody staff did not change his yard because they felt that he would be safe on the medically restricted yard.  Because the documentation on this evaluation was unavailable, it was unknown whether they evaluated psychological as well as physical safety.  Agitation, frustration, and fear are all risk factors for suicide.  The CDCR suicide report reviewer noted that beginning 5/18/12, the inmate had entered the anniversary period for his conviction, penalty, and subsequent death sentence; this anniversary may also have contributed to the suicide as an acute risk factor.  Finally, as an inmate on condemned row, the inmate continued to be single celled, which was another acute risk factor.

The inmate was prescribed Zoloft 100 mg every afternoon at the time of his suicide.  Of the provided medical record documentation, there was no SRE dated 5/25/12, nor were there any progress notes from that date though they were referenced in the CDCR suicide report and in the Death Review Summary.  In fact, the Death Review Summary indicated that progress notes and SREs would be attached to the report.  However, only two notes from the medical chronic care clinic were included with the Death Review Summary.

There were several SREs completed during the inmate's incarceration, though all were not available for review.  There was no history of suicidal ideation or attempt.  The inmate was consistently seen as low risk though it should be noted that the first SRE was not completed until one year into his incarceration on death row.  It was unclear what became of the prior records from 1999 and 2000.  All SREs mentioned until August 2011 were discussed in the suicide report but were not found in the provided records.  A 7/19/05 SRE indicated that the inmate had support from his brother and was future-oriented regarding appealing his case, despite having fears for his safety.  A subsequent SRE, dated 6/28/07, noted only supportive friends but provided no explanation regarding the inmate's brother.  It was not documented whether the brother was still a support to the inmate, whether the brother had died, or whether the brother had

withdrawn his support or fought with the inmate.  On 12/09/08, another SRE was completed and noted that the inmate was hopeful and optimistic about his appeal, but only mentioned a "significant person" in his life.  It seemed that the inmate's social support may have been shrinking, but it was unclear whether this was just due to the words used by the clinicians or if there had been an actual reduction in social support.  According to an SRE dated 4/07/09, the inmate was reported to still be hopeful about his case and to still be focused on his "best friend." The inmate stated that he would never kill himself because it would "devastate" his best friend. Another SRE completed on 8/5/09 noted that the inmate's social support was "meager" and that he had one friend but that the friend "does not write often or visit."  Clearly the social support system that the inmate had was dwindling.  However, there was no discussion of this or of any coping strategies for the inmate.

On 4/13/10, a completed SRE indicated that the inmate's mood had improved due to new hobbies and several new pen pals.  There was no discussion as to the status of the inmate's prior friend and whether that friend had completely withdrawn from the inmate's life.  For some reason, there were reportedly two SREs completed one week apart in December (12/8 and 12/15) 2010.  Based on the suicide report, they both contained the same findings of low risk with acute risk factors of safety concerns and single cell placement.  Protective factors "greatly expanded" to include interpersonal social support, future orientation, positive coping skills and conflict resolution skills, active and motivated in psychiatric treatment, and self-efficacy.  There was no explanation regarding the change in social support or who had come into the inmate's life to provide this support.  There were also no details provided regarding safety concerns or any of the new information at all.  On 3/10/11, another SRE was completed that did not state anything new or provide any details or pertinent information.  The SREs completed on 8/3/11 and 11/18/11 were grouped together, leaving one to assume that they were identical.  The only acute risk factor was single cell status and the added protective factor was that the inmate had insight into his problems.  Again, there was no explanation or details provided to explain this addition.  The inmate was also most likely experiencing safety concerns related to the harassment in the unit and on the yard that should have been noted in the November SRE, but were not.

Finally, the suicide report noted a 5/25/12 SRE.  However, it could not be located in the medical record documents scanned and made available for this review.  Despite reviewing the files multiple times, no SRE of that date could be found.  This SRE would have occurred two days prior to the inmate's suicide.  It would have been completed at a time when the inmate had been sharing concerns regarding his safety, expressing significant harassment by a neighboring inmate, and feeling like he had few options because he had been told by other inmates that he could not move his cell to another area because the inmates on that side did not like him either. The inmate also reported feeling "very" lonely and isolated with a desire to connect with people, yet he turned down group therapy, which was the only option presented to him by a clinician.  It should be noted that the inmate asked to speak to this other clinician, not his own primary clinician, for some unknown reason.  This reluctance seemed to suggest that he may not have been fully involved and active with treatment.  It also appeared that he had no social support and no sense of optimism or self-efficacy.  He may also have had a recent loss of social support, which was an acute risk factor.  The inmate may have had other acute risk factors: anxiety, depression, interpersonal isolation, hopelessness and helplessness, and recent negative staff interactions (there were some reports that staff were also giving him a hard time because of the

television show and of his crimes).  None of these issues were addressed in the SRE described in the suicide report and there were no progress notes from 5/25/12 or close to that date to provide any further information.  The last progress note was dated 5/1/12.  It was a brief psychiatric contact that took place cell front because the inmate refused to come to health care services for the appointment.

The inmate had multiple medical issues that were being treated, with varying degrees of success, over the years.  He was diabetic and hypertensive; both were felt to be fairly well-controlled with medications in 2012.  He had chronic pain.  Various issues would arise over the years.  For example, in July 2011, he had surgery on his knee that had subsequent complications, giving him ongoing pain issues.  He also had problems with pain in his feet, ankles, back, and shoulders.  By early 2012, the chronic pain and peripheral neuropathy were felt to be under control with morphine 120 mg twice per day and other medications.  He was also diagnosed with hypertriglyceridemia, and was monitored and treated with Simvastatin.  In addition, he had gastroesophageal reflux disease, lower urinary tract symptoms, and chronic obstructive pulmonary disease/asthma, which were all stable.  He was hard of hearing and required a hearing aid.  The inmate also had allergic rhinitis, which was stable.  At the time of his death, he was prescribed 12 separate medical medications.  He required a wheelchair to ambulate more than short distances, but reportedly could walk adequately within the unit, if not far.  However, medical progress notes post-surgery (July 2011) seemed to indicate that he would walk but hold onto his wheelchair for stability even for short distances.

There were no recommendations produced as a result of the CDCR suicide report.  There was, however, note of an error in the 837AB when the paramedic was told that CPR was provided uninterrupted for 30 minutes when in fact it had only been provided for eight minutes.  The reviewer did not feel that this caused any problems related to the inmate's care.

The CDCR reviewer believed that because the inmate had attempted suicide in full visibility without an effort to conceal himself during a busy time on his unit, he did not fully intend to kill himself.  Instead, the reviewer believed that the inmate was ambivalent about killing himself or was trying to bring about a housing change by appearing to have tried to kill himself.

**Findings:**  The inmate's suicide does not appear to have been a foreseeable death as he did not report suicidal intent or plans to any staff.  Whenever the inmate was asked directly about suicidal ideation or intent, he consistently denied it; this despite letters found after his death that indicated his strong ambivalence toward suicide.  Yet the inmate never explicitly stated to any staff member that he had any intention to harm himself.  His cell had obviously not been searched in some time, so his correspondence that contained so many references to suicide and giving up was not discovered by staff.  If it had been, then mental health staff could have been alerted to his suicidal thoughts and addressed them through treatment, possibly decreasing his suicide risk.  The inmate, however, exhibited numerous acute risk factors or "red flags" to which clinical staff should have attended.  Somehow these were not identified, either through a lack of assessment or through improper assessment.  All of the inmate's acute risk factors could have been addressed through treatment and custody interventions.

As defined in this report, it is this reviewer's opinion that this suicide was preventable if mental health and custody staff had collaborated regarding the inmate's mental health status, ongoing anxiety, safety concerns, interpersonal isolation, and ongoing harassment by other inmates and possibly by staff.  The only option presented to the inmate by custody was for the inmate to move.  This could have resulted in the inmate being identified as an informant or snitch and being further targeted and harassed.  Based on documentation, staff did not intervene to put a stop to the behavior, despite the fact that custody staff and all prison staff are responsible for safely and humanely housing inmates.  The inmate who was responsible for the greatest degree of harassment could have been disciplined; he could have been moved to a less desirable cell or even moved to the Adjustment Center for a period of time.  This would keep responsibility for bad behavior where it should be, with the perpetrator.  While staff did not know that this inmate was going to kill himself, there were enough "red flags" that staff should have created a revised comprehensive individualized treatment plan that addressed acute risk factors and reduced the inmate's suicide risk.

In addition, if mental health staff had taken the time to ensure thorough review of documents in the eUHR and taken the time to properly interview the inmate, SREs may have been more frequently and accurately completed, particularly the one for 5/25/12.  A comprehensive SRE on that date would have noted increased risk factors and decreased protective factors and prompted the clinician to take further action.  The inmate was receiving minimal care that may have been appropriate if he was stable, but he appeared to be slowly deteriorating, though it is difficult at times to be sure due to the minimal documentation.  SREs contained little information beyond the checked items and clinicians did not explain changes between SREs, creating significant clinical questions.

The inmate had significant medical issues.  While they generally appeared to be adequately treated, he was in chronic pain that was at times exacerbated.  This did not appear to be addressed or explored in treatment.  In fact, except for isolation, none of the inmate's suicide risk factors appeared to have ever been directly addressed.  It is unclear how much the inmate's chronic medical conditions may have contributed to his overall mental status.

## 11.  Inmate K

Brief History:  This inmate was a 35-year-old Caucasian male who committed suicide by hanging on 5/30/12 at Folsom.  He was a participant in the MHSDS at the 3CMS level of care at the time of his death.  He had been single celled in the ASU.  The inmate entered the CDCR via the HDSP RC on 7/11/05 to serve an 11-year sentence for assault with a deadly weapon.  He was sentenced to an additional eight years in 2009 after pleading guilty to battery on an inmate; at the time of his death, he was scheduled for trial as a result of the attempted murder on an inmate charge.  This would have resulted in a third strike with a mandatory sentence of 25-years-to-life if found guilty.

The incident reports (837AB) provided a narrative description and a partial timeline of the incident by the responding officers.  The inmate was found by an officer unresponsive and hanging from a noose inside his assigned cell on 5/30/12 at approximately 2127.  The officer was conducting a 30-minute welfare check when he found the inmate with a braided blue sheet fashioned into a ligature around the inmate's neck and the other end of the sheet attached to the

electric conduit of the cell's light fixture.  The incident report further stated that the officer yelled on the tier, "Man down. B-side, Cell 14."  The sergeant called a Code One medical emergency via institutional radio.  Two officers entered the inmate's cell and one of them cut the ligature about six inches above the knot.  The two officers then moved the inmate from the cell and placed him on a Stokes litter.  They reportedly began CPR and responding staff assisted in escorting the inmate to the TTA.  Correctional officers took turns performing CPR on the inmate and medical staff called the watch commander from the TTA requesting a Code Three ambulance.  At approximately 2155, City of Folsom Fire Department paramedics arrived and an EMT pronounced the inmate dead at that time.  A staff physician pronounced the inmate dead at 2200.  At approximately 2218, the Sacramento County Coroner's Office was called, and at approximately 2315, the Deputy Coroner arrived on the grounds.  At approximately 2340, the watch commander attempted to notify the inmate's next of kin (his sister), but the available phone number was no longer in service.

The suicide report provided additional information regarding the incident.  The report coincided with the incident report regarding the initial discovery of the inmate hanging at 2127 by the officer.  The inmate appeared unconscious in an upright position with his back to the cell wall.  The correctional officer blew his whistle and alerted the sergeant who was on the front landing of the tier.  The sergeant called "man down" via institutional radio, and the officer ran to the front of the tier, opened the cut-down box, and placed the Stokes litter at the front of Tier 2B.  The sergeant retrieved the cut-down tool and proceeded to the front of the cell, accompanied by another officer.  Upon arrival of the initial responding officer, the cell door was unlocked.  The officers entered the cell and lifted the inmate, cutting the braided sheet approximately six inches above the knot.  The inmate was removed from the cell and placed on the Strokes litter.  The officer attempted to find a pulse, but was unsuccessful.  One of the corrections officers then initiated chest compressions, which were maintained by other corrections officers as the Stokes litter was brought to the first tier.  An RN then arrived as the inmate was being carried to the first tier.  She found him to be cold and pale with no response to physical stimulations, with dilated and fixed pupils, and absent respirations and a pulse.  CPR was performed by a correctional officer en route to the TTA.  It was further noted that the inmate arrived at the TTA at 2130 and that healthcare staff assumed care; they were soon assisted by Folsom State Prison Fire Department staff upon their arrival.  The noose was removed with medical scissors from the inmate's neck after arrival at the TTA.  A Code Three was called by the nurse and the on-call physician was notified.  Oxygen was administered via the ambu bag.  The AED and three lead EKGs were also applied with findings of asystole and lack of pulse and respiration.  A community ambulance arrived at 2152 and assumed care.  A paramedic declared the inmate deceased at 2155.

The suicide report noted that the coroner's full report had not yet been received at the time of the suicide report.  The coroner's report also was not available for this review.  The suicide report provided information regarding the inmate's early juvenile and criminal justice history.  He was the second child and only son of drug-addicted parents.  He was born in Washington, but his family moved to Eureka, California when he was a young child.  His parents were reportedly heroin addicts and alcoholics.  His mother and sister reportedly suffered from depression.  The inmate was reportedly emotionally abused by his parents, with physical abuse from the father

and sexual abuse by a relative when he was 13 to 14 years of age for a six-month period. During this time, his parents divorced and he lived with his mother in Oregon, where she remarried.

The inmate's childhood was marked by several instances of arrest as a runaway. He dropped out of school after the ninth grade, joining the Job Corps and completing his GED. He married at age 23 and he had two daughters. After separating in 2001, he had another relationship that resulted in two additional children. He had a significant history of substance abuse that began at age nine with marijuana and continued to his instant offense with addictions to alcohol and methamphetamine.

The inmate's criminal justice history was extensive. He had arrests that began in 1995 in Oregon for driving on a suspended/revoked license, unrestraint of child, domestic battery, failure to appear, forgery (numerous), second-degree theft (numerous), criminal possession of forgery instruments, harassment, menacing, failure to carry/present operator's license, and second-degree burglary. These convictions resulted in multiple jail sentences and probation, as well as a prison sentence in Oregon of 16 months for first-degree burglary. The instant offence occurred on 7/2/04 and involved a dispute between the inmate and the uncle of his girlfriend regarding a $20 debt. A fight ensued, and the inmate hit the man in the head with a baseball bat resulting in several fractures and leaving him in critical condition. He was found guilty of assault with a deadly weapon on 5/6/05 and was sentenced to 11 years in prison. He entered the CDCR at the HDSP RC on 7/11/05.

He arrived at Folsom on 10/25/05 as a Level III inmate with 34 points and a Medium A custody level. His EPRD was 11/6/13. He had no reported gang affiliation. He worked in the vocational janitorial program, and in 2006, received his first RVR for smuggling contraband. In October 2006, he was screened for the California Out-of-State Correctional Facility Program, but it did not appear that he was transferred; the inmate continued his program at Folsom until he was removed on 8/23/07 at the request of the instructor due to the inmate's lack of interest and his request for removal. Sometime during August 2007, he became involved with a prison gang; on 9/11/07, he was placed in ASU due to the attempted murder of an inmate with a stabbing weapon. He pleaded no contest and was sentenced to an eight-year sentence, which moved his EPRD to 2/7/21. He returned to ASU on 8/20/09 due to a pending investigation as to his involvement in a riot. This investigation indicated that his continued presence in general population constituted a threat to the security of the institution and he remained in ASU pending transfer.

The inmate transferred to CSP/Sac on 4/8/10 for general population housing. He was again placed in ASU on 11/19/10 due to a charge of attempted murder of an inmate. The district attorney accepted the referral and he was apparently scheduled for trial on 6/8/12; he had been attempting a plea bargain for a sentence of less than life in prison. At the time of his suicide, he had temporarily been transferred to the ASU at Folsom due to overflow conditions. He was awaiting return to the ASU at CSP/Sac at the time of his death.

The suicide report provided the following information regarding the inmate's mental health treatment in CDCR. The inmate completed the initial mental health screening upon his arrival at HDSP RC on 7/11/05. He denied mental health issues, prior mental health treatment or suicidal

thoughts, and previous suicide attempts, and was cleared from further mental health assessment. His screening for developmental disability was also negative.  He presented with poor adjustment to ASU after the death of a family member and was placed in the 3CMS program.  At that time, he reportedly experienced depressed mood, insomnia, isolation, and agitation.  He was initially prescribed psychotropic medication, but requested discontinuation after approximately six months; the suicide report noted that this coincided with ASU release to general population. The medication was discontinued on 2/17/09 and the inmate was removed from the MHSDS at his request on 7/28/09.  However, he was returned to the 3CMS program in April 2010 after he requested assistance with depression, anxiety, and poor sleep and appetite after receiving bad news in the mail.  He indicated that he had previously requested removal from the MHSDS due to gang pressures.  He was prescribed Remeron on 4/14/10, but began refusing the medication after his transfer to CSP/Sac; the medication was discontinued on 4/28/10.

The suicide report noted that the inmate reported a history of mental health treatment after his arrival at CSP/Sac.  He stated that he had been provided with a diagnosis of Bipolar Disorder and had been treated with medications in the community, including in the county jail and at a local hospital in Oregon.  He reported treatment with Depakote and Lithium, which he discontinued; he indicated that he did not wish to take psychotropic medications.  On 6/1/10, he reported to the primary clinician that he was sleeping well with good appetite, mood, and energy, and he had positive comments regarding the program at CSP/Sac.  On 11/19/10, he requested removal from the MHSDS indicating that he had only requested placement to be transferred from Folsom.  He received an RVR on the same date resulting in ASU placement.  He was retained in the 3CMS program at the following IDTT meeting on 12/7/10 due to increased stressors, which included a possible SHU term and additional prison time.  He had reported, "this place is even worse, it's the last place I want to be.  I'm an active white, we can't be over here."  He continued to insist on removal from the MHSDS, and on 1/11/11, was discharged from the MHSDS.

The inmate again re-entered the MHSDS on 3/3/11, stating that he had left the gang, was facing a life sentence, and had lost everything.  He was described as visibly distraught, agitated, and anxious.  He was prescribed Remeron and was described as improved over the following few weeks.  Effexor was added on 4/29/11 due to ongoing depression and passive suicidal ideation; on 5/5/11 he was reportedly improved.  Medications were increased on 5/26/11.  On 6/15/11, after he was seen in the ICC, a cell search recovered 13 Remeron tablets and a "stockpile" of over-the-counter Zantac.  Subsequently, all medications were ordered DOT.  On 8/25/11, the primary clinician saw the inmate in a confidential setting when he indicated that he had been offered a 25-years-to-life sentence which he indicated was "alright news."  He was described as stable over the next several months.

The inmate was seen on 2/7/12 when he reported some anxiety and sleep difficulties; his medications were adjusted.  On 5/15/12, he was retained at the 3CMS level of care and his IDTT was conducted in absentia as he indicated that he would not attend stating "I'm good."  On the same date, he was told that he would be temporarily transferred to the Folsom ASU due to housing shortages at CSP/Sac and he was placed in a holding cell.  He told the primary clinician "I've been in here 22 months, I know how it goes you got nothing coming to you over there.  I would rather die than move there.  I was going to do it.  I had my sheet braided."  He was assessed with a GAF score of 30 at that time and was placed in an alternative housing cell with

suicide precautions pending MHCB admission.  On the following day, he was assessed by a "crisis-triage" psychologist who completed a suicide assessment, rescinded the MHCB admission order, and released the inmate to return to the CSP/Sac ASU with a recommendation for five/eight-day follow-up; however, the inmate was instead immediately transferred to the Folsom ASU.  The suicide report indicated that the inmate's primary clinician at CSP/Sac was informed of the plans for MHCB non-admission and return to the CSP/Sac ASU.  MHCB follow-up was completed at Folsom; this was initiated on 5/17/12.  The clinical summary by the Folsom IDTT on 5/22/12 stated the following:

> IM [inmate] is temporarily in FSP-ASU due to overcrowding at CSP SAC ASU.  IM reported that he is not happy that he is in FSP ASU and hopes that he will be able to get back to CSP SAC soon.  IM arrived from CSP SAC on a 5 day FU [follow-up] for MHCB.  IM has denied SI [suicidal ideation] since his arrival.  IM has a history of depressed symptoms.

Reportedly due to a dental appointment scheduling conflict, the inmate did not attend his IDTT on 5/29/12.  The IDTT reviewed and approved the treatment plan update and the inmate was seen later that day at approximately 1030 by the psychiatrist.  The inmate requested and received an increase in his Remeron dosage due to depressive symptoms; Effexor was unchanged and a psychiatric follow-up appointment was scheduled for three to four weeks.  He reportedly denied suicidal ideation and expressed hope of returning soon to CSP/Sac.  His primary clinician saw him at approximately 1100; the progress note indicated that he was very frustrated regarding having had his methadone prescription transferred.  They discussed a counseling chrono that the inmate had received on 5/25/12 as to medication hoarding.  The inmate indicated that he would file a 602 if he did not receive his medication.  The suicide reviewer commented that the clinician told the reviewer that the inmate "seemed self-sufficient, knew the system and how it worked, and was resourceful in a correct sense."  The clinician did not detect evidence of mental illness and the inmate did not endorse suicidal ideation.

The suicide reviewer indicated that the inmate had no prior suicide attempt history in the CDCR; although he reported a history of attempts between 1999 and 2003, the reviewer was unable to determine the number of attempts as the inmate's reports varied, and there was no independent verification in the medical record.  He was provided with various diagnoses over the course of his CDCR incarceration.  These diagnoses included initial diagnoses of Adjustment Disorder with mixed mood and Bereavement, and possible diagnoses of Anxiety Disorder and Depressive Disorder at the time of initial intake.  He was later provided with diagnoses that included Anxiety Disorder NOS, Adjustment Disorder, and eventually Depressive Disorder NOS with deferred diagnosis on Axis II.  His GAF scores were generally assessed in the low to mid 60s, with the exception of the GAF score of 30 on 5/15/12 when his MHCB admission was rescinded at CSP/Sac.

SREs that were completed prior to 2010 generally indicated low suicide risk.  A SRE completed on 5/15/12 noted as chronic risk factors history of childhood abuse, major depressive disorder, substance abuse, violence, poor impulse control, suicide attempts, long/life sentence, Caucasian, and male.  Acute risk factors were listed as suicidal ideation, current/recent depressive episode, agitated or angry, recent bad news, recent change in housing, safety concerns, and single cell

59

placement.  Protective factors included family support, exercises regularly, and insight into problems.  The inmate reported a plan to kill himself and a desire to die; "…Pt was fidgety and appeared anxious.  Speech WNL.  Thoughts were linear and logical. SI reported with a plan to hang himself."  He was assessed with moderate chronic and acute risk for suicide.  The justification of risk level provided was that he had a history of extensive substance abuse, treatment for depression, and ASU placement for attempted murder, with prior suicide attempts and no indication of MHCB placement; "chronic risk should be considered moderate to high.  During the past several months the pt has refused individual sessions.  He has reported some depression but does not come out to discuss his symptoms.  When he was told today that he would be moved to Old Folsom for overflow housing he became upset and stated he would rather die than move over there.  He reported SI with a plan to hang himself."  The plan called for placement on suicide precautions for danger to self.

On 5/16/12, a SRE was completed at the time of the inmate's return to ASU and non-admission to the MHCB.  This SRE was identical to the one completed on the previous day with the same chronic risk and protective factors.  The acute risk factors eliminated suicidal ideation, current/recent depressive episode, and agitated or angry as acute risk factors, but retained recent bad news, recent change in housing, safety concerns, and single-cell placement.  He was assessed with moderate chronic and low acute suicide risk.  The justification provided was that the inmate presented with appropriate mood and needed time to adjust to the move to Folsom; "I/P clearly acknowledged that he reported suicidality for the express purpose of avoiding the transfer to Old Folsom.  There are currently no signs of suicidality/homicidality and I/P is clearly able to advocate for himself well."  The plan outlined was for return to regular housing, to initiate five/eight day follow-up, and to discontinue suicide precautions.

The inmate's medical history was significant.  Upon arrival to CDCR in 2005, his initial health screening was significant only for hepatitis C and occasional knee pain.  In 2009, he began to report lower back pain.  He was evaluated, which included imaging studies, and treated with non-steroidal anti-inflammatory medications and a muscle relaxant.  During late 2009, he was prescribed a back brace and medication for neuropathic pain.  A second imaging study revealed changes consistent with "degenerative disk disease with spinal stenosis and radiculopathy."  A referral for pain management, possible epidural injections, and continued medication treatment was recommended; Neurontin was increased to 2100 mg/day and morphine sulfate at 30 mg/day for two months.  Two months later, Neurontin was increased further and morphine was continued.  The inmate requested an increase in morphine on 3/30/10, which was denied, and he filed a 602.  On 4/21/10, a reviewing physician on Folsom's pain management committee met with the inmate and indicated that his MRI results were consistent with his complaints and that he was on a relatively low dosage of morphine and a relatively high dosage of Neurontin.  His medication dosages were adjusted, but physical therapy was not initiated due to his anticipated transfer to CSP/Sac on 4/23/10.

On 10/25/10, morphine was changed to methadone 30 mg/day and Neurontin was continued.  Baseline testing such as EKG was performed that revealed possible abnormalities.  The inmate complained of neck pain in February 2011 and was prescribed Methocarbamol for approximately one week.  Neurontin was discontinued on 2/17/11 and he remained solely on morphine 30 mg/day without difficulty.  The inmate indicated that despite EKG abnormalities, he wished to

continue methadone treatment and a follow-up EKG was ordered for January or February 2012. However, the suicide reviewer noted that this test was not located in the medical record. There were several instances in which the LVN administering medications believed that the inmate was not taking all of his methadone. Informational chronos for alleged hoarding were written on 1/13/12, 1/20/12, and 1/21/12. After the inmate accused the LVN of harassment and denied the allegation, offering to take a drug test to confirm appropriate blood levels, the primary care physician, after discussion with the inmate, decided to make no changes in the medication regimen.

The inmate was prescribed Naproxen following an acute knee injury on 4/19/12. He reportedly received all of his medications prior to his transfer to Folsom. After arrival at Folsom, there was an issue regarding continuity of methadone after transfer; he did not receive his methadone on the evening of 5/22/12. The suicide report indicated that although he received all of his other medications without disruption, methadone bridging orders had expired and the primary care physician was reluctant to order the medication until he had evaluated the inmate. The inmate submitted a health care services request form on 5/18/12 stating, "I need to see the doctor so I can get my knee exrayed [sic] please! Thank you!" He submitted another request two days later stating, "I need to get my methadone renewed. I am a CSP SAC inmate and have been taken off my meds. I am in pain from my back and knee. Chronic Care." He was seen as a "walk in/add on" patient in response to the requests when it was noted that his knee had slight swelling and he had a slight limp. He was instructed to apply ice or heat and the nurse ordered: "To MD line routine to eval R knee pain & continue meds as ordered."

The inmate was seen in the TTA after a "man down" incident in his cell. He reported that his right knee pain was so intense that "it gave out & I fell to the ground I also am having back pains for years & I can't move my R leg because of pain. I got transferred from next door & they stopped my Methadone for no reason." The physician's assessment was "Back pain and right lower extremity pain due to herniated nucleus pulpous which is also the cause of his muscle atrophy." He ordered methadone 15 mg twice per day with 30-day follow-up with the primary care physician; the inmate received the medication until the day of his death. On 5/25/12, the psych tech indicated that the inmate was caught pouring crushed medications onto the floor and he was provided with a counseling chrono. The inmate was seen on the day prior to his death for a dental examination and reportedly indicated a desire for additional follow-up treatment.

The suicide report indicated that on the day of his death, the inmate was seen by his primary care provider; prior to that appointment, the family nurse practitioner (FNP) had reviewed his recent medical history and noted that "I/M possibly caught diverting methadone on 5-25-12 while housed in Ad Seg." After this review, he discussed the case with Folsom's chief physician and surgeon; the note stated "Recommend DC methadone – violation of pain contract by I/M for possible drug diversion." The note further stated "I/M wishes to discuss the methadone prescription with Dr. __. I/M sent to TTA to be seen by Dr. __ for further evaluation." The order for methadone discontinuation was noted at 1300. The inmate was brought to the TTA at 1325 where he told the nurse "(t)hey stopped my methadone & I don't know why." He reportedly refused vital signs or to sign a refusal form. The nurse released him for return to his housing unit and told him to discuss the issue with his primary care provider. He was described as "upset."

The suicide reviewer noted that the FNP wrote a note on 6/1/12 after learning of the inmate's suicide that was entitled "Additional information from chart review considered on 5-30-12."  The note included the following:

- List of chronos, by date, which alleged hoarding of medication at CSP SAC and FSP;
- Reference to the EKG of 12-20-11 which showed an increased QT interval;
- Summary of the results of the last MRI;
- The following statement, 'Previously documented on several encounters there was no effect on gait or symptoms suggestive of disability.'

The FNP further stated "(d)ue to the patient past and current history of hoarding, drug diversion and documented EKG change, I decided to DC methadone at this time, continue to follow-up patient clinically and treat appropriately.  Alternatives were offered but patient decided to terminate visit."

The preliminary CCHCS Death Review Summary was completed from 6/12/12 through 7/9/12.  The summary noted that the inmate had coexisting conditions of "depression, hepatitis C, suicide attempts X 2, CCCMS & chronic pain."  It categorized the death as a suicide and stated that the death was possibly preventable, with contributing cause analysis of medication delivery and medication prescribing issues.  The summary further stated:

> This was a 35 yo male with little, significant past medical history except for some chronic R knee and low back pain.  The patient had frequent contact with the mental health system (CCCMS) and, at times, his mood seemed difficult to manage.  His MHHx included 2 past, suicide attempts (old) and a recent suicide threat and watch (5/15/12).  The patient had been on opiates (morphine and methadone) for years for his chronic pain.  Yet, just prior to his death, there appeared to be (per the MAR and PNs) some uncertainty about his need for these meds and, perhaps, some inconsistency in getting the meds to him (e.g., 7362s).  Furthermore, two previous, alleged diversions plus a more recent incident (5/25/12) lead to the discontinuance of his methadone on the day of his death.  The failure to consistently deliver the patient's pain medication once at FSP along with its abrupt discontinuance (not a taper) might have contributed to this patient's suicide.

Regarding the standard of care for the emergency medical response, the summary stated the following:  "Care looked mostly appropriate, but records reviewed lack the usual detail.  No sure why the noose was not removed at the cell site, but later removed in the TTA."  With regard to the standard of care of medical providers, the report stated:  "I do not understand the apparent confusion over his opiate need between providers (Dr. C, J, W & NP K) and then its subsequent discontinuance- diversion?  Frequently, diversion of any kind leads to opiate discontinuance.  However, this is normally done over a tapering (e.g., 2 week) period.  NP K failed to taper this patient's opiates."  Information regarding the standard of care of nursing was not included in the report, and the reader was referred to the nursing review (this review was not provided to this reviewer).  Regarding systemic concerns, the report stated:  "CEO (Institution) and Quality Management (QM) are sent notification of all systemic issues identified.  CMEs to review with

all PCPs their need to communicate about and coordinate with each other on common patients' opiate usage.  CMEs to examine the delivery of medications as patient move from one site to the other."

On 7/23/12, a request for review was forwarded to the Death Review Committee.  The memorandum stated that the Suicide Case Review Committee had met on 7/13/12 regarding the suicide, and that the reviewer had noted the following concerns regarding the management of the inmate's health care:

> The inmate's prescription for methadone was stopped suddenly and without an interview of the inmate, despite his documented history of compliance with the medication.  It appeared that the decision to discontinue the medication was based upon the primary care physician's (PCP) suspicion that the inmate might have been hoarding/diverting his medication.  Although the record contained information that made this a reasonable concern, the record also demonstrated that other providers doubted the veracity of the earlier reports of possible diversion.

> A second concern involved an action by a nurse who met with Inmate __ at the Triage and Treatment Area (TTA) on May 30, 2012.  Our committee recognizes that this is not a serious concern; however, we are offering it to you for your review, based on our reviewer's belief that this action may have had an impact on the inmate.  Apparently, after learning that his methadone would not be continued, the inmate attempted to advocate for himself by requesting to be seen at the TTA.  He was not willing to cooperate with the usual procedure at the TTA and insisted he only wanted his methadone renewed.  After he refused to have his vitals taken, the TTA nurse told him that he would be returned to his building and that he would need to address medication issues with his PCP (i.e., the family nurse practitioner who had just discontinued the methadone).  The nurse's note indicated that inmate was 'upset.'  Our reviewer noted that, at this point, Inmate __ was experiencing considerable stress and could have benefited from 'a willingness to assist and an attitude of caring and compassion' from the TTA nurse.

No response to this request for review by the Death Review Committee was noted in the information that was provided to this reviewer.

The incident reports documented the presence of a note among the inmate's effects in his cell after his death.  The suicide report indicated that he wrote a suicide note that stated:  "I could not take the pain; I could not take the sickness, I could not take the game, You all play with our live's, [sic] I just could not take life, in this place,

> Last word's [sic]        [signed] Inmate __"

The suicide report provided two recommendations and Quality Improvement Plans as follows:

> Problem 1:  The inmate's bridging order for opiate medication was allowed to expire without interviewing the inmate and was discontinued (see CCHCS Preliminary Death

Review Summary on the 'Standard of Care of Medical Providers' and 'Systemic Concerns.')
Quality Improvement Plan 1:  This concern has been referred by the Suicide Response Coordinator at DCHCS Headquarters to CCHCS Death Review Committee for appropriate review and action if necessary.

Problem 2:  Tier COs signed for all of the completed welfare checks, although from 0700 to 2100, the ASU S&E COs actually completed the wellness checks.  Further, these checks seem to be generally completed on the hour and half-hour rather than at random times within the 30 minute period, thus making the time of the next check too predictable.
Quality Improvement Plan 2:  The Warden or designee at FSP shall provide training to all custody staff regarding the correct procedure of providing and documenting welfare checks.

