1   DONALD SPECTER – 083925
    STEVEN FAMA – 099641
2   PRISON LAW OFFICE
    1917 Fifth Street
3   Berkeley, California  94710-1916
    Telephone:    (510) 280-2621
4

5

6

7
    JON MICHAELSON – 083815
8   JEFFREY L. BORNSTEIN – 099358
    LINDA L. USOZ – 133749
9   MEGAN CESARE-EASTMAN – 253845
    K&L GATES LLP
10  4 Embarcadero Center, Suite 1200
    San Francisco, California  94111-5994
11  Telephone:   (415) 882-8200

12  Attorneys for Plaintiffs

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

13              UNITED STATES DISTRICT COURT

14              EASTERN DISTRICT OF CALIFORNIA

15

16  RALPH COLEMAN, et al.,

17              Plaintiffs,

18         v.

19  EDMUND G. BROWN, Jr., et al.,

20              Defendants.

Case No. Civ S 90-0520 LKK-JFM

**EXPERT DECLARATION OF CRAIG
HANEY**

21

22

23

24

25

26

27

28

[752643-7]

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS AND ACRONYMS .......................................................... iv

I.      INTRODUCTION ................................................................................................. 1

II.     FOUNDATION FOR EXPERT OPINION ........................................................... 7

III.    EXPERT OPINIONS ......................................................................................... 11

        A.      Summary of Expert Opinions ................................................................. 11

                1.      Current State of Implementation of the Population Reduction
                        Order:  A Critical Step that Has Not Been Sufficient to
                        Remedy the Identified Constitutional Violations .............................. 14

                2.      CDCR's Reliance on Harsh and Dangerous Segregation Units
                        and Impact on Mentally Ill Prisoners .................................................. 17

                3.      Use of Dangerous Placements ("Bad Beds") due to Lack of
                        Appropriate Beds in the System ........................................................... 21

                4.      Significant Staff Shortages that Make Delivery of Appropriate
                        Mental Health Treatment Impossible ................................................... 23

                5.      Treatment Space Problems that Make Delivery of Appropriate
                        Mental Health Treatment Impossible ................................................... 25

                6.      Lack of Meaningful Treatment and Inmate Idleness ......................... 26

                7.      Alarming Practices and Conditions Relating to Risk of Suicide
                        in CDCR Prisons .................................................................................. 27

                8.      Challenges Shouldered by Staff Given California's Still Deeply
                        Troubled Prison Mental Health Care System ...................................... 28

        B.      Institutional Tours and Reviews ............................................................ 29

                1.      Mule Creek State Prison (MCSP) ....................................................... 29

                        a.      Overview .................................................................................. 29

                        b.      Segregation Units .................................................................... 31

                                (i)     Use of Administrative Segregation due to
                                        Crowding and Institutional Stressors ........................... 31

                                (ii)    Lack of Appropriate Treatment Space in
                                        Administrative Segregation.......................................... 33

                                (iii)   Lack of Meaningful Treatment and Inmate
                                        Idleness in Administrative Segregation ....................... 35

i

(iv)    Excessively Harsh Conditions for Mentally Ill Prisoners in Administrative Segregation...................... 38

c.    Staffing Shortages .................................................. 43

d.    Use of "Bad Beds" due to Lack of Appropriate Beds............ 48

e.    Extremely Harsh Conditions for Prisoners Placed on Suicide Watch or Suicide Precautions ................................... 51

f.    Problems with Suicide Prevention ........................................... 53

2.    California Institution for Men (CIM) ............................................ 56

a.    Overview ...................................................................... 56

b.    Lack of Appropriate Treatment Space .................................... 58

c.    Staffing Shortages .................................................. 63

d.    Lack of Meaningful Treatment and Inmate Idleness .............. 65

e.    Use of "Bad Beds" due to Lack of Appropriate Beds............ 65

(i)    Use of Harsh Administrative Segregation Units for Inmate-patients due to "Lack of Bed" ("LOB")........................................................ 66

(ii)    Use of "Bad Beds" in Reception Center Units due to Lack of Appropriate Beds in the CDCR's System ........................................................ 71

(iii)    Use of Inappropriate Beds in General Population for EOPs Waiting for Transfer to Appropriate Beds......................................................... 73

f.    Dangerous and Unduly Harsh Housing and Treatment of Mentally Ill Prisoners .............................................. 75

3.    California State Prison, Corcoran (COR)........................................ 79

a.    Overview ...................................................................... 79

b.    Lack of Appropriate Treatment Space and Impact of Extremely Harsh Conditions on Patient Treatment ............... 80

c.    Staff Shortages and Staff Reductions Despite Unchanged Mental Health Population ..................................... 85

d.    Lack of Meaningful Treatment and Inmate Idleness .............. 87

(i)    Lack of Meaningful Treatment for EOP Population ................................................... 88

(ii)    Lack of Meaningful Treatment for CCCMS

[752643-7]

Population ................................................. 90

e.   Use of "Bad Beds" due to Lack of Appropriate Beds............ 96

4.   California Correctional Institution, Tehachapi (CCI) ..................... 101

a.   Overview ....................................................... 101

b.   Lack of Appropriate Treatment Space ................................. 103

c.   Staffing Shortages ................................................. 104

d.   Lack of Adequate Treatment Space, Meaningful Treatment, and Out-of-Cell Time for Mentally Ill Prisoners ...................................................... 106

e.   Use of "Bad Beds" due to Lack of Appropriate Beds........... 108

(i)   Mentally Ill Prisoners Placed in the Harsh Outpatient Housing Unit due to Lack of MHCB and EOP Beds ............................................ 109

(ii)   Mentally Ill Prisoners Placed in Harsh Administrative Segregation Settings due to Lack of Appropriate Beds ....................................... 111

(iii)   Mentally Ill Prisoners Placed in Harsh SHU Settings ....................................................... 115

f.   Dangerous and Extremely Harsh Housing and Treatment of Mentally Ill Prisoners ...................................... 119

C.   Current Conditions Are Putting *Coleman* Class Members' Lives and Well-Being in Serious Jeopardy ................................................. 123

1.   Addressing the Use of Harsh, Dangerous Segregation Units for Mentally Ill Prisoners Waiting for an Appropriate Bed in the System ....................................................... 124

2.   Addressing Exceedingly Long and Indeterminate Stays in Segregation Units ........................................................... 127

IV.   CONCLUSION ........................................................ 130

EXPERT DECLARATION OF CRAIG HANEY

## TABLE OF ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| ACA | American Correctional Association |
| APP | Acute Psychiatric Program |
| ASH or Atascadero | Atascadero State Hospital |
| ASP or Avenal | Avenal State Prison |
| ASU | Administrative Segregation Unit |
| BCP | Budget Change Proposal |
| CAL or Calipatria | Calipatria State Prison |
| CCC | California Correctional Center |
| CCCMS | Correctional Clinical Case Manager System |
| CCI | California Correctional Institution |
| CCPOA | California Correctional Peace Officers Association |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CEN or Centinela | Centinela State Prison |
| CIM | California Institute for Men |
| CIW | California Institute for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| CMO | Chief Medical Officer |
| COR or Corcoran | California State Prison/Corcoran |
| CPR | Cardiopulmonary Resuscitation |
| CRC | California Rehabilitation Center |
| CSH or Coalinga | Coalinga State Hospital |
| CTC | Correctional Treatment Center |
| CTF | California Training Facility/Soledad |
| CVSP or Chuckwalla | Chuckwalla Valley State Prison |
| DMH | Department of Mental Health |
| DSH | Department of State Hospitals |
| DOT | Direct Observation Therapy |
| DVI or Deuel | Deuel Vocational Institute |
| EOP | Enhanced Outpatient Program |
| EOP ASU | Enhanced Outpatient Program Administrative |

EXPERT DECLARATION OF CRAIG HANEY

[752643-7]

| Hub | Segregation Unit |
|---|---|
| FOL or Folsom | Folsom State Prison |
| HDSP or High Desert | High Desert State Prison |
| ICF | Intermediate Care Facility |
| ISP or Ironwood | Ironwood State Prison |
| KVSP or Kern Valley | Kern Valley State Prison |
| LAC or Lancaster | California State Prison/Lancaster |
| LVN | Licensed Vocational Nurse |
| LOB | Lack of Bed |
| MCSP or Mule Creek | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| MHOHU | Mental Health Outpatient Housing Unit |
| MHSDS | Mental Health Services Delivery System |
| NKSP or North Kern | North Kern State Prison |
| OHU | Outpatient Housing Unit |
| OIG | Office of the Inspector General |
| PBSP or Pelican Bay | Pelican Bay State Prison |
| PCP | Primary Care Provider |
| PLRA | Prison Litigation Reform Act |
| PSH or Patton | Patton State Hospital |
| PSU | Psychiatrist Services Unit |
| PVSP or Pleasant Valley | Pleasant Valley State Prison |
| R&R | Reception and Receiving |
| RC | Reception Center |
| RJD or Donovan | Richard J. Donovan Correctional Facility |
| RN | Registered Nurse |
| SAC or Sacramento | California State Prison/Sacramento |
| SATF | California Substance Abuse Treatment Facility (II) |
| SCC or Sierra | Sierra Conservation Center |
| SHU | Segregated Housing Unit |

EXPERT DECLARATION OF CRAIG HANEY

[752643-7]

| SM | Special Master in the *Coleman* case |
|---|---|
| SNY | Special Needs Yard |
| SOL or Solano | California State Prison/Solano |
| SQ or San Quentin | California State Prison/San Quentin |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP or Salinas Valley | Salinas Valley State Prison |
| TB | Tuberculosis |
| TTA | Triage and Treatment Area |
| UHR | Unit Health Records |
| VSPW or Valley State | Valley State Prison for Women |
| VPP | Vacaville Psychiatric Program |
| WSP or Wasco | Wasco State Prison |
| ZZ Cell | Makeshift Temporary Cells Outside of Clinic Areas |

EXPERT DECLARATION OF CRAIG HANEY

[752643-7]

I, Craig Haney, declare:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could competently so testify.

# I.     INTRODUCTION

2.     I am a Professor of Psychology, Director of the Legal Studies Program, and director of the Graduate Program in Social Psychology at the University of California at Santa Cruz.  I have been teaching graduate and undergraduate courses in social psychology, research methodology, psychology and law, forensic psychology, and institutional analysis at the University of California for 35 years.  I previously served as the Chair of the Department of Psychology, Chair of the Department of Sociology, and Director of the Graduate Program in Psychology.  I received a Ph.D. in Social Psychology from Stanford University and a J.D. degree from the Stanford Law School.  I have been the recipient of a number of scholarship, fellowship, and other academic awards and have published approximately one hundred scholarly articles and book chapters on topics in law and psychology, including encyclopedia and handbook chapters on conditions of confinement and the psychological effects of incarceration.  My book on the psychological consequences of imprisonment, <u>Reforming Punishment: Psychological Limits to the Pains of Imprisonment</u>,[1] was published by the American Psychological Association in 2006. (My curriculum vitae is attached to this Report as "**Appendix A**.")

3.     For approximately 40 years, I have been studying the psychological effects of living and working in institutional environments.  In the course of that work, I have conducted what is perhaps the only laboratory experiment ever done on the acute psychological effects of prison-like environments.[2]  This research, which has come to be

---

[1] Craig Haney, *Reforming Punishment: Psychological Limits to the Pains of Imprisonment*. Washington, DC: APA Books (2006).

[2] This study was originally published as Haney, C., Banks, C., and Zimbardo, P., Interpersonal Dynamics in a Simulated Prison, 1 *International Journal of Criminology and*

(continued…)

EXPERT DECLARATION OF CRAIG HANEY

[752643-7]

1   known as the "Stanford Prison Experiment," is regarded as a classic social psychological

2   study of the effects of institutional environments.[3]  For the 40 years since that study was

3   completed, I have continued to study and publish scholarly articles on the psychology of

4   imprisonment.  My research on this topic has included conducting numerous interviews

5   with correctional officials, officers, and prisoners to assess the nature and consequences of

6   living and working in correctional settings.  In addition, I have statistically analyzed

7   aggregate correctional data to examine the effects of overcrowding, punitive segregation,

8   and other conditions of confinement on the quality of prison life and the ability of

9   prisoners to adjust to them.

10

11

_____

12   (… continued)

13   *Penology* 69 (1973), and has been reprinted in numerous books in psychology and law and
translated into several languages.  For example:  Steffensmeier, D., and Terry R.  (Eds.)

14   *Examining Deviance Experimentally*.  New York:  Alfred Publishing, 1975; Golden, P.
(Ed.) *The Research Experience*.  Itasca, Ill.:  Peacock, 1976; Leger, R. (Ed.) *The Sociology

15   of Corrections.*  New York:  John Wiley, 1977; *A kiserleti tarsadalom-lelektan foarma.*

16   Budapest, Hungary:  Gondolat Konyvkiado, 1977; Johnston, N., and Savitz, L. *Justice and
Corrections.*  New York:  John Wiley, 1978; *Research Methods in Education and Social

17   Sciences.*  The Open University, 1979; Goldstein, J. (Ed.), *Modern Sociology.*  British

18   Columbia:  Open Learning Institute, 1980; Ross, R. (Ed.) *Prison Guard/Correctional
Officer*:  *The Use and Abuse of Human Resources of Prison.*  Toronto:  Butterworth's

19   1981; Monahan, J., and Walker, L. (Eds.), *Social Science in Law*:  *Cases, Materials, and
Problems.*  Foundation Press, 1985; Siuta, Jerzy (Ed.), *The Context of Human Behavior.*

20   Jagiellonian University Press, 2001; and Ferguson, Susan (Ed.), *Mapping the Social

21   Landscape: Readings in Sociology.*  St. Enumclaw, WA: Mayfield Publishing, 2001;
Pethes, Nicolas (Ed.), *Menschenversuche (Experiments with Humans).*  Frankfurt,

22   Germany: Suhrkamp Verlag, 2006.

23   [3] The American Psychological Association sponsored a "retrospective" commemorating
the 25th anniversary of this study at its Annual Convention a decade ago, and a 40th

24   anniversary commemorative event two years ago at the Annual Convention in Washington,
DC.  *See also* Haney, C., and Zimbardo, P., The Past and Future of U.S.  Prison Policy:

25   Twenty-Five Years After the Stanford Prison Experiment, 53 *American Psychologist* 709-

26   727 (1998); and Haney, C., and Zimbardo, P., The Stanford Prison Experiment, in Brian
Cutler (Ed.), *The Encyclopedia of Psychology and the Law* (pp. 756-757). Volume II.

27   Thousand Oaks, CA: Sage Publications (2008).

28

[752643-7]

4.      In addition, I have toured and inspected and analyzed conditions of confinement at numerous state prisons (including in Alabama, Arkansas, Arizona, California, Florida, Georgia, Idaho, Louisiana, Massachusetts, Montana, New Jersey, New Mexico, Ohio, Oklahoma, Oregon, Tennessee, Texas, Utah, Washington, and Wyoming), maximum security federal prisons (at McNeil Island, Washington; Marion, Illinois; Lewisburg, Pennsylvania; and the United States Penitentiary and Administrative Maximum or "ADX" facility in Florence, Colorado), as well as prisons in Canada, Cuba, England, Hungary, and Russia.  In 1989, I received a UC-Mexus grant to conduct a comparative study of prisons and prison policy in the United States and Mexico.  As a result of that research grant, I toured a number of Mexican prisons, interviewed correctional officials and, in conjunction with United States Department of State officials, interviewed many United States citizens who were incarcerated in Mexico.

5.      I have lectured and given invited addresses throughout the country on the psychological effects of living and working in institutional settings (especially maximum security prisons) at various law schools, bar associations, university campuses, and numerous professional psychology organizations such as the American Psychological Association.  I have also served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations, including the Palo Alto Police Department, the California Judicial Council, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, the NAACP Legal Defense Fund, and the United States Department of Justice.

6.      For example, in the summer of 2000, I was invited to attend and participated in a White House Forum on the uses of science and technology to improve crime and prison policy, and in 2001, I participated in a conference jointly sponsored by the United States Department of Health and Human Services (DHHS) and the Urban Institute concerning government policies and programs that could better address the needs of formerly incarcerated persons to facilitate their reintegration into their home communities.

[752643-7]

3

EXPERT DECLARATION OF CRAIG HANEY

1   I continued to work with DHHS and other organizations on the issue of how best to

2   maximize the success of recently released prisoners.  In 2005, I was the Scholar-in-

3   Residence at the Center for Social Justice, at the Boalt Hall School of Law, a role that

4   included delivering an invited lecture to students and faculty on the psychological effects

5   of conditions of confinement, and consulting with law students and faculty members on a

6   variety of prison-related issues.

7          7.      More recently, in 2011, I was a member of a delegation of scholars who

8   traveled to Washington, DC to brief members of Congress and their staffs on the special

9   psychological, social, and economic challenges faced by the formerly incarcerated during

10  the "re-entry" process.  In 2012, I testified before the United States Senate Judiciary Sub-

11  Committee (chaired by Senator Richard Durbin) on the psychological effects of isolated

12  confinement.  I am currently a member of a National Academy of Sciences Committee on

13  the Causes and Consequences of High Rates of Incarceration in the United States.

14         8.      In addition to the research I have conducted into the psychological effects

15  of confinement and patterns of adjustment in institutional settings, I also have extensive

16  experience evaluating the life histories and psychological reactions of individual clients in

17  the criminal justice system.  Beginning as a Law and Psychology Fellow at the Stanford

18  Law School in the mid-1970s, I participated for several years in an intensive clinically-

19  oriented course co-taught by law professor Anthony Amsterdam and psychiatrist Donald

20  Lunde that sensitized me to the special problems and vulnerabilities of psychiatrically-

21  impaired criminal defendants and prisoners with special needs.  Since that time, I have

22  been extensively involved in teaching and conducting research on a variety of forensic

23  issues that have placed me in continuing contact with diverse prisoner populations, many

24  of whose members suffer from adverse effects of institutionalization, as well as pre-

25  existing psychiatric disorders and developmental disabilities.[4]

26

27  _____

28  [4] For example, *see* Haney, C., and Specter, D., Legal Considerations in the Treatment of
                                                                        (continued…)

9.      For example, for nearly 35 years I have been studying the backgrounds and social histories of persons accused and convicted of violent crime.  In the course of this research, I have evaluated the background and social histories of defendants and convicted persons, carefully assessed the effects of prior periods of institutionalization, and analyzed the ways in which these factors have influenced the development and psychological functioning of the persons in question.  Much of that work has entailed an assessment of the potentially adverse effects of their institutional histories as well as evaluations of their potential for future prison adjustment.

10.      My interests in these broad issues within the general area of psychology and law is both academic and professional.  Thus, in the course of my work on conditions of confinement, adjustment to incarceration, and effects of institutionalization on persons accused or convicted of violent crime, I have been qualified and have testified as an expert in various state and federal courts, including the Superior Courts of Lake, Los Angeles, Marin, Monterey, Orange, Sacramento, San Diego, San Francisco, and Ventura counties in California, state courts in Alabama, Arizona, Florida, New Jersey, New Mexico, Oregon, Wyoming, and Utah, as well as Federal District Courts in the Western and Eastern Districts of Washington, the Northern, Southern, and Eastern Districts of California, the District Court of New Mexico, the Southern District of Illinois, and the Northern District of Georgia.

11.      In the course of this academic and professional work, I have also evaluated and testified concerning the psychological effects of conditions of confinement in the mainline housing units of various maximum and medium security prisons in a number of states (including California, New Jersey, New Mexico, Oregon, Utah, and Washington).  For example, I have evaluated and provided testimony about the psychological effects of

(… continued)

"Special Needs" Offenders, in Ashford, J., Sales, B., and Reid, W., (Eds.), *Treating Adult and Juvenile Offenders with Special Needs* (pp. 51-79).  Washington, D.C.: American Psychological Association (2000).

[752643-7]

overcrowded conditions of confinement in the mainline housing units at the California

Men's Colony, Folsom, San Quentin, and Soledad prisons.  In the mid-1980s I toured,

inspected and conducted extensive interviews in more than a half dozen Texas prisons, and

examined and analyzed numerous documents as the basis for an opinion about the

psychological effects of overcrowding in the Texas Department of Corrections.

12.     I have often focused in this work on the effects of conditions of confinement

on so-called "special needs" prisoners (primarily the mentally ill and developmentally

disabled).  For example, under the auspices of the United States Department of Justice, I

evaluated conditions of confinement and the quality of care provided at Atascadero State

Hospital, a forensic facility designed to house mentally-ill and developmentally-disabled

offenders for the State of California.  As noted above, I testified as an expert witness

concerning conditions of confinement and their effects on prisoners at the California

Men's Colony, which was a treatment-oriented facility in which many mentally-ill

prisoners were housed at the time I evaluated it.  In addition, I evaluated the effects of

conditions of confinement on prisoners at the California Medical Facility at Vacaville

(including prisoners housed in the Department of Mental Health units),[5] and also testified

about the prevalence of seriously mentally-ill prisoners in the California Department of

Corrections, as well as the special psychological problems that living in isolated housing

units created for them.[6]  I have also evaluated the psychological effects of conditions of

confinement at juvenile justice facilities, on the condemned or "death row" units in several

states (including Arkansas, California, New Mexico, and Texas), and in various special

treatment facilities for sex offenders (in Florida and Washington).

13.     In much of my research, writing, and testimony about prison conditions,

especially in recent years, I have focused on the assessment of the psychological effects of

---

[5] *Gates v. Deukmejian*, Civ-S-87-1636 LKK-JFM (E.D. Cal.  1990).

[6] *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal.  1995).

[752643-7]

confinement in so-called "lockup," punitive segregation, or so-called "supermax"

confinement (in what are variously known as management control, security housing, high

security, or close management units).[7]  This has included tours and inspections and

interviews in a number of what were once called "management control units" as well as

"security housing units" in institutions in California, in several separate prisons or

specialized units in each of the states of Arizona, Idaho, Louisiana, Maine, Massachusetts,

Montana, New Jersey, New Mexico, Ohio, Oregon, Pennsylvania, Texas, Utah, and

Washington, as well as at the United States Penitentiary at Marion, Illinois and the Federal

Administrative Maximum ("ADX") at Florence, Colorado.  I have testified about the

effects of isolation and social deprivation in the Security Housing Unit at Pelican Bay State

Prison,[8] and in several of the High Security Units in the Texas Department of Corrections,

among others.[9]

## II.      FOUNDATION FOR EXPERT OPINION

14.      I was retained by counsel for Plaintiffs in *Coleman v. Brown* to review and

assess the issues and factual claims raised in Defendants' Motion to Terminate, filed on

January 7, 2013.  My review both included and went beyond the specific mental health

care and treatment issues raised in Defendants' motion to terminate, covering mental

health and treatment issues that have been considered by the *Coleman* single-judge court,

---

[7] *See generally* Haney, C., and Lynch, M., Regulating Prisons of the Future:  The Psychological Consequences of Supermax and Solitary Confinement, 23 *New York University Review of Law and Social Change* 477-570 (1997); Haney, C., Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, *Crime & Delinquency* (special issue on mental health and the criminal justice system), *49*, 124-156 (2003); Haney, C., A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons, 35 *Criminal Justice and Behavior* 956-984 (2008); and Haney, C., The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful, *Prison Service Journal UK* (Solitary Confinement Special Issue), Issue 181, 12-20 (2009).

[8] *See Madrid v. Gomez*, 889 F. Supp. 1146, 1280 (N.D. Cal.  1995).

[9] *See Ruiz v. Johnson*, 37 F. Supp. 855 (S.D.  Texas 1999).

the *Coleman*/*Plata* three-judge court, and the United States Supreme Court in *Coleman*/*Plata*. My tasks included reviewing an extensive number of documents provided by Plaintiffs' counsel that pertain to the current nature and quality of medical and mental health care in the California Department of Corrections and Rehabilitation (CDCR) and the conditions of confinement that prevail throughout the State's prison system.

15.    I provided my expert opinion and findings during the *Coleman*/*Plata* overcrowding proceedings.[10] Given those findings along with the three-judge court's and the Supreme Court's findings that overcrowding was the "primary" cause of the constitutional violations in *Coleman*, my review has necessarily included the impacts of the continued overcrowding in nearly all CDCR institutions. A list of the documents I was provided by Plaintiffs' counsel and reviewed in advance of preparing this report is appended as **Appendix B**. A list of prior cases in which I have testified at trial or deposition in the past four years and a statement of compensation are attached as **Appendix C**.

16.    In addition to the documents reviewed, as listed in Appendix B, I also recently conducted tours and interviews in numerous facilities and housing units located in four prisons where *Coleman* class members reside.[11] The prisons were: Mule Creek State Prison (MCSP), in Ione, California; California Institution for Men (CIM), in Chino, California; California State Prison-Corcoran (COR), in Corcoran, California; and California Correctional Institution (CCI), in Tehachapi, California.[12] Due to the extremely

_____

[10] Expert Report of Professor Craig Haney ("10/30/08 Haney Report"), *Coleman* Dkt. No. 3201, October 30, 2008.

[11] *Coleman* class members are CDCR prisoners with serious mental illness.

[12] I had previously toured, inspected, and interviewed prisoners at Mule Creek State Prison, the California Institution for Men, and the California Correctional Institution in conjunction with the overcrowding proceedings in 2007 and 2008. I performed the same tasks during that time period at Valley State Prison for Women (VSPW) in Chowchilla, California; Salinas Valley State Prison (SVSP) in Soledad California; California Substance Abuse and Treatment Facility (SATF) in Corcoran, California; North Kern State Prison

(continued…)

compressed discovery and briefing schedule in this matter, I conducted these one-day tours over a two-week period during the month of February 2013.  In the course of these tours, I made a point of visiting a representative sample of housing units where mentally ill prisoners were housed, including General Population, Special Needs Yard, Administrative Segregation, Security Housing Unit, and mental health crisis bed units and overflow crisis bed units.

17.      As discussed in Part I, my experience, research, and expertise includes a great deal of work on the subject of the psychological effects of prisoners in high security or segregation units.  These kinds of units in CDCR's system were a particular focus of my review.  Because of the special sensitivity and vulnerability of mentally ill prisoners to the harsh regimes that exist in Administrative Segregation Units ("ASUs" or "Ad Segs"),[13] I made a point of touring, and speaking to a number of the mentally ill prisoners housed in, the Ad Segs at each of the prisons I toured.  I also toured and spoke to men housed in the Security Housing Units (SHUs) at Corcoran and the California Correctional Institution,[14] which hold a significant population of prisoners under severe locked down conditions.

18.      In the course of touring these four CDCR facilities, institution staff photographed a number of different areas inside the prisons at my direction.  I have

_____

(… continued)

(NKSP) in Delano, California; and Wasco State Prison (Wasco) in Wasco, California.

[13] Administrative Segregation Units are locked-down units within the prison where prisoners are housed for a wide variety of "administrative" reasons.  Special security procedures are used in the transport of Ad Seg prisoners and their out-of-cell time and other program participation is drastically reduced.  They spend the overwhelming majority of their time locked in their cells.

[14] Security or Secured Housing Units are also locked-down units within the prison where prisoners are housed as a result of disciplinary infractions (specific offenses committed in prison, or gang status), or sometimes for safety-related concerns.  As with AD SEG prisoners, special security procedures are used in the transport of SHU prisoners and their out-of-cell time and other program participation is drastically reduced.  They, too, spend the overwhelming majority of their time locked in their cells.  There are currently five (5) SHUs in CDCR's system.

[752643-7]

reviewed and relied on those photographs in developing my opinions in this matter, and many are attached as exhibits to this report.

19.     During the tours, I had numerous conversations with correctional administrators, clinical staff, and line correctional officers, with Defendants' counsel present throughout.  I was also able to converse with numerous prisoners who were participants in the CDCR's mental health delivery system, including many who were in the Correctional Clinical Case Management System (CCCMS)[15] as well as those in the Enhanced Outpatient Program (EOP).[16]  I also conducted private, one-on-one interviews with individual prisoners who were selected with the assistance of Plaintiffs' counsel and institutional staff from the various lists of mentally ill prisoners at each facility.

20.     I have recently conducted tours of CDCR prisoners as the plaintiffs' expert consultant in the case *Mitchell v. Felker*, 2:08-cv-01196-JAM-EFB (PC) (E.D. Cal.).  In *Mitchell*, the plaintiffs have alleged that CDCR imposes race-based lockdowns to respond to potential security threats, regardless of whether all the prisoners in that racial group have any involvement in the potential threat.  I have been asked to review CDCR's lockdown practices, including the impacts of lockdowns, during which prisoners may be locked in their cells twenty-four hours a day, and deprived of outdoor exercise, program

---

[15] CCCMS prisoners constitute the largest CDCR mental health category.  It comprises approximately 27,600 prisoners with mental illness, and are supposed to receive medication management, meet with a clinician at least every 90 days, and receive mental health treatment as clinically indicated.  When CCCMS prisoners are housed in Ad Seg, they are supposed to receive enhanced mental health services that include weekly case manager contacts and daily rounding from psychiatric technicians.

[16] EOP includes seriously mentally ill prisoners who require a higher and more intensive level of mental health care.  These prisoners are unable to function in a general population prison setting and, as a result, are supposed to be in sheltered treatment programs and live in segregated housing units.  They are supposed to receive 10 hours each week of therapy or "structured therapeutic activities."  When they are housed in Ad Seg, they are supposed to be provided with weekly case manager contacts and receive daily rounding from psychiatric technicians.  There are approximately 4,650 EOP prisoners in the CDCR.

activities, religious services, visits, or phone calls with family members.  In my review in the *Mitchell* case, I have learned of the ways in which mentally ill prisoners may be impacted and harmed as a result of prison lockdowns.  I have considered and relied on information gained from that review in forming my opinions in this case as well.

21.     As part of my expert review, I was asked to formulate expert opinions concerning: (a) whether there are current and ongoing constitutional violations that persist with respect to the State's treatment of mentally ill prisoners in CDCR; (b) whether and how overcrowding continues to be the primary cause of those continuing constitutional violations; (c) whether and why further reductions in the prisoner population and continuing Special Master oversight are appropriate remedies to the constitutional violations related to the State's treatment of prisoners with serious mental illness; (d) whether the current conditions and treatment provided for prisoners in segregation settings—specifically, Administrative Segregation Units and Security Housing Units—is appropriate or poses undue risk of harm and suffering; and (e) whether any practices, policies, or conditions related to the treatment of California prisoners with serious mental illness are having significant adverse psychological effects on prisoners.

## III.     EXPERT OPINIONS

### A.     Summary of Expert Opinions

22.     Pursuant to the United States Supreme Court decision in *Brown v. Plata*, upholding the remedial order of the three-judge court, and the implementation of the AB 109-mandated "realignment" of responsibilities for incarceration between the state and counties, the CDCR has undergone significant reductions in the size of its inmate population, from approximately **154,445** when the three-judge court entered its population reduction order to its current population of approximately **122,814**.  However, the California prison system remains significantly overcrowded, operating at approximately

1   149% of its capacity.[17]  According to the most recently available national data from the

2   Bureau of Justice Statistics, California was the second-most overcrowded prison system in

3   the country in 2011, behind only the very troubled Alabama system.[18]  Even considering

4   the population reductions that have occurred in the last year, the national data suggest that

5   California's prison system remains far more overcrowded than the vast majority of state

6   prison systems in the country.

7       23.     The *Coleman* Special Master's 25th Round Report concluded there remain a

8   number of areas of deficient institutional performance with respect to the care and

9   treatment of mentally ill prisoners.  Those deficiencies include problems regarding:

10  (1) suicide prevention, such as the persistence of harsh measures in segregation settings,

11  inadequate management of prisoners at high risk of suicide, and incomplete efforts to

12  improve the clinically competency levels in the completion of Suicide Risk Evaluations

13  (Report at 17-25); (2) timely placement of seriously mentally ill patients into inpatient care

14  settings (Report at 25-34); (3) provision of appropriate treatment to EOP prisoners in

15  segregation settings, including the disproportionate number of prisoners in segregation

16  who are mentally ill, the elevated risks of decompensation and suicide, the use of

17  segregation placements for non-disciplinary reasons, the harshness of segregation settings,

18  in the extended lengths of stays in segregation that many prisoners face (Report at 34-38);

19  (4) the progressing but still incomplete construction of mental health beds as well as

20  necessary clinical treatment and office space (Report at 38-44); and (5) insufficient mental

21  health staffing (Report at 44-49).

22  _____

23  [17] Declaration of Michael W. Bien ("Bien Decl.") Ex. 1 (CDCR Weekly Report of
    Population as of Feb. 27, 2013).

24  [18] The Bureau of Justice Statistics calculations appear in: Carson, E., & Sabol, W.,

25  *Prisoners in 2011*.  NCJ 239808.  Washington, DC: U.S.  Department of Justice
    (December, 2012), p. 29, Appendix Table 14.  They are based on December 31, 2011

26  population data.  California and Alabama were operating at 175% and 196% of their
    design capacities, respectively.  Only six states, including California, had state prison

27  populations that exceeded 145% of their system's design capacity.

28

24.     I found ample evidence that these and other problems persist, and that they are interfering with the delivery of important, and Program Guide-mandated, mental health services at the four prisons that I toured in February 2013 and throughout CDCR's system.

25.     It is important to note that the numerous problems that I describe in this declaration were readily apparent at each institution that I visited, in the single-day tours that I was able complete in the available time.  I am confident that even more such problems would have been identified and additional concerns surfaced with more time available in which to conduct inspections and interviews.  I raise this point to underscore how widespread and glaring many of the inadequacies in the mental health care delivery system continue to be.

26.     In the same vein, I note that the many tragic cases of individual prisoners whom I interviewed, and whose compelling accounts of ill treatment are contained in these pages, came from persons selected more or less randomly, without my having had any previous contact with or knowledge about them, and generally without having been directed to them by Plaintiffs' counsel.  Instead, the men that I interviewed who were suffering so badly as a result of these deficiencies and whose mental health conditions had deteriorated (often dangerously so) were individuals whom I chose to interview precisely because I knew nothing about them (except, typically, for their lengths of stay in one or another unit and level of care).  They were picked randomly from the inmate roster, or cell-front as I walked through various housing units trying to identify *Coleman* class members, or because, in a few instances, they called out to me.  Moreover, I have provided a relatively complete account of the information that most of the interviewees provided to me, without selecting only the "worst cases," or unrepresentative narratives.

27.     In addition, my review of system-wide data and materials strongly suggests that the kinds of problems I observed at the four institutions I toured are not unique to the institutions I was able to tour.

28.     For these reasons, I believe that there are many more inmate-patients just like the individuals I interviewed, among the tens of thousands of *Coleman* class members,

[752643-7]

1    who are also suffering and at risk of serious psychological harm because of the conditions

2    and practices that I describe here.

### 1. Current State of Implementation of the Population Reduction Order: A Critical Step that Has Not Been Sufficient to Remedy the Identified Constitutional Violations

5        29.    Just as at the time of my last inspections in 2007 and 2008, those problems

6    were manifestly and primarily the result of the continued overcrowding that plagues the

7    California prison system.  Although they have been abated somewhat in light of the

8    reductions in the overall inmate populations, the system is still very overcrowded and the

9    overcrowding-related problems are still present.  Moreover, because the serious mental

10   health treatment problems I observed during my tours are primarily caused by the

11   persistent overcrowding, I would expect to see many of these same kinds of problems in

12   other CDCR facilities that are as crowded as the ones I inspected.

13       30.    Since my October 30, 2008 expert report on the effects of severe

14   overcrowding on the operation of the mental health care delivery system in the CDCR,

15   there have been there have been five (5) additional rounds of Special Master oversight and

16   reporting, and there has been a partial reduction in the overall level of severe

17   overcrowding.  The inspections that I conducted of four (4) institutions and many of the

18   documents that I reviewed pertaining to their operation provided clear evidence that there

19   have been a number of improvements in overall conditions of confinement and in certain

20   aspects of institutional functioning.  Of course, there also have been some corresponding

21   improvements in the delivery of certain aspects of mental health care services.  This is

22   exactly what my and other experts' earlier analyses predicted should and would happen as

23   careful court oversight and monitoring proceeded in conjunction with population

24   reductions.  In that sense, these improvements represent a strong confirmation of the

25   conclusion advanced in the three-judge court proceeding—that is, that the overwhelming

26   levels of overcrowding with which the CDCR was beset were the primary cause of

27   California's inability to provide constitutionally adequate medical and mental health care.

28

31.     However, it is critically important to acknowledge that the CDCR is still severely overcrowded, by virtually any measure.  Thus, even with the population reductions, California remains an outlier.  It must be noted that some individual prisons are much *more* overcrowded than the overall system-wide figure indicates, and have scarcely benefitted from population reductions, if at all.  It is also important to recognize that there has essentially been no reduction in the overall mentally ill prisoner population, even as the prison system itself has become somewhat less overcrowded.

32.     Even under the best of circumstances, it would be unreasonable to expect that the effects of these partial reductions in the overall level of overcrowding could possibly translate so rapidly into substantial and widespread improvements in the functioning of the medical and mental health care delivery systems.  This kind of prison change does not come about through a simplistic mechanical process (here, one in which reductions in levels of overcrowding would automatically and almost immediately produce corresponding improvements in the delivery of services).  Instead, the CDCR is a complex human system in which norms, expectations, and an entire "culture" must be shifted and modified both within and between the mental health and custody staff as well as the inmates.  The dysfunction in the system that chronic and severe overcrowding produced, and the norms, expectations, and culture that it generated, have been entrenched for a very long time.  The insurmountable level of overcrowding that has been the primary cause of the continuing constitutional violations began more than a decade and a half ago and intensified consistently over that period.  The CDCR prisoner population reductions were only initiated in earnest two (2) years ago.  In some prisons, that decline has been modest.  Backlogs and other crowding-related stresses still predominate in several prisons and across the system.

15
EXPERT DECLARATION OF CRAIG HANEY

33.     In my book on the psychological limits of the pains of imprisonment,[19] I addressed some of what I termed the "situational pathologies" that can come about as a result of prison overcrowding, when far too many prisoners are housed in a correctional environment than it was designed to safely and humanely hold.  Some of those pathologies pertain to the behavior of the individuals—prisoners and correctional staff—who are directly and adversely affected by having to live and work inside places that become decidedly more difficult to tolerate and function in.  But some of the pathologies are broader and institutional in scope.  That is, prisons and prison systems also adapt in dysfunctional ways to overcrowding, especially when the overcrowding is truly severe and chronic or longstanding.  This kind of institutionally entrenched, overcrowding-driven dysfunction takes a significant amount of time and effort to reverse.

34.     In the recent tours and interviews I conducted in the CDCR, and in the large amount of documentary evidence I reviewed, it became abundantly clear that many of the same problems that I identified earlier and that prevented the delivery of adequate and effective mental health care services persist.  In many very basic respects that I describe in the pages that follow, the system is still broken.  It has not been—and cannot be—fixed until the chronic and severe overcrowding is fully addressed.  The remaining deficiencies are deep and widespread, and they are having tragic consequences for the thousands of mentally ill prisoners who continue to be subjected to them.

35.     In addition, the full range of harms that are continuing to be inflicted on California's mentally ill prisoners have come into sharper focus now that some of the most egregious and obvious aspects of overcrowding (*i.e.*, the triple-bunked gymnasiums and day rooms) have been addressed.  The CDCR's continuing inability to provide for the mental health needs of its prisoners is produced in large part by a nexus of persistent

---

[19] Craig Haney, *Reforming Punishment: Psychological Limits to the Pains of Imprisonment*.  Washington, DC: APA Books (2006), Chapter 7 ("Overcrowding and the Situational Pathologies of Prison").

EXPERT DECLARATION OF CRAIG HANEY

[752643-7]

problems that my inspections made clear have hardly been faced at all, much less satisfactorily addressed.  That nexus includes continuing and in some cases even more drastic shortages of mental health and correctional staff; lack of adequate clinical space; and widespread levels of inmate-patient idleness and lack of meaningful treatment opportunities that were as bad and often worse than those I observed at the time of my 2007 and 2008 tours.

### 2. CDCR's Reliance on Harsh and Dangerous Segregation Units and Impact on Mentally Ill Prisoners

36.     Among my most urgent concerns is CDCR's systemic backlogs, transfer stoppages, and outright "lack of beds" that force inmate-patients into shockingly inappropriate and potentially extremely damaging settings where they are placed at grave risk and do not receive needed and constitutionally required levels of treatment and care.

37.     These inappropriate and risky settings disproportionately include extreme forms of segregation, in which inmate-patients are not only subjected to severe and psychologically painful isolated confinement but also to overly punitive, demeaning and degrading practices and procedures.  In case after case, I found that inmate-patients were being housed in these harsh environments for excessively long periods of time, and were often there for non-disciplinary reasons (including the simple fact that the individual prison or larger prison system literally had nowhere else to put them).  In addition, the experience of such long-term, seemingly arbitrary suffering sometimes aggravated inmate-patients' mental health conditions or precipitated rule violations that, in turn, led to even longer-term and more punitive outcomes.

38.     As I and many other researchers and knowledgeable mental health professionals have observed, segregated housing places prisoners at grave risk of psychological harm.  This is especially true when prisoners are confined in especially harsh and deprived conditions for very long periods of time.  There is widespread agreement that mentally ill prisoners are particularly susceptible to this risk of harm. There are many studies of the effects of isolation in general that underscore the ways that it

can undermine psychological well-being,[20] and even more substantial evidence of its

negative psychological effects in prison settings.  This evidence comes from a variety of

sources, including personal accounts, descriptive studies, and systematic research on

solitary and supermax-type units.  As I have noted in previously published reviews,[21] the

data that establish these harmful effects have been collected in studies conducted over a

period of several decades, by researchers from several different continents with diverse

backgrounds and a wide range of professional expertise.[22]

39.     Studies identify a range of symptoms that appear to be produced by these

conditions, including: appetite and sleep disturbances, anxiety, panic, rage, loss of control,

paranoia, hallucinations, and self-mutilations.  Moreover, direct studies of prison isolation

have documented a broad range of harmful psychological reactions, including increases in

the following psychiatric symptoms and problematic behaviors: negative attitudes and

affect, anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction,

hallucinations, loss of control, irritability, aggression, and rage, paranoia, hopelessness, a

_____

[20] For example, see: Graham Thornicroft, Social Deprivation and Rates of Treated Mental Disorder: Developing Statistical Models to Predict Psychiatric Service Utilisation, 158 *British Journal of Psychiatry* 475-484 (1991).

[21] For example, see: Craig Haney and Mona Lynch, Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement, 23 *New York Review of Law & Social Change* 477-570 (1997); Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, 49 *Crime & Delinquency* 124-156 (2003); Craig Haney, A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons, 35 *Criminal Justice and Behavior* 956-984 (2008); and Craig Haney, The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful, *Prison Service Journal UK* (Solitary Confinement Special Issue), Issue 181, 12-20 (2009).

[22] For example, see: Christopher Burney, *Solitary Confinement*.  New York: St. Martin's Press (1961); Frank Rundle, The Roots of Violence at Soledad.  In Erik Olin Wright, (Ed.), *The Politics of Punishment: A Critical Analysis of Prisons in America* (pp. 163-172).  New York: Harper (1973); Robert Slater, Psychiatric Intervention in an Atmosphere of Terror, 7(1) *American Journal of Forensic Psychiatry* 5-12 (1986); Slater, R., Abuses of Psychiatry in a Correctional Setting, 7(3) *American Journal of Forensic Psychiatry* 41-47 (1986).

EXPERT DECLARATION OF CRAIG HANEY

[752643-7]

1    sense of impending emotional breakdown, self-mutilation, and suicidal ideation and

2    behavior.

3         40.    Moreover, the *prevalence* of negative psychological symptoms (that is, the

4    extent to which prisoners who are placed in these units suffer from these and related

5    symptoms) is very high.  In my own study of a representative sample of prisoners in the

6    Pelican Bay SHU, for example, every symptom of psychological distress that I measured

7    but one (fainting spells) was suffered by more than half of the prisoners.[23]  Many of the

8    symptoms were reported by two-thirds or more of the prisoners in this isolated housing

9    unit, and some were suffered by nearly everyone.  Well over half of the SHU prisoners

10   reported a constellation of symptoms—headaches, trembling, sweaty palms, and heart

11   palpitations—that is commonly associated with hypertension.  I also found that almost all

12   of the prisoners evaluated reported ruminations or intrusive thoughts, an oversensitivity to

13   external stimuli, irrational anger and irritability, difficulties with attention and often with

14   memory, and a tendency to socially withdraw.  Almost as many prisoners reported a

15   constellation of symptoms indicative of mood or emotional disorders—concerns over

16   emotional flatness or losing the ability to feel, swings in emotional responding, and

17   feelings of depression or sadness that did not go away.  Finally, sizable minorities of the

18   prisoners reported symptoms that are typically only associated with more extreme forms of

19   psychopathology— hallucinations, perceptual distortions, and thoughts of suicide.

20        41.    Because of their more fragile mental states, mentally ill prisoners are more

21   vulnerable to both the stress of overcrowding *and* the pains of isolated confinement.  In

22   addition, they are uniquely susceptible to what can be described as a "vicious cycle" of

23   segregation once they commit disciplinary violations and are placed in segregated housing.

24   More specifically, the severe conditions of confinement that accompany overcrowding

25   place special stressors on mentally ill prisoners that may worsen their conditions and lead

---

[23] Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax"
Confinement, 49 *Crime & Delinquency* 124-156 (2003).

[752643-7]

1  to decompensation.  This is especially true in prison systems as overcrowded as

2  California's, where mental health problems are likely to become more serious before they

3  are detected and addressed, and are likely to worsen in the absence of appropriate

4  treatment.

5       42.    A lack of appropriate treatment and care in general population and

6  worsening mental condition often ends up "[c]ausing hostile and aggressive behavior to the

7  point that [inmate-patients] break prison rules and end up in segregation units as

8  management problems."[24]  Moreover, overcrowded prison systems are more likely to resort

9  to punitive forms of social control than others, so that if and when mentally ill prisoners do

10  violate prison rules in an overcrowded prison, those violations are more likely to be

11  responded to with punishment.  Because of highly stressful conditions in segregation and

12  the fact that mental health care is usually sporadic and of uneven quality there, inmate-

13  patients can regress even further and, "this regression can go undetected for considerable

14  periods of time before they again receive more closely monitored mental health care."

15  Unfortunately, this is a cycle that "can, and often does, repeat."[25]

16       43.    Yet the placement of mentally ill prisoners in Ad Segs and SHUs places

17  them at grave risk of harm and, unless this "vicious cycle" can be broken, that risk will

18  continue to mount.  This represents one of the critically important ways in which mentally

19  ill prisoners can be damaged and harmed by overcrowded conditions of confinement—not

20  just by the overcrowding to which they are directly exposed, but by the practices and

21  reactions that the larger prison system has developed in response to the overall pressure

22  and dysfunction that overcrowding brings about.  Just as in my previous inspections of

23  overcrowded CDCR facilities—and if anything, even more so this time—I observed a

24

25

26  [24] Streeter, P., Incarceration of the Mentally Ill: Treatment or Warehousing? 77 *Michigan Bar Journal* 166 (1998), at p. 167.

27  [25] *Ibid.*

28

EXPERT DECLARATION OF CRAIG HANEY

1  range of these damaging and destructive practices and conditions imposed on mentally ill

2  CDCR prisoners.

### 3. Use of Dangerous Placements ("Bad Beds") due to Lack of Appropriate Beds in the System

44.      The essence of the concept of a "bad bed" is that it is a place where prisoners are "treated badly." That bad treatment can and has in the past involved placing thousands of prisoners in untenable housing situations (triple bunked gymnasiums and dayroom floors), where their day-to-day lives were extremely dangerous and degraded. The CDCR has thankfully eliminated most or all of those kinds of bad beds and this is an absolutely necessary first step in addressing the unconstitutional conditions that overcrowding brought about. But "bad beds" can also occur under circumstances in which prisoners are "treated badly" by being subjected to harsh, inhumane, or dangerous conditions that are due to the CDCR's systemic inability to place prisoners in an appropriate bed that is designed and equipped to meet their mental health, security, and other needs.

45.      It became very clear on the tours of CDCR institutions that I conducted is that the current system is not providing remotely appropriate beds for many of its mentally ill population, and that it cannot do so under current levels of overcrowding. While it is true the total CDCR population has been reduced in light of the orders of the three-judge court, and affirmed by the United States Supreme Court, the mental health population remains essentially the same, not only in the institutions that I visited, but also system-wide. There are presently not enough appropriate places in the system to ensure the treatment, safety, and well-being of all of the mentally ill prisoners who are housed in it.

46.      I will provide many specific, tragic examples of how this problem is manifested in my institution reviews below. However, at a systemic and numerical level, the State's own data confirm that the CDCR does not have the functional capacity or available space to get mentally ill prisoners into the placements that it has itself identified as appropriate and necessary for them.

47.     Specifically, I reviewed the EOP and CCCMS transfer data for January 2013 and the first half of February 2013.  The data for the week of February 11, 2013 (the most recent data I have been provided) show that EOP and CCCMS inmate-patients simply cannot be moved into appropriate beds.  During that week, institutions requested the transfer of 234 EOP inmate-patients to appropriate EOP programs throughout CDCR's system; only 32 (13.7%) could be transferred.  CCCMS prisoner placement efforts were equally stunted by the lack of appropriate beds and a system to get inmate-patients to such beds:  of the 1435 CCCMS inmate-patients for whom transfer to an appropriate bed was requested, just 271 (18.9%) could be transferred.  The data were consistent from week to week in the rest of the materials I reviewed.[26]

48.     The problem is not just the lengthy times that inmate-patients must wait before being transferred.  The critically dangerous nature of this problem comes into real focus only with the realization that these inmate-patients who are waiting for an appropriate bed are being held in some of the harshest, non-therapeutic settings imaginable.

49.     I observed this problem in real time during each of my tours.  Scores of mentally ill and vulnerable prisoners were being held in the Ad Seg units, the SHUs, inadequate Reception Center housing, and unlicensed (and extremely inadequate) crisis-level beds, for the sole reason that the CDCR did not have available appropriate beds for them.  As I discuss below, the damage to mentally ill and emotionally fragile prisoners that can and does result from this situation is palpable.  I observed and spoke with an enormous number of inmate-patients who were suffering, and getting dramatically worse, languishing for weeks and months in a "bad bed," waiting for an appropriate bed to become available.

---

[26] Bien Decl. Ex. 2.  (CDCR Weekly Data on MHSDS Transfers, Week of Feb. 11, 2013).

EXPERT DECLARATION OF CRAIG HANEY

50.     It is well known and documented, by the Special Master's expert Dr. Ray Patterson,[27] by CDCR consultant and suicide prevention expert Lindsay Hayes,[28] CDCR's own Senior Psychologist Specialist for the Statewide Mental Health Program Dr. Robert D. Canning,[29] and in numerous other data and materials I have reviewed in this case and in my own research, that these bad beds—including segregation units and OHUs—are high-risk settings that put human beings at grave risk of psychological harm, including suicide.

### 4.     Significant Staff Shortages that Make Delivery of Appropriate Mental Health Treatment Impossible

51.     Very similar to my observations in 2007 and 2008, staffing shortages in the CDCR remain severe, especially for certain categories of critical mental health staff, and in some cases have recently gotten dramatically worse.  In light of the fact that the mental health populations at the institutions I toured remain at the same high levels, the continuing and severe staff shortages (and even staffing reductions at some institutions), have made the effective delivery of adequate mental health treatment nearly impossible.

52.     As discussed later in my report, I observed staffing shortages that impacted the delivery of mental health treatment and programming at each institution I visited.  For example, MCSP had substantial shortages of psychiatrists, psychologists, social workers, recreational therapists, preventing the institution from even fully utilizing the treatment space that they have.  They, like many institutions, have also been prevented from hiring a second Chief Psychologist and Correctional Health Services Administrator, as a way of "providing salary savings," according to the Director of Correctional Health Care

---

[27] *Coleman* Dkt. No. 4308, Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2011, Jan. 25, 2013.

[28] *Coleman* Dkt. No. 4350-1, Ex. N, Hayes CDCR Suicide Prevention Consultation Memorandum, pp. 9-11, 15.

[29] Bien Decl. Ex. 3 (CDCR Suicides: Result of Recent Analyses, Jan. 25, 2013).

Services,"[30]  even as the current staff acknowledges that this additional staffing is important and would be helpful.  CIM, meanwhile, has a significant shortage of psychiatrists and other staff deficits that prevent delivery of important services for mentally ill inmate-patients.  Corcoran reported major staffing challenges and reductions, putting great stress on the psychiatrists, psychologists, and access to care officers who are trying to provide treatment to an undiminished number of vulnerable mentally ill prisoners.  And at CCI, I heard about and saw the consequences of substantial staffing deficits for psychiatrists, primary clinicians, social workers, psychiatric technicians, and recreational therapists, resulting in back-breaking caseloads and use of non-clinical staff for clinical duties (*e.g.*, a recreational therapist who appears to provide the majority of the talk therapy sessions to inmate-patients).

53.     The reductions of allocated staff, and the inability to fill already allocated staff positions, had a clear impact on both the quantity and quality of the treatment and programming I observed during my tours.  My observations were wholly consistent with the Special Master's findings that the full implementation of Defendants' mental health staffing plan has not yet occurred, and that there remain problematic (and in some cases worsening) staff shortages in psychiatry, psychology, social work, and in mental health leadership positions at the institutions that negatively impact the delivery of care to the mentally ill.[31]

54.     My findings on staffing shortages and their impact on the mental health system are also consistent with the conclusions of the Special Master's suicide expert, Dr. Patterson.  Dr. Patterson recently identified two "major conditions" that he concluded must be considered in addressing the continuing suicide problem in the CDCR.[32]  They

---

[30] Declaration of Diana Toche in Support of Motion to Terminate, *Coleman* Dkt. No. 4275-3 ¶ 6.

[31] Special Master's 25th Round Report, p. 44-48 (*Coleman* Dkt. No. 4298).

[32] As I wrote in my earlier overcrowding report, "[b]ecause of the extreme and tragic

(continued…)

both relate very directly to the ongoing and, as yet, inadequately addressed problems of overcrowding and staffing.  The first is the "persistent size of the mental health population in the prisons," notwithstanding the overall reduction in the number of inmates in the CDCR.  As Dr. Patterson and I have both noted, there has been almost no reduction in the number of inmates in the MHSDS since the population reductions were initiated.  In fact, the mental health caseload population was reduced only by 852 prisoners (or 3%) between the end of May 2007 and the beginning of November 2012.[33]  The second problem that Dr. Patterson identified pertained directly to staffing and the high number of vacancies that persist among CDCR's mental health staff.  Specifically, he concluded that "[t]he lack of sufficient mental health staff continues to exacerbate the … problem of inadequacy in assessment, treatment, and interventions" that characterize the great majority of the suicides that occurred in the CDCR in 2011.[34]

### 5. Treatment Space Problems that Make Delivery of Appropriate Mental Health Treatment Impossible

55.     I observed numerous, glaring problems with the clinical treatment and office space available to provide mental health care during my institutional tours.  At some facilities (MCSP and COR), I was told that additional clinical space was planned for the distant future.  At CIM, I learned that a project to create additional EOP treatment space was slated to start construction in the second half of 2014, and that a previous plan to

---

(… continued)

nature of suicide, it is regarded as a basic measure of whether and how well a mental health care delivery system is functioning.  That is, whatever else such a system does, it should be reasonably effective at preventing its patients from taking their own lives." 10/30/08 Haney Report ¶ 351.

[33] As Dr. Patterson reported, the MHSDS population in CDCR was 32,958 on May 25, 2007, and 32,106 on November 2, 2012.  *See Coleman* Dkt. No. 4308, Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2011, Jan. 25, 2013, p. 16.

[34] *Coleman* Dkt. No. 4308, Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2011, Jan. 25, 2013, p. 16.

EXPERT DECLARATION OF CRAIG HANEY

[752643-7]

1 create additional Ad Seg treatment space had been eliminated.  At CCI, there were no

2 plans to build additional treatment space for mental health programming despite the

3 terribly inadequate space being used for group treatment in the segregation units.

4        56.     As the Special Master noted, many construction projects intended to create

5 additional and necessary clinical treatment and office space remain unfinished; many were

6 projected to be finished by now, but their completion has been delayed.[35] In the meantime,

7 the lack of adequate treatment space at CDCR institutions limits the amount of treatment

8 that can be provided and—just as significant—has a profound impact on the quality of the

9 treatment being provided.  This includes the lack of appropriate office space for clinicians

10 to do their work, the lack of timely access to patient records, the lack of private and

11 confidential treatment space, unduly harsh practices related to treatment (including the use

12 of strip searches, restraints, and treatment cages without any apparent clinical or custodial

13 justification), and group treatment spaces that make meaningful "group" interaction

14 impractical and unlikely if not actually impossible.

### 6.     Lack of Meaningful Treatment and Inmate Idleness

16        57.     Related to the staff shortages and lack of clinical space mentioned above, I

17 observed many mentally ill inmate-patients simply were not receiving meaningful

18 treatment and were housed in restrictive programs that drastically limited their out-of-cell

19 activity.  As I discuss in this report and have studied for decades, the effects of the kind of

20 isolated confinement and lack of out-of-cell activity to which they were subjected, along

21 with the lack of meaningful treatment, create a very high risk of psychological harm.  Yet

22 these are precisely the conditions and practices to which these inmate-patients have been

23 consigned.  The negative impact of this egregious treatment is apparent in their

24 descriptions of their worsening mental health conditions and in the documentary record of

25 their deterioration.

---

[35] Special Master's 25th Round Report, p. 38-44 (*Coleman* Dkt. No. 4298).

[752643-7]

7.    **Alarming Practices and Conditions Relating to Risk of Suicide in CDCR Prisons**

58.    During my tours, I observed inmate-patients being subjected to a number of very alarming practices and conditions that clearly contravened those urged by both the Special Master's suicide expert and a nationally recognized authority on suicide prevention who served as a consultant to the CDCR.  The continued use of harsh and punitive practices to manage prisoners at risk of suicide was apparent at each of the four institutions I toured.  I am aware that the CDCR's former consultant on suicide prevention Lindsay Hayes, the Special Master's expert on suicides Dr. Ray Patterson, and even the State's experts in the current litigation have observed similar and disturbing practices at other institutions and throughout the CDCR.

59.    To provide just a few examples, Lindsay Hayes, in his CDCR Suicide Prevention Consultation Memorandum, was "quite concerned about the current conditions observed in the [Outpatient Housing Units]" (housing prisoners on suicide precautions or suicide watch) at several institutions.  He noted specifically that there were OHU cells that had inadequate lighting, lacked visibility, and had poor sanitation (*i.e.*, dirty floors and walls, non-sanitized mattresses, etc.)  He also found that there was "no security or therapeutic rationale for prohibiting inmates from having suicide-resistant bedding" in the OHU.[36]  His description of the problems that he saw in these OHUs closely matched what I saw on my observations, made more than 18 months after his report.  For example, the OHUs at MCSP and CCI were barren, filthy, and dim, and required patients on suicide observation or suicide watch to sleep on the floor.  These OHUs certainly should be considered high on the list of "bad beds" that are still prevalent throughout the CDCR; they are inhumane, dangerous housing locations used because of overcrowding and resulting "lack of beds" problems with which the prison system still struggles.  At MCSP,

---

[36] *Coleman* Dkt. No. 4350-1, Ex. N, Hayes CDCR Suicide Prevention Consultation Memorandum, pp. 9-11.

[752643-7]

1   the OHU continues to be used to relieve crowding pressures in the MHCB unit and

2   elsewhere, while at CCI, the OHU is being used to house prisoners requiring EOP or

3   MHCB level of care because no appropriate bed can be found.

4        60.    Similarly, Dr. Ray Patterson identified serious concerns about the

5   appropriate completion of Suicide Risk Evaluations (SREs), and the relationship of such

6   inadequacies to the high suicide rate among CDCR prisoners.  An SRE Proctor-Mentor

7   Program was supposed to be implemented system-wide pursuant to the State's August

8   2010 plan to address the persistent problem of California's high rate of inmate suicides.[37]

9   The need for further SRE training for clinical staff was specifically identified a MCSP

10   following a suicide there in July 2012.  Yet, as discussed later in my report, I learned that

11   MCSP had begun its SRE training program just days prior to our tour, apparently because

12   the institution knew that we were coming to review the institution's mental health

13   program.  This delay in initiating SRE training (in a facility that had recently suffered a

14   suicide for which SRE training was identified as one appropriate response) was a very

15   troubling discovery, and it was compounded by a very problematic approach to suicide risk

16   assessments that were being conducted by clinicians at the facility, potentially placing

17   further lives at risk.

     **8.**     **Challenges Shouldered by Staff Given California's Still Deeply Troubled Prison Mental Health Care System**

20        61.    The very serious problems and deficiencies in the operation of the

21   institutions that I describe should *not* be interpreted as a negative commentary on the

22   professionalism or dedication of the overwhelming majority of the mental health and

23   correctional staff members who work in them.  Quite the contrary, in nearly every instance

24   they appeared to me to be confronted with virtually insurmountable barriers that prevented

25   them from delivering the appropriate and effective mental health services that they were

_____

27   [37] *Coleman* Dkt. No. 3918, Ex. A.

[752643-7]

striving to provide.  Implicit in my findings is my strongly held belief that the members of the *Coleman* class continue to deserve better treatment than the CDCR's mental health delivery system is providing them.  But the same is true in a somewhat different way for the custody and mental health staff.  They, too, deserve better.  That is, they deserve to be able to work in a system that provides them with the resources, opportunities, and options that they need to function in professionally appropriate, effective, and successful ways.  Those deficiencies, too, are part of the legacy of California's still inadequate prison mental health care system and the persistent overcrowding that plagues the CDCR.

62.     With this in mind, and before discussing the findings of my individual institutional reviews in detail, I want to express my appreciation for the amount of time that the correctional and mental health staff members and administrators spent discussing a wide range of significant (and often difficult) issues with me and, with rare exceptions, for the candor and openness with which they answered questions and provided a wealth of important and insightful observations and information.

**B.     Institutional Tours and Reviews**

**1.     Mule Creek State Prison (MCSP)**

**a.     Overview**

63.     When I previously toured Mule Creek, in November 2007, the prison was beset with very serious overcrowding and with many other problems that that overcrowding primarily caused, including the use of inappropriate treatment space, widely voiced staff concerns about such things as inadequate safety and treatment that were related to overcrowding, dramatically overcrowded housing units ("bad beds" in gyms and dayrooms), and a range of what I called "extreme adaptations" to the overcrowding that the prison staff was trying to manage.[38]

---

[38] 10/30/08 Haney Report, pp. 101-113.

EXPERT DECLARATION OF CRAIG HANEY

[752643-7]

64.     I toured MCSP a second time on February 7, 2013.  My tour began with the EOP and CCCMS Administrative Segregation Unit, which was in Building C-12.  I then visited Building C-13, which contains the overflow Ad Seg., the six (6) Mental Health Outpatient Housing Unit (MHOHU) cells, and the five (5) alternative MHOHU cells.  I also toured the Correctional Treatment Center's (CTC) mental health crisis beds, the Level IV EOP/CCCMS SNY on A Yard, and the Level III EOP/CCCMS SNY on B Yard.

65.     At our morning orientation meeting, Warden William Knipp was very enthusiastic about the progress that had been made at the prison, suggesting that we would be "hit in the face" by the magnitude of the changes, and that "everything you can think of has been cut in half."  In fact, conditions had improved in a number of ways at Mule Creek.  The dramatically overcrowded housing units that once existed in the gyms and dayrooms at the facility are certainly gone, and some other positive changes at the institution (including some added treatment space) have allayed some of the staff's earlier overcrowding-related concerns.  However, many of the same or similar problems remain. In fact, some of the earlier problems have been exacerbated by persistent mental health staff shortages in the face of a very large mental health population that, at least at the higher level of EOP acuity, has not declined at all since my 2007 tour.

66.     As we learned, the population reduction was certainly not "in half," but rather about 29%; the count was 2837 the day we toured, down from the approximate peak population of 4011 (more than 235% design capacity) of just a few years ago (as reported by Warden Knipp).  (At the time I toured the institution on November 2, 2007 in conjunction with the three-judge court proceeding, the population was approximately 3800, as I reported in my earlier report.) Notwithstanding these population reductions, Mule Creek State Prison remains seriously overcrowded at **167% of design capacity**.  If Warden Knipp is correct that, as he told me, conditions have "not been this good in 20 years here," that is at least in part a reflection of how bad things had been over much of that prior period, when the prison routinely operated at over 200% of capacity.

67.     As Chief Psychologist Dr. Jim Telander correctly observed at our orientation meeting, "if you reduce crowding, you reduce stress on the mental health population." Some of that has undoubtedly occurred at Mule Creek, as the traditional "bad beds" (triple-bunked gymnasiums and dayrooms) at the prison have been eliminated.  However, even the Warden and the clinical staff at the orientation meeting conceded that the size of the mental health population at the facility had not been reduced at all, and still represented a very large percentage of the overall prisoner population there.  For example, when the Special Master toured in August 2012, he reported that the MHSDS population at the prison was 1,682, which represented 55% of the total prisoner population.  There were almost an identical number of inmate-patients at the prison when I visited in February 2013.  In fact, the size of the EOP population had actually increased slightly from the time of my 2007 visit: it was approximately 556 the day that I visited in 2013, compared to approximately 543 the day I toured in 2007.  Thus, although the prison has experienced overall reductions in its population, the MHSDS population clearly has not gotten any smaller.

68.     In any event, a number of very significant challenges to the delivery of adequate mental health care for the *Coleman* class remain and are described below.  In the course of my review, it became apparent that these challenges are very closely related to the persistent overcrowding at the institution.

**b.     Segregation Units**

**(i)     Use of Administrative Segregation due to Crowding and Institutional Stressors**

69.     MCSP appeared to rely especially heavily on the use of Ad Seg for the control and management of *Coleman* class members, housing them under truly adverse conditions of confinement where their mental health conditions are placed at grave risk, and where it is difficult to deliver effective mental health treatment that might address or compensate for the psychological stress of isolated confinement.  The Special Master

EXPERT DECLARATION OF CRAIG HANEY

[752643-7]

noted the presence of inmate-patients in the Mule Creek Ad Segs, noting that CCCMS prisoners stayed in these units for an average of 75 days.[39]

70.    It is clear that overcrowding throughout the CDCR serves as the primary driver for the placement of mentally ill prisoners in Ad Seg and other inappropriate beds (such as beds in higher-security-than-necessary units) at MCSP.  For example, according to the State's own data, for the week following our tour (the week of February 11, 2013), MCSP requested transfer of 37 EOP inmate-patients to an appropriate EOP bed elsewhere in the CDCR system; just two (2) of the 37 were in fact transferred.  There were simply no available appropriate beds in the system for the vast majority of these 37 EOP inmate-patients.  This was particularly true for EOP inmate-patients who belonged in CDCR's lower security, Level II EOP SNY yard; *none* of the 32 EOP inmate-patients endorsed for transfer to the California Substance Abuse Treatment Facility and State Prison (SATF) (the system's only Level II EOP SNY yard) were in fact transferred.[40]  Indeed, during the Special Master's 25th Round of monitoring, 67% of EOP prisoners housed in the MCSP Ad Seg for more than 90 days were there while waiting for a transfer to an appropriate bed in the CDCR system.[41]

71.    That same week, only 10 of 35 MCSP CCCMS inmate-patients who had been endorsed for transfer to an appropriate bed were in fact transferred and placed in such a bed.[42]

72.    On the day I visited MCSP, there were approximately 50 CCCMS prisoners in Ad Seg, and another 40 Ad Seg prisoners who were at the EOP level of care.  Many of these men (as discussed below), were in Ad Seg waiting for transfer to appropriate CCCMS or EOP bed in the system.

---

[39] Special Master's 25th Round Report, pp. 137-138 (*Coleman* Dkt. No. 4298).

[40] Bien Decl. Ex. 2 (CDCR Weekly Data on MHSDS Transfers, Week of Feb. 11, 2013).

[41] Bien Decl. Ex. 18, at 12 of 15 (MCSP 25th Round Management Report).

[42] Bien Decl. Ex. 2 (CDCR Weekly Data on MHSDS Transfers, Week of Feb. 11, 2013).

EXPERT DECLARATION OF CRAIG HANEY

[752643-7]

73.     Among the 41 EOP prisoners at Mule Creek who were awaiting transfer to an appropriate bed at the time of our tour, 6 were housed in Mule Creek's Ad Seg unit (including Prisoner A, discussed below, who had deteriorated while housed in the Ad Seg to the point that he required APP acute inpatient care, for which he was also awaiting transfer.  We were also told that, 10 of the 40 EOP prisoners in Ad Seg had been kept there over the 90-day limit.  The most recent data provided to Plaintiffs, from January 18, 2013, showed that there were 7 EOP prisoners in Ad Seg for longer than 90 days.

### (ii)     Lack of Appropriate Treatment Space in Administrative Segregation

74.     There has been no visible progress made in improving treatment space in the Ad Seg at Mule Creek since my last visit some five and half years ago, when this was clearly identified as a serious problem.  Additional construction is apparently planned to provide clinical treatment and office space for the EOP ASU on A yard.  But this project is in the "design and planning process," and the current goal is for construction to *begin* in about a year (March 2014).  We viewed the site where it is anticipated that this badly needed treatment/office space will be built; it is currently a fenced off vacant lot with large containers in the middle of it.  A photograph of the site of this planned treatment/office is attached as **Photo Exhibit A**.  (MCSP 4)

75.     Some of the very same problematic treatment conditions that I observed in 2007 appeared unchanged in 2013.  For example, here is how I earlier described the treatment space in C-Facility, Building 12 Ad Seg:

> The configuration of Building 12 was [problematic]….  Clinicians have "offices" that sit completely out in the open on the dayroom floor of the housing unit, and a semi-circle of treatment cages stands against the wall behind them.  Even though there are cubicle panels that create what appear to be semi "private" offices, much of what goes on in the treatment area is completely visible to the prisoners in the unit, especially to the prisoners on the second tier of the unit.  Indeed, the treatment cages actually face the cells.  There is a large EOP and CCCMS population in the unit and it is very noisy, with prisoners yelling across the unit.  The noise and shouting (and sometimes the taunts) of the other prisoners are pervasive and distracting.[43]

---

[43] 10/30/08 Haney Report ¶ 197.  Mule Creek's Management Report for the Special

(continued…)

[752643-7]

1

76.     Unfortunately, the appearance and atmosphere on the floor of the C-12 Ad

Seg housing unit were largely unchanged in 2013.  The unit is still dominated by the

presence of treatment cages, which are arranged in a semi-circle behind some desks and

partitions, placing the groups out of the view of at least the first tier prisoners on the unit.

Photographs of this area, which I consider to be very problematic as a space for

meaningful group therapy, are attached as **Photo Exhibits B and C**.  Groups still take

place on the floor of the housing unit itself, and prisoners are still escorted to the treatment

cages in plain view of others in the unit.  In the middle of one of the semi-circles of

treatment cages is a stand that holds a television with a VCR and several of movies that

apparently are shown during group treatment sessions, including *Titanic*, as can be seen in

**Photo Exhibit D**.  In addition to the half-circles of cages, there are a number of individual

cages on the floor as well, and together they create an environment that is not only

congested and inhospitable but not at all conducive to meaningful therapy (or even to

meaningful interpersonal interaction).  There was a fair amount of noise on the unit the day

we were there, as inmates in their cells were yelling at each other and at the officers.

77.     I was again taken aback by the large number of treatment cages that nearly

filled one side of the unit floor in the Ad Seg unit; it was something that I had seen when I

was in this unit five (5) years earlier (but that I never see in any of the other prison systems

with which I am familiar, except for California's).  The unit supervisor, who had been at

the prison for some 15 years, told us that the group treatment cages on the floor of the

housing unit were new, but they (or ones very much like them) were clearly there at the

_____

(… continued)

Master's 25th Round tour, created by staff at the institution, likewise noted that "[a]ccess
to office and treatment space at MCSP has improved, with the exception of the treatment
area for ASU EOP and ASU CCCMS" under the heading "Obstacles to Providing Mental
Health Services and Adherence to Program Guide Requirements."  Bien Decl. Ex. 18 at 2
of 15.

[752643-7]

1   time of my 2007 tour.  They were arranged in such a way that provided no effective

2   auditory or visual privacy or confidentiality, and it is hard to imagine how the clinicians'

3   job in providing confidential treatment could not be negatively impacted by such

4   arrangement, a photograph of which is attached as **Photo Exhibit E**.  The State's expert,

5   Jacqueline Moore, in viewing this same photograph, also had concerns about this setting

6   for treatment.[44]

7       78.     The Special Master noted many of the same things during his visit in August

8   2012, commenting on the fact that, for EOP inmates in segregation, "[g]roup therapy space

9   was relegated to two formations of nine modules on the dayroom floor, providing

10  negligible auditory or visual privacy."[45]  In addition, he noted that "[m]onthly psychiatric

11  contacts occurred routinely, but were compromised by lack of privacy for their settings."

12  The non-private, inhospitable nature of the treatment space in these units may be why

13  many prisoners reported to me that, although they did not think they were benefitting a

14  great deal from the more common cell front contacts that they had with their clinicians,

15  they also were not particularly eager to participate in the groups that occurred on the

16  dayroom floors.  As the Special Master reported in August, 2012: "[O]ver 40 percent of

17  weekly [primary clinician] contacts occurred at cell-front.  Out-of-cell contacts took place

18  in dayroom holding cells that afforded limited privacy."[46]

19              **(iii)    Lack of Meaningful Treatment and Inmate Idleness
                          in Administrative Segregation**

20

21      79.     Many inmate-patients at Mule Creek complained about the lack of

22  meaningful treatment, a lack of groups, groups that were scheduled but did not meet, or

23  _____

24  [44] Bien Decl. Ex. 4 (Defs. Expert Jacqueline Moore Deposition Tr. at 162:11-163:7,
        163:10-13).

25  [45] Special Master 25th Round Report, p. 137 (*Coleman* Dkt. No. 4298).

26  [46] Special Master 25th Round Report, p. 137 (*Coleman* Dkt. No. 4298).

27

28

1   ones that resorted to showing movies and little else when they did meet.  Inmate-patients

2   housed in restricted housing, especially, described the ways in which their mental health

3   was being adversely affected by the combination of the harsh conditions of their

4   confinement and the corresponding lack of out-of-cell time and meaningful programming.

5         80.     For example, while in the C-12 Ad Seg unit, I interviewed Prisoner B, a

6   Level III EOP who told me he was being held there for his own safety (*not* because he had

7   received a rules violation report or "RVR").  In fact, he said that he had been waiting to be

8   transferred to another institution, perhaps a "soft" yard at a place like the California Men's

9   Colony.  He said that he had been physically attacked in the past by other prisoners

10  because of the nature of his commitment offense.  Prisoner B complained that "every

11  single group" run on the unit is "recreational—they show lots of movies, and provide no

12  real treatment."  As he put it, "I came here as SNY" four (4) months ago—a timeframe

13  confirmed by the institution's records—but since then "I've been locked in this box with

14  no real treatment."  Prisoner B was distraught when he spoke with me and said since he

15  had been housed in this unit he had often come very close to trying to take his own life.

16  He complained about being stuck in his cell without anything to do, and said that the

17  groups—which he thought were supposed to be held daily on the unit—are often not held

18  at all.  In fact, "you can be in your cell for five straight days.  I have been.  The psych techs

19  just come by to see if you are alive."  He told me that he has been "begging for treatment

20  and help" and is not getting it.

21        81.     I interviewed Prisoner C, a prisoner who is also housed in the C-12 Ad Seg

22  and who told me that he had been considered an EOP inmate for the past 5 years.

23  Prisoner C said that the recreational therapist for the unit, Ms. Simpson, is supposed to

24  have some 15 groups scheduled during the week.  However, for some reason, she had not

25  been there for approximately the past three weeks and, as a result, no groups at all had

26  been run.  Prisoner C said that in any event he decided he no longer wanted to attend the

27  groups because they lacked therapeutic value: "it's just movies, they show them over and

28  over."  Apparently Prisoner C was being kept at MCSP for court-related reasons and he

1   was eager to return to his home prison, Kern Valley State Prison, because, as he put it, "I

2   get real groups" there.  At the Mule Creek Ad Seg, he said, "we stay in boxes and go nuts."

3        82.   I also interviewed Prisoner D, another EOP inmate who was housed in the C-

4   12 Ad Seg.  He told me that he had been placed in the DVI Ad Seg (which does not

5   provide EOP treatment) in March 2012.  He reported that he was transferred to the Ad Seg

6   at MCSP in August 2012.  Prisoner D explained that because there had been no groups at

7   all at the DVI Ad Seg, he made a point of coming out of his cell whenever groups were

8   held on his unit at MCSP.  He was emphatic, however, that he was not getting his Program

9   Guide-required 10 hours of therapeutic activity.  He estimated that, for example, in the

10   previous week he had been out of his cell for no more than four (4) hours.  Even when

11   groups do occur, Prisoner D said, they are typically "just movies"; sometimes, he said,

12   they are educational movies but, "more often, just regular movies."  In any event, he said,

13   the group leaders repeat them so "I've seen them all, more than once."  He emphasized: "I

14   don't get any real groups here, not where we talk to each other or to the therapist."  He

15   acknowledged that inmates in the unit do have access to "yard" but also said that "it's cold

16   out there, and they just put you in a cage, without a seat, like a dog kennel."  Otherwise, he

17   said, "my program is stay in my cell—it's driving me crazy."  I visited the yards to look at

18   the conditions Prisoner D had described.  Indeed, the Ad Seg "yard" consists of a large

19   concrete area that is crisscrossed by thick fencing, creating a number of enclosed, separate

20   exercise cages.  A photograph of the area is attached as **Photo Exhibit F**.

21        83.   The lack of access to meaningful treatment and activity was even more

22   severe in the C-13 overflow Ad Seg.  I talked to a number of inmate-patients  in C-13 who

23   described this to me.  For example, I interviewed Prisoner E, who told me that he was a

24   CCCMS prisoner who had been placed in the Ad Seg unit in January, from A Yard at

25   MCSP.  He said "we have no program" here except for yard.  This was confirmed by

26   Prisoner F, a long-time prisoner (in CDCR since 1984), who had been in Ad Seg for 3

27   months for safety concerns (not for disciplinary reasons), pending a transfer to an SNY

28   yard at another institution.  He said that the psych techs come by to check on the prisoners

1  in the unit only about once a week and that, although he did not know his clinician's name,

2  did see her at his cell front.  Prisoner F told me that "I don't like the [treatment] cages.  I

3  feel like a dog, like an animal—so I don't usually go out; if I see my clinician, I see her at

4  my cell front."

### (iv)   Excessively Harsh Conditions for Mentally Ill Prisoners in Administrative Segregation

7      84.      For perhaps obvious reasons, as I have noted, mentally ill prisoners are

8  especially vulnerable to the harsh conditions and psychological stress of segregation.[47]

9  They are at greater risk of deterioration and harm than others in these conditions.  The

10  psychological deterioration and harm they experience sometimes takes the form of even

11  more troubled and troubling behavior; that is, they may "act out," or become disruptive or

12  aggressive in response to the added stress of isolated confinement.  Overcrowded prisons

13  or prison systems that lack the staff and treatment capacity and housing options to respond

14  to that troubled and troubling behavior more appropriately often resort to even harsher and

15  more deprived forms of confinement, an approach that almost certainly will worsen the

16  inmate-patient's condition and behavior.[48]

17      85.      For these reasons, I found the "management cells" that are in use on the C-12

18  Ad Seg unit at MCSP to be very problematic.  Photographs of the inside of one these cells

19  are attached as **Photo Exhibits G, H and I**.  The row of cells are located in what is

20  referred to as a "vestibule"—essentially behind a large partition that blocks off the area, as

21  depicted in the photographs attached as **Photo Exhibits J and K**.  The sergeant on the

---

[47] The institution provided troubling data that, during the Special Master's 25th Round of monitoring, one-third of inmate patients housed in the Ad Seg did not receive pre-placement screening for mental health issues, including suicide risk.  Bien Decl. Ex. 18, at 11 of 15 (MCSP 25th Round Management Report).

[48] As a related matter, I was alarmed to see that 88% of the institution's use of force incidents during the 25th Round of monitoring involved mentally ill inmate patients.  Bien Decl. Ex. 18, at 14 of 15.

floor described the advantage of this arrangement—"if they are disruptive, it's not as much of a problem because of the barrier"—but it also has the unfortunate consequence of blocking off the sight lines of the officers in the control room that is located on the other side of the unit and also those of most staff elsewhere on the floor (except when they go behind the partition and into the vestibule).  The cells are smaller in dimension, have no top bunk and, we were told, the officers have the ability to stop the water in them.  The cells are designed to maximize control but, in my opinion, fail to take into account the likely adverse effects that confinement in them will have on the inmate's mental health. When I asked about the rationale for using them, the unit sergeant told us: "if the prisoners are psychotic and misbehaving, we can control them better" this way.  I suspect that he is correct, but only in the most limited, immediate sense.  This practice ignores the longer-term mental health implications of such severe deprivation on already vulnerable mentally ill inmate-patients.  There was one prisoner in one of the management cells because, we were told, "he was disruptive last night."  The cell was as stark and barren as it could possibly be made, and the prisoner inside was allowed to have literally nothing in it.  He was certainly "under control," but at what cost to his longer-term functioning and well-being?

86.    One prisoner who had spent time in these Ad Seg management cells, Prisoner A, an EOP prisoner, was escorted out into an individual treatment cage on the floor of C-12 to speak with me.  He appeared to be very psychotic, and told me that he had been diagnosed with PTSD, was an SNY prisoner, and also said "I get very paranoid."  He complained that there were no televisions in the Ad Seg unit, did not know the name of his case manager, and could not tell me what the mental health program was in the unit.  He said "I'm just trying to hold on."  He also told me that "I just want my caseworker to help me."  His medical records indicated that Prisoner A's condition had deteriorated over the preceding several months, as he waited to be transferred to an appropriate bed at the EOP level of care within the CDCR.  The records also show that he had been at Mule Creek since February 2012 and, some point, was endorsed for transfer from Mule Creek to an

SNY yard at Corcoran.  However, before he could be transferred, his mental health condition worsened significantly.  On October 15, he was admitted to the MHCB, after having had at least two (2) prior admissions (one recently).  He was described as severely disturbed (including eating his own feces).  While in the MHCB, he threatened staff.  After remaining in the MHCB for several weeks, he was sent to Ad Seg (on November 6).  By the time of his December 19, 2012 treatment plan, his mental health condition was continuing to worsen (he was described as "confused, disorganized, psychotic, and delusional" and "getting worse") and he was referred to the inpatient Intermediate Care Facility (ICF) level of care.  On January 7, 2013, his condition had worsened further, to the point that he was referred to the higher level of care in the DSH Acute Psychiatric Program (APP).  By January 16, 2013, an IDTT note indicated he was "floridly psychotic and delusional," and "running around naked, mopping the floor with underwear."

87.     Yet by January 30, 2013, Prisoner A was being housed in a management cell inside the unit, still awaiting transfer to DSH inpatient hospitalization.  And, by the time of our tour on February 7, 2013, when I interviewed him in Ad Seg, he had been waiting to be transferred to an APP bed for nearly month.  Indeed, it had been almost two months since his first DSH referral (to ICF) for inpatient care.  In my opinion, placing such a highly unstable and ill individual in Ad Seg, much less a management cell in Ad Seg, is a cause for great concern (and a very clear example of the CDCR's continued and widespread use of "bad beds" because overcrowding has prevented them to transferring prisoners to appropriate ones).

88.     Based on what I observed, the mental health staff members who service the Ad Seg unit were not properly recognizing and responding to the heightened risks that are created for inmate-patients who are housed in isolated confinement.  For example, in the C-12 Ad Seg yard, a prisoner who seemed distraught approached me at one of the gates.  Prisoner G said that he was a hearing impaired EOP prisoner who had been in Ad Seg for 5 months and "it's getting to me.  I can't take the small cell, it's closing in, being locked up all the time."  He described a number of relatively recent suicide attempts: "I was

[752643-7]

depressed and my mind was out-of-control.  I put a sheet around my neck.  I was going to hurt myself.  I really need help."  He told me that he wanted to go to a DSH facility "but my clinician said I wasn't sick enough, even though I've had many suicide attempts.  I've been in the MHOHU several times since I got here.  They just keep me there, then tell me I'm not sick enough."  One mental health record, date January 2, 2013, stated that Prisoner G was "still feeling depressed," but "I don't want to go to OHU because it is too cold.  No mattress.  No blanket."  He shared these same concerns about the MHOHU with me in our interview.

89.     When I later reviewed Prisoner G's institutional records, I learned he appeared to have been incarcerated on a "cruelty to animals" offense.  He arrived at MCSP on September 27, 2012, and, at the time he was moved from EOP ASU to the prison's MHOHU on January 23, 2013, he had been to the CTC "at least five times."  On January 24, a decision was made to retain him in the MHOHU, on the basis of this justification: "Allowing him to remain here will reduce the workload, energy diverted from staff to shuttle him back and forth anyway" between Ad Seg and MHOHU.  Clearly, this note suggests that staff did not think that Prisoner G could function in Ad Seg without decompensating, and anticipated "shuttling" him back and forth to the MHOHU when he did.  A January 28 note indicated that Prisoner G wanted to go to PSU or DMH.  He threatened to hang himself, and was pepper-sprayed by correctional officers when he made a motion to tear a sheet in his cell.  He was then discharged from the MHOHU and placed back in a management cell in the EOP ASU.

90.     On January 29, Prisoner G was still in a management cell and complaining to officers that he was cold, wanted a blanket, and was depressed.  An IDTT held the next day noted, remarkably in my opinion, that Prisoner G was being retained in a management cell in part because of his "disturbing behavior of self harm gesture."  According to Prisoner G, he has served most of his prison sentence and will be paroling in the next year.

91.     I also interviewed Prisoner H in the C-12 Ad Seg unit.  He appeared to be extremely psychotic when I spoke to him.  He was incoherent at cell front, told me loudly

1   that "we are going to shut this down," and claimed that he was actually a high ranking

2   religious priest who was not on the mental health caseload but rather had been mislabeled

3   as a mental patient in an effort to silence him.

4        92.    When I asked staff on the unit floor to see the medical/mental health records

5   for Prisoner H and the other prisoners I'd spoken to in the unit, no one seemed to know

6   how to do that.  Although we were told that access to the records could be done on the

7   housing unit floor via computer, no one seemed to know exactly how this could be done,

8   or to know even where the computers were with which it could be attempted.[49] As we

9   waited to get access to Prisoner H's records, a clinical staff member told me that the

10  clinicians on the unit take handwritten notes that they then must type later on into the

11  electronic database with a laptop.  We were also told that "people pick up our handwritten

12  notes and scan them" into the case files.  Once a laptop had finally been located, no one

13  present knew how to sign on, so we never were able to look at any records for Prisoner H

14  or the other inmate-patients.

15       93.    Prisoner H's clinician, Dr. Ortigo, was in the unit and talked to me a bit

16  about him.  He explained that Prisoner H had had a traumatic brain injury but that the

17  records pertaining to this "have been lost."  (My subsequent records review confirmed that

18  some eight *(8) volumes* of Prisoner H's medical and psychiatric records had been lost.)

19  Dr. Ortigo proceeded to discuss the facts of Prisoner H's commitment offense with me at

20  some length, but said very little about his mental health condition.  He told me that since

21  Prisoner H arrived in the unit (May 27, 2012), he generally does not leave his cell for

22  treatment.

23

24

25  [49] The Special Master noted a similar issue from his team's August 2012 inspection:

26  "[C]linicians had limited access to information from the electronic charts due to lack of

laptop computers and eUHR terminals in segregation."  Special Master's 25th Round

27  Report, p. 137 (*Coleman* Dkt. No. 4298).

28

[752643-7]

94.     The records that I subsequently reviewed indicated that Prisoner H was moved from EOP to CCCMS status in early December 2012.  Later in the month an IDTT entry noted "deterioration in his functioning," along with "grave disability" which the team thought might be due to the reduction in his level of care.  However, when he refused to leave his cell in order to be transferred from Ad Seg, he was housed instead in a management cell on the unit.  Not surprisingly, Prisoner H deteriorated even further in the highly dangerous Ad Seg management cell.  At the time of our tour, Prisoner H had been in Ad Seg for 256 days.

### c.     Staffing Shortages

95.     At our initial orientation meeting at Mule Creek, we were told that the mental health staff levels at the prison had "improved."  Specifically, staff said that primarily because the prison had been so significantly understaffed for so long, the new CDCR "standardized staffing" model, implemented in July 2012, resulted in MCSP retaining most of its previous staffing allocations, despite the reduction in its overall prisoner population.  However, it became clear that here, too, very significant overcrowding-related problems remained.  Indeed, the mental health staff supervisors who attended the orientation meeting noted that, although the overall vacancy rates had dropped, mental health staffing was "still a problem."  For example, the Chief Psychiatrist position at the prison is currently open and has been since July 2011.  In addition to that open position, MCSP has 5 psychiatrist vacancies (out of 12, for a vacancy rate of 42%), with 2.5 of those currently covered by contractors.[50]

96.     The situation for psychologists was slightly better but hardly adequate: of 32.5 positions, there are 10.5 open (for a vacancy rate of 32%), with just one contractor.

---

[50] Mule Creek reported to the Special Master that, during the last round of monitoring, psychiatric medication non-compliance issues were "in part … due to staffing shortages," and that psychiatrists attended inmate patients' treatment team meetings just 58% of the time.  Bien Decl. Ex. 18, at 7 & 9 of 15 (MCSP 25th Round Management Report).

[752643-7]

1    Similarly, of 18 social workers allocated to the prison, there were 10 on staff (a vacancy

2    rate of 44%) and of the 16 allocated recreational therapist positions, 9 were filled (also a

3    vacancy rate of 44%).  We were also told that one Chief Psychologist position and the

4    Correctional Health Services Administrator position were being held vacant as "cost

5    savings."  Dr. Telander, currently the only Chief Psychologist, stated that his

6    responsibilities were substantial, and that the hiring of a second Chief Psychologist would

7    be very helpful.  As discussed earlier, I understand that CDCR has chosen not to allocate

8    any second Chief Psychologist positions at any institutions for purposes of "providing

9    salary savings," identifying the position as "non-critical."[51]

10       97.      Staff-related shortages of some sort appear to be longstanding at Mule Creek.

11   The *Plata* Receiver's MCSP Operational Assessment and Facility Master Plan Report,

12   conducted December 18-20, 2007, documented some of them.  The Receiver made

13   reference to a staff that "obviously [takes] great pride … in the institution"—a reference

14   that I would endorse, then and now—but went on to identify a number of serious

15   overcrowding-related "barriers to care" that included staffing shortages and "an immediate

16   need to expand services" to EOP inmate/patients at Mule Creek "in order to provide 10

17   hours of therapeutic services as required under the *Coleman* Program Guides."[52] At that

18   time, the primary concern appeared to be the lack of escort staff; presently, however, the

19   "barriers to care" pertain more particularly to the lack of mental health staff.

20       98.      At the time of the Special Master's visit in August 2012, the prison reported

21   that it was "in the process of hiring staff to fill newly-created positions, the effect of which

22   was to elevate the vacancy rate in mental health."[53] Yet, as I noted above, at the time of my

23

24   ───────────────

25   [51] Declaration of Diana Toche in Support of Motion to Terminate, *Coleman* Dkt. No.
     4275-3 ¶ 6.

26   [52] 10/30/08 Haney Report ¶¶ 199-200.

27   [53] Special Master's 25th Round Report, p. 129 (*Coleman* Dkt. No. 4298).  Mule Creek's
     25th Round Management Report stated, under the heading "Obstacles to Providing Mental

28                                                            (continued…)

[752643-7]

1    visit some five (5) months later, in February 2013, most of the vacancy rates that the

2    Special Master reported were approximately the same or worse (including for the Chief

3    Psychiatrist, psychiatrists, recreational therapists).  In addition to the vacancy rates, the

4    Special Master concluded that the mental health supervisors' poor attendance at the quality

5    management meetings was "due to staff turnover."[54] Finally, the Special Master identified

6    several other problems that may have been the result of staffing (or training) problems at

7    the institution, including the failure to "routinely track" custody wellness checks, and the

8    fact that "a third of the 739 inmates placed into segregation during the review period did

9    not receive a pre-placement screen."[55]

10         99.    These above-cited and substantial mental health staff shortages limit the

11   prison's ability to provide appropriate programming for *Coleman* class members, a

12   complaint I heard repeatedly from individual class members themselves as I toured the

13   prison and spoke with them.  Not having sufficient staff to provide appropriate mental

14   health programming to the institution's substantial mentally ill population serves to

15   undermine many positive steps Mule Creek has taken in the aftermath of ridding itself of

16   its traditional "bad beds."  And there certainly have been some.  For example, at the initial

17   orientation meeting, we were informed that some badly needed construction projects had

18   been completed at the prison.  There was an EOP modular "build-out" on B yard, a

19   CCCMS modular "build-out" on C yard, and a conversion on A yard to upgrade clinical

20   space.  Staff reported that this additional space had improved the ability to deliver mental

21   health services.

22   _____

(… continued)

23   Health Services and Adherence to Program Guide Requirements," that created by staff at
     the institution, likewise noted that "[t]he Chief Psychiatrist position is advertised but

24   continues to be vacant. In addition a staff psychologist is acting as the senior psychologist
     supervisor for the ASU Mental Health Program."  Bien Decl. Ex. 18 at 2 of 15 (MCSP

25   25th Round Management Report).

26   [54] Special Master's 25th Round Report, p. 130.

27   [55] Special Master's 25th Round Report, p. 131.

28

100.    However, when we toured the mental health treatment area in Facility B, which houses Level III SNY EOP inmates, the Chief Psychologist told me that they are able to provide only about 7-8 hours of group each week for the EOPs.[56] Although they have the space to do more, he said, "we don't have the staff." He also said he could use more space like this and was hoping to get it.  At the time we toured this unit, there were several groups in progress, and a few individual consultations underway, in which prisoners were sitting across from clinicians, unrestrained.  It appeared to be the kind of contact that the EOP prisoners all reported to me that they badly needed but repeatedly said they were not getting in remotely the Program Guide-mandated amounts.

101.    The new EOP treatment center (Facility A, Level IV) was converted into a relatively pleasant and functional space, about half of which was devoted to offices and about half to treatment.  It had once been used for vocational training and prison industries (which I learned had not been moved elsewhere inside the facility and were lost permanently to the prison).  There were two groups in session when we entered (at around 1 PM), and in one of them the group leader was showing a film (that at least appeared to be educational rather than a commercial movie).  The Chief Psychologist indicated that he thought they were able to deliver between 7-8 hours of treatment "or just under that" per week.  He also said that the most direct challenge to being able to deliver close to the required amount of treatment, or even doing better, was "staff shortages."

102.    In the CCCMS area, we spoke with Dr. Wilcox who runs the program.  He explained that his staff sees inmates every 90 days and "as needed."  Each clinician has a caseload of about 150 inmates each, who are brought to the clinicians' offices.  They are only able to run a few groups for the CCCMS patients, saying "we have waiting lists to get

_____

[56] The Special Master expressed concerns about this as well, for example, noting that, at MCSP: "Mainline EOP inmates were offered an average of 6.9 hours of therapeutic activity per week.  This deficit in hours was due in part to the institution's strict adherence to schedules for locking and unlocking housing unit doors, which often resulted in missed or abbreviated sessions for EOP inmates."  25th Round Report, pp. 138-139.

[752643-7]

1    into groups … we don't offer a lot of groups so it takes weeks." He noted that the whole

2    yard is SNY but that they did not currently offer any groups that dealt with the special

3    mental health challenges of being an SNY prisoner (such as a group for sex offenders). He

4    also noted that they sometimes had an issue with the mixing of the EOP, CCCMS, and

5    SNY general population prisoners on the yard: "It is a major concern of ours and we watch

6    out for it."

7         103.    When we entered Building 6 on B Yard (EOP-Level III yard), I interviewed

8    several prisoners. Prisoner I told me that "a lot of the programs—groups—are cancelled."

9    He said that it is not uncommon for the prisoners to get called out to group, go over to the

10   treatment center, only to find that the groups are not going to take place after all. The

11   prisoners then have to stay there until the next institutional unlock. In fact, Prisoner I said

12   that he thought about a third of the groups were regularly cancelled, estimating, for

13   example, that among the last eight (8) scheduled groups, 3 were cancelled. He said:

14   "Sometimes group just checks you in, then releases you, with no group taking place. Or

15   instructors just show films and say, 'think about it.'" But he says some of the groups are

16   good and, in any event, he likes the social contact. He told me that he was waiting for a

17   transfer to a Level II facility, but that there was a shortage of EOP beds at that lower

18   custody level.

19        104.    Also in Building 6, I interviewed Prisoner J, a 22 year old prisoner, who told

20   me he suffers from bi-polar disorder. He was recently in Ad Seg for about four (4)

21   months. He said his time in Ad Seg was so empty that he had almost no memory of the

22   four (4) months he spent there. Prisoner J told me that he too is on a waiting for a Level II

23   EOP SNY bed. He likes to go to groups but said that the groups usually consist of just

24   videos, and also often get cancelled.

25        105.    In the same housing unit (B Yard, Building 6), I interviewed Prisoner K, an

26   EOP inmate-patient who had come from Wasco as a CCCMS, in August 2011. He said he

27   had been raised to the higher EOP level of care at Mule Creek in July 2012. Prisoner K

28   seemed very anxious and unstable. He knew his clinician's name but complained that the

1  clinician did not help him, and had refused put him in groups (even though Prisoner K said

2  he wanted to participate in them).  He complained about the lack of treatment and activity:

3  "I'm not getting any treatment for my problems.  I haven't been in one group inside the

4  treatment space, ever.  I go to my clinician's office once a week—10 minutes."  Prisoner K

5  said that, other than a shower every 72 hours, "I have no program."  His clinician

6  (Dr. Meeker) said he was attending treatment 30% of the time, and had been to DSH

7  previously in the last year.  My review of his records show that he had a history of suicidal

8  gestures and acts of self-harm, including cutting his wrist and biting and punching himself

9  in the face.  He had been referred to ICF level of care on January 10, 2013 but as of March

10  1, he was still at MCSP (per CDCR Inmate Locator).

11        106.   As I have noted, reductions in the profound levels of 200% or more of

12  overcrowding that were once commonplace at Mule Creek allowed for the spaces that had

13  been filled with bunks to be returned to their original purposes.  But persistent

14  overcrowding-related problems have frustrated that transition as well.  Warden Knipp

15  proudly told us that the gyms, once filled with prisoners and bunks, were now used for

16  recreation purposes by the prisoners.  We passed by the doors to the gyms, which no

17  longer contained bunks and were in fact empty.  But they were also locked and had no

18  prisoners or recreational activities happening, even though prisoners were on the yard and

19  it was raining outside.  An MCSP staff member who accompanied us on the tour indicated

20  that, although the gyms had been emptied of bunks, and could be returned to their original

21  purpose, the prison lacked the custody staff to keep them open for recreational use on a

22  regular basis; he said that, given the staffing situation, the gyms were only used on the

23  weekends.

24              **d.    Use of "Bad Beds" due to Lack of Appropriate Beds**

25        107.   As was true of all four prisons I inspected, MCSP experienced unacceptable

26  backlogs in transferring class members because of the lack of appropriate beds elsewhere

27  in the system.  This meant that mentally ill prisoners were being held in inappropriate

28  housing for longer than Program Guide-specified lengths of time.  In some cases, the

1   negative impact on their mental health, behavior, and institutional well-being was readily

2   apparent.  These backlogs affect more than a tiny or insignificant number of inmate-

3   patients who happen to have gotten caught up in some kind of random error or aberrational

4   institutional snafu.  They are instead the predictable consequence of operating a prison

5   system that still has far too many prisoners and far too few staff, too little appropriate

6   treatment space, and simply not enough viable housing options to adequately address their

7   mental health needs.  Indeed, MCSP staff gave us a "List of Inmates Awaiting Transfer"

8   showing that there were approximately 35 EOP prisoners at the institution, currently being

9   housed in a higher-than-appropriate security level EOP program while waiting for a Level

10   II EOP SNY bed to become available for them.[57]  There were 6 more EOP prisoners

11   waiting for a transfer to another EOP SNY yard and most of them were being housed in

12   Ad Seg.

13       108.   My observations about MCSP's problems in placing mentally ill prisoners in

14   appropriate beds were consistent with those made by the Special Master at the time of his

15   August 2012 tour.  He noted, for example, that during the 6 month reporting period:

16   "Access to DSH continued to be slow.  Nearly 45 percent of the 18 referred inmates were

17   not transferred to DSH within required timeframes…  The average delay between referral

18   [for acute care] and transfer was nearly 19 days."[58] In addition, the Special Master found

19   that nearly a third of the prison's 57 MHCB admissions to the crisis care unit lasted longer

20   than 10 days, and that "[a]pproximately 40 percent of the prolonged stays involved inmates

21   waiting for DSH beds."[59] Finally, he reported that "[d]emand for crisis care at MCSP

22   exceeded MHCB capacity, thereby necessitating the continued use of six MHOHU beds in

23   an overflow segregation unit."  Of the 150 such MHOHU placements (discussed below),

24

25   _____

26   [57] Declaration of Jane Kahn Filed under Seal ("Kahn Decl. (filed under seal)") Ex. 2.

26   [58] Special Master 25th Round Report, p. 134 (*Coleman* Dkt. No. 4298).

27   [59] Special Master 25th Round Report, p. 134.

28

1  17% lasted longer than 72 hours, for the most part "attributed to lack of space in housing

2  units."[60]

3       109.    These problems were illustrated in the numerous individual cases of many of

4  the prisoners with whom I spoke at Mule Creek.  Prisoner B, whose case I mentioned

5  above, is a Level III EOP who was being held in the C-12 Ad Seg for his own safety while

6  awaiting a transfer to an appropriate bed.  He told me that he has been taking psychotropic

7  medications for approximately 20 years but that, when he arrived at Mule Creek, the

8  medications were taken away.  His records show that he had discharged from a DSH

9  inpatient program at CMF to MCSP, where he was placed in the OHU for one day and

10 then to Ad Seg.  Upon his arrival from DSH to MCSP, a psychiatrist met with him and

11 discontinued his medication, apparently because Prisoner B failed to respond to his

12 questions.  After this, he was not seen by a psychiatrist to discuss medications until his

13 IDTT meeting nearly two months later, on January 9, after he had spent additional time in

14 a crisis bed.  The case is concerning for a variety of reason: Prisoner B had been stabilized

15 in an inpatient facility and, upon return, was placed directly in the harsh settings of the

16 OHU—where he had no bed and had to sleep on the floor—and then to the Ad Seg, where

17 his treatment and out-of-cell time continued to be significantly limited.  In my experience,

18 this return for inpatient level of care treatment to the harsh segregation environment is

19 dangerous.  In addition, the medication prescribed by the DSH psychiatrist was stopped

20 without explanation.

21       110.    In B Yard, Building 7, I spoke with Prisoner L who was a 37 year old man

22 with apparent medical problems, wearing an eye patch.  He was very frail and said that he

23 thought he had lost as much as 100 pounds over the last 5 years.  He also seemed to be

24 psychotic when I spoke to him, for example, explaining that there were devices located

25 throughout his body that were affecting him physically and mentally.  He told me that he

26

27 [60] Special Master 25th Round Report, pp. 134-135.

28

1    had moved back and forth between CCCMS to EOP levels of care, and that he thought he

2    was on the list to be transferred to a mental hospital, but he did not know which one or

3    when it might come through.  I later learned from his institutional records that he was, in

4    fact, referred for ICF level of care.  However, as of March 1, 2013, he was still at MCSP

5    (per the Inmate Locator.)

6         **e.      Extremely Harsh Conditions for Prisoners Placed on
              Suicide Watch or Suicide Precautions**

7

8         111.   I also toured the MHOHU in the very unusual Building C-13, which appears

9    relatively unchanged from the last time I was there, in November, 2007.  This unit has a

10   chain link fence separating about one-third of the unit, with "A Section" serving as an Ad

11   Seg unit and the other side operating as a GP SNY for Level III inmates.  The MHOHU is

12   located here, and consists of a row of cells on the bottom floor.  It was empty the day I

13   visited, although the cell logs showed that, in the 17 days preceding our tour, there had

14   been at least one prisoner in the MHOHU every day but three.[61]  Prisoners are brought to

15   the unit in handcuffs and leg irons and then are clinically evaluated.  The MHOHU cells

16   are completely bare, except for a thin mattress on the floor, and prisoners are kept in these

17   cells clothed only in suicide smocks for the duration.  There was some confusion about the

18   purpose of MHOHU confinement.  The sign on the wall near the doors of the cells clearly

19   indicated "suicide watches," as shown in **Photo Exhibit L** yet the staff insisted "we don't

20   place people who are suicidal in here."  We were told that the MHOHU generally receives

21   about 18 patients a month, and that the "overflow unit," which was in operation the last

22   time I visited, was no longer needed.  A photograph of a MHOHU cell, which is barren

23   and requires prisoners housed in it to sit and sleep on the floor, is attached as **Photo**

24   **Exhibit M**.  On the second tier of C-13, directly above the 6 MHOHU and 5 MHOHU

25   overflow cells, were additional Ad Seg cells for CCCMS and GP prisoners.

26

27   [61] Kahn Decl. (filed under seal) Ex. 3 (Cell Activity Logs for MCSP OHU, Jan. 21 – Feb. 7, 2013).

28

112.    In the CTC, Dr. Cordosi (Psychologist) discussed the operation of the unit and a number of the patients who were housed there.  Dr. Cordosi explained that just a few weeks ago the unit was completely full (all eight beds filled).  There have been some occasions in which they were completely full and had to send inmates to the OHU instead.  Dr. Cordosi said that he actually liked to use the OHU because prisoners can go there, instead of the CTC, to be evaluated, and that often "we turn them around and they don't get a crisis bed."

113.    At least along certain important dimensions, the operation of this unit appeared to be geared more toward a categorically high level of security and control, irrespective of the inmate-patient's threat level, mental health needs, or the consequences of these practices for his emotional well-being.  The Special Master expressed concern in August 2012 that "[l]ocal efforts to reduce the use of handcuffs and treatment modules in the MHCB unit were unsuccessful."  More specifically, he noted that: although "MCSP instituted a process for assessment of all inmates admitted to the MHCB for 'danger to others' … [m]ental health staff reported that even though less than 20 percent of admissions were found to be potentially dangerous to others, handcuffing and use of treatment modules were used throughout stays in the MHCB."[62] This was still the case when I visited the prison five (5) months later.  Dr. Cordosi acknowledged that the unit generally restrains all of the prisoners when they are moved internally, no matter where in the prison they have come from.  He noted that this is technically a case-by-case decision but that they essentially always use restraints.  There were four mental health patients in the CTC on the day we were there.  All had yellow signs outside their cell indicating that they were subject to use of restraints whenever they were out of their cell.

114.    In addition, we were told that treatment for patients in the CTC consisted of IDTT meetings at a conference table in a meeting room where, if the patient is restrained

---

[62] Special Master 25th Round Report, p. 136 (*Coleman* Dkt. No. 4298).

EXPERT DECLARATION OF CRAIG HANEY

[752643-7]

1   when escorted outside of his cell—and all are—he is kept in cuffs at the table for the IDTT

2   meeting.  Moreover, all patients, whether they are escorted with cuffs or not, are placed in

3   the treatment cage for one-to-one treatment sessions with their clinician.  A photograph of

4   this cage where one-to-one treatment is delivered to patients at risk of suicide is attached

5   as **Photo Exhibit N**.

### f.        Problems with Suicide Prevention

7        115.    Shortages among mental health staff may also underlie some suicide-related

8   concerns that have been raised at MCSP.  The death of Prisoner M, who took his own life

9   on June 7, 2012, helps to illustrate this point.  Prisoner M was housed in the C-12 Ad Seg

10  unit (a unit that I have addressed in some detail in Part B.1.b, above), and was at the

11  CCCMS level of care.  He had been in Ad Seg since April 4, 2012.  On June 7, 2012, he

12  received what was apparently upsetting news—that he would be transferred because of

13  enemy concerns.  He was found hanging in his cell later that day.

14       116.    In fact, Prisoner M had a history of becoming suicidal when he was

15  confronted with change—whether a transfer, placement in Ad Seg, or a move to a new

16  bunk.  He had at least two prior suicide attempts in prison.  The State's Suicide Report on

17  this case, issued July 20, 2012, identified the inadequacy of the Suicide Risk Evaluation

18  (SRE) as a contributing problem, and directed the Chief of Mental Health at MCSP to

19  facilitate the development of the Proctor-Mentor Program to provide training and improve

20  performance on SREs.  This program was in fact proposed nearly two years early in

21  Defendants' August 2010 Report filed in response to the Court's order that the State take

22  steps "necessary to address the problem of inmate suicides," which the court found "deeply

23  troubling."[63]  Dr. Timothy G. Belavich, the then-acting Deputy Director of the Statewide

24  Mental Health Program Division of Correctional Health Care Services, and Kathleen L.

25  Dickinson, the then-acting Director of the Division of Adult Institutions, signed off on the

_____

27  [63] *Coleman* Dkt. No. 3836, Apr. 14, 2010.

Quality Improvement Plan for Suicide Risk Evaluations on Sept. 7, 2012, indicating that: "No further actions are necessary."

117.    However, implementation of the Proctor-Mentor Program was for some reason delayed.  In fact, after the tour, I saw an email from the MCSP Chief Psychologist, dated January 30, 2013 (just eight days before our tour and more than six months after Prisoner M's death) to "All MCSP Clinical Staff" that stated "Welcome to the kick off for the SRE mentor program."[64]  We certainly were not told at the tour that the program had only just begun—"kicked off," so to speak; instead we were told only that "fewer than one-third" of clinical staff had been trained to date.  I was unable to determine (or even inquire about) why the delay in implementing the program had occurred because, for whatever reason, I was not told about it.  Based on my observations, it is reasonable to believe that staffing shortages and workload issues may have played a role in creating the delay.

118.    As a related matter, there was concern expressed by some prisoners that some staff apparently did not take their expressions of suicidality seriously.  For example in Building 7, in B Facility, which houses Level III EOP SNY prisoners, I interviewed Prisoner N who complained of numerous problems, including a concern that the mental health staff repeatedly ignored his expressions of suicidal intentions, even when he told them that he thinks about killing himself all the time.  He said he is uncomfortable and paranoid on the yard.  Although he told me that he goes to and benefits from groups when they are held—"the groups are helpful when they happen"—Prisoner N said he does not feel safe in most places in the prison except his cell.  He elaborated that: "People have approached me and threatened me, so I'm afraid."  He also said "I am suicidal.  I have had problems with depression my whole life.  I tell people here that I'm depressed and suicidal.

---

[64] Bien Decl. Ex. 7.

[752643-7]

1    I think about ways to kill myself.  Climbing the fence here.  Hanging myself."  But,

2    according to him, these expressions have been largely ignored.

3          119.   At the end of our tour of MCSP, we discovered some very troubling

4    information in the mental health records of some inmate-patients that may help to explain

5    the complaints I heard about clinicians who ignored expressions of suicidality.  The

6    following remarkable notation appeared multiple inmate-patients' mental health records:

7    "Given base rate of 15-20 suicides per 100,000, inmate-patients annually in CDCR, in light

8    of current low risk, per Bayesian analysis, suicide in the foreseeable future secondary to an

9    Axis I disorder not likely.  MHCB/DMH will not reduce this risk substantially compared

10   to EOP to justify their greater restrictions and allocation of resources."[65]

11         120.   Although I am not able to evaluate this entry from a purely clinical

12   perspective, it does seem to reflect a fundamental misunderstanding of the CDCR's suicide

13   prevention policy and, frankly, has disturbing implications.  Taken on its face, it appears to

14   be a categorical justification for *never* initiating higher levels of MHCB/DMH care in

15   response to an inmate's expression of suicidality.  The assertion also clearly implies that

16   the use of the SREs is unnecessary and irrelevant (since judgments about the appropriate

17   course of action with any particular inmate can and should be governed by "Bayesian

18   analysis").[66]

19

20   _____

21   [65]  Kahn Decl. (filed under seal) Exs. 4 & 5.  Bayesian analysis is essentially a statistical
     approach that focuses on conditional probabilities.  I am not aware of its use in mainstream
22   clinical psychology assessments of individual patients.  In any event, I find it extremely
     troubling that it appears to be used here as the basis for finding a *reduced* suicide risk for
23   patients in a setting (Ad Seg) where the suicide rate is extraordinarily high.

24   [66] It is notable that the Special Master has also recently expressed concerns about the
     infrequent use of SREs at MCSP.  Although staff attributed the deficiencies to "paperwork
25   and data entry" problems, the Special Master's audits "found that SRE's were completed
     for only a third of inmates admitted to the MHCB unit for suicidal behavior, and for fewer
26   than half of inmates upon discharge."  Special Master 25th Round Report, p. 136
     (*Coleman* Dkt. No. 4298).
27

28

121.   Equally problematic is the fact that the base rate calculation on which the assertion is premised is clearly erroneous.  For one, the overall rate of suicide in the CDCR is above 15-20 suicides per 100,000; the persistent elevation of the CDCR's suicide rate above the national average is the subject of ongoing and serious concern; the use of the lower, erroneous rate raises questions about what, if any, suicide-related training the clinician(s) who made these entries actually have had.  Second, it ignores the fact that, depending on the particular characteristics of the inmate (per SRE and other indicators) and the particular setting in which he is housed (such as whether he is in segregated housing), the probabilities of suicidal behavior and a successful suicide itself may be multiplied many times above any overall "base rate."  This erroneous, generic "base rate" analysis of suicidality was being applied—with potentially tragic results, in my opinion— for inmate-patients (such as Prisoner G and Prisoner B, discussed above) who have documented past suicide attempts and who were housed in a CDCR segregation unit (where the base rate for suicide is approximately 150 per 100,000 inmate-patients,[67] nearly 10 times the rate the clinician was using).  It is hard to imagine a more flawed (or more dangerous) approach to suicidality.[68]

## 2.   California Institution for Men (CIM)

### a.   Overview

122.   When I previously toured the California Institution for Men (CIM) in Chino, on October 29, 2007, it was operating at over 200% of capacity, with a very large

---

[67] *Coleman* Dkt. No. 4325 at 88.

[68] In the case of Prisoner B, just four (4) days after his return from DSH inpatient care, and while he was in the MHOHU for crisis evaluation, the same clinician who utilized this problematic "base rate" analysis stopped this patient's medication without clear explanation.  In fact, the documented treatment plan consisted of the following:  "No medication … as the clinical emphasis should promote his taking ownership for his safety rather than expecting others to do it for him," and "Continue EOP, though I support CCCMS or GP [*i.e.*, lowering the level of care or removal from the mental health system] if he continues to complain yet reject help."  Kahn Decl. (filed under seal) Ex. 5.

1   population of Reception Center inmates, some 90% of whom were parole violators who

2   often served their entire terms in reception.  The 1,530 *Coleman* class members housed at

3   CIM comprised approximately 25% of the nearly 7000 prisoners who were housed at

4   CIM's four separate facilities (which included Ad Seg units in Palm, Cypress, and sections

5   of Birch Hall).  I identified numerous problems with the conditions and operation of the

6   institution that were primarily caused by the serious overcrowding at CIM and elsewhere

7   in the system and which adversely affected the delivery of mental health services.  Those

8   problems included lack of appropriate treatment and office space, severely overcrowded

9   housing units, the placement of vulnerable class members in dangerous and inappropriate

10  settings, and the frequent and prolonged confinement of EOP and CCCMS prisoners in Ad

11  Seg where they received little treatment and were exposed to especially harsh conditions.

12          123.    My most recent *Coleman*-related tour of CIM occurred on February 12,

13  2013.  At the initial orientation meeting, the Acting Warden Brenda Cash and Chief

14  Psychologist Vic Jordan noted that there has been a significant reduction in the Reception

15  Center mission of the facility.  At one time, the Reception Center dominated CIM, which

16  was receiving 92 new prisoners per day; we were told that it was now down to

17  approximately 12 prisoners per day.  Staff reported that most of their Reception Center

18  prisoners now come from San Diego County.  Over the preceding several years, and in

19  response to Realignment, parts of CIM were "repurposed" when the old Reception Center

20  East became a Level III SNY CCCMS yard, which is now referred to as C Yard.  The

21  overall population has been reduced to 4,628, or **155.5% of design capacity**.  However,

22  the mental health caseload at the prison has not been appreciably reduced; the day we were

23  there it consisted primarily of CCCMS inmates (which numbered approximately 1392 the

24  day) and a smaller number of EOPs (a total of 55).  The total of 1447 represents a net

25  reduction of only approximately 83 *Coleman* class members since 2007 (and almost no

26  reduction since mid-May 2012, at the time of the Special Master's inspection, when 1469

27  *Coleman* class members were reportedly housed there).

28

124.    Staff told us at the orientation meeting that the number of mentally ill prisoners housed in Ad Seg was down to 60 (from over 100).  Later in the tour, however, we learned that this count did not reflect actual numbers.  Many mentally ill (and non-mentally ill) prisoners had been placed in an Ad Seg unit solely because of a "Lack of Beds" at the institution and/or in the CDCR; indeed, as I discuss in more detail below, CIM staff has minted a new classification category or term to apply to such prisoners in Ad Seg for this reason—"LOB."  We were told that because these prisoners were not considered or reported as "Ad Seg" prisoners—they were on "LOB" not "Ad Seg" status—they did not count as being in Ad Seg (even though they clearly were).  I was unable to get a complete count of the total number of mentally ill prisoners who were actually being housed in an Ad Seg unit, including for disciplinary reasons, safety concerns, and "LOB."

125.    After the morning orientation meeting, my tour of CIM began with a visit to the unlicensed MHCB on D-Yard.  I then visited the B Facility (formerly CIM-Central), including the Reception Center mental health offices, the Reception Center housing for EOP and CCCMS (Madrone Hall), Administrative Segregation Units (Cypress Hall and Palm Hall), and Angeles Hall on A-yard (formerly Reception Center West), a dorm setting that houses General Population, CCCMS, and EOP prisoners.

126.    In the course of my tour, I observed a number of severe problems that compromised the delivery of adequate mental health care for the *Coleman* class members at CIM.  Once again, these problems are closely related and inherently tied to the persistent overcrowding at the institution and elsewhere in the CDCR.

### b.    Lack of Appropriate Treatment Space

127.    In the past, CIM was severely challenged by a lack of appropriate treatment and office space.  Acting Warden Cash and Chief Psychologist Jordan told me that there had been some construction at the prison that included new treatment and office space, which the staff reported had improved the quality of care to non-Ad Seg CCCMS and EOP inmates.  In addition, as the Special Master reported, the overall number of admissions to

[752643-7]

1 the MHCB unit had declined over the preceding years (perhaps because of the overall

2 decline in the prisoner population and the many fewer Reception Center inmates who were

3 arriving at the prison), and the very problematic "transitional bed housing overflow unit"

4 was closed.[69]

5       128.    However, despite this additional space and the reduction in the overall

6 population at the prison, there was still a need for more clinical space at CIM.  Thus

7 Dr. Jordan told us that CIM had submitted a request for additional treatment beds, for the

8 D Facility CCCMS mainline, but a plan for such beds had not yet been approved.  The

9 Health Care Facility Improvement Program (HCFIP) included a project to create new

10 treatment space for EOPs in the B Facility; this is currently slated to *start* construction in

11 Q3 2014.  He told us that the creation of additional Ad Seg treatment space was initially

12 included in the HCFIP, but has been eliminated from any construction plans.  Thus, there

13 is no plan to improve or build new treatment/office space for the Ad Seg at CIM, where

14 many of the treatment problems are and have long been concentrated.

15       129.    We began our physical tour of the facility at the unlicensed MHCB, where

16 treatment space issues were immediately apparent.  (I understand that the MHCB, which is

17 not licensed under California state law, is able to operate solely due to the *Coleman*

18 Court's order waiving state laws in light of the emergency lack of MHCBs in the system.)

19 On the way into the unit, we encountered a large number of Reception Center inmates who

20 were sitting in large holding cages—as many as ten (10) in several different cages, all in

21 restraints—waiting to receive medical or mental health screening.  Several of them told me

22 that they had not yet had their breakfast or lunch, and that sometimes inmates will wait as

23 long as five (5) or more hours in the cages before being seen and returned to their housing

24 unit.

25

26 _____

27 [69] Special Master's 25th Round Report, p. 352 (*Coleman* Dkt. No. 4298).

28

130.    In the MHCB unit, we learned that there were a total of 14 patients being housed on one side of the unit, but that six (6) of them were being held past their "discharge" dates.  At the time we toured—9:30 AM—about half of the 14 patients there were lying on the floor, with their blankets pulled up over their heads.  The unit has the distinct feel of a disciplinary segregation unit—there are solid steel doors, and completely bare cells.  In addition, all of the mental health staff on this side of the MHCB were wearing protective plastic face shields in addition to thick protective vests.  Dr. Jordan explained that "all of us wear them when we talk to max prisoners."  (Staff on the other side of the MHCB unit were not required to wear the face shields.) We were told that all of these inmate-patients who were being seen for individual clinical contacts or for their treatment team meetings were placed inside a cage in the unit's "multi-purpose room" (which held many cages) or in a small office.  These strange and inhospitable treatment settings are depicted in **Photo Exhibits O and P**, respectively.

131.    We next toured the B Facility mental health clinic, passing by a long row of men in cages, waiting for their mental health appointments.  This is where the Reception Center (RC) inmates are seen, including about 155 CCCMS and 42 EOPs.  We were told that the RC CCCMS inmate/patients are seen at the 30 day mark, to determine whether they are at the appropriate level of care, and that they have their medications reviewed by a psychiatrist at roughly the same interval.  There is no group program for the CCCMS RC inmate-patients.  The wing where the consultations and evaluations take place was pleasant and quiet.  One of the clinicians with whom we spoke, Dr. Lindsay, said that it was "hard to move SNY EOP prisoners," even after they are endorsed, because there are "no beds elsewhere in the system to put them in."  He was also candid about the limited nature of programming in the RC: "Reception sucks" he said bluntly, and the prisoners "don't have yard time as much as they should, or out of cell time."[70] As we left this area of the prison,

---

[70] The Special Master had identified a number of programming-related problems in the

(continued…)

1   Dr. Lindsay commented in passing on the makeshift nature of the space that was available

2   for use at CIM, and the challenges that the mental health staff still face in trying to meet

3   their treatment responsibilities: "The guy who designed this place should be

4   horsewhipped," he said, "it's just not built right."

5        132.   In 2007, the treatment of *Coleman* class members in CIM Ad Seg units was a

6   major concern.  I wrote in my report at the time that:

> Mental health clinicians, who had recently begun implementation of the EOP
> Reception Center groups in cages set up in Cypress, confirmed that there was
> a very high refusal rate for the caged groups and that they would try to visit
> these men cell-front.  In order to enter the Ad Seg tier, however, everyone is
> required to wear not only a protective vest but also a plastic face mask.[71]

10        133.   The problem of the "very high refusal rate for caged groups" persists and

11  has taken on additional dimensions.  Dr. Jordan had noted at the morning orientation

12  meeting that CIM had tried to "incentivize" the inmates' participation in treatment and

13  IDTT meetings in Ad Seg but acknowledged that the attempt was not very successful.  In

14  fact, a report written by a trio of experts who were hired by the Defendants in this

15  proceeding also "noted an issue in regard to administrative segregation inmates'

16  willingness to participate in treatment at all levels of treatment."  They reported having

17  observed that "five administrative segregation inmates in a row refused to come out for

18  their Interdisciplinary Treatment Team meeting, which indicates that inmates may have

19  difficulties with forming therapeutic alliances with the treatment staff.  CDCR has a policy

20  _____

21  (… continued)

   Reception Center when he visited in mid-May 2012:

> CIM did not meet Program Guide requirements in many areas of its
> reception center program during the monitoring period.  For EOP inmates,
> the institution was noncompliant with initial and follow-up IDTT meetings,
> initial psychiatry contacts, and follow-up primary clinician contacts… The
> institution was not compliant with the requirement that inmates receive five
> hours of structured therapeutic activity per week.

   Special Master 25th Round Report, p. 354 (*Coleman* Dkt. No. 4298).

[71] 10/30/08 Haney Report ¶ 122.

EXPERT DECLARATION OF CRAIG HANEY

[752643-7]

that addresses inmates who refuse therapeutic groups and staff stated that they followed this policy and therefore inmates refusing care are appropriately monitored."[72]  Perhaps in response to this feedback, one of the recent QITs at CIM specifically addressed treatment compliance in the Ad Seg unit.  The staff estimated that over the years they have had an approximately 50% refusal rate for treatment in the Ad Seg, and Dr. Jordan conceded that they have "always had difficulty there."  He said that CIM staff went to other institutions to evaluate how they were handling this problem.  However, senior staff acknowledged that the efforts to improve the situation have not been "brilliantly successful."  This was borne out by our observations later in the day, as described below.

134.    We toured the Ad Seg units midday, entering the Cypress unit first.  We had been told that IDTT meetings were scheduled to take place at around that time and, in light of the continuing problem with inmate participation and the institution-initiated QIP to address the issue, we hoped to be able to sit in on several of them to assess whether and how things had improved.  However, when we got to the room where the IDTT meetings were to take place, we found a dispirited group of staff sitting around a large table, and no inmate-patients.  *Of the nine (9) scheduled IDTTs for the day, every single inmate had refused to attend.*  The 11 staff members present—which included a psychiatrist, several psychologists and social workers, as well as at least one custody staff member—seemed to be motivated and thoughtful, committed to addressing the needs of the inmate-patients, but they were at a loss to figure out what was wrong or how they might go about remedying this lack of participation.[73]

---

[72] Report of Dvoskin, Moore, & Scott, p. 23 (*Coleman* Dkt. No. 4275-5 at 25 of 41).

[73] When he visited the prison in mid-May 2012, the Special Master noted that "documentation indicated that most clinical contacts for administrative segregation EOP inmates were brief 'check ins' and that 64 percent of them occurred cell front."  In addition, he had a less than positive view of the nature of the IDTT meetings:  "There was little engagement with the inmate and minimal discussion of clinical interventions.  DSH consideration was not integrated into the treatment team process.  Diagnostic formulations

(continued…)

[752643-7]

135.   After a thoughtful discussion with staff, there seemed to be at least two plausible explanations for the problem.  One was the very large size of the (11-person) group, whose members were seated in a formal and seemingly intimidating fashion around the long table.  The second was the general atmosphere that pervaded the room itself.  A long row of treatment cages was lined up against the back wall of the room, directly across from where the patient would be seated during the IDTT meeting.  In addition to this, the meeting table is surrounded by individual offices that each hold a treatment cage inside.  In short, it is an unwelcome and intimidating setting, as can be seen in **Photo Exhibit Q**.  The mental health staff also acknowledged that, although they try very hard, many inmates refuse to come out of their cells to attend individual mental health consultations.  The groups for both Ad Seg units also meet in this room, and we were told that they, too, experience quite a few refusals.  Staff reported certain "cultural" concerns among the prisoner population that they thought impacted treatment participation in Ad Seg, but given my observations and interviews with the mentally ill prisoners, institutional and systemic obstacles like those described above clearly play a substantial role.

### c.     Staffing Shortages

136.   CIM, like the other prisons I toured, was facing some important staffing shortages that appeared to place a great deal of pressure on the existing staff and to impact the treatment delivered to the mentally ill population at the institution.  This was most apparent in the area of psychiatry.  The position of Chief Psychiatrist remains vacant, and the overall shortage of psychiatrists is problematic.  We were told that the facility has 14.5 psychiatrist positions allocated and 10 filled (a vacancy rate of 31%, although two (2) psychiatrists were apparently out on leave).  In addition, CIM reported to the Special

_____

(… continued)

and treatment interventions were problematic, and supervisory staff provided minimal guidance or feedback."  Special Master 25th Round Report, p. 355 (*Coleman* Dkt. No. 4298).  Since we were unable to observe an actual IDTT meeting in progress, we could not determine whether this was still the case.

[752643-7]

1   Master at the time of his May 2012 tour that the institution faced this "obstacle" to

2   providing mental health services: "There was a hiring freeze for Mental Health positions

3   and, as a result of Assembly Bill 109, a reduction of 2.5 senior psychologist supervisor

4   positions and 14 staff psychologist positions during the reporting period.… The office

5   services supervisor (OSSII) and health program specialist (HPSI) positions could not be

6   filled due to the hiring freeze. This resulted in a significant reorganization of staff

7   assignments throughout the institution and increased supervisory responsibilities."[74]

8       137.    The impact of the overall shortage of psychiatrists was illustrated in the

9   course of our visit.  In the Ad Seg IDTT meeting and discussion that we had with the

10   mental health staff, the psychiatrist present lamented the fact that the institution was

11   "down" several psychiatrists.  Indeed, he was a senior psychiatrist who was pulled away

12   from his duties that day in order to ensure that there was at least one psychiatrist present

13   for the scheduled IDTT meetings (even though, as I described above, no patients actually

14   attended the IDTTs that day).

15       138.    The State's experts saw another concerning consequence of insufficient

16   staffing.  The State's expert Jacqueline Moore reported that because CIM "doesn't have

17   sufficient staff to concentrate on all of the inmates," the could not provide discharge

18   planning, including to "fill out the social security applications, make sure people had

19   housing, other therapies" for two-thirds of CCCMS inmate-patients "due to caseload."

20   This was due to the plain fact that "there were more CCCMS prisoners at CIM than there

21   were staff available to do discharge planning" for them.[75] In my opinion, the combination

22   of overcrowding and staffing shortages at the institution were having far-reaching and

23   negative effects on inmate-patients, both during their incarceration and as they prepared

24   for release into the community.

25   _____

26   [74] Bien Decl. Ex. 19, at 9 of 21 (CIM 25th Round Management Report).

27   [75] Bien Decl. Ex. 6 (Moore Deposition Tr. at 179:5-180:12).

28

#### d.      Lack of Meaningful Treatment and Inmate Idleness

139.    A persistent complaint voiced by a number of inmate-patients with whom I spoke throughout the day concerned the lack of meaningful treatment, programming, and activity.  In some instances, these complaints were exacerbated by the inappropriate housing to which the prisoners were being subjected largely because, even with the reductions in its overall population and change in mission, CIM continues to operate with too few resources and too little flexibility to address the needs of its prisoners.  Staff psychologist Dr. Hewitt provided us with data on the number of hours EOP prisoners at CIM were supposedly receiving each week.  He agreed that they had been struggling for the last several months to provide adequate weekly treatment to EOP prisoners at the institution.  For example, he provided data showing that, from November 2012 to January 2013, only 35% of EOP prisoners at CIM were receiving even five hours of treatment per week.  Dr. Hewitt described some of the efforts that the institution had made to improve these numbers, and for the first week or so of February, it appeared that treatment hours had increased somewhat.  Dr. Hewitt identified several challenges on this issue, including space constraints, escort issues, inmate movement challenges, and yard and treatment scheduling conflicts—all of which are directly or indirectly related to continuing overcrowding issues.

140.    As I noted above, the lack of adequate treatment time in the Ad Seg units seemed to be caused in part by the harsh and inhospitable environment in which much of it took place.  Mental health staff in the Cypress Ad Seg IDTT meeting with whom we met told us that although they did try to schedule groups there—as many as seven (7) sessions per week—they typically attracted no more than five (5) patients to participate in each session.  This worked out to well below one hour per week per MHSDS prisoner for the scores of CCCMS patients and several EOP patients housed in the Ad Seg at CIM.

#### e.      Use of "Bad Beds" due to Lack of Appropriate Beds

141.    We were aware of another recent QIT initiative at CIM that focused on achieving level of care referrals within required timeframes.  Dr. Jordan acknowledged that

1  they "have had trouble with that."  He said the problem is mostly attributable to lack of bed

2  availability in the system.  Dr. Jordan noted that Level II SNY EOP beds are a "major

3  problem" (which we also heard at MCSP) given that the only EOP SNY Level II program,

4  at SATF, has a lengthy waitlist, and there is no real EOP capacity at CIM (as confirmed in

5  the CDCR's monthly data for CIM mental health programs).

6       142.   The State's data confirm as much.  For the week of the tour (the week of

7  February 11, 2013), *none* of the 15 EOP inmate-patients for whom the institution requested

8  transfer from CIM to an appropriate EOP bed were in fact transferred.[76]  There were

9  simply no available appropriate beds in the system for these EOP inmate-patients.  For

10  example, CIM reported to the Special Master that, during the 25th Round, the average

11  length of stay for an EOP in the CIM Reception Center was 91 days, with the reason for

12  such lengthy stays "primarily due to [inmate-patients] who were endorsed and awaiting

13  transfer."[77]  Meanwhile, as discussed below, there were many EOP and CCCMS inmate-

14  patients struggling to cope in Ad Seg units, in Reception Center settings, or in other units

15  where they never should have been placed in the first place.  The persistence of

16  overcrowding in CDCR's system remains the primary driver of this problem, in my

17  opinion.

18           **(i)**      **Use of Harsh Administrative Segregation Units for Inmate-patients due to "Lack of Bed" ("LOB")**

19

20       143.   That Ad Seg housing is dangerously overused in the CDCR due to

21  overcrowding-related pressures could not be more clearly illustrated than by what we

22  discovered in CIM's Ad Seg units.  We toured two Ad Seg Units, Cypress Hall and Palm

23  Hall.  One tier of the three-tier Cypress Ad Seg unit is depicted in **Photo Exhibit R**.

24  While looking at a large board on the wall that serves as the housing roster for Cypress, we

25      —————————————

26  [76] Bien Decl. Ex. 2 (CDCR Weekly Data on MHSDS Transfers, Week of Feb. 11, 2013).

27  [77] Bien Decl. Ex. 19, at 20 of 21 (CIM 25th Round Management Report).

28

1   saw a strange acronym—"LOB"—one that was applied to the *vast majority* of the inmates

2   in that Ad Seg unit.  A photograph of this large housing roster board is attached as **Photo**

3   **Exhibit S**, with the purple and pink cards representing "LOB" prisoners.  I had never seen

4   this "LOB" designation before and when I inquired what it meant, the correctional officer

5   nearby explained to me matter-of-factly that these initials stood for "Lack of Bed," and

6   that the overwhelming number of inmates housed in this Ad Seg unit were not actually on

7   administrative segregation status but were there merely because there was nowhere else to

8   put them.  Ad Seg was serving as a kind of "RC overflow unit," with obvious problematic

9   consequences.  Mainline prisoners, particularly those coming into prison on RC status,

10  should never be housed in Ad Seg.  Whether or not they technically "mix" with Ad Seg

11  prisoners (and apparently they do not), housing them together creates many security risks

12  and mental health problems.[78]

13      144.   Not only was "LOB" a new designation that no one at the prison had

14  mentioned to us (and was, frankly, as I said, not one that I had ever seen before, in many

15  years of studying prisons) but it also served to mask the actual number of *Coleman* class

16  members who were in fact living in the Ad Seg unit.  The number of EOP and CCCMS

17  prisoners in Ad Seg we were given in the morning orientation at CIM *appeared not to*

18  *count* any "LOB" EOP and CCCMS prisoners, though there was a very substantial number

19  of them.  When we inquired, staff told us that the "LOB" prisoners in Ad Seg were not

20  included in the Ad Seg "count," because they were there due to lack of beds, not because

21  they were actually classified as "Ad Seg."  This made little sense to me.  Staff explained

22

23  _____

24  [78] Although the Special Master may not have been aware of the nature and magnitude of
    the "LOB" problem in CIM's Ad Seg unit, he was aware of some degree of mixing of

25  different categories of inmates in the unit and commented on one of the problems it
    created:  "The mixed use of Cypress Hall for administrative segregation and non-

26  administrative segregation inmates created delays with inmate escorts.  The mix of SNY,
    non-SNY, and administrative segregation inmates also limited inmates' ability to move

27  about freely."  Special Master 25th Round Report, p. 354 (*Coleman* Dkt. No. 4298).

28

1  that "LOB" prisoners were allowed certain privileges not given to "Ad Seg" prisoners in

2  the unit (such as canteen).  However, they were denied phone calls and, according to the

3  "LOB" prisoners we spoke with, had to deal with the bitterly cold showers and limited

4  yard time just like everyone else in the Ad Seg unit.

5          145.    The confusion that surrounds the "LOB" prisoners' housing arrangements,

6  and the kind of gyrations that the CDCR is still forced to engage in because of its

7  continuing overcrowding pressures, were illustrated in an interview that I did with

8  Prisoner O, a CCCMS prisoner housed in Ad Seg.  He said simply, "I don't know what I

9  am or why they moved me here.  I'm being treated like I'm in reception … and I'm having

10  problems."  He proceeded to explain that he had already been in reception at CIM, back

11  when the gyms were in operation.  After 6 months there he was sent to CCI.  After he

12  spent some time in the Orange County jail for court-related reasons, he was sent back to

13  CDCR, but to another Reception Center (at Wasco).  Then he was sent to CIM in April of

14  last year, where he has been for the last nine (9) months.  But, for reasons he claimed not

15  to know or understand, he was moved into the Ad Seg unit in January, was double celled,

16  and lost his property (including his television) in the process.

17          146.    Prisoner O insisted that he had not received a 115 rule violation report, and

18  had not yet been to committee for endorsement to a specific program.  He said he was

19  being treated as if he was <u>both</u> an Ad Seg and an RC prisoner, but he was in fact neither.

20  He complained about the idleness in Ad Seg: "We get yard once a week, at best."

21  Prisoner O said he was becoming very frustrated, and reported that his mental health was

22  suffering significantly.  He reported that he had been "doing really well" on A yard, but

23  was having a difficult time coping in Ad Seg.  He stated "At this point, I'm not so stable."

24  He had previously had thoughts of killing himself in Ad Seg, and said that he has struggled

25  to get his "brain to calm down" in this very difficult setting.  Several other prisoners I

26  interviewed confirmed that there were many prisoners in the Ad Seg unit who were there

27  simply because there were no other places to put them ("LOB"), and that they were denied

28

1    televisions, had limited property and essentially no program, except for yard (which

2    amounted to no more than about one hour a week).

3         147.   During the Ad Seg IDTT meeting, the supervising psychologist for both the

4    Ad Seg and MHCB units acknowledged that "we recognize that isolation is not good for

5    people who have psychiatric problems and vulnerabilities.  They can decompensate here

6    [in Ad Seg] and end up in an MHCB, even though they may want to be in Ad Seg, because

7    they are afraid."  I saw evidence of this destructive process at work in all four (4)of the

8    prisons I inspected—prisoners who were placed in Ad Seg environments for various

9    reasons, ones often having nothing to do with disciplinary infractions, and decompensating

10   as a result of the harsh conditions to which they are exposed, sometimes so much so that

11   they acted out aggressively (thereby incurring actual infractions) or required a higher level

12   of mental health care.

13        148.   Indeed, the inmate-patients I interviewed in the Ad Seg units at CIM were

14   very consistent in describing the lack of meaningful therapeutic (or any) programming they

15   received there.  For example, Prisoner P was an EOP inmate in the Cypress Ad Seg who

16   told me he had gotten no EOP programming in this unit, "just yard, maybe once a week."

17   That meant that he got no treatment whatsoever for the approximately two and a half

18   months he had been housed in the Ad Seg.  He was placed in the Reception Center

19   Madrone Hall—where he said the did have some groups that he both participated in and

20   considered beneficial—but was returned to Ad Seg at the time of our tour because, he said,

21   he was waiting to be transferred to an EOP bed at another prison.

22        149.   Another "LOB" prisoner in Ad Seg, Prisoner Q, described what it felt like to

23   be housed this way.  He told me that he had serious medical problems, in addition to his

24   CCCMS status and the fact that he was taking psychotropic medications for depression and

25   anxiety.  He did not know the name of his case manager, but he had seen him cell front.

26   Despite his depression, which he said at times got very bad, he told me that he found it

27   very difficult to talk about the depth of his problems with staff.  "If you say you want to

28   kill yourself, they strip you naked and put you in a cage for eight hours," he said.

1   Prisoner Q also provided some possible insight into why the refusal rate for mental health

2   contact is so high (at CIM and in other CDCR institutions).  He said that the correctional

3   officers discourage participation in treatment by both the manner and tone with which they

4   approach the inmates whom they are supposed to escort from their cells to the treatment

5   area.  Second, as Prisoner Q put it, "who wants to come out for 'therapy' in a cage?  You

6   feel non-human."  He explained that even the prisoners who are technically not Ad Seg

7   inmates, the "LOB" prisoners, have their treatment contact in the Ad Seg area, individual

8   treatment cages and all.

9        150.   Prisoner R, CCCMS, was also in the Cypress Hall Ad Seg as an "LOB."  He

10  said he had been offered yard once since being placed in this unit.  He said he had not been

11  offered any group treatment, though he thought it would be useful for him.  He also stated

12  that, because he was in Ad Seg, he (like everyone else in the unit) was not given utensils.

13  He said that he was eating with his canteen ID card folded up as a makeshift spoon.

14       151.   The aberration of housing "non-Ad Seg" (*i.e.*, "LOB") prisoners in the Ad

15  Seg has led to strange and potentially dangerous practices in the unit itself.  As Deputy

16  Warden Hill explained, the "LOB" prisoners did _not_ receive the thirty-minute welfare

17  checks or the 31-point pre-placement questionnaire that all prisoners are supposed to

18  receive when they are placed in an Ad Seg unit.  Yet these critical mental health-related

19  practices are designed to protect the safety and well-being of all prisoners who are placed

20  in the harsh Ad Seg environment and to identify those who are at risk of suicide, regardless

21  of whether the institution has formally designated them as "Ad Seg" or "LOB."  As the

22  "LOBs" I have quoted above make clear, they are suffering and their mental health is at

23  risk of seriously deteriorating in Ad Seg regardless of the label under which they have

24  been sent there.

25       152.   Notably, the State's expert Jacqueline Moore identified and had serious

26  concerns about EOP inmate-patients held in Ad Seg for lengthy periods of time, for non-

27  disciplinary reasons and simply while awaiting for an appropriate EOP bed to open in the

28  system.  She testified this problem stemmed from the fact that there were "more inmates

than appropriate beds" with respect to these EOP inmate-patients.  At CIM, she recalled there being nine (9) EOPs in the segregation unit.  She found that they "were very sick inmates," that "they were hearing voices" or "were having auditory hallucinations" or, in one case, "was seeing signs of his grandmother.  They were sick inmates; they needed to be somewhere else."[79]  I too saw many inmate-patients who appeared to be very sick in the CIM segregation unit; they were there solely because there was no other place to put them.

153.    No one can dispute that Ad Seg is high-risk setting when it comes to suicide.  In my opinion, prisoners like Prisoner O and others thrown into CIM's harsh Ad Seg setting are at even higher risk.  They are caught in a kind of Kafkaesque nightmare, not knowing why they are being housed in Ad Seg (other than that the system is so overcrowded that there is no appropriate bed available for them) or how long they will be there.

(ii)    **Use of "Bad Beds" in Reception Center Units due to Lack of Appropriate Beds in the CDCR's System**

154.    I observed disturbing use of extremely harsh housing for mentally ill inmate-patients in CIM's Reception Center housing unit (Madrone Hall), a photo of which is attached as **Photo Exhibit T**.  In the Madrone unit, I spoke with Prisoner S, an EOP prisoner who was housed on the second tier of the unit.  He told me that he was having a very hard time there and, looking into his cell, it was not difficult to see why.  Prisoner S is a huge man—about 6'3" and 340 pounds.  He has a cellmate, who is also EOP and is also very large—Prisoner S estimated that he was about 6' tall and 240 pounds.  He told me that the two of them were pressured and cajoled into being cellmates and moving to the second tier by the prison staff, who came to them and said they had run out of room in the unit.  Except for the other EOPs, everyone in the unit now is apparently double celled, including Prisoner S and his cellmate.  However, the cell is so small that Prisoner S's

---

[79] Bien Decl. Ex. 5 (Moore Deposition Tr. at 166:4-168:9).

1  cellmate has to sleep on the floor.  They have folded his bunk up against the wall, to use as

2  a shelf on which they keep their property, so there is enough room in the cell for them to

3  (barely) move around.  A photograph of their dirty and very claustrophobic cell is attached

4  as **Photo Exhibit U**.  Although Prisoner S said he did attend the EOP groups when they

5  were offered, there were only 3 of them, for an hour each, adding up to much less than the

6  10 hours of programming that is required by the Program Guide.  He reported that he gets

7  an hour or so of yard every four (4) days.  In addition, "we have no hot water, so we clean

8  up in the sink."  Prisoner S told me he is getting released from prison soon.

9       155.    The stories of prisoners I encountered at CIM who were languishing in

10  inappropriate beds, and in some instances deteriorating psychologically or incurring RVRs

11  or both, while waiting for transfers elsewhere in the prison or the larger prison system were

12  many and varied.

13       156.    Another inmate-patient in the Madrone unit, Prisoner T, is a CCCMS inmate

14  who told me that "we have no program here, we just stay in our cell."  He said he has been

15  in this unit for 6 months and does not know when he will be transferred to his regular

16  prison—"they say they've got no beds."  Although he is a Level II prisoner, he believes he

17  is being considered for transfer to a Level III prison because of the system-wide space

18  shortages.  Prisoner T told me: "It's been a living hell.  I thought it was my illness but they

19  are making it a lot worse."  He explained that he and the other inmates who are in his

20  situation get yard for only about an hour a week, they are not allowed to have televisions,

21  and otherwise we "just sit in our cells."  He did say that some of the staff at least made an

22  effort to provide groups that, when the groups actually met, at least he got out of his cell

23  for about an hour three times per week.  His cell, like other cells on his tier, is extremely

24  small, dirty, and bleak, as depicted in **Photo Exhibit V**.

25       157.    Madrone Hall is among the most stark and inhospitable non-segregation

26  units I have observed in my nearly 40 years of studying prison environments.  The cells are

27  extraordinarily dark, filthy, and claustrophobic.  I was very troubled to observe the cell that

28  Prisoner T was made to live in, given its dimensions and condition.  When I saw that two

[752643-7]

large EOP inmate-patients, Prisoner S and his cellmate, were double-celled in an essentially identical cell, I was shocked.

158.    I understand that CDCR contracted with Pulitzer/Bogard & Associates (P/BA) to complete a report on "Prison Capacity Planning" in June 2010.  The firm's Final Report was issued on October 3, 2011.  In that report, P/BA did a review of CDCR institutions' capacity using a variety of measures.  P/BA identified:

> … more than 8,000 cells [in CDCR's system that are less than 55 square feet, including more than 2,800 cells that are less than 40 square feet.  In most cases, these cells currently hold two inmates, even though they would not be large enough ([under] ACA standards) for even one inmate.  These cells currently are used to house inmates in the following classifications: General Population, Administrative Segregation, and EOP's.
>
> While use of these small cells is not acceptable in principle, the reality is that it is not practical to simply take them off line and remove them entirely from inclusion in CDCR's system-wide capacity.…[80]

159.    That 8,000 CDCR cells do not meet the American Correctional Association (ACA) standard for minimum cell size to house a single prisoner is noteworthy.  That a substantial number of such undersized cells would be filled with two prisoners borders on unconscionable.  I was not surprised to see that PB&A identified the cells in Madrone Hall at CIM (at 47.8 gross square feet each) to be among the cells not meeting ACA standards.  Prisoner T was housed in such a cell, while Prisoner S and his cellmate  were double-celled in one.  It is almost impossible to imagine how these men could survive this way for very long.  They were not only suffering under these conditions, but given their status as EOP inmate-patients, were being placed at grave risk of psychological harm.

**(iii)    Use of Inappropriate Beds in General Population for EOPs Waiting for Transfer to Appropriate Beds**

160.    We also toured the Angeles unit on Facility A, which is a very crowded unit that houses four (4) EOPs in a setting that is otherwise intended for prisoners at no more

---

[80] Bien Decl. Ex. 8.  PB&A California Department of Corrections and Rehabilitation Prison Capacity Planning Final Report, Oct.  3, 2011, p. 25.

[752643-7]

than a CCCMS level of care.  Each of these EOP prisoners was waiting for transfer to an EOP SNY yard that accommodated their Level II custody level.  I interviewed Prisoner U, who informed me that his mental health problems were very serious—he hears voices, has severe anxiety, and becomes very depressed.  The crowded and mixed dorm (EOP, CCCMS, GP) in which he is housed is not easy for him to tolerate.  His program consists of being visited by psych techs in the unit each day, for a welfare check, and a weekly visit to his case manager.  There is one "group" that he attends, on Fridays, but he is almost always the only inmate-patient who attends.  Otherwise "I just go to yard; there are no jobs, no vocational training, nothing.  We just watch TV and sleep."

161.    The Angeles unit, where Prisoner U and 3 other EOPs were housed with CCCMS and GP prisoners, was lined with several rows of bunk beds, all of which appeared to be completely filled.  A photograph of this very old and crowded unit is attached as **Photo Exhibit W**.  It is worth noting that the Office of the Inspector General had, in November 2008 and again in April 2010, identified serious structural and overcrowding challenges at CIM, and particularly on A yard.  An April 2010 Office of the Inspector General (OIG) Special Report found severe inmate overcrowding on A yard (then referred to as Reception Center West), and also "long-standing maintenance and repair shortfalls that may soon require replacement of many of these buildings.  Among the worst of the buildings were the eight wooden barracks that housed inmates on RC West [now A yard]."[81]  The OIG November 2008 audit of CIM, cited again in the OIG's April 2010 Special Report, noted that "if funding is not dramatically increased, CIM's condition will reach a level of degradation by 2014 [such] that independent facilities management experts throughout the industry would recommend demolishing and replacing the entire institution."[82]  At the time of my tour, staff reported that there were approximately 300

---

[81] Bien Decl. Ex. 9 (April 2010 OIG Special Report) at 7.

[82] Bien Decl. Ex. 10 (November 2008 OIG Report) at 2; Bien Decl. Ex. 9, at 7.

EXPERT DECLARATION OF CRAIG HANEY

[752643-7]

1   mentally ill prisoners housed on A yard, which had a total population of approximately

2   1000 inmates.  This figure was approximately 160 inmates over staffed capacity, and

3   nearly twice the design capacity of 615 identified in the April 2010 OIG report.

4          162.   Prisoner U told us that had been waiting for 140 days for a transfer to an

5   EOP program: "I've been waiting and waiting and waiting.  There are just no beds," he

6   said.  As of March 7, 23 days after my tour, Prisoner U was still waiting at CIM for that

7   transfer (according to CDCR inmate locator).

8                   **f.       Dangerous and Unduly Harsh Housing and Treatment of
                             Mentally Ill Prisoners**
9

10         163.   Following up on one inmate-patient's description of what happens at CIM to

11  prisoners who express suicidal ideation—"they strip you naked and put you in a cage for

12  eight hours"—I asked a psych tech in the Palm Hall Ad Seg about the process of exactly

13  what happens to an Ad Seg prisoner if he tells them he is having suicidal thoughts or

14  engages in suicidal behaviors.  He explained that the prisoner is pulled from his cell, and

15  put in a cage in a clinical office, until a psychiatrist is contacted.  He said that this step

16  generally moves quickly and the psychiatrist usually orders that the patient be moved to

17  the crisis unit.  Staff would then move the prisoner into another cage on the other side of

18  the unit, where he would be made to wait "30 minutes to several hours" until a custody

19  officer could be allocated to escort the prisoner to the MHCB.  A photograph of the cages

20  where the suicidal prisoner would face this lengthy wait is attached as **Photo Exhibit X**.

21  For this entire time waiting for crisis bed placement, the prisoner would be stripped to his

22  underwear.  It is not difficult to recognize how and why this process might discourage

23  prisoners with thoughts of suicide or self-harm from reporting this to staff, and a number

24  of inmate-patients confirmed this in the course of my interviews.  Meanwhile, CIM

25  reported that there were five (5) serious suicide attempts during the Special Master's 25th

26  Round of monitoring (including two by hanging, one by lacerations, one by swallowing

27

28

1   razor blades, and one by jumping from a tier).[83]   We were told that there had been another

2   serious suicide attempt around Thanksgiving 2012 (by razors).

3       164.    In addition to the painful and dehumanizing process that precedes placement

4   in the MHCB unit, the unit itself is problematic, in part because inmate-patients are often

5   kept there for long periods of time.  For example, an inmate-patient in the MHCB,

6   Prisoner V, told me that the unit itself made him feel depressed: "oh my god it's

7   depressing"—and also complained that it was very cold in the cells.  He came to CIM from

8   an Ad Seg unit in Tehachapi (CCI) on Friday because he was very suicidal.  But he said he

9   was having a hard time with the isolation in the MHCB too: "I like to talk to people—I

10  hear voices, talking quiets them down."  He did not know who his doctor was but said he

11  had seen someone.  Unfortunately, "I couldn't understand his accent and he got mad at

12  me."  He said he was on the list to go to a DMH facility, but did not know which one or

13  when he would be moved.  Prisoner V reported that he feels claustrophobic in the

14  treatment cages that are used in the unit—"like the bars are coming in."  (Notably, he had

15  been housed in the CCI Ad Seg, having finished a SHU term in August 2012, and was

16  awaiting transfer to an open SNY bed.  As I learned on my subsequent tour of CCI, they

17  routinely place inmate-patients in Ad Seg after they have completed their SHU terms.  As

18  the experiences of Prisoner V and others like him illustrates, such a practice is problematic

19  and, to be frank, dangerous.)

20      165.    Another inmate, Prisoner W, who was on the Ad Seg side of the MHCB, told

21  me—and his records confirmed—that he technically had been discharged from the MHCB

22  some 3 weeks ago, but remained there nonetheless: "I'm trying to get out of here.  I'm

23  EOP, and I want to go back to B Facility.  I go home in September."  He told me further

24  that he had been "going in and out of this MHCB for the last 6 months."  He said he was

25  hearing voices, seeing things, and had tried to take his own life several times in the past.

26  _____

27  [83] Bien Decl. Ex. 19, at 18 of 21 (CIM 25th Round Management Report).

28

He did not know his clinician's name and told me "I haven't seen my [regular] psych in a month."

166.   He said that the reason that he was still in the MHCB was because "they don't have a bed for me in B Yard."  When I asked why he had been going back and forth between the MHCB and his regular housing unit, he explained that he deteriorates when he goes back to B Yard—"we are mixed in with prisoners who are not mentally ill, and I am afraid of them."  Worse, because B Yard is a Reception Center, "there isn't anything there for us to do… we have no program."  He ended up in Ad Seg, not because of any disciplinary infractions, but rather because he needs protection and there is not anywhere else to put him.  He explained further that "EOP guys are at risk around the SNY guys—we get victimized.  They knock us around like a basketball.  I almost killed myself because of it.  I feel safe in [the MHCB unit]."  Prisoner W said that whenever he is seen by the mental health staff he is put in a treatment cage.  He also said that he is always placed in restraints anytime he is moved with the MHCB (possibly because he was admitted from the Ad Seg unit), even though he is a Level I prisoner (the lowest security level in CDCR's system).

167.   Prisoner W's records confirmed the account of his history that he had provided to me.  He was originally placed in Ad Seg at CIM in late September 2012, for safety concerns.  He deteriorated in Ad Seg and subsequently had multiple MHCB admissions, beginning in early October and continuing through January 2013.  Prisoner W was also at high risk of suicide—the records indicated that both his father and brother had committed suicide and that Prisoner W himself had attempted suicide on 5 occasions.

168.   Chief Psychologist Jordan later confirmed that the EOPs at CIM who are in fear may have entirely legitimate concerns: "they don't feel safe" and it is often reasonable that they do not.  Yet the prison has few if any options to protect them except to either keep them in a GP yard and hope that they do not get harmed before an EOP SNY bed opens that allows for their transfer (which can take quite a while given the insufficient number of such beds in the system given the current size of the population), or place them

1  in a harsh Ad Seg unit where they are at serious risk of deterioration, or wait until they

2  have decompensated so much that they must be admitted to the MHCB.

3       169.    I also spoke with Prisoner X, in the MHCB unit.  He was extremely

4  psychotic and nearly incoherent during much of the interview.  He said he had been

5  recently returned from Atascadero State Hospital, where he had been for some eight (8)

6  months.  I later reviewed his mental health records and learned that he had been in the

7  OHU in May 2012 before transferring to Atascadero State Hospital.  On the day I

8  interviewed him, he had been given a Haldol shot and his speech was very slow and

9  slurred.  But he did manage to tell me that he believed that the correctional officers at CIM

10 wanted to get him raped.  He also explained that his family members had managed to

11 infiltrate and occupy his nervous system, and they were devising ways to kill him from the

12 inside.  He said he was afraid to tell anybody about the things that were happening because

13 he feared they would mistreat him.

14      170.    Prisoner X's mental health records indicated that he had been discharged

15 from the OHU a few days before I interviewed him, but remained there for 5-day follow-

16 up.  Several days after I saw him, he was re-admitted to the OHU with this notation in the

17 file:  "The patient was seen cell-front this morning because Custody was unable to escort

18 secondary to extended count."  There appears to have been an IDTT team meeting

19 conducted cell-front, leading to a referral to DMH, although it was unclear from records

20 whether it was to ICF or APP.  There was also a notation that Prisoner X was "Acutely

21 psychotic" and he was described essentially the same way on February 19, 2013.

22 However, as of March 2, 2013, according to the Inmate Locator, he was still at CIM.

23      171.    In Palm Hall, one of CIM's Ad Seg unit, I interviewed Prisoner Y, who was

24 kept in handcuffs even though he was in a treatment cage during our interview.  He was

25 very upset and told me "my program is I stay in my cell 24/7."  He added, "I am afraid the

26 cops want to kill me, so I stay in."  He told me that he was "already messed up" when he

27 got to Ad Seg and got worse after arriving.  So he resumed medications, which he is taking

28 now.  "I hear voices and see things when I'm not on the meds."  He said that mental health

1  comes by to check on him every day, and asks him to come out, but he is so afraid that he

2  does not even go to out to yard.

3              **3.      California State Prison, Corcoran (COR)**

4                   **a.      Overview**

5          172.    California State Prison, Corcoran was not one of the prisons that I evaluated

6  in my inspections in conjunction with the 2008 overcrowding proceedings.  However,

7  Corcoran was toured by the Special Master's team of experts during that time period, in

8  September 2008 (as part of the 21st round of monitoring).  At that time, the institution's

9  population was 5,767 prisoners.  The total mental health caseload population at Corcoran

10 in September 2008 was about 1,409 inmate-patients.  The CCCMS population included

11 approximately 383 in SHU, 192 in Ad Seg, and 599 in GP.  The EOP population included

12 approximately 41 in the EOP ASU and 139 in GP.[84]

13         173.    While the overall population has clearly been reduced since 2008, the mental

14 health caseload has stayed very nearly the same.  When I toured Corcoran on February 19,

15 2013, Acting Warden Gipson informed us that the current count at the institution was

16 4,535, or **145.5% design capacity**.  Yet, the total mental health caseload population at

17 Corcoran was about 1,431 inmate-patients, an *increase* since September 2008, and 31.6%

18 of the total population at the prison.  The CCCMS population was approximately 1,209,

19 including 418 CCCMS patients in the SHU, 132 CCCMS patients in Ad Seg, and 659

20 CCCMS patients in GP.  The EOP population included 79 in the EOP ASU (almost double

21 the number housed there in September 2008) and 143 in GP.  CSP-Corcoran also operates

22 a large 24 bed MHCB unit.  On the day of our tour, there were 27 patients in the MHCB—

23 24 in the MHCB, and 3 in overflow beds in the Acute Care Hospital.  Two patients were

24 waiting for transfer to an open bed in MHCB units at other institutions.

25

26 _____

27 [84] Special Master's 21st Round Report, pp. 150-169 (*Coleman* Dkt. No. 3638).

28

174.    The reduction in the overall inmate population has allowed the prison to end the practice of using the gymnasiums as triple-bunked housing units (although one of the gyms is currently being used for office space).  However, the Acting Warden told us that "the population reduction has not impacted our services or how we run the prison."  My tour revealed that, if anything, mental health programming has been reduced at Corcoran in the last few years, even though the number of mentally ill inmate-patients has increased.

175.    In the course of day, as we toured the prison, I made a point of asking Dr. Fischer, the Chief Psychologist**,** who seemed most knowledgeable about and responsible for organizing the *Coleman* monitoring data and compliance process at the prison, what his opinion was of the way that the case-related oversight and evaluation operated.  Dr. Fischer told me that he definitely did not find the Special Master monitoring onerous.  He said: "*Coleman* is not burdensome at all.  We keep these records anyway. We just pull them together for the Special Master visits."

176.    During our day at CSP-Corcoran, I observed activities and spoke with class members and staff in the EOP and CCCMS Ad Seg units and EOP ASU treatment area in Building 3A, the SHUs in Buildings 4A and 4B, and the MHCB and overflow crisis care beds in Corcoran's General Acute Care Hospital (GACH).

177.    As with all 4 of the prisons I evaluated, despite some reductions in the overall prisoner population, CSP-Corcoran continues to experience many problems that are primarily caused by persistent overcrowding there and elsewhere in the CDCR, especially the use of "bad beds" due to the lack of appropriate beds in the systems, staff shortages, and shortages of appropriate treatment space.

> **b.      Lack of Appropriate Treatment Space and Impact of Extremely Harsh Conditions on Patient Treatment**

178.    We were told that there is some mental health office and treatment space under construction at the prison, and we were able to see the construction site during the tour.  We were told that it was to be activated in June, although, frankly, that seems unrealistic after having seen the site itself and the status of construction.  In the meantime,

1    treatment and programming space at the institution continues to be sorely lacking.

2    Dr. Fischer acknowledged that it was difficult to convert the prison into something that it

3    was not built to be: "This prison was built 25 years ago.  We don't have the infrastructure

4    for much medical and mental health care."

5         179.    We toured the EOP ASU treatment area, which is a large office area

6    containing 6 groups rooms and 12 individual clinician offices.  The offices are very

7    sparsely furnished with only a desk, chair, and an individual treatment cage in each.  The

8    group rooms were fitted both with treatment cages and, in at least some of them, what are

9    referred to as "ATOM chairs"—metal chair-like devices that are being tested at Corcoran

10   and considered as alternatives to the treatment cages.[85] The chairs appear to allow for more

11   open communication between the inmates, but the inmates are tightly restrained while they

12   are seated in them, so that their movement is restricted.  A photograph of one of these

13   "treatment chairs" at Corcoran is depicted in **Photo Exhibit Y**.  Although this was

14   described as an ongoing evaluation or "experiment" that would last for two years, during

15   which time CDCR would conduct a comparative study of the ATOM chairs to the

16   treatment cages that are currently in use throughout California prisons, the Captain who

17   was with us said that he already knew that the inmates clearly preferred the cages.  This,

18   however, was not a view that I heard from the inmate-patients with whom I spoke

19   throughout the day, a number of whom expressed a preference for the ATOM chairs, and

20   even more so for clinical space that did not require the use of restraints, cages, or the

21   _____

22   [85] According to a December 5, 2011 letter from Brigid Hanson, Chief of CDCR's Office of
23   Labor Relations to Steve Weiss, Chief of Labor for the California Correctional Peace
     Officers Association, the acronym stands for Alternative Treatment Option Module" and
24   refers to a "modified variant of the New York Restart Chair, a chair used in group therapy
     and in which the Inmate/Patients (I/Ps) are secured with restraints."  According to
25   Ms. Hanson, "[t]he purpose is to provide I/Ps with a more therapeutic environment during
26   group and individual counseling sessions that provides more direct, open contact with the
     clinician as well as the other group participants, while maintaining a safe environment for
27   all."  Bien Decl. Ex. 11.

28

ATOM chair (such as the non-contact visiting room arrangement that recently began for Ad Seg clinical contacts at CCI-Tehachapi in response to feedback from the Special Master's experts). One wheelchair-bound inmate-patient I spoke with, Prisoner Z, explained to me that the officers discourage the inmates from going to group when they are scheduled to use the ATOM chair, in part because it is extra work for them to place them in restraints in the treatment area and once again when they are placed in the chair. He also told me that "the escorts don't like to walk us back and forth [to treatment groups]. Plus they think we are all faking, and say so." He prefers the ATOM chairs because "when I am in a cage I feel like an animal."

180.    Nonetheless, the Captain said the patients' preference for the treatment cages was based on the fact that the ATOM restraint chairs required the inmates to remain stationary for an hour. In addition, the special procedures that are used to ensure that the prisoners are continuously restrained do seem quite cumbersome. Thus, prisoners who are to be placed in the ATOM chairs first submit to the procedures that are used with all Ad Seg prisoners who are brought to the treatment facility: they are first strip searched in their housing unit, placed in restraints, and then escorted in handcuffs across the large outdoor yard into the treatment building. Once inside the facility, however, the ATOM prisoners are then seated on a bench where officers then place them in leg restraints. They are then escorted into the group room, where they are seated in the ATOM chair and chained to the metal base of the chair.

181.    As I noted above, there are treatment cages inside each of the individual clinician's offices as well. When I asked the correctional officer who was serving as our photographer to enter one of the cages in order to take a photograph that captured the prisoner's view, from the inside of the cage looking out, he adamantly refused to do so. He complied only after one of his supervisors instructed him to do so. She explained that "you know, our officers don't like to get inside those things." These photographs taken from inside the treatment cage are attached as **Photo Exhibits Z and AA**. I momentarily

[752643-7]

1  sat inside the treatment cage myself, and it was indeed a cramped and uncomfortable

2  space.

3         182.   We traveled around the large yard at the facility to enter the EOP ASU unit,

4  from which the inmate-patients are taken to and returned from treatment.  We learned from

5  the officers in charge of the unit and from the inmate rosters that it also houses a number of

6  CCCMS inmate-patients.  We observed the process by which the prisoners were readied to

7  be escorted to treatment.  It consisted of removing them from their cells (in restraints),

8  taking them to a row of individual treatment cages lined up against the far wall of the

9  housing unit, taking them out of restraints, and subjecting them to a strip search, which

10 occurred in plain view of others and out on the housing unit floor.  Once completed,

11 prisoners put their clothes back on, were placed in restraints again, and removed from the

12 cages so that they could be escorted across the yard to treatment.

13        183.   The State's trio of experts noted in their joint report that this practice of strip

14 searching inmate-patients as a prerequisite to attending treatment "can be a disincentive to

15 group participation and should be reviewed."[86]  I also find the practice to be unusual and

16 disturbing.  The Special Master also found, *several years ago*, that similar strip search

17 protocols at Corcoran were problematic insofar as they "thwarted inmate participation" in

18 mental health treatment.[87]

19        184.   We observed this elaborate strip search protocol in process, and watched as

20 the inmate-patients were readied to be escorted to the treatment area on the other side of

21 the yard.  Because there is a "two-escort" policy at this and other such units, two (2)

22 officers are required to escort every one prisoner.  This means, of course, that when, say, 5

23 inmate-patients are being escorted to attend a group, 10 correctional officer escorts must

24

25

---

26 [86] Report of Dvoskin, Moore, & Scott, p. 23 (*Coleman* Dkt. No. 4275-5 at 25 of 41).

27 [87] Special Master's 21st Round Report, p. 163 (*Coleman* Dkt. No. 3638).

28

1  accompany them.  Quite a few correctional officers were required to escort a relatively

2  small group of inmate-patients to the treatment center.

3      185.   The nature of the treatment space, predominance of treatment cages, and

4  elaborate restraint and security protocols in the Corcoran SHU were similarly troubling.

5  We toured Corcoran's large SHU, which houses a total of 1,368 prisoners.  The door by

6  which the SHU is entered leads directly into a hallway that connects to the housing units

7  on either side.  Just as you enter the hallway there is a door that is marked "property/supply

8  storage."  Behind this door was a converted utility room that was being used as the primary

9  group treatment space.  There were a half dozen treatment cages inside, arranged in a

10  semi-circle, in front of a stand that held a computer terminal and monitor (but no

11  keyboard).  The utility room felt and looked like exactly that—an industrial type storage

12  area that had been re-fashioned as a makeshift treatment space.

13      186.   A short distance down the hallway from this room is the "board room,"

14  which we were told is where individual case manager contacts occur.  In fact, as we passed

15  by, we saw a clinician sitting at the far end of a table, facing the treatment cage, but at

16  quite a distance (several feet) away from the prisoner who was locked inside.  The housing

17  unit itself is an old style SHU design.  Prisoners are placed in restraints before they exit

18  their cells, and are each escorted by two (2) officers out of the housing unit and down the

19  hallway to the "property/supply storage" room, where they are supposed to receive group

20  treatment and where we interviewed them for our tour.

21      187.   The lack of appropriate treatment space in Corcoran's MHCB unit took a

22  somewhat different form—there was hardly any space at all.  Dr. Bola is in charge of the

23  unit, which was at capacity (including the 3 overflow cells) on the day of our tour.  She

24  was candid about the challenges that she and the rest of her staff faced there.  For one, the

25  treatment and IDTT space in the unit is wholly inadequate.  There are two small rooms,

26  each of which contains a desk or two, and an individual treatment cage.  The rooms are

27  barely large enough to hold more than a single clinician comfortably but they are

28  nonetheless used for IDTTs, which are supposed to include the inmate-patient and several

members of his treatment team.  The IDTT/office space where I interviewed a prisoner was a converted shower room (and the original tile was still in place).  Dr. Bola said, "we are running a large hospital here, and we need more room for treatment."

          **c.**       **Staff Shortages and Staff Reductions Despite Unchanged Mental Health Population**

188.    The staff shortages at the CSP-Corcoran are severe, and strikingly similar to the staffing shortages that existed at the time of the overcrowding proceedings.  Notably, allocated mental health staff at Corcoran has been cut substantially in the last few years, despite the mental health caseload remaining steady.  In other words, there are fewer clinical and custody staff at Corcoran who are responsible for the care, treatment, and safety of a population of inmate-patients that has seen no corresponding decrease.  As one would expect, these staffing reductions and shortages have had clear negative consequences on the delivery of mental health care.

189.    Thus, Corcoran has no Senior Psychiatrist on staff, and just 2.5 of the 11 psychiatrist positions are filled (a 77% vacancy rate, a portion of which is covered by contract psychiatrists).[88]  On the day that we visited, the impact of this lack of staff was acute.  Dr. Fischer told us that "we probably have just 6 psychiatrists, total, here today, 2.5 staff, and 4 contract."  Dr. Bola, from the MHCB unit, also acknowledged that "we are so short of psychiatrists that they cover as best they can."

190.    The staffing problems for psychologists were also severe, more than they would otherwise appear on paper.  That is because, we were told, they stemmed primarily from the fact that, of the 29 positions allocated, approximately 8-10 of the psychologists

---

[88] In comparison, in September 2008, 4.5 of the 16.3 allocated psychiatry positions were filled by state employees.  Special Master's 21st Round Report, p. 151 (*Coleman* Dkt. No. 3638).  *Notably, about five (5) allocated psychiatry positions have apparently been eliminated since 2008.*

were on "extended sick leave."[89]  Dr. Fischer explained that these staffing shortages

became acute about a year ago, as a result of unexpected departures and long-term

absences.  "We quickly went from caseloads of about 100 inmates per clinician to about

160," he explained to me.  The psychologist staffing is substantially worse now than at the

time of the Special Master's August 2012 tour, when there were more psychologist

positions allocated (33.5) and filled (32.75).[90]  Social worker staffing is only slightly

better, with 5.5 vacancies out of 18 allocated positions (a vacancy rate of 31%).

191.    In addition, we were told that the prison was short approximately 32 escort

officers, with 133 of 165.7 allocated positions filled.  This was a serious problem also

noted at the time of the Special Master's August 2012 tour, when he found that:

> Information obtained from staff indicated that there were issues with access
> to care.  *Due to insufficient numbers of access to care officers, clinicians
> reported that they could not see their caseload inmates for sufficient lengths
> of time and still see all scheduled inmates.*  Some clinicians resorted to
> seeing inmates at cell front.  Instances of clinicians choosing not to see
> inmates at cell front appeared in the monthly access-to-care report as if the
> contacts had been cancelled by the clinician.  Reasons for lack of group
> therapy offerings for CCCMS inmates in the SHU and administrative and
> mainline housing yards included insufficiency of access-to-care officers, as
> well as lack of programming space and safety concerns.[91]

192.    The Special Master elaborated on the continuing impact that staffing

challenges had on treatment.  For one, "[a]lready limited escort availability" in the SHU

"had become even more limited due to the increased demand from medical and dental

services, which resulted in longer wait times for clinical contacts."[92]  In Ad Seg, he

---

[89] In comparison, in September 2008, 8.21 of the 35.21 allocated psychologist positions
were vacant.  Special Master's 21st Round Report, p. 151.  That is, the number of
vacancies was about the same, but *six (6) allocated psychologist positions have apparently
been eliminated since 2008*, leaving the total number of psychologists significantly
depleted.

[90] Special Master's 25th Round Report, p. 203 (*Coleman* Dkt. No. 4298).

[91] Special Master's 25th Round Report, pp. 220-221 (emphasis added).

[92] Special Master's 25th Round Report, p. 213.

1 reported that "[t]wo escort officers provided services for six clinicians with mental health

2 appointments for about 160 inmates seen weekly.  Staff described difficulties in seeing

3 their caseload inmates for the clinically required time due to escort and physical plant

4 issues."[93]

5       193.   I heard complaints about many of exactly the same problems from inmate-

6 patients on my tour—including a preponderance of clinical contacts that took place cell

7 front and an overall lack of group therapy and other programming.  These problems

8 appeared to stem from the very significant staff shortages, among other things.

9       194.   Dr. Fischer was candid about the impact that these inter-related staffing

10 problems had on the delivery of mental health services, telling us that "we have no

11 mainline or Ad Seg groups for CCCMS inmates because of staff shortages" (whereas they

12 had such groups about a year ago) and saying later that "our groups are dramatically down

13 because of the loss of staff."

14       195.   Dr. Bola who, as I noted, is the clinician in charge of the MHCB, told me

15 near the end of our tour that the staffing problems at Corcoran had gotten worse, *not* better

16 over the last 5 years.  "We used to be able to run groups—now we are just keeping our

17 heads above water.  We just don't have the staff.  We have good staff, and they do their

18 best but … it's terrible."

19       **d.**    **Lack of Meaningful Treatment and Inmate Idleness**

20       196.   Due to the staffing shortages, severe space constraints, MHSDS population

21 pressures at Corcoran, and other factors, inmate-patients are stuck in a system that cannot

22 and does not provide meaningful treatment and programming.  The negative impact on

23 these inmate-patients' mental health is palpable.

24

25

26 _____

27 [93] Special Master's 25th Round Report, p. 217.

28

[752643-7]

(i)      **Lack of Meaningful Treatment for EOP Population**

197.    EOP inmate-patients in the Corcoran Ad Seg and GP are not receiving remotely the Program Guide-required amounts of treatment and programming.  The lack of groups for EOP inmate-patients was a significant problem at the time of the Special Master's August 2012 inspection.  He reported that: "Institutional data showed that only 42 percent of scheduled group contacts were completed.  Lapses were due predominantly to modified programming and inmate refusals."[94]

198.    In Corcoran's 25th Round Management Report, the institution acknowledged that lockdowns and modified programs impacted the delivery of mental health treatment to inmate-patients at the prison.  Under "Obstacles to Providing Mental Health Services and Adherence to Program Guide Requirements," the Report noted that "[m]odified programs have been in effect on 3A and 3B Facilities during the reporting period due to lockdowns. These have resulted in some disruption to mental health services ….  The EOP ML program was unable to conduct groups for about two weeks on 3B facility due to lockdowns."[95]

199.    Although the Special Master regarded the content of at least one observed clinical group as "well-conducted and clinically meaningful," he also documented the fact that "[a]ccording to institutional data, EOP inmates were offered only an average of 6.7 hours of structured therapeutic activities per week, including some activities that were not therapeutic activities."[96]  This constitutes substantially less treatment that EOP inmate-patients were reportedly getting in 2008, when they received an average of 8.65 hours per

---

[94] Special Master's 25th Round Report, p. 215 (*Coleman* Dkt. No. 4298).

[95] Bien Decl. Ex. 20, at 3 of 16 (COR 25th Round Management Report).

[96] Special Master's 25th Round Report, p. 215.

[752643-7]

1  week.[97] The reductions in staffing also likely play a role in this drop-off in mental health

2  programming.

3       200.   Lack of access to meaningful therapeutic activities persists for EOP inmate-

4  patients.  The Correctional Captain in charge of access to treatment who accompanied us

5  throughout the tour explained that "we schedule for 10 hours and we get a wide range but

6  rarely make 10 or even get close" for EOP inmate-patients.

7       201.   EOP ASU treatment is also deeply lacking.  Concerns similar to those that

8  were voiced to me by the Ad Seg EOP inmate-patients surfaced in the Special Master's

9  most recent report.  The Special Master documented the fact that nearly half (46%) of all

10 primary clinical contacts with EOP ASU inmates were conducted cell-front rather than in

11 confidential settings, and that only slightly more than half of the inmate-patients (57%)

12 attended their at least 10 hours of structured therapeutic activities per week.  The

13 complaints over the content of the group treatment that I heard (discussed below) may help

14 to explain the Special Master's observation  that "34 percent of inmates refused more than

15 half of offered treatment during any given week."[98]

16      202.   I also have significant concerns about the substance of the EOP ASU group

17 treatment sessions that were provided.  We observed a group session, comprised of just 3

18 prisoners, all restrained in the ATOM chairs, watching a movie that was being shown by

19 the staff member leading the group.  As she later explained, it was a movie about Bob

20 Marley, the reggae singer.  We spoke to each of the participants in the group.  Prisoner AA

21 told me that he had just arrived at Corcoran a few weeks earlier, from Mule Creek.  He had

22 moved from EOP to CCCMS at Mule Creek, but "caught a charge" and was transferred

23 here, where he was moved back to EOP level of care.  He had seen his case manager once

24 since arriving at Corcoran but had no idea what his name was.  Prisoner AA said that he

25

26  [97] Special Master's 21st Round Report, p. 165 (*Coleman* Dkt. No. 3638).

27  [98] Special Master's 25th Round Report, p. 210.

28

EXPERT DECLARATION OF CRAIG HANEY

1   comes to group when they are offered because he feels safer in the group sessions than out

2   on the yard.  Prisoner BB, who arrived at Corcoran from Coalinga-DSH a few weeks ago,

3   told me that this particular group consisted of watching movies and listening to music.  He

4   said that the other groups he has attended at Corcoran have all involved watching movies.

5   He has "never had a talking group" since he arrived at the prison.  The staff member who

6   was running the group told us that, in addition to showing movies, she also sometimes

7   plays games (such as "Family Feud") with her inmate-patients.

8       203.   I note that the State's experts commented on the fact that "some groups …

9   appeared to consist primarily of showing the inmate a movie or entertainment video," and

10   opined that the "the majority of group therapy time [should be] devoted to

11   psychotherapeutic, rehabilitative, skill building, and psychoeducational activities."[99]  I

12   think this is a sensible recommendation but saw very little evidence of that at Corcoran (or

13   the other 3 prisons I toured).  It is certainly not the way the vast majority of inmate-patients

14   described the substance of the groups in which they participated.

15               **(ii)     Lack of Meaningful Treatment for CCCMS
                            Population**

16

17       204.   The Special Master found in August 2012 that "[n]o therapeutic groups were

18   available to CCCMS inmates at the time of the site visit.  Non-therapeutic groups, which

19   were not led by mental health staff, operated on a limited basis during the reporting

20   period."[100]  This too is a marked and troubling drop-off in mental health programming for

21   this population since the time of the overcrowding trial, when the Special Master reported

22

23   ———————————————

24   [99] Report of Dvoskin, Moore, & Scott, pp. 17-18 (*Coleman* Dkt. No. 4275-5 at 19-20 of
     41).

25   [100] Special Master's 25th Round Report, p. 216 (*Coleman* Dkt. No. 4298).  CCCMS inmate

26   patients also had far less access to confidential clinical contacts.  According to the Special
     Master, although 88% received at least weekly primary clinical contacts, 69% of the

27   contacts occurred at cell front.  Special Master's 25th Round Report, p. 218.

28

that there were "several ongoing groups" for CCCMS prisoners.[101]  Indeed, complaints about the insufficient number of groups, and the added concern about the poor therapeutic quality of the groups were nearly universal among the inmate-patients I encountered months later.

205.    As described above, a shortage of access to care officers has made it impossible for clinicians to have confidential contact with their patients as frequently as is clinically indicated.[102]  The institution reported to the Special Master that this shortage "has resulted in longer wait times for clinicians providing therapeutic services" to CCCMS prisoners in segregation units, and that "[t]his escort shortage has required innovative strategies to insure adequate mental health treatment is provided."[103]  Based on my observations and interviews, this issue remains highly problematic.

206.    Unfortunately, we were unable to observe any of the newly begun (in September) SHU groups actually in process on the day that we toured Corcoran.  We were told that the groups in that SHU building were *all* scheduled for Mondays and that, because our tour was taking place on a Tuesday, we would be unable to see any of them in session.  However, I was able to speak with SHU inmate-patients about the groups and what I learned was not encouraging.

207.    I spoke with Prisoner CC who told me that he had a life sentence and had been in SHU for approximately eight (8) years.  He was on indeterminate SHU status for gang affiliation, the validity of which he vehemently denied.  Prisoner CC said that "it's crazy in here, my mental health problems started here."  He said that he became "obsessed" with the nature of his confinement because he just could not tolerate the rigors of SHU.  He reported that he now suffers from a lack of concentration, from visual

---

[101] Special Master's 21st Round Report, p. 166 (*Coleman* Dkt. No. 3638).

[102] Special Master's 25th Round Report, p. 220-221 (*Coleman* Dkt. No. 4298).

[103] Bien Decl. Ex. 20, at 4 of 16 (COR 25th Round Management Report).

EXPERT DECLARATION OF CRAIG HANEY

[752643-7]

hallucinations, ruminations, and has been placed on medication because he has anxiety attacks that come about "because of my stress." He complained about the lack of consistent care—"I've had 3 different case managers in a month and a half"—and the fact that the custody staff discourages prisoners from coming out of the cells to see their clinicians. He also said that very few groups were ever held in SHU, either in the "property/supply storage" room or anywhere else. To his knowledge, there was only one group—a "recreational therapy" group—held in the room that we were in; he said that it has met no more than three (3) or so times in five (5) or six (6) months. He reported that his case manager comes to see him once a month, and there is someone else (whose status was unclear to him) who comes by his cell once a week and hands out puzzles (but, he said, "she can't actually pull you out" of your cell).

208.    Prisoner CC told me that conditions and treatment in the Corcoran SHU have only been getting worse, not better: "They blame the budget. Case managers tell us, 'we are understaffed, our caseloads are too high,' so they can't do anything." He said that the storage room that we were in, as inhospitable to treatment as it seemed, was regrettably no longer used much: "We used to have groups, but this room is really not used here anymore." This meant that, as he told me, other than yard every other day, Prisoner CC has had no real program in SHU. Moreover, he said even "the yard is not really a yard," you are in a cage instead, and cannot even "kiss the grass." Prisoner CC said that the harsh conditions and the lack of activity, programming, and treatment were having a terrible effect on him. He said that he has seen a lot of people "lose it" in SHU, and did not want to become one of them.

209.    Out on the "yard," which we passed by in order to get to the other SHU unit, there were rows of exercise cages sitting atop concrete slabs; they filled most of the space outside the building and you could see little else. A photograph of these exercise cages is attached as **Photo Exhibit BB**. As we entered the next SHU unit, and again walked into a hallway connecting the housing pods, we opened another "property/storage supply" door. Inside we found five (5) men in treatment cages, participating in a group that was being led

by a recreational therapist.  He explained that he was conducting what he called a "leisure, recreation, and education group," that consisted of showing inmate-patients a commercial film called "The Other Guys" (starring Will Ferrell).  He was vague about its intended therapeutic value.  We learned that the group is scheduled to meet once a month and each session is supposed to last for two (2) hours.  It is intended for CCCMS inmate-patients who are in the SHU.  The recreational therapist leading the group said that he handles most of what he called the "artsy" groups at the Corcoran.  He seemed very committed to doing so, telling us that: "I am sure it prevents decompensation and crisis bed admissions."

210.    I interviewed Prisoner DD in a room that adjoined the property/storage supply room.  After escort officers placed him in a treatment cage, even though he had been brought to the interview in a wheelchair, he explained that he has a long-standing medical condition that affects his legs and compromises his ability to walk.  He said that he has been in prison for some 23 years, and that almost all of it has been spent in SHU.  He told me that he was last in a mainline prison environment in 1993, but it was for no more than about a month.  Prisoner DD explained that his SHU time was started, and was repeatedly extended, over an ongoing dispute that he had with correctional officers about his medical condition.  Years ago, when the dispute started, Prisoner DD said he was disabled by severe pain in his legs, caused by a medical condition from which he was suffering.  He insisted on using a wheelchair which, he said, the guards did not want to provide or allow him to use when he was being escorted.  When he refused to come out of his cell without the wheelchair, he was cell extracted numerous times and given a succession of additional SHU terms.

211.    Prisoner DD's dispute over his medical condition and the accommodations to which he was entitled as a result continued at the Pelican Bay SHU, where he was put on a Keyhea order for involuntary medication (which is still in effect).  The medical dispute was finally resolved (in his favor) after Prisoner DD arrived at Corcoran and, in 2004, doctors correctly diagnosed the painful condition from which he was suffering.  Nonetheless, he said that the medical care at Corcoran in general is terrible and he worries

[752643-7]

that he is physically deteriorating as a result of it.  However, he said that the mental health

care in the Corcoran SHU is even worse: Other than medications, "I don't know what other

treatment I'm entitled to, and I don't think there is any.  I have no program here.  I just

function in my cell, on my own.  There are no activities.  We go to cage yards, and that's

it."  He said he sees his case manager in the same room that I interviewed him in, always

in the treatment cage located inside it, every 90 days.  His case manager also comes by his

cell from time to time.  Prisoner DD was in the MHCB unit for two (2) months recently,

and describes it as follows: "They take everything away, your clothes, your property—you

are in a smock" the whole time.

212.    I next spoke to Prisoner EE, a SHU inmate-patient who told me that he has

been incarcerated since 1997 under the "3 Strikes" law (and on the basis of a seemingly

very insignificant offense—drug residue on a spoon).  He is now hopeful that he can be

resentenced and perhaps released in light of the recent passage of Proposition 36.  He said

that the "program" in the Corcoran SHU does not vary much—the psych techs come by

the cells every day to give inmate-patients a crossword puzzle and ask them how they are

doing, and there is a case manager meeting every month (with a person whose name he

cannot recall) that lasts for about 15-20 minutes but no more than that.  Because

Prisoner EE is in the process of debriefing (*i.e.*, the process by which staff determine

whether a prisoner has dropped out of a gang), he was moved to this side of the SHU,

where he said all of the other prisoners who are in the debriefing process are also housed.

213.    Prisoner EE recalled that there used to be groups held when he was housed

on the other side of the SHU, where he had been until recently, but that they stopped

holding them several years ago:  "They said it was because they were understaffed, had too

many people.  We haven't had them for five or six years.  I've been in this unit, on this

side, for seven or eight months, and no groups have been offered."

214.    The CCCMS prisoners in the Corcoran SHU were not the only ones who

were adamant about the lack of treatment and programming for inmate-patients at

Corcoran.  For example, Prisoner FF, and Ad Seg inmate-patient, was interviewed in one

EXPERT DECLARATION OF CRAIG HANEY

of the treatment cages and seemed somewhat disoriented, perhaps heavily medicated.  He was slow speaking and had a vacant look in his eyes.  He told me that he is CCCMS, sees a person he thinks is his case manager a few times a week cell front, and has been to the treatment center for group "a few times."  He said, "in group, we just sit down and watch movies, and one time we talked about our problems."  He said that, other than that, he did not have much of a program: "I sleep, eat, do puzzles.  I don't have a TV."  He also said that he was told he would be transferred "to a mental hospital in a few weeks," but he had no idea which one.

215.    I got a better sense of the serious consequences of not providing treatment programming to CCCMS inmate-patients when I spoke to Prisoner Z, an EOP ASU inmate-patient who told me he had cycled back and forth between CCCMS and EOP levels of care.  Prisoner Z said the groups are essential to his mental health, and he goes to them whenever he can.  He said that the number of groups that are actually available to Ad Seg inmate-patients at Corcoran falls far short of what is required and beneficial for the men there—"they are way short."

216.    This cycling back and forth between the CCCMS and EOP levels of care.  In the course of the tour, Dr. Fischer explained that because the EOPs do have access to at least *some* groups, they can often be stabilized enough to lower their level of care to CCCMS.  However, when they are returned to the CCCMS environment, where there are no groups available, they often deteriorate and end up back in EOP.  Some of the reason for the lack of groups for CCCMS inmate-patients clearly has to do with the shortages in the clinical staff that I mentioned earlier, and some comes from the lack of available custody staff, as well as the distances that must be traversed to get from housing units to treatment space and the especially cumbersome procedures that are employed when Ad Seg and SHU inmate-patients are involved.  Dr. Fischer noted that "we do our clinical work well, but we have to work with serious custody constraints."  In short, the constraints the stem from their very serious staffing shortages and elaborate restraining, escort, and

caging procedures impede the ability of institutions like Corcoran to provide appropriate

mental health programming to all mentally ill prisoners who are incarcerated there.

### e.     Use of "Bad Beds" due to Lack of Appropriate Beds

217.    A pervasive problem at Corcoran, and one that is inextricably related to the

continued overcrowding pressures at Corcoran and in the larger prison system, was lack of

appropriate beds, which has led to the institution's use of restrictive and dangerous beds

for inmate-patients for no other reason than that CDCR has found no other place to put

them.

218.    The State's data confirm its own failure to place mentally ill inmate-patients

in appropriate beds where CDCR recognizes their need to go.  For the week prior to our

tour (the week of February 11, 2013), only one of 14 EOP inmate-patients for whom the

institution requested transfer from COR to an appropriate EOP bed were in fact

transferred.  And while transfer to an appropriate bed at another institution was requested

for 82 CCCMS inmate-patients that week, only eight (8) actually transferred.[104]

219.    As discussed below, there were many EOP and CCCMS inmate-patients

dealing with serious and often deteriorating mental health issues while awaiting transfer.

This was most clearly seen in Corcoran's harsh and punitive Ad Seg units.  Notably,

Corcoran reported to the Special Master that, during the 25th Round of monitoring, 16

EOP prisoners were held in Ad Seg for longer than 90 days due to "endorsed awaiting

transfer/bed availability."[105]

220.    As with all of the prisons that I evaluated during these most recent tours,

CSP-Corcoran in my opinion overuses its segregation units, housing prisoners in the Ad

Seg who have not committed rules violations but are kept there because of a lack of more

appropriate beds elsewhere at the prison or in the larger prison system, and keeps them and

---

[104] Bien Decl. Ex. 2.  (CDCR Weekly Data on MHSDS Transfers, Week of Feb. 11, 2013).
[105] Bien Decl. Ex. 20, at 13 of 16 (COR 25th Round Management Report).

other inmate-patients in segregation units far too long.  These prisoners are subjected to potentially damaging conditions of confinement and forms of treatment that are likely to worsen their mental health conditions and send them into a deteriorating spiral from which some may not return.

221.   We saw clear-cut evidence of this during our Corcoran tour.  The Ad Seg unit, Building 4, where nearly all of the prisoners are CCCMS, houses many inmate-patients who have finished their SHU terms and should be placed in a regular general population housing unit or in an SNY yard.  However, due entirely to a lack of appropriate beds, these men are required to first do time—sometimes a considerable amount of time—in Ad Seg until an available bed is identified for them.  A number of prisoners in this unit and elsewhere complained about this practice because, as they emphasized, conditions in Ad Seg are, in many respects, as harsh and difficult to face as those in SHU.  The prisoners thus have the experience of finally completing their SHU terms only to then be moved into a unit where they are subjected additional harsh conditions and the inevitable mental duress that follows.  In the Building 4 Ad Seg, for example, the inmate-patients are seen by mental health staff in the unit itself, in individual treatment cages that are arrayed along the wall, blocked by a security screen, to prevent prisoners housed on the first tier from seeing them.  There are no groups made available for these CCCMS prisoners.

222.   Prisoners are kept in Ad Seg for other non-disciplinary reasons (such as for their own safety) as well.  In the Building 4 Ad Seg unit, for example, Prisoner GG told me that he had a long mental health history that dated back to his time on the streets, and that he was in Ad Seg for safety rather than disciplinary reasons.  He complained that, although he had just arrived at Corcoran a few weeks earlier, he had been given little or no assistance by the staff.  He still did not have his property (his cell was completely barren), and he said that his medications, which he had been taking for a long time, had been

1    stopped.  This apparently occurred despite the fact that he had been in an MHCB unit as

2    recently as December for cutting himself (and he showed me the still visible scars).[106]

3         223.    Prisoner HH, a Building 4 Ad Seg CCCMS inmate-patient told me, and his

4    records seem to confirm, that he has been at Corcoran Ad Seg since about August 2012.

5    He was placed there after spending about a year and a half in the Corcoran SHU.  He said

6    he has been kept in Ad Seg for so long because he has waiting for space to open up at

7    another institution.  He told me he has been to MHCB units several times in the past and

8    that he had a very difficult time in the Corcoran SHU: "SHU was very hard and very

9    bizarre.  I hear voices talking to me on a special frequency."  He said that he only saw his

10   case manager once a week or less in SHU, sometimes as little as once a month.  Now in

11   Ad Seg, he appeared very depressed and distressed.  He does not have a television or any

12   other stimulation to pass the time and, aside from going to yard several days a week, he

13   said "I am just in my cell."  He explained that his time in SHU was extended because "I

14   was depressed, and the voices were so bad that I couldn't take it," and he got into a fight

15   with his cellmate.

16       224.    When I asked on the unit to see Prisoner HH's records I was told that there

17   was not any way to do that.  Clinicians who come on the unit have to return to their offices

18   in order to get access to the computers where the records are stored.  I was able to review

19   his records after the tour.  His treatment program appeared to be weekly contacts with a

20   clinician.  Clinicians had documented that Prisoner HH was suffering a range of delusions,

21   including that he was a famous songwriter, that he had won the lottery, and that he was

22   being "specially monitored and watched."  I noted that one of his weekly contacts in

23   February 2013 had been cancelled, and another in January 2013 was done at cell front due

24

25   [106] Corcoran reported that there were seven serious suicide/self-harm attempts during the
26   25th Round reporting period, including one by hanging, three by lacerations, one by
     overdose, one by asphyxia, and one by swallowing a foreign body.  Bien Decl. Ex. 20, at
27   15 of 16 (COR 25th Round Management Report).

28

1   to "staffing related issues."  I also found concerning that he had recently been given a rule

2   violation for "refusing a cell mate," which can result in a new SHU term.  Though staff

3   documented that a mental health assessment had been done (although Prisoner HH did not

4   participate), the clinician found that the mental illness did not contribute to the refusal of a

5   cell mate leading to the infraction.  There was little discussion of the basis of this finding,

6   which was made despite the fact that Prisoner HH was having well-documented delusions

7   during this time period.  The records suggest he may be placed in the SHU again soon.

8   Given my review, I fear that he will only get worse if he remains in segregation.

9       225.    In the EOP ASU unit, I interviewed Prisoner II at his cell front.  He

10  expressed concerns about his safety and the belief that he was being "set up" by the

11  officers in the unit, whom he was certain were trying to get him killed.  He said that he had

12  arrived at Corcoran about a month ago, and was placed in Ad Seg because he had "gone

13  PC [protective custody] at Delano" (that is, that he required a new placement to address

14  identified safety concerns).  Since he arrived at Corcoran he has been too afraid to do

15  much of anything, and has not attended groups.  He did see his case manager, Dr. Harris,

16  twice and has gone to yard once in the month that he has been here.  He also told me that

17  he has spent about a total of 12 days at the Corcoran MHCB, during which time he said he

18  was not allowed to have any clothing.  He said that the experience in the MHCB unit was

19  so terrible that "I told them I felt better just to get out—but I didn't [feel better]."  It was

20  unclear what the status of his transfer to an appropriate bed was, but he was still at

21  Corcoran more than two weeks later (as of March 7), according to the CDCR inmate

22  locator.

23      226.    When we visited the MHCB, there appeared to be a number of prisoners who

24  were held there beyond their discharge date, or for periods that were longer than seemed

25  warranted without a decision being made about a disposition and possible referral in their

26  case.  For example, I interviewed Prisoner JJ, who was very distraught.  He told me that he

27  had been to MHCB a total of seven (7) times in the past year, and that he had a long

28  history of mental health problems that stretched back over his 11 years in prison (which he

1  had entered at age 19).  He said that this history included not only being EOP but also

2  having been to the DSH facility at Salinas Valley for four (4) months.  He said the

3  treatment staff does not care about him and uses his mental problems against him.  "I feel

4  I'm suicidal and homicidal all the time."  When his Keyhea was denied, he said "the doctor

5  told me to attack somebody."  Prisoner JJ told me that he is extremely concerned about and

6  frightened of having his blood drawn; he seems certain that the staff is insisting on

7  drawing blood from him for some nefarious purpose.  He told me that being confined to

8  his cell around-the-clock was really getting to him: "You are just isolated in your room, the

9  whole time without your property, just your mail."  Prisoner JJ said that he has been caught

10 in a cycle whereby he moves back and forth between the EOP ASU, the MHCB, and back

11 again.  He came to Corcoran about one year ago, as a CCCMS on a GP yard, and found the

12 mental health care to be terrible.  He said there was no treatment space on that yard and,

13 even though the staff kept saying that groups were going to start up, they never did.  When

14 I spoke with Dr. Bola a short time later, she told me that the staff was "debating" whether

15 to send Prisoner JJ to DSH again.  She felt "he's been here too long," but had not yet been

16 able to discuss his case with the psychiatrist because he had been gone from the institution

17 for several weeks.

18      227.    Time spent in the Corcoran MHCB is, incidentally, exceedingly harsh for

19 inmate-patients requiring crisis level care.  For example, in August 2012, the Special

20 Master's experts observed a daily meeting of a clinical contact team in the Corcoran

21 MHCB that was also attended by an inmate "who was cuffed and escorted into the

22 treatment module."  Yet MHCB "[c]linical staff appeared reluctant to have the inmate un-

23 cuffed, although he had done nothing to harm himself, nor 'manipulated' or refused to

24 follow orders.  This team also did not discuss the potential referral of inmates to DSH care

25 for cases whose stays exceeded ten days, but deferred it to an upcoming IDTT meeting."

26 In addition, "[c]lothing for inmates in the MHCB and overflow remained restricted to a

27 safety smock, regardless of clinical condition or length of stay, although other types of

28 property may be returned to the inmate.  Clinical staff were reluctant to reconsider this

1  practice."[107]   The continuation of these sorts of practices, in my opinion, contributes to the

2  harsh and non-therapeutic settings I observed in the MHCB and other high security units I

3  observed at Corcoran.

### 4.   California Correctional Institution, Tehachapi (CCI)

#### a.   Overview

6      228.   I originally toured the California Correctional Institution (CCI-Tehachapi) at

7  the end of July 2008.  At that time, the prison was operating at slightly over 200% of its

8  design capacity.  It had a relatively high number of *Coleman* class members (over 1500,

9  including nearly 100 EOPs).  The overcrowding-related problems went well beyond the

10  most obvious housing anomalies (*i.e.*, the use of makeshift gym dormitories) and ranged

11  from very serious staffing shortages, a severe lack of treatment and office space, the

12  inability to provide appropriate levels of care (largely because of the lack of available),

13  appropriate beds elsewhere in the system, and a severe lack of programming offered in

14  both Ad Seg and SHU.  The reduction in population and changes in the mission of units at

15  the prison has meant that at least some of these problems have been abated.  But the prison

16  is still very overcrowded and many serious overcrowding-related problems remain 4½

17  years later.

18      229.   I toured CCI again on February 22, 2013.  At our initial orientation meeting,

19  Acting Warden Holland described some of the many changes that CCI has undergone

20  since I visited earlier, including the way in which some of the yards at the prison were

21  "repurposed" to lower security level housing units.  The overall population of CCI was

22  approximately 4,511 at the time of our recent tour, or **162.1% design capacity**.  As I said,

23  this was a noticeable reduction from the population at the time of my tour on July 29,

24  2008, when the population was at approximately 203% design capacity.  CCI reported that

25  it currently housed 1035 CCCMS inmate-patients, and 12 at the EOP level of care.  CCI

---

27  [107] Special Master's 25th Round Report, p. 212 (*Coleman* Dkt. No. 4298).

still houses a large SHU population; there were 1215 prisoners in SHU the day we were there (about 120% of its capacity), 191 of whom were CCCMS and 3 EOP.  The Ad Seg unit held 197 prisoners, including 101 currently at the CCCMS level of care and 5 EOP patients.  We asked Dr. Walsh, the Chief Psychologist, about the number of EOPs at CCI, which does not have an EOP program.  He said that many of them were GP or CCCMS patients who had decompensated while at CCI and mental health staff found that they now needed EOP level of care.

230.    Dr. Walsh was the Chief Psychologist when I toured CCI the first time and, given the major *Coleman*-related responsibilities that his position entails, I asked him about the monitoring and compliance process.  He told me that he did not mind the effort that went into preparing for the *Coleman* monitoring and regular inspections.  He said that the preparation and recordkeeping not only did not present a problem but that the overall process was actually was a positive one.  More specifically, it allowed him and his staff "to periodically check on what we are doing and how good we are doing.  We generate the paperwork anyway.  But I just wish we'd get more kudos for how hard we work.  Otherwise, it's not a problem."  The only time he could remember having been prevented from implementing a treatment plan or a clinical innovation by the *Coleman* Special Master was with respect to a modification that he had made to some treatment cages (having them cut in half so that they could fit through the narrow door of the room where he wanted to use them).  A member of the Special Master's team told him he could not use the modified treatment cages because they were now too narrow.  Otherwise, there have not been any intrusive interventions he could think of that prevented him from doing anything he wanted to do.

231.    On the day of my tour, I visited the institution's OHU on the A yard, the Ad Seg on the A yard, and the SHU on the B Yard and on the A yard.  Although I was the only expert on the tour and was accompanied by just one attorney for Plaintiffs, we were accompanied at any one time by between 10 and 15 officers, staff members, and attorneys from CCI and the State.  Some of these individuals never introduced themselves or spoke

102

1   with me, and I am not sure why they were on the tour.  This large group did, however,

2   have the effect of substantially slowing down our tour activities, as each of us had to show

3   identification and sign in/out at various checkpoints each time we moved from one unit to

4   the next.  Given these delays and the long distances between facilities inside the prison, I

5   did not have the opportunity to visit Facilities C, D, and E, which housed over 600

6   prisoners on the mental health caseload.

7                     **b.      Lack of Appropriate Treatment Space**

8             232.    During my 2008 visit to the prison, there were extremely serious space

9   limitations that compromised the delivery of adequate mental health care and they were

10  acknowledged by the staff members with whom I spoke.  In my Report, I summarized the

11  comments of a Deputy Warden who accompanied us during much of the tour this way:

12          [The Deputy Warden] explained that there were inherent design problems at
            CCI that compromised their overall programming capacity.  He said that
13          there was no treatment space on the units because "treatment" was not
            something that CCI was originally designed to do.  Now that it has been
14          made a more central part of CCI's mission, he said, there is little that can be
            done to overcome the physical limitations that were initially built into the
15          design of the facility.[108]

16            233.    We were told that there has been no major construction at CCI since I visited

17  in July 2008, except for a trailer that has been added that is used for treatment in E Facility.

18  The "repurposing" of a number of units made it difficult to tell whether the space

19  limitations with which the prison was plagued in the past have gotten appreciably worse.

20  No one suggested that they had gotten dramatically better.

21            234.    We began our physical tour of the institution in the OHU.  Dr. Walsh

22  explained that they try to monitor the patterns of admission to the OHU, so that if someone

23  comes more than once in 6 months, they try to get them transferred to a MHCB unit

24  somewhere in the system.  He was candid about the space limitations with which they were

25  still working in the OHU: "There is not a whole lot we can do about treatment space.  But

26  _____

27  [108] 10/30/08 Haney Report ¶ 245.

28

1  we've done a lot with what we have—converting space as best we can to try to create

2  treatment space."  In fact, the treatment room for mental health admissions to the OHU is

3  located in one such makeshift space, in a place that obviously once served as a storage

4  room (it has "clean linen" sign on the door).  The mental health cells in the OHU are

5  barren and bleak, and the inmate-patients inside them were lying on the floor when we

6  walked through in the late morning, huddled on thin mattresses, with their blankets pulled

7  up over their heads.

8       235.   On the other hand, CCI successfully managed the "conversion" of a non-

9  contact visiting area for clinical use in the Ad Seg area of the prison Specifically, the lack

10  of appropriate space for one-on-one clinical contacts in the Ad Seg unit at CCI led the

11  prison to take rooms that once were used for non-contact attorney visits and convert them

12  into treatment space.  A row of these smaller rooms (with glass partitions that separate the

13  inmate-patient from the clinician), are located in a separate building near the Ad Seg

14  housing.  Captain Lundy, the correctional officer in charge of the Ad Seg units explained

15  that the conversion had been prompted by concerns that the Special Master had expressed

16  over the inadequate, non-confidential space that was being used previously—treatment

17  cages in the middle of the small Ad Seg housing units that were positioned too close to the

18  nearby cells.  (Those cages remain on the Ad Seg housing unit floors, but are not used.)

19       236.   The building also contains a much larger room that was once used for

20  contact visiting but which is now empty, some small rooms where clinical staff members

21  now have offices, and a medium sized conference room where IDTT meetings take place.

22  (Interestingly, there is no treatment cage in this IDTT meeting location.  Dr. Walsh

23  explained that they do not need one because the patient is required to sit in restraints for

24  the duration of the treatment meeting.)

25            **c.     Staffing Shortages**

26       237.   We were informed that there was a very significant loss of allocated staff

27  positions at CCI so that, although the institution's vacancy rates were not as high as they

28  had been in the past, their mental health staffing was, in fact, down considerably in terms

of the sheer numbers of staff.  Dr. Walsh, Chief Psychologist, told us that they currently had a vacancy in the Chief Psychiatrist position, and that of the six (6) allocated psychiatrist positions, only three (3) were filled with state employees (two were covered by registry).  Dr. Walsh said that the prison was "aggressively recruiting psychiatrists" and that he was hopeful that they would have the open positions filled in a couple of months. Later, when we were talking about a particularly effective psychiatrist who I remembered from when I was there in 2008 but had subsequently left, he told me that it was still almost impossible to attract and retain talented psychiatrists at the facility given its location. Social worker positions were seriously understaffed; of 12 positions allocated, only three (3) were filled (for a vacancy rate of 75%), and there was only one recreational therapist on staff of the three (3) positions that were allocated.

238.   As an illustration of how staffing levels at the prison will continue to be affected by the new formula being used to allocate mental health positions, we were told that they would soon lose 10 of their 16 allocated psychiatric technician positions (which would automatically improve their vacancy rate but substantially decrease the total number of staff available to provide mental health services).  CCI reported to the Special Master at the time of his team's 25th Round monitoring tour that, among the "Obstacles to Providing Mental Health Services and Adherence to Program Guide Requirements," was that "CCI MH AB109 realignment staffing losses amount to over 60% of clinical line staff and 70% of supervisory staff."[109]  This is, of course, a substantial cut in clinical staffing at the institution.

239.   When I was at the Ad Seg unit, I interviewed one clinician, Dr. Jensen, in large part because the prisoners with whom I had spoken in Ad Seg seemed to think very highly of her.  She praised the cooperation that she said the escort officers now showed, and she seemed very dedicated to her work.  However, she also acknowledged that there

_____

[109] Bien Decl. Ex. 21, at 2 of 11 (CCI 25th Round Management Report).

[752643-7]

1   were some problems with which she and the other clinicians had to contend, ones having

2   to do primarily with staff shortages and workloads.  She noted that she performs several

3   functions at the prison, serving not only as a case manager for 46 Ad Seg inmate-patients

4   (with whom she is supposed to have a substantive clinical contact each week), but also is

5   the mental health staff member who does mental health assessments for RVRs imposed

6   against mentally ill prisoners and others with potentially psychologically mitigating

7   circumstances.  She stated that although these mental health assessments had almost

8   doubled recently, she was still the only clinician assigned to do them.  Dr. Jensen

9   acknowledged that she sometimes cannot get to all of her patients without depending on

10  another clinician to help.  As she noted, "we have lost quite a bit of our staff and it has

11  posed real challenges.  Our yards are very far apart, and it's hard to share staff, so these

12  staff losses are hard on us.  Our population is down, but our staffing losses have more than

13  made up for that.  We've had to be even more creative and strive harder to get appropriate

14  treatment."  She said that, on average, she does 10-12 one-to-one contacts per day which,

15  given her other responsibilities, places limits on the amount of time she can spend with

16  each inmate-patient.

17           **d.    Lack of Adequate Treatment Space, Meaningful
                     Treatment, and Out-of-Cell Time for Mentally Ill Prisoners**

18

19           240.   We spent a fair amount of time trying to locate a treatment group in session

20  at the facility.  When I finally got to observe one of them take place, it was an unusual

21  scene.  First of all, the group was being held in a large open hallway outside the dining

22  hall.  But there was a very loud blower or industrial fan that was on in the background; it

23  was so loud that it was very difficult to hear.  In addition, the hallway was very cold

24  (which was especially problematic because none of the inmate-patients was wearing a

25  jacket or coat).  In addition, as shown in **Photo Exhibit CC**, the treatment cages—all nine

26  (9) of them—were arranged in a long straight line, so that the participants really could not

27  function as a "group" at all.  It would have been impossible for any one prisoner to see (or

28  hear) another prisoner who was more than two cages away, and the prisoners

1  acknowledged this to me when I spoke to them.  Moreover, the group leader (who

2  appeared to be animated and engaged) was standing a good 10 feet away from the cages.

3  The group "activity" consisted of her standing in front of the prisoners with a large picture

4  book, showing them scenes from the book and then asking for their suggestions on how to

5  resolve the conflicts that were depicted.  The class was described as "anger management,"

6  but the person in charge told us that she was a recreational therapist, not a psychologist or

7  clinical social worker.

8      241.   Nonetheless, the three (3) prisoners who attended said that they enjoyed the

9  experience and were happy to get a chance to get out of their cells and participate in some

10  kind of activity.  They also said that there were rarely more than three (3) prisoners who

11  attended the group—"most guys refuse."  They told me that group is intended for SHU

12  prisoners who are on the mental health caseload and is held once every two (2) weeks.

13  The prisoners said that they did not know the therapist's name but thought she was good,

14  and also that "we don't really hear each other."  They agreed that because they did not

15  have much else to do, the group was a welcome break in the day-to-day monotony, no

16  matter the content.  "We are supposed to get 10 hours a week [out of our cells], but we are

17  lucky if we get five or six hours."  All three said that they saw their clinicians no more than

18  once a month, and sometimes even more infrequently than that.  We were later given the

19  CCI "Group Therapy Schedule," which I was told  is the only mental health treatment that

20  takes place at the prison, other than the weekly or monthly one-to-one clinical contacts.

21  We were told repeatedly that mentally ill prisoners do have access to clinically-indicated

22  group treatment, but the staff acknowledged that group treatment was extremely limited.[110]

23  Based on the chart provided to us, it appears that there are a total of nine (9) groups

24  provided, six (6) of which are conducted by the recreational therapist that we had

25  observed; however, none of her groups actually consist of recreational therapy.  Of the

26  _____

27  [110] Bien Decl. Ex. 12 (Group Therapy Schedule, CCI Tehachapi).

28

1  nine (9) groups (which we were told lasted one hour each), six (6) were done every other

2  week, and three (3) were done weekly.  This adds up to approximately 24 total group

3  treatment hours per month for the 1035 CCCMS patients and 12 EOP patients at the

4  institution.  The group we observed had three (3) patients attending, but we were told that

5  there can be as many as six (6) patients in a group.

6     242.   Even assuming six (6) patients attend every group in a given month

7  (something that prisoners told us rarely if ever occurred), that adds up to just 144 treatment

8  hours available to mentally ill prisoners per month (6 patients X 24 treatment hours).  *That*

9  *means that there are approximately 0.14 group treatment hours/month, or 0.034 group*

10  *treatment hours/week, for each caseload prisoner at CCI.*  The schedule also reveals that

11  there are no group treatment sessions provided for the 468 CCCMS and one EOP prisoner

12  housed in Facilities D and E.[111]  It is hard to imagine that such a mental health program

13  provides clinically indicated treatment to the large number of mentally ill prisoners who

14  are housed at CCI.  My interviews with many inmate-patients in distress at CCI, who

15  reported having little or no group treatment available to them, confirmed as much.

16         **e.     Use of "Bad Beds" due to Lack of Appropriate Beds**

17     243.   Just as overcrowding in CDCR's system was driving the use dangerous Ad

18  Seg and other inappropriate beds at MCSP, CIM, and COR, the same problem was

19  impacting the men incarcerated at CCI.  For the week of February 11, 2013, CCI

20  requesting the transfer of 54 CCCMS inmate-patients to an appropriate bed at another

21  CDCR institution; only five were actually transferred.  More than half (28) of these 54 men

22  were waiting to transfer to an appropriate bed at Kern Valley State Prison (KVSP); *none* of

23  those men were transferred.[112]  As I learned during my tour, several of them were housed

24  in Ad Seg waiting for transfer to an appropriate bed, and had been endorsed  to KVSP or

25  _____

26  [111] Bien Decl. Ex. 13 (CCI Weekly Population Summary (provided on Feb. 22, 2013)).

27  [112] Bien Decl. Ex. 2.  (CDCR Weekly Data on MHSDS Transfers, Week of Feb. 11, 2013).

28

1  elsewhere *many times*.  (Each "endorsement" must be renewed every three (3) months.)

2  As a result of these overcrowding-related backlogs, scores of men lingered in

3  inappropriate, and dangerous, beds because there was no appropriate place to put them.

4       244.   I observed and spoke with inmate-patients who found themselves placed in

5  inhumane or dangerous settings at CCI—including in the OHU (where prisoners are made

6  to sleep on the floor), in the Ad Seg, or in the SHU (where many prisoners end up after

7  having acted out due to long waits in Ad Seg necessitated by delayed transfers to

8  appropriate beds).  In short, I saw a system that, largely due to crowding, could not meet

9  the placement and treatment needs of the mentally ill, often with real harm being the end

10  result.

11             **(i)**    **Mentally Ill Prisoners Placed in the Harsh**

12                      **Outpatient Housing Unit due to Lack of MHCB and**
                     **EOP Beds**

13       245.   Throughout the day that I toured CCI, I heard a number of complaints from

14  inmate-patients to the effect that they were being housed in problematic and especially

15  harsh housing units while they were awaiting transfer to an appropriate bed somewhere

16  else in CCI itself or elsewhere in the CDCR system.  There were numerous examples of

17  this, including in the OHU.  I interviewed OHU inmate-patient, Prisoner KK who said he

18  had been in prison for approximately 16 of his 35 years.  He told me that he had been

19  mistreated in the past at this OHU, and that he was housed here again temporarily, having

20  been transported from Salinas Valley State Prison to attend court.  Prisoner KK said that:

21  "They put me in the OHU because they don't have an EOP bed for me."  He said that,

22  among other things, he received no yard time while he was being held in the OHU.  The

23  floor officer in the OHU confirmed that Prisoner KK was there because CCI did not have

24  an appropriate EOP bed for him.  Prisoner KK was provided some property (e.g.  two

25  books, and eventually a razor) in his OHU cell, but was otherwise treated like the other

26  mental health patients housed there (including being placed in restraints for all escorts,

27  being forced to sleep on the floor in his cell, and so on).  His Progress notes repeatedly

28  quoted him as saying "I'm not suicidal … I'm stable" and noting that he was an EOP "just

1  at CCI for court.  Says he is bored and is asking for his property, to get to shower, real

2  clothes, etc."  His Progress Notes indicated that he was in the CCI OHU at least from

3  February 21 to February 28, and the Inmate Locator lists him as still at CCI as of March 4

4  (meaning he had been there for one week and likely longer).

5      246.    There were also two OHU mental health patients who had been awaiting

6  transfer to an MHCB at another institution, having been referred for MHCB level of care

7  two days earlier.  We were told it generally takes a couple days for such transfers to occur.

8  Both of these patients were EOPs at CCI while awaiting transfer to an EOP bed at

9  institutions that had an EOP program.

10     247.    Lindsay Hayes, in his August 16, 2011 report for CDCR, was "quite

11 concerned about the current conditions observed in the OHUs" at certain institutions,

12 including the unsanitary conditions and lack of beds or other humane amenities.[113]  The

13 prisoners that I described above were languishing in exactly these kinds of harsh OHU

14 beds at CCI, while they waited for transfer to an appropriate bed in the system.

15 Photographs of these barren OHU cells, where inmate-patients I spoke with were held for

16 several days following their mental health crisis admission, are attached as **Photo**

17 **Exhibits DD and EE**.

18     CCI's 25th Round Management Report, prepared for the Special Master, raised an

19 additional concern.  It stated that only "64% [of OHU patients admitted for suicidality]

20 were administered a [Suicide Risk Evaluation (SRE)] at the time of placement, 0%

21 received an SRE upon release from OHU, and 62% received a five day follow-up upon

22 their release."  CCI stated that a "contributing factor" to this low performance in the areas

23 of suicide prevention was "loss of mh staff assigned to the OHU which has not been

24 replaced."[114]

25 _____

26 [113] *Coleman* Dkt. No. 4350-1, Ex. N, Hayes CDCR Suicide Prevention Consultation
   Memorandum, pp. 9-11.

27 [114] Bien Decl. Ex. 21 at 8 of 11 (CCI 25th Round Management Report).

28

1                 **(ii)**       **Mentally Ill Prisoners Placed in Harsh**
2                           **Administrative Segregation Settings due to Lack of**
                           **Appropriate Beds**

248.   This problem was not restricted to the OHU.  In fact, when we discussed these issues with Captain Lundy in the Ad Seg housing unit, he told us that "way more than half" of the prisoners in the CCI Ad Seg were awaiting transfers elsewhere.  He explained in more detail that the Ad Seg prisoners at CCI fell into two general categories—those prisoners who had been sent directly to Ad Seg from GP yards, and those who were coming "back down" from SHU, after the completion of their SHU term.  On the day of our tour, there were a total of 197 Ad Seg prisoners.  Captain Lundy told us that 65 of them had been placed in Ad Seg from the GP/SNY yards (Facilities C D and E) at CCI, and two (2) more were housed in the CCI Ad Seg pending a court appearance. *There were some 130 prisoners were currently housed in Ad Seg after having ended their SHU term; these men were awaiting placement in an appropriate program elsewhere.*  And, as we learned, many of them were mentally ill inmate-patients who were suffering under very severe Ad Seg conditions simply because there was no appropriate bed elsewhere in the system in which to place them.

249.   While I was in the Ad Seg unit, I spoke with Prisoner LL, who told me he had been waiting in Ad Seg for 90 days, having completed his SHU term.  However, because of the amount of time that he was in Ad Seg waiting to transfer and the harsh conditions under which he waited, he was afraid that he on his way back into SHU.  He told me he was having a hard time with the oppressive conditions in segregation: "my anxiety is starting to overwhelm me.  I'm pacing back and forth, about to lose it."  He said that he was endorsed for Kern Valley but that the endorsement had been withdrawn—the frustration of being in Ad Seg built up and "because of the long wait in Ad Seg I caught another case" and may now face another SHU term.  He explained that, in this segregation setting, "there's nothing … I'm so stressed out here, it's overwhelming to me, but they won't move me."  He said he did not know of any groups being held on the unit or accessible to prisoners like him.  He sees his clinician, Dr. Jensen, for a few minutes each

[752643-7]

1   week and goes to yard, and that is all there is for him to do.  He also was afraid of the

2   stress building up and getting to him, precipitating another incident that would give him a

3   third strike: "I could end up in here for life."

4          250.    I spoke with another prisoner in Ad Seg who was also awaiting transfer to

5   Kern Valley State Prison for an appropriate SNY bed.  Prisoner MM told me he has "been

6   here 14 months waiting for a bus to KVSP.  I'm just waiting" in Ad Seg.  He had been

7   endorsed for transfer to KVSP five (5) times, with the first four (4) having expired.  He

8   said that this long and unnecessary stay in Ad Seg followed an already long SHU term: "I

9   was in SHU for 3 years."  Apparently, because of safety concerns, KVSP is the only place

10   he can go.  He does not like to leave his cell in Ad Seg, in part because of "the chains" and

11   elaborate escort procedures: "it's too much."  He generally goes to his psych consults

12   because he likes Dr. Jensen.  But the clinical contact often lasts only a couple of minutes

13   with her, and the same is true if she comes by his cell and talks to him cell front.  He says

14   he has no idea if there are any groups here, but he has never heard of any.  In addition:

15   "We mostly shower in our cells—we get pulled [for shower] fewer than 3 times per week."

16   He added: "I can't get my books, can't get an ink pen, even if we buy something we can't

17   get it—we get nothing in Ad Seg."  He says that he is able to go to yard about one time per

18   week, but that he is placed in a cage about the same size as his cell, and that "it's like

19   another cell, just outside."  Photographs of the exercise cages in which CCI's segregated

20   prisoners spend their time in "yard" are attached as **Photo Exhibits FF, GG and HH**.

21          251.    I interviewed another inmate-patient housed in Ad Seg, Prisoner NN who

22   told me that he had been a CCCMS inmate-patient on a Level I yard (CCI Facility E) for

23   18 months.  When he received an RVR (stemming from an incident while he was in the

24   hospital), it led to a SHU term.  He was placed in the OHU for three days around the time

25   of this incident, but oddly the mental health assessment (by Dr. Jensen) found no

26   relationship between his mental health condition and the alleged behavior.  Because he has

27   significant medical issues, CDCR told him he could not be sent to the CCI SHU.

28   However, because there was no appropriate bed available to meet his complex needs, he

1   was instead placed in a CCI Ad Seg cell just a few buildings away from the SHU, waiting

2   for such a bed to become available somewhere else.  He has since been elevated to EOP

3   level of care, but remains in Ad Seg, with no EOP program, just the same.  Dr. Jensen is

4   his case manager and he likes her, but he said she is only able to spend a few minutes with

5   him (or anyone for that matter) because she and the other case managers "don't have time

6   for any longer."  Apparently Dr. Jensen covers most or all of the inmates in Ad Seg

7   Building 8.  A review of Prisoner NN's records showed that he was in fact suffering under

8   the Ad Seg conditions where he was being kept.  He had been placed on suicide watch

9   during his stay in Ad Seg, and also had received a second RVR, which Dr. Jensen found

10  stemmed from his mental health condition.  On January 28, Dr. Jensen wrote that

11  Prisoner NN told her:  "I got another 115 by Dr. Tate.  I'm so upset.  I want to stop eating

12  until they transfer me out of here.  I'm at the end of my rope.  I don't know what else to

13  do."  And a February 14, 2013 Progress Note, completed well after his level of care had

14  been raised to EOP, reported him saying to his clinician, as he said to me, "I really need to

15  get to a program."

16      252.   Prisoner NN attended one group (an anger management group similar to the

17  group I saw in session earlier) a few times after arriving in Ad Seg, but said that has not

18  been offered any group for some time.  His records confirmed that his last group was 10

19  weeks ago, in early December 2012, when the recreational therapist running the group

20  documented that staff should "continue to monitor and offer groups bi-weekly" to him.

21  But there is no indication, either from Prisoner NN or in his records, that this was done; he

22  does not appear to have been offered any group since that time.  He said it is "really hard

23  back here.  No books.  By yourself every day."

24      253.   When we spoke with CCI's health care administrator about Prisoner NN's

25  case, he explained that Prisoner NN's SHU term had expired and he was awaiting transfer

26  to an appropriate EOP bed.  Because there was not such a bed available in the system, he

27  had also been endorsed to the EOP ASU at R.J. Donovan while he was waiting for an open

28  EOP bed.  This was a clear example of the "ripple effect" that overcrowding produces on

what remains a highly stressed mental health system:  backlogs for one mental health bed (EOP) cause further backlogs elsewhere (EOP ASU).  And meanwhile, a mentally ill inmate-patient gets worse in a bad bed in which he should never have been placed to begin with.

254.    I spoke with Prisoner OO CCCMS, at one of the tables.  He told me he had been in prison for 20 years and had been sent to CCI from Mule Creek to serve a SHU term.  After he had completed his SHU term, he was sent to Ad Seg in September 2012.  He has remained in Ad Seg for the last five (5) months.  Prisoner OO's records indicate that he is "high risk medical" also high-risk for suicide.  His father hanged himself, and his brother has a total of five (5) suicide attempts.  Given the extremely high suicide risk in CDCR's segregation settings and the clear lack of therapeutic programming in the CCI Ad Seg, such a placement is indisputably a very dangerous one for this man.

255.    Prisoner V, who I met with at CIM ten days earlier, had been in the CCI Ad Seg after having completed a SHU term.  He had then been sent to the CCI Ad Seg for six (6) more months in harsh segregation conditions, where his mental health deteriorated significantly.  He had required transfer to the CIM MHCB because he was very suicidal.  He told me, "I was trying to kill myself.  I can't take it."  He had been lingering in the Ad Seg at CCI, waiting for an appropriate SNY bed at KVSP.  He told me it was very difficult for him there, and he became very emotional talking about his experiences in segregation.  He said he did not like to leave his cell in the CCI Ad Seg, because officers often would do a full strip search on him.  "Everything.  Squat.  Cough.  Everything."

256.    Not only was Prisoner V in this very dangerous segregation setting solely because CDCR could not place him in an appropriate bed, but there appears to have been a significant delay in transferring him to an MHCB when his suicidality was recognized.  His records state that he was placed in the CCI OHU, an unlicensed crisis care unit, on January 31, 2013.  The same day, the physician ordered that he be transferred to an MHCB.  He nevertheless remained in the CCI OHU for eight (8) more days before finally getting transferred to CIM.  Because the practice in the CCI OHU is to place suicidal

1  inmate-patients in barren cells with no beds, this means that Prisoner V was made to sleep

2  on the floor for eight (8) days, until CDCR finally found an MHCB in which to place him.

3      257.    The problem of backlogs and the unavailability of appropriate beds at CCI

4  and in the larger CDCR system (both of which remain significantly overcrowded) lead to

5  this serious and destructive domino effect in which inmate-patients get stuck in harsh

6  segregation units.  These units are by their nature very dangerous and places where their

7  treatment needs cannot be and are not adequately addressed.  This problematic pattern is

8  still very prevalent in the CDCR institutions I toured, and it was certainly in evidence at

9  CCI.

10        **(iii)    Mentally Ill Prisoners Placed in Harsh SHU Settings**

11      258.    Of course, the SHUs at CCI are also very harsh and subject inmate-patients

12  to conditions of confinement that may further damage their already fragile mental health

13  conditions.  In fact, there are *Coleman* class members in these units who are suffering and

14  whose mental conditions are being adversely affected by their time in SHU and the lack of

15  programming and treatment they receive there.

16      259.    The backlog problem that affected CCI's Ad Seg also occurred in its SHU,

17  although it was manifested a little differently.  Prisoner PP is an EOP SHU inmate-patient

18  (although EOPs are not supposed to be in SHU) who told me that he gets case manager

19  contact once a week but also said that "we don't really get much mental health care."  He

20  said he was waiting for a transfer to Ad Seg and then to a PSU, where he said he has been

21  endorsed to go.  He told me that there are no groups for EOPs in SHU, except for one that

22  meets in the hallway outside the dining hall (apparently, a group led by the recreational

23  therapist that I observed earlier).  Prisoner PP said the group is supposed to meet every two

24  weeks but sometimes takes place only once a month.  He goes to it because, as he said, "I

25  need social contact."  Other than that and his weekly clinical contact with his case

26  manager, which he said can last for as little as 5 or 10 minutes, he has very little to do and

27  gets virtually no help for his serious mental health problems.

28

260.    Of course, these harsh conditions and the corresponding lack of care have taken a toll on Prisoner PP's mental health condition.  Prisoner PP told me that, during the time he has been in SHU, he has been to the OHU or MHCB multiple times.  In fact, he told me that he started out at the CCCMS level of care, but his symptoms had worsened while he was in SHU.  He began having psychotic episodes, hallucinations, and feeling paranoid, and he was recently made EOP.  Prisoner PP was hopeful that he would get more treatment when he finally got to his next placement.  He reported that he has had eight (8) suicide attempts, including one in June 2012, while in the SHU at CCI (resulting in a long MHCB stay at Corcoran).  For obvious reasons, I was very concerned about Prisoner PP's safety and well-being in the unit where I met with him.

261.    In the Facility B SHU, Housing Unit 8, A Section, I spoke with Prisoner QQ, who told me he had been CCCMS since 2011, and has been hearing voices.  He is only 22 years old and came to prison in August 2010, with a three (3) year sentence.  He will be released in April of this year.  He appeared very fragile and unstable.  He told me that he has a long mental health history, dating back to when he was a juvenile.  (His records indicated that he had 2-3 past suicide attempts by hanging.)  When Prisoner QQ was on the SNY yard at Wasco, he received an RVR that resulted in a 15-month SHU term.  He was sent to CCI.  He said that he has relied primarily on his cellmate to try to maintain emotional stability under the harsh regimen of SHU: "I got no real mental health treatment when I got here.  My celly, who has been down 17 years, has been helpful to me.  He is patient with me.  I hear voices all the time."

262.    Prisoner QQ said that he had been taken off his medications in January, but did not know why.  He thought it might have something to do with him having missed an appointment with his psychiatrist.  In any event, he told me he was having a very hard time without them.  He was changed to EOP on February 7th and is supposed to see his case manager every week.  When I asked him how he passed his time in SHU, he told me, "I stay in my cell, pace back and forth, talk to myself."  He said he goes to yard occasionally to clear his head but otherwise has little to do in his cell.  His records indicated that he was

[752643-7]

1  placed in the OHU on January 29, 2013, because he had been expressing suicidal ideation

2  and plans to take his own life for the 3 preceding days.  He was discharged back to SHU at

3  a CCCMS level of care on January 30 but then, as I noted above, was elevated back to

4  EOP a week later.

5      263.    Prisoner QQ told me that he likes his clinician (Dr. Adair), but also said that

6  "she's only able to spend 20-30 minutes with me each week."  He cannot, and has not,

7  received EOP level treatment in the CCI SHU.  He was under the impression that he was

8  being sent to CSP-Los Angeles County, and he has just been trying to hold on until that

9  happened.  According to his most recent IDTT meeting (on February 7, 2013), his

10  Treatment Plan indicated that he was not getting any groups or any other therapy beyond

11  his weekly one-to-one contact and weekly rounds by the psych tech.  He was receiving no

12  enhanced treatment and was not receiving any medication.  His unstable state was so

13  concerning to me that I asked the CCI mental health staff with us on the tour to arrange for

14  him to be seen by a clinician as soon as possible.

15      264.    In the A Facility SHU, Building 5, I interviewed another inmate-patient,

16  Prisoner RR.  He told me that he was getting hardly any therapeutic contact or support in

17  the SHU.  He told me that he arrived at CCI in January, and spent time in the Ad Seg unit

18  before coming to the SHU in the beginning of February.  He said that he has not seen a

19  case manager since he entered the SHU, and he said there were no groups either.  When he

20  was at his last prison, Pleasant Valley, he said that groups were offered, that they "watched

21  movies" in them, and that he attended them.  Prisoner RR told me he had a severe "anxiety

22  problem" for which he was being medicated.  The physical manifestation of his anxiety

23  was very apparent during our conversation; his hands were in constant and pronounced

24  nervous motion the entire time we spoke.  He said that it was "really hard to keep control,"

25  that he knew he needed help with his problems, but that he was not getting any, and that

26  made him even more anxious.  He said that he had not had an IDTT meeting yet, and also

27  told me that the psych techs do not check on the prisoners in SHU "the way they should,"

28

1   which he explained meant that they did not come often and when they did they passed by

2   quickly without really stopping to check on the inmates' well-being.

3   265.   Another SHU inmate-patient, Prisoner SS told me that he was hardly being

4   seen by the clinical staff.  He said he had been in Kern Valley, and had gotten to CCI about

5   a month ago to serve a 15-month SHU term.  He said the psych techs only come by to

6   check on them once a week, that he does not know his case manager's name, and that he

7   was told he would only be able to see him every 30 days (in a meeting that, the one time

8   that it occurred, lasted about 30 minutes).  He had never heard of any groups being offered

9   for SHU prisoners at CCI.

10   266.   Prisoner TT is a CCCMS SHU inmate-patient who told me that he has been

11   dealing with psychological problems since he was a child.  He said he had been "stuck in

12   Ad Seg, waiting for a transfer to an SNY yard, when I caught a case in Ad Seg and now

13   I'm in SHU."  He had finished a SHU term in 2011, then spent approximately nine (9)

14   months in Ad Seg while waiting to be transferred to an appropriate bed.  He said that the

15   period in SHU and then Ad Seg was especially hard for him, given the lack of any program

16   and the fact that he could not even have a TV or radio to pass the time in Ad Seg.  At some

17   point during his time in Ad Seg, he received a new RVR (for harassing another person

18   through the mail), and he was placed back in SHU around July or August 2012.  His

19   current SHU term ends in June 2013, and he is very concerned about being sent back to Ad

20   Seg again when that term ends, continuing a cycle between two extremely isolating

21   segregation settings.

22   267.   Prisoner TT said that to his knowledge there are no groups being offered in

23   SHU.  If groups were offered, he said, he would go because "it helps to talk, to deal with

24   my anger").  Prisoner TT told me that he only sees his case manager once a month, that

25   "we spend only 15-20 minutes with him," and "I don't know his name; he's Middle

26   Eastern."  Prisoner TT said that the psych techs come by his cell "once a week, at best."

27   Other than that, his only time out of his cell, or minimal contact with others, is when he

28   goes to yard.  But, as he put it, "I go from my cell to a cage.  What's the difference?"

268.    The last inmate-patient I spoke with in SHU, Prisoner UU, told me that he had suffers from PTSD, and that his symptoms include flashbacks and episodes of mania. His records showed that on Dec. 24, Prisoner UU submitted a HC Services Request stating: "I would like to talk to Mental Health.  I've been down 3 years with 4 ½ to go.  I find myself thinking different.  I'm getting more and more institutionalized.  My way of thinking and my anger issues needs to be addressed ASAP.  Thank you."  However, as of February 7, 2013, more than two (2) months later, there was no indication in his records that he had been seen or actually placed on CCCMS status.  When I spoke with Prisoner UU (on February 22nd), he said that he thought he had only very recently been placed back on the mental health caseload.  (In fact, his name did not appear on the caseload roster off of which Defendant's counsel was initially working with and he at first refused to allow me to speak with him.  I persisted and the prison staff kindly double-checked against the most current roster, and learned that, in fact, Prisoner UU was correct—he had just been placed on the *Coleman* caseload.)  Prisoner UU recounted a long history of traumatic experiences in prison, where he was sent at age 16 and has lived more or less continuously for the last 23 years.  During this time, he said, he was "beaten, stabbed, shot" on a number of occasions, which resulted in his current PTSD diagnosis. He told me: "I've been on CCCMS before.  I ask for groups.  I need to be around people— they just want to give you a pill.  It doesn't work, plus it interferes with my medical problems."  He said that the last time he was CCCMS he objected to receiving medications and was removed from the caseload.  But he is worried that despite now being placed back at a CCCMS level of care, he will not be helped "because they have no groups," in SHU.

### f.      Dangerous and Extremely Harsh Housing and Treatment of Mentally Ill Prisoners

269.    Implicit in my lengthy discussion of the institutional histories of the many inmate-patients who are being subjected to these harsh, severely deprived, and potentially damaging conditions of confinement—most often merely because they are waiting to be transferred elsewhere—is the concern that many of them will decompensate and require an

[752643-7]

1   even higher (and more difficult to obtain) level of care, or act out in response to the

2   harshness of their environment and lack of treatment, precipitating an even longer stay in

3   punitive segregation.  There were numerous examples of this destructive process in

4   operation at CCI, beyond the ones I have already recounted.

5        270.   I spoke to Prisoner VV, EOP, who told me he was in a Level III GP unit at

6   CCI before being sent to Ad Seg.  He thought the infraction was a minor one and was told

7   he would be transferred to another prison, but he is still in Ad Seg.  He has been awaiting

8   transfer to an EOP SNY bed since February 11.  As of March 4, he was still waiting at

9   CCI, and still clearly not receiving the kind of EOP level of care that he needs.  He

10  complained about the fact that there was nothing to do in Ad Seg.  "I've lost a lot of

11  weight—30-40 pounds—from exercising in my cell, because that's the only thing to do."

12  Prisoner VV seemed to me to be a little "off" and very guarded.  For example, he would

13  not fully explain why he did not want to go to see his clinician.  His records document that

14  he was at the EOP level of care until January 2012, when he was made CCCMS.  Then he

15  was sent to Ad Seg in May 2012 for possession of a weapon (razor) and assault on peace

16  officer.  No RVR-MH appears to have been done, although Prisoner VV has a history of

17  suicide attempts by cutting wrists.  He has been in the CCI Ad Seg since May 5, 2012 and

18  appeared to be suffering there.

19       271.   In the adjoining Ad Seg unit (Facility A, unit 8B), Captain Lundy showed us

20  the "intake" cells in the Ad Seg, which consist of several cells that have been retrofitted for

21  suicide prevention (they do not have shelving and so on).  But they are dismal, dank,

22  and—at least the ones I looked at—terribly dirty.  There is a concrete bottom bunk and the

23  inmate housed in the one that I entered had covered the open toilet with a piece of cloth

24  (no doubt to minimize the odor).  This cell is depicted in **Photo Exhibit II**.  The officer in

25  the unit said that they do have to use non-intake, non-retrofitted cells at times when there

26  are more prisoners coming in to Ad Seg than available intake cells.

27       272.   The use of "management cells" in Ad Seg was a troubling practice, a

28  variation of the way they were being used at Mule Creek.  Prisoner WW was a CCCMS

[752643-7]

1   prisoner who was in a "management cell" in the 8B Ad Seg unit at CCI when I visited.

2   These cells, too, are terrible to see—there is a row of five (5) of them on the bottom tier of

3   the unit—and they are barren and dirty.  His cell is depicted in **Photo Exhibit JJ**.

4   Prisoner WW told me, "I sleep on the floor like an animal.…  I've been in Ad Seg a year

5   trying to get a transfer."  Prisoner WW explained further that he has "what amounts to" a

6   life sentence in the CDCR, and that he had been waiting in Ad Seg for about a year, until a

7   bed opened up somewhere in the system for him.  (His records confirm that he has been

8   endorsed to KVSP multiple times.  While waiting, he was placed in OHU on at least one

9   occasion.)  Finally, he said, he just could not take it—"I lost it, banged on the door, now I

10  got a 115 and might get a SHU term."  From his perspective, this has happened because he

11  was held in Ad Seg for so long, beyond what he could tolerate or endure.  He called his

12  current situation the "bottom of the barrel" and a very hard place to be.  Captain Lundy

13  said that prisoners are placed in management cells for varying periods of time, with 10

14  days the standard.  He told us that stays in these management cells can be as short as two

15  (2) to three (3) days, but also last longer than 10 days in some cases.  These management

16  cells were a very extreme version of the otherwise very harsh conditions that I saw in the

17  segregation units at CCI.

18        273.    The lack of stimulation, and specifically the lack of anything to watch, listen

19  to, or do, was a continuing complaint among the Ad Seg prisoners at CCI and one of the

20  things they pointed to making Ad Seg confinement so unbearable.  Several mentally ill

21  inmate-patients in the Ad Seg complained that there is no stimulation, such as televisions

22  or radios.  One told me, "There are no electrical outlets in the cells in Ad Seg, so nothing

23  to do."  I observed that the outlets had in fact been covered in the Ad Seg cells that we

24  examined.  I am aware that there is a CDCR memorandum, dated December 14, 2010, that

25  states: "In the interest of enhancing positive mental health activities in Ad Seg, and as one

26  fact of the larger California Department of Corrections and Rehabilitation effort to prevent

27  suicide in Ad Seg, please ensure your institution is facilitating possession of allowable

28  entertainment appliance in Ad Seg," with exemptions "granted for those institutions

1   lacking the physical plant capability to provide electricity or programming the Ad Seg

2   cells."  Some 14 months after this memorandum was issued, Ad Seg prisoners at CCI still

3   lack electrical outlets in their cells.  It was curious to me that the CCI Ad Seg cells had

4   outlets that were covered, while nearly identical buildings on the same yard had working

5   outlets in the cells that were being used for entertainment appliances.

6        274.   CCI's harsh OHU setting warrants additional note.  The OHU is used to

7   provide crisis level care, although it is not equipped or licensed the way an MHCB is.  The

8   OHU at CCI has two sides, one that is designated for GP and SNY medical cases and the

9   second, called the "Max side," which is used to house segregation prisoners who are in the

10  OHU for medical reasons, and for *all* patients there for suicide watch or precautions,

11  regardless of their security level or the housing unit from which they had come.  The cells

12  on both sides of the OHU are barren, as I noted earlier.  In addition, all patients on the

13  "max side," including all mental health patients, are treated as segregation prisoners,

14  meaning that they are always escorted in restraints and are placed inside treatment cages to

15  receive their clinical contacts.  To be clear: No distinction was made in the OHU between

16  mental health patients who had been in segregation for a disciplinary reason, had been in

17  segregation for non-disciplinary reasons, or who had come to the OHU from GP or SNY

18  housing.  Instead, a categorical policy or practice was applied that subjected all of them to

19  restraints and cages, regardless of their security or clinical needs.

20        275.   Prisoner XX, a young man who was in the treatment room with the OHU

21  clinician when we arrived, illustrates this point.  He told me that he had just arrived at the

22  OHU the day before.  He was there in part out of safety concerns—he felt very vulnerable

23  at the prison and sought safety from his cellmate—"I can't handle his lifestyle, it pounds

24  up in my mind.  I get stressed, depressed, I need to be alone."  He also said that "when you

25  are CCCMS, there is not much of a program" at CCI.  He told me that inmate-patients

26  have to fill out a request to see a case manager and visits from them are infrequent.  For

27  example, he said that he had only seen his case manager twice since October (and he did

28  not know her name).  He said there were no groups for prisoners at his level of care, and

that he worried about the very infrequent contact—"if you have to fill out a form, it could be too late."  Prisoner XX said that this was the first time he had been confined in one of the treatment cages and he did not like it.  Moreover, although he was a GP prisoner, he had been brought to the OHU in restraints, and he was put in restraints to be moved between his OHU cell and the treatment cage that provided only a very small metal disc for one to sit.  A photograph of this set-up for OHU patients to meet with their clinician is attached as **Photo Exhibit KK**.  The treatment cage and small desk are located in a room marked with a "Clean Linen" sign on the outside door.  Prisoner WW also told me that it was very cold in the OHU cell.  Prisoner XX's records indicated that he was at an EOP level of care from November 2011 until April 2012.  In August 2012, he was place in Ad Seg for 5 days for "safety" concerns.  This time, he was discharged from OHU on February 22, 2013, after spending three (3) days there.

### C.   Current Conditions Are Putting *Coleman* Class Members' Lives and Well-Being in Serious Jeopardy

276.   Based on the tours and interviews that I conducted and the analysis of the documents I have reviewed, I believe that there are a number of critically important, urgent remedies that should be implemented immediately to address the host of persistent problems I have identified, ones that continue to represent real threats to the lives and mental health of inmate-patients in the CDCR.  Of course, the three-judge court order on overcrowding remains critical to resolving the problems that persist, and I believe that its terms must be fully abided by.  The partial compliance with this order has already produced some necessary (but not sufficient) improvements in at least certain aspects of the mental health delivery system.  Such progress, however, is in real jeopardy of being stalled or even reversed by virtue of a number of other problems that either have not been addressed at all or have recently become more widespread and acute (such as the long-term placement of inmate-patients in harmful segregation units due to lack of appropriate placements).  To stop or suspend the process of fully implementing the three-judge court's

1    overcrowding order would have devastating effects on the progress that has already been

2    made and the additional tasks that must be accomplished.

3        277.    Moreover, in addition to the full implementation of the three-judge court's

4    overcrowding order, the ongoing and consistent monitoring by the Special Master should

5    continue for the near future.  It is obviously an integral part of the process by which

6    necessary improvements in the mental health delivery system will be achieved and

7    maintained.  Contrary to the claims that have been advanced by the State's experts that this

8    process is unduly onerous and obstructs their clinical practice, the clinical supervisors with

9    whom I discussed the matter agreed that *Coleman* monitoring has a beneficial effect on

10   their ability to oversee and implement an overall appropriate standard of care, and does not

11   impede their efforts.

12       278.    In addition, there are a range of additional remedies that I believe are

13   urgently needed and imperative to implement, especially in light of what I have learned

14   about how extensive the patterns and practices of subjecting numerous *Coleman* class

15   members to potentially dangerous forms of isolated, segregated confinement have become.

16       279.    In my opinion, the problems that I detail throughout this declaration are

17   serious ones that will require additional resources and important policy changes to remedy.

18   In my opinion, CDCR's overuse of segregation units, and the extremely harsh and

19   dangerous nature of those units are among the most pressing issues.  As discussed below,

20   segregation units are extremely dangerous places in which to house mentally ill prisoners

21   because the risks of mental health decompensation and suicide are exceedingly high.

22   Decisive action is urgently needed to address the unacceptable level of risk in these units.

23       **1.    Addressing the Use of Harsh, Dangerous Segregation Units for**

24   **Mentally Ill Prisoners Waiting for an Appropriate Bed in the System**

25       280.    At every institution that I toured, I observed mentally ill and highly

26   vulnerable prisoners being held in harsh and severe placements and being subjected to

27   deprived and degrading conditions while waiting for appropriate beds.  These institution-

28   specific observations were entirely consistent with the CDCR statewide data that I

reviewed.  It appears from my observations and review that the CDCR is choosing to use segregation units and other inappropriate housing to hold mentally ill prisoners until an appropriate bed comes available somewhere in the system.  Moreover, they are doing this without any proper regard for the clear (and clearly known) negative and potentially dangerous psychological consequences for the inmate-patients housed in this manner. These placements in inappropriate new forms of degrading and dangerous "bad beds" in many cases last for many months.  I observed many mentally ill inmate-patients who were suffering greatly as a result.

281.   While my research and experience has shown that segregation settings similar to CDCR's Ad Segs and SHUs have potentially dangerous and devastating effects on anyone who is placed there, it is unconscionable to expose mentally ill prisoners to such dangers simply because the system cannot place them in an appropriate bed.  The extremely large number of mentally ill prisoners currently housed in CDCR segregation units for "non-disciplinary reasons"—such as for their own safety or due to "Lack of Beds"—is alarming.  The State appears to agree, yet has not addressed the issue.  As Senior Psychologist Specialist for the Statewide Mental Health Program Dr. Robert D. Canning noted in his January 25, 2013 memorandum:

> Administrative Segregation (ASU): Segregated settings have traditionally been considered higher risk settings when it comes to suicide.  In particular, ASU has been a particular focus of suicide prevention efforts by CDCR going back over a decade.  Despite a spike in the percentage of suicides in ASU in 2004, the average over the years has been about 35% of all suicides occur in ASU, with another 10% occurring in SHU, PSU, and on condemned units ….
>
> *[D]ata collected by suicide evaluators found that many inmates who housed in ASU at the time of their deaths are placed there not for disciplinary reasons, but for safety reasons.  Although there are many complexities surrounding these situations, it is worth noting that placement in ASU of already fearful inmates may only serve to make them even more fearful and anxious, which may precipitate a state of panicked desperation, and the urge to die.*[115]

---

[115] Bien Decl. Ex. 3, CDCR Suicides:  Result of Recent Analyses, Jan. 25, 2013 (emphasis added).  Heriberto G. Sánchez, Ph.D., a clinician at CDCR's California Men's Colony, recently wrote about the added vulnerability of prisoners who are placed in segregation for

(continued…)

[752643-7]

282.    The suicide rate in CDCR's Ad Seg units has been between 129 and 229 per 100,000 since 2007.  CDCR's Ad Seg suicide rate was 157 per 100,000 in 2012, more than 6 ½ times an already high CDCR system-wide suicide rate of 24 per 100,000.[116] The State's data indicate that, for nearly half of suicides that occurred in Ad Seg between 2007 and 2012, the victim was in Ad Seg for "safety" concerns and/or pending transfer to an appropriate bed in the system.[117]  (It is ironic, and also highly disturbing, that mentally ill prisoners are being placed in such extraordinarily dangerous settings for "safety" reasons, where we know that a disproportionately high number of people take their own lives.) These are stunning statistics, and facts that warrant prompt action—action that CDCR has unfortunately refused to take themselves, despite their clear awareness of the problem.

283.    It is my opinion that, given the enormous risk of suicide and mental health deterioration in Ad Seg—which, as confirmed for the CDCR by Dr. Canning, appears to be even greater for those prisoners in Ad Seg for non-disciplinary reasons—a policy should be implemented that prohibits *any* mentally ill prisoner, or any other prisoners identified as being at elevated risk of suicide, from being placed in segregated housing for non-disciplinary reasons—particularly for their own "safety" or because they are being made to wait for an appropriate bed to become available in the CDCR system.

_____

(… continued)

their own safety:  "[T]he main concern is the long-term suicide risk associated with the length of time on the unit and the prisoner's ability to cope and function for the duration of the placement.  Prisoners placed in the administrative segregation unit for their safety face similar stressors related to being isolated.  They also may experience anxiety, fear, and paranoia associated with the initial safety concerns that led to their placement on this unit." Bien Decl. Ex. 22, Heriberto G. Sánchez, Ph.D., Suicide Prevention in Administrative Segregation Units: What is Missing, *Journal of Correctional Health Care*, 00(0) 1-8 (2013), p. 3.

[116] *Coleman* Dkt. No. 4325, Ex. I, CDCR Suicide Rates: ASU vs. Systemwide Chart.

[117] Kahn Decl. (filed under seal) Ex. 6, CDCR Segregation Suicide Data Table.

1

2

### 2.   Addressing Exceedingly Long and Indeterminate Stays in Segregation Units

3    284.   It is also my opinion that the lengthy, and in many cases indeterminate, stays

4  of mentally ill prisoners in segregation units (Ad Seg and SHU) must be definitively

5  addressed.  For one, although I understand that the CDCR has indicated that it is making

6  efforts to reduce lengths of stay in segregation, strict time limits should be developed and

7  implemented for the placement of mentally ill prisoners, and others identified as being at

8  elevated risk of suicide, in a segregation setting.  It is my opinion that, given the

9  overcrowding-related institutional stress and systemic dysfunction that has given rise to the

10  widespread overuse of "bad beds" in Ad Seg and SHU isolation units and elsewhere in the

11  CDCR, and the other persistent and widespread institutional inadequacies (such as in

12  mental health staffing) that I have documented above, the use of "aspirational" or non-

13  binding time limits for this population in segregation will continue to be ineffective, and

14  the serious risk of harm to *Coleman* class members will go on unabated.

15    285.   The American Psychiatric Association's "Position Statement on Segregation

16  of Prisoners with Mental Illness" states that "[p]rolonged segregation of adult inmates with

17  serious mental illness, with rare exceptions, should be avoided due to the potential for

18  harm to such inmates."[118]  The tours and interviews that I have summarized in the

19  preceding pages, and the suicide and other data to which I have referred, underscore the

20  fact that this harm is very real and very serious.

21    286.   The American Psychiatric Association's position statement goes on to state

22  that "[i]f an inmate with serious mental illness is placed in segregation, out-of-cell

23  structured therapeutic activities (*i.e.*, mental health/ psychiatric treatment) in appropriate

24  programming space and adequate unstructured out-of-cell time should be permitted."  In

25  the course of my tours, both clinical staff and inmate-patients conveyed to me that, under

26

27  [118] Bien Decl. Ex. 14, American Psychiatric Association, Position Statement on Segregation of Prisoners with Mental Illness, Dec. 2012.

28

1  current CDCR conditions, *neither* the out-of-cell structured therapeutic activity *nor* the

2  unstructured out-of-cell time is adequate.  This substantially raises the very serious

3  psychological risk that the inmate-patients in prolonged segregation incur.

4      287.   Finally, and with the preceding observations in mind, it is my opinion that a

5  policy of excluding certain classes of mentally ill prisoners from being placed in

6  segregation should be fashioned and implemented.  This has already been done for the

7  Pelican Bay State Prison SHU and the standalone Administrative Segregation Units.[119]  It

8  is my opinion that, given the current conditions that exist in CDCR's segregation units,

9  including the extreme deprivation and degraded nature of many of the environments, and

10  the chronic lack of meaningful activity and appropriate treatment that prisoners are

11  afforded there, and given the well-known risks borne by mentally ill inmate-patients who

12  are placed in those units, the prudent and appropriate course of action is to *exclude* those

13  mentally ill patients at greatest psychological risk from segregated housing altogether.

14      288.   For example, inmate-patients completing a stay in a DSH inpatient mental

15  health facility or in a Mental Health Crisis Bed are, intuitively be at heightened risk of

16  psychological harm—harm that very clearly can include suicide—if they are discharged

17  back into a segregation unit.  This is an example of the type of obvious elevated risk that

18  cannot and should not be permitted in a constitutionally adequate mental health system that

19  is designed to safeguard the well-being of its inmate-patients.  Such an exclusionary rule is

20  consistent with already existing Program Guide requirements.[120]

---

22  [119] Bien Decl. Ex. 15, Program Guide 12-8-1 through 12-8-3 (Security Housing Unit).

23  [120] Bien Decl. Ex. 16, Program Guide 12-5-27 & 28 (Mental Health Crisis Bed) ("Upon
24  completion of MHCB inpatient treatment, cases transferred to the MHCB as 'Psychiatric
   and Return' shall be returned to the sending institution, unless the sending institution does
25  not provide the level of care that the inmate-patient currently requires or the inmate-patient
   has any other case factor(s) that preclude return to the sending institution.  In those cases,
26  the MHCB will transfer the inmate-patient to an institution that provides the appropriate
   level of care and security."); Bien Decl. Ex. 17, Program Guide 12-6-13 (Department of
27  Mental Health Inpatient Program) ("Inmate-patients will be returned to the institution from
28                                                          (continued…)

289.    A meaningful and effective effort to remove vulnerable inmate-patients at high risk of serious harm from segregated housing would also include a comprehensive assessment of all prisoners currently in those units who have been housed there for more than 90 days.  Absent such a proactive assessment, even severely mentally ill prisoners can get "lost" or ignored in these units.  Their activity is so restricted that unit staff have so little opportunity to genuinely interact with them or observe them behave.[121]  Even rounding by mental health staff can become little more than a routine and uninformative "check in" that fails to uncover newly emerging or worsening mental health conditions. As a result, mentally ill inmate-patients may languish in segregation without being identified, even as their psychological conditions deteriorate further.  A proactive and in-depth assessment of the psychological condition of every prisoner housed in a CDCR segregation unit for longer than 90 days is an essential first step toward safeguarding

/ / /

/ / /

/ / /

_____

(… continued)

which they came per the 'psych and return' policy provided that institution can meet the level of care and security needs of the inmate-patient.")

[121] Dr. Sánchez, the California Men's Colony clinician, described concerns about the way that prisoners' suicide risk increases during the course of their time in segregation this way:  "The initial mental health screening may not identify any concerns upon admission and this would be a correct assessment.  However, as the prisoner sits in his cell thinking, he may eventually come to understand his predicament.  Since the situation is not static but is constantly changing, the initial assessment may not be correct on the following day.  As the prisoner begins to analyze how [the circumstances leading to his segregation placement] will impact many aspects of his life, his thoughts and emotions will begin to change.  Thus, the 'life span' and reliability of these mental health screens and suicide risk evaluations are very short in these types of fluid situations.  This might explain why suicides still occur despite prisoners passing these screens and all of the efforts by mental health and custody staff."  Bien Decl. Ex. 22, H. Sánchez, Suicide Prevention in Administrative Segregation Units: What is Missing, *Journal of Correctional Health Care*, 00(0) 1-8 (2013), p. 3.

EXPERT DECLARATION OF CRAIG HANEY

[752643-7]

1   against this very real problem and implementing a meaningful exclusion order (so those

2   identified as most at risk can be removed without further damage to their mental health).

3   **IV.   CONCLUSION**

4        290.   Important and necessary progress has been made to address overcrowding

5   and the many serious deficiencies in the CDCR mental health care system that I included

6   in the October 2008 report that I prepared in conjunction with the three-judge

7   overcrowding proceedings.  In my opinion, despite the commendable efforts of many

8   clinical and correctional staff at the institutions that I recently toured, and as reflected in

9   the many documents that I reviewed, major systemic problems remain that prevent the

10   delivery of minimally adequate, constitutionally mandated mental health care from being

11   delivered to *Coleman* class members.  The partial population reductions that have already

12   occurred have been essential to the progress that has been made.  But these reductions are

13   incomplete and the ultimate goal of achieving a constitutionally adequate system has not

14   been attained.  Continuing overcrowding, at both the institutional and systemwide level,

15   remain the primary barrier to adequately identifying and effectively meeting the serious

16   mental health needs of the *Coleman* class.

17

18        I declare under penalty of perjury under the laws of the United States that the

19   foregoing is true and correct and that this declaration is executed in Santa Cruz, CA on

20   March 11, 2013.

21

22           Craig Haney

23           _____

        Craig Haney

24

25

26

27

28

[752643-5]

**EXPERT DECLARATION OF CRAIG HANEY**

# PHOTO EXHIBIT A

Planned Location for EOP Administrative Segregation  Office/Treatment Space at MCSP (Bates MCSP 4)



# PHOTO EXHIBIT B

Treatment Cages for Group Therapy in EOP Administrative Segregation Unit (C-12) at MCSP (Bates MCSP 24)



MCSP  24

# PHOTO EXHIBIT C

Dayroom Floor Area Used for Group Therapy on EOP Administrative Segregation Unit (C-12) at MCSP (Bates MCSP 28)



MCSP   28

# PHOTO EXHIBIT D

TV and VCR (with Titanic movie) in Area Used for Group Therapy in EOP
Administrative Segregation Unit (C-12) at MCSP (Bates MCSP 7)



**MCSP   7**

# PHOTO EXHIBIT E

Treatment Cages for Individual Mental Health Clinical Contacts in EOP
Administrative Segregation Unit (C-12) at MCSP (Bates MCSP 14)



**MCSP   14**

# PHOTO EXHIBIT F

Exercise Yard and Exercise Cages for Prisoners in Administrative
Segregation at MCSP (Bates MCSP 33)



MCSP   33

# PHOTO EXHIBIT G

Interior of "Management Cell" (Cell 123) in EOP Administrative Segregation Unit (C-12) at MCSP (Bates MCSP 15)



# PHOTO EXHIBIT H

Interior of "Management Cell" (Cell 123) in EOP Administrative Segregation Unit (C-12) at MCSP (Bates MCSP 18)



MCSP   18

# PHOTO EXHIBIT I

Interior of "Management Cell" (Cell 123) in EOP Administrative Segregation Unit (C-12) at MCSP (Bates MCSP 22)



MCSP   22

# PHOTO EXHIBIT J

View of "Management Cells" Area, Which Sits Behind a Partition and Treatment Cages in EOP Administrative Segregation Unit (C-12) at MCSP (Bates MCSP 23)



# PHOTO EXHIBIT K

View of "Management Cells" Area, Which Sits Behind a Partition and Treatment
Cages in EOP Administrative Segregation Unit (C-12) at MCSP (Bates MCSP 20)



# PHOTO EXHIBIT L

MCSP Mental Health Outpatient Housing Unit (MHOHU), with Sign Stating that MHOHU Cells House "Suicide Watch and OHU Inmates" (Bates MCSP 40)



ALL NEW
ARRIVAL SUICIDE
WATCH AND OHU
INMATES ARE TO
BE WANDED WITH
METAL DETECTOR
BEFORE
ENTERING THE
CELL

REMOVE ALL
PLASTIC BAGS FROM
SACK LUNCHES
BEFORE ISSUING TO
SUICIDE WATCH AND
OHU INMATES!

(INCLUDING THE BREAD BAG)

THEY MAY TRY TO HURT THEMSELVES
WITH THE BAG.

OHU AND SUICIDE
WATCH
SHOWER
PROGRAM
MON, WED, FRI.
SECOND WATCH

# PHOTO EXHIBIT M

MCSP Mental Health Outpatient Housing Unit (MHOHU), in Which the Prisoner Can Sit or Sleep Only on the Floor (MCSP 39)



MCSP  39

# PHOTO EXHIBIT N

Treatment Cage Used to Conduct Individual Clinical Contacts for Prisoners in MCSP's Mental Health Crisis Bed (MHCB) Unit (Bates MCSP 49)



CSP   49

# PHOTO EXHIBIT O

"Multi-purpose room"  with Treatment Cages Used to Conduct Individual
Clinical Contacts for Prisoners in CIM's Unlicensed Mental Health Crisis Bed
(MHCB) Unit (Bates CIM 10)



CIM   10

# PHOTO EXHIBIT P

Treatment Cage Used to Conduct Individual Clinical Contacts for Prisoners in
CIM's Unlicensed Mental Health Crisis Bed (MHCB) Unit (Bates CIM 13)



CIM 13

# PHOTO EXHIBIT Q

CIM Administrative Segregation Unit (Cypress Hall), Treatment Team Meeting
Space with Treatment Cages (Bates CIM 30)

CIM   30

# PHOTO EXHIBIT R

CIM Administrative Segregation Unit (Cypress Hall West, Tier 1) (Bates CIM 35)



# PHOTO EXHIBIT S

CIM Administrative Segregation Unit (Cypress Hall) Housing Census Board –
Prisoners in Administrative Segregation Due to "LOB" ("Lack of Bed") Are
Marked with Purple or Pink Cards (Bates CIM 34)

CIM 34

# PHOTO EXHIBIT T

CIM Reception Center Housing Unit (Madrone Hall, B-Yard) (Bates CIM 19)



CIM  19

# PHOTO EXHIBIT U

CIM Reception Center Housing Unit (Madrone Hall, B-Yard), Cell 227, Which Was Double-Celled with Two EOP Inmate-Patients (One of Whom Slept on the Floor) (Bates CIM 24)



# PHOTO EXHIBIT V

CIM Reception Center Housing Unit (Madrone Hall, B-Yard), Cell 131, Which
Housed a CCCMS Inmate-Patient (Bates CIM 21)



CIM   21

# PHOTO EXHIBIT W

CIM A-Yard, Angeles Unit Dorm, Which Houses EOP, CCCMS, and General Population Prisoners (Bates CIM 37)



# PHOTO EXHIBIT X

CIM Administrative Segregation Unit (Palm Hall), Row of Cages Used to Hold
Suicidal Prisoners until Custody Staff Is Available to Escort Prisoner to Mental
Health Crisis Bed (MHCB) Unit (Bates CIM 36)



# PHOTO EXHIBIT Y

Treatment Chair (Alternative Treatment Option Model ("ATOM") for Group
Therapy in EOP Administrative Segregation Unit at Corcoran (Bates COR 6)



COR 6

# PHOTO EXHIBIT Z

View from Inside Treatment Cage Used for Individual Clinical Contacts for Inmate-Patients in Segregation at Corcoran (Bates COR 11)



COR 11

# PHOTO EXHIBIT AA

View from Inside Treatment Cage Used for Individual Clinical Contacts for
Inmate-Patients in Segregation at Corcoran (Bates COR 12)



COR 12

# PHOTO EXHIBIT BB

Exercise Cages for Prisoners in Segregation at Corcoran (Bates COR 62)

COR 62



# PHOTO EXHIBIT CC

Row of Treatment Cages in Old Dining Hall for Segregation Prisoners' Group Therapy at CCI (Bates CCI 83)



CCI   83

# PHOTO EXHIBIT DD

Interior of Outpatient Housing Unit (OHU) Cell Used for Suicidal Prisoners at CCI (Bates CCI 58)



CCI   58

# PHOTO EXHIBIT EE

Interior of Outpatient Housing Unit (OHU) Cell, with Thin Mattress on Floor, Used for Suicidal Prisoners at CCI (Bates CCI 59)



CCI   59

# PHOTO EXHIBIT FF

Exercise Cages for Prisoners in Segregation at CCI (Bates CCI 88)



CCI   88

# PHOTO EXHIBIT GG

Exercise Cages for Prisoners in Segregation at CCI (Bates CCI 89)



# PHOTO EXHIBIT HH

Exercise Cages for Prisoners in Segregation at CCI (Bates CCI 93)



CCI  93

# PHOTO EXHIBIT II

Intake Cell in Administrative Segregation Unit at CCI Facility A (Unit 8B)
(Bates CCI 73)



CCI   73

# PHOTO EXHIBIT JJ

"Management Cell" in Administrative Segregation Unit at CCI Facility A (Unit 8B) (Bates CCI 78)



CCI   78

# PHOTO EXHIBIT KK

Treatment Cage and Room Used to Conduct Individual Clinical Contacts for Suicidal Prisoners in CCI Outpatient Housing Unit (OHU) (Bates CCI 62)



CCI   62

# APPENDIX A TO DECLARATION OF CRAIG HANEY

CURRICULUM VITAE

Craig William Haney
Professor of Psychology
Department of Psychology
University of California, Santa Cruz 95064

home address:      317 Ocean View Ave.
                      Santa Cruz, California 95062
phone:            (831) 459-2153
fax:               (831) 425-3664
email:            psylaw@ucsc.edu


PREVIOUS EMPLOYMENT

| | |
|---|---|
| 1985-present | University of California, Santa Cruz, Professor of Psychology |
| 1981-85 | University of California, Santa Cruz, Associate Professor of Psychology |
| 1978-81 | University of California, Santa Cruz, Assistant Professor of Psychology |
| 1977-78 | University of California, Santa Cruz, Lecturer in Psychology |
| 1976-77 | Stanford University, Acting Assistant Professor of Psychology |


EDUCATION

| | |
|---|---|
| 1978 | Stanford Law School, J.D. |
| 1978 | Stanford University, Ph.D. (Psychology) |
| 1972 | Stanford University, M.A. (Psychology) |
| 1970 | University of Pennsylvania, B.A. |

HONORS AWARDS GRANTS

2012      Appointed to National Academy of Sciences Committee to Study the Causes and Consequences of High Rates of Incarceration in the United States.

Invited Witness, United States Senate, Judiciary Committee.

2011      Edward G. Donnelly Memorial Speaker, University of West Virginia Law School.

2009      Nominated as American Psychological Foundation William Bevan Distinguished Lecturer.

Psi Chi "Best Lecturer" Award (by vote of UCSC undergraduate psychology majors).

2006      Herbert Jacobs Prize for Most Outstanding Book published on law and society in 2005 (from the Law & Society Association, for <u>Death by Design</u>).

Nominated for National Book Award (by American Psychological Association Books, for <u>Reforming Punishment: Psychological Limits to the Pains of Imprisonment</u>).

"Dream course" instructor in psychology and law, University of Oklahoma.

2005      Annual Distinguished Faculty Lecturer, University of California, Santa Cruz.

Arthur C. Helton Human Rights Award from the American Immigration Lawyers Association (co-recipient).

Scholar-in-Residence, Center for Social Justice, Boalt Hall School of Law (University of California, Berkeley).

2004      "Golden Apple Award" for Distinguished Teaching, awarded by the Social Sciences Division, University of California, Santa Cruz.

National Science Foundation Grant to Study Capital Jury Decision-making

2

| | |
|---|---|
| 2002 | Santa Cruz Alumni Association Distinguished Teaching Award, University of California, Santa Cruz. |
| | United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project. |
| | American Association for the Advancement of Science/American Academy of Forensic Science Project: "Scientific Evidence Summit" Planning Committee. |
| | Teacher of the Year (UC Santa Cruz Re-Entry Students' Award). |
| 2000 | Invited Participant White House Forum on the Uses of Science and Technology to Improve National Crime and Prison Policy. |
| | Excellence in Teaching Award (Academic Senate Committee on Teaching). |
| | Joint American Association for the Advancement of Science-American Bar Association Science and Technology Section National Conference of Lawyers and Scientists. |
| 1999 | American Psychology-Law Society Presidential Initiative Invitee ("Reviewing the Discipline: A Bridge to the Future") |
| | National Science Foundation Grant to Study Capital Jury Decision-making (renewal and extension). |
| 1997 | National Science Foundation Grant to Study Capital Jury Decision-making. |
| 1996 | Teacher of the Year (UC Santa Cruz Re-Entry Students' Award). |
| 1995 | Gordon Allport Intergroup Relations Prize (Honorable Mention) |
| | Excellence in Teaching Convocation, Social Sciences Division |
| 1994 | Outstanding Contributions to Preservation of Constitutional Rights, California Attorneys for Criminal Justice. |
| 1992 | Psychology Undergraduate Student Association Teaching Award |
| | SR 43 Grant for Policy-Oriented Research With Linguistically Diverse Minorities |
| 1991 | Alumni Association Teaching Award ("Favorite Professor") |

| 1990 | Prison Law Office Award for Contributions to Prison Litigation |
|---|---|
| 1989 | UC Mexus Award for Comparative Research on Mexican Prisons |
| 1976 | Hilmer Oehlmann Jr. Award for Excellence in Legal Writing at Stanford Law School |
| 1975-76 | Law and Psychology Fellow, Stanford Law School |
| 1974-76 | Russell Sage Foundation Residency in Law and Social Science |
| 1974 | Gordon Allport Intergroup Relations Prize, Honorable Mention |
| 1969-71 | University Fellow, Stanford University |
| 1969-74 | Society of Sigma Xi |
| 1969 | B.A. Degree Magna cum laude with Honors in Psychology |
| | Phi Beta Kappa |
| 1967-1969 | University Scholar, University of Pennsylvania |

## UNIVERSITY SERVICE AND ADMINISTRATION

| 2010-present | Director, Legal Studies Program |
|---|---|
| 2010-present | Director, Graduate Program in Social Psychology |
| 2009 | Chair, Legal Studies Review Committee |
| 2004-2006 | Chair, Committee on Academic Personnel |
| 1998-2002 | Chair, Department of Psychology |
| 1994-1998 | Chair, Department of Sociology |
| 1992-1995 | Chair, Legal Studies Program |
| 1995 (Fall) | Committee on Academic Personnel |
| 1995-1996 | University Committee on Academic Personnel (UCAP) |

4

| 1990-1992 | Committee on Academic Personnel |
|---|---|
| 1991-1992 | Chair, Social Science Division Academic Personnel Committee |
| 1984-1986 | Chair, Committee on Privilege and Tenure |

## WRITINGS AND OTHER CREATIVE ACTIVITIES IN PROGRESS

Books:

Context and Criminality: Social History and Circumstance in Crime Causation (working title, in preparation).

Articles:

"The Psychological Foundations of Capital Mitigation: Why Social Historical Factors Are Central to Assessing Culpability," in preparation.

## PUBLISHED WRITINGS AND CREATIVE ACTIVITIES

Books

| 2006 | Reforming Punishment: Psychological Limits to the Pains of Imprisonment, Washington, DC: American Psychological Association Books. |
|---|---|
| 2005 | Death by Design: Capital Punishment as a Social Psychological System. New York: Oxford University Press. |

Monographs and Technical Reports

| 1989 | Employment Testing and Employment Discrimination (with A. Hurtado). Technical Report for the National Commission on Testing and Public Policy. New York: Ford Foundation. |
|---|---|

Articles in Professional Journals and Book Chapters

2012      "Politicizing Crime and Punishment: Redefining 'Justice' to Fight the 'War on Prisoners,'" West Virginia Law Review, 114, 373-414.

"Prison Effects in the Age of Mass Imprisonment," Prison Journal, in press.

"The Pains of Imprisonment: Prisonization and the Psychological Consequences of Incarceration," in J. Petersilia & K. Reitz (Eds.), Oxford Handbook of Sentencing and Corrections (pp. 584-605). New York: Oxford University Press.

2011      "The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement," American Criminal Law Review, 48, 121-141. [Reprinted in: S. Ferguson (Ed.), Readings in Race, Gender, Sexuality, and Social Class. Sage Publications (2012).]

"Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the 'Empathic Divide'" (with Mona Lynch), Law and Society Review, 45, 69-102.

"Getting to the Point: Attempting to Improve Juror Comprehension of Capital Penalty Phase Instructions" (with Amy Smith), Law and Human Behavior, 35, 339-350.

"Where the Boys Are: Macro and Micro Considerations for the Study of Young Latino Men's Educational Achievement" (with A. Hurtado & J. Hurtado), in P. Noguera & A. Hurtado (Eds.), Understanding the Disenfranchisement of Latino Males: Contemporary Perspectives on Cultural and Structural Factors (pp. 101-121). New York: Routledge Press.

"Looking Across the Empathic Divide: Racialized Decision-Making on the Capital Jury" (with Mona Lynch), Michigan State Law Review, 2011, 573-608.

2010      "Demonizing the 'Enemy': The Role of Science in Declaring the 'War on Prisoners,'" Connecticut Public Interest Law Review, 9, 139-196.

"Hiding From the Death Penalty," Huffington Post, July 26, 2010 [www.huffingtonpost.com/craig-haney/hiding-from-the-death-pen-pen_b_659940.html]; reprinted in Sentencing and Justice Reform Advocate, 2, 3 (February, 2011).

2009        "Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination" (with Mona Lynch), Law and Human Behavior, 33, 481-496.

"The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful," Prison Service Journal UK (Solitary Confinement Special Issue), Issue 181, 12-20. [Reprinted: California Prison Focus, #36, 1, 14-15 (2011).]

"The Stanford Prison Experiment," in John Levine & Michael Hogg (Eds.), Encyclopedia of Group Processes and Intergroup Relations. Thousand Oaks, CA: Sage Publications.

"Media Criminology and the Death Penalty," DePaul Law Review, 58, 689-740. (Reprinted: Capital Litigation Update, 2010.)

"On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence," University of Missouri-Kansas City Law Review, 77, 911-946.

"Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse," (with P. Zimbardo), Personality and Social Psychology Bulletin, 35, 807-814.

2008        "Counting Casualties in the War on Prisoners," University of San Francisco Law Review, 43, 87-138.

"Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation," Hofstra Law Review, 36, 835-882.

"A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons," Criminal Justice and Behavior, 35, 956-984.

"The Consequences of Prison Life: Notes on the New Psychology of Prison Effects," in D. Canter & R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-165). Burlington, VT: Ashgate Publishing.

"The Stanford Prison Experiment," in J. Bennett & Y. Jewkes (Eds.), Dictionary of Prisons (pp. 278-280). Devon, UK: Willan Publishers.

"Capital Mitigation," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 60-63). Volume I. Thousand Oaks, CA: Sage Publications.

7

Death Qualification of Juries," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 190-192). Volume I. Thousand Oaks, CA: Sage Publications.

"Stanford Prison Experiment," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 756-757) (with P. Zimbardo). Volume II. Thousand Oaks, CA: Sage Publications.

"Supermax Prisons," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 787-790). Volume II. Thousand Oaks, CA: Sage Publications.

2006    "The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions," Washington University Journal of Law & Policy, 22, 265-293. [Reprinted in: N. Berlatsky, Opposing Viewpoints: America's Prisons. Florence, KY: Cengage Learning, 2010.]

"Exonerations and Wrongful Condemnations: Expanding the Zone of Perceived Injustice in Capital Cases," Golden Gate Law Review, 37, 131-173.

"Preface," D. Jones (Ed.), Humane Prisons. San Francisco, CA: Radcliffe Medical Press.

2005    "The Contextual Revolution in Psychology and the Question of Prison Effects," in Alison Liebling and Shadd Maruna (Eds.), The Effects of Imprisonment (pp. 66-93). Devon, UK: Willan Publishing.

"Achieving Educational Equity: Beyond Individual Measures of Merit," (with A. Hurtado), Harvard Journal of Hispanic Policy, 17, 87-92.

"Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal," in M. Hetfield (Ed.), Report on Asylum Seekers in Expedited Removal. Volume II: Expert Reports. Washington, DC: United States Commission on International Religious Freedom.

2004    "Special Issue on the Death Penalty in the United States" (co-edited with R. Weiner), Psychology, Public Policy, and Law, 10, 374-621.

"Death Is Different: An Editorial Introduction" (with R. Wiener), Psychology, Public Policy, and Law, 10, 374-378.

"The Death Penalty in the United States: A Crisis of Conscience" (with R. Wiener), Psychology, Public Policy, and Law, 10, 618-621.

"Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation, and the Empathic Divide," DePaul Law Review, 53, 1557-1590.

"Capital Constructions: Newspaper Reporting in Death Penalty Cases" (with S. Greene), Analyses of Social Issues and Public Policy (ASAP), 4, 1-22.

"Abu Ghraib and the American Prison System," The Commonwealth, 98 (#16), 40-42.

"Disciplinary Segregation," in Mary Bosworth (Ed.), Encyclopedia of U.S. Prisons and Correctional Facilities (240-244). Volume 1. Thousand Oaks, CA: Sage Publications.

"Super-Maximum Secure Prisons," in Mary Bosworth (Ed.), Encyclopedia of U.S. Prisons and Correctional Facilities (pp. 938-944). Volume 2. Thousand Oaks, CA: Sage Publications.

2003    "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," Crime & Delinquency (special issue on mental health and the criminal justice system), 49, 124-156. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), Psychology and Law: Criminal and Civil Perspectives. Hampshire, UK: Ashgate (2007).]

"The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment," in Travis, J., & Waul, M. (Eds.), Prisoners Once Removed: The Impact of Incarceration and Reentry on Children, Families, and Communities (pp. 33-66). Washington, DC: Urban Institute Press.

"Comments on "Dying Twice": Death Row Confinement in the Age of the Supermax," Capital University Law Review, in press.

2002    "Making Law Modern: Toward a Contextual Model of Justice, Psychology, Public  Policy, and Law, 7, 3-63.

"Psychological Jurisprudence: Taking Psychology and Law into the Twenty-First Century," (with John Darley, Sol Fulero, and Tom

Tyler), in J. Ogloff (Ed.), <u>Taking Psychology and Law into the Twenty-First Century</u> (pp. 35-59). New York: Kluwer Academic/ Plenum Publishing.

"Science, Law, and Psychological Injury: The <u>Daubert</u> Standards and Beyond," (with Amy Smith), in Schultz, I., Brady, D., and Carella, S., <u>The Handbook of Psychological Injury</u> (pp. 184-201). Chicago, IL: American Bar Association. [CD-ROM format]

2001    "Vulnerable Offenders and the Law: Treatment Rights in Uncertain Legal Times" (with D. Specter). In J. Ashford, B. Sales, & W. Reid (Eds.), <u>Treating Adult and Juvenile Offenders with Special Needs</u> (pp. 51-79). Washington, D.C.: American Psychological Association.

"Afterword," in J. Evans (Ed.), <u>Undoing Time</u> (pp. 245-256). Boston, MA: Northeastern University Press.

2000    "Discrimination and Instructional Comprehension: Guided Discretion, Racial Bias, and the Death Penalty" (with M. Lynch), <u>Law and Human Behavior</u>, <u>24</u>, 337-358.

"Cycles of Pain: Risk Factors in the Lives of Incarcerated Women and Their Children," (with S. Greene and A. Hurtado), <u>Prison Journal</u>, <u>80</u>, 3-23.

1999    "Reflections on the Stanford Prison Experiment: Genesis, Transformations, Consequences ('The SPE and the Analysis of Institutions')," In Thomas Blass (Ed.), <u>Obedience to Authority: Current Perspectives on the Milgram Paradigm</u> (pp. 221-237). Hillsdale, NJ: Erlbaum.

"Ideology and Crime Control," <u>American Psychologist</u>, <u>54</u>, 786-788.

1998    "The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment," (with P. Zimbardo), <u>American Psychologist</u>, <u>53</u>, 709-727. [Reprinted in special issue of Norweigian journal as: USAs fengselspolitikk i fortid og fremtid, <u>Vardoger</u>, 25, 171-183 (2000); in H. Tischler (Ed.), <u>Debating Points: Crime and Punishment</u>. Englewood Cliffs, NJ: Prentice-Hall (2001); in <u>Annual Editions</u>: <u>Criminal Justice</u>. Guilford, CT: Dushkin/McGraw-Hill, in press; Herman, Peter (Ed.), <u>The American Prison System</u> (pp. 17-43) (Reference Shelf Series). New York: H.W. Wilson (2001); and in Edward Latessa & Alexander Holsinger (Eds.), <u>Correctional</u>

<u>Contexts: Contemporary and Classical Readings</u>. Fourth Edition. Oxford University Press (2010).]

"Riding the Punishment Wave: On the Origins of Our Devolving Standards of Decency," <u>Hastings Women's Law Journal</u>, <u>9</u>, 27-78.

"Becoming the Mainstream: "Merit," Changing Demographics, and Higher Education in California" (with A. Hurtado and E. Garcia), <u>La Raza Law Journal</u>, <u>10</u>, 645-690.

1997  "Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement," (with M. Lynch), <u>New York University Review of Law and Social Change</u>, <u>23</u>, 477-570.

"Psychology and the Limits to Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law," <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 499-588.

"Commonsense Justice and the Death Penalty: Problematizing the 'Will of the People,'" <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 303-337.

"Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death," <u>Stanford Law Review</u>, <u>49</u>, 1447-1486.

"Mitigation and the Study of Lives: The Roots of Violent Criminality and the Nature of Capital Justice." In James Acker, Robert Bohm, and Charles Lanier, <u>America's Experiment with Capital Punishment</u>: <u>Reflections on the Past, Present, and Future of the Ultimate Penal Sanction</u>. Durham, NC: Carolina Academic Press, 343-377.

"Clarifying Life and Death Matters: An Analysis of Instructional Comprehension and Penalty Phase Arguments" (with M. Lynch), <u>Law and Human Behavior</u>, <u>21</u>, 575-595.

"Psychological Secrecy and the Death Penalty: Observations on 'the Mere Extinguishment of Life,'" <u>Studies in Law, Politics, and Society</u>, <u>16</u>, 3-69.

1995  "The Social Context of Capital Murder: Social Histories and the Logic of Capital Mitigation," <u>Santa Clara Law Review</u>, <u>35</u>, 547-609. [Reprinted in part in David Papke (Ed.), <u>Law and Popular Culture</u>, Lexis/Nexis Publications, 2011)].

"Taking Capital Jurors Seriously," <u>Indiana Law Journal</u>, <u>70</u>, 1223-1232.

"Death Penalty Opinion: Myth and Misconception," <u>California Criminal Defense Practice Reporter</u>, <u>1995(1)</u>, 1-7.

1994    "The Jurisprudence of Race and Meritocracy: Standardized Testing and 'Race-Neutral' Racism in the Workplace," (with A. Hurtado), <u>Law and Human Behavior</u>, <u>18</u>, 223-248.

"Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions" (with M. Lynch), <u>Law and Human Behavior</u>, <u>18</u>, 411-434.

"Felony Voir Dire: An Exploratory Study of Its Content and Effect," (with C. Johnson), <u>Law and Human Behavior</u>, <u>18</u>, 487-506.

"Broken Promise: The Supreme Court's Response to Social Science Research on Capital Punishment" (with D. Logan), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 75-101.

"Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death" (with L. Sontag and S. Costanzo), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 149-176. [Reprinted in Koosed, M. (Ed.), <u>Capital Punishment</u>. New York: Garland Publishing (1995).]

"Modern' Death Qualification: New Data on Its Biasing Effects," (with A. Hurtado and L. Vega), <u>Law and Human Behavior</u>, <u>18</u>, 619-633.

"Processing the Mad, Badly," <u>Contemporary Psychology</u>, <u>39</u>, 898-899.

"Language is Power," <u>Contemporary Psychology</u>, <u>39</u>, 1039-1040.

1993    "Infamous Punishment: The Psychological Effects of Isolation," <u>National Prison Project Journal</u>, <u>8</u>, 3-21. [Reprinted in Marquart, James & Sorensen, Jonathan (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u> (pp. 428-437). Los Angeles: Roxbury Publishing (1997); Alarid, Leanne & Cromwell, Paul (Eds.), <u>Correctional Perspectives: Views from Academics, Practitioners,</u>

and Prisoners (pp. 161-170). Los Angeles: Roxbury Publishing (2001).]

"Psychology and Legal Change: The Impact of a Decade," Law and Human Behavior, 17, 371-398. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), Psychology and Law: Criminal and Civil Perspectives. Hampshire, UK: Ashgate (2007).]

1992      "Death Penalty Attitudes: The Beliefs of Death-Qualified Californians," (with A. Hurtado and L. Vega). Forum, 19, 43-47.

"The Influence of Race on Sentencing: A Meta-Analytic Review of Experimental Studies." (with L. Sweeney). Special issue on Discrimination and the Law. Behavioral Science and Law, 10, 179-195.

1991      "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," Law and Human Behavior, 15, 183-204.

1988      "In Defense of the Jury," Contemporary Psychology, 33, 653-655.

1986      "Civil Rights and Institutional Law: The Role of Social Psychology in Judicial Implementation," (with T. Pettigrew), Journal of Community Psychology, 14, 267-277.

1984      "Editor's Introduction. Special Issue on Death Qualification," Law and Human Behavior, 8, 1-6.

"On the Selection of Capital Juries: The Biasing Effects of Death Qualification," Law and Human Behavior, 8, 121-132.

"Examining Death Qualification: Further Analysis of the Process Effect," Law and Human Behavior, 8, 133-151.

"Evolving Standards and the Capital Jury," Law and Human Behavior, 8, 153-158.

"Postscript," Law and Human Behavior, 8, 159.

"Social Factfinding and Legal Decisions: Judicial Reform and the Use of Social Science." In Muller, D., Blackman, D., and Chapman,

A. (Eds.), <u>Perspectives in Psychology and Law</u>.  New York:  John Wiley, pp. 43-54.

1983    "The Future of Crime and Personality Research:  A Social Psychologist's View," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavioral Behavior</u>. Lexington, Mass.:  Lexington Books, pp. 471-473.

"The Good, the Bad, and the Lawful:  An Essay on Psychological Injustice," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavior</u>.  Lexington, Mass.: Lexington Books, pp. 107-117.

"Ordering the Courtroom, Psychologically," <u>Jurimetrics</u>, <u>23</u>, 321-324.

1982    "Psychological Theory and Criminal Justice Policy:  Law and Psychology in the 'Formative Era,'" <u>Law and Human Behavior</u>, <u>6</u>, 191-235. [Reprinted in Presser, S. and Zainaldin, J. (Eds.), <u>Law and American History: Cases and Materials</u>. Minneapolis, MN: West Publishing, 1989; and in C. Kubrin, T. Stucky & A. Tynes (Eds.) <u>Introduction to Criminal Justice: A Sociological Perspective</u>. Palo Alto, CA: Stanford University Press (2012).]

"Data and Decisions: Social Science and Judicial Reform," in P. DuBois (Ed.), <u>The Analysis of Judicial Reform</u>.  Lexington, Mass.: D.C. Heath, pp. 43-59.

"Employment Tests and Employment Discrimination:  A Dissenting Psychological Opinion," <u>Industrial Relations Law Journal</u>, <u>5</u>, pp. 1-86.

"To Polygraph or Not:  The Effects of Preemployment Polygraphing on Work-Related Attitudes," (with L. White and M. Lopez), <u>Polygraph</u>, <u>11</u>, 185-199.

1981    "Death Qualification as a Biasing Legal Process," <u>The Death Penalty Reporter</u>, <u>1</u> (<u>10</u>), pp. 1-5. [Reprinted in <u>Augustus: A Journal of Progressive</u> <u>Human Sciences</u>, <u>9(3)</u>, 9-13 (1986).]

1980    "Juries and the Death Penalty:  Readdressing the <u>Witherspoon</u> Question," <u>Crime and Delinquency</u>, October, pp. 512-527.

"Psychology and Legal Change: On the Limits of a Factual Jurisprudence," Law and Human Behavior, 6, 191-235. [Reprinted in Loh, Wallace (Ed.), Social Research and the Judicial Process. New York: Russell Sage, 1983.]

"The Creation of Legal Dependency:  Law School in a Nutshell" (with M. Lowy), in R. Warner (Ed.), The People's Law Review. Reading, Mass.: Addison-Wesley, pp. 36-41.

"Television Criminology:  Network Illusions of Criminal Justice Realities" (with J. Manzolati), in E. Aronson (Ed.), Readings on the Social Animal. San Francisco, W.H. Freeman, pp. 125-136.

1979    "A Psychologist Looks at the Criminal Justice System," in A. Calvin (Ed.), Challenges and Alternatives to the Criminal Justice System. Ann Arbor: Monograph Press, pp. 77-85.

"Social Psychology and the Criminal Law," in P. Middlebrook (Ed.), Social Psychology and Modern Life. New York: Random House, pp. 671-711.

"Bargain Justice in an Unjust World:  Good Deals in the Criminal Courts" (with M. Lowy), Law and Society Review, 13, pp. 633-650. [Reprinted in Kadish, Sanford and Paulsen, Robert (Eds.), Criminal Law and Its Processes. Boston: Little, Brown, 1983.]

1977    "Prison Behavior" (with P. Zimbardo), in B. Wolman (Ed.), The Encyclopedia of Neurology, Psychiatry, Psychoanalysis, and Psychology, Vol. IX, pp. 70-74.

"The Socialization into Criminality:  On Becoming a Prisoner and a Guard"  (with P. Zimbardo), in J. Tapp and F. Levine (Eds.), Law, Justice, and the Individual in Society:  Psychological and Legal Issues (pp. 198-223).  New York: Holt, Rinehart, and Winston.

1976    "The Play's the Thing:  Methodological Notes on Social Simulations," in P. Golden (Ed.), The Research Experience, pp. 177-190. Itasca, IL: Peacock.

1975    "The Blackboard Penitentiary:  It's Tough to Tell a High School from a Prison" (with P. Zimbardo).  Psychology Today, 26ff.

"Implementing Research Results in Criminal Justice Settings,"

<u>Proceedings</u>, Third Annual Conference on Corrections in the U.S. Military, Center for Advanced Study in the Behavioral Sciences, June 6-7.

"The Psychology of Imprisonment:  Privation, Power, and Pathology"  (with P. Zimbardo, C. Banks, and D. Jaffe), in D. Rosenhan and P. London (Eds.), <u>Theory and Research in Abnormal Psychology</u>.  New York:  Holt Rinehart, and Winston.  [Reprinted in:  Rubin, Z. (Ed.), <u>Doing Unto Others:  Joining, Molding, Conforming, Helping, Loving</u>.  Englewood Cliffs:  Prentice-Hall, 1974.  Brigham, John, and Wrightsman, Lawrence (Eds.) <u>Contemporary Issues in Social Psychology</u>.  Third Edition. Monterey:  Brooks/Cole, 1977. Calhoun, James  <u>Readings, Cases, and Study Guide for Psychology of Adjustment and Human Relationships</u>. New York: Random House, 1978.]

1973          "Social Roles, Role-Playing, and Education" (with P. Zimbardo), <u>The Behavioral and Social Science Teacher</u>, Fall, 1(1), pp. 24-45. [Reprinted in:  Zimbardo, P., and Maslach, C. (Eds.) <u>Psychology For Our Times</u>. Glenview, Ill.:  Scott, Foresman, 1977.  Hollander, E. and Hunt, R. (Eds.) <u>Current Perspectives in Social Psychology</u>. Third Edition. New York: Oxford University Press, 1978.]

"The Mind is a Formidable Jailer:  A Pirandellian Prison" (with P. Zimbardo, C. Banks, and D. Jaffe), <u>The New York Times Magazine</u>, April 8, Section 6, 38-60.  [Reprinted in Krupat, E. (Ed.), Psychology Is Social:  Readings and Conversations in Social Psychology. Glenview, Ill.: Scott, Foresman, 1982.]

"Interpersonal Dynamics in a Simulated Prison" (with C. Banks and P. Zimbardo), <u>International Journal of Criminology and Penology</u>, 1, pp. 69-97.  [Reprinted in:  Steffensmeier, Darrell, and Terry, Robert (Eds.) <u>Examining Deviance Experimentally</u>. New York: Alfred Publishing, 1975, Golden, P. (Ed.) <u>The Research Experience</u>. Itasca, Ill.: Peacock, 1976; Leger, Robert (Ed.) <u>The Sociology of Corrections.</u> New York:  John Wiley, 1977; <u>A kiserleti tarsadalom-lelektan foarma</u>. Budapest, Hungary: Gondolat Konyvkiado, 1977; Johnston, Norman, and Savitz, L. <u>Justice and Corrections</u>. New York: John Wiley, 1978; <u>Research Methods in Education and Social Sciences.</u> The Open University, 1979; Goldstein, J. (Ed.), <u>Modern Sociology</u>. British Columbia:  Open Learning Institute, 1980; Ross, Robert R. (Ed.), <u>Prison Guard/ Correctional Officer: The Use and Abuse of Human Resources of Prison.</u> Toronto:  Butterworth's 1981; Monahan, John, and Walker, Laurens (Eds.), <u>Social Science in Law: Cases, Materials, and Problems</u>. Foundation Press, 1985: Siuta, Jerzy (Ed.), <u>The Context of Human Behavior</u>. Jagiellonian

16

University Press, 2001; Ferguson, Susan (Ed.), <u>Mapping the Social Landscape: Readings in Sociology</u>. St. Enumclaw, WA: Mayfield Publishing, 2001 & 2010; Pethes, Nicolas (Ed.), <u>Menschenversuche (Experiments with Humans)</u>. Frankfurt, Germany: Suhrkamp Verlag, 2006.]

"A Study of Prisoners and Guards" (with C. Banks and P. Zimbardo).  <u>Naval Research Reviews</u>, <u>1</u>-<u>17</u>.  [Reprinted in Aronson, E. (Ed.) <u>Readings About the Social Animal</u>. San Francisco: W.H. Freeman, 1980; Gross, R. (Ed.) <u>Key Studies in Psychology</u>. Third Edition. London: Hodder & Stoughton, 1999; Collier, C. (Ed.), <u>Basic Themes in Law and Jurisprudence</u>. Anderson Publishing, 2000.]

## MEMBERSHIP/ACTIVITIES IN PROFESSIONAL ASSOCIATIONS

American Psychological Association

American Psychology and Law Society

Law and Society Association

National Council on Crime and Delinquency

## INVITED ADDRESSES AND PAPERS PRESENTED AT PROFESSIONAL ACADEMIC MEETINGS AND RELATED SETTINGS (SELECTED)

2012        "The Psychological Consequences of Long-term Solitary Confinement," Joint Yale/Columbia Law School Conference on Incarceration and Isolation, New York, April.

2011        "Tensions Between Psychology and the Criminal Justice System: On the Persistence of Injustice," opening presentation, "A Critical Eye on Criminal Justice" lecture series, Golden Gate University Law School, San Francisco, CA, January.

"The Decline in Death Penalty Verdicts and Executions: The Death of Capital Punishment?" Presentation at "A Legacy of Justice" week, at the University of California, Davis King Hall Law School, Davis, CA, January.

"Invited Keynote Address: The Nature and Consequences of Prison Overcrowding—Urgency and Implications," West Virginia School of Law, Morgantown, West Virginia, March.

"Symposium: The Stanford Prison Experiment—Enduring Lessons 40 Years Later," American Psychological Association Annual Convention, Washington, DC, August.

"The Dangerous Overuse of Solitary Confinement: Pervasive Human Rights Violations in Prisons, Jails, and Other Places of Detention" Panel, United Nations, New York, New York, October.

"Criminal Justice Reform: Issues and Recommendation," United States Congress, Washington, DC, November.

2010    "The Hardening of Prison Conditions," Opening Address, "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Desensitization to Inhumane Treatment: The Pitfalls of Prison Work," panel presentation at "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Mental Ill Health in Immigration Detention," Department of Homeland Security/DOJ Office for Civil Rights and Civil Liberties, Washington, DC, September.

2009    "Counting Casualties in the War on Prisoners," Keynote Address, at "The Road to Prison Reform: Treating the Causes and Conditions of Our Overburdened System," University of Connecticut Law School, Hartford, CN, February.

"Defining the Problem in California's Prison Crisis: Overcrowding and Its Consequences," California Correctional Crisis Conference," Hastings Law School, San Francisco, CA, March.

2008    "Prisonization and Contemporary Conditions of Confinement," Keynote Address, Women Defenders Association, Boalt Law School, University of California, November.

"Media Criminology and the Empathic Divide: The Continuing

18

Significance of Race in Capital Trials," Invited Address, Media, Race, and the Death Penalty Conference, DePaul University School of Law, Chicago, IL, March.

"The State of the Prisons in California," Invited Opening Address, Confronting the Crisis: Current State Initiatives and Lasting Solutions for California's Prison Conditions Conference, University of San Francisco School of Law, San Francisco, CA, March.

"Mass Incarceration and Its Effects on American Society," Invited Opening Address, Behind the Walls Prison Law Symposium, University of California Davis School of Law, Davis, CA, March.

2007 "The Psychology of Imprisonment: How Prison Conditions Affect Prisoners and Correctional Officers," United States Department of Justice, National Institute of Corrections Management Training for "Correctional Excellence" Course, Denver, CO, May.

"Statement on Psychologists, Detention, and Torture," Invited Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"Prisoners of Isolation," Invited Address, University of Indiana Law School, Indianapolis, IN, October.

"Mitigation in Three Strikes Cases," Stanford Law School, Palo Alto, CA, September.

"The Psychology of Imprisonment," Occidental College, Los Angeles, CA, November.

2006 "Mitigation and Social Histories in Death Penalty Cases," Ninth Circuit Federal Capital Case Committee, Seattle, WA, May.

"The Crisis in the Prisons: Using Psychology to Understand and Improve Prison Conditions," Invited Keynote Address, Psi Chi (Undergraduate Psychology Honor Society) Research Conference, San Francisco, CA, May.

"Exoneration and 'Wrongful Condemnation': Why Juries Sentence to Death When Life is the Proper Verdict," Faces of Innocence Conference, UCLA Law School, April.

"The Continuing Effects of Imprisonment: Implications for Families and Communities," Research and Practice Symposium on

19

Incarceration and Marriage, United States Department of Health and Human Services, Washington, DC, April.

"Ordinary People, Extraordinary Acts," National Guantanamo Teach In, Seton Hall School of Law, Newark, NJ, October.

"The Next Generation of Death Penalty Research," Invited Address, State University of New York, School of Criminal Justice, Albany, NY, October.

2005    "The 'Design' of the System of Death Sentencing: Systemic Forms of 'Moral Disengagement in the Administration of Capital Punishment, Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Humane Treatment for Asylum Seekers in U.S. Detention Centers, United States House of Representatives, Washington, DC, March.

"Prisonworld: What Overincarceration Has Done to Prisoners and the Rest of Us," Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Prison Conditions and Their Psychological Effects on Prisoners," European Association for Psychology and Law, Vilnius, Lithuania, July.

2004    "Recognizing the Adverse Psychological Effects of Incarceration, With Special Attention to Solitary-Type Confinement and Other Forms of 'Ill-Treatment' in Detention," International Committee of the Red Cross, Training Program for Detention Monitors, Geneva, Switzerland, November.

"Prison Conditions in Post-"War on Crime" Era: Coming to Terms with the Continuing Pains of Imprisonment," Boalt Law School Conference,  After the War on Crime: Race, Democracy, and a New Reconstruction, Berkeley, CA, October.

"Cruel and Unusual? The United States Prison System at the Start of the 21st Century," Invited speaker, Siebel Scholars Convocation, University of Illinois, Urbana, IL, October.

"The Social Historical Roots of Violence: Introducing Life Narratives into Capital Sentencing Procedures," Invited Symposium, XXVIII International Congress of Psychology, Beijing, China, August.

"Death by Design: Capital Punishment as a Social Psychological System," Division 41 (Psychology and Law) Invited Address, American Psychological Association Annual Convention, Honolulu, HI, July.

"The Psychology of Imprisonment and the Lessons of Abu Ghraib," Commonwealth Club Public Interest Lecture Series, San Francisco, May.

"Restructuring Prisons and Restructuring Prison Reform," Yale Law School Conference on the Current Status of Prison Litigation in the United States, New Haven, CN, May.

"The Effects of Prison Conditions on Prisoners and Guards: Using Psychological Theory and Data to Understand Prison Behavior," United States Department of Justice, National Institute of Corrections Management Training Course, Denver, CO, May.

"The Contextual Revolution in Psychology and the Question of Prison Effects: What We Know about How Prison Affects Prisoners and Guards," Cambridge University, Cambridge, England, April.

"Death Penalty Attitudes, Death Qualification, and Juror Instructional Comprehension," American Psychology-Law Society, Annual Conference, Scottsdale, AZ, March.

2003     "Crossing the Empathic Divide: Race Factors in Death Penalty Decisionmaking," DePaul Law School Symposium on Race and the Death Penalty in the United States, Chicago, October.

"Supermax Prisons and the Prison Reform Paradigm," PACE Law School Conference on Prison Reform Revisited: The Unfinished Agenda, New York, October.

"Mental Health Issues in Supermax Confinement," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Roundtable on Capital Punishment in the United States: The Key Psychological Issues," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Psychology and Legal Change: Taking Stock," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Economic Justice and Criminal Justice: Social Welfare and Social Control," Society for the Study of Social Issues Conference, January.

"Race, Gender, and Class Issues in the Criminal Justice System," Center for Justice, Tolerance & Community and Barrios Unidos Conference, March.

2002    "The Psychological Effects of Imprisonment: Prisonization and Beyond." Joint Urban Institute and United States Department of Health and Human Services Conference on "From Prison to Home." Washington, DC, January.

"On the Nature of Mitigation: Current Research on Capital Jury Decisionmaking." American Psychology and Law Society, Mid-Winter Meetings, Austin, Texas, March.

"Prison Conditions and Death Row Confinement." New York Bar Association, New York City, June.

2001    "Supermax and Solitary Confinement: The State of the Research and the State of the Prisons." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"Mental Health in Supermax: On Psychological Distress and Institutional Care." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"On the Nature of Mitigation: Research Results and Trial Process and Outcomes." Boalt Hall School of Law, University of California, Berkeley, August.

"Toward an Integrated Theory of Mitigation." American Psychological Association Annual Convention, San Francisco, CA, August.

Discussant: "Constructing Class Identities—The Impact of Educational Experiences." American Psychological Association Annual Convention, San Francisco, CA, August.

22

"The Rise of Carceral Consciousness." American Psychological Association Annual Convention, San Francisco, CA, August.

2000    "On the Nature of Mitigation: Countering Generic Myths in Death Penalty Decisionmaking," City University of New York Second International Advances in Qualitative Psychology Conference, March.

"Why Has U.S. Prison Policy Gone From Bad to Worse? Insights From the Stanford Prison Study and Beyond," Claremont Conference on Women, Prisons, and Criminal Injustice, March.

"The Use of Social Histories in Capital Litigation," Yale Law School, April.

"Debunking Myths About Capital Violence," Georgetown Law School, April.

"Research on Capital Jury Decisionmaking: New Data on Juror Comprehension and the Nature of Mitigation," Society for Study of Social Issues Convention, Minneapolis, June.

"Crime and Punishment: Where Do We Go From Here?" Division 41 Invited Symposium, "Beyond the Boundaries: Where Should Psychology and Law Be Taking Us?" American Psychological Association Annual Convention, Washington, DC, August.

1999    "Psychology and the State of U.S. Prisons at the Millennium," American Psychological Association Annual Convention, Boston, MA, August.

"Spreading Prison Pain: On the Worldwide Movement Towards Incarcerative Social Control," Joint American Psychology-Law Society/European Association of Psychology and Law Conference, Dublin, Ireland, July.

1998    "Prison Conditions and Prisoner Mental Health," Beyond the Prison Industrial Complex Conference, University of California, Berkeley, September.

"The State of US Prisons: A Conversation," International Congress of Applied Psychology, San Francisco, CA, August.

"Deathwork: Capital Punishment as a Social Psychological System," Invited SPPSI Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"The Use and Misuse of Psychology in Justice Studies: Psychology and Legal Change: What Happened to Justice?," (panelist), American Psychological Association Annual Convention, San Francisco, CA, August.

"Twenty Five Years of American Corrections: Past and Future," American Psychology and Law Society, Redondo Beach, CA, March.

1997        "Deconstructing the Death Penalty," School of Justice Studies, Arizona State University, Tempe, AZ, October.

"Mitigation and the Study of Lives," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, Chicago, August.

1996        "The Stanford Prison Experiment and 25 Years of American Prison Policy," American Psychological Association Annual Convention, Toronto, August.

1995        "Looking Closely at the Death Penalty: Public Stereotypes and Capital Punishment," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Race and the Flaws of the Meritocratic Vision," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Taking Capital Jurors Seriously," Invited Address, National Conference on Juries and the Death Penalty, Indiana Law School, Bloomington, February.

1994        "Mitigation and the Social Genetics of Violence: Childhood Treatment and Adult Criminality," Invited Address, Conference on the Capital Punishment, Santa Clara Law School, October, Santa Clara.

1992    "Social Science and the Death Penalty," Chair and Discussant, American Psychological Association Annual Convention, San Francisco, CA, August.

1991    "Capital Jury Decisionmaking," Invited panelist, American Psychological Association Annual Convention, Atlanta, GA, August.

1990    "Racial Discrimination in Death Penalty Cases," Invited presentation, NAACP Legal Defense Fund Conference on Capital Litigation, August, Airlie, VA.

1989    "Psychology and Legal Change: The Impact of a Decade," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, New Orleans, LA., August.

"Judicial Remedies to Pretrial Prejudice," Law & Society Association Annual Meeting, Madison, WI, June.

"The Social Psychology of Police Interrogation Techniques" (with R. Liebowitz), Law & Society Association Annual Meeting, Madison, WI, June.

1987    "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," APA Annual Convention, New York, N.Y. August.

"The Nature and Function of Prison in the United States and Mexico: A Preliminary Comparison," InterAmerican Congress of Psychology, Havana, Cuba, July.

1986    Chair, Division 41 Invited Address and "Commentary on the Execution Ritual," APA Annual Convention, Washington, D.C., August.

"Capital Punishment," Invited Address, National Association of Criminal Defense Lawyers Annual Convention, Monterey, CA, August.

1985    "The Role of Law in Graduate Social Science Programs" and "Current Directions in Death Qualification Research," American Society of Criminology, San Diego, CA, November.

"The State of the Prisons:  What's Happened to 'Justice' in the '70s and '80s?" Invited Address to Division 41 (Psychology and Law); APA Annual Convention, Los Angeles, CA, August.

1983    "The Role of Social Science in Death Penalty Litigation." Invited Address in National College of Criminal Defense Death Penalty Conference, Indianapolis, IN, September.

1982    "Psychology in the Court:  Social Science Data and Legal Decision-Making." Invited Plenary Address, International Conference on Psychology and Law, University College, Swansea, Wales, July.

1982    "Paradigms in Conflict: Contrasting Methods and Styles of Psychology and Law." Invited Address, Social Science Research Council, Conference on Psychology and Law, Wolfson College, Oxford University, March.

1982    "Law and Psychology: Conflicts in Professional Roles." Invited paper, Western Psychological Association Annual Meeting, April.

1980    "Using Psychology in Test Case Litigation," panelist, American Psychological Association Annual Convention, Montreal, Canada, September.

"On the Selection of Capital Juries: The Biasing Effects of Death Qualification." Paper presented at the Interdisciplinary Conference on Capital Punishment. Georgia State University, Atlanta, GA, April.

"Diminished Capacity and Imprisonment: The Legal and Psychological Issues," Proceedings of the American Trial Lawyers Association, Mid-Winter Meeting, January.

1975    "Social Change and the Ideology of Individualism in Psychology and Law." Paper presented at the Western Psychological Association Annual Meeting, April.

SERVICE TO STAFF OR EDITORIAL BOARDS OF FOUNDATIONS, SCHOLARLY JOURNALS OR PRESSES

2011-present   Editorial Consultant, <u>Social Psychological and Personality Science</u>.

2008-present   Editorial Consultant, <u>New England Journal of Medicine</u>.

2007-present   Editorial Board Member, <u>Correctional Mental Health Reporter</u>.

2007-present   Editorial Board Member, <u>Journal of Offender Behavior and Rehabilitation</u>.

2004-present   Editorial Board Member, American Psychology and Law Society Book Series, Oxford University Press.

2000-2003   Reviewer, Society for the Study of Social Issues Grants-in-Aid Program.

2000-present   Editorial Board Member, <u>ASAP</u> (on-line journal of the Society for the Study of Social Issues)

1997-present   Editorial Board Member, <u>Psychology, Public Policy, and Law</u>

1991   Editorial Consultant, Brooks/Cole Publishing

1989   Editorial Consultant, <u>Journal of Personality and Social Psychology</u>

1988-   Editorial Consultant, <u>American Psychologist</u>

1985   Editorial Consultant, <u>American Bar Foundation Research Journal</u>

1985-2006   <u>Law and Human Behavior</u>, Editorial Board Member

1985   Editorial Consultant, Columbia University Press

1985   Editorial Consultant, <u>Law and Social Inquiry</u>

1980-present   Reviewer, National Science Foundation

1997   Reviewer, National Institutes of Mental Health

1980-present   Editorial Consultant, <u>Law and Society Review</u>

1979-1985   Editorial Consultant, <u>Law and Human Behavior</u>

1997-present    Editorial Consultant, <u>Legal and Criminological Psychology</u>

1993-present    <u>Psychology, Public Policy, and Law</u>, Editorial Consultant


<u>GOVERNMENTAL, LEGAL AND CRIMINAL JUSTICE CONSULTING</u>

Training Consultant, Palo Alto Police Department, 1973-1974.

Evaluation Consultant, San Mateo County Sheriff's Department, 1974.

Design and Training Consultant to Napa County Board of Supervisors, County
        Sheriff's Department (county jail), 1974.

Training Consultation, California Department of Corrections, 1974.

Consultant to California Legislature Select Committee in Criminal Justice, 1974,
        1980-1981 (effects of prison conditions, evaluation of proposed prison
        legislation).

Reviewer, National Science Foundation (Law and Social Science, Research
        Applied to National Needs Programs), 1978-present.

Consultant, Santa Clara County Board of Supervisors, 1980 (effects of jail
        overcrowding, evaluation of county criminal justice policy).

Consultant to Packard Foundation, 1981 (evaluation of inmate counseling and
        guard  training programs at San Quentin and Soledad prisons).

Member, San Francisco Foundation Criminal Justice Task Force, 1980-1982
        (corrections expert).

Consultant to NAACP Legal Defense Fund, 1982- present (expert witness, case
        evaluation, attorney training).

Faculty, National Judicial College, 1980-1983.

Consultant to Public Advocates, Inc., 1983-1986 (public interest litigation).

Consultant to California Child, Youth, Family Coalition, 1981-82 (evaluation of
        proposed juvenile justice legislation).

Consultant to California Senate Office of Research, 1982 (evaluation of causes

and consequences of overcrowding in California Youth Authority facilities).

Consultant, New Mexico State Public Defender, 1980-1983 (investigation of causes of February, 1980 prison riot).

Consultant, California State Supreme Court, 1983 (evaluation of county jail conditions).

Member, California State Bar Committee on Standards in Prisons and Jails, 1983.

Consultant, California Legislature Joint Committee on Prison Construction and Operations, 1985.

Consultant, United States Bureau of Prisons and United States Department of the Interior (Prison History, Conditions of Confinement Exhibition, Alcatraz Island), 1989-1991.

Consultant to United States Department of Justice, 1980-1990 (evaluation of institutional conditions).

Consultant to California Judicial Council (judicial training programs), 2000.

Consultant to American Bar Association/American Association for Advancement of Science Task Force on Forensic Standards for Scientific Evidence, 2000.

Invited Participant, White House Forum on the Uses of Science and Technology to Improve Crime and Prison Policy, 2000.

Member, Joint Legislative/California Department of Corrections Task Force on Violence, 2001.

Consultant, United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project, 2002.

Detention Consultant, United States Commission on International Religious Freedom (USCRIF). Evaluation of Immigration and Naturalization Service Detention Facilities, July, 2004-present.

Consultant, International Committee of the Red Cross, Geneva, Switzerland, Consultant on international conditions of confinement.

Member, Institutional Research External Review Panel, California Department of Corrections, November, 2004-2008.

Consultant, United States Department of Health & Human Services on programs

designed to enhance post-prison success and community reintegration, 2006.

Consultant/Witness, U.S. House of Representatives, Judiciary Committee, Evaluation of legislative and budgetary proposals concerning the detention of aliens, February-March, 2005.

Invited Expert Witness to National Commission on Safety and Abuse in America's Prisons (Nicholas Katzenbach, Chair); Newark, New Jersey, July 19-20, 2005.

Testimony to the United States Senate, Judiciary Subcommittee on the Constitution, Civil Rights, and Property Rights (Senators Brownback and Feingold, co-chairs), Hearing on "An Examination of the Death Penalty in the United States," February 7, 2006.

National Council of Crime and Delinquency "Sentencing and Correctional Policy Task Force," member providing written policy recommendations to the California legislature concerning overcrowding crisis in the California Department of Corrections and Rehabilitation.

Trainer/Instructor, Federal Bureau of Prisons and United States Department of Justice, "Correctional Excellence" Program, providing instruction concerning conditions of confinement and psychological stresses of living and working in correctional environments to mid-level management corrections professionals, May, 2004-2008.

Invited Expert Witness, California Commission on the Fair Administration of Justice, Public Hearing, Santa Clara University, March 28, 2008.

Invited Participant, Department of Homeland Security, Mental Health Effects of Detention and Isolation, 2010.

Consultant, "Reforming the Criminal Justice System in the United States" Joint Working Group with Senator James Webb and Congressional Staffs, 2011 Developing National Criminal Justice Commission Legislation.

Invited Participant, United Nations, Forum with United Nations Special Rapporteur on Torture Concerning the Overuse of Solitary Confinement, New York, October, 2011.

<u>PRISON AND JAIL CONDITIONS EVALUATIONS AND LITIGATION</u>

Hoptowit v. Ray  [United States District Court, Eastern District of Washington, 1980; 682 F.2d 1237 (9th Cir. 1982)].  Evaluation of psychological effects of conditions of confinement at Washington State Penitentiary at Walla Walla for United States Department of Justice.

Wilson v. Brown  (Marin Country Superior Court; September, 1982, Justice Burke).  Evaluation of effects of overcrowding on San Quentin mainline inmates.

Thompson v. Enomoto (United States District Court, Northern District of California, Judge Stanley Weigel, 1982 and continuing).  Evaluation of conditions of confinement on Condemned Row, San Quentin Prison.

Toussaint v. McCarthy  [United States District Court, Northern District of California, Judge Stanley Weigel, 553 F. Supp. 1365 (1983); 722 F. 2d 1490 (9th Cir. 1984) 711 F. Supp. 536 (1989)].  Evaluation of psychological effects of conditions of confinement in lockup units at DVI, Folsom, San Quentin, and Soledad.

In re Priest  (Proceeding by special appointment of the California Supreme Court, Judge Spurgeon Avakian, 1983).  Evaluation of conditions of confinement in Lake County Jail.

Ruiz v. Estelle  [United States District Court, Southern District of Texas, Judge William Justice, 503 F. Supp. 1265 (1980)].  Evaluation of effects of overcrowding in the Texas prison system, 1983-1985.

In re Atascadero State Hospital  (Civil Rights of Institutionalized Persons Act of 1980 action). Evaluation of conditions of confinement and nature of patient care at ASH for United States Department of Justice, 1983-1984.

In re Rock  (Monterey County Superior Court 1984).  Appointed to evaluate conditions of confinement in Soledad State Prison in Soledad, California.

In re Mackey  (Sacramento County Superior Court, 1985).  Appointed to evaluate conditions of confinement at Folsom State Prison mainline housing units.

Bruscino v. Carlson  (United States District Court, Southern District of Illinois 1984 1985).  Evaluation of conditions of confinement at the United States Penitentiary at Marion, Illinois [654 F. Supp. 609 (1987); 854 F.2d 162 (7th Cir. 1988)].

Dohner v. McCarthy  [United States District Court, Central District of California, 1984-1985; 636 F. Supp. 408 (1985)].  Evaluation of conditions of confinement at California Men's Colony, San Luis Obispo.

Invited Testimony before Joint Legislative Committee on Prison Construction and Operations hearings on the causes and consequences of violence at Folsom Prison, June, 1985.

Stewart v. Gates [United States District Court, 1987]. Evaluation of conditions of confinement in psychiatric and medical units in Orange County Main Jail, Santa Ana, California.

Duran v. Anaya  (United States District Court, 1987-1988).  Evaluation of conditions of confinement in the Penitentiary of New Mexico, Santa Fe, New Mexico [Duran v. Anaya, No. 77-721 (D. N.M. July 17, 1980); Duran v. King, No. 77-721 (D. N.M. March 15, 1984)].

Gates v. Deukmejian (United States District Court, Eastern District of California, 1989).  Evaluation of conditions of confinement at California Medical Facility, Vacaville, California.

Kozeak v. McCarthy (San Bernardino Superior Court, 1990).  Evaluation of conditions of confinement at California Institution for Women, Frontera, California.

Coleman v. Gomez (United States District Court, Eastern District of California, 1992-3; Magistrate Moulds, Chief Judge Lawrence Karlton, 912 F. Supp. 1282 (1995). Evaluation of study of quality of mental health care in California prison system, special mental health needs at Pelican Bay State Prison.

Madrid v. Gomez (United States District Court, Northern District of California, 1993, District Judge Thelton Henderson, 889 F. Supp. 1146 (N.D. Cal. 1995). Evaluation of conditions of confinement and psychological consequences of isolation in Security Housing Unit at Pelican Bay State Prison, Crescent City, California.

Clark v. Wilson, (United States District Court, Northern District of California, 1998, District Judge Fern Smith, No. C-96-1486 FMS), evaluation of screening

procedures to identify and treatment of developmentally disabled prisoners in California Department of Corrections.

Turay v. Seling [United States District Court, Western District of Washington (1998)]. Evaluation of Conditions of Confinement-Related Issues in Special Commitment Center at McNeil Island Correctional Center.

In re: The Commitment of Durden, Jackson, Leach, & Wilson. [Circuit Court, Palm Beach County, Florida (1999).] Evaluation of Conditions of Confinement in Martin Treatment Facility.

Ruiz v. Johnson [United States District Court, Southern District of Texas, District Judge William Wayne Justice, 37 F. Supp. 2d 855 (SD Texas 1999)]. Evaluation of current conditions of confinement, especially in security housing or "high security" units.

Osterback v. Moore (United States District Court, Southern District of Florida (97-2806-CIV-MORENO) (2001) [see, Osterback v. Moore, 531 U.S. 1172 (2001)]. Evaluation of Close Management Units and Conditions in the Florida Department of Corrections.

Valdivia v. Davis (United States District Court, Eastern District of California, 2002). Evaluation of due process protections afforded mentally ill and developmentally disabled parolees in parole revocation process.

Ayers v. Perry (United States District Court, New Mexico, 2003). Evaluation of conditions of confinement and mental health services in New Mexico Department of Corrections "special controls facilities."

Disability Law Center v. Massachusetts Department of Corrections (Federal District Court, Massachusetts, 2007). Evaluation of conditions of confinement and treatment of mentally ill prisoners in disciplinary lockup and segregation units.

Plata/Coleman v. Schwarzenegger (Ninth Circuit Court of Appeals, Three-Judge Panel, 2008). Evaluation of conditions of confinement, effects of overcrowding on provision of medical and mental health care in California Department of Corrections and Rehabilitation. [See Brown v. Plata, 131 S.Ct. 1910 (2011).]

APPENDIX B TO DECLARATION OF
CRAIG HANEY

# APPENDIX B TO THE DECLARATION OF CRAIG HANEY

| DOCUMENT |
|---|
| eUHR of multiple COR inmates |
| eUHR of multiple CIM inmates |
| eUHR of multiple CCI inmates |
| eUHR of multiple MCSP inmates |
| Plaintiffs' Response to Defs' Objections and Motion to Strike Portions of the 25th Special Master's Report [Dkt. 4324] |
| CCI site inspection documents, Bates CCI 1-53; provided by Defs |
| CCI site photos, Bates CCI 54-94; provided by Defs |
| CCI site inspection documents, Bates CCI 95-116; provided by Defs |
| CCI Special Master's 25th Round tour binders |
| CIM Special Master's 25th Round tour binders |
| MCSP Special Master's 25th Round tour binders |
| CIM site photographs, Bates CIM 1-38; provided by Defs |
| CIM site inspection documents, Bates CIM 38-190; provided by Defs |
| COR Special Master's 25th Round tour binders |
| COR site photographs, Bates COR 1-64; provided by Defs |
| COR site inspection documents, Bates COR 65-111; provided by Defs |
| MCSP site photographs, Bates MCSP 1-49; provided by Defs |
| MCSP site inspection documents, Bates MCSP 50-83; provided by Defs |
| 2/18/13 Deposition of Lindsay Hayes in the instant, w/exhibits |
| 2/13/13 Deposition of Jacqueline Moore in the instant, w/exhibits |
| 2/27/13 Deposition of Christopher Meyer in the instant, w/exhibits |
| 2/22/13 Deposition of Diana Toche in the instant, w/exhibits |
| 3/5/13 Deposition of Jeffrey Beard in the instant, w/exhibits |
| 2/27/13 Deposition of Joel Dvoskin in the instant, w/exhibits |
| 3/1/13 Deposition of John Brim in the instant, w/exhibits |
| 2/25/13 Deposition of Richard Johnson in the instant, w/exhibits |
| 2/28/13 Deposition of Steve Martin in the instant, w/exhibits |
| 2/22/13 Deposition of Tim Belavich in the instant, w/exhibits |
| Coleman: Order Granting in Part and Denying in Part Plaintiffs' Motions for Discovery, 2/21/13 [Dkt. 2546] |
| 24th round Management Reports for: ASP, CAL, CEN, CIM, CIW, CMC, CMF, COR, CRC, CTF, CVSP, FSP, HDSP, ISP, KVSP, LAC, NKSP, PBSP, PVSP, RJD, SAC, SATF, SCC, SOL, SQ, SVSP and WSP |

| |
|---|
| 25th round Management Reports for: ASP, CAL, CCC, CCI. CCWF, CEN, CIM, CIW, CMC, CMF, COR, CRC, CTF, CVSP, DVI, FOL, HDSP, ISP, KVSP, LAC, MCSP, NKSP, PBSP, PVSP, RJD, SAC, SATF, SCC, SOL, SQ, SVSP, VSPW and WSP |
| Special Master's 25th round monitoring report on compliance 1/18/13 [Dkt. 4298] |
| Special Master's report on expert Patterson's report re: suicides in 2011, 1/25/13 [Dkt. 4307] |
| Dr. Raymond Patterson's Expert Report re: CDCR Suicides in 2011, 1/25/13 [Dkt. 4308] |
| Defs' Amended Objections and Motion to Strike or Modify Portions of 25th Round Special Master's Report, 1/29/13 [Dkt. 4314] |
| Joel Dvoskin's Comments: Exhibit 1. to Defs' Objections and Motion to Strike or Modify, 1/28/13 [Dkt. 4312-1] |
| Belavich Declaration and Exhibits 1-7 ISO Defs' Objections and Motion to Strike or Modify, 1/28/13 [Dkt. 4313] |
| Pltfs' Response to Defs' Amended Objections and Motion to Strike or Modify Portions of 25th Round Special Master's Report, 2/11/13 [4324] |
| Kahn Declaration ISO Pltfs' Response to Defs' Amended Objections and Motion to Strike or Modify Portions of 25th Round Special Master's Report, 2/11/13 [4325] |
| Defs' Objections & Motion to Strike or Modify Portions of Special Master's 2011 Suicide Reports, 2/11/13 [Dkt. 4326] |
| Pltfs' Opposition to Defs' Objections & Motion to Strike or Modify Portions of SM's 2011 Suicide Report, 2/21/13 [Dkt. 4350] |
| General summary: Special Master's 24th round Monitoring Report on Compliance 7/2/12 [Dkt. 4205] |
| Expert report of Craig Haney,  10/30/2008 [Dkt. 3201] |
| Expert report of Pablo Stewart, 10/30/2008 [Dkt. 3217] |
| Supplemental expert report of Pablo Stewart, 10/30/2008 [Dkt. 3221] |
| Defs' Motion and Notice of Motion to Terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under FRCP 60(b)(5), 1/7/13, [Dkt. 4275] |
| Declaration of Belavich ISO Defs' Motion and Notice of Motion to Terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under FRCP 60(b)(5), 1/7/13, [Dkt. 4277] |
| Declaration of Beard ISO Defs' Motion and Notice of Motion to Terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under FRCP 60(b)(5), 1/7/13, [Dkt. 4281] |

| |
|---|
| Declaration of Meyer ISO Defs' Motion and Notice of Motion to Terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under FRCP 60(b)(5), 1/7/13, [Dkt. 4278] |
| Declaration of Barton ISO Defs' Motion and Notice of Motion to Terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under FRCP 60(b)(5), 1/7/13, [Dkt. 4282] |
| Declaration of Johnson ISO Defs' Motion and Notice of Motion to Terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under FRCP 60(b)(5), 1/7/13, [Dkt. 4276] |
| Declaration of Ceballos ISO Defs' Motion and Notice of Motion to Terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under FRCP 60(b)(5), 1/7/13, [Dkt. 4275-2] |
| Declaration of Toche ISO Defs' Motion and Notice of Motion to Terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under FRCP 60(b)(5), 1/7/13, [Dkt. 4275-3] |
| Memorandum of P&A ISO of Motion to Terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under FRCP 60(b)(5), 1/7/13, [Dkt. 4275-1] |
| Declaration of Vorous ISO Defs' Motion and Notice of Motion to Terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under FRCP 60(b)(5), 1/7/13, [Dkt. 4275-4] |
| Defs' January 2013 Status Report in Response to June 30, 2011 Order, 1/15/13, [Dkt. 2518] |
| Declaration of Jeffrey Beard ISO Defs' Motion to Vacate or Modify Population Reduction Order. 1/7/2013, [Dkt. 4281] |
| COMPSTAT DAI Report for CIM 1/1/2013 |
| Coleman Court's Order re: suicide beds. 12/5/2011, [Dkt. 4125] |
| Coleman Court's Order re: suicide beds. 7/21/2011, [Dkt. 4044] |
| Revised schedule: suicide resistant beds, 6/27/12 |
| 8/29/12 Memo, Belavich to Vorous re: installation of suicide resistant beds in MHCB. |
| 3/15/11 CDCR Memo, Mental Health Crisis Bed Unit-Use of Mechanical Restraints and Escort Policies |
| Defendants' file on suicide of CIM inmate. |
| Defendants' file on heat related death of CIM inmate. |
| COR institutional summary: excerpted from Special Master's 24th round Monitoring Report on Compliance 7/2/12 [Dkt. 4205] |
| COR Individual case studies: exhibit D Special Master's 24th round Monitoring Report on Compliance 7/2/12 [Dkt. 4205 ] |

| |
|---|
| CIM institutional summary: excerpted from Special Master's 24th round Monitoring Report on Compliance 7/2/12 [Dkt. 4205] |
| CIM Individual case studies: exhibit K Special Master's 24th round Monitoring Report on Compliance 7/2/12 [Dkt. 4205 ] |
| MCSP institutional summary: excerpted from Special Master's 24th round Monitoring Report on Compliance 7/2/12 [Dkt. 4205] |
| MCSP Individual case studies: exhibit B Special Master's 24th round Monitoring Report on Compliance 7/2/12 [Dkt. 4205 ] |
| COR institutional summary: excerpted from Special Master's 25th round Monitoring Report on Compliance 1/18/13 [Dkt. 4298] |
| COR individual case studies: exhibit 1 Special Master's 25th round Monitoring Report on Compliance 1/18/13 [Dkt. 4298] |
| CIM institutional summary: excerpted from Special Master's 25th round Monitoring Report on Compliance 1/18/13 [Dkt. 4298] |
| CIM individual case studies: exhibit T Special Master's 25th round Monitoring Report on Compliance 1/18/13 [Dkt. 4298] |
| MCSP institutional summary: excerpted from Special Master's 25th round Monitoring Report on Compliance 1/18/13 [Dkt. 4298] |
| MCSP individual case studies: exhibit C Special Master's 25th round Monitoring Report on Compliance 1/18/13 [Dkt. 4298] |
| Declaration of Meyer ISO Defs' Motion and Notice of Motion to Terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under FRCP 60(b)(5), 1/7/13, [Dkt. 4275] |
| 22nd tri-annual report of the Federal Receiver's turnaround plan of action for 9/1/12 to 12/31/12: *Achieving a Constitutional Level of Medical Care in California's Prisons.* 1/25/13 |
| Office of the Inspector General: CIM Medical Inspection Results, 4/12 |
| 5/24/12 CDCR Memo re: inmate safety issues and clinical services |
| Excerpt: Coleman v. Wilson, Findings and Recommendations after trial, 6/6/1994 |
| Excerpt: Coleman v. Wilson, 912 F. Supp. 1282 (1995) |
| CIM COMPSTAT DAI Report, 1/11/13 |
| 1/19/10 Suicide notification of  CORinmate. |
| 4/12/10 Suicide report and executive summary for COR inmate. |
| 8/6/10 Report implementation of Quality Improvement Plan for suicide of COR inmate. |
| Autopsy report of COR inmate. |
| 9/5/12 Suicide notification of  COR inmate. |
| 10/28/10 Death notification of COR inmate. |
| Excerpt Medical examiner's report decedent COR inmate |

| |
|---|
| Excerpt incident report, death  of COR inmate. |
| Autopsy report of COR inmate. |
| 1/19/11 Death notification of COR inmate. |
| 10/16/11 CDCR item: *Inmate Death at Corcoran Under Investigation* |
| Undated Death notification of COR inmate. |
| Death Review Summary for COR inmate. |
| Excerpt 7229 death of COR inmate. |
| Excerpt incident report on death of COR inmate |
| Movement summary for COR inmate |
| Autopsy report of COR inmate. |
| 1/24/13 CDCR item: *Inmate Death at Corcoran Under Investigation* |
| Scripps News Service item: *Inmate on Hunger Strike Dies at California State Prison, Corcoran* |
| 1/14/13 CDCR item: *Inmate Death at Corcoran Under Investigation* |
| Special Master's Report on Defs' Review of Suicide Prevention Policies, Practices and Procedures, 9/27/10 [Dkt. 3918] |
| Governor's Office briefing document: *Health Care Facility Improvement Program, California State Prison System,* 3/9/11 |
| Pulitzer/Bogard & Assoc. *CDCR Prison Capacity Planning, final report.* 10/3/11 |
| Special Master's 21st Monitoring Report on Defs' Compliance with Provisionally Approved Plans, Policies and Protocols, 7/31/09, [Dkt. 3638] |
| State of CA, Office of Administrative Law 3/12/12 memo: alternative treatment option models |
| Declaration Michael Bien ISO Plaintiffs' Motion for Leave to Take Depo of John Brim, 2/25/13, [Dkt. 4354-1] |
| Amer. Corr. Assoc. MCSP pre-review, 2/4/13-2/8/13 |
| CDCR PowerPoint: SRE mentor program overview |
| Telander memo to MCSP clinicians re: SRE mentor program |
| SRE mentor program schedule |
| 12/14/10 CDCR Memo re entertainment appliances in ASU |
| Office of the Inspector General: Special Report Aug. 2009 Riot at CIM |
| Judge Moulds' 2/14/13 Order re deposition of Lindsay Hayes |
| CIM prison mental health data, most current available (as of 2/12/13) |
| CIM staffing data, most current available (as of 2/12/13) |
| CIM prison mental health data, most current available at time of Defs' expert tour, 5/1/12 to 5/2/12 |
| CIM prison staffing data, most current available at time of Defs' expert tour, 5/1/12 to 5/2/12 |

| |
|---|
| CIM prison mental health data, most current available at time of Plaintiffs' expert tour for overcrowding, 10/29/07 |
| CIM prison staffing data, most current available at time of Plaintiffs' expert tour for overcrowding, 10/29/07 |
| DSH reporting data as of 12/31/12 |
| CIM photos, 8/7/2006 |
| CIM EOP Treatment Hours |
| CIM List of CCCMS patients in ASU |
| CIM List of MHCB Patients |
| CIM LPT staffing data |
| CIM MHCB escort list |
| CIM Morning meeting materials |
| CIM Palm housing roster |
| CIM Patients awaiting transfer |
| CIM Recent QITs |
| CIM Welfare check logs |
| COR site map and unofficial MH forms |
| Docs from 2-19-13 COR tour |
| COR photo index |
| CIM photo index |
| MCSP photo index |
| 2/27/13 letter Baldwin-Haney re CD of eUHR records |
| List of supplemental materials produced 2/28/13 |
| List of supplemental materials produced 2/25/13 |
| ASU Post-placement MM screening |
| Docs provided at MCSP tour morning meeting 2-7-13 |
| Robert Precobb AI 6970 MM records (provided to CH at MCSP 2-2-13) |
| CDCR Contract & Invoices |
| CDCR emails |
| CDCR Notes |
| CDCR report, August 16, 2011 |
| CDCR report, August 16, 2011-redacted version |
| CDCR report |
| Exhibit 1-Resume |
| Dr. Haney's notepad |
| Receiver's MCSP Operational Assessment and Facility Master Plan Report, conducted 12/18/07 – 12/20/07 |
| CDCR weekly data |
| MCSP photos |

| |
|---|
| Plaintiffs' Expert file: MCSP photos |
| News item: "*Mule Creek Inmates Riot*" |
| MCSP Dental and mental health personnel liasion (sic) section mental health vacancy report |
| Sanchez, Heriberto, *Suicide Prevention in Administrative Segregation Units: What is Missing?*, Jour Corr. Health Care, 2013 |
| Compendium of Suicide Information, January 2013 |
| CSP Solano photographs |
| CMF phase report |
| CMC photos |
| 8/16/11 Memo, Hayes to Gilevich re CDCR suicide consultation |
| 8/16/11 Memo, Hayes to Gilevich re CDCR suicide consultation (redacted) |
| 1/30/11 Memo, Hayes to Gilevich re CDCR suicide consultation |
| Curriculum Vitae of Lindsay Hayes |
| 3/4/13 letter, MWB-Vorous et al. re: dangerous staff shortages in DSH programs |
| Plaintiffs' Expert File: Supplemental suicide deaths CCI |
| Plaintiffs' Expert File: Supplemental suicide deaths MCSP |
| News Article: "Mental Unit too Much to Ask at CIM", 2/7/2007 |
| News Article: "Many Speak Out Against Possible CIM Expansion"; Inland Valley Daily Bulletin, 1/30/13 |
| Plaintiffs' Expert file on heat related deaths |
| Plaintiffs' Expert file on possible heat related deaths |
| Plaintiffs' Expert file: prison mental health care, compiled for COR expert tour |
| Plaintiffs' Expert file: prison staffing, compiled for COR expert tour |
| Plaintiffs' Expert file: DSH reporting data, compiled for COR expert tour |
| Plaintiffs' Expert file: treatment and office space for Ad-Seg, compiled for COR expert tour |
| Plaintiffs' Expert file: relevant press reports, compiled for COR expert tour |
| CIM site photograph Index |
| COR site photograph Index |
| 1/29/13 Letter, Tseng-Haney re expert materials |

# APPENDIX C TO DECLARATION OF CRAIG HANEY

<u>Craig Haney Trial, Hearing, Deposition Testimony over Last 4 Years</u>

<u>Trial/Hearing Testimony</u>:

People v. Varner (2009)
Ashmus v. Calderon (2010)
Tiner v. Belleque (2010)
Nevada v. Conner (2010)
People v. Topete (2011)
U.S. v. Lujan (2011)
Delaware v. Sykes (2012)
People v. Gatica (2012)
U.S. v. Richardson (2012)
Arizona v. Carlson (2012)

<u>Deposition</u>:

Silverstein v. Federal Bureau of Prisons (2009)
Gavin v. Alabama (2010)

<u>Haney Statement of Fees/Compensation</u>:

My billing rate for out-of-court time is $250/hr. plus reasonable travel expenses.
My billing rate for providing testimony, both in-court and out-of-court, is $1,500
for half a day and $3,000 for a full day.