DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. Civ S 90-0520 LKK-JFM |
| Plaintiffs, | **EXPERT DECLARATION OF EDWARD KAUFMAN, M.D.** |
| v. | |
| EDMUND G. BROWN, Jr., et al., | Judge:   Hon. Lawrence K. Karlton |
| Defendants. | |

**TABLE OF CONTENTS**

**Page**

TABLE OF ABBREVIATIONS ................................................................................. ii

INTRODUCTION ................................................................................................... 1

I.      EDUCATION, TRAINING, AND EXPERIENCE ................................. 1

II.     FOUNDATION FOR EXPERT OPINIONS IN THIS ACTION ............... 3

III.    EXPERT OPINIONS ............................................................................. 6

       A.     Summary ................................................................................ 6

       B.     Major Staffing Shortages ..................................................... 7

       C.     Inadequate, Inappropriate, and Anti-Therapeutic Treatment Space ............ 16

       D.     Poor Medication Management and Medical Record Keeping ..................... 21

       E.     Excessively Punitive Practices in the Mental Health Crisis Beds ............... 28

       F.     Inappropriate and Harmful Overuse of Administrative Segregation ........... 31

              1.     Ill-Advised Use Administrative Segregation for Non-Disciplinary Reasons ....... 31

              2.     Harmful Use of Administrative Segregation for Mentally Ill Patients ............ 40

              3.     Excessive SHU Sentences in Extreme Isolation ................................. 42

       G.     Inadequate Quality and Quantity of Mental Health Treatment .................... 45

       H.     Chronic Insufficiency of Mental Health Treatment for CCCMS Patients .......... 50

       I.     Major Custodial Interferences With Mental Health Treatment .................... 53

CONCLUSION ....................................................................................................... 57

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ACA | American Correctional Association |
| APP | Acute Psychiatric Program |
| ASH or Atascadero | Atascadero State Hospital |
| ASP or Avenal | Avenal State Prison |
| ASU | Administrative Segregation Unit |
| BCP | Budget Change Proposal |
| CAL or Calipatria | Calipatria State Prison |
| CCC | California Correctional Center |
| CCCMS | Correctional Clinical Case Manager System |
| CCI | California Correctional Institution |
| CCPOA | California Correctional Peace Officers Association |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CEN or Centinela | Centinela State Prison |
| CIM | California Institute for Men |
| CIW | California Institute for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| CMO | Chief Medical Officer |
| COR or Corcoran | California State Prison/Corcoran |
| CPR | Cardiopulmonary Resuscitation |
| CRC | California Rehabilitation Center |
| CSH or Coalinga | Coalinga State Hospital |
| CTC | Correctional Treatment Center |
| CTF | California Training Facility/Soledad |
| CVSP or Chuckwalla | Chuckwalla Valley State Prison |
| DMH | Department of Mental Health |
| DSH | Department of State Hospitals |
| DOT | Direct Observation Therapy |
| DVI or Deuel | Deuel Vocational Institute |
| EOP | Enhanced Outpatient Program |
| EOP ASU Hub | Enhanced Outpatient Program Administrative Segregation Unit |
| FOL or Folsom | Folsom State Prison |
| HDSP or High Desert | High Desert State Prison |
| ICF | Intermediate Care Facility |
| ISP or Ironwood | Ironwood State Prison |
| KVSP or Kern Valley | Kern Valley State Prison |
| LAC or Lancaster | California State Prison/Lancaster |
| LVN | Licensed Vocational Nurse |

EXPERT DECLARATION OF EDWARD KAUFMAN, M.D.

| | |
|---|---|
| LOB | Lack of Bed |
| MCSP or Mule Creek | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| MHOHU | Mental Health Outpatient Housing Unit |
| MHSDS | Mental Health Services Delivery System |
| NKSP or North Kern | North Kern State Prison |
| OHU | Outpatient Housing Unit |
| OIG | Office of the Inspector General |
| PBSP or Pelican Bay | Pelican Bay State Prison |
| PCP | Primary Care Provider |
| PLRA | Prison Litigation Reform Act |
| PSH or Patton | Patton State Hospital |
| PSU | Psychiatrist Services Unit |
| PVSP or Pleasant Valley | Pleasant Valley State Prison |
| R&R | Reception and Receiving |
| RC | Reception Center |
| RJD or Donovan | Richard J. Donovan Correctional Facility |
| RN | Registered Nurse |
| SAC or Sacramento | California State Prison/Sacramento |
| SATF | California Substance Abuse Treatment Facility (II) |
| SCC or Sierra | Sierra Conservation Center |
| SHU | Segregated Housing Unit |
| SM | Special Master in the *Coleman* case |
| SNY | Special Needs Yard |
| SOL or Solano | California State Prison/Solano |
| SQ or San Quentin | California State Prison/San Quentin |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP or Salinas Valley | Salinas Valley State Prison |
| TB | Tuberculosis |
| TTA | Triage and Treatment Area |
| UHR | Unit Health Records |
| VSPW or Valley State | Valley State Prison for Women |
| VPP | Vacaville Psychiatric Program |
| WSP or Wasco | Wasco State Prison |
| ZZ Cell | Makeshift Temporary Cells Outside of Clinic Areas |

**INTRODUCTION**

I have personal knowledge of the matters set forth herein, and if called as a witness, I could competently so testify.

**I.       EDUCATION, TRAINING, AND EXPERIENCE**

1.       I am currently the Medical Director at Northbound Therapeutic Services (NTS) in Costa Mesa, California.  Over the course of my career, I have served as a Medical Director and Consulting Psychiatrist at a number of treatment centers and chemical dependency treatment programs.  I have also worked in correctional settings and hospitals.  I have a broad background in psychiatry, both as a clinician and an academic.  (My curriculum vitae is attached to this Report as "**Appendix A**.")

2.       I am licensed to practice medicine in the State of California.  I received life-time board certification in psychiatry in 1971.  In 1987, I was certified in Alcohol and Other Drug Dependencies through examination by the American Society of Addiction Medicine.  In 1993, I received certification in addiction psychiatry from the American Board of Psychiatry and Neurology.

3.       In 1992 and 1993, I was retained by the Plaintiffs to write an expert report in the *Coleman v. Wilson* lawsuit.  In connection with that lawsuit, I toured four California prisons:  California Correctional Institution in Tehachapi, California; California State Prison Corcoran in Corcoran, California; California Men's Colony in San Luis Obispo, California; and Richard J. Donovan Correctional Facility in San Diego, California.  I also extensively reviewed reports and medical records relating to mental health care in California prisons.  In 1993, I submitted an expert declaration to the *Coleman* court.

4.       I graduated from Jefferson Medical College in 1960.  While I was in medical school, in 1959, I received a U.S. Public Health Fellowship in Public Health and Preventive Medicine.  After graduating from medical school, I took my internship at Los Angeles County General Hospital and residency in psychiatry from 1961 to 1964 at the New York State Psychiatric Institute of the Columbia Presbyterian Medical Center.  I received graduate training at the Columbia University Psychoanalytic Clinic and received

1  my Psychoanalytic Certificate from there in 1970.

2      5.      I was Chief of Psychiatric Services at Lewisburg Federal Penitentiary in

3  Pennsylvania from 1964 to 1966.  In this position I was responsible for all mental health

4  treatment and evaluation of inmates at that facility.  I also participated in several

5  institutional committees.  The facility housed approximately 1,000 prisoners.

6      6.      Subsequently, I became the Senior Research Psychiatrist and Director of an

7  Inpatient Unit at New York State Psychiatric Institute's Washington Heights Community

8  Mental Health Services and Chief of Emergency Psychiatric Services at St. Luke's

9  Hospital Center in New York City.

10      7.      I also served as the first Director of Psychiatry for Prison Mental Health

11  Services of the City of New York.  In this position, which I held from 1971 to 1973, I

12  developed regionalized treatment programs at each jail as well as an inpatient unit at

13  Riker's Island.  During my tenure, I was able to more than double the number of mental

14  health professionals employed in the New York City prison system.

15      8.      I have extensive experience working with narcotic addicts since 1965,

16  including as the Chief Psychiatrist and Medical Director of the Lower East Side Service

17  Center in New York City, where I directed services for over 1,000 narcotic addicts.  I also

18  served on the Standards and Advisory Panel for Juvenile Justice of the New York State

19  Division of Criminal Justice Services.

20      9.      As an academic, I have been a professor of psychiatry at Albert Einstein

21  College of Medicine, Mt. Sinai School of Medicine, and the University of California,

22  Irvine, where I was a Professor in Residence.

23      10.      I have been a psychiatric consultant to the Orange County Department of

24  Mental Health and to the Metropolitan State Hospital in Norwalk, California, where I

25  helped develop treatment programs for drug addicts.  I served as Chief of Clinical

26  Psychiatric Services at UCI Department of Psychiatry.  My responsibilities included

27  directing all inpatient and emergency psychiatric care.  From 1978 to 1981, I was also a

28  Professor in the Department of Family Medicine at UCI Medical Center where I was

[748409-1]

1   involved in training and supervision of Family Medicine residents.

2        11.    I served as Director of UCI's Chemical Dependency Program at Capistrano-

3   By-The-Sea Hospital.   I became Chief of Staff at Capistrano-By-The-Sea Hospital, a

4   position I held from 1993 to 1995.

5        12.    From 1985 to 1990, I was the psychiatrist who evaluated all psychiatric

6   emergencies for FBI employees in the western United States.

7        13.    Since then, in addition to teaching, I have served as a Medical Director at a

8   number of treatment centers, including the Phoenix House and my current role at the NTS.

9        14.    I am widely published in the field of substance abuse and various treatment

10  modalities.  I have written three books on substance abuse and addiction, edited five books

11  on that subject, and authored more than 33 book chapters.  I have also written numerous

12  journal articles, which are set forth in my CV.

13       15.    Over the fifty years that I have been teaching psychiatry, I have taught a

14  variety of different subjects in that field.  My specialties within the field are prison mental

15  health, family therapy, and the treatment of substance abuse.  I taught courses in the latter

16  two topics at UCI on a yearly basis for over fifteen years.  In addition, I have taught

17  courses in psychiatric treatment of all types, health delivery systems and community

18  psychiatry.  I have also lectured on mental health care in prisons and jails.

19  **II.    FOUNDATION FOR EXPERT OPINIONS IN THIS ACTION**

20       16.    I was retained by counsel for Plaintiffs in *Coleman v. Brown* to review and

21  assess the issues and factual claims raised in Defendants' motion to terminate that was

22  filed on January 7, 2013.  My review both included and went beyond the specific mental

23  health care and treatment issues raised in Defendants' motion to terminate.   My tasks

24  included reviewing an extensive number of documents provided by Plaintiffs' counsel that

25  pertain to the current nature and quality of medical and mental health care in the California

26  Department of Corrections and Rehabilitation (CDCR) and the conditions of confinement

27  that prevail throughout the state's prison system.  A list of the documents I was provided

28  by Plaintiffs' counsel and reviewed in advance of preparing this report is appended as

1  Appendix B.   A list of prior cases in which I have testified at trial or deposition in the past

2  ten years and a statement of compensation are attached as Appendix C.

3       17.     In addition to the documents reviewed, as listed in Appendix B, I also

4  recently conducted tours and interviews in numerous housing units located in three prisons

5  where *Coleman* class members reside.[1]  The prisons were: Central California Prison for

6  Women (CCWF), in Chowchilla, California; California Institution for Men (CIM), in

7  Chino, California; and California State Prison-Corcoran (COR), in Corcoran, California.

8  Due to the extremely compressed discovery and briefing schedule in this matter, I

9  conducted these tours over a three-week period during the month of February 2013.  In the

10  course of these tours, I visited housing units where mentally ill prisoners were housed,

11  including General Population, Reception Center, Administrative Segregation, Security

12  Housing Unit, and mental health crisis bed units.  Because of the special sensitivity and

13  vulnerability of mentally ill prisoners to the harsh regimes that exist in Administrative

14  Segregation Units (ASUs or "Ad Segs"),[2] I also made a point of touring and speaking to a

15  number of the mentally ill prisoners housed in the ASUs at each of the prisons.  At

16  Corcoran, I also toured and spoke to men housed in the Security Housing Units (SHU),[3]

17  where prisoners also are housed under severe locked down conditions.  In addition, in the

18  course of touring these three CDCR facilities that I visited, institution staff photographed a

19  number of different areas inside the prisons themselves at my direction.  I have reviewed

20

21  [1] *Coleman* class members are CDCR prisoners with serious mental illness.

22  [2] Administrative Segregation Units are locked-down units within the prison where
23  prisoners are housed for a wide variety of "administrative" and disciplinary reasons.
    Special security procedures are used in the transport of Ad Seg prisoners and their out-of-
24  cell time and other program participation is drastically reduced.  They spend the
    overwhelming majority of their time locked in their cells.

25  [3] Security or Secured Housing Units are also locked-down units within the prison where
    prisoners are housed as a result of disciplinary infractions (specific offenses committed in
26  prison, or gang status), or sometimes for safety-related concerns.  As with Ad seg
    prisoners, special security procedures are used in the transport of SHU prisoners and their
27  out-of-cell time and other program participation is drastically reduced.  They, too, spend
    the overwhelming majority of their time locked in their cells.

28

1   and relied on those photographs in developing my opinions in this matter.

2       18.     During the tours, I had numerous conversations with correctional

3   administrators, clinical staff, and line correctional officers, with Defendants' counsel

4   present throughout.  I was also able to converse with numerous prisoners who were

5   participants in the CDCR's mental health delivery system, including many who were in the

6   Correctional Clinical Case Management System (CCCMS),[4] as well as those in the

7   Enhanced Outpatient Program (EOP).[5]  I also toured and spoke to inmates at the Mental

8   Health Crisis Bed (MHCB) unit of each of the three prisons I visited.  I also reviewed

9   medication records onsite at some of the facilities I visited.  I conducted private, one-on-

10  one interviews with individual prisoners who were selected with the assistance of

11  Plaintiffs' counsel and institutional staff from the various lists of mentally ill prisoners at

12  each facility.

13      19.     In addition to touring the above-listed prisons and reading reports concerning

14  the mental health care delivery system throughout CDCR institutions, I also reviewed the

15  electronic medical records for the patients I met.  Many of the records were generated

16  when the patients were located at other CDCR institutions.  As a result, I have reviewed

17  records regarding the provision of mental health care at numerous CDCR institutions.

18      20.     Based on my background in psychiatry, my background in correctional

19

---

20  [4] CCCMS prisoners constitute the largest CDCR mental health category. It comprises
21  some 27,600 prisoners with mental illness, all of whom are supposed to receive medication
    management, meet with a clinician at least every 90 days, and receive mental health
22  treatment as clinically indicated.  When CCCMS prisoners are housed in Ad Seg, they are
    supposed to receive enhanced mental health services that include weekly case manager
23  contacts and daily rounding from psychiatric technicians.

    [5] EOP includes seriously mentally ill prisoners who require a higher and more intensive
24  level of mental health care.  These prisoners are unable to function in a general population
    prison setting and, as a result, are supposed to be in sheltered treatment programs and live
25  in sheltered housing units.  They are supposed to receive 10 hours each week of therapy or
    "structured therapeutic activities."  EOPs are not supposed to be housed in ad seg units for
26  more than 30 days, and they are supposed to be with weekly case manager contacts and
    receive daily rounding from psychiatric technicians while waiting for transfer to EOP Ad
27  seg hubs, where they are supposed to receive full EOP treatment.  There are approximately
    4,650 EOP prisoners in the CDCR.

28

1  mental health, my personal observations and interviews at the prisons mentioned above,

2  my review of numerous medical files of prisoners, my review of certain documents

3  produced by experts in this action, and my review of correctional standards, I make the

4  following observations and conclusions.

5  **III.   EXPERT OPINIONS**

6  **A.   Summary**

7        21.   More than 20 years after *Coleman v. Wilson* was initiated and almost two

8  years after the United States Supreme Court upheld the three-judge court's population

9  reduction order in *Brown v. Plata*, the CDCR has undergone significant reductions in the

10  size of its inmate population, from approximately 154,445 when the three-judge court

11  entered its population reduction order to its current population of approximately 122,814.

12  However, the California prison system remains significantly overcrowded, operating at

13  approximately 149% of its capacity.[6]  According to the most recently available national

14  data from the Bureau of Justice Statistics, California was the second-most overcrowded

15  prison system in the country in 2011, behind only the Alabama system.[7]  Even considering

16  the population reductions that have occurred in the last year, the national data suggests that

17  California's prison system remains far more crowded than the vast majority of state prison

18  systems in the country.

19        22.   The *Coleman* Special Master's 25th Round Report examined the state of

20  mental health care in the California prisons and identified a number of significant areas of

21  concern related to the care and treatment of mental ill prisoners.  Among other problems,

22  the Special Master identified deficiencies regarding: (1) suicide prevention, such as the

---

24  [6] Declaration of Michael W. Bien ("Bien Decl.") Ex. 1 (CDCR Weekly Report of Population as of Feb. 27, 2013).

25  [7] The Bureau of Justice Statistics calculations appear in:  Carson, E., & Sabol, W.,
26  *Prisoners in 2011*.  NCJ 239808. Washington, D.C.: U.S. Department of Justice (December, 2012), p. 29, Appendix Table 14.  They are based on December 31, 2011
27  population data. California and Alabama were operating at 175% and 196% of their design capacities, respectively.  Only six states, including California, had state prison populations that exceeded 145% of their system's design capacity.

[748409-1]

1   persistence of harsh measures in segregation settings, inadequate management of prisoners

2   at high risk of suicide, and incomplete efforts to improve the clinically competency levels

3   in the completion of Suicide Risk Evaluations;[8] (2) timely placement of seriously mentally

4   ill patients into inpatient care settings;[9] (3) provision of appropriate treatment to EOP

5   prisoners in segregation settings, including the disproportionate number of prisoners in

6   segregation who are mentally ill, the elevated risks of decompensation and suicide, the use

7   of segregation placements for non-disciplinary reasons, the harshness of segregation

8   settings, and the extended lengths of stays in segregation that many prisoners face;[10] (4)

9   the progressing but still incomplete construction of mental health beds as well as necessary

10  clinical treatment and office space;[11] and (5) insufficient mental health staffing.[12]

11         23.    I found ample evidence that all of these problems—and others—persist and

12  that they are interfering with the delivery of essential mental health services at the three

13  prisons I toured in February 2013.

14         **B.    Major Staffing Shortages**

15         24.    Perhaps more striking than any other problem I observed at the institutions I

16  visited was the chronic shortage of clinical staff.  The mental health staff at each institution

17  described significant shortages of staff that hindered their capacity to deliver even basic

18  mental health care.  CCWF had the most dire staff shortages of the institutions I toured.

19  Dramatic cuts in mental health staff coincided with a dramatic increase in the number of

20  inmates due to the closure of Valley State Prison for Women (VSPW).  In the past year,

21  CCWF has lost one-third of its mental health staff, including 11 psychologists and two

22  staff psychiatrists, while the mental health caseload population has grown.

23

24  _____

[8] Special Master's 25th Round Report, pp. 17-25 (*Coleman* Dkt. No. 4289).

25  [9] *Ibid.* at 25-34.

26  [10] *Ibid.* at 34-38.

27  [11] *Ibid.* at 38-44.

[12] *Ibid.* at 44-49.

28

[748409-1]

25.     When I was there on February 8, 2013, CCWF was the most overcrowded of all California's prisons, and one of the doctors said the institution was experiencing its highest mental health caseload population ever.  The warden told me the total population of the prison on the day I visited was 3,645 – approximately 182% of design capacity.  I was not provided a total count of caseload inmates that day, but the available records show that on January 18, 2013, there were 1,286 CCCMS patients and 38 EOPs.[13]  49 CCCMS and 3 EOP patients were in administrative segregation.[14]

26.     When I visited CCWF, it was experiencing significantly more overcrowding than at the time of the State's experts' tour or the Special Master's tour for the 25th Round Monitoring Report.  The warden said the population was at 182% of the design capacity on the day I visited.  It was at about 140.2% when the State's experts visited CCWF,[15] and it was approximately 137.4% when the Special Master toured the prison for the 25th Round Monitoring.[16]

27.     The effects of staff shortages were present everywhere I went at CCWF.  The Registered Nurses at the Reception & Release (R&R) Center spoke of working from 10 am to 1 am to process the influx of new inmates.  They told me they had lost nurses under Realignment "with no backfill at all."  The staff in Building 504, which houses a chaotic mix of administrative segregation, EOP administrative segregation, SHU, and condemned row inmates, told me that they used to have groups for the inmates in that building, but could no longer offer any groups as a result of cuts to mental health staff.  This was consistent with the Special Master's observation in August 2012, even before the recent population spike, that "[g]roups were not offered to inmates in administrative segregation"

---

[13] Bien Decl. Ex. 23 (HCPOP Mental Health Population by Institution as of Jan. 18, 2013) at 1.
[14] *Ibid.* at 2.
[15] Bien Decl. Ex. 24 (CDCR OISB Weekly Population Report as of Apr. 18, 2012) at 2 (showing the total CCWF prison population as 2,810 – 140.2% of design capacity).
[16] Special Master's 25th Round Report, p. 400 (*Coleman* Dkt. No. 4289) (showing the total CCWF prison population as 2,754 – 137.4% of design capacity).

[748409-1]

1  at CCWF.[17]

2      28.    In Building 503, which houses EOP patients and Reception Center non-

3  caseload inmates, the staff also told me they had to significantly limit the group therapy

4  offerings for EOP patients and can no longer offer any groups for CCCMS patients.  The

5  warden said CCWF has been unable to fully  accomplish its new mission as an EOP

6  administrative segregation "hub" because of inadequate clinical staff; she also noted that

7  the institution does not have "the authority to hire" the necessary additional staff to fulfill

8  its mission.

9      29.    These staffing shortages are very damaging to the quality and sufficiency of

10  mental health treatment.  For example, CCWF's failure to offer group treatment to EOP

11  inmates in administrative segregation units is a serious deficiency.  Some of the EOP

12  patients whom I met at CCWF were acutely mentally ill and clearly in need of additional

13  treatment.  This is particularly problematic in light of CCWF's recent designation as an

14  EOP Ad Seg "hub."

15      30.    This was the case with Prisoner A, an EOP patient who suffers from Bipolar

16  Disorder and Schizoaffective Disorder.  She said she hears voices that give her commands

17  to lash out.  Prisoner A told me that she had not received a therapy session other than a

18  brief contact at her cell front since her transfer to CCWF.  She also had not been offered a

19  group therapy session at CCWF, despite expressing a strong desire to pursue group

20  therapy.  Her medical records indicate that she was not provided with group therapy when

21  she was at VSPW either, noting that Prisoner A was on the "waiting list for anger

22  management and exercise groups."

