1  DONALD SPECTER – 083925
STEVEN FAMA – 099641
2  PRISON LAW OFFICE
1917 Fifth Street
3  Berkeley, California  94710-1916
Telephone:    (510) 280-2621
4

5

6

7

8  JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
9  LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
10  K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
11  Telephone:    (415) 882-8200

12  Attorneys for Plaintiffs

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

13

14  UNITED STATES DISTRICT COURT

15  EASTERN DISTRICT OF CALIFORNIA

16

17  RALPH COLEMAN, et al.,

18        Plaintiffs,

19        v.

20  EDMUND G. BROWN, Jr., et al.,

21        Defendants.

Case No. Civ S 90-0520 LKK-JFM

**EXPERT DECLARATION OF
JEANNE WOODFORD IN SUPPORT
OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO
TERMINATE**

Judge:   Hon. Lawrence K. Karlton

22

23

24

25

26

27

28

[755648-1]

1

**TABLE OF CONTENTS**

2
                                                                                          **Page**

3    INTRODUCTION .................................................................................................. 1

4    I.      EDUCATION, BACKGROUND, AND EXPERIENCE WITH CDCR ................... 1

5    II.     FOUNDATION FOR EXPERT OPINIONS IN THIS ACTION ............................ 3

6    III.    EXPERT OPINIONS IN THIS MATTER .................................................... 4

7            A.      The Unique Needs of Condemned Inmates ...................................... 4

8            B.      Crowding and Staffing in Units for the Condemned ...................... 12

9            C.      The Specialized Care Program ...................................................... 15

10   IV.     OTHER OPINIONS REGARDING MENTAL HEALTH CARE
             DELIVERY AT SAN QUENTIN ............................................................... 19

11           A.      The Adjustment Center ................................................................. 19

12           B.      The Mental Health Assessment Process in RVR Adjudications ................. 21

13           C.      Suicide Prevention / Emergency Response .................................... 22

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[755648-1]

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO TERMINATE

**TABLE OF ABBREVIATIONS**

| ACA | American Correctional Association |
|---|---|
| APP | Acute Psychiatric Program |
| ASH or Atascadero | Atascadero State Hospital |
| ASP or Avenal | Avenal State Prison |
| ASU | Administrative Segregation Unit |
| BCP | Budget Change Proposal |
| CAL or Calipatria | Calipatria State Prison |
| CCC | California Correctional Center |
| CCCMS | Correctional Clinical Case Manager System |
| CCI | California Correctional Institution |
| CCPOA | California Correctional Peace Officers Association |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CEN or Centinela | Centinela State Prison |
| CIM | California Institute for Men |
| CIW | California Institute for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| CMO | Chief Medical Officer |
| COR or Corcoran | California State Prison/Corcoran |
| CPR | Cardiopulmonary Resuscitation |
| CRC | California Rehabilitation Center |
| CSH or Coalinga | Coalinga State Hospital |
| CTC | Correctional Treatment Center |
| CTF | California Training Facility/Soledad |
| CVSP or Chuckwalla | Chuckwalla Valley State Prison |
| DMH | Department of Mental Health |
| DSH | Department of State Hospitals |
| DOT | Direct Observation Therapy |
| DVI or Deuel | Deuel Vocational Institute |
| EOP | Enhanced Outpatient Program |
| EOP ASU Hub | Enhanced Outpatient Program Administrative Segregation Unit |
| FOL or Folsom | Folsom State Prison |
| HDSP or High Desert | High Desert State Prison |
| ICF | Intermediate Care Facility |
| ISP or Ironwood | Ironwood State Prison |
| KVSP or Kern Valley | Kern Valley State Prison |
| LAC or Lancaster | California State Prison/Lancaster |
| LVN | Licensed Vocational Nurse |

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE

| LOB | Lack of Bed |
| MCSP or Mule Creek | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| MHOHU | Mental Health Outpatient Housing Unit |
| MHSDS | Mental Health Services Delivery System |
| NKSP or North Kern | North Kern State Prison |
| OHU | Outpatient Housing Unit |
| OIG | Office of the Inspector General |
| PBSP or Pelican Bay | Pelican Bay State Prison |
| PCP | Primary Care Provider |
| PLRA | Prison Litigation Reform Act |
| PSH or Patton | Patton State Hospital |
| PSU | Psychiatrist Services Unit |
| PVSP or Pleasant Valley | Pleasant Valley State Prison |
| R&R | Reception and Receiving |
| RC | Reception Center |
| RJD or Donovan | Richard J. Donovan Correctional Facility |
| RN | Registered Nurse |
| SAC or Sacramento | California State Prison/Sacramento |
| SATF | California Substance Abuse Treatment Facility (II) |
| SCC or Sierra | Sierra Conservation Center |
| SHU | Segregated Housing Unit |
| SM | Special Master in the *Coleman* case |
| SNY | Special Needs Yard |
| SOL or Solano | California State Prison/Solano |
| SQ or San Quentin | California State Prison/San Quentin |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP or Salinas Valley | Salinas Valley State Prison |
| TB | Tuberculosis |
| TTA | Triage and Treatment Area |
| UHR | Unit Health Records |
| VSPW or Valley State | Valley State Prison for Women |
| VPP | Vacaville Psychiatric Program |
| WSP or Wasco | Wasco State Prison |
| ZZ Cell | Makeshift Temporary Cells Outside of Clinic Areas |

[755648-1]

**INTRODUCTION**

I, Jeanne Woodford, declare:

1.      I  have personal knowledge of the matters set forth herein, and if called as a witness, I could competently so testify.  I make this declaration in support of Plaintiffs' Opposition to Defendants' Motion to Terminate Relief in *Coleman v. Brown*.

## I.      EDUCATION, BACKGROUND, AND EXPERIENCE WITH CDCR

2.      I received my B.A. from Sonoma State University in 1978.  Since that time, I have experience working at all levels of California correctional facilities.

3.      In 1978, I became a correctional officer at San Quentin.  I worked for the California Department of Corrections and Rehabilitation (CDCR) for the next 27 years in various custodial and management positions, including Correctional Counselor, Program Administrator, Captain, Litigation Coordinator, Associate Warden, Chief Deputy Warden and eventually the Warden of San Quentin from 1999 through 2004.

4.      In March 2004, Governor Schwarzenegger appointed me as the Director of what was then the California Department of Corrections.  On July 1, 2005, the California Department of Corrections was reorganized and renamed the California Department of Corrections and Rehabilitation.  In July 2005, Governor Schwarzenegger appointed me to be the Undersecretary for the CDCR and then the acting Secretary of the Department.  I retired from the CDCR in July 2006.

5.      From November 2006 until May 2008, I was the Chief Adult Probation Officer for the City and County of San Francisco.  In that position, my responsibilities included the administration of the Adult Probation Department, formulating policies and plans for the rehabilitation of adult probationers, managing the budgetary and fiscal activities and services of the organization, working with other agencies to improve services for individuals on adult probation, directing the preparation, approval, review and maintenance of records and reports, and cooperating with various social service agencies, law enforcement bodies and interested groups regarding crime prevention programs and services.

1

6.     I am currently the Executive Director of Death Penalty Focus, a non-profit organization devoted to the abolition of the death penalty.  I am also currently a Senior Distinguished Fellow at the Chief Justice Earl Warren Institute on Law and Social Policy at the University of California-Berkeley.

7.     I have been involved in evaluations and needs studies for federal, state, and local correctional facilities, including jail needs studies for the Placer County Jail and for the cities of Kirkland and Bellevue, Washington.  I also participated in investigations of various civil rights complaints filed by ICE detainees confined in a county correctional facility in Pinal County, Arizona in 2011.  From 2007 through 2010, I was a member of a task force on the American Bar Association (ABA) Criminal Justice Standards on the Treatment of Prisoners.

8.     In the past seven years I have spoken at more than 60 meetings and conferences regarding correctional issues, and I have testified before the California State Legislature and Congress on at least 12 occasions.  I have also taught courses regarding corrections policy in California at Sonoma State University in 2009 and 2010 and through Stanford University's Continuing Studies program in 2011.

9.     In the last five years, I testified as an expert witness in the three-judge overcrowding trial in the *Plata v. Brown* and *Coleman v. Brown* cases.  *See Coleman v. Schwarzenegger*, 2009 U.S. Dist. LEXIS 67943, *aff'd sub nom. Brown v. Plata*, 563 U.S. ___, 131 S. Ct. 1910 (2011).  I was not compensated for that testimony.

10.    A complete description of my educational and employment background is set forth in my resume and curriculum vitae, which are attached as **Appendix A**.

11.    All of my positions with the CDCR included work with prisoners with mental illness.  While a correctional officer, one of my responsibilities was to escort prisoners to their mental health appointments.  As a supervisor in housing units, I was responsible for ensuring that correctional officers did the same.  As a correctional counselor, I advocated for inmates to be examined by mental health staff.  As a manager at San Quentin and at CDCR headquarters I worked with mental health staff and court-

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE

1  appointed personnel on the improvement of mental health care delivery both at San

2  Quentin and in the Department generally.

3    12.    During the early part of my career at San Quentin, the provision of mental

4  health services there was governed by the settlement agreement in *Marin v. Rushen*, rather

5  than by any orders of the *Coleman* court.  The *Marin* case came to a close while I was an

6  administrator at San Quentin, and we worked from that time forward to bring San Quentin

7  within the *Coleman* framework.  As a result, I am very familiar with the *Coleman* case and

8  requirements.

9    13.    I continued to work to improve mental health delivery within the prisons,

10  within the *Coleman* framework and more generally, while serving as Director,

11  Undersecretary, and Acting Secretary of the CDCR.  The extremely high prison population

12  during my tenure hampered our efforts in this regard.  For example, it was very difficult to

13  transfer inmates between prisons for appropriate and proper reasons, such as providing

14  more efficient delivery of services to inmates with similar care needs.

15  **II.    FOUNDATION FOR EXPERT OPINIONS IN THIS ACTION**

16    14.    I have been asked to provide an expert opinion in this matter.  I am being

17  compensated for my time spent preparing this declaration in this matter at a rate of $150

18  per hour or $1500 per day, and for any time spent testifying in this matter at a rate of $800

19  per half day or $1600 per day.

20    15.    My opinions, as detailed below, are based upon my years of correctional

21  experience, my review of documents provided to me, and an inspection of the facilities and

22  programs at San Quentin conducted on February 26, 2013.  A list of documents provided

23  to me by Plaintiffs' counsel is attached as **Appendix B**.  I also reviewed a number of

24  documents produced by Defendants subsequent to my site inspection, including copies of

25  CDCR form 114a custody logs for 20 inmates, classification call sheets for a sample of

26  condemned inmates who are participants in the Mental Health Services Delivery System

27  (MHSDS), and classification and Rules Violation Report (RVR) documents copied from

28  seven of the ten central files that I reviewed while at San Quentin.

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO TERMINATE

1

2      16.     The photographs attached as **Photo Exhibits A, B and C**, and explained

3  below, were taken during my site inspection by a uniformed San Quentin custody officer

4  of locations within the prison that I personally visited and viewed.

