1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  PRISON LAW OFFICE
   1917 Fifth Street
3  Berkeley, California  94710-1916
   Telephone:    (510) 280-2621
4

5

6

7
   JON MICHAELSON – 083815
8  JEFFREY L. BORNSTEIN – 099358
   LINDA L. USOZ – 133749
9  MEGAN CESARE-EASTMAN – 253845
   K&L GATES LLP
10 4 Embarcadero Center, Suite 1200
   San Francisco, California  94111-5994
11 Telephone:    (415) 882-8200

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

12 Attorneys for Plaintiffs

13              UNITED STATES DISTRICT COURT

14              EASTERN DISTRICT OF CALIFORNIA

15

16 RALPH COLEMAN, et al.,                    Case No. Civ S 90-0520 LKK-JFM

17        Plaintiffs,                        **EXPERT DECLARATION OF
                                             PABLO STEWART, M.D.**
18    v.
                                             Judge:   Hon. Lawrence K. Karlton
19 EDMUND G. BROWN, Jr., et al.,             Date:    March 27, 2013
                                             Time:    10:00 a.m.
20        Defendants.                        Crtrm.:  4

21

22

23

24

25

26

27

28

[754904-2]

1

**TABLE OF CONTENTS**

2

**Page**

3

OPINIONS ........................................................................................................ 9

4  A.     Opinion One:  The Mental Health Care Currently Provided in the CDCR's
Mental Health Delivery System Does Not Meet The Minimum Standards of

5        Care Required Under The United States Constitution. ................................. 9

6      1.     Inadequate Staffing and Problems with Recruitment and Retention of
Trained, Qualified Mental Health Staff: ......................................... 16

7

         a.     My Opinion Regarding the Effect of Staffing Vacancies: ................ 16

8

         b.     Statewide Evidence of Staffing Shortages: ........................................ 17

9

         c.     Evidence of Staffing Shortages in DSH Inpatient Programs: ............ 18

10

         d.     Staffing Vacancies, Program Space Issues and Recruitment and

11            Retention Problems at the Individual Prisons Visited: ...................... 21

12                  1.     SVSP Staffing Issues: ............................................................. 24

13                  2.     Problems at SVSP with The Use of Registry Workers: .......... 26

14                  3.     SVSP Program Space and Confidential Treatment Space

15                      Issues: ...................................................................................... 27

16                  4.     Overview of CSP-Sacramento Staffing Issues: ....................... 28

                5.     The Staffing Problems at CSP-Sacramento Are

17                      Exacerbated By The Burdens of Using the New
Electronic Records System Without Access in Housing

18                      Units ....................................................................................... 32

19                  6.     The Role of Two Different Staffing Problems in the
Suicide of a CSP-Sacramento Class Member in

20                      November of 2011 ................................................................... 33

21                  7.     Staffing Problems at CSP-Los Angeles County: .................... 37

22                  8.     Staffing Problems at RJ Donovan: ........................................ 40

23                  9.     Problems with the Lack of Confidential Treatment

24                      Space at RJD and LAC ........................................................... 41

                10.     Staffing Problems at San Quentin ......................................... 42

25

26      2.     The CDCR Must Eliminate the Pervasive and Dangerous Medication
Management Problems in the Mental Health Delivery System ................... 43

27           a.     My Opinion Regarding the CDCR's Medication Management
Problems: ............................................................................................ 43

28

i

b.  System-Wide Evidence Regarding the CDCR's Medication
    Management Problems:........................................................ 43

    1.  Delayed or Non-Existent Responses to Medication Non-
        Compliance: ........................................................... 44

    2.  Laboratory Testing Problems:.................................... 44

    3.  Medication Renewal Problems: ................................. 45

    4.  Informed Consent Problems:..................................... 46

    5.  AIMS Testing Problems:........................................... 46

    6.  Medication Problems at Prisons Not Visited: ........... 46

c.  Problems with Medication Management at Specific Prisons I
    Visited ...................................................................... 48

    1.  Problems with Medication Delivery and Distribution
        Observed at CSP-Los Angeles County: .................... 48

    2.  Problems with Medication Management and Medication
        Distribution Practices at SVSP: ............................... 50

    3.  Problems with Medication Management at CSP-
        Sacramento:.............................................................. 51

    4.  Problems with Medication Management at RJD: ....... 53

    5.  Problems with AIMS Testing Observed During My RJD
        Tour:....................................................................... 56

    6.  Problems with Medication Management At San
        Quentin:.................................................................... 57

3.  The CDCR Must Increase and Improve Its Suicide Prevention Efforts
    by Ending the Use of Alternative Placements for Suicidal Prisoners,
    Eliminating the Use of Dangerous and Punitive Suicide Watch
    Conditions, and Conducting Staggered Welfare Checks Every Half
    Hour for All Prisoners in Segregation Units. ................................. 59

    a.  My Opinions Regarding the CDCR's Suicide Prevention
        Problems:.................................................................. 59

    b.  Overcrowding, and the High Suicide Rate in the CDCR ................. 60

    c.  The High Suicide Rate in Administrative Segregation Units ........... 63

    d.  Lockdowns and Suicides ................................................ 65

    e.  The Dangers of Excessively Punitive Suicide Watch
        Conditions: ............................................................... 68

    f.  The Dangers of Using Alternative Placements for Suicide

Watch: ....................................................................................... 71

g.   Punitive Suicide Watch Conditions and Usage of Alternative
     Placements at Prisons Inspected ........................................... 74

     1.   Punitive Suicide Watch Conditions at SVSP ......................... 74

     2.   Use of Alternative Placements at SVSP for Suicidal
          Prisoners: ....................................................................... 76

     3.   Use of Punitive Suicide Watch Procedures and
          Alternative Placements at CSP-Sacramento: ......................... 77

     4.   Use of Punitive Suicide Watch Procedures and
          Alternative Placements at CSP-LAC ................................... 81

     5.   Use of Punitive Suicide Watch Procedures and
          Alternative Placements at RJD ........................................... 84

h.   Problems with Existing Suicide Prevention Measures in the
     CDCR ................................................................................... 85

     1.   Problems with Welfare Checks: ............................................. 85

     2.   Problems with Adequacy of the Intake Cells: ......................... 90

     3.   Problems with Inadequate Suicide Risk Evaluations
          (SREs) and Failures to Conduct SREs Whenever
          Needed. ........................................................................... 92

     4.   Overly Long Stays in Administrative Segregation. ................ 96

     5.   Defendants Must Cease Using Administrative
          Segregation Units As Bad Beds – Both As "Alternative
          Placements" for Suicide Watch and for Protective
          Custody .......................................................................... 97

4.   The CDCR Must Improve the Amount and the Quality of the
     Treatment in All of Its Enhanced Outpatient Programs. ...................... 99

     a.   My Opinion Regarding the CDCR's Inadequate Treatment
          Programs for Administrative Segregation EOP Level of Care
          Prisoners and PSU Prisoners: .......................................... 100

          1.   The EOP Administrative Segregation Unit at Salinas
               Valley State Prison: ................................................... 104

          2.   The EOP Administrative Segregation Unit and the
               Psychiatric Services Unit at CSP-Sacramento: ............ 108

          3.   The EOP Administrative Segregation Unit at LAC: ........... 111

          4.   The EOP Administrative Segregation Unit at RJD: ........... 114

          5.   The "Carson Unit" EOP Administrative Segregation

[754904-2]

Unit at San Quentin ............................................................ 120

b.  My Opinion About Problems with Delivery of Care in Mainline Enhanced Outpatient Programs (EOPs) .......................... 123

1.  SVSP: ........................................................................ 124

2.  CSP-Sacramento: ..................................................... 125

3.  CSP-Los Angeles County: ...................................... 126

4.  RJ Donovan: ............................................................ 130

c.  The CDCR's Inadequate Treatment Programs for Protective Custody "SNY" EOP Level of Care Prisoners: ................................ 131

5.  The CDCR Must Improve Access to High Quality MHCB Care and to High Quality Inpatient DSH Care. .................................................. 134

a.  Overview of Statewide Problems With Access To Higher Levels of Care in MHCB Units and DSH Inpatient Units: ............. 134

b.  Problems Observed In The MHCB Units at SVSP, CSP-Sacramento, CSP-LA County, RJD and San Quentin: ................... 139

1.  The MHCB Unit at SVSP ...................................... 139

2.  The MHCB Units at CSP-Sacramento ................... 140

3.  The MHCB Unit at CSP-LA County ..................... 145

4.  The MHCB Unit at RJD .......................................... 148

6.  Serious Problems Observed With the Quality of Care in DSH Programs Overall ............................................................................ 153

7.  The CDCR Must Eliminate Barriers In Access To Inpatient Care for Death Row Prisoners ............................................................... 159

CONCLUSION ................................................................................................ 166

[754904-2]

iv

# TABLE OF ABBREVIATIONS

| ACA | American Correctional Association |
|-----|-----------------------------------|
| APP | Acute Psychiatric Program |
| ASH or Atascadero | Atascadero State Hospital |
| ASP or Avenal | Avenal State Prison |
| ASU | Administrative Segregation Unit |
| BCP | Budget Change Proposal |
| CAL or Calipatria | Calipatria State Prison |
| CCC | California Correctional Center |
| CCCMS | Correctional Clinical Case Manager System |
| CCI | California Correctional Institution |
| CCPOA | California Correctional Peace Officers Association |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CEN or Centinela | Centinela State Prison |
| CIM | California Institute for Men |
| CIW | California Institute for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| CMO | Chief Medical Officer |
| COR or Corcoran | California State Prison/Corcoran |
| CPR | Cardiopulmonary Resuscitation |
| CRC | California Rehabilitation Center |
| CSH or Coalinga | Coalinga State Hospital |
| CTC | Correctional Treatment Center |
| CTF | California Training Facility/Soledad |
| CVSP or Chuckwalla | Chuckwalla Valley State Prison |
| DMH | Department of Mental Health |
| DSH | Department of State Hospitals |
| DOT | Direct Observation Therapy |
| DVI or Deuel | Deuel Vocational Institute |
| EOP | Enhanced Outpatient Program |
| EOP ASU Hub | Enhanced Outpatient Program Administrative Segregation Unit |
| FOL or Folsom | Folsom State Prison |
| HDSP or High Desert | High Desert State Prison |
| ICF | Intermediate Care Facility |
| ISP or Ironwood | Ironwood State Prison |
| KVSP or Kern Valley | Kern Valley State Prison |
| LAC or Lancaster | California State Prison/Lancaster |
| LVN | Licensed Vocational Nurse |

EXPERT DECLARATION OF PABLO STEWART, M.D.

[754904-2]

| LOB | Lack of Bed |
|---|---|
| MCSP or Mule Creek | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| MHOHU | Mental Health Outpatient Housing Unit |
| MHSDS | Mental Health Services Delivery System |
| NKSP or North Kern | North Kern State Prison |
| OHU | Outpatient Housing Unit |
| OIG | Office of the Inspector General |
| PBSP or Pelican Bay | Pelican Bay State Prison |
| PCP | Primary Care Provider |
| PLRA | Prison Litigation Reform Act |
| PSH or Patton | Patton State Hospital |
| PSU | Psychiatrist Services Unit |
| PVSP or Pleasant Valley | Pleasant Valley State Prison |
| R&R | Reception and Receiving |
| RC | Reception Center |
| RJD or Donovan | Richard J. Donovan Correctional Facility |
| RN | Registered Nurse |
| SAC or Sacramento | California State Prison/Sacramento |
| SATF | California Substance Abuse Treatment Facility (II) |
| SCC or Sierra | Sierra Conservation Center |
| SHU | Segregated Housing Unit |
| SM | Special Master in the *Coleman* case |
| SNY | Special Needs Yard |
| SOL or Solano | California State Prison/Solano |
| SQ or San Quentin | California State Prison/San Quentin |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP or Salinas Valley | Salinas Valley State Prison |
| TB | **Tuberculosis** |
| TTA | Triage and Treatment Area |
| UHR | Unit Health Records |
| VSPW or Valley State | Valley State Prison for Women |
| VPP | Vacaville Psychiatric Program |
| WSP or Wasco | Wasco State Prison |
| ZZ Cell | Makeshift Temporary Cells Outside of Clinic Areas |

EXPERT DECLARATION OF PABLO STEWART, M.D.

I, PABLO STEWART, do hereby declare:

1.      I am a physician licensed to practice in California, with a specialty in clinical and forensic psychiatry.  A true and correct copy of my current *curriculum vitae* is attached hereto as **Exhibit A**.  My background and experiences as relevant to my expert testimony in this termination proceeding are set forth below.  Much of this background and experience was previously outlined in my October 2007 Report to this Court regarding overcrowding in the California Department of Corrections and Rehabilitation ("the CDCR"), but it is repeated here for the sake of convenience and to update the Court on my additional experiences in the last five years.  I make this Declaration in Support of Plaintiffs Opposition to Defendants' Motion to Terminate Relief in *Coleman v. Brown*.

2.      In 1973, I earned a Bachelor of Science Degree at the United States Naval Academy in Annapolis, Maryland.  In 1982, I received my Doctor of Medicine from the University of California San Francisco, School of Medicine.  In 1985, I received the Mead-Johnson American Psychiatric Association Fellowship for demonstrated commitment to public sector psychiatry and was selected as the Outstanding Psychiatric Resident by the graduating class of the University of California San Francisco (UCSF), School of Medicine.  In 1985-1986, I served as the Chief Resident of the UCSF Department of Psychiatry at San Francisco General Hospital and was responsible for direct clinical supervision of seven psychiatric residents and three to six medical students.

3.      Throughout my professional career, I have had extensive clinical, research, and academic experience in the diagnosis, treatment, and prevention of mental illnesses in correctional and other institutional contexts.  In my work, I have specialized in community and correctional treatment programs for individuals with chronic and severe mental illnesses, as well as substance abuse and related disorders.  I have also specialized in diagnosis, treatment, and care programs for persons with Major Depressive Disorder and Posttraumatic Stress Disorder (PTSD), in the management of patients with dual diagnoses and the application of psychotropic medication to such individuals, and in the history and use of psychotropic medications in institutionalized populations.

EXPERT DECLARATION OF PABLO STEWART, M.D.

[754904-2]

4.      I have also specialized in the needs of severely mentally ill individuals in sheltered treatment programs in institutional contexts, such as the Enhanced Outpatient Program ("EOP"), Psychiatric Services Unit ("PSU") and Mental Health Crisis Bed ("MHCB") treatment programs currently operating in the California Department of Corrections and Rehabilitation (the "CDCR"), and the inpatient acute and intermediate psychiatric hospitalization programs operate by the Department of State Hospitals ("DSH") for prisoners from the CDCR.  As discussed in the body of my report below, during my recent tours of CDCR institutions, I encountered many serious problems with the quality of the mental health care currently being delivery in those programs and units.

5.      I have designed and taught courses in correctional psychiatry at the University of California, San Francisco.  I have also designed and taught courses on the protocols for identifying and treating psychiatric patients with various disorders and have supervised psychiatric residents in teaching hospitals.  I have worked closely with local, state and federal governmental bodies to design and present educational programs about psychiatry, substance abuse, and preventative medicine.

6.      I also have extensive experience managing, monitoring, and reforming correctional mental health systems.  Between 1986 and 1990, I was the Senior Attending Psychiatrist for the Forensic Unit of the University of California, San Francisco, which was located at San Francisco General Hospital.  In that capacity, I had administrative and clinical responsibility for a 12-bed maximum-security psychiatric ward and worked as the liaison with the Jail Psychiatric Services of the City and County of San Francisco.  My duties in that position included advising the San Francisco City Attorney on issues pertaining to forensic psychiatry.

7.      Between August 1988 and December 1989, I served as the Director of Forensic Psychiatric Services for the City and County of San Francisco.  In that capacity, I had administrative and clinical oversight responsibility for the psychiatric care provided to the inmate population in San Francisco at both the county jails and in the 12-bed locked inpatient treatment unit at the San Francisco General Hospital.  At the time, mental health

care in the San Francisco's jails was subject to a consent decree in the case *Stone v. City and County of San Francisco*, 968 F.2d 850 (9th Cir. 1992).  During that period, San Francisco's jails were overcrowded, and the *Stone* consent decree included remedies designed to limit overcrowding.   While I was working as the Director of Forensic Services in San Francisco, the plaintiffs in the *Stone* case brought contempt proceedings against the City because of overcrowding that they asserted violated the consent decree.

8.     I have also served as a psychiatric expert or consultant to various federal courts or other organizations implementing remedial decrees covering the provision of mental health care in correctional institutions.  For ten years, between April 1990 and February of 2000, I served as a court-appointed medical and psychiatric expert for this Court in the consent decree case *Gates v. Deukmejian*, E.D. Cal. Case No. CIV S-87-1636. Among other things, that case involved the provision of adequate psychiatric care to mentally ill inmates at the California Medical Facility (CMF) in Vacaville, California.

9.     My experiences working on the *Gates* case also informed me about the difficulty of providing mental health services in locked, high security units.  As part of the *Gates* case, CMF was forbidden from housing mentally ill inmates in its Willis Unit, a three-tier administrative segregation unit, because of the severity of conditions and the acknowledged difficulty of providing adequate mental health services in this type of setting.   Housing mentally ill individuals in the Willis Unit was also forbidden because of the difficulty of doing emergency response in the unit.  As discussed in greater detail below, one of the major areas where the CDCR's treatment programs are currently falling short of constitutional standards is in its segregated programs, including EOP administrative segregation programs and PSU programs.

10.     Between October 1996 and July 1997, I served as a psychiatric expert for the United States District Court for the Northern District of California in the case of *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Ca. 1995), an omnibus case involving psychiatric care and other issues at Pelican Bay State Prison in Crescent City, California.   In my work on the *Madrid* case, I gained first-hand knowledge concerning the severe impact of prolonged

1   isolation in segregation units on mentally ill inmates, as well as additional concrete

2   understanding of the need for constant monitoring of both non-mentally ill and mentally ill

3   inmates in lock up units in order to prevent any further decompensation, since housing in

4   these units by itself sometimes causes, contributes to and/or intensifies psychiatric

5   instability.

6        11.     Between July of 1998 and February of 2004, I served as a psychiatric

7   consultant to the National Council on Crime and Delinquency (NCCD) and subsequently

8   for the Institute on Crime, Justice and Corrections at Washington University (when it took

9   over monitoring responsibilities from NCCD) in their efforts to monitor juvenile detention

10  and treatment facilities operated by the State of Georgia.  In that case, I monitored an

11  Agreement between the United States Department of Justice and the State of Georgia

12  designed to improve the quality of care in its juvenile detention facilities.  The Agreement

13  encompassed mental health care, medical care, educational services, and treatment

14  programs.  Overcrowding was a major issue in the Georgia case.  As part of the Agreement

15  to address overcrowding, Georgia was required to limit the intake of youths from the

16  counties into their state juvenile system in order to prevent the fragile mental health system

17  from being overwhelmed.

18       12.     Also as part of the monitoring in that case, Georgia created significant new

19  mental health treatment programs with dedicated staffing and capacity limitations,

20  including most significantly a new inpatient treatment facility for boys and a second new

21  inpatient treatment facility for girls.

22       13.     The Agreement also included a provision forbidding the prior practice of

23  housing suicidal youths in administrative segregation units, and required "mainstream"

24  housing and suicide watch monitoring of such youths.  The youths would go to school and

25  work during the day, and would continue their suicide watch in their housing units

26  overnight.  This provision was introduced because it had become clear under the prior

27  practices that suicidal youths frequently would not come forward with their suicidal

28  feelings because they did not want to be locked down in administrative segregation for

suicide watch.  This further demonstrated to me the dangerous and damaging nature of isolation in locked units for suicidal individuals.  It also demonstrated to me the dangerous nature of punitive suicide watch conditions when they discourage suicidal individuals from coming forward and seeking treatment.  As discussed in my report below in greater detail, one of the major failings of the CDCR's suicide prevention policies currently is the systems' tolerance of a variety of extremely punitive suicide prevention practices that have the effect of discouraging suicidal prisoners from coming forward with their true feelings.

14.     Between June of 2003 and December of 2004, I was hired by the State of New Mexico as a defense expert for the implementation phase of the psychiatric sections of the "Ayer's Agreement" covering the New Mexico Corrections Department (NMCD). The Agreement was a settlement between a class of New Mexico prisoners and the NMCD concerning the provision of adequate psychiatric care for inmates in New Mexico's highest security facility.  The Ayers Agreement concerned a mental health treatment program in a disciplinary detention unit similar to the Security Housing Unit (SHU) at Pelican Bay State Prison.  The treatment program implemented in the unit was based in part on the treatment standards for the Psychiatric Security Unit (PSU) mental health care programs in California.  New Mexico implemented the new treatment program with an acknowledgement that they needed to maintain minimum clinical staff-to-inmate ratios given the severe nature of the housing conditions in the locked-down unit, and the potential for mental decompensation.

15.     I have also worked as an expert consultant for the United States Department of Justice (USDOJ) on inspections and remedial work in connection with youth facilities in California and Michigan.   In August and September of 2003, I was retained as a medical and psychiatric expert for the USDOJ in connection with an inspection of the N.A. Chaderjian Youth Correction Facility in Stockton, California.  In that inspection, we looked at overcrowding and whether the level of psychiatric care being provided met constitutional minimums, based on the number of wards and the limited number of staff. We concluded that the facility was badly overcrowded and understaffed.  At the time, the

facility consisted entirely of locked units, and the inspection found that the staff failed to provide minimally adequate medical and mental health services, that the facility locked down its wards excessively, that medication delivery was faulty, that the level of ward access to yard and recreation was insufficient, and that the institution's suicide prevention efforts were underdeveloped, overwhelmed, and ineffective.  All of these problems were closely correlated with the extensive overcrowding that existed at that time at that institution.  Moreover, these types of problems are typical in the overcrowded systems with which I have been involved in one capacity or another.

16.     Between March of 2003 and the summer of 2006, I worked as an expert for the USDOJ in connection with inspections to identify and remedy various problems at the Maxey Training School, a youth facility with large medical and mental health treatment programs in Whitmore Lake, Michigan.  The case involved the adequacy of medical and mental health care provided at the facility.  The case included an investigation of excessive lock-downs of suicidal youths.

17.     In 2007 and 2008, I prepared expert statements and testified before this court and the three-judge panel in the *Coleman/Plata* overcrowding litigation.  My expert report in that case was cited twice in the Unites States Supreme Court decision upholding the three-judge court's imposition of an order requiring California to reduce overcrowding.

18.     I have presented numerous papers before mental health professionals, prosecuting and defense attorneys, probation officers, and judges, and have published in professional and peer-reviewed journals on topics including prison mental health services, dual diagnosis, mental illness, alcohol and drug abuse, and the treatment of substance abuse.  These presentations and publications include: "Alcohol and Other Drugs and the Courts" (2010), "The Mentally-Ill Offender in Reentry Courts" (2010); "Mental Health Aspects of Diminished Capacity and Competency" (2007); "Methamphetamine-Induced Dual Diagnosis Issues" (2006); "Proper Assessment of Drug Court Clients" (2006); "Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices" (2004); "Cultural Considerations in Working with the Latino Patient"

(2002); "Psychiatric Complications of the Methamphetamine Abuser" (2001); "The Assessment, Diagnosis, and Treatment of the Patient with Multiple Disorders" (2001); "Managing People of Different Pathologies in Mental Health Courts" (2000); "Model for Health Appraisal for Minors Entering Detention" (2000); "Co-Occurring Disorders: Substance Abuse and Mental Health" (2000); "The Dual-Diagnosed Client" (2000); "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering" (1999); "Working With the Substance Abuser in the Criminal Justice System" (1999); "Mental Illness and Drug Abuse" (1999); "Alcoholism: Practical Approaches to Diagnosis and Treatment" (1999); "Criminal Justice and Substance Abuse" (1999); "Impulse Control Disorders" (1999); "Major Depressive Disorder" (1999); "Substance Abuse and Major Depressive Disorder" (1999); "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed" (1998); "Assessment and Treatment of the High Risk Offender" (1999); "Assessment of Substance Abuse" (1995); "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues" (1994); and "Psychiatry, Homelessness, and Serious Mental Illness" (1994).

19.    I am currently a Diplomat of, and have served as an Examiner for, the American Board of Psychiatry and Neurology.

20.    Since 1986, I have held academic appointments as Clinical Instructor, Assistant Clinical Professor, Associate Clinical Professor, and Clinical Professor in the Department of Psychiatry, University of California, San Francisco, School of Medicine.  I received the Henry J. Kaiser Award for Excellence in Teaching in 1987 and was selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic years 1988-1989, 1990-1991, and 1994-1995.  I designed, planned, and taught "Drug and Alcohol Abuse" and "Alcoholism," one-unit courses covering major aspects of drug and alcohol abuse; supervised fourth-year medical students in the care of dually diagnosed patients at the Psychiatric Continuity Clinic, Haight Ashbury Free Clinic; facilitated a weekly psychiatric intern seminar on "Psychiatric Aspects of Medicine," and lectured on addictionology and

7

1    substance abuse to the School of Pharmacy, University of California, San Francisco.   I

2    also coordinated a course on Prisoner Health at University of California San Francisco

3    School of Medicine between January 2002 and January 2004.

4    21.    I have held numerous positions with responsibility for ensuring the quality of

5    clinical services provided by inpatient and community-based programs.  From 1997 to

6    1998, I was Director of Clinical Services for San Francisco Target Cities Project.  I also

7    served as (1) Medical Director of the Comprehensive Homeless Center, Department of

8    Veterans Affairs Medical Center in San Francisco, where I had overall responsibility for

9    the medical and psychiatric services at the Homeless Center; (2) Chief of the Intensive

10   Psychiatric Community Care Program, Department of Veterans Affairs Medical Center in

11   San Francisco, a community-based case management program; (3) Chief of the Substance

12   Abuse Inpatient Unit, Department of Veterans Affairs Medical Center in San Francisco,

13   where I had overall clinical and administrative responsibilities for the unit; and (4)

14   Psychiatrist, Substance Abuse Inpatient Unit, where I provided consultation to the

15   Medical/Surgical Units regarding patients with substance abuse problems.  Between 2006

16   and 2009, I served as a member of the Board of Directors of the Physician Foundation at

17   the California Pacific Medical Center.

18   22.    I also served as a Physician Specialist to the Westside Crisis Center, San

19   Francisco, from 1984 to 1987, and to the Mission Mental Health Crisis Center from 1983

20   to 1984.  I was the Chief of Psychiatric Services at the Haight Ashbury Free Clinic from

21   1991 until February 2006.  I also worked as a Technical Assistance Consultant to the

22   Center for Substance Abuse Treatment, which is part of the Substance Abuse and Mental

23   Health Services Administration of the United States Department of Health and Human

24   Services.

25   23.    I have also been employed as Psychiatric Consultant to the San Francisco

26   Drug Court and to the Hawaii (Honolulu) Drug Court.

27   24.    I currently work as a private psychiatric consultant and as a Clinical

28   Professor in the Department of Psychiatry at the University of California San Francisco,

School of Medicine ("UCSF").  At UCSF, I currently facilitate a weekly psychotherapy-training group for residents in the Department of Psychiatry as well as performing other teaching responsibilities.

25.     I have been retained by plaintiffs' attorneys in the *Coleman* case as an expert on prison medical care and prison psychiatry and the impact of overcrowding on prisoners' medical and mental health.  I have also been retained to offer my expert opinion on matters relating to whether the CDCR's current system of providing mental health care meets constitutional minima.

26.     My opinions set forth below are based upon the documents and other evidence that I have reviewed to date concerning current conditions within the CDCR, on my tours of Salinas Valley State Prison (SVSP), California State Prison-Sacramento (CSP-SAC), California State Prison – Los Angeles County (CSP-LAC), Robert J. Donovan Correctional Facility (RJD) and San Quentin (SQ), and on my professional knowledge and my experiences working in correctional settings.  On each of these tours, I visited most or all of the key mental health programs in the institution, interviewed key staff members and clinical leadership, and interviewed class members in various mental health programs.  On each tour, we also requested documents and information of various sorts relevant to the operations of the mental health programs at that institution.

27.     Prior to rendering any opinions, I reviewed a variety of reports, documents, court filings, prisoner medical records and other materials relevant to the current conditions in the CDCR.  A complete list of the materials I have reviewed is attached hereto as **Exhibit B**.

## OPINIONS

28.     My opinions and bases for them are as follows.

A.     <u>**Opinion One**</u>**:  The Mental Health Care Currently Provided in the CDCR's Mental Health Delivery System Does Not Meet The Minimum Standards of Care Required Under The United States Constitution.**

29.     It is my opinion that the CDCR mental health programs I observed at each of the prisons I visited are not meeting the minimum constitutional standard of care in a

[754904-2]

number of interlocking ways.  Moreover, based on my review of documents, statistical

reports, the Special Master's reports, the CDCR's own internal suicide reviews, the

Receiver's reports and other systemic information listed in **Exhibit B**, I believe that the

concrete problems I observed first hand at the five institutions where I conducted

inspection tours are illustrative of broader system-wide problems that exist throughout the

CDCR.  In addition, it is my opinion that these systemic failures are exacerbated by

ongoing overcrowding in the CDCR.

30.     Given the myriad geographic, demographic, physical plant and operational

differences between different prison systems, it can be difficult to pinpoint what

affirmatively constitutes a constitutionally minimum standard of mental health care before

it has been achieved in a given system.  However, in cases like the present one, it is often

easier to say when a system has not yet achieved a constitutional standard of care.  To my

mind, mental health care falls short of Constitutional minimums and must be brought up to

a higher standard whenever a given mental health system knowingly permits undue and

avoidable suffering and death to persist in the system of care due to failures to

appropriately address serious medical needs.

31.     Thus, to the extent that CDCR failures to send patients to a higher level of

care, staffing shortages, inadequate suicide prevention procedures, medication

management problems, inadequate access to crisis beds and inpatient level of care,

overcrowded mental health programs or inadequate treatment programs for EOP, PSU and

Department of State Hospitals prisoners cause unnecessary and avoidable suffering and

fall below the standard of care, these problems are impermissible and must be remedied to

bring the system into compliance with Constitutional minimums.    To my mind, the

standard of care in the community is relevant only to the extent that it shows what kinds of

suffering may be avoided by proper treatment of mental health conditions in accordance

with professional norms.

32.     The problems documented in this report are not new and are well known.

Given the ongoing monitoring by the Special Master in this case, and the evidence in his

1  reports concerning these problems, it is clear to me both that (1) defendants' mental health

2  managers have long known both about the substantial harms that are resulting from the

3  inadequacies in the CDCR's mental health care programs, and that, (2) defendants have

4  failed to undertake all reasonable measures to correct those dangerous problems. For

5  example, rather than implementing the suicide prevention measures advocated by Lindsay

6  Hayes, the suicide prevention consultant the department hired to improve its suicide

7  prevention procedures, the CDCR administrators "buried" his report and

8  recommendations. *See* Ex. 28 to Bien Dec. (6/18/12 e-mail from Robert Canning to

9  Lindsay Hayes: "Obviously when your report landed it was not roundly applauded and in

10  fact was buried.").

11      33.     Both the relevant standard of care here and the unique problems faced by

12  mentally ill prisoners were cogently highlighted in the 1993 Scarlett Carp and Associates

13  Report, a report, authored in part by defendants' current expert Joel Dvoskin, which

14  formed the foundation for defendants' current Mental Health Services Delivery System

15  ("MHSDS"):

16          Problems presented by severe mental disorders create some urgency
        within the prison environment. The behaviors symptomatic of such
17      disorders can be profoundly disruptive and stressful to other inmates and,
        particular, to staff who are not trained to handle them. Afflicted inmates
18      should be legitimately able to expect help from qualified staff in the
        reduction of the severe stress that accompanies mental illness; moreover,
19      access to treatment has been formally established by the courts as a right of
        these offenders. *While this study was not initiated in response to any*
20      *particular litigation, the mental health service delivery system proposed*
        *herein was developed with the goal that it be constitutionally adequate.*

21

22  *See* Ex. 29 to Bien Dec., filed herewith (excerpts from Defendants' Trial Exhibit X.1338,

23  California Department of Corrections, Final Report, Mental Health Services Delivery

24  System Study, February 16, 1993, by Western Consortium for Public Health in association

25  with Scarlett Carp and Associates, Inc. ["The Scarlett Carp Report"], Executive Summary,

26  at i [emphasis supplied].)

27      34.     The Scarlett Carp Report first set forth many of the key standards for the new

28  CDCR mental health system. In light of the failure, discussed in detail below, of the

1   CDCR to meet the 10 hours per week standard which was ultimately adopted for EOP

2   care, it is important to note that the Carp report envisioned sheltered EOP-like treatment

3   environments where "seriously mentally disordered prisoners will receive a full day of

4   therapeutic programming," and where "those who are able will be mainstreamed into

5   general population programs and activities appropriate to their custody requirements."  Ex.

6   29 to Bien Dec. at 10.

7           35.     The 1993 Scarlett Carp Report also warned about the dangers of housing

8   mentally ill prisoners in administrative segregation, noting that "*segregation may severely*

9   *exacerbate pre-existing mental illness."*   Ex. 29 to Bien Dec., Scarlett Carp Report,

10   Executive Summary, at vi.  Twenty years after the report, this concern continues to be

11   relevant in the CDCR.  As discussed in greater detail below, in my recent tours of locked

12   units in the CDCR where mentally ill prisoners are housed, units where an alarmingly high

13   percentage of the system's suicides take place, I found a number of individuals whose

14   mental illness appeared to be in state of acute exacerbation that was likely caused or

15   exacerbated by their long stay in segregation.

16           36.     In my prison tours and in the documents I have reviewed in the preparation

17   of this opinion, I have observed serious and systemic deficiencies that must be remedied to

18   bring the MHSDS into compliance with Constitutional minimums in the following key

19   areas:

20   •    inadequate staffing and problems with recruitment and retention of trained,

21        qualified mental health staff;

22   •     inadequate sheltered treatment programs for more severely mentally ill

23         individuals (Enhanced Outpatient or "EOP" programs and Psychiatric

24         Services Unit or "PSU" programs) and inadequate Administrative

25         Segregation ("ASU") treatment programs;

26   •    problems with timely transfers to appropriate crisis care beds for inmates

27        experiencing mental health crisis or grave disability;

28   •    medication management problems;

1          •          difficulty accessing Department of State Hospitals ("DSH") inpatient

2                      treatment programs, premature discharges from those DSH programs, and

3                      problems with the quality of care in DSH inpatient treatment programs and

4                      with suicide prevention efforts in those programs;

5          •          the particular difficulties faced by death row prisoners who are unable to

6                      access inpatient care;

7          •          a pervasive lack of adequate program and office space for mental health

8                      programs; and,

9          •          severe and dangerous problems with the department's suicide prevention and

10                    emergency response efforts.

11  I have also come to the opinion, discussed further below, that these deficiencies are related

12  to and exacerbated by ongoing overcrowding in the CDCR.

13          37.     As a medical educator and a career clinical psychiatrist, I feel obliged to

14  begin the discussion of my findings in this report by noting the high level of clinical acuity

15  among the prisoners I interviewed during my tours in the last few weeks and months.  In

16  conducting the interviews of class members with class counsel, most often in EOP and

17  other sheltered housing units, I often found myself wishing that my psychiatry medical

18  students and residents were present with me on these inspection tours, because it is rare in

19  the course of one's psychiatry practice in the community to encounter so many individuals

20  displaying such severe and disabling mental health conditions.   While such individuals

21  might be valuable case studies for students learning to recognize and treat severe mental

22  illnesses, the reasons for this are very troubling – the fact is that these individuals should

23  not be permitted to remain in their psychotic, depressed, manic, potentially assaultive

24  and/or suicidal conditions without more urgent interventions and transfers to more

25  intensive mental health treatment programs.

26          38.     I stress the severity of the mental illnesses I observed, as well as the fragility

27  of the mentally ill prisoners I encountered on these tours, because their precarious mental

28  health conditions highlight the high stakes in these proceedings.  For better or worse, the

1   CDCR has been entrusted with the care of many or most of the sickest mentally ill

2   individuals in the State of California, individuals who struggle with debilitating chronic

3   conditions who in an earlier era might have been confined to state mental hospitals for

4   most of their lives.

5        39.    These individuals are particularly vulnerable to the harsh, stressful, chaotic

6   and violent conditions that prevail in the CDCR today, and to the CDCR's pervasive use of

7   isolation and segregation as a means of controlling violence.  They are also the individuals

8   most at risk for suicide.  They are also particularly vulnerable to the stresses and pressures

9   of overcrowded prisons.  These are the individuals for whom a properly functioning mental

10  health treatment system is not a luxury.   Such a system, which can catch them when they

11  have a crisis and provide them with the necessary supports, is a necessity on which in

12  some cases their long-term prognosis or even their survival depends.

13       40.    The problems that I identified during my inspection tours and that are

14  discussed in this report are inter-related and have a tendency to reinforce each other,

15  making each individual problem worse and more entrenched.  In this way, for example, the

16  severe shortage of clinical psychiatrists that currently exists statewide in the CDCR makes

17  it more difficult to conduct appropriate medication management activities and to respond

18  in a timely manner when individuals go off their psychiatric medications.  And when no

19  one intervenes in a timely manner, many individuals who stop taking their psychiatric

20  medications will decompensate and need to transfer to a higher level of care.   However,

21  shortages in the amount of available bed space at higher levels of care in Department of

22  State Hospital programs means that many such individuals will wait for transfers to DSH

23  in Mental Health Crisis Bed Units, filling up scarce crisis beds that are otherwise needed

24  for mental health crisis care.   Similarly, it appears that pressure from administrators to

25  reduce the waiting list for scarce DSH beds means that a significant number of severely

26  mentally ill individuals are being prematurely returned from DSH and wait in MHCB beds

27  to be re-referred back to DSH.  (As discussed below, in my tours, I encountered numerous

28  cases where prisoners had been, in my opinion and in the opinion of CDCR clinicians,

14

prematurely returned from inpatient programs run by DSH.  Thus, I was not surprised when I was shown the recent testimony of an experienced DSH psychiatrist that in recent months "we were under pressure from [DSH administrators at SVPP] to move the old people out – the old patients out and take in new patients so as to keep our waiting lists down."  *See* Ex. 68 to Bien Dec.)

41.    In turn, the shortages of Mental Health Crisis Beds caused by the use of these beds for premature returns from DSH lead to the use of "alternative housing" locations for suicide watch because there are no MHCB beds available for this purpose. Unfortunately, the CDCR chooses to use unsafe, unlicensed, and punitive alternative locations for suicide watch, including cells inside noisy, harsh and chaotic administrative segregation units, standing cages, and cells without bathrooms.  Often prisoners in these alternative locations are stripped naked or down to their boxer shorts, cuffed, and denied beds and/or bedding.  Many prisoners I met during my tours told me that these locations are often cold, frightening, unpleasant and dirty, and that their knowledge of such practices and/or their first-hand experience with such conditions makes them less likely to come forward if they are suicidal at any time in the future.

42.    The fact that these punitive suicide watch policies, procedures, and locations discourage suicidal prisoners from coming forward is a factor that has increased the overall suicide rate in the CDCR to its current high levels.

43.    Finally, all of these problems in effect force the managers of the CDCR to be constantly putting out fires, rather than planning for long-term improvements to the overall system of mental health care.

44.    All of these problems are made worse by ongoing overcrowding, which is apparent in the extreme clinical staff shortages, office and treatment space shortages, lack of bed space, frequent lockdowns of long duration, medication management problems and high clinical acuity of the mentally ill prisoners I observed on my tours.  All of these problems are typically endemic in overcrowded prison systems.

45.     To choose another way to show the strong inter-relationship between the many problems discussed in this report, it is possible to see the deleterious influence of almost every other problem discussed in this report in the high suicide rates for CDCR prisoners and in the individual suicide reports and the various annual CDCR and expert suicide reviews.   Thus, in the sections below on staffing shortages, medication management problems, inadequate or delayed access to inpatient care in crisis beds and DSH programs, inadequate care for EOP prisoners generally and especially in locked units, and on the lack of confidential program and office spaces, I have been able to illustrate the problem in part by reliance on suicides reports and suicide analyses by the CDCR or by outside experts that mention the role of this problem in a particular suicide or set of suicides.

**1.      Inadequate Staffing and Problems with Recruitment and Retention of Trained, Qualified Mental Health Staff:**

**a.      My Opinion Regarding the Effect of Staffing Vacancies:**

46.     It is my opinion that the pervasive current clinical staffing shortfalls in the CDCR and in Department of State Hospitals (DSH) undermine the ability of their respective clinicians to deliver adequate quantities and adequate quality of mental health care in the prison system and in the relevant DSH inpatient care programs.   It is also my opinion that ongoing overcrowding is a major factor in the development of these staffing problems and in the difficulty of solving them.   Overcrowded systems need more clinicians because there are more patients, and because the patients are sicker. Overcrowded prison systems also suffer from shortages of office space and treatment space, and shortages of beds at higher levels of care to which the most critically ill patients can be transferred, which makes such prison systems more unpleasant and dangerous environments in which to work, and which in turn makes recruitment and retention of qualified mental health staff more difficult.

EXPERT DECLARATION OF PABLO STEWART, M.D.

[754904-2]

1          **b.       Statewide Evidence of Staffing Shortages:**

2          47.     As noted by the Special Master, the current staffing ratios for clinical

3    positions in the CDCR were developed by defendants themselves after a thorough study

4    and are intended to meet the clinical needs the department has identified:

5                    As stated above, the staffing plan was based on an assessment of
              clinical need and designated according to a ratio-based model by which the
6             numbers and types of positions were driven by the numbers and needs of the
              inmate population.  The new positions, therefore, were created because they
7             were deemed necessary to meet the needs of the inmate patient populations.
              *Where positions are not filled, the implication is that clinical need is not*
8             *being met.*

9    Docket 4298 (25th Monitoring Report of the Special Master) at 46-47 (emphasis supplied).

10         48.     In her Declaration in Support of the Defendants' Termination Motion, Diane

11   Toche, the Acting Director of the CDCR's Health Care Services Division, admits to

12   current statewide vacancies of 653 mental health positions, after accounting for the use of

13   registry workers and other non-staff workers, out of a total of 2202.26 such positions (after

14   accounting for the non-allocation of two positions at each institution).  *See* Docket No.

15   4275-3, Declaration of Diana Toche in Support of Motion to Terminate at ¶¶ 6, 8.  This

16   translates to a statewide vacancy rate, even after accounting for the use of registry workers

17   and even after taking long-term absences out of the picture (which does not seem

18   appropriate, given that these long term absences are the functional equivalent of

19   vacancies), of 29.65 percent.

20         49.     Put another way, this means that if the defendants staffing plan correctly

21   assessed the clinical need of the patient population in the CDCR, then 29.65 percent of the

22   clinical needs of class members in this case are not being met.

23         50.     Of particular concern to me is the current statewide shortage of psychiatrists.

24   According to the statewide vacancy data produced to plaintiffs' counsel on March 1, 2013,

25   reflecting staffing data as of January 2013, the statewide vacancy rate for psychiatrists in

26   that month was 41.3 percent.  *See* Ex. 32 to Bien Dec.  This is an alarming figure in a

27   system where medication plays a critical role in the treatment of prisoners with severe,

28   chronic mental illness.  As discussed in detail below in the sections on individual prisons

1  that I inspected, these shortages have a concrete and damaging impact on the quality of

2  care provided in the CDCR in a variety of different areas of mental health care delivery.

3         **c.     Evidence of Staffing Shortages in DSH Inpatient Programs:**

4         51.    I have reviewed the testimony of Dr. Brim, an experienced psychiatrist

5  working at the Salinas Valley State Prison Department of State Hospitals inpatient

6  program, and letters written by all of the psychiatrists in the program there, complaining

7  about severely inadequate staffing in that program.  *See* Ex. 68 to Bien Dec. (Dr. Brim

8  Depo excerpts).  Current staffing caseloads for psychiatrists in the intermediate inpatient

9  care (ICF) hospital programs there are at about 40 patients per psychiatrist.  The letter

10 argues that these ratios ought to be closer to the standard of 15 patients per psychiatrist

11 promised by management at SVPP and at the new hospital at Stockton.  In light of the

12 extremely high psychiatrist caseloads and the loss of three psychiatrists in the last six

13 weeks, the clinicians warned management of the DSH programs on January 23, 2013 that

14 current staffing levels were creating "an unacceptable level of risk, as far as patient

15 safety."  They explained that:

16         As psychiatrists, we are united in our belief that the level of staffing
           currently present is not safe or appropriate for an ICF level of care.  We
17         believe that it potentially creates an unsafe situation for both staff and
           patients.  When patient safety is at stake, we cannot in good conscience
18         continue to take on a higher and higher caseload without making you aware
           of our concerns.  In November 2012, SVPP had its first completed suicide.
19         Current staffing levels will create an unacceptable level of risk, as far as
           patient safety.  We will continue to do our best for every patient, under every
20         circumstance.  ***But we need to inform you that we will be working in a state
           of protest regarding our caseload and the rate of admissions.***

21

22 *See* Ex. 30 to Bien Dec. (January 23, 2012 Letter to SVPP Executive Director Charles

23 DeSilva) at 1-2.  All nine of the current treating psychiatrists in the SVPP program

24 personally signed this letter.

25         52.    Dr. Brim's testimony about current conditions in the DSH inpatient

26 programs at SVSP is very troubling in a variety of respects, and is discussed in greater

27 detail in Section 6 below, at ¶¶ 431-451, which covers the problems I observed in my visit

28 to the inpatient programs at Salinas Valley.   That section also includes a review of the

1  troubling recent suicide of Prisoner A while in the SVPP intermediate program on

2  November 29, 2012, which the psychiatrists noted with concern in their January 23, 2013,

3  letter to DSH management was the first suicide the program has experienced.

4       53.     Dr. Brim's testimony is also relevant to staffing issues here because he

5  underscored the impact of pressures to discharge patients prematurely on staffing:

6           My understanding is that there was a general feeling – and I – I felt
           this way – that we were under pressure from administration to move the old
7           people out – the old patients out and take in new patients so as to keep our
           waiting list down.
8
            And many of the psychiatrists – well, I would say all – felt that this
9           was resulting in shorter stays for the patients than historically had been the
           case.  And they felt that it was getting to the point that people were not
10          staying in all cases at least as long as they needed to.  There was pressure
           from administration to get them out quickly so that new people could be
11          brought in.

12           That does impact the workload, because when a new person comes
           in, there's quite a bit of work to do on the part of the psychiatrist, research
13          assessment, so on.  So as the number of admissions and discharges go up,
           that means more work for the psychiatrist.

14

15  Ex. 68 to Bien Dec. (Brim Deposition Excerpts).

16       54.     The January letter and Dr. Brim's testimony confirm the staffing problems at

17  DSH documented in the monthly statistical packages provided to plaintiffs' counsel in the

18  *Coleman* case each month.  In the most recent of these monthly reports, the following high

19  clinical vacancy rates are reported for the key DSH inpatient programs at Salinas Valley

20  State Prison (SVSP) and at the California Medical Facility (CMF) in Vacaville (the rates

21  are lower at Atascadero State Hospital (ASH) and Coalinga State Hospital (CSH),

22  although those programs treat fewer CDCR patients):

23

| Institution | Positions | Vacant | Vacancy Rate | Functional Vacancy Rate |
|---|---|---|---|---|
| Salinas Valley | 90 | 35 | 39% | 36% |
| Vacaville | 149.2 | 59.20 | 40% | 36% |

| Atascadero | 942.7 | 831.70 | 12% | 11% |
| Coalinga | 742.50 | 121.75 | 16% | 4% |

*See* Ex. 31 to Bien Dec. (DSH Monthly Staffing and Staffing Vacancies Report as of January 1, 2013, provided by Debbie Vorous to the Coleman parties on February 15, 2013).  As the exhibit makes clear, at the Salinas Valley DSH programs and the Vacaville DSH programs, the high vacancy rates of nearly 40 percent are only very slightly reduced through the use of contractors.  These kinds of vacancy rates are very troubling, particularly given the many criticisms of DSH programs that I heard on my inspection tours from *Coleman* class members who had been treated in those programs, and also from CDCR clinical staff members whose patients had returned from DSH still experiencing a high level of psychiatric disability.

55.   Dr. Brim's testimony also confirmed that the staffing problems in the Department of State Hospitals (DSH) inpatient programs at Salinas Valley State Prison are not confined to psychiatrists.  Dr. Brim explained both that "nursing was also very short" on staff, and that "the social workers in particular were concerned because they were stretched so thin."  *See* Ex. 68 to Bien Dec. (Brim Deposition Excerpts) at 23-25.

56.   As discussed in greater detail below, I found on my inspection tour at SVSP that the temporary inpatient programs that currently operate there are not the equivalent in most significant respects to more thorough and complete inpatient treatment programs of the sort historically operated by DSH at Atascadero State Hospital.  I also heard notable criticisms from patients concerning the treatment program in the permanent 64-bed inpatient hospital facilities operated at SVSP by DSH.  More troubling still, a number of CDCR clinicians I spoke with at different prisons were critical of the difficulties they experienced in getting some cases into DSH.  I was also disturbed to hear about so-called "DSH failures" – individuals who were deemed unable to benefit from inpatient hospital care despite their very high level of dysfunction – and about individuals being prematurely discharged from DSH hospitals.  In my experience, hospitals do not refuse to care for patients whose level of disability requires admission.

EXPERT DECLARATION OF PABLO STEWART, M.D.

[754904-2]

1

**d.      Staffing Vacancies, Program Space Issues and Recruitment and Retention Problems at the Individual Prisons Visited:**

2

3      57.      According to the CDCR's own figures in the most recent available monthly

4    statistical reports provided to plaintiffs' counsel and made available to me, the figures for

5    staffing vacancies in the CDCR statewide and at the individual prisons I visited, as of

6    January 2013 are as follows:

7                                        **January 2013 Staffing Data**
                          (Produced by Defendants in March 1, 2013 Monthly Statistical Data.)

8

| Location | Est. State Controller's Office Staff Positions (Larger of Authorized* or Established**) | Number of Vacancies | Percent Vacant | Registry Coverage, Long Term Sick (PY) and New Hires (Adjusted Vacancy Rate) | Functional Vacancy Rate[1] |
|----------|------|------|------|------|------|
| Statewide | 2238.06 | 732.52 | 32.73% | 137.66 (594.86) | 26.58% |
| SVSP | 88.50** | 25.0 | 28.25% | 9.37 (15.63) | 17.66% |
| CSP-SAC | 170.50* | 59.07 | 34.65% | 20.67 (38.40) | 22.52% |
| CSP-LAC | 108.6* | 44.1 | 43.37% | 6.67(37.43) | 34.47% |
| RJD | 140.20** | 35.7 | 25.46% | 6.75 (28.95) | 20.65% |
| SQ | 119.40* | 43.8 | 36.68% | 2.49 (41.31) | 34.60% |

---

[1] The percentage given as the functional vacancy rate in this chart is identical to the percentage in the March 1, 2013 monthly staffing data package provided to the plaintiffs by defendants on March 1, 2013 (reflecting staffing data as of January 2013), with the exception of the percentages given for SVSP and RJD.   The reason for the difference is that defendants use the total number of authorized positions and this chart uses the total number of positions currently established in those cases since the number of established positions is higher.   I thought it simpler and more logical to count all filled positions against the larger number of the established positions or authorized positions.   The numbers in this chart for the number of positions and vacancies and coverage through contract workers are all taken directly from defendants' own charts provided in the March 1. 2013 Monthly Statistical Report.   *See* Ex. E to Declaration for underlying data.

58.     Each month, the CDCR provides a package of statistical reports about its mental health population, its staffing, the census of CDCR prisoners in DSH-run programs and in its own mental health programs, waiting lists and various other issues to the Special Master and plaintiffs' counsel for the *Coleman* class.  According to the CDCR's most recent monthly statistical reports, the number and percentage of staffing vacancies at the individual prisons I visited at the time of my visit was similar to or larger than at the time these same prisons were visited by the defendants' experts last spring, notwithstanding the assurances in the joint report by defendants' experts that staffing concerns they noted had been remedied since their prison visits.  *See* Docket 4275-5, Exhibit 1 to Vorous Dec., Clinical Evaluation of California's Prison Mental Health Services Delivery System by Joel Dvoskin, Ph.D., Jacqueline M. Moore, RN, Ph.D. and Charles L. Scott, M.D. at 13-14 (e-filing pagination) (discussing system-wide and SVSP specific staffing problems), and 21 (noting no group therapy at LAC for EOP-SNY individuals because of "inadequate staff and space available").

59.     Defendants' consultants went to SVSP on May 21-22, 2012.  At that time, the functional vacancy rate at SVSP was reportedly 22.5 percent, slightly higher than it is now.  Currently, the functional vacancy rate at SVSP is 17.66 percent.  *See* Ex. 33 to Bien Dec.  However, as discussed below in greater detail, when I visited SVSP, it was clear that there were significant ongoing staffing issues there.  In addition, the DSH programs at SVSP have a vacancy rate of 39 percent and a functional vacancy rate of 36 percent.  *See* Ex. 31 to Bien Dec.

60.     Defendants' consultants went to CSP Sacramento on February 29-March 1, 2012.  At that time, about a year ago, the functional vacancy rate at CSP-Sacramento (CSP-SAC) was 12.85 percent, much lower than it is now (although the total number of staff positions filled is not very different from what it is now).  *See* Ex. 34 to Bien Dec.  Currently, defendants' most recent monthly report with data for January 2013 reports a functional vacancy rate for CSP-Sacramento of 22.52 percent.  *See* Ex. 32 to Bien Dec.

61.    Defendants' experts visited CSP-Los Angeles County (CSP-LAC) on May 3-4, 2012.  At that time, the functional vacancy rate at LAC was 12.11 percent, much lower than it is now.   Currently, the functional vacancy rate at CSP-LAC is a staggering 34.47 percent.  *See* Ex. 35 to Bien Dec.

62.    Defendants' consultants visited RJ Donovan State Prison (RJD) on March 28-29, 2012.  At that time, the functional vacancy reported in the monthly statistics was reportedly less than one percent, much, much lower than it is right now.  Currently, the functional vacancy rate at RJD is 20.65 percent.  See Ex. 36 to Bien Dec.

63.    Defendants' experts visited San Quentin State Prison (San Quentin) on May 23-24, 2012.  At the time the functional vacancy rate reported was 23.64 percent.   *See* Ex. 37 to Bien Dec.   In contrast, defendants' most recent monthly document production reports a much higher functional vacancy rate for San Quentin of 34.60 percent.   *See* Ex. 32 to Bien Dec.

64.    In addition to staffing vacancies, other related staffing problems that I noted on my tours included (a) frequent turnover in key clinical positions, (b) difficulties associated with training large numbers of registry workers, and (c) a widespread lack of adequate office, program, and confidential treatment and interview space, particularly in high security and administrative segregation programs.  These problems undermine the quality of mental healthcare in the CDCR by making it difficult for institutions to implement changes and training programs that are necessary to bring the mental health programs up to constitutional standards.

65.    For example, as discussed in greater detail below, administrators and staff members at several of the institutions I visited complained about the fact that registry workers are only permitted to work up to half of the year under current state law.  This means that the experienced registry psychiatrist I interviewed in the unlicensed crisis bed unit for suicidal prisoners at CSP-Sacramento on January 29, 2013, a critical front-line care provider to the very sick, frequently suicidal prisoners I encountered in that unit, was due to stop working for the remainder of the fiscal year a few weeks after my visit, with

EXPERT DECLARATION OF PABLO STEWART, M.D.

[754904-2]

1    his final day being February 13, 2013.  Management staff at various institutions I visited

2    complained to me that these kinds of turnovers require constant re-training of new staff

3    and undermine the continuity of care offered to class members.  Similarly, treatment and

4    office space shortages make working conditions more difficult for clinical staff and make

5    it more difficult to retain their services and to recruit new staff.  System-wide, the Special

6    Master's most recent report noted "a persistent problem was the lack of sufficient clinical

7    space, with reports of continued space shortages at" California Men's Colony, Mules

8    Creek State Prison, Salinas Valley State Prison and Valley State Prison for Women.

9    Docket 4298 (25th Special Master's Report at 36-37.)  It is my experience that these kinds

10   of space and staffing shortages are common in overcrowded prison mental health systems.

**1.     SVSP Staffing Issues:**

12           66.     At the time of my visit to SVSP on January 28, 2013, SVSP managers were

13   struggling to cope with ongoing staffing problems, although one of the managers we

14   interviewed downplayed the significance of the staffing problems.  My own interviews

15   during the tour with individual class members illustrated the negative effects of these

16   staffing shortages on the mental health treatment provided at SVSP, including failures to

17   provide adequate groups to EOP prisoners, failures to undertake appropriate efforts at

18   diagnostic clarification, and failures to conduct appropriate monitoring of medications.

19           67.     At the time of my visit, SVSP was operating its mental health programs with

20   an "Acting" Chief of Mental Health and an "Acting" Chief Psychiatrist, underscoring the

21   ongoing staff retention problems in the mental health program.   Defendants' own experts

22   also expressed concerns about staffing and space shortages at SVSP in their report, and I

23   share their concerns.  Specifically, defendants' experts recounted when they visited SVSP,

24   "the mental health director expressed concerns regarding staffing and space shortages."

25   *See* Docket 4275-5, Ex. 1 at 14.  However, the experts' report asserts that the department

26   has "already initiated steps to remedy" the staffing problem, including the use of tele-

27   psychiatry.  *Id.*  At the time the defendants' experts visited SVSP in May of 2012, there

28   were 62.00 mental health positions filled.  Ex. 33 to Bien Dec.  In the most recent monthly

1    report with data for January 2013, it indicates that there are 63.5 position filled at SVSP –

2    nearly the same number as when the defendants' experts visited.  Ex. 32 to Bien Dec.

3        68.    During my recent visit, SVSP's Acting Chief of Mental Health, Marni

4    Schneider, reported a number of serious problems with respect to staffing.  She indicated

5    that out of 6.5 Recreational Therapist positions at the institution, 4 are vacant, a vacancy

6    rate for this position of 61 percent.  She also noted that not having enough recreational

7    therapists was one of the reasons it was proving so difficult for the institution to deliver 10

8    hours of structured therapeutic activity each week to its EOP prisoners.  She also indicated

9    that there is no agency offering registry or contract coverage for Recreational Therapists.

10   Dr. Schneider also explained that SVSP had explored covering recreational therapy groups

11   using Psychiatric Technicians but that scope of practice issues prevented the institution

12   from doing this.  Dr. Schneider also reported that currently 4 out of 7 social worker

13   positions are vacant.

14       69.    Also on my visit to SVSP, the Acting Chief Psychiatrist, Dr. Sirkin, reported

15   that out of 9 staff psychiatrist positions, four are currently filled, and that 2.5 more

16   positions are covered by contractors, resulting in a functional vacancy rate of 27.8 percent.

17   *See* Ex. 32 to Bien Dec. at 32.  Unlike defendants' experts, the Special Master's experts,

18   and the Chief of Mental Health at SVSP at the time of defendants' experts visit, Dr. Sirkin

19   did not think there was a current shortage of psychiatrists.  However, including contract

20   coverage, SVSP current has the same number of psychiatrists that the institution had in

21   June of 2012 when the trio of CDCR expert consultants visited.  *See* Ex. 38 to Bien Dec.

22   (SVSP staffing chart from monthly statistical reports, reflecting data as of June 2012).

23   Based on that visit, the CDCR's experts noted the following concerns about staffing:

> The mental health director expressed concerns regarding staffing and space
> shortages.  In addition to the factors listed in item #1 above [re-alignment
> related staffing changes], these problems related to recruitment, retention,
> and leadership issues.  *We were especially concerned with the number of
> psychiatrists on staff there*.  The Department was already aware of these
> issues, and had already initiated steps to remedy the situation.  One likely
> additional solution will be the introduction of telepsychiatry to support the
> efforts of the on-site psychiatrists.

*See* Exhibit 1 to 1/07/13 Vorous Declaration (Docket 4275-5) at 12 (emphasis supplied). Based on my tour, I share these concerns about staffing and space shortages at SVSP, and it is clear that they have not yet been remedied.

70.     In light of the defendants' own experts' comment about tele-psychiatry providing a partial remedy for the shortage of psychiatrists at SVSP, it is noteworthy that at the time of my visit to SVSP on January 28, 2013, the institution was not yet using any telepsychiatry, although they indicated that they planned to start doing so three days after our tour.  The defendants' experts visited SVSP more than six months ago, in June of 2012.

71.     The defendants' own experts' notes from their visit to SVSP also highlight the difficult staffing problems there.  Dr. Scott, the team psychiatrist, wrote in his notes on his visit to SVSP that "Dr. Kaley blocked hiring 2 psychiatrists" and that there was "great conflict between psychiatry and psychology."  *See* Ex. 63 to Bien Dec.  Dr. Scott also either noted down his own feelings or was relaying the feelings of another clinician, writing that SVSP was a "very dysfunctional place."  *Id.*

72.     As noted above, the staffing problems at SVSP played a significant role in the problems with the delivery of mental health care that I observed or learned about there, including medication management problems, problems with transfers to higher levels of care, and severe problems with delivering 10 hours a week of structured therapeutic activity to EOP class members.

**2.     Problems at SVSP with The Use of Registry Workers:**

73.     During my tour of the institution on January 28, 2013, SVSP staff members also noted that using registry workers has serious drawbacks, given the operation of the current state rule that contractors can work a maximum of 975 hours a year, which in practice means that they have to stop working after 7 months.  SVSP's Acting Chief of Mental Health, Marni Schneider noted that there is "a huge problem with continuity of care" with contractors, and that "once [they are] trained, you have to replace them."

1
2

### 3.   SVSP Program Space and Confidential Treatment Space Issues:

3   74.   In the Special Master's 25th Monitoring Report, he urged that "all [ASU

4   EOP] hub institutions must look critically at their own space resources and maximize their

5   own capacities to provide a private, confidential environment for patients to communicate

6   openly with clinicians and fellow therapeutic group members." Docket 4298 (25th Special

7   Master's Monitoring Report) at 37.  The Special Master found that clinical contacts were

8   held in non-confidential holding cells at SVSP when the volume of clinical contacts

9   exceeded the number of available offices, and that only an average of 41 percent of clinical

10   contacts with EOP Administrative Segregation prisoners took place in a confidential

11   setting.  Docket 4298 (25th Special Master's Report) at 260.

12   75.   On my tour, SVSP's Acting Chief of Mental Health, Marni Schneider, Ph.D,

13   also reported that SVSP continues to experience serious program and office space issues.

14   She told us that forty percent (40%) of the EOP groups in the mainline EOP programs on

15   D-Facility currently take place on the recreation yard.  She also noted that there is not

16   enough office and treatment space for confidential interviews with class members.  She

17   noted that the D-Yard gym was going to be used for these groups starting the day after our

18   tour.  However, staff members explained that the gym is also a large open space that, like

19   the yard, will not afford privacy or confidentiality (or quiet) to participants in groups in

20   that space.  A new office space project in D-8 is planned but that project is in the

21   preliminary planning stages and has not broken ground yet, and would only provide

22   treatment and office space for a smaller EOP program that would have to be moved to that

23   area of D-Facility sometime in the future.

24   76.   It was also noted on the tour that SVSP is in the process of completing

25   construction of new office and treatment space for an EOP SNY program on A-Facility.

26   That program is reportedly on schedule to open in September of 2013, one month ahead of

27   its construction completion deadline of October 2013.  However, this space is for a new

28   protective custody (called a Special Needs Yard or "SNY" yard in the CDCR) EOP

1  treatment program and will not remedy the space problems faced by the mainline EOP

2  program currently housed in D-3 and D-4 units on D-Facility.  Mainline and SNY

3  prisoners are not allowed to mix, even in intensive mental health programs.  Also A-

4  Facility is a considerable distance from D-Facility, making use of office space there for D-

5  Facility clinicians difficult if not infeasible.

6          **4.    Overview of CSP-Sacramento Staffing Issues:**

7          77.    The most recent staffing data available indicates that at the time of my visit

8  to CSP-Sacramento, the functional vacancy rate was 22.52 percent, including a staffing

9  vacancy rate among psychiatrists of 35.36 percent and a "functional" vacancy rate for

10  psychiatrists after counting registry workers of 15.31 percent.  The institution also had a

11  functional vacancy rate among recreational therapists of 43.67 percent.  The staffing data

12  also show an extremely large number of vacancies in Office Technician positions, with 10

13  of 23 positions vacant and a functional vacancy rate of 44.68 percent.  Defendants' data

14  also shows a high rate of vacancies (relative to other prisons) among clinical psychologists,

15  with a staffing vacancy rate for that position of 29.57 percent, and a functional vacancy

16  rate of 10.20 percent.  Ex. 32 to Bien Dec. (March 1, 2013 Report Reflecting January 2013

17  data, at p 27 of 35).

18          78.    Following the tour, CSP-Sacramento provided a chart showing staffing

19  levels in key clinical positions as of January 21, 2013.  Ex. 39 to Bien Dec. (CSP-

20  Sacramento post-tour production at Bates No. SAC 115).  The numbers in that chart are

21  similar to the information above, although the numbers for staff psychiatrists are somewhat

22  worse, with 8.75 out of 21 staff psychiatrist positions vacant and 4 positions covered by

23  contractors, for a functional vacancy rate of 23 percent.  The functional vacancy rate for

24  recreational therapists was somewhat lower than in the January data, at 33 percent.  *Id.*

25          79.    Mental health and custody managers interviewed at the outset of the tour at

26  CSP-Sacramento indicated that the current statewide hiring freeze has an impact on hiring

27  in that the institution is required to apply for an exemption for each position filled, which

28  causes additional delay and adds another burden to the hiring process.

28

EXPERT DECLARATION OF PABLO STEWART, M.D.

80.     The managers also expressed concern about the ongoing shortage of psychiatrists at the prison.  They noted that psychiatrists are only able to attend about 7% of IDTT meetings because they are prioritizing more urgent patient care.  Staff also acknowledged problems with lapsing of medication consents due to the shortages.  CSP-Sacramento managers also expressed concern about frequent turnover of psychiatrists in one of their EOP programs.  They indicated that they are assembling a new management team to work with the clinicians in that unit to improve the program.

81.     In connection with monitoring tours by the Special Master's Team, the Mental Health Program managers at each institution generally produce what is referred to as a "Management Report" on the current status of various programs and issues in the mental health program at their institution.  The defendants have produced these Management Reports for the 25th round visits by the Special Master and I have reviewed them.  In their Management Report for the Special Master team's most recent "hybrid paper" review of CSP-Sacramento in early July, 2012, managers at CSP-Sacramento included the following statement about staffing problems under the heading "Obstacles to Providing Mental Health Services and Adherence to Program Guide Requirements:"

> Access to treatment is regularly impacted in all programs by staff absences.  Absences for vacation and sick leave (including long term sick) were not covered with registry staff during the review period.  In addition, staff who retired were not replaced until funds were available on retirement payout.

Ex. 40 to Bien Dec. at 7.  The Management Report also noted that the institution has an ongoing Quality Improvement Team titled "Coping with Psychiatrist Shortages," which demonstrates that this problem is a serious issue and has been a long-lasting problem at the prison.  Ex. 40 to Bien Dec. at 13.

82.     We were told on our tour that one response to the shortage of psychiatrists was that medication renewals were being done by senior and supervising psychiatrists rather than staff psychiatrists.  This is a troubling practice since the treating staff psychiatrists presumably know their individual patients much better than their supervisors.

83.    When I toured CSP-Sacramento, Shama Chaiken, the head of Mental Health programs there, indicated that the institution had adopted various strategies to deal with the shortage of psychiatrists, including more efficient means of monitoring lab results, but that the "workload for psychiatrists at [CSP/Sacramento] is always high, [and psychiatry] staff is always prioritizing care."   She explained that one reason for the high workload generally is that there are 442 patients on involuntary medications at the institution, and she said that they are trying to do *Keyhea* renewals without using staff psychiatrists (using senior psychiatrists instead).  As noted above, she indicated that psychiatrists attend only 7% of the Interdisciplinary Treatment Team (IDTT) meetings at the institution because the psychiatrists are prioritizing more urgent care.  However, these treatment team meetings are a key part of the system for managing mental health patients in the CDCR – it is where clinicians share information with the patient and with each other about how the patient is doing and what will be done in the future to manage the patient's care.  It is very important for psychiatrists to attend these meetings and to hear from the patient and the other treating clinicians about how well the patient is functioning on his or her current treatment and medication regimen.

84.    Like her colleagues at other prisons, Ms. Chaiken also complained during the tour about the impact of state rules limiting the use of registry workers to 975 hours per year, explaining that the rule means that they lose their more experienced registry staff members all the time and have to begin training new employees constantly.

85.    In the defendants' experts' joint report, they also expressed concern about the amount of EOP treatment being provided at CSP-Sacramento, which they concluded was a product of staffing shortages:

> At the time of our visit … the amount of group therapy offered and received was lower than at other prisons, largely because of staffing issues, which we understand were under the control of the Receiver's office. However, at the time of this report, the issue had been resolved, additional staff had been hired, and the group therapy offered met the standard of care.

*See* Exhibit 1 to 1/07/13 Vorous Declaration (Docket 4275-5) at 20-21.

86.     Based on concrete information to the contrary gleaned during my visit to the institution and in my document review, I do not agree with the statement by the trio of experts working for defendants that additional staff members have been hired and that the problem of the amount of group therapy provided in the EOP programs at CSP-Sacramento has been solved.

87.     At the time of the defendants' experts visit to CSP Sacramento in February of 2012, there were 111.3 total mental health positions and 12.75 staff psychiatrist positions at CSP-Sacramento that were filled.   *See* Ex. 34 to Bien Dec.  Based upon the most recent staffing data from January 2013, there were 111.4 total mental health staff positions and 13.25 staff psychiatrist positions filled, almost the identical number of positions overall, and an increase of 0.5 in the number of staff psychiatrist positions filled. *See* Ex. 32 to Bien Dec. at 27.  Essentially, the staffing levels are the same as when the defendants' experts toured the prison, even as the mental health caseload and the size of the treatment programs at CSP-Sacramento have expanded.

88.     In addition, evidence concerning the number of EOP treatment hours being actually attended by EOP prisoners at CSP-Sacramento that was produced following our January 29, 2013 tour showed that for the time period of October 1, 2012 through December 31, 2012, with key holiday weeks (where less treatment was certainly provided due to staff holidays) excluded, class members in its EOP treatment programs were getting only about half of the required 10 hours per week of therapy:

| Program | Scheduled Hours | Offered Hours | Attended Hours |
|---|---|---|---|
| Administrative Segregation EOP | 11.6 | 9.9 | **5.4** |
| Mainline EOP | 12.3 | 9.1 | **5.2** |
| Psychiatric Services Unit (PSU) | 10.2 | 7.7 | **5.4** |

*See* Ex.41 to Bien Dec. (documents Bates Stamped by defendants as SAC 31).

89.    The low number of treatment hours actually being attended by patients in these EOP programs is very troubling, especially given the extremely high level of clinical acuity of the prisoners I interviewed in the programs.

90.    As the chart above provided by staff members at CSP-Sacramento demonstrates, CSP-Sacramento is still unable to deliver more than about 5 hours of week structured therapeutic treatment activities to any of its EOP prisoners.  Yet CSP-Sacramento is viewed as having one of the best physical plants for delivering treatment. Staff members at CSP-Sacramento and elsewhere jokingly refer to the CSP-Sacramento treatment area as the "Taj Mahal."  Yet despite this excellent physical plant, the institution is unable to deliver adequate mental health treatment.  This problem is discussed in greater detail in the section on EOP treatment programs below.  It is mentioned here to show the continuing harm caused by staffing shortages at CSP-Sacramento.

**5.    The Staffing Problems at CSP-Sacramento Are Exacerbated By The Burdens of Using the New Electronic Records System Without Access in Housing Units**

91.    Given the shortage of staff psychiatrists at CSP-Sacramento, I was concerned to learn about the difficulties psychiatrists faced in using the new electronic records system there.  On the tour in the mainline EOP program, I interviewed Dr. Jackson, the new EOP staff psychiatrist, about how he uses the electronic medical records system.  He was on the EOP unit seeing patients at the time, and he had a stack of paperwork that he was carrying with him.  He explained that prior to seeing the patients on his caseload, he looks at the last few months of electronic medical records for each patient on his office computer, which is located in another area at some distance from the EOP unit.  He then prints out hard copies of key documents from the electronic record and takes notes on those copies summarizing the key information gleaned from his record review.  He then writes out progress notes from his visit with inmates on his caseload, and puts the notes in to be scanned into the electronic record.  However, he said he keeps his own personal copy of the records because "sometimes the computers are down" and because it takes at least 24 hours for his notes to be scanned into the system and "something could happen between now and when

EXPERT DECLARATION OF PABLO STEWART, M.D.

1   the scan is entered into the system."  The entire process seemed very cumbersome, time-

2   consuming, and clinically dangerous.   Clinicians should have access to up to date,

3   accurate medical records while performing their clinical contacts with patients.  Given the

4   existing staffing shortages, the undue demands and inefficiencies of this new electronic

5   records system needs to be remedied by making electronic records available throughout the

6   prison and allowing for clinicians to quickly and reliably enter their own notes into the

7   system.

### 6.   The Role of Two Different Staffing Problems in the Suicide of a CSP-Sacramento Class Member in November of 2011.

92.   The suicide of Prisoner B, a severely and chronically mentally ill class member at CSP-Sacramento, on November 26, 2011, illustrates the dangers associated with the staffing problems that are now endemic both at CSP-Sacramento and system-wide in the CDCR.  Both the institution's shortage of psychiatrists, and absences in the key DSH coordinator position contributed to critical failures to provide Prisoner B with appropriate care.

93.   Prisoner B had a history of severe mental illness starting around age 18, when he was first diagnosed as having Bipolar Disorder with Psychotic Features and prescribed Lithium to stabilize his mood.  The suicide report for Prisoner B described his clinical presentation when at CSP-Sacramento in 2011:  "[Prisoner B] *was very delusional, and seemed wrapped in his own fantasy world.  He often did not know the date or time, nor did he understand the roles of mental health staff.  The adequacy of his medication therapy was questionable. Due to his in-cell violence and severe psychosis, he was single-celled. He rarely came out of his cell to engage in activities available to him, although he was polite and otherwise cooperative*."  *See* Ex. 14 to Kahn Dec., (January 10, 2012 Executive Summary of Prisoner B Suicide Report) at 1.

94.   Prisoner B would have been released on parole on October 4, 2011, but he received an additional four years on his sentence after assaulting a correctional officer at Salinas Valley in June of 2009, at a time when he was psychotic and on the waiting list for

1    the intermediate inpatient care Salinas Valley Psychiatric Program (SVPP) run by the

2    Department of State Hospitals (DSH) on the grounds of Salinas Valley State Prison.  (*Id*. at

3    5, 8.)  The [DSH] referral was based on the observation that he was regressing and

4    becoming more isolated and withdrawn.  *Id*. at 8.

5       95.   In 2011, when he returned to CSP-Sacramento from a long stay in the SVPP

6    inpatient program at Salinas Valley, Prisoner B remained on a *Keyhea* order for

7    involuntary medication.  *Id*. at 9.  He returned to CSP-Sacramento from DSH on March 1,

8    2011.  In the Spring and Summer of 2011 Prisoner B was noted to be decompensating and

9    his diagnosis was changed to Schizophrenia, Disorganized Type.  *Id*. at 9.  In August of

10   2011, Prisoner B was seen to be decompensating further and he was referred back to DSH

11   intermediate care at the Salinas Valley Psychiatric Program and accepted and placed onto

12   the waiting list for the program.  *Id*.  A bed in the DSH program became available three

13   months later on November 3, 2011, but his paperwork for the transfer was not completed

14   in a timely manner and he took his own life more than three weeks later on November 26,

15   2011.  *Id*.  The role of staffing problems in delaying his transfer to DSH is highlighted in

16   the suicide report:

17          To complete the transfer packet, an update on the inmate's medical
        condition was required on the CDCR Form 7371 Health Care Transfer
18      Information.  As per institutional procedure, an e-mail was sent to nursing
        supervisors requesting completion of this form on an urgent basis, with a due
19      date of November 8, 2011.  However, the form was not returned.  Typically,
        the mental health DMH coordinator follows up delinquent forms; however,
20      due to a subsequent series of key staff absences, the follow up was not
        successful.  Had the form been submitted in a timely manner, the inmate
21      would have been transported to DMH no later than December 8, 2011, and
        quite likely as soon as the packet was submitted.  Potentially, he could have
22      left prior to November 26, 2011, the date of his suicide.

23   Ex. 14 to Kahn Dec., Prisoner B Suicide Report, Executive Summary, at 10.

24          96.   The CDCR's internal suicide report by longtime reviewer Dr. Steenman

25   identified two serious problems for remedial action.  The first was the failure to process the

26   paperwork needed for the DSH transfer.  The second was that "inadequate medication

27   management for severe psychosis was noted by this review."  On the latter topic, the

28   Suicide Report called for a Quality Improvement process by the Chief Psychiatrist or

1   designee to review Prisoner B's psychiatrist's treatment of prisoners with severe mental

2   illness.

3         97.    In response to the latter requirement in the suicide report, the Chief

4   Psychiatrist at CSP-Sacramento prepared a memo to the Chief of Mental Health

5   concerning the recommendation about medication management issues and the psychiatrist

6   who failed to adequately care for Prisoner B.  According to the memo, the psychiatrist who

7   was responsible for treating Prisoner B was a contractor who chose not to return to CSP-

8   Sacramento following the suicide.  In addition, at the time of the death, the psychiatrist

9   was being closely counseled and monitored.  *At the time, the psychiatrist had a caseload of*

10  *over 90 severely mentally ill patients, including 40 on Keyhea orders.*  He was

11  overwhelmed with his caseload and shortly after the Prisoner B's suicide, the psychiatrist

12  requested reassignment to a different program with a smaller caseload.  *See* Ex. 15 to Kahn

13  Dec., (Prisoner B Quality Improvement Process documents, February 2, 2012 Memo).

14        98.    In his careful review of the case for the Special Master, Dr. Patterson

15  expanded on the issues identified in the CDCR report, and underscored several more areas

16  of concern.  First, Dr. Patterson concluded that given his high level of dysfunction, a

17  decision to return Prisoner B to DSH should have been made almost immediately upon his

18  return from the program in March of 2011:

19          He was clearly decompensating and not participating at the EOP level
   of care and his delusions and bizarre behaviors were active.  It is unclear
20  based on this reviewer's analysis of this inmate's care and treatment as to
   why he was not referred to the MHCB and as necessary to APP for acute
21  management of his active symptoms.  The suicide review in this reviewer's
   opinion correctly identified the referral to DSH was not acted upon promptly,
22  but even the referral to ICF was delayed several months despite the inmate's
   clearly deteriorating situation.
23

24  Docket 4308 (Special Master's Review of Suicides in CDCR in Calendar Year 2011) at

25  257.  Second, Dr. Patterson highlighted emergency response problems when this prisoner

26  was found.  *Id.*

27        99.    Neither review focuses very much on what I consider to be the most

28  disturbing aspect of this case: namely, the fact that the major injuries suffered by Prisoner

B both took place while he was waiting for admission to an inpatient hospitalization program.  This is a profoundly tragic case, both because Prisoner B was denied the care he needed to such great detriment, and because this denial took place repeatedly.  During the first delay in transferring him to DSH in 2009, while he was on the waiting list, Prisoner B assaulted a correctional guard and had 4 years added to his sentence.  But for that assault, he would have been released to the community in October of 2011.  Then, in August 2011, he was referred back to DSH, once it was clear that he could not be safely maintained in an EOP program – something that should have been clear at the outset of his EOP stay in March and April of 2011.  And finally, nearly four months in to a second long wait on the SVPP DSH waitlist, at the end of November 2011, he took his own life.

100.    A final issue identified by Dr. Steenman in the CDCR's internal suicide report is critical.  Dr. Steenman argues that Prisoner B is an example of someone whose clinical picture was so severe that he should have remained permanently in a DSH facility, but that such a placement is not currently permitted under the MOU between the agencies:

> In actuality, what would be ideal for someone as ill as inmate [Prisoner B] is a permanent commitment to an intermediate care facility (ICF).  Unfortunately, this is not available to inmates once they are committed to prison .…  The death of inmate [Prisoner B] indicates that CDCR should consider reviewing the feasibility and clinical wisdom of legislation that would allow indefinite commitment of severely ill inmates to DMH.  The current Memorandum of Understanding with DMH (per Penal Code 2684) only allows inmates to remain for a few months or until no further improvement is demonstrated, despite the fact that severely mentally ill persons do not get better in a few months and often need long term care in the appropriate environment to maintain any gains they do achieve.

Ex. 14 to Kahn Dec., Prisoner B Suicide Report at 15.

101.    I agree wholeheartedly with this recommendation.  In my visits to the MHCB and other crisis bed units at five prisons, I encountered numerous extremely psychotic individuals who were in the process of being transferred once again to an inpatient care program and/or who had recently returned from DSH (within the last month) and were too ill to be maintained in a CDCR facility.   There were three such individuals in the MHCB unit at RJD alone, among the seven individuals waiting in the MHCB unit there for transfer to DSH.  I also encountered numerous individuals in EOP units and EOP

36

1  administrative segregation units who were waiting for DSH care and whom I concluded

2  were too mentally ill to be maintained safely in an EOP environment.  A number of these

3  individuals are likely candidates for long-term hospital placement.  I also heard at several

4  prisons about individuals being prematurely discharged from DSH hospitals and about

5  individuals considered "DSH failures" and sent back to the CDCR.  Dr. Brim's testimony

6  confirms that there has been pressure on DSH clinicians to prematurely discharge patients

7  in order to keep down the waiting list.  *See* Ex. 68 to Bien Dec.  These individuals clog up

8  the scarce MHCB beds in the CDCR, forcing the CDCR to use dangerous alternative

9  placements for inmates who are acutely suicidal.  The process of cycling back and forth

10 from DSH is also disruptive to the psychiatric stability of these individuals and to my mind

11 impairs their long-term prognosis.

12      102.   In my opinion, this case illustrates at least three additional critical points.

13 First, whether staffing vacancies were or were not primarily responsible for this prisoner's

14 death, his story illustrates the dangerousness of staffing shortages and waitlists.  Second,

15 the case illustrates the dangers of tolerating the presence of individuals in CDCR EOP

16 programs whose severity of clinical condition dictates that they be maintained in a hospital

17 setting.  Third, his case illustrates that frequent turnover in front-line clinical staff and

18 overcrowding-related caseloads create unacceptable dangers for class members in this

19 case.

20      103.   The November 29, 2012 suicide of another CSP-Sacramento prisoner who

21 was sent to the Salinas Valley Psychiatric Program run by the Department of State

22 Hospitals after a long transfer delay is similar to the Prisoner B Suicide in some very

23 troubling respects.  *See* Discussion at ¶¶ 436-445, *infra*.

### 7.      Staffing Problems at CSP-Los Angeles County:

25      104.   I also observed serious staffing-related problems when I visited CSP-Los

26 Angeles County on January 31, 2013 and February 1, 2013.  In the 25th Round Report, the

27 Special Master noted a number of concerns about staffing at CSP-Los Angeles County.

28 For example, he noted that "[f]or the fourth consecutive monitoring period, the chief

EXPERT DECLARATION OF PABLO STEWART, M.D.

1  psychiatrist position at CSP/LAC was vacant." Docket 4298 (25th Special Master's

2  Monitoring Report) at 53. The CSP-Los Angeles County Mental Health Management

3  Report issued in conjunction with the 25th round of monitoring by the Special Master also

4  noted concerns about staffing changes due to AB 109 impacting the ability of LAC to

5  adhere to Program Guide requirements in the ASU-EOP program in December 2011 and

6  January 2012: "*Due to this CSP-LAC lost several staff members who were replaced with*

7  *staff from the Department of Juvenile Justice (DJJ). Almost all of the staff that were*

8  *impacted worked in the ASU-EOP program. For this reason, our ability to adhere to*

9  *Program Guide requirements in ASU-EOP suffered during the months of December and*

10  *January.*" Ex. 42 to Bien Dec. (LAC Management Report for 25th Round) at 7. As

11  detailed in the section below on problems with EOP care statewide, I found serious

12  deficiencies in the care being provided in the EOP Administrative Segregation Unit at

13  CSP-Los Angeles County during my tour at the end of January 2013.

14        105.   Prior to my visit, I reviewed the most recent staffing data, which reflected

15  staffing at CSP-Los Angeles County in November of 2012. At that time, a number of key

16  positions were vacant, including: the Chief Psychiatrist position, 1 of the 2 Chief

17  Psychologist positions was vacant, 2 of 10 social worker positions were vacant (but there

18  were 17 authorized social worker positions and only 10 established), 10 of 36 established

19  clinical psychologist positions were vacant, 5.5 out of 12 established staff psychiatrist

20  positions were vacant (a 45.8 percent vacancy) rate, although the use of 4.0 PY worth of

21  registry psychiatrists reduced this to 12.5%, 2 of 6 Senior Psychologist Supervisor

22  positions were vacant (33%), and 4.15 of 7.15 allocated (12 authorized) recreational

23  therapist positions were vacant, with no coverage (so either a 58 percent vacancy rate or if

24  using authorized positions the rate is 75 percent.). The 25th Special Masters Report noted

25  that due to staff illness, there had been multiple changes in the person responsible for

26  covering the DSH coordinator positions. This is a dangerous position for which to permit

27  frequent turnover. As discussed above, staff absences in this position at CSP-Sacramento

28  may have contributed to the suicide of a class member there.

EXPERT DECLARATION OF PABLO STEWART, M.D.

106.    Staffing data provided by defendants in early March 2013, reflecting January 2013 staffing levels at the institution, indicates an overall staffing vacancy rate for CSP-Los Angeles County, after accounting for registry and other coverage of vacant positions, of 34.47 percent.  *See* Ex. 32 to Bien Dec., March 1, 2013 Staffing Data (reflecting January 2013 staffing levels) at 21 of 35.

107.    At the time of my tour, staff members at LAC reported unofficial data on staffing indicating some improvements in the staffing picture, noting for example, that the Chief Psychiatrist position was now filled, and that there were now 28 of 32 authorized staff psychologist positions filled.  They also reported that there were 7.5 out of 12.0 staff psychiatrist positions filled, an increase of 1.0 psychiatrist since the December 2012 data and 2.0 psychiatrists since the November data.  The institution also reported increased contractor coverage of psychiatrist vacancies, although I was not able to confirm this on my tour.

108.    Nevertheless, one of the two Chief Psychologist positions remained vacant at the time of my tour at CSP-Los Angeles County, and 9 out of 13 recreational therapist positions remained vacant with no applications on file for the position.  Also, at the time of the tour, there was an "acting" DSH referral coordinator, suggesting that turnover in that key position remained a problem.

109.    In my opinion, these chronic staffing vacancies contribute to the ongoing inability of CSP-Los Angeles to deliver adequate structured therapeutic activity hours to prisoners in its three EOP groupings – EOP ASU, mainline EOP, and SNY EOP (SNY EOP is a protective custody EOP program).  The following chart produced by CSP-Los Angeles County following my tour shows the low number of treatment hours being currently attended in these critical EOP programs during the three month period from November 2012 through January 2013:

| LAC EOP Program | Treatment Hours Scheduled | Treatment Hours Offered | **Treatment Hours Attended** |
|---|---|---|---|
| Mainline EOP | 9.86 | 6.93 | **3.82** |
| Administrative Segregation EOP | 11.30 | 10.00 | **6.35** |

Ex. 43 to Bien Dec. (CSP-Los Angeles County post-tour production) at LAC 146.

110.   The number of hours defendants scheduled and offered are irrelevant to the clinical care issue here, which is how many hours were actually attended by class members. "Scheduled" hours that are not actually offered have no influence on the clinical care of patients. Similar, "offered" treatment hours not actually attended by patients have no effect on the mental health of class members. As explained in greater detail in my section on EOP care at LAC, below at ¶ 358 to 366, these low numbers are themselves inflated in that the prison counts groups towards these totals that should probably not be counted. For instance, when prisoners are waiting to meet with their case managers at CSP-Los Angeles County, they are given magazines to read and the time spent waiting is counted as participation in a "wait and talk" group. The large number of groups being refused at CSP-Los Angeles County is also very troubling to me. In my experience, when groups have therapeutic value, patients are motivated to attend those groups.

### 8.   Staffing Problems at RJ Donovan:

111.   I also observed serious staffing problems at RJ Donovan Correctional Institution, which I visited on February 12, 2013. As noted above, the overall functional vacancy rate at RJD as of January of 2013 was 20.65%. Key clinical vacancies at RJD listed in the January of 2013 data included 11 of 22 Office Tech positions, with no registry coverage (50% functional vacancy), 8 of 15 Staff Psychiatrist positions, with 3.7 registry coverage (28.6% functional vacancy rate), and 3.5 out of 20.5 Psychiatric Social worker positions, with no registry coverage (more than 17% functional vacancy). At the time of the tour on February 12, 2013, there were still serious problems: 7 staff psychiatrist positions were vacant out of 15 positions, with some additional contract coverage.

EXPERT DECLARATION OF PABLO STEWART, M.D.

[754904-2]

1    Managers noted that this was still causing some problems with ordering and reviewing

2    laboratories for psychiatric medications (the results of some internal RJD studies on

3    laboratories are set forth in the next section below on medication management.)  On the

4    other hand, managers on the tour reported some improvement in the vacancy rate for social

5    workers, with 17.5 out of 20.5 positions filled, for a vacancy rate of 15%.

6              **9.    Problems with the Lack of Confidential Treatment Space**
                       **at RJD and LAC**
7

8              112.    There were also serious challenges at RJD and LAC in the area of

9    confidential space for treatment, particularly in their EOP Administrative Segregation

10   Units.  Photographs of the RJD EOP Administrative Segregation office space on the day

11   room floor are attached to the Photographic Appendix filed herewith as Appendix B and C.

12   These photos show the temporary offices where case managers and other psychiatric staff

13   members meet with their patients on the dayroom floor of the housing unit.  The location

14   of the offices in wider view is visible in the photographs attached as Appendix D and E,

15   which show the offices in relationship to the arcs of treatment cages used for groups, on

16   the floor of the housing unit, beneath tiers of cells and the interior gun station/control

17   station where an armed officer observes the housing unit.

18             113.    In some respects the arrangement of these meeting spaces at RJD is better

19   than the bare cages used for therapist-patient meetings on the dayroom floor of the EOP

20   Administrative Segregation Unit at CSP-Los Angeles County.  Photographs of the cages

21   used for therapist-patient case manager meetings in the Los Angeles County unit are

22   attached to the Photographic Appendix to the report at Appendix F and G.

23             114.    These arrangements clearly make recruitment and retention of staff for these

24   units much more challenging.  However, more than just a staffing retention problem, these

25   arrangements at both institutions mean that staff members are required to meet with EOP

26   administrative segregation prisoners in non-confidential areas on the crowded, noisy,

27   chaotic dayroom floors in the housing units, under the watchful eyes of an armed guard.

28   This creates particular challenges in establishing a trusting, confidential, appropriately

therapeutic therapist-patient relationship in these units.  There is essentially no confidential treatment space available in either EOP Administrative Segregation program.

### 10. Staffing Problems at San Quentin

115.    Perhaps because of its location in the Bay Area, the clinical vacancy rate for clinical staff at San Quentin was somewhat lower than at the other prisons for the key psychiatrist positions.

116.     In the Management Report for the first six months of 2012 prepared in connection with the Special Master's team's visit on August 6-8, 2012, under "Obstacles to Providing Mental Health Services and Adherence to Program Guide Requirements," San Quentin managers noted that "adjustments and changes to staffing, not only in mental health but also in the custody and medical departments, have also impacted the provision of services at times" and that the "planned population changes and uncertainty due to realignment have, at times, impacted department morale."  *See* Ex. 45 to Bien Dec. (San Quentin Management Report) at 2.  However, on the tour, the mental health program manager expressed confusion when asked about these concerns and indicated that they were resolved.

117.    In the March 1, 2013 monthly staffing documents, reflecting January 2013 data, there were some continuing areas of staffing concern at San Quentin, including the fact that 7.4 of 13.4 Office Technician positions were vacant, a vacancy rate of 55 percent, and that 4 of 8 authorized Recreational Therapist positions were vacant, a vacancy rate of 50 percent.  *See* Ex. 32 to Bien Dec. (January 2013 staffing data for San Quentin from March 1, 2013 monthly statistics production) at 31.

118.    On my inspection tour at San Quentin on February 26, 2013, the head of the mental health program there denied that there are any current staffing problems at the prison.  Given the large number of extremely sick and inadequately treated mentally ill individuals I observed on my tour at San Quentin, this lack of concern was itself very troubling.

**2.      The CDCR Must Eliminate the Pervasive and Dangerous Medication Management Problems in the Mental Health Delivery System**

   **a.      My Opinion Regarding the CDCR's Medication Management Problems:**

119.    The staffing problems in the CDCR, particularly the shortage of psychiatrists, and also the burdensome nature of the new electronic medical records system, has caused medication management problems that are very dangerous to class members in this case.

120.    In my inspection tours at the five prisons I visited, I encountered a variety of medication management problems. Medication management is critical for individuals with chronic severe mental illness. When they go off of their medications, which is a regular occurrence in many cases, such individuals often become psychotic, depressed, manic, assaultive, suicidal and/or gravely disabled. When such symptoms are not treated, problematic behavior can ensue, such as assaultive, erratic or unsafe behavior with potentially severe consequences. First, as the case of Prisoner B above illustrates, some such prisoners may become assaultive when off of their medications. In a prison context, such behavior can lead to violent encounters with staff members and to prosecution and convictions for assault, which can lead to additional prison time. Second, the long-term prognosis of some mentally ill individuals is harmed when they are allowed to remain untreated in a psychotic state. For example, the literature shows that individuals who are experiencing a first psychotic episode have a much better long-term prognosis if they are started quickly and aggressively on antipsychotic medications. Moreover, it is well established that the longer a person experiences psychiatric symptoms such as psychosis or depression, the more likely it is that they will experience these symptoms again in the future.

   **b.      System-Wide Evidence Regarding the CDCR's Medication Management Problems:**

121.    The 25th Special Master's Report noted a variety of concerns statewide with medication management issues. The Special Master noted particularly widespread

EXPERT DECLARATION OF PABLO STEWART, M.D.

[754904-2]

1   problems in a number of critical areas.   Each key area where there are widespread

2   problems is discussed below in turn.

### 1.   Delayed or Non-Existent Responses to Medication Non-Compliance:

5   122.   First, in responding to medication non-compliance the Special Master noted

6   that 19 prisons were not compliant "with appropriate identification, documentation,

7   referral, and response to inmate medication non-compliance," while nine prisons were

8   compliant with these requirements, based on their own self-monitoring.  Docket 4298 (25th

9   Special Master's Monitoring Report) at 68.

10   123.   In my opinion, responding rapidly and appropriately to instances of

11   medication non-compliance is one of the most important components of a properly

12   functioning mental health system.  For many chronically mentally ill individuals, periods

13   of medication non-compliance are an aspect of their disease process.  The psychiatric term

14   "anosognosia" refers to the fact that many mentally ill patients are oblivious to their

15   disease state and their need for proper treatment including medication.  Literature shows

16   that individuals who become medication non-compliant are more likely to require

17   psychiatric hospitalization, among other negative outcomes.

### 2.   Laboratory Testing Problems:

19   124.   Second, the Special Master also reported widespread problems with ordering

20   appropriate laboratory tests for psychiatric medications.  In the 25th round reviews, the

21   Special Master reported that ten prisons plus North Kern State Prison (where the finding of

22   non-compliance was based on a small sample reviewed) were non-compliant with

23   laboratory testing protocols, while another ten institutions (mostly institutions with smaller

24   mental health programs, including the four desert institutions, Calipatria, Centinela,

25   Ironwood State Prison and Chuckawalla Valley State Prison, which are required to transfer

26   any mentally ill prisoners on medication to another facility) were reportedly compliant

27   with medication laboratory testing protocols.  *See* Docket 4298 (25th Special Master's

28   Report) at 69-70.

125.   Psychiatric medications tend to have particularly severe and potentially dangerous side effects.  Some of these side effects, including tremors and other involuntary movements, can become permanent if not addressed quickly when they first appear.  Other medication side effects include diabetes and other severe metabolic disturbances.  The "atypical antipsychotics" such as Zyprexa, Risperdal, and Geodon are known to cause potentially life threatening hyperglycemia and hyperlipidemia.  Effective laboratory monitoring is required with these medications, particularly since they are so widely prescribed among *Coleman* class members.

### 3.    Medication Renewal Problems:

126.   Third, the Special Master reported generally good compliance with medication renewals at 21 institutions.  However, he noted non-compliance in this area at five prisons including two prisons with large mental health programs – the California Medical Facility (CMF) and Mule Creek State Prison.  He also noted that timely medication renewal orders were "problematic" at a sixth prison, Salinas Valley State Prison, and that a seventh prison, CSP-Sacramento, "just missed compliance."  *See* Docket 4298 (Special Master's 25th Draft) at 68.    In addition to having large mental health programs of their own, CMF and SVSP serve as hub prisons for inpatient care programs.  CSP-Sacramento has an extremely large mental health population, three crisis bed units, and is one of only three prisons with a Psychiatric Services Units or "PSU" which provides EOP level of care treatment to prisoners serving Security Housing Unit ("SHU") terms, typically for infractions committed in prison.

127.   Gaps in medication administration due to failures to renew medications are very serious problems and can be very damaging for the care of mentally ill patients.  Gaps in medication administration can exacerbate the problem of medication non-compliance, and can lead to symptom re-emergence including suicidal, psychotic, and assaultive behavior.

EXPERT DECLARATION OF PABLO STEWART, M.D.

[754904-2]

1

#### 4.      Informed Consent Problems:

2      128.    Fourth, moderately widespread were problems with obtaining informed

3  consents for medications, with SVSP listed as "problematic" in this area, nine other

4  prisons listed by the special master as non-compliant, and 12 prisons reporting that current

5  informed consents were in the charts of mental health patients.  Docket 4298 (25th Special

6  Master's Report) at 69.

7      129.    Informed consent is important as a legal requirement, but it is also of clinical

8  significance.  When informed consents are obtained as part of an appropriate effort to

9  educate patients about their own condition and their medications, it can enhance

10  medication compliance, improve the clinicians' ability to spot side effects by enlisting that

11  patients assistance with this critical task, and enhance overall mental health care by

12  establishing trust between the clinician and patient.

13

#### 5.      AIMS Testing Problems:

14      130.    As discussed below, I found serious problems with inadequate AIMS testing

15  in my inspections.  "AIMS" stands for Abnormal Involuntary Movement Scale.  The test is

16  used to identify the initial occurrence of involuntary muscle movements in patients

17  receiving antipsychotic medications.  The early identification of these symptoms allows

18  the clinician to initiate treatment to prevent these involuntary muscle movements from

19  becoming a more intractable problem and developing into Tardive Dyskinesia.    AIMS

20  testing is an important aspect of medication management for individuals taking

21  antipsychotic medications.

22

#### 6.      Medication Problems at Prisons Not Visited:

23      131.    Defendants own Management Reports also admit to a variety of troubling

24  problems with medication management at the many prisons that I was unable to visit on

25  my inspection tours.  Some examples of the problems with medication management noted

26  in those reports include the following:  (1) at CCI-Tehachapi, only 40 percent of cases of

27  medication non-compliance had follow-up appointments with a psychiatrist within 7 days

28  of the referral (DRPD 1 0051); (2) At Centinela State Prison, only 64 percent of cases

audited had AIMS testing completed and available (DRPD 1 00087); (3) at the California Men's Colony, an audit revealed that only 33 percent of cases reviewed had fully documented and addressed abnormal test results (CMC Management Report at 9) and only 70 percent of cases had AIMS testing as required; (4) at CMF, only 77 percent of cases where patients moved from one part of the institution to another received their medications without interruption and there were documented responses to abnormal laboratory test results in only 71 percent of cases (DRPD 1 00189); (5) at Deuel Vocational Institution, only 67 percent of patients discharged from MHCB units continued to receive their psychotropic medications without interruption (DRPD 1 00269); (6) at Folsom, a number of key medication compliance issues were not even being tracked (DRPD 1 00284) and only 42.1 precent of applicable cases reviewed had appropriate AIMS testing (DRPD 1 00285); (7) at High Desert State Prison, psychiatrists reviewed results and documented clinical action in only 22 percent of cases with abnormal laboratory test results (DRPD 00300) and only 62 percent of medication administration records contained records that were complete and legible (DRPD 1 00301), (8) at Ironwood State Prison there were problems with medication administration records being lost and not making it into the medical record (DRPD 1 00316); (9) at Kern Valley State Prison, only 25 percent of patients transferring within the institution continued to receive their psychiatric medications without interruption (DRPD 1 00329), only 63 percent of cases had laboratory tests ordered when clinically indicated, and only 54 percent of cases of medication non-compliance received a follow-up appointment with a psychiatrist within the required 7 day period (DRPD 1 00330); (10) at North Kern State Prison, only 59 percent of cases reviewed had laboratory tests ordered when clinically indicated (DRPD 1 00398); (11) at Pleasant Valley State Prison, only 64.2 percent of cases of medication non-compliance had documented clinical follow up within the required time period  (DRPD 1 00423), (12) at the Substance Abuse Training Facility, only 27.7 percent of cases of medication non-compliance had documented follow-up appointments with a psychiatrist within 7 days (DRPD 1 00489); and finally, (13) at Solano, only 68 percent of cases had laboratory

[754904-2]

testing ordered when clinically appropriate and when there were significant laboratory test results, clinical action in response to the results was documented only 64 percent of the time (DRPD 1 00521).

### c.    Problems with Medication Management at Specific Prisons I Visited

#### 1.    Problems with Medication Delivery and Distribution Observed at CSP-Los Angeles County:

132.    On Friday February 1, 2013, during the second day of touring at CSP-Los Angeles County, I observed the psychiatric technicians distribute morning medications in the EOP Administrative Segregation Unit.  I observed the process through approximately 15 different cells.  The medications were handed to each prisoner in their cell through the food port, and the prisoner was observed taking the medication through the door. Unfortunately, the mesh covering on the doorways in the unit does not afford good visibility for Direct Observation Therapy, or even the visibility needed to confirm the identity of the prisoner taking the medication.  The doors to the cells have small round holes drilled into the steel facing of the door, and then the entire cell door is covered with Plexiglas, making it difficult to communicate with and to see the prisoner.  Of the individuals whose medication distribution I observed, approximately one third of the individuals refused their medications.  The cell coverings in this unit are captured in photograph LAC 112.  A copy of this photograph is attached to the Photographic Appendix to this Report as Photographic Appendix Exhibit A.

133.    In one of the roughly 15 cells where I observed medication delivery in this unit, one of the individuals being given his medications started to take his medications and then said "these are not my medications."  It turned out he had been given another inmate's medications.  It was lucky he was able to recognize his medications.

134.    Also, the psychiatric technicians did not ask any questions while distributing the medications. For example, standard nursing practice is to ask about clinical efficacy and any possible side effects when distributing medications.  The psychiatric technicians I observed distributing the medications did not ask any questions of this sort, and did not

[754904-2]

1    even elicit basic information of the sort that might establish some rapport that would

2    encourage prisoners to tell them about problems they were experiencing.  These critical

3    elements are the foundation of any well-run medication management system.

4          135.    My observations of these medication distribution practices were confirmed

5    in conversations with class members at different prisons.  Also, in her deposition

6    testimony, defendants' expert Jacqueline Moore, who is a nurse, was extremely critical of

7    the fact that CDCR nurses at every prison she visited except San Quentin did not know the

8    side effects of commonly used psychiatric medications:

9          Q.    What does that note refer to?

10         A.    Nurses were unfamiliar with the side effects of psychiatric meds.

11         Q.    I imagine that's on your radar because you're a nurse?

12         A.    I asked them.

13         Q.    Why did you ask this question?

14         A.    I asked all the institutions.  That was one of the criteria on my audit tool.

15         Q.    And here -- SE is side effects?

16         A.    Side effects.

17         Q.    And is this particular [item] of concern to you in your analysis?

18         A.    Yes.

19         Q.    Why is that?

20         A.    Because it's a common practice that nurses know the side effects of the
             medication that they're giving because very often you are the one that might
21            observe lithium toxicity in an inmate.

22         Q.    So it's important to be aware of the side effects of the psych medications in
             order to ensure the safety and well-being of those patients?

23         A.    Yes, sir.

24         Q.    Did you observe this problem at any other institutions?  Do you remember?

25         A.    Yes.

26         Q.    Do you remember which institutions?

27         A.    All of them except San Quentin.

28

1    Ex. 67 to Bien Dec. (Moore Deposition Excerpts) at 180-181.

2        136.   In the Special Master's 25th Report, he noted a number of problems with

3    medication management at CSP-LAC.  First, he noted that there were instances of the

4    Keyhea coordinator not being notified of newly arriving Keyhea inmates.  Second, he also

5    noted "the timely provision of Keyhea medications was also problematic at CSP/LAC."

6    Docket 4298 (25th Special Master's Report) at 71.  Third, the Special Master noted that

7    CSP-Los Angeles County was not compliant with medication continuity for newly arriving

8    prisoners.  Docket 4298 (25th Special Master's Report) at 67.

9            **2.    Problems with Medication Management and Medication
             Distribution Practices at SVSP:**

10

11       137.   I also observed and read about problems with medication management and

12   the lack of appropriate responses to instances of medication non-compliance at SVSP.  As

13   noted above, SVSP was one of 19 prisons where the Special Master's most recent report

14   found serious problems with inadequate responses to instances of medication non-

15   compliance.  *See* Docket 4298 (25th Special Master's Report) at 68.  Other issues discussed

16   by the Special Master at SVSP included problems with "implementation of procedures for

17   response to cases of medication non-compliance, expiration of medications, obtaining

18   informed consents, parole medications, and ordering of clinically indicated lab results."

19   Docket 4298 (25th Special Master's Report) at 257.

20       138.   The Mental Health Managers' Management Report in connection with the

21   most recent round of monitoring at SVSP noted several serious medication management

22   problems.  First, SVSP managers admitted that during the reporting period, only 80 percent

23   of patients received timely renewals of their medication.  Ex. 44 to Bien Dec. (SVSP

24   Management Report) at 9 (DRPD 1 00544).  This percentage is more alarming than might

25   at first appear, given that standard practice in the CDCR based on the medication records I

26   reviewed is to renew psychiatric medications for periods no longer than 90 to 120 days.

27   This is probably a good practice to ensure more frequent reviews by psychiatrists for

28

[754904-2]

1    clinical efficacy and side effects, but if the medications are not timely renewed, it creates

2    more chances that someone might go off of their medication and decompensate.

3        139.    The Management Report for SVSP also noted that the institution had

4    reviewed 108 randomly selected electronic health records of individuals receiving

5    psychiatric medications and found that in the 23 cases where laboratory tests were

6    clinically indicated, only 60% of the time were the tests ordered.  Ex. 44 to Bien Dec.

7    (SVSP Management Report) at 9 (DRPD 1 00544).

8        140.    The report also noted that only 81 percent of 75 applicable cases had proper

9    AIMS testing done.  *Id*.  Problems with AIMS testing at RJ Donovan and San Quentin,

10   and the nature and importance of AIMS testing is discussed below at ¶¶ 157 to 163.

11       141.    When I was touring SVSP, I also noted some significant issues with

12   medication distribution.  For example, I observed staff members distributing medication in

13   the C-Yard, Building 7.  I had concerns at the time with the short time frame of the

14   interactions.  The staff members distributing medication did not ask about clinical efficacy

15   or medication side effects, nor did they take the time to ask any of the prisoners how they

16   were doing in general.  Open-ended questions during this kind of encounter, in my

17   experience, can often elicit crucial information for treating mental health patients.  Also,

18   the speed of the interaction in my estimation meant that the ability to do meaningful Direct

19   Observation Therapy (DOT) was very limited.  Effective Direct Observed Therapy was

20   also limited by the fact that the medications were being distributed through the cell

21   doorway food port.

**3.    Problems with Medication Management at CSP-Sacramento:**

24       142.    I also observed medication management problems on my tour of CSP-

25   Sacramento.  During the tour, I asked about the finding in the Special Master's 25th

26   Monitoring Round Report that CSP-Sacramento was only responding appropriately to

27   cases of *Keyhea* medication non-compliance 52% of time.  *See* Docket 4298 (Special

28   Master's 25th Report) at 87-88 (also noting more generally that "responses to cases of

medication noncompliance was compliant in only 75 percent of cases.") *Keyhea* medications are involuntary medications administered by court order. Those patients tend to be especially severely ill and in particular need of immediate clinical intervention if they go off their medications. Dr. Chaiken reported during the tour that this number had improved recently to 76% of the time. This improvement is positive, but if 25% of cases of medication non-compliance are not being follow up appropriately, that is a very serious concern.

143. Following up on every instance of medication non-compliance is the standard of care in community facilities, and is critical for avoiding the well-known, serious suffering and harm that many mentally ill individuals experience when they stop taking their psychotropic medications. As noted above, gaps in medication administration can exacerbate the problem of medication non-compliance, and can lead to symptom re-emergence including suicidal, psychotic, and assaultive behavior. In their Management Report in connection with the most recent tour, CSP-Sacramento managers admitted that a medication management audit for instances of medication non-compliance follow up found that results averaged 52%. *See* Ex. 45 to Bien Dec. (CSP-Sacramento Management Report) at 16.

144. In addition to the problems following up on medication non-compliance, the 25th Monitoring Report also noted problems with laboratory testing: "Laboratory testing of blood levels of inmates taking psychotropic medications was compliant in 71 percent of cases, but for those taking Clozapine, it was 96-percent compliant. Response to abnormal test results was compliant in only 50 percent of cases." *See* Docket 4298 (25th Special Master's Report) at 86. Dr. Chaiken noted during my tour that the institution was responding to its psychiatrist shortage by finding ways to monitor laboratories more efficiently. She also noted that the institution does experience problems with medication consents lapsing.

145. During my tour, the Chief Psychiatrist noted that the institution is using Senior Psychiatrists rather than staff psychiatrists to renew medications. This is

EXPERT DECLARATION OF PABLO STEWART, M.D.

1   understandable given the severe staffing shortages there, but in my opinion the staff

2   psychologists may be better suited for this task, assuming that they know their individuals

3   patients better than the Senior Psychiatrists and have built up some rapport with them.

4       **4.       Problems with Medication Management at RJD:**

5       146.   RJ Donovan has also struggled with serious medication management

6   problems.   In the Mental Health Managers' Report to the Special Master's team in

7   conjunction with the most recent 25th round of monitoring last summer, RJD managers

8   admitted to a number of serious medication management concerns in a variety of key

9   areas.

10       147.   <u>Follow up on medication non-compliance</u>:  For example, the Management

11   Report noted that during "the month of June 2012, [only] 53.9% of audited cases of

12   medication non-compliance had documented follow-up appointments with a psychiatrist

13   within 7 days of the referral."  Ex. 46 to Bien Dec. (RJD Management Report, DRPD 1

14   00438) at 6.

15       148.   <u>Incomplete medication administration records</u>:  The report also indicated that

16   only "[s]eventy-four percent (74%) of the eUHRs reviewed contained MARs that were

17   complete."  *Id*.

18       149.   <u>Ordering Labs and Responding to Results</u>:  The report also explained that

19   staff members at RJD reviewed 10 applicable cases and only "80% had laboratory tests

20   ordered when clinically indicated."  Moreover "psychiatrists reviewed results and

21   documented clinical action in 0% of the three cases with significant laboratory tests."  *Id*.

22       150.   <u>Completion of AIMS testing every six months for all prisoners on</u>

23   <u>psychotropic medications</u>:  The report also stated that during "the reporting period, ten

24   eUHRs of inmates receiving psychotropic medication were reviewed for the presence of

25   AIMS.  The AIMS was completed within the last six months for 70% of the ten applicable

26   cases."  *Id.*

27       151.   <u>Direct Observation Therapy (DOT) medication distribution</u>:  "Direct

28   Observation Therapy" or "DOT" is a form of medication distribution where the nurse or

psychiatric technician distributing the medication closely observes the individuals taking the medication and checks their mouth to make sure the medication has been taken.  This is very important to prevent psychiatric patients from "cheeking" or hiding their medication in their mouths.  This method of medication distribution is widely used throughout the CDCR.  However, according to the RJD Management Report, during pill lines, DOT procedures were only followed 90 percent of the time.  *Id.*

152.    On my tour of RJD, I asked mental health managers about these problems with medication management.  The managers noted that they are still trying to correct problems with follow-ups to instances of medication non-compliance and that proper ordering of laboratory studies and review and response to those studies ordered is an area where the institution "still has some challenges at times."

153.    Because of these problems, I asked RJD managers for more recent data about medication monitoring, which they produced to plaintiffs' counsel following the tour and which I have reviewed.   First, I asked for data regarding appropriate, documented, timely responses to instances of medication non-compliance.  In response to this request, RJD produced the following chart giving the percentage of charts where there was a physician's order or progress note showing an evaluation within 7 days of referral:

| Report Month | Percentage |
|---|---|
| October 2012 | 65% |
| November 2012 | 90% |
| December 2012 | 30% |
| January 2013 | 30% |

Ex. 47 to Bien Dec. (Bates Nos. RJD 53, RJD 54 and RJD 55).  The low compliance rates for December and January are alarming.

154.    I also asked for data about laboratory studies and was provided with a chart containing measures of compliance with laboratory studies in various categories for the months of October 2012 through December 2012.  *See* Ex. 47 to Bien Dec.  The

[754904-2]

compliance levels documented on this chart were generally adequate, with the exception of some of the less commonly ordered tests in the Department's protocol.  While this was somewhat encouraging, it still shows that defendants are not able to follow their own medication management protocols.

155.    RJD also provided me with data from a recent audit of the completeness of medication administration records or "MARS."  *See* Ex. 48 to Bien Dec.  Below is a reproduction of the table of data provided by defendants:

| Audit Month | Total Number of MARs Reviewed | Total Number of Complete MARs | Total Number of Incomplete MARs | Percentage of Complete MARs |
|---|---|---|---|---|
| December-12 | 21 | 16 | 5 | 76% |
| November-12 | 23 | 23 | 3 | 87% |
| October-12 | 22 | 18 | 4 | 82% |
| 4th Quarter Avg. | 66 | 54 | 12 | 82% |

*See* Ex. 48 to Bien Dec. (Bates No. RJD 0055).

156.    The completeness of medication administration records is critical for patient care.  Without complete records, a clinician is unable to adequately assess a particular patient's treatment progress or lack of progress in response to a prescribed medication.  Also, a clinician would be unable to adequately monitor side effect from a given medication unless the medication administration records is legible, present in the file, complete, and up to date.   The results of the audit above of medication administration records at RJD mean one can expect that about 18% of the time when a prisoner goes off his medications at the institution, there is a chance the lapse will be missed or recognition of the lapse will be delayed.  Moreover, poor records will make staff more distrustful in general of the information they have about medication compliance or non-compliance.

### 5.   Problems with AIMS Testing Observed During My RJD Tour:

157.   During my inspection tours at SVSP, CSP-Sacramento, CSP-Los Angeles County, the RJ Donovan Correction Institution, and San Quentin State Prison, I observed a number of individuals exhibiting involuntary muscle movements of the type associated with long-term use of antipsychotic medications.   "AIMS" stands for Abnormal Involuntary Movement Scale.  As noted above, the test is used to identify the initial occurrence of involuntary muscle movements in patients receiving antipsychotic medications.

158.   Tardive dyskinesia is a condition marked by involuntary, repetitive body movements that can include facial tics such as tongue movements, lip movements, and grimacing, and it can also include hand or body movements.  In some cases it can include grunting and respiratory problems.

159.   One critical component of any mental health care system for severely and chronically mentally ill individuals is routine testing to spot the onset and worsening of Tardive Dyskinesia.  It is important to ensure identification at the earliest possible time of the onset of these involuntary movements.  The reason early identification is essential is that if the symptoms are not identified early and responded to appropriately, there is a chance that the symptoms may become irreversible.  That is, the longer a person suffers from them, the higher the chance that they will become irreversible.

160.   I did not check for documentation of AIMS testing at every prison I visited. However, I did look for documentation after I noticed several individuals displaying some involuntary movements at RJ Donovan Correctional Institution.

161.   In particular, I was concerned by involuntary movements I observed when interviewing Prisoner C in the MHCB unit at RJD, and Prisoner D in the EOP Administrative Segregation Unit at RJD.  Prisoner C exhibited some involuntary movements likely associated with antipsychotic medications (symptoms of possible tardive dyskinesia).   My review of his medical records found only one AIMS test result in his

record, from more than a year ago, on January 13, 2012.  It is my understanding that the CDCR policy is that AIMS testing should be done every six months, which seems like a clinically appropriate interval of time (except that it should be done more frequently if there are concerns that symptoms are worsening).  If that is the standard, Prisoner C should have been given two more AIMS tests since last January.

162.    Prisoner D also exhibited some involuntary movements likely related to the use of antipsychotic medications.  My review of his record found two AIM tests, one from July 27, 2011 and a second from October 5, 2011.  Both tests documented mild involuntary movements.  *See* Ex. 16 to Kahn Dec.  In my opinion, given the marked involuntary movements I observed when interviewing Prisoner D, his movements appear to have worsened since that time.  Prisoner D should be given routine AIMS testing and if his symptoms persist or continue to worsen, his medications need to be changed to address these troubling side effects.

163.    These are two examples of the serious medication management problems I observed in this round of inspections that I believe are related to the severe statewide shortage of psychiatrists in the CDCR.

**6.      Problems with Medication Management At San Quentin:**

164.    San Quentin was also struggling with medication management problems.  The Management Report prepared by San Quentin's Mental Health Managers in connection with the most recent Special Master's monitoring tour last summer indicated some serious problems with laboratory tests, responses to medication non-compliance, and AIMS testing.  First, the report explained that based on a random selection of 165 UHRs where laboratory tests were indicated, laboratory tests were ordered 92 percent of the time and lab tests were reviewed and clinical action documented 88 percent of the time.  Ex. 45 to Bien Dec. (SQ Management Report) at 5.  The report also admitted that its audits found that in cases of medication non-compliance, inmate-patients were only referred to a physician 93 percent of the time and were seen within the required 7 days of referral only 53 percent of the time.  *Id.*

57
EXPERT DECLARATION OF PABLO STEWART, M.D.

165.   The 25th Draft Special Master's Report notes that at San Quentin "MAPIP audits found compliance rates of 53 percent for timeliness of psychiatrist consults in cases of medication noncompliance, 70 percent for conduct of AIMS testing, and 88 percent for the presence of up-to-date informed consent forms in eUHRs.  Reports of line mental health staff corroborated these audit results."  Docket 4298 (25th Progress Report) at 174.

166.   I was very concerned about the medication side effect that I observed when interviewing San Quentin EOP Administrative Segregation inmate Prisoner E.  Prisoner E returned from an inpatient program run by the Department of State Hospitals two weeks before I interviewed him at San Quentin on February 26, 2013.  Prisoner E reported that he was only allowed to stay in the acute DSH program at California Medical Facility for eight days before being returned to San Quentin.  In my opinion, Prisoner E was prematurely discharged, as evidenced by the fact that he continues to be suicidal and psychotic and he has moderate to severe akathesia.  "Akathesia" is a muscle restlessness that is sometimes seen as a side effect of antipsychotic medications.  Prisoner E indicated that his problem started when he was taken off of his regular medications.  He asserted that he was taken off Abilify because it is non-formulary.  He was particularly adamant that Artane would help him to cope with his shakes.  Prisoner E is very anxious and appeared to be becoming increasingly suicidal because nothing is being done to address his severe medication side effects.

167.   A review of the medical records for Prisoner E indicates that he is currently on Remeron.  His most recent treatment plan dated February 22, 2013 noted that "his inconsistent presentation and drug-seeking behavior were noted on DMH paperwork as has been consistently documented in SQ paperwork."  The paperwork notes that he "is always insistent on receiving Artane."  At the same time, the treatment plan notes that "due to history of increasing acting out behavior, inmate-patient will be maintained at EOP LOC."  Artane is a challenging medication to use because there is always a risk of abuse.  At the same time, there are many individuals for whom it is the best way to control side effects.  Prisoner E needs to be closely followed and his medication side effects need to be

[754904-2]

addressed.   Interestingly, a 2011 treatment plan notes that Prisoner E "was admitted to DMH-ICF on 5/18/10 for program participation under 50%, refused to attend groups and was discharged as a program failure on 6/1/10.  DMH discharge summary indicates inmate has a long history of [auditory hallucinations] and depression and may exaggerate symptoms for secondary gain, such as receiving narcotics or a change in housing."  The treatment plan notes a history of suicide attempts over 20 years.  In a January 22, 2013, during a suicide risk assessment, he reportedly told the clinician: "People are using my medication to power trip over me.  I don't like it.  If I don't get my medication I'm going to kill someone or myself."  The fact that someone is manipulative in a prison context does not mean that his or her suicidality is not real and is not dangerous.

168.    Even if Prisoner E is manipulating, he still can be very suicidal. Manipulation does not prevent someone from killing themselves or from assaulting staff members.  A well-functioning medication distribution system with effective Direct Observation Therapy would significantly reduce the potential for abuse from medications like Artane, and allow clinicians the option to use this very effective medication where it is clinically indicated.

### 3.     The CDCR Must Increase and Improve Its Suicide Prevention Efforts by Ending the Use of Alternative Placements for Suicidal Prisoners, Eliminating the Use of Dangerous and Punitive Suicide Watch Conditions, and Conducting Staggered Welfare Checks Every Half Hour for All Prisoners in Segregation Units.

#### a.     My Opinions Regarding the CDCR's Suicide Prevention Problems:

169.    The CDCR's suicide rate is significantly higher than the national average, despite years of remedial efforts, court orders, and critiques of various suicide-related policies and procedure from the Special Master's experts, the CDCR's own headquarters suicide review team, and the CDCR's retained outside consultants including both Mr. Hayes and Dr. Dvoskin.   I believe that the high suicide rate is likely related, at least in part, to continuing overcrowding in the CDCR.  It is also my opinion that the high suicide rate likely persists (1) because of the continued use of harsh, punitive suicide watch

59

EXPERT DECLARATION OF PABLO STEWART, M.D.

1   conditions, including various unsafe "alternative placements" used in lieu of licensed crisis

2   beds, (2) because of the failure of the Department to adopt national correctional standards

3   like 30 minute welfare checks for all prisoners in segregated units for their entire stay in

4   these units, (3) because the Department declined to implement many of the

5   recommendations of their own suicide prevention consultants, including their internal

6   suicide review team, Lindsay Hayes, and Joel Dvoskin, and (4) because the department

7   continues to use punitive and dangerous alternative placements rather than MHCB beds for

8   suicide watch.  Finally, it is my opinion that the high suicide rate can be reduced and future

9   suicide deaths avoided by aggressively implementing these recommended suicide

10  prevention efforts and reforms.

11              **b.      Overcrowding, and the High Suicide Rate in the CDCR**

12              170.   The current suicide rate in the CDCR is extremely high.  It has been high for

13  the last five years and the general trend has been one of an increasing per-capita rate.

14  Indeed, Dr. Robert Canning, the CDCR's chief suicide reviewer, acknowledged in a

15  January 2013 report that "both the overall raw rate (Figure 1) and the frequency (Figure 3)

16  of suicide in the CDCR have trended upward since 2000."  Ex. 3 to Bien Dec. (text on

17  page 4, citing charts on pages 8 and 10 of the report).

18              171.    At the same time, as this Court is well-aware from the overcrowding

19  proceedings, the CDCR has been severely overcrowded for much of the last decade, with

20  the highest extent of overcrowding occurring around 2007.  Although this rough

21  correlation between overcrowding and the high suicide rate in the CDCR does not prove

22  that overcrowding is responsible for the high suicide rate in the CDCR, I believe that the

23  two statistics are related, at least in some respects, as discussed below.

24              172.   As Dr. Patterson's careful analysis of the 2011 CDCR suicides explains, the

25  suicide rate in the CDCR has been consistently above the national average for prisons in

26  recent years.  *See* January 13, 2013 Report on Suicides Completed in the California

27  Department of Corrections and Rehabilitation in Calendar Year 2011 (Docket No 4308).

28  For the calendar year 2011, the suicide rate in the CDCR was 21.01 per 100,000 prisoners,

1   essentially unchanged from the 2010 rate of 21.10 per 100,000.  *Id.* at 1.  In 2010, the

2   suicide rate for prisons nationwide was 16.0 per 100,000 prisoners.  *Id.*  Dr. Patterson

3   explains that the high CDCR rates for 2010 and 2011 "also compare unfavorably to the

4   rates during the decade 2001 to 2010 among the eight largest state prison systems during

5   that decade, and with the U.S. Federal System from 2001 to 2008 (the most recent year for

6   which the U.S. Bureau of Justice Statistics reports suicide rates in U.S. Federal prisons.)."

7   *Id.* at 1-2.   For example, Dr. Patterson points out that the suicide rate for US Federal

8   Prisons between 2001 and 2008 was 8 per 100,000, or nearly one-third the rate in

9   California's prisons.  *Id.* at 2.

10         173.   It is not surprising to me that the suicide rate in the CDCR has been

11  extremely high during the last decade, a period when the CDCR has also been chronically

12  overcrowded.  In his 2011 suicide report, Dr. Patterson also includes a trend analysis

13  comparing the seven-year period of 2005 through 2011 with the six-year period between

14  1999 and 2004.  That analysis shows a sharp rise in the suicide rate during the more recent

15  period.  In the earlier six-year period, the CDCR rate averaged 16.2 suicides per 100,000

16  inmates.  In the later seven-year period, the rate rose sharply to 21.6 per 100,000.  *Id.* at 3.

17  It is true that the population of the CDCR was already high and arguably the system was

18  already overcrowded at the beginning of the earlier period, but I believe that some of the

19  harms to mentally ill prisoners living in overcrowded systems accrue and become worse

20  over time.  Moreover, even assuming for the sake of argument that there is no causal

21  relationship between the two phenomenon, it is clear that ongoing overcrowding makes the

22  task of reducing the high suicide rate much more difficult.

23         174.   In any case, I believe there are good reasons beyond the numbers themselves

24  to believe that a relationship exists between overcrowding and completed suicides in the

25  CDCR.  <u>First</u>, overcrowded prisons are more frequently locked down and tend to offer far

26  less programming to each prisoner than non-overcrowded ones.  As discussed below in

27  greater detail, these conditions create heightened risks for suicide prevention in a variety of

28  ways, but one important way they create risks is because they impair the functioning and

mental health of individuals who are mentally ill and or otherwise susceptible to suicidal ideation.  Both the lack of purposeful activity and the social isolation experienced in locked-down, overcrowded prisons are damaging to mental health.  Second, overcrowded prisons tend to have fewer mental health and custody staff for each prisoner, making surveillance more difficult among the population of at-risk mentally ill individuals.  Third, in my experience, overcrowded prisons are more violent and more stressful for mentally ill prisoners than prisons that are not overcrowded.  These factors greatly increase the risks of suicide among susceptible prisoners.

175.  Dr. Patterson's report also notes the high percentages of CDCR suicides where "at least some degree of inadequacy in assessment, treatment or intervention" was noted in connection with the suicide review.  *See* January 13, 2013 Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2011 (Docket No 4308) at 3.  In 2011, such problems were noted in 73.5 percent of the suicides.  *Id.*  In 2010, such problems were noted in 74 percent of the cases.  *Id.*

176.  Of particular concern to Dr. Patterson was the fact that 50 percent of the 2011 cases involved problems with failure to conduct a Suicide Risk Assessment (SRE) or else problems with the Suicide Risk Assessment that was conducted.  *Id.*  In their 2010 internal suicide report, CDCR suicide reviewers also noted that the area of Suicide Risk Assessment was the most common area of focus for quality improvement plans stemming from the suicide review process for mental health disciplines.  *See* Ex. 52 to Kahn Dec. at 4.

177.  Dr. Patterson also explained that in five of the suicide cases in 2011, including three in administrative segregation units at the time of their death, the bodies of the prisoners showed evidence of the onset of *rigor mortis* at the time of their discovery, indicating that two to four hours had passed since their death with no discovery.  *Id.* at 2-3.  Dr. Patterson explained that this "underscor[es] the importance of timely welfare checks and custodial checks."  *Id.* at 3.  The issues of welfare checks and Suicide Risk Assessments are discussed in greater detail below.  Mr. Hayes in his review of CDCR

[754904-2]

suicides in the calendar year 2010 also noted with concern a number of cases where prisoners who took their own lives were found with evidence of *rigor mortis*. *See* Ex. 50 to Bien Dec. (August 16, 2011 Hayes Memorandum) at 2 ("16% (4 of 25) of the [2010 suicides reviewed by Mr. Hayes] involved inmates who were found with either rigor mortis and/or the [internal CDCR suicide] review determined that cell checks were not performed as required.").

### c.       The High Suicide Rate in Administrative Segregation Units

178.    During the last six years, a high proportion of the suicides in the CDCR have taken place in administrative segregation units, as shown in the chart below:

| Year | Total Number Suicides | Percentage of Suicides In ASU |
|------|----------------------|-------------------------------|
| 2007 | 34 | 32% |
| 2008 | 37 | 43% |
| 2009 | 25 | 40% |
| 2010 | 35 | 34% |
| 2011 | 43 | 26% |
| 2012 | 32 | 34% |

179.     Given that the CDCR's administrative segregation units only hold somewhere between 5,500 and 7,000 prisoners at any one time, these figures make clear that the risk of suicides is concentrated in these units and that these units should be one major area of focused remedial efforts designed to reduce the suicide rate.

180.    Defendants are well aware of this problem.  An internal CDCR Report containing an analysis of suicides in administrative segregation units in recent years that was produced by Dr. Canning and dated January 25, 2013, and provided to plaintiffs in discovery, notes the high percentage of all suicides since 2007 in segregated units: "about 35% of all suicides occur in ASU, with another 10% occurring in SHU, PSU, and on

[754904-2]

1    condemned units (*see* tables)." *See* Ex. 3 to Bien Dec. at 1.  In other words, about 45% of

2    all suicides in the CDCR occur in segregated units of one type or another.

3         181.   The suicide risks associated with administrative segregation housing were

4    also highlighted by the defendants' suicide consultant Lindsay Hayes in his 2011 report to

5    CDCR mental health managers.  Mr. Hayes explained his concerns by pointing out that of

6    the 25 suicide cases from 2010 that he reviewed, "44% (11 of 25) of the cases involved

7    inmates who were confined in Administrative Segregation Unit cells (ASU)."  Ex. 50 to

8    Bien Dec. at 2.  He noted that this fact was "consistent with previous CDCR data

9    indicating that there is a disproportionate number of suicides occurring within ASU cells."

10   *Id.*

11        182.   Mr. Hayes explained that in response to this known phenomenon, the CDCR

12   had "instituted several corrective actions, including designating suicide-resistant intake

13   cells in the ASU units, as well as requiring correctional officers to conduct cell checks at

14   30-minute intervals during the first 21 days of ASU confinement.  *However, my review of*

15   *the suicide reports found that several inmates who committed suicide shortly after ASU*

16   *placement were not placed in designated ASU intake cells and, as indicated above, several*

17   *ASU inmates were not observed at 30-minute intervals as required*."  *Id.* (emphasis

18   supplied).

19        183.   In my tours of CDCR administrative segregation units more than 18 months

20   after Mr. Hayes made his recommendations, I also noted problems with the adequacy of

21   the number of intake cells, the use of them for new arrivals and with staggering of the

22   wellness checks in those units.  For example, when touring the administrative segregation

23   units in the B-6 and B-7 Buildings at RJ Donovan Correctional Institution, we were told

24   that there were 16 intake cells for both units, and that all 16 intake cells were in Building 6,

25   which is the EOP Administrative Segregation Unit.  Each prisoner on intake status in the

26   two units had a pink tag on his cell door.  We counted 35 inmates on intake status in

27   Building 6 and 37 inmates on intake status in Building 7, for a total of 72 prisoners on

28   intake status in units with only 12 retrofitted intake cells. *See* Ex. 59 to Bien Dec. (list of

alternative placements at RJD provided by RJD staff on day of February 12, 2013 tour).

Moreover, at the time of our visit, not all of the 12 intake cells were being used by

prisoners on intake status.   Staff in this unit and in every other administrative segregation

unit where I asked about the adequacy of the number of intake cells acknowledged that

there are often not enough intake cells to accommodate all newly arriving prisoners in the

unit.  My understanding is that currently prisoners are supposed to be placed into intake

cells for their first three days and that wellness checks every half hour take place for the

first 21 days in administrative segregation.  In my opinion, there need to be more safety

cells and everyone should be given wellness checks for the duration of their stay in

administrative segregation units.

### d.      Lockdowns and Suicides

184.    Prisons that experience long lock-downs are a lot like administrative

segregation units, and the dangers for mentally ill prisoners in both environments are

similar – social isolation, the lack of purposeful activity, stress, less clinical contact, more

conflict with potentially hostile custody staff members, less surveillance of prisoners, and

noisy conditions – all of which tend to worsen existing mental illness.

185.    During my tours, it was clear that some CDCR prisons have a culture which

tolerates lockdowns of extremely long duration.

186.    For example, during my morning meeting with managers at SVSP on

January 28, 2013, the Warden reported that C-Yard has basically been locked down for

much of the last 12 years.  I am not entirely sure if this is an exaggeration, but this is

consistent with what we learned when I toured C-Yard at SVSP in 2007, when I was told

that the yard had only been operating to the point where CCCMS groups could be run for

only one week during the entire year.  During the meeting at SVSP on January 29, 2013,

staff also confirmed that B-Yard has been locked down for most of the last three years.

Although SVSP is likely among the CDCR institution with the longest lockdowns, the

problem is not confined to SVSP.  Detailed data and information about system-wide

lockdowns in the CDCR recently filed by the Prison Law Office in a case concerning race-

based lockdowns demonstrate that lockdowns are a frequent occurrence system-wide in the CDCR. *See generally*, Ex. 79 to Bien Dec. (Declaration of Devin M. McDonell in Support of Plaintiffs Motion for Class Certification and For Preliminary Injunction in *Mitchell v. Felker*, U.D.D.C. Eastern District, CA Case No. 08-CV-01196 JAM EFB, Docket 160-1) at Exhibit A, at 3 of 3. In my experience, overcrowded systems tend to experience more and more frequent lockdowns.

187. There were also a number of documents I reviewed in preparation for the SVSP tour that document extremely long lockdowns at the institution and suggest that these may have played a role in some of the suicides there (since December of 2011 there have been nine suicides at SVSP). For example, the CDCR Suicide Report for Prisoner F, who hung himself on August 12, 2012 in Building B-5 on B-yard at SVSP, noted that that:

> … A and B yards at SVSP have been closed for over 900 days due to a riot. [Prisoner F] had a porter assignment and was released from his cell for work duty, but other inmates have been without yard privileges for nearly three years. The Warden acknowledged during the exit interview that the yards needed to be reopened and yard programming reinstated for the health of the inmates. He is working to achieve this but so far the yards remain closed.

Ex. 17 to Kahn Dec. (Prisoner F, August 12, 2012 DOD, September 24, 2012 Suicide Report) at 11.

188. A suicide report for an SVSP prisoner from 2010 also mentions lockdowns. In the suicide report for Prisoner G, who took his own life on November 5, 2010 on A-Yard, the sensitive needs or "SNY" yard at SVSP, it states that his "housing unit had been affected by lock-down status on three occasions in the last half of 2010." The report contains a vivid and detailed description of what it means for a given unit to be on "lockdown" or to use the term used in the CDCR, to be on a "modified program":

> This modified program, like the one just before it, applied to all inmates. This meant that all inmates were escorted in restraints and were subjected to an unclothed body search prior to escort. All meals were provided by cell feeding with a sack meal for lunch. Dayroom and recreational activities, canteen visits, receipt of packages, all phone calls, and religious service attendance were not permitted. Showering was conducted on a non-daily, rotating basis, with cell partners.

[754904-2]

1    Ex. 18 to Kahn Dec. (2/9/11 Suicide Report for Prisoner G, Date of Death November 5,

2    2010 in A-Yard Building 4) at 14.

3         189.   In the Management Report produced by mental health managers at SVSP in

4    connection with the 25th Round monitoring visit by the Special Master's team to SVSP last

5    summer, under the category "Obstacles to Providing Mental Health Services and

6    Adherence to Program Guide Requirements," mental health staff managers indicated that

7    "modified programs remain an obstacle to providing mental health services on B and C

8    yards.  Both yards were locked down for the majority of the reporting period."  Ex. 44 to

9    Bien Dec. (CSP-Sacramento Management Report) at 5.

10        190.   It is my opinion that long-term lockdowns create a variety of problems for

11   seriously mentally ill prisoners, including increased risks both that such prisoners will

12   become suicidal, and that when such prisoners are suicidal, their suicidality will not be

13   properly identified.  These risks operate in a number of ways.  First, lock-downs increase

14   the social isolation of prisoners, depriving them of important sources of social support

15   which can result in emotional instability.  Second, when a unit is locked down most of the

16   time, surveillance of the mental health population becomes more difficult.  Custody staff is

17   often busier during periods of lockdowns, because they need to feed all prisoners in their

18   cells, and because they need to escort prisoners to medical appointments and other

19   programs.  Third, clinical staff members also tend to spend a larger proportion of their time

20   seeing patients cell front, and the lack of confidentiality in such cell front clinical

21   encounters itself increases the risk that prisoners will not be forthcoming about their true

22   feelings.  Fourth, because prisoners are not going to programs like school or work, they

23   interact with fewer staff members who might be alert to any suicidal feelings or

24   psychological struggle.  Fifth, lockdowns impose significant psychological burdens simply

25   by forcing prisoners to stay in small cells all of the time.

26        191.   During lockdowns, prisoners generally do not get out to the yard at all.  This

27   means they experience yard less often in general population units than they would if they

28

1  were being held in Administrative Segregation.  Finally, being confined in close quarters

2  with a cellmate for long periods of time creates significant stressors of its own.

3          **e.**        **The Dangers of Excessively Punitive Suicide Watch Conditions:**

4        192.    In my opinion, another set of practices that increase the risk of completed

5  suicides in the CDCR are the excessively punitive suicide watch conditions that I

6  personally observed and heard about from both staff and *Coleman* class members during

7  my recent tours.  These risks were once again well-articulated by the defendants' own

8  suicide consultant, Lindsay Hayes, who recommended that the CDCR adopt less punitive

9  and restrictive conditions for suicidal prisoners.  I concur with his recommendations

10 wholeheartedly.  His description of the problem and resulting recommendation is as

11 follows:

> In my tours of the visited facilities, I found very restrictive conditions for
> inmates that were on suicide observation status.  All inmates were stripped of
> all clothing and possessions, and given only a safety smock.  Except for
> being offered a shower every other day, they were confined to their cells at
> all other times, without consideration for out-of-cell time, telephone calls,
> visitation, etc.  I was informed that these were correctional (not mental
> health) decisions.
>
> It would be my opinion that such a practice is overly restrictive and
> seemingly punitive.  Confining a suicidal inmate to their cell for 24 hours a
> day only enhances isolation and is anti-therapeutic.  Under these
> circumstances, it is also difficult, if not impossible, to accurately gauge the
> source of the inmate's suicidal ideation.  Take, for example, the daily
> scenario of a clinician interviewing an inmate on suicide observation status.
> The inmate has been in the cell for a few days, clothed only in a smock.  He
> rarely has been out of the cell that has an incredibly foul odor because the
> inmate has not showered (even if it had been offered).  The clinician then
> asks the inmate: "Are you suicidal?"  Given the circumstances he finds
> himself in, the likelihood of an inmate answering affirmatively to that
> question, the result of which will be his continued placement under these
> conditions, is highly questionable.

23 *See* Ex. 50 to Bien Dec. (August 16, 2011 Memorandum from Lindsay M. Hayes) at 5.

24       193.    I share these concerns and agree with Mr. Hayes' recommendations.

25 Punitive, isolating conditions raise the risks that individuals will become suicidal, and once

26 someone is suicidal, such conditions raise the risks that individuals will follow through on

27 their suicidal feelings.  Punitive suicide watch conditions also raise the risk in the future

28

1    that these same prisoners will hide their true suicidal feelings because they do not want to

2    be exposed to such conditions.

3        194.    The trio of clinical experts/consultants working for the state on the

4    termination motion also expressed concern in their report about the use of punitive suicide

5    watch procedures:

6            In some institutions, inmates placed on constant observation for
             purposes of a suicide watch were also required to wear a suicide smock.
7            Because the removal of inmates' clothing could be perceived as punitive, this
             automatic practice may deter inmates from reporting their suicidal thoughts.
8            Therefore, the decision regarding a suicide smock when an inmate is on
             constant observation should be individualized to the inmate's risk of using
9            their clothing as an instrument of suicide while being watched.

10   *See* Exhibit 1 to 1/07/13 Vorous Declaration (Docket 4275-5) at 37.

11       195.    I also agree with this statement as far as it goes, but it also seems to me to

12   greatly understate the problems with punitive suicide watch conditions in the CDCR.   To a

13   certain extent, I believe Mr. Hayes understates the problem as well.

14       196.    Prisoners I spoke with on my tours described a variety of additional punitive

15   features of suicide watch at their prisons.  <u>First</u>, they told me everywhere I went, that when

16   a prisoner is suicidal, the first step is for custody to take the prisoner out of their cell, strip

17   him naked or down to their boxers, and place him in the shower or a standing cage (a

18   version of the "treatment module" used in many therapy groups, but smaller, often lacking

19   a seat, and with wire mesh all around it and Plexiglas also covering the front of the cage

20   and sometimes also the sides.)   These cages are cold and exposed, as they are typically

21   located in public places where the prisoner can easily be watched.  As an example, copies

22   of photographs of such standing cages from CSP-Sacramento EOP Administrative

23   Segregation and PSU housing units which we were expressly told were used for housing

24   suicidal prisoners for up to four hours while waiting for mental health to come and do an

25   evaluation are attached to the Photographic Appendix to this Report as Appendices H, I

26   and J (Bates Nos. SAC 131, SAC 135, SAC 148).  Additional photographs of similar cages

27   used for the same purpose in housing units at other prisons are provided in the sections

28   below discussing punitive suicide watch features at each prison I visited.  In addition, at

1   some prisons and in some units all prisoners placed in these holding cages are cuffed, and

2   at some prisons they are both cuffed and shackled.   At some prisons, it appears that

3   prisoners are given paper gowns when placed in these cages, while in others they are

4   stripped down to their boxers or even stripped naked.

5         197.   Second, at a number of prisons, another set of standing cages or sometimes

6   upright cages with small seats are used to house suicidal prisoners in the treatment and

7   triage area of the Mental Health Crisis Bed unit until an initial nursing evaluation can be

8   done, when the larger regular holding tanks (with benches and a toilet) are being used for

9   prisoners waiting for treatment in the treatment and triage area during the day.  A

10  photograph taken and produced by defendants of the standing cages used at Salinas Valley

11  State Prison for this purpose is attached to Photographic Appendix to this Report as

12  Appendix K (Bates Nos. SVSP 47).  At RJ Donovan Correctional Institution, the standing

13  cages used for this purpose were outdoors next to the main entrance to the CTC.

14  Photographs of the outdoor RJD standing cages and suicide watch instructions on the front

15  of one of the cages are attached to this Report in the accompanying Photographic

16  Appendix as Appendices L, M, N and O (Bates Nos. RJD 3-6).

17        198.   Mr. Hayes' 2011 Report to the CDCR's mental health managers also

18  highlights evidence based on his review of 25 of the 35 CDCR suicides in 2010 that such

19  punitive conditions are very dangerous.  He notes, for example, that "28% (7 of 25) of the

20  cases involved inmates who committed suicide within hours or days following their

21  discharge from suicide observation status, or cases in which inmates either threatened

22  suicide, expressed suicidal ideation, and/or had other suicide risk factors that did not result

23  in their placement on suicide observation status."  Ex. 50 to Bien Dec. (August 16, 2011

24  Hayes Memorandum) at 2.  These numbers underscore the risk that punitive conditions

25  might prevent prisoners from admitting when they are continuing to feel suicidal in order

26  to escape the harsh conditions of suicide watch in the CDCR.

27

28

      **f.**      **The Dangers of Using Alternative Placements for Suicide Watch:**

199.   In my recent tours of 5 prisons, I was also very concerned about the use of what mental health managers in the CDCR call "alternative placements" to house suicidal prisoners.  In my opinion, most of the individuals being observed in these placements should be admitted to an MHCB bed instead.  These alternative placements take place throughout the prison system, and evidence provided to plaintiffs by defendants concerning the use of such placements statewide during the last 32 weeks of 2012 (a period of slightly more than seven months, from May 18, 2012 through December 27, 2013) shows that there were a total of 2429 such alternative placements.  *See* Ex. 51 to Bien Dec.  The same document shows that 729 of these alternative placements lasted for more than 24 hours, violating the requirements of the *Coleman* Program Guides the individuals referred to MHCB programs must be transferred within that time period.  *See* 2009 Revision to Program Guides at 12-5-4:  "The inmate-patient shall be transferred within 24 hours of referral."

200.   I am concerned about the use of these placements for a variety of reasons.  First, as the photographs of these alternative placements discussed in the sections on the individual prisons show, many of these placements are unsafe for suicidal prisoners, having features that are not suicide proof.  For example, attached to the Photographic Appendix as Appendices CC, DD, EE and FF are photographs of the B-Yard contraband cells at CSP-Sacramento.  These cells are used as alternative placements for suicidal prisoners.  The ceiling of one of the cells is photographed in Appendix EE.  The pipe fixture evident in that photo shows that the cells are not suicide-proof and have unsafe features that someone could use to hang themselves.  The contraband cells have only low metal beds, and several of the other spaces used for alternative placements at CSP-Sacramento did not have any beds at all.  *See* Photographic Appendix S.

201.   Second, in the event that medical assistance is needed, these placements are often far from nursing and medical staff, often either in noisy and chaotic administrative

71
EXPERT DECLARATION OF PABLO STEWART, M.D.

segregation units or else in isolated areas where few staff are likely to be present other than whoever is conducting the suicide watch.

202.    These alternative placements were never designed to house acutely suicidal individuals.  They are an extremely harsh alternative to the professional/clinical setting of the MHCB.    MHCB units are a lot like small hospitals.  They are well-staffed, bright, the cells are spacious, and there is good visibility into the cells.  These setting have numerous advantages over the ad hoc, often punitive alternative placements now widely used around the CDCR.   Given how bad these alternative placements are, I am surprised that the suicide rate is not even higher than it is right now.

203.    The use of alternative placements during the seven month period for which defendants provided data to plaintiffs was widespread.  Sixteen different prisons used such placements in the following amounts during  the period between May 18, 2012 and December 27, 2012:

| Institution | Number of Alternative Placements |
|---|---|
| Calipatria | 1 |
| Central California Women's Facility | 1 |
| Centinela | 28 |
| California Men's Colony | 120 |
| California Medical Facility | 4 |
| Folsom State Prison | 30 |
| Kern Valley State Prison | 142 |
| Los Angeles County | 291 |
| North Kern State Prison | 589 |
| Pleasant Valley | 49 |
| RJ Donovan Correctional Institute | 103 |

72
EXPERT DECLARATION OF PABLO STEWART, M.D.

| CSP-Sacramento | 468 |
| CSP-Solano | 3 |
| San Quentin State Prison | 2 |
| Salinas Valley State Prison | 295 |
| Wasco State Prison | 303 |
| Total | 2429 |

204.    There has been a moderate decline in the use of these placements during the last seven months of 2012, but only a moderate decline, from an average of around 80 such placements a week to an average closer to 50 placements a week.  Below is a chart breaking down the use of alternative placements by week during the seventh month period between May 18, 2012 and December 27, 2012:



This chart shows that the use of alternative placements peaked during the summer months and declined moderately after the summer before leveling off somewhere between 40 and 60 uses of alternative housing for suicidal prisoners each week.

205.    I was particularly concerned about the prisons that use sections of their Administrative Segregation units for alternative suicide watch housing.  As I noted in my 2008 report to the three-judge court and as I discussed above, housing suicidal prisoners in

1   Administrative Segregation Units is dangerous for a variety of reasons.  First, the noisy,

2   chaotic, and harsh conditions in these units can exacerbate existing mental illness and

3   worsen someone's psychiatric instability and suicidality.  Second, in my experience the

4   cells in these units are often cold, bare, and dirty, once again discouraging prisoners from

5   coming forward when they feel suicidal.  Third, the security requirements in administrative

6   segregation units may make rescue efforts more difficult if they are needed.

7        206.   The primary cells used for alternative placements at both RJD and LAC are

8   in administrative segregation units.  To their credit, as far as I was able to discern, CSP-

9   Sacramento, San Quentin and SVSP are not currently using Administrative Segregation

10  units for alternative placements of this type.

11          **g.**       **Punitive Suicide Watch Conditions and Usage of Alternative**

12                  **Placements at Prisons Inspected**

13                **1.**     **Punitive Suicide Watch Conditions at SVSP**

14       207.   SVSP has a very serious problem with suicides.  In the 14 months since

15  December of 2011, there have been 9 suicides at SVSP, including one in the DSH inpatient

16  hospital.  Indeed, there was a suicide of an EOP Administrative Segregation class member,

17  Prisoner H five days before my visit in January of 2013.  During the tour staff told me that

18  Prisoner H had recently returned from inpatient care at Atascadero State Hospital.

19  Prisoner H took his own life on January 24, 2013, in the D-2 EOP Administrative

20  Segregation Unit.  The Warden and other staff expressed sincere concern about the large

21  number of suicides at SVSP in the last 14 months and about the suicide of Prisoner H in

22  particular.  I was troubled, however, that mental health staff indicated that they had looked

23  for common problems in the nine suicides and had identified none.  The reason they

24  suggested, that the poor economy might have played some role in the rash of suicides by

25  making it more difficult for relatives to come and visit, reflects a failure to look objectively

26  at the numerous policies and procedures under CDCR control.

27       208.   Prisoner H's suicide is one example of a broader problem I saw a number of

28  times on my recent inspection tours.  Prisoners often return from DSH inpatient care

1   directly to administrative segregation units.  In my opinion, the drastic change in clinical

2   environments between these two placements only serves to worsen the risk of suicide for

3   mentally ill inmates.  In addition, the harsh, restrictive administrative segregation setting is

4   one where any gains in functioning that were achieved in programming-rich inpatient

5   hospital programs are likely to be forfeited.

6          209.   While we were at SVSP, we interviewed a group of prisoners waiting for

7   their group to begin in a classroom in the mainline EOP unit, which is located in housing

8   units D-3 and D-4, about staff responses to suicidal prisoners and about suicide watch

9   procedures.  These prisoners told us that when an inmate in their housing unit is suicidal,

10  only about half of staff members would even respond by treating the suicidal assertion

11  seriously and taking the prisoner out of the cell.  They also told us that the standard

12  response was to take the person out of their cell, strip them naked, and leave them in a

13  holding cell or cage for several hours and in some cases all day.   These prisoners indicated

14  that if they were feeling suicidal in the future, they would be reluctant to share their

15  feelings with staff due to the punitive nature of the suicide watch conditions at the prison.

16         210.   When we visited the D-8 CCCMS Administrative Segregation Unit at SVSP,

17  we spoke with staff regarding procedures for handling a suicidal prisoner.  Staff reported

18  that they place such prisoners into a holding cage in the hallway areas and call mental

19  health staff to evaluate them.  We also interviewed the Unit Psychologist, Doug Beatty,

20  who confirmed that the standing hallway cages are used for suicidal prisoners, who are

21  typically stripped naked and are initially evaluated by a mental health clinician in the

22  cages.  Mr. Beatty also noted that there are no groups in the CCCMS administrative

23  segregation area because there is no space for them.  He also noted that he sees his

24  caseload cell front when they will not come out of the cell and that about 50% of the

25  inmates on his caseload always refuse to come out of their cell.

26         211.   In the freestanding ASU unit, where no caseload prisoners are permitted due

27  to the extremely harsh conditions, we spoke with custody staff member who also indicated

28  that when someone is suicidal they are placed into a standing cage until clinical staff

1   members can come and evaluate them.  He said that after a clinician sees the suicidal

2   prisoner, the prisoner might be taken to the CTC.  He also suggested that he believed some

3   prisoners faked being mentally ill and suicidal to get out of the unit, because there are no

4   televisions allowed in the freestanding ASU but mentally ill ASU prisoners are permitted

5   television.

**2.      Use of Alternative Placements at SVSP for Suicidal Prisoners:**

8          212.   The most recent Special Master's report noted that SVSP was frequently

9   using alternative placements for suicidal prisoners:  "During the review period 246 inmates

10   were placed into alternative housing pending crisis bed screening/evaluation."  Docket

11   4398 (25th Draft Report) at 261.  At that time and continuing at the time of my tour, the

12   only alternative placements in use at SVSP that we were shown were three small upright

13   cages (although with seats) used for short periods during the day, and two larger holding

14   cells in the Treatment and Triage Area of the CTC with toilets that are used at night.  *See*

15   Photographic Appendix K (Upright Cages) and Appendix P (Holding Cells).  None of

16   these cells have beds.  The Special Master noted that based on an analysis of the

17   placements in the second half of May, 2012, it was concluded that the lengths of stay in

18   these alternative placements varied from 1.5 to 42.5 hours and averages 14.2 hours.  *Id*.

19   The Special Master noted that "custody logs of the use of these cells were often incomplete

20   and did not include release times."  *Id*.

21          213.   The use of these alternative placements continued during the fall of 2012 and

22   into this year.  Logs of the use of these alternative placements produced by defendants

23   after the tour of SVSP showed that these cells were used for suicidal prisoners 31 times in

24   November of 2012, 31 times in December of 2012, and 36 times in January of 2013.  *See*

25   Ex. 20 to Kahn Dec.  The longest stay in these cells in January was 37.5 hours, the longest

26   stay in December was 22 hours, and the longest stay in November was 24 hours.  *Id*.  In

27   my opinion, the use of these placements is yet another excessively punitive component of

28

1   the suicide watch procedures at SVSP that must be eliminated.  Individuals who are

2   suicidal should be placed directly into an MHCB bed for observation and assessment.

3           **3.      Use of Punitive Suicide Watch Procedures and Alternative Placements at CSP-Sacramento:**

4

5         214.   I also observed punitive suicide watch conditions being employed at CSP-

6   Sacramento during my tour there on January 29, 2013.  CSP-Sacramento is the largest user

7   of such placements in the CDCR.  This is especially true if one counts placements in the

8   unlicensed MHCB unit, or "MHCBU" unit there as an alternative placement.  The

9   unlicensed MHCB unit is a regular housing unit where acutely suicidal inmates are placed

10  into regular high custody level prison cells rather than a truly clinical setting of the type

11  found in a licensed MHCB.  The prison has staffed this unlicensed unit with the same

12  staffing ratios as an MHCB unit.  While this level of staffing is helpful, the physical plant

13  in the unlicensed MHCB is not at all the equivalent of a licensed MHCB, where the cells

14  are bright and spacious and there is good visibility and plenty of space for clinician offices

15  and for confidential meetings with clinicians.  The ad hoc, cluttered nature of the

16  unlicensed MHCB unit at CSP-Sacramento can be seen in the photograph attached to the

17  Photographic Appendix filed with this report as Appendix Q.

18        215.   Not including the use of this unlicensed unit, CSP-Sacramento had 515

19  prisoners admitted to alternative placements during the 25th round review period.  Docket

20  4298 (25th Special Master's Report) at 93.   The Special Master's 25th Report notes that

21  171 of these individuals were eventually transferred to an MHCB and that the average

22  length of stay in the alternative placement prior to MHCB transfer was 1.9 days with

23  lengths of stay ranging from zero to 3.24 days.  *Id.*

24        216.   The defendants produced an excel spreadsheet in their document production

25  in connection with this termination motion showing the use of alternative placements

26  statewide at various prisons between May 18, 2012 and December 31, 2012.   This data

27  has been sorted by prison.  The portion of this data covering CSP-Sacramento shows that

28  the prison used alternative placements 468 times during this period.  *See* Ex. 26 to Kahn

1  Dec.  Of those 468 placements, 54 placements in alternative housing lasted for more than

2  24 hours.  *Id*.

3      217.    During the tour of CSP-Sacramento, we also requested that the CDCR

4  photographer take photographs of some of the alternative placements used at the prison,

5  and copies of those photographs are attached to the Photographic Appendix to this Report

6  as Appendices R, S, and T.   Those photographs are of the so called "zz cells" outside the

7  door of the CTC that are used as alternative placements.

8      218.    The photograph attached as Appendix T is of a sign on the door of one of

9  the two ZZ alternative holding cells.  Suicide watches are routinely conducted in these

10  cells, and the sign is a suicide watch instruction sign.  The sign says, among other things,

11  "*do not converse with the inmate*."  This is a remarkable and very troubling instruction,

12  because what suicidal individuals require more than anything else is human interaction, to

13  help them work through their feelings and to break their isolation.  Human contact is

14  therapeutic when someone is suicidal.  This instruction gives precisely the wrong message

15  to individuals conducting suicide watches in this location.  The existence of this sign is

16  particularly surprising given that CSP-Sacramento is viewed as one of the better mental

17  health programs currently in the CDCR.

18      219.    Defendants' expert Dr. Dvoskin, in an excerpt of his deposition that has been

19  shown to me, noted that he did encounter a staff member at CSP-Sacramento observing an

20  individual on suicide watch who "didn't talk to the inmate" and that he would "would be

21  opposed to" any instruction not to speak to suicidal prisoners.  *See* Ex. 69 to Bien Dec.

22      220.    CSP-Sacramento has a team that manages its use of these numerous

23  alternative placement locations that is aptly named the "Crisis Triage Team."  This team

24  was described as follows in the Special Master's 25th Report:  "CSP/Sac had in place a

25  crisis triage team who monitored and managed the alternative housing placements,

26  including movements between the MHCBs, the unlicensed MHCB, the OHU, and all

27  alternative housing locations."  Docket 4298 (25th Special Master's Monitoring Report) at

28  94.

221.    I visited the "Crisis Triage Team" on my tour of CSP-Sacramento on January 29, 2013, and interviewed the clinical staff members working in the office of the team on that day.   Given the scarcity of MHCB beds and the overwhelming need, I understand why the institution was obligated to form this type of unit.  However, the need for such a team highlights the realities and burdens on clinical staff in the CDCR of not having a sufficient MHCB resources to cope with the apparent high levels of suicidality at the institutions.

222.    We visited the Crisis Triage Team a little after noon, and they indicated that there were two individuals in holding cells who were waiting for placement.  The individuals the team was trying to place were both participants in the PSU program and both were being held in standing cages in the rotunda's of their respective housing units.  The individuals were Prisoner I and Prisoner J.  Prisoner I had been in a holding cage in his unit for more than three hours when I met with the team.  He had been placed in the module at 9:15 that morning.  He was not yet being tracked as placed into alternative housing, because, we were told, these initial placements of up to four hours within the housing unit are not counted as alternative placements.   At the time of our visit, the MHCB units were all full, and these individuals were being held while waiting for a bed to open.

223.    CSP-Sacramento is one of the prisons where prisoners are typically held for a significant period of time in their housing units before being sent to an alternative placement or to an MHCB bed.  We interviewed Prisoner I briefly in the rotunda area of his PSU housing unit who had been pulled out of his cell earlier that day after expressing suicidal ideation.  He was wearing boxers and a t-shirt, but he was standing and he was cuffed.  The cage was in the middle of a very busy, chaotic hallway in the unit, and no one appeared to be paying much attention to the prisoner (although he was in view of and close to numerous staff, and I do not think he was in any immediate danger at the time.) Prisoner I's electronic health records reflect that he was initially placed into the unlicensed

1  MHCB unit around 1:00 that afternoon and that documented suicide watch checks on him

2  began around 2:00 that afternoon.

3      224.    Prisoner J's records reflect that he was placed into a holding cell because he

4  was storing his feces in baggies and exhibiting other bizarre behavior.  *See* Ex. 22 to Kahn

5  Dec.  His records include DSH referral packets that seem to indicate that an initial referral

6  that was initially prepared to the acute care program operated by DSH at the California

7  Medical Facility on December 19, 2012.  *Id*. (DSH Referral Packet.)  For reasons that are

8  not entirely clear but which may have involved the need for a Vitek hearing, Prisoner J's

9  referral package to acute care does not appear to have been completed until mid-January,

10  2013 nearly a month after the referral was initiated.  A progress note from the morning of

11  my visit noted that custody reported that Prisoner J was having paranoid delusions.  At the

12  time of my tour, he was one of 13 individuals on a list defendants provided of individuals

13  waiting at CSP-Sacramento for transfer to DSH.  *See* Ex. 23 to Kahn Dec.  Clearly, if there

14  are 13 people waiting for DSH housing to open up at one institution, there is a waiting list

15  for inpatient care.

16      225.    I am deeply troubled by the fact that this apparently profoundly psychotic

17  individual identified as requiring acute inpatient care in a state hospital program was

18  housed in the PSU program while waiting for transfer.  His records indicate that staff

19  members were aware for several weeks of the fact that he had been storing his feces.  I do

20  not understand why he was not moved to acute inpatient care more rapidly nor do I

21  understand why he was not housed in an MHCB bed in any interim period while he was

22  waiting for placement into the acute care program.

23      226.    Another prisoner that I interviewed at CSP-Sacramento in the EOP

24  Administrative Segregation Unit in Housing Unit A-5 also told us about punitive suicide

25  watch procedures used in that housing area.  Prisoner K said he had been in the EOP

26  Administrative Segregation Unit for 5 months for an assault on staff.  He too was waiting

27  for transfer to DSH and is on the list of individuals waiting for DSH transfer given to us on

28  the day of the tour.  Prisoner K has been admitted to the crisis beds at CSP-Sacramento at

1   least three times since he was placed into Administrative Segregation in August of 2012.

2   He told us the following concerning how housing unit staff responded each time he was

3   suicidal:  He indicated that, generally, for the first four to five hours after telling staff he

4   was suicidal, he was placed into a standing cage in his housing unit.  He said that in the

5   cages, he was stripped down to his boxer shorts, handcuffed and ankle cuffed, and was

6   unable to sit down.  He said that he thought staff members try to discourage people from

7   going to crisis beds by making them so uncomfortable in the cages, which are also cold.

8   He said that after four to five hours in the cage, staff would ask him whether he wanted to

9   go back to his cell.  He told me that he persisted in asserting that he was suicidal each time

10   and was transferred to the unlicensed MHCB or the licensed MHCB on these occasions.

11   He also indicated that he had spent time in the ZZ holding cells near the CTC and that the

12   housing cells in the unlicensed MHCB were cold and dirty and unpleasant and that he

13   hoped he did not ever have to go back to that unit.  *See* Photographic Appendix R and S

14   (Photographs of ZZ holding Cells at CSP-Sacramento).

15       227.    As noted above, it is my opinion that these kinds of punitive conditions for

16   individuals on suicide watch are dangerous and should be discontinued as soon as possible.

17              **4.      Use of Punitive Suicide Watch Procedures and Alternative**
                          **Placements at CSP-LAC**

18

19       228.    CSP-Los Angeles County also employs alternative placements for suicidal

20   prisoners.  For suicidal individuals who are already in an administrative segregation unit,

21   the first placement in alternative housing will be into cells 121-126 in the EOP

22   Administrative Segregation Unit.  Photographs of two of these administrative segregation

23   alternative placement cells are attached to the Photographic Appendix to this report.  *See*

24   Appendices U, V and W.

25       229.    For suicidal individuals who are not yet in administrative segregation, cells

26   101 through 105 in the D-1 EOP unit are used initially.  *See* Appendix X.   After these

27   holding tanks are full, then the administrative segregation cells are used for general

28   population prisoners, too.  If all of these cells are filled, then the institution uses two

1    holding tanks in the CTC used for patients waiting to be seen in the clinic.  If the clinic

2    cells are in use, then the next step is to use holding tanks in the clinics after business hours.

3    Finally, if all of these other locations are full, the institution will use cells in the Receiving

4    and Release area where new arrivals to the prison are processed.

5         230.    We requested a log of alternative placements from CSP-Los Angeles

6    County.  CSP-Los Angeles County was also covered in the statewide list of alternative

7    placements between May 19, 2012 and December 27, 2012.  Defendants excel spreadsheet

8    for this period was used to create Exhibit 24 to the Kahn Declaration.  That exhibit shows

9    that during the roughly 7.5 months covered, there were a total of 291 individuals held in

10   alternative placements at CSP-Los Angeles County.  Of those 291 placements, 121 were

11   for more than 24 hours.  *See* Ex. 24 to Kahn Dec.

12        231.    Staff members at CSP-Los Angeles County told me that when an individual

13   is suicidal, the standard procedure at the institution in a regular housing unit is to place

14   them into a safe holding cell.  Often this is a so called "therapeutic module" (an upright

15   cage for sitting or standing only, depending on the specific module) in the program office

16   on the yard.

17        232.    When I was interviewing class members in the protective custody EOP

18   program on C-Yard on January 31, 2013, I spoke with Prisoner L about his experiences

19   with suicide watch at CSP-Los Angeles County.  Prisoner L told us that he had been

20   suicidal in the Summer of 2012 and was placed into a crisis bed for 34 days, after which he

21   was transferred to the Department of State Hospitals Acute Inpatient Program at CMF-

22   Vacaville.  I confirmed this by looking at his medical records.  He indicated that when he

23   was in the A-4 Administrative Segregation Unit and told staff he was suicidal, he was (1)

24   initially placed into a holding cage on the unit for a short period, and (2) then he was

25   stripped naked and placed into a bare cell with a concrete bed in the Administrative

26   Segregation unit.  He was held in that cell in the Administrative Segregation Cell for 8 or 9

27   hours and then (3) he was placed into a mental health crisis bed in the correctional

28   treatment center at the prison where he was given a jumpsuit.  He confirmed that the

1    punitive suicide watch features he experienced might discourage him from reporting

2    suicidal feelings in the future.  I explained to Prisoner L the importance of telling staff of

3    his suicidality in the future.

4           233.    In the C-Yard EOP program, we also spoke with Prisoner M who described

5    similar punitive features in the suicide watch procedures in the A-4 EOP Administrative

6    Segregation Unit that he experienced when he was suicidal in January of 2012.  Prisoner M

7    said that when he told staff that he was feeling suicidal he was immediately placed into a

8    standing cage in the unit, stripped, and given a paper jumpsuit to wear.  He said that next

9    he was placed into one of the bare intake/alternative holding cells in the same

10   Administrative Segregation Unit for 2 or 3 days.  During that period he said he was very

11   cold and uncomfortable.

12          234.    Several other prisoners I interviewed at CSP-Los Angeles County also

13   complained about the harsh suicide watch conditions they had endured in the A-4

14   Administrative Segregation Unit.

15          235.    The dangers of this type of harsh suicide watch housing, and in particular the

16   use of holding cages was highlighted in a CDCR suicide report for a 2010 Suicide at CSP-

17   Los Angeles County.  Prisoner N took his own life on February 11, 2010.   At the time, he

18   was a participant in the reception center EOP program.  *See* Ex. 34 to Kahn Dec.  In the 10

19   day period before he took his own life, Prisoner N was put in a holding cages twice for

20   suicide observation.  *Id*. at 7, 9.  The first time, on February 2, 2010, he spent 4 hours and

21   50 minutes in the holding cage.  *Id*. at 7.  The second time, on February 5, 2010, he was in

22   the holding cage from 1800 hours until 1110 the next morning, a total of more than 17

23   hours, before he was sent back to his cell.  *Id*. at 9.   Although the suicide report does not

24   draw any conclusions about these experiences, in my view these prior experiences in a

25   punitive holding cell may have led Prisoner N to be less forthcoming about his true

26   suicidal feelings when he successfully took his own life a few days later.  Either way, his

27   story illustrates the serious risks of such housing practices.

28

1
2

**5.     Use of Punitive Suicide Watch Procedures and Alternative Placements at RJD**

3       236.    According to CDCR reports, the RJ Donovan Correctional Institution in San

4   Diego uses alternative placements somewhat less often than the other three institutions

5   discussed above.  *See* Ex. 25 to Kahn Dec.  During the May 18, 2012 through December

6   27, 2012 period for which the defendants provided data about system-wide use of

7   alternative placements, RJD used such placements 103 times. *Id.*  Of those 103 alternative

8   placements, 43 lasted more than 24 hours, thus violating the Program Guide requirement

9   of a referral to MHCB within 24 hours.  RJD also had a number of very long stays in

10   alternative housing – the three longest stays in alternative housing during this period were

11   90.22 hours, 59 hours, and 49.5 hours.

12       237.    Like CSP-Los Angeles County, RJ Donovan employs cells in its

13   Administrative Segregation Units as alternative housing.  Twelve beds in the EOP

14   Administrative Segregation Hub building are designated as intake cells and are also used

15   as alternative placements for individuals on suicide watch.  Photographs of two of these

16   cells are attached to the Photographic Appendix to this Report as Appendices AA and BB.

17   RJ Donovan also employs a holding cell in its CTC for alternative placements.  *See*

18   Photographic Appendices Y and Z.  As noted above, RJD also employs standing

19   cages/holding tanks outside the door of the CTC for initial nursing evaluations of suicidal

20   prisoners being brought to the MHCB unit.  Appendices L and O.  Finally, RJD uses cell

21   150 in its mainline EOP housing unit as an alternative placement.

22       238.    While at RJ Donovan, I spoke with a class member named Prisoner O, in the

23   MHCB about his experiences on suicide watch.  I also had some concerns about Prisoner

24   O's need for speedier access to DSH inpatient care, discussed below at ¶¶ 425, 426.

25   Prisoner O's experience on suicide watch in January 2013 was as follows:  When he told

26   staff members he was feeling suicidal, Prisoner O was taken out of his cell and placed into

27   an upright holding cage on the dayroom floor of the SNY EOP program on C-Yard at RJD.

28   He was stripped down to his boxer shorts and cuffed for 3-4 hours standing in the cage and

84

EXPERT DECLARATION OF PABLO STEWART, M.D.

sometimes sitting in a cramped position on the floor area of the small cage/module.  He indicated it was cold and unpleasant in the cage.  Eventually he was transferred to a bed in the MHCB unit.  He has been in crisis beds on three occasions for suicidality since returning from DSH in December.  Given the acuity of his condition, in my opinion these sorts of punitive suicide watch practices are inappropriate.  Prisoner O has been referred back to DSH for his chronic suicidality.  While he waits for DSH, he has been repeatedly sent back to his EOP housing unit.  In my opinion, Prisoner O should be kept in the MHCB unit until he is transferred to DSH.

### h.   Problems with Existing Suicide Prevention Measures in the CDCR

239.    There are a number of different problems with the defendants' suicide prevention measure that I identified on my inspections and in my review of the relevant documents on this issue.  In my opinion, aside from the use of punitive suicide watch conditions and alternative placements, the most critical suicide prevention problems are (1) inadequate welfare checks by policy, in that they are restricted to individuals in their first 21-days in administrative segregation, contrary to American Correctional Association Standards, and inadequately conducted welfare checks in practice in that they are generally not appropriately staggered, (2) inadequate intake cells in administrative segregation units, (3) inadequate suicide risk assessments, (4) overly long stays in administrative segregation units, (5) use of administrative segregation for protective custody cases.

240.    On inspection tours, I encountered problems in a number of these critical parts of the CDCR's suicide prevention procedures.

### 1.   Problems with Welfare Checks:

241.    Problems with the adequacy of welfare checks exist statewide according to various recent reviews of CDCR suicides.  In his recent report on suicides in the calendar year 2011, the Special Master's expert, Dr. Raymond Patterson, notes that "thirty minute welfare checks for inmates newly admitted to administrative segregation units were not conducted consistently." Docket 4308 at 2.  As noted above, both Dr. Patterson's 2011

EXPERT DECLARATION OF PABLO STEWART, M.D.

[754904-2]

1   review and Lindsay Hayes review of 2010 suicides found numerous cases where rigor

2   mortis had set in indicating that 2 to 4 hours had passed since the prisoner's death and that

3   neither the every half-hour welfare checks for newly arrived prisoners, nor required hourly

4   custody checks had been conducted as required.  *See* Docket 4308 at 2-3 and Ex. 50 to

5   Bien Dec.  The CDCR's internal suicide reviewer Dr. Canning also noted in his report on

6   2010 suicides problems with "correct usage of intake cells and timely welfare checks for

7   new arrivals to segregated housing."  Ex. 49 to Bien Dec. at 10 (DEXP 103758).

8       242.   There were serious problems with staggering of welfare checks at many of

9   the units I visited on my inspection tours.  At SVSP, we asked for copies of the welfare

10   check logs from the D-Yard EOP Administrative Segregation Units in Buildings 1 and 2.

11   Ex. 52 to Bien Dec.  Those logs do not show appropriate staggering of the welfare checks.

12   Staggering welfare checks is essential so that suicidal prisoners do not know when the

13   checks will take place.  The logs for the day of our visit to SVSP showed that the start

14   times for the last four rounds of welfare checks on the unit took place at 12:02, 12:32,

15   1:01, and 1:32 in A-Pod of Building D-2, at 12:00, 12:01, 1:03 and 1:31 in B-Pod of

16   Building D-2 and at 12:00, 12:30, 1:00, 1:30 in C-Pod of Building D-2.  These minor

17   variations in start time are insignificant, and are not enough to create any meaningful doubt

18   about when the custody officer will be conducting the checks.   Truly staggered welfare

19   checks that can occur at any time during a particular 30 minute period can significantly

20   reduce the risk of a successful suicide occurring.

21       243.   The welfare checks were also not appropriately staggered in the freestanding

22   ASU at Salinas Valley.  Copies of the logs from those units are attached to the Bien

23   Declaration filed with this report as Exhibit 53.  The logs for that unit were slightly more

24   staggered, but virtually all of the checks (with a handful of exceptions) began within about

25   five minutes in either direction from the half-hour mark.  *See* Ex. 53 to Bien Dec.

26       244.   We also requested copies of welfare check logs during my tour of CSP-

27   Sacramento in two different Administrative Segregation Units.  First, we requested copies

28   of the logs in the Building A-5 EOP Administrative Segregation Unit.  *See* Ex. 54 to Bien

EXPERT DECLARATION OF PABLO STEWART, M.D.

1    Dec.  The copy produced by defendants of the log is almost illegible, but it looks like most

2    or all of the entries start in the first five or six minutes of each half hour interval.  Also

3    while at CSP-Sacramento, we asked for copies of the welfare check logs for the Building

4    B-4 CCCMS Administrative Segregation Unit.  *See* Ex. 55 to Bien Dec.  These logs for the

5    period January 8, 2013 through January 28, 2013 include numerous entries where the

6    welfare checks are not even minimally staggered.  *See* Ex. 55 at Bates Nos. SAC 41, 43,

7    48-57.  For those entries where the checks are somewhat staggered, they are staggered only

8    by a few minutes.

9         245.    We also request welfare check logs during our tour of CSP-Los Angeles

10   County.  The logs from the Building A-4 EOP Administrative Segregation Unit at CSP-

11   Los Angeles County are attached to the Bien Declaration as Exhibit 56.  Many of the

12   welfare checks in this batch covering a period of several weeks at the end of January 2013

13   are not staggered, and those that are staggered are only very minimally staggered by a few

14   minutes around the half-hour.  (There are a handful of examples where there is more

15   appropriate staggering, for example, at Bates No. LAC 49.)  We also requested welfare

16   check logs from the Building A-5 CCCMS Administrative Segregation building and from

17   the Stand-Alone Administrative Segregation Building at CSP-Los Angeles County.  *See*

18   Ex. 57 and 58 to Bien Dec.   The welfare checks in those records are also for the most part

19   not appropriately staggered.

20        246.    We did not request welfare check logs during our tour of RJ Donovan

21   Correctional Institution.  I did observe one log at RJ Donovan where the checks were

22   staggered more than at the other institutions I visited.  However, the 25th Round Special

23   Master's Report  found that despite a local audit finding 90% compliance with welfare

24   checks, "a review of the logs revealed several instances of intervals as long as one to two

25   hours between checks."  Docket 4298 (25th Monitoring Report) at 368.

26        247.    Moreover, the internal CDCR Suicide Report on the June 23, 2012 suicide at

27   RJD of Prisoner P found very serious problems with the welfare checks in Prisoner P's

28   unit, and with the documentation of those welfare checks.  *See* Ex. 28 to Kahn Dec.  It is

1   important to note that Prisoner P was initially found by an officer conducting welfare

2   checks in the Facility B, Building 6 EOP administrative segregation building.  He was

3   housed in cell 147.  He took his own life on his first day in Administrative Segregation.  It

4   is also noteworthy that his cell is not one of the intake cells identified to us by RJD staff

5   members on tour.  *See* Ex. 59 to Bien Dec. (list of Alternative Placements at RJD produced

6   by the institution on the morning of the tour, listing the 12 intake cell in B-6 and not

7   including cell 147 in that list).

8       248.   The suicide report for Prisoner P found numerous problems with the welfare

9   checks and the documentation of those checks, including the following:  (1) inaccurate

10  dating of the logs, (2) failures to list what cells were being checked on the log, and (3)

11  failure to note when checking the entire unit because of the high number of prisoners

12  needing welfare checks.  However, the most troubling findings were that "the length of

13  time a round takes was sometimes not sufficient to ensure an adequate welfare check" and

14  that "some of the times listed were not credible." Ex. 28 at 17.  In support of the latter

15  finding, the suicide reviewer noted that "*on four pages of Welfare Check Tracking Sheets,*

16  *encompassing 96 rounds of 100 cells, the shortest time to inspect 100 cells was given as*

17  *three minutes; that number occurred three times (with the same CO).  Four minutes was*

18  *documented nine times.  One officer took exactly 10 minutes for each of his six rounds.  It*

19  *would be difficult to perform an adequate welfare check on 100 cells in some of the time*

20  *spans given, especially in a darkened cell*." Ex. 28 at 17.

21      249.   I have personal experience with this kind of problem in my work monitoring

22  troubled correctional systems.   In the case I worked on concerning youth facilities in

23  Georgia with the United States Department of Justice, in order to ensure adequate and

24  timely welfare checks, we required the State to install a "key card" system for guards to

25  swipe outside each individual cell in order to ensure that proper welfare checks were being

26  conducted.   In my opinion, the CDCR needs to develop some system of greater

27  accountability for welfare checks in its administrative segregation units.

28

250.   Prisoner P's suicide review also found very serious and troubling problems with failures to conduct a Suicide Risk Assessment (SRE) when appropriate, with the completeness of medication administration records, and with poor treatment planning for this prisoner by his case manager.  *Id.* at 16-18.  The review found that Prisoner P's treatment plan "was vague and did not include all current symptoms," that treatment goals "were non-specific," and that the treatment plan had not been modified in more than a year.  *Id.*  In my experience, these are the kinds of quality of care problems that one often encounters in overcrowded penal systems, where case managers are burdened by high caseloads, high levels of clinical acuity, and understaffing.

251.   Problems with welfare checks were also discussed in the suicide reviews for two suicides at Salinas Valley State Prison in recent years.  In the first suicide report, concerning the suicide of Prisoner Q on October 30, 2010 in one of the Administrative Segregation Units at Salinas Valley, it explains that there was no documentation of any 30 minute welfare checks on the day of Prisoner Q's suicide.  *See* Ex. 29 to Kahn Dec. (Prisoner Q Suicide Report SVSP 2010).  A second Salinas Valley Suicide Report, concerning the December 6, 2011 death of Prisoner R in the stand-alone Administrative Segregation unit there, indicated that he was found in *rigor mortis*.  *See* Ex. 30 to Kahn Dec.

252.   The death of Prisoner R illustrated another problem with the manner in which custody wellness checks are performed in the CDCR.  Prisoner R hung himself on his 22nd day in the Administrative Segregation Unit.  *See* Ex. 30 to Kahn Dec.  CDCR policy is that these half-hourly welfare checks are only conducted for the first 21-days of someone's stay in administrative segregation.  Prisoner R would have been aware of this policy, and it appears he waited until the checks were stopped before taking his life.   In my opinion, it would greatly enhance the safety of prisoners in these units to conduct these wellness checks at least every half hour for the duration of every prisoner's stay in administrative segregation.  It is my understanding that this is also the American Correctional Association Standard for these checks.  *See* Ex. 64 to Bien Dec. (ACA

EXPERT DECLARATION OF PABLO STEWART, M.D.

[754904-2]

1  Wellness Checks Standard.)  This standard was recommended to CDCR officials in 2006

2  by Mr. Hayes and others.  *See* Docket 2011 at ¶¶ 10-11 (Hayes) and Docket 2012 at ¶¶ 7-

3  10 (Kautzky).

4  253.   During the tour of San Quentin State Prison on February 26, 2013, we also

5  requested welfare check logs covering the most recent 20 day period.  *See* Ex. 60 to Bien

6  Dec.   Those checks also were not adequately staggered.

7  254.   When welfare checks are not truly staggered was to be the case in almost all

8  of the units where we checked on the logs, the basic purpose of doing the checks at all is

9  undermined.

10  **2.     Problems with Adequacy of the Intake Cells:**

11  255.   Defendants' suicide consultant Lindsay Hayes discussed the adequacy of

12  both intake cell placements and welfare checks in his 2011 report to defendants.  Based on

13  his review of 2010 suicides, he noted that "my review of the suicide reports found that

14  several inmates who committed suicide shortly after ASU placement were not placed in

15  designated ASU intake cells and, as indicated above, several ASU inmates were not

16  observed at 30-minute intervals as required."  Ex. 28 to Kahn Dec. at 2.  As noted above,

17  problems with the adequacy of the number of intake cells were also noted in the 2010

18  suicide review by CDCR suicide reviewer Dr. Canning.  Ex. 49 to Bien Dec. (Annual

19  Report on Quality Improvement Plans in Suicide Report for 2010) at 10 (DEXP 103758).

20  256.   This issue is also noted in the Special Master's most recent report.  He

21  reports that "CSP/Sac reported that only 32 percent of newly-arrived inmates in

22  administrative segregation were placed into designated intake cells."  Docket 4298 (25th

23  Special Master's Report) at 64.

24  257.   That percentage is higher than the percentage of intake prisoners in intake

25  cells at RJ Donovan at the time of our tour there on February 12, 2013.  As noted above at

26  ¶ 183, when we inspected the EOP and CCCMS Administrative Segregation Units at RJ

27  Donovan Correctional Institution, we discovered that although there were 12 intake cells in

28  one of the two buildings, the two side by side administrative segregation buildings on B-

1   Facility (in Building B-6 and B-7) had a total of 72 prisoners on intake status in units –

2   more than 5 times the number of available intake cells.  Moreover, at the time of our visit,

3   not all of the 12 intake cells were being used by prisoners on intake status.   Clearly, the

4   number of retrofitted intake cells is grossly inadequate at this time.

5        258.    Staff in these units at RJD and in every single other administrative

6   segregation unit where I asked about the adequacy of the number of intake cells

7   acknowledged that there are often not enough intake cells to accommodate all newly

8   arriving prisoners in the unit.  Also, some administrative segregation units did not have any

9   intake cells.  For example, in the Building D-8 CCCMS Administrative Segregation Unit

10  at Salinas Valley State Prison I was told by staff that there were no special intake cells.

11       259.    The CDCR is well aware of this problem.  As noted above, in Dr. Canning's

12  January 2013 report on suicide trends in the CDCR since 2007, he notes that about 45

13  percent of all suicides in the CDCR since 2007 have taken place in segregated units (35

14  percent in administrative segregation units, and another 10 percent in SHU units, PSU

15  units and condemned units).  *See* Ex. 3 to Bien Dec. at 1.  The report highlights the fact

16  that "since the beginning of 2007, 49% of inmates who died by suicide in ASU had spent

17  less than 21 days in ASU at the time of their death."  *Id*. at 1-2.  An e-mail produced by

18  defendants along with his report included an internal excel database that appears to be an

19  analysis of suicides in administrative segregation prepared for Dr. Canning.  See Ex. 6 to

20  Kahn Dec.

21       260.    This excellent internal CDCR suicide data analysis shows that of the 25

22  individuals who took their own lives within their first 10 days in an administrative

23  segregation unit since 2007, <u>not a single one of them was housed in an intake cell that had</u>

24  <u>been retrofitted to be suicide proof</u>.  *See* Ex. 3 to Kahn Dec.  This is a remarkable finding

25  and one that demands remedial action to ensure a greater number of intake cells in each

26  administrative segregation unit and to ensure that all prisoners entering administrative

27  segregation units spend their first 21 days (or at least their first 10 days) in a suicide-proof

28  intake cell.  *Id*.

261.   As noted above, the suicide report for Prisoner P, who took his own life in the Building B-6 EOP Administrative Segregation Unit at RJD, makes clear that he was not in an intake cell at the time of his death on his first day in administrative segregation. He was in cell 247L, which is not one of the intake cells in that unit.   *See* Ex. 28 to Kahn Dec., (suicide report giving location as 247L) and VV (list of intake cells provided on the day of my inspection tour not including cell 247).

262.   In my opinion, this dangerous shortage of suicide-proof intake cells in administrative segregation units must be addressed as soon as possible by expanding the number of suicide-proofed intake cells or else by making all administrative segregation cells suicide-proof.

### 3.   Problems with Inadequate Suicide Risk Evaluations (SREs) and Failures to Conduct SREs Whenever Needed.

263.   In his report on suicides in the Calendar Year 2011, the Special Master's expert Dr. Patterson also discussed serious problems with the Suicide Risk Assessments in the CDCR:

> Alarmingly, in 50 percent of the suicide cases in 2011, inmate suicide risk evaluations either were not done, or found levels of "low" or "no appreciable" risk of suicide, without adequate consideration of risk factors, past history, and/or review of medical records.  As a result, interventions that could have been appropriate were not implemented.

Docket 4308 (Report on Suicides in CDCR in Calendar Year 2011) at 3.

264.   Moreover, Dr. Patterson details a number of specific Suicide Risk Evaluation (SRE) process failures in cases where the SRE was improper, including failures to do the following:

- obtain information that was available in records or via staff referrals, and instead relying on inmates' self-reports;
- assess risk and/or protective factors;
- conduct adequate mental status examinations;
- develop and implement appropriate plans for follow-up evaluation and care;
- prepare adequate management plans, including collaboration with custody;

[754904-2]

1         and/or

2    •    recommend transfers of inmates to more appropriate clinical settings,

3         including MHCBs or DSH programs.

4  *See* Docket 4308 (Special Master's Report on Suicides in the Calendar Year 2011) at 11.

5         265.   Dr. Patterson notes that the CDCR response to these Suicide Risk Evaluation

6  problems has been to develop and begin to implement a suicide risk evaluation mentoring

7  program at all prisons.  However, he points out that "its actual implementation remains

8  partial at this time, two years after it was initially ordered."  *Id* at 12.

9         266.   Documents produced by defendants in the last few weeks in response to

10 plaintiffs' document requests demonstrate that in fact, implementation of this process has

11 been rushed and remains incomplete.  For example, on January 19, 2013, ten days prior to

12 our visit to CSP-Sacramento, Shama Chaiken, the Chief of Mental Health at CSP-

13 Sacramento, reported to her supervisor that the mentoring program there had "been on the

14 back burner" and promised to "come up with an implementation plan next week." Ex. 62

15 to Bien Dec.   This is not that surprising to me given the staffing shortages Ms. Chaiken is

16 managing at CSP-Sacramento and the extremely mentally ill patient population there.  *See*

17 ¶¶ 77-90, *supra*.   Later, she sent an e-mail to her staff suggesting the mentoring program

18 was being implemented more for the benefit of litigation than for its substance, noting that

19 "for experienced staff it takes about an hour," and that "the folks who are mentored can

20 then become mentors for others the following week."  She then tells them that "we need to

21 make some progress by the time the plaintiff attorneys come out the following week."  *See*

22 Ex. 61 to Bien Dec. (Exhibits 12 and 13 to Beard Depo).  Before I read these e-mails, I had

23 imagined that the mentoring/training program on Suicide Risk Evaluations involved a

24 long-lasting training relationship to transmit the critical clinical skills for handling suicide

25 risk assessments.

26        267.   This cavalier attitude about the SRE training/mentoring program is

27 particularly alarming given that two suicide reviews since 2011 concerning suicides at

28 CSP-Sacramento have identified serious problems with the suicide risk assessments.

268.    First, both Dr. Patterson's review of 2011 Suicides and the relevant internal CDCR suicide report discuss serious problems with suicide risk assessments done for Prisoner S, who took his own life on at CSP-Sacramento on March 25, 2011, 8 days before he was due to parole into the custody of the INS for deportation to Mexico.  *See* Ex. 31 to Kahn Dec. (CDCR Prisoner S Suicide Report) and Docket 4308 at 102-107.    At the time, Prisoner S had just returned from a nine-month stay in the intermediate inpatient care program run by the Department of State Hospitals at Salinas Valley (SVPP).  A Suicide Risk Assessment conducted by clinicians at SVPP was noted by Dr. Patterson to be "remarkable in that it listed no prior suicide attempts and [failed to use] a translator during the interview . . . [the prisoner's] risk levels were assessed as 'low' despite the inmate's prior near lethal attempt and history of risk factors."  Docket 4308 at 105.   The CDCR Suicide Report does not include any recommendations for remedial, action, but it notes that an INS agent spoke with Prisoner S's psychiatrist a few days before Prisoner S's death about his "psychiatric fragility."  Ex. 31 to Kahn Dec. at 7.  The report indicates that no new suicide risk assessment was conducted following this contact from the agent.  No recommendations were contained in the CDCR Suicide Review regarding this EOP prisoner.  However, Dr. Patterson's Report was critical of both the poor quality SRE done by DSH clinicians in the Salinas Valley Psychiatric Program (SVPP), and about the failure of the SRE initially done by CSP-Sacramento clinicians upon his return to the institution from DSH three days before his death to properly assess his risk:

> Although he was seen after his arrival at CSP/Sac by a clinician who determined that he was not actively suicidal, his chronic risk factors and his imminent deportation did not appear to have been factored in as additional risk factors affecting his acute level of risk, and his GAF score was 38.

Docket 4308 at 107.  Dr. Patterson also noted that he could not locate a copy of the SRE performed at CSP-Sacramento in the medical records for this prisoner.  *Id.*

269.    A second CSP-Sacramento suicide where the adequacy of the clinical response to a suicidal class member was questioned is that of Prisoner T, who took his own life on July 24, 2012 in an administrative segregation overflow unit at CSP-Sacramento.

1    Ex. 32 to Kahn Dec.  A psychologist went to see Prisoner T the day before his death after

2    custody staff noticed he was acting strangely and the Chief Deputy Warden asked that he

3    be seen.  *Id.* at 8.  The clinician who went to see Prisoner T noted that he was "agitated,

4    angry, pacing in his cell, refused to communicate, and had recently been involved in an in-

5    cell fight with his cellmate."  *Id.* at 13.  However, the clinician indicated that a mental

6    status exam was not possible because of the inmate's refusal to cooperate.  *Id.* at 13.  This

7    was a serious lapse of professional duty.  The fact that a patient isn't "cooperative" does

8    not relieve a clinician from the responsibility to conduct a mental status exam.  The suicide

9    report was critical of the clinician's failure to document her reasons for not referring the

10   prisoner to a higher level of care, and of her apparent failure to review his electronic health

11   record.  *Id.*  Although it is not documented as a problem in the suicide report, it appears

12   that the clinician did not consider conducting a suicide risk assessment.

13          270.    Suicide risk assessment problems were also identified in the Suicide Reports

14   for two of the six suicides that took place at Salinas Valley State Prison in 2012.   First , in

15   the suicide review for Prisoner U, who took his own life on March 20, 2012 in the

16   Administrative Segregation Unit at SVSP, the report concluded that the SRE completed by

17   both his primary clinician and the MHCB clinicians were poor.  *See* Ex. 33 to Kahn Dec.

18   (Prisoner U Suicide Report).

19          271.    Second, in the suicide review for Prisoner F, who took his own life on

20   August 12, 2012 at Salinas Valley State Prison, the reviewer was critical of the suicide risk

21   evaluations she reviewed in his file and in other reviews she has conducted.  Ex. 17 to

22   Kahn Dec.   She explained that "*noted during this review, as in others at other facilities, is*

23   *the poor inter-rater reliability of the SRE and the reluctance of clinicians to classify an*

24   *inmate a moderate or high risk even when the data clearly show numerous chronic risk*

25   *factors.  In this inmate's case, the multiple chronic factors were correctly identified but*

26   *because he denied a history of suicidal ideation or attempts the clinician rated him low.*

27   *More training appears to be needed.*"

28

272.    An email produced by defendants concerning Suicide Risk Assessment mentor training at San Quentin similarly documents that the training process is nowhere near completed.  *See* Ex. 62 to Bien Dec.  The email shows that less than half of the clinicians (28 of 61) had been trained in the new SRE mentor program at San Quentin as of February 4, 2013.  *Id*.

273.    I agree with Dr. Patterson that improvement in this area is critically needed, given the problems cited in his report and discussed above.

### 4.    Overly Long Stays in Administrative Segregation.

274.    The defendants' trio of experts hired for these termination proceedings was concerned about long stays in administrative segregation for EOP prisoners.  They discussed this issue at length:

> Administrative Segregation Units had a statistical overrepresentation of completed suicides when compared to other housing units, despite the CDCR's significant efforts to address this problem.  Sadly, this is the case in prisons across the country, and reinforces the importance of using Administrative Segregation Units only when it is absolutely necessary to protect staff and inmates.  For this reason, and because the environment is not therapeutic, we recommend that placement of inmates who require EOP level of care be housed in Administrative Segregation Units only when absolutely necessary

275.    I agree wholeheartedly with this concern.  As discussed in the following section concerning problems with the adequacy of care for EOP prisoners in various EOP programs, I encountered many, many extremely mentally ill prisoners in my tours of EOP units, and particularly in EOP administrative segregation hubs.  Many of these individuals clearly needed a higher level of care and more intensive mental health interventions on a variety of different fronts – better medication management, more groups, more case manager contact, crisis care, and/or inpatient care.  Housing such individuals in an administrative segregation environment is high risk in a variety of different ways.  It makes the delivery of mental health services critical to their stabilization much more difficult.  It makes it hard to closely monitor their medication compliance.  In many units it makes it impossible to have confidential clinical interviews because there is not confidential treatment space.  It makes rescue efforts more difficult in the event that these

[754904-2]

1  individuals engage in acts of self-harm.  Most importantly, the environment itself is

2  counter-therapeutic, and increasingly so over time spent there.

3       276.   On my tours of individual EOP administrative segregation hub units, we

4  identified the most severely mentally ill individuals in two different ways as candidates to

5  interview.  First we looked at lists provided by defendants of the length of stay of everyone

6  in the unit and selected the individuals with the longest stays.  Then we asked custody staff

7  on the unit who knew the prisoners well to help identify the most mentally ill individuals

8  on the unit.  The two lists of potential interview candidates were almost always the same,

9  suggesting that the longer EOP prisoners stay in segregation, the more severely mentally ill

10  they become.

11       277.   Many of the prisoners I met in these units would struggle in a regular EOP

12  program.  In an EOP administrative segregation program, they get even less care at the

13  same time that they are exposed to the anti-therapeutic segregation environment, an

14  environment that is toxic for individuals with mental illness.  It is my opinion that the

15  CDCR should limit stays of EOP individuals as much as possible to minimize the terrible

16  harms caused by these units.

### 5. Defendants Must Cease Using Administrative Segregation Units As Bad Beds – Both As "Alternative Placements" for Suicide Watch and for Protective Custody.

19       278.   I am especially concerned about the use of administrative segregation units

20  as the primary housing placement for individuals with safety concerns.  In internal CDCR

21  Review of Suicides in the CDCR in 2010, the CDCR's main suicide reviewer Dr. Canning

22  points out that "five of the twelve inmates housed in Administrative Segregation at the

23  time of their death were originally placed there for safety reasons."  Ex. 19 to Kahn Dec.

24  (2010 CDCR Suicide Review) at 14 (DEXP 103774).

25       279.   Similarly, in the internal CDCR Report discussed above containing an

26  analysis of suicides in administrative segregation units since 2007 that was authored by Dr.

27  Canning on January 25, 2013, the high percentage of suicides in these units involving

28  protective custody placements is documented.  *See* Ex. 3 to Kahn Dec.  In the excel

[754904-2]

1  spreadsheet prepared for Dr. Canning, it indicates that since 2007, at least 27 out of the 64

2  individuals who killed themselves in an administrative segregation unit were placed into

3  those units for their own safety.  Ex. 3 to Kahn Dec.  Dr. Canning writes very movingly

4  about the dangers of administrative segregation housing for such individuals:

5          [D]ata collected by suicide evaluators found that many inmates who
         housed in ASU at the time of their deaths are placed there not for
6         disciplinary reasons, but for safety reasons.  Although there are many
         complexities surrounding these situations, it is worth noting that placement
7         in ASU of already fearful inmates may only serve to make them even more
         fearful and anxious, which may precipitate a state of panicked desperation,
8         and the urge to die.

9
10 *See* Ex. 3 to Bien Dec. (January 2013 Suicide Analysis by Dr. Canning) at 2 (emphasis

   supplied).
11
12         280.    The Defendants' clinical consultants/experts also advised the department that

13 inmates waiting for placement into an protective custody SNY program should not be

   allowed to languish or linger in EOP ASU programs, explaining that "we suggest a
14
   reconsideration of any 'automatic' referrals to an Administrative Segregation Unit in the
15
   absence of a specific finding of danger to others or to the institution."  *See* Exhibit 1 to
16
   1/07/13 Vorous Declaration (Docket 4275-5) at 36.
17
           281.    These expressions of deep concern from the CDCR's own clinical experts
18
   highlights one key fact I observed on my tours of administrative segregation units – these
19
   units are the only places I visited on my tours in the last few months where I observed
20
   what should properly be thought of as "bad beds."  Administrative Segregation Units at
21
   LAC and RJD are used for alternative housing of suicidal patients.  When I visited Mule
22
   Creek State Prison in 2007 and 2008, I recall that some suicide watches were being done in
23
   the Administrative Segregation Units there as well.  I understand from plaintiffs' counsel
24
   that MCSP continues to house individuals in "alternative placements" in its Administrative
25
   Segregation Unit at this time.
26
           282.    These units are also used to house protective custody cases and SNY (which
27
   stands for "Special Needs Yard" and is also the formal CDCR status designation for
28

1   protective custody prisoners once approved) individuals waiting for a transfer.  This mix of

2   purposes and uses is an unhappy and unhealthy by-product of overcrowding, and one that

3   should be dismantled.  Although the CDCR policy on protective custody housing pre-dates

4   overcrowding, this aspect of the department's administrative segregation use should

5   ideally be de-coupled from the punitive function of the units in the same way that the

6   suicide watch mission and the EOP care missions need to be taken out of these units.

7       **4.**    **The CDCR Must Improve the Amount and the Quality of the Treatment in All of Its Enhanced Outpatient Programs.**

8

9       283.    All of the Enhanced Outpatient Program (EOP) units I visited on my

10  inspection tours were failing to ensure that prisoners in the program were actually

11  receiving the minimum of 10 hours of structured therapeutic activity provided for in the

12  Program Guides.   Program Guides at 12-4-9.   There are several different types of EOP

13  treatment programs in the CDCR.   All EOP programs are sheltered treatment programs

14  where mentally ill prisoners live in separate units from non-mentally ill prisoners.    The

15  program is for "mentally ill patients who, because of their illness, experience adjustment

16  difficulties in a General Population (GP) setting, yet are not so impaired as to require 24-

17  hour inpatient care."  Program Guides at 12-4-1.  The main types of EOP programs are (1)

18  basic EOP programs, (2) protective custody or "SNY" EOP programs, (3) Psychiatric

19  Services Unit or "PSU" programs, which are EOP level of care programs for prisoners

20  with Security Housing Unit ("SHU") terms and (4) EOP Administrative Segregation

21  Programs, and (5) EOP treatment for condemned prisoners on death row at San Quentin.

22      284.    The prisoners I met and assessed in each of these different types of EOP

23  programs around the state displayed a very high level of clinical acuity.  These prisoners

24  all had a demonstrated clinical need to receive at least 10 hours of structured clinical

25  activity weekly.  This need was not being met.  The care being provided to the SNY EOP

26

27

28

[754904-2]

1   patients and EOP Administrative Segregation patients I interviewed was particularly

2   deficient.[2]

3       **a.    My Opinion Regarding the CDCR's Inadequate Treatment**
        **Programs for Administrative Segregation EOP Level of Care**
4       **Prisoners and PSU Prisoners:**

5       285.   It is my opinion that EOP level of care prisoners (including PSU prisoners,

6   who are EOP prisoners in a specialized SHU program that is similar in some respects to a

7   long-term EOP administrative segregation program) are particularly vulnerable to

8   decompensating within a segregated environment and that the inmates in the EOP

9   administrative segregation programs I visited were not receiving even close to 10 hours a

10  week of treatment and appeared to be poorly functioning and exhibiting severe symptoms

11  of mental illness as a result.

12      286.   I also agree with defendants' expert Dr. Dvoskin and the Special Master's

13  expert Dr. Metzner that in addition to at least 10 hours of out-of-cell therapeutic activity,

14  these individuals need significant additional out of cell time such as yard time for

15  recreation.  *See* Ex. 4 to Dvoskin Depo at 764 (article on Supermax confinement of

16  mentally ill prisoners stating: "For inmates with a serious mental illness who legitimately

17  need an extremely high level of security, the specialized mental health program should

18

19  _____

20      [2] At one prison that I visited, RJD, I was informed by staff that one of the 3 EOP
    programs at the prison was offering close to 15 hours a week of structured therapeutic
21  activity and that prisoners in the program were actually receiving an average of more than
    10 hours a week of such activity.  This was an SNY program and it is the only EOP
22  program I heard about or read about (except for CIW in the 25th Special Masters Report)
    where the number of hours a week of structured therapeutic activity actually being
23  received by prisoners was greater than 10 hours.  However, we ran out of time to visit this
    program at the end of the day of our tour, so I was unable to confirm this by speaking with
24  prisoners and staff in the unit. San Quentin also was purportedly delivering more hours to
    the EOP prisoners not on death row, but it has a small EOP population outside of death
25  row, and most or all such EOPs are reception center prisoners only required to receive 5
26  hours a week.

27

28

1 offer at least 10 to 15 hours per week of out-of-cell structures therapeutic activities in

2 addition to at least another 10 hours per week of unstructured exercise or recreation time.")

3    287.    As noted above, it is also my opinion that the CDCR should be required to

4 reduce the lengths of stay of EOP prisoners in these segregated units.

5    288.    Each of the 5 prisons that I visited, SVSP, CSP-Sacramento, LAC, RJD and

6 San Quentin, has an EOP Administrative Segregation Hub program.  These are enhanced

7 programs that offer EOP level of care treatment within the administrative segregation

8 environment.

9    289.    As discussed above in the section on suicide prevention, administrative

10 segregation units are anti-therapeutic in a variety of ways.  First, many prisoners in such

11 units are single celled, and prisoners in these units spend all of their time locked in their

12 cells with little or no opportunity for social interaction.  This type of isolation can be

13 extremely damaging for chronically and severely mentally ill individuals like the

14 individuals who require EOP level of care.  Second, the relationship with custody staff in

15 these units is frequently very tense and hostile.   This can interfere with the delivery of

16 care, and the tension and hostility of these units can exacerbate existing mental illness,

17 particularly for paranoid and otherwise psychotic prisoners.  Third, inmates are placed into

18 these units because of some sort of incident or crisis – a fight with another prisoner or

19 staff, a disciplinary infraction for which they are likely to serve more time, sometimes for a

20 criminal infraction for which they might be prosecuted, or for protective custody reasons.

21 This means that virtually everyone in these units has been placed there because of a

22 negative and possibly even traumatizing incident.  In many ways, the first few days in

23 administrative segregation are like the first few days in jail – the transition to these places

24 of punishment is highly stressful and destabilizing, and prisoners are at a high risk for

25 suicide and other harmful activities.

26    290.    The Special Master noted the near-universal failure of the EOP hubs to

27 provide 10 hours of treatment in his recent 25th Monitoring Report:

28

101

1
2
3
4

> Another concerning finding at the [EOP Administrative Segregation] hubs was that ten of the 11 hubs failed to offer at least ten hours per week of structured therapeutic activity [ ].  Only CIW was able to meet that benchmark.  Structured therapeutic activity is a critical part of the EOP care in general.  This is particularly true in segregation units, where the group dynamic and interaction with others can help ameliorate the anti-therapeutic effects of isolation on the mentally ill patient.

5   Docket 4298 (25th Monitoring Report of the Special Master) at 37.

6        291.    The trio of clinical experts/consultants working for the CDCR also had

7   concerns about the amount and quality of treatment being offered in EOP programs

8   generally.  They noted in their report that "CDCR should continue to increase the quantity

9   of groups that are offered" in its EOP units in general.  Exhibit 1 to 1/07/13 Vorous

10  Declaration (Docket 4275-5) at 17, § e.

11       292.    The defendants' clinical experts also appear to share my concern about the

12  quality of groups, discussed in greater detail below.  Prisoners told me that many of the

13  groups, at least at certain prisons, consist entirely of watching popular movies on television

14  or reading newspapers.  Defendants' experts noted that "[w]e also observed some groups

15  that appeared to consist primarily of showing the inmate a movie or entertainment video."

16  Exhibit 1 to 1/07/13 Vorous Declaration (Docket 4275-5) at 17, § e (noting that some such

17  television watching may encourage group participation but asserting that "the majority of

18  group therapy time [should be] devoted to psychotherapeutic, rehabilitive, skill building,

19  and psycho-educational activities").

20       293.    I personally witnessed one such group in the mainline, general population

21  EOP program on D-Yard at CSP/Lancaster, where the handful of prisoners in the group

22  were reading newspapers and magazines while a popular movie played on the television.

23  The prisoners were not interacting with the group leader.   A photograph of the room

24  where the group was held that shows the television and a prisoner reading a magazine is

25  attached to the Photographic Appendix as Appendix GG (photo bearing the Bates No.

26  LAC 124).  There were only three or four prisoners in this "group."

27       294.    I also personally observed that many of the EOP groups scheduled to last an

28  hour (and counted as an hour towards the 10 hours per week of structured therapeutic

1  activity) lasted for considerably less time.  For example, the EOP patients I spoke to after

2  their stress management group had finished in the RJD EOP ASU told me their group was

3  scheduled to continue until noon.  However, the group was over and I was speaking to

4  them by 11:45, if not sooner, at least 15 minutes before the group was scheduled to end.

5      295.    Similarly, we spoke with the members of a mainline EOP treatment group at

6  SVSP before their group started.  The group at SVSP was scheduled as an hour long group

7  starting at 1:00, but the group did not start until 1:15 and generally was let out at 1:50 to

8  allow custody to return the prisoners to their cells before the next round of groups.  The

9  group leader and the group members confirmed that the group probably typically lasts only

10 35 minutes.  The group leader also confirmed that even though it is shorter than one hour

11 in duration, they "count" it as an hour of treatment.  On the day we observed, it was even

12 shorter because something took place on the yard, so it only lasted 25 minutes.  The group

13 leader in the SVSP mainline EOP group said that the institution had made a decision to

14 only offer 7 hours of treatment a week, but to focus on improving the quality of the groups.

15 The inmates in the SVSP group we spoke with stated that they found the group interesting

16 but a little "random."

17     296.    The Special Master's report also noted pervasive problems with the lack of

18 confidential treatment space in these units statewide in the 25th Report:

19         A pervasive problem found during twenty-fifth round monitoring was
        that all 11 [EOP administrative segregation] hubs failed to conduct all
20      clinical contacts and/or therapeutic groups in confidential settings.  Many
        individual contacts were occurring cell-front, or in areas affording the patient
21      no auditory or visual privacy.  A related persisting problem was the lack of
        sufficient clinical space, with reports of continued space shortages at CMC,
22      MCSP, SVSP, and VSPW.  Patient candor is necessary to a successful
        clinical interaction, but no patient can reasonably be expected to
23      communicate openly unless he or she is afforded a private treatment setting.

24 Docket 4298 (25th Monitoring Report of the Special Master) at 36-37.  As noted above in

25 the staffing sections, I found pervasive shortages of confidential clinical staff space at

26 SVSP, CSP-Los Angeles County, and the RJ Donovan Correctional Institution.  I also

27 observed ad hoc office and treatment spaces at CSP-Sacramento in the unlicensed MHCB

28 and at San Quentin in the East Block unit for the condemned.

297.   I was also concerned about the lengths of stay of EOP prisoners in the various segregation units I visited.  This is also a concern that was important to the trio of experts working as consultant to the state.  As discussed above, in their report, they argued that "EOP level of care be housed in Administrative Segregation Units only when absolutely necessary for the safety of staff or inmates, and only for as long as absolutely necessary."  *See* Exhibit 1 to 1/07/13 Vorous Declaration (Docket 4275-5) at 21.  The Defendants' clinical consultants/experts also advised the department that inmates waiting for placement into an protective custody SNY program should not be allowed to languish or linger in EOP ASU programs, explaining that "we suggest a reconsideration of any 'automatic' referrals to an Administrative Segregation Unit in the absence of a specific finding of danger to others or to the institution."  *See* Exhibit 1 to 1/07/13 Vorous Declaration (Docket 4275-5) at 36.

298.   I agree with these opinions, as far as they go.  However, I think that given the severity of the mental illness I observed in these units, some concrete time limit on the placement of mentally ill prisoners in these units should be considered.    Currently, there are no limits on how long an EOP individual can remain in segregation.

299.   Moreover, I believe that given the stressors and hardships of administrative segregation placements for mentally ill individuals, it is especially bothersome and alarming that these prisoners are not even receiving anywhere close to the minimum of 10 hours per week of structured therapeutic activity called for in defendants' own program guides.

### 1.    The EOP Administrative Segregation Unit at Salinas Valley State Prison:

300.   In his most recent report, the Special Master wrote that in the EOP Administrative Segregation Unit at SVSP only "an average of five to seven hours" of weekly structured therapeutic activity was attended by each prisoner.  Docket 4298 (25th Monitoring Report of the Special Master) at 260.  He also documented that "the arrangement of therapeutic modules for group sessions in a straight line was not conducive

to group process." (*Id*.)  Photographs of the relevant group rooms at SVSP were taken on our tour and are attached to the Declaration as Appendices HH and II (photographs bearing the Bates stamps SVSP 63 and SVSP 65).  I agree with the Special Master that these rows of cages are totally inappropriate for providing group therapy to severely mentally ill individuals, as they may it impossible for the participant to see and interact with each other.

301.    During the review period for the 25th monitoring round, the Special Master also found that only "an average of 41 percent" of clinical contacts took place in a confidential setting" in the SVSP EOP Administrative Segregation program.  Docket 4298 at 260.  He also noted that for a week in February of 2012, the entire clinical program was shut down "for a week of staff development and program planning."  *Id*.

302.    While at Salinas Valley State Prison, I spoke with staff members and prisoners in the EOP Administrative Segregation Unit on D-Facility in Buildings 1 and 2. I visited the EOP Administrative Segregation Unit shortly after I spoke with non-administrative segregation EOP prisoners in the neighboring general population EOP program.   In the course of our discussion with this general population EOP group, they informed us about a recent event on the yard.  They described an inmate who was becoming increasingly psychotic, walking around the yard screaming and shirtless, and whose overt psychotic symptoms were ignored by staff.  After this inmate continued to decompensate over several days, his illness resulted in his assaulting another inmate, and in his subsequent placement in administrative segregation.

303.    We located that prisoner, Prisoner V, who had been sent to the D-2 Administrative Segregation Unit, and interviewed him in the unit.  We found him to be exceedingly psychotic and in a hyper-agitated manic state.   In his altered mental state, he admitted to us that he stopped taking his medications and substituted reading for the medications.  He also started screaming that he wanted a cellmate because he wanted to talk to someone.

304.    Prisoner V also said that when he had told his doctor that he wanted to stop taking his medications, the doctor said, "you are not on *Keyhea*, you can stop taking them if you want."  We checked with the acting head of mental health, who looked up his records, and found out that Prisoner V is diagnosed as suffering from Schizoaffective Disorder.  His only current psychotropic medication was the antipsychotic Haldol.  I later confirmed this by reviewing records from his electronic health record.  Whatever occurs to this man as a punishment for his acting out could have been totally avoided by appropriate and timely mental health intervention.

305.    There were several revealing progress notes in his medical record.  The first note is from January 17, 2013, about 10 days before our visit, when Prisoner V was still in the general population EOP program, and a few days before he assaulted another inmate. The progress note states that Prisoner V was yelling "I'll get you with both guns whoever said that" at no one in particular.  Ex. 37 to Kahn Dec.  The clinician wrote that it was necessary to "remove [Prisoner V] from [a] dangerous situation by referral to MHCB, referral to DSH, raise [level of care]."  *Id.*  It appears that he was admitted to the MHCB but was released after a few days back to the general population unit, because a second note from January 24, 2013 states that he was "just released from MHCB and is decompensating, refusing medications, acting erratic with liable moods."  Ex. 38 to Kahn Dec.  Unfortunately, it appears that in response to this condition all that was done was to remove him from his job.  In my opinion, Prisoner V should have been transferred back to the MHCB unit immediately and then sent to a higher level of care in an inpatient DSH program.  What makes this even more egregious is that this prisoner was in the EOP treatment program, designed as a sheltered treatment environment where prisoners would be observed and where the program guide mandates at least 10 hours of staff contact a week.  He should have been moved to a higher level of care before he assaulted another prisoner.  The prisoners on his unit, with no special expertise in mental health care, we all rightly offended that this did not take place.

[754904-2]

306.    I also spoke with several prisoners with long stays in the Salinas Valley EOP Administrative Segregation program.  The first of these individuals, Prisoner W, refused to come out of his cell, so I spoke with him briefly at cell front.  When staff looked up his diagnosis for us in the eUHR for me, they reported that that his diagnosis is Psychotic Disorder NOS, and that he refusing all psychiatric medications.  He was overtly psychotic, and had been in Administrative Segregation for more than seven months, since June 7, 2012.  Despite his long stay in EOP Administration Segregation, he remained with a "not otherwise specified diagnosis," and he was not receiving any medication, in spite of his very poor level of functioning.  For reasons that are unclear to me, he is being allowed to remain in his cell and deteriorate over time.   Also, I was troubled by the fact that this class member carried an "Psychotic Disorder Not Otherwise Specified" or "NOS" diagnosis after many months in this unit.  Given his long stay in the unit, treating staff members should had sufficient time to clarify his diagnoses and change the "NOS" diagnosis to a more specific diagnosis.

307.    A treatment note from his electronic medical record is attached to the Kahn Declaration as Ex. 39.  The note and his other records indicate that he was discharged from DSH in June of 2012 and returned directly to the EOP Administrative Segregation Unit.  *See* Ex. 39 to Kahn Dec.  He has not been sent back to DSH since that time, despite his low level of functioning and increasing dysfunction.  Possibly this is because of the belief that he does not meet the criteria for *Keyhea*.  *See* Ex. 39 to Kahn Dec.   However, it appears from the same notes that he has rules violations for obstructing staff and for assault from the last few months, suggesting that he does meet *Keyhea* requirements as a danger to others.  *Id*.  The progress note states  that he does not discuss mental health issues with Prisoner W "because it would be contraindicated at this time due to paranoia and hostile behaviors," but that "an attempt at rapport is being made by the PC by offering blank paper ever week."  *Id*.  Rapport is important but Prisoner W needs inpatient level of care treatment as soon as possible, before he hurts someone else and potentially is prosecuted on new charges for the assault.

[754904-2]

308.    I also interviewed two other prisoners being treated at the EOP level of care in the unit.  Both complained about harsh conditions, lack of clean laundry, and each feared retaliation from custody staff.  Both were nervous that talking to us on the tour would lead to their cells searched and "torn up" by custody staff members.  One of these two prisoners told us he had only been to three groups in his first three weeks in the EOP Administrative Segregation Unit.

309.    The mental health manager in the unit indicated that in the program, prisoners were actually attending only about five hours of treatment a week.  In my opinion this is completely inadequate.  Treating staff on the unit also acknowledged that the start of the first set of groups after lunch is often delayed by count, making the groups less than a full hour.

310.    Also, custody staff on the unit told us that they do not have enough intake cells for all of the new arrivals on the unit, noting that "with the amount of intake we have, there's just not enough intake cells."

311.    This was an extremely harsh environment where it is particularly important to meet the program standards of ten hours per week of structured therapeutic activity.

### 2.    The EOP Administrative Segregation Unit and the Psychiatric Services Unit at CSP-Sacramento:

312.    At CSP-Sacramento, the Special Master's 25th Report noted that "[t]he institution had a number of problems meeting Program Guide requirements for EOP inmates in administrative segregation."  Docket 4298 (25th Monitoring Report of the Special Master) at 90.  The Special Master found that "EOP inmates were offered only an average of 8.66 hours of structured therapeutic activities per week in administrative segregation" and that "[o]n average, EOP inmates in administrative segregation refused 4.29 hours and received 4.37 hours" per week of such treatment.  Docket 4298 (25th Special Master's Monitoring Report) at 91.

313.    The Special Master also discussed the inadequate treatment in the PSU unit at CSP-Sacramento at some length:

[754904-2]

1    It also should be noted that the problem of insufficient structured therapeutic activity was not confined to the administrative segregation units. Inmates in the PSU at CSP/Sacramento were scheduled for 9.94 hours per week of structured therapeutic activity, but were offered only 7.91 hours. Only 28.5 percent of PSU inmates were offered ten hours of group therapy per week.  Inmates refused an average of 2.66 hours and received 5.25 hours. The EOP hubs must take stock of why they are nearly universally failing short on this parameter of EOP care.  Whatever may be the reason – be it clinical or custodial staffing challenges, space shortages, some combination therof, or other reasons – the provision of at least ten hours of structured therapeutic activity should be made a priority.

7 Docket 4298 (25th Monitoring Report of the Special Master) at 37.

8  314. These findings by the Special Master are confirmed in the CSP-Sacramento Management Report for the same period.  *See* Ex. 40 to Bien Dec. (CSP-Sacramento Management Report for 25th Round Review) at 23-25.

11  315. During my tour of CSP-Sacramento on January 29, 2013, I asked defendants for updated information about the number of treatment hours actually received by EOP prisoners in the three main EOP programs at the prison.   The information provided is re-produced in ¶ 88 *supra* (in my staffing section) and below, and covers the time period of October 1, 2012 through December 31, 2012, with key holiday weeks (where less treatment was certainly provided due to staff holidays) excluded:

| CSP-SAC Program | Scheduled Hours | Offered Hours | Attended Hours |
|---|---|---|---|
| Administrative Segregation EOP | 11.6 | 9.9 | **5.4** |
| Mainline EOP | 12.3 | 9.1 | **5.2** |
| Psychiatric Services Unit (PSU) | 10.2 | 7.7 | **5.4** |

*See* Ex. 41 to Bien Dec. (Post-tour CSP-Sacramento production document Bates Stamped SAC 31.)  It is clear from this chart that the total number of hours of treatment actually being received by EOP level of care class members at CSP-Sacramento in each of the three EOP level of care programs is seriously inadequate.

[754904-2]

EXPERT DECLARATION OF PABLO STEWART, M.D.

316.   I toured the EOP Administrative Segregation Unit at CSP-Sacramento on January 29, 2013, spending about an hour on the unit, during which time I also spoke confidentially with several prisoners in the EOP ASU program.   The unit was noisy, chaotic, and somewhat dirty.   One again, the clinical acuity of the prisoners I spoke with was very high.

317.   One of these prisoners, Prisoner K, had been in the EOP ASU for five months for an assault on staff.  He told me that he gets very depressed and suicidal and that he is waiting for a transfer to inpatient care in a Department of State Hospitals (DSH) inpatient program.   Prisoner K was on list of 13 individuals waiting for transfer to DSH from CSP-Sacramento on the morning of our tour there on January 29, 2013.  I also confirmed in his medical record that he was approved to go to DSH at the end of December and had been waiting since that time – for more than a month.  In my opinion, this long waiting period is clinically inappropriate and harmful to Prisoner K and similar individuals waiting for inpatient level of care treatment.  Prisoner K's psychotic condition appeared to be extremely unpleasant for him.  He told me that he is constantly feeling depressed and suicidal and that he hears his dead sister's voice talking to him, and that he only sleeps about three hours a night.  He told me that he is offered groups for about two hours a day, but that "in half of them, they just sit you in cages and play music" so he often did not attend.

318.   We also interviewed one individual, Prisoner X, who had been in the PSU unit at CSP-Sacramento for five years.  (The Psychiatric Services Unit or "PSU" is an EOP level of care program for individuals who are serving Security Housing Unit or "SHU" terms).  Prisoner X told us that he is on a reduced program because he does not like to come out of his cell.  He said that at most he goes to three groups per week and that this is all that is scheduled for him.  He said he never goes to yard.  This is another example of the staff being aware that EOPs do not receive the full complement of care required by the program guides.   In my opinion, it is critical for staff members to work closely with

1   individuals like Prisoner X and to encourage greater group and programming participation

2   in order to maximize their level of functioning.

3           **3.       The EOP Administrative Segregation Unit at LAC:**

4           319.    As noted above, at CSP/Los Angeles County, all of the treatment spaces for

5   the EOP Administrative Segregation Unit are on the dayroom floor.  In the most recent

6   Management Report in connection with the 25th Round of Special Master's Monitoring,

7   CSP-Los Angeles County Mental Health managers reported that only 57 percent of EOP

8   prisoners in the unit were *offered* 10 or more hours of structured therapeutic activity each

9   week.  Ex. 42 to Bien Dec. (LAC Management Report) at 16.  They also indicated that 26

10  percent of EOP class members in the unit refused more than 50% of the offered treatment

11  during a given week, and that these individuals received daily primary clinician contacts

12  only 34% of the time.  *Id.*

13          320.    I toured the LAC EOP Administrative Segregation on the morning of

14  February 1, 2013.  I interviewed 6 individuals in the unit and spent about an hour and a

15  half in the unit.  The unit was noisy and dirty, and the dayroom floor of the unit was

16  cluttered with desks, holding cages, bookshelves, and make-shift dividers separating small

17  treatment areas of cages.  *See* Photograph Appendices A, F, G, MM, NN, OO and PP.  The

18  prisoners I met with in the unit all exhibited a high level of clinical acuity.   Many of them

19  complained to me about the lack of televisions or radios provided in other EOP

20  administrative segregation units, and many of them complained that relations with custody

21  staff in the unit were tense.   Many of the prisoners I met with on the unit had been held

22  there for an extremely long period of time.

23          321.    For example, Prisoner Y told me that he had been in the unit for three years.

24  His treatment plans confirmed that he was initially placed into the unit on April 14, 2010.

25  The plans also indicated that he is CCCMS level of care and that he was admitted to an

26  MHCB in September of 2012 for Suicidal Ideation.  His current Diagnosis is Depression

27  NOS, and he is taking several antidepressants.  He appeared to be struggling at his current

28  CCCMS level of care and in my opinion should be considered for a higher level of care.

[754904-2]

322.    During the tour of LAC, I asked staff members about the number of treatment hours actually being received each week to prisoners in the EOP Administrative Segregation Unit.  Staff members informed me that during the month of December 2012, the number of treatment hours actually received by individuals in the EOP Administrative Segregation averaged 6.9 hours per week in the first two weeks of December 2012, 6.7 hours in the third week, and 4.7 hours during the week of the Christmas Holiday.  This is somewhat better than the roughly 5 hours a week of treatment being received at CSP-Sacramento, and the 5 hours per week that the Chief of Mental Health at SVSP told me that EOP patients are receiving in the SVSP EOP ASU.

323.    As noted in the staffing section above to show some of the harms associated with staffing shortages there, after the tour, CSP-Los Angeles County produced the following chart showing the number of treatment hours being currently attended in its EOP programs during the three month period from November 2012 through January 2013:

| LAC EOP Program | Treatment Hours Scheduled | Treatment Hours Offered | Treatment Hours Attended |
|---|---|---|---|
| Mainline EOP | 9.86 | 6.93 | **3.82** |
| Administrative Segregation EOP | 11.30 | 10.00 | **6.35** |

Ex. 43 to Bien Dec.  (As discussed below, based on information gathered during our tour, I believe that SNY EOP prisoners on C-Facility at LAC are not even receiving the paltry 3.82 hours a week being received by general population EOP prisoners.)  The high level of refusals reflected in this chart is very troubling to me.  In my experience, if groups are well-designed, confidential and genuinely therapeutic, prisoners are motivated to attend them and the refusal rates are lower than those reflected above.

324.    The patients I spoke with in the EOP Administrative Segregation Unit at CSP-Los Angeles County included a number of extremely mentally ill individuals, including Prisoner Z.  Although interviewed in the EOP ASU unit, Prisoner Z was actually

[754904-2]

downgraded to CCCMS level of care in October of 2012.  He felt his EOP level of care was arbitrarily reduced in retaliation for his filing of administrative appeals.  He indicated that he believed he had major mental health issues that were not being adequately dealt with by staff members in his unit.  He is diagnosed as having Bipolar Disorder, and his current medications include Paxil and Trileptal.  A psychiatrist note from January 2, 2013 notes that he has a history of Mood Disorder NOS.   He was very manic when I spoke with him, and based on what he told me, he had a history of suicide attempts including several serious attempts.  Given his presentation, I was surprised that he was not on any antipsychotic medication.  I do not see any clinical justification for lowering his level of care from EOP to CCCMS and I believe he needs to be receiving the full 10 hours of week of mandated EOP treatment activities.

325.    Another very mentally ill individual I interviewed in this unit was Prisoner AA.  According to his January 3, 2013 Treatment Plan, Prisoner AA is currently diagnosed with Psychotic Disorder, NOS.  Prisoner AA was placed into the EOP Administrative Segregation Unit on October 2, 2012.  He was raised to EOP level of care in the March of 2012 during a crisis bed stay following a period of not eating and acute paranoia.   In my opinion, Prisoner AA has been receiving care at the EOP level of care for too long to still be carrying a "not otherwise specified" or "NOS" diagnosis.  As explained above, the use of such a diagnosis is generally a place-holder while further observation and diagnostic clarification is conducted.  The fact that the diagnosis has not changed may reflect limitations on care caused by staffing shortages or may reflect other factors.  He is prescribed Paxil (20 mg), Buspar (10 mg am and 10 mg pm), Haldol (5 mg, pm) and Cogentin.  He was placed on the *Keyhea* in March of 2012 while at CIM for acute paranoia, suicidal ideation, and refusing to eat, and he continues to be receiving involuntary medications.  His treatment plan indicates a history of psychotic symptoms and suicide attempts starting in childhood.  He told me that he hears voices and he appeared extremely agitated and restless when we met.  He is a good example of the kind of inmate in these locked units whose mental illness is very severe and requires a

1 minimum of 10 hours of week of therapeutic out of cell treatment.   If he does not get the

2 full 10 hours of treatment, he likely will eventually require treatment at a higher level of

3 care.

4        326.   I also interviewed an individual in the CCCMS Administrative Segregation

5 Unit in Building A-5 whom I believe needs to be EOP level of care.  Prisoner BB had been

6 in administrative segregation for 22 months when we saw him.  He told us that he had a

7 history of spending nine years in the SHU at CCI-Tehachapi.  He was very depressed when

8 we saw him and he appeared to be struggling with severe anxiety.  He told me that he

9 believes that "if you kill yourself you go to hell," but that if he did not believe that, he

10 would have killed himself already.  Like many other prisoners, he expressed anger about

11 the punitive suicide watch condition in the prison, telling us that "I don't want to be

12 stripped all naked in a cold cell with someone watching me."  He said he is unable to

13 program around other people.  His most recent treatment plan from January 24, 2013 notes

14 that he refused to come out of his cell for the IDTT and that he "consistently refused to

15 leave his cell for PC contacts."  It also notes that he has a mood disturbance "evidenced by

16 periods of depression (sad mood, low motivation, slowed speech, hopelessness) to periods

17 of agitation/anger (significant irritability, impulsive behavior, restlessness, and physical

18 aggression)."  He is currently on Paxil and the antidepressant Remeron.  In my opinion

19 Prisoner BB is struggling a great deal and needs to be moved to a higher level of care –

20 into an EOP program – and to be given at least the required 10 hours a week of treatment

21 in that program.

22     **4.**      **The EOP Administrative Segregation Unit at RJD:**

23        327.   According to the RJ Donovan Mental Health Management Report from the

24 time of the August 2012 monitoring tour by the Special Master's team, "only 52% of SNY

25 EOPs attended more than ten hours of treatment on average."  Ex. 46 to Bien Dec. (RJD

26 Management Report) at 8 (DRPD 1 00440).  The report did not provide any information

27 about the number of mainline EOP hours attended, but indicates that only 9.87 hours are

28 offered per inmate in this program.  *Id.* at 9.  The report also indicated that in the EOP

1   Administrative Segregation Unit at RJ Donovan, prisoners attended only 7.03 hours of

2   treatment and refused 4.5 hours of structured treatment.  *Id.* at 12.

3       328.   According to the same report, 44 percent of EOP administrative segregation

4   prisoners at RJD had stays in the unit of longer than 60 days and 32 percent had stays

5   longer than 90 days.  *Id.*  The RJD Management Report also confirmed that the EOP

6   administrative segregation unit there has *no* confidential treatment space:  "I/Ps were seen

7   0% of the time in a confidential setting.  The ASU treatment space is within the housing

8   unit on the dayroom floor.  Consequently, no treatment space in ASU is considered

9   confidential except the IDTT space in building 6, which is a separate room."  *Id.*

10       329.   The patient population I observed in the Administrative Segregation EOP

11   unit at RJD contained a number of very severely ill patients with prominent psychotic and

12   mood symptoms who were not receiving the minimum amount of care required to stabilize

13   their mental health symptoms and improve their functioning to the highest possible level.

14       330.   The number of hours of group treatment being received was inadequate, and

15   in practice the tracking systems used by the prison were over-reporting the number of

16   hours of treatment actually received.  For example, when we arrived in the unit, a group on

17   the dayroom floor that started at 10:30 and was supposed to continue until noon had just

18   ended at 11:45 and we spoke with members of the group.  They indicated that they are

19   getting only one group each day, and that they used to get more.  They said there are three

20   group areas on the dayroom floor and that typically there is now only one group going on

21   at a time.  They indicated that about two months ago, they started to get fewer groups.

22       331.   The men in the EOP treatment group at RJD also indicated that some EOP

23   prisoners on the unit are placed on "group restricted status" as a punishment.  It is a one-

24   week restriction on group attendance for violations of group rules.  Both the decision to

25   place the hold and to release the hold are purportedly documented in the treatment records.

26   At the time we visited, a class member named Prisoner CC was on a restriction of this

27   type.

28

332.    On my tour, I was able to confirm that all of the treatment spaces for groups and for individual clinical contacts at RJD, like those at LAC, are on the dayroom floor and are non-confidential.  A photograph of the group treatment spaces at RJD is attached to the Photographic Appendix to this Report as Appendix D (Bates RJD 21) and Appendices JJ, KK and LL (Bates RJD 16, RJD 18 and RJD 19).  As the photographs attest, these crescents of treatment cages are not private.  They are at the center of noisy, chaotic housing unit, below the watchful gaze of an armed security officer.  Individual clinical contacts with treating psychiatric staff members on the unit also take place in cages on the dayroom floor, as shown in the photographs attached hereto as Appendices B and C. This problem has been noted in a number of reports but not addressed at this time.  *See* 24th Special Master's Monitoring Report at 220 (noting that none of the weekly individual case manager contacts "were conducted in a confidential setting due to physical plant limitations").

333.    In speaking with the members of the treatment group in the Building B-6 EOP Administrative Segregation Unit at RJD, I noted that the individuals in the group were extremely needy and generally unhappy with the treatment they were receiving and with conditions in the unit.  They complained that they currently are only receiving at most one group per day.  They explained that a few months ago they were receiving more groups.  In addition they explained that there is a "group restricted" status that is imposed on some individuals for a week at a time as punishment for misbehavior.  The also complained that they do not have access to television.  Overall, my impression was that this was a very psychiatrically impaired group of individuals who required more intensive mental health treatment to improve their levels of functioning.

334.    After speaking with the group members who had just finished the group on the dayroom floor, I then conducted confidential individual interviews with some of the longest stay EOP ASU prisoners.  We asked staff members to help us identify mentally ill individuals who did not come out of their cells very often.  The individuals selected by the unit custody staff also happened to have among the longest lengths of stay on the unit,

1   suggesting that the length of their confinement in the Administrative Segregation Unit may

2   have had something to do with their high level of clinical acuity.

3       335.   <u>Prisoner DD</u>:  We met with Prisoner DD in the Building B-6 EOP

4   Administrative Segregation Unit at RJD.  He had been housed in the EOP Administrative

5   Segregation Unit since June 21, 2012, or for more than seven months at the time of our

6   visit to RJD on February 12, 2012.   He was placed into administrative segregation for

7   safety concerns.  *See* Ex. 36 to Kahn Dec. at June 26, 2012 Progress Note.  He is currently

8   on a *Keyhea* order as a danger to himself, and he is awaiting transfer to DSH in this EOP

9   Administrative Segregation environment.  He is currently diagnosed as having

10  Schizoaffective Disorder, Bipolar Type, and he is prescribed two different antipsychotic

11  medications, Geodon, and Haldol Decanoate, and he is also prescribed the antidepressant

12  Remeron and the mood stabilizer Lamictal.  He does not go to group, stays in his cell all

13  the time, and only sees his primary clinician.  He gave a confusing story about the reasons

14  he does not come out of his cell, one being the severity of his auditory hallucinations.  He

15  heard the voices of two women, Sophie and Vanessa, who talk to him and who direct his

16  behavior.  For example, he said they tell him not to come out of his cell and to keep the

17  lights off.   He also said he did not want to go to DSH because these women "keep saying

18  they will not honor me there."   He told me he does not come out of his cell to shower

19  because "I don't want to drown in the shower."

20      336.    Prisoner DD is a chronically mentally ill individual who has a history of

21  multiple admissions to various hospitals operated by the Department of State Hospitals

22  (DSH), including Atascadero State Hospital, Vacaville, and Patton State Hospital.

23  According to his most current January 16, 2013 Treatment Plan, he has a history of 75

24  hospitalizations for mental health issues.  *See* Ex. 36 of Kahn Dec. (January 16, 2013

25  Treatment Plan and other records for Prisoner DD).  The Treatment Plan documents that

26  he had an onset of psychotic symptoms starting at age 18.  The Treatment Plan also

27  explains that Prisoner DD also contends with "numerous complex medical issues"

28  including Multiple Sclerosis, Migraine Headaches, and a seizure disorder.  He has a 17%

1  attendance rate for groups and has recently begun to refuse even out of cell contacts with

2  his primary clinician.

3      337.   My main concern with his case is that despite the obvious severity of

4  Prisoner DD's mental health symptoms during the last seven months, treating staff

5  members in the EOP ASU only recently decided to send him to DSH.  Prisoner DD is

6  taking two different antipsychotics, but for reasons that are not totally clear, he is allowed

7  to languish in his cell.  A more clinically appropriate course would have been to refer him

8  many months ago to inpatient treatment for stabilization of his severe psychotic symptoms

9  when he first started refusing to leave his cell.  He also needs more intensive management

10  of his complex medical situation than what can be provided in an Administrative

11  Segregation Unit.  Given the complexity of his overall clinical situation, he should be

12  placed into a mental health crisis bed pending his transfer to DSH.  The CDCR must not

13  tolerate this kind of patient languishing in an ASU cell and quietly decompensating.

14      338.   Prisoner EE:  The Correctional Officer in the unit indicated that Prisoner EE

15  is also referred to DSH and waiting in the EOP Administrative Segregation Unit for

16  transfer to DSH.  However, his treatment records indicate that around January 23, 2013 a

17  decision was made not to refer him to DSH at this time.   It appears that Prisoner EE's first

18  psychotic incident and the onset of his psychotic illness was in August of 2012.   His

19  treatment plan of August 28, 2012 states that he "was made EOP on 8/3/12 (contrary to his

20  stated desire) and has no prior history of mental health issues or treatment.  He denies

21  previous experience with depression and anxiety as well as any severe symptoms of mental

22  illness including Auditory Hallucinations and Visual Hallucinations."   His most recent

23  treatment plan indicates that he denies having a mental illness and does not want to go to

24  DSH.  Prisoner EE is diagnosed as suffering from Schizophrenia, Paranoid Type.   His

25  treatment plan of January 23, 2013, documents that he suffers from auditory and visual

26  hallucinations and "he appears to immerse himself into a delusional world."  He is

27  currently refusing to take medications.  He is also refusing to go to any groups.  Prisoner

28  EE is very mentally ill.  Given the severity of his delusional symptoms, it does not appear

1  that there is sufficient work being done by clinical staff members to try to engage Prisoner

2  EE in treatment or to get him to try taking medications.  He had been in the EOP Ad Seg

3  for 7 months, since at least July 21, 2012 (according to the records provided by RJD on the

4  day of the tour).

5       339.    In my opinion, the CDCR treatment staff should not tolerate this high level

6  of psychiatric dysfunction in its EOP program and should have referred Prisoner EE to

7  DSH many months ago.  In addition, they should have made more significant efforts to

8  engage him in treatment and possibly start him on a Keyhea.  At the time he was first

9  psychotic in the Summer of 2012, he was making dangerous statement to other prisoners

10  that he was the head of the Mexican Mafia and had been ordering hits.

11      340.    Prisoner D:  This was another very mentally ill individual in the EOP

12  Administrative Segregation Unit at RJD.  He had spent 9 months in the EOP ASU unit.

13  He told us that starting around Christmas 2011, he had "hit a roller coaster of problems."

14  Prisoner D had two MHCB admissions in 2012.  He had been to DSH for inpatient care in

15  2010 for depression and suicidal ideation.  (Treatment Plan dated 1/2/13.)  The treatment

16  plan lists his current diagnosis as Major Depression, Recurrent, rule-out Schizoaffective

17  Disorder.  His current medications include two antidepressants, Remeron and Effexor.  He

18  is also being treated with the antipsychotic Geodon.  In the treatment plan, it notes that he

19  report that due to a conflict with custody staff, he will not come out of his cell for groups.

20  He told us that he had felt suicidal in the last few days, and that he would talk to staff

21  about these suicidal feelings.  His treatment plan of 1/2/13 indicates that he "has a

22  contingent condition that he will most assuredly kill himself if his mother dies." Prisoner D

23  is yet another very mentally ill individual who has been allowed to remain in his cell, and

24  who does not participate in any group treatment, and who has currently not been referred

25  to a higher level of care.

26      341.    Prisoner D also exhibited involuntary movements of his mouth and tongue,

27  suggesting possible tardive dyskinesia.  Despite this, he had not been given an AIMS test

28

[754904-2]

1  since 2011.  His last AIMS test in the eUHR of 10-5-11 noted that he had abnormal mouth

2  and tongue movements.

3      **5.    The "Carson Unit" EOP Administrative Segregation Unit
             at San Quentin**

4

5      342.    I visited the EOP Administrative Segregation Unit at San Quentin State

6  Prison on February 26, 2013.  The unit is located on the first tier of the "Carson" unit.  I

7  spent about an hour and a half in the unit and I interviewed or attempted to interview four

8  EOP level of care individuals on the unit (one of the individuals was too psychotic and

9  paranoid to be interviewed).  The unit was dark, dirty, noisy and chaotic.  The cells in the

10 unit were very small and dimly lit.  There was no confidential space in which to interview

11 class members on the unit, so we had to conduct confidential interviews with the prisoners

12 in a small office with an open doorway and ask staff to step away from the doorway.

13 While we were on the unit doing these interviews, a custody officer told us that Prisoner

14 FF, an EOP patient on the unit, had told staff he was suicidal.  The office told us after we

15 were finished interviewing the four prisoners that Prisoner FF had been taken out of his

16 cell, placed into a holding cage for about 5 minutes, and then escorted to the treatment and

17 triage area in the medical building.

18     343.    The individuals we interviewed in this unit were severely mentally ill and

19 were struggling with the harsh conditions in the unit.  The first individual we attempted to

20 interview was Prisoner GG.  Prisoner GG would not come out of his cell to speak with us,

21 so we attempted to speak to him cell-front.  When we spoke with him cell front, it was

22 clear that he was very paranoid, very psychotic and delusional, and that he was unwilling

23 to speak to us about his mental health care.  He told us that he was kidnapped from the

24 Hall of Justice in San Francisco and urged us to call the San Francisco Sheriff and tell him

25 about the kidnapping.  Prisoner GG's clinical presentation was alarming, and the manner

26 in which his case has been handled is also very troubling to me.

27     344.    Prisoner GG was described to me by Dr. Frank as someone who chronically

28 refuses treatment who had been recently referred and admitted to the APP acute inpatient

120
EXPERT DECLARATION OF PABLO STEWART, M.D.

1    program operated by the Department of State Hospitals at the California Medical Facility

2    in Vacaville.  Dr. Frank explained that DSH initially resisted the referral saying that they

3    do not have a program for individuals who refuse treatment routinely but do not meet the

4    standard for involuntary medication.  Later in the day we were told that one reason

5    Prisoner GG was not moved to the MHCB was that a cell extraction would likely be

6    necessary in order to move him.  In my opinion, Prisoner GG is too severely mentally ill to

7    be waiting for an acute DSH inpatient placement in an EOP Administrative Segregation

8    Unit.

9        345.    I also interviewed Prisoner E, whose case I described in detail in the

10   medication management section above at ¶¶ 166 to 168, because of the severe side effects

11   he was experiencing.  At the time I interviewed him, Prisoner E had just returned from

12   inpatient care at DSH two weeks earlier.  As discussed above, he continued to be psychotic

13   and suicidal and more needed to be done to address his severe medication side effects.

14       346.    I also interviewed another severely mentally ill EOP patient named Prisoner

15   HH.  Prisoner HH told me that he is diagnosed with Paranoid Schizophrenia, although his

16   treatment plan from December 26, 2012 indicates a diagnosis of Psychotic Disorder NOS.

17   As noted above, this generic "NOS" diagnosis is generally inappropriate for someone who

18   has been receiving continuous mental health treatment for a long period of time, as has

19   Prisoner HH.   He told me that he hears voices and suffers from delusions.  His medical

20   records confirmed that he is currently receiving the mood stabilizer Depakote and the

21   antipsychotic Geodon.  Prisoner HH recently spent time in the Salinas Valley inpatient

22   psychiatric program run by DSH, and he was returned from DSH to San Quentin after

23   nearly a year in the program in late October of 2012.  He appeared to have been returned

24   from SVPP directly to administrative segregation, although his records are not totally clear

25   on this point.  His records indicate that he has a long history of psychiatric hospitalization

26   in state mental hospitals and in county mental health units in San Francisco.  He started

27   hearing voices when he was 10 or 11 years old.  While he was in the inpatient program at

28   Salinas Valley in 2012, he was placed on a Keyhea order for involuntary medication based

[754904-2]

1    on being a danger to others.  Prisoner HH told me that he went to the MHCB recently

2    because he thought that the correctional officers on his unit were poisoning his food.  It is

3    my opinion, based upon his clinical presentation, that Prisoner HH needs a higher level of

4    care.  He is acutely psychotic with manic features and is potentially violent because he

5    experiences command auditory hallucinations to hurt people and he is very paranoid.

6    These symptoms are all very amenable to treatment at the right level of care.  Prisoner HH

7    may be an example of someone who requires long-term DSH inpatient level of care

8    treatment to maintain his highest level of functioning.

9         347.    These three individuals all struck me as needing a higher level of care.  I was

10   troubled that they were all being maintained in an EOP Administrative Segregation Unit

11   despite their obvious need for more intensive mental health interventions.  I was also

12   disturbed by the fact that a number of individuals I met on my tours are returned from

13   DSH directly to an EOP Administrative Segregation Unit or PSU unit.  Examples of this

14   phenomenon include Prisoner E and possibly Prisoner HH at San Quentin, discussed

15   above, and Prisoner SS and Prisoner UU, both of whom I met in the MHCB at CSP-

16   Sacramento, but who had both been returned directly from DSH into the PSU, and had

17   both quickly decompensated in the PSU.  Another example is Prisoner ZZ, whose case is

18   discussed below in the section on MHCB units.  I saw Prisoner ZZ in the MHCB unit at

19   RJD.  He had recently returned from the APP acute program at CMF in mid-January 2013.

20   Upon his return to RJD he was placed into the EOP ASU at RJD because of enemy

21   concerns, and he decompensated almost immediately following his placement into

22   administrative segregation.  In my opinion it is inappropriate to return someone from the

23   comparatively treatment rich therapeutic environment of an intermediate or acute inpatient

24   program directly to the highly restrictive, anti-therapeutic environments of administrative

25   segregation.  Such transfers are almost certain to undermine the increased level of

26   functioning and treatment compliance generally achieved through an inpatient placement.

27

28

1

**b.     My Opinion About Problems with Delivery of Care in Mainline Enhanced Outpatient Programs (EOPs)**

2

3      348.    I also observed serious problems with the delivery of care to mainline EOP

4   prisoners at each of the five prisons I visited.  As discussed above in the staffing section, in

5   many of these programs, there were serious staffing and program space shortages.

6   Moreover, all of the EOP programs I visited were falling well short of the 10 hours per

7   week treatment mandated in the Program Guides.

8      349.    In the 25th Progress Report, the Special Master did not include an overview

9   of general population EOP programs.  However, the Special Master noted problems with

10   the 10 hours requirements in many different individual prison reviews, and noted overall

11   that "access to mainline and SNY [protective custody] EOP programs continued to be slow

12   in many cases," and noted that 55 percent of the 31 EOP inmates waiting for transfer at

13   ASP, CIM, CTF, HDSP and PVSP had been waiting for transfer to a program for more

14   than 60 days.  Docket 4298 (Special Master's 25th Report) at 79.

15      350.    In the recent 25th Monitoring Report of the Special Master, he noted

16   numerous examples of prisons not meeting the 10 hours per week of structured therapeutic

17   treatment activities requirement.  *See* Docket 4298 (25th Report) at 95 (CSP/SAC:  "only

18   51 percent of EOP inmates were offered ten hours of structured therapeutic activity per

19   week"), 138 (MCSP:  "Mainline EOP inmates were offered an average of 6.9 hours of

20   therapeutic activity per week."), 157 (CMF:  "CMF was not meeting the Program Guide

21   requirement of offering at least ten hours of structured therapeutic activities per week per

22   inmate for EOP inmates. Data on structured therapeutic activities was requested during the

23   site visit, and ultimately indicated that approximately 69 inmates were participating in 50

24   percent or less of the offered structured therapeutic activities during the reporting

25   period."), 215 (COR:  "According to institutional data, EOP inmates were offered only an

26   average of 6.67 hours of structured therapeutic activities per week, including some

27   activities that were not therapeutic activities."), 251 (ASP: "Inmates [at the EOP level of

28   care waiting for transfer to a full program] were offered a weekly average of 1.51 hours of

structured therapeutic activity and received an average of 1.38 hours."), 86 (<u>CMC</u>: "CMC offered 13.3 hours of structured therapeutic activities per week during the review period. On average, 7.57 hours were attended and 5.75 hours were refused."), 373 (<u>RJD</u>: "Seventy-one percent of EOP inmates were offered ten or more hours of structured therapeutic activity per week. However, 41 percent refused more than five hours per week.").

351.    Many of the individuals I met in the mainline EOP programs I visited were struggling because they were not receiving enough treatment.

### 1.    SVSP:

352.    For example, at Salinas Valley State Prison, 40 percent of mainline EOP groups in the D-Facility Buildings 3 and 4 programs took place on the yard.  Moreover, the mental health program manager Marni Schneider indicated that only about 8 hours of treatment are scheduled each week in the programs and that most prisoners in the program were actually attending only 5 or 6 hours of treatment each week.   As explained above, the group we observed in this program actually only lasted about 35 minutes on a good day, a fact confirmed by the instructor and the participants in the group, meaning that the treatment hours are being over-counted.

353.    We spoke with the Jeremy Price, a psychologist who leads one of the groups in the mainline GP EOP program on D-3 and D-4.  He indicated that currently, they offer about 7 hours of treatment per week to their EOP patients.  He indicated that management of the mental health program had decided to offer fewer groups of higher quality.  He also indicated that there were frequent refusals to come to group, and that sometimes this was because of scheduling issues with other programs and services.  For example, he said that on Wednesdays, prisoners often did not come to group because they had canteen at the same time.

354.    We waited for the 1:00 pm group to begin, led by Dr. Price.  The inmates did not all arrive until around 1:25 p.m., and the group ended at 1:50 p.m.  Dr. Price acknowledged that the group would be counted as an hour of treatment, even though it

1   only lasted for 25 minutes.  He also acknowledged that this kind of delay in starting the

2   group was typical. Because of the shortage of treatment space, the EOP program regularly

3   holds groups on the yard, weather permitting.  Dr. Price indicated that these groups are

4   frequently cancelled.

5       355.   We then spoke confidentially with eight prisoners waiting for Dr. Price's

6   group to begin.  These EOP prisoners uniformly indicated that their biggest problem was a

7   lack of understanding of mental illness by custody staff members at SVSP.  These

8   prisoners complained that when they reported mental health symptoms to custody staff,

9   they were often humiliated and demeaned.  They also complained that if you are suicidal at

10  SVSP, you sit in a cage all day, and indicated that this would make them reluctant to come

11  forward and discuss their true feelings if they are suicidal in the future.  This was further

12  evidence that the institution employs punitive measures to discourage people from

13  expressing their true depth of their suicidal feelings.

14                  **2.    CSP-Sacramento:**

15      356.   Even mainline EOP programs with adequate treatment space available like

16  that at CSP-Sacramento are struggling to deliver the required 10 hours per week of

17  structured therapeutic activities.  As noted above, prisoners in the CSP-Sacramento general

18  population EOP program were only been receiving about 5.2 hours of treatment in the

19  mainline EOP program during the last 3 months of 2012.  *See* Chart at ¶ 315 and Ex. 41 to

20  Bien Dec.

21      357.   I interviewed a number of individuals in each of the mainline EOP programs

22  who were struggling either because they were not receiving the full complement of

23  required EOP treatment, or because they required an even higher level of care.  At CSP-

24  Sacramento, for example, I interviewed Prisoner II in the A-Yard, Building 7 Mainline

25  EOP program. Prisoner II was referred to DSH for intermediate care on December 10,

26  2012 and was still waiting for a placement in the program.  He had been suicidal and

27  placed into the unlicensed crisis unit at one point while waiting for his transfer.  At the

28  time of my visit on January 29, 2013, he was back in the mainline EOP program, where he

1  was waiting for transfer to DSH.  At the time of my interview, he was prescribed 80 mg

2  two times per day of the antipsychotic medication Geodon, and he appeared to be

3  overmedicated.  He suggested as much to his case manager on the day after my visit.  In a

4  progress note on that day, she reported that he said "I want to know if you can reduce the

5  dose [of Geodon] for me.  The dose its on slows me down too much…" (Ex. 35 to Kahn

6  Dec. 1/30/13 Progress Note.)  His DSH referral noted his multiple crisis bed admissions

7  and stated:  "*He is described as loose, disorganized, fragmented, tangential, and*

8  *presenting with grandiose and persecutory delusions, and if often treatment non-compliant*

9  *with medication.  He has several documented incidents of violence and self-injurious*

10  *behavior.*"  (Ex. 35 to Kahn Dec., 12/10/12 Referral Form 7482, December 19, 2012 Date

11  of Final Referral Packet.)   Given this prisoner's high level of illness, in my professional

12  opinion he should have been housed at a higher level of care such as an MHCB unit while

13  waiting for ICF level of care.   The mainline Enhanced Outpatient Program where he was

14  housed at the time of my tour was not providing enough programming and support to keep

15  him safe and maintain, let alone improve, his level of functioning.

### 3.    CSP-Los Angeles County:

17       358.    At CSP-Los Angeles County, a new treatment space built for the mainline

18  EOP program on D-Facility in Buildings 1 and 2 was being converted to treatment space

19  for the EOP administrative segregation prisoners, even though the program was only

20  actually delivering an average of 3.52 hours a week of structured therapeutic activity per

21  week (*see* chart at ¶ 323).   The treatment programs for the LAC mainline program were

22  spread out in various ad hoc spaces – some groups were held in the visiting rooms, see

23  Photographic Appendix QQ and RR, other take place in classrooms.  *See* Appendix GG.

24  Despite all these ad hoc spaces, there is not enough space for groups for the program.

25       359.    We met a number of individuals with very high clinical acuity in the EOP

26  program at CSP-Lancaster.  For example, I interviewed Prisoner JJ, who told me that he

27  has been EOP since 2001 and that he has gone to the intermediate inpatient care program

28  at Salinas Valley State Prison three different times.  He told me that he stopped going to

groups years ago and that he did not feel safe discussing his personal information in an open group setting.  He said he has an individual case manager meeting two or three times a month and that he does not take any medications because they make him feel drowsy. His medical records indicated that he is diagnosed with Paranoid Schizophrenia and that he does not take his medications.  His treatment plan notes that he does not become suicidal, but he was referred to DSH in 2009 for failing to participate in treatment activities.  A DSH referral was initiated the week before we saw him.  I agree with the decision to refer Prisoner JJ to DSH, but I think the decision should probably have been made sooner.

360.    Another very ill individual we encountered at CSP-Los Angeles County in the mainline EOP program was Prisoner KK.  Prisoner KK was identified by staff members on the unit as someone who was not doing well and might need more attention from mental health staff.  He refused to come out and speak with us, but from the room just off the unit where we were interviewing other prisoners, we could observe him standing in his cell on the second tier and continually pacing and shouting ranting at no one in particular.  He was reading papers and appeared to be having auditory and visual hallucination.  I tried to interview him cell front, but found him to be very psychotic and in urgent need of acute psychiatric hospitalization.  A treatment plan in his electronic medical record from January 10, 2013 gives the following account of his situation:

> [Prisoner KK] returned from DMH-SVPP on 6-1-2011.  He continues to refuse all services.  He was transferred between EOP and DMH repeatedly since 2007.  All efforts to treat him to date have been unsuccessful.  He was at DMH from 4-2908 to 9-4-08; from 8-17-09 to 3-16-10; and from 12-15-10 to 5-31-11.  He was at EOP at the intervening times.  He refuses to participate in all forms of treatment.  He insists that CDCR cannot simultaneously incarcerate and treat him.  He asserts that he is being treated against his will and has repeatedly asked to be left alone.  He believes that camera monitors him 24 hours a day and when in conversation with mental health acts as if he were a prosecutor trying a case.  The discharge report from SVPP recommended "… after years of failed attempts to provide treatment, it would seem appropriate to leave him in a solo cell in a secure custody environment … where clinical observation could continue and any change in his safety status would be … detected … Clinically he meets criteria for Paranoid Personality Disorder and there is much history consistent with Schizophrenia, Chronic Paranoid Type."

This note continues and explains that due to the "aggravation" of clinical encounters with

127
EXPERT DECLARATION OF PABLO STEWART, M.D.

Prisoner KK, mental health staff "has been monitoring I/P through observation and consultation with custody staff." This treatment plan, which is dated January 10, 2013, is virtually identical to the treatment plans dated October 18, 2012, July 26, 2012, May 3, 2012 and extremely similar to the treatment plans dated February 14, 2012, November 16, 2011, and August 30, 2011, with the sole major difference being that these last three treatment plans note a few periodic efforts to engage Prisoner KK in treatment. *See* Ex. 40 to Kahn Dec. (Treatment Plans).

361.   In my opinion, staff at CSP-Los Angeles County and perhaps also DSH staff need to do more to engage Prisoner KK in treatment. It may be that with a longer period in DSH, staff might be able to gain his trust and achieve a breakthrough in his treatment. Given the high intensity of his mental health symptoms when I observed him, it is my opinion that he requires immediate acute inpatient hospitalization followed by intermediate inpatient care for an extended period of time. Indeed, he may be an example of an individual who needs to be permanently housed in a DSH intermediate facility. There is no justification for mental health staff in the CDCR and in DSH to have decided to give up on treating this individual.

362.   I also interviewed Prisoner LL in the mainline EOP unit. His most recent treatment plan dated February 5, 2013 indicates that he is refusing all medications and diagnosed with Schizophrenia, Paranoid Type. During my interview it was clear that he was very psychotic. He exhibited loose associations, tangential speech and flight of ideas. He needs groups and medications. His most recent treatment plan indicates that he attended 49 percent of his scheduled groups during the reporting period. The treatment plan noted "*transient delusions and paranoid ideation, with expansive mood, grandiosity, mild anxiety, irritable mood, restlessness, poor attention and concentration has been indicated. I/P has significant flight of ideas and unusual mannerism. I/P has indicated a tendency of minimizing his mental health symptoms*." In my opinion, this patient is struggling with severe mental health issues that indicate he should be referred to a higher level of care.

EXPERT DECLARATION OF PABLO STEWART, M.D.

[754904-2]

363.   I interviewed a total of 10 individuals in the D-1 and D-2 EOP programs at CSP-Los Angeles County.  Of those 10, I believe that 4 individuals needed a higher level of care – the 3 individual cases discussed in the preceding paragraphs, and Prisoner MM who appeared to me to be too psychiatrically fragile to participate in groups at the time of my interview with him, and who also needed a higher level of care.

364.   The other seven individuals I interviewed in the EOP program at CSP-Lancaster also generally were struggling with severe mental health issues and in my opinion need to be receiving the full 10 hours each week of meaningful, structured therapeutic activity.

365.   As discussed above, I also had concerns about the content of some of the groups at CSP-Los Angeles County.  A number of prisoners at the institution indicated that many of the groups are simply listening to groups or watching popular movies, and we observed one EOP group in the education area where the television was on and the prisoners were reading magazines.  *See* Photographic Appendix GG.  These activities did not appear to be either "structured" or "therapeutic."  I was also informed by staff in the EOP unit about a "wait and talk group" where prisoners waiting for meetings with their case manager were given magazines to read in a room together and this time was counted towards their hours of structures therapeutic activity.

366.   In general, as a result of my inspections during the last few months, I am concerned that there is a tendency among CDCR clinicians, perhaps because they encounter such severe mental illness routinely in their practices, to tolerate too high a level of acuity for too long before referring patients to higher levels of care such as MHCB units and DSH inpatient programs.  I am aware that working in a correctional mental health treatment is very challenging, and I have great sympathy for these clinicians, given the demands of working in this difficult environment, but I think it is incumbent upon prison mental health staff and managers to carefully guard against becoming overly comfortable with the presence of individuals with extremely severe psychotic symptoms in their programs, and to refer all such cases expeditiously to appropriate higher levels of care.

#### 4.    RJ Donovan:

367.    At RJ Donovan, when we visited the mainline EOP, the group rooms in the treatment area adjacent to A-Facility were all shut down because there had been an incident on the yard involving pepper spray and the prisoners involved in the altercation needed to be decontaminated in the EOP treatment area.  This was a concrete example of the many different kinds of things that can interrupt, delay or cancel treatment programs in a prison setting.  In the most recent Special Master's monitoring report it indicated that mainline general population EOP prisoners at RJD were actually receiving only 6.59 hours per week of structured therapeutic treatment.  Docket 4298 (25th Special Master's Monitoring Report) at 374.  This is a low number of treatment hours, especially given the large building with what appears to be ample treatment space adjoining the yard.

368.    I spoke with 5 prisoners in the A-Facility EOP program on February 12, 2013.  Some common complaints on the unit were that custody staff members were very hostile to prisoners in the program and accused them, among other things, of "hiding out" in the program.  There was also apparently a serious problem with inadequate supplies of toilet paper on the yard in recent months, although there were many boxes of toilet paper near the entrance to the yard when we visited.  These individuals also indicate that although the groups are generally scheduled to last an hour, they often ended 15 minutes early.  Prisoners in the main EOP housing buildings also complained that they do not have cable television in their cells, unlike every other building on the yard.

369.    One of the prisoners we interviewed, Prisoner NN, had been in the CTC the week before our visit, and was discharged on February 5, 2013, following a suicide attempt.  He indicated that he cut himself and then told custody staff, and that they took him right to the Correctional Treatment Center, where he was bandaged and placed into an MHCB bed for two nights, after being evaluated by a nurse in one of the alternative holding cells in the CTC.  He indicated that he was cold in the MHCB, and that he was given only a suicide smock and was released after two nights and one day.  His discharge summary from the CTC noted that he "endorsed command AH telling him to cut himself."

[754904-2]

According to his medical records, Prisoner NN is currently prescribed the antipsychotic drug Haldol and the antidepressants Remeron and Prozac.  His most recent treatment plan dated December 14, 2012 notes prior hospitalization at DSH for auditory hallucinations, paranoid ideation, and homicidal and suicidal ideation.  His current diagnosis at that time was Schizoaffective Disorder and Depression by History.  The treatment plan noted that he attends 44 percent of the programming offered to him and indicates that he will be monitored for mood instability and psychotic symptoms.  In my opinion, these symptoms have recurred, and Prisoner NN should be evaluated for a possible referral back to an intermediate care program run by DSH.

### c.    The CDCR's Inadequate Treatment Programs for Protective Custody "SNY" EOP Level of Care Prisoners:

370.    I also toured two small "Special Needs Yard" or "SNY" EOP programs at the institutions I visited.  "SNY" is the CDCR's protective custody designation.  The first program I toured was in A-Facility at Salinas Valley State Prison, which I toured on January 28, 2013.  The second program was at CSP-Los Angeles County in C-Facility and was toured on January 31, 2013.  Neither program was even providing as much treatment as the other EOP programs that I visited during my tours.

371.    **SVSP:**  At the end of our full eight-hour day touring Salinas Valley State Prison, we interviewed two EOP prisoners on A-Facility, a protective custody or "SNY" Facility.  Neither prisoner was receiving close to the 10 hours each week of structured activity required for EOP level of care prisoners.  The first prisoner we interviewed reported that he received two hours of group activity and one individual contact each week.  The second prisoner we interviewed had been in the unit a few days had not had any mental health contacts.  A new SNY EOP treatment building for a larger, more formalized program was nearing completion on the yard, but we did not have time to tour the facility and the building was not schedule to be completed until the fall.

372.    **LAC:**  On my visit to CSP-Los Angeles County on January 31, 2013, I spent several hours touring the new SNY EOP program on C-Facility, including the gym where

[754904-2]

1    treatment activities are scheduled for individuals in that program.  I also spoke to Eleanor

2    Feldman, a social worker in charge of the new group treatment program there.

3    Photographs of the treatment space in the gym are attached to the Photographic Appendix

4    as Appendices SS and TT.  Ms. Feldman explained that she runs three groups each

5    Monday and three groups each Wednesday in the gym.  She said that the groups are

6    frequently cancelled because custody staff members assigned to the gym are routinely re-

7    directed to other responsibilities.  She said that it was "very hard" to get a regular group

8    routine going because there a "lots of interruptions."  As the photographs illustrate, the

9    treatment space in the gym also does not seem particularly conducive to conducting

10   groups, consisting of long rows of fixed wooden benches that were used as bleachers for

11   the gym when the building was used for recreation.  The groups are also not confidential,

12   as custody staff are present in the gym when the groups are taking place and there is no

13   separation or privacy in the large open space. At the time of my tour, there were 28 EOP

14   SNY individuals housed on C-Facility at CSP-Lancaster.   Nine of these individuals had

15   been approved for transfer to a more established EOP SNY program at a different prison.

16          373.   I interviewed 5 of the SNY EOP prisoners during my visit to C-Facility.

17   These individuals all had chronic mental illnesses and needed the full 10 hours of

18   therapeutic EOP programming to maintain their level of functioning.  All of these

19   individuals were struggling in the locked-down SNY environment, where they only

20   received limited yard and dayroom.  Also, none of these men 10 hours of therapeutic

21   programing.  In fact, they all reported that they were receiving 1 to 2 groups a week

22   maximum, each lasting no more than 45 minutes.  They also uniformly reported that no

23   groups at all were provided until the last few weeks.  All of the SNY EOP prisoners I

24   interviewed also said they get very limited dayroom because they are not given A1A

25   privilege status like other EOP prisoners.  These facts were all confirmed by Ms. Feldman,

26   the social worker on the yard who leads the groups.

27          374.   The first prisoner I interviewed in this program, Prisoner OO, had been

28   waiting on C-Facility for eight months to transfer to an SNY EOP program.  According to

his January 18, 2013 treatment plan, he is diagnosed with Schizoaffective Disorder, and is currently taking the antipsychotic medication Geodon and the antidepressant Remeron. The treatment plan notes recent inappropriate behavior and periods of hypomanic agitation.  The plan also notes that he once jumped out of moving car while experiencing paranoid delusions.  During my interview with him, Prisoner OO said he did not receive any group treatment at CSP-Los Angeles County until a few weeks before our visit.  He said he gets two groups and one short case manager contact each week.  He observed sympathetically that the few clinical staff members in the program are generally "overwhelmed."  He also complained that he does not get to spent time in the dayroom because his credit earning status is not A1A, unlike EOP prisoners at most prisons.  In my opinion this prisoner needs more group treatment and more frequent case manager contacts, as well as more out of cell time in the dayroom and/or on the yard in order to maximize his level of functioning and stabilize his mental health condition.  He needs the full EOP treatment program including 10 hours each week of therapy.

375.    Another prisoner I interviewed in the Special Needs Yard EOP program on C-Facility at CSP-Los Angeles County, Prisoner M, was on a *Keyhea* order for involuntary medication and has been told that he cannot transfer to a more established EOP SNY program until after his *Keyhea* renewal hearing on March 1, 2013.  He is diagnosed with Bipolar Disorder, "most recent episode depressed, severe," and he is prescribed a number of different mood stabilizers and antidepressants including Trileptal and Effexor.  A treatment plan from November 7, 2012 indicates that he began to receive mental health treatment at around the age of 11.  He had been suicidal in January of 2012 and was placed in an "alternative placement" cell in the Administrative Segregation Unit at CSP-Los Angeles County.  He complained about the cold conditions in the cell, and the hostility of custody staff in that unit.  He said he was sent to inpatient care at DSH Vacaville for a period of time following that incident.  Prisoner M also complained about the lack of dayroom time and limited treatment being provided.  When I mentioned him to the social worker, she agreed that he "could use more attention" given his severe mental health

[754904-2]

1   condition.   In my opinion, given his severe mental health issues and his troubled

2   presentation, this individual needs significantly more treatment and monitoring that is

3   currently being provided to him in this program.

4        376.   A third individual I interviewed on this unit was Prisoner PP, a transgender,

5   developmentally disabled individual who is also struggling with the lack of treatment

6   available in this program.  She is diagnosed in a treatment plan data January 24, 2013 as

7   suffering from Major Depression Disorder, Recurrent.  She is taking Zyprexa, Buspar and

8   Zoloft.  She explained that she is routinely forced by custody staff members to strip and

9   bare her breasts when going out to program.  She complained that the treatment groups

10  only recently started and that there are not enough of them to really assist with her severe

11  depression.   She also complained about the lack of dayroom, and about the fact that the

12  program is not really a "sheltered" program because the EOP prisoners must eat dinner

13  with the non-EOP SNY prisoners.  In addition, she indicated and her file confirms that she

14  spent nine months in inpatient care at DSH in 2012.  In my opinion, given her severe

15  mental health condition, this prisoner needs significantly more care than is being provided

16  to her currently in the SNY EOP program.

17  **5.    The CDCR Must Improve Access to High Quality MHCB Care and to**
        **High Quality Inpatient DSH Care.**

18

19           **a.    Overview of Statewide Problems With Access To Higher Levels of**
                 **Care in MHCB Units and DSH Inpatient Units:**

20       377.   My visits to the 5 MHCB units at the prisons I inspected illustrate a number

21  of different chronic system problems in the CDCR.  First, because there are yet not enough

22  MHCB beds system wide, access to MHCB beds is difficult and acutely ill, suicidal

23  prisoners are often placed into suicide watch, in punitive, inappropriate and unsafe

24  alternative locations.

25       378.   Second, there were significant delays in transfers out of MHCB units for

26  patients urgently needing inpatient level of care treatment in DSH programs.  These delays

27  harm those waiting in the MHCB units, while taking up scarce MHCB beds for individuals

28  who would do better in a DSH facility.   These units can safely maintain prisoners who are

gravely disabled or a danger to themselves or others, but they generally do not have any groups, exercise programs, or privileges. They are designed for short-term housing of such prisoners.

379. Third, I saw a number of individuals in MHCB units who had been returned prematurely from DSH inpatient programs, underscoring serious quality of care problems in the DSH programs. The fact that there was pressure in the DSH Salinas Valley inpatient programs to discharge patients early in order to keep the waiting list short has been confirmed in deposition by DSG psychiatrist Dr. Brim. *See* Ex. 68 to Bien Dec. (Brim Deposition Excerpts) at 18 ("we were under pressure from administration to … move old patients out and take in new patients so as to keep our waiting list down.) Fourth, I saw a number of individuals waiting in EOP Administrative Segregation Units or PSU units for transfer to DSH facilities. In many or most cases such individuals should be housed in an MHCB while waiting for transfer to inpatient care.

380. Although access to MHCB units and to DSH programs appears to have improved in recent years, there are still serious problems. In the 25th Monitoring Report, the Special Master noted that "a number of institution's performance continued to lag on the basic elements within the process [of] moving seriously mentally [ill] patients into inpatient care." Docket 4298 at 33. The report goes on to note that "tracking of referrals remains problematic at approximately one-third of men's institutions" and that "over-two thirds of institutions did not complete DSH referral packets timely." *Id*. The Special Master also noted that "transfers continued to be slow to both acute level care and intermediate inpatient care at a number of institutions." *Id.*

381. I understand that a member of the Special Master's team recently alerted CDCR managers that on February 28, 2013, the waiting list for acute inpatient care in the DSH program at the California Medical Facility was 32 individuals, with 4 additional prisoners waiting for acceptance. *See* Ex. 71 to Bien Dec. This is a serious problem. I have also been shown recent deposition testimony by Secretary Beard indicating that the state is considering opening yet another temporary emergency unit at the California

1  Medical Facility to address this ongoing shortage.  *See* Ex. 70 to Bien Dec. (Beard

2  Deposition Excerpts) at 171 ("there's been discussions about perhaps opening up a second

3  floor of L wing, specifically to address the APP problem").

4        382.    As to intermediate inpatient care access, in his most recent report, the Special

5  Master noted that "a number of institutions continued to struggle to transfer inmates to

6  DSH intermediate care within 30 days of referral.  Rates of compliance with the 30-day

7  time line were 24 percent at CSP/LAC, 32 percent at CIM, and 50 percent at SVSP, KVSP,

8  and NKSP.  Compliance rates were 61 percent at PBSP, 64 percent at MCSP, 71 percent at

9  RJD, and 83 percent at both CSATF and DVI."  Docket 4298 at 75.

10       383.    Although defendants contend that there is no waiting list for DSH care,

11  recent monthly data footnote indicates that there are 29 inmate-patients waiting for

12  inpatient care, including one patient who has been waiting for 52 days at CSP-Sacramento

13  because of a *Keyhea* hearing scheduled for February 21, 2013.  Ex. 65 to Bien Dec.  When

14  we toured the intermediate inpatient DSH programs during our tour of SVSP on January

15  28, 2013, staff in the newer of the two permanent 64-bed intermediate care program kept

16  mentioning the "waiting list" and then correcting themselves and describing it as the

17  "accepted referral list."

18       384.    The Special Master also found problems with MHCB access in his most

19  recent report, noting that of 18 prisons with MHCB beds, MHCB capacity at 10 of the

20  prisons was insufficient to meet the need for crisis beds.  *Id*. at 76.

21       385.    The data concerning the extensive ongoing use of alterative placements set

22  forth in ¶¶ 203-204 above also demonstrates that there is clearly insufficient MHCB beds

23  space available system-wide.  That data shows that during the last 7 months of 2012, there

24  were 2492 alternative placements and that 729 of those placements lasted for more than 24

25  hours.  If a CDCR prisoner requires suicide watch and care for more than 24 hours, they

26  are supposed to be transferred to an MHCB unit.

27

28

386.    The Special Master's recent report also documents extensive use of unlicensed Outpatient Housing Units for suicidal patients in prisons without an MHCB unit:

> Seven men's prisons did not have licensed or unlicensed MHCBs and sent inmates in need of crisis care to other prisons.  Six of these prisons – ASP, CCI, CRC, CTF, DVI and SCC – used OHU beds to monitor crisis cases pending transfer to an MHCB unit or return to housing.  There were 203 mental health OHU placements at DVI, 165 at CCI, 99 at ASP, 85 at CTF, 54 at CRC, and 41 at SCC.  Rates of compliance for the 72-hours timeframe for stays in the OHU were 63 percent at ASP, 71 percent at DVI, 80 percent at SCC, 82 percent at CTF, 85 percent at CRC, and 90 percent at CCI.

Docket 4298 at 77.  Although I did not tour any unlicensed Outpatient Housing Units (OHUs) on my recent tours, I did tour the OHU at DVI in 2007 and in my opinion that unit is a harsh and punitive environment for suicidal prisoners.  In his 2011 Report to Defendants, Mr. Hayes was very critical of the conditions he observed in the OHUs he visited.  *See* Ex. 28 to Kahn Dec. at 8-10.  For example, he noted that OHUs at both Deuel Vocational Institution and at MCSP had "poor lighting, visibility, and sanitation conditions (i.e., dirty floors and walls, non-sanitized mattresses, etc.)."  Ex. 28 to Kahn Dec. at 9.  Prisoners who require acute crisis care for suicidality should be given care in a licensed facility, where there is adequate nursing and other clinical coverage and where the physical plant is designed to maximize the safety of prisoners being monitored.

387.    Obviously, cells and procedures used for suicide watch should not be punitive.  Beds, clothing, treatment, and perhaps even some daily programming like work or education must be permitted, not merely observation and suicide smock and a mattress on the floor.

388.    Also, the most recent monthly report section on MHCB bed transfers notes that Health Care Placement Oversight Program (HC-POP), the CDCR headquarters department that manages MHCB referrals and admissions between institutions, notes that in the month of January 2013, there were 332 MHCB referrals to crisis care units at other institutions.  *See* Ex. 66 to Bien Dec.  Of those 322 MHCB referrals in January, only 155 were actually placed into a crisis bed.  *Id.*  All of the 177 individuals not placed (who

137

1   constituted 53 percent of the total number referred) had their referrals rescinded.  *Id.*  Of

2   these 177 cases, 73 were placed into an MHCB at the local institution making the referral,

3   99 were determined to no longer need MHCB care, 3 were paroled, and 2 were not

4   medically cleared for transfer.  *Id.*

5          389.    Also, as discussed below in greater detail, it is my opinion, based on the

6   individual cases I saw in the MHCB units that I visited, that there are clinically significant

7   delays in the transfer of prisoners to DSH units from CDCR prisons.  Also, when cases are

8   delayed by the time it takes to obtain DSH acceptance, this is not counted on any "waiting

9   lists."   Also, in many of the cases discussed above and in the sections below on my

10   interviews in various MHCB units, I saw numerous individual cases where CDCR

11   clinicians waited far too long before starting the referral process for severely mentally ill

12   individuals in need of inpatient care treatment.

13          390.    There were 13 patients waiting for transfer to DSH programs in the MHCB

14   unit at CSP-Sacramento or in an administrative segregation EOP environment at the time

15   of my visit on January 29, 2013.  When I visited the MHCB unit at RJ Donovan

16   Correctional Institution, 7 of the patients in the 13 bed unit were waiting for transfers to

17   DSH, including 3 individuals who had been returned from DSH in the last month.  That is

18   20 prisoners waiting for DSH care in just two prisons.

19          391.    I was particularly alarmed that in my prison tours I encountered a significant

20   number of individuals waiting to be transferred to a DSH hospital who were not housed in

21   an MHCB unit but needed to be so housed.  At CSP Sacramento, inmate Prisoner J, who

22   was placed into alternative suicide watch housing on the day of our tour, had been referred

23   to DSH Intermediate care on January 16, 2013 and was waiting for acceptance and transfer

24   in the PSU at the time he became suicidal.  I was not able to interview Prisoner J, but his

25   records indicate that he was admitted to the unlicensed MHCBU unit at CSP-Sacramento

26   on the day of our tour.  The suicide risk assessment completed upon his admission that day

27   indicated that he is on the waiting list for DSH and had been storing his own feces for

28   several weeks.  Similarly, in the EOP ASU unit at RJD, I interviewed two individuals who

EXPERT DECLARATION OF PABLO STEWART, M.D.

1    were waiting to be transferred to DSH – and whose level of functioning in the EOP ASU

2    can be described as marginal at best – neither was regularly coming out to participate in

3    groups, and both exhibited symptoms of active psychosis.  *See supra* at ¶¶ 335-339.

          **b.**    **Problems Observed In The MHCB Units at SVSP, CSP-Sacramento, CSP-LA County, RJD and San Quentin:**

          **1.**    **The MHCB Unit at SVSP**

7    392.    During my visit to SVSP, I interviewed patients in the MHCB unit and

8    toured the unit.  Although managers denied using the standing cages in the MHCB for

9    suicidal prisoners, custody staff confirmed that standing cages for suicidal inmates are

10   used for periods of less than 4 hours at a time during the day when the facility is using the

11   "wet" holding cells (small rooms with toilets used as holding rooms) are being used for

12   people who are waiting for medical appointments.  The MHCB psychiatrist is a contractor

13   whose maximum annual hours were due to run out soon.  The institution has no control

14   over their beds because HCPOP controls access.  Staff somewhat reluctantly agreed that

15   there are problems getting suicidal patients from SVSP admitted to the local MHCB.

16   393.    Although MHCB and management staff reported that they do not use many

17   alternative holding cells for suicidal prisoners, the log in the unit showed that the night

18   before we toured it, a prisoner (Prisoner QQ) was held in one of the holding tanks in the

19   CTC, which has a toilet, but no mattress, from 10:30 p.m. the prior night until 8:33 am the

20   morning of our tour, on suicide precautions, a ten-hour period.  A photograph of the cell

21   where Prisoner QQ stayed on suicide watch is attached to the Photographic Appendix as

22   Appendix P.  Custody staff in the MHCB unit on my tour explained that during the

23   daytime, this cell is used for prisoners waiting for clinic appointments, so any individual

24   who continued to need an alternative placement during the day would be transferred to one

25   of the three standing cages shown in Appendix K.

26   394.    There are a number of punitive aspects to the manner in which suicidal

27   prisoners are managed at SVSP, and in the MHCB unit itself.  Custody staff in

28   Administrative Segregation and in non-segregated units we visited on the tour reported that

1    when an inmate reports they are suicidal, they are immediately moved to a cage in their

2    housing unit, ostensibly for their own protection until they can be evaluated by a clinician

3    on the unit.   Unfortunately this punitive placement that is allegedly for triage purposes,

4    has the net effect of discouraging inmates from expressing their suicidal ideation.  As

5    discussed above at ¶ 355, we conducted interviews prior to an EOP group with a group of

6    eight GP EOP patients who strongly endorsed the view that these and other punitive

7    suicide prevention measures discouraged them from coming forward and reporting feelings

8    of suicide.

9        395.   It was clear from speaking with staff members in the MHCB unit at SVSP

10   that the nine beds available for MHCB care in the Correctional Treatment Center are

11   virtually always filled or reserved for a prisoner coming from another institution.  Access

12   to the unit is controlled from CDCR headquarters, meaning that typically, Salinas Valley

13   cannot place its own suicidal prisoners directly into the unit.

14       396.   The psychiatrist working in the unit was a contractor.

15              **2.      The MHCB Units at CSP-Sacramento**

16       397.   I spend a considerable amount of time during my tour of CSP-Sacramento on

17   January 29, 2013 touring the MHCB units at the facility, speaking with clinical staff in the

18   unit, and having confidential interviews with patients being held in the unit.  CSP-

19   Sacramento actually has three different MHCB units at the facilities:  MHCB I and MHCB

20   II are licensed facilities with a combined capacity of 26.  There is a third MHCB unit at the

21   prison that is not licensed, but that has the same staffing levels as a traditional licensed

22   MHCB unit.  This unlicensed MHCB is in a tradition high security Level IV 180-degree

23   style housing unit, the highest custody level housing style in the prison system except for

24   the Security Housing units at Pelican Bay, Corcoran, and CCI-Tehachapi.  The unlicensed

25   MHCB (called the MHCBU by staff at the prison) has a capacity of 20.  All three units

26   were completely full on the day of my tour, with two additional cases identified by the

27   Crisis Triage Team as requiring placement into an MHCB bed waiting in standing cages in

28   their housing units for placements.  The Crisis Triage Team was hoping an MHCB bed

1  would open up to permit the admission of one of these cases.  *See* Discussion of alternative

2  suicide watch placements at CSP-Sacramento at ¶¶ 214 to 227, *supra*.

3       398.    In the morning meeting before I toured the MHCB unit, the Acting Chief

4  Psychiatrist Elena Schwartz explained that the institution experiences some difficulties

5  getting people with medical issues admitted to DSH facilities.  She said that generally the

6  problem was one of significant delays in access rather than outright denials, because

7  generally after a conference call with the DSH clinicians who managed intake (called the

8  "CCAT" process), DSH would generally accept these cases.  However, she noted that

9  these cases can be very hard to manage them in the interim and take up scarce MHCB bed

10 space.

11      399.    I was concerned to learn during the CSP-Sacramento tour that DSH

12 programs sometime decide to end their treatment of individual patients who may not be

13 responding well to treatment, and sends them back to the CDCR facility with no apparent

14 clinical change from when they were initially referred.  The receiving CDCR facilities

15 often then re-apply within a very short time frame to send them back to DSH.

16      400.    Other cases are called "DSH failures."  For example, in the unlicensed

17 MHCB unit at CSP-Sacramento, we interviewed Prisoner RR.  He is an extremely

18 psychotic, very severely regressed individual who at the time of our interview met the

19 Welfare and Institution Code 5150 standard of being "gravely disabled."  He had recently

20 returned from DSH on high doses of Clozaril and Haldol Dekonoate (long-acting

21 injectable Haldol).  In spite of his receipt of these two medications, when I interviewed

22 him, he was in an extremely psychotic state and very clearly had a continuing need for

23 intensive inpatient psychiatric care.  CDCR clinicians were attempting the very difficult

24 task of managing this very ill individual in an unlicensed make-shift crisis unit constructed

25 in a regular high security housing unit, with very little in the way of retrofitting, and little

26 or no confidential treatment space.  He had been in the unit since January 9, 2013, and the

27 CDCR had already referred him back to the DSH.

28

401.    Other individuals I encountered at CSP-Sacramento were DSH "frequent fliers" who went back and forth to DSH inpatient programs so frequently that their case illustrated a need for longer term or even permanent placement in an inpatient facility for some CDCR patients who cannot be maintained at a lower level of care.

402.    Prisoner SS, whom I interviewed in the PSU program at CSP-Sacramento, is an example of this phenomenon.  He had been in the PSU program for a year, and he told me that he has cycled back and forth between DSH several times since arriving in the high security PSU program.   The transition from DSH to a locked CDCR administrative segregation-style treatment one is often a difficult one for individuals like Prisoner SS. His medical records include an October 9, 2012 treatment plan where he was diagnosed with Schizoaffective Disorder, Bipolar Type.  However, a recent progress note by his psychiatrist dated January 18, 2013 gives him the diagnosis of Mood Disorder NOS and notes that he is receiving Zyprexa and Lithium.

403.    As explained above, an "NOS" or "not otherwise specified" diagnosis is a general diagnosis used while efforts at diagnostic clarification are undertaken.  When someone has been observed in a mental health program for many months, this type of diagnosis should not be employed.  Its use here suggests the psychiatrist writing the progress note did not have access to his record to review this prisoner's prior diagnoses, or that he did not have the time to do meaningful diagnostic clarification, or that he did not know the prisoner well enough to be confident in a more specific diagnosis.  Any one of these 3 reasons would underscore the fact that there are problems with continuity of care and with/or with adequate clinical resources at CSP-Sacramento.

404.    There were several similar cases encountered on the tour, discussed below. These cases are especially troubling given the fact that CSP-Sacramento has a dangerous shortage of MHCB beds and is having to employ a crisis triage team to manage its use of unlicensed alternative placements for suicidal individuals.  By taking up scarce MHCB beds, these "DSH failures" cause a ripple of harm through the lower levels of mental health care in the CDCR.

405.   Given the high demand for MHCB bed space, and the frequent use of alternative placements, I was surprised by the long lengths of stay of individuals in the MHCB units at CSP-SAC.  One reason cited by staff members was the presence of individual waiting to go to DSH and individuals returned from DSH who were still very ill. Prisoner TT is another example of the very sick individuals cycling in and out of DSH who fill up scarce CDCR inpatient beds.  He had spent a number of months in 2012 in the MHCB at SAC, and had spent a period of time at the APP unit at CMF.  After he was returned to SAC, he again ended up in the MHCB and SAC struggled to get DSH to take him back.  Eventually, after a CCAT, DSH agreed to take him back to the APP and then to place him into the ICF.

406.   In reviewing his medical records, I was alarmed that DSH chose to return Prisoner TT from acute inpatient care in the Vacaville acute inpatient psychiatric program to CSP-Sacramento after approximately 30 days in the acute program without making the referral to intermediate inpatient care requested by CSP-Sacramento.  When he returned to CSP-Sacramento he almost immediately returned to engaging in serious self-injurious behavior and was placed into the MHCB, where he has spent months waiting to be referred back to DSH.  His discharge summary from his most recent DSH stay in November of 2012 makes clear DSH does not enjoy having to deal with this difficult patient.  However, the discharge plan also makes clear that a long-term intermediate care hospital setting with a behavior incentives program is in fact the only treatment he respond to, making the DSH return of this prisoner to CSP-Sacramento all the more troubling:

> When he was referred back to DSH, the sending institution recommended that he be placed in intermediate level of care for continued treatment following his stays on acute units.  This option was thoroughly considered by the treatment team.  It appears as if this individual required long-term treatment for debilitating personality traits; specifically those associated with borderline and antisocial personality**.  It has been shown that when housed in a structured setting for an extended period of time and managed with a behavior plan, his emotional outbursts and self-injurious behaviors begin to slowly decrease**.  Unfortunately, as is with any DSH unit, this patient eventually discharges and needs to start over with a new treatment team.  Inevitably, this results in his behavior of self-injurious insertions that he knows works to his best interest, i.e., angry outbursts, hostility, threats, and testing of boundaries as he seeks optimal accommodations in each

[754904-2]

1    number…

2    12/5/12 DSH Vacaville Discharge Summary for Prisoner TT at 7 (emphasis supplied).

3    There can be no doubt that Prisoner TT presents a very difficult set of mental health care

4    management challenges.  However, this discharge summary basically says that Prisoner

5    TT only responds to long term inpatient care, but then declines to provide such care on the

6    grounds that it will not be permanent.  It makes no sense to discharge him without

7    referring him to the only level of treatment to which he apparently will respond, and,

8    moreover, in my opinion it amounts to a dereliction of an admittedly difficult professional

9    duty to manage this kind of challenging patient.

10         407.    The section quoted above goes on to note that Prisoner TT "had numerous

11   attempts and failures at the intermediate care level of care and difficulty programming in

12   groups as a result of his threats toward others."  However, I am under the impression that

13   part of the purpose of the high custody SVPP intermediate program is precisely to be able

14   to handle such cases.  A December 5, 2012 social work discharge note for Prisoner TT

15   notes that while in the acute program, he "responded well to incremental reward system,

16   which gave him something to work for an look forward to."  In my opinion, he should not

17   have been returned to CSP-Sacramento.  Prisoner TT was referred back to ICF care in a

18   DSH program on December 14, 2012, 9 days after he was returned from acute DSH

19   inpatient care.  Apparently that referral must have been denied because his electronic

20   health record contains a second DSH referral, this time to acute care, dated January 17,

21   2013.  He is now in the process of being referred back to the acute program, with an

22   apparent promise from DSH that they will refer him to intermediate care at SVPP

23   following his acute inpatient placement at CMF-VPP.  The series of improper DSH denials

24   and the return of Prisoner TT to CSP-Sacramento mean that he has spent two months in the

25   CSP-Sacramento MHCB unit at the wrong level of care, experienced additional self-injury,

26   and taken up needed bed space for other CSP-Sacramento prisoners in need of crisis care.

27         408.    Another example of a burdensome case on the MHCB unit at SAC related to

28   DSH is Prisoner UU.  Prisoner UU is an individual who has never been convicted of a

crime who was transferred to the PSU at Sac under Penal Code 7301.  He was transferred

to SAC after assaulting other patients and staff at Atascadero State Hospital.  His

medication reconciliation records from January 5, 2013 indicates he is currently prescribed

Haldol and Lithium, and a treatment plan suggests some of his recent assaultive history

might be related to the use of the medication Risperdal for a period of time, rather than

Haldol on which he apparently does better.  His medical record reflects discharges from

MHCB care on December 13, 2012 after a 21-day stay, and a CTC discharges (presumably

from crisis bed stays) on August 3 and 25, 2012, and an OHU discharge on July 17, 2012,

and a DSH discharge on March 14, 2012.  He told us he could not handle the PSU and

became very suicidal.  When we spoke with him in the PSU unit at CSP-Sacramento, he

was waiting for a transfer to the SVPP ICF program.

### 3.       The MHCB Unit at CSP-LA County

409.     At Lancaster, I was once again struck by the extremely high level of acuity

among the patients I interviewed, and by the large percentage of the patients in the unit

when I visited who were either waiting to go to DSH hospital programs or who had

recently been returned from a DSH program, apparently prematurely given their presence

once again in the MHCB and their re-referral to DSH.  At the time of our visit to CSP-Los

Angeles County, we were given a list of 11 individuals waiting for transfer to either a DSH

acute or intermediate program, and told that two additional referrals were pending that had

not been included on the list.  *See* Ex. 41 to Kahn Dec. (List of individuals waiting to

transfer to DSH at time of LAC tour).   All five of the individuals I interviewed in the

MHCB unit were waiting to be transferred to a DSH program.

410.     The most recent CSP-Los Angeles County Management Report describes the

MHCB unit at the prison as follows:

> The institution has a 13 bed, Mental Health Crisis Bed (MHCB) unit.
> Inmate-patients are received from internal referrals as well as from other
> institutions.  During the reporting period, 355 referrals were received from
> within the institution and 2 referrals were received from other institutions.
> During the reporting period, the total number of admissions to the MHCB
> unit was 237.  Where 127 were admitted to the LAC MHCB unit and 110
> were admitted to MHCB units at other institutions by HCPOP.  The average

[754904-2]

length of stay (LOS) was 15.7 days.  The range was from 2 days to 124 days
Ex. 40 to Bien Dec. (CSP-Sacramento Management Report) at 13-14.  This section of the
Management is remarkable for its admissions concerning lengths of stay.  For example, the
average length of stay is well beyond the 10-day timeline in the Program Guides and in
state licensing rules, at almost 16 days.  And the report notes one extremely long stay of
124 days.  Moreover, it is clear that individuals going to DSH are responsible for virtually
all of the excessive stays.  The report notes that "When [Inmate/Patients] on the DMH
waiting list were removed from the calculation, the average LOS in the MHCB was 10.6
days."  *Id*.

411.    When I toured the MHCB unit at CSP-Los Angeles County on January 29,
2013, I met with a number of individuals in the MHCB unit there.  On the tour, I learned
that the MHCB unit is full most of the time, and staff confirmed that a significant number
of the beds were taken up by people awaiting placement in higher levels of care, some of
whom have come back from DSH programs very recently.  We interviewed five very
psychotic individuals, none of whose primary placement reason was suicidality.  Instead,
they were having behavioral problems and unable to program due to the severity of their
mental illness.

412.    The first individual, Prisoner VV was discharged from the MHCB the day
after my visit on February 1, 2013.  His MHCB Discharge Summary noted a Diagnosis of
Depression.  He was admitted to the MHCB on January 3, 2013.   The discharge summary
notes a prior MHCB admission from November 9, 2012 through November 21, 2012.
Although he was brought to the MHCB after claiming to be suicidal, once there he
disclaimed any suicidal intent.  However, he was kept in the unit, apparently in an effort at
diagnostic clarification and medication adjustment in an effort to improve his severely
impaired level of functioning and his severe depression.   He was referred to DSH acute on
January 14, 2013.  While he was in the MHCB unit, his diagnosis was changed to Major
Depressive Disorder, Recurrent, Severe, with Psychotic Features.  Based on my interview
with this patient, I found him to be very psychotic, with severe mood symptoms, and in my

[754904-2]

1   opinion he needs to be considered for transfer to a higher level of care in an inpatient

2   program at DSH.

3        413.   Next, I interviewed Prisoner WW.  Prisoner WW was acutely psychotic.  He

4   told me that he was routinely seeing individuals that he killed when he was a 19 year old.

5   He said he was a licensed security guard and had shot several individuals while not on

6   duty.  Staff on the MHCB unit told me that Prisoner WW had been referred to DSH acute

7   inpatient at the Vacaville DSH Psychiatric Program a few days before our visit.  He told

8   me that his medications were not working and said "they're haunting me" in reference to

9   the victims of his shooting.  He also told me that he keeps hearing his son's voice and he

10  stated "I'm tired, I don't want to live like this anymore."  In my opinion he was acutely

11  psychotic and severely depressed with referential thinking, and he urgently needed acute

12  inpatient care.  He had been in the MHCB unit for 11 days on the day that I met with him.

13  I agree with the decision to transfer him to DSH.

14       414.   I also spoke briefly with Prisoner XX, who was acutely psychotic at the time

15  I met him.  He was clearly responding to internal stimuli when we met with him.  He is

16  also very severely mentally ill and urgently needs a rapid transfer to inpatient care.

17  According to his medical records, Prisoner XX was being referred back to the SVPP

18  intermediate inpatient program at Salinas Valley, after having being returned to LAC from

19  that very program on January 13, 2013.   He had been in the SVPP intermediate program

20  from August 22, 2012 through January 13, 2013.   His return to the CDCR appears to have

21  been premature given his high level of psychosis at the time I interviewed him.  His

22  referral back to the DSH program took place after he was housed for several days in the A-

23  4 Administrative Segregation Unit at CSP-Lancaster on suicide watch in Cell 121.  In my

24  opinion this individual was much too mentally ill to be safely housed in alternative

25  placement like the Administrative Segregation Unit at CSP-Los Angeles County.  I agree

26  with the decision to place him into an MHCB and refer him back to DSH.

27       415.   Next, I spoke with Prisoner YY.  He had been in the MHCB unit at CSP-Los

28  Angeles County since January 10, 2013, and had been previously in the MHCB unit

1   between December 28, 2012 and January 7, 2012.  He lasted three days before being

2   returned to the MHCB.  He is an example of an MHCB and DSH "frequent flier."  He was

3   waiting for transfer to the DSH acute program at DSH at the time I met him.  His discharge

4   summary from the MHCB at CSP-Los Angeles County, which is dated January 28, 2013

5   even though I saw him in the MHCB unit on January 31, 2012, indicates current

6   medications including Geodon, Buspar, and Zoloft, but notes a history of poor medication

7   compliance.  His referral packet to DSH noted that "this is the I/Ps second MHCB

8   admission to LAC in past 2 weeks stemming from extreme mood lability, agitation,

9   suicidal ideation, lack of impulse control, erratic behavior, and disregard for his own and

10  others safety.  I/P has continued to demonstrate volatile behavior including banging on his

11  door, threatening staff, and refusing contact with MH staff."   His Diagnosis is Bipolar I

12  Disorder, Most Recent Episode Manic.  I agree with the decision to refer him to DSH acute

13  care.  He is a very impaired, psychiatrically fragile individual who needs a prolonged

14  period of intermediate inpatient care.

15          416.    I was struck by the severity of the mental illness I observed in these

16  gentlemen in the MHCB at CSP-Los Angeles County.  They would be among the sickest

17  individuals one would encounter in any state mental hospital.  These were very severely ill

18  and very fragile, and they needed an expedited transfer to DSH.  For a number of these

19  individuals, I believe that the DSH transfer periods are too long to wait, and that the

20  Special Master should consider requiring a procedure for expediting transfer to inpatient

21  hospitalization for cases like these individuals.   Particularly for individuals who require

22  acute inpatient care, any delay in access is potentially dangerous and clinically

23  contraindicated.

24                      **4.        The MHCB Unit at RJD**

25          417.    The MHCB unit at RJD was different from all of the other MHCB units I

26  toured at other prisons, in that they did have two vacant beds on the morning of our tour.

27  They had vacancies, as they should, but at the same time, roughly six of 11 cases in the

28  unit were waiting to go to DSH (and the number had been 7 of 12 cases the morning of the

1   tour before a prisoner was transferred after more than a month in the crisis beds to another

2   facility).

3       418.   The individuals I interviewed in the MHCB unit were exceedingly psychotic

4   and the majority of them were also suffering from mood symptoms.  Three of the cases

5   were waiting to go back to DSH and had been at DSH already at the end of December.

6   These are very mentally ill individuals for whom MHCB level of care is important to

7   prevent further harm.  However, these are also individuals for whom MHCB care is not

8   sufficient to restore them to a higher level of functioning.  These individuals need inpatient

9   level of care as soon as possible, and any delays in obtaining it are harmful to them.  The

10  fact that these individuals are taking up precious MHCB resources is also troubling –

11  particularly given the widespread use of alternative placements throughout the prisons I

12  visited.  Although RJD had a few empty beds on the day of our tour, the institution

13  continues to use alternative placements regularly, although less often than in the past.

14      419.   <u>Prisoner ZZ</u>:  For example, the clinical experience with Prisoner ZZ, who is

15  very sick and repeatedly goes to DSH, is that he cannot be maintained at any level short of

16  an inpatient level of care.  This individual has been chronically mentally ill since

17  childhood.   His medical records indicate that he is currently on a *Keyhea* Order for

18  involuntary medication.  At the time that I saw him in the MHCB unit at RJD, his

19  diagnosis was Schizoaffective Disorder, Bipolar Type.  His medications included two

20  different long-acting injectable antipsychotic medications, Haldol Decanoate and

21  Paliperidone.  In addition, he is prescribed the antidepressant Prozac on a daily basis.   He

22  reported a life-long history of cycling in and out of inpatient psychiatric facilities.  Most

23  recently, he told us, he returned from Vacaville Acute Psychiatric Program to RJD in the

24  middle of January 2013 (Date of Discharge January 14, 2013).

25      420.   In this most recent short period at RJD after returning from Vacaville ICF,

26  Prisoner ZZ told us he got sick after being almost immediately placed into administrative

27  segregation because of enemy concerns.  After a few days in administrative segregation, he

28  stopped eating, got very depressed, and slit his wrists.   It is fair to say that based on his

1    history, Prisoner ZZ has demonstrated that he cannot be maintained short of an inpatient

2    level of care.

3       421.    It is important that Prisoner ZZ remains in the MHCB until he transfers to an

4    inpatient program run by DSH, because it prevents further clinical deterioration that could

5    be very harmful.  But at the same time, being in the MHCB does not serve to restore his

6    overall level of functioning to one where he can be safely maintained in a programming

7    environment and his level of functioning and stability can be maximized.  Like several of

8    the other individuals we observed in the MHCB unit at RJD, while waiting for DSH care,

9    he also ties up the institution's and CDCR's precious MHCB resources.

10       422.    <u>Prisoner C</u>:  Prisoner C had also recently returned to RJD from a DSH

11    program when we saw him in the MHCB unit at RJD.  He was discharged from the SVPP

12    intermediate care program on January 26, 2013.   According to the DSH discharge

13    summary, he was "admitted to DSH/SVPP on July 26, 2012 from RJ Donovan."  When I

14    saw him on February 12, 2013, he was diagnosed with Schizoaffective Disorder,

15    Depressed Type, and mild mental retardation.  His was prescribed two different

16    antipsychotic medications, Ziprasidone (60 mg, twice a day), and Zyprexa (20 mg, twice a

17    day).  In addition, he was prescribed the mood stabilizer Depakote (750 mg, twice a day).

18    Prior to going to DSH last July, he was a participant in the A-Yard mainline EOP program

19    at RJD.  However, at some point he stopped taking his medications and he started to hear

20    voices telling him to kill himself, which apparently happens whenever he goes off of his

21    medications.  He told me that he stopped taking his medications because a correctional

22    officer was bothering him.  He also told me that when he stopped his medications, no

23    doctor or nurse came to see him about it and no one came to encourage him to take his

24    medications.

25       423.    Prisoner C is an example of what happens when you do not do enough for

26    someone who is medication non-compliant.  He appears to be a severely mentally ill

27    individual who quickly deteriorates when not on his medications.  The records indicate that

28    when he goes off his medications, command hallucinations instructing him to kill himself

1    return quickly.  Staff needs to intervene aggressively with him whenever he stops his

2    medications.

3         424.    As noted above in ¶ 161, Prisoner C also exhibited some involuntary

4    movements that require that he be given more consistent AIM testing and that staff

5    respond appropriately if his involuntary movements worsen.

6         425.    Prisoner O:  Prisoner O is another person who cycles back and forth to DSH.

7    According to a suicide risk assessment dated January 2, 2013, he was only back at RJD for

8    7 days before being placed into the MHCB.  He told us that he has been in the crisis beds

9    three times since coming back from DSH in December.  He had been 10 months in

10   intermediate inpatient care at the newer of the two DSH stand-alone 64-bed SVPP

11   intermediate programs prior to returning to RJD.   According to his treatment plan dated

12   January 9, 2013, he is currently diagnosed with Schizoaffective Disorder, Depressive

13   Type, for which he is prescribed the antipsychotic medication Zyprexa (30 mg per day).

14        426.    During Prisoner O's suicide risk assessment of January 23, 2013, it was

15   noted that a custody office was present during the interview.   Due to the extremely

16   sensitive nature of a suicide assessment and the need to take every possible step to

17   encourage candor on the part of the individuals who is suicidal, in my opinion it is

18   inappropriate to have a custody officer present during this type of clinical interview.  Like

19   Prisoner ZZ, whose is discussed above, Prisoner O needs to be in an MHCB because it

20   prevents further clinical deterioration.  However, it does not serve to restore his overall

21   level of functioning to one where he can be safely maintained in a programming

22   environment or where his level of functioning and stability can be maximized.  Also, while

23   waiting for DSH care, he also ties up the institution's and CDCR's precious MHCB

24   resources.

25        427.    Prisoner AAA:  Prisoner AAA had been in the MHCB for about two weeks

26   when I saw him.  He is currently very psychotic and not taking any medications.  He is a

27   very mentally ill individual who needs a higher level of care.  He is also waiting to go to

28   DSH.  This is a very psychotic young man whose clinical presentation is absolutely

1  consistent with the early stages of schizophrenia.   For an individual with his clinical

2  presentation, it is critical to intervene aggressively to help improve the overall prognosis

3  for his condition. The literature suggests that if you intervene rapidly and aggressively

4  during the early stages of a psychotic disorder, the person has a better prognosis.  Given

5  the importance of quick intervention for Prisoner AAA, I was concerned that the treating

6  staff members were not intervening in an appropriate manner to encourage him to start

7  back on his medications.

8       428.   Prisoner BBB:  Prisoner BBB was in the MHCB unit at RJD at the time of

9  our tour.  He is diagnosed with Adjustment Disorder with mixed emotional features.

10  Prisoner BBB cut his wrists in the beginning of January.  He then spent two weeks in the

11  MHCB being evaluated and started on the antipsychotic Risperdal and the antidepressant

12  Zoloft.  The chart review and his interview with me revealed that due to a personality

13  conflict with one of the nursing staff, he unilaterally decided to stop taking his medications

14  in mid-January.  He was then discharged a few days later and his medications were

15  discontinued by treating staff "given his lack of compliance and his apparent lack of

16  interest in treatment for his psychiatric condition."   (*See* RJD Document Bates RJD 119.)

17  Prior to the conflict with the nurse, he was considered to be psychotic and depressed, but

18  clinical staff became more skeptical of his claimed suicidal ideation after he was non-

19  compliant with his medication.

20       429.   Prisoner BBB was discharged to the CCCMS ASU in B-7 on January 23,

21  2013, and 2.5 days later he made a noose and hung himself.  The MHCB medical record

22  states "he was admitted yesterday morning after allegedly trying to hang himself with a

23  sheet in ASU cell the night prior."  (RJD 00119.)   The same record indicates that he

24  reported experiencing command auditory hallucinations telling him to kill himself.  When

25  I interviewed him during the prison inspection, he told me that he would have died if not

26  discovered by staff members.  He also made it very clear to me that it was a serious

27  attempt from which he was expecting to die.   Also according to the medical record, he

28  told the staff "I'll get it right" in regards to trying to commit suicide successfully.  (RJD

152

EXPERT DECLARATION OF PABLO STEWART, M.D.

119.)   During the course of his stay in the MHCB, he was found to be in possession of two "folder pieces of aluminum foil, which he had compressed into blunt little sticks, which he said he wanted to stick into an outlet to electrocute himself."  (*Id.*)

430.    In my opinion, Prisoner BBB has mood congruent delusions, is depressed and psychotic.  The decision to discontinue him from his medications seemed to be made in a casual manner given the seriousness of his symptoms and his overall presentation.  I agree with treating staff's current decision to refer Prisoner BBB to DSH.

### 6.    Serious Problems Observed With the Quality of Care in DSH Programs Overall

431.    During my tours I encountered frequent criticism from CDCR clinicians and from class members regarding the quality of care currently being provided in DSH programs.  These complaints included complaints from CDCR clinicians about delays in access, the refusal of DSH to take cases of certain individuals with dementia, "DSH failures" who were considered not amenable to DSH treatment programs and in effect discouraged from being re-referred, and premature returns from DSH before the individuals were fully stabilized or had achieved the maximum benefit they could get from the programs.  The complaints from prisoners included the lack of adequate treatment programs in the temporary DSH intermediate programs, and complaints described in greater detail below, about basic conditions in some of the DSH programs.

432.    As discussed above at ¶¶ 51 to 56, DSH currently is experiencing severe staffing shortfalls at both its Salinas Valley programs and its Vacaville programs.

433.    As the section above makes clear, in my interviews in various MHCB units, I encountered a number of individuals who were discharged prematurely from various DSH inpatient programs, some of whom were being referred back to DSH after a very short period.   Those individuals, whose cases are described above, were of great concern to me because they were clearly suffering during their long stays in MHCB units with acute psychotic symptoms, severe mood symptoms, and/or severe paranoid delusions.  The individuals in this category that I would describe as "early returns" include Prisoner RR,

[754904-2]

1 Prisoner TT, Prisoner UU, Prisoner XX, Prisoner ZZ, Prisoner C, and Prisoner O.  All had

2 been at DSH recently and all were in the process of being returned to DSH for additional

3 inpatient level of care treatment.

4         434.    Thus, I was not surprised when I was shown the recent testimony of DSH

5 psychiatrist Dr. Brim concerning pressure at DSH to discharge long-stay cases from the

6 inpatient unit in order to keep the waiting list down.  This testimony is set forth above in

7 the staffing section of this report, but it is worth repeating here:

8           My understanding is that there was a general feeling – and I – I felt
          this way – that we were under pressure from administration to move the old
9           people out – the old patients out and take in new patients so as to keep our
          waiting list down.
10
          And many of the psychiatrists – well, I would say all – felt that this
11          was resulting in shorter stays for the patients than historically had been the
          case.  And they felt that it was getting to the point that people were not
12          staying in all cases at least as long as they needed to.  There was pressure
          from administration to get them out quickly so that new people could be
13          brought in.

14 Ex. 68 to Bien Dec. (Brim Depo excerpts) (emphasis supplied).

15         435.    The Department of State Hospitals (DSH) operates 4 intermediate inpatient

16 ("ICF") hospital programs inside the walls of the Salinas Valley State Prison (SVSP) for

17 high security male prisoners.  These four units together are called the Salinas Valley

18 Psychiatric Program or "SVPP."   SVPP has two fully licensed 64-bed units, T-1 and T-2,

19 and two temporary emergency unlicensed units that operate in converted regular prison

20 housing units, D-5 and D-6 and C-5 and C-6.  The total capacity for all four units,

21 according to information provided by Charles DeSilva, the director of the programs, on the

22 day of my tour, January 28, 2013, would be 370.  However, because the facility is unable

23 to fully utilize 4-man dorms in the initial T-1 facility, the actual capacity is only 344.   A

24 variety of evidence that I reviewed in preparing this report and on my tour at SVPP in

25 January 2013 underscored quality of care problems at Salinas Valley Psychiatric Program

26 as well as staffing problems.

27         436.    The November 2012 Suicide in the SVPP Intermediate Program Run by

28 DSH:  First, as the SVPP staff psychiatrists noted in their letters about staffing difficulties

1   in January and February of 2013, the SVPP program experienced its first suicide last fall.

2   Prisoner A hung himself in the "temporary" Facility C, Building 5 intermediate inpatient

3   program at SVSP on November 29, 2013.  He was initially revived through CPR, but was

4   found to be brain dead and he was declared dead on December 4, 2012.   The CDCR

5   Suicide Review Team issued its report on the suicide recently.  See Ex. 42 to Kahn Dec.

6   (Prisoner A Suicide Report).  The suicide report noted a variety of very serious problems

7   with his care while in the DSH program.

8           437.    One set of problems in Prisoner A's case involved bureaucratic delays in his

9   admission to the full DSH intermediate program.  *See* Ex. 42 to Kahn Dec.  (Prisoner A

10   Suicide Report) at 8-9.  Prisoner A had an arguably fairly serious suicide attempt on July

11   19, 2012.  *Id*.  He cut himself with a nail clipper on the arm, requiring sutures, and then

12   swallowed the nail clipper.  *Id*.  He was initially housed in alternative suicide watch

13   housing and then was sent to the MHCB unit at San Quentin.  While he was in San

14   Quentin, his primary clinician at CSP-Sacramento contacted the treating psychiatrist at San

15   Quentin because he was concerned that Prisoner A had not been referred to the DSH acute

16   program at CMF.  However, the psychiatrist reported that Prisoner A had barely

17   participated in treatment since arriving at San Quentin and told the treatment team there

18   that he had "made a mistake" and wanted to be discharged as soon as possible.  *Id*.   In my

19   opinion, it may have been a serious error not to refer Prisoner A to the APP program

20   despite this apparent resistance to treatment.  Individuals who are committed to

21   successfully taking their own life will often hide the seriousness of their attempts, and

22   treating staff members at San Quentin should have been alert to this possibility.

23           438.    In any event, Prisoner A was returned to CSP-Sacramento, where his low

24   level of participation in treatment led to a referral to DSH inpatient care.  The referral

25   package was completed on August 15, 2012 and the paperwork sent to DSH on September

26   12, 2012 with a recommendation that Prisoner A be admitted to the intermediate treatment

27   dorms at CMF-Vacaville. *Id*. at 9.  On September 18, 2012, DSH-Vacaville responded

28   that due to custody factors, Prisoner A's referral "would be deferred to the DSH high

security program." *Id*.  Unfortunately, "an email was not sent to the Salinas Valley program" and no one noticed the error until more than two months later, on October 30, 2012. *Id*.  At that time, he was quickly accepted by SVPP on November 2, 2012, and was transported to SVPP on November 7, 2012.   *Id*.

439.    Once he arrived at SVPP, Prisoner A again experienced significant delays in accessing the full treatment program.  *Id*. at 9-10.   In the intermediate care programs at DSH, newly arriving prisoners are not allowed to program outside of their cell until their case is reviewed by a CDCR institutional classification committee, or ICC.

440.    During this period when the prisoners are waiting for the ICC to approve them for full programming, new DSH intermediate inpatient care patients are considered to be in "Stage 1" of the program.  In Stage 1, a prisoner cannot leave his cell even to meet individually with his clinicians.  *See* Ex. 68 to Bien Dec. (Brim Depo excerpts) at 58.  This prohibition requires clinicians to hold non-confidential cell-front meetings with the prisoners.  *Id*. at 58-60.  Dr. Brim, the DSH psychiatrist, explained that he and other psychiatrists at DSH have long had concerns about the impact of this requirement on new arrivals: "Typically patients complain that they have more privileges at the prisons where they came from than they're finding at Level 1 in our program, and they feel like they've been deprived privileges by being sent to our program."  Ex. 68 to Bien Dec. at 55.

441.    Normally, the ICC is supposed to convene to clear an inmate into the next stage of the program within the first two calendar weeks of the patient's admission to the program.  Ex. 42 to Kahn Dec. (Prisoner A Suicide Report) at 9.  For some reason, in Prisoner A's case, the ICC did not meet to clear him into Stage 2 of the program for more than three weeks.  On November 21, 2013, while still waiting to be released from Stage 1, Prisoner A cut one of his arms out of frustration at still being kept at Stage 1.  *Id*. at 10.  Prisoner A was given sutures on his arm and was housed in a safety cell overnight, and then returned to his cell.  *Id*.  Although I do not have treatment records that reflect all of the details of this suicide attempt and the DSH response to it, it appears to me that given his recent suicide attempts at CSP-Sacramento and DSH and his history of crisis care in an

1    MHCB and in the acute DSH program in 2009, the November 21, 2013 suicide attempt

2    should have resulted in a prolonged period of suicide watch and possibly a transfer to acute

3    or crisis care.

4        442.    Finally, after another seven days passed, ICC reviewed his case and Prisoner

5    A was released for programming.  He attended one group on the evening of November 28,

6    2012.  *Id*.  The next morning, he attended one group from 8 to 8:50 in the morning.  He

7    was discovered hanging in his cell approximately 10 minutes later at 9:01 a.m.  *Id*.

8        443.    In my opinion, the handling of this case reveals serious problems with the

9    referral process both in the CDCR and in DSH.  First, both organizations should have a

10   referral tracking process that prevents and individual referral from getting lost for two

11   months due to a processing error.  Prisoner A was identified as needing inpatient care in

12   early August, 2012, but he was not actually transferred to the level of care for

13   approximately 81 days.  Second, it is clear that the ICC review process in SVPP inpatient

14   programs must be expedited.  After an 81 day wait to get to the right level of care, Prisoner

15   A then spent another 21 days locked in his cell with no programming.

16       444.    Prisoner A left what could be interpreted as his suicide note scrawled on the

17   wall of his cell before he took his own life:  "I came here slightly depressed.  Now I am

18   severely depressed.  This place is hopeless!"  Ex. 42 to Kahn Dec. at 12.

19       445.    <u>The Role of DSH Errors in Other Recent Suicides</u>:  Moreover, DSH clinical

20   errors were also found to have played a role in several other suicides.  For example, both

21   the CDCR suicide review and Dr. Patterson's review of the suicide of Prisoner S at CSP-

22   Sacramento in March of 2011 found that this prisoner was given an inadequate Suicide

23   Risk Assessment while in the Salinas Valley Psychiatric Program and that had this been

24   done correctly, the suicide might have been preventable.  Dr. Patterson's report explained:

25           The inmate's suicide may very well have been preventable had he had
         an accurate SRE [Suicide Risk Evaluation] while still housed at SVPP and
26       had he not been transferred to a lower level of care at CSP/Sac.  Although he
         had been seen soon after his arrival at CSP/Sac by a clinician who
27       determined that he was not acutely suicidal, his chronic risk factors and his
         imminent deportation did not appear to have been factored in as additional
28       risk factors affecting his acute level of risk.

157

1   *See* Docket 4308 (2011 Suicide Review) at Appendix F page 107.   Dr. Patterson noted

2   that the faulty SVPP suicide risk evaluation failed to document or acknowledge this

3   prisoner's serious suicide attempt in 2010.

4     446.   <u>Problems with Quality of Care in the "Temporary" Intermediate Care DSH</u>

5   <u>Units at SVPP</u>:  I also observed and learned of serious problems with the care currently

6   being delivery in the "temporary" intermediate inpatient (ICF) programs in the C-5 and C-

7   6 Buildings at Salinas Valley State Prison.

8     447.   During my inspection tour at Salinas Valley State Prison on January 28,

9   2013, I visited both the newer of the two free-standing 64-bed intermediate care hospitals

10   at SVSP and the "temporary" ICF program.  I started by touring the new DSH 64-bed

11   hospital.  While we were unable to speak to many patients in the new DSH ICF hospital,

12   we were shown impressive group treatment and art therapy rooms, private counseling

13   spaces, and DSH staff indicated that the environment is treatment rich, with patients in

14   stages 2 and 3 of the treatment plan program receiving more than 10 hours of week of

15   therapy and structured treatment.   Photographs of these treatment spaces are attached to

16   this report as Appendices UU and VV.

17     448.   This was in stark contrast to the treatment and treatment environment I

18   observed in the C-5 temporary ICF program.  The C-5 program had private clinical offices,

19   but did not have private group room, meaning that groups were held on the dayroom,

20   under the sighting of an armed gunner, and within earshot of unit custody staff and other

21   inmates.  In addition, one of the three "pods" on C-5 was an intake unit that was not used

22   for groups.  As a result groups were limited to two at a time on the dayroom floor.  *See*

23   Photographic Appendices WW and XX.   I spoke with a half-dozen inmate-patients in the

24   C-5 program on the yard outside the housing unit about the program.  They uniformly

25   reported that they receive at best one group a day.  They also complained about the lack of

26   clothing in the program, as well as lack of soap and laundry service.  They also reported

27   problems with consistent medication administration.  One prisoner reported that he does

28   not take his medications and staff members do not do anything about it.

EXPERT DECLARATION OF PABLO STEWART, M.D.

449.   DSH staff on the temporary ICF unit indicated that they do not have any electronic health records and that they do not track how many hours of groups are actually being provided to their patients.  By way of contrast, they indicated that the permanent program has a very useful electronic records system.

450.   Many of these troubling observations were confirmed by Dr. Brim, the DSH psychiatrist, in his recent deposition.  He noted that "there has been a severe shortage of clean clothes, bedding, coats" in the program, which he indicated is the responsibility of the CDCR. Ex. 68 to Bien Dec. (Brim Deposition Excerpts) at 61-63.

451.   Dr. Brim also noted other serious problems in the program, including concerns that understaffing was placing staff members in the program at risk.  *Id*. at 77-79.  He also described problems with lack of access to electronic medical records in the treatment units in the temporary program and other medical records problems.  Id. at 89-91.  He also confirmed the statements of the prisoners I met on the yard of the C-5/C-6 program that they were receiving one hour of group programming a day.  *Id.* at 91 ("I haven't, you know, made a study of that, but that sounds about it right.")

**7.   The CDCR Must Eliminate Barriers In Access To Inpatient Care for Death Row Prisoners**

452.   I visited San Quentin on February 26, 2012 and spoke to staff extensively about mental health care for the condemned and especially about the so-called "Specialized Care Program" for death row prisoners there who require inpatient level of care.

453.   I was also told that there are currently 25 condemned EOPs at the institution out of a total condemned population of 691, meaning that about 3.6% of the condemned population is receiving mental health services at the EOP level of care.  The system-wide rate for EOP care in the most recent monthly reports is roughly similar to this rate, but I would have expected a much higher level of acuity among death row prisoners based upon my experiences with such prisoners.

EXPERT DECLARATION OF PABLO STEWART, M.D.

[754904-2]

454.    At the time of my visit in late February, San Quentin had designated a 10-bed area in the Correctional Treatment Center for a new Specialized Care Program that was designed to attempt to care for death row individuals in need of inpatient level of care. They had also moved three prisoners into the new space, and had identified another seven individuals to be transferred into the program over time.   I interviewed all three prisoners currently in the new program, as well as two dedicated social workers who appear to be delivering the bulk of the treatment in the new program.  I also interviewed two candidates identified for eventual placement into the Specialized Care program who were still living on East Block.  Finally, I attempted to interview two additional individuals who have been identified for placement into the new program, but they were both too psychotic, paranoid and hostile to speak with me for more than a few moments.

455.    The Special Master's most recent report includes extensive reporting on the inadequacies of a prior attempt to set up a Special Treatment Program to provide inpatient level of care program for death row prisoners:

> Defendants have reported that its specialized care program for condemned inmates was first implemented on November 8, 2010, and has been in existence ever since, with a census of 8 to 10 inmates at any given time.…  The institution described the program as a viable option and alternative to DSH intermediate level of care.

> The monitor's expert requested all policies and local operating procedures and the program description and census…  Basic clinical requirements such as admission and discharge criteria were not articulated…  [T]here were space limitations and challenges with escorts which created problems with access to care.  The two confidential office areas (C and D) with modules served the entire caseload of inmates in the condemned unit, hinder availability of confidential contacts.  One of those spaces appeared to also serve as a law library, potentially limiting access even further.…

> Most of these inmates clearly needed inpatient care and were not receiving it or its equivalent.

Docket 4298 (25th Report of the Special Master) at 177-178.  Other key criticisms of the program included the fact that "the primary treatment modality in the condemned care program appeared to be medication management and recreational therapy," but unfortunately the recreational therapists cell front contacts with patients "were more like cell-front wellness checks than clinical contacts."  *Id.* at 179.

[754904-2]

456.    In early December, 2012, the Special Master's experts visited San Quentin and reviewed plans for the treatment of death row prisoners.  In the 25th Report, he is critical of the treatment planning in the condemned unit as not being specific enough regarding treatment goals and not adequately shared with the team.  *Id*. at 181.  The Special Master's team also met with several inmates who were allegedly participating in the new program and noted that the prisoners "*expressed concern about lack of sufficient groups and activities, particularly during weekends.  They reported that they rarely received yard time on the weekends and spend most or all of that time locked up*."  Docket 4298 (25th Report) at 183.

457.    The first three prisoners I interviewed in the Specialized Care Program were housed in the Correctional Treatment Center, adjacent to the MHCB unit.

458.    The first prisoner I interviewed in the new Specialized Care Program was Prisoner CCC.  He had only been in the program for 3 or 4 days.  Prior to being moved into the new program, he was not participating in any programing for more than a year.  He indicated that he is very depressed.  He told me that he has spent about 18 months in his cell in East Block without going out, except for a single visit to the yard.  He said it took a long time for the institution to do anything in response to his lack of programming.  Prisoner CCC's medical records indicate that he is currently on a *Keyhea* order for involuntary medication.  According to his February 12, 2013 Treatment Plan, he is diagnosed with Schizophrenia, Disorganized Type, by History.  He is currently on Risperdal, Cogentin, and Haldol.  The treatment plan noted that he was not leaving his cell.  In a diagnostic comments section of the treatment plan, it states that "*he presents as guarded, isolated, lacking insight into his mental illness and is currently on an involuntary medication order.  He has a history of yelling in his cell, poor hygiene, and disorganized thought which has been improved with medications*."  The treatment plan appears to indicate that he meets DSH referral criteria 1 and 2.  In my opinion, this prisoner requires inpatient level of care treatment at the intermediate level for an extended period of time.

EXPERT DECLARATION OF PABLO STEWART, M.D.

[754904-2]

459.    Next, I interviewed Prisoner DDD.  Prisoner DDD is currently under a *Keyhea* order for involuntary medication based upon a finding that he is gravely disabled. He is mute, and would not speak during my interview with him, although he was able to communicate some by nodding his head to indicate "yes" or shaking his head to indicate "no."  He is diagnosed with Schizophrenia, Catatonic Type, Provisional.  The social workers on the unit described Prisoner DDD as "very disengaged" and noted his poor hygiene.  His February 14, 2013 Treatment Team Level of Care form (CDCR Form 7388B) notes that he requires inpatient level of care treatment.  He is currently being started on the anti-psychotic medication Clozapine.  I agree that Prisoner DDD requires treatment at an inpatient level of care for an extended period of time.

460.    Next, I interviewed the third of the three individuals currently in the new Specialized Treatment area of the CTC, Prisoner EEE.  Prisoner EEE is not currently taking any psychiatric medications.  His current diagnosis is Schizoaffective Disorder, Depressed Type, by History.  The last time he was on a *Keyhea* was in 2010.  He indicated that he has spent time in a state mental hospital but was unable to remember the name of the hospital.  His treatment plan indicates a prior history of treatment at the Department of Mental Health.  He was unable to tell me how long he has been in the new program.  When I spoke with the treatment staff on the unit, they told me that Prisoner EEE's isolative symptoms began nearly three years ago in 2010.  A treatment plan from January 2013 notes that he has a history of "*psychosis, hallucinations, paranoia, depression, and irritability. . . . He will talk to [his primary clinician] for brief period of time cell front, but does not agree to attend out of cell therapeutic activities.  His medication compliance has been poor, he has refused to take his medications for 3 months in a row*."  January 8, 2013 Treatment Plan.   In my opinion, Prisoner EEE also requires inpatient level of care treatment for an extended period of time to restore him to a higher level of functioning.

461.    After meeting with these three individuals, I met with two social workers who were providing the bulk of the treatment on the unit. *They indicated that all three individuals now in the program had been refusing virtually all out of cell treatment for*

*several years.*   They indicated that Prisoner EEE was referred to the program because his primary clinician in East Block had not seen him come out of the cell or even sit up for many months.  They indicated Prisoner DDD was referred because he would not speak or respond.   And Prisoner CCC was referred because of his refusal of all services.

462.   They said that the activities on the new unit included medication management and lots of programming, including music and art therapy, activities on the fourth floor yard and in the group rooms on the second floor of the CTC building, reading and poetry groups, and a movie group on the weekends.  They indicated that the current participants are very withdrawn, so they are tailoring the program to their tolerance levels and will work them up to more programming.  They use an incentive credits system involving paper that can be traded for a snack.  They indicated that the goal is to increase their functioning to a level where they can be integrated back into East Block.

463.   These individuals I interviewed who are already in the program, as well as the candidates for the program who I interviewed on East Block, all were acutely mentally ill and to have a strong need for inpatient level of care treatment.  If there were no Specialized Care Program, these individuals would otherwise need to be transferred to an inpatient treatment program run by the Department of State Hospitals.

464.   I do not think it is possible to run an inpatient care program that is the equivalent to state hospital level of care treatment in the hospital building at San Quentin. However, to even begin to approximate such an intensive, treatment rich hospital program, San Quentin will to do much more than they are doing currently.  I have not been shown a comprehensive program description, detailed admission and discharge criteria, assessments of staffing needs and space needs, or any of the other program information the Special Master has called upon defendants to develop if they are going to proceed with the new program.  I also do not know what impact the presence of such a program might have on the availability of medical beds at the institution.   It is also certain that any such program, given its small size, would be unlikely to afford the same range of treatment options that are provided in the larger DSH intermediate inpatient programs.

465.   I was very troubled by the fact that the three individuals I met who have been moved into the program so far had been waiting for more than two years in their regressed, isolative, very acutely mentally ill states without being referred and transferred to an inpatient care program.  Leaving these individuals to struggle with their extremely severe mental health conditions for two years or more without much more aggressive interventions much sooner is in my mind unconscionable.

466.   After interviewing the first three participants in the new program, I interviewed two individuals in the East Block housing unit for the condemned who were identified as needing the approximation of inpatient care provided by the new Specialized Care Program.  My understanding is that the plan is to move these individuals into the new space, although no timetable was provided concerning these movements.

467.   The first individual was Prisoner FFF.  Prisoner FFF is a transgender individual who has been receiving hormones but has not had sex re-assignment surgery, and the CDCR is apparently unwilling to provide such surgery.  As a result, Prisoner FFF is chronically suicidal.  She told me that her last serious suicide attempt was in January of 2013.  I asked how she spent her time in East Block, and she responded that she paces back and forth all day.  I also discussed the groups available on East Block with her.  She indicated that guards come around every day asking if people want to go to groups.  She said that she does not go to groups most of the time, in part because she doesn't know who will be in the groups on any given day.  She was also critical of the "therapeutic yard" provided, explaining that the only thing the recreational therapist does in the group is to turn on the radio during yard time.  She said that she spent 9 months in the acute psychiatric program at CMF in 2009 and that she has been to the acute APP program at CMF six times since arriving on death row in 2009.

468.   According to a mental health crisis bed discharge summary from December 30, 2012, she is diagnosed with Major Depression with Psychotic Features and Gender Identity Disorder.   At the time of her discharge on January 4, 2013, she was prescribed Haldol, Remeron, and Ativan.  The discharge form noted that Prisoner FFF's denial of

suicidal ideation upon discharge "appeared to be conditional, rather tentative, and not quite convincing."  She is currently on a *Keyhea* order for involuntary medication.  Her electronic medical record reflects the following dates for discharges from the CTC since 2010, presumably each time for suicidality:  January 4, 2013, November 27, 2012, October 29, 2012, May 7, 2012,  February 23, 2012, January 23, 2012, October 1, 2011, October 7, 2010, September 7, 2010, August 26, 2010, May 24, 2010, March 23, 2010, and February 14, 2010.   In my opinion, this prisoner is a chronically suicidal, high risk prisoner who needs to be housed at a higher level of care than what can be provided in East Block.  She should be receiving inpatient care, or at least MHCB care while awaiting transfer to inpatient care, and she should be provided with intermediate inpatient care for an extended period of time.

469.    The second individual I was able to interview was Prisoner GGG.  Prisoner GGG is a 56-year-old individual who told me that he has been on death row since 1970.  He told me that he does not know what EOP stands for and that he does not think he is in the mental health program.  He was very psychotic when I spoke with him.  He told me that he did not go to groups because he was concerned about the church, and proceeded to explain to me that East Block used to be church at one time.  At one point, he told me that he had been at San Quentin since he was 10 years old.  In his February 7, 2013 Treatment Plan, he is diagnosed with Schizophrenia, Disorganized Type, by History.  He is currently not taking any medications.  He is a chronically psychotic individual with evidence of cognitive impairments.  He needs a nursing home level of care.  He should not be housed in a unit such as East Block.

470.    I attempted to interview two other individuals housed in East Block who are chronic refusers that have been identified for eventual placement in the Specialized Care Program.  The first is Prisoner HHH and the second was Prisoner III.  Both individuals were too mentally ill, disorganized, and hostile to speak to us at any length.  Staff told me that Prisoner HHH screams all night long, raving, and keeping other prisoners awake.  They said that he showers but does not participate in any other programs.  They said he

[754904-2]

makes a lot of enemies with the other prisoners because of his inappropriate screaming. These individuals were both extremely mentally ill and in my opinion require inpatient level of care. They too should not be permitted to remain in a regular housing unit given the severity of their mental health symptoms.

471.   The experience of the individuals I interviewed on the condemned unit who require inpatient care makes clear that inpatient level of care treatment needs to be made available for individuals on death row, and the Department should not delay making such care available as soon as possible. In my opinion, the easiest way to accomplish that goal is to allow these individuals to program in the high custody level inpatient program at Salinas Valley.

**CONCLUSION**

472.   In conclusion, I would like to once again emphasize the high levels of clinical acuity among the patients I met during my recent tours. The patients with whom I spoke in the CDCR at the EOP, MHCB, and DSH level of care are among the sickest psychiatric patients I have ever seen in my career. Given the severity of their mental illness, it is exceedingly problematic that the EOP programs, designed as they are to keep very ill people safe and stable in a prison setting, are not meeting the *minimum* goals for treatment that the department itself set up years ago for this critical program.

473.   I was also very concerned about access to higher levels of care for these individuals, and about managing the high levels of suicidality among this population. It is critical that these individuals have prompt, barrier free access to MHCB units when they become suicidal, as well as quick access to long-term hospital based care when their symptoms are unable to be managed in a regular EOP program.

474.   I was also alarmed by the degree of psychiatric disability that I observed among the death row prisoners I interviewed. These individuals in the new Specialized Care Program were all very acutely mentally ill, and many of them had been left to suffer in very regressed, psychotic, and/or gravely disabled state with very little intervention for years at a time.

475.   I also was troubled by the problems with delivering care to EOP prisoners in administrative segregation.  This is a housing site that both causes and exacerbates mental illness.  The best thing clinically for many of the patients I saw would be to keep them out of these units.  In the event that such prisoners must be so housed, then their stays in these units need to limited, the levels of treatment provided in these units needs to increase, and welfare checks must be provided for all individuals in these units for their entire stays.

476.   **My Rate:**  I charge $450 per hour for time spent testifying, with a four hour minimum and a day rate of $4,000.

I do so declare, under penalty of perjury under the laws of the United States and of the State of California, that the foregoing is true and correct and that this Declaration was signed this 14th Day of March, 2013, at San Francisco, California.


Pablo Stewart, M.D.

EXPERT DECLARATION OF PABLO STEWART, M.D.

[754904-2]

# PHOTO APPENDIX TO DECLARATION OF PABLO STEWART

# Appendix A

LAC Building A-4, EOP Administrative Segregation, Photo of Front of Cell Showing Coverings Through Which Medication Distribution and Direct Observed Therapy of Medication is Conducted (Bates LAC 112).



LAC 112

# Appendix B and C

Therapist Offices In The EOP Administrative Segregation Unit in Building B-6 at RJ Donovan Correctional Institution (Bates RJD 7, RJD 8).



RJD   7



12  12:33PM

**RJD  8**

# Appendix D and E

Views of the Dayroom Floor from the Second Tier in the B-6 EOP Administrative Segregation Unit at RJD, Showing Relationship of Therapist Offices to Treatment Cages and Second Story Gunner Station/Control Station (Bates RJD 21, RJD 22).





# Appendix F and G

Photograph of Cages or "Treatment Modules" Used for Therapist-Patient Meetings in the EOP Administrative Segregation Unit at CSP-Los Angeles County, Building A-4 (Bates LAC 106, LAC 107).



LAC 106



LAC 107

# Appendix H, I and J

Photographs of "Standing" Cages Used in PSU and EOP ASU Housing Units at CSP-Sacramento to Hold Suicidal Prisoners for up to Four Hours Until Mental Health Staff Conduct an Initial Evaluation and Decide Whether to Place Them into an Alternative Placement for Suicide Watch or into an MHCB unit (Bates SAC 131, SAC 135, and SAC 148).



SAC 131

SAC 135



# Appendix K

Photograph of Standing Cage in the MHCB at SVSP Used for Suicidal Prisoners for up to Four Hours During the Day When the "Wet Cells" (Larger Holding Cells With Toilets) in the CTC Are Not Available Because They Are Being Used for Prisoners Waiting to be Seen in the Medical Clinic (Bates SVSP 47).



SVSP 47

# Appendix L, M, N and O

Photographs of Standing Cages Used for Evaluation Outside the CTC Treatment and Triage Area at RJ Donovan Correctional Institution (and Actually Outdoors) (Bates RJD 3, RJD 4, RJD 5 and RJD 6).



12  12:17PM

RJD  3

# HOLDING TANK LOGS

TO START A HOLDING TANK LOG OR NOT TO START
A HOLDING TANK LOG... THAT IS THE QUESTION??

The inmate is placed in a tank waiting for a routine
scheduled appointment.  NO LOG

The inmate is waiting to be escorted back to the
facility.  NO LOG

The inmate was involved in a fight on the Plaza and
placed in the holding tank for security and/or 7219.
YES, start a LOG

The inmate is waiting to be evaluated by a Clinician
due to crisis care issues.  YES, start a LOG and
REQUIRES direct 1 on 1 observation

The inmate is waiting to be housed in a Mental Health
Crisis Bed. YES, start a LOG and REQUIRES direct 1
on 1 observation

When starting a LOG, it's started at the time he is
placed in the Holding Tank.

HOLDING TANK LOGS ARE LOCATED IN THE TTA.
WHEN IN DOUBT, TALK TO THE TTA SERGEANT

For a better understanding of this policy, refer to
RJDCF Operational Procedure #126.

RJD



RJD   5



# Appendix P

Photograph of SVSP Holding Cells in CTC Used as Alternative Placements (Bates SVSP 48).



SVSP 48

# Appendix Q

Photograph of CSP-Sacramento Unlicensed MHCB or "MHCBU" Unit Located in Standard 180-Design Level IV Housing Unit Pod (Bates SAC 137).

# Appendix R and S

Photographs of "ZZ Cells" Outside The Main Entrance to the CSP-SAC MHCB Unit, Which Are Used As Alternative Placements for Suicidal Prisoners (Bates SAC 116 and SAC 118).

SAC 116

SAC 118

# Appendix T

Photograph of Sign on Door of ZZ Cell at CSP-Sacramento Instructing Staff Members Not to Speak to Suicidal Prisoners (Bates SAC 120).



SAC 120

# Appendix U and V

Photographs of Administrative Segregation Cell Used As Alternative Placement For Suicidal Prisoners at CSP-Los Angeles County – Cell 121 in the Building A-4 EOP Administrative Segregation Unit (Bates LAC 108, and LAC 110).





LAC 110

# Appendix W

Photograph of Administrative Segregation Cell Used As Alternative Placement For Suicidal Prisoners at CSP-Los Angeles – Cell 122 in the A-4 EOP Administrative Segregation Unit (Bates LAC 111).



LAC 111

# Appendix X

Photograph of Cells Used As Alternative Holding Cells for Suicidal Prisoners at CSP-Lancaster in the Building D-1 Mainline EOP Building – Cells 102 and 103 (Bates LAC 121).



LAC 121

# Appendix Y and Z

Photographs of "Alternative Placement" for Suicidal Prisoners, Holding Cells in the CTC Treatment and Triage Area at RJ Donovan Correctional Institution (Bates RJD 1 and 2).



RJD 1



# Appendix AA and BB

Photographs of Intake/Alternative Placement Cells Used for Suicide Watch in the B-6 EOP Administrative Segregation Unit at RJ Donovan (Bates RJD 13 and 14).





# Appendix
# CC, DD, EE, and FF

Photographs of B-Yard Contraband Cells Used for Alternative Placements at CSP-Sacramento.  The photograph Bates-stamped SAC 152 shows unsafe hanging risk features on the ceiling of one of the cells (Bates SAC 150, SAC 151, SAC 152 and SAC 153).



SAC   150

**SAC   151**



SAC   152

SAC   153

# Appendix GG

Photograph of a CSP-Los Angeles County Mainline EOP Treatment Group In Progress on D-Yard on February 1, 2013, Showing TV on and Participant Reading a Magazine (Bates LAC 124).



LAC 124

# Appendix HH and II

Photographs of Salinas Valley State Prison EOP Administrative Segregation Group Treatment Rooms Showing Cages (or "Therapeutic Modules") Arranged in a Straight Line in Front of the Television, A Configuration Impeding Group Activities (Bates SVSP 63 and SVSP 65).



SVSP 63



SVSP 65

# Appendix JJ, KK and LL

Photographs of Treatment Cages in Crescent Formation on Dayroom Floor of the EOP Administrative Segregation Building at RJ Donovan Correctional Institution (Bates RJD 16, RJD 18, and RJD 19).



12  12:52PM

RJD  15



RJD 18



RJN 19

# Appendix
# MM, NN, OO, and PP

Photographs of Treatment Cages in Crescent Formation on Dayroom Floor of the EOP Administrative Segregation Building at CSP-Los Angeles County Building A-4 (Bates LAC 100, LAC 101, LAC 102, and LAC 103).



LAC 100



LAC 101



LAC 102



LAC 103

# Appendix QQ and RR

Photographs of the Two Visiting Rooms used for Mainline EOP Groups for the Mainline EOP Program on D-Yard at CSP-Los Angeles County (Bates LAC 119, and LAC 120)



LAC 119



LAC 120

# Appendix SS and TT

Photographs of the C-Facility at CSP-Los Angeles County, which is Currently Used as a Treatment Space for SNY EOP Groups (Using Benches in the Corner of the Photograph (Bates LAC 136, and LAC 137)



LAC 136



LAC 137

# Appendix UU and VV

Photographs of Treatment Rooms in the 64-Bed Intermediate Inpatient Care Hospital at SVPP (Bates SVSP 58, and SVSP 59)



SVSP 58



# Appendix WW and XX

Photographs of Treatment Spaces on the Dayroom Floor of the Temporary ICF Program in Buildings C-5 and C-6 at SVPP (Bates SVSP 61, and SVSP 62)



SVSP 61



SVSP 62

# EXHIBIT A TO THE DECLARATION OF PABLO STEWART

CURRICULUM VITAE

**PABLO STEWART, M.D.**
**824 Ashbury Street**
**San Francisco, California 94117**
**(415) 753-0321; fax (415) 753-5479; e-mail: pab4emi@aol.com**
**(Updated  January 2013)**

EDUCATION: University of California School of Medicine, San Francisco, California, M.D., 1982

United States Naval Academy Annapolis, MD, B.S. 1973, Major: Chemistry

LICENSURE: California Medical License #GO50899
Hawai'i Medical License #MD11784
Federal Drug Enforcement Agency #BS0546981
Diplomate in Psychiatry, American Board of
Psychiatry and Neurology, Certificate #32564

ACADEMIC APPOINTMENTS:

September 2006- Present | Academic Appointment: Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine.

July 1995 - August 2006 | Academic Appointment: Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine.

August 1989 - June 1995 | Academic Appointment: Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine.

August 1986 - July 1989 | Academic Appointment: Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine.

EMPLOYMENT:

December 1996- Present | Psychiatric Consultant
Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues; extensive experience in all phases of capital litigation.

1

| | |
|---|---|
| January 1997-<br>September 1998 | <u>Director of Clinical Services, San Francisco Target Cities</u><br><u>Project</u>.  Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court   Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | <u>Medical Director, Comprehensive Homeless Center,</u><br><u>Department of Veterans Affairs Medical Center, San Francisco.</u><br>Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | <u>Chief, Intensive Psychiatric Community Care Program,</u><br><u>(IPCC) Department of Veterans Affairs Medical Center, San</u><br><u>Francisco.</u>  Overall clinical/administrative responsibility for the IPCC, a community based case management program.  Duties also include   medical/psychiatric   consultation   to   Veteran Comprehensive Homeless Center.  This is a social work managed program that provides comprehensive social services to homeless veterans. |
| April 1991 -<br>February 1995 | <u>Chief, Substance Abuse Inpatient Unit, (SAIU), Department</u><br><u>of Veterans Affairs Medical Center, San Francisco.</u><br>Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | <u>Psychiatrist, Substance Abuse Inpatient Unit, Veterans</u><br><u>Affairs Medical Center, San Francisco.</u>  Clinical responsibility for patients   admitted   to   SAIU.   Provide   consultation   to   the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | <u>Director, Forensic Psychiatric Services, City and County of</u><br><u>San  Francisco.</u>   Administrative  and  clinical  responsibility  for psychiatric services provided to the inmate population of San Francisco.   Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | <u>Senior Attending Psychiatrist, Forensic Unit, University of</u><br><u>California, San Francisco General Hospital.</u>  Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward.  Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward. Liaison with Jail Psychiatric Services, City and County of San Francisco.   Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |

| | |
|---|---|
| July 1985<br>June 1986 | <u>Chief Resident, Department of Psychiatry, University of</u><br><u>California</u> <u>San Francisco General Hospital.</u>  Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second year medical students. |
| July 1984 -<br>March 1987 | <u>Physician Specialist, Westside Crisis Center, San Francisco,</u><br><u>CA.</u>  Responsibility for Crisis Center operations during assigned shifts; admitting privileges at Mount Zion Hospital.  Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 -<br>July 1985 | <u>Psychiatric Consultant, Marin Alternative Treatment, (ACT).</u><br>Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 -<br>November 1984 | <u>Physician Specialist, Mission Mental Health Crisis Center,</u><br><u>San Francisco, CA.</u>  Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982-<br>July 1985 | <u>Psychiatric Resident, University of California, San Francisco.</u><br>Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | <u>Infantry Officer - United States Marine Corps.</u><br>Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Commander of a Vietnamese Refugee Camp.  Received an Honorable Discharge.  Highest rank attained was Captain. |

HONORS AND AWARDS:

| | |
|---|---|
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award For Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident.  The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship.  One of sixteen nation-wide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry.   Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>May 2008 | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 - | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 -<br>January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000-<br>April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001-<br>Present | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002-<br>June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003-<br>April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003-<br>January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |
| February 2004-<br>June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004-<br>January 2006 | Member of Human Services Commission, City and County of San Francisco. |

| | |
|---|---|
| February 2006-<br>January 2007 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007-<br>Present | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing.  Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine.  Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine.   Duties included screening applications and interviewing candidates for medical school. |
| October 1978 -<br>December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic.<br>Provided free instruction to the public on proper methods of exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| | |
|---|---|
| July 2003-<br>Present | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| September 2001-<br>June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| January 2002-<br>January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| April 1999-<br>April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998-<br>June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 -<br>November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| March 1995-<br>Present | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 -<br>June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 -<br>February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 -<br>June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 -<br>February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |

| | |
|---|---|
| September 1990 -<br>November 1996 | Off ward supervisor, PGY II psychiatric residents,<br>Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical<br>Center. |
| September 1990 -<br>June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU),<br>San Francisco Veterans Affairs Medical Center. |
| September 1990 -<br>June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans<br>Affairs Medical Center. |
| September 1989 -<br>November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 -<br>June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight<br>Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 -<br>Present | Tavistock Organizational Consultant.<br>Extensive experience as a consultant in numerous Tavistock<br>conferences. |
| September 1987 -<br>December 1993 | Course Coordinator of Elective Course, University of<br>California, San Francisco, School of Medicine.  Designed, planned<br>and taught course, Psychiatry 170.02, "Alcoholism".  This is a 1-<br>unit course offered to medical students, which covers alcoholism<br>with special emphasis on the health professional.  This course is<br>offered fall quarter each academic year. |
| July 1987-<br>June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco<br>General Hospital and Veterans Affairs Medical Center. |
| July 1986 -<br>June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 -<br>August 1990 | Clinical supervisor, Psychology interns/fellows,<br>San Francisco General Hospital. |
| July 1986 -<br>August 1990 | Clinical supervisor PGY I psychiatric residents,<br>San Francisco General Hospital |
| July 1986 -<br>August 1990 | Coordinator of Medical Student Education, University of<br>California, San Francisco General Hospital,  Department of<br>Psychiatry.  Teach seminars and supervise clerkships to medical<br>students including: Psychological Core of Medicine 100 A/B;<br>Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric<br>Clerkship 110 and Advanced Clinical Clerkship in Psychiatry<br>141.01. |
| July 1985 -<br>August 1990 | Psychiatric Consultant to the General Medical Clinic,<br>University of California, San Francisco General Hospital.  Teach<br>and supervise medical residents in interviewing and<br>communication skills.  Provide instruction to the clinic on the<br>psychiatric aspects of ambulatory medical care. |

COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK:

| | |
|---|---|
| October 2007<br>-Present | Plaintiffs' expert in 2007-2010 overcrowding litigation and in opposing current efforts by defendants to terminate the injunctive relief in *Coleman v. Brown,* United States District Court, Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM.  The Litigation involves plaintiffs' claim that overcrowding is causing unconstitutional medical and mental health care in the California state prison system. Plaintiffs won an order requiring the state to reduce its population by approximately 45,000 state prisoners.  My expert opinion was cited several times in the landmark United States Supreme Court decision upholding the prison population reduction order.  *See Plata v. Brown,* ___ U.S. ___, 131 S. Ct. 1910, at 1933, n.6, and at 1935, 179 L. Ed. 2d 969, at 992, n. 6, and at 994 (2011). |
| July/August 2008 | Plaintiff psychiatric expert in the case of Fred Graves, et al., plaintiffs v. Joseph Arpaio, et al., defendants (District Court, Phoenix, Arizona.)  This case involved Federal oversight of the mental health treatment provided to pre-trial detainees in the Maricopa County Jails. |
| February 2006-<br>December 2009 | Board of Directors, Physician Foundation at California Pacific Medical Center. |
| June 2004-<br>September 2012 | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-<br>June 2008 | Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services. |
| June 2003-<br>December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD).  This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit. |
| October 2002-<br>August 2006 | Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section. |
| July 1998-<br>June 2000 | Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project.  This Project provides assistance to programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities. |
| July 1998-<br>February 2004 | Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities.  NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, |

critical mental health, medical and educational services, and treatment programs.  NCCD ceased to be the monitoring agency for this project in June 1999.  At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency.  The work remained unchanged.

| | |
|---|---|
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign Against Drug Abuse (SF CADA). |
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer Center (ATTC), University of California, San Diego. |
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines. |
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic. Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.  Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996-<br>July 1997 | Psychiatric Expert for the U. S. Federal Court in the case of Madrid v. Gomez.  Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 -<br>January 2000 | Psychiatric Expert for the U.S. Federal Court in the case of Gates v. Deukmejian.  Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 -<br>December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.  Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues.  Special emphasis on dual diagnostic patients. |
| July -<br>December 1981 | Medical/Psychiatric Consultant, Youth Services, Hospitality Hospitality House, San Francisco, CA.  Advised youth services staff on client management.  Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 - June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 - Present | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| June 1991- June 1994 | Board of Directors, Pacific Primary School, San Francisco, CA. |
| April 1989 - July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 - May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

PRESENTATIONS:

1.  San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1. (10/12/1990). "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.  Grand Rounds. Department of Psychiatry, University of California, San Francisco, School of Medicine. (12/5/1990). "Advances in the Field of Dual Diagnosis."

3.  Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference. (3/3/1991). "Planning a Satisfying Life in Medicine."

4.  24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California. (9/11/1991). "The Chronically Ill Substance Abuser."

5.  Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6.  Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.  First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.  American Group Psychotherapy Association Annual Meeting. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9.  Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10. University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11. American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

12. Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13. Utah Medical Association Annual Meeting. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14. Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15. Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16. University of California, San Diego. Addiction Technology Transfer Center Annual Summer Clinical Institute: (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98). "Treating Multiple Disorders."

17. National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists. (9/10/94). "Psychiatry, Homelessness, and Serious Mental Illness."

18. Value Behavioral Health/American Psychiatry Management Seminar. (12/1/1994). "Substance Abuse/Dual Diagnosis in the Work Setting."

19. Grand Rounds. Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry. (1/24/1995). "Models of Addiction."

20. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project. (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01). "Demystifying Dual Diagnosis."

21. First Annual Conference on the Dually Disordered. (3/10/1995). "Assessment of Substance Abuse." Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22. Delta Memorial Hospital, Antioch, California, Medical Staff Conference. (3/28/1995). "Dealing with the Alcohol and Drug Dependent Patient." Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23. Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada. (11/23/95). "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24. The Labor and Employment Section of the State Bar of California. (1/19/96). "Understanding Alcoholism and its Impact on the Legal Profession." MCCE Conference, San Francisco, CA.

25.     American Group Psychotherapy Association, Annual Training Institute.  (2/13-2/14/96), National Instructor - Designate training group.

26.     American Group Psychotherapy Association, Annual Meeting.  (2/10/96).  "The Process Group at Work."

27.     Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28.     International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe".  (10/5-10/11/96)

29.     Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client".  (11/14/96)

30.     Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery".  (11/22/96)

31.     Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32.     Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33.     DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California.  (7/31/97)

34.     The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender".  Wilsonville, Oregon. (8/1/97)

35.     The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California.  (2/12/98)

36.     American Group Psychotherapy Association, Annual Training Institute, (2/16-2/28/1998), Intermediate Level Process Group Leader.

37.     "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience."  The Haight Ashbury Free Clinics Inc., in conjunction sponsored this seminar with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis. San Francisco, California.  (3/6-3/8/1998)

38.     "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection."  The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39.     Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40.     Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

41.     Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42.     "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer." The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference. San Rafael, California. (6/20/1998)

43.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44.     Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45.     "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46.     9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues and Pain Management for Chemically Dependent Patients." San Francisco, CA. (9/10/98)

47.     Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000." "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA. (9/18/98)

48.     Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder." Napa, CA. (9/23/98)

49.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA. (9/30/98)

50.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA. (10/13/98)

51.     California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA. (10/15/98)

52.     California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel. (10/15/98)

53.     Northwest GTA Health Corporation, PEEL MEMORIAL HOSPITAL, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada.  (10/23/98)

54.     1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA.  (12/11/98)

55.     "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA.  (1/7/99)

56.     Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder."  (1/19/99)

57.     "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA.  (1/22 & 2/5/99)

58.     Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High Risk Offender."  (2/17/99)

59.     American Group Psychotherapy Association, Annual Training Institute, (2/22-2/24/1999).  Entry Level Process Group Leader.

60.     "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii.  (3/5 & 3/6/99)

61.     "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA.  (3/10/99)

62.     "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA.  (3/11/99)

63.     "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA.  (3/17/99)

64.     Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i.  Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies.  Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility.  (4/2-4/9/99)

65.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA.  (4/14/99)

66.     "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA.  (4/21/99)

67.     California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California.  (4/29/99)

68.     "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i.  (4/30/99)

69.     State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital."  Honolulu, Hawai'i.  (4/30/99)

70.     "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i.  (4/30/99)

71.     11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Concord, California.  (5/6/99)

72.     The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Escondido, California.  (5/7/99)

73.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California.  (5/13/99)

74.     "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", Third annual conference presented by the Southern California Mental Health Directors Association.  Anaheim, California.  (5/21/99)

75.     15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho.  (5/25/99)

76.     "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California.  (6/3/99)

77.     "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan.  (6/14/99)

78.     "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan.  (6/17/99)

79.     "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan.  (6/26/99)

81.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California.  (7/13/99)

82.     "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California.  (7/15/99)

83.   "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84.   1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry.  Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness.  What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California.  (8/3/99)

85.   "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center.  Kahului, Maui.  (8/23/99)

86.   "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California.  (9/13/99)

87.   "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California.  (9/14/99)

88.   "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California.  (9/16/99)

89.   "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California.  (9/23/99)

90.   "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona.  (9/28/99)

91.   "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i.  (10/8-10/10/99)

92.   "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California.  (10/12/99)

93.   "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California.  (10/14/99)

94.   "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California.  (10/21/99)

95.   "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California.  (1/27/00)

96.   "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California.  (3/6/00)

97.   "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California.  (3/16/00)

98.   "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California.  (3/17/00)

99.     "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California.  (4/3/00)

100.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California.  (4/4-4/5/00)

101.    "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California.  (5/15/00)

102.    National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California.  "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.    "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California.  (6/9/00)

104.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunderoad Adolescent Treatment Centers, Inc., Oakland, California.  (6/29 & 7/27/00)

105.    "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California.  (9/8/00)

106.     "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California.  (9/9/00)

107.    Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey.  "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108.    "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.  (11/1/00, 3/13/01)

109.    "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110.    "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California.  (12/5/00)

111.    "Wasn't One Problem Enough?"   Mental Health and Substance Abuse Issues. 2001California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California.  (3/2/01)

112.    "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process."  County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California.  (3/8 & 4/5/01)

113.    "Assessment of the Patient with Substance Abuse and Mental Health Issues."  San Mateo County General Hospital Grand Rounds.  San Mateo, California.  (3/13/01)

114.  "Dual Diagnosis-Assessment and treatment Issues." Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California. (5/8/01)

115.  Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California. (5/10/01)

116.  National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice." I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol. New Orleans, LA. (6/1-6/2/01)

117.  Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California. (6/15/01)

118.  Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington. (11/15/01)

119.  The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California. (4/25/02)

120.  Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

121.  3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System." (6/5/02)

122.  New Mexico Department of Corrections, "Group Psychotherapy Training." Santa Fe, New Mexico. (8/5/02)

123.  Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California. (8/15/02)

124.  California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California. (8/22/02)

125.  San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

126.  First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas." El Centro, California. (1/28/02)

127.  Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128.  Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129.  "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (10/1/03), (12/3/03)

130.   "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California.  (10/18/03)

131.   "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section.  Pasadena, California.  (4/2/04)

132.   Lecture tour of Japan (4/8-4/18/04).  "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133.   San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis."  (9/9/04)

134.   "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section.  Sacramento, California.  (4/8/05)

135.   "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University.  San Francisco, California. (8/13/05)

136.   Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse."  San Francisco, California. (10/24/05)

137.   Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse."  Woodland, California. (1/25/06), (6/23/06)

138.   "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.   Lecture tour of Japan (4/13-4/23/06).  "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness."  Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.   "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference.  Sacramento, California. (4/25/06)

141.   "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.   "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference.  Sacramento, California. (4/27/07)

143.   "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network.  Medford, Oregon.  (5/10/07)

144.   "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar.  San Francisco, California.  (8/2/07)

145.   "Capital Punishment," Human Writes 2007 Conference.  London, England.  (10/6/07)

146.   "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California.  (10/30/07)

147. "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference.  San Diego, California. (12/13/07)

148. "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada.  (4/10/08)

149. "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program.  Chelan, Washington.  (6/3/08)

150. "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference.  Burlingame, California.  (6/19/08)

151. Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152. 2010 B. E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th.)

153. Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA.  This conference was designed to assist the Federal Court to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154. Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court.  San Francisco, California. (1/12/2011 & 1/25/12)

155. 2011 B. E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th.)

156. 2012 B. E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd.)

PUBLICATIONS:

1) Kanas, N., Stewart, P. and Haney, K. (1988). *Content and outcome in a short-term therapy group for schizophrenic outpatients*.  Hospital and Community Psychiatry, 39, 437-439.

2) Kanas, N., Stewart, P. (1989*). Group process in short-term outpatient therapy groups for schizophrenics.*  Group, Volume 13, Number 2, Summer 1989.

3) Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.*  Journal of Psychoactive Drugs, Vol. 23(4) Oct-Dec 1991, 387395.

4)   Banys, P., Clark, W.H., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal.* Journal of Substance Abuse Treatment, Vol 11(1), 9-15.

5)   Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, W.H., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* The Journal of Nervous and Mental Disease, Vol 182(10), 570-575.

6)   Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W. O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trail Of Tyrosine for Cocaine Dependence.* Journal of Psychoactive Drugs, Vol. 28(3), July-September 1996

7)   Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999

8)   Stewart, P. (1999). *New Approaches and Future Strategies Toward Understanding Substance Abuse.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)   Stewart, P. (2002). *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. By Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)  Stewart, P., Inaba, D.S., and Cohen, W.E.  (2004). *Mental Health & Drugs.*  Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11)  James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* National Institute of Corrections, Accession Number 019468.

12)  Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13)  Stewart, P., Inaba, D.S., and Cohen, W.E.  (2007). *Mental Health & Drugs.*  Chapter in the book, *Uppers, Downers, All Arounders, Sixth Edition*, CNS Publications, Inc., Ashland, Oregon

14)  Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Seventh Edition,* CNS Publications, Inc., Ashland, Oregon

EXHIBIT B TO THE DECLARATION OF
PABLO STEWART

**EXHIBIT B TO THE DECLARATION OF PABLO STEWART**

| DOCUMENTS |
|---|
| eUHRs of SVSP Prisoners Printed at SQ (Copies of printouts retained by CDCR) |
| eUHRs of LAC Prisoners Printed at SQ (Copies of printouts retained by CDCR) |
| eUHRs of SAC Prisoners Printed at SQ (Copies of printouts retained by CDCR) |
| eUHRs of RJD Prisoners Printed at SQ (Copies of printouts retained by CDCR) |
| eUHRs of SQ Prisoners Printed at SQ (Copies of printouts retained by CDCR) |
| SQ site inspection documents, provided by Defs at and after tour |
| SQ site photos provided by Defs |
| RJD site inspection documents, provided by Defs at and after tour |
| RJD site photos provided by Defs |
| SAC site inspection documents, provided by Defs at and after tour |
| SAC site photos provided by Defs |
| LAC site inspection documents, provided by Defs at and after tour |
| LAC site photos provided by Defs |
| SVSP site inspection documents, provided by Defs at and after tour |
| SVSP site photos provided by Defs |
| 2-18-13 Deposition of Lindsay Hayes, w/ exhibits |
| 2-13-13 Deposition of Jacqueline Moore, w/ exhibits |
| 3-5-13 Deposition of Jeffrey Beard, w/ exhibits |
| 2-27-13 Deposition of Joel Dvoskin, w/ exhibits |
| 3-1-13 Deposition of John Brim, w/ exhibits |
| Lindsay Hayes Notes received 2-5-13 |
| Lindsay Hayes Contract & Invoices received 2-5-13 |
| Lindsay Hayes Emails received 2-5-13 |
| Lindsay Hayes 8-16-11 report received 2-5-13 |
| Lindsay Hayes 8-16-11 redacted report received 2-5-13 |
| Lindsay Hayes 1-30-11 report received 2-5-13 |
| Lindsay Hayes CV received 2-5-13 |
| Activation schedule and cover letter from Defs to Special Master, 1-2-13 |
| Undated Photos of LAC Dorm Bunks |
| Coleman Order: Dkt 4044, 7-21-11 |
| Coleman Order: Dkt 4125, 12-05-11 |
| Coleman Order: Dkt 4199, 6-15-12 |
| Coleman Order: Dkt 3929, 10-5-10 |
| Coleman Order: Dkt 3911, 9-13-10 |
| Coleman Order: Dkt, 3761, 1-4-10 |
| Coleman Order: Dkt 3744. 12-08-09 |
| Coleman Order: Dkt 3865. 6-21-10 |
| Coleman: Supplemental Expert Report of Stewart, Dkt 3221, 10-30-08 |

| |
|---|
| Coleman: Expert Report of Stewart, Dkt 3217, 10-38-08 |
| Coleman: Dkt 3217, 10-30-08 |
| Coleman: Expert Report of Haney Dkt 3201, 10-30-08 |
| Coleman: Special Master's Report on Completed Suicides 2011 Dkt 4307 1-25-13 |
| Coleman: Patterson Report on Completed Suicides 2011 Dkt 4308 1-25-13 |
| 25th Round Management Reports for: ASP, CAL, CCC, CCI. CCWF, CEN, CIM, CIW, CMC, CMF, COR, CRC, CTF, CVSP, DVI, FOL, HDSP, ISP, KVSP, LAC, MCSP, NKSP, PBSP, PVSP, RJD, SAC, SATF, SCC, SOL, SQ, SVSP, VSPW and WSP |
| Exibit V to 25th Round Management Report: Individual Studies, RJD, Dkt. 4298, 1-18-13 |
| Exibit L to 24th Round Management Report: Individual Studies, RJD, Dkt. 4205, 7-2-12 |
| Monthly Report of Federal Receiver's Turnaround Plan of Action, 2-29-12 |
| Monthly DSH Bed Utilization Data for November and cover letter, 12-17-12 |
| Monthly Stat Report Excerpt - MH Program Clinical Hire Tracking 8-27-07 to 9-12-08 |
| Monthly Stat Report Excerpt - MH Program Clinical Hire Tracking 8-27-07 to 7-1-12 |
| Monthly Stat Report Excerpt - MH Program Clinical Hire Tracking 8-27-07 to 7-1-12 |
| Monthly Stat Report Excerpt - MH Program Clinical Hire Tracking 8-27-07 to 7-14-08 |
| Monthly Stat Report Excerpt - MH Program Clinical Hire Tracking 8-27-07 to 12-1-12 |
| Monthly Stat Report Excerpt – LAC and SVSP Staffing Summary as of November 2012 |
| Monthly Stat Report Excerpt – LAC and SVSP Staffing Summary as of June 2012 |
| Monthly Stat Report Excerpt – SQ Staffing Summary, Most Current Available |
| Monthly Stat Report Excerpt – RJD Staffing Summary, Most Current Available |
| Monthly Stat Report Excerpt – SVSP Staffing Summary as of August 2008 |
| Monthly Stat Report Excerpt – May 2012 MHSDS MIS Report and Cover Letter dated 7-3-12 |
| Monthly State Report Excerpt – April 2012 Census data and Cover Letter dated 6-4-12 |
| Monthly Stat Report Excerpt – Enclosure 9 October 2007 and Cover letter dated 2-26-08 |
| Monthly Stat Report Excerpt – Enclosure 9 Nov. 2007 and Cover letter dated 2-26-08 |
| Monthly Stat Report – August, 2008 and Cover Letter dated 9-30-08 |
| Monthly Stat Report – June 2012 and Cover Letter dated 8-3-12 |
| Monthly Stat Report – November, 2012 and Cover Letter dated 1-3-13 |
| CDCR OISB Weekly Population Report as of 7-23-08, dated 7-28-08 |
| CDCR OISB Weekly Population Report as of 5-2-12, dated 5-7-12 |
| CDCR OISB Weekly Population Report as of 1-9-13, dated 1-14-13 |
| CDCR OISB Weekly Population Report as of 7-23-08, dated 7-28-08 |
| CDCR OISB Weekly Population Report excerpt as of 5-16-12, excerpt undated |
| Other Weekly, Monthly and Annual System Wide and Institution Specific Staffing, Clinical Hire and MH Population Data as Appropriate. |
| Chart: Suicide Resistant Beds at Statewide MHCB Cells, 6-27-12 |
| 8-29-12 Letter re Suicide Resistant Beds at Statewide MHCB |
| Special Master Report on 24th Round Monitoring, Dkt 4205, 7-2-12 |
| Special Master Report on 25th Round Monitoring, Dkt 4298, 1-18-13 |
| Photos of SVSP from 2008 and Present |

| |
|---|
| Excerpts from Dkt 4278, 1-7-13 |
| CDCR Today Press Release re Prison Homicide, 9-18-12 |
| COMPSTAT SVSP DAI Statistical Report – 13 Month Analysis as of 1-11-13 |
| COMPSTAT LAC DAI Statistical Report – 13 Month Analysis as of 1-11-13 |
| COMPSTAT RJD DAI Statistical Report – 13 Month Analysis as of 1-11-13 |
| COMPSTAT SAC DAI Statistical Report – 13 Month Analysis as of 1-11-13 |
| Monthly Report on Licensure of Intermediate Care Treatment Programs and Cover Letter dated 6-1-12 |
| Monthly Report on Licensure of Intermediate Care Treatment Programs and Cover Letter dated 1-2-13 |
| Monthly Staffing and Vacancy Report for DSH and Cover Letter dated 12-19-12 |
| Monthly Staffing and Vacancy Report for DMH and Cover Letter dated 6-26-12 |
| Monthly Staffing and Vacancy Report for DSH and Cover Letter dated 12-19-12 |
| 3-15-11 CDCR Memorandum re: MHCB Use of Mechanical Restraints and Escort Policies. |
| Transcript of Deposition of Pablo Stewart, 9-18-08 |
| Pulitzer/Bogard & Assoc.: CDCR Prison Capacity Planning, final report. 10/3/11 |
| CDCR Division of Correctional Health Care Services: Mental Health Services Delivery System Program Guide, 2009 Revision |
| 6/18/12 e-mail from Robert Canning to Lindsey Hayes |
| Excerpts from Defendants' Trial Exhibit X.1338, California Department of Corrections, Final Report, Mental Health Services Delivery System Study, February 16, 1993 |
| January 23, 2012 Letter to SVPP Executive Director Charles DeSilva, at 1-2 and February 12, 2013 Letter |
| DSH Monthly Staffing and Staffing Vacancies Report as of January 1, 2013, provided by Debbie Vorous to the Coleman parties on February 15, 2013 |
| Staffing data for SVSP on May 21-22, 2012 |
| Staffing data for CSP-Sacramento for February 29-March 1, 2012 |
| Staffing data for CSP-Los Angeles County (CSP-LAC) for May 3-4, |
| Staffing data for RJ Donovan State Prison (RJD) on March 28-29, 2012 |
| Staffing data for San Quentin State Prison (SQ) on May 23-24, 2012 |
| January 10, 2012 Executive Summary of Nazari Suicide Report |
| Nazari QIP documents, including February 2, 2012 Memo to Shama Chaiken |
| RJD Medication Management MAPIP Data |
| RJD Medication Management MAR Audit Data |
| AIMS testing (2 pages) for Inmate |
| CDCR 2010 CDCR Internal Suicide Report by Dr. Canning, DEXP 103750-106778. |
| Excel Spreadsheet sorted for RJD covering alternative placements at RJD from May 18, 2012 through December 27, 2012. |
| CSP-Sacramento Logs of Alternative Placements |
| Summary of Cases in Alternative Housing Produced by Defendants |

| |
|---|
| Excel Spreadsheet Sorted for LAC Covering Alternative Placements from May 18, 2012 through December 27, 2012 at CSP-Los Angeles County. |
| Excel Spreadsheet sorted for CSP-Sacramento covering alternative placements in the same period. |
| Excel Spreadsheet sorted for San Quentin covering alternative placements at RJD from May 18, 2012 through December 27, 2012.  Cases highlighted in red lasted longer than 24 hours. |
| E-mails Regarding SRE Mentor Training Program at CSP-Sacramento (Exhibits 12 and 13 to Beard Depo) |
| E-mail from Rachel Chen to Kathleen O'Meara Regarding SRE training at San Quentin, dated February 4, 2013 and excel spreadsheet |
| Dr. Scott notes on SVSP staffing issues (DEXP 110940-110941) |
| Dr. Canning January 25, 2013 Report: CDCR Suicides:  Results of Recent Analyses and Spreadsheet Excepts and Tables |
| ACA Wellness Check Standards |
| February 1, 2013 Monthly Report on Licensure of Intermediate Care Treatment Programs |
| February 19, 2013 Summary of Inter-Institutional Mental Health Crisis Bed Referrals and Transfers for January 2013 |
| List of Individuals waiting to Transfer to DSH programs provided by CSP-Los Angeles County |
| Mohamedu Jones Email Monday March 04, 2013 at 7:00 am |
| SVSP: Initial Inmate Death Report, DOD 11-20-12 |
| SVSP: Executive Summary and Suicide Report, DOD 12-17-11 |
| SVSP: Suicide Notification, DOD 10-25-12 |
| SVSP: Suicide Notification, DOD 9-17-12 |
| SVSP: Executive Summary and Suicide Report, DOD 5-7-10 |
| SVSP: Executive Summary and Suicide Report, DOD 11-5-10 |
| SVSP: Executive Summary and Suicide Report, DOD 10-30-10 |
| SVSP: Executive Summary and Suicide Report, DOD 9-5-10 |
| SVSP: Executive Summary and Suicide Report, DOD 3-20-10 |
| SVSP: Executive Summary and Suicide Report, DOD 8-12-12 |
| SVSP: Executive Summary and Suicide Report, DOD 12-6-11 |
| SVSP: Initial Inmate Death Report, DOD 12-2-12 |
| SVSP: Report on Implementation of QIP for Inmate Suicide, DOD 11-5-10 |
| SVSP: Report on Implementation of QIP for Inmate Suicide, DOD 9-5-10 |
| SVSP: Report on Implementation of QIP for Inmate Suicide, DOD 3-20-12 |
| SVSP: Report on Implementation of QIP for Inmate Suicide, DOD 10-30-10 |
| SVSP: Initial Inmate Death Report, DOD 11-29-12 |
| SVSP: Crime/Incident Report, DOD 11-20-12 |
| SVSP: Crime/Incident Report, DOD 10-25-12 |
| SVSP: Crime/Incident Report, DOD 9-17-12 |
| SVSP: Autopsy Report, DOD 9-5-10 |

| |
|---|
| SVSP: Coroner's Report, DOD 10-30-10 |
| SVSP: Crime/Incident Report, DOD 12-2-12 |
| SVSP: Coroner's Report, DOD 9-5-10 |
| SVSP: Inmate Movement History, DOD 11-20-12 |
| SVSP: Inmate Movement History, DOD 10-25-12 |
| SVSP: Crime/Incident Report, DOD 9-17-12 |
| SVSP: Coroner's  Report, DOD 9-5-10 |
| SVSP: Inmate Movement History, DOD 10-25-12 |
| SVSP: Inmate Movement History, DOD 9-17-12 |
| SVSP: Inmate Movement History, DOD 12-2-12 |
| SVSP: Coroner's  Report, DOD 9-17-12 |
| SVSP: Coroner's  Report, DOD 11-5-10 |
| SVSP: Coroner's  Report, DOD 12-17-11 |
| SVSP: Coroner's  Report, DOD 8-12-12 |
| SVSP: Coroner's  Report, DOD 3-20-12 |
| SVSP: Coroner's  Report, DOD 12-6-11 |
| SVSP: Report on Implementation of QIP for Inmate Suicide, DOD 3-7-10 |
| SVSP: Executive Summary and Suicide Report, DOD 3-5-10 |
| SVSP: Death Notice, DOD 4-6-10 |
| SVSP: Death Notice, DOD 10-11-10 |
| SVSP: Initial Inmate Death Report, DOD 10-11-10 |
| SVSP: Initial Inmate Death Report, DOD 4-6-10 |
| SVSP: Crime/Incident Report, DOD 10-11-10 |
| SVSP: Crime/Incident Report, DOD 4-6-10 |
| SVSP: Coroner's  Report, DOD 10-11-10 |
| SVSP: Autopsy Report, DOD 4-6-10 |
| News Item: "SVSP Homicide Under Investigation" CDCR Today, 9-18-12 |
| News Item: "SVSP Homicide Investigation Continues" CDCR Today, 9-18-12 |
| SAC: Death Notice, DOD 12-10-11 |
| 10-18-12 email, Vorous-Kahn re: Death at CSP-SAC |
| SAC: Initial Inmate Death Report, DOD 12-10-11 |
| News Item: "Homicide at CSP-SAC Under Investigation" CDCR Today, 10-18-12 |
| SAC: Crime/Incident Report, DOD 12-10-11 |
| SAC: Inmate Movement History, DOD 12-10-11 |
| SAC: Medical Report of Injury or Unusual Occurrence, 12-10-11 |
| News Item: "Inmate Dies After Being Stabbed at CSP-SAC" CDCR Today, 10-7-11 |
| SAC: Death Notice, DOD 1-2-11 |
| SAC: Initial Inmate Death Report, DOD 1-2-11 |
| SAC: Death Review Summary, DOD 1-2-11 |
| SAC: Coroner's Report, DOD 1-2-11 |
| SAC: Executive Summary and Suicide Report, DOD 9-20-11 |

| |
|---|
| SAC: Executive Summary and Suicide Report, DOD 3-25-11 |
| SAC: Executive Summary and Suicide Report, DOD 8-13-10 |
| SAC: Executive Summary and Suicide Report, DOD 11-26-11 |
| SAC: Cover Sheet, Executive Summary and Suicide Report, DOD 7-24-12 |
| SAC: Report on Implementation of QIP for Inmate Suicide, DOD 8-13-10 |
| SAC: Executive Summary and Suicide Report, DOD 7-24-12 |
| SAC: Coroner's Report, DOD  8-13-10 |
| SAC: Coroner's Report, DOD  3-25-11 |
| SAC: Coroner's Report, DOD  9-20-11 |
| SAC: Coroner's Report, DOD  11-26-11 |
| RJD: Death Notice, DOD 12-7-10 |
| RJD: Memo re Inmate Death, DOD 12-7-10 |
| RJD: Initial Inmate Death Report, DOD 12-7-10 |
| RJD: Coroner's Report, DOD 12-7-10 |
| RJD: alt. version Coroner's Report, DOD 12-7-10 |
| RJD: Suicide Notification, DOD 6-12-12 |
| RJD: Suicide Notification, DOD 6-29-12 |
| RJD: Executive Summary and Suicide Report, DOD 6-11-12 |
| RJD: Executive Summary and Suicide Report, DOD 6-29-12 |
| RJD: Report on Implementation of QIP for Inmate Suicide, DOD 6-29-12 |
| RJD: Report on Implementation of QIP for Inmate Suicide, DOD 6-11-12 |
| RJD: Coroner's Report, DOD  6-29-12 |
| RJD: Death Notice, DOD 10-3-11 |
| RJD: Updated Death Notice 3-1-10 |
| RJD: Death Review Summary, DOD 10-3-11 |
| RJD: Death Notice, DOD 3-1-10 |
| RJD: Amended Death Review Summary, DOD 10-3-11 |
| RJD: Inmate Movement History, DOD 10-3-11 |
| RJD: Initial Inmate Death Report, DOD 10-3-11 |
| RJD: Death Review Summary, DOD 3-1-10 |
| RJD: Initial Inmate Death Report, DOD 3-1-10 |
| RJD: Crime/Incident Report, DOD 10-3-11 |
| RJD: Crime/Incident Report, DOD 3-1-10 |
| RJD: Coroner's Report, DOD 10-3-11 |
| RJD: Coroner's Report, DOD 3-1-10 |
| 12-29-10 Letter re 150 Level IV EOP SNY Beds at RJD |
| News Item: "Riot Erupts at Donovan State Prison", NBC San Diego, 11-14-06 |
| LAC: Death Notice, DOD 8-19-10 |
| LAC: 10-18-12 email, Vorous-Hughes, re Death at LAC |
| LAC: Executive Summary and Suicide Report, DOD 11-27-10 |
| LAC: Executive Summary and Suicide Report, DOD 6-30-11 |

| |
|---|
| LAC: Suicide and Non-Suicide Fact Determination, DOD 6-30-11 |
| LAC: Crime/Incident Report, DOD 6-30-11 |
| LAC: Initial Inmate Death Report, DOD 6-30-11 |
| LAC: Offender Commitment Data Entry, DOD 6-30-11 |
| LAC: Executive Summary and Suicide Report, DOD 3-30-11 |
| LAC: Executive Summary and Suicide Report, DOD 2-11-10 |
| LAC: Executive Summary and Suicide Report, DOD 8-25-10 |
| LAC: Initial Inmate Death Report, DOD 8-25-10 |
| LAC: Preliminary Death Review Summary, DOD 8-25-10 |
| LAC: Crime/Incident Report, DOD 8-25-10 |
| LAC: Offender Commitment Data Entry, DOD 8-25-10 |
| LAC: Autopsy Report, DOD 8-25-10 |
| LAC: Coroner/Investigator's Narrative, DOD 8-25-10 |
| LAC: Executive Summary and Suicide Report, DOD 1-25-11 |
| LAC: Initial Inmate Death Report, DOD 5-29-12 |
| News Item: "Suspected Inmate Homicide at California State Prison-Los Angeles County", CDCR Today, 10-3-12 |
| LAC: Report on Implementation of QIP for Inmate Suicide, DOD 8-25-10 |
| LAC: CDCR Operational Procedure 535 |
| LAC: California Prison Health Care Services, Emergency Medical Response Training |
| LAC: Report on Implementation of QIP for Inmate Suicide, DOD 1-25-11 |
| LAC: Report on Implementation of QIP for Inmate Suicide, DOD 3-30-11 |
| LAC: Report on Implementation of QIP for Inmate Suicide, DOD 6-30-11 |
| LAC: Report on Implementation of QIP for Inmate Suicide, DOD 2-11-10 |
| LAC: Crime/Incident Report, DOD 8-19-10 |
| LAC: Crime/Incident Report, DOD 12-4-11 |
| LAC: Autopsy Report, DOD 1-25-11 |
| LAC: Death Review Summary, DOD 8-19-10 |
| LAC: First Medical Responder Data Collection Tool, DOD 5-29-12 |
| LAC: Autopsy Report, DOD 8-19-10 |
| LAC: Death Review Summary, DOD 12-4-11 |
| LAC: Autopsy Report, DOD 12-4-11 |
| LAC: Autopsy Report, DOD 8-25-10 |
| LAC: Coroner/Investigator's Narrative, DOD 2-11-10 |
| LAC: Autopsy Report, DOD 3-30-11 |
| LAC: Coroner/Investigator's Narrative, DOD 3-30-11 |
| LAC: Autopsy Report, DOD 6-30-11 |
| LAC: Inmate Health Care Files |
| News Item: "More Details Emerge About Fatal Stabbing at SQ", S.F. Examiner, 7-27-10. |
| SQ: Death Notice, DOD 7-26-10 |
| SQ: Initial Inmate Death Report, DOD 7-26-10 |

| |
|---|
| SQ: Crime/Incident Report, DOD 7-26-10 |
| SQ: Death Review Summary, DOD 7-26-10 |
| SQ: Coroner's Report, DOD 7-26-10 |
| SQ: Death Notice, DOD 12-20-10 |
| SQ: Initial Inmate Death Report, DOD 12-20-10 |
| SQ: Death Review Summary, DOD 12-20-10 |
| SQ: Inmate Medical Records, DOD 12-20-10 |
| SQ: Additional Inmate Medical Records, DOD 12-20-10 |
| SQ: Coroner's Report, DOD 12-20-10 |
| News Item: "Condemned Inmate…Death", CDCR Today, 1-31-13 |
| News Item: "The Making of a Killer", Chico News and Review, 7-12-07 |
| SQ: Death Notice, DOD 8-24-10 |
| SQ: Executive Summary and Suicide Report, DOD 8-24-10 |
| SQ: Report on Implementation of QIP for Inmate Suicide, DOD 8-24-10 |
| SQ: Death Notice, DOD 8-28-10 |
| SQ: Executive Summary and Suicide Report, DOD 8-28-10 |
| SQ: Report on Implementation of QIP for Inmate Suicide, DOD 8-28-10 |
| SQ: Death Notice, DOD 4-6-10 |
| SQ: Executive Summary and Suicide Report, DOD 4-6-10 |
| SQ: Report on Implementation of QIP for Inmate Suicide, DOD 4-6-10 |
| SQ: Autopsy Report, DOD 4-6-10 |
| SQ: Death Notice, DOD 2-28-11 |
| SQ: Executive Summary and Suicide Report, DOD 2-28-11 |
| SQ: Report on Implementation of QIP for Inmate Suicide, DOD 2-28-11 |
| SQ: Autopsy Report, DOD 2-28-11 |
| SQ: Death Notice, DOD 11-17-11 |
| SQ: Revised Death Notice, DOD 11-17-11 |
| SQ: Report on Implementation of QIP for Inmate Suicide, DOD 11-17-11 |
| SQ: Coroner's Report, DOD 11-17-11 |
| SQ: Death Notice, DOD 4-25-12 |
| SQ: Executive Summary and Suicide Report, DOD 4-25-12 |
| SQ: Coroner's Report, DOD 4-25-12 |
| SQ: Suicide Notification, DOD 5-27-12 |
| SQ: Executive Summary and Suicide Report, DOD 5-27-12 |
| SQ: Coroner's Report, DOD 5-27-12 |
| News Item: "Condemned Inmate…Death Investigated as a Suicide", 8-27-12, CDCR Today |
| 8-27-12 email Vorous-Kahn re: SQ Suicide |
| SQ: Suicide Notification, DOD 8-26-12 |
| SQ: Executive Summary and Suicide Report, DOD 8-26-12 |
| SQ: Coroner's Report, DOD 8-26-12 |