1  DONALD SPECTER – 083925
STEVEN FAMA – 099641
2  PRISON LAW OFFICE
1917 Fifth Street
3  Berkeley, California  94710-1916
Telephone:    (510) 280-2621
4

5

6

7

8  JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
9  LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
10 K&L GATES LLP
4 Embarcadero Center, Suite 1200
11 San Francisco, California  94111-5994
Telephone:    (415) 882-8200

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
LISA ELLS – 243657
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

12 Attorneys for Plaintiffs

13 UNITED STATES DISTRICT COURT

14 EASTERN DISTRICT OF CALIFORNIA

15

16 RALPH COLEMAN, et al.,

17       Plaintiffs,

18     v.

19 EDMUND G. BROWN, Jr., et al.,

20     Defendants.

Case No. Civ S 90-0520 LKK-JFM

**EXPERT DECLARATION OF ELDON VAIL**

21

22

23

24

25

26

27

28

[752643-6]

EXPERT DECLARATION OF ELDON VAIL

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   ASSIGNMENT ....................................................................................... 2

III.  FOUNDATION FOR EXPERT OPINION ........................................... 2

IV.   EXPERT OPINIONS .............................................................................. 9

    A.   Summary of Expert Opinions .................................................... 9

    B.   CDCR Uses Excessive Force that Disproportionately Affects
        Mentally Ill Inmates ................................................................... 9

        1.   The Unjustified Offensive Use of Expandable Batons ...................... 11

        2.   The Excessive Use of Oleoresin Capsicum Spray ........................... 13

        3.   The Lack of Meaningful Consultations with Medical Staff
            During Controlled UOF ................................................................ 19

        4.   The Lack of Video Recordings of UOF Incidents ........................... 20

        5.   The Lack of Mandatory Review of UOF Incidents ........................... 21

    C.   CDCR's RVR Process Does Not Contain Sufficient Protections for
        the Due Process Rights of Mentally Ill Inmates ............................. 23

        1.   The Incomplete Preparation and Limited Use of MHAs in RVR
            Hearings .................................................................................. 24

        2.   CDCR's Use of SHU Terms for Mentally Ill ................................... 27

        3.   The Lack of Any Internal Monitoring Regarding the Use,
            Quality, or Effectiveness of MHAs ............................................... 27

        4.   The Lack of Interactions Between Mental Health and Custody
            Staff During the  RVR Process ..................................................... 28

        5.   The Selection of Ineffective Staff Assistants for Mentally Ill
            Inmates .................................................................................... 29

        6.   CDCR's Widespread Use of "Management Status" .......................... 30

    D.   Improper Custody Interference with Mental Health Treatment .................. 32

        1.   The Vestigial Impacts of Overcrowding .......................................... 32

        2.   The Negative Impacts of Sustained Lockdowns ............................... 34

        3.   Housing Assignments and Programming ........................................ 34

4.    The Marginalized Role of Mental Health Staff .................................. 36

5.    Unfair Segregation Practices ............................................................ 38

6.    Confrontational Custody Attitudes and Lack of Training ................. 41

V.    CONCLUSION .......................................................................................... 46

EXPERT DECLARATION OF ELDON VAIL

1    I, Eldon Vail, declare:

2    1.    I have personal knowledge of the matters set forth herein, and if called as a

3    witness, I could competently so testify.

4    **I.    INTRODUCTION**

5    2.    I am a former correctional administrator with nearly thirty-five years'

6    experience working in and administering adult institutions.

7    3.    Before becoming a corrections administrator, I held various line and

8    supervisory level positions in a number of prisons and juvenile facilities in Washington, in

9    addition to serving as a Juvenile Parole Officer and pre-release supervisor.  I have served

10   as the Superintendent (Warden) of 3 adult institutions, including facilities with maximum

11   security inmates.

12   4.    My experience as a prison and corrections administrator included

13   responsibility for, and a focus on, the mentally ill population and their custody, housing,

14   and treatment.  As the Superintendent of McNeil Island Corrections Center I was charged

15   with designing and opening a new program for mentally ill inmates within the Washington

16   Department of Corrections (WDOC).  I did so in collaboration with leaders from a number

17   of departments from the University of Washington ("UW") who informed the design and

18   operation of the two units devoted to this population.  That collaboration continued for

19   nearly 20 years as UW staff came to assist the department in improving our treatment of

20   mentally ill inmates throughout the system, with a focus on moving them out of high

21   security bed placement whenever possible.

22   5.    As Assistant Director of Prisons in Washington my responsibilities included

23   oversight of mental health programs for all prisons in the State of Washington.  Part of this

24   assignment was to oversee the design of a capital project that doubled the size of

25   Washington's largest program for the mentally ill.  My primary focus was to design a

26   housing continuum for the mentally ill that did not rely on over-classifying individuals as

27   maximum security, and instead move them through less restrictive levels of prison

28   housing.

EXPERT DECLARATION OF ELDON VAIL

6. Most recently, I served as Secretary for the WDOC from November 2007 until I retired in July 2011. Prior to that, I was the Deputy Secretary for WDOC for seven years, from 1999-2006. As Deputy Secretary and later as Secretary, I focused on providing proper treatment for the mentally ill in prison on a system-wide basis.

7. In accordance with Rule 26 of the Federal Rules of Civil Procedure, I have attached as **Exhibit 1** to this report a copy of my current resume, which summarizes my qualifications and professional experience. Since July 2012, I have been retained in a total of five cases.

8. My current rate is $150 per hour for consulting, deposition, and trial. My compensation is not affected in any way by the content of my opinions or the outcome of this lawsuit.

## II.  ASSIGNMENT

9. I have been retained by Plaintiffs to evaluate and offer my opinion of the Mental Health Services Delivery System ("MHSDS") in the CDCR pursuant to the requirements of *Coleman v. Brown*.

10. The particular focus of my review has been on the internal discipline process ("RVR" process) and use of force ("UOF") policy and practice with respect to mentally ill inmates within the CDCR. I have also been asked to offer opinions on the role and influence of custody staff in the care and treatment of the mentally ill within the CDCR.

11. My work on this matter is on-going. This report summarizes my current opinions given the available information I have reviewed to date. If additional information is produced, I may modify or supplement my analyses and opinions accordingly.

## III.  FOUNDATION FOR EXPERT OPINION

12. I considered information from a variety of sources in the course of my work. This includes certain information provided by the parties; court filings submitted by the parties; certain deposition testimony; and other information I have obtained from public sources.

13.    I was first contacted regarding this case on January 30, 2013. Shortly thereafter, Plaintiffs' counsel provided me a number of documents for review, including but not limited to pleadings in this case and the Three-Judge Court, the Special Master's 25th Interim Report and supplemental/related reports, UOF and annual reports from the Office of the Inspector-General ("OIG"), CDCR's MHSDS Program Guide, and CDCR's policies, procedures, internal reports and training materials. I also reviewed the declaration of Steve Martin, submitted in support of Defendants' Motion to Terminate, as well as Mr. Martin's file, and attended Mr. Martin's deposition in this case. A complete list of the materials I reviewed in this matter is attached hereto as **Exhibit 2,** and may be referred to in footnotes and/or other citations within this report.

14.    In addition to the documents reviewed, as listed in Appendix B, I also recently conducted tours and interviews in numerous facilities and housing units located in four prisons where *Coleman* class members reside.[1] The prisons were: California State Prison, Corcoran (February 19, 2103), Kern Valley State Prison ("KVSP") (February 20, 2013), California State Prison, Los Angeles County ("LAC") (February 21, 2013), and San Quentin State Prison (February 26, 2013, and March 12, 2013). Due to the extremely compressed discovery and briefing schedule in this matter, I conducted these one-day tours over a two-week period during the month of February 2013. In the course of these tours, I made a point of visiting a representative sample of housing units where mentally ill prisoners were housed, including General Population, Special Needs Yard, Administrative Segregation, Security Housing Unit, and mental health crisis bed units and overflow crisis bed units. During the tours, I had numerous conversations with correctional administrators, clinical staff, and line correctional officers, with Defendants' counsel present throughout. At each facility I was also able to converse with numerous prisoners who were participants in the CDCR's mental health delivery system, including many who

---

[1] *Coleman* class members are CDCR prisoners with serious mental illness.

1    were in the Correctional Clinical Case Management System (CCCMS)[2] as well as those in

2    the Enhanced Outpatient Program (EOP).[3] I also conducted private, one-on-one interviews

3    with individual prisoners who were selected with the assistance of Plaintiffs' counsel and

4    institutional staff from the various lists of mentally ill prisoners at each facility.

5        15.    With the exception of the inspection at San Quentin, Plaintiffs' counsel

6    provided me with binders of information pertinent to each facility, prior to the inspection.

7    I was accompanied by Plaintiffs' counsel on each tour.

8        16.    I am informed and I believe that, prior to each inspection, Plaintiffs' counsel

9    requested that the following be made available during my inspection: full packets of

10    RVRs involving Class Members, logs of RVR and 115-MH RVR assessments, local

11    operating procedures and training materials on RVR mental health procedures, Use of

12    Force Reports, including videos and the Institution Review Process.

13        17.    At Corcoran, we first met with the Warden, members of her executive staff,

14    and officials from the CDCR central office. The inspection included visits to the 3A

15    Treatment Room, Administrative Segregation ("Ad Seg"), Enhanced Outpatient Program-

16    Sensitive Needs Yard ("EOP-SNY"), the Special Housing Unit ("SHU") and the Mental

17    Health Crisis Bed ("MHCB") unit. In each of these units we spoke with staff and inmates

18

19

20    [2] CCCMS prisoners constitute the largest CDCR mental health category. It comprises approximately 27,600 prisoners with mental illness, and are supposed to receive

21    medication management, meet with a clinician at least every 90 days, and receive mental health treatment as clinically indicated. When CCCMS prisoners are housed in Ad Seg,

22    they are supposed to receive enhanced mental health services that include weekly case manager contacts and daily rounding from psychiatric technicians.

23

24    [3] EOP includes seriously mentally ill prisoners who require a higher and more intensive level of mental health care. These prisoners are unable to function in a general population

25    prison setting and, as a result, are supposed to be in sheltered treatment programs and live in segregated housing units. They are supposed to receive 10 hours each week of therapy

26    or "structured therapeutic activities." When they are housed in Ad Seg, they are supposed to be provided with weekly case manager contacts and receive daily rounding from

27    psychiatric technicians. There are approximately 4,650 EOP prisoners in the CDCR.

28

1  and looked at various logs. We also spoke with the UOF Coordinator and interviewed

2  mental health staff responsible for completing the Mental Health Assessment ("MHA")

3  and Lieutenants who conducted the inmate disciplinary hearings with respect to the Rules

4  Violation Reports ("RVRs") issued to inmates. While at Corcoran, I had the opportunity

5  to view three videos of controlled use of force incidents. No RVR or UOF packets were

6  made available to me by CDCR, however.

7         18.    After my tour, documents were made available to me from the files of

8  defendants' expert Steve Martin. From those files I was able to review information from

9  22 RVR packets from Corcoran, although I do not believe they were all complete. I also

10  reviewed 13 UOF packets and various UOF and Incident Report logs.

11         19.    At KVSP, we again had an initial meeting with the warden, members of his

12  executive staff and officials from the CDCR central office. We asked that certain

13  information be made available to us by 11:00 a.m., including a list of staff reductions

14  during the past year; RVRs for class members for the last three to six months; controlled

15  UOF videos for class members during the last three months and class member appeal

16  information for the last three months. The inspection included visits to Ad Seg, the

17  MHCB, the EOP-SNY and the mental health building. In each of those units we spoke

18  with staff and inmates and viewed logs that we requested. We interviewed mental health

19  staff members who are responsible for completion of the MHA, and lieutenants who serve

20  as hearing officers. We spoke with administrators throughout the day. I spoke with a

21  group of EOP inmates attending a group therapy session. Later in the day, well past 11:00

22  a.m., we went to a file room where the RVRs were stored. None of the information we had

23  requested was available for immediate viewing, and we had to wait for it to be assembled.

