**EXHIBIT 5**

0001

1                    UNITED STATES DISTRICT COURT
2                    EASTERN DISTRICT OF CALIFORNIA
3                              ---oOo---
4   RALPH COLEMAN, et al.,          )
                                    )
5                                   )
                 Plaintiffs,        )
6                                   )
                       vs.          )   No. Civ S 90-0520 LKK-J
7                                   )
    EDMUND G. BROWN, JR., et al.,   )   Volume I
8                                   )
                                    )   Page 1 - 300
9                Defendants.        )
    _____)
10
11
12                          DEPOSITION OF
13                         STEVE J. MARTIN
14                   THURSDAY, FEBRUARY 28, 2013
15
16
17          CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
18
19   REPORTED BY:
20   HOLLY THUMAN, CSR No. 6834, RMR, CRR
21   ----------------------------------------------------------
22                       JAN BROWN & ASSOCIATES
23            WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES
24       701 Battery Street, 3rd Floor, San Francisco, CA 94111
25                  (415) 981-3498 or (800) 522-7096

```
1                             I N D E X
2        EXAMINATION BY:                                      PAGE
3        MR. BORNSTEIN                                           5
         MS. CESARE-EASTMAN                                    295
4        Reporter's Certificate                                300
5                 EXHIBITS MARKED FOR IDENTIFICATION
6        NO.                DESCRIPTION                       PAGE
7        Exhibit 1   Draft document headed "Use of Force        27
                     Audit Tool [Steve]" (DEXP 102825
8                    through -826)
9        Exhibit 2   Handwritten notes (DEXP 105127 through     59
                     -658)
10
         Exhibit 3   Percentage of Use of Force and Non-Use     63
11                   of Force Incidents Involving Mental
                     Health Patients, 2011 June - November
12                   (DEXP 105486)
13       Exhibit 4   Email chain, Martin to McKinney,           74
                     November 9, 2012 (DEXP 010156)
14
         Exhibit 5   State of California Department of          76
15                   Corrections and Rehabilitation
                     Memorandum, September 12, 2012, to
16                   Associate Directors - Division of
                     Adult Institutions, Wardens (DEXP
17                   009657 through -658)
18       Exhibit 6   Coleman Audit Best Practice               122
                     Recommendations for Use of Force (DEXP
19                   105138 through -143)
20       Exhibit 7   Handwritten notes (DEXP 105146)           207
21       Exhibit 8   Coleman Review, Round XXV, California     211
                     Correctional Health Care Services
22                   (DRPD 1 00450 through -479)
23       Exhibit 9   Handwritten notes headed "Telcon          235
                     4/13/12" (DEXP 105149 through -150)
24
25            (Cont'd)
```

2

| | | | |
|---|---|---|---|
| 1 | Exhibit 10 | December 2011 Richard J. Donovan Correctional Facility document, Operation Plan No. 66 (DEXP 105439 through -448) | 243 |
| 2 | Exhibit 11 | Handwritten notes headed "RVR 3/28/12" (DEXP 105489 through -490) | 246 |
| 3 | Exhibit 12 | Rules Violation Report, 12-25-11, R.J.D.C.F. (DEXP 105497 through -505) | 250 |
| 4 | Exhibit 13 | 2/15/12 email, McKinney to Dvoskin and others (DEXP 000013) | 267 |
| 5 | Exhibit 14 | Email chain, 12/12/2011, McKinney to Martin (DEXP 009583 through -584) | 270 |
| 6 | Exhibit 15 | March 17, 2011 State of California Memorandum, Hunnicutt to Neotti (DEXP 105453 through -454) | 281 |
| 7 | Exhibit 16 | May 12, 2011 State of California Memorandum, Hunnicutt to Neotti (DEXP 105455 through -456) | 282 |
| 8 | Exhibit 17 | July 18, 2011 State of California memorandum, Hunnicutt to Paramo (DEXP 105457 through -459) | 283 |
| 9 | Exhibit 18 | October 9, 2011 State of California Memorandum, Hunnicutt to Paramo (DEXP 105460 through -461) | 283 |
| 10 | Exhibit 19 | October 9, 2011 State of California Memorandum, Hunnicutt to Paramo (DEXP 105462 through -463) | 285 |
| 11 | Exhibit 20 | Handwritten notes headed "RJD Cont'd 3/28/12" (DEXP 105464 through -465) | 287 |
| 12 | Exhibit 21 | Rules Violation Report, sent up on January 23, 2012 (DEXP 105506 through -507) | 291 |
| 13 | Exhibit 22 | Rules Violation Report: Mental Health Assessment Request - CDCR 115-MH Supplemental Information Form for Hearing Officer, 12/22/11 (DEXP 105512) | 294 |

```
 1                              --o0o--
 2              Deposition of STEVE J. MARTIN, taken by the
 3      Plaintiffs, at K&L GATES LLP, Four Embarcadero Center,
 4      Suite 1200, San Francisco, California 94111, commencing
 5      at 9:27 a.m., on THURSDAY, FEBRUARY 28, 2013, before me,
 6      HOLLY THUMAN, CSR, RMR, CRR.
 7                              --o0o--
 8                             APPEARANCES
 9      FOR THE PLAINTIFFS:
10           K&L GATES LLP
             Four Embarcadero Center, Suite 1200
11           San Francisco, California 94111
             415.249.1059
12           By:  JEFFREY BORNSTEIN, Attorney at Law
                  jeff.bornstein@klgates.com
13                MEGAN F. CESARE-EASTMAN, Attorney at Law
                  megan.cesare-eastman@klgates.com
14                RANJINI ACHARYA, Attorney at Law
15           ROSEN BIEN GALVAN & GRUNFELD LLP
             315 Montgomery Street, Tenth Floor
16           San Francisco, California 94104-1823
             By:  MICHAEL W. BIEN, Attorney at Law
17                415.433.6830
                  (Present when indicated.)
18
19      FOR DEFENDANTS:
20           ATTORNEY GENERAL OF CALIFORNIA
             455 Golden Gate Avenue, Suite 11000
21           San Francisco, California 94102-7004
             By:  PATRICK RICHARD McKINNEY II
22                Deputy Attorney General
                  415.703.3035
23                Patrick.McKinney@doj.ca.gov
24      ALSO PRESENT:  ELDON VAIL
25
```

