# EXHIBIT 7

1  PRISON LAW OFFICE
   DONALD SPECTER, Bar No. 83925
2  STEVEN FAMA, Bar No. 99641
   E. IVAN TRUJILLO, Bar No. 228790
3  SARA NORMAN, Bar No. 189536
   ALISON HARDY, Bar No. 135966
4  REBEKAH EVENSON, Bar No. 207825
   1917 Fifth Street
5  Berkeley, CA 94710
   Telephone: (510) 280-2621
6
   KIRKPATRICK & LOCKHART PRESTON
7  GATES ELLIS LLP
   JEFFREY L. BORNSTEIN, Bar No. 99358
8  EDWARD P. SANGSTER, Bar No. 121041
   RAYMOND E. LOUGHREY, Bar No. 194363
9  55 Second Street, Suite 1700
   San Francisco, CA 94105-3493
10 Telephone: (415) 882-8200

11 THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
12 CLAUDIA CENTER, Bar No. 158255
   600 Harrison Street, Suite 120
13 San Francisco, CA 94107
   Telephone: (415) 864-8848

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

14
   Attorneys for Plaintiffs

15              IN THE UNITED STATES DISTRICT COURTS
16             FOR THE EASTERN DISTRICT OF CALIFORNIA
               AND THE NORTHERN DISTRICT OF CALIFORNIA
17      UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
18       PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| 19  RALPH COLEMAN, et al., | No.: Civ S 90-0520 LKK-JFM P |
| 20      Plaintiffs, | **THREE-JUDGE COURT** |
| 21      vs. | |
| 22  ARNOLD SCHWARZENEGGER, et al., | |
| 23      Defendants | |
| 24  MARCIANO PLATA ,et al., | No. C01-1351 TEH |
| 25      Plaintiffs, | **THREE-JUDGE COURT** |
| 26      vs. | |
| 27  ARNOLD SCHWARZENEGGER, et al., | **EXPERT REPORT OF PROFESSOR** |
| 28      vs.   Defendants | **CRAIG HANEY** |

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................ 1

II.   FOUNDATION FOR EXPERT OPINIONS IN THIS ACTION ....................... 6

III.  EXPERT OPINIONS ................................................................................. 9

      A.   Summary of Expert Opinion .......................................................... 9

           1.   Nature of the Continuing Constitutional Violations ................. 10

      B.   The Effects of Overcrowding on Prisoners and Prison Systems ........... 22

           1.   The Nature of Overcrowding .......................................... 23

           2.   Devolving Standards of "Overcrowding" Inside the CDCR .......... 24

           3.   The Psychological Effects of Overcrowding on Prisoners ........... 27

           4.   The Behavioral Effects of Overcrowding on Prisoners and Prisons ......... 34

           5.   The Relationship Between Overcrowding and the Overuse of
                Segregation ............................................................. 41

           6.   Summary of Effects of Prison Overcrowding ......................... 49

      C.   The CDCR Is A Chronically And Severely Overcrowded Prison System ........... 50

           1.   Broad Reviews of the CDCR and Crowding ........................ 51

           2.   Personal Tours of Eight Severely Overcrowded California Prisons .......... 56

                a.   California Institution for Men (CIM) ......................... 57

                     (i)    CIM Overview .......................................... 57

                     (ii)   EOP Reception Center Program. ....................... 59

                     (iii)  Inadequate Space, Suicidal Transfer Delay and Lack
                            of Medical Records. ................................... 60

                     (iv)   Use of Dangerous Overflow Units for MHCBs. .......... 60

                     (v)    Lack of Office and Treatment Space. .................. 61

                     (vi)   Overcrowded Housing Units with Idle Prisoners. ........ 62

                     (vii)  Co-mingling of EOP Prisoners with Other
                            Populations ........................................... 65

                     (viii) Delays Transferring EOP Prisoners Out of
                            Administrative Segregation. .......................... 66

|         | (ix)    | Administrative Segregation Units | 67  |
| b.      | Valley State Prison for Women (VSPW) | | 75 |
|         | (i)     | VSPW Overview | 75 |
|         | (ii)    | Treatment and Office Space and Staffing | 76 |
|         | (iii)   | Overcrowding in Housing Units, Dayrooms and Gyms | 78 |
|         | (iv)    | Security Housing and Administrative Segregation Units | 80 |
| c.      | Salinas Valley State Prison (SVSP) | | 83 |
|         | (i)     | SVSP Overview | 83 |
|         | (ii)    | MHCB Access | 86 |
|         | (iii)   | DMH Level IV ICF Beds | 87 |
|         | (iv)    | Impact of Lockdowns on EOP Programs | 89 |
|         | (v)     | Impact of Lockdowns on Facility C | 91 |
|         | (vi)    | Facility C-Lockdown Suicides | 93 |
|         | (vii)   | Behavior Modification Unit | 95 |
|         | (viii)  | Custody and Clinical Staffing Problems in ASUs | 97 |
|         | (ix)    | Impact of MHCB/DMH Shortages | 100 |
| d.      | Mule Creek State Prison (MCSP) | | 101 |
|         | (i)     | MCSP Overview | 101 |
|         | (ii)    | Inappropriate Treatment Space | 102 |
|         | (iii)   | Staff Concerns Related to Overcrowding | 105 |
|         | (iv)    | Overcrowding and Housing Units | 106 |
|         | (v)     | Extreme Adaptations to Overcrowding | 108 |
| e.      | California Substance Abuse Treatment Facility (SATF) | | 113 |
|         | (i)     | SATF Overview | 113 |
|         | (ii)    | Shortages of Space for Offices and Treatment | 115 |
|         | (iii)   | Lack of Beds at Appropriate Level of Care | 117 |
| f.      | California Correctional Institute (CCI) | | 131 |

