EOP:  Transfers to general population ("GP") EOP programs should occur within
60 days, or 30 days if clinically indicated.

EOP Administrative Segregation Unit ("ASU") Hub:  EOP prisoners housed in
the regular ASU should transfer to an EOP ASU Hub within 30 days of
placement in the regular ASU or within 30 days of referral to EOP level of care.

PSU:  EOP prisoners housed in the ASU who are endorsed for the PSU must be
transferred within 60 days of endorsement.

23.    In the Court's July 23, 2007 Order referring this matter to the three-judge panel,
the Court found, based upon information documented by the Special Master, that these transfer
timelines are not being met.[25] The Special Master reported that "[d]elays in transfers,
especially to the most intensive treatment programs for prisoners at the highest custody levels
[have become] "endemic."[26]

24.    Housing at the appropriate level of care, the ability to transfer prisoner-patients
to appropriate levels of care, and the resources to provide treatment at each level of care are
key elements in the provision of mental health care.  The State does not have enough beds
at nearly every level of care right now (Fiscal Year 2007/2008).[27]

25.    Additionally, the *Coleman* Special Master recently reported in his Report and
Recommendations on Defendants' August 2007 Supplemental Bed Plan that "[f]inding
available beds in either of these programs [MHCB and inpatient DMH] remains a daily
challenge that still exceeds CDCR's capability..."[28] In June 2007, the Court found that

---

[25]  Coleman Pls.' Trial Ex. 46 at 6.

[26]  *Id.*

[27]  *See, generally,* Coleman Pls.' Trial Ex. 12.

[28]  Coleman Pls.' Trial Ex. 12 at 3.

"Defendants are providing to class members only twenty-six percent of the beds at ASH [DMH inpatient psychiatric program] called for by their plan. That is unacceptable."[29]  The Special Master also concluded that recent events, including the population crisis, implementation of the *Plata* Receivership, and defendants' newest bed plan, "have caused widespread confusion and uncertainty, which now threaten to stall the allocation of construction and operational funding critically needed to meet the increasingly desperate need for acute and intermediate inpatient and mental health crisis beds in CDCR."[30]  In May 2006, the Court described the effect of the shortage of intermediate care facility beds and mental health crisis beds in the CDCR:  "It is undisputed that the shortage is leaving critically mentally ill prisoners languishing in horrific conditions without access to immediately necessary mental health care."[31]  Even in his 15th Report, the Special Master warned that the long waiting lists for the special MHCB, PSU, and DMH beds meant that "suicidal and other seriously mentally ill and violent inmates lack access to clinically necessary levels of monitoring and treatment."[32]  In a Report issued in the summer of 2008, the *Coleman* Special Master found that the shortage of MHCBs remained a barrier to clinically adequate care. Specifically: "[t]imely access to appropriate levels of care, essential to the efficacy of a mental health delivery service continued to elude CDCR."[33]  In addition, the Special Master documented the continued use of alternative sites for prisoners who required MHCB level of care, a practice that was a direct result of the MHCB shortages. Moreover, he described these sites as "uniformly inappropriate for acute care."[34]  In fact, as the Special Master noted, "[f]ourteen institutions that did not have adequate access to licensed crisis beds

---

[29] Coleman Pls.' Trial Ex. 8 at 3:4-5.

[30] Coleman Pls.' Trial Ex. 5 at 9-10.

[31] Coleman Pls.' Trial Ex. 3 at 2:16-18.

[32] Joint Pls.' Trial Ex. 40 at 421.

[33] Joint Pls.' Trial Ex. 57 at 349.

[34] *Id.* at 352.

resorted to using a variety of temporary monitoring arrangements, most of which were grossly inappropriate alternatives to acute care." [35]

26.    In the Special Master's most recent draft report on suicides within the CDCR, he found that "[c]ontinuing use of ZZ cells and other holding cells for inmates awaiting transfers to *bonafide* CTCs with MHCBs, and placements in OHUs that exceeded the 72-hour time limitations, were ongoing obstacles to the care of inmates in need of constant or close monitoring or timely transfer to higher levels of care.[36]

27.    The documents that I reviewed clearly indicate that, as I noted earlier, defendants do not anticipate being able to meet the need for mental health beds at every level of care until 2014, at best.  For example, the *Coleman* Special Master concluded in his Report filed September 24, 2007 that full implementation of defendants' latest proposed bed plan "will stretch out" to January 2014.[37] He also noted that "objections to defendants' present and preceding bed plans on the part of plaintiffs, experts, special master and the Court all reflect a decade of accumulated experience and frustration that justifies fully concerns about CDCR's ability to generate and implement this latest plan effectively."[38]  The Special Master further suggested that the actual implementation of the defendants' bed plan may be unlikely to occur within a decade.[39]

28.    Similarly, the Receiver has acknowledged the many serious obstacles he has faced in his efforts to construct adequate health care facilities, which will include mental health beds.[40]  In his most recent quarterly report to the *Plata* Court, the Receiver stated: "before

---

[35] *Id.*

[36] Joint Pls.' Trial Ex. 58 at 11.

[37] Coleman Pls.' Trial Ex. 12 at 11.

[38] *Id.* at 12.

[39] *Id.* at 13.

[40] Joint Pls.' Trial Ex. 56 at 46-47.

[245286-1]

constitutionally adequate health care can be delivered in California's prisons, there needs to be *constitutionally adequate treatment facilities to provide such care*. Unless and until these facilities are constructed, the major health care class action cases will continue indefinitely. Likewise, prisoners will continue to die unnecessarily."[41] Nevertheless, despite "avoidable prisoner deaths" that "illustrate the human cost of the State's failure to provide adequate funding for needed health care treatment facilities," the Receiver concluded that the "State's failure to make this necessary financial commitment puts the Receiver's entire remedial program at risk."[42] A significant part of the *Coleman* mental health bed plan may be folded into the Receiver's plan to construct medical and mental health treatment facilities for 10,000 prisoner-patients.[43]

29.    Meanwhile, some of the beds that CDCR is routinely operating at higher levels of care are, in fact, overflow "jury-rigged" or makeshift units that do not meet appropriate standards for mental health treatment, according to CDCR and DMH guidelines. One example of this is occurring in the Reception Center EOP Program. This program appears to be a "stopgap" response to the overwhelming population pressures in CDCR. EOP patients are not being transferred out of Reception Centers in a timely manner, and some serve their entire terms there. However, the guideline for the Reception Center EOP Program approved as an emergency stopgap by the Court is not equal to the care mandated by the Program Guide for EOP patients. For example, the Reception Center EOP program provides for only five hours of treatment per week, while EOPs housed in mainline EOP or EOP administrative segregation programs must be provided with a minimum of ten hours of treatment per week.[44] Furthermore, due to overcrowding within CDCR, Reception Center EOPs were not

---

[41] *Id.*

[42] *Id.* at 56.

