> The greater the proportion of young prisoners housed in the institution, the greater the infraction and assault rates. There is some evidence for an interaction effect between age and prison size. Younger prisoners may be more susceptible to the problems and control structures in large prisons than older prisoners.[106]

67. Another study obtained similar results, with overall correlations that revealed "a significant association between density and total assaults and assaults on prisoners" such that the greater the density the more frequent the assaults. But the relationship between crowding and violence was "strongest in the institutions housing young offenders."[107]

68. These age-related crowding effects are not difficult to understand. Younger prisoners tend to be more volatile, sensitive to their surroundings and, in general, more likely to react aggressively to the tensions and conflicts that crowded conditions of confinement generate. However, prison officials and staff members often respond to these crowding-related infractions by punishing prisoners, frequently by placing them in disciplinary segregation units. The heightened reactivity of younger prisoners to the context of crowded living conditions means that greater numbers of them will be exposed to even harsher conditions in the segregated or isolated housing units where they will be confined.

69. A number of adverse and presumably unintended long-term consequences are likely to follow from this scenario. Prison officials typically use a prisoner's disciplinary segregation status to bar him from participation in any form of educational or vocational programming. Moreover, time spent in segregation simultaneously places prisoners at risk of developing a host of adverse psychological reactions that are associated with long-term isolation (that I will discuss in a subsequent section of this report). The absence of even

---

[106] Ekland-Olson, S., Barrick, D., & Cohen, L. Prison Overcrowding and Disciplinary Problems: An Analysis of the Texas Prison System, 19 *Journal of Applied Behavioral Science* 163-176,174 (1983); Gilbert Gaes and William McGuire, Prison Violence: The Contribution of Crowding Versus Other Determinants of Prison Assault Rates, 22 *Journal of Research in Crime and Delinquency* 41-65 (1985).

[107] Nacci, P., Teitelbaum, H., & Prather, J. Population Density and Prisoner Misconduct Rates in the Federal Prison System, 41 *Federal Probation* 26, 29 (1977).

minimal forms of programming and exposure to potentially disabling solitary confinement jeopardize subsequent adjustment in the mainline prison population as well as in the freeworld. And, once these prisoners do return to prison, they may well find that their prior disciplinary status leads more readily (or even automatically) to their classification as a present security risk, making them prime candidates for assignment to a segregation unit once again.

70. In light of the panoply of negative individual and institutional effects of prison overcrowding that I have summarized in the preceding paragraphs, it is perhaps not surprising that several studies have suggested that crowded prisons are associated with increased recidivism. For example, at the start of the 1980s, several British researchers found a strong relationship between overcrowding and prison ineffectiveness in England—prisoners released from overcrowded prisons were more likely to be recommitted for subsequent criminal infractions. The relationship could not be explained away by other variables, leading the researchers to recommend a reduction in prison overcrowding in order to improve the ability of prisons to reduce crime. By sending fewer people to prison or by reducing the effective lengths of prison sentences, they argued, the effectiveness of prison might be enhanced.[108]

71. Similarly, several years after this English study, Canadian researchers concluded that placing low-risk offenders in often-overcrowded high security facilities resulted in high rates of re-incarceration.[109] The rates were significantly higher than those of comparable low-risk offenders who had been placed in halfway houses. The researchers concluded that the failure to properly divert low-risk offenders from high to low security facilities—something that overcrowded prison systems often lack the capacity to do—"may actually increase the risk of future recidivism."[110]

---

[108] Farrington, D. & Nuttall, C., Prison Size, Overcrowding, Prison Violence, and Recidivism, 8 *Journal of Criminal Justice* 221-231, 230 (1980).

[109] Bonta, J., and Motiuk, L., The Diversion of Incarcerated Offenders to Correctional Halfway Houses, 24 *Journal of Research in Crime & Delinquency* 302 (1987).

[110] *Id.* at 312.

