at CIM where bunks have been installed in the dayrooms are very troubling—in terms of the inadequate space afforded the prisoners, the degrading and degraded nature of a number of the housing units themselves, and the way that the prisoners are "enclosed" inside the dayrooms of some of them. In fact, the dayroom dormitories in the Colusa unit are unlike anything I have seen in any other prison system I have visited. The makeshift dayroom dormitory holds some 38 beds and houses CCCMS and EOP prisoners together. However, the dayroom itself is actually fenced in, giving the very distinct impression that the entire dormitory is in a large cage—a caged-in dormitory within a prison housing unit. During the tour, we were told that the unit was caged because of a riot that occurred several years ago at CIM that resulted in injuries to staff and prisoners. The unit, which is a general population unit within the reception center, felt very much like an administrative segregation unit.

111.     The bunks are also arranged very close together, and there was a dank feel and odor to the unit. There were only four toilets for the 38 men in the dormitory, and they were largely out in the open, affording no privacy. The prisoners had draped a sheet around the sides of one of the toilets so that they could sit on it partially shielded from the others. Although there was a dispute about how much yard time the prisoners got—a correctional officer said about 10 hours a week, while a number of prisoners indicated that they only went to yard every four to five days for an hour or two —there was no question that these prisoners did not have jobs, and were not being afforded educational or vocational training of any kind. They got out of their caged dormitory for yard, showers, and chow, but nothing else on a regular basis. Indeed, at approximately 11 a.m., when I visited the dormitory, I counted nearly half the prisoners lying or sitting idly on their bunks, engaged in no meaningful activity at all.

112.     CIM also houses prisoners inside two large, makeshift gym dormitories. I toured both of these units, each of which houses approximately 200 prisoners. The living conditions are degraded and degrading. All of the prisoners sleep on double bunk beds, arranged in tight

---

[165] *Id.*

[248286-1]                    EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

rows. None of the prisoners are provided with lockers, so they store all of their possessions in paper grocery bags. The prisoners housed in these dormitories have little or no privacy, and virtually nothing to do. Just as with the prisoners in the dayroom dormitories, they are confined in open areas that allow them to do little more than exist. In the gym dorms, obviously, there are many more men living this way. The officer in charge of one of the gym dorm housing units on the day I was there told me that that "program" in the dormitory consisted of "laundry exchange, chow, and showers; when I say 'open the dayroom,' I just mean 'turn on the TV.'"

113.    The housing units themselves are extraordinary, difficult to adequately capture in words. The bunks are laid out in an area that is cavernous —the size of a full gymnasium— so the double bunks are stretched out as far as the eye can see. I think it is fair to say that the safety and security of the prisoners in these units is entrusted in large part to the prisoners themselves. Because of the physical layout of the housing units, effective monitoring and surveillance by correctional officers is a virtual impossibility.  There are three officers assigned to the unit, plus a gunner.

114.    One of the gym dorms I toured had ten toilets and seven showers, all arranged in the open, in full view of one another.  Thus, here, too, there is no privacy afforded to prisoners. When a counselor or case manager comes to this particular gym dorm to see a prisoner, the meeting takes place inside an office with large glass windows that adjoins and looks out on the shower and toilet area, and also is in plain view of it. The gym dorm housed a small number of EOP prisoners and a significant number of CCCMS prisoners.

115.    The other gym dorm unit I visited also housed a small number of EOPs and a significantly larger number of CCCMS prisoners. It was in a state of significant disrepair. The officers indicated that they make an attempt to remove EOP prisoners when and if they discover that they have been placed in this unit. When we toured this particular dorm, all of the prisoners had been temporarily moved outside because an "incident" had occurred and the unit was being searched. The shower and toilet areas were filthy and slippery, with water collected on the floor, and broken pieces of tile. The walls were dirty, and the doors and windows were rusted in places.

-64-

116.    As I suggested above, both of the dormitories appeared to be extremely dangerous places in which to live and work. There were blind spots throughout, and even the dorm officer who sits or stands on a raised officer's station peering out over the bunks cannot see what is taking place just a few yards away, let alone at the far corner of the gymnasium. In the case of the second gym dorm I toured, the windows on the ceiling had been painted some time ago—a remnant of the days when the gym was once used to show movies. Now that it had been converted to a housing unit, however, no one had bothered to remove the paint, so there was barely any natural light coming into the gym from above. In addition, three of the ten overhead lights were out—the officer told me that they had been for some time—so the housing unit was very dimly lit.

### (vii)    Co-mingling of EOP Prisoners with Other Populations.

117.    Despite these cramped and claustrophobic conditions and severe restrictions, I was told that there are a number of EOP prisoners housed in these crowded units throughout CIM. The mixing of EOP prisoners with general population and CCCMS prisoners in the same housing units, either in dorms or cells, was of serious concern. As I pointed out in my earlier discussion of the general consequences of overcrowding, prison staff in prisons like CIM— operating at over 200% of capacity—have little wiggle-room in making decisions about where to house prisoners. Thus, custody staff at CIM are often forced to place vulnerable prisoners in settings that are dangerous and inappropriate. I was told that EOP prisoners were afforded the opportunity to attend "groups" that were held in the offices that were adjacent to the dormitories, in plain view of the other prisoners. This turned out to be a common problem in the CDCR—EOP and CCCMS prisoners being housed in units where their "treatment" was arranged in plain view of general population prisoners—although no one in CDCR seemed particularly concerned about it. In any event, on the day I visited CIM, the particular groups that were being run in the unit I saw were devoted to "leisure skill development"—the prisoners came out to play checkers and other board games for an hour.

