"[d]etermining space and staffing needs is very difficult to speculate as our inmate Mental Health population is constantly changing, creating immediate staffing and space deficiencies."[299] The Warden expressed two additional, interrelated overcrowding concerns: that the "[c]urrent overcrowding packages provide temporary relief" that may evaporate "due to population fluctuations," and the fact that, given continuing operation at over 200 percent of capacity, "our existing infrastructure is unable to support proposed growth projections." Apparently, the concerns with respect to adequate water, waste, and electricity were identified years earlier in previous proposals from the prison "but have not been funded or scheduled."[300]

### e. California Substance Abuse Treatment Facility (SATF)

#### (i) SATF Overview

206. I toured SATF on July 28, 2008. SATF is located in the Central Valley of California, south of Fresno. During the morning meeting, staff reported the prison census for July 28, 2008 at 7,193 prisoners, which was well over 200% capacity for this prison built for 3,424.[301] The population on the CDCR website for the week was listed at 7,156, or 209% of capacity.[302] SATF is a large, sprawling prison. In fact, we were told that it is physically the largest prison in the world, with buildings that stretch out some 1.5 miles long—and that it is the world's most populous. It also may have the dubious distinction of holding the greatest number of prisoners beyond its design capacity; on the day we visited it, SATF housed some **3700** more prisoners than it was built for.

207. SATF is comprised of seven separate facilities, a Correctional Treatment Center with 16 licensed mental health crisis beds, and two administrative segregation units, including a stand-alone Ad Seg, where mentally ill prisoners cannot be housed. The prison houses

---

[299] Coleman Pls.' Trial Ex. 99 at 1.

[300] Coleman Pls.' Trial Ex. 99 at 2-3.

[301] Joint Pls.' Trial Ex. 59.

[302] Joint Pls.' Trial Ex. 60.

several different custody levels and its housing types range from cells to large dormitories. On the day of our tour, prison staff also provided us with a packet of documents that included: an MHSDS census by yard and level of care, treatment space schedule by day of week and yard, MHCB admission/discharge report for April 1 to July 25, 2008, MHCB log for July 28, 2008 and a list of EOPs at SATF, including their length of stay, endorsement status and comment field. I have reviewed these documents. Prison staff reported to us during our tour that there were a total of 157 prisoners housed in the stand-alone Administrative Segregation unit and 136 prisoners housed in the regular Ad Seg unit, which is located in E1 (the vast majority of which were on the mental health caseload). SATF does not have an EOP program, which means it is not staffed for EOP patients and does not have treatment space allocated for EOP programming. Prior to the day of the tour, the prison staff provided us with MHSDS data reporting that approximately 1380 3CMS and 35 EOP prisoners were housed at SATF on July 21, 2008.[303] On July 28, 2008, eight of the 35 EOPs at SATF had been waiting at least 100 days to transfer to an EOP program. Almost half of the EOPs had been waiting more than 60 days, including a significant number of EOPs housed in Ad Seg (who should have been transferred to an EOP HUB within 30 days). According to SATF's own EOP List, the reason for these delays in transfers was the lack of EOP beds system-wide.[304]

208.   In the draft 20th Report, the Special Master noted that the EOP population at SATF had rapidly expanded at SATF by October 2007 "[t]he number of EOP inmates awaiting transfer continued to increase, growing from eight in September 2006 to 16 in April 2007 and then reaching 23 by the end of October 2007."[305] During the 20th round of monitoring, SATF also experienced difficulty transferring EOPs within transfer requirements and "[t]ransfer delays were attributed by staff to the system-wide shortage of Level III and Level IV EOP

---

[303] Coleman Pls.' Trial Ex. 100.

[304] Coleman Pls.' Trial Ex. 100.

[305] Joint Pls.' Trial Ex. 57 at 141.

beds, and in particular the lack of SNY beds at MCSP and EOP hub beds at CSP/Corcoran."[306] According to the Special Master (and confirmed by SATF staff on the day I toured), SATF follows a practice of dispersing EOPs throughout the immense prison. (We were driven in golf carts from unit to unit at SATF during the tour.) As the Special Master noted, this negatively impacts the ability of mental health clinicians to provide EOPs with a weekly case manager contact.[307] Yet the practice persists.

