toured in A Yard, I saw what has become an all too familiar scene inside California prisons—more than a hundred men sitting in or milling around their open bunks, with little or nothing to do. The floor officer in this makeshift gym dorm did not know how many prisoners in the unit were on the mental health caseload or who they might be. I noted that the unit was relatively clean and quieter than some other gym dorms I have seen. The officer explained that this is because the unit is reserved largely for short-termer prisoners who are about to parole. He said, "we don't want any problems, so [we tell them] keep your bed clean, do your classes or whatever, and don't make waves." A prisoner in the gym, Prisoner SS told me that he has been diagnosed with bi-polar disorder and is 3CMS. He has made three requests within the last month to have his medication changed, but nothing has happened. He said that he is feeling very depressed. Although he sees a psychologist once a month, he has not seen her yet this month. In any event, he said, that is the full extent of the treatment he receives.

230.   In another makeshift gym dorm that I saw at SATF—this one in B Facility—the prisoners are triple bunked. There are 140 men in this gym dorm, which is a little less clean and not as quiet as the previous one. The officer on the floor explained that this dorm, too, is intended for short-termers although "we sometimes end up with guys on long-term." One of the sergeants in the unit, told me: "I don't like the housing here, I don't like to keep people in the humidity. The environment is bad here. I'd like to see the day when we can use a gym as a gym. But I guess that's just me." He noted that, in addition to complicating the supervision of the unit, it strains the infrastructure (toilets, etc.) and, the increased number of people in the unit means that it gets much hotter during the summer months

231.   While in the B Facility gym dorm, I interviewed Prisoner TT who told me that he had had serious mental health problems on the street, where he took Seroquel, Prozac, and Elavil, and had been an EOP prisoner in his prior term of incarceration. He said that he was having mental health problems at SATF, but that the staff was unresponsive and unhelpful to his many requests: "I'm not getting any help. I'm a Level I, I have only 6 points—I need help before I get out next year. If I get out with these problems, I'm going to be in trouble." He reported to me that when he arrived at SATF he was placed in the Substance Abuse Program

on Facility F or G, but he was praying out loud and officers sent him to the mental health crisis unit. When he left the crisis unit, he was sent to the B Facility gym dorm. Prisoner TT became agitated during the interview and expressed concerns about custody procedures in the gym dorm, including the fact that he is placed in handcuffs when he sees his case manager during clinical appointments. He reported that he was refusing clinical care because of the way he was being mistreated. I spoke to the Acting Chief Psychologist about my concerns regarding this prisoner's level of care and his continued housing in the overcrowded gym dorm setting.

232.  In addition to makeshift gym dorms, SATF has makeshift dayroom housing on a number of units. I toured housing unit E-4, which has 20 extra bunks arranged on each side of the unit dayroom. I was told the same arrangement exists in E 2, 3, and 5. Prisoners live out in the open, with little or no privacy, in cramped quarters that are in full view of the others in the unit. One of the floor officers told me "this is bad. I never thought I'd see the day. I've been in the system 16 years, and I never thought it could happen." The added number of prisoners in the unit made it more difficult to supervise, taxed the infrastructure (due to overuse of toilets and the like), and made the unit hotter in the summer months "with so many extra bodies in here." Although all of the prisoners who have been placed in the dayroom bunks are lower custody, the floor officer explained that "3CMS inmates are all over the place. Their mental health status is not part of the decision about whether to house them in the dayrooms."

233.  I interviewed one of the prisoners housed in the unit, who has been endorsed for transfer to an EOP program since April 2008 but has been delayed due to "no beds", and will be released from prison in a few months – November 20, 2008.[323] Prisoner UU, who is currently at EOP level of care, has been in the CDCR for the last three years and has been waiting more than three months to transfer to an EOP program.[324] The reason provided by the

---

[323] Coleman Pls.' Trial Ex. 93.

[324] *Id.*

prison for his delayed transfer is "no beds."[325] He reported a history of suicide attempts, including a suicide attempt by hanging at Soledad, another where he attempted to cut his neck at Wasco, and one at SATF where he cut his arm. He was previously treated at the California Men's Colony at San Luis Obispo as an EOP and recalled that he got one-to-one counseling, groups, and participated in a much better program. But now, he said, "I'm getting nothing in here—a social worker who does nothing sees me once a week, I get no groups, no nothing." He indicated that he has been asking to go to Mule Creek, to take advantage of the programming there, but "they won't send me." He has been admitted to SATF's CTC for suicidal ideation three times since March 29, 2008.[326] He explained that his last crisis bed admission occurred when "they forced me into the triple bunked gym, no matter what. I had a 'no triple bunk' order which they ignored. I've also been forced into double-bunked dayroom housing, even though I'm an EOP. Each time I've been forced into these dorms, I start to lose it."

