closet that she actually shares with another clinician. The OHU is a very busy unit with 244 admissions between January 1 and July 26, 2008.[337] CCI has attempted to transfer patients from the OHU using the Health Care Placement Unit in CDCR headquarters, but system-wide shortages have impacted on their ability to move patients to the appropriate level of care. In March 2008, CCI referred for transfer 8 MHSDS prisoners for MHCB placement, but only one transferred after waiting 7 days, and the other 7 returned to their housing units after waiting from 2 to 16 days for an MHCB transfer.[338] In April 2008, CCI referred 5 prisoners for MHCB placement, with 1 placed after waiting 12 days and the remaining 4 returned to their housing unit at CCI after waiting from 3 to 20 days for an MHCB transfer.[339] In May 2008, CCI referred 5 prisoners for MHCB placement, with 1 placed after 7 days, and 4 returned to their housing unit after waiting from 4 to 14 days for MHCB placement. Finally, in June 2008, CCI referred 10 prisoners for MHCB placement, with 4 placed after waiting 9 to 14 days, and 6 returned to their housing unit or parole after waiting from 2 to 43 days for MHCB placement.[340]

       (v)  **Inability to Provide Appropriate Levels of Care**

251. As has been true for all of the CDCR facilities that I have toured, CCI is plagued by not being able to transfer mentally ill and other special needs prisoners to the appropriate locations elsewhere in the system—the beds the prisoners have been deemed clinically in need of. It is a chronic problem here as elsewhere in the system. Thus, Dr. Eppler, one of the psychologists working in the Reception Center, told me that CCI is forced to hold EOP prisoners who are also SNY for many months, because the only appropriate placement for them—the program at Mule Creek State Prison— does not have any space for them: "We have

---

[337] Coleman Pls' Trial Ex. 106.

[338] Coleman Pls.' Trial Ex.132.

[339] Coleman Pls.' Trial Ex.133.

to keep EOP/SNYs for 6 or 7 months because they can't get transferred to Mule Creek." Obviously, this creates special challenges for the CCI clinical staff. As Eppler put it: "I've got to program them somehow—how can I? They are told they should be moved but they aren't. They don't get what they know they are entitled to—phone, visits, packages, but don't [get these things] because they are awaiting their transfer, waiting for a bed, for 6 or 7 months!" The Special Master was aware of this problem as well, noting during the 20th round of monitoring that "[a]dherence to EOP transfer deadlines notably declined during the reporting period." [341] On the MHSDS List for EOPs dated July 29, 2008, showing transfer deadline dates, there are a total of 102 EOPs listed and 46 of them (45%) are beyond the transfer deadline date.[342] The primary reasons provided for the delays are "lack of EOP beds" and "no vacancies at endorsed institutions."[343]

252.  In addition to the problem of EOP transfers, CCI suffers from an inability to provide appropriate levels of care at the facility itself. Thus, at the initial orientation meeting, Dr. Alavarez, Senior Psychologist, explained that the OHU currently has 8 beds that are used as MHCBs and another four "flex" beds that can be converted from medical to mental health use. If mental health needs more beds, medical patients are supposed to be transferred to community hospital beds. But the Chief Medical Officer reported to us that the community hospitals were unwilling or unable to accommodate CCI medical transfers so the system did not work as planned. Dr. Pouyon, the OHU director who took us on a tour of the unit, introduced us to Dr. Price, an OHU psychologist who told me he was working to simplify the OHU admission process for mental health patient/prisoners. But he addressed what he thought was a major problem at the CCI OHU: "Our patients are staying too long here—[we're]

---

[340] Coleman Pls.' Trial Ex. 135.

[341] Joint Pls.' Trial Ex. 57 at 255.

[342] Coleman Pls.' Trial Ex. 156.

[343] *Id.* at pages 4-5.

running this like a CTC, but we don't have a license to function like that—it's not good practice." He elaborated that, in terms of staffing ratios, space, and equipment, and facility infrastructure, the OHU falls far short of the professional standards it should meet for a CTC operation.

253. The problem of prisoner/patients backing up in the OHU because of a lack of bed space elsewhere—one that was a chronic issue in all of the other prisons I toured—was clearly present at CCI as well. Dr. Pouyon noted that there were "people who we release from OHU status but [who] stay here because we don't have beds." It is also the case that prisoners remain in the OHU for long periods after being accepted for a DMH transfer, where they "languish on a waiting list" for months. Indeed, CCI has several prisoners who have been waiting this way since February, 2008. Dr. Walsh added that "EOP transfers are not pretty. They are staying here longer and longer. We are getting more EOPs coming into the system on parole violations who were EOPs when they left—the lack of bed availability is what is killing us."

