days.[360] It appears from this log that his referral for transfer to Mule Creek was rescinded due to the rules violation issued to him and his transfer timeline was restarted. He had been getting groups five times a week and seeing his doctor until he was placed in this unit, but now "there is no programming... You sit in group in the dayroom, where you can't hear sometimes, or other prisoners are at their door listening to you." Prisoner BBB indicated that he had to stand at his cell door and yell to his doctor that he wanted to see him. He said that his clinician did come on a regular basis, but that he was having a hard time getting a review or change in his medications. In addition, "when I do see my doc, I have to get pulled out to the cage. You don't feel comfortable talking, especially if there are others around." He reported further that the Ad Seg unit was taking a toll on him: The COs here all call us 'J-Cats." I am pacing, I haven't slept all night, trying to hold it together, not losing it. There are quite a few people in here with mental health problems like me." The "Category J Program" was a pre-*Coleman* mental health unit at California Medical Facility (CMF).

273. I toured housing unit D-4 (B side), and spoke to one of the EOP officers on the unit. She explained that their EOP population is increasing; when she came there about a year ago, there were only five EOPs here, and now there are twenty-six of them in the unit. They try to hold one or two groups a day for EOPs. Today, for example, a recreational therapy group will be held and a so-called "outlier" group for people who cannot be with others. Recreational therapy consists of playing games, socializing and, as she put it, "just getting out of the cell for an hour." The groups "would have 20-24 prisoners, out on benches, in the middle of the unit," in the dayroom area. Indeed, the "group space" consisted of a row of a few secured wooden benches in the middle of the dayroom floor. There is no privacy, either from the other prisoners or staff in the unit, or from anyone else who happens to be out in the dayroom at the time.

---

[360] *Id.*

### (iii) Understaffing

274. Like virtually all of the prisons in the overcrowded California system, North Kern is also plagued by serious staffing shortages. Although the facility had an additional 20 psychologist positions allocated to them about six months ago to meet their growing need, they found it was simply "impossible to fill them." Thus, they now have a total of 39 psychologist positions allocated to them, but only 19 are filled by regular CDCR employees. Some 10 psychologist positions (of the total shortfall of 19) have been filled through the registry. In the CDCR June 2008 staffing data provided to the Special Master, NKSP reported that nearly a quarter—21.59 of 89.59—of its clinical positions were vacant, including 18 psychologist positions.[361] Only 8 of the 18 psychologist positions were covered by registry clinicians.[362]

275. I learned from Dr. Hirakawa that they have someone in a temporary or "overflow" MHCB every day at North Kern. Dr. Pitts, Senior Supervising Psychiatrist at the prison, told me that the combination of staffing and space shortages affected many aspects of mental health care at the facility. For example, he indicated that he had to "steal a psychiatrist to staff R & R," even though "they should be seeing patients but can't." He noted that, "when you see how many obstacles we face, it's a miracle there aren't more suicides."

276. James McNarren, Mental Health Supervisor, was also candid about the ways in which overcrowding has compromised the delivery of mental health services at North Kern. For example, he told me: "[We have] huge space problems. This place was never designed for what we are having to do. We are too crowded to do the things we are supposed to do. [We] don't have the space to do treatment, but we try to do the best we can." He told me later that he thought the problem of excessively long waits for transfers to DMH was getting worse rather than better: "It takes forever. There are not enough beds. [We] just can't get gravely disabled prisoners in there." In addition, he felt that space limitations had forced them to create

---

[361] Coleman Pls.' Trial Ex. 91.

[362] *Id.*

Case 2:90-cv-00520-LKK-JFM   Document 3201   Filed 10/30/2008   Page 164 of 267

makeshift treatment areas. "We've been having groups on benches in the dayrooms of housing units," for example.

277.   Dr. McNarren also addressed the very limited level of care that is being provided for 3CMS prisoners due to the significant overcrowded-related problem that plague North Kern. He explained that these prisoners "are just getting an initial evaluation and then only 90-day follow ups—no groups or clinical contact on a regular basis after that. We don't have the staffing or the space to see them. I wish we could, but the Reception Centers, 3CMS prisoners are not getting anything. If they make a request, of course, we try to see them, but [we] can't be proactive at all."

