similar to NKSP, with reception center housing on Yards A-D, in a mix of celled and dorm settings. General population prisoners are housed on Yard A and the Ad Seg is located on Yard D. Yard E is a minimum security facility. In addition to the CTC which has 6 designated MHCBs, the clinical staff reported the existence of overflow crisis beds in B-2, B-6 and D-6.

300.   Wasco is faced with a number of serious overcrowding-related problems. As we were leaving the Administration Building, the Chief Medical Officer (CMO), Dr. Michael Songer told me that "we are coming apart at the seems. We don't have enough space to put people, don't have enough space to see them. Plus, we can't hire psychiatrists. We just can't. We can hire psychologists but not psychiatrists. It's a big problem." These serious overcrowding-related issues—lack of clinical staff (in particular, psychiatrists), lack of treatment and programming space, and far too many prisoners—jointly undermine the treatment of *Coleman* class members at this facility.

(ii)   **Shortages of Space for Offices and Treatment**

301.   The Acting Chief Psychologist, Troy Newton told me that he and his staff did not have "anywhere near" enough space to do the things they are required to do for the overwhelming numbers of prisoners for whom they are responsible. The space shortages required all sorts of improvised, makeshift approaches that, in turn, often had unintended consequences or compromised the delivery of services in other ways. For example, the lack of space required them to convert a prisoner holding area into clinical office space. However, the resulting lack of a holding area precluded clinicians from seeing patients in these offices, as they originally had intended.

302.   When Dr. Newton took me to one of the areas where the clinicians are housed, he showed me the converted space, which he said staff referred to as "the homeless shelter." In the individual offices that were located in the same building, several psychologists shared each one of the desks. Each office had only one phone and no computers. Apparently, some computers had been purchased but not hooked up because "we don't have the tech staff" to do it. The space for clerical staff in the clinical office area was also extremely overcrowded. Six

staff members worked inside a very small area, including in a storage closet that had been converted into clerical office space. In Dr. Newton's opinion, mental health staff at Wasco need "2 or 3 more buildings" equivalent in size to the two trailers they now occupy.

303. I toured the RC EOP "mental health clinic." The room is reasonably large and certainly appropriate to accommodate group therapy or counseling. However, the psychiatric technician in the clinic at the time, Ms. Bell, explained that "this is the only room we have for group." With over 90 EOPs, "there can be 20 guys in here at a time—it's not unusual for the room to be jammed." She also said that the staff tries to run an active EOP group program but that sometimes the groups have to be cancelled because of workload issues. Although "group is a priority," she has a number of other responsibilities that prevent her from doing more groups, and sometimes interfering with those that are scheduled. For example, she noted that she had to cancel some of her groups the week before—"I didn't have enough time and had too much [else] to do"—and that no one had been able to cover them. There are only two psychiatric technicians "for 90+ EOPs—we have to walk all over the place because they are all over the facility. It takes forever to see them." The psychiatric technician supervisor who came into the clinic as we were leaving confirmed that "it's really hard to do rounds with 91 EOPs."

304. Wasco's CMO, Dr. Songer, discussed another overcrowding-related problem with me. He told me "at times it's overwhelming in these suicide watches— 12 outside the CTC—we can't oversee them. There are too few places in the state where we can find crisis beds. The [local] hospitals won't accept a non-acute medical patient anymore, we don't have any way to create space." He indicated that there have been times in the past when every bed in the CTC was filled with MHCB prisoners. Moreover, he talked about tensions with custody staff and their inability or unwillingness to provide escorts for prisoners with mental illness and medical needs who must be transported throughout the prison to receive proper care: "People are ducated and they just don't get there. It's frustrating as hell." He indicated further that this was a "huge" problem for the EOPs at Wasco. He acknowledged, as Dr. Newton had earlier, that space continues to be a serious problem at the prison. Mental health staff does not have enough space for clinicians to see their clients. They have to go on the units to do so, but even

-164-

this is cumbersome, with custody staff not necessarily always willing to facilitate their contact in the units.

### (iii) Overcrowding in Housing Units

305. I toured the A Gym, a large three-level bunked makeshift dormitory housing unit that, according to the floor officer, currently housed 107 men. It suffered from the same kind of degraded environmental conditions and potential security problems as the other makeshift gym housing units I have seen in different CDCR facilities. The floor officer noted that, although she was not sure whether there were any 3CMS prisoners currently housed in this unit, some certainly had been in the past. She told me that even though an effort is made not to retain prisoners in this housing unit any longer than necessary, at least one prisoner had been housed there since February—a period of some six months. When I asked about the challenges she faced working in this unit, she told me "it is a hard place to oversee. We have a gunner, but it's hard to see everything and it gets hot in here a lot," so prisoners sometimes have a difficult time. When she or other officers notice that a prisoner "can't handle it," they call mental health to arrange a visit.

