proceeded, an elaborate set of delusional beliefs eventually emerged. He told me he had become suspicious and "paranoid of the COs in here, as well as the other inmates." As he continued, he described a set of personal concerns that involved underdeveloped genitals, other inmates and people on the streets who threatened and berated him because of this anatomical problem, and voices that told him to engage in homosexual acts and threatened him with gang rape. He said that when he tells the voices that they are not making any sense and that he wants them to stop, they simply get louder. Prisoner OOO was adamant that these experiences were objectively true, and was so frustrated by mental health staff member's suggestions that they might not be true, that he no longer wanted to see any clinicians. Prisoner OOO remains housed at Wasco State Prison without access to EOP or DMH level of care for which he was referred and accepted months ago.

329. Prisoner PPP told me that he had come into CDCR in 1996 and subsequently had a number of short recommitments, due primarily to parole violations. He had been hospitalized in state mental hospitals in the past, including Atascadero for five months (during which time he was declared an MDO), and several others in Oregon, Washington, and California. He said that he was diagnosed with schizophrenia, and bi-polar, schizo-affective type. He takes Abilify and another medication for his anxiety. Prisoner PPP was placed on EOP status several years ago, and was an EOP prisoner when he returned to Wasco about 21 months ago. He was referred and accepted at DMH's program at SVPP on February 11, 2008, and is listed as #43 on the waiting list for a bed.[379] He has had many problems with his cellmates in the past, and gotten into fights with them. As a result, he has been on single cell status for approximately 14 months. However, he believes the social isolation is having an adverse effect on him: "I am finding it hard to talk to people—I feel like a vegetable." Although he tries to go to groups, he finds that he sometimes does not feel comfortable around others and has to return to his cell. Prisoner PPP said that he hears a single voice talking to him

---

[379] Coleman Pls.' Trial Ex. 163.

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[248286-1]

frequently; he acknowledged that it was talking to him in the course of our interview. He told me that he was referred to DMH about four months ago, but has continued to wait for his transfer to occur. He has been to the CTC here several times, for suicide attempts, and is eager to receive the treatment he hopes will be provided at a DMH facility. He said: "I got a lot out of Atascadero. I'm a program guy. I did a ton of programs there." But there are very few useful programs at Wasco. Prisoner PPP told me: "I've been here almost two years, getting stagnant. EOP 'program' here is only an hour and a half a day, at best. What do you do the rest of the time?" Although the groups here do serve the purpose of getting you out of your cell, he said, they mostly consist of watching movies. "I am just losing my mind here. I know I'm mentally ill, but I'm not getting better in here. I am becoming a vegetable in here." In Ad Seg, he noted, the situation was much worse. Despite being a "program guy," he had a hard time with the cages: "I couldn't handle the cages. I never got my head right in there."

330.    The next prisoner I interviewed at Wasco was Prisoner QQQ, a 24-year old man from Bakersfield who told me he had a 10th grade education. Prisoner QQQ said he was an EOP prisoner, diagnosed with schizophrenia, and hears voices that have been talking to him since he was about 11 years old. He was somewhat disoriented during our conversation and had difficulty remembering things (such as how long he was at his present institution, or the process he underwent when he first entered Wasco). The voices he hears bother him all night, so he cannot sleep. This means that he is often sleepy all day, too sleepy to go out to the yard. Prisoner QQQ has been to the CTC because he was going to hurt himself—something he told me he has done a number of times on the street, but he cannot remember when or how long he stayed there. He is waiting for a transfer to another prison—he thinks it might be Mule Creek, but is not sure of this. He appeared to be very psychotic and very depressed. Prisoner QQQ indicated that he will be released from prison in about a year. Prisoner QQQ was referred and accepted to SVPP on April 23, 2008, and is #107 on the waitlist.[380]

---

[380] Coleman Pls.' Trial Ex. 163.

