# EXHIBIT 9

# EVALUATING THE EFFECTIVENESS OF RESIDENTIAL TREATMENT FOR PRISONERS WITH MENTAL ILLNESS

DAVID LOVELL
DAVID ALLEN
CLARK JOHNSON
*University of Washington*
RON JEMELKA
*Texas Health Quality Alliance*

An intermediate-care residential program for mentally ill male prison inmates in Washington provides medication monitoring, skills training, and a supportive milieu to help participants cope with life in prison. Participants were substantially less symptomatic when they left the program than when they entered. Comparisons of preprogram and postprogram behavior showed significant reductions in staff assaults, infractions, and use of expensive resources, as well as higher rates of work and school participation. A minority of inmates continued to be difficult to manage despite program interventions. Effectiveness measures are discussed in relation to the obligation to provide medically necessary care to inmates with severe mental illness.

That increasing numbers of persons with mental illness can be found in U.S. prisons and jails has recently become a subject of concern among researchers and other observers (Butterfield, 1998; Isaac & Armat, 1990; Jemelka, Trupin, & Chiles, 1989; Lamb & Weinberger, 1998; Lovell & Jemelka, 1998). Literature reviews report a consensus among clinical studies that from 10% to 15% of state prison inmates suffer from severe mental illness. This trend has been

AUTHORS' NOTE: *David Lovell, Department of Psychosocial and Community Health, University of Washington; David Allen, Department of Psychosocial and Community Health, University of Washington; Clark Johnson, Department of Psycho-*

CRIMINAL JUSTICE AND BEHAVIOR, Vol. 28 No. 1, February 2001 83-104
© 2001 American Association for Correctional Psychology

attributed to a variety of factors and raises serious questions about criminal justice and social service policies. The presence of inmates with serious mental illness also poses two major issues for prison systems: the obligation to provide clinically adequate care and disruption by inmates whose mental illness renders them ill-equipped to cope with prison settings.

While they are wards of the state, inmates with mental illness are entitled to reasonable and timely access to medically necessary treatment (Cohen, 1993; Jemelka et al., 1989; Metzner, Cohen, Grossman, & Wettstein, 1998). Establishing access to mental health care in prisons is an arduous task, requiring not only an infusion of personnel and program resources, but the incorporation of clinical procedures into a system with other overriding objectives. In the mental health service sector, wherein care is commonly predicated upon diagnosis, it may be unthinkable to treat a patient without officially recording a relevant diagnosis. What is unthinkable in the prison environment, on the other hand, is transferring an inmate into a medium security setting without obtaining a medium custody classification. Classification systems and programming are set up to respond to the custody and security aspects of behavior rather than to clinical need.

Mentally ill inmates often encounter difficulties coping with prison life (Adams, 1988; Jemelka et al., 1989; Kupers, 1999; Toch & Adams, 1986, 1989). Some mentally ill offenders require ongoing medical supervision, cannot understand and follow rules, cannot exercise the discretion required for safe living among other offenders, and can disturb other offenders. Some mentally ill inmates are erratic and unpredictable, and both prisoners and staff place a high value on predictability. Prisons operate under the assumption that inmates are in

*social and Community Health, University of Washington; Ron Jemelka, Washington Institute for Mental Illness Research and Training, Department of Psychiatry and Behavioral Sciences, University of Washington (now at Texas Health Quality Alliance). This work was supported by the University of Washington–Department of Corrections Mental Health Collaboration, funded by contract with the State of Washington, Department of Corrections. The authors wish to express their appreciation to administrators in the office of correctional operations and to prison staff at McNeil Island Corrections Center for their cooperation with this research. The authors are also grateful to Fred Cohen, Gregg Gagliardi, and the anonymous reviewers at Criminal Justice and Behavior for helpful comments on earlier drafts.*

voluntary control of their behavior. Although staff may sympathize with the predicament of those with mental illness, the presence of other offenders makes it difficult for staff to make allowances for the cognitive and volitional limitations of the mentally ill. As a consequence, inmates with mental illness tend to receive more infractions than others, and spend disproportionate amounts of time in segregation or maximum security settings such as intensive management or control units (Adams, 1988; Jemelka et al., 1989; Toch & Adams, 1986, 1989).

A study of mental illness in the Washington prison system found prevalence rates of 3.7% for mania, 4.4% for schizophrenia, and 10% for depression (Jemelka, Wiegand, Walker, & Trupin, 1992). Because the system houses 14,000 inmates (Department of Corrections, 2000), and has a total of only 398 mental health beds, most mentally ill inmates must live in general population settings. Some inmates are too disabled by mental illness ever to live safely in general population and must be segregated; in the absence of residential units that provide clinical intervention and support, they may languish in disciplinary settings. Others can be maintained in general population on an outpatient basis, with occasional counseling and medication management. A third group, however, may require residential treatment but can be expected eventually to cope with prison if they can learn to control the effects of their disabilities. We use the label *intermediate care* to refer to residential programs that aim to prepare members of this third group to manage themselves in general population settings. A number of states have developed a range of care options that include intermediate residential care as well as outpatient (general population) and intensive treatment (e.g., Georgia Department of Corrections [DOC], 1999; Greene, 1988; Michigan Department of Mental Health [DMH], 1996; Ohio DRC, 1999). This study concerns an intermediate care unit in Washington state: the Mental Health Program at McNeil Island Corrections Center (McNeil program).