On 9/11/12, Folsom presented DCHCS with the response to the Quality Improvement Plans. They noted that the first issue was not assigned to Folsom.  Regarding the second problem noted, Folsom provided documentation including the training agenda and sign-in sheets as to the training of all custody staff in the correct procedure of providing and documenting welfare checks.

On 9/21/12, the Deputy Director (A) Statewide Mental Health Program and Director (A) Division of Adult Institutions submitted their report on implementation of the Quality Improvement Plan in response to the suicide report.  The report indicated that the responses were reviewed and approved by the Suicide Case Review Focused Improvement Team, CCHCS on 9/21/12.  The Directors indicated that no further actions were necessary.

**Findings:**  This inmate had a history of mental health treatment, primarily within the CDCR at the 3CMS level of care.  He also had a history of chronic medical concerns resulting in chronic pain and long-term treatment with opioid medications.  He had at times requested removal from the MHSDS and discontinuation of psychotropic, primarily antidepressant, medications.  Prior to his suicide, he was consistently prescribed and reportedly receiving his psychotropic medications.  Although he had a reported history of suicidal attempts, details regarding them were sketchy and vague.  It appeared that a number of significant stressors may have resulted in his suicide; these included his transfer to the Folsom ASU, disruptions in the bridge orders for medications, the failure of his plea bargain to prevent a third strike conviction, and ultimately, discontinuation of methadone on the day of his suicide and other stressors included in the suicide report.

This inmate's death did not appear to be foreseeable.  SREs that were completed on 5/15/12 indicated moderate chronic and acute risk and a SRE completed on the following day indicated moderate chronic and low acute suicide risk.  Although the determination was made that MHCB admission was not indicated, this decision was aggravated by the inmate's transfer to Folsom's ASU rather than his return to the CSP/Sac ASU and the lack of communication between mental health and custody staff regarding this move.  Additional communication may have led to different treatment planning and disposition for this inmate.  In addition, he was placed in

alternative housing at CSP/Sac due to the lack of an MHCB; he was evaluated the following day when he reportedly indicated that he was no longer suicidal and had only wanted to avoid transfer to Folsom.  The use of these alternative housing cells remains counter-therapeutic and due to the conditions of the cells, may be a disincentive for inmates to convey their true concerns and symptoms in an attempt to be removed from the cells.

The suicide report noted that approximately one hour had elapsed between the last 30-minute wellness check and the time of the inmate's discovery.  The reviewer noted that documentation of the checks was not staggered and that tier officers documented completion of the checks, although the ASU S&E officers actually completed the checks.  These comments were included in the report's recommendations.

The suicide reviewer included some recommendations in the suicide report that were not articulated in the QIP provided.  Although it did not appear that the issues mentioned were causative, this reviewer is in agreement with these recommendations for improved suicide prevention in the future.  The reviewer called for more accurate documentation, in this instance regarding SRE completion.  The reviewer also noted the lack of communication between custody and mental health staff regarding the inmate's transfer to Folsom, noting that more information may have led to a different disposition for the inmate after release from alternative housing.  The reviewer also noted that communication and consultation was needed between healthcare and mental health staff for an inmate such as this one with coexisting medical and mental health concerns.  If mental health staff had been alerted to the discontinuation of the inmate's methadone, he may have been assessed and treated as needed.  Lastly, the Death Review Summary noted that the inmate's death was "possibly" preventable.  This reviewer is in agreement with the assessment that this death was preventable based upon the definition provided in this report.

## 12. Inmate L

Brief History:  This inmate was a 38-year-old African-American male who committed suicide by hanging on 6/7/12 at MCSP.  The inmate was a participant in the MHSDS at the 3CMS level of care at the time of his death.  He was single-celled in the ASU.  The inmate returned to the CDCR on 6/17/09 via the NKSP RC.  He had pled nolo contendere to one count of possession of a controlled substance with intent to sell.  He was sentenced to seven years in prison.  His MEPD at the time of his death was 9/27/13.

The incident reports (837AB) indicated that the inmate was discovered on 6/7/12 at approximately 4:01 p.m. by an officer who was passing out the evening meal trays.  The inmate, who was the sole occupant of his cell, was observed by the officer and appeared to be hanging from a noose that was attached to the wall shelf inside of the cell.  One end of the noose was wedged into the space between the shelf and the wall, and the other end was wrapped around the inmate's neck.  The noose appeared to be manufactured from a state-issued sheet.  The officer ordered the inmate to come to the door, but the inmate was non-responsive and the officer immediately notified ASU staff that he had a possible "hanger" inside the cell.  The ASU sergeant announced a Code One medical emergency on his radio and called for the ERV to respond.  An ASU officer retrieved the cut-down tool from the control booth officer and responded to the cell.  Another officer retrieved the extraction shield and responded to the cell.

An officer ordered the inmate to respond to the door, but he did not, and the control booth officer opened the cell door.  Several officers entered the cell, placed handcuffs on the inmate in front of his body, and cut the noose from around his neck.  He was removed from the cell and placed on his back on the floor outside of the cell.  Two LVNs responded and began lifesaving procedures, including CPR, and applied the AED.  An officer responded from the TTA with the ERV, and several officers placed the inmate on a gurney and carried him out to the ERV while the two LVNs continued CPR.  The inmate was secured to the ERV and transported to the TTA with CPR continuing during transport.  Emergency room staff took control of the inmate and continued lifesaving efforts, but at approximately 4:40 p.m. a physician pronounced the inmate deceased.

The suicide report provided a timeline of the emergency response.  It indicated that at 16:01 the inmate was discovered and a medical emergency was announced.  At 16:03 the control booth officer opened the cell door and the inmate was cut down and placed on the floor of the cell.  CPR was begun at 16:04 and the AED was attached and indicated "no shock."  The ERV arrived at the building at 16:05 and the inmate was transported, arriving at the TTA at 16:10.  Lifesaving measures continued, including use of the AED, and the inmate's skin was noted as "warm" and "dry."  Multiple attempts at intubation were unsuccessful due to severe edema and distortion of the airway, and CPR continued.  At 16:22, EMS personnel arrived from the community and also attempted intubation, but were unsuccessful.  CPR continued, an IV line was placed, and normal saline and Epinephrine were administered.  At 16:40, the inmate was pronounced dead by the TTA physician.

An autopsy report was provided by the Office of the Coroner, Amador County.  It indicated that the autopsy was conducted on 6/11/12.  The cause of death was determined to be asphyxiation (minutes) due to hanging (minutes).  A toxicology analysis was conducted, including a complete drug screen and blood sample, which indicated that no common acidic, neutral, or basic drugs were detected, and no ethyl alcohol was detected.  However, Carbamazepine 6.8mg/L and Hydroxyzine 0.27mg/L were detected.  The effective level of Carbamazepine was 4-12mg/L and the effective level of Hydroxyzine was 0.05-0.09mg/L, with a potentially toxic range of greater than 0.1mg/L.  The Hydroxyzine level was above the potentially toxic range.

The suicide report recalled the inmate's criminal justice history.  The reviewer also noted that the inmate was an unreliable historian who had a number of aliases and apparently told his clinicians falsehoods about his symptoms, particularly about his history; therefore, the information that he provided and verified information regarding his background was almost non-existent.  He was arrested as a juvenile three times between 1989 and 1991 and was sent to juvenile hall twice for the crimes of burglary and receipt of stolen property.  In 1992, he was convicted of robbery and sentenced to three years in prison; while in prison, he was convicted of possession of a deadly weapon by a prisoner.  He was placed on parole, although the date of such parole was unclear from the records.  He was also arrested for violating parole five times between January 1997 and being convicted for possession of a controlled substance in September 2001.  He was paroled in July 2002, but returned to the CDCR in October 2002 for a parole violation and new prison term; in April 2003, while serving that term, he was a victim of battery by another inmate.  In March 2004, he was again a victim of assault.  He was transferred to an MHCB at CSATF in April 2004

66

and paroled in May 2004. He was returned to the CDCR in August 2004 on a parole violation and a new term for possession of a controlled substance, but he paroled in July 2005.

The inmate returned to the CDCR on a parole violation with a new sentence in April 2006 and paroled in September 2007. He returned to the CDCR for his last prison term on the commitment offense of possession with intent to transport/sell a controlled substance and parole violations on 6/17/09, as noted above. He was transferred to ASP on 10/19/09, received an RVR for fighting with an inmate on 1/20/10, and was admitted to the MHCB at CMF on 1/26/10. He returned to ASP on 2/4/10 and was transferred to MCSP for EOP level of care on 2/8/10. The suicide report referenced the inmate having been found guilty of ten RVRs after his arrival at MCSP, including offenses of "cheeking" his medications, four incidents of fighting, disruptive behavior, destruction of state property, engaging in behavior which might lead to violence, disobeying orders, and battery on an inmate. He had been housed in the ASU following a charge of battery on another inmate on 4/4/12 and remained in the ASU until his death. The suicide report also noted that on 5/24/12 the inmate met with the ICC. Attempts were made to resolve an enemy concern that would allow the inmate to remain at MCSP, but they were unsuccessful; the inmate learned on the day of his suicide that he would most likely be transferred to RJD or PVSP.

According to the eUHR and suicide report records, it was unknown whether family members had any history of mental illness. However, the inmate reported that his mother had committed suicide by hanging as well as by heroin overdose when he was three years old, and he was subsequently placed in foster care. He had a history of polysubstance abuse including marijuana, cocaine, PCP, methamphetamine, inhalants, and alcohol, but according to records appeared not to have had any mental health treatment prior to incarceration. When he first entered the CDCR in September 2001 he was placed at CSATF, and remained there until he paroled in July 2002. He returned to CDCR in October 2002 with a parole violation and new prison term and remained until May 2004. He had been admitted to an MHCB during an incarceration after having been the victim of an assault in which, according to the suicide report, he was stabbed seven times.

The inmate returned to the CDCR in August 2004 and was placed on an SNY. He transferred to CMF for psychiatric treatment in May 2005 and subsequently paroled in July 2005. He returned to CDCR in April 2006 on a parole violation with a new prison term, transferred to CMF for psychiatric treatment, and paroled in September 2007.

The inmate returned for his last prison term in June 2009, as stated above, and was placed at the EOP level of care. He was admitted to the MHCB from 12/8/09 through 2/8/10 with diagnoses of Major Depressive Disorder, severe, with psychotic features, Anxiety Disorder NOS, and Polysubstance Dependence. He was placed at the EOP level of care from 2/8/10 through 6/22/10, when his level of care was changed to 3CMS, where it remained until his death. There did not appear to be documentation of the completion of an SRE during his MHCB admission. However, on 2/16/10 an SRE indicated "No Apparent Significant Risk," even though the inmate was on five-day follow-up at that time. The SRE noted numerous risk and protective factors, including a history of previous suicide attempts within the CDCR. However, the SRE did not list these previous suicide attempts, including two attempted hangings on 4/8/06 and 12/8/09 and the inmate's cuts to his arms, hand, and knees on 1/20/10. The suicide report appropriately noted

that a SRE conducted on 2/17/10 by the same clinician who conducted the 2/16/10 SRE indicated that a correctional officer or staff interview occurred, but the eUHR and C-file were not reviewed.  In that risk assessment, the inmate denied a number of historic and current risk factors and endorsed protective factors that were untrue, while the clinician did not review the records; record review would have demonstrated inaccuracies in the inmate's statements.  The clinician noted "no extensive history of SA-future oriented-motivated and willing to try different treatment options.  Relatively low number of risk factors endorsed – fair number of protective factors.  Was not suicidal this past OHU."

The inmate was placed in the MHCB at CMF on 1/26/10 because of suicidal behavior, including his attempt to hang himself on the yard in front of other inmates and staff.  His diagnoses of record at that time were Major Depressive Disorder with psychotic symptoms, mild, recurrent.  He was previously diagnosed with Mood Disorder NOS, Bipolar Disorder, and Schizoaffective Disorder.  He had received a variety of medications during his prior incarcerations including antidepressant, antipsychotic, and mood stabilizing medications.

The inmate returned to the MHCB on 1/20/10 after he had cut his arms, hands, and knees; these activities were determined to be suicidal gestures after the inmate reported engaging in them for attention.  He remained at CMF from 1/26/10 through 2/8/10, and then returned to MCSP at the EOP level of care.  His level of care was changed to 3CMS on 6/22/10 as he had not demonstrated symptoms of serious persistent mental illness and his diagnosis was changed to Mood Disorder NOS by history and Polysubstance Dependence.  He was also diagnosed with Personality Disorder NOS, and was prescribed Prozac.  He had variable adherence to Prozac and in May 2011, his medication was changed to Buspar due to reported anxiety and panic symptoms.  He was continued at the 3CMS level of care.  He was also prescribed Vistaril at night for sleep.

An interdisciplinary progress note by the program manager dated 2/9/12 indicated that he met with the inmate to complete an RVR mental health assessment secondary to a CDC RVR issued on 1/25/12 for behavior which might lead to violence.  The program manager concluded that there were 1) no mental health factors that would cause the inmate difficulty in understanding the process; 2) recent (eight weeks) irritability and sleeplessness secondary to medication regimen may have served to contribute to the behavior that led to the RVR; and 3) no mental health factors that indicated that the hearing officer should consider and assess a new penalty.

The inmate remained at the 3CMS level of care.  On 4/4/12, he received an RVR for battery on an inmate and was placed in the ASU.  His diagnosis remained Mood Disorder NOS.  On 4/6/12 he was seen by a psychiatrist who added the diagnosis of possible Malingering.  He was referred for another psychiatric evaluation by his primary clinician on 4/8/12 because he was reportedly delusional.  The psychiatrist noted that the inmate was overheard speaking with other inmates and was appropriate.  During the interview, the inmate also was very appropriate until he began talking about "strange happenings and unusual ideas about his life."  The psychiatrist assessed that he was not delusional and made no changes to his treatment.

The CDC 115-MH RVR completed on 4/12/12 indicated that it was performed in response to a violation of 4/4/12 in that the inmate "presented with a delusional story, yet his speech was clear

and demonstrated linear thinking (other than the delusion).  His grooming and hygiene were WNL; he acknowledged suicidal thoughts, yet his 2 plans were for the future: going on a hunger strike or hanging himself in one of the Yard 'cages.'"  The psychologist completing the report noted for the question regarding whether the inmate's current mental state contributed to the behavior leading to the RVR "yes," and "if found guilty of the offense there are mental health factors the hearing officer should consider."  These factors were described as the inmate not having slept "for weeks," and irritability because he had not been taking prescribed medication.

Records indicated that the inmate reported suicidal ideation on 4/20/12; he stated that he had been having it intermittently for some time, related to the reality of possibly spending the rest of his life in prison.  He added that he was not currently thinking of suicide and had no current plan or intent.  A psychiatrist increased his Vistaril to 100 mg as needed and added Buspar; Buspar was added as the inmate agreed to take it, but the psychiatrist noted that it would be discontinued if the inmate refused.

The inmate was seen on 4/24/12, 5/3/12, and 5/10/12.  These sessions were unremarkable with the exception of the inmate reporting to his primary clinician that he was sentenced to a life term although he had an EPRD of 9/27/13.  The inmate's Buspar was discontinued on 5/15/12 by the psychiatrist, who noted that the inmate was not taking it.  On 5/17/12, the primary clinician noted that the inmate would be a candidate for MHSDS removal as he was stable with few current symptoms, although he continued to take psychotropic medications (Vistaril).  The inmate was again seen by his primary clinician on 5/24/12 and during that session correctly reported that he had a possible parole date in September 2013 and was indeed not a lifer.  The eUHR indicated that during the sessions with the primary clinician, the inmate was resistant to discussing mental health issues; however, the report also noted that the primary clinician was considering the inmate's removal from the MHSDS.

The inmate saw the psychiatrist for the last time on 5/29/12.  This was the same psychiatrist who was considering taking the inmate off of medications as he was missing medications.  However, the inmate reported that he would take his medications regularly and did not want them to be discontinued.  It was noted that the inmate refused to come out of his cell, but was alert and friendly and his mood was "good."  It was also noted that he had "no talk of S/H," indicating suicidal/homicidal ideation, his affect was appropriate, and his thoughts were organized and logical.  His diagnosis remained Mood Disorder NOS by history.

The inmate was seen by his primary clinician for the last time on 5/31/12.  He noted that the inmate was again reluctant to discuss issues related to his mental health.  However, the inmate talked about his childhood and family, being the only member of his family in prison, and blaming his father for leading him into a criminal lifestyle.  He related this to his having assaulted a drill sergeant in the military after his father had insisted that he join the military.  The suicide reviewer noted that as far as they were able to ascertain, none of the information that the inmate related to the primary clinician during the session on 5/31/12 was true; this despite the primary clinician reporting it was the first time that he felt the inmate's responses were genuine. MAR review also indicated that the inmate was not taking his noon dosage of Buspar for the week of 6/1/12 through 6/7/12; this was reported to the psychiatrist on 6/4/12, but had not been addressed before the inmate committed suicide on 6/7/12.

69

Of note was the meeting with the ICC on 6/7/12. At this meeting, the inmate was told that he would be transferred to another institution because of enemy concerns once he was released from the ASU; the inmate was unhappy and upset about the news regarding his transfer.

The last SRE was conducted on 5/16/11; the clinician noted the sources of information to include the eUHR and interview with the inmate and custody. The clinician noted historic/chronic risk factors but indicated no acute risk factors, which the CDCR suicide reviewer and this reviewer found inaccurate; the suicide reviewer noted "somewhat surprisingly, as the inmate had 4 RVR's, 2 for fighting, over the past 12 months." The CDCR suicide reviewer also noted that the inmate reported several protective factors that were "in fact, not present."

The inmate's medical status was remarkable for a seizure disorder that was being treated with Tegretol (carbamazepine). Given his history of medication non-adherence, a review of the Tegretol blood levels indicated that he was adherent. His carbamazepine level was 5.2 (therapeutic range 4.0 to 12.0) on 6/4/12. He also had been taking Dilantin previously, but requested a medication change because of side effects.

The suicide reviewer noted that the inmate's primary clinician was interviewed; the clinician reported that he had briefly spoken with the inmate on 6/6/12, the day prior to his death. The primary clinician told the reviewer that the inmate was excited about the possibility of moving to "A" yard after leaving ASU, and was looking forward to the ICC meeting on the following morning. That meeting took place on 6/7/12 at 11:00 a.m., when the inmate was told that he was going to be transferred to another facility rather than "A" yard. A progress note dated 6/7/12 at the time of the ICC indicated that the inmate was placed in the ASU on 4/4/12 for battery on an inmate with alerts for suicidal behavioral history, assaultive behavior, and self-injury. The inmate attended the meeting and was described as cooperative; his diagnosis was noted as Mood Disorder NOS by history. The committee determined that the inmate would be retained in the ASU with a suspended SHU term and a plan to transfer him to another facility, which included RJD, PVSP, and HDSP. The inmate's behavior in response to the ICC action was that he "attended," "was cooperative," and "agreed." Participation in treatment was noted as very good, response to treatment as fair, medication compliance as compliant, and the IDTT recommendation for cell placement was no mental health recommendation.

The suicide reviewer noted in the report "the inmate was angry and was overheard to say on the way back to his cell, 'I'll show them.'" He was returned to his cell by 11:30 a.m. The reviewer noted that it was likely that sometime close to 16:00 he tore a strip of material from his sheet and poked it through a crack between the wall and the bookcase at the rear of the cell and hanged himself. The reviewer noted that his body was still warm when he was discovered and that the inmate knew the mail was usually delivered between 15:15 and 15:30, and dinner was delivered between 15:45 and 16:00. The reviewer noted the inmate picked a spot in the cell where he was mostly concealed from view and that dinner delivery was delayed by a few minutes.

The suicide reviewer also noted that although not directly related to the events of the inmate's death, the reviewer was dismayed by the SREs performed for the inmate at MCSP. They appeared to be conducted in haste, without adequate documentation review, and were frequently

70

based on the inmate's self-report, which was extremely unreliable; this would have indicated that the inmate posed moderate risk throughout his MCSP incarceration.

The suicide report provided one problem and Quality Improvement Plan as follows:

>Problem:  SREs completed at MCSP were inadequate in that they did not reflect the inmate's documented mental health history and seemed to be based largely on self report. Quality Improvement Plan:  The Chief of Mental Health or designee at MCSP shall facilitate the development of the Proctor-Mentor Program (PMP) by: 1) Developing a draft local operating procedure (LOP) for the PMP; 2) Constructing a schedule for the rotation of all mental health staff through the PMP, including a projected timeline for completion of staff training in the PMP.

A Death Review Summary (preliminary) was provided by a physician and dated "July 2012." The physician noted the primary cause of death as well as the co-existing conditions of Seizure Disorder, Polysubstance Dependence, and Personality Disorder.  The inmate's movement summary, an executive summary, and chronological list of significant events were provided.  A physician indicated the standard of care for emergency medical response and the standard of care for medical providers were met, had no comments as to the standard of care of nursing, and noted no systemic concerns.

On 9/7/12 the Deputy Director (A) Statewide Mental Health Program, and Director Division of Adult Institutions provided their report on implementation of Quality Improvement Plans for the inmate's suicide.  Included in their response was a draft mental health local operational procedure dated October 2012 entitled "Suicide Risk Evaluation Proctoring and Mentoring Program" which described the program at MCSP.  In addition, a "MCSP PMP Review Schedule" dated 8/13/12 was provided, but no participants were listed.  The above documents were in response to a Quality Improvement Plan dated 8/21/12 restating the QIP requirements from the suicide report to include the above-listed documents and signed by the MCSP chief of mental health, warden, and chief executive officer.

**Findings:**  This inmate's suicide does not appear to have been foreseeable as he was not reporting suicidal ideation or intent in the days to weeks prior to his suicide.  However, as appropriately noted by the suicide reviewer, his chronic risk of suicide should have been assessed as moderate and was not due to inadequate SREs at MCSP.  The Quality Improvement Plan/Corrective Action was for MCSP to develop a local operating procedure and training for the Proctor and Mentoring Program.  Although the draft LOP and in-service training sheets were provided, there is no indication from this Quality Improvement Plan report that the actual proctoring and mentoring occurred at MCSP, and no updated information was provided to address the issue.  As defined in this report, this inmate's suicide was not preventable; however, had he been properly assessed as being at moderate-chronic suicide risk, it may have resulted in more effective treatment planning and possibly a higher level of care, such as EOP.  His suicide, however, appears to have been an impulsive act directly related to his receiving what was for him "bad news" that he would be transferred to another facility rather than his anticipated request of transferring to a different yard at MCSP.

Although there were inadequacies in assessment, particularly SREs, as noted by the CDCR suicide reviewer and this reviewer, they do not appear to have contributed directly to the inmate's death.

**13.  Inmate M**
Brief History:  This inmate was a 26-year-old Hispanic single man who was found hanging in his cell at RJD on 6/11/12.  On 9/4/02, at the age of 17, the inmate shot and killed a female gang member sitting in a car.  He was sentenced to 40-years-to-life for second degree murder in June 2004 and was admitted, at the age of 18, to the CIM RC on 6/29/04.  He was single celled on a Sensitive Needs Yard.  He was a participant in the MHSDS at the EOP level of care.  He was transferred to RJD on 8/19/11, where he remained until death.  His MEPD was 9/5/42.

On 6/11/12 at 0501 hours the inmate was discovered by a correctional officer during the institutional count.  The officer activated his alarm and announced a Code One medical emergency via radio.  Additional officers arrived, entered the cell, cut the inmate down, pulled him outside of the cell, removed the sheet from around his neck, and began CPR.

At 0508 hours, medical personnel from the TTA arrived at the cell and relieved the officers performing CPR.  The inmate was cold to the touch, unresponsive to external stimuli, with pupils fixed and dilated, and cyanosis in the nail beds.  His teeth were clenched, and staff was unable to establish an oral airway.  The AED advised to continue CPR.  911 was contacted and the officers wheeled the gurney with the inmate to the emergency transport vehicle, which arrived at the TTA at 0520 hours; CPR continued.

Paramedics arrived at the TTA at 0523 hours.  Medical staff established an IV line and administered Epinephrine two minutes later.  CPR continued while appropriate medications were provided in a timely manner.  At 0537 hours, paramedics contacted a physician at the University of California at San Diego and provided a status report.  The physician pronounced the inmate dead via telephone.  An autopsy report was provided by the Office of the Medical Examiner, San Diego County, dated 9/28/12 and posted to the secure website on 11/26/12; it indicated that the cause of death was hanging and the manner of death was suicide.  The toxicology report was negative.

The inmate had a history of substance abuse since the age of 13.  His job history included working part-time as a landscaper and at a fast food restaurant.

Family history indicated that he was the fourth child of six siblings.  A grandmother was diagnosed with Schizophrenia and died of suicide.  There was no previous juvenile or adult legal history prior to his current incarceration.

The inmate had received four disciplinary actions, one of which resulted in a SHU term for assault on an inmate.  His last RVR occurred on 10/12/11, for failure to report to his school assignment.  During his incarceration, he had been placed in ASU on at least six occasions.

On 1/26/09, while housed at ISP, he requested SNY housing.  On 2/5/09, the ICC indicated that he could program at CMC as an alternative to SNY housing.  The inmate subsequently appealed

72

this decision.  He was transferred to CMC on 3/10/09, and soon thereafter stated that he did not need SNY placement.

On 6/10/10, while housed in the ASU related to a battery on an inmate, he committed a battery on another inmate resulting in serious bodily injury.  He subsequently began demonstrating mental health problems about one month later while in the ASU.  He was assessed to require 3CMS level of care.  On 7/15/10, he received a SHU term for the previously referenced battery that occurred while he was housed in the ASU.  He was transferred to CSP/Corcoran on 10/1/10 to serve the SHU term.  His custody level had increased to a Level IV classification.  Following completion of the SHU term, he was transferred to KVSP on a Level IV SNY program.

At the time of his death, the inmate had a zero balance in his trust account with the last deposit of $100 occurring on 4/6/12.  This money was used during April 2012 for canteen items.  The inmate had received visits from his parents beginning in August 2004, although they gradually decreased in frequency; there were no visits from them during 2012.  He had visits during his incarceration from other family members and from a female friend.  His last visit at RJD was on 1/13/12 from an unknown female.

The suicide report summarized the five letters written in Spanish from his mother that were found in the inmate's property with dates ranging from 8/25/11 through 2/1/12.  There was also an 11/12/11 letter from his sister and a 5/15/12 letter from an organization that supported families who had loved ones in prison.  The contents of the letters from family members ranged from being supportive to scolding him for not working or attending school and not responding to their requests to visit him.  The 5/15/12 letter from the previously referenced organization included the following information:

> [His] mother was going to participate in a weekend event for women who have loved ones in prison.  This event was planned for June 29 through July 1, 2012.  The author stated that part of the weekend activities was for prisoners to write a letter to their mother.  The author stated the letter should show compassion and be uplifting, and only his mother was to see the letter.  The author added that these letters are the most important part of the weekend event and to please take this assignment seriously… The author ended by stating she needed to have a letter by June 15, 2012, at the very latest.

A 6/29/04 transfer summary from the Los Angeles County Jail did not mention any medical or mental health problems while the inmate was in the county jail.  The initial health care screening at CIM RC was negative from a mental health perspective.  A 7/1/04 mental health evaluation that occurred while the inmate was in the ASU pending transfer to the CSP/Corcoran SHU indicated that he did not have any mental health problems.  The reason for this referral was not clear from review of his medical record.  During the following six years, the inmate was housed at three different institutions and did not have any mental health contacts until he was transferred to CMC.

The inmate was transferred to CMC on 3/10/09.  He was placed in the ASU for fighting on 4/19/10.  A SRE was completed on 6/11/10 while he was still housed in the ASU.  Both chronic

and acute risk factors were identified during this assessment.  He was rated by the evaluating social worker as a moderate suicide risk on chronic risk factors and low risk on acute risk factors.  A review by the IDTT was recommended.

The inmate was placed on suicide precautions in the MHCB at CMC on 7/13/10 after reporting feeling distressed about safety concerns for himself and his family in the context of the Mexican Mafia prison gang.  He was discharged three days later; a mental disorder was not diagnosed.  On 7/20/10, the social worker repeated the SRE and again identified chronic and acute risk factors.  The inmate reported a history of suicide attempts, stating that he attempted suicide "10-15 times" prior to entering prison, with the most recent attempt occurring in 2002 when he put a gun to his head.  He was rated with moderate risk on both chronic and acute risk factors.  He appeared to be genuinely concerned for his and his family's safety.  He stated that he had a disagreement with the Mexican Mafia and owed them $10,000.

The social worker again evaluated the inmate on 7/21/10.  He now reported a history of treatment for ADHD with treatment via medication beginning at the age of six.  Diagnoses of Adjustment Disorder, unspecified, Polysubstance Dependence and Antisocial Personality Disorder were provided.  After review by an IDTT, he was placed at the 3CMS level of care.

A psychologist transferred the inmate to the MHCB on 7/29/10 for supportive counseling due to his report of depression because of numerous stressors related to his ASU placement, pending SHU term, gang affiliation, and family safety.  Adjustment Disorder with depressed mood and Personality Disorder NOS were diagnosed.

On 9/14/10, the inmate was again transferred to the MHCB after reportedly telling his mother during a visit that his life was in danger and he had suicidal ideation.  Another SRE was completed, which rated him moderate on chronic risk factors but moderate to high on acute risk factors.  His transfer to CSP/Corcoran was apparently vacated and his problems resolved.  He was discharged from the MHCB three days later.  Upon discharge, he was rated as a low risk for acute risk factors.

The inmate was later transferred to CSP/Corcoran to serve his SHU term on 10/1/10.  He was evaluated by a psychiatrist on the following day due to reported auditory hallucinations and suicidal thinking.  He was diagnosed as having a Major Depressive Disorder with psychotic features and Antisocial Personality Disorder.  He was admitted to the MHCB.  On 10/19/10, he was noted to be prescribed Risperdal.

A psychologist completed another SRE on 1/5/11, but the reason for the referral was not stated.  The inmate was assessed to be a moderate risk for chronic factors and low risk for acute factors.  The inmate refused to attend his 1/18/11 IDTT, which documented that he had been noncompliant with prescribed medication.  A 4/12/11 IDTT described him as being medication compliant since 2/25/11.  However, he was refusing to see his family because previously they would not visit him.  He stated "my family does not exist for me anymore."  He was nonetheless conflicted regarding his family as he stated that he was depressed because he was away from them.

74

A psychologist again evaluated the inmate on 5/2/11, diagnosing Major Depressive Disorder with psychotic features and rule out Psychotic Disorder. Another SRE was completed; it was assessed to be low for chronic risk factors and low for acute risk factors

On 7/12/11, the inmate was treated at a local hospital for dehydration, low blood pressure, and lethargic behavior. He was admitted to the MHCB with diagnoses of Major Depressive Disorder, recurrent, severe with psychotic features and Antisocial Personality Disorder. The admission was for precautionary reasons due to the inmate's history of suicidal behavior and need for continuing medical monitoring. The SRE rated him as having a low risk for chronic risk factors and low risk for acute risk factors. Upon discharge on 7/20/11, a SRE was completed by a social worker who identified significantly more risk factors than the prior evaluator. The assessment was moderate risk for chronic risk factors and low risk for acute risk factors.

The inmate was transferred to RJD on 8/19/11. A 9/9/11 primary clinician evaluation in preparation for the IDTT meeting provided history that had not been previously reported by the inmate. This history included having his memory erased at the age of 10 when someone gave him some coffee and committing his first crime when he was five years old by stabbing a person who stole his bike. He denied his commitment offense. He was diagnosed as having Psychosis NOS and Antisocial Personality Disorder.

During October 2011, the inmate continued to complain that the Mexican Mafia was out to kill him and that he was experiencing auditory and visual hallucinations.

The inmate was evaluated by a psychiatrist for initial assessment purposes on 11/16/11 due to command hallucinations telling him to hang himself. He was prescribed Risperdal, Remeron, and Abilify. He was provided with a diagnosis of Psychosis NOS. The plan by the psychiatrist was to see him again in 90 days or sooner as needed.

A correctional officer referred the inmate for a mental health assessment on 11/25/11 due to poor attention span and poor hygiene.

On 12/22/11, the inmate reported to his primary clinician that he was having family problems. He reportedly lay in bed and watched television all day and did not care about anyone else. Symptoms included auditory and visual hallucinations and paranoid thinking.

A different psychiatrist assessed the inmate on 2/6/12. Psychotic symptoms were present. Medications were adjusted and an appointment in 30 days was to be scheduled. The psychiatrist again saw the inmate on 2/22/12. The plan was to see him again in 45 days. The inmate informed his primary clinician on 3/21/12 that he could not sleep because he was talking to himself. Visual and auditory hallucinations continued. His level of care remained at 3CMS.

The inmate's primary clinician reported on 4/13/12 that the inmate's appetite had decreased and he was losing weight. Auditory and visual hallucinations continued, as did his depression. Excessive sleep was described, but suicidal thinking was absent. His primary clinician noted a

gradual decline in the inmate's functioning during the past six months; an increase in his level of care to EOP was to be considered at his next IDTT.

A correctional officer again referred the inmate to mental health on 4/10/12 due to the inmate not going to meals and sleeping too much.  The IDTT reviewed him on 4/17/12.  His six-month history of decompensating with minimal response to attempts to increase his level of functioning was noted.  He was also having trouble following directions, having bizarre thinking, and appeared to be responding to internal stimuli.  He was not compliant with his medications and on average took his medication once every three days.  Diagnoses included Psychotic Disorder NOS, Polysubstance Dependence, Substance Induced Psychotic Disorder, and Antisocial Personality Disorder.  His level of care was changed to EOP

For reasons that were not documented, the inmate was not seen again by the psychiatrist until 4/17/12 during the IDTT.

According to the CDCR suicide report, the IDTT again reviewed the inmate on 5/1/12.  The inmate now acknowledged having shot his victim due to disrespect issues.  He also described hearing voices telling him to kill his cellmate that began about one year earlier.  The treatment plan included medication, weekly meetings with his primary clinician, groups and recreational activities, and specific cognitive interventions to target auditory and visual hallucinations and depression.  Prescribed medications included Risperidone and Remeron.  However, there was disagreement between the psychiatrist and other IDTT members as to whether the inmate suffered from a serious mental disorder.  This reviewer was also unable to locate any documentation regarding this IDTT meeting in the records provided.  The suicide report also indicated that the psychiatrist evaluated the inmate on the same day as the IDTT.  The evaluation referenced in the suicide report was located, but was dated 5/7/12 (see next paragraph).