23      31.    Staffing shortages also hindered the quality of mental health treatment

24  provided to Prisoner B, a CCCMS patient in administrative segregation at CCWF.

25  Prisoner B told me that her case manager had reduced her visits from once a week to every

26

27  [17] Special Master's 25th Round Report, p. 410 (*Coleman* Dkt. No. 4289).

28

1   other week "because her caseload is so big."  Moreover, her medical file clearly records

2   the adverse impact of staffing shortages on her mental health treatment.  One record in

3   Prisoner B's file states that her "treatment process" was affected by "modified programs

4   due to a significant increase of MH [mental health] patients in ASU [administrative

5   segregation unit]."  The treatment plan also notes "the increased number of mental health

6   patients [which] occurred from the closure of VSPW."[18]  Another note in Prisoner B's

7   medical record states that a clinical contact "occurred cell front to manage the large influx

8   of MH patients in ASU *while understaffed*."[19]

9       32.     In my opinion, shortages in custody staff also have diminished the quality

10  and sufficiency of mental health care at CCWF.  The medical records of Prisoner C, a

11  CCCMS patient in the ASU whom I interviewed, reflect that she was seen at cell-front by

12  her clinician because the prison was "short of staff escorts."[20]  Prisoner B's records reflect

13  that a "contact occurred at cell-front because of the lack of escorting officers."  Likewise,

14  Prisoner A's health records note that she missed a mental health appointment "because of

15  custody issues."  Regular, confidential appointments with mental health clinicians

16  constitute a key component of mental health care, and custody shortages that interfere with

17  patients' consistent and confidential access to their doctors pose a serious problem.

18      33.     At CIM, I also observed problematic staff shortages.  When I was there, the

19  overall population at CIM was 4,628, which is about 155.5% of the institution's design

20  capacity.  Of the total prison population, 1,447 individuals – approximately 31.3% – were

21  on the mental health caseload.

22      34.     CIM's internal Management Report identified staffing cuts as an "obstacle[]

23  to providing mental health services and adherence to Program Guide requirement."[21]  The

24  _____

25  [18] Declaration of Jane Kahn Filed under Seal ("Kahn Decl. (filed under seal)") Ex. 7.

26  [19] Kahn Decl. (filed under seal) Ex. 8 (emphasis added).

27  [20] Kahn Decl. (filed under seal) Ex. 9.

    [21] Bien Decl. Ex. 19, at 9 of 21 (CIM 25th Round Management Report).

28

1  report noted that between October 2, 2011 and March 31, 2012, there was "a reduction of

2  2.5 senior psychologist supervisor positions and 14 staff psychologist positions."[22]

3       35.    When I was at CIM, I received mixed accounts of the number of

4  psychiatrists on staff at CIM.  At least 4.5 of the 14.5 authorized psychiatrist positions

5  were vacant, but it appeared that there were even more functional vacancies when sick

6  leave was factored in.  Later in the day, a supervising psychiatrist told me that CIM is

7  down to eight psychiatrists to serve the 1,447 patients on the mental health caseload.  The

8  chief psychiatrist position was vacant.  One of the two psychologists in the Reception

9  Center was out on extended leave with an injury.  I was also informed that the institution

10  has been unable to hire psych techs and nursing personnel because of new medical acuity

11  guidelines.  It was clear to me from talking to the mental health clinicians over the course

12  of the day that they felt understaffed and under pressure to keep up with their large

13  caseloads.

14       36.    My first sight upon entering the infirmary on B-Facility at CIM was a pair of

15  medium-sized cage-like cells with about eight to ten Reception Center (RC) inmates in

16  each.  The inmates were cuffed and told me they had been waiting several hours for their

17  medical appointments.  A photograph of the patients waiting for their appointments is

18  attached as **Photo Exhibit A**.  The CDCR doctor leading our tour confirmed that some of

19  the inmates were waiting for psychiatric appointments.  Patients throughout the day told

20  me that they frequently have to wait in crowded holding cells for hours before they can

21  meet with mental health staff, often causing them to miss meals.  In my opinion, this

22  problem likely reflects shortages in both mental health staff and custody staff.   The

23  scarcity of available mental health appointments means that clinicians are over-booked,

24  and the shortage of custody staff extends patients' wait times by limiting the availability

25  and frequency of escorts.  This is a serious matter.  If patients have to wait in cuffs and

26

27  [22] *Ibid.*

28

1  crowded holding cells for hours and miss their meals in order to see their doctors, they are

2  less likely to attend appointments and therefore less likely to convey essential health

3  information to their clinicians and receive necessary treatment.  This, in turn, raises the

4  overall acuity of the population and adds to the pressures on the already overstretched

5  mental health staff.   It also causes patients to suffer unnecessarily on account of

6  insufficient treatment for mental illness.

7          37.     I was also struck by significant staffing shortages in CIM's administrative

8  segregation unit (ASU), where I observed a senior staff psychiatrist attending an IDTT

9  meeting because the regular psychiatrist was out on sick leave.  Of course, this means the

10  treating psychiatrist, with knowledge of the patients, was not participating in the meeting.

11  It also means the stand-in psychiatrist could not attend to his own job responsibilities.  This

12  was consistent with what I had read in CIM's internal Management Report, which reported

13  that CIM's ASU "was significantly impacted by staffing issues created by the AB 109

14  mission change" and found that "disrupted continuity and chronic understaffing of the

15  program" resulted.[23]  We were informed that the AB 109 "mission change" for CIM had

16  resulted in significant custody and clinical staffing cuts, but only a minor reduction in the

17  mental health caseload.

18          38.     Consistent with what I observed at CCWF, staffing shortages at CIM also

19  made it difficult for clinicians to see patients in confidential spaces or for meaningful

20  amounts of time.  The Special Master noted that "[s]ixty-two percent of primary clinician

21  contacts occurred cell-front" for CCCMS patients at CIM, and many of them were "merely

22  'check-ins.'"[24]

23          39.     Shortages in custody staff were also prominent at CIM.  In Cypress Hall, an

24  administrative segregation housing unit, all five inmates whom I interviewed expressed

25  frustration about the complete lack of response to their repeated requests to meet with

26

27  [23] Bien Decl. Ex. 19, at 8 of 21 (CIM 25th Round Management Report).

   [24] Special Master's 25th Round Report, p. 355 (*Coleman* Dkt. No. 4289).

28

1  custody counselors about their housing classifications.  Each of them was on the mental

2  health caseload and had been placed in the ASU due to a shortage of appropriate Special

3  Needs Yard (SNY) or closed custody beds.  No one at CIM had responded to their

4  repeated written and oral inquiries about why they had been placed in the ASU and when

5  they would be transferred elsewhere.  The CDCR doctor with whom I toured the facility

6  confirmed that CIM has a shortage of correctional counselors to address or facilitate

7  changes in inmate housing classifications.

8       40.    As with many of the other institutions I visited and read about, Corcoran's

9  population of mental health caseload patients also has risen as a share of the total inmate

10  population in recent years.  Although the overall prison population has dropped since

11  2008, the mental health caseload has increased slightly as an absolute number and

12  significantly as a share of the total population.  In August 8, 2008, the total mental health

13  population at Corcoran was just 25% of the total population.[25]  When I visited Corcoran on

14  February 19, 2013, I was told the total mental health caseload population was 1,431

15  patients – 31.6% of the total inmate population.  The EOP population has also risen since

16  2008 despite reductions in the overall population – from 204 EOP patients in August 2008

17  to 222 EOP patients when I was there.[26]  This suggests the overall acuity of the population

18  at Corcoran is rising.

19       41.    Despite the slight increase of the mental health caseload since 2008, the

20  allocation of psychiatrist positions at Corcoran has dropped by more than 33%, from 16.3

21  to 11.  Likewise, the number of allocated psychologist positions at Corcoran has dropped

22  from 35.21 to 29.  And even in light of those reduced staff allocations, the vacancy rates at

23  Corcoran are tremendous.  Only 2.5 of the 11 authorized staff psychiatrist positions were

24  filled on the day I visited, with the addition of approximately four contract psychiatrists.

25  _____

26  [25] Bien Decl. Ex. 25 (HCPOP Combined Mental Health Population Per Institution as of
    Aug. 8, 2008) at 1.

27  [26] *Ibid.*

28

EXPERT DECLARATION OF EDWARD KAUFMAN, M.D.

[748409-1]

Eight to ten of the 29 authorized psychologists were out on extended sick leave.  5.5 of the 18 authorized licensed social worker positions were vacant.

42.     The staff psychiatrist with whom I met openly referred to the "shortage of psychiatrists" and its adverse impact.  During a morning meeting with prison staff, Dr. Fischer, the chief psychologist, said the caseloads of mental health staff "have increased dramatically with the loss of staff."   In the course of a year, clinicians' caseloads rose from an average of 100 patients to an average of 160.  He noted that staffing had declined significantly over the past year due to retirement, sick leave, and "transfers to the coast."  The staff members laughed when Dr. Fischer referenced "transfers to the coast," but it is my opinion that high rates of staff turnover and sick leave are characteristic of an overcrowded system in which staff members work long hours and manage unreasonably large caseloads of acutely ill individuals.

43.     Several inmates at Corcoran spoke of frequent changes in their case managers.  Prisoner E, a CCCMS inmate I met in the SHU, told me he has had four different case managers and sees them infrequently.  Prisoner E said it seems like "every time we make progress, they take them away."  Prisoner E's comment was echoed by a record in his file noting that his treatment had been affected by the fact that "so many case managers have cycled through this building.

44.     Consistent with what I observed at all the institutions I visited, Corcoran's internal Management Report noted that there was an "escort shortage," which "has resulted in longer wait times for clinicians providing therapeutic services."[27]  Likewise, the Special Master reported that "[d]ue to insufficient numbers of access to care officers, clinicians reported that they could not see their caseload inmates for sufficient lengths of time and still see all scheduled inmates."[28]  The Special Master also noted that "[r]easons for lack of group therapy offerings for 3CMS inmates in the SHU and administrative and mainline

---

[27] Bien Decl. Ex. 20, at 4 of 16 (COR 25th Round Management Report).

[28] Special Master's 25th Round Report, pp. 220-21 (*Coleman* Dkt. No. 4289).

[748409-1]

1  yards included insufficiency of access-to-care officers, as well as lack of programming

2  space and safety concerns."[29]  When I visited Corcoran, it was confirmed that escort

3  officers are still in short supply.  At that time, Corcoran had 32.7 vacant escort officer

4  positions, and I heard complaints from patients about long lines and non-confidential

5  clinical contacts.

6      45.     In my opinion, these staff shortages pose a major obstacle to the provision of

7  basic mental health care.  Staff shortages not only mean that patients receive an inadequate

8  *amount* of treatment; shortages also lower the *quality* of treatment that is received.  Morale

9  suffers when staff does not have the resources to succeed at their jobs.  Overworked

10 clinicians are more likely to make errors.  Frequent and extended sick leave among clinical

11 staff cause discontinuity in the patient-clinician relationship.  Moreover, shortages in

12 custody staff negatively impact mental health treatment by limiting patients' access to

13 mental health appointments, reducing the frequency of yard time, requiring patients to stay

14 in their cells more, and limiting the regularity and quality of welfare checks.

15     46.     Unfortunately, addressing the staffing shortages at the institutions I toured is

16 not likely to be a simple matter.  At each institution, I was told about the difficulty of

17 recruiting mental health staff—particularly psychiatrists.  This does not surprise me, given

18 the isolated locations of many of the prisons and the minimal resources available to

19 support the work of staff psychiatrists.  Moreover, high turnover rates among psychiatrists

20 will likely continue as long as they feel that other problems, such as inappropriate

21 treatment spaces, heavy caseloads of very acute patients, and shortages of custody staff,

22 persist.  Recruiting and retaining mental health staff is a complex and long-term challenge,

23 but one which must be met in order to prevent patients from decompensating and

24 suffering.

25

26

27 [29] *Ibid.* at 221.

28

[748409-1]

15

### C. Inadequate, Inappropriate, and Anti-Therapeutic Treatment Space

47. At each of the three institutions I toured, I was dismayed to find inadequate treatment spaces that actively interfered with the provision of basic mental health care. Confidential treatment space is a basic and necessary component of adequate mental health treatment. Requiring patients to convey personal mental health information within earshot of other inmates and custody officers is anti-therapeutic and counterproductive. Mental health staff must depend on accurate information from patients in order to provide care. Moreover, clinicians must fully observe and interact with patients in order to gauge whether they are decompensating or showing signs of problematic side effects from psychotropic medications. Without providing confidential spaces in which to observe and elicit information from patients, mental health care providers cannot ensure that they are providing appropriate—even life-saving—treatment.

48. At CCWF, several patients told me that the majority of their clinical contacts take place at their cell fronts. This was consistent with the Special Master's 25th Report, which found that "[i]ndividual clinical contacts were most often conducted cell-front due to lack of treatment modules" at CCWF.[30]

49. Prisoner B told me that most of her interactions with clinicians take place across the door of her cell. Prisoner B's account was corroborated by her medical record, which observed "a high number of cell-front contacts over the last quarter." One report in Prisoner B's file specifically stated that the "contact occurred at cell front because of the lack of available confidential space." Prisoner B is in administrative segregation and has been diagnosed with major depressive disorder and a personality disorder. Her files describe her as agitated, depressed, and angry. A patient in those circumstances requires more meaningful and personal treatment than a cell-front contact in order to prevent decompensation.

---

[30] Special Master's 25th Round Report, p. 408 (*Coleman* Dkt. No. 4289).

EXPERT DECLARATION OF EDWARD KAUFMAN, M.D.

[748409-1]

50.     Prisoner A told me that most of her interactions with clinicians consist of someone walking by her cell (presumably a psych tech doing rounds) and calling out "everything ok?" then walking to the next cell and doing the same thing.  She feels that she cannot communicate how she is really feeling under those circumstances.

51.     This is consistent with the CCWF Management Report, in which the institution reported to the Special Master that "the provision of clinical services in a confidential setting is minimal" for individuals in administrative segregation and the SHU.[31]

52.     Shouted cell-front interactions are not meaningful clinical contacts, particularly given that the cells doors are generally made of very heavy and thick steel.  In order to speak to a patient, one generally has to speak very loudly and lean into a small slot in the door, which usually precludes being able to make eye contact with the patient. Relying on information elicited in this manner is highly problematic in terms of mental health treatment and suicide risk assessment.

53.     The shortage of appropriate treatment space extends to group treatment as well.  At CCWF, EOP patients are housed in a unit with non-caseload RC patients.  A line of red tape on the floor separates the two populations.  A photograph of the unit is attached as **Photo Exhibit B**.  I was told that a wall was supposed to be built to separate the two populations and create greater privacy, but the staff did not know if or when the wall actually would be built.  In the meantime, a few cells in between the two populations remain empty to maintain the separation of the populations.  The result is diminished freedom of movement and greater confinement for both populations.

54.     I observed an EOP group in the dayroom of the shared EOP and RC housing unit.  The group was conducted in the middle of the open dayroom, within earshot of custody officers and other inmates.  The Special Master's 25th Report noted that

---

[31] Bien Decl. Ex. 26, at 3 of 17 (CCWF 25th Round Management Report).

EXPERT DECLARATION OF EDWARD KAUFMAN, M.D.

"[m]ainline EOP groups were conducted on the dayroom floor, which limited confidentiality and was noisy, or in a small room just off the dayroom."[32]  Likewise, CCWF's Management Report referred to disruption of EOP groups in the dayroom due to shared housing units and a lack of appropriate treatment space.[33]  This is troubling and resonates with my observations.  Group therapy is only effective when patients are able to build rapport and develop a sense of safety and trust.  This simply cannot be achieved in a setting in which patients cannot be sure who is hearing them or what the consequences of their disclosures will be.

55.    In the case of CCWF, it is particularly distressing to note, as the warden told me, that a construction project to create badly needed treatment and office space for EOP general population has been "re-scoped."  The new project will be reduced in size, and the warden told me it "might" be done sometime in 2014.  The Special Master also noted that a revised schedule for construction had not been released.[34]  When I was at CCWF, construction had not yet begun.

56.    The EOP administrative segregation treatment space at CCWF was similarly concerning.  The "treatment room" consisted of a walled-off section of the housing unit with several treatment modules lined up in a row.  I find it hard to imagine how even an excellent clinician could provide effective group treatment in a room full of cage-like modules that are not even facing one another.  I was told this space had not yet been used, but was constructed to accommodate CCWF's new mission as an EOP administrative segregation "hub," which I find concerning because it was a harsh and untherapeutic space that I observed to be inadequate as a treatment facility.  The Chief Psychologist told me that CCWF had been sent treatment modules and patients, but no authority to hire staff to provide care for the women.  A photograph of two of the treatment modules in the new

---

[32] Special Master's 25th Round Report, p. 412 (*Coleman* Dkt. No. 4289).
[33] Bien Decl. Ex. 26, at 3 of 17 (CCWF 25th Round Management Report).
[34] Special Master's 25th Round Report, p. 43 (*Coleman* Dkt. No. 4289).

1   treatment room is attached as **Photo Exhibit C**.

2   57.   At CIM, I also observed major limitations in the treatment space. The

3   "group treatment space" for administrative segregation inmates is a line of treatment

4   modules in the back of a crowded, busy room with mental health staff and custody officers

5   milling about. Interdisciplinary Treatment Team (IDTT) meetings are also conducted in

6   this space. Patients who wish to disclose private information must do so at the risk of

7   being overheard by a wide cast of characters.

8   58.   When I met with patients in the administrative segregation unit, I did so in a

9   dingy and cramped space in the corner of the housing unit. The Chief of Mental Health at

10  CIM told me that a long-planned project to add treatment space for administrative

11  segregation has been canceled, and there is no longer a plan to improve or build new office

12  or treatment space for the administrative segregation unit.

13  59.   At CIM, these limitations in treatment space are compounded by the

14  generally dismal atmosphere and infrastructure. Many of the housing units are dark and

15  dirty with tiered designs. A photograph is attached as **Photo Exhibit D**. I read about

16  individuals who attempted suicide at CIM by jumping off an upper tier of a housing unit.[35]

17  One of the psychologists told us "the guy who designed this place should be

18  horsewhipped." Indeed, I saw a report of the Office of the Inspector General in 2008 that

19  recommended, "demolishing and replacing the entire institution" on account of its

20  "degradation" and "crumbling infrastructure."[36] This did not surprise me, given the grim

21  architecture and atmosphere of CIM.

22  60.   Prisoner K, an EOP patient in a tiered housing unit for Reception Center

23  inmates, described being freezing in his cell. Prisoner K told me that he only had one

24  blanket for most of the winter despite making multiple requests for additional blankets; he

25  only managed to get another blanket after asking his group therapy clinician to insist that

---

26

27  [35] Bien Decl. Ex. 19, at 18 of 21 (CIM 25th Round Management Report).

[36] Bien Decl. Ex. 10 (November 2008 OIG Report) at 2.

28

1  the correctional officers give her EOP patients more blankets. Meanwhile, clinicians at the

2  morning meeting at CIM referenced heat deaths of patients on heat-sensitive psychotropic

3  medications.

4         61.    Problems with inappropriate and inadequate treatment space plague

5  Corcoran as well.  There, treatment for EOP administrative segregation inmates takes place

6  in a converted gym.  The room is sectioned off into "treatment spaces" with temporary

7  half-walls.  One such treatment space is depicted in **Photo Exhibit E**.  Sound travels freely

8  around throughout the building.  Several inmates complained to me about the lack of

9  auditory privacy.  I experienced some of these frustrations firsthand when I interviewed

10 inmates in administrative segregation in Building 3A03.  I was confined to a sectioned-off

11 space in the middle of the housing unit, without auditory or visual privacy.  The inmates I

12 interviewed seemed distracted by the presence of custody officers in such close proximity,

13 and I felt that it was difficult to elicit sensitive information under those circumstances.

14        62.    The EOP administrative segregation group session I observed at Corcoran

15 took place in a room at the back of the converted gym.  The patients were hand and foot-

16 cuffed into Alternative Treatment Option Modules, known as "ATOM chairs," with a

17 metal bar pressing on their arms.  When I spoke with the patients, they generally described

18 the chairs as painful and restrictive.  Prisoner I, a patient at Corcoran, told me he does not

19 attend groups because he doesn't like "being chained to a chair."  His medical file reflects

20 that he has declined to participate in groups because he finds the ATOM chair so

21 unpleasant.

22        63.    The group I observed at the Corcoran SHU was held in a dirty concrete room

23 with exposed pipes on the ceilings, a broken computer in the corner, and very harsh light.

24 The door into the room was marked "Property/Supply Closet."  Next door, a clinician was

25 meeting with a patient.  The patient was in a cage, and the clinician's desk was at least

26 three to five feet away, with a computer screen partially blocking her face.

27        64.    These treatment space problems are not superficial.  Non-confidential,

28 uncomfortable, and punitive treatment spaces actively interfere with patients' disclosure of

1 critical information about their mental health.  Harsh, alienating treatment settings

2 discourage patients from participating in treatment, which has the effect of heightening

3 overall acuity among patients and increasing the risk of suicide and major psychiatric

4 decompensation.

5        **D.**       **Poor Medication Management and Medical Record Keeping**

6       65.     As a psychiatrist, I am very concerned about some of the practices I observed

7 with respect to the prescription and provision of psychotropic medications at the prisons I

8 toured.   Many patients on the mental health caseload take very serious psychotropic

9 medications, including antipsychotics, mood stabilizers, and antidepressants.  Responsibly

10 and ethically managing these medications requires psychiatrists to meet with patients

11 before prescribing new medications, familiarize themselves with patients' clinical histories

12 and diagnoses, conscientiously identify and track patients' side effects, and ensure that

13 medications are provided and ingested in accordance with their indications.  Based on my

14 observations at CCWF, CIM, and Corcoran, I am concerned that patients' medications are

15 not being properly administered and reviewed.

16       66.     At CCWF, I received a number of troubling reports about medication

17 management.  A nurse in the RC cited an instance in which a psychiatrist had prescribed

18 six medications, including two antipsychotic medications, Seroquel and Olanzapine,

19 without personally seeing or evaluating the patient for up to 14 days.  A CCCMS patient

20 on condemned row at CCWF, Prisoner D, expressed serious concern about her access to

21 medications.  Prisoner D's medical file reflects that she has previously complained about

22 her psychiatry appointments being canceled and causing her medications to lapse.  Her

23 records reflect that she told mental health staff that it has "happened before" and she was

24 worried about it happening again.