5      17.     During my inspection of San Quentin, I spoke with a number of correctional

6  administrators, clinical staff, and line correctional officers, sergeants, and lieutenants.  I

7  also conducted confidential interviews with four inmates who are participants in the mental

8  health delivery system, as well as one non-confidential interview with an inmate during

9  which two custody officers remained present, and one cell front interview.

10  **III.     EXPERT OPINIONS IN THIS MATTER**

11      **A.     The Unique Needs of Condemned Inmates**

12      18.     At the time of my site inspection, there were currently 691 condemned

13  inmates housed at San Quentin in three main areas – the East Block, the Adjustment

14  Center, and North Segregation. It is also my understanding that several condemned

15  inmates are housed within the Correctional Treatment Center (CTC) on a permanent or

16  semi-permanent basis, either for medical reasons or as participants in the "Specialized

17  Care for the Condemned" mental health program.  I toured each of these areas during my

18  site inspection.  My overarching opinion with respect to the mental health needs of the

19  condemned population is that while there have been great improvements, the program

20  offered to the condemned inmates and the policies applicable to them are insufficient to

21  address their particular and unique concerns.

22      19.     I have reviewed Defendants' expert report prepared by Dr. Dvoskin,

23  Dr. Scott, and Dr. Moore, and was surprised to find that these experts did not speak to or

24  apparently even assess the adequacy of the mental health services provided to the

25  condemned population.  Defendants' experts' opinions regarding the excellence of the

26  CDCR's mental health screening, referral, and treatment systems entirely fail to take into

27  account the functioning of those systems with respect to the condemned population, which

28  is at high risk for mental health problems.   It is my understanding that Defendants' experts

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO TERMINATE

1   conducted a two-day site inspection of San Quentin, including of the units where

2   condemned prisoners are housed.  It is also my understanding that Defendants' experts

3   were asked not to assess the Specialized Care for the Condemned program, which I

4   understand to be a major feature of the mental health program offered to the condemned

5   population.

6       20.     Condemned inmates present unique custodial challenges that can complicate

7   their mental health status and treatment process.  Condemned inmates have even less

8   control than the general prison population over their housing assignments, their

9   programming options, and certainly their lengths of stay in prison.  All of these factors are,

10  in my experience, significant mental health stressors.  In order to adequately address their

11  mental health needs, custody and mental health staff must work closely together to develop

12  and operate an effective, coherent program that proactively addresses these unique

13  custodial challenges.

14      21.     On the headquarters level, I experienced during my tenure at San Quentin

15  and at the CDCR a systematic failure to properly account for the needs of those on death

16  row.  I saw no evidence during my present review to indicate that this problem has been

17  ameliorated.  For example, I reviewed a COMPSTAT data report containing information

18  about inmate characteristics, disciplinary incidents, appeals data, and programming

19  participation, all of which in my experience was critical to appropriate management of the

20  institution.  The report did not identify inmate numbers delineated according to the three

21  distinct missions of San Quentin (Reception Center, Condemned, and General Population).

22  It also failed to provide any usable information about the numbers of condemned inmates

23  who are classified as Grade A (in my experience, a designation meaning that those inmates

24  are given as many privileges as possible, similar to general population inmates, despite

25  remaining in high-security housing) or Grade B (a designation meaning that those inmates

26  are given limited privileges and for custodial purposes treated in a manner similar to

27

28

5

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO TERMINATE

administrative segregation or security housing unit (SHU) inmates).[1]  In the absence of this data, it seems very difficult if not impossible to make appropriate decisions about the condemned population, including decisions about the provision of space and staffing sufficient to properly manage their mental health needs.

22.      On the institution level, my conversations with institution staff throughout the course of my inspection reflected a consistent failure to appropriately consider the unique nature of death row in institution decision-making.  For example, North Segregation houses Grade A condemned inmates and permits them to mingle with one another in open areas of the tiers for several hours a day.  It is quieter and, from a custodial perspective, more open than East Block or the Adjustment Center, and thus is widely considered the most desirable housing location for condemned inmates.  However, when I visited, I was informed that there are no MHSDS inmates housed in North Segregation. There does not appear to be a specific institutional policy preventing MHSDS inmates from being housed in North Segregation; however, it is clear that inmates believe this to be the policy and believe that if they are diagnosed as needing mental health care, they will be moved away from North Segregation.  This is a significant disincentive that very likely could preclude an inmate from seeking necessary care, and one that San Quentin has evidently made no effort to address.  It is also my understanding that North Segregation inmates are not provided with regular monitoring of their mental health status by either custody or mental health staff.  That is, they do not receive the regular casual custodial contact that non-segregation inmates receive, because the unit is designed to maintain physical barriers between inmates and staff.  This type of contact is important as it allows custody staff to monitor inmates for signs of mental health deterioration.  Nor do inmates

---

[1] The distinction between Grade A and Grade B inmates also affects their level of mental health monitoring, as it is my understanding that Grade A, non-MHSDS condemned inmates housed in East Block and North Segregation receive mental health staff rounding only twice per month, even though those units are for other purposes considered segregated housing units.

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE

[755648-1]

in North Segregation receive the frequent mental health rounding and cell front status checks required for segregation inmates, because as I was informed while visiting the unit, mental health staff perform rounds there only twice per month.  Therefore, the opportunities for mental health staff to monitor these inmates for signs of deterioration are very limited.

23.     It is also my opinion that new arrivals on death row should be closely monitored for signs of mental health deterioration or crisis.  I was informed during my site inspection that there were three newly-condemned inmates who had recently arrived at San Quentin and who were all housed in the Adjustment Center.  Staff in that housing unit were not able to immediately identify those individuals and did not appear to have made any particular provisions for monitoring them.  I was also informed that none were *Coleman* class members, but it was unclear whether mental health screening had yet occurred for those individuals.  It is my experience that newly-condemned inmates often experience extreme mental health distress and suicidal ideation.  The lack of a specific protocol or practice for monitoring of such inmates reflects the lack of an organized plan for the mental health screening and treatment of condemned inmates that takes their unique circumstances into account.

24.     With respect to inmates who have spent many years on death row, San Quentin does not appear to have a coherent way to regularly assess whether those inmates are experiencing mental health deterioration.  It is my understanding that the average length of stay on California's death row is 25 years.  Condemned inmates do not transfer between prisons in the way that other inmates do over the course of this long incarceration, nor do they routinely experience changes in custody status of the sort that would trigger mental health evaluations for non-condemned inmates.  As a result, they are not regularly re-evaluated for their mental health needs.

25.     During my tenure at San Quentin, I worked with Dr. Ponath, a senior San Quentin mental health staff member, to establish a system and a schedule to complete a mental health evaluation of every condemned inmate.  This systematic reassessment was

1    conducted in late 2003 or early 2004, and to the best of my knowledge, was the last such
2    complete mental health reassessment of every condemned inmate.  I was surprised to learn
3    during my site inspection that regular mental health screenings of condemned inmates who
4    are not currently participants in the mental health delivery system are not provided.

5         26.    During my visit to San Quentin, I was provided with data indicating that only
6    25 of 691, or 3.6%, of the condemned population are receiving mental health services at
7    the Enhanced Outpatient Program (EOP) level of care.  This seemed significantly lower
8    than I would expect based upon my experience working with condemned inmates, whom I
9    found to be substantially more prone to severe depression and other mental health
10   problems than the general prison population.  Although an additional 156 condemned
11   inmates are reportedly receiving mental health services at the Correctional Clinical Case
12   Management System (CCCMS) level of care, the low percentage of EOP inmates
13   indicates to me a serious problem with under-assessment of condemned inmates' mental
14   health needs.

15        27.    Separate from any generalized assessment program, during my site
16   inspection, I inquired of staff how they monitor condemned inmates for mental health
17   deterioration.  The answers I received indicated that there is informal monitoring by
18   custody staff but that there is no regularly conducted screening or testing.   I was also
19   informed that there are no written protocols requiring mental health assessment of inmates
20   whose behavior I would consider a mental health "red flag," for example, inmates who
21   refuse to attend yard or take showers on a regular basis.

22        28.    I reviewed CDCR form 114a custody logs in each of the housing units we
23   visited where MHSDS inmates were housed.  Custody officers are required to record
24   detailed information on the 114a log regarding all services as well as regular and
25   significant daily activities offered for each inmate in segregated housing conditions,
26   including those on death row.  During my tenure at San Quentin, I relied upon these logs to
27   assess whether inmates were receiving adequate yard time, whether custodial staff on
28   particular units were adhering to policies regarding yard and shower offerings, and

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO TERMINATE

1   whether particular individuals were refusing to leave their cells.  I consider the 114a logs

2   to be the best and most accurate source of information about the daily activities of inmates,

3   including about abrupt changes in particular inmates' usual patterns that may reflect

4   mental health issues.

5       29.     Many of the 114a logs that I reviewed during my February inspection did not

6   demonstrate that adequate yard time had even been offered to the particular inmates, and

7   many of the logs reflected alarmingly high rates of refusals of yard time and/or showers.

8   On East Block in particular, many 114a logs spanning the three weeks prior to my

9   inspection did not contain *any* documentation of offered yard time at all. I also saw in the

10  114a logs many examples of inmates whose pattern of yard and/or shower refusal would

11  have lead me to refer them for mental health assessment had I encountered them while

12  working at San Quentin.

13      30.     Subsequent to my site inspection, Defendants produced expanded samples of

14  the 114a logs for my review.  Attached as **Exhibit 12 to the Confidential Declaration of**

15  **Jane Kahn Filed under Seal** are the 114a logs for one inmate whose records were

16  produced in that sample, whom I understand to be a participant in the MHSDS system at

17  the CCCMS level of care.  This condemned inmate was housed in East Block from the

18  beginning of the logs produced (October 5, 2012) through February 12, 2012.  There is no

19  documentation that this inmate attended *or was even offered* yard of any kind from

20  October 5, 2012 through February 12, 2013.  As noted in the 114a log instructions, offered

21  and refused yard time should be recorded in Column 2 of each sheet.  In addition, during

22  this entire four-month period, the 114a logs reflect that this inmate showered only five

23  times.  He also frequently refused cleaning materials for his cell.  Beginning on December

24  30, 2012, this inmate began to refuse meals and trash pickup on a near-daily basis, but was

25  not seen by mental health staff for more than a week.  After he was "cleared" by mental

26  health staff on January 7, 2013, this inmate continued to refuse meals, trash pickup,

27  showers, and cleaning supplies throughout January and February.   This inmate then had to

28  be forcibly extracted from his cell on February 12, 2013 because he would not submit to

9

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO TERMINATE

having his vital signs taken for purposes of monitoring an influenza outbreak in East Block, according to other documents produced by Defendants that I have reviewed.  He was then transferred to the Adjustment Center where the 114a logs document his continued refusals of yard time and showers.  He also refused to be interviewed by me during my site inspection, according to staff in the Adjustment Center. This is an excellent, if dreadful, example of the utility of the 114a logs in detecting mental health deterioration by death row inmates.  It is my opinion that this inmate should have been transferred for mental health evaluation immediately following the forcible cell extraction, and that his activities as reflected in the 114a logs from the Adjustment Center indicate that he remains in urgent need of a referral for mental health evaluation.