24  Nine RVRs were made available on site but they were incomplete because the MHAs were

25  not provided with them. KVSP staff told us that the MHAs were in a separate file, and no

26  MHAs were made available for me to view. I was able to view only two videos of inmate

27  interviews supporting their complaints for excessive UOF by custody staff. We were told

28  that there were no controlled UOF incidents against class members for the past year and so

1   there were no videos available to view. I reviewed four UOF packets in order to speak

2   with the inmates who had made the complaints. We completed one interview but were

3   unable to complete the second because prison staff forced us to leave the premises at 4:30

4   p.m.

5         20.    At LAC, we again started with a meeting with the warden and various local

6   and central office officials. At the initial meeting we asked for all RVR packets for class

7   members for the past six months for whom MHAs were provided; all UOF reports,

8   including videos for controlled incidents for the last six months; and appeals related to

9   claims of unnecessary UOF. At the end of the day we received only RVR logs, a box of

10   final UOF reports, and one controlled UOF video. We did not receive the RVR packets

11   with MHAs or the UOF packets we requested. I had time to look at about 15 UOF packets

12   and to view the single video made available to me. Our inspection included visits to Ad

13   Seg, EOP Ad Seg, the MHCB, EOP-SNY and general population units in D yard. In each

14   of these units we spoke with staff and inmates. We interviewed mental health staff

15   members who complete the MHA, lieutenants who serve as hearing officers. We spoke

16   with prison administrators throughout the day.

17         21.    Subsequent to the tours I reviewed the 31 UOF reports and 16 RVR reports

18   for LAC that were provided with Mr. Martin's file.

19         22.    At San Quentin we again started the day with a meeting with the warden and

20   various local and CDCR officials. During our inspection we went to a Reception Unit that

21   was a SNY; an Ad Seg unit; Death Row; and the Adjustment Center. In each of these

22   units we spoke with staff and inmates and looked at various logs.[4]  We interviewed

23   mental health staff members who complete the MHA, and lieutenants who serve as hearing

24   officers. We spoke with administrators throughout the day. After our inspection we were

25   taken to the warden's office building to view RVRs and UOF information. When we got

26

_____

27   [4] While interviewing inmates in the San Quentin dining hall I observed rats running around
in broad daylight.

28

EXPERT DECLARATION OF ELDON VAIL

there the videos were not set up so we waited while several staff worked to figure out how
to operate the equipment. Two videos of UOF were made available and we viewed them
both. Several UOF videos we requested were not made available to us until Plaintiffs'
counsel specifically asked for them again. We were told that additional UOF videos
existed but we were denied access to them because the officers involved were being
investigated for excessive UOF. We did view two video interviews of inmates making
those same allegations. Approximately 20 RVR packets were made available to us but at
least five of them were duplicate copies of the same event. I reviewed about 10 of them.
We were not provided UOF reports, only UOF logs.

      23.    After the tour, I reviewed three RVR packets and six UOF packets from San
Quentin which were contained in Mr. Martin's file.

      24.    At every facility we were escorted by up to 10 or 11 staff from CDCR and
the Attorney General's office. The size of the entourage we traveled with greatly slowed
our access through various check-points within each facility and appeared to inhibit some
staff and inmate class members from speaking with us freely. On more than one occasion,
I had to ask CDCR staff, from warden to correctional officer, to "please step back" so that
inmates could speak to me without being overheard. In one instance, an officer would take
one step back at a time and then ask me if that was enough.

      25.    During each inspection I focused on speaking with class members, and the
staff members involved in their care and treatment, as well as the administrators of
programs for MHSDS inmates. I made a point to visit the residential and treatment space
available for inmate patients. During these tours I interviewed dozens of inmates and
spoke with several staff members and administrators at each institution.

      26.    Since my inspection I have reviewed much of the information from Mr.
Martin's files, including information for facilities that I did not visit. I am informed and
believe that Defendants did not provide Plaintiffs' counsel with Mr. Martin's complete file
until March 1, 2013. I have reviewed the files for: the Richard J. Donovan Correctional
Facility ("RJD"), including five UOF reports and nine RVR packets; the California

1  Medical Facility ("CMF"), including four UOF reports and two RVR packets; the

2  Substance Abuse Treatment Facility, Corcoran (SATF), including six UOF reports and

3  seven RVR packets; the California State Prison, Sacramento (SAC), including three UOF

4  reports; and the California State Prison, Centinela, including five UOF reports and two

5  RVR packets. My review of Mr. Martin's material is ongoing.

6      27.    Most of the material that I reviewed from the prisons I visited, that did not

7  come from Mr. Martin's files, came from a time period after Mr. Martin's inspection of

8  CDCR prisons, giving me a broader base of information from which to form a more

9  current perspective on CDCR operations.

10      28.    On March 11, 2013, after the March 1 discovery deadline, I received from

11  Plaintiffs' attorneys 14 CD's of documents responsive to Plaintiffs' request for information

12  that was sought prior to the prison inspections I conducted. My review of this material in

13  ongoing.

14      29.    On March 12, 2013, on the grounds of the San Quentin State Prison, I

15  reviewed approximately 55 UOF videos from the prisons I inspected. Twelve of those

16  videos were of controlled UOF events, 31 were videos of inmate interviews that were

17  recorded as part of the CDCR internal investigation process (sometimes the inmates were

18  interviewed because they alleged abuse, other times because they suffered injuries in a

19  UOF situation), two of the videos could not be viewed on the equipment provided and the

20  rest were duplicate copies or videos I had viewed previously.

21      30.    In total, during and since my inspections, I have reviewed approximately 114

22  RVR reports, approximately 134 UOF reports, 18 controlled UOF videos and 31 video

23  interviews of inmates involved in UOF situations. These UOF incidents and RVR reports

24  cover the period from approximately August 2011 to the present.

25      31.    Additionally, in January and February of 2013, for my work as an expert in

26  the *Mitchell* litigation concerning racial lockdowns, I inspected other prisons in the State of

27  California, including: Salinas Valley State Prison (January 29, 2013), Kern Valley State

28

EXPERT DECLARATION OF ELDON VAIL

1  Prison (January 30, 2013), Solano State Prison (February 5, 2013), High Desert State

2  Prison (February 6, 2013).

3      32.    In March of 2011, I toured San Quentin State Prison and Solano State Prison

4  with then CDCR Secretary Matt Cate, and had extensive conversations with him about the

5  challenges facing the California prison system.

6      33.    In connection with my anticipated trial testimony in this action, I may create,

7  from various documents produced in this litigation, exhibits that refer or relate to the

8  matters discussed in this report, or in my deposition testimony. I have not yet created any

9  such exhibits as of the date of this report.

10 **IV.**    **EXPERT OPINIONS**

11     **A.**    <u>**Summary of Expert Opinions**</u>

12     34.    From the materials made available to me, on the basis of my inspections, and

13 based upon my expertise and experience, I believe:

14     •   The CDCR, as a matter of practice and sometimes by policy, engages in
15        unnecessary and excessive use of force with mentally ill inmate patients;

16     •   The CDCR's RVR process is seriously compromised for mentally ill inmate
17        patients, and does not systematically account for their mental illness when
       adjudicating prison rule violations.

18     •   The CDCR allows custody staff to dominate and interfere with mental health
19        treatment.

20     **B.**   <u>**CDCR Uses Excessive Force that Disproportionately Affects Mentally Ill
21        Inmates**</u>

22     35.    CDCR uses physical force on mentally ill inmate patients at a rate that is

23 dramatically higher than on the non-mental health population. Although CDCR produces

24 much data, information on this crucial variable is not clearly reported. From reviewing the

25 last available Mental Health Management Reports (MHMRs) submitted by each

26 institution, and comparing them to general population reports available on the CDCR web

27 site for the same time period, I noted that two-thirds of CDCR institutions demonstrate a

28 significant disproportionality. A third of the institutions report that the rate of UOF

1    incidents against mentally ill inmates is more than double their representative population.[5]

2    Three institutions a rate of UOF incidents against the mentally ill that is triple their

3    representative population.[6]  In several prisons the percentage of total UOF incidents that

4    occurred against the mentally ill reached 87-94%.[7]  These highly disturbing, system-wide

5    statistics illustrate that CDCR's UOF policies, and the implementation of those policies,

6    unfairly victimize the mentally ill.

7         36.    CDCR's Use of Force Policy is defined in the CDCR Operations Manual,

8    Chapter 5 Article 2.  This policy is quite extensive on procedural details but also gives

9    CDCR officers broad discretion, stating, "Use of Force Options do not have to be utilized

10   in any particular sequence, but should be the force option staff reasonably believes is

11   sufficient."

12   _____

13   [5] ASP, CCI, CIM, CIW, CMC, SQ, CCWF, NKSP, PBSP, SCC, VSP, and WSP all
     reported a percentage of UOF incidents that occurred against mentally ill inmates that was
14   more than double the MHSDS inmate population at the respective institution.  For
     example, at CIM 63% of the total UOF incidents during the reporting period occurred
15   against MHSDS inmates, who comprise only 28% of the total prison population.  Other
     prisons provided the following data:  Avenal - 55% of the UOF incidents, 24% of the
16   population; CCI – 50% of the UOF incidents, 23% of the population; CMC – 87% of the
     UOF incidents, 30% of the population; San Quentin – 53% of the UOF incidents, 25% of
17   the population; CCWF – 72% of the UOF incidents, 33% of the population; NKSP – 60%
     of the UOF incidents, 25% of the population; Pelican Bay – 49% of the UOF incidents,
18   14% of the population; SCC – 36% of the UOF incidents, 11% of the population; VSPW –
     81% of the incidents, 43% of the population; Wasco – 49% of the UOF incidents, 22% of
19   the population.  Notably, Mr. Martin only visited and/or reviewed documents from four of
     these prisons.
20
     [6] Three institutions, CMC, PBSP, and SCC all reported a percentage of UOF incidents that
21   occurred against mentally ill inmates that was *triple* the MHSDS inmate population at the
     respective institution.  CMC – 87% of the UOF incidents, 30% of the population; Pelican
22   Bay – 49% of the UOF incidents, 14% of the population; SCC – 36% of the UOF
     incidents, 11% of the population.
23
     [7] These institutions were:  SAC (94% incidents, 55% MHSDS population), CIW (90%
24   incidents, 40% MHSDS population), MCSP (88% incidents, 54% MHSDS population),
     CMC (87% incidents, 30% MHSDS population).  At SAC, all but 10 of the 178 reported
25   UOF incidents occurred against the mentally ill.

26

27

28

37.    Line officers throughout the CDCR are routinely equipped with weapons more typically found in prison armories in other states.  Such items include Oleoresin Capsicum ("OC") crowd control dispensers, OC grenades and expandable batons.  In other jurisdictions, these weapons are restricted to either very few staff or made available only when necessary to control a group disturbance or riot.  The officers in the elevated booths in CDCR living units are equipped with lethal force options, and less lethal 40mm weapons.  Again, such weaponry is a rarity inside living units in correctional programs around the country.  Most jurisdictions very rarely bring a lethal weapon inside the perimeter of a secure prison facility.

38.    In my view, such a formidable arsenal made available so routinely to line officers creates a climate of violence and increases the likelihood that those weapons will be used when they are not needed.  The result is an overreliance on force as opposed to improving and refining the officers' verbal de-escalation skills.

### 1.    The Unjustified Offensive Use of Expandable Batons

39.    Expandable batons are more typically issued as a defensive weapon in other prisons, if they are issued at all.  However, in the UOF reports I have reviewed, these batons appear to be used in the CDCR for offensive purposes.