1      MR. BORNSTEIN:  Q.  Well, let's go back to
2  Exhibit 4, your email.  And at the top, in your response
3  to Mr. McKinney, you say:
4          Patrick, thanks for sharing this memo.  I
5      think the Deputy Director was spot-on in
6      addressing two of my major concerns and his
7      direct involvement in moving this forward when
8      coupled with the OJT provided by the Wardens
9      should bear fruit and serve as timely refinements
10     to the system.  Steve.
11     A.  Correct.
12     Q.  So it -- obviously, it sounds like you thought
13  that this was a good development.  Right?
14     A.  Correct.  Correct.
15     Q.  And you thought that it needs to be coupled
16  with the on-the-job training that this memo suggests
17  needs to happen.  Right?
18     A.  Correct.
19     Q.  And then, as you put it, it should bear fruit.
20  What does that mean?
21     A.  That we should see maybe some diminution,
22  reduction, in the use of OC spray in controlled
23  use-of-force situations.
24     Q.  Why is it that you wanted there to be a
25  reduction in the use of OC spray, or why did you make

```
 1   that recommendation?
 2        A.   I was concerned about the amounts in some of
 3   the deployment applications that -- you know, the
 4   different kinds of dispersal agents used in a controlled
 5   use-of-force situation in which the inmate was inside
 6   his cell, secured in his cell and was not armed or
 7   barricaded, that I had concerns that sometimes,
 8   occasionally, quite a lot of chemical agents used in
 9   that -- used with applications that weren't necessarily
10   appropriate for that setting.
11        Q.   I believe you described the -- is it MK?
12        A.   MK?
13        Q.   MK-9?
14        A.   Yes.
15        Q.   Is that right?  That's the big canisters that
16   most of the guards have?
17        A.   Yeah, it's a crowd control -- a crowd control
18   contaminant size OC canister.
19        Q.   And that's -- you observed that that seemed to
20   be one of the weapons of choice in terms of cell
21   extractions?
22             MR. McKINNEY:  Objection.  Argumentative.
23             THE WITNESS:  Yeah, certainly, oftentimes, yes.
24             MR. BORNSTEIN:  Q.  In California?
25        A.   In California.
```

1      Q.   And you were concerned that, in particular, in
2   the close quarters of a cell, that particular crowd
3   disbursement MK-9 canister might put a lot of gas in
4   there that might be overwhelming?
5      A.   A lot of gas, yes.
6      Q.   Unnecessary?
7      A.   Yes.
8      Q.   Unsafe?
9      A.   Certainly increases risk.
10     Q.   And you wanted the policy to change so that
11  that wouldn't be the weapon the choice?
12          MR. McKINNEY:  Objection.  Assumes facts not in
13  evidence, misstates prior testimony, it's vague and
14  ambiguous, it's argumentative.
15          THE WITNESS:  I had multiple discussions on the
16  appropriateness of MK-9 being the standard issue to line
17  officers.  And I also had concerns that -- about the
18  lack of guidance of when to deploy this weaponry versus
19  that weaponry, chemical agents.
20          MR. BORNSTEIN:  Q.  But in particular, what is
21  addressed in this memo and what you had recommended was
22  that there needed to be more control at the
23  institutional level about when and how they used OC
24  spray, especially in connection with cell extractions,
25  but not limited to that.

1        MR. BORNSTEIN: Q. Isn't that true?

2        MR. McKINNEY: Asked and answered. Misstates

3   prior testimony. It's argumentative. It's compound.

4   It's unintelligible.

5        THE WITNESS: My findings are that the system

6   is effective. Can the system be improved? Of course.

7   Of course it can. Any system can. Is it -- could it

8   stand some significant retooling and so forth?

9   Certainly. I think I would make suggestions that would

10  be cast as significant.

11       But is it -- is it failing to in most cases

12  flush out and identify instances of plainly excessive or

13  unnecessary force? The system is structured to do that.