[248286-1]
EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

(i)      CCI Overview ................................................................. 131

(ii)     Insufficient Clinical and Custody Staff ............................. 132

(iii)    Use of Substandard, Non-Traditional Housing ................ 133

(iv)     Severe Lack of Clinical Office and Treatment Space ....... 135

(v)      Inability to Provide Appropriate Levels of Care .............. 138

(vi)     Lack of Adequate Programming in ASU and SHU.......... 143

g.   North Kern State Prison (NKSP) ........................................ 146

(i)      NKSP Overview ............................................................. 146

(ii)     Shortages of Space for Offices and Treatment ................. 146

(iii)    Understaffing ................................................................ 151

(iv)     Reception and Receiving Problems ................................. 153

(v)      Lack of Programming ..................................................... 155

(vi)     Overcrowding in Housing Units ...................................... 159

(vii)    Lack of Beds at Appropriate Level of Care and
         Delays in Transfers .......................................................... 159

h.   Wasco State Prison (WSP) ................................................. 162

(i)      WSP Overview ............................................................... 162

(ii)     Shortages of Space for Offices and Treatment ................. 163

(iii)    Overcrowding in Housing Units ...................................... 165

(iv)     Lack of Beds at Appropriate Level of Care and
         Transfer Delays ............................................................... 165

(v)      Reception Center Problems .............................................. 170

(vi)     Profoundly Mentally Ill Prisoners Receiving Little or
         No Treatment ................................................................. 172

3.   General Observations About the Impact of Overcrowding in These
     Facilities ............................................................................. 177

a.   Backlogs Due to Overcrowding.......................................... 177

b.   Staff Shortages ................................................................. 179

c.   Space Shortages ................................................................ 180

d.   Lack of Meaningful Activity and Treatment ....................... 181

|  |  | e. | Use of Holding Cages | 183 |
| | | f. | Overcrowded Housing Units | 184 |
| | | g. | Lockdowns | 185 |
| | | h. | Impact of Overcrowding Effects on Quality of Mental Health Care and Suicide Prevention | 186 |
| | | i. | Disproportionate Impact of Overcrowding on Vulnerable Parole Population | 189 |
| | | j. | Perniciousness of Overcrowding Effects | 191 |
| | D. | | The Only Remedy to the Continuing Constitutional Violations That Are Primarily Caused by Overcrowding is to Reduce the Population of the CDCR | 192 |
| IV. | | | CONTINUING CONSTITUTIONAL VIOLATIONS THAT ARE PRIMARILY CAUSED BY OVERCROWDING SHOULD BE REMEDIED BY OVERALL POPULATION REDUCTIONS TO BETWEEN 100-145% OF CDCR'S DESIGN CAPACITY | 200 |
| V. | | | CONCLUSION | 207 |

[248286-1]      EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

## TABLE OF ABBREVIATIONS/ACRONYMS

| | |
|---|---|
| 3CMS: | Correctional Clinical Case Manager System |
| ACH: | Acute Care Hospital |
| ADD: | Attention Deficit Disorder |
| ADHD: | Attention Deficit Hyperactivity Disorder |
| ADL: | Activities of Daily Living |
| Ambu bag: | Ambulatory Bag Used for CPR |
| APP: | Acute Psychiatric Program at Vacaville |
| ASH: | Atascadero State Hospital |
| ASP: | Avenal State Prison |
| ASU: | Administrative Segregation Unit |
| BMU: | Behavioral Modification Unit |
| BPT: | Board of Prison Terms |
| C-file: | Central File |
| C&PR: | Classification and Parole Representative |
| CAL: | Calipatria State Prison |
| CAP: | Corrective Action Plan |
| CC: | Correctional Counselor |
| CCAT: | Coordinated Clinical Assessment Team |
| CCC: | California Correctional Center |
| CCI: | California Correctional Institution |
| CCM: | Clinical Case Manager |
| CCPOA: | California Correctional Peace Officers Association |
| CCWF: | Central California Women's Facility |
| CDC: | California Department of Corrections |
| CDCR: | California Department of Corrections and Rehabilitation |
| CEN: | Centinela State Prison |