[43] Coleman Pls.' Trial Ex. 55.

[44] Coleman Pls.' Trial Ex. 9.

congregated in designated housing units despite the fact that EOP program is "characterized by a separate housing unit … for mentally ill inmate-patients who, because of their illness, experience adjustment difficulties in a General Population (GP) setting."[45] Yet, in July 2007, the *Coleman* Special Master reported to the Court that this is the level care that is and will be provided to a significant number of prisoners who require an EOP level of care: "Apart from EOP prisoners in administrative segregation, mental health crisis beds, or alternative housing pending admission to mental health crisis beds, on May 25, 2007, there were 463 EOP inmates in the seven reception centers surveyed in this report, representing over ten percent of all EOP inmates in CDCR institutions."[46] The number of such prisoners continues to grow. Thus, by June 2008, the number of EOP patients housed in the same seven reception centers had reached 707—all patients waiting transfer to a mainline EOP program.[47] An additional 79 EOP patients were housed in other reception centers around the CDCR.[48] In addition, however, as I learned in my most recent tours and will detail below, even these "reduced" level of care Reception Center EOP programs are makeshift programs operated out of makeshift spaces under circumstances and staffing levels that compromise the quality of care provided.

30.    Similarly, some of the units currently operating as intermediate care facilities at SVPP and CMF do not meet the criteria for DMH intermediate care facilities. The D-5 and D-6 units at SVPP and the P-2 and P-3 units at CMF are operating as "interim" intermediate care programs, and the Court waived the state licensing requirements for inpatient facilities so that defendants could meet this overflow need in the short term, given the current emergency the

---

[45] Joint Pls' Trial Ex. 9 at 12-4-1.

[46] Coleman Pls.' Trial Ex. 9 at 28.

[47] Coleman Pls.' Trial Ex. 57:  CIM, 196, DVI 70, NKSP 69, RJD 96, LAC 113, SQ 45, WSP 118.

[48] *Id.*

CDCR faces.[49]  However, these units do not have the appropriate treatment space for mental health patients at this level of acuity, nor do they have the resources to provide yard and out-of-cell time in the appropriate manner.  For example, in the SVPP D-5 and D-6 units, all mental health treatment occurs on the dayroom floor.  On October 18, 2007, the Court ordered defendants to develop and submit proposals for developing "adequate mental health treatment and counseling space" at these SVSP and CMF units.[50]  Defendants have created construction proposals for SVSP and CMF in response to the October 2007 Coleman order,[51] but these are long-term projects that, under the best case scenario, will take years to complete.  Thus, the SVSP proposal includes treatment space for both the EOP and the DMH units, but has a projected completion date of January 2011 that is contingent on being funded by the Legislature.[52]  The CMF treatment space proposal covers only the EOP program, but it projects a completion date of 2012, and only if funding is approved.[53]  In the meantime—a period of several years at best—the existing mental health treatment programs will be forced to "make do" with the existing inadequate treatment space.

    31.    The tours that I have completed, discussions I have had with numerous mental health and custody staff, and the extensive documents I have reviewed all confirm that institutions throughout the California prison system are using a variety of different types of "overflow" housing to scramble to meet their pressing need for MHCB beds. These include housing such as OHU beds, "Mental Health" OHU ("MOHU") beds, and "ZZ" cells. In his May 31, 2007 Report to the Court, the *Coleman* Special Master found that: "Over the past three years, however, the number of inmate/patients referred to a MHCB level of care has

---

[49] Coleman Pls.' Trial Ex. 3 at 4-5.

[50] Coleman Pls.' Trial Ex. 48 at 6.

[51] Coleman Pls.' Trial Exs. 58-59.

[52] *Id.*

[53] *Id.*

[248286-1]

regularly and significantly exceeded the number of MHCBs available in CDCR, resulting in the placement of inmate/patients in need of a MHCB level of care in a variety of temporary housing alternatives, which often lack the heightened monitoring and treatment essential to the MHCB level of care.... Most of these alternative placements lack suitable staffing and/or the physical configuration needed for the continuous monitoring or intensive treatment provided in a MHCB unit. While strict time limits on their use are prescribed in both department and local policies, they are not consistently observed."[54] The problem persists. Thus, the continued use of alternative sites to house prisoner requiring MHCB placement was documented overall by the Special Master in his draft 20[th] Report and by individual institutions during the 21[st] round monitoring tours.[55]

    32.    The situation at the California Men's Colony (CMC) provides just one illustrative example of the chronic nature of this problem. In 2006, the *Coleman* Court ordered that a locked observation unit (LOU) at CMC be re-opened despite its failure to meet state law licensing requirements. The Court found that although "State licensing requirements serve an important function...It is essential to provide immediately mental health crisis beds to critically ill inmates in the CDCR...Under present circumstances, state licensing requirements must temporarily give way to measures necessary to remedy the Eighth Amendment violations that remain unresolved in this action."[56] The unlicensed facility at CMC provides crisis bed care at a prison that has a large mental health population, including more than 500 EOP patients.[57] On March 27, 2007, the Coleman court ordered defendants to complete and occupy a 50 bed

---

[54] Joint Pls.' Trial Ex. 35 at 3-4.

[55] Joint Pls.' Trial Ex. 57 at 352; and *see, e.g.* Coleman Pls.' Trial Exs. 60-61: CIM Memo May 7, 2008 re activation of TBH in March and April 2008; DVI SPR-FIT, 4/9/08, L-Wing overflow Unit population was 89; DVI SPR-FIT, 5/14/08, L-Wing overflow unit population was 84.