72.     Long-term "criminogenic" or crime-producing overcrowding effects can occur in other ways as well. Indeed, severely overcrowded prison systems can generate a wide variety of problems that may reverberate back into the community and eventually back into the prison system itself. For example, because prisoners lack sufficient programming and treatment in overcrowded systems, they are more likely to re-enter the free society no better—and often much worse—than they left. This is especially true for mentally ill prisoners whose psychiatric conditions are likely to worsen in the face of the harsh and punitive conditions they face in overcrowded prisons. If mentally ill prisoners do not receive proper, effective treatment in prison, they will return home with mental health needs that local communities with already limited treatment resources will be called upon to address. Mentally ill prisoners who worsen or decompensate in prison will need even higher levels of care and, in extreme cases, they may become chronically or even permanently disabled. Untreated or worsened mental health conditions also may render some prisoners more dangerous when they return from prison than when they left.

73.     In addition, prisoners who are traumatized by severely overcrowded prison conditions or exposure to the extreme forms of violence that can occur within them may leave prison with psychiatric disorders that they did not have or manifest as clearly at the outset of their prison sentences. That is, some number of prisoners will enter prison without a documented history of mental illness but, because of the severe deprivations, profound indignities, and dangerous conditions they confront, develop serious trauma-related disorders that may require mental health treatment both in prison and later in free society. In the absence of such treatment, these prisoners are prime candidates to re-offend.

74.     Thus, overcrowded prisons tend to beget overcrowded prisons. In fact, California is a perfect example of the way in which a chronically and severely overcrowded prison system sends prisoners back into the community ill-prepared to successfully reintegrate there. Increasing numbers of them re-offend or violate the conditions of their parole quickly and repeatedly, which in turn continues to generate greater numbers of prisoners and exacerbates the prison overcrowding problem.

### 5. The Relationship Between Overcrowding and the Overuse of Segregation

75.  As I already have noted, an unprecedented influx of prisoners compromises the meaningful evaluation and classification of incoming prisoners. In a severely overcrowded prison system like California's, a prisoner's security level and available bed space largely determine housing assignments. This means that many fewer new prisoners pass through an intake process that includes a comprehensive diagnostic evaluation and what—in the days of rehabilitation—was referred to as a "needs assessment." Thus, even chronic deficits in educational or vocational skills are overlooked or ignored in initial classification and subsequent housing assignments. Indeed, a chronically and severely overcrowded prison system for the most part lacks the resources with which to address the broad range of prisoner needs and problems anyway.

76.  Among other things, this means that prison administrators have few incentives or positive rewards at their disposal with which to manage and control prisoner behavior. That is, overcrowded prisons lose their programming orientation and options. They are rarely in a position to offer well-behaved prisoners meaningful opportunities for personal growth or skill development, or participation in engaging activities or thriving organizations as "carrots" to reinforce and shape prisoner behavior. Lacking carrots, overcrowded prisons and prison systems rely increasingly on "sticks." Thus, overcrowding leads to increasingly negative forms of institutional control and, as population pressures mount, the use of harsh discipline and punishment tends to escalate.

77.  The use of harsher and more punitive policies and procedures to maintain order and control means that custody staff increasingly rely on security hardware and surveillance technology to control prisoner behavior. The extent of their dependence on the technology and implements of control has concerned some penologists, who worry about the "de-skilling" of correctional officers—the fact that interpersonal skills atrophy in prison systems where problems are solved and conflict defused increasingly by a reflexive tendency to lock up or lock down problematic or challenging prisoners (or the entire housing units in which they

reside). Indeed, overcrowded prisons may engage in the more frequent use of "lockdowns" and forms of disciplinary sanctions and segregation that further restrict prisoner movement and keep them separated from staff as well as one another. In California, as I will document in a subsequent section of this report, this includes the placement of troubled and troublesome prisoners—many of whom are mentally ill—in ASUs and SHUs.