### (viii)   Delays Transferring EOP Prisoners Out of Administrative Segregation.

118.    I have reviewed the monitoring documents provided to plaintiffs' counsel during the 20th Round Monitoring tour of CIM, which occurred on October 10-12, 2007, a few weeks before my visit. In the Corrective Action Plan prepared by the institution to address access to appropriate care in the administrative segregation units, the monitors and institution found: "The mental health population in ASU continues to be high with an average ASU population of 113, the same as reported the last audit period. In addition, the EOP population in ASU remains high with an average of 30 – up 10% from last site visit. Access to EOP hub beds continues to be the main reason for delay, driving up this census. During past site visits the monitors reviewed performance audits and determined that due to physical limitations unique to the facility, the optimal number of mentally ill prisoners that CIM could effectively house and treat was 62. The accuracy of this capacity estimate appears to be confirmed by this past monitoring period's statistics."[166] The total administrative segregation population for CIM, in June 2007, was 356.[167] In fact, during my tour of the prison, there were at least 100 mentally ill prisoners housed in the administrative segregation units at CIM. Furthermore, during the tour, staff reported that the prison continues to experience on-going delays in transferring EOP prisoners who are confined to Ad Seg units to EOP Hubs where they will receive EOP level of care within thirty (30) days, as mandated by the *Coleman* Program Guide.[168] In the monitoring documents that I have reviewed that were provided to plaintiffs' counsel during the 21st round monitoring tour of CIM, held on May 14-16, 2008, the prison staff reported that the "mental health population in ASU continues to be high with an average ASU population of 120, up

---

[166] Coleman Pls.' Trial Ex. 41 at 7.

[167] Coleman Pls.' Trial Ex. 38.

[168] Joint Pls.' Trial Ex. 9 at 12-1-13.

[248286-1]                EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

from the last audit period.  In addition, the EOP population in ASU remains high with an average of 35 also up from the last visit."[169]

### (ix)   Administrative Segregation Units.

119.   I also toured the administrative segregation unit in Palm Hall and Cypress Hall. There were approximately 100 prisoners on the mental health caseload housed in the administrative segregation units, both EOPs and CCCMS.  After touring these units, which are dark, noisy and include a section referred to as "deep seg"— three or four cells recessed into a dark space with another set of door coverings—I agree with the institution and the *Coleman* monitors that providing appropriate mental health care in these units to the large numbers of mentally ill prisoners currently housed in these units is impossible. In the draft 20th Report, the Special Master discussed some of the obstacles to care that were observed in the ASUs at CIM. They included office space deficits, non-compliance with suicide prevention policies, custody practices that resulted in non-confidential clinical contacts, excessive waiting times in holding cells prior to and after clinical contacts, and the failure to provide minimum Title 15 required outdoor yard time.[170]

120.   As part of the CDCR's Suicide Prevention plan filed with the court and required to be implemented system-wide, prisons are obligated to provide 30-minute welfare checks on all prisoners housed in their administrative segregation units during the first three weeks of their stay.[171]  In the 20th Monitoring Round documents provided to the *Coleman* monitors and plaintiffs' counsel, CIM custody staff acknowledged their inability to provide 30 minute welfare checks because of insufficient custody staffing resources.[172]  In fact, CIM acknowledges that "Walking time to complete Ad Seg and Ad Seg overflow wellness checks is

[169] Coleman Pls' Trial Ex. 88 at 5.

[170] Joint Pls.' Trial Ex. 57 at 266.

[171] Coleman Pls.' Trial Ex. 45.

[172] Coleman Pls.' Trial Ex. 43.

-67-

[248286-1]

54 minutes…Acknowledging this is inadequate time lines it must be stated it is the best we can do without additional resources…Additionally when the renovation begins late '07 in Cypress and the Ad Seg prisoners are moved to Birch Hall walking time will be increased by 15-20 minutes."[173]   This non-compliance was confirmed by the Special Master in the Draft 20[th] Report: "CIM was noncompliant with pre-placement screenings and the 30-minute welfare checks in administrative segregation."[174]

121.   One of the officers in the Ad Seg unit showed us additional walk-alone yards under construction outside the unit.  The officer referred to these yards as "dog runs."  He reported to us that currently the men in the Ad Seg units are provided with approximately 3 to 4 hours of yard per week, but that would be increased once the new yards were completed. The men that we spoke to on the tiers and in interviews told us that they currently receive much less yard time than the officer reported to us.  One said that he understood that he did not get yard "because he was EOP."  Another, Prisoner II said he was afraid to leave his cell for any reason.  I reviewed portions of Prisoner II's unit health record.  It indicated that he had originally been placed in administrative segregation for safety concerns and because "appropriate housing is currently unavailable at this facility."[175]  He had several crisis bed admissions in 2007 because of psychotic symptoms, including an admission on November 7-13, 2007, after I saw him during my site visit.  In fact, he never transferred to a mainline EOP program, but rather paroled out of CIM on January 25, 2008.  Three days after paroling out, he was rearrested by the Upland Police Department because he reported feeling suicidal, and was placed in the Mental Health ward of the Arrowhead Regional Hospital on a Welfare and Institutions Code Section 5150 hold.  His records indicate that he was released on February 5, 2008, but was admitted to the Royale Health Care Center psychiatric unit the next day for

---

[173]. Coleman Pls.' Trial Ex. 43.

[174] Joint Pls.' Trial Ex. 57.

[175] Coleman Pls.' Trial Ex. 89.