     (ii) **Shortages of Space for Offices and Treatment**

209. During our orientation meeting, SATF administrators reported that their mental health program was fully staffed, although they still made some use of clinicians from the registry (several psychologists and 3.5 psychiatrist positions). However, the increase in staffing has created corresponding shortages in space; we were told "we don't have enough space for all the new folks we've hired." In the staffing data for June 2008 provided by Division of Correctional Health Care Services, SATF reported 6 clinical vacancies, with only 2 of their vacancies covered by registry clinicians.[308]

210. We were also told at the orientation that there were treatment spaces in all of the various interconnected facilities that comprise the SATF complex. In addition, however, the institution submitted plans about a year ago that would have authorized fairly significant additional mental health treatment space to be constructed on each of the yards and in the Ad Seg. Unit located in E-1.[309] The acting chief psychologist acknowledged that they have not heard a word back about the fate of the proposal since it was submitted. Obviously, there has been no additional construction. He told us that "we need to be doing more groups, and the proposed treatment modules would allow us to do this." In fact, despite its enormous size, the

---

[306] Joint Pls.' Trial Ex. 57 at 149.

[307] Joint Pls.' Trial Ex. 57 at 149.

[308] Coleman Pls.' Trial Ex. 91.

institution is pressed for space. Chief Deputy Warden Allison said that they were "looking at our two vacant gyms"—not for use as gyms but rather as "interim treatment spaces to be converted." In fact, SATF already utilizes chapel areas and some space designed for hobby craft in the prison for mental health treatment.

211.  Acting Chief Psychologist Coffin told me that "because we are making use of spaces not originally designed for treatment, we are limited even more in the summer months." That is in part because some of the areas that they have converted for use as treatment spaces are too hot in the summer, and also because they cannot effectively utilize the yard areas for everyone because a number of prisoner/patients are on heat sensitive medications.

212.  The space limitations have resulted in a dispersal of clinical offices and treatment spaces to less than ideal areas of the prison. Thus, rather than intelligently and efficiently planning the creation of appropriate clinical offices and treatment spaces, the staff has been forced to utilize wherever space it can convert for clinical use. Among other things, for example, I was told that the Ad Seg clinicians have their offices in A Yard, at another part of the prison, even though they are supposed to service prisoners in the Ad Seg unit. Obviously, this limits their access to prisoner/patients in their housing units.

213.  Dr. Jesus Juarez, the CTC supervising psychiatrist, told me that the prison actually does have staff shortages, and needs more personnel in order to function properly. Some of the staff shortages impact little things. For example, he mentioned that he had recently been provided with a computer to use at SATF but there were no technical staff available to connect it. Other staff shortages pose more serious problems. Dr. Juarez told me that "we are short of psychiatrists. We need more. The six we have are not enough." Dr. Juarez went on to explain that his staff is always very busy in the CTC. He said that the MHCBs at SATF are always full. If they aren't filled with SATF prisoners, "then Sacramento sends us people to fill up." They need more clinical staff to meet these needs.

---

[309] Coleman Pls.' Trial Ex. 101.

214.   Dr. Juarez was also emphatic that office and treatment space are "at a premium here. I am sharing an office with three other doctors, plus I have to see patients there. I have to do dictation when the other doctors are working there. If I get another psychiatrist I'll have to put him in there too. And we run a group in there. We don't have enough space here…" In addition, he told me, the same room "multi-purpose" room—is used for IDTT in the CTC.

215.   The issues of appropriate space and available staffing came up again and again. The Triage and Treatment Area ("TTA") is outside of the CTC. I was told that prisoners who appear to be in a mental health crisis are first brought to the TTA, where they are put in a treatment cage—referred to here as a "safety cell"—that sits in the corner of the room. The prisoner stays in the cage until a psychiatrist can assess his condition. However, the TTA nurse told me that, when there is no psychiatrist on site, a suicidal prisoner could stay in the cage overnight, with a custody staff member sitting in front of the cage, observing the prisoner throughout.