234. I also toured C Facility at SATF, which had been on lockdown status since Friday (three days before the tour). Apparently, there was conflict on the yard and a large group of prisoners began fighting. The sergeant accompanying us indicated that this was regarded as a very serious incident and "we'll be down a while, much more than a week." He indicated that the 3CMS prisoners in this Facility "are all over the place, wherever there are beds." He also explained that, when a unit is in lockdown here, prisoners may be placed in restraints and taken to the clinic for the clinical contacts, assuming that there are enough custody staff to provide the needed escorts. Otherwise, there will be little or no movement anywhere. I toured several of the specific housing units that were on lockdown and, indeed, there was literally no movement occurring at all. As I passed through the units to observe the conditions, the prisoners who were locked down in their cells complained about the heat, the lights, and the inactivity.

---

[325] *Id.*

[326] Coleman Pls.' Trial Ex. 100.

235. The severe overcrowding-related problems that plague the CDCR adversely affect and undermine the quality of care that is afforded to *Coleman* class members in a variety of ways and can accumulate to worsen a mentally ill prisoner's condition over time. This was illustrated in the case of Prisoner VV whom I happened to interview at Mule Creek when I toured there on November 2, 2007, and saw again at SATF during my tour of the CTC. I have reviewed portions of Prisoner VV's central and medical records, including records that I reviewed during the tour at SATF. At the time I saw him at Mule Creek, his level of care was EOP and he had been identified with a development disability, hearing and vision impairment.[327] Prisoner VV had been transferred to Mule Creek from CMF-Vacaville's acute DMH program on June 28, 2007. His DMH Discharge summary, dated the same day, indicated that his level of care was EOP, he was hearing and vision impaired, and had a developmental disability (DD2), as well as a diagnosis of Major Depression with psychotic features.[328] When he arrived at Mule Creek he was placed in Ad Seg and he remained there for many months for safety concerns. I interviewed him in early November in the Ad Seg unit. He continued to receive EOP level of care, and was evaluated by his treatment team on November 20, 2007 and retained in EOP. However, by December 20, 2007, his level of care had been reduced to 3CMS. Clinical notes after that period indicate that he appeared to have some difficulty coping with this reduced level of care, especially because he had been told he would be transferring to SATF, which was located far from his grandmother, who was a source of emotional support to him. On March 27, 2008, he was issued a Rules Violation for mutual combat, but during the report, he told the officer that he "wrote a suicide note stating that I was going to create an incident on the yard that would cause the yard-gun C/O to shoot and kill me."[329] He was evaluated for suicide risk and found to have a "high risk" and was admitted to

---

[327] Coleman Pls.' Trial Ex. 102.

[328] Coleman Pls.' Trial Ex. 102.

[329] Coleman Pls.' Trial Ex. 102.

the OHU and kept there for six days, until he discharged on April 1, 2008.[330] He was never transferred to one of the licensed crisis beds at Mule Creek during that period of time. When he was discharged, he was observed on five day suicide follow-up, and three days later, he was transferred to SATF on April 9, 2008. Upon his arrival at SATF, Prisoner VV was immediately placed in E-1, Ad Seg "due to lack of available bed space on Facility D."[331] He has experienced serious difficulties coping at SATF and had been admitted to the crisis unit at least three times when I encountered him in the CTC on suicide watch on July 28, 2008. He was brought out for an interview in a full-length blue suicide smock and seemed very disoriented and upset as he sat down in the treatment cage where I was required to interview him. He began by telling me that he had been harassed by custody staff at SATF—"there are a lot of people who are mean to me." He also said that when he came here from the EOP program at Mule Creek he stayed in the hole, in Ad Seg, "because they didn't have a bed" for him elsewhere. Then he went to D Yard, in a DDP (developmentally disabled) program that he described as "nasty, unclean." He said he was doubled celled there and that he began to be targeted by other prisoners who learned of his child molestation conviction some 15 years ago. He told me "there were no groups in D Yard, every so often I'd see a clinician, but not every week." He explained that his mental condition had deteriorated at SATF: "since I've gotten here I've gotten much worse. I am really afraid for my life. I'm hearing voices, I want to die." Prisoner VV is hearing impaired, but he said that the prison has ignored this disability and failed to replace his lost hearing aid despite multiple requests. As a result, he explained, "I sometimes miss announcements, so it gets me in trouble." This apparently led to his latest disciplinary write-up, when instructions were given over the loudspeaker and he did not hear them. "They put me in the hole for nothing. In the hold I wanted to kill myself because I knew the staff would continue to harass me. They put me in a cage and left me there for a long time."