254. Another clinician talked about the OHU "overflow" and the fact that they have had to leave mentally ill prisoners in the 4A holding cells for a day or two (and, in the past, it was not uncommon to leave them there for as many as three days). The Special Master noted this use of "alternative sites" during the 20th round when "seven percent of inmates referred to the OHU were placed in 'alternative' holding cells pending admission to OHU beds."[344] Dr. Price described some of the consequences of this back-up, which results in people being kept long-term under conditions that were intended for short-term confinement: "We have people who may stay here for quite a long time—they don't get any yard, no group—they need resocialization. So we have psych techs who come in periodically and read newspapers to them and so on to make sure they don't lose sociability completely."

255. Being kept in such a place for a long period of time, awaiting transfer to a more appropriate facility, would likely affect a person's "sociability" and a great deal more. Indeed,

---

[344] Joint Plts. Trial Ex. 57 at 255.

the cells reserved for mentally ill patient/prisoners in the OHU that I saw were barren, desolate, and depressing. In fact, the Special Master reported a "recurring shortage of safety mattresses and suicide smocks" during the 20th round of monitoring at CCI.[345] Many of the mentally ill inmates housed in these cells on the day I toured were lying down on the bare floor, with blankets pulled up over their heads.

256. I visited the 4A treatment area located between Housing Units 5 and 6 to see some of the prisoner/patients who were housed there, including two prisoners who had been referred to DMH some six months ago (in February) but had yet to be transferred. In fact, I was told by a senior psychologist who works in this unit, that DMH had actually dropped these two prisoners from their list at the start of July. Thus, he said, both prisoners are now "in limbo," with few alternatives that could be pursued for them. For example, he said, if CCI wanted to send them to the EOP program at SVSP, "they'd be 160th on the list... [and] the EOP hub at Lancaster is even harder" to get a prisoner into. He told me that they offered the prisoners as much in the way of EOP services as they could—which amounted to seeing them once a week—"but these guys are needier than that."

257. Dr. Gendalman, a clinician on the unit, told me that one of the prisoners I wanted to interview, Prisoner WW, was very paranoid and rarely came out of his cell. He will not take his medications and does not appear to be eating. She was aware of an incident I, too, saw reflected in his records in which he had urinated on his food tray. "We regard [this] as gassing, so he had to be in Ad Seg." Yet she felt strongly that "he doesn't appear to be decompensating enough to be referred [because] they wouldn't take him. Bizarre behavior doesn't get you very far up on the list" for DMH transfers. This prisoner appears on the CCI DMH referral log provided to me on the day of the tour as accepted to ASH APP on February 29, 2008 and remains on the waitlist.[346]

---

[345] *Id.*

[346] Coleman Pls.' Trial Ex.157.

258. When I went to Prisoner WW's cell to speak with him, he appeared very frail and very afraid. He told me he saw his clinician once or so a week and agreed that she was helpful. But he told me that he does not like to come out of his cell or be around people at all. He said, "I don't like groups. I only go to yard by myself," and repeated that he was too afraid to come out of his cell. Indeed, even as he spoke to me, his eyes were darting around and he was nervously looking behind me to the tier, to see who was out there and what was happening. He told me that he is very afraid of being placed on EOP because he is sure that it would result in his transfer to another prison where he would be killed. Prisoner WW told me that he gets out of prison on November 23rd of this month but that he feels he doesn't need any more help. "I'll be OK," he told me.

259. I saw Prisoner XX one of the Building 5 prisoners who had been awaiting DMH transfer for many months. He was brought out to one of the treatment cages in the hallway outside the unit, where I interviewed him. He was so floridly psychotic that it was almost impossible to converse with him. In the midst of his disorientation, he did manage to tell me: "Prison is a certain level of suffering. I don't know why people want to torture one another." Prisoner XX did manage to tell me that he had been in prison for about 14 years, including some time spent at Patton State Hospital, where he said he had been "many times." His mind wandered throughout our interview. He was often unable to respond cogently and he could not remember exactly when he had last seen his clinician. He told me he was currently taking Resperidol and he thought that it helped him. Prisoner XX said: "I've been told that I should be going somewhere else, but I don't know where or when. I can't predict the future." He also is listed on the DMH Referral list as accepted to APP on February 8, 2008, but currently on the waitlist.[347]