278.   The various ways in which both space and staffing shortages interact with one another to compromise mental health programming for *Coleman* class members was underscored in the interviews I conducted with several prisoners at North Kern. The first, Prisoner CCC told me he has been at North Kern since January, 2008, approximately 7 months. He seemed somewhat disoriented at times, and had difficulties with memory. Prisoner CCC told me that he had only completed the 6th grade in school. With respect to his mental health status, he told me he is a 3CMS prisoner who hears voices and has long taken psychotropic medications. Prisoner CCC said he took Seroquel and Wellbutrin in the past but the doctors will not prescribe these medications here. He said that he had problems getting seen by mental health and medical staff in a timely fashion. For example, he told me that he had finally seen a doctor yesterday, after requesting a visit for 88 days. The longer we talked, the clearer it became that Prisoner CCC was very impaired, and that he had a hard time expressing himself. He indicated that, while at North Kern, he "had a seizure and officers left me on the floor." He also said that he believed the nurse and the COs were trying to kill him and, "I am afraid for my life in here but they don't care." Prisoner CCC has about 10 more months before he completes the prison term for his parole violation and will be released. He said that he was told he would do this entire prison term at North Kern, although he was supposed to transfer to CMC. He explained that he had been "locked up" and eventually brought to this unit about a week ago because "I was suffering and I was thinking about killing myself." When the staff

[248286-1]   EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

became aware of this, he said, "they put me in a cage, in front of the medical [unit]—they didn't give me any food—I just sat in the cage for 5 or 6 hours before someone came to see me. Then they brought me here. Then, just yesterday, a psychologist came to see me."

### (iv) Reception and Receiving Problems

279. North Kern serves as a Reception Center for several Southern California counties. The Receiving and Reception area of the prison is struggling under the press of the numbers of people who must be processed, with limited space and staffing, on a daily basis. I was told that the paperwork that new prisoners come with, off the bus from the county jails and into R & R, is minimal. Dr. Hirakawa told me: "We have to try to figure it out—a hundred a day—who is mentally ill, who isn't. We don't get the information we need from county and there are just too many of them." In addition, because many of the inmates are short-termer prisoners, coming in on parole violations and about to be released relatively soon, it is difficult to stabilize them before they leave the prison: "We have a guy in a MHCB right now who is suicidal. He is paroling today. Our job is to try to stay on top of it with parole."

280. A floor officer at the R & R, explained that, as with all of the Reception Centers, "the county is supposed to let us know that a guy has mental health problems. If they don't, we try to pick it up here," through the brief psychological screening they do. The R & R area at North Kern is a large open room, with a semi-circular counter, forming a kind of rotunda area in the center, with several large cells or holding tanks arranged along the perimeter. One of the psychologists, Dr. Murphy, acknowledged the space problems with which the unit is plagued. In fact, the psychiatrist and psychologist who work in the R & R unit must share a converted cell that serves as their office. The area is cramped—there can be two clinicians and two prisoners in it on occasion—so Dr. Murphy prefers to do his interviews at the large counter area in the center of R & R, even though there is a fair amount of traffic and not a great deal of privacy afforded there. He told me that the facility typically receives somewhere between 70-150 new prisoners, five days a week, and that mental health staff does more extensive screening with about 20% of them. When they do, typically "we are blind to detailed medical

information [and] just have what county tells us or what the nurse picks up" from the earlier brief screening that has been done.

281.   At the end of the day, I entered C West Building, a regular dormitory housing unit that housed 200 reception center prisoners in 100 bunk beds. C West dorm is a mirror image of C East dorm. I was also informed that C Yard has two-story dorms in buildings C1-4, which I did not visit at NKSP (but did see the same type of structure the next day during my tour of Wasco Reception Center). I had an opportunity to interview several recently arrived prisoners who had a perspective on what it was like to be recently processed through R & R. (These were prisoners whose names the state's expert randomly drew from the roster in the housing unit.) Because there was no available treatment or office space on the unit, the prisoners agreed to be interviewed at the dining tables in the center of the dormitory, as the other prisoners in the unit looked on. Also, because dinner was about to be served and the tables we were using were needed to feed the prisoners, we were able to interview only a few prisoners.