### (iv) Lack of Beds at Appropriate Level of Care and Transfer Delays

306. I toured one of the Reception Center housing units, B-2(B). One of the floor officers in the unit, explained that this unit housed "a little bit of everything, including EOPs, SNYs, *Armstrong* class members, DDPs, and Suicide Watch overflows." There were 13 men living in makeshift triple and double bunks, set out on the dayroom floor, directly in front of the unit television on the wall. He acknowledged that EOP prisoners could be housed in these open bunks, depending on their circumstances—"I have done it lots of times." As I found was true of most of the units in the various prisons I toured, however, the officer did not know offhand how many EOPs he presently had in his unit, and he was not at all certain of exactly who any of them were: "We don't have an open list and I don't know." He indicated that a number of groups were held in the housing unit. However, they were conducted at the fixed

-165-

metal tables on the dayroom floor, ones that he said were open to everyone in the unit, regardless of their mental health status.

307. I asked the Unit Sergeant about the suicide watch cells in the unit. He told me: "I don't think it is a good idea to have suicide watch cells in here. This is not set up for it. But the prison wrote the procedure and we have to follow it. On a bad day, we have had as many as ten suicide watch inmates here; we've had them for several days at a time. After three or four days, they take them to CTC." Dr. Newton added at this juncture that: "We are in desperate need of more CTC beds. This suicide watch procedure is dangerous. It's only a matter of time before someone kills [him]self."

308. Wasco officials indicated that they regularly contact the Health Care Placement Unit in Sacramento for assistance in placing prisoners in a mental health crisis bed when their CTC is full. For example in April 2008, the prison referred eight prisoners for MHCB placement because their MHCBs were full. However, none of these referred patients were transferred.[369] The four EOPs who were referred for MHCB placement were eventually returned to their housing unit after waits of up to seven days.[370] Similarly, in May 2008, the prison referred seven EOP and one 3CMS prisoner for MHCB placement system-wide, but none were transferred.[371] Four of the EOPs were eventually admitted to the crisis unit at Wasco.[372] In June 2008, it appears that neither of the EOPs referred to HCPU were transferred to an MHCB system-wide during their waits of 9 and 19 days before they were admitted to the

---

[369] Coleman Pls.' Trial Ex. 133.

[370] *Id.*

[371] Coleman Pls.' Trial Ex. 134.

[372] *Id.*

NKSP MHCB.[373] The CTC Overflow table provided to me on the day of my site inspection lists 18 prisoners, including 13 EOPs, with lengths of stay ranging from 2 to 24 days.[374]

309. The Special Master confirmed that the use of holding cells pending MHCB admission was problematic at Wasco: "Lengths of stay often exceeded four hours ... [a]lternative holding cells were utilized frequently, and for prolonged periods of time in many different settings throughout the institution. There was no indication that the CTC was used as the priority setting. Documentation revealed suicide watches conducted in the CTC, holding cells, administrative segregation, and R & R. Records showed at least 134 uses of alternative cell placement in a six-month period, including several prisoners with multiple admissions. One quarter of the prisoners in the alternative settings were held on suicide watch for three to nine days."[375]

310. In the D-6 Ad Seg unit, the housing officer showed me the modifications in the cells where prisoners on suicide watch were placed. The cells have solid doors (unlike the standard Ad Seg doors in this unit, which have perforated cell coverings with Plexiglas placed over them), and concrete bottom bunks, to prevent prisoners from getting under them. All of the windows were painted over ("to prevent communication" but also precluding any view of the outside world). One of the offices in this part of the Ad Seg unit is used for "groups" and three treatment cages had been placed inside the room. The officer indicated that he had about 13 or so EOP prisoners in his unit and "a lot of 3CMSs." Although the EOPs were getting groups, in the cages mentioned above, the 3CMS prisoners were limited to psych tech rounding contact.

311. Dr. Newton also noted that, because of the shortage of appropriate beds where prisoners with similar needs could be housed in one centralized location, "EOPs are being put

---

[373] Coleman Pls.' Trial Ex. 135.

[374] Coleman Pls.' Trial Ex. 161.