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[248286-1]

331.    Finally, I interviewed Prisoner RRR, who was very concerned about being placed in jeopardy for talking with me. He was convinced that some of the staff at Wasco were out to get him and that he was at risk. Prisoner RRR is a long-term prisoner in the California system, having done some 18 years in prison, and a total of about eight years in the SHU (at Tehachapi and New Folsom). He has been taking psychotropic medications for 25 years, and currently suffers from Hepatitis C, and is an SNY prisoner. He has heard voices in the past and, although he is classified as a 3CMS prisoner now (taking Zoloft and Zyprexa), has been on EOP status a number of times in the past, including being subjected to Keyhea orders. Prisoner RRR reported mental health problems because "I get no treatment in here—just meds—the psych tech doesn't even come by my door. They haven't offered me <u>any</u> groups... I get out in two months. They haven't helped me at all. I asked and was told that they don't have the resources here. But I've been in prison almost 15 years straight and I am going to have a hard time back on the streets." Prisoner RRR is due to be released from prison at the end of September.

### 3.    General Observations About the Impact of Overcrowding in These Facilities

332.    Below I summarize some of the numerous overcrowding-related problems that I encountered on these tours and interviews, ones that I either saw directly, heard staff members describe, or about which prisoners repeatedly and consistently complained.

#### a.    Backlogs Due to Overcrowding

333.    There are troublesome and potentially dangerous backlogs at virtually every critical juncture in the mental health delivery system, whether they involve the flow of critical information (such as the forwarding of medical and mental health records), delays in the time it takes to make appropriate referrals and to transfer prisoners to their proper destinations (where they would receive badly needed care and treatment), or the speed at which mentally ill prisoners are removed from inappropriate housing and units (whether they are Ad Seg, "bad beds," or holding cages). For example, a correctional counselor at CIM told me candidly that "the transfer process is not working as well as it should" and estimated that it was taking as

many as 120 days for EOPs to move through the classification process and be sent to their proper destination. Other professional staff told me that they have "had EOPs in Ad Seg on my caseload for months. I know I'm not supposed to but I do." The same person later told me that "I've had EOP guys in Ad Seg for 6 months or more."

334.    These comments and my observations are representative of a system in overall crisis, one that cannot meet the court-mandated and agreed upon mental health transfer timelines. For example, in CDCR's monthly summary of mental health crisis bed referrals and transfers from the Chief of the Health Care Placement Oversight Program, Rick Johnson,[381] for June 2008, there were a total of 355 MHCB referrals of which only 52 were actually placed. A large number (303, or 85%) of referrals were "rescinded" by the referring clinician before Health Care Placement Oversight Program staff could locate an empty mental health crisis bed within CDCR. Approximately one-third of those rescinded were ultimately placed in a crisis bed at the prison where they were housed. However, over a third of the prisoners referred to an MHCB (114/303) waited an average of more than a week (8.46 days) before their referral was rescinded.[382] Those 52 prisoner/patients who were successfully transferred to an MHCB in another prison spent an average of nearly 10 days (9.33) awaiting transfer; with 40 days as the outer range for days waiting to transfer. Only 5 prisoners, less than 2% of those referred, were transferred to an MHCB within the required 24 hours.[383]

### b.    Staff Shortages

335.    Every facility I visited suffered significant staff shortages of some kind—ranging from significant shortages of custody staff to a drastic shortage of psychologists, to the overuse of contract psychiatrists. In various ways, serious staffing shortages all translate into inadequacies in the mental health delivery system and, in some instances, an outright denial of

---

[381] Coleman Pls.' Trial Ex. 135.

[382] *Id.* at 8.

[383] *Id* at 2.

needed and mandated mental health services. In many of the units this means that professional staff are doubling up on duties, performing more tasks than they should be called upon to handle, and managing far larger caseloads than is appropriate or effective. One psychologist at CIM told me "I can't keep up with everything. I've been doing too much. We hired new staff, but that hasn't helped." He also told me "in my opinion, we are doing about 50% of what we should be doing."