Before the program was established, there were two residential settings for male inmates with mental illness. At the state penitentiary, a special housing unit (SHU) provided a safe living environment for inmates with mental illness who had been unable to cope with other settings. In another prison, the special offender unit (SOU) was

designed to treat the most extremely disordered inmates in a maximum-security setting. It provided intensive physical control of inmate movements as well as a full complement of mental health and custody staff, individualized treatment and behavior management plans, and psychoeducational groups. Because of its architecture and staffing, it was twice as expensive to operate as any other living unit in the department (Christopher Murray & Associates, 1995).

The McNeil program operates on the premise that, like some other disabilities, mental illness may not be curable, but persons with mental illness can cope with the disability if provided with effective clinical care and equipped with the needed understanding and skills. Like SHU and SOU, the program is aimed at inmates with severe mental disorders (schizophrenia, bipolar disorder, major depression). However, it places far more emphasis on preparing its participants for general population. Unlike the other special settings, the program allows inmates to leave the unit for meals, recreation, programming, and work assignments alongside general population inmates. Although inmates move to general population from the other two units, they usually do so through the McNeil program.

The main elements of the McNeil program have been described (Lovell & Jemelka, 1998). It is housed in a 1,400-bed, medium-custody facility and consists of a 75-bed medium-security living unit and a 22-bed intake/segregation wing in the facility's segregation building. The main living unit is a direct-supervision setting, allowing inmates free movement about the unit. The program is staffed by a specialized series of positions: correctional mental health counselors (CMHCs), who have both custody and treatment duties. Case management, mental health treatment, and supervision responsibilities increase as one moves up the series. The program is also staffed by nurses, psychiatrists, psychologists, and program administrators. In addition to counseling, medication, and case management, the program provides a set of psychoeducational classes to build participants' skills and a supportive environment in which appropriate behavior is modeled by staff and other inmates. The psychoeducational classes apply cognitive-behavioral principles and consist of such offerings as anger management, stress management, symptom recognition, and relapse prevention.

One special feature of the McNeil program is its commitment to collaboration with researchers. University consultants were involved in program design and initial staffing, have collaborated with the program through clinical consultation, and have constructed the database on program participants from which this report is drawn. This unusual degree of academic involvement does not imply, however, that the program was or could have been designed to answer research questions. The program was established to help the prison system manage a problematic class of inmates by addressing their clinical needs, while fitting in with standard prison security and classification procedures. It is these considerations, rather than research protocols, that govern the flow of inmates into and out of the program and the selection of interventions.

The vulnerable status of prisoners and the obligation to provide necessary care place severe limits on the use of experimental designs. Inmates with mental illness cannot be assigned randomly to treatment versus no-treatment conditions. Some treatment evaluations use waiting-list members as a control (Wexler, Falkin, & Lipton, 1990), but this procedure cannot be applied when care options are limited and administrators are ethically required to quickly transfer the most urgent (e.g., suicidal) cases into treatment settings. Hence, outcome assessment must rely on before-and-after measures, using external (nondesign) information to mitigate the weaknesses of this approach (Cook & Campbell, 1979).

The evaluation hypotheses addressed in this study concern two of the program objectives, with special emphasis on the second: (a) The McNeil program aims to stabilize mentally ill inmates; accordingly, we should expect to find that participants show fewer and less severe psychiatric symptoms when they leave the program than when they entered; (b) mentally ill inmates pose a variety of prison management problems and the McNeil program aims to prepare participants for general population. Accordingly, we should expect participants to show better adjustment to prison after program exposure, as measured by infractions, staff assaults, work and school participation, and housing assignments. To provide context, our findings are accompanied by descriptions of the clinical and behavioral characteristics of program participants.

## METHOD

### PARTICIPANTS

There were 448 inmates admitted to the McNeil program between its inception late in 1994 and January 1, 1999; of these, 31 were admitted more than once. Of the 448 participants, 52 were still in the program as of June, 1999, when data collection ended; there were 187 in other prison settings and 209 in the community. There was wide variation in lengths of stay in the program, ranging from 6 days to 3 years. The average length of stay was 7 months (median, 217 days; the mean, 278 days, is elevated by a small number of participants with very long stays). On leaving the program, about one fifth (21%) were sent directly to the community. Over one third (36%) went to general population at the host institution, usually moving on from there to other general population settings.

Our analyses cover participants who had spent at least 3 months in the program.[1] Though this requirement may appear to introduce a selection bias, it must be remembered that the McNeil program was intended to serve only inmates who required residential treatment but could eventually prove capable of placement in a medium-security setting. Referrals and admissions to the program were based on the observations and concerns of prison staff, and thorough assessments had often not occurred before the participants arrived. Ninety days was deemed a reasonable period for trial-and-error testing of suitability for the program. Of the 93 cases with transfers to other prison settings after fewer than 90 days in the program, about a quarter were sent to more restrictive settings such as SOU and SHU, the remainder to general population (participants who stayed longer in the program had a similar ratio of special setting to general population transfers).