A third psychiatrist assessed the inmate on 5/7/12.  The inmate was noted to be grandiose and mildly pressured in speech.  The psychiatrist deferred his diagnosis on Axis I, but diagnosed Antisocial Personality Disorder on Axis II and indicated that the inmate did not want psychotropic medications.  His psychotropic medications had been discontinued on 5/3/12 by another psychiatrist.

The next documentation by the primary clinician was dated 5/30/12.  The inmate was attending some groups, but stated that his medication had been interrupted.  He denied suicidal and homicidal thinking.  His cellmate had left two days earlier.  The inmate was assessed to be stable.

A fourth psychiatrist again saw the inmate on 6/1/12 at cell front due to a lockdown.  An increase in auditory hallucinations and depressed mood were reported since the last appointment, but the inmate denied suicidal thinking.  He reported that his medications had been discontinued.  The psychiatrist counseled him on the importance of taking his medication every day, but he only agreed to take his medication every third day.  The psychiatrist concluded that the benefits of intermittent use of medication outweighed the risk of taking his medication inconsistently.  The psychiatrist also informed the CDCR suicide report writer that the inmate seemed angry that the psychiatrist went to the inmate's cell to see him.  Remeron 15 mg at night for sleep and

depression as needed and Risperidone 5 mg three tablets at night for auditory hallucinations were ordered. MAR review indicated that the inmate did not take the Remeron and took Risperidone only once on 6/3/12.

The primary clinician met with the inmate on 6/5/12. The inmate reported attending groups, but did not go to yard. Delusional thinking was present, as well as visual hallucinations. Suicidal and homicidal thinking and auditory hallucinations were denied.

Medical records indicated that the inmate missed 14 mandatory mental health appointments between 5/1/12 and 6/8/12. A licensed psych tech indicated that he had a 58-percent group attendance rate. Another licensed psych tech described him as having a flat affect and typically being by himself. Yet another licensed psych tech reported that he participated in physical movement groups, but did not attend core groups.

The inmate's physical examination was unremarkable in June 2004. During 2006, he began to complain of various symptoms that subsequently led to numerous medical evaluations and diagnostic tests. He complained of back problems and diagnostic studies confirmed spinal issues. Other medical complaints appeared to be related to anxiety and excessive worry. An MRI of his lumbar spine in January 2008 showed some abnormalities. Diagnostic studies in August 2008 confirmed a left L5 radiculopathy. A January 2009 MRI showed degenerative spine disease. Back pain became more severe in October 2009, resulting in a neurologist recommending an epidural steroid injection.

The inmate had surgery in May 2010 for a fractured base of his fifth metacarpal on his right wrist. In 2009 and 2010, he requested testing for hepatitis, HIV, and other diseases. Reported symptoms included stomach pain and blood in his stool. During November 2010, he wrote that he was positive for HIV and needed help. A physician suspected his problems were related to mental illness but felt the need to send him to an outside hospital to rule out any serious illness. He continued to send in sick call requests during November and December 2010 related to his concerns about having HIV. HIV tests from 2008 through 2011 were negative, as were tests for hepatitis. The inmate's somatic concerns continued through 2011.

The inmate was also diagnosed with gastroesophageal reflux disease. The writer of the CDCR suicide report interviewed the inmate's primary care physician. The physician indicated that the inmate did not complain much about his chronic pain, which was being treated with Tylenol #3. Signs or symptoms that would suggest that he was thinking about suicide were absent.

The suicide report included the following summary:

> The inmate-patient did not give any clear warning about his suicide. However, he had been functioning marginally since the onset of his mental illness in 2010. Depression, anxiety and fear seem to be constant emotions that he was confronting, and this had to have been stressful for him. In an interview with his sister for this report, his sister noted mental health difficulties in her brother, including depressive symptoms, beginning two years ago. Addition, the assignment to write a letter to his mother might have overwhelmed him and

reminded him of the consequences of his crime both for him and his family.  He had already given indication he was having difficulty dealing with his long prison term and as his depression became worse, he pulled away from his family and they apparently began to retreat from him.  His method of suicide and the time he chose to commit suicide suggests he had high intent on ending his life.  The date of his death also coincided with the anniversary of the death of an older sister, who died on June 11, 1983, before the inmate was born.

The suicide report also included the following:

Prior to the formal death review, the staff at RJD-CF identified problems in this suicide case and had already begun implementing their own quality improvement plans to address the issues.  The following list describes RJD's plans for addressing the more salient issues:

Providing training to staff on conducting detailed interviews such as when an inmate-patient reports a history of suicidal behavior.
Conducting suicide risk evaluations as part of treatment planning.
Considering the need for a higher level of care at each IDTT.
Diagnosing all mental disorders so the IDTT can develop specific treatments for each illness.
Resolving IDTT differences of opinion in a collaborative manner with the focus on providing safe and effective care to the inmate-patient.
Working with medical staff when there are medical issues involved.
Identifying and correcting the problem of missed appointments.
Providing training with staff on diagnosing and how countertransference issues might interfere with proper diagnosing.

The following list indicated RJD's self-identified problems and quality improvement plans resulting from their local case review.  The problems and solutions were in agreement with difficulties noted by the CDCR suicide report reviewer.

Problem 1:  Despite the inmate's history of suicidal ideation and attempts and his frequent crisis bed admissions prior to arriving at RJD, no SREs were completed by clinicians at RJD.
Quality Improvement Plan 1:  As proposed by RJD staff, the Chief of Mental Health or designee at RJD shall continue the process of rotating staff  through the Proctor/Mentor Program (MP) for SRE training, identification of risk, and risk management.  Documentation training is scheduled to occur in August of 2012.

Problem 2:  The inmate demonstrated an ongoing reluctance to comply with his medication routine.  Psychiatrists attempted to encourage his compliance by prescribing psychotropic medications on an as-needed basis and based on the inmate's request.  This practice is both not standard and places decisions regarding the medication regimen into the hands of the inmate-patient rather than the psychiatrist.

Quality Improvement Plan 2:  The Chief Psychiatrist has already met with the psychiatrists at the institution and directed them to follow a best practice model for the prescription of psychotropic medications.

Problem 3:  Documentation describing the inmate's psychological concerns appeared inconsistent with his presentation and suggested the need for a more in-depth review of his history along with more detailed interviewing of his current symptoms.  For instance, he was described in the record as stable despite a decline in functioning over a six-month period that included depression, anxiety, sleep disturbances, and obsessive somatic concerns.

Quality Improvement Plan 3:  As proposed by RJD staff, the Chief of Mental Health or designee at RJD shall utilize the Proctor/Mentor Program to provide a forum for mental health to discuss treatment planning, best practices and how to achieve consistent implementation of those standards within the institution.  Quality chart reviews, which began in April 2012 with an initial focus on inmates with recent self-injurious behaviors (SIBs) and suicide attempts (SAs) will continue and be expanded to include other at-risk inmates on the RJD high risk list.

Staff clinicians identified as performing below the standard will continue to be monitored, trained, and progressively disciplined as needed.  Documentation training is also scheduled for August 2012.

Problem 4:  A one-month gap in weekly primary clinician contacts occurred in May 2012, when the inmate was a participant in the EOP level of care, which requires weekly clinical contact.

Quality Improvement Plan 4:  The Chief of Mental Health at RJD already identified the problems contributing to this error.  The identified clinician and program office technician (OT) received training on utilizing the MHTS Due Date Report for managing caseloads.  Program Lead Clinician will be monitoring the Due Date-Report and confirming timely contacts with the contact interval report.

It was also requested by the CDCR reviewer that two months' worth of minutes be submitted from RJD's Suicide Prevention and Response Focused Improvement Team meetings.

The 7/3/12 California Prison Health Care Services Final Death Review summary included the following information:

1.  The emergency response timeline and actions were assessed to appear appropriate.
2.  Standard of Care of Medical Providers:  The standard of care was met.
3.  Standard of Care of Nursing:  [pending]
4.  Systemic Concerns:  None.
5.  The death was not preventable.

A 9/12/12 memorandum from Brian J. Main, Psy.D., SPR FIT Coordinator at RJD-CF provided documentation that the QIPs had been appropriately implemented.

**Findings:**  This reviewer is in agreement with the issues identified in the Quality Improvement Plans implemented at RJD as previously summarized.  However, this reviewer thinks that there were several other key issues not identified in the suicide report work at RJD.  Specifically, there were untimely psychiatric follow-up assessments at RJD.  For example, the inmate should have been seen sooner than 2/6/12 after his initial 11/16/11 psychiatric assessment based on his history and presentation at that time.  The planned 45-day follow-up after his 2/22/12 psychiatric assessment did not occur for reasons that were not documented.  The inmate was next seen, or at least discussed, at the 4/17/12 IDTT although he was not seen on a one-to-one basis until 5/7/12 by a different psychiatrist.  The problems associated with the lack of timely appointments with a psychiatrist were exacerbated by the fact that all but two of his appointments were with different psychiatrists, which was again repeated during the 6/1/12 appointment with a psychiatrist.  This lack of continuity of care contributed to a lack of effective interventions regarding his medication non-adherence, diagnostic differences among the clinicians as referenced in the 5/1/12 IDTT (see the CDCR suicide report), and lack of a SRE occurring during his incarceration at RJD.

For similar reasons summarized above, the inmate's appointments with his primary clinician were also not timely, especially once he was changed to the EOP level of care.  These untimely appointments also contributed to a lack of effective interventions relevant to his medication non-adherence and poor attendance at group treatment.

Based on the available information, this reviewer does not think that the inmate's suicide was foreseeable, although it may have been foreseeable if appropriate information/assessments had been reviewed and/or performed.  For reasons summarized in RJD's review process and in this reviewer's additional comments summarized above, it is this reviewer's opinion that the inmate's suicide was preventable, as defined in this report.

Deviation from Program Guide requirements included untimely appointments with the psychiatrist and primary clinician, IDTTs not providing appropriate documentation relevant to consideration for a higher level of care, and not performing SREs when indicated.

**14. Inmate N**
Brief History:  This inmate was a 36 year-old Native-American man incarcerated at ASP, who committed suicide by hanging on 6/28/12.  He was serving an eight-year sentence for arson of an inhabited structure.  When learning from the tribal housing authority that he would not be assigned the family home following his father's death, he became angry and set a fire in his bedroom.  This was his second CDCR incarceration.  He was admitted to the WSP RC on 8/30/07.  The inmate was eventually transferred from CTF to ASP on 9/25/09.  He was a participant in the MHSDS at the 3CMS level of care at the time of his death.  He was single celled in administrative segregation at the time of his death.

The inmate was transferred from the general population at ASP to administrative segregation for safety reasons at his request on 6/27/12 at 1500 hours after being interviewed by the yard lieutenant.  At 1230 hours that same day the inmate had informed a dining room officer that he was worried about Hispanic inmates focusing on him.  During a confidential interview at 1340 hours he informed custody staff that he was involved in carrying drugs for Mexican gangs.

On Thursday, 6/28/12, at about 0645 hours, administrative segregation staff discovered the inmate unresponsive in his cell. Staff conducted an emergency medical extraction. Soon after entry, staff removed the inmate from the cell and initiated lifesaving measures until he was transported to the ASP TTA, where the physician pronounced him deceased at 0708 hours due to the presence of rigor mortis. An autopsy report listed the cause of death as ligature strangulation and the manner of death as suicide. Toxicology report was positive for methamphetamine and amphetamine.

The suicide report included the following information:

0645: A correctional officer observing the morning meal in administrative segregation discovered the inmate lying motionless face up on the lower bunk, appearing to be asleep. From outside the cell there was nothing visible to suggest the inmate had harmed himself. An LPT was summoned for assistance.

0647: A Code One medical response to administrative segregation was requested after the LPT was unable to get the inmate to respond. Correctional officers were instructed by the sergeant to prepare for an emergency medical extraction.

0650: The officers entered the cell and placed a shield over the inmate's body. They noticed a 37-inch-long piece of yellow cloth wrapped around the inmate's neck and tied once. The cloth was removed and the inmate was placed on a backboard.

0655: The inmate was removed out of his cell onto the floor of the tier. An RN assessed the inmate and found no vital signs. CPR was initiated with the aid of an AED.

The suicide report indicated that the inmate had been placed in administrative segregation after a pre-placement screening. Due to a large amount of intake that day, the only cell available was located in a far corner of the unit, and the inmate was not considered a suicide risk. The inmate was single-celled because a compatible cellmate was unavailable at that time, based on the inmate's SNY status. Custody welfare checks were conducted approximately every 30 minutes.

The inmate was found deceased early the following morning, before any mental health rounds were conducted that day. The last welfare check before the inmate was found unresponsive was documented as occurring between "0630 - 0637 hours."

There was not a juvenile criminal history. The inmate's first arrest was for possession of a controlled substance at the age of 21. Subsequently he had alcohol-related arrests including four DUIs, which resulted in the disposition of summary probation or jail. After his fifth arrest he was committed to CDCR with a 24-month sentence for felony DUI with four priors. The inmate entered CDCR on 6/1/00 and initially paroled on 8/1/01, but returned to prison twice for violations. He remained in the community following his third parole release on 10/3/03 and discharged one of his cases on 7/14/05. On 8/28/04 he again violated his parole, which led to a three-year probation that was revoked upon his second CDCR commitment.

The controlling offense for the inmate's last incarceration occurred on 5/6/07. This offense was related to his alcohol abuse, alienation from his immediate family members, anger, and sense of entitlement. He returned to CDCR on 8/30/07 as a second termer with an eight-year sentence after being convicted of setting fire to the family home when he learned that the home was not being assigned to him but to an older sister.

The suicide report indicated that the inmate had been described by custody as being a relatively problem free inmate. His only rule infractions were as follows:

    8/7/09: refusal to accept assigned housing
    8/16/11: possession of tobacco
    10/9/11: refusal to perform an assigned task

Based on the OBIS report, it appears that the inmate had two very brief stays in administrative segregation during 2007 and 2009.

The inmate had no known mental health history prior to his jail incarceration that immediately preceded his second CDCR incarceration. Relevant past history included an uncle dying by suicide and the inmate having a long-standing substance abuse history.

When the inmate arrived at the WSP RC on 8/30/07, a nurse indicated on the initial health screening form that he was "possibly" suicidal. The inmate reported being on suicide watch a month earlier while in jail and the confidential jail transfer summary noted "has had suicidal ideation." He further reported a suicide attempt by overdose in May 2007 while in the jail. The inmate was immediately referred to mental health for further assessment. The mental health evaluator indicated no imminent risk of suicide at that time, and referred the inmate to psychiatry for a medication review. While in jail, the inmate had been prescribed mirtazapine for depression. The WSP RC psychiatrist saw the inmate that day, and continued mirtazapine 15 mg daily for 30 days. He was then to be released to general population housing without mental health treatment.

Less than two weeks later the inmate made a suicide attempt on 9/9/07 by swallowing 35 Prilosec tablets that belonged to his cellmate. He was medically cleared and then placed into administrative segregation for MHCB overflow purposes. He was on a suicide watch from 2045 hours that evening until 1100 hours the following morning, 9/10/07, during which time he had no suicidal ideation. He later reported that he had felt suicidal because he had been thinking about his family and his crime. He was subsequently assessed to have a rapid cycling bipolar disorder, and Depakote was added to his medications. The inmate was discharged to a 3CMS level of care on 9/13/07. Despite various requests by him to be removed from the 3CMS caseload, he continued receiving this level of care throughout his incarceration.

His diagnoses of Bipolar Disorder NOS, Alcohol Dependence, Amphetamine Dependence and deferred diagnosis on Axis II generally remained the same during his incarceration except following his last IDDT that occurred on 10/12/11.

Relevant history, regarding the inmate's 2007 suicide attempt, suicidal thinking (especially during 2008) and Bipolar Disorder diagnosis was adequately documented in his UHR.  However, the clinician at the October 2011 IDTT did not review the UHR and relied on the inmate's self-report.  He questioned the history of a Bipolar Disorder and suggested that a diagnosis of Major Depressive Disorder be ruled out.  Ironically, the same clinician had written a progress report two months earlier commenting on the inmate's irritability, which had been cited by other clinicians as part of his clinical presentation.  A SRE was completed by this clinician on 10/12/11, but it was based on information solely provided by the inmate.  Inaccurate information elicited from the inmate and reported by this clinician included lack of any prior suicide attempts, no family history of suicide, and no history of violence or poor impulse control.  There were nine SREs and/or SRACs present in the UHR (from 9/10/07 through 1/7/10, including a SRAC completed by the same clinician on 10/8/09) that documented prior suicide attempts and other risk factors.

The inmate's GAF score generally was in the range of 60 to 65.

During February 2008, the inmate again reported the presence of suicidal thinking, which appeared to be precipitated by thinking about his crime.  His insight into the nature of his mental health problems and need for treatment was described as poor.  He was periodically non-compliant with medication, which was often associated with return of symptoms (e.g., mania, irritability, anxiety, and depression).  Prescribed medications generally included mirtazapine and divalproex (Depakote).

Depakote was discontinued during February 2011 after the inmate refused to take it.  Subsequent trials on Celexa and then Prozac were not helpful.  All medications reportedly were discontinued during June 2011 at his request.

The suicide report described the inmate as not liking to talk about his thinking or feelings with his therapist, and he declined participation in group therapy.  Due to frequent housing moves secondary to non-adverse custody needs, the inmate had frequent changes in his primary clinician.

The inmate's last documented primary clinician contact occurred on 5/10/12.  His request to be removed from the 3CMS program was not approved.  The suicide report included the following:

> The note commented that the inmate did not like talking about himself or his feelings, consistent with prior notes and observations.  Given that inmate __'s past four quarterly primary clinician sessions had been with four different psychologists, his reluctance to speak was perhaps understandable…  On May 11, 2012 inmate __ had his last psychiatry contact for a routine follow-up, also with the psychiatrist he had never seen previously.  He was assessed as stable off medication.

The suicide report did not comment on the potential impact of the lack of a suicide alert in this inmate's UHR in the context of the nursing administrative segregation pre-

screening process as well as the administrative segregation intake process.  The suicide report indicated that the case review addressed several additional concerns as follows:

> One involved the welfare checks provided to the inmate prior to his discovery at 0645 hours and whether or not the inmate was very deceased at the time of the checks.  Due to the position of the inmate, the final welfare checks that occurred between 0630 and 0637 hours did not notice anything unusual.  The noose was not observable, given his position on his bunk, and he appeared to be sleeping.  The fact that by 0708 hours the inmate (ending provided CPR in the TTA) was in rigor does not imply that his death occurred hours before, due to the variability in the onset of rigor.  Rigor, according to the medical experts of the Suicide Case Review Committee, depends upon a number of factors and varies considerably from one individual to the next.  Without a core body temperature reading, it is not possible to ascertain the exact time of death.  A second concern was about the delay of ten minutes from the time of discovery to the initial provision of CPR.  When the inmate was discovered, it was not apparent that he had hung himself.  He appeared to have experienced a medical emergency and staff proceeded quickly to enter the cell.  After doing so, the noose was discovered and CPR was provided within five minutes of the time the noose was found.  According to medical experts, the emergency response was rapid and appropriate.

The suicide report provided vague information regarding the 30-minute custody welfare checks – only stating that they were performed "approximately every 30 minutes."  The welfare checks for newly admitted inmates to administrative segregation, according to the LOP, are to be conducted every 30 minutes for the first 21 days after arrival.

A second concern discussed during the formal case review was the delay of ten minutes from the time of discovery to the intial provision of CPR.  The suicide report indicated that the "medical experts" assessed the minute delay in initiating CPR after the noose was discovered to be "rapid and appropriate."  However, a delay of five minutes in initiating CPR is neither rapid nor appropriate, since it is doomed to be unsuccessful after a lapse of adequate oxygenation to vital organs for over four minutes.

The suicide report included the following problems and Quality Improvement Plans:

> Problem 1:  On October 12, 2011 the the inmate's primary clinician completed an SRE based only on the inmate's self report.  History of suicide attempts, family history of suicide, and poor impulse control were not documented.  This error was repeated on MHTS.  According to the Chief of Mental Health at ASP, several concerns exist regarding this clinician's clinical practice.
>
> Quality Improvement Plan:  Referral of this clinician to the mental health peer review subcommittee at DCHCS for a professional practice review.  (The clinician apparently retired prior to such a review.)
>
> Problem 2:  Inmate __ was not placed into an intake cell upon entry into the ASU.  Intake cells were full at that time.

Quality Improvement Plan:  Training of custody staff relevant to the local operating procedure regarding the management of intake cells in the administrative segregation housing unit.  Documentation was present relevant to completion of this recommendation for a select few correctional officers.  Additional actions included weekly audits by the Facility A Captain and Lieutenant to ensure compliance with initial housing of inmates in administrative segregation and custody training for administrative segregation staff on the topic of 30-minute welfare checks.

The "final" 10/24/12 CCHCS combined Death Review Summary appeared to be incomplete as evidenced by the Death Review Committee's assessment and preventability/improvement matrix sections not being completed.  In addition, no reference to rigor mortis was present in this summary report.  Discussion regarding the timelines involving the emergency medical response was absent.

**Findings:**  This inmate's suicide does not appear to have been foreseeable, but as defined in this report in this reviewer's opinion this suicide was preventable.  There were a number of significant clinical issues present in this case although not all of them were directly causally linked to the inmate's death.  The suicide report identified most, but not all of these issues, although this reviewer has significant disagreements with some of the assessments summarized in the suicide report relevant to these issues.  This reviewer does not agree with the conclusion summarized in the suicide report that essentially implies that rigor mortis could have been been obvious in less than 23 minutes following death.  It is concerning that this issue was essentially assessed to be non-conclusive.  It is widely accepted that rigor mortis begins within two to four hours following death.  Conditions associated with a faster onset of rigor mortis, such as vigorous exercise prior to death, were not present.

It is this reviewer's opinion that the welfare checks either did not occur at least every 30 minutes and/or were not done properly (observe signs of life - e.g. breathing) based on the report relevant to the onset of rigor mortis.

These disagreements, which have already been summarized, included the following:

1. It is this reviewer's opinion that the presence of rigor mortis noted by the physician at 0708 hours was strong indication that 30-minute welfare checks were either not performed or performed improperly.
2. The emergency response was not rapid and appropriate.

This reviewer is in agreement with the corrective action that was proposed relevant to the clinician who participated in the October 2011 IDTT without reviewing the inmate's eUHR in addition to performing an SRE under similar circumstances.  It is this reviewer's opinion that the suicide review should have recommended further steps to take to ensure that this was not a common problem with IDTT's involving other inmates at ASP.

This reviewer is also in agreement that there were significant problems related to implementation of the LOP governing the use of intake management cells in the administrative segregation unit.

85

Significant clinical problems that were present, which cannot be directly causally linked to his death, but should have resulted in further discussion/corrective actions included the following:

1. Lack of continuity of care for the inmate in the context of having four different primary clinicians during the year prior to his death, as well as seeing a new psychiatrist during May 2012.
2. The ability to adequately manage the inmate's lack of compliance with medications was significantly compromised by lack of continuity of care and the infrequent contacts with his primary clinician.
3. The Axis II "deferred diagnosis" remained for several years and was never addressed in IDTTs or in the suicide review.
4. The rationale for the change in diagnosis from bipolar disorder to rule out major depressive disorder during the 10/12/11 IDTT was not adequately addressed in subsequent clinical notes.

## 15. Inmate O

Brief History:  This inmate was a 43-year-old Caucasian male who committed suicide by hanging on 6/29/12 at RJD.  He was a participant in the MHSDS at the EOP level of care at the time of his death.  The inmate was single celled in administrative segregation.  He returned to the CDCR for his fifth term on 10/28/03 as he was sentenced to a 12-year four-month term for burglary.  At the time of his death he was classified as Level II with 24 classification points and at Medium A custody status.  His EPRD was 3/26/13.

The incident reports (837AB) provided a narrative description of the incident by the first responding officers.  The incident reports noted that at approximately 2315 on 6/29/12, one of the floor officers was conducting the welfare checks for housing unit six when he observed the inmate hanging inside his cell from a sheet attached to the upper bunk.  The officer activated his personal alarm and called Central Control on his radio for an ETV.  Additional custody staff arrived, and the sergeant instructed the control booth officer to open the cell door for cell 247 at 2317.  A sergeant and officer entered the cell; the inmate was handcuffed and the sheet was removed from the inmate's neck; the incident report noted that the officer commented that the sheet was very loosely tied and was easily removed.  The inmate was removed from the cell.  An officer checked for a pulse, and no pulse was detected.  An officer then began to perform CPR with the assistance of the sergeant.  Another officer arrived at the scene and retrieved the ambu bag from Central Control and provided it to the officers performing CPR.  Medical staff and additional custody staff arrived in the ETV at approximately 2319; the inmate was then placed on the gurney and was transported to the ETV.  CPR was continued as the inmate was transferred to the TTA.  The inmate arrived at the TTA at approximately 2327.  He was subsequently transferred to the University of California at San Diego (UCSD).  On 6/29/12 at approximately 1438 the custody staff at the hospital was informed by the UCSD physician that the inmate had died of anoxic brain injury as a result of the suicide.

The suicide report provided a timeline of the incident as well as some additional information.  The correctional officer who discovered the inmate hanging came on duty on the day of the event at 2200.  During his initial welfare check that occurred between 2211 and 2234, he asked the inmate why he was housed in administrative segregation; the inmate told him that he had been

"jumped on the yard." At approximately 2222, the inmate asked the same officer for a Title 15 handbook, and he was told that it would be brought to him on the next rounds. The suicide report noted that the officer conducted his next round, according to the administrative segregation 30-minute welfare check tracking sheet, between 2238 and 2248; and his third round began at 2313.

The report indicated that upon the arrival of medical staff (RN and nurse practitioner) at 2320, they found no pulse or respirations. An oral airway was placed, and oxygen was continued. The inmate's neck was stabilized with a cervical collar and CPR was continued. CPR continued as the ETV arrived at the TTA at 2327. Upon arrival at the TTA, medical staff assumed care of the inmate and lifesaving measures were continued according to Advanced Cardiac Life Support (ACLS) guidelines. At 2330 an angiocath was inserted into the inmate's arm, and Epinephrine and Atropine were administered. The cardiac monitor showed an idioventricular rhythm of 23 to 30 beats per minute; CPR was continued. A weak carotid pulse was detected at 2333, but at 2335 there was no palpable pulse. CPR was resumed, and "no shock" was advised by AED. At 2336 Epinephrine was again administered, and the cardiac monitor showed sinus tachycardia. A strong carotid pulse was noted and CPR was discontinued. Paramedics from the community arrived at 2340, and the inmate was transported to UCSD Medical Center to the ICU on 6/24/12 at 0003.

At the time of the suicide report, the reviewer noted that the full coroner's report had not yet been received. That report was not available to this reviewer.

The suicide report provided information regarding the inmate's criminal justice history, and this information was in part based upon the San Diego County Probation Officer's Report of 10/22/03. Although the inmate had a history of alcohol use since age 16 and methamphetamine use (his drug of choice) since age 17, there was no record of juvenile criminal activity. He had a significant substance abuse history, including incomplete treatment at a community treatment facility and housing in sober living residences; it appeared that his adult criminal justice problems arose as a result of his substance abuse. He was convicted of burglary and possession of a controlled substance on 11/28/88, and he was sentenced to four years in prison. He committed a battery on a peace officer while in the CDCR and received an additional two-year sentence. The inmate was convicted of possession of a controlled substance on 4/16/99, and he received a four-year prison CDCR sentence. The inmate also had several parole violations that resulted in a return to prison. On 7/28/03 he entered the garage of an inhabited home and attempted to steal items. He was apprehended after a brief high speed chase after he was discovered by the homeowner and fled the home. He pled guilty to one count of first degree burglary and evading a peace officer on 3/23/04. He entered the CDCR at the RJD RC for his fifth CDCR incarceration on 10/28/03; at that time he had two felony strikes. His EPRD was 3/26/13.

During his last incarceration, the suicide report described his adjustment to prison as "adequate." The inmate was provided with a job as a housing clerk; however, he was fired after he was found out of bounds. As the inmate enjoyed this job, this firing prompted an episode of self-injurious behavior. He subsequently received a job with the yard crew. The inmate received two RVRs during his incarceration; on 10/12/06 he was charged with possession of inmate-manufactured

alcohol, and on 2/21/11 he was charged with fighting.  He was found guilty of both RVRs.  On 6/23/12, he was transferred to administrative segregation due to a charge of battery on an inmate.  At the time of his death, he had an outstanding appeal filed regarding the changing of his name to " _____ " which was the name present on his birth certificate.  Two reviews regarding this issue had been denied, and he was awaiting a response from the courts before filing another appeal.

The suicide report provided information regarding the inmate's mental health treatment during incarceration.  Upon his entry into the CDCR, he was screened at the time of intake and was referred for further mental health evaluation.  Based upon the results of this evaluation, he was placed into the MHSDS at the EOP level of care; at the time of intake he reported a history of suicide attempts as well as command auditory hallucinations that told him to kill himself as well as visual hallucinations.  After transfer to the main facility from the reception center, a treatment plan on 6/14/04 provided diagnoses of Bipolar Disorder and Personality Disorder NOS, but no mention of amphetamine dependence.  Symptoms that were documented included hypersomnia, anhedonia, anxiety, amotivation, paranoia and continued command auditory hallucinations telling him to kill himself.  After treatment with psychotropic medications, his symptoms improved gradually.  The inmate was added to the high risk list of inmates due to concerns regarding suicide during an IDTT that occurred on 5/18/05.  After the inmate cut his arm, his primary clinician considered referral to DMH during June 2005, but this was not accomplished due to the inmate's reluctance to transfer; as per the suicide report, "the inmate did not feel he was 'that mentally ill' and mentioned that he did not want to leave his television behind."  There was no documentation of the completion of a SRE at that time.

The inmate was admitted to the MHCB on 7/26/05 for 24 hours due to an increase in auditory hallucinations.  It appeared that his symptoms improved with medication changes; although he continued with depressive symptoms and auditory hallucinations.  During February 2007, he received a new cellmate whom the suicide report noted as his "partner."  The inmate received a job as a housing clerk, which he enjoyed; he worked at this job from April 2008 to late 2010.  He made a suicide attempt by cutting his chest after he was removed from this job on 11/15/10.  At that time he was evaluated in the TTA and was provided with a diagnosis of Borderline Personality Disorder; the clinician stated "Probably not a significant suicidal or homicidal risk – probably manipulative."  A SRAC assessed the inmate with moderate chronic and low acute risk for suicide at that time.  The inmate displayed marked lability over the next several months, and during an appointment on 12/16/10, he reported that he had discontinued his psychotropic medications; the suicide report noted that no SRE was performed or other staff consulted regarding this issue.  The inmate reportedly initiated a fight during the food line on 2/21/11, resulting in an RVR; he cut himself afterward and later disclosed this information to the psychiatrist.  There was no documentation that this information was shared with other clinicians, including the primary clinician.  The inmate reportedly functioned near baseline until February 2012 when he began exhibiting increased anxiety and rumination regarding his upcoming parole.  As a result of this increased anxiety and rumination, the primary clinician provided the inmate with a homework assignment that included a "Worry List"; this list was found in the deceased inmate's effects.  The suicide reviewer included the contents of this list in the suicide report; it read as follows:

88

Worry List
That I'll go to SATF and leave my cellie behind and never see him again
The black will try to get my cellies lead porter spot from the cops
No one will hire me when I get out and I won't be able to get SSI
Sunday
Worried about SATF
Worried about paroling
Racing thoughts
Adrenaline rushs very unhappy
Monday
Worried about the future
Intense unhappiness
Making plans for what I'll do to myself if I fail
Afraid of other people[s] homophobia

A treatment plan update on 5/3/12 provided a list of problems that did not include the inmate's most pressing concern, parole planning; in addition, the problem list omitted auditory hallucinations. Interventions were non-specific and generic, such as continued medication management with the psychiatrist. The Form 7388-B indicated that the inmate did not meet criteria for higher level of care consideration; despite documentation that the inmate met criterion three that describes the presence of chronic psychiatric symptoms that have lasted for six months. On 6/11/12, the inmate was seen by the psychiatrist when he reported that he had not taken chlorpromazine (an antipsychotic medication) for one week due to weight gain and that he had been in distress. The psychiatrist prescribed hydroxyzine for anxiety and continued Lithium, Remeron, and Buspar. On the following day, the inmate was seen again by the psychiatrist when he asked for ziprasidone due to increased stressors that the psychiatrist noted as upcoming parole and transfer to CSATF; the psychiatrist prescribed this medication and continued the others previously mentioned. The progress note also indicated that the inmate requested an Olson review to obtain documentation that he believed would assist in obtaining SSI after parole. On 6/21/12 there was documentation of an IDTT; the treatment plan was essentially unchanged with non-specific problems and interventions and the lack of documentation of appropriate consideration of higher level of care consideration as was previously discussed. The inmate was cleared for referral to the CSATF dual diagnosis program. The last documentation in the medical record occurred on 6/22/12 when the inmate was last seen by his primary clinician; at that time he discussed his mother's offer for him to live with her and the father's offer of financial assistance. There was again no documentation of parole planning. The suicide reviewer also noted that the primary clinician had not requested to see the inmate's 'Worry List' which he had been assigned. There was documentation that indicated that the inmate generally was an active participant in group therapy.

This inmate had a long history of suicide attempts and self-injurious behaviors, and the suicide reviewer indicated that the inmate's self-report provided conflicting information. These included at least seven or eight attempts that began in 1987 with wrist cutting and included instances of overdose, wrist cutting and an attempted hanging at a county jail in 1999. The last documented attempt was a cutting incident that occurred on 2/21/11. The most recent SREs that were completed for this inmate occurred on 5/12/09 and 11/15/10; the evaluation on 11/15/10

indicated moderate chronic risk and low acute suicide risk, and this evaluation occurred after the inmate cut his chest and was evaluated in the TTA.  He received mental health services at the EOP level of care during his several incarcerations, with the exception of an MHCB admission during 2005.