25       67.     Similarly, Prisoner A's medical record reflects that when she was at VSPW,

26 she reported having "gone to the med line window several different times and told they did

27 not have her meds."  At that time, Prisoner A was taking Lithium Carbonate and

28 Perphenazine.  The medical record reports that Prisoner A was concerned "that she might

1  be having problems if she did not get back on [her medications] soon."  Indeed, sudden

2  interruption to a regular dose of Lithium Carbonate could trigger serious problems such as

3  a severe manic episode or suicidal depression.  In addition, missing doses of these types of

4  medications can cause serious rebound symptoms, which can be difficult to diagnose and

5  physically painful.

6        68.  At CIM, Prisoner K told me that shortly after arriving at the prison from the

7  San Diego County Jail, he stopped receiving his medications for a full week.  He reported

8  this to the psych techs on the unit, but received no response.  Without his medications, the

9  voices in his head got worse.  Prisoner K fell into a deep depression and stopped eating.

10  The situation was only resolved once his cellmate reported Prisoner K's decompensation to

11  one of the staff psychologists, who called Prisoner K into his office and ensured that he

12  started receiving his medications again.  This episode is substantiated in Prisoner K's

13  medical file in a report by the staff psychologist about how Prisoner K failed to receive his

14  prescribed dose of Risperdal in the mornings.

15        69.  Similarly, the medical records of another CIM patient, Prisoner L, reflect that

16  the nursing staff at his previous institution, CCI, sometimes did not deliver his morning

17  medications.  Prisoner L has been diagnosed with schizophrenia, and at the time he

18  reported that his medications were not being consistently delivered, Prisoner L was taking

19  Zoloft, Remeron, and Thorazine, which are potent psychotropic medications that must be

20  taken with regularity.

21        70.  In the case of Prisoner T, a delusional and psychotic patient I met in the

22  MHCB at CIM, medical records reflect an abrupt and unexplained withdrawal of an

23  antipsychotic medication.  The record states that during Prisoner T's last MHCB

24  admission, "[h]e was stabilized on Zyprexa and discharged.  For unclear reasons, the

25  Zyprexa was stopped.  The patient subsequently decompensated and was referred back to

26

27

28

the hospital ….”[37]  At a minimum, this alarming account reflects poor recordkeeping and a failure to monitor a highly acute patient after MHCB discharge; it may also reflect deficiencies in medication distribution.

71.     These are very serious clinical failures with potentially dangerous consequences for patients.  Doctors should not be prescribing major antipsychotic medications without an in-person meeting with the patient and a review of prior medical records.  Likewise, patients absolutely must receive regular doses of their prescribed medications.  Inconsistent medication can lead to a return of psychosis, anxiety, insomnia, and depression.

72.     In general, I found that medications were poorly managed at the prisons I toured.  I heard about widespread hoarding of medications, including from Prisoner R, an EOP patient in the ASU at Corcoran, who told me he had attempted to kill himself by overdosing on pills he had “cheeked”—that is, he pretended to ingest the pills when they were administered, but instead hid them in his mouth against his cheek and later removed and saved them.  Prisoner R told me this was relatively easy to do because the checks performed by psych techs are generally very perfunctory.  The State’s experts noted “variation in the quality of Licensed Psychiatric Technician rounds” in their discussion of the SHU.[38]  My observations suggest that the same concern applies to other settings as well.

73.     Patients also told me about pervasive trading and overdosing on prescribed medications.  At CCWF, Prisoner D told me that many inmates snort prescribed medications which they get from other inmates.  Prisoner B told me she is frequently pressured by other inmates to give them her prescribed medications.  A psychologist at the MHCB at CIM told me that drug overdoses are very common at CIM.  When I asked what kind of drugs inmates typically overdose on, she confirmed that prescription medications

[37] Kahn Decl. (filed under seal) Ex. 10.

[38] Report of Dvoskin, Moore, & Scott, p. 24 (*Coleman* Dkt. No. 4275-5 at 26 of 41).

[748409-1]

1  are among them and also said "everything—meth, heroin, ecstasy lately."  The same

2  doctor also told me about pervasive gang problems in the SNY yards, including a gang

3  called the "Two-Fivers."

4      74.     Medication refusals were also rampant at the prisons I visited.  Medication

5  refusals are a major problem because sudden withdrawal from a potent medication may

6  cause serious physical and psychological responses.  If a patient refuses medication

7  because of side effects, a prompt psychiatric evaluation often results in transition to a

8  different effective medication or treatment regime.  This is critical because it can prevent

9  the patient from suffering withdrawal symptoms and the underlying condition from going

10  untreated.

11      75.     In my opinion, high rates of medication refusals represent a fundamental

12  breakdown of trust and communication between clinicians and patients.  I believe part of

13  the problem is that patients are not provided adequate opportunities ask questions or

14  receive important information about their medications.  In my experience, patients are

15  more likely to stop taking medications when they experience side effects or have concerns

16  about the medications.  In a functional mental health system, professionals inquire

17  frequently about side effects and talk confidentially with patients about their experiences

18  with the medications.  Perfunctory psych tech rounds do not offer patients a realistic

19  opportunity to learn about their medications or express concerns.  Moreover, cell-front

20  contacts with clinicians do not afford sufficient privacy for discussion of complex and

21  often sensitive side effects.  Consequently, it is my opinion that some patients' refusals of

22  medications reflect inadequacies in the underlying system of medication management and

23  patient care.

24      76.     My concern is heightened by indications that many nurses are unfamiliar

25  with the side effects of psychotropic medications.[39]  When I was at Corcoran, I was told

26  _____

27  [39] The State's expert Jacqueline Moore testified that she found that "[n]urses were
28  unfamiliar with the side effects of psychiatric meds" at all institutions except San Quentin.
   (footnote continued)

that only 6.5 of the total staff psychiatrist positions were filled, *including* four contract psychiatrists.  In its 25th Round report to the Special Master, Corcoran reported that the "total number of inmates in the MHSDS receiving psychotropic medications at the end of the reporting period" was 1,441.[40]  In a system where 6.5 staff psychiatrists have to manage psychotropic medications for 1,441 patients, nurses have to be on the front lines of patient care, including monitoring, observing, and answering questions.  Many psychotropic medications have very significant side effects, including kidney failure, diabetes, heat stroke, increased cholesterol, and suicidality, to name but a few of a multitude of potential serious problems.  It is essential for the individuals who interact with patients to understand the side effects of the medications that are prescribed and to rigorously monitor patients for signs that they may be experiencing side effects.  Without those measures in place, a medication regime can be rendered ineffective, physically harmful, or psychologically damaging.

77.     I also have serious concerns about the system for following up on medication refusals.  I was told at the institutions I visited that a patient's medication refusals are reported to a doctor if the patient refuses medications for three consecutive days or four out of seven days.  I also saw reference to this policy in the medical records I reviewed.  Waiting until a patient has missed three consecutive days of medications or four of seven days of medications is unacceptable.  Many of the patients whose files I observed take high doses of potent psychotropic medications.  Withdrawal from some of these medications is known to cause serious physical effects and significant decompensation after just one or two missed doses.  If patients are refusing medications, this information must be reported to and acted upon by a medical professional within 24 hours.  Responding to patient

_____

Dr. Moore acknowledged that it is important for nurses to be aware of side effects and stated that is "a common practice that nurses know the side effects of the medication that they're giving because very often you are the one that might observe lithium toxicity in an inmate."  Bien Decl. Ex. 27 (Defs. Expert Jacqueline Moore Deposition Tr. at 180:6-181:12).

[40] Bien Decl. Ex. 20, at 7 of 16 (COR 25th Round Management Report).

[748409-1]

1   refusals is an integral part of a prescribing doctor's responsibility.  Failure to do so comes

2   at the expense of patients' mental and physical health.

3          78.     The quality and management of medical records at the institutions I visited

4   also dismayed me.  A psychiatrist at CCWF showed me the computer system in place to

5   analyze and audit the psychotropic medications prescribed to inmates.  I found the system

6   useful and observed that it served a purpose in identifying potential contraindications in

7   prescribed medications.  However, it certainly does not replace meaningful individual

8   patient records which should contain detailed progress and treatment notes.

9          79.     Overall, I found the medical records I reviewed to be very superficial and

10  sparse.  The files I reviewed included records from the institutions I visited as well as

11  records from a number of different prisons where the patients I interviewed were

12  previously held.  Across the board, the medical records were inadequate.  They were

13  formulaic and scant, and they provided very little insight into a given patient's condition.

14  Although there were a few limited exceptions in which medical records provided important

15  and useful information about patients and reflected a real process of *treatment*, adequate

16  medical records were the exception to the rule among the hundreds of pages of medical

17  records I reviewed.

18         80.     This is not an insignificant problem.  Clinicians rely upon patient notes and

19  records in order to provide appropriate care.  This reliance is heightened in circumstances

20  like the ones I observed, in which: (1) clinicians do not see their patients often or

21  meaningfully enough to be familiar with them and their conditions, and (2) high rates of

22  sick leave and turnover frequently require new clinicians to familiarize themselves with

23  patients' conditions.  Moreover, medical records generally reflect the quality of treatment

24  provided.  I find it worrisome that virtually none of the medical records I reviewed

25  demonstrate that actual psychological treatment is taking place.  To the contrary, the

26  records I reviewed generally reflect a system in which patients receive perfunctory,

27  insufficient, and inadequate care for serious mental health conditions.

28         81.     Although CDCR claims to use an electronic medical record system, I found

that doctors relied heavily on paper records for individual patient care.  When I was at the MHCB unit at CCWF, for example, I observed and reviewed the paper files for several of the current patients.[41]  I asked why the doctors were not using an electronic record, and the nurse explained that the paper notes are only scanned in every so often.   In the event of an inpatient admission, the records are usually scanned in after the patient leaves the facility.  Consequently, many of the relevant records will exist only in paper.  The paper files I reviewed were chaotic and would have been difficult for a clinician to readily access and navigate.

82.    Even when the records exist in electronic form, a great many of them are just scanned versions of handwritten notes.  In one instance at CCWF, neither the nurse nor I could discern the handwriting of the psychiatrist—even as to the patient's primary diagnosis.   Having reviewed electronic health records for the patients I interviewed on my tours of CCWF, CIM, and Corcoran, I can attest that many of the records are totally or nearly illegible.  The handwriting is often indecipherable, and poor quality of scanning seems to exacerbate the problem.  As a psychiatrist reviewing the records, I found that a significant number of the medical records were rendered useless because of the extreme difficulty of deciphering them.

83.    In addition to being legible, health records must be accessible to the clinicians who need them.  This is particularly important—and perhaps particularly challenging—given the high incidence of cell-front contacts between patients and mental health clinicians.  The file of one CCCMS patient whom I met at CIM stated that at the time of the clinical encounter, the "UHR [universal health record] was not available for review."  This does not surprise me.  Even when contacts are not conducted cell-front, many of the treatment spaces I observed do not have computers.  At Corcoran, one of the

---

[41] I was told the CCWF mental health crisis beds are referred to as "mental health program beds" (MHPB) because of their location in a Skilled Nursing Facility, but that they are essentially the same as MHCBs and serve the same function.

27
EXPERT DECLARATION OF EDWARD KAUFMAN, M.D.

treatment rooms appeared to have a computer that was missing a keyboard.  When I asked about this, I was told the clinicians "bring their own keyboards."  Whether or not clinicians actually do bring their own keyboards for patient therapy sessions, the lack of infrastructure for electronic medical records further limits their usefulness.  Regular review of patient records is a necessary component of even basic treatment of mental illness. Again, these limitations are particularly problematic given the general absence of sustained, meaningful therapeutic relationships and the need for heavy reliance on medical records.

### E.    Excessively Punitive Practices in the Mental Health Crisis Beds

84.    I am also very concerned about punitive practices directed at individuals in acute psychological distress.  At each of the institutions I visited, I observed or heard about practices, which would discourage patients in crisis from coming forward for necessary care.  The MHCBs I toured were very harsh places, with stark walls, heavy doors, and holding cells in the hallways or outside the units.  Photographs of cells in the MHCBs at CIM and Corcoran are attached as **Photo Exhibit F** and **Photo Exhibit G**.  Patients were often wearing nothing but suicide resistant smocks, and many slept on the floor of their cells.

85.    I observed widespread cuffing and extensive use of holding cells at the MHCBs I visited.  As far as I could tell, all the inmates at CCWF were cuffed for virtually all of their movements around the unit.  The same was true at CIM, where I also was told that all clinical staff members wear plastic shields over their faces and protective vests for all interactions with the "max" patients.

86.    At CIM, I observed a room for group treatment of MHCB patients.  The room had a table and chairs, surrounded by a series of cage-like treatment modules.  I asked whether all groups take place in the modules or if patients are ever permitted to sit at the table for the treatment.  I was told that all patients are required to undergo treatment in the modules, even if they are not coming from administrative segregation and have no history of disciplinary issues.  This blanket policy is problematic.  At a minimum, the

[748409-1]

1   treatment modules pose a challenge to meaningful therapeutic interactions.  To use them

2   for individuals in acute distress, who may be feeling deeply isolated, even when there is no

3   documented need for the modules is counter-therapeutic and inhumane.

4         87.   At CCWF, Prisoner D described very punitive and alienating treatment at the

5   MHCB.  Prisoner D attempted suicide in June 2011.  Immediately upon the discovery of

6   Prisoner D's attempt, the staff stripped her, searched her, and put her in a cell at the

7   MHCB with only a suicide smock and blanket.  She was told to "stay in here and think

8   about what you did."  Prisoner D described the MHCB staff as some of "the coldest people

9   I've ever encountered," at a time when she deeply vulnerable and experiencing acute

10  psychological crisis.  Prisoner D recounted the incident to me with great distress.

11        88.   Prisoner F, a CCCMS patient housed in the Corcoran SHU, gave a similar

12  account of his experience at the MHCB.  He was most recently admitted to the MHCB at

13  Corcoran in January 2013 due to suicidal thoughts and plans.  When he told custody staff

14  in the SHU that he was feeling suicidal, they immediately cuffed and strip-searched him,

15  which, he said, made him feel even more like he wanted to kill himself.  He was then

16  placed in a holding cell at the MHCB for about an hour and a half before being strip-

17  searched again and put into an MHCB cell.

18        89.   These practices are consistent with the Special Master's observations.  In the

19  25th Round Monitoring Report, the Special Master recounted an incident in the Corcoran

20  MHCB in which in a patient was cuffed and held in a treatment module while meeting

21  with the clinical contact team.  The report noted that "[c]linical staff appeared reluctant to

22  have the inmate uncuffed, although he had done nothing to harm himself, nor

23  'manipulated' or refused to follow orders."[42]

24        90.   These practices are anti-therapeutic and should be reviewed as to their

25  absolute necessity.  If CDCR is serious about reducing the incidence of suicide in its

26

27  _____

[42] Special Master's 25th Round Report, p. 212 (*Coleman* Dkt. No. 4289).

28

1  prisons, it must take a hard look at the factors that discourage individuals experiencing

2  suicidal ideation from coming forward for assistance.   These types of punitive practices

3  can cause patients to become more suicidal and nonetheless to conceal their suicidal

4  ideation in order to avoid feeling dehumanized in the treatment setting.

5      91.    Suicide prevention and screening are an essential component of any prison

6  mental health care system.  A competent evaluator must review suicide risk factors

7  frequently and carefully, with ready access to all the necessary information about a

8  patient's case history and recent behavior.  This is particularly critical for the many

9  mentally ill patients in segregated housing units because, as the State's experts noted,

10  "Administrative Segregation Units ha[ve] a statistical overrepresentation of completed

11  suicides when compared to other housing units."[43]

12      92.    When I asked a psychiatrist in the Corcoran MHCB about suicide prevention

13  measures, he told me that even as a MHCB-based psychiatrist, he receives no training in

14  suicide risk evaluation.  Likewise, he provides no training to others on suicide risk

15  evaluation.  I find this worrisome, given the high rates of suicide in California prisons and

16  the frequency with which the patients I met spoke of past suicide attempts and recent

17  suicidal ideation.

18      93.    I also asked the psychiatrist about a Proctor-Mentor form which I had seen in

19  the course of reviewing documents for this case.  I thought it was a useful form which

20  could serve a purpose in improving suicide risk assessments in the prisons.  While the

21  CDCR attorney who accompanied us knew about the form, the MHCB psychiatrist had

22  never heard of it.

23      94.    Reducing the overall incidence of suicide in prisons may be a complex

24  endeavor, but some steps are straightforward.  Rigorously training clinicians and custody

25  staff in suicide evaluation is one.  Reducing the use of harsh, punitive measures such as

26  _____

27  [43] Report of Dvoskin, Moore, & Scott, p. 21 (*Coleman* Dkt. No. 4275-5 at 23 of 41).

28

1   cuffing and caging patients in acute psychological crisis settings is another.

2

3       **F.      Inappropriate and Harmful Overuse of Administrative Segregation**

            **1.      Ill-Advised Use Administrative Segregation for Non-Disciplinary**
4                      **Reasons**

5       95.      Overall, I was very alarmed by the extensive use of administrative

6   segregation units for individuals on the mental health caseload—often for reasons wholly

7   unrelated to disciplinary infractions.  At every institution I toured, I met individuals on the

8   mental health caseload who were housed in ASUs due to a shortage of appropriate beds.

9   These individuals experienced long periods of severe idleness, lack of human contact, and

10  extreme confinement to the detriment of their mental health.

11      96.      The situation was most concerning at CIM, where I encountered widespread

12  use of ASUs for caseload patients with no apparent disciplinary infractions.  Like the

13  State's experts, I observed that these individuals were "housed in an Administrative

14  Segregation Unit for their own protection; not because they posed a danger to others."[44]

15  CIM had classified many of these individuals as "LOB"—"lack of bed."  In other words,

16  there are enough individuals whom CIM has been unable to place in appropriate housing

17  settings that they created a specific category for them.  A board on the wall of the

18  administrative segregation unit showed that there are two types of LOBs—SNY LOBs and

19  General Population (GP) LOBs.  A photograph of the board, with purple and pink cards

20  representing "LOB" inmates, is attached as **Photo Exhibit H**.  The vast majority of the

21  inmates in the Cypress Hall administrative segregation housing unit were LOBs, not

22  inmates who had been designated for administrative segregation.  Unlike inmates who are

23  formally placed in administrative segregation, these individuals have undergone no process

24  and, in many cases, received no explanation before being placed in isolation.  They have

25  no sense of when their confinement in the ASU will end, and their requests for information

26  _____

27  [44] Report of Dvoskin, Moore, & Scott, p. 19 (*Coleman* Dkt. No. 4275-5 at 21 of 41).

28

1    and explanations have been overwhelmingly ignored by custody officers.  When I spoke to

2    them, they were confused and, in some instances, desperate and decompensating.

3        97.    The first individual I met in this circumstance was Prisoner L, a CCCMS

4    patient with a history of serious suicide attempts.  Prisoner L has been designated SNY.

5    He came to CIM in the spring of 2012 and was assaulted on A-Yard.  This account was

6    corroborated by his medical records, which reflect that Prisoner L went to the MHCB in

7    May 2012 and reported that he had been attacked and feared for his life on the A-yard.

8    Prisoner L was told he would be transferred to another institution, but instead was placed

9    in the ASU at CIM and has been waiting there for more than nine months.  Prisoner L told

10   me, "I feel like I've been put in the hole when I didn't do anything wrong."

11       98.    Prisoner L is constantly confined to his cell except to go to yard about once a

12   week and "chow" twice a day for about fifteen minutes.  The showers are cold.  He is strip

13   searched whenever he leaves the unit.  Prisoner L does not have a television or radio, and

14   he does not have access to his property.  Prisoner L only sees a doctor approximately every

15   30 days, and the appointments typically last 10 to 15 minutes.  When I asked Prisoner L

16   about welfare checks, he said no one walks by his cell or checks on him.  The staff later

17   confirmed to me that there are no welfare checks for LOBs because they are not

18   technically in administrative segregation—just housed in an administrative segregation

19   unit where they are confined to their cells nearly all the time.[45]  Prisoner L's medical

20   records also reflect that he is denied even some of the limited opportunities provided to Ad

21   seg inmates: "Per custody I/P [inmate patient] unable to attend the movie group because he

22   is LOB and unable to mix with ADSEG inmates."[46]

23       99.    Prisoner L described a number of admissions to the MHCB at CIM,

---

25   [45] I also find it concerning that despite being housed in ASUs, in substantially similar

26   conditions as Ad Seg inmates, the "LOBs" are not counted in CDCR's total administrative
     segregation population.  I question the value of a count of administrative segregation

27   inmates that does not include individuals housed in administrative segregation units.

     [46] Kahn Decl. (filed under seal) Ex. 11.

28

including once when he thought he was going to hurt himself and another time when he went there out of desperation about being stuck "in the hole." He said he did not know how else to get someone to talk to him other than by going to the MHCB. The staff at the MHCB, however, was unable to change his housing designation, and Prisoner L was sent back to the ASU, where he has remained ever since. When I met him, Prisoner L had been housed in the administrative segregation unit for about nine months. Prisoner L finds the isolation incredibly difficult and feels that he is increasingly depressed and despairing.

100.   I also interviewed Prisoner P, a CCCMS inmate in the Cypress Hall administrative segregation unit. Prisoner P is a recent veteran and has been diagnosed with Post-Traumatic Stress Disorder and Major Depressive Disorder. Prisoner P arrived at CIM in September 2012, and he was still classified as a Reception Center inmate when I met him five months later in February 2013. When Prisoner P arrived at CIM from the San Diego County Jail, he denounced the gang with which he had formerly associated and was designated SNY. He said that the "Two-Fivers," a gang in the SNY yard had put out a hit on his life. Accordingly, Prisoner P was placed in the Ad Seg unit for lack of an available appropriate placement. Prisoner P told me he has been endorsed for transfer to an SNY placement, but never got transferred. Instead, he has spent several months, in his words, "locked down 24 hours a day," with no idea when he will be released from isolation.

101.   Like the other patients with whom I spoke in Cypress, Prisoner P told me that he gets to go to yard once a week or less. He is stripped down "buck naked" anytime he leaves the unit. The showers are freezing cold, and the custody staff rarely passes by the cells. Prisoner P was particularly distressed about his lack of access to religious services and group therapy. He heard about a veteran's group at CIM which he thinks could help with his PTSD from a recent deployment, but the custody staff told him that he is not entitled to groups in his current classification.

102.   Prisoner P's medical record reflects that he experiences "constant flashbacks" to an improved explosive device detonation in Iraq. Prisoner P's file also recommends "consult for EOP placement." Prisoner P told me he thinks he should be EOP

1   and his mental health counselor suggested that might be appropriate, but the custody

2   counselor told him that if he went EOP, he would have no choice but to go back to Birch,

3   the yard where the Two-Fivers gang has a hit on his life.  As a result, Prisoner P feels that

4   he cannot receive the appropriate level of mental health care and believes his

5   psychological condition is worsening.