31.     I selected several individuals to interview based on the information contained within their 114a logs related to rates of yard and shower refusal.  Many, if not all, of the individuals to whom I spoke appeared to me to be in need of higher levels of mental health care than they were receiving. For example, I spoke with a condemned inmate, currently housed on East Block, who identifies as a transgender woman.  This Caucasian individual, who appeared to be in her early 30s, had long hair and a feminine presentation.  She was willing to engage with me about her mental health care and status.  She reported to me that she does not attend group yard because of safety concerns, which I believe may relate to her transgender status and feminine appearance.  I reviewed documents in this inmate's central file which indicated to me that she was removed from assignment to a group yard on August 8, 2012 pending an investigation of her safety concerns, and that the investigation remained ongoing as of October 24, 2012.  Inmates with safety concerns or those who cannot participate in group yards attend yard in walk-alone yard cages. Attached as **Photo Exhibit A** to this declaration is a photograph of a walk-alone yard space on the "yard side" of East Block.  This inmate reported to me that in lieu of appropriate accessible out-of-cell activities, she spends up to 10 hours per day pacing in her cell.  My review of this inmate's central file and mental health records, which reveal a history of mental health crisis bed stays, hunger strikes, concerns about her high risk of

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE

[755648-1]

1    self-mutilation, and suicide attempts, indicate to me that although this inmate is designated

2    as being at the EOP level of care, she is in need of a higher level of mental health care than

3    can be provided at San Quentin.  I would have referred her for an evaluation regarding her

4    need for such care had I encountered her while working at San Quentin.

5         32.     I spoke with another condemned inmate in East Block who reported that he

6    goes to yard only about one time per month, and only to the walk-alone yard space as

7    pictured in **Photo Exhibit A**.  As this space is under a roof, this inmate reported to me that

8    he sees the sun only about once a week for about five minutes at a time when he goes to

9    mental health groups in the Correctional Treatment Center (CTC), a hospital building

10   located near East Block.   This Hispanic individual who appeared to be in his late 40s

11   seemed to be very seriously depressed with a troubling flat affect.  He was willing to speak

12   with me, but offered very short and non-elaborative answers.  My review of this inmate's

13   central file indicated that he is assigned to a walk-alone yard space by his own request, and

14   that he has a history of reported suicidal ideation and inpatient hospitalizations.  Although

15   his mental health records indicate he is designated as being at the EOP level of care, I

16   would have referred him for an evaluation regarding his possible need for a higher level of

17   care than can be provided at San Quentin had I encountered him while working at San

18   Quentin.

19        33.     During my tenure at San Quentin I found that condemned inmates routinely

20   failed to attend their classification hearings, which are conducted approximately every 90

21   or 120 days, or more frequently if circumstances warrant.  An inmate's failure to

22   participate in classification committee hearings eliminates an important source of

23   information regarding an inmate's mental health status, and further contributes to the need

24   for an organized program of periodic re-assessment of condemned inmates' mental health

25   needs.  I reviewed 10 central files of condemned inmates with serious mental illness during

26   my site inspection, all of whom are currently or were previously identified to Plaintiffs'

27   counsel as participants in the Specialized Care for the Condemned Program, and it appears

28   to continue to be the case that condemned inmates do not attend their classification

11

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO TERMINATE

1   hearings.  For example, I reviewed the central file of an inmate who has, based upon the

2   documentation provided to me, not attended a classification committee hearing since

3   August 5, 2004.  In the intervening years, the classification committee has discussed him

4   in absentia approximately 22 times.  A second inmate apparently has not attended a

5   classification committee hearing in more than five years, since August 16, 2007.  A third

6   inmate has not attended a hearing in nearly five years, since May 22, 2008.  Another

7   inmate has attended his classification committee hearing only twice since August 2006, in

8   July and September 2009.  He has thus apparently not attended a classification committee

9   hearing in more than three years.

10       34.    Further, although I did not review the central files of condemned inmates not

11  already identified as *Coleman* class members, it is my experience that many condemned

12  inmates who are not identified as requiring mental health services do in fact require such

13  care.  In the absence of any comprehensive program of re-assessment and in the absence of

14  an inmate's participation in classification committee hearings, there appears to be no

15  adequate mental health screening mechanism in place on death row.

16       **B.     Crowding and Staffing in Units for the Condemned**

17       35.    I testified before the three-judge court that, in my opinion, at least five

18  percent of housing within a prison or system should be vacant in order to manage the

19  movement of prisoners appropriately.  This remains my opinion.  Without a five percent

20  vacancy rate, it is very difficult to permit movements of prisoners so as to ensure

21  appropriate housing and delivery of medical and mental health care.

22       36.    I am aware that in April 2011, the Governor announced that he was

23  cancelling a long-planned project to construct a new housing facility for condemned

24  inmates.  According to documents I have reviewed, this project would have provided

25  housing for 1,152 condemned inmates and added visitor, medical, and mental health

26  facilities to accommodate the needs of that inmate population.   My understanding is that

27  the project was cancelled for budgetary reasons.  To my knowledge, no subsequent plan or

28  proposal has been put forth to properly accommodate California's rapidly growing death

1   row population.

2        37.    At the current time, there is insufficient capacity to appropriately house the

3   growing condemned population within the units currently used for that purpose.  I was

4   informed during my site inspection that there are seven cells remaining among the non-

5   segregation units housing condemned inmates.  It is my understanding that San Quentin

6   receives an average of two newly-condemned inmates per month.  Thus, in approximately

7   four months, the condemned population will exceed the cell space set aside for it.

8        38.    I was informed during my inspection that a plan has been submitted to

9   CDCR Headquarters to allow the expansion of the condemned population into D (Donner)

10  section, which I understand to be currently housing general population inmates.  Plaintiffs'

11  counsel requested a copy of such a proposal, to the extent that any exists in writing, and

12  did not receive any documentation thereof.  In my experience, even if such a proposal is

13  currently pending at the Headquarters level, it will take longer than three months to

14  adequately convert D section to housing suitable for the condemned and to hire, or retrain,

15  staff sufficient to operate D section as condemned housing.  It is also my recollection that

16  there are no office spaces within D section that would be suitable for use either by mental

17  health staff or for mental health treatment, which would require additional custody staff to

18  routinely transport inmates from that area to the CTC for mental health care.

19       39.    It is also my opinion that there appears to be inadequate physical space

20  within the existing condemned housing units to provide appropriate recreational activities

21  that, in my experience, are critical to the maintenance of long-term mental health stability.

22  For example, I was told that the walk-alone area on the "yard side" of East Block is used

23  both for EOP recreational therapy and other groups, and for exercise time for inmates who

24  require a higher-security yard.  I was not provided with any documentation of an organized

25  plan and schedule permitting both uses to be carried out in a manner that allows adequate

26  time for both.

27       40.    Inmates who attend open group yards on the "bay side" of East Block

28  reportedly have to choose between yard time and attendance at scheduled treatment

13

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO TERMINATE

1    activities, because they are required to remain out on the yard for the entire four hours they

2    are scheduled to be there without regard to other appointments.  The "bay side" group

3    yards are also reportedly extremely crowded, with over 50 inmates using one small section

4    of the yard at a time.  Attached as **Photo Exhibit B** is a photograph of one of the group

5    yards on the "bay side," and reflects the paucity of space available for the use of such a

6    large number of inmates.

7           41.    Generally speaking, there did not appear to be enough yard space across the

8    units housing condemned inmates to accommodate all of those inmates.  During my tenure

9    at San Quentin, Grade A condemned inmates received up to six hours of yard time a day,

10   seven days a week.  I was informed during my site inspection that condemned inmates on

11   group yard are offered yard time every other day for up to four hours and that condemned

12   inmates assigned to walk-alone yards are offered up to 10 hours of yard time per week, but

13   the 114a logs that I reviewed do not support this.  Based on my understanding of the

14   various uses to which the walk-alone yards are put (for exercise, for therapeutic groups,

15   and for recreational therapy groups), and on the numbers of inmates assigned those yards,

16   there does not appear to be adequate space for every inmate who is assigned to attend the

17   walk-alone yards to actually do so.  I was also informed that inmates as a matter of practice

18   are not permitted to re-enter the housing unit once they have exited for yard time, which

19   can be a significant disincentive for inmates assigned to spend four hours in the sunless,

20   bare, concrete-floored walk-alone cages that precludes them from attending the yard at all.

21   I reviewed extensive documentation on the units in the form of CDCR form 114a logs, as

22   detailed in Paragraphs 28 and 29 above, from which it appears that yard time is frequently

23   not even offered to condemned or administrative segregation inmates.

24          42.    In addition to the inadequate physical space on San Quentin's yards, there

25   appeared to me to be insufficient resources available on the yards to allow for adequate

26   and appropriate programming.  I spoke with a recreational therapist during my visit who

27   was conducting a group activity among inmates who were using separate walk-alone

28   cages.  He informed me that San Quentin's recreational therapists must purchase at their

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO TERMINATE

1  own expense equipment—in this case, a board game set—for use in their programs.  I also

2  observed on the group yards that there is very little seating, and was told that one inmate

3  was permitted to carry a bucket out to the yard as an accommodation for his mobility

4  impairment.  As noted above, inmates are not generally permitted to re-enter the housing

5  unit once they have exited for yard; the limited resources available on the group yards can

6  be a disincentive that precludes the increasing number of older and mobility-impaired

7  inmates from accessing any yard time at all.

8          43.      It also remains my opinion, as at the time of my prior testimony before the

9  three-judge court, that adequate numbers of custodial staff are necessary to provide

10  prisoners with timely access to medical and mental health care.  Custody staff are required

11  to escort inmates to mental health services, not only for routine appointments but also

12  when inmates are in need of emergency or urgent treatment.  In addition, custody staff play

13  a crucial role in alerting mental health providers when prisoners are experiencing mental

14  health deterioration or crises.  It is essential to the well-being and indeed the survival of

15  prisoners with mental health needs that custodial officers perform these functions.  I was

16  informed by one lieutenant with whom I spoke during my site inspection that the new

17  standardized staffing model does not provide San Quentin with sufficient custodial staff to

18  meet its needs.  I was also concerned to discover during my visit that, although it is my

19  understanding that the EOP administrative segregation "hub" at San Quentin is scheduled

20  to close in the near future, staff at the institution seemed unaware of this pending closure

21  and were unable to speak to its ramifications for custody staffing in the institution as a

22  whole.  I have also reviewed documents indicating that there is no dedicated mental health

23  staffing for condemned inmates as a whole, and certainly insufficient mental health

24  staffing for the specialized care program.

25          C.      The Specialized Care Program

26          44.      I was asked to review the Specialized Care for the Condemned program that

27  is purportedly offered to treat the mental health needs of certain condemned inmates at San

28  Quentin. My understanding is that the inmates in the program are those deemed in clinical

[755648-1]

15

need of greater than EOP level of care and/or in need of inpatient mental health care.  My understanding is that CDCR's policy is that condemned inmates may not be transferred to DSH (Department of State Hospitals) intermediate care facility (ICF) inpatient care.