40.    The state's expert in this case, Mr. Steven Martin, had more time to study CDCR practices, view more department documents and inspect more prisons than I did.  I have relied on his work and observations to inform my own opinion, even though we disagree in our final conclusions.  As part of his work, Mr. Martin provided a list of four UOF "Best Practice" recommendations to the CDCR.[8]  In his recommendations, Mr.

---

[8] *Coleman Audit Best Practice Recommendations for Use of Force*, Martin, S. (DEXP105138-39, 105143).  Mr. Martin's recommendations are:  1) "Revisit referral/investigation requirements per Use of Force Regs 51020"; 2) "Currently, there is virtually no guidance in 51020 regarding the sue of the expandable baton"; 3) "Currently MK-9 OC canisters are standard issue to line-level CO's.  The MK-9 it is [sic] classified as a 'crowd management' delivery system"; and 4) "I strongly endorse the recommendation

(continued...)

1  Martin expressed his concern about the standard issue of the expandable baton to line

2  officers without sufficient instruction to staff regarding appropriate use. I share Mr.

3  Martin's concern. As Mr. Martin accurately reported, "[t]he expandable baton is a tactical

4  impact weapon deployed for self-defense typically when an officer is subject to active or

5  targeted aggression by an inmate."[9] Without guidance on the appropriate use of the baton,

6  it is much more likely to be used as an offensive instrument to inflict pain in order to gain

7  compliance. Since the use of the baton is rarely going to be documented on video, I am

8  greatly concerned at the lack of clear direction to CDCR officers from their administration

9  on how the baton is to be deployed.

10        41.    Indeed, from the use of force logs made available to me, the baton is used

11  with disturbing frequency. I have yet to encounter a report documenting its use for

12  defensive purposes. The ready availability of the baton, without guidance to the staff in its

13  deployment, contributes to an atmosphere of violence between CDCR staff and inmates.

14  Inmates I interviewed frequently described being subjected to the baton use as "being

15  beaten." Its standard issue and frequent use to break up fights, which could be controlled

16  by other means, makes it hard to fault the inmates' characterization.

17        42.    Early during our inspection of the California State Prison at Corcoran, an

18  alarm went off in a mental health treatment building. We had just entered into a yard and

19  had a view of that yard and the front of several living units. The inmates in the yard

20  dropped to the ground and several dozen staff exited their posts and ran towards the source

21  of the alarm. We witnessed that about a third of the officers had removed the batons from

22  their duty belts and carried them in their hands, raised and ready. With absolutely no

23  (… continued)

24  made in the OIG Report on Use of Force, May 2012, wherein it was recommended that the
    Institutional Appeals Coordinator should notify the Use of Force Coordinator of all inmate

25  appeals containing use of force allegations … .'' A true and correct copy of this document
    is attached hereto as **Exhibit 3**.

26

27  [9] *Coleman Audit Best Practice Recommendations for Use of Force*, Martin, S., at
    Recommendation No. 2, attached hereto as **Exhibit 3**.

28

1    knowledge of the situation they were about to encounter, they were poised and ready to use

2    their batons – hardly a defensive posture. The alarm turned out to be a malfunction, but I

3    consider it greatly illustrative of the overreliance upon the baton by custody officers within

4    the CDCR.

5        43.    Despite the state's own expert's concern that there is "virtually no guidance"

6    within CDCR about the use of the expandable baton, this issue remains unaddressed within

7    the California prison system. This is especially troublesome given the shockingly

8    disproportionate use of force against mentally ill inmates throughout California's prisons

9    documented in CDCR's own reports.

10        **2.    The Excessive Use of Oleoresin Capsicum Spray**

11        44.    In my view, CDCR staff routinely use more pepper spray than is necessary to

12    control a situation and routinely do not allow for sufficient intervals before dispensing

13    additional rounds. The result is use of force that is excessive for the situations being

14    confronted. Although Mr. Martin, predictably, blamed the Court's Special Master for the

15    lack of oversight, the responsibility lies with CDCR, the agency running California's

16    prisons.

17        45.    I note that in the OIG's Initial Report on Use of Force within the California

18    Department of Corrections and Rehabilitation from November 2011, the following

19    recommendation was made:

20
21            "THE DEPARTMENT SHOULD ENSURE APPROPRIATE TRAINING
        FOR PEPPER SPRAY USE DURING CELL EXTRACTIONS AND
22            SHOULD INCLUDE GUIDELINES FOR ASSESSING EXPOSURE
        ELEMENTS, TIME AND EFFECTIVESNESS."

23            Pepper spray is a chemical agent that causes tearing of the eyes,
        impaired vision, coughing, difficulty breathing, burning sensation, and
24            inflammation of the skin. When used to remove an inmate from a cell,
        the use of pepper spray may avoid the need to use physical force
25            against the inmate. Although current training requires officers to use
        only the amount of chemical agents reasonable to gain compliance,
26            the department does not have clear guidelines establishing what is a
        reasonable amount of time between pepper spray applications. In
27            reviewing use-of-force incidents, we discovered great disparities in
        the use of pepper spray for cell extractions during which the
28

13

1    department forcibly removes an inmate from a cell. The OIG
2    recommends that the department provide additional guidelines
     regarding the use of pepper spray during cell extractions. These
3    guidelines should include: how to assess whether or not the inmate
     received an adequate exposure to pepper spray; the amount of time to
4    let the pepper spray take effect once adequate exposure has been
     achieved before initiating additional applications; and how to
5    determine when pepper spray is ineffective and another use-of-force
     option should be considered.

6        46.    Based on my review, it appears that, to date, no such training or guidelines

7    have been made available to CDCR. Indeed, the OIG's Use-of-Force Report for the period

8    July-December 2011 notes that CDCR responded by rejecting the OIG's recommendation,

9    responding that its "current use of force policy adequately controls the use of pepper

10   spray."

11       47.    Attention was again turned to this issue in 2012, as a result of

12   recommendations made by Defendants' expert, Mr. Martin. In his report to the court, Mr.

13   Martin indicates that late in 2012, due to conversations he had with CDCR administrators,

14   M.D. Stainer, Deputy Director of Facility Operations, drafted a memo to all Wardens

15   within the CDCR.[10] (*See* Martin Report, at p. 9-10.) In that memo, dated September 12,

16   2012, Deputy Director Stainer directed all Wardens " ... to initiate On the Job Training for

17   facility commanders and managers in an effort to ensure that personnel always considers

18   alternatives to the use of chemical agents in controlled use of force situation."[11]

19       48.    In this memo Deputy Director Stainer also acknowledged that CDCR policy

20   "does not restrict the amount or number of OC products used ... ." He states his

21   expectation that, " ... during controlled use of force situations [] sufficient time is provided

22   _____

23   [10] Report of Defense Expert Steve Martin, at p. 9-10, attached as Exhibit 2 to the
24   Declaration of Debbie J. Vorous, submitted in support of Defendants' Motion to
     Terminate.

25   [11] Memorandum entitled, *Use of Chemical Agents During Controlled Use of Force*
26   *Situations and Review of Use of Force Incidents*, Stainer, M.D., September 12, 2012
     (DEXP009657-009658) ("Stainer Memo."). A true and correct copy of this document is
27   attached hereto as **Exhibit 6**.

28

1  between applications to allow the product to be effective."[12]  His observations

2  notwithstanding, Mr. Stainer fails to address the use of crowd-control sized OC dispensers

3  for cell extractions, and offers no additional guidance to CDCR custody officers.  He also

4  failed to incorporate Mr. Martin's recommendations concerning the need to restrict the use

5  of crowd-control OC dispensers in individual cell extractions and to weigh all canisters

6  before and after their use to ascertain the amount of OC gas actually deployed.

7      49.    While Mr. Stainer's memorandum is a positive step forward, as an

8  experienced corrections administrator, I am well aware of how a memo to wardens is

9  unlikely to produce any sustained change in line staff practice.  In my experience, to

10  produce systemic change, more robust efforts must be made to amend the department's

11  written policies, combined with comprehensive training to line staff charged with the

12  responsibility for making use of force decisions.  In other words, a memorandum to the

13  wardens, by itself, will not usually result in systematic change.

14      50.    During my site inspections, I queried several wardens and prison officials

15  about the frequent use of OC spray in their facilities.  None of them made any reference to

16  Mr. Stainer's memo or described to me any steps they have taken to implement it.  In their

17  defense, the lack of specific guidance in the memo should make Mr. Stainer's

18  recommendations difficult to implement.

19      51.    From my own review of CDCR's UOF reports and the videos of controlled

20  UOF situations that I have seen, the actual behavior on the line has not changed since the

21  publication of the memo or the time of Mr. Martin's recommendation.

22      52.    On March 13, 2013, I viewed a UOF video from Corcoran taken in the

23  summer of 2012.  The inmate patient was in a state of de-compensation and was refusing

24  his medication.  He was being housed in the MHCB.  Mental health staff had appropriately

25  decided it was time to administer his medication and to use force if need be.  What I

26  _____

27  [12] Stainer Memo., *supra*, attached hereto as **Exhibit 6**.

28

1   witnessed was three blasts of OC, quickly administered in large dosages, in less than four

2   minutes.  The chemical clearly had an effect as the inmate screamed for help to try and

3   stop the pain it was causing him.  However, he was not lucid or coherent enough to be able

4   to follow the officer's orders to back up to the cell and "cuff up."  He turned in circles near

5   the cell door but did not get the concept that relief might come if he could back up to the

6   cell door and then manage to place his hands through the cuff port in the door.  During this

7   time, one officer's voice can be heard on camera urging that he be sprayed again.  At one

8   point the inmate does manage to get his hand near the cuff port and it is grabbed by an

9   officer.  A handcuff is quickly applied to the one hand.  Attached to the cuff is a chain.

10   Attached to the chain is a triangle device that is designed to not fit through the cuff port

11   itself.  During this scuffle the inmate is sprayed with OC again, this time from about 2 feet

12   away.  The inmate then breaks away from the grasp of the officers and is now inside the

13   cell, essentially chained to the door by the single cuff attached to the chain that is attached

14   to the triangle that is wedged in the outside of the cuff port.  He continues to scream and

15   cry for help.  Finally the officers decide they are going to have to enter the cell to subdue

16   the inmate.  Upon entry to the cell, the inmate is completely wet from the massive spray

17   that has been deployed, as is the floor of the cell.  All parties immediately slip and wind up

18   in a pile on the floor.  The pile moves from inside the cell to outside the cell, with the

19   inmate's wrist still attached to the cuff that is now attached to the open door.  Eventually,

20   the officers get the inmate on a gurney and then to a restraint room where he is restrained

21   and medicated.

22       53.  I have yet to locate the use of force report or any subsequent investigation of

23   this event so I am unaware if it resulted in any injuries to the inmate patient or to the staff.

24   If there were no injuries, everyone was very lucky.  This was a disorganized, ill planned

25   and poorly executed use of pepper spray on a decompensating inmate patient that resulted

26   in excessive use of force.

27       54.  Shortly after I viewed this video I watched another video from Corcoran,

28   involving a class member, taken in September 2012.  Early in the tape a CDCR official

EXPERT DECLARATION OF ELDON VAIL

speaks to the camera and explains that the inmate is refusing to exit his cell but that they have checked the central file and determined that has a result of prior cell extractions, the inmate appears to be "immune to OC." Therefore they are going to have to enter the cell to bring him out using simple physical force. Of all the videos I have viewed and all the reports I have read from CDCR, this is the only one where this force option was chosen for a cell extraction. After they go through the obligatory process at the cell front, officers enter the cell with shields, quickly lay the resisting inmate down on his bunk, get him cuffed and move him out. It was a quick and efficient cell extraction. No one got hurt; no one was at much risk.