14       MR. BORNSTEIN: Q. Okay. And the fact that it

15  is structured to do that is something that's important

16  to you. Right?

17       A. Yes.

18       Q. Did -- have you -- in the year plus that you've

19  been an expert for the State, have any use-of-force

20  referrals resulted in discipline of any staff?

21       MR. McKINNEY: Objection. Calls for

22  speculation.

23       MR. BORNSTEIN: Q. To your knowledge.

24       A. I was not able to document a fully realized

25  imposition of a disciplinary sanction for an excessive

1   use of force that I looked at.

2       Q.  Or an unnecessary use of force?

3       A.  Unnecessary, excessive.

4       Q.  And that's one of the hallmarks, one of the
5   criteria that you insist upon in terms of being a viable
6   part of a use of force system and process, don't you?

7       A.  Yes.

8       Q.  And so we don't know, is really the answer,
9   because you couldn't figure it out from your work.  Is
10  that right?

11      A.  There were always -- they were in varying
12  stages of progression toward some resolution.

13      Q.  But none of them have been resolved.

14      A.  I couldn't find one where, yes, we imposed this
15  penalty through the formal disciplinary process for this
16  violation.

17      Q.  Did you have the opportunity to look at any of
18  the sort of -- what do they call it, Internal Affairs?
19  Is that who does these investigations?

20      A.  Well, they're an entity that does, the agency,
21  Internal Affairs.

22      Q.  Did you get any of their reports about what
23  they were doing?

24      A.  You mean particular investigations?

25      Q.  Yeah.

```
 1        A.   Right.  If I was charged with reviewing the
 2   entire disciplinary process, yes.
 3        Q.   You would make sure that there was something
 4   that was consistent across the board, wouldn't you?
 5        A.   I'm actively monitoring that in a statewide
 6   system now, and my record speak for itself on that, that
 7   it's adequately monitored.
 8        Q.   Okay.  And would you think it adequate if the
 9   hearing officer, the lieutenant, assigns his -- I don't
10   know, one of his deputies or one of his people that
11   works directly under him to be the Staff Assistant for
12   inmates?  Do you think that that would be a good thing?
13             MR. McKINNEY:  Objection.  Lack of foundation,
14   vague and ambiguous.
15             THE WITNESS:  I'd want a bit more detachment
16   and probably create a system that's different than what
17   you just described.
18             MR. BORNSTEIN:  Q.  Why?
19        A.   Well, you want some freedom for that Staff
20   Assistant to adequately represent that inmate, and it --
21   you know, the more separation you get between that Staff
22   Assistant and his immediate superior, probably the more
23   you move towards ensuring some vigorous advocacy if it
24   should come into play.
25        Q.   Hard to do when you're working for the guy
```

```
 1            MR. BORNSTEIN:  Okay.  Here's the next exhibit,
 2   which is 5.
 3            (Deposition Exhibit 5 was marked for
 4             identification.)
 5            MR. BORNSTEIN:  Q.  Exhibit 5 is in fact a copy
 6   of the memo that was sent to you by email by
 7   Mr. McKinney?
 8       A.   Yes.
 9       Q.   And it's dated December 12, 2012, to Associate
10   Directors, Division of Adult Institutions, and it says,
11   Wardens.  And the subject is, "Use of Chemical Agents
12   During Controlled Use of Force Situations and Review of
13   Use of Force Incidents," and on the second page, it's
14   signed by M.D. Stainer, Deputy Director, Facility
15   Operations, Division of Adult Operations.  Correct?
16       A.   Correct.
17       Q.   And this was -- this came out of your meeting
18   with Mr. Stainer.  Right?
19            MR. McKINNEY:  Objection.  Vague and ambiguous.
20            THE WITNESS:  I -- I don't know that it did.
21   It -- I think there was a relationship in some
22   recommendations and observations I had made into the
23   central CDCR that had been shared with the deputy
24   director, and that, coupled with some observations he
25   had made maybe just in his office, generated this memo.
```

1    A.   Correct.

2    Q.   In your interviews with wardens, say, at

3 Corcoran, for instance -- you interviewed a warden

4 there.  Right?

5    A.   Well, I meet with -- I don't know whether the

6 warden at Corcoran was there.  But I think he was.  But

7 yeah, typically we did.

8    Q.   Kern Valley?  Did you interview a warden there?

9         MR. McKINNEY:  Objection.  The witness has

10 never testified that he went to Kern Valley.

11         THE WITNESS:  Yeah, I don't -- I'd have to look

12 at my notes to see which wardens.

13         MR. BORNSTEIN:  Q.  You didn't go to Lancaster.

14 What about at San Quentin?  Did you interview the warden

15 there?

16    A.   Yes.

17    Q.   Did you find evidence as to whether or not

18 there were any progressive use-of-force policies in any

19 of those institutions?

20    A.   I don't know what that is.

21    Q.   Let me rephrase it then.

22         Did you find any policy or procedure that sort

23 of said, all right, here's -- you know, we're going to

24 try and use this level of force initially, and if that

25 doesn't work, then we're going to go to this level of