| | |
|---|---|
| CHCFs: | California Health Care Facilities |
| CIM: | California Institute for Men |
| CIW: | California Institute for Women |
| CM: | Case Manager |
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CMO: | Chief Medical Officer |
| CO: | Correctional Officer |
| COR: | California State Prison/Corcoran |
| CPR: | Cardiopulmonary Resuscitation |
| CRC: | California Rehabilitation Center |
| CSATF: | California Substance Abuse Treatment Facility |
| CSH: | Coalinga State Hospital |
| CSP: | California State Prison |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CTC: | Correctional Treatment Center |
| CTF: | California Training Facility/Soledad |
| CTQ: | Confined To Quarters |
| CVSP: | Chuckawalla Valley State Prison |
| DAI: | Division of Adult Institutions |
| DCHCS: | Division of Correctional Health Care Services |
| DDP: | Developmental Disabilities Program |
| DHS: | Department of Human Services |
| DMH: | Department of Mental Health |
| DNR: | Do Not Resuscitate |

-vi-

| DOF: | Director of Finance |
|---|---|
| DON: | Director of Nursing |
| DOT: | Directly Observed Therapy |
| DRC: | Death Review Coordinator |
| DRMC: | Delano Regional Medical Center |
| DSM: | Diagnostic and Statistical Manual |
| DTP: | Day Treatment Program |
| DVI: | Deuel Vocational Institute |
| EOP: | Enhanced Outpatient Program |
| EPPD: | Earliest Possible Parole Date |
| EPRD: | Earliest Possible Release Date |
| ERDR: | Emergency Response and Death Review Committee |
| ERRC: | Emergency Response Review Committee |
| FIT: | Focus Improvement Team |
| Folsom: | Folsom State Prison |
| FTE: | Full-Time Equivalent |
| GACH: | General Acute Care Hospital |
| GAF: | Global Assessment of Functioning |
| GP: | General Population |
| HCCUP: | Health Care Cost and Utilization Program |
| HCM: | Health Care Manager |
| HCPU: | Health Care Placement Unit |
| HCQMC: | Health Care Quality Management Committee |
| HDSP: | High Desert State Prison |
| HQ: | Headquarters |
| HS: | *Hora Somni*/Hour of Sleep |
| ICC: | Institutional Classification Committee |
| ICF: | Intermediate Care Facility |

| ICU: | Intensive Care Unit |
| IDTT: | Interdisciplinary Treatment Team |
| IEX: | Indecent Exposure |
| IMHIS: | Inmate Mental Health Information System |
| INS: | Immigration and Naturalization Service |
| IP: | Inmate Profile |
| I/P: | Inmate/Patient |
| ISP: | Ironwood State Prison |
| ISU: | Investigative Services Unit |
| KVSP: | Kern Valley State Prison |
| LCSW: | Licensed Clinical Social Worker |
| LOC: | Level of Care |
| LOP: | Local Operating Procedure |
| LOU: | Locked Observation Unit |
| LPN: | Licensed Practical Nurse |
| LPT: | Licensed Psychiatric Technician |
| LSW: | Limited Suicide Watch |
| LVN: | Licensed Vocational Nurse |
| MAR: | Medication Administration Record |
| MCSP: | Mule Creek State Prison |
| MDD: | Major Depressive Disorder |
| MDO: | Mentally Disordered Offender |
| MH-4: | Mental Health Assessment |
| MHCB: | Mental Health Crisis Bed |
| MHOHU: | Mental Health Outpatient Housing Unit |
| MHSDS: | Mental Health Services Delivery System |
| MHTS: | Mental Health Tracking System |

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH
[248286-1]

| | |
|---|---|
| MOD: | Medical Officer of the Day |
| MOU: | Memorandum of Understanding |
| MSF: | Minimal Support Facility |
| MTA: | Medical Technical Assistant |
| NCF: | Normal Cognitive Functioning |
| NKSP: | North Kern State Prison |
| NOS: | Not Otherwise Specified |
| OHU: | Outpatient Housing Unit |
| OIA: | Office of Investigative Affairs |
| OP: | Operating Procedure |
| OT: | Office Tech |
| PBSP: | Pelican Bay State Prison |
| PC: | Primary Clinician |
| PHU: | Protective Housing Unit |
| PIA: | Prison Industry Authority |
| POC: | Parole Outpatient Clinic *or* Psychiatrist on Call |
| POD: | Psychiatrist on Duty *or* Psychiatrist of the Day |
| PSH: | Patton State Hospital |
| PSU: | Psychiatric Services Unit |
| PSW: | Psychiatric Social Worker |
| PT: | Psychiatric Technician |
| PTSD: | Post Traumatic Stress Disorder |
| PVSP: | Pleasant Valley State Prison |
| QIP: | Quality Improvement Plan |
| QIT: | Quality Improvement Team |
| QMAT: | Quality Management Assessment Team |
| QMT: | Quality Management Team |
| R&R: | Receiving & Release |