[56] Coleman Pls.' Trial Ex. 3 at 3-4.

[57] Coleman Pls.' Trial Ex. 57.

-19-

MHCB at CMC "as soon as possible." However, this project remains stalled. On February 26, 2008, the *Coleman* court, in an order regarding the construction agreement in *Plata*, *Perez*, *Armstrong*, and *Coleman*, addressed plaintiffs' concerns about the 50-bed MHCB at CMC, stated that "[a]pproval of the construction agreement does not relieve defendants of their obligation to comply with this court's March 27, 2007 order."[58] The start of this critically needed MHCB project has nonetheless been delayed by at least a year. No patients will benefit from this yet unfunded project for many years.

33.    I have been informed that two years after construction began in May 2006, CDCR opened the new CMF 50-bed MHCB facility to its first patients.[59] It is unclear how much this overdue resource will affect the massive backlog of patients waiting for higher levels of care. In my opinion, due to the effects of overcrowding on the delivery of mental health care, any reduction in the waitlists for higher levels of care will be temporary due to the pent-up demands in the system. During my site inspection at Wasco Reception center on August 1, 2008, the clinical staff in the CTC reported that they experienced difficulty referring their overflow crisis bed patients to the new CMF unit because their reception center prisoners do not have the medical work-up that CMF is requiring prior to transfer.

34.    As problematic as the widespread use of these overflow beds is, CDCR is so overcrowded that it has not been able to create enough of them. Thus, there continue to be waiting lists to get prisoner/patients into these beds. For example, the State reported that as of November 1, 2007, there was a 108 person waiting list for beds at SVPP, even with the overflow D-5 and D-6 units operating.[60] The waitlist for the SVPP intermediate care DMH beds has continued to expand since November 1, 2007 with the most recent waiting list data

---

[58] Coleman Pls.' Trial Ex. 63.

[59] Coleman Pls.' Trial Ex. 64.

[60] Coleman Pls.' Trial Ex. 70.

[248286-1]    EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

for July 31, 2008, listing 173 patients currently accepted and waiting for transfer to SVPP.[61] Recent documents from CSP-Sacramento show that ZZ beds, which are "contraband watch cells" were used as alternate sites for crisis beds patients <u>after</u> CTC beds, OHU beds, and MOHU beds were already full. These documents show that these cells are used regularly, with 62 admissions to ZZ cells and approximately 900 admissions to the MOHU in seven months.[62]

35.    Similarly, at CIM during the 19th round of monitoring, the Special Master found that "there were 106 admissions to the Del Norte overflow MHCBs."[63] By the 20th round of monitoring, the number of admissions to the overflow MHCBs had increased to 384 and the Special Master noted: "[t]here were no physical plant modifications, and cells in Del Norte were inadequate for potentially suicidal or agitated inmates. Large grate vents, unsafe bunk beds, and blind spots were not addressed." [64]

36.    It also appears that some prisons are operating EOP units that are explicitly intended to be "temporary" because they are not appropriate for provision of this level of care. However, it seems inevitable that these units will continue to operate for years to come because of the current, overcrowding-driven bed shortage. This, in turn, has led to more interim measures being implemented to attempt to make these supposedly-temporary beds workable over the long term. For example, there is a "temporary" EOP mental health program operating at MCSP, and in March 2007, the Court approved defendants' *ex parte* request that they be permitted "to install adequate temporary treatment and office space to accommodate the existing and newly-opened Enhanced Outpatient Program mental health programs until replacement programs have been completed and occupied elsewhere in CDCR."[65]  However,

---

[61] Coleman Pls.' Trial Ex. 78.

[62] Coleman Pls.' Trial Ex. 17.

[63] Joint Pls.' Trial Ex. 69 at 95.

[64] Joint Pls.' Trial Ex. 57 at 263.

[65] Coleman Pls.' Trial Ex. 4 at 1-2.

even here, there have been delays in trying to make "temporary" space more adequate. Thus, to date, the temporary treatment space at Mule Creek State Prison has not yet been completed.[66]

37.    In summary, as the *Coleman* Court noted throughout its July 23, 2007 Order, although some progress had been made over the years in the provision of mental health care in California prisons, this trend has been dramatically reversed by the overcrowding crisis.[67] Prisoners throughout the CDCR are living in harsh and extreme conditions of confinement. As detailed throughout this declaration, and based on my observations and review of documents, I have concluded that overcrowding is now interfering with the ability of the CDCR to meet timelines for transfers to treatment programs at every level of care in its mental health system; it has resulted in an insurmountable shortage of clinical and custody staff; it has overrun all available treatment, office, and programming space; and combined with the environmental effects of overcrowding itself, these delays, shortages, and inadequacies in mental health care are exacerbating existing mental illness, and creating negative psychological consequences for prisoners who, but for overcrowding, would likely not exhibit these problems and symptoms.

**B.    The Effects of Overcrowding on Prisoners and Prison Systems**

38.    Overcrowding impacts every aspect of prison life. In addition to its direct, adverse effects on prisoners and correctional officers, chronic and severe overcrowding can precipitate reactions and adaptations that actually exacerbate its harm, leading to even more dramatic, even tragic consequences. That is, extreme and persistent levels of prison overcrowding force individuals and institutions to adapt in ways that are often counterproductive, and produce even more serious harm. Exposure to chronic and severe overcrowding has especially harmful effects on mentally ill and other vulnerable prisoners.

---

[66] Coleman Pls.' Trial Ex. 55.

[67] Coleman Pls.' Trial Ex. 46.

[248286-1]

### 1.     The Nature of Overcrowding

39.     It is important to note that "overcrowding" is measured or understood as a function of more than just the ratio of prisoners to the rated capacity of a particular facility; it also includes the extent to which a prison, or prison system, houses more prisoners than it has adequate resources and infrastructure to humanely accommodate. Indeed, when prison systems increase their rated capacity without commensurate increases in programming, medical, and mental health resources, they are still "overcrowded" even though, technically, they do not house greater numbers of prisoners than they are designed to hold. Thus, a correctional facility "could be operating at fewer prisoners than its rated capacity, yet be overcrowded."[68] California prisons are chronically and severely overcrowded both in the sense that they house far more people than they were designed to hold, and because they do not have remotely enough programming, medical, and mental health resources—staff, space, and other infrastructure—to humanely house the unprecedented numbers of prisoners who are confined in them.