78.  Presumably designed to limit and control violence by keeping prisoners isolated from one another, segregated housing confines prisoners in especially harsh and deprived conditions for very long periods of time. Especially for mentally ill prisoners, this kind of confinement comes with a significant risk of psychological harm. As a general matter, psychologists know from studies of behavior and adjustment in free society that social isolation is generally bad for people's psychological well being.[111] Its effects are no more positive in prison. Thus, there is substantial evidence of the negative psychological effects of isolated confinement that comes from a variety of sources, including personal accounts, descriptive studies, and systematic research on solitary and supermax-type units. The data that establish these harmful effects have been collected in studies conducted over a period of several decades, by researchers from several different continents who had diverse backgrounds and a wide range of professional expertise.[112]

---

[111] For example, see: Graham Thornicroft, Social Deprivation and Rates of Treated Mental Disorder: Developing Statistical Models to Predict Psychiatric Service Utilisation, 158 *British Journal of Psychiatry* 475-484 (1991). Cf. Margaret K. Cooke & Jeffrey H. Goldstein, Social Isolation and Violent Behavior, 2 *Forensic Reports* 287-294, 288 (1989):

> A socially isolated individual who has few, and/or superficial contacts with family, peers, and community cannot benefit from social comparison. Thus, these individuals have no mechanism to evaluate their own beliefs and actions in terms of reasonableness or acceptability within the broader community. They are apt to confuse reality with their idiosyncratic beliefs and fantasies and likely to act upon such fantasies, including violent ones.

[112] For example, see: Christopher Burney, *Solitary Confinement*. New York: St. Martin's Press (1961); Frank Rundle, The Roots of Violence at Soledad. In Erik Olin Wright, (Ed.), *The Politics of Punishment: A Critical Analysis of Prisons in America* (pp. 163-172). New York:
(continued . . .)

Case 2:90-cv-00520-LKK-JFM    Document 3201    Filed 10/30/2008    Page 55 of 267

79.    For example, mental health and correctional staff who have worked in disciplinary segregation and isolation units have reported observing a range of problematic symptoms manifested by the prisoners confined in these places.[113] The authors of one of the early studies of solitary confinement summarized their findings by concluding that "[e]xcessive deprivation of liberty, here defined as near complete confinement to the cell, results in deep emotional disturbances."[114] A decade later, Professor Hans Toch's large-scale psychological study of prisoners "in crisis" in New York State correctional facilities included important observations about the effects of isolation.[115] After hundreds of in-depth interviews with such prisoners, he concluded that "isolation panic" was a serious problem among prisoners in solitary confinement. Symptoms reported included rage, panic, loss of control and breakdowns, psychological regression, a build-up of physiological and psychic tension that led to incidents of self-mutilation.[116]

---

Harper (1973); Robert Slater, Psychiatric Intervention in an Atmosphere of Terror, 7(1) *American Journal of Forensic Psychiatry* 5-12 (1986); Slater, R., Abuses of Psychiatry in a Correctional Setting, 7(3) *American Journal of Forensic Psychiatry* 41-47 (1986).

[113] For detailed reviews of all of these psychological issues, and references to the many empirical studies that support these statements, see: Craig Haney & Mona Lynch, Regulating Prisons of the Future: The Psychological Consequences of Supermax and Solitary Confinement; and Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, both *supra* note 7.

[114] Bruno M. Cormier & Paul J. Williams, Excessive Deprivation of Liberty, 11 *Canadian Psychiatric Association Journal* 470-484 (1966), at p. 484. For other early studies of solitary confinement, see: Gendreau, P., Freedman, N., Wilde, G., & Scott, G., Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement, 79 *Journal of Abnormal Psychology* 54-59 (1972); George Scott & Paul Gendreau, Psychiatric Implications of Sensory Deprivation in a Maximum Security Prison, 12 *Canadian Psychiatric Association Journal* 337-341 (1969); Richard H. Walters, John E. Callagan & Albert F. Newman, Effect of Solitary Confinement on Prisoners, 119 *American Journal of Psychiatry* 771-773 (1963).

[115] Hans Toch, *Men in Crisis: Human Breakdowns in Prisons*. Aldine Publishing Co.: Chicago (1975).

[116] Toch noted that although isolation panic could occur under other conditions of confinement it was "most sharply prevalent in segregation." *Ibid* at 54. Moreover, it marked an important dichotomy for prisoners: the "distinction between imprisonment, which is tolerable, and

(continued . . .)