[248286-1]

additional mental health care, and was released again on February 7, 2008. His parole was revoked a few days later for a technical violation (that was apparently related to his mental illness) for "failing to report" and he was returned to CIM reception center on February 11, 2008, where he was admitted to the crisis unit for 10 days. On April 2, 2008 (the date of the last record that I have reviewed) he was expressing concern for parole because "I don't want to be left at the bus stop again."

122.    Mental health clinicians, who had recently begun implementation of the EOP Reception Center groups in cages set up in Cypress, confirmed that there was a very high refusal rate for the caged groups and that they would try to visit these men cell-front. In order to enter the Ad Seg tier, however, everyone is required to wear not only a protective vest but also a plastic face mask.

123.    Based upon my tour of the Ad Seg units, and discussions with clinical and custody staff and prisoners housed in these units, it is my opinion that these housing units are dangerous places to house prisoners with serious mental health concerns. I agree with Dr. Jordan, the Senior Psychologist Supervisor, who attended a meeting of the Suicide Prevention Committee at CIM on May 10, 2007 and reportedly: "expressed concerns about the possibility of another suicide occurring in administrative segregation due to the number of inmates, their acuity level, and the lack of clerical support, offices, and the limited escort availability."[176] One suicide occurred in Palm Hall, one of the Ad Seg units in August 2006.[177] More recently, a suicide occurred in the administrative segregation unit at CIM on March 30, 2008.[178]

124.    Of course, I am aware that approximately 9 months have passed since I toured CIM and interviewed staff and prisoners there. One of the overall conclusions that I have reached in the course of my analysis of the magnitude and centrality of the overcrowding

---

[176] Coleman Pls.' Trial Ex. 42.

[177] Coleman Pls.' Trial Ex. 18.

[178] Coleman Pls.' Trial Ex. 85.

[248286-1]                    EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

problem that plagues the CDCR is that it cannot and will not be remedied by implementing a series of piecemeal solutions that ignore the essence of the problem itself—the fact that the CDCR houses significantly more prisoners than it can provide constitutionally adequate mental health care for. In addition to the sheer magnitude of the problem, CDCR's track record in attempting to remedy the effects of the overcrowding crisis is entirely consistent with the judgment I have reached. However, to underscore that fact, I believe it is instructive to note the lack of progress that has been made by CDCR in solving the profound, pervasive, and well-documented problems that described above at CIM, as reflected in the institution's own "Corrective Action Plan' (dated May 14-16, 2008). Aside from citing in passing to more recent reports (such as the Special Master's draft 20[th] Report) with respect to the other institutions that I have visited, I will not repeat this exercise of separately citing at length to the Corrective Action Plans. But, like CIM's, they vividly underscore the endemic and intractable nature of the overcrowding problems CDCR confronts.

125. CIM's Corrective Action Plan," dated May 14-16, 2008, conceded that there were a number of continuing overcrowding-related problems that continued to plague the institution. Potential solutions for many of these problems were significantly hampered by inadequate staffing (*i.e.*, too few correctional personnel for the numbers of prisoners whose mental health needs had to be addressed). Thus, in response to the fact that "[i]nmates on the psychiatric ward of the hospital, at the time of the August monitoring visit, were locked in their cells most of the time and received little programming," CIM sought to increase the number of group therapy sessions available. However, CIM acknowledged that this effort was impeded by what officials admitted was a "lack of adequate numbers of custody personnel to insure safety and security needs related to inmate movement required for group therapy."[179] Even with augmentation of their clinical staff within the MHCB, CIM reported that "obstacles to full utilization for this increased clinical staffing are: insufficient clinical programming space for

---

[179] Coleman Pls.' Trial Ex. 88, at 1.

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[248286-1]

group and recreational therapy activities, insufficient office/one to one clinical interview space, insufficient custody escort staff, and inadequate allocation of counselors to cover the treatment teams.[180]

126.    CIM's Corrective Action Plan acknowledged an increase in the overall EOP population at the institution, growing from about 145 for the first four months of this period then rising gradually up to "around 180 currently"[181], and a corresponding increase in the use of Transitional Bed Housing, "with 28 inmates overflowed in March and 47 for the first 28 days in April."[182] CIM acknowledged another continuing, overcrowding-related problem—the fact that "[w]eekly clinical contacts continued to be held at cell-front due both to shortages in custody staffing and lack of program space."[183] In fact, officials at the facility admitted that attempts to resolve this particular problem were impeded by these three additional overcrowding-related issues: "Lack of custody staff allocated to Administrative Segregation to provide inmate movement and security necessary to meet program guideline mandates"; "Lack of clinical staff allowed to Administrative Segregation to provide clinical contacts necessary to meet Program Guides"; and "Lack of clinical office space".[184]

127.    Indeed, throughout the entire CIM May, 2008 Corrective Action Plan, correctional officials identified a daunting number of continuing, serious problems that, in various ways, are <u>directly</u> connected to the serious overcrowding that continues to plague CIM, and the CDCR in general. That is, CIM officials are continuing to operate a prison that, in a number of fundamental ways, lacks the capacity to manage and respond to the extraordinary number of prisoners it contains, perhaps especially those prisoners who are mentally ill. The

---

[180] *Id* at COL0023890.

[181] *Id.* at 2.

[182] *Id.*

[183] *Id.* at 3.