        (iii)   Lack of Beds at Appropriate Level of Care
            (a)   EOP Beds

216.   At the SATF orientation we heard about a chronic problem that continues to plague CDCR facilities—EOPs who have been endorsed for transfer to more appropriate programs and levels of care but cannot be moved because of the shortage of bed space. Thus, we were told: "the hubs are always full. We call every week—CMF, Corcoran, Salinas Valley—they are all full. We try to get them out, but there is no room anywhere and it takes months sometime." The Acting Chief Psychologist told us that their program for the EOPs is to have them seen once a week by a case manager, once a month by a psychiatrist, and daily by the psych techs, if they are in Ad Seg. However, they are unable to provide their EOPs with group therapy or other enhanced services during their prolonged stays at the prison. The prison staff acknowledged to us in the morning meeting and during the tour of the prison, that they made no effort to house the EOP prisoners in a single building on a yard in order to enhance the monitoring, safety or clinical care provided to these patients. In fact, we observed EOP prisoners scattered in many yards throughout the prison. As a result of the extended stays at

SATF and the limited mental health treatment provided to these EOPs while they waited for transfer, many of them were being admitted to the MHCBs for stabilization, often more than once.[310] In fact, 15 of the 35 EOPs who were at the prison when we toured, had been admitted to the MHCB at least once, and 9 had multiple admissions.[311]

### (b) MHCB and DMH Access

217. SATF has a CTC that is licensed for 14 mental health crisis beds that they have expanded to 18, although four of the beds still require retrofitting to ensure that they are safe for suicidal patients. The Chief Psychiatrist noted that all of the beds in the CTC are "flex" beds that can be converted to an MHCB. The staff reported that during a shortage of MHCBs, they are able to send medical patients out to nearby hospitals to open up bed space for mentally ill patients when they are determined to be in crisis. As I noted above, the CTC is "always full." In fact, on the day of our tour, the majority of the MHCBs were filled with patients from other prisons, including prisoners from DVI (4), Centinela (2), and CSP-Sacramento (3). Once again, the staff acknowledged that "DMH beds are very, very scarce," and suggested that the wait to transfer typically lasts a minimum of 30 days.

### (c) 3CMS Program

218. In addition to the impacted space and treatment resources in the CTC, and the chronic problems with effectuating DMH transfers, SATF appeared to be running a very limited program for its 3CMS prisoners. The Special Master described SATF's inability to provide an adequate 3CMS program to be related to the prison's limited "success at recruiting and retaining clinical staff."[312] During the 20th round monitoring period, "[c]hronic staff

---

[310] Coleman Pls.' Trial Ex. 100.

[311] *Id.*

[312] Joint Pls.' Trial Ex. 57 at 152.

turnover clearly compromised 3CMS services."[313] The Acting Chief Psychologist acknowledged to me problems with staff retention but stated that he hoped they would be more successful with the new staff hired. Another staff person during the morning meeting reported that staff retention problems were related to their hiring of unlicensed psychologists who would leave after they completed their necessary hours for licensing. When I asked whether new hires were licensed, I was informed that they were not.

219. During our tour of Facility A, I visited the Chapel space that we were told was used for group therapy on this yard. The schedule on the door indicated that the Chapel was available for mental health programming only four hours a week, on Tuesdays from 12:00 until 4 p.m. Facility A houses approximately 188 3CMS prisoners.[314] Perhaps not surprisingly, the Special Master found that although group therapy offerings increased on five of the seven yards, "inmate demand for groups outpaced CSATF's ability to provide them and wait lists for groups were lengthy."[315]