---

[330] Coleman Pls.' Trial Ex. 102.

[331] Coleman Pls.' Trial Ex. 102.

236.  Prisoner VV told me that he ended up in the CTC "because I was losing it. I thought they were going to kill me. I wanted to kill myself." He said that he has been in the CTC at SATF several times before. This time, it has been for 14 days. He expressed a great deal of concern about his future: "I have no idea what I'm going to do to take care of myself. I have no skills, I'm really scared. I don't want to be homeless, sleep out in the rain, eat out of garbage cans like the last time I was out." After I finish talking with Prisoner VV, I went to look at his crisis bed cell. It was barren, a mattress pressed to the back corner of the cell, with nothing else in it. Nonetheless, although he says the staff wants to return him to D Yard, "I won't go." I also spoke with his clinician in the CTC, Dr. Jesus Juarez, who told me "today I made him EOP. He is having serious problems." Dr. Juarez confirmed that Prisoner VV has hearing problems but noted also that, because of his serious mental health problems, he "doesn't process information well" and "he also gets agitated when he misunderstands things." In addition to his developmental disability, Prisoner VV is diagnosed with schizo-affective disorder, has hepatitis, and is suffering from a staph infection that requires him to be on quarantine. Dr. Juarez explained that Prisoner VV "will be hard to transfer. He's a Level IV SNY/EOP" who will take "90 days or more" to transfer from SATF. Prisoner VV will eventually transfer back to Mule Creek's EOP program where I first interviewed him back in November 2007. I reviewed Prisoner VV's medical records at the end of the day, and the clinical notes confirmed his high level of suicidality. I also discovered during my review of his records notes for at least ten other prisoners misfiled inside his medical record. I notified prison staff of this filing error.

### f. California Correctional Institute (CCI)
#### (i) CCI Overview

237.  I toured and inspected and interviewed staff and prisoners at CCI on July 29, 2008. CCI is located south of Bakersfield, near the Mojave Desert. The Warden reported that the count on the day we were there was 5,625, and this included a total of 1499 prisoners who were on the mental health caseload, 1,402 of whom were 3CMS and 95 EOPs. (The EOP population at the prison appears to have increased significantly this year; during the 20th round

of monitoring, as of January 1, 2008, the total number of EOPs at the prison was 68.)[332] On the CDCR official website, CCI's population was reported as 5,652, or 203 percent of its design capacity of 2,783.[333] CCI has a reception center, a Security Housing Unit (SHU), administrative segregation, Level I and II gym housing, and an unlicensed Outpatient Housing Unit (OHU). The prison staff provided me with documents showing OHU admission data from January 1, 2008 through July 26, 2008, an EOP log for July 29, 2008, a housing report for MHSDS prisoners, an RC EOP transfer log, and a DMH referral log.

### (ii) Insufficient Clinical and Custody Staff

238.    The high vacancy rates among mental health clinicians at CCI and the use of registry staff to fill these vacancies has been a persistent problem at CCI,[334] apparently the result of very significant and chronic clinical staff recruitment and retention problems. These issues surfaced at the very outset of our tour, and were repeatedly mentioned by administrators and supervisory staff throughout the day. In fact, the problem was so serious that there seemed to be an air of resignation about the problem—"we simply can't get remotely the number of professional people we need to come work here" was the way many of the staff with whom I discussed the issue characterized it. For example, the Chief of Psychology, Dr. Walsh addressed the issue during our orientation meeting with the prison administration this way: "Recruitment and retention? I suppose the word 'nightmare' is appropriate. We do everything we can but we just can't get them here." More than half of their allocated psychiatrist positions (5.5 of 8) are filled by contract psychiatrists, and 40% of the psychology positions are open. Also at this initial meeting, Dr. McDill, the reception center Senior Psychologist, indicated that the prison had utilized some 25,000 contractor hours over the last 8 months to service the mental health needs of the prisoner population there. In his words, "that gives you a feel for

---

[332] Joint Pls.' Trial Ex. 57.

[333] Joint Pls.' Trial Ex. 60.

[334] Joint Pls.' Trial Ex. 57; Joint Pls.' Trial Ex. 36.

how much we depend on it." The June 2008 staffing data provided by CDCR to the Coleman Special Master, confirmed CCI's report of their use of significant contractor hours to fill its significant vacancies (28 vacancies, with 21 of them filled by contractors).[335]

239. The Senior Psychiatrist who runs the OHU, Dr. Pouyon, explained that CCI relies so heavily on contract mental health personnel like him for a variety of reasons that make Tehachapi a difficult place to attract and retain professionals—"the weather, terrain, distance from LA—we can't get physicians here."