260. The last prisoner I interviewed, Prisoner YY was also seen in one of the treatment cages in the hallway outside 4A. He told me he had been diagnosed with bi-polar and

---

[347] Coleman Pls.' Trial Ex.157.

obsessive compulsive disorders, and that he continued to see and hear things that others did not. He said that when he is in close confinement he "can't take it, the walls close in on me." Prisoner YY said that he was once taking a variety of psychotropic medications simultaneously, including Remeron, Zoloft, Depakote, and Geodon, and that, because of the serious side effects they produced, he now takes only Geodon. He said that he first came into the prison system in 1999, at age 17, to serve a sentence of life with parole. At that time, he said, he was guarded about what he perceived to be his "mental health problems" because he did not want "to let people take advantage of it." But his problems worsened by the time he got to CCI and he began to have visual hallucinations and to hear voices. "They took me to the infirmary, to a bare cell, on the floor, where you sleep. It didn't help me." Prisoner YY was placed on the EOP caseload in November, 2007, but was taken off a few months ago. Although he said he still hears the voices all the time, he is getting very little treatment at CCI. There is "no helping, no groups—not any help at all… I have no program at all, since April. We haven't even been to yard. I just stay in my cell and watch the walls close in on me." He appeared to be doing poorly at 3CMS level of care. Staff later confirmed that this unit has been on complete lockdown (no yard whatsoever) since April 3, 2008, when several staff members were the victims of a serious attack by two prisoners.

### (vi) Lack of Adequate Programming in ASU and SHU

261. The lack of adequate programming and treatment in the segregation units at CCI was apparent from the last several interviews described above. In addition, the Special Master observed that "limited program space [in the administrative segregation units at CCI] often forced clinicians to interview inmates in non-confidential settings."[348] Very severely mentally ill prisoners are being housed under extremely harsh conditions with very little out-of-cell time or meaningful treatment being provided to them. Some of them appear to be so ill that they cannot utilize even the limited clinical contact they are afforded. I have reviewed documents

---

[348] Joint Pls.' Trial Ex. 57 at 256.

indicating that there were two suicides in the CCI SHU in 2007. There was another suicide in the Ad Seg unit in March 2008 not long before we toured the prison.[349] Remarkably, however, no one with whom we discussed the problem of suicides at the institution saw fit to inform us that another suicide had taken place just a few days before our visit.[350]

262. There were additional overcrowding-related problems with mental health programming at CCI. The prison is one of several CDCR facilities that house a Security Housing Unit (SHU), where prisoners are placed for having been found guilty of what the Department regards as the most serious disciplinary infractions. We toured one of these units, 4B, Housing Unit 5, B section. As we walked toward the unit from the outside, we passed by small exercise cages—so-called "individual exercise modules"—where a number of prisoners were outside under the midday sun. Prisoners in the SHU here can be double celled "if they are compatible," and many of them do live this way. In the SHU at CCI, mentally ill prisoners are not separated from everyone else, and they are not concentrated in one area of the unit. The unit I toured was an "old style" SHU that appeared to predate even the Pelican Bay model. One of the COs in the SHU told me that he had two suicides in his housing unit in just one week last year (December, 2007). He did not know whether either of them was on the mental health caseload.

263. I interviewed a SHU prisoner, Prisoner ZZ in a treatment cage just outside the housing unit. He told me that he had been in prison most of his life—only five years spent on the street since 1970. Prisoner ZZ had been in the SHU at Pelican Bay three different times over this period and came to the CCI SHU about four and a half years ago. This is where he decided to "de-brief," and relinquish his prior gang affiliation He explained that he was placed on 3CMS status at CCI about three years ago and he was hoping that the debriefing process would be finished by now. In fact, he turned in his "autobiography" some 30 months ago and

---

[349] Coleman Pls.' Trial Ex. 83; Coleman Pls. Trial Ex. 85.

[350] Coleman Pls.' Trial Ex. 85.

has become very concerned that he has not been transferred to another facility. The stress of the long wait and the uncertainty about his fate has made his psychological condition much worse: "I'm under a lot of stress now—things are stacking up on me. I was asking repeatedly to see a psychiatrist—it took two weeks before he came to see me. Prisoner ZZ is an active participant in a group that is held in the treatment cages—he and two other prisoners participate in a "how to survive the SHU" group together, which he finds beneficial. But the mental health contact is far too limited. He complained that he received only one group per week, and had only one regular psych tech contact per week, but he added that "they don't really do anything." He reported that the frequency of psych tech rounding was cut back a year ago from daily rounding to a psych tech round only once a week.