282.   Prisoner DDD told me he had recently arrived at North Kern and been there for a little over a month. Because he once worked for a sheriff's department in California, he has protective custody concerns. He also suffers from a generalized anxiety disorder for which he was taking Zoloft and Trazadone for 10 years on the streets. This was his first prison term and he said that he was traumatized by what happened to him at the North Kern R & R—the "worst experience I've had in my life." He described being stripped naked at R & R when he arrived, and then being moved to a holding cell where he was finally provided with boxers and left by himself for six to eight hours. Prisoner DDD said he was then placed in a larger holding tank with ten to fifteen other prisoners who were all given mats to sleep on, on the floor of the large cell. He believes he was held in R & R for a total of about 36 hours before being moved into an actual housing unit. "They said they were waiting for beds to open up." It was approximately seven days before he was allowed to take his first shower. Other than showers every several days after that, he said there was no program whatsoever—not even dayroom—in the housing unit where he was kept. Prisoner DDD was dismayed to learn that the medications he had been

taking on the street would not be administered to him in prison. The prison psychiatrist told him that it simply wasn't possible. He complained about the lack of mental health care overall: "There is no one-to-one therapy of any kind, just a meds consultation where they tell you that you can't have what you need." As we ended the interview, he told me, "Aside from wanting to be dead, I'm doing OK."

283. Prisoner EEE arrived on May 9, 2008, and is also a first termer. He told me that he has only a short sentence to do and should be released in about six months. He said it was a shock to come to North Kern, in part because there were so many people, and so many fights in the dorms. (In fact, he said, we had just missed one that occurred in this dorm before we got there.) Prisoner EEE had mental health problems on the streets, where his physician had prescribed anxiety medication for him. He also said he was taking Wellbutrin at the country jail, before coming to North Kern. At North Kern, however, he was taken off Wellbutrin and put on Prozac, which was then changed to Effexor (which he told me he finds more effective). However, he, too, acknowledged that, aside from the brief clinical contact he had with a psychiatrist to review his medications, he has had "no other contact with clinicians," even though, as he said, he "would like to very much." He told me he felt that his anxiety disorder was aggravated by living in the dormitory setting, which has disturbed his sleep and made him feel nervous and unsafe. As he put it, the experience at North Kern is tearing him down without giving him an opportunity to build himself back up.

### (v) Lack of Programming

284. Very little activity and programming appeared to be taking place at North Kern. Of course, such widespread idleness is likely taking a toll on prisoners in general and mentally ill prisoners in particular. As Dr. Hirakawa acknowledged to me: "The Reception Center is locked down most of the time. That's why there's so much acuity—no jobs, they don't know where they are going, and only get yard two times a week."

285. Not surprisingly, the lack of programming and activity was especially evident in the Ad Seg unit at North Kern. I toured the D-6 Ad Seg unit, where the total count in the unit was 157, and there were overflow Ad Seg prisoners on the other side of the unit. The

supervising sergeant explained that their EOPs are supposed to be moved out of this unit and into a hub EOP. Instead, they "often aren't and wait for a while in this unit." According to NKSP's EOP Transfer Log, three of the nine EOPs listed as EOP Ad Seg, were not transferred to an EOP Hub within the transfer timeline of 30 days and have remained in the Ad Seg, for 50 days, 226 days, and 363 days.[363] The cell assignment board in the unit indicated that this side of the unit held a total of 6 EOP prisoners and about 30 who were 3CMS. Although the sergeant did not know offhand exactly who the EOP prisoners in the unit were, or how long any particular one had been here, he did know that the EOPs in Ad Seg were treated a bit differently from the other Ad Seg prisoners (who essentially had no program at all). The sergeant indicated that their policy was to double cell everyone in Ad Seg because of space shortages and the difficulty of finding single cells. However, he said that single cell assignments could be made when there were obvious gang or safety issues involved or, on occasion, when mental health staff intervened.

286.   Prisoners throughout the CDCR have talked about the pressures that are put on them to double cell, even if they feel they cannot handle it, or have a history of having had cell fights in the past. This is true of *Coleman* class members as well as others, despite the fact that their mental health conditions may render them singularly ill-suited to have a cell mate. As it turned out, this issue was underscored by the two prisoners whom I happened to interview next.