[375] Joint Pls.' Trial Ex. 57 at 217.

in with SNY's and PCs, which put stress on all the groups." In addition, he noted, "we get people here who really should be in mental hospitals." Wasco has six licensed MHCBs and they convert other beds in the CTC to MHCBs as needed. As Dr. Newton noted, however, the problem is that they only "have staffing for the six licensed beds," without any additional staff allocated for the "overflow," which can be substantial at Wasco. In fact, I was told that it was not uncommon at Wasco for them to have as many as 12 or 13 overflow crisis beds in use, and "we have had as many as 20-21," despite not having the staff "to cover that the way we should." All of the MHCBs in the CTC were full the day I visited Wasco, and there were at least six mentally ill prisoners in "overflow" beds located throughout the facility.

312.   Inside the CTC itself, there were complaints from staff that that the delays in obtaining DMH beds continued to back up the use of MHCBs at the facility. As one of clinicians put it, "I've heard it before that the DMH referrals have been improved but nothing changes." In fact, there were a number of prisoners in the CTC who had been there for a considerable period. One prisoner had been in the CTC for 102 days, awaiting a transfer to the appropriate DMH facility. Despite this long-term retention of mentally-ill prisoners, the CTC is not able to offer them regular therapeutic or treatment groups. In fact, the first group that staff could remember being conducted there in a long time had been held the week before.

313.   We encountered one particular tragic case as we passed through the Wasco CTC. I saw a prisoner lying down in one of the cells near the entrance to the unit. We were told that he had been in the CTC for a very long time. I asked to interview him. Inmate III was brought to an area in the CTC that is used for IDTT and that doubles as clinician office space, and talked with me. Mr. III, is a 49 year-old prisoner who has had one leg amputated just below his knee (the result of being shot by prison staff at Tehachapi) and he requires a wheelchair for mobility. He confirmed that he had come to the CTC at Wasco approximately 102 days ago. He told me that he was picked up on the streets for soliciting a prostitute and, because the prospect of returning to prison for a parole violation was so overwhelming, he attempted suicide by slashing his wrists and throat. By all accounts, it was a very serious

suicide attempt. After a few days of hospitalization, Mr. III was transported to Wasco as a parole violator.

314.   The severity of his suicide attempt resulted in his immediate placement in the CTC, some 102 days ago. Although obviously in need of a higher level of care than could be provided in the CTC, Mr. III was held there in part because he had "appealed his parole violation" (and DMH would not consider him for transfer until that issue had been resolved). However, his hearing date was postponed because the Wasco clinical staff had determined that Mr. III's precarious mental health status required that a nurse accompany him on the trip to Fresno (where his parole violation hearing was to be held). Unfortunately, the prison lacked any available staff for this purpose. Because his hearing was delayed, his transfer to DMH or another more appropriate facility was postponed indefinitely and he remained in his MHCB cell in the CTC. I later learned that the hearing was apparently held on July 18th, and Mr. III's transfer is now imminent.

315.   The conditions of Inmate III's confinement during this 102-day waiting period were abysmal. The MHCBs lack furniture so, for more than three months, Inmate III lived his life—slept, ate, and otherwise just sat—literally on the floor of his barren cell. In addition to his amputation, Inmate III indicated that he has four artificial disks in his spine, so that being forced to live on the floor was physically very painful as well as degrading. As he put it, "I'm a wreck, physically and mentally." He told me that about three weeks ago a correctional officer took pity on him and provided him with a thin mattress to sleep on; he asked for a pillow too but this request was denied. During his hundred days in MHCB, Inmate III was clothed for this time in a standard smock and was required to eat from a paper plate, without any utensils, even plastic ones. He told me that he tore off a piece of the paper plate to use as a makeshift spoon because he did not want to be forced to eat with his hands. Because his amputation made it impossible for him to walk, he was forced to "scuttle" when he wanted to move around in his cell and he showed me the calluses on his knees from this practice.

316.   Other than routine cell front check-ups from mental health staff, and an occasional visit from the recreational therapist who comes by the unit to see all of the patients

there, Inmate III received no regular individual or group therapy while he was confined in the CTC. He said that he had never been taken out of his cell for mental health treatment of any kind; the staff "tell me that's not their job—just [do it] through the door." Because of his MHCB status, he also could not have social visits from outside the prison or receive canteen. A brief review of Inmate III's records in the CTC confirmed the basic facts that he relayed to me.