336.    The CDCR June 2008 system-wide staffing data corroborates what I saw and heard at the individual prisons I toured. With 440 mental health vacancies system-wide, representing 24% of the overall positions, more than 206 psychologist and 88 psychiatrist positions were vacant in June 2008.[384] A total of 80 of the psychologist and 38 of the psychiatrist vacancies were covered by registry, leaving significant missing staff in these critical positions.[385] Of perhaps greater concern is the revelation in the Special Master's review of the long-awaited workload study that CDCR's 2008-09 staffing requests (based on the workload study numbers) significantly underestimated the staffing needed to implement critical portions of the *Coleman* Program Guide requirements (for example, the EOP Ad Seg program, the RC EOP program, the RC EOP pre-release planning component and so on).[386] Furthermore, key tasks were omitted when determining staffing workloads, including central file reviews, frequency of case manager contacts, psychiatric review of the medical records and so on. Finally, there were concerns expressed about key assumptions provided to the researchers upon which they based their calculations (including, for example, that only 30 percent of the 3CMS population were taking medication, although the actual percentage is approximately 80 percent.).[387] CDCR has now been tasked with revising the workload study

---

[384] Coleman Pls.' Trial Ex. 91.

[385] *Id.*

[386] Coleman Pls.' Trial Ex. 64.

[387] *Id.*

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[248286-1]

calculations with the Special Master's critique in mind, to conduct reviews of the staffing needs twice a year, and to involve the *Coleman* experts in the process. Once the more accurate staffing needs have been calculated that provide for the implementation of the *Coleman* Program Guide, a more valid staffing augmentation can be determined for each prison, along with a calculation of the additional treatment and office space that will be needed to accommodate the much expanded clinical teams. In short, however, the actual clinical and custody staffing necessary to provide the mental health care required by the *Coleman* Program Guide is significantly greater than the existing budgeted levels; yet defendants have been unable to recruit and retain staff even to meet the budgeted levels. In my opinion, the serious deficiencies in office and treatment spaces I observed throughout the system are themselves an obstacle to ever achieving appropriate clinical staffing. The working conditions are terrible and there is no space, in any event, for more clinicians.

### c.    Space Shortages

337.    Although the specific kinds of staff shortages varied from place to place, and some facilities reported having nearly all of their budgeted positions filled (at least in one or another clinical category), shortages in space were widespread, generic, and severe. Each one of the facilities I toured was short of significant amounts of space needed to perform otherwise critical tasks and responsibilities. The shortages of offices were perhaps most obvious at (but certainly not restricted to) those facilities fortunate enough to have even near their allotted number of filled staff positions. And every prison had inadequate space in which to conduct treatment. In some units, prisoners had to be transported to other parts of the prison for treatment—a time consuming and custody-staff intensive practice—because, as clinician after clinician told me, "we don't have any program space here at all." Even in facilities that had added new clinical staff to handle the mental health caseloads, space was at a premium. For example, the chief psychologist at VSPW told me that they expected their newly hired staff to increase the number of groups they could offer and reduce the long waiting lists but, "as far as space, we are literally crawling all over each other... We've been going through the prison inch by inch, looking at storage rooms, anything that is possible to use for mental health

-180-

space." Indeed, clinicians and mental health clerical staff were literally operating out of converted visiting rooms, closets, and storage rooms. Storage spaces, benches sitting out in the middle of open dayroom floors, and chapels were being used as clinical "treatment" areas. Another clinician told me, "we don't have space to have the confidential contacts we need," and that fact was clearly and repeatedly evident in every facility I toured. These kinds of complaints were echoed again and again by staff members at every prison I visited.

338.    In many of the units I toured, the critical shortage of treatment space meant that prisoners were forced to draw unwanted, embarrassing, and potentially problematic attention to their mental health status, as they were taken out of their cells or from their housing units, sometimes to participate in group or individual counseling in full view of the rest of the prisoners on the unit. As one mental health staff member told me, many of the groups were being underutilized because "prisoners don't like the stigma."