It was understood that inmates would leave when they had exhausted their ability to benefit from the McNeil program. Releases, however, were no more contingent than program admissions on a specific clinical or behavioral standard. Staff were not quick to transfer inmates who initially proved disruptive, often tolerating frequent infractions and returns to the segregation wing of the program as long

as they felt the inmate would eventually respond to the program. Length of stay was one consideration for release, with an 18-month maximum guideline (although some participants stayed much longer if staff felt no other unit was suitable). Other considerations included custody levels, classes taken or planned, improvement or deterioration in behavior, the participant's desire to move, and the availability of specialized program slots elsewhere (e.g., the department's sexual offender treatment program).

## MEASURES

During regular visits to the McNeil program, we reviewed participants' medical charts to collect diagnostic and other data. Records in the DOC electronic Offender-Based Tracking System (OBTS) were reviewed for each participant on program entry and program departure, and records for those with 3 months or more in the program were reviewed periodically thereafter until they left prison. We collected information on demographics, Washington felony history, prison stays, and prison adjustment during the current incarceration: major infractions, staff assaults, work and school assignments, loss of good time credit due to infractions, and housing assignments (days spent in segregation, intensive management units [IMUs], and the SOU). Separate tallies of each inmate's prison adjustment data were maintained for the preprogram, in-program, and postprogram periods.

Changes in psychiatric symptom expression were measured by the Brief Psychiatric Rating Scale (BPRS) (Overall & Gorham, 1962). The BPRS is a widely used, reliable instrument (Hedlund & Vieweg, 1974) that quantifies the severity of various psychiatric symptoms exhibited by participants during a brief, semistructured clinical interview. University faculty trained several program staff—a psychologist, nurse practitioner, and psychiatrist—in the use of the BPRS and conducted joint BPRS assessments to calibrate rating criteria. Since 1996, BPRSs have been consistently administered when participants first arrived, and exit BPRSs have been administered since 1997. Copies of tests were provided to researchers and scores were entered in our program client database.

PRISON ADJUSTMENT

In Washington, violations of prison rules are classified into general and serious infractions. This distinction is almost universally termed *minor* and *major* by DOC staff and is comparable to that between misdemeanors and felonies in the community. Not surprisingly, staff assaults have special significance to correctional workers. Major infractions and their dispositions are recorded in OBTS. Multiple violations may be incurred in a single incident (e.g., fighting and interfering with staff), but dispositions are determined in a single proceeding. Because we are interested in rates and disciplinary costs, which are event-based, we have counted incidents rather than charges in our program client database.

Past studies have provided estimates of resources used in disciplinary proceedings (Lovell & Jemelka, 1996) and of the per-inmate annual operating costs of prisons systemwide and different types of facilities within the department (Christopher Murray & Associates, 1995). Difficulty in managing an inmate results in greater use of expensive resources through disciplinary proceedings, good time loss, and stays in segregation, IMUs, or the SOU. Calculating these costs on a per-inmate, per-day basis results in a *cost index*: an approximate ratio between the annual costs attributable to program participants and the annual costs attributable to the average prison inmate.[2] By definition, the average cost index for all inmates in the system is 1. A cost index of 1.5 indicates that an inmate has used about 50% more expensive resources than the typical prison inmate. Because the cost index employs fixed rather than marginal costs, and omits the added expense of program participation, reduction in participants' cost index scores would not suffice to show that the program's financial benefits outweigh the costs. Such reductions would be necessary, however, for a showing that the program is cost-effective (see Levin, 1983, for the distinction between cost-effectiveness and cost-benefit analysis). The primary use of the cost index in this analysis is to provide a quantifiable, combined measure of the extent to which a program member has been a high-maintenance inmate (Lovell, Johnson, Jemelka, Harris, & Allen, 2000).

TABLE 1:   Primary Offenses of Program Participants

| Crime Type | Number | Percentage |
|---|---|---|
| Homicide | 56 | 13 |
| Sex offenses | 133 | 30 |
| Other violent offenses (assault, robbery, arson) | 116 | 26 |
| Property offenses (burglary, theft, etc.) | 60 | 13 |
| Drug offenses | 67 | 15 |
| Other felonies | 15 | 3 |

NOTE: $N = 447$.

# RESULTS

## PROFILE OF PARTICIPANTS

Program participants were similar to all Washington prisoners in ethnicity (DOC, 2000): 68% White, 22% African American, 5% Hispanic or mixed, 2% Native American, and 2% Asian or Pacific Islander. The percentage with previous prison terms (35%) resembles the percentage among other Washington prisoners. The current sentence lengths of program participants showed wide variation and have increased since the program began. Twenty percent had sentences in the 1- to 2-year range, 29% from 3 to 5 years, 24% from 6 to 10 years, and 27% for more than 10 years. The average sentence length for the high-end group was 21 years. As with length of stay in the program, the presence of a small number of participants with long sentences elevates the mean sentence length (9 years); the median sentence length, a more representative figure, was 5.7 years. Whichever statistic is used, program participants have longer sentences than the average sentence (47 months) of all felony offenders sentenced to Washington prisons in fiscal year 1996 (Sentencing Guidelines Commission, 1996).