The inmate's medical history was significant for a diagnosis of peripheral neuropathy with resulting pain and tingling in his feet.  He was treated with Neurontin to address the pain, and the inmate underwent an extensive work-up regarding the cause of this issue.  He was also receiving medical treatment for hepatitis C and gastroesophageal reflux disease.  The inmate had been diagnosed with hypertension, but he discontinued his medications during December 2011 with subsequent normal blood pressure readings.  He had requested a medical chrono to limit his work assignments due to foot pain; the chrono was dated 6/20/12, but he made the request on 6/15/12.  At the UCC on 6/19/12 he was removed from his yard crew job assignment, and his points were reduced to 24.  The suicide reviewer indicated that the inmate's medical condition did not appear to play a role in his suicide.

The suicide reviewer noted that on the day after his last contact with the primary clinician, 6/23/12 at 1109, the inmate was sitting at a table with some books and briefly left; upon his return an inmate of another race was sitting at the table.  The inmate then hit the other inmate and a fight ensued, requiring custody use of pepper spray and eventually the use of batons to end the altercation.  The inmate was told that he would receive an RVR for battery on an inmate requiring use of force.  He was brought to the TTA for treatment of a hand abrasion, and he received a tetanus immunization.  He was cleared by mental health, transferred to administrative segregation and was housed in an intake overflow cell.  The psychiatric technician talked with the inmate during medication pass at 1630 and reported that the inmate did not appear agitated or distressed.

The suicide report noted that RJD staff, prior to the formal death review, identified problems with this case and had already begun to implement their own quality improvement plans to address the identified concerns.  Although eight issues were identified in this process, the formal suicide report provided only five recommendations.  The issues identified at the institutional level that were included in the suicide report included the following:

1. The 30-Minute Welfare Check Tracking Sheet was incorrectly completed.  It was noted that the "ASU staff in the Housing Unit 6 begins the Welfare Check Tracking Sheet from the time their first watch starts at 2200 hours, to reflect the following day's date (which will begin in two hours at 0000) and not the current date.  Due to this practice, the log for the date Inmate __ was found reflected a date inconsistency.  The staff member who found Inmate __ first signed in on the Welfare Check Tracking Sheet on June 24, 2012, at 2211 hours, instead of June 23, 2012."

2. "The area on the Welfare Check Tracking Sheet listing what cells are being checked was sometimes blank.  By leaving this area without cell numbers it was difficult to confirm the 30-Minute Welfare Checks were being conducted on the inmates requiring them.  The ASU Sergeant indicated that sometimes when they

have a high number of inmates requiring 30-minute checks, they do the checks on the entire unit.  That should be noted on the Welfare Check Tracking Sheet if it is the case."

3.  "The length of time a round takes was sometimes not sufficient to ensure an adequate welfare check.  In addition some of the times listed were not credible."

4.  There were issues regarding MAR documentation; some clinicians signed the MAR with no initials or vice versa, making it difficult to determine the provider.  Additionally in this case, the inmate's psychotropic medications were not administered by DOT, and the MAR reflected medication administration when the inmate was medication non-compliant.  The report noted that RJD received a 90-percent compliance rate with the 25th round Coleman monitoring of the administration of DOT medications, and recent improvements in the referral for medication non-compliance as reasons that a formal recommendation would not be provided regarding this issue in the suicide report.

5.  "There were problems related to mental health treatment."  The reviewer noted that the "quality of treatment planning was poor….Treatment goals were non-specific…in spite of the inmate reporting chronic auditory hallucinations, this symptom was not listed as a problem."

6.  "The progress notes completed by the clinician appeared cursory, formulaic and lacked relevant details.  Encouragement and reframing appeared to be the primary treatment interventions.  When they were ineffective, the clinician did not document that other interventions were tried."  The reviewer noted that the Chief of Mental Health at RJD had recently implemented a clinical monitoring project to provide ongoing monitoring of professional practices for mental health staff.

7.  The lack of appropriate completion of an SRE when indicated was noted.  On 11/15/10 when the inmate cut his chest, an SRE was completed in the TTA; however, the primary clinician did not perform a follow-up SRE, nor was there documentation that the issue was addressed in subsequent treatment.  On 12/16/10, the inmate presented very distraught with anger and reported suicidal and homicidal ideation as well as medication non-compliance; however, no SRE was completed, no other staff were consulted and no referral for a higher level of care occurred.

8.  "Poor communication between disciplines seems to have occurred on several occasions for Inmate ___.  An inadequate review of the UHR by the primary clinician occurred.  In addition, documentation and follow-up by the psychiatrist who provided treatment to Inmate ___ was inadequate."  The report noted that the psychiatrist failed to inform other team members regarding the cutting behavior on 2/21/12, although the information was included in the progress note of 3/3/11.  No SRE was completed, and the treatment plan was not updated with self-harm as a problem until June 2011.  The reviewer also noted that custody did not make a

91

mental health referral when the inmate received an RVR for the fight on 2/21/11, as this referral was mandatory for EOP inmates.

The suicide report provided five recommendations and Quality Improvement Plans as follows:

Problem 1:  Several omissions and inconsistencies in the 30-Minute Welfare Check Tracking Sheet were noted during this review, as detailed in the first three bullet points outlined in the Discussion section of this report.
Quality Improvement Plan:  The Warden or designee at RJD shall conduct an inquiry into the difficulties noted above pertaining to the documentation and completion of 30-minute welfare checks.  Corrective actions shall be taken including staff training and an update of local operating procedures (LOP), if needed.

Problem 2:  This review noted difficulties in the mental health treatment of Inmate __ as outlined in the progress notes, the treatment plan, and treatment goals.  While it is impossible to know whether these difficulties were a matter of poor documentation or reflective of the quality of the actual treatment provided to the inmate, the picture provided by available documentation suggests mental health treatment that included formulaic progress notes, non-specific treatment goals and failure to try different interventions when the current interventions proved ineffective.
Quality Improvement Plan:  The Chief of Mental Health or designee at RJD shall conduct an interactive training with mental health staff focusing on mental health treatment concerns such as goals, interventions, and adequate documentation.  In addition to this training, a new project providing monitoring and support to clinical staff has been implemented at RJD.

Problem 3:  An SRE was not completed following an event in which the inmate cut himself deeply, requiring sutures.  It was not apparent from the documentation that the primary clinician consulted with another clinician, or made a referral to a higher level of care, despite the inmate's increase in symptoms.
Quality Improvement Plan:  The Chief of Mental Health or designee at RJD shall continue to facilitate for all mental health staff at RJD the Proctor/Mentor Program (PMP) for SRE development and shall include the primary clinician as a mentee in order to foster development for that clinician in the identification of risk and risk management.

Problem 4:  On February 21, 2011, the inmate initiated a fight in the morning food line, and received an RVR.  No referral was made for a mental health evaluation for possible mitigation of the RVR.  The MHSDS Program Guide (Attachment B, page 56) requires such a referral for inmates in the EOP level of care who receive an RVR.

Quality Improvement Plan:  The Warden or designee at RJD has already provided a training update to all custody staff regarding RVR mental health referral requirements, based on the updated RVR training provided to RJD in 2012.

Problem 5:  After the fight on February 21, Inmate __ cut himself and disclosed his behavior to a psychiatrist on March 3, 2011.  An SRE was not completed, the treatment plan was not updated with self-harm as a problem until June 2011, and documentation did not indicate that IDTT members were informed of the self-harm incident.

Quality Improvement Plan:  The Chief Psychiatrist or designee at RJD noted during the review of this case on August 10, 2012, that although the psychiatrist in question is no longer employed at RJD, currently employed psychiatrists will be provided a training update regarding policies and clinical documentation as outlined in August 28, 2008 memorandum "Guidelines for Clinical Documentation by Psychiatrists."

The Combined Death Review Summary (final) dated 10/24/12 noted that the primary cause of death was anoxic brain injury and the secondary cause of death was asphyxiation due to hanging. The inmate had coexisting conditions of chronic hepatitis C, gastroesophageal reflux disease (GERD), peripheral neuropathy, and mood disorder.  It noted that the inmate's death was not preventable.  The physician and nurse noted in the report that the inmate had been seen regularly in the Chronic Care Program and his medical conditions were managed appropriately.  It also stated that the emergency response after the incident appeared to be timely and appropriate with the exception of a "minor documentation discrepancy."  The report stated that after the inmate was diagnosed with the anoxic brain injury/permanent vegetative state, UCSD ICU providers contacted his family and the decision was made to withdraw care.  He was pronounced dead on 6/29/12 at 1438.  Regarding the standard of care for the emergency medical response, the report noted that the response was timely and appropriate, with a documentation discrepancy related to one of the providers.  One provider noted that the inmate had a palpable pulse and then at 2335, no pulse, so CPR was resumed and a second Epinephrine dosage was given.  The nursing notes indicated that the inmate had a weak carotid pulse and idioventricular rhythm on the monitor when the second Epinephrine dosage was given and CPR was continued.  This discrepancy was attributed to a documentation error.  Regarding the standard of care for medical providers and nurses, the standard of care was met.  No systemic issues were identified.  The section of the report regarding the preventability/improvement matrix was not completed.

On 10/5/12, RJD presented DCHCS with the response to the QIPs.  The memorandum indicated that all had been implemented at RJD; although the first QIP for custody staff was implemented after the deadline of 9/28/12.  The following were the responses to the five QIPs:

1. An investigation conducted on 10/10/12 resulted in the ASU custody Captain identifying record keeping errors that were out of compliance with Local Operating Procedure (LOP) #1: Administrative Segregation Procedures, which addresses welfare checks in ASU (Attachment A).  On 10/10/12, On the Job Training (OJT), which incorporated a review of LOP #1, was provided to ASU staff.  The IST sign in sheets for this training are attached (Attachment B).  A

memo was submitted by the newly assigned B-Yard Custody Captain to the CEO offering an explanation for the required training and inquiry occurring after the headquarters deadline of 9/28/l2 (Attachment C).

2.  To address treatment planning and documentation concerns with the primary clinician identified in this case, on the job training was provided by the Proctor-Mentor Program Coordinator on 9/25/12.  Following a review of the clinician's Treatment Plans in eUHR, three poor quality treatment plans were selected.  During training with the primary clinician, the selected treatment plans were reviewed, areas of concern were discussed, and direct feedback for improving various sections was provided.  Additionally, the primary clinician was trained on accessing the RJD Documentation Manuals (Attachment D) on the mental health share drive.  IST sheet titled, *Treatment Planning - Goals, Interventions, Documentation, & Updates* is attached (Attachment E).  To address treatment planning and documentation issues with other clinical staff at RID:  During the month of August 2012, Dr. Greenwald, Chief Psychologist at RJD, selected a Senior Psychologist Supervisor to create and implement a local monitoring program to address individual clinician issues that have not improved with training by the program supervisor or Proctor-Mentor.  The current performance improvement plan to address poor quality documentation includes the following:
    - Identification of problem through peer review quality chart audits (Attachment F).
    - Referral to Program Supervisor for training, which incorporates following RJD's documentation manuals; Referral to Proctor-Mentor to address SRE concerns.
    - Follow up audit of clinician following initial training for 3 month period.
    - Progressive discipline and Referral to local monitor as indicated.

3.  At RJD, 15 clinicians have completed the PMP training and observation process (Attachment G).  The identified psychologist in this case participated in the training and observation on 9/25/l2 (Attachment H & I).  The Executive Mental Health Staff at IUD will be rotating all primary clinicians through the Proctor-Mentor Program for SRE training; a minimum of 2 clinicians per month will be required to complete the PMP process with our PMP Coordinator.  PMP quarterly progress updates will be submitted to the DCHCS SPR FIT Coordinator. On 9/25/12, the Chief Psychologist and Chief Psychiatrist signed a memorandum addressed to all mental health clinicians clarifying the requirements and expectations for SRE completion (Attachment J).

4.  Following the date of the error described above, custody staff participated in a required RVR Mental Health Referral training.  Attendance Logs provided by IST Sergeant are attached (Attachment K).

5.  On 9/26/12, the Chief Psychiatrist distributed the policy outlining clinical documentation for psychiatrists to all RJD psychiatry staff (Attachment L).  The Chief Psychiatrist was unable to provide OJT to the identified psychiatrist in this case as she had transferred to CIM in August of 2011.

On 11/7/12 the Deputy Director (A) Statewide Mental Health Program and Director (A) Division of Adult Institutions submitted their report on implementation of the Quality Improvement Plan in response to the suicide report.  The report indicated that the responses were reviewed and approved by the Suicide Case Review Focused Improvement Team, CCHCS on 10/25/12.  The Directors indicated that no further actions were necessary.

**Findings:**  This inmate who was a long-time participant in the EOP at RJD committed suicide upon his arrival to administrative segregation by hanging; he later died at a local hospital of anoxic brain injury.  This inmate had a chronic history of anxiety, mood instability, auditory hallucinations and considerable concern regarding a possible transfer to CSATF and his upcoming parole.  Although it did not appear that his suicide was foreseeable, it was preventable, based upon the definition of preventability utilized in this report, had there been adequate mental health treatment provided and adequate treatment planning to address his need for pre-release planning and assistance in transitioning to the community.  None of these issues appeared to have been adequately addressed in therapy.  The suicide reviewer noted many of these issues in the suicide report.

There were several occasions in which the inmate was not appropriately evaluated for suicide risk as indicated.  Additionally, poor communication between the treatment team further worsened the treatment that was provided.  This inmate remained with chronic symptoms, despite his involvement in treatment, but it did not appear that he received adequate consideration of referral to a higher level of care when indicated.  None of the Form 7388-Bs noted that he may have met criterion three that addressed the presence of chronic psychiatric symptoms for at least six months, which was the case for this inmate.  It also appeared that the primary clinician inappropriately dismissed the consideration of referral to DSH after the inmate expressed his reluctance to transfer due to ties with his cellmate and concern that he would lose his television.  Medication management appeared to be primarily driven by requests from the inmate and not by thorough evaluation and consideration of appropriate medication alternatives.  Appropriate treatment planning with the provision of needed treatment, including pre-release planning and referral for DSH intermediate care, may have been beneficial in addressing the chronic symptoms that this inmate experienced and may have prevented this incident.

The suicide reviewer noted concerns regarding the treatment provided by the psychiatrist and stated that the psychiatrist was no longer employed by RJD; however, information from the RJD QIP response indicated that this psychiatrist was working at another CDCR facility.  This is an issue of concern and a limitation of the suicide review process.  The issues regarding this psychiatrist should be viewed from a systemic standpoint, not solely at an institutional level which is the current format for the process of QIPs; this issue should be addressed regardless of the staff member's location of CDCR employment.  Failure to do so may only result in transfer of problems elsewhere and illustrates the need for greater systemic monitoring and oversight regarding suicide prevention efforts at the CDCR.

One additional issue that was not identified in the suicide report was the housing of this inmate in an intake overflow cell at the time of his death by hanging.  Although it is unclear what specifically constituted an intake overflow cell in administrative segregation at RJD, these cells are generally those that may not have been modified for intake purposes, such as changing the air

vents to smaller grates.  If this was the case in this suicide, it would argue for the modification of all air vents in administrative segregation, an area with a disproportionate number of suicides, as institutions routinely house administrative segregation intake inmates in unmodified cells due to the lack of modified cells available for intake purposes.

# EXHIBIT A

Raymond F. Patterson, M.D., D.F.A.P.A.

Dr. Patterson is a psychiatrist licensed in the State of Maryland, the Commonwealth of Virginia and the District of Columbia who has over 35 years of experience in clinical, forensic, and administrative psychiatry.  He received his doctor of medicine from Howard University in 1977 and is a Distinguished Fellow of the American Psychiatric Association.  Dr. Patterson is board certified as a Diplomate of the American Board of Psychiatry and Neurology in Forensic Psychiatry, a Diplomate of the American Board of Forensic Psychiatry and a Diplomate of the American Board of Psychiatry and Neurology in General Psychiatry.  After completing his psychiatric residency at the National Institutes of Mental Health at St. Elizabeth's Hospital in Washington, D.C., he began his career as a medical officer at St. Elizabeth's Hospital in 1977 and two years later was appointed as the Medical Director of the Division of Forensic Programs. He has served as Commissioner of Mental Health for the District of Columbia and also as the Director of Forensic Services for the Department of Mental Health in Washington, D.C.  He has maintained a private practice in general and forensic psychiatry since 1981 and has served as a faculty member at Howard University College of Medicine, Georgetown University Department of Psychiatry and the University of Maryland, School of Medicine.  Dr. Patterson has served as a consultant regarding correctional facilities and mental health facilities in over 17 jurisdictions. He was a surveyor for the Joint Commission on the Accreditation of Healthcare Organizations. He has been a speaker and lecturer at over 100 different forums both nationally and internationally, and has published numerous articles on the administration of forensic populations, managed care in correctional mental health, and regulatory agency standards. During his career, Dr. Patterson has appeared frequently on national television news programs and has been a frequent guest on local radio talk shows to discuss clinical and forensic issues. He has received awards for achievements in his field from no less than 17 different organizations and groups including the U.S. Department of Justice and the U.S. Secret Service.  Dr. Patterson is currently a peer reviewer for the Journal of the American Psychiatric Association and the Journal of the American Academy of Psychiatry and the Law.

**Raymond F. Patterson, M.D., D.F.A.P.A.**
**1904 R Street, N.W.**
**Washington, D.C.  20009**
**Telephone:  (301) 292-3737**
**Fax:  (301) 292-6272**

EDUCATION
|  |  |
|---|---|
| 1973 - 77 | Doctor of Medicine<br>Howard University College of Medicine<br>Washington, D.C. |
| 1970 - 73 | Undergraduate<br>Northwestern University<br>Evanston, Illinois |

MEDICAL LICENSURES
State of Maryland
District of Columbia
Commonwealth of Virginia

BOARD CERTIFICATIONS
|  |  |
|---|---|
| 2004, 2012 | Recertification as Diplomate of the American Board of Psychiatry and Neurology in Forensic Psychiatry |
| 1994 | Diplomate of the American Board of Psychiatry and Neurology, Added Qualifications in Forensic Psychiatry |
| 1988 | Diplomate of the American Board of Forensic Psychiatry |
| 1983 | Diplomate of the American Board of Psychiatry and Neurology in General Psychiatry |

FACULTY APPOINTMENTS
|  |  |
|---|---|
| 1996 - Present | Associate Professor of Psychiatry<br>Howard University College of Medicine<br>Washington, D.C. |
| 2008 - Present<br>1988 – 2000 | Associate Professor of Psychiatry<br>Georgetown University Department of Psychiatry<br>Washington, D.C. |
| 1992 – 2001 | Associate Professor of Psychiatry<br>Institute of Psychiatry and Human Behavior<br>University of Maryland, School of Medicine<br>Baltimore, MD |
| 1982 - 1996 | Clinical Instructor<br>Howard University College of Medicine<br>Washington, D.C. |

|  |  |
|---|---|
| 1982 - 1992<br>& 1998 - 2001 | Clinical Faculty<br>Overholser Division of Training<br>St. Elizabeths Hospital<br>Washington, D.C. |

## APPOINTMENTS/POSITIONS

|  |  |
|---|---|
| 1981 - Present | Private Practice in General and Forensic Psychiatry<br>1904 R Street, N.W.<br>Washington, D.C. 20009 |
| Mar 1998 – Oct 2001 | Director of Forensic Services<br>Commission on Mental Health Services<br>Washington, D.C. |
| May 1997 – Mar 1998 | Chief Psychiatrist<br>Department of Public Safety & Correctional Services<br>Baltimore, MD |
| Sept 1995 – Mar 1998 | Senior Psychiatric Consultant<br>Patuxent Institution<br>Department of Public Safety & Correctional Services<br>Jessup, MD |
| Nov 1996 – April 1997 | Chief Psychiatrist<br>Central Detention Facility<br>Department of Corrections for the District of Columbia<br>Washington, D.C. |
| Aug 1994 – Sept 1995 | Director<br>Division of Demonstration Programs<br>Center for Mental Health Services<br>Substance Abuse, Mental Health Services Administration<br>United States Department of Health and Human Services<br>Rockville, MD |
| Oct 1992 – July 1994 | Superintendent and State Forensics Director<br>Clifton T. Perkins Hospital Center<br>Mental Hygiene Administration, State of Maryland<br>Jessup, MD |
| Jan 1992 – Sept 1992 | Commissioner<br>Commission on Mental Health Services<br>Washington, D.C. |
| Mar 1987 – Sept 1992 | Forensic Services Administrator<br>Commission on Mental Health Services<br>Washington, D.C. |
| July 1985 – Feb 1987 | Associate Superintendent<br>General Clinical Programs<br>St. Elizabeths Hospital<br>Washington, D.C. |
| Sept 1983 – Feb 1987 | Medical Director<br>Division of Forensic Programs<br>St. Elizabeths Hospital<br>Washington, D.C. |

2

| July 1981 – Sept 1983 | Staff Psychiatrist<br>Division of Forensic Programs<br>St. Elizabeths Hospital<br>Washington, D.C. |
|---|---|
| Dec 1981 – July 1982 | Staff Psychiatrist<br>Alexandria Community Mental Health Center<br>Alexandria, VA |
| May 1980 – Nov 1982 | Admitting Psychiatrist<br>Psychiatric Institute of Washington<br>Washington, D.C. |
| Feb 1979 – Mar 1980 | Medical Officer<br>Godding-Noyes Asylum Program Division<br>St. Elizabeths Hospital<br>Washington, D.C. |

## CONSULTATIONS

| Aug 2010 - Present | Consultant<br>Ohio Legal Rights Service<br>Columbus, OH |
|---|---|
| 2009 – Present | Consultant<br>U.S. Department of Justice<br>Washington, D.C.<br>Re:  Grant County Jail, Kentucky |
| 2009 – Present | Consultant<br>U.S. Department of Justice<br>Washington, D.C.<br>Re:  Erie County Holding Center, New York |
| 2001 - Present | Consultant<br>Philadelphia Prison System<br>Philadelphia, PA |
| 1996 - Present | Special Expert to Federal Special Master<br>California Department of Corrections<br>Sacramento, CA |
| 1994 - Present | Consultant - Examiner in General Psychiatry<br>American Board of Psychiatry and Neurology<br>Chicago, IL |
| March 2010 | Consultant<br>Pennsylvania Institutional Law Project<br>Philadelphia, PA |
| October 2009 | Presentation and Workshop<br>Judges, Attorneys and Clinicians for the Baltimore County Drug Court<br>and Mental Health Court<br>Baltimore, MD |
| July 2009 | Consultant<br>Monroe County Jail<br>Rochester, NY |

3

| July 2009 | <u>Consultant</u><br>Sexually Violent Predator Program, Treatment and Detention Facility<br>Illinois Department of Mental Health<br>Rushville, Illinois |
|---|---|
| 2008 – 2009 | <u>Consultant</u><br>U.S. Department of Justice<br>Washington, D.C.<br>Re: Delaware Correctional Center |
| December 2008 | <u>Consultant</u><br>U.S. Department of Justice<br>Washington, D.C.<br>Re: Lake County Jail, Indiana |
| 2007 - Present | <u>Consultant</u><br>Unity Health Care, Inc.<br>District of Columbia Central Detention Facility<br>Washington, D. C. |
| 2004 - 2009 | <u>Consultant</u><br>U.S. Department of Justice<br>Washington, DC<br>Re: Augusta State Medical Prison |
| 1999 - 2007 | <u>Monitor</u><br>New Jersey Department of Corrections<br>Trenton, NJ |
| July 2005 | <u>Consultant</u><br>Illinois Department of Mental Health<br>Joliet, Illinois<br>Re: Sexually Violent Predator Program |
| 2003 - 2006 | <u>Consultant</u><br>U.S. Department of Justice<br>Washington, DC<br>Re: Wyoming State Prison |
| 2003 – 2005 | <u>Consultant</u><br>California Youth Authority<br>California Department of Corrections (Little Hoover Commission)<br>Sacramento, CA |
| Dec 2002 | <u>Consultant/Participant</u><br>Reentry Roundtable<br>Urban Institute<br>Los Angeles, CA |
| April 2002 | <u>Consultant</u><br>Prison Law Office<br>San Quentin, CA<br>Re: California Youth Authority |
| 2001 - 2005 | <u>Consultant</u><br>Department of Public Safety and Corrections<br>State of Louisiana<br>Baton Rouge, LA |

4

| | |
|---|---|
| 2000 - 2001 | <u>Consultant</u><br>Department of Justice<br>South Carolina Department of Corrections<br>Columbia, SC |
| 1999 - 2005 | <u>Consultant</u><br>New York State Office of the Attorney General<br>Albany, NY |
| Sept 1999 | <u>Consultant</u><br>Cultural Issues in Correctional Mental Health<br>Massachusetts Department of Mental Health<br>  & Department of Corrections<br>Gardner, MA |
| April 1999 | <u>Consultant</u><br>Taylor-Hardin Forensic Facility<br>Tuscaloosa, AL |
| 1996 - 2001 | <u>Consultant</u><br>Central State Hospital<br>Virginia Department of Mental Health<br>Petersburg, VA |
| 1996 – 1997 | <u>Consultant</u><br>Department of Mental Health<br>San Juan, Puerto Rico |
| May – June 1995 | <u>Consultant</u><br>Maryland Adjustment & Classification Center (Supermax)<br>Department of Public Safety & Correctional Services<br>Baltimore, MD |
| May 1995 | <u>Psychiatrist Member</u><br>Special Task Committee to review mental health needs for Cuban<br>  and Haitian Migrants<br>Guantanamo Bay, Cuba |
| 1993 – 1994 | <u>Psychiatrist Member</u><br>Center for Mental Health Services Ad Hoc Working Group<br>  for Mental Health and Criminal Justice Systems<br>United States Department of Health and Human Services<br>Rockville, MD |
| 1991 - 1993 | <u>Clinical Consultant</u><br>Law Center Clinical Program<br>Georgetown University<br>Washington, D.C. |
| 1989 - 1991 | <u>Consultant</u><br>The National Conference of Christians and Jews, Inc.<br>Washington, D.C. |
| Oct 1989 | <u>Consultant-Examiner</u><br>American Board of Forensic Psychiatry, Inc.<br>American Academy of Psychiatry and the Law<br>Baltimore, MD |

| 1989 - 1990 | Psychiatric Consultant<br>U.S. Capitol Police<br>Washington, D.C. |
|---|---|
| 1988 - 1991 | Forensic Psychiatric Consultant<br>Georgia Regional Hospital<br>Atlanta, GA |
| May 1987 | Consultant on Professional Supervision and Clinical Privileges<br>Indiana Department of Mental Health<br>Indianapolis, IN |
| 1985 – 1996 | Consultant Surveyor<br>Joint Commission on the Accreditation of Healthcare<br>  Organizations<br>Oak Brook Terrace, IL |
| 1983 - 1987 | Psychiatric Consultant<br>United States Marshal's Service<br>Washington, D.C. |
| 1982 - 1984 | Psychiatric Consultant<br>Metropolitan Police Department<br>Washington, D.C. |

## SPEAKING ENGAGEMENTS & PRESENTATIONS

| Sept 2012 | Presenter<br>"The Criminal Mind:  Presidential Assassins, Terrorists, and Serial<br>  Killers"<br>Medicine for Lawyers: A One Day Seminar on Up and Coming Medical-<br>Legal Topics<br>Klores Perry Mitchelle, P.C.<br>Washington, D.C. |
|---|---|
| June 2012 | Presenter<br>"Alternatives to Solitary Confinement:  Prisoners with Disabilities"<br>2012 TASC P&A/CAP Annual Conference<br>Baltimore, MD |
| July 2011 | Lecturer<br>"Correctional Psychiatry"<br>Forensic Fellowship Program<br>St. Elizabeths Hospital<br>Washington, D.C. |
| April 2011 | Guest Lecturer<br>"The Expert Witness"<br>John Marr Day<br>St. Elizabeths Hospital<br>Washington, D.C. |
| October 2010 | Presenter<br>"Behavioral Management of Drug Addicted Patients"<br>Society of Correctional Physicians 2010 Annual Conference<br>Las Vegas, NV |

| June 2010 | Presenter |
|---|---|
| | "Risk Assessment and Conditional Release Decision Making" |
| | Mental Health and Justice 2010 Conference |
| | Mental Health Court Association 3rd Annual Conference |
| | Illinois Department of Human Services |
| | Glen Elyn, IL |

Nov 2008      Presenter
"The Shotgun Stalker – Terrorism in Adams Morgan"
CME Activity:  Forensic Psychiatry: Crimes of the Washington
    Metropolitan Area
Washington Hospital Center
Washington, D.C.

July 2008      Presenter
"Presidential Assassins, Terrorist Suspects & Other High Profile Cases"
20th Annual Statewide Conference on Mental Health and Justice
Mental Health Forensic Services Bureau
Illinois Department of Human Services
Chicago, IL

April 2008      Speaker
"Forensic Assessment of Competency in Civil and Criminal Matters"
Grand Rounds
Howard University Department of Psychiatry
Washington, D.C.

March 2008      Guest Lecturer
"Understanding Testimony by Mental Health Experts"
Baltimore City Mental Health Court
Baltimore, MD

Jan 2008      Guest Lecturer
"Understanding Testimony by Mental Health Experts"
Washington, D.C., Superior Court Judges
Washington, D.C.

Dec 2007      Speaker/Panelist
"Moussaoui Presentation"
Forensic Evaluations:  A Focus on Cultural Considerations
John Marr Symposium
Georgetown University Hospital
Washington, D.C.

Sept 2007      Guest Lecturer
"Interview techniques and how to elicit information from mentally ill or
    retarded defendants"
Baltimore City Mental Health Court
Baltimore, MD

July 2007      Speaker
"Assessment and Management of the Violent Patient"
Grand Rounds, Howard University Department of Psychiatry
Washington, D.C.

Oct 2006      Panelist
"Terrorism and the Death Penalty:  Expert Testimony and Legal Strategy
    in the Moussaoui Trial
American Academy of Psychiatry and the Law Annual Meeting
Chicago, IL

| | |
|---|---|
| April 2006 | Presenter<br>"Working Effectively with the Adult Forensic Consumer"<br>Clinical and Cultural Competency Training for DMH Stakeholders<br>Department of Mental Health<br>Washington, D.C. |
| August 2005 | Presenter<br>"Forensic Psychiatry: Competence to Stand Trial and Legal Insanity"<br>Department of Psychiatry Grand Rounds<br>Howard University Hospital<br>Washington, D.C. |
| May 2005 | Speaker<br>"History of Forensic Psychiatry and Landmark Forensic Cases"<br>Sesquicentennial Celebration Program<br>St. Elizabeths Hospital<br>Washington, D.C. |
| June 2003 | Speaker<br>"Impulsive Aggression in Children and Adolescents"<br>National Capital Symposium on Mental Health<br>Howard University Hospital<br>Washington, DC |
| May 2002 | Presenter<br>"Mental Health Defenses"<br>Continuing Legal Education Program<br>District of Columbia Bar<br>Washington, D.C. |
| Mar 2002 | Presenter<br>"Assessment and Management of Axis I and Axis II Disorders<br>   in Forensic Disorders in Forensic Patients"<br>State-wide Grand Rounds<br>New York State Office of Mental Health<br>Albany, NY |
| Mar 2002 | Keynote Speaker<br>"Correctional Psychiatry"<br>Louis Van Wezel Schwartz Symposium on Mental<br>   Health Issues in Correctional Psychiatry<br>Washington, DC |
| Mar 2002 | Panelist<br>"Impact of September 11[th]"<br>Washington Bar Association Judicial Council Seminar<br>Washington, DC |
| Mar 2002 | Speaker/Panelist<br>"New Challenges and Opportunities in Mental Health"<br>NASW Conference on New Dimensions in Social Work Practice<br>Washington, DC |
| Nov 2001 | Keynote Speaker<br>"Maintaining the Integrity of the Unit"<br>Kirby Forensic Center w/ NYU School of Medicine<br>14th Annual Forensic Workshop<br>New York, NY |

May 2001   Guest Speaker and Workshop
       "Civil vs. Forensic Cultures" (Part II)
       Kirby Forensic Psychiatric Center
       Wards Island, NY

May 2001   Speaker/Participant
       "Saving Our Youth: Juvenile Justice & Mental Health"
       13th Annual Conference
       Mental Health Association of the District of Columbia
       Washington, DC

June 2001   Speaker
       "Partnerships Behind the Walls and Beyond:  Mental Health
        Disabilities Among Offender Populations"
       Lt. Joseph P. Kennedy Institute
       Washington, D.C.