6        103.   Like Prisoner L, Prisoner P said his psychologist generally only spends 15

7   minutes with him when they meet.  He said he often has to wait up to six hours in a

8   holding cell for appointments, and then "all they do is run through the suicide checklist."

9   Prisoner P has submitted several inmate requests for information and assistance with his

10  housing situation, but has not received any answers or responses.  He said the situation

11  "makes you want to hang yourself, theoretically."

12       104.   In the same housing unit, I met with Prisoner N, a CCCMS patient with a

13  history of serious suicide attempts and multiple admissions to the MHCB.  Prisoner N

14  hears voices, which primarily take the form of very demanding whispers, and he takes

15  Zyprexa, Buspar, Remeron, and Vistaril.  Prisoner N was designated SNY after being

16  assaulted for allegedly being a snitch.  His file states that he is SNY and has been placed in

17  an administrative segregation unit "for safety."  The file also refers to "gang politics in

18  SNY."

19       105.   For a short period of time, Prisoner N was designated for administrative

20  segregation, but then he was transferred to "LOB" status.  He said the situation is

21  marginally better as a "LOB" than it was when he was officially in administrative

22  segregation because he is occasionally allowed to go to canteen and is cuffed less

23  frequently.  On the other hand, he said, there were hot water showers in the Palm Hall Ad

24  Seg unit, and he had opportunities to get his hair cut and nails trimmed.  His current

25  housing arrangement is identical to when he was officially designated Ad seg.  He is still

26  confined to a "very crowded" cell with rare opportunities to leave.  Prisoner N still has no

27  extended stay privileges, such as access to phone calls and packages, despite having been

28  "LOB" at CIM for almost a year.

106.    Prisoner N spoke with desperation about his experience in the administrative segregation unit, during which the voices in his head have intensified.  Prisoner N finds the isolation and near constant confinement in his cell extremely difficult, and not knowing when he will be released from the Ad Seg Unit makes it even worse.  Prisoner N's medical record shows that he told a clinician in July 2012 that "I'm still hearing voices and am suicidal.  I can't handle being in Ad seg much longer."  Seven months later, he remains in an administrative segregation unit battling with auditory hallucinations.

107.    I met with two additional CCCMS inmates in substantially similar circumstances.  One of them, Prisoner O, also reported freezing cold showers and poor hygiene in the Ad Seg unit.  Prisoner O showed me his very long, overgrown toenails, which he is unable to clip and which cause him physical pain.  Like the others, he reported that he has to wait in a "cage" for up to six hours to see a psychologist for 15 minutes.

108.    Prisoner Q suffers from Crohn's Disease a serious medical condition, in addition to an anxiety disorder and mood instability.  He was transferred to CIM from the Substance Abuse Treatment Facility and State Prison (SATF) because doctors told him the E-Yard at CIM was better equipped for his medical needs.  Prisoner Q showed me paperwork endorsing him for SNY housing on CIM's E-Yard and another form stating that "celled Level-II housing, as required for inmates assigned to Closed Custody, is not currently available."  Prisoner Q has made multiple requests to meet with the classification committee, but they have gone unanswered.  Like Prisoner O and the other inmates I interviewed, Prisoner Q was frustrated, confused, and greatly distressed about his seclusion.

109.    The Special Master had reported that "[t]he mix of SNY, non-SNY, and administrative segregation inmates also limited inmates' ability to move about freely" in CIM's Cypress Hall.[47]  I certainly found this to be true, though I was unprepared for the

---

[47] Special Master's 25th Round Report, p. 354 (*Coleman* Dkt. No. 4289).

EXPERT DECLARATION OF EDWARD KAUFMAN, M.D.

1   long and indeterminate nature of the Ad Seg unit confinement, the absence of basic

2   privileges, and the patients' near-constant confinement in small cells.

3        110.   I encountered and heard accounts of about patients on mental health caseload

4   patients inappropriately housed in Ad Seg units at Corcoran and CCWF as well.  At

5   CCWF, Prisoner A is an EOP patient being held in administrative segregation because of a

6   paucity of appropriate housing.  She told me that shortly after she arrived at CCWF,

7   someone with whom she had had problems at a prior institution spotted her on the yard.

8   The next thing she knew, Prisoner A had been placed in the Ad Seg unit.  Her medical file

9   corroborates this account and reflects that the "placement reason indicated as enemy

10  concerns/lack of bed space."  As a result of the shortage of appropriate bed space, Prisoner

11  A was being held in a unit shared with condemned row, SHU, and mainline administrative

12  segregation inmates.  She told me she found the presence of death row inmates on the unit

13  unnerving.  Prisoner A was desperate for transfer to somewhere she can receive group

14  treatment, but like the other individuals placed in Ad Seg units because of CDCR's

15  inability to meet the needs of its population, Prisoner A did not know when or if she would

16  be transferred.

17       111.   To that end, my observations are not fully consistent with the State's experts'

18  with respect to the conditions for women housed in the CCWF Ad Seg unit "solely for

19  their own protection."[48]  The State's experts noted that "great effort was expended to

20  ensure that these women received the same number of treatment hours that they would

21  have received in an EOP program."[49]  While I cannot speak to the amount of effort

22  expended, the mental health staff in the Ad Seg unit that houses SNY inmates explicitly

23  told me that no group therapy is offered on account of staffing shortages.  This also was

24  corroborated by Prisoner A's statements and medical records.

25       112.   Prisoner J is a CCCMS patient whom I met in an Ad Seg unit at Corcoran.

26  _____

27  [48] Report of Dvoskin, Moore, & Scott, p. 22 (*Coleman* Dkt. No. 4275-5 at 24 of 41).
    [49] *Ibid.*

28

He told me that he had served his SHU term and had been endorsed for transfer to Kern Valley State Prison (KVSP) for Level IV SNY placement, but was never actually moved. He showed me a form stating that due to "overwhelming" population numbers at KVSP he could not be transferred.  A note in Prisoner J's medical file from February 2012—a year before I met him—stated that he "want[ed] to leave Ad seg asap" and had "been waiting a year."  The custody officer in charge of the Ad Seg unit where Prisoner J was held told me that "it happens quite a bit" that individuals without administrative segregation designations are held in the Ad Seg unit.  He said that GP inmates in administrative segregation units are "the best to house" because they will "go wherever" just to get out of isolation.

113.   I also spoke with Prisoner H, an EOP patient who had just been transferred to Corcoran after an extended stay at the Department of State Hospitals (DSH).  He described his Ad seg housing at Corcoran as "a dungeon."  Prisoner H said he was initially told he would be transferred to SATF as a Level 2 SNY, but recently has been receiving mixed reports about when and if he will be transferred out of the Ad Seg unit.  Prisoner H's medical file reflects that he should be "housed with a protective population."  His treatment plan notes that he is "feeling depressed in part due to EOP placement/isolation."[50]  When asked about Prisoner H's situation, Dr. Fischer confirmed that SNY inmates, including EOPs, are placed in administrative segregation units because they "fulfill the protective requirements of SNY," and inmates are "safe in Ad Seg."

114.   In my opinion and based on my clinical and academic experience, it is wholly inappropriate and anti-therapeutic to house mentally ill inmates in administrative segregation units, particularly for indeterminate periods of time and unstated reasons.  I

---

[50] Importantly, Corcoran reported to the Special Master that, during the 25th Round of monitoring, 16 EOP prisoners were held in Ad seg for longer than 90 days due to "endorsed awaiting transfer/bed availability."  Bien Decl. Ex. 20, at 13 of 16 (COR 25th Round Management Report).  I have grave concerns about these extended placements in seclusion for very ill individuals like Prisoner H.

1   question the characterization of mentally ill inmates in Ad Seg units as "safe."  To the

2   contrary, several patients told me that isolation increases the symptoms of their mental

3   illness, and there is every reason to believe this is true.  Several of the individuals I met in

4   Ad Seg units experienced auditory and visual hallucinations.  In my experience, these

5   symptoms can be heightened by isolation and lack of stimulation.

6        115.   Moreover, the practice of housing "LOBs" (whether explicitly designated as

7   such or not) in administrative segregation units is especially damaging because of the

8   indeterminate and seemingly arbitrary nature of the placement.  The patients in that

9   circumstance whom I met were terrified and felt powerless.  They did not understand why

10   they had been sent to an administrative segregation unit, and they were desperate to know

11   when they would be transferred out of seclusion.  Indeed, four of the five "LOBs" I met in

12   Cypress Hall at CIM had been to the MHCB because of psychological distress they

13   attribute in large part to their housing situation.

14        116.   Housing SNY inmates with mental illness in administrative segregation for

15   lack of appropriate alternative placements is particularly inhumane and ill-advised because

16   so many of these individuals are vulnerable in the first place.  In my observation, many of

17   these individuals became "SNY" in the first place because they were assaulted, victimized,

18   or otherwise felt unsafe in the general population.  Some of them, like Prisoner L, told me

19   they affirmatively sought out SNY designation because they felt they could not cope in the

20   general population.  Moreover, most of the "LOB" patients I met had been diagnosed with

21   major mental illness.  It is reasonable to suspect that in at least some cases, these

22   individuals' failure to cope in the general population was connected to their mental illness.

23   These individuals need *more* care, attention, and treatment on account of their

24   psychological vulnerabilities—not extreme and indefinite isolation in segregated housing

25   units.  Reflexively placing these individuals in administrative segregation as a form of

26   overflow housing is inhumane and dangerous.

27        117.   In my opinion, the State's experts' recommendation that "inmates with

28   serious mental illness who are housed in an Administrative Segregation Unit while

38

EXPERT DECLARATION OF EDWARD KAUFMAN, M.D.

1   awaiting a Special Needs Yard bed be placed at the front of any waiting list" is a step in

2   the right direction, but insufficient.  Housing individuals on the mental health caseload in

3   Ad Seg units for lack of a more appropriate bed should be prohibited.  At a minimum, the

4   practice should be strictly time-limited.  Moreover, these individuals should be allowed all

5   the privileges to which they would be entitled if they were appropriately placed in SNY or

6   other non-segregated yards, such as access to their property, permission to make phone

7   calls and receive packages, and permission to have televisions and radios where possible.

8   Given that these individuals spend so much time confined in their cells, the requirements

9   for group time, out of cell time, and wellness checks that apply to administrative

10  segregation inmates also should apply equally to these individuals.

11          118.    It is also worth noting that the problems associated with the inappropriate use

12  of Ad Seg units are directly related to overcrowding.  At CIM, the Chief of Mental Health

13  specifically stated that "Level II SNY EOP bed availability is a major problem," and in

14  fact, "all EOP beds are a problem."  A psychologist in the CIM Reception Center

15  confirmed that inmates' movement from the Reception Center to the mainline has been

16  slowed by the unavailability of EOP and especially SNY EOP beds.  The Chief of Mental

17  Health at CCWF also noted that EOP beds are scarce.  Likewise, the Special Master

18  reported that "[a]ccess to mainline and SNY EOP programs continued to be slow in many

19  cases."[51]  The very title "LOB," of course, infers that there are simply not enough beds to

20  meet the needs of the population.  The same was true at CCWF and Corcoran, where lack

21  of appropriate bed space had led to housing placements that exacerbate the mental health

22  of the inmates.  In my opinion, a system is dangerously overcrowded when it lacks safe,

23  appropriate housing for inmates.  In my opinion, CDCR's failure to place even very

24  mentally ill inmates in an appropriate setting reflects its inability to keep up with the basic

25  needs of its population.

26  _____

27  [51] Special Master's 25th Round Report, p. 79 (*Coleman* Dkt. No. 4289).

28

EXPERT DECLARATION OF EDWARD KAUFMAN, M.D.

2.     **Harmful Use of Administrative Segregation for Mentally Ill Patients**

119.    Importantly, my concerns about administrative segregation are not limited to "LOBs." Housing individuals on the mental health caseload in administrative segregation for any reason is ill-advised and anti-therapeutic.

120.    At CIM, I met Prisoner S, who had been sent to administrative segregation due to violence against a cellmate. Prisoner S is CCCMS and suffers from major depression. He experiences paranoia and previously attempted to hang himself in prison.

121.    Prisoner S described difficulty enduring life in administrative segregation. He sits in his cell most of the day. Once a week, he has a group in what he called "a cage." When he goes to yard, it is a tiny individual yard that feels "like a kennel for dogs." Anytime he leaves the building, he is strip-searched. He said he rarely gets books, and even when he does, "you can only read for so long." Prisoner S told me he "kinda go[es] crazy in that cell." He has no one to talk to and nothing to do. He tries to deal with his anger by doing calisthenics, but often he just paces around in his cell. He said he thinks about hurting himself.

122.    Even Prisoner S medical file reflects the toll that administrative segregation takes on his psychological condition. A clinician noted that "part of his depression may be his . . . limited socialization and interaction with others."

123.    Indeed, the supervising psychologist with whom I spoke at an IDTT meeting in one of CIM's Ad Seg units acknowledged that administrative segregation can harm people with psychological vulnerabilities and that the isolation causes some individuals to decompensate. She also acknowledged that decompensation in administrative segregation can lead to increased MHCB admissions. She said that the Ad Seg unit and the MHCB at CIM have a "lot of shared patients," who cycle back and forth. In fact, the overlap is so significant that recently she was assigned to supervise both units in part to create greater continuity of care for those individuals. Another psychologist at the IDTT meeting noted that the isolation of the Ad Seg units may "give [patients] a hard time" even if they were

[748409-1]

1  "not having a hard time" otherwise.

2      124.   In my opinion, keeping individuals with mental illness in constant isolation

3  has the effect of raising the overall acuity of the mental health population.  Put simply, this

4  means that a given prison population will have more mental health needs than it otherwise

5  would as a result of using seclusion indiscriminately and inappropriately.  In a system

6  where mental health resources are scarce, housing arrangements that have the effect of

7  increasing mental health needs are counterproductive, as well as inhumane.

8      125.   It is well established that the suicide rate is higher in administrative

9  segregation than the general population, both in California prisons and nationwide.

10  Indeed, the State's experts noted this in their own report.[52]  Individuals on the mental

11  health caseload who are placed in segregated housing experience isolation and idleness, to

12  the detriment of their mental health.  They receive less mental health treatment and

13  monitoring.  Given the rate of suicide in administrative segregation units, it is appalling

14  that (1) these units are used reflexively in response to bed shortages, and (2) individuals

15  known to have major mental illnesses and previous suicide attempts are serving long and

16  often indeterminate terms in these units.

17      126.   In my opinion, patients on the mental health caseload simply should not be in

18  Ad Seg units.  I agree with the State's experts that administrative segregation units should

19  be used "only when it is absolutely necessary to protect staff and inmates" and "only for as

20  long as is absolutely necessary."[53]  There should be a specific, reviewable process in place

21  to determine that placement in an Ad Seg unit is absolutely necessary.  And where

22  administrative segregation is found to be absolutely necessary, the placement should be

23  strictly time-limited.  Anyone on the mental health caseload facing the prospect of

24  seclusion should have the minimal comfort of knowing when the isolation will end.

25

26  _____

27  [52] Report of Dvoskin, Moore, & Scott, p. 21 (*Coleman* Dkt. No. 4275-5 at 23 of 41).
    [53] *Ibid.*

28

EXPERT DECLARATION OF EDWARD KAUFMAN, M.D.

[748409-1]

### 3.      Excessive SHU Sentences in Extreme Isolation

127.    At the Corcoran SHU, I met individuals who have been held in extreme isolation for extended periods of time—some for many years.[54]  Many of these individuals were serving indeterminate SHU sentences, and all of them had diagnosed mental illnesses.  They are housed in small cells in a series of bleak, cavernous concrete rooms, and they exercise in fenced-off individual yards.  One patient reported that he was provided one group, but the others said they have not attended or been given the opportunity to attend any groups.  The individuals I met in the SHU were isolated, lonely, and struggling with serious psychological conditions.  In my opinion, the long-term isolation to which these individuals have been exposed is dangerous, harmful, and anti-therapeutic.

128.    Prisoner E is a CCCMS patient who has been in the SHU for almost 13 years.  Prisoner E said he was placed in the SHU after being found with drugs in his cell, but was subsequently given an indeterminate sentence due to imputed gang association.  Prisoner E described a very isolated and difficult existence in the SHU.  He eats alone, sits in his cell alone, and goes to yard alone.  His only interactions with other inmates are shouts from across the fenced individual yards.  Sometimes the SHU inmates play chess with pieces of toilet paper dyed with Kool-Aid, calling out moves through the walls of their cells.  Otherwise, Prisoner E rarely speaks to anyone.  No one touches him except the custody officers when he is being escorted to or from his fenced off yard.  Prisoner E was emotional when he spoke about how much he misses getting to touch or hold others.  He has a brother and sister in Arizona, but he does not think it would be worthwhile for them to visit and have to talk to him across the glass.

129.    Prisoner E feels that he has changed because he has spent so many years in the SHU.  His depression has grown worse, and he finds that he gets angry more quickly.

---

[54] The Corcoran SHU had a total population of 1,368 prisoners when we were there.

EXPERT DECLARATION OF EDWARD KAUFMAN, M.D.

[748409-1]

He feels overwhelmed by the unfairness of having to spend so much time in isolation. Prisoner E said he used to like to help other people, but now he feels hardened.  His medical records reflect a "constant cycling of case managers," and Prisoner E finds it hard to trust anyone.

130.    Prisoner E's tone of desperation was echoed by another inmate, Prisoner G, who has been in the SHU for five years.  Prisoner G was sentenced to the SHU because he refuses cellmates.  He told me that he was seriously assaulted by a cellmate years earlier and can no longer bear sharing a cell.

131.    Prisoner G is CCCMS, and although he was not sure of his own diagnosis, his medical records reflect that he has been diagnosed with schizoaffective disorder, bipolar type.  Prisoner G has been admitted to the MHCB on several occasions and has a history of hitting his head against the wall to relieve stress.  He used to have a Keyhea order for involuntary medications, but it is no longer in effect.

132.    Prisoner G told me he feels like he is about to go crazy from being in the SHU.  He feels claustrophobic and listless.  Recently, he feels "like the walls are closing in" on him, "emotionally and physically."  When Prisoner G is in a bad state, he "trashes his cell," sometimes hoarding empty food containers or tearing papers into tiny pieces and spreading him around his cell.  Despite displaying symptoms of major mental illness, Prisoner G said he has not been offered any groups and sees his case manager only once every 30 days, generally for 15 minutes or less.

133.    I also met with Prisoner F, a patient who has alternated between CCCMS and EOP levels of care.  Prisoner F has been in the SHU for about 13 years.  Prisoner F has decompensated significantly over the course of his indeterminate SHU sentence.  He started hearing voices around 2004, after about four years of being in the SHU.  He was feeling lonely at the time, and the voices started telling him "they're going to get you," over and over.

134.    Prisoner F described a recent plan to kill himself in the SHU by tearing up the bed sheets and using them as a noose.  He wanted to die because he did not see a "way

1   out of the SHU." He was taken to the MHCB, which he found isolating as well. He said it

2   was terrible being strip searched and confined to a holding cell, but the MHCB was much

3   better than the SHU overall because he got "contact visits" with doctors every day.

4   Prisoner F has a serious mental illness, and based on meeting him and reviewing his file, it

5   is my opinion that he is suffering unnecessarily in seclusion. Someone with serious

6   auditory hallucinations and serious suicidal ideation needs vastly more treatment,

7   interaction, recreation, and monitoring than Prisoner F has been receiving in the SHU for

8   the last 13 years of his life.

9        135.   In my opinion, individuals on the mental health caseload should be

10  categorically excluded from the SHU. The extended isolation to which they are subject

11  can cause existing psychological conditions to deteriorate and new ones to develop.

12  Moreover, isolation of the variety that these individuals described affords clinicians less

13  opportunity to interact with and observe patients. This can cause delayed identification

14  and treatment of major decompensation.

15       136.   Moreover, it is not appropriate to place patients in administrative segregation

16  as a matter of course when they leave the SHU. Those patients who have served SHU

17  terms should be carefully evaluated and promptly be returned to less isolated conditions

18  when indicated, not routinely placed in administrative segregation units. To the extent that

19  re-socialization is in order after such extreme and prolonged isolation, activities to enhance

20  re-socialization should be provided in the SHU.

21       137.   The captain of one of the Ad Seg units at Corcoran told me that it is not

22  uncommon for people to "cycle in and out of the SHU." In those cases, CCCMS patients

23  who are housed in the SHU decompensate under the conditions of isolation and become

24  EOP. Because EOP patients are excluded from the SHU, they are then removed to

25  alternative housing. When they re-stabilize outside the SHU and are re-classified as

26  CCCMS, they go back to the SHU, and the cycle begins again. The captain referred to

27  three inmates in that situation, though I was unable to interview them because they were at

28  yard. Dr. Fischer confirmed that some patients do not function well in the SHU and

1    become symptomatic in that environment.

2         138.    In my view, this situation is unacceptable.  It is inexcusable to house

3    individuals in seclusion even after it has been demonstrated that they decompensate under

4    conditions of isolation.  It is important to note that the experience of decompensation itself

5    can be very traumatic for individuals with mental illness.  Avoiding preventable

6    psychological crises is prudent in terms of managing MHCB resources, but it is also very

7    important for the individuals themselves, who may be significantly damaged by the

8    experience of psychological crisis.  In my opinion, it is unethical to house individuals in

9    isolation despite having every reason to believe the placement will cause them profound

10   suffering and trauma.

11        **G.     Inadequate Quality and Quantity of Mental Health Treatment**

12        139.    Overall, I observed a vastly inadequate amount of treatment provided to

13   patients on the mental health caseload—often far below the Program Guide requirements

14   and certainly below what is necessary to prevent suffering and decompensation.

15        140.    This was true at CIM, where, by all accounts, EOP RC inmates are receiving

16   far too few hours of treatment and out-of-cell exercise.  Dr. Lindsay, a psychologist at the

17   CIM RC, summed up the situation bluntly, stating "reception sucks."  He told us that RC

18   inmates receive less treatment and less recreation and out-of-cell time.  Prisoner K told us

19   he is only offered about two groups each week, and the unit psychologist confirmed this.

20   Although he took pains to describe efforts to increase treatment hours for mentally ill RC

21   inmates, it was clear that the institution does not offer EOP patients in RC the ten hours of

22   treatment to which they are entitled.  The same is true of out of cell time.  Prisoner K also

23   noted that he is only allowed to go to yard twice a week, and not at all in some weeks.