45.     First, the program as it is currently in operation is too nebulous to fully evaluate its functionality from a custody perspective.  I was given a brief tour of the beds set aside within the CTC for this program, and I believe that it could operate effectively given appropriate trained staffing and resources.  However, I saw no evidence that such staffing has yet been designated or trained.  I inquired as to whether there was adequate staffing and was told in vague terms that there was "enough," but was not offered any specifics.  For example, I was told by an institution psychiatrist that inmates housed in the CTC for purposes of the Specialized Care Program would have access to yard space on East Block for treatment groups and for exercise.  But transporting inmates to East Block for these purposes would require significant custodial staff time and effort, and I neither saw nor was told of any evidence of a staffing plan that would permit such yard usage.

46.     I have reviewed an August 15, 2011 status report prepared by San Quentin staff regarding the provision of care to participants in the Specialized Care program, as well as several other status reports and memoranda regarding the program.  All of the memoranda I reviewed reflected serious concerns regarding the role and participation of custody staffing in implementing an effective specialized care program for condemned inmates.  Most troublingly, the August 15, 2011 memorandum, attached as **Exhibit 13 to the Sealed Declaration of Jane Kahn**, indicated that for approximately two weeks, little to no mental health services were provided as a result of an unexplained conflict between custody and mental health staff regarding scheduling of activities.  In my experience, it is extraordinary for institution staff to have prepared a memorandum of this nature, and the events recounted herein reflect a serious breakdown in protocols and expectations.  Subsequent documents indicated that this had been resolved, although did not specify in what manner or whether steps had been taken to prevent a recurrence of the issue.  I also reviewed documents indicating that institutional staff has long been aware of the need for

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE

[755648-1]

1   increased custody and mental health staffing for the specialized care program, and has

2   gotten little to no support from headquarters in securing that staffing.  It is troubling to me

3   that more than 18 months subsequent to the August 15, 2011 memorandum, San Quentin

4   was still unable to provide specifics regarding the custody staffing or protocols for the

5   specialized care program.  This is another aspect in which the program, as it exists today,

6   is too vaguely defined to be properly evaluated.

7          47.    Second, in my opinion, there is no custodial justification for a categorical

8   ban on transferring condemned inmates to intermediate inpatient care at appropriate, high-

9   security DSH facilities, such as those located inside of Salinas Valley State Prison (SVSP)

10  or California Medical Facility (CMF).  Instead of the blanket ban currently imposed to

11  prevent condemned inmates from accessing care, a policy requiring individualized

12  assessment of the mental health needs and security concerns of each individual prior to

13  transfer for ICF care should be developed and implemented.  Such an individualized

14  assessment should consider case-specific factors such as age, disability, legal status, and

15  disciplinary history.  It is my opinion that were such an assessment conducted of the

16  individuals currently receiving "specialized care" at San Quentin, many if not all would be

17  deemed both in need of a transfer to ICF care and suitable for such a transfer from a

18  custodial perspective.

19         48.    Part of such an individualized assessment would likely be to examine the

20  Rules Violation Report (RVR) histories of each of the individuals, which in my experience

21  provides a window as to their overall level of security risk.   I reviewed ten years of RVR

22  histories for ten individuals whom I was told were either presently or previously on the list

23  of participants in the Specialized Care Program, and saw nothing in these histories

24  supporting the conclusion that these individuals could not be safely transferred to ICF care

25  if in need of such care.  For example, one of the individuals has had only one RVR in his

26  more than 25 years on death row, which he received when he was the victim of an assault

27  in 1987.  Another individual had no RVR more recent than 1995, and that for a non-violent

28  offense (the destruction of a blanket in his cell); a third individual had no RVR more recent

[755648-1]

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO TERMINATE

1   than 1999, and that for failing to maintain an acceptable level of hygiene in his cell – often

2   a key indicator to custody staff that an inmate is experiencing mental health deterioration.

3   A fourth individual, whose central file contained many documents regarding hunger strikes

4   and generally reflected a serious need for mental health care, did not have any RVRs at all.

5   None of these individuals present risks greater than those of Level IV high-security non-

6   condemned inmates who are routinely permitted access to ICF programs.  Even the

7   individual with the most recent RVRs, from 2009 and 2011 for racially-charged outbursts

8   directed at staff, appeared to me to be an individual in need of significant mental health

9   intervention, and not an individual too dangerous to receive such care.  A second

10  individual received an RVR in 2009 for delaying a peace officer after he reported suicidal

11  ideation.  Again, every indication is that this inmate requires a very significant level of

12  mental health care and should, at the very least, be carefully assessed regarding his need

13  and suitability for inpatient care.

14       49.     It is my experience and understanding that condemned inmates are routinely

15  transferred from San Quentin to various community facilities for medical care.  In my

16  opinion, if these transfers are possible and routinely managed from a custodial perspective,

17  there should be no custodial bar to effecting similar transfers to high-security DSH

18  facilities.  In addition, I am aware that condemned inmates are permitted to transfer to

19  DSH facilities for acute care when necessary, and are able to participate safely in

20  established DSH acute psychiatric programs (APP) at CMF.

21       50.     It is my opinion that, from a custodial perspective, condemned inmates could

22  also participate safely in established ICF programs at CMF.  I am generally familiar with

23  the facilities and security arrangements at CMF, and believe that it is capable of safely

24  managing condemned inmates in need of ICF care.  I am also informed that there are

25  unused spaces within the "L Wing" at CMF; it is my opinion that one such space could be

26  safely used, with appropriate physical modifications, planning and staffing, to provide

27  inpatient programming to condemned individuals if the CDCR determined them to require

28  a segregated unit.

[755648-1]

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO TERMINATE

51.     I am informed that various CDCR personnel, including Secretary Beard during his deposition, expressed opinions to the effect that condemned inmates often prefer to remain on death row in their so-called community, and that this is offered as a justification for refusing to transfer condemned inmates for ICF care.  Ultimately, any decisions about whether a condemned inmate is transferred to ICF care should be based upon his need for such care and not upon staff's views of his preferences.

## IV.    OTHER OPINIONS REGARDING MENTAL HEALTH CARE DELIVERY AT SAN QUENTIN

### A.     The Adjustment Center

52.     During my inspection, I also reached a number of conclusions about facilities and programs at San Quentin that are used by both condemned and non-condemned *Coleman* class members.

53.     I visited the Adjustment Center, where it is my understanding that both condemned and non-condemned administrative segregation inmates are housed.  Within the Adjustment Center, I visited a group room that was dirty and crowded with treatment cages, some of which were rusty.  A photograph of three of the cages in this group room is attached as **Photo Exhibit C** to this declaration.  The room, which I was informed is also used as a law library, appeared to lack appropriate and safe exits, and generally seemed to be an unsafe space for both inmates and staff.  In my experience, conducting group treatment in such an environment would be a deterrent both to the institution's ability to staff the program, and to inmates' willingness to participate in treatment.

54.     I was also informed by a senior psychiatrist who accompanied me on my inspection that groups held in the Adjustment Center have neither a settled and predictable mental health staff member leading the group, nor a regular roster of inmates attending the group.  It is my experience that inmates with mental health needs are most likely to attend group treatment if they know both who will be leading a particular group and who else will be attending.  The policy or practice of providing stability in neither respect to inmates in the Adjustment Center is a deterrent to their accessing needed mental care.

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE

[755648-1]

55.     I was also very concerned that in the Adjustment Center, three inmates refused to come out of their cells when I requested to interview them.  I selected these inmates to interview based upon the high rates of yard and shower refusals reflected in their 114a logs.  One such high-refusal inmate who was willing to come for an interview, held non-confidentially with custody staff remaining in the room, appeared to be openly paranoid and delusional.  In spite of his clean appearance, this African-American individual expressed a variety of delusions, including that he was being subjected to some kind of electroshock therapy in his housing at the Adjustment Center.  I also found it unusual that the presence of custody staff in this interview did not preclude this inmate from openly expressing his delusions.  My conversation with him highlights that there can be a discrepancy between an inmate's outward appearance and his actual mental health status, and emphasizes the need for regular assessment of individuals who do not routinely leave their cells.  I was told, and this inmate's health records confirm, that he is CCCMS.  Had I encountered him while working at San Quentin, I would have referred him for a mental health evaluation as a very likely candidate for a higher level of care.

56.     While in the Adjustment Center, I observed a prominent sign stating that "all inmates must be 'stripped out' upon return from any appointment held outside the" Adjustment Center, including mental health appointments.  I understand this to mean that Adjustment Center inmates are subject to strip searches after returning from, *e.g.*, the CTC where many mental health appointments and groups are held.  In my opinion, this policy may create a deterrent to care for some inmates and, while it may be necessary in the case of individuals housed in the Adjustment Center as a result of legitimate security concerns, need not necessarily apply to every Adjustment Center inmate.  The blanket application of this policy to every inmate housed in the Adjustment Center, regardless of an individual's actual security risk, is a further negative ramification of the fact that the condemned housing units are operating at levels of crowding that preclude custody staff from making individualized housing and security decisions, and that the Adjustment Center is housing more different types of inmates with various custodial needs than can be properly

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE

[755648-1]

1    managed.

2        57.    I am aware that it is currently CDCR policy to provide 30 minute wellness

3    checks for individuals in administrative segregation, such as the Adjustment Center, only

4    for the first 21 days that an individual is in administrative segregation.  I have reviewed the

5    Declaration of Walter Kautzky, filed in 2006 in this matter, and agree with his position,

6    which is also the standard of the American Correctional Association, that all administrative

7    segregation inmates should be observed by a correction officer at least every 30 minutes.

8    *See* Declaration of Walter L. Kautzky in Support of Plaintiffs' Objections to Defendants'

9    Plan to Address Suicide Trends in Administrative Segregation Units, Oct. 31, 2006,

10   Docket No. 2012.  I am informed that Defendants' experts Dr. Joel Dvoskin and Dr. Jackie

11   Moore also endorsed this position during their depositions in this matter.  In particular, I

12   agree that 30 minute welfare checks permit the identification of mental health and

13   custodial crises before they escalate, and that they permit the faster identification and

14   prevention of suicide attempts.  It is my understanding that current CDCR policy requires

15   such checks only within the first 21 days of an inmate's confinement to administrative

16   segregation; CDCR should expand 30 minute welfare checks to all administration

17   segregation and condemned inmates without delay.

18       **B.    The Mental Health Assessment Process in RVR Adjudications**

19       58.    I observed a complete RVR adjudication hearing for one individual, and part

20   of a hearing for a second.  Both individuals were non-condemned inmates housed, to my

21   understanding, in Carson section, an administrative segregation unit.

22       59.    In the case of the complete RVR hearing that I observed, the inmate had

23   received the RVR for refusing a transfer from administrative segregation to general

24   population housing and will now be referred to classification with a recommendation for a

25   SHU term, after having been found guilty.  A mental health assessment had been

26   conducted for this CCCMS prisoner but, in my opinion, did not provide any helpful

27   substantive input.  The inmate's reasons for refusing the transfer were unclear and were

28   apparently not explored by mental health prior to the hearing or by the adjudicating officer

[755648-1]

1   at the hearing, but in my experience, inmates with mental health issues often view transfers

2   to mainline housing and to shared cells with great, if resolvable, trepidation.  It would have

3   been helpful to have had more substantive input from mental health and/or to have had his

4   mental health clinician at the hearing.  In my opinion, this is not an inmate who presents a

5   danger meriting an expensive SHU placement; his concerns about transfer to the mainline

6   at San Quentin could very likely have been addressed without resorting to use of limited

7   SHU resources as a punishment.  Following this inmate's probable SHU term (which may

8   be served at San Quentin due to a backlog in transferring inmates sentenced to SHU terms

9   or may require transfer to another facility), the issue underlying this RVR will have

10  remained unaddressed and unresolved.  It is thus very likely to result in subsequent

11  unnecessary RVRs.  I interviewed this inmate at cell front following the hearing, but was

12  not able to adequately explore this issue with him given the setting.