55.    While I thought the UOF incident described above was appropriate, all of the wardens and command staff I met with on my inspections, and the majority of the videos I viewed, demonstrate a strong institutional preference for and overreliance on the use of pepper spray. Further, when OC spray is used, it appears to still be used in excess in most cases. My point in juxtaposing these two events is to point out how stuck CDCR is in their use of OC as their primary means for cell extraction. There is no tactical analysis and no focus on what they can do to present the least risk of harm to the inmate and staff. There is only the overreliance on spray.

56.    Despite the concern of the OIG and the recommendation of the state's own expert, the use of OC spray remains excessive, and unaddressed by CDCR.

57.    In his four "Best Practice" UOF recommendations, Mr. Martin also questioned the use of crowd control OC dispensers, "…into a cell of an unarmed or unbarricaded inmates."[13] He accurately opined that current CDCR policy offers no guidance to staff about what type of OC dispenser to use in a given situation. Mr. Martin suggests that OC dispensers issued to staff be weighed before or after use so that they can be better monitored, an excellent practice in place in many jurisdictions around the

---

[13] *Coleman Audit Best Practice Recommendations for Use of Force*, Martin, S., at Recommendation No. 3, attached hereto as **Exhibit 3**.

EXPERT DECLARATION OF ELDON VAIL

country. Mr. Martin is correct in both of these recommendations but from my observations and the UOF videos and reports that I have viewed, there is no evidence they have been adopted by the CDCR prison system. The likelihood that the use of excessive amounts of OC continues, and it is difficult for supervisors to review the incidents since canisters are not being weighed in CDCR facilities.

58.    I viewed a videoed UOF incident from San Quentin, where four lengthy bursts from a large OC dispenser, plus two OC grenades, were thrown into the cell of a single MHSDS inmate -- who presented no imminent threat -- within a period of 5 to 6 minutes during a controlled UOF cell extraction. The inmate appeared so disoriented that it was clear half way through the event that he did not have the capacity to comply with the orders that came from the staff to "cuff up" and exit his cell. The gas came so fast, with very little time elapsing during each application, that my visceral reaction was that this mentally ill prisoner was being tortured. Towards the end of the incident, as the staff finally realized the inmate was not going to voluntarily exit his cell, the staff opened the door and several officers went in to get him. You could clearly hear on the tape one staff member say, "fucking pussy." Everything about this event meets the definition of excessive. There was very little apparent effort to try and defuse the situation before force was used, or to listen to the concerns being expressed by the inmate.

59.    In many of the videos I reviewed where pepper spray was deployed, too much spray was used with too short of an interval between applications. This pattern is also reflected in the majority of the UOF reports I reviewed. It is common for CDCR staff to report that they used crowd-control dispensers and OC grenades during a cell extraction.

60.    From the written reports, the amounts are excessive. From the videos, the amounts are excessive and deployed with very little waiting time between applications, most often just a few seconds.

61.    Allowing for proper time between intervals and limiting the amount of spray dispensed into a closed cell is important for two reasons. One, it simply takes time before the chemicals can take effect and they need time to "work" before more are dispensed.

1  Two, it is simply wrong to inflict more pain on inmates than is necessary to gain control of

2  any situation. It undermines the exercise of legitimate authority by corrections staff and is

3  likely to fuel more tension in the institution. Inmates understand that sometimes physical

4  force must be used. They also understand that when the authority is abused it leads to

5  more tension between staff and inmates.

### 3. The Lack of Meaningful Consultations with Medical Staff During Controlled UOF

6  62.    I have additional concerns about the UOF practices I witnessed in the prisons

7
8  I inspected, and the intersection of these UOF practices with CDCR policy. The UOF

9  videos I reviewed showed that the required pre-use-of-force contact between mental health

10  staff and the inmate patient is cursory at best, with only a minute or two spent by the

11  practitioner with the inmate, before the intervention is deemed to be ineffective. The

12  application of force then quickly begins. Furthermore, I encountered UOF videos and

13  packets which failed to document that a clinical intervention occurred for EOP and MHCB

14  inmates – in direct violation of CDCR policy.

15  63.    The CDCR Department Operations Manual (DOM) 51020.12.2 requires that

16  in a controlled use of force situation involving a seriously mentally ill inmate, a licensed

17  health care practitioner, " ... shall attempt to verbally counsel the inmate and persuade the

18  inmate to voluntarily come out of the area without force." This policy is important and can

19  result in fewer UOF incidents.

20  64.    In a UOF video I viewed while inspecting Corcoran, medical staff were

21  appropriately consulted prior to the deployment of pepper spray on an inmate patient in a

22  controlled UOF situation. Medical staff did not clear the inmate for exposure to pepper

23  spray as he was identified as having asthma. However, a facility Captain is then seen on

24  camera clearly indicating that he is overruling the medical determination, saying it is for

25  the "safety and security of the institution" and then directs his staff to use the spray. In this

26  particular case the inmate was on "management status" (a practice I will discuss later in

27  this report) and was locked in a module on the day-room floor of the living unit. He was

28

1    upset but presenting no immediate threat.  Whether or not this needed to be a UOF

2    situation at all is questionable.  To take the additional risk of using OC spray on an inmate

3    patient with asthma was reckless and unnecessary given the lack of serious risk presented

4    by the inmate.

5         65.    In reviewing UOF videos and packets I have found numerous other examples

6    where medical recommendations against the use of spray, usually for inmates with asthma,

7    were ignored or overruled by custody staff.

8         66.    The lack of focus on this particular issue is gravely concerning, because I

9    have yet to see any evidence that staff in CDCR give anything more than lip service to this

10   policy requirement.  In my own experience, I have often found that mentally ill inmates

11   can be "talked down" and that UOF situations can frequently be avoided.  In order for that

12   to occur, however, custody staff must have great patience and be committed to the

13   principle and the satisfaction of avoiding force rather than using it.

14         **4.    The Lack of Video Recordings of UOF Incidents**

15         67.    Video recordings of UOF incidents are an important safety measure that

16   CDCR does not appear to be used with any frequency.  I read many UOF reports and

17   RVRs where the officer quickly sprayed OC into the cells of inmates who were doing

18   things such as failing to close their food port, or failing to return their tray upon demand.

19   Such inmate behavior may be irritating to the staff and may need to be addressed, but a

20   quick burst of OC spray into a cell is excessive and unnecessary.  Because it is

21   "unplanned," there will be no video record made of the incident.

22         68.    If a situation is more pressing, and the inmate is locked into his cell but is not

23   engaged in any violent behavior, a cooling off period (as required by CDCR's own policy

24   in other situations) would be more appropriate.  If that fails to resolve the situation, there

25   should be plenty of time to obtain a video camera and prepare staff for a controlled use-of-

26   force event.  The failure to do so permits officers to inflict physical punishment when

27   insulted or disrespected by inmates, without creating a record that is available for review.

28

EXPERT DECLARATION OF ELDON VAIL

1   This practice says a great deal about how CDCR's officers view inmates and their own

2   role within the prisons, and how CDCR permits them to treat mentally ill inmates.

3       69.    Unfortunately, the practice of immediate infliction of pain and punishment is

4   currently sanctioned and authorized by CDCR's DOM 51020.11.2.  Discretion is left to the

5   officer on the floor whether or not to use OC spray or contact a supervisor.  In my view,

6   there should be no discretion in such situations absent an immediate threat sufficient to

7   justify an immediate use of force.  If force is necessary in such an incident, it should be

8   both controlled and recorded on video.  In the absence of such clear policy directions, the

9   CDCR sanctions a practice that is unnecessary and excessive.

10      70.    A stern requirement for the use of a camera in a potential use of force

11  situation wherever and whenever possible is a profound protective measure for line staff,

12  inmates and the prison administration.  CDCR's current practices result in the use of the

13  camera only for controlled cell extractions.  Instead, I believe CDCR needs to build an

14  expectation for custody staff to get a camera rolling during a UOF incident whenever

15  possible, especially in yards and dayrooms where some officers are assigned to fixed posts.

16  This would do much to reduce inmate acting out and provide more accountability for staff

17  behavior.  I believe that the CDCR will find it has a controlling effect on both inmates and

18  staff, and will improve the inmates' belief in the legitimate authority of the institution's

19  administration, which is a critical component to improving institution safety.

20          **5.    The Lack of Mandatory Review of UOF Incidents**

21      71.    In Mr. Martin's deposition in this case he states, "I was not able to document

22  a fully realized imposition of a disciplinary sanction for an excessive use of force that I

23  looked at."[14]

24

25

---

26  [14] Depositon of Steve Martin, taken in this case ("Martin Depo.") at pp. 95:18-96:7.  A
    true and correct copy of relevant portions of the Martin Depo. is attached hereto as **Exhibit
27  4**.

28

72.    When I asked CDCR officials about their process for investigating UOF incidents, their responses were vague, evasive and not on point. If CDCR, at the facility or state level, or the OIG do in fact track such outcomes, I was not able to discover it in my inquiries. In fact, at San Quentin I was informed that certain UOF information Plaintiffs' counsel requested in advance of the tour was withheld because it was the subject of a pending investigation. Given the level of concern about staff UOF within CDCR, this absence of transparency should be addressed. That Mr. Martin, in more than a year of work with full access to CDCR documents and officials, was unable to locate even one example of an officer disciplined for excessive UOF is powerful evidence that the UOF review and employee discipline system is badly broken and ineffective. The absence of a transparent and effective review and employee discipline system is, in and of itself, a message to line staff that they will likely suffer no consequences for the unnecessary and excessive use of force against inmate patients.

73.    In Mr. Martin's recommendations to CDCR, he also suggests that they expand their mandatory review criteria for UOF incidents beyond those that involve deadly force, great bodily injury or serious bodily injury. His recommendation states:

> Criteria should be expanded to include: unexplained injuries, impact strikes to lethal target areas (head, eyes, throat, spine, or groin) regardless of seriousness of injury, incomplete/ conflicting reports, and application of non-lethal weaponry that exceeds what would normally be expected for the type of force reported, e.g., unarmed inmate in cell subjected to great amounts of chemical agents via multiple delivery systems such as MK-9, MK-46 and Grenades (see Corcoran, COR-04B-11-12-0793). Once one of these incidents is referred there should be an operating presumption that is will be investigated.[15]

74.    I wholeheartedly agree with Mr. Martin's recommendation. An outside review would provide accountability regarding excessive use of OC and the unregulated

---

[15] *Coleman Audit Best Practice Recommendations for Use of Force*, Martin, S., at Recommendation No. 1, attached hereto as **Exhibit 3**

1 | use of the expandable baton, which lead to a pattern and practice of unnecessary UOF on
2 | inmate patients within CDCR.

3 |     75.    This last, very important recommendation by the state's own expert remains
4 | unaddressed by CDCR. In light of this failure, I cannot understand why and how the
5 | CDCR thinks that it has reformed its system sufficiently to argue before this court that it
6 | now adequately provides for the care and treatment of the mentally ill population of
7 | inmates.

8 |     76.    In my review of video interviews of inmates who made allegations of
9 | unnecessary or excessive UOF, it is my conclusion that this is not a meaningful process.
10 | Nearly without exception, the interviewers, usually conducted by sergeants or lieutenants,
11 | are solely focused on getting through the questions from their predetermined script and do
12 | not listen or properly question the class members they are interviewing. Their lack of skill
13 | as investigators is appalling. They frequently cut the inmate off when his answers don't
14 | follow the script and sometimes castigate the inmates for trying to tell a more complete
15 | story. It is clear the group of staff who perform this function are not trained investigators
16 | and are more interested in creating a record for the State than they are at getting to the truth
17 | about any specific event. The fact that this farce is part of CDCR's internal investigation
18 | process is reflective of its systemic lack of credibility.