[248286-1]    EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

| | |
|---|---|
| RC: | Reception Center |
| RJD: | Richard J. Donovan Correctional Facility |
| RN: | Registered Nurse |
| RT: | Recreation Therapist |
| RVR: | Rule Violation Report |
| SAC: | California State Prison/Sacramento |
| SCC: | Sierra Conservation Center |
| SHU: | Security Housing Unit |
| SI: | Suicidal Ideation |
| SMY: | Small Management Yard |
| SNF: | Skilled Nursing Facility |
| SNY: | Sensitive Needs Yard |
| SPC: | Suicide Prevention Committee |
| SPR-FIT: | Suicide Prevention and Response Focused Improvement Team |
| SPU: | Special Processing Unit |
| SQ: | California State Prison/San Quentin |
| SRA: | Suicide Risk Assessment |
| SRAC: | Suicide Risk Assessment Checklist |
| SRC: | Suicide Review Committee |
| SRN: | Senior Registered Nurse |
| SSI: | Supplemental Security Income |
| SVP: | Sexually Violent Predator |
| SVPP: | Salinas Valley Psychiatric Program |
| SVSP: | Salinas Valley State Prison |
| TCMP: | Transitional Case Management Program |
| THU: | Transitional Housing Unit |
| TLU: | Transitional Living Unit |

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[248286-1]

| | |
|---|---|
| TPU: | Transitional Program Unit *or* Temporary Protective Unit |
| TTA: | Triage and Treatment Area |
| UCC: | Unit Classification Committee |
| UCSF: | University of California at San Francisco |
| UHR: | Unit Health Records |
| UNA: | Unidentified Needs Assessment |
| VSPW: | Valley State Prison for Women |
| VPP: | Vacaville Psychiatric Program |
| WSP: | Wasco State Prison |

## I.   INTRODUCTION

1.     I am a Professor of Psychology and former Chair of the Department of
Psychology at the University of California at Santa Cruz. I have been teaching graduate and
undergraduate courses in social psychology, research methodology, psychology and law,
forensic psychology, and institutional analysis at the University of California for 30 years, and
previously served as the Director of the Graduate Program in Psychology, Chair of the Legal
Studies Program, and Chair of the Department of Sociology. I received a Ph.D. in Social
Psychology from Stanford University and a J.D. degree from the Stanford Law School. I have
been the recipient of a number of scholarship, fellowship, and other academic awards and have
published approximately one hundred scholarly articles and book chapters on topics in law and
psychology, including encyclopedia and handbook chapters on conditions of confinement and
the psychological effects of incarceration. My book on the psychological consequences of
imprisonment, <u>Reforming Punishment: Psychological Limits to the Pains of Imprisonment</u>,[1]
was published by the American Psychological Association in 2006. (My curriculum vitae is
attached to this Report as "Appendix A.")

2.     For approximately 35 years, I have been studying the psychological effects of
living and working in institutional environments. In the course of that work, I have conducted
what is perhaps the only laboratory experiment ever done on the acute psychological effects of
prison-like environments.[2] This research, which has come to be known as the "Stanford Prison

---

[1]     *Craig Haney, Reforming Punishment: Psychological Limits to the Pains of
Imprisonment*. Washington, DC: APA Books (2006).

[2]     This study was originally published as Haney, C., Banks, C., and Zimbardo, P.,
Interpersonal Dynamics in a Simulated Prison, 1 *International Journal of Criminology and
Penology* 69 (1973), and has been reprinted in numerous books in psychology and law and
translated into several languages. For example: Steffensmeier, D., and Terry R. (Eds.)
*Examining Deviance Experimentally*. New York: Alfred Publishing, 1975; Golden, P. (Ed.)
*The Research Experience*. Itasca, Ill.: Peacock, 1976; Leger, R. (Ed.) *The Sociology of
Corrections*. New York: John Wiley, 1977; *A kiserleti tarsadalom-lelektan foarma*.
Budapest, Hungary: Gondolat Konyvkiado, 1977; Johnston, N., and Savitz, L. *Justice and
Corrections*. New York: John Wiley, 1978; *Research Methods in Education and Social
(continued . . .)

Experiment," is regarded as a classic social psychological study of the effects of institutional environments.[3] For the 35 years since that study was completed, I have continued to study and publish scholarly articles on the psychology of imprisonment. That research has included conducting numerous interviews with correctional officials, officers, and prisoners to assess the nature and consequences of living and working in correctional settings. In addition, I have statistically analyzed aggregate correctional data to examine the effects of overcrowding, punitive segregation, and other conditions of confinement on the quality of prison life and the ability of prisoners to adjust to them.