40.     It is also important to note that the negative consequences of overcrowding go beyond the failure to provide essential services to prisoners. Overcrowded prisons are dangerous for staff and prisoners alike because they create a variety of security-related problems and risks. Of course, these security-related problems and risks, in turn, create enormous and often insurmountable obstacles to effective treatment and constitutionally mandated care for mentally ill prisoners.

41.     The risks and dangers of overcrowding have been well understood and acknowledged by corrections officials and experts for decades. Indeed, when I first began to study the psychology of imprisonment in the 1970s, it was widely understood among corrections officials that whenever their prisons were nearing 90-95% of their capacity, they were becoming dangerously overcrowded. This was because of the recognition that in order to safely maintain a closed environment like prison, where people are involuntarily housed, staff

---

[68] R. Ruddell & G. Mays, Rural Jails: Problematic Prisoners, Overcrowded Cells, and Case-Strapped Counties, 35 *Journal of Criminal Justice* 251-260 (2007), at 255.

[248286-1]
EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

and administrators must have sufficient options to readily move and separate prisoners, both for security and treatment-related classification reasons. As prisons become full, tensions mount and deprivations begin to multiply; administrators must have sufficient degrees of freedom to respond to the special needs and conflicts that inevitably result. As a prison closes in on having every one of its cells filled, those degrees of freedom are correspondingly reduced and serious problems begin to go unaddressed and eventually worsen.

### 2.  Devolving Standards of "Overcrowding" Inside the CDCR

42.     Of course, we have traveled a very, very long distance in California from that original concept of what constitutes an "overcrowded" prison. Prison officials have come to expect, make do, and manage in the face of levels of overcrowding that are unprecedented and have lasted for an astounding length of time. The quality of life inside CDCR facilities has profoundly deteriorated and the physical safety and the mental health of the people who live and work there have been jeopardized as a result.

43.     To provide a sense of exactly how far standards of acceptable overcrowding have deteriorated in California, consider that as recently as the late 1970s there was a widespread consensus among the state's correctional officials about the evils of "double-celling"—the practice of housing two prisoners in a single cell usually designed to hold one person. High level prison administrators in California (and virtually everywhere else in the country) understood that double-celling was problematic, dysfunctional, and potentially damaging, even if they were forced to resort to it from time to time. Thus, here is how 1979 correctional task force that included a number of high-ranking California prison officials explained the state's official policy:

> According to legislative and departmental policy, the Department of Corrections does not sanction double-celling prisoners. This task force agrees with the basic premise that <u>double-celling violates basic standards of decent housing, health, and institutional security</u>; however, at present, there is no viable alternative to double-celling prisoners as population projections are realized. Thus, while concurring that <u>double-celling is totally undesirable</u>, the task force must recommend this, and has attempted to propose gradual

population increments and associated staffing to lessen the impact of overpopulation.[69]

44.    I know of no conceptual development or theoretical breakthrough —in psychology or penology or any other discipline—over the last several decades that alters or challenges the fundamental validity of these observations. Yet, in the intervening decades, we have come to accept double-celling and much, much worse as a matter of course. Instead of sound penological or psychological theory, this new-found acceptance of unprecedented levels of overcrowding appears to derive purely from necessity. To be sure, nothing more than necessity could account not only for the CDCR's acceptance of double-celling (which is nearly universal, even in the state's least overcrowded prisons), but also its "creative" definitions and redefinitions of "tolerable overcrowding." Indeed, the "acceptable" percentage of prisoners housed at different kinds of facilities <u>beyond</u> those facilities' design capacity has continued to inexplicably but inexorably rise. As a result, increasingly intolerable levels of overcrowding can be "accommodated" and made to appear less drastic than they are.

45.    The court-appointed Receiver in *Plata v. Schwarzenegger* clearly documented these shifting standards in his May 15, 2007, Overcrowding Report.[70] As he noted, CDCR has repeatedly redefined "tolerable overcrowding" by continuing to increase the acceptable

---

[69] Housing Inventory & Population Impact Task Force, California Department of Corrections, *Prison Overcrowding: A Plan for Housing Felons Through FY 1986/87* (1979), at iv (emphasis added). The practice of double-celling was still controversial enough in 1983 to prompt a trio of California state senators to attempt to introduce a Senate Constitutional Amendment that read in part:

> This measure, if adopted by the voters, would provide that the practice of double-celling shall not be deemed to be, or constitute, the infliction of cruel and unusual punishment. The measure would also provide that Department of Corrections regulations providing for double-celling are not invalid on the basis that they provide for double-celling of prisoners.

Senate Constitutional Amendment No. 41, introduced by Senators Boatright, Davis, and Presley on August 30, 1983.

percentages above design capacity so that "crowding limits were steadily lowered."[71] To illustrate, below is a summary of some of the shifting limits from the relevant CDCR Master Plans, depicting changes in <u>allowable</u> prisoner populations <u>above</u> the design capacities of the different types of housing units:

| Master Plan | Dormitory | Celled Housing |
|---|---|---|
| 1995-1998 | 120% | 130% |
| 1995-2000 | [not available] | 170% (for Level IV) |
| 1998-2003 | 190% (including gym housing) | 190% |

I can think of no possible reason—other than necessity and expediency—why a maximum allowable capacity of 120% or 130% over design capacity set for the years 1995-1998 would be increased to 190% by 1998-2003.

46.    In addition, as the Receiver also noted: "During these same years various CDCR housing definitions were repeatedly modified, and new terms were instituted such as 'crisis' and 'nontraditional' (the CDCR's designation for prisoners housed in classrooms, hallways, etc.). Prison staff refer to such beds as 'ugly' beds."[72] Unfortunately, overcrowding cannot simply be defined away, especially in a prison setting. Definitional gymnastics notwithstanding, the basic concept of overcrowding—housing more people than space, resources, or infrastructure can humanely accommodate—remains valid. Moreover, in a legal context, there is a constitutional line that cannot be crossed.