[248286-1]    EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

80.   More recent studies have identified other symptoms that appear to be produced by these conditions. Those symptoms include: appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations. Moreover, direct studies of prison isolation have documented an extremely broad range of harmful psychological reactions. These effects include increases in the following potentially damaging symptoms and problematic behaviors: negative attitudes and affect, anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, and rage, paranoia, hopelessness, a sense of impending emotional breakdown, self-mutilation, and suicidal ideation and behavior.[117]

---

isolation, which is not." *Ibid.*

[117] For example, see the numerous studies cited in the articles referenced *supra* at note 7. In addition to those direct studies, and the many studies summarized in the literature reviews to which I have referred, there is a significant international literature on the adverse effects of solitary confinement. For example, see: Henri N. Barte, L'Isolement Carceral, 28 *Perspectives Psychiatriques* 252 (1989). Barte analyzed what he called the "psychopathogenic" effects of solitary confinement in French prisons and concluded that prisoners placed there for extended periods of time could become schizophrenic instead of receptive to social rehabilitation. He argued that the practice was unjustifiable, counterproductive, and "a denial of the bonds that unite humankind." In addition, see: Reto Volkart, Einzelhaft: Eine Literaturubersicht (Solitary confinement: A literature survey), 42 *Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen* 1-24 (1983) (reviewing the empirical and theoretical literature on the negative effects of solitary confinement); Reto Volkart, Adolf Dittrich, Thomas Rothenfluh, & Paul Werner, Eine Kontrollierte Untersuchung uber Psychopathologische Effekte der Einzelhaft (A controlled investigation on psychopathological effects of solitary confinement), 42 *Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen* 25-46 (1983) (when prisoners in "normal" conditions of confinement were compared to those in solitary confinement, the latter were found to display considerably more psychopathological symptoms that included heightened feelings of anxiety, emotional hypersensitivity, ideas of persecution, and thought disorders); Reto Volkart, et al., Einzelhaft als Risikofaktor fur Psychiatrische Hospitalisierung (Solitary confinement as a risk for psychiatric hospitalization), 16 *Psychiatria Clinica*, 365-377 (1983) (finding that prisoners who had been kept in solitary confinement were overrepresented as compared to other prisoners who were hospitalized in a psychiatric clinic); Boguslaw Waligora, Funkcjonowanie Czlowieka W Warunkach Izolacji Wieziennej (How men function in conditions of penitentiary isolation), *Seria Psychologia I Pedagogika* NR 34, Poland (1974) (so-called "pejorative isolation" of the sort that occurs in prison strengthens "the asocial features in the criminal's personality thus becoming an essential cause of difficulties and failures in the process of his resocialization"). See, also, Ida Koch, Mental and Social Sequelae of Isolation: The Evidence of Deprivation Experiments and of

(continued . . .)

---

81.     In addition, there are correlational studies of the relationship between housing type and various kinds of incident reports in prison. They show that self-mutilation and suicide are more prevalent in isolated, punitive housing units like ASUs and SHUs. So, too, are signs of deteriorating mental and physical health (beyond self-injury), other-directed violence, such as stabbings, attacks on staff, and property destruction, and collective violence.[118] Indeed, within CDCR, suicides are much more likely to occur inside the segregated housing units.[119]

---

Pretrial Detention in Denmark, in *The Expansion of European Prison Systems, Working Papers in European Criminology No. 7* 119 (Bill Rolston & Mike Tomlinson eds. 1986) who found evidence of "acute isolation syndrome" among detainees that occurred after only a few days in isolation and included "problems of concentration, restlessness, failure of memory, sleeping problems and impaired sense of time an ability to follow the rhythm of day and night" (at 124). If the isolated confinement persisted—"a few weeks" or more—there was the possibility that detainees would develop "chronic isolation syndrome," including intensified difficulties with memory and concentration, "inexplicable fatigue," a "distinct emotional lability" that can include "fits of rage," hallucinations, and the "extremely common" belief among isolated prisoners that "they have gone or are going mad" (at 125). See, also: Michael Bauer, Stefan Priebe, Bettina Haring & Kerstin Adamczak, Long-Term Mental Sequelae of Political Imprisonment in East Germany, 181 *Journal of Nervous & Mental Disease* 257-262 (1993).