[184] *Id.*

additional overcrowding-related problems included but were not limited to: a Mental Health Tracking System that is "inadequate to perform [the] task" of tracking and properly accounting for prisoners, and the use of an "ASU environment [that] is difficult for mental health inmates," so that "they quickly decompensate when returned from the MHCB, only to return to the MHCB after a few days or a week." This problem is said to have contributed to "<u>many severely acute cases and unfortunate patient outcomes</u>"[185]

128.    Indeed, the ASU environment at CIM is one where the "mental health population… continues to be high" and the EOP population is increasing. Despite these increases, the prison staff admitted that EOP prisoners have "[i]nadequate access to EOP hub beds" because EOP Hub facilities continue to operate "at capacity which makes it difficult to transfer these inmate/patients to the facilities designed to provide adequate treatment."[186]The reason? Again, overcrowding-related problems: "[D]ue to physical limitations unique to the facility, the optimal number of mentally ill inmates at CIM could effectively house and treat in ASU was 62 which puts our current census at over 200% of capacity"[187]  Similarly, CIM staff reported that the DMH referral times increased during this monitoring period "from 9 to 25 total days" and "[w]aiting lists prioritized by acuity wave [sic] been an ongoing reality with CMF acute referrals, SVPP ICF referrals and recently, also for ASH ICF."[188]

129.    Further, during the 21st round monitoring period, in the reception center the "average length of stay for inmates at the EOP level of care was 106 days" and "[a]s a result of transfer delays and short parole sentences many EOP inmates parole from CIM."[189]  The ASU, where RC EOP prisoners are housed "does not have the space and resources needed to meet

---

[185] Coleman Pls.' Trial Ex. 88 at 4 (emphasis added).

[186] *Id* at 5.

[187] *Id.*

[188] *Id* at 38-39.

[189] *Id* at 11.

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH
[248286-1]

compliance in this [EOP group treatment hours] area."[190] Moreover, despite these prolonged stays in reception, 3CMS prisoners "received no treatment other than medication management and crisis intervention," were "not assigned case managers and no treatment plans were prepared for these inmates"[191]   Here, too, the reasons were directly related to the fact that CIM houses more prisoners than it has staff and space to accommodate. Thus, officials acknowledged that three things were preventing them from solving these serious problems: "Insufficient staffing for EOP treatment in Reception Center" and "Physical plant limitations and need for adequate custody staff."[192]  Further: "CIM is not staffed to provide complete CCCMS services for mental health inmates upon arrival, transfer or discharge" and is plagued by "[p]hysical plant restrictions (lack of adequate office space and group room facilities) and lack of custody staff to assist with inmate movement and security."[193]

130.    Another major area of concern was the "significant backlog of unfiled materials" making prisoners' medical files "relatively useless to clinicians seeing inmates," in part because the "case manager and psychiatric notes were lost or filed late or in a disorganized fashion" or were "often difficult to read."[194] Not surprisingly, the major obstacle to solving this problem was the dearth of "[m]edical records staffing resources." [195]   During the March 2008 monitoring tour, staff continued to describe medical records as a "challenging area at CIM."[196]

131.    Beyond the lack of key badly needed mental health staff, CIM continues to lack appropriate treatment space. Thus, for example, fewer than half (42%) of clinical visits in ASU

---

[190] Coleman Pls.' Trial Ex. 88, at 13.

[191] *Id*, at 7, 10.

[192] *Id* at 8.

[193] *Id.* at 10.

[194] *Id.* at 20.

[195] *Id.* at 21.

[196] *Id.*.

[248286-1]

were "held in a confidential setting."[197]  Not only was there little adequate treatment space, but even once prisoners had been seen by clinical staff, "there was a problem with timely follow-up for inmates in reception," attributed to "[p]sychiatric staff vacancies" and "[o]ffice technician vacancies." [198]

132.    CIM staff noted that the "increase in admissions [to the MHCB] appears to be coinciding with an increase in the overall EOP population at CIM, growing from about 145 for the first four months of this period then rising gradually up to around 180 currently."[199]  As a result of the increased admissions, the prison was forced to use its overflow MHCB beds, with "28 inmates overflowed in March and 47 for the first 28 days in April."[200]  Some of the MHCB beds were unavailable because they were used by "inmate/patients awaiting DMH LOC." [201] The problem of "repeated admissions in the MHCB" by individual prisoners was similarly attributed to "[l]imited staff" available "to process and expedite transfers," a "[l]ack of bed availability for EOP and DMH placement," and the "[l]ack of adequate number of clinical staff allocated to provide follow up services in the Reception Center."[202]

133.    As I say, the persistence of these profound, pervasive, and well-documented problems suggests to me that they can only be adequately solved by implementing a set of new and decisive policies that go to the heart of the phenomenon that virtually everyone agrees is causing them—overcrowding itself.

---

[197] Coleman Pls.' Trial Ex. 88 at 5.

[198] *Id.* at 39-40.

[199] *Id.* at 2.

[200] *Id.*

[201] *Id.*

[202] *Id.* at 33.

### b.   Valley State Prison for Women (VSPW)

### (i)   VSPW Overview

134.   Valley State Prison for Women is one of three CDCR prisons housing women in the state. VSPW has a reception center, mainline, SHU and Ad Seg units, and an OHU. It does not have a licensed CTC, but rather has an unlicensed infirmary (OHU). CCCMS prisoners are mixed throughout the reception center and on other yards.  VSPW has no regular EOP program, but has an Ad Seg EOP Hub. The Special Master Reported in the 18th Monitoring Report that in January 2007, 26 percent of VSPW's prisoners were participants in MHSDS, with 1,004 MHSDS participants and 3,806 total prisoners.[203]  These numbers have increased. Thus, according to the most recent data provided by defendants, VSPW had 1143 participants in the MHSDS on June 20, 2008, including 1129 3CMS (151 percent of their 3CMS capacity) and 14 EOPs (156 percent of their EOP capacity).[204]