220. I interviewed several prisoners in A Facility, which houses both EOP and 3CMS prisoners in dormitories as well as cells. When we arrived on the yard and asked whether the EOP prisoners were placed in any one particular housing unit, the sergeant told us that they were not. The stories told to me by several A Facility prisoners illustrated some of the ways in which overcrowding at SATF limits the staff's options in dealing with mentally ill prisoners and the level of care that is provided. The first prisoner that I interviewed, Prisoner NN had a significant history of DMH inpatient hospitalization that immediately pre-dated his arrival at SATF four weeks earlier. He had come from the DMH psychiatric Hospital at Coalinga, where he had been for 10 months and, before that, he spent some 8-9 months at DMH's Atascadero hospital. Before going to Atascadero, he was a 3CMS prisoner at SATF. Yet Prisoner NN was

---

[313] *Id.*

[314] Coleman Pls.' Trial Ex. 105.

[315] Joint Pls.' Trial Ex. 57 at 153.

returned to SATF at his former level of care – 3CMS – six weeks before he was scheduled for parole, apparently with no parole discharge planning provided. He told me he was diagnosed with PTSD (the result of extensive child abuse) and bi-polar disorder, and currently takes Thorazine, Effexor, and Depakote. He said that "there's a lot in my case file," but that for some reason "the psychs have overlooked it." Prisoner NN has been in and out of prison several times since 1996, most of the time returning because he said that he "self medicates" when he experiences mental health problems and psychological stress on the street. He told me that his psychological problems are greatly exacerbated when he is forced to live in open dormitory settings. He feels vulnerable and crowded and his PTSD symptoms are aggravated. He elaborated that "I'm very sensitive to lights, noise, crowds—people make me anxious when they are all around, and it's so crowded here." When he feels crowded in this way, "I become paranoid, sure that other prisoners are against me, trying to harass me,[that] people are talking about me. So I tried to kill myself." Prisoner NN showed me long cuts on his arms from this suicide attempt, and said that he had received 110 stitches as a result of this. He also said that he is an active participant in programs when they are available and that, for example, the mental health program at Coalinga was a good one in which he had been actively involved. Indeed, he said his psychiatric condition began to noticeably improve when he was at Coalinga. However, it deteriorated when he was sent back to SATF. He told me: "I started getting suicidal again." He told staff that he was feeling suicidal and he was admitted to the CTC on July 3, 2008 for suicide precautions and was kept there for fourteen days.[316] He told me: "I preferred being naked on a bed in CTC to being in a dorm. But they moved me back to the dorm anyway." After this crisis bed admission, his level of care was raised to EOP.

221.   Prisoner NN was most upset about the unresponsiveness of custody and clinical staff to the difficult time he had coping with the overcrowded conditions in the dorm and the way those conditions exacerbated his mental health symptoms since he returned to prison from

---

[316] Coleman Pls.' Trial Ex. 100.

the DMH hospital. He said that staff "feel its our own fault and don't do much for us, unless they are forced to." In fact, he said, "how we are housed, in the face of the overcrowding, isn't something that they bother with. They can't." He insisted that he had tried to talk with staff about the way that he was panicked by the dorm housing and the fact that it was adversely affecting his mental health, but to no avail: "Before I tried to kill myself, I told them what was happening," but "they said the dorm housing was not something they could change." Even after he told them, directly, "something is going to happen," they "shrugged and said, '[we] can't help you.'" Prisoner NN said that he was forced to live in the crowded dormitory even though he had a "cell-living only" chrono (that SATF refused to honor). He also said that, since coming back to SATF from the state mental hospital about a month ago, the only EOP program that was available in his unit was a once a week meeting with a psychologist. He has had no groups at all over this one month period. Remarkably, this prisoner is scheduled to parole from prison in about two weeks—on August 15, 2008.