240. The severe staffing problem was perhaps most acute among the clinicians, but it affected custody staffing levels as well. Some of the severe overcrowding and understaffing issues were addressed later by the Associate Warden who accompanied us during several parts of the tour. He said that CCI was still significantly understaffed, and that "we have put in for 96 additional custody staff so we can do what we need, to deliver the basics properly." In fact, the lack of adequate numbers of custody for mental health and medical escorts came up several times at CCI. For example, the clinicians in the 4A OHU overflow unit told me that they could not run weekday groups in the treatment cages that they had "because there aren't enough custody staff—there are too many things for them to do—so they have to run the groups on weekends, with whatever clinical staff are there, when the custody staff has less to do.

     (iii) Use of Substandard, Non-Traditional Housing

241. The overcrowding crisis has profoundly affected prisoner housing at CCI. At our initial meeting with Warden Gonzalez at CCI, he acknowledged that the facility had "gyms in every yard being used for housing." The makeshift gym dormitories were "de-activated for about a month and a half, but then [population] went back up," so the prison was forced to reactivate them. In addition, there is dayroom housing in the intake area of the prison. All of these overcrowding-related problems were evident as I toured the facility. The institution has been operating at 200% of capacity for a considerable period of time, with no end—or help—

---

[335] Coleman Pls.' Trial Ex. 91, at p. 2.

in sight. In fact, the Associate Warden noted that despite facing these very serious space shortages, CCI has not yet seen one single "in-fill bed. No ground broken on anything, even though CCI is supposed to be one of the first four facilities" to receive these new beds in the system.

242. As the Warden acknowledged at the outset of our tour, there are a number of prisoners at CCI who are living in non-traditional housing settings, becoming what the Sergeant escorting us for part of our tour at CCI, called "floor sleepers." Many of the "floor sleepers" were in the gym makeshift dormitory that we visited that was being used for Reception Center prisoners. The full count inside the gym was 136 prisoners—the entire room pretty much filled with open double-bunks on which the prisoners lived. The floor officer, who said he had been there five years "so I pretty much know what's going on," at first indicated that he did not think there were any mental health caseload prisoners housed there. He did not have a list of any kind to readily consult. When we checked the housing report for MHSDS, however, we found that there were 15 CCCMS prisoners dispersed throughout the makeshift dormitory. Conditions inside this housing unit were frankly no better or worse than the others I saw throughout CDCR—open, unsafe, lacking in privacy, and providing the prisoners with little or nothing to do during the day to pass the time.

243. We toured another, slightly larger makeshift gym dormitory that is in use in Housing Unit 4B, where some 142 prisoners are currently confined. The substandard environmental conditions were evident here as well. Here, too, mental health caseload prisoners were housed without custody staff being certain of how many or who, exactly, they were. One of the floor officers indicated that there were "some" 3CMS prisoners currently assigned to this unit and, although there did not appear to be any EOPs there now, they had had them there before. Although this type of housing is intended as short term, for Reception prisoners, the officer indicated that some prisoners have stayed in the gym dorm for six months or more. In addition to the terrible environmental conditions in the unit, it was also apparent that the prisoners really have no programming opportunities. As the officer put it, "they have the dayroom, play games, that's it. And they eat in here." The "dayroom" consists of a series of

14 tables, which also serve as the "dining hall" for the gym residents, and 1 television set in the dorm (used by 140 prisoners). A prisoner confirmed for me that there was "nothing else to do... no program at all." He was resigned to the fact that this was all he would have access to until he paroled from the prison in January, 2009. He said he had been told he would have to stay in this unit for another six months or so "because there are no beds anywhere in the system to put me."

### (iv) Severe Lack of Clinical Office and Treatment Space

244. CCI is plagued with very severe clinical office and treatment space shortages. At the outset of our tour I asked CCI administrators about the four proposed treatment modules that had been requested and were mentioned in documents that I reviewed before my visit.[336] The Warden told me that they had in fact submitted the proposal for these badly needed new treatment modules but that, unfortunately, they were not approved. The additions would have provided two new mental health and two new medical treatment modules at the prison, ones that the administrators at the orientation meeting acknowledged were very badly needed. The staff indicated that, instead, they were now "hoping to convert" a visiting area at the prison for clinical use, but that this "is a work-in-progress" and little more than an idea at this point. We were also told that, in part because of the lack of treatment space and in part because of the lack of available custody staff to serve as escorts (addressed further below), it is "a challenge on a daily basis to make sure prisoners in SHU/ASU are getting their one hour out-of-cell time." The Chief of Psychology, Dr. Walsh, indicated candidly at the orientation meeting and throughout the rest of the day that space was a continuing, critical problem at the facility. He told me simply that a great deal of additional space was "badly needed" so that the clinical staff could do its job properly.