264.  A second SHU prisoner, Prisoner AAA, appeared to be significantly impaired. He told me that he had been in the CDCR for 12 years, serving a sentence of 385 years to life. Although he was on 3CMS status early in his prison term, he is now on EOP status. Prisoner AAA has had one brief stint in Patton State Hospital, which occurred in 1996, when he was committed there for 72 hours from the streets. He said that he has moved from prison to prison for the last 12 years. Prisoner AAA is both hearing and visually impaired, a member of the *Clark* class of developmentally disabled prisoners, and is an EOP prisoner. He told me that he has been hearing voices since he was a teenager, and has taken a number of anti-psychotic medications (including Thorazine and Haldol). He understands that he may represent a threat to others: "When I get upset, I want to hurt people who are bugging me. I've had lots of problems with cellies." He has also attempted suicide on a number of occasions. He told me: "I'm psychotic. They make you psychotic in here." Prisoner AAA was concerned over the level of care he was being provided at CCI. He told me: "I kept telling them I wasn't getting any help. As 3CMS you get nothing. I've had two groups—they both ended when the clinician left, after I opened up to her. [We had] only a couple of sessions, but it stopped." He told me that the psych techs visit the prisoners on the caseload only once a week, "to give you a puzzle." He told me that he had been made an EOP three or four months ago and has been awaiting a transfer ever since. Prisoner AAA was referred for EOP transfer on March 20,

2008, but has remained at CCI well beyond the 60 day transfer timeline because of a "lack of beds."[351] Prisoner AAA said that the EOP program at CCI does not differ much from the minimal program he had been getting as a 3CMS, except that he gets group once a week, when they bring him out to one of the cages. But he also said that the COs are always rushing his clinician, asking her if she is finished yet.

### g. North Kern State Prison (NKSP)

#### (i) NKSP Overview

265. I toured and inspected and interviewed staff and prisoners at NKSP on July 31, 2008. According to CDCR data, the facility was operating at 200% capacity on July 30, 2008, with 5,404 prisoners confined in a prison designed for 2,694.[352] Staff reported to us during the tour that the prisoner census on that day was 5,381 prisoners. They also reported that there were 917 3CMS, 66 EOP and 10 MHCB patients in their census. NKSP has a large reception center population spread over four yards. Yard A has five 270 housing units, with two for general population, one gym and three for reception center prisoners. Yard B has six "wingnut" units all for reception center prisoners. Yard C has four "wingnut" units and two dorms, all for reception center prisoners. Yard D has six wingnut units, five for reception center and one for Ad. Seg. Yard E is a minimum security facility. A Yard also has a makeshift OHU in building 4, which is a mixed housing unit of RC Ad Seg Overflow and the OHU. The prison is located approximately four miles north of Kern Valley State Prison and is an exact replica of a neighboring prison, Wasco State Prison.[353]

#### (ii) Shortages of Space for Offices and Treatment

266. At the initial orientation meeting, the prison staff provided me with a log of all MHCB admissions for May-July 2008, a NKSP EOP transfer log, a list of all NKSP MHSDS

---

[351] Coleman Pls.' Trial Ex.156.

[352] Joint Pls.' Trial Ex. 59.

[353] Coleman Pls.' Trial Ex. 104.

prisoners, and a log of Mental Health Temporary Housing with lengths of stay and re-housing locations. Warden Hense began the meeting by acknowledging that the North Kern facility was not built with any real programming or treatment space, yet is now required to provide it. She noted that they recently created a temporary "OHU" by modifying a number of cells, but the unit is unlicensed and they did not get any additional staffing allocations associated with the OHU beds. So, as she said, "it's not an actual OHU." However, because of the reported waitlist of six to ten days for an MHCB, the staff reported that the OHU is regularly used for prisoners waiting for a crisis bed.