287.   I interviewed Prisoner FFF who told me that he is 28 years old, and has been to prison several times before. However, he had never been on the mental health caseload until he came into the system this last time, having been returned to custody for a parole violation. He said that he has been given a diagnosis of bi-polar disorder, and is now taking Depakote and Effexor. His level of care is 3CMS. Although he did not ask for mental health help when he was first processed into North Kern, he ended up getting into a fight and was put on suicide

---

[363] Coleman Pls.' Trial Ex. 159.

watch after that. He told me that he has always had a problem with his anger, and that he had a tendency to "black out" in fights. After his initial fight at North Kern, he served a couple month term in the prison Ad Seg. He was then double-celled and got into another fight—a very serious fight—with his cellmate in which he (Prisoner FFF) was sent to the hospital. After this hospitalization, he was sent to Ad Seg a second time, because of the cell fight, and served an 11-month term. He told me that he was fortunate enough to receive some badly needed mental health contact from the clinician who was assigned to the unit, Dr. Roberts. Unfortunately, this clinical contact terminated when Prisoner FFF was released from Ad Seg. He said that now "I only see my psych every 90 days—I've only seen her once. Also, they insisted on having a CO in the room with us, and I'm not comfortable doing that." In fact, he said, he keeps putting in requests about his mental health status but they keep being ignored. He, too, complained about the overall lack of programming and treatment. Prisoner FFF told me he gets yard twice a week, dayroom on the non-yard days, and has a porter job. Besides this limited time—yard and job—the only time he gets out of his cell is to eat in the dayroom. There is no other formal programming available. "We don't even get phone calls here. Visits last one hour, behind glass." He believes "they are handling people by medicating them, 'here, take this, go to sleep.'"

288.    I interviewed an Ad Seg prisoner, Prisoner GGG who told me he re-entered CDCR in January, 2007, after one prior prison term. He once had been an active gang member and had served more than six years in the Security Housing Units at Corcoran and Pelican Bay. However, he dropped out of the gang in 1998, while he was at PBSP SHU. He explained that he knew that he had mental health problems for a long time but, because receiving mental health treatment was not looked on favorably by his fellow gang members, he did not seek any help. When he got out of prison in 2000, he said "I had a really hard time adjusting on the streets." When Prisoner GGG arrived at North Kern in 2007, he got into a very serious fight with his cellmate. He ended up in Ad Seg and that's where he first asked for help with his mental health problems. However, Prisoner GGG complained about the lack of treatment or programming for 3CMS prisoners at North Kern: "We are lucky if we get 10 minutes of

clinical time or contact. I got put on 3CMS but nothing much changed—no change in meds—they bring you to a cage—you either stand up or sit down, but nothing much happens there." Prisoner GGG acknowledged that 3CMS prisoners also could receive "group" in Ad Seg: "We go into the little room next door, stand in those cramped cages, and watch a movie for an hour. That's our 'group.'"

289.   I was later able to determine that Prisoner GGG and Prisoner FFF had been mutual combatants in the cell fight that resulted in Prisoner FFF's hospitalization and that led to both of them being sent to Ad Seg. Prisoner GGG explained the dilemma for people who are having mental health problems, who may have a history of having cell fights and who, because they are not be getting along with their present cellmate or feel that they need to be single-celled, are at risk of subsequent conflicts: "You get a write-up if you won't double cell. It will hold up your transfer for at least 90 days. They force you to take a cellie, even if you've had multiple instances of cell violence like I have." In fact, both Prisoner GGG and Prisoner FFF were not only on 3CMS status but both said that they have had anger problems in the past. Yet they were celled together, got into a very serious fight where one of them was very badly injured, and they both did Ad Seg time.