### (v) Reception Center Problems

317. Wasco State Prison serves as one of the Reception Centers for intake into the CDCR for prisoners from a number of areas in Southern California. I toured the Receiving and Reception ("R & R") area of the prison, which is laid out virtually identically to the North Kern facility visited the day before. However, I was told that the Wasco R & R receives a larger percentage of parole violators compared to North Kern. I talked to a contract psychiatrist, Dr. Christina Golden, who was assigned to R & R at Wasco. She told me that she shared office space on the unit with a nurse, so typically tried to conduct more or less confidential psychiatric evaluations with prisoners by sitting outside the bars of the large holding cells where they were kept. She was very candid about the consequences of overcrowding and the lack of appropriate bed space at the prison, in particular at the CTC: "We do the best we can, but we put people in overflow all the time. We're desperate for beds."

318. In her view, the situation certainly had not improved recently: "In the last two weeks, custody has been pulling its hair out because they do not have beds anywhere." Dr. Golden was equally candid about the challenges faced by clinicians who are doing screening in the R & R: "We don't really catch all the people who need 3CMS and EOP that come in—the psych screening is so brief. I don't really have records. [I] never have them before I see [a prisoner]. I've never seen a doctor's note or history on the courts' record—never—I just have a medication record—the rest is my clinical judgment."

319. Dr. Golden also told me about a prisoner, Inmate JJJ, who entered the facility the day before, and whose case she thought illustrated some of these problems. Inmate JJJ had come in the day before acting strangely and was identified by custody staff as needing immediate psychiatric attention. She interviewed him, without any paperwork that might have

-170-

indicated his medication needs or prior mental health history. She immediately determined that he needed to be put on suicide watch in an appropriate MHCB. However, she also knew that this might be difficult to arrange. He was moved to a "dry cell," on the floor of the R &R unit, to await transfer to an MHCB. However, instead of being moved to an MHCB that day, where they could care for him, as he should have been, she said, Inmate JJJ remained in the holding cell in the R & R today. She told me, with much concern: "I just saw him. He shouldn't be here. A custody person has had to watch him." Then she added: "We are struggling here, trying to provide decent psychiatric care in a place like this, but it is really hard."

320.  When I went to look for Inmate JJJ, I found that he was being kept in a separate cell off the main rotunda area of R & R. There was blanket on the floor, but no bunk, mattress, toilet, or sink in the cell. Inmate JJJ was standing straight up in the middle of the cell, almost at attention, dressed in a suicide gown; he had urinated on the floor. A nurse's assistant, who was sitting outside his cell, holding suicide watch, confirmed that he had been like this for quite a while. Inmate JJJ had a fixed gaze and he would not make eye contact. He appeared to be completely unresponsive, virtually catatonic. The nurse told that he had been standing more or less motionless for hours and that, in fact, he had been in exactly this state when she had left him the day before: "his behavior hasn't changed." He clearly had not eaten—the food tray that sat on the bench behind him did not appear to have been touched. As I was trying (unsuccessfully) to talk with Inmate JJJ, and asking the nurse about his case, the mental health staff members who handle the CTC overflow showed up for the first time. When they arrived, Dr. Newton indicated to me that the "overflow staff should have been in to see him last night." The psychiatrist explained that, unfortunately, they currently had "no place to put him; we'll have to move someone" in order to make room for him.

321.  When I discussed Inmate JJJ's case with the Lieutenant, who oversees R & R, he acknowledged the serious challenges his staff regularly faces in R & R. For one, he told me, they do not often have much information about individual incoming prisoners when they come off the bus. "When parole violators come in, there is no information with them. [The paperwork] says, 'parole hold,' with a picture of the guy and where he's from." So the prison

staff has to do their mental health and other assessments essentially from scratch in most cases. In Inmate JJJ's case, the Lieutenant recalled that "he was basically catatonic when he came in." We determined from examining the unit logs that Inmate JJJ had been processed in at 1330 hours the day before. Thus, he remained in a catatonic state, standing in a bare holding cell, awaiting a transfer to an MHCB, for nearly 24 hours. He was still there when we left the unit.

### (vi) Profoundly Mentally Ill Prisoners Receiving Little or No Treatment

322.    One of the most unsettling consequences of the profound level of overcrowding that plagues the CDCR facilities that I have inspected is the frequency with which seriously mentally ill prisoners are being consigned to "back ward" type housing units where they are subjected to extremely harsh conditions of confinement and receive little or no genuine mental health care. Despite the good intentions of many of the clinical and custody staff, there are simply too many of these prisoners to be cared for properly under these conditions and they end up figuratively lost and hopeless in the system. I interviewed several of these prisoners at Wasco.