### d.    Lack of Meaningful Activity and Treatment

339.    Idleness has increased at all of the prisons, presumably due to overcrowding and the fact that there are too few programming activities, jobs, escorts, and treatment opportunities for the number of prisoners at each prison. In some VSPW units, for example, women told me that they used to get out of their cells twice a day for programming, but that has now been cut to just once per day. Everywhere I went in the prisons I visited, most of the prisoners were in their cells during most of the day I was at the prison. The one exception to this was Mule Creek, where several of the large outdoor yards were being put to good use. But even there, prisoners complained widely about the lack of adequate programs (as opposed to recreation) and the content of the programs they were provided. And, in any event, the prisoners at the other facilities did not fare nearly as well. In literally every prison I visited, large numbers of prisoners, many of whom were on the mental health caseload, were sitting or milling about, with no programs or activities in which to participate. This was most striking in the makeshift dorm or dayroom housing units—or the bizarre "caged-in" dayroom dorms at CIM—where a hundred men or women at a time were sitting atop or standing around their double or triple

bunks. But it was true of the celled housing units as well, where there was typically little or no inmate movement or meaningful activity in progress.

340.    And the enforced idleness is even more profound—almost total—for the mentally ill prisoners who have been placed in the Ad Seg and SHU units. One CIM prisoner's comment was typical of what I saw and heard. He told me: "I just lay on my bunk all day long. That's all I do. I have group on Wednesday and Fridays—about how not to be depressed. Nobody else goes. You have to sit in a cage, with your handcuffs on. But I go for something to do. I am the only member of my 'group' sitting there in the cage." The numbers of such *Coleman* class members living under these severe conditions is substantial and periods of time that they spend there quite substantial. For example, the Health Care Placement Unit Information Report (dated June 20, 2008) shows that at SATF alone there are approximately 50 CCCMS prisoners who have been housed in Ad Seg for more than 200 days, several for over 1000 days.[388]

341.    In addition, the content of the therapy groups I observed or learned about in many of the units was frankly questionable. Many of the groups appeared to serve little more purpose than to get the prisoners out of their cells (not an insignificant goal, but hardly psychotherapy for seriously mentally ill prisoners). Thus, I watched two Ad Seg EOP prisoners at CIM stand side-by-side in their treatment cages for "group"—which consisted of watching the film "Mission Impossible." At another prison, *Coleman* class members told me they had recently watched "The Mummy" in one of the "group therapy" sessions. In fact, numerous prisoners told me that their groups consisted of little more than watching movies, and that they participated largely because this was one of the only ways that they could get out of their cells, however briefly and infrequently.

342.    Indeed, many of the prisoners I interviewed complained about the lack of real treatment at the prisons where they were housed. Although some said that they were getting

---

[388] Coleman Pls. Trial Ex. 57 at R10-14, R10-15.

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH
[248286-1]

contacts with the clinical staff (a number did not), they nonetheless felt that little was being done to truly help them with their mental health problems. In addition, however, a uniformly expressed complaint on the part of prisoners who were nearing release dates was that they had been given little or no preparation for their return to free society. One told me, "it's difficult to come into prison to begin with. But my mind has been off, and I haven't been thinking about reality, and still I got no real help here. So I'm trying to help myself, and I am proud of myself for doing that."

343.   Numerous prisoners complained about waiting to be transferred out of the reception center or waiting to go to another more appropriate program than they had been cleared for, and never being told why they were forced to continue to wait or when they would get the help they needed. And a very large number voiced complaints about their medication—for example; being abruptly taken off medication that they felt was effective, or being given heavy doses of medication that had such adverse effects that they stopped taking it.