Table 1 presents a profile of the primary offenses of program participants. It shows that violent or sexual offenses account for 69% of program participants. There are 30% serving sentences for sexual offenses (compared with 22% for inmates as a whole; Department of

TABLE 2:  Primary Axis I Diagnoses of Program Participants

| Diagnosis Type | Number | Percentage |
| --- | --- | --- |
| Schizophrenia | 91 | 25 |
| Schizoaffective, psychosis NOS | 86 | 24 |
| Bipolar disorder | 64 | 17 |
| Depression | 62 | 17 |
| Drug-related disorders | 28 | 8 |
| Sexual disorders | 9 | 2 |
| Other (PTSD, dementia) | 24 | 7 |

NOTE: $N = 364$. NOS = not otherwise specified; PTSD = post-traumatic stress disorder.

Corrections, 2000) and 13% for murder or manslaughter (comparable with the 14% rate for all prison inmates).

At the time of chart review, recorded diagnoses by psychologists or psychiatrists (in other prison units, in the program, or during previous hospital stays) were available in 364 cases. The primary *DSM-IV* Axis I diagnoses have been recoded into seven general categories, with results displayed in Table 2. Almost half of the participants were diagnosed with schizophrenia or similar major thought disorders; another 35% were diagnosed with bipolar disorders or major depression. Thus, more than four fifths of the participants fit standard criteria for serious mental illness on primary diagnosis alone. Among the remainder with other primary diagnoses, the vast majority were referred to the program because they were depressed, paranoid, delusional, suffering from mood swings, or suicidal. In short, the McNeil program appears to be serving the population for whom it was intended.

Many program inmates have also been affected by chronic brain damage, which may have resulted from prenatal or perinatal complications, head injuries, or substance abuse. Of the 154 participants admitted since July, 1997, when we began systematically recording these data, there were 24 (16%) with evidence of brain damage. (The evidence took various forms including medical histories, neuropsychological evaluations, self-reports, and diagnosed seizure disorders.) This figure probably underestimates the rate of damage among program participants because there has been no single reliable source in OBTS data or clinical files for this information.

TABLE 3:   Distribution of BPRS Total Scores: Initial Program Tests and Exit Tests

| Initial | Exit | | | | Total |
|---|---|---|---|---|---|
| | Mild | Moderate | Marked | Severe | |
| Mild (0-13) | 10 | 5 | 4 | 1 | 20 |
| Moderate (14-23) | 12 | 17 | 6 | 3 | 38 |
| Marked (24-36) | 18 | 24 | 12 | 4 | 58 |
| Severe (37+) | 5 | 15 | 10 | 4 | 34 |
| Total | 45 | 61 | 32 | 12 | 150 |

NOTE: $N = 150$ admissions; $p < .001$, McNemar test for symmetry. $N$ includes three participants with two treatment trials (admissions) apiece. BPRS = Brief Psychiatric Rating Scale, 18-item version, items scored 0 to 6.

CLINICAL PROGRESS BY PARTICIPANTS

The patterns of scores on individual BPRS items have been used to define a set of presenting symptom prototypes among psychiatric patients (Overall, 1974). The symptom prototypes are determined not by total scores, but by which items have high scores: for example, a patient with a "florid thought disorder" profile will have high scores for hallucinatory behavior and unusual thought content, whereas one with an "anxious depression" profile will score high on anxiety and depressive mood. Patients with some prototypes, however, tended to have higher total scores than others; therefore, for expository purposes, we used the symptom prototype data (Overall, 1974) to classify BPRS total scores into levels of severity. We summed the average scores for individual items and found that patients showing a florid thought disorder profile averaged a total score of 44.5; patients showing other symptom profiles associated with major mental illness (paranoid hostility, withdrawn-disorganized, hostile depression) averaged from the mid-20s to the low 30s; whereas patients who showed an "anxious depression" profile averaged 14.5. On this basis, the program inmate scores were grouped into four severity ranges (mild, moderate, marked, and severe, as specified in Table 3).

There were 150 participants with more than 3 months in the McNeil program on whom we had both exit BPRS scores and scores from tests given when they entered the program or shortly thereafter. (There

were only 150 because of the late introduction of exit BPRSs). Across the 150 cases, the average decline in scores was about eight points ($p < .001$). Table 3 presents a cross-tabulation of initial test scores against exit test scores, classified by level of severity; the cell values indicate the number of participants with particular combinations of initial and exit test severity levels. There is a significant decrease in the number with symptoms classified as marked or severe, and a concomitant increase in the number with symptoms classified as moderate or mild. Participants were substantially less symptomatic when they left the program than when they entered.