Mar 2001   Keynote Speaker
       "Cultural Competence in Forensic Settings"
       8th Annual Forensic Conference
       Little Rock, AR

Nov 2000   "Forensic Psychiatry in Practice"
       University of Baltimore
       Baltimore, MD

Oct 2000   "Correctional Psychiatry (Advanced Course)"
       Annual Meeting
       American Academy of Psychiatry and the Law
       Van Couver, B.C. Canada

June 2000   Faculty & Speaker
       "Outpatient Commitment in the District of Columbia"
       Medical Services Division of Circuit Court of Baltimore
       Baltimore, MD

June 2000   Panelist
       "Government and Private Roles in the Provision of Forensic
        Mental Health Services"
       Innovations in Forensic Mental Health Conference
       Ehrenkranz  School of Social Work, Research Department
       New York University School of Medicine
       New York, New York

June 2000   Faculty and Speaker
       "Outpatient Commitment in the District of Columbia"
       Medical Services Division of the Circuit Court of Baltimore
       Baltimore, MD

April 2000   Keynote Speaker
       "Cultural Competence in Forensic Settings"
       17th Annual Forensic Workshop
       Missouri Department of Mental Health
       Lake Ozark, MO

March 2000   Keynote Speaker and Workshop
       "Cultural Competence in Forensic Settings" (Part I)
       Kirby Forensic Psychiatric Center
       Wards Island, NY

| | |
|---|---|
| Dec 1999 | Panelist<br>"Mental Health and Criminal Justice: An In-Depth, Interactive<br>Exchange to Examine Appropriate Roles for State Mental<br>Health Agencies"<br>National Association of State Mental Health Program Directors<br>Winter 1999 Commissioner's Meeting<br>Washington, D.C. |
| Nov 1999 | Panelist<br>Mental Health and the Law<br>35th Criminal & 3rd Appellate Practice Seminars<br>Criminal Practice Institute & Appellate Practice Institute<br>Washington, D.C. |
| Nov 1999 | Presenter<br>"Understanding Forensic Expert Witness Testimony"<br>University of Maryland<br>Baltimore, MD |
| August 1999 | Presenter<br>"The Intersection of Mental Health, Civil, & Criminal<br>Issues"<br>1st Annual Commission on Mental Health Services Conference<br>Washington, D.C. |
| June 1999 | Presenter<br>"Expert Witness Testimony"<br>Georgetown University Law School<br>Washington, D.C. |
| May 1999 | "Relapse in Forensic Settings"<br>Annual Meeting<br>American Psychiatric Association<br>Washington, D.C. |
| May 1999 | Speaker<br>"Juvenile Justice – Should 14 Year Olds Be Tried As Adults?"<br>Family Advocacy and Support Association, Inc.<br>Washington, D.C. |
| Mar 1999 | Presenter<br>"Forensic Psychiatry in Practice"<br>University of Baltimore<br>Baltimore, MD |
| Oct 1998 | Keynote Address<br>"Cultural Competency in Forensic Settings"<br>NASMHPD 1998 State Mental Health Forensic Directors Conference<br>St. Petersburg, FL |
| Oct 1998 | Speaker and Panelist<br>"Opening the Door:  Mental Health & Criminal Justice Systems"<br>Woodley House, Potomac Residence Club, Inc.<br>Washington, D.C. |
| May 1998 | Presenter<br>"Direct and Cross-examination"<br>D.C. Office of the Corporation Counsel<br>Washington, D.C. |

10

| | |
|---|---|
| Oct 1998 | "Correctional Psychiatry (Basic Course)"<br>Annual Meeting<br>American Academy of Psychiatry and the Law<br>New Orleans, LA |
| Nov 1997 | <u>Discussant</u><br>Thirteenth Annual Rosalyn Carter Symposium on Mental<br>    Health Policy<br>The Carter Center Mental Health Task Force<br>Atlanta, GA |
| June 1997 | "Hospitalization:  Who Needs It?"<br>Consortium on Special Delivery Settings<br>Council on Psychiatric Services<br>American Psychiatric Association<br>SanDiego,CA |
| Oct 1996 | <u>Presenter</u><br>"Regulatory Agencies and Mental Health Care Delivery<br>    Systems"<br>Tulane University Medical Center<br>New Orleans, LA |
| Mar 1996 | <u>Presenter</u><br>"Presidential Assassins"<br>Tenth Annual Conference<br>Florida State Hospital<br>Orlando, FL |
| Nov 1995 | <u>Discussion Group Leader</u><br>"Public Psychiatry"<br>American Psychiatric Association<br>Washington, D.C. |
| Sept 1995 | <u>Presenter</u><br>"A Comparison of Treatment Models for Women in Forensic<br>  Hospitals"<br>1995 State Mental Health Forensic Directors Conference<br>National Association of State Mental Health Program Directors<br>Madison, WI |
| July 1995 | <u>Presenter</u><br>"Successes from the Streets:  Strategies Beyond Shelters<br>    and Jails"<br>15th Annual National Alliance for the Mentally Ill Convention<br>Washington, D.C. |
| July 1995 | <u>Presenter</u><br>"Implications of Treatment Breakthroughs for Persons with<br>  Mental Illness"<br>'Knowledge Development and Application in Mental Health<br>  and Criminal Justice Systems for Persons with Mental<br>  Illness Living in the Community' Conference<br>Albuquerque, NM |
| June 1995 | <u>Presenter</u><br>"Fostering Hope and Celebrating Strengths, Embracing<br>    Families and Communities"<br>Family Advocacy and Support Association, Inc.<br>Washington, D.C. |

11

| | |
|---|---|
| May 1995 | Presenter<br>"Perspectives on Mental Illness in the Criminal Justice<br>  System"<br>Alliance for the Mentally Ill of Michigan<br>Southfield, MI |
| April 1995 | Keynote Address: "Approaches to Violent Behavior"<br>Second Annual Forensic Conference<br>Little Rock, AR |
| April 1995 | Presenter<br>"Clinical Diagnosis and Treatment of Mental Illness: An<br>  Overview for the Non-Clinician"<br>Superior Court of the District of Columbia<br>Washington, D.C |
| Nov 1994 | Presenter<br>"Community Forensics: Evolving Trends"<br>Grand Rounds Presentation<br>Department of Psychiatry<br>George Washington University Hospital<br>Washington, D.C. |
| Oct 1994 | Presenter<br>"An Overview of Mental Illness and Managing Violent<br>  Persons in the Hearing Room"<br>National Association of Administrative Law Judges<br>Baltimore, MD |
| Sept 1994 | Keynote Address: "Community Forensics"<br>National Association of Social Workers Working with<br>  Forensic Patients and Their Families<br>Bethesda, MD |
| May 1994 | Panelist<br>"The Mentally Ill in Prisons"<br>National Coalition for the Mentally Ill in Prisons<br>United States Capitol<br>Washington, D.C. |
| May 1994 | Presenter<br>"Community Forensics and Aftercare: Placement and<br>  Treatment Issues"<br>Johns Hopkins Department of Psychiatry<br>Baltimore, MD |
| May 1994 | Presenter<br>"Transition Services for Mentally Ill Offenders"<br>The National Coalition for the Mentally Ill in the Criminal<br>  Justice System<br>Breakfast and Briefing for Members of Congress<br>Washington, D.C. |
| May 1994 | Presenter<br>"Managing a Violent Crisis: Media Relations,<br>  Countertransference, and Other Internal and External<br>  Systems Issues", Managing the Risk of Violence<br>Georgia Regional Hospital<br>Atlanta, GA |

12

| | |
|---|---|
| May 1994 | <u>Presenter</u><br>"Remediation for the Juvenile Offender"<br>Patuxent Institution Staff Retreat<br>Marriotsville, MD |
| April 1994 | <u>Keynote Address:</u><br>"Providing a Continuum of Care for Forensic Patients"<br>Galt Scholar Lecturer<br>Virginia Department of Mental Health, Mental Retardation<br>   and Substance Abuse<br>Richmond, VA |
| April 1994 | <u>Guest Speaker</u><br>"Forensic Inpatient Services: Trends for the 90s"<br>Fourth Annual Conference for Forensic Mental Health<br>   Treatment Providers<br>Vernon, TX |
| April 1994 | <u>Presenter</u><br>"Emergency Psychiatry"<br>Grand Rounds, Department of Emergency Medicine<br>University of Maryland Hospital<br>Baltimore, MD |
| Mar 1994 | <u>Presenter</u><br>"Effective Clinical Documentation"<br>Catonsville Community College<br>Catonsville, MD |
| Jan 1994 | <u>Presenter</u><br>"Community Forensics"<br>Grand Rounds, Department of Psychiatry<br>University of Maryland<br>Baltimore, MD |
| Jan 1994 | <u>Speaker</u><br>"Overview of the Forensic System in Maryland"<br>Educational Program Series<br>Baltimore Mental Health Systems, Inc.<br>Baltimore, MD |
| Dec 1993 | <u>Presenter</u><br>"The Insanity Defense and Serial Sex Offenders"<br>Thurgood Marshall Inn of Court<br>Superior Court of the District of Columbia and the U.S.<br>   Court of Appeals<br>Washington, D.C. |
| July 1993 | <u>Keynote Address:</u>  "The Forensic Care Providers' Role in<br>   Educating the Public"<br>Third Annual Conference for Forensic Mental Health<br>   Treatment Providers<br>Vernon, TX |
| June 1993 | <u>Keynote Address:</u>  "Forensic Mental Health Care in the<br>   United States"<br>The Alliance for the Mentally Ill of Maryland<br>The 11th Annual Convention, Hood College<br>Frederick, MD |

May 1993
Presenter
"Developing an Integrated System for Correctional
 Institutions"
1993 Annual Meeting
American Psychiatric Association
San Francisco, CA

May 1993
Presenter
"Community Violence:  How Have We Arrived Here?  Can
 We Go Anywhere Else?"
Georgia Regional Hospital
Atlanta, GA

April  1993
Presenter
"Mock Trial:  Serial Rapists"
Board of Professional Responsibility
District of Columbia Court of Appeals, Annual Disciplinary Conference
Washington, D.C.

April 1993
Presenter
"History of Forensic Psychiatry and the Insanity Defense"
Psychiatry Grand Rounds
University of Maryland
Baltimore, MD

Feb 1993
Presenter
"The Insanity Defense in the Federal System and the District
 of Columbia"
Forensic Psychiatry Fellowship Program Seminar
University of Maryland
Baltimore, MD

Jan 1993
Keynote Address:  "Violence is a Community Problem:  How
 Did We Get Here?"
Workshop on Violence and the Community
Sponsored by the University of Maryland
Linthicum, MD

Nov 1992
Speaker
"The Psychological Dimensions of Preventing Violence"
Violence in Our Community Action Agenda
1992 Family Life Conference
Henry C. Gregory III, Family Life Center
Washington, D.C.

Sept 1992
Speaker
"Cross Cultural Differences in Evaluation and Treatment"
Treatment or Punishment:  Mental Illness and the Criminal
Justice System
National Alliance for the Mentally Ill
Washington, D.C.

May 1992
"Evaluation and Treatment of Blacks in Jails and Prisons"
Annual Meeting
American Psychiatric Association
Washington, D.C.

14

| May 1992 | Speaker<br>"Children and Violence"<br>D.C. Mental Health Association Annual Luncheon and<br>  Workshop<br>Washington, D.C. |
|----------|----------|
| Feb 1992 | Presenter<br>"Hostage Negotiations"<br>Annual Hostage Negotiation Seminar<br>Baltimore County Policy Department<br>Baltimore, MD |
| Oct 1991 | "Criminalization of the Mentally Ill"<br>Annual Meeting<br>American Academy of Psychiatry and the Law<br>Orlando, FL |
| Sept 1991 | "Victimization of Staff and Critical Incidents"<br>Twelfth Annual Conference<br>NASMHPD State Mental Health Forensic Directors<br>Birmingham, AL |
| Sept 1990 | "Maintaining the Integrity of the Unit"<br>Eleventh Annual Conference<br>NASMHPD State Mental Health Forensic Directors<br>Sante Fe, NM |
| June 1990 | Speaker<br>"Signs and Symptoms of Depression"<br>Women in Business<br>Prince George's Chamber of Commerce<br>Landover, MD |
| May 1990 | Speaker<br>"Not Guilty by Reason of Insanity:  Implications for the<br>  Judicial System, the Community and Clinicians"<br>Region 4 Community Mental Health Center Conference<br>Washington, D.C. |
| May 1990 | Speaker<br>"Violent Death and the Family:  Multiple Victims"<br>St. Francis Center Conference<br>Washington,D.C. |
| Dec 1989 | Speaker and Panelist<br>"Mental Health is Everybody's Business"<br>Fifth Annual Mental Health Planning Conference<br>D.C. State Mental Health Planning Council<br>Washington, D.C. |
| Oct 1989 | Presenter<br>"Mental Health Issues in the Courtroom"<br>D.C. Superior Court Judges and Commissioners<br>Washington, D.C. |
| April 1989 | Speaker<br>"People Reaching People: Pathways to Black Mental Health"<br>D.C. Chapter of the Association of Black Psychologists<br>Howard University<br>Washington, D.C. |

| | |
|---|---|
| Nov 1987 | <u>Speaker</u><br>"Client and Community Rights and Responsibilities"<br>Fourth Annual State of the District of Columbia Mental<br>  Health Conference<br>Washington, D.C. |
| June 1987 | <u>Speaker</u><br>"Advocacy - A Shared Responsibility"<br>Information, Protection and Advocacy Center for<br>  Handicapped Individuals, Inc.<br>Washington, D.C. |
| Jan 1987 | <u>Speaker</u><br>"Depression:  Approaches to Community Management"<br>PSI Associates, Inc.<br>Washington, D.C. |
| Oct 1986 | <u>Presenter</u><br>"Re-enactment of Ezra Pound Trial"<br>Annual Meeting<br>American Academy of Psychiatry and the Law<br>Philadelphia, PA |
| Aug 1986 | <u>Presenter</u><br>"Forensic Psychiatry and General Psychiatric Practice"<br>Howard University Hospital<br>Washington, D.C. |
| June 1986 | <u>Speaker</u><br>"Schizophrenia:  Treatment Approaches"<br>PSI Associates, Inc.<br>Washington, D.C. |
| Nov 1985 | <u>Presenter</u><br>"Sexual Psychopathology and Anti-Androgen Therapies"<br>St. Elizabeths Hospital<br>Washington, D.C. |
| Oct 1985 | <u>Presenter</u><br>"Re-enactment of Ezra Pound Trial"<br>Medical Society Scientific Day Program<br>St. Elizabeths Hospital<br>Washington, D.C. |
| Mar 1985 | <u>Presenter</u><br>"Tarasoff and Its Offsprings:  Implications for Clinical<br>  Practice"<br>Eighth Annual John Marr Day Symposium<br>St. Elizabeths Hospital<br>Washington, D.C. |
| Sept 1984 | <u>Presenter</u><br>"Civil Commitment and Post NGI Proceedings"<br>Criminal Practice Institute<br>Washington, D.C. |

Jan 1984
<u>Presenter</u>
"Critical Issues in Forensic Psychiatry: Where Do We Go
   From Here?"
Seventh Annual John Marr Day Symposium
St. Elizabeths Hospital
Washington, D.C.

June 1983
<u>Speaker</u>
"Psychological Effects of Cancer"
Introductory Course in Cancer Education for D.C. Health and
   Science Teachers
Washington, D.C.

Dec 1980
"Use of Psychotropic Medications in Pregnancy: A Review"
St. Elizabeths Hospital Medical Society
Washington, D.C.

Aug 1979
"The Psychosocial Aspects of Liaison Psychiatry to Cancer
   Patients"
The National Medical Association Annual Meeting
Detroit, MI


## <u>PUBLICATIONS</u>

1. Patterson, RF. "Commentary: The Problem of Agreement on Diagnoses in Criminal Cases"
   Journal of the American Academy of Psychiatry and the Law
   November 2010

2. Patterson, RF and Hughes, KC., "Review of Completed Suicides in the California Department
   of Corrections and Rehabilitation, 1999 to 2004"
   Psychiatric Services (A Journal of the American Psychiatric Association)
   June 2008

3. Patterson, RF and Greifinger, RB. ,"Treatment of Mental Illness in Correctional Settings"
   Chapter in <u>Public Health Behind Bars: From Prisons to Communities</u>
   Edited by Robert B. Greifinger, Springer Science + Business Media, LLC, 2007

4. Patterson, RF, and Greifinger, RB. "Insiders as Outsiders: Race, Gender and
   Cultural Considerations Affecting Health Outcome after Release to the
   Community"
   Journal of Correctional Health Care, Vol. 10, #3, Fall 2003

4. <u>Co-Author</u>
   Task Force Report: Guidelines for Treatment of Schizophrenia in a Correctional Setting
   National Commission on Correctional Health Care
   Washington, DC

5. Patterson, RF, "Review Mechanisms and Regulatory Agencies"
   Chapter in <u>Mental Health Care Administration: A Guide for Practitioners</u>.
   Edited by P. Rodenhauser, M.D. University of Michigan Press. 2000

6. Dvoskin, JA, and Patterson, RF: "Administration of Treatment Programs for
   Offenders with Mental Disorder"
   Chapter in <u>Treatment of Offenders With Mental Disorders</u>
   Edited by R.M. Wettstein. Guilford Press, New York, 1998.

7. Patterson, RF, and Wise, BF: The Development of Internal Forensic Review
   Boards in the Management of Hospitalized Insanity Acquittees.
   Journal of the American Academy of Psychiatry and the Law 26 (4), 1998.

8.  Patterson R: Managed Care in Corrections.
    Journal of the American Academy of Psychiatry and the Law 26 (1), 1998.

MEDIA ACTIVITIES

| | |
|---|---|
| Dec 2007 | "Treatment of Insanity Acquitees in the U.S. Virgin Islands"<br>National Public Radio |
| Jan 1998 | "Competence and Criminal Responsibility"<br>FOX Evening News<br>Washington, D.C. |
| Jan 1998 | "Unibomber"<br>FOX Morning News<br>Washington, D.C. |
| Dec 1996 | "Holiday Blues and Depression"<br>Crosstalk - WDCU Live Public Radio Talk Show<br>Washington, D.C. |
| Dec 1995 | "Violence in the Community" and "The Holiday Blues"<br>Crosstalk - WDCU Live Public Radio Talk Show<br>Washington, D.C. |
| Oct 1993 | "Understanding Your Mental Health"<br>Focus on Health<br>WOL Radio 1450 AM<br>Washington, D.C. |
| Oct 1993 | "The Criminally Insane"<br>FOX TV<br>Washington, DC |
| June 1993 | "Psychodynamics of Violence" and "Total Well Being"<br>WPFW-FM Talk Radio Show<br>Washington, D.C. |
| Mar 1992 | "State of the District: Need and Delivery of Mental Health<br>   Care Services Through DHS"<br>DC Today, Channel 16<br>Washington, D.C. |
| Jan 1992 | "A Perspective on Justice"<br>Discussion with Prince Georges County State's Attorney<br>Channel 18<br>Prince Georges County, MD |
| Sept 1991 | "Panic Disorders"<br>Urban Health Report<br>WHMM-TV, Channel 32<br>Washington, D.C. |
| July 1991 | "Serial Killers"<br>FOX News Channel 5<br>Washington, D.C. |

| Mar 1991 | "Domestic Violence"<br>Urban Health Report<br>WHMM-TV, Channel 32<br>Washington, D.C. |
| --- | --- |
| Mar 1991 | "Anxiety Disorders"<br>Urban Health Report<br>WHMM-TV, Channel 32<br>Washington, D.C. |
| Aug 1990 | "Impact of the Marion Barry Trial on the Community"<br>Evening Exchange<br>WHMM-TV, Channel 32<br>Washington, D.C. |
| Aug 1990 | "After the Trail"<br>WNTR-AM Radio<br>Washington, D.C. |
| May 1990 | "Your Mental Health"<br>Crosstalk - WDCU Live Public Affairs Talk Show<br>Washington, D.C. |
| May 1989 | "How Stress Factors Affect the Community"<br>The Morning Show with Cathy Hughes<br>WOL Radio Talk Show<br>Washington, D.C. |
| Feb 1987 | "A Washington Life"<br>Washington Post Magazine<br>Washington, D.C. |
| Jan 1987 | "The San Isidro Murder Slayings:  Psychological Aspects"<br>Newscenter 4<br>Washington, D.C. |

OTHER ACTIVITIES

| 2006 - Present | Peer Reviewer<br>Psychiatric Services<br>Journal of the American Psychiatric Association<br>Arlington, VA |
| --- | --- |
| 1998 - Present | Peer Reviewer<br>Journal of the American Academy of Psychiatry and the Law<br>Blumfield, CT |
| 1998 - 2004 | Chairman<br>Institutional and Correctional Psychiatry Committee<br>American Academy of Psychiatry and the Law<br>Blumfield, CT |
| 2000 - 2001 | President<br>Washington Psychiatric Society<br>Washington, D.C. |
| August 1999 | Co-Chairman<br>National Summit on Violence Throughout the Life Span<br>Colorado Violence Prevention Center<br>Denver, CO |

19

| | |
|---|---|
| 1999 - 2000 | President-Elect<br>Washington Psychiatric Society<br>Washington, D.C. |
| 1998 - 1999 | President<br>Guttmacher Forensic Educational Fund, Inc.<br>Baltimore, MD |
| Dec 1997<br>& Jan 1998 | Trainer<br>Suicide Prevention Training for Correctional Officers<br>Central Booking Intake Facility and Baltimore City Detention Center<br>Baltimore, MD |
| 1997 - 1998 | Vice President<br>Guttmacher Forensic Educational Fund, Inc.<br>Baltimore, MD |
| 1996 - 1997 | Chairperson<br>Consortium on Special Delivery Settings<br>Council on Psychiatric Services<br>American Psychiatric Association<br>Washington, D.C. |
| 1994 - 1999 | Vice Chairperson<br>Council on Psychiatry and Law<br>American Psychiatric Association<br>Washington, D.C. |
| 1994 - 1997 | Member<br>Executive Council<br>American Academy of Psychiatry and Law<br>Blumfield, CT |
| 1994 - 1997 | Member<br>Ad Hoc Committee to Develop a Slate of Candidates for<br>   Election to the American Board of Psychiatry and Neurology<br>Deerfield, IL |
| 1993 - 1997 | Member<br>Institutional and Correctional Psychiatry Committee<br>American Academy of Psychiatry and the Law<br>Bloomfield, CT |
| 1993 - 1994 | Vice-Chair to Executive Committee<br>Forensic Division<br>National Association of State Mental Health Program Directors<br>Alexandria, VA |
| 1992 - 2001 | Member<br>Committee on Added Qualifications in Forensic Psychiatry<br>American Board of Psychiatry and Neurology<br>Deerfield, IL |
| 1990 - 1994<br>& 1998 - 2001 | Member and Washington, D.C. Representative<br>Forensic Division<br>National Association of State Mental Health Program<br>   Directors<br>Alexandria, VA |

| | |
|---|---|
| 1992 - 1994 | <u>Treasurer</u><br>Washington Psychiatric Society<br>Washington, D.C. |
| 1992 - 1994 | <u>Member</u><br>Institutional Review Board<br>Department of Health and Mental Hygiene<br>State of Maryland |
| 1990 - 1991 | <u>President</u><br>D.C. Chapter<br>Washington Psychiatric Society<br>Washington, D.C. |
| 1990 - 1991 | <u>Member</u><br>ABT Oversight Committee<br>Patuxent Institute<br>Jessup, MD |
| 1990 - 1991 | <u>Chairman</u><br>Council on Psychiatry<br>D.C. Medical Society<br>Washington, D.C. |
| 1989 - 1994 | <u>Councilmember</u><br>Council on Psychiatry<br>D.C. Medical Society<br>Washington, D.C. |
| 1989 - 1990 | <u>Secretary</u><br>Council on Psychiatry<br>D.C. Medical Society<br>Washington, D.C. |
| 1987 - 1993 | <u>Member</u><br>Advisory Merit Selection Panel<br>(Appointed by Chief Judge Fred B. Ugast of the Superior<br>  Court of the District of Columbia)<br>Washington, D.C. |
| 1986 - 1988 | <u>Co-Editor</u><br>American College of Mental Health Administration Newsletter<br>Washington, D.C. |
| 1985 - 1986 | <u>Editor</u><br>St. Elizabeths Hospital Medical Society Newsletter<br>Washington, D.C. |

## <u>AWARDS</u>

| | |
|---|---|
| February 2001 | "Key to Louisiana State Penitentiary at Angola"<br>Louisiana Department of Corrections<br>Baton Rouge, LA, |
| May 1998 | Award for Support to Commission on Mental Health Services<br>Department of Nursing, Commission on Mental Health Services<br>Washington, D.C., |

| | |
|---|---|
| February 1998 | "Key to Patuxent Institution"<br>Department of Public Safety and Correctional Services<br>Jessup, Maryland |
| March 1996 | Distinguished Visiting Professor<br>Florida State Hospital<br>Orlando, Florida |
| 1994 | Certificate of Appreciation for Dedication to Clifton T. Perkins Hospital<br>and the Mental Health Forensic System of Maryland<br>Department of Health and Mental Hygiene<br>Baltimore, Maryland |
| 1994 | Certificate of Appreciation<br>Medical Records Department, Clifton T. Perkins Hospital<br>Jessup, Maryland |
| November 1992 | Award for Public Service<br>United States Department of Justice<br>Washington, D.C., |
| October 1992 | Certificate of Appreciation<br>Risk Management/Quality Assessment Program<br>Mental Hygiene Administration<br>Baltimore, Maryland |
| October 1992 | Outstanding Public Service Recognition Resolution<br>Council of the District of Columbia<br>Washington, D.C. |
| October 1992 | Distinguished Service Award<br>Department of Human Services, District of Columbia<br>Washington, D.C. |
| October 1992 | Meritorious Public Service Award<br>Office of the Mayor<br>Washington, D.C. |
| October 1992 | Our Hero Award<br>Patient's Rights Council<br>St. Elizabeths Hospital<br>Washington, D.C., |
| October 1992 | Outstanding Assistance and Support to Law Enforcement<br>United States Secret Service<br>Washington, D.C. |
| September 1992 | Superior Support for United States Public Health Service<br>Washington, D.C. |
| May 1992 | Certificate of Appreciation for Dedicated Service to the Psychiatry<br>Section of the Medical Society of the District of Columbia<br>Washington, D.C. |
| February 1992 | Certificate of Appreciation for Hostage Negotiations Conference<br>Baltimore County Police Department<br>Baltimore, Maryland |

| 1989 | Blacks in Government Award for Outstanding Service in Forensic Psychiatry and Community Service<br>Washington, D.C. |
|---|---|
| March 1987 | The ADAMHA Administrators Award for Achievements of the Quality Assurance Workgroup<br>St. Elizabeths Hospital<br>Washington, D.C. |
| June 1986 | Alumnus of the Year<br>St. Elizabeths Overholser Division of Training<br>Washington, D.C. |

## MEMBERSHIP IN PROFESSIONAL ASSOCIATIONS

American Academy of Psychiatry and the Law
American College of Mental Health Administration (Fellow)
American Medical Association
American Psychiatric Association (Distinguished Fellow)
Black Psychiatrists of America
Howard University Medical Alumni Association
Medical Society of the District of Columbia
National Alliance for the Mentally Ill
National Medical Association
Society of Correctional Physicians
Washington Psychiatric Society

# EXHIBIT B

Kerry C. Hughes

Dr. Hughes is a licensed psychiatrist in the State of Georgia and is also certified by the American Board of Psychiatry and Neurology. After graduating from the University of Iowa College of Medicine and completing a psychiatric residency training program at Emory University, Dr. Hughes became a staff psychiatrist at the Fulton County Jail in Atlanta. He was appointed as Director of Mental Health Services at the Fulton County Jail and held that position for over a decade. Dr. Hughes was also a staff psychiatrist at a behavioral institute and a mental health center both located in Atlanta. He also held the position of Medical Director for an outpatient program in Chamblee, Georgia for four years. Dr. Hughes served as an assistant professor of clinical psychiatry at the Morehouse School of Medicine for 18 years. He has served in the role of expert, consultant or monitor in five jurisdictions and has co-authored publications regarding mental health issues in correctional facilities.

# CURRICULUM VITAE

**KERRY COURTNEY HUGHES, M.D.**
1579 Monroe Dr., Ste. F  Box 612
Atlanta, GA  30324
FAX: 404-364-9708
EMAIL: dockc99@AOL.COM

| | |
|---|---|
| **DATE OF BIRTH:** | SEPTEMBER 9, 1960 |
| **PLACE OF BIRTH:** | JACKSON, MISSISSIPPI |
| **CITIZENSHIP:** | U.S.A. |
| **LICENSURE:** | GEORGIA COMPOSITE STATE BOARD OF MEDICAL EXAMINERS |
| **SPECIALTY BOARD CERTIFICATION:** | AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY CERTIFICATE #38864 JANUARY, 1994 |

## EDUCATIONAL BACKGROUND:

Emory University Affiliated Hospitals, Atlanta, Georgia:  Residency in Psychiatry, July, 1986 - June, 1990

The University of Iowa College of Medicine, Iowa City, Iowa:  Medical Degree, 1982 - 1986

Jackson State University, Jackson, Mississippi:  Bachelor of Science Degree in Biology, 1978 - 1982

Clinton High School, Clinton, Mississippi, 1974 - 1978

## EMPLOYMENT EXPERIENCE:

Director of Mental Health Services, Fulton County Jail, 901 Rice Street, Atlanta, Georgia, 1993 – May 2004

Staff Psychiatrist, Fulton County Jail, 901 Rice Street, Atlanta, Georgia, 1990 - 1993

Staff Psychiatrist, West Fulton Mental Health Center, 475 Fairburn Road, S.W., Atlanta, Georgia, 1990 - 2001

Medical Director, Peachtree Alternatives, Incorporated, Outpatient Recovery Program, 5115 New Peachtree Road, Suite 102, Chamblee, Georgia, 1990 - 1994

Psychiatrist, The Behavioral Medicine Institute of Atlanta, Paces Pavilion, Suite 202, 3193 Howell Mill Road, N.W., Atlanta, Georgia, 1990 - 1991

## ACADEMIC POSITIONS:

Assistant Professor of Clinical Psychiatry, Morehouse School of Medicine, 720 Westview Dr., Atlanta, Georgia, 1990 – 2008.

## FORENSIC EXPERIENCE:

Psychiatric Expert for the United States District Court of the Eastern District of California; case Coleman et al. v. Brown et al., April 1998 – present.

Psychiatric Expert for the United States Department of Justice, Civil Rights Division; Miami-Dade County Jail, November 2011 – present.

Neutral Psychiatric Expert, case Jaime Bravo, et al., v. Board of County Commissioners for the County of Doña Ana, the Doña Ana County Detention Center et al., July 2010 – January 2012.

Mental Health Consultant, Doña Ana County Adult Detention Center, January 2012 - present.

Psychiatric Expert for the United States Department of Justice, Civil Rights Division; Santa Fe County Adult Detention Center, May 2004 – November 2009.

Psychiatric Expert for the United States Department of Justice, Civil Rights Division; Oahu Community Correctional Center, October 2005 - 2006.

Psychiatric Expert for the United States Department of Justice, Civil Rights Division; Mobile County Metro Jail, September 2003.

Federal Court Monitor for the United States District Court for the District of New Jersey Vicinage of Trenton; case C. F., et al., v. Terhune et al., August 2001 – 2007.

Mental Health Survey Team Leader, Hendry Correctional Institute, Immokalee, Florida;

for United States District Court Middle District of Florida; case Celestineo vs. Dugger et. al., July 1991

Mental Health Survey Team Leader, Martin Correctional Institute, Indiantown, Florida; for United States District Court Middle District of Florida; case Celestineo vs. Dugger et. al., August, 1991

Mental Health Resurvey Team Leader, North Florida Reception Center, Lake Butler, Florida; for United States District Court Middle District of Florida; case Celestineo vs. Dugger et. al., December, 1991

Mental Health Resurvey Team Participant, Charlotte Correctional Institute, Punta Gorda, Florida; for United States District Court Middle District of Florida; case Celestineo vs. Dugger et. al., December, 1991

## PUBLICATIONS:

National Commission on Correctional Health Care Task Force Report: Clinical Guidelines for Correctional Facilities, Guidelines for Treatment of Schizophrenia in a Correctional Setting; Jeffrey L. Metzner, M.D. (chairperson), Steven Dubovsky, M.D., Joel Dvoskin, Ph.D., Kerry Hughes, M.D., Dennis Koson, M.D., Molly Finnerty, M.D., and Raymond Patterson, M.D., Chicago IL, National Commission on Correctional Health Care, May 2004.

Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004. Raymond F. Patterson, M.D., Kerry Hughes, M.D., Psychiatric Services. June 2008; Volume 59, Number 6: Pages 676-82.

## RESEARCH:

A Comparison of Pulmonary and Intestinal Lymphoid Cell Recirculation and Tissue Localization in Sheep, Brookhaven National Laboratory, Medical Department, Supervisor - Daniel Joel, D.V.M., Ph.D., 1982

Minority Access to Research Careers (M.A.R.C.) Project, A Comparison of Infectivity of Three Strains of Codling Moth Granulosis Virus by E.L.I.S.A., University of California at Berkeley, Department of Entomology and Parasitology, Supervisor - Louis Falcon, Ph.D., 1981

## PROFESSIONAL ORGANIZATIONS:

American Medical Association

American Psychiatric Association

American Academy of Psychiatry and the Law

Society of Correctional Physicians

Black Psychiatrists of America

American Correctional Health Services Association

Georgia Psychiatric Physicians Association

Academy of Correctional Health Professionals

Southern Medical Association

American Medical Student Association, 1982 - 1986

Student National Medical Association, 1982 - 1986

## APPOINTMENTS, ACTIVITIES AND ORGANIZATIONS:

Fellow of the American Psychiatric Association, May 2009

Institutional and Correctional Psychiatry Committee, American Academy of Psychiatry and the Law, 2001 – 2006.

Committee Chairperson, Correctional Psychiatry Committee, Atlanta Chapter of the Black Psychiatrists of America, 2000 – 2005.

Commission on AIDS, American Psychiatric Association, 1988 - 1989

Committee of Black Psychiatrists, American Psychiatric Association, 1989 - 1990

Medical Student Council, 1984

Senior Participant, Senior Clinical Conference for Freshman Students, 1982

President of the Pre-Health Society, Jackson State University, 1981

Alpha Phi Alpha Fraternity, Incorporated

Jackson State University Concert Choir and Chorale, 1978 - 1982

Jackson State University Marching Band and Brass-wind Ensemble, 1978 - 1982

University of Iowa Alumni Association

Jackson State University Alumni Association

## AWARDS AND HONORS:

APA-NIMH Minority Fellowship, 1988 - 1989

Trainee-Consultant, APA-NIMH Minority Fellowship, 1989 - 1990

Magna Cum Laude, Jackson State University, 1982

President's List Scholar, Jackson State University, 1982

Phi Kappa Phi Honor Society, Jackson State University, 1982

Who's Who Among American Universities and Colleges, 1981 - 1982

## COMMUNITY ACTIVITIES:

South Fulton Running Partners

Atlanta Track Club

# EXHIBIT C

Jeffrey L. Metzner, M.D.