24        141.    This was also true for EOP patients at CIM, whom I observed to be vastly

25   undertreated while they waited for extended periods of time to be sent to an appropriate

26   EOP placement.  Prisoner M is an EOP patient whom I met in Angeles Hall.  Prisoner M

27   was designed as EOP in October 2012.  Despite the Program Guide's requirement that

28   individuals be placed in EOP settings within a maximum of 60 days, Prisoner M was still

[748409-1]

awaiting transfer four months after he was classified as needing EOP level of care.  In the meantime, he was housed in a chaotic, crowded dorm.  The housing unit is depicted in **Photo Exhibit I**.  Prisoner M was tremendously distressed when I met him.  He felt that without therapy or work opportunities, there was no reason to keep living.  He found that the crowded bunk unit in which he was housed exacerbated the symptoms of his mental illness, and he described feeling fearful for his safety.  He cried as he recounted a recent traumatic incident in which another inmate, who was a friend of his, had been violently attacked.  He told me that he is offered only one group per week and it consisted of reading newspapers with other EOP patients awaiting transfer to appropriate placements.  Without any programming or any opportunities to be constructive, Prisoner M felt that his psychological condition was rapidly deteriorating.  His medical records reflect high chronic suicide risk and escalating depression.

142.   As previously noted, EOP patients in administrative segregation at CCWF receive no groups at all, in direct contravention of the Program Guide's 10-hour requirement and despite CCWF's recent designation as an EOP Ad seg hub.  The impact of these deficiencies was illustrated by Prisoner A's mounting desperation as an EOP in the Ad Seg unit.

143.   More broadly, the rapid growth of the caseload population at CCWF without a corresponding increase in mental health staffing has led to a higher incidence of modified programs and non-confidential clinical contacts. This was reflected in both the comments of the staff and the medical records I reviewed.

144.   At Corcoran, therapy for EOP patients is far below Program Guide standards as well.  The Special Master reported that only "42 percent of scheduled group contacts were completed" and pointed to modified programming as a cause of some lapses.[55]  The Special Master report also observed, "EOP inmates were offered only an average of 6.67

---

[55] Special Master's 25th Round Report, p. 215 (*Coleman* Dkt. No. 4289).

EXPERT DECLARATION OF EDWARD KAUFMAN, M.D.

[748409-1]

hours of structured therapeutic activities per week, including some activities that were not therapeutic activities."[56]  This was consistent with the comments of a correctional officer, who accompanied the tour and confirmed that EOP patients are not receiving even close to 10 hours of treatment at Corcoran.

145.    Treatment for EOP patients in administrative segregation was also lacking at Corcoran.  The Special Master reported that only 57% of EOP patients were even *offered* ten hours of structured therapeutic activities.[57]

146.    Even where therapy was provided to patients at the prisons I toured, I observed it to be inadequate and generally of poor quality.  Almost all the patients with whom I spoke told me their appointments with case managers rarely last longer than 15 minutes.  At times, those appointments take place in non-confidential settings where patients feel they cannot disclose sensitive or embarrassing information.  Among all the patients I interviewed, only one—an EOP patient housed in the RC in CIM—expressed that he trusted and valued his case manager, Dr. Lindsay.  Aside from that pleasant exception, patients spoke of their clinicians with distrust and frustration.  Neither they nor a review their medical records suggested that they were receiving meaningful, systematic mental health treatment.

147.    One sign that therapy has not been successful is the overwhelming rate of decline for therapy sessions and, in particular, IDTT meetings.  At CIM, I observed an IDTT session in the administrative segregation unit with a table full of mental health professionals.  When we asked where the patients were, I was informed that *all* of the nine patients scheduled for sessions had declined to participate.  The staff said this was a lower than usual turnout, but conceded that very low turnout is typical of the IDTT meetings in the Ad seg unit.  This was consistent with comments at the morning meeting that efforts to increase participation at IDTT meetings had not been "brilliantly successful."  This was

---

[56] *Ibid.*

[57] *Ibid.* at 333.

EXPERT DECLARATION OF EDWARD KAUFMAN, M.D.

[748409-1]

1  also consistent with what I had read in the State's experts' report about inmates'

2  "decreased willingness to participate in treatment" in the CIM Ad seg unit.[58]  According to

3  their report, five inmates in a row refused to come out for IDTT meetings on the day they

4  observed.[59]  The State's experts' report attributed the low participation rates in part to the

5  poor morale of the treatment team.  The State's experts noted that a Quality Improvement

6  Plan (QIP) had been initiated "with positive results."[60]  While I cannot speak to the relative

7  level of staff morale following the implementation of the QIP, I can attest to the

8  persistence of high rates of decline for treatment.

9        148.   Multiple factors may lead patients to refuse treatment, but a refusal rate of

10  that magnitude should give clinicians pause.   I agree with the State's experts that such low

11  turnout rates "indicate[] that inmates may have difficulties forming therapeutic alliances

12  with the treatment staff."[61]  In my experience, patients are less likely to participate in

13  treatment if they do not feel that they are being heard or that the treatment is meaningful.

14  This issue, of course, is inextricably linked to the chronic staffing shortages and inadequate

15  treatment spaces I observed.

16        149.   Moreover, it is my opinion that excessive cuffing and generally punitive

17  treatment of patients further alienates them from treatment and makes mental health

18  treatment less effective.  The IDTT records in Prisoner B's medical file note that she was

19  unable to sign the form because she was "cuffed during IDTT."  While it is possible that

20  such cuffing was absolutely necessary for the patient's safety and the safety of the

21  clinicians, I have seen no evidence that such an evaluation is made before patients are

22  cuffed as a matter of course.  Cuffs are uncomfortable and isolating.  Where cuffs are not

23  strictly necessary, they are a significant hindrance to therapy.

24  

25  [58] Report of Dvoskin, Moore, & Scott, p. 22 (*Coleman* Dkt. No. 4275-5 at 24 of 41).

26  [59] *Ibid.* at 23 (*Coleman* Dkt. No. 4275-5 at 25 of 41).

27  [60] *Ibid.* at 22 (*Coleman* Dkt. No. 4275-5 at 24 of 41).
   [61] *Ibid.* at 23 (*Coleman* Dkt. No. 4275-5 at 25 of 41).

28

150.   Like the State's experts, I observed groups that "appeared to consist primarily of showing the inmate a movie or entertainment video."[62]  In fact, the groups I observed consisted almost exclusively of patients—usually cuffed to ATOM chairs or confined to treatment modules—watching movies or listening to music.  In the Corcoran SHU, the "therapy" group consisted of patients in treatment modules watching a movie called "The Other Guy."  The EOP Ad seg group consisted of three men sitting in ATOM Chairs watching a movie about Bob Marley.  I spoke with the participants afterward and they confirmed that they generally just watch movies or listen to music in their groups, sometimes with limited conversation before or after.  One of them said he had never been to a talking group.  At the group they were attending when I met them, the Bob Marley movie was accompanied by no conversation or therapy.  Similarly, at CIM, Prisoner M's EOP group consisted of several men in a room reading newspapers.

151.   The mental health staff in the Reception Center at CIM told us that the groups are run by recreational therapists.  The Special Master also noted that groups at CIM "were often facilitated by psych techs and recreational therapists."[63]  This was generally true at CCWF, where we observed an EOP group in the dayroom conducted by a psych tech.

152.   I am in favor of opportunities for patients to get out of their cells.  Watching movies and listening to music can be stress-relieving, and I got the sense from talking to patients that these groups can be an opportunity for them to be treated humanely for an hour or so.  Certainly, this is important—particularly for the many mentally ill patients who are otherwise kept in near total seclusion.  However, it is not group therapy in any meaningful sense.  In this regard, I agree with the State's experts that while entertainment may be valuable at some level, group therapy time must involve "psychotherapeutic,

---

[62] Report of Dvoskin, Moore, & Scott, p. 17 (*Coleman* Dkt. No. 4275-5 at 19 of 41).
[63] Special Master's 25th Round Report, p. 355 (*Coleman* Dkt. No. 4289).

1   rehabilitative, skill building, and psychoeducational activities."[64]

2       153.   Group therapy is an important tool in the treatment of mental illness, but the

3   mere fact that patients are sitting together with a psych tech does not mean the gathering

4   constitutes "group therapy" or structured therapeutic activity.  Group therapy requires a

5   skilled, trusted facilitator, a confidential setting, and a treatment plan as to what modalities

6   are appropriate for each of the individuals in the group, their needs and how to meet these

7   needs.  Without these components, groups cannot be expected to contribute meaningfully

8   to the treatment of mental illness or to prevent decompensation.

9       **H.**    **Chronic Insufficiency of Mental Health Treatment for CCCMS Patients**

10       154.   Overall, I am concerned about the mental health treatment offered to

11   CCCMS patients, who constitute the vast majority of the mental health caseload—more

12   than 27,000 patients.  I am particularly troubled by the very minimal therapy and

13   recreational opportunities provided to CCCMS patients held in administrative segregation

14   units, Reception Center, and the SHU.  I have reviewed the medical records for the patients

15   with whom I met, and between the file review and my interviews, I have concluded that

16   many of the patients classified as CCCMS have acute mental illness and are at risk of

17   serious decompensation.  On the whole, the amount of treatment they are provided is not

18   sufficient to meet their basic mental health needs.

19       155.   Most of the CCCMS patients I met had major mental illness.  For example,

20   Prisoner G has been diagnosed with schizophrenia, bipolar type and antisocial personality

21   disorder.  He takes Abilify, Cogentin, and Vistaril.  His record notes that he experiences

22   "severe mood swings, manic episodes and psychotic features."  He has previously been on

23   a Keyhea order due to medication refusals.  Under the Program Guide, the only "required

24   treatment" for Prisoner G in the SHU is a meeting with a clinician "every 30 days or more

25   frequently as clinically indicated," weekly LPT rounds, and a quarterly update of his

26    

27   [64] Report of Dvoskin, Moore, & Scott, p. 18 (*Coleman* Dkt. No. 4275-5 at 20 of 41).

28    

1   treatment plan by the IDTT.  "Orientation and supportive counseling for institutional

2   adjustment," social skills training, and group therapy are not required—and in Prisoner G's

3   case, not received.  In my view, these requirements are insufficient to provide necessary

4   care to CCCMS patients with the level of acuity I have observed.  This is particularly so

5   because some of the CCCMS patients I interviewed at the Corcoran SHU had been in the

6   SHU for many years, even 13 years in one case.   An individual like Prisoner G, suffering

7   from schizophrenia and taking potent psychotropic medications to manage his mental

8   illness, should not face the degree of isolation to which Prisoner G is exposed.  To the

9   extent individuals like Prisoner G are in the SHU for any period of time, they must be

10   entitled to much greater recreation and therapy opportunities.

11          156.    The mental health care to which CCCMS patients are entitled in

12   administrative segregation also falls short of what is necessary to prevent suffering and

13   decompensation.  Prisoner B is a CCCMS patient in administrative segregation at CCWF.

14   She experiences psychosis and visual hallucinations.  Her behavior is erratic to the point

15   that cell extraction has been discussed on at least one occasion.  According to her medical

16   records, she has been known to "rant" and frequently gets agitated and angry.  Her medical

17   records reflect several refusals of medications.

18          157.    Under the Program Guide, CCCMS patients in administrative segregation

19   like Prisoner B are entitled only to LPT rounds every day, individual clinical contacts

20   every week, and medication monitoring.  Providing activities such as group therapy is not

21   required.  Like all inmates in segregated housing, she is entitled to ten hours a week of

22   yard time, but nothing entitles Prisoner B to leave her cell during the other 158 hours in the

23   week.  In her particular case, her medical record reflects that many of her clinical contacts

24   also have taken place while she remained in her cell.

25          158.    Individuals classified as "LOBs," who are housed in administrative

26   segregation units merely because of a shortage of appropriate beds, experience

27   substantially similar isolation and confinement.  At CIM, they go to yard no more than

28   once a week and are otherwise confined to their cell at all times, except for short meals

1   twice a day and occasional appointments.  They are entitled to few, if any, groups, and

2   when they do leave their cells to go to mental health appointments, they have to wait in

3   even smaller cage-like cells for up to six hours.

4        159.   In my opinion, this is an insufficient amount of treatment for CCCMS

5   patients, particularly given the extremely long and often indeterminate duration of many

6   administrative segregation and SHU placements.  Indeed, even the State's expert,

7   Dr. Dvoskin, has written that inmates with serious mental illness in segregated conditions

8   should be provided "at least 10 to 15 hours per week of out-of-cell structured therapeutic

9   activities in addition to at least another 10 hours per week of unstructured exercise or

10   recreation time."[65]  The vast majority of the patients I met were receiving neither 10 hours

11   of out-of-cell structured therapeutic activities nor 10 hours of unstructured exercise or

12   recreation time, to say nothing of 15 hours of unstructured out-of-cell time.  Indeed, the

13   CCCMS patients I met are not even *entitled* to out-of-cell structured therapeutic activities.

14   In this sense, the shortcomings in care which I observed in the care of CCCMS patients are

15   not limited to CDCR's noncompliance with the Program Guide.  Rather, these deficiencies

16   also reflect the insufficiency of the Program Guide itself.

17        160.   It is my impression that CDCR has responded to mental staffing shortages

18   and funding limitations by focusing its resources on individuals with the most acute mental

19   illness.  While I can understand the rationale underlying that decision, the result is a

20   significant dearth of treatment for individuals with very serious, but non-acute, mental

21   illness.  It is not adequate for a mental health delivery system to provide significant

22   services only to individuals currently experiencing total psychological crisis.  The critical

23   mental health care needs of the rest of the mentally ill population, like the CCCMS patients

24   I met, get overlooked.  Furthermore, underserving non-acute mental illness ultimately

25   leads to more individuals becoming acutely mentally ill.  All too often, that is the only way

26   _____

27   [65] Jeffrey Metzner and Joel Dvoskin, An Overview of Correctional Psychiatry, *Psychiatry Clinics of North America* 29 (2006), 761, 764.

28

they can get the mental health care they require.  In that sense, CDCR's failure to provide appropriate levels of care increases the population's overall acuity.  In my opinion, if CDCR were not leaving so many mentally ill individuals in isolated conditions for extended periods of time, fewer of those individuals would decompensate to the level of crisis.

161.   To that end, I also have concerns about whether some individuals on the mental health caseload are receiving treatment at the appropriate level of care.  Rather than confining some CCCMS patients to administrative segregation, a safer and more appropriate environment for some of them—indeed many of the ones I met—would be an EOP level of care.  Individuals with a history of major suicide attempts, persistent auditory hallucinations, recurrent psychosis, and multiple admissions to MHCBs require intensive mental health treatment, care, and monitoring which I have not observed to be provided at the CCCMS level of care.

162.   Throughout my tours, I heard about great difficulty finding placements for EOP patients entering the prison system, returning from MHCBs or DSH, or being reclassified to EOP level of care.  This was communicated to me by the Chiefs of Mental Health at CIM and CCWF, as well as a few staff psychologists.  CIM reported to the Special Master that the average length of stay for an EOP in the CIM Reception Center was 91 days, with the reason for such lengthy stays "primarily due to [inmate patients] who were endorsed and awaiting transfer."[66]  I am concerned clinicians may be less likely to designate patients as EOP in light of these chronic problems finding appropriate EOP beds.  A mental health care system that classifies patients' level of care according to bed availability instead of patients' needs is dangerously failing its patients.

**I.     Major Custodial Interferences With Mental Health Treatment**

163.    I am also troubled by the pattern of significant custodial interferences to

---

[66] Bien Decl. Ex. 19, at 20 of 21 (CIM 25th Round Management Report).

EXPERT DECLARATION OF EDWARD KAUFMAN, M.D.

[748409-1]

1   mental health treatment at the prisons I visited.  The strip-searching policies at the

2   institutions I toured are a classic and particularly egregious example of this type of

3   interference.  At CCWF, the women I interviewed in the Ad Seg unit, including one who

4   was there merely because of lack of SNY bed space, were strip-searched twice every time

5   they left the building.  Even to go to yard, the inmates had to endure a strip search on the

6   way out of the unit and another on the way back in.  These strip-searches involved

7   removing all clothes, bending, and squatting behind a partial screen.  The policy applied

8   even for medical appointments outside the building.  Prisoner A told me that she was

9   required to undergo two strip searches for a routine dentist appointment.  Prisoner B told

10  me she found it "dehumanizing" to be strip searched and often did not go to yard as a

11  result.

12          164.    The same strip-search policies apply to individuals in the Ad Seg unit at

13  Corcoran.  There, because the mental health treatment space takes place in a converted

14  gym separate from the housing unit, EOP inmates are strip searched even when for

15  standard mental health contacts.  This practice greatly discourages patients from taking

16  advantage even of the minimal recreation and therapy they are provided.  One patient,

17  Prisoner I, told me that the primary reason he does not go to yard is because he gets strip

18  searched.  He simply did not think the outdoor time was worth the unpleasant experience

19  of being strip searched.   The State's experts commented with concern about this practice

20  at Corcoran as well.[67]

21          165.    At CIM, even the patients who are designated as "LOB" are strip searched

22  when they go to yard.  Several of them raised this issue in our interviews.  An EOP patient

23  in the Reception Center, Prisoner K, said that all RC inmates going to yard are stripped to

24  their underwear and required to walk across the yard in their shoes, socks, and underwear

25  until they cross another gate.  Only then are they permitted to put their clothes back on.

26  

27  [67] Report of Dvoskin, Moore, & Scott, at 23 (*Coleman* Dkt. No. 4275-5 at 25 of 41).

28

1   Prisoner K says he likes getting outside, but being stripped searched and having to walk in

2   his underwear across a crowded yard discourages him from going to yard.

3       166.   Patients in the Ad Seg unit and the RC have to contend with significant

4   seclusion to the detriment of their mental health.  Custodial policies that discourage

5   patients from treatment and recreation are anti-therapeutic and counterproductive.  Strip

6   searching is particularly problematic in light of the significant number of patients who

7   have experienced sexual abuse.  Having reviewed the medical records of the patients I

8   interviewed, I can attest that many of them have been the victims of sexual abuse such that

9   the experience of being disrobed in front of a stranger could be particularly distressing and

10  degrading.

11      167.   Prisoner K also recounted an instance in which he was pulled out of his

12  therapy group at CIM to be strip searched.  He said the custody officers interrupted the

13  group, pulled him out, and strip searched him in plain sight of others.  Prisoner K said the

14  officers did not find any contraband and released him, but he was too humiliated to return

15  to his group and instead went back into the tiny cell he shares with his cellmate in the

16  Madrone housing unit.  It was apparent from Prisoner K's affect while recounting the

17  situation that this episode was very distressing to him.  While I did not have access to

18  Prisoner K's central file to acquire more information about this incident, his group leader's

19  notes state that he left group once because of an "outside" issue and that group was

20  disbanded once because of a custodial emergency.  Such behavior is unacceptable and can

21  be profoundly damaging, particularly to someone like Prisoner K, who requires EOP level

22  care and has significant psychological vulnerabilities.

23      168.   The Chief of Mental Health at CIM said he is actively trying to "weed out

24  the prosecutorial attitude" among some treatment staff.  While I met some very well-

25  intentioned clinicians on my tours, I also received credible reports about abusive treatment

26  of individuals with mental illness.  Prisoner K's clinician recorded in his medical file that

27  he said custody officers had trashed his cell, intentionally withheld blankets, and yelled at

28  him for talking to himself.  Prisoner K described a pattern of antagonistic and humiliating

1   treatment of RC EOP patients by custody officers.

2       169.    The medical records of Prisoner C, whom I interviewed at CCWF, reflect her

3   frustration with having hygiene products intentionally withheld by custody officers.  The

4   LOB patients I met at CIM also described punitive and antagonistic treatment by custody

5   officers, who intentionally ignored their pleas for assistance, such as turning on a light in a

6   dark cell or allowing the inmates to leave the cell temporarily when their toilet overflowed

7   and leaked feces on the floor of their small shared cell.

8       170.    These antagonistic relationships with custody staff destroy trust and create an

9   atmosphere of fear, frustration, helplessness, and anger.  Individuals with mental illness

10  may be especially unequipped to deal with these contentious relationships.  For example,

11  Prisoner G told me that the officers in the SHU "goad" him.  In response to taunts from

12  custody officers, Prisoner G "throw[s] food out and trash[es] his cell."  These behaviors,

13  which are likely caused by Prisoner G's lack of coping skills, the inadequate therapeutic

14  program he receives, and/or his mental illness, cause him to receive disciplinary

15  infractions.  This, in turn, perpetuates his frustration and despair as well as the duration of

16  his confinement to segregated housing.

17      171.    Another anti-therapeutic custodial practice is the imposition of frequent

18  lockdowns and modified programs at the prisons I toured.  This problem was most

19  apparent to me at CCWF, where the medical records I reviewed are replete with references

20  to interruptions to mental health care on account of lockdowns.  Prisoner D's file describes

21  an extended lockdown and makes multiple references to lockdowns of her unit.  Prisoner

22  C's file states that her clinical contact took place at her cell-front "due to modified

23  program."  Prisoner B's medical record is explicit about the connection between

24  lockdowns and overcrowding, stating that the treatment was impacted by "modified

25  programs due to a significant increase of MH patients in ASU."

26      172.    While the staff at CIM denied that there were any modified programs in

27  effect the day I visited, several of the inmates I interviewed independently informed me of

28  a recent escape attempt on one of the housing units.  Several of them expressed that their

1  yard time was even more restricted and the custody officers were even harsher than usual

2  since that attempt.  The Assistant Warden at CIM confirmed that there had been an escape

3  attempt, but offered no additional information.

4      173.   At Corcoran, the warden also told me no lockdowns or modified programs

5  were in effect, but the staff alluded to a lockdown in October 2012 that lasted "several

6  months."  Corcoran's internal Management Report also identified modified programs as on

7  a list of "Obstacles to Providing Mental Health Services and Adherence to Program Guide

8  Requirements.  The report noted lockdowns in two facilities and observed that the "EOP

9  ML program was unable to conduct groups for about two weeks on the 3B facility due to

10  lockdowns."[68]  Furthermore, when I inquired about the status of an ongoing construction

11  project at Corcoran, I was told that the project was delayed because an extended lockdown

12  had interrupted the availability of inmate labor.

13                            **CONCLUSION**

14      174.   Overall, it is my opinion that many of the discrete problems I have identified

15  and described overlap, and together often serve to amplify the serious and negative effects

16  on mental health care in California prisons.  In my review of the prison mental health care

17  system at CDCR, I observed major shortages of treatment and custody staff; inaccessible

18  and unreliable medical records; erratic distribution of serious psychotropic medication; a

19  dearth of confidential treatment space in which patients can convey essential information;

20  excessive use of punitive measures against individuals in acute psychological crisis; anti-

21  therapeutic custodial practices that discourage patients from accessing badly-needed

22  treatment; and a dangerous overuse of seclusion for patients with mental illness.

23  / / /

24  / / /

25  / / /

26

27  [68] Bien Decl. Ex. 20, at 3 of 16 (COR 25th Round Management Report).