13      60.     During the RVR hearing time that I observed, another inmate refused to

14  attend the hearing for an RVR he had received for refusing to attend a mental health

15  appointment.  The hearing officer dismissed the RVR without input from the inmate.  I

16  received confusing information from the hearing officer about whether and how mental

17  health staff would follow-up on the refusal to attend the hearing.  Upon reviewing this

18  inmate's health records records, I became aware that he recently spent ten months in a

19  DSH inpatient program, and has only recently returned to San Quentin where he is housed

20  in administrative segregation.  The circumstances surrounding this RVR, the hearing, and

21  the lack of a clear protocol for follow-up following a refusal to attend the hearing do not

22  seem custodially appropriate to me for an inmate whose mental state is clearly quite

23  fragile.  Nor was it apparent why this prisoner was housed in administrative segregation

24  upon his return from a DSH psychiatric hospitalization.

25      **C.      Suicide Prevention / Emergency Response**

26      61.     I have reviewed the internal CDCR suicide reports for suicides completed at

27  San Quentin from 2010 through August 2012, a total of eight suicides.  I have the

28  following opinions regarding three of the suicides, which I found particularly problematic

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO TERMINATE

1  in various custodial respects.

2      62.    I have reviewed the report of an August 28, 2010 suicide by an inmate

3  housed in North Segregation, who apparently had no contact with mental health staff

4  between approximately 1990 and his death.  As discussed above in Paragraphs 24-26, I

5  find the lack of an organized screening program or process for long-term death row

6  inhabitants troubling.   In addition, this inmate's suicide was precipitated by the

7  commutation of his sentence to life without parole and his fears about moving to a general

8  population prison, which in my opinion should have triggered a mental health evaluation.

9  I was also very concerned to note the conclusion of the suicide reviewer that this inmate

10  was found in rigor mortis at least several hours prior death.  It is my understanding that

11  custody officers in North Segregation are required to check inmates' wellbeing at least

12  once per hour, which should have precluded this long interval between death and

13  discovery.

14      63.    I have reviewed the report of a November 17, 2011 suicide by a condemned

15  inmate housed on East Block.  The suicide report reflects that this inmate, who was

16  admitted to San Quentin in 1999, was seen only six times by mental health clinicians in

17  more than a decade on death row.  The last contact, approximately four months before the

18  inmate's suicide, concluded that he was not in need of further mental health services.

19  Again, I am concerned that San Quentin's lack of a protocol for the regular complete

20  evaluation of long-term condemned inmate's mental health states may have played a factor

21  in permitting this inmate to slowly deteriorate within intervention.  In addition, as in the

22  suicide reviewed above, this inmate was found in a state of rigor mortis indicating death

23  several hours before discovery, notwithstanding custody orders requiring hourly fire and

24  security checks on East Block.  The suicide reviewer questioned the veracity of

25  documentation reflecting the completion of such checks, given the inmate's condition upon

26  discovery.  I share that concern.

27      64.    I have reviewed the report of a May 27, 2012 suicide by a condemned inmate

28  housed on East Block.  The suicide report reflects that this inmate was a participant in the

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO TERMINATE

[755648-1]

1    MHSDS at the CCCMS level of care.  In my opinion, the suicide report does not

2    adequately assess the role that staff harassment may have played in this suicide.  The

3    inmate complained about a particular staff member harassing him and getting other

4    inmates to harass him, particularly following televised reports of his crime.  The inmate

5    was either delusional about this harassment or it was actually a problem; in either case, the

6    circumstances surrounding the allegation merit more investigation than they appear to have

7    received.  For example, the suicide reviewer does not appear to have looked for or

8    reviewed any CDCR form 602 appeals filed by this inmate about the alleged harassment.

9    It is also significant to me that the suicide reviewer noted that the inmate could not have

10   moved cells in order to get away from his harassers without finding another inmate with

11   whom to switch cells.   This is an effect of East Block's, and death row's, operation at full

12   capacity levels.

13        65.    I am more broadly concerned about the high number of appeals filed by

14   inmates at San Quentin that are "screened out," that is, not answered on their merits by

15   institution staff.  The COMPSTAT data that I reviewed in advance of my site inspection

16   indicated that in December 2012, 416 of 482 appeals, or approximately 86%, were

17   screened out.  In my experience, this indicates that there are a very significant number of

18   inmate concerns that are not being addressed, potentially including issues like the above

19   inmate's allegations of staff harassment.  It is also concerning to me that the number of

20   appeals even filed by inmates has dropped significantly, with 175 fewer appeals filed in

21   December of 2012 than in January of 2012.  This decline limits the information available

22   to staff regarding inmates' needs, including their mental health needs.

23        66.    I also reviewed the California Prison Health Care Services "Death Review

24   Summary" and related documentation for an inmate who died in the San Quentin CTC

25   MHCB unit while on 1:1 suicide watch on December 20, 2010.  The review concluded that

26   this was an unintentional overdose rather than a suicide.  I was gravely concerned about

27   the missing and incomplete reports from the individuals involved in the inadequate and

28   inexplicably delayed response to this inmate's need for emergency medical care.  In

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO TERMINATE

1   particular, it appears that the Certified Nursing Assistant (CNA) tasked with the 1:1

2   observation was the first to notice the inmate's serious medical condition, but that

3   individual did not sound a medical emergency alarm.  Instead, the CNA notified a

4   Registered Nurse within the unit, who notified a physician.  But the alarm was ultimately

5   not sounded until 10 minutes after a correctional counselor stated that someone needed to

6   see the inmate, and CPR did not commence for 24 minutes after that statement.  During my

7   tenure at San Quentin, the CDCR's rule was that any staff member who saw a medical

8   emergency was required to sound an alarm without delay.  I am informed that current

9   policy is that CNAs are not permitted to speak with inmates on suicide watch, which may

10  in part explain why the CNA did not investigate the inmate's status and sound an alarm.

11  In any event, this death reflects a dramatic failure on the part of CDCR staff to

12  appropriately respond to a serious medical emergency when one was experienced by

13  someone on suicide watch.

14

15      I declare under penalty of perjury under the laws of the United States and the State

16  of California that the foregoing is true and correct, and that this declaration is executed at

17  San Francisco, California this _14th_ day of March, 2013.

18

19                                      Jeanne Woodford
                                        _____

20                                      Jeanne Woodford

21

22

23

24

25

26

27

28

[755648-1]

EXPERT DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO TERMINATE

# PHOTO EXHIBIT A

SQ Walk-Alone Yard Space on the "Yard Side" of East Block



1

SQ   335

# PHOTO EXHIBIT B

SQ Group Yard Space on "Bay Side" of East Block



SQ  334

# PHOTO EXHIBIT C

SQ Adjustment Center: Treatment Cages in Group Room



SQ   329

# APPENDIX A TO DECLARATION OF JEANNE WOODFORD

*Jeanne S. Woodford*

*Post Office Box 732*
*Benicia, CA 94510*
*Home: (707) 746-1712*
*Cell: (707) 853-0928*
*E-mail:  jeannewoodford@comcast.net*

**OBJECTIVE**:        **Utilize my experience in criminal justice to improve public safety through evidence based practices and reform.**

**EDUCATION:**

*1974 - Associate of Arts Degree*
*Santa Rosa Junior College*
*Santa Rosa, California*
*Liberal Arts*

*1978 - Bachelor of Arts Degree*
*Sonoma State University*
*Rohnert Park, California*
*Criminal Justice, emphasis on Psychology and Sociology*

**CAREER EXPERIENCE:**

**11/10 to Present      Senior Fellow Berkeley Center for Criminal Justice**

Work on a variety of criminal justice projects. Provide leadership and assistance to Student interns engaged in criminal justice policy development.

**4/11 to Present        Executive Director Death Penalty Focus**

Death Penalty Focus
870 Market St. Suite 859
San Francisco, Ca. 94102

Provide leadership and management of Death Penalty Focus, a non-profit dedicated to the mission of ending the death penalty.

*5/86 to PRESENT      Correctional Consultant and Educator*

*Involved in volunteer and contract work to improve the criminal justice system.  I have been a guest speaker at UC Berkeley Law School, Stanford Law School, Stanford School of Public Policy, Santa Clara School of Law and various community groups.  I have written Op-Ed pieces and testified in front of US Congress and the California Legislature.  I have taught criminal justice classes at Sonoma State University and Stanford.  I am currently consulting on a federally funded Women's Reentry grant for the City and County of San Francisco.  I have served as an expert witness in death penalty cases.*

*11/06 to 05/08*          ***Chief Adult Probation Officer, San Francisco Adult Probation Department***

*Management and leadership of the San Francisco Adult Probation Department: I lead staff through a strategic planning process to establish the goals, values and mission of the San Francisco Adult Probation Department. Assisted staff with implementation of evidence based practices and began caseload management focused on successfully completing probation. I also meet with the Mayor, the Courts, the District Attorney, the Public Defender, the Sheriff and Community Groups to improve communication and the effectiveness of the Probation Department. Budget: Eleven Million Dollars.*

*07/05 to 07/06*          ***Appointed by Governor Arnold Schwarzenegger: Undersecretary of the California Department of Corrections and Rehabilitation (CDCR)***

*Responsibilities included leading major policy, program and organization change; representing the Administration before the Legislature, Department of Finance, and other state, federal, and local government, and constituent group. Provide administrative direction to all CDCR staff. Chaired the Corrections Standard Authority and the Prison Industries Board. I also lead efforts to bring accountability to the CDCR through data driven decision-making. I continued my efforts to advocate for rehabilitation and a sentencing commission for California. Budget: Eight billion dollars.*

*03/04 to 07/05*          ***Appointed by Governor Arnold Schwarzenegger: Director Department of Corrections***

*Responsible for the administration of 32 State prisons, 38 conservation camps, more than 185 parole units, and contracts with 50 public or private community-based facilities or centers. In this capacity, I served as the Chair, Prison Industry Board. As the Director I worked with the Secretary of the Agency to add Rehabilitation to the mission of the CDC. I also lead efforts to address conditions of confinement for inmates to include overcrowding, health care and mental health care. I advocated for the expansion of visiting for the incarcerated and their families. I also started the gender responsive commission to create policies and appropriate programs for women incarcerated in the CDC. Budget: Six billion dollars.*

*02/99 to 02/04*          ***Warden San Quentin State Prison***

*Responsible for the leadership and management of San Quentin State Prison. San Quentin has three primary missions: Reception Center, condemned housing, and a level II general population. Developed and implemented programs for prisoners including The Success Dorm; the first reentry program in a California prison. Budget: One hundred and ten million dollars.*