19 |     77.    Indeed, the CDCR is not poised to "...to accomplish custodial and
20 | correctional functions with minimal reliance on the use of force," despite that being the
21 | stated intent of DOM 51020.1. Structurally, they engage in multiple practices, some of it
22 | codified in department policy, to use force with great frequency, resulting in a
23 | disproportionate impact on mentally ill inmates.

24 |     **C.    CDCR's RVR Process Does Not Contain Sufficient Protections for the
          Due Process Rights of Mentally Ill Inmates**

25 |
26 |     78.    In more than a third of CDCR institutions, mentally ill inmates receive
27 | RVR's at a higher rate than non-class members. Again, data is hard to come by, and this

28 |

EXPERT DECLARATION OF ELDON VAIL

particular area is reported with some inconsistency,[16] but it is clear from the information that is available that the RVR process is a common experience for many of the mentally ill. If you take into consideration that some CDCR facilities house few if any class members, this disproportionality is even more significant. For example, one prison reported that **99%** of RVRs issued during the reporting period were issued to mentally ill inmates.[17]

79.    The RVR process for the mentally ill has several fundamental flaws, which lead me to believe it is not integrated into the CDCR prison system and is often ineffective. While I applaud CDCR's attempts to build accommodations for mentally ill inmate patients into their regular internal prison hearing process, I found no evidence that such accommodations are actually working, or that the CDCR is adequately reviewing its implementation to ensure its procedures are being followed. Indeed, there is very little aggregate data available to track the outcomes of RVRs issued to mentally ill inmates, which I believe is a serious limitation in being able to judge the efficacy of any accommodations for mentally ill inmates.

### 1.    The Incomplete Preparation and Limited Use of MHAs in RVR Hearings

80.    I am informed and believe that, by order of the Court on August 2, 2007, CDCR was required to implement a system wherein a Mental Health Assessment ("MHA") was to be completed on certain mentally ill inmates facing a prison disciplinary hearing. The determination of who receives a MHA is sometimes driven by specific policy requirements (for example, all EOP and MHCB inmates require one) and at other

---

[16] CVSP, FOL, IRON and VSPW provided insufficient information to determine what percentage of the total RVRs issued were issued to the mentally ill.

[17] Kern Valley State Prison issued 99% (417/422 ) of its total RVRs to mentally ill inmates, who comprise only 34% of the total prison population. Also noteworthy was LAC, who issued 84% of its RVRs to the mentally ill, double their 43% representative population. When the Warden at LAC was asked whether the RVR process, as implemented, disproportionately affected mentally ill inmates, he was unaware of the problem, responding that it did not.

EXPERT DECLARATION OF ELDON VAIL

1    times is left to the discretion of the hearing officer based on a layman's assessment of the

2    inmate's behavior. Based on my review, it appears that the exercise of this discretion

3    almost never results in a request for an MHA assessment for an inmate patient, likely

4    because a custody officer does not have sufficient training or skill to evaluate the behavior

5    of mentally ill inmates. A better practice would have mental health staff make assessments

6    and recommendations for discretionary MHAs.

7         81.    The mental health professionals I interviewed during my inspections gave a

8    very consistent account of the process they use to complete a MHA. They also expressed a

9    very consistent account of their frustration at not knowing whether or how their input is

10   actually used in the RVR hearing process. No one, including prison wardens on my tours,

11   kept any aggregate data on how often the mental health clinician's input changed the

12   outcome of or sanction at the hearing. While such aggregate data will tell you nothing

13   about an individual case, it may tell you a great deal about the behavior of particular

14   hearing officers or mental health clinicians (positive or negative) at the facility level.

15   From a system-wide level, I was surprised it was not a data point for CDCR administrators

16   in Sacramento as part of their COMSTAT process, to see if some institutions are

17   struggling with the MHA requirement more than others.

18        82.    Further, in the numerous MHAs that I was able to review, there were serious

19   problems with continuity of the clinicians' findings. The clinicians did regularly report

20   that the mental illness was a contributing factor to the behavior, which caused the RVR to

21   be issued in the first place. However, with disturbing frequency the clinician did not

22   recommend that the sanction be mitigated. This is true even though every clinician I asked

23   believes that isolation of the mentally ill, whether in Ad Seg or in a SHU, is likely to

24   exacerbate mental illness. A finding of guilt in a RVR hearing for certain charges can

25   result in that sanction. On the rare occasions when mitigation was recommended for the

26   sanction, the most common recommendation was that the inmate did not lose their yard

27   privileges.

28

EXPERT DECLARATION OF ELDON VAIL

83.    There were other problems with the complete MHA forms. Sometimes box three (asking whether the sanction should be mitigated) was checked "yes," but there was then no written explanation to guide the hearing officer's decision. Another problem was the use of formulaic language by the clinician completing the form. Again, without some detail regarding the inmate patient, a hearing officer is left without sufficient information to make a decision that accounts for the inmate's treatment needs.

84.    Furthermore, I noted a lack of a consistent understanding among psychologists regarding the purpose of "mitigation" for a MHA. Some thought the purpose of a MHA was to mitigate only the punishment an inmate patient would receive if found guilty. Others thought the purpose was to reduce the underlying charge, when justified. Consequently, the manner in which the MHAs were prepared, and the level of detail contained therein, varied widely by institution and individual psychologist.

85.    Insufficient attention to an inmate's mental health status is reflected in the hearing officers' reports of the RVR hearings. With some frequency, the hearing officers simply use formulaic language such as, "I took the MHA into consideration," without any explanation of how the MHA input influenced the outcome.

86.    Mr. Martin also made a number of "Best Practice" recommendations to CDCR about its RVR process. One of those recommendations was to require the hearings officers to, "...affirmatively state whether they modified or mitigated the penalties based on the MH assessment."[18] I would go further, and require the hearing officers to document how they incorporated the input from the MHA, or failed to incorporate it, and if so, why,

_____

[18] *Coleman Audit Best Practice Recommendations for RVR Process*, Martin, S. (DEXP105140-42), at Recommendation No. 3. Mr. Martin's recommendations are: 1) "Establish protocols for hearing officers and clinicians to meet periodically to discuss and resolve issues related to the RVR MH Assessment"; 2) "The model for the RVR process at RJD should be closely examined for possible replication at all facilities"; 3) "The hearing officers should affirmatively state whether they modified or mitigated the penalties based on the MH Assessment..."; 4) "Consider revising the RVR: Mental Health Assessment Request ... ." A true and correct copy of this document is attached hereto as **Exhibit 4**.

EXPERT DECLARATION OF ELDON VAIL

1   into their final written decision.  In my opinion, without such information, it is impossible

2   to assess whether the procedure is actually working, and renders any opinion that the RVR

3   process adequately accounts for mental illness unsupportable.

### 2.    CDCR's Use of SHU Terms for Mentally Ill

5   87.    Current CDCR policy contemplates the possibility of a sentence of a

6   predetermined term in a SHU for findings of guilt for non-violent offenses such as refusing

7   a cell mate, which has particular implications for the mentally ill.  It is true that some

8   mentally ill inmate patients in CDCR sometimes require very secure housing in order to

9   keep them and others safe.  Sometimes medications need to be stabilized, a quality

10  relationship with a clinician needs to established, or other factors may create the need for

11  intervention, to assist a mentally ill patient to gain enough self control to be able to

12  function in a less restricted housing unit.  To keep an inmate patient in a segregated

13  environment in such circumstances may be justified.

14  88.    However, I would argue that the typical conditions of confinement in SHU

15  for a predetermined length of time is often counterproductive to treatment, can exacerbate

16  mental illness and is excessive when imposed without taking into account the inmate

17  patient's progress in treatment.  To keep mentally ill patients isolated for longer than is

18  necessary can erase what progress they have made and further impair their future

19  functioning.

### 3.    The Lack of Any Internal Monitoring Regarding the Use, Quality, or Effectiveness of MHAs

89.    The "formulaic" approach to the RVR and MHA processes within CDCR, as

discussed above, was also reflected in the data collected in relation to the review process

itself.  From the self reports prepared by every CDCR prison for the Special Master's XXV

monitoring report, facilities tracked only the total numbers of the RVRs for class members

and the percentages of required MHAs completed (3 institutions were not yet tracking the

percent of MHAs completed).  There was no tracking of qualitative data except at one

facility, CSP Solano. To me, it is apparent that the CDCR is a system still counting process measures and not outcomes.

### 4. The Lack of Interactions Between Mental Health and Custody Staff During the RVR Process

90.     Initially, I found it somewhat puzzling that the mental health professionals did not have a more significant impact on RVR hearing outcomes. From my interviews I discovered that there is very little dialogue about MHAs and related RVR hearings between the mental health staff who complete the MHA form, and the custody lieutenant who conducts the hearing. Several reported never being contacted or contacting the other party regarding information contained in the MHA. The result is that a well-intentioned process has become formulaic and ineffective, and does not create the internal collaboration which I believe is necessary to hold individual inmates accountable for their behavior while taking into account their mental health treatment and limitations.

91.     Indeed, it is rare for mental health or custody staff to advocate for inmates within the RVR process. While this need not be a common practice, it is sometimes appropriate and in such circumstances should be encouraged within the CDCR. I spoke with a psychologist at KVSP who was most frustrated with his experience in connection with an RVR received by one of the inmate patients. He called the system "arbitrary and capricious" and told us that we were foolish if we thought the *Coleman* lawsuit would change anything. He related a story about an inmate on his caseload, who had a two-ounce tuna can fall off a shelf in his cell onto the leg of an officer. The inmate was written up for assault, a violation that could result in a term of confinement in a SHU. The psychologist advocated on behalf of the inmate at every level of review, all the way to the Captain, but had no success. He stated that he went to this length because of the possibility that his patient could face a term in the SHU.

92.     The dominance of custody staff in the RVR process is built into its very structure. The lieutenant for a particular shift for a particular yard is assigned as the hearing officer for RVRs that are alleged by his staff in the same areas that he supervises.

1    This creates the appearance of a conflict of interest as inmates and some mental health

2    staff do not believe such a structure ensures a fair hearing process. In my experience, it is

3    much more typical to see hearing officers be placed outside of the immediate custody

4    chain of command, even if they hold the rank of lieutenant, so that some independence is

5    possible. Given CDCR's historic inability to reform their practices, I believe inmate

6    patients would be better served by an alternate model.

7          **5.    The Selection of Ineffective Staff Assistants for Mentally Ill Inmates**

8

9        93.      CDCR's policy and practice for selecting staff assistants for inmate patients

who are incapable of navigating the RVR process without assistance is gravely concerning

10    to both myself and Mr. Martin. Staff assistants are universally assigned by the lieutenant

11    hearing officer, who selects a subordinate correctional officer from the same unit as the

12    inmate to perform this function, sometimes choosing the officer that serves as the clerk for

13    the hearings process. I found no instances where anyone other than a custody officer acted

14    as a staff assistant. It is unlikely that a peer of the officers who initiate the RVR can or

15    will be able to serve as an effective advocate for inmate patients, especially considering the

16    number of RVRs issued for offenses against custody staff. As Mr. Martin noted in his

17    deposition, "[w]ell, you want some freedom for that Staff Assistant to adequately represent

18    that inmate, and it -- you know, the more separation you get between that Staff Assistant

19    and his immediate superior, probably the more you move towards ensuring some vigorous

20    advocacy if it should come into play."[19] It is even more unlikely that the officer selected

21    will be able to serve as an inmate advocate in front of his or her lieutenant. From the

22    records I reviewed this process provides no help to an inmate who is struggling to

23    understand what is happening to him, or advocate for himself. I believe that the current

24    process for selecting staff assistants renders them essentially meaningless.

25

26 ───────────────────────

27 [19] Martin Depo at pp. 241:8-24, attached hereto as **Exhibit 3**.