3.     In addition, I have toured and inspected and analyzed conditions of confinement at numerous state prisons (including in Alabama, Arkansas, Arizona, California, Florida, Georgia, Idaho, Louisiana, Massachusetts, Montana, New Jersey, New Mexico, Ohio, Oklahoma, Oregon, Tennessee, Texas, Utah, Washington, and Wyoming), maximum security federal prisons (at McNeil Island, Washington, Marion, Illinois, and the Administrative Maximum or "ADX" facility in Florence, Colorado), as well as prisons in Canada, Cuba, England, Hungary, and Russia. In 1989, I received a UC-Mexus grant to conduct a comparative study of prisons and prison policy in the United States and Mexico. As a result of that research grant, I toured a number of Mexican prisons, interviewed correctional officials and, in conjunction with United States Department of State officials, interviewed many United States citizens who were incarcerated in Mexico.

---

*Sciences.* The Open University, 1979; Goldstein, J. (Ed.), *Modern Sociology.* British Columbia: Open Learning Institute, 1980; Ross, R. (Ed.) *Prison Guard/Correctional Officer: The Use and Abuse of Human Resources of Prison.* Toronto: Butterworth's 1981; Monahan, J., and Walker, L. (Eds.), *Social Science in Law: Cases, Materials, and Problems.* Foundation Press, 1985; Siuta, Jerzy (Ed.), *The Context of Human Behavior.* Jagiellonian University Press, 2001; and Ferguson, Susan (Ed.), *Mapping the Social Landscape: Readings in Sociology.* St. Enumclaw, WA: Mayfield Publishing, 2001; Pethes, Nicolas (Ed.), *Menschenversuche (Experiments with Humans).* Frankfurt, Germany: Suhrkamp Verlag, 2006.

[3] The American Psychological Association sponsored a "retrospective" commemorating the 25th anniversary of this study at its Annual Convention a decade ago. *See, also,* Haney, C., and Zimbardo, P., The Past of Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment, 53 *American Psychologist* 709-727 (1998).

4.     I have lectured and given invited addresses throughout the country on the psychological effects of living and working in institutional settings (especially maximum security prisons) at various law schools, bar associations, university campuses, and numerous professional psychology organizations such as the American Psychological Association. I have also served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations, including the Palo Alto Police Department, the California Judicial Council, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, the NAACP Legal Defense Fund, and the United States Department of Justice.

5.     For example, in the summer of 2000, I was invited to attend and participated in a White House Forum on the uses of science and technology to improve crime and prison policy, and in 2001, I participated in a conference jointly sponsored by the United States Department of Health and Human Services (DHHS) and the Urban Institute concerning government policies and programs that could better address the needs of formerly incarcerated persons to facilitate their reintegration into their home communities. I continued to work with DHHS and other organizations on the issue of how best to maximize the success of recently released prisoners. And, in 2005, I was the Scholar-in-Residence at the Center for Social Justice, at the Boalt Hall School of Law, a role that included delivering an invited lecture at the school on the psychological effects of conditions of confinement and consulting with law students and faculty members on a variety of prison-related issues.

6.     In addition to the research I have conducted into the psychological effects of confinement and patterns of adjustment in institutional settings, I also have extensive experience evaluating the life histories and psychological reactions of individual clients in the criminal justice system. Beginning as a Law and Psychology Fellow at the Stanford Law School in the mid-1970s, I participated for several years in an intensive clinically-oriented course co-taught by law professor Anthony Amsterdam and psychiatrist Donald Lunde that sensitized me to the special problems and vulnerabilities of psychiatrically-impaired criminal defendants and prisoners with special needs. Since that time I have been extensively involved

in teaching and conducting research on a variety of forensic issues that have placed me in continuing contact with diverse prisoner populations, many of whose members suffer from adverse effects of institutionalization, as well as pre-existing psychiatric disorders and developmental disabilities.[4]

7.      For example, over the last 25 years I also have been studying the backgrounds and social histories of persons accused and convicted of violent crime. In the course of this research, I have evaluated the background and social histories of defendants and convicted persons, carefully assessed the effects of prior periods of institutionalization, and analyzed the ways in which these factors have influenced the development and psychological functioning of the persons in question. Much of that work has entailed an assessment of the potentially adverse effects of their institutional histories as well as evaluations of their potential for future prison adjustment.

8.      My interests in these broad issues within the general area of psychology and law is both academic and professional. Thus, in the course of my work on conditions of confinement, adjustment to incarceration, and effects of institutionalization on persons accused or convicted of violent crime, I have been qualified and have testified as an expert in various state and federal courts, including the Superior Courts of Lake, Los Angeles, Marin, Monterey, Orange, Sacramento, San Diego, San Francisco, and Ventura counties in California, state courts in New Jersey, New Mexico, Oregon, Wyoming, and Utah, as well as Federal District Courts in the Western and Eastern Districts of Washington, the Northern, Southern, and Eastern Districts of California, the District Court of New Mexico, and the Southern District of Illinois.

9.      In the course of this academic and professional work, I have also evaluated and testified concerning the psychological effects of conditions of confinement in the mainline

---

[4] For example, *see* Haney, C., and Specter, D., Legal Considerations in the Treatment of "Special Needs" Offenders, in Ashford, J., Sales, B., and Reid, W., (Eds.), *Treating Adult and Juvenile Offenders with Special Needs* (pp. 51-79). Washington, D.C.: American Psychological
(continued . . .)