---

[70] Joint Pls.' Trial Ex. 26.

[71] *Id.* at 11.

[72] *Id.*

### 3.    The Psychological Effects of Overcrowding on Prisoners

47.    There are a number of basic facts of life in overcrowded prison settings that generate a wide range of unpleasant, harmful, and potentially very dangerous and damaging effects, especially when the overcrowding is chronic and severe. Crowding intensifies or amplifies the basic pains of imprisonment. Prisoners in overcrowded correctional settings are forced to interact with more unfamiliar people, under extremely close quarters that afford little or no privacy or respite, where their basic needs are less likely to be addressed or met. The frequency of interactions, the sheer numbers of violations of personal space that occur, the forced closeness of the contact, and the reduction or elimination of respite from one another all expose prisoners to greater levels of psychological stress. Prisoners in overcrowded prisons are more idle and on edge.

48.    Indeed, overcrowding operates at an individual level to worsen the experience of imprisonment by literally changing the nature of the context or situation to which prisoners must adapt on a day-to-day basis. The longer someone is exposed to overcrowded conditions, the greater the length of time during which problematic coping mechanisms can evolve in response.[73] Thus, all other things being equal, short-term overcrowding is less problematic than exposure to long-term or chronically crowded prison conditions. In addition to these direct, individual-level effects, which I will discuss in a subsequent section, overcrowding changes the way the prison itself functions.

49.    Not surprisingly, a large literature on overcrowding has documented a range of adverse effects that occur when prisons have been filled to capacity and beyond. In the 1980s, when prisons in different parts of the United States were beginning to receive unprecedented numbers of incoming prisoners, a group of prison researchers concluded that "crowding in prisons is a major source of administrative problems and adversely affects prisoner health,

---

[73] For example, see the discussion in J. Bonta, Prison Crowding: Searching for the Functional Correlates, 41 *American Psychologist* 99-101 (1986), and the references cited therein.

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[248286-1]

behavior, and morale."[74] Two other early commentators concluded their review of the literature in much the same way, namely, that "[w]ith few exceptions, the empirical studies indicate that prison overcrowding has a number of serious negative consequences."[75] Although other variables may mediate or reduce the negative effects of crowding,[76] its psychological toll can be substantial.

50.    Thus, despite an occasional study that yields an inconclusive finding,[77] there is little reason to doubt that crowding significantly worsens the quality of institutional life and increases the destructive potential of imprisonment. Among other things, we know that prison overcrowding increases negative affect among prisoners,[78] elevates their blood pressure,[79] and

---

[74] Vernon Cox, Paul Paulus, and Garvin McCain, Prison Crowding Research: The Relevance for Prison Housing Standards and a General Approach to Crowding Phenomena, 39 *American Psychologist* 1148 (1984); Gaes, G., The Effects of Overcrowding in Prison. In M. Tonry and N. Morris (eds.), *Crime and Justice: Annual Review* of Research (1985); Paul Paulus, *Prison Crowding: A Psychological Perspective* New York: Springer-Verlag (1988).

[75] Thornberry, T., and Call, J., Constitutional Challenges to Prison Overcrowding: The Scientific Evidence of Harmful Effect, 35 *Hastings Law Journal* 313, 351(1983). Overcrowding studies at women's prisons showed similar effects. See Barry Ruback & Timothy Carr, Crowding in a Woman's Prison: Attitudinal and Behavioral Effects, 14 *Journal of Applied Social Psychology* 57-68 (1984).

[76] For example, Ekland-Olson, S., Crowding, Social Control, and Prison Violence: Evidence From the Post-*Ruiz* Years in Texas, 20 *Law and Society Review* 389 (1986). However, one of the reasons that quantitative measures of the adverse effects of prison crowding sometimes yield inconsistent results has to do with this basic fact of prison life:  The prison and the prison staff also react and adjust to the levels of overcrowding, setting in motion a chain of events that changes what is being measured and how. Thus, for example, the ability of staff to identify disciplinary infractions, and how they react to and punish those that are identified, may change in unpredictable ways as a prison becomes increasingly overcrowded.

[77] For example, see Jeff Bleich, The Politics of Prison Crowding, 77 *California Law Review* 1125-1180 (1989).

[78] E.g., Paul Paulus, Vernon Cox, Garvin McCain, & J. Chandler, Some Effects of Crowding in a Prison Environment, 5 *Journal of Applied Social Psychology* 86, 90 (1975): "The present study indicates that living under relatively crowded housing conditions in a prison produces both negative affect and a lower criterion of what constitutes overcrowding."

[79] E.g., D'Atri, D., Psychophysiological Responses to Crowding, 7 *Environment and Behavior*
(continued . . .)

leads to greater numbers of prisoner illness complaints.[80] Not surprisingly, exposure to "long-term, intense, inescapable crowding" of the sort that now characterizes California prisons results in high levels of stress that "can lead to physical and psychological impairment."[81] In addition, a number of studies have found that overcrowding is associated with higher rates of disciplinary infractions, especially among younger prisoners.[82] For example, one study concluded that in prisons "where crowded conditions are chronic rather than temporary and where people prone to antisocial behavior are gathered together, there is a clear association

---

237, 247 (1975): "[T]he major hypothesis that there would be an association between degree of crowding and blood pressure, systolic and diastolic, was strongly supported."

[80] E.g., McCain, G., Cox, V. and Paulus, P., The Relationship Between Illness Complaints and Degree of Crowding in a Prison Environment, 8 *Environment and Behavior* 283, 288 (1976).

[81] Paulus, P., McCain, G., & Cox, V., Death Rates, Psychiatric Commitments, Blood Pressure, and Perceived Crowding as a Function of Institutional Crowding, 3 *Environmental Psychology and Nonverbal Behavior* 107,115 (1978). See, also, Ostfeld, Adrian, Dasl, Stanislav, D'Atri, David, & Fitzgerald, Edward, *Stress. Crowding. and Blood Pressure in Prison*. Hillsdale, NJ: Lawrence Erlbaum (1987).