[118] For example, see: Howard Bidna, Effects of Increased Security on Prison Violence, 3 *Journal of Criminal Justice* 33-46 (1975); K. Anthony Edwards, Some Characteristics of Prisoners Transferred from Prison to a State Mental Hospital, 6 *Behavioral Sciences and the Law* 131-137 (1988); Lindsay M. Hayes, National Study of Jail Suicides: Seven Years Later. Special Issue: Jail Suicide: A Comprehensive Approach to a Continuing National Problem, 60 *Psychiatric Quarterly* 7 (1989); Elmer H. Johnson, Felon Self-Mutilation: Correlate of Stress in Prison. In Bruce L. Danto (Ed.) *Jail House Blues*. Michigan: Epic Publications (1973); Anne Jones, Self-Mutilation in Prison: A Comparison of Mutilators and Nonmutilators, 13 *Criminal Justice and Behavior* 286-296 (1986); Peter Kratcoski, The Implications of Research Explaining Prison Violence and Disruption, 52 *Federal Probation* 27-32 (1988); Ernest Otto Moore, A Prison Environment: Its Effect on Health Care Utilization, *Dissertation Abstracts*, Ann Arbor, Michigan (1980); Frank Porporino, Managing Violent Individuals in Correctional Settings, 1 *Journal of Interpersonal Violence* 213-237 (1986); and Pamela Steinke, Using Situational Factors to Predict Types of Prison Violence, 17 *Journal of Offender Rehabilitation* 119-132 (1991).

[119] In 2004, 73 percent of the suicides within CDCR prisons occurred in segregated housing. Docket 1806 at 7. In 2005, 37 percent of the suicides occurred in segregated housing and in 2006, 44 percent of the suicides occurred in segregated housing. Given the actual prison population that is housed in segregated units—less than 10,000 prisoners out of 165,000—the high number of suicides occurring among this small number of prisoners is quite staggering.

(continued . . .)

---

-45-

82. The use of extreme forms of solitary confinement in so-called "brainwashing" and methods of torture also underscores its painful, damaging potential. In fact, many of the negative effects of solitary confinement are analogous to the acute reactions suffered by torture and trauma victims, including post-traumatic stress disorder ("PTSD") and the kind of psychiatric sequelae that plague victims of what are called "deprivation and constraint" torture.[120]

83. The <u>prevalence</u> of psychological symptoms (that is, the extent to which prisoners who are placed in these units suffer from these and related symptoms) is very high. In my own study of a representative sample of prisoners in the Pelican Bay SHU, for example, every symptom of psychological distress that I measured but one (fainting spells) was suffered by more than half of the prisoners.[121] Many of the symptoms were reported by two-thirds or more of the prisoners in this isolated housing unit, and some were suffered by nearly everyone. Well over half of the SHU prisoners reported a constellation of symptoms—headaches, trembling, sweaty palms, and heart palpitations—that is commonly associated with hypertension. I also found that almost all of the prisoners evaluated reported ruminations or intrusive thoughts, an

---

In CDCR's own 2004 Suicide Report, they calculated the suicide rate for their administrative segregation population at **248 per 100,000**. Coleman Pls' Trial Ex. 164 at 15.

[120] Solitary confinement is among the most frequently used psychological torture techniques. In D. Foster, *Detention & Torture in South Africa: Psychological, Legal & Historical Studies*. Cape Town: David Philip (1987), Psychologist Foster listed solitary confinement among the most common "psychological procedures" used to torture South African detainees (at 69), and concluded that "[g]iven the full context of dependency, helplessness and social isolation common to conditions of South African security law detention, there can be little doubt that solitary confinement under these circumstances should in itself be regarded as a form of torture" (at 136). See, also: Matthew Lippman, The Development and Drafting of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 27 *Boston College International & Comparative Law Review* 275- (1994); Tim Shallice, Solitary Confinement—A Torture Revived? *New Scientist*, November 28, 1974; F.E. Somnier & I.K. Genefke, Psychotherapy for Victims of Torture, 149 *British Journal of Psychiatry* 323-329 (1986); and Shuan R. Whittaker, Counseling Torture Victims, 16 *The Counseling Psychologist* 272-278 (1988).