135.   When I visited Valley State Prison for Women (on October 30, 2007), it housed 3,810 women in a facility designed for approximately 2,000. On the CDCR website, VSPW's population was listed as 4,022 women as of July 30, 2008, which was 203.7 percent of its design capacity of 1,980.[205] Although some of the VSPW staff talked proudly about their compliance with the requirements of *Coleman*, my observations of the prison and conversations with staff and prisoners revealed much at the prison to be concerned about. There are many problems there that stem from the severe overcrowding and the corresponding lack of treatment space that characterizes the facility. Among other things, their medical and mental health treatment areas are cramped and inadequate. I was told that they have had as many as 90 prisoners in the waiting room area which, as the Chief Medical Officer noted, is a

---

[203] Joint Pls.' Trial Ex. 36 at 297.

[204] Coleman Pls.' Trial Ex. 57.

[205] Joint Pls.' Trial Ex. 59.

[248286-1]          EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

direct result of overcrowding at the prison. She also noted that the prison lacked appropriate long-term treatment options for women with very serious mental health problems.

### (ii)    Treatment and Office Space and Staffing

136.    During my visit, I was told by the Acting Chief of Mental Health that VSPW recently has been able to hire significant numbers of new mental health staff due to salary increases, but that the institution does not have the office and treatment space to appropriately accommodate these new employees. Months after my tour, this problem continues to plague the institution. Thus, on April 21-23, 2008, nearly six months after my visit, the prison staff stated that "[t]he primary challenge facing the mental health as well as the entire healthcare department remains the severe lack of space. Dental, Mental Health and Medical must compete for space in areas that were never intended to house and treat the current inmate-patient population."[206] Despite having requested "immediate relief for the lack of space at VSPW," the prison reported "[n]o progress has been made with this to date."[207] This general problem applied more specifically to the Reception Center, where "[t]here are ongoing and serious problems related to office space for treatment/evaluation."[208]

137.    During my tour I routinely heard from staff that space is the "number one challenge" at VSPW. One senior clinician told me that they were "crawling all over each other"—and documents drafted by the institution for the *Coleman* monitoring team that I reviewed confirmed these comments. All clinical staff members were sharing offices, including some senior staff members who had tripled up on offices. The institution was so short of treatment space that I was told storage rooms were being converted to this use. Although the institution did offer some groups, mental health staff reported that the groups were virtually always full and always had long waiting lists. I was told that VSPW has had to

---

[206] Coleman Pls.' Trial Ex. 90 at p.1.

[207] *Id.*

[208] *Id.*

[248286-1]                    EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

shorten the number of weeks that each group cycle lasts in order to be able to get more prisoners through them. Worse, still, some prisoners I interviewed reported that sometimes a group session or "hour" lasts for only five to ten minutes. When prisoners complain, they are told that groups cannot be scheduled for different times or longer periods because the space is being used for something else. One prisoner in B-yard reported that there had been no groups except a lifer group in more than three months.

138.    When I met with one of the clinicians who directs the reception center mental health program, she explained that staff members in this area also do not have enough office space. Screening of many of the prisoners who arrive without urgent issues actually took place in the dining hall—obviously non-confidential—but she explained that there is no other space to go into because prisoners are housed in dayrooms in the reception center.

139.    Staffing vacancies and the reliance on contractors remains a problem at VSPW. In the April 2008 monitoring documents, the prison reported 18.88 clinical vacancies, with contractors covering a small percentage of those vacancies.[209]   In June 2008, the prison reported similar vacancy rates of 18.05 clinical positions, with 2.4 of those vacancies covered by contractors.[210]  The majority of the vacancies were psychologists and social workers who provide case management services to the reception center and mainline mental health caseload prisoners.[211]

140.    The Corrective Action Plan also acknowledged a continuing "[l]ack of individualized treatment plans with coherence between diagnosis, plan and treatment provided," an area where improvement was reflected in the previous audit but not in the current one. The identified obstacles included "[l]ack of group treatment space," "[l]ack of ideas for time-limited treatment," and "[l]ack of staff to provide therapy as dictated by program

---

[209] Coleman Pls.' Trial Ex. 90.

[210] Coleman Pls.' Trial Ex. 91.

[211] Id.

guide." [212]  In this area VSPW noted "compliance rates appear to have fallen from the review done on 9/107." [213]  Among the reasons given for decreased compliance were possible audit problems, the number of newly hired clinicians who required additional training, and the increased volume of evaluations required for the reception center prisoners.[214]

### (iii)   Overcrowding in Housing Units, Dayrooms and Gyms

141.   As was true of all of the prisons I visited, the overcrowding at VSPW has necessitated use of housing arrangements and configurations that are extremely troublesome and that subject the prisoners to conditions of confinement that are potentially dangerous and psychologically damaging. These kinds of housing arrangements are especially problematic for prisoners who suffer from pre-existing mental illness or possess special psychological vulnerabilities.  For example, a number of the housing units at VSPW now use their dayrooms as makeshift dormitories where prisoners are double-bunked.

142.   In the standard VSPW housing unit, 40 such bunks (housing 80 prisoners) have been placed in the dayroom, significantly increasing the number of prisoners living in the unit and, at the same time, significantly degrading the overall living conditions there (both for the women in the makeshift dorms and those in other parts of the unit). In addition to subjecting the prisoners who are housed on these open bunks to marginal and degraded living conditions, the presence of the bunks deprives the other women in the housing units of the opportunity to use the dayrooms for their intended purpose. Indeed, officers told me that, prior to the introduction of the dayroom dorms, prisoners were allowed to use the dayrooms for recreation and a number of constructive activities throughout the day; now they get about 4 hours of recreation time, which must all be spent in the yard outside the unit.