222. I interviewed a second prisoner from A Facility who also had a significant mental health history but was receiving very little treatment for it. Prisoner OO has had several prior CDCR prison terms and is now at SATF for a parole violation. He has been on the mental health caseload off and on, and has taken psychotropic medications for depression. The last time he entered prison, around April, 2008, he went through the Reception Center at the Duel Vocation Institution (DVI), where he sought mental health help and even requested placement in solitary confinement to try to ward off a deepening depression that he felt was brought about by a number of deaths that had recently occurred in his family. He told me that staff there said "everybody has deaths, learn to get over it." When he came to SATF about a month later, at the end of May, 2008, he felt his depression "just got worse, I was getting more desperate." Prisoner OO sent clinical staff here a chrono asking for help for the depression, but got no response. After a few days, he was frustrated and angry and received a CDCR 115 for his disruptive behavior. He was put in a holding cell and eventually taken to the CTC, where he spent 7 days. He said they "gave me meds, [put me] on a bare mattress, in a wrap around garment."

223. After about 7 days in the CTC, Prisoner OO was placed on the mental health caseload as 3CMS and was sent to the gym. Since being released from the CTC, several months ago, he told me: "I've had no groups, seen my case manager only twice, and the psychiatrist who does meds review once—that's it." Prisoner OO said he doesn't' know if there are any groups he can participate in—"no one told me anything"—hasn't discussed a treatment plan with the IDTT, and says that his case manager "just asks me, 'how are you doing?' and doesn't seem concerned about providing me treatment."

224. The third A Facility prisoner, Prisoner PP is a 37 year-old man who said although he had made several suicide attempts when he was younger, and had suffered extensive sexual and other kinds of abuse in his life, this was the first time he had been in any type of mental health program while in prison. When he came into the prison system, through the Reception Center at DVI, he could not sleep and was hearing voices. At DVI "I got to see the psychologist right away, they gave me meds to calm me down." But then he was sent to SATF. He was 3CMS when he got here but told me that his clinician felt he should be placed on EOP status because he was not coping well at the prison. In fact, he is listed on SATF's EOP Log as EOP since April 17, 2008.[317] He is taking Remeron, Vistaril, and Depakote. He told me that "A-2 is a hard place to live… [there is] constant movement, noise, fast paced, shadows." Prisoner PP said he had a much easier time handling cell housing than the dormitory unit he is in. He feels that he has been given very little mental health help to cope with his problems or the situation that he is facing. Thus, he said that despite being at SATF since May, 2007, he had been in no groups at all and had to ask for contact with his psychologist rather than being in a program where regular contact was provided as a matter of course.

225. In fact, Prisoner PP said that he has no real program of any kind here. Because he already has his GED he is not eligible for educational classes and, because he is required to

---

[317] Coleman Pls.' Trial Ex. 93.

complete fully 85% of his sentence, is not eligible for work assignments. Not only is it difficult to absorb the day-to-day idleness and lack of mental health treatment but, he told me, "we are locked down whenever our yard or B Yard has problems." He went on to explain that because the prison is short of custody staff, whenever one yard is locked down, the adjoining one is too because the correctional staff are called to that other yard. (This practice was later confirmed to me by custody staff.) Prisoner PP said that it was not uncommon for this to happen a couple of times a week, and that some of the lockdowns lasted as long as a week or two. He told me that he had been endorsed for transfer and is on the wait list for an EOP/SNY program. However, his clinician told him that "the only reason I'm not moving is that there aren't enough beds," and he had no idea whether or when he would go.  Prisoner PP should have transferred to an EOP program by June 16, 2008, but his log entry states "no beds" as the reason for his delayed transfer."[318]

226.   Finally, I interviewed Prisoner QQ, who is a 35-year old man who explained that he first came into the prison system when he was in his 20s, and began receiving his first mental health care the last time he entered prison. He said that he began hearing voices and seeing things in the Orange County Jail and that he continues to do so. He is taking Resperidol and Zoloft now.  Prisoner QQ was 3CMS until May 15, 2008, when he was placed on EOP status.[319] He told me that he had never learned to read or write, and also that he was developmentally disabled. Like the other prisoners I spoke with, he was very concerned because he is not getting enough mental health care while he waits for his transfer to an EOP program.  He said he sees his case manager once a week, in the chapel, and the case manager just asks him about the voices. This brief contact and the medications he takes are the full extent of the treatment that he receives. "I am just waiting to be transferred to an EOP program. I heard it takes a long time." In the meantime, he is living in the dormitory in A Yard.