245. The Deputy Warden who accompanied us during much of the tour, further explained that there were inherent design problems at CCI that compromised their overall

---

[336] Coleman Pls.' Trial Ex. 103.

programming capacity. He said that there was no treatment space on the units because "treatment" was not something that CCI was originally designed to do. Now that it has been made a more central part of CCI's mission, he said, there is little that can be done to overcome the physical limitations that were initially built into the design of the facility.

246.   The first area of the prison we visited was R & R, where we were escorted by a Sergeant who told us that most of the prisoners who come into CCI are from San Bernardino and Los Angeles counties. It takes them about 6 hours to fully process incoming prisoners into the facility through R & R. Even here, however, the lack of appropriate space was a concern. Thus, one of the psychologists assigned to this unit explained that the psychological assessments that are done in R & R must be completed on one the several open tables out on the dayroom floor, which "is not very good but we have no other room." Obviously, the area is not very private and "if someone is nervous or uncomfortable, it's not very effective" to ask them about their mental health concerns in such an open, public area.

247.   Space shortages were evident in other areas of R & R as well. For example, the clinic that services the R & R facility has a holding cell that is used to hold suicidal, homicidal, or decompensating prisoners until they can be admitted to the infirmary (OHU) or referred to a mental health crisis bed. The mental health staff informed me that a prisoner could be routinely held in this cell for as long as four hours but, also, that it has been the case that some were kept there for a full day. The delay is caused by the fact that the people who are in charge of the OHU are the only ones who can admit prisoners there. One of the psychologists who runs the EOP programming for Reception Center prisoners, Dr. Matlen, explained that the OHU is "so short staffed, and it's also a very small OHU, so they are always having to triage." As a result, R & R prisoners in crisis have to wait for the OHU staff to get to them. In a nearby office area, there is another holding room, this one containing three holding cages, which a unit sergeant explained were originally intended to hold disciplinary cases but now have been converted to mental health use. Dr. Matlen indicated that it is not uncommon to have all three of them occupied, so that the prisoners have to be interviewed—often about very sensitive issues—in each other's presence. Although no prisoner is supposed to be held in the cages

awaiting transfer for longer than 4 hours, and most were not, the log book in the unit indicated that some were, for as long as 5 or 6 hours on occasion.

248. Dr. Matlen also said that they try to run as many EOP groups as they can, to at least get the mentally ill prisoners out of their cells, and also to provide some face-to-face contacts for them. Dr. Matlen told me she felt that she had adequate staffing with which to run these particular EOP programs, in part because their staff allocations were "ratio driven" and staffing levels had been set according to the number of prisoners who were being serviced. However, she immediately added: "But space? Are you kidding? We don't have anywhere near enough!" Dr. Matlen said that the clinical space shortage at CCI included the lack of office space—"we have no real office space for most of the staff," as well as severely restricted space for groups—"we have to use the chapel and the housing units for groups—it's terrible—the chapel doesn't want us there and the groups in housing are bad—right out in the open where everyone can see them." Dr. Walsh added, "You know the studies about how many rats can you put in one small space without them losing it? That's about where we are with space and my staff."

249. The OHU at CCI is a standard clinic area, but it is very crowded. Dr. Pouyon, the contract Chief Psychiatrist who runs the OHU, told me that space is a very significant problem. "I had to give up my desk to other staff. I'm 'working out of my car,' so to speak, I walk all over the place" in order to do the job. In fact, the OHU staff have had "space utilization" meetings and proposed significant modifications but, unless and until the expansions are implemented, as Dr. Pouyon put it: "we're packed in, have no space to do anything." Moreover, "we don't even have internet access, our books are old—we can't get online. We are an archaic system and I am trying my best to bring it into the modern era."

250. In another part of the OHU we were shown a converted bathroom that now holds a desk and a treatment cage, where patients in the OHU can be seen by clinicians. As Dr. Price put it, "we've gotten better at doing more with less." Indeed, they were learning to do more with less in many parts of CCI. In 4A, where the OHU overflow is housed, for example, one psychologist, Dr. Gendalman, showed me her office, which consisted of a cramped broom