267. Previously the Special Master noted about North Kern that "[a]ccess to MHCBs also remained problematic. As a result, holding cell usage continued."[354] Among the documents provided to me at the onset of the site inspection was a nine page log of prisoners who had been placed in temporary housing during May-July 2008 pending review for possible placement in an MHCB.[355] Among those prisoners who were ultimately placed in an MHCB, the lengths of stay in the "mental health temporary housing" ranged from 1.5 hours to 208.8 hours (or 8.7 days). Many on this list were held for several days while they waited placement in an MHCB.[356] In addition, in June 2008, NKSP referred 97 prisoners to the Health Care Placement Unit in Sacramento for assistance in placing them in an MHCB because their own local crisis beds were full.[357] However, only one of the referrals was actually placed in a crisis bed; the remaining 97 referrals were rescinded because they were either returned to their housing unit or eventually were placed in one of North Kern's crisis beds (*e.g.* only eight of the

---

[354] Joint Pls.' Trial Ex. 57 at 237.

[355] Coleman Pls.' Trial Ex. 158.

[356] *Id.*

[357] Coleman Pls.' Trial Ex. 135.

twenty-one EOPs referred were eventually placed in NKSP's MHCB unit, with the remaining thirteen returned back to their housing unit from the alternative placements.).[358]

268.  There was a request that the prison had made for a more substantial increase in space—specifically, three additional trailers that would have housed three to five additional offices each, with space for group and individual treatment and prisoner assessments. However, we were informed that the request was not approved. The staff agreed that this was unfortunate because the increased space would have provided what Dr. Hirakawa, Chief Psychologist, indicated was "what we need, minimally," to meet *Coleman* requirements. When I talked later with Dr. Hirakawa about the request for the new trailers, and asked him what he thought the odds were that North Kern eventually would get the requested additional clinical space, he said: "Our chances of getting those trailers funded is slim to none. We'll just have to continue to make do, I'm sure."

269.  One of the ways they were "making do" was apparent at the first area of the prison I toured after the orientation meeting—a converted prisoner visiting room (complete with a row of phones and glass partitions) that now serves as clinical office space. The desks are aligned lengthwise, in the long narrow room, where approximately twenty staff members share just two computers, none of which have internet access. There is just one phone for all of the staff who work in this area. One of the psychiatrists who accompanied us on much of the tour, Dr. Pitts, Senior Supervising Psychiatrist, noted that these facilities were "terrible," and he lamented the fact that, among other things, the mental health staff could not rely on internet resources to supplement their knowledge.

270.  The severe space shortage has impacted their delivery of mental health services in a variety of ways. For example, because North Kern lacks adequate programming space, they had devised a plan to conduct a number of treatment groups for mentally ill prisoners in the prison chapel. Dr. McNarren, explained to me that they had obtained permission to use the

---

[358] *Id.*

chapel for treatment space and, even though they knew it would be a makeshift arrangement, there was no other space available for them to use. However, even this plan had to be placed on hold due to the summer heat and lack of air-conditioning in the unit. To date, they have been unable to get this problem fixed.

271. Among other things, the shortage of space has prevented the clinical staff from doing all of the confidential interviews that they need to do in their offices, and some of them have to be conducted at a desk in a hallway, despite the lack of privacy. They also try to have at least one group a day for EOPs in each yard but, as Dr. McNarren told me, "it's hard, with everyone competing for space, not enough space to have them."

272. We toured the A-4 housing unit at North Kern, where there were Reception Center prisoners housed, some Ad Seg, and a makeshift OHU. The floor officer stated that this unit handles MHCB overflow and Ad Seg overflow as well, something it was presently being used for. At first we were told that there were no EOPs presently housed there, but then the officer checked a unit roster and determined that there were actually two. (Indeed, one was yelling to us that he was EOP and had been in this unit since mid-June.) Dr. Hirakawa did not know that there were any EOPs in the unit or why the ones we found were there. Prisoner BBB, the one yelling to us, is an SNY prisoner who came into North Kern in October of last year, and was placed on EOP status in December. He told me he has been diagnosed with schizophrenia and is bi-polar. Prisoner BBB reported that he has been awaiting a transfer to Mule Creek but he was accused of indecent exposure and said he was placed back here, in "the hole," about three weeks ago. Indeed, he is listed on a NKSP EOP transfer log dated May 22, 2008, as arriving at NKSP on October 29, 2007, with EOP level of care noted on December 12, 2007. At that time, he was endorsed for transfer to MCSP with his length of stay noted as 162 days at NKSP.[359] However, on the July 29, 2008, EOP Transfer Log, after he was placed in Ad Seg, his arrival date was noted as June 16, 2008, and his length of stay listed as **only 38**

---

[359] Coleman Pls.' Trial Ex. 159.