290.   While I was at the Ad Seg unit, I went into the "treatment" room at the end of the unit. It consists of a small, cramped room, with three cages arranged inside. None of the cages has seats.  Dr. McNarren told me that they had ordered new cages, ones with seats, a while ago but that "we don't know what happened to them." I was told that individual mental health contacts typically took place out on the unit dayroom floor, also in treatment cages. There were three cages arranged in a row on the dayroom floor, with "privacy screens" or partitions between them that supposedly protected the individual prisoners from being watched by other prisoners in the unit during their counseling session. The unit sergeant told me that he made a point of moving the privacy screens back reasonably far from the treatment cages themselves, to maximize the distance at which the clinician could stand, "in case the prisoner wants to spit on [them] through the cage." One of the prisoners (Prisoner GGG) told me that he felt that the "privacy screens" were superfluous, given the public nature of the sessions

themselves. He said: "I have no idea why they use the screens. Everybody can still hear you, everybody knows who is going behind the screen, so it makes no sense."

### (vi) Overcrowding in Housing Units

291. As I noted above, North Kern was operating at 200% of capacity the day I toured there. Not surprisingly, this level of overcrowding translated into the extensive use of "non-traditional" or "bad" beds—housing prisoners under inappropriate conditions, especially inappropriate for the confinement of mentally ill prisoners. For example, I toured a mainline housing unit at North Kern, A-2, which has makeshift dayroom housing. The floor officer initially indicated that he did not believe there were any mental health caseload prisoners housed there, or perhaps there were just a few. If there were any, he did not know who they were specifically. In fact, when the prisoner roster was checked, we learned that there were some forty-five 3CMS prisoners in this unit alone. There was no program being run for the 3CMS prisoners in the unit itself; instead, the officer indicated that they would be given ducats to go to the clinic, where he thought they could participate in groups. The floor officer also told me that it was definitely harder to supervise a unit with dayroom housing like this. There are "too many people, too much movement on the floor, [and it] also gets hotter because of so many people. Things like showers take longer and so on."

292. I also toured the A Yard gym, a large makeshift gym dormitory that holds some 140 prisoners. This is a unit comprised entirely of working prisoners, including one who is on the mental health caseload. A floor officer told me that he typically did not know whether there were mental health caseload prisoners in the unit or, if so, who they were: "I overhear them talking to a nurse about meds, and then I know." But, otherwise, he would not. However, he also acknowledged that, although it is rare, he does remember that there have been mental health caseload prisoners housed in the gym, sometimes for months.

### (vii) Lack of Beds at Appropriate Level of Care and Delays in Transfers

293. From the very start of our tour at North Kern—from the morning orientation meeting and for much of the rest of the day—we heard about the crisis bed shortages at the

-159-

facility. Chief Psychologist, Dr. Hirakawa told us that the North Kern gets about 100 new prisoners each day, and that nowadays it seems many more of them are coming into prison who need crisis beds. But the crisis beds simply are not available. On any particular day, he said, "we have a census of 6-10 people <u>waiting</u> for a crisis bed... We had to become creative. [You'll] see EOPs, and CCCMSs, Ad Segs in hallways. The reality is that we have no place to see patients. It's a serious problem."

294. In this regard, I toured the CTC trailer at North Kern. It has holding cells in the front that are used for prisoners with special needs, and overflow from the CTC itself. The cells are not suicide proof. The North Kern CTC has 10 licensed MHCBs. Although there were exactly 10 prisoners in the crisis beds on the day we visited, Dr. Schmidt, a psychologist who works in the unit, told me that "I've been here for 10 years. This is the second time I've seen no one in our overflow." He went on to tell me that it was a "big problem" to house the CTC overflow "all the way over in A4," because it limited staff access to them.

295. This general issue—the lack of beds at the appropriate level of care at North Kern—was underscored and illustrated in some of the interviews I conducted with prisoners. For example, while in the D-4 housing unit, I interviewed Prisoner HHH. Prisoner HHH told me: "I need help. I'm 3CMS, have been since 1998, diagnosed as a paranoid schizophrenic." He said that he had been sent to Patton State Hospital in the past, and had two prior suicide attempts. He also was in an outpatient mental health program the last time he was on the streets. Prisoner HHH was returned to CDCR about a year ago and has requested EOP level of care to address increased mental health symptoms. However, the request has been refused. He is currently taking Geodon, although he has taken Remeron, Zoloft, and Seroquel in the past. Prisoner HHH went on to explain that the staff at North Kern "tried to put me in dorms" but that he "got suicidal—I hated it." He is especially concerned about being sent to a dormitory at Corcoran State Prison, which he believes is what is in store for him. But, because he is SNY, he does not want to go there. In fact, he says, he very much wants to participate in groups, to receive some form of counseling or treatment, but feels he is getting nothing but medication here. Because he gets out of prison in November, 2009, he says, "I want to get the help I need."