323.    I conducted interviews with several prisoners in the D-6 Ad Seg unit, in an office space on the other side of the housing unit that also contained treatment cages and was used for EOP "groups." The first prisoner, Prisoner KKK appeared to be profoundly psychotic. He was extremely confused and disoriented, and answered each of my questions with a stream of consciousness that was mostly impossible to follow. Prisoner KKK was able to focus only momentarily, but then his answer dissolved into a floridly psychotic speech that included the assertion that he was a member of the CIA, an "Alpha Omega," and that he was being asked "to prosecute the state of France." Among other things he was able to tell me that he thought he had been at the prison for about two months, knew that he currently had a cellmate, and had been to Patton State Hospital in the past. He said he was not presently taking medications, and did not know when he would be getting out of prison or Ad Seg.

324.    Dr. Newton later told me that he was troubled to hear about Prisoner KKK's serious psychosis and the fact that he'd been in Ad Seg for many months. He indicated that,

given the seriousness of his mental health problems, he "should be treated." When I inquired further about Prisoner KKK's status, the unit staff said they thought he was in a situation similar to Prisoner III —that is, that he could not be transferred to DMH until his parole status was resolved.

325.  The next prisoner, Prisoner LLL also appeared to be psychotic, but not as floridly as the previous prisoner. Prisoner LLL told me that he was 34 years old, an EOP prisoner who had been in Ad Seg for about 5 months, and was currently taking Risperdol and Depakote. He said that he had been to a number of state hospitals, including Patton, Metropolitan, and Atascadero, and believed that he was on the waiting list for DMH or Salinas Valley. He told me what his life consists of in Ad Seg: "I masturbate, draw, and read…" He acknowledged that "it's hard in here because I have no money, [and] can't get canteen. I got a bag of chips last month. It was great, delicious," he said, wistfully. Because of "problems with cellies in the past," he said, he is single celled now, and also goes to the yard by himself. Prisoner LLL said that he has a history of multiple self mutilations and three or four suicide attempts. He still thinks about suicide.

326.  I interviewed another Ad Seg prisoner in D-6, Prisoner MMM. Prisoner MMM is an EOP prisoner who has been waiting at least six months at Wasco Reception center to transfer to an EOP program.[376] He originally was returned to custody on a parole violation, but because of a cell fight, he was now facing more serious charges and did not know when he would be released. He said that his mental health problems began in 2004, during an earlier term of incarceration, after he had been beaten up by a group of several other prisoners and rendered unconscious. Apparently, he began to have delusions after that and, as he put it, "just lost it." When he returned to prison the last time, he was placed on EOP status as well, diagnosed as suffering from schizo-affective disorder, but was housed with another prisoner who was not on the mental health caseload. They did not get along and it precipitated the cell

---

[376] Coleman Pls.' Trial Ex. 162.

fight for which Prisoner MMM now faces new charges. He acknowledged that the EOP program had improved some since he had been placed on it many years ago, when there literally "was nothing." Nonetheless, this EOP prisoner has been delayed in his transfer to an EOP program well beyond the required 60 days.

327.    I attempted to interview another Ad Seg EOP prisoner, Prisoner NNN. Because he refused to be escorted out of his cell by officers, I tried to speak with him cell front. It was impossible to do so. Prisoner NNN is an older prisoner who was disheveled, unkempt, and very troubled on the day I tried to interview him. He spoke a constant stream of words, as he sat on the top bunk in his cell and, although it was extremely difficult to hear him through the Plexiglas covering on his cell door, he seemed very upset and totally incoherent. One of the floor officers on the unit told me that he does this all the time—that is, he sits atop his bunk and talks constantly but incoherently to anyone who comes by. The officer said Prisoner NNN never comes out of his cell, does not go to yard, and he was not sure whether he ever showered. I was told that Prisoner NNN had refused to sign the conditions of his parole when he was last released from prison, which resulted in his parole being immediately violated. This EOP prisoner arrived at the reception center on November 28, 2007, but no explanation was provided on the prison's EOP log for his transfer delay of more than seven months.[377]

328.    At the end of the day, I conducted interviews with three additional prisoners, outside of the Ad Seg unit. Prisoner OOO paroled out of Wasco Reception Center on June 24, 2008, while he was waiting to transfer to the DMH program at SVPP.[378] He returned to Wasco RC on July 3, 2008, as a parole violator, only 9 days later. He is currently an EOP who said he was taking Effexor and two other medications whose names he could not remember. Prisoner OOO seemed very well oriented and coherent at first, expressing his desire to be taken off the mental health caseload and to no longer be given medications. However, as our conversation

---

[377] Coleman Pls.' Trial Ex. 162.

[378] Coleman Pls.' Trial Ex. 163.