### e.   Use of Holding Cages

344.   The use of holding cages is rampant throughout the CDCR. Prisoners are kept in holding cages when they are awaiting transport or escorts, when they are waiting to see medical or mental health staff and, for some of them, when they are supposed to be receiving individual counseling (even in cages that sit inside a clinician's office) or participating in "group therapy" sessions (inside cages that are arranged in semi-circles). Some of the cages are small, many are in disrepair (with paint peeling in them), and most of them are dirty. Many of them lack seats, so that prisoners must engage in "group therapy" standing up, or a prisoner who may be in crisis and awaiting transport must manage to remain upright until his escort arrives. In the hallway outside the infirmary at CIM an officer told me that they try to keep the prisoners who are waiting to see a nurse or doctor—and who, therefore, presumably have some sort of medical problem—"in the small cages no more than 4 hours." Inside the infirmary at CIM, a large group of about 10 Sensitive Need Yard prisoners or "SNY" (those who need to be separated from other prisoners because of special vulnerabilities or for other reasons) were

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

sitting and standing together in a much larger cage—but still clearly a cage—waiting to receive medical help.

### f.    Overcrowded Housing Units

345.    As I mentioned earlier, many of the housing units in the prisons I visited almost defied description, and ranged from uncomfortable to uninhabitable. It should be noted that the so-called "bad beds" are pervasive in the CDCR; I myself literally saw many hundreds of them in my tours of just eight prisons. Even the prisoners who are housed in traditional cells have been double bunked in cells designed for one. One CIM prisoner told me that he has to lift his legs up whenever his cellmate uses the toilet in their small cell, because his legs otherwise hang over it. As inconvenient and uncomfortable as this arrangement is, this prisoner is more fortunate than most because he is in a cell.

346.    In discussing the dormitory housing units I saw on these tours, I have often referred to them as "makeshift" dormitories, to underscore the way in which they represent an exigent response to the prison overcrowding crisis. The dormitory housing units I saw were in spaces that were originally intended for other uses—first built as gymnasiums and dayrooms. They are not appropriate spaces for housing prisoners and, unlike other forms of dormitory housing in some other prison systems, they were not constructed with this purpose in mind. The converted spaces are highly problematic in a number of ways, including the sheer density of the housing; the impossibility of monitoring prisoner behavior (especially in the larger makeshift gymnasium dorms, but also on the dayroom floors where officer stations and sight lines that were designed for cellblocks are obstructed by the bunks); the inadequacy of the toilet and other hygiene-related facilities, ventilation, and heating and cooling systems (all of which entail converting and supplementing existing infrastructure in ways that cannot possibly meet the extraordinary levels of use to which they are subjected); the lack of sufficient, dedicated recreational and programming space, accommodations for basic prisoner privacy needs, appropriate storage for prisoners' personal possessions, and so on.

347.    Despite the impermanent and makeshift "feel" of the units, large numbers of prisoners are spending many months and years housed inside the barely habitable spaces. Not

[248266-1]    EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

only are many of these makeshift dormitories shocking to see—especially the huge "triple bunk" dormitories located inside gymnasiums—but such housing units are dangerous and degrading, and they are likely to take an especially severe toll on prisoners who have pre-existing mental health and medical problems.

### g.    Lockdowns

348.    Lockdowns appear to me to be used in California prisons far more than I have seen (or heard of) being used in any other prison system in the country. They are particularly problematic when used on such a frequent or long-term basis. Prisoners in CDCR facilities are being confined to their cells, denied programming and recreational activity, and must eat all of their meals in their cells. Elsewhere in the country lockdowns are used as a last resort by prison systems that cannot control their prisoner populations any other way; in some California prisons (C Facility at SVSP, for example), they have become routine, a way of life. When lockdowns and similar modified programs are overused, as they are in California, in my opinion, they represent another clear indication that the prison system is in crisis. This is true in part because lockdowns usually prove to be highly counter-productive. That is, the increased frustration they generate often increases rather than decreases the very tensions and conflicts they are supposed to help alleviate, and they deepen antagonisms between groups (who blame one another for the especially harsh and deprived conditions under which they are forced to live). In the meantime, prisoners—especially those with pre-existing psychiatric conditions—suffer emotionally and psychologically.