There were few significant relationships between changes in symptom levels, as exhibited in Table 3, and behavioral measures on participants. Comparing those who shifted to higher symptom levels ($n = 23$, the upper right corner of the table) with those with reduced levels of symptoms ($n = 84$), the former had significantly shorter stays in the program (205 vs. 360 days, $t$ test, $p = .001$). They were less likely to be transferred to general population environments when they left the program and had higher rates of major infractions before, during, and after the program; but these relationships fell short of statistical significance. Changes in symptom levels were not associated with the amount of time inmates spent in segregation while in the program, nor with their previous or subsequent cost index scores. These results are consistent with other findings (Lovell et al., 2000) and indicate that the behavior to which prison staff respond is not wholly determined by psychiatric symptoms.

BEHAVIORAL BASELINES AND OUTCOMES

After a brief discussion of staff assaults, we will present baseline cost index and major infraction rates for general population inmates and McNeil program participants. Subsequent outcome comparisons apply to a pre-post group of 140 inmates with at least 180 days of prison time before the program, 90 days in the program, and 180 days of prison time afterward. These criteria are intended to allow sufficient periods before and after treatment to establish rates of behaviors. It should be noted that the pre-post comparisons do not address possible program effects on inmates who come directly from reception or who leave prison from the program or shortly afterward. Within the

pre-post group, we will also distinguish between subsets of partici-
pants who were transferred from the program to special versus general
population settings and consider a subset who were diagnosed with
psychotic disorders. Finally, we will discuss several positive indica-
tors of prison adjustment—work and school participation—for mem-
bers of the pre-post group.

*Staff assaults.* Staff assaults are such important but statistically rare
events that it would be misleading to represent them in terms of rates.
Although there were 66 inmates with previous staff assaults, only 15
had assaulted staff during the 2 years preceding program admission.
During the 2 years following program admission, there were 5 who
assaulted staff (including 2 who had not done so previously). Because
staff assaults are rare events, the numbers of individuals with staff
assaults over equal periods before and after program admission were
modeled as Poisson distributions. Staff assaults following program
admission were significantly lower than prior to program admission
($z = 2.01, p < .05$; see Sachs, 1984, p. 187). This result suggests that the
program may have contributed to more cooperative relationships
between staff and participating inmates.

*Baseline behavioral rates.* Among 245 participants who had at
least 6 months in prison before the program, and at least 90 days in the
program, the previous rate of major infractions was 2.96 per year.
Their previous cost index was 1.46, indicating that they used the
department's resources at a rate approximately 46% higher than the
average prison inmate. The previous infraction rate for program
inmates as of 1996 was 2.45; assuming stability in staff infraction
practices, it appears that the level of past disruptiveness among pro-
gram admissions has been rising. A previous study of general popula-
tion inmates at the host institution showed that during 1994, they com-
mitted major infractions at a rate of 0.89 incidents per year.[3] The
infraction histories of program participants, therefore, appear to sup-
port previous findings that inmates with mental illness are more dis-
ruptive than others (e.g., Adams, 1988).
     Toch and Adams (1989) found that the most common pattern
among inmates who infracted was early disruptiveness followed by
better adjustment to the prison milieu. Among mentally ill inmates,

TABLE 4:   Major Infraction Rates and Cost Indices Before, During, and After Pro-
gram Participation

| Group | n | Major infraction rates (per year) | | | Cost Indices | |
|---|---|---|---|---|---|---|
| | | Previous | Program | Post | Previous | Post |
| Pre-post | 140 | 2.74 | 1.44** | 1.65** | 1.42 | 1.31* |
| Special setting transfers | 39 | 4.68 | 3.34 | 3.09* | 1.64 | 1.72 |
| General population transfers | 101 | 2.00 | 0.71** | 1.10** | 1.34 | 1.16** |
| Psychotic | 57 | 2.83 | 0.88** | 1.13** | 1.51 | 1.25** |

NOTE: $N = 140$ admissions. Statistics refer to paired $t$ test comparisons between earlier
and later rates. $N$ includes five participants with two treatment trials (admissions)
apiece.
*$p < .05.$ **$p < .01.$

however, "higher infraction rates do not result from brief periods of
unusually intense disciplinary involvement but rather can be attrib-
uted to fairly chronic disruptiveness" (p. 54). To test whether high
preprogram rates among our participants were due primarily to early
maladjustment, we examined major infractions over the 2 years before
program admission among 127 inmates who had been in prison at
least 2 1/2 years (mean = 8.6; median = 6.1 years) and had spent more
than 3 months in the program. Major infraction rates over this period
averaged 3 per year, which is consistent with the pattern of chronic
maladjustment described by Toch and Adams.

*Pre-post group outcomes.* Infraction rates and cost index scores for
members of the pre-post group are based on substantial periods of
exposure, averaging 63 months preprogram, 13 months in-program,
and 20 months postprogram; the respective medians are 40 months, 10
months, and 18 months. A minority of participants with extremely
high infraction rates and cost index scores are making disproportion-
ate contributions to average rates. We have therefore analyzed the
rates among several subgroups: those transferred to special settings
(SHU or SOU), those transferred to general population units, and
those with psychotic disorders. Table 4 displays comparative infrac-
tion rates and cost index scores among members of the pre-post group
and its subsets.