Jeffrey L. Metzner received his M.D. from the University of Maryland Medical School in 1975 and completed his psychiatric residency at the University of Colorado's Department of Psychiatry during 1979. He is a Clinical Professor of Psychiatry at the University of Colorado School of Medicine in Denver, Colorado, where he is also Associate Director of the forensic fellowship program. Dr. Metzner has provided consultation to judges, special masters, monitors, state departments of corrections, city and county jails, U.S. Department of Justice, the National Prison Project, and others involved in the field of correctional psychiatry in over 36 states. Dr. Metzner was a member (2006) of the Institute of Medicine Committee on Ethical Considerations for Revisions to DHHS Regulations for Protection of Prisoners Involved in Research. Dr. Metzner has written extensively on the psychiatric care of prison populations. He was on the American Psychiatric Association's task force that published the first edition of guidelines for Psychiatric Services in Jails and Prisons (1989). Dr. Metzner is the current author of Appendix E: Mental Health Considerations for Segregated Inmates, in Standards for Mental Health Services in Correctional Facilities published by the National Commission on Correctional Healthcare (2008).

**JEFFREY L. METZNER, M.D., P.C.**
**3300 EAST FIRST AVENUE**
**SUITE 590**
**DENVER, COLORADO  80206**
**TELEPHONE (303) 355-6842**
**FACSIMILE (303) 322-2155**

## CURRICULUM VITAE

October 2012

## BIOGRAPHICAL DATA

**Place of Birth:** Hagerstown, Maryland
**Citizenship:** U.S.A.
**Marital Status:** Married

**Education:**
> University of Maryland (College Park, Maryland), B.S., 1972.
> University of Maryland Medical School (Baltimore, Maryland), M.D., 1975.
> Internship:  University of Colorado Health Sciences Center (UCHSC), January 1975 – July 1975.
> Psychiatric Residency:  UCHSC, July 1975 - July 1979.

**Licensure:**
> State of Colorado License (#20007), July 1975 to present (expires 4/30/2013).
> State of California License (#G43933), March 3, 2000 to present (expires 3/2014).
> State of Georgia License (#051986), September 19, 2002 to December 31, 2005).
> State of New Mexico (#2003-0547), August 18, 2003 to present (expires 7/1/2015).
> State of Pennsylvania (#MD425683), January 25, 2005 to present (expires 12/31/2014).

**Academic Appointments:**
> Chief Resident, Psychiatric Liaison Division, University of Colorado School of Medicine (July 1978 to July 1979).
> Clinical Instructor, Department of Psychiatry, University of Colorado School of Medicine (July 1978 to July 1981).
> Assistant Clinical Professor, Department of Psychiatry, University of Colorado School of Medicine (July 1981 - July 1989).
> Associate Clinical Professor, Department of Psychiatry, University of Colorado School of Medicine (July 1989 to October 1995).
> Clinical Professor, Department of Psychiatry, University of Colorado School of Medicine (October 1995 to present).
> Clinical Professor, Department of Pediatrics, University of Colorado School of Medicine (October 1995 to present).
> Member, Committee on Senior Clinical Appointments, University of Colorado School of Medicine (December 1996 to June 2006).
> Lecturer-in-Law, University of Denver, College of Law (October 1984 to 1986).

Case 2:90-cv-00520-KJM-DB   Document 4376   Filed 03/13/13   Page 199 of 255

Associate Director, Forensic Psychiatry Fellowship Program, Department of Psychiatry, University of Colorado School of Medicine
　　　(1992 to present).
Member, Search Committee (for Department of Psychiatry Chairperson)
　　　(October 1999 to August 2000).

**Other Activities:**

Governor's Criminal Insanity Task Force (1978-1979):
　　　Member, Subcommittee concerning release procedures.
　　　Member, Subcommittee concerning the issues of treatment of criminally insane in correctional or mental health facilities.
Member, Disability Law Committee, Colorado Bar Association (1981-1995).
Member, Colorado Medical Society's Committee on Medical Care in Correctional Institutions (1983-1990).
Reviewer, Child Abuse and Neglect: The International Journal (1986 to 2005).
Reviewer, J Amer. Acad. Psychiatry and the Law (1993 to present)
Reviewer, Hosp. Community Psychiatry (1993 to present)
Reviewer, American Psychologist (February 1999 to 2001)
Reviewer, American Journal of Evaluation (May 2009)
Reviewer, JAMA (2001)
Reviewer, Administration and Policy in Mental Health and Mental Health Services Research (June 2005)
Reviewer, Journal of Dual Diagnosis (November 2005)
Reviewer, American Journal of Psychiatry (June 2006 to present)
Reviewer, The Journal of Clinical Psychiatry (2008)
Reviewer, Acta Astronautica (2011)
Editorial Board, Behavioral Sciences & the Law (2001 to present)
Co-chairman, Civil Commitment Task Force (a coalition of major mental health care professional organizations, pertinent consumer and family advocacy organizations, and relevant legal organizations) (April 1987 to September 1990).
American Board of Psychiatry and Neurology, Inc.
　　　Examiner (October 1988 to 2006, Senior Examiner, 1997 to 2006).
　　　Member, Committee on Certification for Added Qualifications in Forensic Psychiatry (August 1995 to present).
　　　Member, Steering Committee on Certification for Added Qualifications in Forensic Psychiatry (June 2002 to present); Chair, (June 2008 to present).
American Board of Forensic Psychiatry, Inc.
　　　Examiner, American Board of Forensic Psychiatry, Inc. (October 1989 to 1994).
　　　Member, Written Examination Committee (October 1989 to 1993).
　　　Member, Board of Directors (July 1, 1992 - March 17, 1995).
　　　Chairman, Oral Examination Committee (July 1992 to May 1993).
Chairperson, Expert Panel-Psychiatric Disorders and Commercial Drivers, U.S. Department of Transportation (February 1990 to May 1991).
Member, State of Colorado Mental Health Advisory Board for Service Standards and Regulations (April 1990 - July 1996).

Chairperson, Psychological/Psychiatric Task Force on Impairment, State of Colorado, Department of Labor and Employment December 1992 to 1995, November 1999 – December 2000).

Member, Work Group Advisors for the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 1994.

Member, Advisors on Forensic Issues for the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 1993-1994.

Member, Board of Directors, Accreditation Council on Fellowships in Forensic Psychiatry (May 1994 to 1996).

Member, Colorado Supreme Court Grievance Committee (December 1995 to 1999).

Member, Attorney Regulation Committee (Colorado Supreme Court), (1999 to 2004).

Site Reviewer, Accreditation Council for Graduate Medical Education (1996 to 1998).

Member, Institute of Medicine Committee on Ethical Considerations for Revisions to DHHS Regulations for Protection of Prisoners Involved in Research, March 2005 to 2006.

Medical Panel Expert, Federal Motor Carrier Safety Administration, Psychiatric Disorders and Commercial Motor Vehicle Driver Safety, 2009.

**Honors:**

AOA (1975).

University of Colorado Health Sciences Center, Department of Psychiatry Clinical Faculty Award, June 1992.

University Colorado of Health Sciences Center, Department of Psychiatry Clinical Faculty Award Outstanding Overall Achievement, March 21, 2002.

American Academy of Psychiatry and the Law
Outstanding Service Award (October 1999).

Pfizer Visiting Professor, University of Massachusetts Medical School, Department of Psychiatry, (September 26-28, 2000).

Seymour Pollack Distinguished Achievement Award for distinguished contributions to forensic psychiatry (October 2003).

American Psychiatric Association
Fellow, American Psychiatric Association (December 1987 to present).
Distinguished Fellow, American Psychiatric Association (January 2003 to 2012).
Distinguished Life Fellow, American Psychiatric Association (May 2012 to present).

Visiting Professor, University of Hawaii, John A Burns School of Medicine, Department of Psychiatry, May 2-6, 2005.

Recipient, 2005 National Adolescent Perpetration Network Brandt F. Steele Memorial Award

Recipient, Colorado Psychiatric Society Outstanding Achievement Award, 2005

Recipient, National Alliance for the Mentally Ill Exemplary Psychiatrist Award, 2005

Yochelson Visiting Scholar, Yale Medical School, Department of Psychiatry, April 23- 25, 2008

Recipient, Isaac Ray Award, awarded by the American Psychiatric Association and the American Academy of Psychiatry and the Law, May 5, 2008

Recipient, B. Jaye Anno Award of Excellence in Communication, awarded by the National Commission on Correctional Health Care, October 11, 2010.

**Professional Society Memberships:**

Colorado Psychiatric Society:

Membership Committee (1981-1990; Chairman, 1981-1983).

Legislative Committee (1979-present; Chairman, 1983-1991, 1992 to 2000.

Member, Forensic Committee (1981 to 2002).

Treasurer (1982-1984).

Member, Committee on Medical and Psychiatric Care for the Canon City Facility (December 1979 - June 1980 and July 1981 to 1983).

Trustee (1984-1986).

Fellowship Committee (1987 to 2004).

President-Elect (May 1990 to May 1991).

President (May 1991-May 1992).

Assembly Representative (May 1994-May 2000).

Member, Board of Directors, Colorado for Physicians Mental Health/Political Action Committee (1988 to 2000; Chairman, 1988-1990).

American Correctional Health Services Association, Member (1984 - present).

Rocky Mountain Chapter of the American Correctional Health Services Association:

Member at large, Board of Directors (January 1984 to March 1988).

American Psychiatric Association (1978 to present):

Member, Task Force on Psychiatric Services in Correctional Facilities (December 1985-1989).

Member, Council on Psychiatry and the Law (May 1989-May 1994), Vice-Chairman (May 1993-May 1994), May 1999–May 2004, Vice-Chairman (May 1999-May 2000), Chairman (May 2000-May 2004).

Assembly Liaison, Council on Psychiatry and the Law (May 1994 to May 2000).

Member, Task Force on Sexually Dangerous Offenders (1993 to 1999).

Consultant, Commission on Judicial Action (1994-1996).

Member, Commission (Committee) on Judicial Action (1997-2002; 2004-2009), Chairperson (May 2004 to May 2008).

Area VII Member, APA Nominating Committee (May 1997 - May 1999).

Member, Task Force to Revise Task Force Report # 22 Seclusion and Restraint: The Psychiatric Uses (2003 to December 2006).

Member, Committee on Public Policy, Litigation and Advocacy (May 2002 to May 2004), Consultant (May 2004 to May 2006), Chairperson, (May 2008-May 2011).

Consultant, Council on Advocacy and Public Policy (May 2008-May 2009).

American Academy of Psychiatry and the Law (1983 to present):

Member, Public Information Committee (November 1984 to 1994; Chairman, October 1989 to January 1993).

Jeffrey L. Metzner, M.D.
Curriculum Vitae
Page 5 of 15

       Member, Committee on Psychiatric Services for Correctional Facilities (November 1984 to October 1995).

       Member, Committee on International Relations (November 1984 to October 1986).

       Member, Site Selection Committee (October 1988 to 1996, Chairman, January 1993 to 1996).

       Member, Institutional Forensic Psychiatry Committee (1991-1994).

       Member, Nominating Committee (1991-1993, 2003, 2005, 2007, 2008).

       Member, Peer Review of Psychiatric Testimony (1992-1995, 1997-1999).

       Associate Editor, American Academy of Psychiatry and the Law Newsletter (July 1988 - July 1992).

       Councilor (October 1991 - October 1994).

       Program Committee (1994 to 2002).

       Chairman, Program Committee for the 1995 Annual Meeting.

       Treasurer (October 1995 - October 1997).

       Vice-President (October 1997 - October 1998).

       President-elect (October 1999 – October 2000).

       President (October 2000-October 2001).

       Member, Board of Directors, AAPL Institute on Education and Research, (2002 to 2010).

       Member, task force on disability guidelines (2006- 2008).

American Correctional Association, Member (1986 to present).

       Member, Mental Health Committee (1996-2002).

American College of Legal Medicine, Associate-In-Medicine (February 1986 to December 2005).

American Academy of Forensic Sciences, Member (February 1991 to 2007).

Member, Medical Committee, Colorado Guardianship Center for Persons with Developmental Disabilities (1989-1993).

Group for the Advancement of Psychiatry:  Psychiatry and Law Committee (1991 to 1998).


**Correctional Psychiatry:**

       Chief of Psychiatry, Colorado State Penitentiary (June 1980 to July 1981).

       Consulting Psychiatrist, National Prison Project (1981 to present).

       Consulting Psychiatrist, U.S. Department of Justice, Civil Rights Division (1990 to present).

       Court Monitor (United States District Court, Southern District of New York), Reynolds et al. v. Sielaff et al., (1991-1994).

       Consultant, Office of the Court Monitor (United States District Court for the District of Puerto Rico), Morales Feliciano et al. v. Rossello Gonzales et al., (1991-1997).

       Member, Monitoring Team (United States District Court for the District of Kansas, Judge Richard D. Rogers), Porter et al. v. Finney et al. (No. 77-3045-R), (September 1992 to May 1994).

       Certified Correctional Health Professional - Advanced Status (February 1, 1994).

       Accreditation Surveyor, National Commission on Correctional Health Care (1995 to 2006).

Consultant, Office of the Court Monitor (United States District Court, Southern District of Ohio, Western Division, Magistrate Judge Robert Steinberg and Judge Spiegel), <u>Dunn et al. v. Voinovich et al.</u> (No. C1-93-0166), (1995 to 2000).

Consultant of the Office of the Special Master and to The Honorable Thelton E. Henderson (United States District Court, Northern Division of California), <u>Madrid et al. v. Gomez et al.</u> (No. C90-30-94-TEH), (1995 to 2008).

Court-Appointed Expert (United States District Court for the Northern District of Illinois, Eastern Division, Judge James B. Zagel), <u>Harrington et al. v. Kiley et al.</u> (No. 74 C 3290), (June 20, 1995 to 2006).

Court-Appointed Expert (United States District Court for the Eastern District of California, Judge Lawrence K. Karlton), <u>Coleman et al. v. Wilson et al.</u> (No. CIV S-90-0520), (March 1996 to present).

Member, Monitoring Team (United States District Court for the Middle District of Georgia, Judge Claude Hicks, Jr.), <u>Cason et al. v. Seckinger</u> (No. 84-313-1-MAC), (1996 to 1998).

Consultant to the Office of the Monitor, <u>Goldsmith v. Dean</u> (No. 2: 93-CV-383), (1996 to 1998.).

Member, Monitoring Team (United States District Court for the District of Montana, Helena Division), <u>USA v. Montana et al.</u> (No. 94-90-H-CCL), (1996 to 1999).

Consultant to the Monitor (United States District Court, Western District of Washington), <u>Hallet v. Payne</u>, (No. C93-5496)(T)(D), (1998 to 1999).

Consultant to the Court (United States District Court, Southern District of Florida), <u>Carruthers, et al. v. Jenne, II, et al. (Case No. 76-6086-CIV-Hoeveler)</u>, (January 2002 to present).

Psychiatric Monitor for the Memorandum of Agreement between the U.S. Department of Justice and the Los Angeles County, California re: mental health services at the Los Angeles County Jail (December 2002 to present).

Monitor for the Stipulated Agreement Re: <u>McClendon, et. al. v. The City of Albuquerque, et. al.</u> USDC No. CIV 95-0024 MV/ACT, May 2005 to 2009.

Psychiatric Expert for the Independent Monitor Re: the Settlement Agreement between the U.S. Department of Justice and the Delaware Department of Corrections (February 2007 to 2010).

Psychiatric Monitor for the Agreed Order in the U.S.A. v. Dallas County Jail CRIPA Investigation (July 2007 to present).

Psychiatric Monitor for the Memorandum of Agreement between the U.S. Department of Justice and the State of Maryland re: the Baltimore City Detention Center (July 2007 to present)

Jointly appointed consultant for the Memorandum of Agreement between the U.S. Department of Justice and the State of Wisconsin re: the Taycheedah Correctional Institution (TCI) (May 2008 to present).

Member, Society for Correctional Physicians (2009 to present).

Psychiatric Monitor for the Memorandum of Agreement between the U.S. Department of Justice and the Cook County Board of Commissioners and the Cook County Sheriff's Office (June 2010 to present)

Jeffrey L. Metzner, M.D.
Curriculum Vitae
Page 7 of 15

**Other Information:**
>    Chief of Psychiatry, Division of Forensic Psychiatry, Colorado State Hospital (1978).
>    Staff Psychiatrist, Denver General Hospital (July 1, 1979 to July 1980).
>    Private Practice:  Denver, Colorado (July 1979 to present).
>    Spalding Rehabilitation Hospital:
>> Consulting Psychiatrist - Pain Rehabilitation Program (December 1979-1995).
>> Medical Staff President (May 1983 - May 1984).
>> Member, Board of Directors (May 1986-1995).
>> Chairman, Board of Directors (January 1992 to October 31, 1995).
>    Consulting Psychiatrist, Institute of Forensic Psychiatry, Colorado Mental Health Institute at Pueblo (July 1981 to November 1986; December 1991 to present).
>    Consulting Psychiatrist, Denver Veterans Administration Hospital, Administrative Medicine disability examinations (1981 to 2006).
>    Clinical Director, Perpetration Prevention Program, C. Henry Kempe National Center for the Prevention and Treatment of Child Abuse and Neglect, Department of Pediatrics, UCHSC (1986 to 2006).
>    Diplomate, American Board of Psychiatry and Neurology (April 1981).
>    Diplomate, American Board of Forensic Psychiatry (October 1985).
>    Certified, Added Qualifications in Forensic Psychiatry, American Board of Psychiatry and Neurology (1994), Recertified (2002-2014; April 2011-December 2021).
>    Full operating level treatment provider and full operating level evaluator, as per standards established by the Colorado Sex Offender Management Board (October 2003 to 2007).
>    Monitor for the Neiberger et al. v Schoenmakers et al. Settlement Agreement (Colorado Mental Health Institute – Pueblo Institute for Forensic Services) January 2005 to December 2006.

## PUBLICATIONS

### National Newsletters

1.   Metzner JL: The Role of the Psychiatric Resident in Medical Student Education. Association of Academic Psychiatry, 5: July 1979.

2.   Metzner JL: Brady et al v. Hopper: The Special Relationship Between Foreseeability and Liability. American Academy Psychiatry and the Law Newsletter, 8: Dec. 1983.

3.   Metzner JL: Bee v. Greaves: Pretrial Detainees and Involuntary Medication. Amer. Acad. Psychiatry and the Law Newsletter, 10: April 1985.

4.   Metzner JL: The Right to Refuse Treatment in Colorado: People v. Medina. Amer. Acad. Psychiatry and the Law Newsletter, 10: Dec. 1985.

Jeffrey L. Metzner, M.D.
Curriculum Vitae
Page 8 of 15

5.  Metzner JL: <u>Ward v. Kort:</u> Forensic Hospitals and Legal Access to the Courts. Amer. Acad. Psychiatry and the Law Newsletter, 10: Dec. 1985.

6.  Metzner JL: <u>Colorado v. Connelly:</u> Confessions of the Mentally Ill.  Amer. Acad. Psychiatry and the Law Newsletter, 11: Sept. 1986.

7.  Metzner JL: <u>Colorado v. Connelly:</u>  Confessions of the Mentally Ill. Amer. Acad. Psychiatry and the Law Newsletter, 12: April 1987.

8.  Metzner JL: <u>Miller v. District Court:</u> Psychiatric Evaluation and the Attorney-Client Privilege.  Amer. Acad. Psychiatry and the Law Newsletter, 12: Sept. 1987.

9.  Metzner JL: <u>Romero v. Colorado:</u> The Admissibility of Posthypnotic Testimony. Amer. Acad. Psychiatry and the Law Newsletter, 13: April 1988.

10.  Metzner JL: <u>Rotman v. Mirin.</u> Amer. Acad. Psychiatry and the Law Newsletter, 13: Dec. 1988.

11.  Metzner JL: <u>Perreira v. Colorado.</u> Amer. Acad. Psychiatry and the Law Newsletter, 14: Sept. 1989.

12.  Metzner JL: <u>Washington v. Harper:</u> Treatment Refusal in a Penal Setting Revisited. Amer. Acad. Psychiatry and the Law Newsletter, 15: Sept. 1990.

13.  Metzner JL: <u>Colorado v. Serravo:</u> Insanity Clarified. Amer. Acad. Psychiatry and the Law Newsletter, 17: April 1992.

14.  Metzner JL: <u>Rufo v. Inmates of Suffolk County Jail.</u> Amer. Acad. Psychiatry and the Law Newsletter, 17: Dec. 1992.

15.  Metzner JL:  Amendment to Rule 26: Information Essential for the Forensic Psychiatrist. Amer. Acad. Psychiatry and the Law Newsletter, 19: Sept. 1994.

16.  Metzner JL:  Prison Litigation Reform Act. Amer. Acad. Psychiatry and the Law Newsletter, 21: Sept 1996.

**<u>Book Chapters</u>**

1.  Metzner JL: Insanity Plea, in <u>Psychiatric Decision Making.</u>  Edited by Dubovsky SL, Feiger AJ, Eiseman B. Philadelphia, B.C. Decker, Inc., 1984.

2.  Metzner JL: Competency to Stand Trial, in <u>Psychiatric Decision Making.</u>

3.  Metzner JL: Civil Commitment of Adults, in <u>Psychiatric Decision Making.</u>

Case 3:90-cv-00520-KJM-DB   Document 4376   Filed 03/13/13   Page 206 of 255

4.   Metzner JL:  Chronic Depression, in <u>Psychiatric Decision Making.</u>

5.   Ryan G, Metzner JL, and Krugman RD:   When the Abuser is a Child, in <u>Understanding and Managing Child Sexual Abuse.</u>   Edited by Oates, RK. Philadelphia, W.B. Saunders, 1990.

6.   Metzner JL, Struthers DR, and Fogel MA: Psychiatric Disability Determinations and Personal Injury Litigation, in <u>Principles in Practice of Forensic Psychiatry</u>. Edited by Rosner, R.  New York, Chapman & Hall, 1994.

7.   Metzner J, Ryan G:  Sexual Abuse Perpetration, in <u>Conduct Disorders in Children and Adolescents.</u>  Edited by Sholevar, GP.  Washington, D.C., American Psychiatric Press, Inc., 1995.

8.   Metzner JL: Confidentiality and Privilege, in <u>Psychiatric Secrets.</u>   Edited by Jacobson JL & Jacobson AM. Philadelphia, Hanley & Belfus, Inc., 1995.

9.   Metzner JL, Cohen F, Grossman LS, Wettstein RM; Treatment in Jails and Prisons, in <u>Treatment of Offenders with Mental Disorders.</u> Edited by Wettstein, RM. New York, NY, The Guilford Press, 1998.

10.  Metzner JL, Becker J, Juvenile Sex Offenders, in <u>Dangerous Sex Offenders: A Task Force Report of the American Psychiatric Association</u>. Edited by Zonana H. Washington, D.C., American Psychiatric Association, 1999.

11.  Metzner JL: Confidentiality and Privilege, in <u>Psychiatric Secret (2nd Edition)</u>. Edited by Jacobson JL & Jacobson AM. Philadelphia, Hanley & Belfus, Inc., 2000.

12.  Metzner JL: Trends in Correctional Mental Health Care, in Management and Administration of   Correctional Health Care.  Edited by Moore J. Kingston, New Jersey, Civic Research Institute, 2003.

13.  Metzner JL, Buck JB: Psychiatric Disability Determinations and Personal Injury Litigation, in <u>Principles in Practice of Forensic Psychiatry, (Second Edition)</u>. Edited by Rosner, R.  London, Arnold, 2003.

14.  Dvoskin JA, Spiers EM, Metzner JL, Pitt SE: The Structure of Correctional Mental Health Services, in <u>Principles in Practice of Forensic Psychiatry, (Second Edition)</u>. Edited by Rosner, R.  London, Arnold, 2003.

15.  Metzner JL, Dvoskin JA: Psychiatry in Correctional Settings, in <u>Textbook of Forensic Psychiatry.</u> Edited by Simon, RI and Gold, LH.  Washington, American Psychiatric Press, 2004.

16. Metzner JL (associate editor): Mental health chapters, in Clinical Practice in Correctional Medicine, Second Edition. Edited by Puisis, M. Philadelphia, Mosby Elsevier, 2006.

17. Metzner JL (associate editor): Mental health chapters, in Clinical Practice in Correctional Medicine, Second Edition. Edited by Puisis, M. Philadelphia, Mosby Elsevier, 2006.

18. Metzner JL, Hayes LM: Suicide Prevention in Jails and Prisons, in Textbook of Suicide Assessment and Management. Edited by Simon, RI and Hales, RE. Washington, American Psychiatric Press, 2006.

19. Metzner JL, Humphreys S and Ryan G: Juveniles Who Sexually Offend: Psychosocial Intervention and Treatment, in Textbook of Sex Offenders: Identification, Risk Assessment, Treatment, and Legal Issues. Edited by Saleh, FM, Grudzinskas, AJ Bradford, JM and Brodsky, DJ. New York, Oxford University Press, 241-264, 2009.

20. Metzner JL, Monitoring a Correctional Mental Health System, in Handbook of Correctional Mental Health (Second Edition). Edited by Scott CL. Washington, DC, American Psychiatric Publishing, Inc. 377-394, 2009.

21. Ruiz A, Dvoskin JA, Scott CL, Metzner JL (eds): Manual of Forms and Guidelines for Correctional Mental Health. Washington, DC, American Psychiatric Publishing, Inc. March 2010.

22. Metzner JL, Dvoskin JA: Psychiatry in Correctional Settings, in Textbook of Forensic Psychiatry. Edited by Simon, RI and Gold, LH. Washington, American Psychiatric Press, 2010.

23. Metzner JL, Current Issues in Correctional Psychiatry, in Practical Guide to Correctional Mental Health and the Law. Edited by Cohen F. Kingston, NJ: Civic Research Institute, 2011.

24. Metzner JL, Hayes LM: Suicide Prevention in Jails and Prisons, in Textbook of Suicide Assessment and Management, Second Edition. Edited by Simon, RI and Hales, RE. Washington, American Psychiatric Press, 2012.


**Peer Reviewed Journals**

1. Dubovsky SL, Metzner JL, Warner R: Problems with Internalization of a Transplanted Liver, Amer. J. Psychiatry, 136: 1090-1091, 1979.

Jeffrey L. Metzner, M.D.
Curriculum Vitae
Page 11 of 15

2. Metzner JL, Dubovsky SL: The Role of the Psychiatrist in Evaluating a Prison Mental Health System in Litigation. Bull.Amer.Acad. Psychiatry and the Law, 14:89-93, 1986.

3. Metzner JL, Fryer GE, Usery D: Prison Mental Health Services: Results of a National Survey of Standards, Resources, Administrative Structure, and Litigation. J. Forensic Sciences, 13: 433-438, March 1990.

4. Metzner JL: Applied Criminology. Current Opinion in Psychiatry, 4:856-860, 1991.

5. Metzner JL: A Survey of University-Prison Collaboration and Computerized Tracking Systems in Prisons. Hosp. Community Psychiatry, 43:713-716, July 1992.

6. Metzner JL: Prisons, Hospitals, and Other Institutions. Current Opinion in Psychiatry, 5:809-812, 1992.

7. Metzner JL, Dentino AN, Goddard SL, Hay DP, Hay L, Linnoila M: Impairment in Driving and Psychiatric Illness. J. Neuropsychiatry and Clinical Neurosciences, 5:211-220, 1993.

8. Metzner JL: Guidelines for Psychiatric Services in Prisons. Criminal Behaviour and Mental Health, 3:252-267, 1993.

9. Metzner JL, Miller RD, Kleinsasser D: Mental Health Screening and Evaluation within Prisons. Bull. Amer. Acad. Psychiatry and the Law, 22:451-457, 1994.

10. Hoge SK, Appelbaum P, Jorgenson L, Goldstein N, Metzner J, Patterson R, Robinson G: APA Resource Document: Legal Sanctions for Mental Health Professional/Sexual Misconduct. Bull. Amer. Acad. Psychiatry and the Law, 23:433-448, 1995.

11. Ryan G, Miyoshi TJ, Metzner JL, Krugman RD, Fryer GE: Trends in a National Sample of Sexually Abusive Youths. J. Am. Acad. Child Adolesc. Psychiatry 35: 17-25, 1996.

12. Metzner JL: Correctional Psychiatry. Current Opinion in Psychiatry, 10:441-444, 1997.

13. Metzner JL: An Introduction to Correctional Psychiatry: Part I. J. Amer. Acad. Psychiatry and the Law, 25:375-381, 1997.

14. Metzner JL: An Introduction to Correctional Psychiatry: Part II. J. Amer. Acad. Psychiatry and the Law, 25:571-579, 1997.

15. Metzner JL:  An Introduction to Correctional Psychiatry: Part III. J. Amer. Acad. Psychiatry and the Law, 26:107-116, 1998.

16. Metzner JL:  <u>Pennsylvania Department of Corrections et al. v. Ronald R. Yeskey</u>: Prisons and the Americans with Disabilities Act of 1990.  J. Amer. Acad. Psychiatry and the Law, 26:665-668, 1999.

17. Metzner JL: Class Action Litigation in Correctional Psychiatry. J. Amer. Acad. Psychiatry and the Law, 30: 19-29, 2002.

18. Metzner JL: Prison Litigation in the USA: It Helps.  J. Forensic Psychiatry, 13: 240-244, 2002.

19. Metzner JL: Commentary: The Role of Mental Health in the Disciplinary Process. J. Amer. Acad. Psychiatry and the Law, 30: 497-499, 2002.

20. Metzner JL: Improving Correctional Mental Health Systems: An Academic/Forensic Psychiatrist's Perspective. Acad. Psychiatry, 27: 201-203, 2003.

21. Metzner JL: Commentary: Physician Reporting of Impaired Drivers. J. Amer. Acad. Psychiatry and the Law, 32:80-82, 2004.

22. Metzner JL and Dvoskin JA: An Overview of Correctional Psychiatry.  Psychiatric Clinics N Am , 29: 761-772, 2006

23. Gold LH and Metzner JL: Psychiatric Employment Evaluations and the Health Insurance Portability and Accountability Act. Am J Psychiatry 153: 1878-1882, 2006

24. Wortzel H and Metzner J: *Clark v. Arizona*: Diminishing the Right of Mentally Ill Individuals to a Full and Fair Defense. J. Amer. Acad. Psychiatry and the Law, 34:545-8, 2006.

25. Metzner JL: Introduction to: Resource Document on the Use of Restraint and Seclusion in Correctional Health Care. J. Amer. Acad. Psychiatry and the Law, 35:415-416, 2007.

26. Metzner JL, Tardiff K, Lion J, et al: Introduction to: Resource Document on the Use of Restraint and Seclusion in correctional Health Care. J. Amer. Acad. Psychiatry and the Law, 35:417-425, 2007.

27. Gold LH, Anfang SA, Drukteinis AM, Metzner JL, Price M, Wall BW, Wylonis L, Zonana HV: AAPL Practice Guideline for the Forensic Evaluation of Psychiatric disability. J Am Acad Psychiatry Law 36 (Suppl 4):S3–50, 2008

28. Metzner JL: Monitoring a Correctional Mental Health Care System: the Role of the Mental Health Expert. Behav. Sci. Law 27: 727–741, 2009.

29. Metzner JL, Ash P: Commentary: The Mental Status Examination in the Age of the Internet--Challenges and Opportunities. J Am Acad Psychiatry Law 38:27-31, 2010.

30. Metzner JL, Fellner J: Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics. J Am Acad Psychiatry Law 38:104-108, 2010.

31. Appelbaum KL, Savageau J, Trestman RL, Metzner JL, Baillargeon, JG: A National Survey of Self Injurious Behavior in American Prisons. Psychiatric Services 62:285-290, 2011.

32. Metzner JL: Treatment for Prisoners: A U.S. Perspective. Psychiatric Services 63: 276, 2012.

**Book Reviews**

1. Metzner JL: A Review of The Psychopathic Mind: Origins, Dynamics, and Treatment. J. Forensic Sciences, 13: 1502-1503, Nov. 1990.

2. Metzner JL: Males at Risk: The Other Side of Child Sexual Abuse. Child Abuse & Neglect, 15:153-157, 1991.

3. Metzner JL: The Crimes Women Commit, The Punishments They Receive. Bull. Amer. Acad. Psychiatry and the Law, 19:323-324, 1991.

4. Metzner JL: When a Child Kills: Abused Children Who Kill Their Parents. JAMA, 267:3214, 1992.

5. Metzner JL: Children of Chemically Dependent Parents: Multiperspectives from the Cutting Edge. Child Abuse & Neglect, 17:566, 1993.

6. Metzner JL: Before and After Hinckley: Evaluating Insanity Defense Reform. J. Nervous and Mental Disease, 182:362-363, 1994.

7. Metzner JL: Caring For Victims. JAMA, 273: 1796-1797, 1995.

8. Metzner JL: Explorations in Criminal Psychopathology: Clinical Syndromes with Forensic Implications. Psychiatric Services, 49:393, 1998.

Case 2:90-cv-00520-KJM-DB   Document 4376   Filed 03/13/13   Page 211 of 255

9.   Metzner JL: <u>Legal and Ethical Dimensions for Mental Health Professionals.</u> Psychiatric Services, 51:1056, 2000.

10.  Metzner JL: <u>A Handbook for Correctional Psychologists: Guidance for the Prison Practitioner.</u> J Amer. Acad. Psychiatry and the Law, 30: 328, 2002.

11.  Metzner JL: <u>Concise Guide to Psychiatry and Law for Clinicians, 3rd ed.</u> J Clin Psychiatry 63: 1052-1053, November 2002.

12.  Metzner JL: <u>Going up the river. Travels in a prison nation.</u> J Forensic Psychiatry & Psychology. 14: 642-643, 2003.

**<u>Other</u>**

1.   Metzner JL: The Adolescent Sex Offender: An Overview. The Colorado Lawyer, 16: Oct. 1987.

2.   Weinstein HC, Hoover JO, Metzner JL, Shah SA, Steadman HJ: Task Force Report 29: Psychiatric Services in Jails and Prisons, American Psychiatric Association, March 1989.

3.   Metzner JL: <u>Perreira v. Colorado</u> - A Psychiatrist's Duty to Protect Others.   The Colorado Lawyer, 18: Dec. 1989.

4.   Metzner JL, Tucker GH, Black DW, Felthous A, Linnoila M: Conference on Psychiatric Disorders and Commercial Drivers. Federal Highway Administration, Publ. No. FHWA-MC-91-006, Washington, DC, May 1991.