28

175.   Individually, these problems are grave.  In concert, these problems are so severe as to fundamentally deny basic mental health treatment to inmates with serious mental illness.  This is alarming because these practices have the effect of increasing the acuity of the mentally ill population in California prisons—and thus *increase* the challenge of serving the system's mental health needs.  These deficiencies also heighten the risk of suicide among inmates by exposing mentally ill prisoners to conditions known to exacerbate their symptoms, denying them sufficient treatment to prevent the deterioration of their illness, and irresponsibly managing patients' serious psychotropic medications.  At a more basic, human level, the inadequacies in the mental health care delivery system in California prisons are egregious because they harm human beings and cause real and unnecessary suffering.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this  /2 day of March, 2013.

Edward Kaufman, M.D.

# PHOTO EXHIBIT A

CIM B-Facility – Cuffed Reception Center Inmates Awaiting Medical
Appointments, Often for Several Hours



CIM  3

# PHOTO EXHIBIT B

CCWF Building 503 – A Line of Red Tape Separating EOP Patients from Non-Caseload Reception Center Prisoners



CCWF 11

# PHOTO EXHIBIT C

CCWF Building 504 – "Treatment Modules" in New EOP Administrative Therapy Treatment Space



CCWF 8

# PHOTO EXHIBIT D

CIM Madrone Hall – Reception Center Housing Where Inmates Are Confined in Cells Almost Continuously



# PHOTO EXHIBIT E

COR Treatment Room for EOP Administrative Segregation Inmates, Used for Individual Therapy



COR 7

# PHOTO EXHIBIT F

CIM Mental Health Crisis Bed Unit, Used for Patients in Acute Psychological Crisis



CIM   7

# PHOTO EXHIBIT G

CIM Mental Health Crisis Bed Unit, Used for Patients in Acute Psychological Crisis



COR 45

# PHOTO EXHIBIT H

CIM Administrative Segregation Unit (Cypress Hall) Housing Census Board – Prisoners in Administrative Segregation Due to "LOB" ("Lack of Bed") Are Marked with Purple or Pink Cards

CIM 34

# PHOTO EXHIBIT I

CIM Angeles Hall Housing Unit Where EOP Patients Await Transfer



CIM  38

Appendix A to Declaration of
Edward Kaufman, M.D.

**EDWARD KAUFMAN, MD**
CURRICULUM VITAE

## PERSONAL

Business Address:    32392 S. Coast Highway, Suite 250
Laguna Beach, CA  92651
(949) 488-3332, FAX (949) 488-7840
email:  ed.kaufman@yahoo.com

## EDUCATION

Undergraduate:    Temple University
Philadelphia, PA
B.A. 1953-1956
Biology

Medical School:    Jefferson Medical College
Philadelphia, PA
MD, 1956-1960

Internship:    Los Angeles County Hospital
Los Angeles, CA  1960-1961
Rotating Internship

Residency:    New York State Psychiatric Institute
Columbia Presbyterian Medical Center
New York, NY 1961-1964
Psychiatry

Graduate Training:    Columbia University
Psychoanalytic Clinic
New York, NY 1962-1970
Psychoanalytic Certificate

Licensure:    California:  AO 19663

Board Certification:    American Board of Psychiatry and Neurology
1971 - Present

ASAM    Lifetime Certificate of Competence, 1988, Addiction Medicine

Certificate of Added Qualifications in    American Board of Psychiatry
Addiction Psychiatry    and Neurology, 1993

## Professional Membership

American Psychiatric Association    1963-Present

American Group Psychotherapy Association    1973-1991

| American Orthopsychiatry Association | 1978-1991 |
|---|---|
| Southern California Psychiatric Association | 1978-1984 |
| Orange County Psychiatric Association | 1985-Present |
| California Society for Addiction Medicine (CSAM). | 1980-2000 |
| American Family Therapy Association | 1983-1991 |
| Association of American Medical Colleges | 1983-1992 |

American Psychoanalytic Association  1984-1990
 (Extended Associate Member)   1999-2001

Association for Academic Psychiatry   1985-1992

American Academy of Psychiatrists in  1985-Present
 Alcoholism and the Addictions
 (Now AAAP)

American Medical Society on Alcoholism 1986-2002
 and other Drug Dependencies
 (Now American Society of Addiction Med.)

American Association of Directors of  1984-1991
 Psychiatric Residency Training

International Society of Addiction Medicine (ISAM) 1999-2001

Alumni Associations:
 Temple University
 Jefferson Medical College
 Columbia University
 New York State Psychiatric Institute
 Columbia Psychoanalytic Institute

## HONORS AND AWARDS

U.S. Public Health Service Fellowship in Public Health and Preventive Medicine, 1959

Second Prize in Psychiatry at Jefferson Medical College, 1960

Second Prize, Psychiatric Residents Research Award New York State Psychiatric Institute, 1964

Fellow, American Psychiatric Association, 1980

Life Fellow, American Psychiatric Association, 1999

Annual Donovan Memorial Lecture, Eagleville Hospital, 1980

Examiner, American Board of Psychiatry and Neurology, 1980 - Present (Senior Examiner...1985-present)

University of California, Irvine, Psychiatric Residents Award for Outstanding Teaching, 1983, 1985

E. Pumpian-Mindlin Annual Visiting Professorship, University of Oklahoma, 1988

California Attorneys for Criminal Justice Award for Outstanding Contribution to the Preservation of Prison Inmates Rights, 1994

Best Doctors in America, 1992 - 2006, Best Doctors Inc., Boston, MA

Keynote Speaker:  Bridging the Gap:  Helping the Dually Diagnosed through Substance Abuse and Psychiatric Services, Yale University School of Medicine, 1995

Outstanding Alumnus in Psychiatry, Jefferson Medical College, 1995

Best Doctors in America, 2013, Best Doctors,Inc. Boston, MA

## RESEARCH AWARDS

National Institute of Health, Small Projects Grant, The Effect of Exercise on the Sleep/Dream Cycle, 1965

Van Ameringen Foundation, Heroin Abuse in Columbia University Students, 1968-70

Principal Investigator, L-Alpha Acetyl Methadol Phase 3 Study, Lower East Side Service Center, 1976

University of California, Irvine, Department of Psychiatry, Research Committee Award, The Effects of Alcohol and Depression on the Family System, 1980-1981

Principal Investigator, NIMH Graduate Training Award ($58,000/yearly), 1983-1986

California Department of Mental Health Grant, Academic Linkages ($20,000 yearly, three years funded), 1985-1988

Beverly Lowry Research Endowment, Substance Abuse Prevention ($275,000 from 1986, interest available on a yearly basis to 2005)

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| Instructor in Psychiatry 1967-1977 | Columbia University College of Physicians and Surgeons, NY |
| Assistant Clinical Professor 1972-1977 | Albert Einstein College of Medicine Bronx, NY |
| Assistant Clinical Professor 1973-1977 | Mt. Sinai School of Medicine New York, NY |
| Visiting Assistant Professor 1977-1979 | Albert Einstein College of Medicine Bronx, NY |
| Associate Clinical Professor 1977-1980 | University of California, Irvine Irvine, CA |
| Associate Professor in Residence, 1980-1985 | University of California, Irvine Irvine, CA |
| Professor in Residence 1985-1992 | University of California, Irvine Irvine, CA |
| Clinical Professor (Retired) | University of California, Irvine |

1992-continuing                  Irvine,CA

## CLINICAL APPOINTMENTS

Chief, Psychiatric Services      Lewisberg Federal Penitentiary
1964-1966                        Lewisberg, PA

Consulting Psychiatrist          Bucknell University
1964-1966                        Lewisberg, PA

Senior Research Psychiatrist     New York State Psychiatric Institute,
and Director, Inpatient          Washington Heights Community Mental Health
Treatment Unit, 1966-1967        Services, New York, NY

Chief, Emer.Psych.Svcs.          St. Luke's Hospital Center
1967-1971                        New York, NY

Consultant                       Reality House
1967-1972                        New York, NY

Director, Psychiatric Day        St. Luke's Hospital Center
Center, 1971                     New York, NY

Director of Psychiatry           Prison Mental Health Services of the City
1971-1973                        of New York, NY

Chief Psychiatrist               Lower East Side Service Center
Medical Director                 New York, NY
1973-1977

Psychiatric Consultant           Orange County Department of Mental Health
1977-1978                        Santa Ana, CA

Psychiatric Consultant           Metropolitan State Hospital
1977-1978                        Norwalk, CA

Medical Director                 Venice Drug Abuse Coalition
1977-1979                        Venice, CA

Staff Psychiatrist               University of California, Irvine
1978-1992                        Medical Center, Orange, CA

Chief, Clinical Psychiatric      University of California, Irvine
Services, 1978-1983              Medical Center, Orange, CA

Consulting Psychiatrist          University of California, Irvine
Dept. of Family Medicine         Medical Center, Orange, CA
1978-1992

Director of Family Therapy       University of California, Irvine
Training, 1979-1995              Medical Center, Irvine, CA

| | |
|---|---|
| Staff Psychiatrist<br>1979-1996 | Capistrano by the Sea Hospital<br>Dana Point, CA |
| Director of Psychiatric<br>Education, 1983-1991 | University of California, Irvine<br> Orange, CA |
| Executive Director<br>1986-1990 | The Family Center<br>San Bernardino, CA |
| Consultant<br>1985-1990 | Federal Bureau of Investigation |
| Medical Director<br>1988-1990 | University of California, Irvine<br>Chemical Dependency Program<br>Capistrano by the Sea Hospital<br>Dana Point, CA |
| Medical Director<br>1990-1996 | Chemical Dependency Program<br>Capistrano by the Sea Hospital<br>Dana Point, CA |
| Chief of Staff<br>1993-1995 | Capistrano by the Sea Hospital<br>Dana Point, CA |
| Partner<br>1994-1996 | California Behavioral Health Alliance<br>(Mental Health IPA), Aliso Viejo |
| Medical Director<br>1996-1998 | Genesis, Chemical Dependency Program<br>South Coast Medical Center<br>Laguna Beach, CA |
| Consulting Psychiatrist<br>1995-2008 | Pacific Hills Treatment Center<br>San Juan Capistrano, CA |
| Consultant<br>1996-97 | Committee on Treatment Services for Addicted Patients<br>American Psychiatric Association |
| Member<br>Board of Registered Nursing<br>State of California | Nursing D.E.C. |
| Consultant<br>American Psychiatric Association | Council on Addiction Psychiatry |
| Medical Director<br>2008-2010 | Pacific Hills Treatment Center<br> San Clemente, California |
| Consulting Psychiatrist<br>2000-2012 | Phoenix House<br>Santa Ana, California |
| Medical Director<br>2011-2012 | Phoenix House<br>Santa Ana, California |
| Medical Director<br>2012 - continuing | Northbound Therapeutic Services (NTS)<br>Costa Mesa, CA |

**Professional and Service Activities**

| | |
|---|---|
| 1973-1977 | New York County District Branch, American Psychiatric Association, Committee on Community Psychiatry |
| 1974-1977 | New York County District Branch, American Psychiatric Association,, Committee on Drug and Alcohol Abuse |
| 1975 | Editorial Advisory Committee to NIDA's Polydrug Abuse Demonstration Program |
| 1975-1977 | Association for Psychoanalytic Medicine, Committee on Social Issues |
| 1975-1977 | Methadone Advisory Council, New York City Addiction Services Agency |
| 1976-1977 | Methadone Advisory Council, New York State |
| 1976-1977 | Board of Director, Reality House |
| 1976-1977 | Board of Directors, Greater New York Coalition on Drug Abuse |
| 1977 | Council Member, Executive Committee, New York County District Branch of the American Psychiatric Association |
| 1977 | Standards and Advisory Panel for Juvenile Justice, New York State Division of Criminal Justice Services |
| 1977-1979 | Coordinator of UCI Psychiatric Residency Program, Metropolitan State Hospital, Norwalk, CA |
| 1978-1979 | Coordinator, UCI Community Psychiatry Residency Programs |
| 1978-1984 | Alcohol Studies Advisory Broad, University of California, Irvine |
| 1980-Present | Fellow - American Psychiatric Association |
| 1980-Present | Examiner, American Board of Psychiatry and Neurology (1985-Present-Senior Examiner) |
| 1981-1982 | Special Review Consultant, Clinical, Behavioral and Psychosocial Research Review Committee of the National Institute on Drug Abuse (NIDA) |
| 1981-1983 | Advisory Panel on Psychiatry, California Medical Association, San Francisco, CA |
| 1982-1985 | Family Committee, Southern California Psychiatric Society |
| 1982-1986 | Psychosocial Research Subcommittee of the Drug Abuse, Clinical, Behavioral and Psychosocial Research Review |

|                     |                                                                                                                      |
|---------------------|----------------------------------------------------------------------------------------------------------------------|
|                     | Committee of NIDA                                                                                                     |
| 1983-1986           | Member, Board of Directors, The Family Center, San Bernardino, CA                                                    |
| 1983,1985,1986      | Grant Reviewer, Swiss National Research Council, Division of Medicine and Biology                                     |
| 1984-1991           | Southern California Regional Coordinator, American Association of Directors of Psychiatric Residency Training (AADPRT) |
| 1984-1987           | Chairman, Task Force on Clinical Rotations in Alcohol and Drug Abuse, American Psychiatric Association                 |
| 1985-1988           | Member, Executive Council, Orange County Psychiatric Society                                                          |
| 1985 - Present      | Member, Ethics Committee, Orange County Psychiatric Society                                                           |
| 1985-1987           | Vice President, American Academy of Psychiatrists in Alcoholism and Addictions (now AAAP)                             |
| 1987-1989           | President, American Academy of Psychiatrists in Alcoholism and Addictions (now AAAP)                                  |
| 1985-1989           | Chairman, Drug Abuse Committee, Psychiatric Services Council, American Psychiatric Association                         |
| 1985-1988           | Chairman, American Psychiatric Association Task Force on Substance Abuse Curriculum and Clinical Experience            |
| 1986                | Consultant, American Psychiatric Association Task Force, Treatment of Psychiatric Disorders                           |
| 1986                | Chairman, Internal Steering Committee, Substance Abuse Project, American Psychiatric Association                       |
| 1986-1989           | Faculty, Orange County Center for Psychoanalytic Studies, Orange, CA                                                  |
| 1990-1992           | Consultant, Council on Addiction Psychiatry, APA, 1994-1995 Washington, DC                                            |
| 1991-1992           | Member, Task Force on Families and Mental Illnesses, California Alliance for the Mentally Ill                          |
| 1992-1994           | Member, Committee on Certification for Added Qualification in Addiction Psychiatry, American Board of Psychiatry and Neurology, Deerfield, IL |
| 1992-1996           | Member, Advisory Committee, Center for Research on Adolescent Drug Abuse, Temple University, Philadelphia, PA          |

| | |
|---|---|
| 1993-1997 | Member, Technical Advisory Committee, California Addiction Training Center, University of California, San Diego, CA |
| 1997 | Member, Committee on Treatment Services for Addicted Patients, Council on Addiction Psychiatry, American Psychiatric Association |
| 1998 | Special Review Consultant, Amphetamine Treatment SAMSA |
| 2001 | Chairperson, National Institute of Drug Abuse, CSAT, Family Therapy Treatment Improvement Protocol (TIP) |

**EDITORIAL SERVICE**

**Editorial Board Service:**

| | |
|---|---|
| 1974-2006 | Editor-in-Chief, American Journal of Drug and Alcohol Abuse |
| 1979 | Member, Editorial Board, Prison Health |
| 1980-present | Executive Editor, International Journal of the Addictions |
| 1980-2000 | Member, Editorial Board, Advances in Alcohol and Substance Abuse |
| 1985-Present | Editorial Review Board: Journal of Substance Abuse Treatment |
| 1985-1990 | Editorial Review Board, Journal of Studies on Alcohol |
| 1990 | Member, Editorial Board, Clinical Textbook of Addictive Disorders |
| 1990-Present | Member, Editorial Board, Journal of Family Violence |
| 1991-1994 | Member, Editorial Board, Family Dynamics of Addiction Quarterly |

**Editorial Appointments:**

| | |
|---|---|
| 1973, 1981 1983-1992 1994-1995 | Editorial Reviewer, American Journal Of Psychiatry |
| 1981 | Editorial Reviewer, Alcoholism: Clinical and Experiment |
| 1981-2002 | Editorial Reviewer, Hospital and Community Psychiatry (Now Psychiatric Services) |

| 1981, 1983, 1986 | Reviewer, <u>Journal of Studies of Alcohol</u> |
|---|---|

1982-1983     Editorial Reviewer, <u>Journal of Nervous and Mental Disease</u>

1984-1985     Editor, American College of Psychiatrists, Psychiatry
            Resident Training Examination

1987-1991     Editorial Board, <u>Contemporary Psychiatry</u>

1989       Editorial Reviewer, <u>Journal of American Medical
            Association</u>

2000       Discussion Leader, International Addiction Editors
            Meeting, Krakow, Poland, July 2000.

2000-       Board of Directors, International Addiction Editors
            Group, July 2000


**<u>CONFERENCE/WORKSHOPS</u>**

As Panelist or Workshop Leader

<u>Summary only of those since 1984</u>:

1.  "A Workable System for Family Therapy for Alcoholics", ADAPCP Conference, Manheim, German, August, 1985.

2.  "Structural Family Therapy," Brentwood VA Hospital, Los Angeles, CA, September, 1985.

3.  " A Workable System for Family Treatment of Alcoholism," George C., Ham Symposium, Chapel Hill, NC, November 1985.

4.  "Substance Abuse Rotation and Curriculum in Psychiatry Residency Training," American Association of Directors of Psychiatric Residency Training, New Orleans, LA, January 1986, 1987.

5.  "Family Therapy with alcoholism:  Integrating Systems Thinking with Intervention Strategies, American Family Therapy Association, Washington, DC, June 1986.

6.  "Teaching and Identification, Evaluation and Treatment of Adolescent Substance Abuse," January, 1987.

7.  "Appropriate Prescribing of Common Drugs with Addictive Potential, "California Society, San Francisco, CA, May 1987.

8.  "Substance Abuse in Psychiatric Practice,"  American Psychiatric Association, Chicago, IL, May 1987.

9.  "Medical Education in Alcoholism and Drug Abuse," American Psychiatric Association, Chicago, IL, May 1987.

10.  "Group Psychotherapy Approaches with Alcoholics and substance Abusers, " 39th Institute on Hospital and Community Psychiatry, Boston, MA, October, 1987.

11.  "Preparing Physicians for Their Responsibilities in Combating Chemical Dependency:  Residency Training," California State Department of Alcoholic and Drug Programs and Area Health Education

System, Los Angeles, CA, June 1988.

12.  "Dual Diagnosis and Treatment of Cocaine Abusers,"  APA Committee on Drug Abuse, May 1990.

13.  "Psychology of Addiction:  How It Effects Children and Family," Pomona Valley Hospital Medical Center, Pomona, CA, February 1990.

14.  "Training:  Outpatient Management of the Dual Diagnosed Client,"  Inyo County, CA, May 1990.

15.  "Psychiatric Syndromes in Substance Dependence," APA 145th Annual Meeting, Washington, D.C., May 1992.

16.  "Contemporary Psychiatric Substance Abuse Treatment,"  APA 145th Annual Meeting, Washington, D.C., May 1992.

17.  "Contemporary Psychiatric Substance Abuse Treatment," APA 146th Annual Meeting, San Francisco, CA, May 1993.

18.  "Clinical Advances in Adolescent Substance Abuse,"  Critical Issues in Adolescence, New York Medical College, Tarrytown, NY, April 1993.

19.  "What's New in Family System Diseases," and "Recent Advances in the Treatment of Depression," Second Annual Chemical Dependency Services Addiction Treatment Conference, Orange, CA, June 1994.

20.  "Question the Experts," Writing for Journals, Hospital and Community Psychiatry, San Diego, CA, September 1994.

21.  "The Comprehensive Treatment of Substance Abusers,"  APA 148th Annual Meeting, Miami, FL, May 1995.

22.  "Addiction Treatment in the New Economic Era," APA 148th Annual Meeting, Miami, FL, May 1995.

23.  "Psychotherapy for the Addictions in the Era of Managed Care," American Academy of Addiction Medicine, 9th Annual Meeting, Florida, December 1998.

24.  "Working with Couples and Families of Addicted Patients," American Academy of Addiction Medicine, 10th Annual Meeting, Nassau, Bahamas, December 1999.

25.  Master Clinician, Case Conference on Family Therapy, American Academy of Addiction Medicine, 11th Annual Meeting, Phoenix, Arizona, December 2000.

## PRESENTATIONS

Summarized Prior to 1984:

1.  "Family Structures of Drug Dependent Individuals," APA Annual Meeting, Atlanta, GA, May 1978.

2.  "The Right to Treatment Suit as an Agent of Change,"  APA Annual Meeting, Atlanta, GA, May 1978.

3.  "Structural Approaches to Drug Abusers and Their Families,"  Forest Hospital Foundation, Des Plaines, IL, March 1979.

4.  "Family Dynamics and Treatment of Adolescent Substance Abusers," Beechgrove Regional Children's Center, Kingston, Ontario, Canada, March 1979.

5.  "Myth and Reality in the Family Patterns and Treatment of Substance Abusers," invited Keynote

Speaker, The Annual Donovan Memorial Lecture, Eagleville Hospital and Rehabilitation Center, Eagleville, PA, May 1979.

6.  "Family Therapy with Drug And/Or Alcohol Abusers," presented at Professors Rounds, Payne Whitney Psychiatric Hospital, New York, NY, May 1979.

7.  "Effective Family Therapy with Drug Abusers,"  Philadelphia Child Guidance Center, Philadelphia, PA, June 1979.

8.  "Adult Suicide:  The Family and Psychopharmacological Treatment," University of California, Irvine, Annual Associated Alumni Meeting, Lake Tahoe, CA 1979.

9.  "Family Therapy of Drug Abuse," Department of Psychiatry, Medical College of Georgia, Augusta, GA, October 1979.

10.  "Family Therapy of Alcoholism," Department of Psychiatry, Augusta Veterans Administration Hospital, Augusta, GA, October 1979.

11.  "Abnormal Family Systems in Medical Disease and How to Change Them,"  Department of Psychiatry, University of Alabama, Tuscaloosa, LA, October 1979.

12.  "Drug Abuse Problems and Treatment in America and Their Implications for Asia,"  Bangkok Christian Hospital, Bangkok, Thailand, November 1979.

13.  "New and Controversial Approaches in Psychiatry,"  Loma Linda University of School of Medicine, Alumni Association, Annual Postgraduate Convention, Loma Linda, CA, February 1980.

14.  "Family Research Issues in Alcoholism,"  National Institute on Alcohol Abuse and Alcoholism, Butler Hospital, Providence, RI, October 1982.