*08/97 to 02/99*          ***Chief Deputy Warden***
                          ***San Quentin State Prison***
                          ***San Quentin, CA  94964***

*Directly responsible for the day-to-day operation of San Quentin State Prison: 1,500 staff and a prisoner population of 5,800. Budget: $110,000,000*

*04/96 to 8/97*          ***Associate Warden, Correctional Facility***
                         ***San Quentin State Prison***
                         ***San Quentin, California  94964***

*Directly responsible for managing San Quentin's Central Services Division. Primary responsibility for perimeter security, yards, gates, wall posts, dining hall, Receiving and Release and visiting and mail programs. Additional responsibilities include the position of San Quentin's Equal Employment Opportunity (EEO) Coordinator. Managed a custody personnel budget of $56,000,000.*

*06/78 to 4/96*          ***Held a variety of positions within the California Department of Corrections to include: Correctional Officer, Correctional Counselor, Program Administrator and Captain. I was also the Litigation Coordinator for three years, which provided extensive experience with court compliance and monitoring.***

### *APPOINTMENTS:*

- *Walden House Board of Directors*
- *Prison Industries Authority Board Member (appointed by California Senate Rules Committee)*
- *Governors Leadership Institute*
- *Class A (non-alcoholic) Trustee with the General Services Board for Alcoholic Anonymous*
- *John Jay College of Criminal Justice Advisory Committee*
- *Governors Technology Services Board for the Department of technology Services*
- *Council on Mentally Ill Offenders (Chair)*
- *Correctional Standards Authority (Chair)*
- *Friends Outside Sacramento Chapter (Honorary Chair)*

## CURRICULUM VITAE OF JEANNE S WOODFORD

| DATE | TITLE |
|---|---|
| March 19, 2004 | California Judicial Council in Monterey - Speaker |
| April 21, 2004 | Senate Budget Sub 2 Committee Hearing - Speaker |
| April 22, 2004 | Briefing Director's Introduction Remarks Little Hoover Commission |
| May 4, 2004 | Opening Statement (Senator Romero) Hearing |
| May 5, 2004 | Assembly Oversight Hearing-Budget - Speaker |
| May 21, 2004 | Medal of Valor-California State Capitol- Speaker |
| June 1, 2004 | Joint Hearing Assembly Committee on Health - Speaker |
| June 8, 2004 | Friends Outside Annual Dinner-Keynote Speaker |
| June 23, 2004 | Confirmation Opening Remarks Senate Rules |
| June 28, 2004 | Statewide Training of Chief Probation Officers – Keynote Speaker |
| August 16, 2004 | Mule Creek State Prison Media Event with the Governor - Speaker |
| August 23, 2004 | NOVA Conference Speaker |
| September 13, 2004 | 5th Annual Centerforce Inside/Out Summit – Keynote Speaker |
| September 15, 2004 | League of Women Voters-Speaker |
| September 17, 2004 | Odyssey-Speaker |
| September 29, 2004 | Legislative Hearing "The Inmate Health Care Challenge:  Fixing a Broken System in Light of the Deukmejian Report" (Senate Select Committee on Government Oversight and Senate Select Committee on the California Correctional System) - Speaker |
| October 9, 2004 | California Judges Association Conference in Monterey-Panel w/Senator Jackie Speier |
| December 8, 2004 | Sonoma State University Perspective on the Future - Speaker |
| January 2005 | Article:  Managing Death Row – co-writer. Appeared in Managing Special Populations in Jails & Prisons text |
| February 8, 2005 | Senate Select Committee on the California Correctional System (Hearing on Racial Segregation in Prisons) – Speaker |
| February 23, 2005 | Sonoma County Peace Officer of the Year Banquet-Keynote Speaker |
| March 10, 2005 | Harvard University, John F. Kennedy School |

## CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| | of Government Forum-Panel on Corrections – Panel Member |
| March 16, 2005 | Forensic Mental Health Conference Speaker |
| DATE | TITLE |
| April 21, 2005 | Citizen's Advisory Committee Conference, Opening Remarks |
| April 23, 2005 | California Correctional Supervisor's Organization Keynote Speaker |
| April 24, 2005 | Hospitals & Institutions Conference Speech |
| May 12, 2005 | Alcoholic's Anonymous Volunteers in Parole Keynote Speaker |
| May 25, 2005 | Rehabilitation Conference Speaker |
| June 6, 2005 | National Institute of Corrections Faith-Based Conference. Washington D.C. – Speaker |
| June 14, 2005 | Friends Outside Annual Dinner Speaker |
| June 24, 2005 | Basic Correctional Officer Academy Graduation – Speaker |
| July 20, 2005 | California Youth Authority Medal of Valor – Speaker |
| July 27, 2005 | Channel City Club Keynote Speaker |
| October 17, 2005 | Educators Keynote Speaker-Lake Tahoe |
| October 20, 2005 | Employers Forum "San Diego County's Undiscovered Labor Resource" (Community Reentry Project) Keynote Speaker |
| October 21, 2005 | Basic Correctional Officer Academy Graduation – Speaker |
| January 25, 2006 | Little Hoover Commission (Sacramento) Opening Remarks |
| February 1, 2006 | Fire Chiefs Return to Work Coordinators Conference – Opening Remarks |
| February 2, 2006 | Senate Hearing "Have California's Prisons Been Rehabilitated" – Speaker |
| May 19, 2006 | Medal of Valor Speaker-California State Capitol |
| May 23, 2006 | Coalition of Alcohol and Drug Associations Public Policy Conference – Morning Speaker |
| May 27, 2006 | Sonoma State Commencement Exercises |
| June 8, 2006 | American Institute of Architects National Convention and Design Exposition – Speaker |
| August 2006 | Los Angeles Times article titled: "Why I quit the Prison System" |
| November 27, 2006 | Speaker at USC Annenberg Institute for Justice and Journalism |

# CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| February 4, 2007 | Article:  The Future of Prison Design featured in the American Institute of Architect's magazine |
| May 18, 2007 | Sonoma Learning – Sonoma State University Speaker |
| July 14, 2007 | Judicial Council of California Symposium – Speaker |
| July 17, 2007 | Sonoma State – Speaker |
| September 6, 2007 | Northern California Service League – 12th Annual Reentry Conference – Speaker |
| September 11, 2007 | Hastings Law School, San Francisco – Speaker |
| October 23, 2007 | Eighth Annual Inside/Out Summit – Critical Juncture – Innovative Solutions for Addressing the Impacts of Youth & Adult Incarceration in our communities – Speaker |
| November 2007 | Association of Women Executives in Corrections – Speaker |
| November 28, 2007 | White House Faith & Community Initiatives National Summit on Prisoner Re-entry – Speaker |
| January 23, 2008 | USC Annenberg Institute for Justice and Journalism – Speaker |
| March 4, 2008 | Center for Collaborative Solutions (CCS) Annual Labor Management Conference – Presenter/Speaker |
| March 14, 2008 | UC Berkeley – Violence Conference – Speaker |
| March 15, 2008 | USF – Symposium – Solutions for California Prisons – Speaker |
| March 31, 2008 | John Jay College of Criminal Justice – Speaker |
| April 22, 2008 | Testified before the US Subcommittee on Crime, Terrorism, and Homeland Security in support of revising the Prison Litigation Reform Act |
| May and June 2008 | Review and audit of the San Mateo Youth Services Center following and escape of a youth facing an adult trial as an adult |
| September 24, 2008 | Testified before the California Legislative Subcommittee in support of Proposition 5 |
| October 7, 2008 | Centerforce Summit Forum panel participant, Rohnert Park California |
| October 10, 2008 | Berkeley Law Center Conference panel |

## CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| October 2008 | Signed rebuttal to argument in favor of Proposition 9 for the California General Election official voter information guide |
| November 6, 2008 | American Institute of Architects speaker regarding design influence on corrections |
| November 8, 2008 | Panel participant with American Institute of Art and Design discussing the influence of Architectural design on criminal justice reform |
| January 2009 | Appointing to the Prison Industries Authority (PIA) Board by Senate Rules |
| February 3, 2009 | Testified as an expert before the Federal Three Judge Panel regarding the impact of overcrowding on health care and mental health treatment. |
| February 27, 2009 | Speaker Berkeley Criminal Justice Forum |
| March 9, 2009 | Speaker Sonoma State University Criminal Justice Forum |
| March 19, 2009 | Speaker Hastings School of Law, Defining the Problem-The State of Criminal Justice in Ca. |
| April 2009 | Entered into 5 month contract with Drug Policy Alliance to develop criminal justice policy strategy for Ca. |
| May 2009 through August 2009 | Volunteered consulting services at the request of Legislators working on Ca. Correctional budget issues |
| May 2009 | Editorial in San Diego Tribune regarding corrections and accountability |
| June 30, 2009 | Guest speaker The Fellowship Forum, a group of Stanford graduates and Hewitt Packard executives |
| August 12, 2009 | Interviewed for Time Magazine regarding corrections in Calif.  (On-line edition) |
| August 13, 2009 | Interviewed for NPR- All Things Considered, regarding correctional issues in Ca. |
| September and October 2009 | Taught a series of classes at Sonoma State University entitled Overview of Corrections |
| September 2009 | Jail needs study Cities of Kirkland and Bellevue, Washington. |
| October 1, 2009 | Guest Speaker Saint Mary's College Moraga, Ca. |
| October 2, 2009 | Guest Speaker University of California Berkeley |
| October 21, 2009 | Taught class to Los Angeles Public Defenders |

## CURRICULUM VITAE OF JEANNE S WOODFORD

|  |  |
|---|---|
|  | Office "An Overview of California Prisons" |
| October 27, 2009 | Lead panel discussion regarding Criminal Justice and the State of California |
| October 2009 to present | Contracted for Needs Study Placer County Jail |
| February 2010 | Contracted to assist implementing the Second Chance Reentry Grant for the City and County of San Francisco |
| February 2010 | ABA Criminal Justice Standards on Treatment of Prisoners completed.  I was a member of the task force for a portion of the five-year project. |
| April 12, 2010 | Appeared on Pod Cast regarding Correctional Reform for the UC Berkeley Criminal Justice Center |
| April 13, 2010 | Taught six week course at Sonoma State University regarding the State of Corrections in California |
| May 11, 2010 | Testified before the Ca. Legislature regarding Options for Improving Prison Operations and Outcomes |
| June 30, 2010 | Testified before the Ca. Legislature regarding SB 399, The Fair Sentencing for Youth Act. |
| September and October 2010 | Taught six week course at Sonoma State University regarding the State of Corrections in California |
| November 3, 2010 | Attend Cal RAPP training and participate in strategic planning to assist SF Adult Probation to implement evidence based practices and procedures. |
| November 9, 2010 | Began as a Senior Fellow at the Berkeley Center for Criminal Justice. |
| November 15, 2010 | Guest speaker for Dr. Barbara Bloom regarding corrections in California; Sonoma State University |
| November 17, 2010 | Panelist at the American Society of Criminologist. |
| November 18, 2010 | Testified before the Little Hoover Commission Topic: Reorganization of the California Department of Corrections |
| December 2, 2010 | Three Strikes Conference Stanford University |
| January 4, 2010 | Speaker Hastings Law School Topic: Corrections in California |
| January 7, 2011 | Presenter SALT Award to the Prison Law Office for Human Rights work. |
| January 20, 2011 | Speaker UC Irvine Topic: Death Penalty and California Criminal Justice |

# CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| February 8, 2011 | Speaker-Stanford for Professor Nation, Public Policy class |
| February 22, 2011 | Speaker-Stanford School of Law, Joan Petersilia class on Criminal Justice |
| March 31, 2011 thru May 19, 201116, 2011 | Attorney General transition team meeting-Smart on Crime Project |
| April 5, 2011 | Speaker-1st Congregation Church of Sonoma |
| April 6, 2011 | Speaker-UC Berkeley Criminal Justice Course |
| April 18, 2011 | Speaker-UC Berkeley, Dr. Krisberg Class |
| April 26, 2011 | Speaker-Mills College, Death Penalty Symposium |
| April 2011 to present | Expert Armstrong v. Brown, United States District Court Northern District of California C-94-2307 CW ADA Case. |
| May 2011 to present | Expert for New York State Office of Children and Family Services regarding violence in NY Juvenile Secure facilities. |
| May 2, 2011 | Speaker-USC 3-Strikes Conference |
| May 3, 2011 | Speaker Oakmont Symposium Topic: The State of Corrections |
| May 10, 2011 | Speaker-SF Public Defender's Conference on Criminal Justice |
| June 7, 2011 | Guest Speaker-Bob Edwards KQED |
| June 26, 2011 | Guest Speaker-CVS Channel 5 |
| June 28, 2011 | Guest Speaker National Latino Peace Officers Sonoma County Chapter |
| August 1, 2011 | Guest Ron Owen Radio Show KGO |
| August 4, 2011 | Guest Pacifica Radio |
| August 8, 2011 | Guest KCEO Radio, Kent Peters Show |
| August 10, 2011 | Speaker Chevron Retirees Luncheon Topic Criminal Justice in California |
| August 11, 2011 | Speaker Junior State of America, Sacramento, Ca. |
| August 14, 2011 | Guest KGO Lara Starr Producer |
| August 17, 2011 | Testified before Ca. Legislative Appropriations Committee regarding SB 490 bill to place death penalty on the Ca. ballot |
| August 30, 2012 | Debate San Mateo DA Wagstaff SF ACLU |
| September 13, 2011 | Speaker Fountain Grove Men's Club topic: Criminal Justice in Calif. |
| September 15, 2011 | Speaker Solano Reentry Council Topic: The importance of Reentry Councils |
| September 22, 2011 | Guest KGO Peter Collins Show |
| September 24, 2011 | Guest Speaker PAX Christi Event in LA |

## CURRICULUM VITAE OF JEANNE S WOODFORD

|  | regarding the Death Penalty |
|---|---|
| October 13, 2011 | Speaker Hastings Law School Professor Blocks class |
| October 27, 2011 | Participated in Realignment Panel Hastings Law School. |
| November 3, 2011 | Speaker Mt. Diablo Peace and Justice Conference |
| November 6, 2011 | Speaker Ignatius Church San Francisco |
| November 13, 2011 | Speaker Grace Episcopal Church Bakersfield, Ca.  Topic: The Death Penalty |
| November 14, 2011 | Speaker California State University Bakersfield |
| November 29, 2011 | Speaker Rotary Club of San Francisco |
| November 30, 2011 | Speaker Berkeley Women's Club |
| December 6, 2011 | Speaker Marin Bar Association Topic: The Death Penalty in California |
| December 14, 2011 | Guest KCBS Jeff Ball Host |
| January 9, 2012 | Guest KQED Cate Cochran CBC Radio Canada |
| January 10, 2012 | Speaker Saint Mary's College Speakers Series |
| January 17, 2012 | Speaker Trinity United Methodist Church |
| January 17, 2012 | Speaker Sisters of Saint Joseph of Orange |
| January 18, 2012 | Speaker Law Offices of the Public Defender Riverside |
| January 18, 2012 | Speaker Scripps College Balch Hall |
| January 25, 2012 | Speaker for the showing of the movie Incendiary, The Metreon San Francisco |
| January 26, 2012 | Speaker San Ramon Valley Democratic Club |
| January 31, 2012 | Speaker Women of Westminster Tiburon |
| February 1, 2012 | Speaker Merage School UC Irvine event held in SF |
| Fall Semester 2012 | Professor UC Hastings School of Law Course: Overview of Criminal Justice |
| February 6, 2012 | UCLA Law School Forum on the death penalty |
| February 11, 2012 | Panel Hastings School of Law Topic: Realigning California's Criminal Justice System |
| February 16, 2012 | Speaker Los Altos Country Club |
| February 24, 2012 | LMU Restorative Justice Panel |
| February 26, 2012 | Speaker Berkeley Sunday Gathering Topic: Death Penalty |
| March 1, 2012 | Safe Ca Signature Filing Press Conference |
| March 7, 2012 | Speaker Sacramento Jesuit High School |
| March 14, 2012 | Speaker SF Academy of Architecture for Justice |

# CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| March 16, 2012 | Speaker Caleb Foote Symposium UC Berkeley Topic: Realignment |
| April 5, 2012 | Guest Canadian Radio the Matt Holmes Show |
| April 12, 2012 | Debate Saint Mary's College Death Penalty LA Deputy DA Stirling |
| April 16, 2012 | Speaker UC Berkeley Professor C Gardner |
| April 19, 2012 | Speaker Santa Clara University School of Law |
| April 24, 2012 | Panel Golden Gate University topic: Death Penalty |
| April 27, 2012 | Speaker ACLU Sonoma County Annual Dinner |
| May 8, 2012 | Speaker The Arthur Benjamin High School Sacramento |
| May 10, 2012 | Guest Student Radio Station El Cerrito |
| May 14, 2012 | Speaker Heald College Concord |
| May 16, 2012 | Guest Bruce Robinson Radio Show Rohnert Park |
| May 17, 2012 | Speaker Diocese of San Diego |
| May 20, 2012 | Speaker Sunday Gathering Pacific Palisades |
| May 21, 2012 | Speaker Young Democrats LA. |
| June 5, 2012 | Speaker Ron Owen Show KGO Radio |
| June 7, 2012 | Speaker Sheriffs Association Meeting Placer Co. |
| June 17, 2012 | Speaker  Unitarian Universalist Breakfast Forum San Francisco |
| June 27, 2012 | LA Press Victims Press Conference |
| July 25, 2012 | KTVU Radio Interview |
| July 26, 2012 | Speaker Vanguard Court Watch of Yolo County |
| August 13, 2012 | Guest KRXA Hal Ginsberg show |
| August 16, 2012 | Speaker Democratic Women Club Monterey |
| August 17th, 2012 | Speaker St. Paul's Episcopal Church Monterey |
| August 18, 2012 | Speaker Old Mission Church Monterey |
| August 19, 2012 | Speaker United Methodist Church Atascadero |
| August 30, 2012 | Debate Death Penalty DA Wagstaff |
| September 7, 2012 | Speaker Marin Library Mill Valley |
| September 12, 2012 | KQED Forum Radio Guest |
| September 13, 2012 | Speaker UC Berkeley, Professor David Onek |
| September 18, 2012 | Testified before California Legislature Prop 34 |
| September 20, 2012 | Speaker Safe Ca. Event LA |
| September 25, 2012 | Speaker USF ST Thomas More Society |
| September 25, 2012 | Speaker Christ the King Church Pleasant Hill |
| September 27, 2012 | Speaker Stanford University Law School |
| September 27, 2012 | Speaker Stanford Chapter of the NAACP |
| September 30, 2012 | Debate Asian Pacific Islander Political Forum |

## CURRICULUM VITAE OF JEANNE S WOODFORD

|  |  |
|---|---|
|  | Sacramento Deputy Sacramento DA |
| October 2, 2012 | NPR Richard Gonzales |
| October 5, 2012 | Speaker California Agriculture Leadershi |
| October 7, 2012 | Speaker Holy Families Catholic Church LA |
| October 9, 2012 | Catholic Press Conference Church of Saint Raphael and Mission San Rafael |
| October 23, 2012 | Debate Prop 34 Congregation Sha'ar DA Wagstaff |
| October 24, 2012 | Speaker Alamo Woman's Club Walnut Creek |
| October 25, 2012 | Guest Democracy Now |
| October 25, 2012 | San Jose Mercury News on line Debate Death Penalty McGregor Scott |
| October 26, 2012 | Guest Fox Radio |
| October 29, 2012 | Guest KALW Radio |
| November 1, 2012 | Guest KCBS Radio |
| November 8, 2012 | Capitol Weekly Panel Post-Mortem Conference 2012 Election |
| November 13, 2012 | Guest KQED radio |
| November 21, 2012 | Guest KQED radio host Dick Gordon |
| November 28, 2012 | Faculty Miller Implementation Training Conference Atlanta, Georgia |
| December 9, 2012 | Recipient of the Chief Justice Earl Warren Civil Liberties Award ACLU of Northern California |
| January 31, 2013 | Speaker UC Berkeley Wine and Crime event |
| February 6, 2013 | Panelist in Sonoma State University career day |
| February 8, 2013 | Awarded the June Morrison-Tom Gitchoff Founders Award Western Society of Criminologist |

# APPENDIX B TO DECLARATION OF JEANNE WOODFORD

**APPENDIX B TO THE DECLARATION OF JEANNE WOODFORD**

| DOCUMENT |
| --- |
| Decl. Of Jeanne Woodford ISO Pls.' Renewed Motion To Require Defs. To Track And Accommodate Needs Of *Armstrong* Class Members Housed In County Jails And Ensure Access To A Grievance Procedure And Motion To Enforce 2001 Permanent Injunction, 8/4/11 [Dkt. 1913] |
| Notice Of Motion And Motion To Terminate Under The Prison Litigation Reform Act [18 U.S.C. § 3626(b)] And To Vacate The Court's Judgment And Orders Under Federal Rule Of Civil Procedure 60(b)(5), 1/7/13, [Dkt. 4275] |
| Memorandum Of Points And Authorities ISO Motion To Terminate Under The Prison Litigation Reform Act [18 U.S.C. § 3626(b)] And To Vacate The Court's Judgment And Orders Under Federal Rule Of Civil Procedure 60(b)(5), 1/7/13, [Dkt. 4275-1] |
| Decl. of Laura Ceballos ISO Motion To Terminate Under The Prison Litigation Reform Act [18 U.S.C. § 3626(b)] And To Vacate The Court's Judgment And Orders Under Federal Rule Of Civil Procedure 60(b)(5), 1/7/13, [Dkt. 4275-2] |
| Decl. of Diana Toche ISO Motion To Terminate Under The Prison Litigation Reform Act [18 U.S.C. § 3626(b)] And To Vacate The Court's Judgment And Orders Under Federal Rule Of Civil Procedure 60(b)(5), 1/7/13, [Dkt. 4275-3] |
| Decl. of Debbie J. Vorous ISO Motion To Terminate Under The Prison Litigation Reform Act [18 U.S.C. § 3626(b)] And To Vacate The Court's Judgment And Orders Under Federal Rule Of Civil Procedure 60(b)(5), 1/7/13, [Dkt. 4275-4] |
| Exhibit 1 to Vorous Decl., 1/7/13, [Dkts.4275-5 through 4275-9] |
| Exhibit 2 to Vorous Decl., 1/7/13, [Dkt. 4279] |
| Decl. Of Rick Johnson ISO Motion To Terminate Under The Prison Litigation Reform Act [18 U.S.C. § 3626(b)] And To Vacate The Court's Judgment And Orders Under Federal Rule Of Civil Procedure 60(b)(5), 1/7/13, [Dkt. 4276] |
| Decl. Of Tim Belavich ISO Motion To Terminate Under The Prison Litigation Reform Act [18 U.S.C. § 3626(b)] And To Vacate The Court's Judgment And Orders Under Federal Rule Of Civil Procedure 60(b)(5), 1/7/13, [Dkt. 4277] |