28

94.     The fact that many of the inmates subject to these hearings are seriously mentally ill, unstable or psychotic (which may have been a major factor in the underlying event giving rise to the RVR), makes the absence of an independent, trained and effective staff assistant even more troubling.  Any fairness from the hearing process with this profound structural flaw is hard to imagine.

### 6.    CDCR's Widespread Use of "Management Status"

95.     In addition to the physical punishment authorized by policy and demonstrated in practice that I discussed in the Use of Force section of this report (for example, the immediate pepper spraying of inmates who won't give up their food tray or otherwise allow the food port in their cell door to be closed), there is another, more troubling, manner in which due process is currently being circumvented by CDCR officers who work in the living unit.

96.     When inspecting Corcoran, I had the opportunity to view a use of force incident on video, involving an inmate who was on something called "management status." He was an EOP inmate housed in Administrative Segregation (Ad Seg) who had been moved to a holding cell in the dayroom and placed on "management status."  I understood that this was an informal disciplinary procedure where the inmate can be summarily disciplined by being removed from his cell, stripped to his underwear and have all his property removed from his possession.  In this case the inmate was subjected to OC spray while in the holding cell as the officers held up their shields and dispensed a large volume of pepper spray into the cage until the inmate capitulated, allowing himself to be cuffed, decontaminated and then returned to his assigned cell.  Shortly thereafter he was again sprayed, removed from his cell, decontaminated and moved to a Mental Health Crisis Bed. There was little evidence of offering a cool down period to the inmate or any serious effort by the licensed health care staff to de-escalate the situation.   That this occurred in an EOP unit, where an inmate was placed on "management status" and then OC spray was inflicted on a prisoner who was about to be transferred to an MHCB, an even higher level of mental

1  health care, illustrates, with startling clarity, the insensitivity of CDCR's approach to

2  managing mentally ill inmate patients. .

3      97.    Such a serious limitation on the conditions of confinement as management

4  status should be highly regulated and monitored.  Typically, any limitations on conditions

5  of confinement should be rationally related to the immediate behavior of the inmate.

6  Taking all of an inmate's property and stripping him to his underwear as a matter of policy

7  or practice, when it is not connected to the behavior being demonstrated by the inmate, is

8  unnecessary, dehumanizing, degrading and likely to incite the inmate.

9      98.    I was informed by the warden at Corcoran that the action of taking all the

10  property from a disruptive inmate can occur with the approval of the Captain, after unit

11  staff have placed the inmate in the holding cell, and can last up to 72 hours.

12      99.    Despite extensive searching, I could not find clear authority for this practice

13  in the CDCR DOM's or in the California Code of Regulations (CCR), Title 15, Crime

14  Prevention and Corrections.  I did find, in CCR 3333(f), reference to something called

15  "Management Cases."  It is unclear to me if this guideline applies to the practice we found

16  at Corcoran and other institutions.

17      100.    When inspecting LAC, we were giving a copy of their Local Operating

18  Procedure (LOP), entitled, Holding Cell Procedures #511.  This appears to be guidelines

19  for the same practice that we observed at Corcoran.  Again, it allows for limitations on

20  conditions of confinement to be implemented outside the normal RVR process and without

21  an obligation on the part of the staff to draw a clear nexus between the behavior of the

22  inmate and the limitations on conditions of confinement.  At LAC, this procedure can be

23  approved by a unit sergeant.

24      101.    I am unclear if these two guidelines apply to the same situations, but I am

25  convinced that there is a clear lack of due process for inmate patients in these

26  circumstances, which warrants closer scrutiny.

27      102.    In my view, the CDCR has not yet implemented a fully effective system to

28  accommodate disciplinary hearings for the mentally impaired inmates sentenced to their

1    care and custody. Mental health staff are not able to suggest when a MHA is appropriate

2    for someone on their caseload and they are not called upon to be staff assistants. There is a

3    systemic lack of understanding among mental health staff of the purpose of a MHA. They

4    are not directly consulted by hearings officers and do not have any knowledge whether or

5    not their recommendations made have any impact on hearings outcomes. At the aggregate

6    level, neither do their warden's and neither does staff from the CDCR central office.

7        **D.    Improper Custody Interference with Mental Health Treatment**

8        103.    I believe that mentally ill inmate patients in the CDCR are receiving a

9    disproportionate number of RVRs and are being subjected to disproportionate UOF

10    because of the lack of integration of custody and mental health staff. Fundamentally,

11    CDCR is not organized or oriented to provide adequate and integrated mental health

12    treatment.

13        **1.    The Vestigial Impacts of Overcrowding**

14        104.    The CDCR has faced massive overcrowding in its prisons for a very long

15    period of time. There is a broad consensus among corrections professionals and

16    corrections researchers about the impacts on facility operations, which chronic and severe

17    levels of overcrowding can bring, especially for someone who is mentally ill. Many of

18    these impacts have been eloquently presented to the court previously.[20] Prison officials are

19    forced to rely on harsher treatment of inmates as they struggle to control prisons full of too

20    many inmates with not enough to do. Programming opportunities for inmates are not

21    available to help maintain order and prison officials are forced to rely more on the "stick"

22    and less on the "carrot." Not unexpectedly, large groups of inmates who are forced to live

23    in overcrowded conditions with little productive activity have increased behavior

24    problems, and the incidence of violence and self-harm within the institution escalates. The

25    _____

26    [20] Expert Report of Professor Craig Haney, filed in the Three-Judge Court in the *Coleman*
     matter, on October 30, 2008. A true and correct copy of these documents is attached
27    hereto as **Exhibit 7**

28

EXPERT DECLARATION OF ELDON VAIL

1  disruption violence and self-harm can cause to the daily operation of the prison forces staff

2  into a vicious cycle of restricting inmate activity, which can result in atrophy of staff skills.

3  The normal day in the life of an overcrowded prison is full of increased restrictions on

4  inmate movement, as inmates spend more and more time in their cells. The use of

5  lockdowns of all or parts of the prison increases, and ever greater numbers of inmates are

6  placed in solitary confinement. The prison culture becomes dominated solely by punitive

7  methods of control, at the expense of all other methods of operation and a new prison

8  culture, a lockdown culture, is created.

9      105.    This is precisely what has happened in CDCR, and little, if anything, has

10  changed. In my opinion, CDCR continues to operate as if it suffers the chronic and severe

11  overcrowding at the same levels they were at three or four years ago, despite reductions in

12  overall prisoner population.

13      106.    Because overcrowding is beginning to be reduced in some facilities, the first

14  question I asked each warden I met was how the reduction in population at their facility

15  has changed their operations. With one exception, the wardens told me nothing had

16  changed, they continue to operate as they always have, in the manner described in this

17  report. (The exception was the warden of San Quentin who told me that now they can do a

18  better job of getting inmates to mental health groups.) The wardens clearly did not

19  understand what fewer inmates might mean for their operation — that it is an opportunity

20  to begin to rethink how they do business — so that they might reduce violence and

21  improve outcomes in treatment for the mentally ill and ultimately improve community

22  safety by reducing their recidivism rate.

23      107.    Mentally ill inmates have a hard time coping with the prison environment to

24  begin with, let alone the overcrowded prison environment. There is broad consensus of the

25  impact on the mentally ill inmate from living in overcrowded prisons. The mentally ill

26  have a reduced ability to cope with stress caused by the complicated social environments

27  brought on by overcrowding, and are made more likely to decompensate and suffer from

28  their experience, and they predictably act out. This results in a vicious cycle of increased

1  levels of discipline and use of force on inmates who are mentally ill, whose illness is made

2  worse by the lack of adequate mental health treatment as resources are stretched and

3  punitive control techniques take over as the dominant method of daily prison operation.

4  The result is inmates released upon completion of their sentence who are more likely to re-

5  offend because their illness was not stabilized or treated and may well have been

6  exacerbated while they were incarcerated.

### 2.    The Negative Impacts of Sustained Lockdowns

8        108.    The length and frequency of lockdowns in CDCR is without parallel in any

9  prison system in the country.[21] Lockdowns interfere with the delivery of services to all

10  inmates, but especially treatment of the mentally ill.  Lockdowns build resentment from

11  the inmate population, especially when they are race based, as is the practice in CDCR,

12  and are perceived to be unfair.  Lockdowns in the CDCR are extraordinarily long.  The

13  longer a prison is on lockdown, the harder it is to come off.  The more staff and inmates

14  are separated from normal relationships, the more those relationships erode.  Staff skills

15  begin to deteriorate.  Lockdowns bring out the worst in staff and inmates, especially if they

16  go on longer than is actually necessary to resolve the situation and restore order to the

17  facility.  Frequent lockdowns are likely to result in increased anger and an elevated

18  potential for violence within the institution.  When lockdowns are frequent, of long

19  duration, and based upon race, inmates' confidence in the system is eroded and they are

20  likely to believe lockdowns are occurring for purely punitive reasons.

### 3.    Housing Assignments and Programming

22        109.    CDCR makes housing assignments based upon race and gang affiliation,

23  further aggravating the confined population.  Access to programs (other than yard, which

---

[21] Exhibits A and B from the Declaration of Devin M. McDonnell, filed March 5, 2013 in support of Plaintiffs' Motion for Class Certification and Motion for Preliminary Injunction in the matter of *Mitchell v. Felker*, U.S. District Court for the Eastern District of California, Case No. 08-CV-01196 JAM EFB.  A true and correct copy of these documents is attached hereto as **Exhibit 8.**

EXPERT DECLARATION OF ELDON VAIL

in systems other than CDCR does not fit within the definition of "program") is very limited, even when prisons are not locked down. There is extremely restricted access to dayrooms in every CDCR prison I have visited. Even though there are functional dining halls next to living units in some Level Four facilities, inmates are fed in their cells. I was told that everyone prefers it that way. I believe that, instead, it is one more way to keep inmates in their cells, part of a culture created by the severe and chronic overcrowding of CDCR prisons. Some CDCR prisons that had to convert their gymnasiums to overflow living units still have not reclaimed those gyms for inmate recreation.

110.    Custody staff control the schedule in CDCR facilities. For those inmate patients who live in general population living units, scheduling of time for therapeutic group participation is a source of common complaint. It is often in conflict with other events, such as religious services and yard time. Inmate patients must choose to practice their faith, get exercise or get treatment – a problem that hardly encourages treatment. CDCR seems to design a daily routine that keeps inmates in their cells as much as they possibly can. Positive inmate programs and time out of cell is an important part of improving institution safety and treatment for the mentally ill. Custody practice does not illustrate any understanding of this concept. Schedules should be adjusted so that inmate patients can participate in therapy and have access to services provided to non-mentally ill inmates. There is plenty of room in their daily program schedule for this to happen.

111.    Further, there are very few jobs, there is very little education and there are very few incentives to motivate inmates to stay out of trouble. Such conditions of confinement are difficult for all inmates. For someone who is mentally ill, these conditions can exacerbate their mental illness.

112.    In my view, the CDCR needs to integrate mental health treatment with the operation of their living units where the mentally ill are housed, and with the overall facility operation, if they want to make progress that is meaningful.

### 4.    The Marginalized Role of Mental Health Staff

113.    With the exception of the MHCB units, mental health staff play no direct role in the daily operation and supervision of living units where the mentally ill reside in CDCR facilities, even in units designed to house MHSDS inmates exclusively.  The custody practices, without exception or any kind of individual assessment, of requiring mentally ill inmates to be cuffed (or strip searched) whenever they leave their cells in segregated housing units, and requiring the use of "treatment module" cages are counter-therapeutic.  Mental health staff are treated as visitors to the units, not as co-workers who belong and share the workload of managing inmate behavior.  There is no intermediate residential care program for mentally ill inmates in CDCR.  There is no supportive milieu. There is no therapeutic environment within living units in the CDCR for treatment except for those inmate patients in acute distress who are housed in the MHCB.  There is no integration of what happens in treatment with what happens in the living units.  What does exist is a great deal of time spent in cells and for those who are lucky, a chance to see their primary clinician once per week and participate in two to three groups, even if sometimes that has to occur in a "therapeutic module" cage.  As a result there is no safe and supportive environment in which inmate patients can practice the skills they learn in treatment.  This is a fundamental flaw in CDCR's approach to managing the mentally ill and I encountered very little awareness of this critical missing piece in any of my inspections of CDCR facilities, interviews, or document review.