[248286-1]

housing units of various maximum and medium security prisons in a number of states
(including California, New Jersey, New Mexico, Oregon, Utah, and Washington). For
example, I have evaluated and provided testimony about the psychological effects of
overcrowded conditions of confinement in the mainline housing units at the California Men's
Colony, Folsom, San Quentin, and Soledad prisons. In the mid-1980s I toured, inspected and
conducted extensive interviews in more than a half dozen Texas prisons, and examined and
analyzed numerous documents as the basis for an opinion about the psychological effects of
overcrowding in the Texas Department of Corrections.

    10.    I have often focused in this work on the effects of conditions of confinement on
so-called "special needs" prisoners (primarily the mentally ill and developmentally disabled).
For example, under the auspices of the United States Department of Justice, I evaluated
conditions of confinement and the quality of care provided at Atascadero State Hospital, a
forensic facility designed to house mentally-ill and developmentally-disabled offenders for the
State of California.  Also, as noted above, I testified as an expert witness concerning conditions
of confinement and their effects on prisoners at the California Men's Colony, which was a
treatment-oriented facility in which many mentally-ill prisoners were housed at the time I
evaluated it. In addition, I evaluated the effects of conditions of confinement on prisoners at
the California Medical Facility at Vacaville (including prisoners housed in the Department of
Mental Health units),[5] and also testified about the prevalence of seriously mentally-ill prisoners
in the California Department of Corrections, as well as the special psychological problems that
living in isolated housing units created for them.[6]  I have also evaluated the psychological
effects of conditions of confinement at juvenile justice facilities, on the condemned or "death

---

Association (2000).

[5] *Gates v. Deukmejian*, Civ-S-87-1636 LKK-JFM (E.D. Cal.)(1990).

[6] *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995).

row" units in several states (including Arkansas, California, New Mexico, and Texas), and in various special treatment facilities for sex offenders (in Florida and Washington).

11.    In much of my research, writing, and testimony about prison conditions, especially in recent years, I also have focused on the assessment of the psychological effects of confinement in so-called "lockup," punitive segregation, or so-called "supermax" confinement (in what are variously known as management control, security housing, high security, or close management units).[7] This has included tours and inspections and interviews in a number of what were once called "management control units" as well as "security housing units" in institutions in California, in several separate prisons or specialized units in each of the states of Louisiana, Massachusetts, New Mexico, Oregon, Texas, and Washington, as well as at the Federal Penitentiary at Marion, Illinois. For example, I have testified about the effects of isolation and social deprivation in the Security Housing Unit at Pelican Bay State Prison,[8] and in several of the High Security Units in the Texas Department of Corrections.[9]

## II.    FOUNDATION FOR EXPERT OPINIONS IN THIS ACTION

12.    I was retained by attorneys for Plaintiffs in *Coleman v. Schwarzenegger* and *Plata v. Schwarzenegger* to complete several inter-related tasks. Those tasks included reviewing and summarizing the existing psychological and social science literature on the effects of overcrowding in prison settings. They also included reviewing an extensive number of documents provided by Plaintiffs' counsel that pertain to the current nature and quality of medical and mental health care in the California Department of Corrections and Rehabilitation (CDCR), the conditions of confinement that prevail throughout the state's prison system and,

---

[7] *See, generally,* Haney. C., and Lynch, M., Regulating Prisons of the Future: The Psychological Consequences of Supermax and Solitary Confinement, 23 *New York University Review of Law and Social Change* 477-570 (1997); and Haney, C., Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, *Crime & Delinquency* (special issue on mental health and the criminal justice system), *49*, 124-156 (2003).

[8] *See, Madrid v. Gomez*, 889 F. Supp. 1146, 1280 (N.D. Cal. 1995).

[9] *See, Ruiz v. Johnson*, 37 F. Supp. 855 (S.D. Texas 1999).

[248286-1]    EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

especially, the ways in which these things may be affected by the chronic and severe
overcrowding that continues to plague CDCR facilities. An updated list of the documents I
was provided by Plaintiffs' counsel and reviewed in advance of preparing this report is
appended as Appendix B. A list of prior cases in which I have testified at trial or deposition in
the past four years and a statement of compensation is attached as Appendix C. I submit the
present report to update and replace my report dated November 9, 2007.