[82] There are a number of studies that have documented the fact that overcrowding contributes significantly to various forms of prison aggression and infractions. For example, see: G. Gaes, & W. McGuire, Prison Violence: The Contribution of Crowding Versus Other Determinants of Prison Assault Rates, 22 *Journal of Research in Crime and Delinquency* 41-65 (1985); J. Wooldredge, T. Griffin, & T. Pratt, Considering Hierarchical Models for Research on Prisoner Behavior: Predicting Misconduct With Multilevel Data, 18 *Justice Quarterly* 203-231 (2001) (overcrowding predicted prisoner misconduct in the New York, Washington, and Vermont prison systems). This appears to especially true in prisons that house "younger" prisoners (e.g., where their median age is 27 years or less). For example, see: S. Ekland-Olson, D. Barrick, & L. Cohen, Prison Overcrowding and Disciplinary Problems: An Analysis of the Texas Prison System, 19 *Journal of Applied Behavioral Sciences* 163-176 (1983); and Nacci, J. Prather, & H. Teitelbaum, *The Effect of Prison Crowding on Prisoner Behavior*. Washington, DC: U.S. Bureau of Prisons (1977). Thus, a "meta analysis" (a statistical procedure that combines the results of a number of different studies) concluded that although overcrowding did not appear to have a significant effect on misconduct within the prison population as a whole, it did have "substantially larger effects among younger prisoners, consequently leading to higher levels of violent and nonviolent misconduct among younger prisoner populations." T. Franklin, C. Franklin, & T. Pratt, Examining the Empirical Relationship Between Prison Crowding and Prisoner Misconduct: A Meta-Analysis of Conflicting Research Results, 34 *Journal of Criminal Justice* 401-412 (2006).

between restrictions on personal space and the occurrence of disciplinary violations."[83] And there is also evidence to suggest that psychiatric patients are more likely to become aggressive in housing units that lack adequate bed space and are overcrowded. [84]

51.     Among other things, crowded prisons generally experience increased noise levels and temperatures that can be elevated to intolerable levels during summer months, which in turn increase irritability. In addition, effective surveillance becomes more difficult because of the sheer number of people who must be monitored. Overcrowded housing units are more difficult to keep clean, more likely to fall into disrepair and suffer breakdowns in plumbing and other basic services more frequently. Unintentional violations of personal space are not only more likely in overcrowded prisons but also, in turn, are more often perceived as provocations (and responded to accordingly). In fact, perhaps in part because the subjective experience of prison crowding is so stressful, it actually leads prisoners to perceive others in their surrounding environment as more hostile and intentionally malevolent, increasing their readiness to react to those others as threatening.[85]

52.     Prison overcrowding also affects prisoners' mental and physical health by increasing the level of uncertainty with which they regularly must cope. Thus, crowded conditions heighten the level of cognitive strain that persons experience by introducing social complexity, turnover, and interpersonal instability into already dangerous prison environments in which interpersonal mistakes or errors in social judgments can be fatal. Of course, overcrowding also raises collective frustration levels inside prisons by generally decreasing the

---

[83] Megargee, E. The Association of Population Density, Reduced Space, and Uncomfortable Temperature with Misconduct in a Prison Community, 5 *American Journal of Community Psychology* 289, 295 (1977).

[84] For example, see: B. Ng, S. Kumar, M. Ranclaud, & E. Robinson, Ward Crowding and Incidents of Violence on An Acute Psychiatric Inpatient Unit, 52 *Psychiatric Services* 521-525 (2001); and Palmstierna, et al., The Relationship of Crowding and Aggressive Behavior on a Psychiatric Intensive Care Unit, 42 *Hospital and Community Psychiatry* 1237-1240 (1991).

[85] For example, see: C. Lawrence & K. Andrews, The Influence of Perceived Prison Crowding on Male Prisoners' Perception of Aggressive Events, 30 *Aggressive Behavior* 273-283 (2004).

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[245286-1]

resources, programming, and other activities that are available to the prisoners confined in them. The sheer number of things prisoners can do or accomplish on a day-to-day basis is compromised by the increasingly scarce resources and the multiplicity of people in between them and their goals and destinations. [86]

     53.    One widely cited literature review concluded that although prisons <u>in general</u> were not necessarily harmful to prisoners, overcrowded prisons certainly were. It included the following empirically documented observations: that "physiological and psychological stress responses … were very likely [to occur] under crowded prison conditions"[87]; that "a correlation [has been found] between population density and misconduct [when age is used as a moderator variable]"[88]; that there is "a significant relationship between crowding and post-release recidivism"[89]; and that "high prisoner turnover [in some prisons has been found to predict] prisoner disruptions."[90] These reviewers also acknowledged that "as sentence length or exposure to crowded situations increase so does the risk for misconduct"[91]; and that "[w]hen threats to health come from suicide and self-mutilation, then prisoners are clearly at risk."[92]

---

[86] For example, Vernon Cox, Paul Paulus, & Garvin McCain, Prison Crowding Research, 39 *American Psychologist* 1148,1159 (1984). See, also, Edward Sieh, Prison Overcrowding: The Case of New Jersey, 53 *Federal Probation* 41-51(1989) for a brief review. For a discussion of the health risks of prison and jail overcrowding, see Bailus Walker & Theodore Gordon, Health Risks and High Density Confinement in Jails and Prisons, 44 *Federal Probation* 53-58 (1980).

[87] James Bonta and Paul Gendreau, P., Reexamining the Cruel and Unusual Punishment of Prison Life, 14 *Law and Human Behavior* 347-372 (1990), at 353.

[88] *Ibid.*

[89] At 354.

[90] *Ibid.*

[91] *Ibid.*

[92] At 356.

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[248286-1]

54.     Prisoners confined to severely and chronically overcrowded prisons commonly live in more rapidly deteriorating and dilapidated housing units. Obviously, overcrowded prisons are dirtier and their infrastructure is in greater disrepair because of the overuse they receive. In extreme cases, prisoners may be herded into makeshift housing that clearly was intended for some other purpose and affords them even less privacy than the already minimal amounts they receive in standard prison environments. The degraded conditions under which prisoners live serve as constant reminders of their compromised and stigmatized social status and role. A diminished sense of self-worth and personal value may result from this. That is, like the rest of us, prisoners derive and internalize symbolic meaning from the way they are treated. When they are treated in harsh and humiliating ways, and are confined in abysmal housing units, many come to think of themselves as deserving no more than the degradation and stigma to which they are being subjected.[93] This degraded identity may be difficult or impossible to relinquish when they are released from prison.