[121] Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, *supra* note 7.

oversensitivity to external stimuli, irrational anger and irritability, difficulties with attention and often with memory, and a tendency to socially withdraw. Almost as many prisoners reported a constellation of symptoms indicative of mood or emotional disorders—concerns over emotional flatness or losing the ability to feel, swings in emotional responding, and feelings of depression or sadness that did not go away. Finally, sizable minorities of the prisoners reported symptoms that are typically only associated with more extreme forms of psychopathology— hallucinations, perceptual distortions, and thoughts of suicide.

84.   Unless a prison system steadfastly guards against it—and few overcrowded prison system are able to—certain categories of vulnerable prisoners are likely to be placed disproportionately in these units where, precisely because of their vulnerabilities, they are at greater risk of suffering serious harm. For example, one commentator has described the "vicious cycle" into which mentally ill and developmentally disabled[122] prisoners can fall when they commit disciplinary violations and are placed in segregated housing. A lack of appropriate treatment and care in general population may worsen their condition, "[c]ausing hostile and aggressive behavior to the point that they break prison rules and end up in segregation units as management problems." Because of highly stressful conditions in segregation and the fact that mental health care is usually sporadic and of uneven quality there, "this regression can go

---

[122] I have not focused specifically on developmentally disabled prisoners in this report. However, they, too, are especially vulnerable to the negative consequences of overcrowding, in part because of the deteriorating living conditions with which they must contend and the reduced number of options that they may have with which to adapt. For example, as one observer put it, "A prisoner with mental retardation whose circumstances have placed him or her among brighter peers without support may well learn to survive through aggression." Hall, J., Correctional Services for Prisoners with Mental Retardation: Challenge or Catastrophe? (pp. 167-190). In Conley, R., Luckasson, R., & Bouthilet, G. (Eds.), *The Criminal Justice System and Mental Retardation* (pp. 167-190). Baltimore, MD: Brooks (1992), at p. 172. Other studies have confirmed this. For example: "[R]esearch evidence has suggested that the mentally retarded are slower to adjust to the prison routine, have more difficulty learning rules and regulations, and as a result, accumulate more rule infractions than the average prisoner." Finn, M. (1993). Disciplinary "Careers" of Mentally Retarded Prisoners, 19 *Journal of Offender Rehabilitation* 57-73 (1993), at p. 60. Precisely because overcrowded prisons enforce more stringent and unyielding routines, increase prisoners' frustration, and generate more potential

(continued . . .)

undetected for considerable periods of time before they again receive more closely monitored mental health care." Unfortunately, this is a cycle that "can, and often does, repeat."[123]

85.  Indeed, in my own research, I found a higher percentage of prisoners who suffer from serious forms of mental illness residing in isolated or segregated housing, as compared to their numbers in the general prison population. Other researchers have found the same kind of high prevalence rates. For example, a Canadian study estimated that approximately 29 percent of prisoners in special handling and long-term segregation units suffered from "severe mental disorders."[124] A more recent study conducted by a group of Washington state researchers also found that 29 percent of intensive management prisoners in the state's correctional system manifested at least one pre-defined indication of serious mental disorder (such as multiple admissions to an acute care mental care facility, or having been in one of the prison system's residential mental health units).[125] California's segregated housing units also contain a disproportionately high concentration of mentally prisoner/patients. Thus, in the CDCR, although mentally ill prisoners comprise less than 25 percent of the overall prison population, by August 2007, 46 percent of the prisoners housed in the administrative segregation units were on the mental health caseload.[126]

86.  Unfortunately, as I have already suggested, the overrepresentation of mentally ill prisoners in isolation units like ASUs and SHUs is potentially dangerous and damaging. All other things being equal, it also is a problem that is more likely to plague overcrowded prison systems than others. There are several reasons why this is so. For one, these systems typically

---

conflicts, developmentally disabled prisoners are more challenged to avoid rule infractions.