---

[212] Coleman Pls.' Trial Ex. 90 at 33.

[213] Coleman Pls.' Trial Ex. 90 at 34.

[214] *Id.*

-78-

143.    As problematic as the dayroom dorm housing appeared, the 8-person rooms in which many of the VSPW prisoners lived were equally if not more cramped. In fact, many of the women said that they actually preferred the dayroom dorms to the 8-person cells for safety reasons—they told me that when the doors were closed and the women were locked in the close quarters of the cells, there was little or no opportunity for staff to monitor what went on inside. With four double bunks, one toilet, one shower, and two sinks crammed into each cell, it could be likened to living in a steamy shower stall.

144.    A number of the women at VSPW told me that they felt closed in and claustrophobic in these cramped and crowded quarters. One CCCMS prisoner told me: "I have a hard time around people—in the housing unit, yard, everything is so crowded here—I don't do anything but sit in my cell. I used to go to yard or dayroom but not now. I just want to be away from people." Staff at VSPW reported that they do not consider CCCMS status in their housing decisions in these units, so CCCMS prisoners are spread throughout both dayrooms and cells.

145.    Out of three reception center housing units, two of them were configured with the 8-person dorm rooms mentioned above plus the double bunks in the dayroom. The other reception center housing unit had double cells along with the double-bunks in the dayroom. However, at the time of my visit, these were unoccupied (although the prisoners I talked to reported that this was not always the case). They also reported that some of the cells in this unit are used as overflow Ad Seg housing, and that they had been used for this purpose as recently as two weeks prior to my visit. When Ad Seg prisoners are housed in this unit, then the reception center prisoners do not receive dayroom, and must choose between taking showers or going to yard.

146.    Just as many other CDCR facilities have, VSPW resorted to housing prisoners in makeshift gym dormitories. The gym that I observed currently houses 200 prisoners in double-bunks.  The atmosphere is very much like that in the men's prisons where the gymnasiums have been converted into housing units. The women in the gym dormitories at VSPW were at least afforded metal lockers in which to keep their property (an improvement over the paper

-79-

bags provided to the men in CIM gym dorms). However, they still had no real privacy in this huge dorm. The women live on open bunks that also stretch out across a huge area that is impossible to monitor. Women must use the shower stalls and toilets in plain view of one another, and the ventilation ducts and cross beams on the ceiling of the gym appeared to be filthy with some kind of material that resembled insulation; many of the women complained to me about it and said that pieces or particles of it dropped on them from time to time. At the time of my visit, 5 out of the 17 toilets had "out of order" signs on them.

### (iv)   Security Housing and Administrative Segregation Units

147.   The Security Housing and Administrative Segregation Units at VSPW were severe and especially problematic for *Coleman* class members, a fairly large number of whom were housed there. In fact, we were told that out of the 63 prisoners housed in the SHU, more than half were on the mental health caseload, with 34 CCCMS and 2 EOP. In Ad Seg, roughly 25 percent were on the mental health caseload, with 28 CCCMS and 2 EOP out of 129 total prisoners. Unfortunately, the population of mentally ill prisoners in the SHU and Ad Seg units has not been reduced since my visit in October 2008.[215] The Ad Seg unit sergeant was unclear about how often mental health staff members actually came into the unit. He also indicated that "groups run all day" and that both CCCMS and EOP prisoners have access to groups. However, the prisoners told me a different story. For example, I learned that the group that was taking place on the unit on the day of my visit—which consisted of several women standing in treatment cages that were arrayed in a semi-circle in a separate room off the unit dayroom— was the only one that they knew about that was available to CCCMS prisoners. Moreover, they told me that this was its first meeting. The women reported more generally that access to groups for EOP prisoners was sporadic at best. In addition, I learned from staff as well that, when one-to-one clinician contact occurred, it took place on the open dayroom floor. On the

---

[215] The Ad Seg MHSDS population was 24 3CMS and 6 EOP and the SHU MHSDS population was 33 3CMS and 2 EOP. Coleman Pls.' Trial Ex. 57.

day of my visit, the prisoners in the Ad Seg unit did not receive any yard, apparently due to a faulty gate lock. However, we received mixed reports about whether yard was regularly provided for prisoners in the Ad Seg unit.

148.   Here, too, there were concerns expressed by prisoners about whether and how they were being prepared for their release from prison. One VSPW prisoner who has been diagnosed as psychotic and is on the EOP caseload told me: "I am scared about my fate when I get out. Am I going to be a zombie who has to be on big doses of medicine to function at all?" She complained about the fact that groups are sometimes cancelled—"sometimes we have only one group for the whole week"—and also about the lack of meaningful content in the groups themselves, which she said often consisted of nothing more than watching Animal Planet or Disney Channel television shows.