---

[318] Coleman Pls.' Trial Ex. 93.

[319] Coleman Pls.' Trial Ex. 93.

He told me: "It's hard over in the dorm. I'm trying to learn how to live there. The noise in the dorm makes the voices louder." He, too, confirmed that the unit is plagued by numerous lockdowns that can go on for days at a time. Prisoner QQ is listed on SATF's EOP Chart with a notation that his transfer is delayed because of "no beds."[320]

### (d) Ad Seg Issues

227. I toured the stand alone Ad Seg unit at SATF, where we were told that there were no 3CMS or EOPs currently housed. There are offices in the Ad Seg unit with individual cages in them that the clinical staff uses for assessments and also one-to-one treatment. We were shown a holding cell where a suicidal prisoner could be placed pending evaluation and transfer to the CTC. It was totally barren with no bed, toilet or sink, although there was a grate in the floor. The Ad Seg program consists of 10 hours of yard per week, in outside yards that are monitored over television screens and a gunner. The prisoners in Ad Seg also get access to law library and recreational books, which are brought to their cells. They can choose to have a radio or a television but, if the get a 115 disciplinary write up (for example, for refusing to double cell with another prisoner), their television can be taken away. The Ad Seg is configured as a straight row of cells—the 180 degree design, only one tier high. The cells are totally barren inside. There is a television, in the cells that have them, sitting on a makeshift stand. There are no shelves in the cells. The cells themselves are all concrete, including the bunks. The "yards" are completely caged-in, about the size of the cells in dimension. As our correctional escort acknowledged as we toured the unit: "These units are not good for the mental health of inmates, there is nothing for them to do or see."

228. I also toured the E-1 Ad Seg unit, which has a "capacity" of 200—if all of the prisoners are double-celled—but currently holds 136. The unit sergeant explained that the unit has a heavy concentration of *Coleman* class members. He estimated that there were as many as 100 3CMS and 6 EOPs in the unit that day. The EOP prisoners are mixed in with the others,

---

[320] Coleman Pls.' Trial Ex. 93.

and none of the prisoners on the mental health caseload are housed in a special area or concentrated in any particular part of the unit. The unit roster indicated that some of the EOP prisoners had been in the Ad Seg unit since December, 2007, and others since February, 2008. I looked into the case of one of them in particular, Prisoner RR, who had been in the unit since December, 2007. He was described as having many mental health issues, suicide attempts, and behavior problems. Prisoner RR appears on the EOP Log with EOP level of care as of July 25, 2008. However, the MHCB admission log noted that he was admitted to the MHCB on March 27, 2008 from Ad Seg and was EOP level of care.[321] During his four admissions to the MHCB listed on this log over the past few months, his level of care bounced back and forth between EOP and 3CMS, and during the seven months he has lived in the unit, he remained in this regular Ad Seg, rather than an EOP Hub where he would have received increased mental health care.[322] Yet, as the unit sergeant explained, "these EOPs have been endorsed for hubs and they are just sitting here waiting for a bed somewhere in the system." There were holding cages along the side of the unit floor that the sergeant told us were used for individual clinical appointments as well as for other purposes (that included disciplinary cases). The sergeant explained that there had been treatment cages recently placed on the dayroom floor but then removed; he did not know whether new cages would be placed there later. In fact, if treatment cages are placed on the dayroom floor of this housing unit for group therapy sessions, they would not provide adequate sound or visual privacy to the prisoners participating in group therapy.

(e)     **Overcrowding in Housing Units**

229.   As I noted earlier, despite the enormous size of the institution, SATF is plagued by overcrowding. It has more prisoners than it can properly house and, among other things, has had to convert gyms into dormitories just to hold them. In the makeshift gym dorm that I

---

[321] Coleman Pls.' Trial Ex. 100.

[322] Joint Pls.' Trial Ex. 9.