But it does not appear to be available at North Kern. He indicated that he is still hearing voices, gets paranoid, and "I worry that people are out to get me." Yet, even after he has requested help and explained his problems, "still nothing happens." His "program" at North Kern, as he described it to me, is that, in addition to twice weekly dayroom: "I stay in the cell all the time, except for yard. I go a couple of times a week. That, and TV, and showers, is it."

296. North Kern has also found it impossible to meet EOP transfer deadlines. At the general orientation meeting, staff informed us that they continued to be concerned about the length of time that EOP prisoners were staying at their facility, one that they conceded was not designed to house EOPs on a long-term basis. The mental health staff indicated that the problem was not so much getting the EOPs endorsed for placement elsewhere but rather finding the beds once they were endorsed. The Warden also acknowledged that "we have a lot of them, and it's hard to place [these] inmates." In fact, the prison's own data indicate that 25 of the 66 EOP prisoners (or 38%) at NKSP on July 29, 2008 were there beyond the *Coleman* transfer timelines.[364] More problematic, however, was the fact, that EOPs represented 21 percent of the admissions to the MHCB between May and July 2008, although they are only a small percentage of the overall MHSDS population (on July 29, 2008, only 7 percent of the overall MHSDS).[365] It seems that EOP prisoners who are housed at NKSP without EOP level of care do not fair well. The Special Master found that NKSP's failure to transfer their EOP prisoners in a timely fashion was not due to institutional delays, but rather "attributed to lack of beds around the state."[366]

297. In addition to problems transferring EOPs, the Special Master found that "[a]ccess to DMH acute care was inadequate over the monitoring period."[367] Indeed, Dr.

---

[364] Coleman Pls.' Trial Ex. 159.

[365] Coleman Pls.' Trial Ex. 159, Coleman Pls.' Trial Ex. 160.

[366] Joint Pls.' Trial Ex. 57 at 238.

[367] *Id.* at 237.

Hirakawa told me something that was echoed everywhere I went, namely that "DMH transfers are a real problem. Unless your guy is suicidal, you can't get him in. [He] sits on the waiting list." Dr. Pitts agreed, saying that the backlog for transfer of gravely disabled prisoners was "a real problem. Our gravely disabled patients stay 90 days or so often in the CTC." Dr. Hirakawa said that they have found it very difficult to find any crisis beds elsewhere in the state, and that it is rare for their CTC to have an empty bed: "We often have 10 or even 15, which means we need to go elsewhere."

298. At the CTC, Dr. Schmidt noted that their DMH referrals "used to languish here for 45-60 days," and that this had "gotten somewhat better in recent months." But the referrals were still staying too long—he could not estimate how long—and if they were not suicidal they still "languish a very long time." Staff told us about one patient in the CTC who had been in the unit for a month since he had been referred and accepted in DMH on June 23, 2008, 38 days ago. He was currently number 16 on the DMH waitlist for an acute bed. There were several other patients in the unit who had either been referred to DMH or had extended stays and were being evaluated for an acute referral. Dr. Schmidt noted that "when we put people on the DMH referral list for grave disability, they just don't go, even if they are profoundly disabled or dangerous."

### h. Wasco State Prison (WSP)

#### (i) WSP Overview

299. I toured and inspected and interviewed staff and prisoners at Wasco State Prison on August 1, 2008. The prison staff provided me with charts and data reporting the MHSDS census, the crisis bed census, EOP transfer data including delay factors, and DMH referrals and transfers. On July 30, 2008, the prison population was reported as 5,938, or 199% of its design capacity of 2,984.[368] The prison staff reported to us that the mental health population on July 29, 2008 was 1117 3CMS and 105 EOP and 6 MHCB patients. Wasco's physical plant is

---

[368] Joint Pls.' Trial Ex. 59.