349.    In fact, the former CDCR Chief Deputy Secretary of Adult Institutions, Scott Kernan, has attributed the extraordinary number of lockdowns and "modified programs"—as much as 1,435 days at one prison—directly to overcrowding. Crowded conditions lead to riots, which produce long lockdowns that, in addition to subjecting prisoners to especially harsh conditions of confinement that raise tensions, also:

> ...deflect prison resources so that while correctional officers now
> must respond to the increased security concerns and maintain
> watch over an increasingly dangerous prison population, they are

not able to assist [prison officials in] addressing the inmates'
mental health concerns by escorting prisoners to appointments and
providing access to yard.[389]

350.    I could not agree more. Yet I saw little evidence in the prisons I visited that this
enlightened perspective had altered CDCR's overall sense of urgency about the magnitude of
the overcrowding crisis it faces or decreased the willingness of individual wardens to continue
to rely on lockdowns as an ill-advised strategy for managing prisoner conflict.

### h.    Impact of Overcrowding Effects on Quality of Mental Health Care and Suicide Prevention

351.    Because of the subjective nature of the experience of mental illness, it is
sometimes difficult to precisely measure whether and how the quality of mental health care in
a prison system has improved the overall mental health of prisoner/patients. This is one of the
reasons that indirect but objective measures—staffing, program and contact hours, waiting
times to receive appropriate levels of care, and so on—are typically relied on to estimate or
monitor progress (or deterioration) in the quality of care provided.  One obvious exception to
this occurs when the subjective suffering associated with mental illness results in someone
taking his or her life. Moreover, because of the extreme and tragic nature of suicide, it is
regarded as a basic measure of whether and how well a mental health care delivery system is
functioning. That is, whatever else such a system does, it should be reasonably effective at
preventing its patients from taking their own lives. And, when it does not, it is possible to
analyze the events that led up to the suicide, which may help to account for it having happened,
and to learn what could have or should have been done to prevent it.

352.    This is the logic by which the Special Master's annual "Report on Suicides" is
conducted. The information that it contains is revealing, and identifies some of the ways that
the overcrowding-related problems that plague the CDCR continue to severely undermine the
quality of mental health care provided. For example, the "Report on Suicides Completed in
California Department of Corrections and Rehabilitation in Calendar Year 2005"—the seventh

---

[389] Coleman Pls.' Trial Ex. 53 at 2 (Declaration of Scott Kernan).

[248286-1]    EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

such annual report that has been written—was forwarded by the Coleman Special Master on November 26, 2007.[390] The Special Master calculated the number of suicides in CDCR to be 43, 17 more than in calendar year 2004. Nearly three-quarters (72.1%) had a history of suicidal behavior, fully 86% had a history of past mental health treatment. In addition, about a third (32.6%) were housed in an ASU or SHU, and two-thirds (67.4%) were on the Mental Health Services Delivery System caseload at the time of their death.[391]

353.    Indications of "inadequate treatment" (including "canceled appointments not rescheduled, referrals not responded to, past medical records not reviewed, unsupported diagnoses, non-compliance with treatment without reassessment, assignment to inappropriate LOC, failure to provide five-day clinical follow-up, [and] failure to provide immediate CPR") were present in three-quarters (74.4%) of the cases. Based on the longitudinal data provided in the Report, it appears that the most recently calculated suicide rate—for 2005—is higher than any previous year. Between 1998 and 2005, the suicide rate has varied somewhat, from a low of 9.3 per 100,000 in 2000 to a high of 26.2 per 100,000 in 2005.[392]

354.    A number of the inadequacies in treatment that the Special Master identified appear to be the direct result of the severe overcrowding-related problems from which the CDCR continues to suffer. Thus, the failure to reschedule appointments, respond to referrals, review medical records, reassess treatment compliance, employ appropriate levels of care, and conduct required five-day clinical follow-ups all represent the kind of poor quality of care that comes about in understaffed, overpopulated prison systems. In addition, the Special Master identified a host of other overcrowding-related problems that were likely to have directly impacted suicide rates. These included: the continuing failure of CDCR clinicians "to utilize information available in unit health records (UHRs) or central files (C-Files) or through

---

[390] Joint Pls.' Trial Ex. 61 at 1-2.

[391] *Id.* at 7-9.

[392] *Id.* at 10.