In the pre-post group, there was a significant improvement in major
infractions and use of expensive resources following program stays,

TABLE 5:   Steady Work or School Assignments Before, During, and After Program Participation (in percentages)

|  | Work | School | Either |
|---|---|---|---|
| Previous to program | 27 | 15 | 34 |
| In program | 51** | 34** | 62** |
| After program | 41** | 26* | 51** |

NOTE: $N = 140$ admissions. $N$ includes five participants with two treatment trials (admissions) apiece.
*$p < .05$. **$p < .01$.

although rates remained high in comparison to the average general population inmate. The high average rates of infractions during and after program involvement, and the continuing (though decreased) drain on expensive resources, are mostly accounted for by a high-maintenance minority who did not adapt well to the program (as shown by their program infraction rates) and whose next destination was SHU or SOU. Those who adapted well enough to be transferred to general population units showed greater sustained declines in infraction rates and cost index scores. Participants diagnosed with psychotic disorders (schizophrenia, schizoaffective, psychosis not otherwise specified [NOS]) were the most successful during and after their stay in the program.

Work and school activities were assessed by the presence or absence of steady work or school assignments during the 6 months preceding participants' entry into the program, during their stay, and during a 6-month period beginning 3 months after they left the program (the 3-month lag is included to allow the receiving institution time to find an appropriate placement for them). Results for the pre-post group are displayed in Table 5.

As with infractions, the pattern of work and school assignments is one of improvement in the program which is usually sustained afterward.

## DISCUSSION

No study of program effectiveness can be entirely convincing without a control group. However, the interpretability of a before-and-after

study can be strengthened if we have reason to consider the major threats to validity implausible (Cook & Campbell, 1979). Consider first cohort or history effects: for example, improvements in the grades of a group of students given special training may be due to changes in grading practices that affect students across the board during the study period. By virtue of imprisonment, study participants were isolated from most historical trends external to the program that might affect outcomes—with the exception of staff infraction practices. Study participants, however, were admitted to the McNeil program over a period of 4 years, so that preprogram observations on some participants overlapped with postprogram observations on others. Furthermore, the rising trend in preprogram infraction rates suggests that prison staff in other units have not become more tolerant of infractions over the study period. Extended periods of preprogram and postprogram observation also make it unlikely that changes in behavioral measures are due to statistical regression (i.e., the possibility that because of random fluctuations, abnormally high—or low—scores on an earlier test will be followed by scores closer to the mean on later tests).

The principal threat to validity in our study is maturation: the possibility that increasing experience or age, rather than program intervention, is responsible for changes in behavior after program exposure. Maturation is relevant to prison misbehavior in two ways (Toch & Adams, 1989): advancing age, which brings reduced proclivity for raising a ruckus; and added experience, through which inmates learn to handle prison more effectively. High infraction rates for longer-term inmates during the 2 years before program participation suggest, in accordance with previous findings (Toch & Adams, 1989), that added experience did not usually improve adjustment to prison for inmates with mental illness. For the 46 longest-term inmates, however, with more than 10 years of prison before program—but not for those with fewer than 10 years—there is a significant downward trend between the first part of their prison terms and the 2 years before program admission. For members of this group, with an average of 16 years in prison (median, 13 years) before the program, aging is likely to play a role in behavior. There were 23 members of the pre-post group with more than 10 years of preprogram prison time. Excluding them from the analysis would not undermine any of the reductions in

cost index or infraction rates reported in Table 4; indeed, it would accentuate the differences because the longest-term inmates also showed smaller reductions following the program. (However, we have retained them in the pre-post group to avoid introducing a selection bias by excluding inmates whom the program was intended to serve.)

Although we have reasons to exclude the maturation hypothesis for most longer-term inmates, our data do not permit testing it with participants who had fewer than 2 1/2 years in prison before coming to the program. But the evidence for chronic maladjustment among prisoners with mental illness makes it unlikely that added prison experience would account for the general improvement we observed in postprogram prison adjustment measures. Without a control group, of course, we cannot definitively rule out maturation or other less obvious factors as explanations for our results. But we are sufficiently confident in the findings to recommend them for consideration by scholars, administrators, and legislators concerned about providing effective clinical care for prisoners with mental illness.

We reported above a lack of association between measures of clinical change and many of our behavioral measures. Varying the criteria for grouping clinical change participants, and using nonparametric rather than parametric tests of significance, made no difference to this result. We suspect that several factors are at work here. First, there was a limited amount of overlap (47 cases) between the clinical change and the behavioral change cohorts. Some clinical change participants lacked the requisite period of preprogram or postprogram prison experience, and some pre-post participants were admitted and discharged before the program began regular exit BPRSs. It is possible that some relationships (e.g., between clinical change and rate of infractions and between clinical change and later housing assignments) would have proved significant had there been greater numbers of participants on whom both kinds of measure were available. Second, our follow-up study of program graduates in other settings (Lovell et al., 2000) found that some inmates functioned effectively in general population despite continuing to show signs of delusions, hallucinations, or mood swings in clinical interviews. It is conceivable that the skills training and supportive milieu offered by the program may have prompted changes in behavior and attitudes, allowing some inmates to manage themselves successfully despite persistent psychiatric symptoms.