5.   Metzner JL: Mental Health Considerations for Segregated Inmates, in Standards for Health Services in Jails. Chicago, IL, National Commission on Correctional Healthcare, 2003.

6.   Metzner JL: Mental Health Considerations for Segregated Inmates, in Standards for Health Services in Prisons. Chicago, IL, National Commission on Correctional Healthcare, 2003.

7.   Metzner, JL: Clinical Case 3. Confidentiality of Patient Records Requested by the Court.   Available   at:   http://www.ama-assn.org/ama/pub/category/11088.html Accessed October 1, 2003.

8.   Metzner JL: HIPAA: Does it cause barriers to conducting mortality reviews? Jail Suicide/Mental Health Update, 13: Summer 2004.

Jeffrey L. Metzner, M.D.
Curriculum Vitae
Page 15 of 15

9.   Dvoskin JA and Metzner JL: Commentary: The Physicians' Torture Report. Correctional Mental Health Reporter, 8, May/June 2006.

10.  Metzner JL: Mental Health Problems of Prison and Jail Inmates.   Correctional Mental Health Reporter, 8, January/February 2007.

11.  Metzner JL, Tardiff K, Lion J, Reid W, Recupero PR, M.D., Schetky DH, Edenfield BM, Mattson M, Janofsky JS: The Use of Restraint and Seclusion in Correctional Mental Health Care. Approved as a resource document by the American Psychiatric Association. December 2006.

12.  Martinez R, Metzner JL: In memoriam: Robert D. Miller, M.D., Ph.D.: September 4, 1941-July 13, 2006. Beh Sci Law, 25: 333-335, 2007

13.  Metzner JL: Correctional Mental Health. *Virtual Mentor.* 2007; 10(2):92-95. http://virtualmentor.ama-assn.org/2008/02/ccas3-0802.html. Accessed February 1, 2008.

14.  Metzner JL: Mental Health Considerations for Segregated Inmates, in Standards for Health Services in Jails. Chicago, IL, National Commission on Correctional Healthcare, 2008.

15.  Metzner JL: Mental Health Considerations for Segregated Inmates, in Standards for Health Services in Prisons. Chicago, IL, National Commission on Correctional Healthcare, 2008.

16.  Metzner JL: Appendix E: Mental Health Considerations for Segregated Inmates, in Standards for Mental Health Services in Correctional Facilities. Chicago, IL, National Commission on Correctional Healthcare, 2008, pp129-131

# EXHIBIT D

Kathryn A. Burns, M.D., M.P.H.

Dr. Burns is a psychiatrist licensed in the State of Ohio and certified by the American Board of Psychiatry and Neurology in General Psychiatry and Forensic Psychiatry, and the National Commission on Correctional Health Care as a Certified Correctional Health Professional. Dr. Burns graduated from Case Western Reserve University School of Medicine and received her Masters in Public Health from Ohio State University School of Medicine and Public Health. She has held the position of staff psychiatrist, senior psychiatrist and medical director at various community mental health programs and state hospitals in the State of Ohio. She has served in the role as consultant, expert or monitor in 19 jurisdictions. Dr. Burns has served as a consultant to the Western Reserve Psychiatric Hospital, Shawnee Forensic Center Forensic Center of District IX and the Cuyahoga County Court Psychiatric Clinic. She was the Chief Psychiatrist for the Ohio Department of Rehabilitation and Correction and has provided direct care to inmates in jails. Dr. Burns is an assistant professor of psychiatry at two medical schools in the State of Ohio. She has also been a physician surveyor for the National Commission on Correctional Health Care; she is an editorial board member and contributing editor for the Correctional Mental Health Report Civic Institute and is also an appointed member of the Forensic Psychiatry Committee of the American Board of Psychiatry and Neurology. Dr. Burns has presented at over 20 forums with a focus on mental illness in correctional settings and has published numerous articles.

# Curriculum Vitae

## Kathryn A. Burns, M.D., M.P.H.

System Chief Clinical Officer
Alcohol, Drug & Mental Health Board of Franklin County
447 East Broad Street
Columbus, Ohio 43215
614.222.3756
Fax: 614.224.2698

Date of Birth: November 12, 1957

**Education:**    Cleveland State University
Cleveland, Ohio (1976-1980)
B.S. in Biology, Magna Cum Laude

Case Western Reserve University School of Medicine
Cleveland, Ohio (1981-1985)
M.D.

Ohio State University School of Medicine & Public Health
Columbus, Ohio (1997)
M.P.H.

**Training:**    Psychiatric Resident (1985-1989)
University Hospitals of Cleveland
CWRU School of Medicine

Chief Resident, Department of Psychiatry (1988-1989)
University Hospitals of Cleveland

**Specialized Education:**

Forensic Fellow, Department of Psychiatry (1989-1990)
University Hospitals of Cleveland
CWRU School of Medicine

CWRU School of Law: *Criminal Law; Criminal Law & Psychiatry; Civil Law & Psychiatry* (1989-1990)

Cleveland-Marshall College of Law: *Law & Psychiatry in the Criminal Justice System* (1989)

**Academic Appointments:**

Case Western Reserve University School of Medicine
Assistant Clinical Professor of Psychiatry

The Ohio State University College of Medicine
Auxiliary Faculty - Assistant Professor of Psychiatry

**Professional Licenses:**

        State Medical Board of Ohio, License # 35-05-7006

**Certification:**      American Board of Psychiatry & Neurology
Psychiatry, Certificate No. 35117 (1992)

American Board of Psychiatry & Neurology
Forensic Psychiatry, Certificate No. 36 (1994)

National Commission on Correctional Health Care
Certified Correctional Health Professional (2000)

**Professional Memberships:**

**American Psychiatric Association** (1986-Present)
Appointed to Task Force to Revise APA Report on Jails & Prisons,
Council on Psychiatric Services (1997-2000)
Elected to Distinguished Fellow (12/01/99)
Active in Caucus of Psychiatrists Practicing in Criminal Justice
Settings (1995-present)
Appointed as member of Mentally Ill in the Criminal Justice System
Committee (07/08 – present)

**Ohio Psychiatric Association** (1986-Present)

**American Academy of Psychiatry & the Law** (1988-Present)
Institutional & Correctional Psychiatry Committee (2000-2002)
Criminal Behavior Committee (1997-1999)
Public Information Committee (1991)

**Midwestern Chapter of the American Academy of Psychiatry &
the Law** (1988-Present)
Annual Meeting Program Committee Chair (1992)
Chapter President (1993-1994)

**International Academy of Law and Mental Health**
(1992-Present)

**American Correctional Association** (1995-Present)
Appointed to Mental Health Committee (1998-2000)

**American Correctional Health Services Association**
(1995-Present)

2

**Professional Experience**:

Mentally Disordered Offender Program:
Psychiatrist, Senior Psychiatrist (1988-1994)
*(Outpatient mental health treatment for adults with serious mental illnesses granted probation for felony level offenses)*

Money & Mailboxes:  Psychiatric Consultant (1988, 1991-1993)
*(Outpatient mental health treatment for homeless persons with serious mental illnesses)*

Lorain Community Hospital:  Staff Psychiatrist (1989)

Cuyahoga County Court Psychiatric Clinic:  Staff Psychiatrist (1989-1993)
*(Pre-trial and post-conviction psychiatric evaluations of adults on issues of competency to stand trial, criminal responsibility, drug dependency, civil commitment)*

CWRU School of Medicine, University Hospitals of Cleveland Department of Psychiatry:
Assistant Professor of Psychiatry (1990-1992)

SAMI/M-Power Program:  Staff Psychiatrist (1990-1994)
*(Outpatient community mental health day treatment program for adults with co-occurring substance abuse and mental illness.)*

Western Reserve Psychiatric Hospital:  Psychiatric Consultant (1990-1992)

Cleveland Psychiatric Institute:  Director, Court Evaluation Unit (1991-1994)

Neighborhood Counseling Services:  Medical Director (1992-1994)
In addition to Medical Director, served as treating psychiatrist for Conditional Release Unit *(community mental health treatment for persons found Not Guilty by Reason of Insanity)*

Cuyahoga County Community Mental Health Board:  Chief Clinical Officer (1994-1995, 2002-2007)

Ohio Department of Rehabilitation and Correction:  Chief Clinical Officer
Bureau of Mental Health Services (1995-1999)

Wright State University School of Medicine:  Assistant Clinical Professor of Psychiatry (1995-2000)

Twin Valley Behavioral Healthcare – Columbus Campus:
Director of Forensic Services (1999-2002)

The Ohio State University College of Medicine:  Assistant Clinical Professor of Psychiatry  (1999-2002)          *Outstanding Faculty Award (June 2002)*

Shawnee Forensic Center:  Psychiatric Consultant (1998-2010)

3

National Commission on Correctional Health Care:  Physician Surveyor (1998-present)

Forensic Center of District IX, Inc.:  Psychiatric Consultant (2000-present)

Editorial Board Member/Contributing Editor:  Correctional Mental Health Report
Civic Research Institute, Inc., Kingston, NJ (1999-Present)
Forensic Psychiatric Center of Northeast Ohio, Inc.: Psychiatric Consultant (2005-present)

Liaison for Mental Health Services in Jails; Ohio Criminal Justice Coordinating Center of Excellence, Northeastern Ohio Universities College of Medicine (2006 - )

Appointed to Forensic Psychiatry Committee of the American Board of Psychiatry & Neurology (2009 - )

**Presentations:**

***Attempted Family Murder:  Dissociation vs. Dissimulation***
Phillip J. Resnick, MD, co-presenter
CWRU Department of Psychiatry Grand Rounds, Cleveland OH (January 1990)
Ohio Association of Forensic Directors, Columbus OH (March 1990)

***Working with the Forensic Client in Community Treatment***
Phillip J. Resnick, MD, co-presenter
National Case Management Conference, Cincinnati OH (September 1990)

***Corrections & Community Collaboration:  The Mentally Disordered Offender Program***
American Psychiatric Association 43rd Institute on Hospital & Community Psychiatry, Los Angeles CA (October 1991)

***Not Mad, Still Bad, What Now?:  The Disposition of Non-Mentally Ill Insanity Acquittees***
American Academy of Psychiatry & the Law – Midwestern Chapter Meeting
Cleveland OH  (April 1992)

***Forensic Psychiatry in the Community:  The Cuyahoga County Experience***
American Academy of Psychiatry & the Law – Midwestern Chapter Meeting
Detroit MI (April 1994)

***Treatment/Placement Implications & Strategies for the 18+ Offender***
Ohio Department of Youth Services Annual Program Conference
Columbus OH (December 1994)

***Assertive Community Treatment Teams:  Stopping the State Hospital Revolving Door***
MetroHealth Medical Center Department of Psychiatry Grand Rounds, Cleveland OH (January 1995)
All Ohio Institute on Community Psychiatry, Cleveland OH (March 1995)

4

***Can We Talk:  Emergency Psychiatry Meets Managed Care***
Kenneth Serta, MD, co-presenter
American Psychiatric Association Annual Meeting, Miami Beach FL (May 1995)

***Legal & Program Aspects of Staff Victimization***
Fred Cohen, moderator
American Correctional Association Annual Meeting, Indianapolis IN (January 1997)

***Hot Off the Press:  New Guidelines for Jails & Prisons***
H. Weinstein, C. Newkirk, J. Zil, co-presenters
American Psychiatric Association Annual Meeting, Toronto, Canada (May 1998)

***Legal vs. Moral Wrongfulness Schism***
S. Noffsinger, M. Carroll, D. Pinals, co-presenters
American Academy of Psychiatry & the Law Annual Meeting
New Orleans LA (October 1998)

***So You're Incompetent to Stand Trial – Now What?***
S. Noffsinger, J. Radio, A. Hernandez, co-presenters
American Academy of Psychiatry & the Law Annual Meeting
Baltimore MD (October 1999)

***APA Guidelines for Correctional Psychiatry***
American Academy of Psychiatry & the Law – Midwestern Chapter Annual Meeting
Cleveland OH (April 2000)

***Forensic Psychiatry Board Review Course***
Topics presented:  Competencies:  Civil & Criminal; Managed Care
Boston MA (October 2001)

***Firearms Risk Management in Inpatient Psychiatric Care***
XXVIIth International Congress on Law & Mental Health
Amsterdam, The Netherlands (July 2002)

***Course:  Correctional Psychiatry***
H. Weinstein, C. Newkirk, K. Gilbert, A. Hanson, J. Zil, co-presenters
53rd Institute on Psychiatric Services, APA Annual Fall Meeting, Orlando FL
(October 2001)
H. Weinstein, K. Gilbert, A. Hanson, J. Zil, co-presenters
54th Institute on Psychiatric Services, APA Annual Fall Meeting, Chicago IL
(October 2002)
H. Weinstein, K. Gilbert, A. Hanson, J. Zil, co-presenters
55th Institute on Psychiatric Services, APA Annual Fall Meeting, Boston MA
(October 2003)

***Practicing Rewarding Psychiatry in Jails and Prisons – A Practicum***
H. Weinstein, K. Gilbert, A. Hanson, co-presenters
American Psychiatric Association Annual Meeting, Atlanta GA
(May 2005)

5

***Providing Mental Health Care at the Prison's Back Door: Re-Linking Mentally Ill Offenders to Community Treatment***
XXIX International Congress on Law & Mental Health
Paris, France (July 2005)

***Preventing Suicide in Correctional Facilities***
H. Weinstein, K. Gilbert, A. Hanson, co-presenters
57th Institute on Psychiatric Services, APA Annual Fall Meeting, San Diego, CA (October 2005)

***Prescribing Controlled Substances in Prison***
K. Appelbaum, J. Metzner, R. Trestman, co-presenters
American Academy of Psychiatry & the Law Annual Meeting
Montreal Canada (October 2005)

***Jail Suicide Prevention***
Ohio Department of Mental Health 2006 Annual Forensic Conference
Sandusky OH (August 2006)

***Jail Mental Health Services***
Ohio Department of Mental Health 2007 Annual Forensic Conference
Wilmington OH   (August 2007)

***Psychiatric Services in Jails & Prisons:  It's Time to Revise the APA Guidelines***
H. Weinstein, co-presenter
American Psychiatric Association Annual Meeting, Washington DC
(May 2008)

***Psychopharmacology in Jails and Prisons: Principles, Practice and Special Issues***
H. Weinstein, E. Roskes, B. Bay, co-presenters
61st Institute of Psychiatric Services, APA Annual Fall Meeting, New York, NY (October 2009)

**Publications:**

Sherman M, Burns K, et al.:  Firearms Risk Management in Psychiatric Care. *Psychiatric Services* 52: 1057-1061, 2001.

Burns K:  Creating a Mental Health Classification System. *Correctional Mental Health Report* 4(1):3, 2002.

Burns K:  Mental Health Screening.  *Correctional Mental Health Report* 4(2):19, 2002.

Burns K:  Mental Health Evaluation.  *Correctional Mental Health Report* 4(3):35, 2002.

Burns K:  "Jail Diversion and Correctional Psychotropic Medication Formularies"; Management and Administration of Correctional Health Care, J. Moore, ed.  Kingston NJ:  Civic Research Institute, 2003.

Burns K:  "Psychopharmacology in Correctional Settings"; Handbook of Correctional Mental Health Care. C.L. Scott and J.B. Gerbasi, eds. Arlington VA:  American Psychiatric Publishing, Inc., 2005.

Burns K:  The Red Zone: Boundaries of Clinical Versus Forensic Work in Correctional Settings.  *Correctional Health Care Report* 7(5):67, 2006; also appears as Chapter 19 Correctional Psychiatry Practice Guidelines and Strategies.  O.J. Thienhaus and M. Piasecki, eds.  Kingston NJ: Civic Research Institute, 2007.

Burns K: Commentary: The Top Ten Reasons to Limit Prescription of Controlled Substances in Prisons.  J Am Acad Psychiatry Law 37:50-2, 2009.

Burns K:  "Pharmacotherapy in Correctional Settings"; Handbook of Correctional Mental Health Care, Second Edition. C.L. Scott, ed. Arlington VA:  American Psychiatric Publishing, Inc., 2010.

Burns, K:  Psychiatry behind bars: Practicing in jails and prisons.  Current Psychiatry 10:2-15, 2011.

# EXHIBIT E

Mary Perrien, Ph.D.

     Dr. Perrien is a psychologist licensed to practice in the state of California and Idaho. She received her Master of Arts, Clinical Psychology in 1994 and her Doctor of Philosophy, Clinical Psychology in 1998 from the University of Hawaii. She began her career in correctional mental health in 1998 as a staff psychologist at the Butner Federal Correctional Complex in South Carolina. In 2000, she started as a psychologist at the California State Prison at Corcoran where she rose to the position of Chief Psychologist/Director of Mental Health Services in 2003. In 2005 she assumed the position of Chief Psychologist/Director of Mental Health for the Idaho State Department of Corrections and then moved to the position of Chief (Deputy Director), Division of Education and Treatment. Dr. Perrien currently works as a consultant and expert in the area of mental health treatment in correctional settings. She has worked in various jurisdictions as an expert assessing the adequacy of mental health treatment in correctional facilities, including work for the Department of Homeland Security. She has lectured at the University of Hawaii and Boise State University. Dr. Perrien has issued technical reports on the treatment and supervision of sexual offenders and has made over 20 presentations to various groups including correctional facilities and judges. Dr. Perrien is currently a member of the American Psychological Association and the National Commission on Correctional Health Care.

# Mary Perrien, Ph.D.
**3313 W. Cherry Lane**
**Meridian, ID 83642**
**208-965-0875**

| | | |
|---|---|---|
| **EDUCATION** | **University of Hawaii, Manoa** | |
| | Doctor of Philosophy, Clinical Psychology | 1998 |
| | Master of Arts, Clinical Psychology | 1994 |
| | | |
| | **San Jose State University** | |
| | Bachelor of Arts, Psychology | 1991 |

**LICENSURE STATUS** PSY18582 (Valid, California)
PSY 202317 (Valid, Idaho)

**EMPLOYMENT**

**Safe Society Solutions**          May 2010 to
Sole Proprietor          present

Services: Forensic evaluations; psychosexual evaluator; expert testimony and expert consultation regarding conditions of confinement and compliance with constitutional requirements for mental health services for incarcerated populations; consultation to law enforcement and correctional agencies; expert consultation to judicial, executive and legislative branches on policy related to correctional practices, correctional health care, and sex offender management; expert consultation for sex offender treatment development and evaluation; expert consultant and program evaluator to State and Federal Courts; expert consultation to law enforcement and correctional agencies on recidivism reduction strategies.

**Chief (Deputy Director), Division of Education**
**and Treatment**          September 2006 to
Idaho State Department of Correction          May 2010
Supervisor, B. Reinke (Director)          208-658-2000
1299 N. Orchard Street
Boise, ID 83706
Responsibilities:
Position reported to the Director of the Department of Correction and the Board of Correction and had clinical, administrative and contract oversight of all educational, medical, mental health, substance abuse and rehabilitative programs provided within all correctional facilities and community corrections districts (i.e., probation and parole) throughout the State of Idaho for male and female offenders.  This included program development and program evaluation within all of these areas.   This position was responsible for evaluating conditions of confinement and identifying conditions having an adverse effect on inmate's mental health and working with the Chief of Prisons to resolve adverse conditions of confinement, particularly in segregated (locked down or high security) housing units.  The position was responsible for training all staff in the areas of responsibility defined above.  This included training parole/probation officers, correctional officers and non-sworn personnel.

**EMPLOYMENT**
**Continued**

The position was responsible for maintaining accreditation for the Robert Janss School which provided all educational and vocational services to offenders.

Expanded responsibilities included recruitment, retention and staff development; resolution of complaints related to Equal Employment Opportunity and Sexual Harassment Policies.

Expanded responsibilities also included providing expert consultative services to the Judiciary, Executive and Legislative branches of State Government.

**Chief Psychologist/Director of Mental Health**            September 2005 to
Idaho State Department of Correction                         September 2006
Supervisor, R. David Haas, (Medical Services Director)   208-571-5645
1299 N. Orchard Street
Boise, ID 83706
Responsibilities:
Responsible for clinical management of all mental health services delivered throughout the state at correctional facilities housing male and female inmates. In addition to direct clinical supervision of state mental health staff, this included contract oversight for psychiatric and other clinical services provided by the medical contractor and at the privately managed facility. As chief, completed a Service Manual standardizing the delivery of Correctional Mental Health Services and establishing clear guidelines for care. In addition, trained staff in identifying inmates who were decompensating as a result of conditions of confinement who required enhanced services for stabilization or placement in alternative housing. This included a specific program for segregation.

Staff Recruitment and Development: my responsibilities included community and university outreach as part of recruitment efforts; developing student training programs to expose university students to correctional health care; and developing and conducting training to enhance competency in correctional health care for staff.

Clinical consultative services provided to Community Corrections Division as well as the Judiciary and other state agencies. This expert consultation included sex offender assessment, treatment and management as well as mental health care.

**Chief Psychologist/Director of Mental Health**            July 2003 to
**Services – Correctional Facility**                         September 2005
California State Prison at Corcoran
Supervisor, Dr. John Klarich (Chief Medical Officer)        deceased
P.O. Box 8800
Corcoran, CA 93212
Responsibilities:
Responsible for clinical management of all mental health programs for a maximum-security institution with more than 5000 male inmates. Responsibilities included: the supervision of clinical and clerical staff of more than 80 including Senior Clinical Supervisors (i.e., Senior Psychologist, Supervisor and Senior Supervising Psychiatric Social Worker); oversight of the mental health assessment portion of the disciplinary process; resolution of complaints related to Equal Employment Opportunity and Sexual Harassment Policies and ensure that

**EMPLOYMENT**
**Continued**

**Chief Psychologist/Director of Mental Health Services – Correctional Facility (Continued)**

the work environment is free of discrimination, harassment, retaliation, and unprofessional conduct through the education and training of employees. The particular emphasis in the program was segregation or locked down units as these units made up a substantial portion of this prison population.

Program Development: One of my primary duties was to develop the Mental Health Program at COR, an institution with a long history of failure to meet minimum standards of care and Federal Court monitoring expectations. This was achieved through collaboration and provision of consultative services to custody and non-custody staff as a member of an interdisciplinary team. This includes working closely with local administrators (i.e., Warden and Chief Medical Officer/Healthcare Manager) as well as agency administrators (i.e., Regional Health Care and Institution Administrators, Health Care Services Division administrators).

Mental Health Quality Management Committee Chair – duties included quality oversight for all areas related to the provision of mental health services, program evaluation, coordination of quality management activities including Quality Improvement Teams, and provided recommendations to Healthcare Quality Improvement Committee and Chief Medical Officer.

Coordinate recruitment activities at the local level. This included community outreach and the management of a clinical training program for students of social work and clinical psychology.

Provided training to mental health staff in areas such as forensic psychology, assessment and treatment of sex offenders, and ethics and legal issues in correctional psychology.

Maintained the safety and security of the institution through the education and training of clinical staff as well as direct observation of inmates.

**Senior Psychologist, Supervisor – Correctional Facility**                          October 16, 2001 to
                                                                                                                        July 7, 2003
California State Prison at Corcoran
Supervisor, Dr. Greg Hirokawa (Chief Psychology)          661-303-6883
P.O. Box 8800
Corcoran, CA 93212
Responsibilities:
Supervised and managed multiple clinical programs for maximum-security male incarcerated offenders diagnosed with a major mental illness in accordance with legally mandated guidelines and clinical judgment. This included supervising (staff of up to 31) psychologists, social workers, psychiatric technicians, and recreational therapists. Performed Chief Psychologist duties in the absence of the Chief Psychologist.

**EMPLOYMENT**
**Continued**

Member of the Negotiation Management Team.  Responsible for responding to potential and actual hostage situations and for providing Critical Incident Stress Debriefing as part of the Employee Post-Trauma Program.

| | |
|---|---|
| **Psychologist - Clinical, Correctional Facility** | July 10, 2000 to |
| California State Prison at Corcoran | October 15, 2001 |
| Supervisor, Dr. Greg Hirokawa | 559-992-8800 x6649 |
| P.O. Box 8800 | |
| Corcoran, CA 93212 | |

Responsibilities:
Provided case management and clinical services to male inmates incarcerated in a state correctional facility in accordance with legally mandated guidelines and clinical judgment. Primary responsibilities were inmates in segregated ("locked down") housing with emphasis on identifying inmates who were decompensating under the conditions of confinement, preventing decompensation in these conditions, and maintaining/improving functioning or attempting to move inmates to alternative housing.

Developed and implemented Forensic Training Seminar to increase the knowledge of existing staff regarding issues and standards in forensic and correctional psychology and sex offender assessment and treatment as well as to increase staff expertise in the areas of assessment and treatment with forensic populations.   Provided expert consultation to colleagues in the area of assessment of psychopathy.

Developed and implemented a Multicultural Training Seminar to increase staff expertise in working with a culturally diverse inmate population.

| | |
|---|---|
| **Staff Psychologist, Sex Offender Treatment** | |
| **Program** | November 1998 |
| Federal Correctional Institution, Butner | through June 2000 |
| (medium/high security) | left to pursue current |
| | employment |
| Supervisor, Andres Hernandez, Psy.D. | 919-575-4541 |
| Butner, NC | |

Responsibilities:
Provided clinical services to male inmates incarcerated in a federal correctional facility.  This included establishing safe and secure program and housing practices, psychosexual evaluations, risk assessment, formulation and communication of release recommendations to U.S. Probation Officers, and individual and group therapy.  Supervised predoctoral clinical interns and Master's level clinicians in assessment, treatment, report writing and psychological consultation with other disciplines.

Consulted with other disciplines and agencies (e.g., Federal Court, U.S. Probation) to provide psychological expertise.  Developed and provided training programs designed for U.S. Probation regarding the assessment, treatment and supervision of sex offenders, and mental health services within a correctional setting.

**EMPLOYMENT
Continued**

**Staff Psychologist, Sex Offender Treatment
    Program (Continued)**

Provided Custody Services with support on regular and as needed basis. This included sole responsibility for supervising and maintaining order over inmates in housing unit; transporting mechanically restrained inmates between secured housing units; visual and physical inspections of inmates, housing units and other areas where contraband may be hidden; maintaining appropriate firearm qualifications and handling firearms in accordance with post orders.

Provided Employee Assistance Services to correctional staff and assisted the Negotiation Management Team.

**OTHER
CLINICAL WORK
EXPERIENCE**

**Therapist/Group Facilitator (variable hours)**    June 1994 to June 1997
Child & Family Services    808-521-2377
Programs:
    Parents United Program
        Incest Families
    Sex Offender Treatment Program (in correctional setting)
Responsibilities:
Provided individual, family, and group therapy to victims, offenders, and family members including supportive counseling, cognitive-behavioral therapy, anger management, stress management, communication training, social skills training, and relapse prevention.

Conducted comprehensive psychosexual evaluations of incarcerated male sex offenders.

Provided program development and implementation as well as treatment outcome evaluation.

**Therapist/Researcher**    October 1996 through
Honolulu Police Department    June 1997
801 S. Beretania Street    808-529-3735
Supervisor Ewa Stamper, Ph.D.
Honolulu, HI
Responsibilities:
Provided individual and marital therapy to sworn and civilian personnel and their family members; therapy included crisis counseling, supportive counseling, bereavement counseling, substance abuse therapy, anger management, stress management, communication and social skills training, and interpersonal negotiation skills.

Established a research program to assess the efficacy of current pre-employment screening practices for sworn employees.

Participated and provided training in Hostage Negotiation Skills and Crisis Management.

Provided training and services related to Critical Incident Stress Debriefing and Workplace Violence.

**OTHER RELATED
EXPERIENCE**

**Expert**                                                July 2012-present
As part of a multidisciplinary team, conducting a system-wide assessment of
mental health services within the Ohio Department of Corrections.  This project is
part of their internal quality management review process.

**Expert**                                               May 2011-March 2012
Under the direction of Fred Cohen, Esq., and as part of a multidisciplinary team,
conducted a system-wide assessment of mental health services within the Illinois
Department of Corrections.  This project was the result of a class action lawsuit
(*Rasho v. Walker)* brought by inmates and was focused on constitutional
compliance.

**Expert**                                               August 2010-present
Office for Civil Rights and Civil Liberties, Department of Homeland Security.
Serve as a contract expert to assist in investigations of detainee
complaints/allegations of inadequate mental health care and deaths in custody.

**Expert**                                               April 2007-present
Special Master, Matthew A. Lopes,Jr.,  Esq
Responsible for providing expert consultation to the Special Master as part of an
ongoing monitoring process in the *Coleman v Brown* case in California.

**TEACHING
EXPERIENCE**

**Instructor Peace Officers Training Academy**      multiple 2006-present
Meridian, ID
Managing offenders with mental illness and suicide risk management.

**Guest Lecturer, various Psychology and**          multiple 2006-present
      **Criminology courses**
**Boise State University**
Boise, ID
Presentations included leadership principles, careers in corrections and
correctional health care, special needs populations, assessment and treatment
with criminal justice populations and reentry.

**Instructor, The Psychology of the Polygraph**     February 2006
**Peace Officer Standards Training Academy**
Meridian, ID
A 30-hour course for sworn and non-sworn law enforcement personnel offered as
part of a Polygraph Certification Academy.

**Lecturer, Social Psychology**                     multiple 1994-1997
**Department of Psychology, University of Hawaii**
Duties:
Responsible for all phases of teaching, including selection of text and additional
materials, preparation and execution of lectures, selection and design of
classroom  experiments  to  demonstrate  social  psychological  concepts,
construction and administration of examinations, assignment and review of
additional course requirements (i.e., papers), and the assignment of course
grades.

**TEACHING**
**EXPERIENCE**
**Continued**

**Lecturer, Introduction to Clinical**                  multiple 1995-1997
**Psychology**
**Department of Psychology, University of Hawaii**
Duties:
Responsible for all phases of teaching including: selection of text and additional materials; preparation and execution of lectures; selection and design of classroom activities to demonstrate clinical activities, concepts, and ethical dilemmas; construction and administration of examinations; assignment and review of additional course requirements (i.e., papers); and the assignment of course grades.

**Lecturer, Introduction to Psychology**          May 1994 through June
**Department of Psychology, University of Hawaii**   1994
Duties:
Same as previously mentioned including supervision of teaching assistant.

**OTHER RESEARCH**
**EXPERIENCE**

**State of Idaho, Criminal Justice Commission**   Spring 2008 through
**Researcher**                                    Spring 2009
Duties:
Conduct evaluation and analysis of current practices in sex offender management in the areas of case disposition (judiciary), assessment, treatment and supervision.

Conduct analysis of how well Idaho's current practices in the areas defined above meet established best practice principles. This project was also to include recommendations for meeting best practice standards in deficient areas.

**State of Hawaii, Office of the Attorney General**   Fall 1995 through
**Research/Policy Assistant**                         Summer 1997
Duties:
Assist in research projects and policy development focused on sex offenders. Provide expert testimony to state legislators as needed.

**TECHNICAL**
**REPORTS**

Perrien, M. (2009).  Sex offenders:  Analysis of best practice and current practice in Idaho for case disposition, assessment, treatment and supervision.  A Report provided to the Idaho Criminal Justice Commission.

Perrien, M. (2008).  Sex offenders: The current practices in the State of Idaho for case disposition, assessment, treatment and supervision. A Report provided to the Idaho Criminal Justice Commission.

Kunitake, M., Perrien, M., Yokoi, E., Perrone, P., Green, T., Sakamoto-Cheung, S., & Richmond, J. (1997).  Felony sexual assault arrests in Hawaii. Crime Trend Series:  State of Hawaii Department of the Attorney General, 5(2), 1-9.

**PRESENTATIONS**    Perrien, M. (September 2009).  Presenter at the annual Idaho District Judges Retreat Training, Twin Falls, Idaho. Topic areas included judicial orders, content and considerations; special needs groups and recidivism research.

Perrien, M. (January-March 2009).  Provided expert testimony in multiple Senate and House Legislative hearings, including the Joint Finance and Appropriations Committee, Senate and House Judiciary and Rules Committees and Senate and House Health and Welfare Committees. Areas of focus included constitutional requirements related to mental health services for correctional populations, community services for offenders with mental illness, negative outcomes for community members with untreated mental illness due to lack of available services, positive outcomes for inmates with mental illness who receive reentry planning, and sex offender assessment, treatment and management.

Perrien, M. (January 2009).  Presenter at the annual Idaho District Judges Seminar.  Boise, ID.  Topic areas were sex offender management, substance abuse services and services for offenders with mental illness.

Perrien, M. (December 2008).  Educating correctional officers to respond to medical emergencies.  A paper presented at the conference Operational Excellence in Correctional Healthcare, Las Vegas, NV.

Perrien, M. (September 2008).  Panel Presenter at the annual Idaho District Judges Retreat Training.  Sun Valley, Idaho. Topic areas included substance abuse services including therapeutic communities, supervision standards, sex offender management and the role of assessment in case planning.

Perrien, M. (January-March 2008).  Provided expert testimony in multiple Senate and House Legislative hearings, including the Joint Finance and Appropriations Committee, Senate and House Judiciary and Rules Committees and Senate and House Health and Welfare Committees. Areas of focus included mental health services to correctional populations with an emphasis on explaining the need for and benefits of a Secure Mental Health Facility for the Department of Correction; progress related to the delivery of education and treatment services for offenders, sex offender management and reentry needs and standards.

Perrien, M. (January 2008).  Presenter at the annual Idaho District Judges Seminar.  Boise, ID. Topic area was sex offender management including utilization of assessment in case dispositions, supervision guidelines, assessment and treatment.

Perrien, M. (September 2007).  Panel Presenter at the annual Idaho District Judges Retreat Training.  Sun Valley, Idaho. Topic areas included correctional mental health services, recidivism reduction programs, utilization of assessment in case dispositions.

Perrien, M. (January-March 2007).  Provided expert testimony in multiple Senate and House Legislative hearings, including the Joint Finance and Appropriations Committee, Senate and House Judiciary and Rules Committees and Senate and House Health and Welfare Committees. Areas of focus included mental health services to correctional

**PRESENTATIONS**
**Continued**
populations, substance abuse services for people with mental illness and reentry needs for inmates with mental illness.