15.  "Family Systems Influences on the Eating disorders,"  Department of Psychiatry, University of California, Irvine, CCM, Extension Service, Irvine, CA, November 1982.

16.  "The Many Faces of Domestic Violence," University of California, Los Angeles, CA, January 1983.

17.  "Recent Developments in Alcoholism Treatment,"  APA Annual Meeting, New York, NY, May 1983.

18.  "The Therapeutic Community in Brief Hospitalization,"  APA Annual Meeting, New York, NY, May 1983.

19.  "Family Therapy for Alcohol and Drug Abuse Problems," University of Minnesota, MN, May 1983.

20.  "Families with Sick Adolescents,"  Southern California Society for Adolescent psychiatry, Mammoth, Ca, March 1984.

21.  "Families and Family Therapy In Alcoholism,"  APA Annual Meeting, Los Angeles, CA, May 1984.

22.  "Psychotherapy with Good Prognosis Cancer Patients," Paper Sessions, APA,Dallas, TX, May 1985.

23.  "The Difficult Patient:  Treatment of Borderline, Substance Abuse, and Affective Disorders," Kaiser Permanente Department of Psychiatry, Anaheim, CA, June 1985.

24.  "Medical Student Education:  New Methods for Changing Times,"  Association of Directors of Medical Student Education in Psychiatry, Chicago, IL, June 1985.

25.  "Chemical Dependency:  Family therapy and Dual Diagnosis,"  Emerson A North Physician

Symposium, Cincinnati, OH, November 1985.

26. "Families, Family Therapy and Substance Abuse," Child and Adolescent Grand Rounds, Long Island Jewish Medical Center, New York, NY, May 1987.

27. "Families, Family Therapy and Substance Abuse," Hillside Hospital, Department of Psychiatry Grand Rounds, New York, NY, May 1988.

28. "Drugs, Alcohol and Our Children, Some Current Issues," APA Council on Addiction Psychiatry, May 1991.

29. "Update on Alcoholism/Addictions Treatment," Joint Session with the American Academy of Psychiatrists in Alcoholism and Addictions, Hospital and Community Psychiatry, Los Angeles, CA, October 1991.

30. "Countertransference and Other Mutually Interactive Aspects of Psychotherapy with Substance Abusers," Hospital an Community Psychiatry, Los Angeles, CA, October 1991.

31. "Drug Exposed Young Children," National Conference on Drug Abuse Research and Practice: An Alliance for the 21st Century, Washington, DC, January 1991.

32. "Legalization of Drugs," Drug Abuse is Life Abuse, Board of Director's Meeting, County of Orange, Newport Beach, CA , May 1992.

33. "Is the War on Drugs Working?", University of California, Irvine, October 1992.

34. "Intervention, Chemical Dependency and Aging: Differential Diagnosis and Intervention," County of Orange Alcohol, Drug and Aging Task Force, Santa Ana, CA, October 1993.

35. "Family Therapy: New Developments Update," The Century of the Mind and the Decade of the Brain, California Psychiatric Association, October 1993.

36. "Integrated System of Psychotherapy for the Dually Diagnosed," 5th Annual Conference on Dual Diagnosis, New Haven, Connecticut, September 1995.

37. "Working with the Family of Dual Disorder Patients," 2nd Annual San Diego Dual Disorder Conference, San Diego, CA, February 1996.

38. "Collaborative Care for Patients with High Risk/High Cost Conditions," Primary Care Behavioral Healthcare Summit, San Diego, CA, March 1996.

39. "Alcohol and Chemical Dependency: Detection and Treatment," Rosemead School of Psychology, Biola University, La Mirada, CA, June 1996.

40. "Alcoholism: Steps to Recovery," South Coast Medical Center, Laguna Beach, CA, April 1997.

41. "Depakote in Bipolar Disorder," Grand Rounds, University of California, Irvine, CA, April 1998.

42. "Zyprexa: A Slide/Lecture Program," Chanteclair, Newport Beach, CA, May 1998.

43. "Drug Abuse," South Coast Medical Center, Laguna Beach, CA, July 1998.

44. "Addiction Counseling Competencies: The Knowledge, Skills and Attitudes of Profesional Practice," Kethea, Therapy Center for Dependent Individuals, Athens, Greece, September 1998.

45. "Family Treatment of Substance Abuse in Delinquent Patients," National Research Institute, Kethea,

Therapy Center for Dependent Individuals, Athens, Greece, January 2001.

**PUBLICATIONS**

**Books:**

1)      Kaufman, E., <u>Substance Abuse and Family Therapy</u>, Grune and Stratton, New     York, NY, 1985.

2)      Kaufman, E., <u>Help At Last:  Coping with Substance Abusing Men</u>, Gardner     Press, Inc., New York, NY, 1989.

3)      Kaufman, E.,<u>Psychotherapy of Addicted Persons</u>, Guilford Press, New York, NY,      1994.

**Books Edited:**

1)      Schecter, A., Alksne, H., Kaufman, E., <u>Drug Abuse:  Modern Trends, Issues and</u> <u>Perspectives</u>, Marcel Dekker, Inc. New York, NY, 1978.

2)      Schecter, A., Alksne, H., Kaufman, E., <u>Critical Concerns in the Field of Drug</u>     <u>Abuse,</u> Marcel Dekker, Inc., New York, NY, 1979.

3)      Kaufman, E., Kaufmann, P., <u>Family Therapy of Drug and Alcohol Abuse</u>,     Gardner Press, New York, NY, 1979, (Second Addition, 1992).

4)      Pattison, E.M., Kaufman, E., <u>Encyclopedia Handbook of Alcoholism</u>, Gardner   Press, New York, NY, August, 1982.

5)      Kaufman, E., Kaufmann, P.,<u>Familientherapie Bei Alkohol und</u>       <u>Drogenabhaniegkeit,</u> Lambertus-Verlag, Grieburg im Breisgau Gestaltung, 1983     (German Adaptation of #3).

6)      Kaufman, E.,<u>Power to Change:  Family Case Studies in the Treatment of</u>      <u>Alcoholism</u>, Gardner Press, New York, NY, 1984.

**Book Chapters:**

1)      Kaufman, E., "Reality House, A Self Help Day Care Center for Addiction," in   <u>Drug Abuse</u> <u>Current Concepts and Research</u>, W. Keup (Ed.), Charles C. Thomas,    Springfield, IL, 1971.

2)      Kaufman, E., "A Psychiatrist Views An Addict Self Help Program" in <u>Drug</u>     <u>Abuse</u>  <u>Law</u> <u>Review,</u> C. Boardman and Company, New York, NY, 1973, pp.         472-483.

3)      Kaufman, E. "Group Therapy Techniques Used by the Ex-Addict Therapist," in <u>Group</u> <u>Psychotherapy and Group Function</u> in Rosenbaum and Berger, (Eds.),   Basic Books, Inc. New York, NY, 1975, pp. 535-556, Second Edition.

4)      Dutaa, S., Kaufman, E., "Multiple Drug Abuse," in <u>Drug Abuse:  Clinical and</u>   <u>Basic Concepts</u>, Sachndra, N. Pradhan (Ed.), C.V. Mosby Co. St. Louis, MO,   1977.

5)      Kaufman, E., DeLeon, G., "The Therapeutic Community:  A Treatment Approach         for Drug Abusers," in <u>Treatment Aspects of Drug Dependence</u>, Schecter (Ed.),    CRC Press, Florida, pp. 83-97, 1978.

6)      Kaufman, E., "Psychiatric Approaches to Drug Dependence," in Treatment      Aspects of Drug Dependence, schecter, A. (Ed.), CRC Press, Florida, pp.      109-116, 1978.

7)      Kaufman, E., "The Relationship of Social Class and Ethnicity to Drug Abuse," in Multicultural View of Drug Abuse, Smith, E.., Anderson, S.M., Buxton, M., et al      (Eds)., G.K. Hall, and Company, Schenkman Publishing Co., Inc., pp. 158-163,      1978.

8)      Pattison, E.M., Kaufman, E., "Alcohol and Drug Dependence," in Psychiatry in  General Medical Practice, Usdin, E. and Lewis, J.M. (Eds.) McGraw Hill, New  York, NY, pp. 305-336, 1979.

9)      Kaufman, E., Kaufmann, P., "Family Therapy of Substance Abusers," in      Yearbook of Substance Use and Abuse, Volume II, Brill, L. and Winick, C.,      (Eds.) Human      Science Press, New York, NY, pp. 113-143, 1980.

10)     Kaufman, E., Family Therapy:  A Treatment Approach with Substance Abusers,"      in Substance Abuse:  Clinical Problems and Perspectives, J.H. Lowinson, P. Ruiz,  (Eds.) Baltimore, MD, 1981, pp. 437-448.

11)     Pattison, E.M., Kaufman, E., "Family therapy in the Treatment of Alcoholism, " in Family Therapy and Major Psychotherapy, M. Lansky, (Ed.), Grune and      Stratton, New York, NY, pp. 203-229, 1981.

12)     Kaufman, E., Kaufmann, P., "Multiple Family Therapy with Drug Abusers," in Dependence and Alcoholism, Volume II:  Social, Behavioral Issues, A.J.      Schecter, (Ed.), Plenum Press, New York, NY, pp. 107-118, 1981.

13)     Saxon, S., Kuncel, E., Kaufman, E., "Life Events Leading to Suicide in Drug      Abusers," in Drug Dependence and alcoholism, Volume II: Social and Behavioral   Issues, A.J. Schecter, (Ed.), Plenum Press, New York, NY, pp. 769-777, 1981.

14)     Saxon, S., Kuncel, E., Kaufman, E., "Self Destructive Behavior Patters in Male  and Female Drug Abusers," in Drug Dependence and alcoholism, Volume II:      Social and Behavioral Issues, A.J. Schecter (Ed.) Plenum Press, New York, NY,      pp. 779-787, 1981.

15)     Kaufman, E., Kaufmann, P., "Family Structures of Drug Dependent Individuals,"      in Drug Dependence and Alcoholism, Volume II:  Social and Behavioral Issues,      A.J. Schecter, (Ed.), Plenum Press, New York, NY, pp. 843-853, 1981.

16)     Kaufman, E., "Group Therapy and Substance Abusers," in A Handbook for Group      Therapy, M. Grotjahn, E., Friedman, F. Kline (Eds.), Van Nostrand Reinhold,     New York, NY, pp. 163-191, 1982.

17)     Kaufman, E., "The Current State of Family Intervention in Alcoholism  Treatment," in Psychosocial Treatment of Alcoholism, M.Galanter,  E.M.Pattison (Eds.),      American Psychiatric Association Press, Washington, DC,      pp. 1-16, 1984.

18)     Kaufman, E., "Family Therapy in the Treatment of Alcoholism," in Current      Treatment of Substance Abuse and Alcoholism, T. Bratter, G. Forrest, (Eds.),      Free Press, pp. 376-397.

19)     Kaufman, E., "Family Adaptation to Substance Abuse," in Substance Abuse and      Psychopathology, A.L. Alterman (Ed.), Plenum Press, New York, NY, pp.      343-364, 1985.

20)     Kaufman, E. "Adolescent Substance Abuse and Family Therapy," in Adolescent      and Family Therapy:  A Handbook of Theory and Practice, M. Pravder, S. Koman    (Eds.), Gardner Press, New York, NY, 1985, pp. 245-267.

21)     Kaufman, E., "Family Systems/Perspectives of New Directions," in Alcohol      Abuse Treatment

Research, B. McCrady, N. Noel, T., Nirenberg, (Eds.), NIAAA,          Rockville, MD, 1985, pp. 225-233.

22)     Kaufman, E., "Family Therapy:  A Treatment Approach with Substance Abusers          in Inpatient and Residential Facilities," in Drug and Alcohol Use:  Issues and          Factors, S. Einstein, (Ed.), Plenum Press, New York, NY, pp. 281-288, 1985.

23)     Kaufman, E., "Families and Family Therapy in Alcoholism," in Family          approaches Psychiatric Disorders, M. Lansky (Ed.), American Psychiatric Press,     Washington, DC, pp. 13-44, 1985.

24)     Kaufman, E., "The Applications of Research in Biological Vulnerability to Drug          Abuse Prevention," in R. W. Pickens and D.S. Svikis (Eds.), Biological          Vulnerability to Drug Abuse, a NIDA Research Monograph 89, Rockville, MD,          1989

25)     Kaufman, E. "Family Therapy in Substance Abuse Treatment," in Treatments of          Psychiatric Disorders, T.B. Karasu, (Ed.), American Psychiatric Press, Vol. 2, pp          1397-1416, 1989.

26)     Kaufman, E., Borders, L., "Ethnic Family Differences in Adolescent Substance  Use," in The Family Context of Adolescent Drug Use, R. Coombs, F. Fawzy          (Eds.),   Haworth Press, New York, NY, pp. 99-121, 1988.

27)     Kaufman, E. Redding, K., "A Model for Psychotherapy with the Early Stage       Cancer Patient," in Psychosomatics:  Theory and Practice, E.S. Garze-Trevino  (Ed.), World Scientific Publishing Co., Singapore, 1989.

28)     Kaufman, E., "The Chronic Mentally Ill and the Role of the Psychiatrist," in       Future Directions for Psychiatry, J. Talbott (Ed.), American Psychiatric Press,     Inc., Washington, DC, 1989.

29)     Kaufman, E., "Recent Developments in Psychoactive Substance Abuse and          Dependence," in Drug Interactions in Psychiatry, R. Shader and D. Ciraulo (Eds.),          Williams and Wilkins, Inc., Baltimore, MD, 1989.

30)     Kaufman, E., "Adolescent Substance Abusers and Family Therapy," in Family   Therapy for Adolescent Drug Abuse, A.S. Friedman and S. Granick (Eds.),          Lexington Books, DC Heath and Company, Lexington, MA, pp. 47-61, 1990.

31)     Kaufman, E., "Ethnic Family Differences in Adolescent Substance Use," in          Advances in Therapies for Adolescents, C. Austand and N. Steefel (Eds.),   Jossey-Bass Publishers, Inc., 1991.

 **Peer Reviewed Journal Articles**

1)      Muzio, J., Roffwarg, H., Kaufman, E., "Altercations in the Nocturnal Sleep Cycle
        Resulting from LSD," Electroencep. Clin. Nerophysio., 21:  313-324, 1966.

2)      Kaufman, E., "A Psychiatrist Views an Addict Self-Help Program," American   Journal of Psychiatry, 128(7):  846-852, January 1972.

3)      Kaufman, E., "Methadone and/or Ex-Addict Therapy:  Are they a Cure for Heroin
        Addiction?" Contemporary Drug Problems, 207-223, Spring, 1972.

4)      Kaufman, E., "Prison:  Punishment, Treatment or Deterrent?" Journal of          Psychiatry and Law, 1(3):  335-351, 1972.

5)      Kaufman, E., "Can Comprehensive Mental Health Care be Provided in an          Overcrowded Prison System?" Journal of Psychiatry and Law, 1(2):  243-262,          Summer, 1973.

6)      Kaufman, E., "The Psychodynamics of Opiate Dependence;  A New Look," American Journal of Drug and Alcohol Abuse, 1(3):  349-370, 1974.

7)      Kaufman, E., "the Abuse of Multiple Drugs:  I.  Definition, Classification and     Extent of the Problems," American Journal of Drug and Alcohol Abuse, 3(2):        279-292, 1976.

8)      Kaufman, E. "The Abuse of Multiple Drugs:  II  Psychological Hypotheses,     Treatment Considerations," American Journal of Drug and Alcohol Abuse, 3(2),   293-301, 1976.

9)      Kaufman, E. "The Use of Ex-Addicts and Other Paraprofessionals as Mental     Health Workers in Prisons," Diseases of the Nervous System, 37(1):  679-678, December 1976.

10)     Kaufman, E. "Polydrug Abuse of Multidrug Misuse:  It's Here to Stay," British  Journal of Addiction, 72:  339-347, 1977.

11)     Kaufman, E. "the Right to Treatment Expert," American Psychiatric Association        District Branch Bulletin, 19(8), May 1977.

12)     Kaufman, E., Kaufmann, P., "Multiple Family Therapy:  A New Direction in the Treatment of Drug Abusers," American Journal of Drug and Alcohol Abuse, 4(4):    467-478, 1977.

13)     Kaufman, E., "How Drug Abuse Causes Complications for the Mother and     Neonate," Contemporary OB/Gyn, 11(6):  32-47, 1978.

14)     Kaufman, E., "Video Techniques in Family Psychiatry," American Journal of   Videology, 1(2), Spring 1978.

15)     Kaufman, E., "The Therapeutic Community and Methadone:  A Way of     Achieving Abstinence," The International Journal of the Addictions, 14(1):        18-23, 1979.

16)     Kaufman, E., "Family Structures of Drug Dependent Individuals," World Journal       of Psychosynthesis, 11(4):  18-23, 1979.

17)     Kaufman, E., "The Violation of Psychiatric Standards of Care in Prisons,"      American Journal of Psychiatry, 137(5):  566-570, 1980.

18)     Saxon, S. Kuncel, E., Kaufman, E., "Self Destructive Behavior Patterns in Male and Female Drug Abusers," American Journal of Drug and alcohol Abuse, 7(1): 19-20, 1980.

19)     Kaufman, E., "Myth and Reality in the Family Patterns and Treatment of     Substance Abusers," The American Journal of Drug and Alcohol Abuse, 7(3,4):   257-277, 1980.

20)     Kaufman, E. "Family Structures of Narcotic Addicts," The International Journal of the Addictions, 16(2):  93-102, 1981.

21)     Kaufman, E., Pattison, E.M., "Differential Methods of Family Therapy in the     Treatment of Alcoholism," Journal of Studies on Alcohol, 42(11: 951-971, 1981.

22)     Kaufman, E., "The Relationship of Alcoholism and Alcohol Abuse to the Abuse        of Other Drugs," American Journal of Drug and Alcohol Abuse, 9(1): 1-17, 1982.

23)     Kaufman, E., "Benzodiazepine Receptors," The Western Journal of Medicine,   128(3):  405-406, 1983.

24)     Kaufman, E., "Family Aspects of Female Substance Abuse," <u>World Journal of   Psychosynthesis</u>, 15(1): 9-14, 1983.

25)     Kaufman, E., "Family System Variables in Alcoholism," <u>Alcoholism Clinical and Experimental Research</u> 8(1): 4-8, 1984.

26)     Kaufman, E., Borders, L., "Adolescent Substance Abuse in Anglo-American   Families, <u>Journal of Drug Issues</u>, 14(2):  365-377, 1984.

27)     Kaufman, E., "Family Systems and Family Therapy of Substance Abuse:  An   Overview of Two Decades of Research and Clinical Experience," <u>International   Journal of the Addictions</u>, 20(6,7): 897-916, 1985.

28)     Kaufman, E., Sporty, L, Plon, L., "Changing Diagnostic Patterns After DSMIII,"   <u>World Journal of Psychosynthesis</u>, 16:  30-34, 1984-1985.

29)     Kaufman, E. "Critical Issues in Family Research in Drug Abuse," <u>Journal of Drug   Issues</u>, 15(4):  463-476, Fall 1985.

30)     Kaufman, E., "Commentary:  Variations in the Families of Alcoholics," <u>Family   Process</u>, 24(3): 377-380, September 1985.

31)     Kaufman, E., " A Workable System of Family Therapy for Drug Dependence,"   <u>Journal of Psychoactive Drugs</u>, 18(1):  43-50, Jan-Mar, 1986.  Reprinted in <u>Focus on Family and Chemical Dependency</u>, 9(5):  10-13, 1986.

32)     Kaufman, E., "The Family of the Alcoholic Patient," <u>Psychosomatics</u>, 27(5):   347-353, May 1986.

33)     Kaufman, E., " A Contemporary Approach to the Family Treatment of Substance   Abuse Disorders," <u>American Journal of Drug and Alcohol Abuse</u>, 12(3):   199-212, 1986.  Reprinted in the Brown University <u>Digest of Addiction Theory   and Application</u>.

34)     Kaufman, E., Micha, V., Colomer, N., "Psychotherapy with Good Prognosis   Cancer Patients," <u>Psychosomatics</u>, 28(10):  540-548, 1987.

35)     Kaufman, E., Borders., "Ethnic Family Differences in Adolescent Substance   Abuse," <u>Journal of Chemical Dependency Treatment,</u> 1988.

36)     Kaufman, E., Reoux, J., "Guidelines for the Successful Psychotherapy of   Substance Abusers," <u>American Journal of Drug and Alcohol Abuse</u>, 14(2):   199-209, 1988.

37)     Kaufman, E., "The Psychotherapy of Dual Diagnosis Patients," <u>Journal of   Substance Abuse Treatment</u>, 6(1):  1988.

38)     Heh, C., Overall, J., Kaufman, E., "The Investigation of Alcoholic Behavior," <u>The International Journal of the Addictions</u>, 25(4):  1990.

39)     Kaufman, E., McNaul, J., "Recent Developments in Psychoactive Substance   Abuse and Dependence," <u>Hospital and Community Psychiatry</u>, March 1992.

40)     Galanter, M., Kaufman, E., Meyer, R., Robinowitz, C., Tainter, Z., "A Study of  the Current Status of Psychiatric Education in Alcoholism and Drug Abuse," <u>The   American Journal of Psychiatry</u>, 146(1):  35-39, 1990.

41)    Giglio, J., Kaufman, E., "The Relationship Between Child and Adult    Psychopathology in Children of Alcoholics," International Journal of the  Addictions, 25(3), 1990.

42)    Weatherford, V., Kaufman, E., "Adult Children of Alcoholics:  An Exploration of    Axis II Disorders and Replicated Dysfunctional Family Patterns,: Journal of    Family Violence, 6(4), 1991.

43)    Kaufman, E., "Critical Aspects of the Psychodynamics of Substance Abuse and  the Evaluation of Their Application to a Psychotherapeutic Approach," The    International Journal of the Addictions, 25(2), 1990-1991.

44)    Kaufman, E., "Countertransference and Other Mutually Interactive Aspects of    Psychotherapy with Substance Abusers," The American Journal on Addictions,    1(3), Summer, 1992.

45)    Kaufman, E., McNaul, J., "Recent Developments in Psychoactive Substance    Abuse and Dependence, Hospital and Community Psychiatry, 43(3), March 1992.

46)    Shapiro, D.H., Weatherford, V., and Kaufman, E., "Control Profile of Adult    Children of Alcoholics, A Preliminary Investigation," American Journal of Drug    and Alcohol Abuse, 20(2), March, 1994.

47)    Kaufman, E., "Diagnosis and Treatment of Drug and Alcohol Abuse in Women," American Journal of Obstetrics and Gynecology, January 1996, Vol. 174,  pp.   21-27.