| |
|---|
| 3JC: Notice Of Motion And Motion To Vacate Or Modify Population Reduction Order; Memorandum Of Points And Authorities ISO Motion, 1/7/13, [Dkt. 2506] |
| 3JC: Decl. Of Robert A. Barton ISO Defs.' Motion To Vacate Or Modify Population Reduction Order, 1/7/13, [Dkt. 2507] |
| 3JC: Decl. Of Jeffrey Beard, Ph.D, ISO Defs.' Motion To Vacate Or Modify Population Reduction Order, 1/7/13, [Dkt. 2508] |
| 3JC: Defs. Response To Oct. 11, 2012 Order To Develop Plans To Achieve Required Prison Population Reduction, 1/7/13, [Dkt. 2511] |
| 3JC: Decl. Of Brenda Grealish ISO Defs.' Response To Order To Develop Plans To Achieve Required Prison Population Reduction, 1/7/13, [Dkt. 2512] |
| 3JC: Decl. Of Kathleen Allison ISO Defs.' Response To Order To Develop Plans To Achieve Required Prison Population Reduction, 1/7/13, [Dkt. 2513] |
| 3JC; Decl. Of Michael Stainer ISO Defs.' Response To Order To Develop Plans To Achieve Required Prison Population Reduction, 1/7/13, [Dkt. 2514] |
| Decl. of Chris Meyer ISO Motion To Terminate Under The Prison Litigation Reform Act [18 U.S.C. § 3626(b)] And To Vacate The Court's Judgment And Orders Under Federal Rule Of Civil Procedure 60(b)(5), 1/7/13, [Dkt. 4278] |
| Special Master 25th Round Monitoring Report Re Defs.' Compliance, 1/18/13, [Dkt. 4298] |
| Special Master's Report On Expert Patterson's report re Suicides in 2011, 1/25/13 [Dkt. 4307] |
| Dr. Raymond Patterson's Expert Report re: CDCR Suicides in 2011, 1/25/13, [Dkt. 4308] |
| Special Master's 2011 Suicide Report Redacted List |
| Pls.' Response To Defs.' Objections And Motion To Strike Or Modify Portions Of The Twenty-Fifth Round Monitoring Report Of The Special master (Fed. R. Civ. P. 53), 2/11/13, [Dkt. 4324] |
| Decl. Of Jane E. Kahn ISO Of Pls.' Response To Defs.' Motion To Strike Or Modify Portions Of The Twenty-Fifth Round Monitoring Report Of The Special Master (Fed. R. Civ. P. 53), 2/11/13, [Dkt. 4325] |
| Defs.' Objections And Motion To Strike Or Modify Portions Of Special Master's Report On Suicides Occurring In California Department Of Corrections And Rehabilitation Facilities in 2011, 2/11/13, [Dkt. 4326] |
| Office Of The Inspector General Use of Force Report, Jan. – June 2012 |
| Office Of The Inspector General Use of Force Report, July – Dec. 2011 |

| |
|---|
| Office Of The Inspector General Use of Force Report, Nov. 2011 |
| Article 2 – Use Of Force, Department Of Operations Manual, Updated Through Jan. 1, 2012 |
| CDCR Report To The Special Master re CCCMS Mental Health Assessments, June 3, 2011 |
| 10/26/11 CDCR Memo re RVR Training |
| 11/3/11 CDCR Memo re Revision To The Mental Health Assessment Request Process For Rules Violation Reports (Update) |
| MHSDS Program Guide, Inmate Disciplinary Process and Chps. 5, 6, 10, 12-4-17 to 12-4-21) |
| Order re Recommendations on Suicide Prevention and Policies, 6/9/05 |
| CACHES Emergency Medical Response, Revised 7/2/12 |
| 12/12/08 CDCR Memo re Revised 30 Minute Welfare Check Process |
| 3/5/11 CDCR Memo re MUCH Use Of Mechanical Restraints And Escort Policies |
| 8/29/12 CDCR letter re Completion of Suicide Resistant Beds |
| 12/5/11 Order re Suicide Resistant Beds |
| 8/29/12 Order re Suicide Resistant Beds |
| *Coleman v. Wilson*, 912 f. Supp. 1282 (1995) E.D. Cal |
| Coleman v. Wilson, Findings And Recommendations, 6/6/06, [Dkt. 547] |
| 3JC Opinion And Order re Plata, 8/4/09, [Dkt 2197] |
| Brown v. Plata, 131 S. Ct. 1910 (2011) |
| Order To Show Cause re Defs Obj. & Mtn. To Strike Or Modify Portions of 25th Special Master Report, 2/13/13, [Dkt. 4335] |
| 3JC Pls. Opposition To Defs.' Motion To Vacate Or Modify Population Reduction Order And Counter Motion For Further Relief, 2-12-13, [Dkt. 2528] |
| Excerpt: SQ Suicides From 2012 Special Master's Report, [Dkt 4376], 3-13-13 |
| Plaintiffs' Expert File:Inmate Deaths |
| SQ Management Report |
| SQ Institutional Summary: excerpted from Special Master's 25th Round Monitoring Report on Compliance, 1/18/13 [Dkt. 4298] |
| SQ Case Studies: excerpted from Special Master's 25th Round Monitoring Report on Compliance, 1/18/13 [Dkt. 4298] |

| |
|---|
| SQ General Summary: excerpted from Special Master's 23rd Round Monitoring Report on Compliance, 12/1/11 [Dkt. 4124] |
| SQ Institutional Summary: excerpted from Special Master's 23rd Round Monitoring Report on Compliance, 12/1/11 [Dkt. 4124] |
| SQ Institutional Case Studies: excerpted from Special Master's 23rd Round Monitoring Report on Compliance, 12/1/11 [Dkt. 4124] |
| General and SQ Specific: excerpted from 3JC Supplemental Expert Report Of Pablo Stewart, M.D., 10/30/08, [Dkt. 3221] |
| 3JC; Defs. Feb 2013 Status Report On Institution Populations, 2/15/16 |
| CDCR Weekly Population Reports, Jan. 2010 Through Feb. 2013 |
| CCHCS 22nd Tri-Annual Report Of The Federal Receiver's Turnaround Plan Of Action, Sept. 1- Dec 31, 2012, 1/25/13 |
| OIG Report, SQ Medical Inspection Results Cycle 3, 8/2012 |
| Compstat DAI Reports |
| 4/30/10 CDCR Letter To Special Master re Specialized Care |
| 3JC Pls. 2nd Request For Inspection Notice, 2-1-13 |
| 3JC Pls. Statement In Response To Oct 11, 2012 Order Re Population Reduction, 1/7/13, [Dkt. 4283] |
| 3JC Decl. Of James Austin ISO Of Pls.' Statement In Response To October 11, 2012, Order, 1/7/13, [Dkt. 4283-1] |
| 3JC Decl. Of Steven Fama ISO Of Pls.' Statement In Response To October 11, 2012, Order, 1/7/13, [Dkt. 4283-2] |
| 3JC Decl. Of Michael W. Bien ISO Of Pls.' Statement In Response To October 11, 2012, Order, 1/7/13, [Dkt. 4283-3] |
| 3JC Pls. Proposed Order 1/7/13, [Dkt 4283-7] |
| 3JC Defs' Response To Oct. 11, 2012 Order To Develop Plans To Achieve Required Prison Population Reduction, 1/7/13, [Dkt 4284] |
| 3JC Decl. Of Brenda Grealish ISO Defs.' Response To Oct. 11, 2012 Order To Develop Plans To Achieve Required Prison Population Reduction, 1/7/13, [Dkt 4285] |
| 3JC Decl. Of Kathleen Allison ISO Defs.' Response To Oct. 11, 2012 Order To Develop Plans To Achieve Required Prison Population Reduction, 1/7/13, [Dkt 4286] |
| 3JC Decl. Of Michael Stainer ISO Defs.' Response To Oct. 11, 2012 Order To Develop Plans To Achieve Required Prison Population Reduction, 1/7/13, [Dkt 4287] |

| |
|---|
| 3JC Dec. Of Paul B. Mello ISO Defs.' Response To Oct. 11, 2012 Order To Develop Plans To Achieve Required Prison Population Reduction, 1/7/13, [Dkt 4288] |
| eUHR of multiple SQ Inmates |
| RVR LOP Training Material |
| 1/25/12 DAPO memo re Specialized Care for the Condemned: CTC Expansion |
| 8/15/11 Brief Status Report: Specialized Care For The Condemned, MHSDS San Quentin |
| 5/25/11 DAPO Specialized Care For The Condemned - Budget Hearing Status Report |
| 12/01/11 Executive Status Report: Specialized Care For The Condemned |
| 09/07/11 Brief Status Report: Specialized Care For The Condemned, MHSDS San Quentin |
| Decl. Of Walter L. Kautzky ISO Pls.' Objections To Defs.' Plan To Address Suicide Trends In Administrative Segregation Units, 10/31/06, [Dkt. 2012] |
| The Future of California Corrections Blueprint, Full Report |
| Decl. of Jeanne Woodford ISO Of Pls.' Opposition To Defs.' Motion To Dismiss And/Or Motion For Summary Judgment/Adjudication, 9/29/08, [Dkt. 3056] |
| Mental Health Assessment Training |
| Plaintiffs' Expert file: Relevant Press Reports, compiled for SQ expert tour |
| Plaintiffs' Expert file: Pls.' *Armstrong* Monitoring Notes |
| News Article: "AP Exclusive: Inmate lawsuits cost Calif. $200M", The Sacramento Bee, 2/11/13 |
| Plaintiffs' Expert File:Inmate Deaths and Suicide Reports |
| Report Of Doyle Wayne Scott, 11/9/07 |
| Report of Ronald Shanksy, 11/9/07 |
| Plaintiffs' Expert File: Prison Staffing, compiled for SQ Expert Tour |
| Plaintiffs' Expert File: Prison Mental Health Care, compile for SQ Expert Tour |
| Plaintiffs' Expert File: DSH Report Data (SQ Specific), compiled for SQ Expert Tour |
| Publication: ACLU Public Safety Realignment, California At A Crossroads |
| Publication: ACLU Assessment – California Prison Realignment 1 Year Anniversary |

| |
|---|
| News Article: "Jerry Brown cancels plan for $356-million death row", LA Times, 4-29-11 |
| Cover Letters, Tseng-Woodford re Expert Materials Enclosed |