114.    I have demonstrated success using a different approach.  As the Superintendent of the McNeil Island Corrections Center in the early 1990s I attacked the problem of how to provide appropriate treatment for the mentally ill who were sentenced to prison, in collaboration with researchers and clinical experts from the University of Washington.  We created a program to serve the seriously mentally ill population (roughly equivalent to the CDCR EOP inmates).  Approximately half were diagnosed with schizophrenia or other major thought disorders, a little over a third were diagnosed as

EXPERT DECLARATION OF ELDON VAIL

1  bipolar or suffered from major depression. The remainder were referred to the program
2  because they were depressed, delusional or suicidal.

3       115.   The program was designed as an intermediate care residential program.
4  Program housing consisted of two units. One was a small portion of our maximum-
5  security building, with the major portion of the population living next door in a direct
6  supervision living unit. The maximum-security housing served as intake and was available
7  for inmates who had episodes of decompensation. The program goal was to move as many
8  inmates as possible through treatment and back into the regular population of the prison.
9  Inmates in the medium units carried keys to their rooms and had access to the central
10  services of the institution, including the dining hall and recreation facilities.

11      116.   The program was staffed with a hybrid of custody and mental health
12  personnel  Line officers were replaced by a new job category, correctional mental health
13  counselors, who were part of the treatment team. About two thirds of them had experience
14  as correctional officers and one third were hired from the community. Additional staff
15  included psychiatrists, psychologists, and nurses. Administration and operation of the unit
16  was shared between corrections administrators and mental health professionals with the
17  operational leads in jobs entitled Correctional Mental Health Program Manager and
18  Correctional Mental Health Unit Supervisor — titles that make clear that their role was to
19  blend the knowledge and wisdom of good custody with the knowledge and wisdom of
20  good mental health treatment.

21      117.   We provided psycho-educational treatment. The living unit itself was used
22  as environment to practice the skills being learned away from the pressures mentally ill
23  inmates can experience in a general population prison. We expected staff and inmates
24  alike were to model pro-social behavior. Along with individual treatment from the
25  primary clinicians, inmates were offered classes in such areas as anger management,
26  medication management, and symptom recognition.

27
28

EXPERT DECLARATION OF ELDON VAIL

118.   The program worked, as evidenced by the attached report,[22] one of many written about this program.  Infraction rates for the population went down, and the symptoms inmates suffered before arriving in the program were more stable after its completion.  Most significantly, the majority of program participants were able to move into general population and function adequately enough to stay there.

119.   Our success in this program continues to inform care for the mentally ill throughout the Washington Department of Corrections to this day.  This is difficult work, but it is not impossible work.

### 5.   Unfair Segregation Practices

120.   Instead of an evidenced based treatment environment, CDCR policy and practice is to apply uniform custody procedures to all prisoners assigned to a housing unit without consideration of their individual risk or treatment progress.  Requiring mandatory cuffing when leaving the cell and the use of treatment modules is the practice in all the EOP Ad Seg units and regular Ag Seg units that I inspected.  CDCR does not distinguish between prisoners who are being disciplined and prisoners held for administrative purposes of for their own safety.  Nor do they take into account the treatment needs of individual inmates. The result is that a non-violent victim of violence is subject to the same restrictive conditions as the inmate who assaulted him.  These unnecessary and excessive security restrictions are barriers to confidential and therapeutic relationships between clinicians and patients, and explain the high rates of refusal for group and individual treatment many institutions report.  Delivery of treatment services is compromised by such practices.

121.   There are no limits on the amount of time a *Coleman* class member can be housed in an Ad Seg or SHU unit, and CDCR data shows numerous prisoners who remain

---

[22] *Evaluating the Effectiveness of Residential Treatment for Prisoners With Mental Illness*, Lovell, D., et al., Criminal Justice and Behavior, Vol. 28, No. 1, February 2001.  A true and correct copy of this document is attached hereto as **Exhibit 9.**

EXPERT DECLARATION OF ELDON VAIL

in segregation for many months and some for many years. In the Corcoran SHU, some class members have been there for more than a decade. According to numerous studies, segregation units are dangerous locations for mentally ill inmates to be housed. The American Psychiatric Association recently took the following position on this issue:

> Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates. If an inmate with serious mental illness is placed in segregation, out-of-cell structured therapeutic activities (i.e., mental health/psychiatric treatment) in appropriate programming space and adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for these individuals.[23]

122.    CDCR experiences an extremely high rate of suicide in its segregation units. There are many policies and practices that the CDCR should adopt to reduce its use of segregation and limit the amount of time that the mentally ill spend in these harsh environments. I agree with the findings of Lindsay Hayes[24] and others, that CDCR suicide prevention practices that include stripping prisoners who express suicidal ideation, and holding them in a cell with no privileges, no property and only a suicide smock to wear, will be experienced as punitive and is likely to discourage prisoners from seeking help in the future when they are feeling depressed or suicidal.

123.    Custody procedures interfere regularly with the treatment that is provided to inmate patients in Administrative Segregation or in a Special Housing Unit. These sessions with clinicians occur in what CDCR calls "treatment modules", basically a holding cell, often on the floor of the dayroom. Inmates and mental health staff alike are adamant that these modules do not provide adequate confidentiality for effective treatment,

---

[23] Position Statement on Segregation of Prisoners with Mental Illness, American Psychiatric Assn. Official Actions, December 2012. A true and correct copy of this document is attached hereto as **Exhibit 10**.

[24] Memorandum entitled *CDCR Suicide Prevention Policy*, Hayes, L., et al., August 16, 2011. A true and correct copy of this document is attached hereto as **Exhibit 11**.

1   and serve as a disincentive to inmate participation in treatment. Inmates complain that,

2   other than in anticipation of of our visit, these modules are rarely cleaned and that some

3   inmates urinate and defecate in them. Additionally, in many of the living units I visited,

4   even though the modules are on the dayroom floor of the living unit where the inmate

5   resides, the inmates were escorted in restraints from their assigned cell to the module

6   where they were then strip searched, an additional disincentive for some inmates to want to

7   come out of their cells for treatment. This practice is unnecessary from an institution

8   security perspective and so the actual purpose of this practice is perplexing. One mental

9   health staff reported that this process sometimes leaves the inmate patients in crisis and

10  upset, and worked up to the point of wanting to hurt themselves. Another clinician called

11  this lack of confidentiality "crippling." The only alternative to the cages is for the

12  treatment provider is to talk to their patient at the front of their assigned cell on the tier, an

13  even more difficult place to achieve confidentiality.

14      124.  CDCR has a policy requiring staggered checks every half hour for the first

15  21 days upon placement of an inmate in Administrative Segregation. When I reviewed

16  logs in the living units these checks were being performed but with some frequency they

17  were not "staggered." Apparently the requirement for these checks has emerged as a result

18  of the high rate of suicide within CDCR. They would be better served by following the

19  American Correctional Association standard which says:

20          Written policy, procedure and practice require that all special
            management inmates are personally observed by a correctional
21          officer at least every 30 minutes on an irregular schedule.
            Inmates who are violent or mentally disordered or who
22          demonstrate unusual or bizarre behavior receive more frequent
            observation; suicidal inmates are under continuing observation.
23

24      125.  This State of Washington, for example, has followed this practice for at least

25  30 years, and has a significantly lower inmate suicide rate than California. As it is an

26  ACA standard, it is by far the practice of the vast majority of prison systems in this

27  country.

28

EXPERT DECLARATION OF ELDON VAIL

126.    CDCR has a practice of sometimes holding inmate patients in Ad Seg while they await transfer to a general population bed that meets their level of care need. We encountered many such inmates waiting to be moved. Many had been waiting for a few months. One psychologist at LAC told us some inmate patients get "stuck in this building" for a year or more waiting for a transfer. There was no clear need for them to sit in Ad Seg, where their mental illness might be exacerbated, when they were otherwise cleared for general population placement. The practice of prolonging inmates in a segregated environment while they simply await a transfer potentially damages some mentally ill inmates, and is unnecessarily and unjustifiably punitive for those inmates.

### 6.    Confrontational Custody Attitudes and Lack of Training

127.    Custody staff in the living units where the mentally ill inmates are housed, especially in the EOP units, are not sufficiently trained to work with the mentally ill on a day to day basis. When someone is hearing voices, is manic or is severely depressed, they lack the capacity to regulate their behavior with the same speed and responsiveness as someone who is not suffering such distress. Custody staff need to be trained to understand that some mentally ill inmate patients will not be able to conform quickly to their orders. Inmate self reports, reports from mental health staff, RVR reports and UOF reports that I have reviewed all illustrate that this is the case. Inmates wind up being disciplined and react accordingly — some with aggression and some who choose to withdraw to their cells rather than face more confrontation. Neither option works to improve the mental health of inmate patients.

128.    I have spent nearly 35 years working with inmates of all types. They are a challenging population to work with. I am well aware of the concept of staff splitting, where inmates seek to pit one staff member against another by assuring him that he are the one (sometimes the only one) that understands what they are going through. I am equally familiar with inmate manipulation and the length of what some prisoners will go through to get you to do their bidding. I saw some of that in my inspections and took it for what it was and left it out of this report. But there were certain themes that emerged from my

EXPERT DECLARATION OF ELDON VAIL

1  conversations with inmate patients in each institution we inspected, that by their very

2  frequency and commonality, sometimes corroborated by mental health staff and sometimes

3  by the written records I reviewed, achieved credibility sufficient to include in my report.

4      129.    It appears that custody officers in CDCR frequently refer to participants in

5  the MHSDS as "J-cats," a pejorative term for those they consider to be mentally ill or

6  "stupid." Apparently this phrase is a long-standing practice within the CDCR, leftover

7  from the old mental health classification system that existed pre-*Coleman*. This was

8  reported to us during each prison inspection and it was not a question we asked of any

9  inmate. It is apparently part of the staff culture of CDCR and cuts across institution lines.

10  Others reported to us that on the way to meet with their psychologist, correctional officers

11  would mock inmates by saying such things as, "do you need a hug today?" Some, who

12  were assigned to a Sensitive Needs Yard (SNY) reported disparaging comments from

13  officers about their manhood because of their assignment to the SNY. Such comments are

14  completely unprofessional and have no place in an environment that should be oriented

15  towards therapy.

16      130.    One clinician I interviewed told me that the attitudes of custody officers are a

17  major obstacle to the effective delivery of mental health services within his institution and

18  said custody put "barrier upon barrier upon barrier" between inmates and mental health

19  staff. He reported that due to custody's control over scheduling, inmate patients are denied

20  access when they need services. Another clinician told me that he hoped prison authorities

21  would give mental health staff greater autonomy to develop a more tailored approach to

22  treatment of mentally ill inmates.

23      131.    At LAC we heard a consistent story from inmates (who had no knowledge of

24  which one of them we would be calling out to speak with) that the officer who was

25  assigned the armed post in a booth in a living unit for the mentally ill frequently used his

26  40mm weapon. One day, after an assault on a staff member in another unit, this officer

27  used the loudspeaker and told all the inmates in his unit that if they ever hit anyone in his

28  yard he would get out his gun (the M-16) with real bullets and shoot to kill. When we

1  queried a mental health staff member who frequently worked in this unit if she was aware
2  of this collective concern from inmates, she acknowledged that she was. She said she
3  often asked this officer, at the end of the workday, how his day went. He routinely made
4  comments to her such as, "well, I didn't get to shoot anyone today."