   13.  In addition to the documents reviewed, as listed in Appendix B, I also conducted
tours and interviews in numerous housing units located in eight prisons where *Coleman* class
members reside.[10] The prisons were: California Institution for Men (CIM), in Chino,
California; Valley State Prison for Women (VSPW), in Chowchilla, California; Salinas Valley
State Prison (SVSP), in Soledad, California; Mule Creek State Prison (MCSP), in Ione,
California; California Substance Abuse and Treatment Facility (SATF), in Corcoran,
California; California Correctional Institution (CCI), in Tehachapi, California; North Kern
State Prison (NKSP), in Delano, California; and Wasco State Prison (Wasco), in Wasco,
California. In the course of these tours, I made a point of visiting a representative sample of
mainline housing units, including those that had been impacted by the severe overcrowding in
CDCR (*e.g.*, housing units that had been converted into makeshift dayroom and gymnasium
dormitories). I also toured areas that contained specialized mental health and crisis beds.
Because of the special sensitivity and vulnerability of mentally ill prisoners to the harsh
regimes that exist in Administrative Segregation Units (ASUs),[11] I also made a point of touring
and speaking to a number of the mentally ill prisoners housed in the ASUs at each of the
prisons. In the cases of VSPW and CCI, I also toured and spoke to men and women housed in

---

[10] *Coleman* class members are CDCR prisoners with serious mental illness.

[11] Administrative Segregation Units are locked-down units within the prison where prisoners
are housed for a wide variety of "administrative" reasons. Special security procedures are used
in the transport of Ad Seg prisoners and their out-of-cell time and other program participation
is drastically reduced. They spend the overwhelming majority of their time locked in their
cells.

the Security Housing Units (SHU),[12] where prisoners also are housed under severe locked

down conditions. In addition, in the course of touring the last four CDCR facilities that I

visited, we photographed a number of different areas inside the prisons themselves. I have

reviewed and relied on those photographs, as well as photographs and videos materials

obtained from the CDCR's own publicly accessible website depicting conditions inside CDCR

institutions.

     14.    In addition to the tours themselves, and my conversations with correctional

administrators, clinical staff, and line correctional officers, I was able to converse with

numerous prisoners who were participants in the CDCR's mental health delivery system,

including many who were in the Correctional Clinical Case Management System (CCCMS)[13]

as well as those in the Enhanced Outpatient Program (EOP).[14]  I also conducted private, one-

on-one interviews with individual prisoners who were selected by Plaintiffs' counsel from the

various lists of CCCMS and EOP prisoners at each facility and from correspondence.

---

[12] Security or Secured Housing Units are also locked-down units within the prison where prisoners are housed as a result of disciplinary infractions (specific offenses committed in prison, or gang status), or sometimes for safety-related concerns. As with AD SEG prisoners, special security procedures are used in the transport of SHU prisoners and their out-of-cell time and other program participation is drastically reduced. They, too, spend the overwhelming majority of their time locked in their cells.

[13] CCCMS prisoners constitute the largest CDCR mental health category. It comprises some 28,000 prisoners with mental illness who live in general population housing, and are supposed to receive medication management and meet with their case manager every 90 days. When CCCMS prisoners are housed in Ad Seg, they are supposed to receive enhanced mental health services that include weekly case manager contact and daily rounding from psychiatric technicians.

[14] EOP includes seriously mentally ill prisoners who require a higher and more intensive level of mental health care. These prisoners are unable to function in a general population prison setting and, as a result, are supposed to be in sheltered treatment programs and live in segregated housing units. They are supposed to receive 10 hours each week of therapy or "structured therapeutic activities."  When they are housed in Ad Seg, they are supposed to be provided with weekly case manager contact and receive daily rounding from psychiatric technicians. There are approximately 4,900 EOP prisoners in the CDCR.

15.     Finally, I was asked to formulate expert opinions concerning: a) the impact of overcrowding on prisons, prison systems in general, and the California prison system in particular; b) whether and how overcrowding is the primary cause of the continuing constitutional violations that have been identified in the California prison system; c) whether and why a prisoner relief order is the only appropriate remedy to the overcrowding-related constitutional violations that continue to plague the California prison system; and d) assuming that the Court will issue a prisoner release order, what population level or percentage of design capacity is an appropriate target that is likely to remedy the overcrowding-related constitutional violations.

## III.   EXPERT OPINIONS

### A.   Summary of Expert Opinion

16.     The relevant psychological and social scientific literature on prison overcrowding underscores its negative impact on virtually every aspect of prison life, from the pains of imprisonment suffered by prisoners, to the performance and well-being of correctional officers and other prison employees, to the way in which individual institutions and prison systems discharge their constitutionally mandated duties and functions. In my experience as a scholar and researcher who has studied prisons in the United States for more than 35 years, no other single aspect or condition of confinement has had a more significant impact on the prisons of this country or prisons in the State of California.

17.     Because of the tremendous importance of overcrowding and its impact on virtually every aspect of prison life, it is my opinion that it is the primary cause of the continuing constitutional violations that plague the California prison system, including the CDCR's inability to provide medical and mental health care for state prisoners that meets the relevant constitutional minimum standards.