55.     Of course, there are many prisoners who enter overcrowded prison systems with pre-existing psychological problems and psychiatric disorders. For obvious reasons, chronically and severely overcrowded prison systems are challenged to obtain and retain adequate numbers of clinical staff and to implement treatment programs that address the needs of this special population. In addition to the lack of adequate numbers of treatment staff proportionate to the sheer numbers of mentally ill prisoners, these prisoners are themselves especially sensitive to the harsh realities of overcrowded prisons. Mentally ill prisoners are more likely to be adversely affected by the forced intimate contact that overcrowded housing units require because, depending on the nature of their illness, they may be far less adept at

---

[93] These issues have been explored extensively in the past by sociologists. See, for example: Homant, R., Employment of Ex-Offenders: The Role of Prisonization and Self-Esteem, 8 *Journal of Offender Counseling, Services, & Rehabilitation* 5-23 (1984); Irwin, J., *The Felon.* Englewood Cliffs, NJ: Prentice-Hall (1970); McCorkle, L., & Korn, R., Resocialization Within Walls, 293 *The Annals* 88-98 (1954); Thomas, C., & Peterson, D., *supra* note 58; Title, C., Institutional Living and Self-Esteem, 20 *Social Problems* 65-77 (1972); and Wulbert, R., Prisoner Pride in Total Institutions, 71 *American Journal of Sociology* 1-9 (1965).

reading social cues, controlling their impulses, or regulating their emotional states than the prisoners with whom they must so closely and constantly interact. The decreased opportunities for normal, non-pressured social interaction may undermine already impaired reality testing. And the sheer stress of severely overcrowded confinement may overwhelm their already fragile coping mechanisms, creating fear and anxiety in what these prisoners experience as an increasingly unpredictable world. Thus, mentally ill prisoners are more likely to decompensate from exposure to such pressurized, overcrowded environments, and they are vulnerable to victimization from the overcrowding-related conflicts that occur with increased frequency.

56.    Whether or not they enter prison with pre-existing psychiatric disorders, some prisoners find the severe conditions of confinement in badly overcrowded systems to be traumatic. Others are exposed to violence and other emotionally wrenching events that will have long-lasting psychological consequences. As a result, some develop "post-traumatic stress disorder" (PTSD)—a range of long-term trauma-related symptoms, including depression, emotional numbing, anxiety, isolation, hypervigilance, and related reactions—in response to prison trauma.[94] In this regard, psychiatrist Judith Herman and others have proposed that the diagnostic category of post-traumatic stress disorder be restructured to include what she has termed "complex PTSD," a disorder created by "prolonged, repeated trauma or the profound deformations of personality that occur in captivity."[95] Complex PTSD can result in protracted

---

[94] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*. 4th Edition. Washington, DC: American Psychiatric Association (1994), at 111. For more detailed discussions of the disorder, see C. Peter Erlinder, Paying the Price for Vietnam: Post-Traumatic Stress Disorder and Criminal Behavior, 25 *Boston College Law Review* 305 (1984); Helzer, J. E., Robins, L. N., & McEvoy, L., Post-Traumatic Stress Disorder in the General Population, 1317 *The New England Journal of Medicine* 1630-1634 (1987); Rowan, A. B., Foy, D. W., Rodriguez, N., & Ryan, S., Posttraumatic Stress Disorder in a Clinical Sample of Adults Sexually Abused as Children, 18 *Child Abuse and Neglect* 51-61 (1994); John P. Wilson and Beverly Raphael (Eds.), *International Handbook of Traumatic Stress Syndromes*. New York: Plenum (1993).

[95] Judith Herman, A New Diagnosis. In Judith Herman (Ed.), *Trauma and Recovery*. New York: Basic Books (1992), at 119. See, also, Herman, Judith Lewis. Complex PTSD: A Syndrome in Survivors of Prolonged and Repeated Trauma. In George S. Everly Jr., Jeffrey M.

(continued . . .)

---

-33-

depression, apathy, and the development of a profound sense of hopelessness. For some prisoners, it represents the long-term psychological cost of adapting to oppressive forms of prison confinement.[96]

57.     In any event, many prisoners adapt to the pains of extreme forms of imprisonment in severely overcrowded prisons by developing overt psychological symptoms or experiencing an exacerbation of ones that already exist—including clinical depression, paranoia, and psychosis.[97]

### 4.     The Behavioral Effects of Overcrowding on Prisoners and Prisons

58.     Prison systems, administrators, and staff also respond to overcrowding in a variety of ways that, in turn, impact prisoner behavior. In an important sense, of course, overcrowding is a systemic problem, and prison systems "behave" differently in the face of it. Because overcrowding is such a pernicious problem, however, few if any of these adaptations have long-term positive consequences.

59.     For one, overcrowded prison systems often respond to the influx of unprecedented numbers of prisoners by reducing the amount of screening, monitoring, and managing that they perform. This typically includes compromises that are made in the assessment and treatment of vulnerable or special needs prisoners. As one group of clinicians acknowledged: "Unfortunately, the prospect of screening prisoners for mental disorder and treating those in need of mental health services has become a daunting and nearly impossible

---

Lating, (Eds.), *Psychotraumatology: Key Papers and Core Concepts in Post-Traumatic Stress* (pp. 87-100). New York: Plenum (1995).

[96] Judith Herman, Complex PTSD: A Syndrome in Survivors of Prolonged and Repeated Trauma, 5 *Journal of Traumatic Stress* 377-391 (1992).

[97] Cf. DeWolfe, R., and DeWolfe, A., Impact of Prison Conditions on the Mental Health of Prisoners, 1979 *Southern Illinois University Law Journal* 497 (1979); Hans Toch, *Men in Crisis : Human Breakdowns in Prison*. Chicago, IL: Aldine (1975); Hans Toch, *Living in Prison : The Ecology of Survival*. New York: Free Press (1977).

task in the present explosion of prison growth."[98] Unidentified and untreated mentally ill prisoners in mainline prison populations not only are more likely to deteriorate themselves, but also to have a significant adverse effect on the prisoners with whom they must live and interact—sometimes incurring their wrath and mistreatment.