[123] Streeter, P., Incarceration of the Mentally Ill: Treatment or Warehousing? 77 *Michigan Bar Journal* 166 (1998), at p. 167.

[124] Hodgins, S., & Cote, G., The mental health of penitentiary prisoners in isolation, 33 *Canadian Journal of Criminology* 177-182 (1991).

[125] Lovell, D., Cloyes, K., Allen, D., & Rhodes, L., Who lives in super-maximum custody? A Washington State study, 64 *Federal Probation* 33-38 (2000).

lack adequate treatment resources and programs to effectively monitor and manage mentally ill prisoners in the general population. The mental health of those prisoners is likely to worsen in the absence of appropriate treatment, and their problems are likely to become more serious before they are detected and addressed. In addition, the severe conditions of confinement that accompany overcrowding place special stressors on mentally ill prisoners that may worsen their conditions and lead to decompensation. Moreover, overcrowded prison systems are more likely to resort to punitive forms of social control than others, so that if and when mentally ill prisoners do violate prison rules in an overcrowded prison, those violations are more likely to occur in prisons that are more prone to punishment.

87.  Yet, as I have suggested, the placement of mentally ill prisoners in ASUs and SHUs places them at risk. It represents one of the critically important ways in which mentally ill prisoners can be damaged and harmed by overcrowded conditions of confinement—not just by the overcrowding to which they are directly exposed, but by the practices and reactions that the larger prison system has developed in response to the overall pressure and dysfunction that overcrowding brings about. As I will discuss in greater detail below, during my site inspections of the administrative segregation units, staff reported and I observed inadequate treatment space, insufficient staffing resources, inadequate access to exercise and yard, lack of programming and poor access to higher levels of care when these prisoners decompensated in these harsh environments.

### 6. Summary of Effects of Prison Overcrowding

88.  In summary, I know of no reputable prison expert who doubts that prison overcrowding—especially when it is chronic and severe—significantly impacts the broadest and most fundamental aspects of prison life in negative ways that have adverse consequences for prisoners. For all of the reasons I have outlined above, overcrowding certainly undermines

---

[126] Coleman Pls.' Trial Ex. 81.

the quality of medical and mental health care in prison.[127] As a representative of the World Health Organization summarized it: "Overcrowding is an obvious cause or contributory factor to many of the health problems in prison, most notably communicable diseases and mental health, including the use of psychoactive substances."[128] Not surprisingly, correctional administrators and law enforcement officials also acknowledge the wide-ranging negative effects of overcrowding on incarcerated populations and penal institutions. For example, between 80-90% of a sample of county sheriffs in the United States perceived overcrowding to have resulted in increased acts of violence between prisoners, increased violence between prisoners and staff, and increased facility maintenance expenses, and nearly one half or more of the total surveyed reported that overcrowding increased medical and mental health problems among prisoners.[129]

### C. The CDCR Is A Chronically And Severely Overcrowded Prison System

89. As someone who has studied the California prison system for more than 30 years, I have been a witness to the growth of the prison population in the state to its current unprecedented and intolerable levels of overcrowding. I systematically evaluated prison conditions in the early 1980s, in what were then among the state's largest prisons, as a very sizable influx of new prisoners began to enter the Department of Corrections. The problems that I and other experts identified in those early years were ones that a number of courts attempted to address through court orders limiting crowding-related practices such as double-celling, and that other courts deferred intervening to solve because of assurances from the CDC

---

[127] For example, see Roy Walmsley, Prison Health Care and the Extent of Prison Overcrowding, 1 *International Journal of Prisoner Health* 9 (2005): "It is universally acknowledged that overcrowding in prisons has a negative impact on the provision of health care" (at 1).

[128] H. Nikogosian, Representative of WHO Regional Office for Europe and former Minister of Health for Armenia. In *Prison Healthcare News* No. 5, Summer, 2003. London: International Centre for Prison Studies, King's College, London.

[129] P. Kindade, M. Leone, & S. Semond, The Consequences of Jail Crowding, 41 *Crime & Delinquency* 150-161 (1995).