149.   Prisoner JJ, another VSPW prisoner on the EOP caseload told me that she had been either in SHU or Ad Seg for virtually her entire prison term—a total of approximately 6 years. She said that she had been kept in these segregated units despite that fact that she was diagnosed as schizophrenic, had serious enough mental health problems in the free society to have been sent to Patton State Hospital, and was taking Haldol at the time I interviewed her. More troubling still, she felt that she had received little or no help during her incarceration (in part because she had been kept segregated for virtually her entire time in prison) and yet she was scheduled for release in less than a month. She voiced complaints both about the content of the groups she had attended as well as the circumstances under which they were held: "They have groups for EOP—we stand or sit in cages and watch TV. It doesn't help me and so I don't come out." In light of her imminent release from prison, and the fact that "nobody has helped me with my release," she was extremely concerned about what was going to happen to her. I reviewed portions of Prisoner JJ's records and confirmed that she did have a history of treatment at Patton State Hospital and at EOP level of care.[216] She had been housed in

---

[216] Coleman Pls.' Trial Ex. 92.

administrative segregation or SHU for most of her prison time, with some periods in the crisis unit or in EOP programs. She also had a history of suicide attempts. She was placed in administrative segregation when she returned to VSPW on a parole revocation in March 2007 and was housed there when I saw her. She had multiple crisis bed admissions for suicidal ideation and was treated at the EOP level of care until she paroled out on January 4, 2008. Her records reflect that she returned to VSPW on a parole violation on February 27, 2008 and was placed on EOP level of care in the reception center. [217] On March 4, 2008, she was reviewed in her treatment team and was retained at EOP level of care. Less than a week later, on March 10, 2008, she was recommended by her clinicians for removal from EOP despite clinical notes that described her with: "affect was blunted," and as "less compliant with groups" and complaining of "intermittent fearfulness and paranoia."[218] A chrono in her file showed that she was at an EOP level of care on March 9, 2008, and 3CMS on March 10, 2008. Despite the reduction in her level of care, she was followed weekly by her case manager but was no longer provided with the ten hours of group therapy available to EOP prisoners. Her medications were changed several times and she was described as having a "childlike disposition."[219] On June 16, 2008, she was involved in an incident in her housing unit, which the officer writing up the rules violation described as a mixed housing unit for reception center and administrative segregation overflow prisoners. She ignored an order to stop walking toward the door, and the officer used physical force on her. I could not tell from the records whether this rule violation resulted in a DA referral or other sanctions.

---

[217] *Id.*

[218] *Id.*

[219] *Id.*

[248288-1]     EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

### c.      Salinas Valley State Prison (SVSP)

### (i)      SVSP Overview

150.      Salinas Valley is a Level III/Level IV high security prison located south of the city of Salinas in the Salinas Valley.  According to CDCR population data as of midnight October 31, 2007 SVSP had a population of 4,093 and a design capacity of 2,372; it was operating at 173% of capacity.[220]  Its population also remains high—somewhat higher than at the time I visited. CDCR website's listed SVSP's population as of midnight July 30, 2008 as 4,116, with a slightly increased design capacity of 2,388.[221]  Since my visit in November 2007, there have been two additional suicides at the prison – one in administrative segregation and one on a general population yard.[222]

151.      I toured Salinas Valley State Prison (SVSP) on November 1, 2007.  During the initial meeting with the SVSP Warden and other SVSP staff, including key clinical and custodial leadership, staff reported on some significant challenges, population moves and factors affecting the prison's ability to provide adequate health care to the prisoner population. Although the prison administration informed us that they had recently ended the use of most of their "non-traditional" housing—makeshift gymnasium and dayroom dorms, the facility still housed close to twice the number of prisoners it was designed to hold.  Staff reported that the mental health population included approximately 1200 CCCMS, 240-250 EOP, 96 DMH, and 5-8 MHCB patients, for a total of approximately 1554 mentally ill prisoners at SVSP, or 38 percent of the total prison population.  The Warden reported that 150 of the CCCMS prisoners were housed in Ad Seg.  In the 18th Monitoring Report, the Special Master found that "[t]he level of mental health treatment provided to 3CMS inmates in administrative segregation was similar to that reported in the preceding three monitoring periods. Each week a large number of

---

[220] See Joint Pls.' Trial Ex. 25 at 2.

[221] Joint Pls.' Trial Ex. 59.

[222] Coleman Pls.' Trial Ex. 85; Coleman Pls.' Trial Ex. 95.

[248286-1]

prisoners were seen out of cell, but effort alone could not overcome structural impediments to meeting Program Guide requirements…. Staff reported that 80 3CMS prisoners at most could be seen out of cell in one week due to limits imposed by schedules and space constraints."[223] The 3CMS population in Ad Seg at the time of my visit was almost twice the number that SVSP's own staff determined could be seen weekly out-of-cell in Ad Seg as required by the Program Guide.[224] Overcrowding in SVSP's Ad Seg has worsened since my tour: in June 2008, defendants reported that there were 208 3CMS prisoners housed in the Ad. Seg units, an increase of more than one-third.[225] In the draft 20th Report, the Special Master found that "[c]linical staffing, space, scheduling, and the arrangements of holding cells used for group treatment [in ASU] were among the factors that thwarted the delivery of adequate mental health treatment … Refusal rates were high. In one of the two rooms containing holding cells for group treatment, cells were arranged in a straight line. In the other group room, noise from nearby machinery was problematic." [226]

152.    During my tour staff explained how staffing levels affected clinical care. For example, many of the clinical positions in both medical and mental health were covered by contractors. In addition, Dr. Kalie, the Chief Psychologist reported that 14.5 of 29 psychologist positions are vacant and cannot be covered by registry employees. She also volunteered that "we work until 7 or 8 PM each night to get the job done, working 60 hours a week" (and also acknowledged that this meant they were being paid for a 60 hour week as well). Dr. Lee, the CMO, reported that medical vacancies have been filled by both full-time state employees (50%) and by contract employees (50%). He discussed the problems associated with the use of contract and registry staff at SVSP, noting that reliance on

---

[223] Joint Pls.' Trial Ex. 36 at 155-156.