Finally, there are some inmates whose symptoms may improve but whose attitudes have not, and who continue to take an oppositional stance in their dealings with prison staff.

The results reported above indicate that for most inmates, the program has been accomplishing its objectives. Inmates were significantly more stable in terms of psychiatric symptoms when they left than when they arrived. Inmates had better infraction records and consumed less of the department's management resources after they left the program, and most were able to maintain themselves in general population settings. One previous study, in New York, indicated that intermediate care facilities can reduce infractions and segregation (Condelli, Dvoskin, & Holanchock, 1994). Because intermediate care programs in the New York study placed less emphasis on preparing patients for general population prison settings, it reported postadmission rather than posttreatment outcomes. It was also limited to 6-month preprogram and postadmission periods. Our study, therefore, strengthens empirical support for residential programs aimed at improving the coping capacity of mentally ill inmates. It also describes a method of quantifying effects—the cost index—that may be useful in assessing whether a program meets the obligation to provide care in a cost-effective manner.

We noted at the outset that the obligation to treat mentally ill inmates rests on ethical and constitutional considerations. In addition to limiting the use of experimental designs, this obligation implies that other standards, besides the outcome measures reported here, need to be considered in assessing whether the state is providing medically necessary care. Are inmates screened for mental illness and are there follow-up evaluations for those with positive screens? Are those screened and evaluated referred to needed levels of care in a timely manner? Are symptoms of mental illness evaluated and treated in accordance with professional standards? Are treatment plans timely and responsive to the needs of inmates? These questions call for performance audits as well as effectiveness evaluations (Davis, 1990) and remind us that the effectiveness of a treatment approach cannot be fairly evaluated unless we also consider whether it has been carried out with integrity (Quay, 1977). This is particularly true in a prison set-

ting, wherein persistent constraints on mental health treatment reflect a system designed for other purposes.

Because we know that measurable changes in symptoms or behavior—and sometimes both—can be achieved, questions about program integrity are sharpened when such effects are not found. It is important to remember, however, that these questions concern not only the program in question but the surrounding system of care. If no outpatient care were available in the general population sites to which program graduates were transferred, it is doubtful that program gains could be sustained. These issues are illustrated by the high-maintenance minority of participants who continue to consume inordinate resources despite (and during) program participation. The prison careers of such "disturbed disruptive" inmates have previously been described (Toch, 1982; Toch & Adams, 1989) and continue to merit greater attention and a detailed, qualitatively rich analysis that is beyond the scope of this article. Their lives in the community as well as in institutions have been fraught with peril for themselves and others, and standard methods of intervention, whether disciplinary or therapeutic in conception, have not reliably induced cooperation.

The risk of failure with the least tractable inmates may be seen as a cost of doing business. Other previously disruptive inmates respond well to the program and do well afterward; if all difficult inmates were excluded from the program, or quickly transferred out when initial efforts failed, the program's value to the system would be decreased. It is worth asking whether specific program enhancements would increase its rate of success with highly disruptive inmates. Because high-maintenance inmates have been problematic in every setting, however, it makes sense to coordinate their care across institutions rather than treating them as the sole problem of the staff they are currently antagonizing (Lovell & Rhodes, 1997). Corrections officers and mental health providers should be encouraged to confer, with each other and with their colleagues in other institutions, about what has and has not worked in particular cases. These practices may unleash the creativity of prison staff and enhance the system's ability to cope with the problems that mentally ill prisoners pose for themselves and others.

# NOTES

1. Because some participants were admitted several times, our outcome analyses cover treatment trials rather than participants. To avoid counting posttreatment outcomes twice, the posttreatment period was treated as ending with the next admission. Because this complication affects only a few cases, to avoid awkwardness we refer to individuals (subjects, participants, inmates) rather than admissions throughout the text. The numbers with multiple admissions are reported in the relevant tables.

2. This is not a precise ratio because average costs for all inmates include costs of processing infractions and use of more expensive residential facilities. Extrapolating from the studies from which this index was derived (Christopher Murray & Associates, 1995; Lovell & Jemelka, 1996), we estimate that more precise calculations, if we had the required data, might lower both the preprogram and postprogram cost index figures by 0.02 to 0.03. This difference would not affect our findings.

3. The 0.89 figure should not be compared mathematically to infraction rates among program participants because it represents an annual average for the daily population of a medium-security prison during the last half of 1994, rather than an average of rates across the prison terms of individuals. This procedure gives less weight than our preprogram averages do to individuals who commit infractions over shorter periods of time. Furthermore, it does not cover the beginning of the general population inmates' terms, when infractions were more likely. Because of these differences, we cannot claim that a 2.96 rate among program participants is three times the general population average, but we remain confident that it is substantially higher. This confidence is strengthened by the high rates for the previous 2 years among program participants with longer previous experience: because the base period is the same for all, the resulting averages are the same by either method, and the beginning of prison terms is excluded.

# REFERENCES

Adams, K. (1988). The disciplinary experiences of mentally disordered inmates. *Criminal Justice and Behavior, 13*, 297-316.

Butterfield, F. (1998, March 5). Prisons replace hospitals for the nation's mentally ill. *The New York Times*, pp. A1, A18.