Perrien, M. (January 2007). Panel Presenter at the annual Idaho District Judges Seminar, Boise, Idaho. Topic areas included correctional mental health services, reentry for inmates with mental illness and sex offender assessment and treatment.

Perrien, M. (November 2006). Suicide Risk Management in Corrections. Paper presented at the Idaho Suicide Prevention Action Network Conference, Boise, Idaho.

Perrien, M. (November 2006). Mental Health Care in Corrections and Community Corrections. Presentation to District 7 Judges, Idaho Falls, Idaho.

Perrien, M. (October 2006). Correctional Mental Health Care in Idaho. Presentation to the Mental Health and Substance Abuse Treatment Delivery Systems Interim Legislative Committee.

Perrien, M. and Muller, C. (June 2006). Cultural Competence and Multi-cultural Psychology. Paper presented at the Idaho Mental Health Coalition Conference, Boise, Idaho.

Perrien, M. (April 2006). Sex Offender Treatment in Correctional Setting. Paper presented at the annual National Commission on Correctional Health Care Updates Conference, Las Vegas, Nevada.

Perrien, M. (November 2005). Sex Offender Risk Assessment. A training for clinical staff employed by the Idaho Department of Correction and Corrections Corporation of America.

Perrien, M. (October 2005). Sex Offender Management. Informational presentation at Community Meeting sponsored by Idaho Department of Correction, Boise, Idaho.

Perrien, M. (September 2005). Sex Offender Management. Informational presentation at Community Meeting sponsored by Idaho Department of Correction, Pocatello, Idaho.

Perrien, M. (April 2003). Cultural Competence and Multi-cultural Mental Health Services. A training workshop presented to mental health staff at CSP-Corcoran.

Perrien, M. (2002, multiple). Forensic Evaluations and Courtroom Expert Testimony.A training workshop for mental health staff at CSP-Corcoran.

Perrien, M. (2001, multiple). Psychopathy and the Hare Psychopathy Checklist, Revised. A training workshop for mental health staff at CSP-Corcoran.

Perrien, M. (2000, February). The Assessment, Treatment, Management and Community Supervision of the Sex Offender. A training workshop provided to U.S.Probation Officers, Long Island, NY.

**PRESENTATIONS**
**Continued**

Perrien, M. (1999, July).  Psychopathy and the Hare Psychopathy Checklist, Revised.  A training workshop for predoctoral interns presented at the Federal Correctional Institution at Butner.

Perrien, M. (1999, April).  Psychopathy and the Hare Psychopathy Checklist Revised.  A training workshop for doctoral and masters level staff in the Sex Offender Treatment Program at the Federal Correctional Institution at Butner.

Perrien, M. & Kunitake, M. (1997, February).  Demographic characteristics of felony sex assault arrestees in Hawaii.  Paper presented to the Hawaii State Legislature at an Informational Symposium on Community Notification of Sex Offenders in Honolulu, Hawaii.

Perrien, M. & Kunitake, M. (1997, February).  Registration and community notification of sex offenders in Hawaii.  Paper presented at the annual meeting of the Western Society of Criminology conference in Honolulu, Hawaii.

Perrien, M. & Marsella, A.J. (1996, April).  Reported frequencies and perceived severity ratings of traumatic and near-traumatic events among college students.  Paper presented at the meeting of the Western Psychological Association, Santa Clara, California.

**ASSOCIATIONS/MEMBERSHIP**

American Psychological Association, member
Association for the Treatment of Sexual Abusers, member
National Commission on Correctional Health Care, member

# EXHIBIT F

Henry Dlugacz, J.D., L.M.S.W.

Mr. Dlugacz received his Master of Social Work in 1981 and went on to receive his Juris Doctor in 1991 from the New York Law School. He began his career in correctional mental health in 1981 as a social worker at a forensic inpatient unit in New York. Mr. Dlugacz then moved to the Montefiore Rikers Island Health Service where he provided clinical care and was a mental health unit chief involved in central office activities for the entire Rikers Island mental health program. After the Montefiore leaving Rikers Island Health Service, Mr. Dlugacz became the Director of Mental Health Services and acting Assistant Program Director at Saint Vincent's Hospital Correctional Health Program. Mr. Dlugacz has worked as an expert or consultant in the evaluation of correctional facilities in eight jurisdictions. He is a founding co-chair of the Committee on Mental Health of the New York Bar Association, is currently an adjunct professor of law at New York Law School and a clinical assistant professor of psychiatry and behavioral sciences at New York Medical College.

*HENRY A. DLUGACZ*
*99 Park Avenue, suite 1600*
*New York, N.Y. 10016*
*212/490-0400*
*Cellular: 646/346.0646*
*HDlugacz@BLHNY.com*

## EDUCATION

**Juris Doctor**, New York Law School 1991 *cum laude*
Moot Court Certificate of Honor;
Notes & Comments Editor, Human Rights Journal

**Master of Social Work**, Hunter College School of Social Work 1981

**Bachelors of Art**, Queens College, 1979 *cum laude*
Departmental honors; honors program in the study of the Humanities

2009-          **Partner,** Beldock, Levine & Hoffman LLP, New York, N.Y.

2007-          **Expert, Correctional Mental Health**
               *Coleman vs. Schwarzenegger,* 912 F. Supp. 1282 (E.D. Cal. 1995)
               United States District Court, Eastern California
               Hon. Lawrence K. Karlton, Senior District Judge
               Member of Special Master's expert panel in class action lawsuit involving
               mental health care in entire state correctional system.

2003-          **Compliance Monitor,** *Brad H. et al. v City of New York, et al.* 117882/99
               Supreme Court, State of New York
               One of two court-appointed monitors monitoring compliance with
               Stipulation involving reentry planning for inmates with mental disabilities
               for entire New York City jail system; reports; manage experts.

2002-          **Adjunct Professor of Law**, New York Law School, N.Y., N.Y.
               (Mentor-Professor 2002-2006, Adjunct Professor 2006-present)
               Co-taught in Nicaragua on State Department grant. Co-created
               interdisciplinary courses on  Mental Health Issues in Jails and Prisons;
               Lawyering Skills in Representation of Persons with Mental Disabilities.

2000-          **Mediator**
               United States District Court for the Eastern District of New York
               Mediation and Arbitration Panel for Federal-Court annexed mediation.

1

1997-         **_Assistant Clinical Professor of Psychiatry & Behavioral Science_**
             New York Medical College, Valhalla, N.Y.
             Until mid-2010 core faculty in forensic psychiatry fellowship program:
             correctional mental health, forensic issues; didactic training; evaluation;
             training to testify as expert witness; currently on voluntary faculty.

## EXPERIENCE

2012         **_Expert Consultant_**
             Mental Disabilities Rights International/American Bar Association Rule of
             Law Initiative, Mexico City, Mexico

2012         **_Consulting Expert_**
             Bureau of Corrections, US Virgin Islands (St. Croix)
             _USA v. Virgin Islands et. al_ No 86-265 (D.V.I.)

1993-2010    **_Private consulting, monitoring and legal practice_**
             Focus on mental health; corrections; court monitoring of complex
             litigations; mediation; forensic and disabilities issues; health-care.

2000-2010    **_Counsel, Mental Health and Healthcare_**
             St. Vincent's Catholic Medical Center, N.Y., N.Y.
             Outside counsel: Represented hospital in mental hygiene hearings in New
             York State Supreme Court, retention, treatment over objection,
             guardianships. Reviewed and advised on contracts, memorandum of
             understanding, clinical research and affiliation agreements.

2007-2010    **_Expert, Correctional Mental Health,_** New Mexico Protection &
             Advocacy/New Mexico ACLU, Albuquerque, N.M.
             Inspected jail, assessed mental health care, recommended remediation;
             active participation in successful settlement negotiations.

2009         **_Invited Witness_**
             New Jersey General Assembly, Trenton, New Jersey
             Invited to testify at hearings conducted by the Majority Leader on reentry
             issues. Testified on correctional mental health and reentry planning.

2007-2009    **_Expert Consultant, Correctional Mental Health_**
             _Hadix v. Caruso_, No. 4:92-CV-00110-RAE
             United State District Court, Western District of Michigan
             Hon. Robert J. Jonker, District Judge (Mental Health Consultant to the
             Office of the Independent Medical Monitor in class action lawsuit)

2

2002-2008    ***Founding Co-Chair***, New York State Bar Association, Albany, N.Y.
             Committee on Mental Health Issues of Healthcare Law Section

2005-2006    ***Mediator****, Pierce County et al v State of Washington et al,* (03-2-00918-8)
             Superior Court, Thurston County, Washington State
             Hon. Paula Casey
             Co-mediated settlement of complex class action lawsuit with multiple
             public and private parties involving funding, discharge planning, and
             community mental health treatment issues. Appointed by court on consent
             of the parties as mediator of discharge-planning aspects of settlement.

2001-2006    ***Adjunct Professor of Law***
             St. John's University School of Law, Queens New York
             Taught advanced law school seminar on mental health law.

2005         ***Invited Witness***
             New York State Assembly, Albany, New York
             Invited to testify in hearings before three Assembly Committees
             concerning enactment of civil commitment statute for sex offenders.

2005         ***Expert Trainer***
             European Court of Human Rights/ Mental Disability Advocacy Center
             Council of Europe, Strasbourg, France
             Under auspices of the Council of Europe, Court of Human
             Rights & MDAC conducted training for lawyers on multi-disciplinary
             support during litigation for clients with mental disabilities.

2001-2005    ***Federal Court Monitor/Expert Consultant***
             *Rust et al. v. Western State Hospital, et al.* (C00-5749)
             Western District of Washington, Hon. Robert J. Bryan
             Federal class-action litigation involving state forensic
             hospital. Was lead expert for plaintiffs, then appointed as one of two
             monitors to report on and assist in the attainment of compliance with order
             involving active treatment, treatment planning, discharge plans, patient
             risk assessment, staffing levels, physical plant issues, hospital census.

2002         ***Contributor/Reviewer***, American Public Health Association, Task Force
             Standards for Health Services in Correctional Institutions

2001         ***Expert Consultant***
             Mental Disability Rights International, Washington, D.C.
             Conducted inspections of facilities and training in Mexico City.

3

2000- 2001    *Expert Consultant (Mental Health and Generalist)*
PricewaterhouseCoopers, Fair Lakes, Virginia
As part of multidisciplinary team, evaluated correctional facilities
pursuant to agreement with the United States Department of Justice,
Marshall Service and Immigration and Naturalization Service.

2000- 2001    *Expert Consultant/Correctional Mental Health*
Council of State Governments, New York, N.Y.
Consultant to corrections work group of interdisciplinary project
regarding persons with mental disabilities in the criminal justice system.
Worked with State Senators, corrections and mental health commissioners,
service providers and advocates.

1993-2000    *Expert and Mediator, Correctional Mental Health*
*Duran et al v King et al*, (77-721)
Federal Court, District of New Mexico, Alb., New Mexico
Hon. John Conway, Chief District Judge
For Special Master, led team in the monitoring mental health aspects of
Consent Decree in complex, class action lawsuit involving the entire New
Mexico prison system: Quality of mental health care, levels of mental
health care, credentialing of staff, development of criteria for placement in
segregation, evaluation of the Continuous Quality Improvement Plan,
suicide prevention, policies and procedures; development of Corrective
Action Plans. Co-mediated and monitored state court termination plan.

1989-1997    *Director of Mental Health Services & Assistant Program Director*
Saint Vincents Hospital Correctional Health Program, N.Y., N.Y.
(*Director of MH1989-1998; Acting Ass't Program Director 1996-1998*)
As acting assistant program director, assisted in directing all aspects of
NCCHC & JCAHO accredited, multi-site, ambulatory care program;
Supervised eight department heads; CQI; policies. Authored significant
segments of major proposals.

As Mental Health Director, developed, implemented and directed entire
multi-site JCAHO and NCCHC accredited correctional mental health
program; developed and conducted CQI program; recruitment and
evaluation of all psychiatrists, psychologists and social workers;
developed policies and procedures; oversaw clinical care; conducted post- mortem
reviews; implemented new programs such as family and group therapy
services; discharge planning services; developed screening and assessment
protocols and instruments, and suicide prevention protocols.

4

1997-1998   **Consultant**
American Psychological Association, Washington, D.C.

1992-1994   **Law Clerk**
Saint Vincents Hospital, Department of Legal Affairs, N.Y., N.Y.

1987-1989   **Mental Health Unit Chief**
Montefiore Medical Center/Rikers Island Health Service, Bronx, N.Y.
Direct responsibility for all aspects of mental health clinic in NYC jail-system's busiest intake facility; administrative and clinical supervision of all mental health staff; decisions regarding appropriate levels of care; implemented new programs such as orientation screening; group therapy; inmate suicide prevention aide and correction officer training.

1987-1989   **Recruitment and Education Coordinator**
Montefiore Medical Center/ Rikers Island Health Service, Bronx, N.Y.
Actively involved in most aspects of central office activities for entire Rikers Island mental health program including program development, research, development of evaluation instruments. In charge of recruitment and screening of medical and non-medical mental health staff.
Developed on-going training programs, and retention activities.

1983-1987   **Clinical Social Worker**
Montefiore Medical Center/Rikers Island Health Service, Bronx, N.Y.
Assessment, crisis intervention, short-term individual and group treatment of detainee population. Conducted assessment of thousands of individuals: decisions regarding appropriate level of care, and suicide risk level.

1981- 1983   **Clinical Social Worker**
Mount Sinai Services at Elmhurst (In-pt. hospital Female Forensic Unit), Elmhurst, N.Y.
Member of multi-disciplinary treatment and forensic evaluation team; counseling; family therapy; investigations to aid competency assessments. Also maintained caseload in the outpatient psychiatry clinic and covered psychiatric emergency room.

5

## PUBLICATIONS

### Books:

**Lawyering Skills in the Representation of Persons with Mental Disabilities,** 2006, Carolina Academic Press, M. Perlin, K. Gould, Cohen, H. Dlugacz & R. Friedman

**Mental Health Issues in Jails and Prisons,** 2008, Carolina Academic Press Michael L. Perlin & Henry A. Dlugacz

**Competence in Criminal and Civil Law: From Legal Theory to Clinical Applications,** 2008, John Wiley Michael L. Perlin, Pamela Champine, Henry A. Dlugacz & Mary Connell

**Re-Entry Planning for Offenders with Mental Disorders: Policy and Practice,** 2010, Civic Research Institute Henry A. Dlugacz (Editor)

### Books in progress:

**Re-Entry Planning for Offenders with Mental Disorders: Policy and Practice, Volume II** Civic Research Institute Henry A. Dlugacz (Editor)

### Book Chapters:

*Liability Management and the Correctional Psychiatrist: A Review of Key Considerations,* **Correctional Psychiatry: Practice Guidelines and Strategies,** (Henry A. Dlugacz & Julie Y. Low) (Ole J. Thienhaus and Melissa Piasecki, eds. 2007, Civic Research Institute)

*A Continuum of Care for Adults with Mental Illness Leaving Jail and prison: A review of essential reentry elements* (Henry A. Dlugacz, Nahama Broner, Stacy S. Lamon),**Correctional Psychiatry: Practice Guidelines and Strategies,**(Ole J. Thienhaus and Melissa Piasecki, eds.) 2007, Civic Research Institute)

*Clinically Oriented Reentry Planning in Correctional Settings,* **Handbook of Correctional Mental Health Second Edition,** (Charles L. Scott & Joan B. Gerbasi, Eds) 2009, American Psychiatric Publishing) (Dlugacz, H. & Roskes, E.)

*The Criminal Justice System and Offenders Placed in an Outpatient Setting,* **Handbook of Correctional Mental Health Second Edition,** (Charles L. Scott & Joan B. Gerbasi, Eds) 2009, American Psychiatric Publishing) (Roskes, E., Cooksey, C., Lipford, S., Dlugacz, H.)

6

**Book Chapters in Progress**:

*Ethical Issues in Correctional Psychiatry in the United States*, Ethical Issues in Prison Psychiatry (Konrad, Norbert; Völlm, Birgit; Weisstub, D.N. (Eds.) forthcoming 2013, Springer Publishing, International Library of Ethics, Law, and the New Medicine, Vol. 46 (Dlugacz, H., Low, J., Wimmer, C., Knox, L.)

**Journals Edited**:

Special Editor, New York State Bar Association Health Law Journal, Special Issue on Mental Health, Spring, 2006.

**Articles**:

*United States v. Charters: A Case in Two Acts: In Search of a Middle Ground* 7 New York L. Sch. J. of Human Rights 311 (1990).

*Riggins v. Nevada: Towards a Unified Standard for a Prisoner's Right to Refuse Medication?*, 17 Law and Psychology Review 41 (1993).

*Out-Patient Commitment: Some Thoughts on Promoting a Meaningful Dialogue* 53 New York L. Sch. L. Rev. 79 (2009).

*It's Doom Alone That Counts: Can International Human Rights Law Be An Effective Source of Rights in Correctional Conditions Litigation?* Special Edition on Correctional Mental Health 27 Behavioral Sciences and Law (2009) (Perlin, M. & Dlugacz, H.)

*The Ethics of Representing Clients with Limited Capacity in Guardianship Proceedings,* The Saint Louis University Journal of Health Law & Policy (Dlugacz, H. & Wimmer, C.) Saint Louis University Journal of Health Law & Policy Vol. 4 Issue 2, 2011

**Articles in Progress:**

*The Legal Aspects of Administering Antipsychotic Medications to Jail and Prison Inmates,* upcoming Special Issue of the International Journal of Law and Psychiatry on "Prisons and Mental Health"

*Recent Developments in the treatment of Mental Health Issues in Immigration Removal Proceedings,* Dlugacz, H, Piasecki, M, Wimmer, C. (under submission)

## ACADEMIC

| | |
|---|---|
| 2012 | ***Invited Lecturer,*** Benjamin N. Cardozo School of Law, N.Y., N.Y. |
| 2011 | ***Invited Lecturer,*** University of Maryland Schools of Law, Medicine, and Social Work, Baltimore, MD |
| 2011 | ***Invited Lecturer,*** Association of American Law Schools, S.F., CA. |
| 2010 | ***Invited Lecturer,*** Benjamin N. Cardozo School of Law, N.Y., N.Y. |
| 2009-2010 | ***Invited Reviewer,*** International Journal of Prison Health |
| 2007-2008 | ***Invited Reviewer,*** John Wiley & Sons, Inc. Reviewed book proposals. |
| 2006 | ***Invited Lecturer,*** New York State Judicial Institute, and White Plains, NY Mental Hygiene Legal Services, First and Second Appellate Divisions |
| 2006 | ***Invited Reviewer,*** Journal of the International Academy of Law and Mental Health |
| 2005 | ***Faculty Member and Co-program Chair*** New York State Bar Association, Continuing Legal Education Program on Mental Health Courts |
| 2005 | ***Invited Lecturer,*** Columbia University Mailman School of Public Health, New York, New York |
| 2003- | ***Instructor for Mediation Exercise,*** New York University School of Law, New York, New York (on annual, volunteer basis) |
| 2002 | ***Invited  Lecturer,*** New York University School of Law, N.Y., N.Y. |
| 2002 | ***Moot Court Judge,*** New York Law School, N.Y., N.Y. |
| 2000 | ***Invited Lecturer,*** St. John's University School of Law, Queens, N.Y. |
| 1999 | ***Adjunct Assistant Professor*** Fordham University Graduate School of Social Service, N.Y.C. |
| 1998-1999 | ***Field Work Instructor*** Fordham University School of Social Work, N.Y., N.Y. |

8

| 1993-1994 | *Lecturer*, New York University Graduate School of Social Work, N.Y.C. |
| 1992-1994 | *Attorney-Mentor*, New York Law School, N.Y., N.Y. |
| 1993 | *Invited Lecturer*, New York University School of Social Work, N.Y.C. |
| 1990 | *Invited Lecturer,* New York University School of Medicine, N.Y., N.Y. |
| 1987-1991 | *Research Assistant* New York Law School, Professor Michael Perlin |
| 1988-1990 | *Invited Lecturer,* New York Law School, N.Y., N.Y. |
| 1988 | *Invited Lecturer,* Hofstra University, N.Y. Hempstead, N.Y. |
| 1984-1985 | *Field Work Instructor,* Hunter College School of Social Work, N.Y.C. |

## Presentations: Legal, Policy, Administrative, Clinical Issues in Mental Health Care

American Public Health Association, Washington, D.C. November, 2011

Association of the Bar of the City of New York, N.Y. Continuing Legal Education Program on representation of clients with diminish capacity, November, 2011

33rd International Congress on Law and Mental Health, Humboldt University, Berlin, Germany July, 2011

32nd International Congress on Law and Mental Health, New York University School of Law, New York, N.Y., June 2009 (paper presented by co-author)

30th International Congress on Law and Mental Health, University of Padua, Padua, Italy, June 2007

Continuing Legal Education Seminar, conducted for Criminal Court Judges of the Manhattan Criminal Court, Brooklyn, N.Y., April, 2007

Lincoln Hospital, Department of Psychiatry, Grand Rounds, November, 2006

New York State Assembly Roundtable on Criminal Penalties and Legislation on Civil Commitment of Sex Offenders. (participant) July, 2005

29th Congres International de Droit et de Santé Mentale/Laboratoire d'Ethique Medicale et de Sante Publique/Faculte de Medecine de Necker, Universite Rene Descartes (International Congress on Law and Mental Health) Paris, France, July 2005

9

XII World Congress of Psychiatry, Yokohama, Japan, August, 2002

National Association of Developmental Disabilities, New Orleans, Louisiana, October 2001 (paper was presented by a colleague)

XXV Congres International de Droit et de Sante Mentale (International Congress on Law and Mental Health) University of Siena, Siena, Italy July 2000

American Psychology-Law Society and the European Association of Psychology and Law, Trinity College, Dublin, Ireland, July 1999

XXIII Congres International de Droit et de Santé Mentale/Laboratoire d'Ethique Medicale et de Sante Publique/Faculte de Medecine de Necker, Universite Rene Descartes (International Congress on Law and Mental Health) Paris, France, June 1998

New York University, Annual Forensic Mental Health Conference, NY, NY, June, 1998;

Saint Vincents Hospital, Department of Psychiatry Grand Rounds, NY, NY April,1998

Saint Barnabas Hospital, Correctional Health Affiliate, Grand Rounds, Bronx, NY, March 1998

American Psychological Association. Annual Meeting, August 1994

Annual Meeting American Academy of Psychiatry and Law, Orlando, Florida, October 1991 (paper profiled in the *Psychiatric News*, November 15, 1991)

American Psychiatric Association Annual Meeting, New York, N.Y. May 1990

Orthopsychiatric Annual Meeting, Miami, Florida, April 1990

Annual Meeting of the American Group Therapy Assn., Boston, Mass, February 1990

American Public Health Assn. Annual Meeting, Chicago, Ill., October 1989

**COMMITTEE MEMBERSHIPS AND ADVISORY BOARDS** (past and current)

Association of the Bar of the City of New York, Committee on Legal Issues Affecting People with Disabilities; New York State Bar Association, Dispute Resolution Section; New York State Bar Association, Health Law Section: Founding Co-Chair, Special Committee on Mental Health; Member of Executive Committee; Association of the Bar of the City of New York, Problems of the Mentally Ill; sub-committee on conditions in Prisons; New York State Bar Assn., Committee to Confer with the Medical Society of the

10

State of N.Y.; Committee on Public Health; New York Law School, Advisory Board on Scholarly Publications; Saint Vincent's Hospital and Medical Center of N.Y., Hospital-wide Counsel on Domestic Violence; New York Health and Hospitals Corporation, City-wide Committee on Jail-based Mental Health Services; New York City Department of Mental Health, State-wide Forensic Mental Health Task-force; Advisory Board on the Formation of the New York City Links Program; Advisory Board, Friends of Island Academy, Juvenile NYC Link Program.

## LICENSES, CERTIFICATIONS, ADMISSIONS, RECOGNITIONS

**Attorney** admitted to practice law in the Courts of the State of New York (First Department) and in the Federal Courts of the Southern & Eastern Districts of New York. Accredited for preparation, presentation and prosecution of claims for veterans benefits before the Department of Veterans Affairs.

**Social Worker** Licensed Social Worker, New York State

**Court Evaluator** and **Guardian:** certified under Article 81 of the New York State Mental Hygiene Law, Office of Court Administration of the State of New York. Trained by the Association of the Bar of the City of New York.

**Mediator** Advanced Training in Mediation: United States District Court for the Eastern District of New York; The Center for Mediation in Law, N.Y., N.Y. Additional training in the Mediation of Bio-Ethical Disputes (Center for Health Law and Ethics, University of New Mexico, Division of Bioethics, Montefiore Medical Center/Albert Einstein College of Medicine and the United Hospital Fund of New York).

**"Super Lawyer"** 2012 New York City Metro under Health Law category

**Diplomate:** American Board of Forensic Social Workers

**Fellow:** The American College of Forensic Examiners

## LANGUAGES
Conversational Spanish: Studied in Mexico, certificate awarded: Instituto de Estudios de America Latina, August, 1981, Cuernavaca, Mexico

## REFERENCES: Available upon request

11

# ACRONYMS and ABBREVIATIONS

3CMS:                   Correctional Clinical Case Manager System

ACH:                    Acute Care Hospital

ADD:                    Attention Deficit Disorder

ADHD:                   Attention Deficit Hyperactivity Disorder

ADLs:                   Activities of Daily Living

AED:                    Automatic Electronic Defibrillator

AHA:                    Assistant Hospital Administrator

Ambu bag:               Ambulatory Bag Used for CPR

APP:                    Acute Psychiatric Program at Vacaville

ASH:                    Atascadero State Hospital

ASMHS:                  Administrative Segregation Mental Health Services

ASP:                    Avenal State Prison

ASU:                    Administrative Segregation Unit

BLS:                    Basic Life Support

BMU:                    Behavioral Modification Unit

BPT:                    Board of Prison Terms

C-file:                 Central File

C & PP:                 Clinical Policy and Programs

C&PR:                   Classification and Parole Representative

CAL:                    Calipatria State Prison

CAP:                    Corrective Action Plan

CAT II:             Category II

CC I:               Correctional Counselor I

CC II:              Correctional Counselor II

CCAT:               Coordinated Clinical Assessment Team

CCC:                California Correctional Center

CCF:                Community Correctional Facility

CCI:                California Correctional Institution

CCPOA:              California Correctional Peace Officers Association

CCWF:               Central California Women's Facility

CDC:                California Department of Corrections

CDCR:               California Department of Corrections and Rehabilitation

CEN:                Centinela State Prison

CIM:                California Institution for Men

CIW:                California Institution for Women

CM:                 Case Manager

CMC:                California Men's Colony

CMF:                California Medical Facility

CMO:                Chief Medical Officer

CO:                 Correctional Officer

CPER:               Clinical Performance Enhancement and Review Subcommittee

CPR:                Cardiopulmonary Resuscitation

CRC:                California Rehabilitation Center

CSATF (II):         California Substance Abuse Treatment Facility (II)

| | |
|---|---|
| CSH: | Coalinga State Hospital |
| CSP: | California State Prison |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CTC: | Correctional Treatment Center |
| CTF: | California Training Facility/Soledad |
| CTQ: | Confined To Quarters |
| CVSP: | Chuckawalla Valley State Prison |
| CYA: | California Youth Authority |
| DA: | District Attorney |
| DAI: | Division of Adult Institutions |
| DCHCS: | Division of Correctional Health Care Services |
| DDP: | Developmental Disabilities Program |
| DDPS: | Distributed Data Processing System |
| DHS: | Department of Human Services |
| DMH: | Department of Mental Health |
| DNC: | Death Notification Coordinator |
| DNR: | Do Not Resuscitate |
| DOF: | Director of Finance |
| DON: | Director of Nursing |
| DOT: | Directly Observed Therapy |

DRC:              Death Review Committee

DRMC:             Delano Regional Medical Center

DSM:              Diagnostic and Statistical Manual

DTP:              Day Treatment Program

DVI:              Deuel Vocational Institute

EOP:              Enhanced Outpatient Program

EPPD:             Earliest Possible Parole Date

EPRD:             Earliest Possible Release Date

ERDR:             Emergency Response and Death Review Committee

ERRC:             Emergency Response Review Committee

ERV:              Emergency Response Vehicle

ETV:              Emergency Transport Vehicle

FIT:              Focus Improvement Team

Folsom:           Folsom State Prison

FPTTP:            Foreign Prisoner Transfer Treaty Program

GACH:             General Acute Care Hospital

GAF:              Global Assessment of Functioning

GP:               General Population

HCCUP:            Health Care Cost and Utilization Program

HCM:              Health Care Manager

HCPU:             Health Care Placement Unit

HCQMC:            Health Care Quality Management Committee

HDSP:             High Desert State Prison

| | |
|---|---|
| HQ: | Headquarters |
| HRT: | Health Records Technician |
| HS: | *Hora Somni*/Hour of Sleep |
| ICC: | Institutional Classification Committee |
| ICF: | Intermediate Care Facility |
| ICP: | Intermediate Care Program |
| ICU: | Intensive Care Unit |
| IDTT: | Interdisciplinary Treatment Team |
| IEX: | Indecent Exposure |
| IMHIS: | Inmate Mental Health Information System |
| IMSP: | Inmate Medical System Policy |
| INS: | Immigration and Naturalization Service |
| IP: | Inmate Profile |
| I/P: | Inmate/Patient |
| ISP: | Ironwood State Prison |
| IST: | In-Service Training *or* Incompetent to Stand Trial |
| ISU: | Investigative Services Unit |
| KOP: | Keep on Person |
| KVSP: | Kern Valley State Prison |
| LCSW: | Licensed Clinical Social Worker |
| LLE: | Language Learning Enterprises |
| LOC: | Level of Care |
| LOP: | Local Operating Procedure |

| | |
|---|---|
| LOU: | Locked Observation Unit |
| LPN: | Licensed Practical Nurse |
| LPT: | Licensed Psychiatric Technician |
| LSW: | Limited Suicide Watch |
| LVN: | Licensed Vocational Nurse |
| MAR: | Medication Administration Record |
| MCSP: | Mule Creek State Prison |
| MDD: | Major Depressive Disorder |
| MHCB: | Mental Health Crisis Bed |
| MHOHU: | Mental Health Outpatient Housing Unit |
| MHP: | Mental Health Program |
| MHQMS: | Mental Health Quality Management System |
| MHS: | Mental Health Subcommittee |
| MHSDS: | Mental Health Services Delivery System |
| MHSPC: | Mental Health Suicide Prevention Coordinator |
| MHSR: | Mental Health Suicide Reviewer |
| MHTS: | Mental Health Tracking System |
| MOD: | Medical Officer of the Day |
| MOU: | Memorandum of Understanding |
| MPIMS: | Madrid Patient Information Management System |
| MSF: | Minimal Support Facility |
| MTA: | Medical Technical Assistant |
| NCF: | Normal Cognitive Functioning |

| | |
|---|---|
| NKSP: | North Kern State Prison |
| NOS: | Not Otherwise Specified |
| NPPEC: | Nursing Professional Practice Executive Committee |
| NVDRS: | National Violent Death Reporting System |
| OHU: | Outpatient Housing Unit |
| OIA: | Office of Investigative Affairs |
| OJT: | On the Job Training |
| OP: | Operating Procedure |
| OT: | Office Tech |
| PBSP: | Pelican Bay State Prison |
| PC: | Primary Clinician |
| PES: | Psychiatric Evaluation Service |
| PHU: | Protective Housing Unit |
| PIA: | Prison Industry Authority |
| po: | *per os* (by mouth) |
| POC: | Parole Outpatient Clinic *or* Psychiatrist on Call |
| POD: | Psychiatrist on Duty *or* Psychiatrist of the Day |
| PPE: | Personal Protective Equipment |
| PPEC: | Professional Practice Executive Committee |
| PPRC: | Psychological Peer Review Committee |
| PSH: | Patton State Hospital |
| PSU: | Psychiatrist Services Unit |
| PSW: | Psychiatric Social Worker |

PT:                    Psychiatric Technician

PTSD:                  Post-Traumatic Stress Disorder

PVSP:                  Pleasant Valley State Prison

QIP:                   Quality Improvement Plan

QIT:                   Quality Improvement Team

QMAT:                  Quality Management Assessment Team

QMT:                   Quality Management Team

QNC:                   Quality Nurse Consultant

QVH:                   Queen of the Valley Hospital

R&R:                   Reception and Receiving

RC:                    Reception Center

RJD:                   Richard J. Donovan Correctional Facility

RN:                    Registered Nurse

RT:                    Recreational Therapist

RVR:                   Rule Violation Report

SAC:                   California State Prison/Sacramento

SCC:                   Sierra Conservation Center

SHU:                   Segregated Housing Unit

SI:                    Suicidal Ideation

SMTA:                  Senior Medical Technical Assistant

SMY:                   Small Management Yard

SNF:                   Skilled Nursing Facility

SNY:                   Sensitive Needs Yard

| | |
|---|---|
| SOA&P: | Subjective Objective Assessment and Plan |
| SPRFIT: | Suicide Prevention and Response Focused Improvement Team |
| SPU: | Special Processing Unit |
| SQ: | California State Prison/San Quentin |
| SRA: | Suicide Risk Assessment |
| SRAC: | Suicide Risk Assessment Checklist |
| SRC: | Suicide Review Committee |
| SRN: | Senior Registered Nurse |
| SVP: | Sexually Violent Predator |
| SVPP: | Salinas Valley Psychiatric Program |
| SVSP: | Salinas Valley State Prison |
| TCMP: | Transitional Case Management Program |
| TLU: | Transitional Living Unit |
| TPU: | Transitional Program Unit *or* Temporary Protective Unit |
| TTA: | Triage and Treatment Area |
| UCC: | Unit Classification Committee |
| UCSF: | University of California at San Francisco |
| UHR: | Unit Health Records |
| UNA: | Unidentified Needs Assessment |
| VSPW: | Valley State Prison for Women |
| VPP: | Vacaville Psychiatric Program |
| WHO: | World health Organization |
| WSP: | Wasco State Prison |