## PUBLICATIONS LAST TEN YEARS

1)    Kaufman, E., "Family Therapy:  A Treatment Approach with Substance Abusers," Substance Abuse:  A Comprehensive Textbook, J. Lowinson, J. Ruiz, P. Millman, Williams and Wilkins, Baltimore, MD, 1992; Revised, 1999.

2)    Kaufman, E., "Family Therapy:  Other Drugs," Textbook of Substance Abuse   Treatment, M. Galanter, H. Kleber (Eds.), American Psychiatric Press,    Washington, DC, 1994; Revised, 2000.

3)    Kaufman, E., "Treatment Types:  Group and Family Therapy," Encyclopedia of Drugs and Alcohol, J. Jaffee (Ed.), Macmillan Library, Simon Schuster    MacMillan, New York, 1995.

4)    Kaufman, E., "Families and Family Therapy in the Treatment of Female    Substance Abusers," in Treatment Services for Drug Dependent Women NIDA,    1995.

5)    Kaufman, E., "Famliy Therapy in Substance Abuse Treatment," in Treatments of Psychiatric Disorders," 2nd Edition, G. Gabbard, (Ed.) American Psychiatric  Press, Washington DC, 1995.

6)    Kaufman, E., Steinglass, P., Wilson, J., Case Conference:  Master Clinicians,    Proceedings of the American Academy of Addiction Psychiatry, 11th Annual  Meeting and Symposium, Phoenix, AZ, December 2000.

## ABSTRACTS

1)    Kaufman, E., "The Rehabilitated Addict as Prison Mental Health Worker,"    Proceedings of the 35th Annual Meeting of National Research Council    Committee on Problems of Drug Dependence, May 1973.

2)    Kaufman, E., "Psychiatric Care in an Overcrowded Prison System," Proceedings    of the American Psychiatric Association Meeting, Honolulu, HI, 1973.

3)      Kaufman, E., "The Polydrug Abuse Problem in America," <u>Proceedings of the 31st International Congress on Alcoholism and Drug Dependence</u>, Bangkok, Thailand, February 1975.

4)      Kaufman, E., "Multidrug Abuse:  Definition and Determinants, " <u>Proceedings of      the 37th Annual Scientific Meeting of Committee on Problems of Drug        Dependence</u>, pp. 218-233, Washington, DC, May 1975.

5)      Wellisch, D., Kaufman, E., "Family Therapy in Developments in the Field of     Drug Abuse," <u>Proceedings of the 194th National Association for the Prevention of     Addiction to Narcotics</u>, E. Senay, Vl. Shorty, H. Alkesne, (Eds). Schenkman       Publishing Co., pp 555-556, 1975.

6)      Kaufman, E. "Treatment Approaches to the Young Heroin User," <u>Proceedings of         the 194th National Association for the Prevention of Addiction to Narcotics</u>, E.        Senay, V. Shorty, H. Alksne, (Eds), Schenkman Publishing Co., pp 555-556, 1975

7)      Kaufman, E., "Address to the United States Subcommittee to Investigate Juvenile Delinquency," <u>Committee of the Judiciary</u>, 18(2):  103-110, 199-216,           Washington, DC, July, August 1975.

8)      Kaufman, E. "What Administrative and Operational Complexities are Peculiar to Combined Treatment Programs?" <u>Proceedings of the Eighth Annual Eagleville     Conference</u>, Eagleville, PA, June 1975.

9)      Kaufman, E. "The Right to Treatment Suit as an Agent of Change," <u>Proceedings          of the Meeting of the American Psychiatric Association</u>, Atlanta, GA, May 1978.

10)     Kaufman, E., "Addictive Personalities," <u>Inquiries About Behavioral Medicine</u>, p        25, New York, NY, October 1979.

11)     Kaufman, E., "Myth and Reality in the Family Patterns and Treatment of        Substance Abusers," in Substance Abuse:  The Family in Trouble, <u>Proceedings of the 13th Annual Eagleville Conference</u>, Eagleville, PA, May 1980.

12)     Kaufman, E., "Family Structures of Narcotic Addicts" and "Multiple Family       Therapy with Drug Abusers" (with P. Kaufmann).  Abstracted in <u>Drugs and the          Family</u>, T.J. Glynn, (ed), NIDA, pp 106-108 and 238-240, Rockville, MD 1981.

13)     Kaufman, E., Sporty, L, "The Therapeutic Community in Brief Hospitalizations," <u>Proceedings of the American Psychiatric Association Annual Meeting</u>, p. 279,    May 1983.

14)     Kaufman, E., "The Current State of Family Intervention in Alcoholism  Treatment," <u>Proceedings of the American Psychiatric Association Annual          meeting</u>, May 1984.

15)     Kaufman, E., "Family Systems and Family Therapy of Alcoholism, " <u>Proceedings          of the American Psychiatric Association Annual Meeting</u>, p. 185, May 1984

16)     Kaufman, E., Micha, V., Coleman, N. "Psychotherapy with Good Prognosis        Cancer Patients," <u>American Psychiatric Association Annual Meeting Abstracts</u>, p.            182, 1985.

17)     Kaufman, E., "Psychobiology and the Treatment of Drug Dependence," <u>American Psychiatric Association Annual Meeting Abstracts</u>, p. 219, 1985.

18)     Kaufman, E., " A Contemporary Approach to the Family Treatment of Substance      Abuse Disorders," <u>Proceedings of the American Psychiatric Association Annual</u>      <u>Meeting</u>, Symposium Committee on Drug Abuse, March 1985.

19)     Kaufman, E., "Prison Psychiatry:  Process and Practice," <u>Proceedings of the</u>      <u>American Psychiatric Association, 139th Meeting</u>, Washington, DC, May 1986.

20)     Kaufman, E., "Alcoholism 1986:  Update and Practice," <u>Proceedings of the</u>      <u>American Psychiatric Association</u>, Washington,, DC, May 1986.

21)     Kaufman, E. "Enmeshed Enemies:  The Family Structures of Narcotic Addicts,"      <u>First Regional Congress of Social Psychiatry</u>, Santa Barbara, CA, September      1987.

22)     Weatherford, V., Kaufman, E., "Adult Children of Alcoholics:  Personal and Transgenerational Patterns," <u>Proceedings of the American Psychiatric Association 141st Annual Meeting</u>, Washington, DC, May 1988.

23)     Weatherford, V., Reist, C., Kaufman, E., Kauffman, C., "Personality Patterns of Adult Children of Alcoholics and Post Traumatic Stress Disorder," <u>Proceedings  of the American Psychiatric Association 141st Annual Meeting</u>, Washington, DC,      May 1988.

24)     Kaufman, E., Khantzian, E., Mirin, S., Czechowicz, D., Westermeyer, J. "The      Efficacy of Substance Abuse Treatments," <u>Proceedings of the American      Psychiatric Association 141st Annual Meeting</u>, Washington, DC, May 1988.

25)     Kaufman, E. "The Future of Clinical Psychiatry," The Drug Abuse Committee,  <u>Proceedings of the American Psychiatric Association 141st Annual Meeting,</u>  Washington, DC, May 1988.

26)     Kaufman, E., Banys, P., Chappel, J., Galanter, M., "Contemporary Psychiatric    Substance Abuse Treatment," <u>Proceedings of the American Psychiatric Association 144th Annual Meeting</u>, Washington, DC, May 1991.

27)     Miller, N., Cloninger, R., Kaufman, E., Ries, R., Schuckit, M., "Psychiatric        Syndromes in Substance Dependence," <u>Proceedings of the American Psychiatric      Association 145th Annual Meeting</u>, Washington, DC, May 1992.

28)     Kaufman, E., Banys, P., Chappel, J., Galanter, M.," Contemporary Psychiatric    Substance Abuse Treatment," <u>Proceedings of the American Psychiatric Association 145th Annual Meeting</u>, Washington, DC, May 1992.


**<u>INVITED ARTICLES</u>**

1)      Kaufman, E., "Mental Health Services in Prisons of New York City:  A First      Look," <u>American Psychiatric Association District Branch Bulletin</u>, 14(4),          February 1972

2)      Kaufman, E., "Polydrug Abuse:  A New Epidemic?" <u>American Psychiatric Association Bulletin,</u> 18(2), September 1975.

3)      Kaufman, E., "Addictive Personalities," <u>Behavioral Medicine</u>, p. 29, October 1  979.

4)      Kaufman, E., "Family Therapy," In the <u>Clinical Treatment of Substance Abusers,</u>      L. Brill, (Ed), The Free Press, New York, NY pp 133-150, 1981.

5)      Kaufman, E., "Marital problems Caused by Marijuana Usage," in <u>Medical      Aspects of Human Sexuality</u>, Hospital Publications, New York, NY, pp   75-85,   1982.

6)      Kaufman, E., "Is Family Therapy Effective with Addicts?" Contemporary Psychiatry, 2(3):  176-178, 1983.

7)      Kaufman, E., "Effect of Adolescent Substance Abuse on Family Life," in Medical Aspects of Human Sexuality, Hospital Publications, New York, NY, pp. 28-53,      1983.

8)      Kaufman, E., "A Modified Milieu for Acute Patients," Hospital and Community Psychiatry, 34(4):  384- 1983.

9)      Kaufman, E., "Antagonism or Partnership:  Alcoholics Anonymous and      Psychotherapy," Contemporary Psychiatry, 5(1):  10-12, March 1986.

10)     Kaufman, E., "The Influence of Race and Ethnicity on Alcohol Use, Abuse, and Dependence," Contemporary Psychiatry, 5(3):  212-215, September 1986.

11)     Kaufman, E., Khantzian, E., Westermeyer, J., et al, "Position Statement on      Psychoactive Substance Use and Dependence:  Update on Marijuana and      Cocaine," American Journal of Psychiatry, 144(5):  698-699, May 1987.

12)     Kaufman, E., "The Chicken/Egg Controversy as Seen in the Relationship of      Psychopathology to the Addictive Disorders," Contemporary Psychiatry, 7(1):   59-61, March 1988.

13)     Kaufman, E., "Mental Health Care for Mentally Disturbed Offenders:  An      International Travesty," Contemporary Psychiatry, 7(1):  39-41, March 1988.

14)     Dobos, D., Kaufman, E., "Does Alcohol Relieve Tension?" Contemporary      Psychiatry, 7(2):  125-128, June 1988.

15)     Kaufman, E., Glass, J., "What's New Under the Sun?"  Contemporary Psychiatry,      9(2):  74-76, June, 1990.

16)     Kaufman, E., "What to Do When Your Child is Taking Drugs," Parenting/Teens Magazine, 1994.

17)     Kaufman, E., "The Relevance of Personality Disorders to the Understanding and Treatment of Addictive Disorders," Primary Psychiatry, September 1995.

Appendix B to Declaration of
Edward Kaufman, M.D.

# APPENDIX B TO THE DECLARATION OF EDWARD KAUFMAN

| DOCUMENT |
|---|
| eUHR of multiple CCWF inmates |
| eUHR of multiple COR inmates |
| eUHR of CIM multiple inmates |
| Pltfs' Response to Defs' Objections and Motion to Strike Portions of the 25th Special Master's Report [Dkt. 4324] |
| CCWF site inspection documents, Bates CCWF 1-29; provided by Defs |
| CCWF site photographs, Bates CCWF 1-9; provided by Defs |
| CIM Special Master's 25th Round tour binder |
| CIM site photographs, Bates CIM 1-38; provided by Defs |
| CIM site inspection documents, Bates CIM 38-190; provided by Defs |
| COR Special Master's 25th Round tour binder |
| COR site photographs, Bates COR 1-64; provided by Defs |
| COR site inspection documents, Bates COR 65-111; provided by Defs |
| 2/18/13 Deposition of Lindsay Hayes in the instant, w/exhibits |
| 2/13/13 Deposition of Jacqueline Moore in the instant, w/exhibits |
| Special Master's 25th round monitoring report on compliance 1/18/13 [Dkt. 4298] |
| Special Master's report on expert Patterson's report re: suicides in 2011, 1/25/13 [Dkt. 4307] |
| Dr. Raymond Patterson's Expert Report re: CDCR Suicides in 2011, 1/25/13 [Dkt. 4308] |
| Defs' Amended Objections and Motion to Strike or Modify Portions of 25th Round Special Master's Report, 1/29/13 [Dkt. 4314] |
| Joel Dvoskin's Comments: Exhibit 1. to Defs' Objections and Motion to Strike or Modify, 1/28/13 [Dkt. 4312-1] |
| Belavich Declaration and Exhibits 1-7 ISO Defs' Objections and Motion to Strike or Modify, 1/28/13 [Dkt. 4313] |
| Pltfs' Response to Defs' Amended Objections and Motion to Strike or Modify Portions of 25th Round Special Master's Report, 2/11/13 [4324] |
| Kahn Declaration ISO Pltfs' Response to Defs' Amended Objections and Motion to Strike or Modify Portions of 25th Round Special Master's Report, 2/11/13 [4325] |
| Defs' Objections & Motion to Strike or Modify Portions of Special Master's 2011 Suicide Reports, 2/11/13 [Dkt. 4326] |
| Pltfs' Opposition to Defs' Objections & Motion to Strike or Modify Portions of SM's 2011 Suicide Report, 2/21/13 [Dkt. 4350] |

| |
|---|
| Plata: Opinion and Order Three Judge Court re: prison overcrowding, 8/4/09 [Dkt. 2197] |
| Plata: Order Three Judge Court re: evidentiary matters, 8/4/09 [Dkt. 2198] |
| Patterson Expert Report re: CDCR completed suicides in 2008 and 2009, 5/16/11 [Dkt. 4009] |
| Patterson Expert Report re: CDCR completed suicides in 2010, 11/9/11 [Dkt. 4110] |
| Special Master's Report on Patterson Expert Report re: CDCR completed suicides in 2008 and 2009, 5/16/11 [DKt. 4008] |
| Special Master's Report on Patterson Expert Report re: CDCR completed suicides in 2010, 11/9/11 [Dkt. 4109] |
| Brown v. Plata, 131 S. Ct. 1910 (2011) |
| CCWF Coleman 25th Round Mental Health Services Delivery System Management Report, 5/16/12, Bates DRPD 1 00057-78 |
| Coleman v. Schwarzenegger, Defs' Report and Plan for Improvement of EOP in ASUs, 7/11/07 [Dkt. 2311] |
| Coleman: Mental Health Services Delivery System Guide, Chapter Seven: Administrative Segregation; 2009 Revision |
| CIM Coleman 25th round Mental Health Services Delivery System Management Report, 10/1/11 to 3/31/12 |
| General summary: Special Master's 24th round Monitoring Report on Compliance 7/2/12 [Dkt. 4205] |
| CIM institutional summary: Special Master's 24th round Monitoring Report on Compliance 7/2/12 [Dkt. 4205] |
| CIM Individual case studies: Special Master's 24th round Monitoring Report on Compliance 7/2/12 [Dkt. 4205] |
| Expert report of Craig Haney,  10/30/2008 [Dkt. 3201] |
| Expert report of Pablo Stewart, 10/30/2008 [Dkt. 3217] |
| Supplemental expert report of Pablo Stewart, 10/30/2008 [Dkt. 3221] |
| Defs' Motion and Notice of Motion to Terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under FRCP 60(b)(5), 1/7/13, [Dkt. 4275] |
| Declaration of Belavich ISO Defs' Motion and Notice of Motion to Terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgement and Orders under FRCP 60(b)(5), 1/7/13, [Dkt. 4277] |
| Defs' January 2013 Status Report in Response to June 30, 2011 Order, 1/15/13, [Dkt. 2518] |
| Declaration of Jeffrey Beard ISO Defs' Motion to Vacate or Modify Population Reduction Order. 1/7/2013, [Dkt. 4281] |

| |
|---|
| COMPSTAT DAI Report for CIM 1/1/2013 |
| Coleman Court's Order re: suicide beds. 12/5/2011, [Dkt. 4125] |
| Coleman Court's Order re: suicide beds. 7/21/2011, [Dkt. 4044] |
| Revised schedule: suicide resistant beds, 6/27/12 |
| 8/29/12 Memo, Belavich to Vorous re: installation of suicide resistant beds in MHCB. |
| 3/15/11 CDCR Memo, Mental Health Crisis Bed Unit-Use of Mechanical Restraints and Escort Policies |
| Defendants' file on suicide of CIM inmate. |
| Defendants' file on heat related death of CIM inmate. |
| COR institutional summary: Special Master's 24th round Monitoring Report on Compliance 7/2/12 [Dkt. 4205] |
| COR Individual case studies: Special Master's 24th round Monitoring Report on Compliance 7/2/12 [Dkt. 4205] |
| Declaration of Meyer ISO Defs' Motion and Notice of Motion to Terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgement and Orders under FRCP 60(b)(5), 1/7/13, [Dkt. 4278] |
| 22nd tri-annual report of the Federal Receiver's turnaround plan of action for 9/1/12 to 12/31/12: *Achieving a Constitutional Level of Medical Care in California's Prisons*. 1/25/13 |
| Office of the Inspector General: CIM Medical Inspection Results, 4/12 |
| COR Coleman 25th round Mental Health Services Delivery System Management Report, 8/20/12 to 8/23/12 |
| 5/24/12 CDCR Memo re: inmate safety issues and clinical services |
| Excerpt: Coleman v. Wilson, Findings and Recommendations after trial, 6/6/1994 |
| Excerpt: Coleman v. Wilson, 912 F. Supp. 1282 (1995) |
| 7/27/12 Memo: Prudhomme-Belavich re Quality Improvement Plan for Suicide of inmate Oscar Trujano |
| Executive Summary and Suicide Report for Oscar Trujano |
| General summary: Special Master's 23rd round Monitoring Report on Compliance 12/1/11 [Dkt. 4124] |
| CCWF institutional summary: Special Master's 23rd round Monitoring Report on Compliance 12/1/11 [Dkt. 4124-5] |
| CCWF Individual case studies: Special Master's 23rd round Monitoring Report on Compliance 12/1/11 [Dkt. 4124-6] |
| CCWF COMPSTAT DAI Report, 1/11/13 |
| 1/19/10 Suicide notification of  COR inmate. |
| 4/12/10 Suicide report and executive summary for COR inmate. |

| |
|---|
| 8/6/10 Report implementation of Quality Improvement Plan for suicide of COR inmate. |
| Autopsy report of COR inmate. |
| 9/5/12 Suicide notification of  COR inmate. |
| 10/28/10 Death notification of COR inmate. |
| Excerpt Medical examiner's report for COR inmate. |
| Excerpt incident report, death  of COR inmate. |
| Autopsy report of COR inmate. |
| 1/19/11 Death notification of COR inmate. |
| 10/16/11 CDCR item: *Inmate Death at Corcoran Under Investigation* |
| Undated Death notification of COR inmate. |
| Death Review Summary for COR inmate. |
| Excerpt 7229 death of COR inmate. |
| Excerpt incident report on death of COR inmate. |
| Movement summary for COR inmate. |
| Autopsy report of inmate for COR inmate. |
| 1/24/13 CDCR item: *Inmate Death at Corcoran Under Investigation* |
| Scripps News Service item: *Inmate on Hunger Strike Dies at California State Prison, Corcoran* |
| 1/14/13 CDCR item: *Inmate Death at Corcoran Under Investigation* |
| Report, Office of the Inspector General: California Institution for Men, Quadrennial and Warden Audit. Nov. 2008 |
| Metzner, Jeffrey and J. Dvoskin, *Overview of Correctional Psychiatry*; Psych. Clin. N. Am. 29 (2006) 761-772 |
| CIM prison mental health data, most current available (as of 2/12/13) |
| CIM staffing data, most current available (as of 2/12/13) |
| CIM prison mental health data, most current available at time of Defs' expert tour, 5/1/12 to 5/2/12 |
| CIM prison staffing data, most current available at time of Defs' expert tour, 5/1/12 to 5/2/12 |
| CIM prison mental health data, most current available at time of Pltfs' expert tour for overcrowding, 10/29/07 |
| CIM prison staffing data, most current available at time of Pltfs' expert tour for overcrowding, 10/29/07 |
| DSH reporting data as of 12/31/12 |
| CIM photos, 8/7/2006 |
| CIM photos, 8/7/2006 |
| CIM EOP Treatment Hours |
| CIM List of CCCMS patients in ASU |

| |
|---|
| CIM List of MHCB Patients |
| CIM LPT staffing data |
| CIM MHCB escort list |
| CIM Moning meeting materials |
| CIM Palm housing roster |
| CIM Patients awaiting transfer |
| CIM Recent QITs |
| CIM Welfare check logs |
| 3/1/13 Letter, Baldwin-Kaufman re CD of supplemental materials/ w index |
| 2/28/13 Letter, Baldwin-Kaufman re two discs of supplemental materials/ w index |
| News Article: "Mental Unit to Much to Ask at CIM", 2/7/2007 |
| News Article: "Many Speak Out Against Possible CIM Expansion"; Inland Vally Daily Bulletin, 1/30/13 |
| Plaintiffs' Expert file on heat related deaths |
| Plaintiffs' Expert file on possible heat related deaths |
| Plaintiffs' Expert file: prison mental health care, compiled for COR expert tour |
| Plaintiffs' Expert file: prison staffing, compiled for COR expert tour |
| Plaintiffs' Expert file: DSH reporting data, compiled for COR expert tour |
| Plaintiffs' Expert file: treatment and office space for Ad-Seg, compiled for COR expert tour |
| Plaintiffs' Expert file: relevant press reports, compiled for COR expert tour |
| Plaintiffs' Expert file: prison mental health care, compiled for CCWF expert tour |
| Plaintiffs' Expert file: prison staffing, compiled for CCWF expert tour |
| Plaintiffs' Expert file: suicide documents, compiled for CCWF expert tour |
| Plaintiffs' Expert file: treatment and office space for EOP, GP, compiled for CCWF expert tour |
| CCWF site photograph Index |
| CIM site photograph Index |
| COR site photograph Index |
| 12/2/12 email, Vorous-Kahn re: mission changes at CCWF |
| Exemplar of CDCR Form 7277 Initial Health Screening |
| Coleman v. Wilson: Declaration of Edward Kaufman, 2/4/1993 |
| 9/25/12 email, McCray-Kahn re: CIM RC EOP Heat Deaths |
| 1/28/10 email, Kahn-Vorous re: suicide @ COR |
| 1/3/13 email, Kahn-Vorous re: COR SHU in-cell death |

Appendix C to Declaration of
Edward Kaufman, M.D.

Edward Kaufman Trial, Hearing, Deposition Testimony over Last 4 Years

Trial/Hearing Testimony:

Morrison v. Morrison (2012)

Kaufman Statement of Fees/Compensation:

My billing rate for out-of-court time is $275/hr. or $3,300/day, plus reasonable travel expenses.  My billing rate for providing testimony, both in-court and out-of-court, is $3,000 for half a day and $5,000 for a full day.