5      132.   These are all examples of the substantial disconnect in the understanding of
6  custody staff about their obligation to accept and understand, at least not undermine, that
7  their role should be to enhance the proper treatment of mentally ill inmate patients. It is a
8  statement about the culture among custody staff and it is a statement about the lack of
9  accountability by their supervisors and administrators to not hold their staff more
10  accountable.

11      133.   Many of the mental health staff I interviewed strongly expressed their desire
12  for the increased training of custody staff. I acknowledge that there has been some cross
13  training with hearing officers and clinicians regarding the RVR process. There has also
14  been some limited cross training at CSP-LAC and it is remembered fondly. But upon
15  inquiry I was told this training was over a year ago and there are no concrete plans for it to
16  continue.

17      134.   In order to improve treatment outcomes, CDCR should provide extensive
18  post specific training for those assigned to work in housing units for mentally ill inmates.
19  They should also screen who is allowed to work there and evaluate individual competency
20  to work in these positions. Supervision of those units and their program should be shared
21  between custody and mental health administrators. Right now mental health staff are left
22  standing on the outside, trying to help inmates navigate the lockdown living conditions
23  they experience in CDCR.

24      135.   I spoke with two inmates on death row at San Quentin, who had been there
25  more than a decade, and have experienced first-hand the enhancement of services that has
26  developed since the requirements of the *Coleman* lawsuit have been placed on CDCR.
27  One of the inmates showed us the scar on the back of his head that he said he got when hit
28  with a wooden block shot by a 40mm. He told us he was in seven fights before he

EXPERT DECLARATION OF ELDON VAIL

1  received the treatment required by *Coleman* and told us he has not been in a fight since.

2  Both inmates were very clear that without the *Coleman* lawsuit and the Special Master in

3  place, they have no confidence that the treatment they are today receiving would continue

4  in any form.

5      136.   The class member inmates we interviewed were sometimes chosen at

6  random, other times we selected them because they had been involved in a UOF situation.

7  In a San Quentin reception unit we talked to a few inmates who had been involved in UOF

8  incidents, all on their first day.  The first inmate we met with told us about his first day of

9  arrival at the prison.  After some preliminary intake procedures he was taken to the living

10  unit to be assigned to a cell.  As he came to the cell he saw the other inmate inside and told

11  the officer that the two were not compatible and he needed to be assigned elsewhere.  His

12  concern was not acted upon by the officer.  Once the cell door was shut behind him his

13  new cell mate explained what was going to happen next.  The cell mate handed the class

14  member a razor blade and told him he need to shout "man-down" and when the officers

15  came back to the cell he was to hold the razor to his neck and say he was going to kill

16  himself.  Either that or he would be beaten or killed.  The inmate chose the "man-down"

17  option and when the staff member came, he immediately pepper sprayed the class member,

18  took him for a cold shower, locked him naked in a cell – in December – for several hours,

19  and finally took him to a bed in the MHCB.  A sad story, we thought at the time.  Except

20  we were soon to discover it was a common experience upon arrival at San Quentin for

21  some newly arriving inmates.

22      137.   In very short order we discovered a total of four inmates who had exactly the

23  same experience occur on their first day in prison--take the razor blade, shout "man-

24  down", threaten to kill yourself or be beaten.  This is not what we were looking for.  It is

25  not what we were expecting to find.  I requested the use of force reports for each of these

26  incidents and they track with the inmates' version of the events, with the exception that

27  some say they were sprayed after they followed the officer's order to put the blade down.

28

1  In each case the officers say they sprayed because the inmate would not put the blade

2  down.

3      138.  We returned to the unit where these events occurred and asked the unit

4  Sergeant if this story was familiar to them and he and some of his officers indicated that it

5  indeed was. They said all the inmates have to do is come to them and they would help but

6  I question how an inmate is to know this on the first day they arrive in prison. We also

7  asked a supervising psychologist if she was aware of this pattern and she said she had

8  heard of it but didn't think it was a frequent occurrence. CDCR should more closely

9  examine this phenomenon and find a solution that protects the inmates. This is clearly a

10  flaw in their reception process and a failure in their obligation to provide appropriate care

11  for newly arriving inmates who are mentally ill.

12      139.  This example and the routine disparaging comments made to mentally ill

13  inmates are not patterns that were hard for us to uncover in our inspections of CDCR

14  prisons, despite the limitations imposed by the large presence of CDCR staff and their

15  counsel. CDCR authorities should be aware of them and should be busy finding solutions.

16  I am left with the overwhelming conclusion that they just don't get it. They have not

17  internalized the lessons offered by the courts or by what is happening in other prison

18  systems around the country. CDCR runs an insular system that has sold themselves a

19  delusion that inmates in California are somehow different and more difficult than those in

20  other states. They are not different; they are just treated that way and the results are

21  predictable.

22      140.  It is encouraging and important to note the progress that has been made in

23  relationships between mental health providers and their inmate patients. It was common

24  for class members I interviewed to report some satisfaction with the groups they were able

25  to participate in. There was much higher praise for the one-to-one contact they were

26  having with their primary clinician.

27      141.  However, there is likely a generation of officers in CDCR and probably even

28  their wardens that do not know prison safety must begin with good security procedures,

EXPERT DECLARATION OF ELDON VAIL

1   but cannot be fully-achieved without multiple incentives in place and the belief by the

2   inmate population that the facility is ruled with legitimate authority — an authority that

3   can demonstrate balance and fairness in how they treat staff and inmates.

4   **V.   CONCLUSION**

5       142.   In conclusion, CDCR has a level of tolerance for incidents, and for certain

6   types and techniques to impose "control" that renders its use of force on inmates patients a

7   reflection of what the agency has been through historically as a result of severe

8   overcrowding. I find that there is a discernable pattern and practice with respect to use of

9   force which is sometimes based on written policy provided to custodial staff, and at other

10  times based on absence of written policy or a complete disregard for the recommendations

11  of CDCR's own expert consultants. As a result, both formally and informally, the CDCR

12  has bound itself to an approach which systemically inflicts unnecessary and excessive use

13  of force on class members.

14      143.   In the RVR, or inmate disciplinary process, application of noble policy

15  statements fall far short of stated goals. There are fundamental flaws in the assignment of

16  hearings officers and of staff assistants. Both practices result in a failure to provide

17  consistently fair hearings and proper advocacy for class members. The lack of monitoring

18  at the local and at the statewide level reflects a depth of ignorance and obfuscation that is

19  impossible to justify. It prevents CDCR from obtaining accurate information about

20  whether the RVR process is being implemented in accordance with program goals, and

21  what effect that has on inmate patients. The lack of frequent communication between

22  hearing officers, line custody officers and mental health staff prevents a working

23  partnership from developing that could tailor disciplinary outcomes to the treatment needs

24  of the mentally ill, providing actual mitigation when justified. In structure and in practice

25  the CDCR fails to ensure a disciplinary hearing process that systematically fails to

26  accommodate for the needs of the mentally impaired in its custody.

27      144.   The overwhelming dominance of custody staff throughout the CDCR and the

28  structure and practices they have adopted during the years of severe overcrowding result in

1  a culture of lockdown. This approach is counter productive to the precise goals the agency

2  wishes to achieve: safe institutions with proper treatment for the mentally ill. The "Green

3  Wall," a descriptive term inmates and staff often use to describe the intractability of

4  custody staff, is impermeable and resistant to change. CDCR administrators need to

5  recognize and accept this unbalanced reality of their facility operations so that they can

6  confront this obstacle and begin to allow mental health staff to operate mental health

7  treatment programs that are effective and meaningful. I find that CDCR continues to fail

8  to provide mental health care at a level sufficient for me to recommend that the court cease

9  its oversight.

10     145.   Mr. Martin made what he called "best practice" recommendations for both

11  the RVR and UOF practices within CDCR. While I agree with his recommendations, I

12  disagree when he calls them "best practices." Rather, I would identify his

13  recommendations as bare minimums that CDCR should adopt to begin the process of

14  moving its facility operation toward the levels practiced and accepted in other corrections

15  systems around the country.

16     146.   It is necessary to go further than Mr. Martin. CDCR should:

17  •   Review its Use of Force policy and remove the authority of officers to inflict
18      corporeal punishment on inmates who fail to give up a food tray or close the
        food slot in cell doors.

19  •   Examine its procedures related to the use of holding cells and the practice of
20      "management status" so that any emergency restriction imposed beyond
        normal conditions of confinement is related to an immediate threat presented
21      by the inmate. Without a due process component (unavailable because of an
22      emergency), such limitations should last only as long as necessary for the
        inmate to cease disruptive behavior.
23

24  •   Prohibit, by policy, the use of crowd-control OC dispensers during cell
        extractions.
25

26  •   Provide clear written guidance and expectations in policy for the use of OC
        that address the amount dispensed and requires waiting periods between
27      subsequent applications. Provide extensive training to implement this policy
        change.

28

- Provide clear written guidance in policy that restrict the use of the expandable baton to situations that are defensive, for the safety of the officer, or in which there is a risk of death or serious bodily harm. CDCR should provide extensive training to implement this policy change.

- Remove the expandable baton as an item of standard issue and instead make it post specific, determined in part by the security level of the inmate population.

- Make video cameras available in all elevated booths or towers. If the officer in the post is not engaged with a weapon to help control a situation, expect them to use the camera to document an incident and any subsequent use of force.

- Improve efforts, through training and practice, to de-escalate situations that are likely to result in a use of force. Provide additional training to mental health staff who are now expected to be part of this process, and consider cross-training hostage negotiators to perform this function.

- Create an investigative system for use of force that is truly transparent by including reports of outcomes where use of force was found to be unnecessary or excessive.

- Restructure the hearing process so that hearing officers are independent of the custody chain of command.

- Expand the types of staff who can perform the staff assistant function to include mental health staff.

- Allow clinicians from the inmate's treatment team to be part of the determination of guilt and the assignment of sanctions phase in the RVR process, so that hearing outcomes enhance instead of undermine treatment goals.

- Change its policy so that SHU terms are not proscribed but last only as long as necessary for inmate patients to regain self control so that they can function in the general population.

- Reexamine the criteria for holding inmate patients in Ad Seg except for when they present a risk to themselves or to others.

- Increase the professionalism and the accountability for all institution staff, so that disparaging comments about individuals or groups of inmates, whether they are mentally ill or not, are prohibited.

EXPERT DECLARATION OF ELDON VAIL

- Invest in strategies that provide more incentives for inmates to resist the pressure of gang culture and peer-approval.

- Restructure the schedule of the normal day so that opportunities for out of cell time are maximized, and inmates are not forced to chose between treatment and religious services.

- Share authority for the operation of intermediate residential treatment programs between custody and mental health staff.

- Create strict criteria for staff assignments to treatment units and review their performance frequently.  Remove staff who do not demonstrate a capacity to work with the mentally ill.

- Provide post specific training for officers assigned to mental health treatment units.

- Adopt the ACA standard for staggered welfare checks for all inmates housed in any type of solitary confinement

147.   These recommendations are only a starting point for the kind of systemic change that needs to happen within CDCR.

148.   CDCR must dig deeper and understand that this moment of decline in its inmate population brings with it the opportunity and the obligation to change its practices. CDCR needs to find out what others are doing to run prison systems with significantly less violence, less litigation, and fewer suicides.  If CDCR fails to take this opportunity, we can expect more of the same, especially once the Court's direct supervision and oversight is removed.  CDCR says it strives to be the best prison system in the country.  Instead, it is an aberration, a system that continues to move in exactly the opposite direction from what is happening elsewhere in the U.S.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration is executed in Portland, OR on March 14, 2013.

E. Vail

Eldon Vail

49