18.     It is my opinion that a prisoner release order that results in a significant and expeditious reduction in the number of prisoners housed in the CDCR is the only appropriate remedy to the continuing overcrowding-related constitutional violations. I base this opinion on my knowledge of and experience with court-ordered institutional change in this state and

others, as well as my knowledge of the depth and magnitude of the overcrowding problem in the CDCR—a problem that reached crisis-level proportions many years ago and has been allowed to continue to worsen. I also base this opinion on my knowledge of the history of prison overcrowding in California and the CDCR's decades-long record of failing to anticipate the magnitude of this problem, failing to recognize the urgency of the continuing overcrowding crisis it faced, and failing to fully appreciate the harm inflicted on prisoners, staff members, and California communities by levels of prison overcrowding it came to regard as "acceptable" or "tolerable." The gap between the urgency of the problem and the insufficiency of CDCR's response is evident in their projected "best case scenario" date for a solution—the year 2014— which underscores why a prisoner release order is necessary. Even the active involvement of the *Plata* Receiver in addressing the shortfall of mental health beds in the system will not appreciably advance this date. Thus, although it is my understanding Receiver does not intend to build all of the outstanding mental health beds that will be required by the CDCR, the construction of the new mental health/medical facilities that the Receiver does plan to build are projected to be completed in July 2013.[15] However, even the Receiver has acknowledged that there is uncertainty of this completion date. Thus, he has said "[t]he key to hitting our 2013 target date for completing this objective is the commencement of construction at the first site no later than February 2009, with construction completed at that site no later than February 2011."[16]

### 1.    Nature of the Continuing Constitutional Violations

19.    In its July 23, 2007 Order referring consideration of a prisoner release order to the three-judge panel, the *Coleman* Court concluded that CDCR's mental health care delivery system has not come into compliance with the Eighth Amendment, despite twelve years of

---

[15] Joint Pls.' Trial Ex. 56 at Exhibit 1 at 28; Coleman Pls.' Trial Ex. 55 at 7 showing the following mental health bed projects to be constructed by CDCR: 50 bed MHCB at CMC, 32-bed MHCB at SQ, and 67 EOP bed at CMF.

[16] *Id.*

remedial work in this case.[17]  The Court cited significant delays in access to care at the highest levels of need, alarming rates of staffing vacancies, and a severe lack of programming space, among other problems, as evidence that the current level of unmet mental health need in the CDCR—estimated by the *Coleman* Special Master to be one-third of the *Coleman* class—"is unconscionable."[18]  The Court noted that although it has issued at least seventy-seven orders over more than eleven years directed at bringing California's prison mental health care system into constitutional compliance, "the system still falls woefully short of meeting the requirements of the Eighth Amendment."[19]

     20.     The *Coleman* Special Master, in a Report filed with the Court on May 31, 2007 regarding the effects of overcrowding on mental health treatment, concluded that a lack of treatment and programming space, beds, and staff was still pervasive throughout the CDCR system. He provided a number of examples, including a consistent decline over the past two years "in the number of hours of therapeutic activities offered in most institutions to Enhanced Outpatient Program prisoner/patients in administrative segregation units, repeatedly attributed to the acute absence of adequate space."[20]  The Special Master also reported a functional vacancy rate among clinicians of 19.86 percent, and concluded that there was sufficient staff to provide full mental health services to roughly two-thirds of the mental health caseload.[21]  He noted that this analysis "does not even address the endemic shortages of escort correctional officers, nursing staff, clerical and records keeping personnel, pharmacy staff and lab technicians."[22]

---

[17] Coleman Pls.' Trial Ex. 46 at 6:6-8.

[18] Coleman Pls.' Trial Ex. 46 at 6-7.

[19] Coleman Pls.' Trial Ex. 46 at 8:4-10.

[20] Joint Pls.' Trial Ex. 35 at 6.

[21] *Id.* at 11-12.

[22] Joint Pls.' Trial Ex. 35 at 12.

21.    Some of the standards for measuring whether constitutional requirements are being met are set forth in the Revised Program Guide approved by the *Coleman* Court ("Program Guide"). On March 2, 2006, the *Coleman* Court ordered defendants to immediately implement the Program Guide, which provides the protocol for the provision of mental health care in the CDCR.[23] I have reviewed the standards in the Program Guide relevant to this declaration.

22.    One of the key elements of the Program Guide is the transfer timeline chart that sets forth the required timeframes for transferring prisoners to appropriate levels of care.[24] For obvious reasons, the ability of a mental health delivery system to meet these timeframes is indispensable to the provision of adequate mental health care. They are, in essence, the limits placed on the amount of time a prisoner/patient must wait before receiving the care that clinicians have determined he or she needs. In relevant part, these timeframes are:

Reception Centers:  EOP transfers should occur within 60 days, or 30 days if clinically indicated.  CCCMS transfers should occur within 90 days, or 60 days if clinically indicated.

MHCB:  MHCB transfers should occur within 24 hours of referral.

DMH:  Transfers to DMH acute placements should occur within 10 days of referral, if accepted to DMH.  Referral must be completed within 2 working days of identification.  Transfers to DMH intermediate care placements should occur within 30 days of referral, if accepted to DMH.  Referral must be completed within 5-10 working days.

---

[23] Coleman Pls.' Trial Ex. 47.

[24] Joint Pls.' Trial Ex. 9 at 12-1-13.

[248286-1]