60.    Overcrowding also means that prison systems experience pressures to reallocate already limited programming and other resources to create bed space and maintain basic security. Thus, in addition to significant reductions in correctional services, activities, programming, and treatment for prisoners, of course, overcrowded prisons are correspondingly plagued by higher levels of idleness. The prison overcrowding crisis in the United States in general and California in particular coincided with the advent of a correctional philosophy that saw punishment rather than rehabilitation become the stated goal and primary purpose of imprisonment. Unprecedented amounts of unproductive inactivity have resulted from the confluence of these trends. Put simply, a severely and chronically overcrowded prison system like the one that now exists in California cannot keep the majority of its prisoners meaningfully or productively engaged in activities and programs.

61.    Moreover, chronic idleness produces more than mere boredom. There is widespread agreement among correctional experts that empty, idle time in prison produces negative psychological and behavioral effects. As far back as the 1980s, when the trends toward overcrowding and the lack of prison programming had just begun, the U.S. Government Accounting Office noted: "Corrections officials believe that extensive prisoner idleness can lead to destructive behavior and increase violence within institutions. Moreover, idleness does little to prepare prisoners for re-entry into society."[99]

---

[98] Frank DiCataldo, Alexander Greer, & Wesley Profit, Screening Prison Prisoners for Mental Disorder: An Examination of the Relationship Between Mental Disorder and Prison Adjustment, 23 *Bulletin of the American Academy of Psychiatry and Law* 573-585, 574 (1995).

[99] United States Government Accounting Office, *Report to the Attorney General: Improved Prison Work Programs Will Benefit Correctional Institutions and Prisoners* 2 (1982).

62.    Idleness-related frustration also increases the probability of interpersonal conflict and assaults in prison. Unfortunately, as I noted earlier, overcrowding simultaneously reduces the opportunities for staff to effectively monitor prisoner behavior and drastically limits their options to reduce animosities between prisoners by separating them or sending them to different facilities. Thus, there is greater stress and more opportunity for interpersonal conflict, less for prisoners to do, fewer positive or productive outlets to release the resulting tension, decreased staff capacity to identify prisoner problems, and fewer options to solve them once they do.

63.    Moreover, the kind of widespread idleness and lack of purposeful activity that pervades overcrowded prisons has been identified as a major cause of self-harm and suicide among prisoners.[100] Indeed, a 2005 nationwide study of prison suicides found that the "the probability of suicide increases dramatically as overcrowding increases..."[101] These researchers found that suicide rates were lower in minimum security facilities overall—presumably because of the greater levels of program participation—but that overcrowding actually produced the greatest effect on the suicide rate at these facilities. That is, at high levels of overcrowding, minimum security prisons were as likely to experience suicide as their medium and maximum security counterparts. In fact, some prison researchers have concluded that one of the best ways to decrease the rate (not just the absolute number) of prison suicides would be to reduce the total number of incarcerated persons.[102]

---

[100] For example, see: M. Leese, S. Thomas, & L. Snow, An Ecological Study of Factors Associated with Rates of Self-inflicted Death in Prisons in England and Wales, 29 *International Journal of Law and Psychiatry* 355-360 (2006).

[101] M. Huey & T. McNulty, Institutional Conditions and Prison Suicide: Conditional Effects of Deprivation and Overcrowding, 85 *Prison Journal* 490-514 (2005), at 506.

[102] For example, see: P. Marcus & P. Alcabes, Characteristics of Suicides by Prisoners in an Urban Jail, *44 Hospital and Community Psychiatry* 256-261 (1993); and D. MacDonald & N. Thomson, Australian Deaths in Custody, 1980-1989, 159 *Medical Journal of Australia* 581-585 (1993). Of course, no one would argue that a simple reduction in population is all that is needed to address suicidality among prisoners. Clearly, a corresponding concern for the needs

(continued . . .)

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[245286-1]

64.     Another negative behavioral effect of overcrowding that stems from the changes it produces at both individual and institutional levels is the increased risk of sexual victimization. For example, one prison researcher has noted that "[i]n less well-regulated institutions in which prisoners have little recourse to protection or in which there may be collusion between dominant prisoners and staff to maintain the peace, sexual violence tends to be greater."[103] Others have suggested that overcrowded conditions in which prisoners have much idle time may contribute to higher numbers of prison rapes.[104]

65.     Researchers also have documented greater amounts of illicit drug use among prisoners who are incarcerated in overcrowded prison settings, leading one of them to conclude that "reducing drug-related behaviors inside prison may require alleviating prison crowding…"[105] There are several plausible explanations for this relationship, including the fact that illicit drug use is more difficult to monitor and prevent in overcrowded prisons and the likelihood that prisoners will attempt to cope with the stress of overcrowded living conditions through increased drug use.

66.     As I noted earlier, overcrowding appears to have especially adverse effects on the institutional behavior of younger prisoners. Thus, one study of the Texas prison system found that:

---

of the prisoners who remain behind in prison, as well as those who are released or diverted to non-prison settings, is also needed. For example, see: S. Fruehwald, P. Frottier, K. Ritter, R. Eher, & K. Gutierrez, Impact of Overcrowding and Legislational Change on the Incidence of Suicide in Custody Experiences in Austria, 1967-1996. 25 *International Journal of Law and Psychiatry* 119-128 (2002), who argue that reductions in prisoner populations must be accompanied by suicide prevention training among custodial staff.

[103] King, M., Male Rape in Institutional Settings. In Mezey, G., & King, M. (Eds.), *Male Victims of Sexual Assault*. Oxford: Oxford University Press (1992), at 70.

[104] Gunby, P. Sexual Behavior in an Abnormal Situation, 245 *Medical News* 215-220 (1981).

[105] W. Gillespie, A Multilevel Model of Drug Abuse Inside Prison, 85 *Prison Journal* 223-246 (2005), at 21. Perhaps not surprisingly, Gillespie found that the overcrowding effect appeared to be particularly pronounced among prisoners with a prior history of street drug use.