[224] Joint Pls.' Trial Ex. 9 (§ 12-7-12).

[225] Coleman Pls.' Trial Ex. 57

[226] Joint Pls.' Trial Ex. 57 at 184-185.

[248266-1]

contractors and registry impacted quality and continuity of care because these staff left frequently, did not have the same commitment level as state employees, and retraining replacement registry staff drained other staff resources. In recent mental health staffing data provided by defendants reporting June 2008 data, SVSP reported 117.25 mental health positions and 35.5 vacancies, including 12.37 of the 28 psychologist positions.[227] Only 3.54 of these 12.37 open positions were covered by registry hours in June 2008.[228] Even when adjusted for registry coverage, the overall vacancy rate for clinical staffing was 21%.[229]

153.    The Warden also reported to us during the meeting that SVSP had experienced significant custody staffing shortages recently, with as many as 200 of 840 custody positions vacant. He noted that among the current 100 custody vacancies, 27% are Sergeant positions. The staffing shortages were so dire at the prison that SVSP has 21 custody officers on loan from other prisons. Despite this, the prison was still short somewhere in the neighborhood of 100 custody officers, requiring the prison to run "hundreds of overtime shifts per week." The Warden reported that he also has vacancies in many support positions, including clerical, plant operations, and food service. The clinical staff confirmed that the high vacancy rate among custody officers has a negative impact on the delivery of medical and mental health care. This was later confirmed by custody officers during my tour of the prison. In the draft 20th Report, the Special Master discussed disturbing findings regarding "custodial dysfunction" at SVSP, which impacted on the delivery of mental health care to 3CMS, EOP and DMH patients.[230] Among the problems cited was the taunting of prisoners about their mental health disabilities, the arbitrary enforcement of rules, the restriction of spaces set aside for mental health

---

[227] Coleman Pls.' Ex. 91 at 26.

[228] *Id.*

[229] *Id.*

[230] Joint Pls.' Trial Ex. 57 at 188-189.

[248286-1]                    EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

programs, and the "fail[ure] to properly manage the priority ducat system."[231] Similar obstacles to care existed within the DMH units at SVSP.[232]

154. The Warden reported to us that all four facilities at the prison were on lockdown status during our visit, including the EOP housing units. During the tour of the prison I was able to observe the impact of the lockdowns on prisoners housed in the EOP treatment programs in D-Facility and in C-Facility. A number of the individual clinical staff, at least in some of the units (especially in B Yard, the SNY Level III facility), were very positive about recent changes at SVSP, such as the deactivation of one of the large gyms, and were proud of the fact that they were now able to run a number of treatment groups. However, their experiences were by no means uniformly shared and the facility suffered from many obvious overcrowding-related problems. One of the facilities, C Facility, a Level IV CCCMS yard, has been on lock-down status for almost two years. The Special Master recently confirmed that as a result of the lockdowns and modified programming on C Facility, "no group treatment was provided on C Yard."[233]

### (ii)    MHCB Access

155. During the morning meeting, Dr. Lee reported that although there are 8 MHCB beds in the Correctional Treatment Center, some of these beds are routinely filled by medical patients. As a result, the prison has been forced to continue its use of "overflow" MHCB beds. The Special Master has found that "[s]tandard CTC procedures resulted in heavy use of both types of cells and many overnight stays in large holding cells. Logs of holding cell use maintained by custody and nursing staff were incomplete…Staff reported that holding cells located in the yards were rarely used after September 2006, but those in the treatment and

---

[231] Joint Pls.' Trial Ex. 57 at 188.

[232] *Id.* at 189.

[233] Joint Pls.' Trial Ex. 57 at 188.

triage area of the CTC were in use daily and frequently housed prisoner overnight. The holding cells in daily use were stand-up mesh cells."[234]

156.    When I toured the CTC, I spoke with Dr. Chase, the CTC psychologist in charge of the unit. She reported that the MHCBs are always full, sometimes necessitating the use of "overflow" beds, as well as "holding arrangements" consisting of wet cells, dry cells, and holding cages for prisoners who are awaiting admission into the unit. According to Dr. Chase, although the prison houses over 1500 mentally ill prisoners, not all of the 8 MHCB beds are available for mental health prisoners because they are occupied by medical patients. As a result, the prison must sometimes place prisoners in the holding cells for several days or refer them to an outside MHCB unit. Dr. Chase reported that the "dry cells," which are tiny, freestanding upright cages with mesh wiring surrounding them (and no toilet), are used during the day to house suicidal prisoners until an MHCB bed becomes available. During the tour of the CTC, there were three men housed in these tiny "dry cells," all of whom were waiting for administrative hearings for involuntary medication orders. At night, those prisoners not already transferred into an MHCB bed are transferred into a "wet cell," one of the four holding cells outside the entrance of the CTC which have toilets. The longest stays that Dr. Chase recalled were from Thursday evening to a Monday morning. Clinical staff also reported that they routinely use "BPT cells" located on each yard for overflow suicide watch.

157.    In addition, the shortage of DMH beds in the system means that prisoners who should be prioritized for transfer to inpatient care wait for inordinate periods of time. A tragic example was the paraplegic prisoner I saw in the CTC who had been on a hunger strike since July and had been awaiting transfer to an acute DMH bed for several weeks.

### (iii)    DMH Level IV ICF Beds

158.    During the morning meeting with the Warden and other staff, I spoke with Vic Brewer of DMH, Executive Director of the DMH operated Salinas Valley Psychiatric Program

---

[234] Joint Pls.' Trial Ex. 36 at 153.

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[246286-1]