Christopher Murray & Associates. (1995). *Criminal justice in Washington state: Growth factors, cost components, potential economies*. Olympia: State of Washington, Sentencing Guidelines Commission.

Cohen, F. (1993). Captives' legal right to mental health care. *Law and Psychology Review, 17*, 1-39.

Condelli, W., Dvoskin, J., & Holanchock, H. (1994). Intermediate care programs for inmates with psychiatric disorders. *Bulletin of the American Academy of Psychiatry & Law, 22*, 63-70.

Cook, T. D. & Campbell, D. T. (1979). *Quasi-experimentation: Design & analysis issues for field settings*. Boston: Houghton Mifflin.

Davis, D. (1990, January/February). Do you want a performance audit or a program evaluation? *Public Administration Review*, 35-41.

Department of Corrections, Planning and Research Section. (2000). *Client characteristics, population movement, and custody report for fiscal year 1999*. Olympia, WA: Author.

Georgia Department of Corrections. (1999). *Standard operating procedure, MH/MR organiza-tion and administration*. Atlanta, GA: Author.

Greene, R. (1988). A comprehensive mental health care system for prison inmates: Retrospec-tive look at New York's ten year experience. *International Journal of Law & Psychiatry, 11*, 381-389.

Hedlund, J., & Vieweg, M. (1974). The Brief Psychiatric Rating Scale: A comprehensive review. *Journal of Operational Psychology, 11*, 48-65.

Isaac, R., & Armat, V. (1990). *Madness in the streets: How psychiatry and the law abandoned the mentally ill*. New York: Free Press.

Jemelka, R., Trupin, E., & Chiles, J. (1989). The mentally ill in prisons: A review. *Hospital and Community Psychiatry, 40*, 481-491.

Jemelka, R., Wiegand, G., Walker, E., & Trupin, E. (1992). Computerized offender assessment: A validation study. *Psychological Assessment, 4*, 138-144.

Kupers, T. (1999). *Prison madness: The mental health crisis behind bars and what we must do about it*. San Francisco: Jossey-Bass.

Lamb, H., & Weinberger, L. (1998). Persons with severe mental illness in jails and prisons: A review. *Psychiatric Services, 49*, 483-492.

Levin, H. M. (1983). *Cost-effectiveness: A primer. New Perspectives in Evaluation: Vol. 4*. Beverly Hills: Sage.

Lovell, D., & Jemelka, R. (1996). When inmates misbehave: The costs of discipline. *The Prison Journal, 76*, 165-179.

Lovell, D., & Jemelka, R. (1998). Coping with mental illness in prison. *Family and Community Health, 21*, 54-66.

Lovell, D., Johnson, C., Jemelka, R., Harris, V., & Allen, D. (2000). *Living in prison after resi-dential mental health treatment: A program follow-up*. Manuscript submitted for publication.

Lovell, D., & Rhodes, L. (1997). Mobile consultation: Crossing correctional boundaries to cope with disturbed offenders. *Federal Probation, 61*(3), 40-45.

Metzner, J., Cohen, F., Grossman, L., & Wettstein, R. (1998). Treatment in jails and prisons. In R. M. Wettstein (Ed.), *Treatment of offenders with mental disorders* (pp. 211-264). New York: Guilford.

Michigan Department of Mental Health. (1996). *Criteria and guidelines, corrections mental health program*. Ypsilanti, MI: Bureau of Forensic Mental Health Services.

Ohio Department of Rehabilitation and Correction. (1999). *Standard operating procedure man-ual*. Columbus, OH: Bureau of Mental Health Services,

Overall, J. (1974). The Brief Psychiatric Rating Scale in psychopharmacology research. In P. Pinchot & R. Martin (Eds.), *Modern problems in pharmacopsychiatry: Vol. 4. Psychological measure-ments in psychopharmacology*. Basel, New York: Karger.

Overall, J., & Gorham, D. (1962). The Brief Psychiatric Rating Scale. *Psychological Reports, 10*, 799-812.

Quay, H. (1977). The three faces of evaluation. *Criminal Justice and Behavior, 4*, 341-354.

Sachs, L. (1984). *Applied statistics: A handbook of techniques* (Z. Reynarowych, Trans.). New York: Springer-Verlag.

Sentencing Guidelines Commission. (1996). *Adult felony sentencing: Fiscal year 1996*. Olym-pia, WA: Author.

Toch, H. (1982, Fall). The disturbed disruptive inmate: Where does the bus stop? *Journal of Psy-chiatry and Law*, 327-349.

Toch, H., & Adams, K. (1986). Pathology and disruptiveness among prison inmates. *Journal of Research in Crime and Delinquency, 23*, 7-21.

104     CRIMINAL JUSTICE AND BEHAVIOR

Toch, H., & Adams, K. (with Grant, J.). (1989). *Coping: Maladaptation in the prison*. New Brunswick, NJ: Transaction Books.

Wexler, H., Falkin, G., & Lipton, D. (1990). Outcome evaluation of a prison therapeutic community for substance abuse treatment. *Criminal Justice and Behavior, 17*, 71-92.